**EXHIBIT 1**

Valley Medical Ce
**Covington Primary Care**
16850 S.E. 272nd
Covington, WA 98042

JAN 2 4 2002
DATE:

MADDING LINDA J
241666

## ADULT HEALTH MAINTENANCE EXAM

ALLERGIES: _____

CURRENT MEDS: _premarin ? + QD_

SUBJECTIVE NOTES: — recent death of husb
— insomnia
(R) stress incont — no U.T.I. sx
trouble n over lyr

IMMUNIZATIONS: ... declined ... needed

COUNSELING ...

CHEMOPROPHYLAXIS ...
eye ✓

**PHYSICAL EXAMINATION:** ☑ All items examined, abnormalities circled   ☐ Only checked items examined, abnormalities circled

| VITAL: | T: 98.4 | R: 16 | LMP: hyst | DRUG ALLERGIES: |
| SIGNS  WT: 151 | HR: 80 | BP: 110/60 | LAST PAP: | NKA |

☑ GENERAL APPEARANCE
sl obese
sl sad

☑ SKIN SYSTEM
Hair          Skin
Scalp         Nails

☑ HEAD/EYES
Lids          NC/AT
Conjunctiva   Conjunctiva
Lens          PERRLA
Pupils        Vision

☑ EARS/NOSE/THROAT
Canals        Teeth
TM's          Gums
Hearing       Tongue
Nose          Pharynx

☑ NECK/NODES
ROM   Thyroid   Nodes   Bruits

☑ LUNGS
Percussion      Breath Sounds

☑ BREASTS  BSE N
c/Awkward/Tamashell doc: Revised 7/99

☑ CARDIOVASCULAR
Neck veins    Rate
Murmurs       Rhythm
PMI           S1/S2

☑ ABDOMEN
Shape         Liver
Sounds        Spleen
Scars         Masses

☑ MUSCULOSKELETAL/EXTREMITIES
Back          Color
CVA           Veins
Joints        Edema

☑ NERVOUS SYSTEM
Cranial Nerves   Coord.
Sensory          Gait
Motor            Reflexes   Mental Status

☑ GENITALIA/RECTUM
Ext. Gen.   BUS      Hernia   Prostate
(Vagina)    Cervix   Rectal   Penis
Uterus      Adnexa   Occult   Testes

large cystocele

(Record chronic conditions & ongoing plans on problem list)

| Assessment | Plan |
|---|---|
| I. Health Maintenance | |
| A. Introphylaxis | A. up to date |
| B. Screening | B. |
| C. Chemoprophylaxis (ex. folate, estrogen) | thx colon polyps → labs Colonoscopy p 3 yrs. |
| D. Counseling | HRT  cont Prem .625 gd |
| 1) Substance Use | 1) |
| 2) Diet/Exercise | 2) |
| 3) Injury Prevention | 3) enc. to exercise |
| 4) Sexual Behavior | 4) disc'd Safe sex |
| 5) Dental Health | 5) |
| 2. Stress incont. | 2. → Trial of Kegel's, Gyn consult |
| 3. insomnia / grief rxn | 3. → clonazepam hs poqhs p |
| 4. | 4. |
| 5. | 5. |
| 6. | 6. |
| 7. | 7. |
| 8. | 8. |
| 9. | 9. |
| 10. | 10. |

RETURN VISIT _____

Primary Physician's Signature

DATE 1/24/02

Reviewer's Signature

MADDINGL_LSPC_MDR00076

# EXHIBIT 2

Tamara J. Sleeter, M.D.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

|  |  |
|---|---|
| | )Master File No. 2:12-MD-02327 |
| IN RE: ETHICON, INC., PELVIC | )  MDL 2327 |
| REPAIR SYSTEM PRODUCTS LIABILITY | ) |
| LITIGATION | ) JOSEPH R. GOODWIN |
| | ) U.S. DISTRICT JUDGE |
| | ) |
| | ) |
| LINDA J. MADDING; et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 2:12-CV-02512 |
| | ) |
| ETHICON, INC., et al., | ) |
| | ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION OF TAMARA J. SLEETER, M.D.

August 17, 2016

Renton, Washington

Tamara J. Sleeter, M.D.

Page 28

1      deposition are to a reasonable degree of medical

2      certainty?

