EXHIBIT 22

Hunter A. McKay, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

| | |
|---|---|
| IN RE: ETHICON, INC., PELVIC | ) MASTER FILE NO. |
| REPAIR SYSTEM PRODUCTS LIABILITY | ) 2:12-MD-02327 |
| LITIGATION | )     MDL 2327 |
| | ) |
| | ) JOSEPH R. GOODWIN |
| | ) U.S. DISTRICT JUDGE |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| LINDA J. MADDING; et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:12-CV-02512 |
| | ) |
| ETHICON, INC., et al., | ) |
| | ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION OF HUNTER A. MCKAY, M.D.

June 15, 2016

Seattle, Washington

Hunter A. McKay, M.D.

Page 15

1      surgical treatment of Mrs. Linda Madding?

2   A  Yes.

3   Q  And upon reviewing those records, did your memory become

4      refreshed as to when you first treated Mrs. Madding?

5   A  Yes.  Thank you.

6         The first encounter was in 2003, and the exact date

7      was November 10th, 2003.

8   Q  I would like to direct your attention to Bates Page 64.

9      It may be helpful here.

10  A  How do I find 64?

11        Mine go up to 48-- no, 50-- I don't go beyond 52.

12  Q  Let me see.

13  A  Unless they're out of order.

14  Q  I was referring to the Bates label on the bottom.

15        It begins at 59, and then it ends at 94.

16  A  Oh, all right.  Well, I didn't know what the Bates system

17     was.

18  Q  Okay.  Is that clear now?

19  A  Yes.

20  Q  All right.

21  A  Thank you.

22  Q  So if you go to Bates Page 64--

23  A  Yes.

24  Q  Doctor, could you describe for the Ladies and Gentlemen

25     of the Jury why it is that Mrs. Madding first sought your

Hunter A. McKay, M.D.

Page 16

1    treatment?

2  A    Her symptoms were slow stream, difficulty emptying,

3       intermittency, urinary frequency, and she also had

4       evidence of urinary retention, and I believe urodynamic

5       evidence of an obstructive voiding pattern.

6  Q    And did she receive a set of diagnoses by you as a result

7       of those symptoms?

8  A    Yes.  I felt that she had obstruction due to her TVT

9       tape.

10  Q   And what did you note underneath the urologic impression

11      there at the time?

12  A   Urinary retention, overactive bladder, and status post

13      TVT.

14  Q   Could you describe urinary retention for us?

15  A   In the normal course of voiding, most folks empty all but

16      30 milliliters or less.  That is their residual, is 30

17      milliliters or less.  That is considered normal.

18          Anything greater than that is, to some degree,

19      urinary retention.

20          It can be very mild, can be over a thousand

21      milliliters.

22  Q   What about Mrs. Madding allowed you to conclude that she

23      was retaining urine?

24  A   I think she had evidence of retention from Dr. Sleeter's

25      office.

Hunter A. McKay, M.D.

Page 21

```
 1        obstructive uropathy of the urethra due to mechanical

 2        obstruction.

 3    Q   So if I understand you correctly, you attempted to treat

 4        some of her symptomatology with medication, but not the

 5        urinary retention symptoms, correct?

 6    A   Well, antibiotics and anticholinergics may be helpful for

 7        some of these symptoms, but the main culprit here was

 8        obstruction, but we didn't know that for sure, and indeed

 9        she went three years after Dr. Sleeter's operation before

10        she needed the takedown, so some patients only go three

11        months and they need the takedown of the TVT.

12    Q   There is something I would like to clear up here.

13            You said that she was experiencing retention she

14        ultimately concluded was due to the TVT sling device,

15        correct?

16                        MR. JOHNSON:  Object to form.

17            You can still answer.

18                        THE WITNESS:  Yes, so a little

19        confusing to me as far as exactly what answer to offer

20        you.

21            Could you repeat the question?

22    Q   (By Mr. Kramer)  I was just trying to summarize something

23        that you also said.

24    A   Oh.

25    Q   I was asking-- you ultimately concluded she was
```

Hunter A. McKay, M.D.

Page 22

1    experiencing urinary retention due to the TVT sling

2    device, correct?

