# EXHIBIT C

Neeraj Kohli, M.D.

```
 1           UNITED STATES DISTRICT COURT

 2          SOUTHERN DISTRICT OF WEST VIRGINIA

 3                  AT CHARLESTON

 4

 5     * * * * * * * * * * * * * * *

 6   IN RE:  ETHICON, INC.      * MASTER FILE NO.

 7   PELVIC REPAIR SYSTEM       * 2:21-MD-02327

 8   PRODUCTS LIABILITY         * MDL 237

 9   LITIGATION                 *

10     * * * * * * * * * * * * * * *


11

12         DEPOSITION OF NEERAJ KOHLI, M.D.

13              CROWNE PLAZA HOTEL

14             320 Washington Street

15             Boston, Massachusetts

16       March 21, 2016          1:13 p.m.

17

18

19

20         Maryellen Coughlin, RPR/CRR

21

22

23

24

25
```

Neeraj Kohli, M.D.

1    APPEARANCES:

2    Representing the Plaintiff:

3            MOTLEY RICE LLC

4            321 South Main Street, Suite 200

5            Providence, Rhode Island 02903

6            BY:  Jonathan D. Orent, Esq.

7            401.457.7700

             jorent@motleyrice.com

8

9    Representing the Defendants:

10           CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.

11           One Constitution Center, 3rd Floor

12           Boston, Massachusetts 02129

13           BY:  Kathleen M. Guilfoyle, Esq.

14                      -and-

15               John P. Veysey, Esq.

16           617.241.3000

17           kguilfoyle@campbell-trial-lawyers.com

18           pveysey@campbell-trial-lawyers.com

19

20

21

22

23

24

25

Neeraj Kohli, M.D.

```
 1                    I N D E X

 2    EXAMINATION                        PAGE

 3     BY MS. GUILFOYLE                     6

 4     BY MR. ORENT                       162

 5     BY MS. GUILFOYLE                   168

 6

 7                    EXHIBITS

 8     NO.        DESCRIPTION           PAGE

 9     1     Notice to take deposition of     7

10           Dr. Kohli

11     2     Curriculum vitae of Dr. Kohli    19

12     3     Expert report of Dr. Kohli       23

13     4     Dr. N. Kohli Expert Report:      67

14           Internal Ethicon Documents Cited

15     5     AUGS Position Statement on Mesh  74

16           Midurethral  Slings for Stress

17           Urinary Incontinence

18     6     AUGS Frequently Asked Questions  96

19           by Providers Mid-urethral Slings

20           for Stress Urinary Incontinence

21     7     None

22     8     None

23     9     None

24     10    Deposition of Dr. Kohli         102

25     11    Trial testimony of Dr. Kohli    102
```

Neeraj Kohli, M.D.

EXHIBITS CONTINUED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 12 | AUA Guideline for the Surgical Management of Female Stress Urinary Incontinence: 2009 Update | 112 |
| 13 | Effectiveness and complication rates of tension-free vaginal tape-obturator in the treatment of female stress urinary incontinence in a medium- to long-term  follow up Pan-Fen Tan, et al | 122 |
| 14 | Seven years of objective and subjective outcomes of transobturator vaginal tape: Why do tapes fail, Stavros Athanasiou, et al | 125 |
| 15 | Five-year Results of a Randomized Trial Comparing Retropubic and Transobturator Midurethral Slings for Stress Incontinence, Eija Laurikaninen, et al | 131 |

Neeraj Kohli, M.D.

EXHIBITS CONTINUED

NO.         DESCRIPTION                    PAGE

16    Medium-term and long-term              137

      outcomes following placement of

      midurethral slings for stress

      urinary incontinence: a

      systematic review and

      metaanlysis, Giovanni A.

      Tommaselli, et al

17    Two Routes of Transobturator          149

      tape procedures in stress

      urinary incontinence: A

      meta-analysis with direct and

      indirect comparison of

      randomized trials, Pallavi M.

      Latthe, et al

18    Long-Term Results of Burch            151

      Colposuspension, Fuat Demirci,

      et al

Neeraj Kohli, M.D.

```
 1              P R O C E E D I N G S

 2

 3                   NEERAJ KOHLI, M.D.,

 4         having been first duly sworn, was examined

 5         and testified as follows:

 6

 7                        EXAMINATION

 8    BY MS. GUILFOYLE:

 9         Q.      Good afternoon, Dr. Kohli.

10         A.      Good afternoon.

11         Q.      Am I pronouncing your name right?

12         A.      Yes.

13         Q.      As you know, my name is Kathy

14    Guilfoyle, and my associate John Veysey and I

15    represent -- well, are some of the attorneys that

16    represent the defendants in this case.

17                 Could you please state your full

18    name and spell it for the record?

19         A.      Neeraj Kohli.  N-E-E-R-A-J, last

20    name Kohli, K-O-H-L-I.

21         Q.      And am I correct, Dr. Kohli, that

22    you have been designated by the plaintiffs as an

23    expert on the topic of the TVT-O?

24         A.      Yes.

25         Q.      You understand that?
```

Neeraj Kohli, M.D.

1         A.      Yes.

2     (Whereupon, Deposition Exhibit 1,

3      Notice to take deposition of Dr. Kohli,

4      was marked for identification.)

5         Q.      (BY MS. GUILFOYLE) I'm going to

6   show you, sir, what's been marked as Exhibit 1

7   for this deposition and ask you to take a look at

8   it.

9               Now, I'm going to ask you specific

10   questions, but I guess my first question's

11   whether or not you have seen it before.

12         A.      Yes, I was sent a copy of this just

13   recently.

14         Q.      Okay.  And looking at what's been

15   marked as -- I mean what's Schedule A on

16   Exhibit 1, have you had a chance to review that

17   before coming here today?

18         A.      I didn't get a chance to review all

19   of it.

20         Q.      Did you review at any of it?

21         A.      Yeah, I looked at it very quickly

22   when I originally got it.

23         Q.      Okay.  I guess what I would like to

24   do is let me know whether or not you have any

25   documents either with you today or if not with

Neeraj Kohli, M.D.

1    you today in your possession, custody or control

2    that are responsive to Schedule A.

3         A.      Sure.

4                 MR. ORENT:  Hold on.  Let me just

5    say, obviously we have some objections to some of

6    this material being produced.  I don't think I

7    got this 'til mid last week, so we haven't had

8    the time to file a formal objection to certain

9    things on here, but we can deal with whether we

10   have objections based on --

11                MS. GUILFOYLE:  Yeah, that's fine.

12   And in part the reason why the notice was late

13   was this whole issue of where this was going to

14   take place.

15                MR. ORENT:  Yeah.

16                MS. GUILFOYLE:  So fair enough.

17        A.      Kathy, I can go through each of the

18   document requests or I can tell you what I

19   brought with me today.

20        Q.      Oh, so you do have some stuff with

21   you?

22        A.      Oh, I did, yeah.

23        Q.      Okay.

24        A.      I wanted to be prepared.

25        Q.      First tell me what you have with

Neeraj Kohli, M.D.

1    you today?

2         A.      So I have a copy of my C.V.; I have

3    a copy of my Rule 26; and I have a thumb drive

4    which actually has the information that I was

5    provided by Motley Rice to review in preparation

6    for this case and the deposition.

7         Q.      And is all of the information that

8    you were provided by Motley Rice to review in

9    conjunction with this deposition, is that all

10   reflected in your report?

11        A.      Not all of it is reflected in the

12   report.  Where I thought it was relevant it was

13   reflected.

14               Also in my report are experiences

15   that I've had, knowledge that I've gained in 20

16   years of doing this, as well as papers that I

17   have reviewed in the past or recently more in

18   conjunction with my teaching, my clinical

19   responsibilities and my knowledge in general.

20        Q.      Okay.  So can you tell me in

21   categories what type of information you were

22   provided by Motley Rice?

23        A.      Sure.  It's actually according to

24   the folders.  I was provided certain past

25   depositions.

Neeraj Kohli, M.D.

1      Q.      Okay.

2      A.      I was provided certain

3   documentations in terms of internal Ethicon

4   communications, whether they be e-mails or

5   reports.

6              I was also provided copies of IFUs,

7   patient education materials, anything else that

8   was for educational or promotional aspects, which

9   many of those I had already seen.  I was provided

10  some references, some clinical references --

11     Q.      Oh, go ahead, and I'll ask you.

12     A.      -- in terms of articles which,

13  again, were generally articles that I'd seen

14  before but also other articles that I hadn't

15  seen, in addition to many of the articles that

16  I've looked at independently outside of this

17  litigation.

18     Q.      Okay.  You have with you a

19  computer; is that fair to say?

20     A.      Yes.

21     Q.      And are you reading from a list of

22  documents that --

23     A.      The exact thumb drive that I've

24  actually given you is exactly these files, so I'm

25  just telling you exactly what I gave you.  So I

Neeraj Kohli, M.D.

 1   have this for you.

 2        Q.     Oh, okay.

 3              MR. ORENT:  You know what I'd like

 4   to do?  I haven't had an opportunity to look at

 5   it just to make sure that there's nothing

 6   privileged on here, so I'll do that on a break --

 7              MS. GUILFOYLE:  That's fine.

 8              MR. ORENT:  -- so we can mark it as

 9   an exhibit to the deposition.

10              MS. GUILFOYLE:  Okay.

11              Had you finished going through the

12   categories of --

13        A.     Yes.

14        Q.     -- information that you've been

15   provided by Motley Rice?

16              Now, as far as past depositions, do

17   you recall what past depositions you were

18   provided?

19        A.     So some -- so most of the -- some

20   of them I have read, and some of them I haven't,

21   but I was provided Dr. Weisberg's deposition,

22   Dr. Robinson's deposition, Dr. Owen's deposition,

23   Dr. Pinot Hinoul's deposition, and those are the

24   majority of the depositions that I reviewed.

25        Q.     Were you provided other depositions

Neeraj Kohli, M.D.

```
 1   that you opted not to review?

 2        A.      I was provided them, but they were

 3   not -- I didn't -- I wasn't provided them in a

 4   timely enough manner to get them reviewed for

 5   this deposition.

 6        Q.      Okay.  So the four that you said,

 7   Weisberg, Robinson, Owens and Hinoul --

 8        A.      Correct.

 9        Q.      -- are the four that you reviewed.

10        And were these depositions that you

11   specifically requested, or were they depositions

12   that were just given to you by Motley Rice?

13             MR. ORENT:  Objection.

14        A.      They were given to me.

15        Q.      After reading the ones that were

16   given to you by Motley Rice, did you request

17   access to additional depositions?

18        A.      No, the only other depositions I

19   had asked for were if there were any other

20   depositions for other experts for TVT-O, and so I

21   did get Dr. Shavari's TVT-O deposition, and I did

22   get Dr. Rosenzweig's and Dr. Blaivas.

23        Q.      And did you get those depositions

24   prior to preparing your report?

25        A.      No.
```

Neeraj Kohli, M.D.

```
1        Q.      So after you prepared your report?

2        A.      Yes.

3        Q.      Did you ask for them before you

4   prepared your report?

5                MR. ORENT:  Objection.

6        A.      No.

7        Q.      As far as Ethicon documents, can

8   you estimate how many Ethicon documents you

9   reviewed?

10       A.      In terms of number of documents --

11       Q.      Yeah, yeah.

12       A.      -- or pages?

13       Q.      Well, either, whichever is easier

14  for you.

15       A.      I would probably say it is close to

16  2000, 2500.

17       Q.      Okay.  And were these documents,

18  these Ethicon documents, again, documents that

19  were culled out and given to you as opposed to

20  documents that you specifically requested?

21       A.      Correct.

22       Q.      And after reviewing the documents

23  that were provided to you, did you obtain any

24  additional documents?

25       A.      No.
```

Neeraj Kohli, M.D.

1      Q.      Did you request additional

2   documents?

3      A.      No.

4      Q.      Did you review all the documents,

5   Ethicon documents, that were provided to you?

6      A.      Yes.

7      Q.      And what was the general subject

8   matter of those documents?

9      A.      I guess they would be in several

10  broad categories.  One was e-mail correspondences

11  between Ethicon team members and either customers

12  or other team members.  The other would be

13  internal reports.  The other would be educational

14  or promotional or marketing materials.  And that

15  would be the bulk of the documents that I

16  received.

17     Q.      And were the documents that you

18  received, the Ethicon documents, were they during

19  a different specific time frame?

20     A.      Most of them I would characterize

21  were from the early stages of development of

22  TVT-O to probably most recently would be changes

23  in the most recent IFU from 2015.

24     Q.      Okay.  And then you said you were

25  given certain patient education materials, did

Neeraj Kohli, M.D.

1    you say?

2         A.        Yes.

3         Q.        And are you referring to like

4    brochures?

5         A.        Exactly.

6         Q.        And did you review brochures for a

7    certain time period?

8         A.        I was given several brochures.  I'm

9    not sure if I really paid attention to when they

10   were published or printed, but I reviewed any

11   brochures.  And many of them I had already seen

12   because we used them in the past and we've seen

13   them as part of our patient educational

14   materials.

15        Q.        Okay.  And then you also said

16   clinical references.  Are you referring to

17   studies?

18        A.        Clinical studies, yes.

19        Q.        And do you recall what studies you

20   reviewed?

21        A.        Oh, there's a full variety of

22   different studies, and again, they are on the

23   thumb drive.  Some of them were basic science

24   type regarding mesh.  Some of them were clinical

25   comparative studies or observational studies

Neeraj Kohli, M.D.

1  regarding surgical procedures ranging from TVT-O

2  to other surgical procedures.  Some of them were

3  position statements or notices or directives from

4  professional societies.  Again, a lot of that

5  clinical information was information that I had

6  already been exposed to in my general work

7  responsibilities, but they were provided to me in

8  a organized and more compact manner.

9       Q.     Did you review all of those clinic

10 references in conjunction with coming up with in

11 your opinions that are set forth in your report.

12      A.     I reviewed most of them.  Some of

13 this were provided afterwards or I had seen some

14 papers afterwards, and those were not necessarily

15 added into my report.

16      Q.     What do you mean by that, Doctor,

17 some you saw afterwards.  Did you request ones

18 afterwards?

19      A.     No, but in the course of us writing

20 the report, we're continuously reading the

21 literature, doing research, presenting papers,

22 teaching, so I've been exposed to those.  But

23 again, I couldn't tell you exactly or

24 specifically which they were because I didn't

25 bring them into a file saying that this is part

Neeraj Kohli, M.D.

1    of my knowledge base.

2         Q.      And so those are papers that would

3    not be reflected on the thumb drive?

4         A.      Correct.

5         Q.      And when you say "us," when you're

6    talking about preparing the report, who are you

7    referring to?

8         A.      Oh, just me.  I'm sorry.

9         Q.      Now, were there any other

10   categories of documents that we haven't gone

11   through?

12        A.      No.

13        Q.      And when were you retained in this

14   case, Doctor?

15        A.      I think it was the latter half of

16   last year.  Probably October, November.

17        Q.      All right.  Let's just finish out

18   Exhibit 1, if we can.  So we've talked about the

19   thumb drive.  I guess if we go through the

20   categories, we can just discuss whether or not

21   they were covered by what's on the thumb drive or

22   whether Mr. Orent has an objection or.

23               So it looks like number 1 would be

24   the -- category 1 would be the documents that are

25   referenced in the thumb drive?

Neeraj Kohli, M.D.

1      A.      Yes.

2      Q.      All right.  What about category 2?

3      A.      I have not provided an invoice yet,

4   and I would have to go back and -- I haven't even

5   calculated the number of hours.  A lot of this

6   was done in a fairly short time frame, while I

7   was doing other clinical responsibilities.  So I

8   just got the work done, and now I have to go back

9   and do that.  So I don't have necessarily a

10  invoice currently created or the exact number of

11  hours that I spent on the case.

12     Q.      But do you have any ballpark number

13  of hours that you spent?

14            MR. ORENT:  Don't guess.  If you

15  have a reasonable approximation, you can give a

16  reasonable approximation.

17     A.      I mean clearly it was greater than

18  100, but I don't know how many hours we spent.

19     Q.      And the hundred, is that at your

20  hourly rate of -- is it a $1000 an hour?

21     A.      Yes.

22     Q.      And how do you maintain your

23  billing records?

24     A.      Oh, I -- well, I basically look at

25  how much time I've spent, and I basically write

Neeraj Kohli, M.D.

1    down how much time I've spent on a calendar, and

2    then just basically go back and take a look at

3    all that, add up the time we've spent on

4    conversations and any other assorted time I've

5    spent on the case.

6        Q.      So it's fair to say that this would

7    be something that would be easy enough for you to

8    do, to go back to your office and calculate the

9    total number?

10              MR. ORENT:  Objection.

11       A.      Well, I'm going to have to do it to

12   give them an invoice.

13       Q.      Right.

14       A.      You know, when I'm going to do it

15   and when I can get around to doing it, I can't

16   necessarily tell you that.

17       Q.      Okay.  Anyone else in your office

18   work on this case?

19       A.      No.

20    (Whereupon, Deposition Exhibit 2,

21     Curriculum vitae of Dr. Kohli,

22     was marked for identification.)

23       Q.      All right.  Your curriculum vitae

24   I'll show you which has been marked as Exhibit 2.

25              Is that a fair and accurate copy of

Neeraj Kohli, M.D.

1   your updated CV?

2        A.        I think I have a more updated CV

3   which I brought with me.

4        Q.        Okay.

5        A.        Let me just make sure.  Yes.  So

6   this is a more updated CV, and I was going to use

7   this as a reference today, but I'd be happy to

8   give it to you or leave it with you afterwards.

9        Q.        That's fine.  If you could --

10  clearly when you were comparing what's been

11  marked as Exhibit 2 to the one that you brought

12  with you, you were looking for something to see

13  whether it was on the CV or not.  Can you direct

14  me to the additional information that's on the

15  one in front of you and not on what's been marked

16  as Exhibit 2?

17       A.        Oh, yeah.  So I don't update my CV

18  as frequently as I should, but I won the Academy

19  Award in 2012.

20       Q.        Oh, congratulations.

21       A.        Thank you.  So I knew that that was

22  there, on a more recent C.V., and I didn't see it

23  on yours.  So that was one of the things that I

24  looked at, if it was there.

25       Q.        So an Academy Award for what?

Neeraj Kohli, M.D.

1        A.        I was executive producer for best

2    documentary.   Harvey Weinstein bought our film.

3                  MR. ORENT:  Wow.

4                  MS. GUILFOYLE:  Wow.

5        A.        It was a good ride.

6        Q.        What was the film?

7        A.        It was called "Undefeated."  It's

8    about a football -- underprivileged high school

9    football team in Manassas, Tennessee, and the

10   coach and the story.

11       Q.        Oh, congratulations.

12       A.        Thank you.

13       Q.        Okay.  Other than winning the

14   Academy Award, not to, you know, diminish that in

15   anyway, is there anything else --

16       A.        Again --

17       Q.        -- that you saw missing on the

18   version of the CV that I've marked as Exhibit 2?

19       A.        Again, there's probably differences

20   between the two, and one of the reasons is that

21   every few years in terms of my Harvard academic

22   appointment I have to update my CV, and that's

23   really what brings me to update my CV.  So I know

24   that I've added some things to this.  But I just

25   knew that was not there, so that was one of the

Neeraj Kohli, M.D.

1   things that was a red flag.  But, again, I'm

2   happy to give you a copy of my updated CV.

3          Q.      Any recent publications that you've

4   done on TVT-O?

5          A.      Not recent, no.

6          Q.      Do you know when the last date of

7   your publication on TVT-O was done?

8          A.      I'm not even sure if we've really

9   done any specific publications on TVT-O.  We have

10  done -- I have done review articles and grand

11  rounds about in general urogynecology, whether it

12  be surgical or non-surgical procedures, and it

13  may have been mentioned in that, but I can't

14  remember right off the top of my head if there

15  was a recent -- that we did any kind of recent

16  clinical paper specifically on TVT-O in a

17  singular or a comparative nature.

18         Q.      Okay.  So is it fair to say that

19  what's been marked as Exhibit 2 is generally a

20  fair and accurate representation of your resume?

21         A.      In terms of TVT-O, yes.

22         Q.      Right, okay.  So let's look at

23  number 5.

24         A.      So that is included -- oh, 5.  4 is

25  done.

Neeraj Kohli, M.D.

1      Q.      Right.

2      A.      That is part of my expert report.

3   (Whereupon, Deposition Exhibit 3,

4    Expert report of Dr. Kohli,

5    was marked for identification.)

