# EXHIBIT J

Konstantin Walmsley, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

- - -

| | | |
|---|---|---|
| IN RE: ETHICON, INC. | : | Master File |
| PELVIC REPAIR SYSTEM | : | No. |
| PRODUCTS LIABILITY | : | 2:12-MD-02327 |
| LITIGATION | : | |
| _____ | : | MDL NO. 2327 |
| | : | |
| DAWN BAKER, et al | : | |
| | : | |
| v. | : | CASE NO. |
| | : | 2:12-cv-02476 |
| ETHICON, INC., et al. | : | |
| | : | |

- - -

August 11, 2016
- - -
Expert deposition of
KONSTANTIN WALMSLEY, M.D., taken pursuant
to notice, was held at Courtyard Marriott
West Orange, 8 Rooney Circle, West
Orange, New Jersey, beginning at 12:04
p.m., on the above date, before Kimberly
A. Cahill, a Federally Approved
Registered Merit Reporter and Notary
Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.591.5672
deps@golkow.com

Konstantin Walmsley, M.D.

Page 2

```
 1    APPEARANCES:
 2
 3    MOTLEY RICE LLC
      BY:  HAYLEIGH T. STEWART SANTRA, ESQUIRE
 4    28 Bridgeside Boulevard
      Mt. Pleasant, South Carolina  29464
 5    (843) 216-9373
      hstewart@motleyrice.com
 6    Representing the Plaintiffs
 7
      FROST BROWN TODD LLC
 8    BY:  CHARLES M. PRITCHETT, ESQUIRE
      400 West Market Street
 9    Floor 32
      Louisville, Kentucky  40202-3363
10    (502) 589-5400
      cpritchett@fbtlaw.com
11    Representing the Defendants Johnson &
      Johnson and Ethicon
12
13
14
15                    -   -   -
16
17
18
19
20
21
22
23
24
```

Page 3

1              -   -   -
2                I N D E X
3              -   -   -
4
5    Testimony of:   KONSTANTIN WALMSLEY, M.D.
6      By Mr. Pritchett              6
       By Ms. Santra              120
7
8              -   -   -
9           E X H I B I T S
10             -   -   -
11

        NO.           DESCRIPTION            PAGE
12
13     Walmsley       Notice of          10
        (Baker)-1     Deposition of
14                    Konstantin
                      Walmsley, M.D.
15
        Walmsley       Rule 26 Expert     13
16      (Baker)-2     Report of
                      Konstantin
17                    Walmsley, M.D.
18     Walmsley       11/20/15 Curriculum 14
        (Baker)-3     Vitae of Konstantin
19                    Walmsley
20     Walmsley       Document Titled     15
        (Baker)-4     "Materials
21                    Reviewed"
22     Walmsley       6/20/16 Encounter   25
        (Baker)-5     Summary for Dawn
23                    Baker
24     Walmsley       Notes of Office     67

Konstantin Walmsley, M.D.

Page 4

```
 1      (Baker)-6      Visits from Rural
                       Health for Dawn
 2                     Baker, BAKERD
                       RURALH_MDR00024
 3
        Walmsley       Notes of Office      70
 4      (Baker)-7      Visits from Rural
                       Health for Dawn
 5                     Baker from January
                       and February 2009
 6
        Walmsley       5/11/09 Notes of     73
 7      (Baker)-8      Date of Encounter
                       with Dawn Baker by
 8                     Kupper,
                       BAKERD_UGP_MDR00002
 9                     through
                       BAKERD_UGP_MDR00007
10
        Walmsley       6/18/09 "Appendix B 80
11      (Baker)-9      - Bladder Health
                       Questionnaire
12                     (Sample)" for Dawn
                       Baker,
13                     BAKERD_PSR_00007
                       and
14                     BAKERD_PSR_00008
15
16
17
18
19
20
21
22
23
24
```

Konstantin Walmsley, M.D.

```
 1                    —   —   —

 2            DEPOSITION SUPPORT INDEX

 3                    —   —   —

 4

 5   Direction to Witness Not to Answer

 6   Page Line      Page Line       Page Line

 7

 8   Request for Production of Documents

 9   Page Line      Page Line       Page Line

10

11

     Stipulations

12

     Page Line      Page Line       Page Line

13

14

15   Question Marked

16   Page Line      Page Line       Page Line

17

18

19

20

21

22

23

24
```

Konstantin Walmsley, M.D.

Page 6

```
 1                   -  -  -

 2             KONSTANTIN WALMSLEY, M.D.,

 3        after having been duly sworn, was

 4        examined and testified as follows:

 5                   -  -  -

 6             EXAMINATION

 7                   -  -  -

 8  BY MR. PRITCHETT:

 9        Q.    Would you tell us your name,

10  please?

11        A.    Konstantin Walmsley.

12        Q.    And what is your

13  professional address?

14        A.    777 Bloomfield Avenue, Glen

15  Ridge, New Jersey  07028.

16        Q.    Dr. Walmsley, my name is

17  Chuck Pritchett.  I represent Ethicon and

18  Johnson & Johnson in this lawsuit brought

19  by Dawn and Michael Baker.

20             Do you understand that

21  you've been identified as a case-specific

22  expert in this lawsuit by the Bakers?

23        A.    Yes.

24        Q.    And do you understand that
```

Konstantin Walmsley, M.D.

Page 7

1    we are here today to talk about all of

2    your specific -- case-specific opinions,

3    the grounds and basis for those opinions?

4           A.    Yes.

5           Q.    And as you know, this is my

6    only opportunity to talk to you, so if

7    you could make sure to try to give me all

8    of your opinions and the grounds for

9    those opinions, I would appreciate it.

10          A.    Certainly.

11          Q.    And you're prepared to

12   discuss all of your opinions and the

13   basis for those opinions today?

14          A.    Yes, sir.

15          Q.    I understand you have four

16   case-specific opinions:  One, that Ms.

17   Baker has scar plate formation due to the

18   TVT Secur?

19          A.    Yes.

20          Q.    Two, that her complaints of

21   pelvic pain and dyspareunia are caused by

22   the scar plate formation?

23          A.    Yes.

24          Q.    And you performed a

Konstantin Walmsley, M.D.

Page 8

1    differential diagnosis.  Right?

2         A.    I did.

3         Q.    Your third opinion is that

4    she still is experiencing pelvic pain,

5    vaginal pain, dyspareunia, and mixed

6    urinary incontinence?

7         A.    Yes.

8         Q.    And your last opinion

9    addresses her prognosis.

10         A.    That's correct.

11         Q.    Any other opinions that I

12    missed or are contained in your report?

13         A.    No, I don't believe so.

14         Q.    And of course I'm leaving

15    out -- you have two general causation

16    opinions as well; correct?

17         A.    Yes, sir.

18         Q.    And by the protocol, we're

19    not here to talk about those today.

20         A.    That's correct.

21         Q.    Okay.

22             Can you tell me when you

23    were first retained by Ms. Baker's legal

24    counsel to do work in this case?

Konstantin Walmsley, M.D.

Page 9

1          A.     It would have been in the
2     mid to latter part of May.
3          Q.     May of this year?
4          A.     That's correct.
5          Q.     And you've worked with that
6     law firm before?
7          A.     I had.
8          Q.     And when did you first begin
9     your work for your opinions in this
10    lawsuit?
11         A.     At some point in June, I
12    would have begun my work on this case.
13         Q.     And that's about the time
14    that you performed an independent medical
15    examination of Ms. Baker?
16         A.     Yes, sir.
17              MR. PRITCHETT:  And this is
18         not totally a memory test.  I'll
19         give you your report to refer to
20         as we proceed.
21              I want to mark as Exhibit 1
22         to your deposition the deposition
23         notice.
24                   -   -   -

Konstantin Walmsley, M.D.

1              (Deposition Exhibit No.

2         Walmsley (Baker)-1, Notice of

3         Deposition of Konstantin Walmsley,

4         M.D., was marked for

5         identification.)

6                   -   -   -

7              THE WITNESS:  Thank you.

8    BY MR. PRITCHETT:

9         Q.    Have you seen that notice

10   before I just handed it to you?

11        A.    I have.

12        Q.    Schedule A requests that you

13   bring certain documents described there.

14   Can you tell me what, if anything, you

15   brought with you today?

16        A.    What I have today is my

17   laptop computer, which has electronic

18   versions of many of the Schedule A

19   requests.

20        Q.    Well, can you tell me what

21   those are?

22        A.    It has my curriculum vitae.

23   It contains my reliance list.  It would

24   contain my report, and it also may

Konstantin Walmsley, M.D.

Page 11

1    contain some of my billing, although I

2    sometimes have billing on one of my other

3    computers.

4            Q.    Any other documents?

5            A.    No.

6            Q.    What about medical records?

7                  MS. SANTRA:  We're going to

8            -- I will send you a link of all

9            the medical records that were sent

10           to Dr. Walmsley.  And I have his

11           C.V. and reliance list that were

12           served with the report if you need

13           those.

14   BY MR. PRITCHETT:

15           Q.    Can you tell me

16   approximately how much chargeable time

17   has accrued for your work in this case?

18           A.    Yes.  Roughly 7 to 11 hours

19   to the best of my recollection.

20           Q.    And you charge $500 per

21   hour; is that correct?

22           A.    Yes, sir.

23           Q.    Does that include deposition

24   testimony?

Konstantin Walmsley, M.D.

Page 12

1        A.      Yes.

2        Q.      Is that the same charge for

3   performing an IME?

4        A.      Not exactly.  A lot of -- my

5   IME charges tend to be vetted or scrubbed

6   through the office, so I don't get

7   compensated for the IME.  My practice

8   gets compensated for the IME.

9        Q.      Do you charge $500 per hour

10  for reviewing medical records?

11       A.      Yes.

12       Q.      And I was going to ask you,

13  your work in this case, is this run

14  through your practice group, which is

15  Urology Group of New Jersey, or you

16  individually?

17       A.      Me individually.

18       Q.      Is there anything requested

19  in Schedule A which you did not -- well,

20  you didn't bring anything, but which

21  we've omitted?

22               You mentioned your report,

23  your C.V., your reliance list, maybe some

24  billing.  Plaintiffs' counsel's going to

Konstantin Walmsley, M.D.

Page 13

1    send me a link to medical records.

2    Anything else?

3          A.    No.

4                MR. PRITCHETT:  I'm going to

5          mark as Exhibit 2 your report.

6                      -  -  -

7                (Deposition Exhibit No.

8          Walmsley (Baker)-2, Rule 26 Expert

9          Report of Konstantin Walmsley,

10         M.D., was marked for

11         identification.)

12                     -  -  -

13               MR. PRITCHETT:  Counsel, do

14         you have a copy of the report to

15         refer to?

16               MS. SANTRA:  Yes.

17   BY MR. PRITCHETT:

18         Q.    Does that appear to be a

19   copy of your report?

20         A.    Yes.

21               MR. PRITCHETT:  And I'm

22         going to mark as Exhibit 3 your

23         C.V. that was provided to us at

24         the time your report was served.

Konstantin Walmsley, M.D.

Page 14

```
 1                 -  -  -
 2              (Deposition Exhibit No.
 3          Walmsley (Baker)-3, 11/20/15
 4          Curriculum Vitae of Konstantin
 5          Walmsley, was marked for
 6          identification.)
 7                 -  -  -
 8   BY MR. PRITCHETT:
 9          Q.    Does that appear to be a
10   copy of your C.V.?
11          A.    Yes, sir.
12          Q.    There was some mention of an
13   updated C.V.  Can you tell me what would
14   be updated?
15          A.    The only thing I updated
16   were some of my extracurricular,
17   nonprofessional activities.
18          Q.    Do any of those
19   extracurricular activities have anything
20   to do with your opinions in this case?
21          A.    No, sir.
22          Q.    Or your work in this case?
23          A.    No.
24          Q.    You said they're
```

Konstantin Walmsley, M.D.

Page 15

1    nonprofessional?

2         A.    Yes, sir.

3              -  -  -

4         (Deposition Exhibit No.

5         Walmsley (Baker)-4, Document

6         Titled "Materials Reviewed", was

7         marked for identification.)

8              -  -  -

9    BY MR. PRITCHETT:

10        Q.    I'm going to hand you what

11   I've marked as Exhibit 4.  That is your

12   -- what you called the reliance list.

13   And I believe on here, it's called

14   "Materials Reviewed."

15             Is there anything to be

16   supplemented for the reliance list?

17        A.    No.

18        Q.    Was the reliance list

19   prepared by you or Ms. Baker's legal

20   counsel?

21        A.    It was prepared by me.

22        Q.    And were there any materials

23   that you considered for your opinions in

24   this case that you requested, but did not

Konstantin Walmsley, M.D.

Page 16

1    receive?

2            A.    No.

3            Q.    It mentions depositions of

4    medical providers?

5            A.    Correct.

6            Q.    Is it your understanding

7    that there were any depositions of

8    medical providers in this case?

9            A.    Not in this case, no.

10           Q.    You mentioned instructions

11   for use and on that you put Gynecare TVT

12   instructions for use.  Do you see that?

13           A.    I do.

14           Q.    Is that the IFU you reviewed

15   for your opinions in this case?

16               MS. SANTRA:  Object to the

17           form.

18               THE WITNESS:  Not

19           specifically.

20   BY MR. PRITCHETT:

21           Q.    Does that pertain to your

22   general causation opinions?

23           A.    The general causation

24   opinions are related, yes, to the TVT

Konstantin Walmsley, M.D.

Page 17

1    IFU, but it's applicable to the year in

2    which the case relates to and also the

3    type of TVT product, whether it's, for

4    example, TVT Secur, which has a different

5    IFU -- it's meant to encompass or

6    incorporate all of them.  If that's not

7    specific there, I apologize.

8         Q.    So you did review the TVT

9    Secur IFU for your opinions in this case?

10        A.    Yes.

11        Q.    Did you actually read over

12   the IFU again or just relying upon your

13   past use of it?

14        A.    I read it over again.

15        Q.    And you mentioned the

16   patient brochures as well?

17        A.    Yes.

18        Q.    Did you have any

19   communications with Ms. Baker's treating

20   doctors?

21        A.    No, sir.

22        Q.    Did you feel that that

23   wasn't necessary for your opinions?

24        A.    I felt that it wouldn't have

Konstantin Walmsley, M.D.

Page 18

1    been very helpful, correct.

2         Q.    Would you have liked to have

3    had access to a deposition of, for

4    instance, Dr. Hodges, who implanted the

5    TVT Secur?

6              MS. SANTRA:  Object to form.

7              THE WITNESS:  I think the

8         depositions of the implanting

9         surgeons can in certain instances

10        be helpful.

