# Exhibit D

Wenxin Zheng, M.D.

```
 1                    IN THE SUPERIOR COURT
                   OF NEW JERSEY LAW DIVISION
 2                        BERGEN COUNTY
 3   KATHRYN E. CORBET and ERIC   )
     R. CORBET,                   )
 4                                )
                  Plaintiffs,     ) MASTER DOCKET NO:
 5                                ) BER-L-11575-14
     VS.                          )
 6                                )
     ETHICON, INC., ETHICON       ) CIVIL ACTION: In re
 7   WOMEN'S HEALTH AND           ) Pelvic Mesh/Gynecare
     UROLOGY, a Division of       ) Litigation, Case No. 291
 8   Ethicon, Inc., GYNECARE,     ) CT
     JOHNSON & JOHNSON, AND       )
 9   JOHN DOES 1-20,              )
                                  )
10                Defendants.     )
11   ********************************************************
12             ORAL AND VIDEOTAPED DEPOSITION OF
13                    WENXIN ZHENG, M.D.
14                    NOVEMBER 18, 2015
15   ********************************************************
16        ORAL DEPOSITION OF WENXIN ZHENG, M.D., produced as a
17   witness at the instance of the Plaintiffs, and duly
18   sworn, was taken in the above-styled and numbered cause
19   on November 18, 2015, from 9:16 a.m. to 5:28 p.m.,
20   before Lisa C. Hundt, CSR, RPR, CLR in and for the State
21   of Texas, reported by machine shorthand, at the law
22   offices of Thompson & Knight, located at 1722 Routh
23   Street, Suite 1500, Dallas, Texas, in accordance with
24   the New Jersey Rules of Civil Procedure and the
25   provisions stated on the record or attached hereto.
```

Wenxin Zheng, M.D.

Page 2

1        A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3     Daniel J. Thornburgh, Esquire
      And
4     Brandon Morris, Esquire
      AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
5     17 East Main Street
      Suite 200
6     Pensacola, Florida 32502
      850.202.1010
7     850.916.7449 Fax)
      dthornburgh@awkolaw.com
8
   FOR THE DEFENDANTS:
9
      S. Peter Voudouris, Esquire
10    TUCKER ELLIS, LLP
      950 Main Avenue
11    Suite 1100
      Cleveland, Ohio 44113
12    216.696.4634
      216.592.5009 (Fax)
13    peter.voudouris@tuckerellis.com
14    And
15    M. Andrew Snowden, Esquire
      BUTLER SNOW, LLP
16    150 3rd Avenue South
      Suite 1600
17    Nashville, Tennessee 37201
      615.651.6700
18    615.651.6701 (Fax)
      Andy.snowden@butlersnow.com
19
20  ALSO PRESENT:  Mr. John Hines, Videographer
21
22
23
24
25

Page 4

1                EXHIBITS
2  NO.   DESCRIPTION                    PAGE
3  Ex. 1   Notice of Video Deposition.................  7
4  Ex. 2   Dr. Zheng's File (Contained on a Flash
           Drive)....................................  7
5
   Ex. 3   Expert Report of Wenxin Zheng, M.D. Dated
6          08/07/14................................. 11
7  Ex. 4   Expert Report of Wenxin Zheng, M.D.
           (Brought by Witness)...................... 12
8
   Ex. 5   Expert Report of Dr. Iakovlev.............. 12
9
   Ex. 6   Kathryn Corbet's Records from Pennsylvania
10         Hospital.................................. 90
11 Ex. 7   Kathryn Corbet's Records from North Dover
           Ob/Gyn Associates.........................121
12
   Ex. 8   Histopathology of Excised Midurethral
13         Sling Mesh................................152
14 Ex. 9   Pathologic Evaluation of Explanted Vaginal
           Mesh:  Interdisciplinary Experience From a
15         Referral Center...........................167
16 Ex. 10  Kathryn Corbert's Medical Records from
           PennUrology...............................172
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2                           PAGE
3  Appearances...........................  2
4  Exhibits..............................  4
5  Stipulations..........................  5
6  WENXIN ZHENG, M.D.
7     Examination by Mr. Thornburgh................  5
8  Corrections Page................................ 280
9  Reporter's Certificate........................... 282
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1              P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We're now on record.
3  My name is John Hines.  I'm videographer with Golkow
4  Technologies.  Today's date is Wednesday, November 18th,
5  2015.  The time is approximately 9:16 a.m.
6        This video deposition is being held in
7  Dallas, Texas, in the matter of Kathryn Corbet vs.
8  Ethicon Inc. for the Superior Court of New Jersey law
9  division, Bergen County.  The deponent is Dr. Wenxin
10 Zheng.
11        Will counsel please introduce themselves
12 for the record.
13        MR. THORNBURGH:  Daniel Thornburgh for the
14 plaintiffs.
15        MR. MORRIS:  Brandon Morris for the
16 plaintiffs.
17        MR. VOUDOURIS:  Peter Voudouris for the
18 defendants.
19        MR. SNOWDEN:  Andy Snowden for the
20 defendants.
21            WENXIN ZHENG, M.D.,
22 having been first duly sworn, testified as follows:
23            EXAMINATION
24 BY MR. THORNBURGH:
25    Q.  Good morning, Doctor.

Wenxin Zheng, M.D.

Page 6

1    A.  Good morning.
2    Q.  How are you?
3    A.  Okay.
4    Q.  Good.  Can you please state your name -- full
5 name for the record?
6    A.  Wenxin Zheng.
7    Q.  And is it pronounced Dr. Zheng?
8    A.  That's fine.
9    Q.  Okay.  I'll do my best.  If I butcher your
10 name during the deposition, I apologize.
11    A.  That's okay.  No problem.
12    Q.  Doctor, you've been deposed previously?
13    A.  Correct.
14    Q.  Okay.  How many times have you given a
15 deposition?
16    A.  I think three times.
17    Q.  Three times in the mesh litigation or three
18 times total?
19    A.  Three times for the mesh litigation.
20    Q.  And was that for the Lewis case -- the -- and
21 the Husky -- sorry, the Lewis case?
22    A.  Lewis case, Husky, and Edwards.
23    Q.  Edwards.
24        And did you have an opportunity to look at
25 the deposition notice?

Page 7

1    A.  Yes.
2    Q.  Okay.  I'll mark as Exhibit Number 1 the
3 deposition notice.
4        (Exhibit Number 1 was marked.)
5    Q.  And when did you review the deposition notice?
6    A.  Last week.
7    Q.  Okay.  And did you take some steps to gather
8 records that were responsive to the request for
9 production of documents attached to the deposition
10 notice?
11    A.  Yes.
12    MR. VOUDOURIS:  Dan, if I can help you
13 out.  His complete file, including his billing and
14 photographs, I understand, and literature is on this
15 jump drive.
16    Q.  (BY MR. THORNBURGH)  We will mark as Exhibit
17 Number 2 to the deposition notice what counsel for
18 Ethicon, Johnson & Johnson, have provided to me, which
19 is purported to be your file in this case.
20    A.  Yes.
21        (Exhibit Number 2 was marked.)
22    Q.  And what steps did you take to gather the
23 records responsive to the deposition notice?
24    A.  It's mainly from my computer, my desktop.
25    Q.  Okay.  And what is your understanding of the

Page 8

1 documents contained within Exhibit Number 2?
2    A.  Can you rephrase your question?
3    Q.  Yeah.  And -- and I apologize.  If at any time
4 during the deposition, you don't understand my question,
5 just let me know, ask me to rephrase it --
6    A.  Sure.
7    Q.  -- or re-ask it, and I'll do my best --
8    A.  Okay.
9    Q.  -- to ask you a better question.
10    A.  No problem.
11    Q.  But my question to you was:  What document --
12 what is your understanding of the documents that are
13 contained on Exhibit 2?
14    A.  My understanding is just whatever I have read,
15 whatever I produced for my report, maybe part of the
16 document you -- related to this case.
17    Q.  And I think counsel representing you here
18 today indicated that your billing records are contained
19 within Exhibit Number 2.  Is that correct?
20    A.  Correct.
21    Q.  Okay.  And then your case file, what would
22 your case file include?
23    A.  What do you mean "case file"?
24    Q.  The -- what -- what types of records did you
25 maintain in your case -- in your file for this case?

Page 9

1    A.  Okay.  Whatever the medical record for -- for
2 the patient Corbet, I received, I will maintain, I will
3 keep in my desk -- in my desktop.  And also, whatever
4 the draft I made for my report, I will maintain.  And
5 also, the slides I reviewed, the pictures I took and
6 that, generally, also will be maintained in my file.
7    Q.  Okay.
8    A.  And, also, literatures I reviewed relevant to
9 this case also be main -- be maintained.
10    Q.  Okay.  And so for the literature that you
11 reviewed relevant to this case, would that include --
12 does Exhibit Number 2 have the documents -- all of the
13 literature that you reviewed that are -- that's
14 identified in your reliance list on your report?
15    A.  It's not necessarily in -- everything
16 inclusive, but I think more relevant articles I saved.
17    Q.  And you had indicated there were some photo
18 micrographs?
19    A.  Yeah.
20    Q.  Okay.  And are there photo micrographs
21 contained within Exhibit Number 2 that are in addition
22 to the photo micrographs that are contained within your
23 expert report?
24    A.  In a few of them, I think it's because when I
25 generate my expert report, I have to use some of these

Wenxin Zheng, M.D.

Page 10

1 pictures rather than the whole pictures. But it's
2 still, all the pictures I took is maintained and it's in
3 the file.
4    Q.  Okay.  Do you -- do you recall approximately
5 how many micro -- or photo micrographs are contained
6 within Exhibit Number 2?
7    A.  Probably there's about 20, 25 pictures total.
8    Q.  And defense counsel had indicated also and I
9 think you confirmed that your invoice for the work that
10 you've performed in the Corbet case -- or invoices,
11 perhaps -- are also contained within Exhibit Number 2?
12    A.  Yes.  I only billed once for that.
13    Q.  Okay.  So one invoice?
14    A.  Yes.
15    Q.  Okay.  And do you recall -- because I don't
16 have a --
17    A.  How many hours?
18    Q.  Yeah.  Do you recall how many hours you billed
19 on the invoice?
20    A.  I think it's about 49 hours.  That was from
21 last year.
22    Q.  And is that at $600 an hour?
23    A.  Correct.
24    Q.  And so all of the work that you've performed
25 last year, the 49 hours, would that represent the time

Page 11

1 that you spent preparing for -- preparing your expert
2 report?
3    A.  Correct.  Reading medical records, literatures
4 and prepare reports and reading slides, taking pictures,
5 to prepare for presentations.
6    Q.  Okay.  How much time was spent reading the
7 medical literature?
8    A.  Maybe, I think, probably 50 percent of the
9 time.  I can't be exact.
10    Q.  And what was the other 50 percent of your time
11 devoted to?
12    A.  And then medical records, understanding the
13 whole situation.  And then writing reports and pathology
14 analysis and photograph taking.
15      (Exhibit Number 3 was marked.)
16    Q.  I've marked as Exhibit Number 3 your expert
17 report dated August 7th, 2014.
18    A.  Yes.
19    Q.  Does this appear to be your full report in the
20 Corbet versus Ethicon case?
21    A.  Yes.  From the first page, it looks identical.
22      MR. THORNBURGH:  Counsel.  If you don't
23 need it...
24      MR. VOUDOURIS:  I have my own copy.
25 It's 3?

Page 12

1      MR. THORNBURGH:  Pardon me?
2      MR. VOUDOURIS:  Exhibit 3?
3      MR. THORNBURGH:  Exhibit 3, yeah.
4    Q.  (BY MR. THORNBURGH)  You have -- it appears
5 that you have some additional documents in front of you.
6 What do you have in front of you that you brought with
7 you today?
8    A.  It's my expert report, the same thing as
9 yours.  And then Dr. Iakovlev's report.
10    Q.  Okay.  We'll go ahead and mark as Exhibit
11 Number 4 the expert -- your export report that you
12 brought with you today.
13    A.  Okay.
14      (Exhibit Number 4 was marked.)
15    A.  Mine's a single page.  Yours is double page,
16 so...
17    Q.  Okay.  And are there any -- did you make any
18 changes or anything on Exhibit Number 4 different than
19 Exhibit Number 3?
20    A.  I didn't change at all.
21    Q.  And we'll mark as Exhibit Number 5 the report
22 you brought with you today regarding Dr. Iakovlev.
23    A.  Yeah.
24      (Exhibit Number 5 was marked.)
25    Q.  Did you bring any other documents with you

Page 13

1 today other than the documents contained on Exhibit
2 Number 2, the -- which is the thumb drive, or Exhibit
3 Number 3 and 4?
4    A.  No.
5    Q.  Now, I know that you billed, you said,
6 49 hours last year in preparation for your expert
7 report.  How much time have you -- strike that.
8      Regarding the 49 hours, do you know what
9 the invoice date is?
10    A.  Last year sometime.  I don't remember exactly.
11 Maybe --
12    Q.  It will be identified on Exhibit Number 2,
13 right?
14    A.  Right.
15    Q.  Have you done additional work in preparation
16 for this case or this deposition that's not contained
17 within your invoices on Exhibit Number 2?
18    A.  Oh, yes.  Because after a year, then you
19 know, not really I can remember everything.
20    Q.  Okay.
21    A.  So therefore, when I received a notice from
22 Mr. Snowden saying this case is going to be on
23 deposition, and then I start to review again.
24    Q.  Okay.  And how much time have you spent
25 reviewing and -- the case and preparing for this

Wenxin Zheng, M.D.

Page 14

1  deposition?
2     A.  Because I have additional medical records
3  coming that I have read.  And then I do a new literature
4  search and additional findings.  And then, also, have to
5  review my -- what I have written, because I may not
6  remember what I have done in the past.  That's a year
7  ago.
8     Q.  Okay.  So let me make sure I under -- I'm
9  sorry.  Were you done?
10    A.  Yeah.
11    Q.  Let me make sure I understand.  So since last
12 year, you have -- and after the -- the date of your --
13 your invoice, you have reviewed additional medical
14 records.  How much time have you spent reviewing
15 additional medical records?
16    A.  Oh, I don't remember exactly, because this is
17 through e-mails, you know, from Butler's law office
18 sending -- e-mail these medical records, and I have to
19 download and read, probably, several hours.  I have no
20 idea exactly how -- how many hours I have spent for
21 that.
22    Q.  Okay.  You also indicated that you did a new
23 literature search and additional findings.  What do
24 you -- how much -- well, strike that.
25         You also indicated that did you a new

Page 15

1  literature search.  How much time did you devote to
2  doing additional literature searches?
3     A.  Several hours.  I think mainly I want to see
4  if there's any recent advances in the field to see, you
5  know, whether there's any new publications related to
6  this topic.
7     Q.  Did you identify any additional new literature
8  that you felt was relevant to your opinions?
9     A.  Yeah.  I have the two most relevant
10 publications, I think.  One is Hill's article.  The
11 other is Dr. Smith's article regarding histological
12 finding from those explanted mesh specimens.
13    Q.  Okay.  So Hill's article?
14    A.  Right.
15    Q.  And I think you said Smith?
16    A.  Smith.
17    Q.  Is that the same article?
18    A.  Different.
19    Q.  Different articles?
20         Did you include those two articles on --
21 within Exhibit Number 2?
22    A.  I believe it's there in the -- Exhibit
23 Number 2, yeah.
24    Q.  Okay.  And what significance did the Hill and
25 Smith articles have in this case?

Page 16

1     A.  I --
2         MR. VOUDOURIS:  Objection; compound.
3         Go ahead.
4         THE WITNESS:  Okay.
5     A.  Okay.  I think based on my impression, Hill's
6  article basically study the explant vaginal mesh
7  dividing into three groups.  One group was, like, a
8  voiding dysfunction, then the other group is -- was pain
9  then /erosion and then the third group, combination of
10 these two.  Then compared the amount of information they
11 found from histological findings.
12    Q.  (BY MR. THORNBURGH)  And do you recall what
13 their conclusions were regarding voiding dysfunction?
14    A.  Right.  The conclusion is a little bit
15 surprise to me, also -- probably also, it's reasonable.
16 Because they found in the voiding dysfunction group,
17 these patients has highest amount of inflammation
18 compared to those patient complain with pain or even
19 erosion.
20    Q.  And why was that significant or surprising to
21 you?
22    A.  Because, typically, if it's -- there is
23 erosion or exposure -- what's called mesh exposure to
24 outside surface -- then you should have more
25 inflammation.

Page 17

1     Q.  Okay.  So was there an association made by
2  these authors or some of these authors that mesh
3  exposure was associated, number one, with an increased
4  inflammatory response, and, number two, with an
5  increased risk of voiding dysfunction?
6         MR. VOUDOURIS:  Objection.
7         Go ahead.
8     A.  I don't think they -- they concluding that
9  way.
10    Q.  (BY MR. THORNBURGH)  What was their
11 conclusion?  Did they correlate the two?
12        MR. VOUDOURIS:  Objection.
13    A.  I think they correlate mainly to see if the
14 inflammation may contribute one of these critical
15 findings, but their finding is they're more associated
16 with the voiding dysfunction group.
17    Q.  (BY MR. THORNBURGH)  So increased inflammation
18 in women who have had mesh implants had an increased
19 risk of voiding dysfunction as a result of the
20 inflammation?
21        MR. VOUDOURIS:  Objection.
22    A.  No.  I -- I don't think that you can conclude
23 in that way.  That's not in my understanding.
24    Q.  (BY MR. THORNBURGH)  I think your answer was
25 they correlate mainly to see if the inflammation may

Wenxin Zheng, M.D.

Page 18

1  contribute to one of these critical findings, but their
2  finding is they're more associated with the voiding
3  group.  What do you mean by that?
4      A.  It's -- that's -- that's the descriptive
5  finding, all right?  It's basically association.  Does
6  not necessarily meaning one is the cause, the other is
7  the results.
8      Q.  But in any event, they found that for women
9  implanted with mesh devices who had an -- had an
10  increase in inflammatory response, there was an
11  association -- or an increased association of voiding
12  dysfunction?
13      MR. VOUDOURIS:  Object to form.
14      Q.  (BY MR. THORNBURGH)  Is that -- is that fair
15  and accurate?
16      A.  I think my understanding is more inflammation
17  is associated with patients with voiding dysfunction.
18  That's it.
19      Q.  And those patients had mesh implantation?
20      A.  Yes.
21      Q.  And you also indicated that there was -- that
22  they looked at -- strike that.
23          You also indicated that one of the things
24  that they studied -- I'm sorry.  Strike that.
25          The voiding dysfunction, is that the Hill

Page 19

1  article or the Smith article?
2      A.  That's in the Hill's article.
3      Q.  Okay.  And the pain and erosion, is that the
4  Hill article or the Smith article?
5      A.  Also Hill's article.
6      Q.  Okay.  And --
7      A.  Those three groups I just mentioned that.
8      Q.  And what did the authors in the Hill article
9  conclude regarding women implanted with mesh devices and
10  the complications of pain and erosion?
11      MR. VOUDOURIS:  Objection.
12      Go ahead.
13      A.  I don't think they -- they try to concluding
14  that way.  They just try to see whether these groups of
15  these patients to have more inflammation maybe
16  associated with one or the other.  That's the basic
17  study.
18      Q.  (BY MR. THORNBURGH)  And did they find that
19  women implanted with mesh devices who had an increase in
20  inflammation also had pain and erosion?
21      MR. VOUDOURIS:  Objection.
22      A.  No.  They have actually less.
23      Q.  (BY MR. THORNBURGH)  So it's your -- it's
24  your -- your testimony that the authors who published
25  the Hill article concluded that women who have pain and

Page 20

1  erosion have less inflammation?
2      A.  Correct.  That's their conclusion.
3      Q.  And then final -- you said the last subissue
4  in the article was a combination of voiding dysfunction,
5  pain, and erosion.  What do you mean by that?
6      MR. VOUDOURIS:  Objection.
7      Go ahead.
8      A.  They combine these two groups and compare to
9  see what happens.
10      Q.  (BY MR. THORNBURGH)  And what were their
11  conclusions when they combine the two groups?
12      A.  They basically -- if they combine these two
13  groups, shows no difference between mesh exposure versus
14  pain and also in combination with voiding dysfunction.
15      Q.  And what was significant to you in your mind
16  in -- for the Corbet case regarding the Hill article?
17      A.  And I think overall, basically, inflammation
18  does not play a bigger role for mesh implants.  I think
19  that's the overall message when I read this article.
20      Q.  What about voiding dysfunction?
21      A.  Voiding dysfunction, they found a little more
22  inflammation, mainly -- probably related to urinary
23  tract infection issues.  Because when any patient has a
24  voiding dysfunction, then has increase the chance to get
25  bacteria infection, therefore, more inflammation can be

Page 21

1  found.
2      Q.  And what was significant in your mind
3  regarding their findings of pain and erosion?
4      A.  Pain --
5      MR. VOUDOURIS:  Objection.
6      Go ahead.
7      A.  Pain and erosion overall is a lower incidence
8  among all these -- the patients received mesh implants,
9  TVT or TVTO; overall is lower incidence.
10      Q.  (BY MR. THORNBURGH)  What was the incidence
11  rate described in the Hill article concerning women
12  implanted with mesh devices and pain and erosion?
13      A.  And I think they -- based on the subjects they
14  studied -- I don't remember exactly how many -- you
15  know, each group has how many patients there -- but
16  these patients does not also represent overall
17  population of the patient who received TVT or TVTO
18  implants.
19      Q.  That's -- that's your opinion, right?
20      A.  That's my understanding.
21      Q.  That wasn't the opinion of the authors of the
22  Hill article, correct?
23      A.  That's -- that's my understanding after
24  reading this, yes.
25      Q.  Is that your opinion, or was that the opinion

Wenxin Zheng, M.D.

Page 22

1 of the authors in the Hill article?
2    A.  That's what I said.  After reading this
3 article, my impression isn't that way.  Okay.  But if
4 you want to study this one, it's better probably to
5 read -- take this article again.
6    Q.  Yeah, we'll -- we'll -- maybe what we'll do on
7 a break is we'll -- we'll print out those articles.
8    A.  Right.
9    Q.  Okay.  We'll talk about --
10    A.  And then we can study paragraph by paragraph.
11    Q.  Do you recall how many explants were analyzed
12 by the researchers in the Hill article?
13    A.  It's about over a hundred, yeah.
14    Q.  And do you recall which -- which devices were
15 analyzed?
16    A.  What do you mean "which devices"?
17    Q.  What -- was it sling -- mesh sling devices,
18 mesh devices used for repair of pelvic organ prolapse,
19 or a combination of the two?
20    A.  I didn't pay that attention.  Probably
21 majority of them, they're sling -- a sling device.
22    Q.  And regarding the Smith article, what -- what
23 was that article about?
24    A.  I think Smith article is interesting because
25 they noticed the -- pathology department, when they

Page 23

1 receive all these explanted mesh specimens, they have
2 very heterogeneous way to handle the specimen.  So
3 therefore, they try to study to see if there any better
4 way to handle these specimen, more uniformly.  Because
5 more and more these days, any hospitals they start to
6 receive more explanted specimens.
7        And then they found, actually in the past,
8 50 -- almost 50 percent of them, they just do not have
9 any microscopic examination.  I think that's -- that's
10 the -- the -- the same experience I have encountered in
11 the past.
12    Q.  So let me back up a little bit on this -- on
13 the Smith article.  Again, we'll print that out if we --
14        MR. THORNBURGH:  Is there a printer here
15 that we can have someone print an article during a
16 break, these articles?
17        MR. VOUDOURIS:  Sure.  I imagine it
18 wouldn't be a problem.
19    Q.  (BY MR. THORNBURGH)  Okay.  But to go back
20 real quick on the Smith article, you said that hospitals
21 are receiving more and more explanted specimens?
22        MR. VOUDOURIS:  Objection.
23    A.  Correct.  Based on my understanding, yes,
24 compared to the years -- like five years ago, yeah.
25 These days, more specimens coming to the hospital in

Page 24

1 different places.
2    Q.  (BY MR. THORNBURGH)  Okay.  And you also
3 indicated that their finding was that 50 percent had no
4 microscopic examination?
5    A.  Right.  Based on the Smith article, they
6 mentioned that.
7    Q.  Does that mean that there were 50 percent of
8 mesh specimens that were not analyzed microscopically?
9    A.  They analyzed grossly and recorded grossly and
10 do not submit routinely for microscopic examination.
11 That's the classical way for pathology department to
12 handle these so-called foreign body material.
13    Q.  And so was it the -- did the Smith authors --
14 the authors of the Smith article, did they suggest that
15 new protocols needed to be in place so that more of
16 these mesh specimens that are sent to pathology
17 departments are actually looked at and analyzed
18 microscopically?
19    A.  I think so, yes, they did.
20        MR. MORRIS:  Is it -- is it Smith or
21 Schmidt?
22        THE WITNESS:  Smith, S-M-I-T-H.
23        MR. MORRIS:  Okay, thanks.
24    Q.  (BY MR. THORNBURGH)  And for -- for Hill, is
25 it H-I-L-L?

Page 25

1    A.  Correct.
2    Q.  And are you in agreement with the authors of
3 the Smith article that for mesh specimens that are
4 explanted from women, more microscopic analysis needs to
5 be conducted?
6    A.  I think so.  Particularly in these days
7 because many legal issues involved, I think it's
8 reasonable to have a standard way to handle these
9 specimens should include microscopic examination.
10    Q.  Did they recommend a pathology registry
11 program where specimens would be provided to a central
12 location or locations, analyzed microscopically and then
13 the pathological findings reported in the registry?
14    A.  I don't remember they have this kind of
15 sentence, no.
16    Q.  Did they discuss the number of mesh specimen
17 explants at any particular hospital?
18    A.  I think also from the single institution, from
19 their institution.  I don't remember which one is that.
20 But it's recorded in the -- in the publication.
21    Q.  Okay.  So they -- they were reporting on their
22 single institution?
23    A.  I think -- my memory -- I didn't pay detail
24 attention to where these specimens came from.  I think I
25 just answered the overall situation.  That was my

Wenxin Zheng, M.D.

Page 26

1  impression.
2      Q.  Did they indicate in their publication how
3  many mesh explant specimens have been received by their
4  institution?
5      A.  I think it's -- it's better to review the
6  material method in the article.
7          Sir, let me ask you, you are reading
8  whatever -- it's already recorded?
9          MR. THORNBURGH:  Yeah, off the --
10         MR. VOUDOURIS:  Off the record.
11         THE WITNESS:  It's a simultaneous --
12         THE REPORTER:  Wait, wait.  Off the record
13  or --
14         MR. VOUDOURIS:  Off the record.
15         THE REPORTER:  Let the videographer...
16         THE VIDEOGRAPHER:  Off the record at
17  9:46 a.m.
18         (Off the record.)
19         THE VIDEOGRAPHER:  We're back on record at
20  9:47 a.m.
21     Q.  (BY MR. THORNBURGH)  Okay.  So let's go back
22  to the question I'd asked before we started talking
23  about the Hill and the Smith articles.
24     A.  Okay.
25     Q.  And I'd asked you how much time you'd spent in

Page 27

1  the case -- this case preparing for this deposition.
2  And you had indicated that you had additional medical
3  records, and then you did a new literature search, and
4  you identified Hill and Smith.  Are there any other new
5  literatures -- or new -- strike that.
6          Were there any other new articles that you
7  found to be relevant and significant to your opinions?
8      A.  I think many of the articles I have read, but
9  I don't think will influence my opinions regarding the
10  pathology part, so therefore, I did not pay a lot of
11  attention to this.
12     Q.  So you didn't -- you didn't rely on any
13  additional articles since your report that you thought
14  were significant or relevant in -- in your opinion?
15     A.  Correct.
16     Q.  Other than the Smith and the Hill articles?
17     A.  Because these are two pathology-related
18  articles, pathological findings.  It's similar work what
19  I'm doing.
20     Q.  Okay.  You -- after you had indicated that you
21  did a new literature search, you also said that -- that
22  additional findings.  What did you mean by "additional
23  findings"?
24     A.  Additional articles, basically.  You have --
25  you do have several other articles published after my

Page 28

1  report, basically within a year period.
2      Q.  Okay.  So you were -- when you said additional
3  findings, you weren't talking about additional findings
4  with respect to your review of the --
5      A.  Of the literature.  I mean, additional --
6          MR. VOUDOURIS:  Hold on.  Doctor --
7      Q.  (BY MR. THORNBURGH)  Yeah.  Let me try to
8  finish the question.
9          Because -- you weren't -- you were only
10  talking about the literature, you weren't talking about
11  additional findings with respect to either your review
12  of updated medical records or your review or re-review
13  of the pathological specimens that you have related to
14  Ms. Corbet?
15     A.  Let me, yeah, rephrase my answer.  So
16  basically, additional findings that's additional
17  literature findings.
18     Q.  Okay.
19     A.  It's not additional pathological findings from
20  Corbet case.
21     Q.  So the additional -- additional time that you
22  spent preparing for this deposition was also your review
23  of -- your re-review of the medical records and your
24  report?
25     A.  Yes.  I have to refresh my mind, because

Page 29

1  that's -- that was written a year ago and I don't expect
2  myself I can remember everything I have done.
3      Q.  Okay.  Did you review any additional -- strike
4  that.
5          Were you provided with any additional
6  internal Ethicon documents?
7      A.  Yes.
8      Q.  And did you -- the reason why I'm asking this
9  question is because I never received a supplemental --
10  you haven't supplemented your expert report, right?
11     A.  I don't have any supplement expert report.
12     Q.  And you haven't supplemented your reliance
13  list, correct?  Your -- the list of materials that
14  you're relying on?
15     A.  No.
16     Q.  All right.  You haven't --
17     A.  No, I haven't.
18     Q.  -- supplemented your reliance list or your
19  expert report?
20     A.  No.
21     Q.  The additional internal Ethicon documents that
22  you claim to have reviewed since your report was --
23  strike that.  Let me just make sure I understand.
24         Are you saying that you've reviewed
25  additional internal documents since you -- since you

Wenxin Zheng, M.D.

Page 30

1 drafted and served and signed your expert report?
2    A.  Yes.
3    Q.  Okay.  Are those additional internal Ethicon
4 documents contained within Exhibit Number 2, the thumb
5 drive?
6    A.  I think so.
7       MR. VOUDOURIS:  They are.
8    Q.  (BY MR. THORNBURGH)  Do you recall which -- or
9 what internal Ethicon documents you have reviewed which
10 are contained within Exhibit Number 2?
11    A.  I don't remember exactly what's the name of
12 these documents, but I think if you really want to be
13 sure what I -- what was included, you may just print a
14 list, then we can discuss would be better.
15    Q.  Do you recall what relevance those new
16 additional Ethicon internal documents had with respect
17 to this case?
18    A.  I think there is one interesting internal
19 study by Mr. McLean -- or I'm not sure what last name.
20    Q.  Dr. Berkeley?
21    A.  McLean -- I have no -- not exactly.  Start
22 with M, anyway.  Okay.  And -- yeah, if you can show me,
23 that would be better, if you have it.
24    Q.  Well, you know, what we'll do is, on a break,
25 we'll look at your Exhibit Number 2 --

Page 31

1    A.  Right.
2    Q.  -- and we'll have any additional Ethicon
3 documents printed.
4    A.  If you would like to print out, that would be
5 better that way.
6    Q.  Okay.  Any other -- is it just one additional
7 internal Ethicon document?
8    A.  Yeah.  I think this one, because he did some
9 experiments that -- that's interesting experiments.
10    Q.  And what interesting experiments were
11 conducted?
12    A.  So basically, the experiments was to try to
13 demonstrate if the TVT filaments after oxidization then
14 can generate these, like, bark-like material or can
15 retain the stainings as -- as suggested by Dr. Iakovlev.
16 And then the conclusion is -- the answer is no.
17    Q.  Okay.  So let me just make sure I understand.
18 So --
19    A.  Right.
20    Q.  So you -- what you thought was an internal --
21 or what you -- what you represented as being an internal
22 Ethicon document is actually not an internal Ethicon
23 document but the expert report of Dr. Steven McLean?
24    A.  Steven McLean, yes, correct.
25    Q.  Okay.

Page 32

1    A.  Is this the one you refer to or no?  This
2 is --
3    Q.  Well, I had asked -- my question to you was,
4 what internal Ethicon documents have you reviewed?
5    A.  Oh.  I -- I believe this looks like internal,
6 because not, like, published already.
7    Q.  You understand that Dr. McLean is not
8 identified or disclosed as an expert in the Corbet case?
9 Do you know that?
10    A.  I -- I'm not aware of this.  But anyway, this
11 is the material I received and that I read.  Because I
12 don't have habit to correlate who represents who and
13 what is what for those.  And these -- these documents --
14 when I review I feel is interesting, that's it.
15    Q.  Okay.  And so you're talking about the -- the
16 opinions of Dr. McLean concerning his experiments of
17 intentionally oxidizing TVT mesh specimens?
18    A.  Yes.
19    Q.  Okay.  And do you recall how he attempted to
20 intentionally oxidize those mesh specimens?
21       MR. VOUDOURIS:  Objection.
22       Go ahead.
23    A.  Not in detail.  But I think if we can open the
24 document and read through and I think that will refresh
25 my mind a little bit.

Page 33

1    Q.  (BY MR. THORNBURGH)  Okay.  Do -- do you
2 recall him conducting in part of his experiment a test
3 to -- strike that.
4       Do you recall that as part of his
5 experiment he did use UV light?
6    A.  UV light as the -- as a demonstrative method
7 for oxidization, that's true.
8    Q.  Okay.  And -- and UV light is -- strike that.
9       You'd agree with me that women that have
10 mesh implanted in their bodies, their mesh isn't exposed
11 to UV light, correct?
12    A.  That's different.  That's true.  However, the
13 point is, because there is in no way to do a human --
14 use a human body or use a woman to do experiments like
15 this at this moment, because ethically it's not
16 allowed --
17    Q.  My -- my --
18    A.  -- and also not practical.
19    Q.  I'm sorry.  But my question was, you
20 understand that UV light does not mimic the degradation
21 process that occurs in the human body when the mesh --
22 the mesh specimens are exposed to enzymes, neutrophils,
23 macrophages, and -- and things of that nature, correct?
24       MR. VOUDOURIS:  Objection; form.
25    A.  From that point of view, yes.  However,

Wenxin Zheng, M.D.

---

Page 34

1 because the -- degradation -- the overall degradation
2 process claimed by Dr. Iakovlev is because of these
3 inflammatory cell that produce oxidative -- oxidative
4 stress. Therefore, these oxidative stress can be
5 mimicked by some other way to try to simulate similar
6 condition. That's the experiment.
7     Q.  (BY MR. THORNBURGH)  Right.  But the ex vivo
8 experiment conducted by Dr. McLean, you would agree,
9 would -- used UV light to radiate the mesh specimens
10 which doesn't occur in the human body?
11     A.  That's different thing, yes.
12     Q.  So you agree with me?
13     A.  I think from that point of view, yes, you have
14 a correct statement.
15     Q.  And the second experiment that he performed
16 was using chemicals where he exposed mesh -- a mesh --
17 or mesh specimens to certain oxidizing chemicals for a
18 period of about four and a half weeks?
19         MR. VOUDOURIS:  Objection.
20     A.  I don't remember exactly how long, what
21 exactly he did.  I think if you really want to review
22 what is the process, I think it's better to read the
23 article rather than just based on my memory.  Because
24 these days, in addition to prepare the -- the
25 deposition, I also have to work.  I have many other

Page 35

1 things.  I'm not the full-time just work on this, okay,
2 so...
3     Q.  (BY MR. THORNBURGH)  Did you consider any of
4 the publications concerning in vivo degradation which
5 found that in order to identify through scanning
6 electron microscopy or other techniques -- strike that.
7         Did you look at any -- or consider any of
8 the publications, medical or scientific publications,
9 which indicate that in order to get breaking on the
10 outer shell or cracking on the -- surface layer of
11 implanted meshes, that they have to be implanted for a
12 period of about a year or more?
13         MR. VOUDOURIS:  Objection; form,
14 foundation.
15     A.  I still don't understand what your question.
16     Q.  (BY MR. THORNBURGH)  Yes.  So let me -- I -- I
17 think I asked a very poor question, so let me try again.
18         Did you consider any scientific or medical
19 publications that concluded that in order for mesh to
20 crack on the surface, to identify cracks on the surface,
21 that mesh needs to be implanted for a period of longer
22 than one year?
23         MR. VOUDOURIS:  Same objection.
24     A.  I'm a pathologist, okay?  I read slides and
25 the microscope.  Was my experience, I did not see any

Page 36

1 evidence of degradation.  That's -- that's why I barely
2 pay attention to these electron microscopic kind of
3 very -- you magnify those things to a very high level to
4 see these cracks.  You know, those -- for me, it's
5 really not relevant.  That's the -- basically, that's my
6 understanding.  Therefore, I don't -- do not pay
7 attention to those.
8     Q.  (BY MR. THORNBURGH)  So you don't consider the
9 medical or scientific publications that have been
10 published in peer-reviewed articles that looked at
11 explanted meshes after a period of time in -- in the --
12 in the body and used techniques such as scanning
13 electron microscopy and concluded that the mesh had
14 degraded in vivo?
15         MR. VOUDOURIS:  Objection; form,
16 foundation.
17     Q.  (BY MR. THORNBURGH)  Let me ask -- let me
18 let me ask a better question.  You didn't consider any
19 of the scientific or medical peer-reviewed publications
20 where the scientists had concluded that the mesh had
21 degraded in vivo?
22         MR. VOUDOURIS:  Objection; form,
23 foundation.
24     A.  Well, as I said, based on my own experience
25 and I do not see any evidence of degradation, that's

Page 37

1 number one.  Because from tissue response to -- adjacent
2 to the mesh, whether there is a so-called bark-like
3 material or no bark-like material, all the tissue
4 response, they look the same, similar, number one.
5         Number two is, there is no any clinical
6 significance regarding these so-called degrade -- the
7 bark-like material with or without shows any clinical
8 difference from those patients.  So therefore, my
9 understanding is there is no meaning -- or no evidence
10 to say to -- to -- to lead me to look for evidence that
11 there is a truly degradation from those implants.
12         MR. THORNBURGH:  Okay.  Move to strike
13 nonresponsive to my question.
14     Q.  (BY MR. THORNBURGH)  My question was simply:
15 You testified that you didn't find the studies that
16 looked at explanted meshes using scanning electron
17 microscopy and concluded that the mesh had degraded to
18 be relevant to you --
19     A.  Correct.
20     Q.  -- in this case, right?
21     A.  Correct.  Therefore, I did not pay attention
22 to these articles.
23     Q.  So you didn't consider them, right?  It's a
24 simple question.
25         MR. VOUDOURIS:  Objection.

