# EXHIBIT I

Paul J. Michaels, M.D.

Page 1

```
          IN THE UNITED STATES DISTRICT COURT

       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

                   CHARLESTON DIVISION


_____
                              )
IN RE: ETHICON, INC., PELVIC  )   Master File No.
REPAIR SYSTEM PRODUCTS        )
PRODUCTS LIABILITY LITIGATION )    2:12-MD-02327
                              )
THIS DOCUMENT RELATES TO THE  )       MDL 2327
FOLLOWING CASES IN WAVE 2     )
OF MDL 200:                   )
                              )    JOSEPH R. GOODWIN
Tamara Carter, et al. v.      )
Ethicon, Inc., et al.         )   U.S. DISTRICT JUDGE
Civil Action No. 2:12-cv-01661)
                              )
Sandra Childress, et al. v.   )
Ethicon, Inc., et al.         )
Civil Action No. 2:12-cv-01564)
                              )
Marion Chrysler v.            ) PAUL J. MICHAELS, M.D.
Ethicon, Inc., et al.         )
Civil Action No. 2:12-cv-02060) JUNE 18, 2016
                              )
Melissa Sanders, et al. v.    )
Ethicon, Inc., et al.         )
Civil Action No. 2:12-cv-01562)
                              )
Ana Sierra, et al. v.         )
Ethicon, Inc., et al.         )
Civil Action No. 2:12-cv-01819)
                              )
Toni Hernandez v.             )
Ethicon, Inc., et al.         )
Civil Action No. 2:12-cv-02073)
_____)


 Reported by:

 Rebecca J. Callow, RMR, CRR, RPR
```

Paul J. Michaels, M.D.

```
                                                    Page 2
 1
 2
 3       DEPOSITION OF PAUL J. MICHAELS, M.D.
 4       THIS DOCUMENT RELATES TO MARION CHRYSLER
 5              Austin, Texas
 6          Saturday, June 18th, 2016
 7                4:18 p.m.
 8
 9
10  Deposition of PAUL J. MICHAELS, M.D, pursuant to
11  Notice held at the offices of Hissey Kientz,
12  9442 N. Capital of Texas Highway Building 1,
13  First Floor Conference Room, Austin, Texas, before
14  Rebecca J. Callow, Registered Merit Reporter,
15  Certified Realtime Reporter, Registered
16  Professional Reporter, and Notary Public in and
17  for the State of Texas.
18
19
20
21
22
23
24
```

```
                                                    Page 3
 1  A P P E A R A N C E S:
 2
 3  FOR PLAINTIFFS:
 4       Aylstock, Witkin, Kreis & Overholtz, PLLC
 5       17 East Main Street
 6       Suite 200
 7       Pensacola, Florida 32502
 8       (850) 202-1010
 9       BY:    Bryan F. Aylstock, Esquire
10              baylstock@awkolaw.com
11
12  FOR PLAINTIFFS:
13       Danny L. Curtis, P.C.
14       9229 Ward Parkway
15       Suite 370
16       Kansas City, Missouri 64114
17       (816) 523-4667
18       BY:    Danny L. Curtis, Esquire
19              dcurtis@dannylcurtispc.com
20
21
22
23
24
```

```
                                                    Page 4
 1  A P P E A R A N C E S:
 2
 3  FOR JOHNSON & JOHNSON AND ETHICON, INC.:
 4       Thomas Combs & Spann PLLC
 5       300 Summers Street
 6       Suite 1380
 7       Charleston, West Virginia 25301
 8       (304) 414-1807
 9       BY:    David B. Thomas, Esquire
10              dthomas@tcspllc.com
11
12  FOR JOHNSON & JOHNSON AND ETHICON, INC.:
13       Butler Snow, LLP
14       150 3rd Avenue South
15       Suite 1600
16       Nashville Tennessee 37201
17       (615) 651-6700
18       BY:    M. Andrew Snowden, Esquire
19              andy.snowden@butlersnow.com
20
21
22
23
24
```

```
                                                    Page 5
 1                  INDEX
 2                                        PAGE
 3  PAUL J. MICHAELS, M.D.
 4  Examination by Mr. Snowden ........................6
 5  Changes and corrections  .........................57
 6  Signature Page  ..................................58
 7  Court Reporter's Certificate .....................59
 8
 9
10
11
12              EXHIBITS
13  NO.       DESCRIPTION                    PAGE
14  Exhibit 1    Expert Report of Paul J.        6
15         Michaels. M.D. (Re: Marion
16         Chrysler)
17  Exhibit 2    4/18/2013 Surgical Pathology   37
18         Report for Marion Chrysler
19
20
21
22
23
24
```

Paul J. Michaels, M.D.

Page 6

1        (Exhibit 1 marked.)
2        PAUL J. MICHAELS, M.D.,
3   Called as a witness herein, having been first duly
4   sworn by a Notary Public, was examined and testified as
5   follows:
6              EXAMINATION
7   BY MR. SNOWDEN:
8     Q.  Good afternoon, Dr. Michaels.
9     A.  Good afternoon.
10    Q.  I'm handing you what's been marked as
11  Exhibit 1.  Could you take a look at that, please,
12  and let me know if that contains your entire
13  case-specific report regarding Marion Chrysler.
14        (Document review.)
15    A.  Yes.
16  BY MR. SNOWDEN:
17    Q.  Okay.  And does that Exhibit No. 1 contain
18  all of your case-specific opinions regarding
19  Ms. Chrysler?
20    A.  Yes.
21    Q.  Have you done any work since the date you
22  signed this report on Ms. Chrysler's case?
23    A.  Yes.
24    Q.  And what have you done?

Page 7

1     A.  I reviewed her deposition, and I
2   re-reviewed her medical records.  And I reviewed the
3   defense pathology expert report.  I would say that's
4   about it.
5     Q.  Okay.  And based on that work that you've
6   done, is there anything you want to change about
7   your opinions in this case?
8     A.  No.
9     Q.  Okay.  Do you have any changes at all to
10  your opinion before we start?
11    A.  Not that I know of.
12    Q.  If you turn to the last page of the
13  exhibit.
14    A.  Okay.
15    Q.  There's a list there of materials reviewed.
16        Do you see that?
17    A.  Yes.
18    Q.  It lists the deposition of Sean Ryan.
19        Do you see that?
20    A.  Yes.
21    Q.  You didn't review that one?
22    A.  I don't recall reviewing that, no.
23    Q.  And in terms of the medical records you see
24  listed below, have you reviewed all those medical

Page 8

1   records?
2     A.  I would have to go through my computer
3   where I have all of them and confirm, but I reviewed
4   extensive diverse medical records.  So I would
5   imagine that that's a complete and accurate list.
6     Q.  How many mesh specimens did you review for
7   Ms. Chrysler?
8     A.  Just one.
9     Q.  And did that come to you already prepared
10  on histology slides?
11    A.  Yes.
12    Q.  So you haven't reviewed a gross specimen
13  for Ms. Chrysler?
14    A.  Correct.
15    Q.  Beginning on page 4 of your report in the
16  section in all caps, "Marion Chrysler," is that sort
17  of your summary of -- well, let me just ask it.
18        What's the purpose of this section of
19  your report?
20    A.  It's a brief summary of my review of her
21  pertinent medical history and course.
22    Q.  And how do you decide what's included in
23  this summary?
24    A.  It's what I determine as a physician is

