# EXHIBIT F

Suzanne Parisian, M.D.

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
 3     ---------------------------- )
       IN RE:  ETHICON, INC., PELVIC ) Master File No.
 4     REPAIR SYSTEM PRODUCTS         ) 2:12-MD-02327
       LIABILITY LITIGATION          ) MDL 2327
 5                                    )
                                      ) JOSEPH R. GOODWIN
 6                                    ) U.S.  DISTRICT JUDGE
       ---------------------------- )
 7                                    )
       Shirley Freeman, et al.,      )
 8                                    )
             Plaintiffs,             )
 9                                    ) Case No.
       vs.                           ) 2:12-cv-00490
10                                    )
                                      )
11     ETHICON, INC., et al.,        )
                                      )
12          Defendants.              )
       ---------------------------- )
13
14                     PROLIFT+M
15              Tuesday, March 8, 2016
16                      -  -  -
17              Deposition of SUZANNE PARISIAN, M.D.,
            held at Marriott Tempe at the Buttes, 2000
18          West Westcourt Way, Tempe, Arizona,
            commencing at 9:00 a.m., on the above date,
19          before Alisa Smith, Arizona Certified Court
            Reporter.
20
21                      -  -  -
22
23              GOLKOW TECHNOLOGIES, INC.
24          877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Suzanne Parisian, M.D.

---

**Page 2**

```
1   APPEARANCES:
2
3     WAGSTAFF & CARTMELL, LLP
      BY:  NATE JONES, ESQUIRE
4     4740 Grand Avenue, Suite 300
      Kansas City, Missouri 64112
5     816.701.1100
      njones@wcllp.com
6     Representing Plaintiffs
7
8
      AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
9     BY:  BRYAN F. AYLSTOCK, ESQUIRE
      17 East Main Street, Suite 200
10    Pensacola, Florida 32502
      850.202.1010
11    baylstock@awkolaw.com
      Representing Plaintiffs
12
13
      BUTLER SNOW LLP
14    By:  WILLIAM M. GAGE, ESQUIRE
      Renaissance at Colony Park
15    1020 Highland Colony Parkway, Suite 1400
      Ridgeland, Mississippi 39157
16    601.948.5711
      william.gage@butlersnow.com
17    Representing Defendants Ethicon, Inc.,
      and Johnson & Johnson
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1                    I N D E X
2   WITNESS                              PAGE
3   SUZANNE PARISIAN, M.D.
4     Direct Examination by Mr. Gage        5
5
6                    * * * * *
7              EXHIBITS MARKED
8

    EXHIBIT   DESCRIPTION                  PAGE
9
10    1       Notice to Take Deposition of Suzanne   6
11            Parisian
12    2       Dr. Parisian's Expert Report      6
13    3       List of Documents Provided or     6
14            Identified for Review in the above
15            Referenced Lawsuit
16    4       Suzanne Parisian, M.D.'s CV       6
17    5       Legal Testimony History, Suzanne  6
18            Parisian, M.D.
19    6       Composite Exhibit re Surgical Mesh   6
20            Action Team
21    7       Reclassification of Urogynecologic  10
22            Surgical Mesh Instrumentation, FDA
23            Questions
24    8       Black binder notebook            15
25    9       Black binder notebook            15
```

---

**Page 4**

```
1              EXHIBITS MARKED
2
    EXHIBIT   DESCRIPTION                  PAGE
3
4    10      Red folder containing Dr. Parisian's   16
5            file
6    11      Document with handwritten notes RE:    37
7            Ethicon
8    12      Normal Pelvic Anatomy Diagram         63
9    13      Pelvic floor diagrams             64
10   14      Sources of Risk Information Piechart   69
11   15      Gynecare Prolift Surgeon's Resource   89
12           Monograph
13   16      Medical Literature re Prolift+M       93
14   17      Gynecare Prolift+M labeling          115
15   18      Gynecare Prolift+M and Prosima patient 159
16           brochure
17   19      Composite exhibit containing medical   167
18           literature
19
20
21
22
23
24
25
```

---

**Page 5**

```
1            SUZANNE PARISIAN, M.D.,
2   the witness herein, having been first duly sworn by
3   the Certified Court Reporter, was examined and
4   testified as follows:
5            DIRECT EXAMINATION
6   BY MR. GAGE:
7     Q.  Good morning, Dr. Parisian.
8     A.  Good morning.
9     Q.  My name is William Gage.  I'm with Butler
10  Snow Law Firm.  I'll be taking your deposition
11  today.
12          Could you state your name, please?
13    A.  My name is Dr. Suzanne Parisian.
14    Q.  And your current address?
15    A.  7117 North Third Street, Phoenix, Arizona.
16    Q.  And, Dr. Parisian, as we discussed before
17  the deposition, we only have three hours under
18  the -- either the court order and/or agreement of
19  the parties, so there may be places where -- and
20  I'll apologize in advance -- where if, you know,
21  counsel will permit, I may sometimes withdraw
22  questions if it looks that your answer is going to
23  be too long or too convoluted, because I would
24  rather move to another subject.
25          So I apologize in advance for perhaps at
```

Suzanne Parisian, M.D.

Page 6

1  times being curt, but it's because of the short time
2  limit, so -- and I know counsel may not always agree
3  with me, but we'll manage and try to work the best
4  that we can.
5      A.  Yes, sir.
6          (Whereupon, Exhibit Nos. 1 through 6
7  were marked for identification.)
8  BY MR. GAGE:
9      Q.  We've premarked some exhibits.
10         Exhibit 1 to the deposition is the
11  deposition notice.  Exhibit 2 to the deposition is
12  Dr. Parisian's report.
13         Is that correct, Dr. Parisian?
14     A.  Yes, sir.
15     Q.  Exhibit 3 is a document entitled "List of
16  documents provided or identified for review in the
17  above-referenced lawsuit."
18         And, Dr. Parisian, you're familiar with that
19  document?
20     A.  Yes, sir.
21     Q.  Document 4 is Dr. Parisian's current CV.
22         And, Doctor, you agree with that?
23     A.  Yes, sir.
24     Q.  Exhibit 5 is a list of Dr. Parisian's court
25  testimony from January 2011 to January 2016, which

Page 7

1  you, Dr. Parisian, provided us; correct?
2      A.  Yes, sir.
3      Q.  And then Exhibit 6 is a collection of
4  documents.  It's a composite exhibit.  It contains
5  probably a quarter of an inch stack of documents
6  that counsel represented before the deposition
7  started are documents that were obtained, presumably
8  by plaintiffs, from FDA through an open records
9  request, that relate to various issues at the FDA
10  with regard to pelvic mesh.
11         And, Dr. Parisian, I assume you've reviewed
12  these as well?
13     A.  Yes, sir.
14     Q.  All right.  And that collection of documents
15  is marked as Exhibit 6.
16         All right.  Dr. Parisian, with respect to --
17  with respect to your report, who typed it?
18     A.  Me.  All the typos are mine.
19     Q.  Okay.  Did you send a copy to plaintiffs'
20  counsel for review before you finalized it?
21     A.  No.
22     Q.  You just wrote it?
23     A.  Yes, sir.
24     Q.  Okay.  Is this just one draft?
25     A.  Yes, sir.  It's not really a draft.  It's a

Page 8

1  working copy.  And so when I finish it, I send it to
2  them.
3      Q.  All right.  And when you sent it to them,
4  did you send it to them signed, or did you send it
5  to them unsigned and then request feedback or
6  comment?
7      A.  Well, I have to -- sign it, I have to
8  scan my signature, so they're all unsigned, and then
9  I have to scan the signature and send it to them.
10     Q.  All right.  So when you typed your report
11  and sent it to plaintiffs' counsel, the version that
12  we are working with today is the same version that
13  you would have sent to plaintiffs' counsel?
14     A.  Yes, sir.
15     Q.  Okay.  Are there any other documents apart
16  from your report that -- that you created as part of
17  your work in this case?
18     A.  No.
19     Q.  No spreadsheets, databases, or other data
20  compilations?
21     A.  That's correct.
22     Q.  And are all of the opinions you tend -- you
23  intend to offer in this case contained within the
24  confines of your expert report?
25     A.  Well, it depends what you ask me.  I've

Page 9

1  tried to summarize them.  If there's -- more
2  documents come up, then -- like this document that
3  just came, you know, that's not in my report.  So
4  I -- at the time I wrote the report, I tried to
5  capture the information.
6      Q.  All right.  And what you're referring to
7  when you talk about "the document" is Exhibit 6;
8  correct?
9      A.  Yes, sir.
10     Q.  So I understand that, you know, you've given
11  us an expert report that's over 100 pages in length,
12  and I may ask you about certain portions of that
13  today, and you may give me additional information or
14  opinions.
15         Presumably, those will all be subparts, if
16  you will, of what's contained in the document?
17     A.  Hopefully, yes, sir.  That's what this is
18  for; right?
19     Q.  Right.
20         And then you've got Exhibit 6, which is
21  really kind of new and separate and apart from the
22  actual report itself; correct?
23     A.  True.  I mean, I knew that there was a
24  working group.  I just had never seen the documents
25  from the working group before.

Suzanne Parisian, M.D.

Page 10

1    Q.   All right.  And apart from Exhibit 6, you're
2  not aware of any other document or database or
3  notation of ideas or concepts that you have created
4  or that you would use to provide opinions that are
5  not already contained within your report?
6    A.   That would be -- there actually has been a
7  release by FDA, the reclassification of instruments,
8  and that was just February 26, so there are those
9  documents.
10   Q.   All right.  So, Dr. Parisian, you just
11 handed me a collection of documents about maybe a
12 quarter of an inch --
13   A.   Yes.
14   Q.   -- maybe an eighth of an inch to a quarter
15 of an inch high.  I'm going to mark those
16 collectively as Exhibit 7.
17   A.   Right.  And those are from the FDA's Web
18 site.
19        (Whereupon, Exhibit No. 7 was marked
20 for identification.)
21 BY MR. GAGE:
22   Q.   All right.  And just looking over those, the
23 document -- first document is entitled,
24 "Reclassification of Urogynecologic Surgical Mesh
25 Instrumentation, FDA Questions," dated

Page 11

1  February 26, 2016; correct?
2    A.   Yes, sir.
3    Q.   All right.  And then behind that appears to
4  be -- well, there is a document entitled,
5  "Reclassification of Urogynecologic Surgical Mesh
6  Instrumentation," dated February 26, 2016; correct?
7    A.   Yes, sir.
8        And I mentioned that the FDA was going to
9  reclassify them in my report --
10   Q.   Yes.
11   A.   -- so this has just subsequently come out on
12 the FDA's Web site.
13   Q.   All right.  So we'll -- we will talk about
14 this document, which I have now marked as collective
15 Exhibit 7.
16       Are there any other additional documents or
17 data summaries, compilations of data, of any shape,
18 form, or character other than what we've already
19 discussed?
20   A.   I don't believe so.
21   Q.   Okay.  Do you have any plans on
22 supplementing any of your opinions with regard to
23 Prolift+M?
24   A.   Not that I'm aware of.
25   Q.   Dr. Parisian, with regard to Exhibit 3,

Page 12

1  which is your list of documents provided or
2  identified for review in the above-referenced
3  lawsuit --
4    A.   Yes, sir.
5    Q.   -- do you see that? --
6    A.   Yes, sir.
7    Q.   -- who typed this document?
8    A.   I didn't type it.
9    Q.   Do you know who typed it?
10   A.   No.
11   Q.   Do you know how you came into possession of
12 it?
13   A.   No.  I knew that -- no, I don't.
14   Q.   Okay.  Do you understand this document to
15 be -- and I'm speculating here, but I'll throw it
16 out and see what you know.
17       Do you understand this document to have been
18 prepared by plaintiffs' counsel in this case?
19   A.   Yes, sir.
20   Q.   Okay.  And this -- have you reviewed this
21 document?
22   A.   I haven't reviewed it, no, sir.
23   Q.   So you don't know whether this document,
24 Exhibit 3, contains a list of everything that has
25 been provided to you?

Page 13

1        MR. JONES:  Objection.
2        THE WITNESS:  I don't know that it
3  does.
4        I mean, in terms of what has been
5  provided, I know that there was -- the people
6  providing me were keeping track of it, and then I
7  cite some different things in my report, and so
8  they're trying to put that in.
9        I didn't type the list.  I don't have
10 any reason to think that it wouldn't contain it, and
11 that's why I brought the documents that I thought
12 may be new documents and not on the list.
13 BY MR. GAGE:
14   Q.   Do you have a separate list of documents
15 that have been provided to you or which you have
16 reviewed in connection with your expert report?
17   A.   No.
18   Q.   How did you physically receive documents?
19   A.   I received them in folders, these black
20 binders which I brought today, and so that's how I
21 received them.
22   Q.   Okay.  So I'm going to just stand up and
23 kind of go walk around on the other side of the
24 table to just take a look at the black folders.
25       So what you have -- what you've brought with

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 14

1  you to the deposition today are three large black
2  binders that fit into one box, and they have -- one
3  of them is TVT-Secur, so we'll save that one for the
4  next deposition.
5       That leaves two other binders, and one of
6  those two -- Dr. Parisian, this one at least, when I
7  pick up the first document, appears to relate to
8  Prolift+M.  Is that correct?
9    A.  Yes, sir.
10   Q.  So is it fair to say, is the other one
11  Prolift+M or is it Secur?
12   A.  It's 522 -- it's the 522 documents.
13   Q.  Okay.
14   A.  And I think -- I know TVT Secur had been in
15  the Garcia deposition, that black binder.
16   Q.  Yes.
17   A.  I haven't touched it since then, and so that
18  was there at that deposition.
19   Q.  Okay.  Well, I'll tell you what.  So that I
20  don't forget it, I'm going to put the TVT Secur
21  notebook on top of my TVT -- I'm going to give it
22  back to you, but I'm going to put it over here so
23  that when we take this deposition, hopefully I'll
24  remember to ask you about it.  If I don't, maybe you
25  can remind me.

Page 15

1    A.  Okay.
2    Q.  All right.  So with regard to Prolift+M, we
3  have two notebooks here.  One you're saying relates
4  primarily to the 522 issues?
5    A.  Yes, sir.
6    Q.  And the second of which is just really kind
7  of your general Prolift+M documents, and I also see
8  that you've got some notes in here too.  Is that
9  correct?
10   A.  Yes, sir.
11       (Whereupon, Exhibit Nos. 8 and 9 were
12  marked for identification.)
13  BY MR. GAGE:
14   Q.  All right.  So why don't we mark as
15  Exhibit 8 this notebook that you've given me that
16  contains a lot of handwriting, a lot of sticky
17  notes, and then a lot of photocopied documents.
18       And I'll ask you, Doctor -- and then we'll
19  mark as Exhibit 9 the notebook that you told me
20  relates primarily to the 522 orders.
21       And Nate and Bryan and I will figure out
22  later how we photocopy this because I hate to create
23  a gigantic depo with a gigantic amount of exhibits,
24  but we'll figure out --
25       MR. JONES:  The best way, the easiest

Page 16

1  way we can.
2       MR. GAGE:  Yeah, We'll figure out a
3  way, and I will definitely want to get a copy of
4  this, but I know we don't really have that -- I
5  don't think we have that ability to do it today.
6       MR. JONES:  I think we can work
7  together to find a solution.
8       MR. GAGE:  But, Counsel, can I ask that
9  I have a copy of all the handwritten notes and the
10  stickies?
11       MR. JONES:  You will get that binder,
12  absolutely.
13       MR. GAGE:  Perfect.  Thank you.
14       And the same for Exhibit 9 as well and
15  the TVT-Secur.  Okay.  Thank you.
16       THE WITNESS:  And then these are
17  documents that I went and pulled, too, that relate
18  to the Prolift+M, so some of those are mine.  That's
19  my file, so you have my file.
20       (Whereupon, Exhibit No. 10 was marked
21  for identification.)
22  BY MR. GAGE:
23   Q.  All right.  So that -- so Dr. Parisian's
24  handed me a folder, a red folder, that's probably
25  two inches thick --

Page 17

1    A.  Yeah.  I guess so, yeah.
2    Q.  -- about two inches thick of documents that
3  Dr. Parisian -- Dr. Parisian, did you identify this
4  as your file?
5    A.  Yeah, that's my file.  Not everything fit in
6  the notebook.
7    Q.  Okay.  So these would just be documents much
8  like those found in Exhibit 8, but they just
9  wouldn't fit inside of that notebook --
10   A.  Correct.
11   Q.  -- that we've marked as --
12   A.  And they weren't sent to me.  I went and got
13  them.
14   Q.  Okay.  That's -- that's important.
15   A.  Right.
16       They're not that -- they're not that
17  exciting of documents, but I just wanted you to have
18  the whole thing.
19   Q.  Was everything in Exhibit 8 provided to you
20  by plaintiffs' counsel?
21   A.  Yes, sir.
22   Q.  Was everything in Exhibit 9 provided to you
23  by plaintiffs' counsel?
24   A.  Yes, sir.
25   Q.  And everything in Exhibit 10 were documents

Suzanne Parisian, M.D.

1   that you got on your own?
2      A.   Yeah.  Miscellaneous documents, yes, sir.
3      Q.   Okay.  And then the documents that we talked
4   about that were part of Exhibit 6 from FDA, those
5   were provided to you by plaintiffs' counsel;
6   correct?
7      A.   Yes, sir.
8      Q.   What about Exhibit 7, the reclassification
9   documents?
10     A.   No.  I went and got those.
11     Q.   Okay.  So Exhibit 7 and Exhibit 10 are
12  the -- would it be correct to say that what is found
13  in Exhibit 7 and Exhibit 10 are the only documents
14  that you have gathered on your own accord in
15  connection with your opinions on Prolift+M?
16          MR. JONES:  Objection.
17          THE WITNESS:  I believe that's correct,
18  because I think -- I mean, obviously, I referenced
19  the guidance documents, like the surgical mesh
20  guidance and the -- and I believe they're in those
21  black folders.
22          But I would have gotten my own 510(k)s,
23  and -- and some of them are in there, but some of
24  those guidance documents I think are -- I just
25  didn't want to be duplicative.

1   BY MR. GAGE:
2      Q.   Okay.  So what about medical literature?  If
3   I wanted to know every piece of medical literature
4   that you reviewed in connection with your opinions
5   on Prolift+M, where would I go to find that?
6      A.   Some of it would be in the black folders.  I
7   don't have a file for medical literature for
8   Prolift+M.  So a lot of it would have come from the
9   folders -- would have been in the black documents
10  that were given to me.
11     Q.   And if counsel -- if the list that's marked
12  as Exhibit 3, what we sometimes call the reliance
13  list, is accurate, it would presumably contain every
14  document that is in Exhibit 8?
15     A.   It should, yeah.  I would expect it to.
16     Q.   Okay.  So the universe of medical literature
17  that you reviewed would either be in Exhibit 3, or
18  if maybe counsel made a mistake and didn't type it
19  up, it would be in Exhibit 8?
20     A.   Yes.
21     Q.   You do not have a separate stack, pile, or
22  collection of medical literature that you reviewed
23  for the Prolift+M case that is apart from what
24  you've handed me today?
25     A.   No.  And if you look in the red folder,

1   there are some things that I got from -- from my
2   search of the national medical library, blood work,
3   abstracts, and so those are in there.
4          So see -- there they are, the abstracts and
5   stuff, because some of them are in French -- so you
6   would have it all.
7      Q.   Okay.  As I look through -- as I'm looking
8   through the documents in Exhibit 10, I see the
9   deposition of Marty Weisberg from November 2015, I
10  see Prolift+M FDA 510(k) timeline, 522 Order and
11  re-commercialization.  I see some information about
12  ENDOLOOP?
13     A.   Right, because I talk about ENDOLOOP in my
14  report, so those are the documents I pulled.
15     Q.   Okay.  I see some stuff about ARTISYN.  I
16  see some information about -- some information you
17  pulled back on the MAUDE database.  Is that correct?
18     A.   Yes, sir.
19     Q.   And then I see a document called Summary of
20  Care for Carolyn Moorehead?
21     A.   Right.
22     Q.   What is that?
23     A.   That was how I originally got this.  It was
24  going to be Ms. Moorehead's case, Prolift+M.  I
25  think they -- I don't know -- I don't know what

1   happened to Ms. Moorehead, but that's what I
2   received.
3      Q.   All right.
4          MR. GAGE:  I would -- I would ask
5   counsel, plaintiffs' counsel --
6          MR. JONES:  Just for the record, I
7   think that's related to her prior involvement in the
8   TVT-Secur case, and so I think she's trying to be --
9   over-sharing perhaps in giving her complete file and
10  anything -- so if that's part of her complete file,
11  and so we'll take that out and make sure that's not
12  in the final exhibit.
13         MR. GAGE:  I think, unless you guys
14  disagree, the document that I am looking at is
15  purely -- it's about a seven- or eight-page
16  document.  It appears to be --
17         THE WITNESS:  Just medical history.
18         MR. GAGE:  -- exclusively related to
19  one plaintiff, and it goes into quite a good bit of
20  detail about her individual health.
21         MR. JONES:  Absolutely.
22         MR. GAGE:  What I would recommend is --
23  I would like a copy of it, but I do not believe it
24  should be marked as an exhibit unless you're
25  prepared to redact almost everything out of it,

Suzanne Parisian, M.D.

Page 22

1  because I don't think that this needs to be
2  generally circulated with her deposition transcript.
3          MR. JONES:  Correct.
4          MR. GAGE:  We agree to that?
5          MR. JONES:  And I think what might be
6  the best approach is for me to go through that
7  particular exhibit prior to it being formally
8  marked, and like you said, give it a careful read
9  and make sure there's no information in there that
10  shouldn't be in there.
11          MR. GAGE:  I don't -- you know, if
12  somebody wants a copy of the deposition of
13  Dr. Parisian that we've taken, I would like to be
14  able to give it to them without worrying about
15  somebody's very specific --
16          THE WITNESS:  Should I give it to him
17  and have him look at it?
18          MR. GAGE:  I mean, I would like a copy
19  of it, and I think as counsel I can look at it, but
20  I don't want it to be part of the record that gets
21  moved around.
22  BY MR. GAGE:
23     Q.  All right.  All right.
24          So, Dr. Parisian, let me ask you this about
25  your reliance list.

