# EXHIBIT G

Suzanne Parisian, M.D.

Page 1

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3    ---------------------------- )
      IN RE:  ETHICON, INC., PELVIC ) Master File No.
 4    REPAIR SYSTEM PRODUCTS        ) 2:12-MD-02327
      LIABILITY LITIGATION          ) MDL 2327
 5                                  )
                                    ) JOSEPH R.  GOODWIN
 6                                  ) U.S.  DISTRICT JUDGE
      ---------------------------- )
 7                                  )
      Shirley Freeman, et al.,      )
 8                                  )
          Plaintiffs,              )
 9                                  ) Case No.
      vs.                           ) 2:12-cv-00490
10                                  )
                                    )
11    ETHICON, INC., et al.,        )
                                    )
12        Defendants.              )
      ---------------------------- )
13
14                    TVT-SECUR
15             Tuesday, March 8, 2016
16                     - - -
17            Deposition of SUZANNE PARISIAN, M.D.,
          held at Marriott Tempe at the Buttes, 2000
18        West Westcourt Way, Tempe, Arizona,
          commencing at 1:35 p.m., on the above date,
19        before Alisa Smith, Arizona Certified Court
          Reporter.
20
21                     - - -
22
23            GOLKOW TECHNOLOGIES, INC.
24        877.370.3377 ph | 917.591.5672 fax
25                 deps@golkow.com
```

Suzanne Parisian, M.D.

---

Page 2

1   APPEARANCES:
2
3     WAGSTAFF & CARTMELL, LLP
      BY:  NATE JONES, ESQUIRE
4     4740 Grand Avenue, Suite 300
      Kansas City, Missouri 64112
5     816.701.1100
      njones@wcllp.com
6     Representing Plaintiffs
7
8     AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
9     BY:  BRYAN F. AYLSTOCK, ESQUIRE
      17 East Main Street, Suite 200
10    Pensacola, Florida 32502
      850.202.1010
11    baylstock@awkolaw.com
      Representing Plaintiffs
12
13
      BUTLER SNOW LLP
14    By:  WILLIAM M. GAGE, ESQUIRE
      Renaissance at Colony Park
15    1020 Highland Colony Parkway, Suite 1400
      Ridgeland, Mississippi 39157
16    601.948.5711
      william.gage@butlersnow.com
17    Representing Defendants Ethicon, Inc.,
      and Johnson & Johnson
18
19
20
21
22
23
24
25

---

Page 4

1                EXHIBITS MARKED
2
      EXHIBIT   DESCRIPTION                    PAGE
3
4     10      Composite re Prolift          30
5     10A     Amended Expert Report of John Miklos   31
6     11      United States Patent No. 6,287,316 B1   32
7     12      Polypropylene Monofilament Kitted Mesh  36
8             Fabrics documents
9     13      Microbiological Safety document re   39
10            CODMAN ETHISORB Dura Patch
11    14      ORDB 510(k) STERILITY REVIEW GUIDANCE  39
12            7/3/97
13    15      Dr. Parisian's Billing         60
14    16      Gynecare TVT Patient Brochure  78
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1              I N D E X
2   WITNESS                         PAGE
3   SUZANNE PARISIAN, M.D.
4     Direct Examination by Mr. Gage        5
5
6              * * * * *
7          EXHIBITS MARKED
8
      EXHIBIT   DESCRIPTION                    PAGE
9
10    1       Notice to Take Deposition of Suzanne   6
11            Parisian
12    2       Dr. Parisian's Expert Witness Report   10
13    3       Dr. Parisian's CV              10
14    4       Legal Testimony History, Suzanne   11
15            Parisian, M.D.
16    5       List of Documents Provided or   11
17            Identified for Review in the above
18            Referenced Lawsuit
19    6       Binder labeled TVMS Docket, TVT Secur   19
20    7       Composite exhibits re FDA      25
21            communications
22    8       Reclassification of Urogynecologic   26
23            Surgical Mesh Instrumentation, FDA
24            Questions
25    9       Gynecare's TVT label           28

---

Page 5

1              SUZANNE PARISIAN, M.D.,
2   the witness herein, having been first duly sworn by
3   the Certified Court Reporter, was examined and
4   testified as follows:
5              DIRECT EXAMINATION
6   BY MR. GAGE:
7     Q.   Good afternoon, Dr. Parisian.
8     A.   Good afternoon.
9     Q.   Before we get started with the Q and As, and
10  just so that the reader of this transcript will know
11  what has transpired, we are together in Phoenix,
12  Arizona.  It is in the afternoon.
13         And this morning, from approximately 9 a.m.
14  local time until noon or somewhat after noon, I
15  deposed you concerning your opinions in the federal
16  multidistrict litigation concerning the Prolift+M
17  device; correct?
18    A.   Yes, sir.
19    Q.   And during that deposition, I asked you a
20  pretty significant number of questions about your
21  background, training, experience, what you have and
22  have not done; correct?
23    A.   Yes, sir.
24    Q.   And you would agree with me that nothing has
25  changed in the intervening hour since we concluded

Suzanne Parisian, M.D.

1  that deposition and the start of this deposition
2  that would cause your answers to change to the vast
3  majority of those questions; correct?
4      A.  Yes, sir.
5      Q.  So can we agree that it would be in our --
6  everyone's best interest of time management for me
7  not to re-ask those questions?
8      A.  Yes, sir.
9      Q.  Okay.  And I would refer the reader of the
10  depo to the Prolift+M transcript of Dr. Parisian's
11  testimony in the event that they wish to read that
12  information.
13          (Whereupon, Exhibit No. 1 was marked
14  for identification.)
15  BY MR. GAGE:
16      Q.  All right.  Dr. Parisian, the first document
17  I'll hand you is the Notice to Take Deposition of
18  Suzanne Parisian, which is marked as Exhibit 1.
19          You've seen this document; correct?
20      A.  This morning for the Prolift.  I hadn't seen
21  it before.
22      Q.  I think that's actually a combined depo
23  notice that pertains to both Prolift+M, and then
24  somewhere in there, it also pertains to TVT-Secur.
25      A.  Okay.  No, I hadn't seen it before.

1      Q.  And just so the record is clear, we're here
2  this afternoon not to discuss your Prolift+M
3  opinions but your TVT-Secur opinions.
4      A.  Yes, sir.  And there was another depo for
5  that once before too.
6      Q.  Yes.
7          And the depo you're referring to is the
8  deposition in the Garcia versus Ethicon case;
9  correct?
10      A.  Yes, sir.
11      Q.  And I believe that deposition occurred in
12  February 2015; correct?
13      A.  Sometime in 2015, yes, sir.
14      Q.  Have you had a chance to read that
15  deposition?
16      A.  I don't recall that I have.
17      Q.  Okay.
18          MR. JONES:  Real quick, William.  I
19  won't take much of your time.  And just for the
20  record, we do have an agreement that you will not be
21  covering the topics that were already covered in
22  that deposition that was taken of Dr. Parisian in
23  February 2015.  And today's deposition will be
24  limited to topics that are new and outside of the
25  topics that were covered in that deposition.

1          MR. GAGE:  Yes, with the
2  understanding -- with two -- two caveats.  One is
3  plaintiffs' counsel, obviously, then agrees that
4  that deposition in the Garcia case can be used as
5  though it were taken in the federal MDL case.
6          MR. JONES:  I don't think we're going
7  to have any objection against that.
8          MR. GAGE:  Okay.  And then secondly,
9  there are a few places where I'll need to ask
10  questions that would be repetitive of what was asked
11  in February of 2015, but it is being asked to
12  determine if the witness has done anything since --
13          MR. JONES:  Sure.
14          MR. GAGE:  -- February 2015.  So --
15  but --
16          MR. JONES:  But a general agreement.
17          MR. GAGE:  Yeah, general agreement that
18  we don't intend to be duplicative of what you were
19  deposed about in February 2015.
20          MR. JONES:  And just to add to that,
21  there were -- you did e-mail some specific topics
22  that you thought maybe it was a rough roadmap of
23  what you believe to be the topics that you felt were
24  new, or maybe a better word, not covered in the
25  February 2015 deposition that you had the right to

1  ask about.
2          And if we need to refer to that at any
3  point, that might help, but generally speaking, not
4  going to cover same ground that was covered in the
5  February 2015 depo.
6          MR. GAGE:  Yeah, generally speaking.  I
7  mean, I did send you the -- I think there was a
8  question -- when I sent that e-mail, there was a
9  question as to whether I should even be permitted to
10  take any deposition of her on TVT-Secur.
11          So what I did was I went through the
12  report of Dr. Parisian in the MDL case and compared
13  it to the disclosure and the depo in Garcia in order
14  to assure myself there really was some differences,
15  because I was concerned maybe there were no
16  differences, in which case my position would be much
17  more difficult.
18          And by illustration, I showed you -- I
19  e-mailed and sent six topics, but trust me, you and
20  I are generally on the same agreement.  I don't
21  want -- I've got limited time.
22          MR. JONES:  When we get there, we'll
23  dig into it.
24          MR. GAGE:  Exactly, exactly.  I've got
25  limited time with her, and I need to focus on things

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 10

1  that she's not --
2       MR. JONES:  Absolutely.
3       MR. GAGE:  It's good for me to find the
4  stuff that she hasn't been asked about.
5       (Whereupon, Exhibit No. 2 was marked
6  for identification.)
7  BY MR. GAGE:
8     Q.  All right.  So, Dr. Parisian, I'm going to
9  hand you what I have marked as Exhibit No. 2, and I
10  believe this to be your TVT-Secur opinion in the MDL
11  case, but please look that over and confirm that
12  that is correct.
13    A.  Yes, sir.  Yes, it is.
14       (Whereupon, Exhibit No. 3 was marked
15  for identification.)
16  BY MR. GAGE:
17    Q.  All right.  And, Dr. Parisian, I'll hand you
18  what's been marked as Deposition Exhibit No. 3 to
19  your TVT-Secur deposition.  It also happens to be
20  marked Deposition Exhibit No. 4 to the Prolift+M
21  deposition.
22       This is your current CV.  Is that correct?
23    A.  Yes, sir.
24    Q.  And it is current and accurate, and there's
25  nothing more to add or subtract from it; correct?

Page 11

1     A.  Yes, sir.
2       (Whereupon, Exhibit No. 4 was marked
3  for identification.)
4  BY MR. GAGE:
5     Q.  I'll also hand you Exhibit No. 4, which is
6  also marked as Exhibit No. 5 in the Prolift+M case
7  today, and this is the legal testimony history of
8  Dr. Parisian.  Is that correct?
9     A.  Yes, sir.
10    Q.  And that's a complete and accurate listing
11  of your legal history over -- for the time period
12  that's stated in that report; correct?
13    A.  Correct.  It won't have Prolift+M on it.
14    Q.  I'm sorry?
15    A.  It won't have Prolift+M on it yet in terms
16  of the depo.
17    Q.  Which was taken this morning?
18    A.  Right.
19       (Whereupon, Exhibit No. 5 was marked
20  for identification.)
21  BY MR. GAGE:
22    Q.  And then, Dr. Parisian, I want to mark as
23  Exhibit 5 --
24    A.  Well, the red one is 4, so that would be 5,
25  yeah.

Page 12

1     Q.  All right.  This will be Parisian Exhibit 5
2  to your TVT-Secur opinion, and I understand this
3  to be the list of documents provided or identified
4  for review in the above-referenced lawsuit.  Is that
5  correct?
6     A.  That's what it states, yes, sir.
7     Q.  This is what we often refer to as the
8  reliance list.
9       Can you confirm that for me, that that is
10  yours for the Secur case?
11    A.  Yes, sir.
12    Q.  All right.  Dr. Parisian, with regard to
13  your TVT-Secur report in the MDL, who typed that up?
14    A.  I did.
15    Q.  Can you tell me approximately when you
16  started work on that report and when you completed
17  work on it?
18    A.  No, sir.  I don't have the -- I can't do
19  that without the bill in front of me.  I'll get you
20  the bill.
21    Q.  All right.  Let me just ask you, we know
22  that you were deposed in the Garcia case in February
23  of 2015; correct?
24    A.  Right.  Um-hmm, yes.
25    Q.  That was about TVT-Secur; right?

Page 13

1     A.  Right, but there was no report written at
2  that time.
3     Q.  And that was the first and only -- well,
4  that was the first case in which you had been
5  designated as a TVT-Secur expert.  Is that right?
6     A.  That's right.
7     Q.  Before that case, had you been retained to
8  provide opinions on any Ethicon mesh device?
9     A.  No.  No, I hadn't.
10    Q.  And can you -- and is it -- it is fair to
11  say that you were retained by the plaintiffs in the
12  MDL in the year 2015 to provide an expert opinion on
13  TVT-Secur?  Is that correct?
14    A.  Technically, I wasn't employed by the MDL to
15  start with.  I was with Clark, Love & Hutson, just
16  one case.
17    Q.  All right.  So in the Garcia case, that's a
18  Clark --
19    A.  Right.
20    Q.  -- Clark, Love case; correct?
21    A.  Right.
22    Q.  And who retained you in the MDL for
23  TVT-Secur?
24    A.  I sort of got transferred, and I think
25  Wagstaff & Cartmell are the people that are the

4 (Pages 10 to 13)

Suzanne Parisian, M.D.

Page 14

1  office I'm supposed to touch base with.
2    Q.  Okay.  So Clark, Love possibly got in touch
3  with Wagstaff & Cartmell, and that's how you got
4  involved in the MDL litigation for TVT-Secur?
5    A.  Something like that.  I'm not sure if they
6  were in the MDL.  I don't know.  Somehow I ended up
7  in the MDL in a wave.
8    Q.  And would that transfer have occurred after
9  your deposition in Garcia?
10    A.  Yes.
11    Q.  Not looking for specific dates.  Just
12  ballpark.
13      Do you know when you first -- well, strike
14  that.
15      Is it fair to say that all the opinions you
16  intend to offer in this case are contained either in
17  your expert report that we've already marked or in
18  your TVT-Secur deposition in the Garcia case or in
19  the disclosure in the Garcia case?
20    A.  Yes.  As far as I know, I've tried to
21  capture them all in those three documents.
22    Q.  All right.  I don't have an extra copy of
23  your TVT-Secur deposition in Garcia or an extra
24  clean copy of your disclosure, so I'm not going to
25  mark those as exhibits.

Page 15

1      But I'm explaining to whoever may read this
2  deposition, we all know what those documents are.
3  It was one disclosure that you filed -- or that was
4  filed on your behalf in Garcia about TVT-Secur, and
5  then of course there's one deposition transcript,
6  the actual date of which was February 12, 2015?
7      MR. JONES:  Correct.
8      And we can get to the bottom of this
9  later, but my memory is that there might have been a
10  supplemental disclosure filed as well.
11      MR. GAGE:  Yes.
12  BY MR. GAGE:
13    Q.  Dr. Parisian, do you recall filing a
14  supplemental disclosure in the TVT -- for TVT-Secur
15  in the Garcia case?
16    A.  I don't -- I don't recall that.  Did I do
17  that?
18      MR. JONES:  And that's my memory that
19  there was one filed in court.  Again, if you have
20  it, if you don't have it, we can get to the bottom
21  of it later but --
22      MR. GAGE:  Okay.
23      MR. JONES:  -- my memory is that there
24  was a supplemental designation filed in that case
25  that's on that docket.

Page 16

1      MR. GAGE:  Okay.  All right.  So I
2  don't have a copy of that.
3      MR. JONES:  It may have been marked --
4  I don't think it was marked at her deposition,
5  though.
6      MR. GAGE:  Okay.  I do -- it seems like
7  I recall some discussion of it at her deposition,
8  though.  I could be mistaken.
9  BY MR. GAGE:
10    Q.  All right.  So I've marked as Exhibit 5 here
11  for this deposition a notebook, a black binder
12  called TVMS docket at the top, and then below it, it
13  says, "TVT Secur."
14      And it says, "This belongs" -- on the cover
15  it says, "This belongs to Suzanne Parisian, MD," and
16  I've marked that as Exhibit 5.
17      Do you see that?
18    A.  Yes, sir.
19    Q.  And you gave that notebook to me or your
20  counsel before the start of this deposition;
21  correct?
22    A.  Correct.  And I --
23      MR. JONES:  Just for the record, that
24  was also gave to you, Ethicon, at the February 2015
25  deposition as well.

Page 17

1      MR. GAGE:  That was going to be my very
2  next question.
3      MR. JONES:  Sorry.
4      MR. GAGE:  That's all right.
5      THE WITNESS:  Yes, it's the same
6  document that was given to you.
7  BY MR. GAGE:
8    Q.  All right.  So I'll ask the question.
9      Dr. Parisian, this notebook that's been
10  marked as Exhibit 5 at this deposition is exactly
11  the same notebook that was given to Ethicon's
12  counsel in the -- in your deposition in the Garcia
13  case back in February 2015?
14    A.  Yes, sir.
15    Q.  Okay.  And this notebook contains a number
16  of highlights in it.  I see, I think, a few
17  handwritten comments here and there.  I certainly
18  see a lot of stickies -- yellow, purple, orange,
19  red.
20      Is it fair to say that all of the markings
21  on all the documents contained within Exhibit 5 are
22  your markings?
23    A.  Yes.
24    Q.  And you're the one that affixed the stickies
25  to the various documents?

Suzanne Parisian, M.D.

Page 18

1    A.   Correct.
2    Q.   Do the colors of the stickies or their
3  organization or placing have any significance?
4    A.   No.
5    Q.   All right.
6    A.   And they were on at the other depo too, the
7  stickies.
8    Q.   Okay.  Good.
9         We'll ask to have a copy made, if we don't
10  already have this from the prior depo, complete with
11  the highlighting and the stickies.
12    A.   Yes.
13    Q.   Dr. Parisian, there is a -- we have to make
14  a change here.  Let's get this very clear on the
15  record.
16         The black notebook entitled, "TVMS Docket,
17  TVT Secur," the one that you and I have just been
18  discussing, we're going to have to mark that
19  Exhibit 6 --
20    A.   Okay.
21    Q.   -- not Exhibit 5.
22    A.   Okay.
23    Q.   That was my mistake.  So we're going to mark
24  that Exhibit 6, and I'm going to draw through the 5
25  and mark the No. 6 on that exhibit sticker that's

Page 19

1  attached to the front of that notebook.
2         (Whereupon, Exhibit No. 6 was marked
3  for identification.)
4  BY MR. GAGE:
5    Q.   So, Dr. Parisian, Exhibit 5 to this
6  deposition is your reliance list for your federal
7  MDL TVT-Secur report; correct?
8    A.   I think so.  I did mention this morning that
9  I saw Dr. Miklos' report, and I don't know if -- I
10  don't see it on the reliance list.  And so that
11  would be a report that I have seen --
12    Q.   Okay.
13    A.   -- because you said, "Oh, that's for
14  TVT-Secur."
15    Q.   Right.
16         So -- and we'll -- we'll figure this out
17  through the course of the next several questions,
18  but what I'm -- did you prepare the reliance list
19  that's marked as Exhibit 5?
20    A.   No.
21    Q.   Do you know who prepared that?
22    A.   No.  No, I don't know who prepared it.
23    Q.   Have you ever seen that before?
24    A.   You know, I don't remember if that was at
25  the same -- at the depo that we had for Garcia, the

Page 20

1  same list.
2    Q.   Well, it's got a federal heading at the top
3  of it --
4    A.   Right, right.
5    Q.   -- and by that time in February of 2015, you
6  had not been retained to provide an expert opinion
7  in the federal court proceeding for TVT-Secur, had
8  you?
9    A.   Correct.  They can change the heading.  I'm
10  talking about the list.
11    Q.   Gotcha.
12    A.   There should have been a reliance list at
13  the depo.  That's all.
14    Q.   Got it.
15         Do you have a reliance list from Garcia
16  other than just merely the contents of that notebook
17  that's marked as Exhibit 6?
18    A.   No.
19    Q.   If I were to -- if I were to try to
20  understand the universe of documents that you have
21  reviewed for your TVT-Secur opinions, is it correct
22  to say that there are two sources?  One is the
23  reliance list that's marked as Exhibit 5, and the
24  second would be the notebook that's marked as
25  Exhibit 6?

Page 21

1         MR. JONES:  Objection.
2         THE WITNESS:  They should be similar,
3  the book and the reliance list.
