# EXHIBIT E

Duane Priddy, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: ETHICON, INC., PELVIC )

REPAIR SYSTEM PRODUCTS      ) Master File No.
LIABILITY LITIGATION        ) 2:12-MD-02327
THIS DOCUMENT RELATES TO THE ) MDL 2327
FOLLOWING CASES IN WAVE 1 OF ) JOSEPH R. GOODWIN
OF MDL 200:                 ) U.S. DISTRICT JUDGE
----------------------------)
HARRIET BEACH               )
v.                          ) CIVIL ACTION FILE
                            ) No. 2:12-CV-00476
ETHICON, INC., et al.       )
----------------------------)
SHARON BOGGS, et al.        )
                            ) CIVIL ACTION FILE
v.                          ) No. 2:12-CV-00368
                            )
ETHICON, INC., et al.       )
----------------------------)
JUDITH BRUHN, et al.        )
                            ) CIVIL ACTION FILE
v.                          ) No. 2:12-CV-00888
                            )
ETHICON, INC., et al.       )
----------------------------)
JANICE COLONNA              )
                            ) CIVIL ACTION FILE
v.                          ) No. 2:12-CV-01274
                            )
ETHICON, INC., et al.       )
----------------------------)
MARY F. CONE                )
                            ) CIVIL ACTION FILE
v.                          ) No. 2:12-CV-00261
                            )
ETHICON, INC., et al.       )
----------------------------)
SANDRA CYRUS                )CIVIL ACTION FILE
v.                          ) No. 2:12-CV-01283
ETHICON, INC., et al.       )
----------------------------)

Videotaped Deposition of DUANE PRIDDY, PH.D.
March 8, 2016

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 2

```
 1   AMANDA DELEON, et al.      )
                                ) CIVIL ACTION FILE
 2   v.                         ) No. 2:12-CV-00358
                                )
 3   ETHICON, INC., et al.      )
     ----------------------------)
 4   ROSE GOMEZ, et al.         )
                                ) CIVIL ACTION FILE
 5   v.                         ) No. 2:12-CV-00344
                                )
 6   ETHICON, INC., et al.      )
     ----------------------------)
 7   DONNA HANKINS, et al.      )
                                ) CIVIL ACTION FILE
 8   v.                         ) No. 2:12-CV-01011
                                )
 9   ETHICON, INC., et al.      )
     ----------------------------)
10   BETH HARTER, et al.        )
                                ) CIVIL ACTION FILE
11   v.                         ) No. 2:12-CV-00737
                                )
12   ETHICON, INC., et al.      )
     ----------------------------)
13   MARY HENDRIX, et al.       )
                                ) CIVIL ACTION FILE
14   v.                         ) No. 2:12-CV-00595
                                )
15   ETHICON, INC., et al.      )
     ----------------------------)
16   WILMA JOHNSON              )
                                ) CIVIL ACTION FILE
17   v.                         ) No. 2:11-CV-00809
                                )
18   ETHICON, INC., et al.      )
     ----------------------------)
19   JANET JONES                )
                                ) CIVIL ACTION FILE
20   v.                         ) No. 2:12-CV-00762
                                )
21   ETHICON, INC., et al.      )
     ----------------------------)
22
23
          Videotaped Deposition of DUANE PRIDDY, PH.D.
24
```

Page 3

```
 1   PAULA KRITZ, et al.        )
                                ) CIVIL ACTION FILE
 2   v.                         ) No. 2:12-CV-00938
                                )
 3   ETHICON, INC., et al.      )
     ----------------------------)
 4   EDITH NOLAN                )
                                ) CIVIL ACTION FILE
 5   v.                         ) No. 2:12-CV-00864
                                )
 6   ETHICON, INC., et al.      )
     ----------------------------)
 7   NOEMI PADILLA              )
                                ) CIVIL ACTION FILE
 8   v.                         ) No. 2:12-CV-00567
                                )
 9   ETHICON, INC., et al.      )
     ----------------------------)
10   MIRANDA PATTERSON          )
                                ) CIVIL ACTION FILE
11   v.                         ) No. 2:12-CV-00481
                                )
12   ETHICON, INC., et al.      )
     ----------------------------)
13   REBECCA PRATT              )
                                ) CIVIL ACTION FILE
14   v.                         ) No. 2:12-CV-01273
                                )
15   ETHICON, INC., et al.      )
     ----------------------------)
16   STACY SHULTIS              )
                                ) CIVIL ACTION FILE
17   v.                         ) No. 2:12-CV-00654
                                )
18   ETHICON, INC., et al.      )
     ----------------------------)
19   JANET SMITH                )
                                ) CIVIL ACTION FILE
20   v.                         ) No. 2:12-CV-00861
                                )
21   ETHICON, INC., et al.      )
     ----------------------------)
22
23
          Videotaped Deposition of DUANE PRIDDY, PH.D.
24
```

Page 4

```
 1   RACHEL TAYLOR, et al.      )
                                ) CIVIL ACTION FILE
 2   v.                         ) No. 2:12-CV-00765
                                )
 3   ETHICON, INC., et al.      )
     ----------------------------)
 4   PATRICIA TYLER             )
                                ) CIVIL ACTION FILE
 5   v.                         ) No. 2:12-CV-00469
                                )
 6   ETHICON, INC., et al.      )
     ----------------------------)
 7   VIRGINIA WHITE, et al.     )
                                ) CIVIL ACTION FILE
 8   v.                         ) No. 2:12-CV-00958
                                )
 9   ETHICON, INC., et al.      )
     ----------------------------)
10
11                 - - -
12
13       Videotaped Deposition of DUANE
14   PRIDDY, PH.D., taken on behalf of the
15   Defendants, pursuant to the stipulations
16   agreed to herein, before Maxyne Bursky,
17   Registered Professional Reporter, at 111
18   Perimeter Center West, Atlanta, Georgia,
19   on the 8th day of March, 2016, commencing
20   at the hour of 9:59 a.m.
21
22
23
24
```

Page 5

```
 1
 2   Examination                      Page
 3       By Mr. Hutchinson            8,168
 4       By Mr. Jackson               158
 5
 6             INDEX TO EXHIBITS
 7   Exhibit      Description         Page
 8     1    Notice to take videotaped
            deposition of Dr. Priddy    8
 9
      2    Flash drive (retained by counsel)   9
10
      3    Expert report of Dr. Priddy  12
11
      4    ASTM D3895-14, 8 pages       26
12
      5    ASTM F1980-02, 6 pages       57
13
      6    Polymer Stabilizers, A Survey with
14         Reference to Possible Applications
           in the Conservation Field by Dr.
15         de la Rie                    61
16    7    Report of Dr. Moy from Ethicon,
           ETH.MESH.15958452-469        72
17
      8    Antioxidant Plaox-DLTDP, 1 page   95
18
      9    Seven Year Dog Study by Thomas
19         Barbolt, 4 pages plus
           ETH.MESH.11336183-259, 11336071-088,
20         11336165-177, 09888187-223 and
           11336181-183                 135
21
      10   Diagram of elongation and break
22         strength, 1 page             140
23                  - - -
24
```
INDEX TO EXAMINATION

2 (Pages 2 to 5)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 6

1  APPEARANCES OF COUNSEL:
2  On behalf of the Plaintiffs:
3     EDWARD A. WALLACE, Esq.
      TIMOTHY E. JACKSON, Esq.
4     Wexler Wallace LLP
      55 West Monroe Street
5     Suite 3300
      Chicago, Illinois 60603
6     312.346.2222
      312.346.0022  (facsimile)
7     eaw@wexlerwallace.com
      tej@wexlerwallace.com
8
      FIDELMA L. FITZPATRICK, Esq.
9     Motley Rice LLC
      321 South Main Street
10    Providence, Rhode Island 02903
      401.457.7728
11    401.457.7708  (facsimile)
      ffitzpatrick@motleyrice.com
12
13  On behalf of the Defendants:
14    CHAD R. HUTCHINSON, Esq.
      Butler Snow, LLP
15    Suite 1400
      1020 Highland Colony Parkway
16    Post Office Box 6010
      Ridgeland, Mississippi 39158-6010
17    601.948.5711
      601.985.4500  (facsimile)
18    chad.hutchinson@butlersnow.com
19
20  Also Present:
21    PHILIP KIMBALL, Videographer
22
23              - - -
24

Page 7

1        (The signature of the witness to the
2        deposition was reserved.)
3        THE VIDEOGRAPHER:  We are now on the
4   record.  My name is Philip Kimball.  I'm
5   a videographer for Golkow Technologies.
6   Today's date is March 8, 2016, the time
7   is 9:59 a.m.  This video deposition is
8   being held in Atlanta, Georgia, in the
9   matter of Harriet Beach versus Ethicon,
10  Incorporated, et al., Case Number
11  2:12-CV-00476.
12       This case is being heard in the
13  United States District Court, Southern
14  District of West Virginia at Charleston.
15  The deponent is Duane Priddy.
16       Counsel, will you please identify
17  yourselves for the record.
18       MR. HUTCHINSON:  Chad Hutchinson,
19  counsel for Ethicon and Johnson &
20  Johnson.
21       MR. JACKSON:  Tim Jackson on behalf
22  of the plaintiffs.
23       MR. WALLACE:  Ed Wallace on behalf
24  of the plaintiffs.

Page 8

1        MS. FITZPATRICK:  Fidelma
2   Fitzpatrick on behalf of the plaintiffs.
3        THE VIDEOGRAPHER:  The court
4   reporter is Maxyne Bursky and will now
5   swear in the witness.
6           DUANE PRIDDY,
7   having been first duly sworn, testifies as follows:
8   EXAMINATION
9   BY MR. HUTCHINSON:
10       Q.  Good morning, Dr. Priddy.  How are you?
11       A.  I'm doing well.
12       Q.  Good.  My name is Chad Hutchinson.  I'm
13  counsel for Ethicon and Johnson & Johnson.  Do you
14  understand you are under oath?
15       A.  I do.
16       Q.  Do you understand you are giving testimony
17  subject to the penalty of perjury?
18       A.  Yes.
19       Q.  What is your specialty?
20       A.  Polymer chemistry, materials science.
21       Q.  Do you have any subspecialty?
22       A.  No.
23          (Priddy Deposition Exhibit 1 was
24       marked for identification.)

Page 9

1   BY MR. HUTCHINSON:
2        Q.  I have handed you what we will mark as
3   Exhibit 1 to your deposition.  Did you bring some
4   documents responsive to that notice?
5          (Witness reviewing document.)
6        A.  I read through this and I believe the
7        documents provided to you are responsive, yes.
8          (Priddy Deposition Exhibit 2 was
9        marked for identification.)
10  BY MR. HUTCHINSON:
11       Q.  You have handed me a flash drive that
12  we'll mark as Exhibit 2.
13       MR. HUTCHINSON:  And, Counsel, I will
14       just retain, since this is my copy, we're
15       going to mark it Exhibit 2, but I'll just
16       retain control over it; is that fair?
17       MR. JACKSON:  That's fine.
18  BY MR. HUTCHINSON:
19       Q.  What is included on the flash drive that
20  your counsel handed me?
21       A.  A copy of my report, some documents that I
22  have reviewed, my billing record, my time log in
23  this matter.  That's all I recall offhand.
24       Q.  Does the flash drive contain all of the

3 (Pages 6 to 9)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 10

1  documents that you reviewed and relied upon in
2  reaching your opinions?
3      A.  I believe so.
4      Q.  Have you reviewed this flash drive that
5  your lawyer has handed me?
6      A.  Yes.
7      Q.  Have you been deposed as an expert in the
8  AMS litigation?
9      A.  Yes.
10     Q.  Was that the mesh litigation?
11     A.  Yes.
12     Q.  Were you an expert, a polymer science
13  expert in that litigation?
14         MR. JACKSON:  Objection, form.
15     A.  Yes.
16  BY MR. HUTCHINSON:
17     Q.  How many times have you been deposed in
18  the AMS litigation?
19     A.  Once.
20     Q.  Have you read your testimony transcript?
21     A.  No.
22     Q.  When were you first contacted in this
23  case?
24     A.  I'd say last September maybe.

Page 11

1      Q.  Of 2015?
2      A.  Yes.
3      Q.  Who contacted you?
4      A.  Mr. Wallace.
5      Q.  What did he ask you to do?
6          MR. JACKSON:  Objection, form.
7      A.  Serve as an expert witness in the Ethicon
8  mesh matter.
9  BY MR. HUTCHINSON:
10     Q.  Anything else specifically that he asked
11  you to do?
12     A.  No.
13     Q.  Have you ever had any contacts with Mr.
14  Wallace before?
15     A.  Yes.
16     Q.  In the AMS litigation?
17     A.  Correct.
18     Q.  Did you reach opinions similar in the AMS
19  litigation as you have in this litigation?
20         MR. JACKSON:  Objection.
21     A.  I did not review my AMS testimony, so I
22  don't recall.
23  BY MR. HUTCHINSON:
24     Q.  Did you opine in the AMS litigation that

Page 12

1  the mesh degrades with oxidation?
2          MR. JACKSON:  Objection, form.
3      A.  I believe so.
4          (Priddy Deposition Exhibit 3 was
5      marked for identification.)
6  BY MR. HUTCHINSON:
7      Q.  Doctor, I will hand you what we'll mark as
8  Exhibit 3 to your deposition.  Do you recognize that
9  as the report that you submitted in this case?
10         (Witness reviewing document.)
11     A.  Yes.
12     Q.  Is it complete and accurate?
13         MR. JACKSON:  Counsel, I just want
14     to note on the record that there are two
15     emails at the end of this document which
16     are not part of Dr. Priddy's report.
17  BY MR. HUTCHINSON:
18     Q.  Doctor, is that complete and accurate?
19     A.  It looks, yes, it looks like I might have
20  to update my list of scientific articles and
21  publications, but other than that, it's accurate.
22     Q.  Are you talking about you need to update
23  your CV in there?
24     A.  Yes.

Page 13

1      Q.  Otherwise, that report is complete and
2  accurate; is that fair?
3      A.  Yes.
4      Q.  Did anybody else work on that report other
5  than you?
6      A.  No.
7      Q.  How much time did you spend preparing that
8  report?
9      A.  Maybe twelve hours.  I'm not sure.
10     Q.  Would the time that you spent preparing
11  that report be reflected on the flash drive that you
12  handed me before the deposition?
13     A.  Probably not completely because normally I
14  under-record the time I actually spend.  I actually
15  generally spend more than what I write down.
16     Q.  Why do you under-record your time?
17     A.  Just because I -- I like to make sure
18  that I'm not overcharging, so I tend to be
19  conservative when I'm recording my time.
20     Q.  Doctor, are all the opinions that you
21  intend to offer in this case included in your expert
22  report?
23     A.  I may end up doing a supplemental report.
24     Q.  But as we sit here right now, are all the

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

1  opinions that you have so far included within your
2  expert report marked as Exhibit 3?
3      A.  Yes.
4      Q.  Do you have plans sitting here now to do a
5  supplemental report?
6      A.  Not specifically, but I may.
7      Q.  Why are you considering doing a
8  supplemental report?
9      A.  While I was preparing for my deposition,
10 reading through everything, I just thought it might
11 be wise for me to do a supplemental report in the
12 future.
13     Q.  On what specific issue would you do a
14 supplemental report on, sir?
15         MR. JACKSON:  Objection, form.
16     A.  I'm not sure at this point.  Maybe my
17 review of the results in the 80s of Ethicon's
18 research, some things caught my eye that I thought
19 were important and I might generate some opinions
20 about those in the future.
21 BY MR. HUTCHINSON:
22     Q.  But sitting here today, if you do a
23 supplemental report, it is your plan to do a
24 supplemental report only on the 1980 documents from

1  Ethicon; is that fair?
2          MR. JACKSON:  Objection, form.
3      A.  At this point, that's -- yeah.
4  BY MR. HUTCHINSON:
5      Q.  Your reliance list, Doctor, included in
6  your expert report, is it complete and accurate?
7      A.  I believe so, yes.
8      Q.  Your CV that's included in your expert
9  report, is that the most recent version if you added
10 the publications that you referenced earlier?
11     A.  Yes.
12     Q.  What publications would you need to add to
13 your CV to make it current?
14     A.  I published a paper -- well, it was just
15 accepted by the peer reviewers -- that I am going
16 to present at a conference here in May, and I'll
17 add that.
18     Q.  What did you present about?
19     A.  It was understanding the science behind
20 the failure of exercise balls.
21     Q.  Doctor, have you ever published anything
22 regarding mesh or Prolene?
23     A.  No.
24     Q.  Have you ever published anything regarding

1  polypropylene?
2      A.  Not that I recall.
3      Q.  Doctor, have you ever given any
4  presentations on mesh, Prolene, or polypropylene?
5      A.  No.
6      Q.  Have you ever worked for a medical device
7  company before?
8      A.  Yes.
9      Q.  Did your work focus on mesh or
10 polypropylene?
11     A.  No.
12     Q.  Other than the attorneys here, have you
13 ever discussed your opinions with anybody else?
14         MR. JACKSON:  Objection, form.
15     A.  Are you talking about the opinions in this
16 report?
17 BY MR. HUTCHINSON:
18     Q.  Yes.
19     A.  No.
20     Q.  Is it fair to say you have never discussed
21 your opinions with any type of scientist or medical
22 doctor or engineer; is that fair?
23     A.  That is correct.
24     Q.  Never communicated your opinions to FDA,

1  correct?
2      A.  That's correct.
3      Q.  Or any scientific organization?
4          MR. JACKSON:  Objection, form.
5      A.  That's correct.
6  BY MR. HUTCHINSON:
7      Q.  Doctor, how many hours did you spend
8  reviewing the internal Ethicon documents?
9      A.  I would say probably 14, 15 hours.
10     Q.  Did you sign a confidentiality agreement
11 with respect to the documents you received from
12 Ethicon?
13     A.  Well, I mean, as part of my retainer
14 agreement there's confidentiality in there that I'm
15 not going to share or publish or discuss.
16     Q.  I understand.  Is that retainer agreement
17 included on Exhibit 2 which is the flash drive that
18 was handed to me before the deposition?
19     A.  I'm not sure.
20     Q.  Where is the retainer agreement?
21     A.  I would have a copy probably on my
22 computer, or if not, a hard copy in my files.
23     Q.  When is the last time you have seen the
24 retainer agreement?

5 (Pages 14 to 17)

Golkow Technologies, Inc. - 1.877.370.DEPS

Duane Priddy, Ph.D.

Page 18

1    A.  I don't recall.
2    Q.  Any reason to believe that it's been lost
3  or destroyed?
4    A.  No.
5    Q.  Other than your retainer agreement,
6  though, did you sign any type of paper regarding a
7  confidentiality agreement with respect to the
8  Ethicon documents you reviewed?
9    A.  I don't believe so.
10   Q.  Do you advertise your services?
11   A.  Yes.
12   Q.  On the internet?
13   A.  Yes.
14   Q.  Anywhere else?
15   A.  Yes.
16   Q.  Where?
17   A.  I'm listed as an expert on three or four
18  different websites, I believe, that aren't mine.
19   Q.  Other than the internet, do you advertise
20  your services anywhere?
21   A.  No.
22   Q.  Your billing rate is $375 an hour for
23  record review and 550 for testimony?
24   A.  Correct.

Page 19

1    Q.  You don't consider yourself an FDA expert,
2  do you?
3    MR. JACKSON:  Objection, form.
4    A.  I mean, I have done a lot of interaction
5  with the FDA when I was at Dow, I did a lot of
6  extraction studies and those kind of things to help
7  fill out paperwork for FDA applications.
8  BY MR. HUTCHINSON:
9    Q.  Do you consider yourself a regulatory
10  expert?
11   MR. JACKSON:  Objection, form.
12   A.  Again, I have done a lot of interaction
13  with government regulatory agencies.
14  BY MR. HUTCHINSON:
15   Q.  I understand that, but do you hold
16  yourself out as an expert, sir?
17   MR. JACKSON:  Objection to form.
18   A.  With regard to FDA?
19  BY MR. HUTCHINSON:
20   Q.  Yes.
21   A.  I know a lot about it.  That's all I can
22  say.
23   Q.  I understand, but my question is:  Do you
24  consider yourself a regulatory or FDA expert?

Page 20

1    MR. JACKSON:  Objection, calls for a
2  legal conclusion.
3    A.  Let's put it this way:  I don't advertise
4  myself as an expert for FDA.
5  BY MR. HUTCHINSON:
6    Q.  Is there anything on your CV that reflects
7  your expertise as a regulatory or FDA expert?
8    A.  No.
9    Q.  Doctor, you are not a pathologist?
10   A.  I am not a pathologist.
11   Q.  Not a medical doctor?
12   A.  I am not a medical doctor.
13   Q.  Not a toxicologist?
14   A.  No.
15   Q.  Not a biostatistician?
16   A.  What?
17   Q.  A biostatistician?
18   A.  A biostatistician, I do a lot of
19  statistical analysis, but bio, not a
20  biostatistician.
21   Q.  Are you an epidemiologist?
22   A.  No, I'm not.
23   Q.  Are you an expert in biomaterials?
24   MR. JACKSON:  Objection, form.

