# EXHIBIT G

Scott A. Guelcher, Ph.D.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF KERN
CASE NO. S-1500-CV 279123 LHB

COLEEN M. PERRY,                         PLAINTIFF


vs.


HUNG T. LUU, M.D.,                       DEFENDANTS
JOHNSON & JOHNSON, a New Jersey
Corporation; ETHICON, INC., a
New Jersey Corporation; and
DOES 1-60,



        The deposition of SCOTT A. GUELCHER, Ph.D.,

called by the Defendants for examination, taken

before Michelle E. Kerr, RPR, a Notary Public in and

for the Commonwealth of Kentucky, Daviess County, at

1719 West End Avenue, Nashville, Tennessee, on

December 18, 2014, commencing at 9:40 a.m.

a54c1a8b-9393-421a-8f67-0f6a35abc023

## Scott A. Guelcher, Ph.D.

Page 2

1    A P P E A R A N C E S
2
   APPEARANCE FOR PLAINTIFF:
3
   Jeffrey M. Kuntz, ESQUIRE
4  WAGSTAFF & CARTMELL
   4740 Grand Avenue, Suite 300
5  Kansas City, MO  64112
   jkuntz@wcllp.com
6
   Michael H. Bowman, ESQUIRE
7  WEXLER WALLACE, LLP
   55 West Monroe Street, Suite 3300
8  Chicago, Illinois  60603
   mhb@wexlerwallace.com
9
10 APPEARANCE FOR DEFENDANT:  Hung T. Luu, M.D.
   (Via Telephone)
11
   Zachary S. Rosen, ESQUIRE
12 BOYCE SCHAEFFER MAINIERI, LLP
   500 Esplanade Drive, Suite 950
13 Oxnard, California  93036
   zrosen@boyceschaefferlaw.com
14
15 APPEARANCE FOR DEFENDANTS:  Johnson & Johnson and
   Ethicon, Inc.
16
   Nils B. (Burt) Snell, ESQUIRE
17 BUTLER SNOW, LLP
   500 Office Center Drive, Suite 400
18 Fort Washington, Pennsylvania  19034
   burt.snell@butlersnow.com
19
20
21
22
23
24
25

Page 3

1    I N D E X
           PAGE
2
   Direct Examination by Mr. Snell          4
3
   Cross-Examination by Mr. Rosen         265
4
   Cross-Examination by Mr. Kuntz         265
5
   Redirect Examination by Mr. Snell      267
6
7
8
9
10   E X H I B I T S
           PAGE
11
   1 - Article by Clave                    49
12
   2 - Pathology Slides - Coleen Perry     90
13   (Three Sets)
14 3 - Thumb Drive Containing Reliance    150
     Documents
15
   4 - Summary of Opinions by Dr. Guelcher  192
16
   5 - Document Containing Listing of     241
17   Cases
18 6 - Curriculum Vitae                   242
19 7 - Printout from Vanderbilt University 257
     Medical Center Website
20
21
22
23
24
25

Page 4

1        SCOTT A. GUELCHER, Ph.D.,
2  HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH, THE
3  WHOLE TRUTH, AND NOTHING BUT THE TRUTH, TESTIFIED AS
4  FOLLOWS:
5           DIRECT EXAMINATION
6  BY MR. SNELL:
7  Q  State your name for the record, sir.
8  A  Scott Guelcher.
9  Q  What profession are you in, Dr. Guelcher?
10 A  I'm an Associate Professor of Chemical
11    Engineering at Vanderbilt University.
12 Q  You understand we're here today to take your
13    deposition in the Coleen Perry case, which is
14    currently pending in California?
15 A  I do.
16 Q  And you're here today to give your opinions
17    and the bases for those opinions, correct?
18 A  Yes.
19 Q  When were you first contacted to serve as an
20    expert in the Perry case?
21 A  I believe it was September, September '14.
22 Q  So in September of 2014, you were contacted
23    to be an expert in the Perry case?
24 A  That's what I remember.
25 Q  Who were you contacted by?

Page 5

1  A  By plaintiff's counsel, Jeff Kuntz and Tom
2    Cartmell.
3  Q  And what did you understand your assignment
4    to be in relation to the Coleen Perry case?
5  A  Assignment, I'm not sure what you mean by
6    that.
7  Q  What did you understand your purpose was to
8    be as an expert involved in the Perry case?
9  A  Well, I was testifying about defects in the
10    Abbrevo mesh.
11 Q  Did you say effects?
12 A  Defects in the Abbrevo mesh product.
13 Q  You have given other deposition and trial
14    testimony in mesh litigation, correct?
15 A  Yes, I have.
16 Q  You testified in the Huskey case that
17    involved Ethicon's TVT-O product, correct?
18 A  I did.
19 Q  You were deposed and gave trial in West
20    Virginia, correct?
21 A  That's correct.
22 Q  And at the time that you gave that testimony,
23    it was under oath as well, correct?
24 A  That's correct.
25 Q  And did you tell the truth in that testimony?

2 (Pages 2 to 5)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 6

1   A  Yes.
2   Q  How many hours have you spent on the Perry
3      case?
4   A  I'm not sure.  I haven't billed any invoices
5      for time yet, so I don't know the total
6      number of hours.
7   Q  Can you give me your best estimate?
8   A  I don't know.  Maybe 20.  But when I submit
9      my invoices, that will be the more reliable
10     number.  I haven't added it up yet.
11  Q  Well, do you have the invoices on your
12     calendar?
13  A  No.
14  Q  In the Huskey case, you testified that you
15     submitted your invoices to Dr. Dunn in
16     connection with that matter.  Do you recall
17     giving that testimony?
18  A  That's correct.
19  Q  Are you submitting your invoices to Dr. Dunn
20     in the Perry case?
21  A  I'm not sure yet how that will be.  I'll be
22     billing -- my plan is -- it's not resolved
23     yet, whether I will independently or through
24     Dr. Dunn's company.
25  Q  How do you track your time that you spend in

Page 7

1      the Perry case?
2   A  I have some paper records, but it's not --
3      nothing is official.  I've not been
4      releasing -- in the past, all the invoices
5      have been submitted through Dr. Dunn's
6      company.  Nothing is official until I submit
7      the invoices.  I don't have the invoices
8      right now.
9   Q  Well, in the Huskey case, you testified under
10     oath that you submitted monthly invoices to
11     Dr. Dunn, which included the time spent, the
12     time of day spent and a brief description of
13     your activities.  Do you recall giving that
14     testimony?
15  A  I do.
16  Q  And at what point in time has that changed?
17  A  Very recently.  In the past maybe month or
18     two.
19  Q  When was the last time you sent an invoice to
20     Dr. Dunn with regard to your work as an
21     expert in mesh litigation?
22  A  I don't remember.  Maybe a month or two ago.
23     I don't remember the date.
24  Q  As I understand it, Dr. Dunn received a cut
25     from the amount billed for your work in the

Page 8

1      Huskey case.  Do you recall giving that
2      testimony?
3            MR. KUNTZ:  Objection.
4   A  I'm not sure what you mean by a cut.
5   BY MR. SNELL:
6   Q  In the Huskey case, as I recall it, you
7      received $200 per hour for review and work,
8      correct?
9   A  I don't believe that's -- well, it was 200 or
10     210.  He raised the rates.  Okay.  It was 200
11     or 210.  The rates have been changed, and I
12     don't remember if it was before or after
13     Huskey.  It may have been 200.  It may have
14     been 210.  I can't remember.
15  Q  And Dr. Dunn billed $275 an hour for your
16     review time, correct?
17  A  If I bill 200, then Dr. Dunn would have
18     billed 275.
19  Q  And is it your testimony that that
20     arrangement has changed within the last one
21     to two months?
22  A  Yes.  I have not submitted any invoices for
23     this case, but the plan for moving forward is
24     for me to submit invoices independent of
25     Dr. Dunn's company.

Page 9

1   Q  Do you have your own company that you will be
2      submitting invoices under?
3   A  I do.
4   Q  What's the name of that company?
5   A  Guelcher Consulting, LLC.
6   Q  In the Huskey matter, you testified that you
7      kept a calendar and a recording of your time
8      spent and the days that you worked as an
9      expert.  Do you recall giving that testimony?
10  A  I do.
11  Q  Have you done the same thing here?
12  A  I have not.  Not in the same way.
13  Q  Why not?
14  A  I just changed it.  I have a right to change
15     the way I keep the time.
16  Q  So what materials or documents do you have
17     that would reflect the time you've spent up
18     until the time of this deposition for the
19     Perry case?
20  A  I don't have them yet because I haven't
21     submitted the invoices.  That's what I said.
22  Q  I'm not asking about invoices.
23     I'm asking what other materials or
24     documents -- what would you look to to draft
25     an invoice so that you would know the

3 (Pages 6 to 9)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 10

1     accurate amount of hours for your billing
2     that you would submit?
3   A  I have some paper at home.
4   Q  What paper at home?
5   A  Well, I have a piece of paper that has hours
6     written on it, but I haven't added everything
7     up yet because I haven't submitted the
8     invoice.
9   Q  Is this a piece of paper in a notebook or --
10  A  No, it's just a note.
11  Q  Do you have a copy of that that you can give
12    to counsel?
13  A  No, I don't, because we haven't been doing
14    that.  We've been providing invoices, and
15    Dr. Dunn was providing invoices, and I just
16    don't have an invoice yet that I've sent in.
17    Until it's finalized, I don't -- I've not
18    been submitting records of time until there
19    is a final invoice.
20        MR. SNELL:  Well, I'm going to
21    make a request that you get a copy of that to
22    counsel, and we'll attach it to the
23    deposition.
24        MR. KUNTZ:  We'll get you a
25    copy.

Page 11

1   A  I can send an invoice after today and that
2     will make it official.  Is that okay?
3   BY MR. SNELL:
4   Q  Well, that's fine.  But I'd like to know what
5     it is because I will have questions about
6     that potentially.
7   A  What is?  I don't understand.  You said you'd
8     like to know what it is if I send you an
9     invoice.  You know what it is.  It's an
10    invoice that says my hours and what I did, so
11    I'm not sure what you're looking for.
12  Q  Well, right now you currently have -- you
13    testified you have a document that has your
14    hours and the time you spent.  That's the
15    document I would like.  If you draft an
16    invoice, I would like that as well.
17  A  Okay.
18  Q  When did you form Guelcher Consulting, LLC?
19  A  It's been very recent.  In the past few weeks
20    maybe.
21  Q  What happened between you and Dr. Dunn that
22    led you to believe that you should go out
23    independent of Dr. Dunn?
24  A  Nothing happened with Dr. Dunn.  I'm not sure
25    what you're asking me.

Page 12

1   Q  For over a year, you submitted invoices
2     through Dr. Dunn and his company, correct?
3   A  That's correct.
4   Q  Is it your testimony that there was nothing
5     that made you decide to go out and become
6     independent of Dr. Dunn?
7   A  Well, that's not what you asked me the first
8     time.  You ask me what happened, implying
9     that something disruptive happened in our
10    working relationship, which nothing happened.
11    It's just a decision to do this
12    independently.
13  Q  How much are you billing now for your work --
14  A  The same rate.
15  Q  Let me finish my question.
16  A  Sure.
17  Q  How much are you billing for your time as an
18    expert in the Perry case for review of
19    materials?
20  A  The same rates as Dr. Dunn.
21  Q  Can you tell me how much per hour?
22  A  Dr. Dunn raised his rates from 275 to 285 for
23    report writing, reviewing of documents, etc.
24    I will be charging that rate.  For testimony,
25    I just can't remember the number right now.

Page 13

1     I think it's maybe 385 is a number for
2     testimony, but that would be on the invoice.
3     I can't remember the number right now.
4   Q  So it's your intention to bill $285 per hour
5     for reviewing materials and report writing
6     and things like that?
7   A  That's what Dr. Dunn was billing.  And since
8     I'm doing the same activities, I thought it
9     reasonable to bill the same rate.
10  Q  Dr. Dunn is not an expert in this case.
11    You're aware of that, correct?
12  A  My understanding is that Dr. Dunn has not
13    been produced as an expert witness for
14    Plaintiffs.
15  Q  All right.  So for you -- I just want to get
16    a clean answer without injecting Dr. Dunn
17    into this Q and A.  The rates that you,
18    Dr. Guelcher, are charging for report writing
19    and review of documents for this matter in
20    the Perry case will be $285 per hour; is that
21    correct?
22  A  That's correct.
23  Q  The rate that you will charge for testimony,
24    as best as you can figure at this point in
25    time, is $385 per hour?

4 (Pages 10 to 13)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 14

1  A  That's correct.
2  Q  Will you have a different rate for trial
3     testimony if you are called to testify at
4     trial?
5  A  I don't believe so.  I intend to use the same
6     rates that were being billed in the past, and
7     there was no difference between trial and
8     deposition testimony.  Those numbers were the
9     same.  So whatever those numbers are, it will
10    be the same.  There won't be a difference.
11 Q  You understand that this trial will be in
12    California?
13 A  Yes.
14 Q  And you're agreeable to traveling to
15    California for trial?
16 A  Yes.
17 Q  Your expenses of traveling to California,
18    would you bill for those?
19 A  That's what Dr. Dunn has done in the past,
20    and I would continue that practice.
21 Q  So if you come to trial in California, you
22    will bill for your expenses, such as air
23    fare, and hotel room, and meals, correct?
24 A  Yes, that's correct.
25 Q  Have you ever met Mrs. Perry?

Page 15

1  A  I have not.
2  Q  Have you spoken to Mrs. Perry?
3  A  I have not.
4  Q  Have you ever spoken to any of Mrs. Perry's
5     family or friends?
6  A  No.
7  Q  Have you ever spoken with any of Mrs. Perry's
8     doctors?
9  A  No.
10 Q  Okay.  Have you spoken with any other experts
11    about the Perry case?
12 A  Any other experts defined as --
13 Q  Defined as -- let me ask you this.  Besides
14    yourself, who do you understand to be the
15    other experts besides yourself in the Perry
16    case?
17 A  I don't know who the other experts are that
18    they are calling.  I haven't spoken with
19    them.
20 Q  So you have not spoken with a Dr. Rosenzweig
21    about the Perry case?
22 A  I have not.
23 Q  Have you ever spoken with Dr. Rosenzweig?
24 A  I have not.
25 Q  Dr. Michael Thomas Margolis from California,

Page 16

1     have you ever spoken to him?
2  A  No.
3  Q  Okay.  Dr. Donald Marks, he is another
4     expert --
5  A  I have not.
6  Q  You have not spoken with him?
7  A  No.
8  Q  Have you reviewed any expert reports or
9     expert declarations in the Perry case?
10 A  Yes.
11       MR. KUNTZ:  Aside from this own?
12       MR. SNELL:  Yes, of course.
13 BY MR. SNELL:
14 Q  Let me just take that off the table and
15    reformulate.
16       Setting aside your expert declaration
17    listed opinions, have you reviewed any other
18    experts' declarations or listed opinions?
19 A  Declarations, no, I don't believe so.
20 Q  Okay.  For your opinions in this case, you're
21    not relying on the declarations or reports of
22    any other experts, correct?
23 A  No, I'm not relying on any other
24    declarations.
25 Q  You're not relying on any other experts'

Page 17

1     opinions, correct?
2  A  Yes.
3  Q  Do you know if any independent medical
4     examinations have been done on Mrs. Perry?
5  A  I'm not aware of any of those outcomes of
6     those medical examinations.  I've not
7     reviewed that.
8  Q  So you haven't reviewed any of the IME
9     outcomes or reports in this Perry case,
10    correct?
11 A  No.
12 Q  I'm not correct?
13 A  I have not reviewed, yeah.  I'm sorry.
14 Q  Okay.  And you're not relying on the outcomes
15    of any IME reports; is that correct?
16 A  Yes, that's correct.
17 Q  When you do issue your invoices or invoice
18    for the Perry case, will the check be made
19    payable to Guelcher Consulting, LLC, or to
20    you personally?
21 A  It will be made to the LLC.  I'm the sole
22    owner of the LLC, so it will be made to the
23    LLC.
24 Q  Is Guelcher Consulting, LLC, a Tennessee
25    corporation?

5  (Pages 14 to 17)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 18

1    A  Yes.  It's been registered with the secretary
2       of state.
3    Q  As I understand it from your testimony at
4       Huskey and other matters, you believe your
5       expertise is in the field of biomaterials
6       design?
7    A  That's one way of saying it.  I have
8       expertise in biomaterials science and
9       engineering.  Another way you could say it is
10      that my work involves design of materials for
11      use as bone grafts or skin grafts, design of
12      biomaterials as diagnostics for studying
13      cancer metastasis.
14   Q  You have a Ph.D., correct?
15   A  Yes.
16   Q  Any higher education than that?
17   A  I did a postdoctoral research training at
18      Carnegie Mellon in biomedical engineering.
19   Q  But that was not something for which a degree
20      was earned; is that correct?
21   A  It's not a degree, but it's postdoctoral
22      training.  It counts as training.
23   Q  You're not a medical doctor, correct?
24   A  No, I'm not a medical doctor.
25   Q  You're not a pathologist?

Page 19

1    A  I'm not a pathologist.
2    Q  You don't treat any patients, correct?
3    A  I don't treat patients.
4    Q  You're not a toxicologist, correct?
5    A  I'm not a toxicologist.
6    Q  What is the difference between your expertise
7       and Dr. Dunn's expertise?
8    A  So Dr. Dunn and I have overlapping expertise
9       in polymer science and engineering.  My
10      expertise is differentiated from Dr. Dunn's
11      in biomaterials, preclinical testing of
12      biomaterials, evaluation of biomaterials
13      using in vitro and in vivo models.  Those
14      would be some examples of how my expertise is
15      differentiated from Dr. Dunn's.
16   Q  Is Dr. Dunn more of a polymer chemist than
17      you are?
18   A  I would not state it this way.  I've had
19      extensive experience in polymer chemistry,
20      science and engineering.  I've worked for
21      several companies in the area of polymers.
22      My postdoctoral training was in polymers for
23      bone scaffolds.  And for the past ten years
24      at Vanderbilt, I've been working on polymers
25      and I taught -- and I developed and taught a

Page 20

1       course on polymer science and engineering at
2       Vanderbilt.
3    Q  In prior cases, as I understand it, and have
4       read your testimony, Dr. Dunn, if testing was
5       done, he would have been the one to perform
6       the testing on meshes?
7    A  That's correct, Dr. Dunn did the testing.
8    Q  Is there a certain reason for that?
9    A  The reason relates to the nature of our
10      employments at Vanderbilt.  Dr. Dunn is a
11      professor of the practice.  I'm a tenured
12      associate professor with a federally-funded
13      research program.  And so we have different
14      appointments, that's the reason.
15   Q  I don't understand that.
16         Can only professors do the type of
17      testing that he performed in the prior cases?
18   A  I'm qualified to do the testing.  It's that I
19      have graduate students working in my
20      laboratory on federal research grants.
21      Dr. Dunn has a company with employees.  It's
22      simpler for him to do the testing than for me
23      from an administrative perspective.  So that
24      doesn't have anything to do with
25      qualifications or ability.  It's more because

Page 21

1       of these practical reasons.
2    Q  So you have graduate students working under
3       you who are being subsidized, whose work is
4       being subsidized by federal funding; is that
5       correct?
6    A  I wouldn't say it's being subsidized.  The
7       work is being funded by federal funding, and
8       in some cases, by corporate funding.  Their
9       stipends are paid either from fellowships or
10      from the grants, not from the consulting.
11   Q  Okay.  Well, what about the fact of graduate
12      students working under you who are supported
13      by federal funding, what affect does that
14      have on why Dr. Dunn did the testing and you
15      didn't?
16   A  Well, to have graduate students working on
17      that sort of testing would require a
18      disclosure to the university, so I haven't
19      had them involved.  I've disclosed the
20      consulting activity to the university
21      required by the policy, but to have graduate
22      students involved would require more, and I
23      just haven't done that at this time.
24   Q  What type of disclosure did you make to the
25      university with regard to your goal as an

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 22

1  expert witness?
2  A  Every year we are required to file a
3    disclosure report that would include --
4    because I have NIH grants, the NIH requires
5    us to disclose travel funded by third
6    parties.  I'm required to disclose
7    relationships with companies that I have had
8    grants from companies in the past, consulting
9    relationships with companies.  These
10   activities are disclosed.
11       In the past what I've disclosed is that I
12   was a consultant working for Polymer and
13   Chemical Technologies.
14  Q  So your disclosure stated that you worked as
15   a consultant in polymer and --
16  A  For Polymer and Chemical Technologies.
17   That's Dr. Dunn's company.  So last year's
18   disclosure, that's what I have filed.  I have
19   to update it this year again.
20  Q  Did you identify in your disclosure that you
21   were serving as an expert on behalf of
22   plaintiffs in the transvaginal mesh
23   litigation?
24  A  We're not required to disclose the activity,
25   only the fact that we're consulting.

Page 23

1  Q  So you did not disclose that you were
2    consulting with plaintiffs' attorneys in
3    transvaginal mesh litigation?
4  A  I don't remember what I disclosed right now,
5    the exact details.  I disclosed that I had a
6    consulting relationship.  I don't remember
7    the detail of what I exactly disclosed.  I
8    would have to look at it again.
9  Q  Now, that you're billing your services
10   directly through your own corporation, are
11   you going to disclose that you are consulting
12   and serving as an expert to plaintiffs in
13   transvaginal mesh litigation?
14  A  When I submit the invoices, I will update the
15   disclosure, but that hasn't been finalized
16   yet.  When I submit the invoices, I will
17   update the disclosure.
18  Q  Where does this disclosure get submitted to
19   within Vanderbilt?
20  A  At the dean's office, dean of engineering.
21  Q  If you do any testing of meshes in your role
22   as a plaintiff's expert, and you utilize any
23   of Vanderbilt's equipment, personnel, or any
24   other assets owned by Vanderbilt, do you have
25   to give prior notice of that to Vanderbilt?

Page 24

1  A  That's a complex question.  It depends on
2    what's being used and the specific faculty
3    member.  It would have to be discussed with
4    the university.  I don't know the answer to
5    that.  There is not a fixed answer to that
6    question.
7  Q  If you have one of your graduate students who
8    is supported by federal funding analyze
9    meshes from the mesh litigation, would you
10   have to disclose that to anyone?
11  A  I would discuss that with the dean's office.
12   But Dr. Dunn's company did the testing, so --
13  Q  Where is Dr. Dunn's company located at?
14  A  At his residence in Nashville.
15  Q  He has employees working out of his home in
16   Nashville?
17  A  I can't speak to those details about
18   Dr. Dunn's company.  I don't know how he
19   operates his company other than his business
20   relationship with me.
21  Q  Do you know if Dr. Dunn utilized any of the
22   graduate students at Vanderbilt in any
23   analyses pertaining to transvaginal mesh?
24  A  Not to my knowledge.
25  Q  Do you know if Dr. Dunn utilized any

Page 25

1    Vanderbilt personnel besides yourself in any
2    analyses or investigation pertaining to
3    transvaginal mesh?
4  A  Again, Dr. Dunn would have to speak to that.
5    I don't know.
6  Q  Who is your immediate supervisor currently?
7  A  My department chair, Kane Jennings.
8  Q  Could you spell that?
9  A  K-A-N-E Jennings.
10  Q  And that's within the department of what?
11  A  Chemical and biomolecular engineering.
12  Q  So you work within the Department of Chemical
13   and Biomolecular Engineering at Vanderbilt?
14  A  That is correct.
15  Q  Is that a particular school at Vanderbilt?
16  A  That department is within the school of
17   engineering.
18  Q  Besides Dr. Dunn, who, if anyone else at
19   Vanderbilt is aware that you are serving as
20   an expert for plaintiffs in the transvaginal
21   mesh litigation?
22  A  Professor Ken Debelak, D-E-B-E-L-A-K.  He's
23   an Associate Professor of Chemical and
24   Biomolecular Engineering at Vanderbilt.
25   Dr. Dunn retained him through his company as

7 (Pages 22 to 25)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 26

1    an expert in prior litigation over a year
2    ago.  I believe Dr. Debelak was deposed in
3    this first case, but not since.
4  Q  Have you had anyone at Vanderbilt perform any
5    activity on your behalf with regard to
6    anything you've done in the transvaginal mesh
7    litigation as an expert?
8  A  So I have a graduate student who was doing
9    oxidative degradation testing through her
10   dissertation project, and she provided --
11   well, I asked my graduate students to write
12   standard operating procedures for everything
13   we do.  I review and discuss those procedures
14   with them and approve them, and she gave that
15   protocol to Professor Dunn.
16  Q  What's the name of this graduate student?
17  A  Anne Talley, T-A-L-L-E-Y.
18  Q  Let me see if I understand this.  So you
19   asked all of your graduate students to write
20   SOP's?
21  A  So for anything that we do in the laboratory,
22   for any polymer that we make, for any
23   analysis that we run, such as oxidative
24   degradation testing, we review the literature
25   and prepare a standard operating procedure or

Page 27

1    an SOP for the procedure, and I believe
2    that's part of student training.  These are
3    the types of activities they will do in the
4    industry, so I ask my students to write these
5    types of documents.
6  Q  What did you ask Anne Talley to do
7    specifically that pertained to your work as
8    an expert in the transvaginal mesh
9    litigation?
10  A  I didn't ask her -- I asked her to write the
11   SOP for the medium, preparing the medium.
12   And then Dr. Dunn asked her for that SOP is
13   my understanding.
14  Q  Why did you ask Ms. Talley to write the SOP
15   for the preparation of the medium?
16  A  Well, she was the one that was working in
17   this area on her research project, so she had
18   the most knowledge about it.
19  Q  When you say medium, what medium are you
20   referencing?
21  A  The medium that was used in the in vitro
22   testing with the mesh.
23  Q  What was that medium?
24  A  It's a solution of 20 percent cobalt chloride
25   -- I'm sorry.  Strike that.  It was a

Page 28

1    solution of 20 percent hydrogen peroxide with
2    cobalt chloride, and I don't remember the
3    exact amount.  That's the solution.
4  Q  And this solution is used for the in vitro
5    testing of mesh?
6  A  This solution was first developed by Dr. Jim
7    Anderson in 1993.  It was first published --
8    his group published a number of papers on it.
9    I published two papers with it.  It's used to
10   assess the degradation of biomaterials under
11   oxidative conditions that are similar to
12   those in the human body, more specifically,
13   that are similar to those under conditions
14   where there are adherent inflammatory cells
15   in the biomaterial, the foreign body
16   reaction, I should say, the effects of the
17   foreign body reaction on the stability of the
18   biomaterial.
19      It's a very general well-known
20   established test that's been cited dozens of
21   times.
22  Q  So did Ms. Talley or any of your other
23   graduate students do any in vitro testing on
24   the mesh?
25  A  No.  As I said before, that testing was done

Page 29

1    by Dr. Dunn's company.
2  Q  Was the testing done by Dr. Dunn's company
3    before or after Ms. Talley's SOP was given to
4    Dr. Dunn?
5  A  I believe it was after, because they used
6    that SOP to prepare the solution.  These
7    activities were done by Dr. Dunn, but I don't
8    know who in his company did what.  I just
9    know that my lab through Anne provided them
10   with a solution with a -- strike that -- with
11   an SOP for preparing the solution, and then
12   they did the testing.
13  Q  Did Ms. Talley know that she was writing an
14   SOP that would be given to plaintiffs'
15   experts in the transvaginal mesh litigation
16   for utilization in certain testing?
17  A  She did not prepare the SOP for plaintiffs.
18   She prepared the SOP for use in my
19   laboratory.  She was aware of the mesh
20   litigation, but she was not -- she did not
21   write it for this.  It's an SOP for my
22   laboratory.  It falls within the scope of her
23   activities on her funded research project.
24      MR. SNELL:  Move to strike.
25  BY MR. SNELL:

8 (Pages 26 to 29)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 30

1 Q  Did Ms. Talley know that she was preparing an
2    SOP that would be given to a plaintiff's
3    expert for use in transvaginal mesh
4    litigation?
5 A  The way you asked that question, no, I don't
6    believe it.  It was written for my
7    laboratory.  She did not write it for the
8    testing.  It's an SOP that was in my
9    laboratory.
10 Q  How long did it take Ms. Talley to write this
11    SOP?
12 A  I don't know.
13 Q  Did you assign Ms. Talley to write this
14    particular SOP regarding this testing?
15 A  I believe so.  I asked her to write the SOP
16    for the procedure in general to use in our
17    lab.  We use it for other projects as well.
18 Q  You were aware when you asked Ms. Talley to
19    write the SOP regarding the testing, that it
20    would be used by Dr. Dunn in his role as an
21    expert for plaintiffs in the mesh litigation?
22 A  I was aware of that.
23 Q  Did Dr. Dunn give Ms. Talley any money or
24    renumeration for writing this SOP that he
25    used in his role as an expert in the mesh

Page 31

1    litigation?
2 A  He wouldn't give her renumeration because it
3    was written within the course of her work at
4    Vanderbilt and her project.
5 Q  So the answer is, no, he didn't give her any
6    money?
7 A  No.
8 Q  And did you give Ms. Talley any money or
9    renumeration for writing the SOP that you
10    were aware of that would be used in testing
11    meshes in transvaginal litigation?
12 A  I didn't give her money because it was
13    written for her research project for her work
14    at Vanderbilt.
15 Q  So the answer is no, you didn't give her any
16    money, correct?
17 A  No, but for that reason.  It wasn't written
18    for the mesh litigation.
19 Q  Other than Ms. Anne Talley, have you involved
20    any of your other graduate students in any
21    testing or analyses pertaining to your work
22    as an expert in the transvaginal mesh
23    litigation?
24 A  No.
25 Q  How long ago was it that Ms. Talley wrote

Page 32

1    this SOP?
2 A  I don't remember.  I don't know when exactly
3    she wrote it or when it was revised or
4    finalized.  I don't remember.
5 Q  Well, was it this year or last year?
6 A  I don't know.
7 Q  When did Dr. Dunn do this testing that he
8    utilized Ms. Talley's SOP that she wrote
9    while as a graduate student for you?
10 A  It was done in September.
11 Q  Of 2014?
12 A  Yeah.
13 Q  So, certainly, Ms. Talley would have been
14    working on this SOP during the calendar year
15    of 2014, correct?
16 A  She would have been working on it.
17    Typically, these are documents that we write
18    and we revise, so I have had students write
19    SOP's, and then other students come back and
20    revise them.  That's how we do it.  We revise
21    them based on new papers that have been
22    published, new information, so I don't know
23    the history of the document.  I can't
24    remember that.
25 Q  Is Ms. Talley currently a graduate student at

Page 33

1    Vanderbilt?
2 A  Yes.
3 Q  If you had done any of the types of testing
4    that Dr. Dunn has performed in his role as an
5    expert in the transvaginal mesh litigation on
6    the mesh, what type of paperwork or
7    disclosures would you have had to give to
8    Vanderbilt?
9 A  I don't know.  It's difficult to answer these
10    questions.  We tend to address them when --
11    I just -- as I said earlier, I have not been
12    doing testing of materials for litigation at
13    Vanderbilt, so I don't know what I would have
14    to do.  So far I've disclosed the consulting
15    activity.  I may very will make additional
16    disclosures as we move along and the
17    situation changes, but it's a very fluid
18    situation.
19    We disclose these types of things as they
20    arise.  So it's difficult to say without
21    actually seeing the situation.
22 Q  Does Vanderbilt require you to disclose any
23    relationships upon which you receive outside
24    monies?
25 A  I already answered this.  We're required to

9 (Pages 30 to 33)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 34

1    disclose consulting relationships.  When I
2    submit a grant application, I'm required to
3    disclose whether I have a significant
4    financial interest.  The NIH changed the
5    rules in 2012.  I disclose whether there is a
6    significant financial interest, and then the
7    dean's office works with me to figure out if
8    there is a conflict, and if there is, how do
9    we manage it.
10       So there is no fixed set procedure.  It's
11   very much handled on a case-by-case basis.
12   And disclosures are continuously updated as
13   new information becomes available.
14   Q  How is significant financial interest
15   defined?
16   A  The NIH defines a significant financial
17   interest as $5,000 a year.  That's one way to
18   define it.  Another is equity.  Strike that.
19   The NIH defines it as $5,000 or greater.
20   Financial interest, that could be cash.  That
21   could be equity.  That could be any form of
22   compensation, but the threshold is $5,000.
23   Q  Have all monies you receive in your role as
24   an expert in the transvaginal mesh litigation
25   for the calendar year 2014 been paid to you