3   A   Yes.

4   Q   Okay.  And can we have that go back in time to the

5      beginning of the deposition?

6         Are you comfortable with that?

7   A   Yes.

8   Q   Okay.  Thank you.

9                 MR. JOHNSON:  Object to the form.

10                   (Exhibit No. 3 marked

11                       for identification.)

12

13  Q   (By Mr. Plattenberger)  Doctor, I next want to show you

14      what's been marked as Exhibit No. 3.

15         Doctor, does Exhibit No. 3 appear to evidence a

16      separate conversation that you had with Linda Madding on

17      4/11/02 or is this just the typed version of the

18      conversation that we were just discussing?

19   A   This was a result of the conversation of 4/11/02, as

20      documented from the handwritten note.

21         It is a further expansion on the handwritten note.

22   Q   This information that we see here in Exhibit No. 3, was

23      that information communicated by you to Linda Madding?

24   A   Yes.

25   Q   Okay.  So I would like to go through the warning

Tamara J. Sleeter, M.D.

Page 29

1   information in Exhibit No. 3 that is different from or in

2   addition to the warning information that was in Exhibit

3   No. 2, okay?

4   A   Okay.

5   Q   So in Exhibit No. 3 you told Mrs. Madding, prior to her

6       implant surgery, that on occasion her symptoms may be

7       worse after this type of surgery, correct?

8           It is the second to last full paragraph.   I

9       apologize.

10  A   I did tell her that there could be some problems after

11      surgery that weren't there before surgery.

12  Q   What did you mean when you used the word "symptoms," if

13      you recall?

14  A   I don't recall specifically if they were symptoms related

15      to her or symptoms in general.

16  Q   Okay.   You also warned her, during this conversation,

17      that a catheter may be needed for some time after

18      surgery, correct?

19  A   That's correct.

20  Q   You also warned her that leakage due to a fistula may

21      occur, correct?

22  A   Correct.

23  Q   You also warned her that tape can erode through the

24      structures of the bladder and urethra, and vascular

25      injuries and bowel injuries can occur, correct?

Tamara J. Sleeter, M.D.

Page 30

1  A  Correct.

2  Q  You also warned her that if it is too tight, it may need

3     to be partially or completely removed with return of

4     incontinence in some cases, correct?

5  A  Correct.

6  Q  And in that sentence when you used the word "it," are you

7     referring to the TVT?

8  A  Yes.

9  Q  All those warnings that we just went over, that you

10    communicated with Linda Madding, those were all specific

11    to the TVT, correct?

12 A  Correct.

13 Q  If you go to the first paragraph in Exhibit No. 3,

14    Doctor, it says, "Today we had a discussion about the

15    risks and benefits of anterior and posterior repair

16    with"-- I can never say that word correctly.

17       Can you say that, "sacrospinous"--

18 A  "Sacrospinous fixation."

19 Q  --"and TVT placement as definitive surgical treatment."

20       Do you see that?

21 A  Yes.

22 Q  What did you mean when you used the phrase "definitive

23    surgical treatment"?

24 A  Repair of the defects that she had that was leading to

25    her stress incontinence or her incontinence.

Tamara J. Sleeter, M.D.

Page 31

1    Q    And what defects were those, if you recall?

2    A    She had pelvic relaxation.  The supporting structures had

3         been attenuated over time, or childbirth, so that she

4         couldn't hold her urine when she wanted to.

5    Q    So when you use the word "definitive," could you just--

6         I'm sorry if I missed your answer to this.  I was reading

7         this note.

8             Could you just expand on that a little bit by what

9         you meant by "definitive"?

10   A    Well, we planned to treat her with one surgery.

11   Q    And was Mrs. Madding told that this would be one surgery

12        and then her symptoms would be relieved?

13                        MR. JOHNSON:  Object to the form.

14                        THE WITNESS:  She was told that the

15        object of the surgery was to relieve her symptoms

16        permanently.

17   Q    (By Mr. Plattenberger)  Understood.  Thank you.

18            And that information, that it could relieve her

19        symptoms permanently, was that benefit information that

20        was given to you by Ethicon?

21                        MR. JOHNSON:  Object to the form.

22                        THE WITNESS:  Yes.

23                        (Exhibit No. 4 marked

24                         for identification.)

25        /////

Golkow Technologies, Inc. - 1.877.370.DEPS

Tamara J. Sleeter, M.D.