3                      MR. JOHNSON:  Object to the form.

4         You can answer.

5                      THE WITNESS:  Let me rephrase your

6    statement of what you thought I said.

7                      MR. KRAMER:  Sure.  Go ahead.

8                      THE WITNESS:  The assumption, before

9    going to the operating room, was that she had obstructive

10   uropathy, and that she had a good chance of improving if

11   we removed the obstructing TVT.

12        The proof of that was her clinical improvement after

13   the procedure, so perhaps that answers the question.

14        The presumption is not a fulfilled hypothesis until

15   the clinical results are in.

16   Q    (By Mr. Kramer)  That gives us a place to move forward.

17        To say that the TVT was causing obstruction was not

18   to say that you thought the Ethicon TVT device was

19   defective as of March 2005, right?

20   A    I would agree with that statement.

21   Q    And so that also means that in March of 2005 you would

22   not have told Mrs. Madding that the Ethicon TVT device

23   was defective, correct?

24                      MR. JOHNSON:  Object to the form.

25                      THE WITNESS:  I don't think I would

Hunter A. McKay, M.D.

Page 23

1       have said-- I would have used those words, no.

2   Q  (By Mr. Kramer)  Sitting here today, do you think that

3       the Ethicon TVT device is a defective product?

4   A  In the case that we are speaking about, Linda Madding, I

5       do not believe the TVT is defective.

6   Q  As we just discussed, you ultimately recommended a

7       surgical takedown of the Ethicon TVT device for

8       Mrs. Madding's symptoms, correct?

9   A  Yes.

10   Q  And so could you describe what a TVT takedown surgery

11       would involve?

12   A  Yes.

13       "Takedown" is a bit of a misnomer, but basically, if

14       you can imagine a garden hose and then put a horseshoe

15       underneath it, with the open end up, what we do is we

16       take out that portion of the horseshoe that is beneath

17       the garden hose, which is the portion of the tape which

18       is beneath the urethra, and that is what we do.

19       We don't remove the entire tape for obstruction

20       because there's usually no need to do that.

21   Q  And so how much of the tape would you say you removed?

22   A  Oh, maybe three centimeters, two to three centimeters

23       typically.

24   Q  And how-- strike that.

25       Do you know how much of the tape would be left

Hunter A. McKay, M.D.

Page 32

1    Q    Does it appear to be an accurate reflection of a record

2         that you yourself authored?

3    A    Yes.

4    Q    And is this the type of record that would be kept in the

5         ordinary course of business at a medical practice?

6    A    Yes.

7    Q    Doctor, did you consider Mrs. Madding's March 2005

8         surgery a success?

9    A    This report of April 6th, 2005 suggests that it was,

10        since she was quite a bit improved.

11   Q    And which of the symptoms specifically do you note that

12        the March 2005 surgery helped resolve for Mrs. Linda

13        Madding?

14   A    Well, she had been getting up a couple of times at night

15        having difficulty emptying, large residuals, frequency,

16        and urgency, and my statement of April 6th says that all

17        her symptoms improved, and her residual, instead of being

18        345, was now zero, so she was emptying better.

19   Q    It seems like there was a pretty dramatic amount of

20        improvement after your surgery of Mrs. Madding in March

21        of 2005.

22            Is that correct?

23   A    I think so.

24   Q    Were there any symptoms at all that still remained that

25        may have not been treated by the March 2005 TVT takedown

Hunter A. McKay, M.D.

Page 33

1    surgery?

2   A    In Paragraph No. 2 I comment that her only symptom is

3        occasional urge incontinence.  That's an overactive

4        bladder symptom, as we discussed earlier, but it has been

5        occasional only, and so she was only wearing pads for

6        security, not for repetitive need to change garments.

7            That's not uncommon after any sort of urologic

8        procedure on the lower tract, that patients will have

9        gradual improvement of their symptoms as things heal.

10  Q    Doctor, to your knowledge, did Mrs. Madding have any

11       complications related to her March 2005 surgery?

12  A    Not that I'm aware of.

13  Q    Doctor, when was the last time that you saw Mrs. Madding,

14       to your memory?

15  A    I think April 6th, 2005.

16  Q    And--

17  A    Correct me if I'm wrong.

18           Do you have records that state anything further

19       beyond that?