6      Q.      (BY MS. GUILFOYLE) Okay.  So your

7   expert report which actually I'll show you which

8   is marked as Exhibit 3.

9      A.      Yes.

10      Q.      And that's near the end of your

11   expert report you have a list of cases?

12      A.      Correct.

13      Q.      And is that a fair and accurate

14   representation of all the cases in which you've

15   given either deposition or trial testimony in the

16   past four years?

17      A.      Yes.

18      Q.      Okay.  There are no cases missing

19   from that?

20      A.      To my knowledge.  I don't believe

21   so.

22      Q.      Do you keep a list of cases in

23   which you've given trial or deposition testimony,

24   Doctor?

25      A.      I don't.  What I usually do is I

Neeraj Kohli, M.D.

1    usually search my calendar, and usually it will

2    say trial or deposition, and that's what I

3    usually use.

4         Q.      So if you were deposed, for

5    example, in 2015, you would remember that, right?

6         A.      Right.

7         Q.      And having reviewed the list of

8    cases, you believe that's fair and accurate?

9         A.      I believe so, yes.

10        Q.      What about number 7, graphics,

11   testing, recordings, spreadsheets?

12        A.      I have none of those.

13        Q.      Category 8?

14        A.      I have none of those.

15        Q.      And number 9, is it fair to say

16   that's what been marked as Exhibit 3 is a fair

17   and accurate copy of your final report?

18        A.      It is.

19        Q.      Category number 10?

20        A.      I have none of those.

21        Q.      Number 11?

22        A.      Testing done by me.  I have done no

23   testing.

24        Q.      Okay.

25        A.      Again, no testing for number 12.

Neeraj Kohli, M.D.

1       Q.       13?

2       A.       We have no plaintiff in this case.

3       Q.       Right.  14, communications

4    reflecting.

5       A.       I've had no communication with any

6    other experts.

7       Q.       Okay.

8       A.       Again, 15 --

9       Q.       Right, is on the thumb drive.

10      A.       Thumb drive.

11      Q.       Okay.

12      A.       16, all of my opinions are

13   supported with the literature in reference on my

14   Rule 26.

15      Q.       Okay.  Do you have copies of any of

16   your deposition transcripts at your office or

17   elsewhere?

18      A.       From previous trials?

19      Q.       Right.

20      A.       I do.

21      Q.       Okay.  And do you maintain those in

22   a certain file?

23      A.       They're either maintained in a

24   certain file or they're part of a e-mail trail

25   with the lawyers.  Some of them I --

Neeraj Kohli, M.D.

```
 1              MR. ORENT:  Note my objection.

 2       A.       Some of them I got copies, and some

 3   of them I didn't get copies of my depositions.

 4       Q.       Okay.  How many times have you

 5   testified, Doctor, at a deposition?

 6       A.       You mean taken a deposition?

 7       Q.       Been deposed, yeah.

 8       A.       I would say probably about 10 to 12

 9   times.

10       Q.       And of those 10 to 12 times, how

11   many of those occasions have been as an expert

12   witness?

13       A.       I would say the vast majority of

14   them.

15       Q.       And do you know the distinction I'm

16   drawing between like a treating physician and an

17   expert?

18       A.       Yes.  I was just about to say I

19   think one of the cases I was a treating

20   physician, maybe two of the cases.  But I would

21   say probably, I would have to guess, between 9

22   and 10 of those would be as an expert.

23       Q.       Okay.  And in the cases where you

24   were a treating physician, is it fair to say that

25   you were not being deposed because you were a
```

Neeraj Kohli, M.D.

1    defendant in the case?

2         A.      Correct.

3         Q.      Okay.

4         A.      Touch wood.

5         Q.      All right.  And then what about

6    trial testimony, do you know how often you've

7    testified at trial?

8         A.      I would have to guesstimate four or

9    five times.

10        Q.      When's the most recent time you

11   have testified at trial, Doctor?

12        A.      That probably would have been at

13   the Miklos case in Atlanta which is on my --

14        Q.      Yes, it is on your --

15        A.      -- Rule 26.  And I think that was

16   probably two years ago, maybe.  2012, 2013.

17        Q.      What was the Miklos case about?

18        A.      The Miklos case was a med mal case

19   where the patient had a prolapse and Dr. Miklos

20   put in a mesh sacral colpopexy, and then she had

21   pain issues and recurrence afterwards, and she

22   brought a case against him regarding his

23   treatment.

24        Q.      And you testified on behalf of

25   Dr. Miklos?

Neeraj Kohli, M.D.

1        A.        Correct.

2        Q.        What was the product that was used

3    in that case?

4        A.        Oh, I don't know which mesh he

5    used.

6        Q.        Right.

7        A.        I apologize.  Again, it wasn't

8    focussed on the company or the actual product,

9    more on the diagnosis and treatment of the

10   condition.

11       Q.        Sure.  Fair enough.  I just wanted

12   to know if you recalled.

13                 What about 19?

14       A.        No.  Again, any graphics that I

15   used I included in my Rule 26.

16       Q.        Okay.  So the diagrams that you

17   have that are in there and stuff are what you're

18   referring to?

19       A.        Correct.

20       Q.        All right.  21?

21       A.        I don't have any Ethicon products

22   that I used.

23       Q.        22?

24       A.        Again, nothing relevant to this

25   case.

Neeraj Kohli, M.D.

1          Q.          Okay.  23?

2          A.          I don't have any pending

3     publications or draft submissions currently, so

4     that would be not applicable.

5          Q.          All right.  24?

6          A.          Most of my presentations are all

7     included in my CV.

8          Q.          Okay.  Are there any ones that you

9     did relative to TVT-O that are not included in

10    your CV?

11         A.          There may be some done many years

12    ago.  Again, TVT-O is not a very contemporary

13    product in terms of my usage or education or

14    discussions currently.  So I can't remember the

15    last time -- it would have been at least two

16    years is the last time where I've ever even

17    mentioned TVT-O in a presentation.

18         Q.          Would there be some reason why,

19    Doctor, though, that you would include -- that

20    you wouldn't have included it on your CV?

21         A.          Again, I give so many talks, and we

22    are so busy doing so many different things

23    that -- and the reality is after your CV is 50

24    pages, most people don't look at a lot of it.

25    And so given that we give so many grand rounds

Neeraj Kohli, M.D.

1  and those kinds of talks, sometimes I don't

2  include every single talk that I've put in.

3       Q.      Okay.  And I guess my question

4  really is did you make a decision not to include

5  certain talks or presentations that you did with

6  respect to TVT-O on your CV?

7       A.      No.

8       Q.      All right.  The next category,

9  communications to and from medical societies?

10       A.      I don't have any communications.

11              25, I don't advertise my

12  availability as an expert or consultant in

13  litigation.

14              Syllabus and texts, number 26,

15  again, I don't have those available, but they

16  have not been relevant or germane to TVT-O.

17       Q.      Okay.  27, is there anything other

18  than what's on the --

19       A.      Correct, I've never given any prior

20  testimony, statements or presentations to any of

21  those organizations.

22       Q.      Okay.

23       A.      28 is on the thumb drive.

24       Q.      Okay.  Is there anything that's not

25  on the thumb drive, Doctor, that is part of your

Neeraj Kohli, M.D.

```
1    file in this case?

2         A.      No.

3         Q.      Okay.

4         A.      And then --

5         Q.      29, you know, talks about

6    communications to and from counsel.  And I guess

7    what I'm interested in knowing is whether you in

8    fact have communications to and from counsel that

9    obviously are not included on your thumb drive?

10               MR. ORENT:  I'm going to object to

11   that.  My understanding is that we've not given

12   any hypotheticals and that there are no facts or

13   assumptions underlying it, so that's in a

14   non-relevant category.  And relative to

15   compensation, the Doctor has already testified

16   that he's yet to produce any bills, so there are

17   no documents responsive to that --

18               MS. GUILFOYLE:  Okay.  Well, let me

19   ask --

20               MR. ORENT:  -- and so we object --

21               MS. GUILFOYLE:  Okay.

22               MR. ORENT:  -- to other documents.

23        Q.      (BY MS. GUILFOYLE) Let me ask you,

24   Doctor, have you -- in conjunction with preparing

25   your report that's marked as Exhibit 3, did you
```

Neeraj Kohli, M.D.

1  prepare drafts and exchange them with plaintiffs

2  counsel?

3              MR. ORENT:  I'm going to instruct

4  him not to answer that question on the basis of

5  the Rule 26 as amended in December of 2010.  I

6  think it's the 2010 amendments going forward make

7  that privileged.

8       Q.       (BY MS. GUILFOYLE) Doctor, did you

9  prepare multiple drafts of the report?

10      A.       No.

11      Q.       You just prepared one draft?

12      A.       And there were -- I think there

13  were some typos and some verbiage that was just

14  revised because, more for typo, but there was no

15  material changes in my Rule 26.

16      Q.       Okay.  And did you have an

17  understanding as to what categories needed to be

18  addressed in the Rule 26 disclosure --

19              MR. ORENT:  Objection.

20      Q.       -- or what was expected to be

21  contained in the report?

22              MS. GUILFOYLE:  I'm asking him

23  personally.

24              MR. ORENT:  Okay.  So you can

25  answer with respect to your understanding but not

Neeraj Kohli, M.D.

1    the substance of communications with counsel.

2              So, in other words, you should not

3    repeat conversations you've had, but you can give

4    your understanding as to what was suppose to be

5    in the report.

6         A.      So I was instructed or counseled

7    that what my opinions were about TVT-O and how

8    the procedure was is what I should concentrate

9    on, and so all of the opinions that I have in my

10   Rule 26 were all my opinions of what I felt TVT-O

11   was --

12        Q.      Okay.

13        A.      -- and then data that supported

14   those opinions.

15        Q.      And then short of just changing

16   some verbiage and typos, you never made any

17   changes once you drafted the initial report; is

18   that your testimony?

19        A.      Correct.

20        Q.      Can you briefly just describe for

21   me your formal educational background?

22        A.      Yes.  I completed high school in

23   Holliston High School, 1985.  When you're an

24   Indian male, you have a choice of becoming an

25   engineer or a doctor.  My father was an engineer.

Neeraj Kohli, M.D.

1    My grandfather was a doctor.  I thought I looked

2    good in white, so out of high school I decided I

3    wanted to be a doctor, and I got admitted into

4    the six-year med program at BU.  I did my

5    undergrad in two years.  I had a guaranteed

6    admission into med school right out of high

7    school, and then I did my medical school at

8    Boston University.

9              Following that applied to different

10   areas for residency.  I've always kind of been a

11   family oriented person and decided to stay in

12   Boston and did my four-year residency at Beth

13   Israel Hospital in Boston affiliated with Harvard

14   Medical School.

15             During that time period, I had the

16   privilege of working with David Staskin who is a

17   world renowned female urologist who said that

18   you've good hands, don't waste them, and the next

19   thing I knew I entered the fellowship of

20   urogynecology at Mickey Karram.  It was the one

21   place that I interviewed because it was a last

22   minute decision, and I was privileged enough to

23   spend two years with Mickey.  I learned a lot.

24   He offered me the opportunity to stay on with him

25   as a partner, which I did for about a year and a

Neeraj Kohli, M.D.

1    half.

2              At one point I started thinking

3    maybe I'll stay here, and we started looking for

4    houses, or I started looking for houses.  And in

5    Cincinnati if you want to have a nice house, you

6    live on the Kentucky side so you can see

7    Cincinnati.  And when my friends in the northeast

8    realized I might actually be moving to Kentucky,

9    they gave me a lot of flak, and then I decided to

10   come back to Boston.

11             I came back, and I joined Peter

12   Rosenblatt at Mount Auburn Hospital.  At that

13   time, many urogynecologists were leaving Boston,

14   and so even though we were at Mount Auburn

15   Hospital, I had the opportunity to provide urogyn

16   services to Tufts New England Medical Center and

17   Beth Israel, and I was co-division chief of both

18   of those areas.

19             During the six-year program, I

20   double majored in economics and premed, so I

21   always wanted to do my MBA.  So I did the

22   executive MBA program at Kellogg.  I did that for

23   two years while I was still practicing.  And as

24   soon as I finished, six months following that the

25   Brigham & Women's called me up and said we're

Neeraj Kohli, M.D.

```
 1    looking for a new division chief, and we'd like
 2    you to throw your name in the hat.  I applied for
 3    that position, was privileged to get that
 4    position.  So I started the division as well as
 5    the fellowship at Brigham & Women's.  I was there
 6    for seven to eight years.  We built up one of the
 7    busiest urogyn divisions in the country.  I
 8    continued to train fellows, had a great time.
 9                  And my father had passed away
10    during that time period, and I decided that I
11    wanted to have a better work life balance, and I
12    wanted to pursue some more entrepreneurial
13    activities, so I resigned my position at the
14    Brigham at that time while maintaining my Harvard
15    academic affiliation.
16                  I'm currently in private practice
17    as medical director for Boston Urogyn, but it
18    allows me more time to spend with my family as
19    well as more time to do some of these other
20    entrepreneurial activities.
21        Q.       Okay.  Thank you, Doctor.
22        A.       You're welcome.
23        Q.       So you are board certified in what
24    areas?
25        A.       Ob-gyn and female reconstructive
```

Neeraj Kohli, M.D.

1  pelvic surgery.

2      Q.      Do you currently implant mesh?

3      A.      Yes.

4      Q.      And when did you first start to

5  implant mesh?

6      A.      That would probably be during my

7  training.

8      Q.      Okay.  As a resident?

9      A.      As a resident, we would do some

10  slings.  The traditional techniques of slings

11  because minimally invasive midurethral slings

12  weren't there then.

13      Q.      Okay.

14      A.      But also during my fellowship we

15  did a lot of sacral colpopexies as an open

16  approach, so we did implant mesh during that time

17  period as well.

18      Q.      Do you currently implant any

19  midurethral slings?

20      A.      Yes.

21      Q.      Do you -- what type of slings do

22  you implant?

23      A.      Although I have done many in the

24  past, currently we do only retropubic suburethral

25  slings.

Neeraj Kohli, M.D.

1      Q.       And how long have you been --
2   limited your sling practice to retropubic?
3      A.       I would have to guess.  Probably
4   the last five, six years.
5      Q.       And is there a particular
6   manufacturer or brand sling that you implant?
7      A.       We currently use the Gynecare TVT
8   at one of our hospitals, and I use the Boston
9   Scientific Prolift -- I'm sorry.  Advantage Fit
10   at one of our other hospitals.
11      Q.       And how many times per month or per
12   year if it's easier would you estimate you
13   implant a suburethral sling?
14      A.       I'm probably doing anywhere from 15
15   to 25 slings a month.
16      Q.       And that would be any combination
17   of those two manufacturers?
18      A.       Yes.
19      Q.       And those slings are both made out
20   of polypropylene mesh, correct?
21               MR. ORENT:  Objection.
22      A.       Yes.
23      Q.       Was there a certain period of time,
24   Doctor, if any, when you implanted the TVT-O?
25      A.       Yes.

Neeraj Kohli, M.D.

1     Q.       Okay.  And during what time frame

2  did you implant the TVT-O for?

3     A.       I think we -- and again, this is

4  just based on my recollection.  The first two or

5  three years after TVT-O was introduced, which I

6  believe was in 2003, 2004, we were implanting

7  TVT-O at that point and then stopped thereafter.

8     Q.       So roughly 2003, 2004 to 2006?

9     A.       Yeah, 2005, 2006.

10    Q.       And when you were implanting the

11 TVT-O sling, do you have an estimate as to how

12 many times per month on average you implanted

13 that sling?

14    A.       I don't have an estimate on how

15 many times per month, but I would say that I've

16 probably done between 50 and 100 TVT-O slings.

17    Q.       Total?

18    A.       Total.

19    Q.       And do you record that information

20 anywhere?  Would that be something that you could

21 go back and look at to get the exact number or

22 not?

23    A.       So one of the problems has been is

24 that in the last 15 years I've gone from one

25 hospital system to another to another, and

Neeraj Kohli, M.D.

```
 1    oftentimes we -- in those days we were using
 2    Outlook which tended to be hospital specific.
 3         Q.       Mm-hmm.
 4         A.       And I didn't have the foresight to
 5    say that when I'm leaving the hospital I'm going
 6    to download all of my e-mails and all of my
 7    calendar data which was in Outlook.  So I have
 8    lost access to many of those.
 9              Now as we go to a cloud-based
10    system, it's a little easier to keep those, but
11    unfortunately, I don't have access to that data
12    which would still be in a previous institution.
13         Q.       Sure.  Now, I'm not saying, Doctor,
14    that you should or you shouldn't have it.  What
15    I'm asking you really is whether you do have
16    access to that?
17         A.       I don't.
18         Q.       Okay.  And of those 50 to 100
19    people that you implanted the TVT-O, how many, if
20    you can recall, had complications?
21         A.       What do you mean by complications?
22    In terms of intraop --
23         Q.       Complications that you
24    attributed --
25         A.       -- postoperatively --
```

Neeraj Kohli, M.D.

1        Q.        Yeah, postoperatively that you

2    attributed to the TVT-O sling.

3                 MR. ORENT:  Objection, form.

4        A.        It's hard for me to recall that

5    number right now off the top of my head.

6        Q.        How about a ballpark number?

7                 MR. ORENT:  Objection.  If you can

8    provide a reasonable approximation, you can do so

9    but don't guess.

10       A.        Yeah, I would really be guessing

11   given the number of the many procedures we were

12   doing during that time period, different types of

13   slings, different products of slings.  So it

14   would be really a guess for me to say how many

15   complications we had during that time period.

16       Q.        Okay.  So there's no way that you

17   could go back and recreate that information?

18       A.        No.

19       Q.        All right.  During that time frame

20   when you were implanting the TVT-O sling, were

21   you implanting other slings as well?

22       A.        Yes.

23       Q.        And what other slings were you

24   implanting at the same time?

25       A.        Again, we were doing retropubic

Neeraj Kohli, M.D.

1    slings --

2         Q.        Mm-hmm.

3         A.        -- and we were doing transobturator

4    slings outside in.

5         Q.        So which manufacturer were you

6    using?

7         A.        During that time period because we

8    were at multiple hospitals, we would always use

9    different manufacturers so that the residents and

10   the fellows could get good experience and then we

11   could also have good experience.

12                  So in the past, we've used various

13   manufacturers.  It's hard for me to remember

14   exactly during that time frame which

15   manufacturers.  But in the past we've used

16   Coloplast, we've used AMS --

17        Q.        That's like the SPARC sling?

18        A.        No, the AMS Monarc sling.

19        Q.        Oh, the AMS Monarc, okay.

20        A.        We've used a Bard sling.  Again,

21   you asked specifically about the TOT.

22        Q.        Right.

23        A.        We used Gynecare, and we used

24   Kildare.  As well as the Boston Scientific.

25        Q.        And what was that?

Neeraj Kohli, M.D.

1      A.      I think that's called the Lynx.

2      Q.      Lynx?

3      A.      Again, all of these were

4  transobturator outside in.

5              MR. ORENT:  I think it's the

6  Obtryx.

7              THE WITNESS:  It was Obtryx, yes.

8  Lynx is another one.  It's a prepubic.

9      Q.      And when you say "we," are you

10  referring to your practice?

11     A.      It's me, my fellows, my residents.

12     Q.      Okay.  So when you're talking about

13  the numbers, you're referring to your group

14  collectively or are you referring to you,

15  yourself?

16     A.      Me as the surgeon.

17     Q.      Okay.  So the 50 to 100 TVT-O was

18  you, not your group?

19     A.      Yes.

20     Q.      What about your group, do you have

21  a sense of how many TVT-Os your group implanted?

22              MR. ORENT:  Objection.

23     A.      I don't.  I never keep a track of

24  what my partner or partners were doing and what

25  cases they're doing.

Neeraj Kohli, M.D.

1      Q.      And what was the reason, Doctor,

2  that you stopped using the TVT-O sling, if there

3  was a specific reason?

4      A.      I felt it was not as safe as some

5  of the other transobturator techniques.

6      Q.      And why is that?

7      A.      Well, I did a lot of training for

8  Gynecare during that time period, and one of the

9  things that really left a mark on me is we did a

10  cadaver lab at Newton-Wellesley Hospital --

11      Q.      Yeah.

12      A.      -- and May Wakamatsu who was the

13  chief of urogynecology at MGH was one of the

14  participants.