11   BY MR. PRITCHETT:

12        Q.    How can they be helpful?

13        A.    To perhaps give me an

14   impression of, in a surgeon's words, the

15   indications for the procedure, his or her

16   understanding as to the risks, benefits,

17   and alternatives at the time when they

18   were providing informed consent and

19   executing the procedure, and also to

20   perhaps give additional information

21   peri-procedurally as far as how patients

22   did and their attributing benefits,

23   complications, and such to the -- to --

24   you know, in their words, what the

Konstantin Walmsley, M.D.

Page 19

1    patient was experiencing.

2         Q.    Were you provided with any

3    summaries of medical records prepared by

4    others?

5         A.    Not to my knowledge, no.   I

6    don't recall any.

7         Q.    You didn't prepare any

8    medical chronology or summaries?

9         A.    My medical chronology was

10   really generated on the report kind of as

11   a realtime document as I was going

12   through the records.

13        Q.    Were you -- you mentioned

14   that you had depositions -- well, let me

15   take that back.

16              Did you review the

17   deposition of Ms. Baker?

18        A.    I did.

19        Q.    I didn't see it listed on

20   your reliance list.

21        A.    If you look at my expert

22   report -- and I apologize for the

23   confusion -- at the bottom of page 2, her

24   deposition was part of my review.

Konstantin Walmsley, M.D.

Page 20

1        Q.    Bottom of page 2 of your

2    report.

3        A.    Correct.  The reliance list,

4    if I was being more thorough, I would

5    have probably written "Depositions of

6    Medical Providers and/or Patient," which

7    I did not, to my discredit.

8        Q.    Did you review the

9    deposition of her husband?

10        A.    I don't recall seeing her

11    husband's deposition.

12        Q.    And, again, you didn't feel

13    that that's necessary for your opinions

14    and conclusions in this case?

15        A.    I would say, perhaps not

16    necessary, but could have been helpful.

17        Q.    Have you communicated in any

18    way with other experts in this case?

19        A.    No.

20        Q.    Plaintiffs have designated

21    other expert witnesses, so you haven't

22    talked to them?

23        A.    Yeah, I mean, I don't know

24    of all of them, so -- but I don't believe

Konstantin Walmsley, M.D.

Page 21

1    so, no.

2           Q.    Have you read any of the

3    other expert reports?

4           A.    I've read one expert report.

5           Q.    Which one was that?

6           A.    If you want to call it that.

7    It was Dr. Khandwala's IME, Salil

8    Khandwala.

9           Q.    Sure.  So you have a copy of

10   his report?

11          A.    Yes.

12          Q.    Did you bring that today?

13          A.    I have it here, yes.

14          Q.    Have you exchanged or shared

15   documents with any of the other experts

16   in this case, regardless of whether you

17   talked to them or not?

18          A.    No.

19          Q.    So you're not relying on the

20   opinions of other experts in this case

21   for your opinions.

22                MS. SANTRA:  Object to form.

23                THE WITNESS:  No, not -- not

24          directly, I'm not.

Konstantin Walmsley, M.D.

Page 22

1    BY MR. PRITCHETT:

2         Q.    What do you mean by

3    "directly"?

4              MS. SANTRA:  Object to form.

5         He's incorporated the TVT-S

6         general opinions in his reliance

7         list.

8              THE WITNESS:  Yeah.

9    BY MR. PRITCHETT:

10        Q.    So did you review -- you

11   mentioned you did not review the reports

12   of other experts in this case; correct?

13        A.    I didn't know if you were

14   speaking about case-specific or general

15   reports, so I stand corrected.  I thought

16   you were talking about case-specific

17   reports.

18        Q.    That's fine and I should

19   have clarified.

20              Did you read the general

21   causation reports?

22        A.    I've read some of them.

23        Q.    For this case.

24        A.    Correct.

Konstantin Walmsley, M.D.

Page 23

1        Q.    Which ones did you read?

2        A.    In this instance, the Jerry

3    Blaivas general report.

4        Q.    Who I understand you know.

5    Right?

6        A.    He trained me a long time

7    ago, yes, yeah.

8        Q.    Any others?

9        A.    Primarily just that one.

10       Q.    Why did you read his report?

11       A.    I -- well, I found it

12   helpful.  I found it comprehensive and,

13   you know, I think of him as a key opinion

14   leader in the world of pelvic

15   reconstructive surgery, so I lend a lot

16   of weight to his opinions.

17       Q.    Did you read his report

18   before you formulated your opinions in

19   this case?

20       A.    I had read it before then, I

21   believe, yeah.

22       Q.    Which of your specific

23   causation opinions did you rely on Dr.

24   Blaivas' report for?

Konstantin Walmsley, M.D.

Page 24

1              MS. SANTRA:  Object to form.

2              THE WITNESS:  Specific

3        opinions.

4              MR. PRITCHETT:  Yes.

5              THE WITNESS:  Well, I think,

6        to be fair, I'd probably have to

7        look at his report to specifically

8        answer your question, but

9        certainly as it relates to some of

10       the complications this individual

11       suffered, Dr. Blaivas describes in

12       his causation reports the

13       incidence of these complications

14       and the fact that he sees them in

15       patients implanted with mesh.

16  BY MR. PRITCHETT:

17       Q.    So it deals mainly with

18  complication rates of certain complaints

19  patients have?

20             MS. SANTRA:  Object to form.

21             THE WITNESS:  Well, I think

22       some of it's that and some of it

23       also is qualitative as well as

24       quantitative data.

Konstantin Walmsley, M.D.

Page 25

1            MR. PRITCHETT:  Let me hand
2       you what I'm going to mark as
3       Exhibit 5.
4                  -  -  -
5            (Deposition Exhibit No.
6       Walmsley (Baker)-5, 6/20/16
7       Encounter Summary for Dawn Baker,
8       was marked for identification.)
9                  -  -  -
10           MR. PRITCHETT:  And this is
11      what's called encounter summary,
12      dated June 20, 2016.
13           I think these are your notes
14      from your IME; is that correct?
15           THE WITNESS:  That's
16      correct.
17           MR. PRITCHETT:  You may want
18      to keep Exhibits 2 and 5 handy
19      when we start talking about her
20      specifically.
21           THE WITNESS:  Okay.
22   BY MR. PRITCHETT:
23      Q.    Are there any written
24   materials concerning what you did for

Konstantin Walmsley, M.D.

Page 26

1    your case-specific opinions and what you

2    found in your examination of Ms. Baker

3    other than what's in Exhibit 2, which is

4    your report, and Exhibit 5, which is your

5    encounter summary --

6           A.    No.

7           Q.    -- or the IME report?

8           A.    Right.  No, there's not.

9           Q.    If you'd look at Exhibit 2,

10   which is your report, look at the third

11   page, under "Clinical History" --

12          A.    Yes.

13          Q.    -- you listed certain dates

14   and treatments of Ms. Baker in the past;

15   correct?

16          A.    Yes.

17          Q.    Why did you list those

18   particular events rather than others?

19          A.    Generally speaking, I tried

20   to provide bullet points in the clinical

21   history that were in my opinion

22   reflective or contributory to the reasons

23   for my report.

24          Q.    Is that another way of

Konstantin Walmsley, M.D.

Page 27

1    saying these were relevant to your

2    report?

3         A.    Yes.

4         Q.    Is it fair to say that other

5    records of visits to healthcare providers

6    are not relevant to your report?

7              MS. SANTRA:  Object to form.

8              THE WITNESS:  I would

9              probably say less relevant.  I

10             mean, there may be a finding in a

11             visit of, I don't know, pelvic

12             pain or something that one might

13             consider as somewhat relevant, but

14             to my estimation, perhaps not

15             relevant enough to be provided in

16             the summary.

17   BY MR. PRITCHETT:

18        Q.    I notice that the last visit

19   that's noted in "Clinical History" was

20   June 30, 2009, which was her postop visit

21   with Dr. Hodges; is that correct?

22        A.    Yes.

23        Q.    And, again, why wouldn't you

24   want to look at records of her treatment

Konstantin Walmsley, M.D.

Page 28

1   after the implant surgery?

2           A.    Well, to some degree, I may

3   not have had or may not have seen those

4   records; and to the other extent, I guess

5   I put forth the relevance.

6           Q.    So are you saying you may

7   not have all of her medical records?

8               MS. SANTRA:  Object to form.

9           Since this report was written, we

10          have sent more records that we've

11          gotten to Dr. Walmsley.  So when

12          he wrote this report, he may have

13          had less records than he does

14          today, if that makes sense.

15              MR. PRITCHETT:  Is this link

16          going to tell me what records he

17          had before he prepared his report?

18              MS. SANTRA:  Well, he tells

19          you on page 2 --

20              MR. PRITCHETT:  He lists

21          providers.

22              MS. SANTRA:  Yep, I can set

23          it up that way.

24              MR. PRITCHETT:  So, yeah, I

Konstantin Walmsley, M.D.

Page 29

```
 1            would like to know exactly what he

 2            had --

 3                 MS. SANTRA:  Sure.

 4                 MR. PRITCHETT:  -- at the

 5            time he finalized his report and

 6            then what was sent subsequently.

 7                 MS. SANTRA:  Okay.

 8    BY MR. PRITCHETT:

 9            Q.   Do you happen to know that,

10    Dr. Walmsley?

11            A.   It wasn't a lot of stuff

12    that I received subsequently.  I don't

13    remember the specifics.

14            Q.   Is it possible you had no

15    medical records pertaining to Dawn

16    Baker's care and treatment after the mesh

17    surgery other than her postop visit?

18            A.   I don't believe that to be

19    the case.

20            Q.   So were -- is it your

21    understanding that plaintiffs' counsel

22    were choosing which records for you to

23    review?

24                 MS. SANTRA:  Object to form.
```

Konstantin Walmsley, M.D.

Page 30

1           THE WITNESS:  I don't think
2      that's the case either, because --
3      I mean, that hasn't happened with
4      previous work I've done for the
5      lawyers who retain me for this
6      case.
7  BY MR. PRITCHETT:
8      Q.    When you undertook your work
9  in this case, did you want to have her
10 complete medical records pertaining to
11 her care and treatment?
12     A.    Of course, yeah.
13     Q.    When you received what
14 medical records you did before you
15 prepared your report, did you think those
16 were the complete records of her care and
17 treatment?
18     A.    That was my understanding.
19          MS. SANTRA:  Object to form.
20     I'll just state for the record, as
21     discovery is ongoing, we get -- we
22     receive more records for each case
23     every day.  So to the extent
24     you're trying to imply we're

Konstantin Walmsley, M.D.

Page 31

1          withholding records from Dr.

2          Walmsley, that was not the case.

3     BY MR. PRITCHETT:

4          Q.    Sitting here today -- strike

5     that.

6               So you've received some

7     additional medical records from

8     plaintiffs' counsel that reflect visits

9     with healthcare providers after her

10    implant surgery; correct?

11         A.    Yes.

12         Q.    So you know she sought some

13    care and treatment after implant surgery;

14    correct?

15         A.    Correct.

16         Q.    Do -- since we -- well, do

17    any of those postimplant medical records

18    other than her postop visit have any

19    significance to your opinions?

20         A.    No.

21         Q.    Looking at your materials

22    relied upon again, let's go back to the

23    instructions for use.  You mentioned that

24    you did look at the TVT Secur IFU;

Konstantin Walmsley, M.D.

Page 32

1    correct?

2            A.      Yes, I did.

3            Q.      How often in your practice

4    do you review instructions for use?

5            A.      Often, yeah.

6            Q.      What is "often"?

7            A.      Well, if I'm doing a

8    procedure over and over again, I don't

9    look at the IFU each time for the

10   procedure, but I always like to review it

11   during the first few executions of a

12   procedure, both before and even

13   afterwards, just to corroborate, for

14   example, my surgical technique.

15                  And I would say, every six

16   months to a year, I like to revisit the

17   IFU, not only to refresh my memory, but

18   just to kind of reinforce my

19   understanding of a product when using it.

20           Q.      Is that the only source of

21   information you look at when you're using

22   a product?

23           A.      No.

24           Q.      What other sources of

Konstantin Walmsley, M.D.

Page 33

1    information do you look at?

2         A.    Well, I think there are

3    different things you try to glean from a

4    product.  I mean, as far as surgical

5    technique, for example, some of that, I

6    can derive from key opinion leaders,

7    papers that describe procedure.

8              As far as expectations of

9    the procedure, peri-procedurally, risks,

10   benefits, some of that information can be

11   extracted from authoritative textbooks,

12   manifests that are peer reviewed or

13   written by key opinion leaders.

14             There are workshops and

15   cadaveric labs that device manufacturers

16   also organize that can be helpful as

17   well.

18        Q.    You mentioned that you look

19   at the IFU partially for risk

20   information?

21        A.    It helps me, yeah.

22        Q.    Would it be within the

23   standard of care for a surgeon to only

24   look at the IFU for risk information

Konstantin Walmsley, M.D.

Page 34

1    before using a product?

2          A.    I would say so.  I would

3    think so.

4          Q.    Do you think it's important

5    for surgeons to look at articles and

6    studies as well for risk information?

7          A.    I think that can be helpful

8    as well, yes.

9          Q.    Don't you agree that the

10   more a product is used, more information

11   becomes available about benefits and risk

12   information?

13                MS. SANTRA:  Object to form.

14                THE WITNESS:  Well, I think

15          you're -- well, it depends upon

16          the specific benefits or risks

17          being put forth, but possibly,

18          yes.

19   BY MR. PRITCHETT:

20          Q.    So is it important for a

21   surgeon such as yourself to keep abreast

22   of that type of information as it becomes

23   available?

24          A.    I think that's helpful.

Konstantin Walmsley, M.D.

Page 35

1          Q.    And where do you get that

2     information other than the IFU?

3          A.    Well, I think the same

4     things I put forth before in your

5     question.

6          Q.    So professional

7     organizations.

8          A.    To some extent, professional

9     organizations.  You know, more so updated

10    literature, interactions with key opinion

11    leaders, whether they come in the form of

12    device manufacturer-organized conferences

13    or other types of venues and conferences.

14         Q.    Okay.  And you do that in

15    your practice?

16         A.    I try to, yeah.

17         Q.    You mentioned in your

18    Exhibit 4 incorporated materials -- well,

19    we already talked about that.

20               You mentioned the medical

21    literature in your reliance list, which

22    is Exhibit 4; correct?

23         A.    Yes.

24         Q.    Did you specifically look at

Konstantin Walmsley, M.D.

Page 36

1    any of these -- any of this literature

2    other than the IFU in preparing your

3    report in the Dawn Baker case?

4                    MS. SANTRA:  Object to form.

5                    THE WITNESS:  Well,

6              obviously, some, I relied upon

7              more than others; but, you know,

8              the reality is, I -- each article

9              has a certain amount of weight in

10             terms of allowing me to arrive at

11             opinions.