---

Wenxin Zheng, M.D.

Page 38

1    A.  I did not read these articles.
2    Q.  (BY MR. THORNBURGH)  Okay.
3    A.  Okay.
4    Q.  Doctor, what is -- in the path -- in the
5  pathology field, do you understand what I mean by
6  chatter?  Do you know what chatter is?
7    A.  I don't know what is chatter.  Can you
8  explain?
9    Q.  Yeah.  Have you -- when a -- when a microtome
10 is used --
11   A.  Uh-huh.
12   Q.  -- and cuts through, you know, has a
13 cross-section, the mesh tissue and specimen -- strike
14 that.
15       When a microtome is used to create
16 slides --
17   A.  To make sections.
18   Q.  -- can a microtome sometimes scratch the
19 surface of the -- for example, a polymer -- and cause
20 what is known in the pathology field to be chatter or an
21 artifact?
22       MR. VOUDOURIS:  Objection.
23   A.  Yeah.  That's so-called a cutting artifact, a
24 section artifact.  That's very common in the pathology
25 lab.

Page 39

1    Q.  (BY MR. THORNBURGH)  Have you heard of it
2  referred to as chatter before?
3    A.  No.
4    Q.  In any event, it's when the microtome causes
5  scratching on -- on the specimen that you're analyzing
6  under the microscope?
7    A.  Right.
8    Q.  And that's just an artifact caused from the
9  blade, right?
10   A.  Right.  That's related to the blade.  That's
11 why there is a rule after a certain usage, the blade
12 should be changed.
13   Q.  And if you are seeing this artifact on
14 specimens that you're analyzing, does that indicate to
15 you that the blade should be changed?
16       MR. VOUDOURIS:  Objection.
17   A.  It is not obvious in the routine microscope
18 examination from this Corbet case, okay?  I do not see
19 apparent sectioning artifact to cause like a
20 fragmentation or scratch linings, those things, I don't
21 see that.
22   Q.  (BY MR. THORNBURGH)  No, I'm not -- I'm not
23 asking you in this case.  I'm just saying, generally, as
24 a pathologist, if you are getting this artifact of the
25 microtome blade scratching the specimen that you're

Page 40

1  trying to analyze, that is an indication that you need
2  to -- need to change the blade of the microtome, right?
3        MR. VOUDOURIS:  Objection.  Hold on a
4  second, Dan.  We talked about before and there's
5  agreement that this deposition is case specific to
6  Corbet.  He just answered you, and he told you that he
7  didn't find any artifact when he looked at the Corbet
8  slide.  So I think you're going past the agreement about
9  fact specific Corbet questions.
10       MR. THORNBURGH:  Well, I'm not -- number
11 one, I'm not trying to do that and that's not my
12 intention.  He had indicated that an additional thing
13 that he has reviewed since his expert report was served
14 was the McLean report.  And so I'm asking him questions
15 that are relevant to the McLean report.
16       MR. VOUDOURIS:  Well, they're not relevant
17 to Corbet, but...
18       MR. THORNBURGH:  If he's relying on them
19 in this case -- if he's not relying on it, then that's
20 fine.
21       MR. VOUDOURIS:  You didn't ask him if he
22 was relying on that -- that part of McLean for his
23 opinions in this case.
24   Q.  (BY MR. THORNBURGH)  Are you relying on the
25 McLean -- Dr. McLean's report?

Page 41

1    A.  I'm not fully rely on Dr. McLean's report, but
2  I -- as I mentioned, when I read through his report,
3  looks -- sounds interesting.  And because there is
4  particle issue there, staining issue, that's relevant to
5  what Dr. Iakovlev claim, so that's -- that was the
6  reason.
7    Q.  Have you reviewed any other -- or strike that.
8        So to go back to my original question,
9  have you reviewed any additional Ethicon internal
10 documents, and your response was you looked at the
11 McLean expert report.  So let me try to clarify.  Have
12 you looked at any additional Ethicon internal documents
13 since you issued your expert report?
14   A.  I don't remember many other -- there is one
15 old report I briefly scanned through.  That was back to
16 1983, something like this kind of report.  That was a
17 long time ago.  But the pictures, the printout -- the
18 pictures is very poor quality.  They not look very good,
19 so, therefore, I did not pay much attention to that.
20 But I did receive this.
21   Q.  So you looked at some internal document dated
22 from 19 -- from the 1980s that you looked at but you
23 disregarded because the pictures were not of good
24 quality?
25   A.  Right.

Wenxin Zheng, M.D.

1     MR. VOUDOURIS: Objection.
2     A.   And there -- I feel may not be very relevant
3  for that.
4     Q.   (BY MR. THORNBURGH) Did you ask Ethicon's
5  lawyers to provide you with better copies of the images
6  that they have or may have in their files?
7     A.   I -- I didn't.  Because I feel that was a long
8  time ago and they're -- back to 1980s.  And right now is
9  2015, is over 30 years.
10    Q.   So you didn't consider that in this case, the
11  article -- that -- strike that.
12         So you didn't consider this 1980 internal
13  Ethicon document in this case because, number one, the
14  date, and number two, because of the poor quality of the
15  images?
16    A.   Poor quality, right.  And that's why I did not
17  pay a lot of attention.  I did not use that as a -- or
18  studied that for -- for my deposition.
19    Q.   And so I think I know what document you're
20  referring to.
21    A.   Right.
22    Q.   Correct me if I -- if I'm wrong, but you're
23  referring to an internal Ethicon document from 1980s
24  where Ethicon received explanted prolene sutures,
25  correct?

1     A.   Correct.
2     Q.   And they analyzed those sutures using
3  histological methods similar to the methods that were
4  employed by Dr. Iakovlev in this case, correct?
5         MR. VOUDOURIS: Objection.
6     A.   I really -- frankly speaking, I really don't
7  know the detail of this, because first of all, one is,
8  as I mentioned, the time is a long time ago.  Two is the
9  quality of the pictures are very poor.  For me, it's
10  difficult to compare what they're saying, you know, what
11  they tried to document.
12    Q.   (BY MR. THORNBURGH) Did you read the section
13  in the document called methods?
14    A.   So then -- then additionally, I think I really
15  don't have time to read all the stuff within this --
16  this is pretty thick, based on my memory --
17    Q.   That's fair.
18    A.   -- so I -- I didn't go through.
19    Q.   That's fair.
20    A.   Right.
21    Q.   So you were -- you felt rushed and didn't have
22  enough time, so you didn't go through the -- the
23  document --
24    A.   The detail for these things.
25    Q.   Okay.

1     A.   And I flip through --
2         MR. VOUDOURIS: Objection.
3         Go ahead.
4     A.   I flip through these -- a few pictures,
5  looks -- and the picture does not look very good.
6     Q.   (BY MR. THORNBURGH) So you looked at the
7  pictures, you looked at the date, but you didn't read
8  the content; is that fair?
9     A.   Uh-huh.
10    Q.   Because you were rushed?
11    A.   That's fine.
12    Q.   Did you look at and consider any additional
13  internal Ethicon documents other than the 1983 internal
14  memo that we just discussed?
15    A.   I didn't.
16         MR. THORNBURGH: Take a break?
17         MR. VOUDOURIS: [Nods head.]
18         THE VIDEOGRAPHER:  We're off record at
19  10:12 a.m.
20         (Break taken.)
21         THE VIDEOGRAPHER:  We're back on record at
22  10:20 a.m.
23    Q.   (BY MR. THORNBURGH) Doctor, before we went
24  off the record, we were talking about the one additional
25  Ethicon document that you reviewed since your report.

1  And that document was provided to you by Ethicon's
2  counsel?
3     A.   Correct.
4     Q.   And, in fact, all of the internal documents
5  that you have reviewed have all been provided to you by
6  Ethicon, correct?
7     A.   Correct.
8     Q.   And that document wasn't provided to you until
9  after you had testified in three other Ethicon cases,
10  correct?
11    A.   I don't remember exactly, but previously, I
12  also have received possibly similar documents, but I'm
13  not sure.
14    Q.   Okay.  But the document that we discussed
15  earlier from 1983 --
16    A.   Uh-huh.
17    Q.   -- which was a histopathology study looking at
18  microcracking on explanted prolene sutures, that
19  document wasn't provided to you until after you'd
20  already testified and reached opinions in the Lewis,
21  Husky, and Edwards cases, correct?
22         MR. VOUDOURIS: Objection.
23    A.   But based on my memory, it looks like that,
24  yes.
25    Q.   (BY MR. THORNBURGH) And that document was

Wenxin Zheng, M.D.

Page 46

1  provided to you after you had already issued and signed
2  your expert report in this case, correct?
3      A.   That was only recently, therefore, yes.
4      Q.   When was that document provided to you?
5      A.   A couple weeks ago.
6      Q.   It was provided to you a couple of weeks ago
7  and you didn't have time to review the text and content
8  of the document other than the date and the pictures?
9          MR. VOUDOURIS:   Objection.
10     A.   I think I have time, but I just didn't pay
11  attention to these, because my opinion is not -- not
12  going to rely on those documents, therefore, I didn't go
13  through.
14     Q.   (BY MR. THORNBURGH)   So you had time, you just
15  didn't review it?
16     A.   Yeah.
17     Q.   And, in fact, regarding all of the -- how many
18  internal Ethicon documents have you looked at in this
19  case?
20     A.   So if you consider this is one, then the other
21  one is McLean's paper, and I think these are the two I
22  have received.
23     Q.   The internal documents that Ethicon provides
24  to you are chosen by Ethicon, correct?
25         MR. VOUDOURIS:   Objection.

Page 47

1      A.   I did not ask, therefore, you know, I -- yes,
2  Dr. Snowden's office sent me these documents.
3      Q.   (BY MR. THORNBURGH)   You meant Mr. Snowden,
4  right?
5      A.   Yeah.   I mean, Mr. Snowden, yeah.
6          MR. SNOWDEN:   I got a promotion.
7      Q.   (BY MR. THORNBURGH)   Okay.   And --
8          MR. VOUDOURIS:   Well, a juris doctor is a
9  doctor, right?
10     Q.   (BY MR. THORNBURGH)   You had no -- no input in
11  the types of documents that were provided to you,
12  correct?
13     A.   No.
14     Q.   And so you have to rely on Ethicon to provide
15  you with documents that are relevant to this case,
16  correct?
17     A.   No.   I rely on the slides I received and my
18  expertise I have.   Then I generate my opinion.   That's
19  the main thing I rely on.
20     Q.   So are you telling this court and the ladies
21  and gentlemen of the jury if Ethicon has internal
22  documents discussing Ethicon's scientists' study of
23  explanted prolene sutures for degradation -- in vivo
24  degradation, those internal documents would not be
25  important to you in this case?

Page 48

1          MR. VOUDOURIS:   Objection; form,
2  foundation.
3      A.   As I mentioned to you a couple of times, one
4  is a very old document.   Two is, I don't feel this is
5  very much relevant to today's findings, all right.   That
6  was 30 years ago.   And then three is, the picture, the
7  quality was very poor, so it's difficult to compare what
8  is really, you know, what they mean at that time.
9      Q.   (BY MR. THORNBURGH)   But if Ethicon has
10  additional internal documents concerning studies that
11  were performed by Ethicon's scientists of explanted
12  prolene sutures, those would be relevant to you,
13  wouldn't they?
14         MR. VOUDOURIS:   Objection; form,
15  foundation.
16     A.   Well, that's -- that's why I say based on my
17  understanding at that time, I don't think this --
18  there's not much relevance, because my focus is on what
19  I have expertise, number one.   Number two is, what the
20  slides I received and what the clinical information I
21  have.   Then I render my opinion, okay?
22         Then, plus, as I also mentioned to you,
23  degradation versus nondegradation.   Based on my
24  observation, there is no evidence -- no histological
25  evidence for me to say there's any evidence of

Page 49

1  degradation.   Therefore, I do not consider those
2  documents I will rely on that are relevant to -- for my
3  opinion.
4      Q.   (BY MR. THORNBURGH)   So if -- you're telling
5  the ladies and gentlemen of this jury and this judge
6  that if Ethicon has internal documents where their
7  scientists concluded that the prolene degraded in vivo,
8  you wouldn't find that important or relevant to your
9  case -- to your opinions?
10         MR. VOUDOURIS:   Objection; asked and
11  answered.
12     A.   I think you're repeating -- repeat -- asking
13  the same question, and my answer is still the same.   And
14  there -- these -- my opinion is mainly rely on the
15  material I have received, like the slides, okay?
16  Because I'm a pathologist, okay?   Number one.
17         Number two is, also, I rely on the
18  clinical findings for the -- for this case, right?   Then
19  I render my opinion.   I do not -- I can't have all
20  these, like, reading all the materials, you know, within
21  the field or even internal for that particular case, the
22  internal document from Ethicon.   As I mentioned, one is,
23  too old.   Two is, quality of the picture is not good.
24  So therefore, I don't know how can I evaluate for that.
25     Q.   (BY MR. THORNBURGH)   But in all fairness,

Wenxin Zheng, M.D.

Page 50

1  Doctor, you're a paid expert witness in this case,
2  right?
3          MR. VOUDOURIS:  Objection.
4     A.  That's right.
5     Q.  (BY MR. THORNBURGH)  You're being paid $600
6  per hour to evaluate Mrs. Corbet's case, right?
7     A.  Yes.
8     Q.  And you are being paid $600 per hour to
9  testify today, right?
10    A.  Yes.
11    Q.  And you're going to be paid $600 to testify at
12 trial, right?
13         MR. VOUDOURIS:  Objection.
14    A.  Yes; if I go.
15    Q.  (BY MR. THORNBURGH)  But you didn't find it
16 important enough in this case to review documents
17 created and generated by Ethicon scientists before this
18 litigation started --
19    A.  That's --
20    Q.  -- concerning the issues of degradation found
21 in explanted prolene devices or opinions concerning
22 pathological findings concerning explanted prolene
23 devices, correct?
24         MR. VOUDOURIS:  Objection; compound, form,
25 foundation, and asked and answered.

Page 51

1     A.  As I mentioned to you, I think you are
2  repeating this question multiple times.  I already
3  answered that.
4     Q.  (BY MR. THORNBURGH)  But my question was:
5  Before this litigation started -- let me strike that.
6          Did you -- have you talked to any of
7  Ethicon's employees?
8     A.  I don't think I talked to any Ethicon
9  employee.
10    Q.  So in -- in reaching your opinions today, you
11 didn't reach out to any of Ethicon's employees to
12 discuss with them what their findings were concerning
13 degradation observed in explanted prolene devices?
14         MR. VOUDOURIS:  Objection.  Again, the
15 agreement is that this is a Corbet fact specific
16 deposition.  He was already asked this lines of
17 questions in his Husky and Edwards deposition.
18    A.  And, again --
19         MR. VOUDOURIS:  So you've already --
20 Doctor, you've already addressed those questions in
21 prior depositions.
22    Q.  (BY MR. THORNBURGH)  Concerning your opinions
23 in this case, Ethicon did provide to you at least one
24 internal Ethicon document, right?
25    A.  Yes.

Page 52

1     Q.  And if they had additional internal Ethicon
2  documents concerning observations and conclusions that
3  explanted prolene devices degraded, it wouldn't matter
4  to you because you don't rely on the internal documents
5  of other Ethicon scientists?
6          MR. VOUDOURIS:  Objection; asked and
7  answered.
8          Go ahead.
9     A.  As I mentioned to you, I'm a pathologist.  I
10 mainly rely on whatever the material I have, such as
11 slides I received for this case.  That's the most
12 important thing, all right.  Then also, I use routine
13 microscope the pathologists are using every day for
14 their practice to examine what in the slide.  Then
15 report candidly about what the finding from the slide.
16 That's my main duty, I think.
17         I have, also, the freedom -- yes, as you
18 say, I'm paid for the deposition or my professional
19 time, but I still -- I'm freedom to choose what is more
20 important or more candid for me to represent, you know,
21 this case, okay.  It's not like you -- I'm paid, then
22 you --
23         MR. VOUDOURIS:  You've answered -- you've
24 answered his question.
25         THE WITNESS:  Okay.

Page 53

1     Q.  (BY MR. THORNBURGH)  Since you issued your
2  report in this case, do you have an understanding that
3  Dr. Iakovlev's study regarding explanted mesh devices
4  has been published in the peer-reviewed articles?
5     A.  I noticed that.
6     Q.  Have you published any studies in the
7  peer-reviewed articles concerning -- since your last
8  deposition -- concerning your examination of explanted
9  mesh devices?
10    A.  Not yet.
11    Q.  Are you planning to?
12    A.  Yes.  We -- because this -- I also feel this
13 is a needed within the pathology -- surgical pathology
14 field.  Just like Dr. Smith's paper, they found
15 approximately 50 percent of the cases not being
16 processed properly.  Therefore, there is a need in this
17 field as a pathologist.
18         If they -- when they receive these
19 specimen, they should know how to handle them in a
20 standard way rather than just a random way.  I think
21 that's the reason we are planning to do.
22    Q.  So let me try to understand exactly.  Are you
23 planning on writing a report -- or a publication similar
24 to the Smith publication, or are you planning on
25 publishing your opinions concerning your evaluation of

Wenxin Zheng, M.D.

Page 54

1  explanted mesh devices?
2        MR. VOUDOURIS:  Objection.
3     A.  No, we are planning to just to provide
4  information to the field, or to the general
5  pathologists, let them be aware these specimens become
6  more common, although they consider as their foreign
7  body kind of material and people usually pay less
8  attention for those specimens.
9        But these days, because of the importance
10 in the field, then people -- pathologists should be
11 aware how to handle these specimens, how to describe or
12 what they should look for in the microscope in their
13 practice.  That's the purpose we are planning to do.
14    Q.  (BY MR. THORNBURGH)  Okay.
15    A.  I'm not planning to do -- to -- specifically
16 to address what Iakovlev's opinion and -- and my
17 opinion.  This is not relevant at all.
18    Q.  Okay.  So just to summarize, because that was
19 a lot of information --
20    A.  Right, right.
21    Q.  -- since your report, Dr. Iakovlev has
22 published his opinions concerning his observations of
23 explanted polypropylene, including TVT, devices, in
24 peer-reviewed publications, correct?
25    A.  In the -- in the one article peer reviewed,

Page 55

1  yes.
2     Q.  And what does it mean to be peer reviewed?
3     A.  Peer reviewed can have many meaning.  That
4  means within the field.  Then the editor of the journal
5  will ask for one, two, or three reviewers to review
6  what's the information in it.
7     Q.  And that's because you want to make sure that
8  the peer-reviewed allows for the publication of more
9  reliable articles because the peers, your peers, review
10 it and are critical when they review it, and determine
11 whether or not it should be published, correct?
12       MR. VOUDOURIS:  Object to form.
13    A.  It's not necessary for that.  Because I served
14 as a co-chief editor for one of the professional
15 journals recently.  And we know within this process the
16 authors are encouraged to submit the reviewer's name,
17 because in every specialties, they -- they have some
18 people they know are doing similar work.  So therefore,
19 there is a preference by authors who should review their
20 articles.  That's the process.
21       Therefore, this kind of process, although
22 is still considered as a peer review, but it's not
23 necessary all peer-reviewed articles.  They are
24 scientifically sound or they are just correct for their
25 opinion.  It still represent a group of the author's

Page 56

1  opinion.
2     Q.  (BY MR. THORNBURGH)  Okay.  So let me make
3  sure I understand that correctly.  Number one, you're
4  not suggesting in any way that Dr. Iakovlev somehow
5  had -- had some -- strike that.
6        You're not suggesting that Dr. Iakovlev in
7  this case, in publishing his -- his articles in the
8  peer-reviewed journals that he published those articles,
9  had some sort of input on who reviewed his article, are
10 you?
11    A.  This is a common process.  I'm not sure what
12 they have done in the process, but this is the common
13 process.  Every author or authors when they submit
14 articles, they have a chance to suggest who will be the
15 reviewers.  Then, in many journals, they will follow
16 these suggestions to pick up the reviewers.
17    Q.  Okay.  But you're not suggesting that that --
18 you don't have any basis or --
19    A.  No.
20    Q.  -- information to suggest that happened with
21 Dr. Iakovlev's article, right?
22    A.  That's why I say this in general.
23    Q.  So in general, when -- so let's talk about
24 that.  In general, it's your understanding from your
25 experience working in -- as a -- I think you said chief

Page 57

1  editor?
2     A.  Yes.
3     Q.  -- co-chief editor in a peer-reviewed journal
4  that, unfortunately, publications -- articles can get
5  published through a peer-reviewed process when -- when
6  the author actually has some influence on who reviews
7  the publication?
8        MR. VOUDOURIS:  Objection; form.
9     A.  Yes, this is correct.
10    Q.  (BY MR. THORNBURGH)  And that would include,
11 for example, if Ethicon's key opinion leaders want --
12 wanted to publish their studies in a peer-reviewed
13 publication under -- based on your experience, they
14 could have some influence or input into who actually
15 reviews their article before it gets published in the
16 journal, correct?
17       MR. VOUDOURIS:  Objection; form,
18 foundation.
19    A.  Author has this choice.  However, journal
20 editors has their own decision who should be asked for
21 review.  So these are the dual ways.  It's not only one
22 way.
23    Q.  (BY MR. THORNBURGH)  Journal editors such as
24 yourself?
25    A.  Right.

Wenxin Zheng, M.D.

Page 58

1    Q.  Who's a paid expert for Ethicon?

2         MR. VOUDOURIS:  Objection.

3    A.  What do you mean?  Paid for -- expert for --

4    Q.  (BY MR. THORNBURGH)  You're an expert for

5  Ethicon in the litigation, right?

6    A.  The journal -- my journals, they -- we do not

7  have any publications related to mesh yet so far.

8    Q.  But in some circumstances, the authors have

9  input on who reviews their publications and editors can

10  veto a decision to have reviewers -- certain reviewers

11  review an author's publication.

12         And in the current situation, you're an

13  editor for a peer review publication and also an expert

14  for Ethicon?

15         MR. VOUDOURIS:  Objection; form,

16  foundation, asked and answered, and very compound.

17    A.  Yeah.  I think that this is not

18  really relevant.

19    Q.  (BY MR. THORNBURGH)  I'll withdraw the

20  question.

21    A.  Yeah.  Not really relevant.

22    Q.  This is a new position that you have, though,

23  as a co-editor?

24    A.  It's been for two years.

25         MR. THORNBURGH:  I assume I can ask some

Page 59

1  questions about that if he wasn't a co-editor in the

2  prior cases?

3         MR. VOUDOURIS:  You can ask.

4    Q.  (BY MR. THORNBURGH)  What -- what

5  peer-reviewed publication are you a co-editor for?

6    A.  The journal name is American Journal of

7  Clinical and Experimental Obstetrics and Gynecology.

8    Q.  What do you mean by "experimental obstetrics

9  and gynecology"?

10    A.  That means within the ob -- obstetrics and

11  gynecology field, all the studies related to the

12  clinical side as well as experimental side, then we will

13  accept if they have a good quality.

14    Q.  In other words, if they apply some sort of --

15  strike that.

16         In other words, if their method was

17  reliable?

18         MR. VOUDOURIS:  Objection.

19    A.  We have to review.  That's why -- depending on

20  the quality and what kind of study, what kind of method

21  they use, study design, hypothesis, then the contents,

22  then the results, then all these, you know, relevant

23  informations.  That's a complicated process.  I don't

24  think you want to understand.

25    Q.  (BY MR. THORNBURGH)  No; I'm not going to

Page 60

1  spend much time.  Let me just -- let me try to see if I

2  understand just briefly.  So if I did an experiment, for

3  example, and I experimented and I had one sample -- N

4  equals one, right?

5    A.  Right.

6    Q.  If I had one sample and I reached a conclusion

7  based on that one sample and sent it to you to be

8  published in an article, would you have a problem with

9  publishing an article that reaches conclusions based on

10  an experiment that included only one sample?

11         MR. VOUDOURIS:  Objection; form and

12  foundation.

13    A.  Usually, that will be rejected.  I don't think

14  many journals will accept based on a single sample, but

15  we do have interesting case report.  Case report, that's

16  different issue.

17    Q.  (BY MR. THORNBURGH)  So -- and -- so for a

18  peer-review publication, a study with N equals 1 -- I

19  think I've read somewhere that you want to have at least

20  three samples in an experiment in order for it to be

21  considered reliable.  Is that accurate?

22    A.  No.

23         MR. VOUDOURIS:  Objection; form,

24  foundation.

25         You've answered his question.

Page 61

1         THE WITNESS:  Yeah.

2    A.  No.

3    Q.  (BY MR. THORNBURGH)  How's it not?  I'm

4  trying -- I'm just trying to understand.

5    A.  No.  This is a -- like a publication -- or

6  receive a manuscript to be considered for publication is

7  a -- is a long process.  It's not that simple.  I cannot

8  use one minute or two minutes to explain to you the

9  entire process.  I think this is also not relevant for

10  this case too.

11    Q.  Fair enough.

12         Do you have an updated curriculum vitae?

13         MR. VOUDOURIS:  It's on Exhibit 2.

14    A.  Yes.  I submitted that and also included in

15  the thumb drive.

16    Q.  (BY MR. THORNBURGH)  So in -- for preparing

17  for this deposition, approximately how many hours --

18  strike that.

19         In preparing for this case and

20  re-reviewing the case, looking at the new articles,

21  getting ready for this deposition, approximately how

22  many hours do you have invested in this case since your

23  invoice of last year?

24         MR. VOUDOURIS:  Objection; asked and

25  answered.

Wenxin Zheng, M.D.

Page 62

1    MR. THORNBURGH:  I don't think I asked how
2 many hours.
3    A.  I didn't estimate exactly, but I think
4 approximately 15 hours.
5    Q.  (BY MR. THORNBURGH)  15?
6    A.  Approximately.
7    Q.  And it looks like, according to the invoice
8 that was produced on Exhibit Number 2, which we'll maybe
9 mark later on as a separate exhibit, you've been paid in
10 this case so far approximately $29,400.  Does that sound
11 about accurate?
12    A.  That sounds accurate.
13    Q.  And since that invoice, you've worked on this
14 case for approximately 15 additional hours?
15    A.  Right.  Because it's only recently I've been
16 noticed, you know, deposition starts.
17    Q.  And the deposition notice is actually marked
18 as Exhibit Number 1.  If you can grab Exhibit Number 1
19 real quick.  When was that notice sent to you -- or I'm
20 sorry, strike that.
21    When was that notice -- what's the date of
22 that notice?
23    A.  I don't remember exactly what the date the
24 notice.  I think a couple -- starting from maybe a
25 couple of months ago, I -- Andy sent me a note saying --

Page 63

1 asking me what is available dates, possible dates and --
2    MR. VOUDOURIS:  Doctor, listen to his
3 question.
4    Q.  (BY MR. THORNBURGH)  Yeah, my -- my
5 question --
6    MR. VOUDOURIS:  He asked -- he asked a
7 different question.
8    Q.  (BY MR. THORNBURGH)  Yeah.  My question is
9 simply -- because you indicated you had -- since your
10 invoice of last year, you had worked for about 15
11 additional hours on this case, and you said that you
12 began that work after you received the deposition
13 notice.  And so my question to you was, well, what's the
14 date of the deposition notice?
15    MR. VOUDOURIS:  I think he was confused by
16 your earlier question.
17    A.  I don't -- don't remember when Andy --
18    Q.  (BY MR. THORNBURGH)  If you just look at
19 page --
20    MR. VOUDOURIS:  Doctor --
21    Q.  (BY MR. THORNBURGH)  If you look at page 2 of
22 the deposition notice, it says November 13th, 2015.  Do
23 you see that on Exhibit 1, page 2?  Do you need help?
24 Right there on the bottom -- right there, see the last
25 notation on that page, it says date?

Page 64

1    A.  This is the notice for today's deposition,
2 right?
3    Q.  Yes.
4    A.  And -- yeah, I mean, I guess this -- if you're
5 asking -- you already know the answer.  I don't know why
6 you're asking me this question.
7    Q.  Because I get to ask these -- these questions.
8 For -- for good or for bad, I get to ask these
9 questions.
10    So the date is November 13th, 2015.  So
11 the 15 additional hours that you put in this case since
12 the invoice of last year, would that have all happened
13 after November 13th of 2015?
14    A.  Yeah.  Mainly -- majority of the -- the work
15 has been done, that's these, you know, days, basically.
16 That's why I say some of these documents I really don't
17 have time to go through.
18    Q.  So the 15 hours is after November --
19 November 13th, 2015, right?
20    A.  That's -- that's fair.
21    MR. VOUDOURIS:  Objection.
22    A.  In the -- yeah, in the last several days.
23    Q.  (BY MR. THORNBURGH)  Okay.  And how much
24 time -- how much of the 15 hours was spent on meeting
25 with Ethicon's attorneys to prepare for this deposition?

Page 65

1    A.  I think a couple of hours, you know, we met
2 for that.
3    Q.  Did you meet one -- one time, two times, more
4 than two times?  How many times did you meet in
5 preparation for this deposition?
6    A.  Last -- yeah, we have twice.
7    Q.  Okay.  So the first time you met was when?
8    A.  That was last week sometime.  I don't remember
9 exactly.  But then also yesterday.
10    Q.  Okay.  So the first meeting that you had in
11 preparation for this deposition last week, how long did
12 that meeting last?
13    A.  Probably about one hour, one and a half hour.
14    Q.  Okay.  And then you indicated, I think, that
15 you also met again yesterday?
16    A.  Yesterday.
17    Q.  And how long did you meet yesterday in
18 preparation for this deposition?
19    A.  Similar time.
20    Q.  So one to one and a half hours?
21    A.  Right.
22    Q.  So you've -- you've met and prepared -- you
23 met with Ethicon's lawyers in preparation for this
24 deposition for approximately two to three hours?
25    A.  Yes.

Wenxin Zheng, M.D.

Page 66

1    Q.  So if you worked 15 hours and you worked --
2  and you spent two to three hours preparing with
3  Ethicon's lawyers, what was the rest of the time
4  dedicated to?
5    A.  Reading, write, and review my report and
6  refresh my mind what plaintiff's expert has said, just
7  Dr. Iakovlev's report in the Exhibition [sic] Number 5.
8  So those are the time I spent.
9    Q.  Have you read since --
10       MR. VOUDOURIS:  Dan, I'm sorry.  Do you
11  want to go off the record for a second?
12       MR. THORNBURGH:  Sure.
13       THE VIDEOGRAPHER:  We're off -- we're off
14  record at 10:52 a.m.
15       (Break taken.)
16       THE VIDEOGRAPHER:  We're back on record at
17  10:57 a.m., beginning of Tape 2.
18    Q.  (BY MR. THORNBURGH)  In preparation for
19  your -- strike that.
20       Have you read or reviewed any additional
21  depositions in this case in preparation for your expert
22  opinion -- in preparation for your deposition?
23    A.  I read Dr. Smith's deposition.
24    Q.  When did you read Dr. Smith's deposition?
25    A.  I think the -- the first time was -- was last

Page 67

1  year before the -- this expert report was prepared.
2    Q.  Okay.  So you read it -- and I think it's -- I
3  think you identified that as a deposition that you
4  read --
5    A.  Right.
6    Q.  -- and you identified that in your expert
7  report from last year.  Since your expert report, have
8  you read any additional depositions?
9    A.  No, I -- I don't.
10    Q.  How much in total have you been paid by
11  Ethicon to serve as an expert in the Ethicon mesh
12  litigation?
13       MR. VOUDOURIS:  Objection.
14    A.  I don't remember.
15    Q.  (BY MR. THORNBURGH)  Do you have an
16  estimation?
17       MR. VOUDOURIS:  Objection.
18    A.  Frankly speaking, I barely pay attention to
19  the money issues.
20    Q.  (BY MR. THORNBURGH)  Greater than $100,000?
21       MR. VOUDOURIS:  Objection.
22    A.  I don't think so.
23    Q.  (BY MR. THORNBURGH)  Around 100,000?
24       MR. VOUDOURIS:  Objection.
25    A.  My main work is my own work, all right?  This

Page 68

1  is -- I don't rely on the expert witness as my main
2  income, no.
3    Q.  (BY MR. THORNBURGH)  That wasn't my question.
4    A.  I know.  That's why I say -- I answered I
5  don't remember exactly.
6    Q.  Okay.  But I'm entitled to a fair estimation.
7  So do you think it's been about 80,000 to $100,000?
8       MR. VOUDOURIS:  Objection.
9    A.  Maybe after all these cases.  Each case is
10  about $25,000, something like that.  I -- but I don't
11  quote exactly, okay?  This is the rough estimation.
12    Q.  (BY MR. THORNBURGH)  Okay.  And so you've --
13  you've testified in the Husky, Edwards, and Lewis cases,
14  correct?
15    A.  Correct.
16    Q.  And you're testifying in this case.  So is
17  that about $100,000?
18       MR. VOUDOURIS:  Objection.
19    A.  I'm not sure.
20    Q.  (BY MR. THORNBURGH)  Approximately?  If
21  it's -- if it's $25,000 per case?
22       MR. VOUDOURIS:  Objection; asked and
23  answered.
24    A.  I'm not sure.  That's why I said, okay?
25    Q.  (BY MR. THORNBURGH)  Have you consulted with

Page 69

1  Ethicon on any additional cases other than the four that
2  we've mentioned?
3    A.  I don't think so.
4    Q.  Have you been disclosed as an expert witness
5  in any other case where you've been retained by Ethicon
6  as an expert other than the Lewis, Husky, Edwards, or
7  Corbet cases?
8    A.  I think I have disclosed whatever I have done
9  for litigations or serve as expert witness, yes.
10    Q.  Right.  So is there any -- have you been
11  disclosed as an expert in any cases other than the four
12  cases that we've discussed today?
13    A.  I have disclosed.
14    Q.  Okay.  What case -- what cases?
15    A.  Like ovarian endometrio cancer case.
16       MR. VOUDOURIS:  Doctor --
17       THE WITNESS:  Right.
18       MR. VOUDOURIS:  -- I'm sorry to interrupt.
19  I'm just trying to help you.  That's not the question
20  he's asking you.
21       THE WITNESS:  Right.
22       MR. VOUDOURIS:  And you were already asked
23  about the prior times you've served as an expert in
24  other litigation when you were deposed in the Husky and
25  Lewis deposition.

Wenxin Zheng, M.D.

Page 70

1    Q.  (BY MR. THORNBURGH)  And I'm not going to go
2   there.  I'm just trying to find out if you've been
3   disclosed as an expert in any other cases for -- for --
4   as an expert for Ethicon.
5    A.  For Ethicon?  I have -- whatever the case I
6   received, I always disclosed what I have done.  That's
7   for sure.
8    Q.  I -- let me -- so let me just try and clarify.
9   So what disclosure means --
10        MR. VOUDOURIS:  Dan, can I help you?  I
11   don't believe he's --
12    Q.  (BY MR. THORNBURGH)  Have you been identified
13   as an expert witness --
14        MR. THORNBURGH:  Go ahead.
15        MR. VOUDOURIS:  Let me help you.  I don't
16   believe he's --
17        MR. THORNBURGH:  You know the answer?
18        MR. VOUDOURIS:  Yeah.
19        MR. THORNBURGH:  Okay.
20        MR. VOUDOURIS:  I don't believe he's been
21   disclosed in other cases other than the ones he's
22   mentioned.
23    Q.  (BY MR. THORNBURGH)  Okay.  Have you consulted
24   with any other mesh manufacturers?
25    A.  No.

Page 71

1    Q.  Since issuing your expert report, have you
2   published any articles in any peer-review journals?
3    A.  Not for mesh.  Yes, I have -- every year I
4   have more than 10 papers published.
5    Q.  That was going to be my next question.  So I
6   think the answer is, yes, you've published since you
7   issued your expert report.  Is that fair?
8    A.  Yes.
9    Q.  Which you -- I assume you've -- is included in
10   your updated CV, which is attached as Exhibit 2?
11    A.  Yes.  You can -- you can see it.
12    Q.  And none of those like -- like prior to the --
13   this -- like prior to your expert report that you issued
14   in this case -- strike that.
15        None of the new publications that you've
16   authored or coauthored that have been published in
17   peer-reviewed articles since your expert report relate
18   to mesh, correct?
19    A.  Correct.
20    Q.  And none relate to the TVT product?
21    A.  Correct.
22    Q.  And you have no intention of publishing in
23   peer-reviewed articles concerning your work as an expert
24   in these cases, right?
25    A.  I don't have intention to use these material

Page 72

1   for publication.  That's for sure.  But I do have plan,
2   together with my students, to summarize the mesh
3   specimen related to the surgical pathology practice.
4    Q.  And that's what we discussed earlier?
5    A.  Correct.
6    Q.  Not a -- an article regarding your findings as
7   a pathologist under the microscope, but rather,
8   recommendations to the community about doing microscopic
9   examinations of explanted mesh devices?
10    A.  Correct.
11    Q.  And when do you plan on publishing that?
12    A.  We don't know because everybody's so busy,
13   lots of things going on.  So as soon as we have
14   adequate -- manage to be ready, then we are ready.
15    Q.  Is the manu -- has the manu -- strike that.
16        Have you began to write the article?
17    A.  Not yet.  We're still collecting the data.
18    Q.  Okay.  So there's no draft of any --
19    A.  No.
20    Q.  -- form?
21        And so right now, you and your students
22   are collecting data?
23    A.  Correct.
24    Q.  What types of data are you collecting?
25    A.  It's explanted mesh material.