Page 9

1   medically relevant.
2     Q.  And if you go -- if you start at the
3   beginning, it lists her past medical history in the
4   third sentence.
5         Do you see where I am?
6     A.  Yes.
7     Q.  Okay.  And do you see polycystic kidney
8   disease?
9     A.  Yes.
10    Q.  What impact, if any, did that have on your
11  opinions in this case?
12    A.  Well, patients with polycystic kidney
13  disease can have recurrent urinary tract infections.
14  They can have a lot of renal functional issues
15  requiring transplant, because the parenchyma of the
16  kidneys is basically fibrotic because of the
17  numerous cysts that they develop microscopically and
18  become apparent grossly.  I would say that would be
19  the main issues of polycystic kidney disease.
20    Q.  Can it be painful?
21    A.  They can.
22    Q.  Do you know whether Ms. Chrysler's
23  polycystic kidney disease caused her pain?
24    A.  I don't recall reading if she experienced

Page 10

1  any sort of dull, aching abdominal pain with her
2  polycystic kidney disease -- that was attributed to
3  her polycystic kidney disease.
4           But it seemed to me, based on the
5  reports of pain that I read, that the quality and
6  timing of the pain was not consistent with it being
7  from her polycystic kidneys.
8      Q.  Will you be offering any opinions in this
9  case regarding urinary symptoms experienced by
10 Ms. Chrysler?
11     A.  As in like her infections?  I don't know
12 what urinary symptoms you're referring to.
13     Q.  Well, are there any urinary symptoms that
14 you will -- that you're attributing to the mesh in
15 this case?
16          (Document review.)
17     A.  Other than the erosion through her urethra
18 and the pain associated with that, no.
19     BY MR. SNOWDEN:
20     Q.  Will you be offering any opinions in this
21 case that the mesh implanted in Ms. Chrysler was
22 cytotoxic?
23     A.  I do not know what you mean by "cytotoxic."
24 Like, I'm not used to hearing "cytotoxic" in the

Page 11

1  description of a foreign body.
2      Q.  Will you be offering any opinions in this
3  case that the polypropylene used in Ms. Chrysler's
4  TVT posed a risk of cancer for her?
5      A.  No.
6      Q.  Will you be offering an opinion in this
7  case regarding any loose particles out in the tissue
8  from Ms. Chrysler's TVT?
9      A.  I don't specifically know of loose tissues
10 that I've read about in her medical records.
11     Q.  And I'm sorry.  My question wasn't clear.
12 It probably was -- it's getting late.
13          Do I -- are you offering any opinions
14 at trial that -- regarding any loose polypropylene
15 particles within Ms. Chrysler's tissue?
16          MR. CURTIS:  I object to the form of
17 the question.  I mean, he doesn't really know what
18 opinions he's going to be -- he can tell you what
19 opinions he has today, but he doesn't know what he's
20 going to be asked to do at trial.  So I think maybe
21 you can ask him what opinions he's formed.
22          MR. AYLSTOCK:  So the record's clear
23 as well, we'd love to have every pathology slide
24 that your experts were provided for every division

Page 12

1  under the protocol.  So if you'd like to send us
2  those, we'll make a blanket request right now and --
3          MR. SNOWDEN:  Okay.  And just for the
4  record, that's the first request I've received
5  related to it.
6          MR. AYLSTOCK:  Oh, well, no.  You've
7  received blanket requests and opposed them every
8  single time.  I myself have sent you them, so I
9  disagree with your characterization.
10         MR. SNOWDEN:  All right.  Bryan,
11 you're welcome to re-send me that e-mail, or
12 wherever you've made that request, and I'll look at
13 it.  But can we continue with the deposition?
14         MR. CURTIS:  Go ahead.
15         MR. SNOWDEN:  Did I get an answer to
16 the last question?  I don't think I did.  And if I
17 didn't, would you please re-read it.
18         (The record was read as requested:
19         "Are you offering any opinions at
20         trial that -- regarding any loose
21         polypropylene particles within
22         Ms. Chrysler's tissue?")
23         MR. CURTIS:  Subject to my objection.
24     A.  I will have to, I guess, wait until trial

Page 13

1  to see what I'm asked, because I -- if I'm
2  comfortable answering a question, whether it's in a
3  deposition or at trial, based on the information in
4  the data that I have at hand, I'll answer it.
5          So with regards to cancer and
6  cytotoxic effects of the mesh, I don't know of
7  anything about that.  So I would say comfortably,
8  more likely than not, I wouldn't be offering any of
9  those opinions at trial.
10         But if I'm made aware of other medical
11 records or other slides that are out there that
12 demonstrate fragments of mesh that are not
13 associated -- you know, loose fragments of mesh not
14 associated with the main mesh material that are out
15 in the tissue, then, yes, I could change my -- or
16 amend my opinion at a later time.
17     BY MR. SNOWDEN:
18     Q.  As you sit here today, do you have an
19 opinion regarding any loose particles of
20 polypropylene in Ms. Chrysler's specimen?
21     A.  As I sit here today, I do not have any
22 specific opinion regarding loose mesh particles
23 within Ms. Chrysler.
24     Q.  Do you have any opinions that the TVT sheds

Page 14

1  particles?
2       MR. AYLSTOCK: We're getting very
3  general. I'm not going to tell him not to answer,
4  but this is an example of something that is clearly
5  a general question. He's already said he's -- what
6  he's going to testify to here, and now you ask a
7  general question.
8    A. Can I answer?
9  BY MR. SNOWDEN:
10   Q. Yes.
11   A. With respect to this case, I don't know of
12 anything mentioned in the medical records that
13 specifically addressed disrupted particles of mesh.
14   Q. Will you be offering -- strike that.
15       Do you have any opinions regarding
16 laser-cut mesh versus mechanically cut mesh as it
17 relates to Ms. Chrysler?
18   A. As it relates to Ms. Chrysler, I don't have
19 any specific opinions regarding how mesh is cut.
20   Q. Okay. Do you know whether Ms. Chrysler's
21 mesh was laser cut? Or mechanically cut?
22   A. I don't recall seeing which it was. I'm
23 not -- I don't recall which one it was.
24   Q. As it relates to your opinion in

Page 15

1  Ms. Chrysler's case, does it make a difference
2  whether the mesh is laser cut or mechanically cut?
3       MR. CURTIS: Isn't that what you asked
4  two questions ago?
5    A. I -- I would have to re-review the
6  literature regarding that, because that's not my
7  focus as a pathologist. With respect to, I guess,
8  the being able to distinguish an inflammatory,
9  fibrosing reaction or foreign-body-type reaction
10 based on that, I haven't seen pathologic --
11 histopathologic, I guess, studies with respect to
12 that.
13       So I don't really know with respect to
14 that its effect in tissue sections of humans.
15 BY MR. SNOWDEN:
16   Q. Will you be offering any opinion in this
17 case that the mesh implanted in Ms. Chrysler caused
18 her dyspareunia?
19       MR. CURTIS: Object to the form of the
20 question.
21       (Document review.)
22   A. I would have to re-review her aspects of
23 the deposition with regards to how she describes her
24 dyspareunia, because I don't -- I don't recall that