Page 23

1     A.  Um-hmm.
2     Q.  You indicated earlier, I believe, that
3  plaintiffs' counsel provided you with some documents
4  to review.  Is that correct?
5     A.  Yes, sir.
6     Q.  Did you ask for any additional documents
7  from plaintiffs' counsel?
8     A.  I asked for any FDA-related documents, and
9  that was why they gave me the document that we have
10  now -- is that Exhibit 6 or --
11     Q.  Is it Exhibit 8?
12     A.  No.  It's the one you just got today.
13     Q.  Exhibit 6?
14     A.  Yeah, Exhibit 6.  And that's how I happened
15  to come upon it, because I said I wanted anything
16  FDA-related, and so they gave me that.
17     Q.  All right.  So Exhibit 6 was not in the
18  stack of documents that they originally provided
19  you; correct?
20     A.  That's correct.
21     Q.  And then with respect to the documents that
22  are on your reliance list, do you know who made the
23  determination as to what to send to you?
24     A.  No.
25     Q.  Presumably, it would have been somebody with

Page 24

1  plaintiffs' counsel; correct?
2     A.  Right.
3     Q.  Apart from Exhibit 6, did you ever go
4  through your documentation that was provided to you
5  by plaintiffs' counsel and ask them to send you
6  anything else to review in connection with your
7  Prolift+M opinions?
8     A.  I don't think so.
9     Q.  Okay.  Exhibit 4 is your CV, and I assume it
10  is current?
11     A.  Yeah.  Yes, it is.
12     Q.  Exhibit 5 is your list of court testimony
13  from January 2011 to January 2016.
14          I assume the definition of court testimony,
15  this is every place that you've ever been deposed or
16  testified live at trial during those -- during that
17  time period.  Is that correct?
18     A.  Yes, sir.
19     Q.  And is that -- is this list current and
20  accurate and correct?
21     A.  Yes, sir.
22     Q.  Let me ask you this before I forget.  You
23  have been asked at prior depositions if you have --
24  if your testimony has ever been excluded, and I know
25  there have been a couple of occasions that you've

Page 25

1  indicated.
2          Are you aware of any time in the last two
3  years where your testimony has been excluded for any
4  reason?
5     A.  No.
6     Q.  Okay.  So the instances where your testimony
7  has been excluded, at least to your knowledge,
8  predate the last two years?
9     A.  Yes.
10     Q.  It would have been -- it would have been
11  sometime earlier than 2014?
12     A.  Yes.  And by excluded, I'm not saying --
13  sometimes a judge will say, "You can't talk about
14  this.  You can't talk about that," but we're talking
15  about excluded where I didn't go to court and stuff,
16  and I only know of maybe one time.
17     Q.  All right.  And Exhibit 7, which was the
18  reclassification documents, you pulled those
19  yourself off the FDA Web site.  Is that correct?
20     A.  Yes, sir.
21     Q.  All right.  And the original document that
22  you handed me has your highlights on it?
23     A.  Yes, sir.
24          MR. GAGE:  So, Nate, as we set about
25  the task of photocopying these things, I would ask

7 (Pages 22 to 25)

Suzanne Parisian, M.D.

Page 26

1  that the highlighting be --
2          MR. JONES:  Yeah.  You will get them as
3  produced.
4          MR. GAGE:  -- replicated as they're
5  produced.
6  BY MR. GAGE:
7      Q.   All right.  So, Dr. Parisian, I'm on Exhibit
8  No. 8, which is the notebook of documents.
9          And I think, if I'm remembering correctly,
10  you've testified this is largely a printoff or a
11  printout of documents that were provided to you by
12  plaintiffs' counsel.  Is that correct?
13     A.   These were the only documents that were
14  provided to me.
15     Q.   Okay.  Were they provided to you in the form
16  of a notebook, on paper, or were they provided to
17  you on a disk or some other electronic means?
18     A.   In a notebook.  You have them as -- that was
19  how they were provided.
20     Q.   Okay.  So the actual document, Exhibit 8, or
21  the actual Exhibit 8 is the actual notebook that
22  plaintiffs' counsel actually provided to you?
23     A.   Yes, sir.
24     Q.   Okay.  And apart from this -- apart from
25  Exhibit 8 and Exhibit 9 -- well, let me -- actually,

Page 27

1  strike that.
2          Was Exhibit 9, is it -- was it provided to
3  you in this form?
4      A.   Yes, sir.
5      Q.   Okay.  So when I'm holding Exhibit 9, this
6  is the actual notebook that was actually provided to
7  you by plaintiffs' counsel?
8      A.   Yes, sir.
9      Q.   Okay.  And Exhibit 8 contains a good bit of
10  handwriting.
11          I assume all of the handwriting in this is
12  yours?
13     A.   Yes, sir.
14     Q.   And I assume all of the stickies are yours?
15     A.   Yes, sir.  And there's no color
16  coordination.
17     Q.   Okay.  And the highlighting is all done by
18  you?
19     A.   Yes, sir.
20     Q.   And this was all done after you had been
21  retained and before you wrote your report?
22     A.   Yes, sir.
23     Q.   Do you have any plans on doing any
24  additional work with respect to Prolift+M?
25     A.   No, sir.

Page 28

1      Q.   Are you waiting on any information which
2  might cause you to alter your opinions in this case?
3      A.   No, sir.
4      Q.   Have you -- is there any pending request to
5  plaintiffs' counsel for additional documents or
6  information that you are waiting on with regard to
7  Prolift+M?
8      A.   No, sir.
9      Q.   I may have covered this earlier, but I'm not
10  sure it's clear in my mind, which means it may not
11  be clear in the record.
12          With regard to medical literature, I think
13  you -- that you have reviewed in connection with
14  this case, as I understand, it's come from two
15  sources.  It's either going to be in one of the
16  exhibits that we've already marked that came from
17  plaintiffs' counsel, or it's going to be in
18  Exhibit 10, which is a collection -- which includes
19  some documents that you yourself gathered; correct?
20     A.   Yes, sir.
21     Q.   I saw that there were several depositions on
22  your reliance list.
23          Did you read those?
24     A.   Yes, sir.
25     Q.   Did you read all of the documents on your

Page 29

1  reliance list?
2      A.   Well, let's -- which ones specifically are
3  you asking me of?
4      Q.   Well, let me ask you this.
5      A.   I don't remember reading them all.  I looked
6  at parts of them.  I wouldn't say that I've read
7  every single word of every one of them.
8      Q.   Okay.  So, for example, when I look through
9  Exhibit 8 and Exhibit 9 and Exhibit 10, I don't see
10  any deposition transcripts, but I see deposition
11  transcripts on your reliance list.
12     A.   Right.
13     Q.   Can you tell me where those deposition
14  transcripts are and how you received them?
15     A.   No, because I don't -- I don't have them
16  sitting on my computer.  If they're not in there, I
17  haven't reviewed them.
18     Q.   Okay.  So --
19     A.   And I don't think I cite most of them in
20  terms of my report.  The ones that I've reviewed I
21  cite in my report.  Because I know -- I know who
22  some of these people are, but I haven't read them
23  all, so I don't know where they are.
24     Q.   All right.  So if there's a -- the only
25  depositions that you would have read would be

Suzanne Parisian, M.D.

Page 30

1 depositions that you specifically cited to in your
2 report. Is that correct?
3    A.  Yes, sir.
4    Q.  And if there's a deposition that appears on
5 your reliance list, which is marked as Exhibit 3,
6 that is not cited in your expert report, then it
7 means that you did not read that deposition. Is
8 that correct?
9    A.  I haven't read all of those depositions, no,
10 sir. That's correct. I know who some of these
11 people are but did not read all their depositions.
12    Q.  Okay. So for the depositions that you did
13 read --
14    A.  Um-hmm.
15    Q.  -- where are they physically located?
16       It was my understanding you had given us
17 everything that you physically had in your
18 possession, and I don't see any deposition
19 transcripts. And I'm just wanting to know, where
20 are those transcripts?
21    A.  You know, I don't recall. I don't recall.
22 I didn't look at my computer last night to see if
23 there are depositions on that. I can go look and
24 see and update you as to what ones I have.
25    Q.  Okay.

Page 31

1    A.  But I don't -- I didn't look at it last
2 night to see if there's any depos on there.
3    Q.  All right. So I would ask for you to visit
4 with counsel and to give us --
5    A.  Any depos that I've been sent?
6    Q.  -- any depos that you've been sent.
7    A.  Okay.
8       MR. JONES:  And I'll just tell you, I
9 didn't print off the depositions for you. I can go
10 do that if that's what you're wanting me to do, but
11 they're not -- the printed 500-page long depositions
12 are not in those binders. We'd have about 20
13 binders.
14       MR. GAGE:  Yeah. I think what I would
15 like to have, if it's okay for you, Nate, and
16 Dr. Parisian, is if you guys could just send me a
17 document that says, "Here are the deposition
18 transcripts that I, Dr. Parisian, reviewed" -- I
19 guess it would fall into two categories:  "Here are
20 the transcripts I received and didn't review. Here
21 are the transcripts that I received and did review."
22       THE WITNESS:  Okay.
23       MR. GAGE:  And then just sign your
24 name, "Before I" -- "Before I signed my Prolift+M
25 report" --

Page 32

1       THE WITNESS:  Right.
2       MR. GAGE:  -- if you could provide
3 me -- would y'all be willing to give me that one
4 page?
5       MR. JONES:  We'll talk about it and see
6 what we can do, but we'll work on that.
7       MR. GAGE:  Okay. Because I'm going to
8 need something that has the witness's --
9       MR. JONES:  Correct.
10       THE WITNESS:  Right. I can do that.
11 Because I didn't look on my computer last night.
12 That's why I can't answer the question.
13 BY MR. GAGE:
14    Q.  That's fine.
15       But I just need -- just for posterity and
16 for the depo, I'll need something -- I'll need a
17 document that you have approved and agreed to --
18    A.  Right.
19    Q.  -- with regard to that issue, so I'll make
20 that request --
21    A.  Right.
22    Q.  -- and we'll work with Nate to get that.
23    A.  So you will know who I've read.
24    Q.  Exactly.
25       Have you read any expert reports from any

Page 33

1 expert witness in this litigation?
2    A.  I know I've read Dr. Miklos' report, but
3 that's our side, isn't that?
4    Q.  Yes.
5       And I believe was that in connection with
6 your TVT-Secur opinions in the Garcia case?
7    A.  I think so, yeah.
8    Q.  Apart from Dr. Miklos' expert report, have
9 you read any expert reports from anyone else in the
10 mesh litigation?
11    A.  I don't think I have.
12    Q.  And I'll represent to you, I didn't see any
13 in these documents. But in -- as I ask -- as I just
14 asked for the list of deposition transcripts, if
15 you -- when you go back to your computer, if you see
16 that you have received and didn't review expert
17 reports or if you received and did review expert
18 reports, I would ask that you add that to the list.
19    A.  I don't recall reviewing any expert reports
20 for Prolift+M.
21    Q.  Have you spoken to anyone who you understand
22 to be an expert in this litigation?
23    A.  No.
24    Q.  And, Dr. Parisian, as I understand it, you
25 have served as an expert witness for plaintiffs in

Suzanne Parisian, M.D.

Page 34

1   mesh cases other than those involving Ethicon or
2   Johnson & Johnson.  Is that correct?
3       A.   Yes, sir.
4       Q.   And is it correct to say that anytime you've
5   either testified live in court or been deposed you gave
6   be reflected on the list of testimony that you gave
7   us?
8       A.   That five -- I did -- I don't think on that
9   list would be the ProtoGen.  I did ProtoGen, depos
10  in that.  That was a long time ago.
11      Q.   But that wouldn't be on the list because the
12  list has a cutoff?
13      A.   Right.  It's five years.
14      Q.   Right.
15      A.   And then the other thing would have been I
16  was in a case against Johnson & Johnson with an
17  attorney, Ray Putney, that had a sling that had been
18  placed, and a woman had a bone anchor that was pre
19  all this stuff.  It was be- -- and so there was an
20  early case against Johnson & Johnson in Texas --
21      Q.   Do you remember --
22      A.   -- and so those wouldn't be in the two -- in
23  the lists that you have.
24      Q.   Do you remember what product was involved in
25  that case?

Page 35

1       A.   It was -- it was -- well, it was Johnson &
2   Johnson's sling, and it was a bone anchor.  I think
3   a Mitek bone anchor, and I think it was a PROLENE
4   sling.
5            And it was being done -- this is before they
6   had clearance for this, and that was in Texas.  I
7   know the attorney's name is Ray Putney, and I don't
8   remember what the woman's name was.  I think --
9            Anyway, so -- but Johnson & Johnson had
10  actually been in the OR when she was having all this
11  implanted, some of their executives and stuff.
12      Q.   Do you know if this was a TVT or a TVT-O?
13      A.   Oh, no, no, no.  It was pre -- it was before
14  TVT.  So it was actually something that the company
15  was looking at before they did their TVT.
16      Q.   So this is something that predates -- an
17  implant that would predate 1998?
18      A.   Yeah, yes.
19      Q.   All right.
20      A.   And so that went to court, and then it
21  settled, and so that's not on that list.
22      Q.   All right.  Have you ever testified in a
23  mesh trial?
24      A.   Yes.  Boston Scientific, a trial in, I
25  think, Delaware or Rhode Island for Motley Rice.

Page 36

1       Q.   And that was within the last couple years?
2       A.   Yes, sir.  And that's on my history.
3       Q.   All right.  And you've never been charged
4   with a crime of any type; correct?
5       A.   No, sir.  Thank goodness.
6       Q.   Who actually retained you for your Prolift+M
7   work?
8       A.   Lee Lundquist for Clark, Love & Hutson.
9       Q.   Had you ever worked for them before?
10      A.   Yes, sir.
11      Q.   Can you just give me some details about the
12  nature of the relationship with Clark, Love before
13  you were asked to opine on Prolift+M?
14      A.   I had worked with them on -- the Garcia case
15  was with them, and I had worked with them -- many
16  attorneys I work with are part of the MDL, and so
17  they had been -- I originally met them in Paxil where
18  I was involved with Paxil litigation.  And then I
19  met them again when I was involved with Trasylol,
20  but -- so the only times I was working for them
21  specifically was for mesh, and that was for Ethicon.
22      Q.   How long did you work for them on Paxil?
23      A.   Paxil is still going on.
24      Q.   Are you still doing work for Clark, Love in
25  Paxil?

Page 37

1       A.   No.  I'm doing -- no, no, but Paxil, it's
2   still going on.  They don't go away.
3       Q.   Are you still doing work for anyone for
4   Paxil?
5       A.   Yes.
6       Q.   But not Clark, Love?
7       A.   No.  They're out, but it continues on.
8       Q.   All right.  Do you have any documents or
9   invoices reflecting compensation in this case,
10  either amounts billed and not paid or amounts billed
11  and paid?
12      A.   You know, I didn't bring that.  I did bring
13  my worksheet for just the last couple days which we
14  haven't billed for yet.
15      Q.   All right.  Dr. Parisian's handing me a
16  document that we'll mark as Exhibit 11.
17           (Whereupon, Exhibit No. 11 was marked
18  for identification.)
19  BY MR. GAGE:
20      Q.   And this is a single sheet of paper that at
21  the top says, "Wagstaff & Cartmell.  Attention Jeff
22  Kuntz, Attorney, re:  Ethicon," and it reflects two
23  hours of work -- I'm sorry -- it reflects several
24  hours of work on March 6, 2016, and then several
25  hours of work on March 7, 2016?

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 38

1    A.   Yes, sir.
2    Q.   Okay.  And I take it this is just an
3  itemization of the amount of time you've spent over
4  the last two days?
5    A.   Right.  Yes, sir.
6    Q.   Okay.  Do you have an itemization of how
7  much time you spent before March 6 on Prolift+M?
8    A.   I believe there was a bill, and I don't -- I
9  didn't bring the bill.  I didn't look at the depo
10  notice.  I didn't bring the bill.
11    Q.   Okay.
12         MR. GAGE:  So I'll ask Nate and you to
13  provide that to us.
14         MR. JONES:  Yep, we'll provide it.
15         THE WITNESS:  And that was sent to
16  Clark, Love & Hutson, so I just didn't think of it.
17  BY MR. GAGE:
18    Q.   Would that bill contain all of your time for
19  fees and expenses apart from Exhibit -- what's been
20  listed in Exhibit 11?
21    A.   Yes, sir.
22    Q.   All right.  You don't happen to know or
23  recollect how much that amount was in the invoice
24  that you will be producing to me?
25    A.   No, sir.  Because I don't make out the

Page 39

1  billing, so I don't know how much it was.
2    Q.   Can you estimate how long it took you to
3  draft your -- or to review materials and draft your
4  Prolift+M report?
5    A.   No.  With the bill, I could probably, but I
6  don't have it in front of me, so I don't know.  It
7  took a while.
8    Q.   Do you have an estimate of how many hours
9  you've --
10    A.   No.
11    Q.   -- spent on Prolift+M?
12    A.   No.
13    Q.   But that would be reflected in the invoice
14  to Clark, Love?
15    A.   Yes, sir.
16    Q.   Okay.  So if I add whatever's in that
17  invoice to Clark, Love to Exhibit 11, I'll have the
18  entirety of everything that you have billed and/or
19  worked with regard to Prolift+M in this case?
20    A.   Yes, sir.
21    Q.   Can you recollect, even if it's just by
22  estimate, how much time you spent reviewing
23  documents as opposed to how much time you've spent
24  actually drafting your report?
25    A.   No, because I'm doing both at the same time.

Page 40

1  I'm going through the book and drafting at the same
2  time, so it's not like I broke them out separate.
3    Q.   Have you traveled anywhere for purposes of
4  gathering information or for working on your
5  Prolift+M --
6    A.   No.
7    Q.   -- report?
8         Have you watched any videos?
9    A.   No.
10    Q.   Have you conducted any interviews?
11    A.   No.
12    Q.   Dr. Parisian, I read your TVT-Secur report
13  in Garcia -- I'm sorry -- your TVT deposition in
14  Garcia.
15    A.   Right, because there was no report.  It was
16  only disclosure.
17    Q.   Right.
18         So I read your deposition there, and that
19  deposition was in February of 2015, so from time to
20  time, I may ask you some questions that appear to be
21  duplicative, but the reason I ask them is because
22  there's been a passage of a year and I just need to
23  make sure that something hasn't changed since you
24  last testified about some issues that are general in
25  nature.

Page 41

1         In that deposition, you indicated that you
2  had made over a million dollars over the last five
3  years doing litigation work.
4         Do you recall that testimony?
5    A.   I think the defense actually indicated it
6  was a million.
7    Q.   Did -- had you made any sort of calculation
8  on that?
9    A.   No, I haven't.  Every year I've worked I've
10  given the numbers, so it's no problem for defense to
11  sit there and add up the numbers.
12    Q.   Right.
13    A.   And so I think the defense brought up that
14  number.  I don't know what it is.  I mean, I haven't
15  hidden anything.  And last -- so --
16    Q.   Well, do you know what the -- since I'm
17  trying to stitch together what happened in 2015 so
18  we can bring that testimony forward, can you give us
19  an estimate of the total amount you've earned doing
20  litigation work in 2015?
21    A.   In 2015, it would have been about 700,000.
22  That's how much the company brought in.  I didn't
23  keep all that.  But I'm trying to cut back.  That's
24  what I testified in the depo, too, is I'm trying
25  to -- actually, I was trying to retire, and so it's

Suzanne Parisian, M.D.

Page 42

1  coming down, but not yet.  But that was what it was
2  last year.
3      Q.   Can you break out that $700,000 for me and
4  just generally attach your earnings to various
5  pieces of litigation that you've worked on in 2015?
6      A.   You mean --
7      Q.   So, for example -- I'm just giving you an
8  example -- "In 2015, I made 150,000 from mesh.  I
9  made 150,000 from Plavix."
10     A.   No, I can't do that.  I didn't do Plavix
11  either, so, no, I can't really figure out which --
12  you have my list, so -- you know, of all the cases
13  I've had.
14     Q.   Do you know how much you've earned working
15  on the mesh litigation?
16     A.   No.  At one time I figured it out, but I
17  haven't done it recently.
18     Q.   Can you give me an estimate of what
19  percentage of time in 2015 you spent working for any
20  mesh claim?
21     A.   No, because as you know, I've done mesh for
22  a long time.  I mean, with the -- I don't even know
23  what year AMS settled and all that stuff, so I've
24  been working on mesh for years.  I did not figure up
25  the time, but I've been doing it longer than one

Page 43

1  year.
2      Q.   In 2015, I know I've got the places where
3  you've testified, but can you itemize for me the
4  various pieces of litigation where you're serving as
5  an expert witness in 2015 irrespective of whether
6  you've actually testified?
7      A.   Usually the deposition list will talk about
8  what -- what I've been involved with because I
9  really am trying to cut my cases back.  And so the
10  things I gave depositions are probably the active
11  cases that I had.
12     Q.   You don't -- do you recall any work that you
13  did in 2015 for any piece of litigation where you
14  weren't deposed?
15     A.   No.  It seems like you write a report, and
16  then they want to depose you, so, no.
17     Q.   So if I looked at your list of depositions,
18  that would give me an accurate picture of --
19     A.   Let me look at it before I answer.
20         All right.  So I said my depositions; right?
21  So are you wanting to know what I'm active in right
22  now?
23     Q.   Yes.
24     A.   Is that what you're wanting?  Okay.
25         Why don't we do it that way, because some of

Page 44

1  the cases I've been involved in are not active
2  anymore.
3         Wright Medical, that's a hip implant.  Yes,
4  I'm still active in that.  AMS pelvic mesh, that is
5  not active right now as far as I know.
6      Q.   Is that because of a settlement?
7      A.   Yeah.
8         Mirena, I'm still active in Mirena, which is
9  Bayer.  The second case there would be a Bayer case,
10  same thing, Mirena.  So all the American Medical
11  stuff is gone.  Yasmin and YAZ, that's gone.
12  They're not doing that one anymore as far as I know.
13         PLEVA, I think the PLEVA cases are gone.
14  The generic Reglan cases as far as I know.  C.R.
15  Bard, I am active in C.R. Bard.  Those are the IVC
16  filter cases, so those would be things I'm still
17  active in.
18         Ethicon, Wright, so those are -- those are
19  basically what I'm active in now.  Let's see.
20  Anything else?  Abbott Laboratories, that's
21  Depakote.  That's a birth defect case.  I'm still
22  active in that.  So -- Boston Scientific, yes, I'm
23  still active in that mesh, but only for Motley Rice.
24         And the Zometa and Aredia litigation, I
25  don't know what's going on with that stuff.  I think

Page 45

1  all the ONJ cases are kind of gone.  There's some
2  hip fractures cases that may be occurring.
3         And so those are the main active -- I have
4  fewer cases now than I used to, yeah, so those --
5  those would be the ones that I'm active in.
6         I don't know what's going to happen with
7  Fosamax and the hip fractures.
8      Q.   All right.  Thank you.  That was helpful.
9      A.   Okay.  So those are the witnesses I'm
10  still -- and Paxil came back, so I have Paxil again.
11  Apparently, it's re- -- come back.  And then Kugel
12  Mesh came back.  And so there's some Kugel Mesh
13  cases, and there's actually still one or two HRT
14  cases, hormonal placement therapy.
15         So I'm trying to cut -- so I have it down to
16  like less than ten.
17     Q.   All right.  Have you published any of the
18  opinions you're offering here today?
19     A.   No.
20     Q.   Have you spoken with any scientist,
21  engineer, or medical doctor regarding your opinions?
22     A.   No.
23     Q.   Is it correct to say that you developed
24  these opinions specifically for this litigation?
25         MR. JONES:  Objection.

12 (Pages 42 to 45)

Suzanne Parisian, M.D.