4  BY MR. GAGE:
5    Q.   And you're speaking of Exhibit 5 and 6?
6    A.   Five and six, yeah.
7    Q.   Have you looked to see to the extent to
8  which they're similar?
9    A.   No, no.  But this was sent to me all put
10  like this, so I assumed that the person who put the
11  reliance list knew what they sent to me.
12    Q.   Okay.  And when you were tapping your
13  finger, you were tapping your finger on the notebook
14  marked as Exhibit 6?
15    A.   Six, yes.  And I'm just saying about five, I
16  just never checked because I knew it was coming from
17  someone else who was sending me a reliance list.
18    Q.   All right.  So Exhibit No. 6 which is the
19  notebook, that supplied to you in the form in
20  which it sits on this desk right now, i.e., in a
21  hard copy notebook?
22    A.   Yes, sir.  Stickies and all that are mine,
23  but it was in a book.
24    Q.   Was that sent to you by the Clark --
25    A.   Yes.

Suzanne Parisian, M.D.

1    Q.   -- Hutson firm?
2    A.   Yes.
3    Q.   Did you receive from that firm any disks or
4  other electronic copies of documents for you to
5  review?
6    A.   I don't recall.  I didn't check it.  This
7  was -- this was the bulk of what I used, so I don't
8  recall a CD.  I don't -- I didn't look at my
9  computer for it because I knew that this was what I
10  had used primarily for the report.
11    Q.   Is it possible that you have additional
12  TVT-Secur documents on your computer that aren't in
13  the notebook?
14        MR. JONES:  Objection.
15        THE WITNESS:  They would have been
16  things that are not confidential documents other
17  than depos.  I don't know if there's depos on it.
18        That would be the only thing that would
19  be confidential, because I would go and pull stuff
20  up and put it on the computer.
21  BY MR. GAGE:
22    Q.   All right.  Do you have a list, or can you
23  provide me with a list of the depos that you would
24  have -- well, strike that.
25        On the reliance list, on the first page,

1  there's a section that calls -- that attempts to
2  itemize the depositions that have been provided to
3  you.
4        Do you see that?
5    A.   Yes, sir.
6    Q.   Do you know if that list on page 1
7  accurately matches the depositions you actually have
8  reviewed and/or received for purposes of your
9  TVT-Secur opinion?
10    A.   I don't know.  I can do the same thing that
11  I'm going to do for the Prolift+M and go look and
12  see what's on my hard drive.
13    Q.   Okay.  Good.  That's where I was headed.
14        I was going to ask you through your counsel
15  if you would be willing to give us an itemization.
16  I don't need anything fancy, but just an itemization
17  that bears your signature so we know it has been
18  approved by you --
19    A.   Right.
20    Q.   -- that would identify any depositions that
21  you may have received and/or reviewed for purposes
22  of your TVT-Secur opinion and which don't already
23  appear on Exhibit 5.
24    A.   Yes.
25    Q.   And to your -- when I deposed you earlier

1  this morning on Prolift+M, you handed me several
2  exhibit -- several stacks of additional documents
3  that you had reviewed in conjunction with your
4  Prolift+M documents -- Prolift+M opinions.
5        Do you have any additional documents that
6  you would like to hand me with regard to your
7  TVT-Secur opinions that you have either gathered on
8  your own or have received from some other source?
9    A.   Yes.  Here they are.
10    Q.   All right.  So --
11        MR. JONES:  Just for clarification, I
12  think the 2008 FDA big document that was marked as
13  Exhibit 6 earlier, I think that would probably also
14  be applicable to her TVT-Secur.
15        THE WITNESS:  You mean the 522?
16        MR. JONES:  Yeah.
17        MR. GAGE:  Okay.  So I'm glad you
18  mentioned that, Nate.
19        MR. JONES:  Maybe not so much the other
20  one, the reclassification.
21        MR. GAGE:  All right.  So why don't
22  we -- again, Nate, we don't ever know who's going to
23  be reading this stuff.  It could be, you know -- and
24  you and I may remember it, but the people who are
25  going to come along after us.

1        THE WITNESS:  Yeah.  The
2  reclassification and the instruments, that would be
3  another one.  Do you have that?  I think so.
4        MR. GAGE:  I'll pull that one too.
5        MR. JONES:  I think it's underneath
6  your hand.
7        (Whereupon, Exhibit No. 7 was marked
8  for identification.)
9  BY MR. GAGE:
10    Q.   So, Dr. Parisian, I'm handing you a stack of
11  documents that you handed me this morning in
12  conjunction with your Prolift+M which I understand
13  to be documents that you obtained from counsel that
14  pertain to FDA communications about surgical mesh.
15  Is that correct?
16    A.   One of them does.  This one here does.  This
17  one here is the -- the -- yeah, there you go.
18        So, yes, Exhibit 7 would be what we had from
19  this morning as Exhibit 6, and it's the FDA
20  inter-discussion about what they were going to do
21  with mesh.
22    Q.   Okay.  And are you talking about Exhibit 7
23  to this deposition, the stack of FDA documents,
24  those are documents -- well, let me ask it like
25  this:  Are those documents that you reviewed --

Suzanne Parisian, M.D.

Page 26

1  first reviewed after you wrote your TVT-Secur
2  report?
3     A.  Yes.
4     Q.  So those are just additional materials upon
5  which you may refer as you give your opinions on
6  TVT-Secur?
7     A.  Right.  And it's basically the internal
8  discussion of the FDA.
9     Q.  And I think we discussed it during the
10  Prolift+M deposition that it is at least your
11  understanding that those documents were obtained by
12  plaintiffs' counsel through some form of request to
13  the FDA.  Is that correct?
14     A.  They look like the type received from a FOIA
15  request.  They're redacted.
16     Q.  And FOIA is F-O-I-A, Freedom of Information
17  Act, request?
18     A.  Yes, sir.
19        (Whereupon, Exhibit No. 8 was marked
20  for identification.)
21  BY MR. GAGE:
22     Q.  All right.  And then the other document that
23  we need to mark is another stack of documents that
24  you handed me during the Prolift+M deposition this
25  morning where the title of it is "Reclassification

Page 27

1  of Urogynecologic Surgical Mesh Instrumentation, FDA
2  Questions."  We marked it as deposition Exhibit 7 to
3  your Prolift+M.  It will now be deposition Exhibit
4  No. 8 to your TVT-Secur.
5     A.  Yes.
6     Q.  And is that the stack of documents that --
7  that you handed me this morning from the Prolift+M?
8     A.  Yes, sir.
9     Q.  All right.  And, Dr. Parisian, those -- I
10  see some -- some highlighting and a sticker on that.
11        Is that your highlighting and your sticker?
12     A.  Yes, sir.  Yes, sir.  It's mine.
13     Q.  All right.  And if I remember correctly,
14  those were documents that you actually pulled, found
15  yourself.  Is that correct?
16     A.  Yes, sir.
17     Q.  All right.  Are there any additional
18  documents or reports that you have reviewed and/or
19  relied upon in conjunction with your Prolift+M
20  expert report in the federal MDL?
21     A.  You mean the TVT-Secur?
22     Q.  I'm sorry.  Let me rephrase it.  I knew that
23  was going to happen.
24        Dr. Parisian, apart from the documents that
25  we've already covered during this deposition, are

Page 28

1  there any other documents or materials that you
2  reviewed or relied upon in preparing your expert
3  report in the federal MDL for TVT-Secur?
4     A.  Well, I brought the Amended Miklos' report.
5  I brought also, if you look in there, the 2015 TVT
6  label even though --
7     Q.  Oh, I'm sorry.  These documents in front of
8  me were part of what you handed me.  Okay.
9        So let's mark those real quick.
10        (Whereupon, Exhibit No. 9 was marked
11  for identification.)
12  BY MR. GAGE:
13     Q.  So, Dr. Parisian, I'm handing you a document
14  that I've marked as Exhibit No. 9, which is the
15  documents you handed me a few moments ago.
16        Can you tell me what that is?
17     A.  This is -- I believe it's the 2015 -- yeah,
18  the Ethicon label.  It's the most recent one I can
19  find.
20     Q.  And that one has been changed from prior
21  versions; correct?
22     A.  Yes, sir.
23     Q.  Is it -- is it an adequate label?
24     A.  No, it's not an adequate label.  It's a
25  better label, but it's not an adequate label because

Page 29

1  it's still not very specific to TVT.  It's not
2  anything to do with TVT-S.  It's just TVT, but it is
3  the current one right now.
4     Q.  All right.  Now, T- -- and you couldn't put
5  out a 2015 label for TVT-S because it's no longer on
6  the market?
7     A.  That's right.  It's off the market.
8     Q.  All right.  And where did you get that label
9  from?
10     A.  I asked for it, and I got it from counsel
11  yesterday.
12     Q.  All right.  Are there any other documents
13  that you asked counsel to provide you?
14     A.  Yes.  The one that you had from the FDA,
15  that one we've all discussed.  The other things all
16  there are mine.
17     Q.  All right.  And the ones -- what you're
18  referring to are the documents that are still in my
19  hand that I haven't marked as exhibits yet, and
20  we're going to go through those.
21        But your -- your -- your statement with
22  regard to these documents still in my hand are --
23  these are documents that --
24     A.  They were in my folder, and I don't think
25  you had them necessarily, so I was giving them to

Suzanne Parisian, M.D.

Page 30

1  you to be complete.
2      Q.   Got it.  All right.  So let me look at this
3  really quick.
4          (Whereupon, Exhibit No. 10 was marked
5  for identification.)
6  BY MR. GAGE:
7      Q.   Doctor, I'm handing you Parisian Exhibit 10.
8          What is that document, which you gave to me
9  earlier?
10     A.   Actually, this is for Prolift.  It should
11 have been for Prolift.  Yeah, these are all
12 documents that I thought I had given to you this
13 morning that I didn't, yeah.  So they really should
14 go with the one we had this morning.
15     Q.   All right.  So --
16     A.   There is one document that applies to both
17 of these in there, and that's the Ethicon references
18 off of their Web site as to medical literature.  And
19 that would have been what Ethicon would give a
20 physician for the medical literature.
21         But like you said, the product TVT is off
22 the market, TVT-S, Secur, and the rest are there for
23 pelvic organ prolapse.
24     Q.   All right.  I'm going to --
25         MR. GAGE:  Let's just go off the record

Page 31

1  for a second.
2          (Discussion off the record.)
3  BY MR. GAGE:
4      Q.   So TVT-Secur -- so now that we're back in
5  the TVT-Secur deposition, Dr. Parisian, you handed
6  me a collection of documents which we were going to
7  go through after the deposition started.
8          One of them is an Amended Expert Report of
9  Dr. John Miklos in the Garcia case; correct?
10     A.   Yes, sir.
11         (By agreement of the parties, the court
12 reporter was instructed after the deposition to mark
13 the Amended Expert Report of John Miklos in the
14 Garcia case as Exhibit 10A to the deposition in
15 order to correct a mistake made by defense counsel
16 in marking two different exhibits as Exhibit 10
17 during the deposition.)
18         (Whereupon, Exhibit No. 10A was marked
19 for identification.)
20 BY MR. GAGE:
21     Q.   All right.  And that was a document that you
22 had at the time you wrote -- or at the time that you
23 were deposed in the Garcia case; correct?
24     A.   Yes, sir.
25     Q.   And what was the significance, if any, of

Page 32

1  this report to your opinions on TVT-Secur?
2      A.   The physician opinions, because that's what
3  he talks about, and, also -- what was the
4  significance?  I believe when I had the Garcia, I
5  talked about it, and I didn't see it listed on the
6  reliance list, and so I wanted to make sure you had
7  it.
8      Q.   Okay.  Have you for purposes of your MDL
9  report received any physician expert reports?
10     A.   No.
11     Q.   Have you received any expert reports from
12 anyone?
13     A.   No.
14     Q.   All right.
15         MR. GAGE:  I'm going to mark as a
16 collective exhibit a number of documents that you
17 handed me that appear to pertain to patents.  And
18 this is going to be Exhibit 11.
19         (Whereupon, Exhibit No. 11 was marked
20 for identification.)
21 BY MR. GAGE:
22     Q.   All right.  Dr. Parisian, you handed me
23 after the depo started the documents that are in
24 collective Exhibit No. 11.
25         Can you tell me what those are and what

Page 33

1  their significance are to your opinions in the MDL?
2      A.   I knew one of your questions was about the
3  TVT-S that you were going to ask me about
4  microporous versus heavy, and so I was trying to
5  find the definition of PROLENE.
6          And so that was what I actually went and got
7  this one patent from, and it's not the patent as
8  much as it defines what PROLENE is, and so that's
9  why I have that patent, and I put a yellow sticky
10 there, and it's highlighted.
11     Q.   So the yellow highlighting and sticky are
12 yours?
13     A.   Right.
14     Q.   Did you actually get that between the time
15 that we concluded the Prolift+M deposition and this
16 afternoon?
17     A.   No, no.  I had it.  I got it last night
18 because I knew that was one of your questions.
19     Q.   When you said, "I knew that that was one of
20 your questions," you were just speculating that I
21 was going to ask you that?
22     A.   Yes, yes.
23     Q.   Okay.  And it turns out that I did ask you
24 that?
25     A.   Yes, and I had gone and done my homework and

Suzanne Parisian, M.D.

Page 34

1 I want -- because it's hard to have a definition of
2 PROLENE and so -- because, you know, it's a
3 pre-amendment product, and it's been out there, and
4 so I've been trying to find something that would
5 define it to look at, you know, the weight and the
6 porosity.
7      So I found something, and so -- and then as
8 I went and looked for the patent, I went and got the
9 trademarks, just to kind of get -- put me on the
10 right track as time-wise, so that's what this is
11 about.
12   Q.   Is it your understanding that the TVT-Secur
13 is made of the same mesh that's contained within the
14 documents marked as Exhibit 11?
15   A.   It's not -- it's made of the same -- no.
16 This is -- this is different.  The mesh that it's
17 made out of is the PROLENE here where it's talking
18 about the standard PROLENE.  So it's made of this
19 mesh, which is the PROLENE.
20   Q.   All right.  And when you say -- you're
21 pointing to page 4 of this document --
22   A.   Right.
23   Q.   -- that references PROLENE mesh manufactured
24 by Ethicon, Inc., and it gives an average
25 flexibility, burst strength, pore size, and

Page 35

1 thickness; correct?
2   A.   Correct.
3      And so the company is defining what PROLENE
4 is so I wanted to -- because it's kind of hard to
5 pin it down, and so I believe TVT-Secur is made out
6 of PROLENE, which is your basic garden variety
7 PROLENE, and so -- and it's 49 percent porosity and
8 trying to -- so I was trying to hone in on it.
9   Q.   Okay.  And I think you and I were discussing
10 this earlier, and we got a little confused.
11      You understand there's PROLENE material and
12 there's PROLENE mesh?
13   A.   Sure, I know about PROLENE suture.  I mean,
14 yes, I can go through PROLENE, but it's all from the
15 resin, which is a polypropylene resin that they can
16 make it into suture, they can make it into fibers,
17 and they extrude it and make it into mesh.
18   Q.   Okay.  So for purposes of the TVT-Secur
19 opinion that you have, is it your understanding, for
20 example, that the average flexibility, the burst
21 strength, the pore size, and the thickness of the
22 TVT-Secur is that which is found on page 4 of this
23 document that's marked as Exhibit 11?
24      MR. JONES:  Objection.
25      THE WITNESS:  You know, I don't know.

Page 36

1 I haven't seen a specification where the company
2 defines PROLENE, but I was trying to put my finger
3 on something that the company defines.
4 BY MR. GAGE:
5   Q.   Okay.  So --
6   A.   It's in their patent defining what PROLENE
7 is, and so that's where I will -- you know, I would
8 just say in terms of the porosity and stuff.
9      So I have no doubt that the TVT-S is made
10 out of PROLENE, and PROLENE has been on the market
11 since the '70s, before -- before it was even 510(k)
12 cleared.
13      (Whereupon, Exhibit No. 12 was marked
14 for identification.)
15 BY MR. GAGE:
16   Q.   All right.  Dr. Parisian, I'm handing you a
17 collection of documents that were already tabbed as
18 collective Exhibit 12.
19      Can you tell me what those documents are and
20 what is their significance, if any, to your
21 TVT-Secur opinion?
22   A.   Well, it's showing different -- if you're
23 manufacturing, you want to get mesh, polypropylene
24 filament mesh.  These are the types of documents --
25 one of them is a guidance document.  I don't know if

Page 37

1 you're familiar with that.
2      But these are mesh patterns.  See how the
3 mesh -- so people can get it woven, and they have
4 different -- I was trying to hone in on the PROLENE.
5 Nobody calls one of these PROLENE, but you can look
6 at the mesh pattern and try to figure out the size.
7   Q.   Were you able to determine, from looking at
8 Exhibit 12, which of the various lines of data
9 pertain to the mesh in TVT-Secur, if any?
10   A.   This -- this one here looks the most like
11 it, but I'm not the mesh expert.  I mean, that would
12 be like 100 weight.  This is the right weight,
13 thickness, so it would be something like in this
14 here.
15   Q.   And the line that you're referring to is the
16 line that has PPKM 601?
17   A.   Yeah.  But, again, I'm not your mesh expert,
18 so . . .
19   Q.   All right.  And then -- and did you gather
20 this document on your own?
21   A.   Yes, sir.
22   Q.   Was this just for your own general guideline
23 information?
24   A.   Yes, sir.
25   Q.   I take it you don't have any -- you're not

10 (Pages 34 to 37)

Suzanne Parisian, M.D.

Page 38

1  rendering any specific opinions about this document?
2      A.  No.
3      Q.  Okay.  And then since it is a composite
4  exhibit, it's got something from surgicalmesh.com
5  behind it.
6      A.  Right.  And so I was just going and looking
7  at sources of polypropylene mesh.  This is the
8  guidance document which is -- we haven't discussed
9  that yet.
10     Q.  All right.  So the final document contained
11  within composite Exhibit 12 is a guidance for
12  preparation of premarket notification application
13  for surgical mesh dated March 2, 1999; right?
14     A.  Right.
15     Q.  And that's an FDA guidance; correct?
16     A.  That's right.
17     Q.  Did that ever become final?
18     A.  You know, I don't think it has.  I've never
19  seen one after 1999.  I know they've had a thing for
20  IDEs for SUI devices, and they're going to do a PMA,
21  but I don't think I've seen a later version.
22     Q.  Again, the reason you handed me that
23  document is because it was a document that you went
24  and got on your own -- is that correct? --
25     A.  Yes, sir.

Page 39

1      Q.  -- the guidance?
2          (Whereupon, Exhibit No. 13 was marked
3  for identification.)
4  BY MR. GAGE:
5      Q.  All right.  Then the final exhibit is
6  Exhibit No. 13.  It's a single sheet of paper, at
7  the top of which it says, "Microbiological Safety."
8          Dr. Parisian, what is that document?
9      A.  This is the ETHISORB Dura Patch.  I was
10  looking at the -- there's some microscopic
11  information about it.
12     Q.  What is the significance of that document,
13  if any, to your TVT-Secur opinion?
14     A.  Well, TVT uses the -- that patch.  That's
15  what the arms are the ETHISORB Dura Patch.  So I
16  was looking for documents about the Dura Patch.
17     Q.  Well, I should be perhaps more pointed.
18          Is there anything specific in that document
19  that impacts your opinion one way or the other about
20  the safety or efficacy of the TVT-Secur?
21     A.  Not anything other than what I've written in
22  my report, but I'm giving it to you to be complete.
23          (Whereupon, Exhibit No. 14 was marked
24  for identification.)
25  ///

Page 40

1  BY MR. GAGE:
2      Q.  All right.  And then the final document -- I
3  thought I was finished, but I had one more --
4  Parisian Exhibit No. 14.
5          Dr. Parisian, that document has what as its
6  title?
7      A.  510(k) Sterility Review Guidance.  There's
8  actually a guidance document that you can get.  It's
9  the same document.
10     Q.  All right.  What is the significance, if
11  any, of that document to your TVT-Secur opinions in
12  the MDL?