Page 21

1    A.  I have done a lot of work with different
2  biomaterials.  Again, it's difficult to quantify
3  expert or non-expert, but I have experience working
4  with biomaterials.
5  BY MR. HUTCHINSON:
6    Q.  So it is difficult for you to quantify
7  whether or not you are an expert in biomaterials?
8  Did I understand your testimony correctly?
9    MR. JACKSON:  Objection, form.
10   A.  It's a non-quantifiable question, in my
11  thinking.
12  BY MR. HUTCHINSON:
13   Q.  Do you consider yourself an expert, sir,
14  in biomaterials?
15   MR. JACKSON:  Objection, asked and
16  answered.
17   A.  All I can say is I know a lot about
18  biomaterials.
19  BY MR. HUTCHINSON:
20   Q.  Do you consider yourself an expert, is my
21  question?
22   MR. JACKSON:  Objection to form.
23   A.  I'm an expert in materials.
24  BY MR. HUTCHINSON:

Golkow Technologies, Inc. - 1.877.370.DEPS

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 22

1    Q.  What about biomaterials?
2    A.  And biomaterials are included in
3  materials.
4    Q.  Are you an expert in biocompatibility?
5    A.  Again, I know a lot about
6  biocompatibility.  It's just difficult for me to
7  give a yes-no answer to that when I know a lot about
8  it, but, yeah.
9    Q.  Doctor, are you an expert in the
10 biological response to foreign bodies?
11       MR. JACKSON:  Objection, form.
12    A.  Again, I know a lot about it but I'm
13 not a pathologist, so.
14 BY MR. HUTCHINSON:
15    Q.  Do you consider yourself an expert in the
16 biological response to foreign bodies?
17       MR. JACKSON:  Objection, form.
18    A.  I'll just say I know a lot about it.
19 BY MR. HUTCHINSON:
20    Q.  You won't answer that question?
21    A.  I just did.
22       MR. JACKSON:  He just gave the
23    answer.
24    A.  It's not a simple yes-no answer.

Page 23

1  BY MR. HUTCHINSON:
2    Q.  Do you consider yourself an expert in the
3  design of surgical mesh?
4       MR. JACKSON:  Objection, form.
5    A.  As far as the design includes materials
6  selection for it, yes.
7  BY MR. HUTCHINSON:
8    Q.  Do you consider yourself an expert in
9  female anatomy?
10    A.  No.
11    Q.  Doctor, let's talk about the testing you
12 did.  You did some accelerated aging testing; is
13 that correct?
14       MR. JACKSON:  Objection, form.
15    A.  The testing I did was called oxidation
16 induction time testing.  It is an accelerated test,
17 yes.
18 BY MR. HUTCHINSON:
19    Q.  And at what temperature did you do it?
20    A.  200 degrees Centigrade.
21    Q.  Why did you choose that number?
22    A.  Because it's the recommended temperature
23 in the ASTM D3895 OIT testing standard.
24    Q.  And you followed the protocols from the

Page 24

1  ASTM D3895 and ASTM 1980, correct?
2       MR. JACKSON:  Object to the form.
3    A.  1980, no, I did the ASTM D3895.
4  BY MR. HUTCHINSON:
5    Q.  Did you follow the protocols from the ASTM
6  1980?
7    A.  I would say no.  The 1980 is specific to
8  packaging for medical devices, and so I didn't,
9  since this was not packaging for a medical device, I
10 did not follow that.
11    Q.  Doctor, your expert report, Page 3, states
12 that you followed the Q10 protocol as described in
13 ASTM F1980, correct?
14    A.  Correct.
15    Q.  What was the Q10 protocol that you
16 followed?
17    A.  That protocol is basically a mathematical
18 protocol where you operate under the assumption, and
19 it is an assumption, that the oxidation rate or
20 reaction rate doubles the kinetics of the oxidation
21 reaction, doubles every 10 degrees Centigrade
22 increase in temperature.  So that protocol is used
23 to extrapolate from the elevated temperature to make
24 predictions, and I emphasize the word predictions,

Page 25

1  because that's all it is, of what would happen at
2  the lower temperatures.  So that's what's referred
3  to by the Q10 protocol.
4    Q.  Is the Q10 protocol defined in the ASTM
5  1980 protocol?
6       MR. JACKSON:  Objection, form.
7    A.  Yes.
8  BY MR. HUTCHINSON:
9    Q.  Is that what you followed?
10       MR. JACKSON:  Objection, form.
11    A.  I followed the Q10 protocol regarding the
12 doubling of reaction rate every 10 degrees.  That
13 methodology for calculation is what I followed.
14 BY MR. HUTCHINSON:
15    Q.  Did you follow anything else from ASTM
16 1980?
17       MR. JACKSON:  Objection, form.
18    A.  No.
19 BY MR. HUTCHINSON:
20    Q.  Are you giving any life expectancy
21 opinions regarding Prolene?
22       MR. JACKSON:  Objection, form.
23    A.  No, other than just general, not specific.
24 BY MR. HUTCHINSON:

7 (Pages 22 to 25)

Duane Priddy, Ph.D.

Page 26

1    Q.  Are your general life expectancy opinions
2  regarding Prolene included in your expert report?
3    A.  My expert opinion is that its life
4  expectancy is not indefinite, that it degrades so
5  it's not going to last forever.
6    Q.  But you are not giving any specific life
7  expectancy opinions, are you, sir?
8        MR. JACKSON:  Objection, form.
9    A.  No.
10     (Priddy Deposition Exhibit 4 was
11     marked for identification.)
12 BY MR. HUTCHINSON:
13   Q.  I hand you what we'll mark as Exhibit 4 to
14 your deposition.
15     (Witness reviewing document.)
16   Q.  This is the ASTM that you followed,
17 correct?
18   A.  Yes.
19   Q.  Is this the version that you followed?
20   A.  I'm not sure if it's the dash 14 version
21 or not.  I would think it probably is not the dash
22 14 version.  It's probably an earlier version,
23 because I have been doing OIT for many years, much
24 earlier than 2014.

Page 27

1    Q.  But 2014 -- or 14, rather, stands for
2  the year, correct?
3    A.  Correct.
4    Q.  You used an older version of the ASTM
5  3895?
6        MR. JACKSON:  Objection, form.
7    A.  Yes.
8  BY MR. HUTCHINSON:
9    Q.  Why?
10   A.  Because I have been doing it for many
11 years preceding '14, and once I get the lab set up
12 doing a specific test, following a specific standard
13 in a specific way, I just don't deviate it.
14   Q.  Sir, did you ever compare the version, the
15 older version that you used of 3895 to the most
16 recent ASTM 3895 2014?
17   A.  No.
18   Q.  Are you aware of any changes between those
19 two ASTM protocols?
20   A.  I would have to study it in depth to look
21 for those differences.
22   Q.  But you can't tell us those differences
23 now?
24   A.  No.

Page 28

1    Q.  Doctor, on Page 2 of your expert report,
2  you did what is called oxidative induction time
3  testing; is that correct?
4    A.  Correct.
5    Q.  You generated some -- I'm going to call
6  that, by the way, OIT for short.  Are you and I on
7  the same page?
8    A.  Absolutely.
9    Q.  You generated some OIT values contained in
10 your report; is that right?
11   A.  That is correct.
12   Q.  And you used OIT to compare the oxidative
13 stability of 10 different Ethicon mesh samples?
14   A.  That's correct.
15   Q.  Who conducted the tests?
16   A.  A technician at Materials Engineering,
17 Inc. located in Virgil, Illinois.  They are an A2LA
18 certified laboratory.
19   Q.  How far away is that from your office?
20   A.  About 180 miles probably.
21   Q.  Do you know the names of the person who
22 did the testing?
23   A.  Yes.
24   Q.  What were their names?

Page 29

1    A.  Steve Johnson is the technician that runs
2  that test.
3    Q.  Were you present when Steve Johnson did
4  any of the tests?
5    A.  No.
6    Q.  Did you direct the work of Steve Johnson
7  in any way?
8        MR. JACKSON:  Objection, form.
9    A.  To the extent of how I wanted the mesh
10 samples analyzed, yes.
11 BY MR. HUTCHINSON:
12   Q.  Did you provide any written correspondence
13 to Steve Johnson on how to do the tests?
14   A.  No.
15   Q.  Do you know how long Steve Johnson took to
16 do the tests?
17       MR. JACKSON:  Objection, form.
18   A.  About a week.
19 BY MR. HUTCHINSON:
20   Q.  Eight hours a day?
21   A.  I wasn't there to watch him.  I don't
22 know.
23   Q.  Do you know how much specific time Steve
24 Johnson did in doing the tests?

8 (Pages 26 to 29)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 30

1    A.  No.
2    Q.  Has Steve Johnson sent you a bill for
3  doing those tests?
4    A.  I have a credit card on file with him and
5  when he's done, he just charges my card.
6    Q.  Has he charged your card yet?
7    A.  I have to check.  I don't recall offhand.
8    Q.  Do you have any idea how much money Steve
9  Johnson is going to charge you to do the tests that
10  are outlined in your expert report?
11    A.  Well, I know that he charges me about $200
12  to run an OIT test and since he ran these ten tests,
13  I can do the math.
14    Q.  Doctor, do you know if Steve Johnson had
15  any help doing the tests?
16    A.  He has another technician that works with
17  him.
18    Q.  What's that technician's name?
19    A.  It was a new hire.  I don't even recall,
20  Mark somebody.
21    Q.  Do you know how this new hire has been
22  trained?
23    A.  I don't.
24    Q.  Have you ever met this new hire?

Page 31

1    A.  No.
2    Q.  Do you know how much time this new hire
3  named Mark spent on this test?
4       MR. JACKSON:  Objection, form.
5    A.  I don't think he has done anything on the
6  test.  I think Steve Johnson did it all.
7  BY MR. HUTCHINSON:
8    Q.  And Steve Johnson did this DSC test,
9  correct?
10    A.  That's correct.
11    Q.  Differential scanning calorimetry?
12    A.  That's correct.
13    Q.  He used some samples of Ethicon's mesh,
14  right?
15    A.  That's correct.
16    Q.  Did you give the samples to Steve Johnson?
17    A.  I sent them to him.
18    Q.  Is that reflected in the chain of custody
19  documents?
20    A.  It is.
21    Q.  Have you ever received any chain of
22  custody documents from Steve Johnson?
23    A.  No.
24    Q.  Steve Johnson was the one who actually

Page 32

1  handled the mesh, correct?
2    A.  That is correct.
3    Q.  Have you ever asked for any chain of
4  custody documents from Steve Johnson?
5    A.  I just talked to him to make sure that he
6  received them.  He said yes, I have.  But I confirmed
7  his receipt of the meshes that I sent to him.
8    Q.  But you have no chain of custody documents
9  showing what Steve Johnson did with the mesh,
10  correct?
11       MR. JACKSON:  Objection, form.
12    A.  I know he received them and analyzed them
13  and he still has them.
14  BY MR. HUTCHINSON:
15    Q.  How did you ship the samples to Steve
16  Johnson?
17    A.  UPS.
18    Q.  Where did you get the samples to ship to
19  Steve Johnson?
20    A.  From Fidelma, an attorney.
21    Q.  When did you receive them?
22    A.  I'd have to look at the chain of custody
23  documents.  I believe it was mid-December.
24    Q.  What products did you receive?

Page 33

1    A.  I received six different TVTs and four
2  different Gynemeshes.
3    Q.  Would you describe the Gynemeshes that you
4  received?
5    A.  Describe them?
6    Q.  Yes, sir.
7       MR. JACKSON:  Objection, form.
8  BY MR. HUTCHINSON:
9    Q.  Describe them for the jury.  What did they
10  look like?
11    A.  It's just a strip of polypropylene mesh
12  between, I assume, some stainless steel rods.
13    Q.  How else would you describe the Gynemesh
14  that you received?
15       MR. JACKSON:  Objection, form.
16    A.  That's about all I can say about it.
17  BY MR. HUTCHINSON:
18    Q.  How was the Gynemesh that you received
19  with the two stainless rods different from the six
20  TVTs that you received?
21       MR. JACKSON:  Objection, form.
22    A.  They both had mesh between metal rods and
23  I didn't specifically study exactly how they were
24  different so I can't answer that question.

9 (Pages 30 to 33)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 34

BY MR. HUTCHINSON:
1
2    Q.   So all products that you received had mesh
3  between two stainless steel rods; is that correct?
4    A.   That's my recollection, yes.
5    Q.   Doctor, let's talk about the sampling that
6  was used for the DSC.  DSC is a test, by the way,
7  right?
8    A.   Yes.
9    Q.   That's an analytical test?
10    A.   It's a piece of equipment.
11    Q.   And the purpose of the equipment is in
12  essence to melt the product inside, fair enough?
13        MR. JACKSON:  Objection, form.
14    A.   No.
15  BY MR. HUTCHINSON:
16    Q.   What's the purpose of the equipment?
17    A.   It's to detect thermal heat flow, whether
18  it be cooling or heating with plastic materials.
19    Q.   But you do that by melting the plastic
20  material, correct?
21        MR. JACKSON:  Objection, form.
22    A.   Not necessarily.
23  BY MR. HUTCHINSON:
24    Q.   Did you melt the samples that you received

Page 35

1  in this case?
2    A.   At 200 degrees, that's above the melting
3  point so they would be melted, yes.
4    Q.   How did you make the specimen sample?
5    A.   It was cut with scissors.
6    Q.   In your lab or in Steve Johnson's lab?
7    A.   Steve Johnson did the cutting.
8    Q.   Were you supervising the cutting of the
9  samples with Steve Johnson?
10    A.   I was not present, but we discussed the
11  protocol of how to collect the samples.
12    Q.   What was the average sheet thickness of
13  the sample?
14        MR. JACKSON:  Objection, form.
15    A.   I don't recall.
16  BY MR. HUTCHINSON:
17    Q.   Did you ever ask Steve Johnson about what
18  the average sheet thickness was of the sample?
19    A.   I asked him what the thickness was.
20    Q.   What did he tell you?
21    A.   I don't recall.  It was less than -- I
22  don't recall.
23    Q.   Why is that not included in your expert
24  report?

Page 36

1    A.   Because it wasn't relevant to my opinion.
2    Q.   Doctor, was this test sample compressed or
3  molded into a sheet format?
4    A.   No.
5    Q.   Why not?
6    A.   Because that would have given the sample
7  another heat history, and I wanted to have the
8  samples tested in their original use shape as
9  monofilaments.
10    Q.   How many times was the DSC test run?
11        MR. JACKSON:  Objection, form.
12    A.   It's run once, and I had him run it in
13  pure oxygen, switching from nitrogen to oxygen, and
14  I also asked him to run it switching from nitrogen
15  to air, so he ran it twice for each sample.
16  BY MR. HUTCHINSON:
17    Q.   Do you know how long he ran it in pure
18  nitrogen?
19    A.   You run it for so many minutes until the
20  equipment is stable, get a smooth baseline.  That's
21  generally five minutes or so at 200.
22    Q.   But my question is, do you know how long
23  Steve Johnson ran it in pure nitrogen?
24    A.   Whatever the standard dictates, and I

Page 37

1  believe it's five minutes.
2    Q.   Do you know how long Steve Johnson ran the
3  sample or ran the test, rather, in pure oxygen?
4        MR. JACKSON:  Objection, asked and
5  answered.
6    A.   It's in the data.  Once you switch from
7  nitrogen to oxygen, that's time 0, and then you run
8  it in pure oxygen until the exotherm is over and
9  that gives you your OIT data.
10  BY MR. HUTCHINSON:
11    Q.   Let's look at Exhibit 4 and turn with me
12  to Page 2.
13    A.   Okay.
14    Q.   Under "9. sampling."  Do you see that?
15    A.   Yes.
16    Q.   9.1 says, "The following sample
17  preparation procedures are recommended:  the test
18  sample is compression molded into sheet format."
19        Did I read that correctly?
20    A.   Absolutely.
21    Q.   Why did you not follow that protocol?
22        MR. JACKSON:  Objection, form.
23    A.   Because it's recommended and, as I said
24  previously, that would require another heat history

Duane Priddy, Ph.D.

Page 38

1  on the sample, and I wanted to look at pristine mesh
2  samples in their use state.  And I didn't want to
3  alter that.
4        So that would have affected the results to
5  have done it that way.  And I emphasize the word
6  "recommended," because you don't have to do it that
7  way, it's just the recommended.
8    Q.  I understand, but fair to say that you
9  didn't follow the recommended sampling procedure in
10  ASTM 3895, correct?
11    MR. JACKSON:  Objection, form.
12    A.  Absolutely for good reason, it would have
13  affected the results negatively.
14  BY MR. HUTCHINSON:
15    Q.  Doctor, there is nothing in your expert
16  report about how the samples were prepared, is
17  there?
18    A.  Not in the report directly, no.
19    Q.  Why did you not include that in your
20  expert report?
21    A.  Because it has no bearing on my opinions.
22    Q.  Doctor, did you do any type of statistical
23  calculations to confirm that the results you got
24  from this test that Steve Johnson did were

Page 39

1  statistically significant?
2    MR. JACKSON:  Objection, form.
3    A.  What I did do --
4  BY MR. HUTCHINSON:
5    Q.  We are going to get to what you did do in
6  a minute.  I want to know the answer to my question
7  first and then we'll get there.
8    MR. JACKSON:  Counsel, you have to
9    let him answer the question.
10  BY MR. HUTCHINSON:
11    Q.  Did you do any type of statistical
12  calculations to --
13    A.  Yes.
14    Q.  Are those statistical calculations
15  included in your expert report?
16    A.  No.
17    Q.  Why not?
18    A.  Just didn't include it.
19    Q.  Any reason?
20    A.  No.
21    Q.  What type of statistical calculations did
22  you do?
23    A.  I had Steve Johnson extract the additives
24  from the mesh samples and to determine if the OIT

Page 40

1  numbers data gave a correlation with the level of
2  antioxidant in the mesh samples.  And the reason I
3  did that is just to confirm that there's a
4  statistical correlation between the level of
5  antioxidant and the OIT values because if there
6  hadn't have been, then I would have been concerned
7  about the validity of the results.
8    Q.  Doctor, let's look at Exhibit 4 for a
9  minute.  This is that ASTM 3895.
10    A.  Yes.
11    Q.  Bottom of Page 1, 4.3 states, "Unless
12  otherwise specified, the analysis temperature used
13  in this test has been arbitrarily set at 200 degrees
14  C."
15        Do you see that?
16    A.  Yes.
17    Q.  That's the temperature you used?
18    A.  Correct.
19    Q.  You used an arbitrary number?
20    MR. JACKSON:  Objection, form.
21    A.  I used the number specified in the
22  standard, yes.
23  BY MR. HUTCHINSON:
24    Q.  And the number specified in the standard

Page 41

1  is an arbitrary number, correct?
2    MR. JACKSON:  Objection, form.
3    A.  It is the number that I run.  Every time I
4  do an OIT test I do it at 200 degrees.  That's just
5  always the way I run it.
6  BY MR. HUTCHINSON:
7    Q.  I understand that, but the number that you
8  used is an arbitrary number according to the ASTM
9  standard, correct?
10    MR. JACKSON:  Objection, form.
11    A.  If they -- they define it as an arbitrary
12  number, so.
13  BY MR. HUTCHINSON:
14    Q.  Doctor, would you ever attempt to publish
15  a paper in a peer-reviewed journal using arbitrary
16  data?
17    MR. JACKSON:  Objection, form.
18    A.  I certainly would attempt to publish an
19  article in a paper based upon following an ASTM
20  standard.
21  BY MR. HUTCHINSON:
22    Q.  Would you ever attempt to publish anything
23  in a peer-reviewed journal with an arbitrary number?
24    MR. JACKSON:  Objection, form.

11 (Pages 38 to 41)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 42

1     A.  If it is specified in the standard, yes.
2  BY MR. HUTCHINSON:
3     Q.  Doctor, your report states that the mesh
4  sample was heated to 200 degrees under pure
5  nitrogen; is that right?
6     A.  Yes.
7     Q.  That's the temperature at which you
8  conducted this aging study?
9        MR. JACKSON:  Objection, form.
10    A.  Correct.
11 BY MR. HUTCHINSON:
12    Q.  That's also known as the accelerated aging
13 temperature, correct?
14    A.  Yes.
15    Q.  That equates to roughly 392 degrees
16 Fahrenheit?
17    A.  Correct.
18    Q.  That's about 300 degrees Fahrenheit above
19 the normal temperature of a human being; is that
20 correct?
21    A.  Correct.
22    Q.  And it is well above the melting point of
23 Prolene, isn't it?
24       MR. JACKSON:  Objection, form.