Page 35

1    through Dr. Dunn's company?
2    A  The money I have received has all been
3    received through Dr. Dunn's company, that's
4    right, yes.  The money I received, yes.
5    Q  Does anyone at Vanderbilt know the scope of
6    Dr. Dunn's company?
7    A  I can't speak to Dr. Dunn's company.  I don't
8    know the details of his arrangement with the
9    university.  I just don't.  He has a
10   different type of appointment than I have.
11   He doesn't do federally-funded research.
12   That's what I know.  I don't know the details
13   of his arrangement with Vanderbilt.
14   Q  Is Dr. Dunn in a position of authority over
15   you at Vanderbilt?
16   A  No.
17   Q  If Dr. Dunn wanted to do federally-funded
18   research, would he be able to in light of his
19   activities and the amount of money his
20   company bills for expert work in the
21   transvaginal mesh litigation?
22   A  I can't speak to that.  I don't know how much
23   his company bills or makes.  I don't know
24   that information.
25   Q  Have you investigated what affect your

Page 36

1    independent role now as an expert and
2    billing as an expert will have on your
3    ability to work or run a lab that has
4    federally-funded research?
5    A  Yes, I have.
6    Q  And what affect, if any, have you learned
7    about that?
8    A  I'm contemplating updating my disclosure.
9    And -- well, I will leave it at that.
10   Q  Have you had any discussions with anyone at
11   Vanderbilt about ways you could work around
12   the ramifications that the receipt of federal
13   funding has on your role as an expert?
14       MR. KUNTZ:  Objection.
15   A  I don't like this word work around.  That's
16   not what we do.  We identify conflicts.  We
17   disclose information to the dean's office.
18   We work with the dean's office to identify
19   conflicts.  If conflicts are identified, we
20   work with the dean's office and the general
21   counsel's office to identify and manage a
22   plan, which is then approved -- approved by
23   the conflict of interest committee.
24       I've been through this process multiple
25   times.  I've had management plans.  I've been

Page 37

1    disclosing conflicts to Vanderbilt since I
2    started there.  There is a very standard and
3    routine process.  Faculty are allowed and
4    encouraged to participate in activities
5    outside of Vanderbilt.  I do this in the
6    course of my research with licensing,
7    start-up companies.  This is routine.
8        There is a process and a procedure.  And
9    we're not working around anything.  We're
10   trying to find a way to work within the
11   framework of the federal regulations and
12   university policy.  It's very standard for
13   universities.
14   BY MR. SNELL:
15   Q  Have you told Vanderbilt how much money you
16   have earned as an expert in the transvaginal
17   mesh litigation?
18   A  You have asked me this before.  And I said we
19   are not required in the course of our work to
20   disclose that.  If I believe that I see a
21   conflict between my research and the
22   consulting, then I will disclose that and the
23   university will -- we will have those
24   discussions, but we are not required to
25   disclose this information for consulting

10 (Pages 34 to 37)

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 38

1    work.
2  Q  So the answer to my question is, no, you have
3     not disclosed that to Vanderbilt, correct?
4  A  I'm not required -- strike that.
5  Q  My question is simple.  Have you disclosed to
6     Vanderbilt --
7  A  And I believe I have answered your question.
8  Q  I think you are telling me about what you're
9     required to do.
10       I'm asking you, have you, Dr. Guelcher,
11    disclosed to Vanderbilt the monies, the
12    amount of monies you have earned as a
13    plaintiff's expert in transvaginal mesh
14    litigation?
15             MR. KUNTZ:  Object.  Answer it.
16  BY MR. SNELL:
17  Q  It's a yes or no answer.
18  A  No, I've not disclosed, but I'm not --
19  Q  Have you informed your dean of your current
20    intention to bill as an independent
21    consultant to attorneys in the transvaginal
22    mesh litigation?
23  A  Why would I inform the dean of this?  I've
24    not informed the dean.  I have to inform the
25    dean when I believe there is a conflict.  And

Page 39

1     if and when I make that assessment, I will
2     update my disclosure.  But according to
3     Vanderbilt policy, we're not required to do
4     those things.
5  Q  Well, if you spent approximately 20 hours at
6     $285 an hour thus far, that is over $5,000.
7     Are you telling me that if you have a greater
8     than $5,000 interest in your role as an
9     independent billing consultant to
10    transvaginal mesh litigation, you do not need
11    to tell that to the dean?
12             MR. KUNTZ:  Objection.
13  A  No, you are misinterpreting and
14    misunderstanding what I have said.  The
15    question is, whether the proposed research,
16    when I submit a grant application, I submit
17    an application to the NIH for federal
18    funding.  I have to answer the question, do
19    you have a significant financial interest in
20    the outcome of this federally-funded project.
21       Significant financial interest is defined
22    as more than $5,000.  But at this point in
23    time and in the past there -- at this time,
24    there is no overlap between the consulting
25    work and the federally-funded research.  So

Page 40

1     if and when I submit a grant application,
2     that would create the conflict, but that's
3     tied to INH funding.  That's not -- why I'm
4     not required to disclose it unless there is a
5     conflict of the federally-funded research
6     project.
7  Q  Have you performed any testing on Ms. Perry's
8     mesh?
9  A  I have not.
10  Q  Have you looked at Ms. Perry's mesh under a
11    scanning electron microscope?
12  A  I have not.
13  Q  What are all of the different tests, methods
14    that one can do to try to determine whether
15    there is degradation of polypropylene?
16  A  So degradation of polypropylene could be
17    assessed by SEM imaging.  That's typically
18    how we assess it.
19  Q  FTIR --
20  A  FTIR -- I'm sorry.
21  Q  FTIR is a way that one can go about trying to
22    assess whether there is degradation of
23    polypropylene, correct?
24  A  No, that's not why we use FTIR.  We use FTIR
25    to assess for oxidation, chemical changes in

Page 41

1     the polypropylene.  That can be assessed by
2     the FTIR.
3  Q  And when you look for oxidation via FTIR,
4     what you are looking for is to see if there
5     is a potential that would lead to
6     degradation; is that correct?
7  A  No.  We are looking at oxidation to answer
8     the specific question of is the surface
9     oxidizing, is it chemically changing.  And we
10    can see that by peaks in the FTIR spectra
11    that are not there in the normal
12    polypropylene, but do appear for oxidized
13    polypropylene.
14  Q  Now, as I understand it, Dr. Dunn, in prior
15    work did FTIR in connection with assessing
16    the question of is there degradation of
17    polypropylene?
18  A  And why is that -- I don't know what you're
19    referring to.
20  Q  I recall in your Huskey testimony, in your
21    deposition, you testified that all of the
22    testing done was done by Dr. Dunn.  And I
23    believe you identified FTIR, XPS, and I don't
24    know if there were others.
25  A  I don't remember the testing that Dr. Dunn

11 (Pages 38 to 41)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

1    did for the Huskey trial. I do believe we
2    did FTIR. I don't remember the others, but
3    oxidation and degradation are related, but
4    they're -- in terms of -- and there may be
5    times that people use the word degradation to
6    consider all of these effects, but I'm
7    speaking specifically about oxidation as a
8    chemical process, and degradation as a
9    physical one, and they're assessed by
10   different techniques.
11       And I don't remember all of the testing
12   that Dr. Dunn did for the Huskey trial. I
13   don't remember that.
14   Q   So if one does FTIR testing and sees that the
15       surface is oxidized, that does not
16       necessarily mean that the material is
17       degraded, correct?
18   A   There are numerous tests to assess -- they
19       could be degraded, but we would assess
20       degradation using a different technique than
21       FTIR. FTIR, as I said, is for chemical
22       oxidation, which is a chemical change. There
23       may be degradation, but we would confirm that
24       with a technique such as SEM.
25   Q   So if a scientist has a positive FTIR finding

1    for oxidation on the surface, he would then
2    need to confirm that with SEM in order to
3    reasonably say with scientific certainty that
4    there was degradation?
5            MR. KUNTZ: Objection.
6    A   I would say that the literature teaches us
7        that these processes are related, oxidation.
8        Chemical oxidation leads to physical
9        degradation. And so if I see evidence of
10       oxidation, I would expect to see physical
11       degradation in time. To visibly see that
12       physical degradation, I would do the
13       technique such as SEM.
14          But if I see oxidation, I would certainly
15       expect based on published literature findings
16       that there would be degradation in time to
17       some extent.
18   BY MR. SNELL:
19   Q   Well, if you see chemical oxidation, it is
20       not a guarantee that physical degradation has
21       taken place, correct?
22          MR. KUNTZ: Objection.
23   A   I think I just answered that. It's a strong
24       indicator that there is also physical
25       degradation.

1    BY MR. SNELL:
2    Q   The fact that's it's a strong indicator,
3        though, that in and of itself means that
4        there is some possibility that you will not
5        see physical degradation, and there is a
6        possibility as well that you will see it,
7        physical degradation, if you look at SEM,
8        correct?
9            MR. KUNTZ: Objection.
10   A   Again, the literature tells us that you would
11       expect degradation. Is it -- unless you
12       actually see it, you can't prove -- you can't
13       guarantee that it's there, but you would
14       certainly expect it. It's within a
15       reasonable degree of scientific certainty to
16       expect that you would have degradation in
17       time if that surface is being oxidized.
18          There are numerous papers that teach
19       about this, about polymers in general,
20       polymers that are susceptible to oxidative
21       attack showed signs of physical degradation.
22       This was all worked out a number of years
23       ago.
24          MR. SNELL: Move to strike.
25   BY MR. SNELL:

1    Q   My question is this. It's straight forward.
2        The fact that you see chemical oxidation,
3        that does not mean that you would also see
4        under SEM analysis physical degradation if
5        you were to look at that particular time; is
6        that correct?
7            MR. KUNTZ: Objection. Asked
8        and answered. Calls for speculation, and is
9        an incomplete hypothetical. But go ahead.
10   A   This is a speculative question. What I'm
11       saying is, if there is oxidative changes, the
12       body of literature teaches within a
13       reasonable degree of scientific certainty
14       that there will be at some time physical
15       degradation. That's what the literature is
16       teaching us.
17   BY MR. SNELL:
18   Q   You keep saying at some time there will be
19       physical degradation. At what time will
20       there be physical degradation?
21   A   As I've said in my previous testimony, it's
22       unpredictable. And that's a problem for the
23       design of the device, because it's subject to
24       changes that can happen that you can't
25       predict the timing of these changes and what

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 46

1    the implications will be.
2    Q  Do you have an opinion as to what is the
3      earliest point in time where there can be
4      physical degradation of Ethicon's Prolene
5      polypropylene used in TVT Abbrevo?
6    A  Again, that's a speculative question. I
7      believe that upon implantation, the device
8      will be colonized by adherent inflammatory
9      cells. This is well-known in the literature,
10     the foreign body reaction. Those cells will
11     secrete species that oxidize it. The timing
12     of all these events can depend on a number of
13     factors, the nature of the inflammatory
14     response where it's implanted, the mechanical
15     stresses in the environment, whether there is
16     a bacterial infection.
17         The timing can be highly variable. It
18     can happen early or it can happen late. The
19     point is that it's unpredictable. That's
20     what I've been saying.
21   Q  Well, I would like to know what does the
22     literature teach you about the earliest point
23     in time when you can say there is physical
24     degradation of the Prolene polypropylene
25     mesh?

Page 47

1          I don't want to rehash everything you
2      talked about in Huskey. I know you talked
3      about what was seen in two years and I
4      believe five or seven years in a dog study
5      and things like that. So with all of those
6      principles that you've already testified
7      about, let me just back up and re-ask it.
8    A  Okay.
9          MR. KUNTZ: Objection.
10   BY MR. SNELL:
11   Q  What is the earliest point in time that you
12     can say that there is physical degradation of
13     the Prolene polypropylene mesh?
14   A  I just can't answer that question. There are
15     too many factors that can influence it. To
16     say -- again, it's too speculative. It
17     depends on many factors in addition to the
18     chemical oxidation.
19   Q  Based on all of the literature that you saw,
20     what was the earliest time reported that
21     there was physical degradation of the Prolene
22     polypropylene mesh?
23   A  For Prolene polypropylene, I can say from the
24     Clave paper and the explants that were
25     studied in Clave, he recorded degradation in

Page 48

1      time periods of three months and later.
2      That's what Clave reported.
3    Q  And you have a list of materials here today.
4      Where in Clave does it say that --
5    A  I would have to see the paper. I know that
6      in Clave, it says that -- he notes that
7      explants -- I would have to see it to give a
8      precise answer. The number I remember is
9      three months.
10         (Deposition Exhibit No. 1 was
11     marked for identification.)
12   BY MR. SNELL:
13   Q  Doctor, I've handed you Exhibit No. 1. Is
14     that the Clave paper you were referring to,
15     sir?
16   A  That is correct.
17   Q  So can you show me where in Clave it states
18     that physical degradation occurred in the
19     Prolene polypropylene mesh at a certain time
20     period?
21   A  I'm looking for that. So on Page 264 of
22     Clave, it states degradation was observed
23     only in samples implanted for at least three
24     months.
25   Q  That is a general statement about the overall

Page 49

1      cohort of explants, correct?
2    A  That's my understanding.
3    Q  That statement is not necessarily particular
4      to a Prolene polypropylene mesh implant,
5      correct?
6    A  There could have been Prolene implants in
7      this study. That statement doesn't specify
8      whether that applies to Prolene or not.
9    Q  So my question is, can you point to any
10     literature which informs you of the earliest
11     time which the Prolene polypropylene mesh
12     physically degrades?
13         MR. KUNTZ: Objection.
14   A  I don't know of this -- you mean in vivo of
15     patients?
16   BY MR. SNELL:
17   Q  Yes, sir.
18   A  I don't know of a study that has specifically
19     reported that.
20   Q  In the dog study -- and you're still relying
21     on the dog study as well with the Prolene
22     sutures?
23   A  The dog study, it's in my reliance materials,
24     so it's part of the documents I have
25     reviewed.

13 (Pages 46 to 49)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott  A.  Guelcher,  Ph.D.

Page 50

1  Q  At what point in time was physical
2     degradation observed in that study?
3  A  I can't remember.  I would have to look at
4     the document.
5  Q  Okay.  At a break, I would like for you to
6     look at that document.  And I will have the
7     same question for the vascular graft Prolene
8     suture study, what is the earliest point in
9     that study if at any point in time it showed
10     physical degradation?
11  A  Again, I would have to look at it.  I don't
12     remember that level of detail.
13  Q  Am I correct that although Clave reports
14     there were 100 explanted samples, a smaller
15     number were actually analyzed?
16  A  What do you mean analyzed?  I'm not sure what
17     you mean.
18  Q  Let me ask you, how many explants were
19     analyzed in the Clave study?
20  A  I would have to look at it.  There were 100
21     explants.  I'm still not sure what you're
22     asking, though.  I mean, there were 100
23     explants.
24  Q  How many of those 100 explants were actually
25     analyzed?

Page 51

1  A  Well, I think it depends on the method, so --
2     they did a chemical analysis on 32 explants.
3     It doesn't necessarily say in the methods.
4  Q  Why did Clave do less than one-third of the
5     overall sample size for chemical analysis?
6  A  I don't know.  I would have to look at this
7     to --
8  Q  By only analyzing 32 out of 100 explants for
9     a chemical analysis, what limitations does
10     that place upon the interpretation one can
11     draw from the Clave paper?
12  A  Well, what I believe Clave is saying is
13     consistent with my opinions, that these
14     events can happen and can lead to problems
15     and complications.  He's not saying it
16     happens all the time in every mesh at this
17     particular time.
18     He is saying that these meshes change,
19     which is consistent, which is my opinion in
20     this case, that the meshes change, and that
21     introduces an extra level of risk because
22     these changes make the meshes -- make their
23     behavior unpredictable.  That is what he is
24     saying.
25          MR. SNELL:  Move to strike.

Page 52

1  BY MR. SNELL:
2  Q  My question was not what is he saying.  My
3     question was to you, what limitations does
4     that place upon what one can draw from Clave
5     due to the fact that only 32 out of 100
6     explants were submitted for chemical testing?
7  A  I don't see how it limits the finding that he
8     sees changes.  That's what he is reporting,
9     whether he sees it in 32 or 50, whether he
10     looked at 32 or 100.  I mean, you may be
11     implying that he was cherry-picking data, but
12     I have no reason to believe that.  This is a
13     peer-reviewed journal.
14     I mean, he studied what he could study,
15     but it doesn't limit the finding that these
16     changes happened.  Whether he did 32 or 100,
17     he still saw changes.  So I don't understand
18     how that limits that finding.
19  Q  Well, he had 100 explants, and he only
20     subjected 32 to chemical analysis.  We can
21     agree to that, right?
22  A  That's what it states.  But beyond that, I
23     don't --
24  Q  And you don't know the methodology by which
25     he selected the particular 32 for chemical

Page 53

1     analysis, correct?
2  A  Well, let me read it.  I need to read this,
3     because I'm not quite following where you are
4     going with this.
5     Okay.  So he says -- I mean, he explains
6     himself.  The samples were divided into four
7     groups.  Because of the small sample size and
8     physical condition of the explanted
9     materials, extensive and complete chemical
10     analysis was difficult, which I think most
11     would agree is true.  And he has several
12     groups listed here, four groups.
13     One of the fourth group is a control with
14     pristine implants, which he has a number of
15     pristine implants listed.  So he grouped one
16     as degraded polypropylene that he analyzed by
17     SEM.
18     Group two is a group of nondegraded
19     explants, which again looks like
20     polypropylene mesh.  And then the fourth
21     group of PET explants.  That's what he says
22     he did.  And he says it was difficult.  He
23     probably didn't have much material to work
24     with, but these are explants.  This isn't a
25     clinical trial.  These are explants, so that

14 (Pages 50 to 53)

Golkow  Technologies,  Inc.  -  1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 54

1   is what he had to work with.
2   Q   But do you know then the methodology by which
3       he determined the cut point for whether it
4       was too difficult or not to do SEM analysis?
5   A   He doesn't provide more detail, but this is
6       what I understand that he did.
7   Q   So we have no way of knowing what chemical
8       analysis would have shown for those 68
9       explants that were not subjected to chemical
10      analysis; is that fair?
11  A   Say that again.  I didn't catch it.
12  Q   Sure.
13          We do not know what, if anything, would
14      have been shown for the 68 other explants
15      that were not subjected to chemical analysis
16      because the chemical analyses were not done;
17      is that fair?
18  A   We don't know.  He didn't report it, for
19      reasons that I'm not entirely sure.
20  Q   And in Clave's paper, am I correct that not
21      all of the polypropylene explants were even
22      -- had physical degradation?
23  A   Yes.  But I talked about this earlier, Clave
24      is not trying to report the incidents of --
25      strike that.  He's not trying to report

Page 55

1   frequency.  He is saying that he observed it.
2   With what he had, with what he could test, he
3   observed evidence.  He doesn't say he
4   observed it in every sample, but he did
5   observe it.  That's what he is saying.  So he
6   did not observe it in every sample, but we've
7   talked about this.
8   Q   Dr. Clave did report the rate of degradation
9       that he saw in the samples that he actually
10      did analyze, correct?
11  A   He did report that number but --
12  Q   So for polypropylene monofilament at the
13      table at the top of Page 266, do you see
14      that?
15  A   I see that number.  I know what you're
16      saying.
17  Q   And you understand the Prolene polypropylene
18      mesh in the TVT Abbrevo to be a monofilament
19      polypropylene?
20  A   Yes.
21  Q   And what Clave found was that only one-third
22      of that sample of polypropylene monofilament
23      that he actually looked at was degraded,
24      correct?
25  A   I look at it a little differently.  I look at

Page 56

1   it as, wow, one-third were degraded, that's a
2   lot.  That's how I look at it.
3   Q   Regardless of how you want to characterize
4       it, let's see if we can agree to this.
5       Dr. Guelcher, we can both agree that
6       Dr. Clave reported that the rate of
7       degradation in the polypropylene monofilament
8       was one-third or 33.33 percent, correct?
9   A   That's what he reported.  But to try to
10      construe that that is a good number is beyond
11      my understanding.  That's what he reported.
12      He reported that one-third were degraded.
13          MR. SNELL:  Move to strike.  I'm
14      just looking for a yes or no.
15  BY MR. SNELL:
16  Q   If we can agree to this basic fact.  How you
17      characterize it, I know what position you're
18      coming from.  All right.
19          In the Clave paper for the polypropylene
20      monofilament, the rate of degradation seen
21      was one out of three or 33.33 precent,
22      correct?
23  A   That's what's in the table.
24  Q   Fair enough.
25          And you have your interpretation of that?

Page 57

1   A   I do.
2   Q   And let me ask you, if more likely than not
3       it's 51 percent or higher, you can't look at
4       the Clave paper and say it's more likely than
5       not that there would be degradation to
6       polypropylene monofilament mesh, correct?
7           MR. KUNTZ:  Objection.  You can
8       answer.
9   A   If I were a patient looking at that number, I
10      would be concerned.
11          MR. SNELL:  Move to strike.
12      Nonresponsive.
13  BY MR. SNELL:
14  Q   When you look the Clave paper, you can't say
15      it's more likely than not that there was
16      degradation to the polypropylene monofilament
17      mesh, correct?
18          MR. KUNTZ:  Objection.
19  A   I don't even know how to answer that
20      question.  I mean, it's -- he reported 33
21      percent.  I will agree that he reported that
22      in this table, in table two, he reports -- or
23      figure two, he reports that 33 percent were
24      degraded.  Beyond that, I can't -- that's
25      what he says.

15 (Pages 54 to 57)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 58

1    BY MR. SNELL:
2    Q   So you would agree that Dr. Clave's paper in
3        this table and report, that it's more likely
4        than not that the mesh was actually not found
5        to be degraded, correct?
6    A   I cannot answer that question. That doesn't
7        make any sense. I mean, this is what he
8        reported. To try to construe that -- that's
9        what he reported and what he tested. To try
10       to construe more out of this, this wasn't a
11       controlled study where he was trying to
12       measure race of degradation. He made
13       observations and he reported a number, this
14       percentage that I saw to be degraded.
15           He was not aiming to estimate some -- he
16       is just reporting. This is the way I read
17       this paper. So I can't answer this question
18       that it's more likely than not on anything.
19       That's just the number he provides.
20   Q   So the Clave paper we can agree does not
21       stand for the proposition that it's more
22       likely than not that polypropylene
23       monofilament is degraded?
24           MR. KUNTZ: Objection.
25   A   I can't agree to this line of questioning.

Page 59

1        This is -- why can't we not just agree that
2        -- I agree this is what he reported. And
3        beyond that, I'm not going to agree to any
4        other interpretation of that number. That's
5        what he reports. It's an observation saying
6        that this can happen, which is what I've been
7        saying in my trial and deposition testimony,
8        that these events can happen and Clave
9        observed it. That's what it says.
10   Q   So you believe these events of degradation
11       can happen, and Clave observed it in
12       one-third of the sample, correct?
13   A   He observed it in 33 percent of the samples
14       that he tested.
15   Q   And an expert can take Clave and say, because
16       it was seen in Clave, and it was seen in
17       33.33 percent, that means that all meshes
18       will be degraded, correct?
19           MR. KUNTZ: Objection. Asked
20       and answered.
21   A   But I've not been saying that. I've been
22       saying specifically that oxidation and
23       degradation can occur in these meshes, and it
24       can lead to adverse events. The timing of
25       when -- these things are unpredictable.

Page 60

1        That's what I'm saying. Unpredictable means
2        you can't predict, and that's a problem.
3        That's why the design is flawed is because
4        you can't predict. The changes can happen,
5        and you can't predict when or the
6        implications of those changes.
7            My simple point is that Clave sees those
8        events and reports them, but this is not a
9        study designed to investigate the number of
10       meshes that got -- that were degraded.
11       That's not what he is saying. He is
12       observing -- he is reporting an observation.
13       I think you're misinterpreting. You're
14       trying to put me in a position to
15       misinterpret Clave, and I can't do that. I
16       can only report on what I see.
17   BY MR. SNELL:
18   Q   So you can only report that for the samples
19       that Clave did decide to analyze for
20       degradation, it was 33.33 percent for the
21       polypropylene monofilament, and to try to
22       take that number and extrapolate it is not
23       something you're willing to do?
24           MR. KUNTZ: Objection.
25   A   When have I done that in trial testimony?

Page 61

1        You've seen my depositions.
2            MR. SNELL: Move to strike.
3    BY MR. SNELL:
4    Q   We are going to be here all day. I'm not
5        asking about when did I see you doing
6        something. I really not.
7    A   I just feel like you're covering old ground
8        that I've been over so many times, and you're
9        trying to get me to misrepresent a paper that
10       I've testified about so many times. And I
11       don't understand why you're doing that.
12       That's why I'm frustrated.
13   Q   Well, it's a simple yes or no answer.
14   A   But the questions are convoluted. And the
15       way you're asking them is implying certain
16       things. When you say he decided to analyze.
17       Why could we not say, Clave analyzed -- in
18       the number of samples that Clave estimated by
19       SEM, he observed 33 percent of them were
20       degraded. I agree with that. That's what
21       Clave says.
22           But I don't want to agree to any other
23       questions that infer some kind of intent or
24       something in Clave. That's what I'm
25       resisting. I'm not trying to be difficult.

16 (Pages 58 to 61)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 62

1    I just feel like I have been very clear about
2    what I think about this paper.  And I'm just
3    saying that it is consistent with my
4    testimony that these events can happen.
5    That's what I am saying.  That's what I have
6    always been saying.
7    Q   I just want to get an answer to my question.
8        You interpret Clave as being consistent
9        with your opinion in that it can happen.  And
10       Clave observed it in 33.33 percent, correct?
11   A   Yes, he observed it in 33 percent, that's
12       fine.
13   Q   But you not take Clave and extrapolate Clave
14       to say that a certain rate of degradation
15       will be seen in the mesh samples?  Yes or no.
16             MR. KUNTZ:  Asked and answered.
17       Eight times.
18   A   I've not done that and I'm not doing that
19       now.
20   BY MR. SNELL:
21   Q   Okay.  That's all I wanted to know was is
22       that something you would do or would not do.
23   A   Well, where you ended up with the question, I
24       was fine with it.  I'm not trying to be
25       difficult.  I'm sorry.

Page 63

1             MR. SNELL:  All right.  Let's
2        take a break.
3             (A brief recess was taken from
4        10:40 to 10:50 a.m.)
5    BY MR. SNELL:
6    Q   Doctor, you didn't look at Mrs. Perry's
7        medical records, correct?
8    A   I did not look at her records.
9    Q   Did you look at any of the depositions taken
10       in Mrs. Perry's case, hers or any of her
11       doctors or family members?
12   A   I looked at some depositions, but I can't
13       remember exactly those -- I don't know.
14   Q   Are you certain that they were depositions in
15       the Perry case or could they have been from
16       some other matter?
17   A   It could have been.  There has been so many
18       cases, it's hard for me to keep all of the
19       documents straight.
20   Q   I'm looking at your reliance list, and I gave
21       you this back.
22   A   The reliance list?
23   Q   Your list of materials on there that you
24       provided --
25             MR. KUNTZ:  I will tell you that

Page 64

1        there is no case specific depositions on
2        there.
3             MR. SNELL:  Well, that is what I
4        was going to say.
5    BY MR. SNELL:
6    Q   So, Dr. Guelcher, I looked at your reliance
7        list.  It's on the thumb drive.  And I didn't
8        see any case specific depositions,
9        particularly from Mrs. Perry's case.  Is that
10       consistent or inconsistent with your
11       knowledge?
12   A   I have -- it's consistent with my knowledge,
13       yeah.
14   Q   You're not relying on any case specific
15       depositions in the Perry case for your
16       opinions are you, sir?
17   A   I am not.
18   Q   All right.  Thank you.
19   A   Okay.
20   Q   Earlier we were talking about some testing.
21       And you didn't do any SEM testing on
22       Mrs. Perry's explant, correct?
23   A   No, I did not.
24   Q   Did you have anybody else do any testing of
25       Mrs. Perry's explant on your behalf?

Page 65

1    A   I did not.
2    Q   Okay.  You didn't do any FTIR testing on
3        Mrs. Perry's explant, correct?
4    A   I did not.
5    Q   Did you do any GPC testing on Mrs. Perry's
6        explant?
7    A   No.  The only explant I received was in the
8        form of sections of the slides of tissue, so
9        it's -- I didn't do any of this type of
10       testing on that material.
11   Q   You did not do XPS testing on Mrs. Perry's
12       mesh, correct?
13   A   That's correct.
14   Q   You did not do DSC testing on Mrs. Perry's
15       mesh, correct?
16   A   No.
17   Q   You did not do EDX testing on Mrs. Perry's
18       mesh; is that correct?
19   A   That's correct.
20   Q   Are there any tests besides SEM, FTIR, GPC,
21       XPS, DSC and EDX that someone can do to look
22       for either chemical or structural
23       degradation?
24   A   So Dr. Iakovlev, who has testified in other
25       litigation, not in this particular case I

17 (Pages 62 to 65)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 66

1 don't believe, but he has a microscopic
2 method for evaluating degradation of the mesh
3 by microscopy.
4 Q Dr. Iakovlev is a pathologist as you
5 understand it?
6 A He is a pathologist at a hospital in Toronto.
7 Q And Dr. Iakovlev is not an expert in this
8 case to your knowledge; is that correct?
9 A To my knowledge. I've not discussed this
10 case with Dr. Iakovlev.
11 Q Do you know if Dr. Iakovlev has looked at
12 Mrs. Perry's mesh or slides?
13          MR. KUNTZ: Objection.
14 A Not to my knowledge.
15 BY MR. SNELL:
16 Q Do you know if Dr. Iakovlev's microscopic
17 method for evaluating mesh has been analyzed
18 by any of the pathology medical societies,
19 like the American Association of Surgical
20 Pathologists or the American College of
21 Pathology?
22 A I don't know the answer to that. But we are
23 preparing a manuscript on explaining mesh
24 that will be submitted soon. And I'm a
25 co-author on that manuscript.

Page 67

1 Q Does this manuscript concern Mrs. Perry's
2 explant to your knowledge?
3 A I am not aware of Dr. Iakovlev -- strike
4 that. From my perspective, the patients are
5 de-identified. I don't know the identity of
6 any patients in that study. What
7 Dr. Iakovlev knows, I don't know.
8 Q And were these explanted meshes received by
9 you or Vanderbilt or were they received by
10 Dr. Iakovlev or someone else?
11 A They were all received by Dr. Iakovlev from
12 varying sources. All of those details,
13 he knows. I did not handle the specific
14 materials. I was never involved in that.
15 Q For this testing, who did the testing that is
16 going to be the subject of this manuscript?
17 A So Dr. Iakovlev did the testing. My
18 contribution was suggesting disdain for
19 myeloperoxidase, which is a marker for
20 reactive oxygen. And that information is
21 concluded and discussed in the manuscript.
22 And I have assisted Dr. Iakovlev with
23 revising and editing the manuscript.
24      I have made my changes and sent these to
25 him. And that's been my role in the

Page 68

1 manuscript.
2 Q As you sit here today, is it correct, sir,
3 that you do not know the particular patients
4 for whom those slides were made that are
5 going to be the subject of this manuscript?
6 A That is correct. I do not know their
7 identity.
8 Q Okay. Actually, some slides from Mrs. Perry
9 were brought to the deposition today,
10 correct?
11 A That's correct.
12 Q Have you looked at those slides?
13 A I looked at them visually, but I did not look
14 at them under the microscope.
15 Q Okay. Now, the Perry slides that you looked
16 at visually, how did you come to obtain
17 those?
18 A Through plaintiff's counsel.
19 Q You didn't get those through from
20 Dr. Iakovlev?
21 A No, I did not. Plaintiff's counsel.
22 Q And you have not sent Mrs. Perry's slides to
23 Dr. Iakovlev, correct?
24 A I received the slides from Plaintiff's
25 counsel, and they have been in my possession

Page 69

1 since.
2 Q Okay. When did you receive those slides that
3 are particular to Mrs. Perry?
4 A A few weeks ago maybe. I don't remember
5 exactly.
6 Q What is this myeloperoxidase stain that you
7 referenced earlier?
8 A It's myeloperoxidase. It's spelled
9 M-Y-E-L-O-P-E-R-O-X-I-D-A-S-E.
10 Q And what is the purpose of the
11 myeloperoxidase stain?
12 A So myeloperoxidase is an enzyme that converts
13 hydrogen peroxide and other substrates to
14 hydroxl radicals and other forms of reactive
15 oxygen species. And so if we see a stain
16 that is positive for myeloperoxidase, that
17 tells us that the inflammatory cells are
18 secreting reactive oxygen species, that the
19 mesh is being exposed to the reactive oxygen
20 species and would therefore be a marker of
21 this initiation of events of oxidation and
22 degradation. That's the purpose of the
23 stain.
24 Q Okay. To your knowledge, Mrs. Perry's
25 pathology slides have not been stained with

18 (Pages 66 to 69)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 70

1    this myeloperoxidase stain; is that correct?
2  A  That's my understanding.
3  Q  So as I understand it, the myeloperoxidase
4    stain --
5  A  You can call it MPO.
6  Q  Thank you.  That makes it a lot easier.
7    The MPO stain is a stain that one can do
8    to look for reactive oxygen?
9  A  That's correct.  I published two papers on
10   this in my work at Vanderbilt.  So it's a
11   routine essay.
12 Q  And reactive oxygen is what these
13   inflammatory cells secrete or can secrete; is
14   that correct?
15 A  So the Dr. Anderson review that's in my
16   reliance materials from the 2008 seminars in
17   immunology teaches that within days of
18   implantation, the biomaterial, including
19   polypropylene, including Prolene mesh, is
20   colonized by these inflammatory cells that
21   adhere to the surface.  And the enzymes that
22   they secrete, such as MPO, are these --
23   result in the formation of reactive oxygen
24   species to which the surface of the material
25   is exposed.