Page 32

1   Q   (By Mr. Plattenberger)   Thank you.

2       Doctor, I want to show you what we have marked as

3       Exhibit No. 4.

4       Doctor, can you briefly describe what document this

5       is?

6   A   This is Valley Medical Center's operative consent form.

7   Q   So is this something that you would have given to Linda?

8   A   Yes.

9   Q   Okay.  If you go down to Box No. 4 in the left-hand

10      column, do you see that?

11  A   Mm-hm.

12  Q   It says, "I have been informed that there are significant

13      risks, such as severe loss of blood, infection, and

14      cardiac arrest, that can lead to death or permanent or

15      partial disability, which may be attendant to the

16      performance of any procedure."

17      Did I read that correctly?

18  A   Yes.

19  Q   Is this information that we see on this page about

20      surgery under general anesthesia generally?

21  A   Yes.

22  Q   Okay.  Thank you.

23      Doctor, the last three documents that we looked at,

24      as far as you know, are those all of the documents in her

25      medical records that evidence informed consent

Tamara J. Sleeter, M.D.

Page 33

1    conversations that you had with Linda Madding prior to

2    her April 2002 implant surgery?

3  A  Yes.

4  Q  Thank you.

5        Have you and I discussed every specific warning or

6    potential risk that you communicated to Linda Madding

7    prior to her April 2002 implant surgery?

8                    MR. JOHNSON:  Object to the form.

9                    THE WITNESS:  Yes, we have.

10  Q  (By Mr. Plattenberger)  Thank you.

11        Again, that information came from Ethicon, correct?

12                    MR. JOHNSON:  Object to the form.

13                    THE WITNESS:  Yes, it did.

14                        (Exhibit No. 5 marked

15                        for identification.)

16

17  Q  (By Mr. Plattenberger)  Thank you.

18        Doctor, I want to show you what we have marked as

19    Exhibit No. 5.

20        This is the 2002 IFU.

21        Doctor, we are going to be using the bolded letters

22    and numbers in the lower right-hand corner of the

23    document as a reference, okay?

24  A  Okay.

25  Q  If you could please turn to the page that has the last

Tamara J. Sleeter, M.D.

Page 90

1  Q  Did you find pelvic organ prolapse in Mrs. Madding when

2     you first saw her?

3  A  Yes, I did.

4  Q  And we'll get into more detail as to what you found.

5         As part of your practice at Valley Women's Center,

6     Dr. Sleeter, did you make an effort to stay up to date

7     with the state of medical knowledge regarding stress

8     urinary incontinence?

9  A  Yes, I did.

10 Q  Regarding urge incontinence?

11 A  Yes, I did.

12 Q  Regarding the treatment of stress urinary incontinence?

13 A  Yes, I did.

14 Q  Regarding the use of midurethral slings for the treatment

15    of stress urinary incontinence?

16 A  Yes, I did.

17 Q  And regarding the risks associated with stress urinary

18    incontinence?

19 A  Yes, I did.

20 Q  How did you keep up to date?

21 A  Education by representatives that would come by with the

22    new tapes, literature reading, discussing with my

23    colleagues.

24 Q  Did you attend medical meetings in which those topics

25    were discussed?

Tamara J. Sleeter, M.D.

Page 91

1    A    Yes, I did.

2    Q    Did you attend continuing medical education programs

3         regarding stress urinary incontinence and its treatment?

4    A    Yes, there were some.

5    Q    During your active practice, were you a member of any

6         societies?

7    A    No, I was not.

8    Q    During your practice, at any point in time, did you take

9         any courses from any manufacturer with respect to

10        treatment of stress urinary incontinence with midurethral

11        slings?

12   A    Yes, I did.

13   Q    What did you take?

14   A    There was a course in Florida where you were invited to

15        come observe a number of these kinds of surgeries.

16   Q    Do you recall what manufacturer put that on?

17   A    I think it was Ethicon.

18   Q    I know in this particular case you implanted an Ethicon

19        TVT product in Mrs. Madding, correct?

20   A    Correct.

21   Q    At any point in time did you implant other midurethral

22        sling products, that were manufactured by other

23        manufacturers, in women?

24   A    No, I did not.

25   Q    So TVT was the exclusive type of midurethral sling that

Tamara J. Sleeter, M.D.