20  Q    I think the March 6th, 2005 record indicates, at the very

21       bottom, that you told her to return on an as-needed

22       basis, right?

23                       MR. JOHNSON:  You mean April 6th?

24                       THE WITNESS:  April 6th appears to be

25       the last visit.

Hunter A. McKay, M.D.

Page 33

1       surgery?

2   A   In Paragraph No. 2 I comment that her only symptom is

3       occasional urge incontinence.  That's an overactive

4       bladder symptom, as we discussed earlier, but it has been

5       occasional only, and so she was only wearing pads for

6       security, not for repetitive need to change garments.

7           That's not uncommon after any sort of urologic

8       procedure on the lower tract, that patients will have

9       gradual improvement of their symptoms as things heal.

10  Q   Doctor, to your knowledge, did Mrs. Madding have any

11      complications related to her March 2005 surgery?

12  A   Not that I'm aware of.

13  Q   Doctor, when was the last time that you saw Mrs. Madding,

14      to your memory?

15  A   I think April 6th, 2005.

16  Q   And--

17  A   Correct me if I'm wrong.

18          Do you have records that state anything further

19      beyond that?

20  Q   I think the March 6th, 2005 record indicates, at the very

21      bottom, that you told her to return on an as-needed

22      basis, right?

23                      MR. JOHNSON:  You mean April 6th?

24                      THE WITNESS:  April 6th appears to be

25      the last visit.

Hunter A. McKay, M.D.

Page 64

1       done TVT revisions?

2   A   Six to ten.

3   Q   What has been the reason for those revisions, if you can

4       recall?

5   A   Retention, erosion, bowel perforation requiring

6       laparotomy.

7           Mostly erosion.

8   Q   Can you just tell the jury what erosion is?

9   A   If the vaginal epithelium does not heal over the tape,

10      the tape is visible and palpable and present during

11      intercourse and can be the source of chronic pain,

12      drainage, frequency, urgency, urinary infections.

13  Q   You saw Mrs. Madding on, I think, four different

14      occasions or five different occasions.

15          At any time when you evaluated her, was there ever

16      any evidence of erosion?

17  A   No.

18  Q   Was there ever any evidence of the vaginal epithelium not

19      healing over the tension-free vaginal tape?

20                      MR. KRAMER:  Objection; form.

21                      THE WITNESS:  No.

22  Q   (By Mr. Johnson)  Was there ever any evidence that-- of

23      exposure during the times that you evaluated

24      Mrs. Madding?

25  A   No.

Hunter A. McKay, M.D.

Page 65

1    Q    In your evaluations of Mrs. Madding, they would have

2         included pelvic examinations, correct?

3    A    Yes.

4    Q    Was one of the things that you were specifically looking

5         for, evidence of any erosion or exposure of the

6         transvaginal tape?

7    A    Yes.

8    Q    And at no time did you find any?

9    A    I did not.

10   Q    Now, I am going to turn to your care and treatment of

11        Mrs. Madding.

12            I believe, during Counsel's questioning, we

13        established that your first treatment was in November

14        2013, correct?

15   A    Yes.

16   Q    And your last treatment was in April of 2005?

17   A    Yes.

18                                    (Exhibit No. 7 marked

19                                       for identification.)

20

21   Q    (By Mr. Johnson)   I am going to hand you what we've

22        marked as Exhibit No. 7.

23            Can you just identify this document for the jury?

24   A    This is a consultation letter sent to the primary care

25        doctor, Dr. Julie Komarow, dated November 10th, 2003, and

Hunter A. McKay, M.D.

Page 77

1    Q    And my question-- because of time, I was trying to get to

2         the end.

3              Did you have a final diagnosis at the end of your

4         treatment of her, as to what her diagnosis had been?

5                             MR. KRAMER:  Objection; form.

6                             THE WITNESS:  Again, I am thinking out

7         loud here when I say "working diagnosis," meaning, "I'm

8         not sure exactly what's going on.  Let's see if treatment

9         is successful in a fashion that would cement the

10        diagnosis of urethral syndrome."

11             Say the antibiotics work or cystoscopy with urethral

12        dilatation improved the patient's symptoms, then we would

13        say, "Well, this is not mechanical.  This is something

14        that is related to inflammation."