15      Q.      Right.

16      A.      Now, here's a woman who has a lot

17  of knowledge of the anatomy, has a lot of

18  experience doing surgical procedures for

19  incontinence, and I remember vividly that I was

20  teaching her at my cadaveric station, and she put

21  the needle in, and she turned the handle parallel

22  to the floor, and when she advanced the needle,

23  it came out retropubically.  And at that point I

24  realized training other doctors on this technique

25  was complicated and complex and could cause

Neeraj Kohli, M.D.

1    complications.

2              In addition, my continued knowledge

3    of the procedures really told me in my experience

4    that I thought the outside in was safer.

5         Q.      Okay.  Did you have any trouble

6    using the TVT-O sling when you were implanting

7    it, Doctor?

8         A.      To my recollection, I don't

9    remember any obvious complication, but if I felt

10   like it was a risky procedure and there was a

11   safer alternative, in the best interests of my

12   patients I didn't feel like I could continue

13   using it.

14             In addition, I had a discussion

15   with Gynecare during that time period because all

16   the other companies had a transobturator

17   outside-in approach, and I felt like Gynecare's

18   discussions with me about why the inside-out

19   approach was better didn't seem valid in my mind,

20   and for those reasons we stopped using the

21   product.

22        Q.      Now, are the discussions that

23   you're referring to set forth in your Rule 26

24   report?

25        A.      They are.

Neeraj Kohli, M.D.

1       Q.      Did you have any other discussions

2   other than what's set forth in your Rule 26

3   report with Gynecare with respect to the TVT-O?

4       A.      No, that was -- they're fully

5   reflected in my Rule 26.

6       Q.      So no further discussions?

7       A.      Not to my recollection.

8       Q.      Well, do you have any reason to

9   believe, Doctor, that you had other discussions

10  but they're not reflected in your report?

11      A.      No.

12      Q.      At a certain point in time, did you

13  stop -- well, strike that.

14              At a certain point in time, did you

15  do preceptor training for Ethicon or Gynecare?

16      A.      Yes.

17      Q.      And during what time frame did you

18  do that?

19      A.      We were very active doing training

20  from the initial introduction of Gynecare TVT all

21  the way to TVT-O and then stopped or reduced our

22  activities with Gynecare about that time and as

23  Prolift was coming out.

24      Q.      Did you do any preceptor training

25  for Prolift?

Neeraj Kohli, M.D.

1      A.      I don't recall whether we did.  I

2  don't think so.

3      Q.      Okay.  Did your position with

4  respect to the TVT-O sling, was that impacted in

5  any way with the decision not to have as much

6  training you set forth in your report?

7              MR. ORENT:  Objection to form.

8      Q.      Yeah, that is a bad question.

9              In your report, Doctor, I note that

10  you make a reference to a decrease in training by

11  Ethicon and a reference to an increased amount of

12  training by sales reps.  Do you recall that in

13  your report?

14      A.      Yes.

15      Q.      Did your opinion as to the safety

16  and efficacy of the TVT-O sling change as a

17  result of Ethicon or Gynecare's change in

18  training?

19      A.      Well, I felt like the TVT-O was not

20  a safe procedure.  One because of the

21  instrumentation, two because of the anatomic

22  procedural content, and then three also because

23  of the educational program.

24      Q.      But at a certain point in time,

25  Doctor, you implanted between 50 to 100 TVT-O

Neeraj Kohli, M.D.

1    slings, correct?

2         A.        Yes.

3         Q.        I'm trying to figure out what was

4    it that all of a sudden made you decide I'm not

5    going to use it anymore.

6                   MR. ORENT:  Objection, asked and

7    answered.

8         A.        And, again, I think I answered that

9    question.  It was a combination of doing the

10   cadaver lab and seeing how complicated the

11   instrumentation was, seeing that the anatomy and

12   how the procedure was being done in relationship

13   to the anatomy was not as safe as the

14   alternatives, as well --

15        Q.        What do you base that on?

16        A.        Based on my knowledge of the

17   anatomy and some of the things that I did talk

18   about in the TVT-O report as well as subsequent

19   papers that have come around in talking about

20   anatomic relations and what the risk structures

21   are in that space.

22        Q.        As far as the --

23                  MR. ORENT:  Hold on.  Were you done

24   with the answer to that question?

25                  THE WITNESS:  Yes.

Neeraj Kohli, M.D.

1    Q.      As far as the complaint made by or

2    your observation with respect to the cadaver lab

3    at Newton-Wellesley, was that the only

4    observation that you made that caused you concern

5    about the TVT-O?

6    A.      No, I think that was a very vivid

7    memory --

8    Q.      Okay.

9    A.      -- and I think it really stuck with

10   me given who it was and what we were seeing.  But

11   I have had the opportunity to see hundreds of

12   physicians in cadaver labs as well as during our

13   surgical preceptorships and what their knowledge

14   base is and the kinds of questions that they ask,

15   and I just felt as a combination of many of those

16   things TVT-O was not a very applicable product to

17   the broad generally trained gynecologist, and I

18   just felt that it was not a very safe product in

19   relationships to the other products that were

20   available.

21   Q.      That's your personal opinion?

22   MR. ORENT:  Objection.

23   A.      Correct.

24   Q.      Do you know whether the doctor at

25   Mass. General, for example, went on and implanted

Neeraj Kohli, M.D.

```
 1   a TVT-O sling?

 2        A.      I don't.

 3        Q.      Did any doctors that you did any

 4   training with at the cadaver lab or otherwise

 5   with the TVT-O ever voice any concerns to you

 6   about it?

 7        A.      I remember in the group that we

 8   were at -- and again, I don't know which doctors

 9   were in that group -- many of them that was a

10   little scary to them about where the needle came

11   out and where it should have come out, so I do

12   remember that.  Again, I just don't have the

13   details on who those doctors were.

14        Q.      But it's fair to say, Doctor, with

15   any new procedure there's always some

16   apprehension about how it works, and how

17   successful it will be; is that fair to say?

18              MR. ORENT:  Objection.

19        A.      Yes.

20        Q.      So you can't tell me today that

21   these concerns that you just voiced were nothing

22   more than that, can you?

23              MR. ORENT:  Objection, misstates

24   his prior testimony.

25        A.      Repeat the question for me.
```

Neeraj Kohli, M.D.

1      Q.      Sure.  Do you need the prior

2  question?

3      A.      No.

4      Q.      Okay.  You can't tell me that the

5  comments or apprehensions that -- the comments

6  that they made were anything other than the

7  apprehension felt with a new procedure or a new

8  product?

9              MR. ORENT:  Objection.

10     A.      Correct.  Part of it was me, my

11  apprehension as somebody who had been a surgical

12  preceptor for over a thousand physicians in the

13  past and seen how they did these procedures for

14  the first time or the second time in the cadaver

15  lab and how they were doing this procedure in a

16  comparative fashion.

17     Q.      When did you stop using the TVT-O

18  in relationship to when you stopped receiving

19  compensation for being a preceptor?

20             MR. ORENT:  Objection.

21     A.      I don't think there was a

22  correlation to that.  And, in fact, part of it

23  was is that up 'til then we had, me and a few

24  other physicians, had been the core team where

25  all Gynecare technology was being discussed,

Neeraj Kohli, M.D.

1    developed, trialed, researched, taught, and so I

2    know that there was talk of us also being

3    involved in the Prolift and being involved in the

4    teaching and training of that procedure, but that

5    was another procedure that I didn't feel

6    comfortable with.  So it wasn't the availability

7    of compensation or teaching opportunities.  It

8    was more my own apprehension and anxiety about

9    the procedures.

10        Q.     Okay.  Did you -- but it's fair to

11   say that you stopped receiving compensation from

12   Ethicon and Gynecare?

13        A.     Well, when I stopped using the

14   product, there was no preceptorships to be done

15   if I wasn't using the product, so that is a true

16   statement.

17        Q.     Okay.  Is it your testimony that

18   because you decided to stop using the product

19   that was why you stopped being retained as a

20   preceptor or hired as a preceptor?

21             MR. ORENT:  Objection.

22        A.     Yes.

23        Q.     Do you agree that one of the goals

24   of a urogynecologist is to advance the care of

25   women?

Neeraj Kohli, M.D.

1          MR. ORENT:  Objection.

2       A.      I think that's a very vague

3   question, and the reason being is that not all

4   advancements are good, safe or effective.  I

5   think some advancements are better for patients

6   in terms of safety, efficacy outcomes, and there

7   are some advancements that aren't, and I think

8   part of our job as clinicians is to do what's

9   best for our patients and do no harm and be

10   critical about technology and advancements in

11   medicine, and sometimes wait for appropriate data

12   before we decide to either go further or to adopt

13   or not adopt any advancement that's proposed.

14       Q.      Did you ever participate in any

15   clinical trials for the TVT-O?

16       A.      I can't remember, and I don't think

17   we did.

18       Q.      I certainly will defer to you to

19   look at your resume.  I can tell you that I did

20   not see any mention of that.

21       A.      Yeah, I don't think we did any

22   clinical trials of the TVT-O.

23       Q.      Okay.  Did you ever participate in

24   any peer-reviewed studies on the use of the

25   TVT-O?

Neeraj Kohli, M.D.

```
1         A.       Let's see here.  I don't believe we
2    did.  Yeah, I don't think we've written, again,
3    any peer-reviewed studies analyzing the TVT-O.
4         Q.       Are you familiar with other studies
5    that have been peer reviewed analyzing the TVT-O?
6         A.       Yes.
7         Q.       Are you familiar with other studies
8    involving like mata-analyses?
9         A.       Yes.
10        Q.       Do you know what the term
11   mata-analyses means?
12        A.       Meta-analyses?
13        Q.       Meta.
14        A.       Yes.
15        Q.       What does that mean, Doctor?
16        A.       It essentially means looking at a
17   series of different papers that have been done
18   and pooling that data and doing an analysis of
19   that data in order to increase sample size as
20   well as the number of operators or physicians
21   presenting that data.
22        Q.       And do you rely on those in your
23   practice, Doctor?
24        A.       We rely on a variety of
25   information, clinical research, meta-analyses,
```

Neeraj Kohli, M.D.

1    personal experience, but that would be one of the

2    components of something we would look at in terms

3    of data?

4         Q.     As far as like starting with what

5    you consider the most reliable; is that a

6    clinical trial?

7              MR. ORENT:   Objection.

8         A.     And again, there are different

9    types of research that are graded as far as

10   levels of evidence.  The literature talks about

11   Level I evidence being a randomized prospective

12   controlled trial.

13        Q.     Mm-hmm.

14        A.     Typically the randomization is

15   typically key.  So Level II data would be a

16   prospective trial with a cohort or case control,

17   but it's not randomized.

18        Q.     Mm-hmm.

19        A.     Level III data would be more

20   retrospective with again a case control.  And

21   Level IV data would be more of a case series

22   which is more of an observational study.

23        Q.     Okay.

24        A.     A meta-analysis can be categorized

25   as Level I or Level II depending on the types of

Neeraj Kohli, M.D.

```
 1    studies that they increase -- that they include.
 2         Q.      Okay.  So when you say Level I,
 3    you're talking about -- if you go Level I to IV,
 4    Level I being like the top?
 5         A.      Yes.
 6         Q.      Or the gold standard?
 7                 MR. ORENT:  Objection to the use of
 8    the term gold standard.
 9         A.      It's a ranking --
10         Q.      Right.
11         A.      -- in terms of how strong would a
12    study be in its design.  It doesn't necessarily
13    imply that its conclusions are valid because the
14    study design may be appropriate but the power of
15    the study or the length of follow-up may restrict
16    the applicability of its conclusions.
17                 So if you have a study which is a
18    Level I study which has 50 patients in each arm
19    and they followed them for one year --
20         Q.      Right.
21         A.      -- Level I is good, but the 50
22    patients in each arm may not have been a
23    sufficient number of patients to draw the
24    conclusions, as well as the fact that your
25    conclusions are only good for that one year
```

Neeraj Kohli, M.D.

1   because beyond that we don't know what happens.

2        Q.      Would you agree with me, Doctor,

3   that a Level I study is better than just an

4   observational study?

5              MR. ORENT:  Objection, incomplete

6   hypothetical.

7        A.      Well, again, it's a little bit of

8   an apples and oranges because a Level I study

9   design is better than a Level IV observational

10  study design, but if you have 50 patients in each

11  arm for a Level I and you have 1500 patients in

12  the Level IV, each of those studies has their

13  pros and cons.

14       Q.      Are you a member of the

15  International Urogynecological Association?

16       A.      Yes.

17       Q.      And also the American

18  Urogynecological Association?

19       A.      Yes.

20       Q.      And you have been a member since

21  around 1996?

22       A.      Yes.

23       Q.      And do you consider those

24  organizations important organizations in your

25  field?

Neeraj Kohli, M.D.

1      A.      Yes, I think they're organizations

2  which allow an exchange of ideas.  They promote

3  the field of urogynecology and encourage research

4  and, again, an exchange of ideas.

5      Q.      Have you served on any particular

6  committee or board on either of those

7  organizations?

8      A.      So I was part of the coding and

9  nomenclature board of AUGS, and then I'm

10  currently on the mesh special interest group of

11  AUGS.

12      Q.      What is the mesh special interest

13  group?

14      A.      So sometimes organizations will

15  take certain topics or procedures and say we need

16  more focus on these topics or procedures, and

17  then they'll create a special interest group

18  which is a panel of doctors who have interest or

19  expertise in exploring this on behalf of the

20  organization, creating studies serving as an

21  interaction between industry and the

22  organization, potentially doing scientific

23  analyses, position statements and other

24  scientific endeavors.

25      Q.      In conjunction with your role on

Neeraj Kohli, M.D.

1    this special interest group, have you prepared or

2    participated in the preparation of any special --

3    any papers or --

4          A.      Not a --

5          Q.      -- position statements or --

6          A.      So I know we were involved in the

7    position statement that AUGS brought out in terms

8    of --

9          Q.      Mesh?

10         A.      -- mesh and slings recently.

11               At most of our meetings, it's an

12   open forum so that we have an agenda of what

13   we're going to discuss, and people can present

14   and come and ask questions and see how we're

15   addressing things.  And if the organization has

16   specific questions or challenges or projects in

17   our specific field of interest, then they would

18   talk to us about that.

19         Q.      So as a member of the mesh special

20   interest group, did you participate in the

21   drafting of any of those position statements?

22         A.      Just -- not specifically, in terms

23   of we were able to provide input or basically,

24   you know, say, yes, I want to participate or not

25   I want to participate.

Neeraj Kohli, M.D.

1    Q.      What do you mean, yes, you want to

2  participate or no, you don't?

3    A.      In the sense that they actually had

4  a core group of people who were doing it, and

5  then they said that if you want to be involved,

6  you can be involved.  If you don't want -- the

7  special interest group is oftentimes a very

8  flexible committee which allows you, because

9  everybody has different interests and they're

10 also busy at different times.  So they can

11 actually either elect to participate or not

12 participate depending on their level of interest

13 and time available for certain projects.  So in

14 the AUGS position statement for slings, I did not

15 actively participate in that.

16    Q.      Okay.  Now, I may have asked you

17 this before from the beginning, but I just want

18 to just make sure that I have.

19              When were you retained?

20              MR. ORENT:  Objection.

21    A.      I think it was in November or

22 December of last year.

23    Q.      And were you retained by Motley

24 Rice?

25    A.      Yes.

Neeraj Kohli, M.D.

1      Q.      And have you been retained by

2  Motley Rice in other cases to serve as an expert

3  witness?

4      A.      So --

5              MR. ORENT:  Objection.  And,

6  Doctor, to the extent that you may or may not be

7  working on other projects where you have not

8  disclosed an opinion, that is considered work

9  product, and I would instruct you not to answer

10  to the extent that you may or may not be working

11  on anything that is not before the court or been

12  disclosed.

13              MS. GUILFOYLE:  Okay.  I think I'm

14  entitled to know whether or not he's been

15  retained by your firm, and if so, on how many

16  cases and information like that.  Are you taking

17  the position that's protected?  'Cause I don't

18  believe it is.

19              MR. ORENT:  I think he can answer

20  yes or no to that question, but the substance of

21  any opinions, if there are any, would certainly

22  be privileged.

23              MS. GUILFOYLE:  I'm not asking him

24  about the substance.

25              MR. ORENT:  Okay.  Or the

Neeraj Kohli, M.D.

1    identities of any other defendants or things like

2    that.  Any details beyond yes or no.  Well, let's

3    just take it -- take it with this question first.

4                    MS. GUILFOYLE:  Right.

5                    THE WITNESS:  Can you repeat the

6    question?

7                    MS. GUILFOYLE:  Sure.

8                    Have you been retained by Motley

9    Rice in any other cases?

10       A.       No.

11                   MR. ORENT:  That makes it whole lot

12   easier.

13       Q.       Do you recognize the name Margaret

14   Thompson?

15       A.       Yes.

16       Q.       Have you ever been retained by

17   Margaret Thompson?

18       A.       On this case, for this report.

19       Q.       Okay.  Not on any other occasions?

20   Is that your testimony, Doctor?

21       A.       Yes.

22       Q.       And the point person for purposes

23   of this report, is that Mr. Orent or is that

24   Ms. Thompson?

25                   MR. ORENT:  That I think gets

Neeraj Kohli, M.D.

1    beyond discoverable material.  I'm going to

2    instruct you not to answer on that one.

3                 MS. GUILFOYLE:  Okay.

4                 Doctor, we've marked your report as

5    Exhibit 3, and you -- I believe you've testified

6    that that's a fair and accurate copy of your

7    report, correct?

8         A.      Yes.

9         Q.      Do you intend to update or

10   supplement this report in any way?

11        A.      At the present time, I have no

12   intention of doing that.

13        Q.      I noticed in your report, and I can

14   find the section, you said something about if

15   additional information becomes available or you

16   receive additional documents.  It's near the end.

17   And I guess I just want to know is that the -- is

18   that the only circumstances under which you

19   intend to potentially supplement your report?

20        A.      Yes.

21        Q.      And you know what I'm referring

22   to --

23        A.      Yes.

24        Q.      -- on page 39?

25        A.      It's on 38, the second paragraph.

Neeraj Kohli, M.D.

1        Q.        What did you do to prepare for this

2    deposition?

3        A.        I met with Jonathan yesterday for

4    two hours.

5        Q.        Okay.

6        A.        And I also re-read my report and

7    did a cursory review of some of the IFUs as well

8    as a few of the papers.

9        Q.        Which particular papers did you

10   re-review or do a cursory review of?

11       A.        I think -- I don't know exactly

12   which papers.  I mean, I literally just scanned

13   them very quickly.  It was just in the ones that

14   were in my cited materials folder and literature.

15   I think one of them was the 17 year data on TVT.

16   One was the original paper by Deleval where he

17   talked about the TVT-O modification.

18       Q.        Okay.

19       A.        The other was the paper by Deleval

20   where he talked about the Abreva modification.

21   And that was mostly what I reviewed.

22       Q.        Okay.  And you read all of those

23   papers in conjunction with the preparation of

24   your report?

25       A.        Previously.

Neeraj Kohli, M.D.

1          Q.        Right.

2          A.        And most of them previous to even

3    doing the report.

4          Q.        Right, right.  I was just asking.

5                    So going back to the cases in which

6    you offered testimony, are you familiar with the

7    Corriveau versus Bard case?

8          A.        Yes.

9          Q.        Is there some reason why that case

10   isn't on your list?

11         A.        I did a deposition on that case.

12         Q.        Okay.  Did you have an

13   understanding that this was only trial testimony?

14   'Cause the category says other cases in which I

15   have testified as an expert at trial or by

16   deposition.

17         A.        No, my apologies.  That was the

18   case I believe I was as a treating physician that

19   I told you about just recently that I did.  So I

20   apologize, that was an oversight on my part.

21         Q.        'Cause in fact that was in 2015,

22   right?

23         A.        Yes.

24         Q.        And in that case, you were

25   testifying as a treater and you were testifying

Neeraj Kohli, M.D.

1    against the Bard product?

2                   MR. ORENT:  Objection.

3         A.        I was just asked to talk about my

4    treatment, about the patient.

5         Q.        And you were also retained by Bard

6    previously in the Scott case as an expert on

7    their behalf -- on its behalf, correct?

8         A.        Yes.

9         Q.        And you testified at trial and at

10   deposition in the Scott matter; isn't that true?

11        A.        Yes.

12        Q.        Are there any -- now that you

13   understand that you were suppose to include the

14   Corriveau case, are there any other cases that

15   you did not understand you were suppose to

16   include on that expert report?

17        A.        Oh, it wasn't so much that I didn't

18   understand.  It was an oversight on my part.

19        Q.        Okay.  Well, any other cases that

20   you believe you have not included on that list?