12                    Was there one particular

13             article that was very, very

14             helpful in me formulating my

15             opinions on Dawn Baker?  I mean,

16             as we sit here today, I can't say,

17             oh, well, I really found the

18             Duckett article more helpful, for

19             example.  As we sit here today, I

20             can't point to one or a number of

21             articles that were more relied

22             upon than others.

23   BY MR. PRITCHETT:

24             Q.    Do these articles also

Konstantin Walmsley, M.D.

Page 37

1    pertain to your general causation

2    opinions?

3          A.    Yes.

4          Q.    Are you able to

5    differentiate which of these articles

6    pertain to your general causation

7    opinions as opposed to your specific

8    causation opinions?

9          A.    Well, my two general opinion

10   articles in the Dawn Baker case relate to

11   proper informed consent and the fact that

12   safer alternative designs were in

13   existence.

14              So to that end, the AMA at

15   8.08, information relating to informed

16   consent, the TVT Secur instructions for

17   use are obviously very instrumental to my

18   general opinions.

19              And then primarily towards

20   page 3 of my reliance list, there is some

21   data relating to autologous rectus

22   fascial slings and their equivalents that

23   specifically play into general opinion

24   number 2.

Konstantin Walmsley, M.D.

Page 38

1            So those are some of the
2    references in my reliance list that were
3    perhaps a little bit more impactful for
4    my general opinions formulations.
5            Q.    I didn't see on your
6    reliance list any Ethicon documents other
7    than the IFU and the patient brochure; is
8    that correct?
9                MS. SANTRA:  Object to form.
10           He's -- we talked about the
11           incorporated materials in the
12           general TVT Secur report.
13   BY MR. PRITCHETT:
14           Q.    What Ethicon documents other
15   than the IFU and the patient brochures
16   are you relying upon for your
17   case-specific opinions?
18                MS. SANTRA:  Object to form.
19                THE WITNESS:  Really,
20           primarily, those are the only ones
21           that are Ethicon specific.
22   BY MR. PRITCHETT:
23           Q.    What about depositions of
24   Ethicon representatives; are you relying

Konstantin Walmsley, M.D.

Page 39

1    upon any of those for your case-specific

2    opinions?

3          A.    We talked about Dr. Blaivas'

4    report.  Is that something that should be

5    included in this or --

6          Q.    No, I'm talking about

7    depositions of representatives or

8    individuals of Ethicon.

9          A.    Pardon me.  None.

10         Q.    And can you tell me what you

11   did to prepare for this deposition?

12         A.    Yes.  I briefly re-reviewed

13   Dawn Baker's medical records, including

14   the updated records I was provided.  I

15   re-reviewed my expert report and my IME

16   report and I also re-reviewed the report

17   of Dr. Khandwala.

18         Q.    Do you know Dr. -- and I'm

19   going to butcher his name -- Khandwala?

20         A.    I do not.

21         Q.    And of course you met with

22   counsel; correct?

23         A.    Briefly this morning, yes.

24         Q.    We'll talk a little bit

Konstantin Walmsley, M.D.

Page 40

1    about some of your background so I get a

2    better understanding.

3              You are a board-certified

4    urologist; correct?

5         A.    Yes, sir.

6         Q.    And in your practice, do you

7    treat men and women?

8         A.    I do.

9         Q.    And what's the percentage

10   breakdown between men and women?

11        A.    It's about two-thirds and

12   one-third, two-thirds men/one-third

13   women.

14        Q.    Has that changed in recent

15   years or has that been the way for a

16   while?

17        A.    Been about the same for a

18   while now.

19        Q.    And "for a while," I mean,

20   the last ten years or so?

21        A.    Yeah, I think that's about

22   right.

23        Q.    And your practice includes

24   treating women for SUI; correct?

Konstantin Walmsley, M.D.

Page 41

```
 1          A.     Yes.
 2          Q.     And do you treat women for
 3   other urinary dysfunction?
 4          A.     Yes.
 5          Q.     Such as urge problems?
 6          A.     Yes.
 7          Q.     And you do -- does your
 8   treatment include nonsurgical treatment?
 9          A.     Yes.
10          Q.     And it also includes
11   surgical treatment; correct?
12          A.     Yes.
13          Q.     And can you tell me the
14   types of surgery you use now to address
15   SUI in women?
16          A.     Yes.  Urethral bulking
17   procedures, autologous fascial sling
18   treatments, and mid-urethral
19   polypropylene mesh sling surgery.
20          Q.     And the bulking, are they
21   injections; is that how that works?
22          A.     These are injections into
23   the urethra, yes.
24          Q.     Have your patients benefited
```

Konstantin Walmsley, M.D.

Page 42

```
 1   from mesh mid-urethral slings?

 2            A.    Most of them have.

 3                  MS. SANTRA:  Object to form.

 4            This is getting into the general

 5            area that doesn't have a lot to do

 6            with Ms. Baker.

 7   BY MR. PRITCHETT:

 8            Q.    Have you had good experience

 9   with them?

10            A.    With what?

11            Q.    Mesh mid-urethral slings?

12            A.    Fairly good experience, yes.

13            Q.    And you mentioned

14   polypropylene.  Is this the same

15   polypropylene that you use in your

16   practice that was used in the TVT Secur?

17            A.    I'm not sure.

18            Q.    Well, it's a polypropylene

19   mesh; correct?

20            A.    Yeah, but -- this is true.

21            Q.    So --

22            A.    In that sense, that's

23   correct.

24            Q.    Configuration may be
```

Konstantin Walmsley, M.D.

Page 43

1    different?

2            A.      You know, the edge of the

3    TVT Secur mesh was palpably, to my

4    examination, having felt multiple meshes,

5    was different.  It was a sharper-edged

6    mesh, but it was a polypropylene

7    lightweight mesh.

8            Q.      You agree that TVT Secur is

9    a lightweight, large-pore polypropylene

10   mesh?

11           A.      Yes.

12           Q.      And all of the mesh slings

13   that you currently use are large-pore

14   polypropylene?

15           A.      Lightweight mesh, yes.

16           Q.      And I know from reading

17   about you that your practice has changed

18   a little bit on your surgical treatment.

19   So tell me, how many polypropylene

20   mid-urethral slings have you implanted in

21   your career to treat SUI in women?

22                   MS. SANTRA:  Object to form.

23                   THE WITNESS:  I would reckon

24           -- I mean, in the hundreds,

Konstantin Walmsley, M.D.

Page 44

1          probably -- somewhere between 225

2          and 350 or in thereabouts.

3              I was a more active

4          implanter earlier in my career.

5          I'm less active of an implanter

6          now, but I still do the

7          procedures.

8              So I'm thinking to myself,

9          if I've been in practice for 12

10         years and I was as busy as 20 to

11         30 a year, but then it tapered off

12         to about maybe 10, it's somewhere

13         in that 200-plus range of some

14         kind.

15    BY MR. PRITCHETT:

16         Q.    But you still use

17    polypropylene mesh slings for treatment

18    of SUI in women?

19         A.    In select women, I do, yes.

20         Q.    And when's the last time you

21    used the mesh sling?

22         A.    About three weeks ago.

23         Q.    You mentioned that you also

24    do autologous fascial sling procedures;

Konstantin Walmsley, M.D.

Page 45

1    correct?

2         A.    I do.

3         Q.    How do you decide whether to

4    use the autologous fascial sling in a

5    patient versus the mesh mid-urethral

6    sling?

7         A.    Well, it's a joint

8    discussion between the patient and

9    myself.  So some of the dynamic to use

10   one or the other is patient driven and

11   some of it is perhaps more doctor driven.

12              As far as the consideration

13   I put in towards using autologous fascia

14   as opposed to synthetic mesh, it depends

15   on their degree of sexual activity and it

16   also depends to some degree on their age

17   and also to some degree on their

18   understanding and willingness to accept

19   mesh-specific risks.

20        Q.    When you said it was patient

21   driven, what did you mean by that?  Are

22   you talking about those factors?

23        A.    I think, to some degree, I'd

24   almost just as soon educate the patient

Konstantin Walmsley, M.D.

Page 46

1    towards my concerns and what I think are

2    pros and cons of each and then deferring

3    the judgment to the patient.

4              Q.    Are there advantages of

5    synthetic mesh mid-urethral slings over

6    autologous fascial sling procedures?

7                   MS. SANTRA:  Object to form.

8                   THE WITNESS:  To some

9         degree.

10   BY MR. PRITCHETT:

11             Q.    What are those?

12             A.    Well, there's less morbidity

13   because they're -- in the sense of

14   incision, because if you're using an

15   autologous fascial sling, you have to

16   harvest this tissue from the host site.

17                  For the surgeon, it takes a

18   bit more time and sweat equity, if you

19   will, to execute the procedure.  So it's

20   a little more laborious for the surgeon,

21   which for a patient may be an advantage

22   because it's a shorter procedure; for a

23   surgeon, might be an advantage because

24   the sling, quite frankly, is technically

Konstantin Walmsley, M.D.

Page 47

1    an easier procedure.

2            Q.    So it's, generally speaking,

3    an easier procedure?

4                 MS. SANTRA:  Object to form.

5                 MR. PRITCHETT:  I'm talking

6            about the mesh.

7                 THE WITNESS:  From a

8            technical standpoint, the mesh is

9            felt to be easier.  I think that's

10           a reasonable conclusion.

11   BY MR. PRITCHETT:

12           Q.    And it's quicker?

13                MS. SANTRA:  Object to form.

14                THE WITNESS:  It's a quicker

15           procedure.

16   BY MR. PRITCHETT:

17           Q.    Is it outpatient?

18           A.    Yes.

19           Q.    Is autologous fascial sling

20   procedures outpatient?

21           A.    Usually that's a 23-hour

22   admission, you know, where they'll stay

23   overnight.

24           Q.    From the extra incision, can

Konstantin Walmsley, M.D.

Page 48

1    additional complications occur in the

2    autologous fascial sling procedure?

3              MS. SANTRA:  Object to form.

4              THE WITNESS:  Those are

5         infrequent, but they can happen.

6    BY MR. PRITCHETT:

7         Q.    And what are those?

8              MS. SANTRA:  Object to form.

9              THE WITNESS:  Wound

10        infections, pain at the incision

11        site.  There theoretically can be

12        risks of hernias where the mesh is

13        excised, although typically that

14        doesn't really occur.

15   BY MR. PRITCHETT:

16        Q.    Can that pain become

17   chronic?

18             MS. SANTRA:  Object to form.

19             THE WITNESS:  I've never

20        seen that myself, but I suppose in

21        theory it can.

22   BY MR. PRITCHETT:

23        Q.    Have you ever taken part in

24   studies regarding the treatment of SUI in

Konstantin Walmsley, M.D.

Page 49

1    women?

2          A.    No.

3          Q.    Have you published any

4    peer-reviewed literature regarding mesh

5    mid-urethral sling procedures?

6          A.    I have not.

7          Q.    Or the products themselves?

8          A.    I have not.

9          Q.    Have you taken part in

10   studies regarding the treatment of SUI in

11   women using autologous fascial slings?

12              MS. SANTRA:  Object to form.

13              THE WITNESS:  I have not.

14   BY MR. PRITCHETT:

15         Q.    Have you ever used TVT

16   products?

17         A.    I have.

18         Q.    And which ones did you use

19   and approximately when?

20         A.    I used the TVT Classic from

21   2001 to 2005.  I used the TVT-O in the

22   2006 to 2007 arena.  And that is it.

23         Q.    Between 2001 and 2007, were

24   you also performing autologous sling

Konstantin Walmsley, M.D.

Page 50

1    procedures to treat SUI in women?

2              MS. SANTRA:   Object to form.

3              THE WITNESS:   Earlier on,

4        yes.

5    BY MR. PRITCHETT:

6        Q.    What do you mean, "earlier

7    on"?

8        A.    You pointed to a six-year

9    window --

10       Q.    Yes -- here's my point:   At

11   the time you were using TVT products, you

12   were also in some cases doing autologous

13   fascial sling procedures --

14       A.    That's correct.

15       Q.    And how would you -- again,

16   would you use the same process to decide

17   for a patient which procedure to use?

18       A.    Well, it's different today

19   than it was back then.

20       Q.    How is it different?

21       A.    Well, today, my concerns as

22   it relate to the permanence of some of

23   the complications I've seen with mesh

24   slings, there is a higher proportion of

Konstantin Walmsley, M.D.

Page 51

1   patients who would, let's say, more
2   strongly consider the autologous fascial
3   sling than the mid-urethral sling
4   procedure.
5           And for that matter, there's
6   a growing number of patients in my
7   practice that would just as soon defer on
8   surgery altogether rather than getting
9   the problem fixed.
10          Q.    Just live with it.
11          A.    There's more patients who
12  have taken on that opinion.
13          Q.    But when you were using the
14  TVT products between 2001 and 2007, what
15  would drive you to recommend to a patient
16  using autologous fascial slings?
17          A.    Well, I think to be fair,
18  you're talking about a span of time where
19  I was a resident, a fellow, and then in
20  private practice.
21          So obviously, as a resident
22  and fellow, I didn't have as much input
23  into the choice of procedure being done.
24  In my private practice, I really only

Konstantin Walmsley, M.D.

Page 52

1   used TVT on the order of a handful of

2   times before I started using other

3   products anyway, and I really wasn't

4   doing many autologous fascial slings

5   early in my private practice because

6   there had been such a full swing or shift

7   towards the use of the mid-urethral

8   slings at that time.

9          Q.    But when you did use it,

10  what would drive that consideration,

11  autologous fascial slings versus a TVT

12  product?

13         A.    Primarily the attending that

14  I was working with at the time, because

15  when I first got into private practice, I

16  wasn't performing any autologous fascial

17  slings.  I was using exclusively

18  mid-urethral slings.

19         Q.    During 2001 to 2007, were

20  you using mesh mid-urethral slings

21  manufactured by others?

22         A.    Yes.

23         Q.    And what types did you use?

24         A.    I used the AMS SPARC kit.  I

Konstantin Walmsley, M.D.

Page 53

1    used the Boston Scientific kit, which I
2    believe was called Obtryx at the time,
3    and then I also started using a sling
4    made by Bard called the Uretex sling.
5         Q.    And what would drive you on
6    which manufacturer's sling to use?
7              MS. SANTRA:  I'm going to
8         object to form that this is all
9         general opinion.  We've gone
10        almost an hour now without talking
11        about Ms. Baker.
12             THE WITNESS:  Those
13        decisions were a little bit more
14        kind of subjective.  They weren't
15        necessarily based on my -- an
16        objective conclusion that one mesh
17        was different or better than the
18        other.
19             In the instance of my early
20        years, I probably used the Bard
21        sling because I appreciated the
22        elasticity to that sling and felt
23        -- as it felt ex-vivo, without
24        having been implanted, it felt

Konstantin Walmsley, M.D.