Page 73

1    Q.  So are you --
2    A.  Mesh specimens.
3    Q.  Are you actually collecting mesh specimens?
4    A.  No.  We only examine the slides already
5   existed or the samples received in the department of
6   pathology in the University of Arizona.
7    Q.  All right.  So let me just try to understand
8   this.  So you're collecting data, and the data that
9   you're collecting are slides that are available --
10   pathology slides that are available at Arizona
11   University --
12    A.  Uh-huh.
13    Q.  -- or University of Arizona.  But you have no
14   intention of analyzing those slides and publishing your
15   findings -- your pathological findings concerning that
16   analysis?
17        MR. VOUDOURIS:  Objection; form.
18    Q.  (BY MR. THORNBURGH)  Because I thought earlier
19   you testified that you had no intention of -- I think I
20   understand.  So you have no intention of publishing your
21   findings based on your review of mesh devices that
22   you've looked at in the context of this litigation?
23    A.  No, I'm not planning to do that, because this
24   is --
25        MR. VOUDOURIS:  You answered his question.

Wenxin Zheng, M.D.

Page 74

1    A.   Yeah, I already answer this question.
2    Q.   (BY MR. THORNBURGH)  So -- so do you plan on
3  publishing your findings from your review of explanted
4  pathology specimens that you're currently collecting
5  from the University of Arizona?
6         MR. VOUDOURIS:  Objection; form.
7    A.   As I say, we are planning to publish or
8  summarize the data regarding mesh specimen received in
9  the past five years in the University of Arizona, which
10  may be useful for the surgical pathology field.  How to
11  handle the specimen correctly, how to describe -- or
12  what the kind of features that a pathologist should look
13  for.  Those are the information will be useful for the
14  field.
15    Q.   (BY MR. THORNBURGH)  Okay.  So when you say
16  you're going to summarize the data, you're talking about
17  your analysis of the pathology material at the
18  University of Arizona, right?
19         MR. VOUDOURIS:  Objection; form.
20    A.   Yes; based on the pathology material there.
21    Q.   (BY MR. THORNBURGH)  And, currently, you're
22  collecting the data?
23    A.   Currently, we are collecting the data.
24    Q.   Have you determined how many explant specimens
25  are available at Arizona for the five-year period?

Page 75

1    A.   Yeah.  We estimated the total -- we did a
2  search after our approval.  We have a total of
3  approximately 150 cases.
4    Q.   Total of 158 cases?
5    A.   -50, 1-5-0.
6    Q.   150 cases.  And this is a single institution
7  at the University of Arizona?
8    A.   Correct.
9    Q.   Is it the pathology department at the
10  University of Arizona?
11    A.   Yes.
12    Q.   And are you a pathologist at the University of
13  Arizona?
14    A.   I was there for 10 years.
15    Q.   Are you still there?
16    A.   Recently, starting from July 1st of this year,
17  I relocate to UT Southwestern.
18    Q.   And are these pathology -- strike that.
19         So the pathology material that is being
20  collected, 150 or so that have been identified, are
21  those specimens -- have -- strike that.
22         Have you previously analyzed those
23  specimens as an employee of University of Arizona?
24         MR. VOUDOURIS:  Objection.
25    A.   Majority of these cases, I sign out the

Page 76

1  reports.
2    Q.   (BY MR. THORNBURGH)  And for the majority of
3  those cases that you sign out the reports that you've
4  done in the past -- and I think you described this
5  earlier when we talked about the Smith article, that
6  most pathologists report on their macroscopic
7  observations.  Is that accurate?
8    A.   Some of them, yes.
9    Q.   Okay.  And so of the 100 -- of the majority of
10  the 150 that you've looked at in the past and have
11  issued -- or signed out on the reports, was that based
12  on macroscopic or microscopic observations?
13    A.   I don't know how many they are macroscopic
14  only, but if macroscopic only, we will just record a
15  number.  And all the findings will be based on
16  microscopic findings.
17    Q.   For the 150 at Arizona, you wouldn't have to
18  necessarily go -- strike that.
19         When you were working for the University
20  of Arizona as a pathologist and you were signing off on
21  the reports, is it fair to say the majority of those
22  reports that you signed off on were based on a
23  macroscopic observation of the explant material?
24    A.   No.
25         MR. VOUDOURIS:  Objection.

Page 77

1    A.   Mainly -- majority of such cases based on,
2  they do have microscopic slides prepared.
3    Q.   (BY MR. THORNBURGH)  I know they may have --
4  so they have microscopic slides prepared.  Does that
5  mean they were actually analyzed by you or another
6  pathologist microscopically, or were the reports signed
7  off based on a macroscopic observation?
8         MR. VOUDOURIS:  Objection.
9    A.   Majority of them based on both macroscopic as
10  well as microscopic.
11    Q.   (BY MR. THORNBURGH)  So is it fair to say --
12  is -- is it your understanding that, like the Smith
13  article, perhaps, that 50 percent were microscopic and
14  50 percent were macroscopic?
15         MR. VOUDOURIS:  Objection.
16    A.   Things are different, because our institution,
17  things -- starting from, I think, two to three years
18  ago, we have noticed those situations in the entire
19  medical field, so therefore, I was asked to provide
20  standard protocol how to handle these specimen.
21         Then -- since then, every specimen, if the
22  specimen -- the size is larger than two centimeters,
23  then half of them will be processed for microscopic
24  examination.
25    Q.   (BY MR. THORNBURGH)  Okay.  So a lot of

Wenxin Zheng, M.D.

Page 78

1 information. And this is why your -- why you decided to
2 do an article -- publish an article on it and working
3 with your students. So let me just try to figure out.
4         About two to three years ago, you drafted
5 the protocol on how to handle specimens?
6     A. Correct.
7     Q. Okay. Have you produced that protocol in any
8 of these cases yet?
9     A. We did not publish, because it's like internal
10 guideline for our pathologists. And also, we have -- in
11 the University of Arizona, we have risk management
12 office. They were involved for some of those cases,
13 because they -- it's labeled as a legal case, so
14 therefore, they have to save the -- some of the specimen
15 into the risk management office.
16         Then, that cause lots of problem, because
17 the pathologist department -- pathology department is
18 responsible to release pathological finding. And if
19 they are -- they want to help -- hold these cases, then
20 we are not able to issue the report. So therefore, we
21 all came together, then came out as a general consented
22 guideline. I'm the main person to provide this
23 guideline --
24     Q. Okay.
25     A. -- because I was -- I was the GYN pathologist

Page 79

1 there.
2     Q. Okay. So my question was: Has that written
3 protocol been produced in any of the cases -- litigation
4 cases to date?
5     A. It's -- all these litigation cases today is
6 not from University of Arizona, therefore, it's not
7 relevant.
8         MR. THORNBURGH: We want -- I want a copy
9 of the protocol from the University of Arizona that he
10 drafted and -- which serves as a protocol for how to
11 handle mesh specimen explants.
12         MR. VOUDOURIS: I don't know if I have any
13 control over what the internal department at the
14 University of Arizona says and whether they're IRB and
15 HIPAA implications --
16         THE WITNESS: Right.
17         MR. VOUDOURIS: -- so I can't answer that
18 question.
19         MR. THORNBURGH: I'll send a follow-up
20 e-mail requesting it.
21     Q. (BY MR. THORNBURGH) And just to follow up on
22 some other things that you said, you were the -- sorry.
23 Strike that.
24         So you test -- just testified that the
25 risk management office was involved in some of the

Page 80

1 pathology specimens that were received at the University
2 of Arizona because some of those cases were labeled as
3 legal -- legal cases, correct?
4     A. Yes.
5     Q. So the specimen goes to the risk management
6 office at that point?
7         MR. VOUDOURIS: Objection. If you know.
8     A. Yes. Some of them, they go, then that's why I
9 say because these are conflicts. If risk management has
10 all the specimens, then department of pathology has no
11 specimen, then no report is going to be issued.
12 Therefore, the clinician is concerned, and then
13 pathology department also is concerned.
14         And -- because they send to us and we
15 don't have report, therefore clinician, risk management
16 office, and pathologist all come together and have a
17 consensus meeting how to handle these specimens. Then I
18 generate this guideline.
19     Q. (BY MR. THORNBURGH) Okay. And so did the
20 guideline somehow -- I assume based on what I think I
21 understand from your testimony, the guideline
22 established that half of the specimen would be divided
23 and kept at the University of Arizona risk management
24 department, and then the other half would be analyzed by
25 you or other pathologists?

Page 81

1         MR. VOUDOURIS: Objection.
2     Q. (BY MR. THORNBURGH) And that was for the
3 legal -- the legal cases?
4         MR. VOUDOURIS: Objection.
5     A. Yeah, yeah. If you really want to know the
6 content, I think because I'm the person write this one,
7 I can tell you the basic components, all right? The
8 basic thing is if the specimen is larger than two
9 centimeter in size, all right, then we will cut half for
10 histological examination process. Then the remaining
11 half will be saved in the formalin and will be delivered
12 to the high risk -- or risk management office, number
13 one.
14     Q. (BY MR. THORNBURGH) To -- sorry, go ahead.
15     A. Number two, if the specimen is smaller than
16 two centimeter in size, then no histological section
17 will be done because it's for legal purposes. Then the
18 entire specimen will be delivered to the risk management
19 office.
20     Q. Okay. So I think I understand all -- so let
21 me just figure it out, just make sure I understand it.
22 And you're -- you were the person that oversaw this
23 change in the process at the University of Arizona,
24 right?
25     A. Correct.

Wenxin Zheng, M.D.

Page 82

1  Q.  And that was two to three years ago?
2  A.  Yes.
3  Q.  And that was while you were serving as an
4  expert for Ethicon?
5  A.  No.  I don't think that's the -- that's the
6  reason.  Because I -- I'm the --
7  Q.  That wasn't -- my question wasn't, was that
8  the reason?  My question to you was:  When the protocol
9  changed, based on your recommendations, you were an
10  expert for Ethicon?
11      MR. VOUDOURIS:  Objection; form.
12  A.  That's not related, because --
13  Q.  (BY MR. THORNBURGH)  It's a yes-or-no
14  question, though.
15  A.  Yeah.
16  Q.  I mean, were you an expert at the time for
17  Ethicon?
18  A.  At the time, I was, but this was not the
19  reason because I'm the expert for Ethicon, then I will
20  provide -- volunteer and provide this guideline.  No.
21  Because I am -- I was the chief of the GYN pathology
22  there, then in handling all the GYN specimen, including
23  mesh specimen --
24  Q.  Okay.
25  A.  -- okay?

Page 83

1  Q.  Hold on.  So my question was simply:  At that
2  time, when you changed the protocol, you were an expert
3  of -- for Ethicon?  That's my only question.
4      MR. VOUDOURIS:  Objection; form, and
5  foundation.
6  Q.  (BY MR. THORNBURGH)  So the answer to that
7  question is yes, right?
8  A.  Yes.
9      MR. VOUDOURIS:  Objection.
10  Q.  (BY MR. THORNBURGH)  And so -- so if I had a
11  legal case, all right, my client had a mesh specimen of
12  two centimeters that was available at the University of
13  Arizona, and I sent a request for preservation of the
14  two centimeter sample -- explant sample so that it could
15  be evaluated for purposes of litigation, the protocol
16  that you established would actually send for litigation
17  purposes only one centimeter to be analyzed?
18  A.  If it --
19      MR. VOUDOURIS:  Hold on.
20  Q.  (BY MR. THORNBURGH)  Let me -- let me -- let
21  me -- let me ask again.  I'll withdraw that line of
22  questioning and let me get it down.
23      So two to three years ago, as an expert
24  for Ethicon, you changed the protocol such that if I had
25  a case -- I had -- I had -- I represented a client whose

Page 84

1  mesh was explanted and sent to the pathology department
2  of the university that was greater than two centimeters,
3  and I sent a preservation letter to preserve that
4  evidence for purposes of litigation, you would first
5  divide that specimen and keep it and analyze it at the
6  University of Arizona and send the other half for
7  litigation -- for -- to the risk management for hold?
8      MR. VOUDOURIS:  Hold on.
9  Q.  (BY MR. THORNBURGH)  Right?
10      MR. VOUDOURIS:  Hold on.  I gave you
11  leeway to ask questions about this.  This has absolutely
12  nothing to do with the fact specifics of Corbet.  You
13  have asked tons of questions about it that has nothing
14  to do with Corbet.  And I --
15      MR. THORNBURGH:  He's -- he's offering
16  this testimony.
17      MR. VOUDOURIS:  Well, I'm telling the
18  doctor --
19      MR. THORNBURGH:  I'm just following up on
20  it.
21      MR. VOUDOURIS:  This has nothing to do
22  with Corbet.  He's asked -- he's answered plenty of
23  questions on this topic, so let's get to the fact
24  specifics of Corbet.
25      MR. THORNBURGH:  I mean, I think, in all

Page 85

1  fairness, he -- he offered that -- that -- that
2  information voluntarily.  I get to follow up on it and
3  say, you know, if I send -- if I -- if my -- if I send a
4  preservation letter to the University of Arizona for a
5  specimen that was explanted from my client and there's
6  two centimeters, I don't get the full explant to be
7  analyzed?
8      MR. VOUDOURIS:  It has nothing to do with
9  the fact --
10      MR. THORNBURGH:  I think that's important.
11      MR. VOUDOURIS:  It has nothing to do with
12  the fact specifics of Corbet.
13      MR. SNOWDEN:  If you want to pull out an
14  Ethicon preservation notice which tells the hospital to
15  follow their standard procedures, why don't you show him
16  that?
17      MR. THORNBURGH:  That's something we'll
18  take up at a later time.
19  Q.  (BY MR. THORNBURGH)  How much -- in
20  Mrs. Corbet's case, how much mesh was explanted?
21  A.  I think I have a gross description about the
22  slides and the specimen I received.
23      Yes.  I said I received the following
24  material labeled as Kathryn Corbet.  And then date of
25  surgery, that was February 19, 19 -- 2013.  And the

Wenxin Zheng, M.D.

| Page 86 |
|---|

1 first batch includes three H&E slides and two unstained
2 slides.
3          All right. Then the slides labeled as A1,
4 B1, and C1. Then slide C1 represent ex -- excised mesh.
5 Now, A1 and B1 were from bladder biopsies. The second
6 batch of the slides include five H&E and four
7 corresponding S-100 staining with was one positive
8 control, and the four masson trichrome stained slides
9 and one positive control. So those are the material I
10 received.
11     Q.  Okay. And that's the material that you
12 received from -- after Mrs. Corbet had her explant --
13     A.  Correct.
14     Q.  -- from -- at the University of Pennsylvania
15 Health System?
16     A.  Yes.
17     Q.  Do -- do you know anybody -- any -- any
18 pathologist who work at the University of Pennsylvania
19 Health System?
20     A.  Personally, I don't know any pathologist
21 there, but they must have large amount of pathologists
22 there.
23          MR. VOUDOURIS: He just asked you if you
24 knew anyone at the University of Pennsylvania pathology
25 department.

| Page 87 |
|---|

1     A.  Yeah, personally, I don't know anyone as a --
2 as a collaborator or -- or friend, no.
3     Q.  (BY MR. THORNBURGH) And we're going to get
4 into the -- the records here pretty soon, but -- in
5 greater detail. But do you know what a consensus --
6 consensus conference case is?
7     A.  Consensus conference means a group of
8 pathologists read certain case together, get a consented
9 opinion. That's a consensus conference.
10     Q.  And do you do a consensus conference -- or did
11 you do a consensus conference at the University of
12 Arizona?
13          MR. VOUDOURIS: Objection.
14     A.  We do -- we do all the time, but mainly for
15 cancer cases as well as for difficult cases or unusual
16 cases.
17     Q.  (BY MR. THORNBURGH) And when -- in your
18 experience when these consensus conferences take place,
19 is there documentation created that discusses the
20 consensus reached by the pathologists who reviewed the
21 pathology material separate from the pathology report
22 that's signed by the pathologist?
23          MR. VOUDOURIS: Objection.
24     A.  Okay. Within the consensus meeting,
25 generally, there is a sheet. All the pathologists

| Page 88 |
|---|

1 present will be recorded. Therefore, they're
2 reviewing -- one pathologist will present his or her
3 cases. Then the remaining pathologists will render
4 their opinion, either agree or provide different
5 interpretations, then, finally, people will get a
6 consent.
7     Q.  (BY MR. THORNBURGH) Have you participated in
8 a consensus conference before?
9          MR. VOUDOURIS: Objection.
10     Q.  (BY MR. THORNBURGH) Since -- how about since
11 your last deposition, have you participated in a
12 consensus?
13     A.  Every week, we have that.
14     Q.  Have you participated, since your last
15 deposition, in a consensus conference case regarding a
16 mesh explant?
17          MR. VOUDOURIS: Objection.
18     A.  There -- there is no -- no need for mesh to be
19 considered for a consensus, because this is not
20 considered as a complicated case or difficult case.
21     Q.  (BY MR. THORNBURGH) That wasn't my question,
22 though. My question was --
23          MR. THORNBURGH: So move to strike.
24     Q.  (BY MR. THORNBURGH) My question was pretty
25 simple. As -- since your deposition, have you served on

| Page 89 |
|---|

1 a consensus panel concerning the analysis of explanted
2 mesh material?
3          MR. VOUDOURIS: Objection; asked and
4 answered.
5          MR. THORNBURGH: And the answer is yes or
6 no. I mean, he -- he didn't answer the question.
7     A.  I answered no.
8          MR. VOUDOURIS: He said there's no need
9 to.
10     A.  I also give you the reason why no, because
11 there is no reason to have any hospital -- so far, based
12 on my understanding -- to review the mesh material in
13 the consensus conference. I can guarantee you.
14     Q.  (BY MR. THORNBURGH) It appears from -- from
15 your --
16     A.  Except for some complications or for other
17 reasons. In general, there is no need at all.
18     Q.  Does it appear from your review of the
19 pathology report from Mrs. Corbet's explant that there
20 was a consensus conference concerning her explant
21 material?
22     A.  I don't think I have written something like
23 that. Can you show me where it is? Or we may have some
24 misunderstanding there.
25          (Sotto voce conversation.)

Wenxin Zheng, M.D.

Page 90

1        (Exhibit Number 6 was marked.)
2        Q.  I'm going to mark as Exhibit Number 6 and
3    we're going to talk about this throughout the
4    deposition, but this -- I'm handing you Exhibit
5    Number 6, which is from the pathology department at the
6    Pennsylvania hospital.  There you go.
7            MR. VOUDOURIS:  Do you have an extra copy?
8            MR. THORNBURGH:  I'm sorry, Counsel.  I
9    didn't do that on purpose.
10           (Witness reviewed document.)
11       Q.  (BY MR. THORNBURGH)  And if you turn in
12   Exhibit Number 6, if you turn to Bates number ending in
13   -08.  Are you there?
14       A.  Yes.
15       Q.  And do you understand -- you understand that
16   you're looking at the -- do you recognize that you're
17   looking at the pathology --
18       A.  The pathology report from the University of
19   Pennsylvania Health System.
20       Q.  Okay.  And you see --
21       A.  You highlighted specimen C, right?
22       Q.  Did I highlight that?  I gave you the wrong
23   copy, I'm sorry.  Can I get that back?
24       A.  That's okay.
25           MR. THORNBURGH:  I'll re-mark it.

Page 91

1            MR. VOUDOURIS:  For the record, this
2    document says case conference -- consensus conference
3    case, but it doesn't reflect which specimen, A, B, or C,
4    was part of the consensus conference case.
5            MR. THORNBURGH:  I appreciate the speaking
6    objection.
7            MR. VOUDOURIS:  Does this exhibit have any
8    highlighting of yours in it?
9            MR. THORNBURGH:  That does not.
10       Q.  (BY MR. THORNBURGH)  So my question is, you
11   see on page Bates number ending in -08 of Exhibit
12   Number 6 under the file -- final diagnosis, it says
13   consensus conference case?
14       A.  Which sentence says that?
15       Q.  Under -- under final diagnosis C, eroded
16   vagina mesh.
17           MR. VOUDOURIS:  Objection.
18       A.  The gross description or microscopic -- okay.
19   Consensus conference case, okay.  All right.
20           MR. VOUDOURIS:  There's no question.  He
21   just asked you if you saw it.
22       A.  I see it, but can I explain to you?
23           MR. VOUDOURIS:  Hold on.  He just asked
24   you a question and you answered it.  Wait for the
25   question.

Page 92

1            THE WITNESS:  Okay.
2        Q.  (BY MR. THORNBURGH)  Do you see where it says
3    consensus conference case?
4        A.  I saw that.
5        Q.  Would that indicate to you that the mesh or
6    other explant tissue material that was removed from
7    Mrs. Corbet's body was looked at by multiple
8    pathologists during a consensus conference?
9            MR. VOUDOURIS:  Objection; form,
10   foundation.
11       A.  Here, consensus conference case usually
12   indicate part of the specimen as being reviewed in
13   the -- in this consensus meeting, okay?  Part of the
14   specimen.  All right.  It's not a very good way to
15   record in the very vague way, say consensus conference
16   case.
17           Typically, people will say which specimen
18   has been reviewed in that consensus meeting, and then
19   what kind of opinion or consensus opinion has been
20   reached?  That's a typical way of a more -- it's a
21   better way to describe, rather than just say consensus
22   conference case, okay.
23           Then, for this case, we have three
24   specimens, right, A, B, and C.  Only C is the mesh
25   specimen.  A and B -- between the B specimen -- in the B

Page 93

1    specimen, you have a urothelial papilloma, which is
2    considered as a small benign tumor, okay?  Then, for
3    some --
4        Q.  (BY MR. THORNBURGH)  That's -- strike that --
5    well, excuse me.  I don't mean to interrupt, but small
6    benign tumor, is that what you said, papilloma?
7        A.  Yes, uh-huh.
8        Q.  That's nothing serious, right?
9            MR. VOUDOURIS:  Objection.
10       Q.  (BY MR. THORNBURGH)  Nothing significant?
11           MR. VOUDOURIS:  Objection.
12       A.  Well, if it is true, it's nothing serious.
13   However, if for some inexperienced pathologist, or the
14   pathologist who does not have much experience about this
15   diagnosis, then they will show in the consensus meeting,
16   and then try to get confirmation of the diagnosis.
17   That's usually the case.  If you want to confirm whether
18   this is correct, then you can call the pathologist, what
19   does it mean, and they will explain to you in detail.
20       Q.  (BY MR. THORNBURGH)  Okay.  So let me ask you
21   this:  In a consensus conference case, does the
22   pathology -- final pathology report get issued before or
23   after the conference?
24           MR. VOUDOURIS:  Objection; form --
25       A.  Because pathology report --

Wenxin Zheng, M.D.

Page 94

1        MR. VOUDOURIS:  -- and foundation.
2        A.  Pathology report almost always released after
3    consensus meeting.
4        Q.  (BY MR. THORNBURGH)  So is it your
5    understanding, based on your review of the pathology
6    report, that this pathology report most likely was
7    submitted after the consensus conference took place?
8        MR. VOUDOURIS:  Objection; form,
9    foundation.
10       A.  Yes, this is usual case.
11       Q.  (BY MR. THORNBURGH)  And according to the
12   pathologist -- or the pathology report, which is marked
13   as Exhibit Number -- within -- contained within Exhibit
14   Number 6 and found on the -- the final diagnosis found
15   on 00009, "The consensus was skin and fibroadipose
16   tissue with mesh and associated foreign body giant cell
17   reaction and chronic inflammation" [as read]?
18       MR. VOUDOURIS:  Objection; form and
19   foundation.
20       A.  The consensus conference case in the last line
21   for this report does not specifically indicate this is
22   for specimen C, okay?  It is just only indicated this
23   case, all right, somehow has been just gone through the
24   consensus meeting.  That's my understanding.
25       It certainly does not indicate the mesh

Page 95

1    is -- just goes through the consensus meeting.  Because
2    I can guarantee, all right, in United States not -- I
3    can say majority of the pathologists is not going to
4    show the mesh around to say, okay, do you recognize this
5    as mesh material?  No.  There's no meaning for a
6    pathologist usually, right?  They just describe what
7    they --
8        MR. VOUDOURIS:  You've answered his
9    question.
10       Q.  (BY MR. THORNBURGH)  The -- the -- you would
11   agree with me that, in any event, number one, under the
12   eroded and vaginal -- eroded vaginal mesh, final
13   diagnosis, it says consensus conference case, right?
14       MR. VOUDOURIS:  Objection --
15       Q.  (BY MR. THORNBURGH)  That's what it says?
16       MR. VOUDOURIS:  Objection; form,
17   foundation.
18       Q.  (BY MR. THORNBURGH)  That's where it appears
19   on the pathology report, right?
20       A.  It -- it's on the pathology report, it's
21   obvious.
22       Q.  And the conclusion regarding the foreign body
23   and chronic -- and -- and inflammatory response
24   identified on this pathologist -- pathology report from
25   Mrs. Corbet's explant indicates that the mesh was

Page 96

1    associated with foreign body giant cell reaction and
2    chronic inflammation, right?
3        A.  Yes.  That's always the case.
4        Q.  It doesn't say mild, right?
5        MR. VOUDOURIS:  Objection.
6        A.  You can read.  It does not -- it's not there.
7    People -- if that's why --
8        MR. VOUDOURIS:  You've answered his
9    question.
10       Q.  (BY MR. THORNBURGH)  It doesn't say mild
11   inflammatory response, right?
12       A.  Based on this report.
13       MR. THORNBURGH:  I've got to take a bio
14   break.
15       THE VIDEOGRAPHER:  We're off record at
16   11:39 a.m.
17       (Break taken.)
18       THE VIDEOGRAPHER:  We're back on record at
19   12:43 p.m.
20       Q.  (BY MR. THORNBURGH)  Doctor, did you have a
21   good lunch?
22       A.  Yes.  Thank you.
23       Q.  Okay.  Good.
24       Doctor, I just want to circle back to a
25   couple of things that you testified to before we went on

Page 97

1    our lunch break.  One of the things you'd indicated --
2    I'm not going to go into great detail and re-ask these
3    questions, but one of the things you indicated was that
4    you were developing -- or wanted to develop a protocol
5    or to find a protocol in the publication that you're
6    planning to publish?
7        A.  Yes.
8        Q.  Okay.  And does that include a protocol for
9    grading your pathological findings?
10       MR. VOUDOURIS:  Objection.
11       Go ahead.
12       A.  I think we are planning to generalize those
13   guideline for all -- for majority of the surgical
14   pathologists to -- who is going to encounter or receive
15   these specimens, how to handle them, number one, grossly
16   and microscopically.
17       And microscopically, yes, we will
18   illustrate what are the most common findings they should
19   describe, such as -- include -- data will include
20   information -- amount of information or the degree of
21   information, that's true.
22       Q.  (BY MR. THORNBURGH)  And does part of that
23   protocol include grading the degree of, for example,
24   inflammation on some sort of scale?
25       A.  Yes.  We are going to put mild -- no

Wenxin Zheng, M.D.

Page 98

1  information will be 0, mild will be 1, moderate will be
2  2, then severe or marked will be 3. Those are typical
3  grading system being used in the general surgical
4  pathology practice.
5      Q. And within each one of those subgrades, do
6  you -- are you -- do you plan on providing some type of
7  guideline based on your -- or the morphological findings
8  under the slide, for example, if you see a certain
9  amount of neutrophils, you get a certain grade, or if
10  you see a certain amount of giant cells, you get a
11  certain grade for -- is that how it works?
12     A. Yes. I think this is -- will be very much
13  similar to Hill's paper I already described.
14     Q. Have you already created or drafted the
15  protocol?
16         MR. VOUDOURIS: Objection.
17     A. No.
18         MR. VOUDOURIS: Asked and answered.
19     Q. (BY MR. THORNBURGH) Did you -- did you -- so
20  you didn't use that type of grading system in your
21  evaluation of Mrs. Corbet's explant material, correct?
22         MR. VOUDOURIS: Objection.
23     A. In -- for Mrs. Corbet's case, I have described
24  based on my findings, yes. I used a grading system.
25     Q. (BY MR. THORNBURGH) Is the reason why you --

Page 99

1  you're developing this protocol, want to publish this
2  protocol, to provide objective criteria so that the
3  pathological findings are less subjective?
4      A. Correct.
5      Q. So the grading, for example, for inflammation
6  or the inflammatory response based -- based on the
7  number of inflammatory cells that are present in a
8  microscopic slide?
9          MR. VOUDOURIS: Objection.
10     A. Yes. Based on the number, then the -- the
11  extensiveness and the locations -- close -- the
12  relationship with the mesh fiber spaces.
13     Q. (BY MR. THORNBURGH) And how do you determine
14  the extensiveness of the inflammatory response? Is that
15  also based on the number of inflammatory cells present
16  in the slide?
17     A. Usually we will enter lower power, for
18  instance, 4X, and then we will see how many foci of
19  these inflammations will be localized within the slide.
20  That's so-called extensiveness.
21     Q. So you'll see the -- you'll use 4X, and that's
22  the magnification?
23     A. That's usually -- 4X, sometimes, yes. In a --
24  in a scanning situation, you use -- we use lower power.
25  Then, if -- when we want to confirm these are

Page 100

1  inflammatory cell or not inflammatory cell, then we will
2  turn on a high power to confirm.
3      Q. So at first, you start with a 4X power?
4      A. Typically.
5      Q. And you scan the entire specimen?
6      A. Correct.
7      Q. And -- and look for the morphological features
8  of the specimen?
9      A. Correct.
10     Q. Like the number of inflammatory cells?
11     A. Correct.
12     Q. Like the number of foreign body giant cells?
13     A. Correct.
14     Q. Or multinucleated giant cells?
15     A. Giant cells, that means multinuclear giant
16  cells.
17     Q. And the purpose of that is to create an
18  objective way to grade rather than a subjective
19  analysis?
20     A. Correct. And if in the long-term run, if many
21  such findings accumulate, then these data can be
22  analyzed together.
23     Q. And you -- I think you said that your -- the
24  criteria is essentially based on the guidelines
25  discussed in the Hill article, right?

Page 101

1          MR. VOUDOURIS: Objection.
2      A. It's not based on, because this is a
3  general -- in general practice, within the pathology,
4  people use these criteria to describe. That's so-called
5  semiquantitative method. It's not exact quantitative.
6  Semiquantitative method.
7      Q. (BY MR. THORNBURGH) And so I'm just trying to
8  understand. Are you saying that the authors -- that
9  the -- that the people that published -- the doctors
10  that published the Hill article called histopathology of
11  excised midurethral -- urethral sling mesh use a
12  semiquantitative method?
13         MR. VOUDOURIS: Objection.
14     A. Yes.
15     Q. (BY MR. THORNBURGH) And in your guidelines
16  that you want to publish, how would you define mild
17  inflammation?
18         MR. VOUDOURIS: Objection. Counselor, we
19  talked about his protocol this morning. We've already
20  discussed that your deposition today is Corbet fact
21  specific. You have gone far afield of that. I've given
22  you a leeway.
23         MR. THORNBURGH: I'm -- I'm not trying to.
24         MR. VOUDOURIS: But you have. And -- and
25  let's stop and let's move on, and let's ask about fact

Wenxin Zheng, M.D.

Page 102

1  specific Corbet topics.
2          MR. THORNBURGH: Well, I'm tying this all
3  into the fact specific. My -- my question is absolutely
4  related to Corbet.
5          MR. VOUDOURIS: How so?
6          MR. THORNBURGH: Because I want to know --
7  because you're going to find out, but I want to -- I
8  want to know --
9      Q. (BY MR. THORNBURGH) Let me ask you this
10 question: You didn't use -- is it fair to say that you
11 did not use the criteria that was identified -- or the
12 guidelines -- grading guidelines that were used in the
13 Hill article in your evaluation of Mrs. Corbet's
14 pathology slides?
15         MR. VOUDOURIS: Objection, compound.
16     A. Hill article published it this year, right?
17 And that's why I say the grading system -- or
18 semiquantitative grading system for the amount of
19 inflammation is generally accepted within the pathology
20 field. That's the criteria I'm using, and also many
21 other pathologists are using if they want to use -- to
22 grade the amount of inflammation.
23     Q. (BY MR. THORNBURGH) Okay. So is that the
24 criteria that you used in your evaluation of
25 Mrs. Corbet's pathology?

Page 103

1      A. Correct.
2          MR. THORNBURGH: That's why I'm trying --
3  that's why I'm asking these questions.
4      Q. (BY MR. THORNBURGH) And so how -- using that
5  criteria, how many inflammatory cells identified in
6  the -- a single mesh specimen would lead you to conclude
7  that the inflammatory response was mild?
8          MR. VOUDOURIS: Objection, again, that is
9  not case specific to Corbet.
10         MR. THORNBURGH: He said -- he said that
11 he used this in the Corbet case, so I'm trying to figure
12 it out. I don't know how that's not specific to Corbet.
13         THE WITNESS: Should I answer?
14         MR. VOUDOURIS: Go ahead.
15         THE WITNESS: That's not a big issue.
16     A. Mainly, as I said, this is -- first of all,
17 this is semiquantitative method, okay? The amount of
18 inflammation or the degree of inflammation is not based
19 on pure number of the inflammatory cells, all right?
20 That's so-called semiquantitative.
21         We see amount of in -- inflammation
22 surrounding certain area. If they sparse, only few,
23 small amount in the lower power, then confirm in the
24 higher power, then that's considered as a mild or even
25 minimal. Minimal, mild is basically the same, okay?

Page 104

1          If there is basically no easily
2  identifiable inflammatory cells, then we will classify
3  it as no information. And if we see clusters of these
4  inflammations relatively easily identifiable surrounding
5  the mesh fiber spaces, then we will say that's moderate,
6  all right, in addition to some of these giant cells.
7  Then, if we see huge amount of accumulation of
8  inflammatory cells, all right, in large amount of area,
9  then we say that's a severe or marked. That's so-called
10 a semiquantitative grading system.
11     Q. (BY MR. THORNBURGH) Okay. And so I'm just
12 trying to understand how you applied it to Mrs. Corbet's
13 case. When you say "sparse," what does that mean
14 specifically?
15     A. Shall I show you pictures I have?
16     Q. No. I'm just -- I'm just talking --
17     A. Right. Then within the picture, then you can
18 see much better. Otherwise, we are talking -- when I
19 describe I have picture in my mind, but you are not
20 pathologist, you don't understand what I'm talking, so
21 we are making circles. So the best thing is pointing
22 with a picture, I can show you what -- exactly what I
23 mean.
24     Q. We're about ready to go through -- we're going
25 to go through your entire report, case specific

Page 105

1  report --
2      A. Okay.
3      Q. -- here in a moment.
4          But is it fair to say that -- that -- that
5  an individual pathologist's definition of sparse -- or
6  observation of sparse inflammatory cells is still
7  subjective, or is there a -- is there -- are there
8  objective criteria that lead to a conclusion that the
9  inflammatory response -- inflammatory cells are sparse?
10         MR. VOUDOURIS: Objection.
11     A. There is variation, that's for sure. Because
12 a semiquantitative method, all microscopic observation,
13 there is certain degree of variation. That's for sure,
14 okay. But more or less, in general, people agree on.
15     Q. (BY MR. THORNBURGH) Are -- is there a
16 different method than semiquantitative?
17     A. There is no definitive method except some
18 people like to use, like, immunohistochemical stainings.
19 For instance, like a CD68 can identify the number of
20 inflammatory cells.
21         But still even though they use
22 immunohistochemical stainings, then overall is not going
23 to count the individual cells, how many cells, give you
24 a specific number. Still give you ballpark, roughly,
25 amount how much is mild or is moderate or severe.

Wenxin Zheng, M.D.

Page 106

1  That's the situation.
2  Q. I think I understand.
3  A. Right.
4  Q. The other thing I wanted to circle back around
5  on was, you said that you recently left your employment
6  with the University of Arizona?
7  A. Correct.
8  Q. What was the reason for leaving University of
9  Arizona?
10      MR. VOUDOURIS: Objection.
11      Go ahead.
12  A. UT Southwestern provides a better opportunity
13  for my academic practice.
14  Q. (BY MR. THORNBURGH) Okay. So you're -- when
15  did you leave University of Arizona?
16  A. That was July of this -- this year.
17  Q. Okay. And you accepted a position at UT
18  Southwestern in July of this year as well?
19  A. Yeah. That's the --
20  Q. That's why --
21  A. Right.
22  Q. And what position did you accept at UT
23  Southwestern? What's your current position there?
24  A. I'm a tenured full professor of pathology as
25  well as obstetrics and gynecology. And then also, I

Page 107

1  have endowed distinguished professorship in UT
2  Southwestern. Then I'm also the group leader as the
3  chief of the GYN pathology group. Within this group, I
4  have 10 pathologists involved.
5  Q. Now, in preparing to offer opinions in this
6  case, what were you asked -- case specific, what were
7  you asked to do -- what was -- strike that.
8      What did you do to come to your
9  opinions -- case specific opinions in Mrs. Corbet's
10  case? What did you review?
11  A. I reviewed the slides, reviewed the medical
12  records, reviewed some depositions from surgeons, and
13  then generated my idea -- or my opinion.
14  Q. Okay. So you reviewed the medical records,
15  you reviewed the pathology material, and you reviewed
16  depositions?
17  A. Right. And also including plaintiff's expert
18  report, because I have to address those specific points.
19  Q. And did you attempt to correlate the clinical
20  findings identified in the medical records to your
21  pathological findings?
22      MR. VOUDOURIS: Objection.
23      Go ahead.
24  A. I tried, but from histological point of view,
25  all the histological findings usually do not predict,

Page 108

1  you know, what exactly the clinical manifestation should
2  be -- or would be -- in this particular case.
3  Q. (BY MR. THORNBURGH) You said most of the
4  time. Are there -- is there any -- has there ever been
5  a time that you have correlated your histopathological
6  observations of an explanted mesh to the clinical
7  findings discussed in medical records?
8  A. Oh, yes.
9      MR. VOUDOURIS: Objection.
10  A. Yes. In the past, for instance, if I found
11  marked amount of inflammation, including pus formation
12  within the specimen, then that's correlated to the
13  clinical finding of infection. You know, those are
14  situation.
15  Q. (BY MR. THORNBURGH) Since your last
16  deposition -- I believe I read in one of your
17  depositions that you're receiving one or two explant
18  meshes per week for a period of time? I'm just trying
19  to understand. Has that changed since your last
20  deposition?
21  A. Still similar, when I was in Arizona.
22  Q. So when you were in Arizona up until the time
23  you left, you were receiving on a weekly basis one to
24  two mesh explants?
25      MR. VOUDOURIS: Objection.