Page 16

1  off the top of my head.
2  BY MR. SNOWDEN:
3    Q. And I'm not trying to trick you here. I
4  don't find the word "dyspareunia" in your report.
5  That's why I'm asking you whether you have an
6  opinion in this case regarding whether mesh caused
7  any dyspareunia in Ms. Chrysler.
8    A. Well, I don't remember her testimony. But,
9  obviously, that's a form of vaginal pain -- or it
10 can be. As pelvic pain, I just don't remember from
11 her medical record whether that was occurring at the
12 time she was having sexual intercourse.
13       So I would have to re-review her
14 deposition, because there were so many that I
15 reviewed in preparation for today and tomorrow.
16   Q. Will you be offering any opinions that the
17 mesh implanted in Ms. Chrysler deformed while in the
18 body?
19       MR. CURTIS: Object to the form of the
20 question.
21   A. Well, based on the specimen that I had, it
22 was a very superficial specimen that was only taken
23 out from the urinary tract without associated
24 supporting tissue around it. So I can extrapolate

Page 17

1  from the degree of fibrosis I can see in just that
2  very minimal amount of tissue that I had that it's
3  much more likely than not that the amount of mesh
4  remaining likely shows deformation.
5  BY MR. SNOWDEN:
6    Q. Other than the minimal amount of tissue
7  associated with the specimen that you received, do
8  you have any other basis for your opinion regarding
9  deformation?
10   A. No. I would say that the fact that I was
11 able to find so many pertinent features within this
12 very minimal amount of tissue speaks to the fact of
13 what a prominent response she more likely than not
14 has in the remaining mesh that is still implanted.
15   Q. Are you offering any opinion in this case
16 regarding migration of the mesh?
17       MR. CURTIS: Object to the form of the
18 question.
19   A. Yes.
20 BY MR. SNOWDEN:
21   Q. And what is that?
22   A. It's that it migrated.
23   Q. Okay. Where did it migrate from and where
24 did it migrate to?

Page 18

1  A. Well, it migrated into the urethra, and I
2 would imagine the surgeon didn't put it in the
3 urethra. So that's the very least of where it
4 migrated.
5  Q. Other than you imagining that the surgeon
6 did not place it in the urethra, what's the basis
7 for your opinion that it migrated?
8  A. Well, let me clarify since you
9 sarcastically said "imagine."
10  I -- she -- her symptoms of pain
11 occurred years after she had the TVT placed. So if
12 my recollection is correct -- so she had that
13 performed on June of 2003, and the mesh within the
14 urethra wasn't noted until 2013.
15  So it's not that I'm imagining that it
16 wasn't placed. That doesn't seem -- that is likely
17 not an occurrence that mesh would be sitting within
18 her urethra for a decade.
19  So that's the basis of my opinion that
20 it migrated and that it wasn't placed there.
21  Q. And I didn't mean to offend. I was just
22 trying to use your words appropriately in the
23 question.
24  So as I understand it, your basis is

Page 19

1 that the pain appeared years later. Is that -- in a
2 nutshell, is that basically it?
3  A. That's --
4  MR. CURTIS: Object to the form of the
5 question.
6  A. My recollection is that her -- the type of
7 pain that I'm associating the histopathologic
8 features with occurred after her mesh was implanted.
9 BY MR. SNOWDEN:
10  Q. When did that begin?
11  A. I don't have -- she talks about it, I
12 think, in her deposition. And I don't have the
13 specific records. I don't document the specific
14 records of her different pain, because she had pain
15 postoperatively which was different than this type
16 of pain.
17  So I would have to go through her
18 records again to be able to say -- and look through
19 her deposition to be able to say when this different
20 quality pain started.
21  Q. Would you agree with me that your summary
22 of the pertinent medical history in your report that
23 you signed on May 4th, 2016, doesn't recount any
24 medical records that mention pain?

Page 20

1  (Document review.)
2  A. Well, I do in the paragraph starting on
3 June 24th, 2003. It said "associated" -- "with
4 associated right groin pain and sharp right lower
5 quadrant pain."
6  And then I talked about, presented
7 with complaints of sharp pelvic pain for one month
8 in August 2014.
9  So I don't know where you're getting
10 that I didn't talk about pain.
11 BY MR. SNOWDEN:
12  Q. I'm sorry. We've done a lot of these. I
13 didn't mean --
14  MR. AYLSTOCK: Now I'm confused. And
15 the names are all -- they're all the same.
16  MR. SNOWDEN: So I apologize. I
17 wasn't trying to trick you. Okay?
18  MR. CURTIS: Did you just misstate
19 your question?
20  MR. SNOWDEN: Yes.
21  MR. CURTIS: So the question is
22 withdrawn, and we're starting again. Is that right?
23  MR. SNOWDEN: Yes.
24  MR. CURTIS: Okay.

Page 21

1  MR. SNOWDEN: I was not trying to put
2 anything over on you.
3  MR. CURTIS: Okay. The doctor's
4 stamina is putting us all to shame, so let's keep
5 moving.
6 BY MR. SNOWDEN:
7  Q. So, Doctor, in your review of the specimen,
8 did you identify any nerves?
9  A. No. I didn't identify any prominent
10 nerves.
11  Q. Did you identify any nerves?
12  A. Well, I mean, no. I did not identify any
13 nerves. If there were -- if there was an axon
14 present, I wouldn't have seen it with what I had.
15 But I didn't identify any histologically confirmed
16 nerves.
17  Q. Did you identify any nerve receptors in the
18 specimen?
19  A. I didn't use any stains to try and identify
20 any nerve specimens -- or nerve receptors.
21  Q. If you didn't see any nerves, is it fair to
22 say you didn't see any neuromas?
23  A. There were no neuromas in the superficial
24 specimen.

Page 22

1  Q. Your description of the slides on page 5
2  list two HNE-stained slides and one
3  immunohistochemical stain using an antibody directed
4  at the S100 protein.
5      Do you see that?
6  A. Yes.
7  Q. Is there any reason why you didn't take any
8  pictures or include any pictures of the S100 stain?
9  A. It didn't show anything.
10 Q. Did you take any photographs that you
11 didn't -- photomicrographs that you didn't include
12 in your report?
13 A. I don't recall. I typically include the
14 pictures that I take.
15 Q. Did you find any mucosal lining in your --
16 strike that. I'll start again.
17     Did you find any mucosa in your
18 specimen?
19 A. I don't believe I did. No.
20 Q. Did you see any tissue necrosis in the
21 specimen?
22 A. No.
23 Q. Did you identify any edema in the specimen?
24 A. Not any significant edema that I recall.