Page 46

1    THE WITNESS: Well, not -- it isn't
2 really, because, I mean, I've been involved with --
3 the opinions about Prolift+M, yes, but as you know,
4 I've been involved in this type of issue for other
5 products.
6 BY MR. GAGE:
7    Q.  Is it fair to say that your opinions were
8 not developed for some research project or study
9 that you are involved in?
10    A.  Yes.
11    Q.  Is it correct that you are not offering any
12 opinions on general causation or specific causation?
13    A.  And I'll qualify that.  That to me means
14 like medical causation for a particular plaintiff
15 because, obviously, I think that Prolift+M could
16 contribute.  There could be complications like what
17 is seen in a patient.
18        But I don't see my role as a clinician in
19 terms of a particular case giving medical causation.
20        Is that what you're asking?
21    Q.  Yes.
22        I will say that in the TVT-Secur deposition,
23 you answered that question or one similar to it by
24 saying that your opinions would be further developed
25 once you had reviewed the plaintiffs' medical

Page 47

1 records.
2        MR. GAGE:  Can -- and I suppose I
3 should -- I suppose I should have asked counsel if
4 they're willing to stipulate that Dr. Parisian will
5 not be reviewing plaintiff medical records and
6 offering case-specific opinions?
7        MR. AYLSTOCK:  So stipulated.
8        MR. JONES:  Yeah.
9        MR. GAGE:  Okay.
10        MR. JONES:  That's not in our plans.
11        THE WITNESS:  Yeah.
12        And I look at it as the timing because
13 usually why I review the records is the timing
14 because a judge would want a case to be relevant to
15 that particular patient.
16        And so I'm not the causation, but I'm
17 looking at it, in terms of testimony, the period of
18 time.
19 BY MR. GAGE:
20    Q.  Okay.  So, for example, if there were
21 multiple IFUs, for example, in Prolift+M, you may
22 look at the medical records in order to determine
23 which was the applicable IFU.  You may look at the
24 medical records.  You may look at the depositions.
25        But it's not your intent to then provide a

Page 48

1 case-specific medical causation opinion?
2    A.  That's correct.
3    Q.  Okay.  I also did not see anything in your
4 report about any manufacturing defect opinions,
5 where you would be offering an opinion that any
6 particular lot of Prolift+M had a manufacturing
7 defect.  Is that correct?
8    A.  That's correct.  I've offered that in other
9 cases but not for this one.
10    Q.  All right.
11    A.  And, again, if -- that would be if there is
12 actually a specific plaintiff and I happen to look
13 at their lot, and then I would go look at -- and so
14 that's the one time that I did that in an AMS case.
15    Q.  What was the opinion in summary that you
16 provided for a specific lot in a case?
17    A.  It was a specific lot in that the -- it was
18 in Texas, and it had been kept out in the sales
19 rep's car, and so it had gotten hot.
20        And then we went back and looked at the
21 device history record.  There had been a lot of
22 problems with the manufacturing of that particular
23 lot.  So I went through the case reports and the
24 design history and manufacturing, and there -- most
25 of the lot had been rejected.

Page 49

1        And so this was a particular case where this
2 one was like, what?  Why did you let that go?
3    Q.  And for Prolift+M, at least to date, you
4 have not been asked to do such a case-specific
5 analysis?
6    A.  That is correct.
7    Q.  You're not here as a representative of FDA;
8 correct?
9    A.  That is correct.
10    Q.  Not speaking on behalf of FDA; correct?
11    A.  That is correct.
12    Q.  FDA has not reviewed or endorsed any of your
13 opinions in this case; correct?
14    A.  That is correct.
15    Q.  Have you ever spoken with anyone from FDA
16 regarding your opinions in this case?
17    A.  No, and I would think that I would be
18 precluded from that, too, but I have not.
19    Q.  Have you ever called or written to FDA about
20 any of your opinions in this case?
21    A.  No.
22    Q.  Were you invited by FDA to be part of a 2011
23 advisory committee concerning pelvic mesh?
24    A.  No.
25    Q.  Do you know why not?

13 (Pages 46 to 49)

Suzanne Parisian, M.D.

Page 50

1    MR. JONES:  Objection.
2    THE WITNESS:  No, I don't know why not.
3  I wouldn't have put my name out there to be on it.
4  For one thing, I'm not a urologist.  I'm not a
5  biomaterials person.  And I just have not put myself
6  out there where I would be that expert for that
7  panel.
8  BY MR. GAGE:
9    Q.  Have you ever been invited by FDA to be on
10 an advisory committee of any type?
11   A.  I was at a meeting, an advisory meeting, to
12 talk about device labeling, and so I was asked to
13 come and talk about that.  The FDA was trying to
14 standardize device labeling to drug labeling, so
15 that was -- and it's on my CV.
16   Q.  Do you remember what year that was?
17   A.  Oh, gosh.  '97, '98.  It wasn't recently.
18 I'd feel very conflicted if I go to the FDA just
19 because of all the stuff that I'm in, and it's
20 better not to talk about anything.
21   Q.  Did you testify at that committee meeting?
22   A.  I was actually on the panel, so there is a
23 transcript with my testimony in it.
24   Q.  Do you know where that transcript is?
25   A.  No.  You probably could get it through -- at

Page 51

1  the FDA.
2    Q.  All right.  Have you ever seen that
3  transcript?
4    A.  No.
5    Q.  Has anybody ever cross-examined you with
6  that transcript?
7    A.  No.
8    Q.  All right.
9    A.  I know what I said, and, so, no, I didn't --
10   Q.  Recognizing that we have -- we're under a
11 tight time limit, can you give me a summary of what
12 you testified to at that meeting that is less than
13 30 seconds in length?
14   A.  They were -- yeah, sure.
15     They were trying to make device labeling
16 like drug labeling, and there were difficulties in
17 terms of that.  In terms of writing an adequate
18 device label, it's tricky compared to a drug label,
19 and so that was my -- my discussion was the
20 difference between a drug label and a device label.
21   Q.  And, again, in a summary fashion, what are
22 the differences in your opinion?
23   A.  It's -- it's just -- there's -- it's just a
24 drug label is fairly standard.  It's a pill, and you
25 give the same kind of information over and over.

Page 52

1  Whereas, devices, there's all kinds of devices, so
2  you're going to have problems if you try to make it
3  the exact same format.
4    Q.  Dr. Parisian, I know that some of this was
5  touched on during your TVT-Secur opinion, but I'm
6  concerned that it may have been -- some of it in the
7  context of Secur and not Prolift+M, so I'm going to
8  re-ask some of these questions.
9      At FDA were you ever involved with Prolift
10 or Prolift+M?
11   A.  No.
12   Q.  Were you ever involved with any mesh
13 products for pelvic organ prolapse?
14   A.  Not that I recall.  I don't -- I don't
15 recall.
16   Q.  When you were at the FDA, were you ever
17 involved with mesh stress urinary incontinence
18 devices?
19   A.  I don't think so, because I was there -- I
20 left FDA in '95, and so the birth of mesh actually
21 came after that.  I've been involved with mesh but
22 not necessarily for SUI.  I've gone to meetings, I
23 think at the NIH, about SUI issues but not
24 specifically for this type of issue.
25   Q.  While you were at FDA, were you ever

Page 53

1  involved with pelvic floor repair devices?
2    A.  Not devices, no.  I had gone to meetings
3  talking about pelvic floor repair but not devices.
4    Q.  After you left FDA, is it correct to say
5  that you had no involvement with FDA's review of
6  Prolift or Prolift+M or any of the mesh devices?
7    A.  That's correct.
8    Q.  Have you ever drafted a label or an IFU for
9  a surgically implantable device?
10   A.  In clinical trials.
11   Q.  What was that device?
12   A.  It was a device that was being used as a
13 shunt in the brain, CNS shunt, and it was being used
14 in elderly people to try to do clinical trials for
15 Alzheimer's disease, and that's the only one I can
16 recall, and I was a consultant.
17   Q.  What was the company?
18   A.  It was Stanford University.  They were
19 trying a clinical trial, so it wasn't a company per
20 se.
21   Q.  So it was a medical device that they had
22 created and wanted to run some clinical trials on?
23   A.  Well, they had me help them create the
24 medical device, and then they wanted to run some
25 trials to see if they could reduce Alzheimer's

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 54

1  spread, and so I was involved with them.
2      Q.  Did you help create an IFU?
3      A.  For the investigators, yes, sir.
4      Q.  Where could I get a copy of that?
5      A.  I don't know if you can.  It was an IDE, and
6  I don't think it really took off.  I don't know what
7  happened to it.
8      Q.  Do you have a copy of it?
9      A.  I don't have a copy of it.  It was back in,
10 like, '96.
11     Q.  There was some discussion -- well, there was
12 some discussion during your TVT-Secur deposition of
13 your working for a company called "Insurex."
14     A.  SURx, yeah, S-U-R-x.
15     Q.  S-U-R-x?
16     A.  Right.
17     Q.  Right.  I think that transcript incorrectly
18 called it "Insurex," I-n-s-u-r-e-x.
19     A.  No.  You will never find it.  S-U-R-x.
20     Q.  S-U-R-x?
21     A.  It's a radiofrequency device for using a
22 radiofrequency current to try to control a woman's
23 SUI, in terms of that, so -- and I was brought in as
24 a consultant because they had gotten rejected by the
25 FDA, and I was to come in and help clean up the data

Page 55

1  so they could get cleared.
2      Q.  Do you recall what year or years that
3  occurred?
4      A.  No.  It would have been, like, in the '90s.
5  It was when I first left the FDA.
6      Q.  Did you assist that company in drafting
7  instructions for use for that device?
8      A.  Yes.  But more importantly, I had to look at
9  their data because that was the issue that they had
10 gotten in trouble with with the FDA.  So we cleaned
11 up their data.
12         I don't remember if it was PMA or a 510(k),
13 but it got cleared.
14     Q.  Do you -- did you in that case review or
15 comment on the IFU?
16     A.  It was a training manual, yeah, so I looked
17 at the training manual because you have to be able
18 to comment on how doctors can do it.  My main focus,
19 though, was the clinical data.
20     Q.  Did you provide edits or input to the
21 training manual?
22     A.  Yes.  I looked at it and gave what my
23 thoughts were, but in terms of -- again, it was the
24 data that I had to look at.
25     Q.  Do you have a copy of that training manual?

Page 56

1      A.  No.
2      Q.  Do you know where I could get a copy of it?
3      A.  No.  I don't even know if the company is
4  still making it or if they sold it.
5      Q.  Have you ever drafted a patient brochure for
6  a surgically implantable device?
7      A.  At the FDA I commented on them in terms of
8  surgically implantable devices.  I have not drafted
9  it from square one.  But in terms of medical
10 devices, you're often more interactive with
11 companies in terms of -- like, I know I was involved
12 with implantable cardiac defibrillators when they
13 first came out and also some of the -- so those
14 would have been issues that I was looking at the
15 labels, but I didn't draft them.
16     Q.  Do you -- could you identify for me any --
17 and I assume while you were at FDA you also looked
18 at and commented upon instructions for use with
19 regard to medical devices?
20     A.  Yes, sir.
21     Q.  Is there -- can you identify for me any
22 instructions for use or patient brochures that you
23 reviewed, edited, and/or approved while you were at
24 FDA?
25     A.  That's really hard.  I don't know, I mean,

Page 57

1  because I -- that would have been my routine to look
2  at the IFU and make comments because I looked at
3  IFUs post market for people who needed warnings and
4  had gotten into safety issues and looked at them
5  premarket.
6          I remember being involved with Cook
7  Catheter.  They had an amniotic -- chorionic villus
8  sampling device.  I remember working on that in
9  terms of the approval.  That was a PMA product.
10 That would have been there.  But, no.  That was --
11 routine exam was that you would look at the labeling
12 and make comments.
13         But more in postmarket, when people got into
14 recall issues, I would always say, "Put a warning,"
15 or do stuff, so it would have been more in my
16 postmarket days.
17     Q.  Dr. Parisian, I know much of this was
18 covered at your prior deposition, but, again, it's
19 been a gap of a year's time, and I want to make sure
20 nothing has changed.
21         Are you still a licensed medical doctor?
22     A.  Yes.
23     Q.  And you are a pathologist; correct?
24     A.  Yes.
25     Q.  You have not gotten any new certifications

Suzanne Parisian, M.D.

Page 58

1  or training in the last year since you were deposed
2  in the Garcia case?
3      A.  That's correct.
4      Q.  Have you treated any patients since 1988?
5      A.  Not as -- I've treated my family, but not as
6  a -- no, I don't have a clinical practice.
7      Q.  All right.  And do you have any current
8  board certifications?
9      A.  Yeah.  I'm board certified, anatomic and
10  clinical pathology.
11     Q.  Any staff privileges at any hospital?
12     A.  No.
13     Q.  Are you credentialed at any hospital?
14     A.  No.
15     Q.  Did you ever participate in a cadaver study
16  regarding any mesh device?
17     A.  No.  A lot of cadavers but not with mesh.
18     Q.  Ever participate in any animal studies
19  regarding any mesh device?
20     A.  No.
21     Q.  Ever design any clinical trials or protocols
22  or studies regarding any device involving mesh?
23     A.  No.
24     Q.  Ever involved in any clinical research
25  regarding mesh?

Page 59

1      A.  No.
2      Q.  Ever designed mesh?
3      A.  No.
4      Q.  And I think you testified earlier you've
5  never done any biomechanical testing of mesh.  Is
6  that correct?
7      A.  That's correct.
8      Q.  No lab work regarding mesh?
9      A.  That's correct.
10     Q.  Have you done any testing of a polypropylene
11  or mesh explant?
12     A.  No.
13     Q.  And do you know what I mean when I say
14  "explant"?
15     A.  Yeah, sure.  Somebody who's removed it, like
16  a surgical specimen.  No.
17     Q.  Have you ever inspected polypropylene or a
18  mesh explant of any kind?
19     A.  No.
20     Q.  Have you ever looked at explanted mesh under
21  a microscope?
22     A.  No.
23     Q.  Is it correct to say that you've never been
24  involved in a clinical trial to evaluate the safety
25  or efficacy of a medical device or part or all of a

Page 60

1  device that was either polypropylene or synthetic
2  surgical mesh?
3      A.  Correct.
4      Q.  And you did no mechanical testing of the
5  mesh in Prolift+M?
6      A.  Correct.
7      Q.  You did not do any type of testing or
8  measurements on the mesh in Prolift+M?
9      A.  Correct.
10     Q.  And that's not something you would do in
11  your normal practice?
12     A.  Correct.
13     Q.  Have you ever diagnosed pelvic organ
14  prolapse?
15     A.  Well, yes.
16     Q.  When was that?
17     A.  When I used to do OB/G -- and when I did GYN
18  exams.
19     Q.  When was that?
20     A.  That would be in the '80s.  I mean, I had a
21  clinic, and so we would see women all the time for
22  GYN clinic day.  So, yeah, I've seen prolapse.
23     Q.  Did you ever treat it?
24     A.  Not with mesh or surgically treat it, no.
25  If a woman had problems, then you would send her to

Page 61

1  a urologist at that time.  That was in the '80s.
2      Q.  Did you ever perform any surgery to treat
3  pelvic organ prolapse?
4      A.  No.
5      Q.  Do you believe that today you have the
6  requisite education, training, and experience to
7  counsel a patient about the treatment options for
8  pelvic organ prolapse?
9      A.  I wouldn't engage in that.  I'm a regulatory
10  expert.  I'm not going to consult with patients
11  about it.
12     Q.  Have you ever implanted a medical device
13  used to treat pelvic organ prolapse?
14     A.  No.  We used to use pessaries and things for
15  that, and -- but that was not implanted.
16     Q.  Do you consider yourself an expert in pelvic
17  organ prolapse?
18     A.  No.
19     Q.  Have you ever implanted or explanted any
20  medical device?
21     A.  I don't know.  I mean, it wouldn't have been
22  a major -- I mean, there's some devices that are
23  small that you would have implanted or -- I don't
24  know.  I mean, it's a long time ago.
25     Q.  When was the first time you heard of Prolift

Suzanne Parisian, M.D.

Page 62

1  or Prolift+M?
2      A.   When I was asked to look at it.
3      Q.   In litigation?
4      A.   Yes, sir.
5      Q.   Any idea as to how many Prolift+M devices
6   have been implanted in the United States or in the
7   world?
8      A.   No, sir.
9      Q.   Have you ever seen a Prolift or Prolift+M
10  implanted in the body in a live setting?
11     A.   No.
12     Q.   Have you ever watched a video of a Prolift
13  or Prolift+M procedure?
14     A.   No.
15     Q.   Have you ever held a Prolift or Prolift+M
16  device in your hand?
17     A.   No.
18     Q.   Have you ever been in the same room with a
19  Prolift or Prolift+M device?
20     A.   No.  Nobody at the FDA would be either.
21         MR. AYLSTOCK:  Whenever you get to a
22  breaking point, my coffee is out.
23         MR. GAGE:  That's fine.  Why don't we
24  stop.  Yeah, let's take a quick one here.
25         (Short recess was taken.)

Page 63

1   BY MR. GAGE:
2      Q.   Dr. Parisian, would you agree that there are
3   patients who have had Prolift+M implanted who have
4   had no complications?
5      A.   I don't know.
6      Q.   Would you agree that there are patients who
7   have had good experiences with Prolift+M?
8      A.   I don't know.  That would be the urologist
9   and gynecologists talking about that.
10     Q.   Would you agree that there are women who
11  have a Prolift+M placed where it has been a safe and
12  effective device for them?
13     A.   I don't know.
14     Q.   Would you agree that there are a significant
15  number of doctors in the United States who believe
16  the Prolift+M was safe and effective?
17     A.   You know, I don't know, but I mean, the FDA
18  is going to reclassify all these POP devices in
19  order to have a PMA.  So FDA doesn't agree with
20  that, so I don't know.
21         And so you're asking me questions.  Who
22  knows?  You have to have follow-up.  So I don't
23  know.
24         (Whereupon, Exhibit No. 12 was marked
25  for identification.)

Page 64

1   BY MR. GAGE:
2      Q.   Dr. Parisian, I'm handing you just a chart
3   of the pelvic anatomy that I've marked as
4   Exhibit 12.
5          Are you familiar with the pelvic floor
6   anatomy?
7      A.   As a pathologist, yes, sir.
8      Q.   Are you familiar with the POP-Q system?
9      A.   The POP-Q system?
10     Q.   Yes.
11     A.   No.
12     Q.   Do you know what that is?
13     A.   I know what POP is, but I don't know what
14  the Q part is.
15     Q.   All right.  So if I were to ask you to draw
16  for me on this chart the various points, such as
17  point AA, point BA, point C, point D, under the
18  POP-Q system, would you be able to do that?
19     A.   No.
20     Q.   All right.
21         (Whereupon, Exhibit No. 13 was marked
22  for identification.)
23  BY MR. GAGE:
24     Q.   Dr. Parisian, I'm handing you Exhibit 13.
25         Do you know what that is?

Page 65

1      A.   This is -- this is -- I don't know if it's
2   Prolift+M or Prolift.  This is the pelvic floor,
3   what it looks like in the 510(k) in terms of the
4   diagrams.  I'm not sure which one it is
5   particularly, but it would be the different pelvic
6   floor mesh configurations with the arms like -- so
7   that's what it is.
8      Q.   Are you able to discern as between these
9   three which is the Prolift total -- Prolift+M total,
10  the Prolift+M anterior, and the Prolift+M posterior?
11         MR. JONES:  Objection.
12         THE WITNESS:  Well, my guess would be
13  that the first one with all the stuff is the total.
14  And I'm not -- I'm not sure which one would be the
15  anterior and which would be the posterior.
16         I'm guessing.  I mean, I'm not the
17  person that would be doing this, but -- so I think
18  the one that's got the biggest one here, that would
19  be total.
20  BY MR. GAGE:
21     Q.   All right.
22     A.   Because it's got everything on it.
23     Q.   And the one that you're pointing to is the
24  one on the far left?
25     A.   Yes, sir.

Suzanne Parisian, M.D.

Page 66

1    Q.  All right.  Dr. Parisian, I read your
2  Prolift+M report, and is it -- it's correct to say
3  that you are critical of both the Prolift+M
4  instructions for use and the Prolift+M patient
5  brochure.
6        Is that a fair statement?
7    A.  Oh, I think we start further back than that.
8        I think the design and the development of
9  the product, the -- and the information being
10  provided to the physicians from what the company
11  knew in Europe.
12        So, yes, I am critical of that, but it
13  starts back further than just the brochure and the
14  IFU.
15    Q.  Okay.
16        MR. GAGE:  So move to strike as
17  nonresponsive.
18  BY MR. GAGE:
19    Q.  Just focusing in on the IFU and the patient
20  brochure, is it correct to say that you are critical
21  of the IFU and the patient brochure for Prolift+M?
22    A.  Yes.
23    Q.  Okay.  Have you drafted an IFU or a patient
24  brochure for Prolift+M that you believe is adequate?
25    A.  No.

Page 67

1    Q.  Have you provided -- or strike that.
2        Do you have a document that you have edited
3  that would show edits or changes to the existing
4  Prolift+M IFU or patient brochure that would, if
5  adopted, make it adequate?
6    A.  No.
7    Q.  Do you intend to testify before a jury that
8  the inclusion of specific words or the removal of
9  specific words in either the IFU or the patient
10  brochure would be necessary in order to make those
11  documents adequate?
12        MR. JONES:  Objection.
13  BY MR. GAGE:
14    Q.  Do you understand what I'm saying?
15        I'm trying to understand whether you intend
16  to testify to a jury, "Here's -- here's the list of
17  the -- of the specific words that they should have
18  included in an IFU in order for it to be adequate,"
19  or "Here's a list of the words that should have been
20  taken out of the Prolift+M IFU in order to make it
21  adequate."
22        MR. JONES:  Objection.
23        THE WITNESS:  I mean, a lot of it is
24  going to depend on what the physicians say, what
25  they think they should have known for their

Page 68

1  particular case.  I mean, that's usually what has
2  happened.
3        If a physician said, "I needed to know
4  this, I needed to know that," then I'll look at
5  the IFU and I'll say, "It's not there," the
6  information that they were asking about.
7        And then the other thing that I usually
8  testify to are the types of information that are
9  specific to Prolift+M that are not in the label.
10  And so I would give that.
11        But have I written a label, no, and it
12  would usually be, "This is the types of information
13  that a physician would need to know."  Usually it's
14  reinforced by what the physician says, and then it
15  needs to be made specific for Prolift+M.
16        What are the things that you're having
17  in the literature, the reports?  What was it that
18  they knew in France?  I think I said about the 2D
19  imaging, that you could look at the 2D imaging and
20  see if the person was having the -- the product
21  eroding.
22        So there are some things in my report
23  as to things that would need to be in an adequate
24  IFU, but I haven't written an adequate IFU for it.
25  ///

Page 69

1  BY MR. GAGE:
2    Q.  Have you ever spoken with a doctor who has
3  implanted a Prolift or a Prolift+M device?
4    A.  No.
5    Q.  Have you read the depositions of any doctors
6  who have implanted Prolift or Prolift+Ms?
7    A.  No.
8        (Whereupon, Exhibit No. 14 was marked
9  for identification.)
10  BY MR. GAGE:
11    Q.  All right.  Dr. Parisian, I'm going to hand
12  you a chart I marked as Exhibit 14.  I will confess
13  to that I -- it's in my own handwriting, and I only
14  have one copy which you and Nate can look at at the
15  same time.  And I may have to come around on your
16  side of the table so I can kind of look at it.
17        But I want you to just take a look at it and
18  I'll give you a second to read it.
19    A.  Okay.
20    Q.  So, Dr. Parisian, what I've got there is a
21  circle divided into, I guess, eight piecharts -- or
22  pie slices, and I've gotten -- I've written in
23  that -- in those piecharts, IFU, Prof. Ed, which
24  means professional education, then med
25  school/training, then med lit, which means medical

Suzanne Parisian, M.D.