13     A.  Well, the 1997 document says that the
14  reviewer is not going to review the sterility
15  information.  They're going to leave that until a
16  facility inspection.  So it was kind of a change in
17  policy because FDA actually had looked at sterility
18  data up until '97.  In '97 they stopped.
19     Q.  Why?
20     A.  You know, I don't know why they did.  They
21  stopped because I think they wanted to cut cost.  It
22  takes a lot for a reviewer, and it -- they wanted to
23  speed up the process, and they decided that they
24  would check sterility information when they did a
25  good manufacturing practices quality systems

Page 41

1  inspection.
2      Q.  Did you find this document on your own?
3      A.  I have it -- that one I don't think I did,
4  but I have that document at home.
5      Q.  Where did you get this?
6      A.  It was in my papers here.  I don't know
7  where it came from, but there is a real guidance
8  document that looks like a guidance document that
9  goes with that, and I have it.  But I don't know
10  why, and that was just floating in these documents
11  here.
12     Q.  You mentioned something about inspections?
13     A.  Yes, sir.
14     Q.  Does FDA have the power or the ability to
15  conduct inspections of manufacturers of 510(k)
16  cleared devices?
17     A.  Well, when?  I mean, FDA has the authority
18  to inspect manufacturing facilities.  They're
19  regulatory or required to do it every two years, but
20  they're not making that.  They're supposed to be
21  inspecting.
22          But are you talking about at the time of the
23  510(k)?
24     Q.  No.
25          Let's talk about Ethicon and the TVT-Secur.

Suzanne Parisian, M.D.

Page 42

1    A.   Okay.
2    Q.   During the time that the TVT-Secur was on
3  the market, did FDA have the legal authority to
4  conduct an inspection of Ethicon's manufacturing
5  facilities and/or documents concerning TVT-Secur?
6         MR. JONES:  Objection.
7         THE WITNESS:  The FDA does have the
8  legal authority, but it's at the -- it's at the
9  pleasure of the company in terms of what they want
10  to show the FDA.
11        FDA doesn't just get cart blanche over,
12  "We want to see all your documents."  They can ask
13  for them, and the manufacturer can say yes or no.
14        But do they have the authority to
15  inspect?  Yes, the FDA does.  Do they have the
16  resources to inspect?  Not much.  That's where
17  they're falling behind.
18  BY MR. GAGE:
19    Q.   When they conduct an inspection, what do
20  they inspect?
21    A.   Usually pick maybe one or two devices as
22  kind of exemplary type of things that they look at,
23  and they're looking for systemic error or some kind
24  of an issue.  And so they don't inspect everything.
25  They don't have time or resources to inspect

Page 43

1  everything.  That's when they come to a facility
2  inspection.
3         Sometimes in the documents I saw for the FDA
4  work committee, they actually were sending
5  inspectors in to try to get information about the --
6  so that's kind of a directed inspection where
7  they'll have a district office person go in and get
8  some documents that they're asking for.
9         The FDA has fairly limited ability to
10  inspect.  They can, but they don't.
11    Q.   Just with respect to TVT-Secur and Ethicon,
12  did FDA ever conduct any inspections?
13    A.   I don't know.  In the document that I saw
14  from the FDA in 2007, 2008, they were talking about
15  going and doing an inspection to get information of
16  all manufacturers, so I don't know.
17    Q.   Did any other regulatory body conduct any
18  inspections or audits of Ethicon for its pelvic mesh
19  devices while TVT-Secur was on the market?
20    A.   You mean in the United States?
21    Q.   In any country.
22    A.   I'm not aware of them inspecting.  I know
23  that they were having to deal with other countries
24  outside the United States, but I'm not aware of
25  anything specific.

Page 44

1    Q.   Do regulatory bodies outside of the United
2  States have the authority to conduct inspections or
3  audits of a medical device manufacturer, such as
4  Ethicon, and a device like the TVT-Secur?
5         MR. JONES:  Objection.
6         THE WITNESS:  They have the authority.
7  I mean, the thing is resources.  Because now we're
8  even using -- in the United States, we're using
9  foreign inspectors to try to catch -- catch up on
10  our inspecting of facilities.  You know, they're
11  trying to harmonize them so they can inspect.
12        But, you know, I don't -- I don't
13  think -- and I didn't discuss any of the inspections
14  in my report.
15  BY MR. GAGE:
16    Q.   During the time period when TVT-Secur was on
17  the market, if FDA conducted an inspection or an
18  audit, could they ask to see any document the
19  company may have with regard to TVT-Secur, or can
20  they only ask for a subset of documents?
21        MR. JONES:  Objection.
22        THE WITNESS:  They can ask.  The
23  company doesn't have to provide them.  Usually they
24  will put it in their inspection report if the
25  company refused, so the company is allowed to

Page 45

1  refuse.
2         And every inspection for a medical
3  device company is announced, so it's not like the
4  FDA surprises them.  They know they're coming.  They
5  know what they're going to ask for.  And it's -- and
6  it's supposed to be at the convenience of the
7  company.
8  BY MR. GAGE:
9    Q.   Dr. Parisian, do you consider your TVT-Secur
10  report to be complete?
11    A.   At this moment in time, I don't have
12  anything else that I want to add to it.
13    Q.   All right.  So you have no current plans to
14  supplement the opinions.  Is that correct?
15    A.   As far as I know, yes, sir.
16    Q.   Do you have any plans to do any additional
17  work with regard to TVT-Secur?
18    A.   No, sir.  I have not been requested to do
19  anything else.
20    Q.   Is there any information that you're waiting
21  on relating to TVT-Secur which might cause you to
22  change or alter the opinions in your report?
23    A.   No.
24    Q.   Have you asked plaintiffs' counsel for any
25  documents or other papers that you may need with

12 (Pages 42 to 45)

Suzanne Parisian, M.D.

Page 46

1    regard to TVT-Secur?
2        A.   No.
3        Q.   All right.  Dr. Parisian, going back to your
4    reliance list, am I correct that Clark, Love gave
5    you the notebook that's been attached as Exhibit 6?
6    Correct?
7        A.   Yes, sir.
8        Q.   Did you get any additional documents from
9    anyone other than the ones that we've already
10   discussed and marked?
11       A.   No, sir.
12       Q.   So is it -- is it a true statement that your
13   MDL report on TVT-Secur was based on the documents
14   that we have marked already as exhibits with the
15   understanding that you're going to go back and look
16   to see if there were some additional documents or
17   depositions that were not contained either in your
18   reliance list or in the notebook marked Exhibit 6?
19       A.   Yes.
20           MR. JONES:  Objection.
21           THE WITNESS:  Yes, sir.
22           MR. GAGE:  What's the objection?
23           MR. JONES:  The exhibits to the
24   deposition, I don't think you included that in the
25   deposition.  Her testimony, the multiple

Page 47

1    disclosures, we still haven't got to the bottom of
2    the supplemental disclosure issue.
3            I think he's made a reference that it
4    wasn't actually filed or served.
5            MR. GAGE:  Oh, the supplemental?
6            MR. JONES:  I just want to make sure
7    that the supplemental disclosure, her testimony, the
8    exhibits that were included, the prior deposition of
9    TVT-Secur, to me, it's just -- there's a broader
10   universe than what you included in your question.
11           MR. GAGE:  That's good to know.
12   BY MR. GAGE:
13       Q.   So if we include the documents that counsel
14   just referenced, then, Dr. Parisian, is it correct
15   to say that would be the entirety of the universe of
16   the documents that you have reviewed and/or relied
17   upon in preparing your MDL Secur opinion with the
18   exception of the documents that you are going to go
19   back and check and deposition exhibits?
20           MR. JONES:  And objection.
21           Do you want me to explain the
22   objection?
23           MR. GAGE:  Please do.
24           MR. JONES:  The objection is, the issue
25   is for me, you know, she's worked on mesh litigation

Page 48

1    for years.  She's worked on mesh litigation outside
2    of TVT-Secur.  The reliance list and the materials I
3    just referenced are limited to her TVT-Secur
4    materials.
5            That doesn't mean that materials she's
6    reviewed for Prolift+M or, you know, other mesh
7    litigation doesn't generally support her opinions.
8    So that's the distinction for me.
9            I don't want to get into a spot where
10   you're trying to hammer down and box her into this
11   one specific issue.  Oh, wait, she talked for 30,
12   you know, pages, or she reviewed this, you know,
13   article.  It just didn't appear on her TVT-Secur
14   list because it was on another list, Prolift+M,
15   or -- you know, we get into the issue of you go
16   back -- years back to the medical school education.
17   That's my issue, that she's reviewed stuff for --
18   what? -- four, five years now -- three, four, five
19   years on surgical mesh and transvaginal mesh
20   specifically.
21           And those obviously are going to impact
22   her opinions generally.  They might not specifically
23   relate to TVT-Secur, but she's going to rely on that
24   expertise that she's formed over the past four years
25   working on mesh.

Page 49

1            MR. GAGE:  Yeah, and I understand that.
2    And I think my questions are much more directed
3    toward learning what documents did you receive for
4    the purpose of drafting a TVT-Secur report?
5            MR. JONES:  Okay.  And then -- and then
6    if you want to break it up even more to internal
7    documents, then that makes it somewhat easier,
8    because then, you know, if it's related to the
9    Ethicon internal documents on TVT-Secur, then that,
10   to me, breaks it up and makes it more specific.
11           Again, she's reviewed an internal
12   document that may not be specifically about
13   TVT-Secur.  But we were just going back and forth
14   about PROLENE and what exactly does PROLENE mean.
15   Well, it might not be on her TVT-Secur list, a
16   document that speaks to PROLENE.  But that's
17   generally going to support her opinions in a
18   TVT-Secur report if you're going to ask her about,
19   well, what is PROLENE?
20   BY MR. GAGE:
21       Q.   Well, let me ask you this:  She's got two
22   reliance lists in the -- in Ethicon cases, either
23   the Prolift+M or the TVT-Secur reliance list;
24   correct?
25       A.   Yes, sir.

Suzanne Parisian, M.D.

Page 50

1    Q.   And we covered exhaustively today what you
2  have and have not reviewed with regard to Prolift+M;
3  correct?
4    A.   We covered what I reviewed, yes.
5    Q.   Right.
6         With regard to TVT-Secur and your federal
7  opinion, I assume you reviewed some, if not all, of
8  the documents regarding Prolift+M while you were
9  working on your TVT-Secur opinion.
10        Is that a correct statement?
11   A.   Well, they're all cumulative.  I think
12  that's what he's trying to say.
13   Q.   And I'm not suggesting they're not
14  cumulative.  I'm just trying to get an understanding
15  of, so, I've got a basket of documents that were --
16  that were -- they fall into two categories.  For
17  Prolift+M, they're documents that were either sent
18  to you or you got them yourself?
19   A.   Yes.
20   Q.   For TVT-Secur, there's a basket of documents
21  that were either sent to you or you got yourself?
22   A.   Right.
23   Q.   You don't have any other reports for any
24  other Prolift or any other Ethicon devices?
25   A.   That's correct.

Page 51

1         MR. JONES:  And just object.
2         The issue for me, you're saying
3  documents.  In your documents, you're including
4  literature, regulations, internal documents,
5  records, whatever.
6         I mean, you're not meaning internal
7  documents, internal Ethicon documents?
8         MR. GAGE:  No.  I'm being broader than
9  that because I think no matter how broadly you
10  categorize them, they still fall into one of those
11  two buckets.  I either got them alone or I got them
12  from somebody else.
13        THE WITNESS:  Or I know about the
14  issues anyway.
15        MR. JONES:  Or she already knew it.
16        MR. GAGE:  Right.
17  BY MR. GAGE:
18   Q.   But if it's a document, you can't -- you got
19  to specifically have it in your hands.  You either
20  had to go get it or somebody had to give it to you.
21   A.   Right.
22   Q.   It has to be one of those two things.
23   A.   But like we were talking about
24  polypropylene, and I know polypropylene from lots of
25  other issues that has nothing to do with vaginal

Page 52

1  mesh.  So, I mean, I know about poly and we use --
2    Q.   And I'm not trying to limit your knowledge
3  to just the documents you received.  I'm trying to
4  drive at whether there is a universe, a group, a
5  list, a cache, a collection of documents --
6    A.   Right.
7    Q.   -- that you have reviewed for your Ethicon
8  work, be it Prolift+M or TVT-Secur, beyond the
9  documents that we have marked as exhibits either to
10  the Prolift+M deposition or to the TVT-Secur
11  deposition.
12        That's really where I'm just trying to get
13  at.
14        MR. JONES:  Understanding she's worked
15  on additional mesh litigation related to
16  transvaginal mesh products.
17        MR. GAGE:  Yes.
18  BY MR. GAGE:
19   Q.   All right.  So I'll ask this question:  Have
20  you reviewed Ethicon documents for other mesh
21  litigation that does not appear on your reliance
22  list for Prolift+M or TVT-Secur?
23        MR. JONES:  Ethicon internal corporate
24  documents?
25        MR. GAGE:  Yes.

Page 53

1         THE WITNESS:  I looked at Ethicon
2  documents.  I don't know if they're internal.  Like
3  TVT, I looked at -- somewhere along the line, I've
4  seen the 510(k) for TVT and some of the interaction
5  back and forth between the FDA.  And I don't think
6  it would have been in an Ethicon litigation, but
7  there were documents that other people had.
8         So I've seen other Ethicon documents,
9  TVT-O, TVT, so -- but I'm not involved in those
10  cases at this point in time.  And so, you know --
11  but I have seen those documents, but I haven't seen
12  the Ethicon version of the -- I've seen --
13        Because other manufacturers would go
14  get Ethicon documents, and they're usually FYI
15  documents; right?  They've been redacted.  So I have
16  seen Ethicon documents but not necessarily internal
17  documents.
18  BY MR. GAGE:
19   Q.   Okay.  So now let me -- let me limit your --
20  let me change the question.
21   A.   Okay.
22   Q.   Let's talk about only the documents that you
23  have received from lawyers who were making claims
24  against Ethicon.  I don't want to talk at all about
25  documents that maybe the AMS lawyers gave you.  I

Suzanne Parisian, M.D.

Page 54

1  want to talk about the documents that the lawyers
2  representing the plaintiffs in the Ethicon
3  litigation have given you.
4        Do you have any group or list of documents
5  for either Prolift+M or TVT-Secur other than the
6  ones that you have shared with us today in either
7  the Prolift+M deposition or the TVT-Secur
8  deposition?
9     A.  No.  Other than I'm going to go look at the
10  depos and see what I have.
11    Q.  That's what I needed to --
12    A.  So I've given you my file.
13    Q.  Okay.  Now, with regard to the medical
14  literature pertinent to your opinions -- strike
15  that.
16        Regarding the medical opinions regarding
17  TVT-Secur, is it correct to say that the literature
18  that you have reviewed with regard to TVT-Secur is
19  either found in the notebook that's attached as
20  Exhibit 6 or in your reliance list that we've
21  marked, or is otherwise already marked as one of the
22  exhibits in -- in -- to this deposition?
23    A.  I'm looking to see if the --
24        MR. JONES:  Objection.
25        THE WITNESS:  -- Cochrane report is in

Page 55

1  here because the Cochrane report I reviewed for
2  something, and so I've reviewed the Cochrane report
3  even before I got involved in this, and so in terms
4  of TVT-Secur, that's in there.
5  BY MR. GAGE:
6     Q.  All right.  So let me ask you this:  When --
7  when -- is there a list of documents -- see, I
8  understand -- for example, I think what you're
9  saying is like with Cochrane review, you were given
10  that document -- or were you given that document, or
11  did you go find it on your own?
12    A.  I went and found it, but it wasn't for
13  TVT-Secur.  It was looking at mini slings, so I was
14  looking at mini slings, and the TVT-Secur is the one
15  that's in the Cochrane report.  There's a lot of
16  discussion about it.
17    Q.  Okay.  So that document, the Cochrane
18  review, is not going to be in Exhibit 6?
19    A.  No, but I had seen it before.
20    Q.  I understand.
21        It's not in Exhibit 6; right?
22    A.  I don't -- I don't know.  It may be.  That's
23  why I was looking in this report, because I mean,
24  that is relevant to TVT-Secur, and then the FDA
25  document when they were talking about it yesterday,

Page 56

1  the one I have that, Exhibit 6 or 7 --
2     Q.  Yes.
3     A.  -- they were talking about the Cochrane
4  report.  They didn't have the whole Cochrane report
5  in it.  And so that -- I don't see that it's listed
6  on my list, and so that would be something else
7  that's in there in terms of TVT-Secur.
8     Q.  Do you have a list of documents that fall
9  into that category?
10        And just so that we're clear, the category
11  is --
12        MR. JONES:  What is the category?
13        MR. GAGE:  The category is, "The list
14  of documents that I'm relying upon that form the
15  basis for my TVT-Secur opinions which do not appear
16  in my reliance list or in Exhibit 6."
17        MR. JONES:  And what's the scope of
18  that?
19        MR. GAGE:  Well, she was able to
20  specifically recall very acutely the -- the --
21        THE WITNESS:  Cochrane review?
22  BY MR. GAGE:
23     Q.  -- the Cochrane review, and so I would ask
24  you, do you have a list or a -- either a written
25  list or a mental list of, "Here are 8 or 10 or 15 or

Page 57

1  20 or 100 documents that I know are pertinent to
2  TVT-Secur but which don't appear on my reliance list
3  or in this notebook"?
4     A.  That's the only one I can really think of
5  because that's a biggie, but I had read that with
6  nothing to do with TVT-Secur.  I was looking at
7  single incision slings, and so that was something
8  that -- that TVT-Secur is in that.
9     Q.  Did you do a PubMed search for TVT-Secur?
10    A.  I don't think I did.
11    Q.  Did you do a functional equivalent of a
12  PubMed research?  I understand you can do it by
13  using PubMed or some other service.
14        Did you do either a PubMed or some other
15  functionally equivalent medical literature search
16  for TVT-Secur?
17    A.  I don't recall that I did.  I don't recall
18  that I -- I ever did because TVT -- I mean, TVT has
19  been involved in so many other cases, I didn't do a
20  search for TVT-Secur.
21    Q.  And I take it you have already produced what
22  you would consider to be your complete file to us --
23  to me today?
24    A.  Yes, sir, other than the depos that I didn't
25  print out.

Suzanne Parisian, M.D.

Page 58

1    Q.   Have you ever spoken with anyone who you
2    understand to be an expert in the mesh litigation
3    with regard to your TVT-Secur opinions?
4    A.   No.
5    Q.   With regard to your documents and invoices
6    reflecting compensation regarding TVT-Secur, where
7    is that?
8    A.   I didn't bring them.  I didn't see the depo
9    notice, so I didn't bring them.
10   Q.   Shame on you.
11   A.   I know.
12   Q.   I hereby mark that witness's answer in the
13   event you guys complain one bit if one of my experts
14   doesn't bring it.  So noted says the plaintiffs'
15   lawyers.
16   A.   Well, normally when I see the notice, I pull
17   everything out.  I didn't see a notice, so I didn't
18   do it.
19   Q.   Can we -- can I ask you to provide that
20   documentation to Nate, and, Nate, will you agree to
21   provide that?
22        MR. JONES:  Absolutely.  It's coming.
23   And I'll look for the post-it note binder at the
24   next deposition from the defense experts --
25        MR. GAGE:  Thank you.

Page 59

1        MR. JONES:  -- which I know will not be
2    produced.
3        MR. GAGE:  Oh, of course you know it
4    will.
5        I'll tell you what.  What we probably
6    ought to do, if we can agree to do this, can we go
7    ahead and agree -- and, Madam Court Reporter, you
8    might say you don't want to do this, but let's see
9    if y'all will agree to it.
10       Can we agree to mark that document that
11   reflects her compensation on her MDL TVT-Secur work
12   as the next exhibit to this deposition, so that when
13   you produce it to me --
14       MR. JONES:  It will be part of the
15   record?
16       MR. GAGE:  -- can you go ahead and send
17   it to this court reporter so she can make it part of
18   the record so that it carries forward in perpetuity
19   with the depo, and you and I don't have to keep
20   trying to find it later on?
21       MR. JONES:  I think -- I think that's
22   something I will try my best to do.  Absolutely.
23       MR. GAGE:  All right.  And let's make
24   sure --
25       MR. JONES:  I don't see a problem with

Page 60

1    that.  Not knowing really what logistically is
2    required, what I'm getting myself into.  Generally,
3    yes.