Page 43

1     A.  Yes, it is.
2  BY MR. HUTCHINSON:
3     Q.  What is the melting point of Prolene?
4     A.  165 degrees Centigrade approximately.
5     Q.  Doctor, moving to Page 2, at the top under
6  Significance and Use, are you there with me?
7     A.  Yes.
8     Q.  It says, "The OIT is a qualitative
9  assessment of the level (or degree) of stabilization
10 of the material tested."
11       Do you see that?
12    A.  Yes.
13    Q.  And a qualitative test is different from a
14 quantitative test, isn't it, sir?
15    A.  That's correct.
16    Q.  A qualitative test doesn't give you a
17 lifetime prediction, does it?
18       MR. JACKSON:  Objection, form.
19 BY MR. HUTCHINSON:
20    Q.  Doctor?
21    A.  It's standard practice to use data from
22 these kind of tests to do lifetime predictions,
23 realizing it's only a prediction.  With that
24 understanding that it has to be validated by actual

Page 44

1  testing.  If there's a red flag there, it will just
2  give you a red flag.  And so with that
3  understanding, as I say, I routinely use this test
4  for doing lifetime predictions.
5     Q.  I understand, but with that understanding,
6  a qualitative test does not give you lifetime
7  predictions, does it?
8        MR. JACKSON:  Objection, form.
9     A.  Yeah, It gives you predictions, certainly.
10 BY MR. HUTCHINSON:
11    Q.  It doesn't give you lifetime facts or
12 lifetime specifics, does it?
13       MR. JACKSON:  Objection, form.
14    A.  Every time you use an accelerated test
15 protocol to get a prediction, it's only a prediction
16 and you have to follow it up with real life, live
17 tests to validate.
18 BY MR. HUTCHINSON:
19    Q.  And you have to follow it up with real
20 time aging tests, correct?
21       MR. JACKSON:  Objection, form.
22    A.  That is correct.
23 BY MR. HUTCHINSON:
24    Q.  Doctor, you wouldn't rely on a qualitative

Page 45

1  test to determine how long a polymer would retain
2  its physical properties, would you?
3        MR. JACKSON:  Objection, form.
4     A.  I would use it for predictive purposes,
5  yes.
6  BY MR. HUTCHINSON:
7     Q.  Doctor, let's move on to the top of Page
8  2. Under Note 2 it states, "The OIT measurement is
9  an accelerated thermal-aging test and as such can be
10 misleading."
11       Did I read that correctly?
12    A.  Yes.
13    Q.  What does misleading mean?
14       MR. JACKSON:  Objection, form.
15    A.  What they are trying to say there is, if I
16 have different materials, say two different
17 polypropylenes with two different stabilizer
18 packages, one polypropylene has additive stabilizer
19 antioxidant A in it and another one has antioxidant
20 stabilizer package B in it and I run an OIT and I
21 get different values, that it would be misleading
22 for me to say that one is better than the other.
23 BY MR. HUTCHINSON:
24    Q.  Did you consider this statement before

12 (Pages 42 to 45)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 46

1  doing your testing?
2       MR. JACKSON: Objection, form.
3       A.  Yes.
4  BY MR. HUTCHINSON:
5       Q.  Doctor, one would never expect to use
6  Prolene in the body at 200 degrees C, would they?
7       A.  That's correct.
8       Q.  In fact, you would never expect Prolene to
9  be exposed to a hundred percent nitrogen in vivo,
10  would you?
11      A.  No.
12      Q.  You'd never expect Prolene to be exposed
13  to a hundred percent oxygen in vivo, would you?
14      MR. JACKSON: Objection, form.
15      A.  Not pure oxygen.  I certainly would expect
16  it to be exposed to oxidizing species, but not a
17  hundred percent pure oxygen, no.
18  BY MR. HUTCHINSON:
19      Q.  Moving on down on Note 2, last sentence it
20  says, "Volatile antioxidants may generate poor OIT
21  results even though they may perform adequately at
22  the intended use temperature of the finished
23  product."
24       Did I read that correctly?

Page 47

1       A.  Yes.
2       Q.  Did you consider that before you did your
3  testing, Doctor?
4       A.  Yes.
5       Q.  Do you know whether there is a volatile
6  antioxidant in Prolene?
7       A.  The Santonox R and the dilauryl
8  thiodipropionate, both of those additives are not
9  volatile.  At 200 degrees they would not vaporize
10  from the Prolene.
11      Q.  What do you base that on, Doctor?
12      A.  Just my polymer chemistry and experience
13  working with these types of antioxidants.
14      Q.  Did you account for the volatility of
15  DLTDP before you did your testing?
16      A.  Yes.
17      Q.  How?
18      A.  I actually asked the technician to inject
19  a sample of pure dilauryl thiodipropionate -- this
20  is Steve Johnson -- into the gas chromatograph to
21  determine its relative volatility.  In other words,
22  you do that by retention time, how long does it take
23  this chemical to -- before it makes its way through
24  the gas chromatograph, and you get a feel for its

Page 48

1  level of volatility.
2       If it comes through in less than 10
3  minutes, it is volatile.  If it takes 20 minutes to
4  come off the GC column, you know that at
5  200 degrees C, it is not volatile.  And I did the same
6  thing for Santonox R.
7       Q.  Doctor, did you account for the volatility
8  of any other additives contained in Prolene?
9       A.  No, I was focused on the antioxidant
10  species.
11      Q.  Did you focus any on Procol LA-10?
12      A.  No.
13      Q.  Did you ever focus on calcium stearate?
14      A.  No.  Those are lubricants, not
15  antioxidants.
16      Q.  Doctor, the intended use temperature of
17  the finished product, what is the intended use
18  temperature of the finished product?
19      MR. JACKSON: Objection, form.
20      A.  37 degrees C or 98.6 Fahrenheit.
21  BY MR. HUTCHINSON:
22      Q.  It is not 200 degrees C, is it?
23      A.  No.
24      Q.  Doctor, moving on down to Note 3, "There

Page 49

1  is no accepted sampling procedure, nor have any
2  definitive relationships been established for
3  comparing OIT values on field samples to those on
4  unused products.  Hence, the use of such values for
5  determining life expectancy is uncertain and
6  subjective."
7       Did I read that correctly?
8       A.  Absolutely, yes.
9       Q.  Doctor, what would the field sample be in
10  this particular case?
11      A.  The Prolene mesh.
12      Q.  It would be an explant, correct?
13      MR. JACKSON: Objection, form.
14      A.  No, it's a virgin, unused implant.
15  BY MR. HUTCHINSON:
16      Q.  That's what you consider to be a field
17  sample?
18      A.  Yes.
19      Q.  What's the difference between a virgin,
20  unused piece of Prolene and an unused product?
21      MR. JACKSON: Objection, form.
22      A.  There is no difference.
23  BY MR. HUTCHINSON:
24      Q.  Doctor, the ASTM that you quote says

13 (Pages 46 to 49)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 50

1  there have been no definitive relationships
2  established for comparing values on field samples to
3  those for unused products.
4         MR. JACKSON: Objection, misstates
5      witness testimony.
6  BY MR. HUTCHINSON:
7      Q.   That's what the ASTM says, correct?
8      A.   Okay.
9      Q.   And in fact, Doctor, there's been no
10  definitive relationships established for comparing
11  the OIT values of explant to mesh that's never been
12  used in surgery; is that fair?
13     A.   That is fair, yes.
14     Q.   In fact, Doctor, can you stand by your
15  opinions to a reasonable degree of scientific
16  certainty, given that the ASTM that you used says
17  "determining life expectancy is uncertain and
18  subjective"?
19        MR. JACKSON: Objection, form.
20     A.   I'm sorry, I don't understand that
21  question.  Would you repeat it, please?
22  BY MR. HUTCHINSON:
23     Q.   Can you stand by your opinions, given that
24  the ASTM that you used says "determining life

Page 51

1  expectancy is uncertain and subjective"?
2         MR. JACKSON: Objection, form.
3      A.   What I can say is this, the life
4  expectancy is uncertain, that's correct.
5  BY MR. HUTCHINSON:
6      Q.   And the life expectancy is also
7  subjective, isn't it, sir?
8         MR. JACKSON: Objection, form.
9      A.   All I can say is in a nutshell, this data
10  shows that the Prolene material will not last
11  indefinitely in the body.  It is susceptible to
12  oxidative degradation over time.
13  BY MR. HUTCHINSON:
14     Q.   But the life expectancy is subjective,
15  isn't it, sir?
16        MR. JACKSON: Objection, form.
17     A.   It is subject to the conditions in the
18  body, yes, certainly.
19  BY MR. HUTCHINSON:
20     Q.   It is also subjective according to the
21  ASTM protocol, correct?
22     A.   It's always subjective, lifetime of any
23  article is subject to the conditions that the part
24  is under, exposed to.

Page 52

1      Q.   Doctor, would you ever publish anything in
2  the "American Chemical Society" journal that was
3  uncertain and subjective?
4         MR. JACKSON: Objection, form.
5      A.   Yes, I would.
6  BY MR. HUTCHINSON:
7      Q.   Doctor, moving on down to Note 7, it
8  states, "The material composition of the specimen
9  holder can influence the OIT test result
10  significantly."
11        Do you see that?
12     A.   I'm sorry, where are you at?
13     Q.   At the bottom of Page 2, note 7.
14     A.   Reagents and Materials?
15     Q.   No, bottom of Page 2.  It says, "The
16  material composition of the specimen holder."
17        Do you see that?
18     A.   I'm sorry, I'm still not with you.
19  Could you point to where you?
20     Q.   I'll be happy to.
21     A.   Okay, thank you.  Okay.
22     Q.   Do you see that, Doctor?
23     A.   Yes.
24     Q.   What type of specimen holder was used by

Page 53

1  Steve Johnson?
2      A.   It's called a DSC pan.
3      Q.   What is the DSC pan that Steve Johnson
4  used made out of?
5      A.   He told me.  It's in the report and I
6  don't recall offhand.
7      Q.   It is in your expert report?
8      A.   No, it's in his report to me.
9      Q.   Steve Johnson prepared a report and gave
10  it to you?
11        MR. JACKSON: Objection, form.
12     A.   It's data.  He gives me the data with a
13  little note and it tells what the pan is, but I
14  don't recall offhand what the pan is.
15  BY MR. HUTCHINSON:
16     Q.   Where is the data that Steve Johnson gave
17  you?
18     A.   It would be on my computer.
19     Q.   It is not included on this flash drive, is
20  it, sir?
21     A.   It probably is.
22     Q.   Can you testify under oath that this data
23  that Steve Johnson gave you is contained on this
24  flash drive?

14 (Pages 50 to 53)

Duane Priddy, Ph.D.

Page 54

1    MR. JACKSON: Objection, form.
2    A. Not without checking to confirm for sure.
3 I believe I put it on there.
4 BY MR. HUTCHINSON:
5    Q. Doctor, sitting here today, can you tell
6 us the type of specimen holder that Steve Johnson
7 used?
8    A. A DSC pan, and I don't recall what the
9 metal was.
10    Q. Do you know if Steve Johnson used more
11 than one specimen holder?
12    A. The little DSC pans are disposable. In
13 other words, for the OIT test, he uses a specific
14 type of pan that he knows to be, will not influence the
15 data and that's the type of pan he uses. I just
16 don't recall offhand what the metal is.
17    Q. Doctor, have you done anything to
18 determine if the specimen holder that Steve Johnson
19 used affected the results?
20    MR. JACKSON: Objection, form.
21    A. As I say, he in the past has run tests,
22 since he runs the OIT for me all the time, to
23 confirm the OIT test as he runs it is unaffected by
24 the pan that he uses. It's just I don't recall what

Page 55

1 metal it is.
2 BY MR. HUTCHINSON:
3    Q. I understand that, Doctor, but I'm asking
4 you, have you done anything personally to determine
5 if the specimen holder that Steve Johnson used
6 affected the test results?
7    A. I don't run DSC, so technicians do that.
8    Q. Have you done anything, sir, personally to
9 determine if the specimen holder affected the
10 results?
11    MR. JACKSON: Objection, asked and
12    answered.
13    A. As I say, it was done in the past, on past
14 projects.
15 BY MR. HUTCHINSON:
16    Q. I am talking about this project, sir.
17 Have you personally done anything to determine if
18 the specimen holder affected the results, yes or no?
19    MR. JACKSON: Objection, asked and
20    answered.
21    A. In the sense that I made sure that he is
22 using his standard pan under the standard operating
23 procedures for the laboratory as an A2LA certified
24 laboratory. They are annually audited, all their

Page 56

1 processes checked by auditors.
2    And so the DSC pan is always the same.
3 It's been confirmed by him not to affect the
4 results. That's the pan he used. I just can't
5 recall what the metal is offhand.
6    Q. That's right. But my question to you is:
7 Have you personally -- I'm not talking about Steve
8 Johnson, I'm talking about you personally -- have
9 you personally done anything to determine if the
10 specimen holder affected the results?
11    MR. JACKSON: Objection, asked and
12    answered.
13    A. Other than how I have just answered it,
14 no.
15 BY MR. HUTCHINSON:
16    Q. Doctor, can you use your DSC data to make
17 lifetime calculations when one is in pure oxygen and
18 the other is implanted in vivo?
19    MR. JACKSON: Objection, form.
20    A. I wasn't trying to do that. That wasn't
21 the purpose. My purpose for running the test was to
22 look at variability of ten different mesh samples.
23 That was my intent. And so I was looking to see if,
24 when these different samples with the same

Page 57

1 antioxidant formulations in them, when they are
2 suddenly exposed to oxygen, do they have the same
3 OIT value or is it extremely variable. And I saw up
4 to 150 percent variability from the low to the high
5 end.
6    The key message is that these implants
7 have variability in their oxidation resistance.
8 They aren't all the same. That's it. That's the
9 only message that I was trying to figure out there.
10    (Priddy Deposition Exhibit 5 was
11    marked for identification.)
12 BY MR. HUTCHINSON:
13    Q. Doctor, handing you what we'll mark as
14 Exhibit 5 to your deposition. This is the ASTM
15 that you quoted in your expert report, correct?
16    MR. JACKSON: Objection, form.
17    A. Yes.
18 BY MR. HUTCHINSON:
19    Q. I believe it is your testimony, you didn't
20 follow this ASTM 1980 protocol; is that right?
21    A. The only portion that I followed is this
22 Q10 estimate for trying to get a feel for predicting
23 lifetimes.
24    Q. Why didn't you follow anything else?

15 (Pages 54 to 57)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 58

1      MR. JACKSON: Objection, form.
2      A.  Because it's not a -- it has to do with
3  sterile medical device packages, not what's inside.
4  So it's really not a standard that's directly
5  applicable to this situation.
6  BY MR. HUTCHINSON:
7      Q.  Doctor, fair to say you never did any
8  real-time aging studies to confirm the accelerated
9  aging study results that you generated, correct?
10     A.  That is correct.
11     Q.  All of the studies that you did are
12  contained in your expert report; is that correct?
13     MR. JACKSON: Objection, form.
14     A.  I mean, I mentioned a few minutes ago, I
15  ran the OIT test under pure oxygen and then
16  switching from nitrogen to air, and I believe that's
17  the only deviation that was done that wasn't
18  included in the report.
19  BY MR. HUTCHINSON:
20     Q.  Doctor, turn with me to Page 2.
21     A.  Of?
22     Q.  Of Exhibit 5 which is ASTM 1980.
23     A.  Yes.
24     Q.  There on Page 2, note 6.4, this is a

Page 59

1  protocol that you followed in determining the Q10
2  level, correct?
3      MR. JACKSON: Objection, form.
4      A.  Q10.
5  BY MR. HUTCHINSON:
6      Q.  Am I correct?
7      A.  Not really, because they talk about three
8  temperatures here and I only ran one temperature,
9  200.
10     Q.  Doctor, did you follow any type of
11  protocol in your Q10 calculations for determining
12  the temperature that you used?
13     MR. JACKSON: Objection, form.
14     A.  The temperature that I used?
15  BY MR. HUTCHINSON:
16     Q.  Strike that.  What did you use Q10 for?
17     A.  The only portion of this that I used was
18  just what I described earlier, the doubling,
19  approximately doubling of reaction rate every
20  10 degrees.  That's the only -- I just referenced
21  this to support that concept for doing that crude
22  calculation.  That's all.
23     Q.  Doctor, the double reaction rate for every
24  10 degrees, is that based on any ASTM standard?

Page 60

1      MR. JACKSON: Objection, form.
2      A.  No, it's just a normal, understood
3  scientific principle that reaction rates
4  approximately double every 10 degrees.
5      Q.  Is that based on any scientific literature
6  that you can tell me sitting here today?
7      A.  I could, if I was pressed to do so, I
8  could come up with textbook references, organic
9  chemistry 101, polymer chemistry 101 where they
10  teach this doubling of a reaction rate every
11  10-degree principle.  As I say, it's crude and it's
12  just for ballpark, is there a flag, kind of
13  calculations.
14     Q.  But it is your testimony, if I understand
15  it, under oath that ASTM 1980 does not apply to the
16  testing you did, correct?
17     MR. JACKSON: Objection, form.
18     A.  Yes, because it's for packaging.  The only
19  reason I reference it is because of that Q10
20  doubling of reaction rate principle.
21     MR. JACKSON: Chad, we have been
22     going just about an hour.  Are we at a
23     good time for a break?
24     MR. HUTCHINSON: One more thing and

Page 61

1  we'll take a quick break, okay?
2      (Priddy Deposition Exhibit 6 was
3      marked for identification.)
4  BY MR. HUTCHINSON:
5      Q.  Doctor, handing you what we'll mark as
6  Exhibit 6 to your deposition.  This is the
7  de la Rie article that you quoted in your expert
8  report; is that correct?
9      (Witness reviewing document.)
10     A.  Yes.
11     Q.  Did you read this before you quoted it in
12  your expert report?
13     A.  Yes.
14     Q.  Turn to Page 17 with me, please.
15     A.  Okay.
16     Q.  At the bottom of the column on the left,
17  the paragraph starting out with "Materials," are
18  you there with me?
19     A.  Yes.
20     Q.  It states, "Materials which are not
21  exposed to light" -- and by the way, mesh when
22  planted in vivo is not exposed to light, is it?
23     MR. JACKSON: Objection, form.
24     A.  No.  Not while it is in vivo, it is not.

Duane Priddy, Ph.D.

Page 62

1  BY MR. HUTCHINSON:
2      Q.  "Materials which are not exposed to light
3  during their normal life could be tested in heat
4  aging experiments."
5          In fact, that's what you did, correct, a
6  heat aging experiment, correct, on mesh?
7          MR. JACKSON:  Objection, form.
8      A.  Yes, I did.
9  BY MR. HUTCHINSON:
10     Q.  It goes on to say, "But if temperatures
11  are used which are considerably higher than the ones
12  the material is exposed to under normal
13  circumstances, the danger exists of introducing new
14  degradation reactions."
15         Did I read that correct?
16     A.  Yes, you did.
17     Q.  Doctor, did you consider that before you
18  did your accelerated aging tests?
19     A.  Yes.
20     Q.  Did you know what de la Rie said about
21  using higher temperatures?
22     A.  Yes.
23     Q.  How did you account for that?
24     A.  By stating that it is only a rough

Page 63

1  approximation and has to be validated with actual
2  real-time studies because of this possibility.
3      Q.  Doctor, did you do any type of calculation
4  regarding the Arrhenius rate reaction for
5  polypropylene?
6          MR. JACKSON:  Objection, form.
7      A.  That has been done in the literature
8  before.
9  BY MR. HUTCHINSON:
10     Q.  I am asking you:  Did you do any
11  calculation for the Arrhenius rate reaction for
12  polypropylene?
13         MR. JACKSON:  Objection, form.
14     A.  Not on my data, no, I couldn't, because I
15  only ran at one temperature.  I did not run at
16  three temperatures.  You have to run at three
17  temperatures to do the Arrhenius calculations.
18         MR. HUTCHINSON:  We can take a quick
19     break.
20         THE VIDEOGRAPHER:  We are now off
21     the video record.  The time is 10:01 a.m.
22         (Recess.)
23         THE VIDEOGRAPHER:  We are back on
24     the video record with Tape Number 2.  The

Page 64

1      time is 10:08 a.m.
2  BY MR. HUTCHINSON:
3      Q.  Doctor, we are back on the record.  Have
4  you understood all my questions so far?
5      A.  Yes.
6      Q.  Is there anything about the testimony
7  that you have given that you would like to change?
8          MR. JACKSON:  Objection, form.
9      A.  Not at this point.
10  BY MR. HUTCHINSON:
11     Q.  Turn with me to Exhibit 2.  That's your
12  expert report.
13     A.  Okay, got it.
14     Q.  On Page 3 you state you are a plastics
15  consultant for medical supply companies?
16     A.  Yes.
17     Q.  What type of products?
18     A.  Oh, boy.
19     Q.  Let me ask you this:  Any products
20  regarding polypropylene?
21     A.  I mean, I have done materials selection
22  work for Baxalta.
23     Q.  Let's focus on polypropylene.
24     A.  I considered polypropylene as I was

Page 65

1  selecting material, so they just asked me to
2  recommend a material for a certain application.  And
3  I considered polypropylene and ruled it out, just
4  didn't have the right properties for the
5  application.
6      Q.  Doctor, have you ever selected a polymer
7  that has a lifetime warranty?
8          MR. JACKSON:  Objection, form.
9      A.  I don't believe so.
10  BY MR. HUTCHINSON:
11     Q.  Doctor, would you ever guarantee to the
12  recipients of these medical devices that you
13  consulted for, would you ever guarantee to them that
14  their material would never oxidize?
15         MR. JACKSON:  Objection, form.
16     A.  No.
17  BY MR. HUTCHINSON:
18     Q.  Doctor, on Page 3 of your expert report,
19  you reference ISOT.  That stands for incipient
20  surface oxidation time; is that correct?
21     A.  Yes.
22     Q.  Is ISOT in any ASTM standard?
23     A.  It is nowhere.  That is my own acronym.
24     Q.  Doctor, you didn't use a publication to

17 (Pages 62 to 65)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 66

1  come up with your own acronym, did you?
2      A.  I did not.
3      Q.  You made it up just for this experiment,
4  didn't you?
5          MR. JACKSON:  Objection, form.
6      A.  No.
7  BY MR. HUTCHINSON:
8      Q.  Where did you come up with your own
9  acronym?
10         MR. JACKSON:  Objection, form.
11     A.  As I say, I have been using OIT testing
12 for years.
13 BY MR. HUTCHINSON:
14     Q.  I want to talk about ISOT.
15     A.  Yes, I know.  And as part of that, I look
16 at the shape of the OIT curve because normally it is
17 a nice, smooth transition with two slopes and when
18 you get the baseline meandering around and doing
19 strange things, you know that there's something
20 going on that's not normal.  And so I always, just
21 for my own thought processes, identify the point to
22 where something chemically starts to happen and I
23 call that the incipient oxidation point.
24     Q.  But that's something you made up?