Page 71

1    That's what's happening.  That's what I
2    have testified to in the past.
3  Q  Okay.  We can't say in Mrs. Perry's case that
4    there is MPO at the site of her mesh,
5    correct?
6  A  I would say that with a reasonable degree of
7    scientific certainty, he's talking about
8    Anderson's 2008 paper.  Adherent macrophages,
9    when they adhere, they become activated, and
10   they begin to secrete ROS or reactive oxygen
11   species.  And the explants that Dr. Iakovlev
12   has looked at, he has seen myeloperoxidase
13   staining in the ones that he's stained.
14   And so from a reasonable degree of
15   scientific certainty, I would expect to see
16   myeloperoxidase, but we did not -- those
17   stains, those slides to my knowledge have not
18   been stained for MPO, and so I could not
19   assess that.
20 Q  Is it fair to say you could not assess in the
21   Perry case MPO's presence at the mesh; is
22   that correct?
23 A  I don't think I like the words could not.
24   They could be stained.  This work could be
25   done, but that's a decision for plaintiff's

Page 72

1    counsel.  So just to clarify your question,
2    the slides as I received them to my knowledge
3    were not stained for MPO, and so that
4    assessment could not be made.  It could be
5    possible to do that work, but that's a
6    decision for the attorneys to work out, not
7    me.
8  Q  All right.  To your understanding, it could
9    be possible that plaintiff's counsel could
10   have those slides stained for MPO, correct?
11 A  It's a complicated question how these samples
12   are handled, whether or not they're in the
13   right form that it can be done.  I would
14   think we would need the blocks to cut new
15   slides.  I don't know what material is
16   available.  I would say in theory it could be
17   done, but I don't know how practical that is.
18   I don't know the history of the slides,
19   that's the history of the explants.
20 Q  You would not be the one looking at the
21   slides under the microscope if an MPO stain
22   was done in any event?
23 A  I would.  I would look at that under the
24   microscope and I would take a picture.  My
25   students have done that in the past.  But

Page 73

1    this is evidence, I'm not going to just take
2    those slides and stain them for MPO not
3    knowing their history.  There are legal
4    ramifications to that.  You know, both sides
5    have to agree to testing procedures.
6    This is a complicated question.  All I'm
7    saying is that to my knowledge these are H&E
8    sections.  And to assess the presence of
9    myeloperoxidase, they would need to be
10   stained.
11 Q  To assess the presence of MPO, the slides
12   would need to be stained?
13 A  To confirm it.  I need to be very clear what
14   I'm saying.  Based on a reasonable degree of
15   scientific certainty, my work with
16   Dr. Iakovlev, my reading of the literature, I
17   would fully expect to see positive stain from
18   myeloperoxidase.  That has not been visibly
19   confirmed in a section because the slides
20   have not stained for that enzyme.
21 Q  What is the literature that you are
22   referencing with regard to your opinion that
23   you would expect the MPO stain to be positive
24   if it was done in Mrs. Perry's case?
25 A  The paper that comes to mind would be a

19 (Pages 70 to 73)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 74

1  review paper by Professor Jim Anderson at
2  Case Western from 2008 where he cites a very
3  large number of papers in this review.
4      And he teaches that upon implantation,
5  the surface is colonized by these monocytes,
6  inflammatory cells, that differentiate in the
7  macrophages, foreign body giant cells, and
8  become activated when they adhere to that
9  surface and secrete reactive oxygen species,
10  such as myeloperoxidase or they produce.
11  Q  This work by Dr. Iakovlev, has it been
12  published anywhere that you have seen, in a
13  peer-reviewed journal?
14  A  It's not been published.  We're preparing to
15  submit it, the manuscript.  It's not been
16  published yet, though.  It's still a
17  confidential work product that will be
18  submitted.
19  Q  Do you have a copy of the manuscript on the
20  thumb drive?
21  A  No.  It's a confidential work product with
22  Dr. Iakovlev, so we have to maintain strict
23  confidentiality when we submit to the
24  journals so we don't compromise the review
25  process.

Page 75

1  Q  Do you know the rate at which the MPO
2  standing was positive in the samples that
3  Dr. Iakovlev did?
4  A  When you say rate, I think you mean
5  frequency?
6  Q  Sure.
7  A  From my understanding, all of the explants
8  that I've seen from Dr. Iakovlev stained
9  positive for myeloperoxidase.  So I'm not
10  saying that everything I've seen is positive
11  for myeloperoxidase.
12  Q  These are other litigation explants, correct?
13  A  In some cases.  I have seen explants from
14  Dr. Iakovlev for other litigation, and there
15  is also the manuscript.  So I should say, the
16  explants that I've seen stain for
17  myeloperoxidase from Dr. Iakovlev.  All have
18  tested positive for myeloperoxidase or MPO.
19  Q  Do you have those explants or samples in your
20  possession?
21  A  I do not.  That's Dr. Iakovlev's work
22  product.  I've seen -- Dr. Iakovlev has sent
23  me images, pictures of the slides that I've
24  included in expert reports in previous
25  testimony.

Page 76

1  Q  How large of a cohort is this?
2  A  130 patients, explants from 130 patients.
3  Q  And this is a cohort for whom you do not know
4  which patients are particularly involved?
5  A  I am blind to patient identity.
6  Q  Okay.  Would it be fair to say you do not
7  know which manufacturer's meshes are involved
8  for whichever particular patient in that
9  study?
10  A  I believe that in the manuscript,
11  Dr. Iakovlev mentions some of the devices,
12  but I don't know which device went in which
13  patient.  And I don't know if Dr. Iakovlev
14  has that information.
15  Q  As you sit here, you do not personally have
16  knowledge about what device went into which
17  patient?
18  A  I do not.
19  Q  As you sit here, you do not personally know
20  which particular manufacturer's devices were
21  the subject of the 130 patients?
22  A  I believe I have that information.  It may be
23  in the manuscript.  I just can't remember.  I
24  don't remember.  That information may be in
25  the manuscript, but certainly I don't know

Page 77

1  which device was with which patient.  I would
2  not  know that because I don't know the
3  patients.
4  Q  You don't have personal knowledge such that
5  you have confirmed that a particular
6  manufacturer's device was the subject of the
7  130-patient study, correct?
8  A  Yeah, I can't disclose that right now.  I
9  can't even remember it.  I'm just saying for
10  the record, it may be in the manuscript, but
11  I don't remember those devices.
12  Q  If it may be in the manuscript, it's
13  something that Dr. Iakovlev would have put in
14  there and not you?
15  A  Yes, that's fair.
16  Q  So you don't have personal knowledge, you've
17  been relying on what Dr. Iakovlev said, if
18  indeed he even said it in the manuscript,
19  correct?
20  A  That's correct.
21  Q  So I guess you would not know if there were
22  any TVT Abbrevos that were the subject of
23  this manuscript?
24  A  I don't remember.  But I'm not relying on the
25  manuscript for my opinions in this case,

20 (Pages 74 to 77)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 78

1    because it's not been published yet, and
2    we're not disclosing it, so --
3  Q  Okay.
4  A  You're asking me about my experience with
5    mesh and I'm telling you.  That's my
6    understanding.
7  Q  Fair enough.
8        You're not relying on that manuscript in
9    the 130-patient analysis for your opinions in
10   this case, in the Perry case?
11 A  Yes, I would say those findings confirm my
12   opinions, but I am not relying on them
13   because that manuscript is still a work in
14   progress.
15 Q  So when the inflammatory cell attaches to the
16   mesh or to a foreign body, MPO is one of the
17   substances it can release?
18 A  Well, I would say that MPO is an enzyme in
19   the cell that catalyzes the reaction of
20   substrates, such as peroxides, to form,
21   reactive oxygen species such as, you know,
22   hydroxl radicals, superoxide.  There is a
23   very large number of these reactive oxygen
24   species, but MPO is an enzyme that generates
25   those reactive oxygen species.

Page 79

1  Q  It's your opinion that the reactive oxygen
2    species produce compounds, chemicals, which
3    has an affect on the mesh?
4  A  So the reactive oxygen species do impact the
5    mesh.  They -- through this oxidation
6    chemistry of polypropylene, the tertiary
7    carbon hydrogen bond is subject to attack,
8    and those radicals will attack that bond and
9    oxidize the polypropylene.
10 Q  If the radicals don't attack the bond, does
11   the polypropylene get oxidized?
12 A  It may be other mechanisms.  The most
13   well-known is this radical attack.
14 Q  Are you going to come in and testify that
15   there are other methods by which the
16   polypropylene gets degraded besides this, you
17   know, attacking the bond that you've talked
18   about?  I don't see it here in your summary
19   of opinions.
20 A  So in my summary of opinions, I discussed the
21   interactions between oxidation and
22   degradation.  And my point is that oxidation
23   as we're saying is a very early event.  It
24   happens immediately upon implantation.  And
25   at some point, the materials become induced,

Page 80

1    and the properties change very dramatically.
2    But degradation can occur prior to induction,
3    and it certainly can occur after induction,
4    so the two processes are related.
5        The mechanical stresses can certainly
6    impact this as well.  That's known as
7    environmental stress cracking.  So they are a
8    factor, so you can't separate the two.  The
9    mechanical stresses and the chemical stresses
10   are interrelated.
11 Q  You've not seen any embrittlement of
12   Mrs. Perry's mesh, correct?
13 A  I have not tested for it and have not seen
14   it.
15 Q  You've not seen any cracking of Mrs. Perry's
16   mesh, correct?
17 A  Correct.  I haven't tested for it and seen
18   it.
19 Q  You have not seen any molecular weight loss
20   from Mrs. Perry's mesh, correct?
21 A  No.  I've not tested for that and seen it.
22 Q  Besides the macrophages, are there any other
23   cells that you will plan to testify can
24   release these reactive oxygen species?
25 A  Well, Dr. Anderson teaches that monocytes,

Page 81

1    which are very small mononuclear cells,
2    colonize the implant, and then those cells --
3    and they adhere to the implant.  And when
4    they attach or adhere to the surface of the
5    implant, they become activated.  They can
6    differentiate to become macrophages or
7    macrophages can fuse to form foreign body
8    giant cells.
9        And these cells all come from a common
10   lineage, so they're all inflammatory cells.
11   So when they're adhered, they're activated to
12   secrete ROS.  Other types of cells, such as
13   neutrophils, which is commonly seen during
14   acute inflammation or infection, also secrete
15   ROS.  So there are other cell populations.
16   Really just many, many types of cells secrete
17   ROS.  But in my previous testimony, I was
18   focusing specifically about these adherent
19   macrophages in giant cells.
20 Q  It's fair to say you're going to focus on the
21   adherent macrophages in giant cells in the
22   Perry case?
23 A  Yes.
24 Q  Okay.  What happens with the macrophages is
25   -- do they get signaled to the site?

21 (Pages 78 to 81)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 82

1  A  So the signaling is very complex and it's
2     reviewed in Dr. Anderson -- and it's just
3     part of the foreign body reaction.  When you
4     implant a foreign body, many different types
5     of cells infiltrate that site of injury, and
6     there are various chemical signaling factors
7     that are involved.  It's just very complex.
8  Q  Well, let's not go down that road.  I was
9     trying to get to a simplistic step-by-step
10    process.
11       So the macrophages are signaled to the
12    site of the mesh or wherever there would be a
13    foreign body?
14 A  I would say that monocytes are recruited due
15    to the injury, and that mechanism is very
16    complex.  But they go to the site of injury,
17    and they adhere to the foreign body.
18 Q  Okay.  I guess the question I want to ask is,
19    monocytes in the foreign body giant cells,
20    it's correct that they can persist at the
21    site of a foreign body for years, correct?
22 A  So Dr. Anderson teaches in that review that
23    they're present --
24 Q  Can you answer my question yes or no and then
25    the basis after?

Page 83

1  A  Okay.  It's just the way you're phrasing it,
2     I don't necessarily want to say yes or --
3     that's the only problem.
4  Q  All right.  Fair enough.
5  A  I want to answer.  I just want to make sure
6     that there is a clean record of what I'm
7     saying.
8  Q  All right.  So macrophages formed by giant
9     cells can persist at the site of the mesh or
10    foreign body; is that correct?
11 A  Yes, they are there -- again, in the Anderson
12    paper, they are there for the lifetime of the
13    device.  They're persisting.
14 Q  And when you say the Anderson paper, is that
15    the one you identified earlier on the record,
16    sir?
17 A  Yes, sir.
18 Q  Okay.  Thank you.
19       Now, isn't it true, Doctor, that those
20    macrophages in foreign body cells that
21    persist at the site of the foreign body can
22    become quiescent?
23 A  I've seen this idea proposed.  Again, I'm
24    relying on Dr. Anderson's 2008 review.  And
25    Dr. Anderson is a member of the National

Page 84

1     Academy, and his seminal work is in this area
2     of foreign body reaction.  And in this paper,
3     he is saying that the cells adhere and become
4     activated.  And I know that there is a fair
5     amount of scientific research aimed at this
6     idea of inactivating macrophages.  I'm aware
7     of this.
8        But, again, to my knowledge, the teaching
9     in the field is that they are activated.  The
10    work I've done with Dr. Iakovlev is saying
11    that when we see these cells, we see
12    myeloperoxidase when we stain for it.  So
13    that's why I'm expressing the opinion with a
14    reasonable degree of scientific certainty
15    that these cells are activated and secrete
16    ROS when they are attached, when they adhere
17    to the foreign body.
18 Q  Did you look for literature that was contrary
19    to your opinion that these cells remain
20    activated?
21 A  I'm aware of work in this area just through
22    my work that I do.  I can't think of a
23    specific paper right now.  If you have one
24    you want me to look at, I can.  I'm just
25    expressing my general understanding in the

Page 85

1     field without any documents in front of me.
2  Q  You're aware of the belief in the field that
3     these inflammatory cells can become
4     quiescent, and they do not necessarily remain
5     activated at the site of the foreign body?
6  A  I don't -- there are ideas that -- I don't
7     know that -- quiescent I think is a strong
8     word.  Maybe there are varying levels of
9     activity, but I don't know that I've seen
10    convincing proof that they are just
11    completely quiescent.  Again, if you would
12    like me to look at a paper, I will look at
13    one, but this is my understanding.
14 Q  What are lysosomal constituents?
15 A  Can you put some context to that?  I'm not
16    -- just to give me a phrase.  Lysosomal
17    constituents, I mean, what's the context of
18    it?
19 Q  With regard to foreign body giant cells,
20    whether they remain activated releasing their
21    lysosomal constituents?
22 A  I'm just not -- I could look at something.
23    It's hard for me to answer that just in the
24    way that question is phrased.  I would have
25    to look at what you're referring to, because

22 (Pages 82 to 85)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 86

1   I am just not sure what you mean.
2   Q   Did you research the question of whether
3       inflammatory cells become quiescent or
4       deactivated at the site of a foreign body?
5   A   I don't remember specifically doing that for
6       this particular litigation.
7   Q   Are there any books in your field considered
8       authoritative or important to these general
9       principles of foreign body reaction?
10  A   I don't know.  There is lots of -- I mean,
11      I've got a book on biomaterials that has --
12      Professor David Williams has just released a
13      book on biomaterials.  There is a book
14      Biomaterials Science by four very well-known
15      senior scientists that discuss these ideas.
16      You know, these are all important books.
17  Q   Let me ask you this.  Is there any way to
18      test to know whether the cells are remaining
19      activated?
20  A   Well, that's the myeloperoxidase stain.  When
21      I see a positive stain for MPO, that's
22      staining for that enzyme, and that's telling
23      us that the cells are generating ROS.  That's
24      how you do it.
25  Q   Is there any other test that you can do that

Page 87

1       would actually show those substances released
2       by the ROS?
3   A   It's more difficult to do because they are
4       such small molecules.  The myeloperoxidase
5       is just a very -- you know, it's a relatively
6       straight forward stain to do.
7   Q   Do you know if the MPO stain is recognized by
8       the American College of Pathology as a proper
9       stain for assessing the release of that
10      substance by ROS?
11  A   I don't know.  We looked at -- you know, I
12      published this, so it's been peer-reviewed.
13      It was accepted as a marker of presence of
14      oxidative conditions.
15  Q   Does Dr. Williams' paper that you referenced
16      state with certainty that those macrophages
17      of foreign body giant cells continue to
18      remain activated and release substances on
19      the surface of the biomaterial?
20  A   I think you're getting papers confused.  I
21      was referring to the Anderson 2008 paper.
22  Q   Okay.  I'm sorry.  So let me just ask a
23      better question.  Anytime you need to the
24      correct me, let me know.  I get these things
25      confused.

Page 88

1   A   I understand.
2   Q   In the paper by Jim Anderson, does he state
3       that those macrophages in foreign body cells
4       continue to release the substances at the
5       site of the foreign body as years continue to
6       progress and they remain activated?  Is that
7       conclusively stated in the paper?
8   A   So I'd like to answer that by stating what
9       Dr. Anderson does say in that paper.  He says
10      that the cells become activated, and that the
11      foreign body reaction is present throughout
12      the lifetime of the device.  And then he
13      qualifies that as, albeit, in some cases at a
14      low level.
15      So what he is saying, and then what his
16      point is, is that as long as the device is
17      there, this foreign reaction body is ongoing,
18      and that these factors need to be considered
19      in the design of the medical device.  That's
20      what he says.
21  Q   Okay.  So Dr. Anderson does not state that if
22      the cells are there, they are going to be
23      activated and producing these substances?
24  A   I would say it's implied.  It doesn't
25      necessarily specifically state that.  And I

Page 89

1       would be happy to read it from the paper, but
2       it's very strongly implied that that's what's
3       happening in the way that it is stated.
4           THE WITNESS:  I have to go to
5       the bathroom if you don't mind.
6           MR. SNELL:  Let's take a break.
7           (A lunch recess is taken from
8       12:00 to 12:50 p.m.)
9           THE COURT:  Let's take a break.
10  BY MR. SNELL:
11  Q   Doctor, we are going to mark the Perry
12      pathology slides that you have in your
13      possession as Exhibit No. 2.
14          (Deposition Exhibit No. 2 is
15      marked for identification.)
16  BY MR. SNELL:
17  Q   And I will hand you Exhibit 2.  Just confirm
18      for the record that those are the slides,
19      sir.
20  A   Yes, these are the slides I was presented.
21  Q   It looks like there is three different sets,
22      each of them wrapped in bubble wrap?
23  A   Yes.
24  Q   Am I correct, sir, that you're not relying on
25      those pathology slides for your opinions?

23 (Pages 86 to 89)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 90

1  A  That's correct.
2  Q  Do you know what type of inflammatory cells,
3     if any, are present in Mrs. Perry's mesh?
4  A  I don't know.  I didn't look at the slides
5     under a microscope.
6  Q  You therefore would not know how many of any
7     inflammatory cells, if they are present, were
8     actually there, correct?
9  A  That's correct.
10  Q  When we were talking about the inflammatory
11     cells, just so we're on the same page, I'm
12     referring to the macrophages in foreign body
13     giant cells?
14  A  Yes.
15  Q  Okay.  So when we say chronic inflammatory
16     cells --
17  A  Yes.
18  Q  -- are we talking about macrophages in the
19     foreign body giant cells?
20  A  Yes.
21  Q  Okay.  Do you know whether there were any
22     chronic inflammatory cells present in
23     Mrs. Perry's vaginal tissue before her
24     surgeries, one of which included mesh?
25  A  I'm not aware of that information.

Page 91

1  Q  Did you attempt to look at any of the
2     pathology reports in Mrs. Perry's case?
3  A  No, I did not review those reports.
4  Q  Have you attempted to measure any of the
5     reactive oxygen species in Mrs. Perry?
6  A  We talked about this earlier.  I didn't do
7     that.
8  Q  Have you attempted to do any mechanical
9     testing of Mrs. Perry's mesh?
10  A  No.
11  Q  Are you aware of any testing done on
12     Mrs. Perry's mesh to determine whether it
13     became tougher after implantation?
14  A  I'm not aware of any other testing on her
15     mesh.
16  Q  And you would not have done such testing to
17     determine whether it became tougher, correct?
18  A  Seems like -- I'm not sure what you mean by
19     the mesh became tougher.  I mean, it seems
20     like it would be difficult to do.
21  Q  You could test to determine whether the mesh
22     became embrittled in Mrs. Perry, correct?
23  A  Test the outer layer, that could be done by a
24     nanoindentation.  But, again, you need an
25     appropriate amount of mesh in the right form.

Page 92

1     It's not going to work on a histological
2     section.  You would need mesh from the
3     patient before it's been processed for
4     histology to do those measurements.
5  Q  You said that was nano --
6  A  Nanoindentation could measure the brittleness
7     of the surface degraded layer.
8  Q  Is that a particular type of test,
9     nanoindentation?
10  A  It is.
11  Q  Is it separate and apart from some of the
12     other testing that we've discussed?
13  A  It is.  It is mechanical testing at a very
14     small scale.  I've done testing like this
15     with a collaborator at Vanderbilt where we
16     probed the surface with a cantilever beam,
17     and we measure the response and the
18     mechanical force.  You can measure an elastic
19     modulus doing this.
20  Q  You have not done any of this
21     nanoindentation testing on Mrs. Perry's mesh,
22     correct?
23  A  That's correct.
24  Q  Have you seen any photographs of Mrs. Perry's
25     mesh that showed cracking?

Page 93

1  A  I've not seen any photographs of her mesh.
2  Q  Earlier you were talking about the bonding
3     that can occur leading to degradation of the
4     particular atom.  I don't recall if it was
5     carbon or hydrogen.
6  A  You are referring to oxidation and a free
7     radical attack on a tertiary carbon hydrogen
8     bond?
9  Q  Yes, sir.
10  A  Yeah.
11  Q  So for oxidation, is that oxygen which comes
12     and bonds with carbon or the other way
13     around?
14  A  The details of the reaction are very complex.
15     But, essentially, it's a radical attack, a
16     hydroxl radical or oxygen radical can attack
17     that bond.  The chemistry is very
18     complicated.
19  Q  What is the difference between an oxygen
20     molecule and an oxygen radical?
21  A  Well, it's just the nature of the chemical
22     reaction.  In the body -- and in our in vitro
23     testing -- I can speak specifically from our
24     in vitro testing, the solution that we
25     created generated hydroxl radicals, and those

24 (Pages 90 to 93)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 94

1   hydroxl radicals attacked that carbon
2   hydrogen tertiary bond -- tertiary carbon
3   hydrogen bond.
4       The hydroxl radicals attacked that bond,
5   and that's where the pollen becomes oxidized.
6   And then there is a number of steps in this
7   reaction, I would have to look at a paper to
8   explain it, but there is just a number of
9   steps in that chemical reaction. It's very
10  complex.
11  Q  When you say the hydroxl radicals attacked
12    the bond, is that that tertiary bond you were
13    referring to?
14  A  Yes. It extracts the -- I would have to look
15    at the paper to show the exact mechanism, but
16    that tertiary carbon hydrogen bond is
17    vulnerable to an oxidative attack. But the
18    physical chemistry of that reaction is,
19    again, complex.
20  Q  Is it correct that you have not seen the
21    presence of a hydroxl radical in Mrs. Perry's
22    case?
23  A  Yeah. As we have discussed before, I have
24    not done the myeloperoxidase staining or
25    looking for a radical, which would be very

Page 95

1   difficult to do in her case. I have not done
2   that.
3   Q  As I understand it, the presence of hydroxl
4    groups on a surface would be indicative of
5    oxidation?
6   A  It's the OH group forms in a hydroperoxide
7    intermediate. There is a hydroperoxide that
8    forms on the oxidized polypropylene, and we
9    can see that peak by IR spectroscopy.
10  Q  Have you attempted to do any IR spectroscopy
11    in Mrs. Perry's case?
12  A  No, I have not done that.
13  Q  As I understand it, there is testing that can
14    be performed to try to assess atomic
15    percents, such as the percent carbon, percent
16    oxygen, and percent nitrogen; is that
17    correct?
18  A  There is a method called x-ray photoelectron
19    spectroscopy. We will call it XPS. XPS
20    tells us what percentage of the carbon is
21    bound to other atoms. So in pure
22    polypropylene, all of the carbons should be
23    bound. Either the hydrogen or carbon, it's a
24    hydrocarbon. When polypropylene becomes
25    oxidized, we see the formation of

Page 96

1   carbon-oxygen bonds that we can detect by
2   XPS.
3   Q  Have you attempted to look for the presence
4    of carbon-oxygen bond in Mrs. Perry's case?
5   A  I have not done that.
6   Q  Have you attempted to look for the percent of
7    carbon in Mrs. Perry's mesh?
8   A  I have not done that.
9   Q  Have you attempted to look for the percent of
10    oxygen in Mrs. Perry's mesh?
11  A  No.
12  Q  You earlier mentioned different biomaterial
13    books, one of which was your own, I believe?
14  A  I edited a book, Introduction to Bond
15    Materials. It's on my CV.
16  Q  What biomaterial books are used at
17    Vanderbilt?
18  A  So the BME department -- I mean, chemical
19    engineering department, the biomedical
20    engineering department, teaches a course in
21    biomaterials. I'm not sure what they're
22    using now. In the past, they have used a
23    book by Johnna Temenoff on biomaterials. I
24    think they have made some changes to that
25    course. I've never taught that course, so I

Page 97

1   don't know all the details.
2   Q  Is your book used in teaching biomaterials
3    at Vanderbilt?
4   A  Not to my knowledge. But that book was
5    written for a somewhat different purpose than
6    for a teaching textbook.
7   Q  I think earlier you mentioned another book
8    called Biomaterials Sciences, and it had a
9    couple of different editors or authors?
10  A  So there were two well-known books. The
11    older one is -- well, I think it's called
12    Biomaterials Sciences. It was --
13    maybe endorsed isn't the word, but the
14    Society for Biomaterials endorses this book.
15    Endorses may be a strong word. They
16    recognize this book as being an important
17    book, and there are four senior authors on
18    this book.
19        It's written more as a reference text.
20    It's difficult to teach from, because it's an
21    edited book. So it's an excellent resource
22    for study. But for teaching undergraduates,
23    it's not as accessible. So Professor David
24    Williams, who is also a lead world expert in
25    biomaterials, has written a new textbook. I

25 (Pages 94 to 97)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 98

1    contributed some figures to that textbook.
2       And Professor Williams' textbook has been
3    assessed by my colleagues in BME at
4    Vanderbilt for teaching. I'm not sure if
5    they've made a final decision whether to use
6    it. What's attractive about that book for
7    teaching is it's written by one author. So
8    it's a single-author book, and so this is
9    good for teaching undergraduates.
10      My textbook, I edited, so there are
11   chapters by individual contributors. So it's
12   just a different book.
13   Q  When you were going about compiling your
14   book, did you reach out to people who you
15   felt were experts in certain fields to write
16   or contribute to particular chapters?
17   A  That's how we approached editing the book,
18   that's right. That was in 2005 when I was a
19   postdoc.
20   Q  What is the most recent edition of your book?
21   Is it on your CV?
22   A  Well, I co-edited the first edition. There
23   is a second edition, but I didn't co-edit
24   that one. The only one that I have co-edited
25   has been published in 2006. It's on my CV.

Page 99

1    Q  The Society for Biomaterials, you referenced
2    you're a member of that society?
3    A  I am.
4    Q  And the book they recognize as being an
5    important book is Biomaterials Sciences. Is
6    the title An Introduction to Materials and
7    Medicine by --
8    A  That sounds right.
9    Q  -- Buddy Ratner?
10   A  Buddy Ratner, Hoffman, Schoen. They're all
11   founders of the Society for Biomaterials,
12   very well-known. Jack Lemons is the other
13   author.
14   Q  Did any of those authors contribute to your
15   book?
16   A  I don't remember. I don't think so.
17   Q  I want to ask you some questions about TVT
18   Abbrevo. I'm just trying to give you an idea
19   of where I'm going.
20   A  Okay.
21   Q  Because I know we went back and kind of
22   covered some things that we addressed earlier
23   with further questions.
24   A  Okay.
25   Q  Have you done any testing of any type on TVT

Page 100

1    Abbrevo?
2    A  I have not.
3    Q  Have you done any testing of any type on TVT
4    product for stress incontinence? And when I
5    stay TVT, I mean Ethicon's particular TVT
6    product.
7    A  So only the testing performed at Dr. Dunn's
8    laboratory. Just to be clear, Dr. Dunn did
9    that testing. I consulted and advised. We
10   discussed it, agreed to do it, but Dr. Dunn
11   physically performed the testing.
12   Q  Tell me what testing did Dr. Dunn do on an
13   Ethicon TVT device. As I had read -- and
14   I'll tell you why I'm asking. As I had read
15   your Huskey deposition testimony, he had done
16   some testing on maybe one or more AMS meshes
17   and Boston Scientific meshes.
18   A  These are new testing that we've done.
19   Q  Let me just back up then. So as I understand
20   it, Dr. Dunn has done some testing on Ethicon
21   TVT products?
22   A  Yes.
23   Q  Are you relying on that testing for your
24   opinions in the Perry case?
25   A  Let me look at my opinions for a minute.

Page 101

1    Yes, I am relying on that testing. So I
2    should say, I formed my opinions based on the
3    literature review. My opinions are the same
4    as they were in the Huskey case on this
5    particular topic of oxidation and
6    degradation, and this testing further
7    confirms my opinions.
8       And the testing was specifically done to
9    answer the question that Ethicon raised
10   during the trial in August, that Prolene is
11   different from polypropylene and doesn't
12   oxidize because it has antioxidants.
13      So in the testing done by Dr. Dunn, the
14   goal was to answer the question can Prolene
15   in a TVT device oxidize and degrade. And we
16   saw oxidation and degradation of the surface
17   pitting in that testing, in the oxidative
18   medium that I was describing earlier. So the
19   testing was performed to answer a very
20   specific question of -- and to answer the
21   specific question of can the Prolene
22   polypropylene oxidize. That was the purpose
23   of the test.
24   Q  Where is this testing, all of the notebooks,
25   the results, the data generated from it that

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 102

1    you are relying on?
2    A  So this is on the disk that was provided.
3    Q  Okay.  Show me where on the disk that that is
4    this TVTG testing is located.
5    A  I don't have a computer but --
6    Q  Can you use Mr. Kuntz'?
7                MR. KUNTZ:  He can.
8         Let's go off the record for a second.
9              (Off-the-record discussion.)
10   BY MR. SNELL:
11   Q  Counsel is looking at the thumb drive.
12   Obviously, I can't look at it and question
13   the witness about 6,000 files today.  Let me
14   just get some basic information about this
15   testing.
16        The testing that was performed on
17   Ethicon's TVT mesh, what specific device or
18   devices were the subject of the testing?
19   A  I believe it was the TVT.
20   Q  The original TVT retropubic?
21   A  I believe so.  And we also tested an
22   unstabilized polypropylene controlled, it had
23   no antioxidant.
24   Q  Okay.  You said it was an unstabilized
25   Prolene polypropylene?