Page 98

1          then you can pull the cover of the tape off so that it

2          implants into the patient's body.

3     Q    At the time that you did the surgery on Mrs. Madding, was

4          use of a midurethral sling, like the TVT, considered to

5          be a standard of care treatment for stress urinary

6          incontinence?

7                         MR. PLATTENBERGER:  Objection;

8          foundation and form.

9                         THE WITNESS:  It had become the

10         standard of care.

11    Q    (By Mr. Johnson)  Do you know the reason for that?

12                        MR. PLATTENBERGER:  Same objections.

13                        THE WITNESS:  It was available as part

14         of the standard of care.  It wasn't the only thing you

15         could do.

16    Q    (By Mr. Johnson)  Did you ever perform Burch procedures?

17    A    No, I did not.

18    Q    Did you ever perform MMK procedures, Marshall-Marchetti?

19    A    Well, anterior and posterior repair is part of that.

20    Q    All right.  Can you tell a jury what urge incontinence

21         is?

22    A    Urge incontinence is when the patient has the need to go

23         and has to run for the bathroom as quick as she can or

24         she'll get wet.

25    Q    Is that different from stress urinary incontinence?

Tamara J. Sleeter, M.D.

Page 101

1   A   It's possible.

2   Q   But in terms-- if you take a look at the monograph, under

3       "Complications," there are a number of complications

4       listed, correct?

5   A   Correct.

6                    MR. PLATTENBERGER:  Can you tell me

7       what page you are on?

8                    MR. JOHNSON:  Page 9-- actually, it

9       starts at Page 8.

10                   MR. PLATTENBERGER:  And this exhibit

11      doesn't have any Bates number on it.

12                   MR. JOHNSON:  I am saying Page 8

13      through 10 or through 11.

14                   MR. PLATTENBERGER:  Okay.

15  Q   (By Mr. Johnson)  Just in looking through that, Doctor,

16      these were the types of adverse reactions and risks that

17      you were aware of prior to performing the surgery in

18      Mrs. Madding; is that correct?

19                   MR. PLATTENBERGER:  Objection; form.

20                   THE WITNESS:  Yeah.

21  Q   (By Mr. Johnson)  Did you answer?

22  A   I'm sorry, I didn't hear the question.

23  Q   My question is:

24          If you look at the list of complications, causes,

25      and recommendations, and it looks like it's Pages 8

Tamara J. Sleeter, M.D.

Page 102

1       through 10, are those some of the risks that you were

2       aware of with placement of mesh prior to doing surgery on

3       Mrs. Madding?

4                       MR. PLATTENBERGER:  Same objection,

5       and foundation.

6                       THE WITNESS:  Yes.

7   Q   (By Mr. Johnson)  How did you become aware of the risks

8       of stress urinary incontinence surgery with a midurethral

9       sling?

10  A   Through reports in the literature.

11  Q   What did you do to keep up with the literature,

12      Dr. Sleeter?

13  A   I read, on a weekly basis, reports in various journals:

14      New England Journal of Medicine, American Journal of

15      Ob-Gyn, occasionally monographs that came through the

16      hospital.

17  Q   The American Journal of Ob-Gyn, is that the gray journal?

18      the green journal?

19  A   I forget which it is.  I think it's the gray journal.

20  Q   All right.  I take it you also became aware of the risks

21      from meetings with your colleagues at the Valley Women's

22      Clinic; is that correct?

23  A   Yes, that's correct.

24  Q   And other meetings that you attended?

25  A   That's correct.

Tamara J. Sleeter, M.D.

Page 103

```
 1   Q    Medical meetings?

 2              In-- well, you were aware also that there were risks

 3        of stress urinary incontinence surgery procedures even if

 4        mesh was not used; is that right?

 5   A    That's correct.

 6                                        (Exhibit No. 14 marked

 7                                          for identification.)

 8

 9   Q    (By Mr. Johnson)  I am going to hand you-- if you take a

10        look at Exhibit No. 14--

11                          MR. PLATTENBERGER:  Before you start,

12        I would just like a standing objection to any questions

13        related to this document, based on foundation, so I don't

14        have to keep interrupting you.

15                          MR. JOHNSON:  It's done.

16                          MR. PLATTENBERGER:  Okay.  Thank you.

17   Q    (By Mr. Johnson)  Take a look at Exhibit No. 14.

18              This is a listing of potential risks of non-mesh

19        stress urinary incontinence surgery, and what I'm going

20        to ask you to do, Dr. Sleeter, is take a look at this,

21        and let me know what you were aware of these potential

22        risks of non-mesh stress urinary incontinence surgery

23        prior to the surgery performed on Mrs. Madding on April

24        29 of 2002.

25              If you could just take a look at that list and let
```

Tamara J. Sleeter, M.D.