15   Q    (By Mr. Johnson)  So you prescribed some antibiotics?

16   A    Yes, we decided to try that.

17   Q    And did those work?

18   A    No, not to my knowledge, because she obviously came back

19        and still had some problems.

20   Q    Was there any evidence, as of this time, November 10,

21        2003, that the mesh was infected?

22   A    No.

23   Q    Was there any evidence at any time, in your care and

24        treatment of Mrs. Madding, that the mesh was infected?

25   A    No.

Hunter A. McKay, M.D.

Page 87

1    A    Yes.

2    Q    During your surgery did you find any evidence of erosion

3         or exposure of the mesh?

4                        MR. KRAMER:  Objection; form.

5                        THE WITNESS:  No.

6    Q    (By Mr. Johnson)  During your surgery did you find any

7         evidence that the mesh was infected?

8    A    No.

9    Q    Did you find any evidence of any visible infection at the

10        mesh site?

11                       MR. KRAMER:  Objection; form.

12                       THE WITNESS:  No.

13   Q    (By Mr. Johnson)  Did you find any evidence that the mesh

14        had degraded in Ms. Madding's body?

15                       MR. KRAMER:  Form.

16                       THE WITNESS:  I don't know that I

17        would be able to identify what degradation of mesh would

18        look like, but to answer your question, I did not find

19        any evidence of that.

20   Q    (By Mr. Johnson)  Did you find any evidence that the mesh

21        that was being removed had curled in her body?

22                       MR. KRAMER:  Objection; form.

23                       THE WITNESS:  It's not mentioned in

24        the operative report.

25   Q    (By Mr. Johnson)  Is that something you would typically

Hunter A. McKay, M.D.

1        mention, if you had noted curling of the mesh?

2                           MR. KRAMER:  Objection; form.

3                           THE WITNESS:  I believe I would.

4    Q   (By Mr. Johnson)  Did you-- is there any-- was there any

5        evidence, at the time of surgery, that the mesh had

6        roped?

7                           MR. KRAMER:  Objection; form.

8                           THE WITNESS:  I don't know what

9        "roped" means.

10   Q   (By Mr. Johnson)  I think it kind of spins on itself like

11       a rope.

12   A   No, I did not.

13   Q   Is that something that you would have noted if you had

14       seen it?

15                          MR. KRAMER:  Objection; form.

16                          THE WITNESS:  Probably.

17   Q   (By Mr. Johnson)  Was there any evidence, Dr. McKay, of

18       any fraying of the mesh?

19                          MR. KRAMER:  Objection; form.

20                          THE WITNESS:  It's not mentioned, so I

21       have no independent recollection.

22   Q   (By Mr. Johnson)  Is that something that you would

23       typically mention if you saw that?

24                          MR. KRAMER:  Objection; form.

25                          THE WITNESS:  Perhaps.

Hunter A. McKay, M.D.

Page 89

1    Q    (By Mr. Johnson)  During your surgery and removal of the

2         mesh, did you see any abnormality of the mesh?

3                        MR. KRAMER:  Objection; form.

4                        THE WITNESS:  I only have my operative

5         report to go by, and there's no mention of it, so--

6    Q    (By Mr. Johnson)  Would it be your typical custom and

7         practice, if you did see an abnormality in the mesh, to

8         make a note of that in your operative report?

9                        MR. KRAMER:  Objection; form.

10                       THE WITNESS:  Probably.

11                            (Exhibit No. 14 marked

12                             for identification.)

13

14   Q    (By Mr. Johnson)  And then just handing you what we

15        marked as Exhibit No. 14, does this appear to be a true

16        and correct copy of the anesthesia record for your

17        surgery of March 1st?

18   A    Yes.

19   Q    And does that indicate the time the surgery started?

20   A    Yes.

21   Q    And what time was that?

22   A    0900.

23   Q    And when was the surgery finished?

24   A    0953.

25   Q    So the surgical time for you as a surgeon was 53 minutes

Hunter A. McKay, M.D.