21        A.        Again, not to my recollection.

22        Q.        And it's fair to say, Doctor, that

23   the case was not omitted because of the different

24   opinions you took in those two cases, is it?

25                  MR. ORENT:  Objection.

Neeraj Kohli, M.D.

1     A.     I don't understand the question.

2     Q.     Sure.  Is it fair to say -- it's

3  fair to say, Doctor, that you did not omit the

4  Corriveau case because your opinions in that case

5  were contradictory to those in the Scott case?

6     A.     No.

7     Q.     So that is fair to say that?

8     A.     It's fair to say that, correct.  It

9  was an oversight.

10    Q.     Can we mark this as Exhibit 4,

11  please.

12    (Whereupon, Deposition Exhibit 4,

13    Dr. N. Kohli Expert Report: Internal

14    Ethicon Documents Cited,

15    was marked for identification.)

16    Q.     (BY MS. GUILFOYLE) Doctor, I'm

17  going to show you what's been marked as

18  Exhibit 4, and I will represent to you that that

19  is a list of the Ethicon Bate stamp numbers that

20  appear in your report, but do I understand your

21  testimony to be that you have read more pages

22  than what are necessarily reflected in your

23  report?

24    A.     Yes.

25    Q.     Now, are there certain pages of

Neeraj Kohli, M.D.

 1   Ethicon documents or certain categories of

 2   Ethicon documents that you recall reviewing and

 3   deciding that they were not pertinent to your

 4   opinions or rejecting?

 5        A.      No, I think most of the

 6   documentation was probably pertinent to my

 7   opinions.  It's just that in my report I

 8   essentially quoted or referenced certain

 9   documents.  And if I quoted or referenced those

10   documents, I put those in my report.

11        Q.      When you referenced the depositions

12   earlier, the four depositions, I believe, that

13   you have on your thumb drive, did you read them

14   in their entirety?

15        A.      Yes.

16        Q.      And did you read all the exhibits?

17        A.      To the best --

18        Q.      That may have been marked at their

19   depositions?

20        A.      I'm not sure if all the depositions

21   had the exhibits attached.  I did concentrate on

22   the text of the depositions.

23        Q.      Okay.  And did you -- in

24   conjunction with reading those depositions, did

25   you feel that you needed additional testimony to

Neeraj Kohli, M.D.

1    put it into context?

2                    MR. ORENT:  Objection.

3         A.        No.  I mean, I just read them as

4    they were presented to me in conjunction with all

5    the other documents that I received.

6         Q.        Okay.  How much time do you

7    currently spend doing legal consulting?

8         A.        It probably occupies 10 percent of

9    my practice and time.

10        Q.        And for how long a period of time

11   has it occupied approximately 10 percent of your

12   time?

13        A.        Probably more recently only because

14   of the amount of information that was required

15   for this type of case.  Typically I'm doing one

16   to two -- I'd say two cases per year, medical

17   malpractice mostly.  And, again, I would say the

18   vast majority of that is defense with occasional

19   plaintiff work.

20        Q.        Have you ever done a medical

21   malpractice case as a defense expert witness in

22   which you defended a doctor's use of the TVT-O?

23        A.        Not to my recollection.

24        Q.        And then do you also spend a

25   certain amount of your time doing national and

Neeraj Kohli, M.D.

1  international lectures?

2       A.       I do.  I've done much, much less on

3  the international front in the last three years

4  only because of my young kids, but I will be

5  going to Australia in June -- India in June and

6  Australia in July to give lectures.

7       Q.       So in the past four years, say, how

8  much time -- what percentage of your time is

9  spent giving national and international lectures?

10      A.       Out of my lecture time or in my

11  entire practice?

12      Q.       In your entire practice.

13      A.       Oh, again, I would say probably

14  less than 5 to 10 percent.  My real concentration

15  is my practice and my patients.

16      Q.       Okay.  What percentage of your time

17  is spent doing non- -- is educating fellows or

18  teaching at Harvard or any of the other

19  facilities that you're affiliated with?

20      A.       So I operate every Monday with the

21  residents at Partners, and then any other time

22  I'm operating at the Brigham a resident or fellow

23  would be involved.  So it's hard to differentiate

24  only because that's also counted as clinical time

25  and teaching time.  But as far as dedicated

Neeraj Kohli, M.D.

1    lecture time in a classroom with the residents

2    and fellows, it's less than 1 percent.

3         Q.        Okay.  Have you previously been

4    qualified as an expert witness?

5         A.        In what capacity?

6         Q.        In any court.

7                   MR. ORENT:  Objection.

8         A.        The Bard case that we talked about.

9         Q.        The Scott case?

10        A.        The Scott case.

11        Q.        Yeah.

12        A.        And I think that's it.

13        Q.        Has any jurisdiction refused to

14   permit you to offer expert testimony as far as

15   you know?

16        A.        So at one point I was asked to

17   provide expert witness on the defense side in

18   Bard, and they evaluated me as an expert, but I

19   was disqualified as I had previously testified on

20   the plaintiff side, or defense side.

21                  MR. ORENT:  Opposite.

22                  THE WITNESS:  Opposite.

23        Q.        Wait a minute.

24        A.        I was asked to potentially be a

25   plaintiff expert for Bard.

Neeraj Kohli, M.D.

1    Q.      For Bard?

2    A.      Against Bard.

3    Q.      Right.

4    A.      Well after the Scott case.  And

5  then when that was brought in front of the court,

6  they disqualified me because I had done some

7  previous work as a defense expert for Bard.

8    Q.      Okay.  Actually, can we take a

9  quick break?

10           MR. ORENT:  Absolutely.

11           (A break was taken.)

12    Q.      (BY MS. GUILFOYLE) So, Doctor, I

13  want to talk about the opinions that you have set

14  forth in your report and which I think you've

15  summarized in the report as well, and starting

16  with the one about polypropylene.  Summary of

17  Opinions starts on page 8.

18    A.      Yes.

19    Q.      And so your first opinion deals

20  with the use of polypropylene in the TVT-O; is

21  that correct?

22    A.      Yes.

23    Q.      And what is your opinion, Doctor?

24    A.      Well, as stated, the inherent

25  properties of polypropylene make it an unsuitable

Neeraj Kohli, M.D.

1    material for placement in the transobturator

2    space.   These properties include chronic

3    inflammation, foreign body reaction, shrinkage,

4    contraction, fibrosis and nerve entrapment.

5         Q.      So, first of all, any time you

6    implant any type of foreign body into someone's

7    body, it causes a foreign body reaction; isn't

8    that true?

9               MR. ORENT:  Objection.

10        A.      It can.

11        Q.      And polypropylene is considered a

12   suitable material by many organizations; isn't

13   that true?

14              MR. ORENT:  Objection.

15        A.      Again, I don't know the definition

16   of suitable.  Has polypropylene been used by many

17   different surgical specialities and different

18   organizations for surgical procedures in the

19   past, yes.

20        Q.      For example, like Prolene sutures.

21   They are as inert as polypropylene, aren't they?

22              MR. ORENT:  Objection.

23        A.      Again, polypropylene I don't

24   believe is inert, but if Prolene sutures are made

25   of polypropylene, depending on variations in the

Neeraj Kohli, M.D.

1   processing and additives and configuration, it

2   would have a similar reaction.

3       (Whereupon, Deposition Exhibit 5,

4       AUGS Position Statement on Mesh Midurethral

5       Slings for Stress Urinary

6       Incontinence, was marked for

7       identification.)

8       Q.      (BY GUILFOYLE) Doctor, I'm going to

9   show you what's been marked as Exhibit 6,

10  Frequently Asked -- Exhibit 5, the "Position

11  Statement on Mesh Midurethral Slings for Stress

12  Urinary Incontinence" by AUGS, and ask you if you

13  have seen that before?

14      A.      Yes.

15      Q.      And this is an organization that

16  you are a member of, right?

17      A.      Yes.

18      Q.      And are you familiar with the

19  position statement that AUGS has made on the use

20  of midurethral slings?

21      A.      Yes.

22              MR. ORENT:  Objection to form.

23      Q.      You've read this before, Doctor?

24      A.      Yes.

25      Q.      Okay.  And do you agree with the

Neeraj Kohli, M.D.

```
 1    position of AUGS?

 2         A.      I can't say that I necessarily

 3    agree with all statements.

 4               Again, this is a position paper

 5    that's written by several authors, and I wouldn't

 6    say that I agree with every single statement

 7    that's in here.

 8         Q.      Doctor, and I know that you're

 9    trying to be helpful, but there is like a time

10    limit to the depo, too, so if you could try to

11    just focus on the question that I ask you.

12         A.      Sure.

13         Q.      Are there specific provisions in

14    this -- of this statement that you do not agree

15    with?

16         A.      Yes.

17         Q.      And what are they?

18         A.      Well, the first statement,

19    "Polypropylene is safe and effective as a

20    surgical implant."  I don't agree with that

21    statement.

22         Q.      Okay.  Do you agree that it is safe

23    and appropriate as a surgical implant in any

24    situation?

25         A.      Yes, it can be used as a safe and
```

Neeraj Kohli, M.D.

1    effective implant.

2         Q.        Okay.

3         A.        But I don't agree necessarily as a

4    blanket statement that it's a safe and effective

5    implant in all situations.

6         Q.        Okay.  And what about with respect

7    to the use of polypropylene for TVT-O?

8         A.        Again, that was one of my opinions,

9    that I didn't believe that polypropylene in the

10   case of TVT-O was a safe and effective implant.

11        Q.        And why is that?

12        A.        One because of the inherent

13   properties that polypropylene as a foreign body

14   causes, some of those fibrosis and inflammation.

15   Specifically in the space that it's in as well as

16   the structures that it's in causes the

17   complications that are associated with that.

18        Q.        Doctor, isn't it fair to say that

19   polypropylene mesh is used in all midurethral

20   slings?

21             MR. ORENT:  Objection.

22        A.        No.  It is used in the vast

23   majority, but there are biologic slings, there

24   are other slings made of different materials,

25   Marlex, Mersilene, but polypropylene is a

Neeraj Kohli, M.D.

```
1   commonly used material in slings.
2        Q.      Okay.  Are you aware of any
3   manufacturer that makes midurethral slings that
4   does not use polypropylene?
5        A.      Aside from the biologics?
6        Q.      Yeah.
7                MR. ORENT:  Objection.
8        A.      Currently, no.
9        Q.      Okay.  And, in fact, you implant
10  polypropylene midurethral slings in your
11  practice, don't you?
12       A.      Yes.
13       Q.      And are you aware of there being
14  any differences in the polypropylene mesh that's
15  used from one midurethral sling to another?
16       A.      Yes.
17       Q.      And how are you aware of that,
18  Doctor?
19       A.      Again, based on my reading of the
20  literature, there are differences in pore size,
21  there are differences in weave configurations,
22  there are differences in weight, there are
23  differences in the length of the sling, there are
24  differences in the processing of the mesh.  So
25  those are the differences that I'm aware of.
```

Neeraj Kohli, M.D.

1    Q.      Are you aware of any differences --

2  are you aware of what's considered number one

3  mesh or level one mesh?  Does that term mean

4  anything to you?

5    A.      Type one?

6    Q.      Type one, right.

7    A.      So oftentimes the mesh is

8  characterized on whether it's macroporous or

9  microporous --

10   Q.      Right.

11   A.      -- and that's typically what we're

12 referring to as type one microporous mesh.

13   Q.      Mm-hmm.  So go to page 2, if you

14 could, Doctor.

15   A.      Yes.

16   Q.      You don't agree with the statement

17 that polypropylene material is safe and effective

18 as a surgical implant, correct?

19   A.      Again, that's a wide ranging,

20 blanket statement which I do not agree with.

21   Q.      Okay.  And you don't specifically

22 agree that it's appropriate for the use of TVT-O,

23 correct?

24   A.      Correct.

25   Q.      And it's because of what specific

Neeraj Kohli, M.D.

1    reasons?

2              MR. ORENT:  Objection.

3         A.       Again, we discussed the in vivo

4    host tissue responses, which include fibrosis,

5    contraction, scarring, and when those responses

6    occur in certain anatomic spaces and through

7    certain anatomic structures, it changes the

8    safety of using that material.

9         Q.       Is it the way that the TVT-O mesh

10   is implanted that makes the difference in your

11   mind as far as your opinion?

12        A.       Again, if the way it's implanted is

13   speaking to the structures in which it goes

14   through and is involved, then yes.

15        Q.       Do you know what the mesh -- the

16   composition of the mesh is that's used in the

17   TVT-O?

18        A.       In terms of polypropylene?

19        Q.       Yeah.

20        A.       It's made of polypropylene, yes.

21        Q.       Right.  Do you know anything else

22   about it?

23        A.       I know it's got a weight of

24   approximately 110 grams per meter squared.  It's

25   macroporous.  I've seen pictures of the weave.

Neeraj Kohli, M.D.

1    I've had the opportunity to use that mesh on

2    multiple occasions.

3          Q.       Is it your testimony, Doctor, that

4    this polypropylene mesh that is used in

5    suburethral slings is safe and effective to be

6    used in every other manufacturer's suburethral

7    sling other than the TVT-O?

8               MR. ORENT:  Objection to the term

9    suburethral sling.

10         Q.       Midurethral sling.  Sorry.

11         A.       I feel it's safe in the use of the

12   retropubic suburethral sling, but in terms of the

13   obturator sling where it goes through those

14   structures, I don't feel that that material is

15   safe.

16         Q.       Is it your testimony, Doctor, that

17   the use of polypropylene mesh is not safe in any

18   obturator midurethral sling?

19         A.       I think there are relative grades

20   of safety, and comparatively speaking,

21   transobturator outside-in versus transobturator

22   inside-out, the safety profile for the inside-out

23   is significantly less in terms of risk to the

24   patient, higher risk to the patient.

25         Q.       And what kind of training do you

Neeraj Kohli, M.D.

1   have to make that opinion, Doctor?

2        A.      As an implanter of over 3,000 mesh

3   products, 50 to 100 TVT-Os to 2,500 to 3,000

4   retropubic slings, it would be my clinical

5   experience as a surgeon as well as not only an

6   implanter but an explanter.

7        Q.      Do you have any studies that you

8   rely on to support that position?

9        A.      Well, I know that there have been

10  some anatomic studies about the surgical variants

11  of the TVT-O mesh in terms of its relationship to

12  critical structures.  I also know that there have

13  been studies from Deleval himself where he talks

14  about the polypropylene mesh and how it can cause

15  fibrosis through the muscles where the TVT-O was

16  placed, and therefore the development of the TVT

17  Abreva was in order to address those issues.

18       Q.      Doctor, I'm really only directing

19  my questions about the TVT-O.

20       A.      Correct, and I answered your

21  question in terms of the anatomic studies of

22  TVT-O as well as the TVT-O paper that Deleval

23  himself has written which talks about the TVT-O.

24       Q.      And what are the anatomic studies

25  you're referring to?

Neeraj Kohli, M.D.

1          A.          I believe it was -- I would have to

2   look at those and get you those particular

3   references, which I don't have off the top of my

4   head.  Which I can provide those to you.

5          Q.          You don't recall them as you sit

6   here now?

7          A.          I don't.

8          Q.          Okay.  Well, you can look -- maybe

9   during a break you can look at them.

10         A.          Sure.

11         Q.          So number 2, "The monofilament

12   polypropylene mesh MUS is the most extensively

13   studied anti-incontinence product in history --

14   procedure in history."  Do you agree with that,

15   Doctor?

16         A.          I think if you look at the -- yes.

17         Q.          Number 3, "Polypropylene mesh

18   midurethral slings are the standard of care for

19   the surgical treatment of SUI and represent a

20   great advance in the treatment of this condition

21   for our patients."  Do you agree with that

22   statement of AUGS?

23                     MR. ORENT:  Objection.

24         A.          No.

25         Q.          And why is that?

Neeraj Kohli, M.D.

1    A.    There are a great number of my

2    colleagues around the country who feel that

3    synthetic suburethral slings present significant

4    risk, and many of them are continuing to do

5    traditional therapy such as Burchs or cadaveric

6    fascial slings.  And if you believe in this

7    statement that this is the standard of care, all

8    of them would be falling below the standard of

9    care.  And I don't think that -- there are a

10   variety of incontinence procedures, and I just

11   don't feel like the polypropylene sling is the

12   only standard of care.  We have various treatment

13   options for this condition.  There are some, many

14   in this country, who choose not to use a

15   synthetic mesh.

16       Q.    And you know that from what,

17   discussing that with them?

18       A.    I know that from teaching

19   nationally, talking to colleagues, looking at

20   surveys that organizations have done about how

21   many of you are using slings and not using slings

22   and talking to my colleagues.

23       Q.    So do you know whether or not AUGS

24   did a survey before they came out with what's

25   referred to as number 3 in their position

Neeraj Kohli, M.D.

1    statement?

2         A.      Yes.

3         Q.      And do you know whether that survey

4    is accurate?

5                 MR. ORENT:  Objection, foundation.

6         A.      Again, if you look at study design,

7    there's biases in who answers surveys and who

8    doesn't answer surveys.  And although the study

9    may reflect that number, whether it's accurately

10   reflecting the body of surgeons in this country

11   it doesn't.  And the other is that this was only

12   for AUGS members.  A large number of slings are

13   being presented by or performed by urologists or

14   gynecologists who aren't AUGS members, and so the

15   numerator and denominator in this type of

16   analysis is incomplete.

17        Q.      Doctor, as far as AUGS members, do

18   you have any reason to believe that what's

19   reflected in statement 3 did not represent the

20   position of the AUGS members who may have

21   participated in any survey?

22                MR. ORENT:  Objection, foundation.

23        A.      Again, if their survey said greater

24   than 99 percent of AUGS members looking at

25   details of study design of the survey, I'll take

Neeraj Kohli, M.D.

1   the 99 number, but there are reservations and

2   discussions that you can have about study design.

3        Q.      Doctor, do you know whether or not

4   a study was done, and if so, there was -- I mean

5   a questionnaire was done, and if so, the exact

6   results of the questionnaire?

7        A.      Yes, so that's a different

8   question.  So they did give the survey, and this

9   reflects the results of the study.

10        Q.      Okay.  Accurately, fair to say?

11              MR. ORENT:  Objection.

12        A.      As far as what the study reported,

13   yes.

14        Q.      Number 4, "The FDA has clearly

15   stated that the polypropylene MUS is safe and

16   effective in the treatment of SUI."  Do you agree

17   with that, Doctor?

18              MR. ORENT:  Objection.

19        A.      Again, I mean, the quote of the FDA

20   is here, and I agree that the FDA said that.

21        Q.      Okay.  It's just you don't agree

22   with that.  Is that it?

23        A.      Again, they've put minimally in

24   use -- minimally invasive slings, midurethral

25   slings.  They've included lots of slings, but

Neeraj Kohli, M.D.

1    then they qualify it to say single-incision

2    slings are not included.  They didn't do a

3    breakdown of transobturator versus retropubic.

4    But in terms of your question do I agree that the

5    FDA has stated what they've stated on this piece

6    of paper, yes.

7         Q.     And your opinion with respect to

8    the use of polypropylene mesh in midurethral

9    slings pertains only to the outside-in slings

10   like the TVT-O?

11             MR. ORENT:  Objection.

12        A.     And which opinion specifically are

13   you asking about?

14        Q.     Well, you talk about, well, in some

15   cases the use of polypropylene mesh is acceptable

16   for a midurethral sling but certainly in the

17   TVT-O it's not.

18        A.     Correct.

19        Q.     Is there any specific product other

20   than the TVT-O that you feel using polypropylene

21   mesh is inappropriate?

22        A.     Over the last several years, we've

23   come -- again, myself and clinically in my own

24   practice, I've come to the feeling that the

25   transobturator sling is associated with a

Neeraj Kohli, M.D.

1    different set of complications.

2              The TVT-O specifically, again, my

3    issue is the structures that it passes through

4    and the ability to actually explant that in cases

5    of complication.

6         Q.     Okay.  Well, the explant that we're

7    going to deal with is a separate opinion of

8    yours.

9         A.     Sure.

10        Q.     But am I correct that you don't

11   specifically recall with the 50 to 100 TVT-O

12   slings that you implanted what sort of

13   postoperative complications your patients had?

14        A.     Correct.

15        Q.     Okay.  So when you say based on my

16   clinical experience, your clinical experience is

17   something that you don't even recall?

18              MR. ORENT:  Objection.

19        A.     No, because I've had other clinical

20   experience in taking care of other patients who

21   have had TVT-O outside of the numbers that we

22   talked about in my own cases.