Page 54

1          more smooth and supple.

2    BY MR. PRITCHETT:

3          Q.    I'm going to get into some

4    of the potential risks of mesh surgery

5    and we'll get into as it relates to Ms.

6    Baker as well, but you agree that mesh

7    mid-urethral surgery to treat SUI in

8    women has -- it is a pelvic floor

9    surgery; correct?

10         A.    Yes.

11         Q.    And there are certain

12   potential risks of pelvic floor surgery

13   whether using mesh or not using mesh;

14   correct?

15         A.    Correct.

16         Q.    And dyspareunia is a risk of

17   pelvic floor surgery; correct?

18              MS. SANTRA:  Object to form.

19              THE WITNESS:  Yes.

20   BY MR. PRITCHETT:

21         Q.    Scarring is a risk; correct?

22         A.    Correct.

23         Q.    Voiding dysfunction's a

24   risk.

Konstantin Walmsley, M.D.

Page 55

1        A.    Correct.

2        Q.    Potential for surgery in the

3   future to address problems is a risk.

4              MS. SANTRA:  Object to form.

5              THE WITNESS:  Well, that's a

6              little bit of apples to oranges.

7              I mean, I think generally

8              speaking, that's true; but

9              obviously, as we know, the use of

10             mesh creates additional surgeries

11             that are more mesh specific, if

12             you will.

13  BY MR. PRITCHETT:

14       Q.    But whether you're using

15  mesh or not, there could be complications

16  that arise that would require additional

17  surgery; correct?

18             MS. SANTRA:  Object to form.

19             THE WITNESS:  In theory,

20             true.

21  BY MR. PRITCHETT:

22       Q.    Have you known of an

23  instance where additional surgery was

24  needed to address a problem arising from

Konstantin Walmsley, M.D.

Page 56

```
1    a pelvic floor surgery that did not use

2    mesh?

3          A.     Yeah.  Yes.

4          Q.     Has that happened to you or

5    to someone -- one of your colleagues?

6          A.     That has happened to one of

7    my colleagues as a matter of fact.

8          Q.     And just to move on, would

9    you agree that bleeding, wound

10   complications, adhesions, nerve damage,

11   neuromuscular problems, and fistula

12   formation are all potential risk of

13   pelvic floor surgery?

14         A.     Yes.

15         Q.     And would you agree that

16   those potential risks were discussed in

17   medical literature by the time of Ms.

18   Baker's surgery in June of 2009?

19         A.     I would believe so.

20         Q.     Would you agree that those

21   are all potential risks of TVT Secur

22   surgery as well; correct?

23         A.     Yes.

24         Q.     And the risks that we just
```

Konstantin Walmsley, M.D.

1    went through, you yourself learned those

2    from colleagues, studies, reading

3    articles that we talked -- talked about

4    before; is that correct?

5              MS. SANTRA:  Object to form.

6              THE WITNESS:  And my own

7         personal clinical experience, yes.

8              MR. PRITCHETT:  And your own

9         clinical experience.

10   BY MR. PRITCHETT:

11             Q.    Is any one source of

12   information about potential risks more

13   important than the other?

14             MS. SANTRA:  Object to form.

15             THE WITNESS:  I mean, I

16        guess there could be more

17        importance as it relates to

18        reliability or credibility of the

19        source.

20             You know, for example, if,

21        you know, a colleague of mine at a

22        community hospital said, oh, I

23        experienced complications A, B,

24        and C with this, but they didn't

Konstantin Walmsley, M.D.

Page 58

1          give me the severity, the true

2          incidence, I would probably weight

3          that less than what, for example,

4          is put forth in an IFU or, for

5          example, what a key opinion leader

6          might share with me in the context

7          of a peer-reviewed article, so...

8     BY MR. PRITCHETT:

9          Q.    All right.

10              It's fair to say, since we

11    don't have the deposition of Dr. Hodges

12    and you've never talked to her, we don't

13    know what she discussed with Ms. Baker in

14    June of 2009 preceding her TVT Secur

15    surgery; correct?

16         A.    That's correct.

17         Q.    And you can't say what Dr.

18    Hodges knew about the potential risks

19    before performing the TVT Secur surgery

20    on Ms. Baker; correct?

21              MS. SANTRA:  Object to form.

22              THE WITNESS:  Correct.

23    BY MR. PRITCHETT:

24         Q.    Is it your experience then

Konstantin Walmsley, M.D.

Page 59

1    that doctors armed with information about

2    potential risks and complications decide

3    what to talk to the patient about;

4    correct?

5         A.    I believe that's what

6    happens, yeah.

7         Q.    Is it your experience that

8    some doctors are more thorough and

9    detailed in their discussions with

10   patients about potential risks and the

11   informed consent process than others?

12              MS. SANTRA:  Object to form.

13              THE WITNESS:  I would

14           imagine that exists.

15   BY MR. PRITCHETT:

16         Q.    Are you critical in any way

17   of Dr. Hodges' recommendation to use the

18   TVT Secur for Ms. Baker?

19         A.    I'm not.

20         Q.    I take it you read the

21   operative report?

22         A.    I did.

23         Q.    And all of Dr. Hodges'

24   records preop and postop?

Konstantin Walmsley, M.D.

Page 60

```
 1          A.    Yes, I have.

 2          Q.    Any criticisms of her

 3   technique in the surgery?

 4          A.    No.

 5          Q.    Any criticisms of her care

 6   and treatment before or after the

 7   surgery?

 8          A.    No.

 9          Q.    Do you know -- let me back

10   up.

11                Can the TVT Secur be

12   implanted using a U approach or a hammock

13   approach?

14          A.    Yes.

15          Q.    Do you know which approach

16   Dr. Hodges used?

17          A.    I'd have to look again at

18   that operative note to recall.

19          Q.    Is that significant to your

20   opinions, which approach she may have

21   used?

22          A.    Yes, and I recall the

23   approach she used, but I don't have her

24   operative note in front of me to relate
```

Konstantin Walmsley, M.D.

Page 61

1    to that.  I'd have to really see it to

2    specifically recall it.

3                MR. PRITCHETT:  Let me see

4            if I can find it for you.

5                We can, if you want, make

6            this an exhibit, but I'm just more

7            concerned about refreshing his

8            memory.

9                Let me hand you what is

10           titled "Operative Report, Western

11           Baptist Hospital, June 18, 2009"

12           for Dawn Baker.

13               (Pause.)

14               THE WITNESS:  So I suspect

15           that it was a -- a hammock or

16           transobturator placement.

17   BY MR. PRITCHETT:

18       Q.    And why is that significant

19   to your case-specific opinions?

20       A.    Well, sometimes in the

21   setting of pelvic pain, especially if

22   patients have groin pain, it's more

23   consistent with the transobturator

24   approach as opposed to the retropubic

Konstantin Walmsley, M.D.

Page 62

1    approach.

2          Q.     Thank you.

3          A.     You're welcome.

4          Q.     Do you know what training

5    Dr. Hodges received for mesh mid-urethral

6    sling procedures before Ms. Baker's

7    surgery?

8          A.     I'm not aware of that.

9          Q.     Of course you don't know

10   what medical literature she may have read

11   before Ms. Baker's surgery in 2009?

12         A.     No, sir.

13         Q.     You don't know what her

14   clinical experience was with TVT Secur

15   with her patients?

16         A.     I do not.

17         Q.     Do you have any basis for

18   thinking that the IFU for the TVT Secur

19   was the only source of information

20   available to Dr. Hodges to assess

21   potential risks and complications before

22   recommending Ms. Baker's surgery?

23         A.     I do not.

24         Q.     Do you know -- you don't

Konstantin Walmsley, M.D.

1    know if she even read the IFU for the TVT

2    Secur before Ms. Baker's surgery;

3    correct?

4         A.    I don't know the answer to

5    that question.

6         Q.    Well, you don't know if she

7    had ever read it before Ms. Baker's

8    surgery; correct?

9              MS. SANTRA:  Object to form.

10             THE WITNESS:  Yeah, I don't

11        know if she did or did not read

12        it, that's correct.

13   BY MR. PRITCHETT:

14        Q.    Now, you've never designed a

15   mesh product.  Right?

16        A.    I have not.

17        Q.    Have you ever designed any

18   kind of medical device?

19        A.    No, not directly.

20        Q.    What do you mean by "not

21   directly"?

22        A.    I mean, I've never gotten a

23   patent for modifying or changing a

24   device, but I've come up with, you know,

Konstantin Walmsley, M.D.

Page 64

1    creative ways in the operating room to

2    make devices work more effectively for

3    me.  They're off label and not patented.

4          Q.     Well, I don't want to coopt

5    your innovations and run to the patent --

6          A.     It's quite all right.  I'm

7    happy to share it with you --

8          Q.     -- and run to the patent

9    office.

10         A.     Yeah.  But I can give you

11   examples of where I've jerry-rigged, you

12   know, devices to make them work better

13   for me, if that's -- but that doesn't

14   answer your question.

15         Q.     But never commercialized.

16         A.     No, sir.

17         Q.     Have you ever consulted with

18   a manufacturer about information to be

19   included in an IFU?

20         A.     I've not.

21         Q.     And you don't consider

22   yourself to be an expert in FDA medical

23   device labeling requirements?

24         A.     No.

Konstantin Walmsley, M.D.

Page 65

```
 1          Q.    Do you consider yourself an
 2   expert in any way on the laws and
 3   regulations of the Food and Drug
 4   Administration?
 5          A.    I do not.
 6          Q.    Is it your opinion that --
 7   or do you have an opinion one way or
 8   another whether Dawn Baker had ISU in
 9   June of 2009 before her surgery?
10          A.    SUI, do you mean?
11              MR. PRITCHETT:  SUI.  What
12          did I say?
13              MS. SANTRA:  ISU.  I thought
14          it was a term I hadn't heard
15          before.
16              MR. PRITCHETT:  Let me try
17          that again.
18   BY MR. PRITCHETT:
19          Q.    Do you have an opinion
20   whether Ms. Baker had SIU (sic) -- I
21   almost did it again -- in June 2009
22   before her surgery?
23          A.    Yes.
24          Q.    And what is that opinion?
```

Konstantin Walmsley, M.D.

Page 66

1      A.     When she saw Dr. Hodges in
2  May of 2009, she had complaints
3  consistent with SUI.
4      Q.     You mentioned that, in your
5  -- you had read some of the medical
6  records pertaining to Dawn Baker prior to
7  her treatment by Dr. Hodges; correct?
8      A.     Yes.
9      Q.     Do you agree that Ms. Baker
10 had mixed urinary incontinence before her
11 mesh sling surgery?
12     A.     In part, I do, yes.
13     Q.     What part do you not agree
14 with?
15     A.     The urodynamic testing that
16 was done on June 17th was more reflective
17 and documented as SUI; however, she did
18 have overactive bladder complaints and
19 had been on overactive bladder drugs
20 prior to that time.
21            So I think the records
22 support the presence of mixed urinary
23 incontinence, although there's some
24 mention made to stress urinary

Konstantin Walmsley, M.D.

1    incontinence more so than mixed.

2          Q.    And you're relying on the --

3    Dr. Hodges' records to say that she had

4    SUI predominantly over urge?

5          A.    Yes.  Both Dr. Hodges and

6    her primary care doctor, too, for that

7    matter.

8          Q.    Do you know -- and we'll

9    look at some records.

10          Do you recall how long Ms.

11    Baker had mixed urinary incontinence

12    before her mesh sling surgery?

13          A.    Roughly three years or so.

14          MR. PRITCHETT:  Let me hand

15          you what I'm marking as Exhibit 6.

16                    -   -   -

17          (Deposition Exhibit No.

18          Walmsley (Baker)-6, Notes of

19          Office Visits from Rural Health

20          for Dawn Baker, BAKERD

21          RURALH_MDR00024, was marked for

22          identification.)

23                    -   -   -

24    BY MR. PRITCHETT:

Konstantin Walmsley, M.D.

Page 68

1          Q.    And, Doctor, I'll represent

2     to you that these are medical records we

3     obtained from Rural Health pertaining to

4     the care and treatment of Dawn Baker.  I

5     want to -- at least these are notes of

6     office visits; does that look like that's

7     what Exhibit 6 is?

8               Do you agree that these are

9     office notes from a visit, it appears;

10    correct?

11         A.    Yes.

12         Q.    The date was cut off on the

13    top, but I'll represent to you that the

14    date on the top office visit is August 9,

15    2006 and you can see a transcription date

16    on the bottom, 8/29/06.

17              Do you see that?

18         A.    I do.

19         Q.    I just want to go over the

20    symptoms that she was seeing someone for.

21    It says:  She is complaining of urinary

22    stress incontinence.  When she has to get

23    to the bathroom, she has to go then or

24    she won't make it.

Konstantin Walmsley, M.D.

Page 69

1          Did I read that correctly?

2     A.    Yes.

3     Q.    Does that sound like SUI or

4  urge or something else?

5     A.    It sounds more urge

6  consistent than SUI consistent.

7     Q.    And if you'll look at the

8  next visit on the same exhibit, it

9  appears to be an office visit July 10,

10  2007.  Do you see that?

11     A.    Yes.

12     Q.    And the symptoms states:

13  Patient presents today with complaints of

14  urinary incontinence and bladder spasms.

15  She wants something done.

16     A.    Yes.

17     Q.    She has to take a change of

18  clothes.  She leaks if she laughs,

19  coughs, or sneezes.  She has difficulty

20  if she has to urinate.  If she does not

21  get to the bathroom right away, then it

22  is too late.

23          Did I read that part

24  correctly?

Konstantin Walmsley, M.D.

Page 70

1           A.    Yes.

2           Q.    And does that sound like

3    mixed incontinence?

4           A.    It sounds more like mixed

5    incontinence in this description, yes.

6           Q.    Can you tell from that

7    description which one is predominant over

8    the other?

9           A.    It's hard to.

10          MR. PRITCHETT:  Let me hand

11      you what I'll mark as Exhibit 7 --

12          THE WITNESS:  Can we take a

13      break?

14          MR. PRITCHETT:  Sure.

15          (A recess was taken from

16      1:12 p.m. to 1:17 p.m.)

17   BY MR. PRITCHETT:

18          Q.    Are you ready to continue,

19   Doctor?

20          A.    Yes, sir.

21                  -   -   -

22          (Deposition Exhibit No.

23      Walmsley (Baker)-7, Notes of

24      Office Visits from Rural Health

Konstantin Walmsley, M.D.

Page 71

1          for Dawn Baker from January and

2          February 2009, was marked for

3          identification.)