Page 109

1  A. You mean -- you mean UT Southwestern or --
2  Q. (BY MR. THORNBURGH) Sorry. So -- you left
3  Arizona in 2000 --
4  A. Yes.
5  Q. -- July of 2015?
6  A. Right.
7  Q. I think your last deposition was in --
8      MR. VOUDOURIS: April.
9  Q. (BY MR. THORNBURGH) -- 2000 -- April 2014.
10  So was it consistent during that time period that you
11  would continue to receive one to two explants --
12  A. Yeah.
13  Q. -- explant -- mesh explants per week?
14  A. Correct.
15  Q. And since April of 2014, have you received TVT
16  mesh explants at your facility?
17  A. I can't be sure, because typically, in the
18  pathology requisition sheet, they do not specify this is
19  TVT versus any other types of sling. But they do
20  indicate this is a mesh -- vaginal mesh specimen.
21  Q. Are there any -- have you -- in your
22  experience, have you identified any morphological
23  features of a mesh that could allow you to assume or
24  conclude that the mesh explant was a TVT?
25      MR. VOUDOURIS: Objection. This line of

Wenxin Zheng, M.D.

---

Page 110

1 questioning --
2          MR. THORNBURGH: I -- I -- yeah.
3          MR. VOUDOURIS: -- was already asked in
4 his prior deposition.
5          MR. THORNBURGH: Okay. I -- I'm just
6 trying --
7     Q.  (BY MR. THORNBURGH) I mean, for the -- for
8 the --
9          MR. VOUDOURIS: It already has.
10    Q.  (BY MR. THORNBURGH) For the mesh that you've
11 looked at in the last year that you've received on a
12 weekly basis, did any of those contain blue fibers?
13    A.  Oh, yeah. We -- many of such specimens have
14 blue plastic piece.
15    Q.  By "blue plastic piece," you mean the blue
16 fiber?
17    A.  Blue mesh filament.
18    Q.  Since April of 2014, how many mesh explants
19 have you received that have blue mesh filaments?
20    A.  I don't know the answer because I didn't
21 calculate.
22    Q.  Majority?
23          MR. VOUDOURIS: Objection.
24    A.  As I said, probably it's not a good idea to
25 give you just estimation since I do not really count --

---

Page 111

1 you know, calculate how many exactly we have for those
2 specimen contains blue mesh.
3     Q.  (BY MR. THORNBURGH) And based on your
4 review -- so let's talk about the medical --
5 Mrs. Corbet's medical records --
6     A.  Sure.
7     Q.  -- a little bit --
8     A.  Sure.
9     Q.  -- her medical history. Based on your review
10 of Ms. Corbet's medical records, did you come to
11 understand that she had a TVT mesh implanted in 2011 to
12 treat stress urinary incontinence?
13    A.  Yes.
14    Q.  And did you -- also based on your review of
15 her medical records, did you -- did you know -- did you
16 come to understand that she had the TVT mesh explanted?
17    A.  A year later. And before -- in the surgery,
18 she also -- because she had prolapse, like cystocele and
19 rectocele, and the prolapse repair surgery was done too
20 at the same time.
21    Q.  Yeah. So that was -- so during her implant
22 procedure, she had a anterior colporrhaphy and a
23 posterior colporrhaphy, right?
24    A.  Posterior colporrhapy, right, uh-huh.
25 Correct.

---

Page 112

1     Q.  And in 2013, she had a mesh -- her mesh was
2 explanted, correct?
3     A.  Correct.
4     Q.  And what was your understanding based on your
5 review of the medical records and your reading of
6 Dr. Smith's deposition, who explanted the mesh, what
7 was -- what were -- what were the reasons why -- or the
8 reasons for Mrs. Corbet undergoing the mesh explant?
9          MR. VOUDOURIS: Objection; compound.
10    Q.  (BY MR. THORNBURGH) I'll ask a better
11 question.
12          Based on your review of the medical
13 records and Dr. Smith's testimony, what is your
14 understanding for the reason for Mrs. Corbet having her
15 TVT mesh explanted?
16    A.  Because Dr. Smith found an area of mesh
17 exposure.
18    Q.  You did read the medical records and you did
19 read Dr. Smith's testimony, right?
20    A.  Right.
21    Q.  She -- she testified there was more than that
22 reason for the removal of the mesh ex -- of the TVT
23 mesh, correct?
24    A.  I think this is the main reason because
25 exposure. Then patient also complained of pain. And

---

Page 113

1 then, you know, that was -- the common reason, if any
2 doctor finding mesh exposure, this could be the
3 indication to remove.
4          Because if you leave exposed the mesh in
5 the body, then that will cause more, like, complications
6 such as infection. Because vagina is environment
7 exposed to outside and is -- is not, like, aseptic
8 condition. So, basically, has a more chance to expose
9 to bacteria as a contact. So that's the reason.
10    Q.  Do you under -- I'm going to just see if I
11 understand. Was it your understanding from reading the
12 medical records and -- and Dr. Smith's testimony that
13 the mesh was explanted as a result of both the mesh
14 exposure and the -- her pain that she was experiencing?
15    A.  I think that's the reason Dr. Smith explanted
16 the part of the mesh.
17    Q.  And did Dr. Smith also testify that another
18 reason she explanted the mesh was because of the voiding
19 dysfunction that Mrs. Corbet was experiencing after the
20 mesh implant?
21    A.  I was not aware of this.
22    Q.  Based on your review of the medical records,
23 did you come to understand that after Mrs. Corbet was
24 implanted with the TVT device, at some point in time
25 after the implant, she experienced void -- voiding

---

Wenxin Zheng, M.D.

Page 114

1 dysfunction?
2    A.  I think so, yes.  Probably was true, but I did
3 not pay that attention.
4    Q.  Did you come to understand that after the mesh
5 was implanted that Mrs. Way [sic] began to experience
6 overactive bladder?
7    A.  Yes.  That's in the medical record, Dr. Smith
8 did mention that.  I -- that one, I remember that.
9    Q.  Is it your understanding that overactive
10 bladder and urge incontinence is the same thing?
11        MR. VOUDOURIS:  Objection.
12    A.  Not in my specialty.  Overreaction probably
13 somehow has some kind of urgency, more frequency for --
14 for voiding issue.
15    Q.  (BY MR. THORNBURGH)  You said overreaction?
16    A.  Overreactive bladder syndrome, basically,
17 right, you are talking about?
18    Q.  No, not overreaction.  I want to talk about
19 overactive bladder disorder.
20        MR. VOUDOURIS:  Objection.
21    A.  Overreactive bladder is a clinical term.  I'm
22 not -- usually belong to urology, okay?  It's not belong
23 to obstetrics and gynecology, so I'm not expert for that
24 part.
25    Q.  (BY MR. THORNBURGH)  My only question is:

Page 115

1 When you reviewed the medical records of -- of
2 Mrs. Corbet, did you see from your review of those
3 records that after the TVT device was implanted, that
4 Mrs. Corbet was diagnosed with overactive bladder
5 disorder?
6        MR. VOUDOURIS:  Objection.
7    A.  I noticed that this has been stated in the
8 report.
9    Q.  (BY MR. THORNBURGH)  You don't have an opinion
10 one way or the other, I assume, that whether or not the
11 mesh caused overactive bladder?
12        MR. VOUDOURIS:  Objection.
13    A.  I don't have any opinion about this because
14 that's outside of my expertise.
15    Q.  (BY MR. THORNBURGH)  So is it fair to say that
16 you're not going to come and testify at trial and offer
17 an opinion that Mrs. Corbet's overactive bladder
18 dysfunction was or wasn't caused by the mesh?
19        MR. VOUDOURIS:  Objection; asked and
20 answered.
21    A.  I think that's -- that -- yes, I'm not going
22 to provide my opinion related -- regarding the
23 relationship between the mesh implantation and bladder
24 overreaction.
25    Q.  (BY MR. THORNBURGH)  And just for purposes of

Page 116

1 the jury and the ladies and gentlemen -- and the court,
2 you did not perform a pelvic examination of Mrs. Corbet,
3 correct?
4    A.  Correct.
5    Q.  Is it fair to say that you would defer to
6 physicians who have performed a pelvic examination
7 concerning their differential diagnosis of Mrs. Corbet?
8        MR. VOUDOURIS:  Objection.
9    A.  That's not my -- my expert field, because I'm
10 a pathologist.  I provided pathological finding, you
11 know, opinion regarding what I have observed under the
12 microscope.
13    Q.  (BY MR. THORNBURGH)  So it is fair to say
14 that -- let me strike that.
15        You saw in Dr. Smith's testimony she
16 testified that the cause of Mrs. Corbet's erosion and
17 dyspareunia was the mesh.  You saw that, right?
18        MR. VOUDOURIS:  Objection.
19    A.  I didn't see that.
20    Q.  (BY MR. THORNBURGH)  You didn't -- did you
21 read the depo transcript -- the deposition transcript of
22 Dr. Smith?
23    A.  I -- I read the depo, but I did not see that
24 kind of sentence saying Dr. Smith says dyspareunia is
25 caused by mesh.  However --

Page 117

1        MR. VOUDOURIS:  Hold on.  You answered his
2 question.
3    Q.  (BY MR. THORNBURGH)  Dr. Smith is the medical
4 doctor who is actually treating Mrs. Corbet's medical
5 condition after mesh implantation, correct?
6    A.  Yes.
7    Q.  And you -- you are not going to criticize
8 Dr. Smith's observations of Mrs. Corbet during her care
9 and treatment of the plaintiff, correct?
10    A.  There is no reason for me to criticize the
11 commission's finding or description.
12        And -- but I think I want to clarify two
13 things.  One is if somebody or a patient who has mesh
14 exposure, then exposed mesh may cause pain.  That's
15 reasonable.  But if this -- any patient if complains of
16 pain and then when they receive mesh implantation,
17 there's no such relationship.  Says anyone
18 receive the -- because of the patient receiving -- or
19 received mesh implantation, then she also complains of
20 pain, then the pain is caused by mesh.  That's two
21 different issues.  You understand what I'm talking?
22        So my understanding at the beginning, you
23 were asking me if Dr. Smith made a statement, says
24 Mrs. Corbet, the pain complain is caused by mesh.
25 That's why I -- I say I did not see that.  But if you

Wenxin Zheng, M.D.

Page 118

1 are saying -- if -- but I do remember Dr. Smith already
2 stated she -- clinically she found mesh exposed area --
3 or mesh exposure -- in the focal area of the vagina.
4 That's the statement.
5     Q.  Do you -- and then do you recall that she also
6 testified that the mesh exposure caused Mrs. Corbet's
7 dyspareunia or painful intercourse?
8         MR. VOUDOURIS:  Objection.
9     A.  I don't remember says this is the exact cause,
10 the only cause for -- for her pain.  But based on my
11 understanding, yes, anything exposed, mesh, may be
12 related to the pain, or it's uncomfortable feeling.
13 That's a common sense.
14     Q.  (BY MR. THORNBURGH)  You -- and you're not
15 going to come in and testify that Mrs. Way's [sic]
16 dyspareunia wasn't caused from the mesh exposure; is
17 that right?
18         MR. VOUDOURIS:  Hold on.  Objection.  I
19 think you keep saying Mrs. Way's.
20         MR. THORNBURGH:  I'm sorry, Mrs. Corbet.
21 I have a trial...
22     Q.  (BY MR. THORNBURGH)  For Mrs. Corbet, when you
23 come and testify at trial, is it fair to say that you're
24 not going to testify or offer opinions that her
25 dyspareunia was not caused from her mesh exposure?

Page 119

1         MR. VOUDOURIS:  Objection; form.
2     A.  I think I'm going to provide my opinion based
3 on the pathological findings I have found.  Then there
4 is no histological evidence for me to say, all right,
5 this is the -- her dyspareunia complaining is caused by
6 the histological finding I have observed.  Is that
7 clear?
8     Q.  (BY MR. THORNBURGH)  So let me just make sure
9 I understand your opinions.  If Dr. Smith, Mrs. Corbet's
10 treating physician, testified that the mesh exposure was
11 causing Mrs. Corbet's painful intercourse, are you going
12 to suggest or opine at the -- at the trial that
13 Dr. Smith was wrong?
14     A.  That's totally different question.
15 Dr. Smith's finding is a clinical finding.  And my
16 finding is a pathological finding.  So my opinion will
17 be based on the pathological finding, and I -- I'm not
18 in the position to comment Dr. Smith's finding or
19 statement is wrong or is correct.
20     Q.  Did you find path -- did your -- strike that.
21         In your pathological evaluation of
22 Mrs. Corbet's explant, did you identify evidence of mesh
23 erosion?
24     A.  I tried very hard, but I don't see a good
25 evidence of mesh exposure or erosive site.

Page 120

1     Q.  And what would a mesh erosion or exposure look
2 like microscopically?  What would -- what would be the
3 features?
4     A.  Classic feature for exposure or erosion is
5 squamous mucosa on the top but disrupted, number one.
6 Then just right underneath of this disruption area, we
7 will see the mesh fiber just immediately underneath or
8 just exposed in the disrupted area.  Then -- and then
9 usual -- typically, this area will be associated with
10 more intense inflammation.  That's the histological
11 finding for mesh exposure or erosion.
12     Q.  Similar question:  What would be the
13 pathological features of a mesh that was contributing to
14 pain?
15         MR. VOUDOURIS:  Objection.  All of these
16 areas of questioning were asked during his prior
17 deposition, so, again, we're plowing the same field
18 again.
19         MR. THORNBURGH:  Well, I'm just trying to
20 find out if any of those -- you know.
21         MR. VOUDOURIS:  Dan, with all due
22 respect --
23         MR. THORNBURGH:  I -- I -- I'm not
24 trying -- I'm not trying to plow the same field, so I'm
25 not -- that's not --

Page 121

1         MR. VOUDOURIS:  That field has been
2 plowed.
3         MR. THORNBURGH:  All right, let's do this.
4         (Exhibit Number 7 was marked.)
5     Q.  (BY MR. THORNBURGH)  I'll mark as Exhibit
6 Number 7 the medical records from North Dover OB/GYN
7 Associates.  Did you review the records from North Dover
8 OB/GYN Associates in preparation for your expert report?
9     A.  I briefly went through that, because there's
10 not really many pathological related things here.  Yes.
11     Q.  If you'll turn to -- in Exhibit Number 7, if
12 you'll turn to Bates number ending in -23.
13     A.  Yes.
14     Q.  And you see this record is electronically
15 signed -- turn the page to 24.
16     A.  This one [indicating], right?
17     Q.  Yes.  If you'll turn the page, you'll see that
18 it was electronically signed by Dr. Russell Harrell?
19     A.  Uh-huh, yes.
20     Q.  And you understand that Dr. Russell Harrell --
21     A.  Who was the surgeon implanted the mesh.
22     Q.  Okay.  And so based on this record, what were
23 the clinical symptoms that Mrs. Corbet was experiencing
24 at the time that she saw Dr. Harrell on March 23, 2011?
25     A.  She had grade 1 cystocele, grade 2 rectocele

Wenxin Zheng, M.D.

Page 122

1 we mentioned previously.
2     Q.  Okay.  And if you look to the social
3 history --
4     A.  Social history?
5     Q.  Yeah.  Do you see that there on Bates number
6 -23?
7     A.  Alcohol use, drinks occasionally; and tobacco
8 use, denies; then recreational drugs, denies; then diet,
9 balanced diet; lifestyle, active lifestyle.
10     Q.  Okay.  So based on this record, which is --
11 which was recorded prior to her implant procedure, would
12 you agree that -- that Ms. Corbet was not a smoker?
13     A.  Looks like it.
14         MR. VOUDOURIS:  According to the record.
15     A.  According to the record.
16     Q.  (BY MR. THORNBURGH)  Not a smoker?
17     A.  Yeah.  According to the record, yeah.
18     Q.  Did you see any evidence in any of the medical
19 records that she was a smoker?
20     A.  No.
21     Q.  Okay.  And she only occasionally drank
22 alcohol, right?
23     A.  Based on the record.
24     Q.  And so smoking was not a risk factor for
25 Mrs. Corbet with respect to erosion, based on your

Page 123

1 review of the medical records, correct?
2         MR. VOUDOURIS:  Objection.
3     A.  You are talking about individual patient, then
4 try to generalize the conclusion.  So I think it's
5 irrelevant.
6     Q.  (BY MR. THORNBURGH)  Well, you've offered
7 opinions that some of the risk factors that lead to
8 mesh-related complications would be things like diabetes
9 and smoking, right?
10     A.  Yes.  Based on literature, it says in that
11 way, that's true.
12     Q.  So my only question is, because Mrs. Corbet
13 was not a smoker, that wasn't a risk factor for a
14 mesh-related complication, right?
15     A.  But if she has other risk factors, it's --
16 that's why it's individually based.  It's not because
17 she has -- she's not smoker, then she has no risk
18 factor.
19     Q.  We're going to talk about all those, but in
20 your report, you'd indicated there were certain risk
21 factors that individual patients had, and you indicated
22 that smoking was a risk factor, diabetes was a risk
23 factor, and obesity --
24     A.  Correct.
25     Q.  -- were risk factors for mesh-related

Page 124

1 complications, right?
2     A.  Correct.
3     Q.  And Mrs. Corbet was not a smoker, didn't have
4 diabetes, and wasn't obese, correct?
5         MR. VOUDOURIS:  Objection.
6     A.  What else I mention in the risk factor
7 category?
8     Q.  (BY MR. THORNBURGH)  Well, what are the other
9 risk factors?
10     A.  Right.  So you -- I think you are
11 intentionally ignore.  And, also, I said lower estrogen
12 level, okay?  Lower estrogen level.  Lower estrogen
13 level actually is the main factor.
14     Q.  So what's the basis for your opinion that
15 because, number one, that Mrs. Corbet had a lower
16 estrogen level?
17     A.  She's a postmenopausal, right, 61 years old.
18     Q.  So postmenopausal, 61 years old?
19     A.  Right.
20     Q.  Any other basis?
21     A.  That's classical situation for a lower
22 estrogen level.
23     Q.  And so what -- are you referring -- is there
24 some publication that says that if you have lower
25 estrogen levels, you're at risk of suffering some

Page 125

1 mesh-related complication?
2     A.  Because lower estrogen level -- women with
3 lower estrogen level are postmenopausal situation.  The
4 vagina tend to become atrophic; therefore, atrophic
5 one -- vaginas will have a thinner mucosa lining.  And
6 the thinner mucosa linings has a tendency to have injury
7 or dyspareunia, or even if you have an implantation of
8 the mesh, then it's -- it's being considered as a risk
9 for mesh exposure.
10     Q.  If you look at page -- the report that starts
11 on page 23, is there any indication in this report at
12 this time that Mrs. Corbet had vaginal atrophy?
13     A.  It's not stated.
14     Q.  Based on your review of the medical records,
15 when was Mrs. Corbet first diagnosed or -- or observed
16 to have vaginal atrophy?
17     A.  Vaginal atrophy diagnosis usually is not being
18 provided, okay, because this is a common situation in
19 postmenopausal women.
20     Q.  What level of vaginal atrophy places a patient
21 with a mesh device at risk of developing a mesh-related
22 complication?
23         MR. VOUDOURIS:  Objection.
24     A.  I'm not able to -- to provide accurate number
25 of, you know, what the level -- what the percentage of

Wenxin Zheng, M.D.

Page 126

1  the risk the lower estrogen may contribute, but overall,
2  this is accepted concept in the field.  Postmenopausal
3  woman has a tendency to complain this, okay?
4      Q.  (BY MR. THORNBURGH)  And you -- do you
5  understand from looking at the medical records that
6  Mrs. Corbet was taking hormone replacement therapy?
7      A.  I was not aware how long she was taking the
8  hormone replacement, number one.
9          Number two, I also notice that there's a
10  pathology report from -- I think from the report that we
11  just discussed before lunch.  In the microscopic
12  discussion description, it says there is fibrosis in the
13  vaginal mucosa they trimmed, okay?  So that is the part
14  of the evidence -- pathological evidence to support
15  the -- the vagina has at least certain degree of
16  atrophy.
17      Q.  Fine.  So it's your --
18      A.  Fibrosis.
19      Q.  It's your testimony that based on one of
20  Mrs. Corbet's -- in fact, the explant pathology report
21  from the procedure that removed the TVT, the finding of
22  fibrosis in the vaginal mucosa was evidence of atrophy?
23          MR. VOUDOURIS:  Objection to form.
24      A.  No.  No.
25      Q.  (BY MR. THORNBURGH)  I thought -- I'm just

Page 127

1  trying to understand.
2      A.  Yeah.
3      Q.  I thought your testimony was, the finding --
4  the pathological finding of fibrosis in the lining --
5      A.  She has two specimens.  Okay.  One specimen is
6  the -- trim the vaginal mucosa, which does not contain
7  any mesh, okay?  Because the surgeon, Dr. Harrell, was
8  doing prolapse repair.  I don't know if you are -- if
9  you noticed that.
10          MR. VOUDOURIS:  Page -51 of your exhibit,
11  that's what he's referring to.
12      A.  And then within that pathology report in the
13  microscopic description after the diagnosis, it says
14  vaginal mucosa shows fibrosis.  This is different from
15  the explanted mesh.
16      Q.  (BY MR. THORNBURGH)  Okay.  So if we turn to
17  page -51, and that's the pathology report that was done
18  or performed after the implant procedure at -- on
19  specimen removed during the implant procedure?
20      A.  That's during the implantation.
21      Q.  Okay.  What's the lamina propria?
22      A.  Lamina propria means underneath the squamous
23  mucosa.  That's the connective tissue layer.
24      Q.  And where was this tissue removed from?
25      A.  That's from the vagina.

Page 128

1      Q.  What part of the vagina?
2      A.  I think you -- if you want to know exact --
3      Q.  Go to page -- go to page -49.  We'll look at
4  the implant operative report.
5      A.  Yeah.
6      Q.  Okay.  You see that this is -- the date of the
7  surgery was July 14th, 2011?
8      A.  Right.  The same date for the implantation.
9      Q.  Okay.  And the procedure was an anterior and
10  posterior repair of -- colporrhaphy?
11      A.  Right.
12      Q.  And for the benefit of the jury and the court,
13  what is a colporrhaphy?
14      A.  It's a repair of the prolapse, basically.
15      Q.  Using what?
16      A.  Using -- I'm not -- because I'm not a surgeon,
17  okay?  I don't know what kind of material they use or
18  they -- what kind of method to use.  Mainly -- the main
19  purpose for this kind of surgical procedure is to
20  correct the prolapsed organ, therefore to improve the
21  symptoms the patient experienced.
22      Q.  Okay.  And you see that the reason for the
23  anterior repair was a grade 1 cystocele?
24      A.  Yes.
25      Q.  And the reason for the posterior repair was a

Page 129

1  grade 2 rectocele?
2      A.  Right.
3      Q.  Okay.  And if you look at this -- and also
4  during this procedure is when the TVT was implanted,
5  right?
6      A.  Yes.
7      Q.  And do you have an understanding of where the
8  TVT device would have been implanted in Ms. Corbet?
9      A.  Just --
10          MR. VOUDOURIS:  Objection.
11          Go ahead.
12      A.  Just underneath the urethra area and within
13  the vagina.
14      Q.  (BY MR. THORNBURGH)  A different location than
15  where the grade 1 cystocele and grade 2 rectocele were
16  identified?
17      A.  That means one is anterior for -- for
18  cystocele, that means the bladder prolapsed into the
19  vagina or bulging into vagina.  Then rectocele is the
20  rectum bulging to the vagina.
21      Q.  Well, you would agree that the surgery that
22  occurred to repair the grade 1 cystocele would have been
23  in a different -- different anatomical location than
24  where the TVT mesh was implanted?
25          MR. VOUDOURIS:  Objection; form.

Wenxin Zheng, M.D.

Page 130

1    A.  I disagree, because the overall, this is all
2  vagina.  It's considered an -- organ is -- within the
3  vagina.
4    Q.  (BY MR. THORNBURGH)  Do you --
5    A.  So therefore, it's the same location.  But
6  within the vagina, you have different location, that
7  will be fine.
8    Q.  Well, do you have an understanding that a
9  rectocele or a cystocele can cause inflammation?
10       MR. VOUDOURIS:  Objection; form,
11  foundation.
12    A.  Rectocele and cystocele depends on the degree.
13  If they prolapse outside the vagina exposed to her
14  pants, rubbing on her pant all the time, yes,
15  inflammation will occur.  That's very common.
16    Q.  (BY MR. THORNBURGH)  Okay.  So you agree that
17  a anterior -- or a rectocele can cause inflammation?
18       MR. VOUDOURIS:  Object to form.
19    A.  Anterior is cystocele.  Posterior is
20  rectocele, first of all.
21    Q.  (BY MR. THORNBURGH)  Right, right.
22    A.  Yeah.  If they have certain degree, reach to a
23  certain degree of severeness, then inflammation may
24  occur.
25    Q.  What degree or grade of a rectocele can cause

Page 131

1  inflammation?
2       MR. VOUDOURIS:  Objection; form and
3  foundation, beyond the scope.
4    A.  And, again, I -- I'm not a surgeon, number
5  one.  And I do not perform these surgeries.  And what
6  I -- my expertise is within the pathology field.  So I
7  think these questions are best answered by the surgeon.
8    Q.  (BY MR. THORNBURGH)  So is it fair to say that
9  regarding the -- is it -- so is it fair to say that you
10  can't reach an opinion to a reasonable degree of medical
11  certainty or probability whether or not the cystocele or
12  the rectocele caused inflammation which was identified
13  and found on the pathology report from that -- from the
14  implant procedure?
15       MR. VOUDOURIS:  Object to form.
16    A.  I think that's irrelevant question for that.
17  Because what I mentioned from the pathology report, they
18  trimmed redundant vaginal tissue submitted to the
19  pathology, right?  And then within these redundant
20  vagina tissue, they have found -- they have found the
21  fibrosis within the vaginal wall or lamina propria.
22       Therefore, from those descriptions,
23  although I did not review the slides yet, we don't have
24  a question, but I -- we do not have these slides.  But
25  based on that pathology report, I can say she has

Page 132

1  certain degree of vaginal atrophy.  That's very
2  reasonable.
3    Q.  (BY MR. THORNBURGH)  Let's look at the implant
4  operative report.  Do you see it says -- in this report,
5  it says, "A linear incision was made at the apex into
6  the cystocele with a knife and Metzenbaum scissors were
7  used to develop the cystocele with blunt and sharp
8  dissection" [as read].
9       Did I read that accurately?
10    A.  Yeah.
11    Q.  And then it goes on to say that a suture was
12  placed around the cystocele.  Do you see that?
13    A.  Yes.
14    Q.  "And then it was tied down and the cystocele
15  reduced" [as read].
16       Did I read that correctly?
17    A.  Yes.
18    Q.  And then it says, "Excess vaginal mucosa was
19  excised" [as read]?
20    A.  Correct.
21    Q.  All right.  And is it your understanding based
22  on reviewing this report and based on your knowledge,
23  training, and experience, that the excess vaginal mucosa
24  was removed at the location of where the cystocele was
25  located?

Page 133

1    A.  Correct.  It's part of vagina.
2    Q.  Okay.  And you don't know one way or the other
3  whether or not the cystocele can cause inflammation?
4       MR. VOUDOURIS:  Objection; form and
5  foundation.
6    A.  That's what I already say.  The cystocele,
7  if -- to a certain degree if they're protruding out --
8  outside of the vagina, sure, more or less will be
9  related to the inflammation.  That's common knowledge.
10    Q.  (BY MR. THORNBURGH)  Okay.  And then if you go
11  to the next sentence, it says that they basically
12  reapproximated the -- the anterior compartment with a
13  running suture, right?
14       MR. VOUDOURIS:  Objection.
15    A.  Yeah.
16    Q.  (BY MR. THORNBURGH)  And basically, that means
17  just closing the location where there was an incision?
18    A.  Correct.
19    Q.  It says -- goes on to say, "Approximately
20  two-centimeter distal urethra" [as read].
21       Do you see that?
22    A.  Yes.
23    Q.  What -- what that does mean, approximately
24  two-centimeter distal urethra?
25       MR. VOUDOURIS:  Objection; form.

Wenxin Zheng, M.D.

Page 134

1    A.  Urethra is the opening close to the clitoris
2  area in the vagina.
3    Q.  (BY MR. THORNBURGH)  Okay.  So that's going to
4  be a different location than where the excess vaginal
5  mucosa was excised, right?
6    A.  That's correct.
7    Q.  It says, "At the distal urethra location,
8  there was an incision made and the suburethra" [as
9  read] -- strike that.
10        It says that, "At the urethra meatus an
11  incision was made suburethrally approximately two
12  centimeters in length.  Dissection was taken out
13  laterally.  Injection was placed in the retropubic space
14  both transabdominally and transvaginally" [as read].
15        Do you see that?
16    A.  Yes.
17    Q.  And do you have an understanding that the
18  retropubic space is the location where the TVT device
19  would have been placed?
20    A.  Yes.  That's the right place.
21    Q.  And it goes on and describes the rest of the
22  TVT procedure, right?
23    A.  Yeah.
24        MR. VOUDOURIS:  Objection.
25    Q.  (BY MR. THORNBURGH)  Including, you know,

Page 135

1  following the manufacturer's guidelines, right --
2    A.  Yes.
3    Q.  -- to perform the procedure?
4        And then the similar procedure was
5  performed on the other side --
6    A.  Correct.
7    Q.  -- right?
8        All right.  And then it goes on to say,
9  "There was no" -- I'm sorry.  It goes on to say --
10  regarding the posterior repair, if you turn the page to
11  -50.
12        Actually, before we get to the posterior
13  repair, it says that when the procedure was finished,
14  that Dr. Harrell made sure there was good placement of
15  the tape, not too loose, not too tight.  Are you going
16  to offer any opinions regarding whether or not
17  Dr. Harrell, based on your pathological findings, had
18  implanted the TVT device with too much tension?
19        MR. VOUDOURIS:  Objection.
20    A.  I'm not in the position to provide such
21  comments or opinion.
22    Q.  (BY MR. THORNBURGH)  And there's -- and would
23  you agree with me there were no pathological specimens
24  that you could look at that would indicate that
25  Dr. Harrell put the TVT device in with too much tension?

Page 136

1    A.  That's not related to the pathologist
2  specimen.
3    Q.  Okay.  Then going down a couple lines, it
4  talks about the repair of the rectocele.  It says, "A
5  rectocele was developed in the suture was placed around
6  it" [as read].
7        Do you see that?
8    A.  Yes.
9    Q.  It goes on to say it was tied down and
10  reduced, meaning they -- they repaired the rectocele --
11    A.  Posterior part.
12    Q.  -- posterior?
13        And it says, "Excess vaginal mucosa was
14  excised and reapproximated with a running lock of three
15  vicryl" [as read].
16        Do you see that?
17    A.  Yes.
18    Q.  Okay.  Do you understand -- have an
19  understanding that that procedure would have been in the
20  posterior?
21    A.  That's -- that's for the posterior repair.
22    Q.  At the location of the cystocele -- I'm sorry,
23  at the location of the rectocele?
24    A.  At the location of the rectocele.
25    Q.  Okay.  And if we turn the page to the

Page 137

1  pathology report dated July 14th, 2011, it says under --
2  do you see the vaginal -- or final diagnosis, and it
3  says, "Vaginal tissue with mild chronic inflammation of
4  lamina propria" [as read]?
5    A.  Yes.
6    Q.  Okay.  And it's your understanding that was
7  the location of the -- of the tissue that was -- strike
8  that.
9        The tissue that was sent for pathology was
10  tissue that was removed at the site of the rectocele and
11  cystocele repairs?
12    A.  Correct.
13    Q.  And then you had offered an opinion that
14  because -- it says the lamina propria displays fibrosis
15  and a mild chronic inflammatory infiltrate, that -- that
16  you believe that's evidence of an atrophic vagina?
17    A.  Fibrosis is not a normal finding for a normal
18  vagina in reproductive age woman.
19        MR. THORNBURGH:  That wasn't my question,
20  so I move to strike.
21    A.  That's why -- but I want you to understand,
22  because you're not in this field, right?  And in a
23  reproductive age woman's vagina, they have a good
24  elasticity, because normal level of estrogen will
25  support the normal vaginal function.

Wenxin Zheng, M.D.

Page 138

1 Then in the lower estrogen levels, then
2 vagina becomes atrophic, it changes, even in the certain
3 degree of estrogen replacement or hormone replacement.
4 Then that will be depending on the time of replacement,
5 the length of replacement, the dose of replacement.
6 So then if the atrophy already being
7 induced, then it is difficult to completely recover or
8 back to the normal situation. Just like in
9 postmenopausal woman, you want to go back to 30 years
10 old reproductive age, it's unlikely.
11 Q. (BY MR. THORNBURGH) So is it your opinion
12 that based on this pathological finding, that
13 Mrs. Corbet had some degree of vaginal atrophy?
14 A. Correct.
15 Q. Do you know what degree of vaginal atrophy is
16 described here?
17 A. I can't give what the degree or how much
18 degree of atrophy had. But the -- yes, based on this
19 fibrosis finding, it should be -- if the finding is
20 true, then vaginal atrophy is there.
21 Q. And are there medications that can be taken to
22 treat vaginal atrophy?
23 MR. VOUDOURIS: Objection.
24 Q. (BY MR. THORNBURGH) Let me ask a question:
25 Did Mrs. -- a different question, I'll withdraw the last

Page 139

1 one.
2 Did Mrs. Corbet -- was Mrs. -- strike
3 that.
4 Was Mrs. Corbet prescribed medications
5 to -- that typically treat vaginal atrophy?
6 MR. VOUDOURIS: Objection; form and
7 foundation, beyond the scope.
8 A. It is beyond scope. Do you want me to answer
9 my --
10 Q. (BY MR. THORNBURGH) Was -- was -- was
11 Mrs. Way -- I'm sorry, strike that.
12 Was Mrs. Corbet prescribed medication that
13 is used to treat low levels of estrogen for vaginal
14 atrophy?
15 MR. VOUDOURIS: Same objection.
16 A. I'm not aware -- when I read the things, I do
17 not pay attention if she has received hormone
18 replacement, okay? That's number one.
19 But, in general, any postmenopausal woman,
20 if already to certain years, then certain physiological
21 changes cannot be completely restored if hormone
22 replacement is provided, okay? But hormone replacement
23 does improve the symptoms, okay? Or change -- make the
24 patient feel better, that's true. That's why the
25 clinical indication many postmenopausal, if they have

Page 140

1 atrophic-related changes, yes. If there's no other
2 contraindication for hormone replacement, then hormone
3 replacement will be offered.
4 MR. SNOWDEN: He needs to change the tape.
5 MR. THORNBURGH: Okay. Go ahead.
6 THE VIDEOGRAPHER: We're off record at
7 1:54 p.m., end of Tape 2.
8 (Break taken.)
9 THE VIDEOGRAPHER: We're back on record at
10 2:05 p.m., beginning Tape 3.
11 Q. (BY MR. THORNBURGH) Doctor, before we went
12 off the record, I'd asked you a question about risk
13 factors that Mrs. Way --
14 A. Corbet.
15 Q. -- had regarding -- sorry. Strike that.
16 Before we went off the record, before we
17 took a break, I asked you what risk factors Ms. Corbet
18 had that you thought could increase the risk of
19 mesh-related complications. And we had gone through a
20 list: She didn't have diabetes, she didn't have --
21 wasn't a smoker, she wasn't obese, right?
22 A. Correct.
23 Q. And then you identified vaginal atrophy as a
24 risk factor that Mrs. Corbet had; is that correct?
25 A. Correct.

Page 141

1 MR. VOUDOURIS: Objection.
2 Q. (BY MR. THORNBURGH) And did you identify --
3 other than -- strike that.
4 Other than the vaginal atrophy, did you
5 identify any other risk factor for a mesh-related
6 complication?
7 MR. VOUDOURIS: Objection.
8 A. So far, based on the records, we do not see
9 any other related risk factors.
10 Q. (BY MR. THORNBURGH) I'm going to try not to
11 go through all these records to try and get us out of
12 here as quick as possible, but if you'll turn with me to
13 the same exhibit, I think it's Exhibit Number 7.
14 A. Yeah.
15 Q. Bates number ending in -13?
16 A. Page 13?
17 Q. Yeah. Okay. You see that this record is
18 dated October 12th, 2011?
19 A. Yes.
20 Q. And here, it says that Ms. Corbet is a
21 50-year-old female and she presents for a postoperative
22 evaluation, right?
23 MR. VOUDOURIS: Objection. 58?
24 MR. THORNBURGH: 58-year-old female is
25 what it says.

Wenxin Zheng, M.D.

Page 142

1       MR. VOUDOURIS: You said 50.

2       MR. THORNBURGH: Oh. 58-year-old female.

3   A. Correct.

4   Q. (BY MR. THORNBURGH) And the postop -- this

5 postop visit was related to a follow-up for her anterior

6 repair, her posterior repair, and the TVT, right?

7   A. Yes.

8   Q. You see here in this paragraph it says, "She

9 has voiding and control better with sancturra and Valium

10 and still has occasional spontaneous leak. Complain of

11 pain with sex and urge to deficate with sex. Has had

12 vaginal bleeding with sex. Less each time" [as read].