Page 23

1  Q. Did you identify any signs of infection in
2  the specimen?
3  A. Well, there was areas of both acute and
4  chronic inflammation, which can be indicative of an
5  infection.
6  Q. Was the quantity of acute inflammation that
7  you saw in this specimen sufficient for you to say,
8  to a reasonable degree of medical certainty, that
9  there was an infection here?
10 A. Well, to say that there's an infection with
11 a -- well, I should say: To say that there's an
12 infection, I would need to identify an infectious
13 agent.
14     And I didn't have any material to do
15 any sort of supplemental histochemical stains to
16 identify there was an infection -- infectious agent
17 present or not, so I can't say whether there was an
18 infection. But I didn't see any evidence of one.
19 Q. Do you have an opinion in this case
20 regarding whether Ms. Chrysler's mesh contracted?
21 A. Was it contracted? Was that your last --
22 Q. Yes. Sorry. Contracted.
23 A. Well, along the lines of what I said
24 earlier about the deformation, I would say that yes,

Page 24

1  most likely than not it did.
2  Q. And what's the basis for that opinion?
3  A. Again, the basis would be the fact that I'm
4  seeing a significant amount of fibrosis and tissue
5  reaction in a very superficial portion of the
6  specimen, which was completely intraluminal. And
7  based on the fact that I'm seeing that degree of an
8  inflammatory and fibrous response in a superficial
9  portion of a minute specimen that I have, I would
10 extrapolate that if I were to review material from
11 within the actual stroma of the vaginal area, that
12 it would be significantly fibrotic, significantly
13 inflamed, deformed, and contracted based on my
14 review of the superficial aspect that I have in this
15 specimen.
16 Q. You haven't reviewed any specimen of the --
17 her tissue other than this superficial specimen. Is
18 that right?
19 A. This is the only specimen that I have
20 reviewed in this case.
21 Q. For Ms. Chrysler, are there any clinical
22 symptoms you're correlating with the contraction
23 that occurred, in your opinion?
24 A. Her pain, more likely than not.

Page 25

1  Q. Anything else?
2  A. Well, besides, obviously, the fact that it
3  was eroded into the urethra.
4  Q. Anything else?
5  A. Not that I can think of.
6  Q. Were you able to identify any pore spaces
7  in the specimen that you reviewed?
8  A. It was fragmented -- too fragmented.
9  Q. Okay. So you were not able to do so?
10 A. No.
11 Q. Do you have an opinion in this case when
12 the -- well, let me start over. I just want to make
13 sure that I've got this.
14     Is it your opinion that the fibrosis
15 around the mesh led to the contraction? Is that the
16 right --
17 A. That's one aspect of the contraction.
18 Q. Okay. What are the other aspects of the
19 contraction?
20 A. Fibrosis that would be encapsulating
21 that -- based on my review of these slides, I would
22 imagine I would -- it's my opinion it would likely
23 be present, given the fact that I'm seeing so much
24 fibrosis in this superficial aspect that would be

Page 26

1  surrounding it.
2     Q.  When -- do you have an opinion in this case
3  of when that fibrosing reaction would have begun in
4  Ms. Chrysler?
5     A.  Well, in general, fibrosis begins in any
6  patient after a surgical procedure in the range of a
7  few weeks.  And it would have obviously changed in
8  quality over time and degree, depending on how it
9  migrated, where it migrated to.
10         So I would imagine, as in most
11  patients, it would have begun shortly after the time
12  that it was implanted.
13     Q.  Do you have an opinion when the fibrosis
14  was sufficient enough to contract mesh in any
15  clinically significant way?
16     A.  In this particular case?
17     Q.  Yes.  In this case.
18     A.  Well, beginning within a month.  When you
19  have fibrosis in general, it would cause changes in
20  the mesh.
21     Q.  If you turn to page 4 of your report under
22  the heading "Marion Chrysler," you have listed there
23  in the past medical history diverticulosis.
24         Do you see that?

Page 27

1     A.  Yes.
2     Q.  Did you consider that in your opinion in
3  this case?
4     A.  Yes.
5     Q.  What role did that play in your opinion?
6     A.  I don't think it's related to anything.
7     Q.  Okay.  Why not?
8     A.  Because that's my medical opinion.  It's
9  diverticulosis.  Diverticulosis -- a large
10  percentage of the population over a certain age has
11  diverticulosis, and it causes absolutely zero
12  problems unless it becomes diverticulitis and is
13  inflamed and infected.
14         And there's no evidence that she ever
15  had diverticulitis that I could see, and
16  diverticulosis by itself is painless.
17     Q.  In the next line you have that she
18  underwent a total abdominal hysterectomy and right
19  salpingo-oophorectomy?
20     A.  Yes.
21     Q.  Is that a significant surgery?
22     A.  Yes.
23     Q.  Does that in the postoperative period lead
24  to inflammation?

Page 28

1     A.  In the postoperative period, yes, that
2  would lead to inflammation.
3     Q.  Does it also lead to fibrosis?
4     A.  It would lead to some fibrosis in the area
5  of the surgery.  Correct.
6     Q.  Does it carry with it a risk of adhesions?
7     A.  Yes.  You can have adhesions following a
8  total abdominal hysterectomy and right
9  salpingo-oophorectomy.
10     Q.  Do you -- strike that.
11         Do you place any significance on the
12  pathological examination and the findings which you
13  list in your summary from the hysterectomy?
14     A.  Could you repeat that?
15     Q.  Yeah.  So I'm looking at the sentence that
16  begins, "Pathologic examination of this
17  specimen ..." which I believe refers to the
18  abdominal hysterectomy.
19     A.  Um-hmm.
20     Q.  Is there any significance to your opinion
21  in this case from your review of the records
22  regarding that pathologic examination?
23         (Document review.)
24     A.  No.

Page 29

1  BY MR. SNOWDEN:
2     Q.  Let's turn to Figure 1 of your report on
3  page 7.  What are we looking at here?
4     A.  So we're looking at a fragment of the
5  fibrous tissue that has some acute inflammatory
6  cells embedded within it.
7     Q.  Where on this photo are the acute
8  inflammatory cells?
9     A.  Really all along the fibrous tissue in
10  clusters.
11     Q.  Where was the mesh in relation to this
12  fragment?
13     A.  It would be adjacent to it.
14     Q.  On which side?
15     A.  Likely this side.
16     Q.  The left side?
17     A.  Correct.
18     Q.  What's your basis for that opinion?
19     A.  The contour of the tissue and the outer
20  element, the right side, how it has a different
21  quality to the tissue.
22     Q.  Are you able to -- strike that.
23         What's the significance of those
24  findings to your opinion in this case?