Page 70

1  literature, then colleagues, then experience, then
2  patient brochure, and then I think I wrote Surgeon's
3  Resource Monograph.
4      Do you see that?
5      A.  Yes, sir.
6      Q.  Okay.  Do you agree that -- and I think at
7  the title, it says, "Sources of Risk Information."
8  Is that correct?
9      A.  That's what your title is.
10     Q.  All right.  Do you agree that -- well, first
11 of all, you understand what professional education
12 is?
13     A.  Yes, sir.
14     Q.  Okay.  And, obviously, you know -- you are
15 generally familiar with all the other components of
16 that pie chart.  Is that correct?
17     A.  Yes, sir.
18     Q.  Are you familiar --
19     A.  Now, are you talking about just
20 hypothetically in general?
21     Q.  In general.
22     A.  Because it doesn't really reflect what's
23 happening with Prolift+M.
24     Q.  That's correct.
25     A.  Okay.

Page 71

1      Q.  I'm just talking about in general.
2      A.  Okay.
3      Q.  Are you familiar with the Surgeon's Resource
4  Monograph?
5      A.  Right.  That would be your training manual
6  for the surgeon.
7      Q.  Yes.
8          Did you -- is that one of the documents you
9  reviewed?
10     A.  I reviewed it, but I'm not a surgeon, but in
11 terms of -- I mean, because one of the things
12 missing here is your sales force, and that company
13 is doing the training course.
14         And so this is -- this -- this diagram is
15 more typical of traditional -- like a urologist
16 practice or something.
17         But in terms of these cases where the -- the
18 company is the one responsible for the procedure and
19 the training and stuff, it doesn't really reflect
20 the company's involvement.
21     Q.  All right.  So let's -- I take it we need to
22 add the sales force to that chart?
23     A.  I think it would be a big piece of pie on
24 this and also their courses that they have, because
25 your resource monograph is just the book, but

Page 72

1  they're going to, actually, training classes.
2      Q.  Maybe you and I are missing each other a
3  little bit.
4      A.  Probably.
5      Q.  I had referred -- when I was referring to
6  Prof. Ed, I was referring to the Ethicon
7  professional education, which would include
8  everything that would fall underneath that umbrella,
9  such as, you know, didactics, seminars, sales force
10 interaction, and that sort of thing.
11         If I wrote "Ethicon" above "Prof. Ed," would
12 that help fill out that piece of pie chart for you?
13     A.  It would be better, but I think it would be
14 much bigger, because in this particular case, the
15 surgeon is actually dependent on the company to give
16 them all the training and to develop the procedure.
17     Q.  All right.  So what I've done is I've
18 written in "Ethicon" above "Prof. Ed."  I think that
19 would -- that cures at least some of your concern
20 about the chart; correct?
21     A.  If you're talking that's the cadaver lab,
22 that's where they're training -- okay, all right.
23         MR. JONES:  Sales reps --
24         THE WITNESS:  Sales reps.
25         MR. JONES:  -- sales reps, I think, is

Page 73

1  the --
2          THE WITNESS:  Is missing.
3          MR. JONES:  -- is the issue.
4  BY MR. GAGE:
5      Q.  So we'll call it "Ethicon Prof. Ed," and
6  what would be the words you would like to put in
7  there?  Sales reps?  Sales training?  How would
8  you --
9      A.  It would be a bigger piece of the pie
10 because in this --
11     Q.  I'm going to let you -- I'm going to ask you
12 later to give me some -- I'm going to let you in a
13 sense adjust the sizes of the piece of the pie in
14 just a minute.
15         So I just want to get the pieces of the pie
16 properly dominated at this point.
17     A.  Well, let me see.  Where would you -- I
18 mean, you don't have sales reps there.
19     Q.  I know.  I had included sales -- in my mind,
20 I included sales reps under "Prof. Ed."
21         MR. JONES:  Under professional
22 education?
23         I think in her mind maybe they're --
24 maybe that's the disconnect.  Because she can help
25 you fill out this chart, and that's what she's

Suzanne Parisian, M.D.

Page 74

1 trying to do.
2 BY MR. GAGE:
3    Q.   What words can I put into that Ethicon Prof.
4 Ed that would encompass in your mind the totality of
5 what's coming from the company in that section?
6       I'm not trying to trick --
7             MR. JONES:  And don't feel constrained
8 by his terms.  You know, you're getting caught up on
9 he's made them all equal spaces, so don't be
10 confined with trying to fill in his charts the way
11 he has done it.
12            THE WITNESS:  Well, let me do it,
13 because this -- this big piece of the pie is the --
14 is more the sales rep, because they're -- they go
15 through the IFU.  They go through the monograph with
16 the doctor.
17        So they're the ones who -- this would
18 all be sales reps would be doing this, because they
19 make the thing for the people to go to courses.
20 They're -- so they're all setting it up, selling
21 this thing here.
22 BY MR. GAGE:
23    Q.   Okay.
24    A.   Okay.  So that would be the sales rep.  All
25 of this stuff would be them.

Page 75

1    Q.   All right.  And just for the record, what
2 you've done is you've written "sales reps" over
3 "Surgeon's Resource Monograph, IFU, and Ethicon
4 Prof. Ed"?
5    A.   Right.
6    Q.   Do you want to -- I've wrote the word "and."
7       Do we need to delete -- strike through the
8 word "and"?
9    A.   There we go.  We get rid of that.
10    Q.   Okay.
11    A.   But, see, I look at this as this is a big
12 part of the pie.  The medical -- they're trained --
13 they're doctors, yes.  Medical literature, when you
14 learn these procedures, there's not a lot of medical
15 literature.  And in terms of the Prolift+M, most of
16 that had been done in France.
17    Q.   Okay.  We'll get -- I'll get back to the
18 specifics of each of the piecharts.  I just wanted
19 to understand what your view was of the -- of the
20 pie chart.
21       Now, you're still --
22    A.   Because the patient brochure comes from
23 Ethicon too.
24    Q.   Got it.
25    A.   So we have to -- so that made it a bigger --

Page 76

1 a bigger piece.  So you've now got the doctor
2 involved with this thing that mainly comes from
3 Ethicon.  They don't know anything about it.
4       And so, yes, they are trained.  They're a
5 licensed doctor.  The medical literature, there
6 isn't really any.  Colleagues, most of their
7 colleagues don't know about a new thing either.  So
8 this is -- this is the big -- it's almost half the
9 pie.
10    Q.   All right.  So -- and, again, you just --
11 the -- everything in red is your handwriting with
12 the exception of where I wrote the word "Ethicon";
13 correct?
14    A.   Yes, sir.
15    Q.   And I think you've explained why you group
16 those together, and sales reps run across those four
17 pieces of the pie that you've marked in red?
18    A.   Right.
19    Q.   All right.  Okay.  Are there any other
20 sources of risk information that you think is
21 missing?
22            MR. JONES:  Objection.
23            THE WITNESS:  Sources of risk
24 information?
25            Well, as -- as in my report, when I

Page 77

1 talk about -- if we're talking specifically about
2 Prolift+M, the thing that's missing is a lot of the
3 European data.  That -- that is not being given to
4 the physicians in terms of experience.  So they're
5 not getting the foreign experience in terms of the
6 physicians having problems with the Prolift+M.
7 BY MR. GAGE:
8    Q.   But I think that -- I think it would be your
9 opinion it would not, that that's something that
10 Ethicon should be providing in either the Prof. Ed,
11 the IFU, the Surgeon's Resource Monograph or the
12 patient brochure; right?
13    A.   It's my opinion they should, but they
14 didn't.
15       And the Prolift -- the Prolift is where this
16 all comes from, and that had been off label.  That
17 had been no real training, no real development.
18       So you have American physicians that are
19 getting into the Prolift and, you know, they
20 didn't -- they didn't have that -- that wealth of
21 experience from France, and so experience is one
22 thing, because I assume you're talking about the
23 doctor's experience doing procedures?
24    Q.   That's correct.
25       The sources of risk information that are

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 78

1 available to doctors.
2     A.  Right, and that would be his medical
3 experience, but I think the history of the use of
4 the device outside the country, that was not being
5 given to the doctors.  It wasn't given to the FDA
6 either.
7         So, you know, this experience part here
8 is -- you know, you're talking about their
9 experience, so this would be --
10    Q.  I'm talking about the surgeon --
11    A.  Right.
12    Q.  -- the individual surgeon's experience.
13    A.  Right.  Right here.  He's --
14        MR. JONES:  Experience with -- sorry.
15 Experience with what?
16        THE WITNESS:  Yeah.
17        Surgeon experience because most of
18 these surgeons don't have any experience with this
19 stuff, and there's a huge learning curve.
20        So this would be your French data,
21 European data, the learning curve, learning curve.
22 The other thing is that only 10 to 20 percent of the
23 physicians were being asked, and they were all very
24 experienced.
25        So you have no surgeon experience,

Page 79

1 which is a whole other horse of a different color.
2 The colleagues -- you know, Ethicon actually has
3 some input, what their colleagues are telling them,
4 so we don't know what -- Ethicon's input to that.
5         So, I mean, that's why you have to
6 divide the experience as to what actually happened
7 with the device, that only 10 to 20 percent were
8 being trained how to use it.  They were having
9 significant learning curves.
10        So now if you talk about a new surgeon
11 experience, he may not have had it.  He didn't have
12 any experience.
13 BY MR. GAGE:
14    Q.  Could a surgeon gather any -- could a
15 surgeon implant, for example, another manufacturer's
16 device and have any of that experience carry over to
17 the understanding of the risks of Prolift+M?
18    A.  In terms of the 10 to 20 percent that they
19 selected, the company, to train in Europe, those
20 people had experience with other devices.
21    Q.  Well, I'm just talking about in general.
22        If a surgeon, for example, had implanted
23 1,000 pelvic meshes before that were not Prolift+M
24 but then implanted a Prolift+M, would there be any
25 translatable experience?

Page 80

1         MR. JONES:  Objection.
2         THE WITNESS:  You know, I would leave
3 that to a surgeon to explain that, but I know that
4 in terms of Europe, the surgeons that they had used
5 were very experienced, and they had difficulty with
6 the product, and there was a huge learning curve.
7         And I know when they went to marketing
8 in the United States, they were looking for surgeons
9 who did not have experience, who had not wanted to
10 use mesh.
11         So they were targeting doctors who
12 weren't necessarily that experienced in it, so
13 that's why the pie kind of changes because
14 experience, they're not giving the surgical
15 experience in the vast, and I think that that was
16 what was big about the Prolift+M.
17 BY MR. GAGE:
18    Q.  Are you aware that some doctors do not read
19 the IFUs or patient brochures before implanting
20 surgical mesh?
21        MR. JONES:  Objection.
22        THE WITNESS:  You know, in terms of the
23 surgical field, oftentimes the IFU is implanted
24 sterile, and so if you ask --
25 ///

Page 81

1 BY MR. GAGE:
2    Q.  You said the IFU is implanted sterile?
3    A.  Well, it is sterile.  It's in the sterile
4 package.  And so they're not going to sit in an OR
5 and read it.
6         They tend to read it outside of the OR, so
7 some doctors will say, yeah, I didn't read the IFU
8 in the OR because it costs money to sit there and
9 read the IFU.
10        You already decide you're going to use it,
11 so they may have read marketing at some point in
12 time, but the IFU still was required to be adequate
13 instructions and warnings by the regulations
14 whenever they read it.
15    Q.  Do all doctors read the IFUs?
16    A.  You know --
17        MR. AYLSTOCK:  Objection.
18        THE WITNESS:  -- I can't answer for all
19 IFUs.  I just can answer what is required of an IFU.
20 BY MR. GAGE:
21    Q.  All right.  Let me ask, is it acceptable
22 medical practice for a pelvic floor surgeon to
23 implant a Prolift+M without first reading the
24 IFU?
25    A.  It depends.  It depends in what they've been

Suzanne Parisian, M.D.

Page 82

1  told, if they've gone to training courses.  It
2  depends, you know, to say that they've obviously had
3  some training, so each case is going to have a
4  surgeon that's going to answer that question.
5      Q.  All right.  So if a surgeon testified in a
6  particular case that he or she did not read the IFU,
7  that wouldn't necessarily trouble you?
8          MR. JONES:  Objection.
9          MR. AYLSTOCK:  Objection to form.
10         THE WITNESS:  Oftentimes -- not
11 necessarily because oftentimes they will be talking
12 about an IFU that was in the surgery.  You're not
13 going to read it there.  And then oftentimes you
14 back them up, and you go, "Well, did you go to a
15 course?  Did you rely on the sales reps?"
16         So it's -- the other things are
17 important besides the IFU.  The sales rep is a huge
18 entity in terms of this product.  The training
19 courses they go to.
20         So just -- I'm not going to fault
21 somebody for not regarding the IFU because usually
22 they're inadequate anyway, the way they're written.
23 They're not writing robust IFUs.
24         But each surgeon is going to answer how
25 they learned how to do this -- this course, but --

Page 83

1  so, I mean, in terms of medical implanted devices
2  that the IFU has not looked at is not going to
3  necessarily surprise me in the OR.
4  BY MR. GAGE:
5      Q.  Have you conducted any study or survey of
6  pelvic floor surgeons to determine whether they read
7  the Prolift+M IFU?
8      A.  No.
9      Q.  Have you conducted any survey or study of
10 pelvic floor surgeons to determine what risks they
11 understood as a result of reading the Prolift+M IFU?
12     A.  Well, I think the Prolift+M IFU is
13 inadequate to begin with.
14     Q.  I know.
15         But my specific question is, have you
16 surveyed pelvic floor surgeons to determine what
17 risks they understood as a result of reading the
18 Prolift+M IFU?
19     A.  No.
20     Q.  Okay.  Have you conducted any study or
21 survey of pelvic floor surgeons who implanted
22 Prolift+M to determine what risks of the device they
23 understood as a result of medical school education?
24     A.  No, I haven't done that.
25     Q.  Could doctors have learned of the risks of

Page 84

1  Prolift+M from their surgical training?
2          MR. JONES:  Objection.
3          THE WITNESS:  No, I don't think so,
4  because these -- these actually came out as
5  procedure kits, and so that wouldn't have been in
6  their medical training.
7  BY MR. GAGE:
8      Q.  Have you conducted any study or survey of
9  pelvic floor surgeons who implanted Prolift+M to
10 determine what risks of the device they understood
11 as a result of their medical school education?
12     A.  No.
13     Q.  What is the role, if any, of medical
14 literature with regard to devices such as the
15 Prolift+M insofar as the pelvic floor surgeons who
16 might implant the device?
17         MR. JONES:  Objection.
18         THE WITNESS:  The role of medical
19 literature is to impart some knowledge about --
20 about a particular -- I mean, what is literature in
21 general?  I mean, it's to tell you something.
22         But is that where doctors get
23 information about devices?  Not always.  Usually
24 there's a delay in what comes out in the literature
25 compared to what is being done.  It's usually about

Page 85

1  five years that you would think about a delay.
2  BY MR. GAGE:
3      Q.  Should pelvic floor surgeons implanting
4  Prolift+M read the medical literature about the
5  device before implanting it?
6      A.  You know, it's going to be up to the surgeon
7  to talk about it.  I can't -- I mean, I'm not going
8  to say a surgeon has to read the medical literature,
9  because for one thing I just said, there's usually a
10 delay.  When you introduce new technology, there may
11 not be medical literature.
12     Q.  If there is literature, should they read it?
13     A.  It depends.  I don't know.  It depends on
14 the surgeon, what -- how they learn stuff.  What
15 they're -- what they're doing.
16         I mean, in terms of a surgical practice, the
17 surgeons don't always have time to read, to go look
18 for the medical literature.  Remember, now we've got
19 the Internet, and it wasn't always that easy to find
20 literature.
21     Q.  Could doctors have learned of the risks of
22 Prolift+M from their reading of medical literature?
23     A.  Probably not.
24     Q.  Have you conducted any study or survey of
25 pelvic floor surgeons who implanted Prolift+M to

Suzanne Parisian, M.D.

Page 86

1   determine what risks of the device they understood
2   as a result of reading relevant medical literature?
3     A.  No.
4     Q.  Could doctors have learned of the risks of
5   Prolift+M from their experience implanting other
6   mesh devices?
7         MR. JONES:  Objection.
8         THE WITNESS:  It depends.  I can't give
9   an answer on that.
10  BY MR. GAGE:
11     Q.  Have you conducted any study or survey of
12   pelvic floor surgeons who implanted Prolift+M to
13   determine what risks of the device they understood
14   as a result of their experience implanting other
15   mesh devices?
16     A.  No.
17     Q.  Should doctors have availed themselves of
18   training courses before they implant Prolift+M?
19         MR. JONES:  Objection.
20         THE WITNESS:  Again, each doctor is
21   going to talk about that.  I mean, yes, ideally, but
22   I don't know what their experience is, so I don't
23   know.
24  BY MR. GAGE:
25     Q.  Could doctors have learned of the risks of

Page 87

1   Prolift+M from mesh device training courses?
2     A.  Probably not since the company wasn't
3   actually giving the information about the potential
4   risks.  They weren't updating the physicians as to
5   the risks.
6     Q.  Have you conducted any study or survey of
7   pelvic floor surgeons who implanted Prolift+M to
8   determine what risks they understood as a result of
9   participating in training on Prolift+M?
10     A.  No.
11     Q.  Could doctors have learned of the risks of
12   Prolift+M from Ethicon sponsored surgical training?
13     A.  Based on the information I reviewed, no.
14     Q.  Have you conducted any study or survey of
15   pelvic floor surgeons who implanted Prolift+M to
16   determine what risks they understood as a result of
17   participating in Ethicon sponsored training on
18   Prolift+M?
19     A.  No.
20     Q.  Should pelvic floor surgeons implanting
21   Prolift+M read the patient brochure before
22   implanting the device?
23     A.  Not necessarily the patient brochure.  I
24   mean, the patient brochure is usually what they give
25   out.  I mean, it would be -- not be bad for them,

Page 88

1   but I don't think reading the patient brochure is
2   going to tell you how to implant the product.
3     Q.  Would it tell you anything about the risks
4   of implanting the device?
5     A.  Not the patient brochures I reviewed.  Most
6   of them, they were all benefits; no risk.
7     Q.  Did you review the Prolift+M patient
8   brochure?
9     A.  I don't recall if I did or not in terms of I
10   don't remember right now.  But since the company
11   wasn't collecting the long-term data, there's --
12   it's very unlikely there would be any information in
13   it.
14     Q.  Have you conducted any study or survey of
15   pelvic floor surgeons who implanted Prolift+M to
16   determine what risks of the device they understood
17   as a result of reading the Prolift+M patient
18   brochure?
19     A.  No.
20     Q.  And, Dr. Parisian, we talked earlier about
21   the Surgeon's Resource Monograph.
22     A.  The training manual, yes, sir.
23     Q.  And forgive me, my memory is not as good as
24   it once was.
25         Did you or did you not read it?  I'm not

Page 89

1   trying to ask the same question twice.  I just can't
2   remember what your answer was.
3     A.  I may have looked at it.  Since I'm not a
4   surgeon, I wouldn't have looked at it with great
5   depth.
6     Q.  Do you know if you -- do you know if it was
7   a document that was provided to you?
8     A.  I don't recall as we sit here today.
9         (Whereupon, Exhibit No. 15 was marked
10   for identification.)
11         MR. GAGE:  Okay.  Doctor, I'm going to
12   mark as Exhibit No. 15 a document, it begins with
13   ETH.MESH 00658362.  It's entitled the "Surgeon's
14   Resource Monograph."
15         And before I hand it to you, I want to
16   let counsel know that I received an e-mail a
17   couple -- a day or two, yesterday I guess, from
18   somebody in my office that said the copy I'm about
19   to mark is missing a few pages at the end.  And I
20   had already left and didn't have time to get a
21   better copy.
22         So I'm not going to ask Dr. Parisian
23   about the specifics.  I recognize I'm missing a few
24   pages here, but I would ask permission of counsel
25   for me to substitute the correct copy.

Suzanne Parisian, M.D.

Page 90

1    I don't think it's -- I don't think the
2 fact that there's some pages missing at the end are
3 going to impact at all my questioning of the
4 witness.
5    MR. AYLSTOCK: Yeah. Can you just
6 identify which pages or --
7    MR. GAGE: I don't know. He just meant
8 me -- my guy in my office sent me an e-mail and
9 said, "Hey, I want you to know, that is the correct
10 document, but I looked at it, and, apparently, we've
11 got one -- there apparently are a couple pages
12 missing near the end."
13    And I had already made copies and flown
14 out here, so my request would be that we substitute
15 the complete and full copy. I'm not going to ask
16 the witness about the specifics of it such that the
17 missing pages would impact.
18    MR. JONES: Sure. I mean, do you have
19 a copy?
20    MR. GAGE: Yeah. And so there's a copy
21 for the witness, and there's a copy for counsel,
22 obviously.
23 BY MR. GAGE:
24    Q. Dr. Parisian, I just want to know, is this a
25 document that is familiar to you, recognizing that I

Page 91

1 have been told that some pages are missing, a
2 couple -- at least a couple of pages are missing
3 near the end?
4    A. I don't -- I don't recall. I've looked
5 at -- I don't recall.
6    Q. Does it look --
7    A. What's the date of this one anyway? This
8 is -- I can't read the --
9    Q. I don't have a specific date for you.
10 It's --
11    A. I can't read the -- all right.
12    MR. AYLSTOCK: It's sort of -- the copy
13 is not very good.
14    MR. GAGE: Is there a copy review date
15 at the back?
16    MR. AYLSTOCK: There's something, but
17 it's very faint. I don't know.
18    THE WITNESS: So what's your question?
19 BY MR. GAGE:
20    Q. Well, my question is, is this document
21 familiar to you?
22    A. I don't remember.
23    Q. And if it's not on your reliance list, is
24 it -- is it correct to say that you've never seen
25 it?