4        MR. GAGE:  If you want to later, you
5    know, object or call me and say, I now have a reason
6    for it, I'll understand.  I'm not going to go nuts
7    on you, but I do think we're entitled to it.  And I
8    do think it would be very helpful if we attach that
9    document, even though we haven't seen it, as the
10   next exhibit.  What Exhibit No. would that be, Madam
11   Court Reporter?
12       The parties have agreed, subject to
13   Nate's perhaps needing to reconsider, as Exhibit 15
14   the document that Dr. Parisian will provide to Nate
15   that reflects her compensation for the work that
16   she's done with regard to TVT-Secur in the MDL.
17       (Whereupon, Exhibit No. 15 was later
18   marked for identification.)
19   BY MR. GAGE:
20   Q.   Dr. Parisian, do you have any recollection
21   of how much time you would have spent on the
22   TVT-Secur work in the MDL?
23   A.   No, I don't.  I don't, because I know that
24   you had the bill from Garcia.  I produced the bill
25   for that, and then the depo, and then I don't know

Page 61

1    what -- because we're only talking about the report,
2    so I don't know what that was.
3    Q.   What is your hourly rate?
4    A.   $400 an hour for in my office.  $600 an hour
5    for this today.
6    Q.   Deposition?
7    A.   Yes, sir.  And testimony in court.
8    Q.   Is $600 a day?
9    A.   No.  An hour.
10   Q.   I'm sorry.  $600 an hour for trial
11   testimony?
12   A.   Yes, sir.
13   Q.   All right.  Do you know how much time you
14   spent reviewing documents for your TVT-Secur work as
15   opposed to actually writing your TVT-Secur opinion?
16   A.   No.  Because, see, that's a protracted one
17   in that I've done disclosure, and there was time for
18   that, so you should have had the bill from the
19   disclosure, when we came out with, you know, my
20   review time, and so then when it came to writing the
21   report, it really -- I had already made opinions and
22   stuff, so it didn't take that long to write the
23   report for the MDL.
24   Q.   When you -- you were obviously asked
25   sometime in 2015 to write the report for the MDL;

16 (Pages 58 to 61)

Suzanne Parisian, M.D.

1 right?
2    A.   Right.
3    Q.   As I understand it, because of your prior
4 work in Garcia and because the documents were
5 essentially the same, is that a correct statement
6 that the documents you reviewed and relied upon in
7 Garcia are essentially the same?
8    A.   Yes.
9    Q.   And I used the word "essentially."  I'm not
10 trying to trap you and say identically --
11    A.   Right.
12    Q.   -- but they're essentially the same --
13    A.   Right.
14    Q.   -- as between Garcia and the MDL report?
15    A.   Right.
16    Q.   Have you published any of the opinions
17 you're offering about TVT-Secur?
18    A.   No.
19    Q.   Have you spoken with any scientist,
20 engineer, or medical doctor regarding your Secur
21 opinions?
22    A.   No.
23    Q.   Is it correct to say that you developed your
24 TVT-Secur opinions specifically for litigation and
25 not for a research project or formal study?

1    A.   Yes.
2    Q.   And as we discussed at your Prolift+M
3 deposition, you don't have case-specific opinions
4 that you intend to render with regard to any
5 particular TVT-Secur patient; correct?
6    A.   I'm not their medical causation person.
7    Q.   And I think you testified in your Prolift+M
8 deposition that the extent of your case-specific
9 opinions would be a review of the information
10 necessary for you to determine issues, such as the
11 date on which a particular patient may have been
12 implanted, in order to determine what perhaps might
13 be the applicable patient brochure and/or where to
14 place that particular plaintiff's implant date in
15 against the backdrop of some regulatory timeline.
16 Is that correct?
17    A.   In terms of the timeline Ethicon was dealing
18 with in terms of what they knew, when, yeah.  When
19 you go to court -- the reports are written general,
20 and so when you go to court, you have to have a more
21 honed in time period so that it's relevant to the
22 patient.
23         And so I usually use their time frame in
24 order to kind of hone in my regulatory opinions and
25 my opinions of the physician as to what's going on.

1         But it's not causation, per se.  It's just
2 limiting the world to the time that's relevant to
3 that patient.
4    Q.   Right.
5         And so, for example, you don't review a
6 patient -- a particular patient's medical records
7 and then render a medical opinion as to the cause of
8 that particular plaintiff's alleged injuries, for
9 example?
10    A.   Yes.  I try to keep the amount of medical
11 records review low.  I will pay attention to what
12 the physician says as to what he knew and what the
13 labeling should have been because that feeds into
14 the actions that the company could have taken to
15 notify that doctor, so that's part of my pattern
16 too.
17         MR. GAGE:  And, Nate, can we have the
18 same stipulation from counsel as you gave us in the
19 Prolift+M deposition, that you do not intend to put
20 up Dr. Parisian as a case-specific expert apart from
21 the discussion that we just had with her?
22         MR. JONES:  Yeah, yes.
23 BY MR. GAGE:
24    Q.   Dr. Parisian, am I correct you do not have
25 any manufacturing defect opinions with regard to

1 TVT-Secur?
2    A.   Naming individual lot to lot, no, I don't
3 have any.  Obviously, I talk about design in terms
4 of adequacy of design and follow-up and complaint
5 handling, but a specific lot defect, no, because I
6 don't even know who the patients are.  How can I
7 have --
8    Q.   But once you find out who the specific
9 patient is, it's not your -- it's not your role to
10 look at a specific lot and then make a medical or
11 render a medical causation opinion.  Is that
12 correct?
13    A.   I've been asked to do that sometimes, but
14 I'm not -- I'm not planning on doing it because
15 oftentimes we don't have the lot information on
16 these things, and I need to have the -- I need to
17 have manufacturing records.
18         If I get the manufacturing records, I may
19 look at it.  Sometimes it pops up, but I don't know
20 of one right now.
21    Q.   To date, have you reviewed any TVT-Secur
22 manufacturing records?
23    A.   No.
24    Q.   And you're not here as a representative of
25 FDA; correct?

17 (Pages 62 to 65)

Suzanne Parisian, M.D.

Page 66

1  A.  That is correct.
2  Q.  You're not here speaking on behalf of the
3  FDA; correct?
4  A.  That is correct.
5  Q.  FDA has not reviewed or endorsed any of your
6  opinions in this case?
7  A.  That is correct.
8  Q.  Have you ever spoken with anyone from FDA
9  regarding your Secur opinions?
10  A.  No.
11  Q.  Have you ever called or written to FDA about
12  any of your Secur opinions?
13  A.  No.
14  Q.  While you were at the FDA, did you ever have
15  any involvement with TVT-Secur?
16  A.  No.
17  Q.  Any involvement with any of the predicates
18  to TVT-Secur?
19  A.  I don't think so.  I mean, you're -- I don't
20  think so.  I mean, I was in urological devices, but
21  I didn't see anything there.  And the surgical mesh,
22  I was involved with some surgical mesh, but nothing
23  specific to the urological use.  I came after -- I
24  left before ProtoGen and before TVT.
25  Q.  Dr. Parisian, I asked you this morning in

Page 67

1  your Prolift+M deposition a number of questions
2  about board certification, staff privileges,
3  credentials at hospitals and studies that you may or
4  may not have done with regard to surgical mesh.
5       Is it fair to say that the answers you gave
6  in the deposition this morning would be translatable
7  to this deposition such that I do not have to re-ask
8  those?
9  A.  Yes, sir.  I have not changed in that period
10  of time.
11  Q.  Is it correct that you never did any kind of
12  mechanical testing of the mesh in TVT-Secur?
13  A.  Yes.
14  Q.  You did not do any type of testing or
15  measurements of the mesh in TVT-Secur?
16  A.  Correct.
17  Q.  And that's not something you would do in
18  your normal practice.  Is that correct?
19  A.  Correct.  I would normally look at the data
20  and not test it.
21  Q.  Do you believe you have the requisite
22  education, training, and experience to counsel a
23  patient about treatment options for stress urinary
24  incontinence?
25  A.  You know, I probably could as a physician,

Page 68

1  but I wouldn't.  I don't think that I would be the
2  right person to counsel somebody about that.
3  Q.  Why not?
4  A.  I wouldn't counsel a patient about treatment
5  of their urological problems.  I mean, there are
6  certain things I do know.  I mean, patients will ask
7  me, "What have you seen in terms of litigation and
8  stuff?"  I wouldn't do that.
9       That's -- that's a patient and a physician
10  that talk about that.
11  Q.  If someone came to you wanting to counsel
12  with you about treatment options for SUI, what would
13  you tell them?
14  A.  I would tell them that -- what would I tell
15  them?  I would tell them Kegel exercises, what I
16  know, and pumpkin seed.  You know, other things that
17  are noninvasive, and maybe push them on to a
18  urogynecologist, something like that.  That's not
19  mine.
20       I mean, everybody has to have their own --
21  I'm not a -- I'm not a practicing physician right
22  now in terms of counseling patients what to do.
23  Q.  Have you ever seen a TVT-Secur implanted in
24  the body?
25  A.  No.

Page 69

1  Q.  And by that, I mean have you ever watched a
2  TVT-Secur being implanted in someone?
3  A.  No.
4  Q.  Have you ever watched a video of a TVT-Secur
5  procedure?
6  A.  No.
7  Q.  Have you ever held a TVT-Secur in your hand?
8  A.  No.
9  Q.  Have you ever been in the same room as a
10  TVT-Secur device?
11       MR. JONES:  Sorry.  When you get to a
12  stopping point, break --
13       THE WITNESS:  No.
14       MR. GAGE:  Let's take a stopping point.
15       MR. JONES:  Thanks.
16       (Recess taken.)
17  BY MR. GAGE:
18  Q.  All right.  Dr. Parisian, do you agree that
19  you do not have the requisite education, training,
20  and experience to implant a TVT-Secur?
21  A.  Yeah.
22  Q.  And do you agree that you have not had the
23  requisite education, training, and experience to
24  counsel a patient about the risks and benefits of
25  TVT-Secur?

18 (Pages 66 to 69)

Suzanne Parisian, M.D.

Page 70

1      A.   Yeah.  I wouldn't -- I wouldn't do that.
2   That was not what I would do.
3      Q.   Would you agree that there are patients who
4   have had TVT-Secur who have had no complications?
5      A.   I don't know.
6      Q.   Would you agree that there are patients who
7   have had a good experience with TVT-Secur?
8      A.   I -- I don't know.  I don't know what the
9   patient experience is.
10     Q.   Would you agree that there are women who
11  have had a TVT-Secur placed where it has been a safe
12  and effective device for them?
13          MR. JONES:  Objection.
14          THE WITNESS:  It's the same answer.  I
15  don't know.
16  BY MR. GAGE:
17     Q.   Do you know if there are pelvic floor
18  surgeons in the United States who believe the
19  TVT-Secur was safe and effective?
20     A.   I don't know.
21     Q.   If there were such doctors, would you
22  disagree with them on that point?
23     A.   Since I'm not implanting, I would let them
24  talk about it, but I'm sure there's other people
25  that would talk about the other side too, so I don't

Page 71

1   know.
2      Q.   Have you written a draft IFU or a patient
3   brochure for TVT-Secur that is adequate in your
4   opinion?
5      A.   No, I have not written a draft.
6      Q.   Do you have any list or document or
7   PowerPoint slides or anything like that that would
8   purport to be a listing of words that need to be
9   either specifically added to the TVT IFU --
10  TVT-Secur IFU patient brochure or need to be taken
11  out of either the TVT-Secur IFU or patient brochure
12  in order to make them adequate?
13     A.   No, I don't have a list.
14     Q.   Have you ever spoken with a doctor who has
15  implanted a TVT-Secur?
16     A.   No.
17     Q.   Have you ever spoken to any pelvic floor
18  surgeon about the TVT-Secur IFU?
19     A.   No.
20     Q.   Have you read the depositions of any doctors
21  who have implanted TVT-Secur?
22     A.   With Ms. Garcia I did.  I forget who her
23  doctor was, but there were depositions from the
24  doctor.
25     Q.   Any others beyond that?

Page 72

1      A.   No.
2      Q.   Did that deposition inform your MDL opinion
3   in any way?
4      A.   It fed into it.  I don't reference it at all
5   in terms of that, but you asked me if I read a
6   deposition, yes, I read one.
7      Q.   When you say it fed -- the reading of the
8   deposition fed into your MDL report, do you mean --
9   was there anything specific or in particular about
10  that deposition that caused you to change or caused
11  you to write any one of your MDL opinions in a
12  specific way, or do you just mean to say, hey, it's
13  part of the knowledge base that I had at the time
14  when I sat down to write the TVT-Secur report?
15     A.   It's part of the knowledge base.
16     Q.   Did you review any professional education
17  materials from Ethicon with regard to TVT-Secur?
18     A.   I don't believe I did.  I'm trying to
19  remember if I put in my report whether I referenced
20  any marketing.
21          You have a list of -- in my report, you
22  would have the documents that I've reviewed in terms
23  of the marketing of the company.
24     Q.   Would it be fair to say that -- well, strike
25  that.

Page 73

1          And, Doctor, I want to ask you a question.
2   Do you draw any distinction between Ethicon
3   sponsored professional education and Ethicon
4   marketing?
5      A.   They can overlap because sometimes marketing
6   will be in charge of the professional education, and
7   so they can overlap.
8      Q.   What is your understanding of what the
9   professional education training for TVT-Secur
10  entailed?
11     A.   Well, they would identify a physician that
12  would be like usually a key opinion later or
13  trainer, someone that knows the product, and then
14  they would usually have a class full of doctors who
15  want to learn about it.  And they would probably use
16  cadavers, and they would oftentimes do pigs or some
17  other animal, and they would teach them how to do
18  the technique.
19     Q.   Is that a good thing?
20     A.   Is that a good thing?  It's what is done in
21  terms of the procedure.  That's not a bad thing.
22          The thing is that the design of the product
23  actually had some flaws to begin with, and you want
24  to design a product that would behave the way it's
25  supposed to.  And this one had some major problems

19 (Pages 70 to 73)

Suzanne Parisian, M.D.

Page 74

1  in terms of the design.
2      Q.   Are you critical of the Ethicon-sponsored
3  professional education program for TVT-Secur?
4      A.   Not in the program.  The issue is that the
5  physicians weren't really learning about the
6  potential risks and how difficult it was to do the
7  procedure.  So it's more with the contents.
8          But to have a program, no, I'm not critical
9  of their having a program.
10     Q.   Do you recall what documents you reviewed,
11 if any, to determine what training and what risks
12 were covered in the Ethicon-sponsored TVT-Secur
13 professional education program?
14     A.   I have -- I looked at various company
15 documents.  I didn't look at a single course.  I
16 looked at -- and I think if you go to Opinion 7
17 where I talk about the commercial use of the device,
18 those are the documents that I looked at in there.
19         And some of it would be company documents,
20 the cookbooks, the tips and tricks, and -- but not
21 necessarily a coursebook.  Okay?  So it would be
22 under the Section B, and it would go 1 through 10.
23     Q.   Do you have a recollection of looking at any
24 specific documents that were generated as a result
25 of the Ethicon-sponsored professional education for

Page 75

1  TVT-Secur?
2      A.   Not the coursework.  That's why I say I was
3  looking at things where they're internally talking
4  about what they're going to put in the course.
5  That's primarily what's there.
6      Q.   If those documents existed, would you want
7  to see them?
8      A.   I don't know if I would be the person who
9  would see them.  It seems like it would be more of a
10 surgeon that would see them in terms of who's done
11 the procedure.
12         I would look at them in terms of the way I
13 was -- in terms of FDA's training in looking at
14 labeling, but I think it would really be a surgeon
15 that would probably be addressing what the contents
16 are.
17     Q.   Dr. Parisian, let me ask you this:  If
18 Ethicon did not specifically disclose a risk of the
19 TVT-Secur in the IFU but specifically disclosed the
20 risk of -- that risk of TVT-Secur in another form,
21 would that impact at all your opinions?
22     A.   Well, I mean, you may not have every --
23 you're saying they may not have had everything in
24 the IFU.  They may have had some in the training
25 materials.

Page 76

1          And, yes, if you took it together as all
2  labeling, and you took the sales reps as all
3  labeling, but they had been trained to teach this,
4  then, yes, you could get away with that, in that
5  their information, but it has to be accurate.  It
6  has to be fair and balanced in terms of the risk
7  potential.
8      Q.   Did you -- I'm sorry.
9      A.   No, go ahead.
10     Q.   Did you undertake to do a comprehensive
11 analysis of the TVT-Secur IFU, the TVT-Secur
12 Ethicon-sponsored Prof. Ed, and the TVT-Secur
13 patient brochure and other potential documents in
14 order to come up with like an exhaustive list of
15 every risk that the company warned about with regard
16 to Secur?
17         MR. JONES:  Objection.
18         THE WITNESS:  I looked at the company
19 documents.  The company documents, you're talking
20 about different risks that I didn't see reflected in
21 the IFU or the training information or the patient
22 brochure, so the company documents actually are the
23 primary.
24         And the information that you should see
25 being given to the physician in some way should be

Page 77

1  coming from the information that the company has.
2  And that's why my report is broken down talking
3  about what the company knew internally, as opposed
4  to the labeling and the training materials.
5  BY MR. GAGE:
6      Q.   Did you look at any Ethicon-sponsored peer
7  reviewed published medical literature to see whether
8  that was a source of additional risk information for
9  TVT-Secur?
10     A.   I did see some TVT-Secur in it.  The problem
11 with it is that it didn't tend to have a fair
12 balance in terms of the risk.
13         I mean, the FDA, when they went and they did
14 a literature search, said that the information about
15 transvaginal mesh wasn't adequate, that there hadn't
16 been studies that had been done long enough with the
17 success value criteria.
18         Admittedly, those were for SUI and POP, not
19 single incision.  But the literature that I saw was
20 similar, in that the TVT-Secur didn't have long
21 enough follow-up, didn't have good valid end points.
22 So there are complications -- problems with the
23 literature that I did see.
24     Q.   Okay.  Did you attempt, for example -- well,
25 strike that.

Suzanne Parisian, M.D.

Page 78

1    Did you look at the TVT-Secur published
2  medical literature in order to do a comparison
3  between the risks that were disclosed in that
4  literature versus the risks disclosed in either the
5  IFU or the brochure?
6    A.  No.  Because I'm looking at the internal
7  documents, which actually had more information about
8  risks than I saw in the IFU or the patient brochure.
9    Patient brochure has almost no risk
10  information.  So, you know, you really need to look
11  at what the company is saying.  The known, knowable
12  information, as opposed to the information that's
13  being provided.
14    (Whereupon, Exhibit No. 16 was marked
15  for identification.)
16  BY MR. GAGE:
17    Q.  Doctor, I'm handing you a document marked
18  Parisian Exhibit No. 16.
19    Have you ever seen that document before?
20    A.  I don't know.  All these ladies start
21  looking alike in terms of these.  I think I may
22  have.
23    When was this one published?  2008.
24    Q.  Now, just to be clear, Dr. Parisian, did you
25  get that 2008 date from the -- kind of the trademark

Page 79

1  on the very last page of this document?
2    A.  Yes, sir.
3    Q.  Okay.
4    A.  Is that not correct?
5    Q.  I don't know.  I just wanted to know --
6    MR. AYLSTOCK:  Excellent question.
7  BY MR. GAGE:
8    Q.  You said -- you threw out the date 2008.  I
9  just didn't know where you got it from, and then I
10  just wanted to confirm, is that where you're getting
11  the date from?
12    A.  That's where I'm getting the date from.
13    Q.  Okay.
14    A.  Look, the same people are in this one.
15    Q.  Would it be -- would it be correct to say
16  that in order to answer the question whether you
17  have reviewed this specific document before you
18  wrote your TVT-Secur MDL report, I would need to
19  look at either the folder of documents we've marked
20  as an exhibit or your reliance list?
21    MR. JONES:  Or you can just look at her
22  report.  That discusses these items.
23    THE WITNESS:  Yeah, because I'm looking
24  to see, because it's on page 99.  What did I talk
25  about?