Page 67

1      A.  I did, yes.
2      Q.  Doctor, if you look at Page 5, it states,
3  polypropylene is subject to degradation or weakening
4  by oxidative agents.
5      A.  Where are you at now?
6      Q.  Page 5.
7          MR. JACKSON:  Chad, can you let us
8      know which paragraph you are on?
9          MR. HUTCHINSON:  Yes, I'm sorry.
10     Second paragraph, second sentence.
11         THE WITNESS:  Okay.
12 BY MR. HUTCHINSON:
13     Q.  It states, the "chemical reactions
14 continue to occur so long as any oxidizing agents,
15 such as those present in the human body, are
16 present."  Do you see that?
17     A.  Yes.
18     Q.  Doctor, what are the names of the
19 oxidizing agents?
20         MR. JACKSON:  Objection, form.
21     A.  Excuse me?
22     Q.  What are the names of the oxidizing agents
23 that you reference here?
24         MR. JACKSON:  Objection, form.

Page 68

1      A.  Are you talking about in the human body?
2  BY MR. HUTCHINSON:
3      Q.  Yes, sir.
4      A.  Hydrogen peroxide, there's all sorts of
5  oxidizing agents.
6      Q.  All right, hydrogen peroxide.  What else?
7      A.  Again, I'm not a medical doctor or a
8  pathologist, but I have read many reports that refer
9  to oxidizing agents being present in the body,
10 especially with foreign body reactions.  The body
11 will generate oxidizing species.
12     Q.  Those are called reactive oxygen species,
13 correct?
14     A.  Right, ROS.
15     Q.  My question to you is, though, can you
16 name the oxidizing agents that you are aware of in
17 the human body?
18         MR. JACKSON:  Objection, asked and
19     answered.
20     A.  I just named one, hydrogen peroxide.
21 BY MR. HUTCHINSON:
22     Q.  Can you name any others?
23         MR. JACKSON:  Objection, asked and
24     answered.

Page 69

1      A.  There's all sorts of peroxidases which are
2  oxidative enzymes.
3  BY MR. HUTCHINSON:
4      Q.  Other than hydrogen peroxide and enzymes,
5  can you name any other type of oxidizing agents?
6          MR. JACKSON:  Objection, misstates
7      witness testimony.
8      A.  Oxygen.
9  BY MR. HUTCHINSON:
10     Q.  Anything else?
11     A.  That's all I can recall at this point.
12     Q.  Doctor, do you know the amount of hydrogen
13 peroxide that's secreted in the body?
14         MR. JACKSON:  Objection, form.
15     A.  No.
16 BY MR. HUTCHINSON:
17     Q.  Can you quantify it?
18         MR. JACKSON:  Objection.
19     A.  I cannot.
20 BY MR. HUTCHINSON:
21     Q.  Have you ever attempted to quantify it?
22     A.  No.
23     Q.  Have you ever used any type of
24 concentration of hydrogen peroxide to determine how

18 (Pages 66 to 69)

Duane Priddy, Ph.D.

Page 70

1   it affects Prolene?
2       A.  I have not done that.
3       Q.  Doctor, do you have any idea how many or
4   what type of -- strike that.
5           Do you have any idea of the amount of
6   enzymes, oxidizing enzymes that are secreted from
7   the body?
8           MR. JACKSON:  Objection, form.
9       A.  I have never measured it, no.
10  BY MR. HUTCHINSON:
11      Q.  To your knowledge, has it ever been
12  quantified?
13      A.  I do not know.
14      Q.  Doctor, sitting here today, can you
15  quantify the amount of oxidizing agents that are
16  produced by the human body?
17          MR. JACKSON:  Objection, asked and
18      answered.
19      A.  Are you asking have I done it or could it
20  be done?
21  BY MR. HUTCHINSON:
22      Q.  I am asking, have you done it?
23      A.  I have not done it.
24      Q.  Do you know the amount of oxidizing agents

Page 71

1   produced by the human body?
2           MR. JACKSON:  Objection, asked and
3       answered.
4       A.  No.
5   BY MR. HUTCHINSON:
6       Q.  Doctor, do you have any opinions regarding
7   the quantity of oxidizing agents it would take to
8   oxidize Prolene?
9       A.  Well, Prolene is an oxidizable material,
10  so any oxidant is capable of oxidizing Prolene.
11      Q.  My question, sir:  Do you have any idea
12  about the concentration level of oxidizing agents
13  that it would take to oxidize Prolene?
14      A.  Any detectable, measurable amount of an
15  oxidizing species is capable of oxidizing Prolene.
16      Q.  Can you quantify that, Doctor?
17          MR. JACKSON:  Objection, form.
18      A.  A detectable, I don't know what the
19  detection limit of a test you want to use, but if it
20  is detectable, it is capable of oxidizing Prolene.
21  BY MR. HUTCHINSON:
22      Q.  What about a micromole, can a micromole
23  oxidize Prolene?
24          MR. JACKSON:  Objection, form.

Page 72

1       A.  Absolutely.
2   BY MR. HUTCHINSON:
3       Q.  Doctor, do you have any idea how the
4   concentration level of hydrogen peroxide found
5   naturally in the body compares to 30 percent of
6   hydrogen peroxide?
7           MR. JACKSON:  Objection, form.
8       A.  I do not.
9   BY MR. HUTCHINSON:
10      Q.  You would expect 30 percent hydrogen
11  peroxide to be much stronger than the amount of
12  peroxide found in the body, correct?
13          MR. JACKSON:  Objection, form.
14      A.  Absolutely, yes.
15          (Priddy Deposition Exhibit 7 was
16      marked for identification.)
17  BY MR. HUTCHINSON:
18      Q.  Doctor, I will hand you what's been marked
19  as Exhibit 7 to your deposition.  Doctor, this is a
20  memo from Ethicon dated November 5, 1984.  Do you
21  see that?
22          (Witness reviewing document.)
23      A.  I do.
24      Q.  If you look with me, please, and by the

Page 73

1   way, this is a document that you reviewed or relied
2   on in reaching your opinions?
3       A.  I have, yes.
4       Q.  If you look with me on Page 3 at the
5   top --
6           MR. JACKSON:  Chad, can you give us
7       the Bates number of the page you are on?
8           MR. HUTCHINSON:  Yes, it's 15958454.
9           MR. JACKSON:  Thank you.
10  BY MR. HUTCHINSON:
11      Q.  Top paragraph, middle sentence, it says,
12  "Immersion, with Peroxide Changes."
13          Do you see that?
14      A.  Yes.
15      Q.  "To ensure strength of Prolene sutures, in
16  30 percent hydrogen peroxide after a year's time at
17  room temperature did not produce visible surface
18  cracks on any of the fibers."
19          Do you see that?
20      A.  I do.
21      Q.  Doctor, do you have any reason to disagree
22  with this statement?
23      A.  No.
24      Q.  This shows that Prolene exposed to

19 (Pages 70 to 73)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 74

1  30 percent hydrogen peroxide for a year did not
2  produce visible surface cracks; is that correct?
3      A.  That's what that's saying, yes.
4      Q.  Doctor, how did you account for that when
5  reaching your opinions in this case?
6      A.  Irrelevant.
7      Q.  Why?
8      A.  Because they didn't do anything to
9  determine whether the material had oxidized or not.
10     Q.  Doctor, how do you know that?
11     A.  I don't see the data where they detected
12 whether or not oxidation had actually, degradation
13 of the material had occurred.  They just looked for
14 surface cracks.
15     Q.  Doctor, surface cracks are a form of
16 degradation, are they not?
17     A.  Yes.
18     Q.  In fact, visible surface cracks are a form
19 of oxidation via degradation, correct?
20     A.  Yes.
21     Q.  Doctor, what is a Bakelite cap?
22     A.  A Bakelite what?
23     Q.  Spelled B-A-K-E-L-I-T-E, do you know what
24 a Bakelite cap is on a glass vial?

Page 75

1          MR. JACKSON:  Objection, form.
2      A.  Yes.
3  BY MR. HUTCHINSON:
4      Q.  What are Bakelite caps generally made of?
5      A.  Bakelite, which is a phenolic resin.
6      Q.  Doctor, can you explain why the hydrogen
7  peroxide ate away the Bakelite cap and did not
8  affect the Prolene?
9      A.  Yes.
10     Q.  How so?
11     A.  Bakelite is a very hydrophilic,
12 water-loving, resin because phenolics are
13 hydroxylated materials which are hydrophylic.
14 Polypropylene is very hydrophobic, water-hating, so
15 polypropylene repulses and does not absorb water,
16 whereas Bakelite does absorb water.  So the water,
17 the hydrogen peroxide would penetrate into the
18 Bakelite and allow chemical oxidation to occur.
19     Q.  Let's look at Page 5 of your expert
20 report, Doctor.
21     A.  Page 5, okay.
22     Q.  Bottom paragraph, about the middle of the
23 paragraph.  It states, "These chemicals act to
24 extract the antioxidant stabilizers."

Page 76

1          Do you see that?
2      A.  Yes.
3      Q.  Doctor, have you tested that opinion?
4          MR. JACKSON:  Objection, form.
5      A.  That is basic polymer chemistry 101.
6  BY MR. HUTCHINSON:
7      Q.  My question is:  Have you tested that
8  opinion?
9          MR. JACKSON:  Objection, form.
10     A.  Yes.
11 BY MR. HUTCHINSON:
12     Q.  Are the test results included in your
13 expert report?
14     A.  No.
15     Q.  Doctor, what is the rate that chemicals
16 extract the antioxidant stabilizers?
17         MR. JACKSON:  Objection, form.
18     A.  It is dependent upon conditions.
19 BY MR. HUTCHINSON:
20     Q.  What about conditions in vivo, what is the
21 rate that conditions in vivo extract Santonox R or
22 DLTDP?
23     A.  That will be dependent upon a lot of
24 variables.

Page 77

1      Q.  Doctor, can you sit here today and
2  quantify that rate of extraction?
3          MR. JACKSON:  Objection.
4      A.  No.
5  BY MR. HUTCHINSON:
6      Q.  Doctor, can you explain to us in chemical
7  terms how blood extracts antioxidant stabilizers?
8      A.  You mean scientifically how?
9      Q.  Yes, sir.
10     A.  Blood contains water plus a lot of other
11 things, it contains triglycerides, lipids, different
12 things.  And it is the oil or the hydrophobic
13 components in blood, the fats, the oils, the lipids,
14 that extract the stabilizers from the plastic, and
15 even Dr., it starts with B, the Ethicon guy that did
16 the FTIR work, he measured the level of dilauryl
17 thiodipropionate in the surface of sutures that had
18 been removed and saw that there was no detectable,
19 it was all extracted out of the surface.  So even
20 Ethicon knows that these antioxidants are
21 extractable from the material.
22     Q.  Doctor, do you know what formalin is?
23     A.  Yes.
24     Q.  You understand that formalin contains

20 (Pages 74 to 77)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 78

1  formaldehyde?
2      A.  Yes.
3      Q.  Is formaldehyde a solvent?
4      A.  It is normally 37 percent concentration of
5  water, but is it a solvent?  Not really.
6      Q.  Would you consider formalin to be a
7  solvent?
8      A.  Formalin is 37 percent formaldehyde and
9  water.  Water is a terrible solvent.  It is not
10  going to extract anything of consequence from
11  polypropylene.  Polypropylene is repulsive to water.
12      Q.  But my question, sir:  Is formalin a
13  solvent?
14      A.  It is a solvent for ionic species, but it
15  is not a solvent for like additives.
16      Q.  Doctor, would you be able to draw out the
17  chemical structure for the reaction between blood
18  and Santonox R?
19          MR. JACKSON:  Objection, form.
20      A.  The Santonox R does not react with blood,
21  it reacts with oxidizing species that would be
22  in the blood.
23  BY MR. HUTCHINSON:
24      Q.  Doctor, if we turn to Page 7 of your

Page 79

1  expert report, top paragraph, last sentence, you
2  reference antioxidant Santonox R that interferes
3  with the oxidative chain reaction.
4      A.  Yes.
5      Q.  Is that correct?
6      A.  Yes.
7      Q.  Doctor, we talked about ROS earlier, just
8  a minute ago, correct?
9          MR. JACKSON:  Objection, form.
10      A.  Yes.
11  BY MR. HUTCHINSON:
12      Q.  And that stands for reactive oxygen
13  species?
14      A.  Correct.
15      Q.  And reactive oxygen species, they possess
16  a free radical, don't they?
17          MR. JACKSON:  Objection, form.
18      A.  They can, yes.
19  BY MR. HUTCHINSON:
20      Q.  And a reactive oxygen species has a
21  non-bonded electron that wants to bond with
22  something, doesn't it?
23      A.  The ones that are free radicals, yes.
24      Q.  And a free radical is not bonded, is it?

Page 80

1      A.  That's correct.
2      Q.  And a free radical is -- strike that.
3          There is no difference between a free
4  radical formed in the body or a free radical formed
5  during the heat extrusion process, correct?
6          MR. JACKSON:  Objection, form.
7      A.  In the sense they are both free radicals.
8  BY MR. HUTCHINSON:
9      Q.  In fact, Santonox R and DLTDP are free
10  radical scavengers, aren't they?
11      A.  DLTDP is not a free radical scavenger,
12  Santonox R is a free radical scavenger.
13      Q.  Why do you say DLTDP is not a free radical
14  scavenger?
15      A.  Because it works by a different mechanism.
16  What it does is the sulfur reacts with oxygen
17  species.
18          It doesn't have to be a free radical
19  oxygen, it can just be oxygen, specifically
20  hydroperoxides, to become a higher, either a sulfone
21  or a sulfoxide which is a higher oxidized form.  The
22  sulfur converts the hydroperoxide group to an
23  alcohol.  But that's a different chemistry.  That's
24  not free radical-based.

Page 81

1      Q.  Let's talk about the chemistry for
2  Santonox R.
3          MR. JACKSON:  Chad, he wasn't
4  through answering his question.  You got
5  to let him finish.
6  BY MR. HUTCHINSON:
7      Q.  Santonox R is designed to remove free
8  radicals when they are formed, correct?
9      A.  I wouldn't say remove, but negate the
10  effects of free -- interferes with free radical
11  chain reactions.
12      Q.  Doctor, let's look at Page 8 at the top.
13  You reference the testing you did, the gas
14  chromatography, mass spectroscopy, did I say that --
15      A.  That's correct.
16      Q.  Is that the testing that you did?
17      A.  Yes.
18      Q.  Did you personally do the GS-MC testing?
19      A.  GC-MS.
20      Q.  GC-MS testing?
21      A.  I don't run lab equipment.  Trained
22  technicians run lab equipment.  I worked with a
23  technician to tell him how I wanted the test
24  performed, yes.

21 (Pages 78 to 81)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 82

1    Q.  Who did the GC-MS testing, Doctor?
2    A.  Steve Johnson.
3    Q.  He did it too?
4    A.  Yes, he is the technician that does GC-MS
5  and the OIT test.
6    Q.  Which did Steve Johnson do first, did he
7  do the GC-MS or the DSC testing?
8       MR. JACKSON:  Objection, form.
9    A.  He did the OIT first and then I wanted to
10  see if it correlated with the additives so I asked
11  him to do GC-MS so I could see if there was a
12  statistical correlation.
13  BY MR. HUTCHINSON:
14    Q.  Let's talk about the GC-MS testing that
15  Steve Johnson did.  Did Steve Johnson's GC-MS
16  experiment follow any standard or published
17  procedure?
18    A.  It followed what's called SOP, standard
19  operating procedure.  Again, all certified
20  laboratories need SOPs for everything they do.
21  Those SOPs are audited annually, and he followed
22  his SOP for GC-MS.
23    Q.  Which SOP did Mr. Johnson follow?
24    A.  The one for GC-MS in the lab.

Page 83

1    Q.  But what number?
2    A.  I don't -- it's probably in the lab report
3  he sent me, but I don't have the number memorized.
4    Q.  Doctor, did you ever touch the GC-MS
5  equipment?
6       MR. JACKSON:  Objection, form.
7    A.  No.
8  BY MR. HUTCHINSON:
9    Q.  Did you ever touch the DSC equipment?
10       MR. JACKSON:  Objection, form.
11    A.  No.
12  BY MR. HUTCHINSON:
13    Q.  Have you ever even seen the GC-MS or DSC
14  equipment?
15       MR. JACKSON:  Objection, form.
16    A.  Yes, I have.
17  BY MR. HUTCHINSON:
18    Q.  At Steve Johnson's lab?
19    A.  At Steve Johnson's lab.  As a matter of
20  fact I have watched him in the past run it.
21    Q.  But you didn't watch him do this
22  experiment --
23    A.  No.
24    Q.  -- that we are here about today?

Page 84

1    A.  No, I did not.
2    Q.  Doctor, did Steve Johnson perform any
3  controls in his GC-MS experiment?
4    A.  Yes.
5    Q.  What were they?
6    A.  He always puts in an internal standard in
7  the solvent that he extracts, the additives from the
8  plastic, and that internal standard he looks at the
9  size of the response and the retention time to make
10  sure that the equipment is operating.  In other
11  words, it is a known material spiked into the
12  solvent and if that peak is not right, he knows
13  there's an issue.
14    Q.  Did that generate data?
15       MR. JACKSON:  Chad, you have to let
16       the witness finish his answer.
17  BY MR. HUTCHINSON:
18    Q.  I'm sorry, Doctor, if I interrupted you.
19  Did that generate data?
20    A.  What do you mean?
21    Q.  Using the control, when Mr. Johnson used
22  the control, did it generate any data?
23    A.  Yes.
24    Q.  Where is that data?

Page 85

1    A.  It would be in his GC-MS data report.
2    Q.  Is Mr. Johnson's GC-MS data report
3  included on the flash drive that you gave me before
4  the deposition?
5    A.  I believe so.
6    Q.  Why wasn't that GC-MS data included in
7  your expert report?
8    A.  I included just this comment of the
9  correlation, but I did not include the data in the
10  report.
11    Q.  But why not?  Why didn't you include the
12  data in your report?
13    A.  I just didn't.
14    Q.  Doctor, did Steve Johnson ever try to
15  measure the concentration level of DLTDP?
16    A.  Yes.
17    Q.  What was the result of the concentration
18  level of DLTDP?
19    A.  When he ran the test, he did not see the
20  DLTDP.  He couldn't detect it.
21    Q.  Doctor, have you personally ever tried to
22  measure the concentration level of DLTDP in Prolene?
23    A.  Through Steve Johnson I have attempted to
24  do it.

22 (Pages 82 to 85)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

---

Page 86

1      Q.  But you personally?
2          MR. JACKSON:  Objection, asked and
3      answered.
4      A.  I have not run the equipment, no.
5  BY MR. HUTCHINSON:
6      Q.  Doctor, are you aware of any studies that
7  show DLTDP is lost from Prolene once it is implanted
8  in vivo?
9      A.  Yes.
10     Q.  What's the name of the study?
11     A.  That was done by Dr. Burkley, I think his
12  name was.
13     Q.  You are talking about an internal Ethicon
14  scientist?
15     A.  Yes.
16     Q.  Doctor, are you aware of any published
17  peer-reviewed literature that shows DLTDP is lost
18  from Prolene in vivo?
19     A.  Just Dr. Burkley's work.
20     Q.  And nothing else, correct?
21     A.  That's correct.
22     Q.  Doctor, have you ever read Dr. Howard
23  Jordi's expert reports?
24     A.  I don't recall.

---

Page 87

1      Q.  Do you know Dr. Howard Jordi?
2      A.  I know there's a Jordi Lab.
3      Q.  Do you know if the Jordi Labs ever
4  detected DLTDP in Prolene?
5      A.  I don't know.
6      Q.  If Dr. Jordi's lab did detect DLTDP in
7  Prolene, that would be inconsistent with the results
8  of your tests, correct?
9          MR. JACKSON:  Objection, form.
10     A.  No.
11  BY MR. HUTCHINSON:
12     Q.  I thought you told me your tests did not
13  detect DLTDP.
14     A.  No, I'm saying that the way the test was
15  run, it did not detect it.  He only saw a peak for
16  the Santonox R.
17     Q.  Doctor, is it your testimony under oath
18  that the Prolene sample that Mr. Johnson used did
19  not have any DLTDP in it?
20     A.  No, it likely did.  It's just the way
21  that particular test was run, it was
22  non-detectable.  But -- yeah, that's all.
23     Q.  It probably wasn't the best test to
24  determine whether or not DLTDP was in the Prolene?