Page 103

1    A  No.  It's polypropylene without antioxidants.
2    So it would be the equivalent of -- in the
3    Liebert paper where they tested the
4    monofilament with no stabilizers.  It's a
5    polypropylene that has no antioxidants.  So
6    it's unstabilized polypropylene I would call
7    it.
8    Q  So you didn't test the TVT retropubic mesh
9    with antioxidants to the TVT retropubic mesh
10   with antioxidants?
11   A  No, we can't get TVT without the -- the TVT
12   is made from Prolene that has that Prolene
13   antioxidant package, because that's what we
14   tested, that's what we could get.  So we had
15   that exemplar, Dr. Dunn had it, and we
16   compared that to the unstabilized
17   polypropylene.  We also tested two Boston
18   Scientific meshes, but that's not in the
19   materials that we presented.  That's
20   different.
21   Q  You are not relying on this Boston Scientific
22   testing for your opinions in this matter,
23   correct?
24   A  I am not.
25   Q  Okay.

Page 104

1    A  I am just disclosing what we did.
2    Q  This TVT retropubic device that Dr. Dunn
3    tested, was it one single device or was it a
4    batch or numerous ones?
5    A  I believe it was one device with three
6    replicate pieces, three distinct pieces cut
7    from -- it was three or four.  I can't
8    remember the details.  I would have to look
9    at it.  But there were multiple replicates
10   cut from the same mesh.
11   Q  And the unstabilized polypropylene control,
12   where was that obtained from?
13   A  I would have to look at the document to look
14   at the documents for the exact source, but it
15   was purchased from a third-party vendor that
16   sells polypropylene with antioxidants,
17   unstabilized polypropylene.
18   Q  Do you know the vendor?
19   A  I can't remember.  It's in the documents.  I
20   would have to find it.
21   Q  Do you know who purchased this control?
22   A  Dr. Dunn purchased it and did all of this
23   work.
24   Q  You personally were not the one who did any
25   of this testing on the TVT retropubic device,

Page 105

1    correct?
2    A  No.  As I said previously, Dr. Dunn and I
3    consulted, and Dr. Dunn did all of the work
4    physically through his company.
5    Q  So am I correct that you did not do any of
6    the physical testing of this TVT or the
7    control?
8    A  That's right.  Dr. Dunn did.
9    Q  And that was done at his company?
10   A  Yes.
11   Q  Was that testing done out of his house?
12   A  I don't know.  Maybe some of it was done from
13   his house.  I don't remember.
14   Q  Do you know where the testing took place on
15   this TVT retropubic compared to the
16   polypropylene control?
17   A  It was done in his lab at Vanderbilt.
18   Q  Who paid for the testing that Dr. Dunn
19   performed comparing the TVT retropubic to the
20   unstabilized polypropylene control?
21   A  I should clarify that all of these responses
22   I'm telling you to the best of my knowledge.
23   And if Dr. Dunn contradicts what I'm saying,
24   it's because I didn't remember it correctly.
25   I believe that this testing was billed to the

27 (Pages 102 to 105)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 106

1  litigation, but Dr. Dunn would have to
2  confirm that.
3  Q  Is your basis for your testimony in that
4  regard something that Dr. Dunn told you?
5  A  Yes, I'm basing it on -- I have not seen
6  those invoices.  That would be between
7  Dr. Dunn and plaintiff's counsel.
8  Q  Did Dr. Dunn physically do all of his
9  testing?
10  A  Again, I believe that he did, but I don't
11  know the details of -- he would be the one
12  that would have to speak to that.
13  Q  Unfortunately, he is not identified as an
14  expert here.
15  A  I understand that.
16  Q  Were you present for any of the physical
17  testing of the TVT retropubic or the
18  unstabilized polypropylene control?
19  A  Was I present?
20  Q  Present meaning on the premises where the
21  testing was performed, such that you could
22  yourself observe the testing.
23  A  Well, the testing was just very simple.
24  Dr. Dunn placed the -- I'm trying to answer
25  your question as best I can.  So Dr. Dunn

Page 107

1  placed the specimens in vials.  They were
2  weighted down with glass beads in this
3  oxidative medium that I was describing that
4  simulates the environment between the
5  adherent inflammatory cells and the
6  biomaterial.  I have seen those vials.
7      And then at different time points,
8  Dr. Dunn removed the test specimens, rinsed
9  and dried them, and measured RI spectra.  And
10  I've seen those dried specimens.  I've seen
11  the specimens, and so I have seen aspects of
12  the testing, but I didn't watch him do the
13  testing.  But the testing essentially
14  involves incubating  the material in a
15  solution, and then taking it out and testing
16  it by FTIR and SEM.
17  Q  When was this testing on the TVT retropubic
18  device done?
19  A  September and October of 2014.
20  Q  And it was on a single TVT retropubic
21  exemplar, meaning that mesh had not been in
22  the body at all?
23  A  That's correct.
24  Q  When did you first discuss with Dr. Dunn this
25  testing on the TVT retropubic exemplar?

Page 108

1  A  Same time frame.  Maybe August -- it would
2  have been September of 2014 after the Huskey
3  trial.  And, again, the motivation for the
4  tests was based on Ethicon's statements
5  during trial that we had not tested it and
6  couldn't -- we could not say definitively
7  that Prolene polypropylene oxidizes, and that
8  was the motivation for the test.
9      So this is what was said in Huskey trial,
10  we decided to do the test to answer that
11  specific question, can Prolene polypropylene
12  oxidize.
13  Q  Now, Dr. Dunn's Vanderbilt lab, is that on
14  the premises here at Vanderbilt?
15  A  Yes, his lab is at Vanderbilt.
16  Q  Do you know if any graduate students or
17  other people were involved in the testing?
18  A  Dr. Dunn has employees.  I know that.  To
19  what extent they were involved in the
20  testing, I can't speak to.  Again, Dr. Dunn
21  just did all of his.  I don't know those
22  details.
23      I should qualify my comment.  Dr. Dunn
24  does not have employees, but I know that he
25  does pay contractors for services like he

Page 109

1  pays me.  But, again, I cannot speak to how
2  he conducts his business.
3  Q  Why did Dr. Dunn choose to test only one TVT
4  retropubic device?
5  A  That was what we had at the time.  And we
6  knew these depositions and report deadlines
7  were approaching quickly, so we moved forward
8  with what we had.
9  Q  Would you have preferred to have more than
10  one TVT retropubic to test?
11  A  We requested additional exemplars from
12  plaintiff's counsel.  My understanding is
13  that this is a complex request and takes
14  time.  We have requested additional items
15  recognizing the need to test multiple
16  meshes.  But as I said, these requests can
17  take time to process, so we tested what we
18  had.
19  Q  Why is there a need to test multiple meshes?
20  A  I should qualify my answer I need to test.
21  By testing multiple products, it's possible
22  to show that it would happen in many of these
23  products.  It's not possible to test every
24  one.  But considering that the oxidation of
25  polypropylene is due to the inherent

28 (Pages 106 to 109)

a54c1a8b-9393-421a-8f67-0f6a35abc023

## Scott A. Guelcher, Ph.D.

Page 110

1    intrinsic molecular structure of
2    polypropylene, as well as the antioxidant
3    package, if those things are all the same,
4    you would expect a very similar response.
5        Like I said, it's a chemical reaction.
6    So if it's the same material with the same
7    antioxidants, you would expect to see a very
8    similar chemical reaction.  We tested two
9    Boston Scientific meshes because we had to.
10   If we had had more, we could have tested more
11   and would have liked to have done that, but
12   we were limited to what we had at the time.
13               MR. SNELL:  I'm going to move to
14   strike the part about Boston Scientific.
15   A  I understand.  I shouldn't have said that.
16      I'm sorry.
17   BY MR. SNELL:
18   Q  So you would expect to see a similar response
19      you said, correct?
20   A  Yes.
21   Q  If you tested multiple meshes, correct?
22   A  I would.
23   Q  But we know from the teachings of Clave that
24      not all findings will be consistent with
25      regard to degradation, correct?

Page 111

1               MR. KUNTZ:  Objection.
2    A  I think that the conditions are very
3       different.  Clave is in vivo explant, so
4       there are many different factors affecting
5       oxidation.  This study was purely isolating
6       the chemical reaction.  The medium that we
7       used has been published by a number of
8       investigators, including me, that simulates
9       the oxidative conditions in the body.
10          So we're simulating a chemical reaction,
11      not -- there is no cells.  There is no
12      tissue.  It is simply examining that chemical
13      reaction, will that chemical reaction cause a
14      change in Prolene polypropylene.  That was
15      the purpose of the test, so it's very
16      different from, say, Clave's study.  It is
17      very specific.
18          That is why I would expect to see the
19      same changes in any mesh that we tested.
20   BY MR. SNELL:
21   Q  So this study done in a lab is not under the
22      same conditions as one would see in vivo?
23   A  I wouldn't -- I would qualify that -- there
24      are two papers in my reliance materials by
25      Dr. Jim Anderson from 1990 and 1993 in the

Page 112

1    Journal of Biomedical Materials Research.  In
2    the 1990 paper is a seminal paper where
3    Dr. Anderson discovered the effects of the
4    foreign body reaction on a biomedical device.
5        The 1993 paper he simulated.  He
6    reproduced or recapitulated that same
7    oxidation and degradation in that same
8    biomaterial in vitro outside the body.  So he
9    was able to show that this solution, this
10   oxidative solution that I've been talking
11   about recapitulates the oxidative conditions
12   that the biomaterial was exposed to in vitro.
13       I should qualify my previous comment when
14   I said there is no cells.  There is no other
15   cell populations like fibroblasts that are
16   exerting contractile forces.  There is no
17   tissue that is exerting forces.  So this test
18   is isolating the effects of chemical
19   oxidation and was found to agree with in vivo
20   observations.  That's the purpose of the
21   test, and those two papers have shown that.
22       So I hope I'm answering your question.
23   It reproduces certain aspects of the
24   reaction, but not every -- but the ones that
25   I just mentioned.

Page 113

1    Q  The test that was done on the TVT device does
2       not establish that an oxidative condition
3       occurs in vivo; is that correct?
4               MR. KUNTZ:  Objection.
5    A  Let me -- the in vitro test does not
6       establish the in vivo conditions.  It's
7       recapitulating those in vivo conditions.  We
8       know that this happens in the foreign body
9       reaction, and so the test is designed to
10      recapitulate that foreign body reaction in
11      the laboratory.
12   Q  What are the limitations to the test as it
13      was conducted by Dr. Dunn utilizing only one
14      TVT device?
15   A  Well, the limitation of the test is -- I want
16      to be very careful about my opinion.  The
17      question we were asking was -- and what I was
18      presented with in trial, and I believe what
19      Dr. Shelby Thames testified for defense was
20      Prolene polypropylene doesn't oxidize.  It's
21      stabilized.  It's different.  It's Prolene.
22      So we asked a very simple question, can
23      Prolene polypropylene oxidize.
24          We tested one mesh.  And we showed that
25      in that one mesh that we tested, Prolene

29 (Pages 110 to 113)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 114

1  polypropylene oxidized. We have also showed
2  evidence of pitting and surface degradation.
3  So the limitation would be, we're not saying
4  that we saw it in every mesh, we're not
5  saying we saw it in 10,000 meshes. We're
6  saying we saw it in one mesh. And we
7  answered this question that it can oxidize.
8  Because it's a chemical reaction, I believe
9  we would see it in other meshes if we tested
10  those, but I recognize that we didn't. We
11  tested one mesh, but we did show that it can
12  happen in that one mesh.
13  Q  So with that said, let's go back to my
14  question. What are the limitations of the
15  testing that Dr. Dunn did given there was
16  only one TVT mesh?
17          MR. KUNTZ: Objection, asked and
18  answered.
19  A  I thought I answered it. I will try a
20  briefer answer. The limitation would be that
21  we tested one mesh. We showed that it can
22  happen. We did not estimate a probability
23  that it would happen. We tested one mesh and
24  saw that it happened in that mesh that we
25  tested.

Page 115

1          I believe the literature teaches with a
2  reasonable degree of scientific certainty
3  that it would happen in other meshes because
4  presumably they are chemically the same. I
5  didn't look at necessarily the manufacturing
6  doc, but I would presume based on my industry
7  experience that there are specifications for
8  antioxidants and Prolene. I've seen some
9  documents showings those numbers. Provided
10  those compositions are the same, I would
11  expect to see a very similar result, because
12  it is a chemical test testing the effects of
13  a specific chemical reaction.
14  BY MR. SNELL:
15  Q  Is it fair to say that one of the limitations
16  with that test is that it does not establish
17  that Prolene polypropylene degrades in vivo?
18          MR. KUNTZ: Objection.
19  A  I would say it doesn't establish the timing
20  in which Prolene polypropylene oxidizes in
21  vivo. The time scale at which this happens
22  would depend on many other factors, the
23  environment, the patient, I understand that,
24  but I do believe that it shows that it would
25  oxidize. It's just the timing of those

Page 116

1  events.
2          It starts to oxidize immediately when
3  it's implanted. It's colonized by
4  macrophages. I believe with a reasonable
5  degree of scientific certainty it will start
6  to oxidize upon implantation. When it
7  becomes induced, and there are much more
8  dramatic changes in physical properties is
9  unpredictable, as I've said in previous
10  testimony. Those events are unpredictable.
11          But I do believe that the test tells us
12  that the mesh can oxidize, and I would expect
13  it to oxidize under in vivo conditions due to
14  the nature of the inflammatory response that
15  we discussed.
16          MR. SNELL: Move to strike.
17  BY MR. SNELL:
18  Q  One of the limitations to the test that
19  Dr. Dunn did on the single TVT retropubic
20  device was that it does not establish that
21  Prolene polypropylene degrades in vivo; is
22  that correct?
23  A  It does not establish? I'm having a hard
24  time with this word establish. It supports
25  my opinions that these meshes are -- can

Page 117

1  oxidize and degrade in vivo.
2  Q  I'm not asking you whether your
3  interpretation as to whether it supports your
4  opinion.
5          MR. SNELL: So I would
6  respectfully move to strike.
7  BY MR. SNELL:
8  Q  The limitation to this test that Dr. Dunn did
9  on the single TVT is that it does not
10  establish that Prolene polypropylene degrades
11  in vivo; is that correct?
12          MR. KUNTZ: Objection. He said
13  the exact same opposite.
14  A  I'm struggling with the way you phrased the
15  question. I don't want to agree to that. I
16  believe with a reasonable degree of
17  scientific certainty that this test predicts
18  susceptibility to oxidative degradation. And
19  if we see it in vitro, we will see it in
20  vivo.
21          It's just the timing and the severity are
22  unpredictable, but I do believe it will
23  happen. I think that it's -- the timing and
24  the severity, the clinical consequences are
25  unpredictable. That's what I've been saying.

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 118

1   MR. SNELL:  Well, I respectfully
2   move to strike again.
3   BY MR. SNELL:
4   Q   Again, I'm not asking you about
5   susceptibility to oxidation, and I'm not
6   asking you about oxidation, that particular
7   step.  I'm asking you about degradation in
8   vivo.
9   So the question again.  One of the
10   limitations to those tests by Dr. Dunn on the
11   single TVT is that it does not establish that
12   Prolene polypropylene degrades in vivo; is
13   that a fair statement?
14   MR. KUNTZ:  Objection.
15   A   You're speaking specifically of degradation?
16   BY MR. SNELL:
17   Q   Yes, sir.  That's why my question only said
18   degradation.
19   A   Okay.  I would like to explain my answer on
20   this.
21   Q   Can you first agree or disagree and then
22   please feel free to explain?
23   A   So you're saying that it does not establish
24   that it degrades --
25   Q   I will ask it one more time.

Page 119

1   A   I'm trying to give you an accurate answer,
2   and I'm struggling with how to answer this.
3   Q   One of the limitations to the test that
4   Dr. Dunn performed on this single TVT
5   retropubic device was that it does not
6   establish that Prolene polypropylene degrades
7   in vivo; is  that a fair statement?
8   MR. KUNTZ:  Objection.
9   A   I just don't know if I can agree to that.  I
10   believe it -- it -- we didn't see -- I'm just
11   having a hard time with this sentence.  The
12   way you phrase it, I would need to move on,
13   so I will leave this for the attorneys later.
14   But the way you are phrasing that question,
15   for now I will agree to it.  But I have
16   reservations, because I don't believe it
17   captures what I'm really testifying about.
18   BY MR. SNELL:
19   Q   It is a simple fact, isn't it, Doctor, that
20   this test that Dr. Dunn performed on the
21   single TVT device, it is not an in vivo test?
22   Can we agree to that?
23   A   I will agree that it is not an in vivo test.
24   Q   There were no macrophages put on the TVT
25   retropubic device and this test that Dr. Dunn

Page 120

1   performed; is that correct?
2   A   You're misunderstanding the purpose of the
3   test.
4   Q   Sir, you have to listen to my questions and
5   answer them yes or no or whatever.  I'm not
6   asking you about the purpose of the test and
7   all of that.
8   A   That cannot be answered by a yes or no
9   question.  The macrophage is not there, but
10   the consequence of the macrophage is there.
11   That's the test.
12   MR. SNELL:  Move to strike.
13   BY MR. SNELL:
14   Q   What macrophage --
15   A   I'm not going down on this.  Go ahead.  I'm
16   sorry.
17   Q   Were macrophages present in the test that
18   Dr. Dunn did on the single TVT retropubic?
19   A   Macrophages were not present, but what
20   macrophages produce, meaning radicals and
21   reactive oxygen was present.  We generated
22   those reactive species using a chemical
23   reaction instead of a macrophage, but this is
24   an acceptable accepted approach to doing
25   that.

Page 121

1   Just because a macrophage was not there
2   doesn't mean -- it's the same oxidative
3   conditions.  It's just accomplished through a
4   different chemical reaction.
5   MR. SNELL:  Move to strike
6   everything after macrophage was not present.
7   A   I'm not going to back down.  We can stay here
8   'til 5:00 arguing about this.  I'm not going
9   to back down the test.
10   BY MR. SNELL:
11   Q   Sir, we are going to be here multiple days.  I
12   can tell you now.
13   A   Fine.  But I'm not -- you're trying to put
14   words in my mouth.
15   Q   No, sir.
16   MR. KUNTZ:  We're not going to
17   be here multiple days.  We'll get your seven
18   hours and we'll stay here as late as we can.
19   So --
20   MR. SNELL:  No.  First of all,
21   you produced 6,000 pages.
22   MR. KUNTZ:  It doesn't matter.
23   That's the rules under California.  We have
24   no obligation to produce at the start of his
25   depo materials he relied on.  There is no

31 (Pages 118 to 121)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 122

1  obligation under California state law to do
2  that. We have complied. We have brought a
3  disk and brought the materials responsive to
4  the deposition. That is the only thing that
5  is required under California law. I want to
6  make this clear. We have no duty to produce
7  before the depo anything, zero.
8          MR. SNELL: That's fine, if
9  that's your position.
10         MR. KUNTZ: Okay.
11 BY MR. SNELL:
12  Q  Am I correct, sir, that there were no foreign
13     body giant cells that were used in Dr. Dunn's
14     test?
15  A  My answer is the same. The cells weren't
16     there, but the reaction products were.
17         MR. SNELL: Move to strike after
18  the cells were not there.
19  A  These are unreasonable questions. And this
20     deposition is going to get more hostile if
21     you keep going down this line of questioning,
22     just to put it out there.
23  Q  Sir, as the witness, I'm allowed to ask you
24     questions. You may not like the question,
25     but you have to answer the questions.

Page 123

1  A  But the questions are being phrased that
2     you're trying to misrepresent my testimony
3     and misrepresent what I'm saying.
4  Q  I'm not trying to misrepresent your
5     testimony.
6  A  You are.
7  Q  I'm asking you a factual question.
8  A  And the question is --
9  Q  Was there a horse in the room at the time of
10     the test, yes or no? No.
11         Was there a macrophage in the test, yes
12  or no?
13         The interpretation, I will get to that,
14     but I have simple questions, sir, and I'm
15     entitled to simple answers if they're simple
16     questions. You can talk to Mr. Kuntz all
17     night long about your interpretation. That's
18     fine. But I'm actually going to ask you
19     about your interpretation too.
20  A  And I'm entitled to answer questions as I
21     need to. And I'm not going to be put into
22     this difficult position of having things
23     recorded as my testimony that's not what I've
24     ever been saying.
25  Q  You would agree that -- let me back up. What

Page 124

1  is it that you believe this test on this
2  single TVT device compared to the control
3  shows?
4  A  I believe that it shows Prolene polypropylene
5     used to manufacture the TVT device can
6     oxidize and degrade under oxidative
7     conditions similar to those experienced in
8     the human body after implantation.
9  Q  What documents or files out of those 6,000
10     plus show the oxidation?
11  A  The oxidation is evidenced by FTIRs spectra
12     that were measured in weeks zero, one, two,
13     three, four and five. In the FTIRs spectra,
14     we saw minimal hydroxl and carbonyl peaks
15     until week five, where we saw a significant
16     increase in the magnitude of the hydroxl
17     and/or carbonyl peaks, which was indicative
18     of a chemical induction.
19  Q  So what are the file names and the documents
20     that showed this out of the 6,000?
21  A  I don't remember the file names.
22  Q  Well, I'm entitled to know them.
23  A  I know. And I have to look at it. I don't
24     have it here with me. I know that you're
25     entitled to have it, but I don't have it here

Page 125

1  in front of me.
2          MR. KUNTZ: He does have it.
3          MR. SNELL: Out of the 6,000,
4  you think I am some kind of scientist and can
5  pick out this FTIR testing?
6          MR. KUNTZ: The rules are the
7  rules, Burt. You gave us testing two weeks
8  before trial. I don't cry about it. We
9  follow the rules.
10         MR. SNELL: All I'm asking him
11  is to identify it.
12         MR. KUNTZ: That's fine. We'll
13  sit here and he can identify it. Let's pull
14  it up.
15         MR. SNELL: That's what I
16  thought we were doing.
17         MR. KUNTZ: If that's how you
18  want to spend your seven hours with him,
19  let's do it.
20         MR: BOWMAN: There is a folder
21  named FTIR on the drive that was given to
22  you. It's already been disassembled and
23  separated out. There's FTIR, and there's
24  SEM, and XPS.
25         MR. KUNTZ: I'm trying to get

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 126

1    you a link, so you can pull them up.
2  BY MR. SNELL:
3    Q   What documents, if any, in this study that
4        Dr. Dunn did on the single TVT device show
5        that the Prolene polypropylene degrades?
6    A   There are SEM images at weeks zero and five,
7        I believe.  What the name of that file is, I
8        don't know.  I will have to look at the
9        folders to try to find it.
10   Q   Okay.  And what is it about those SEM images
11       that you believe shows degradation?
12   A   There are changes in the surface, including
13       pitting, flaking, changes to the surface that
14       can be observed by SEM.
15   Q   How deep is the pitting?
16   A   I don't know.  I would have to look at the
17       image again to see it.
18   Q   How much material is flaking off?
19   A   Again, I would have to look at it to see
20       that.  We saw SEM is -- we were just really
21       looking to see if it's there or not.  It's
22       difficult to be more quantitative as we can
23       be with the FTIR, but we saw evidence of
24       changes to the surface.
25   Q   Did you attempt to quantify the pitting?

Page 127

1    A   We were working on it.  In the amount of time
2        we had to pull this together, we haven't had
3        time to do it yet.
4    Q   You attempted to quantify the amount of
5        flaking?
6    A   Same answer.
7    Q   Not yet?
8    A   Not yet.
9    Q   Is there anything else about this test that
10       Dr. Dunn did on the single TVT device?
11   A   Anything else that -- I'm sorry.  Go ahead.
12   Q   That's okay.
13   A   It shows degradation.
14   Q   It shows degradation besides the SEM images?
15   A   No, degradation was assessed by SEM.
16   Q   Oxidation was assessed by FTIR?
17   A   That's correct.  And there was XPS testing
18       for some of those samples as well.
19   Q   You said there was XPS testing for some of
20       the samples.  What do you mean?
21   A   Well, I didn't say that very accurately.  I
22       can't remember all of the time points at
23       which we ask did XPS.  I know we did FTIR at
24       zero, one, two, three, four and five.  We did
25       SEM at zero and five, but I can't remember

Page 128

1    the time point at which we did XPS.  It's in
2    the data.  I just can't remember it.
3    Q   What, if anything, did the XPS show?
4    A   The XPS revealed the evidence of
5        carbon-oxygen bonds on the surface of the
6        TVT.
7    Q   How many carbon-oxygen bonds were seen?
8    A   So XPS, we did three distinct measurements at
9        three surfaces on the fiber.  We cannot see
10       microscopically where we're testing, so it's
11       not possible to tell whether we're testing
12       where there is an area of active degradation
13       or not.  Does that make sense?
14          There is areas of pitting on the fibers,
15       and then there is areas on the fibers that we
16       don't see the pitting.  When we do the XPS
17       measurements, we're not exactly sure of where
18       on the fiber we're probing.  We actually
19       picked three spots.  And the XPS measurement
20       tells us at that particular spot that is
21       being probed, what the percentage of the
22       carbon is bound to oxygen.  And we saw many
23       spots.  It's in the data.  I just can't
24       remember the exact numbers, but we saw many
25       spots on the surface where we saw the

Page 129

1    existence of carbon-oxygen bonds.
2    Q   Should there be no carbon-oxygen bonds?
3    A   There should be no carbon-oxygen bonds in
4        nonoxidized polypropylene, polypropylene that
5        has not been oxidized.  I don't want to use
6        pure, because there is other additives.  But
7        polypropylene that has not been oxidized
8        should not reveal evidence of carbon-oxygen
9        bonds.
10          It's similar to FTIR, except FTIR is
11       telling us the functional groups, and XPS is
12       telling us the types of bonds.
13   Q   Were there any inconsistent findings in this
14       test done by Dr. Dunn?
15   A   Not that I'm aware of.
16   Q   Did you put this -- the unstabilized
17       polypropylene control, what was that control?
18   A   It was a polypropylene pellet that was
19       purchased from a third-party vendor.  I don't
20       remember the name of the vendor, but I
21       believe it is in Dr. Dunn's testing documents
22       where the polypropylene has no antioxidant
23       added to it.
24   Q   Are the documents in there that reflect what
25       type of polypropylene pellet and where that

33 (Pages 126 to 129)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 130

1   pellet was from?  Is that in the files?
2   A  I believe that it is.  If it's not, we can
3      get that.  That's a known.  Dr. Dunn has that
4      information.  And I should note that Dr. Dunn
5      has all of the samples from this testing as
6      well.  We still have the material.  We saved
7      everything.
8   Q  Is it kept at his lab or his house?
9   A  I'm not sure where he is storing that, but he
10     has stored that in dark containers protected
11     from the light.  He can speak to that.  He's
12     storing the material.  I'm not sure where.
13  Q  So this polypropylene pellet that was used as
14     an unstabilized control, am I correct that it
15     had not been extruded or gone through any
16     manufacturing process whatsoever?
17  A  I believe that it had probably at least been
18     extruded because we bought it as pellets.  So
19     my understanding is they melt the
20     polypropylene -- I don't know the answer to
21     that.  Dr. Dunn would be able to talk about
22     the history of the sample.
23  Q  Do you know if this polypropylene pellet that
24     you tested was a pellet used in any stress
25     incontinence sling devices?

Page 131

1   A  I have no way of knowing that without knowing
2      the supplier of the pellet.
3   Q  How was it that Dr. Dunn came to decide on
4      which particular polypropylene pellet from a
5      certain manufacturer he was going to obtain?
6   A  So in his previous testimony, Dr. Dunn has
7      investigated a number of polypropylene cases,
8      and he's done similar testing before in which
9      he used unstabilized polypropylene controls,
10     so that decision would have been based on his
11     experience with prior testing.
12  Q  The unstabilized polypropylene control, what
13     tests were done that on that?
14  A  The same tests as were done on TVT.  So it
15     would have been XPS, FTIR and SEM.
16  Q  Did you attempt to calculate any clinical
17     significance of any findings in this test
18     that Dr. Dunn did?
19  A  We are still doing the quantitative analysis,
20     but we will calculate -- how shall I say this
21     -- statistical significance between groups as
22     a function of time.  So we would compare the
23     TVT group to the unstabilized polypropylene
24     group.  We would compare at each time point.
25     And we would compare within each group at

Page 132

1   each time point because we have three or four
2   replicates.
3      I can't remember the exact number, but we
4   have enough replicates that we can speak to
5   the significant differences  between groups
6   as a function of time.
7   Q  But that analysis has not been done yet,
8      correct?
9   A  It has not been done because we are still
10     quantifying the results.
11  Q  Who will do the testing for clinical
12     significance?
13  A  I don't know yet.  We're still discussing
14     this.
15  Q  Who are you considering to do statistical
16     significance testing in this test --
17  A  Dr. Dunn or I.  One of us will do it.
18  Q  Are you a statistician?
19  A  I'm not a statistician, but I've done similar
20     statistical testing in any papers that I've
21     published where we compared differences
22     between material groups and time using a one-
23     or two-way ANOVA.  That's a common method.
24  Q  But you're going to be testing over different
25     time points, correct?

Page 133

1   A  You mean statistically?
2   Q  Yeah.
3      So you will be testing over multiple time
4   points, correct?
5   A  Yes.
6   Q  So, therefore, you will need to apply a
7      Bonferroni or some type of multiple testing
8      equation, correct?
9   A  Yes.  We typically do this.  I believe it
10     will be a two-way ANOVA with a Bonferroni
11     correction.  But, again, we haven't decided
12     that yet.
13  Q  So as you sit here today, you cannot state
14     that the test results were statistically
15     significant upon applying the proper
16     statistical testing?
17  A  We haven't done it yet.  The differences
18     appear to be large, but we have to do the
19     statistics for the FTIR testing.  I don't
20     know what we will be able to do yet on the
21     SEM.  We are discussing that.
22  Q  So the FTIR testing is the testing that you
23     intend to do statistical significance testing
24     upon?
25  A  Yes.

34 (Pages 130 to 133)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 134

1   Q   And the SEM images, because you only took
2       them at limited time points, zero and five
3       weeks, you do not know whether there is
4       enough data to generate statistical
5       significant findings?
6           MR. KUNTZ:  Objection.
7   A   I wouldn't say it that way.  I would say in
8       SEM, we are looking at specific locations.
9       We can't sample the entire mesh area.  So
10      it's -- we're evaluating.  We haven't decided
11      yet what to do with it.
12  BY MR. SNELL:
13  Q   Is it fair to say as you sit here today, you
14      have not decided whether or not to do
15      statistically significant calculations upon
16      the SEM testing part of the test?
17  A   That's right.
18  Q   For the XPS portion of this test, have you
19      attempted to do any statistical significance
20      calculations?
21  A   Not yet.  XPS is similar to SEM, in that
22      we're limited to a relatively small area on
23      the surface of the mesh, so we have a similar
24      sampling concern.  So we haven't yet decided
25      -- with XPS we were more interested in

Page 135

1       confirming the existence of those
2       carbon-oxygen bonds.
3           XPS is a useful technique for showing
4       that the carbon is, in fact, chemically bound
5       to the oxygen.  And so we use XPS as a method
6       to support the FTIR findings.
7   Q   But to date, no statistical significance
8       testing has been done on the XPS portion; is
9       that right?
10  A   It has not been done.
11  Q   Did you attempt to analyze molecular weight
12      in this test?
13  A   We did not.
14  Q   Why not?
15  A   Molecular weight measurements require a
16      considerable amount of material.  Molecular
17      weight measurements also aren't as -- with
18      molecular weight, we are sampling the entire
19      fiber.  Whereas with these other methods,
20      it's more the surface of the fiber.  So it
21      takes a lot of material, and it's difficult
22      to isolate the effects of what's happening on
23      the surface.  In other words, it would take a
24      lot of material to do that, and we didn't
25      have that much.