Page 104

1      me know.

2          If there's any specific one that you were not aware

3      of, if you could point that out to me.

4   A  I was aware of these.

5   Q  Where did you get your knowledge of these risks?

6   A  General reading of the literature.

7                              (Exhibit No. 15 marked

8                                  for identification.)

9

10  Q  (By Mr. Johnson)   If you could take a look at Exhibit

11     No. 15.

12                     MR. PLATTENBERGER:   Same standing

13     objection to any questions related to Exhibit No. 15, if

14     that's okay with you.

15                     MR. JOHNSON:   That's fine.

16                     MR. PLATTENBERGER:   Thank you.

17  Q  (By Mr. Johnson)   Take a look at Exhibit No. 15, and I

18     will just represent to you, Dr. Sleeter, that the

19     left-hand column is identical to what was in Exhibit

20     No. 14, and the right-hand column is a listing of

21     potential risks of mesh stress urinary incontinence

22     surgeries.

23          Could you take a look at that list on the right-hand

24     column, and let me know whether you were aware of those

25     risks prior to the surgery you performed on Mrs. Madding

Tamara J. Sleeter, M.D.

Page 105

1       on April 29, 2002.

2   A   Yes, I was.

3   Q   So prior to surgery on-- and where did you get the

4       information of those risks regarding mesh stress urinary

5       incontinence surgeries prior to April 29, 2002?

6   A   From my reading of the literature, discussion with

7       colleagues.

8   Q   Doctor, so prior to performing surgery-- well, let me ask

9       you this other question:

10          These risks that are listed on Exhibit No. 14 and

11      15, are these generally considered to be risks of pelvic

12      floor surgery, with the exception of erosion of mesh?

13  A   Yes, they are.

14  Q   Is that something that you learned during your residency?

15  A   Yes.

16  Q   Doctor, so prior to performing a surgery on Mrs. Madding

17      on April 29, 2002, you were aware that there was a risk

18      of acute and chronic pain with intercourse following the

19      implantation of the TVT, correct?

20  A   Yes.

21  Q   And you were aware of the risk of acute or chronic pain

22      as a result of the implantation of the TVT product,

23      correct?

24  A   Yes.

25  Q   And you were aware of that before Mrs. Madding's surgery?

Tamara J. Sleeter, M.D.

Page 106

1    A    Yes.

2    Q    And you were aware that there were potential risks of

3         urinary frequency, urgency, dysuria or retention,

4         obstruction, or further incontinence prior to her

5         surgery, correct?

6    A    Yes.

7    Q    As a result of the placement of the mesh?

8    A    As a result of surgery.

9    Q    Yes.

10        And you were aware that those were risks that were

11        also potentially related to the fact that mesh was in

12        place in the body, correct?

13   A    Yes.

14                       MR. PLATTENBERGER:  Objection; form.

15   Q    (By Mr. Johnson)  And you were aware that one or more

16        surgeries might be needed after the midurethral sling

17        surgery; is that right?

18   A    Yes.

19   Q    And I believe you were aware of the risk of erosion of

20        the mesh into other bodily structures, right?

21   A    Yes.

22   Q    In fact, though, in Mrs. Madding's case, based upon the

23        review of the records, which you have had an opportunity

24        to review before this deposition, you never saw any

25        exposure of mesh, erosion of mesh into the vagina or any

Tamara J. Sleeter, M.D.