Page 100

```
 1                              (Exhibit No. 19 marked

 2                               for identification.)

 3

 4                         VIDEOGRAPHER:  We are back on the

 5          record.  The time is 1:25 p.m.

 6     Q    (By Mr. Johnson)  Doctor, I am handing you what we've

 7          marked as Exhibit No. 19, which I believe are notes that

 8          you brought with you to the deposition today.

 9              Are these notes that you made in preparation for the

10          deposition so you could know landmark dates and times?

11     A    Yes.

12     Q    And does it also indicate some of the time that you spent

13          on the case?

14     A    Yes.

15     Q    Okay.  Now I am going to change the subject back to your

16          informed consent that you gave to Mrs. Madding before

17          actually performing the surgery.

18              That's an informed consent you would have given on

19          February 14th, 2005; is that right?

20     A    Yes.

21     Q    Did you indicate to Mrs. Madding, at that time, what the

22          alternatives were for her, if any?

23     A    Well, we had exhausted the conservative options, and of

24          course there's always the option of no surgery.

25              I never insist that a patient undergo a surgical
```

Hunter A. McKay, M.D.

Page 101

1    procedure.

2  Q  At that point in time had you concluded, based upon your

3      review of Dr. Sleeter's records, your own evaluation,

4      care, and treatment of Ms. Madding, that it was likely

5      that there was an obstruction of the urethra that was

6      causing the retention, and that that obstruction was due

7      to the presence of the mesh?

8  A  Yes.

9  Q  Did you tell her that?

10                    MR. KRAMER:  Objection; form.

11                    THE WITNESS:  I don't have an

12      independent recollection, so I don't know what I told

13      her.  I can only refer to the notes.

14  Q  (By Mr. Johnson)  Based upon your normal custom and

15      practice, is that something that you would typically

16      discuss with a patient before doing a surgery?

17                    MR. KRAMER:  Objection; form.

18                    THE WITNESS:  I am not sure what the

19      word "that" refers to.

20  Q  (By Mr. Johnson)  Well, okay, let me ask a specific

21      question--

22  A  Rephrase, please.

23  Q  In the context of a patient similar to Ms. Madding, who

24      has a TVT placed, has several years of retention, and

25      continues with those retention symptoms, you've tried

Hunter A. McKay, M.D.

Page 102

1       conservative attempts with medication, you tried

2       conservative attempts with dilation, and you've concluded

3       that it's probably some kind of mechanical obstruction of

4       the urethra that's causing the retention, based on your

5       custom and practice would you tell the patient that

6       that's what you think is probably going on?

7                           MR. KRAMER:  Objection; form.

8                           THE WITNESS:  I think we would have a

9       frank discussion about the likely diagnosis, which is

10      obstruction, and the likely culprit being the previous

11      TVT.

12   Q  (By Mr. Johnson)  I think you indicated-- during your

13      prior testimony, when you were asked by Counsel, you

14      indicated that in this particular case you don't believe

15      that this obstruction occurred because the TVT was

16      defective; is that correct?

17   A  I would say there was no apparent defect of the material.

18   Q  And I just have-- I wrote down in my notes that-- I have

19      a quote, "In the case we are talking about, I do not

20      believe it was defective," end quote.

21          When you were referring to it, are you just

22      indicating that you are not aware of any defect in the

23      product that caused her retention?

24   A  Yes.

25                          MR. JOHNSON:  That's all I have.

Golkow Technologies, Inc. - 1.877.370.DEPS

EXHIBIT 23

**ASSOCIATED UROLOGISTS**
Board Certified Adult & Pediatric Urology

Guy V. Buell, M.D., F.A.C.S.                                                     Hunter A. McKay, M.D., F.A.C.S.

Talbot Professional Center
4011 Talbot Rd. So., Suite 440
Renton, Washington 98055
(425) 251-3455
Fax: (425) 656-5002

February 14, 2005                                                               FEB 1 8 2005

Julie Komarow, M.D.
16850  SE 272nd
Covington, WA 98042

RE:  LINDA J. MADDING

Dear Julie:

Mrs. Madding is on the schedule for a "take down" of her TVT on March 1.  Hopefully we can afford
her some measure of relief, especially given her large residual urines, including today's value of 348 mL.
I discussed with her the very slight risk of worsening continence and the remote risk of urethral vaginal
fistula.  I will keep you posted as events unfold.

Best personal regards,


Hunter A. McKay, M.D., F.A.C.S.

HAM/sts

cc:  Tamara Sleeter, M.D.