23        Q.     Okay.  So let me clarify that,

24   then.  But it's fair to say that with respect to

25   the TVT-O sling, you have no recollection of

Neeraj Kohli, M.D.

1  whether your patients, the 50 to 100 that you

2  implanted the TVT-O sling, had any complications

3  post surgical?

4           MR. ORENT:  Objection.

5      A.      Correct, not to my recollection.

6      Q.      Okay.  And so when you talk about

7  your clinical experience, you're not even talking

8  about them.  You're talking about any type of

9  explant that you may have done.

10     A.      And other patients that I've seen

11 with complications from the product.

12     Q.      Okay.  So how many patients have

13 you treated for alleged complications with the

14 TVT-O sling?

15     A.      Again, I would probably say it's in

16 the 30 to 50 range.

17     Q.      And what were the complications?

18     A.      Mostly they were centered around

19 pain.

20     Q.      Okay.  And these are patients that

21 you didn't treat before they came to see you,

22 right?  I mean -- strike that.

23           These are patients that you did not

24 treat prior to the implant of the sling?

25     A.      Correct, I was not their surgeon or

Neeraj Kohli, M.D.

1    taking care of them.  They had the surgery

2    elsewhere, and then they saw me.

3         Q.      And to some extent when you're

4    seeing strictly as an explanter, you're not

5    getting the full picture of what the implanter

6    may or may not have encountered during the

7    surgery; isn't that fair to say?

8                 MR. ORENT:  Objection.

9         A.      Correct, I typically try to get

10   access to the operative notes and the

11   preoperative records, but that would be my

12   exposure to the preoperative and intraoperative

13   course of that patient.

14        Q.      You're not talking to the

15   implanting doctor and finding out specifics or

16   particular issues relative to a single plaintiff,

17   are you?

18        A.      Typically, no, unless that doctor

19   calls and says I want you to see my patient and

20   just to let you know this is what happened if

21   something out of the ordinary happened but

22   typically no.

23        Q.      And you would agree with me

24   wouldn't you, Doctor, that there can be a number

25   of non-mesh related reasons for somebody

Neeraj Kohli, M.D.

1    encountering complications during a surgical

2    procedure?

3                    MR. ORENT:  Objection, form.

4        A.       Yes.

5        Q.       And in fact many of the patients

6    that are implanted with midurethral slings in

7    fact have other health conditions that complicate

8    their surgical recovery; isn't that true?

9                    MR. ORENT:  Objection.

10       A.       So what conditions are you

11   specifically talking about?

12       Q.       Obesity, for example.  Smokers,

13   age, other health conditions that impact your

14   ability to heal.

15       A.       Again, I think smoking has been

16   shown to potentially be a factor in healing.  We

17   haven't found in our own surgical experience that

18   a lot of those factors are making a big

19   difference in their postoperative complications

20   or healing or recovery.

21       Q.       What about obesity, Doctor?

22       A.       Again --

23                   MR. ORENT:  Objection.

24       A.       -- unless they are diabetic related

25   to the obesity and they have poor blood sugar or

Neeraj Kohli, M.D.

1  on steroids, and that is more germane in the

2  healing process.  Obesity as an independent risk

3  factor for poor healing, we haven't necessarily

4  found that in our practice or in my practice.

5      Q.      What about infection rates at a

6  particular hospital?  What impact, if any, can

7  that have on the success rate of an implant?

8      A.      It can obviously have an impact if

9  you have an infection.  Again, our infection

10  rates are extremely low, and I would probably say

11  they're under 1 to 2 percent.  Maybe because of

12  our surgical technique, maybe because of the

13  routine use of antibiotics and maybe because of

14  the type of hospitals we operate at which tend to

15  be more community as opposed to tertiary care

16  where infections may be more prevalent in the

17  operating room.

18      Q.      But is that where you're getting

19  all your referrals for the explants or treatments

20  post implant?

21          MR. ORENT:  Objection.

22      A.      When you say "where," specifically

23  what do you mean?

24      Q.      They're not just from the hospitals

25  that you work at or are they?

Neeraj Kohli, M.D.

1      A.      Oh, no, they're from all over the
2  New England area.
3      Q.      Right.  So in many cases, they're
4  from hospitals that you have no familiarity with
5  and have no understanding of what their infection
6  rate may be; isn't that true?
7      A.      Correct.
8      Q.      And often a person can have
9  other -- well, let me ask you that.  Are there
10  other health conditions that can complicate the
11  success rate of the use of a midurethral sling?
12      A.      Are you talking success rate or
13  complication rate?
14      Q.      Complication rate.
15      A.      Again, we talked about some of
16  them.  If you have nutritional deficiency or
17  smoking, that could cause poor wound healing.  If
18  you have diabetes or steroid use, that could
19  cause it.  If you are on a blood thinning
20  medication, that potentially could cause a higher
21  risk of infection and hematoma.  If you had
22  multiple other surgeries, that could make the
23  surgical space scarred and complicated.  Those
24  are probably the major things we look at in terms
25  of taking a patient to the operating room in

Neeraj Kohli, M.D.

1    terms of her intra- and post-operative

2    complication rates.

3         Q.       Okay.  And of the 30 to 50 patients

4    that you have treated for after implant

5    complications or concerns, what percentage have

6    you opted to remove the sling.

7                  MR. ORENT:  Objection.

8         Q.       If you can recall.

9         A.       So the vast majority we will remove

10   the sling because typically they have significant

11   pain on palpation of the sling, and that's kind

12   of what our marker is.  If they have significant

13   pain on palpation of the sling, it's logical that

14   it should be removed.

15                  When we talk about removal, that's

16   a difficult question because we approach it in

17   one of two ways.  If most of the pain is in the

18   vaginal area, we typically will recommend a

19   segmental excision where we remove that portion

20   of the mesh that's causing pain.

21                  Some of these patients are having

22   either unilateral or bilateral groin pain.  And

23   for those patients, we typically will recommend

24   complete removal of that portion of the mesh that

25   goes through the obturator space.

Neeraj Kohli, M.D.

1              So when we talk about removal, it's

2      usually either complete which talks about that

3      portion in the obturator space or segmental which

4      is mostly limited to the suburethral or vaginal

5      portion of the mesh.

6          Q.      So of the 30 to 50 people that

7      you've treated, have you removed the mesh or

8      recommended removal of the mesh in all of those

9      patients?

10         A.      Some of the patients -- we've

11     recommended it on most of the patients.  Some of

12     the patients have opted not to do anything

13     because of the risks associated with removal.

14     Some of them have opted for either physical

15     therapy or trigger point injections because,

16     again, their approach to surgery and potentially

17     their severity of their symptoms, and some of

18     them have opted for removal.

19         Q.      You would agree with me, would you

20     not, Doctor, that there are a number of causes of

21     pelvic pain that are unrelated to the implant of

22     a sling?

23              MR. ORENT:  Objection.

24         A.      Yes.

25         Q.      And, in fact, in many of -- in many

Neeraj Kohli, M.D.

1    people who have slings implanted, they had pelvic

2    pain before and continue to have pelvic pain

3    after?

4                    MR. ORENT:  Objection, foundation.

5         A.      Again, in our practice, we're very

6    hesitant to put slings and do significant pelvic

7    surgery in patients with pelvic pain.  I can't

8    recall those patients from the outside who were

9    sent to us for mesh complication how many of

10   those patients had chronic pain, but typically

11   when we are operating on a patient for pain, it's

12   because there's significant tenderness in the

13   area of the mesh itself.

14        Q.      Right, but you can't rule out that

15   the tenderness that you find when you're

16   examining the patient is due to other conditions

17   unrelated to the mesh, can you?

18                    MR. ORENT:  Objection.

19        A.      Well, when we're touching just the

20   area of the mesh, there's nothing else there but

21   the mesh, so we do rule that out.

22                    If there are other symptoms or

23   other areas of pain involvement, then there could

24   be coexisting processes going on.

25        Q.      And pain is a subjective

Neeraj Kohli, M.D.

1  determination, would you agree?

2            MR. ORENT:  Objection.

3      A.      Pain is a subjective complaint by

4  the patient, and tenderness is an objective

5  observation by us during an examination.

6      Q.      But the tenderness that you see is

7  based on a subjective response.

8            MR. ORENT:  Objection.

9      A.      In the patient reporting pain.

10     Q.      Right.

11     A.      Yes.

12    (Whereupon, Deposition Exhibit 6,

13     AUGS Frequently Asked Questions by

14     Providers Mid-urethral Slings for Stress

15     Urinary Incontinence,

16     was marked for identification.)

17     Q.      (BY MS. GUILFOYLE) All right, I'm

18  going to show you what's been marked as

19  Exhibit 6, Doctor, and ask you to take a look at

20  this.  Have you seen this before?

21     A.      Yes.

22     Q.      And are there any portions of this

23  "Frequently Asked Questions by Providers

24  Mid-urethral Slings for Stress Urinary

25  Incontinence" that you do not agree with?

Neeraj Kohli, M.D.

1        A.        Yes.

2        Q.        What portion?

3        A.        "Does the evidence indicate that

4   mid-urethral slings are safe in the treatment of

5   SUI?"

6        Q.        And that's, again, in -- you don't

7   agree with it because of your position with

8   respect to the TVT-O?

9        A.        Well, I don't agree with it because

10  they say that the only specific complications

11  related to mesh use when we compare it to

12  non-mesh procedures is vaginal mesh exposure and

13  mesh perforations into the urinary tract, and I

14  don't agree with it because there are mesh

15  perforations into the bowel, which, again, if you

16  didn't use a mesh you wouldn't have a mesh

17  perforation, as well as the fact that I think

18  dyspareunia and pain can oftentimes be related to

19  the mesh which they don't -- that they

20  essentially exclude.

21              So I would say that the reason I

22  don't agree with that is because I feel like the

23  complications that are specifically listed in

24  terms of vaginal mesh are incomplete.

25        Q.        Have you read any studies, Doctor,

Neeraj Kohli, M.D.

1    that show a connection between the use of the

2    TVT-O midurethral sling and dyspareunia and pain?

3         A.       I've read studies that show that

4    transobturator slings in general have a banding

5    effect in the vagina.  Which of those slings that

6    they studied, I don't recall in terms of which --

7    if they were TVT-O or outside-in transobturator

8    slings.

9                  We have found or I have found in my

10   clinical experience and my clinical practice when

11   you have a transobturator procedure you can have

12   pain in the vagina and the groin area, so we've

13   noticed that on our patients, and some of those

14   patients have had TVT-O, and some of those

15   patients have had transobturator.

16        Q.       Okay.  So when you're talking about

17   that the patients in your experience, you're

18   talking about the 30 to 50 that have come to you

19   after they've been implanted and after they've

20   suffered complications, right?

21        A.       Yes.

22        Q.       Is there anything else about this

23   position paper you don't agree with, Doctor?

24        A.       Again --

25                 MR. ORENT:  Objection.

Neeraj Kohli, M.D.

1        A.        -- the same concept as opposed to

2   the position paper on meshes where it says that

3   what is the material used and has it been safe,

4   they make a wide sweeping statement that all

5   polypropylene is safe, and I don't necessarily

6   agree with that in terms of how it's been used.

7        Q.        So is your testimony with respect

8   to the polypropylene related to its use in

9   certain mesh in certain slings, or is it related

10  to the composition of the mesh?

11       A.        So it's mostly related to using

12  polypropylene in certain areas, in anatomic

13  areas, in terms of what risks and complications

14  can occur because of meshes in that area and what

15  would be the potential treatment, i.e., removal

16  of those complications.

17       Q.        Okay.  And are you familiar with

18  anything other than I guess your 30 to 50

19  patients that you treated that indicates that the

20  use of mesh for the TVT-O in that particular area

21  where it's implanted causes problems with people?

22       A.        Oh, I think there's a variety of

23  data that talks about groin pain and dyspareunia

24  in TVT-O, and some of it is actually chronic and

25  long term.

Neeraj Kohli, M.D.

1      Q.      But do you recall what they are,

2   Doctor?

3              MR. ORENT:  Objection.

4      A.      Again, I'd be happy to give you

5   those references.  And I also know that there was

6   one paper which was a meta-analysis or review of

7   the MAUDE database which also talks about the

8   complications of that, as well as, again,

9   Dr. Deleval's most recent paper where he talks

10  about the Abreva where he really talks about one

11  of the reasons the Abreva was introduced or

12  developed was to address the concern of groin and

13  thigh pain related to TVT-O.

14     Q.      Okay.  Is there anything else that

15  you rely on?

16     A.      Just general review of the

17  literature and my clinical experience in

18  patients.

19     Q.      All right.  But your clinical

20  experience in patients is related to that 30 to

21  50 --

22             MR. ORENT:  Objection.

23     Q.      -- isn't that true?

24     A.      In the patients that I've taken

25  care of, yes, yes.

Neeraj Kohli, M.D.

1        Q.        Right, right.  I mean, you can't be

2   relying on your clinical treatment of other

3   patients if it's not -- if, one, you don't

4   remember them or, two, it's not related to the

5   TVT-O.

6        A.        Correct.

7                  MR. ORENT:  Objection.

8        Q.        All right.  You agree with that?

9        A.        Yes.

10       Q.        Now, do you recall being questioned

11  at the -- well, do you recall giving testimony in

12  the Scott case?

13       A.        Yes, but I didn't review that

14  deposition for today.

15       Q.        That's okay.  Do you recall being

16  questioned about the use of polypropylene?

17       A.        Yes.

18       Q.        Okay.  What do you recall about

19  that?  You're sort of smiling.  I don't know

20  whether something's coming to mind --

21       A.        Oh, no.  I don't recall the

22  specifics.  I do know that that was part of the

23  questioning.  I don't recall the specifics, but

24  I'd happy to review any specifics you'd like to

25  talk to me about.

Neeraj Kohli, M.D.

1      (Whereupon, Deposition Exhibit 10,

2       3/1/12 Deposition of Dr. Kohli

3       was marked for identification.)

4      Q.      (BY MS. GUILFOYLE) Doctor, you have

5    before you what's marked as Exhibit 10, and I

6    will represent to you that is testimony,

7    deposition testimony, from the Scott versus Bard

8    case.  And if I could ask you to turn to page 17

9    and in particular line 27.

10             MR. ORENT:  There's no line 27 on

11    17.

12             MS. GUILFOYLE:  Can we go off the

13    record for a minute.

14             (A break was taken.)

15      (Whereupon, Deposition Exhibit 11,

16       Trial testimony of Dr. Kohli,

17       was marked for identification.)

18      Q.      (BY MS. GUILFOYLE) I'm going to

19    show you, Doctor, what was marked as Exhibit 11.

20      A.      Okay.

21      Q.      I'll represent to you that's a

22    rough draft of trial testimony by you in the

23    Scott case.  Have you seen that before?

24      A.      I don't recall if I've seen it.

25      Q.      Okay.  If I could direct your

Neeraj Kohli, M.D.

1  attention to page 17, and if you could read to

2  yourself the question and then read out loud the

3  answer.  Actually I'll -- yeah.  Are you ready?

4       A.      I'm on page 17.

5       Q.      Okay.  So on 22 is the question.

6       A.      Would you like me to read it?

7       Q.      Yeah.

8       A.      "The Jury has heard that the pelvic

9  organ prolapse kits particularly Avaulta Plus

10  made of polypropylene are the slings and the TVT

11  procedure you were discussing earlier are they

12  made of polypropylene mesh, too?"

13       Q.      And then your answer, Doctor?

14       A.      "Polypropylene has slowly filtered

15  out to us to be the safest style of synthetic

16  mesh we can use.  We have used a variety of

17  synthetic meshes.  Artificial meshes in the

18  pelvis and for general surgery over the last 50

19  to 60 years the first nylon mesh was first

20  described in 1956 so we have had 50 years of

21  experience with synthetic materials over time as

22  we become smarter as tissue engineering has

23  become more coordinated with the medicine we

24  realize that certain materials are safer.

25  Certain weaves are safer.  Certain structures are

Neeraj Kohli, M.D.

1  safer and currently the general thinking across

2  our society and our leadership out of all the

3  artificial materials polypropylene is probably

4  the safest."

5      Q.      Okay, thank you.  So that was

6  accurate testimony when you gave it at trial

7  under oath, correct?

8      A.      Yes.

9      Q.      Now, one of the opinions that you

10  set forth in your report, Doctor, is that there

11  is a safer alternative to the use of the TVT-O,

12  correct?

13      A.      Yes.

14      Q.      Okay.  And what is it that you rely

15  on for your opinion?

16      A.      Well, I rely on my own clinical

17  experience and my history of taking care of

18  patients as well as some of the literature I've

19  reviewed and books I've read and discussions I've

20  had with colleagues and physicians.

21      Q.      And the safer alternatives that you

22  recommend are in part non-mesh procedures?

23      A.      Well, I think there's a variety of

24  safer alternatives for incontinence, including

25  non-mesh procedures which we talked about, Burch

Neeraj Kohli, M.D.

1    colposuspension, autologous slings, even the

2    needle suspension procedures which might be

3    safer.  I also think that the retropubic TVT is

4    probably a safer procedure as well.

5         Q.     Isn't it true if we're talking

6    about the Burch procedure and autologous -- did I

7    pronounce that right?

8         A.     Autologous.

9         Q.     -- autologous slings that those

10   aren't always an option for an individual

11   patient?

12        A.     I don't know if you would clarify

13   which patients they're not an option for.  It

14   really depends on the surgeon's experience.  It

15   depends on their skill set.  The current group of

16   surgeons who are currently practicing

17   urogynecology there's a generational gap where

18   they haven't done Burchs.  So clearly if they

19   were to recommend a Burch now to a patient, that

20   might be risky in the sense that they don't have

21   experience or expertise doing that procedure.

22        Q.     But when you do the Burch

23   procedure, don't you have to harvest tissue from

24   elsewhere in the body?

25        A.     No, that is the sling procedure.

Neeraj Kohli, M.D.

1    The Burch procedure is actually a series of

2    sutures which are placed in the pubocervical

3    fascia and the periurethral tissue which anchors

4    that tissue to the Cooper's ligament.

5          Q.      But the autologous sling is you

6    harvest tissue --

7          A.      So the sling procedure --

8          Q.      -- is that correct?

9          A.      In the autologous sling, correct,

10   but there are other sling procedures that can use

11   biologic materials where you wouldn't have to

12   harvest.

13         Q.      Okay.  And these require additional

14   incisions and invasiveness, correct?

15               MR. ORENT:  Objection.

16         A.      It depends on your technique and

17   what material you're using.  Oftentimes you can

18   do it through the small incision that you make

19   for the sling if you're using rectus fascia.

20   Some people use vaginal wall, and you can do it

21   through the same vaginal incision you're doing.

22   So depending on the technique and what material

23   you're using, it may or may not require a

24   separate incision or longer operative time.

25         Q.      Isn't it true, Doctor, that the

Neeraj Kohli, M.D.

1    studies indicate that non-mesh repair for stress

2    urinary incontinence have a higher recurrence

3    rate?

4                MR. ORENT:  Objection.  It's an

5    incomplete.

6        A.      Again, if you look at the long-term

7    outcomes, some of the studies have shown very

8    good outcomes with biologic fascial slings and

9    Burch colposuspensions, and some of the studies

10   have shown very good long-term outcomes with

11   synthetic slings.

12       Q.      Is it your testimony, Doctor, that

13   the medical literature out there does not support

14   the position that if you use the Burch procedure

15   or autologous slings that you're more likely to

16   have to repeat the procedure?

17       A.      That's not necessarily my position.

18   More likely to repeat the procedure is difficult

19   to say because some patients if they have

20   recurrence of their incontinence may not

21   necessarily want another procedure.

22               In addition, I do think that the

23   success rates with midurethral slings are high,

24   but again, there is a variation.  As we talk

25   about midurethral slings, we talk of them as a

Neeraj Kohli, M.D.

1   large class, and there are individual procedures

2   and techniques within that class, and some of the

3   success rates are very low.  If you want to talk

4   about midurethral slings such as the

5   single-incision slings such as TVT Secur, that

6   success rate is significantly lower long term

7   than the Burch.

8            So when you say comparing a Burch

9   long term to a midurethral sling, because the

10  midurethral sling is such a large class of types,

11  the success rates may not necessarily be as good

12  long term.

13       Q.     How about versus the TVT-O?

14       A.     To my knowledge, I don't know if we

15  have the same long-term data comparing how long

16  we've studied the long-term effects of a Burch or

17  a non-synthetic midurethral sling compared to a

18  TVT-O.  I would have to look that information up.

19       Q.     Okay.  So you're not aware as you

20  sit here today of any studies that address that?