4                    -  -  -

5    BY MR. PRITCHETT:

6          Q.    I'm going to hand you what's

7    been marked as Exhibit 7.  And these are

8    additional office visits from Rural

9    Health in 2009, before Ms. Baker's

10   surgery in June.

11             I want you to look at the

12   office visit of February 10, 2009.  Do

13   you see that?

14         A.    Yes.

15             MS. SANTRA:  Can I have a

16         copy?

17             MR. PRITCHETT:  Oh, I'm

18         sorry.  I'm just holding it.

19             MS. SANTRA:  Thank you.

20   BY MR. PRITCHETT:

21         Q.    It states:  She wants to

22   talk to me and discuss the Depo.  She is

23   having some breast tenderness.  She said

24   she started having vaginal bleeding

Konstantin Walmsley, M.D.

Page 72

1    today.  She has been having pain after

2    intercourse that will last for 10 to 15

3    minutes just in the last couple of weeks.

4                    Did I read that correctly?

5         A.    Yes, sir.

6         Q.    Do you interpret the Depo to

7    refer to Depo-Provera?

8         A.    Yes.

9         Q.    And that's a female hormone

10   contraceptive; correct?

11        A.    Correct.

12        Q.    Are you familiar with that

13   drug?

14        A.    Somewhat, yeah.

15        Q.    Is pain after intercourse a

16   side effect of that drug?

17        A.    I'm not sure.

18        Q.    Does this indicate to you

19   that she was having painful intercourse

20   before her mesh surgery?

21        A.    Not to my mind, no.

22        Q.    Why is that?

23        A.    Only because she's not

24   having pain with intercourse.  It's pain

Konstantin Walmsley, M.D.

Page 73

1    after intercourse.  And I think, from a

2    technical standpoint, I mean, dyspareunia

3    is pain with intercourse.

4           Q.    Okay.

5           A.    Yeah.

6                 MR. PRITCHETT:  Let me hand

7           you what I'm marking as Exhibit 8.

8                       -   -   -

9                 (Deposition Exhibit No.

10          Walmsley (Baker)-8, 5/11/09 Notes

11          of Date of Encounter with Dawn

12          Baker by Kupper,

13          BAKERD_UGP_MDR00002 through

14          BAKERD_UGP_MDR00007, was marked

15          for identification.)

16                      -   -   -

17   BY MR. PRITCHETT:

18          Q.    And this is notes from a --

19   records from a Dr. Robert Kupper who is a

20   urologist in Paducah.  And it's dated May

21   11, 2009.

22                Did you review this record

23   before formulating your opinions in this

24   case or do you know?

Konstantin Walmsley, M.D.

Page 74

1        A.    I don't specifically recall
2    this record.
3        Q.    I want you to look at, under
4    the history of present -- well, chief
5    complaint is keeps wetting on self.  Do
6    you see that?
7        A.    I do.
8        Q.    And it's in quotes.  And
9    "History of Present Illness," I want to
10   read a few sentences -- and please feel
11   free to read the whole thing if you want,
12   Doctor -- it says:  Miss Baker is a
13   37-year-old Caucasian female sent to me
14   in consultation by Dr. Tom Staton because
15   of urinary incontinence.  This lady has
16   had trouble with wetting on herself for a
17   year and a half, maybe a little bit
18   longer.  Over the past six months,
19   however, it has gotten worse.  She leaks
20   when she cannot get to the bathroom in
21   time.  She gives me a history of what
22   sounds like typical overactive bladder
23   symptoms, frequency - voiding small
24   amounts, urgency, cannot get to the

Konstantin Walmsley, M.D.

Page 75

```
 1   bathroom and will leak on her way to the
 2   bathroom, or urge incontinence.
 3               Did I read that mostly
 4   correctly?
 5        A.     Yes.
 6        Q.     And then it goes on to say
 7   she also leaks with coughing, laughing,
 8   sneezing.
 9               And then he goes on to say
10   that he -- he says it sounds like a
11   combination or complex urinary
12   incontinence; is that correct?
13        A.     Yes.
14        Q.     Do you agree just based upon
15   that description that Ms. Baker before
16   her mesh surgery had complex urinary
17   incontinence?
18        A.     Yes.
19        Q.     And is that another way of
20   saying mixed incontinence?
21        A.     Yes.
22        Q.     And you agree she had
23   overactive bladder symptoms?
24        A.     Correct.
```

Konstantin Walmsley, M.D.

Page 76

1          Q.    Can you tell from that

2    record whether Ms. Baker had

3    predominantly urge or frequency

4    incontinence as opposed to stress at that

5    time?

6          A.    Could you repeat the

7    question?

8          Q.    I think I should.

9                You say in your report that

10   you think she now has -- the urge

11   incontinence predominates over stress.

12         A.    I say that today?

13         Q.    I think so -- well, or do

14   you?

15               If you look at the next to

16   the last page of your report, just above

17   case specific opinion number 4 and you

18   say, "Mrs. Baker currently has this

19   complaint having evolved from a patient

20   with an SUI-dominant incontinence picture

21   to a predominantly urgency urinary

22   incontinence form of MUI."

23         A.    That's correct.

24         Q.    Do you think, based upon the

Konstantin Walmsley, M.D.

Page 77

1    urologist in Paducah, that Ms. Baker, a

2    month before her mesh implant surgery,

3    had predominantly urgency urinary

4    incontinence?

5              MS. SANTRA:  Object to form.

6              THE WITNESS:  I do not think

7         so, no.

8    BY MR. PRITCHETT:

9         Q.    Why is that?

10        A.    Well, I think, to his words,

11   first off, it's complex and, second off,

12   his history of the present illness as

13   well as his physical examination really

14   points towards a true mixed component.

15              She has history of stress

16   incontinence.  She also has a history of

17   urge incontinence.  She has physical exam

18   findings of urethral hypermobility

19   consistent with stress incontinence, but

20   wouldn't allow one to conclude that it's

21   entirely stress incontinence.

22              She's been given medications

23   that would theoretically help with

24   overactive bladder or urgency-related

Konstantin Walmsley, M.D.

Page 78

1   incontinence, but those medications have

2   proven to be ineffective.  In other

3   words, I think it's truly mixed.

4          Q.    Do those medication --

5   you're referring to Detrol or Enablex?

6          A.    Correct.

7          Q.    Do they also cure urinary

8   urge incontinence?

9          A.    They occasionally can cure

10  urge incontinence.  The most typical

11  scenario is that they have some degree of

12  positive impact on that.

13         Q.    But they don't always work.

14         A.    They don't always work, but

15  oftentimes in the setting of true urgency

16  incontinence from overactive bladder,

17  you'll see at least some dent or impact

18  on the problem, not that you would always

19  see that, but typically you do.

20         Q.    I guess I don't understand

21  -- other than the medication part,

22  medication's not working -- why you can

23  conclude that at this point in time that

24  she had a -- SUI predominated over urge.

Konstantin Walmsley, M.D.

Page 79

1          A.     A lot of that comes from the

2    urodynamics report that Dr. Hodges

3    performed.

4          Q.     But based upon this record,

5    putting aside -- we'll get to Dr. Hodges.

6          A.     Okay.

7               MS. SANTRA:   Object to form.

8               THE WITNESS:   Based on this

9          record, I think it would be more

10         challenging as a standalone record

11         to opine that one type of

12         incontinence predominates over the

13         other.

14   BY MR. PRITCHETT:

15         Q.     Any significance to you that

16   he could not elicit any stress

17   incontinence at the examination?

18         A.     Not especially, no.

19         Q.     And then his plan on the

20   next page talks about going slow, trying

21   a nonoperative approach, which includes

22   dietary changes, Kegel exercises, not --

23   timed voiding, et cetera.

24              Do you agree with his plan?

Konstantin Walmsley, M.D.

Page 80

1        A.    I think it's reasonable.

2        Q.    And how long would it take

3    to determine whether the nonoperative

4    approach was working?

5        A.    I would imagine at least a

6    couple of weeks.

7              MR. PRITCHETT:  Let me hand

8              you Exhibit 9, I think which will

9              be the last new exhibit.

10                    -  -  -

11             (Deposition Exhibit No.

12             Walmsley (Baker)-9, 6/18/09

13             "Appendix B - Bladder Health

14             Questionnaire (Sample)" for Dawn

15             Baker, BAKERD_PSR_00007 and

16             BAKERD_PSR_00008, was marked for

17             identification.)

18                    -  -  -

19    BY MR. PRITCHETT:

20        Q.    And this is a bladder health

21    questionnaire dated June 18, 2009.  This

22    was out of Dr. Hodges' office.

23              Is this a record that you

24    looked at before formulating your

Konstantin Walmsley, M.D.

Page 81

1    opinions in this case?

2         A.    Yes.

3         Q.    And is this, a bladder

4    questionnaire, something you use in your

5    practice?

6         A.    Not this type of

7    questionnaire directly, but certainly

8    similar questions are asked.

9         Q.    And this is self-reporting

10   by the patient, you think?

11        A.    Yes.

12        Q.    Do you -- in looking at

13   this, particularly where it says -- the

14   question's about, "Do you lose urine

15   when," can you tell from this whether Ms.

16   Baker had urge predominating over stress

17   or vice versa?

18        A.    No.

19        Q.    And look at the third

20   question from the bottom.  It says, "Have

21   you ever had urethra (bladder tube)

22   stretched?"  And she marked "yes."

23        A.    Yes.

24        Q.    Do you know what that's

Konstantin Walmsley, M.D.

Page 82

1    referring to?

2         A.    As a child, she had a

3    urethral dilation procedure performed.

4         Q.    And what is that?

5         A.    A urethral dilation

6    procedure is a procedure where the

7    urethral tube is serially stretched open

8    or dilated, usually with the use of metal

9    rods that are called sounds.

10        Q.    Sounds terrible.

11        A.    Probably better to do under

12   sedation, yes.

13        Q.    Can that cause any lasting

14   problems with urinary dysfunction?

15        A.    Well, it depends on if the

16   problem re-presents itself, in other

17   words, urethral stenosis or urethral

18   stricture.

19             I get the sense that with

20   her, the problem didn't return because

21   she's never been treated for that

22   condition since that time.

23        Q.    You can put that aside.

24             I want to talk to you about

Konstantin Walmsley, M.D.

Page 83

1    your IME, and you examined her in your

2    New Jersey office; is that correct?

3         A.    Yes.

4         Q.    And you've performed exams

5    for litigation before?

6         A.    I have.

7         Q.    And when you're retained as

8    an expert for litigation, do you always

9    do an exam before giving your opinions?

10        A.    Not always.

11        Q.    So you've given opinions in

12   litigation without an examination.

13        A.    I have.

14        Q.    And what determines whether

15   you do an examination of a litigant or

16   not?

17        A.    I don't know if I can

18   completely answer that question because

19   sometimes I'm not even asked to.

20        Q.    Okay.  Well, that may be the

21   answer.  Sometimes you're asked to,

22   sometimes you're not; correct?

23        A.    I think that might be one of

24   the answers, yeah.

Konstantin Walmsley, M.D.

Page 84

```
 1          Q.    Did she have any -- did she
 2   report any difficulties traveling to New
 3   Jersey?
 4                MS. SANTRA:  Object to form.
 5                THE WITNESS:  I don't quite
 6          recall.
 7   BY MR. PRITCHETT:
 8          Q.    Sitting here, if she walked
 9   in the door, would you recognize her?
10          A.    I would.
11          Q.    Because that was just a few
12   months ago?
13          A.    Yeah, it was June 20th
14   specifically.
15          Q.    Did anyone accompany her to
16   your office?
17          A.    I don't specifically recall
18   that.
19          Q.    Was anyone present in the
20   room for the exam?
21          A.    Yes.
22          Q.    Who?
23          A.    One of my medical
24   assistants.
```

Konstantin Walmsley, M.D.

Page 85

1          Q.      Did she bring any documents

2     with her, like medical records or

3     anything else?

4          A.      No.

5          Q.      What did you know about Ms.

6     Baker before you did your examination in

7     June?

8          A.      Not very much.  I typically

9     try to review medical records after the

10    IME, only because I find that I can see

11    and meet the patient and have a clearer,

12    kind of unfettered conscience, if you

13    will, about the patient.

14         Q.      Had you reviewed any medical

15    records at all?

16         A.      I may have, but more often

17    than not, I typically review the medical

18    records after the IME.

19         Q.      Had you read her plaintiff

20    fact sheet or any of the other materials

21    that had been sent to you?

22         A.      That, I did not look at

23    beforehand.

24         Q.      Did counsel request any

Konstantin Walmsley, M.D.

Page 86

1    facts or data that they wanted you to

2    consider in your exam?

3          A.    No.

4          Q.    And was that the only

5    meeting you had with her, Ms. Baker?

6          A.    Yes, that was the only

7    meeting.

8          Q.    You've had no communications

9    with her since.

10          A.    I have not.

11          Q.    And this was for purposes of

12    an independent examination, but not for

13    care and treatment; correct?

14          A.    Yes.

15          Q.    Any differences in how you

16    would conduct an exam in your -- from

17    your clinical practice?

18          A.    No.

19          Q.    What were the components of

20    the exam?

21          A.    History taking, followed by

22    a physical examination, followed by a

23    review of all the data and the

24    designation of diagnoses or assessments.

Konstantin Walmsley, M.D.

Page 87

1          Q.     And how long did the actual
2    examination last?
3          A.     Probably about 45 minutes.
4          Q.     And the rest was how long?
5    How long was she with you total?
6          A.     She was in the office
7    probably for a good hour.  I guess in
8    terms of the physical exam portion of the
9    evaluation, that was probably on the
10   order of five to ten minutes.
11         Q.     So you did a pelvic exam.
12   Right?
13         A.     Yes.
14         Q.     Did you do testing of any
15   kind?
16         A.     Other than her urine
17   analysis, no.
18         Q.     So you didn't do a Q-Tip
19   test or -- that's considered -- I
20   consider that a test.  Okay?  So let's
21   just make sure we got our terminology
22   right.
23                Other than a pelvic
24   examination, urinalysis, you didn't do

Konstantin Walmsley, M.D.

Page 88

1    anything else.

2         A.    Well, I did an examination

3    outside of the pelvis as well.

4         Q.    Sure.

5         A.    But as it relates to the

6    pelvis exam, I did not do a Q-Tip test.

7    I did not perform a cystoscopy or a

8    urodynamics test.

9         Q.    Are the entire details of

10   your exam described in your -- either

11   your report, Exhibit 2, or your encounter

12   summary, which is Exhibit 5?

13        A.    Yes.

14        Q.    Was she on any medications

15   at the time?  I think you indicate no

16   medications reported, looking at Exhibit

17   5, first page in the middle?

18        A.    Yeah.  For whatever reason,

19   there are no medications listed that she

20   was taking.