13       Do you see that?

14   A. Yes.

15   Q. So this is three months postop -- postimplant

16 procedure, right?

17   A. Yes. From July to October.

18   Q. Okay. And she's reporting for the first time

19 a complaint with pain during intercourse, right?

20       MR. VOUDOURIS: Objection.

21   A. Based on this report.

22   Q. (BY MR. THORNBURGH) And also bleeding with

23 intercourse, right?

24   A. Right.

25   Q. Okay. And then also, it says that she --

Page 143

1 "There was a small -- small area of granulation tissue

2 with vaginal -- vag mildly tender mass on one from

3 abdominal wall to 5 o'clock and vag moblie" [as read].

4       Do you see that?

5   A. Yes.

6   Q. Okay. So what -- what is granulation -- what

7 is granulation tissue?

8   A. Okay.

9       MR. VOUDOURIS: Objection.

10   A. Granulation tissue is the term -- as a

11 pathology term -- describing the wound healing, okay?

12 Any injury or surgical procedures is considered as an

13 injury for tissue. Then during the healing process, if

14 the healing process does not heal well, then you have

15 granulation tissue. Okay. Granulation tissue is

16 composed by fibroconnective tissue, vessels, and

17 inflammation.

18   Q. (BY MR. THORNBURGH) And -- and do you also

19 have an understanding based on your review of the

20 records that you reviewed in this case that granulation

21 tissue is also an indication of a tissue response to

22 synthetic polypropylene mesh?

23       MR. VOUDOURIS: Objection; form

24 foundation.

25   A. This one can be totally unrelated, because

Page 144

1 patient received three procedures, right, anterior

2 repair, posterior repair, and TVT implantation. So this

3 area of granulation tissue can either represent delayed

4 healing process or recent injury by her -- any sexual

5 activity or something like that. These -- all things

6 can happen -- can cause this granulation tissue.

7   Q. (BY MR. THORNBURGH) Is it -- is it -- is one

8 of the things that might -- is -- strike that.

9       Is it possible that for Mrs. Corbet one of

10 the possible explanations for the granulation tissue

11 that was identified on October 12th, 2011, is also the

12 placement of the TVT device that she had implanted three

13 months prior?

14       MR. VOUDOURIS: Objection; form,

15 foundation.

16   A. I have no comment on that. I think the best

17 person to answer this question will be the surgeon,

18 Dr. Smith.

19   Q. (BY MR. THORNBURGH) Okay. So you're not

20 going to offer an opinion one way or the other regarding

21 the granulation tissue; is that fair?

22   A. That's why I say granulation tissue overall is

23 related to the injury and delayed healing process.

24 That's it.

25   Q. Other than that, you're not going to come in

Page 145

1 at trial and try to offer an opinion regarding what the

2 cause of the granulation tissue was that was identified

3 three months after the mesh implant?

4   A. No.

5   Q. Okay. No, you're not going to offer those

6 opinions, right?

7   A. No.

8   Q. Is -- for Mr. Way, was placement of the

9 mesh --

10       MR. VOUDOURIS: Objection.

11       MR. THORNBURGH: Sorry.

12   Q. (BY MR. THORNBURGH) For Mrs. Corbet -- sorry.

13       For Mrs. Corbet, was placement of mesh

14 a -- also a risk factor for erosion?

15       MR. VOUDOURIS: Objection; form,

16 foundation, beyond the scope.

17   A. Based on literature findings, mesh exposure or

18 erosion is a lower complication rate. Overall, it's

19 about maybe three percent or less, okay? So therefore,

20 implantation of the mesh to correct stress urinary

21 incontinence, basically is a -- has a lower rate for

22 this kind of complication, that's the overall situation.

23   Q. Well, isn't it true, though, that if

24 Mrs. Corbet did not have mesh implanted, she wouldn't

25 have experienced a mesh erosion?

Wenxin Zheng, M.D.

Page 146

1        MR. VOUDOURIS:  Objection.
2     A.  If no mesh -- no mesh exposure, that's for
3  sure.  However, if any woman -- postmenopausal woman,
4  even without any implants or mesh or other things, then
5  they still may experience ulceration or laceration or
6  other things or injury.
7        MR. THORNBURGH:  Motion to strike
8  nonresponsive.
9     Q.  (BY MR. THORNBURGH)  My question simply was:
10  If she didn't have mesh implanted, she wouldn't have had
11  mesh erosion?
12        MR. VOUDOURIS:  Objection; asked and
13  answered.
14     Q.  (BY MR. THORNBURGH)  Right?
15     A.  Yeah.  Correct.
16     Q.  Now, eventually, Mrs. Corbet went to see
17  Dr. Smith, right?
18     A.  Yes.
19     Q.  And do you have a recollection of why
20  Mrs. Corbet went to see Dr. Smith?
21     A.  Based on Dr. Smith's deposition, she
22  complained of dyspareunia, then she went to see her.
23     Q.  In fact, if you -- if you look at Exhibit 7,
24  there's a letter from Dr. Smith to Dr. Harrell
25  concerning her evaluation of Ms. Corbet, right?  Do you

Page 147

1  remember seeing that letter?
2        MR. VOUDOURIS:  Page?
3     A.  Can you tell me the page number, please?
4     Q.  (BY MR. THORNBURGH)  Page 26 -- no, it's not,
5  sorry.  Page 27.
6        I mean, maybe this saves us some time.
7  Did you consider these records in reaching your opinion
8  in your case?
9        MR. VOUDOURIS:  Objection.
10     A.  I -- I want to read and understand the
11  clinical situation, that's true.  But many pure
12  clinical-related information, I may not be qualified to
13  answer because I'm a pathologist.
14     Q.  (BY MR. THORNBURGH)  Okay.  Because I don't
15  want to -- you know, I don't want to go over things that
16  you didn't rely on in reaching your opinions in this
17  case.  So to the extent that you didn't consider and
18  rely on the medical records in this case, it may save us
19  some time.
20        So did you consider these records in
21  reaching your opinions or not?
22        MR. VOUDOURIS:  Objection; asked and
23  answered.
24     A.  The medical records will be useful for me, but
25  my opinion mainly rely on the histological findings I

Page 148

1  observed.  So it's not like just a -- a yes-or-no
2  answer.
3     Q.  (BY MR. THORNBURGH)  Was it -- was it
4  significant to you that before Mrs. Corbet had the mesh
5  implanted, she didn't have any complaints of dyspareunia
6  or pelvic pain?
7        MR. VOUDOURIS:  Objection; form, beyond
8  the scope.
9     A.  Yeah, that's a clinical complaining.  Then
10  also, she experience some kind of bleeding also.
11     Q.  (BY MR. THORNBURGH)  There's --
12     A.  Right.
13     Q.  Well, your --
14     A.  So that's --
15     Q.  -- related to her hysterectomy, but my
16  question to you is:  Was it significant in your mind or
17  did you consider, in rendering your opinions, the fact
18  that she did not have any symptoms or complaints
19  regarding painful intercourse prior to having the mesh
20  implanted?
21        MR. VOUDOURIS:  Objection; form,
22  foundation, beyond the scope, compound.
23     A.  Again, this is a clinical symptoms.  I do not
24  rely on these clinical symptoms then, you know, use
25  these clinical findings to interpret my pathological

Page 149

1  findings.  That's for sure.
2     Q.  (BY MR. THORNBURGH)  So I'm just trying to
3  determine whether or not I need to ask you any questions
4  about the medical records.  Let me -- let's talk about
5  this one.  So this record is dated January 31st, 2013,
6  Bates number -27.  Have you seen this record before?
7     A.  Yes.
8     Q.  Okay.  And do you recognize this is a letter
9  from her -- eventually her explanting physician,
10  Dr. Smith, to the implanting physician, Dr. Harrell?
11     A.  Yes.
12     Q.  Do you see where it says that Ms. Corbet was
13  evaluated for severe overactive bladder and recent
14  bleeding episodes?
15     A.  Yes; that's the chief complaint.
16     Q.  Okay.  Did you have an understanding that
17  those conditions or symptoms occurred at some point
18  after placement of the TVT device?
19        MR. VOUDOURIS:  Objection.
20     A.  From time -- time consideration, yes, her --
21  this finding is after TVT implantation.
22     Q.  (BY MR. THORNBURGH)  Okay.  And do you see the
23  chief complaint?
24     A.  Yes.
25     Q.  What is the chief complaint?

Wenxin Zheng, M.D.

Page 150

1    A.  That's the main complaint, the main feeling
2  from the patient.
3    Q.  And what does it indicate that her main
4  problem -- Mrs. Corbet's main problems were on
5  January 31st, 2013?
6        MR. VOUDOURIS:  Objection; form.
7    A.  As you mentioned, it's overactive bladder as
8  well as dyspareunia.
9    Q.  (BY MR. THORNBURGH)  And so it says overactive
10 bladder and pain in the vagina during intercourse,
11 right?
12   A.  [Nods head.]
13   Q.  And do you see where it says that Mrs. Corbet
14 presented for consultation regarding bladder spasms and
15 hematuria?
16   A.  Yes.
17   Q.  Okay.  And are you going to offer any opinions
18 regarding -- regarding the cause of the bladder spasms?
19       MR. VOUDOURIS:  Objection; beyond the
20 scope.
21   A.  No.
22   Q.  (BY MR. THORNBURGH)  Okay.  And -- and are --
23 and hematuria is bleeding, right?
24   A.  Hematuria is bleeding from the urine.
25   Q.  From what, I'm sorry?

Page 151

1    A.  Urine.
2    Q.  Okay.
3    A.  Urination.
4    Q.  And are you going to offer any opinions
5  concerning hematuria?
6        MR. VOUDOURIS:  Objection; beyond the
7  scope.
8    A.  I can tell you based on the pathology report
9  that she had benign papilloma, all right, and that
10 benign papilloma is related to the hematuria.  That's
11 the only thing I can tell you.
12   Q.  (BY MR. THORNBURGH)  Do you see where -- so at
13 least at this point in January 31st, she's complaining
14 of severe overactive bladder disorder and bleeding
15 episodes as well as pain in the vagina during
16 intercourse, right?
17   A.  Correct.
18   Q.  And you had said that you had reviewed the
19 Hill article in preparation for the deposition, right?
20   A.  Yes.
21   Q.  And the Hill article actually talks about
22 voiding dysfunction and overactive bladder disorder
23 associated with inflammatory response in women with mesh
24 explants, right?
25       MR. VOUDOURIS:  Objection.

Page 152

1    A.  I'm not sure which sentence -- which paragraph
2  you referring.
3    Q.  (BY MR. THORNBURGH)  I'll go ahead and mark as
4  Exhibit Number 8.
5    A.  8.
6        (Exhibit Number 8 was marked.)
7    Q.  I've handed you Exhibit Number 8, which we
8  talked about earlier on today, which is the article
9  called "Histopathology of Excised Midurethral Sling
10 Mesh" by Hill and others.
11       MR. VOUDOURIS:  Dan, I believe they made
12 three copies.
13       MR. THORNBURGH:  Sorry.  That wasn't on
14 purpose.
15   Q.  (BY MR. THORNBURGH)  It's -- are you familiar
16 with this document?
17   A.  I have read, but if you asking very specific
18 questions, certainly, I have to read again.
19   Q.  But this is the document that you're referring
20 to earlier in today's deposition?
21   A.  Yes.
22   Q.  This is the new document that you provided --
23 or which was provided in Exhibit Number 2 as new
24 literature that you've reviewed?
25   A.  Correct.

Page 153

1    Q.  And which you rely on for purposes of your
2  opinions in this case?
3    A.  I don't mean rely on opinion of this, because
4  this is a histopathological finding of these explant
5  sling, therefore, it's related to the pathology finding.
6  That's the -- the purpose I read this article.
7    Q.  So this is an article that was published after
8  you had served your expert report, right?
9    A.  Correct.
10   Q.  And it says that, "The purpose or objective of
11 the study was to compare the histological
12 characteristics of pathological specimens excised mid --
13 midurethral sling mesh and surrounding vaginal tissue in
14 patients who presented postoperatively with pain and/or"
15 [as read] --
16       MR. VOUDOURIS:  Objection.  I think it
17 says preoperative.
18   Q.  (BY MR. THORNBURGH)  "Present preoperative --
19 operatively with pain and/or exposure of mesh to
20 patients who underwent mesh excision for voiding
21 dysfunction without pain and erosion" [as read].
22       Did I read that correctly?
23   A.  Correct.
24   Q.  And this was a retrospective case control
25 study, correct?

Wenxin Zheng, M.D.

Page 154

1    A.  Yes.
2    Q.  Of 130 patients?
3    A.  Yes.
4    Q.  And do you see the -- do you recall that in
5  the study, they divided out these patients or their
6  subjects into three groups?
7    A.  Yes.
8    Q.  Women who had voiding dysfunction without
9  pain, women who had pain and/or exposure, and then women
10  who had voiding dysfunction with pain and/or mesh
11  exposure?
12    A.  It's a combination, yes.
13    Q.  Did you rely on this in any way regarding your
14  opinions concerning Mrs. Corbet's mesh explant or the
15  complications from mesh?
16    A.  I do not rely on what they have found to
17  generate my opinion, because my opinion has been
18  generated before this publication came out.
19    Q.  Did you consider it, though, in offering your
20  opinions?
21        MR. VOUDOURIS:  Objection; form.
22    A.  I don't think this is relevant, because I did
23  not change my opinion at all since last year.
24    Q.  (BY MR. THORNBURGH)  Well, Mrs. Way --
25  Mrs. Corbet had TVT, midurethral sling implanted, right?

Page 155

1    A.  Yes.
2    Q.  She -- as we saw from the medical records, she
3  had postimplant voiding dysfunction, right?
4    A.  Yes.
5    Q.  And she also had pain and exposure, right?
6    A.  Yes.
7    Q.  So how is that not relevant to your opinions
8  in this case concerning Mrs. Corbet?
9        MR. VOUDOURIS:  Objection; form.
10    A.  Because my opinion has been basically
11  formulated before this publication came out, number one.
12        Number two, the -- the findings really
13  will not influence my judgment or my comments or my
14  understanding for the -- for the mesh explants.  So
15  therefore, why I have to heavily rely on this finding.
16  But yes, this is a good paper to describe histological
17  findings on these meshes.
18    Q.  (BY MR. THORNBURGH)  Did you have any
19  disagreements with the information in the Hill article?
20    A.  I don't have disagreements --
21        MR. VOUDOURIS:  Objection.
22    A.  -- for that.
23    Q.  (BY MR. THORNBURGH)  Do you have a
24  disagreement with the method they used in evaluating
25  mesh explant pathologically?

Page 156

1        MR. VOUDOURIS:  Objection.
2    A.  No.  They are reasonably, you know, planned --
3  planned for the study.
4    Q.  (BY MR. THORNBURGH)  And you see the result
5  section --
6    A.  Yes.
7    Q.  -- in the abstract?
8    A.  Correct.
9    Q.  It says, "60, 42 percent, with voiding
10  dysfunction only.  21 or 16.2 percent with pain/erosion.
11  And 19, which is 37.7 percent, with both pain and
12  exposure and voiding dysfunction were evaluated" [as
13  read], right?
14    A.  Correct.
15        MR. VOUDOURIS:  Objection; form.
16    Q.  (BY MR. THORNBURGH)  It says, "The voiding
17  dysfunction only group was found to have significantly
18  higher levels of inflammation, median grade 2 on a scale
19  of 1 to 3" [as read], right?
20    A.  Yes.
21    Q.  "Compared to the other two groups with a P
22  value of .007.  There were no statistical differences in
23  fibrosis" [as read].
24        What's fibrosis?
25    A.  Fibrosis means lots of collagens.

Page 157

1    Q.  It's a scar, right?
2        MR. VOUDOURIS:  Objection.
3    A.  No.
4    Q.  (BY MR. THORNBURGH)  Scar tissue?
5        MR. VOUDOURIS:  Objection.
6    A.  No.
7    Q.  (BY MR. THORNBURGH)  You don't believe that
8  fibrosis is scar?
9        MR. VOUDOURIS:  Dan, this was covered --
10        MR. THORNBURGH:  Okay.
11        MR. VOUDOURIS:  -- extensively in his
12  other deposition, pages.
13    Q.  (BY MR. THORNBURGH)  In any event, they're
14  talking about their findings -- their findings within
15  these two -- within these three groups regarding
16  fibrosis was that there was no statistical
17  significant -- statistical differences in fibrosis and
18  giant cell reaction between the three groups?
19    A.  Correct.
20    Q.  In other words, in all three groups, they had
21  the same level or severity of fibrosis and giant cell
22  reaction, right?
23        MR. VOUDOURIS:  Objection.
24    A.  Based on this study, yes.
25    Q.  (BY MR. THORNBURGH)  Do you recall what their

Wenxin Zheng, M.D.

Page 158

1 findings were with respect to the fibrosis and giant
2 cell reaction in these three groups?
3     A.   They have definition within the table.  It
4 says histological grading system, chronic inflammation,
5 you have, basically -- I think all these things we have
6 described.
7     Q.   Well, actually, do you see where it says -- if
8 you go to the table 1, which is the histological grading
9 system --
10     A.   Yeah.
11     Q.   Did you use this same grading system in your
12 analysis of Mrs. -- or similar grading system --
13     A.   Yes.
14     Q.   -- in your analysis of Mrs. Corbet?
15     A.   As I mentioned that, I think, before this
16 publication came out, in general, pathologists will use
17 similar grading system.
18     Q.   Okay.  And so regarding fibrosis, they have
19 basically four grades, right?
20     A.   Yes, from 0 to 3.
21     Q.   And they say 0 is no fibrosis?
22     A.   Right.
23     Q.   I guess that means no collagen?
24         MR. VOUDOURIS:  Objection.
25     A.   No --

Page 159

1     Q.   (BY MR. THORNBURGH)  No fibroconnective
2 tissue?
3     A.   Yeah, mainly fibroconnective tissue.
4     Q.   Mild would be predominantly loose connective
5 tissue with focal fibrosis?
6     A.   Yes.
7     Q.   And then moderate was focal dense fibrosis.
8 And then marked as dense fibrosis with formation of
9 fibrous nodule plaque?
10     A.   Correct.
11     Q.   And then for their inflammation, they, again,
12 have a grading system based on no inflammatory cells,
13 sparse chronic inflammatory infiltrate, confined areas
14 of giant cell reaction, moderate is chronic inflammation
15 infiltrate in areas of giant cell reaction involving
16 adjacent connective tissue?
17     A.   Correct.
18     Q.   Okay.  And marked would be the highest on the
19 scale, which would be marked inflammatory infiltrate in
20 areas of giant cell reaction and prominently involving
21 connective tissue, any germinal center formation?
22     A.   Correct.
23     Q.   What's germinal -- germinal center formation?
24     A.   It's a lymphoid aggregates, like within the
25 lymphoid tissue, you have germinal center.  It's a pure

Page 160

1 pathology term.
2     Q.   Okay.  If you go to -- see the results section
3 on page 592 of Exhibit 8?
4     A.   Yes.
5     Q.   You see it says, "50 -- 45.4 percent of these
6 patients underwent mesh excision for voiding
7 dysfunction" [as read].
8         Did I read that accurately?
9     A.   Yes.
10     Q.   And then, "16.2 percent underwent excision for
11 both pain and exposure and voiding dysfunction.  And the
12 remaining 49, or 37.7 percent, underwent surgical
13 excision for both pain, exposure, and voiding
14 dysfunction" [as read].
15     A.   Correct.
16     Q.   Almost 40 percent underwent surgical excision
17 for pain, exposure, and voiding dysfunction?
18     A.   Correct.
19     Q.   And would that be the group that Mrs. Corbet
20 would have been in if she was involved in this study?
21         MR. VOUDOURIS:  Objection; form.
22     Q.   (BY MR. THORNBURGH)  In other words, is
23 that -- is that -- is that the -- I'll withdraw that
24 question.
25     A.   Okay.

Page 161

1     Q.   If you go to the next page --
2     A.   Yes.
3     Q.   -- most common finding in all groups is mild
4 inflammation, 53 percent?
5     A.   Yes.
6     Q.   Then it says, "Only 9.2 percent of specimens
7 showed no inflammation" [as read].
8         So very little of the explant showed no
9 inflammation, right?
10         MR. VOUDOURIS:  Objection.
11     A.   10 -- about 10 percent, yeah.
12     Q.   (BY MR. THORNBURGH)  Moderate or marked
13 inflammation was noted in 48 or 39 -- 36.9 percent of
14 the specimens, right?
15     A.   Correct.
16     Q.   And then the specimens in the voiding
17 dysfunction only group found to have higher amounts of
18 moderate inflammation.
19         And then it talks about the fibrosis.  It
20 says in the next paragraph, it says, "Moderate fibrosis
21 was seen in 61 percent of pathological specimens with no
22 difference found between the three groups" [as read]?
23     A.   Correct.
24     Q.   Did I read that correctly?
25     A.   Yes.

Wenxin Zheng, M.D.

1    Q.   And so they're saying that in the cohort that
2  they looked at of 160 something patients --
3    A.   130.
4    Q.   170?
5    A.   -30.
6    Q.   130.  In that cohort, 61 percent, greater than
7  half of those patients, specimens demonstrated moderate
8  fibrosis in all groups?
9    A.   Correct.
10   Q.   And that almost all of the specimens that they
11 looked at demonstrated giant cell reaction?
12        MR. VOUDOURIS:  Objection to form.
13   A.   That's a common finding.
14   Q.   (BY MR. THORNBURGH)  It's a common finding to
15 observe --
16   A.   From explanted mesh specimen.
17   Q.   Do you see the discussion section, it says,
18 "The optimal implant into human tissue has been
19 described as one that does not illicit a significant
20 post-tissue reaction, is lightweight, maintains
21 flexibility, and provides long-term support" [as read]?
22        MR. VOUDOURIS:  Is there a question?
23   Q.   (BY MR. THORNBURGH)  Do you see -- do you see
24 that section?
25   A.   I see the sentence, yes.

1    Q.   Okay.  And --
2        MR. VOUDOURIS:  Dan, you know --
3        MR. THORNBURGH:  This is a new -- this is
4  a new publication.
5        MR. VOUDOURIS:  No, I'm not -- I'm not
6  disputing that, but, you know, you're talking about
7  trying to save time.  You're reading sentences from
8  medical records and from a literature and asking him if
9  that's what -- did I read that correctly.
10        MR. THORNBURGH:  No.  And I'm going to
11 follow up with a question.  I didn't say -- I said do
12 you see that section.  The next question is --
13        MR. VOUDOURIS:  I'm just -- I'm just
14 pointing out what you've been doing for the last
15 30 minutes, which is in contradiction to trying to get
16 through this as quickly as possible.
17   Q.   (BY MR. THORNBURGH)  Doctor, do you have any
18 disagreements with the -- with these authors who write
19 that the optimal implant is one that is lightweight?
20        MR. VOUDOURIS:  Objection; beyond the
21 scope.
22   A.   Yeah, this one, lightweight, heavyweight,
23 these mainly belong to material experts.  I --
24   Q.   (BY MR. THORNBURGH)  So you're not going to
25 offer an opinion one way or the other?

1    A.   I'm not going to render my opinion regarding
2  these material weight issues.
3    Q.   So this study found that 60 percent of all the
4  explants had moderate fibrosis?
5    A.   Yes.
6    Q.   Which is fibroconnective issue?
7        MR. VOUDOURIS:  Objection.
8    A.   Which, yes, within the fibroconnective tissue.
9    Q.   (BY MR. THORNBURGH)  And if you look over to
10 the next page, 594, there are some figures where they
11 describe the different grades by showing
12 microphotographs of explant specimens, right?
13   A.   Correct.
14   Q.   Okay.  And do you have any disagreement with
15 the depiction in their microphotographs of the way they
16 graded the -- their explant specimens?
17   A.   No.
18        MR. VOUDOURIS:  Objection; broad.
19   A.   I -- I agree, because I use similar grading
20 system and also use similar representative pictures.
21   Q.   (BY MR. THORNBURGH)  In your experience --
22 strike that.
23        Based on this grading system -- strike
24 that.  I'm going to -- I'm going to try to skip through
25 it.

1        Do you see additionally on the right -- on
2  the right side of page 594 --
3    A.   Second paragraph?
4    Q.   Yeah.  It says, "Presence" -- it says, "One
5  could have" -- sorry.  "Additionally, our findings could
6  be a result of tissue remodeling fibrosis that may occur
7  following placement of midurethral slings.  One could
8  hypothesize that in the presence of inflammatory state,
9  the sling may retract and shrink, therefore applying
10 undue tension along its path, which, in turn, may lead
11 to increased levels of voiding dysfunction" [as read].
12   A.   That's their discussion.
13   Q.   Okay.  So they're --
14        MR. VOUDOURIS:  Hold on.  Wait for the
15 question.
16   Q.   (BY MR. THORNBURGH)  Is it fair to say that
17 what they're saying here is that as a result of the
18 inflammatory response, voiding dysfunction could be a
19 symptom of mesh contraction or shrinkage?
20        MR. VOUDOURIS:  Objection; form,
21 foundation.
22   A.   That's their opinion and discussion for the
23 point, but it's not my opinion.
24   Q.   (BY MR. THORNBURGH)  You have -- do you have
25 an opinion about this statement that you're going to

Wenxin Zheng, M.D.

Page 166

1  offer at trial?
2        MR. VOUDOURIS:  Objection.  All of these
3  areas were covered extensively in his other deposition.
4        Q.  (BY MR. THORNBURGH)  At least these authors
5  are indicating that voiding dysfunction in women
6  implanted -- implanted with midurethral slings could be
7  a symptom of the inflammatory response causing
8  retraction or shrinkage of the scar tissue around the
9  mesh, right?
10        MR. VOUDOURIS:  Objection; form,
11  foundation --
12        A.  I -- I don't have --
13        MR. VOUDOURIS:  -- speculation.
14        A.  -- any evidence from -- based on the
15  histological findings from many explanted sling I
16  observed.  I don't have evidence to support --
17        Q.  (BY MR. THORNBURGH)  I think they're --
18        A.  -- that statement.
19        Q.  I think what they're suggesting is that the
20  evidence would be based on a clinical symptom of voiding
21  dysfunction, right?
22        MR. VOUDOURIS:  Objection --
23        A.  Therefore --
24        MR. VOUDOURIS:  -- hypothesis, form,
25  foundation.

Page 167

1        A.  Therefore, we are talking two different
2  things.  And my opinion mainly based on the pathological
3  findings.
4        Q.  (BY MR. THORNBURGH)  Is it your -- are you
5  saying that another expert like a urogynecologist should
6  be the -- would be the appropriate person to ask
7  concerning whether or not -- or to offer an opinion
8  concerning whether or not voiding dysfunction is a
9  symptom of mesh shrinkage?
10        MR. VOUDOURIS:  Objection.
11        A.  That's your choice.
12        Q.  (BY MR. THORNBURGH)  Because it's a clinical
13  finding?
14        A.  Yeah.
15        Q.  And you're not offering opinions on clinical
16  findings?
17        A.  Correct.  Because I'm not -- I don't have
18  expertise like that.
19        Q.  You also had indicated earlier in the
20  deposition that you were providing the Smith article as
21  a new article to your reliance list, right?
22        A.  Correct.
23        (Exhibit Number 9 was marked.)
24        Q.  I'm just going to mark this exhibit.
25        MR. VOUDOURIS:  Dan, I believe that was

Page 168

1  already --
2        MR. THORNBURGH:  Smith?
3        MR. VOUDOURIS:  It's an exhibit to his
4  deposition in Edwards.
5        MR. THORNBURGH:  Oh.  He testified -- he
6  testified earlier that it was a new article that he was
7  providing on Exhibit 2.  That's what he testified to.
8  The date of this article is --
9        MR. VOUDOURIS:  Hold on.
10        MR. THORNBURGH:  -- 2013.  I wasn't going
11  to ask -- all I'm doing is marking it for the purpose of
12  the record since he -- since he testified about it
13  earlier.
14        MR. VOUDOURIS:  That's fine.  If you're
15  just going to mark it for purposes of the record --
16        MR. THORNBURGH:  Yeah.
17        MR. VOUDOURIS:  -- that's fine.
18        THE WITNESS:  Right.  That's fine.
19        MR. THORNBURGH:  Do you want a copy of it?
20        MR. VOUDOURIS:  Sure.  And this is going
21  to be 10.
22        MR. MORRIS:  9.
23        MR. THORNBURGH:  9.
24        MR. VOUDOURIS:  Hill was 8?
25        THE REPORTER:  Yes.

Page 169

1        Q.  (BY MR. THORNBURGH)  Was that the article that
2  you were referencing earlier?
3        A.  Correct.
4        Q.  And you've already provided testimony in
5  another case concerning that -- that article?
6        A.  No.  At that time, when I wrote my expert
7  report, I was not aware of this publication.
8        Q.  Okay.  So is there something in that
9  publication that you felt was relevant to your opinions
10  in Ms. Corbet's case?
11        A.  No.
12        (Sotto voce conversation.)
13        Q.  I think that your -- I think your testimony is
14  that this is something that you didn't consider when you
15  authored your report in Mrs. Corbet's case?
16        MR. VOUDOURIS:  Objection.
17        A.  I do not cite this paper for my report.  And I
18  mentioned this publication mainly because I concurred
19  with their findings recently, because many specimens
20  pathology department received, actually, they do not
21  have microscopic finding.  That's the main point I
22  presented earlier, okay?
23        MR. VOUDOURIS:  Doctor, it's okay but when
24  you gave your deposition in April of 2014, this
25  Exhibit 9 was marked as Exhibit 3 in that deposition,

Wenxin Zheng, M.D.

Page 170

1 and you were asked questions about it. So that --
2         THE WITNESS: Oh, I may forgot.
3         MR. VOUDOURIS: That -- to use a term we
4 used earlier, that's a field that's already been plowed.
5         THE WITNESS: Okay. Sorry for this. I
6 was confused, maybe.
7         Q. (BY MR. THORNBURGH) And I'm not going to ask
8 you any questions.
9         A. Okay.
10        Q. I just want to mark it for the record.
11        A. Okay.
12        Q. Okay. Let's -- let's turn to your -- your
13 expert report.
14        A. Sure.
15        Q. And I believe most of your report, your
16 general report has already been -- you've already been
17 questioned about it at prior depositions, right?
18        A. Yes.
19        Q. So I'm going to turn your attention to page 9,
20 which is section 2 of your report. It says, "Opinion
21 specific to plaintiff Kathryn Corbet [as read].
22        A. Okay.
23        Q. And so the -- you have a section here under
24 the subsection (a) called patient history.
25        A. Yes.

Page 171

1        Q. And we've gone through some of that history
2 briefly, but was any of this --
3         MR. VOUDOURIS: Objection.
4        Q. (BY MR. THORNBURGH) Was any -- any of these
5 findings, the history findings, relevant to your final
6 conclusions or opinions in this case?
7        A. Yes.
8        Q. Okay. What findings in the patient history
9 section of your expert report were significant to your
10 opinions that you're offering in this case, clinical
11 findings?
12        A. I think for the clinical findings when I write
13 a report, I have to understand the whole situation,
14 right, and what's the history and how those things
15 happens. Then that's the -- that's the normal
16 procedure.
17        It's not necessarily saying when I write
18 down those patient history, then all these points I have
19 to be used for -- to generate my opinion. Okay. That's
20 the overall situation. So you're asking me which part
21 or which sentence I have used significantly for my
22 opinion, I think I am not able to answer this particular
23 question.
24        Q. Was the explant report significant to your
25 opinion in this case?

Page 172

1        A. Yes. And the pathology finding is the -- is
2 the main finding, then my opinion will generate --
3 basically generated based on the pathological
4 observation and examination.
5        Q. I'm just going to mark this exhibit and we're
6 going to look at the explant report really quick.
7         (Exhibit Number 10 was marked.)
8        Q. I marked as Exhibit Number 10 the explant
9 report of -- I'm sorry. I marked as Exhibit Number 10
10 the medical records from PennUrology for Mrs. Corbet.
11        And we already looked at the January 2013
12 record from -- from Dr. Smith to Dr. Harrell.
13        A. Yes.
14        Q. So why don't we just go ahead and look at the
15 operative report regarding the explant procedure. It's
16 on page 2 of Exhibit 10.
17        A. That's from Dr. Smith, right?
18        Q. Yeah. Do you see it?
19        A. Yes.
20        Q. Do you see where it says, "Preoperative
21 diagnosis, eroded mesh, overactive bladder, and
22 macroscopic hematuria" [as read]?
23        A. Yes.
24        Q. And so that -- it says that the procedure that
25 was done was a cystoscopy, bladder biopsy, fulguration,

Page 173

1 excision of eroded -- the vagina mesh and urethrolysis,
2 right?
3        A. Yes.
4        Q. And it says that, "Mrs. Corbet, a 59-year-old
5 female, with a history of TVT sling and a cystocele
6 repair, presented vaginal pain and was found on
7 examination -- physical examination to have eroded
8 vaginal mesh in the left lateral fornix of the vagina"
9 [as read], right?
10        A. Yes.
11        Q. And she also had overactive bladder symptoms
12 and microscopic hematuria, and therefore a cystoscopy
13 was planned, right?
14        A. Yes.
15        Q. And so this is the procedure where the mesh
16 was removed as well as a -- some other pathological
17 tissue, a bladder biopsy, and sent to --
18        A. Pathology.
19        Q. -- pathology, right?
20        A. Correct.
21        Q. It says -- if you look at -- on page Bates
22 number ending in -3, halfway down, it says, "Vaginal
23 exposure was then allowed to be visualized of the left
24 arm of the sling coming through the vaginal wall" [as
25 read], right?

Wenxin Zheng, M.D.

Page 174

1    A.   Yes.
2    Q.   An excision was made above and below the
3 sling?
4    A.   Yes.
5    Q.   And -- and --
6         MR. VOUDOURIS:  Again, Counselor, we're
7 just going through records and repeating what's already
8 been dictated.
9         MR. THORNBURGH:  I -- I get it.  I get it.
10        MR. VOUDOURIS:  You're asking him what
11 he's saying.
12   Q.   (BY MR. THORNBURGH)  What -- and do you -- do
13 you understand that she went above and below the sling
14 to make sure that she captured all of the mesh so
15 that -- all -- enough tissue and mesh to be sent to
16 pathology?
17        MR. VOUDOURIS:  Objection; form.
18   A.   She -- I think based on this sentence, her
19 surgical procedure notes, she covers -- or removes the
20 exposed area and a portion of the mesh in the left side.
21   Q.   (BY MR. THORNBURGH)  And there was only
22 left -- only the left side up to the midline --
23   A.   Correct.
24   Q.   -- was removed, right?
25   A.   Correct.

Page 175

1    Q.   And so is it fair to say that Ms. Corbet
2 continues to have mesh in her body?
3    A.   Yes.
4    Q.   And you're not going to offer any opinions
5 about the mesh that remains in her body, correct?
6         MR. VOUDOURIS:  Objection; beyond the
7 scope.
8    A.   Correct.
9    Q.   (BY MR. THORNBURGH)  And, ultimately, this is
10 the mesh that you -- the pathology material that you
11 analyzed?
12   A.   I have received the slides from this specimen.
13   Q.   And you only analyzed the slides related to
14 the mesh and the mesh -- and the tissue attached to the
15 mesh, right?
16        MR. VOUDOURIS:  Objection; form.
17   A.   And also, I -- I reviewed bladder biopsy too.
18   Q.   (BY MR. THORNBURGH)  I didn't -- I didn't see
19 that in your report.
20   A.   Oh, it's there.
21   Q.   Okay.  Maybe I missed it.  So let's look at
22 your report.
23        MR. VOUDOURIS:  It's under gross findings.
24        MR. THORNBURGH:  Off the record one
25 second.

Page 176

1         MR. VOUDOURIS:  Sure.
2         THE VIDEOGRAPHER:  Off the record.
3         (Break taken.)
4         THE VIDEOGRAPHER:  We're back on record at
5 2:54 p.m.
6    Q.   (BY MR. THORNBURGH)  Okay.  So you're looking
7 at your expert report, which is marked as Exhibit
8 Number 2, and you had indicated that in response to my
9 question whether or not you considered or reviewed the
10 pathological findings of the nonmesh-related tissue that
11 was explanted, and you said, yes, it's in my report.
12 Can you point me out -- point to in your report and tell
13 me where that's located?
14   A.   Okay.  So basically, that's in the gross
15 finding.  I said --
16   Q.   What page are you on?
17   A.   That's on Page 10, gross finding.  All right.
18 First -- second line, first batch includes three H&E
19 slides, all right, labeled SB13-1565, A1, B1, and C1.
20 And then later on, I say slide C1 represent excised
21 mesh, while A1 and B1 were from bladder biopsies.
22   Q.   Okay.  So --
23   A.   And then because bladder biopsy is not really
24 related to the explanted mesh, therefore, I do not
25 provide microscopic finding for these A1 and B1 slide,

Page 177

1 but I did review the slides.  That's why I clearly
2 remember there is a papilloma issue there.
3    Q.   Okay.  So is it your testimony that you
4 actually looked at those pathological slides under a
5 microscope but didn't take photomicrographs and put them
6 in your report?
7    A.   Correct --
8    Q.   Were they produced --
9    A.   -- because it's irrelevant.
10   Q.   Were they produced as part of Exhibit
11 Number 2?
12   A.   The pictures in Exhibit Number 2 does not
13 include pictures from A1 and B1, bladder biopsies,
14 because I did not take any.
15   Q.   Where are those microphotographs located?
16        MR. VOUDOURIS:  Objection.
17   A.   That's in the thumb drive, right?
18   Q.   (BY MR. THORNBURGH)  Oh, okay.  I'm sorry.
19        MR. VOUDOURIS:  I'm confused.
20   Q.   (BY MR. THORNBURGH)  I thought you said --
21        MR. VOUDOURIS:  He -- he just said he
22 didn't take photographs of --
23        MR. THORNBURGH:  I thought he said he did
24 take photographs of the bladder biopsy.
25        MR. VOUDOURIS:  No.