Page 30

1   A.  Well, the presence of acute inflammation in
2  the setting of fibrosis or otherwise often leads to
3  symptomatology of pain.
4   Q.  Anything else significant about this photo?
5   A.  Not other than the presence of the
6  fibrosis.
7   Q.  And if you turn to Figure 5, is Figure 5 --
8  at least the middle portion of Figure 5 -- the same
9  piece of tissue that's shown in Figure 1?
10   A.  Yes.
11   Q.  So looking at Figure 5, you've already told
12  me about that piece in the middle.  Is there any
13  significance --
14       Well, first, what else are we looking
15  at in those other fragments here?
16       MR. CURTIS:  Object to the form of the
17  question.
18   A.  We're just looking at other fragments of
19  fibrous tissue.
20   BY MR. SNOWDEN:
21   Q.  And what's the significance of that finding
22  to your opinion in this case?
23   A.  It just highlights the fibrosis.
24   Q.  Are you able to tell me how large these

Page 31

1  fragments are in Figure 5?
2   A.  No.
3   Q.  Other than the mesh you told us that's to
4  the left of the center portion of Figure 5, can you
5  identify any other areas on Figure 5 where there
6  would have been mesh?
7   A.  Well, in the upper right-hand portion, it's
8  hard to tell with that fragment based on the
9  orientation of the tissue.  So I can't really
10  comment.  But I -- as far as which side it would be
11  on, if it would be on one of those sides.
12       But I can say that that tissue is
13  consistent with tissue adjacent to a mesh because it
14  has the same qualities that the others do that
15  clearly have mesh adjacent to them.
16   Q.  And for that fragment on the right-hand
17  side of Figure 5, how are you able to determine
18  that's connective tissue versus a collection of
19  protein?
20   A.  Based on its appearance.
21   Q.  Let's go back to Figure 2 -- well, go to
22  Figure 2, please.
23       What are you showing with this figure?
24   A.  I am showing another fragment of fibrous

Page 32

1  tissue that would be adjacent to a mesh filament
2  with admixed both acute and chronic inflammatory
3  cells.
4   Q.  And where in Figure 2 are the acute
5  inflammatory cells?
6   A.  They're within the fibrous tissue in the
7  middle of the picture.
8   Q.  Are you able, looking at this Figure 2, to
9  identify any single acute inflammatory cells?
10   A.  Yes.
11   Q.  Could you circle them for me.
12       (Witness complies.)
13   A.  Those would be the ones that I can identify
14  at this magnification.
15   BY MR. SNOWDEN:
16   Q.  Is there anything else significant about
17  Figure 2?
18   A.  No.
19   Q.  Figure 3, if you'd turn there, please.
20       What is shown in this photomicrograph?
21   A.  It shows fibrous tissue with chronic
22  inflammation, some foreign body giant cells.  That's
23  about it.
24   Q.  In your figure legend, you have written,

Page 33

1  "Mesh pore space showing a brisk chronic
2  inflammatory infiltrate."  And you -- then you
3  continue.
4       Do you see that?
5   A.  Um-hmm.
6   Q.  What do you mean by "brisk chronic
7  inflammatory infiltrate"?
8   A.  Well, the entire tissue in this area is
9  involved by inflammatory cells.  It's just a
10  descriptive term.
11   Q.  And I'm just -- I'm trying to understand
12  what you're trying to describe when you say that
13  it's brisk.  Is it the entire tissue is involved?
14   A.  It just means there's several -- it's just
15  a -- it's just a descriptive term.
16   Q.  Can you tell us what the clinical
17  significance of what we see in Figure 3 is?
18   A.  Well, the clinical significance would be
19  that we're seeing evidence of a foreign body
20  granulomatous response to mesh that is outside of
21  the normal confines of the patient's tissues since
22  this was removed within the urethra.
23       So that, by definition, is pathologic
24  and would lead to the symptoms that she described.

Page 34

1 Q. Which symptoms in particular? Is it all of
2 them? Is it some of them?
3 A. The pain.
4 Q. Other than the macrophages, lymphocytes,
5 and scattered foreign body multinucleated giant
6 cells, is there any other type of tissue present
7 here in Figure 3?
8 A. Well, it's within fibrous tissue. And it
9 looks like there's some like proteinaceous fibrin or
10 blood products along the edge. But I don't see any
11 evidence of skeletal muscle; I don't see any
12 evidence of smooth muscle; I don't see any
13 epithelium.
14 Q. Do you have an opinion where the mesh was
15 in Figure 3?
16 A. It's hard to say from this picture alone
17 where it would be.
18 Q. Did you use the polarized lens -- I'm
19 sorry -- polarized filters when you looked at this
20 specimen?
21 A. Yes.
22 Q. Do you recall whether there was mesh in the
23 specimen?
24 A. I don't recall seeing any mesh with

Page 35

1 polarization microscopy.
2 Q. Okay. Did you see any with light
3 microscopy?
4 A. Well, that is light microscopy.
5 Q. Nonpolar, regular light?
6 A. Not that I recall.
7 Q. In Figure 4, what are we looking at here?
8 A. It's a low magnification view of basically
9 the same thing.
10 Q. So what type of tissue are we looking at
11 here?
12 A. We're looking at a lot of fragments of
13 fibrous tissue, some serum fibrin. That would be
14 the brighter pink.
15 Q. Anything else present in the specimen --
16 strike that.
17 Anything else present in this figure?
18 A. Not that I can appreciate at this
19 magnification.
20 Q. Do you attribute any -- any of
21 Ms. Chrysler's complications to what you see in
22 Figure 4?
23 A. Well, Figure 4 shows a lot of tissue. So
24 at higher magnification, yes, but I can't point out

Page 36

1 the particular inflammatory cells from this
2 magnification. This is intended just to give an
3 overall view of the specimen.
4 Q. From your review -- and I think we've gone
5 through all five figures now.
6 From your review of Ms. Chrysler's
7 specimen, did you find that the tissue had been
8 properly preserved?
9 A. Well, it looked -- the histology was not
10 great, so I don't know about how it was -- if it sat
11 out not in formalin when it was received or if when
12 they removed it, if they did something. It was
13 interpretable, but it was not ideal.
14 Q. Did the quality of the specimen impact your
15 analysis in any way?
16 A. No. I would say, if anything, had it been,
17 you know, better preserved, I would have been able
18 to make more specific findings.
19 But I was actually surprised, given
20 the quality of the tissue, that I was able to see as
21 much cellular detail as I did, being able to
22 identify the acute and chronic inflammatory cells
23 and the multinucleated giant cells, which given the
24 small amount of tissue, I was, you know, surprised

Page 37

1 that I could make those out with light microscopy.
2 Q. Does any of the -- and we're talking about
3 Ms. Chrysler in particular. But if the tissue sat
4 out for a couple of years without being in formalin,
5 does that affect the volume of the tissue at all?
6 MR. CURTIS: Object to the form of the
7 question.
8 A. Yes. It would dry up and -- it would dry
9 up. It would kind of -- it would look like it would
10 shrink.
11 BY MR. SNOWDEN:
12 Q. So what we're looking at here in
13 Ms. Chrysler's specimen, in addition to whatever
14 affects tissue-processing themselves have on tissue,
15 we also have an added layer of -- hold on a second.
16 Strike that.
17 (Exhibit 2 marked.)
18 BY MR. SNOWDEN:
19 Q. I'm handing you what's been marked as
20 Exhibit 2.
21 Doctor, do you recall reviewing this
22 record in your review of the records in this case?
23 A. It looks familiar.
24 Q. Okay. And if we look at the collection

10 (Pages 34 to 37)