Page 92

1    A. Probably so if it's not on my list.
2    Q. All right. So, Doctor, I'm going to ask you
3 a question, but if you have not seen the document, I
4 don't believe you're going to be able to answer the
5 question, but I'll ask it just to make sure.
6    Could doctors -- could doctors have learned
7 of the risks of Prolift+M from reading the Surgeon's
8 Resource Monograph?
9    And I suspect your answer will be -- well,
10 let me strike that. Let me just -- let me re-ask
11 it.
12    MR. AYLSTOCK: Okay.
13 BY MR. GAGE:
14    Q. Doctor, could doctors have learned of the
15 risks of Prolift+M from reading the Surgeon's
16 Resource Monograph?
17    MR. AYLSTOCK: And just for the record,
18 there's no date here, and it's Prolift -- it's not
19 the Prolift+M -- document just so the record is
20 clear.
21    THE WITNESS: Right. So this is
22 Prolift.
23    Well, it has a lot of questions because
24 we don't know when a person took a course. We don't
25 know what this one is. And it's Prolift, as opposed

Page 93

1 to Prolift+M. And there's nothing about postmarket,
2 these are the rates that we have.
3 BY MR. GAGE:
4    Q. I'll tell you what. I will withdraw the
5 question because the witness has not reviewed --
6    A. Thank you.
7    Q. Doctor, just to summarize, that document is
8 not familiar to you as you sit here today?
9    A. Correct.
10    Q. And it is correct to say that if that
11 document does not appear on your reliance list which
12 we've marked as an exhibit, then it would be a true
13 statement that today is the first day you've seen
14 that document?
15    A. Yes, sir.
16    Q. Okay.
17    THE WITNESS: May I go to the bathroom
18 really quick?
19    MR. GAGE: Absolutely.
20    THE WITNESS: All right. Be right
21 back.
22    (Recess taken.)
23    (Whereupon, Exhibit No. 16 was marked
24 for identification.)
25 ///

24 (Pages 90 to 93)

Suzanne Parisian, M.D.

Page 94

1  BY MR. GAGE:
2      Q.   Dr. Parisian, I'm going to hand you a
3  composite Exhibit 16, which contains, as I counted,
4  11 different pieces of medical literature regarding
5  Prolift+M.
6          Could you just spend a few seconds looking
7  through that and just generally familiarizing
8  yourself with those documents?
9      A.   Okay.
10     Q.   Dr. Parisian, my question -- well, I'll make
11 a statement, and then I'll ask a question.
12         I will represent to you that I had someone
13 in my office look over your reliance list, and I've
14 been advised by someone in my office that these
15 pieces of medical literature regarding Prolift+M do
16 not appear on your reliance list.
17         And my question to you is, are any of those
18 pieces of medical literature familiar to you?
19             MR. JONES:  Objection.  I don't think
20 that's a completely accurate characterization, but
21 it's just an objection for the record.
22             MR. GAGE:  It may not be.  I was told
23 they couldn't find them on there, and so I didn't go
24 back and double-check, but I asked them to
25 double-check, but I could be --

Page 95

1              MR. JONES:  I think it just has to do
2  with the data and then how it gets published, and I
3  would say a lot of the underlying data is discussed
4  actually in the body of the report and in these
5  articles.
6              THE WITNESS:  Some of them are, like I
7  know the Taiwan study looking at the mesh versus
8  the web, so some of them are but not all of them.
9  BY MR. GAGE:
10     Q.   Do you know why -- assuming I'm correct
11 about this, do you know why they would not be --
12 those that are familiar to you would not be
13 specifically listed on your reliance list?
14             MR. JONES:  Objection.
15             THE WITNESS:  It's because I've looked
16 at a lot of different mesh studies, and so I -- from
17 a lot of different companies, so I might have seen
18 them.
19         I'm not the person who's doing like the
20 ultimate literature search and the -- I'm looking at
21 it from what would have been known and knowable and
22 information but not the person who is an expert in
23 urological treatment of prolapse.
24 BY MR. GAGE:
25     Q.   Who is doing the literature searches?

Page 96

1      A.   I don't know.
2      Q.   I'm talking about for you.
3      A.   For me?
4      Q.   Yes.
5      A.   I do my own literature searches.  What do
6  you mean?  In terms of --
7      Q.   I'm sorry.  I misunderstood.
8          I thought you just said a few minutes ago or
9  just a second ago something that would suggest that
10 you had someone else doing --
11     A.   No.
12     Q.   -- the literature searches for you.
13     A.   No, no, no, no, because, I mean, I've looked
14 at all kinds of mesh.
15         And so if I look at this document, would
16 there be some things that I've seen before, and yes,
17 I have.  Did I do an ultimate literature search in
18 my report for Prolift+M?  No, I didn't do that.  I
19 don't even list that.  But, you know, there are some
20 articles I've seen, some articles I haven't seen.
21     Q.   All right.  Let me ask you this:  Did you
22 read any of the articles in Exhibit 16 for purposes
23 of drafting your Prolift+M report?
24             MR. JONES:  Objection.
25             THE WITNESS:  I don't recall that I

Page 97

1  did, but some of those are things that I've seen, so
2  I don't think so, and I don't think I referenced
3  them particularly, but they're in my head in that
4  I've seen these articles before.
5  BY MR. GAGE:
6      Q.   Okay.
7      A.   Does that answer your question?
8      Q.   Yes.  I think -- and I don't want to be
9  unfair to you, so listen carefully.
10         I think what you're telling me is it's
11 possible that you have seen one or more of these
12 articles in Exhibit 16 through the course of your
13 time working as an expert in the mesh litigation?
14     A.   Right.
15     Q.   But for purposes of drafting your Prolift+M
16 report, you did not specifically review these
17 articles for purposes of drafting that report?
18     A.   Right.
19         And if you notice in my Prolift+M, there's
20 no section that says the medical literature for
21 Prolift+M.
22     Q.   Why is that?
23     A.   Because I didn't do that, and sometimes --
24 some reports that I do, but in this particular
25 case -- I mean, it actually had a very short

Suzanne Parisian, M.D.

Page 98

1  lifespan, and I focused more in my report on the
2  510(k) and the marketing information because we had
3  the Prolift and the Prolift+M, so you're actually
4  having two products in the one report.
5      Q.   Is there some specific reason why you did
6  not include a section in your report about the
7  published medical literature on Prolift+M?
8      A.   I just didn't do it.  I mean, some reports I
9  do.  I didn't do it on TVT-Secur either, but
10  sometimes I would, and then I would list them, but I
11  didn't list them.
12     Q.   Was that your decision?
13     A.   It wasn't anybody's conscious decision.
14  It's just not in the report.
15     Q.   I see.
16         It wasn't that you made a conscious decision
17  not to do it; it's simply that you didn't make a
18  conscious decision to do it?
19     A.   That's right.  Because I felt like there
20  were more people who were talking about the urology,
21  the treatment of patients, and I didn't see that as
22  my role.
23     Q.   Dr. Parisian, you are aware that there are
24  various surgical procedures to repair pelvic organ
25  prolapse that don't involve the use of mesh;

Page 99

1  correct?
2      A.   Right.  Those are your traditional ones for
3  the urology group.
4      Q.   Do you know what the risks of those non-mesh
5  pelvic organ prolapse surgeries are?
6      A.   No, not offhand.
7      Q.   I'll ask you some and then -- I'll ask you
8  about some of the risks, and I'll ask you to let me
9  know whether you believe it's a risk or not.
10         So the first question is, is pain in
11  intercourse a potential risk of a non-mesh pelvic
12  organ prolapse surgery?
13     A.   It can be, but when are you talking about
14  the pain?  Dyspareunia, that would be -- because
15  typically when you think of dyspareunia in those
16  patients, it's usually acute.  It's not something
17  that's chronic.
18         In our cases, the women -- and I'm not going
19  to be talking about this in terms of the symptoms, I
20  don't believe.  Am I?
21         But in terms of dyspareunia, the thing that
22  was unusual here is that it's chronic, it's
23  prolonged, and it can be dyspareunia for a woman and
24  also for her partner in that they can actually feel
25  the mesh.

Page 100

1      Q.   Is chronic dyspareunia a risk of a non-mesh
2  surgery to POP?
3      A.   I don't know that it --
4      Q.   POP -- when I say "POP," you understand what
5  I mean, pelvic organ prolapse, P-O-P?
6      A.   Yeah, pelvic organ prolapse.
7      Q.   Okay.  So let me rephrase the question.
8          Is chronic dyspareunia a risk of a non-mesh
9  surgery to treat POP?
10         MR. JONES:  Objection.
11         THE WITNESS:  And I would say I don't
12  know.  Because when they used to do non-risk --
13  non-mesh surgery, those patients were usually
14  chronic patients to begin with.  They didn't --
15  what's new is that we have the -- the POP procedures
16  with the mesh being done on women who were healthy
17  and had no problems.
18         So that you have to look at the
19  pre-transvaginal mesh surgery as these are patients
20  who are chronic that went to surgery, so I don't
21  know.
22         So, again, it would be a urologist
23  talking about that, but this would be, for our
24  transvaginal mesh, could have chronic dyspareunia in
25  a woman that was -- didn't have it to begin with,

Page 101

1  whereas they may have had it with the other surgery.
2  BY MR. GAGE:
3      Q.   What we would call de novo dyspareunia?
4      A.   Yeah.
5      Q.   Okay.  Is de novo chronic dyspareunia a risk
6  of a non-mesh surgery to treat POP?
7      A.   I don't know because I'm saying with the
8  caveat that those patients who got treated
9  surgically before, like with the Burch or Marchetti,
10  those types of procedures, they -- they actually had
11  a whole bunch of symptoms before their procedure.
12  So I don't know if it was -- de novo was new for
13  those procedures.
14     Q.   Is chronic dyspareunia a risk of a Prolift+M
15  surgery?
16     A.   Yeah.
17     Q.   Is -- does the fact that Prolift+M carries
18  with it the risk of chronic dyspareunia mean that
19  the device is defectively designed?
20     A.   You know, I don't think I've seen a good
21  reason for what the dyspareunia is coming from, so I
22  think that would be others who would talk about
23  that.
24     Q.   All right.
25     A.   Because you could have dyspareunia for many

26 (Pages 98 to 101)

Suzanne Parisian, M.D.

Page 102

1  different factors, so it could be the overall
2  design, surgical. I don't think that's necessarily
3  what I'm talking about in terms of litigation.
4      Q.  Is chronic pain a general risk of a non-mesh
5  surgery to treat pelvic organ prolapse?
6          MR. JONES:  Objection.
7          THE WITNESS:  Well, you know, I'm going
8  to fall back on the FDA saying that they were
9  looking at the non-TVM risks, and they were saying
10  that the risks were unique compared to the risks for
11  the surgical procedures.
12         So the FDA has made that the risks are
13  unique and different for these TVM procedures
14  compared to the traditional surgical procedures.
15         And that's actually what they're going
16  to be doing the PMAs for, to find out that answer,
17  so I can't answer it. That's what the FDA is trying
18  to get data for.
19  BY MR. GAGE:
20     Q.  So my question -- I think my question is, is
21  chronic pain a risk of a non-mesh surgery to treat
22  pelvic organ prolapse?
23         That's my simple question.
24         MR. JONES:  Objection.
25         THE WITNESS:  And I would say I don't

Page 103

1  know, and there's going to be more information --
2  that's what the FDA wants to know. Was chronic pain
3  for the traditional surgical procedure, is it worse
4  now for the TVM procedures? They're trying to
5  quantify that.
6  BY MR. GAGE:
7      Q.  Is vaginal scarring a risk of a non-mesh
8  surgery to treat pelvic organ prolapse?
9          MR. JONES:  Objection.
10         THE WITNESS:  I don't -- I don't know.
11  And vaginal scarring I don't think was -- but,
12  again, this would be a different -- this is apple
13  and oranges in terms of the patient, so I don't
14  know.
15  BY MR. GAGE:
16     Q.  Is injection a risk of a non-mesh surgery to
17  treat pelvic organ prolapse?
18     A.  Infection is a risk for any kind of surgery,
19  but the issue is that the mesh makes it much more
20  difficult to treat the infection.
21     Q.  Are urinary problems, including urinary
22  frequency, retention, obstruction, urge
23  incontinence, and voiding dysfunction a risk of a
24  non-mesh surgery to treat pelvic organ prolapse?
25     A.  I don't know. In terms of who the woman is,

Page 104

1  what the procedure is, I can't answer that. That's
2  what the FDA is trying to get them to answer.
3      Q.  Is organ or nerve damage a risk of a
4  non-mesh surgery to treat pelvic organ prolapse?
5      A.  It can be.
6      Q.  Is bleeding a risk of a non-mesh surgery to
7  treat pelvic organ prolapse?
8      A.  Well, bleeding is always a risk of a
9  surgery. The question is not is it a risk. The
10  issue is, is it worse? For a woman that was fairly
11  stable to begin with is it worse than would be
12  anticipated if she had gone with a traditional
13  procedure?
14         So you're talking apples and oranges. The
15  traditional procedures were people who were in bad
16  states to begin with.
17     Q.  I understand that. I'm not really doing the
18  comparison right now. I'm just simply asking
19  whether these risks are risks of non-mesh surgeries
20  to treat pelvic organ prolapse.
21         I have not yet gone to the next question
22  about comparing those non-mesh surgeries to mesh
23  surgeries.
24     A.  Okay.
25     Q.  So are wound complications a risk of a

Page 105

1  non-mesh surgery to treat pelvic organ prolapse?
2          MR. JONES:  Objection.
3          THE WITNESS:  Yes. It can be. A wound
4  complication, yes.
5  BY MR. GAGE:
6      Q.  Is inflammation a risk of a non-mesh surgery
7  to treat pelvic organ prolapse?
8          MR. JONES:  Objection.
9          THE WITNESS:  It can be. Any surgery
10  can have inflammation risks.
11  BY MR. GAGE:
12     Q.  Is fistula formation a risk of a non-mesh
13  surgery to treat pelvic organ prolapse?
14         MR. JONES:  Objection.
15         THE WITNESS:  It can be.
16  BY MR. GAGE:
17     Q.  Are neuromuscular problems a risk of a
18  non-mesh surgery to treat pelvic organ prolapse?
19     A.  It can be.
20     Q.  Is there a risk that one or more surgeries
21  may be needed to treat an adverse event arising out
22  of a non-mesh surgery to treat pelvic organ
23  prolapse?
24         MR. JONES:  Objection.
25         THE WITNESS:  Yes.

Suzanne Parisian, M.D.

Page 106

1  BY MR. GAGE:
2     Q.  Is a manufacturer of a surgically implanted
3  medical device required to warn surgeons of the
4  general risks of surgery or of only those specific
5  and unique to the device itself?
6     A.  Both.
7        They're supposed to provide adequate
8  instructions and adequate warnings.  So there can be
9  general surgical risks, yes, but you have to make
10 the -- the information so that the physician would
11 know, in terms of your device, what are the
12 potential risks and benefits so they can make an
13 informed decision.
14    Q.  If a risk is common to both a mesh surgery
15 and a non-mesh surgery, must -- must the
16 manufacturer of a medical device making that mesh
17 include that risk in the IFU or the patient
18 brochure?
19    A.  Yes, because as I've been trying to say,
20 there's two different populations.  The woman who
21 went through the traditional, non-mesh surgery was a
22 different population than this woman that would have
23 a 15-minute office procedure, and they usually had
24 minor symptoms.
25       So in terms of the risk versus benefit, a

Page 107

1  woman who's had a bad outcome and problems would be
2  able to accept different risk versus benefit than a
3  woman who has really insignificant issues.
4        And so you have to as a manufacturer give
5  adequate information to the doctor to make a risk
6  versus benefit determination.
7        You're taking a woman that's almost healthy
8  and giving her an elective procedure.  The benefits
9  are not that great, so your risks have to be
10 commiserate with that type of a procedure.
11       So, yes, the manufacturer is required to
12 provide that literature in their label.
13    Q.  And just so that we're clear, that
14 information -- when you use the phrase "that
15 information," you include within that not only the
16 risks that are unique to mesh devices, such as the
17 risk of erosion, but also every risk that could
18 potentially occur even if that risk was not unique
19 to that particular device?
20       MR. JONES:  Objection.
21       THE WITNESS:  What you've forgotten is
22 that you got to put the risk for your device in
23 there.  You haven't said that.  You said that we
24 would have, you know, general risks that -- for
25 surgery, yes, okay.

Page 108

1        But you, as the manufacturer Ethicon,
2  have to have a postmarket surveillance group that's
3  determining what your risks are specific for your
4  device to put in your label.
5        And so that's what's missing is, yes,
6  there are some generic terms that people have put in
7  for mesh, but what's missing from the label is, how
8  does Prolift work in terms of a patient?  How does
9  Prolift+M work in terms of a patient?  A physician
10 can decide whether to implant it.
11 BY MR. GAGE:
12    Q.  Is foreign body response a risk of a
13 non-mesh surgery to treat pelvic organ prolapse?
14       MR. JONES:  Objection.
15       THE WITNESS:  You can have foreign body
16 response -- I mean, it's a very generic name, so
17 what are you talking about, "foreign body response"?
18 BY MR. GAGE:
19    Q.  Do you know what foreign body response is?
20    A.  Sure, I know what it is, but what do you
21 want?  Because a foreign body response, you can
22 have -- like a suture can cause a foreign body
23 response.  And a lot of times sutures will get
24 expelled.  That's a foreign body response.  Or you
25 can have the mesh, which is a foreign body, causing

Page 109

1  it.  So what foreign body response are we talking
2  about?
3     Q.  Well, I think my question was, is foreign
4  body response a risk of a non-mesh surgery that uses
5  any foreign body to treat pelvic organ prolapse?
6     A.  It can be, but the company has to provide a
7  description.  What's the likelihood of having a
8  foreign body response with Prolift+M?
9        I mean, we're talking about Prolift+M.  That
10 information needs to be in the label.  So you don't
11 say it's minor.  How big of a foreign body response
12 are we talking about?
13    Q.  Are surgeons taught about foreign body
14 response in medical school?
15       MR. JONES:  Objection.
16       THE WITNESS:  In a generic fashion,
17 yeah.  Foreign body response is a known term that
18 surgeons would know about.  The thing is --
19 BY MR. GAGE:
20    Q.  What are they taught?
21    A.  What are they taught?  I mean, I think if
22 you're talking about most surgeons, I mean, a
23 foreign body response would mean there's a risk
24 of -- that's why a lot of surgeons don't want to put
25 any foreign materials in a human because people will

Suzanne Parisian, M.D.

Page 110

1  respond to the foreign materials.
2      But the question is the degree of foreign
3  body response that we would have for Prolift+M.
4      Q.  All right.  And my question is, what are
5  surgeons taught?
6          MR. JONES:  Objection.
7          THE WITNESS:  Well, I mean, I can't
8  talk for all surgeons, but I know that for foreign
9  body response is -- from a surgeon's point of view,
10  it's a foreign body.  So suture can cause it.
11  Anything that's a foreign body can cause a foreign
12  body response.
13  BY MR. GAGE:
14      Q.  How long can that foreign body response
15  persist?
16          MR. JONES:  Objection.
17          THE WITNESS:  It depends on the foreign
18  body response.  It can persist.  Like if you leave a
19  sponge in somebody, that will create a foreign body
20  response and eventually will manifest with an
21  infection or something that might trigger it to come
22  out.
23      So it's just -- it's a big spectrum,
24  foreign body response, so I don't think I can answer
25  it any other way.

Page 111

1  BY MR. GAGE:
2      Q.  But is that something that's taught to
3  surgeons in medical school or during their training?
4          MR. JONES:  Objection.
5          THE WITNESS:  You know, we're talking
6  about the degrees.  I mean, because pathologists,
7  we're sitting there describing foreign body
8  responses, and so we are very meticulous.  We look
9  at it, whether it's chronic, whether it's acute, you
10  know, the cell type, and all that stuff.
11      Surgeons just tend to think it's a
12  foreign body, you can have a foreign body response.
13  So there's all kinds of gradations of foreign body
14  response.
15      So, yeah, I think everybody who goes to
16  medical school knows you can have a foreign body
17  response, but you need to tell them what kind of
18  foreign body response you're going to have, and is
19  it going to be severe foreign body response?
20      So it's the two words, foreign body
21  response -- three words, yes, they know those words.
22  But you have to -- as in adequate instructions and
23  warnings, you have to tell them what is to be
24  anticipated for this product.
25  ///

Page 112

1  BY MR. GAGE:
2      Q.  Was the risk of chronic dyspareunia with
3  mesh devices known to the medical community in 2008?
4          MR. JONES:  Objection.
5          THE WITNESS:  I don't -- I think that
6  the medical community's going to have to talk about
7  it in terms of the FDA didn't make it sound like
8  they were in terms of their public health
9  notification.
10  BY MR. GAGE:
11      Q.  Well, I'm --
12      A.  I mean, chronic dyspareunia is -- chronic
13  dyspareunia is a significant problem with a device.
14      Q.  Dr. Parisian, I'm very specific, just asking
15  you this question:  Was chronic dyspareunia with
16  mesh devices known to the medical community in 2008?
17          MR. JONES:  Objection.
18          THE WITNESS:  I don't know.  I can't
19  talk for every -- I mean, again, it would be the
20  physician that's caring for the patient.
21  BY MR. GAGE:
22      Q.  Was the risk of chronic pain with mesh
23  devices known to the medical community in 2008?
24          MR. JONES:  Objection.
25          THE WITNESS:  I can't speak for what

Page 113

1  the medical community knows.
2  BY MR. GAGE:
3      Q.  Was the risk of vaginal scarring with mesh
4  devices known to the medical community in 2008?
5          MR. JONES:  Objection.
6          THE WITNESS:  You know, I can't speak
7  for the whole medical community.  I don't think so.
8  BY MR. GAGE:
9      Q.  Was the risk of urinary problems with mesh
10  devices known to the medical community in 2008?
11          MR. JONES:  Objection.
12          THE WITNESS:  Well, you're talking
13  about general.  You're not talking about Prolift+M.
14  BY MR. GAGE:
15      Q.  Correct.
16      A.  You're just talking general.  I don't know.
17      Q.  Was the risk of organ and nerve damage with
18  mesh devices known to the medical community in 2008?
19      A.  I don't know.
20      Q.  Was the risk of bleeding and wound
21  complications with mesh devices known to the medical
22  community in 2008?
23      A.  Again, I can't answer that.  I mean, these
24  are complications of surgery, but whether an
25  individual surgeon who was putting this in knew

Suzanne Parisian, M.D.

Page 114

1    that, I can't answer that.
2        Q.   Was the risk of inflammation with mesh
3    devices known to the medical community in 2008?
4            MR. JONES:  Objection.
5            THE WITNESS:  I can't answer it.
6    BY MR. GAGE:
7        Q.   Was the risk of fistula formation known to
8    the medical community -- I'm sorry.  Strike that.
9            Was the risk of fistula formation with mesh
10   devices known to the medical community in 2008?
11       A.   I don't -- I don't know if it was or not,
12   and that was part of the issue that the FDA came out
13   with that public health notification is that they
14   were concerned that people weren't aware of the
15   risks.
16       Q.   Was the risk of neuromuscular problems with
17   mesh devices known to the medical community in 2008?
18           MR. JONES:  Same objection.
19           THE WITNESS:  I don't know.  Same
20   answer.
21   BY MR. GAGE:
22       Q.   Was the risk that a surgery involving a mesh
23   device might necessitate one or more surgeries to
24   treat an adverse event known to the medical
25   community in 2008?