Page 80

1  BY MR. GAGE:
2    Q.  Well, let me ask a question.
3    A.  Patient brochures.
4    MR. GAGE:  Nate, this is probably a
5  good discussion for you and me to have.
6    Have -- has counsel for plaintiff done
7  a comparison between her TVT-Secur expert report and
8  her reliance list to make sure those two match up,
9  or should I treat them as to --
10    MR. JONES:  What do you mean "match
11  up"?
12    MR. GAGE:  That she may cite to
13  documents in her report that don't appear on the
14  reliance list?
15    MR. JONES:  Have I gone through that?
16    MR. GAGE:  Yes.
17    MR. JONES:  No.  That's your job.
18    THE WITNESS:  This -- this is --
19    MR. JONES:  Unless you want to do that
20  for us on --
21    THE WITNESS:  This is in my report,
22  this document.
23    MR. GAGE:  This exact document?
24    THE WITNESS:  Yeah.
25    MR. JONES:  So here's the deal.

Page 81

1  Earlier this morning when you were going back and
2  forth about the reliance list, things that you were
3  saying, hey -- and I objected, and I said, hey, I
4  don't think that's accurate.
5    They're listed in her report and so,
6  one, you know, she talks about them specifically in
7  her report, and then you're going to the reliance
8  list.  I'm sure you had someone look at, run it --
9  or on a computer look at, well, that ETH.MESH number
10  isn't on here.  Well, maybe that ETH.MESH number is
11  listed in her report.
12    That is the same brochure listed under
13  a ETH.MESH in the reliance list.  I don't know.  I
14  haven't gone through and done that.
15    But I know that the brochure and IFUs
16  are discussed in her report, and I think
17  specifically -- I actually don't think it's this
18  specific ETH.MESH number, but I know the specific
19  TVT brochure is discussed in her report.  But that's
20  the long way of saying no to your answer -- to the
21  question you asked earlier.
22    MR. GAGE:  I've been burned before at
23  trial many times with experts saying, "Oh, yeah.  I
24  reviewed and relied on this.  It's not on any
25  document or listing that I've given you, but you

Suzanne Parisian, M.D.

Page 82

1  should have asked the right question at the depo,"
2  which is why I'm just -- I go overboard on asking
3  those questions.
4           MR. JONES:  I get it.  I think this one
5  is talked about in her report.
6           THE WITNESS:  Yeah.
7  BY MR. GAGE:
8      Q.  And so, Dr. Parisian, do you -- do you
9  believe this is the document that you have
10  specifically reviewed and discussed in your report?
11     A.  Yes, sir.
12     Q.  Okay.
13     A.  Yes, sir.
14     Q.  And on page -- I'll call it page 13 of the
15  exhibit.
16     A.  Right.
17     Q.  And you'll see the page numbers there.  You
18  see what those page numbers are?
19     A.  Yeah.  In my report, I talk about page 11
20  and page 13 from this document.
21     Q.  All right.  And I may be misquoting you.  If
22  I am, then the record will correct me, and the
23  question will be stricken.
24          But I thought I heard you say the patient
25  brochure did not disclose any of the risks?

Page 83

1      A.  Yes.
2      Q.  Okay.  So we see on page 13 a paragraph that
3  says, "What are the risks?"  And it says, "All
4  surgical procedures present some risks."
5          Do you agree with that?
6      A.  Yes, but that's not telling them about this
7  procedure.
8      Q.  All right.  "Complications associated with
9  the procedure include injury to blood vessels of the
10  pelvis, difficulty urinating, pain, scarring, pain
11  with intercourse, bladder and bowel injury."
12          Do you see that?
13     A.  Yes, sir.
14     Q.  Now, is it your opinion that a patient
15  contemplating a TVT-Secur implant who reads this
16  patient brochure would not recognize those as risks
17  of the TVT-Secur?
18     A.  No.  They're thinking it's risks of the
19  surgery.  All surgical procedures present some
20  risks, so they're talking about the acute phase of
21  the surgery.  They're not talking about the device.
22  They're talking about the surgery.
23          So if a patient was reading that, that's
24  what they would take that home as, oh, okay.  If I
25  have my surgery, this is my potential risk.  But

Page 84

1  they're not saying, you have chronic risks, too,
2  that are going to occur.  It's not just something
3  immediately postop.
4      Q.  Have you discussed this brochure with any
5  TVT-Secur patient?
6      A.  No.
7      Q.  Have you conducted any surveys or studies of
8  TVT-Secur patients as to their understanding of the
9  reading of the TVT-Secur patient brochure?
10     A.  No.  But this is based on my training and
11  experience, looking at labeling as a physician and
12  an FDA person who's been trained to do that.
13     Q.  Have you conducted a -- or have you -- I
14  asked it -- I think I've already asked this, but I
15  can't remember.
16          Have you asked any pelvic floor surgeon
17  about the TVT-Secur patient brochure?
18     A.  No.
19     Q.  Have you conducted a survey or study of
20  pelvic floor surgeons about what they would
21  understand the risks to be of the TVT-Secur
22  procedure from reading the TVT-Secur patient
23  brochure?
24     A.  What a physician would get out of it or what
25  a patient?

Page 85

1      Q.  Physician.
2      A.  Physicians, no, I haven't, but this is not
3  made for a physician.  It's made for a patient.
4      Q.  If a physician read this?
5      A.  Right.  Does it say anything about the
6  chronic complications?  No.
7      Q.  Let me -- let me ask the question.  Okay,
8  Dr. Parisian?
9          If a physician read this patient brochure
10  and they read the sentence, "Complications
11  associated with the procedure include injury to
12  blood vessels of the pelvis," is it your testimony
13  that a physician could only interpret that to mean
14  that it is related to the procedure, not the mesh,
15  and that it only can be acute and not chronic?
16     A.  Yeah.
17     Q.  Okay.  Difficulty urinating?
18     A.  Right.  Postop, they have difficulty
19  urinating, so this is --
20     Q.  Let me pose the question.
21          So a physician reading the phrase
22  "difficulty urinating" could only interpret that to
23  mean it is a risk of the procedure, not mesh, and it
24  could only be acute and not chronic?
25          MR. AYLSTOCK:  Objection to form.

Page 86

1    MR. JONES:  Objection.
2        THE WITNESS:  That's the problem with
3    the way this is written.  It talks about, "All
4    surgical procedures present some risk," and so when
5    it's talking about complications associated with the
6    procedure, they're not saying with the device, with
7    the implant.  You're saying "with the procedure."
8        So a surgeon would be reading this --
9    and a patient which is more important because this
10   is for a patient -- is that these things would be
11   associated with the procedure; not the device.
12       And so these are things that occur from
13   that, not -- not the TVT-Secur.
14   BY MR. GAGE:
15   Q.  All right.  And as to the remainder of that
16   sentence that says "pain, scarring, pain with
17   intercourse, bladder and bowel injury," would the
18   same hold true in the sense that it is your opinion
19   that a surgeon reading those words would associate
20   those complications only with the procedure and not
21   with the mesh and would understand them to be only
22   acute and not chronic?
23       MR. AYLSTOCK:  Objection to the form.
24       MR. JONES:  Objection.
25       THE WITNESS:  Well, this is written for

Page 87

1    a woman.  It's not written for a surgeon.  But
2    there's nothing here that says these are chronic.
3    These conditions can occur postop, that they can
4    occur a long-term away.
5        So the way it's written is that these
6    complications would be something that a woman would
7    expect to see in the immediate postop period.
8    BY MR. GAGE:
9    Q.  But my question was about a doctor, so could
10   you --
11   A.  Well, he's the doctor.  Remember, doctors
12   oftentimes don't see patients after the postop
13   period.  They may see them maybe in a week or two
14   weeks and may never see them again.
15       See, this is saying that in your postop
16   course, you may see something like this, but it's
17   not saying that these women would have a chronic
18   problem.
19       MR. GAGE:  Could you read back the
20   original question?
21       MR. AYLSTOCK:  Before you do that, just
22   for the record, Dr. Parisian was questioned
23   extensively on the TVT-Secur patient brochure in her
24   prior deposition, so I just want to note that.
25       I'm not saying you can't ask another

Page 88

1    question about it, but we are getting into replowing
2    old ground at this time.
3        MR. GAGE:  I gotcha.  I understand your
4    position.  All right.
5        So could you re-ask the question?
6        (Requested portion was read by the
7    Court Reporter.)
8        MR. AYLSTOCK:  Objection to form.
9        THE WITNESS:  And the answer is yes --
10   BY MR. GAGE:
11   Q.  Okay.
12   A.  -- which is what I said.
13   Q.  So the next sentence says, "There's also a
14   risk of the mesh material becoming exposed."
15   A.  Um-hmm.
16   Q.  Do you see that?
17   A.  Um-hmm.
18   Q.  What does that communicate to a surgeon?
19   A.  Postoperatively you could have exposure of
20   the mesh.
21   Q.  What does it communicate to a patient?
22   A.  To a patient?  That you can have
23   complications right after your surgery.
24   Q.  Is it your opinion that that sentence about
25   the risk of the mesh material becoming exposed

Page 89

1    refers only to immediate postop and not in the
2    long-term?
3        MR. AYLSTOCK:  Objection to form.
4        THE WITNESS:  That's the way it's
5    written.  It's talking about that, and then exposure
6    may require treatment.  What does that mean to a
7    patient?  Well, it could mean -- it doesn't say, you
8    may need surgery to have the thing removed.  It just
9    says "treatment."
10       A physician -- if you go back to your
11   physician, it could mean something in the office, as
12   opposed to you might need to take this thing out
13   which -- and you might need revision surgery.
14   That's not being conveyed there.
15   BY MR. GAGE:
16   Q.  Did TVT-Secur -- or did surgeons who
17   implant -- strike that.
18       Did surgeons who implanted TVT-Secur know
19   that the mesh could erode before implanting?
20   A.  You know, every surgeon that's going to have
21   a case, we're going to have the surgeon saying what
22   he knew.  And the question is erode, whether they
23   needed to know that they're going to have surgery,
24   that they had to take it out, how frequently it was
25   eroding.  All those things they didn't know.

23 (Pages 86 to 89)

Suzanne Parisian, M.D.

Page 90

1       And most of them will testify that they
2   haven't known, or they didn't know that in terms of
3   the Garcia case that -- so each surgeon for every
4   case is going to talk about what they knew.
5       Q.   Did you conduct any survey or any study of
6   either surgeons or literature in order to ascertain
7   what risks of TVT-Secur surgeons were aware of
8   generally when the device first came on the market?
9       A.   No.  That would have been -- I looked at the
10  sales documents, and so we actually had the sales
11  documents.  What they're telling the doctor, that
12  this was going to be less invasive and that it was
13  going to be -- because you only had one -- one
14  incision, and that you could do either the egg
15  shaped or the U shaped.  And so they're telling the
16  doctor that it's very easy, one incision, and that
17  doesn't go along with the product.
18      So, no, I didn't.  But looking at this, what
19  are the risks, this is written for a patient, and
20  it's not talking about the long-term risks.  It's
21  only talking about the risks of the surgery.
22      MR. JONES:  I need to make a record
23  real quick on the brochure and the general agreement
24  that we hashed out prior to the depo and at the
25  beginning of the depo it was confirmed that you

Page 91

1   weren't going to cover the same ground as the Garcia
2   case and the Garcia deposition that was taken in
3   February 2015.
4       And you said we'd both do our best
5   jobs, so here's my best job of ensuring that doesn't
6   happen.
7       This brochure that you just marked as
8   an exhibit and asked her, you know, quite a few
9   questions on was actually -- she was actually
10  questioned about it in her prior deposition.
11      A TVT-Secur brochure was actually
12  introduced as an exhibit at that prior deposition.
13  In fact, it looks like it's the same brochure that
14  you just used at this deposition.
15      So if we can do our best to not do that
16  again --
17      MR. GAGE:  I will.
18      MR. JONES:  -- I would really
19  appreciate that.
20      MR. GAGE:  If you'll notice, what
21  provoked it was the witness said, "There is no risk
22  information in the patient brochure."
23      I immediately reached over and got the
24  brochure, which I wasn't intending to use with her.
25  I couldn't let that statement go completely.

Page 92

1       I mean, I know it was covered, but I
2   was surprised to hear her say that, and that's why I
3   did it.
4       MR. JONES:  Okay.  And my response is
5   that I think you could have used what was already
6   covered in the prior deposition, then.
7       THE WITNESS:  And I still hold that
8   opinion.  And the risk information is still
9   inadequate.  There's nothing here to tell the woman
10  about the chronic long-term risks that she's going
11  to have with this device.
12      MR. GAGE:  And we don't need to debate
13  it further.
14      MR. JONES:  It's the record.
15  BY MR. GAGE:
16      Q.   The reason, Dr. Parisian, that I posed all
17  these questions to you is I think your testimony
18  was, there is no, meaning zero, risk information in
19  the patient brochure, and that is what I could not
20  let go unaddressed, and that's why I felt it was
21  necessary.
22      I do understand, admit, and recognize that
23  you've always taken the position that the patient
24  brochure is inadequate, but that was the first time
25  I heard you take the position --

Page 93

1       MR. JONES:  And she talks about it in
2   her report, and it's addressed in her report under
3   risk, so if we can move on.  But that's just -- my
4   point is if we can try our best not to, at the very
5   least, cover the exact same exhibits that were used
6   at the prior deposition --
7       MR. GAGE:  I understand.
8       MR. JONES:  -- that would be great.
9   BY MR. GAGE:
10      Q.   So, Dr. Parisian, what's the risk of erosion
11  with TVT-Secur known to the medical community in
12  2006?
13      A.   2006?  Well, it wasn't known in terms of
14  2008 in terms of the risk of erosion.  FDA was
15  trying to call for the information, even for the
16  single incision sling, so I don't think it was
17  known.
18      That it could occur, yes, but the risk and
19  how frequently it was occurring, the severity of it,
20  no, that was not known.
21      And that was what the -- all the stuff
22  happened in 2008 for the FDA to try to get some
23  information about that for women.
24      Q.   Do you know what the earliest date in the
25  published medical literature is where the risk of

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 94

1   erosion was discussed or identified as a risk of
2   stress urinary incontinence mesh?
3       A.  Well, I know with ProtoGen it was discussed
4   back in '98.
5       Q.  What about the risk of chronic dyspareunia
6   with stress urinary incontinence mesh?  Do you know
7   when that risk was first discussed in the public
8   medical literature?
9       A.  Well, that also was associated with
10  ProtoGen.  The issue is that it was discussed in the
11  literature so, therefore, it was noticed for Ethicon
12  to know that this was a potential risk in anything
13  they designed.
14      Q.  Do you know when the risk of chronic pain as
15  a risk of stress urinary incontinence mesh was first
16  discussed in the public medical literature?
17      A.  I don't know when chronic pain was.
18      Q.  I'm sorry?
19      A.  I don't know the date for chronic pain.
20      Q.  Did you discuss any sort of survey or
21  analysis of the published medical literature to
22  determine what risks, if any, of stress urinary
23  incontinence mesh were known to the medical
24  community as of, say, 2005 or 2006?
25      A.  I've looked at various literature.  No, I

Page 95

1   did not do a search.  I mean, I've looked at
2   literature since the '90s, so, no, I did not do a
3   conducted search to look for when they knew certain
4   things.
5       I go back to the ProtoGen because I know
6   those were the risks that it was getting removed
7   from the market.  So, therefore, to me, that's
8   notice for the industry that there was an issue with
9   ProtoGen, and it was a potential unacceptable risk.
10      Q.  Dr. Parisian, is chronic pain with
11  intercourse a risk of non-mesh stress urinary
12  incontinence surgery?
13      A.  I think we talked about that earlier today.
14  It depends, I mean, because in women who have the
15  non-mesh surgery, you know, the traditional things,
16  they usually are chronic patients anyway.  They've
17  had problems.  They've had multiple surgeries, and
18  so who knows.  I don't know.
19      The question is, would chronic dyspareunia
20  have occurred to a woman who had minimal symptoms,
21  got an elective transvaginal mesh procedure, would
22  that be something you would expect in that patient?
23  No.
24      Q.  All right.  And just to be clear, the
25  questions we talked about this morning, I posed

Page 96

1   these questions in the context of pelvic organ
2   prolapse, and now I'm going to pose these questions
3   in the context of stress urinary incontinence.
4       So they may sound the same as this morning,
5   but they are -- they are different because I'm going
6   from pelvic organ prolapse to stress urinary
7   incontinence.
8       A.  Right.
9       And the answer basically is the same,
10  though, that a woman who would go in and get a
11  surgery from a urologist for stress urinary
12  incontinence before these transvaginal mesh usually
13  is a person that's had chronic problems and
14  symptoms, and so you didn't just lightly go in and
15  have these procedures done.
16      So when the transvaginal mesh came, the
17  issue was you had a brand new population, women that
18  stress urinary incontinence was all she had, and
19  that was just a symptom that may have been
20  uncomfortable when she was at a class in yoga.  And
21  so some of these women didn't have much.
22      So in terms of risk versus benefit, they
23  shouldn't have any kind of risk of chronic
24  dyspareunia when they really had very little benefit
25  that they were going to get from these transvaginal

Page 97

1   mesh.
2       Q.  All right.  So I think the answer to the
3   question -- the question as posed was, is chronic
4   pain during intercourse a potential risk of non-mesh
5   SUI surgery, and I think your answer was yes.  Is
6   that correct?
7       A.  In the caveat that you had two totally
8   different populations.  You had a population that
9   would have gone to surgery, traditional surgery,
10  versus a population with minimal symptoms as a rule
11  for SUI.  And so you're comparing apples and
12  oranges.
13      You have a specific group, yes, they could
14  have chronic dyspareunia, but they are a different
15  starting group than the group that got the
16  transvaginal mesh.
17      Q.  Well, I understand that, and I'm not asking
18  you to weigh the relative risks as between the mesh
19  group and the non-mesh group.
20      I'm just simply asking whether these could
21  be risks in the non-mesh group.
22      A.  Yeah, but with the caveat, you have a
23  totally different population.
24      Q.  Well, we'll -- I will stipulate for all of
25  these questions, they are two different populations.

Suzanne Parisian, M.D.

Page 98

1    I'm not asking you to compare the two populations.
2        A.   Right.
3            I will answer, yes, they will have that
4    risk, but with the caveat that we're talking totally
5    different, apples and oranges.
6        Q.   Understood.
7            And so you would agree that chronic pain is
8    a risk of non-mesh SUI surgery?
9        A.   It can be, yes, sir.
10       Q.   Vaginal scarring is a risk of non-mesh SUI
11   surgery?
12       A.   I don't know about vaginal scarring.  I'll
13   leave that one as I don't know.
14       Q.   Infection is a potential risk of a non-mesh
15   SUI surgery?
16       A.   Infection can be a risk of almost any
17   surgery.
18       Q.   And urinary problems, including urinary
19   frequency, retention, obstruction, urge
20   incontinence, and voiding dysfunction could be
21   potential risks of a non-mesh SUI surgery; correct?
22       A.   Yes.  And you're not talking in time frames
23   either, because you can have infection acute in
24   terms of postop, but would you see chronic infection
25   without a mesh?  Probably not.

Page 99

1            And so, you know, you're not qualifying who
2    the sick people are, and then we're also not putting
3    in the time frame, because infection is more postop
4    for a non-surgical mesh, whereas it's chronic in
5    women who have a surgical mesh, that their mesh gets
6    infected, so it's different.
7        Q.   Understand.
8            Is organ or nerve damage a risk of non-mesh
9    SUI surgery?
10           MR. JONES:  Objection.
11           THE WITNESS:  It can be the same
12   caveat.  And then you're talking about the
13   transobturator pap is usually the one who would see
14   the mesh with the nerve injury.
15   BY MR. GAGE:
16       Q.   Is bleeding a risk of non-mesh SUI surgery?
17       A.   Bleeding is a risk of any surgery acutely.
18       Q.   Are wound complications a risk of non-mesh
19   SUI surgery?
20       A.   Acutely, yes, sir.
21       Q.   Not chronically?
22       A.   Not typically chronically, no.  You tend to
23   be acute postop, period.
24       Q.   You used the word "typically."
25           Can wound complications -- can chronic wound

Page 100

1    complications ever occur with a non-mesh SUI
2    surgery?