---

Page 88

1          MR. JACKSON:  Objection, form.
2      A.  That's correct, yes.
3  BY MR. HUTCHINSON:
4      Q.  Doctor, did you do any type of appropriate
5  testing to determine the level of DLTDP in Prolene?
6          MR. JACKSON:  Objection, form.
7      A.  Yes, I tried to.  I actually had him
8  experiment with different conditions to try to
9  detect the DLTDP.  He did find a condition where he
10  was able to see it.  It's just not -- so it's there,
11  it's just not reported in this data.
12     Q.  What test did he use to detect DLTDP?
13     A.  GC-MS, again.  It's just he ran it under
14  different conditions.
15     Q.  Doctor, why is that information not in
16  your expert report?
17     A.  Because the purpose for doing it was to
18  just make sure that it was there.  I wanted to make
19  sure it was there.
20     Q.  And you confirmed it was there?
21     A.  I confirmed it was there.
22     Q.  Or rather Mr. Johnson confirmed it was
23  there?
24         MR. JACKSON:  Objection, form.

---

Page 89

1      A.  Yes.
2  BY MR. HUTCHINSON:
3      Q.  Doctor, let's go back to the GC-MS test.
4  Did you determine the weight loss for Santonox R
5  before Steve Johnson did his testing?
6      A.  Weight loss?
7      Q.  The weight loss rate?
8      A.  I don't understand the question.  You mean
9  by TGA?
10     Q.  Yes, by glass transition, correct.
11     A.  No, TGA is thermogravimetric analysis.
12  It measures weight loss of materials versus
13  temperature.
14     Q.  TGA?
15     A.  TGA.
16     Q.  Did you do any type of TGA analysis to
17  determine the weight loss for DLTDP?
18     A.  No.
19     Q.  Did you do any type of TGA analysis to
20  determine the weight loss of Santonox R?
21     A.  No.
22     Q.  Why not?
23     A.  As I say, the only time I was looking for
24  volatility, if you will, in other words, loss during

---

23 (Pages 86 to 89)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 90

1  the heat process, was by retention time and the gas
2  chromatograph which gives me a feel for volatility.
3      Q.  Doctor, do you know what the recommended
4  ranges are for DLTDP and Santonox R by weight?
5          MR. JACKSON:  Objection, form.
6      A.  I mean, that's application-specific.  I
7  know what the formulation for Prolene, has a target
8  range of weight.
9  BY MR. HUTCHINSON:
10     Q.  Do you know what the target range of
11 weight of DLTDP and Santonox R is for Prolene?
12     A.  I have seen it.  It seems like it was
13 between 2,000 and 4,000 parts per million or .2 to
14 .4 percent, I think, in that range.  It's probably
15 not correct, but in that ballpark.
16     Q.  Doctor, do you know what the weight loss
17 rate is for DLTDP?
18     A.  From Prolene?
19     Q.  Yes.
20     A.  Under what conditions?
21     Q.  In vivo.
22     A.  In vivo, again, the only data point I got
23 is Dr. Burkley's data where he saw it was totally
24 depleted from the surface after a period of time in

Page 91

1  vivo.
2      Q.  Doctor, do you know what the weight loss
3  rate is for DLTDP in vivo?
4      A.  That's what I just answered.  The only
5  thing I know is from Dr. Burkley's work.
6      Q.  Same question for Santonox R:  Do you know
7  what the weight loss rate is for Santonox R in vivo?
8      A.  No.
9      Q.  Doctor, do you know what the melting point
10 is for DLTDP?
11     A.  Not offhand.
12     Q.  Do you know what the melting point for
13 Santonox R is?
14     A.  Again, not offhand.
15     Q.  Doctor, when we talk about the GC-MS
16 testing, what color was the exemplar that Steve
17 Johnson tested?
18     A.  It's in the lab report he sent me.  He
19 listed the lot number and the color.
20     Q.  What color was it?
21     A.  I don't recall if it was blue or white.
22 I'd have to look at the lab report.
23     Q.  What temperature was the GC-MS set for?
24     A.  It's a program.  Its oven temperature is

Page 92

1  ramped up over time because these additives, like
2  if the oven temperature was set at 40 degrees and
3  you injected the sample, the additive would never
4  come through the instruments.  So you've got to keep
5  raising the temperature until it comes through.
6      Q.  What temperature was it when the material
7  began coming through?
8          MR. JACKSON:  Objection, form.
9      A.  I can't tell you precisely.  I can tell
10 you it was over 200 degrees.
11 BY MR. HUTCHINSON:
12     Q.  Was a solvent used by Mr. Johnson with
13 this GC-MS?
14     A.  Yes.
15     Q.  Do you know what type of solvent Mr.
16 Johnson used?
17     A.  Methylene chloride.
18     Q.  Do you know what quantity of methylene
19 chloride that Mr. Johnson used?
20     A.  Again, it is in his lab procedure he sent
21 me.  I don't know the number offhand.
22     Q.  Doctor, you will agree that that solvent
23 only extracts volatile materials, correct?
24          MR. JACKSON:  Objection, form.

Page 93

1      A.  No.
2  BY MR. HUTCHINSON:
3      Q.  Does it extract volatile materials?
4      A.  Yes.
5      Q.  Doctor, did you know -- my understanding
6  in reading your report is that the GC-MS test only
7  found Santonox R; is that right?
8      A.  That's the only stabilizer that it saw,
9  that he identified as a stabilizer.
10     Q.  Did it pick up any other type of additives
11 to the Prolene?
12         MR. JACKSON:  Objection, form.
13     A.  I do not believe so.
14 BY MR. HUTCHINSON:
15     Q.  Doctor, did the GC-MS that Mr. Johnson
16 did, did it detect Procol LA-10?
17     A.  No.
18     Q.  Why not?
19     A.  It was probably not volatile enough to
20 make it through the instrument.
21     Q.  Do you know what the flash point is for
22 Procol LA-10?
23     A.  Not offhand, no.
24     Q.  Do you know the melting point?

24  (Pages 90 to 93)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

| Page 94 |
|---|
| 1    A.  No. |
| 2    Q.  Do you know the flash point for Santonox |
| 3  R? |
| 4    A.  No. |
| 5    Q.  Do you know the flash point for DLTDP? |
| 6    A.  I do not. |
| 7    Q.  Do you know the flash point or melting |
| 8  point for calcium stearate? |
| 9    A.  No. |
| 10   Q.  Do you have any idea why Mr. Johnson's |
| 11 GC-MS test did not detect calcium stearate? |
| 12   A.  Yes. |
| 13   Q.  Why? |
| 14   A.  It wouldn't be soluble in methylene |
| 15 chloride.  It's only going to extract out what's |
| 16 soluble in that solvent. |
| 17   Q.  Did the GCMS test detect any blue pigment? |
| 18   A.  No. |
| 19   Q.  Why not? |
| 20   A.  Either it's not soluble in methylene |
| 21 chloride or its boiling point is too high to make |
| 22 it through the gas chromatograph, one of the two. |
| 23   Q.  Do you know what the boiling point is of |
| 24 the CPC blue pigment? |

| Page 95 |
|---|
| 1    A.  I do not. |
| 2    Q.  Doctor, did you ever do any type of FTIR |
| 3  analyses on Prolene? |
| 4    A.  No. |
| 5    Q.  Did Mr. Johnson to your knowledge do any |
| 6  type of FTIR analyses on Prolene? |
| 7    A.  No. |
| 8    Q.  Doctor, let's look at Page 12 of your |
| 9  expert report.  Are you there with me? |
| 10   A.  I am. |
| 11   Q.  It states, "The mesh sample," in the top |
| 12 of the first paragraph. |
| 13   A.  Yes. |
| 14   Q.  "The mesh sample is heated to 200 degrees |
| 15 C under pure nitrogen." |
| 16     Is that right? |
| 17   A.  Yes. |
| 18   Q.  Doctor, do you know, we talked about this |
| 19 earlier, do you have any idea what the flash point |
| 20 is for DLTDP? |
| 21     MR. JACKSON:  Objection, asked and |
| 22   answered. |
| 23   A.  No. |
| 24     (Priddy Deposition Exhibit 8 was |

| Page 96 |
|---|
| 1    marked for identification.) |
| 2  BY MR. HUTCHINSON: |
| 3    Q.  Doctor, I want to hand you what we'll mark |
| 4  as Exhibit 8 to your deposition. |
| 5      (Witness reviewing document.) |
| 6    Q.  Exhibit 8 is for an antioxidant DLTDP, do |
| 7  you see that? |
| 8    A.  I do. |
| 9    Q.  The flash point for DLTDP is 150 degrees |
| 10 C; is that correct? |
| 11   A.  That's what it says, yes. |
| 12   Q.  And Doctor, do you have any reason to |
| 13 believe that the flash point for DLTDP would be |
| 14 significantly different than 150 degrees C? |
| 15   A.  No.  It sounds low but I don't have any |
| 16 reason to dispute it. |
| 17   Q.  Doctor, a sample of mesh heated to |
| 18 200 degrees C is 50 degrees Celsius hotter than the |
| 19 flash point for DLTDP, isn't it? |
| 20   A.  That's correct. |
| 21   Q.  Doctor, that would volatize DLTDP, |
| 22 wouldn't it? |
| 23   A.  No. |
| 24   Q.  Why not? |

| Page 97 |
|---|
| 1    A.  Flash point has nothing to do with boiling |
| 2  point. |
| 3    Q.  A flash point is the temperature at which |
| 4  an organic compound gives off enough vapor to ignite |
| 5  in air; is that right? |
| 6    A.  It's ignitable in air by a spark, yes. |
| 7      MR. JACKSON:  Chad, I am going to |
| 8    object to the use of this document just |
| 9    on foundation.  I don't know what it is. |
| 10 BY MR. HUTCHINSON: |
| 11   Q.  Doctor, what did you do to ensure that |
| 12 DLTDP or Santonox R were not burned off when Mr. |
| 13 Johnson heated the mesh to 200 degrees C? |
| 14   A.  As I explained to you, I had him determine |
| 15 its retention time in the GC which gave me a feel |
| 16 for its level of volatility and based upon that |
| 17 data, I knew it was not a very volatile chemical. |
| 18 And of course when chemicals are embedded in a |
| 19 plastic, it's very difficult to drive them, vaporize |
| 20 them and get them out of the plastic at low levels. |
| 21   Q.  Doctor, on Page 13 of your expert report |
| 22 under Section 11 it states, "The antioxidants," |
| 23 plural, "present in the ten meshes were then |
| 24 extracted." |

25  (Pages 94 to 97)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 98

1        Did I read that correctly?
2        A.   That's correct.
3        Q.   DLTDP was found as an antioxidant in this
4   case; is that correct?
5            MR. JACKSON:  Objection, form.
6        A.   Just a minute.  Let me read through this
7   real quick.
8            (Witness reviewing document.)
9        A.   Now, what's your question?
10  BY MR. HUTCHINSON:
11       Q.   My question is, sir:  Was DLTDP extracted
12  using the methylene chloride solvent?
13       A.   All I can say is that in this particular
14  test referred to right here, it was not detected,
15  and I don't know exactly why it wasn't detected.  I
16  don't know if it wasn't extracted or if the
17  conditions for the GC-MS analysis just were such
18  that it didn't detect it.
19       Q.   Did you ever make any effort to find out
20  why?
21           MR. JACKSON:  Objection, form.
22       A.   I asked him to try to detect DLTDP and he
23  played around and was finally able to come up with
24  conditions that he could see it.  But it was not

Page 99

1   this particular test right here, he couldn't see it.
2   BY MR. HUTCHINSON:
3        Q.   What concentration level did Mr. Johnson
4   find DLTDP in?
5        A.   The particular -- I remember numbers,
6   hundreds of parts per million.
7        Q.   Right, but can you quantify the amount of
8   DLTDP concentration level that Mr. Johnson found?
9        A.   I'm sorry, the question again?
10       Q.   Can you quantify the concentration level
11  of the DLTDP that Mr. Johnson found?
12       A.   As I said, it was hundreds of parts per
13  million.  I just don't remember the exact number.
14       Q.   Did Mr. Johnson ever tell you that exact
15  number?
16           MR. JACKSON:  Objection, form.
17       A.   Yes.
18  BY MR. HUTCHINSON:
19       Q.   Where would that data be included?
20       A.   In the data report.
21       Q.   Where is the data report?
22       A.   Should be on the flash drive.
23       Q.   Look at Page 9 for me, please, of your
24  expert report under Summary, Number 2.

Page 100

1        A.   Okay.
2        Q.   It states, "The polymer chain is
3   disentangled."
4            Do you see that?
5        A.   Yes.
6        Q.   Doctor, would you agree that
7   disentanglement of polymer chains allows a polymer
8   to elongate?
9            MR. JACKSON:  Objection, form.
10       A.   No.
11  BY MR. HUTCHINSON:
12       Q.   Doctor, if polymers, if polymer chains do
13  not disentangle, would the polymer become brittle?
14       A.   If the polymer chains do not disentangle,
15  would the polymer become brittle?
16       Q.   Correct.
17       A.   Yeah, it can, yes.
18       Q.   But you disagree that disentanglement of
19  polymer chains allows a polymer to elongate?
20           MR. JACKSON:  Objection, misstates
21       witness testimony.
22       A.   A polymer will elongate under stress
23  whether or not it is entangled.  So I guess I'm
24  not --

Page 101

1   BY MR. HUTCHINSON:
2        Q.   Should the polymer chains become
3   disentangled for a polymer to elongate?
4        A.   No.
5        Q.   Doctor, when you reviewed the internal
6   documents from Ethicon, did you review any documents
7   on biocompatibility?
8            MR. JACKSON:  Objection, form.
9        Q.   Doctor?
10       A.   I'm thinking.  I guess I'm not sure
11  specifically what you are referring to, but I would
12  say yes.
13       Q.   Do you have any opinions about the
14  biocompatibility testing of Prolene that Ethicon
15  did?
16       A.   I don't have an opinion on that.
17       Q.   Doctor, have you ever designed pelvic
18  mesh?
19           MR. JACKSON:  Objection, asked and
20       answered.
21       A.   No.
22  BY MR. HUTCHINSON:
23       Q.   Have you ever done any type of
24  biomechanical testing of pelvic mesh?

26 (Pages 98 to 101)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 102

1    A.  The only testing I have done regarding
2  Prolene mesh are listed in my report.
3    Q.  So we are clear, you have never done any
4  biomechanical testing of Prolene mesh, correct?
5    A.  That's correct.
6    Q.  You have never done any type of
7  biomechanical testing of Prolene, have you?
8    A.  No.
9    Q.  Have you ever been involved in any type of
10  clinical research regarding Prolene?
11    A.  Other than reviewing a lot of documents on
12  the research, no.
13    Q.  My question is, sir:  Have you personally
14  ever been involved in any type of clinical research
15  regarding Prolene?
16    A.  Not as far as conducting the research, no.
17    Q.  Or mesh, have you ever been involved in
18  any clinical research regarding mesh?
19        MR. JACKSON:  Objection, form.
20    A.  Just reviewing the results of the studies,
21  that's it.
22  BY MR. HUTCHINSON:
23    Q.  Have you ever tested a mesh explant?
24        MR. JACKSON:  Objection, form.

Page 103

1    A.  I served as a consultant on a project
2  several years ago involving Kugel mesh and at that
3  point I received a mesh sample, but I don't recall
4  actually evaluate -- or testing it.
5  BY MR. HUTCHINSON:
6    Q.  Do you know what the chemical composition
7  is of the Kugel mesh?
8    A.  Yes, it was a polyester.
9    Q.  It wasn't Prolene, correct?
10    A.  No.
11    Q.  Doctor, you will agree that Prolene has a
12  chemical composition difference compared to
13  polypropylene?
14    A.  Absolutely, yes.  Compared to what?
15    Q.  Compared to polypropylene.  Polypropylene
16  and Prolene are chemically different, aren't they,
17  sir?
18        MR. JACKSON:  Objection, form.
19    A.  Prolene meshes are polypropylene.
20  BY MR. HUTCHINSON:
21    Q.  Doctor, as a materials scientist, would
22  you agree that Prolene has a different chemical
23  composition compared to pure polypropylene?
24        MR. JACKSON:  Objection, form.

Page 104

1    A.  It's got stabilizers and additives, yes.
2  BY MR. HUTCHINSON:
3    Q.  Prolene and polypropylene are not
4  identical, are they?
5    A.  Prolene is polypropylene with additives.
6    Q.  And pure polypropylene is not identical to
7  Prolene, correct?
8        MR. JACKSON:  Objection, asked and
9  answered.
10  BY MR. HUTCHINSON:
11    Q.  Pure polypropylene?
12    A.  Because pure, with no additives, is
13  different than a formulation with additives, yes.
14    Q.  And Ethicon's product is a formulation
15  with additives, correct?
16    A.  That's correct.  All polypropylene
17  products contain additives.  They have to.
18    Q.  But they are different polymers?
19    A.  Polymer is the same.
20    Q.  Doctor, what medical products are you
21  designated to give opinions about?
22    A.  You mean in legal cases?  I've done
23  consulting.
24    Q.  No, in the deposition that you are here

Page 105

1  for today, In Re Ethicon Pelvic Repair System
2  Products Liability Litigation.
3        MR. JACKSON:  Objection, form.
4    A.  I was asked to opine on the use of
5  polypropylene in the TVT and the Gynemesh product
6  lines for urinary incontinence and the pelvic
7  products.
8  BY MR. HUTCHINSON:
9    Q.  Doctor, do you know the names of the
10  products that you are designated to give testimony
11  about for the plaintiffs?
12    A.  As I said, the TVT products, there's like
13  four or five of those and then the prolapse
14  products, there are several of those.
15    Q.  Do you know the names of those products?
16    A.  Boy, I'm terrible at names.  I don't
17  remember the details of all the names, no.  I was
18  shown the names and have seen the names and, yes,
19  but I just don't recall all the names.
20    Q.  Do the opinions that you are giving today
21  relate to all of these products?
22    A.  If they contain polypropylene, yes.
23    Q.  Doctor, have you ever seen a TVT -- strike
24  that.

27 (Pages 102 to 105)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 106

1        I am going to represent to you that you
2    are designated in cases involving Prolene Soft mesh,
3    Gynemesh PS, TVT, Prolift, TVT-O, Prolift+M, TVT
4    Exact, TVT Secur, Prosima and TVT Abbrevo?
5        A.  I have seen all those names, yes.
6        Q.  Thank you.  Doctor, have you ever held any
7    of those devices in your hand?
8            MR. JACKSON:  Objection, form.
9        A.  Yes.
10   BY MR. HUTCHINSON:
11       Q.  When?
12       A.  Back in December when I received the
13   samples for lab testing.
14       Q.  Did you receive one sample of each
15   product?
16       A.  No, I received, I think, four of the
17   Gynemesh products and six of the TVT products.
18       Q.  So fair to say you have never held Prosima
19   or Prolift or Prolift+M in your hands?
20           MR. JACKSON:  Objection, form.
21       A.  That's correct.
22   BY MR. HUTCHINSON:
23       Q.  Doctor, do you know what the indications
24   are for those products?