Page 136

1   Q   Well, you had a whole sling, correct?
2   A   Yes.
3   Q   That's enough to do molecular weight testing
4       on, correct?
5   A   It's difficult for us because we have to send
6       these samples off to an external laboratory
7       that requires a rather large sample size.
8       And we would also want to analyze the
9       molecular weight of that outside degrade and
10      surface layer would be the most informative.
11      So then the material requirements for doing
12      that testing are pretty limiting, so we
13      didn't do it.
14          We believed that the FTIR and the SEM
15      would provide similar information about the
16      breakdown in the structure at the surface.
17      And FTIR and SEM are commonly used by many
18      investigators in these types of studies.  So
19      that's why we did the study the way that we
20      did.
21  Q   Is it correct or not that you had enough
22      material, considering you had a whole sling,
23      to look at the molecular weight?
24          MR. KUNTZ:  Objection.
25  A   I don't know that we did, because we would

Page 137

1       have required separate replicates for that.
2       And Dr. Dunn can speak to this better than I
3       can, but there is not a lot of polymer in
4       that -- I mean, it's a mesh.  And so we
5       needed to have separate replicates for the
6       GPC.  And we would have to have rather large
7       samples in order to send them off for
8       molecular weight analysis because we can't do
9       it at Vanderbilt.  We don't have the
10      equipment.
11          So it would have taken considerably more
12      material, and I don't know that we had it.
13      But, again, Dr. Dunn can speak to that.
14  BY MR. SNELL:
15  Q   Do you know if Dr. Dunn has done molecular
16      weight GPC testing on other mesh
17      manufacturers' slings?
18  A   He has done some testing on exemplars in the
19      past.  But, again, my recollection of this is
20      we had to send away a fairly significant
21      amount of material.  This is what I remember.
22      Again, Dr. Dunn would be able to address that
23      better.
24  Q   Did you discuss doing GPC molecular weight
25      testing and decided not to do it or is this a

35 (Pages 134 to 137)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 138

1    test that just did not really enter into your
2    mind?
3    A  Oh, we discussed it.  We certainly discussed
4    it.  Our conclusion was with the amount of
5    material that we had and the amount of time
6    that we had, it made the most sense to focus
7    on FTIR and SEM for this round of testing
8    and XPS.  We could do those tests with a
9    single set of replicates and save those
10   samples.
11        Keep in mind too, I don't think I was
12   very clear on this point.  But when I say
13   zero, one, two, three, four, five, that's
14   separate materials for each time point
15   multiplied by three or four replicates for
16   each time point, so you can see this is
17   getting to be a rather large number of mesh
18   particles.
19        Considering the time constraints we had,
20   and the amount of material we had, we
21   considered many different types of testing,
22   XPS, DSC, all of this different testing that
23   has been reported in the literature.  We
24   decided to focus on those three to answer the
25   specific question of can it oxidize.  FTIR

Page 139

1    and XPS, we believe were probably the best
2    choices for answering that question of can it
3    oxidize because they're chemical analyses.
4    That was the rationale for why we did it.
5    Q  This medium that you put the samples into
6    which you believe mimics what a macrophage
7    can produce in the body, what specific
8    compounds or chemicals of the macrophage does
9    this compound consist of?
10   A  I think I know what you mean.  So the
11   chemical reaction, cobalt chloride reacts
12   with hydrogen peroxide.  Again, hydrogen
13   peroxide is a substrate for this enzyme,
14   myeloperoxidase or MPO in the inflammatory
15   cells.  That chemical reaction produces
16   hydroxl radicals, OH radical.  And those
17   hydroxl radicals are the species that attack
18   the polypropylene as we've discussed
19   previously.
20        So it generates those hydroxl radicals,
21   which are a form of reactive oxygen species
22   in the body.  Instead of generating this
23   reactive oxygen species through a
24   myeloperoxidase catalyzed reaction in a cell,
25   we are doing this reaction in vitro by

Page 140

1    different reaction mechanism.  But the end
2    product is the same, these hydroxl radicals.
3    Q  I think you said that you are doing this in
4    vitro.  That's not correct, is it?
5    A  Doing what in vitro?
6    Q  Let me back up.  I heard you say something
7    that just threw me off there.
8    A  Okay.
9    Q  When you put the TVT in this other control --
10   can I call it a solution?
11   A  Yes.
12   Q  Is there a specific common name that I can
13   use?
14   A  We can call it oxidative solution if you
15   like.
16   Q  I don't like that.
17   A  You don't like that.  Of course, you don't
18   like that, do you?
19   Q  Try again.
20        MR. BOWMAN:  I've got a
21   suggestion.
22        MR. SNELL:  What?
23        MR. BOWMAN:  The Anderson
24   solution.
25        THE WITNESS:  We can call it the

Page 141

1    solution, that's fine.
2    BY MR. SNELL:
3    Q  Let's get really simple, though.  Just so I
4    understand, that solution, what is it made
5    of?
6    A  Okay.  I can explain -- and, again, this is
7    in the documents, but we mix a solution of
8    cobalt chloride.
9    Q  Okay.  So that's a molecule of cobalt bound
10   with chloride?
11   A  I believe it's COCL2.  Is it CL2 or CL3?  I
12   can't -- it's cobalt chloride.  It's either
13   COCL2 or CL3.  I just don't have it
14   memorized.  But cobalt chloride reacts with
15   hydrogen peroxide, H202.  So the solution is
16   20 percent H202, hydrogen peroxide.  I don't
17   remember the concentration of cobalt
18   chloride, but it's again in the SOP.
19        We mix those together, and they react to
20   give reaction products, including hydroxl
21   anion, that's OH minus.  That's a basic
22   solution.  Plus OH radical, that's OH dot, so
23   hydroxl radical.  And then there is a valence
24   change on the cobalt.  I can't remember the
25   changes it's valenced.

36 (Pages 138 to 141)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 142

1    But the main reaction product is that
2  hydroxl radical that's simulating the
3  reactive oxygen species formed by these
4  inflammatory cells in vivo.
5  Q  Okay.  So the hydroxl radical simulates the
6    reactive oxygen species from the macrophages
7    in foreign body giant cells?
8  A  It is.  So the foreign body giant cells and
9    macrophages produce a number of reactive
10    oxygen species, and hydroxl radicals are one
11    of them.  So in the in vitro test, we are
12    producing these hydroxl radicals and the
13    Bonferroni ROS species produced by the
14    inflammatory cells in vivo or in vitro.  They
15    do this in vitro as well.
16  Q  How do you know that macrophages in foreign
17    giant body cells produce hydroxl radicals in
18    any particular case?
19  A  It's been published in the Dr. Anderson
20    papers that I mentioned that when these
21    inflammatory cells adhere to the biomaterial
22    surface, they secrete a number of these
23    reactive oxygen species, including the
24    hydroxl radicals.
25  Q  How much hydroxl radical do they produce?

Page 143

1  A  I don't know that anybody has measured that.
2  Q  How much hydroxl radical is produced in this
3    test that mesh was put into?
4  A  We don't know.  But the reason we ran the
5    polypropylene control, I can try to answer
6    that.  So we know from Liebert, Liebert took
7    the monofilament, the unstabilized
8    polypropylene, and planted it subcutaneously
9    in a hamster, and he saw a chemical
10    induction.  He saw oxidation induction of
11    this oxidation reaction at 108 days.  Okay.
12      So in our study -- that is 108 days to
13    induction.  That is in vivo in that hamster
14    model, in vivo in the hamster model.  In our
15    study, we saw induction between days 21 and
16    28 for unstabilized polypropylene control.
17    So if you average that, just to give you an
18    approximation to try to answer your question,
19    somewhere between 21 and 28 -- let's call
20    that 25 days, and Liebert saw induction in
21    vivo at around 100 days.
22      That tells us that events are happening
23    in our in vitro test about four times faster
24    than they happen in that in vivo hamster
25    model, which is a subcutaneous suture

Page 144

1    implanted subcutaneously.  That was -- the
2    purpose of that control was to give us some
3    idea of the relative time scale to relate our
4    tests to in vivo conditions as an
5    approximation.
6  Q  In vivo in a hamster, though, not a person?
7  A  Yes, in vivo in a hamster in a subcutaneous
8    space, not the pelvic -- it could be much
9    faster in a pelvic floor.  But it was a
10    suture implanted subcutaneously is what
11    Liebert did.
12  Q  What is the rate of induction of Prolene
13    polypropylene in the pelvic floor?
14  A  We cannot determine that from this test.
15    There are many factors that affect that.
16  Q  Is it correct that you do not know how much
17    of the hydroxl radical is produced in the
18    solution used by Dr. Dunn?
19  A  I'm not sure if that's known how -- no, I
20    don't know that we know that, but --
21  Q  Well, let's see if we can do this.  It would
22    seem to me to be common sense that the amount
23    of hydroxl radicals that would be produced in
24    vivo would be somewhat dependent upon the
25    number of macrophages; is that correct?

Page 145

1  A  That would be one factor.  The extent of the
2    inflammatory reaction would be one factor
3    that would affect induction time.
4  Q  So if there were 1,000 macrophages present,
5    the ability of hydroxl radicals to be
6    produced quantity-wise would be much greater
7    than if only ten macrophages were present.
8    Is that a fair scientific statement?
9  A  You're saying that you would expect more ROS
10    with more macrophages?  Is that what you're
11    saying?
12  Q  No.
13  A  Okay.  Say it again.  I didn't get it.
14  Q  The potential amount of hydroxl radicals that
15    could be produced would be higher if there
16    were 1,000 macrophages present as opposed to
17    only ten.  Is that a fair scientific
18    statement?
19  A  Present on like the --
20  Q  Present at the mesh, present at the tissues.
21  A  Per area of something like this, right?
22  Q  Per the same area?
23  A  Yeah.  I mean, I think this is equivalent to
24    what I said.  If you have more macrophages
25    per area, more foreign body giant cells, that

37 (Pages 142 to 145)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 146

1  is a factor.  I mean, certainly that's a
2  factor.
3      But, again, I want to emphasize that the
4  point of the tests was not to calculate the
5  rate of -- at which through the time at which
6  induction happens.  It was just to answer
7  this question, can it oxidize, can it become
8  induced, can it degrade.  That was the
9  purpose of the tests.
10     So we were not trying to say use these
11 data to calculate the induction time of
12 Prolene mesh in the vaginal space.  There
13 were a number of factors affecting this.  All
14 this test shows is that it happens.  It can
15 oxidize and degrade.  That was the purpose.
16 Q  What is the size of the solution that you put
17   the single TVT device in?
18 A  These were vials.  I don't know.  Maybe 20
19   milliliter vials.  I can't remember the size
20   of them.  They were maybe that tall and maybe
21   that big around (indicating).  They were
22   vials.
23 Q  So you put a piece of the mesh in the vial,
24   and the vial had the solution?
25 A  Yes.

Page 147

1  Q  Were all of the vials filled with the same
2    amount of solution?
3  A  Yes.  I believe those -- I can't remember the
4    number, but Dr. Dunn controlled for that.
5  Q  As you sit here, do you know how much
6    solution was put in each bottle?
7  A  I don't remember the number.  It was in the
8    range of tens of milliliters.  It wasn't more
9    than 100.  I don't remember the number.
10   Dr. Dunn would know.
11       MR. KUNTZ:  Can we take a break?
12   We've been going for one hour and 45 minutes,
13   almost two hours.
14       MR. SNELL:  Yeah.
15 BY MR. SNELL:
16 Q  One other question while we are taking about
17   these vials and solutions.  How many
18   macrophages does one vial equate to?
19 A  I don't know the answer to that.  The best
20   way I can answer this -- and I want to be
21   responsive.  But the best way I can answer
22   this is compared to Liebert, we are seeing an
23   acceleration of about a factor of four.
24   Could that mean that there is four times as
25   many -- it could, but it could mean other

Page 148

1  things as well.
2      I would rather say that there is lots of
3  factors that can affect this.  And it's
4  basically accelerated by -- it happens about
5  four times faster than what Liebert observed
6  in that hamster model.  I can say that.  But
7  how many macrophages, I -- we don't know how
8  many macrophages Liebert observed.  So it's
9  very difficult to calibrate it to that level
10 of detail.
11     Does that make --
12 Q  I guess maybe if I can back up and just make
13   this question as simple as possible.
14 A  Okay.  Yeah.
15 Q  Are there any documents that are in those
16   test files that say for this solution, for a
17   given amount of the solution, that is the
18   equivalent to the hydroxl radicals that can
19   be produced by Y number of macrophages?
20 A  I don't know that that correlation exists.  I
21   don't know.
22       MR. SNELL:  Okay.  Let's take a
23   break.
24       (A brief recess is taken from
25   3:25 to 3:45 p.m.)

Page 149

1        (Deposition Exhibit No. 3 is
2  marked for identification.)
3  BY MR. SNELL:
4  Q  Dr. Guelcher, we are back on the record.  We
5    have marked as Exhibit 3, the thumb drive,
6    that has the different documents, reliance
7    materials, etc., that you brought to the
8    deposition, correct?
9  A  That's correct.
10 Q  And what we're doing now, we are looking
11   under -- there is a folder called Guelcher
12   Reliance Docs that we're going to look under.
13   And we are going to look for test materials,
14   correct?
15 A  That's correct.
16 Q  And then under that there is a subfolder
17   called In Vitro Testing.  Is that a folder
18   that you're looking at?
19 A  Yes, I believe there is a folder called in
20   vitro testing.
21 Q  And the in vitro testing folder has test
22   information pertaining to this test that you
23   testified about earlier where Dr. Dunn
24   conducted the test on the single TVT
25   retropubic device compared to the

38 (Pages 146 to 149)

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 150

1    polypropylene pellet?
2    A  That's correct.
3    Q  Now, within that in vitro testing folder,
4       there are additional subfolders, correct?
5    A  That's correct.
6    Q  All right.  So where is the study protocol?
7    A  Okay.  I'm going to have to look for that.
8           MR. KUNTZ:  Again, there is a
9       folder called protocols.
10          MR. SNELL:  I hear you.  I just
11      want the witness to tell me that it's
12      actually in there and show me where it is.
13   A  I'm looking.  Okay.  Study design and
14      protocols.  There is a folder called study
15      design and protocols.
16   BY MR. SNELL:
17   Q  Okay.  Give me a second.  I'm in the study
18      design and protocols folder.  And where is
19      the study protocol?
20   A  Okay.  There is -- I believe it's the
21      oxidative media Preparation file.  Let me
22      look at that and I believe that is it.  So
23      that is what I was calling the SOP.  It says,
24      Guelcher labs standard operating procedure
25      oxidative media preparation.  This is how we

Page 151

1    prepared the medium that you were asking me
2    about.
3       So it has the recipe for -- it's CoCL2,
4    cobalt chloride hexahydrate, 30-percent
5    hydrogen peroxide solution and water.  And
6    these materials are mixed to make the 1 liter
7    master batch, and the procedures are all
8    listed here for that.  That is how we get the
9    solution.
10   Q  And how much is put into each of the vials?
11   A  I will have to look at a different procedure,
12      because I think this is just the master
13      batch.  Let me find it.
14   Q  Before you leave that document, at the bottom
15      left it says, ADT dash last edit 9/15/14?
16   A  Yes.
17   Q  Who is ADT?
18   A  That's my graduate student, Anne Talley.  She
19      is the one who has been maintaining this
20      draft that I have approved.
21      You asked about what, how much is added,
22      the volume?
23   Q  Yes, the volume added to the vial of the
24      solution.
25   A  Okay.  I am going to have to go back and look

Page 152

1    for that.
2       Okay.  So I found it.  I believe the file
3    is called in vitro mesh testing sample ID's.
4    There is an Excel file in that same folder
5    that we were talking about.
6    Q  Okay.
7    A  And you can see that all of the sample
8       numbers are listed here.  And if you scroll
9       to the bottom of that spreadsheet, you will
10      see procedure.  And so if you look on the
11      procedure, line number five, place 5
12      milliliters of oxidative media in each file.
13      So that would be -- and then he has notes on
14      what he did.  So it's 5 mils, approximately 5
15      milliliters of the media, of solution, in
16      each file.
17   Q  In Anderson's paper, did he use 5 milliliters
18      of solution?
19   A  I don't remember the number that he used or
20      that I used in my papers.  I don't remember
21      that number.
22   Q  Do you know if you deviated from the amount
23      that Anderson used in this test?
24   A  I don't know.  I'd have to check it.
25   Q  Did Dr. Dunn decide the procedure to use

Page 153

1    approximately 5 milliliters of oxidated
2    media in each file?
3    A  I don't know that the Anderson paper
4       specified this level of detail.  We did
5       discuss this.  The Anderson paper did not
6       present a procedure in this level of detail
7       that I remember, but I would have to confirm
8       that by looking at the paper.  Do you want me
9       to do that?
10   Q  Who was it who decided to use 5 milliliters
11      of oxidated media in each file?
12   A  I don't remember.  We discussed this test.  I
13      don't remember discussing where exactly that
14      came from.  I know -- I'm trying to find
15      this.
16      Okay.  Is there a question?  What was the
17      question?  I don't remember.  I thought I
18      answered it, but I will answer it again.
19   Q  Let me just ask the question again.  Who
20      decided to use approximately 5 milliliters s
21      of oxidated media to be put in into each
22      vial?
23   A  I know we discussed this, but I don't
24      remember the details.  We discussed all of
25      these points, and I just don't remember that,

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 154

1    any more details than that.
2  Q  The same number of samples of unstabilized
3    polypropylene control were not used as the
4    TVT; is that correct?
5  A  I need to look at the spreadsheet again.
6    Polypropylene standard -- you say the same --
7    why -- I don't see that.  Where are you
8    looking?
9  Q  I'm looking at the Excel file you pointed out
10    at above PP standard.  Let's just make sure.
11    Is the PP standard, is that the unstabilized
12    polypropylene control?
13  A  Yes.  And to get back to one of your previous
14    questions, the MSDS and the supplier for that
15    material is here.
16  Q  And so for the unstabilized polypropylene
17    control, there were only 15 samples, correct?
18  A  Oh, I see the top of the column, 15 samples.
19    That's probably because it became oxidized
20    more quickly.  I don't -- so we only went out
21    to four weeks with the -- because it became
22    induced faster, the 15 samples.  I don't know
23    the answer to that now, what the number of
24    replicates for each time point was.  I can't
25    tell from this table.

Page 155

1  Q  Why were there only 15 samples of the
2    unstabilized polypropylene control, but 36
3    samples of the TVT?
4  A  Well, one reason would be because we didn't
5    do as many time points.  We did four weeks,
6    it looks like, instead of -- and I don't
7    think that we did as much -- I spoke
8    incorrectly.  I think previously it appears
9    that we actually had separate samples for XPS
10    and FTIR, and it doesn't look like we had as
11    many XPS samples.  I would have to think
12    about that.
13  Q  Do you know why you only analyzed the
14    unstabilized polypropylene control out to
15    four weeks, whereas you analyzed the TVT
16    later?
17  A  It became induced faster, so the unstabilized
18    control became induced between weeks three
19    and four.  So we didn't do as many time
20    limits.
21  Q  You could have still tested it, though, at
22    five and six weeks, right?
23  A  We could have.
24  Q  Did you make an affirmative decision not to
25    test at four and five weeks or is that

Page 156

1    something that Dr. Dunn did?
2  A  I can't remember the details of that decision
3    right now.
4  Q  Who made the decision to only use 15 samples
5    of the unstabilized polypropylene but 36
6    samples of the TVT?
7  A  I don't remember those details either.
8  Q  When you do statistical analyses comparing
9    the unstabilized polypropylene to the TVT,
10    don't you have to take into account
11    differences in sample sizes and differences
12    in the quantity of time points analyzed?
13  A  Yeah, for comparing between -- for comparing
14    between groups, those factors would have to
15    be taken into account, but I just don't
16    remember the details of that study design.
17  Q  Who did the FTIR testing?
18  A  Dr. Dunn.
19  Q  He personally did it or did he have somebody
20    else do it?
21  A  I believe he did it.  But, again, it was done
22    through his company, so I don't know the
23    details of who actually did what
24    measurements, but I believe he did it.
25  Q  Do you know where this FTIR machine was that

Page 157

1    was used in this test?
2  A  Yes.  It's in his laboratory.
3  Q  So he used the Vanderbilt lab FTIR machine
4    for the test?
5  A  Well, I would say he used the FTIR in his
6    laboratory at Vanderbilt.
7  Q  Did he buy that FTIR machine?
8  A  He would have to speak to the details of
9    that.
10  Q  I guess the question is -- you took issue
11    with whether I asked you -- do you know who
12    owns that FTIR machine?  Is it Vanderbilt or
13    Dr. Dunn or --
14  A  I don't know the details of that.  When you
15    said the Vanderbilt lab, that was, I thought,
16    a little vague.  I wanted to clarify that it
17    was -- it's in his laboratory space that he
18    has been assigned at Vanderbilt.
19  Q  Okay.
20  A  That's what I meant.
21  Q  All right.  But it very well could be that
22    that is a machine that is actually owned by
23    Vanderbilt?
24  A  I don't know the details.  As I said,
25    Dr. Dunn has an agreement with the

40 (Pages 154 to 157)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

| Page 158 |
|---|
| 1    university.  That's all I know.  He would |
| 2    have to speak as to the rest of it. |
| 3    Q   Now, the SEM analysis, whose SEM machine was |
| 4    used? |
| 5    A   There is an SEM instrument and it's an |
| 6    institutional resource.  It's a shared |
| 7    resource is perhaps a better way of saying |
| 8    it, and so we pay for machine time. |
| 9    Q   Is it located at Vanderbilt? |
| 10   A   It is. |
| 11   Q   In what school? |
| 12   A   Well, it's an institute, so it's between |
| 13   schools and the members of the school of |
| 14   engineering, college of arts and science, |
| 15   medicine.  It's a shared resource. |
| 16   Q   It's not in Dr. Dunn's lab? |
| 17   A   No. |
| 18   Q   Physically where is it?  Is it within a |
| 19   building in the department of medicine? |
| 20   Department of engineering? |
| 21   A   Again, it's a building that has shared space |
| 22   between the college of arts and science and |
| 23   the school of engineering. |
| 24   Q   Who did the SEM images? |
| 25   A   Again, it was Dr. Dunn's company.  Whether he |

| Page 159 |
|---|
| 1    had an employee doing that, I don't know.  He |
| 2    was responsible for all of that. |
| 3    Q   The XPS machine that was used to look at the |
| 4    sample, where is that machine? |
| 5    A   So that machine is also administered by the |
| 6    institute I was referring to earlier.  It's |
| 7    housed in the laboratory of Professor Bridget |
| 8    Rogers.  So to clarify just for the record |
| 9    one of the earlier questions about who else |
| 10   at Vanderbilt was involved, Professor Bridget |
| 11   Rogers is a professor, an associate professor |
| 12   of chemical and biomolecular engineering, and |
| 13   she did the XPS testing. |
| 14       That slipped my mind earlier, I'm sorry, |
| 15   until we talked about it now. |
| 16   Q   So Dr. Rogers was actually the one who did |
| 17   the XPS testing on this single TVT retropubic |
| 18   device and the unstabilized polypropylene |
| 19   control? |
| 20   A   She did. |
| 21   Q   Were you there when she did the testing? |
| 22   A   No, but I don't need to be there when she -- |
| 23   it's a -- she ran it and -- |
| 24   Q   Why didn't you do the XPS testing? |
| 25   A   That's Dr. Rogers' particular area of |

| Page 160 |
|---|
| 1    expertise.  She has a lot of experience with |
| 2    it. |
| 3    Q   Is Dr. Rogers an expert for plaintiffs in |
| 4    transvaginal mesh litigation that you're |
| 5    aware of? |
| 6    A   Not to my knowledge.  She was contracted by |
| 7    Dr. Dunn to do the work. |
| 8    Q   Do you know how much she was paid by |
| 9    Dr. Dunn? |
| 10   A   I don't know the details of that.  Probably |
| 11   the same as my arrangement, but I don't know. |
| 12   Q   Was she aware of Dr. Dunn's role as an expert |
| 13   in transvaginal mesh litigation? |
| 14   A   Yes, she was, to my knowledge. |
| 15   Q   She is aware that Dr. Dunn is being paid by |
| 16   attorneys for plaintiffs in transvaginal mesh |
| 17   litigation? |
| 18   A   I believe she would. |
| 19   Q   So when she sat down to do this XPS analysis, |
| 20   she knew that the money was coming from |
| 21   plaintiffs' lawyers in transvaginal mesh |
| 22   litigation? |
| 23   A   Yes, I believe she knew that.  I haven't -- |
| 24   I'm hesitating because I can't remember |
| 25   explicitly discussing that with her, but I |

| Page 161 |
|---|
| 1    believe based on conversations with Russell |
| 2    that she knew she was being paid by |
| 3    litigation. |
| 4    Q   Did Dr. Dunn have a conversation with |
| 5    Dr. Rogers about doing this XPS testing? |
| 6    A   Yes. |
| 7    Q   Were you present at the time of that |
| 8    conversation? |
| 9    A   For some of the conversations, we did discuss |
| 10   it as a group with Professor Rogers.  Was I |
| 11   there for every conversation, I can't say |
| 12   that I was.  I did discuss this with |
| 13   Professors Dunn and Rogers. |
| 14   Q   And what was said? |
| 15   A   Well, we discussed how to do the analysis, |
| 16   what we were looking for, how we wanted to do |
| 17   the experiment, and what the goal was.  We |
| 18   discussed the approach for the measurements. |
| 19   Q   Who paid for the SEM time? |
| 20   A   Again, I can't answer that -- oh, for the |
| 21   SEM.  I'm sorry.  I believe that Dr. Dunn has |
| 22   a sponsor research agreement through the |
| 23   university in which he set up a cost center. |
| 24   But, again, he has to speak to all of this. |
| 25   I believe it was paid for by the litigation |

41 (Pages 158 to 161)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 162

1    through a center number from the university.
2  Q  What do you mean by center number?
3  A  Well, when we do internal billing within the
4    university, we have cost centers associated
5    with different funding sources.  So he would
6    have used the cost center associated with his
7    sponsored research agreement.  But, again, I
8    am hesitant to go -- it's his project.  I
9    don't know the details of that.
10  Q  Who paid Dr. Rogers for her time?
11  A  Dr. Dunn.  She invoiced Dr. Dunn, and then
12    Dr. Dunn invoiced plaintiff's counsel.
13  Q  How much did Dr. Rogers' invoice in
14    connection with this test that you're relying
15    on?
16  A  I don't know the answer to that.
17  Q  Do you know how much Dr. Dunn has invoiced in
18    connection with this test that you're relying
19    on?
20  A  I haven't seen his invoices.  I don't know.
21  Q  Would it be based on your understanding more
22    than $50,000 as an accurate prediction?
23  A  I don't know.  I can't put a number on it
24    because I didn't see the invoices.
25  Q  For the use of the XPS machine, am I correct

Page 163

1    that someone would have to pay for that time
2    or usage as well?
3  A  I don't know the details of that arrangement
4    with the XPS with Dr. Rogers.  I can't speak
5    to that.
6  Q  The unstabilized polypropylene control, is
7    that contained within the file that says
8    polypropylene standard MSDS?
9  A  You were interested about the source?
10  Q  Yes.
11  A  Yes, I believe that it is, and I'm going to
12    look at it right now.  So this is the file,
13    polypropylene standard MSDS, and I'm clicking
14    on this link.
15       Okay.  This is an MSDS.  I believe it is
16    the polypropylene standard.  If you see the
17    ingredient, it says isotactic polypropylene
18    at 100 percent.  So this would be the
19    unstabilized polypropylene control.  It was
20    purchased from Scientific Polymer Products,
21    Incorporated, and that would be the MSDS for
22    that material.
23  Q  And this is the pellets that you were talking
24    about?
25  A  Yes.

Page 164

1  Q  These aren't the same pellets that are used
2    in the TVT device, correct?
3  A  Not to my knowledge.
4  Q  What is isotactic polypropylene?
5  A  That is just a reference to the structure of
6    the polypropylene.  Most polypropylene is
7    sold commercially.  And my understanding is
8    isotactic is the most common isomer.  I will
9    say to my knowledge that polypropylene used
10    to make Prolene is also isotactic, if that
11    helps.
12  Q  Are you certain of that?
13  A  Pretty certain.  I believe that's the case.
14  Q  Section 9 has different physical and chemical
15    properties of this unstabilized polypropylene
16    control?
17  A  Section 9, yes.
18  Q  Do you know if these properties are in any
19    way different than the polypropylene pellets
20    that are used in the TVT device?
21  A  Could you ask that again?  I didn't catch it.
22  Q  Sure.
23       For the chemical and physical properties
24    of the unstabilized polypropylene control
25    that you used, are you aware if the

Page 165

1    properties are any different than the same
2    properties for the pellets that are
3    specifically used in the TVT device?
4  A  These properties appear to me to be very
5    similar.  If I'm looking at Sections 9 and
6    10, the melting point of 160 degrees.  This
7    is the melting point I remember for Prolene
8    from some of the internal documents, the
9    saline water is negligible.
10       If we look at stability and reactivity,
11    it also says materials to avoid, oxidizing
12    materials.  It looks very much like something
13    I would see for the MSDS for the
14    polypropylene used to make Prolene that I
15    saw.  So to answer to your question, I would
16    say it looks similar to me.
17  Q  And for the SEM test results that you --
18  A  Did you open the file?  Is that where you
19    are?
20  Q  Yeah, I was going to ask you.  The SEM test
21    results you believe showed pitting and you
22    said peeling.  Would those be found in that
23    folder PCT-168SEM?
24  A  I'm looking.  SEM, yes.
25       Did you have a question or --

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 166

1   Q  I am just trying to see, are the SEM images
2      that you referenced in that file PCT-168SEM?
3   A  I'm looking at a file TVT five week SEM PDF.
4      I'm not sure what you're asking me.  If you
5      can just ask me again what you're looking
6      for.
7   Q  The particular SEM images that you referenced
8      that you believed showed pitting or the
9      peeling?
10  A  Yes.
11         MR. KUNTZ:  I will object.  But
12      go ahead.
13  A  Okay.  So I'm looking at this.  I'm in this
14      SEM directory.  I'm clicking On TVT five
15      weeks.  There is a folder called TVT five
16      weeks, and I believe these are individual
17      files.  And then I believe this file TVT SEM,
18      TVT five weeks SEM PDF, I believe that that
19      is the file I was talking about earlier.
20         So when I open this file, I see a number
21      of SEM images of PET that show that there is
22      a pitting and flaking on the surface of the
23      TVT.  That's what I was describing earlier.
24  BY MR. SNELL:
25  Q  On the second photo -- can you look at my

Page 167

1      computer?
2   A  The second photo is called PCT168SEM007.
3   Q  Yes, that's what I'm looking at.
4   A  Okay.
5   Q  And towards the middle, that's a fiber that
6      we're looking at.
7   A  Yes, that's a specific fiber.
8   Q  Take a look towards the middle at the bottom,
9      if you can look at what I'm looking at.
10      Right here.
11  A  Yes.
12  Q  Right above the times 400.
13  A  Yes.
14  Q  And then moving directly north in the middle
15      here.  What is that?
16  A  That looks to me like an area that I would
17      call degradation, where the surface is
18      changing.  It looks like there is some
19      pitting and some residue, blistering perhaps.
20      That looks like an area of surface
21      degradation.
22  Q  In the SEM photos that I've seen in the
23      literature, those typically show cracks
24      running horizontal, correct?
25  A  That's right.