Page 107

```
 1        other structures, such as the bladder or urethra in
 2        Mrs. Madding; is that correct?
 3    A   That's correct.
 4    Q   Having looked at Dr. McKay's-- some of Dr. McKay's notes,
 5        he didn't note any erosion, exposure, or extrusion of the
 6        mesh into the vagina, bladder, or urethra either, did he?
 7                        MR. PLATTENBERGER:  Objection;
 8        foundation.
 9                        THE WITNESS:  He did not.
10    Q   (By Mr. Johnson)  You were aware that following surgery
11        with implantation of the mesh, that it may not work?
12    A   That's correct.
13    Q   That the patient might continue with stress urinary
14        incontinence; is that right?
15    A   That's correct.
16    Q   Is it your understanding that, from looking at the
17        records that you reviewed prior to this deposition, the
18        stress urinary incontinence symptoms were taken care of
19        following the implantation of the midurethral sling?
20    A   She no longer had stress urinary incontinence.
21    Q   Are you a member or have you been a member of AUGS or
22        SUFU?
23    A   No.
24    Q   Are you familiar with their position statement?
25    A   No.
```

Tamara J. Sleeter, M.D.

Page 122

1      and other adverse reactions" that's on Page 5 of Exhibit

2      No. 6.

3   A  Okay.

4   Q  Plaintiff's counsel went through these, but Doctor, if

5      the IFU provided by Ethicon, as of April 2002, had

6      contained the adverse reactions and other adverse

7      reactions as set forth in Exhibit No. 6, would you still

8      probably have recommended the TVT for Mrs. Madding?

9                 MR. PLATTENBERGER:  Objection; form.

10               THE WITNESS:  I would have still

11     recommended that she have it done, but at that stage of

12     my career, I would have sent her out to somebody else to

13     do it.

14   Q  (By Mr. Johnson)  Why would you have recommended that she

15      still have a midurethral sling placed?

16                MR. PLATTENBERGER:  Hold on before you

17     answer.

18      I would like to object to the last answer as

19     nonresponsive and move to strike.

20   Q  (By Mr. Johnson)  You can still answer.

21      My question is:

22      What is the reason that you would have recommended

23     that she still have the midurethral sling performed?

24   A  It was an option for her to treat her stress urinary

25      incontinence.

Tamara J. Sleeter, M.D.

Page 126

1       fixation versus the placement of the TVT?

2   A   It was a much larger part than placement of the TVT.

3       It's time consuming to do all the dissections that

4       you need to do and get everything laid out, and then you

5       have to put the stitch in and you have to do the repair,

6       and then you can place the TVT as the last that you do.

7   Q   So the vast majority of the surgery was the sacrospinous

8       fixation, not the placement of the TVT?

9   A   That's correct.

10  Q   Does the vaginal incision need to be larger for the

11      sacrospinous fixation than if you were just placing a

12      TVT?

13  A   Much larger.

14  Q   Why is that?

15  A   Because you are opening a space that is longer and wider.

16      With a TVT, you have to have a minimal incision

17      that's not much wider than the tape itself, to be able to

18      place it properly.

19  Q   And then before you placed the TVT, did you inspect the

20      tension-free vaginal tape?

21  A   Yes, I did.

22  Q   What were you looking for when you inspected it?

23  A   To make sure that the cover on the tape was properly

24      intact and it was properly attached to the needles that

25      you use to place it.

Tamara J. Sleeter, M.D.

Page 127

1      There was no evidence of contamination.  The

2      packaging was intact.

3  Q   Was there any abnormality of the mesh that you saw at any

4      point in time?

5  A   No.

6                      MR. PLATTENBERGER:  Objection.

7      Sorry, hold on.

8      Objection; foundation.

9      Thank you.

10  Q  (By Mr. Johnson)  If you had seen an abnormality in the

11     TVT product at the time that you implanted it, what would

12     you have done?

13                     MR. PLATTENBERGER:  Same objection.

14                     THE WITNESS:  I would have asked for a

15     different tape.

16  Q  (By Mr. Johnson)  Did you note any evidence of fraying of

17     the mesh before implanting it in Mrs. Madding?

18                     MR. PLATTENBERGER:  Objection;

19     foundation.

20                     THE WITNESS:  No, I did not.

21  Q  (By Mr. Johnson)  Did you note any evidence of roping or

22     curling of the mesh before you put it in Mrs. Madding?

23                     MR. PLATTENBERGER:  Same objection.

24                     THE WITNESS:  No, I did not.

25  Q  (By Mr. Johnson)  If there had been roping or curling or

Tamara J. Sleeter, M.D.

Page 128

1     fraying, would you have put it in her?

2                   MR. PLATTENBERGER:  Same objection.

3                   THE WITNESS:  No.  I would have asked

4     for a fresh tape.