21       A.     Not off the top of my head.

22       Q.     Okay.  Did you look for any when

23  you were coming up with the opinions in your

24  report?

25       A.     I looked at a lot of the

Neeraj Kohli, M.D.

1   comparative studies about TVT versus TVT-O and

2   those types of studies but not necessarily

3   against some of the more traditional treatment

4   options.

5        Q.      Have you read any studies that talk

6   about the efficacy rate of the Burch procedure?

7        A.      Yes.

8        Q.      Okay.  And what is the efficacy

9   rate?

10       A.      Again, I can't quote the studies

11  right off the top of my head, but I'm estimating

12  in the 10- to 15-year range it's still in the 70

13  to 80 percent range.  Some of the midurethral

14  sling studies have shown a much lower success

15  rate over that time period, and some of them

16  shown a much higher success rate.

17       Q.      Are you aware of studies that show

18  that the TVT-O has a higher success rate than the

19  Burch procedure?

20       A.      Not off the top of my head, but I

21  could, again, relook at those references and then

22  answer that question.

23       Q.      Well, would it surprise you if I

24  told that there are?

25               MR. ORENT:  Objection.

Neeraj Kohli, M.D.

1    A.        If you say that there are and I

2    would look at the literature, I'd be happy to

3    look at it.

4    Q.        Well, Doctor, I'm here to ask you

5    questions about what you rely on for your

6    opinions.  So if you don't know the answer now,

7    you can feel free to just tell me that.

8    A.        Correct, off the top of my head I

9    do not have access to that information.

10   Q.        Okay.  And what about -- did you

11   ever have -- well, what about the autologous

12   slings?  Are you aware of literature out there

13   that indicates that the success rate of the TVT-O

14   is higher than that, than the autologous slings?

15   A.        I have not -- to my knowledge, I

16   don't know of any randomized prospective

17   controlled trials looking at the long-term data

18   of one versus another.

19   Q.        What about any type of medical

20   literature, Doctor?

21   A.        Again, I'm sure that there is

22   comparative series where you could look at how

23   one doctor did a fascial sling or a traditional

24   sling and looked at his patients over ten years

25   and then looked at the TVT-O data of another

Neeraj Kohli, M.D.

1   doctor, but I can't quote that off the top of my

2   head.

3        Q.      Okay.  So as you sit here today,

4   you can't give it to me?

5               MR. ORENT:  Objection.

6        A.      Correct.

7        Q.      I'd ask you to look at what's

8   Exhibit 11, the trial testimony again.

9               Okay, Doctor, if you could turn to

10  page 80 of this transcript.  And in particular,

11  if you could go to lines 15 to 23.

12              MR. ORENT:  I'm sorry, what page

13  was that?

14              MS. GUILFOYLE:  80.

15              And in this portion, I'll represent

16  to you you talk about the success rates of the

17  slings versus other procedures, and in particular

18  at line 15 you say, "So our failure rates for

19  traditional repairs are about 30 percent.  So one

20  in three women who need another -- will need

21  another surgery or may get another surgery down

22  the road.  When we use a mesh our failure rate

23  goes to 10 percent.  So one in ten.  So what I

24  tell my patients is are you willing to take a 20

25  percent reduction in recurrence for a 5 percent

Neeraj Kohli, M.D.

1    risk of complication.  And if you are, then let's

2    go with mesh."  Did I read that correctly.

3                    MR. ORENT:  Objection.

4         A.       You did but out of the wrong

5    context.

6         Q.       Okay.

7         A.       We were talking here about mesh for

8    prolapse, and I don't think we were specifically

9    talking about slings.

10        Q.       Okay.  Fair enough, Doctor.  Mark

11   this as the next exhibit.

12        (Whereupon, Deposition Exhibit 12,

13        AUA Guideline for the Surgical Management

14        of Female Stress Urinary Incontinence:

15        2009 Update, was marked for identification.)

16        Q.       (BY MS. GUILFOYLE) Doctor, I'm

17   going to show you what's been marked as

18   Exhibit 12 --

19        A.       Thank you.

20        Q.       -- and ask you if you recognize

21   that?

22        A.       I don't think I have reviewed this

23   paper.

24        Q.       Okay.  I want to direct your

25   attention to specific -- are you familiar with

Neeraj Kohli, M.D.

1    this organization?

2         A.       Yes.

3         Q.       Okay.  To specific pages.  So if

4    you could go to page -- they're not numbered.

5    Table 16.

6         A.       Appendix A16?

7         Q.       Yeah.  Where the title is

8    "Complications Rate - No Prolapse."

9         A.       Okay.

10        Q.       And do you see the one that says

11   "Burch Suspension"?

12        A.       Yes.

13        Q.       And it talks -- and then the

14   subject of complications on the left are pain,

15   sexual dysfunction and voiding dysfunction.  Do

16   you see that?

17                 MR. ORENT:  Objection.

18        A.       Yes.

19        Q.       Okay.  And they have pain 6

20   percent, sexual dysfunction 3 percent, voiding

21   dysfunction 10 percent.  Did I read that

22   correctly?

23                 MR. ORENT:  Objection.

24        A.       Yes.

25        Q.       And then if you go to the next page

Neeraj Kohli, M.D.

1    where it talks about the autologous fascia at the

2    top, and it has the same subjective complications

3    on the left.  Do you see that?

4         A.     Yes.

5         Q.     And it has pain 10 percent and

6    sexual dysfunction 3 percent.

7         A.     8 percent, I believe.

8         Q.     8 percent, right.  Thank you.  Did

9    I read that correctly?

10               MR. ORENT:  Objection.

11        A.     Yes.

12        Q.     Do you have any reason to doubt the

13   accuracy of those statistics?

14        A.     Again, I haven't had a chance to

15   review this paper or the methodology, but I have

16   no reason to doubt it.

17        Q.     Okay.  Now, one of the opinions

18   that you give, Doctor, was that the TVT-O was

19   approved based on TVT as a predicate device,

20   although they had -- they share little clinical

21   resemblance.  Do you recall that opinion?

22        A.     Yes.

23        Q.     Now, you're not a regulatory

24   expert, are you?

25        A.     I don't know how you would define

Neeraj Kohli, M.D.

1    expert.

2         Q.      Have you worked for the FDA?

3         A.      I have not worked for the FDA.

4         Q.      Have you studied the regulatory

5    rules for submission of any kind of documents by

6    a medical device manufacturer to the FDA?

7         A.      I serve as chief medical officer

8    for a company called ME Medical, and over the

9    last two years we have developed, designed and

10   manufactured a urinary catheter in the area of

11   urogynecology, and as part of that process, we

12   were involved in submitting to the FDA, and I was

13   involved in that.

14        Q.      Okay.  Were you submitting it as a

15   predicate device, Doctor?

16        A.      It's submitted as a predicate

17   device based on a urinary catheter.

18        Q.      Okay.  And you did that on your own

19   without any legal counsel?  Is that your

20   position?

21        A.      Oh, no.  I just said that we did it

22   as part of my involvement as chief medical

23   officer.  We had significant input from the rest

24   of the management team as well as legal counsel

25   as needed.

Neeraj Kohli, M.D.

```
1        Q.        Okay.  And you'd agree with me that

2   the mesh used in the TVT and the TVT-O is the

3   same, correct?

4                  MR. ORENT:  Objection.

5        A.        Yes.

6        Q.        And you'd also agree with me that

7   the only thing that remains in the body following

8   insertion is the mesh, correct?

9        A.        Yes.

10       Q.        In both products?

11       A.        Yes.

12       Q.        What factual evidence do you have

13  to state -- to support your opinion that this was

14  not a proper predicate device?

15       A.        Well, my statement was that they

16  share little clinical resemblance.

17       Q.        Okay.  So you're not challenging --

18       A.        So I can't comment on that.

19       Q.        -- whether or not it was an

20  appropriate predicate device?

21                 MR. ORENT:  Objection, misstates

22  his testimony.

23       Q.        Is that what you're saying?

24       A.        I'm not challenging the ruling of

25  the FDA.  I'm challenging that their argument
```

Neeraj Kohli, M.D.

1    that this was very similar between the two is

2    like saying that a car and a bicycle with

3    training wheels both have four wheels and they

4    both are used to go from Point A to Point B, but

5    that doesn't mean that both of them are similar

6    or that I would put an 8-year-old in a car.  And

7    so my feeling was is that they did not have

8    significant clinical resemblance, exactly how I

9    state it.

10        Q.        Okay.  What evidence do you have,

11   Doctor, to support your position that the TVT-O

12   is a defective design?

13        A.        Again, we discussed this

14   previously, and I do talk about specifics of this

15   which are based on my clinical experience, my

16   teaching for Gynecare, my review of the

17   literature as well as the review of internal

18   Gynecare documents.  It's blind insertion of a

19   permanent device through the transobturator space

20   which is a space that many surgeons and

21   gynecologists and urogynecologists previously did

22   not have a lot of familiarity with.  My issue

23   really is placement of a polypropylene mesh which

24   is a permanent material which can cause fibrosis,

25   contraction, scarring through a space which has

Neeraj Kohli, M.D.

1  significant anatomic structures makes it

2  difficult to remove in its entirety, and we

3  talked a little bit about the fact that the

4  inside-out approach anatomically put certain

5  structures at higher risk, and we also talked

6  about the fact that the distance between

7  inserting the needle and retrieving the needle in

8  the TVT-O is about 4 to 5 centimeters as opposed

9  to the transobturator sling which is typically

10  between 1 and 2 centimeters, and typically the

11  proportion or the risk of a patient is

12  proportionate to the distance of blind needle

13  passage and the position of critical structures

14  in that space.

15      Q.      And what do you base that position

16  on, Doctor?

17      A.      My clinical experience as a surgeon

18  performing these as well as anatomic studies that

19  I've looked at.

20      Q.      Except the clinical experience as a

21  surgeon performing these you don't remember

22  anything about that.

23          MR. ORENT:  Objection.

24      A.      No, I think you're misstating me.

25  I told you that I don't specifically remember any

Neeraj Kohli, M.D.

```
 1   complications that we had, but as far as my

 2   clinical experience performing the procedure, I

 3   have full knowledge and recollection of

 4   performing the procedure as well as doing

 5   multiple training programs at cadaver labs and

 6   teaching of physicians on the technique.

 7        Q.      Okay.  And you were able to do it

 8   successfully, correct?

 9        A.      Yes.

10        Q.      Are you aware of studies that

11   indicate that the TVT-O is as good as if not

12   superior design to the TVT?

13        A.      Can you define what you say in

14   terms of superior?

15        Q.      Well, it's effective, lack of

16   complications, lack of recurrence.

17        A.      So, again, I don't know of

18   long-term data beyond 17 years of the TVT-O, but

19   we do have that for TVT.  So it's hard to compare

20   the outcomes of a procedure where you have 5-year

21   data and 17-year data.  In terms of safety, they

22   have a different set of complications.  You don't

23   see groin and thigh pain, and you don't see

24   abscesses in the obturator muscle with a TVT.

25        Q.      Doctor, is it your testimony that a
```

Neeraj Kohli, M.D.

1   17-year study is not sufficient to offer an

2   opinion as to the safety and efficacy of a

3   medical device?

4               MR. ORENT:  Objection.

5        A.       Again, I think you're misquoting

6   me.  I said that we have --

7        Q.       I'm asking you this question then.

8        A.       No.  I think a 17-year study is

9   amazing in terms of longitudinal follow-up, and

10  we have that for TVT.  But you asked me that

11  isn't it your opinion that TVT-O is as

12  efficacious as a TVT, and my response was is that

13  I can't tell you that because I have 17-year data

14  for a TVT, and I don't have anything close to

15  that for a TVT-O.

16       Q.       So how much data do you need for

17  the TVT-O before you would make that opinion?

18              MR. ORENT:  Objection.

19       A.       Well, if you're comparing two

20  products, I would think that you would have to

21  have comparative data.  To compare the efficacy

22  of one procedure at 5 years to the efficacy of

23  another procedure at 17 years just seems flawed

24  in my case.

25       Q.       So are you saying that in order to

Neeraj Kohli, M.D.

 1    compare the efficacy of the TVT to the TVT-O we

 2    have to wait until the TVT-O has been on the

 3    market for 17 years?

 4         A.     What I'm saying is that I can't

 5    tell you --

 6         Q.     I just want you to answer that

 7    question.

 8                MR. ORENT:  Objection.

 9         A.     Yes.

10         Q.     Okay.  Have you ever had done any

11    meta-analyses yourself?

12         A.     Not a meta-analyses per se.  We

13    have done reviews of the literature when we're

14    doing review papers where we look at the

15    different reviews and we may actually put them in

16    a tabular format.  But in terms of doing a

17    statistical analysis pooling the meta-analyses,

18    no.

19         Q.     Would you consider yourself

20    qualified to do that?

21         A.     Again, my clinical expertise is not

22    in statistics.  I would most likely be talking to

23    a statistician to help develop those analyses.

24         Q.     Would you agree that a randomized

25    clinical trial is one of the most effective ways

Neeraj Kohli, M.D.

1    to evaluate a medical device?

2              MR. ORENT:   Objection.

3         A.        I think given its limitations,

4    although there are limitations to it, it is

5    probably considered Level I data comparative to

6    other types of studies.

7         Q.        All right.

8      (Whereupon, Deposition Exhibit 13,

9        Effectiveness and complication rates of

10       tension-free vaginal tape-obturator in the

11       treatment of female stress urinary

12       incontinence in a medium- to long-term

13       follow up by Pan-Fen Tan, et al,

14       was marked for identification.)

15        Q.        (BY MS. GUILFOYLE) Doctor, I'm

16   going to show you what's been marked as

17   Exhibit 13 for this deposition --

18        A.        Thank you.

19        Q.        -- and ask you if you've ever seen

20   this article before.

21        A.        I believe I have.

22        Q.        Was that in fact one of the

23   articles that you relied on in conjunction with

24   forming your opinions?

25        A.        Yes.

Neeraj Kohli, M.D.

1      Q.      This is a retrospective study,

2   right, that reports on the long-term outcome of

3   the use of TVT-O?

4      A.      Okay, I'm looking at a different

5   paper.  This is what I was given.  This is not a

6   retrospective study.

7      Q.      Right, okay.  Well, you're familiar

8   with this study, Doctor?

9      A.      Yes.

10      Q.      You're familiar with the

11   conclusions reached during this meta-analysis?

12      A.      I'd have to just look at that

13   briefly again.  And what would you like me to --

14      Q.      Directing your attention to the

15   conclusion --

16      A.      Yes.

17      Q.      -- do you see where it says, "The

18   subjective and objective cure rates of stress

19   urinary incontinence were similar among TVT, TOT,

20   and TVT-O in a medium- to long-term follow-up"?

21      A.      Yes.

22      Q.      Did I read that correctly?

23      A.      Yes.

24      Q.      And then it says, "The TVT had a

25   higher risk of bladder perforation than TVT-O and

Neeraj Kohli, M.D.

1   a lower risk of groin/thigh pain than TOT, and

2   TVT had a lower risk of vaginal erosion rates

3   than TOT."  Did I read that correctly?

4         A.      Yes.

5         Q.      Do you have any factual evidence

6   that would contradict the findings of this

7   article?

8               MR. ORENT:  Objection.

9         A.      Again, there are other papers that

10  have a completely different conclusion.  When you

11  look at the discussion, they talk a little bit

12  about the limitations of this paper in terms of

13  many of these randomized controlled trials had

14  small numbers and short-term follow-up.

15        Q.      If I could just -- what articles

16  are you referring to contradict this, the

17  findings of this article?

18        A.      I don't have those off the top of

19  my head, but I have seen articles that talk about

20  different conclusions in terms of long-term

21  outcomes as well as complications, and I'd be

22  happy to provide you those.

23        Q.      Okay.  Well, before we go off the

24  record -- I guess before we go off the record

25  I'll take a break and I'll have you look at your

Neeraj Kohli, M.D.

1    report and tell me where you have referenced any

2    study that contradicted the findings of this

3    article.

4           A.      Okay.

5                   MR. ORENT:  Well, I'm not sure that

6    that's appropriate to do off the record.  I think

7    any question, if you're going to have him do

8    work, that counts against the time.

9                   MS. GUILFOYLE:  Well, I disagree

10   with that.  Maybe we won't get there.

11      (Whereupon, Deposition Exhibit 14,

12         Seven years of objective and subjective

13         outcomes of transobturator vaginal tape:

14         Why do tapes fail, Stavros Athanasiou, et al

15         was marked for identification.)

16       Q.      (BY MS. GUILFOYLE) I'm going to

17   show you what's been marked as Exhibit 14,

18   Doctor, and ask you to take a look at that.  Have

19   you seen this article before?

20          A.      Yes.

21          Q.      Okay.  That's the seven-year study

22   that you were talking about --

23          A.      Yes.

24          Q.      -- before, right?

25                  Are you familiar with the term KHQ?

Neeraj Kohli, M.D.

1          A.          It's a questionnaire that's used as

2     a quality of life measure.

3          Q.          Right.  That's the King's --

4          A.          Health Questionnaire.

5          Q.          -- Health Questionnaire.  And is

6     that something that you use in conjunction with

7     your patients?

8          A.          No, we typically don't.  There are

9     a variety of different quality of life measures

10    for both incontinence and prolapse domains.  We

11    typically use a thing called the PFDI which is

12    the pelvic floor distress inventory.  Different

13    studies use different subjective questionnaires.

14         Q.          But you agree that the use of a

15    questionnaire, whether it's the one that you use

16    or something like the KHQ, is an important tool

17    in assessing patient cure rates?

18         A.          Well, there's two ways to assess

19    patient cure rates, objective and subjective --

20         Q.          Right.

21         A.          -- and some of the validated

22    questionnaires are used for subjective

23    assessment, and the King's Health Questionnaire

24    is one of those widely accepted validated

25    questionnaires.

Neeraj Kohli, M.D.

1      Q.      Okay.  Now, if you look at the

2  conclusion of this seven-year study, Doctor, it

3  says, "The TVT-O procedure provides high

4  objective and subjective long-term efficacy, a

5  clinically meaningful improvement in patient

6  quality of life, and an excellent safety

7  profile."  Do you see that?

8      A.      Yes.

9      Q.      Do you have any evidence that

10  contradicts the findings of this study?

11     A.      I think this is what they concluded

12  from their analysis of their patients.

13     Q.      This involved 124 consecutive

14  women, right?

15     A.      Correct.

16     Q.      Do you have any criticisms of this

17  study?

18     A.      Well, this is a Level III/Level IV

19  study.  So when we talked about the validity of

20  studies going from Level I being a randomized

21  prospective, this is a retrospective study which

22  has no control group, and so it's an

23  observational study.

24              So the quality of the study in

25  speaking of the previous study grades that we

Neeraj Kohli, M.D.

1    talked about, it's in a Level III, Level IV.

2         Q.        Okay.  But certainly more of a

3    study than what you've done on TVT-O, right?

4                   MR. ORENT:  Objection.

5         A.        Yes.

6         Q.        And if you look at the tables

7    reflecting the King's Health Questionnaire

8    results, and it's on page 223.

9         A.        Yes.

10        Q.        Are those the same types of domains

11   that you use in the questionnaire that you use

12   with your patients?

13        A.        The King's Health Questionnaire is

14   more of a psychosocial/emotional type of

15   questionnaire.  The PFDI is more of a

16   symptomatic.  So they looked at psychosocial

17   aspects as opposed to symptom relief.

18                  So this was more how patients

19   perceived their life changed after the procedure

20   as opposed to what was the subjective cure rate

21   of the procedure.

22        Q.        But there's no way -- I mean, they

23   can -- both of those would be related, would you

24   agree?  Their subjective feelings versus their

25   objective cure rate.