21        Q.    Was she wearing any pads or

22   liners?

23        A.    I did not see them on her

24   when I examined her.

Konstantin Walmsley, M.D.

Page 89

1          Q.      Did you ask whether she was

2     using pads or liners?

3          A.      I did.

4          Q.      What did she say?

5          A.      She stated to me that she

6     used pads for social reasons.

7          Q.      Did she say when she -- I

8     understand why she may wear them, but how

9     often or --

10         A.      She wasn't using them all

11    the time or on a daily basis.  The extent

12    of my questioning was when she used them,

13    and the answer that she gave me was, she

14    used them for social reasons, but I

15    didn't delve into the nature of her

16    social reasons.

17                 I concluded that it was

18    probably if she was out for long periods

19    of time or going to a party or going to

20    the mall for a few hours, those types of

21    instances.  That was like my conclusion

22    based on her answer.

23         Q.      Did she tell you anything

24    about her urethral stretching?

Konstantin Walmsley, M.D.

Page 90

1          A.     Not specifically.

2          Q.     Can you tell me your

3     objective findings of the presence of SUI

4     during that visit?

5          A.     Well, I didn't specifically

6     tailor my exam to generate objective

7     findings of SUI, because if I were to

8     have done that, I would have, for

9     example, had her do some provocative

10    maneuvers with her bladder full.

11               By the time she had seen me,

12    she had submitted a urine analysis and

13    for the most part had emptied her

14    bladder.  So examining patients in that

15    fashion, you're not going to elicit

16    objectively stress incontinence because

17    their bladder has no fluid in it.

18         Q.     I understand.

19               If her bladder had been

20    full, would you expect her to leak if she

21    stood and coughed?

22         A.     I would expect her to be at

23    risk for that, yes.

24         Q.     Okay.

Konstantin Walmsley, M.D.

Page 91

1        A.      Yeah.

2        Q.      What do you mean by "at

3    risk"?  She may or may not?

4        A.      Well, I mean, I think,

5    strictly speaking, different patients

6    have different leak point pressures.  If

7    she was someone who had mild stress

8    incontinence, she might not necessarily

9    leak reproducibly with a provocative

10   maneuver as if she had severe stress

11   incontinence, let's say.

12       Q.      Could you determine whether

13   she has mild or severe SUI?

14       A.      I would probably term it in

15   the mild to moderate category based upon

16   her history, based upon what she was

17   relating to me as the type and nature of

18   her incontinence.

19       Q.      Do you have an opinion

20   whether her SUI is worse, the same, or

21   not as severe as she had before her

22   surgery?

23       A.      I think it's hard to draw

24   that conclusion.  I wasn't able to glean

Konstantin Walmsley, M.D.

Page 92

1    from her if it was worse and, if so, how.

2    I mean, to some degree, one tries to do

3    that on the basis of pad use or even pad

4    weight.  I'm not privy to that

5    information, so it's hard to,

6    quantitatively at least, point to

7    severity before and after.

8            Q.    Recurrence of SUI, though,

9    was a known risk of mesh surgery at the

10   time she had hers; correct?

11           A.    Yes.

12           Q.    Because not all the

13   surgeries are a hundred percent

14   successful; correct?

15           A.    Right.

16           Q.    You mentioned she also had

17   urge incontinence?

18           A.    Yes.

19           Q.    How did you determine

20   objectively whether she had urge

21   incontinence?

22           A.    Once again, you know, I

23   think objective is a challenge.  Because

24   when I'm thinking objective findings, I'm

Konstantin Walmsley, M.D.

Page 93

1    thinking, you know, active leaking onto a

2    pad, having a feeling of urgency.  So

3    this was a largely clinical diagnosis

4    made as much on history taking as it was

5    on a physical exam.

6            Q.    And she had urge

7    incontinence before her mesh surgery,

8    too.  Remember us talking about that?

9            A.    We did.

10           Q.    Could you tell or can you

11   tell me whether her urge incontinence is

12   worse today, the same, or not as severe

13   as -- than it was before the surgery?

14                MS. SANTRA:  Object to form.

15                THE WITNESS:  In terms of my

16           interviewing of the patient, what

17           I would conclude is that her mixed

18           urinary incontinence today is now

19           more urge today than it was

20           stress.

21                So the question of, is her

22           urgency urinary incontinence worse

23           today than the urgency urinary

24           incontinence she had before her

Konstantin Walmsley, M.D.

Page 94

1          surgery is difficult for me to

2          answer, because once again, we're

3          talking quantitatively about the

4          severity of her incontinence and I

5          can't sit here and say she's using

6          more pads today than she was, for

7          example, before her surgery.

8    BY MR. PRITCHETT:

9          Q.    And maybe this is asking the

10   same question, just a little bit

11   differently, but she had mixed urinary

12   incontinence before her mesh surgery;

13   correct?

14         A.    Yes.

15         Q.    And she has it now in your

16   opinion; correct?

17         A.    Yes.

18         Q.    And would you give the same

19   answer if I asked you whether her mixed

20   incontinence is worse than it was before

21   the surgery?

22         A.    I think you have to just

23   restate it again if you don't mind.  I'm

24   sorry.

Konstantin Walmsley, M.D.

Page 95

1          Q.    I asked you whether her SUI

2    was different now than before her

3    surgery.

4          A.    Right.

5          Q.    And I asked you about her

6    urge, whether that was different now than

7    it was before her surgery.

8                What about the overall

9    package, the mixed incontinence; can you

10   tell me whether in your opinion it's

11   worse, the same, or not as severe as it

12   was before her mesh surgery?

13               MS. SANTRA:  Object to form.

14               THE WITNESS:  I would

15          probably only like to use the word

16          different.

17   BY MR. PRITCHETT:

18          Q.    How so?

19          A.    Because I think, now, it's

20   more urgency related than stress related,

21   to her accounts at least.

22               MR. PRITCHETT:  Can we take

23          a short break?

24               (A recess was taken from

Konstantin Walmsley, M.D.

Page 96

1          1:43 p.m. to 1:47 p.m.)

2    BY MR. PRITCHETT:

3          Q.    Doctor, during your

4    examination of Ms. Baker, did you see any

5    evidence of exposure, erosion, or

6    extrusion?

7          A.    No, sir.

8          Q.    Did you see any evidence of

9    roping, banding, or curling?

10         A.    No, I did not.

11         Q.    Did you see any evidence of

12   degradation?

13         A.    No.

14         Q.    What about contraction or

15   shrinkage?

16         A.    Yes.

17         Q.    And what evidence did you

18   observe?

19         A.    Well, during my IME, there

20   was some scar tissue noted underneath the

21   sling.

22         Q.    So you're looking at page 2

23   of Exhibit 5 under "Female Genitalia"?

24         A.    That's correct.

Konstantin Walmsley, M.D.

Page 97

1          Q.    And is it the bold part,

2    "Sling is palpable in the mid-urethra"?

3          A.    Yes.

4          Q.    "Mild induration noted

5    laterally at the sulci"?

6          A.    That's correct.

7          Q.    More right than left?

8          A.    Yes.

9          Q.    And so is that the scar

10   plate that you referred to in your

11   report?

12         A.    That's correct.

13         Q.    You're inferring there's

14   contraction or shrinkage because of the

15   scarring that you felt; is that what

16   you're saying?

17               MS. SANTRA:  Object to form.

18               THE WITNESS:  That's

19         correct.

20   BY MR. PRITCHETT:

21         Q.    And what causes the

22   scarring?

23         A.    Typically what happens when

24   mesh is implanted is, there is a chronic

Konstantin Walmsley, M.D.

Page 98

1    inflammatory response that generates

2    fibrosis and scarring.

3         Q.    Would you agree that the

4    only way to know for sure if there was

5    chronic inflammation is to do a biopsy?

6         A.    I think that would be very

7    helpful.

8         Q.    Did you see any inflammation

9    or redness in and around the urethra

10   area?

11        A.    I did not.

12        Q.    Did you see redness or

13   inflammation anywhere else?

14        A.    I did not.

15        Q.    I want to make sure I have

16   all of Ms. Baker's symptomatic conditions

17   which you are attributing to the mesh.

18   You have pelvic pain.  Right?

19        A.    Yes.

20        Q.    Vaginal pain.  Right?

21        A.    Yes.

22        Q.    Now, is that only with

23   intercourse where she has the vaginal

24   pain?

Konstantin Walmsley, M.D.

Page 99

1          A.     Yes.

2          Q.     So if she's not having

3    intercourse, she's not having vaginal

4    pain; is that correct?

5          A.     Correct.

6          Q.     And then you report mixed

7    urinary incontinence, which we've talked

8    about; correct?

9          A.     Yes.

10         Q.     Are there any other

11   symptomatic conditions which you

12   attribute to the mesh other than what we

13   just discussed or just listed?

14         A.     Just those three.

15         Q.     You have no opinions about

16   difficulties with bowel movements?

17         A.     I do not.

18         Q.     You have no opinions about

19   numbness in her right leg?

20         A.     I do not.

21         Q.     You have no opinions about

22   bleeding?

23         A.     I do not.

24         Q.     You have no opinions about

Konstantin Walmsley, M.D.

Page 100

1    urinary tract infections?

2            A.    Not directly, no.

3            Q.    Well, what do you mean

4    "directly"?

5            A.    Well, sometimes one can see

6    a higher risk of infections in patients

7    who have voiding dysfunction and, as an

8    example, patients with more severe

9    incontinence can be at risk for urinary

10   tract infections, patients who don't

11   empty their bladders completely might be

12   at more risk for urinary tract

13   infections.

14                We've discussed that,

15   quantitatively, it's hard for me to

16   objectify if her incontinence is worse

17   today than before her sling, so I can't

18   directly correlate her urinary tract

19   infection risk directly at least with the

20   sling.

21                But if, in fact, her

22   incontinence is an issue and her

23   incontinence were to be worse, it would

24   be something to consider.

Konstantin Walmsley, M.D.

Page 101

1          Q.     Do you agree that she had a
2    history of urinary tract infections
3    before the mesh sling surgery?
4          A.     I do agree with that, yeah.
5          Q.     And her uranalysis was
6    normal?
7          A.     That's correct.
8          Q.     And you did not do a urine
9    culture; correct?
10          A.     I did not.
11          Q.     And I didn't see urinary
12    tract infection mentioned anywhere in
13    your encounter summary, Exhibit 5, or
14    Exhibit 2.  Is it mentioned anywhere?
15          A.     This is true.
16          Q.     And you have no opinions
17    about her claim to emotional injuries;
18    correct?
19          A.     No.
20          Q.     I want to talk about the
21    scar plate formation opinion a little
22    bit.  You agree that some scarring is
23    expected in a mesh sling surgery;
24    correct?

Konstantin Walmsley, M.D.

Page 102

1        A.      Correct.

2        Q.      You mentioned the sling is

3   palpable and I think you clarified it for

4   me already.  That was the -- you weren't

5   palpating the actual sling.  You were

6   palpating what you thought was scar

7   tissue; correct?

8        A.      A little bit of both.  I

9   mean, I was palpating the scar tissue,

10  but knowing that there was mesh material

11  in and around it.

12       Q.      But you couldn't feel the

13  mesh.

14       A.      I couldn't literally feel

15  the actual mesh itself, no.

16       Q.      Was the sling where you

17  would expect it to be?

18       A.      Yes.

19       Q.      It didn't appear to have

20  migrated or anything?

21       A.      No.

22       Q.      Did you detect and record

23  any evidence of tenderness under the

24  sling at the level of the mid-urethra

Konstantin Walmsley, M.D.

Page 103

1    going to the periurethral space?

2         A.    Periurethrally, yes.

3              Generally speaking, when I'm

4    mentioning induration and pain

5    reproducible on palpation, it's

6    correlating with the induration that's

7    noted.  In her case, it was more so on

8    the right side than the left side.

9         Q.    And can you quantify, length

10   or whatever, how much scar plate tissue

11   you felt?

12        A.    Well, I think to be fair,

13   there was scar throughout the entire

14   sling, but there was more thickness

15   towards the edges.

16              So as you're extending out

17   from the mid-urethra towards the

18   periurethral tissues in the upper corners

19   of the vagina, there was more scar tissue

20   in those areas.

21        Q.    Did she mention anything to

22   you about feeling a tugging on her left

23   side?

24        A.    She developed feeling a

Konstantin Walmsley, M.D.

Page 104

1    pulling pain on the groin on the right

2    side.

3                Q.    What about the left side?

4                      I didn't see it either.

5                A.    She did not mention that to

6    me.

7                Q.    And let's go on to the --

8    because I have limited time.  Let's go on

9    to the -- your second opinion about the

10   pelvic pain and dyspareunia.

11                     Let me ask you first, where

12   did you detect the pelvic pain?

13               A.    So on physical exam, her

14   pain was in the vaginal space, in the

15   area of the sling, more so on the right

16   lateral side of the sling than the left.

17               Q.    And pelvic pain, again, was

18   a known potential risk of any pelvic

19   floor surgery; correct?

20               A.    Yes.

21               Q.    Can painful bladder syndrome

22   cause pelvic pain?

23               A.    Yes, it can.

24               Q.    Do you think she has painful

Konstantin Walmsley, M.D.

Page 105

1    bladder syndrome?

2            A.    No, I don't.

3            Q.    Why?

4            A.    Well, she doesn't meet the

5    criteria to have that syndrome.

6            Q.    Okay.  What is the criteria?

7            A.    So interstitial cystitis or

8    painful bladder syndrome is a disease

9    state characterized by pelvic pain,

10   accompanied by irritative voiding

11   symptoms that typically has been going on

12   for a period of time greater than six

13   months.

14           The other diagnostic

15   criteria include cystoscopy with findings

16   that would otherwise be reflective of

17   interstitial cystitis, usually findings

18   whereby one sees changes within the

19   bladder lining during the cystoscopy that

20   would otherwise be reflective of

21   interstitial cystitis.

22           In most instances, we're not

23   encountering patients with interstitial

24   cystitis.  They're having frequency on

Konstantin Walmsley, M.D.

Page 106

```
 1    the order of 15, 20, 30 times, so they
 2    have fairly severe frequency.
 3              Q.    But the -- the severity of
 4    it can vary from 15 to 30.  Right?
 5              A.    True.
 6              Q.    Can painful bladder syndrome
 7    cause dyspareunia?
 8                    MS. SANTRA:  Object to form.
 9                    THE WITNESS:  Possibly, yes.
10    BY MR. PRITCHETT:
11              Q.    Was interstitial cystitis
12    something that you considered in your
13    differential diagnosis?  Because I don't
14    see it mentioned.
15              A.    Yes.
16              Q.    Where was it mentioned?
17              A.    Well, recognized causes of
18    dyspareunia following synthetic mesh
19    sling surgery include a variety of
20    different causations; and in my report, I
21    list infection and inflammation,
22    including, but not limited to,
23    vestibulitis.
24                    I rule that out on the basis
```

Konstantin Walmsley, M.D.