Wenxin Zheng, M.D.

Page 178

1    A.  No.
2    Q.  (BY MR. THORNBURGH)  All right.  You looked at
3    them but didn't take photographs?
4    A.  Right.
5        MR. VOUDOURIS:  Correct.
6    Q.  (BY MR. THORNBURGH)  Gotcha.
7        And you did that because you didn't think
8    that a bladder -- the condition that she had was related
9    to -- in the bladder -- was related to the mesh?
10   A.  Correct.
11   Q.  When you looked at that -- that specimen under
12   the slide or those specimens regarding the bladder
13   biopsy under the microscope, did you look at those in
14   regular -- how did you look at those?  Was it polarized
15   light microscopy or optical microscopy?
16   A.  No.  Just regular routine microscope, light
17   microscope.
18   Q.  I think you testified or you indicated in your
19   expert report that you can see polypropylene when
20   you -- when you look at the specimen using light
21   microscopy or polarized light microscopy; is that right?
22   A.  In both conditions, we can see if the plastic
23   piece of filament is obvious, still remaining in the
24   tissue, yes.  Use routine microscope also can see that.
25   But for small particles, typical it is not clearly

Page 179

1    visible until we use polarized lens.
2    Q.  Okay.  And you didn't look at the biopsy
3    slides using polarized lens?
4    A.  No.
5    Q.  So if there was a small particle that migrated
6    into the bladder causing a calculi, that is something
7    that you would not have seen using regular light --
8    regular microscopy, right?
9    A.  I did --
10       MR. VOUDOURIS:  Objection.
11   A.  I did not use polarized lens to examine the
12   bladder biopsy because I feel there is no reason to do
13   that.
14   Q.  (BY MR. THORNBURGH)  Have you ever seen any
15   documents or internal documents that discuss particles
16   migrating into the bladder --
17       MR. VOUDOURIS:  Objection.
18   A.  There --
19   Q.  (BY MR. THORNBURGH)  -- causing a calculi?
20       MR. VOUDOURIS:  Objection.
21   A.  There are reports some mesh erosions can be
22   erode into bladder, that's true.  But this is not for
23   Ms. Corbet case.
24   Q.  (BY MR. THORNBURGH)  And so is the bladder
25   biopsies that were performed -- or the bladder findings

Page 180

1    that were discussed in the pathology from the explant
2    relevant at all for your opinions in this case?
3    A.  Yeah.  The reason Dr. Smith did a biopsy
4    because she had -- patient had a hematuria, right?  Then
5    she did a cystoscopy and found a papillary lesion there.
6    That's the reason she did a biopsy.  And then her
7    symptom of hematuria can be perfectly explained by the
8    pathological finding.
9    Q.  Okay.  And then -- so if we go to -- back to
10   page -- your case specific opinions section on
11   Page 20 --
12   A.  Yes.
13   Q.  -- you start off basically by criticizing
14   Dr. Iakovlev, right?
15       MR. VOUDOURIS:  Objection.
16       Go ahead.
17   A.  It's not really criticize, I think, because
18   Dr. Iakovlev provide his opinion, and then when I read
19   through, I feel many of the -- his opinion is incorrect.
20   Therefore, I think these are more meaningful or relevant
21   to provide the reason why this is incorrect and what is
22   my opinion or my reason to -- to say -- you know, to
23   provide such a -- such a report, basically.
24   Q.  (BY MR. THORNBURGH)  You say that he
25   tries -- that Dr. Iakovlev tries to use CK -- Figure CK5

Page 181

1    and CK6 to generalize that the pain complained by
2    Ms. Corbet is caused by these histological findings.
3    And then you go into the next section of your report
4    sort of rebutting Dr. Iakovlev's opinions, right?
5    A.  Yes.
6    Q.  Okay.  And did you disagree with the findings
7    observed by Dr. Iakovlev in CK -- Figure CK5 or CK6?
8    A.  Can we --
9        MR. VOUDOURIS:  Objection; broad.
10   Q.  (BY MR. THORNBURGH)  Well, you talk about
11   how -- you say in this paragraph that the nerve
12   fibers -- that -- you say here that Dr. Iakovlev
13   described the nerve fibers shown by regular light
14   microscopy and S -- S100 staining by assuming these
15   nerve fibers represent a single -- or several nerve
16   branches growing into the mesh pores.
17       So do you disagree with that finding, or
18   that observation, from Dr. Iakovlev concerning Figures
19   CK5 and CK6?
20   A.  Then he further states that he -- the spaces
21   within the mesh filled with dense collagen scar, which
22   anchors and entraps the nerve in their positions.  All
23   right.  Yes, I disagree that.
24       MR. VOUDOURIS:  Doctor, you have
25   Dr. Iakovlev's report --

Wenxin Zheng, M.D.

Page 182

1      THE WITNESS:  Right.

2      MR. VOUDOURIS:  -- in front of you --

3      THE WITNESS:  Right.

4      MR. VOUDOURIS:  -- which has the

5 photographs --

6    Q.  (BY MR. THORNBURGH)  I think we marked it --

7      MR. VOUDOURIS:  -- CK5 and CK6.

8    Q.  (BY MR. THORNBURGH)  I think we marked it as

9 Exhibit --

10   A.  5.

11   Q.  -- 5.

12   A.  Yeah.  CK5 and 6.

13      (Sotto voce conversation.)

14      MR. VOUDOURIS:  I believe they start on

15 Page 108 of his report.  But there's no question

16 pending.

17      THE WITNESS:  Yes; those are the

18 questions -- those are the figures, correct.

19   Q.  (BY MR. THORNBURGH)  What page are you on,

20 Doctor?

21   A.  That's on the Page 108 of his report.

22   Q.  Okay.  So on Page 108 of his report is Figure

23 CK5a, right?

24   A.  Right.

25   Q.  And Dr. Iakovlev writes under the figures that

Page 183

1 most nerves can be seen by any stain.

2      Do you agree with that?

3    A.  Yeah.  Most nerves are visible without

4 staining.  You can see that.

5    Q.  And then he goes on to say that, "This nerve

6 is present within a space between filaments, or a

7 compartment within the mesh structure, which was filled

8 by fibrous tissue during healing" [as read].

9      Do you see that?

10   A.  Yes --

11   Q.  Do you agree with --

12   A.  -- I see that.

13   Q.  I'm sorry.  I thought you were done.

14      Do you see that?

15   A.  Right.

16   Q.  Do you disagree with that statement?

17      MR. VOUDOURIS:  Objection; form.

18   A.  I disagree because he said fibrous tissue.

19 Actually, this is integrated tissue based on my opinion,

20 number one.  Number two, yes, the nerve found are

21 located between two mesh fiber spaces.

22      First of all -- I have two points.

23      First of all, it's not necessary to say

24 this location equals to -- to the location within the

25 mesh pore because this is a two-dimensional structure, a

Page 184

1 two-dimensional picture.  Within the mesh pore, you need

2 a three-dimensional picture to show it's inside of the

3 pore or just adjacent to the mesh.  You understand what

4 I'm referring?

5    Q.  (BY MR. THORNBURGH)  So I think I understand.

6 I think when you -- when you actually look down at the

7 slide --

8    A.  Right.

9    Q.  -- is it three-dimensional?

10   A.  It's -- this is two-dimensional.

11   Q.  Well, that's the -- that's the photograph.

12   A.  Right.  It's always two-dimensional.

13   Q.  Even when you're looking at the slide like

14 this?

15   A.  Correct.

16   Q.  Okay.  So your opinion is that because it's

17 two-dimensional, you can't tell whether or not it's

18 within the mesh compartments?

19   A.  Within the pore or outside of pore or just

20 adjacent to the mesh.

21   Q.  Okay.

22   A.  Right.

23   Q.  And so is --

24   A.  It would be --

25   Q.  Is that your criticism regarding --

Page 185

1    A.  This is my -- my opinion.  It's not a

2 criticism, okay.  It's a statement.

3      Okay.  Number two is, these are peripheral

4 nerve.  Peripheral nerve is able to grow.  All right?

5 Dr. Iakovlev also made a similar statement.  This is

6 correct.  Okay.  Then if these tissue can grow just like

7 tissue integration, so you're finding the nerve endings

8 or nerve fibers adjacent to the mesh fiber or even

9 within the mesh pore is a normal finding because this is

10 a part of the tissue integration.

11   Q.  Okay.  So let me try to break that down.

12      MR. THORNBURGH:  He's saying pore --

13      MR. VOUDOURIS:  P-O-R-E.

14      MR. THORNBURGH:  -- P-O-R-E.

15      THE REPORTER:  Thank you.

16      THE WITNESS:  I'm sorry.

17   Q.  (BY MR. THORNBURGH)  Okay.  So, first, your

18 first disagreement with his conclusion is that this

19 isn't fibrous tissue; it's integrated tissue?

20   A.  It's integrated tissue.  It's a healthy

21 tissue.  It's not the fibrous or scar tissue.

22   Q.  All right.  So what's the basis for your

23 opinion that the tissue, that we -- that the pathology

24 slide that we're looking at in CK5a on 108 is integrated

25 tissue and not fibrous tissue?

Wenxin Zheng, M.D.

Page 186

1    A.  Because you have vessel, you have healthy
2  fibroblasts.  You see the vessels there?  And although
3  he did not label that, but in other pictures, you -- you
4  will see vessels.
5    Q.  Where do you see vessels at?
6    A.  Vessels are everywhere.  Many, one, two,
7  three, four and small -- these areas.  Okay.  All these
8  little bit of vessels with linings, they are all vessels.
9  These microvessels everywhere, okay, number one.
10        Number two, you see nerve, as he labeled
11  it very clearly.  In this field, you have several nerve
12  fibers clearly seen there.  Okay.  And the nerve grow do
13  not grow into pure scar.  Nerve grow, you need a
14  vascular supply or nutrition to keep alive.  Okay.  So
15  these are -- that's the reason these are fibroconnective
16  tissue.  It's integrated tissue.
17    Q.  Okay.  So number one, you're saying that
18  because nerves grow and are growing into the scar --
19    A.  I didn't say --
20        MR. VOUDOURIS:  Objection.
21    A.  -- grow into the scar.  That -- you are
22  saying --
23    Q.  (BY MR. THORNBURGH)  Growing into the
24  fibroconnective tissue?
25        MR. VOUDOURIS:  Objection.

Page 187

1    A.  Yeah.  Together with the fibroconnective
2  tissue, nerve can grow as part of the integrated tissue.
3    Q.  (BY MR. THORNBURGH)  Okay.  So that's assuming
4  that these nerves actually grew and didn't get
5  entrapped, right?
6        MR. VOUDOURIS:  I'll object; form,
7  foundation.
8    A.  That's why we're saying -- peripheral nerve
9  can grow is a demonstrated fact.  Everybody knows, okay?
10  That's well-known medical knowledge, all right?  So they
11  can grow.  Because after injury -- injury mean with --
12  the surgery itself is an injury, right?  You've cut the
13  tissue, you implant the mesh, that's injury.  Then you
14  create a space, mesh has a space.
15        And then these tissues will fill the
16  space, become integrated tissue, and become mesh and
17  tissue complex, which is a normal function for -- or the
18  biological basis for the mesh to support or to correct
19  the symptoms in a clinical side.
20    Q.  (BY MR. THORNBURGH)  So you -- let me ask this
21  question:  Do you at least agree that there's
22  fibroconnective tissue bridging from pore to pore?
23    A.  No.  I didn't say bridging because bridging
24  fibrosis is his term, all right?  That's Dr. Iakovlev's
25  term, bridging fibrosis, basically from one side to the

Page 188

1  other side of the mesh pore.
2    Q.  Do you think Dr. Iakovlev made that term up?
3    A.  I -- I don't see anyone else use this term so
4  far based on my understanding.
5    Q.  You haven't seen Ethicon's internal documents
6  dating back as far as 1990s discussing bridging
7  fibrosis?
8        MR. VOUDOURIS:  Objection; form.
9    A.  Okay.  Then --
10    Q.  (BY MR. THORNBURGH)  Is that correct, you
11  haven't seen those documents?
12    A.  I did not remember, you know, these terms came
13  from those.  But anyway --
14        MR. VOUDOURIS:  Hold on, there's not a
15  question pending.
16        THE WITNESS:  Okay.
17    Q.  (BY MR. THORNBURGH)  So the one -- so we
18  talked about you don't believe bridging fibrosis.
19  That's a term that was made up.
20        MR. VOUDOURIS:  Objection.
21    Q.  (BY MR. THORNBURGH)  And the next is -- well,
22  let me ask you this -- let me withdraw.
23        You see the inflammation there,
24  identified?
25    A.  Yes.  We have inflammation, yes.

Page 189

1    Q.  Okay.  What level of inflammation do you see
2  in this slide?
3    A.  It's where -- it's focal area -- first of all,
4  this is only focal area --
5    Q.  Uh-huh.
6    A.  -- of the microscopic picture.  This amount of
7  inflammation most likely will be rendered as mild
8  inflammation.
9    Q.  And that's because -- I think, if I
10  understand --
11    A.  Because --
12        MR. VOUDOURIS:  Hold on.  Don't talk over
13  each other, Doctor.  Let him get his question out.
14    Q.  (BY MR. THORNBURGH)  If I understand the way
15  that you look at these and the way you define, you know,
16  put these into categories, you would call this sparse,
17  scattered inflammatory infiltrates --
18    A.  Yes.
19    Q.  -- is that right?
20        And when you say "focal area," are you
21  talking about a zoomed-in area?  Is that what you mean
22  by that or --
23    A.  That's the area in this picture he use
24  arrow with inflammation.  See that?
25    Q.  Alloy?

Wenxin Zheng, M.D.

Page 190

1    MR. VOUDOURIS: Arrow.
2    A.  Arrow.
3    Q.  (BY MR. THORNBURGH) Arrow. Okay.
4        So the arrow -- so he's pointing to an
5    arrow that shows inflammation, but you don't
6    believe -- you believe that the location of
7    that -- strike that.
8        You believe that the level of inflammation
9    at the location of that arrow is mild?
10   A.  I -- I say overall with this area you see
11   adjacent, except this area, the remaining area has
12   basically no inflammation.
13   Q.  Okay.
14   A.  Therefore, overall, this is mild inflammation.
15   Q.  Okay.  So let's -- let's try to figure this
16   out.  Can you take this pen.  So if we -- when you talk
17   about looking at the entire area and grading it based on
18   the entire area, that would include the area adjacent
19   and outside or away from the fibers, right?
20   A.  Yes.  I will estimate immediate close to the
21   mesh fiber spaces, as well as a few millimeter away from
22   the mesh fiber spaces or adjacent to fibroconnective
23   tissue.
24   Q.  Well, what's the level of inflammation around
25   the mesh fibers at the location of the arrow?

Page 191

1    A.  This area [indicating].
2    Q.  So what's -- what's the grading that you would
3    give that area for -- of inflammation?
4    A.  If -- if this area alone almost everywhere
5    like this, then this will be moderate.
6    Q.  Okay.  So circle the area that you see as
7    moderate.
8    A.  [Witness complies.]
9    Q.  Okay.  Can you just write -- draw an arrow to
10   the circle that you made and write "moderate" for me so
11   that we can see that on the exhibit.
12   A.  [Witness complies.]
13       Remember, if I say similar area have to be
14   found in the different places rather than just only one
15   single focus --
16   Q.  I hear you.  Let's -- let's --
17   A.  -- okay?  So if you have more area like this,
18   then I'm going to render as a moderate.
19   Q.  So just --
20   A.  If this is alone, this will be mild.
21   Therefore, if you want me to say this picture alone
22   represent what, this going to be mild.
23   Q.  Well, no.  Hold on.
24   A.  Right?
25   Q.  You just indicated earlier that it was

Page 192

1    moderate.  When I asked you --
2    A.  No.
3    Q.  -- to write "moderate" --
4    A.  No.  When I say moderate -- if I say -- if I
5    see many areas like this, all right, in the same
6    specimens, then I will say this is moderate.
7    Q.  But you testified a moment ago -- you circled
8    the page, and you said, "If we look at this area alone
9    where the circle is around the fiber, that would be
10   moderate."
11   A.  No.  I said if I see this alone together with
12   other areas like this, then will be moderate.
13   Q.  If we look at -- if we look at the -- just the
14   area --
15   A.  Right.
16   Q.  -- around the fiber, you agree with me that
17   that's moderate inflammation, right, around the fiber?
18       MR. VOUDOURIS: Objection; form.
19   A.  You are separating the whole situation,
20   pointing to a very -- just like we -- we are talking
21   about a forest, and you're pointing to a single leaf and
22   what this leaf represents.  That question becomes very
23   difficult to answer.
24       Mild, moderate, and severe just follow,
25   you can see.  We discussed that already.  I follow

Page 193

1    Dr. Hill's paper.  It's very clear there.  And also, we
2    have other examples for mild and moderate area in my
3    report too.
4    Q.  (BY MR. THORNBURGH) Okay.
5    A.  So that's the reason it's difficult to -- for
6    you -- you want me circle this area, say it's mild,
7    moderate, or severe.
8    Q.  The area that you circled, if -- if the entire
9    area, the entire slide, looked like the area that you
10   circled next to the mesh fibers, that would be graded by
11   you as moderate, right?
12   A.  Yeah, I can say that.
13   Q.  Because -- because there are a -- if we look
14   at the definition from -- from Dr. Hall -- or Hill, from
15   Exhibit 8, there's moderate chronic inflammatory
16   infiltrates in areas of giant cell reaction around --
17   around the mesh fibers on that image?
18       MR. VOUDOURIS: Objection.
19   A.  That's right.  But still, you need amount.
20   It's not like without amount you can just say in that
21   way.  I even cannot tell here there is giant cell or not
22   because this micrograph is -- does not illustrate giant
23   cell there.
24   Q.  (BY MR. THORNBURGH) All right.  So if we look
25   at -- okay.  And so you don't believe that this is

Wenxin Zheng, M.D.

Page 194

1 fibroconnective tissue that -- in between the pores?
2   A. I believe these are fibroconnective tissue.
3   Q. Okay.
4   A. These are not scar tissue.
5   Q. What -- is fibroconnective tissue scar
6 also -- is -- fibrosis is scaring, right?
7         MR. VOUDOURIS: Objection.
8         MR. THORNBURGH: I'm just trying --
9         MR. VOUDOURIS: Dan --
10        MR. THORNBURGH: I'm trying to understand
11 his definition.
12        MR. VOUDOURIS: Yeah. No. I appreciate
13 that. He gave his definition ad nauseam in the
14 deposition --
15        MR. THORNBURGH: Okay. I'm not going
16 to --
17        MR. VOUDOURIS: -- he gave in April.
18        MR. THORNBURGH: -- ask him to do it
19 again. All right.
20        MR. SNOWDEN: He just gave it about five
21 minutes ago.
22   Q. (BY MR. THORNBURGH) All right. So where do
23 you see on exhibit -- on Figure K -- CK5a what you
24 described as vessels?
25   A. Do you want me to label that?

Page 195

1   Q. Yeah; go ahead and label where you see it.
2   A. [Witness complies.]
3       I put a V, okay, there.
4       In this lower power, you easily can
5 identify many vessels, V. If I magnify it to the higher
6 power, we can see much better vessels. It's difficult
7 for you to understand probably for micro -- microscopic
8 picture.
9   Q. What's a vessel look like microscopically?
10 Because it all looks the same to me.
11   A. Yeah. You should come to medical school.
12 Okay.
13   Q. Do you see any vessels between this fiber and
14 this fiber or that fiber [indicating]?
15        MR. VOUDOURIS: Objection.
16   Q. (BY MR. THORNBURGH) For the -- for the
17 record, I'll just go ahead and mark 1, 2, and 3. So
18 1 -- 1, 2, 3. I've marked on Page 108 the fibers and
19 asked if you see any vessels within or between fiber 1,
20 2, and 3.
21       (Witness reviewed document.)
22        MR. VOUDOURIS: Objection; form.
23   A. It is very likely -- it's lower power again,
24 okay. It's very likely just underneath of this arrow
25 that's a vessel. Even red blood cells inside. Okay.

Page 196

1 But we can confirm, you know, using microscope.
2   Q. (BY MR. THORNBURGH) So you'd need -- you
3 would need to confirm that by looking at a higher power?
4   A. Yeah.
5   Q. Is that true for -- strike that.
6       Higher power -- power would allow you to
7 give a more reliable --
8   A. Estimation.
9   Q. -- estimation?
10   A. Correct.
11   Q. All right. Okay. Go to paragraph 2.
12   A. Paragraph 2. B?
13   Q. On Page 21 of Exhibit 2.
14   A. 21, okay.
15   Q. And this is where you discuss the erosion?
16   A. Yes.
17   Q. Okay. And you say that "Dr. Iakovlev notes
18 the mucosal erosion in Ms. Corbet's explanted mesh by
19 showing interrupted squamous mucosa and granulation
20 tissue and mixed inflammation" [as read].
21       And then you cite to CK -- his Figure
22 CK1c, right?
23   A. Correct.
24   Q. And you -- you essentially say that while
25 there is a clinical finding of erosion -- in other

Page 197

1 words, Dr. Smith found an erosion upon examination --
2 you don't believe that there is an erosion identified or
3 observable on CK1c of his report, right?
4         MR. VOUDOURIS: Objection; form.
5   A. Yeah.
6         MR. VOUDOURIS: Go ahead.
7   A. Pathologically, this picture, his CK1a
8 picture, is very fragmented, okay? Do you see that?
9   Q. (BY MR. THORNBURGH) And we're talking about
10 CK1c, right?
11   A. 1a. 1a.
12   Q. 1a and c? Okay. Let's look a and c.
13   A. I would say 1a, b, and c, right?
14   Q. Okay. So if you go to Page 99 of his expert
15 report, right?
16   A. Right.
17   Q. He says "Mucosal erosion site." And he uses
18 H&E staining?
19   A. Right. And then, based on these pictures, no
20 pathologist can say this is the erosive site because
21 these tissues are fragmented.
22   Q. What do you mean by that?
23   A. You see multiple pieces. They are not intact
24 tissue. Right? Do you understand?
25   Q. All right. So your -- it's your opinion that

Wenxin Zheng, M.D.

Page 198

1  no -- no pathologist could find an erosion on this --
2  this specimen because they're fragmented?
3      A.  Yeah.  Because nobody can say, based on these
4  findings, that represent erosive site.
5      Q.  What about on CK1c?
6      A.  CK1c, we have squamous mucosa, right, and
7  underneath of the mucosa, we have, yes, mixed
8  inflammation.  That, I agree.  Lots of inflammation
9  there, okay?  This area we can say is moderate.  That's
10 fine.  Okay.  And then there is underneath another
11 picture showing like lamina propria or fibroconnective
12 tissue underneath.  You see this?
13     Q.  Okay.
14     A.  And then -- however, these three pictures do
15 not show any mesh fiber.  Where is the mesh?
16     Q.  Okay.  But you do see the -- the mucosa's
17 there, right?
18     A.  Mucosa is there.
19     Q.  And that -- that's what -- where the mesh
20 would have eroded through?
21         MR. VOUDOURIS:  Objection; form,
22 foundation.
23     A.  Mucosa is part of the vagina, and Dr. Smith
24 trim and excised a portion of the mesh, right?  And if
25 you want to demonstrate this is the erosive site, you

Page 199

1  have to show immediate adjacent to the mucosa you have
2  mesh.  Then that means it's exposure.  Do you
3  understand?
4      Q.  (BY MR. THORNBURGH)  I think I understand what
5  you're saying, but I thought you agreed, though, that at
6  the site of erosion, you would get a heightened level of
7  inflammatory response, right?
8      A.  That's fine, yeah.  Yes.  Most of the case,
9  yes, they have enhanced level of inflammation.
10     Q.  And you'd agree that on CK1c, these slides
11 demonstrate an enhanced moderate inflammatory response?
12     A.  Compared to the remaining specimen, yes, more
13 inflammation's found in this area.
14     Q.  And are those -- do you see acute, or do you
15 see chronic inflammatory response?
16     A.  We have both acute and chronic.  That's
17 so-called a mix.
18     Q.  And how do you see acute?
19     A.  Acute is neutrophil and chronic is
20 lymphocytes.
21     Q.  And how are those two things colored
22 differently on -- or stained differently on your -- on
23 that --
24     A.  Because in this level, you are not able to
25 tell.  They all become black box.  You have to magnify

Page 200

1  to higher magnification.  Then we are able to tell.
2      Q.  So on Page 101, CK1c, you are agreeing that
3  there is chronic inflammation observed there of a
4  moderate level, but you just can't offer an opinion --
5  you can't state to a reasonable degree of medical or
6  scientific probability that this is the site of the
7  erosion?
8      A.  Correct.  Because if I were Dr. Iakovlev, I
9  will take very low power to show the whole picture,
10 where is the mesh, where is the mucosa.  Then, that's a
11 good demonstration.  But he didn't.  Why he didn't, you
12 can ask him.
13         That's why I say there is no convincing
14 evidence from pathological point of view there is
15 erosive site, but I did not disagree with Dr. Smith's
16 finding in the clinical side.  It's different -- two
17 different issue.
18     Q.  Okay.  If you go on to 3 -- paragraph 3 -- let
19 me as -- well, strike that.
20         Before I go there, did you -- have you
21 asked to look at the microphotograph -- strike that.
22         Have you asked to look at, or did you look
23 at, in rendering your opinions in this case the slides
24 that were evaluated by Dr. Iakovlev?
25     A.  When I read these slides, I think before I

Page 201

1  read these slides, then Dr. Iakovlev already read.  He
2  read first.
3      Q.  Okay.  But you didn't actually get a
4  slide -- the slides that Dr. Iakovlev had and looked at
5  those slides under a microscope; you're just looking at
6  his photomicrographs?
7          MR. VOUDOURIS:  No.  Objection.
8      A.  No.
9          MR. VOUDOURIS:  He did look at the slides.
10     A.  I did look at the slides.  I did look at the
11 slides.
12     Q.  (BY MR. THORNBURGH)  Okay.  That's why -- I
13 just -- I'm trying to understand that.
14     A.  The slides are identical slides.
15     Q.  Okay.  So did you try to find the slide that
16 we saw on CK1c and take a photomicrograph of it in a
17 larger or a lower magnification?
18         MR. VOUDOURIS:  Objection; compound.
19     A.  I see this inflammation, but the -- I think,
20 based on my memory, the mesh fiber is away from this
21 site.  It's not really immediately adjacent to the
22 mucosa.
23     Q.  (BY MR. THORNBURGH)  Because earlier you
24 testified if you were Dr. Iakovlev, you would look at
25 that slide and zoom out so that you could see where the

Wenxin Zheng, M.D.

Page 202

1 mesh fibers are, right?
2    A.   Yes.
3    Q.   Did you do --
4    A.   If -- if I believe this represents the erosive
5 site or exposure site, I will take a lower power
6 picture, then have the high power picture to show.
7    Q.   Despite that you had the same slides, you
8 didn't do that in your -- you didn't take --
9    A.   Because there is no evidence.
10    Q.   Okay.  But you didn't -- you didn't
11 demonstrate that in a photomicrograph attached to your
12 expert report, right?
13    A.   Because there is no evidence of erosive site
14 can be demonstrated from the slides.  That's why --
15 what's the reason I take a picture for that?
16    Q.   It's a heightened, mixed inflammatory response
17 mucosa.
18    A.   I acknowledge that, that the --
19        MR. VOUDOURIS:  Objection.
20    A.   -- focal area has that.
21    Q.   (BY MR. THORNBURGH)  All right.
22    A.   You understand, right?
23    Q.   Yeah.  Your opinions in paragraph 3 --
24    A.   Okay.
25        MR. VOUDOURIS:  We're on page...?

Page 203

1        MR. THORNBURGH:  Page 21 still.
2    Q.   (BY MR. THORNBURGH)  You say "Dr. Iakovlev
3 identifies diffuse scar tissue by showing multiple
4 histological pictures" [as read], and then you provide a
5 list of different figures that are in his report.  Then
6 you opine that his interpretation is incorrect, and
7 you -- and you state that the basis for that is that his
8 report clearly shows viable fibroblasts within the
9 collagen, right?
10    A.   Correct.
11    Q.   And then you said that means the presence of
12 mild to moderate degree of fibrosis?
13        MR. VOUDOURIS:  Without mature --
14    A.   Correct.
15        MR. VOUDOURIS:  -- or pure scar tissue.
16    Q.   (BY MR. THORNBURGH) -- without mature or pure
17 scar tissue.
18        So is it -- let me just understand.  If
19 I -- understand your opinion correctly, you agree that
20 there's a mild to moderate degree of fibrosis observed
21 within CK2a, 2b, 2c, 3a, 3b, and 4?
22    A.   In the different --
23    Q.   You're just -- but you don't believe it's a
24 mature scar?
25    A.   Yeah.  In here and there, it's a focal area.

Page 204

1 You have -- a majority of them, they're mild; the focal
2 area will be moderate.  That's fine.
3    Q.   Where -- which of those exhibits did you
4 find -- I'm sorry.  Let me ask a better question.
5        In those figures, did you find a focal
6 area of moderate fibrosis in each one of those figures?
7    A.   For instance, he labeled -- he --
8    Q.   If could you identify the page number that
9 you're on --
10    A.   Okay.  That's page -- Page 104.  All right?
11 And he labeled was a fibrous tissue, and in parentheses,
12 "scar."  Then again, he said, "Bridging or crossing a
13 pore."
14        Actually, based on my understanding here,
15 it is -- very focally, it's a moderate fibrosis.  But
16 in -- even if a moderate fibrosis you see immediate
17 adjacent that there are multiple vessels.  Then
18 underneath, you have loose connective tissue.
19    Q.   Okay.  Can you circle for me the areas that
20 you agree demonstrate focal moderate fibrosis?
21    A.   These are the area of focal moderate fibrosis
22 [indicating].
23    Q.   And that's on Page 104, Figure CK2c, right?
24    A.   Yes.  And you have vessels, vessels, vessels
25 [indicating].

Page 205

1    Q.   Can you just -- if you go to 3a, CK3a?
2    A.   Yeah.  CK2a, 3a.  Okay.
3        MR. VOUDOURIS:  Page 105.
4    A.   CK3a.  Page 105.
5    Q.   (BY MR. THORNBURGH)  Page 105, yeah.
6        All right.  Now, this says, "CK3a, tissue
7 edema within mesh spaces, H&E, 20X objective, mesh
8 filaments filled with yellow in the labeled copy of the
9 image" [as read].
10        In these fields, there are areas of
11 fibrous tissue where collagen is separated by empty
12 spaces.  Do you see any -- do you disagree with that
13 statement?
14    A.   Yes.  Because I still disagree mainly because
15 there is no way you can tell these are loose connective
16 tissue versus edema.
17    Q.   And what was the basis for that opinion?
18    A.   Because it's just a -- you have a little bit
19 of light space there.
20    Q.   Because of the light space?
21    A.   Yeah.
22    Q.   Because of the stain -- the color of the
23 stain?
24    A.   Right.  That's -- you have a whitish area.
25 You don't know they are loose connective tissue or

Wenxin Zheng, M.D.

Page 206

1 because of a watery kind of element there, so-called
2 edema.
3    Q.   Okay.  So do you agree that there's edema
4 identified in CK3a?
5          MR. VOUDOURIS:  Objection.
6    A.   I cannot be sure this is edema.  And he
7 interprets as edema, but if it was my opinion, I don't
8 think I'm going to label this area represent edema.
9    Q.   (BY MR. THORNBURGH)  If you look at the image
10 on the left on Page 105, CK3a, the very bottom --
11    A.   Yes.
12    Q.   -- underneath -- I'll point to you right here.
13 This area here [indicating]?
14    A.   Yes.
15          MR. VOUDOURIS:  Which area are you
16 pointing to?
17          MR. THORNBURGH:  On the very bottom -- we
18 can -- we can circle it.
19    Q.   (BY MR. THORNBURGH)  We'll circle on Page 105.
20    A.   [Witness complies.]
21    Q.   What do you see in that image?
22    A.   That's still fibroconnective tissue with mild
23 degree of inflammation.
24    Q.   You called that mild degree?
25    A.   Yes.

Page 207

1    Q.   And all the -- all the little purple dots,
2 what are those?
3          MR. VOUDOURIS:  Objection.
4          Go ahead.
5    A.   Purple dots?  You mean black one here
6 [indicating]?
7    Q.   (BY MR. THORNBURGH)  Black dots?
8    A.   Yeah.  Black dots --
9    Q.   Look purple.
10    A.   -- can be inflammatory cell.  Also can be
11 fibroblast, nuclei of the fibroblasts.
12    Q.   Within that circle area, you're saying that's
13 sparse, separated inflammatory cells?
14    A.   Yes.
15    Q.   If you turn the page to CK4.
16    A.   CK4.
17    Q.   It's on Page 107.
18    A.   Yes.
19    Q.   Okay.  So you, again, disagree that this image
20 demonstrates fibrosis?
21    A.   We have certain degree of fibrosis, that's
22 true.  Probably is mild.  But this is too -- magnify too
23 high.  You need an overall picture.
24    Q.   In this picture, do you see moderate --
25    A.   I don't --

Page 208

1    Q.   -- fibrosis?
2    A.   I didn't in that.
3    Q.   What --
4    A.   I do not.
5    Q.   It says that there are lymphocytes identified
6 within this image.  Do you see the lymphocytes?
7    A.   Yes.  Lymphocytes, I agree.
8    Q.   Now, and what is a lymphocyte an indication of
9 in terms of the grading of fibrosis?
10    A.   It's -- it's a main component of the
11 inflammation.  So the amount of lymphocytes, people use
12 that to judge the grade of the inflammation.
13    Q.   And the presence of lymphocytes makes the
14 severity of the inflammation greater?
15          MR. VOUDOURIS:  Objection; form.
16    A.   No.  Lymphocytes almost -- is very commonly
17 present adjacent to these mesh fibers.  That's a part of
18 the normal tissue response.
19    Q.   (BY MR. THORNBURGH)  Normal tissue response
20 to --
21    A.   To implants.
22    Q.   -- foreign body?
23    A.   To foreign body implants.
24    Q.   Did you see, either in the slides that are
25 contained within Dr. Iakovlev's report or within your

Page 209

1 own report, any evidence of nerves with -- in between
2 pores?
3          MR. VOUDOURIS:  Objection; form.
4    Q.   (BY MR. THORNBURGH)  Or nerve distortion?
5          MR. VOUDOURIS:  Objection; form.
6    A.   I did not see any nerve distortion, number
7 one.  Number two, I didn't observe focal area of nerve
8 fibers adjacent to the mesh fiber spaces.
9    Q.   (BY MR. THORNBURGH)  And when I say
10 "distorted" -- "distorted nerves," what's -- what does a
11 distorted nerve look like?
12          MR. VOUDOURIS:  Objection.
13    Q.   (BY MR. THORNBURGH)  Does it bend?
14          MR. VOUDOURIS:  Objection; form.
15    A.   Based on my past experience practicing
16 pathology over 20 years, all right, I see normal nerve
17 endings or fibers in the vaginal tissue.  They all look
18 similar like this; therefore, there is no evidence there
19 is an abnormal -- abnormality.
20          When you say "distortion," basically, it's
21 one of the form.  I -- I don't think any pathology --
22 you know, a typical pathology textbook will describe as
23 a distortion.
24    Q.   (BY MR. THORNBURGH)  Let's look -- if you look
25 at Page 109, CK5b, Dr. Iakovlev's report.  And do you

Wenxin Zheng, M.D.

1  see the --
2     A.  The nerve.
3     Q.  -- nerve that's identified?
4     A.  Yes.
5     Q.  You agree that's a nerve, number one, right?
6     A.  Oh, yeah, sure.
7     Q.  And is that within the fibroconnective tissue
8  near the fibers?
9           MR. VOUDOURIS:  Objection --
10    A.  Near the --
11          MR. VOUDOURIS:  -- form.
12    A.  -- filaments.
13    Q.  (BY MR. THORNBURGH)  Near the filaments?
14    A.  Yes.
15    Q.  And -- and you don't believe that that nerve
16  is distorted in any way?
17    A.  No; not at all.  Because it's a common
18  finding, this shape, because depending on the cut.
19    Q.  Depend --
20    A.  The tissue.
21    Q.  -- depending on the cut of the --
22    A.  Of the tissue.
23    Q.  -- tissue?
24    A.  Yeah.
25    Q.  Okay.  Let's look at some of your slides real

1  quick.  Let's go to Page 12.
2     A.  From my own report?
3     Q.  Yeah.  Yeah, your report, Exhibit 2, Page 12.
4           MR. VOUDOURIS:  Exhibit 2?
5           MR. THORNBURGH:  I think it's Exhibit 2,
6  right?
7           MR. VOUDOURIS:  Oh, I thought you were
8  referring that it says on Page 12, Exhibit 2.
9           MR. THORNBURGH:  No, no.
10          MR. VOUDOURIS:  I know what you're saying.
11  I apologize.
12          THE WITNESS:  My report, Exhibit 4.
13          MR. VOUDOURIS:  Your report is Exhibit --
14          THE WITNESS:  -- 4.
15          MR. THORNBURGH:  Oh, Exhibit 4?
16          MR. VOUDOURIS:  Yes.  Exhibit 2 is the
17  hard drive --
18          MR. THORNBURGH:  That's right.
19          MR. VOUDOURIS:  I'm sorry -- is the disc,
20  yeah, portable disc.
21    Q.  (BY MR. THORNBURGH)  So Exhibit 4, your expert
22  report, go to Figure 3.
23    A.  Figure 3, yes.
24    Q.  And now, you have -- this is a low
25  magnification --

1     A.  Yes.
2     Q.  -- 20 times, 20X?
3     A.  Right.
4     Q.  And you include -- let me ask you this
5  question:  How many microns, i know, from the mesh
6  fiber -- is that -- strike -- strike it.  Let me ask a
7  better question.
8           You have M there.  You see the M?
9     A.  Right.  M is mesh fiber spaces, yes.
10    Q.  So you have -- you say mesh -- M labels the
11  mesh spaces?
12    A.  Yes.
13    Q.  Okay.  So -- because that looks like a mesh
14  fiber to me, not a space.
15    A.  Because -- it's a space because the real mesh
16  is sloughed after tissue processing.
17    Q.  Okay.  So that's where the mesh --
18    A.  Located originally --
19    Q.  -- fibers were located?
20    A.  -- in vivo.
21    Q.  That's where the mesh fibers were located in
22  vivo, right?
23    A.  Correct.
24    Q.  So that's not really -- that's not a pore
25  there; that's actually the mesh fiber?