Page 38

1  date, April 2013, does that correlate with the date
2  of the surgery from which you received a specimen?
3     A.  Yes.
4     Q.  And it appears from this record that there
5  was a gross only done.  Is that correct?
6     A.  Yes.
7     Q.  And if we look at the gross description, it
8  mentions that it was received in the fresh state --
9  "Received in the fresh state is a blood-tinged
10 synthetic mesh-like gray-white foreign object
11 measuring 0.8 by 0.4 by 0.1 cm."
12          Do you see that?
13    A.  Yes.
14    Q.  Well, is it standard practice if it comes
15 fresh and you're not going to put it through that
16 you just -- strike that.
17          Do you know whether they put formalin
18 on it after this point?
19          MR. CURTIS:  Object to the form of the
20 question.
21    A.  I don't know.  They don't specifically say
22 whether they put formalin or not.
23    BY MR. SNOWDEN:
24    Q.  From your review of the specimen, does it

Page 39

1  appear that the tissue sat out for some time?
2     A.  You can see this processing artifact from a
3  number of different causes, so I couldn't say.
4     Q.  Okay.  What aspect of the TVT device led to
5  the fibrosing reaction that you described in these
6  figures?
7     A.  I don't know what you mean.
8     Q.  Yeah.  Do you have an opinion as to a
9  certain aspect of the TVT device that led to the
10 fibrosis that we see in these figures?
11    A.  I guess I don't understand what you mean by
12 "aspect" of it.
13    Q.  Is there something about the TVT mesh that,
14 in your opinion, caused -- causes and caused, in
15 Ms. Chrysler's case, the fibrosis you see here?
16    A.  Again, I don't understand what aspect,
17 other than the polypropylene material.  But I don't
18 know what -- if you're talking about something else,
19 I don't -- I guess I don't understand the question.
20          MR. CURTIS:  Yeah.  I object because I
21 think it's getting back into the general area.
22          Are you talking about the thickness of
23 the filaments or the size of the pores or the weight
24 of the mesh, or just -- what are you talking about

Page 40

1  when you use the word "aspect"?
2          MR. SNOWDEN:  And it's -- okay.
3     BY MR. SNOWDEN:
4     Q.  Do you have an opinion as to what portion
5  of the design of the TVT led to the complications in
6  Ms. Chrysler's case?
7          MR. CURTIS:  I'll object to the form
8  of the question.
9          THE WITNESS:  Could you repeat that?
10         (The record was read as requested:
11         "Do you have an opinion as to what
12         portion of the design of the TVT led
13         to the complications in Ms. Chrysler's
14         case?")
15         MR. CURTIS:  I renew the objection for
16 the reasons stated.
17    A.  Well, I guess, as I've stated before, with
18 respect to small pore size and the overall heavy
19 weight of the polypropylene mesh, that those were
20 contributing factors to the inflammatory and fibrous
21 reaction that we see in Ms. Chrysler's specimen.
22    BY MR. SNOWDEN:
23    Q.  Anything else?
24    A.  I would say that would be the main thing in

Page 41

1  this case.
2     Q.  Do you have any -- will you be offering any
3  opinions in this case regarding how Ms. Chrysler has
4  done following the excision of the mesh specimen
5  that you reviewed?
6          MR. CURTIS:  Object to the form of the
7  question.
8     A.  As I stated earlier, I will answer
9  questions that are asked of me at trial if it's
10 relative to what I have reviewed.  And I have the
11 opinion that I can relate my review of her specimens
12 to her current condition.
13    BY MR. SNOWDEN:
14    Q.  And the -- so I understand it, do you have
15 any basis for your opinion -- strike that.
16         What's the basis for that opinion?
17    A.  What's the basis for my -- I don't
18 understand.  What's basis for my opinion that I'll
19 have an opinion?  It's that I'll have an opinion if
20 I'm asked a question.
21         So as I've said multiple times today,
22 if someone asks me a question and I'm comfortable as
23 a physician and pathologist who's reviewed the
24 material answering the question, I'll answer the

11 (Pages 38 to 41)

Page 42

1  question, just as you've asked me a number of
2  questions that may not necessarily be completely
3  related to what I have reviewed. But if I'm
4  comfortable answering the question, I'll answer the
5  question.
6      I'm going to answer questions that I'm
7  asked. Whether I'm -- the person asking the
8  question is allowed to ask me that question, I don't
9  know. I don't get involved in that.
10     Q. Do you have an opinion regarding any
11 symptomatology of Ms. Chrysler's following the mesh
12 revision surgery in which you received the specimen?
13     MR. CURTIS: Rebecca, I'm sorry. May
14 I hear that again?
15     (The record was read as requested:
16     "Do you have an opinion regarding any
17     symptomatology of Ms. Chrysler's
18     following the mesh revision surgery in
19     which you received the specimen?")
20     A. Yes. I would say that more likely than
21 not, her complaints of sharp pelvic pain are related
22 to the findings that I'm seeing microscopically, and
23 correlate with the likely response in her tissue to
24 the mesh that is still present within that region.

Page 43

1      BY MR. SNOWDEN:
2      Q. Is the basis of your opinion an
3  extrapolation of the review of the specimen and then
4  the review of her subsequent medical records?
5      A. Yes. That would be the main aspect.
6      Q. In your opinion -- well, strike that.
7      When the TVT eroded into Ms. Chrysler's
8  urethra, what caused the pain?
9      A. I would say that the fact that there was a
10 foreign body eroding through a bodily surface caused
11 the pain.
12     Q. And once that mesh was removed from the
13 urethra, and you've reviewed that specimen, what
14 then causes her pain?
15     A. Well, there is still likely mesh around
16 that area, in which it's likely scarred, inflamed,
17 entrapping nerves. All the things that are well
18 described in association with these synthetic
19 devices.
20     So based on this superficial review of
21 what's here, I would say there's no reason for me to
22 have any other opinion that those fibroinflammatory
23 reactions aren't going on in deeper aspects of the
24 mesh that are still within her tissue.

Page 44

1      Q. Did you consider that -- at least in one of
2  Dr. Iakovlev's publications, he reports pain with
3  retropubic slings of less than 2.5 percent?
4      A. I would have to see the publication.
5      Q. Do you know whether you've reviewed that
6  one?
7      A. I've reviewed a lot of publications. I
8  would have to review what you're talking about
9  before I could really, I guess, accurately answer
10 questions about them.
11     Q. Had Dr. Iakovlev authored a publication
12 showing a rate of pain at less than 2.5 percent
13 in -- with the -- after the implantation of
14 retropubic mid-urethral slings, what impact would
15 that have on your opinion?
16     MR. CURTIS: Object to the form of the
17 question.
18     He just told you that he needs to look
19 at the material.
20     A. Again, I would have to look at the context
21 of that study and that data to give you any sort of
22 informative answer about the numbers that you're
23 quoting.
24

Page 45

1      BY MR. SNOWDEN:
2      Q. So if Dr. Iakovlev did a literature
3  review -- a literature review that showed that
4  number, sitting here today, you're not comfortable
5  of giving an answer?
6      MR. CURTIS: I object to the question.
7  It's asked three times in a row, and it's now
8  argumentative.
9      A. Again, I will answer, perhaps slower and
10 more clearly, that I would have to review any
11 article that you're quoting in order to feel
12 comfortable addressing any sort of number that
13 you're discussing, because just hearing you say that
14 there is a less than 2.5 percent incidence of pain,
15 I would have to see if that took into account
16 patients that had mesh slicing through their
17 urethra, because I can't imagine having that kind of
18 a physical finding and not having evidence of pain.
19     So I have no way of responding to that
20 article without reviewing it.
21     BY MR. SNOWDEN:
22     Q. Are you familiar with the Schimpf
23 meta-analysis?
24     A. I'm not. I don't recall.