Page 115

1            MR. JONES:  Objection.
2            THE WITNESS:  I don't think so, and I
3    can't answer for the medical community.  That was
4    why the FDA was asking for that information.
5    BY MR. GAGE:
6        Q.   Was the risk of erosion, exposure, extrusion
7    with mesh devices known to the medical community in
8    2008?
9        A.   Again, I can't answer that.
10       Q.   Was the risk of contraction or shrinkage of
11   the mesh known to the medical community in 2008?
12           MR. JONES:  Objection.
13           THE WITNESS:  Same answer.
14   BY MR. GAGE:
15       Q.   Dr. Parisian, with regard -- let me -- well,
16   strike that.
17           (Whereupon, Exhibit No. 17 was marked
18   for identification.)
19   BY MR. GAGE:
20       Q.   Dr. Parisian, I'm going to hand you
21   Exhibit 17.  Do you know what that is?
22       A.   It looks like the labeling for the
23   Prolift+M.
24       Q.   And I've often referred to it as the IFU,
25   instructions for use.

Page 116

1            Is that what your understanding is?
2        A.   Yeah.  Yes, sir.
3        Q.   You don't need to call me "sir."
4            Have you reviewed this document in
5    preparation for your report?
6        A.   I don't -- I don't recall that I have.
7        Q.   Do you recall whether you looked at the
8    Prolift+M patient brochure?
9        A.   I don't recall what I looked at as we sit
10   here.
11       Q.   All right.  I just got a few questions about
12   the -- about the IFU.
13           Can you see on the second page, about four
14   lines down, it says, "The safety" -- do you see the
15   paragraph beginning with, "The safety and
16   effectiveness"?  Do you see that?
17       A.   Where are you?  Oh, okay.  Yes, sir.
18       Q.   Okay.  So I'm going to read just a sentence
19   there and ask you a question about it.
20           It says, "The safety and effectiveness of
21   the Gynecare Prolift+M systems compared to
22   conventional surgical repair for pelvic organ
23   prolapse have not been demonstrated in randomized
24   clinical trials."
25           Do you see that?

Page 117

1        A.   Yes, sir.
2        Q.   What does that communicate to a surgeon who
3    reads that sentence?
4        A.   That there haven't been -- this is something
5    FDA requested, that there haven't been clinical
6    trials for -- to look at the Prolift+M system.
7        Q.   All right.  And then two -- skip a sentence,
8    and let's go to the next sentence that reads,
9    "Information on."  Do you see that, in the same
10   paragraph?  Actually, it's the next to last sentence
11   in that paragraph.
12       A.   Yes.
13           This is -- this is -- I remember this.  This
14   is the -- the thing that the FDA and the company
15   debated on.  The FDA just wanted it to be that first
16   line all along about there had been no randomized
17   control or trials, and then they negotiated at the
18   last minute that they would have this information.
19   You skipped the part about the bench testing and
20   cadaver testing.
21       Q.   Yes.
22       A.   And the company asked for that, that they
23   wanted to have that there's -- so that implies that
24   there actually has been some testing, which isn't
25   what the FDA had wanted.

30 (Pages 114 to 117)

Suzanne Parisian, M.D.

Page 118

1  And then they have, "The information is
2  available in the public literature." The FDA wanted
3  them to put in some references to certain articles,
4  and they said that -- Ethicon said we wanted to put
5  in that we want you to contact our company sales
6  representative for assistance.
7  So this was -- this is discussed in my
8  report is that negotiated statement that was between
9  FDA and the company.
10  Q. Is it a good thing that the -- that the
11  first sentence appears in the IFU?
12  A. Yeah. That was the line the FDA asked for,
13  because they -- they were concerned.
14  Q. Do you agree that it should have been
15  included?
16  A. Yeah. I think it should have been included
17  all by itself and not the other stuff that they put
18  in about the cadaver testing and the bench testing.
19  That was what the company threw in. I think
20  it would have been much more robust just to have
21  that one line that there's no -- there's no data.
22  There was no data supposedly for this product, which
23  is what FDA was trying to give the physician.
24  Q. All right. So the sentence -- you see the
25  sentence beginning with, "Information on"?

Page 119

1  A. Yes, sir.
2  Q. Okay. It says, "Information on the clinical
3  performance of mesh for pelvic organ repair is
4  available in published literature."
5  Do you see that?
6  A. Yes, sir.
7  Q. What does that communicate to a surgeon who
8  is reading that sentence?
9  A. It sounds like there's actually clinical
10  performance information about this device, and
11  that's not true, and then contact your sales
12  representative.
13  The first line is the important line.
14  There's been no study. And so then when you start
15  getting down in this statement where there's been
16  bench testing and cadaver testing, there really
17  hadn't been, and then the information, go talk to
18  your sales rep, so that's basically a sales
19  promotional-type thing. And this was negotiated at
20  the last minute with the FDA.
21  Q. Is it -- okay. So the sentence that says,
22  "Information on the clinical performance of mesh for
23  pelvic floor repair," is that a true statement?
24  I'm sorry. Let me strike that.
25  "Information on the clinical performance of

Page 120

1  mesh for pelvic floor repair is available in
2  published literature," is that a true statement?
3  A. Yeah, but it really has nothing to do with
4  Prolift+M, so it watered down what FDA was asking
5  for, a statement that there is no information on
6  this stuff, surgeon, so surgeon beware.
7  And instead the company put a much more
8  user-friendly statement in there because the mesh
9  has nothing to do with Prolift+M. I mean, there's a
10  lot of mesh literature but nothing about Prolift+M.
11  Q. Is it your opinion that the -- that the
12  entirety of the mesh literature that preceded
13  Prolift+M is not relevant to Prolift+M?
14  MR. JONES: Objection.
15  THE WITNESS: Not for a surgeon. I
16  mean, the surgeon is trying to figure out, should I
17  use this versus somebody else's thing? Should I use
18  the traditional?
19  So in terms of this information, it's
20  misleading. It's making it sound like there is no
21  information, but we have mesh information that you
22  can look at, so you've watered it down.
23  And so it's unfortunate, and I talk
24  about it in terms of the negotiation. It watered
25  down and made it a much more marketing friendly

Page 121

1  statement to say there's no information. The other
2  mesh literature has nothing to do with Prolift+M,
3  and so it's misleading to even put it there.
4  BY MR. GAGE:
5  Q. What about the literature on Prolift? Would
6  it have any relevance?
7  A. Not necessarily because this is Prolift+M,
8  and FDA said they wanted the two to be clearly
9  separate in terms of information.
10  Q. Let me ask you this: When a device
11  manufacturer submits a 510(k) to the FDA for a
12  device, is it inappropriate for the company to point
13  to medical literature that relates to a product or
14  device?
15  A. No, but Prolift is not the predicate. I
16  mean the --
17  Q. That wasn't my question.
18  A. No.
19  Q. My question doesn't have anything to do with
20  Prolift or Prolift+M.
21  When a device manufacturer submits a
22  510(k) --
23  A. Right.
24  Q. -- to the FDA, is it ever appropriate for
25  the manufacturer to cite to medical literature that

31 (Pages 118 to 121)

Suzanne Parisian, M.D.

Page 122

1  pertains to the predicate?
2      A.  Yes.
3      Q.  Why?
4      A.  Because the reviewer has to have a
5  background of the summary of the safety information.
6  And if there's relevant information in the medical
7  literature, that should be given to the FDA reviewer
8  so they can consider whether they -- there are new
9  issues of safety and effectiveness, if they need to
10 ask for testing information.
11         And so, yeah, that makes -- that would be
12 logical to give that to the FDA.  In fact, you're
13 required to do that in terms of no material fact not
14 provided to the FDA.
15     Q.  All right.  But as I understand it, that
16 same analysis is not appropriate in the context of
17 an IFU for a medical device?
18         MR. JONES:  Objection.
19         THE WITNESS:  No, that's not what I'm
20 saying.
21         In this particular case, the FDA had
22 wanted that line that there was no information of
23 Prolift+M, that it concerned the FDA.  And then the
24 company said, no, we're going to -- and they
25 negotiated this other statement, which waters down

Page 123

1  the message, which is there is no randomized
2  clinical controlled trials.
3  BY MR. GAGE:
4      Q.  I'm talking about the third sentence.
5      A.  Yeah, the information part.
6      Q.  "Information on the clinical performance of
7  mesh for pelvic floor repairs is available in the
8  published literature," now, you and I agree that
9  sentence doesn't specifically relate to Prolift+M?
10     A.  Well, it's a garbage statement.  I mean,
11 it's a garbage statement --
12     Q.  That was where I was headed is is --
13     A.  It's a throw-out statement that you would
14 give to a surgeon.  Well, there's published
15 literature on mesh.  You don't think any surgeon
16 already knows that.
17         And so it really just -- it distracts from
18 what the FDA's message was, that, yeah, there's mesh
19 literature.  Contact your sales rep.  So it's
20 basically taking away the thrust of the warning that
21 the surgeon would have had that, beware, there's no
22 information about this product.
23     Q.  In your opinion, should a surgeon implanting
24 a Prolift+M consult the medical literature
25 concerning mesh for pelvic floor repair before

Page 124

1  implanting Prolift+M?
2      A.  Not necessarily.  They don't have time to do
3  that.  Surgeons are fairly busy, and they rely on
4  the sales reps to give them the important
5  information, which is what it says here, "Contact
6  your sales rep."
7         But I think it's just -- it's a gratuitous
8  statement to say, yeah, there's pelvic mesh
9  literature.  It has nothing to do with Prolift+M.
10     Q.  So in the context of Prolift+M, when the
11 device first comes on the market, it's your opinion
12 there was no published literature regarding its
13 performance?
14     A.  And that's what FDA wanted out there.  They
15 didn't want it to rely on Prolift.  They wanted it
16 to be separate, that there was no literature for
17 Prolift+M.
18     Q.  All right.
19     A.  And that was -- and then we went to the
20 negotiation back and forth between -- and there's
21 nothing wrong with negotiation.  Manufacturers do it
22 all the time.
23         But in terms of adequate conveying to a
24 surgeon, it watered it down so that the information
25 would be lost.

Page 125

1      Q.  Do you know why FDA or does FDA share your
2  opinion that it was watered down and it was a trash
3  statement -- or, excuse me.
4         Was it FDA's opinion that this was garbage
5  information and was a throwaway statement?
6      A.  Actually, if you read in my report, it was
7  at the very end, that they were under a time
8  constraint to get their MDUFA date.  And so they
9  negotiated.  And from an FDA's point of view, it's
10 better to get that in than not have anything at all.
11         So from a public health, they're trying to
12 negotiate what they could do in a MDUFA time frame,
13 and they wanted to get this done.  And so they
14 accepted it.  Nobody argues that they accepted it,
15 but it was a much more robust request by the FDA
16 just to have that one line all by itself.
17     Q.  All right.  Let's go down to adverse
18 reactions.
19         Do you see those?
20     A.  Yes, sir.
21     Q.  Do you recall having read the adverse
22 reactions section of this Prolift+M IFU before
23 today?
24     A.  Yes, sir.
25     Q.  Where did you read it?

32 (Pages 122 to 125)

Suzanne Parisian, M.D.

Page 126

1      A.   In terms of the 510(k), there was
2   information about the Prolift+M, and then the
3   discussion back and forth with the FDA as to those
4   sections.  So it was primarily in the 510(k).
5      Q.   It says, "Potential" -- the first bullet
6   says, "Potential adverse reactions are those
7   typically associated with surgery employing
8   implantable materials of this type, including
9   hematoma, urinary incontinence, ureter -- urinary
10  retention/obstruction, ureter obstruction, voiding
11  dysfunction, pain, infection potentiation, wound
12  dehiscence, nerve damage, or current prolapse,
13  inflammation, adhesion formation, fistula formation,
14  contracture or scarring, and mesh exposure, erosion,
15  or extrusion."
16        Did I read that correctly?
17     A.  Yes, you did.
18     Q.   What do those words communicate to a pelvic
19  floor surgeon?
20     A.   Nothing specific about Prolift+M.  They
21  would look at that and they would go, those are all
22  the things that typically can occur after urinary
23  surgery.
24        But it's not specifically -- it's not robust
25  when it doesn't say, "This has been reported for

Page 127

1   this product."  You know, "We have risks of this."
2        And we think of this, particularly as this
3   product was on the market, that it should have been
4   updated with, what is the report of urinary
5   retention with Prolift+M?  How frequent is it
6   occurring?
7        So you're going to have a list of things
8   here, but it's not going to mean anything to the
9   doctor because he's going to go, "Oh, yeah.  I know
10  these things can happen when you use mesh."
11     Q.   If the frequency -- I take it your one --
12  your criticism there is there's no product-specific
13  frequency in the adverse reactions section; correct?
14        MR. JONES:  Objection.
15        THE WITNESS:  That would be, and it
16  would be something -- when this first came out --
17  BY MR. GAGE:
18     Q.   Could you just answer -- would you answer
19  that?
20     A.   Yes.
21     Q.   And if you could answer it "yes," and then
22  give your explanation, I think that would be
23  helpful.
24     A.   Well, yes.  But the thing is -- I will give
25  them, when they first went on the market, they

Page 128

1   didn't have that information.  But then for a
2   510(k), they can immediately update their
3   information with the -- with the postmarket
4   performance of this product.
5      Q.   Should a pelvic floor surgeon implant a mesh
6   device if they don't have any frequency data with
7   regard to adverse events specific to that device?
8        MR. JONES:  Objection.
9        THE WITNESS:  Well, that's what the --
10  that's what the line up there about, "There's no
11  safety and efficacy information about this product."
12  I mean, that should give a surgeon a little bit of
13  pause if they really realize that there was no
14  information about these risks.
15        You know, in terms of that, that
16  would -- in terms of some other product, it should
17  make a physician think about it.
18  BY MR. GAGE:
19     Q.   So a surgeon reading this IFU would know
20  it's not -- the Prolift+M has not been tested;
21  correct?
22        MR. AYLSTOCK:  Objection to form.
23        THE WITNESS:  No, not the way they go
24  on about the mesh stuff and then right underneath
25  they're going to be talking about Prolift.

Page 129

1   BY MR. GAGE:
2      Q.   I'm sorry.
3        A surgeon reading this Prolift+M IFU would
4   know that there have been no randomized clinical
5   trials involving Prolift+M?
6      A.   That's what they have up in that first line
7   and then if you look underneath --
8      Q.   Hang on.  Let me --
9        MR. AYLSTOCK:  Let her finish.
10        THE WITNESS:  If you look underneath,
11  they go on and start talking about clinical
12  performance for Prolift.
13        Now, remember, FDA had asked that the
14  company not put Prolift in this because they look at
15  these as two different products.  But the company
16  went ahead and put Prolift in here, which implies
17  that somehow Prolift is going to somehow give the
18  information for Prolift+M.
19        MR. GAGE:  I move to strike everything
20  after the initial response to the question.
21  BY MR. GAGE:
22     Q.   Would a surgeon reading the Prolift+M IFU
23  know from reading this IFU that Prolift+M had not
24  been studied in randomized clinical trials?  Yes or
25  no?  If you can answer that yes or no.

33 (Pages 126 to 129)

Suzanne Parisian, M.D.

Page 130

1    A.   Well, we have that statement up there --
2    Q.   Can you answer that --
3    A.   -- so yes.
4    Q.   -- can you answer that yes or no?
5         MR. JONES:  Objection.
6         THE WITNESS:  Well, I can't speak for
7    what any one surgeon would know, but I can speak as
8    a regulatory expert.
9    BY MR. GAGE:
10   Q.   Dr. Parisian --
11        MR. JONES:  Let her finish.
12        THE WITNESS:  There's only one
13   statement there, so they would know from that one
14   statement that it's not been in randomized
15   controlled studies, yes.
16   BY MR. GAGE:
17   Q.   Thank you.
18   A.   But then they go on to talk about the
19   clinical performance, and it implies that Prolift is
20   translatable to Prolift+M, which we know it's not,
21   and so it's misleading.
22        We have one statement up above where it says
23   there's no randomized control.  Then we have mesh
24   literature being referenced.  So any one physician,
25   I can't speak for what they would know, but I can

Page 131

1    say, from the way it's designed as a regulatory
2    expert or an FDA and a physician, it's misleading.
3    It's -- it's vague.  It's like you don't understand
4    what's going on here.
5    Q.   So you don't believe -- I just want to make
6    sure I understand, because I'm struggling to
7    understand you -- that a surgeon who reads the
8    sentence, quote, The safety and effectiveness of the
9    Gynecare Prolift+M system compared to conventional
10   surgical repair for pelvic organ prolapse have not
11   been demonstrated in randomized controlled clinical
12   trials, period, closed quote --
13        MR. JONES:  Objection.
14   BY MR. GAGE:
15   Q.   -- that a surgeon reading that sentence
16   would -- would, because of additional sentences,
17   believe that the device had been studied in
18   randomized controlled clinical trials?
19        MR. JONES:  Objection.
20        THE WITNESS:  You see in -- no.  A
21   surgeon would believe that there was no randomized
22   well-controlled study, yes.
23   BY MR. GAGE:
24   Q.   That was my question.
25   A.   But this is a medical device in surgery, and

Page 132

1    they're not usually studied that way.  So it really
2    is kind of like a statement, like, what does it mean
3    when you go on and then you talk about the mesh
4    literature, you're talking about the clinical
5    performance below, so it's confusing.
6         Yes, but surgical devices are not usually
7    studied in randomized well-controlled studies.
8         MR. GAGE:  All right.  Move to strike
9    everything after the word "but."
10        That -- that was -- thank you.  I
11   finally now understand.
12   BY MR. GAGE:
13   Q.   All right.  Now, Dr. Parisian, with regard
14   to the adverse reactions, would a surgeon understand
15   from reading this Prolift+M IFU that he or she, if
16   they chose to implant a Prolift+M, if all they
17   consulted was the Prolift+M IFU, they would be
18   implanting a device without knowledge of the
19   frequency of the adverse events that are listed in
20   the adverse reactions section?
21   A.   Can you say that again?
22   Q.   Yeah.
23        Would a -- would a surgeon reading this
24   Prolift+M IFU have any information about the
25   frequency of adverse events from reading this

Page 133

1    Prolift+M IFU?
2    A.   No.
3    Q.   So if a surgeon chose to implant a Prolift+M
4    IFU, they would have to go elsewhere for information
5    about the frequency of those adverse events;
6    correct?
7         MR. JONES:  Objection.
8         THE WITNESS:  No.  They're supposed to
9    have it in the label.  An adequate label should have
10   it.
11        MR. GAGE:  Move to strike.  It's not
12   responsive.
13        Could you repeat the question?
14        (Requested portion was read by the
15   Court Reporter.)
16        MR. JONES:  Same objection.
17        THE WITNESS:  No.  Because if you -- if
18   you look -- if, one, they required an adequate
19   label, and, No. 2, if you look at the potential
20   adverse reactions, nothing is there about chronic.
21        I mean, surgeons would think that a lot
22   of this stuff are acute, but there's nothing about
23   these being chronic.
24        MR. GAGE:  Excuse me, Dr. Parisian.  I
25   have to move to strike the answer as nonresponsive.

34 (Pages 130 to 133)

Suzanne Parisian, M.D.

Page 134

1    Could you read the question back?
2    And I'm going to say, if the witness
3  persists, I'm going to have to ask for more time.
4    MR. JONES:  She's answering the
5  question.
6    MR. GAGE:  No, she's not.  Not even
7  close.
8    MR. AYLSTOCK:  She's absolutely
9  answering the question.
10    MR. GAGE:  Not even close.
11    So could you read the question back one
12  more time?
13    (Requested portion was read by the
14  Court Reporter.)
15    MR. JONES:  Objection.
16    THE WITNESS:  Yes, they would, because
17  they're certainly not in the label.  It's not an
18  adequate label.
19    MR. GAGE:  Move to strike everything
20  after the word "yes."
21  BY MR. GAGE:
22    Q.   And is it your opinion that the adverse
23  reactions that are listed in the Prolift+M IFU do
24  not communicate that those are potential risks of
25  the Prolift+M?

Page 135

1    A.  Yes.
2    Q.  Okay.
3    A.  And that they can be chronic, not just
4  acute, because that list is primarily acute
5  complications post-surgery.
6    MR. GAGE:  Move to strike everything
7  after the word "yes" as nonresponsive.
8  BY MR. GAGE:
9    Q.  Dr. Parisian, do you -- you've looked at a
10  number of mesh IFUs in connection with your expert
11  work.  Is that correct?
12    A.  Yes, sir.
13    Q.  Have you found one that's adequate?
14    A.  Not in the cases I've been involved.  I
15  haven't looked at every single one.  I haven't
16  looked at every single one.  I'm not involved in
17  every single case, so . . .
18    Q.  Of the IFUs that you have looked at, have
19  you found any that are adequate?
20    A.  No.  Not -- not the cases I've taken, no.
21    Q.  Have you found any that have frequency data
22  with regard to adverse events?
23    A.  I don't recall.
24    Q.  Can you point me to any medical device IFU
25  for any type of a medical device that you believe is

Page 136

1  adequate?
2    A.  You know, I haven't -- yeah, there's lots of
3  devices that I have not been involved in.  I mean,
4  there's adequate labels.
5    Are you saying that every device in the
6  company -- country?  I don't know.
7    Q.  Dr. Parisian, I'm asking you a question.
8    Can you identify -- well, read the question
9  back.
10    (Requested portion was read by the
11  Court Reporter.)
12    THE WITNESS:  I'm sure there's lots.  I
13  haven't developed that.
14  BY MR. GAGE:
15    Q.  Okay.  After Prolift+M was cleared, did FDA
16  ever recommend any labeling changes for Prolift+M
17  IFU or patient brochure?
18    A.  I don't recall that they did.
19    Q.  Has FDA ever determined that the Prolift+M
20  IFU or patient brochure were false or misleading?
21    A.  Not that I'm aware of in terms of writing,
22  and you're talking about a letter or something.  I
23  haven't seen a letter to that effect.
24    Q.  Has FDA ever declared the Prolift+M IFU or
25  patient brochure to be inadequate after the device

Page 137

1  was cleared?
2    A.  After it was cleared, no.  I haven't seen
3  anything from the FDA.
4    Q.  And FDA has never determined the Prolift+M
5  device was misbranded or adulterated; correct?
6    A.  Correct.  There's no official ruling like
7  that, yes, sir.
8    Q.  Does FDA have the power to make a device
9  manufacturer change the wording in its IFU or
10  patient brochure?
11    MR. JONES:  Objection.
12    THE WITNESS:  The power?  They have the
13  authority.  Do they ever use it?  No.  They try to
14  get voluntary compliance.
15  BY MR. GAGE:
16    Q.  Has Ethicon -- I'm sorry.  Strike that.
17    Has FDA ever concluded that Ethicon failed
18  to provide safety information to FDA that was
19  pertinent to Prolift+M?
20    A.  Well, the Prolift.  That was a 510(k),
21  remember, that they were asking for the Prolift --
22  they hadn't given them the clinical trials, so
23  there's some interaction there.  They didn't do a
24  ruling or some kind of a document, but they did make
25  them give them the information for it.