3        A.   They can occur, yes.
4        Q.   Can inflammation occur with a non-mesh SUI
5    surgery?
6        A.   Inflammation?  What kind of -- I mean, are
7    you talking about inflammation in terms of infection
8    or red, or what are you talking about?
9        Q.   Inflammation of the human tissue.
10       A.   It's kind of a generic term.
11       Q.   If you can't answer the question, then you
12   can't answer it.
13       A.   Yeah, it can occur, but it's just too
14   nonspecific.
15       Q.   Can fistula formulation occur with a
16   non-mesh SUI surgery?
17       A.   It can occur.
18       Q.   Can neuromuscular problems in the groin,
19   thigh, leg, pelvis, or abdominal area occur in a
20   non-mesh SUI surgery?
21       A.   Yes.
22       Q.   And is it sometimes necessary for one or
23   more surgeries to be conducted in order to treat an
24   adverse event arising out of a non-mesh SUI surgery?
25       A.   It can be.

Page 101

1        Q.   Can a foreign body response be a risk of a
2    non-mesh SUI surgery if a foreign body is used?
3        A.   Well, did they -- did they use a foreign
4    body?  I mean, if they used a foreign body, yes.
5        Q.   And we talked about this in the Prolift+M
6    deposition.  I'm not sure it's absolutely necessary
7    that I re-ask it, but I don't want you to later say,
8    well, I was talking only about Prolift+M, so I'll
9    ask this question.
10           Well, no, I won't.  I'll strike that.
11           Doctor, are you aware that some doctors did
12   not read the TVT-Secur IFU before implanting the
13   device?
14       A.   You know, I think we talked about that
15   today.  Yeah, some doctors may not.  They may have
16   relied on the sales rep, the training, the course,
17   other things besides the IFU.
18       Q.   Is it acceptable medical practice for a
19   pelvic floor surgeon to implant a Secur device
20   without first reading the IFU?
21       A.   Well, they obviously have training in it,
22   and so where are they getting their training?  The
23   IFU oftentimes drops into the surgical field, and
24   you're not going to sit there in the OR reading it.
25   So it depends.  I mean, obviously they've had some

26 (Pages 98 to 101)

Suzanne Parisian, M.D.

Page 102

1    training.
2        Q.   When and how often should surgeons read the
3    IFU?
4        A.   Usually the sales reps are the ones who
5    bring it to them and say, "Here.  Read this," and
6    they go through the different features of the
7    product, and they go through telling them what they
8    need to know.  So an IFU is often interacted with
9    the sales force.
10       Q.   How often should they read it?  Should --
11   strike that.
12            How often should a surgeon read the
13   TVT-Secur IFU?
14            MR. AYLSTOCK: Objection.  Form.  Asked
15   and answered.
16            THE WITNESS:  Well, the sales rep
17   usually tells them if there's something new in it or
18   if -- so they're interactive with the sales reps at
19   the same time, so --
20   BY MR. GAGE:
21       Q.   Let me change the question.
22       A.   Yeah.
23       Q.   I may have confused you.
24            For purpose of this question, assume that
25   the IFU does not change, that it's the same IFU.

Page 103

1            Do you have an opinion as to how often a
2    surgeon should read that IFU?
3        A.   No.
4        Q.   Is there any regulatory standard that
5    requires them to read the IFU?
6        A.   No.  That's -- that's medical practice.
7    That's not FDA.
8        Q.   Have you conducted any study or survey of
9    pelvic floor surgeons to determine whether they read
10   the Secur IFU?
11       A.   No.
12       Q.   Have you conducted any study or survey of
13   pelvic floor surgeons to determine what risks they
14   understood as a result of --
15            MR. AYLSTOCK:  You're now asking the
16   exact question precisely that was asked in the prior
17   deposition.
18            MR. GAGE:  Oh, wow.
19            MR. AYLSTOCK:  You're almost going off
20   the same --
21            MR. GAGE:  What page are you on?
22            MR. JONES:  I mean, it's fair to say
23   that the IFU brochure was covered at length in --
24            MR. AYLSTOCK:  Page 121, line 12, "Do
25   you have any study or survey of doctors in what

Page 104

1    risks from the TVT-Secur device they appreciate from
2    the IFU?"
3    BY MR. GAGE:
4        Q.   All right.  Then I'll ask it like this:
5    Doctor, since February of 2015, have you conducted
6    any study or survey of pelvic floor surgeons to
7    determine whether they ever read the Secur IFU?
8        A.   No.
9        Q.   Since February of 2015, have you conducted
10   any study or survey of pelvic floor surgeons to
11   determine what risks they understood as a result of
12   reading the Secur IFU?
13       A.   No.
14       Q.   Have you conducted -- since -- I'm sorry.
15   Strike that.
16            Since February 2015, have you conducted any
17   study or survey of pelvic floor surgeons who
18   implanted Secur to determine what risks of the
19   device they understood as a result of their medical
20   school education?
21       A.   No.
22       Q.   Since February 2015, have you conducted any
23   study or survey of pelvic floor surgeons who
24   implanted Secur to determine what risks the device
25   they understood as a result of their surgical

Page 105

1    training?
2        A.   No.
3        Q.   Since February 2015, have you conducted any
4    study or survey of pelvic floor surgeons who
5    implanted Secur to determine what risks of the
6    device they understood as a result of reading
7    relevant medical literature?
8        A.   No.
9        Q.   Should pelvic floor surgeons implanting
10   Secur read the medical literature about the device?
11       A.   Yeah, I don't have an opinion about that.  I
12   mean, they're responsible for their practice.
13       Q.   Could doctors have learned of the risks of
14   TVT-Secur from reading medical literature?
15            MR. JONES:  Objection.
16            THE WITNESS:  More likely they would
17   have been able to learn it from Ethicon than in the
18   literature.
19   BY MR. GAGE:
20       Q.   But could they learn of risks from reading
21   the TVT-Secur literature?
22            MR. JONES:  Objection.
23            THE WITNESS:  They could if there was
24   such literature out there.
25   ///

27 (Pages 102 to 105)

Suzanne Parisian, M.D.

Page 106

BY MR. GAGE:
1
2    Q.   With regard to the literature that you
3  reviewed in connection with your TVT-Secur report in
4  the MDL, is it fair to say that the literature you
5  reviewed would be included either as a citation in
6  your report itself or in your reliance list or in
7  this document marked as Exhibit 6 or otherwise
8  marked as one of the exhibits at this deposition?
9    A.   I believe so.
10        MR. JONES:  Objection.
11        If you want me to explain, I will.
12        MR. GAGE:  Yes.  Give me -- explain
13  your objection.
14        MR. JONES:  And this goes back to
15  earlier today.
16        You're going to be asking about
17  literature, and that was why I got hung up.  You
18  kept using the word "documents," and I kept bugging
19  you and being annoying about internal documents.
20  I'm sure that was very annoying.
21        MR. GAGE:  Actually, it wasn't.  You've
22  been -- you're not bothering me.
23        MR. JONES:  The literature -- you know,
24  lots of times Ethicon -- you know, this literature
25  will be listed under ETH.MESH number, you know, and

Page 107

1  there's clinical export reports.  There's FDA
2  literature.  There's Cochrane.
3        And so what I don't want to get in a
4  situation of is someone just going through the
5  reliance list and saying, gotcha.  This one isn't on
6  there.  And then, well, it's in the clinical expert
7  report that is in the box that you had for, you
8  know, a year.
9        Or, gotcha.  It's not on your reliance
10  list.  I got -- I handed you in the depo.  You made
11  a reliance list under literatures, all the
12  literature reviewed.  But, oh, wait.  It's listed in
13  the -- you know, as an ETH.MESH Bates number because
14  there was an e-mail sent with three articles
15  attached.
16        That's what -- to me, the objection is
17  so I have an opportunity to explain it at a later
18  point if this becomes an issue that, oh, here's the
19  same article.  Why isn't it in the literature tab on
20  the reliance list, but it was in the box, or it was
21  in the report or it was part of the Cochrane or it's part
22  report or it was part of the Cochrane or it's part
23  of the literature review that she talked about.
24        So that's my objection.
25        MR. GAGE:  Got it.

Page 108

1        MR. AYLSTOCK:  And just to be clear,
2  again, there's extensive questioning on her reliance
3  list and the scientific literature in the prior
4  deposition.  And in particular, the Cochrane report
5  and others, so I think we're really --
6        MR. GAGE:  I'm limiting my question to
7  the literature she's reviewed for her TVT-Secur MDL
8  report.
9        MR. JONES:  I think she's already said
10  it's essentially the same.
11        MR. GAGE:  All right.  So let me ask
12  that question.  I don't think I've asked that
13  question.
14  BY MR. GAGE:
15    Q.   Since your disclosure and deposition in the
16  TVT-Secur case in the Garcia matter, have you
17  reviewed any additional or new medical literature
18  pertinent to TVT-Secur?
19    A.   No.
20    Q.   So whatever TVT-Secur literature may have
21  come out since February of 2015, you would not have
22  reviewed it.  Is that correct?
23    A.   Yes.
24    Q.   Okay.  Since February 2015, have you
25  conducted any study or survey of pelvic floor

Page 109

1  surgeons who implanted Secur to determine what risks
2  of the device they understood as a result of their
3  experience implanting other mesh devices?
4    A.   No.
5    Q.   Since February 2015, have you conducted any
6  study or survey of pelvic floor surgeons who
7  implanted Secur to determine what risks they
8  understood as a result of participating in any
9  training on Secur?
10    A.   No.
11    Q.   Since February 2015, have you conducted any
12  study or survey of pelvic floor surgeons who
13  implanted Secur to determine what risks they
14  understood as a result of participating in
15  Ethicon-sponsored training on Secur?
16    A.   No.
17        MR. JONES:  Form.
18        MR. AYLSTOCK:  Let me just say,
19  William, if we're going to preface every question
20  that was already asked in the prior deposition with,
21  "Since the prior deposition," then I'm going to
22  insist on taking every one of your experts again
23  because their depositions were done months or years
24  ago.  And I'll ask every question starting with,
25  "Since," and that will cure the problem.

Suzanne Parisian, M.D.

Page 110

1    So, I mean, really none of the
2 questions you're asking are on the e-mail where you
3 specifically said, "Here's some new things I would
4 like to ask about." They're just fishing, so it's
5 really getting far afield.
6         MR. GAGE: I understand your objection.
7         And my concern is that I got a 115-page
8 report, I had a five-page disclosure, and then
9 there's been a year -- there's been a year
10 in-between. And I don't know what you guys have
11 asked her to do or examine or look at or what she's
12 done in that intervening year.
13         MR. AYLSTOCK: But all of her opinions
14 are in her report. You know, Judge Goodwin is going
15 to insist that her report is the end all, be all of
16 what her testimony is going to be.
17         So, again, it's not in her report that
18 she did any sort of survey. We're just in my view
19 replowing old ground, and that's not what I thought
20 we were going to be doing.
21         But go ahead. I'm not telling her not
22 to answer or anything. I'm just making my record.
23         MR. GAGE: I'm actually finished with
24 that line of questioning.
25         MR. AYLSTOCK: I'm glad I made the

Page 111

1 record when I did.
2         MR. JONES: Yeah. It worked.
3         MR. AYLSTOCK: Either it worked or I
4 was one question too late.
5         MR. GAGE: All right. Now, these are
6 questions that I have to ask the witness about since
7 February of 2015 because new things have occurred,
8 including things that have occurred after her report
9 was written.
10         MR. AYLSTOCK: Okay.
11         MR. GAGE: And I have to ask -- I'm not
12 trying to be duplicative.
13         MR. AYLSTOCK: I'm not trying to be
14 obstructive.
15         MR. GAGE: Truly, I just -- I have to
16 make sure that I don't get blindsided with this.
17 BY MR. GAGE:
18    Q. And so here's the question, for example. I
19 know that there have been -- since the time of your
20 MDL expert report was written, you've looked at new
21 documents from FDA that were obtained by -- through
22 some Freedom of Information request; correct?
23    A. Um-hmm, yes.
24    Q. Had you looked at those at the time of the
25 Garcia deposition?

Page 112

1    A. The ones that I gave you today?
2    Q. Yes.
3    A. No.
4    Q. Okay. There have also been some additional
5 public pronouncements by FDA with regard to surgical
6 mesh; correct?
7    A. Yes.
8    Q. Okay. So I'm not trying to be duplicative
9 of prior questions, but new materials have come to
10 light --
11    A. Right.
12    Q. -- and I feel compelled to ask you these
13 questions.
14         Has anything in these new materials that
15 you've examined led you to believe that FDA ever
16 recommended any labeling changes for Secur after it
17 was cleared?
18    A. No.
19    Q. Has FDA ever determined that the Secur
20 labeling was false or misleading?
21         MR. JONES: Objection.
22         You're tying this to specifically those
23 new documents, or are you asking generally?
24         MR. GAGE: Yeah, to the new documents.
25 I mean, I haven't looked at --

Page 113

1         MR. JONES: That's not how your
2 question was phrased. That's my objection.
3         MR. GAGE: Well, I prefaced the --
4         MR. JONES: So every question from
5 hereon after is limited to those two new documents?
6         MR. GAGE: I'll tell you what. Why
7 don't we do this. With regard to the -- I'm going
8 to ask you a series of questions with regard to the
9 new information that you have been provided since
10 the time of your Garcia deposition, and then when I
11 finish that sequence of questions, I'll announce it
12 so that that condition no longer applies to that
13 question, or do you want me to just put it in the
14 question?
15         MR. JONES: Yeah, I want it in the
16 question.
17         MR. GAGE: Okay.
18 BY MR. GAGE:
19    Q. Have you seen anything since your deposition
20 in the Garcia case in February 2015 that would lead
21 you to believe that the FDA determined that the
22 Secur labeling was false or misleading?
23    A. Well, in terms of those are regulatory
24 terms, and so are you saying that I've seen a
25 document where the FDA came out and said that?

29 (Pages 110 to 113)

Suzanne Parisian, M.D.

Page 114

1  Cause then there's internally discussions, but
2  there's not a document where they said that the
3  label is false and misleading, other than, how did
4  this product get on the market, and some of the
5  issues with it and so -- but there's no specific
6  pronouncement that they said that.
7       Q.   All right.  Let me follow up.
8            You just said, other than how did
9  this document -- how did this device get on the
10 market?
11      A.   Well, yes.  When you look at the document
12 that I gave you in terms of the FDA's discussion
13 internally about mesh in general, there's --
14 there's --
15      Q.   Do you have that document?
16           MR. JONES:  It's in the box.  Right
17 corner, I think.
18 BY MR. GAGE:
19      Q.   Oh, this one?
20      A.   Yeah.
21      Q.   Let's make sure we're talking about the
22 right document.
23           Are we talking about the collection of
24 documents received --
25      A.   Right.

Page 115

1       Q.   -- from the public records request?
2       A.   Right.
3       Q.   All right.  So that's Parisian TVT-Secur
4  Deposition Exhibit No. 7?
5       A.   Right.
6            So there's discussion in there how the
7  FDA -- how did something get approved for
8  transvaginal insertion.  And so FDA's going back and
9  forth trying to figure out, how did that happen.
10           And then they talk about, they're looking
11 for unsubstantiated claims.  We don't know what
12 happened with that.  So, I mean, they're actually
13 looking at stuff like that, and I don't know what
14 the conclusions were.
15           But in terms of the advisory group here,
16 that they were looking at the labeling.  They were
17 looking at how products got on the market, like the
18 Prolift.  They knew that the Prolift had been on
19 without any clearance, so there's actually internal
20 discussion by the FDA as to what they knew.  But
21 they didn't say false and misleading.
22      Q.   Is there anything in the -- in Exhibit 7
23 that pertains specifically to TVT-Secur?
24      A.   I believe they talk about TVT-Secur in
25 there.  They talk about Prolift.  They talk about

Page 116

1  TVT-Secur.  And then the other guidance document or
2  the other reclassification, they talk about
3  TVT-Secur.  So there are places where they mention
4  it and Prolift.
5            I mean, that focus of that package is on
6  Ethicon.  They weren't looking at any other
7  manufacturer.  They were looking at Prolift and
8  TVT-Secur.
9       Q.   Do you know why that was the case?
10      A.   No.  FDA chose to go -- they apparently had
11 gotten some reports to Office of Compliance, and
12 they were looking at -- I believe they were looking
13 originally at hernia and got -- Ethicon's a big
14 group in terms of hernia repair, and then they
15 segued into transvaginal mesh.
16      Q.   Did -- if having now reviewed the documents
17 in Exhibit 7 now that your MDL report is -- well,
18 you reviewed the documents in Exhibit 7 after your
19 MDL report came out; correct?
20      A.   Yes, sir.
21      Q.   Do you intend to write a supplement to
22 address these documents?
23      A.   No, sir.
24      Q.   Can you tell me how these documents support
25 or refute your opinions?

Page 117

1       A.   They complete the picture of what I thought
2  was going on, that there actually had been
3  decisions -- I've been on committees like this where
4  you have a problem, and then you're trying to figure
5  out how to deal with it from the FDA's point of
6  view.
7            And so it just kind of tops off what I
8  thought was occurring.  I think I had seen in other
9  documents that the FDA had created a group to look
10 at some of these things.
11           So it just -- it's just -- it makes it much
12 more complete.  Why did the FDA come out with a
13 public health notification?  That really discusses
14 why.
15      Q.   What is the date?
16      A.   2007, 2008, so it's before the public health
17 notification in October 2008.
18      Q.   Is it before the -- when was the TVT-Secur
19 510(k) cleared?
20      A.   Oh, gosh.  2000- -- wasn't that around 2007?
21 So we're talking about the same time frame.
22      Q.   Do you know any of the individuals on the
23 surgical mesh action team?
24      A.   Some of them I do.
25      Q.   All right.  So you're not intending on

30 (Pages 114 to 117)

Suzanne Parisian, M.D.

Page 118

1 writing a supplement based on these documents?
2    A.   I haven't been asked to do that.  So let's
3 see.  I think it was around -- TVT-Secur --
4    Q.   So --
5    A.   It was November 30, 2005, so this actually
6 was occurring after TVT-Secur had been on the
7 market.
8    Q.   All right.  So is there anything in that
9 Exhibit No. --
10         MR. JONES:  Seven -- six -- seven.
11 BY MR. GAGE:
12    Q.   -- where FDA makes any conclusion as to
13 whether the TVT-Secur labeling was false or
14 misleading?
15    A.   Well, basically, when they're talking about
16 the MDRs and the reports they're receiving, they
17 know that the labels don't have that.  And so that
18 technically would be, you know, false -- false and
19 misleading in terms of the FDA to try to get the
20 information out to the public.
21         And that's one of the reasons they're trying
22 to do a Section 522 postmarketing study, so they
23 could update the information for the user.
24         So basically you would pursue something like
25 this or you think that the literature for this --

Page 119

1 they look at GYNEMESH, TVT, that the labeling is not
2 reflecting the information that they're seeing in
3 their medical device reports.
4    Q.   Let me change the question.  Does that
5 document you're holding in your hand hold a
6 determination or final conclusion by FDA that the
7 TVT-Secur labeling was false or misleading or
8 inadequate?
9    A.   They're looking at all the transvaginal
10 mesh, not specifically for the TVT-Secur, because
11 you're asking me specifically about that?
12    Q.   That's correct.
13    A.   No.  They were looking at the entire group
14 of products as not having adequate information for
15 the -- for the physician and the patient.
16    Q.   Is there anything in that document that
17 constitutes a final determination by FDA that the
18 TVT-Secur device was misbranded or adulterated?
19    A.   No.  You won't see that in here.
20    Q.   Is there any conclusion or determination by
21 the FDA that Ethicon failed to provide FDA with
22 relevant safety information about TVT-Secur?
23    A.   No.
24    Q.   Is there anything in that document that is a
25 conclusion or finding by FDA that the TVT-Secur was

Page 120

1 illegally marketed?
2    A.   Illegally marketed, no, but there is a
3 conclusion that the FDA is going to call for 522
4 studies.  522 studies by definition would be that
5 there's not enough postmarketing information, and
6 that would include TVT-S, and that would include all
7 the other TVT products.