Page 107

1        A.  Indications?
2        Q.  Yes.
3        A.  What do you mean by indications?
4        Q.  What the product is indicated for from a
5    medical standpoint.
6        A.  In general, yes.
7        Q.  Doctor, do you know how long those
8    products have been on the market?
9        A.  The years vary but it started back in the
10   1990s and then there's recent introductions as
11   recent as, I think 2010 or '11.
12       Q.  Can you tell us the date that each of
13   those products were introduced to the market?
14           MR. JACKSON:  Objection, form.
15       A.  Again, I have seen the dates, I just don't
16   recall.
17   BY MR. HUTCHINSON:
18       Q.  Do you know the physical dimensions of the
19   mesh of each of those products?
20           MR. JACKSON:  Objection, form.
21       A.  Again, I have seen pictures and photo-
22   graphs of them, but I don't recall exact dimensions.
23   BY MR. HUTCHINSON:
24       Q.  Do you know the weight of the mesh of

Page 108

1    those particular products?
2        A.  Again, I've seen that information.  I just
3    don't recall it.
4        Q.  Do you know how many newtons of force are
5    placed on the mesh in vivo?
6        A.  I do not.
7        Q.  Doctor, what do you know about the
8    manufacturing process Ethicon uses to make Prolene?
9            MR. JACKSON:  Objection, form.
10       A.  I know that the resin is manufactured in
11   West Virginia and then it's converted to fiber in
12   Georgia, and then woven into mesh and sent over to
13   Europe where it's cut and then it's shipped back to
14   the US for sale.
15       Q.  Doctor, is the mesh woven or knitted?
16       A.  Oh, boy, I'm not sure of the semantics of
17   the difference between those to be able to answer.
18       Q.  Doctor, do you know if Prolift+M, the mesh
19   in Prolift+M is made of a hundred percent Prolene?
20       A.  I remember, when I looked through the data
21   in the data sheets, I remember that some of the
22   products have polypropylene plus another
23   biodegradable kind of material, either
24   polycaprolactone or glycolate biodegradable

Page 109

1    material.  So it is a hybrid system.
2        Q.  Doctor, my question is:  Do you know what
3    type of biodegradable material Prolift+M has in its
4    mesh?
5            MR. JACKSON:  Objection, form.
6        A.  I have seen it, I just don't recall.
7    BY MR. HUTCHINSON:
8        Q.  Doctor, did you make any efforts to find
9    out what type of biodegradable material is in
10   Prolift+M?
11       A.  Other than reading the sheets that
12   describe them, no.
13       Q.  Do you consider yourself an expert in the
14   manufacturing process of pelvic mesh?
15           MR. JACKSON:  Objection, form.
16       A.  Just the manufacture as far as it goes to
17   making the fibers.  Once the fibers are made, I'm
18   not an expert from that point on.
19   BY MR. HUTCHINSON:
20       Q.  Doctor, have you ever invented any type of
21   polypropylene product that's turned into a fiber?
22       A.  Invented a polypropylene product, I have
23   worked on polypropylene additive formulations.  I
24   led a group at Dow for several years in the 1990s

28 (Pages 106 to 109)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 110

1  where we experimented with different Dow products
2  including polypropylene and the additives and
3  stabilizers that need to be added to those to make
4  various types of products including fibers.
5      Q.  Doctor, have you personally ever performed
6  any testing to determine if Prolene degrades in
7  vivo?
8      A.  I have not done any in vivo testing
9  myself, no.
10     Q.  And you haven't done any loss of
11 mechanical property testing in vivo, have you?
12     A.  I just reviewed the Ethicon documents
13 which showed the loss of strength properties from in
14 vivo implanted Prolene sutures.
15     Q.  But you have never done any testing, have
16 you?
17         MR. JACKSON:  Objection, form.
18     A.  Just reviewed work of others, yes.
19 BY MR. HUTCHINSON:
20     Q.  In fact, you have never tested the
21 durability of Prolene?
22     A.  In vivo?
23     Q.  Yes.
24     A.  Not directly, no.

Page 111

1      Q.  Have you ever tested the durability of
2  Prolene in any form or fashion?
3          MR. JACKSON:  Objection, form.
4      A.  Well, yes, the OIT testing.
5  BY MR. HUTCHINSON:
6      Q.  What about tensile strength, have you ever
7  tested tensile strength of Prolene, whether it be in
8  vivo or outside the body?
9      A.  I just reviewed the Ethicon documents
10 which do that kind of testing.
11     Q.  You have never done tensile strength
12 testing, have you?
13     A.  I have done tensile strength testing.
14     Q.  Of Prolene?
15     A.  Not of Prolene, no.
16     Q.  You have never done elongation testing of
17 Prolene, have you?
18     A.  Just reviewed those documents.
19     Q.  You have never done any toughness testing
20 of Prolene, have you?
21         MR. JACKSON:  Objection, form.
22     A.  No, just reviewed the documents.
23 BY MR. HUTCHINSON:
24     Q.  You have never done any Young's modulus

Page 112

1  testing of Prolene, have you?
2      A.  I sure reviewed the Ethicon documents on
3  the Young's modulus of Prolene.  I was shocked by
4  what I saw.
5      Q.  You have never done any testing of that,
6  have you?
7      A.  I have done modulus testing.
8      Q.  On Prolene?
9      A.  Not on Prolene, no.
10     Q.  You have had the resources available to do
11 all of this testing of Prolene, haven't you?
12     A.  I've had it, but I had all those documents
13 which gave me the data that I needed to opine on
14 that issue.
15     Q.  You will agree with me that degradation
16 affects the physical properties of the polymer?
17     A.  Absolutely, yes.
18     Q.  And it will affect the physical properties
19 of the mesh and/or suture, correct?
20     A.  That's correct.
21     Q.  You will agree that evaluation of the
22 physical properties of mesh is an important part in
23 your analysis on degradation, correct?
24     A.  Absolutely, yes.

Page 113

1      Q.  As well as oxidation?
2          MR. JACKSON:  Objection, form.
3      A.  Yes.
4  BY MR. HUTCHINSON:
5      Q.  Doctor, have you ever done any type of
6  testing or analysis on an explanted Prolene mesh?
7      A.  Just reviewed the literature and the
8  documents.
9      Q.  But you have never done any actual testing
10 of an actual explanted Prolene mesh, have you?
11     A.  Not myself, no.
12     Q.  Have you ever seen a Prolene explanted
13 mesh?
14     A.  Yes.
15     Q.  Where?
16     A.  In the literature.
17     Q.  Have you ever seen an actual Prolene
18 explanted mesh?
19     A.  No.
20     Q.  Have you ever seen an actual Prolene
21 explant that has become degraded?
22     A.  Yes.
23     Q.  Where?
24     A.  In the literature.

29 (Pages 110 to 113)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

| Page 114 | Page 116 |
|---|---|
| 1     Q.  Outside the literature, have you ever seen<br>2 personally a Prolene explant that has become<br>3 brittled?<br>4     A.  No.<br>5     Q.  Or degraded?<br>6     A.  No.<br>7     Q.  Or oxidized?<br>8     A.  No.<br>9     Q.  Or lost physical properties?<br>10       MR. JACKSON:  Objection, form.<br>11     A.  Just in pictures in the literature.<br>12 BY MR. HUTCHINSON:<br>13     Q.  In fact, you have never done any testing<br>14 or analysis on the degradation of Prolene before<br>15 your involvement in this case; is that correct?<br>16       MR. JACKSON:  Objection, asked and<br>17     answered.<br>18     A.  Before involvement in the case, no.<br>19 BY MR. HUTCHINSON:<br>20     Q.  Am I correct?<br>21     A.  That's correct.<br>22     Q.  Thank you.  Doctor, you were designated<br>23 in -- let's look at Exhibit 1 for me, please, it is<br>24 the notice of deposition. | 1 piece of explanted mesh because of various obvious<br>2 reasons.<br>3     Q.  Biohazardous --<br>4     A.  Biohazardous, yes, until I was assured<br>5 that there was no issue.<br>6     Q.  Doctor, fair to say you have never<br>7 inspected the explanted mesh from any of these 23<br>8 women, correct?<br>9     A.  That is correct.<br>10       MR. JACKSON:  We have been going<br>11     about another hour.  Can we take a break<br>12     soon?<br>13       MR. HUTCHINSON:  Yes.<br>14 BY MR. HUTCHINSON:<br>15     Q.  Do you know the date that these women had<br>16 implanted or explanted mesh in them?<br>17     A.  No.<br>18     Q.  Do you have any idea how long these women<br>19 had their mesh in their bodies before it was<br>20 explanted?<br>21     A.  No.<br>22     Q.  Do you know why from a medical or clinical<br>23 standpoint, why any of these 23 plaintiffs had their<br>24 mesh removed? |

| Page 115 | Page 117 |
|---|---|
| 1     A.  Yes.<br>2     Q.  You were designated as an expert in 23<br>3 case-specific cases starting with Harriet Beach,<br>4 Sharon Boggs and going on down all the way to<br>5 Virginia White.  Do you see that?<br>6     A.  Yes.<br>7     Q.  Do you know what type of product these 23<br>8 women received?<br>9       MR. JACKSON:  Objection, form.<br>10     A.  No.<br>11 BY MR. HUTCHINSON:<br>12     Q.  Have you ever reviewed the medical records<br>13 for these 23 plaintiffs?<br>14     A.  No, I have not.<br>15     Q.  By the way, Doctor, have you ever<br>16 attempted to clean an explanted piece of mesh?<br>17     A.  No.<br>18     Q.  Why do you laugh?<br>19     A.  Because I was sent a sample of explanted<br>20 mesh and asked to analyze it and it made me very<br>21 nervous.<br>22     Q.  Who sent it to you?<br>23     A.  This was the Kugel mesh case and I got to<br>24 the point of where I just didn't want to handle a | 1       MR. JACKSON:  Objection, form.<br>2     A.  I can only make assumptions.<br>3 BY MR. HUTCHINSON:<br>4     Q.  You don't have any hard facts on why the<br>5 mesh --<br>6     A.  No.<br>7     Q.  Excuse me, no hard facts regarding why the<br>8 mesh was removed, correct?<br>9     A.  Correct.<br>10     Q.  Doctor, can you make any prediction about<br>11 when the mesh from any of these 23 different<br>12 plaintiffs would have oxidized in vivo?<br>13       MR. JACKSON:  Objection, form.<br>14     A.  Based upon the results of Ethicon's<br>15 testing, yes.<br>16       MR. JACKSON:  Chad, let's take a<br>17     break now.<br>18       MR. HUTCHINSON:  Actually, just two<br>19     more questions and we'll take a break.<br>20       MR. JACKSON:  I will give you two<br>21     questions.<br>22 BY MR. HUTCHINSON:<br>23     Q.  Doctor, can you tell us a specific date<br>24 when Harriet Beach's mesh oxidized? |

Golkow Technologies, Inc. - 1.877.370.DEPS

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 118

1      MR. JACKSON: Objection, form.
2    A.  No.
3      MR. HUTCHINSON: Thank you. We'll
4  take a quick break.
5      THE VIDEOGRAPHER: We are off the
6  video record. The time is 11:08 a.m.
7      (Recess.)
8      THE VIDEOGRAPHER: We are back on
9  the video record with Tape Number 3. The
10  time is 11:18 a.m.
11  BY MR. HUTCHINSON:
12    Q.  Doctor, back on the record. Anything
13  about the testimony you have given you would like to
14  change?
15    A.  No.
16    Q.  Going back to Exhibit 1 and the list of
17  the 23 different plaintiffs, can you tell us the
18  date on which any of these 23 different plaintiffs
19  had their mesh oxidized?
20      MR. JACKSON: Objection, form.
21    A.  I could probably tell you if I had the
22  literature when the meshes were removed.
23  BY MR. HUTCHINSON:
24    Q.  Right, but I am asking when they were

Page 119

1  oxidized.
2    A.  There's so many variables in the human
3  body, it's impossible to know when a mesh, at what
4  point it oxidizes to the point of degradation to be
5  an issue.
6    Q.  Doctor, can you identify by name one
7  person who has had their mesh surgery removed
8  because of degradation?
9      MR. JACKSON: Objection, form.
10    A.  My best is all of them had them, they were
11  degraded by oxidation. Every mesh that was removed
12  from these women, I'm very confident would show
13  evidence of degradation by oxidation. It is because
14  of my knowledge of polypropylene oxidation.
15  BY MR. HUTCHINSON:
16    Q.  You have never talked to the doctors?
17    A.  I have not.
18    Q.  You have never looked at the medical
19  records?
20    A.  That's correct.
21    Q.  You have never talked to any of these
22  plaintiffs?
23    A.  That's correct.
24    Q.  Or any of these family members?

Page 120

1    A.  That's correct.
2    Q.  Doctor, can you state to a reasonable
3  degree of scientific certainty whether or not any of
4  these 23 plaintiffs have had their mesh removed
5  specifically because of degradation?
6    A.  All I can say is that the meshes removed
7  from these women had undergone oxidation. I can say
8  that unequivocally.
9    Q.  Doctor, did the mesh from any of these
10  women fail?
11      MR. JACKSON: Objection, form.
12    A.  Depends on how you define failure.
13  BY MR. HUTCHINSON:
14    Q.  Did the mesh from any of these women stop
15  providing tissue support?
16    A.  I do not know that.
17    Q.  Did the mesh from any of these women lose
18  molecular weight?
19    A.  Yes.
20    Q.  Have you ever done any molecular weight
21  analyses on the explants from these women?
22    A.  No.
23    Q.  How can you tell us that these meshes lost
24  molecular weight without having examined the

Page 121

1  explant?
2    A.  Because I understand the chemistry of
3  polypropylene, and the fact that it interacts with
4  oxidizing species and degrades, and as part of the
5  oxidation process, molecular weight is lowered. And
6  the fact that they were implanted for a period of
7  time, I'm a hundred percent confident that if I had
8  a sensitive way to measure molecular weight, or I
9  should say applied a sensitive technique for
10  measuring molecular weight of all of these explanted
11  meshes, I can detect a loss of molecular weight. I
12  have full confidence of that.
13    Q.  A loss of molecular weight means
14  degradation has occurred, correct?
15    A.  That's correct.
16    Q.  Let's take, for example, Harriet Beach,
17  the first named plaintiff. Do you have any evidence
18  to confirm that Harriet Beach, her explant, lost
19  molecular weight?
20      MR. JACKSON: Objection, asked and
21      answered.
22    A.  Do I have data?
23  BY MR. HUTCHINSON:
24    Q.  Yes, sir.

31 (Pages 118 to 121)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 122

1      A.   Other than my knowledge of polypropylene
2   oxidation chemistry, no.
3      Q.   Doctor, do you have data on any of the 23
4   plaintiffs that would show their mesh lost molecular
5   weight?
6      A.   I have not actually done the measurements
7   to collect the data, no.
8      Q.   In fact, Doctor, you have not done
9   anything according to the scientific method to prove
10  whether or not any of these plaintiffs' mesh
11  degraded in vivo, have you?
12       MR. JACKSON:  Objection, form.
13     A.   I have done a ton of research using the
14  scientific method to study the degradation chemistry
15  of polypropylene.
16  BY MR. HUTCHINSON:
17     Q.   But have you proven that using the
18  scientific method for any of these 23 plaintiffs,
19  yes or no?
20     A.   Not those specific samples, no.
21     Q.   Doctor, are you aware of any peer-reviewed
22  literature that shows there is a clinical effect of
23  degradation in vivo?
24     A.   I've read a ton of literature put out in

Page 123

1   the last ten years on explanted meshes that show
2   degradation.
3      Q.   Doctor, are you aware of any clinical data
4   that shows degradation is clinically significant?
5        MR. JACKSON:  Objection, form.
6      A.   Clinically, I can't equate to that,
7   clinically significant.
8   BY MR. HUTCHINSON:
9      Q.   Doctor, are you aware of any clinical data
10  that shows degradation causes clinical harm?
11     A.   Again, since I'm not a medical doctor, I
12  can't equate the clinical.
13     Q.   Are you aware of any data that shows
14  degradation causes harm in women?
15     A.   Any data?
16     Q.   As a scientist.
17     A.   Other than reading the scientific
18  literature that I've talked about on explants.
19     Q.   Doctor, have you concluded that Prolene is
20  toxic?
21       MR. JACKSON:  Objection, form.
22     A.   I know from reading the MSDS sheets on the
23  different additives in Prolene, I know that the
24  colorant, the copper phthalocyanine pigment is

Page 124

1   cytotoxic, so that tells me that any dye that exudes
2   from the surface in the neighboring tissue would be
3   toxic to it.
4      Q.   Are you offering opinions today to a
5   reasonable degree of scientific certainty that
6   Prolene is toxic in the human body?
7        MR. JACKSON:  Objection, form.
8      A.   No, just that pigment is cytotoxic.
9   That's all I can say.
10  BY MR. HUTCHINSON:
11     Q.   Doctor, as a material scientist, are you
12  aware of any material that's completely inert?
13     A.   Completely inert, about the closest to
14  completely inert is diamond.
15     Q.   Are you aware of any medical device on the
16  market that's completely inert?
17     A.   Again, probably the closest would be
18  titanium, but even that is not, completely is a
19  pretty, 100.00 percent is completely and there's no
20  such thing.
21     Q.   Doctor, are you aware of any mesh, medical
22  device on the market that is inert in the human
23  body?
24     A.   All I can tell you is from reading the

Page 125

1   literature, it appears that PDVF is the closest to
2   being inert but even that's not inert.
3      Q.   Thank you.  Doctor, when we talked about
4   degradation, you will agree that there must be loss
5   of molecular weight for degradation to occur?
6        MR. JACKSON:  Objection, misstates
7        the witness' testimony.
8      A.   No.
9   BY MR. HUTCHINSON:
10     Q.   What happens to a polymer when it loses
11  molecular weight, does it degrade?
12     A.   Yes.
13     Q.   There must be loss of molecular weight for
14  degradation to have occurred, correct?
15     A.   No.
16     Q.   Why not?
17     A.   There's intermediate species like, for
18  example, before molecular weight loss occurs, there
19  is generally oxidation.  There's a hydroperoxide
20  chemical functionality on the polymer and that
21  precedes molecular weight loss.
22     Q.   But for oxidation to have occurred, there
23  must be loss of molecular weight, correct?
24     A.   No.

32 (Pages 122 to 125)

Duane Priddy, Ph.D.

Page 126

1    Q.  Why not?
2    A.  The additives oxidize so they are
3  constantly dynamic, changing in their structure.  As
4  I mentioned earlier, the DLTDP changes to a sulfone,
5  ultimately to a sulfoxide.  That's an oxidized
6  species, so it is changing --
7    Q.  I'm not asking about --
8      MR. WALLACE:  Chad, you have to let
9    him finish.  This has been going on for a
10   while.  Just let him finish.  We have
11   been good all day.
12 BY MR. HUTCHINSON:
13   Q.  Let's talk about oxidation.
14   A.  Okay.
15   Q.  For oxidation to occur, there must be a
16 chain scission in the cleavage of the polymer chain,
17 correct?
18   A.  No, just to explain, you can have
19 oxidation going on of the additives of the polymer
20 chain without degradation that precedes molecular
21 weight loss.
22   Q.  If a polymer oxidizes, will there be loss
23 of molecular weight?
24     MR. JACKSON:  Objection, asked and

Page 127

1  answered.
2    A.  There can be, but there doesn't
3  necessarily have to be.
4  BY MR. HUTCHINSON:
5    Q.  If oxidation occurs, will there be strong
6  carbonyl bands on the FTIR?
7    A.  Again, that's a later stage.  The
8  hydroperoxide group that forms first is not a
9  carbonyl.  You don't see an FTIR carbonyl band.
10     If it changes to another species, then it
11 generates a carbonyl band.  But the first stage of
12 oxidation is generated to a hydroperoxide.  That's
13 still oxidation, but it hasn't formed a carbonyl
14 band yet.
15   Q.  At what point does a loss of molecular
16 weight occur in oxidation?
17   A.  At the point that the hydroperoxide group
18 changes to a carbonyl, it is accompanied by chain
19 scission and you lose molecular weight.
20   Q.  So when you have chain scission, you lose
21 molecular weight?
22   A.  That's correct.
23   Q.  For oxidation to occur, you must always
24 have chain scission of the polymer chain, correct?

Page 128

1      MR. JACKSON:  Objection, form.
2    A.  No.  As I mentioned earlier, you can have
3  oxidation without chain scission.
4  BY MR. HUTCHINSON:
5    Q.  If oxidation occurs, you always have
6  reduced physical properties of the polymer?
7      MR. JACKSON:  Objection, form.
8    A.  In the early stages, it's probably
9  non-detectable.
10 BY MR. HUTCHINSON:
11   Q.  If oxidation occurs, you will have
12 embrittlement?
13   A.  Ultimately.
14   Q.  If oxidation occurs, you will have loss of
15 tensile strength?
16   A.  Ultimately.
17   Q.  If oxidation occurs, you will have loss of
18 elongation?
19   A.  That's dependent.  If body fluids, lipids,
20 oils, fats are absorbed into the polymer, it
21 actually increases elongation.
22   Q.  You will have loss of toughness if
23 oxidation occurs, correct?
24     MR. JACKSON:  Objection, form.

Page 129

1    A.  Depends on how you define toughness, but
2  generally, yes.
3  BY MR. HUTCHINSON:
4    Q.  Let's define it as the area under the
5  curve on a stress-strain diagram.  With that
6  definition, you will have a loss of toughness,
7  correct?
8    A.  Give me a minute to think about that.
9      Yes.
10   Q.  Doctor, would you ever expect to see an
11 increase in physical properties in a polymer that is
12 oxidized?
13   A.  Which physical property?
14   Q.  Tensile strength.
15   A.  Yes.
16   Q.  Young's modulus?
17   A.  Can I explain?  Tensile strength, as a
18 material becomes more brittle, generally increases.
19 Young's modulus, if there's no chemicals absorbed
20 into the material to alter its plastic nature,
21 Young's modulus will generally increase as the
22 material embrittles.
23   Q.  What about toughness?
24   A.  Toughness generally decreases even though

33 (Pages 126 to 129)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 130

1  the tensile strength -- of course, you are getting
2  into some issues here which require a lot of
3  materials science explanations.  But in general, as
4  materials embrittle, the Young's modulus and the
5  tensile strength actually increase but the area
6  under the stress-strain curve decreases.
7      Q.  Doctor, are you aware of any product on
8  the market --
9          MR. HUTCHINSON:  We are going to
10  have to take a quick break, and this
11  obviously does not count as my time.  We
12  are going to have to take a quick break
13  because of the noise outside.
14          THE VIDEOGRAPHER:  We are off the
15  video record.  The time is 11:33 a.m.
16      (Recess.)
17          THE VIDEOGRAPHER:  We are back on
18  the video record.  The time is 11:33 a.m.
19  BY MR. HUTCHINSON:
20      Q.  Doctor, are you aware of any medical
21  product on the market that will never oxidize?
22      A.  No.
23      Q.  Doctor, can oxidation of pelvic Prolene
24  mesh -- strike that.