Page 168

1   Q  This does not show anything like that,
2      correct?
3   A  We don't see the cracking because we did not
4      apply -- these materials are not under
5      tension.  There is no residual strain.  So in
6      the Anderson paper 1993, they prestressed the
7      materials.  And when they did this -- and
8      they incubated them in an oxidative medium.
9      When they did this, they were able to see
10      environmental stress cracking.
11         We did not prestress the materials.
12      Again, the question was really to answer can
13      it oxidize.  So without that mechanical
14      stress, we see more of these effects of
15      peeling and blistering.  And this is
16      described in a number of papers to see
17      environmental stress cracking you need a
18      combination of three things.  One is an
19      oxidative medium, the second is a material
20      that degrades in response to that medium, and
21      the third is mechanical stress.
22         So that -- there is no mechanical stress
23      in this experiment, which would be why I
24      don't believe we were seeing the transverse
25      cracking as noticed in Clave and other

Page 169

1      papers.
2   Q  Isn't another just as plausible answer that
3      there is no proteins and biofilm on these
4      images?
5   A  Not in my opinion.
6   Q  Let me ask you, were proteins and biofilm
7      actually put on your samples of the TVT
8      device?
9   A  So I want to be specific about this term
10      biofilm.  Biofilm is a polysaccharide matrix.
11      It's deposited by bacteria.  To me that's
12      different than protein absorption.  And I'm
13      not aware of papers that are saying protein
14      absorption is causing cracking.  I mean, but
15      the biofilm to me is the polysaccharide
16      matrix deposited by bacteria.
17         Protein absorption is something
18      different, but it -- I mean, the surface is
19      degrading here is what I see in response to
20      the chemical induction is how I interpret
21      these events.
22  Q  There is no cracking in your photos of the
23      SEMs similar to those seen in the body as in
24      Clave and Costello and de Tayrac, correct?
25  A  Again, there is no cracking here because

43 (Pages 166 to 169)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 170

1      these materials were not under any mechanical
2      stress. There was no force. They weren't
3      pre-strained like in the '93 Anderson paper.
4      This is a protocol that was used in the '97
5      Anderson paper to answer the question of
6      oxidation. We didn't have mechanical
7      strengths, and that's why we're not seeing
8      cracking.
9    Q  You would agree that another plausible
10     explanation for why you don't see cracking is
11     there was no biofilm used in your testing?
12         MR. KUNTZ: Objection.
13   A  I don't agree with that.
14  BY MR. SNELL:
15   Q  Have you seen anywhere in the literature
16     during your analyses where cracking was seen
17     on an explant, and upon cleaning the explant,
18     it was determined that biofilm was the source
19     of the cracking? First of all, have you seen
20     that in the literature?
21         MR. KUNTZ: Objection. Go
22     ahead.
23   A  I believe the paper you're talking about that
24     I've seen was -- and correct me if I'm
25     describing the wrong paper, but I have seen a

Page 171

1      paper where the mesh was challenged with
2      bacteria. We have a contaminated mesh. And
3      then the SEM images I saw -- this is only 30
4      days, and this SEM image showed what appeared
5      to be a biofilm, which I would expect,
6      because it was challenged with bacteria, and
7      that biofilm showed cracks. But it looked
8      like a biofilm. It didn't look like the SEM
9      images in Clave. And some of the other
10     explanted mesh papers don't look like
11     biofilms to me.
12         We can look at that paper. It's in my
13     reliance materials. I can look for it, but I
14     believe that's the paper you're referring to,
15     and I have considered that. I believe that's
16     a biofilm. And if you wash that biofilm off,
17     it goes away, and there is no damage to
18     underlying substrate, because it's only 30
19     days. And so these events may not have
20     started happening yet, because 30 days is a
21     relative short period of time. That's my
22     explanation of the paper that I believe
23     you're referring to.
24   Q  It's the de Tayrac paper. You're aware of
25     that? There is actually images where they

Page 172

1      show the cracks. And then after they have
2      cleaned off the biofilm, you know, it was
3      clear that the filaments were fine?
4    A  Yes, but I think this is a different
5      question. I agree with what that paper is
6      saying in that -- we can pull it up and look
7      at it again. I'm going on my memory, but I
8      think it was only 30 days. And I have done
9      these experiments myself. I've contaminated
10     scaffolds and placed them in -- I just
11     published a paper on this last year -- we
12     placed it in a bone defect.
13         We come back four weeks later, and we see
14     a biofilm, and it looks a lot like that
15     biofilm. And they clean it off, and, yeah,
16     there is no damage to the polypropylene
17     because it was only 30 days. It was a very
18     short period of time. And as we've been
19     discussing from Liebert and some of these
20     other papers, we wouldn't -- scientifically,
21     polypropylene would be induced at around 100
22     days.
23         So it's not too surprising to me that in
24     30 days, the polypropylene hasn't started to
25     crack yet. That's a very early time point.

Page 173

1      That's the way I understand that paper. But,
2      again, I would be happy talk about it with
3      you, but that's my memory of that paper.
4    Q  Do we know how much the Prolene polypropylene
5      is induced at 120 days?
6    A  I think I know what you're getting at, but I
7      would like you to ask it a different way.
8      Induction time, it's an event, so we can't
9      say how much it's induced. We can say either
10     it's become induced or it has not. So are
11     you asking -- I guess I'm not sure what
12     you're asking.
13   Q  What is the significance of induction?
14   A  So it's described in many of my reliance
15     materials. But an induction -- just to think
16     of a plot, we see a small change in
17     properties. So it's oxidizing, because there
18     is adherent macrophages in giant cells, and
19     it's oxidizing.
20         And then we reach this point where the
21     reaction becomes autocatalytic, and there is
22     a very strong increase in the slope, kind of
23     like hockey-stick applied. And that change
24     in the slope, we refer to as the chemical
25     induction time. So it's an event.

44 (Pages 170 to 173)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 174

1  So to say how much it is induced, I'm --
2  I'm trying to explain why I can't answer that
3  question.
4  Q  When does that chemical induction time take
5  place with the Prolene polypropylene?
6  A  We talked about this earlier. It's difficult
7  to -- when that happens in the body is going
8  to be affected by a number of factors. But
9  it's -- I think it's unlikely that that would
10  happen in 30 days. That's very early. And
11  that's why I explained the biofilm -- it
12  could happen maybe in some conditions in 30
13  days, but I don't believe in that experiment.
14  Q  Is there a certain point in which it becomes
15  significant?
16  A  What becomes significant?
17  Q  This induction.
18  A  Well, it's an event. So at induction, there
19  is dramatic changes in physical properties.
20  But embrittlement in these events can happen
21  even before induction. But, again, that
22  experiment is just -- they have this one --
23  it only went out to 30 days, and I just don't
24  think they went far enough to see the stress
25  cracking.

Page 175

1  Q  I'm looking here, and there is a folder
2  called TVT six week SEM?
3  A  Yes.
4  Q  That would be the six-week images?
5  A  Let me open that. Let me pull it up. I
6  think that is what it is, but -- yes, that
7  would be the six-week images.
8  Q  Why were SEMs only done on some of the
9  samples?
10  A  We were limited by the number of samples and
11  just the amount of time to get this work
12  done. And so we know that, as I was just
13  explaining, once we reach the induction time,
14  that we would expect to see these significant
15  physical changes, physical degradation.
16  And when the FTIR measurements told us
17  that it was induced between weeks four and
18  five, we did SEM images at week five, and
19  then compared to the pristine sample, because
20  we were comparing the period in which it's
21  become induced. We still have the samples, I
22  believe.
23  And I think we did this really out of
24  time constraints because there was so many
25  samples.

Page 176

1  Q  Under PCT 168 XPS --
2  A  Oh, you're on the XPS now.
3  Q  I'm in a Document 11062014 PCT 168 report.
4  A  Are you looking at the XPS report?
5  Q  Yes. This is actually from Bridget Rogers.
6  A  Okay. I am pulling up the report.
7  Q  On the second page, table one, it says
8  fraction of carbon atoms bonded in the RCOOH
9  and the CO configuration?
10  A  Right.
11  Q  What is that RCOOH?
12  A  So RCOOH is the hydroperoxide group that's
13  formed when the polypropylene is oxidized.
14  It's an intermediate in that complex reaction
15  mechanism.
16  Q  And what does it mean when there is zeros in
17  this table?
18  A  So if it's a zero, that means that in that
19  particular spot she was looking at under the
20  microscope, there was no oxidized
21  polypropylene. In that particular spot, the
22  polypropylene had not been oxidized. And
23  then where we see the numbers is where we see
24  evidence of oxidation of the polypropylene.
25  Q  What does the C equal sign --

Page 177

1  A  That's a carbonyl bond. That's also a
2  reaction product.
3  Q  Why is there supposedly a carbonyl bond in
4  sample two in one week?
5  A  I'm not sure.
6  Q  That makes no sense base on the literature
7  and data as you understand it, correct?
8  A  I wouldn't say it makes no sense. I mean, it
9  could be that small regions of the
10  polypropylene are oxidized before they were
11  implanted. We have seen that in other
12  exemplars. It is possible that there is
13  oxidation on the mesh before it's even
14  implanted
15  Q  Where would that oxidation come from on the
16  mesh?
17  A  Thermal processing. When it's extruded and
18  processed at high temperatures, if those
19  antioxidants get depleted, it's not
20  surprising to me that you would see regions
21  -- we have seen it on exemplars. And I can't
22  say which meshes, but it's possible for the
23  mesh to be oxidized during processing.
24  Q  Is it your opinion that this shows the TVT
25  mesh is thermally oxidized?

45 (Pages 174 to 177)

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 178

1    A   That's not what I'm saying.  I'm saying that
2        that could be an explanation for why that
3        number is not zero.
4    Q   Another explanation could be that her test is
5        just wrong, correct?
6            MR. KUNTZ:  Objection.
7    A   I wouldn't say it's just wrong.  I would say
8        that when you look at the XPS as a whole,
9        it's consistent with the FTIR data.  We see
10       regions of oxidation, and those numbers
11       generally increase with time.  And that point
12       at one week -- yeah, there could be multiple
13       explanations for that.
14   BY MR. SNELL:
15   Q   You would not expect to see a reading at one
16       week for the CO bond, correct?
17   A   No, not if -- I mean, if it had regions of
18       oxidation, that could happen.  It could have
19       been that in that particular measurement, she
20       was looking at a region that hadn't been
21       oxidized during processing.  That can't be
22       ruled out.
23   Q   Well, what are all the possible reasons why
24       you could find this CO finding in the second
25       TVT sample at week one, besides there could

Page 179

1        be thermal oxidation that you're saying, I
2        guess?
3            Could her equipment not be calibrated or
4        running properly on that certain day?
5    A   I think that is pretty unlikely.  I think
6        that it could be that there was a region in
7        the mesh where the antioxidants had been
8        depleted and oxidized very quickly.  It could
9        have happened during thermal oxidation.  I
10       mean, those are some examples of what could
11       have happened.
12           But I don't think one data point that is
13       somewhat unexpected can be used to support
14       the notion that the method is flawed.  You
15       can't rule out that the polypropylene wasn't
16       oxidized.  You simply can't really explain
17       that data point.  There is several possible
18       reasons, and none of them is terribly
19       conclusive.
20   Q   Did you ask her why in the world, Doctor, are
21       you showing a positive finding in one week in
22       the CO bond in the second sample?
23   A   We discussed it with her.
24   Q   But what did she say about why that finding
25       was there at one week?

Page 180

1    A   She said that's what she saw.  She trusts her
2        methods.  She stands by her methods.  I'm not
3        shocked, because as I said, we have
4        sufficient oxidation in these meshes.  The
5        exemplars, you open them out of the box, and
6        in some cases, we have seen oxidation.  So
7        I'm not shocked by this.
8    Q   Is it correct that one explanation could be
9        that something was wrong with her equipment
10       on that date, with the calibration or the
11       test methods she did on that particular
12       sample?
13   A   It's a possibility, but an unlikely one.
14   Q   Did you go back and look at any documents or
15       any log books or anything like that with
16       regard to what happened during that testing
17       on week one?
18   A   We looked at -- Dr. Dunn and I and Dr. Rogers
19       reviewed a fair amount of the original data,
20       which she showed us the peaks in the XPS
21       spectra.
22           She has an algorithm for separating the
23       peaks, as described in her report, and that's
24       what she saw.  And, again, this is looking
25       through a microscope at one small spot on the

Page 181

1        surface, and she saw this region where there
2        was some evidence of oxidation.
3    Q   How small of a spot was that?
4    A   I don't know the size of the spot, but I know
5        that she does this through a microscope.
6    Q   Do you have an idea or a range?  I mean, are
7        we talking about couple of microns or 1,000
8        microns?
9    A   It's not -- you know, 1,000 microns would be
10       a millimeter.  It's not that big.  I don't
11       know the exact size of the spot.
12   Q   There were no positive findings at week two,
13       correct?
14   A   When you say positive, there was no evidence
15       -- none of the spots she looked at at week
16       two showed evidence of oxidation.  That's the
17       way I would describe that.
18   Q   And how do you explain that?
19   A   Well, because she didn't see any evidence of
20       carbon-oxygen bonds at week two on any of the
21       spots she looked at.
22   Q   On week three, there were only two findings
23       that were positive, correct?
24   A   On week three, there were two spots where she
25       saw evidence of oxidation.

46 (Pages 178 to 181)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 182

1    Q   On week three, second sample, it says 0.0088.
2        What does that mean?
3    A   Let me look at her report in a little more
4        detail and make sure I answer that correctly.
5            So table one presents the fraction of
6        carbon atoms bonded in the RCOOH and RCO
7        configurations.  So that would be -- the
8        fraction of carbon atoms for that would be 88
9        percent of the carbon atoms would bond to
10       that group is what she is reporting.
11   Q   At week four, there was only one positive
12       finding, correct?
13   A   Again, there was one spot that showed
14       evidence of oxidation.
15   Q   Do you know why she didn't have a positive
16       finding in the second and third samples, but
17       had one the week before supposedly?
18   A   I wouldn't say supposedly.  Again, we are
19       looking at individual spots.  And if you look
20       at the SEM images, you can see that there are
21       regions where there is degradation and then
22       regions where there is not.  So there are
23       regions on the surface of this polypropylene
24       that are oxidized, and there are regions that
25       are not.  And this is -- these are the number

Page 183

1        of areas that that is what she observed.
2    Q   You said you all looked at the raw data where
3        there were these peaks and things like that.
4        Where is that in this production?
5    A   I don't see that in her report.  We have that
6        data.  I'm not sure where they are.
7    Q   I'm going to request those.
8    A   Yeah, and that's not going to be a difficult
9        thing to provide.
10   Q   Has she done any statistical testing on that
11       XPS?
12   A   No.  And as I mentioned before, XPS is really
13       a qualitative tool to assess the structure of
14       the bonds.  It's telling us that we see these
15       carbon-oxygen bonds that are indicative of
16       degradation.  It is confirming the FTIR
17       findings.  We are relying on the FTIR
18       findings for a more quantitative analysis
19       where we will run our statistical tests.
20           And it's because with XPS, we are looking
21       at different spots, and we can't distinguish
22       whether it's a degraded spot or whether it's
23       a non-degraded spot.  What the XPS data
24       confirms is that there is regions of
25       degradation, and we can even see evidence of

Page 184

1        induction at week five.
2            At week five, we see these remarkable --
3        we see two spots, where now we have
4        essentially 50 percent of the carbon atoms
5        which she was looking at that are bound to
6        oxygen.  We look at these data in week five.
7        The first two samples -- in the first sample
8        and the second sample, we see a dramatic
9        increase in, so that's what --
10   Q   In the third sample, there is no increase,
11       right?
12   A   That's a region where -- well, there is some
13       carbonyl showing up, but that's a region
14       that was less oxidized than the other two.
15       That's the way I would interpret that.
16   Q   The zero means no oxidation seen, correct?
17   A   Well, I think we have to -- as Dr. Dunn has
18       testified previously, we need to consider
19       these two peaks together, because we are most
20       entered in looking at the fraction of carbons
21       that are bound to oxygen.  That tells us
22       about oxidation.  So we do see some carbonyl.
23       And there is no COOH group in that sample.
24           And, again, it is because we are looking
25       at different -- it depends on the spot that

Page 185

1        you are looking at.
2    Q   The CO, that's the carbon oxygen, the
3        carbonyl?
4    A   The CO is a carbonyl bond.
5    Q   Right.
6            So in the first sample, there was no
7        positive finding of the CO bond at weeks
8        four, five or six, correct?
9    A   That's what it says, right.
10   Q   How do you explain that finding?
11   A   Again, I would look at this as adding
12       because these are -- you know, she is trying
13       to separate these two peaks using a
14       mathematical algorithm.  And, you know, I
15       think we have to consider both numbers when
16       we talk about whether the surface is oxidized
17       or not.  Both of those types of bonds can
18       occur on the surface.  That is the way the
19       test works.
20   Q   Even though there were, as she supposedly
21       records, RCOOH bonding, at weeks four, five
22       and six, there is no CO bonding.  That's
23       fair, correct?
24   A   That is what her analysis shows.
25   Q   And there is zeros at even weeks five and

47 (Pages 182 to 185)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 186

1    six, correct?
2    A  Again, it depends on the spot you're looking
3    at.
4    Q  Is it true or not, though, that there is
5    zeros at weeks five and six?
6    A  Yeah, that's what I just said.
7    Q  And these numbers are not consistently
8    showing oxidation across all samples at the
9    same time point either; is that correct?
10   A  That's correct.  And, again, that's because
11   of where you are looking, just like the SEM
12   images, not all regions are degraded.
13   Q  Or it could be because of issues in the test,
14   correct?
15   A  Unlikely.
16   Q  But that's a possibility?
17   A  It's always a possibility.  I mean, it's a
18   possibility of any test.
19   Q  Have you done any analyses on cadaveric
20   slings?
21   A  No.  Cadaveric slings in my understanding
22   aren't made of out of polypropylene.
23   Q  I think I would agree with that.
24       But my question is simple.  Have you done
25   any testing on cadaveric slings?

Page 187

1    A  No.  Why would I?
2    Q  I'm just asking.
3    A  Okay.
4    Q  You're reading too much into my question.
5    A  It's just this kind of came out of no where.
6    Q  Have you ever done any testing on biologic
7    slings?
8            MR. KUNTZ:  Don't do this.
9            MR. SNELL:  I'm going to come
10   back to it, I'm sure.
11   BY MR. SNELL:
12   Q  Are you aware that biologic slings can
13   degrade?
14   A  Okay.  I would not use -- your terms are a
15   little -- when you say biologic, are you
16   talking about like the autograft or the
17   allograft?  What do you mean by biologic?
18   Q  You know like a pig sling.
19   A  You're supposed to call that a xenograft.  I
20   don't know that I would use the word degrade.
21   I would prefer to use a word like remodel.
22   It's reabsorbed, you know, so the old tissue
23   in the xenograft is absorbed, and then new
24   tissue is deposited by it.  That's my
25   understanding of what you're saying, I think.

Page 188

1    Q  Have you ever investigated the
2    biocompatibility of porcine slings?
3    A  What do you mean by biocompatibility?  That's
4    a pretty controversial word.  You mean in an
5    ISO context or -- I'm not sure what you mean.
6    Q  I thought somewhere you talk about
7    biocompatibility.
8    A  Where do I talk about biocompatibility?  I
9    want to be very careful with that word
10   because it has a very evolving meaning.
11   There is an ISO 10993 biocompatibility test
12   that measures certain characteristics of the
13   device.  But biocompatibility really can be
14   best understood in the context of the
15   material and where it's being implanted.  I'm
16   not sure what you're asking about is the
17   problem.
18   Q  Have you done any analysis on cadaveric
19   slings for incontinence?  Meaning, have you
20   searched the literature to try to understand
21   whether they degrade, whether they remodel,
22   anything like that?
23   A  I have looked at that some, but not -- my
24   understanding is that there is this Burch
25   procedure where they can use autograft, I'm

Page 189

1    aware of that, where they harvest autograft,
2    There is the Lynn paper that talks about
3    harvesting autograft and then implanting that
4    as a sling.  I'm less familiar with the
5    allograft and xenograft models.  I don't know
6    where you would get allograft for something
7    like this.
8        But you're saying that there is a pig
9    xenograft --
10   Q  Sling.
11   A  I'm not so familiar with that.
12   Q  Okay.  Have you have done any research on
13   seen any literature that specifically looks
14   at polypropylene slings and determines that
15   they did not degrade?
16   A  Again, I would like to be careful about this
17   word degrade, so I'm going to answer your
18   question as best as I can.  I have seen
19   papers that report findings that the sling
20   does not degrade.
21       There is a paper by Professor Dmochowski
22   at Vanderbilt, he is a co-author on this
23   paper where they looked at -- but they didn't
24   use the types of techniques we're talking
25   about.  My understanding of this paper is

48  (Pages 186 to 189)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 190

1   degradation was assessed by a pathologist
2   from an H&E stained section. And it's not
3   clear to me that you would be able to see
4   degradation with a method like this unless it
5   were really bad.
6       So I'm aware of those papers, and I have
7   read them, and I have considered those views.
8   My concern is that they don't always use
9   these same techniques.
10  Q   What doctor was that? Was that a doctor?
11  A   Yes. He's a urologist at Vanderbilt.
12  Q   Dmochowski?
13  A   Dmochowski. That's who I'm talking about.
14  And I think you know him.
15  Q   Any other papers?
16  A   That's the one that comes to mind. I think
17  there are others too, but that is the one
18  that comes to mind. I mean, there is these
19  Nelson studies and these other papers, but,
20  again, they're not specifically looking --
21  they may report that there is no degradation,
22  but when you read the paper, it's -- well,
23  in this case, they do patient surveys.
24      So how are you going to know that the
25  mesh degraded if you're just talking to

Page 191

1   someone in a survey. So I'm aware that those
2   papers are out there, and I have a read a
3   number of them.
4           MR. SNELL: We are going to mark
5   your summary of opinions as the next exhibit.
6           (Deposition Exhibit No. 4 was
7   marked for identification.)
8   BY MR. SNELL:
9   Q   So as we go through your opinions -- and just
10  to perhaps save us a little time, these are
11  the similar or the same opinions that you had
12  at the Huskey case, correct?
13  A   Yes, most of them are. If it would help, I
14  can distinguish which opinions have been
15  modified or are different since Huskey.
16  Q   Yes, that would be great.
17      Let me ask you to look at the exhibit we
18  marked for your summary of opinions in
19  Mrs. Perry's case, and tell us if the
20  opinions have been changed or added or
21  modified as compared to your Huskey opinion.
22  A   So I believe opinions one, and two, and
23  three, four, five, those five opinions are
24  very similar to Huskey. What I would say is
25  new is the testing that we did further

Page 192

1   supports these opinions, but it doesn't
2   change them.
3       So if we look at opinion three -- and we
4   talked about this, but if we look at opinion
5   three, the antioxidants do not eliminate
6   degradation, and they do not guard
7   indefinitely against oxidative -- this is --
8   the testing is relevant to this opinion. But
9   other than that -- again, it's the same
10  opinion. I'm just saying that the testing
11  further supports it. It doesn't change the
12  opinion.
13  Q   The testing you're referring to is the
14  testing that we've been looking at?
15  A   That we've just discussed, yeah.
16  Q   And that's pertinent to opinion number three
17  about the antioxidants?
18  A   I would say it's really pertinent to all
19  five, but most specifically of opinion three
20  I would say. Opinion six, I think, is
21  similar. I did talk in Huskey about
22  Ethicon's internal documents -- I'm referring
23  to oxidative degradation.
24  Q   Which document are you talking about there?
25  A   There is the Guidon study, the eight-year

Page 193

1   explanted suture study. There is some other
2   -- the dog study even shows evidence of
3   degradation. Those are the two that come to
4   mind.
5       There is some comments in those reports
6   about scraping off material that appeared to
7   be degraded polypropylene on the basis of its
8   melting point and appearance, and
9   environmental stress cracking in the sutures.
10  All of that was discussed in Huskey.
11  Q   In the Guidon eight-year explant suture study
12  that you referenced, when did those findings
13  of dyspareunia show?
14  A   When did those findings of dyspareunia -- see
15  that. You're being cheeky now.
16  Q   Yeah.
17      In the Guidon finger explant suture,
18  that's the vascular graft?
19  A   That's right.
20  Q   All right. At what point did the positive
21  findings that you relied on show up on that
22  study?
23  A   So it was the eight-year time point where the
24  surface cracking became -- I think there was
25  some cracking observed at earlier time

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 194

1    points, but in eight years, I remember it
2    being very severe.
3  Q  And the dog study, at what point in time did
4    any of those findings become significant?
5  A  I would have to look at the documents again,
6    but my latest review of them, it was -- what
7    I remember is the conclusion from the study
8    is that the cracking became worse with time,
9    up to seven years.  Again, that was all
10   discussed in Huskey.
11 Q  I didn't see that.  I don't know if you
12   focused on the timing.
13 A  Okay.  Well, I just read this last night when
14   I was preparing, and I remember some
15   statements saying that the cracking appeared
16   to get worse.  We can pull it up if you want
17   to talk about it.
18 Q  Yes, let's just pull it up.  I just want to
19   understand what you're talking about.
20      It would be under reliance documents?
21 A  I believe it would be.
22 Q  Do you remember how you had it labeled?
23      MR. KUNTZ:  Do you want to ask
24   some questions about it?
25      MR. SNELL:  Yes, just that one

Page 195

1    question about the time point.
2       MR. KUNTZ:  You can use my copy,
3    but I don't want it marked as an exhibit.  It
4    has highlights on it.  I mean, just to speed
5    things up.
6       MR. SNELL:  That's fine.
7       (Off-the-record discussion.)
8  BY MR. SNELL:
9  Q  Okay.  Go ahead.
10 A  I'm just going to give you some points here.
11   So there is -- my understanding is that this
12   dog study was designed to be a ten-year
13   study.  There was a five-year report that was
14   issued.  In five years, two out of the seven
15   Prolene explants revealed cracking in five
16   years.  And then there is some SEM images
17   here that show those explants, and I can see
18   the cracking that they're referring to in two
19   of those explants.
20      I would say that at least in the image I
21   have it's difficult to tell, but it looks
22   like there is a third one that might be
23   showing some evidence as well.  This is what
24   I can see in these micrographs that are not
25   terribly clear.  That was the five-year time

Page 196

1    point.  Now, I'm looking at the seven year
2    time point.  And the conclusions I am reading
3    here, the seven-year in vivo results
4    generally substantiated the five-year
5    findings, degradation in Prolene is still
6    increasing.
7       So the way I interpret this is from year
8    five to year seven, the degradation is
9    progressing, but I don't see any SEM images
10   here.
11 Q  Do you know from that study when the cracking
12   first appeared, besides in five years?
13 A  A few time points I have is five years and
14   seven years is what's shown in this study.
15   And then the fact that it got worse from year
16   five to year seven, and that's what is
17   reported in this study.  And that's what I am
18   relying on for this opinion.
19 Q  That study doesn't establish that the
20   cracking was there at, say, three years?
21 A  It doesn't establish it was there at three
22   years because there was no three-year time
23   point.
24 Q  All you know is that at five years, two out
25   of the overall sample had some cracking?

Page 197

1  A  That's right.
2  Q  So you were looking at your list of opinions,
3    and you had talked about number six.  And
4    number seven?
5  A  So number seven, Ethicon ignored the warning
6    contained in the MSDS for the polypropylene
7    use in its products.  It says the strong
8    oxidizing agents, like peroxides, are
9    incompatible with the polypropylene to the
10   detriment of patients implanted with the
11   mesh.  So the MSDS warns that polypropylene
12   is sensitive to oxidation.
13      Again, our testing plays into this
14   because our testing has shown that even with
15   the antioxidants, it can oxidize.  They don't
16   protect it forever, as I've wrote in opinion
17   three.  And this is a detriment to patients
18   implanted with the mesh for two reasons.
19      One is, we've seen that oxidation
20   degradation  can lead to embrittlement, pain,
21   and complications, as I have testified, with
22   Costello and Clave and Huskey in previous
23   testimony, and it increases the risk.  It's
24   unpredictable, so it increases the risk to
25   the patients.  It's a risk that they have to

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 198

1    live with for their entire lives because the
2    device is there.
3        And as long as it's there, it's going to
4    be -- this reaction is ongoing. That's
5    opinion five. And it's important that the
6    antioxidants say don't protect it forever.
7  Q  That's basically the same as what you
8    expressed in Huskey?
9  A  I believe it is. I just wanted to qualify
10   that I do believe that the testing data has
11   some impact on that opinion, and we've been
12   discussing that. But it's a similar opinion
13   to that held in Huskey.
14 Q  What about number eight?
15 A  Number eight, I think, is also similar to
16   Huskey.
17 Q  In Huskey, as I recall it -- I mean, the
18   primary studies and documents that you
19   referred to and relied upon were the dog
20   study, the vascular suture graft study,
21   Clave, Costello?
22 A  Yes.
23 Q  The other one you mentioned today, Liebert,
24   is that another one that is important to your
25   opinions?

Page 199

1  A  Yes, all of those studies that we've
2    discussed.
3  Q  Okay.
4        MR. KUNTZ: I'm just going to
5    object. We have provided everything to you
6    he has relied on. It's not a memory test to
7    point out every single document, but I think
8    I understand your question.
9  A  I testified that on those at Huskey, and my
10   opinion has not changed in that regard.
11 BY MR. SNELL:
12 Q  And so I'm not going to recover those things
13   with you.
14 A  That would be great.
15 Q  You're not offering any medical or clinical
16   opinions with regard to Mrs. Perry at all; is
17   that correct?
18 A  That's correct.
19 Q  That would be totally outside your expertise,
20   correct?
21 A  Medical and --
22 Q  Clinical?
23 A  Medical and clinical? Just for the record, I
24   would not say it would be outside my
25   expertise to test the explanted mesh and

Page 200

1    provide evidence of oxidation and degradation
2    and conclude that that contributed to the
3    embrittlement of the mesh. That could be
4    done. I did not do that in this case. I
5    didn't have the materials, but I don't want
6    to -- I would say from -- I don't -- maybe to
7    give you a better answer, I am not reviewing
8    medical records and --
9  Q  You're not doing a differential diagnoses and
10   drawing causal relationship inferences?
11 A  Not in this case, no.
12 Q  Nor in general, correct?
13 A  I have testified that -- again, I saw
14   evidence of myeloperoxidase, which was
15   evidenced to me that these oxidative
16   processes are ongoing. That would lead to
17   changes in the polypropylene. So in terms of
18   -- you had a question?
19 Q  The myeloperoxidase is not something you have
20   done on an Ethicon mesh?
21 A  That's correct.
22 Q  It's not something you have done on an
23   explant from an Ethicon patient to your
24   knowledge?
25 A  To my knowledge. It may be in

Page 201

1    Dr. Iakovlev's, but I don't know.
2  Q  And you understand that doctors are the ones
3    who actually do differential diagnoses and
4    draw conclusions about what complications
5    patients have?
6  A  Could you explain differential diagnosis,
7    please?
8  Q  Let me ask you, do you know what a
9    differential diagnosis is?
10 A  Not precisely, I don't thinK. So I suppose I
11   wouldn't do that. I mean, it sounds like a
12   medical term to me.
13 Q  Opinion number nine, explain that opinion to
14   me. Clearly, this is different.
15 A  So after reviewing all of the Ethicon
16   documents and some published papers, my
17   conclusion was that this TVT Abbrevo mesh is
18   stiffer. There are several e-mails from
19   inventors of the mesh, such as Dr. Della
20   Valle, Dr. Nelson, that observed this
21   increase in stiffness, complained about an
22   increase in complications, asserted that this
23   mesh was different, and you could not rely
24   upon TVT machine-cut mesh data to support the
25   notion that TVT Abbrevo is the same.

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 202

1    I reviewed mechanical testing done by
2  Ethicon, and an effort by Dr. Kammerer, I
3  believe, who is a fellow at Ethicon, who
4  basically replotted some of those data and
5  argued from Lynn that the mesh is subject to
6  the very small forces in this environment.
7  And when you compare over that very small
8  force range, he reported that the elongation,
9  the mechanical properties are the same.
10   I do not think this is a good way to
11 approach the problem.  I think you would have
12 to consider as in the paper by Dietz, where
13 he went out to 80 percent, something -- okay.
14 So with the original Ethicon testing, they
15 went to 14 or 15-percent elongation.  The
16 Dietz paper went out to maybe 80-percent
17 elongation.  And at those higher elongations,
18 there are significant differences, stiffness
19 of TVT machine-cut and TVT laser-cut.
20   Dr. Kammerer only plotted the data over a
21 range of up to about a 4-percent strain
22 elongation, and that was just a very limited
23 range.  He concluded that they were similar,
24 but I questioned the physiological relevance
25 of his approach in asserting that Lynn could

Page 203

1  be used to support that assumption.  That's
2  my opinion.
3    So the mesh, I believe, is stiffer.  And
4  the decision was made to use the TVT
5  machine-cut data that is for the laser-cut
6  product even though it was different.  That's
7  my opinion on number nine.
8  Q  So you looked at the e-mails where
9    Dr. Della Valle or others may have written in
10   comments about the mesh being stiffer,
11   correct?
12 A  I reviewed those e-mails, yeah.
13 Q  So you read those the e-mails, and you
14   basically took as what they said to be as
15   true, right?
16 A  I read as much as I could read.  I read a lot
17   of documents.
18 Q  How about this, what independent testing did
19   you do, if any, to confirm or not confirm
20   the supposed higher level of stiffness of
21   the mesh?
22 A  Well, honestly I felt like I didn't need to
23   do independent testing.  This is Ethicon data
24   that they relied on to make decisions.
25   That's what I'm criticizing.  I'm criticizing

Page 204

1    the decision-making process, not -- I did not
2  test these meshes mechanically.  I'm making
3  this opinion on the basis of Ethicon
4  documents where they chose -- they
5  deliberately selected different ranges over
6  which to view the mechanical data.  That's
7  what I'm questioning.
8  Q  Well, I'm going to get to that.  My focus is
9    on the e-mails.
10     Basically, what you did is you looked at
11   some e-mails that some people wrote, and you
12   adopted what they said, correct?
13 A  Well, what do you mean I adopted what they
14   said?
15 Q  Did you assume what was written on the paper
16   was accurate or true?
17     MR. KUNTZ:  I'm just going to
18   object.
19 A  I'm still not getting it.  I mean, there was
20   statements by these surgeons that said it's
21   not the same.
22 BY MR. SNELL:
23 Q  Okay.  This is what I am just asking -- maybe
24   I'm making it too complex.
25 A  Okay.  I'm just not getting something.