5  Q  (By Mr. Johnson)  After the surgery, did Mrs. Madding

6     develop pretty much immediate retention issues?

7  A  It wasn't obvious for the first several days, but then it

8     became obvious.

9                       (Exhibit No. 16 marked

10                         for identification.)

11

12  Q  (By Mr. Johnson)  Could you take a look at Exhibit

13     No. 16, Doctor?

14                   MR. PLATTENBERGER:  Which one is that?

15                   MR. JOHNSON:  (Indicating.)

16                   THE WITNESS:  Okay.

17  Q  (By Mr. Johnson)  Are these hospital progress notes from

18     the hospitalization for April 29 and April 30th, 2002,

19     for Mrs. Madding?

20  A  These notes were taken after she went home, and they were

21     in my office.

22      They were after her surgery.

23  Q  Could you take-- could I see what you're looking at?

24      Maybe we're looking at different--

25  A  I have the postoperative note and then I have PO No. 1,

Tamara J. Sleeter, M.D.

1   Q   It should be 2002.  I don't know why it says 2003.

2   A   She was discharged home on the first postoperative day.

3   Q   So on April 30th, 2002, which is the day of the surgery,

4       she complained of not voiding, has tried everything, her

5       abdomen is distended, and she's very uncomfortable.

6           Is that right?

7   A   That's right.

8   Q   And she was cathed for a thousand "Immediate return."

9           What does that mean?

10  A   That means she probably hadn't voided any over the period

11      of time.

12          It's difficult to say how long it was, but usually

13      most Foleys are taken out at 7 a.m., so it was

14      approximately five hours.

15  Q   So that's a thousand CCs of urine?

16  A   Right.

17  Q   And then with 500 later, that's an additional 500 CCs of

18      urine?

19  A   Right.

20  Q   So in this immediate postop period or the next day, she

21      did have some evidence of retention?

22  A   That's right.

23  Q   And then she was sent home with a Foley plus a leg bag;

24      is that right?

25  A   That's right.

Tamara J. Sleeter, M.D.

Page 149

1          Do you remember that?

2                         MR. JOHNSON:  Object to the form.

3                         THE WITNESS:  I think she was told

4          about some of these things, even though they weren't on

5          this list.

6                         MR. PLATTENBERGER:  Okay.  Objection.

7          I have to move to strike the answer.

8            Can you read the question back, please?

9                         MR. JOHNSON:  I will withdraw my

10         objection.

11                        MR. PLATTENBERGER:  Okay.

12                              (Question on Page 148, Line 20-

13                              15 and Page 149, Line 1 read

14                              by the reporter.)

15

16                        MR. JOHNSON:  I will object to the

17         form.

18    Q    (By Mr. Plattenberger)  Do you remember that, Doctor?

19    A    Yes.

20    Q    Now, if you were aware, prior to implanting Mrs. Madding,

21         of potential serious adverse events or risk of injury

22         regarding the TVT, we have already established that you

23         certainly would have communicated that information to

24         Mrs. Madding during the informed consent conversations,

25         correct?

Tamara J. Sleeter, M.D.

Page 150

1   A   Yes.

2   Q   Okay.  Was it your habit and custom, prior to implanting

3       Mrs. Madding with the TVT, to read warning information

4       provided to you by device manufacturers regarding the

5       devices that you were implanting into your patients?

6   A   Yes.

7   Q   Okay.  And did you read-- was it your habit and custom,

8       prior to implanting Mrs. Madding, to read warning

9       information provided to you by Ethicon, and other people,

10      related to the TVT device?

11  A   Yes.

12  Q   And prior to implanting Mrs. Madding, you relied on that

13      warning information that you received from Ethicon and

14      others to perform your risk-benefit analysis regarding

15      Linda Madding and the TVT, correct?

16                      MR. JOHNSON:  Object to the form.

17                      THE WITNESS:  Yes.

18  Q   (By Mr. Plattenberger)  Doctor, did you see anything in

19      your notes, during your treatment of Linda Madding, to

20      indicate that she was ever wearing diapers or pads, prior

21      to her implant surgery, to deal with her incontinence?

22  A   No, I did not.

23  Q   Okay.  Did you see anything in your notes or has it

24      refreshed your recollection that Linda Madding ever

25      complained to you of specific ways in which her