Neeraj Kohli, M.D.

```
 1                MR. ORENT:  Objection.
 2        A.      No.  So, again, you're misplacing
 3   the text.  There's subjective cure rate versus
 4   objective cure rate, and there's subjective
 5   feelings.  So you said, well, there's subjective
 6   feelings and there's objective cure rate.  There
 7   is, but when you assess outcomes or success,
 8   you're looking at cure rates or improvement
 9   rates, and those can be subjective according to a
10   survey that assesses that or they can be
11   objective compared to testing or documentation.
12                The King's Health Questionnaire
13   does a subjective evaluation of a patient's
14   feelings or impressions towards a procedure and
15   how it impacted various domains of their life
16   psychosocially.
17                A subjective cure rate talks about
18   do you feel like you are improved and did it
19   improve your incontinence.
20        Q.      Looking at the King's Health
21   Questionnaire data, and in particular if you want
22   to look at page 221, it showed a statistically
23   significant improvement in all domains.  Then
24   furthermore, in terms of clinically relevant
25   improvement, the difference between mean
```

Neeraj Kohli, M.D.

```
1   postoperative and preoperative values were over

2   the MICD.  Do you know what MICD means?

3                MR. ORENT:  Objection.

4        A.      Not in this context.

5        Q.      Does it mean different things in

6   different contexts?

7        A.      No.  I don't know what they refer

8   to as MICD here.

9        Q.      Okay.

10       A.      But --

11       Q.      It also says, "There were no major

12  perioperative complications, such as bladder

13  perforation, vessel injuries and obturator

14  hematomas."  Did I read that correctly?

15       A.      Yes.

16       Q.      Do you have any reason to doubt the

17  factual accuracy of the findings in this report?

18                MR. ORENT:  Objection.

19       A.      No.

20       Q.      In this -- staying with that study,

21  I noted that there was no long-term groin pain

22  noted.

23                Do you see the chart that talks

24  about the long-term follow-up?

25                MR. ORENT:  Are you talking about
```

Neeraj Kohli, M.D.

1    the one on 223?

2                    MS. GUILFOYLE:  Yes.

3         A.      That's the King's Health

4    Questionnaire.

5         Q.      I feel like I'm missing a page.

6    You can mark this.

7         (Whereupon, Deposition Exhibit 15,

8          Five-year Results of a Randomized Trial

9          Comparing Retropubic and Transobturator

10         Midurethral Slings for Stress Incontinence,

11         Eija Laurikaninen, et al

12         was marked for identification.)

13        Q.      (BY MS. GUILFOYLE) Doctor, I'm

14   going to show you what's been marked as

15   Exhibit 15 and ask you whether you've seen this

16   article before.

17        A.      I have.

18        Q.      You are familiar -- this is a

19   randomized clinical trial, right?

20        A.      Yes.

21        Q.      And here the results were

22   particularly significant because they were able

23   to test 95 percent of the initial study

24   participants after five years.  Do you recall

25   that?

Neeraj Kohli, M.D.

1        A.       Yes.

2        Q.       And this randomized clinical trial

3   concluded that there was no difference in cure or

4   complication rates between the TVT and the TVT-O;

5   isn't that true?

6        A.       Cure rates were similar, and

7   patient satisfaction was similar.  I don't see

8   where the complication rate table is.  Let's see.

9        Q.       I don't know if there's a table on

10  here.

11       A.       It does say that they were low with

12  no difference between the groups.

13       Q.       And you don't have any reason to

14  doubt the accuracy of the findings of this

15  report, do you?

16       A.       No.

17       Q.       Do you see the patient satisfaction

18  table which is Table 3?

19       A.       Yes.

20       Q.       And would you agree that the --

21  that their patient satisfaction rate between the

22  TVT and TVT-O were similar and high?

23                MR. ORENT:  Objection.

24       A.       Yes, there's no significant

25  difference between the two groups.

Neeraj Kohli, M.D.

1      Q.      All right.  Did you rely on this

2  study at all in forming your opinions?

3      A.      This was one of the studies I

4  reviewed.

5      Q.      But did you rely on it in forming

6  your opinions?

7      A.      Well, I relied on the entire number

8  of studies that I reviewed not only during this

9  process but also outside of this as part of my

10 clinical practice.

11     Q.      Now, in your report you talk about

12 the various different types of slings, like the

13 Monarc, the Delorme.  Do you recall that in your

14 report, other slings?

15     A.      Yes.

16     Q.      And they're all made out of

17 polypropylene mesh, right?

18     A.      Yes.

19     Q.      And would you offer the same

20 opinion about the safety and efficacy of those

21 slings?

22             MR. ORENT:  Objection.

23     A.      In what regard?

24     Q.      That you're offering -- is your

25 opinion with respect to those slings the same as

Neeraj Kohli, M.D.

1    it is with respect to the TVT-O?

2                    MR. ORENT:   Objection.

3          A.        Well, the anatomic -- the

4    procedural steps as well as the anatomic

5    landmarks and position of the TVT-O is different.

6    But in terms of them both being transobturator

7    slings, they are both transobturator slings.  But

8    they are different, so it's hard to say that all

9    of my opinions for TVT-O would apply to

10   transobturator and I didn't have any opinions

11   regarding transobturator for the basis of this

12   report.

13         Q.        Mm-hmm.  Now, on page 24 of your

14   report and on Figure 5, you talk about the

15   needles that are used in the TVT-O are far more

16   complex than the TOT.

17         A.        Yes.

18         Q.        Can you just explain what you mean

19   by that?

20         A.        I really wish I had the needles

21   here, but in lieu of that, the traditional

22   needles for a transobturator fall within two

23   basic categories.  One is a flat C needle which

24   is very one dimensional, and it only has a C on

25   it.  And then the other is a slightly more 3D

Neeraj Kohli, M.D.

1   helical needle which comes straight out and has a

2   90 degree curvature to it.  Those are both

3   spatially much easier to understand.  When we

4   pass needles blindly, we're always taught that

5   you want to try to envision where your needle tip

6   is at all times, and that's a function of the

7   configuration of the needle as well as what its

8   relationship is to the handle.  The TVT-O

9   needle -- again I wish I had a sample here -- if

10  you looked at it, it's a much more complex helix,

11  and as a result, it takes more insight and

12  understanding and potentially experience for a

13  surgeon to know where that tip is.

14       Q.      Okay.

15       A.      And part of the safety profile is

16  if I want to know at all times where my needle

17  tip is, and that was one of the issues I had and

18  one of the issues we discussed in terms of the

19  previous cadaver labs.

20       Q.      Okay.  Can we take a break?

21              MR. ORENT:  Sure.

22              (A break was taken.)

23       Q.      (BY MS. GUILFOYLE) Doctor, I'm

24  going to hand back the Tan article to you and ask

25  you if you could to go to page 29.  It talks

Neeraj Kohli, M.D.

1    about the prevalence of intraoperative

2    complications.  Do you see -- it's actually on

3    the right-hand column.

4        A.     The left-hand column.

5        Q.     I think the right-hand column.

6    With regard to complications, complication rates.

7        A.     I've got "With regard to

8    complication rates, the prevalence of

9    intraoperative bladder perforation" --

10       Q.     Oh, yeah, you're right.  Right.  Do

11   you see that section?

12       A.     Yes.

13       Q.     Okay.  Do you see that the

14   complication rates of intraoperative bladder,

15   perforation, hematoma and void difficulties/

16   urinary retention were significantly lower in the

17   TVT-O group?

18       A.     Yes.

19       Q.     Do you have any reason to doubt the

20   accuracy of these findings?

21       A.     No.

22       Q.     And then if you can go to the

23   right-hand column, the first full paragraph.  It

24   says, "With regard to complication rates, the

25   reoperation rate was significantly higher in TOT

Neeraj Kohli, M.D.

1    compared with TVT-O."

2         A.      Yes.

3         Q.      Do you see that?  Do you have any

4    reason to doubt those findings?

5         A.      No.

6      (Whereupon, Deposition Exhibit 16,

7        Medium-term and long-term outcomes following

8        placement of midurethral slings for stress

9        urinary incontinence: a systematic review

10       and metaanlysis, Giovanni A.

11       Tommaselli, et al, was marked

12       for identification.)

13        Q.      (BY MS. GUILFOYLE) I'm going to

14   show you what's been marked as Exhibit 16 and ask

15   you whether or not you've seen that article?

16        A.      Yes.

17        Q.      Is this an article that you

18   reviewed in connection with your forming your

19   opinions in this case?

20        A.      Yes.

21        Q.      Do you agree with the conclusions

22   reached in the Tommaselli argument?  I mean

23   Tommaselli paper.

24             MR. ORENT:  Objection.  What do you

25   mean by agree?

Neeraj Kohli, M.D.

1       Q.      Do you agree with the findings?

2               MR. ORENT:  Objection to form.

3       Q.      Do you have any reason to doubt the

4   accuracy of the findings?

5       A.      That the transobturator sling is

6   associated with a lower subjective cure rate than

7   the retropubic sling.

8       Q.      No, I was going to direct you

9   somewhere else.

10      A.      Okay, 'cause that was their

11  conclusion.

12      Q.      That may be one of their

13  conclusions.

14      A.      Well, that was the only conclusion

15  that's in the abstract in the front.

16      Q.      Okay.  Well, let me direct you to

17  another page then, Doctor.

18      A.      Sure.

19      Q.      Did you see in the Tommaselli

20  argument -- paper that vaginal injuries were more

21  common with the TOT than the TVT-O?

22      A.      Could you direct me to the specific

23  area?

24      Q.      Sure.  On page -- page 7.

25      A.      I don't even have page numbers on

Neeraj Kohli, M.D.

 1   mine.

 2              MR. ORENT:  Is this the page with

 3   Figure 3?

 4              MS. GUILFOYLE:  Figure 2.

 5        A.     7.

 6        Q.     So it's on the left-hand column.

 7   First it says, "No significant difference was

 8   observed in complications between the TVT-O and

 9   the TOT."

10              MR. ORENT:  Objection, misstates

11   the document.

12        Q.     And then it continues on and says,

13   "Vaginal injuries were more common with TOT than

14   the TVT-O."  Did I read that correctly?

15        A.     Yes.

16        Q.     And then if you can go to -- well,

17   do you have any reason to doubt the accuracy of

18   those findings?

19        A.     Of the statements you read?

20        Q.     Yes.

21        A.     No.

22        Q.     Based on your experience, do you

23   have any reason to doubt the accuracy of the

24   findings in the Tommaselli report --

25              MR. ORENT:  Objection.

Neeraj Kohli, M.D.

1        Q.       -- paper?

2        A.       Are you talking about my experience

3    in terms --

4        Q.       With the 30 to 50 people that --

5        A.       Oh, I was going to ask, just in

6    terms of my patients that I've seen?

7        Q.       Right.

8        A.       No.

9        Q.       Now, one of your other opinions

10    that you have given is that the TVT-O has an

11    increased pain complication component --

12        A.       Yes.

13        Q.       -- is that fair to say?

14        A.       Yes.

15        Q.       And what exactly is your opinion in

16    that regard?

17        A.       Groin pain and vaginal pain is

18    higher in TVT-O compared to retropubic slings

19    which is what my mainstay of treatment is for my

20    patients.

21        Q.       And what studies do you rely upon

22    to support that opinion?

23        A.       All the studies that we've talked

24    about.  In addition -- that I was asked to

25    review.  In addition to the previous studies that

Neeraj Kohli, M.D.

1    I looked at as part of my clinical experience and

2    responsibilities and in terms of my experience

3    over the last 15 years.

4         Q.     Well, when you say all the studies

5    that you were asked to review, do you mean here

6    today at the deposition?

7         A.     Yes, many of them will talk

8    about --

9         Q.     Well, can you just first answer

10   that question?

11        A.     Yes, yes.

12        Q.     And then the other studies that you

13   were asked to review, you're referring to ones

14   that were given to you by plaintiffs counsel?

15             MR. ORENT:  Objection, misstates

16   his testimony.

17        Q.     You talked about three sources of

18   articles.

19        A.     Correct, the studies that you

20   presented to me today --

21        Q.     Right.

22        A.     -- the studies that I was asked to

23   review as part of this that were on my thumb

24   drive --

25        Q.     Right.

Neeraj Kohli, M.D.

1    A.       -- and the other studies and

2    experiences that I've had as part of my clinical

3    practice and my research responsibilities and

4    lecturing responsibilities around the country.

5    Q.       And do you have as you sit here

6    today, Doctor, 'cause I don't know that I saw it

7    in your report, any particular studies that you

8    rely on to support the position that the use of

9    TVT-O is more likely to result in pain -- groin

10   pain?

11   A.       Compared to retropubic slings?

12   Q.       Right.  Other than on a short-term

13   basis.

14   A.       Yeah.  I mean, we can use the study

15   that you just gave me where if you look at some

16   of the sections and complications that you didn't

17   read, it actually says that groin pain and thigh

18   pain was more common in the TVT-O groups.

19            In addition --

20   Q.       Short term or long term, Doctor?

21   A.       Well, again, they don't necessarily

22   discriminate between the two, and you would have

23   to go back to all of the randomized controlled

24   trials that they looked at and talk about long

25   term and short term.

Neeraj Kohli, M.D.

1            The papers that we've seen, and

2    again I can bring those papers out, they've all

3    shown some level of long-term complications.

4    I've seen it in my clinical practice where

5    patients have not had significant groin pain and

6    then three years or four years later they have.

7            And then lastly I would tell you

8    that we wrote a paper in 1998 which was one of

9    the earliest papers about mesh complication about

10   sacral colpopexy, and what we found is when

11   you're dealing with a permanent implant which is

12   there permanently, there's no real statute of

13   limitations on when complications can occur.  So

14   erosions, exposure, contraction, pain can occur

15   any time.

16           So when you're showing me papers

17   that have six-month, three-month, two-year,

18   five-year data, I would tell you that those

19   complications aren't necessarily absolute in the

20   sense that other complications unique to mesh

21   use, which is a permanent material, can happen

22   beyond that time frame, and that's what I've seen

23   in my clinical practice.

24        Q.      Sure.  And you're talking about --

25   but you can find all of those, erosion, pain with

Neeraj Kohli, M.D.

1    respect to any product that's implanted in the

2    body; isn't that true?

3                    MR. ORENT:  Objection.

4        A.        But, again, you specifically asked

5    me about groin pain, and I don't see groin pain

6    when I do a retropubic sling procedure.

7        Q.        You've never seen groin pain when

8    you've used a retropubic sling procedure?

9        A.        Not to my recollection because the

10   mesh doesn't pass in the groin area.

11       Q.        Okay.  And of the 30 to 50 patients

12   that you have dealt with personally, how many

13   have long-term groin pain that you attribute

14   solely to the use of the sling, the TVT sling?

15                   MR. ORENT:  Objection.

16       A.        The complications that I was taking

17   care of?

18       Q.        Yes.

19       A.        The vast majority of them had

20   either vaginal or groin pain.

21       Q.        But I'm talking about a number.

22   You said you treated 30 to 50.  What percentage

23   of the 30 to 50 have you diagnosed with long-term

24   groin pain that you attribute solely to the use

25   of the TVT-O?

Neeraj Kohli, M.D.

1            MR. ORENT:  Objection.

2        A.      And are we separating the vaginal

3    pain, just groin pain.

4        Q.      Yes, first groin pain.

5        A.      I would probably say about 10

6    percent, 15 percent.

7        Q.      And how is it that you come up with

8    that number?

9        A.      To my recollection about what we

10   talked to them about and what the treatments are.

11   I had talked to you about the fact that if they

12   had groin discomfort, we talked to them about

13   removing that groin portion of the mesh.

14            And if you look at how many we've

15   done, it's been a small handful.  So out of the

16   30 to 50, 10 to 15 percent had that type of

17   symptoms, a small handful opted to have surgical

18   revision and a small number which we talked about

19   opted to either have injections or physical

20   therapy or do nothing.

21       Q.      So that's under ten people that

22   you've actually physically treated?

23            MR. ORENT:  Objection.

24       A.      Surgically, in terms of removing

25   the groin portion of TVT-O.

Neeraj Kohli, M.D.

1          Q.       But I thought your testimony before

2      was that the 30 to 50 were people that you

3      actually evaluated for compli -- and treated for

4      complications that you attribute to the TVT-O but

5      that you did not necessarily perform surgery in

6      all cases?

7               MR. ORENT:   Objection.

8          A.       Correct, so I told you that

9      probably about 10 to 15 percent of those patients

10     had chronic long-term or long -- delayed onset

11     groin pain --

12         Q.       Right.

13         A.       -- out of the 30 to 50 for mesh

14     complications.

15         Q.       Right, under ten.   Under ten then.

16         A.       Yes.

17         Q.       And are you aware of any other

18     procedures, say the TOT, where people have groin

19     pain that they associate with the procedure?

20         A.       Yes.

21         Q.       And isn't it true, Doctor, that if

22     there were, say, an infection on the needles that

23     were inserted that you could get groin pain as

24     well?

25         A.       Are you talking short term or long

Neeraj Kohli, M.D.

1  term.

2       Q.      Well, initially short term.  You

3  certainly could get short term.

4       A.      Yes.

5       Q.      Right.  And could that result in

6  long-term complications, Doctor?

7               MR. ORENT:  Objection.

8       Q.      If untreated.

9       A.      If we are talking about the needle

10  being infected, typically that would show up in

11  the short term, not as opposed to in the long

12  term because then that infection would be

13  probably of a different etiology.

14       Q.      So you're saying it's not possible

15  to have a long-term infection of the groin as a

16  result of that?

17               MR. ORENT:  Objection.

18       A.      Again, if you tell me what long

19  term means.  If you told me two years from the

20  time of the initial implant, I would say probably

21  not.  That's like having a UTI for two years that

22  was never treated.  If you told me that, you

23  know, it was three months, four months and that's

24  your definition of long term, you know, I think

25  an infection that was present at the time of

Neeraj Kohli, M.D.

1    surgery could fester for three to four months,

2    but it wouldn't show up three years after putting

3    that mesh in.

4        Q.     So what percentage of the patients,

5    the 30 to 50 patients that you treated that have

6    groin pain, have had a delayed onset of groin

7    pain?

8        A.     The vast majority would have

9    typically delayed onset.  I mean, there was --

10   probably half had delayed onset and half had

11   onset fairly close to the surgery, but there was

12   a delay in diagnosis.  It was felt that their

13   pain was due to positional issues.  Oh, it will

14   go away.  You know, you didn't take proper pain

15   medication, maybe you were too active.  So there

16   was a reason to explain away the pain such that

17   it was not diagnosed until it was persistent a

18   year or two years later.

19       Q.     Are there other causes of groin

20   pain when the TVT-O is used short of there being

21   a problem with the product itself in your

22   opinion?

23       A.     Short term or long term?

24       Q.     Both.

25       A.     Clearly I think there are some

Neeraj Kohli, M.D.

```
 1   positional issues that depend maybe on the length
 2   of the surgery and how the patient was positioned
 3   and how that pain manifests itself.
 4              When I talk about groin pain
 5   related to the mesh, it's typically exactly what
 6   we talked about, that when you touch the area of
 7   the mesh and where the mesh has been there's pain
 8   or tenderness.
 9   (Whereupon, Deposition Exhibit 17,
10      Two Routes of Transobturator tape procedures
11      in stress urinary incontinence: A
12      meta-analysis with direct and indirect
13      comparison of randomized trials,
14      Pallavi M. Latthe, et al
15      was marked for identification.)
16      Q.      (BY MS. GUILFOYLE) All right.  I'm
17   going to show you No. 17 --
18      A.      Thank you.
19      Q.      -- and ask you, Doctor, if you've
20   seen that.
21      A.      Excuse me, one second.  I
22   apologize.
23              (Discussion off the record.)
24      Q.      Are you familiar with this study,
25   Doctor?
```

Neeraj Kohli, M.D.

1     A.     I don't think I've seen this study.

2     Q.     Okay.  I direct your attention to

3   the conclusion.  "The evidence for the equivalent

4   effectiveness of TOT and TVT-O when compared with

5   each other is established over the short term.

6   Bladder injuries and voiding difficulties seem to

7   be less with inside-out tapes on direct

8   comparison."  Do you have any reason to doubt the

9   findings of this study?

10    A.     Again, I haven't had --

11           MR. ORENT:  Objection.

12    A.     -- the chance to review this in

13  detail.  I've just quickly seen that they looked

14  at six months of data, and they're basically

15  saying over the short term.  I have no reason to

16  doubt their conclusions, but whether or not there

17  is scientific validity and what they're analytics

18  and study design were, I can't comment on that.

19    Q.     Are you aware of any studies that

20  talk about long-term outcomes using the Burch

21  procedure?

22    A.     I am aware of studies.  I couldn't

23  quote them off the top of my head, but we do have

24  studies that we referenced early on.