Page 107

1    of the fact that not only did my exam not

2    reflect that, but she had no at least

3    recent history of interstitial cystitis

4    in her medical records.

5              So based on my IME and the

6    medical records that I reviewed in this

7    particular setting, interstitial cystitis

8    was not a factor I took into -- I mean, I

9    -- I excluded it, shall we say.

10         Q.   Did you recall seeing a

11   medical record from her treating doctor,

12   Dr. Cardenas, where he was considering

13   the possibility of IC?

14         A.   I do, yeah.  Yes.  Although,

15   I think, to be fair, I thought Dr.

16   Cardenas may have called to question

17   possibly it being a bowel-related issue.

18         Q.   And you don't think she has

19   any bowel-related issues?

20         A.   I don't recall any strong or

21   compelling history of IBS or bowel issues

22   in this patient.

23         Q.   Did you -- I'm going to talk

24   about the vaginal pain/dyspareunia.  Did

Konstantin Walmsley, M.D.

Page 108

1    you detect or note in your report or your

2    encounter summary any tenderness in the

3    vaginal opening?

4         A.    Well, the tenderness was

5    fairly close to the vaginal opening that

6    I elicited, but it wasn't -- it didn't --

7    to your question, I didn't elicit

8    tenderness immediately upon introducing

9    my fingertips into Ms. Baker's vagina

10   during the exam.

11        Q.    It was with further

12   penetration that you elicited --

13        A.    Some.

14        Q.    -- some tenderness?

15        A.    Some -- some further

16   penetration.  I mean, perhaps between 1

17   and 3 inches upon entry.

18        Q.    If there was -- she had

19   tenderness in the vaginal opening, not 1

20   to more inches, but at the vaginal

21   opening, would you agree that that could

22   not be caused by the mesh?

23             MS. SANTRA:  Object to form.

24             THE WITNESS:  If it was

Konstantin Walmsley, M.D.

Page 109

```
 1          exclusively right at the
 2          introitus, it would be very hard
 3          to attribute that to pelvic mesh.
 4   BY MR. PRITCHETT:
 5          Q.   You read Dr. Khandwala's
 6   report; correct?
 7          A.   I did.
 8          Q.   And he mentioned vulvodynia;
 9   correct?
10          A.   There is mention made of
11   that.
12          Q.   Do you agree with his
13   statements about vulvodynia?
14          A.   When you say do I agree with
15   it, I mean, it's memorialized as such.
16          Q.   I don't understand.
17          A.   I -- you know, I examined
18   her vulva as well and I did not use a
19   Q-Tip.  I used my own gloved fingers and
20   didn't get a similar response vis-a-vis
21   pain.
22               But obviously he
23   memorialized and documented not only did
24   she have vulvodynia, but significant
```

Konstantin Walmsley, M.D.

Page 110

1  vulvodynia.

2           Q.    I'm going to jump down to --

3  because I'm running out of time -- to

4  prognosis.  And I just have a question.

5  You say -- and this is opinion number 4,

6  Exhibit 2 -- you say, in part, "Moreover,

7  she has pelvic tenderness and residual

8  scar tissue in the area where her mesh

9  erosion was treated."

10               Is that a mistake?

11          A.    That should not say that.

12          Q.    It's the third sentence on

13  your case specific opinion number 4.

14          A.    No, that's incorrect.

15          Q.    Is that left over from

16  another report or --

17          A.    That must have been some

18  sort of a residual or not cutting a

19  sentence out or something of that degree.

20  That can be entirely omitted.

21          Q.    You mention that future

22  surgery could help address Ms. Baker's

23  dyspareunia; correct?

24          A.    Correct.

Konstantin Walmsley, M.D.

Page 111

1         Q.    Have any of her treating
2    doctors ever recommended removal of the
3    mesh sling?
4         A.    Well, there's only one
5    doctor in particular and Dr. Cardenas did
6    not.
7         Q.    Are you aware of any of her
8    treating doctors who agree with you and
9    say that the mesh is causing her
10   symptoms?
11             MS. SANTRA:  Object to form.
12             THE WITNESS:  No.
13   BY MR. PRITCHETT:
14        Q.    If she had not had surgery
15   to treat her SUI in 2009, would she still
16   likely have complex urinary incontinence
17   that Dr. Kupper described?
18        A.    I mean, assuming she had no
19   other type of antiincontinence surgery
20   whatsoever?
21        Q.    Yes, sir.
22        A.    I would imagine she would or
23   she may.
24        Q.    So she'd still have problems

Konstantin Walmsley, M.D.

Page 112

1    wetting herself.  Right?

2                   MS. SANTRA:  Object to form.

3                   THE WITNESS:  Likely.

4    BY MR. PRITCHETT:

5         Q.    Is there any significance to

6    you that Ms. Baker did not report to any

7    healthcare provider any leaking until

8    August of 2013, other than her postop

9    follow-up visit with Dr. Hodges?

10        A.    To one extent, based on her

11   specifically, the significance to me

12   falls into the fact that she wasn't one

13   to necessarily see doctors.  She was

14   somewhat of a stoic patient who really

15   oftentimes didn't seek out medical care.

16                   And I do recall with her in

17   particular a bit of a disconcerting

18   comment that she didn't see Dr. Hodges --

19   or she had trouble seeing doctors in the

20   area because they weren't comfortable

21   addressing what she perceived as a

22   mesh-specific problem.

23        Q.    Is that something she told

24   you?

Konstantin Walmsley, M.D.

Page 113

```
 1          A.    I recall her saying
 2   something to that extent to me and I
 3   found it a little disconcerting.
 4          Q.    Was that something she told
 5   you or something she said in her
 6   deposition?
 7          A.    Both.
 8          Q.    But she did see treaters
 9   between June of 2009 and August of 2013;
10   correct?
11          A.    She did.
12          Q.    Any significance to you that
13   she did not report painful intercourse to
14   any treater following her 2009 surgery?
15               MS. SANTRA:  Object to form.
16               THE WITNESS:  What was the
17          latter point?  Was that 2013 that
18          you said that, from 2009 to 2013?
19               MR. PRITCHETT:  Well, on
20          dyspareunia.  Let me just ask it
21          again.
22   BY MR. PRITCHETT:
23          Q.    Any significance to you that
24   Ms. Baker did not report painful
```

Konstantin Walmsley, M.D.

Page 114

1   intercourse to any treater after her 2009

2   surgery?

3                    MS. SANTRA:  Object to the

4             form.

5                    THE WITNESS:  I mean, the

6             only significance I guess to that

7             is, I guess, number 1, it depends

8             on the context, if it's actually,

9             number one, asked; and number two,

10            to what extent she would be

11            comfortable discussing that topic

12            with a provider.

13                   Obviously, the flip-side of

14            that significance is that, well,

15            maybe it wasn't as significant for

16            her to bring it up, but I think

17            there are obviously two sides of

18            an analysis there.

19   BY MR. PRITCHETT:

20            Q.   Any significance to you that

21   Dr. Cardenas noted that Ms. Baker was

22   menopausal in 2015?

23            A.   Yes.

24            Q.   What's the significance of

Konstantin Walmsley, M.D.

Page 115

1    that?

2         A.    Well, I think the

3    significance of that is that when one

4    enters their menopause, they do run the

5    risk of things such as vulvovaginal

6    atrophy, which could present problems

7    with pelvic pain and/or dyspareunia.

8         Q.    Is she to your knowledge

9    under any hormone replacement treatment?

10        A.    No, not to my knowledge.

11        Q.    But you still rule out

12   vaginal atrophy as a potential cause of

13   her dyspareunia even though she is

14   experiencing menopause?

15        A.    Well, both during my IME and

16   Dr. Khandwala's IME and even Dr.

17   Cardenas' evaluation, there's no

18   documentation of vulvovaginal atrophy.

19        Q.    Tell me about any comments

20   or criticisms you have of Dr. Cardenas'

21   report that you said you reviewed.

22        A.    You know, the only comments

23   I would have are that he and I did our

24   exams somewhat differently and probably

Konstantin Walmsley, M.D.

Page 116

1    memorialized different findings.  He also

2    arrived at a conclusion that I wouldn't

3    necessarily have arrived at, that being

4    the diagnosis of interstitial cystitis.

5         Q.    He also doesn't think she

6    has recurrent SUI; is that correct?

7         A.    He did put forth that

8    opinion.

9         Q.    Well, specifically, any

10   criticism of how he conducted the

11   examination?  You said he did it

12   differently.

13        A.    Not per se.  I mean, the

14   only area of interest that I have just

15   difficulty understanding is how the

16   anterior fornix exam was described.

17        Q.    And what's your difficulty

18   in understanding that?

19        A.    Well, he documents

20   tenderness at the level of the bladder on

21   bimanual exam.  He and I have somewhat of

22   a similar finding there as it relates to

23   I find tenderness palpating the mesh at

24   the vaginal sulci, which are quite near

Konstantin Walmsley, M.D.

Page 117

1    the bladder.

2              And then there's another

3    mention of tenderness at the level of the

4    bladder just with a speculum exam,

5    opening the anterior blade of the

6    speculum, and I guess I don't understand

7    where that tenderness is occurring.

8              In other words, is it

9    occurring where the speculum is in

10   contact with the vaginal tissues?  Is it

11   occurring where there's some pulling of

12   scar tissue that's not near the speculum?

13             So just from a semantics

14   standpoint, I'm not sure if the

15   tenderness that Dr. Khandwala is

16   describing in his physical exam is the

17   same as mine.

18        Q.    Okay.

19        A.    The other critique obviously

20   is, the idea of doing a cystoscopy is not

21   an appropriate one.  The patient did have

22   on dipstick trace blood, which raises the

23   possibility of microhematuria, and she

24   did have irritative voiding symptoms.

Konstantin Walmsley, M.D.

Page 118

1             That being said, the fact

2     that once he got to 300 cc's, she had

3     extreme discomfort, the fact that the

4     bladder still looked completely normal at

5     that time, in other words, had no

6     inflammatory changes, leads me to have a

7     hard time concluding that she must have

8     had interstitial cystitis simply because

9     there was discomfort with the cystoscope

10    in her bladder at 300 cc's.

11          Q.    Is it your opinion there's

12    just no way that Ms. Baker has IC?

13          A.    I would probably discount it

14    on the basis of my own findings, but I

15    think it's important to understand that

16    interstitial cystitis, for lack of a

17    better term, is a bit of a wastebasket

18    diagnosis.  It's not necessarily a

19    diagnostic criterion where there are

20    objective measures that need to be hit or

21    obtained to make the diagnosis.

22             So it's a diagnosis that's

23    certainly put forth on plenty of

24    occasions, but a lot of times, the

Konstantin Walmsley, M.D.

Page 119

1    footing or the objective criteria to

2    support that diagnosis are challenging to

3    put forth.

4                And I disagree with the

5    diagnosis of interstitial cystitis, not

6    only on the basis of my interview with

7    the patient and my experience in treating

8    the disease state, but also on the means

9    by which the diagnosis was reached, on

10   the basis of a cystoscopy where at 300

11   cc's, there was pain, but no changes in

12   the bladder that would otherwise suggest

13   inflammation, glomerulations, ulcers, or

14   other findings that we see in patients

15   with interstitial cystitis.

16        Q.    Any other criticisms or

17   areas of disagreement?

18                MS. SANTRA:   Can we check on

19        the time?

20                  -   -   -

21                (A discussion off the record

22        occurred.)

23                  -   -   -

24                MR. PRITCHETT:   Can I get

Konstantin Walmsley, M.D.

Page 120

1          that one --

2                    MS. SANTRA:  Yeah, you can

3          -- that's fine, actually.

4                    THE WITNESS:  The only other

5          critique I would make is that Dr.

6          Khandwala concluded that she had

7          deep dyspareunia on the basis of

8          his exam when, in fact, the pain

9          that she had, which was at the

10         level of the bladder, really is

11         not necessarily one of deep

12         dyspareunia.

13                  It's actually dyspareunia

14         that, location-wise, is more in

15         the midportion or the distal

16         portion of the vagina.

17                    MR. PRITCHETT:  Dr.

18         Walmsley, thank you very much.  I

19         am out of time.

20                    THE WITNESS:  Thank you.

21                    -  -  -

22                    EXAMINATION

23                    -  -  -

24    BY MS. SANTRA:

Konstantin Walmsley, M.D.

Page 121

1          Q.    I'm going to try to get

2     right into it, because I know you need to

3     go, but I may skip around a little bit.

4                 I'm going to talk for a

5     little bit about your reliance list.  And

6     when you wrote your report for Ms. Baker,

7     you had reviewed Dr. Blaivas' general

8     report on the TVT Secur; is that right?

9          A.    I did.

10         Q.    And you actually -- through

11    your materials reviewed list, you

12    incorporated Dr. Blaivas' general

13    opinions on the TVT-S into your report;

14    correct?

15         A.    Yes.

16         Q.    And in addition to Dr.

17    Blaivas' general report on the TVT-S, you

18    also note in general that the TVT-S can

19    cause the types of symptoms that Ms.

20    Baker has experienced; is that correct?

21         A.    Yes.

22         Q.    And you know that not only

23    from Dr. Blaivas' report, but also from

24    your clinical experience, your education

Konstantin Walmsley, M.D.

Page 122

1    and training, and your review of the

2    medical literature; correct?

3           A.    Yes.

4           Q.    And the medical literature

5    that you listed in your reliance list,

6    that's not an exhaustive list of every

7    article you've ever read relating to

8    polypropylene mesh; is that correct?

9           A.    That's correct.

10          Q.    And so, you know, these

11   articles that you've listed, while they

12   may be very relevant to Ms. -- your

13   report for Ms. Baker, that's by no means

14   an exclusive list of everything you've

15   ever read; correct?

16          MR. PRITCHETT:  Objection;

17   form.

18          THE WITNESS:  Correct.

19   BY MS. SANTRA:

20          Q.    And so when you're rendering

21   your opinions for Ms. Baker, you're

22   relying on your knowledge from the time

23   you were in medical school and all of

24   those classes that you took and articles

Konstantin Walmsley, M.D.