1     A.  Right.  It's a -- it's a cluster of the mesh.
2  It is in knots basically.
3     Q.  Okay.  And then you have -- this image
4  includes a considerable amount of tissue without mesh in
5  it, right?
6     A.  Correct.  That's adjacent --
7  so-called adjacent fibroconnective tissue excised by
8  Dr. Smith.
9     Q.  Okay.  Do you know what the distance in --
10  approximately, in microns, is from the --
11    A.  This is not microns.  Several millimeter.
12    Q.  Several millimeters?
13    A.  Okay.  Because the lower power -- 2X lower
14  power, 20X lower power.  The whole field is about
15  1.1 centimeter.  So this is cut like from mesh to this
16  area at least a 5 millimeter [indicating].
17    Q.  Okay.  So it's at least 5 millimeters of
18  tissue that significant -- a vast majority of the image
19  doesn't show tissue that had mesh in it, right?
20    A.  Correct.
21    Q.  And when you look at a slide, you look at it
22  at a low -- a low power, like 20X, or even lower, right?
23    A.  No, just lower first, then higher.  Usually
24  lower will show overall picture.  Then can magnify to
25  show what the representative area from the slides we

Wenxin Zheng, M.D.

Page 214

1  want to show.
2     Q.  Okay.  And so when you graded this sample --
3  or this slide, for inflammation, you included several
4  millimeters of tissue that wasn't even near the mesh,
5  right?
6     A.  I --
7          MR. VOUDOURIS:  Objection; form.
8     A.  I included both immediate adjacent to the mesh
9  and the tissue away from the mesh.  So this picture, I
10  say, barely shows any inflammation in this area, in the
11  several millimeter tissue -- several millimeter away
12  from the mesh fiber.
13     Q.  (BY MR. THORNBURGH)  So the area further --
14  furthest away -- so on exhibit -- Page 12, Figure 3, you
15  say barely shows any inflammation in these areas, and
16  that's the area that's furthest away from the mesh
17  fibers, right?
18     A.  Correct.
19     Q.  And as you get closer and closer to the mesh
20  fibers, you get a greater and greater inflammatory
21  response?
22     A.  It's not greater and greater.  Still minimal
23  is there.  You can see still is a bluish area adjacent
24  to the mesh fiber.  That's minimal.  It's mild.
25     Q.  It's --

Page 215

1     A.  Yes.
2     Q.  -- minimum when you take the entire slide into
3  consideration?
4     A.  Correct.
5     Q.  Including slide -- including tissues that are
6  several millimeters away from the actual mesh?
7     A.  No.  I -- I clearly separate them.  If several
8  millimeter away from the mesh, basically no
9  inflammation.  And then mild -- majority of them, mild
10  inflammation is present.  Mostly immediate adjacent to
11  the mesh fiber.  It's clear, right?
12     Q.  Well, I don't know about that.
13     A.  Okay.
14          MR. VOUDOURIS:  Objection; move to strike.
15          Can we go off the --
16     Q.  (BY MR. THORNBURGH)  But that's what --
17          MR. VOUDOURIS:  Can we go off the record
18  for one second?
19          MR. THORNBURGH:  Yeah.
20          THE VIDEOGRAPHER:  We're off the record at
21  3:46 p.m.
22          (Break taken.)
23          THE VIDEOGRAPHER:  We're back on record at
24  3:58 p.m., beginning tape 4.
25     Q.  (BY MR. THORNBURGH)  Okay.  Doctor, before we

Page 216

1  went off the record, we were looking at Exhibit 4, your
2  expert report and specifically Figure 3, right?
3     A.  Yes.
4     Q.  Which is 20X power, low power, right?
5     A.  Yes.
6     Q.  And I'm still a little bit confused on how
7  you are -- how you are grading this slide.  I think --
8  correct me if I'm wrong, but you look at the entire
9  slide at low power, which includes tissue that is
10  several millimeters away from the mesh fibers, and you
11  calculate, by looking at -- looking at the entire slide,
12  the number of inflammatory cells within the entire slide
13  to reach your final grading of that slide.  Is that
14  accurate?
15     A.  I think this picture I want to show you
16  overall situation in the lower power, including mesh and
17  tissue immediate adjacent to mesh and tissue several
18  millimeter away from the mesh.
19          So I try to show you the overall situation
20  of the specimen.  This is a good way to show overall
21  picture of the specimen rather than just magnify in a
22  very focal area to show some very dense inflammation
23  area.
24          So therefore, I think this -- this is the
25  message I want to convey.  All right?  Yes, I based

Page 217

1  on -- when I grade, I separate them, you know,
2  inflammation amount immediate adjacent to the mesh in
3  which condition, and then tissue several millimeter away
4  from the mesh in what kind of condition.
5     Q.  Okay.  And the reason I ask this question is
6  because all of the images or figures that you have in
7  your report are low power.  The greatest power appears
8  to be 40 power, 40X, right?
9     A.  Yeah, because 40X is the maximum routinely
10  used by pathologist.  Pathologist do not routinely use
11  oil lens.  It's -- which is 100X.  That means magnified
12  to 1,000.
13          THE REPORTER:  To one what?
14          THE WITNESS:  1,000 because --
15          MR. VOUDOURIS:  1,000.
16          THE WITNESS:  1,000.
17     Q.  (BY MR. THORNBURGH)  And -- and if I
18  understand it correctly, that's how you -- you grade
19  based on low magnification and come to a conclusion
20  based on the morphological features of the entire slide?
21     A.  That's not true because lower power is showing
22  you better overall picture.  And when I'm grading, I
23  always turn on the higher power to confirm they are
24  actually inflammatory cells.
25     Q.  Okay.  And by higher power, you mean 40X?

Wenxin Zheng, M.D.

Page 218

1    A.  Yeah.  Higher power is -- highest is 40X.
2    Q.  That's the highest you'll go?
3         MR. VOUDOURIS:  Objection.
4    A.  40X means -- is 40 -- it's 400 basically.
5    Because when we say 40X, we have two lenses close to the
6    slide, and the other lens is close to the eye.  Close to
7    the eye, we always -- that's a 10X.  You understand,
8    right?
9    Q.  (BY MR. THORNBURGH)  I understand.  If you
10   look again just briefly at Exhibit 8 and go to Page 594,
11   which is the Hill article.
12   A.  Right.
13   Q.  And you see the Figure 1 where they show
14   examples of how they grade?
15   A.  Yes.
16   Q.  And they show examples of the -- of how they
17   graded certain slides?
18   A.  Yes.
19   Q.  You would agree with me that that is -- that
20   the researchers in the Hill article are looking at those
21   samples greater than 40X?
22        MR. VOUDOURIS:  Objection.
23   Q.  (BY MR. THORNBURGH)  Let me ask it a different
24   way.  You'd agree that, number one, it's a greater --
25   it's greater power than 20X?

Page 219

1         MR. VOUDOURIS:  Objection.
2    Q.  (BY MR. THORNBURGH)  Right?
3    A.  Yes, greater than 20X.
4    Q.  And would you agree it's greater than 40X?
5         MR. VOUDOURIS:  Objection.
6    A.  I'm not sure, because what did they say?
7    What's the magnification here?  They did not -- in the
8    Figure 11, they did not specify.  Did you see any
9    specification for the magnification?
10   Q.  (BY MR. THORNBURGH)  No.  I'm just asking
11   based on your knowledge, training, and experience what
12   it looked like to you.
13   A.  And based on my understanding, this one looks
14   like -- yes, a 4X.  That means -- my -- this picture is
15   a 2X, 20X total.  This one --
16   Q.  This -- when you say "this picture," you're
17   talking about Page --
18   A.  My picture --
19   Q.  -- 12?
20   A.  -- 12, is --
21   Q.  Figure 3?
22   A.  Yeah.  Figure 3 total is a 20X.
23   Q.  Okay.
24   A.  We are now -- all use a total magnification,
25   20X.

Page 220

1    Q.  Okay.
2    A.  And then here, most likely, is a 40X.
3    Q.  Okay.  So you believe, based on your --
4    A.  Right.
5    Q.  -- knowledge, training, and experience that --
6    A.  Right.
7    Q.  -- Figure 1 --
8    A.  It's like a 40X.  Then the (b) specimen
9    probably about 100X.  And then (c) specimen is also
10   100X.
11   Q.  Okay.  What about the (d) specimen?
12   A.  (D) probably is, maybe, similar or even
13   higher.
14   Q.  100X or greater?
15   A.  200X.  And then (e) probably is lower,
16   possibly is a 40X.
17   Q.  (F)?
18   A.  (F) is kind of similar to the (b) and (c).
19   All right.  That's based on my best judgment.
20   Q.  And do you believe it was appropriate or
21   inappropriate for the researchers in Hill to, for
22   example, in Figure 1c, use 100X magnification?
23        MR. VOUDOURIS:  Object -- objection; form,
24   foundation.
25   A.  That's perfectly appropriate because the

Page 221

1    reason they want to show is to show example of the
2    degree of inflammation and the degree of fibrosis.  So
3    therefore, depending -- depending on the purpose, then
4    use different magnification.
5    Q.  (BY MR. THORNBURGH)  Okay.  And if you look at
6    Figure 4 on Page 13 of your expert report, you say,
7    "mesh with integrative fibroconnective tissue showing
8    mild degree of chronic inflammation" [as read], right?
9    A.  Yes.  Right.  Then this time --
10        MR. VOUDOURIS:  There's no question
11   pending.  He just asked you if that's what you said.
12   Q.  (BY MR. THORNBURGH)  And then you have arrows
13   where you say, "Mild degree of chronic inflammation seen
14   in areas immediately adjacent to mesh filaments" [as
15   read], right?
16   A.  Correct.
17   Q.  And -- and this is at 40X?
18   A.  Correct.
19   Q.  And did you grade the degree of scar --
20   or fibroconnective tissue?  You say mild inflammation,
21   but I don't see a grading for the fibroconnective --
22   what you call fibroconnective tissue.
23   A.  Fibroconnective tissue.  I think I overall
24   mentioned we have mild degree of fibrosis.
25   Q.  When you say "overall," what do you mean?

Wenxin Zheng, M.D.

Page 222

1    A.  That means this entire specimen.
2    Q.  So --
3    A.  And then --
4    Q.  So -- so when you look at the specimen, you
5    grade it as overall mild degree of inflammation, which
6    takes into account the tissue adjacent and away from the
7    mesh filaments, right?
8    A.  Correct.
9    Q.  What about the degree of fibrosis closest to
10   the mesh filaments, what is that level?
11           MR. VOUDOURIS:  Objection; form.
12   A.  Based on this picture, like on Page 13, my
13   report, Figure 4, this is still mild degree.
14   Q.  (BY MR. THORNBURGH)  Okay.  So let's make sure
15   that the record reflects -- if you circle this area over
16   here --
17   A.  Right.
18   Q.  So go ahead and circle that.  That's what you
19   call mild fibrosis, right?
20   A.  This one even no fibrosis this area
21   [indicating].  And this area is mild, okay [indicating]?
22   Q.  Well, let's go ahead and circle right here.
23   What level of fibrosis do you see between those two
24   fibers?  It's clearly greater than the two that you just
25   circled, right?

Page 223

1           MR. VOUDOURIS:  Objection; form.
2    A.  Yes.  That's true, but this is so minor.  It's
3    a very focal area.  I mentioned that in my report, focal
4    area was moderate degree of fibrosis, so --
5    Q.  (BY MR. THORNBURGH)  Go ahead and circle that
6    and identify that as you just did.  If you could just
7    write it up here so I can read it later on.  So moderate
8    degree of focal fibrosis, right?
9    A.  Yeah.
10   Q.  And that's an area that's closest to and
11   between two fibers, right?
12   A.  That's very common too, yes.  Okay.
13   Q.  And same over here, go ahead and circle that
14   area, the area between those two fibers.
15   A.  [Witness complies.]
16   Q.  Okay.  And you -- would you agree that that
17   also is moderate degree of fibrosis?
18   A.  As I said, yes, I agree, but it's a very
19   common finding.
20   Q.  Okay.  Go ahead and identify that as moderate
21   degree of fibrosis.
22   A.  I already did.
23   Q.  No.  The second one we just talked about.
24   A.  Merge together, right?
25   Q.  Oh, so they're the same.  You merge them

Page 224

1    together.
2           So in between those two -- those pores
3    closest to the fiber, it's your opinion that to a
4    reasonable degree of medical probability that the degree
5    of fibrosis between those pores is moderate?
6    A.  That's fine.
7    Q.  Would you agree that the severity of fibrosis
8    is greater closest to the mesh filaments, mesh fibers?
9           MR. VOUDOURIS:  Objection; form,
10   foundation.
11   A.  In general, yes.  That's because that's the
12   way tissue responds to mesh filaments.  That's true.
13   Q.  (BY MR. THORNBURGH)  So that's something that
14   would be common, right?
15   A.  It's quite common.
16   Q.  And expected?
17           MR. VOUDOURIS:  Objection.
18   A.  It's expected.
19   Q.  (BY MR. THORNBURGH)  If you go to Figure 5,
20   here you say, "There are occasional foci of moderate
21   degree of chronic inflammation found in the specimen"
22   [as read], right?
23   A.  Correct.
24   Q.  And you have arrows pointing to the moderate
25   degree of inflammation?

Page 225

1    A.  Yes.
2    Q.  Is that chronic -- moderate degree of chronic
3    inflammation, also?
4    A.  That's -- I said moderate degree, right?
5    That's occasional foci.
6    Q.  And is that common, to be -- a common finding
7    on your mesh fibers?
8           MR. VOUDOURIS:  Objection.
9    A.  I should say majority of -- of the specimens
10   contains mild degree of inflammation based on my past
11   experience.  And for this one, yes, we have focal area
12   of moderate degree of inflammation.
13   Q.  (BY MR. THORNBURGH)  And that's closer to the
14   fiber, right?
15   A.  It's adjacent to the fiber.
16   Q.  Immediately adjacent to the fiber?
17           MR. VOUDOURIS:  Objection; form.
18   A.  That depends how you define "immediate"
19   because you still have some space between
20   inflammation -- cluster of inflammatory cell and the
21   mesh fiber.
22   Q.  (BY MR. THORNBURGH)  Okay.  Then -- and then
23   also on this image, Figure 5 on Page 14 of Exhibit 4, in
24   your report, you say, "The mesh fiber spaces are
25   visualized adjacent to the squamous mucosa" [as read].

Wenxin Zheng, M.D.

Page 226

1    What's the significance of that finding?
2    A.  That the squamous mucosa is the same, and then
3  underneath you see mesh fiber space.  That's descriptive
4  of my finding.
5    Q.  But then you -- but you say immediately after
6  that, "This is an indication -- a probable indication of
7  mesh site exposure" [as read], right?
8    A.  Right.  Then based on this finding, I think,
9  in -- in conjunction with a clinical finding of mesh
10  exposure, then possibly this picture will be much better
11  than the picture Dr. Iakovlev showed.
12    Q.  Okay.  So can you go ahead and circle where
13  you see with -- or just write with this pen where you
14  see the squamous mucosa indicating probable mesh
15  exposure?
16    A.  It's already --
17      MR. VOUDOURIS:  He already has an arrow
18  there.
19    A.  -- in my Figure 11.
20    Q.  (BY MR. THORNBURGH)  I don't see it.  I'm
21  sorry.  Oh, down here.  Well, it's just a -- can you
22  just write there "likely erosion" there?
23      MR. VOUDOURIS:  Objection.
24    A.  What do you mean likely --
25    Q.  (BY MR. THORNBURGH)  That's a likely site of

Page 227

1  erosion, right?
2    A.  I --
3      MR. VOUDOURIS:  Objection.
4    A.  I say -- let me see.  One is located...
5      (Witness reviewed document.)
6    A.  "Indicating a probable mesh exposure site."
7      It's very clear there.  Why you want a
8  separate --
9    Q.  (BY MR. THORNBURGH)  Because we've been doing
10  this game, so --
11    A.  You can do by yourself because this is just
12  clearly there, then --
13    Q.  I'll go ahead and do it for you.
14    A.  Right.
15    Q.  So -- so is it -- is it right --
16    A.  It's not for me.  You -- because I already
17  indicated very clearly.
18    Q.  I see.  But I want to see --
19    A.  Right.
20    Q.  -- a precise location.  So if I circle --
21      MR. VOUDOURIS:  Objection.
22    Q.  (BY MR. THORNBURGH)  -- this area, is that the
23  area that you see it, or is it this area [indicating]?
24    A.  Yeah.  There's arrow indicating this area is
25  squamous mucosa.

Page 228

1    Q.  Okay.  So I'm going to try to accurately
2  circle that where you just indicated, okay?  Is that the
3  area of likely --
4    A.  It is squamous.
5    Q.  -- of the likely erosion?
6    A.  No.  I just --
7      MR. VOUDOURIS:  Objection.
8    Q.  (BY MR. THORNBURGH)  -- or exposure?
9    A.  No.  You don't understand.  This is the
10  squamous mucosa we found, okay?  It's very tiny, all
11  right?  It's -- it's better than the picture
12  Dr. Iakovlev showed because he showed a picture very
13  fragmented.
14      And then I was looking very carefully
15  because I noticed that clinically there is exposure
16  site.  So then underneath you see -- adjacent to this
17  area, you see several mesh fiber spaces, right?
18    Q.  (BY MR. THORNBURGH)  Uh-huh.
19    A.  And then there is a distance from mesh fiber
20  spaces to this squamous mucosa is probably within a
21  millimeter of distance.
22    Q.  I got it.
23    A.  Therefore, it's possible -- I didn't say it's
24  definitive.  It's possible this area represents exposure
25  site.

Page 229

1    Q.  Okay.  So based on that evidence, the location
2  of the fiber --
3    A.  Yeah.
4    Q.  -- to the identification of squamous mucosa --
5    A.  Right.  Because squamous mucosa, that's on the
6  top.
7    Q.  So does that give you the ability to say to a
8  reasonable degree of medical probability or certainty
9  that's the area where the exposure occurred?
10      MR. VOUDOURIS:  Objection.
11    A.  I say the probable or possible area.  It's not
12  like definitively -- there is no definitive evidence
13  saying, you know, from the specimen I examined shows the
14  mesh exposure or erosive site.
15    Q.  (BY MR. THORNBURGH)  Okay.  I mean, you
16  just -- you don't use the word "possible" in your -- in
17  your report.  You actually say probable?
18    A.  Right.
19    Q.  Okay.  So do you agree that that's the
20  probable location of the mesh exposure?
21    A.  Right.  That's -- that's clearly in my report,
22  right?
23    Q.  So I'm going to write "exposure" here, okay?
24  On Page 14 of your report.
25    A.  Should be probable exposure.

Wenxin Zheng, M.D.

Page 230

1    Q.   Sure.  Did you see -- do you see any
2  evidence -- strike that.
3         Okay.  Figure 6 is -- I think that's your
4  last figure, right?
5    A.   There's more than that.
6    Q.   So Figure 6, briefly, you said this is --
7  shows good tissue integration, right?
8    A.   Yes.
9    Q.   And then you point to vessels that are -- how
10 many -- how -- what's the distance of those vessels
11 outside of the --
12   A.   It's less than a millimeter away.
13   Q.   Okay.  So -- so you say this is good tissue
14 integration, and then you have arrows to the vessels.
15 And is the basis for your opinion the presence of the
16 vessels?
17   A.   Presence of vessels and also viable
18 fibroblasts and some nerve endings.
19   Q.   What's the degree of fibrosis over here --
20   A.   It's still --
21   Q.   -- closest --
22   A.   Yeah.
23   Q.   -- closest to the mesh fiber?
24   A.   So this still, overall, is mild in this area.
25 And then -- except this area may be, if you want, is

Page 231

1  moderate.
2    Q.   Okay.  Can you go ahead and draw an arrow to
3  that in the margin so we can see it?
4    A.   Right in this -- overall, this large amount of
5  area there, all mild.
6    Q.   What's your basis for stating that
7  this -- these areas that you circled are mild?
8    A.   Because you have viable fibroblasts and also
9  vessels in it.  And then you have, compared to other
10 tissue away from this area, without any fibrosis here,
11 you have more fibrous collagen.
12   Q.   Furthest -- further away from the mesh
13 filaments, right?
14   A.   Right.  Further away from mesh filaments,
15 there is no fibrosis.
16   Q.   And not in between -- the space between the
17 pores?
18   A.   Space between the pores, most of them, they
19 are still mild, but only very focal area, very close
20 area, you have some moderate degree, but it's --
21   Q.   But that's --
22   A.   -- it's a tiny, tiny place.
23   Q.   You don't see vessels in between the mesh
24 pores?  You've drawn arrows to -- for, but you haven't
25 drawn any arrows between the mesh pores, right?

Page 232

1        MR. VOUDOURIS:  Objection; compound.
2    A.   And there is another one.  If you want, this
3  is another one.  Because there is no reason to indicate
4  every single vessels in it.  Overall situation, if you
5  are trained pathologist, they're easily understand these
6  area they're healthy.  They have innervation, as well as
7  a vascularization; therefore, they are viable tissue.
8    Q.   (BY MR. THORNBURGH)  Is it your opinion that
9  the -- that the tissue over here where you've pointed to
10 the vessels, which is a lighter color stain --
11   A.   Right.
12   Q.   -- is a better, more viable tissue than the
13 tissue that is closest to the mesh --
14   A.   They're all viable so far.
15   Q.   Which tissue looks healthier to you?
16        MR. VOUDOURIS:  Objection; form.
17   A.   These are all healthy tissue look for me.
18   Q.   (BY MR. THORNBURGH)  So -- so are you stating
19 that this area right here next to where you -- where you
20 have the arrows to the vessels further away from the
21 fibers is the same type of reaction that you're seeing
22 closest to the fibers?
23        MR. VOUDOURIS:  Objection; form.
24   A.   It's very much similar but just a less degree
25 of fibrosis.

Page 233

1    Q.   (BY MR. THORNBURGH)  Greater degree of
2  fibrosis closest to the fibers?
3    A.   We already say that.
4    Q.   That's a common finding?
5    A.   Yeah; it's a very common finding.
6    Q.   Figure 7, you say -- so this is your S-100
7  comparison to H&E?
8    A.   Yes.
9    Q.   And -- and what are you trying to demonstrate
10 in this -- in this exhibit, this figure on Page 16?
11   A.   The overall demonstration point is amount of
12 nerve fibers identified in the specimen is within normal
13 limits.
14   Q.   And normal limits compared to what?
15   A.   I mean, it's a normal finding.  Vaginal tissue
16 should have no fibers.
17   Q.   So you're not surprised to find nerves near
18 mesh fiber?
19   A.   Not at all.  If I don't find any, then
20 probably is a problem.
21   Q.   Is it -- let me try and understand quickly
22 about your opinion regarding pain and the finding of
23 nerves.
24        MR. VOUDOURIS:  Dan...
25   Q.   (BY MR. THORNBURGH)  Is it -- is it your

Wenxin Zheng, M.D.

Page 234

1  opinion in this case, in Mrs. -- in Mrs. Corbet's case,
2  that simply because there are nerves within a mesh
3  specimen and nerves near the mesh fibers that -- strike
4  that.
5           You're not saying, I don't think, that the
6  presence -- strike that.  Let me ask a better question.
7           You're not offering an opinion that nerve
8  damage in Mrs. Corbet's case didn't lead to her pain,
9  right?
10          MR. VOUDOURIS:  Objection to form.
11     A.  First of all, I never say that --
12          MR. VOUDOURIS:  And you're misrepresenting
13  what he said.
14     A.  First of all, I never said -- said that there
15  is any evidence of nerve damage, number one.  Number two
16  is presence of nerve in these specimen is a normal
17  finding.  Number three, from histological point of view,
18  I can't say because presence of nerve in this specimen,
19  that's correlated to patient pain.  That's the three
20  points I want to say.
21     Q.  (BY MR. THORNBURGH) Okay.  So essentially, I
22  think, if I could just boil it down, it's your opinion
23  that a pathologist can't opine that the clinical
24  findings of vaginal pain are caused based on presence of
25  nerve fibers found within a mesh specimen slide; is that

Page 235

1  correct?
2           MR. VOUDOURIS:  Objection; form.
3      A.  I only can say based on the finding of this
4  particular case, there is no evidence for me to say
5  these nerves' presence in the specimen predicts the pain
6  in the clinical site.  Is that clear?
7      Q.  (BY MR. THORNBURGH) So you're not saying that
8  the presence of nerves within or around the mesh doesn't
9  cause pain.
10          MR. VOUDOURIS:  Object.
11     Q.  (BY MR. THORNBURGH) It can cause pain, right?
12          MR. VOUDOURIS:  Objection; form,
13  foundation.
14     A.  Let me explain to you in this way:  Nerve --
15  peripheral nerve growth is part of the tissue
16  integration.  That happens almost to every patient who
17  received vaginal mesh implants, okay?
18          So that means even without examining
19  all -- majority of the implant, the mesh, then majority
20  of these patients who received mesh implants, they do
21  not complain pain.  You understand the linkage, right?
22          So therefore, finding these pain -- these
23  nerve in the specimen for Mrs. Corbet cannot predict or
24  correlate or can say associate with the clinical
25  complaint of pain.  Is that clear?

Page 236

1      Q.  (BY MR. THORNBURGH) I think so.
2           So you're saying, I think, that you can't
3  reliably look at a mesh specimen and see nerves present
4  in or around Ms. Corbet's mesh and conclude that it's
5  the presence of the mesh is causing her pain?
6           MR. VOUDOURIS:  Objection; form.
7      A.  Nobody can --
8      Q.  (BY MR. THORNBURGH) Presence of the nerve --
9      A.  Yes.  I can't, and I don't think any other
10  pathologist can.
11     Q.  Is it possible for Mrs. Corbet that the
12  presence of nerves in and around her mesh contributed to
13  her pain?
14          MR. VOUDOURIS:  Objection; form,
15  foundation, and asked and answered.
16     A.  You're asking a hypothesis or assumption.
17  I -- I don't know how to answer that question.
18     Q.  (BY MR. THORNBURGH) Well, what are the -- for
19  Mrs. Corbet what are the potential causes of her pain,
20  which led to the explant of the TVT device?
21          MR. VOUDOURIS:  Objection; form,
22  foundation, beyond his scope.
23          THE WITNESS:  That -- that means I don't
24  have to answer?
25          MR. VOUDOURIS:  Well, you've already --

Page 237

1  you've already testified that you can't look from a
2  pathologist's point of view --
3           THE WITNESS:  Right.
4           MR. VOUDOURIS:  -- at the slides and
5  correlate it with a complaint of pain.
6      Q.  (BY MR. THORNBURGH) So you can't, and won't
7  at trial, offer an opinion to a reasonable degree of
8  medical certainty what the cause of Ms. Corbet's pain
9  is, correct?
10          MR. VOUDOURIS:  Objection; form,
11  foundation.
12     A.  I'm not in the position to explain where is
13  the source for this patient of dyspareunia she
14  complained because based on pathological findings, I do
15  not see any evidence to correlate to the pain.  That's
16  the statement.
17     Q.  (BY MR. THORNBURGH) And I just want to make
18  sure I understand.  You also didn't find any other
19  pathological finding, like a tumor or something else,
20  that could be causing her pain, correct?
21     A.  Yeah.  If I see --
22          MR. VOUDOURIS:  He just -- he just asked
23  you if you did or didn't.
24     A.  I didn't.  But if I see a neuroma, for
25  instance, then, that could be a reasonable finding to be

Wenxin Zheng, M.D.

Page 238

1  associated with the pain.
2      Q.  (BY MR. THORNBURGH)  Okay.  And you said
3  neuroma?
4      A.  Yeah.
5      Q.  What's a neuroma?
6      A.  It's a -- it's a tumor of the nerve.
7      Q.  So you didn't find any sort of -- there was no
8  pathological findings like that --
9      A.  No.
10      Q.  -- that would explain her pain?
11      A.  Correct.
12      Q.  The only finding you have and have
13  demonstrated in these figures that you've attached to
14  your report are mesh explant specimens that contained
15  mesh, right?
16      A.  Yeah.
17      Q.  Some with occasional -- with increased
18  inflammatory response around the mesh fibers compared to
19  the further adjacent tissues?
20          MR. VOUDOURIS:  Objection.
21      A.  My conclusion is in my report, all right?
22  That's clearly --
23      Q.  (BY MR. THORNBURGH)  But my question is:  You
24  didn't find any other pathological findings that could
25  explain pain, but you did find the presence of mesh,

Page 239

1  nerves near the mesh, you found inflammatory response,
2  and chronic foreign body reaction, correct?
3      A.  Correct.
4      Q.  It's not possible for you, as a pathologist,
5  to say that those findings are causing her
6  complications, including pain, right?
7          MR. VOUDOURIS:  Objection; form,
8  foundation, asked and answered.
9      A.  Correct.  And also nobody -- no other
10  pathologist can predict that based on these histological
11  findings.
12      Q.  (BY MR. THORNBURGH)  Didn't Hill and his
13  coauthors identify women who had pain and associated
14  increases of inflammation and chronic foreign body
15  reaction?
16          MR. VOUDOURIS:  Objection; form.
17      A.  I'm not sure for that particular point, but if
18  you have read in -- you know, you can just read.
19          MR. VOUDOURIS:  Audra Jolyn Hill might be
20  a little disappointed that you referred to her as a he.
21      Q.  (BY MR. THORNBURGH)  Mrs. Hill --
22          MR. VOUDOURIS:  No.  Dr. Hill.
23          MR. THORNBURGH:  Dr. Hill.
24      Q.  (BY MR. THORNBURGH)  Dr. Hill found that for
25  nearly 60 percent of the patients who had mesh

Page 240

1  explanted, there was moderate fibrosis, right?
2      A.  That's depending on what kind of condition
3  they -- these individual patients had.
4      Q.  For all -- all three groups, there's no
5  significant difference, remember?
6      A.  I -- I know that.  But for this particular
7  patient, we do not see -- mainly, it is a very focal
8  area with moderate amount of information.  The majority
9  of them, they are mild; and many areas, no inflammation.
10      Q.  On Figure 8, you have an image.  It looks like
11  the same image with different stains and different --
12      A.  Magnification.
13      Q.  -- magnification --
14      A.  Yes.
15      Q.  -- is that right?
16          And you have a square representing where
17  you've magnified the image?
18      A.  Correct.
19      Q.  Okay.  And so in exhibit -- or in Figure 8a,
20  that's just the trichrome stain, right?
21      A.  Correct.
22      Q.  You're not offering any opinions based on
23  that; you're just showing what a trichrome stain of this
24  slide looks like?
25      A.  No.  I want to show because Dr. Iakovlev

Page 241

1  showed very lower power use trichrome stain, says
2  because all these blue color represent the fibrosis.
3  Therefore, he conclude these are the severe fibrosis or
4  scar everywhere.  Then I try to show the same area from
5  the slides he took the picture then magnify gradually to
6  see these are not scar tissue.  That's the point I want
7  to show.
8      Q.  Okay.  So Figure B is a -- what magnification,
9  on Page 22 of your report?
10      A.  B are probably -- panel A is 40X, then panel B
11  is a 40X too.
12      Q.  And that's 40X in H&E, right?
13      A.  Right.
14      Q.  Okay.  And then you -- and what's the distance
15  from the fiber to that area, which looks like it's --
16      A.  It's within less than a millimeter.  It's only
17  maybe half a millimeter away.
18      Q.  500 microns or so?
19      A.  Yeah.  You can see the mesh fiber is about
20  maybe 100 -- 100-micron cross-section diameters;
21  therefore, you only have 2- to 300 microns.
22      Q.  So it's not -- it wouldn't be immediately
23  adjacent to the mesh; it would be further out?
24      A.  It's 2- to 300 micron.  Basically, it's quite
25  close already.  It's a micron level.

Wenxin Zheng, M.D.

Page 242

1    Q.   And it's not in between the mesh pores, right?
2    A.   It's -- it's not mesh pores.
3    Q.   It's outside of the mesh pores, correct?
4    A.   It's -- could be still within the pore
5  because, as I said, two-dimensional pictures, you can't
6  tell within the pore or it's outside the pore or
7  adjacent to the pore.  So basically, what we candidly
8  describe is adjacent to the mesh.  You understand?
9    Q.   Well, I don't understand how it could be
10 within a pore.  Because if we look at your images,
11 right, look at --
12   A.   That's --
13   Q.   -- look at B --
14   A.   Right.
15   Q.   -- it -- it showed -- it appears to show that
16 it's -- it's not between these two pores if it's not on
17 the slide.
18   A.   It's adjacent to the pore.
19   Q.   It's adjacent, but not in between.
20   A.   Doesn't matter.  In between is theoretically
21 also adjacent; because in between, that is not necessary
22 it's within the pore.
23   Q.   Well, do you see any other pores on this side
24 adjacent to the -- the microvessel that you've circled
25 there or squared there?

Page 243

1    A.   Here is a -- is a space.  So I don't know what
2  kind of space is that.
3    Q.   Does it look like a pore?
4           MR. VOUDOURIS:  Objection.
5    Q.   (BY MR. THORNBURGH)  It's too big to be a pore
6  in that space, right?
7    A.   No.
8           MR. VOUDOURIS:  Objection.
9    A.   No.  This is the tissue, missed portion of the
10 tissue there.
11   Q.   (BY MR. THORNBURGH)  You're not going
12 to -- you're not representing to the Court or to the
13 ladies and gentlemen of the jury, and won't at trial,
14 that this microvessel is in between the mesh pores,
15 right?
16   A.   What -- you see the Figure A, panel A, is a
17 trichrome staining, right, it's a lower power trichrome
18 staining.  In the center, that's mesh fiber spaces.
19 Then adjacent, they are all fibroconnective tissue,
20 right?
21   Q.   Yeah.  I'm just -- I'm just going to
22 make -- I'm just making sure that at trial you're not
23 going to suggest or represent to the Court or opine or
24 offer an opinion that this microvessel is in between
25 pores, is filling the space of --

Page 244

1    A.   I didn't say that.  I said just -- the tissue
2  immediate adjacent to the mesh fibers, they represent
3  integrated tissue instead of pure scar.  That's the
4  point.
5    Q.   Does it appear that this is closest to the
6  edge of the scar rather than the center of the --
7    A.   This is not the scar.
8    Q.   -- fibroconnective tissue?
9           MR. VOUDOURIS:  Objection; form.
10   Q.   (BY MR. THORNBURGH)  Let me ask it again.
11 Does it appear that this -- this area that you've
12 identified as a microvessel is -- is closer to the edge
13 of this fibroconnective tissue?
14   A.   It's not -- this specimen just like this area,
15 okay [indicating]?  Okay, like panel A.  And because
16 different levels and you show these area, Dr. Iakovlev
17 says they are all scar tissue.
18           And my point is, these area, they not scar
19 tissue.  Because if you magnify a little bit, you can
20 see viable vessel, as well as viable fibroblasts;
21 therefore, they are not scar tissue.  That's the point.
22   Q.   Figure 9 -- when you say "scar tissue," you're
23 not -- are you saying they're not mature --
24   A.   They're not pure scar.
25           MR. VOUDOURIS:  Objection.

Page 245

1    Q.   (BY MR. THORNBURGH)  Pure scar.  And pure scar
2  would be?
3    A.   Pure scar will be just like Dr. Hill say, like
4  this picture [indicating].
5    Q.   Okay.  So how long -- do you know how
6  long -- how -- strike that.
7           You don't know how long this mesh was
8  implanted in this particular patient, right?
9    A.   He -- she only presented as an example.
10   Q.   And by "this particular patient," I'm talking
11 about this figure --
12   A.   We don't know what kind of condition.
13   Q.   -- Figure E on Page 594 of Dr. Hill's article,
14 right?
15   A.   Right.
16   Q.   And how long was Mrs. Corbet's mesh implanted
17 in her?
18   A.   It's about one year, right?
19   Q.   July 2011 until early 2013?
20           MR. VOUDOURIS:  February 2013.
21   A.   It's over -- a little over a year.
22   Q.   (BY MR. THORNBURGH)  Approximately a year and
23 a half?
24   A.   Yeah.
25   Q.   Okay.  And you know from -- you understand

Wenxin Zheng, M.D.

1 that the tissue response is chronic and lasts for years?

2        MR. VOUDOURIS:  Objection; form.

3    A.  Assuming the foreign body there, usually, yes,

4 you will -- will have more or less inflammatory

5 response.

6    Q.  (BY MR. THORNBURGH)  Do you know how long it

7 takes to get a -- what you call a pure scar tissue?

8        MR. VOUDOURIS:  Dan, this was covered

9 ad infinitum in his prior depositions.

10        MR. THORNBURGH:  Okay.

11    Q.  (BY MR. THORNBURGH)  Do you have any opinions

12 with respect to Mrs. Corbet, whether or not if the mesh

13 had remained in her body for longer, that it would

14 continue to experience increased inflammatory response

15 and foreign body reaction?

16        MR. VOUDOURIS:  Objection; form,

17 foundation --

18    Q.  (BY MR. THORNBURGH)  It -- it would seem --

19        MR. VOUDOURIS:  -- speculation.

20    Q.  (BY MR. THORNBURGH)  The foreign body response

21 and inflammatory response would be persistent and remain

22 constant for the mesh that's still in her body?

23        MR. VOUDOURIS:  Objection; form.

24    A.  I'm not able to predict the things is not

25 happening yet, first of all.  But in general, yes, if

1 you have implanted the mesh, then inflammatory response

2 or tissue response will continue.