Page 46

1  Q. In rendering your -- in coming to your
2  opinion that Ms. Chrysler's post-excision pain was
3  caused by the TVT, did you consider any literature
4  on the rates of pain with TVT?
5  A. I don't understand that question.
6      MR. SNOWDEN: Do you want to read it
7  back slowly for him?
8      MR. CURTIS: Okay. Let's get an
9  answer, then we'll take a break; and we'll all move
10 slowly after that.
11     (The record was read as requested:
12     "In coming to your opinion that Ms.
13     Chrysler's post-excision pain was
14     caused by the TVT, did you consider
15     any literature on the rates of pain
16     with TVT?")
17 A. I would say that if someone's having pain
18 after TVT, it doesn't matter what the rates
19 published of pain with TVT is, because someone is
20 having pain with TVT.
21     So am I aware of studies talking about
22 the incidence of pain post TVT? Yes. And that's
23 important information to take into account for
24 patients deciding whether they're going to have a

Page 47

1  TVT procedure or not.
2      But the fact of the matter is, she is
3  one of those patients that had pain with TVT, and
4  it's not a hypothetical situation. She had mesh in
5  her urethra. That doesn't really get much clearer
6  than that. So, yes, I take that information into
7  account, but I don't think that it really applies in
8  this case.
9      MR. SNOWDEN: Did you still want to
10 take a break?
11     MR. CURTIS: Yeah. Let's take a
12 break.
13     (Recess from 5:30 p.m. to 5:35 p.m.)
14 BY MR. SNOWDEN:
15 Q. Did you find any degradation bark in
16 Ms. Chrysler's specimen?
17 A. No.
18 Q. Are you offering any opinions in this case
19 that Ms. Chrysler's TVT mesh degraded in vivo?
20 A. I haven't reviewed it. I haven't reviewed
21 any evidence of that in the tissue that I have.
22     If I have other tissue from other
23 sources that's made available to me, then I would be
24 able to evaluate for that.

Page 48

1  Q. As you sit here today, do you have an
2  opinion that Ms. Chrysler's TVT mesh degraded
3  in vivo?
4      MR. CURTIS: Objection.
5  A. As I sit here today, I have not
6  specifically seen evidence of degradation in any of
7  her mesh that I have reviewed.
8  BY MR. SNOWDEN:
9  Q. How did Ms. Chrysler's pain -- well, strike
10 that.
11     (Pause in proceedings.)
12 BY MR. SNOWDEN:
13 Q. If we look at your section,
14 "Marion Chrysler," paragraph beginning on
15 6/24/2003 -- are you there?
16 A. Yes.
17 Q. 6/24/2003, that's the date of the TVT mesh
18 implantation. Is that right?
19 A. Yes.
20 Q. The next line you have, "Her postoperative
21 course was significant for urinary retention with
22 difficulty voiding ..."
23     Do you see that?
24 A. Yes.

Page 49

1  Q. Sorry. I didn't read the whole thing.
2      "... that lasted several months."
3      Do you see that?
4  A. Yes.
5  Q. What significance, if any, did the fact
6  that her postoperative course was significant for
7  urinary retention with difficulty voiding have on
8  your opinions in this case?
9  A. I would say that's not really in my purview
10 as a pathology expert to comment on her clinical
11 differential for urinary retention.
12 Q. Why not?
13 A. Because I didn't examine her. So I have
14 no -- there are several different clinical
15 indications -- or clinical etiologies, I should
16 say -- for urinary retention and difficulty voiding
17 postoperatively that I wouldn't be able to comment
18 on. I would leave that to a clinician who was
19 examining her.
20 Q. Would you agree that one of those
21 etiologies is a sling placed with tension against
22 the urethra?
23     MR. CURTIS: Object to the form of the
24 question.

13 (Pages 46 to 49)

Page 50

1  He said this is not his field.
2  A. As I said already, that's not -- that's not
3  my job to do a clinical differential diagnosis for
4  her symptoms without having any tissue to go by.
5  BY MR. SNOWDEN:
6  Q. And I can respect that.
7  But, Doctor, do you have -- I think you
8  told us earlier you have a migration opinion in this
9  case. Is that true?
10  A. Yes.
11  Q. Your opinion is that the mesh migrated in
12  Ms. Chrysler.
13  A. Into the urethra. Yes.
14  Q. So what I want to know is -- and feel free
15  if you need to defer to urogyne colleagues -- where
16  did it migrate from?
17  A. From outside of the urethra to within it.
18  Q. How do you know that if you're going to
19  defer to urogynecology colleagues on whether the
20  mesh was placed too tight or where the mesh was
21  placed?
22  MR. CURTIS: Object to the form of the
23  question. It's argumentative.
24  A. Well, as I said earlier when we discussed

Page 51

1  the migration, there's nothing to indicate to me
2  that her mesh was initially placed within her
3  urethra.
4  So if I have mesh that I'm examining
5  that's within her urethra, and by definition my
6  conclusion is that it was not initially placed
7  within her urethra, then without seeing other
8  evidence of pathology, my conclusion is that, more
9  likely than not, it migrated into her urethra.
10  BY MR. SNOWDEN:
11  Q. And what's the basis for your opinion that
12  it wasn't placed there?
13  A. Because her pain that she described later
14  on in 2012 and further beyond 2012 was reported to
15  be different than the pain she had before and
16  different than her urinary symptoms.
17  Q. If two days -- well, do you have an opinion
18  regarding what role -- well, strike that. Let me
19  start over.
20  Did you consider in your opinion in
21  this case the fact that Ms. Chrysler needed a
22  catheter to void two days postoperatively?
23  A. Yes, I did consider that.
24  Q. And how did you consider it?