35 (Pages 134 to 137)

Suzanne Parisian, M.D.

Page 138

1    Q.   I think my question, though, was specific to
2  Prolift+M.
3    A.   Right.
4       But Prolift fed into Prolift+M in terms of
5  the 510(k), because they said that it wasn't the
6  predicate.  They made them give the French
7  information, the other studies.
8    Q.   Let me ask the question a different way.
9    A.   Okay.
10   Q.   After May of 2008, did FDA ever conclude
11 that Ethicon failed to provide safety information to
12 FDA that was pertinent to Prolift+M?
13   A.   Not that I've seen.
14   Q.   Did FDA ever request or order that Prolift+M
15 be withdrawn from the market?
16   A.   No.
17   Q.   Did FDA ever declare the Prolift+M was
18 illegally marketed?
19   A.   No.
20   Q.   And we can agree FDA never recalled
21 Prolift+M?
22   A.   Well, the FDA very rarely recalls anything,
23 but it was never recalled by Johnson & Johnson.
24   Q.   Was Prolift+M ever recalled by the FDA?
25   A.   No.

Page 139

1    Q.   Did FDA ever determine that Prolift+M was
2  not safe and effective?
3       MR. JONES:  Objection.
4       THE WITNESS:  Well, it was cleared.
5  That was the only interaction with the FDA.  FDA
6  cleared it.  So there's no debate that the FDA
7  cleared it.
8  BY MR. GAGE:
9    Q.   Now, Dr. Parisian, you indicated -- you
10 mentioned in your report you had some information
11 about the 522 studies.
12      Do you remember that?
13   A.   Yes, sir.
14   Q.   Had Ethicon chosen to conduct the studies
15 that FDA requested with regard to Prolift+M, is it
16 correct that the Prolift+M device would have
17 remained on the market while those studies were
18 underway?
19   A.   You know, in terms of the 522, I don't think
20 that's specified.  You could have done a postmarket
21 study for women who were implanted.  You didn't need
22 to keep marketing the Prolift+M.
23      The company chose to pull it off the market
24 and asked FDA to put it on hold.  But if you look at
25 the 522 process, it doesn't have to be commercially

Page 140

1  marketed.
2    Q.   Could -- could Ethicon have continued to
3  market the Prolift+M while conducting the 522
4  studies?
5    A.   They could have.  They would have been
6  required to.  If they continued to market it, they
7  would have had to do the 522 studies.
8       Pulling it off allowed them to put it on
9  hold basically, and -- and FDA had enough on their
10 plate with the other studies, they didn't force them
11 to do a postmarket study on the Prolift+M.
12   Q.   So FDA could have permitted Ethicon to
13 continue marketing Prolift+M while the 522 studies
14 were being conducted on Prolift+M; correct?
15   A.   Yeah, sure.  That's not saying the FDA
16 wanted them to, but it is a 510(k) cleared device.
17   Q.   Have you looked at any of the studies that
18 other manufacturers have done in response to the 522
19 orders?
20   A.   I've been looking at them, yeah.  What do
21 you want to know?
22   Q.   Well, I mean, have some of the manufactures
23 completed those studies?
24   A.   I don't think they've completed them, and
25 some of them are working with the physician groups

Page 141

1  to try to get information, postmarket information.
2       I mean, in terms of the POP, they're going
3  to have to come out with a PMA, so all the
4  manufacturers of a POP device are going to have to
5  come out --
6    Q.   What -- what devices have you seen 522
7  studies or 522 interim results for thus far?
8    A.   I don't recall which ones that I've seen
9  offhand.  I think -- I thought Boston Scientific I
10 saw some, but I don't remember.  I haven't looked at
11 them.
12   Q.   Have you spoken with any patients who have
13 had a Prolift or a Prolift+M implanted in them?
14   A.   No.
15   Q.   And I assume you have not conducted any
16 study or survey of women to determine what risks
17 they may have been aware of as a result of reading
18 the Prolift+M patient brochure?
19   A.   That's correct.  I haven't done a study like
20 that.
21   Q.   Do you know how many mesh manufacturers have
22 patient brochures?
23   A.   No, I don't know how many.
24   Q.   Do you know if any of the manufacturers --
25 well, let me ask you this:  You're working in cases

Suzanne Parisian, M.D.

Page 142

1  against Boston Scientific and Bard and AMS; correct?
2      A.   Not Bard.
3      Q.   Boston Scientific and AMS?
4      A.   AMS.
5      Q.   And Ethicon?
6      A.   And Ethicon.
7      Q.   Did Boston Scientific or AMS have patient
8  brochures for their pelvic organ prolapse devices?
9      A.   I believe so.
10         And then all around 2008, their patient
11 brochures were changing because FDA was trying to
12 get information -- negotiate information into the
13 labels.
14         So they've all had brochures, but 2008 seems
15 to be when FDA was pushing to try to update it with
16 what at least was in the medical literature.
17     Q.   Did you compare the Ethicon patient brochure
18 for Prolift+M to any other manufacturer's pelvic
19 organ prolapse patient brochure?
20     A.   No.
21     Q.   Do you know if the FDA ever commented on the
22 adequacy or the inadequacy of the Prolift+M patient
23 brochure?
24     A.   No, I don't remember seeing them comment on
25 it.

Page 143

1      Q.   Dr. Parisian, I'll represent to you, with
2  regard to Prolift -- and I'm not -- and I'm meaning
3  specifically the Prolift, not Prolift+M. Okay?
4          I'll represent to you that there are in
5  excess of 3- to 400 studies of different types on
6  the Prolift device.
7          Does that surprise you?
8          MR. JONES:  Objection.
9          THE WITNESS:  No.
10 BY MR. GAGE:
11     Q.   On your reliance list, I saw that you had
12 approximately 15 of those studies.
13         Have you -- does that sound about right to
14 you?
15     A.   Probably.
16     Q.   Have you endeavored to look at the other
17 studies that are out there on Prolift?
18         MR. JONES:  Objection.
19         THE WITNESS:  No.
20 BY MR. GAGE:
21     Q.   All right.  Dr. Parisian, continuing, do you
22 have any opinions about the process that led to the
23 classification of surgical mesh in 1988?
24     A.   Do I have an opinion?  No.  I mean, it's
25 just a fact it was a pre-amendment classification.

Page 144

1  The pre-amendment device classified Class 2 in 1988.
2  No.  It's just a fact.
3      Q.   Dr. Parisian, you indicated in your report
4  that --
5      A.   Where are you?
6      Q.   Well, I'll read it to you.
7          It says -- it's Paragraph 41.  You say,
8  "When Ethicon submitted the original Prolift+M
9  510(k), FDA's ODE reviewers became aware that
10 Prolift had marketed, quote, off label, closed
11 quote, for years by Ethicon for POP without 510(k)
12 clearance or an FDA-approved IDE.  Yet, the
13 premarket ODE branch pursued no official regulatory
14 action or civil penalties against Ethicon for its
15 violation of the act.  ODE permitted Ethicon to add
16 Prolift to its Prolift+M 510(k) submission.  This
17 was done at the regulatory discretion of the ODE
18 review branch, and in the past, is a decision based
19 on FDA resources and cost to the public."
20         Do you see that?
21     A.   Um-hmm.
22     Q.   When you say "this was done" -- "this was
23 done at the regulatory discretion of the ODE review
24 branch, and is, in the past, a decision based on
25 FDA's resources and cost to the public," does the

Page 145

1  word "this" mean FDA allowing Ethicon to add Prolift
2  to the Prolift+M 510(k)?
3      A.   Yes, sir.
4      Q.   Okay.  In the preceding sentence, you say,
5  "The premarket ODE branch pursued no official
6  regulatory action or civil penalties against Ethicon
7  for its violation of the act," do you know why they
8  chose to not do that?
9      A.   It takes a lot of time and effort and
10 resources, like I said.  It's just their choice.
11         You could have -- you could have not done
12 that.  That was what their choice was.  Do I know
13 why?  No.  That's how they chose to handle it.
14     Q.   Does FDA's perception of the company's
15 acting in good faith or lack of acting in good faith
16 factor into that discretion?
17     A.   No.  A lot of it has to do with the effort
18 that it would take to bring some kind of a
19 regulatory action.  This way, we can just -- in
20 terms of the process, they can just clear the
21 510(k).
22     Q.   Okay.  So could -- I'm going to ask the
23 question again.  I'm going to ask the court reporter
24 to ask that question again because I'm not sure
25 you -- if you will listen very specifically to the

Suzanne Parisian, M.D.

Page 146

1 wording of it. I want to make sure that you heard
2 it and you are answering that particular question.
3          (Requested portion was read by the
4 Court Reporter.)
5          THE WITNESS: Not necessarily from my
6 experience. Usually it is, what is the company -- I
7 can't make what the intent of the FDA was. It's a
8 fact that they did that.
9          Have I seen situations in the past when
10 I was there and they did that? Yes, but it's not
11 necessarily what the company's -- what the FDA is
12 thinking about the company.
13          It's basically, what would be the
14 effort that it would take to bring a regulatory
15 action against the company, what does it solve, and
16 so they just chose this path.
17 BY MR. GAGE:
18     Q.   Have you seen any statements from FDA about
19 whether FDA believed Ethicon was acting in good
20 faith with regard to this issue?
21     A.   Not at the time. That's why I looked at
22 that document that we have from 2007, 2008, when the
23 FDA was talking about -- they were specifically
24 focusing on Ethicon.
25     Q.   And just to be clear, you're talking about

Page 147

1 the -- Exhibit 6?
2     A.   Right.
3     Q.   Okay.
4     A.   And so at that time, I don't see where
5 they're talking anything about good faith. They're
6 talking about that the product had been marketed,
7 and FDA was trying to figure out how to catch up
8 with this issue.
9          So there may be some statement somewhere,
10 but from the documents that I saw, there wasn't
11 anything in this period of time.
12     Q.   Okay. So if there is such a statement, you
13 haven't seen it?
14     A.   I haven't seen it, and I would have to look
15 at it and put it in context with what was going on.
16 But also having been there, I know that ODE is not
17 one to usually trigger a compliance action, which
18 would have been Office of Compliance postmarket.
19     Q.   In your report in several places, you
20 discuss that certain certifications signed by
21 Ethicon were not in compliance with regulations
22 according to you.
23          Do you recall those statements?
24     A.   I didn't say noncompliance, but they're not
25 consistent with what the normal statement is, and

Page 148

1 they've been changed. They've been altered. And if
2 you were at FDA, you would hardly ever read those
3 things to see that they've been altered, but these
4 were.
5     Q.   On page 71 of your report in Paragraph 197,
6 you have a sentence that says, "Without any
7 explanation, or perhaps as an error in typing,
8 Ethicon changed the statement in the original 510(k)
9 submitted June 2007 and repeated the same error in
10 wording and certification in its submission of
11 September 19, 2007, significantly narrowing the
12 truthful and accuracy scope only to the SE
13 decision."
14     A.   Yes.
15     Q.   Do you recall that?
16     A.   Yes. And I stated there that I don't know
17 why it occurred, so I don't know why it occurred.
18 But whatever it is, it seems to be occurring in
19 their 510(k)s, and it did narrow the scope to that
20 no material fact for the substantial equivalence
21 decision had not been provided.
22     Q.   Have any of the documents that you have
23 reviewed since you wrote this report or any of the
24 information you may have received to gather,
25 investigate, or research since you wrote this report

Page 149

1 given you any additional information that would
2 allow you to say one way or the other as to whether
3 that was an error in typing or whether it was
4 something other than an error in typing?
5     A.   No.
6     Q.   In Paragraph 231 on page 83 of your report,
7 you say, "Thus, PFR and use of laser cutting of PE
8 mesh into new complex shapes introduced new and
9 unaddressed issues of safety and effectiveness for
10 PFR not seen with TVT, SUI, or the AMS predicates.
11 These new issues were not studied by Ethicon."
12          Do you remember that?
13     A.   Yes, sir.
14     Q.   Have you seen any clinical data that
15 indicates that laser cut mesh is dangerous to
16 patients?
17     A.   No. It's just -- in terms of the laser cut
18 mesh, it changes the edge in terms of the -- the
19 potential for rubbing. It's just -- it's not like
20 you're going to see laser cut is dangerous. It's
21 something you need to consider in terms of the
22 forces and the change in the plastic mesh --
23          I mean, it's just a visual difference
24 between machine cut and laser cut mesh.
25     Q.   But you have not seen any clinical data

38 (Pages 146 to 149)

Suzanne Parisian, M.D.

Page 150

1  comparing laser cut to machine cut mesh in terms of
2  patient outcomes, have you?
3       A.   I haven't looked for that in terms of POP.
4  It is a difference between TVT, TVT-O, and TVT-S,
5  and also in terms of the difference for a Prolift.
6  So it's something to be considered in terms of
7  design.
8       Q.   Dr. Parisian, you're generally aware that
9  the -- I believe you've mentioned in your report
10 in various places that plaintiffs allege, and I
11 believe you have opinions that address certain
12 alleged defects in the mesh itself, such as the
13 propensity of the mesh to cause excessive
14 inflammation. Is that -- I mean, that's one of your
15 opinions; correct?
16      A.   Where are you getting that opinion from, I
17 mean, because I know that there's going to be other
18 people talking about the mesh properties?
19      But in terms of the inflammatory response
20 that you have in patients, are you looking at a
21 specific thing in my report?
22      Q.   I think in your TVT-Secur report, you
23 indicated issues like pore size, weight -- pore size
24 and weight of the mesh as being issues for your
25 TVT-Secur?

Page 151

1       A.   I mean, you're talking about that one table,
2  I think, on page 48?
3       Q.   I don't have the specific -- I've got it --
4       A.   Those -- those are the evolution -- I think
5  where -- and if that's one table that you're
6  thinking of, I think that's just the evolution of
7  mesh is basically -- because TVT is just your basic
8  old PROLENE mesh, which is a heavy mesh with a --
9       Q.   I'll tell you what. Let me -- let me
10 move -- because my time is limited, I want to keep
11 moving here, so let me ask it in a different way.
12      Is PROLENE mesh -- can PROLENE mesh be used
13 in the United States for pelvic organ prolapse
14 repair?
15      A.   Well, it is right now, TVT, TVT-O.
16      Q.   Well, that's stress urinary incontinence.
17 I'm talking about the pelvic organ prolapse.
18      A.   Oh, pelvic organ prolapse?  Right now I
19 don't think the company is selling it. Is it?  I
20 mean, they don't have a product with PROLENE mesh.
21      Q.   You're familiar with GYNEMESH PS?
22      A.   Right.
23      Q.   And ARTISYN?
24      A.   Right. And those are put in abdominally.
25      Q.   Correct.

Page 152

1       A.   They're not put in intra-vaginally.
2       Q.   Correct.
3       A.   So, yes, you can use it intra-abdominally.
4       Q.   And that's acceptable with FDA; correct?
5       A.   Right now it is because the FDA has only
6  made the 522s occur for the transvaginal mesh.
7       Q.   Right.
8       There are no 522 orders for the abdominal
9  meshes; correct?
10      A.   Not that I'm aware of.
11      Q.   Do you know if GYNEMESH PS is made of the
12 same material that is found in Prolift+M?
13      MR. JONES:  Objection.
14      THE WITNESS:  Well, the Prolift is
15 GYNEMESH PS. Prolift+M is -- is different. It's
16 ULTRAPRO. And so it's -- it's kind of -- with the
17 Monocryl that's woven into the underlying mesh.
18 Neither one of them are PROLENE. PROLENE is the
19 TVT-S, the T- -- the TVT family is PROLENE.
20 BY MR. GAGE:
21      Q.   Is Prolift+M made of PROLENE?
22      A.   It's ULTRAPRO, which is -- I mean, they're
23 all polypropylene, but it's a different weave and a
24 different mesh than polypropylene, because
25 supposedly when the Monocryl is gone, you have a

Page 153

1  lighter weight mesh. You have also more of the
2  bigger pores when the Monocryl's gone. I think it's
3  like 20 to 30 grams per millimeter squared.
4       Q.   Is the polypropylene in Prolift+M PROLENE,
5  or is it some other substance?
6       MR. JONES:  Objection.
7       THE WITNESS:  Well, they're all
8  polypropylene. They're all the same resin source,
9  which would be your Phillips, Chevron, whatever,
10 polypropylene. So it's -- it's all that same resin.
11      It's just you change your mesh in terms
12 of your weave. Like, if you take GYNEMESH PS, it's
13 a lighter mesh so -- but the very original mother of
14 all of this was PROLENE, which is your heavier mesh.
15 And I think it only has a porosity of 49 percent
16 porous compared to the mesh fabric.
17 BY MR. GAGE:
18      Q.   Are there any differences in the chemical
19 makeup of the polypropylene and PROLENE in Prolift+M
20 as compared to Prolift or TVT?
21      MR. JONES:  Objection.
22      THE WITNESS:  Well, they're all
23 polypropylene. Is that what you're asking me?
24 BY MR. GAGE:
25      Q.   Are they all the same type of polypropylene?

39 (Pages 150 to 153)

Suzanne Parisian, M.D.

Page 154

```
1            MR. JONES:  At what point?
2            THE WITNESS:  Well, they're not all --
3   they're different weaves.  They're different
4   families.
5   BY MR. GAGE:
6     Q.  I'm not talking about weave.  I'm talking
7   about the chemical makeup.
8         Is the -- is the polypropylene in Prolift+M
9   made of the same chemicals and substances that are
10  found in the polypropylene in Prolift and TVT?
11           MR. JONES:  Objection.
12           THE WITNESS:  Right.  It's the same
13  resin, polypropylene resin.
14  BY MR. GAGE:
15    Q.  All right.  What do you make, if anything,
16  of the fact that the FDA permits the use of PROLENE
17  mesh for pelvic organ prolapse repair abdominally?
18    A.  Oh, I know -- I mean, in terms of -- it's a
19  long, tortious history.  Remember, surgical mesh
20  began as a pre-amendment device.
21    Q.  I'll withdraw the question.
22        Dr. Parisian, are you familiar with the
23  phrase "valid scientific evidence"?
24    A.  Yeah.
25    Q.  Dr. Parisian, in order for a new mesh device
```

Page 155

```
1   to be adequately tested for permanent implantation
2   in women, does it need to be supported by valid
3   scientific evidence?
4     A.  Did you say for POP?
5     Q.  I'll withdraw the question and re-ask it.
6         Dr. Parisian, in order for a new mesh device
7   for pelvic organ prolapse to be adequately tested
8   for permanent implantation in women, does it need to
9   be supported by valid scientific evidence?
10    A.  Not yet.  It will when they have to do a PMA
11  for a POP device.
12    Q.  Would it be reasonable for a manufacturer of
13  a new pelvic organ prolapse mesh device to test it
14  in women before it's marketed?
15    A.  It depends.  It depends.  Because the FDA is
16  still going to probably allow them to -- since
17  polypropylene is grandfathered in, they're going to
18  allow them not to specifically look at that mesh,
19  because that's the way the FDA is, and you can start
20  with animal studies before you go to humans.  And
21  so --
22    Q.  Well, if you have a new polypropylene mesh
23  device that you wanted to market, do you believe it
24  should be tested in live women before it's marketed?
25    A.  It depends.  I mean, I would start with
```

Page 156

```
1   animals first before I go and jump into women.
2     Q.  All right.  If animal studies are done, do
3   you believe that women -- female studies should be
4   done before it's marketed?
5     A.  Well, yes, to get robust information in
6   terms of your valid evidence, that you would have a
7   situation where you actually are monitoring the
8   women and you can test, and you get the data from
9   them, so it's more robust.
10        The 510(k) process allowed them not to have
11  that, but it would be more robust for a manufacturer
12  to have that information.
13    Q.  Do you know how many women would need to be
14  the subject of a clinical study using that new mesh
15  design before it could be declared safe and
16  effective?
17    A.  No.  Because that would -- if you're talking
18  about safe and effective, you're talking about a
19  PMA, and I don't know what the FDA is going to say
20  in terms of the PMA for those products.
21    Q.  Do you know how long such a study should
22  last?
23    A.  No.  I don't know how -- I don't know how
24  long FDA is going to -- they usually will --
25    Q.  Well, putting aside the FDA, I'm talking
```

Page 157

```
1   just you, Suzanne Parisian, Dr. Parisian --
2     A.  Okay.
3     Q.  -- with your experience and your talent, can
4   you tell me how long such a study should be
5   conducted in live women before a new mesh POP device
6   is marketed?
7            MR. JONES:  Objection.
8            THE WITNESS:  Well, it's going to be a
9   minimum of a year.  I mean, you need to have a year
10  at least, and then usually you're going to have at
11  least five years data accumulated.  The FDA may
12  clear something before that.
13           Remember, all these devices, FDA, when
14  I've seen what they're trying to say, all these
15  devices had long histories.  So the FDA has been
16  encouraging the people doing the 522s, if you're
17  going to want a PMA, that you actually incorporate
18  your current product that you're using in order to
19  have longer term data, five-year data, when you come
20  in with a PMA.
21  BY MR. GAGE:
22    Q.  Dr. Parisian, did you endeavor to gather
23  MAUDE reports on Prolift+M?
24    A.  No.
25    Q.  So is it fair to say that you are not going
```

40 (Pages 154 to 157)

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 158

1  to render an opinion that specific issue reports or
2  specific patient events regarding Prolift+M were not
3  properly reported to FDA by Ethicon?
4      A.  I haven't looked for specific events.  I
5  think what was more would be the IFU.  What was it
6  the company knew internally and what should they
7  have put in their IFU.
8      Q.  Have you undertaken a review or an analysis
9  of the company's issue reports with regard to
10  Prolift+M?
11     A.  I don't believe I have.
12     Q.  Okay.
13     A.  Because you're talking about like the
14  complaint files and the CAPA?
15     Q.  Yes.
16     A.  I haven't looked at all that.
17     Q.  Dr. Parisian, you are -- well, let me ask
18  you this:  Dr. Parisian, have you seen any of the
19  television advertisements with regards to pelvic
20  mesh?
21     A.  I see something pop up on television.
22  Nothing specific.
23     Q.  Have you examined that issue in connection
24  with your work for any of the mesh litigation that
25  you're involved in?