8         So does that answer your question?
9    Q.   Is that tantamount to a declaration that
10 TVT-Secur was illegally marketed?
11    A.   I didn't say it was illegally marketed.  It
12 was marketed under a 510(k).  What was illegal about
13 it is it wasn't performing the way it was cleared,
14 so it was a prohibited act because it wasn't
15 fulfilling what was said in the 510(k).
16    Q.   And I'm just -- my opinions are limited to
17 just that particular exhibit --
18    A.   Right.
19    Q.   -- because that's something that you got
20 after you wrote your FDA -- I'm sorry -- after you
21 wrote your TVT-Secur opinion.
22    A.   Yes.
23    Q.   And I just want to make sure that nothing in
24 that document in your opinion constitutes a finding
25 or declaration by FDA that TVT-Secur was illegally

Page 121

1 marketed.
2    A.   No.  I wouldn't expect -- I mean, it's not
3 the FDA's job under 510(k).  It would be the
4 company's to say that the product is not marketed
5 because it's not performing the way it's supposed
6 to.
7         I mean, the FDA's big thing is something
8 needs to be done.  They need post-market
9 surveillance.  They need some information out there.
10 They need post-market studies.
11         So the FDA is trying to correct the issue
12 for the public.  Not necessarily to -- they're not
13 focusing on just TVT-S.
14    Q.   Dr. Parisian, several times -- well, a
15 number of times in your TVT-Secur MDL report, you
16 indicate that Ethicon withheld certain information
17 from FDA.
18    A.   I think what I said was they didn't
19 completely disclose the issues that were occurring
20 so that FDA could consider what was going on and ask
21 for new additional information.
22    Q.   All right.  So I've got phrases throughout
23 your report, and I'm just quoting one.  I think it's
24 Paragraph 228, where you say, "Ethicon did not fully
25 and accurately disclose certain information."

Suzanne Parisian, M.D.

1    A.   Yeah.  That's like what I just said.
2    Q.   And then in another place in your MDL
3  report, you opine that, quote, Ethicon withheld key
4  information that was necessary for FDA to determine
5  whether clearance of the 510(k) should occur?
6    A.   Yes.  That means it was not in the
7  application, and it was something they would have
8  had.
9    Q.   Now, Dr. Parisian, it would -- it would be
10  extraordinarily time-consuming for us to go through
11  the report and identify each and every place where
12  you have a phrase that is either identical or
13  similar, i.e., Ethicon did not fully and accurately
14  disclose, Ethicon withheld, et cetera.
15       I think it's fair to say -- and I think you
16  agree with me -- that phrases -- those words or
17  phrases similar to those words appear frequently in
18  your report.  Is that fair?
19    A.   Well, if you go to the Paragraph 228, I
20  specifically say what I'm talking about in terms --
21  I mean, I don't just say that lightly.  I go on and
22  I talk about that the 510(k) didn't really tell the
23  difference between a TVT and a TVT-O, and there was
24  no way somebody could under- -- you know, determine
25  that the TVT-S was totally different.

1       So, I mean, I go on, and then I talk about
2  the French data, and so I'm usually giving specific
3  examples.  I don't just say -- I'm telling you what
4  I think they withheld.
5    Q.   Right.  And I wasn't suggesting that you
6  didn't do that.
7       I'm just asking you that -- to agree, if you
8  want to, that there are a number of places in your
9  MDL report where the sentence contains phrases like
10  "Ethicon did not fully and accurately disclose
11  certain pieces of information" --
12    A.   Right.
13    Q.   -- or "Ethicon withheld certain pieces of
14  information."
15       Would you agree with that?
16    A.   Yes, and then I give the information, why is
17  it important in terms of the reviewer, because the
18  whole thing is to trigger if there's new issues of
19  safety and effectiveness.
20    Q.   Right.
21    A.   And so if they don't have that information,
22  then they can't ask for additional testing.
23    Q.   All right.  My question to you is, with
24  regard to anything in your MDL report, is it your
25  opinion that Ethicon at any place intentionally

1  withheld information from the FDA?
2    A.   I don't know why they did it.  I mean, it's
3  just a fact that certain information wasn't put in
4  there that I think should be important information.
5  They could be the stupidest people in the world.
6  That might have been it.  They could -- so who knows
7  why they did it.  It's just a fact that that
8  information wasn't there, and if I was writing a
9  510(k), I would have included it.
10    Q.   Could it have been a difference of -- a good
11  faith difference of opinion between you and the
12  Ethicon employees?
13    A.   I don't know.  I mean, let the courts
14  decide.
15       It's like that one truthful and accurate
16  statement, I don't know why they always wrote it a
17  different way.  Somebody made them write it a
18  different way.  Someone told them to do it.  Who
19  knows?  I don't know why they did it.
20       But when you go through the 510(k), those
21  are the things that you see that you think somebody
22  should have told the FDA about.  If I was a
23  reviewer, I would have wanted to know.
24    Q.   So I'm trying to understand -- like when you
25  use phrases like "Ethicon withheld key information,"

1  I'm trying to understand, do you have evidence of
2  intent to withhold?
3    A.   No.  It's just not in the 510(k).
4    Q.   Okay.  And that would hold true for not just
5  Paragraph 228 but for the entirety of your report
6  where you have an opinion that Ethicon did not fully
7  and accurately disclose certain information or that
8  Ethicon withheld information, in all of those
9  instances or in none of those instances, is it
10  correct to say that you have evidence of actual
11  intent?
12       MR. AYLSTOCK:  Object to the form of
13  the question.
14       THE WITNESS:  If indeed the company has
15  a statement or e-mail or something that says why
16  they did something, then I would give that.
17       But if I don't have something to tell
18  me what their intent was, then I'm just going to
19  leave it general.  Let the court decide.
20       But if I -- there are times when the
21  company -- company says, we're doing this.  This is
22  what our strategy is going to be.  Well, that would
23  be intent, that I can say, but if I don't have
24  information to support it, I usually just leave it,
25  it's not there.

Suzanne Parisian, M.D.

Page 126

BY MR. GAGE:
2    Q.   Okay.  And I think with regard to the
3 internal e-mails where they may have declared their
4 intent, did you find any internal e-mails or other
5 company documents where, in your opinion, Ethicon
6 consciously attempted to defraud the FDA?
7         MR. JONES:  Objection.
8         THE WITNESS:  That's not something I
9 would talk about.  I mean, because, I mean, there
10 are things where the company has made a decision
11 what they're going to do in terms of marketing, what
12 they want in terms of marketing share.
13        That would be -- you know, their intent
14 so to sell products, but defraud the FDA, that
15 sounds like a legal conclusion, and I don't make
16 legal conclusions.
17 BY MR. GAGE:
18    Q.   Well, let me ask you this:  Did you find any
19 e-mails that, in your opinion, state, "We, Ethicon,
20 are going to not share this with the FDA so that
21 they will not know what we know"?
22        MR. JONES:  Objection.
23        THE WITNESS:  I don't recall.  I'm not
24 going to say no.  I'm not -- I just -- I don't
25 recall at this moment in time because there are

Page 127

1 things where they talk about the FDA and their
2 strategy with the FDA.  If I saw such a document, it
3 would be in my report.
4         MR. AYLSTOCK:  Can we take a quick
5 break whenever you get a chance?
6         (Recess taken.)
7 BY MR. GAGE:
8    Q.   All right.  Dr. Parisian, we're back on the
9 record.
10        Have you endeavored to undertake an analysis
11 of any of the TVT-Secur MAUDE reports?
12    A.   No.
13    Q.   Have you undertaken any analysis of the
14 TVT-Secur issue reports at Ethicon?
15    A.   The issue reports in terms of the
16 manufacturing.
17    Q.   Let me withdraw that question --
18    A.   Okay.
19    Q.   -- and let me get straight to it.
20        I didn't see the report -- I didn't see this
21 opinion in your MDL report, but I just want to make
22 sure, as with Dr. Pence, it's not somewhere lurking
23 out there for me.
24        Do you intend for TVT-Secur to offer any
25 opinion that Ethicon was in possession of certain

Page 128

1 issue reports or product complaint reports that it
2 should have reported to FDA but didn't?
3    A.   I haven't done that review, so I don't
4 intend to do it.  Someone may ask me to do it, but I
5 haven't done it.
6    Q.   Okay.  So you don't have, for example, a
7 list of either specific complaints or specific
8 instances that you saw in the Ethicon documents and
9 then you went to the MAUDE database, and you didn't
10 find an instance that you felt should have been
11 reported, and you would come to a jury and say,
12 "Ladies and gentlemen of the jury, here are whatever
13 the number of internal complaints or issue reports
14 that they should have reported to the FDA, and I went
15 to the MAUDE database, I checked it, and they didn't
16 do that"?
17    A.   No.  I would look at the company documents
18 looking for what they're receiving as reports, but I
19 haven't done that in terms of the MDRs.
20    Q.   Okay.  In your report, you indicate that --
21 and I'm talking about your MDL report -- that the
22 FDA's 510(k) process -- and I'm using your words --
23 the FDA's 510(k) process admittedly has weaknesses,
24 including FDA's required reliance of the
25 truthfulness and accuracy of the information in the

Page 129

1 sponsor's premarketing application.
2    A.   Yes.
3    Q.   Do you remember that?
4    A.   Yes.
5    Q.   Because of the way it's worded, i.e., the
6 process admittedly has weaknesses including --
7    A.   Um-hmm.
8    Q.   -- and you point out the FDA's required
9 reliance of the truthfulness and accuracy portion,
10 are there other weaknesses, in your opinion, of the
11 510(k) process?
12    A.   One is you have a reliance on pre-amendment
13 biomaterials.  Our country tends to only get things
14 approved or cleared that have been on the market
15 since pre-'76.  So inadvertently the 510(k) is
16 locked.  This is the pre-1976 mentality for
17 materials where the rest of the world may use other
18 materials, and so I think that's one of the
19 weaknesses of the 510(k) process.
20        Also, the idea that everything is
21 grandfathered from the pre-amendment devices in the
22 '90s, that -- that's got some flaws in it.
23    Q.   Let me interrupt you and be more precise
24 with my question.
25        In your opinion, does the FDA 510(k) process

33 (Pages 126 to 129)

Suzanne Parisian, M.D.

Page 130

1  have any weaknesses that would be pertinent to
2  TVT-Secur?
3      A.   Yeah.  Because in one of the things, the FDA
4  510(k) process is required to use the least
5  burdensome methods, and so manufacturers can cite
6  something else being cleared, like the Dura Patch,
7  and that is a cleared device in a neurological
8  indication.
9          And so because it is cleared, Johnson &
10 Johnson can then use it in a new intended use, and
11 they can -- they can just cite the 510(k).  They
12 don't necessarily need to go out and provide the FDA
13 with data.
14         FDA is bound to just the least burdensome,
15 so the FDA can't really ask for more testing.
16         Even when -- what is it? -- TVT-Secur, when
17 Dr. Herrera asked for a clinical study for a
18 12-months data, they came in with a 510(k) for the
19 Gynecare Tape, and FDA then can't ask because they
20 had already cleared a device that was a mini tape
21 type thing.  So there's limitation to what the FDA
22 can do based on the 510(k) process.
23         And then also now we have the MDUFA user
24 fees, which they have only 90 days to get a 510(k)
25 done, which is actually a fairly quick turnaround

Page 131

1  time.
2          And so there's -- there's things about the
3  FDA process to try to get new products in the market
4  for the public that make it difficult for the FDA
5  reviewer to get more data.
6          They have -- it's easier to clear stuff than
7  to not clear it.
8      Q.   Are there any -- are there any additional
9  weaknesses of the 510(k) process that you perceive
10 that are pertinent to TVT-Secur?
11     A.   Well, in this particular case, the issue is
12 that the FDA was clearing transvaginal mesh as
13 basically surgical mesh, and they weren't asking for
14 any clinical data.  They were just basically using a
15 checklist.  You know, what is the porosity?  What
16 is --
17         And that was basically what the clearance
18 was, and so that was based on the 510(k) process for
19 general surgical mesh based on mechanics, mechanical
20 properties of mesh.
21         So in some way that -- that actually hurt
22 the TVT products, TVT-S, because the FDA was using
23 basically a checklist.  Oh, here's what the
24 mechanical properties are.
25         And in this particular case with the TVT-S,

Page 132

1  the FDA was told it's less invasive because there's
2  only one incision, but that doesn't mean it's less
3  invasive.  That means it can be even more difficult
4  to put in, but the FDA accepted that Ethicon said it
5  was less invasive, and there really wasn't any data
6  to support that.
7      Q.   All right.  So I want to stay focused on the
8  process, not so much --
9      A.   TVT-S?
10     Q.   Your statement in the report was the 510(k)
11 process has weaknesses --
12     A.   Right.
13     Q.   -- and you moved on to a discussion of --
14     A.   TVT-S?
15     Q.   Well, let me finish.
16         I want -- I would like for you to identify,
17 and maybe you've already done it fully, but I would
18 like for you to identify any weaknesses in the
19 510(k) process that are pertinent to the TVT-Secur.
20     A.   I was trying to do that.
21     Q.   Well, let me make a distinction.
22         When you said that FDA accepted Ethicon's
23 statement that TVT-Secur was less invasive, I don't
24 view that as part of the -- I'm talking about the
25 organizational structure of the 510(k) process --

Page 133

1      A.   The biomaterial is a big one.
2      Q.   -- that would have applied to TVT-Secur.
3  I'm not so much asking about what could FDA have
4  done differently within the existing structure.
5      A.   Okay.  If we just talk about the process,
6  the biomaterials, in that you have polypropylene
7  implanted in women back before 1976, so it's a
8  pre-amendment product that nobody has really looked
9  at, has a long history of use in surgical mesh, but
10 because it was a pre-amendment product, nobody's
11 really looked at it, so that's part of the process.
12         So we basically tied our biomaterials in the
13 United States to pre-1976 because it's much easier
14 for a manufacturer to use a pre-1976 material than
15 to go and develop a new material.
16         And so inadvertently the 510(k) process has
17 held us to older technology or biomaterials, so
18 that's one of the big things.
19         The other one is the process, the least
20 burdensome.  Since 1997 -- yeah, 1997, they had --
21 the FDA reviewers were required to use the least
22 burdensome method for industry to get clearance.
23         And so, therefore, it limits what the FDA
24 can request in terms of, they can't request just --
25 you know, if you have not requested it from somebody

Suzanne Parisian, M.D.

Page 134

1    else, clinical data, you can't request it all of a
2    sudden from somebody else without support, so the at
3    least burdensome is another one in there.
4         The truthful and accuracy statement we have
5    there because the FDA is to assume that there's no
6    material fact not being provided because they sign a
7    certificate.
8         Well, you know, that isn't always the case.
9    The manufacturers haven't been providing the
10   information to the FDA. So those are three big
11   ones, the least burdensome, biomaterials, and what's
12   the third one?
13   Q.   The truthful and accurate.
14   A.   The truthful and accurate. And then MDUFA,
15   people have also looked at MDUFA in terms of having
16   to have something get done within 90 days.
17   Otherwise, the reviewers are held responsible if
18   they take longer. You could only ask for two
19   additional information rounds.
20        So those are things that put a lot of
21   pressure on the reviewer to get something done very
22   quickly.
23   Q.   Are you critical of congress for those
24   features of the process, or are you critical of the
25   FDA for those features of the process?

Page 135

1         MR. JONES: Objection.
2         THE WITNESS: Well, it would be both,
3    because some of those features were developed by the
4    FDA. The FDA developed the 510(k) process.
5    Congress actually thought the PMA would be used more
6    frequently. FDA really got into the 510(k) process,
7    so the 510(k) process has been developed internally
8    more or less.
9         The least burdensome actually came from
10   congress in terms of FDAMA in 1997, so that was
11   congress. The Medical Device User Fee Act was also
12   congress. So it's both of them.
13   BY MR. GAGE:
14   Q.   All right. And would it -- is it fair to
15   say that you disagree with either congress or the
16   FDA on those issues that you have identified?
17   A.   I don't disagree.
18        I mean, I just know from, having worked
19   there, that these are constraints. And when you
20   worked there, these are constraints that you had.
21   You just weren't allowed to ask for anything.
22        So am I complaining about them or what? I'm
23   just saying, these are the constraints that a
24   reviewer has to work with.
25   Q.   All right. And with regard to TVT-Secur, I

Page 136

1    understand it's your opinion that it was not a safe
2    and effective device from day one, and it should
3    never have been cleared.
4         Is that a fair statement?
5    A.   Based on the information that they had, I
6    don't think they had sufficient information to show
7    that it would be substantially equivalent to the
8    Gynecare tape. That was what it was actually
9    cleared against. It wasn't actually cleared against
10   TVT-O or TVT.
11        I think the use of the CODMAN Dura Patch was
12   kind of iffy. That was not a good design thing.
13   And you could do it, but I don't think it was
14   actually tested to make sure that it would be --
15   hold in place.
16   Q.   If the 510(k) process for TVT-Secur had been
17   different, do you believe the FDA would have reached
18   a different decision with regard to the clearance of
19   TVT-Secur?
20   A.   No. I mean, I'm going to say that the
21   TVT-Secur is cleared. It was cleared. And so what
22   does that mean if Ethicon gets a clearance? It
23   means they have to have the device that actually
24   performs the way they described it in their 510(k),
25   and that's really where it all falls down.

Page 137

1         If Ethicon did get clearance; therefore,
2    they needed to market the product that behaved the
3    same way that they said TVT-Secur would work. When
4    it doesn't work, then you're not marketing the
5    device that was cleared under the 510(k).
6         And so it's -- that's where your post-market
7    surveillance comes in. Once you realize it's not
8    working that way, you shouldn't be selling it.
9    Q.   Maybe I misunderstood, but I thought that
10   your opinions with regard to TVT-Secur are
11   impacted -- strike that.
12        I understood that it is your opinion that
13   certain features of the 510(k) process allowed the
14   device like TVT-Secur to get clearance when it
15   should not get clearance under an appropriately
16   rigorous clearance process.
17        Is that your opinion?
18   A.   I look at it as the risks that I'm seeing
19   and saying were foreseeable to Ethicon as the expert
20   in this design of this product. They should have
21   seen this.
22        It has nothing to do with the FDA. It's
23   more with Ethicon in terms of the CODMAN and the use
24   of these products.
25   Q.   I know, but I'm trying to understand why you

35 (Pages 134 to 137)

Suzanne Parisian, M.D.

Page 138

1    put in your expert report that the FDA's 510(k)
2    process has weaknesses.
3        A.   It does.
4        Q.   Have we discussed those weaknesses?
5        A.   Right.
6            Just because you get 510(k) clearance
7    doesn't mean your device is going to work, and so
8    there are weaknesses.  It's not a PMA approval
9    process or anything.  It's -- it's -- but it has
10   limitations.
11           And the FDA can't ask for more information
12   unless they have certain key things to let them do
13   it.  Yes, it's a weak -- it's got system problems,
14   but the issue is you can't market something that
15   doesn't behave the way it's cleared.
16       Q.   Right.
17       A.   So, you know, it's -- yes, indeed the FDA
18   cleared it, but the FDA cleared it, and so then --
19   the FDA clears devices that there is no device even
20   made.  You're describing in your 510(k) what you're
21   going to sell.
22       Q.   But as I understand it, the FDA -- it is
23   your opinion that the FDA cleared TVT-Secur under a
24   process that is flawed?
25       A.   Yeah.

Page 139

1            It has limitations to it, and so if --
2    somebody thinks there's a loss of testing, and
3    there's not.  It's a limited system.  There's
4    certain restrictions on the FDA.
5            FDA can only trigger and ask for certain
6    things if other things occur, so it's -- it's got
7    all kinds of pitfalls in it, but the bottom line is
8    you can't sell the product if it doesn't behave the
9    way you're cleared.
10       Q.   And is it my understanding that in your
11   opinion there are only two organizational bodies
12   that could apply fixes or remedies to that 510(k)
13   process, and that is either congress or the FDA?
14           MR. JONES:  Objection.
15           THE WITNESS:  Well, if you're talking
16   about changing the laws, the congress is the one who
17   gives all the authority and the requirements.  The
18   FDA tries to interpret the laws to fit what congress
19   says, but it is a flawed system.
20           It's not what -- people think that it's
21   perfect.  But the bottom line is, you can't sell.
22   It's a prohibited act, not for the FDA but for the
23   manufacturer, to sell a product that doesn't behave
24   the way it's cleared.