Page 131

1      Can oxidation of Prolene pelvic mesh ever
2  be completely eliminated in vivo?
3          MR. JACKSON:  Objection, form.
4      A.  No.
5  BY MR. HUTCHINSON:
6      Q.  Doctor, you talked about a PVDF earlier;
7  is that correct?
8      A.  Yes.
9      Q.  Is that what you believe would have been a
10  safer alternative than polypropylene?
11          MR. JACKSON:  Objection, form.
12      A.  I have no basis to make that kind of a
13  conclusion other than my understanding of the
14  relative oxidative stability of PVDF versus
15  polypropylene.
16  BY MR. HUTCHINSON:
17      Q.  Doctor, what in your opinion is a safer
18  alternative for Prolene in pelvic floor repair?
19          MR. JACKSON:  Objection, form.
20      A.  I'm not here to opine on that.  I was just
21  asked to talk about polypropylene meshes.  So I'd
22  rather not get into that kind of a discussion.
23  BY MR. HUTCHINSON:
24      Q.  I understand, but do you have an opinion

Page 132

1  sitting here today what the safer alternative for
2  Prolene would be?
3          MR. JACKSON:  Objection, asked and
4  answered.
5      A.  Well, I know from my experience as a
6  polymer scientist, I have worked with PVDF.  It is
7  used in water filtration membranes, and the reason
8  is because it's like a rock when it comes to
9  oxidative stability.
10      They actually clean these membranes by
11  soaking them in concentrated bleach for several days
12  to burn off the organics.  And yet even though it
13  tolerates that for a while, eventually even those
14  membranes eventually oxidize and degrade and have to
15  be replaced.
16      Q.  And there are risks associated with PVDF,
17  correct?
18          MR. JACKSON:  Objection, form.
19      A.  Risks?
20  BY MR. HUTCHINSON:
21      Q.  Yes, medical risks associated with PVDF,
22  correct?
23          MS. FITZPATRICK:  You can't just put
24  an expert up here and ask anything that

Page 133

1      you want.  So if it is tied to his
2      report, fine; but other than that, you
3      are going to have to move on.
4  BY MR. HUTCHINSON:
5      Q.  Can you answer that question?
6      A.  Repeat the question.
7      Q.  Yes.  Are you aware of any medical risks
8  using PVDF as a medical device?
9          MS. FITZPATRICK:  I am going to
10      instruct the witness not to answer unless
11      you can show for some reason it is in his
12      report.
13  BY MR. HUTCHINSON:
14      Q.  Doctor, have you ever tested the
15  durability of PVDF as a mesh material inside the
16  human body?
17          MS. FITZPATRICK:  Same objection,
18      same instruction.
19  BY MR. HUTCHINSON:
20      Q.  Doctor, would you ever guarantee, would
21  you ever provide a lifetime guarantee for PVDF mesh?
22          MR. JACKSON:  Same instruction, same
23      objection.
24  BY MR. HUTCHINSON:

34 (Pages 130 to 133)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 134

1    Q.  Doctor, are you aware of any mesh made, on
2  the market made out of PVDF?
3        MS. FITZPATRICK:  Objection, same
4  instruction.
5        MR. HUTCHINSON:  Instructing the
6  witness not to answer?
7        MS. FITZPATRICK:  I am.  You want to
8  show us why you think that's in his
9  report, I'd be happy to reconsider and
10  look at it; but otherwise, just having an
11  expert witness sitting in the chair and
12  having him opine on things that are well
13  beyond his report is not appropriate.
14  BY MR. HUTCHINSON:
15    Q.  Doctor, could you tell us what would be a
16  reasonably safe alternative to Prolene mesh?
17        MR. JACKSON:  Objection to form.
18    A.  Not without investigating and researching
19  that question.
20  BY MR. HUTCHINSON:
21    Q.  Doctor, have you done any efforts to
22  research or investigate that question?
23    A.  A safer alternative, no.  That's beyond
24  the scope of what I was asked to do.

Page 135

1    Q.  Doctor, what's your opinion about what
2  Ethicon should have done differently to prevent
3  oxidation of Prolene?
4        MR. JACKSON:  Objection, form.
5    A.  There is no technology that I'm aware of
6  where you can prevent the oxidation of
7  polypropylene.
8  BY MR. HUTCHINSON:
9    Q.  Doctor, if we talk about the physical
10  properties of mesh, have you read the seven-year dog
11  study?
12    A.  I have indeed.
13        (Priddy Deposition Exhibit 9 was
14    marked for identification.)
15  BY MR. HUTCHINSON:
16    Q.  I want to hand you what we'll mark as
17  Exhibit 9 to your deposition.
18        (Witness reviewing document.)
19    Q.  Doctor, this is the seven-year Burkley dog
20  study that you relied on?
21    A.  Yes.
22        MR. JACKSON:  I am just going to
23    object because it says Barbolt on the
24    cover.  You said Burkley.

Page 136

1  BY MR. HUTCHINSON:
2    Q.  Doctor, turn with me to the last page of
3  the seven-year dog study marked as Exhibit 9 to your
4  deposition.  Are you there with me?
5    A.  Yes.
6    Q.  Have you ever seen this particular page
7  before?
8    A.  Absolutely, yes.
9    Q.  Did you look at the breaking strength,
10  elongation and Young's modulus for Prolene?
11    A.  I certainly did.
12    Q.  Doctor, what did you notice about it?
13    A.  I noticed the Young's modulus was
14  ridiculously low after seven years.
15    Q.  Doctor, do you have any reason to believe
16  that the negative 70 shown for Prolene is incorrect?
17    A.  No.
18    Q.  Doctor, do you have any reason to believe
19  that the 111 percent increase of elongation for
20  Prolene is incorrect?
21    A.  No.
22    Q.  What about for the breaking strength of
23  negative 5 percent, any reason to believe that's
24  incorrect?

Page 137

1    A.  No.
2    Q.  Doctor, have you ever done any type of
3  analysis using this data from the dog study?
4    A.  Yes.
5    Q.  For Prolene?
6    A.  Yes.
7    Q.  Is it included in your report?
8    A.  No.
9    Q.  Why not?
10    A.  If I do a supplemental report, I'll
11  probably include it, but I didn't include it in this
12  report.
13    Q.  Why not?
14    A.  I can't answer the question.  I just
15  didn't do it.
16    Q.  Did the lawyers that hired you instruct
17  you not to include that in your supplemental report?
18        MR. JACKSON:  Objection, form.
19  BY MR. HUTCHINSON:
20    Q.  I mean in your original report.
21    A.  No.
22    Q.  But you are currently working on
23  evaluating this data, is that your testimony?
24    A.  No, I just said I have evaluated it.

35 (Pages 134 to 137)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 138

1    Q.  Are you currently doing an analysis using
2  this type of data?
3         MR. JACKSON:  Objection, asked and
4     answered.
5  BY MR. HUTCHINSON:
6     Q.  Currently?
7     A.  No, I have analyzed this data.
8     Q.  But I thought you said you have done some
9  tests that are not included in the report.
10        MR. JACKSON:  Objection, misstates
11    witness' testimony.
12    A.  I have in the past, yes.  I have done
13  quite a few tests.
14    Q.  What type of tests of the breaking
15  strength, elongation and Young's modulus of Prolene
16  have you done?
17    A.  I haven't done tests, I have evaluated
18  this data.
19    Q.  Doctor, does this data that we are looking
20  at now support your opinions that Prolene degrades?
21    A.  Absolutely.
22    Q.  How so?
23    A.  The 70 percent loss of modulus, that's
24  huge.

Page 139

1     Q.  That means Young's modulus is stiffness,
2  correct?
3     A.  Yes, it does.
4     Q.  And Young's modulus -- strike that.
5         This means that the Prolene lost
6  70 percent of its stiffness after seven years?
7     A.  That's correct.
8     Q.  And why do you believe that supports your
9  opinion?
10    A.  Going from a 700,000 modulus down to
11  200,000, I took that data and plotted it out.  So I
12  took the tensile, the Young's modulus which is
13  tensile modulus times 0 after one year, after two
14  years, after seven years, plotted it.  It's a
15  straight line, with 98 percent statistical linear
16  straight line.  When I extrapolate that until the
17  time it hits 0 modulus, it predicts ten years, three
18  more years, that material would have been water.
19        A stiffness of 200,000 modulus is, the
20  Prolene, if it had been held up, it would have
21  sagged.  There's no stiffness whatsoever, no
22  integrity.  It would have been like jello.  That's
23  huge.
24    Q.  Is that information in your expert report,

Page 140

1  Doctor?
2     A.  No.
3     Q.  Why not?
4     A.  I focused on the other issues and didn't
5  include that.
6     Q.  You will agree that the physical
7  properties that are shown of the Prolene sutures in
8  the dog study improved after seven years?
9     A.  Absolutely not, no.  Loss of modulus is
10  huge.  That means the material has no integrity.  If
11  it had been any stress at all on it, it would have
12  stretched right out.
13        (Priddy Deposition Exhibit 10 was
14     marked for identification.)
15  BY MR. HUTCHINSON:
16    Q.  Doctor, I want to hand you what we will
17  mark as Exhibit 10 to your deposition.  This shows
18  toughness as the area under the curve, correct?
19        MR. JACKSON:  Objection, form.
20    Q.  The stress-strain chart.
21        (Witness reviewing document.)
22    A.  Yes.
23    Q.  Doctor, these are the same plots or the
24  same data that we saw from the Burkley dog study

Page 141

1  that we just looked at, correct?
2     A.  I don't know.
3     Q.  Why don't you compare the data on this
4  chart to the data on the last page of the seven-year
5  dog study.
6     A.  These stress-strain curves look strange.
7  I would have to actually see the plot-outs from the
8  instruments that ran this stress-strain curve
9  because you normally don't get a 0 point and a point
10  up here that's a perfect straight line.  It's always
11  an arc.
12        So it looks like somebody took a ruler and
13  hand-drew this out.  It doesn't look right.
14    Q.  Doctor, looking at the red at time 0,
15  elongation was 1.68 pounds according to the Burkley
16  dog study, correct?
17    A.  That's percent.
18    Q.  I'm sorry, percent.
19    A.  Right.
20    Q.  Elongation times 0 is 37 percent; is that
21  right?
22    A.  Again, this data doesn't look -- something
23  is wrong with the data.
24    Q.  What's wrong with the data?

36 (Pages 138 to 141)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 142

1    A.  I mean, elongation is not to pounds, it's
2  in percent and above it you have got 37 percent.  I
3  mean, that looks correct, year 0, 37 percent.  It
4  must be the breaking strength is 1.68 pounds.  Okay,
5  now I understand.
6    Q.  Now that you have looked at it, you will
7  agree that the data is correct on Exhibit 10?
8       MR. JACKSON:  Objection, form.
9    A.  Well, again, I can't make that leap.
10 BY MR. HUTCHINSON:
11   Q.  Why not?
12   A.  As I say, the curves look weird.  It looks
13 like somebody hand-drew with a ruler.  The plot-outs
14 from a tensile, an Instron, don't look like this.
15 They are not "blocky" like this.  They are nice,
16 smooth curves.  Somebody has taken the data and
17 hand-drawn this.
18   Q.  Doctor, you will agree that the numbers
19 for the breaking strength and elongation at year
20 zero are the same as the Burkley dog study, correct?
21   A.  Hang on.
22      (Witness reviewing document.)
23   A.  Yes.
24      MR. JACKSON:  Chad, are you asking

Page 143

1  him to compare data in Exhibit 9 and
2  Exhibit 10?  Is that what you are asking
3  him?
4  BY MR. HUTCHINSON:
5    Q.  I'm sorry, did you say yes?
6    A.  Yes, I did.
7       THE WITNESS:  That was what I assume
8  he was asking.
9    Q.  And Doctor, at year 7 --
10      MS. FITZPATRICK:  Chad, can he
11   answer the question so it is clear on the
12   record?
13      MR. JACKSON:  Chad, I just asked,
14   were you asking Dr. Priddy to compare
15   Exhibit 9 and Exhibit 10?  Is that what
16   you just asked him to do?
17      MR. HUTCHINSON:  Yes, I did.  I
18   thought the witness answered your
19   question.  My bad.
20 BY MR. HUTCHINSON:
21   Q.  Doctor, at year 7, is the data on
22 Exhibit 10 the same as the data in the Burkley dog
23 study?
24   A.  Yes, it is.

Page 144

1    Q.  Thank you.  And Doctor, you will agree
2  that the area under the curve is a measure of
3  toughness, correct?
4       MR. JACKSON:  Objection, form.
5    A.  As I say, there's something wrong here.
6  What I'm seeing here with modulus does not equate to
7  what I'm seeing here (indicating).  There's
8  something wrong.
9  BY MR. HUTCHINSON:
10   Q.  But can you tell us sitting here today
11 what's wrong?
12   A.  What I'm saying, modulus is listed here.
13 It's not reflected here (indicating).  There's a
14 problem.  Something is wrong.
15   Q.  I understand.  My question is:  Sitting
16 here today, can you tell us what is wrong?
17      MR. JACKSON:  Objection, asked and
18   answered.
19   A.  I can't.  I have to figure it out.  I
20 cannot figure it out based on what I'm seeing.  It
21 just doesn't equate, is what I'm saying.  There's
22 something, there's a problem.
23 BY MR. HUTCHINSON:
24   Q.  Have you made any efforts to determine

Page 145

1  what that problem is?
2       MR. JACKSON:  Objection, form.
3    A.  Until I just noticed the problem now, no.
4  I should say yes, I have been trying to figure it
5  out the last five minutes and I can't.  It doesn't
6  add up.
7       I've done literally thousands of
8  stress-strain tensile studies on different samples
9  and this doesn't look right.  Something's wrong.
10      Can I interject something at this point?
11 It's not an answer to a question, it is kind of
12 answering your question.
13      Modulus is slope.  There's a huge
14 difference between a slope of a Young's modulus of
15 200,000 and 700,000.
16      These two curves have almost the same
17 slope, and this does not reflect a difference of 200
18 to 700,000.  As I say, something is clearly wrong.
19   Q.  Doctor, can you quantify the rate at which
20 you believe antioxidants are depleted from Prolene?
21      MR. JACKSON:  Objection, asked and
22   answered.
23   A.  In which?
24 BY MR. HUTCHINSON:

37 (Pages 142 to 145)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 146

1    Q.  In vivo.
2    A.  It's too many variables.  It's impossible.
3  It's going to be dependent upon the amount of
4  tension, the amount of inflammation, the amount of
5  oxidizing species, but the foreign body response,
6  there's too many variables, plus you've got the
7  variability in the mesh and its oxidative stability.
8  So you just can't predict that.
9    Q.  Have you made any efforts to test that
10  whatsoever?
11    MR. JACKSON:  Objection, form.
12    A.  Test the rate at which it would, just my
13  OIT work.
14  BY MR. HUTCHINSON:
15    Q.  Doctor, you agree that sutures, Prolene
16  sutures have been on the market for a long time?
17    A.  Yes.
18    Q.  Doctor, are you criticizing Ethicon's
19  Prolene sutures in any way?
20    A.  I was not asked to opine on that.
21    Q.  Do you have any criticisms of Ethicon's
22  sutures?
23    MR. JACKSON:  Objection, asked and
24    answered.

Page 147

1    A.  Again, I wasn't -- I haven't even thought
2  about that.
3  BY MR. HUTCHINSON:
4    Q.  Doctor, have you thought about whether or
5  not sutures made out of Prolene oxidize in the body?
6    A.  If they are made out of polypropylene,
7  they oxidize in the body.  That's a given.
8    Q.  Doctor, do you know if Ethicon's sutures
9  were approved by FDA as safe and effective?
10    A.  I remember reading they were approved by
11  FDA.
12    Q.  Doctor, is it your opinion that every
13  person who has a Prolene suture implanted in their
14  body has an oxidized product in their body?
15    A.  Of course, yes, I am.
16    Q.  What about hernia mesh?  Do you know how
17  long hernia mesh has been on the market?
18    A.  I don't know precisely.  I know a long
19  time.
20    Q.  Is it your opinion that Prolene hernia
21  mesh oxidizes in the body?
22    A.  Yes.
23    Q.  And it is your opinion that every person
24  who has ever received a hernia mesh implant has

Page 148

1  oxidized mesh in their body?
2    MR. JACKSON:  Objection, form.
3    A.  Yes.
4  BY MR. HUTCHINSON:
5    Q.  Doctor, is it your opinion that every
6  medical doctor who uses Prolene in the body is
7  committing malpractice?
8    MR. JACKSON:  Objection, form.
9    A.  I'm not going to go there.  I'm a plastics
10  scientist.  I'm not into that kind of stuff.
11  BY MR. HUTCHINSON:
12    Q.  Do you believe that every medical doctor
13  who is implanting Prolene in the body is doing
14  something wrong?
15    A.  They are probably relying upon the
16  literature provided to them by Ethicon that said
17  it's safe and effective and they are just relying on
18  that, I presume.
19    Q.  My question to you, though, is:  Do you
20  believe that doctors who implant Prolene in the body
21  are doing something wrong?
22    MR. JACKSON:  Objection, asked and
23    answered.
24    MS. FITZPATRICK:  Beyond the scope

Page 149

1    of his opinions.
2    A.  How can I opine on that?  That's beyond
3  my, what I'm asked to do here.
4  BY MR. HUTCHINSON:
5    Q.  Can you answer that question?
6    A.  I'd rather not.  That's an opinion outside
7  my area of expertise.
8    Q.  Can you answer that question?
9    A.  Can I answer it?  I can give you an
10  opinion for what it's worth.
11    MR. JACKSON:  All asked and
12    answered.
13  BY MR. HUTCHINSON:
14    Q.  What's your opinion?
15    A.  Are they doing something wrong?
16    Q.  Yes, by using Prolene in the body as an
17  implant?
18    MR. JACKSON:  Objection, this is
19    outside the scope of the report.
20    A.  I don't think the doctor is doing anything
21  wrong.  He is just relying upon the information he
22  has, his best judgment.  I think Ethicon is doing
23  something wrong but the doctor isn't doing anything
24  wrong.

38 (Pages 146 to 149)

Duane Priddy, Ph.D.

Page 150

1      MR. HUTCHINSON:  Move to strike as
2  non-responsive.
3      MR. WALLACE:  Move to strike because
4  you don't like his answer.
5      MS. FITZPATRICK:  How is that
6  non-responsive?
7      MR. WALLACE:  All right, we are
8  close to done.
9      MR. HUTCHINSON:  How much longer do
10  we have?
11      THE VIDEOGRAPHER:  20 minutes.
12      MR. WALLACE:  We may have some
13  questions so you might want to reserve a
14  couple minutes if you need it.
15  BY MR. HUTCHINSON:
16      Q.  Doctor, let's go back to your expert
17  report on Page 15.  Are you there with me?
18      A.  I am there, yes.
19      Q.  Doctor, are these charts, say, for
20  example, the chart on Page 15.
21      A.  Yes.
22      Q.  What do you call these charts?
23      A.  OIT curves.
24      Q.  Curves.  Doctor, would you expect the

Page 151

1  additives in Prolene to have an exothermic peak?
2      A.  They will, but it's going to be barely
3  detectable.
4      Q.  Why would it be barely detectable?
5      A.  Excuse me, I got to sneeze.
6          Because they are there in such low
7  concentration relative to the polymer that like,
8  when, for example, the DLTDP is oxidized from the
9  sulfur or the sulfide to the sulfone, ultimately to
10  the sulfoxide, that's an exothermic reaction.  But
11  the DLTDP is such low concentration, the instrument
12  is not sensitive enough to detect it.  So you get a
13  slight elevation in the baseline.
14          This curve is not -- if I was to draw a
15  perfectly horizontal line, you would see this
16  deviating up slightly.  That's probably the Santonox
17  R and the DLTDP slowly oxidizing, but you really
18  don't see a significant response until they are
19  depleted and the polypropylene takes over.
20      Q.  Is that the signs of the additives that
21  you are seeing in your thermogram data?
22      A.  Excuse me?
23      Q.  Is that the signs of the additives that
24  you are seeing in your thermogram data?