Page 205

1  Q  You saw some statements in an e-mail?
2  A  Yes.
3  Q  And you read them and what they meant to you,
4    right?
5  A  Yeah.  It seemed like a straight forward
6    statement.  And I read it and that's what it
7    said, so I just --
8  Q  You didn't apply any further analysis to this
9    statement?
10 A  What further analysis would I have applied?
11   It is just what it said.  There were multiple
12   e-mails and there was an e-mail chain.  I
13   read the question, and I read the response,
14   and I -- I mean, I did my best to review it,
15   but some of these comments were rather blunt
16   and direct, so it was --
17 Q  So you interpreted the statements without
18   doing any testing of their veracity or -- of
19   the points?
20 A  I don't know how to test their veracity.  It
21   just -- I mean, there were multiple
22   statements and there were multiple e-mails
23   that seemed to -- among Ethicon employees
24   that addressed this as a concern, so it just
25   wasn't one e-mail.  It was -- there seemed to

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 206

1    be many documents posing the question is TVT
2    machine-cut the same as TVT laser-cut Abbrevo
3    -- laser-cut versus the machine-cut.
4        There were numerous opinions and
5    documents going back and forth. Many were
6    questioning this decision. Others were
7    promoting it. There was -- it looked like a
8    fair amount of descension until Dr. Kammerer
9    did his analysis, and then what appeared to
10   me is that the decision was taken that these
11   products are the same.
12       So I read a lot of documents to form
13   this. I mean, if there is another one you
14   would like me to read, I would be happy to
15   read it. That's why I'm here. But this is
16   what I read, and this is what I saw, and this
17   is the opinion I came to.
18   Q  I mean, these were basically e-mails written
19      by other people who wrote into the company.
20      And that's what you looked at, correct?
21   A  Yes, but some were internally e-mails between
22      -- conversations between Ethicon employees
23      and Europe and North America and --
24   Q  Fair enough.
25       These are people writing e-mails to other

Page 207

1    people, correct?
2    A  Yes.
3    Q  The laser-cut and the mechanical cut mesh,
4       they are the same mesh, correct?
5           MR. KUNTZ: Objection.
6    A  I would say they are cut from the same
7       Prolene mesh, but I would not say that they
8       are the same mesh. One has cut edges with a
9       machine, the other has a cut with a laser.
10      That's not the same to me. But if you want
11      to say they're prepared from the same source
12      mesh, I believe that's correct.
13   BY MR. SNELL:
14   Q  Both of the meshes are made of the same
15      Prolene polypropylene, correct?
16   A  That's my understanding.
17   Q  And it's the same mesh that goes through all
18      of the same extrusion and manufacturing
19      processes up until the point when it's cut to
20      your understanding, correct?
21   A  That's my understanding.
22   Q  Right.
23       The only difference is the edges of the
24   strip of tape, one is cut mechanically and
25   one is cut with a laser, correct?

Page 208

1    A  That's the difference -- to my understanding,
2       that's the only difference in how they are
3       manufactured, but that could introduce
4       differences -- well, okay.
5    Q  But they are the same in that respect,
6       correct?
7    A  The same in what respect?
8    Q  That they are the same up until the point
9       when they decide to cut the edges of the mesh
10      either mechanically or they do it with
11      laser, correct?
12   A  I understand, yeah.
13   Q  Is that correct?
14   A  I believe so. I mean, I don't have the
15      details of how these are --
16   Q  So if we have two pieces of mesh, this is
17      mechanical, this is laser, is there any
18      difference in the mesh that is running down
19      the middle?
20   A  I don't know. That has not been tested. All
21      I can say is that they are cut differently.
22      What affect that has on the mesh in the
23      middle, I don't know that that's been tested.
24   Q  They are knitted the same, right?
25   A  Yeah, but that cutting operation could change

Page 209

1    something. I just don't know and it's not
2    been looked at.
3    Q  Well, Dr. Kammerer looked at it, right?
4    A  No. Dr. Kammerer, I don't believe he
5    actually did any testing. I believe Dr.
6    Kammerer took data from previous experiments
7    and replotted them over a different range of
8    elongation. That's what I believe he did
9    from the documents I saw.
10       I didn't see -- all I saw in his report
11   was that he noted that he was using data from
12   other reports. I didn't see like he actually
13   did do measurements. That was my
14   understanding.
15   Q  The elongation of the mesh, the
16   mechanically-cut and the laser-cut, were the
17   same at out to I believe it was 5 percent.
18   Do you have the document?
19   A  It would help if we had the document. I was
20   going on my memory. I believe it was 4
21   percent maybe. It was not very many. I
22   believe it was 4 percent. It would help if
23   we had it. I don't know if it's on the disk
24   or, I mean, how easy it would be to find.
25   Q  It will be on there. I'm sure if you'd look

53 (Pages 206 to 209)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 210

1    at it, it's on there.
2              MR. KUNTZ:  What are you looking
3    for again?
4              MR. SNELL:  Kammerer's paper,
5    the elongation testing.
6              MR. KUNTZ:  Which one?
7              MR. SNELL:  The analysis he did
8    on elongation of the laser-cut versus the
9    mechanical-cut.  I want him to be able to
10   look at it.
11             (Off-the-record discussion.)
12   BY MR. SNELL:
13   Q  Have you ever tested the forces in the
14      pelvis?
15   A  No, I have not.
16   Q  What is your basis for saying that the
17      reliance on the Lynn period paper is wrong?
18   A  Okay.  So there is another -- okay.  There is
19      another e-mail by Dr. Kammerer, where he
20      comments that the elongation on the mesh
21      could be as high as 50 percent when it is
22      implanted.  And, obviously, if the mesh is
23      elongated when it's implanted, that's going
24      to move you down the force-distance curve.
25             And the other point about Lynn is that

Page 211

1    what Lynn was really measuring was a
2    differential force.  So Lynn was measuring --
3    so the patients were grafted with this what
4    looked like the autograft fascia sling, and
5    he was measuring the force when they cough
6    with a full or empty bladder.  That is a
7    differential force.  You don't know what the
8    initial force or tension of the elongation of
9    that sling was.
10             And the differential forces that he was
11      measuring were so small.  They are something
12      in the range of .1 to .2 pounds.  I mean,
13      that's like taking the meat patty from a
14      junior cheeseburger and hanging it on -- I
15      mean, we are talking forces that are really
16      small.  And that's a differential force on a
17      sling when somebody coughs.
18             It just doesn't seem very plausible to
19      me.  It's a very small force.  If the sling
20      is elongated up to 50 percent, when it's --
21      then it's got some strain, and you don't know
22      what that is.  But that's going to make the
23      stiffness higher if you're moving down that
24      force-stiffness curve.  That's what I'm
25      saying.

Page 212

1              Does that make sense?
2    Q  This is the sling under the urethra, correct
3    A  Yeah.
4    Q  Do you know the size of the urethra?
5    A  Probably pretty small.
6    Q  So that low number, that small number -- do
7       you understand that?  Do you know whether
8       that is consistent or inconsistent with basic
9       anatomy and physiology of the urethra, in the
10      support structures lying underneath the
11      urethra?
12   A  It just seems to me that the sling in that
13      study is different from the slings that are
14      being used as the TVT.  It's placed
15      differently.  I just don't know that you can
16      make that same extrapolation, that the force
17      on that autograft sling when somebody coughs
18      is the same.  It just seems --
19   Q  Do you know that you can't?  I mean, have you
20      done any testing or done any research that
21      ever shows that one cannot do that?
22             MR. KUNTZ:  Objection.  From
23      what he has already said?  From what Kammerer
24      has already said?  I just want to make sure
25      we're clear.

Page 213

1              MR. SNELL:  No, I'm asking him.
2    He says he doesn't know.  Well, what I'm
3    asking you is --
4              MR. KUNTZ:  He just referred to
5    Ethicon's own document, where Gene Kammerer
6    said it was different.  Besides that?
7              MR. SNELL:  No, he didn't.
8              MR. KUNTZ:  Yeah, he did.  He
9    said his e-mail -- yes, he said exactly that.
10   And now you're trying to say that he didn't.
11   A  I'm saying that Dr. Kammerer said that when
12      you implant a sling, it can elongate as much
13      as 50 percent.  And 4 percent -- I mean, I've
14      seen these slings.  For 4 percent, that's
15      like -- 4-percent elongation is like folding
16      it out of the box.  I mean, it's such a small
17      amount.
18             When you install it, it could be 40 or
19      50-percent strain, and that moves you much
20      further down that stress-strain curve where
21      these materials become very, very different.
22      That is Dr. Kammerer's email.  And then he
23      takes this paper from Dr. Lynn that says,
24      well, actually, the differential -- he
25      doesn't even call it a differential force, so

54 (Pages 210 to 213)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 214

1　　that's what it was, because he doesn't know
2　　the initial force on that sling.
3　　　　He just knows that when somebody coughs
4　　and exerts an additional force, that force
5　　was in the range of half a newton.
6　BY MR. SNELL:
7　Q　How do you know what Dr. Kammerer knows?
8　A　Well, that's what he wrote.
9　Q　Well, you just testified that he didn't know
10　　something.  How do you know that?
11　A　What did I say?  I don't know what I said he
12　　didn't know.  I don't know.  He said that
13　　when you implant the sling, it can extend,
14　　it can elongate as much as 50 percent.  Well,
15　　that's a lot more than 4 percent.
16　Q　Do you know what that was in the context of
17　　and what type of testing that was in the
18　　context of?
19　A　In my understanding of reading that e-mail,
20　　that was in the context of the procedure, of
21　　implanting the sling.
22　Q　The 50-percent elongation testing you've seen
23　　done, they didn't even have the sheath on the
24　　mesh; is that correct?  Do you know what I'm
25　　talking about?  Have you seen 50-percent

Page 215

1　　elongation testing?
2　A　I'm not talking about testing.  In
3　　Dr. Kammerer's e-mail, he talked about with
4　　the meshes and the procedures he's observed,
5　　the mesh can elongate up to 50 percent.  That
6　　was, I think, the language that he used.  So
7　　that tells me when it is being implanted,
8　　it's elongating.  It's no longer -- it's not
9　　4 percent.  I mean, he is saying it could be
10　　up to 50 percent.  That is a much bigger
11　　number than meaning 4.  So I'm questioning
12　　how he got this -- he basically took this
13　　number of 4-percent strain, which is very
14　　low, so he could argue that -- that's what it
15　　looks like, that he could argue that over
16　　that very small strain that these meshes are,
17　　in fact, the same.
18　Q　That is your inference of what was going
19　　through his head?
20　A　That's what he said in this document.  He
21　　puts that number for Lynn out, and then he
22　　goes to that stress strain curve, and he
23　　plotted the data over that range that he felt
24　　was physiologically relevant on the basis of
25　　the findings from Lynn.  That's what he did.

Page 216

1　　That's what he says in the report.
2　　　　I mean, I can read from it if you want
3　　to, but that's to me what he said.  He used
4　　Lynn to justify that half a newton of force.
5　Q　Have you have read Dr. Kammerer's deposition?
6　A　I can't remember.  I don't know.  I don't
7　　remember anything specific from his
8　　deposition.
9　　　　Well, I would be interested to --
10　Q　You would be interested to what?
11　A　No, I'm just --
12　　　　MR. KUNTZ:  I would be
13　　interested why we got that e-mail after his
14　　depo, but we can take that up with somebody
15　　else.
16　BY MR. SNELL:
17　Q　Item number ten, I think this was something
18　　that was in Huskey, but you tell me if I'm
19　　wrong.
20　A　There is an element to that.  What's new here
21　　would be referring to this laser-cut versus
22　　machine-cut.  I don't believe -- to my
23　　knowledge, the studies that were done were
24　　this mechanical testing that I was referring
25　　to.  There was a 14-day rabbit study where

Page 217

1　　they were measuring the infiltration, and
2　　they were measuring pull-out strength, but it
3　　was a very short time point, only 14 days.
4　　　　And then there were e-mails from some of
5　　these clinicians saying that we can't -- you
6　　just can't use TVT machine-cut clinical data
7　　to support TVT machine-cut, the notion that
8　　the TVT laser-cut would perform the same,
9　　because the meshes are different.  And I
10　　don't think they did enough testing to
11　　establish whether they were different or not.
12　　I would have liked to have seen more testing
13　　to establish that fact.
14　Q　What testing was done?
15　A　What testing was done?
16　Q　That you're aware of.
17　　　　Well, let me back up.
18　A　Okay.
19　Q　Did you do a PubMed or any other kind of
20　　search to see what clinical literature there
21　　was on the Abbrevo or laser-cut and
22　　mechanical-cut meshes?
23　A　I think there is some study on TVTS, which is
24　　a -- but that product is off the market now.
25　　I was relying heavily on these Ethicon

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 218

1    documents, what they did, and the conclusions
2    that they drew from the testing that they
3    did.  And I just thought that it wasn't -- it
4    wasn't enough.  It wasn't convincing from the
5    way that the whole Kammerer conclusions were
6    drawn to a 14-day rabbit test.  There should
7    have been more preclinical testing.
8        I mean, why did they not file a new
9    510(k)?  That could have been a relatively
10   straight forward thing to do.
11       But to my knowledge, they didn't even
12   file a new 510(k) for the laser-cut mesh.
13   They  just said it's the same without really
14   enough testing to reach that conclusion.
15   There was a process change that was just made
16   and never really validated.  That's what that
17   opinion  was saying.
18   Q   The e-mails from the clinicians, that's the
19       same ones we talked with about with regard to
20       opinion number nine?
21   A   Yeah.
22   Q   And the 14-day rabbit study?
23   A   That's what I remember.  I think there was a
24       14-day rabbit study.
25   Q   Do you know if that is the type of study that

Page 219

1    is normally done in the industry to assess
2    pull-out force?
3    A   That was my understanding.
4    Q   Have you have ever conducted that type of
5        study?
6    A   I have not.  And I think that answers one
7        question about pull-out force, but I don't
8        know that that addresses his question of
9        differences in stiffness between the mesh.
10       And then these clinicians are saying that
11       they are seeing more complications.  So there
12       were clinical warnings coming back that this
13       -- that something seems different here.
14   Q   Are you a regulatory expert, such that you
15       can cite to any regulations right now that
16       say that Ethicon should have filed a 510(k)
17       specific to laser-cut mesh?
18   A   I'm not -- I have a working knowledge of FDA
19       approaches.
20   Q   If you're going to offer an opinion about a
21       510(k) --
22   A   Let me think about it for a minute.  I know
23       where you are going with this.  I just --
24       Let's see if we can work through this.
25   Q   Well, my question is, are you going to try to

Page 220

1    offer an opinion that a 510(k) should have
2    been filed for laser-cut?  Because if you
3    are, I want you to tell me --
4    A   I know what you want me to tell you.
5    Q   -- the regulations, and I want you to tell me
6        exactly what documents they should have
7        looked at.  I want you to basically sit there
8        and be a regulatory expert.
9    A   I get it.
10          MR. KUNTZ:  He will not be
11       giving that opinion.
12   BY MR. SNELL:
13   Q   Can you tell me you're not going to give
14       that opinion and then I can move on?
15   A   I'm upset about what was done.  But so we can
16       move on, I'm not going to give that opinion
17       as a regulatory expert.  There were just
18       things that concerned me, but I'm not going
19       -- okay.  I will retract that.
20          MR. SNELL:  Jeff, he is not
21       going to get up at trial --
22          MR. KUNTZ:  He's not going to
23       give a 510(k).
24   A   I'm not giving a 510(k) opinion.
25          MR. KUNTZ:  That's what you want

Page 221

1    to know.
2    A   I'm not giving a 510k opinion.
3    BY MR. SNELL:
4    Q   Because that's a whole other issue.
5    A   I know.
6    Q   There is nothing in your disclosures that say
7        he is a regulatory expert and he's talking
8        510(k)'s.
9    A   I just have enough knowledge of this that I
10       saw things that disturbed me, but I'm not
11       going to give that opinion as a 510(k)
12       expert.  I will stick to what I told you.  I
13       will reign myself in.  You are provoking me a
14       little bit.  I'm not frustrated.  I'm just --
15   Q   You know what they say, some knowledge is
16       dangerous.
17   A   I'm going to stay within the scope of my
18       opinions that are written here.
19   Q   Thank you.  I would like that.
20       Okay.  Are there specific scientific
21       studies that Ethicon would have done that
22       you are going to say would have produced some
23       type of clinically or statistically
24       significant difference as between the meshes?
25   A   I would have liked to see a longer term

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 222

1    implantation test than just 14 days. I think
2    if there were differences in stiffness, you
3    might have seen it in 90 days, but even
4    longer periods would have been -- this mesh
5    could have been tested in preclinical models
6    more relevant to the vaginal wall. So there
7    is something new in my reliance materials.
8        There is an abstract by Deprest,
9    D-E-P-R-E-S-T. That was published in 2013.
10   It's in the reliance materials, where they
11   had a large animal model where they compared
12   mesh in the abdominal wall to mesh in the
13   vaginal wall, and they saw eightfold more
14   contraction in the vaginal wall.
15       So I think these studies could have been
16   done by Ethicon to assess these differences.
17   I think they could have interpreted their
18   own mechanical data more conservatively. We
19   already discussed that, so I don't want to
20   bring that up again, but those are the
21   studies. But more preclinical studies and a
22   more thoughtful evaluation of their own
23   mechanical data is what I would say.
24   Q  You're not saying that Gene Kammerer, who has
25   got 40 years of experience, is incompetent,

Page 223

1    you just disagree with -- let me just finish.
2    You're not saying he is incompetent, you just
3    disagree with what he did?
4    A  He might be too confident. What he did was
5    -- I don't like it. I don't like the way
6    that he handled the mechanical data to say
7    that everything was the same. I think that
8    was a flawed approach. I'm not saying he is
9    incompetent. I don't like the way he
10   approached that problem. I shouldn't say
11   don't like. I disagree with it.
12   Q  But you have not conducted any independent
13   testing or analyses that would show what he
14   did was incorrect?
15   A  I have not done any other testing. I was
16   relying on Ethicon documents at the time of
17   testing.
18   Q  This Deprest 2013 paper, what type of animal
19   model was that? Was that a pig?
20   A  It was a sheep. It is an abstract, I
21   believe, in the IUGA meeting in 2013. It's
22   in the reliance materials. That's new.
23   Q  Do you know whether the laser-cut mesh has
24   ever been subjected to testing in a sheep?
25   A  I don't know if there was testing in that

Page 224

1    model. I don't know.
2    Q  Would it surprise you to learn that laser-cut
3    mesh has been tested in sheep?
4    A  In what model?
5    Q  The sheep model.
6    A  You mean on a wall model? On a subcu model?
7    Where in the sheep was it tested?
8    Q  I guess my question is, would it surprise you
9    if you learned that it was done?
10   A  Would it surprise me? I know that there was
11   a lot of testing done. I wasn't aware of the
12   study that tested in the vaginal wall. If
13   it's a subcu test, then, again, that's a
14   different environment. The interesting
15   aspect of the Deprest study to me was that
16   they looked at differences -- which they
17   asked the question, is it different in the
18   abdominal wall versus the vaginal wall.
19       And I haven't seen a document that -- I
20   mean, I would be happy to look at it if
21   you've got one, but I haven't seen that.
22   Q  This study by Deprest, how big of a size of a
23   mesh was implanted? Do you know?
24   A  I can't remember the details from that. It's
25   in the abstract. I don't know.

Page 225

1    Q  Do you know how they implanted it in the
2    vaginal wall?
3    A  I can't remember how they did that.
4    Q  It wasn't a sling put between the vagina and
5    the urethra?
6    A  I don't believe it was a sling. I believe it
7    was more -- I just would have to look at it
8    again to remember it, but I don't believe it
9    was a sling. I think they implanted the
10   piece of mesh, but I can't remember the
11   details of how they did that.
12   Q  Do you know when was a sheep model where
13   implantation in the sheep's vagina was first
14   perfected?
15   A  I really don't understand. You mean as a
16   sling or you mean as like an implant? I'm
17   not sure what you mean.
18   Q  As a model. Usually animal models, right,
19   you just don't come up with some theory and
20   do the model. Don't you have to test models
21   before you actually do them?
22   A  Yeah. I mean, I work with colleagues where
23   we design new models for bone healing.
24   Q  Is there a way to validate models? I guess
25   that's what -- I'm kind of getting towards,

57 (Pages 222 to 225)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 226

1    that area.
2    A  Yes.  So if you want to validate a functional
3       model, that's a different question.  I think
4       what they did in this study is they just
5       implanted it adjacent to the tissue.  I don't
6       think it was intended to be a functional
7       sling model.
8          They were just asking the question, well,
9       if I implant it here at the hernia abdominal
10      wall versus here in the vaginal wall, do I
11      see differences in cellular infiltration and
12      contraction and those kinds -- it wasn't a --
13      this abdominal wall model has been around for
14      a while, right.  So I think what they did
15      that was different is they implanted it in
16      the vaginal wall as well.
17   Q  It wasn't validated, though, as between the
18      vaginal wall of the sheep and the abdominal
19      wall of the sheep?
20   A  I don't know what you mean by validated.
21      When I think of validation, that's like a
22      functional model that you have to validate to
23      make, so if you wanted to make a sheep sling
24      model, you would have to validate that.  I
25      understand that, but I don't think that that

Page 227

1    is what they did.
2    Q  This wasn't a validated sheep model study?
3    A  I would say it wasn't a validated sling
4       model.  They weren't modeling the sling in
5       the sheep and trying to draw some conclusion
6       about how the sling would act in a human.  I
7       think they were just asking a question, how
8       would this mesh infiltrate in these two
9       different environments.  That's what that
10      model was, which I think is a legitimate
11      thing to do.
12         People have been implanting -- there is a
13      number of rat abdominal wall models in other
14      rodents and large animals.  I don't think
15      that is a -- I think that is a good approach.
16   Q  Have you ever seen it done before,
17      implantation of mesh in a sheep or a large
18      animal's vagina?
19   A  That's the first I have seen it, but there
20      may be other studies.
21   Q  Did you do any investigation to see whether
22      the findings were consistent or inconsistent
23      with other testing or whether anyone had
24      tried to do that before?
25   A  I have looked for other studies and that's

Page 228

1    what I've found.  I haven't -- well, I have
2    looked.  That's what I know right now.
3    Q  So have we discussed ten?
4    A  I don't have anything to add to ten.
5    Q  And 11 is similar to number ten -- or how is
6       that different from anything you talked about
7       in Huskey?
8    A  Let me read it for a minute.
9    Q  Sure.
10   A  I think the point in 11 is that when I say
11      did not consider -- I think there is a lot of
12      overlap with Huskey.  They do not consider
13      principles of biomaterial science by not
14      testing it in an oxidative environment using
15      a known test that was known since the early
16      90's.  Even though they knew and from their
17      own studies, they saw evidence of oxidation
18      and degradation, they never tested it.
19         So to me, biomaterial science, if I know
20      something is susceptible to oxidation, I need
21      to test that and assess it.  And I guess what
22      would be new here is that, you know, we have
23      tested that.  In one exemplar of TVT mesh, we
24      found that it can't oxidize.  And that test
25      could have been done by Ethicon.  That is

Page 229

1    what I'm saying in 11 that is new.
2    Q  You're saying that test could have been done
3       by Ethicon?
4    A  Yes.
5    Q  But somebody at Ethicon would actually have
6       to believe that this cobalt study that you
7       referenced and the solutions are what
8       actually occurs from macrophages at an
9       unknown concentration in the body, correct?
10              MR. KUNTZ:  Objection.
11   A  Yes.  And there is some well-trained
12      scientists at Ethicon.  Those papers have
13      been cited dozens of times and are well
14      established in the field.  They are well
15      known in the field.  Those papers were
16      instrumental in discovering the problem of
17      the instability of polyether urethane
18      catheter leads, that these leads would
19      oxidize, degrade, and in some cases fail.
20      Those products were withdrawn from the
21      market.
22         So if I were at Ethicon, and I knew that
23      story, I would be very worried about this,
24      because it's the same type of problem, a
25      chemical attack.  It's just an environmental

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

| Page 230 |
|---|
| 1    stress cracking problem, where you have an |
| 2    oxidative environment and materials sensitive |
| 3    to oxidation and mechanical forces.  All of |
| 4    those can lead to this environmental stress |
| 5    cracking in device failure. |
| 6        So if I were at Ethicon and I knew of |
| 7    those problems with those urethane catheter |
| 8    leads, one of the first things I would have |
| 9    done is tested these meshes in this oxidative |
| 10   environment so I would know. |
| 11  BY MR. SNELL: |
| 12   Q  The urethane catheters, were those Ethicon |
| 13     products? |
| 14   A  No.  But a good biomaterials scientist |
| 15     recognizes that these are two polymers that |
| 16     are sensitive to oxidation.  And I would at |
| 17     least want to know -- I would want to know, |
| 18     does it degrade, does it oxidize, does it |
| 19     degrade.  I think you have to ask that |
| 20     question when you're designing a biomedical |
| 21     device, what's the material made of and is |
| 22     that a problem. |
| 23   Q  Well, there could be folks at Ethicon who |
| 24     have relevant experience who look at the |
| 25     paper by Anderson and this cobalt solution, |

| Page 231 |
|---|
| 1    and say that test doesn't actually look like |
| 2    it or is representative of the foreign body |
| 3    reaction in the body.  I mean, couldn't |
| 4    scientists come to that conclusion? |
| 5   A  They could.  But, again, this is a |
| 6     well-accepted test that's been cited a lot |
| 7     and used a lot.  I think it should at least |
| 8     raise some questions, especially when you |
| 9     have your own studies showing evidence of |
| 10    oxidation.  So it's not only the literature, |
| 11    but it's also these own suture studies, the |
| 12    dog study, Guidon study, that showed evidence |
| 13    of oxidation that should have sent off some |
| 14    red flags, hey, this material is sensitive to |
| 15    oxidation, why don't we test it.  That is |
| 16    what I am saying. |
| 17        MR. SNELL:  Let's take a break |
| 18    here.  We've been going for a while. |
| 19        (A brief recess is taken from |
| 20    4:30 to 4:40 p.m.) |
| 21  BY MR. SNELL: |
| 22   Q  Doctor, I want to circle back around to your |
| 23     test, the testing that you were involved in. |
| 24     I just want to make sure that based on |
| 25     that test, you're not going to come into |

| Page 232 |
|---|
| 1    trial and tell the Perry jury that based on |
| 2    the testing you did on that single TVT device |
| 3    that there could be degradation in the human |
| 4    body by a certain time point? |
| 5        MR. KUNTZ:  Objection. |
| 6   A  I've not testified and I don't plan -- I've |
| 7     been saying and I still say that it's |
| 8     unpredictable.  There is no certain time |
| 9     point.  It's unpredictable. |
| 10  BY MR. SNELL: |
| 11   Q  Okay.  I just want to make sure I understand |
| 12     how far you were going to try to take this |
| 13     study. |
| 14     Just so we're crystal clear, you're not |
| 15     going to walk into that trial and say, at one |
| 16     year, you can see degradation from the TVT |
| 17     mesh, and I know it because of the study I |
| 18     did on the TVT device? |
| 19   A  No, I'm not saying that. |
| 20   Q  Okay.  Did you do power calculations on your |
| 21     TVT device study? |
| 22   A  It's an in vitro test.  We typically do power |
| 23     calculations on preclinical studies.  But in |
| 24     the in vitro test, it's in vitro, where it's |
| 25     -- you know, it's -- |

| Page 233 |
|---|
| 1   Q  You need to do power calculations on the |
| 2     front end of this test if you're going to try |
| 3     to do statistical significant testing on the |
| 4     back end, isn't that correct? |
| 5   A  My experience with power calculations, again, |
| 6     is typically in an in vivo study where we |
| 7     estimate -- it's so that we ensure that our |
| 8     study is power enough.  If we estimate a |
| 9     certain variance in a certain number is 10 |
| 10    percent, we want to be able to power our |
| 11    study to make sure that we can see that |
| 12    10-percent effect. |
| 13     But this is an in vitro study, so, well, |
| 14    we did the study, and either we will see a |
| 15    significant difference or we won't.  That's |
| 16    what it is.  If we don't see a significant |
| 17    difference, then maybe the study wasn't |
| 18    underpowered, but we report that it is if |
| 19    it's not significant.  But it's either |
| 20    significant or it's not. |
| 21     I mean, the reason you do a power study |
| 22    in a preclinical study is to make sure you |
| 23    have got enough animals to do your study.  In |
| 24    an in vitro study, well, if we don't see |
| 25    significant differences in the in vitro |

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 234

1     study, then our conclusion would be that it's
2     just not a significant difference.
3   Q  Isn't it true, Doctor, that if you do not do
4     power calculations on the front end of a
5     study, you can't say that there are
6     statistically significant findings on the
7     back end, because you haven't even assessed
8     whether you have an adequately powered study?
9         MR. KUNTZ:  Objection.
10  A  I don't think that's true in in vitro
11    studies.  I don't see people doing this.  I
12    don't see papers where people power their in
13    vitro studies.  We typically do enough
14    replicates that we can calculate a standard
15    deviation and run an ANOVA or a t-test or
16    something, but we don't -- in a clinical
17    trial and in an animal study, we do power
18    analysis all the time, but I just -- I
19    don't --
20  BY MR. SNELL:
21  Q  Did you estimate the potential rate of error
22    in your study before it was done?
23  A  Potential rate of error in --
24  Q  In finding discrepant findings?
25  A  I just don't know where you are going with

Page 235

1     this.
2   Q  Did you do it or didn't you do it?  Did you
3     do a calculation to assess the potential rate
4     of error before you started that study on the
5     TVT device?
6   A  We didn't do that calculation.
7   Q  Did you estimate the variance as you noted
8     earlier?
9   A  But this isn't the way statistics works.  I
10    mean, if we have two populations, we can
11    compare by a t-test.  We can compare those
12    populations and draw within -- we assess P to
13    be .05, and so with this value of P, we can
14    say it's significant or not significant.
15    That's typically what people do in in vitro
16    studies.  We say P is .05, and then we do
17    this -- we can calculate a P value.  You can
18    do it either way.
19        But if you have two populations, you can
20    compare those populations using statistical
21    analyses.  My experience with these power
22    analyses is a lot of it comes down to an
23    ethics concern.  It's not ethical to do an
24    animal study that is insufficiently powered.
25        Because if you do the study, and you

Page 236

1     can't see differences, you don't know -- it's
2     part of justifying the numbers of animals
3     that you're going to use in your test.  But
4     if you have two sets of data, you can compare
5     whether they are statistically different or
6     not.  This is what people do.  It's an in
7     vitro test.  I just don't know where you are
8     coming from.
9   Q  When you do studies, you want to have
10    adequate sample sizes so that you can tell if
11    the results are meaningful.  That's a fair
12    statement, right?
13  A  Yes, but you can tell if the results are
14    significantly different if you see a
15    significant difference.  You can calculate a
16    P value.  You can do a t-test.  You can do an
17    ANOVA on that date.  If you don't see a
18    significant difference, then one reason could
19    be you didn't have enough replicates.  But if
20    you see a significant difference, I don't
21    understand how it's not significant.  If you
22    see a significant difference between two
23    groups, they're different.  That means the
24    differences are -- I don't understand.  I
25    mean, this is like statistics that you learn

Page 237

1     in school.  I mean, comparing two
2     populations.
3   Q  Yeah, but here the two populations was a TVT
4     device and a polypropylene pellet.  It wasn't
5     100 TVT devices and 100 pellets, was it?
6   A  You are so confused on statistics.  To make
7     this clear.  We tested one exemplar, but we
8     cut multiple pieces from each exemplar.  So
9     we have replicates.  So we can say,
10    statistically, in that mesh that we tested is
11    there more oxidation from the FTIR spectra at
12    week five compared to week four compared to
13    these other weeks.
14        We can do that test through even just --
15    we could do a two-way ANOVA to compare
16    changes in time and changes in the mesh or
17    between groups and as a function of time.  We
18    can do that analysis and that can be --
19    that's what people do all the time.
20  Q  You can't do that analysis as between the
21    control, though, because you didn't run all
22    of the same tests at the same time, correct?
23  A  I don't remember the details of that.  We ran
24    the control went out to four weeks.  We ran
25    the TVT out to five, and I think we might

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 238

1   have had one that went to six weeks, but we
2   just didn't have enough sample to go out that
3   far.
4       But we can do all of these statistical
5   analysis, and I will bring it to trial, and
6   you can come at me with whatever you want
7   about statistics, but I just don't see where
8   you are coming from with this. I mean, we
9   can do a statistical test to see whether
10  there is differences at least in the function
11  of time. That's how we are going to assess
12  whether it is induced is the amount of
13  oxidation at week five significantly greater
14  than what we see at weeks, four, three, two,
15  one or zero.
16  Q   That hasn't been done, though, to this point?
17      Or you didn't bring that with you today,
18      right?
19  A   It hasn't been done. We're working on it.
20  Q   The tensile string, is that anything that you
21      tested in this test of the TVT versus the
22      control?
23          MR. KUNTZ: Objection.
24  A   We didn't measure tinsel strength. This
25      takes a lot of material. And, again, it

Page 239

1   doesn't answer the question of whether it can
2   be oxidized. Tensile strength is a bulk
3   test. So because it is a bulk test, it's
4   testing the whole material. You may or may
5   not see -- the problem with doing a tensile
6   strength test is --
7          MR. SNELL: Can I move to
8   strike? I don't want to keep you here later
9   than I have to. It was a yes or no really.
10  BY MR. SNELL:
11  Q   Do you do tensile strength?
12  A   No.
13  Q   All right. Did you do any elongation testing
14      in your --
15  A   No.
16  Q   I don't see it in your opinion, but I just
17      want to confirm this. You're not going to be
18      giving any testimony on what a suitable
19      alternative device for the treatment of
20      stress urinary incontinence was that was
21      equally safe and effective as TVT Abbrevo; is
22      that correct?
23  A   I did not testify on that and I don't plan
24      to.
25  Q   Okay. Are you aware of any evidence that the

Page 240

1   piece of mesh in Mrs. Perry's body became
2   unstable from a polymer standpoint?
3   A   No, I'm not.
4   Q   Are you aware of any evidence that the piece
5       of mesh in Mrs. Perry became brittle?
6   A   No, I'm not aware of that.
7   Q   Are you aware of any evidence that the piece
8       of mesh in Mrs. Perry degraded?
9   A   No.
10  Q   I didn't ask you at the beginning. Have you
11      given testimony at all since the Huskey trial
12      as an expert --
13  A   I provided this listing.
14  Q   -- against anybody? I think you're right.
15          MR. KUNTZ: He gave you an
16  updated copy since the Huskey trial. I think
17  you have it.
18  A   I gave testimony in Boston Scientific since
19  the Huskey trial.
20          MR. SNELL: I have it right
21  here. I'm going to mark it.
22          (Deposition Exhibit No. 5 was
23  marked for identification.)
24  BY MR. SNELL:
25  Q   Doctor, I'm handing you Exhibit 5. Tell me

Page 241

1   what that is, please.
2   A   This is a listing of cases in which I
3       provided testimony in the last four years.
4       And there are five cases listed here in 2013
5       and 2014.
6          MR. SNELL: I'd like to mark
7   what I believe is your CV as the next
8   exhibit.
9          (Deposition Exhibit No. 6 was
10  marked for identification.)
11  BY MR. SNELL:
12  Q   Doctor, I'm handing you Exhibit No. 6. If
13      you would just identify that for the record.
14  A   This is my CV. It lists all of my academic
15      and professional experience.
16  Q   That's current?
17  A   Yes.
18  Q   Okay. Earlier you talked about environmental
19      stress cracking?
20  A   Yes.
21  Q   Is that something you need to look at on SEM
22      to assess?
23  A   I would assess environmental stress cracking
24      by SEM. There are other methods as well, but
25      SEM is one.