25    Q.     Can you mark this, please?

Neeraj Kohli, M.D.

```
 1        (Whereupon, Deposition Exhibit 18,
 2         Long-Term Results of Burch Colposuspension,
 3         Fuat Demirci, et al
 4        was marked for identification.)
 5        Q.      (BY MS. GUILFOYLE) Doctor, do you
 6    recognize what's been marked as Exhibit 18?
 7        A.      I don't think I have seen this
 8    study.
 9        Q.      I direct your attention to the
10    results.  "The study included 220 women of whom
11    155 (group II) had undergone a Burch
12    colposuspension procedure three to six years
13    earlier and were evaluated retrospectively.  The
14    remaining group (group I) had undergone a Burch
15    colposuspension procedure one to two years
16    earlier and were evaluated prospectively."  So
17    they used both a prospective and a retrospective
18    group.
19        A.      Yes.
20        Q.      So at the end -- on the last page
21    it talks about -- not the last.  Yeah, the page
22    before the list of resources.  "The present study
23    has shown that a previous incontinence operation
24    impairs results of further incontinence surgery."
25    Do you agree with that?
```

Neeraj Kohli, M.D.

1              MR. ORENT:   Objection.

2        A.        In terms of their study conclusion

3   or that that's true?

4        Q.        That that's true.

5        A.        I think it really depends on what

6   the previous incontinence surgery was, who

7   operated on them and what the follow-up study is.

8                  I mean, one of the things we like

9   about slings is that they make good what we call

10   salvage operations, and sometimes the success

11   rate of the secondary procedure can be as high,

12   if not higher, than the initial procedure, but

13   again, their quote is, "The present study has

14   shown that a previous incontinence operation

15   impairs the results of further incontinence

16   surgery," and I can only assume that their

17   conclusion is true, although I haven't had a

18   chance to look at their study methodology.

19        Q.        Well, have you experienced that in

20   your own practice, Doctor?

21        A.        We do tell patients that oftentimes

22   if you have a second or third incontinence or

23   prolapse procedure your risk of the procedure and

24   the success rates of the procedure may be

25   small -- lower.

Neeraj Kohli, M.D.

1                     Assuming that the reason they

2    failed is because they may have other anatomic

3    variants as well as the fact that there might be

4    it scarring and other -- and they're older.  So

5    there is that thing to consider.  But whether we

6    found that clinically, I haven't studied that

7    specifically in my own patient population.

8         Q.      So that's not part of your opinion?

9                 MR. ORENT:  Objection.

10        Q.      Correct, Doctor?

11        A.      Part of my opinion?

12        Q.      It is not part of your opinion?

13                MR. ORENT:  Objection.

14        A.      I didn't have any opinion to that

15    in my report.

16        Q.      Okay.  And then it also indicates

17    that suspension sutures are responsible for groin

18    or suprapubic pain.

19                     Have you ever encountered that when

20    you used the Burch procedure, Doctor?

21        A.      We have had suprapubic pain.

22    Whether or not that was short term or long term

23    is difficult for me to say 'cause I don't have

24    the details and those procedures were done 15

25    years ago.

Neeraj Kohli, M.D.

```
 1              As far as groin pain, I don't
 2  recollect a patient that we did the Burch with
 3  that had groin pain, but the groin pain may be
 4  related to positional issues, but I don't
 5  recollect one of our patients that we did that
 6  had a significant or sustained groin pain issue.
 7       Q.     Were you aware of those statistics
 8  within the medical community even if you haven't
 9  encountered it as a treating physician?
10       A.     Again, this paper talks about it,
11  and I would have to go look at the data in terms
12  of groin pain with Burch colposuspensions, but I
13  haven't seen significant mention of that in my
14  review in the past.
15       Q.     Okay.  Have you seen any studies
16  talking about the connection between dyspareunia
17  and Burch colposuspensions?
18       A.     I have in the past, yes.
19       Q.     Well, when you say you've seen it
20  in the past, you don't have any reason to believe
21  that if a Burch procedure was performed today
22  that there wouldn't be those same potential risks
23  of dyspareunia, right?
24              MR. ORENT:  Objection.
25       A.     No, but I was saying that in the
```

Neeraj Kohli, M.D.

1    past when I was looking at the Burch procedure I

2    have seen those studies.

3         Q.    Okay.  Are there any other

4    particular studies, Doctor, or any facts that you

5    rely on that we haven't talked about today to

6    support your opinions?

7         A.    No.  I mean, I think we haven't

8    specifically gone through every study that I've

9    looked at, but you have a list of the studies in

10   terms of what I specifically looked at for this

11   case as well as other studies outside of that

12   list which I look at for my everyday practice in

13   counseling of patients.

14        Q.    Okay.  You haven't -- other than

15   that catheter, you haven't designed any medical

16   devices, have you?

17        A.    Not that I was -- I would say that

18   I was significantly involved with.  I've provided

19   design feedback for a variety of different

20   products --

21        Q.    Right.

22        A.    -- but not that I would say I was

23   materially involved with.

24        Q.    So we've looked at a number of

25   studies that have talked about the risk of

Neeraj Kohli, M.D.

1  complication with TVT-O versus TVT in particular,

2  but one of your opinions is that the TVT-O has an

3  unacceptably high rate of chronic pain.  Is that

4  based solely on the groin issue that you

5  testified about earlier?

6      A.      That and dyspareunia which we

7  talked about.

8      Q.      So when you use pelvic pain, you're

9  referring to dyspareunia?

10      A.      Well, pelvic pain I talk about more

11  in terms of a global description.  They can have

12  chronic pelvic pain, and it can be worsened with

13  dyspareunia, or they can have dyspareunia which

14  is more acute and incidental, but many times

15  they're used interchangeably.

16      Q.      What evidence do you have that

17  Ethicon rushed to market the TVT-O product?

18      A.      Well, again, comparatively

19  speaking, there's internal documents where they

20  said that we have -- you know, the production

21  development phase was suppose to be 24 months,

22  and then they patted themselves on the back in

23  the sense that we did it in nine months with

24  limited resources.  So that's a fairly quick

25  development phase.

Neeraj Kohli, M.D.

1            In addition, there was some

2    internal documentation which talked about that

3    there is an urgency to get this product out

4    because of competitive pressures and the fact

5    that there was erosion of market share of the

6    TOT -- of the TVT product of Gynecare because of

7    the TOT.

8        Q.      Now, Doctor, you -- I think you

9    testified you reviewed approximately or were

10   given access to approximately 2,000 pages of

11   Ethicon documents; is that correct?

12       A.      If not more, yes.

13       Q.      Okay.  You are not, or are you

14   testifying that you have reviewed all the Ethicon

15   documents relative to the development and

16   marketing of the TVT-O?

17       A.      No, I'm only testifying that I

18   reviewed the ones that I was provided.

19       Q.      Okay.  And that's what forms the

20   basis of your opinion?

21       A.      Yes.

22       Q.      What about the opinion that Ethicon

23   marketed the TVT-O indiscriminately to all

24   physicians?  What's the basis for that opinion?

25       A.      Well, I think a few things.  One

Neeraj Kohli, M.D.

1    is, again, I did a lot of training for Ethicon

2    during that time frame, and if you looked at some

3    of the doctors who attended the cadaver labs, the

4    lectures and our surgical preceptorships, they

5    clearly weren't qualified to do some of these

6    procedures.

7              In addition, in the IFUs which

8    bothered me, they basically made cystoscopy

9    voluntary and at the discretion of the physician

10   which I had a problem with and I voiced it to

11   Ethicon because cystoscopy is a very basic and

12   integral procedure which is performed by doctors

13   who do incontinence work all the time.

14             Now, in the IFU for TVT, cystoscopy

15   is actually recommended and almost required as

16   part of that IFU, whereas in TOT or TVT-O it was

17   recommended to be at the discretion of which

18   really made it appropriate or applicable to a

19   wide range of physicians who never did

20   cystoscopy.

21             Now, if you're not doing cystoscopy

22   and you don't know how to look inside the

23   bladder, I'm not sure if you should be putting

24   needles into the pelvis and meshes in the area of

25   the bladder.

Neeraj Kohli, M.D.

1    Q.      What evidence do you have, Doctor,

2  that any doctors who were unqualified or not able

3  to do cystoscopies actually used the TVT-O?

4    A.      I wouldn't be able to tell you a

5  number on that.

6    Q.      Do you have any information on

7  that?

8    A.      I had some doctors who came through

9  my preceptorship who said we don't do cystoscopy

10  and what would you recommend.  And, again, it was

11  a time where we could share our personal

12  experiences, and I was pretty clear about the

13  fact that if you don't do cystoscopy I would not

14  do this procedure.  And if you are interested in

15  doing this procedure, the first thing I would do

16  is learn how to do cystoscopy.

17    Q.      Right.  But you don't have any

18  evidence do you, Doctor, that those doctors that

19  you talked about during your preceptorship didn't

20  go back and get trained on how to do

21  cystoscopies, do you?

22    A.      I do not.

23    Q.      Let's just take one break.

24           (A break was taken.)

25    Q.      (BY MS. GUILFOYLE) Doctor, the

Neeraj Kohli, M.D.

```
 1   people that you were training to use the Ethicon
 2   products such as the TVT-O are surgeons, correct?
 3        A.      They're gynecologists.
 4        Q.      They don't have to be surgeons?
 5        A.      Well, gynecologists are surgeons --
 6        Q.      Surgeons, right.
 7        A.      -- but surgeons aren't all
 8   gynecologists.  All surgeons aren't
 9   gynecologists.
10        Q.      But they're gynecological surgeons.
11        A.      Yes.
12        Q.      And they've had a lot of training
13   through medical school and residency and practice
14   before they even come to go to a like
15   preceptorship or learn about a TVT-O product,
16   correct?
17        A.      Can you clarify what training
18   means?
19        Q.      Sure.  They go through the same
20   type of training that you do.  They see a lot of
21   patients, they perform a lot of surgeries, they
22   are trained in medical school, they are trained
23   by their supervisors at the hospitals, correct?
24                MR. ORENT:  Objection.
25        A.      So many of them have had that
```

Neeraj Kohli, M.D.

1    requisite training for medical school and

2    residency, but many of them were not doing

3    urologic or urogynecologic surgery.

4              So my training where I was trained

5    in a variety of different urogynecological

6    procedures is very different than theirs.  Some

7    of them were coming in to be trained on a

8    incontinence procedure or a sling procedure and

9    had never done an incontinence procedure.  So

10   their training -- yes, they were trained to do

11   routine gynecologic procedures which typically

12   are hysterectomies and basic laparoscopies and

13   tubal ligations.  But did they have specific

14   training coming in of doing incontinence

15   procedures like Burchs or slings or other slings

16   and did they have anatomy of the newer relevant

17   spaces, I can tell you that many of them didn't.

18        Q.    Okay.  But your goal was not, and

19   your job, you did not see your job as to teach

20   them to be surgeons, correct?

21              MR. ORENT:  Objection.

22        A.    My job was to teach with them or

23   share with them how to do this specific surgical

24   procedure.

25        Q.    Right, because they're trained to

Neeraj Kohli, M.D.

1   be surgeons elsewhere and are credentialed to be

2   surgeons by the hospitals where they have

3   privileges; isn't that true?

4            MR. ORENT:  Objection.

5       A.       Again, I had no specific knowledge

6   of their credentialing or what procedure they did

7   in the past, and I was never given that

8   information by Gynecare or almost any other

9   company I taught for.

10            In the course of having

11  conversations and discussions, we would ask, you

12  know, what procedures have you done, what

13  experience have you done so that we could better

14  tailor our education for them when they were with

15  us.

16       Q.       Okay.  I don't have anything else.

17       A.       Thank you.

18            MR. ORENT:  I have just a couple of

19  follow-up questions.

20

21                 EXAMINATION

22  BY MR. ORENT:

23       Q.       Doctor, thank you very much for

24  your testimony today.  I want to turn your

25  attention to Exhibit No. 5.  You recognize and

Neeraj Kohli, M.D.

1    have discussed this as the 2014 position

2    statement on mesh midurethral slings for stress

3    urinary incontinence from the American

4    Urogynecological Society; is that correct?

5        A.      Yes.

6        Q.      Okay.  And, Doctor, I want to first

7    focus on, starting on page 2.  You were asked a

8    question about the monofilament polypropylene

9    mesh midurethral sling is the most extensively

10   studied anti-incontinence procedure in history.

11   Do you remember being asked questions about that?

12       A.      Yes.

13       Q.      Doctor, has anyone ever claimed

14   that the TVT-O is the most extensively studied

15   anti-incontinence procedure in history?

16              MR. GUILFOYLE:  Objection.

17       A.      No.

18       Q.      And is it in fact the most

19   extensively studied anti-incontinence procedure

20   in history?

21              MS. GUILFOYLE:  Objection.

22       A.      No.

23       Q.      And this piece mentions 2,000

24   publications in the scientific literature

25   describing MUS and the treatment of SUI.

Neeraj Kohli, M.D.

1            Doctor, are there 2,000 studies

2     describing TVT-O?

3            MS. GUILFOYLE:  Objection.

4     A.     No.

5     Q.     And, Doctor, if you see here,

6     Full-length -- on paragraph number 3, Full-length

7     midurethral slings, both retropubic and

8     transobturator, have been extensively studied and

9     are safe and effective.  Relative to other

10    treatment options they remain the leading

11    treatment option and current gold standard for

12    stress urinary incontinence.  Do you see that

13    sentence?

14    A.     Yes.

15    Q.     And then it follows up with that,

16    "Over 3 million midurethral slings have been

17    placed worldwide and a recent survey indicates

18    that these procedures are used by greater than 99

19    percent of AUGS members."  And that lists a

20    footnote 14, do you see that?

21    A.     Yes.

22    Q.     And, Doctor, I'm going to turn now

23    to Footnotes 13 and 14.  Number 14 is the study

24    on the impact of the FDA transvaginal mesh safety

25    updates on AUGS members' use of synthetic mesh

Neeraj Kohli, M.D.

1    and biological grafts in reconstructive surgery;

2    is that correct?

3         A.      Yes.

4         Q.      The aim of this study was

5    explicitly to determine whether or not the FDA's

6    statements changed usage; is that correct?

7                 MS. GUILFOYLE:  Objection.

8         A.      Yes.

9         Q.      It had nothing to do with a gauge

10   on what percentage.  It was not intended to

11   determine what percentage of AUGS members used

12   polypropylene midurethral slings, correct?

13                MS. GUILFOYLE:  Objection.

14        A.      Yes.

15        Q.      And the response rate was

16   relatively low for that particular survey; is

17   that correct?

18                MS. GUILFOYLE:  Objection.

19        A.      Yes.

20        Q.      And when you look at a study, you

21   look at things like response rate are pretty

22   important factors, correct?

23                MS. GUILFOYLE:  Objection.

24        A.      Yes.

25        Q.      And this statement was written by

Neeraj Kohli, M.D.

1    Charles Nager, N-A-G-E-R, Paul Tulikangas and

2    Dennis Miller from AUGS and Eric Rovner and

3    Howard Goldman from SUFU, S-U-F-U.

4              Doctor, to your knowledge, does

5    Dr. Miller have associations -- does he own a

6    patent to polypropylene mesh devices?

7              MS. GUILFOYLE:  Objection.

8         A.    Yes.

9         Q.    And is that disclosed anywhere in

10   here?

11             MS. GUILFOYLE:  Objection.

12        A.    No.

13        Q.    And, Doctor, do you know does

14   Dr. Goldman have associations with AMS or other

15   manufacturers?

16             MS. GUILFOYLE:  Objection.

17        A.    Yes.

18        Q.    Okay.  Is that disclosed anywhere

19   in here?

20        A.    No.

21        Q.    Doctor, as a professional, do you

22   think that facts like conflict of interest are

23   important things to disclose?

24        A.    Yes.

25             MS. GUILFOYLE:  Objection.

Neeraj Kohli, M.D.

1      Q.      Doctor, you were shown Exhibit 17,

2  which was an article that you had not previously

3  seen before.  It's from the BJU International out

4  of the United Kingdom.  Do you remember being

5  shown this article?

6      A.      Yes.

7      Q.      Doctor, there is a groin/thigh pain

8  TVT-O odds ratio of 8.05 which is between 3.78

9  and 17.16.  Can you tell us what an odds ratio of

10  8.05 means?

11              MS. GUILFOYLE:  Objection.

12      A.      Well, it essentially means that

13  there's a eight times higher risk or odds that

14  one procedure might actually have a specific

15  complication or occurrence compared to another.

16              So if you have an odds ratio of

17  one, they're basically equivalent.  If you have

18  an odds ratio of a positive number, it means that

19  one procedure has a higher odds of having that

20  complication or outcome.

21              And in this case, eight would mean

22  that it would be eight times higher, and the

23  variation on that would be between 3 and 17.  So

24  in some studies, it was 17 times higher of TVT-O

25  versus its comparative surgical procedure.

Neeraj Kohli, M.D.

1       Q.      And, Doctor, is an eight times odds

2   ratio, is that significant to you as a treating

3   physician --

4               MS. GUILFOYLE:  Objection.

5       Q.      -- as a doctor?

6               MS. GUILFOYLE:  Objection.

7       A.      Yes.

8       Q.      And why is that significant?

9       A.      Well, again, based on its review of

10  the literature, it shows how much more frequently

11  is it with one procedure versus another.  And

12  when you're looking at complications, numbers

13  that are five, six, seven, eight, ten times are

14  relevant and significant.

15      Q.      Okay.  Thank you very much, Doctor,

16  I have no further questions.

17              MS. GUILFOYLE:  I just have a

18  couple of questions.

19

20                  FURTHER EXAMINATION

21  BY MS. GUILFOYLE:

22      Q.      Doctor, I just have one question

23  about the position statement --

24      A.      Sure.

25      Q.      -- on mesh.  You were asked about

Neeraj Kohli, M.D.

1    number 2, the monofilament polypropylene mesh MUS

2    is the most extensively studied incontinence

3    procedure in history.  Do you recall answering

4    questions about that from Mr. Orent?

5         A.    Yes.

6         Q.    And I guess my question is, the

7    monofilament polypropylene mesh that is used

8    in -- that is referred to here is the same

9    monofilament polypropylene mesh that's used in

10   the TVT-O; isn't that true?

11             MR. ORENT:  Objection.

12        A.    Yes.

13        Q.    Okay.  I don't have anything else.

14             (Deposition concluded at 4:52 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Neeraj Kohli, M.D.

```
 1            C E R T I F I C A T E

 2            I, Maryellen Coughlin, RPR/CRR and

 3     notary public in the Commonwealth of

 4     Massachusetts, do hereby certify that the

 5     foregoing is a true and accurate transcript of

 6     my stenographic notes of the deposition of

 7     NEERAJ KOHLI, M.D., who appeared before me,

 8     satisfactorily identified himself, and was by me

 9     duly sworn, taken at the place and on the date

10     hereinbefore set forth.

11            I further certify that I am neither

12     attorney nor counsel for, nor related to or

13     employed by any of the parties to the action in

14     which this deposition was taken, and further

15     that I am not a relative or employee of any

16     attorney or counsel employed in this case, nor

17     am I financially interested in this action.

18            THE FOREGOING CERTIFICATION OF THIS

19     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF

20     THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT

21     CONTROL AND/OR DIRECTION OF THE CERTIFYING

22     REPORTER.

23

24            MARYELLEN COUGHLIN, RPR/CRR

25
```

Neeraj Kohli, M.D.

1                    INSTRUCTIONS TO WITNESS

2

3

4                    Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the appropriate

7    space on the errata sheet for any corrections

8    that are made.

9                    After doing so, please sign the

10   errata sheet and date it.  It will be attached to

11   your deposition.

12                   It is imperative that you return

13   the original errata sheet to the deposing

14   attorney with thirty (30) days of receipt of the

15   deposition transcript by you.  If you fail to do

16   so, the deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24

25

Neeraj Kohli, M.D.

```
  1                 -   -   -   -   -   -

                      E R R A T A

  2                 -   -   -   -   -   -

  3

  4    PAGE   LINE   CHANGE

  5    _____  _____   _____

  6         REASON:   _____

  7    _____  _____   _____

  8         REASON:   _____

  9    _____  _____   _____

 10         REASON:   _____

 11    _____  _____   _____

 12         REASON:   _____

 13    _____  _____   _____

 14         REASON:   _____

 15    _____  _____   _____

 16         REASON:   _____

 17    _____  _____   _____

 18         REASON:   _____

 19    _____  _____   _____

 20         REASON:   _____

 21    _____  _____   _____

 22         REASON:   _____

 23    _____  _____   _____

 24         REASON:   _____

 25
```

Neeraj Kohli, M.D.

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5     hereby certify that I have read the

6     foregoing pages, and that the same is

7     a correct transcription of the answers

8     given by me to the questions therein

9     propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     NEERAJ KOHLI, M.D.              DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24

25

Neeraj Kohli, M.D.

1                        LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25     _____  _____   _____