Page 123

```
 1    that you've reviewed over the past, let's
 2    say, 15, 20 years; is that right?
 3         A.    Correct.
 4         Q.    And so that knowledge is
 5    somewhat cumulative; is that correct?
 6         A.    Yes.
 7         Q.    And so I think you stated
 8    earlier, it's kind of hard to point to
 9    one article versus another article.  And
10    is that because you're relying kind of on
11    your general knowledge based on your
12    experience and training just as a
13    urologist for the past 15, 20 years?
14         A.    That's in part true, yes.
15         Q.    And I want to go to your
16    opinion -- your first opinion in your
17    report, your general opinion on the IFU
18    for the TVT Secur in 2009.  And what is
19    your experience with IFUs?
20         A.    I use IFUs in my practice to
21    understand surgical technique and also
22    understand potential precautions, adverse
23    events, contraindications to the use of a
24    device.
```

Konstantin Walmsley, M.D.

Page 124

1          MR. PRITCHETT:  Let me just

2     object to questions about his two

3     general opinions as opposed to his

4     case-specific opinions.  I was not

5     permitted to ask about the general

6     opinions and you should not be

7     either.

8          MS. SANTRA:  I've let you go

9     on for probably over an hour about

10     his general opinions.  I simply

11     objected.  So I'm going to keep

12     asking my questions.

13          MR. PRITCHETT:  It was

14     background, nothing about his

15     general opinions.

16          MS. SANTRA:  Okay.  Well,

17     I'm going to ask these background

18     -- actually, I'm going to ask

19     these questions about his opinion

20     which is in his case-specific

21     report for Ms. Baker, which you

22     were allowed to go into in depth.

23  BY MS. SANTRA:

24     Q.    And so in making your

Konstantin Walmsley, M.D.

Page 125

1    opinion about the IFU for the TVT Secur

2    in 2009, were you relying on your

3    experience as a practicing urologist who

4    reads IFUs regularly as part of your

5    practice?

6                    MR. PRITCHETT:  Objection;

7         form.

8                    THE WITNESS:  Yes.

9    BY MS. SANTRA:

10        Q.    And who relies on those IFUs

11   regularly when using medical devices?

12                   MR. PRITCHETT:  Objection;

13        form.

14                   THE WITNESS:  Yes.

15   BY MS. SANTRA:

16        Q.    And counsel asked you some

17   questions about whether you can know what

18   Dr. Hodges knew.  Do you remember those

19   questions?

20        A.    Yes.

21        Q.    And first off, you

22   understand that Dr. Hodges has not been

23   deposed yet in this case; is that

24   correct?

Konstantin Walmsley, M.D.

Page 126

1        A.    Correct.

2        Q.    And so to the extent you

3   can't answer anything about -- any

4   questions about Dr. Hodges' testimony,

5   that's because -- that's not because you

6   didn't read the deposition.  That's

7   simply because she hasn't been deposed

8   yet; correct?

9        A.    That's right.

10       Q.    And does it matter to your

11  general opinion number 1 -- would that

12  change your opinion at all if Dr. Hodges

13  never read the IFU?

14            MR. PRITCHETT:  Objection to

15       the form.

16            THE WITNESS:  No.

17  BY MS. SANTRA:

18       Q.    And why is that?

19       A.    I think we talked about

20  informed consent not relying solely upon

21  the IFU.  There are some clinicians that

22  I think use the IFU more than others.

23            To my mind, I think when a

24  clinician's not reading the IFU, he or

Konstantin Walmsley, M.D.

Page 127

1    she to some opinion is still making an

2    informed consent on the basis of the IFU,

3    because the key opinion leaders that are

4    writing the manuscripts, the other

5    material that a clinician uses to gain

6    informed consent probably as a touchstone

7    is affected by the IFU to some degree.

8           Q.     And you were asked some

9    questions about whether all pelvic

10   surgeries have risks.  Do you remember

11   those questions?

12          A.     I do.

13          Q.     Do the nature and

14   characteristics of the complications for

15   mesh versus nonmesh surgery, are those

16   different?

17          A.     Yes.

18          Q.     And how are those different?

19          A.     Well, insofar as mesh is a

20   foreign body, it induces a different type

21   of reactional response in host tissues;

22   and as a result of the means by which the

23   body reacts to mesh, typically, the

24   inflammation, the healing process is

Konstantin Walmsley, M.D.

Page 128

```
 1    different.  The inflammation is of a more
 2    chronic nature.  The scarring is
 3    different when one uses mesh as opposed
 4    to biologic graft materials or even host
 5    materials.
 6              As a result, you know, the
 7    qualitative nature of potential risks is
 8    greater and different.
 9         Q.   And so would listing the
10    risks that go along with any surgery or
11    any nonmesh pelvic surgery, would that be
12    enough to warn about the nature and
13    characteristics of the risks for a
14    product like the TVT Secur?
15              MR. PRITCHETT:  Objection;
16         form.
17              THE WITNESS:  No.
18    BY MS. SANTRA:
19         Q.   And that's just because the,
20    you know, listing vaginal pain doesn't
21    really describe the differences that
22    you've just talked about, for example?
23         A.   That's correct.
24         Q.   On your examination of Ms.
```

Konstantin Walmsley, M.D.

Page 129

1    Baker -- strike that.

2              You talked earlier about

3    your -- your opinion that there is

4    evidence in Ms. Baker's case that she has

5    had chronic inflammation with her TVT

6    Secur; is that correct?

7         A.    Yes.

8         Q.    And how do you know that?

9         A.    That's in large part based

10   on my physical examination of Mrs. Baker

11   that identified indurated tissue and even

12   some tenderness in the area of her sling.

13             Typically, inflammation,

14   that process generates scar tissue and

15   can generate tenderness if it's still in

16   play; in other words, if it's latent but

17   active, the inflammation can generate

18   tenderness.

19             So based on her exam, which

20   not only demonstrates the scar plate, but

21   the tenderness, I arrived at that

22   conclusion.

23        Q.    And does the absence of

24   redness that you could see on an exam,

Konstantin Walmsley, M.D.

Page 130

1    does that change your opinion at all

2    about chronic inflammation?

3         A.    No.

4         Q.    And why not?

5         A.    Because one doesn't need to

6    necessarily appreciate a change in color

7    to render that diagnosis.  It can be made

8    on different bases.

9         Q.    And then with the scar plate

10   that you felt upon examining Mrs. Baker,

11   I think you said you couldn't feel the

12   TVT Secur mesh itself; is that right?

13        A.    I could not directly feel

14   it.  I mean, in large part, if it's not

15   eroding or extruding, it's hard to really

16   feel it, unless it's very, very thin with

17   regards to the vaginal epithelium or

18   lining that you're feeling it under.

19        Q.    Even though you didn't feel

20   the -- directly the TVT Secur mesh

21   itself, you know that the TVT Secur is

22   what caused that scar plate; is that

23   right?

24        A.    It's part of the scar plate,

Konstantin Walmsley, M.D.

Page 131

1    yeah.  It's really incorporated into that

2    plate.

3            Q.    Okay.

4            A.    Yeah.

5            Q.    And you know that based on

6    its location or how do you know that?

7            A.    Based on the description of

8    Dr. Hodges on doing the surgery, based on

9    my understanding of the surgery and the

10   anatomy, it was very clear that where

11   that scar plate was palpated was where

12   the TVT Secur was placed.

13                 The other thing also, just

14   to make mention, that the TVT Secur has

15   some wings at the end of the actual

16   device, so it also serves as a means, if

17   there's thicker scar tissue, generally

18   where those wings are located can

19   correlate with that.

20           Q.    And did that -- was that the

21   case with Ms. Baker?

22           A.    To some degree, yes.  She

23   had somewhat more induration noted

24   laterally where those wings would have

Konstantin Walmsley, M.D.

Page 132

1    been.

2           Q.    And how do you know that

3    there was shrinkage or contracture in Ms.

4    Baker's case?

5           A.    So in Ms. Baker's case, I

6    did not put forth the opinion that the

7    mesh sling contracted.  I mean, it might

8    have contracted.

9                 With single-incision

10   systems, it's a little more difficult to

11   make that conclusion in the absence of

12   histology, because, in a lot of

13   instances, if there is true mesh

14   contraction, you'll actually feel the

15   sling and feel some tautness or tightness

16   to the sling.

17                In this instance, the

18   contraction to my conclusion was more on

19   the basis of wound contraction.

20          Q.    Okay.  So that was the

21   scarring in the scar plate that you felt?

22          A.    Correct, yeah.

23          Q.    And on exam, you were able

24   to reproduce her pain and specifically

Konstantin Walmsley, M.D.

Page 133

1    Ms. Baker was tender at the vaginal

2    sulci; is that correct?

3         A.    Yes.

4              MR. PRITCHETT:   Object to

5         the form.

6    BY MS. SANTRA:

7         Q.    And could painful bladder

8    syndrome or interstitial -- or strike

9    that.

10             Did painful bladder system

11   or interstitial cystitis cause that

12   tenderness that you felt at the vaginal

13   sulci for Ms. Baker?

14             MR. PRITCHETT:   Objection to

15        form.

16             THE WITNESS:   No.

17   BY MS. SANTRA:

18        Q.    And did vulvodynia cause

19   that tenderness that you felt at the

20   vaginal sulci for Ms. Baker?

21        A.    No.

22        Q.    And the cause -- a cause for

23   that would have been the TVT Secur

24   device; correct?

Konstantin Walmsley, M.D.

Page 134

1          A.     Yes.

2          Q.     And did you perform a

3    differential diagnosis when coming to

4    your opinions about Ms. Baker?

5          A.     I did.

6          Q.     And have you based your

7    opinions concerning Ms. Baker on your

8    clinical experience, your review of her

9    records, your independent medical

10   examination of Ms. Baker, and your

11   knowledge of the medical literature?

12         A.     Yes.

13         Q.     When you performed your

14   differential diagnosis for Ms. Baker, did

15   you take into account her past surgical

16   history, including a tubal ligation,

17   cervical cancer with hysterectomy, and a

18   urethra, I guess, stretching as a child?

19         A.     Yes.

20         Q.     And taking into

21   consideration all of those past

22   procedures, you found that the TVT Secur

23   was a cause for her pelvic pain and

24   dyspareunia; correct?

Konstantin Walmsley, M.D.

Page 135

1          A.    Yes.

2          Q.    And you interviewed Ms.

3    Baker; correct?

4          A.    I did.

5          Q.    Did she tell you about the

6    nature of the pain that she feels when

7    she attempts sexual intercourse -- when

8    she has attempted sexual intercourse?

9          A.    Yes.

10         Q.    And do you generally believe

11   her about that pain that she says she

12   experiences?

13              MR. PRITCHETT:  Objection to

14        form.

15              THE WITNESS:  Yes.

16   BY MS. SANTRA:

17         Q.    And would your findings upon

18   exam comport with her symptoms of that

19   pain?

20         A.    Yes.

21         Q.    And Ms. Baker reported

22   having some stress urinary leakage today;

23   is that right?

24         A.    Yes.

Konstantin Walmsley, M.D.

Page 136

```
 1              MR. PRITCHETT:  Objection to

 2        the form.

 3              THE WITNESS:  Yes.

 4   BY MS. SANTRA:

 5        Q.    And so -- and is the TVT

 6   Secur or was the TVT Secur sold by

 7   Ethicon as a permanent solution to stress

 8   urinary incontinence?

 9              MR. PRITCHETT:  Objection to

10        the form.

11              THE WITNESS:  I don't recall

12        specifically permanent.

13   BY MS. SANTRA:

14        Q.    Was the TVT Secur supposed

15   -- intended to be a permanent device?

16        A.    That's true, yes.

17        Q.    And despite the TVT Secur

18   being implanted, Ms. Baker continues to

19   have stress urinary incontinence;

20   correct?

21              MR. PRITCHETT:  Objection to

22        form.

23              THE WITNESS:  Yes.

24   BY MS. SANTRA:
```

Konstantin Walmsley, M.D.

Page 137

1          Q.    Have you rendered all your

2    opinions today to a reasonable degree of

3    medical certainty?

4          A.    I have.

5               MS. SANTRA:  I think that's

6          all I have for you.  Thank you,

7          Doctor.

8               THE WITNESS:  You're

9          welcome.

10              (Witness excused.)

11              (Deposition concluded at

12         approximately 2:39 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

Konstantin Walmsley, M.D.

1

2                       CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6    deposition is a true record of the
testimony given by the witness.

7

            It was requested before
8    completion of the deposition that the
witness, KONSTANTIN WALMSLEY, M.D., have
9    the opportunity to read and sign the
deposition transcript.

10

11

12

13    _____
KIMBERLY A. CAHILL, a
14    Federally Approved Registered
Merit Reporter and Notary Public
15    Dated:  August 16, 2016

16

17          (The foregoing certification
18    of this transcript does not apply to any
19    reproduction of the same by any means,
20    unless under the direct control and/or
21    supervision of the certifying reporter.)

22

23

24

Konstantin Walmsley, M.D.

Page 139

1              INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                    After doing so, please sign

9    the errata sheet and date it.

10                   You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                   It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Konstantin Walmsley, M.D.

Page 140

1        -   -   -   -   -

        E R R A T A

2        -   -   -   -   -

3    PAGE   LINE   CHANGE

4    ____   ____   _____

5    ____   ____   _____

6    ____   ____   _____

7    ____   ____   _____

8    ____   ____   _____

9    ____   ____   _____

10   ____   ____   _____

11   ____   ____   _____

12   ____   ____   _____

13   ____   ____   _____

14   ____   ____   _____

15   ____   ____   _____

16   ____   ____   _____

17   ____   ____   _____

18   ____   ____   _____

19   ____   ____   _____

20   ____   ____   _____

21   ____   ____   _____

22   ____   ____   _____

23   ____   ____   _____

24   ____   ____   _____

Konstantin Walmsley, M.D.

Page 141

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5     hereby certify that I have read the

6     foregoing pages, 1 - 142, and that the

7     same is a correct transcription of the

8     answers given by me to the questions

9     therein propounded, except for the

10    corrections or changes in form or

11    substance, if any, noted in the attached

12    Errata Sheet.

13

14

15    _____

16    KONSTANTIN WALMSLEY, M.D.          DATE

17

18

19    Subscribed and sworn
      to before me this

20    _____ day of _____, 20____.

21    My commission expires:_____

22

      _____

23    Notary Public

24

Konstantin Walmsley, M.D.

Page 142

```
 1                    LAWYER'S NOTES

 2     PAGE  LINE

 3     ____  ____    _____

 4     ____  ____    _____

 5     ____  ____    _____

 6     ____  ____    _____

 7     ____  ____    _____

 8     ____  ____    _____

 9     ____  ____    _____

10     ____  ____    _____

11     ____  ____    _____

12     ____  ____    _____

13     ____  ____    _____

14     ____  ____    _____

15     ____  ____    _____

16     ____  ____    _____

17     ____  ____    _____

18     ____  ____    _____

19     ____  ____    _____

20     ____  ____    _____

21     ____  ____    _____

22     ____  ____    _____

23     ____  ____    _____

24     ____  ____    _____
```