3        Then the degree of -- of inflammation or

4 degree of fibrosis, that's individualized rather than

5 just you can draw an equation that says how many days

6 there then will reach to a certain level.  No.  Every

7 patient is different.

8    Q.  (BY MR. THORNBURGH)  Your -- your Figure 9,

9 the -- the images that you took, is a section that

10 you're -- you've sort of dedicated to the degradation or

11 your opinions concerning degradation?

12    A.  Concerning his so-called bark-like area,

13 right?

14    Q.  Yes.  On Page 24, you've got image A, B, and

15 C, and you took that in a low magnification, right?

16    A.  It's not really low.  You can see.

17    Q.  What's the magnification on exhibit A, B,

18 and C?

19    A.  Did I say that?  Oh, no.

20    Q.  No.

21    A.  Based on this one, most likely will be 40 or

22 100.

23    Q.  Did you take any additional images with higher

24 magnification to get closer to the edge of the mesh

25 fibers?

1    A.  I think like this, the Figure 11, is higher

2 magnification, which is at least 100 or 200.  Okay?

3    Q.  You could have gotten closer on that

4 magnification, right?

5    A.  And because usually closer is not that good.

6 Because here, you can see clearly to see the

7 illustration between the true mesh versus bark, all

8 right?  Everybody can see very clearly.  That's the

9 point.  If it's not very clear, then I will actually

10 magnify to make it clear.

11    Q.  If we look at, for example, Page 60 -- hold on

12 a second -- 24 of Dr. Iakovlev's report.

13    A.  Page 24?

14    Q.  Uh-huh.

15        MR. VOUDOURIS:  What page?  I'm sorry.

16        MR. THORNBURGH:  24 of -- I'm sorry -- 65,

17 image 24b.

18        MR. VOUDOURIS:  Page --

19        MR. THORNBURGH:  24b.

20        MR. SNOWDEN:  Counsel, do you want to use

21 the Corbet portion of deposition or no?

22        MR. THORNBURGH:  I was going to ask what

23 the magnification is on -- on this image.

24        MR. SNOWDEN:  Is that for Ms. Corbet?

25        MR. THORNBURGH:  I'm comparing to the

1 magnification that he used in his report.

2        MR. VOUDOURIS:  Yeah, so --

3        MR. THORNBURGH:  I'm just -- I'm just

4 asking him --

5    Q.  (BY MR. THORNBURGH)  This magnification on

6 Page 65, in 24b is a higher magnification than what you

7 used in Figure 9, right?

8    A.  That's a lot higher.

9    Q.  Okay.  And how much higher; do you know?

10    A.  I don't know.  Maybe still like either

11 solvent, something -- oil lens.  That's the tool he

12 likes to use.

13    Q.  If you turn to Page 116 of Dr. Iakovlev's

14 report, Figure CK8b, this is an image of Ms. Corbet,

15 right?

16    A.  Yes.

17    Q.  Okay.  Do you -- that's a much higher

18 magnification than you used --

19    A.  Right.

20    Q.  -- in your figures -- the figures contained

21 within Figure 9 and Figure 10, right?

22    A.  Right.

23    Q.  And if the bark or the surface layer

24 of -- surrounding the mesh fibers is 2 to 5 microns,

25 wouldn't you agree that to get a better image, you need

Wenxin Zheng, M.D.

Page 250

1 to have a stronger-powered zoom?
2      A.  No.
3           MR. VOUDOURIS:  Objection; form,
4 foundation.
5      A.  I disagree because the point here is if these
6 bark-like material, they represent degraded mesh
7 material, then under the polarized condition, they will
8 show identical birefringing condition.  That's the point
9 I want to show.
10          And what he wants to show is a very high
11 magnification is to show these cracks-like stuff there,
12 all right?  And which is usually -- I don't like to use
13 this kind of very high magnification.
14          If they do want to show, then he should
15 include a lower magnification, show the area he's
16 pointing.  That will be much better picture than to
17 demonstrate some points, right?  Even I don't know where
18 this coming from.  If you show higher magnification
19 from -- for instance, if I show my finger is blown into
20 1,000 times, nobody can tell this from my finger.
21      Q.  (BY MR. THORNBURGH)  So you think it would be
22 better for him to start out --
23      A.  Right.  Start it from lower power, then
24 gradually --
25      Q.  Zoom in?

Page 251

1      A.  Right.  Okay.  So this point, I use the
2 intermediate power is simply try to demonstrate one
3 is -- clear-cut is a mesh, remaining mesh, right, in
4 the -- in the center.  You see the different color and
5 the different -- one is blue, one is yellow, the other
6 is green.
7      Q.  Uh-huh.
8      A.  Why is that?  Because in the polarized
9 condition, these mesh fibers show polarized or
10 birefringent property, right?  And then --
11      Q.  Uh-huh.
12      A.  -- the bark material he claim -- and whatever
13 he claim, that they -- all these bark represent degraded
14 mesh, they should have showed similar birefringent
15 property.  But this picture shows opposite.
16      Q.  How many filters did you use, polarized
17 filters?
18      A.  How many filters?
19      Q.  Yeah.
20      A.  What do you mean?  It's a typical, standard
21 birefringent -- polarized filter.
22      Q.  So it's one -- one polarized filter?
23      A.  Yes.  One is on the top, the other is --
24      Q.  On the bottom?
25      A.  -- on the bottom.  Right.  It's a standard

Page 252

1 pathology practice.
2      Q.  Did you use oil immersion?
3      A.  No.  As I said, surgical pathologists, the
4 highest magnification is 400.  And the oil immersion is
5 for microbiologist or cytopathologist.
6      Q.  So -- so you didn't use oil immersion because
7 you're only going to look at the specimen using 40
8 magnification?
9           MR. VOUDOURIS:  Objection; form.
10      A.  400 -- highest is 400.
11      Q.  (BY MR. THORNBURGH)  So -- so the reason why
12 you didn't use oil immersion is because you were only
13 going to go as high as -- you say 400, but are any of
14 these 400?
15      A.  These are not hundred, but can be -- can go
16 to -- highest is 400.  It's really not necessary to use
17 oil immersion lens.
18      Q.  Unless you're going to do a higher
19 magnification?
20      A.  For me, there is no point to do that; no point
21 to go further high.
22      Q.  So, you know, on Figure CK8b on Page 116,
23 Dr. Iakovlev says that he -- this was a degraded layer
24 of bark, polypropylene, seen using H&E 100X subjective
25 with oil immersion polarized light.

Page 253

1      A.  Right.  He --
2      Q.  This indicates he's using 100X, right?
3      A.  100X means to 1,000 magnification.
4      Q.  Okay.  And your magnification was as high as
5 what on these images in Figures 9 and 10?
6      A.  That's why I -- that's how I say probably
7 is -- maximum is -- is 100.
8      Q.  So that would be 4X and 10X?
9      A.  It's either 4X or 10X then become either 40 or
10 100.
11      Q.  Did you attempt to go to 1,000 magnification
12 or 100X?
13      A.  There is no reason to do that.  That's why I
14 say -- if I magnify too high, then the remaining tissue,
15 you cannot see.  Even if the -- then people can ask me,
16 "Where this coming from?"
17      Q.  Okay.  So -- and that's why you didn't use oil
18 immersion because you don't --
19      A.  Right.  That's why -- that's the same question
20 I'm going to ask you:  "Where this coming from?"  I
21 don't know.
22      Q.  Let me finish the question.  You didn't -- you
23 didn't use oil immersion because you weren't going --
24 going to magnify up to 1,000?
25      A.  There is no reason --

Page 254

1      MR. VOUDOURIS: Objection.
2    A. -- as I said.
3    Q. (BY MR. THORNBURGH) Have you ever -- strike
4  that.
5        Did you place the polarized -- hold on a
6  second. Strike that.
7        Dr. Iakovlev, on -- on Page 116, says, "If
8  there is an object with polarizing properties between
9  the filters, the light plane deviates from the
10  perpendicular plane, and the object becomes visible" [as
11  read].
12        Do you see that?
13    A. Which line is that?
14    Q. So let's -- let's go a couple lines. So if
15  you go to "When two polarizing filters were placed above
16  and below the glass slide" [as read].
17        Do you see that last sentence?
18    A. Okay. The second line, yes.
19    Q. -- "and their polarizing orientation is
20  perpendicular, their light cannot pass through.
21  However, if there is an object with polarizing
22  properties between the filters, the light plane deviates
23  from the perpendicular plane, and the object becomes
24  visible" [as read].
25        Do you have any basis to disagree with

Page 255

1  that statement?
2    A. This is fine because these are the polarized,
3  the -- the nature of the polarized lens, when you use
4  that, and you can see these things.
5    Q. Did you use that same method when you did the
6  polarization --
7    A. Yes.
8    Q. -- in Figure 9 and 10?
9    A. That's routine practice for pathology.
10    Q. Why -- why is -- why are his images darker
11  than your images?
12        MR. VOUDOURIS: Objection.
13    Q. (BY MR. THORNBURGH) Is there a way to add
14  additional -- to keep -- to continue to polarize
15  the -- the filters to get a different image like he's
16  got on figure CK8b?
17        MR. VOUDOURIS: Objection.
18    A. Polarize the condition. If you turn the
19  polarized lens a little bit, like 5 degree, then you see
20  different picture, different color, okay? Then why this
21  is black -- and first of all, I don't know where this
22  coming from, number one. All right?
23        Number two, he say that there is H&E
24  associated. Where is the H&E?
25        Number 3, all these so-called cracks-like

Page 256

1  things he use or arrows indicate that. This could be --
2  well be like artifact we just discussed earlier in the
3  morning through the blades. We don't know what's going
4  on for this one. So there -- this picture did not
5  demonstrate anything at all for me.
6    Q. (BY MR. THORNBURGH) Are you claiming that
7  those cracks that we see on the outer surface of this
8  fiber is artifact?
9    A. We don't know what -- I did not claim. As I
10  said, there is a possibility because nobody can confirm
11  what are those stuff.
12    Q. Okay.
13    A. Because you magnify to the 1,000 times and
14  then to see a very tiny area showing these so-called
15  irregularity, or these lines, on the surface of the
16  polymer fiber.
17    Q. You keep on saying we don't know where this
18  image is coming from, but he's identified that in -- on
19  Page 116. You see that, right? The same fields are in
20  CK5a.
21    A. I know. I would say that where this coming
22  from, CK5a of which -- corresponding to which picture
23  of the -- of the H&E slide.
24    Q. So are -- let me just make sure I understand.
25  Are your criticisms that, number one, you don't know

Page 257

1  where this fiber is coming from, this fiber image?
2    A. Right.
3    Q. Number two, he used 100X objective --
4    A. Right.
5    Q. -- to get close up on the image?
6    A. That's very high. That's 1,000 times
7  magnification.
8    Q. And what are your other criticisms of this
9  image?
10    A. And then his -- his arrows indicating -- let's
11  read -- what's the -- arrow indicating what?
12        (Witness reviewed document.)
13    Q. Blue -- blue granules. Do you -- do you know
14  that the -- do you have an understanding that this TVT
15  mesh is made from a blue pigment?
16    A. Yes.
17    Q. And so do you understand that what he's
18  pointing out here are -- are that there are blue
19  pigments that the polypropylene is made from within the
20  cracked layer?
21        MR. VOUDOURIS: Objection.
22    A. And, again, he cannot prove there is something
23  overlapping. For instance, you have collagens densely
24  adhesed to these mesh fibers also can show overlapping.
25  Underneath is mesh fiber on H and you -- meanwhile, you

Wenxin Zheng, M.D.

1  have dense collagens adhesed to that. Then these
2  collagen also can show linings or cracks, so-called.
3      Q. (BY MR. THORNBURGH) Okay. So you understand
4  this is a cross-section, right?
5      A. Yes.
6      Q. So you're claiming that this -- this outer,
7  cracked layer is collagen, right? Is that what you're
8  claiming?
9      A. I said could be collagen overlapping in this
10  area.
11      Q. Okay. But what he's pointing out here is
12  there are blue granules or pigments which the mesh
13  fibers are dyed with, and he observes them within the
14  cracked area.
15      A. Correct.
16          MR. VOUDOURIS: Objection; form.
17      A. That's why I -- I say they could be
18  overlapping. And under microscope, in certain
19  condition, you can still see blue granules. Meanwhile,
20  the -- the collagen covers on the top. You are not able
21  to see.
22      Q. (BY MR. THORNBURGH) Do you have any evidence
23  of -- of that happening within figure CK8b?
24      A. It's my understanding; it's not evidence
25  based. It's my -- based on my past experience as a

1  pathologist. Because, think it over, the mesh will stay
2  in the human body. It's not going to move around
3  because you have tissue integration. Why tissue
4  integration will hold mesh? Because you have these
5  collagens densely adhesed to the mesh fiber, anchors and
6  fix these mesh fibers.
7      Q. Go to Page 119 real quick, Exhibit CK8f.
8      A. Yes.
9      Q. And do you see that cracked, outer layer
10  identified here in Exhibit CK8f on the outside of the
11  fiber?
12          MR. VOUDOURIS: Objection; form.
13      A. Yes, I saw that.
14      Q. (BY MR. THORNBURGH) Okay. And, again, this
15  is a cross-section of Mrs. Corbet's explant, right?
16      A. Yeah; he claimed that, yes.
17      Q. Okay. And again, this is 100X objective,
18  right?
19      A. Yes.
20      Q. Have you ever looked at any mesh fibers in
21  this case, Ms. Corbet's case, at 100X objective?
22      A. No. I -- there is no need to do that.
23      Q. Okay. And you see again those blue pigments
24  within the cracked layer?
25          MR. VOUDOURIS: Objection; form.

1      A. Meanwhile, it's a purplish.
2      Q. (BY MR. THORNBURGH) You see those purplish --
3      A. Right.
4      Q. -- dots or pigments within the -- or granules
5  within the cracked layer?
6      A. The purplish is staining, right. And
7  underneath, you may have a few granules. That's a
8  possibility.
9      Q. Within the cracked layer?
10      A. Right.
11      Q. And if there are granules within the cracked
12  layer and Mrs. Corbet's mesh was made out of blue
13  pigments, isn't this some evidence that the cracked
14  layer is actually a polypropylene that was implanted
15  into Mrs. Corbet?
16          MR. VOUDOURIS: Objection; form,
17  foundation, speculation.
18      A. You can't confirm that. Okay. Again, just
19  like as I said, there is a possibility you have these
20  overlapping so-called degenerated collagens densely
21  adhesed to the mesh fiber or mesh filament. Then
22  underneath of that, you see blue granule is very common.
23  And plus, collagens, they also can be polarized.
24      Q. (BY MR. THORNBURGH) So it's very -- so I
25  think what I understood you to say is it's very common

1  for you to -- when you look at these explanted meshes on
2  cross-section at a higher magnification to see these
3  blue granules within the layer, the top layer of the
4  mesh --
5          MR. VOUDOURIS: Objection; form.
6      Q. (BY MR. THORNBURGH) -- filament?
7      A. No. It's --
8          MR. VOUDOURIS: Misstates his testimony.
9      A. In the 40X or 400 magnification, usually
10  people are not able to see blue granules. And then
11  plus, it's really not necessary to magnify such a high
12  level to visualize what are they because the best way to
13  show is -- if they are truly degraded mesh fibers, then
14  under polarized condition, they will show birefringent
15  property. But many of them, they don't. That's the
16  fact.
17      Q. (BY MR. THORNBURGH) If you turn the page to
18  26. Again, this is a lower magnification than
19  Dr. Iakovlev uses, right?
20      A. This is a 400 probably.
21      Q. 400X?
22      A. Yeah. Magnification, I mean.
23      Q. 400 magnification, which would be 40X, right?
24      A. 40X is a 400 magnification.
25      Q. And you write here that "The bark-like

Wenxin Zheng, M.D.

Page 262

1 material does not show the same birefringent properties
2 under the polarized light as the mesh fibers in your
3 image using 40X"?
4    A.  Correct.
5    Q.  Do you know how thick that layer is that
6 you're pointing to?
7    A.  It's several microns, like still similar to
8 maybe 3 to 5 micron, as Dr. Iakovlev mentioned.
9    Q.  And is this something that -- well, strike
10 that.
11        Did you see this layer in Mrs. -- in all
12 of Ms. Corbet's fibers or just the ones that you used to
13 do polarized light?
14        MR. VOUDOURIS:  Objection; compound.
15    A.  Can you rephrase your question?
16    Q.  (BY MR. THORNBURGH)  Yeah.  I'm just trying to
17 understand, did you -- when you looked at all of her
18 images --
19    A.  Right.
20    Q.  -- did you try and get close enough to see if
21 there was an outer layer on the outside of the
22 cross-section fiber?
23    A.  Yes.  I examined it very carefully.
24    Q.  And were you able to see an outer layer on the
25 mesh fibers at 40X?

Page 263

1        MR. VOUDOURIS:  Objection; form.
2    A.  Oh, yeah; it's very clear.  And the many
3 so-called bark-like area can be visualized even in the
4 40X magnification or 100X magnification.
5    Q.  (BY MR. THORNBURGH)  Okay.  So on -- under
6 section D, your conclusions, you say, "Based on my
7 review of Ms. Corbet's pathology specimens, I conclude
8 the following:  No evidence of mesh distortion is
9 identified" [as read]?
10    A.  Correct.
11    Q.  And by "mesh distortion," are you referring to
12 curling or roping?
13    A.  Yeah.  Curling, roping, and also including the
14 clinical examination, as stated by Dr. Smith.  When she
15 removed the portion of the implants, she did not
16 describe any abnormality there.
17    Q.  And any other basis for that?  Just a review
18 of the -- the -- the --
19    A.  And --
20    Q.  -- pathology material?
21    A.  Right.  And histologically, all these mesh
22 pictures or figures I have seen, it's very common.  Just
23 almost every explanted mesh will show, more or less,
24 similar pictures.
25    Q.  What -- what do you mean by more or less will

Page 264

1 show similar pictures?  What do you mean by that?
2    A.  Because mesh, just like Dr. Iakovlev's picture
3 and my picture, you can see lower power they can have
4 this kind of appearance or may have different
5 appearance, right?  These -- depending on the -- which
6 plane you cut.
7        So it does not necessarily -- they are not
8 perfectly round, and then -- then these mesh, they are
9 normal.  And then the relationship, like this mesh is
10 round, the other mesh is oval shape.  Then they are
11 perpendicular relationship, then it says it's distorted.
12    Q.  Did you see --
13    A.  Nobody can say that.
14    Q.  Did you see in Dr. Iakovlev's report where he
15 discusses where he can see evidence of curling and
16 roping?
17    A.  Yeah.  I -- I saw that, but I disagree.
18    Q.  And what -- and what's your basis for
19 disagreeing?
20        MR. VOUDOURIS:  Objection; asked and
21 answered.
22    A.  Can you show exactly which picture that you
23 are referring?  Then we will discuss.
24    Q.  (BY MR. THORNBURGH)  Yeah.  Let me just -- you
25 know the -- the image that you have where you have --

Page 265

1 you identified the possible erosion?
2    A.  Right.
3    Q.  And that was image -- you circled it on --
4    A.  That's on Page 14.
5    Q.  On Page 14?
6    A.  Figure 5.
7    Q.  Page 14, Figure 5 is the slide that you --
8 microphotograph that you indicated earlier was a
9 probable exposure, right?
10    A.  Correct.
11    Q.  And do you see any evidence that this is
12 laying flat, this -- this mesh that was explanted is
13 laying flat, or does it appear to be curled up here
14 where you see the squamous mucosa?
15        MR. VOUDOURIS:  Objection; form.
16    A.  If you understand the pathology a little
17 better, then you may not ask this question because the
18 specimen process is a random cut, all right?
19        And also, fresh specimen is different from
20 fixed specimen.  Fresh specimen removed by surgeon and
21 have to be placed in the formalin.  Then after in the
22 formalin, then tissue being fixed.  And by removing the
23 water components, therefore, the specimen shrinks, okay?
24        So then after specimen shrinks, then these
25 pictures, these mesh can be either way, can be arranged

Wenxin Zheng, M.D.

Page 266

1 very randomly, all right?  Even make not only this
2 circle, even can be completely go to this area
3 [indicating].
4    Q.  (BY MR. THORNBURGH)  Okay.
5    A.  It does not mean this mesh just distorted.
6    Q.  So let me just make sure I understand your
7 testimony.  Do you -- you, I think, are agreeing that
8 the image on Page 14 of your report appears to be
9 distorted, but you cannot say that that was -- happened
10 inside her body rather than something that happened --
11    A.  I --
12    Q.  -- after --
13    A.  -- I did --
14        MR. VOUDOURIS:  Are you done?
15        MR. THORNBURGH:  Yeah.
16        MR. VOUDOURIS:  Objection --
17        THE WITNESS:  Okay.
18        MR. VOUDOURIS:  -- form and misstates his
19 prior testimony.
20    A.  Right.  I even didn't say this appeared to
21 curl.  That's you -- what you are saying.
22    Q.  (BY MR. THORNBURGH)  You said it could have
23 this image and --
24    A.  Right.  All these --
25    Q.  -- and you directed --

Page 267

1    A.  What I said is all these findings, they are
2 normal finding, okay?  Whatever the -- the mesh, they
3 can have a totally different picture, all right?  Can
4 have more than 100 kind of different appearance under
5 microscope because the section can be totally different.
6    Q.  Okay.  So when I asked you -- when I said
7 distorted or when I was -- strike that.
8        When I was asking questions about
9 distortion, you said, referring to Exhibit Number 14,
10 that it could appear like this, and you created sort of
11 a roundish -- a round circle as you were demonstrating.
12    A.  Right.
13    Q.  Do you see some evidence of -- of some sort of
14 curling that is happening within this image?
15    A.  We --
16        MR. VOUDOURIS:  Objection.
17    A.  We see all kinds of microscopic
18 representations, including so-called curling.  It's not
19 real curling, okay?  Because, as I say, tissue, after
20 remove the water, tissue contracts.  Then tissue
21 contracts, will change the shape of original mesh
22 in vivo.  So it's totally different from in vivo.
23    Q.  (BY MR. THORNBURGH)  Okay.  So I think you're
24 saying that you can't tell whether or not in
25 Mrs. Corbet's case if there was any evidence of

Page 268

1 distortion because the mesh was explanted and put into
2 formalin; is that right?
3        MR. VOUDOURIS:  Objection; form.
4    A.  That's why I say no -- no histological
5 evidence of distortion.
6    Q.  (BY MR. THORNBURGH)  All right.  So you're
7 not saying that -- you're not going to opine or offer
8 evidence or suggest that it didn't distort inside her
9 body; you're just stating or offering an opinion that
10 you simply can't make that determination after the mesh
11 has been explanted and put into formalin?
12        MR. VOUDOURIS:  Objection; form,
13 foundation, misstates his testimony.
14        Go ahead.
15    A.  But based on clinical finding, Dr. Smith did
16 not state any abnormality, for instance, the -- the --
17 the implanted mesh was displaced or abnormally located,
18 okay?  Number one.
19        Number two, from other publications
20 also -- like ultrasound study also mention based on a
21 several-year follow-up -- I don't remember exactly where
22 it is -- they found that there is no evidence of -- you
23 know, that these implanted mesh will move around or
24 change shape.
25    Q.  (BY MR. THORNBURGH)  What study did you

Page 269

1 reference?
2    A.  That's, I think, one of the study that's in
3 the --
4    Q.  Is that the Klinge study?
5    A.  I don't remember which one, but anyway, it's
6 in the thumb drive.
7    Q.  Is that the study?  And I'm not -- I
8 don't want to -- I'm just trying to understand what
9 study you're using to base your opinion --
10    A.  It's an ultrasound study to see if mesh
11 actually move -- moved from the year 1 -- or day 1
12 implantation and then to after 3 years follow-up to
13 see --
14    Q.  That's --
15    A.  -- if they move at all.
16    Q.  That's actually the study where they began to
17 evaluate mesh movement after three months, right?
18        MR. VOUDOURIS:  Objection; form.
19    A.  I think three years, three-year follow-up.
20    Q.  (BY MR. THORNBURGH)  So that's your basis for
21 the opinion --
22    A.  It's not the basis.  My basis is, first of
23 all, based on my pathological finding, number one.
24 They're very common, all right?  Number two is from
25 Dr. Smith's deposition or surgical pathology report --

Wenxin Zheng, M.D.

Page 270

1    or surgical procedure report.
2        Q.  On number 2 you say the -- the second opinion
3    you have is that, "The specimen shows goods tissue
4    integration with mild and focally moderate degree of
5    fibrosis.  No evidence of diffuse scar formation or scar
6    bridging is identified" [as read].
7            And is that the opinion that you have
8    given throughout today?
9        A.  Yes.
10       Q.  "And no evidence of infection present," right?
11       A.  Correct.
12       Q.  You say, "But focal mesh exposure or erosion
13   may be present" [as read].
14           And that's what you identified?
15       A.  That's what we discussed.
16       Q.  Your next opinion is, "No evidence of nerve
17   entrapment or any abnormal nerve findings in the
18   specimen" [as read]?
19       A.  Correct.
20       Q.  And we discussed that earlier.  And the basis
21   for that is your review of these -- is your
22   opinion -- or the basis for that opinion is that finding
23   nerves in -- in or near mesh is a normal finding?
24       A.  Correct.
25       Q.  "The degree of chronic inflammation of foreign

Page 271

1    body giant cells found in the specimen is within normal
2    limits" [as read]?
3        A.  Yes.
4        Q.  And the norm -- you say "normal limits."  For
5    what?  What is normal limits?
6        A.  Normal limits means almost every explanted
7    mesh should have, more or less, similar degree of
8    inflammation or fibrosis.
9        Q.  So when you --
10       A.  So that means it's -- it's not beyond
11   expectation.
12       Q.  So -- so what -- the way you used the term
13   "normal limits," you're saying that Mrs. Corbet's degree
14   of chronic inflammation of foreign giant cells found in
15   her specimen is consistent with the other specimens that
16   you've explanted or analyzed?
17       A.  Right.  Or consistent with similar even
18   nonmesh implants or foreign body.  Any foreign body
19   implant to human tissues, they normally -- in normal
20   condition, they should have similar findings.
21       Q.  Okay.  So her findings -- the findings that
22   you have analyzing her explant is consistent with the
23   findings that you see in all foreign body explants?
24       A.  Correct.
25       Q.  So normal --

Page 272

1        A.  If -- if they are normal.
2        Q.  Normal limits -- when you say "normal limits,"
3    you're comparing --
4        A.  That means without infection, all these
5    things.  If you -- if the specimen is infected, that's
6    different.
7        Q.  You say here, "No evidence of tissue
8    necrosis," right?
9        A.  Correct.
10       Q.  And -- and then go on to say that "Therefore,
11   there's no cytotoxicity"?
12       A.  Correct.
13       Q.  Okay.  And she did have -- as we've already
14   said, you've observed a probable exposure, and
15   clinically, she had an exposure.  Are you offering an
16   opinion or stating, representing that when there's
17   cytotoxicity, it does not lead to erosions?
18           MR. VOUDOURIS:  Objection and compound.
19       A.  I said there is no evidence here based on
20   histological findings to suggest any cytotoxicity
21   happened.  Because if there is any evidence of
22   cytotoxicity, then we should be able to see cell deaths.
23       Q.  (BY MR. THORNBURGH)  So, you know, I've taken
24   the deposition of, you know, internal employees for --
25   for Ethicon, who've testified that cyto -- that the type

Page 273

1    of symptoms you would expect from cytotoxicity would be
2    an enhanced tissue response or erosion.
3            MR. VOUDOURIS:  Objection.
4        Q.  (BY MR. THORNBURGH)  So are -- are you saying
5    that she -- that erosion is not a finding caused by
6    cytotoxicity?
7        A.  There is no relationship for that.
8        Q.  What's the basis for your opinion that
9    Mrs. Corbet's erosion does not suggest or indicate
10   cytotoxicity?
11           MR. VOUDOURIS:  Objection; asked and
12   answered.
13       A.  I have said very clearly here there is no
14   evidence of tissue necrosis or cell deaths in here;
15   therefore, unlikely there is any cytotoxicity there in
16   this -- these tissue from the mesh specimen.
17       Q.  (BY MR. THORNBURGH)  You're not a
18   toxicologist, though, right?
19       A.  No.
20       Q.  You're not going to offer opinions as a
21   toxicologist at trial?
22       A.  No.
23       Q.  Have you looked at, in making this opinion
24   about Mrs. Corbet, the internal documents of Ethicon
25   concerning their cytotoxicity results?

Wenxin Zheng, M.D.

Page 274

1    A.   No.
2    Q.   Have you read the deposition of Dr. --
3  Dr. Barbolt concerning cytotoxicity?
4    A.   No.
5    Q.   And so what's the basis -- where do you get
6  the -- this statement or the opinion that if it's
7  cytotoxic, you're going to see necrosis?
8    A.   If it's cytotoxic, that means that these
9  chemicals will kill the cell.  That's very simple.  And
10  I don't see cell deaths and even tissue necrosis.
11  Therefore, from that point of view, there is no toxic
12  environment there.  Is that clear?
13    Q.   Yeah.  I'm just trying -- do you have an
14  opinion whether or not cytotoxicity can cause erosion?
15          MR. VOUDOURIS:  Objection; it's beyond the
16  scope.
17    Q.   (BY MR. THORNBURGH)  You're not offering that
18  opinion?
19    A.   I'm not going to offer any opinion of that.
20    Q.   Would you defer to people at Ethicon?
21    A.   Or the expert.
22    Q.   And finding there's no histological evidence
23  to support pain or dyspareunia complained of in the
24  patient, right?
25    A.   From -- yes, from histological perspective,

Page 275

1  there is no evidence to support that.
2    Q.   So it's your opinion that the moderate
3  fibrosis that you identified, the focal fibrosis that
4  you identified, is not associated with pain?
5          MR. VOUDOURIS:  Objection; asked and
6  answered.
7    A.   No.
8    Q.   (BY MR. THORNBURGH)  Fibrosis doesn't cause
9  pain -- so it's your opinion that the fibrosis that you
10  observed in Ms. Corbet is not causing her pain?
11          MR. VOUDOURIS:  Objection.
12    A.   Correct.
13    Q.   (BY MR. THORNBURGH)  And it's not causing her
14  dyspareunia?
15    A.   No direct --
16          MR. VOUDOURIS:  Objection.
17    A.   -- association.  I have stated multiple time
18  from a pathology perspective, reading slides can't
19  predict the patient will have pain or not pain,
20  particularly for this case.
21    Q.   (BY MR. THORNBURGH)  So the presence -- you're
22  saying, I think, that the presence of an inflammatory
23  response -- strike that.
24          You cannot offer an opinion to a
25  reasonable degree of medical probability that the

Page 276

1  presence of inflammation is causing her pain?
2    A.   Not only me; majority of the pathologists will
3  have the same conclusion.
4    Q.   And so I think similar to your opinions that
5  you offered regarding the nerves, are you basically --
6  are you essentially saying that it's impossible to
7  determine that a patient's pain is caused from a
8  pathological finding of inflammation?
9          MR. VOUDOURIS:  Objection.
10    A.   Right.  Pain is a clinical symptom and a
11  patient feeling.  It's a very complex situation, okay?
12  You understand?  So that's --
13    Q.   (BY MR. THORNBURGH)  Inflammation -- I'm
14  sorry.  I thought you were done.
15          Inflammation can cause pain, though,
16  right?
17          MR. VOUDOURIS:  Objection.
18    A.   Depending on how much inflammation you have.
19    Q.   (BY MR. THORNBURGH)  Do you know -- sorry.  Go
20  ahead.
21    A.   For instance, if you have a cut and infected,
22  then lots of inflammation cause erythema, edema, and
23  then you have -- you may have pain.  But if you have a
24  mild, chronic inflammation many people have, then
25  we -- particularly, in majority situation, they do not

Page 277

1  feel pain.
2          MR. VOUDOURIS:  Dan, this was --
3          MR. THORNBURGH:  I'm almost done.
4          MR. VOUDOURIS:  I know.  This was
5  discussed --
6          MR. THORNBURGH:  The -- well, I'm just --
7          MR. VOUDOURIS:  -- extensively.
8          MR. THORNBURGH:  -- summarizing his
9  opinions.
10    Q.   (BY MR. THORNBURGH)  The -- the edema that
11  was -- that Dr. Iakovlev identified is -- it's your
12  opinion that that wasn't edema?
13    A.   Correct.
14    Q.   And if it was edema, if she has edema,
15  is -- is that evidence of pain?
16          MR. VOUDOURIS:  Objection.
17    Q.   (BY MR. THORNBURGH)  Can pain cause edema?
18          MR. VOUDOURIS:  Objection.
19    A.   You always use a hypothetical situation.  And
20  what I'm -- we are answering is to deal with the
21  realistic things.  Whatever we found, then we make
22  statement.
23          So -- and plus, Dr. Iakovlev only pointed
24  a very focal area with a potential, his interpretation,
25  of edema.  And my interpretation is not convinced edema.

Wenxin Zheng, M.B.

## Page 278

1 Could be loose connective tissue. So therefore, there's

2 no evidence to support patient -- a clinical finding of

3 pain.

4     Q. (BY MR. THORNBURGH) Does that summarize all

5 of your opinions?

6     A. Correct.

7     Q. And finally, I think you testified that you

8 got paid $600 an hour, but does that change for trial?

9 Do you get paid more for trial?

10     A. No. I think this the same, always the same.

11     Q. Okay. $600 per hour? Is there a minimum

12 hourly fee per day?

13     A. For trial, I think I mentioned that the

14 maximum will be either 8 hours or 10 hours, no

15 matter -- I'm not going to include my sleeping hours

16 for -- for the trial.

17     Q. So -- so you'd get a minimum of $8 per

18 day -- I'm sorry -- a minimum of 8 hours per day at $600

19 an hour if you appear for trial?

20     A. Usually that's the case.

21     Q. Is that in a fee schedule?

22     A. That's my fee schedule for many years, yes.

23        MR. THORNBURGH: I think that's it.

24        THE WITNESS: Okay.

25        MR. VOUDOURIS: Let's just take a quick

## Page 279

1 break.

2        THE VIDEOGRAPHER: We're off record at

3 5:21 p.m.

4        (Break taken.)

5        THE VIDEOGRAPHER: We're back on record at

6 5:27 p.m.

7        MR. VOUDOURIS: Dr. Zheng, I have no

8 follow-up questions for you, but the court reporter's

9 going to type this deposition up, and you have the right

10 to read it or waive signature. I suggest you tell her

11 that you'd like to read it, but you have to tell her

12 that.

13        THE WITNESS: Okay. I have to read it.

14        THE REPORTER: Okay.

15        MR. VOUDOURIS: All right.

16        MR. THORNBURGH: All right.

17        THE VIDEOGRAPHER: We're off record at

18 5:28 p.m.

19        (Proceedings concluded.)

20

21

22

23

24

25

## Page 280

1           CHANGES AND SIGNATURE

2 WITNESS NAME: WENXIN ZHENG, M.D. DATE: NOVEMBER 18, 2015

3 PAGE LINE    CHANGE     REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

## Page 281

1     I, WENXIN ZHENG, M.D., have read the foregoing

deposition and hereby affix my signature that same is

2 true and correct, except as noted above.

3

4

           _____

5            WENXIN ZHENG, M.D.

6

7

8

9 THE STATE OF _____)

10 COUNTY OF _____)

11

12     Before me, _____, on

13 this day personally appeared WENXIN ZHENG, M.D., known

14 to me (or proved to me under oath or through

15 _____) (description of identity

16 card or other document)) to be the person whose name is

17 subscribed to the foregoing instrument and acknowledged

18 to me that they executed the same for the purposes and

19 consideration therein expressed.

20     Given under my hand and seal of office this

21 _____ day of _____, 2015.

22

23

           _____

           NOTARY PUBLIC IN AND FOR

24            THE STATE OF _____

           COMMISSION EXPIRES:

25

Wenxin Zheng, M.D.

Page 282

1  STATE OF TEXAS   )
2  COUNTY OF DALLAS )
3      I, LISA C. HUNDT, a Certified Shorthand Reporter in
4  and for the State of Texas, hereby certify that,
5  pursuant to the agreement hereinbefore set forth, there
6  came before me on the 18th day of November, A.D, 2015,
7  at 9:16 a.m., at the office of Thompson & Knight,
8  located at 1722 Routh Street, Suite 1500, in the City of
9  Dallas, State of Texas, the following named person,
10  to-wit:  WENXIN ZHENG, M.D., who was by me duly
11  cautioned and sworn  to testify to the truth, the whole
12  truth, and nothing but the truth of his knowledge
13  touching and concerning the matters in controversy in
14  this cause; and that he was thereupon carefully examined
15  upon his oath and his examination reduced to writing
16  under my supervision; that the deposition is a true
17  record of the testimony given by the witness, same to be
18  sworn and subscribed by said witness before any Notary
19  Public, pursuant to the agreement of the parties; and
20  that the amount of time used by each party at the
21  deposition is as follows:
22        Mr. Daniel Thornburgh - 6 hours, 22 minutes,
23        Mr. Peter Voudouris - 0 hours, 0 minutes,
24        Mr. Brandon Morris - 0 hours, 0 minutes,
25        Mr. Andrew Snowden - 0 hours, 0 minutes;

Page 283

1      I further certify that I am neither attorney nor
2  counsel for, nor related to or employed by, any of the
3  parties to the action in which this deposition is taken,
4  and further, that I am not a relative or employee of any
5  attorney or counsel employed by the parties hereto, or
6  financially interested in the action.
7      I further certify that before the completion of the
8  deposition, ___X___ the Deponent, and/or _____ the
9  Plaintiff/Defendant, ___X___ did _____ did not request
10  to review the transcript.
11      In witness whereof, I have hereunto set my hand and
12  affixed my seal this 20th day of November, A.D. 2015.
13
14
15
16
17      _____
                LISA C. HUNDT, CSR, RPR, CLR
18              Texas CSR No. 6533
                Expiration Date:  12/31/16
19
20
21
22
23
24
25