Page 52

1  A. I considered it and thought that it didn't
2  have anything to do with the fact that there was
3  mesh inside her urethra. Because I would imagine
4  that if there was -- it's my opinion that if there
5  was mesh inside her urethra, that that would have
6  made it difficult for her to self-catheterize.
7  Q. How about if the mesh was placed tightly
8  under the urethra?
9  MR. CURTIS: Object to the form of the
10  question.
11  A. I don't know about "placed tightly under
12  the urethra."
13  Again, I didn't exam her -- I
14  didn't -- at the time, I didn't do any
15  urogynecologic studies. But what I'm, again,
16  discussing with regards to the mesh migration in
17  this case is that she was able to self-catheterize
18  postoperatively. So if there was mesh placed within
19  her urethra, I wouldn't think that she would be able
20  to do that.
21  And so, by definition, in my opinion,
22  it migrated to its position where it was when it was
23  excised in 2013.
24

Page 53

1  BY MR. SNOWDEN:
2  Q. Do you have an opinion whether mesh placed
3  with such tension under the urethra that the patient
4  has voiding difficulties for several months could
5  later lead to erosion into the urethra?
6  MR. CURTIS: Object to the form of the
7  question.
8  A. Again, I don't know the surgical
9  complications in that literature with respect to how
10  they're placed -- how the different surgeons place
11  them under tension versus not tension. If it was
12  felt that it was placed with tension at the time, I
13  don't have an opinion regarding that.
14  BY MR. SNOWDEN:
15  Q. Are you offering any opinion -- well,
16  strike that.
17  Do you have any opinion in this case
18  regarding placement?
19  MR. CURTIS: Do you mean placement of
20  the mid-urethral sling?
21  MR. SNOWDEN: Yes. Whether it was
22  proper or improper. I'll clean it up.
23  BY MR. SNOWDEN:
24  Q. Do you have an opinion in this case

14 (Pages 50 to 53)

Paul J. Michaels, M.D.

Page 54

1 regarding whether the TVT sling implanted in
2 Ms. Chrysler was implanted properly or improperly?
3          MR. CURTIS: Object to the form of the
4 question. This is not his field, as I understand
5 it.
6     A.  Again, as I've already said with regards to
7 how the TVT was placed, I can't comment on how it
8 was placed and with what surgical technique that
9 particular surgeon did as I didn't exam her.
10          But what I can say is that, based on
11 my review of her medical records, more likely than
12 not, this was not initially placed within her
13 urethra, which is where it was when it was removed.
14 So, again, by definition, it migrated.
15     BY MR. SNOWDEN:
16     Q.  Putting aside your opinion of whether it
17 was placed in the urethra, are you offering an
18 opinion on the tension it was placed under the
19 mid-urethra?
20          MR. CURTIS: Object to the form of the
21 question for the reasons stated to the last several
22 questions.
23     A.  I do not have any significant expertise in
24 surgical techniques of TVT placement.

Page 55

1     BY MR. SNOWDEN:
2     Q.  In reviewing Ms. Chrysler's specimen in
3 this case, was your review limited to light and
4 polarized light microscopy?
5     A.  Yes.
6     Q.  So you didn't to any scanning electron
7 microscopy.
8     A.  That's correct.
9     Q.  You didn't do any transmission electron
10 microscopy?
11     A.  That's correct.
12     Q.  You didn't do any mechanical testing --
13 sorry. Strike that.
14          You didn't do any mechanical testing on
15 the specimen.
16     A.  I did not do any mechanical testing on her
17 specimen.
18     Q.  You were not in the operating room for any
19 of the procedures. Is that correct?
20     A.  That's correct. I was not in the operating
21 room for any of her procedures.
22     Q.  Have you been consulted by any of
23 Ms. Chrysler's treating physicians regarding
24 Ms. Chrysler?

Page 56

1     A.  I have not been consulted by any of her
2 treating physicians regarding her care.
3     Q.  Outside of counsel for Ms. Chrysler, have
4 you spoken with anyone regarding Ms. Chrysler's
5 case?
6     A.  I don't believe so, no.
7     Q.  You did not see the mesh in vivo. Is that
8 correct?
9     A.  No. I didn't see the mesh inside of
10 Ms. Chrysler.
11     Q.  And during any surgery, you didn't -- you
12 weren't there to see it.
13     A.  That's correct.
14          MR. SNOWDEN: Let's go off the record.
15 Give me just one minute.
16          (Pause in proceedings.)
17     BY MR. SNOWDEN:
18     Q.  Doctor, how long -- strike that.
19          How many hours have you spent working
20 on this case?
21     A.  Maybe around 20.
22          MR. SNOWDEN: All right. I have
23 nothing further. Thank you.
24          (Proceedings concluded at 5:50 p.m.)

Page 57

1          - - - - - -
             E R R A T A
2          - - - - - -
3
4 PAGE  LINE  CHANGE
5 ____  ____  _____
6     REASON: _____
7 ____  ____  _____
8     REASON: _____
9 ____  ____  _____
10    REASON: _____
11 ____  ____  _____
12    REASON: _____
13 ____  ____  _____
14    REASON: _____
15 ____  ____  _____
16    REASON: _____
17 ____  ____  _____
18    REASON: _____
19 ____  ____  _____
20    REASON: _____
21 ____  ____  _____
22    REASON: _____
23 ____  ____  _____
24    REASON: _____

15 (Pages 54 to 57)

Paul J. Michaels, M.D.

Page 58

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
PAUL J. MICHAELS, M.D.          DATE

Subscribed and sworn to before me this _____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

Page 59

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: ETHICON, INC., PELVIC ) Master File No.
REPAIR SYSTEM PRODUCTS )
PRODUCTS LIABILITY LITIGATION ) 2:12-MD-02327
)
THIS DOCUMENT RELATES TO THE ) MDL 2327
FOLLOWING CASES IN WAVE 2 )
OF MDL 200: )
) JOSEPH R. GOODWIN
Tamara Carter, et al. v. )
Ethicon, Inc., et al. ) U.S. DISTRICT JUDGE
Civil Action No. 2:12-cv-01661 )
)
Sandra Childress, et al. v. )
Ethicon, Inc., et al. )
Civil Action No. 2:12-cv-01564 )
)
Marion Chrysler v. )
Ethicon, Inc., et al. )
Civil Action No. 2:12-cv-02060 )
)
Melissa Sanders, et al. v. )
Ethicon, Inc., et al. )
Civil Action No. 2:12-cv-01562 )
)
Ana Sierra, et al. v. )
Ethicon, Inc., et al. )
Civil Action No. 2:12-cv-01819 )
)
Toni Hernandez v. )
Ethicon, Inc., et al. )
Civil Action No. 2:12-cv-02073 )
_____)

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF PAUL J. MICHAELS, M.D.
June 18, 2016

Page 60

I, Rebecca J. Callow, Registered Merit Reporter and Notary Public in and for the State of Texas, hereby certify to the following:
    That the witness, PAUL J. MICHAELS, M.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;
    That the original deposition was delivered to _____.
  That pursuant to information given to the deposition officer at the time said testimony was taken, the following the amount of time used by each party at the time of the deposition:
    M. Andrew Snowden (1h20m)
        Attorney for Johnson & Johnson and
        Ethicon, Inc.
    Danny L. Curtis (0h0m)
        Attorney for Plaintiffs

Page 61

    I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:
    [ ] was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;
    [ ] was not requested by the deponent or a party before the completion of the deposition.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

16 (Pages 58 to 61)

Paul J. Michaels, M.D.

```
                                               Page 62
 1
 2
 3        SUBSCRIBED AND SWORN TO under my hand and seal
 4   of office on this the _____ day of
 5   _____, _____.
 6
 7        _____
 8        Rebecca J. Callow, RMR, CRR, RPR
 9        Notary Public, Travis County, Texas
10        My Commission No. 12955701-3
11        Expires:  09/12/2017
12
13
14
15
16
17
18
19
20
21
22
23
24
```

17 (Page 62)

52c2d2f7-98c2-4fea-a1de-732417ed5c23