Page 159

1      A.  No.
2      Q.  Does -- do -- does mesh advertising
3  potentially bias a patient in favor of reporting or
4  seeking legal counsel?
5      A.  I don't know.
6      Q.  Have you looked at any of those issues with
7  regard to lawyer advertising?
8      A.  No.
9      Q.  Have you attempted to examine how many
10  lawsuits have been filed regarding Prolift+M?
11     A.  No.
12     Q.  All right.
13         MR. GAGE:  Can we just go off the
14  record for a second?
15         (Recess taken.)
16         (Whereupon, Exhibit No. 18 was marked
17  for identification.)
18  BY MR. GAGE:
19     Q.  Dr. Parisian, I'm going to hand you a
20  document marked as Exhibit No. 18.
21     A.  Thank you.
22     Q.  Have you ever seen that document before?
23     A.  Yes.
24     Q.  What is that document?
25     A.  That is a Gynecare, and it's got Prolift+M,

Page 160

1  and it's a patient brochure.
2      Q.  Was this among the documents that you -- as
3  I understand it -- strike that.
4          As I understand it, there have been several
5  versions of various patient brochures that you've
6  reviewed; correct?
7      A.  Yes, sir.
8      Q.  Do you know which ones pertain specifically
9  to Prolift versus -- Prolift+M as opposed to other
10  of the Ethicon devices?
11     A.  No.
12         I was trying to get what date this was.
13     Q.  So why don't you flip through this one?
14     A.  This one is in color.  See, I haven't seen
15  them in color.
16     Q.  Why don't you flip through this one?
17     A.  Okay.
18     Q.  And when you've had a chance to flip through
19  it, just let me know.
20     A.  Okay.
21     Q.  Have you had a chance?
22     A.  Yes, sir.
23     Q.  Okay.  Have you seen this specific patient
24  brochure before?
25     A.  I don't know if I've seen this one.  I've

Page 161

1  seen something like this one.  I don't know what the
2  Prosima is.
3      Q.  Okay.  So if this document does not appear
4  on your reliance list, would it be fair to say that
5  this is the first time you've seen this specific
6  patient brochure?
7          MR. JONES:  Objection.
8          MR. AYLSTOCK:  Objection to form.
9          THE WITNESS:  This one, yes.  In color,
10  yes.  I've seen a patient brochure but usually
11  they're drafts are what I've seen from the 510(k).
12  BY MR. GAGE:
13     Q.  All right.  If we -- let me ask the same
14  question, if we took the color out, have you seen
15  this patient brochure in its -- in its black and
16  white version?
17     A.  I may have because the pictures of the
18  people look familiar.
19     Q.  If the -- if your reliance list does not
20  contain this document, would it be fair to say that
21  today is the first time you've seen this specific
22  patient brochure?
23         MR. JONES:  Objection.
24         MR. AYLSTOCK:  Objection to form.
25         THE WITNESS:  If it's not in the

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 162

1  510(k) -- because there is something in the 510(k)
2  about their -- their patient brochure, I think, so
3  I've seen something, but I don't know.  This one may
4  be the first time, yes.
5  BY MR. GAGE:
6    Q.  All right.  Dr. Parisian --
7    A.  No questions?
8    Q.  Oh, just a couple more.  My last few minutes
9  here.  I want to go back to the concept of valid
10 scientific evidence.
11     Dr. Parisian, are well-controlled
12 investigations considered to be valid scientific
13 evidence?
14   A.  Yes, but then it goes down a hierarchy,
15 because in terms of the FDA's definition, they can
16 go down to like case studies and stuff, so --
17   Q.  I'll read them to you.  We'll kind of take
18 it one at a time.
19     Does valid -- valid scientific evidence may
20 include a well-designed randomized clinical trial?
21   A.  Yes.
22   Q.  Valid scientific evidence may include
23 partially controlled studies?
24   A.  Yes.
25   Q.  Valid scientific evidence may include

Page 163

1  studies and objective trials without match controls?
2    A.  Yes.
3    Q.  And valid scientific evidence may include
4  well-documented case histories conducted by
5  qualified experts?
6    A.  Yes.
7    Q.  And valid scientific evidence may include
8  reports of significant human experience with a
9  marketed device from which it can fairly and
10 responsibly be concluded that there's a reasonable
11 assurance of safety and effectiveness of a device
12 under its conditions of use; correct?
13      MR. GAGE:  Objection to form.
14      THE WITNESS:  Yes.
15      MR. GAGE:  Is that because I read it
16 too quickly?
17      MR. AYLSTOCK:  I couldn't understand
18 what that --
19      MR. GAGE:  She understands it because
20 she knows it's a specific regulatory definition.
21      THE WITNESS:  Right.
22 BY MR. GAGE:
23   Q.  Would you agree that the following are not
24 considered valid scientific evidence to show safety
25 or effectiveness:  Isolated case reports?

Page 164

1    A.  Valid -- because they can be used for
2  safety.  Any -- any patient and human experience can
3  be used for safety.
4    Q.  Let me ask the question a different way.
5      Would you agree that the FDA does not
6  consider valid scientific evidence -- strike that.
7      Would you agree that the FDA does not
8  consider isolated case reports as valid scientific
9  evidence to show safety or effectiveness?
10   A.  For effectiveness particularly, but they
11 will consider them for safety.  You get to decide.
12   Q.  Do you agree that the FDA does not consider
13 random experience as valid scientific evidence to
14 show safety or effectiveness?
15   A.  Effectiveness particularly, because
16 remember, that's the key is what they clear things
17 on or approve it on is effectiveness.  So, yeah,
18 that's not going to cut it for effectiveness, and
19 safety it may.
20   Q.  Well, the FDA doesn't consider isolated case
21 reports or random experience as valid scientific
22 evidence to show safety.
23      Would you agree or disagree with that?
24   A.  I disagree with that, because of postmarket
25 surveillance.  You have to use that information to

Page 165

1  come up with the postmarket information.
2    Q.  I think -- I think --
3    A.  You're not going to approve it or clear it
4  on random case things, but you still consider the
5  safety information.
6    Q.  I think that may be where we're missing, and
7  I think when we talk about showing safety or
8  effectiveness, we're talking about the definition
9  under a 510(k).
10   A.  Yeah.
11     But, remember, most things are showing
12 effectiveness in terms of clearance and approval.
13 Safety is harder to demonstrate.
14     And so everything about a use of a product
15 can relate to safety, and that's why your postmarket
16 surveillance, obviously, you update your levels
17 based on safety information from various sources,
18 including it could be a case report, so -- so safety
19 is a little different than efficacy.
20   Q.  Would you agree that the FDA does not
21 consider unsubstantiated opinions to be valid
22 scientific evidence to show safety and
23 effectiveness?
24   A.  Yeah.  Again, for clearance and approval.
25   Q.  Dr. Parisian, do you understand Prolift+M to

42 (Pages 162 to 165)

Suzanne Parisian, M.D.

Page 166

1    have larger pores and less weight than Prolift?
2         A.   That's theoretically what it's supposed to
3    be.  It's GYNEMESH, but then they've put in the --
4    the Monocryl, and so supposedly when the Monocryl is
5    gone, you have a lighter weight mesh.  It's supposed
6    to be 20 to 30 grams some -- and so theoretically
7    it's going to be lighter weight when that Monocryl
8    has gone away.
9         Q.   Do you believe that Prolift+M is more safe
10   or less safe than Prolift?
11        MR. JONES:  Objection.
12        THE WITNESS:  You know, I don't know.
13   I don't have an opinion.  I think -- I don't have
14   any -- I mean, in terms of the 510(k), there was
15   less data about Prolift+M than there was about
16   Prolift, both of which seemed to have problems.
17        Prolift definitely had problems, but
18   that was what the FDA was saying.  They didn't know
19   that Prolift+M was more safe.  I mean, there's no
20   data to support it.
21        MR. AYLSTOCK:  I think we're done.
22        MR. GAGE:  Yeah, we're done.
23        Well, we're done because my time is up.
24        (Concluded at 12:27 p.m., and then
25   re-opened at 2:05 p.m.)

Page 167

1         (Whereupon, Exhibit No. 19 was marked
2    for identification.)
3    BY MR. GAGE:
4         Q.   All right.  Dr. Parisian, counsel have all
5    agreed to reopen the record on our concluded
6    Prolift+M deposition so that we could cover a
7    document that you forgot to bring to my attention
8    earlier this morning that's pertinent to Prolift+M.
9         I'm handing you a document that -- or a
10   collection of documents, actually, that I have
11   marked collectively as Parisian Exhibit No. 19 to
12   your Prolift+M deposition.
13        Could you tell me what those are?
14        A.   Yes.  And I thought I had given them to you
15   this morning, but I hadn't.
16        It's the medical literatures, some of my
17   searches that I have in my file for Prolift+M and
18   about risk -- the French studies particularly.
19        And the reason I got confused is because
20   the -- let me just take one document out of here
21   because --
22        Q.   And, Dr. Parisian, before you finish, are
23   there other documents in my hand that need to be
24   made part of that composite exhibit, because I've
25   got a US Patent for knitted surgical mesh?

Page 168

1         A.   No.  That can be in there.
2         Q.   I'm sorry?
3         A.   That's PROLENE, so that's okay.
4         Q.   So do you want -- okay.  So I've got some
5    patent and trademark information about PROLENE?
6         A.   Right.
7         Q.   I've got some stuff about Textile
8    Development Associates.  It's called polypropylene
9    monofilament knitted mesh fabrics, a United States
10   Patent, and then an ORDV 510(k) sterility review
11   guidance?
12        A.   Correct.
13        Q.   Are these documents pertinent to your
14   opinions on Prolift+M or just TVT-Secur or to both?
15        A.   The TVT-Secur, yes.  The sterility guidance,
16   I don't think that really is an issue that we're
17   talking about, so it just is in there.  It's just
18   one page, but -- and then the other document there
19   that I gave you is for the Dura Patch.
20        Q.   All right.  And why don't we do it like
21   this.  Let me ask you -- and I'm going to -- since
22   we only have one copy, I'm going to kind of come
23   around and hover over you if you don't mind.
24        A.   No problem.
25        Q.   On Exhibit -- Parisian Exhibit No. 9 to your

Page 169

1    Prolift+M deposition, it looks to be a French study
2    with some of your -- with some handwriting on it?
3         A.   Right.  It's my handwriting, my
4    highlighting.
5         Q.   All right.  And you reference several times
6    during your deposition a French study?
7         A.   Yes, sir.  And that's the French study.
8         Q.   And this document purports to be the French
9    study that you were referencing as you were
10   testifying earlier this morning?
11        A.   It is related to it.  I went and got -- this
12   is 2007, yes, but this is one of the French studies
13   that I went and looked at.
14        Q.   All right.  Now, there's another document in
15   this collection that's an abstract called
16   "Mesh-related infections after pelvic organ prolapse
17   repair surgery"?
18        A.   Yes, sir.
19        Q.   And what was the significance, if any, of
20   this document to your Prolift+M opinions?
21        A.   I was looking at the time, and it was about
22   infection, and I didn't see that it was one of the
23   ones that was in reference to the FDA.  And it was
24   an article about infection in vaginal meshes, so it
25   was just basically looking at what information was

Suzanne Parisian, M.D.

Page 170

1    available at that time.
2        Q.   All right.  And that's an abstract study,
3    2007?
4        A.   2007.
5        Q.   And then -- all right.  Let me just back up
6    real quick.
7            For the French study and the 2007 abstract,
8    are those documents that were provided to you by
9    counsel, or are those documents that you got on your
10   own research?
11       A.   Oh, I got them.  They're mine.  This comes
12   off the Ethicon Web site, and it's the -- it's the
13   reference list for a physician, and so I went
14   through the reference list looking to see, this
15   would be information for a physician.
16           I guess I downloaded it -- when did I
17   download it?  December 2015.  And I've highlighted
18   the ones that were specifically due to vaginal mesh
19   in this thing.
20           There's like 256 references, and there's
21   only a few that are anything to do with vaginal
22   mesh.  Most of them were hernia.
23           You have that.
24       Q.   All right.  So the record is clear,
25   Dr. Parisian, what we're talking about is a document

Page 171

1    that is within the collection of Exhibit No. 19, the
2    first page of which is -- says at the top,
3    "References Ethicon page 3 of 13"; correct?
4        A.   Right.
5            And so if you go on the Ethicon Web site and
6    you hit physician and then you hit references, this
7    is the printout of 459 studies or references on the
8    Ethicon Web site.  And so it's for everything.
9            And so I went and looked to see how many of
10   their 459 had anything to do with vaginal mesh, and
11   23 of them did, and that would be about roughly
12   5 percent.
13       Q.   Okay.
14       A.   So a physician if you went here, there's not
15   a lot about vaginal mesh.  It's mainly about
16   bariatric surgery, hernia, but not much about mesh.
17       Q.   And you did this review on
18   December 16, 2015 --
19       A.   Yes, sir.
20       Q.   -- as evidenced by the date in the bottom
21   right-hand corner?
22       A.   Yes, sir.
23       Q.   And do you understand this list to pertain
24   to all products sold by Ethicon?
25       A.   Yes, sir.

Page 172

1        Q.   And these are my words, not yours, so
2    correct me if I mistake.
3            But am I understanding this to be an omnibus
4    listing of medical references that would pertain to
5    the entirety of the Ethicon product line?
6        A.   Yes.
7        Q.   All right.  And your purpose for going
8    through that was simply to determine how many
9    pertain to mesh and how many pertain to non-mesh
10   devices by Ethicon?
11       A.   That wasn't my reason.  My reason was just
12   that I was looking at the reference list to see what
13   was in it.  And then when I started looking at it, I
14   went, gosh, there aren't many, and so I went through
15   and I picked out the ones that were vaginal mesh.
16       Q.   Are these -- what is a manufacturer supposed
17   to do with regard to reference lists on a Web site?
18   Is there some -- is there a standard or a regulatory
19   expectation?
20       A.   Well, you give them fair balance.  Most of
21   those articles are very positive, so if physicians
22   went to their Web site and wanted to find out risk
23   information, there's not risk information.  Most of
24   these are benefits.  So it's not balanced in terms
25   of giving a physician -- because like you were

Page 173

1    saying, physicians should go look up surgical mesh.
2        Q.   Yes.
3        A.   If you go to the Ethicon Web site, there's
4    not a lot about risk.  There's a lot about benefits.
5    Most of these studies are benefits.  The Nielson
6    studies and here it is, Nielson 11 year, so if you
7    were a surgeon, you're going to say, oh, look.  It's
8    pretty good.  All this stuff is good stuff.
9            And so it's not -- in terms of fair balance,
10   it's not giving you the risk information.
11       Q.   All right.  So if we go -- if we continue
12   further in this document which is marked as
13   collective Exhibit 19, I find another abstract, for
14   lack of better pronunciation, Collinet,
15   C-o-l-l-i-n-e-t --
16       A.   Um-hmm.
17       Q.   -- on Column A, article.  Is that correct?
18       A.   Um-hmm.  Yes, sir.
19       Q.   And the handwriting and the highlighting is
20   yours?
21       A.   Yes, sir.
22           So this is another French -- and so these
23   are -- they're talking about risk factors, and this
24   is a French article.  That's why I'm looking at the
25   abstract.

Suzanne Parisian, M.D.

Page 174

1    But risk factors not referenced for the FDA,
2  and then they're talking about the numbers that I
3  have, 12.27 mesh exposures in two months, so I'm
4  getting the information from this article, and that
5  information was available in 2006 before the FDA
6  even looked at the 510(k).  And that information is
7  not in there.
8    Q.  Well, let me ask you this:  Is this for
9  Prolift+M or is this for Prolift?
10   A.  This is for Prolift.  Yeah, this is for
11  Prolift because it was being done in France.
12   Q.  Should the -- should the -- should Ethicon
13  provide the FDA in its Prolift -- Prolift+M 510(k)
14  the medical literature for Prolift?
15      MR. JONES:  Objection.  Are we -- are
16  we -- I feel like we're getting into rehashing
17  Prolift+M issues and not just marking an exhibit and
18  asking her what she marked.
19      You're kind of getting into asking
20  her -- to me, you're asking her now about
21  substantive opinions outside of this exhibit that
22  you're -- that we marked.
23      MR. GAGE:  I mean, I know, but I mean,
24  I didn't have the exhibit.
25      MR. JONES:  I mean, you get what I'm

Page 175

1  getting at?
2      Are you getting close?
3      MR. GAGE:  It's a quick Q and A.
4      THE WITNESS:  My quick answer is yes,
5  they should have because it is a Prolift, Prolift+M
6  510(k).  And this was the history of what they're
7  proposing to the FDA, so, yes, they should have.
8  BY MR. GAGE:
9    Q.  Okay.  Let me ask you this:  If the 510(k)s
10  had been separate, would you have expected Ethicon
11  to submit with the Prolift+M 510(k) literature
12  pertinent to Prolift?
13   A.  Yeah --
14      MR. JONES:  Objection.
15      THE WITNESS:  -- because it's actually
16  the predicate.  They originally made it so that
17  Prolift was the predicate.  Well, this is -- the
18  Prolift predicate has got this significant failure
19  issue, so the FDA needs to know, are we making
20  changes to Prolift+M because we're addressing the
21  safety issues.
22  BY MR. GAGE:
23   Q.  Okay.  And when you say "failure," you're
24  talking about the mesh exposure rate reported in
25  this study?

Page 176

1    A.  That's right.
2    Q.  Okay.  Did the -- okay.  So here the next
3  one says -- it's another abstract.  It says, "Risk
4  factors for prosthesis exposure in treatment of
5  genital prolapse via the vaginal approach"?
6    A.  Right.
7    Q.  And you've got written on here, "Earlier --
8  not given."  Is that correct?
9    A.  That's correct.
10   Q.  And this is an abstract authored by Belot,
11  B-e-l-o-t; correct?
12   A.  Right.  And so this is more information that
13  they would have had that they didn't provide to the
14  FDA in their 510(k).
15   Q.  Okay.  Is the Collinet and the Belot
16  abstracts, are those listed in that list of
17  literature on the Ethicon Web site, or did you find
18  those through like a PubMed search?
19   A.  Oh, I did this on a PubMed search.  They're
20  not on the FDA's website.  I mean, they're not on
21  Ethicon's Web site, no.  These are ones I found.
22   Q.  Does FDA do PubMed searches when they get
23  510(k) applications?
24   A.  No, no, because it's up to the manufacturer
25  to do them; not the FDA.  FDA had -- particularly at

Page 177

1  this period of time, they didn't really have access
2  to the NIH.
3      If you look at that document in 2007 I had
4  for the FDA, they actually talk about having people
5  go get them articles from the library because
6  there's a library at FDA.  So they -- those
7  reviewers don't do their own searches as a rule.
8  They have somebody else that you have to go through
9  to get stuff.
10   Q.  Is that still the rule today?
11   A.  I don't know.  I mean, I don't know.  I
12  was -- but you can't -- it's not up to the FDA to go
13  get the literature.
14   Q.  Do you know what -- all right.  So let's
15  look at these documents.
16      This one was the -- what did you call it,
17  the Dura --
18   A.  The Dura Patch.
19   Q.  Dura Patch?
20   A.  This is a neurological patch here.
21   Q.  All right.
22      MR. GAGE:  So let me mark this as --
23      (Discussion off the record.)
24  BY MR. GAGE:
25   Q.  All right.  So have we now covered the

45 (Pages 174 to 177)

Suzanne Parisian, M.D.

Page 178

1    additional documents that you found and after we had
2    concluded the Prolift+M deposition?
3        A.   Yes, sir.
4        Q.   Okay.  So the documents that you handed me
5    and marked to me, were those documents that you had
6    at the time you wrote your Prolift+M deposition
7    [sic], or were those documents that you got after
8    you wrote your Prolift+M -- strike that.
9            With regard to Exhibit 19, were these
10   documents that you had in your possession before you
11   wrote your Prolift+M report or after you wrote it?
12       A.   Before.
13       Q.   Okay.  All right.
14           MR. GAGE:  Now I believe we can
15   conclude the Prolift+M deposition and go back into
16   the TVT-Secur deposition.
17           (Deposition concluded at 2:18 p.m.)
18
19
20
21
22
23
24
25

Page 180

1            INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4    and make any necessary corrections.  You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7
8        After doing so, please sign the errata sheet
9    and date it.  It will be attached to your deposition.
10
11       It is imperative that you return the
12   original errata sheet to the deposing attorney within
13   thirty (30) days of receipt of the deposition
14   transcript by you.  If you fail to do so, the
15   deposition transcript may be deemed to be accurate
16   and may be used in court.
17
18
19
20
21
22
23
24
25

Page 179

1            C E R T I F I C A T E
2
3        I, ALISA SMITH, Registered Professional
4    Reporter, Arizona Certified Reporter, do hereby
5    certify that, pursuant to notice, the deposition of
6    SUZANNE PARISIAN, M.D. was duly taken on
7    March 8, 2016, at 9:06 a.m. before me.
8        The said SUZANNE PARISIAN, M.D. was duly
9    sworn by me according to law to tell the truth, the
10   whole truth, and nothing but the truth and thereupon
11   did testify as set forth in the above transcript of
12   testimony.  The testimony was taken down
13   stenographically by me.
14       I do further certify that the above
15   deposition is full, complete, and a true record of
16   all the testimony given by the said witness.
17
18
     _____
19
20       Alisa Smith, RPR, AZ CR 50712
21   (The foregoing certification of this transcript does
22   not apply to any reproduction of the same by any
23   means, unless under the direct control and/or
24   supervision of the certifying reporter.)
25

Page 181

1    - - - - - - -
2    E R R A T A
3    - - - - - - -
4    PAGE   LINE   CHANGE
5
6    ____ ____ _____
     REASON: _____
7
8    ____ ____ _____
     REASON: _____
9
10   ____ ____ _____
     REASON: _____
11
12   ____ ____ _____
     REASON: _____
13
14   ____ ____ _____
     REASON: _____
15
16   ____ ____ _____
     REASON: _____
17
18   ____ ____ _____
     REASON: _____
19
20   ____ ____ _____
     REASON: _____
21
22   ____ ____ _____
     REASON: _____
23
24   ____ ____ _____
     REASON: _____
25

46 (Pages 178 to 181)

Suzanne Parisian, M.D.

Page 182

1       ACKNOWLEDGMENT OF DEPONENT
2
3           I, SUZANNE PARISIAN, M.D., do hereby
4   acknowledge that I have read the foregoing pages, 5
5   through 178, and that the same is a correct
6   transcription of the answers given by me to the
7   questions therein propounded, except for the
8   corrections or changes in form or substance, if any,
9   noted in the attached Errata Sheet.
10
11
        _____        _____
12
        SUZANNE PARISIAN, M.D.         DATE
13
14
15
16
17
18  Subscribed and sworn to before me this
19  _____ day of _____, 20____.
20  My Commission expires: _____
21
22
        _____
23
    Notary Public
24
25

Page 183

1       LAWYER'S NOTES
2   PAGE  LINE
3   _____ _____  _____
4   _____ _____  _____
5   _____ _____  _____
6   _____ _____  _____
7   _____ _____  _____
8   _____ _____  _____
9   _____ _____  _____
10  _____ _____  _____
11  _____ _____  _____
12  _____ _____  _____
13  _____ _____  _____
14  _____ _____  _____
15  _____ _____  _____
16  _____ _____  _____
17  _____ _____  _____
18  _____ _____  _____
19  _____ _____  _____
20  _____ _____  _____
21  _____ _____  _____
22  _____ _____  _____
23  _____ _____  _____
24  _____ _____  _____
25  _____ _____  _____