25   ///

Page 140

1    BY MR. GAGE:
2        Q.   Okay.  And have we identified the flaws in
3    the process that you believe impacted the clearance
4    decision for TVT-Secur?
5        A.   Well, and also I didn't get to say about
6    the --
7        Q.   Could you answer that?
8        A.   Almost, almost.
9        Q.   Have we discussed them?
10       A.   Almost, except for one other thing.
11       Q.   Okay.
12       A.   And that would be the use of the Dura Patch.
13   That -- that really was able to be bridged because
14   it was already a cleared device.
15           So there was minimal requirement for the
16   company to provide anything to the FDA on that, and
17   so it's the bridging system, that if something is
18   cleared, you can bridge it for a new intended use,
19   and, yet, you may not have done clinical studies to
20   make sure that it's actually -- they did a sheep
21   study, but the sheep study is pretty inadequate, the
22   way it's designed.
23       Q.   All right.  And, Dr. Parisian, on -- in
24   paragraph 80, page 36 of your report, you have a
25   sentence that says, "To clear the 510(k) for

Page 141

1    Ethicon, FDA's ODE reviewer requested no information
2    on the PROLENE Surgical Mesh Sling, but short-term
3    clinical or animal data from Ethicon to support the
4    feasibility that Ethicon's proposed TVT tape
5    procedure could be learned and used by surgeons to
6    implant a PROLENE sling with Ethicon's accessories
7    and instructions."
8            Do you see that?
9        A.   Yes, sir.  That's talking about TVT.  That
10   was the history of TVT getting cleared.
11       Q.   Okay.
12       A.   Yeah.  This was --
13       Q.   I was trying to understand the import of
14   this sentence --
15       A.   Oh.
16       Q.   -- at two levels.
17           And my first question is, are you -- are you
18   critical here of the ODE reviewer for not requesting
19   additional information?
20       A.   No.
21           And -- and the thing here is that ProtoGen
22   was out on the market, and they had to give
23   information -- ProtoGen was actually selling well at
24   the time TVT was cleared.
25       Q.   Can you tell me, though, specifically what

36 (Pages 138 to 141)

Suzanne Parisian, M.D.

Page 142

1  you mean when you said, "To clear the 510(k) for
2  Ethicon, FDA's ODE reviewer requested no information
3  on the PROLENE Surgical Mesh Sling, but short-term
4  clinical or animal data from Ethicon"?  The sentence
5  sounds like the reviewer could have requested other
6  information but didn't.
7        And that's what I'm trying to ask.  Is that
8  what you're suggesting?
9      A.  Well, I'm saying -- I'm saying requested
10  would mean he didn't demand it, he didn't require
11  it.  He could request it.
12        And so the ODE reviewer could have
13  requested, but since PROLENE is a cleared product,
14  PROLENE mesh, it would be unlikely that he could
15  force Ethicon to provide him stuff about the PROLENE
16  mesh sling, and so he could ask for something that
17  was new, which was the animal data about implanting
18  the tape sling would meet equipment.  So there's
19  limitations as to what the FDA could request, and
20  I'm not saying request.  I'm saying request.
21      Q.  So is -- what I'm trying to understand is
22  what you're saying is he had the power to request
23  it, but he didn't?
24      A.  No.  He didn't have the power to request it
25  because Ethicon could have told him to go pound

Page 143

1  sand.  I mean, the thing is, they didn't ask for it
2  from ProtoGen, so he can't -- he can't require it.
3  He can request it.
4      Q.  I understand.  I have to --
5            MR. GAGE:  I got to move to strike the
6  answer.
7  BY MR. GAGE:
8      Q.  My question is very specific.
9      A.  Uh-huh.
10      Q.  Are you critical of the ODE reviewer for
11  having the ability to request additional information
12  and not actually requesting it?  That's my simple
13  question.
14      A.  No, I'm not critical of the FDA reviewer,
15  because the FDA reviewer could request it nicely and
16  say, "Could you please give it to me?"  And that's
17  what I'm saying.  Not that he could require it.  He
18  couldn't require it.
19      Q.  Well, why did you point out that he
20  requested no information other than short-term
21  clinical or animal data?  The sentence implies he
22  could have requested more.
23      A.  He could have requested it, but Ethicon
24  wouldn't have to give it to him.
25      Q.  I understand.  But he could have requested

Page 144

1  it?
2      A.  He could have requested, but he didn't that
3  I saw, and what he requested is what he could get.
4      Q.  And we're not to read that sentence as
5  you're being critical of the ODE reviewer for not
6  making the request?
7      A.  No.
8      Q.  Why did you write it, then?
9      A.  It's because it's describing the process,
10  that in terms of PROLENE, the FDA knows that it's
11  already approved as a mesh, so there's very limited
12  information you can ask about PROLENE mesh because
13  it's been marked since the pre-amendment time.
14        So he could request it, but he didn't, and
15  he could request animal data, which is what he did
16  request.  And so he did get some animal data about
17  putting the kit, because that's a new safety issue.
18  PROLENE mesh is not a new safety issue, so it's
19  describing limitations to what FDA can request.
20      Q.  And this would go back to one of the
21  weaknesses in the 510(k) system --
22      A.  That's right.
23      Q.  -- that you identified earlier?
24      A.  That's right.  That was with the
25  biomaterials and being able to reference, you know,

Page 145

1  other devices that are cleared.
2        PROLENE mesh has been cleared, so there's
3  very limited information that an FDA can request.
4      Q.  So would it be correct to say that the
5  weaknesses in the 510(k) process affected the
6  decision to clear TVT-Secur, not just in the context
7  of the 510(k) for TVT-Secur, but also in the 510(k)
8  process for all of the predicate --
9      A.  That's right.
10      Q.  -- devices for TVT-Secur?
11      A.  That's right.
12      Q.  So the weaknesses of the 510(k) system with
13  regard to ProtoGen and TVT and TVT-O all fed into
14  additional weaknesses that manifested during the
15  review of the TVT-Secur 510(k), all of which to some
16  degree led to, in Dr. Parisian's opinion, a flawed
17  decision to clear TVT-Secur?
18      A.  It wasn't the FDA's flawed decision.  It was
19  just the process allows the product to get on the
20  market that may not be safe and effective.
21        Because when you look at a TVT-Secur, it
22  wasn't cleared on TVT or TVT-O.  It was cleared
23  because they found a 510(k) for the Gyne Ideas tape,
24  and because they found a cleared 510(k) for its
25  small tape, FDA couldn't ask for clinical data.

37 (Pages 142 to 145)

Suzanne Parisian, M.D.

Page 146

1    Dr. Herrera wanted 12 months clinical data, and it
2    totally negated what FDA could ask for when the
3    company found a predicate.
4             MR. AYLSTOCK:  And you're down to about
5    eight minutes, just so you know.
6             MR. GAGE:  I'm down to about eight
7    minutes?  Okay.  Thank you.
8    BY MR. GAGE:
9        Q.   Have you looked at any expert report by
10   Dr. Thomas Mule?
11       A.   No.
12       Q.   Do you know who Dr. Thomas Mule is?
13       A.   No.
14       Q.   Okay.  Dr. Parisian, with regard to this
15   deposition Exhibit 8, which was one of the documents
16   you handed me earlier, and I'm going to just kind of
17   come over and stand next to you as we look through
18   those documents.
19            As I understand it, these are documents that
20   you pulled off the FDA Web site or some other Web
21   site.  Is that correct?
22       A.   The FDA's Web site, yes, sir.
23       Q.   What is the significance, if any, of
24   Deposition Exhibit No. 8 to your opinions with
25   regard to TVT-Secur?

Page 147

1        A.   You were asking me before about MDRs.  The
2    FDA went and did MDRs, you know, up here in terms of
3    looking at the instruments and stuff.  So there's a
4    lot of information in here about MDRs.
5             I would then rely on the MDA's database,
6    looking at the different companies, so -- and I
7    think they actually do talk about TVT-Secur in here
8    in some places.
9             The highlighting is mine.  They're going
10   through, looking at -- because I think the
11   instruments also weren't looked at, and so that was
12   why the FDA is wanting to reclassify the instrument
13   because that's important in terms of putting these
14   products in.  They weren't looked at as kits.
15       Q.   And when we talk about instruments, we're
16   talking about the instruments that, in the context
17   of TVT-Secur, would have been provided along with
18   the actual mesh itself?
19       A.   That's right.
20            And so they weren't getting reviewed as kits
21   where you would look at the functionality.  They
22   were -- some people -- well, Johnson -- actually,
23   Ethicon was good.  TVT, they did include the
24   instruments in TVT to begin with, but -- and then
25   they started kind of -- so you needed to look at the

Page 148

1    kit as to how the instruments worked with the -- the
2    tape.
3        Q.   Were the instruments for TVT-Secur brought
4    to the attention of the FDA in conjunction with
5    TVT-Secur's 510(k)?
6        A.   I don't recall.  I think they were in there.
7    But the point was that the FDA was not reviewing
8    them as kits in terms of functionality because when
9    you look at components like that, you're supposed to
10   look at the -- the human factors and stuff like that
11   in using it.
12            And so they weren't -- they were saying in
13   the FDA's memo in 2007, 2008, their internal
14   discussion, how did we get to a transvaginal
15   insertion?  And so the FDA was kind of trying to
16   backtrack, and these instruments are essential to
17   putting these devices in blindly in the pelvis.
18       Q.   I hate to backtrack on you and go back to
19   something we've already covered, but I just realized
20   I needed to cover it.
21            During the Garcia deposition -- I think it
22   was on page 68 of your deposition -- you said, and
23   I'm paraphrasing.  I'm not attempting to quote you
24   exactly, so I would ask that we all not get hung up
25   on that.

Page 149

1             But you essentially said that although your
2    disclosure didn't mention anything about MDR
3    reporting, you did an MDR search the night before
4    your deposition and found inconsistencies of what
5    you believe the company knew versus what was
6    reported in the MDRs.
7             You then said on page 71 that your computer
8    wasn't working well and you were not able to print
9    off all the reports.
10            And on page 73, you implied that you would
11   continue the project and go month by month and
12   gather the data that you needed to support your
13   opinion.
14            Do you have any recollection of that
15   testimony?
16       A.   I remember the testimony, but I wasn't asked
17   to go ahead and do that, so that's not in the
18   report.
19       Q.   Okay.  So just to nail it completely solid
20   shut, is it correct that notwithstanding your
21   testimony and the limited comparison between the MDR
22   reporting and the MAUDE database that you testified
23   to -- testified about in Garcia, your earlier
24   testimony holds true -- that is, you do not intend
25   to provide an opinion in any federal case under this

38 (Pages 146 to 149)

Suzanne Parisian, M.D.

Page 150

1  report that you've served in this case about an
2  analysis or comparison between what Ethicon knew or
3  didn't know with regard to product issue reports or
4  complaint reporting versus what's in the MAUDE
5  database?
6     A.  I haven't been asked to do that.
7     Q.  Okay.
8     A.  And I think I was looking for trends at that
9  time, not specific failure to report, but I was
10  looking at the numbers that were being reported and
11  what I knew were the reports.
12    Q.  Okay.
13    A.  I think they were using company documents.
14    Q.  Have you done any analysis, or have you
15  tried to determine the number of lawsuits that have
16  been filed with regard to TVT-Secur?
17    A.  No.
18    Q.  Have you tried to determine the number of
19  women who were implanted with the TVT-Secur?
20    A.  No.
21    Q.  Have you attempted to do any sort of an
22  analysis about -- have you done an analysis of any
23  lawyer advertising with regard to TVT-Secur?
24    A.  No.
25    Q.  Have you -- in your MDL reports, you have

Page 151

1  got some opinions about alleged problems with
2  heavyweight small pore mesh.
3        Do you recall that?
4     A.  Where are you going?  Forty-eight or
5  something?
6     Q.  It's somewhere around paragraphs 108 to 113.
7     A.  Okay, yeah.
8     Q.  But do you -- and I'm not going to ask you
9  the exact specifics.
10    A.  Paragraph 108, is that the one you want,
11  where I have the list?  And this is -- this is
12  coming from -- this is Ethicon's PowerPoint
13  presentation is what this is.  It is not my list.
14    Q.  Well, that is what I wanted to ask you
15  about.
16        Apart from reviewing the Ethicon documents,
17  did you conduct any additional analysis of other
18  documents, such as published medical literature, to
19  reach any opinions with regard to the weight or pore
20  size of the mesh?
21    A.  Oh, when you saw my patent, I went and tried
22  to get the patent.  I was trying to get that.
23        No, nothing else.
24    Q.  All right.  So what you know -- the
25  documents or the information that support your

Page 152

1  opinions with regard to the weight or the pore size
2  of the mesh would be a function of your review of
3  the company documents on those issues?
4     A.  Right.  Because they're not out in the other
5  documents.
6     Q.  Have you -- have you seen any medical
7  literature with regard to TVT-Secur that attributes
8  any adverse events to pore size or weight of the
9  mesh?
10        MR. JONES:  Objection.
11        THE WITNESS:  No, but it's PROLENE, the
12  mesh.  And, actually, when I look at the literature,
13  I don't see the pore size usually stated.  That was
14  why I have to use company docs.
15  BY MR. GAGE:
16    Q.  Have you read Dr. Marty Weisberg's 2015 --
17  November 2015 deposition?
18    A.  I have looked at it quickly, and that's why
19  you have that.  Remember, I brought that because
20  it's not listed, I don't think, on --
21    Q.  When did you receive that deposition?
22    A.  I received it a couple days ago.
23    Q.  So you received it for the first time after
24  you had written your MDL report.  Is that correct?
25    A.  Yes, sir.

Page 153

1     Q.  Do you intend to supplement, amend, or
2  modify your report based on that deposition?
3     A.  I don't think so.  I haven't been asked to.
4  I don't think I am.
5     Q.  Have you read enough of the deposition to
6  know whether it supports or refutes any of your
7  opinions in your MDL Secur report?
8     A.  It supports my opinions because I know like
9  Health Canada wanted them to update their labeling,
10  their TVT labeling.  I have TVT labeling and they
11  wanted them to take out mild, moderate,
12  inflammation, so it supports my opinions.
13        All the changes that they made to the 2015
14  label they could have made at any other time.  That
15  supports my opinions, so I think it supports it.
16    Q.  Is it fair to say that you are -- is it fair
17  to say that the changes requested by Health Canada,
18  in your opinion, are woefully inadequate to make the
19  TVT-Secur IFU adequate?
20        MR. AYLSTOCK:  Objection to form.
21        THE WITNESS:  Well, I don't -- I mean
22  the bottom line --
23  BY MR. GAGE:
24    Q.  Let me rephrase it.
25    A.  Yeah.

39 (Pages 150 to 153)

Golkow Technologies, Inc. - 1.877.370.DEPS

Suzanne Parisian, M.D.

Page 154

1    Q.  Is it your opinion that the -- that the
2  recommendations from Health Canada are inadequate to
3  make the TVT-Secur IFU adequate?
4    A.  Well, the Canadian came after the TVT-Secur
5  was off the market.  It's the TVT family, so if we
6  talk about it in the family, it's still an
7  inadequate label.  I think that's what you're asking
8  me.  Do I think it's still an inadequate label.
9    Q.  I could ask it --
10        MR. AYLSTOCK:  I think we're over the
11  time.
12        MR. GAGE:  Let me just ask her a couple
13  more.
14        MR. AYLSTOCK:  Okay.
15        MR. GAGE:  Because I want to correct
16  that.
17  BY MR. GAGE:
18    Q.  Is it your opinion that if Ethicon had made
19  the changes to the TVT-Secur IFU that Health Canada
20  recommended when the device was first launched on
21  the market, that that would still not make the
22  TVT-Secur IFU adequate, in your opinion?
23    A.  Right, it wouldn't be adequate.  It was not
24  adequate because the changes that were made are
25  fairly minor.

Page 155

1       It's still not -- in terms of the TVT-Secur,
2  the label is not adequate for TVT-Secur.
3    Q.  Have you -- have you looked at any of the
4  documents?
5    A.  Let me clarify.  It would be better than
6  what they launched it with, but it is not adequate.
7  It still wouldn't be adequate today.
8    Q.  Okay.  All right.
9        MR. GAGE:  I understand counsel is
10  calling me on my time.  So like I'm sure they'll say
11  at every deposition, if I were allowed more time, I
12  would ask more questions, but as a understand it,
13  I've got a hard stop at three hours.
14        So the only thing I'll ask counsel on
15  the record before we go off is we do have to circle
16  back and close some loops on some things, but I
17  think we've all agreed to work in good faith to get
18  that done.
19        MR. JONES:  Indeed.
20        MR. GAGE:  Thank you.  Deposition is
21  terminated.
22        (Deposition concluded at 5:06 p.m.)
23
24
25

Page 156

1        C E R T I F I C A T E
2
3       I, ALISA SMITH, Registered Professional
4  Reporter, Arizona Certified Reporter, do hereby
5  certify that, pursuant to notice, the deposition of
6  SUZANNE PARISIAN, M.D. was duly taken on
7  March 8, 2016, at 1:34 p.m., before me.
8       The said SUZANNE PARISIAN, M.D. was duly
9  sworn by me according to law to tell the truth, the
10  whole truth, and nothing but the truth and thereupon
11  did testify as set forth in the above transcript of
12  testimony.  The testimony was taken down
13  stenographically by me.
14       I do further certify that the above
15  deposition is full, complete, and a true record of
16  all the testimony given by the said witness.
17
18
19     _____
20     Alisa Smith, RPR, AZ CR 50712
21  (The foregoing certification of this transcript does
22  not apply to any reproduction of the same by any
23  means, unless under the direct control and/or
24  supervision of the certifying reporter.)
25

Page 157

1        INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4  and make any necessary corrections.  You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7
8       After doing so, please sign the errata sheet
9  and date it.  It will be attached to your deposition.
10
11       It is imperative that you return the
12  original errata sheet to the deposing attorney within
13  thirty (30) days of receipt of the deposition
14  transcript by you.  If you fail to do so, the
15  deposition transcript may be deemed to be accurate
16  and may be used in court.
17
18
19
20
21
22
23
24
25

Suzanne Parisian, M.D.

Page 158

```
1        - - - - - - - -
2        E R R A T A
3        - - - - - - - -
4
        PAGE   LINE   CHANGE
5
6        ____  ____  _____
7        REASON: _____
8        ____  ____  _____
9        REASON: _____
10       ____  ____  _____
11       REASON: _____
12       ____  ____  _____
13       REASON: _____
14       ____  ____  _____
15       REASON: _____
16       ____  ____  _____
17       REASON: _____
18       ____  ____  _____
19       REASON: _____
20       ____  ____  _____
21       REASON: _____
22       ____  ____  _____
23       REASON: _____
24       ____  ____  _____
25       REASON: _____
```

Page 160

```
1                 LAWYER'S NOTES
2       PAGE  LINE
3       ____  ____   _____
4       ____  ____   _____
5       ____  ____   _____
6       ____  ____   _____
7       ____  ____   _____
8       ____  ____   _____
9       ____  ____   _____
10      ____  ____   _____
11      ____  ____   _____
12      ____  ____   _____
13      ____  ____   _____
14      ____  ____   _____
15      ____  ____   _____
16      ____  ____   _____
17      ____  ____   _____
18      ____  ____   _____
19      ____  ____   _____
20      ____  ____   _____
21      ____  ____   _____
22      ____  ____   _____
23      ____  ____   _____
24      ____  ____   _____
25      ____  ____   _____
```

Page 159

```
1              ACKNOWLEDGMENT OF DEPONENT
2
3          I, SUZANNE PARISIAN, M.D., do hereby
4      acknowledge that I have read the foregoing pages, 5
5      through 155, and that the same is a correct
6      transcription of the answers given by me to the
7      questions therein propounded, except for the
8      corrections or changes in form or substance, if any,
9      noted in the attached Errata Sheet.
10
11
12     _____     _____
        SUZANNE PARISIAN, M.D.        DATE
13
14
15
16
17
18     Subscribed and sworn to before me this
19     _____ day of _____, 20____.
20     My Commission expires: _____
21
22
23     _____
       Notary Public
24
25
```

Golkow Technologies, Inc. - 1.877.370.DEPS