Page 152

1      MR. JACKSON:  Objection, form.
2      A.  Signs?
3  BY MR. HUTCHINSON:
4      Q.  Do you see any signs --
5      A.  I would say it's an indication that they
6  are reacting, yes, they are oxidizing.
7      Q.  Just so the record is clear, what are you
8  referring to specifically?
9      A.  The slight, gradual elevation here is
10  probably due to the antioxidants oxidizing,
11  probably.
12      Q.  That's at the curve, the DSC curve on the
13  top of Page 15, correct?
14      A.  Yes.
15      Q.  Doctor, do you have any opinion regarding
16  the specific concentration level of Santonox R and
17  DLTDP that should have been in Prolene?
18      A.  Just based upon the data sheet I was
19  provided that gave me a target loading level.
20      Q.  Right, but do you have an opinion about
21  Ethicon's Prolene, about what the specific
22  concentration level of Santonox R and DLTDP should
23  have been?
24      MR. JACKSON:  Objection, asked and

Page 153

1  answered.
2      A.  Should have been for the Prolene
3  application?
4  BY MR. HUTCHINSON:
5      Q.  Yes, sir.
6      A.  My opinion is, it's not appropriate to use
7  polypropylene, stabilized polypropylene with those
8  additives in for that application.  It's not
9  appropriate.
10      Q.  Can you tell us what additives if not
11  Santonox R and DLTDP, can you tell us what
12  antioxidants should have been used?
13      A.  Let me restate.  I do not know of any
14  antioxidant stabilizer formulation that's totally
15  non-extractable by oils and fats in the body that
16  you could put into polypropylene and guarantee that
17  it's going to last for decades in the body because
18  they are going to be extracted from the surface.  It
19  is just a given basic polymer science.
20      Q.  Can you tell the ladies and gentlemen of
21  the jury what additives, specific additives should
22  have been used if not Santonox R and DLTDP?
23      MR. JACKSON:  Objection, asked and
24  answered.

39 (Pages 150 to 153)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 154

1    A.   Again, I do not believe it's possible to
2  stabilize polypropylene with any additives to make
3  an implantable mesh product that would last for
4  decades, just not going to happen.
5        MR. HUTCHINSON:  I want to take just
6    a quick break, go off the record.
7        THE VIDEOGRAPHER:  We are off the
8    video record.  The time is 12:01 p.m.
9        (Recess.)
10       THE VIDEOGRAPHER:  We are back on
11   the video record.  The time is 12:04 p.m.
12  BY MR. HUTCHINSON:
13   Q.   Doctor, have you understood all my
14  questions so far?
15   A.   Yes.
16   Q.   Is there anything about the testimony that
17  you have given you would like to change?
18       MR. JACKSON:  Objection, form.
19   A.   Not at this point.
20  BY MR. HUTCHINSON:
21   Q.   Has a court ever determined that you could
22  not give an expert opinion?
23   A.   That I could not?
24   Q.   Yes.

Page 155

1    A.   Yes.
2    Q.   How many times?
3    A.   Twice that I'm aware of.
4    Q.   In what circumstances?
5    A.   One was a patent infringement matter
6  involving, against Nike for a shoe sole design and
7  because I had never designed shoe soles and didn't
8  really have experience working with shoes or shoe
9  soles, they deemed my testimony was not admissible.
10       And the other time was a portion of my
11  testimony was deemed as being not admissible.
12   Q.   In what particular instance?
13   A.   See, that was Jarden versus Hearthmark, et
14  al. Do you want to know the details of that?
15   Q.   Yes.
16   A.   Okay, it involved a company that decided
17  to use hand sanitizer, this gel that we squirt from
18  a bottle on our hands to sanitize them, to market
19  that as a fire starter.  So they used a bottle made
20  out of PVC to dispense that and a child was using it
21  to ignite a fire.  And the flame came up the stream
22  of gel as it was squirting out of the bottle,
23  entered into the bottle, the bottle exploded and
24  blew flaming gel all over him.

Page 156

1        And I made the analogy of napalm.  The
2  judge said that wasn't acceptable.
3    Q.   Doctor, on this DSC curve at the top of
4  Page 15.
5    A.   Yes.
6    Q.   Is oxidation showing as a smooth
7  transition from time 0?
8        MR. JACKSON:  Objection, form.
9    A.   On this one?
10  BY MR. HUTCHINSON:
11   Q.   Yes.
12   A.   Yes, that's typical, that's a smooth,
13  normal transition, yes.
14   Q.   But would you say that that is showing a
15  smooth transition?
16   A.   Yes.
17   Q.   Did you do any resampling?
18   A.   Any what?
19   Q.   Resampling?
20       MR. JACKSON:  Objection, form.
21   A.   Yes, I had duplicates on a couple samples
22  run, yes.
23  BY MR. HUTCHINSON:
24   Q.   Did you do any retesting?

Page 157

1    A.   Retesting, I had the same mesh run a
2  couple times, yes.
3    Q.   But did you do any retesting of that
4  particular DSC curve?
5    A.   I don't understand what you are asking me.
6    Q.   Did you do the test again to see if you
7  could generate the same curve?
8    A.   Oh, yes.
9        MR. HUTCHINSON:  I don't have
10   anything further.
11       MR. JACKSON:  We'll just take about
12   five minutes.
13       THE VIDEOGRAPHER:  We are off the
14   video record.  The time is 12:07 p.m.
15       (Recess.)
16       THE VIDEOGRAPHER:  We are back on
17   the video record.  The time is 12:20 p.m.
18       MR. JACKSON:  I just want to note on
19   the record that Dr. Priddy said that the
20   materials that were available to him in
21   this case were on the flash drive.  They
22   are not on that drive.  We can provide
23   those later if needed.
24       MR. HUTCHINSON:  I'm sorry?

40 (Pages 154 to 157)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 158

1      MR. JACKSON: The literature and the
2  Ethicon documents are not on there, just
3  his work papers.
4      MR. HUTCHINSON: This may be, where
5  is the literature and documents?
6      MR. WALLACE: Since they were your
7  documents, we typically don't include
8  those, but if you want them, we'll give
9  them to you. Typically, you guys don't
10 like to be bothered with your own
11 documents. That was the issue.
12     MR. HUTCHINSON: That was the reason
13 they weren't included on the flash drive?
14     MR. WALLACE: Yes. I think we have
15 done that before.
16 EXAMINATION
17 BY MR. JACKSON:
18     Q. Dr. Priddy, do you remember being asked
19 some questions earlier about your work with AMS?
20     A. Yes.
21     Q. You were a fact witness in AMS?
22     A. I was, yes.
23     Q. You were not an expert?
24     MR. HUTCHINSON: Objection, leading.

Page 159

1      A. Correct.
2  BY MR. JACKSON:
3      Q. You did not give an expert report?
4      A. Right.
5      Q. Mr. Hutchinson asked you earlier if you
6  were an expert in various fields. Do you remember
7  that?
8      A. Yes.
9      Q. What did you understand that word expert
10 to mean to you?
11     A. That that was my primary job function of,
12 specific area of expertise he was mentioning.
13     Q. But just because you said you are not an
14 expert in a particular area doesn't mean you don't
15 have knowledge and expertise in that area?
16     MR. HUTCHINSON: Object, form.
17     A. That is correct.
18 BY MR. JACKSON:
19     Q. Do you remember being asked some questions
20 earlier about Steve Johnson?
21     A. Yes.
22     Q. Steve Johnson is someone who does this
23 testing regularly; is that right?
24     A. Yes.

Page 160

1      Q. You interact with people like Steve
2  Johnson all the time in your professional career?
3      A. I do. I use laboratories all over the US
4  and he is one of the, he's the lab I use for OIT.
5  Depending on the core area of expertise of the lab,
6  I will use different labs for different types of
7  testing. I always use Steve for OIT and GC-MS
8  analysis.
9      Q. So you rely on Steve's work regularly?
10     MR. HUTCHINSON: Form.
11     A. I do.
12     MR. HUTCHINSON: Counsel, if you
13 will give me a just a second to lodge my
14 objection. Form to the last question.
15 BY MR. JACKSON:
16     Q. Dr. Priddy, when Steve Johnson runs a test
17 for you, it is your job to interpret that data?
18     A. That's correct.
19     MR. HUTCHINSON: Form.
20 BY MR. JACKSON:
21     Q. And you do that regularly in your
22 profession?
23     A. I do.
24     Q. Do you recall Mr. Hutchinson asking you

Page 161

1  some questions earlier today about the names of
2  various Ethicon products?
3      A. Yes.
4      Q. Did the names of those products have
5  anything to do with your opinions in this case?
6      A. No.
7      Q. Dr. Priddy, Mr. Hutchinson asked you some
8  questions earlier today about Dr. Jordi. Do you
9  remember that?
10     A. Yes.
11     Q. Can you determine anything about Dr.
12 Jordi's report without seeing his data?
13     A. No.
14     Q. Can you evaluate the hypothetical that Mr.
15 Hutchinson gave you earlier today without seeing Dr.
16 Jordi's data?
17     MR. HUTCHINSON: Object to form.
18     A. No.
19 BY MR. JACKSON:
20     Q. Did anything you were asked by Mr.
21 Hutchinson today change any of your opinions in this
22 case?
23     A. No.
24     Q. Did anything that Mr. Hutchinson asked you

41 (Pages 158 to 161)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 162

1  today change how you view your methodology in this
2  case?
3      A.  No.
4      Q.  Why didn't you review any plaintiff
5  medical records in this case?
6      A.  It wasn't relative to my opinions, didn't
7  affect my opinions.
8      Q.  Dr. Priddy, you were asked some questions
9  earlier about life expectancy of certain products.
10  Do you remember that?
11      A.  Yes.
12      Q.  Can you explain for the jury why you did
13  your testing in this case?
14      A.  Yes, I was looking specifically at the
15  product variability.  Normally, when products are
16  manufactured, they are manufactured to a
17  specification to minimize variability and I just
18  wanted to see if these products, these mesh products
19  were highly variable in their oxidation resistance
20  or if they were all very similar in their oxidation
21  resistance.
22      Q.  Do you remember being asked some questions
23  earlier about how blood in the body interacts with
24  these products?

Page 163

1      A.  Yes.
2      Q.  Is it fair that you need to understand how
3  chemicals in the body interact with these mesh
4  devices to offer your opinions in this case?
5          MR. HUTCHINSON:  Object to form.
6      A.  Well, just the fact that knowing that I
7  do, that bodies contain chemicals which are fats and
8  oils and have the capability to plasticize and
9  extract and affect the properties of plastics that
10  are implanted in the body, the nature of these
11  chemicals, the types of chemicals they are, I
12  understand that and how those types of chemicals
13  interact with materials.  That's all part of my core
14  area of expertise.
15  BY MR. JACKSON:
16      Q.  Dr. Priddy, as the founder and CEO of
17  Plastic Expert Group, what do you do professionally?
18      A.  Consult, serve as an expert witness.
19  Companies are constantly sending me plastic parts
20  that have failed and ask me to figure out the root
21  cause of the failure and make recommendations to
22  them once I determine the cause why they are
23  failing, how to fix it, how to remediate, how to
24  redesign the part, change the material, do what

Page 164

1  needs to be done so they don't have failures
2  anymore.
3          Those are the three main -- it all has to
4  do with plastics.
5      Q.  In your profession, you provide consulting
6  services to medical device companies?
7      A.  I do.
8      Q.  You have been hired by medical device
9  companies to work on implantable medical devices?
10      A.  Correct.
11      Q.  You have provided expert testimony on
12  behalf of medical companies?
13      A.  Expert testimony -- most of my work has
14  been consulting.  I'm trying to think.  Of course,
15  the AMS work I did, my recollection is they were
16  trying to get FDA approval on a mesh product and
17  they asked me to opine, to evaluate and opine on the
18  usefulness of accelerated laboratory testing of
19  their packaging of their device.
20          So it wasn't part of a litigation, it was
21  part of a petition to the FDA.  And I was -- as far
22  as being hired by a medical device manufacturer, to
23  my knowledge, it's all been consulting work except
24  for that.

Page 165

1      Q.  Is the work you have done for medical
2  device companies any different than the work you
3  have done in this case?
4      A.  I have run OIT testing for medical device
5  companies to, for example -- can I give an example?
6      Q.  Sure.
7      A.  Spectranetics was having a problem with
8  degradation of one of their tubing materials that
9  was failing, medical tubing.  So they had me do a
10  failure analysis and I determined that the tubing
11  had degraded.
12          And so I ran OIT testing to determine if
13  it was an oxidation issue, for example.  So to
14  answer your question, it's a little bit different,
15  but I'm using the same kinds of tests, yes.
16      Q.  You have run OIT tests for medical device
17  companies?
18      A.  Yes.
19      Q.  You did an OIT test in this case?
20      A.  Yes.
21      Q.  Is there anything special or unique about
22  the antioxidants used in the Prolene mesh?
23      A.  No, they are just basic workhorse
24  antioxidants.

42 (Pages 162 to 165)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 166

1     Q.  You have published peer-reviewed
2  literature discussing antioxidants in plastics?
3        MR. HUTCHINSON:  Object to form.
4     A.  Yes, I have.
5  BY MR. JACKSON:
6     Q.  Have you done work with antioxidants as
7  part of your day job in your profession?
8     A.  Yes.
9     Q.  Your opinions in this case are based on
10  your professional expertise as well as the documents
11  you have reviewed in the peer-reviewed literature?
12       MR. HUTCHINSON:  Object to form.
13    A.  That's correct.
14  BY MR. JACKSON:
15    Q.  The plaintiffs in this case asked you to
16  opine on the chemical stability of Prolene; is that
17  right?
18       MR. HUTCHINSON:  Form.
19    A.  Yes.
20  BY MR. JACKSON:
21    Q.  If Ethicon had reached out to you 15 or
22  20 years ago and asked you to do the same thing, if
23  they had asked you to offer the same -- strike that.
24       If Ethicon had reached out to you 15 or

Page 167

1  20 years ago and asked you to offer the same
2  opinions for them, would you have done it?
3     A.  Yes.
4     Q.  Would you have run the same tests and
5  analysis that you have run in this case?
6     A.  Most likely.
7     Q.  Is the testing and analysis that you have
8  done in this case widely accepted in your industry?
9     A.  Yes.
10    Q.  As someone who has worked for medical
11  device companies, is accelerated aging testing alone
12  sufficient to determine the suitability of a
13  material?
14    A.  No.
15    Q.  Why not?
16    A.  Because it is only an approximation.  It
17  just lets you know if there is a red flag there that
18  needs to be followed up on or not.
19    Q.  Why did you review Ethicon documents in
20  this case?
21    A.  I wanted to see the kind of testing that
22  they performed and the data they generated on their
23  Prolene mesh products.
24    Q.  You are not a medical doctor?

Page 168

1     A.  No.
2     Q.  So why are you here to offer an opinion on
3  a medical device?
4     A.  Because the medical device is plastic and
5  I'm a plastics expert.
6     Q.  Dr. Priddy, you were asked a lot of
7  questions earlier today about both DLTDP and
8  Santonox R.  Do you remember that?
9     A.  Yes.
10    Q.  Does the presence of either of those
11  antioxidants in the Prolene mesh alter your opinions
12  in this case?
13    A.  No.
14       MR. HUTCHINSON:  Are you done?
15       MR. JACKSON:  I have no more
16    questions.
17       MR. HUTCHINSON:  I got a couple of
18    follow-up questions.
19  EXAMINATION (Continued)
20  BY MR. HUTCHINSON:
21    Q.  Doctor, you testified that you were
22  deposed in the AMS litigation as a fact witness?
23  Did I understand that correctly?
24    A.  Yes.

Page 169

1     Q.  What did you witness?
2     A.  I didn't write a report.  I had done work
3  as a consultant for AMS and so I was deposed, I
4  guess, to just talk, as I recall, just talk about
5  polypropylene oxidation and stability.
6     Q.  Was it a patent type litigation or was it
7  a personal injury type of litigation?
8     A.  I think it was a class action litigation
9  against AMS for their meshes, as I recall.
10    Q.  What was the substance of your testimony
11  in the AMS litigation?
12       MR. JACKSON:  Objection, form.
13  BY MR. HUTCHINSON:
14    Q.  Just in general.
15    A.  It was generally similar to this, the
16  oxidative stability of polypropylene.  It was
17  focused pretty much on chemistry of oxidation of
18  polypropylene.
19    Q.  But you were not designated as an expert
20  in that litigation; is that correct?
21    A.  That's correct.
22    Q.  Did you have a lawyer representing you?
23    A.  Representing me, I had one that hired me.
24    Q.  What did that lawyer hire you to do?

43 (Pages 166 to 169)

Duane Priddy, Ph.D.

Page 170

1      MR. JACKSON:  Objection, form.
2      A.  Just deposed me just as a consultant on
3  the issues involving polypropylene oxidative
4  chemistry.
5  BY MR. HUTCHINSON:
6      Q.  What's the name of the lawyer that hired
7  you?
8      A.  Ed Wallace.
9      Q.  What did Ed Wallace ask you to do?
10      A.  Just deposed me and asked me a bunch of
11  questions during the deposition.
12      Q.  Ed Wallace asked you --
13      A.  I'm sorry, the AMS attorney asked me.  Ed
14  Wallace asked me some questions too, I believe, but
15  yes.
16      Q.  My question is specifically, sir:  Were
17  you designated as an expert in the AMS litigation?
18      MR. JACKSON:  Objection, asked and
19      answered.
20      A.  No, sir, I don't believe so.
21  BY MR. HUTCHINSON:
22      Q.  Did you provide anybody expert opinions in
23  any type of deposition?
24      MR. JACKSON:  Objection, form.

Page 171

1      A.  That deposition I presented information,
2  yes.
3      Q.  As an expert?
4      MR. JACKSON:  Objection, asked and
5      answered.
6      A.  I assume I was considered a plastics
7  expert.
8      Q.  What were your opinions regarding
9  degradation in the AMS litigation, sir?
10      A.  You know, that was what, three years ago.
11  I don't recall the details.  All I remember, it had
12  to do with polypropylene oxidation.
13      Q.  Did it have anything to do with vaginal
14  mesh?
15      A.  I don't even remember that, too long ago.
16      Q.  That was within the last three years?
17      A.  That was about three years ago, I believe.
18      Q.  Did you do any testing of AMS mesh?
19      A.  No, sir.
20      MR. HUTCHINSON:  Let's call it a
21      day.  Thank you, sir, for your time.
22      THE VIDEOGRAPHER:  Now off the video
23      record, the time is 12:37 p.m.
24      (Deposition concluded: 12:37 p.m.)

Page 172

1      E R R A T A  S H E E T
2      Pursuant to Rule 30(e) of the Federal Rules
   of Civil Procedure and/or the Official Code of
3  Georgia Annotated 9-11-30(e), any changes in form or
   substance which you desire to make to your
4  deposition testimony shall be entered upon the
   deposition with a statement of the reasons given for
5  making them.
6      To assist you in making any such
   corrections, please use the form below.  If
7  supplemental or additional pages are necessary,
   please furnish same and attach them to this errata
8  sheet.
        - - -
9
10      I, the undersigned, DUANE PRIDDY, do hereby
   certify that I have read the foregoing deposition
11  and that to the best of my knowledge said deposition
   is true and accurate (with the exception of the
12  following corrections listed below).
13  Page No._____Line No._____should read:_____
14  Reason for change:_____
15  Page No._____Line No._____should read:_____
16  Reason for change:_____
17  Page No._____Line No._____should read:_____
18  Reason for change:_____
19  Page No._____Line No._____should read:_____
20  Reason for change:_____
21  Page No._____Line No._____should read:_____
22  Reason for change:_____
23  Page No._____Line No._____should read:_____
24  Reason for change:_____

Page 173

1  Page No._____Line No._____should read:_____
2  Reason for change:_____
3  Page No._____Line No._____should read:_____
4  Reason for change:_____
5  Page No._____Line No._____should read:_____
6  Reason for change:_____
7  Page No._____Line No._____should read:_____
8  Reason for change:_____
9  Page No._____Line No._____should read:_____
10  Reason for change:_____
11  Page No._____Line No._____should read:_____
12  Reason for change:_____
13  Page No._____Line No._____should read:_____
14  Reason for change:_____
15  Page No._____Line No._____should read:_____
16  Reason for change:_____
17  Page No._____Line No._____should read:_____
18  Reason for change:_____
19
20  Signature     _____
21  Sworn to and Subscribed before me
22  _____, Notary Public.
23  This _____ day of _____, 20___.
24  My Commission Expires:

44 (Pages 170 to 173)

d3397735-afa1-4387-8652-869c31835d32

Duane Priddy, Ph.D.

Page 174

1       C E R T I F I C A T E
2
3    G E O R G I A :

     HENRY COUNTY:
4
5           I hereby certify that the foregoing
     deposition was reported, as stated in the
6    caption, and the questions and answers
     thereto were reduced to the written page
7    under my direction; that the foregoing
     pages 1 through 168 represent a true and
8    correct transcript of the evidence given.
     I further certify that I am not in any
9    way financially interested in the result
     of said case.
10          Pursuant to Rules and Regulations of
     the Board of Court Reporting of the
11   Judicial Council of Georgia, I make the
     following disclosure:
12          I am a Georgia Certified Court
     Reporter.  I am here as an independent
13   contractor for Golkow Global Litigation
     Services.
14          I was contacted by the offices of
     Golkow Global Litigation Services to
15   provide court reporting services for this
     deposition.  I will not be taking this
16   deposition under any contract that is
     prohibited by O.C.G.A. 15-14-37 (a) or
17   (b).
        I have no written contract to provide
18   reporting services with any party to the
     case, any counsel in the case, or any
19   reporter or reporting agency from whom a
     referral might have been made to cover
20   this deposition.  I will charge my usual
     and customary rates to all parties in the
21   case.
        This, the 9th day of March, 2016.
22
     _____
23      MAXYNE BURSKY, CCR-2547
24

d3397735-afa1-4387-8652-869c31835d32