61 (Pages 238 to 241)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 242

1  Q  What are the other methods?
2  A  The microscopy methods with Dr. Iakovlev.
3  Q  Are you aware of any evidence that the piece
4     of mesh in Mrs. Perry has or had
5     environmental stress cracking?
6  A  I'm not aware of any evidence.
7  Q  Earlier we talked about the concept of
8     macrophages in foreign giant body cells being
9     quiescent?
10 A  Yes.
11 Q  You are aware that those cells can be
12    quiescent, correct?
13 A  I'm aware that this is an active area of
14    investigation.  I'm aware that there is a lot
15    of research activity trying to make these
16    cells quiescent or inactivate them.  I'm not
17    aware of any reports that have definitely
18    proven they're quiescent or what makes them
19    quiescent.  I would be happy to look at it.
20       I'm familiar with this idea, but I'm not
21    familiar with any studies that have proven
22    that or shown under what conditions that can
23    occur.
24 Q  You are aware actually that scientists are
25    able to now incubate and generate quiescent

Page 243

1     tissue macrophages for use in studies?  Don't
2     you know that?
3  A  Well, I would like to see the document you're
4     referring to.  I just said I haven't seen
5     that.  I am aware of this idea, but I haven't
6     seen that study.  I would be happy to look at
7     it, but I --
8  Q  My question is not pertaining to a specific
9     study.  It's do you know whether scientists
10    have generated incubated quiescent tissue
11    macrophages for use in studies?
12 A  I'm not sure what you're referring to.  I
13    mean, I would have to see a study to -- I'm
14    aware of this area of research, but I can't
15    comment on it without talking about a
16    specific study at least.  What am I going to
17    say?  I don't know where --
18 Q  Let me ask you this.  You know that
19    scientists manufacture different cell lines
20    for use in studies, correct?
21 A  There are different permanent cell lines that
22    are used in cell culture.  I use them in my
23    own lab.
24 Q  So somebody, scientists or companies make
25    those, correct?

Page 244

1  A  We can buy those from companies.  There is an
2     immortalized cell line that you can buy.
3  Q  So my question to you, then, is, do you know
4     whether there are available for purchase or
5     use quiescent macrophage cells?
6  A  I don't know.  I've never purchased them, but
7     that doesn't mean that they happen in the
8     human body.  Again, without seeing a
9     document, it's difficult to comment on that.
10 Q  How would one definitively prove that
11    macrophages in giant cells become quiescent
12    in the body?
13 A  Well, I would challenge it with a foreign
14    body, and different time points, harvest the
15    cells, and stain for myeloperoxidase.  But
16    it's -- to assess that they are actually
17    quiescent -- I mean, you have to count the
18    number of cells, and then look at the amount
19    of myeloperoxidase, look for degradation.  It
20    would be difficult to show that they are
21    completely quiescent.
22 Q  So what would you have to do to prove that
23    those cells are activated every day of the
24    year for ten years?  You would have to do the
25    same test, wouldn't you?

Page 245

1  A  We talked about this earlier.  What I know is
2     Dr. Iakovlev, whenever we stain for
3     myeloperoxidase, we see it.  So does that
4     conclusively prove that every cell is always
5     -- Dr. Anderson's 2008 review says that these
6     cells are activated and adherent, and this
7     reaction doesn't stop.  That's what he says.
8  Q  How is that proof?  What test has been done
9     under the proper methodology that shows that
10    those cells are always activated every day
11    for a long period of time?  Has anybody done
12    such a test?
13 A  Not that I know of.  But why would they stop?
14    Why would they --
15 Q  Well, I understand that Dr. Anderson may
16    believe that or he wrote something to that
17    effect.  But has that methodology been tested
18    to show that they are always in an activated
19    state day after day after day?
20 A  All I can say is that in my experience with
21    this is that they are activated.  When I
22    talked to Dr. Iakovlev, did you stain for
23    myeloperoxidase, his response was, why would
24    I stain for myeloperoxidase, it has to be
25    there.

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 246

1  Q  Dr. Iakovlev assumes it's there.  But he has
2     not tested for myeloperoxidase on a
3     continuous basis, daily or weekly basis in
4     samples?
5  A  I tell you what, I think most people will be
6     convinced by it.
7  Q  Can you answer that question, please?  That
8     is what Dr. Iakovlev believes, right?
9  A  Yeah.
10 Q  But has he tested for myeloperoxidase in the
11    same samples longitudinally week after week
12    after week after week to see that those are
13    activated?
14 A  Not to my knowledge.
15 Q  All right.  And you haven't done that type of
16    testing, correct?
17 A  No.  But in my experience, when I see
18    macrophages and stain for myeloperoxidase,
19    I've not seen this type of stain.  I need to
20    qualify my comment.  When I see this adherent
21    macrophages in the foreign giant body cells
22    in my work, they appear to be activated.
23 Q  All right.  You can see macrophages and
24    they're not activated.  That is well known,
25    correct?

Page 247

1  A  I don't know that I would say that that is
2     well-known.  I don't know under what
3     conditions -- I mean, I would have to see a
4     study.
5  Q  Well, let me make it simple.  Can macrophages
6     be present and they're not activated?
7  A  In theory, it's possible.  I'm just going by
8     my own experience.  When I see these adherent
9     macrophages, they're activated.  They're
10    secreting this myeloperoxidase.  There is
11    degradation.  That is what I've seen.  I will
12    be happy to look at an example where that is
13    not the case, but --
14 Q  If there are chronic inflammatory cells
15    present, that does not necessarily mean that
16    they are active.  Is that a fair statement?
17 A  It's my opinion that they are active.  I
18    mean, I -- can I say that there is a study
19    showing that they are always active all the
20    time, no.  But I believe they are active
21    unless somebody shows they are not, and I
22    would like to know under what conditions made
23    them not active.
24 Q  There is no test or study that shows that
25    these inflammatory cells are always active?

Page 248

1  A  You already asked this.  I said I don't know
2     of a study that showed that.  I'm just going
3     from my own experience.
4  Q  Do you know if Dr. Iakovlev has done any type
5     of longitudinal study of myeloperoxidase and
6     what it should show when properly applied to
7     samples from the same source over time?
8  A  I mean, he's a pathologist.  He looks at
9     patient explants.  You can't do a study like
10    that in patients, so I don't believe that he
11    has done that study.
12 Q  Did you bring anything else that we haven't
13    marked?
14 A  I think that's it.
15 Q  When you do statistical significance testing,
16    do you try to generate confident symbols as
17    well?
18 A  Sometimes.  It depends on what we're trying
19    to do.  Sometimes when we establish P at .05,
20    sometimes we can calculate a P value.  We've
21    done several different things.
22 Q  Have you actually personally ever calculated
23    a Bonferroni correction for multiple
24    comparison?
25 A  When I was in graduate school.  My students

Page 249

1     do those calculations now, and I review them.
2     There are software programs that you can use
3     to do this.  It's pretty routine, I think.
4  Q  The software plugs in the number of tests and
5     the time points and it generates --
6  A  We can do this with software, yeah.
7  Q  You haven't published or presented on this
8     test, correct, that was done with the TVT
9     device and the pellet control?
10 A  We presented it at the AICHE annual meeting.
11    And I think those slides are on the reliance
12    list.
13 Q  For the TVT?
14 A  In that presentation, we did not identify the
15    source of the mesh.
16        MR. KUNTZ:  I don't think that's
17    on there, Burt.  We will get it to you,
18    though.
19 A  We called it mesh 1, 2 and 3.  We did not
20    identify it as TVT.
21 BY MR. SNELL:
22 Q  Do you know if it was TVT or would you have
23    to go back and look?
24 A  Yes, it was TVT.  We chose not to disclose
25    that at that meeting.

63 (Pages 246 to 249)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 250

1  Q  Where was this at?
2  A  The AICHE, it's the American Institute of
3     Chemical Engineers.  If you would like, I can
4     circle it on my CV.  Would that help you?
5  Q  Sure.  That's fine.  Or if you just want to
6     look at your CV and tell me what page or
7     number.
8  A  That's fine too.  On the CV, it's
9     presentation number 154.
10 Q  Was that a presentation that you actually
11    gave and presented or did someone else do it?
12 A  Dr. Dunn and I both gave the presentation.
13 Q  Was it presented orally?
14 A  It was.
15 Q  Okay.  So I would like to request a copy of
16    that.
17        Did you have to prepare a manuscript in
18    connection with that?
19 A  No.  We submitted a short abstract, which is
20    available online.  We elected not to submit
21    an extended abstract.
22 Q  What was the reason why you didn't submit an
23    extended abstract?
24 A  We typically don't do that for that meeting.
25 Q  Is that the only presentation you have made

Page 251

1     concerning the TVT mesh?
2  A  Yes.
3  Q  Have you made any other presentations that
4     concern transvaginal mesh?
5  A  That's the only one.
6  Q  On opinion number one, you say chemical
7     degradation, embrittlement, structural
8     degradation and other changes.
9  A  Yes.
10 Q  Are there any other changes that you're
11    referencing that you're going to be talking
12    about at trial in the Perry case?  That just
13    seems kind of broad based, and I want to make
14    sure I understand where you're coming from
15    with what other changes means.
16 A  I would probably say I think structural
17    degradation, embrittlement, and chemical
18    degradation are the primary ones that come to
19    mind that I've testified about.
20 Q  Okay.  And number two where it seems to --
21    are you going to try to opine that certain
22    complications occur in patients like chronic
23    inflammation, pain and dyspareunia because of
24    the mesh?
25 A  I'm saying that changes in the mesh can lead

Page 252

1     to problems such as pain, erosion.  The basis
2     for this opinion is the Clave, Costello, Wood
3     papers where they show changes in the mesh,
4     and then how that resulted in degradation.
5     And these are all complications, so these are
6     meshes that failed.
7        And my opinion is that these changes in
8     the mesh contributed to those complications
9     like pain and erosion.  Brittle plastic can
10    cause pain.  Embrittlement can cause stress
11    shielding between the host tissue and the
12    implant, which can lead to poor integration,
13    erosions, and things like that.  These are
14    all points that I made previously in Huskey.
15 Q  In Huskey, though, you didn't testify about
16    that at trial as I recall it because you're
17    not a medical doctor.  Is that consistent
18    with your recollection?
19        MR. KUNTZ:  Objection.  Go
20    ahead.
21 A  I think the Judge may have limited what I
22    would have liked to have said, but I believe
23    it's in the deposition.  I don't think
24    there is any change in what I'm saying, in
25    what I've been saying in these depositions.

Page 253

1  Q  And just so I'm clear, you didn't conduct any
2     type of differential diagnosis to assess the
3     cause of dyspareunia or pain or the potential
4     causes, correct?
5  A  No.
6  Q  You didn't rule out any other cause or
7     potential causes?
8  A  I didn't rule out any other causes.
9  Q  And you didn't investigate the rates of
10    dyspareunia or pain in the general background
11    and compare them to these cohorts?
12 A  I did not.
13 Q  And in Clave, it's fair to state that one
14    cannot say that the complications did not
15    occur before the degradation; is that right?
16 A  It's not clear from Clave the timing of those
17    events.  My opinion is that these changes in
18    the mesh led to those events.  The mesh
19    changed and there was an adverse event.
20 Q  And the adverse events are also you mention
21    on items number eight and nine, extrusions,
22    inflammation, pain, and you mention erosions
23    on nine, correct?
24 A  Yes.
25 Q  You didn't not do any differential diagnoses

64 (Pages 250 to 253)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 254

1    on those, correct?
2    A  No.
3    Q  You didn't assess causation by ruling in or
4      ruling out different causes, correct?
5    A  No, I didn't do that.
6    Q  In the testing that Dr. Kammerer did we
7      talked about earlier, where in the first
8      5 percent of elongation of the mesh, the
9      mechanical-cut and the laser-cut were
10     similar, do you dispute that finding?
11   A  I don't dispute the finding that of the very
12     low elongation.  They are similar but --
13   Q  Okay.  That's my question.
14   A  Yeah.  Okay.
15   Q  Did you look at the clinical expert report
16     that was done by two medical doctors at
17     Ethicon with regard to the laser-cut mesh and
18     elongation?
19   A  I think I reviewed that document, but I can't
20     remember what it said right now.
21   Q  Did that document affect your opinions?
22   A  I would have to look at it again to see what
23     it says.  I don't remember.
24   Q  Did you consider whether either of those
25     doctors had any experience implanting slings

Page 255

1      in women?
2    A  I would have to look at the document.  I just
3      don't remember the documents to answer these
4      questions.  I'd have to look at it.
5    Q  Have you ever consulted with a
6      urogynecologist or a urologist who has
7      experience implanting mesh slings to discuss
8      with them or learn from them the forces that
9      are in play during implantation?
10   A  No, I have not done that.  I relied on the
11     Ethicon documents.
12   Q  The e-mails you were talking about?
13   A  And the other documents, the reports, the
14     papers.
15   Q  Do you even know Dr. Dmochowski here at
16     Vanderbilt?
17   A  I don't know him.
18   Q  Do you know that Dr. Dmochowski uses
19     polypropylene mesh slings?
20   A  That's my understanding.
21   Q  Have you ever written or said anything to any
22     of the doctors here at Vanderbilt to apprise
23     them of what your opinions are?
24   A  I have.  I have contacted -- there is a
25     urogynecologist in the group there, and she e

Page 256

1      suggested I talk to Dmochowski, but I
2      understand he might have been a defense
3      witness, so I haven't done that.  I don't
4      think I'm supposed to do that.  So I have
5      reached out to them, but it hasn't moved
6      forward.
7    Q  Has Dr. Dmochowski been an expert in any of
8      the other cases you're involved in?
9    A  I don't know for sure.  I don't know if he is
10     an expert or not, because I have to resolve
11     this before I can contact him.  But I have
12     reached out to that group at Vanderbilt.
13          MR. KUNTZ:  I wonder if he has
14     disclosed his stuff to Vanderbilt.
15          (Deposition Exhibit No. 7 was
16     marked for identification.)
17   BY MR. SNELL:
18   Q  I am handing you Exhibit 7 from Vanderbilt.
19     Do you recognize this to be from the
20     Vanderbilt Health Website?
21   A  This appears to be urogynecology in the way
22     it's printed.  I think that's what it is.
23          MR. KUNTZ:  I'm going to object.
24     This is not a complete printout.  Are you
25     going to show him the part two where they

Page 257

1      talk about all the mesh complication that
2      they treat?  Are we going to get the full
3      document or just part of it?
4          MR. SNELL:  You can do whatever
5      you want.  This is Page 3 of 3.
6          MR. KUNTZ:  Well, I'm going to
7      object to an incomplete document.  It's a
8      printout of part of the website.
9    BY MR. SNELL:
10   Q  At the top it says, surgical treatments for
11     stress urinary incontinence, including mid
12     urethral slings.  Do you see that?
13   A  Yes, I'm aware of this.  I've seen it.
14   Q  Well, I guess my question to you is is this a
15     website that you visited on the Vanderbilt
16     website?
17   A  I believe I did, because I had to find who to
18     contact, but I believe they also do a number
19     of revisions.
20          MR. SNELL:  Move to strike.
21          THE WITNESS:  Well, you asked.
22     I'm sorry.
23   BY MR. SNELL:
24   Q  My question was straight forward.
25   A  They always are.

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

| Page 258 |
|---|

1    Q  They really are, sir.
2         MR. KUNTZ:  Hold on.  I'm going
3    to object.  You are showing him one document,
4    and I just made my objection.  It is not a
5    straight forward question when you're not
6    showing him the whole website.  And he just
7    said where is the website that shows all of
8    the complications they're treating for mesh.
9    So that is not a straight forward question.
10        MR. SNELL:  That's not even a
11   proper objection.  That's not a proper
12   objection in California.  That's beyond a
13   speaking objection.
14        MR. KUNTZ:  You just said all of
15   my questions are straight forward.  And this
16   is very much a trick question and not a
17   straight forward question.  So don't make
18   your comments unless you --
19        MR. SNELL:  Let's try it again
20   and knock off the ridiculous speaking
21   objections.
22        MR. KUNTZ:  Show him the whole
23   website.
24        MR. SNELL:  Give the man a
25   computer.  You can have him look at anything.

| Page 259 |
|---|

1         MR. KUNTZ:  You bring documents
2    and ask him questions.  My job is to show up
3    with --
4         MR. SNELL:  You are wasting my
5    time.  You're giving speaking objections that
6    are absolutely improper in California.
7         MR. KUNTZ:  You are asking trick
8    questions, and that's what he told you.
9         MR. SNELL:  It's not a trick
10   question.
11   BY MR. SNELL:
12   Q  Doctor, I read to you surgical treatments for
13      stress urinary incontinence include
14      mid urethral slings.  Did you see that?
15   A  Yeah, I've seen it.
16   Q  My question was, have you seen this part of
17      the website?
18   A  I believe so, but it's a printout.  It
19      doesn't really look the same.  I have been on
20      that website.
21   Q  Under what circumstance, would you have gone
22      to the website?
23   A  I was reaching out to that group to discuss
24      mesh.  I have contacted an OB in that group.
25      I can't remember the name right now, but I

| Page 260 |
|---|

1    stopped because it's not proper for me to --
2    I don't know whether he is a defense witness
3    or not, so I would have to resolve this
4    before I would really have to do anything.
5    Q  You did speak to a female urogynecologist?
6    A  Yes.  I can't remember her name.
7    Q  Or do you know if she was a urologist?
8    A  I can't remember.  She was in this group.
9       She has experience with mesh revisions.  And
10      one of my students, one of my medical
11      students, did a rotation with her, and I
12      contacted her, I think, in September, but I
13      dropped it because of this concern about
14      litigation.
15   Q  Okay.  Do you have any understanding of the
16      antioxidants that are in the mesh for the TVT
17      Abbrevo?
18   A  To my knowledge, they are the same as they
19      are in proline resin that I talked about at
20      trial.
21   Q  Okay.  One of the opinions you gave in Huskey
22      was less mesh is better; is that correct?
23   A  That's correct.
24   Q  Why don't you give that opinion here?
25   A  Why don't I give that opinion?

| Page 261 |
|---|

1    Q  Why aren't you giving that opinion here?
2    A  I don't think that was specified as an
3       opinion.  I don't recall that.  I thought it
4       was in the body of the report.  I don't
5       remember that being spelled out as a specific
6       opinion.
7    Q  Do you know Abbrevo uses less mesh that
8       TVT-O, don't you?
9    A  What do you mean by uses less mesh?  The area
10      is smaller, but what about the --
11   Q  Well, answer my question.
12   A  I'm trying to clear up the way you're asking
13      it.  I asking you, do you mean as it has a
14      different density or it's a less area?
15      That's what I'm asking.
16   Q  Does TVT Abbrevo have less mesh than the TVT
17      obturator?
18   A  I mean, it has less surface area of mesh, but
19      I believe the density of that mesh is still
20      the same.
21   Q  When you say less surface area, you mean it's
22      not as long as the TVT-O, correct?
23   A  Yes, I think that's what I mean.
24   Q  It's still 1.1 sonometers wide approximately;
25      is that correct?

66 (Pages 258 to 261)

Golkow Technologies, Inc. - 1.877.370.DEPS

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 262

1  A  To my knowledge, and I believe the density is
2     the same as well.
3  Q  When you say density, what do you mean by
4     that?
5  A  Grams per square meter.
6  Q  Okay.  But we can agree there is less mesh
7     with TVT Abbrevo than TVT-O?
8  A  There is less mesh -- the way you say it, I
9     guess it's true.
10 Q  Now, do you have an opinion as to whether TVT
11    Abbrevo is the better or a safer device than
12    the TVT-O?
13             MR. KUNTZ:  Objection.
14 A  No.  I'm not comparing it to TVT-O.
15             MR. SNELL:  I think I'm about
16    done.  Let me look back through and see if
17    there is anything else.
18             (A brief recess is taken from
19    5:30 to 5:40 p.m.)
20 BY MR. SNELL:
21 Q  Just a few more questions, Doctor.  So I'm
22    going to request that whatever the materials
23    that weren't provided on the testing that was
24    done be provided.  I'm going to leave the
25    deposition open.

Page 263

1      Is there anything you believe is
2   important to your analysis --
3             MR. KUNTZ:  Hold on.  We're not
4   leaving the deposition open.
5             MR. SNELL:  You can say what you
6   want to say.  I'm leaving it open.  I don't
7   have all of the documents.
8             MR. KUNTZ:  California law is
9   you can argue --
10            MR. SNELL:  I'm not going to
11  argue with you.  I'm either right or wrong.
12            MR. KUNTZ:  Okay.
13            MR. SNELL:  I'm either right or
14  wrong.
15 BY MR. SNELL:
16 Q  Is there anything you believe is important in
17    your opinions and analyses that we have not
18    discussed today?
19 A  I believe we have discussed everything that
20    is important.
21 Q  Now, is there any work that you are planning
22    on doing with this case after today?
23 A  No.
24 Q  Besides the statistical calculations?
25 A  No.  No testing is planned, just analyzing

Page 264

1   what we have, and preparing for trial, those
2   types of activities.
3  Q  All right.  Is there a list of analyses that
4     you can tell me or tell the court reporter
5     that you plan to do?
6  A  Plan to do testing.
7  Q  With the testing or pertaining to this case?
8  A  It's the statistical analysis and writing the
9     paper.  That's it.
10 Q  What will you do if you do the statistical
11    calculations and they turn out to not be
12    statistically significant?
13 A  Report it as not significant, like we always
14    do.
15 Q  What else?
16 A  What do you mean what else?
17 Q  What will you do to try to understand why
18    they were not statistically significant?
19 A  I don't know.  I would have to think about
20    that at the time it -- I don't think that
21    that is what is going to happen.  The peak is
22    ten times bigger, and the aragores (phonetic)
23    aren't that -- I believe it's going to be
24    significant, and if it's not, then I will
25    figure out what to do when that happens.  I'm

Page 265

1   not going to misrepresent data.
2             MR. SNELL:  That's fine.  I'm
3   going to leave the door open.  I know counsel
4   has a question or two.
5             MR. ROSEN:  I've got one
6   question.
7             CROSS-EXAMINATION
8  BY MR. ROSEN:
9  Q  Good evening, Mr. Guelcher.  My name is
10    Dr. Rosen.  I'm with Boyce Schaeffer
11    Mainieri.  We represent Dr. Luu.  I just have
12    one question.
13       Do you intend to offer any opinions
14    regarding Dr. Luu at trial in this matter?
15 A  I do not.  My testimony is about the mesh and
16    how it changes after implantation.
17            MR. ROSEN:  That's all.  Thank
18    you.
19            MR. KUNTZ:  Dr. Guelcher, I have
20    a few questions for you.
21            CROSS-EXAMINATION
22 BY MR. KUNTZ:
23 Q  With respect to the studies you've talked
24    about, and the testing you did with Dr. Dunn,
25    in the SEM, FTIR, and XPS, those are all

67 (Pages 262 to 265)

a54c1a8b-9393-421a-8f67-0f6a35abc023

Scott A. Guelcher, Ph.D.

Page 266

1  studies or documents or data that you can
2  review independently of Dr. Dunn, correct?
3  A  Yes, that's correct.
4          MR. SNELL:  Objection.  You've
5  got to give me a chance to object.  Leading,
6  compound.  Go ahead.
7  BY MR. KUNTZ:
8  Q  You repeatedly in your practice are going to
9  have expertise reviewing those types of
10  studies, SEM, FTIR, and XPS?
11          MR. SNELL:  Objection.  Leading
12  compound.  Go ahead.
13  A  Yes, I do.
14  Q  And if Ethicon did those studies or had those
15  types of documents, you could review those
16  independently, correct?
17          MR. SNELL:  Same objections.
18  A  Yes, I could.
19  Q  The last question I have.  Is there any
20  peer-reviewed article that you're aware of
21  that shows or supports the notion that
22  macrophages in foreign body giant cells can
23  be deactivated?
24  A  I'm not aware of such an article.
25          MR. KUNTZ:  Okay.  No more

Page 267

1  questions.
2          REDIRECT EXAMINATION
3  BY MR. SNELL:
4  Q  Are you aware of any book chapters, any
5  articles in the peer-reviewed literature that
6  says that macrophages can indeed be
7  deactivated?
8  A  I'm not aware of those articles.  That's what
9  I said earlier.
10  Q  But you have seen it in the literature or in
11  books that macrophages can be quiescent?
12  A  That's not what I said.  I'm familiar with
13  this idea of reprogramming macrophages, but I
14  am not familiar with any studies that have
15  shown that this has been done or under what
16  conditions it happens.  I mean, I'm familiar
17  with the idea.  I'm just not familiar with
18  such a study is what I'm saying.
19  Q  You're not familiar with such a study that
20  shows that macrophages are activated
21  longitudinally every day for years and years?
22  A  No one has proven that, but Anderson teaches
23  they're activated when they adhere.  That's
24  what it says.
25          MR. SNELL:  Move to strike part

Page 268

1  of the response, part of the answer.
2      I'm done.  Thank you.
3          (Deposition was adjourned at 5:50
4  p.m.)
5          * * *

Page 269

1  STATE OF KENTUCKY    )
2                       )
3  COUNTY OF DAVIESS    )
4
5      I, MICHELLE E. KERR, A NOTARY PUBLIC AT LARGE IN
6  AND FOR THE COMMONWEALTH OF KENTUCKY, DO HEREBY
7  CERTIFY:
8      THAT SAID DEPOSITION WAS TAKEN STENOGRAPHICALLY
9  AND ELECTRONICALLY BY ME AND THAT THE TYPEWRITTEN
10  TRANSCRIPT ABOVE IS A TRUE RECORD OF THE
11  TESTIMONY GIVEN; THAT I ALSO RECORDED AND
12  TRANSCRIBED ANY AND ALL OBJECTIONS MADE BY COUNSEL
13  AND THE REASONS THEREFORE; AND THAT I AM NOT A
14  RELATIVE OR EMPLOYEE OR ATTORNEY OR COUNSEL OF ANY
15  OF THE PARTIES, NOR A RELATIVE OR EMPLOYEE OF SUCH
16  ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED
17  IN THIS ACTION.
18
19
20      IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND
21  AND AFFIXED MY NOTARIAL SEAL ON THIS _____ DAY OF
22  DECEMBER, 2014.
23      _____
        MICHELLE E. KERR, NOTARY PUBLIC
24
25  My Commission Expires:
        March 21, 2017
        March 21, 2017

68 (Pages 266 to 269)

a54c1a8b-9393-421a-8f67-0f6a35abc023

## Scott A. Guelcher, Ph.D.

Page 270

### INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.  It will be
10  attached to your deposition.
11        It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 272

### ACKNOWLEDGMENT OF DEPONENT

1
2        I,_____, do
3   hereby certify that I have read the
    foregoing pages, and that the same
4   is a correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7
                    _____
8   SCOTT A. GUELCHER, PH.D.        DATE
9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
25

Page 271

1        - - - - - -
             E R R A T A
2        - - - - - -
3   PAGE LINE CHANGE
4   ____ ____ _____
5     REASON: _____
6   ____ ____ _____
7     REASON: _____
8   ____ ____ _____
9     REASON: _____
10  ____ ____ _____
11    REASON: _____
12  ____ ____ _____
13    REASON: _____
14  ____ ____ _____
15    REASON: _____
16  ____ ____ _____
17    REASON: _____
18  ____ ____ _____
19    REASON: _____
20  ____ ____ _____
21    REASON: _____
22  ____ ____ _____
23    REASON: _____
24  ____ ____ _____
25    REASON: _____

Page 273

1        LAWYER'S NOTES
2   PAGE LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____

69 (Pages 270 to 273)

a54c1a8b-9393-421a-8f67-0f6a35abc023