# EXHIBIT L

Scott A. Guelcher, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN RE: ETHICON, INC., PELVIC REPAIR)
SYSTEM PRODUCTS LIABILITY          )MASTER FILE NO.
LITIGATION                         )2:12-MD-02327
                                   )MDL 2327
-----------------------------------)
THIS DOCUMENT RELATES TO CASE      )
CONSOLIDATION:                     )JOSEPH R. GOODWIN
                                   )U.S. DISTRICT JUDGE
TERRESKI MULLINS, et al.,          )
                                   )
                  Plaintiffs,      )
vs.                                )CASE NO.
                                   )2:12-CV-02952
ETHICON, INC., et al.,             )
                                   )
                  Defendants.      )


                     DEPOSITION OF

                SCOTT A. GUELCHER, Ph.D.

            Taken on Behalf of the Defendants

                 September 15, 2015

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

| Page 2 |
|---|
| 1 APPEARANCES: |
| 2 For the Plaintiffs: |
| 3   MICHAEL H. BOWMAN, ESQ. |
|      Wexler Wallace, LLP |
| 4   55 West Monroe Street |
|      Suite 3300 |
| 5   Chicago, IL 60603 |
|      304.780.8080 |
| 6   mhb@wexlerwallace.com |
| 7 For the Defendants: |
| 8   DAVID B. THOMAS, ESQ. |
|      Thomas Combs & Spann, PLLC |
| 9   300 Summers Street |
|      Suite 1380 |
| 10  Charleston, WV, 25301 |
|      304.414.1807 |
| 11  dthomas@tcspllc.com |
| 12  CHAD R. HUTCHINSON, ESQ. |
|      Butler Snow, LLP |
| 13  1020 Highland Colony Parkway |
|      Suite 1400 |
| 14  Ridgeland, MS 39157 |
|      601.985.4401 |
| 15  chad.hutchinson@butlersnow.com |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 3 |
|---|
| 1          I N D E X |
| 2 WITNESS: SCOTT A. GUELCHER, PH.D. |
| 3        INDEX OF EXAMINATIONS |
| 4                        Page/Line |
| 5 By Mr. Thomas              6  5 |
| 6 By Mr. Bowman            116  2 |
| 7        INDEX OF EXHIBITS |
| 8                        Page/Line |
| 9 Exhibit 1  Expert Report Of Scott     6  14 |
|             Guelcher, Ph.D. |
| 10 |
|    Exhibit 2  Notice Of Deposition Of Dr.  6  24 |
| 11            Scott A. Guelcher |
| 12 Exhibit 3  Scott A. Guelcher        7  20 |
|             Curriculum Vitae |
| 13 |
|    Exhibit 4  Fee Schedule           8  1 |
| 14 |
|    Exhibit 5  Listing Of Cases In Which  10  13 |
| 15            Testimony Has Been Given In |
|             the Last Four Years |
| 16 |
|    Exhibit 6  August 29, 2015, Invoice   11  15 |
| 17 |
|    Exhibit 7  Binder              12  12 |
| 18 |
|    Exhibit 8  Flash Drive           13  20 |
| 19 |
|    Exhibit 9  Abstract Submitted To The  29  20 |
| 20            IUGA Meeting |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 4 |
|---|
| 1 Exhibit 10  Degradation Of         36  23 |
|              Polypropylene In Vivo: A |
| 2            Microscopic Analysis Of |
|              Meshes Explanted From |
| 3            Patients |
| 4 Exhibit 11  Role Of Oxygen In       44  18 |
|              Biodegradation Of |
| 5            Poly(etherurethaneurea) |
|              Elastomers |
| 6 |
|    Exhibit 12  Guelcher PCT-168 Documents  63  1 |
| 7 |
|    Exhibit 13  Materials Characterization  64  7 |
| 8            And Histological Analysis |
|              Of Explanted Polypropylene, |
| 9            PTFE, and PET Hernia Meshes |
|              From An Individual Patient |
| 10 |
| 11 |
| 12       *** Exhibit 8 was retained *** |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 5 |
|---|
| 1        The deposition of SCOTT A. GUELCHER, |
| 2 Ph.D., taken on behalf of the Defendants, on |
| 3 September 15, 2015, at 9:07 A.M., in the offices |
| 4 of Butler Snow, 150 Third Avenue South, Suite |
| 5 1600, Nashville, Tennessee, for all purposes under |
| 6 the Rules of Civil Procedure. |
| 7        The formalities as to notice, |
| 8 caption, certificate, et cetera, are waived.  All |
| 9 objections, except as to the form of the |
| 10 questions, are reserved to the hearing. |
| 11        It is agreed that Gary Schneider, |
| 12 being a Notary Public and Court Reporter for the |
| 13 State of Tennessee, may swear the witness, and |
| 14 that the reading and signing of the completed |
| 15 deposition by the witness are reserved. |
| 16 |
| 17 |
| 18 |
| 19              * * * |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

2 (Pages 2 to 5)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

| Page 6 |
| --- |

1        SCOTT A. GUELCHER, Ph.D.,
2   was called as a witness and, after having been
3   first duly sworn, testified as follows:
4        E X A M I N A T I O N
5   BY MR. THOMAS:
6   Q.    Good morning, Dr. Guelcher.
7   A.    Good morning.
8   Q.    We're here today in the deposition -- for
9   your deposition in the Mullins versus Ethicon
10  case, correct?
11  A.    Yes.
12  Q.    Let me hand you what I'm going to mark as
13  Deposition Exhibit No. 1.
14        (Marked Exhibit 1.)
15  BY MR. THOMAS:
16  Q.    And ask you if that's your expert report
17  in this case?
18  A.    Yes.
19  Q.    And does Deposition Exhibit No. 1 contain
20  the complete set of your opinions that you're
21  prepared to offer in this case that you have at
22  this time?
23  A.    Yes.
24        (Marked Exhibit 2.)
25

| Page 7 |
| --- |

1   BY MR. THOMAS:
2   Q.    Let me show you Deposition Exhibit No. 2.
3   Deposition Exhibit No. 2 is your Notice of
4   Deposition in this case.  Have you seen that
5   before today?
6   A.    Yes.
7   Q.    And in response to Deposition Exhibit
8   No. 2, did you seek to collect documents that are
9   responsive to the document requests that are
10  attached to that notice?
11  A.    Yes.
12  Q.    And what did you bring to me today?
13  A.    The notebook is the report with the
14  reliance documents.  So the -- I have an updated
15  CV.  There's a few papers that have been updated.
16  Q.    Okay.
17  A.    That's an updated CV.
18  Q.    I'm going to mark your updated CV as
19  Deposition Exhibit No. 3.
20        (Marked Exhibit 3.)
21        THE WITNESS:  I brought the fee
22  sheet.  It's the same as the one in the report.
23  No change there.
24        MR. THOMAS:  Okay.  I will mark your
25  fee sheet as Deposition Exhibit No. 4.

| Page 8 |
| --- |

1        (Marked Exhibit 4.)
2   BY MR. THOMAS:
3   Q.    Do you have an hourly rate?
4   A.    No.
5   Q.    Okay.  And how many hours is a half a day?
6   A.    I don't know.  It's half a day.  We decide
7   at the time that the activity was performed.
8   Q.    Last time I saw your fees, I think, were
9   in the Perry case.  You were charging $475 an
10  hour; is that right?
11  A.    I don't remember.  That's in the range.
12  Q.    Okay.  So Deposition Exhibit No. 4
13  represents your current fees, correct?
14  A.    Yes.
15  Q.    What happens if you only work for an hour?
16  A.    What do you mean only work for an hour?
17  Q.    Well, you --
18  A.    With respect to what --
19  Q.    Well --
20  A.    -- activity?
21  Q.    -- any -- for labor you charge $1,250 for
22  a half a day.
23        What happens if you only work for an hour?
24  A.    Let me look at the fee sheet again.
25  Q.    You have it right there.

| Page 9 |
| --- |

1   A.    So you're looking at -- you're looking at
2   the -- I'm not sure where you're looking,
3   actually.  Was it research and analysis?
4   Q.    Under labor --
5   A.    Yeah.
6   Q.    -- research and analysis, you show half
7   day, full day, $1,250 for a half a day.  Are
8   there --
9   A.    Right.
10  Q.    -- days when you only work an hour?
11  A.    I don't typically -- so the way I -- I do
12  the billing is I -- I charge a flat rate for a
13  report.  And I charge the half day or the full day
14  for travel and testimony.  That's the way the
15  billing is done.
16  Q.    Okay.  So are you doing research and
17  analysis for which you bill your time?
18  A.    I don't remember billing time for research
19  and analysis.  It's all been -- that I can
20  remember, it's -- I bill for a report or I bill
21  for the testimony or the travel.  That's how my
22  billing has been done.
23  Q.    Okay.
24  A.    It's on the fee sheet, but I don't think
25  I've been using that.  I've been billing by

3 (Pages 6 to 9)

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 10

1   reports.
2   Q.    Okay.  And the last entry shows
3   deposition, trial preparation.  Is that a flat
4   rate that you charge to get ready for trial?
5   A.    That's correct.
6   Q.    And then if you're testifying at trial, I
7   see you have an entry here for $2,000 for a half a
8   day and $4,000 for a full day; is that correct?
9   A.    That's correct.
10  Q.    Okay.  What else did you bring?
11  A.    I brought an updated list of previous
12  testimony.
13        (Marked Exhibit 5.)
14  BY MR. THOMAS:
15  Q.    I've marked your updated list of previous
16  testimony as Deposition Exhibit No. 5.
17        Do you have any depositions currently
18  scheduled now -- between now and December?
19  A.    Not that I'm aware.  I don't think so.
20  Q.    Do you have any trials at which you're
21  supposed to appear between now and December?
22  A.    Possibly a Boston Scientific trial in
23  October in North Carolina.
24  Q.    Okay.  Do you know the name of that case?
25  A.    I can't remember.  It's a Boston

Page 11

1   Scientific.  It was part of the wave.  So it
2   was -- it was -- I believe it was part of the
3   Barba wave.
4   Q.    Are you --
5   A.    But I don't remember the case.
6   Q.    Are you planning to attend that trial as
7   you sit here today?
8   A.    That's my intent.
9   Q.    Okay.
10  A.    I think it's the week of the 5th.
11  Q.    Okay.  What else do you have with you
12  today?
13  A.    I have the invoice for the report that I
14  prepared for this case.
15        (Marked Exhibit 6.)
16  BY MR. THOMAS:
17  Q.    I'll mark the invoice for the report that
18  you prepared in this case as Exhibit No. 6.
19        Is that the total amount of time that
20  you've billed plaintiff's counsel for this matter
21  to date?
22  A.    For this -- for this matter, this is what
23  I've billed plaintiff's counsel.
24  Q.    Okay.  What else did you bring with you
25  today?

Page 12

1   A.    That's it.  Well, other than this
2   notebook, which is the report with many of the
3   footnotes.
4   Q.    Okay.
5   A.    Do you want to enter that in?
6   Q.    I always do.  You know that.  I'm going to
7   mark your notebook.
8   A.    I just would like to have it back so I can
9   use it.
10  Q.    Absolutely will.  I'm going to mark your
11  notebook as Deposition Exhibit No. 7.
12        (Marked Exhibit 7.)
13  BY MR. THOMAS:
14  Q.    And is it fair to describe this as your
15  report with all the references that you cite that
16  you need -- want to have to talk about?
17  A.    Not all of the references, but most of the
18  references are there.
19  Q.    Okay.
20        MR. THOMAS:  And, Counsel, I believe
21  you told me before that you have something you
22  need to give me?
23        MR. BOWMAN:  Yes, sir.  It's a thumb
24  drive.
25        MR. THOMAS:  Can you tell me what's

Page 13

1   on the thumb drive?
2         MR. BOWMAN:  Yes.  That is literature
3   and documents that are on his reliance list that
4   was already turned over with his report.  I also
5   have a separate file for testing that was
6   requested in the Notice of Deposition.  It's
7   actually very huge, so I'm going to have to send
8   it to you as a link if that's all right.
9         MR. THOMAS:  So there's additional
10  information; is that right?
11        MR. BOWMAN:  That's right.
12        MR. THOMAS:  Is that the testing that
13  he did on the -- intentionally oxidizing
14  polypropylene?
15        MR. BOWMAN:  So I'm going to let him
16  talk about that, but it's in response to the
17  deposition request 15.
18        MR. THOMAS:  Okay.  I'm going to mark
19  the thumb drive as Exhibit No. 8.
20        (Marked Exhibit 8.)
21        MR. BOWMAN:  For clarity's sake, the
22  thumb drive does not contain the testing.  The
23  testing will be on the link that I send.  Is that
24  all right?
25        MR. THOMAS:  That's fine.  Is there

4 (Pages 10 to 13)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

## Scott A. Guelcher, Ph.D.

Page 14

1  anything else that you can tell me that is not on
2  the thumb drive, other than the testing that was
3  the subject of the request?
4          MR. BOWMAN:  I can.  There were
5  objections made to producing all of his testimony
6  and reports from all pelvic mesh litigations.  And
7  there was -- there were objections made to
8  producing all of his time as was reported in other
9  pelvic mesh litigations.  I believe there were
10 also objections to things beyond the scope of the
11 litigation and as being not responsive per Federal
12 Rule 26.
13         MR. THOMAS:  Okay.
14         MR. BOWMAN:  And we can get into
15 those if you want.  But as far as I know,
16 everything else is being produced.
17         MR. THOMAS:  Well, as we discussed, I
18 believe you stated the objections were filed last
19 night.  I don't have -- we don't have here today,
20 and I don't want to spend time fussing about that
21 because we've -- I'd like to get out of here
22 early, and I'm sure you would too.
23         MR. BOWMAN:  Frankly, I couldn't
24 argue with you if I wanted to, so...
25         MR. THOMAS:  Well, there we have it.

Page 15

1          MR. BOWMAN:  Yes.  All right.
2  BY MR. THOMAS:
3  Q.    Doctor, you heard counsel's explanation of
4  the information that's contained on the thumb
5  drive.  Did you prepare the thumb drive?
6  A.    I did not.
7  Q.    Okay.  You heard him describe some testing
8  that's not on the thumb drive that's going to be
9  supplied to us by a link.  What is that?
10 A.    That was the testing that Dr. Dunn did on
11 several meshes.  And it was produced at Perry
12 deposition.
13 Q.    Is there anything new and different
14 produced in that testing that I'm going to get by
15 link today that hasn't been produced in the Perry
16 case?
17 A.    Not to my knowledge.  I don't -- I believe
18 it's the same information.
19 Q.    Did you review that information before it
20 had been supplied to counsel to give to me?
21 A.    I did not.  I -- it came directly from
22 Dr. Dunn.
23 Q.    Okay.  Dr. Guelcher, you know I've had the
24 opportunity to take your deposition on a couple of
25 times, and I believe Burt Snell took your

Page 16

1  deposition in the Perry case.
2  A.    Yes.
3  Q.    Have you reviewed your testimony in the
4  Huskey case and the Perry case in preparation for
5  this deposition?
6  A.    Yes, I've reviewed some of that testimony.
7  Q.    Is there anything about your answers in
8  either the Huskey case or the Perry case that you
9  believe are -- to be incomplete or inaccurate?
10 A.    No.  I believe my opinions have largely
11 stayed the same, and there's new information that
12 further supports the opinions, but they haven't
13 changed in the basic essence.
14 Q.    And the reason why I asked the question,
15 just to be fair and clear, is that you've already
16 been deposed at length on some very --
17 A.    I understand.
18 Q.    -- basic stuff in your reports, and I just
19 don't want to go over it again.
20 A.    I understand.
21 Q.    Is there any reason for me to ask you
22 about your prior testimony, either the Huskey case
23 or the Perry case, for you -- to give you a chance
24 to further explain your opinions?
25 A.    I don't believe so.

Page 17

1  Q.    Okay.  Since your deposition in the Huskey
2  case, have you had any further training in polymer
3  science?
4  A.    What do you mean by training?
5  Q.    Anything that adds to your skill set to
6  you to evaluate these meshes.
7          MR. BOWMAN:  Object.
8          THE WITNESS:  It's been a year.  I
9  have -- I've published several new papers.  Do you
10 want me to -- I'm not sure what you're asking me.
11 BY MR. THOMAS:
12 Q.    Well --
13 A.    Do you want me to go through new papers,
14 new presentations?  I'm not...
15 Q.    Papers and presentations, I don't need to
16 you go through them in detail, but is that what
17 you're referring to as being the additional work
18 that you've done since we were last together?
19 A.    Well, I'm hung up on the word "training."
20 Training to me means taking a class.  I have
21 additional experience.
22 Q.    Okay.  Have you had any additional
23 classes?
24 A.    Classes on?
25 Q.    Polymer science.

Golkow Technologies, Inc. - 1.877.370.DEPS

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 18

1   A.    I mean, I teach classes. I don't
2   generally take them, so...
3   Q.    I understand. But the answer to the
4   question is no, correct?
5   A.    No.
6   Q.    Okay. But you have done additional
7   research?
8   A.    Yes.
9   Q.    And you have presented papers?
10   A.    Yes.
11   Q.    Is that the extent of the additional work
12   that you've done since we were together last in
13   Huskey?
14   A.    It's all research related.
15   Q.    Okay. And research related to this
16   litigation?
17   A.    How does research relate to the
18   litigation? You mean -- I'm not sure what you
19   mean.
20   Q.    Well, what I'm trying to understand is the
21   additional work or knowledge that you've gained --
22   A.    Right.
23   Q.    -- since the Huskey deposition, is that
24   information and knowledge that you've gained
25   through your research in this litigation?

Page 19

1   A.    Well, it's -- it's in my updated CV. My
2   report has some discussion of new references. So
3   I would say that there's new papers and new
4   presentations that are either on the CV or
5   discussed in the report that reflect my updated
6   knowledge and understanding of pelvic mesh over
7   the past year.
8   Q.    And the updated knowledge and
9   understanding that you have about pelvic mesh over
10   the last year has been gained through your work in
11   this litigation, fair?
12   A.    Not exclusively. Not -- not the
13   litigation. When I think in terms of litigation,
14   I'm thinking in terms of what's been billed to the
15   litigation. And what's been billed to the
16   litigation is reports, depositions, trial
17   testimony. That's what's been billed to
18   litigation. The other work is through my
19   professional appointment at Vanderbilt where I do
20   research. So -- so that's all Vanderbilt
21   research.
22   Q.    What Vanderbilt research have you done
23   since we were together last on the -- on pelvic
24   mesh issues?
25   A.    Well, I co-authored a paper with

Page 20

1   Dr. Iakovlev. I'm sorry. Could you repeat the --
2   you're -- you're referring back to Huskey trial?
3   Q.    The Huskey deposition.
4   A.    Huskey deposition.
5   Q.    That's right.
6   A.    Okay. So the new work that's been done is
7   the study with Dr. Dunn that was funded by his
8   company. Mr. Snell deposed me on this in the
9   Perry case. It was produced in Perry by Jeff
10   Kuntz. So Mr. Snell deposed me on it. But it was
11   part of research at Vanderbilt, paid for by
12   Dr. Dunn's company. Then there's the paper with
13   Dr. Iakovlev, and there's the IUGA meeting
14   that I went to in June.
15   Q.    And where was the IUGA meeting?
16   A.    It was in France.
17   Q.    And who paid for you to attend the IUGA
18   meeting in France?
19   A.    I paid. It was not part of the
20   litigation.
21   Q.    Did you attend -- did any plaintiff's
22   counsel attend that meeting?
23   A.    For any mesh litigation?
24   Q.    Yes.
25   A.    Okay. There either were two attorneys...

Page 21

1   Q.    And who attended that meeting that you
2   knew --
3   A.    Margaret Thompson and Bri Olson (phonetic)
4   from Motley Rice.
5   Q.    And did you work with Ms. Thompson or
6   Ms. Olson while you were in France on the issues
7   presented by this litigation?
8   A.    So Ms. Thompson requested a workshop, a
9   mock trial workshop at the IUGA meeting. And I
10   participated in that mock trial workshop.
11   Q.    And what did you do at the mock trial
12   workshop at the IUGA meeting?
13   A.    I was an expert witness.
14   Q.    Were you compensated for your time?
15   A.    No.
16   Q.    Who else participated in the mock trial
17   workshop?
18   A.    Dr. Iakovlev, Dr. Carey, Dr. Ostergard.
19   That's all I remember.
20   Q.    And was this mock trial workshop put
21   together by Dr. Thompson?
22   A.    It was.
23   Q.    And what did you do to prepare for that
24   mock trial workshop?
25   A.    Well, Ms. Thompson prepared slides for my

6 (Pages 18 to 21)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

## Scott A. Guelcher, Ph.D.

Page 22

1  direct exam. And she prepared handouts for the
2  attendees who -- the people who attended the
3  workshop were divided into two juries, and
4  Ms. Thompson gave them several documents.
5  Q.     And who conducted your direct examination?
6  A.     Ms. Thompson.
7  Q.     Were there any other lawyers other than
8  Margaret Thompson and Bri Olson who were present
9  at the IUGA meeting that you met with?
10  A.     I don't know everyone who was in the
11  audience. I don't know.
12  Q.     And the people who attended the workshop
13  were doctors?
14  A.     There was a mix. They were doctors,
15  Ph.D.s, maybe some trainees. There was a mix of
16  people. I didn't meet all of them.
17  Q.     Do you have a list of attendees?
18  A.     I don't. The IUGA would have that, the
19  people who registered for the workshop. Margaret
20  Thompson may have that. I don't have it that I
21  know. I don't believe I have that.
22  Q.     Do you still have a set of the slides that
23  you used at the mock trial?
24  A.     I was told by plaintiff's counsel that
25  there are objections pending on that.

Page 23

1  Q.     Okay. But do you still have a set of
2  those slides?
3  A.     I believe so. But I haven't looked at --
4  I'm not really sure.
5  Q.     Okay. And have you -- those are slides
6  that you did not produce to me today?
7  A.     I did not produce them at all. They're
8  someone else's property. I mean, Ms. Thompson
9  prepared the slides for me.
10  Q.     Okay. Have you seen the other slides
11  produced by the other witnesses, Dr. Iakovlev,
12  Dr. Carey, and Dr. Ostergard?
13  A.     I don't believe so.
14  Q.     Okay.
15  A.     I don't think I saw that. I saw them
16  present their slides, but I don't have their
17  slides. I have my slides.
18  Q.     Did you take any notes?
19  A.     No.
20  Q.     Did anyone subsidize your expenses for
21  your trip to France for the IUGA meeting?
22  A.     So what do you mean by subsidize my
23  expenses?
24  Q.     Did anybody help you pay for it?
25  A.     Reimburse?

Page 24

1  Q.     That's right.
2  A.     So I -- I paid for it out of my faculty
3  development fund at Vanderbilt as a discretionary
4  expense.
5  Q.     Did you receive any compensation from
6  plaintiff's counsel for your participation in the
7  workshop?
8  A.     No.
9  Q.     You know that all the people you've
10  identified have testified as witnesses for the
11  plaintiffs in the mesh litigation?
12  A.     I do.
13  Q.     Do you know whether there was any effort
14  to present expert witnesses from the defense
15  litigation?
16  A.     Ms. Thompson could speak to that. I can
17  say that there were no defense witnesses. I -- I
18  don't know if there was an attempt or not. She
19  would know. But there was a cross-exam, but there
20  were no defense witnesses, and I don't know why.
21  Q.     Did -- who conducted the cross-exam?
22  A.     Ms. Olson.
23  Q.     Was the presentation videotaped?
24  A.     I don't know.
25  Q.     Do you know whether the presentation was

Page 25

1  recorded by stenography?
2  A.     I don't know that either.
3  Q.     Is this IUGA meeting the same place where
4  you made a presentation to the group on --
5  A.     Are you referring to the PP29, the in
6  vitro oxidation study? Yes.
7  Q.     That's right.
8  A.     It was that -- the workshop was on
9  Wednesday, and I think the talk was later. I'm
10  not -- I don't remember the date. It was after.
11  Q.     How long was the meeting?
12  A.     Four days. I don't know.
13  Q.     How long were you in France?
14  A.     Ten or eleven days.
15  Q.     And other than -- did you attend the
16  meeting all four days?
17  A.     Not all day, but I went to the meeting
18  several days. I don't remember exactly which
19  days.
20  Q.     What else did you do during your time in
21  France?
22  A.     So my wife came with me. I paid for her
23  to come, and she came with me.
24  Q.     Good.
25       Other than your work with Margaret

7 (Pages 22 to 25)

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 26

1  Thompson and Bri Olson and the workshop, did you
2  have any other work on the pelvic mesh litigation
3  while you were on your trip?
4  A.    What do you mean work?  On the litigation
5  or on --
6  Q.    Correct.  On the pelvic mesh.  Anything --
7  anything -- I'm sorry.
8  A.    I'm sorry.  Go ahead, yeah.  I --
9  Q.    I just want to --
10  A.    Yeah.
11  Q.    -- define my question.
12  A.    Yeah, that's what...
13  Q.    You obviously spent almost a week more --
14  A.    Mm-hmm.
15  Q.    -- in France while you were there.
16  A.    Mm-hmm.
17  Q.    And you either spent it vacationing with
18  your wife, which I hope you did, or you spent at
19  least part of it doing some other work with
20  plaintiff's counsel or meeting with other --
21  A.    I understand.
22  Q.    -- people over there to talk about the
23  issues about which you're testifying today.
24  A.    Okay.  Now I understand.  So I'll try to
25  be a little more specific.  We were there two

Page 27

1  weekends, so on the weekends we were doing other
2  things.  During the meeting, we -- we met for the
3  workshop, and then everybody went their separate
4  ways.  So there was -- I think I had some
5  conversations with Dr. Iakovlev about our
6  manuscript that was being reviewed.  I talked with
7  Dr. Carey about writing a research grant to the
8  NIH on mesh.  I -- there wasn't -- I don't
9  remember any discussion of the litigation.  It
10  was -- it was research.  What I would call
11  research, which I would call within the context of
12  my position at Vanderbilt, which is writing
13  research proposals, writing papers, and mentoring
14  students.
15  Q.    What's the topic of the research grant to
16  NIH that you discussed with Dr. Carey?
17  A.    Well, I haven't submitted it yet, so it's
18  all, you know, confidential, new ideas.  I don't
19  have any -- I haven't written anything yet.
20  Q.    Do you -- are you -- not that I'm going to
21  argue about it.
22  A.    Yeah.
23  Q.    Are you refusing to share your ideas with
24  me?
25  A.    I don't want to.  It's -- it's still

Page 28

1  confidential.  I mean, I haven't -- these grants
2  are all confidential when they're submitted, so I
3  don't think it's appropriate to -- to discuss my
4  ideas.  It's not part of my testimony.  It's not
5  in my report.  It's not -- I'm not talking about
6  my externally funded research in this report.  I'm
7  talking about, you know, the opinions that are in
8  here.  So that's not part of my report.
9  Q.    Do the -- strike that.
10  Are the ideas that you discussed with
11  Dr. Carey designed to answer questions that are
12  posed in this litigation?
13  MR. BOWMAN:  Object to form.
14  THE WITNESS:  That's very -- what do
15  you mean questions posed by this litigation?
16  Could you be more -- I'm not -- I'm not sure what
17  you're asking me.
18  BY MR. THOMAS:
19  Q.    I'm just trying -- there are various
20  medical and scientific issues that are debated by
21  Ethicon and the plaintiffs in this litigation, and
22  you're involved in some of those issues.
23  My question is whether the research that
24  you discussed with Dr. Carey is designed to
25  further your knowledge and understanding about the

Page 29

1  issues about which you're testifying today.
2  A.    I would say it's more forward looking.
3  It's about finding new solutions, not so much
4  about -- it's separate from this.
5  Q.    Does it concern an alternative to mesh?
6  A.    It could.
7  Q.    You're not -- you're not going to tell me?
8  A.    No.
9  Q.    Okay.
10  A.    I don't --
11  Q.    I'm not going to argue with you anymore.
12  A.    I mean, this is research that's protected.
13  Q.    Protected by what?
14  A.    By confidentiality.  When I submit a grant
15  to the NIH, the reviewers who review those
16  documents all have to keep it confidential.  And
17  it hasn't even been submitted yet.  So it needs to
18  be confidential.
19  Q.    Okay.
20  (Marked Exhibit 9.)
21  BY MR. THOMAS:
22  Q.    You mentioned a minute ago PP29.  Let me
23  hand you what I've marked as Deposition Exhibit
24  No. 9 and ask you if that's the reference that you
25  just discussed.

8 (Pages 26 to 29)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 30

1  A.    It is.
2  Q.    Tell me what Exhibit No. 9 is.
3  A.    So this is an abstract that was submitted
4  to the IUGA meeting.  It was accepted for an oral
5  presentation, and it was published in the
6  supplement in the International Urogynecology
7  Journal this year.
8  Q.    And did you write Exhibit No. 9?
9  A.    I co-authored it with Dr. Dunn.
10 Q.    Who was the primary author?
11 A.    Well, I was.
12 Q.    All right.  And what contribution did
13 Dr. Dunn make to the writing of Exhibit No. 9?
14 A.    I don't remember.
15 Q.    Okay.
16 A.    I don't remember.
17 Q.    And Exhibit No. 9 is a discussion of the
18 research that you and Dr. Dunn conducted that was
19 produced and discussed in the Perry litigation,
20 fair?
21 A.    Yeah, it was produced and it was
22 discussed.  But Dr. Dunn was not deposed on it.
23 It wasn't -- it was withdrawn from the Perry
24 litigation.
25 Q.    Okay.  And I believe you said that you

Page 31

1  presented this information orally at the meeting?
2  A.    That's right.
3  Q.    And you presented it to doctors and
4  Ph.D.s?
5  A.    I presume that's who was in the audience.
6  I don't know who was in the audience.
7  Q.    How long was your presentation?
8  A.    Oh, I don't know.  Something around ten
9  minutes.  I'm not sure.
10 Q.    Did you have a PowerPoint presentation
11 with your presentation?
12 A.    I did.  And those have been produced.  I
13 gave them to plaintiff's counsel.  It's on the
14 drive, I believe.
15 Q.    Okay.  Is that on the thumb drive that we
16 have today?
17 A.    I believe so.
18 Q.    Thank you.
19    Okay.  Was Dr. Dunn present for the
20 presentation?
21 A.    No.
22 Q.    And what was the message you were trying
23 to convey to your audience when you made the
24 presentation of the information in Exhibit No. 9?
25    MR. BOWMAN:  Object to form.

Page 32

1    THE WITNESS:  The message?  You mean
2  the conclusions?
3  BY MR. THOMAS:
4  Q.    Right.  What were you trying to convey to
5  your audience?
6  A.    That oxidative -- it's stated in the
7  conclusions.  Oxidative degradation of
8  polypropylene pelvic mesh was evidenced by
9  chemical and physical changes under simulated in
10 vivo conditions.  That was the conclusion from the
11 study.
12 Q.    Okay.  And did you discuss the actual
13 experiment that you and Dr. Dunn conducted with
14 the group?
15 A.    I did.  It's in the slides.
16 Q.    All right.
17 A.    I had a slide showing the methods.
18 Q.    What's your -- strike that.
19    Tell me what expertise you have in FTIR.
20 A.    In FTIR?
21 Q.    Yes.
22 A.    Well, I've published a number of papers
23 with FTIR data.  We -- we use it quite a bit for
24 characterizing the composition of polyurethanes.
25 Q.    Mm-hmm.

Page 33

1  A.    I've also published using FTIR to measure
2  the reaction rate of the injectable polypropylene
3  grafts that we make.  So we follow the isocyanate
4  peak over time, fit it to a kinetic model.
5  There's a paper I published in 2012 or '13, a few
6  years ago, where we used ATR-FTIR to monitor the
7  reaction rate.
8  Q.    Are you trained to perform FTIR analysis
9  of fibers, mesh fibers?
10    MR. BOWMAN:  Object to form.
11 BY MR. THOMAS:
12 Q.    Could you do it?
13 A.    I didn't actually do it myself.  Dr. Dunn
14 did it.
15 Q.    Are you trained, though, in the use of
16 FTIR equipment to conduct analyses of mesh fibers?
17 A.    I've done it before, not in the last year,
18 but as a postdoc I did it.
19 Q.    Tell me about your experience as a postdoc
20 in FTIR analysis.
21 A.    Well, it was very similar.  I mean, when I
22 was a postdoc, I did the analysis of -- to
23 polyurethanes using FTIR.  Now I'm a professor, so
24 I have trainees that work for me that do those
25 measurements, but I direct them.

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 34

1  Q.   Okay.  But do you consider yourself
2  qualified to take a piece of polypropylene mesh
3  and conduct an FTIR analysis of it?
4  A.   Yes.  I've done things like that before.
5  Q.   What kind of FTIR machine was used to
6  analyze the mesh in Exhibit No. 9?
7  A.   I'm not sure.  Dr. Dunn has that
8  instrument in his lab, and I don't know what -- we
9  have a Bruker at Vanderbilt.  We've got -- I'm not
10  sure what's in his lab.  The one that I use in the
11  Nanoscience Institute I believe was a Bruker.
12  Q.   Okay.  But you don't know what machine
13  Dr. Dunn used to analyze --
14  A.   I don't know.
15  Q.   -- this mesh?
16  A.   No.
17  Q.   What experience do you have in conducting
18  XPS analysis?
19  A.   I've never done XPS analysis.  I -- my
20  students have done it under my direction, and
21  I've -- I believe I have some papers with XPS.
22  I'd have to look at my CV.
23  Q.   Is it fair to understand that you rely on
24  data generated by XPS as opposed to conducting
25  that kind of testing yourself?

Page 35

1  A.   I've done both.  I don't do it, but
2  they're my trainees.  They're people that I train,
3  that I pay.
4  Q.   I understand.  But I'm trying to find out
5  what experience you have, Doctor.
6  A.   I mean, I have experience interpreting and
7  working with XPS data.  I don't actually do the
8  measurements.
9  Q.   Okay.  That's fine.
10  A.   Okay.  Go ahead.  Sorry.
11  Q.   You have something else you want to say?
12  A.   No.  I'm -- I'm done.
13  Q.   Okay.  Do you have continuing experiments
14  with Dr. Dunn?
15  A.   Not right -- no, not now.
16  Q.   Do you have plans for additional work with
17  Dr. Dunn?
18  A.   I don't know.  I'm not sure yet.
19  Q.   Okay.  Since you spoke at the IUGA meeting
20  and this Exhibit 9 was published, have you
21  discussed with Dr. Dunn the contents of the test?
22  A.   Since the IUGA meeting?
23  Q.   Yes.
24  A.   I believe we talked about it some.  I
25  can't remember the details.  We probably have

Page 36

1  talked about it.  I just -- I don't know.
2  Q.   Do you still have the mesh that you tested
3  as a part of the experimental work in Exhibit
4  No. 9?
5  A.   Dr. Dunn, I believe, has that material.
6  Q.   Okay.
7  A.   It was done through -- he paid for it, so
8  he has the material.
9  Q.   Did you talk with Dr. Iakovlev about the
10  results of the testing that you conducted in
11  Exhibit 9?
12  A.   I believe we discussed it at the meeting,
13  but I can't remember anything definitive.  We
14  talked about, you know -- I don't -- I don't
15  remember.
16  Q.   You mentioned before that you published a
17  paper with Dr. Iakovlev?
18  A.   That's correct.
19  Q.   And Dr. Iakovlev looks at a different
20  methodology for analyzing the extent to which he
21  suggests polypropylene has degraded, correct?
22  A.   Dr. Iakovlev uses microscopy.
23       (Marked Exhibit 10.)
24  BY MR. THOMAS:
25  Q.   And staining?

Page 37

1  A.   I would -- I would -- yes.
2  Q.   Let me show you what's been marked as
3  Deposition Exhibit No. 10 and ask you if
4  Deposition Exhibit No. 10 is the study to which
5  you just referred that you co-authored with
6  Dr. Iakovlev.
7  A.   It is.  This is the version that's
8  published online on their website.
9  Q.   Contents of the article true and accurate
10  to the best of your judgment?
11  A.   Yes.
12  Q.   And you know that Dr. Iakovlev uses his
13  histological stains in an effort to understand the
14  extent to which polypropylene may have degraded?
15  A.   Yes.
16  Q.   Do you understand the chemistry by which
17  tissue is stained?
18       MR. BOWMAN:  Object to form.
19       THE WITNESS:  There's lots of
20  different stains.  I mean, is there -- is there
21  something more specific?  That's just a really
22  broad question.  There's lots of different stains.
23  Are you talking about fixation or staining or what
24  are you -- what are you talking about?
25

10 (Pages 34 to 37)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 38

1    BY MR. THOMAS:
2    Q.    I'm talking about how various stains stain
3    tissue.  Do you know how that works chemically?
4    A.    Some of them, the ones that I've worked
5    with.
6    Q.    Have you worked with H&E stain before?
7    Hematoxylin and eosin?
8    A.    Mm-hmm, yeah.
9    Q.    How does hematoxylin and eosin stain
10   tissue?
11   A.    I need to think for a minute.
12         MR. BOWMAN:  I'm going to object to
13   form.
14   BY MR. THOMAS:
15   Q.    Just for the record, you're reading
16   through --
17   A.    I'm looking at the paper.
18   Q.    -- Exhibit No. 10?
19   A.    Yeah, I'm looking at the paper.
20   Q.    I don't want to interrupt you --
21   A.    Yeah.
22   Q.    -- but may I ask you a question?
23   A.    Sure.
24   Q.    Are you able to tell me, without review of
25   Deposition Exhibit No. 10, how hematoxylin and

Page 39

1    eosin stain tissues chemically?
2    A.    I don't remember the details of it right
3    now.
4    Q.    Do you remember generally how it happens,
5    just a general concept?  Why hematoxylin stains
6    blue and eosin stains pink or red?
7    A.    I don't remember the reasons for the
8    different stains.  I know that the nuclei are
9    staining blue and the cytoplasm is staining
10   pink --
11   Q.    Is that the --
12   A.    -- or red.
13   Q.    Is that the result of a chemical reaction?
14   A.    I mean, I believe so.  It's -- I just
15   don't remember the details of that chemical
16   reaction.
17   Q.    Okay.  Do you understand that a chemical
18   reaction is required in order for a stain to be
19   left in tissue?
20   A.    That's my understanding.
21   Q.    Okay.  Do you know whether polypropylene
22   stains?
23   A.    I wouldn't expect polypropylene to stain.
24   Q.    Why is that?
25   A.    Well, it's a synthetic polymer, so it

Page 40

1    doesn't have the proteins and the...
2    Q.    Would you expect oxidized polypropylene to
3    stain?
4    A.    No, oxidized polypropylene I would not
5    expect to stain.
6    Q.    Okay.  Doctor, let's go back to Exhibit
7    No. 9, please.
8    A.    Okay.
9          Unless -- let me go back to my answer.  It
10   wouldn't -- I need to clarify a point.  It
11   wouldn't necessarily stain, but the dye could get
12   trapped in the pores of a porous material.
13   That's -- I need to add that just to be specific.
14   Q.    And when you say "the dye could get
15   trapped in the pores," what do you mean by that?
16   You're back referring to the paper again?
17   A.    Yeah.  I need to look at this again.  And
18   I should state for the record, my main
19   contribution to this paper was a myeloperoxidase
20   staining.
21         So the degraded oxidized polypropylene
22   layer is -- it's oxidized.  It's a -- it's a
23   porous material, and the -- and the dye can get
24   trapped in those pores, is the way I understand
25   it.

Page 41

1    Q.    Is that based upon your review of
2    Dr. Iakovlev's work?
3    A.    Yes.
4    Q.    Do you have any other basis for reaching
5    that conclusion, other than your review of
6    Dr. Iakovlev's work?
7    A.    That conclusion is based on my work
8    with -- yeah, with Dr. Iakovlev's staining that he
9    did in this paper.
10   Q.    Okay.  Now, when you and Dr. Dunn
11   performed your study where you intentionally
12   oxidized the TVT mesh --
13   A.    Yes.
14   Q.    -- did you ever attempt to see if those
15   samples would stain?
16   A.    No.
17   Q.    Why not?
18   A.    Because that wasn't the question we were
19   trying to answer.  We were -- we were answering
20   the question can the polypropylene in the mesh
21   oxidize, can it degrade.  And we assessed
22   oxidation by XPS and FTIR.  We assessed
23   degradation by SEM.
24   Q.    Did you ever have any conversations with
25   Dr. Iakovlev about testing, whether intentionally

11 (Pages 38 to 41)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 42

1  oxidized polypropylene would hold stain?
2  A.    I believe we may have discussed this at
3  one point for the paper.  I can't remember the
4  details, though.
5  Q.    Did you ever have a discussion about using
6  your samples from your test that are contained in
7  Exhibit No. 9 to determine whether intentionally
8  oxidized polypropylene holds stain?
9  A.    I don't remember it specifically that way.
10  He was -- I believe he was -- I can't remember the
11  details, but I believe he was doing his own
12  oxidation experiment.  And I don't think we were
13  going to give him samples.  I can't remember,
14  though.
15  Q.    What did -- what do you remember about
16  Dr. Iakovlev's own experiment on oxidizing
17  polypropylene?
18  A.    All I remember is that he had some
19  samples, and I don't -- I don't -- to my -- I
20  don't know that he's tested them.  I know that he
21  had samples, but I don't know that he ever tested
22  them.
23  Q.    Did you have discussions with Dr. Iakovlev
24  about the methodology that you used to conduct the
25  test that you and Dr. Dunn conducted there in

Page 43

1  Exhibit No. 9?
2  A.    I believe we -- we talked with him about
3  that.  He was aware of the work.  He was aware of
4  it, of the -- of the -- you're talking about the
5  abstract, right?
6  Q.    That's correct.
7  A.    He was aware of that work, yeah.
8  Q.    Did -- who started their experiments
9  first, do you know?
10  A.    Probably Dr. Iakovlev.  He's been working
11  on this for some time.
12  Q.    I'm talking about the intentionally
13  oxidized polypropylene experiments now.  Do you
14  know who did that first?
15  A.    I don't know.  I --
16  Q.    Before you started your project --
17  A.    Yeah.
18  Q.    -- did you start -- did you talk with
19  Dr. Iakovlev about it?
20  A.    I don't -- I don't remember.
21  Q.    You've been working with Dr. Iakovlev in
22  different contexts for a couple years now,
23  correct?
24  A.    Yeah.  But I got the idea to do the
25  oxidative degradation experiment from my work with

Page 44

1  the lysine-based polyurethane.  So I published a
2  couple papers on that.  That's where I -- that's
3  where I got the idea.  Now, he may have gotten it
4  independently and started before me.  I -- I don't
5  know that.  I don't know when he started it.  But
6  Dr. Dunn and I did this together independently.
7  And I have discussed aspects of it with
8  Dr. Iakovlev, but I don't -- I don't remember when
9  or what exactly.
10  Q.    Okay.
11  A.    Other than what I've told you.
12  Q.    Do you know why Dr. Iakovlev has not yet
13  tested the samples that he is testing now?
14       MR. BOWMAN:  Object to form.
15       THE WITNESS:  I don't know.  I
16  don't -- I don't know what -- he may have tested
17  them.  I just don't know the status of it.
18       (Marked Exhibit 11.)
19  BY MR. THOMAS:
20  Q.    Let me show you what's been marked as
21  Deposition Exhibit No. 11.  Is Deposition Exhibit
22  No. 11 the source document that you used in order
23  to determine the methodology for the tests that
24  are in Exhibit 9?
25  A.    It's -- it's a source.  There are other --

Page 45

1  like I said, I've published two papers on this,
2  which, I mean, I used similar methodology.  I'll
3  have to look at the details of the medium.  I
4  can't remember the...
5  Q.    Well, if you go to page --
6  A.    So where?
7  Q.    -- 520 of --
8  A.    Yeah.
9  Q.    -- Deposition Exhibit No. 11 --
10  A.    Okay.
11  Q.    -- it talks about the in vitro treatments
12  with 20 percent hydrogen peroxide solution, .1
13  cobalt chloride.  Do you see that?
14  A.    Yes.
15  Q.    Is that the same methodology you used in
16  your --
17  A.    I'm sorry.  Where did you read again?
18  I'm...
19       In vitro treatments, 20 percent peroxide
20  with -- I believe it was the same.  Let me check
21  this abstract.  It looks to be the same.
22  Q.    Okay.
23  A.    Yeah.
24  Q.    That's one of the references you cite in
25  your abstract?

12 (Pages 42 to 45)

Scott A. Guelcher, Ph.D.

Page 46

1  A.    It is, yeah.
2  Q.    Okay.  That's where I concluded that that
3  was a source document that you used for your
4  methodology; is that fair?
5  A.    It's a source document.  We're pretty
6  limited on how many references you can show in an
7  abstract.  I -- I probably showed this because it
8  was the first time this specific medium
9  composition was published.  That's probably -- but
10 I don't remember exactly.  But this paper was
11 before mine, so that's probably why I cited it in
12 the abstract because it was published -- I got the
13 idea for my paper from this paper.
14 Q.    And, Doctor, are you aware of any paper
15 that analyzes the extent to which oxidized
16 polypropylene will absorb stain?
17 A.    I don't -- I don't think we're saying that
18 oxidized polypropylene absorbs stain.  I think
19 it -- it gets trapped in the pores.  I'm not
20 necessarily --
21 Q.    Okay.  Let me ask you that question.
22 A.    -- saying it absorbs it.
23 Q.    Let me ask the question that way then.
24 A.    Okay.
25 Q.    Well, first of all, is there -- are you

Page 47

1  aware of any paper that discusses the absorption
2  of stain in oxidized polypropylene?
3  A.    You say "absorption."  You mean like the
4  way it would typically work biologically, right?
5  Q.    Correct.
6  A.    No, I'm not aware of that.
7  Q.    Are you aware of any papers which discuss
8  the extent to which oxidized polypropylene traps
9  stain such that it retains the same and shows
10 color?
11 A.    Well, no, I believe that was the point of
12 this study, is to -- I don't believe that's been
13 published.  I think that was a new finding in this
14 study.
15 Q.    That's Dr. Iakovlev's study?
16 A.    I'm sorry.  Yeah, Dr. Iakovlev's --
17 Q.    Now, those are --
18 A.    -- study.
19 Q.    -- all -- those are all meshes that have
20 been explanted from people, correct?
21 A.    This Dr. Iakovlev study, yes, it's a
22 hundred and some patients, yeah.
23 Q.    And my question is -- I'm referring to
24 pristine mesh intentionally oxidized, whether --
25 question whether that intentionally oxidized

Page 48

1  pristine mesh will trap stains in the pores such
2  that it shows color.
3  A.    I don't know if that's been done.
4  Q.    Okay.  And it's fair to understand that
5  appropriate scientific method would require a
6  study intentionally oxidizing polypropylene,
7  exposing it to stain, to determine whether it
8  does, in fact, get trapped in any cracks, pores,
9  or crevasses in order to show color, correct?
10 A.    I don't know that I would say that.  I
11 mean, it's -- I don't know how easy it is to do.
12 You know, in these previous studies, they -- they
13 oxidize -- they oxidize -- okay.  I'll be more
14 specific.
15     In the -- in Exhibit 11 -- and there's an
16 earlier -- maybe it wasn't this one.  There was an
17 earlier paper in '93 where they strained the
18 samples and they -- they looked for transverse
19 cracks and degradation by SEM, but no one's
20 ever -- it might be difficult to do.  I wouldn't
21 say that it's not scientifically valid because it
22 wasn't done.  That would give further
23 confirmation.  But this is a long paper.  You just
24 don't -- can't -- you know, this was peer reviewed
25 and it was published, so I wouldn't say that it's

Page 49

1  not scientifically valid because it wasn't done in
2  vitro.
3  Q.    Okay.  Until you test it, do you have any
4  scientific basis to conclude that intentionally
5  oxidized polypropylene would, in fact, hold stain
6  such that it shows color?
7         MR. BOWMAN:  Object to form.
8         THE WITNESS:  If it's -- if it's a
9  nanoporous structure, it has porosity, the stain
10 could defuse into those pores.  And it's not
11 necessarily absorbing -- absorbing or reacting
12 like it would with tissue, but it -- it would get
13 trapped within those pores.  But that was just one
14 outcome measure.  There were others as well.  And,
15 you know, typically with paper, you try to show it
16 multiple -- show the same idea multiple ways, and
17 we just didn't do that in vitro experiment in this
18 paper.
19 BY MR. THOMAS:
20 Q.    I understand.
21     Doctor, are you familiar with the process
22 whereby tissue is prepared into histological
23 slides?
24 A.    So, yes.  So all the -- the bone work that
25 I do, I have a woman that does my histology in my

13 (Pages 46 to 49)

Scott A. Guelcher, Ph.D.

Page 50

1  lab. She's my lab manager. And we -- we just
2  have some bones that came in just this week. So
3  we do micro CT. We keep them in formalin for two
4  weeks to fix the tissue, then we have to dehydrate
5  it through a series of alcohols. We embed it in a
6  polymethyl methacrylate resin, then we grind it
7  down to -- cut it, grind it down to 80 microns, do
8  different types of stains, do histomorphometry to
9  measure the amount of bone graft that's left over.
10  So we do this pretty routinely.
11  Q.    Do you manually prepare your slides or do
12  you use a machine?
13  A.    What do you mean manually prepare them?
14  Machine? I'm sorry.
15  Q.    I'm sorry too. My fault.
16        In the preparation of histology slides,
17  the way I understand it, it's a very complex
18  series of -- of cleanings, washings with xylene,
19  alcohol, and water?
20  A.    It depends on what you're doing, right?
21  So for the -- I mean, the rest of the bone work that I
22  do is what we call plastic embedding, hard
23  sections. So we don't cut those on a microtome
24  like what Dr. Iakovlev did. We have a -- we cut
25  them on a band saw, and then we're -- and we glue

Page 51

1  them to a surface and we grind them. We grind
2  them to 80 microns and we -- and then we stain.
3  Q.    Are you familiar with the slide
4  preparation process used by Dr. Iakovlev in the
5  preparation of his slides used in his report,
6  Exhibit 10?
7  A.    I don't know the exact details of how he
8  did it, but typically with soft tissue, you can do
9  the paraffin embedding, which is using different
10  solvents like you described, where you -- you
11  still have to dehydrate the tissue. And you --
12  but you put it in a softer plastic like paraffin
13  so you can cut a thin section on a microtome and
14  see different levels of cellular detail.
15  Q.    And part of that slide preparation process
16  involves the washing away of excess stain, doesn't
17  it?
18  A.    I believe so. There's a protocol.
19  Q.    Do you know how that washing away of
20  excess stain would impact the ability of any
21  oxidized polypropylene to hold stain, as you've
22  postulated?
23        MR. BOWMAN: Object to form.
24        THE WITNESS: I don't know. Again,
25  this is Dr. Iakovlev's work, so he would be the

Page 52

1  one that could speak to those details of the
2  protocol. I didn't -- I don't have his protocol,
3  so I don't know exactly what he did.
4  BY MR. THOMAS:
5  Q.    Okay. Going back to Exhibit No. 9, which
6  is the presentation you made at the IUGA meeting,
7  I want to talk generally about the testing that
8  you conducted with Dr. Dunn.
9  A.    Okay.
10  Q.    Whose idea was it to conduct that testing?
11  A.    It was probably both of ours. I -- I knew
12  of this oxidative medium that was developed by
13  Dr. Jim Anderson in the 1990s. He did some -- so
14  I was aware of that in my own research. Like I
15  said, I've published a couple papers on it, so I
16  knew of the methods. And then I -- we talked with
17  Dr. Dunn about how to actually do the experiment.
18  Q.    Who's "we"? Who talked with Dr. Dunn?
19  A.    Well, I meant Dr. Dunn and me. I mean, we
20  talked --
21  Q.    Okay. Did you have a -- I'm sorry.
22  A.    Yeah, we -- we discussed it together.
23  Q.    Did you have any discussions with
24  plaintiff's counsel about conducting these kinds
25  of experiments?

Page 53

1        MR. BOWMAN: Object to form.
2        THE WITNESS: I don't remember.
3  Maybe. I just don't remember what we -- it's been
4  a while.
5        MR. THOMAS: Okay.
6        THE WITNESS: We did it on our own.
7  I mean, he paid for it. It was our idea. We did
8  it. It was not billed to the litigation.
9  BY MR. THOMAS:
10  Q.    I guess my question is, do you recall
11  having any conversations with plaintiff's counsel
12  about conducting this kind of experiment that's in
13  Exhibit No. 9?
14  A.    I just don't remember. I don't -- I
15  don't...
16  Q.    You talked before about a graduate student
17  in your office doing the protocol for the test?
18  A.    What do you mean by "before"?
19  Q.    At the Perry deposition.
20  A.    Yeah. Yeah.
21  Q.    And how was it that you happened to ask
22  your graduate student to prepare the protocol?
23  A.    Well, she was doing testing for some of
24  her materials on the -- I don't remember the
25  timing of everything, but she was -- she was

14 (Pages 50 to 53)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 54

1  doing -- she was using this medium to test her
2  materials as part of her dissertation, and so she
3  had access to the material, the medium.  And so my
4  students, I typically ask them to write what we
5  call standard operating procedure, SOP.  We -- we
6  write those documents for the common procedures
7  that we do in the lab, and then I review them and
8  approve them.  So it was part of her research.
9  You know, she was doing research in this area, so
10  that's why she was involved, I think.  I can't
11  remember the details.
12  Q.     Now, the protocol calls for testing after
13  six weeks?
14  A.     I don't remember.
15  Q.     Do you remember --
16  A.     I'd have to look at it.  I can't remember
17  the timing.
18  Q.     We'll get to that in a minute.
19        Do you remember why you chose the period
20  that you did?
21  A.     You know, I think we probably wanted to --
22  we were expecting to see changes within about a
23  month, so we figured if we go out six weeks, we
24  would see it, I think.
25  Q.     What kind of changes were you expecting to

Page 55

1  see?
2  A.     Well, changes in the -- in the carbonyl
3  and hydroxyl peaks on the surface of the fibers,
4  the FTIR.  And SEM, you know, looking for
5  degradation by SEM.  So that's what we were
6  expecting to see.
7  Q.     And did you find changes in the carbonyl
8  and hydroxyl peaks for the mesh from the -- strike
9  that.
10        Did you find changes in the carbonyl and
11  hydroxyl peaks consistent with oxidative
12  degradation from the TVT mesh that you sampled?
13  A.     I believe so, but I'd have to look at the
14  data again.  I mean, this wasn't in my report, so
15  I didn't really review any of this stuff.
16  Q.     Well, let's look at the -- let's look at
17  the conclusion of Exhibit No. 9.
18  A.     Yeah.
19  Q.     You say here in the conclusion that
20  "Oxidative degradation of polypropylene, PP,
21  mesh" --
22  A.     Yeah.
23  Q.     -- "was evidenced by chemical and physical
24  changes under simulated in vivo conditions"?
25  A.     Mm-hmm.

Page 56

1  Q.     Now, the simulated in vivo conditions is
2  placing pieces of mesh in this medium, correct?
3  A.     That's right.
4  Q.     What chemical changes did you find in the
5  polypropylene mesh that you tested?
6  A.     Well, that would be in the -- in the
7  figure that's shown here.  I'm just trying to
8  refresh my memory.  But I believe this figure, we
9  don't -- let me just make sure that I -- I say it
10  correctly.  I don't believe this abstract says
11  exactly what these data in Figure 1 are for,
12  but -- so I don't know if it's TVT or a different
13  mesh.  But at the zero weeks, we don't really see
14  hydroxyl or carbonyl peaks in the IR spectra, and
15  at five weeks we do.
16  Q.     So the first figure on the second page of
17  Exhibit 11 is at zero weeks?
18  A.     Yeah.  So if you look on the SEM image, it
19  says "zero weeks" in the top left corner.  That's
20  zero weeks.  So there's really no appreciable
21  carbonyl or hydroxyl peaks in the IR spectra.
22  Q.     And so the second figure on the second
23  page of Exhibit 9, is that meant to be a
24  polypropylene mesh FTIR?
25  A.     It was not meant to be, it is.  So --

Page 57

1  Q.     So that's an F -- that's a --
2  A.     That's an FTIR scan of -- of a
3  polypropylene mesh -- I don't know the
4  manufacturer -- that was incubated in the
5  oxidative medium for five weeks.
6  Q.     Okay.  So the peaks that are shown in the
7  second page of Exhibit 9, on the left you circle,
8  and it says, "Hydroxyl (OH formation.)"
9        What does that show you?
10  A.     That -- well, that's a -- that's where the
11  hydroxyl peak appears in the IR spectra.
12  Q.     Okay.  And that's evidence to you of
13  oxidative degradation?
14  A.     Yes.
15  Q.     And the second peak marked there is
16  carbonyl formation, an arrow and a circle.  What
17  does that represent?
18  A.     Well, that's the formation of the carbonyl
19  peak in the IR spectra.
20  Q.     And what you're trying to show to the
21  reader of this abstract is that your FTIR data on
22  polypropylene pelvic mesh showed these peaks at
23  five weeks; is that correct?
24  A.     Yes.
25  Q.     And on the right is an image that shows

Golkow Technologies, Inc. - 1.877.370.DEPS

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 58

1  five weeks.  And is that the SEM imaging?
2  A.    It is.
3  Q.    And, again, you're trying to show the
4  readers that at five weeks that the polypropylene
5  mesh that you tested looked like this under SEM?
6  A.    That's right.
7  Q.    Okay.
8         MR. THOMAS:  Let's go off the record.
9  I need to take a break, please.
10        (Brief recess observed.)
11 BY MR. THOMAS:
12 Q.    Doctor, going back to Exhibit No. 9, those
13 images at the end that we've just been talking
14 about --
15 A.    Yeah.
16 Q.    -- where you identified for me the FTIR,
17 the polypropylene mesh, what's your basis for your
18 understanding that the peak on the left is -- I
19 think you called it -- is that hydroxyl?  Is that
20 the word you used?
21 A.    Hydroxyl peak.
22 Q.    And the peak on the right, I think we
23 called it a carbonyl peak; is that correct?
24 A.    Yes.
25 Q.    What references did you use in order to

Page 59

1  understand that?
2  A.    I -- I don't remember right now.  The --
3  there are tables that list where these different
4  peaks occur in materials.  I don't remember
5  exactly which reference we used.  I mean, this
6  is...
7  Q.    I know very little about FTIR.  What I do
8  know is that there are standards or tables that
9  you look at --
10 A.    Right.
11 Q.    -- in order to identify different kinds of
12 levels within the FTIR, correct?
13 A.    Right.
14 Q.    And do you recall as you sit here today
15 what you consulted in order to understand what
16 those peaks meant?
17 A.    The specific reference?
18 Q.    Yes.
19 A.    I don't remember the specific reference
20 that we used.  I mean, Dr. Dunn I know has
21 references on these.  I guess I've just been doing
22 it so long, I just know that that's where hydroxyl
23 shows up.  And that's -- carbonyl's in the 16,
24 1700 inverse centimeters range, and this
25 hydroxyl's in this 34, 3500.  It's a broader peak.

Page 60

1  I mean, I know there's references on this.  I -- I
2  don't remember exactly which specific one.  I
3  mean, they're probably cited in some of my papers.
4  Q.    Okay.  And do you remember presenting
5  these slides as a part of your presentation?
6  A.    Well, it wasn't this -- I mean, you have
7  the slides, so it was -- it was similar.  It was
8  FTIR data and SEM data.  That's what I showed.  I
9  didn't present the XPS.  Just a FTIR and the SEM
10 is what I showed.
11 Q.    Okay.  Let's go back to the first page of
12 Exhibit No. 9, down under "Results."
13 A.    Okay.
14 Q.    And midway through that paragraph it says,
15 "The dramatic increase in the size of the dash 0H
16 and C" -- I think that's called --
17 A.    That's the carbonyl.
18 Q.    "Double -- double bond O peaks from four
19 (not shown) to five weeks is indicative of
20 chemical induction."
21       And what you're referring to is the --
22 again, that image on the page 2 of Exhibit No. 9?
23 A.    Yeah.  I'm going from memory because this
24 wasn't in my report, and I'm not relying on it in
25 this case.  But, I mean, what -- what I remember

Page 61

1  is that the -- the -- the peaks up to about three
2  or four weeks were really negligible.  And then it
3  just says here, four to five weeks, we saw a
4  substantial bump.  And this is what's referred to
5  in Liebert's previous paper about induction, where
6  you have a substantial increase in the amount of
7  carbonyl and hydroxyl groups on the surface.
8  That's where -- the basis of that statement.
9  Q.    I don't want to go into great detail on
10 that --
11 A.    No, I know.  Yeah.
12 Q.    -- because I don't want to replow this
13 ground.
14 A.    Yeah, I understand.
15 Q.    But chemical induction is -- is basically
16 the tipping point, isn't it?
17 A.    Tipping point?  It becomes autocatalytic.
18 Is that what you mean?
19 Q.    Is that how you'd describe it?
20 A.    That's how I would -- I mean, it -- my
21 understanding is that you get so many hydroxyl and
22 carbonyl groups on the surface that they --
23 they -- they just -- they start catalyzing this
24 reaction and it becomes much faster, so you start
25 forming more at a faster rate.  That's the idea of

16 (Pages 58 to 61)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 62

1  induction that's --
2  Q.     And at that point --
3  A.     -- taught by Liebert and others.
4         Sorry.
5  Q.     My fault.
6         And at that point, you would lead to the
7  embrittlement, cracking, and failure?
8  A.     Yes.  Once it becomes induced, then
9  degradation sets in.  Embrittlement, cracking,
10 those are all the things that are discussed in the
11 report.
12 Q.     And why did you stop at this point?  Why
13 didn't you continue testing?
14        MR. BOWMAN:  Object to form.
15        THE WITNESS:  I don't remember the
16 details, but we just didn't have that many
17 samples.  We were limited on samples.  We had an
18 examplar.  We didn't have a lot of material.  We
19 wanted to have replicates.  We expected to see
20 oxidation within a month, so we didn't want to
21 miss it, so we sampled weekly.  And we just didn't
22 have that much material.  That's what I remember,
23 but, again, I haven't reviewed these documents
24 because it's not part of my -- it's not part of my
25 report.

Page 63

1         (Marked Exhibit 12.)
2  BY MR. THOMAS:
3  Q.     Doctor, I'm going to hand you what I've
4  marked as Exhibit No. 12.  And Exhibit No. 12 is a
5  set of the documents that you produced to us in
6  the Perry case --
7  A.     Yeah.
8  Q.     -- and which I assume to be a complete set
9  of what is on that link that I've just received.
10        The only thing that's different about
11 these documents is that we've numbered them so
12 that they're available for easier reference.  What
13 you supplied to us was not numbered, and so we've
14 had them numbered sequentially from 1 up to 214.
15 And I want to ask you some questions about these
16 documents.
17 A.     I mean...
18        MR. BOWMAN:  How did you say they
19 were numbered?  You just put them in the same
20 number that they were given to you in the folders?
21        MR. THOMAS:  We received them
22 electronically, and then we just numbered them
23 sequentially as we received them.  See the lower
24 right-hand number?
25        MR. BOWMAN:  Mm-hmm.  You put a Bates

Page 64

1  on them?
2         MR. THOMAS:  Well, it's not a Bates.
3  It's just a number.  Whether that's a -- I guess
4  that qualifies as a Bates.  Just so I can call out
5  a page number and make a better record of what
6  he's looking at.
7         (Marked Exhibit 13.)
8         MR. THOMAS:  Fair enough?
9         MR. BOWMAN:  Yes.  But I need to
10 object as -- you know, this isn't part of his
11 report, and we do have a lot to get through,
12 but...
13        MR. THOMAS:  Oh, we'll have plenty of
14 time today.
15        MR. BOWMAN:  Yeah.
16        MR. THOMAS:  I'm not worried about
17 finishing today on time.  Matter of fact, I'm
18 hoping to catch an earlier flight.
19 BY MR. THOMAS:
20 Q.     Let's go to page 11, please.  Page 11,
21 does that show one of the vials with the mesh in
22 the oxidative medium?
23        MR. BOWMAN:  Object to form.
24        THE WITNESS:  That's what it appears
25 to be.

Page 65

1  BY MR. THOMAS:
2  Q.     Okay.  And take your time looking through
3  this as your want to.  I know you haven't seen it
4  in a while.  I -- the first several pages were
5  just a bunch of empty vials, and that's why I
6  didn't ask you any questions about those.  Those
7  are you photographing all of the vials that -- --
8  A.     I mean, this --
9  Q.     -- you used?
10 A.     -- is all Dr. Dunn's work, so I -- you
11 know, I -- I don't know exactly what he did here
12 because I didn't review it for this.  So, I mean,
13 these all look like vials that he used for the
14 experiment and took a picture of.
15 Q.     Okay.
16        MR. BOWMAN:  Yeah, and that's part of
17 my objection to the document, is that, you know,
18 he's already testified that he didn't take these
19 pictures, that this wasn't --
20        MR. THOMAS:  That's fine.
21        MR. BOWMAN:  -- actually produced.
22 I think it was produced in -- in --
23        MR. THOMAS:  In Perry.
24        MR. BOWMAN:  -- the Perry case.
25 But I don't know that he can

17 (Pages 62 to 65)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 66

1  authenticate a single document in here. I don't
2  know any of that.
3          MR. THOMAS: Well --
4          MR. BOWMAN: And, honestly, I don't
5  know the paging numbers or the system that --
6          MR. THOMAS: Well, I -- your
7  objection's preserved. If he can answer the
8  questions, great. If he can't --
9          MR. BOWMAN: Great.
10         MR. THOMAS: -- that's fine too.
11         MR. BOWMAN: Thank you.
12 BY MR. THOMAS:
13 Q.    On page 13.
14 A.    Okay.
15 Q.    Page 13 is a container labeled "AT
16 oxidative media 9." I think that's 16/14, almost
17 a year ago today.
18 A.    Okay.
19 Q.    Do you recognize that as being the media
20 that was used?
21 A.    I don't know. I mean, I didn't do this.
22 So it's -- the medium has this kind of color.
23 Q.    Okay.
24 A.    Where this came -- I don't -- I can't
25 really say. I don't know.

Page 67

1  Q.    On the left is "AT." Do you know what the
2  AT is? Is that the initials of the graduate
3  student?
4  A.    Those are her initials.
5  Q.    Do you know if that's why that notation is
6  there?
7  A.    I have no idea why it's there.
8  Q.    On the bottom of that bottle is a white
9  thing. Do you know what the white thing is?
10 A.    Again, I don't know because I didn't
11 actually make this, but it appears to be -- it
12 might be a magnetic stir bar. I don't know.
13 Q.    Okay.
14 A.    With a Teflon coating. I don't -- that's
15 what you'd typically use.
16 Q.    On page 15, 15 shows a series of these
17 containers with what appears to be oxidative media
18 with pieces of TVT in them. Is that what you
19 recollect to be part of the experiment?
20 A.    That's what it appears to be.
21 Q.    Okay. And then you go to page 17.
22 Page 17 shows the bottles, and it has three --
23 one, two, three are empty. Do you know why those
24 three are empty?
25 A.    Again, I did not take these pictures, make

Page 68

1  these vials. I don't know. I can't explain these
2  things.
3  Q.    All right. Now, if you go to page 25,
4  page 25 shows what?
5  A.    So the -- the PP standard, I believe --
6  but, I mean, this is an incomplete document, so, I
7  mean, I don't have the whole thing. But I -- it
8  may be what he was -- it looks like what he was
9  calling is the -- is the polypropylene standard
10 that didn't have stabilizer in it.
11 Q.    Okay.
12 A.    That's what I believe that is, but I don't
13 know.
14 Q.    And we get back there and we have all the
15 other documents, I think that confirms that, but
16 I --
17 A.    Okay.
18 Q.    I thought you -- I think that's exactly
19 right.
20 A.    All right.
21 Q.    And so the bottle on the left which has
22 the number 68 at the top is a container of the
23 unstabilized polypropylene?
24 A.    I believe that's what it is, but...
25 Q.    And the vials that are off to the right,

Page 69

1  the six of them, are the unstabilized
2  polypropylene in the oxidative medium; is that
3  correct?
4  A.    I believe so. Again, I didn't do this,
5  so --
6  Q.    Okay.
7  A.    -- I'm speculating.
8  Q.    And if you go to page 40, do you see
9  page 40? This is the first FTIR. What do you
10 call this? A spectra or spectrum? What's the
11 right word to used?
12 A.    This would be an FTIR spectrum.
13 Q.    Okay. The FTIR spectrum up in the upper
14 left-hand corner is identified as No. 10. Do you
15 know what happened to weeks 1 through 9 -- excuse
16 me.
17         Do you know what happened to FTIRs
18 1 through 9?
19 A.    No. Again, this is Dr. Dunn's data, so I
20 don't -- I don't -- I don't know.
21 Q.    We talked before about standards that
22 people use when they do FTIR where they compare
23 their spectra to a library standard or to an
24 industry standard to see how it matches with that
25 library standard. Are you familiar with that

18 (Pages 66 to 69)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 70

1  process?
2  A.     Yeah, I'm familiar with that.
3  Q.     Do you know whether Dr. Dunn did that in
4  this case?
5  A.     I don't know.
6  Q.     Did you have discussions with Dr. Dunn
7  about that?
8  A.     I don't remember the discussions with
9  Dr. Dunn.  I...
10  Q.     As you look at the upper-hand left, this
11  is the PP standard 1.  So this is going to be the
12  unstabilized polypropylene, correct?
13  A.     I believe so.
14  Q.     All right.  And as I look at the
15  spectra -- spectrum, it shows two peaks, one at
16  2800 to 3000 and one at about 1300 to 1500.  What
17  does that tell you?
18  A.     Well, I mean, I believe those are peaks
19  associated with the structure of polypropylene.
20  But I don't -- I don't remember the actual bonds
21  they represent.  I'd have to look at those.  I
22  don't remember that.
23  Q.     There's a peak that appears right around
24  23 -- excuse me, 22 to 24.  Do you know what that
25  represents?

Page 71

1  A.     I can't remember.  I'd have to look at it.
2  Q.     And the reason why I ask is, if you go to
3  the next page, and you go to a standard
4  polypropylene sample, it doesn't have that peak.
5  Any explanation for why those peaks are different,
6  even though it's a standard that's tested at week
7  zero?
8  A.     I mean, I don't remember.  I haven't
9  reviewed this.  I don't -- I don't remember.
10  Q.     Well, as a person who conducts FTIR, do
11  you have an explanation for -- for why two samples
12  of the same material would have different FTIR at
13  the same time?
14  A.     I'd have to look at the details.  I
15  don't -- I don't --
16  Q.     What other details would you have to use,
17  look at?
18  A.     I'd have to look at what other peaks show
19  up in that wavelength.  I mean, I just -- I'd have
20  to review it.  I don't have all those things
21  memorized.  I mean, it's --
22  Q.     Okay.
23  A.     -- a lot of different...
24  Q.     Let's look at pages 42 and 43.  42 and 43
25  are FTIRs 12 and 13.  And they are run 1 and run 2

Page 72

1  of a TVT sample at week zero, correct?
2  A.     That's what it says.
3  Q.     Okay.  If you look at the difference
4  between pages 42 and 43, there's a -- a
5  significant peak at about 2300 in run 2 that is
6  not present in run 1.  Do you know what that peak
7  is on -- in FTIR 13 for run 2?  Do you know where
8  that is and what that indicates?
9  A.     I said before I have to look -- look up
10  what bonds are absorbing in that.  I don't
11  remember the -- the bond that absorbs at that wave
12  number.  I'd have to look at it.
13  Q.     Do you know why there's a differences
14  between what is the same sample run at different
15  times?
16  A.     No.  I didn't run the samples, so I -- I
17  mean, this is somebody -- this is Dr. Dunn's --
18  Q.     Is the --
19  A.     -- data.
20  Q.     -- difference -- I'm sorry.  Go ahead.
21  A.     I mean, it's his data.  I don't -- I don't
22  know.
23  Q.     Is the difference in the peak that appears
24  in image 13 compared to image 12 evidence of
25  contamination of the sample?

Page 73

1  A.     I don't know.  I don't -- I didn't do it.
2  Q.     Let's go to page 52.  Page 52 is week --
3  week 1, TVT 5.  That would be the sample number
4  for the TVT, correct?
5  A.     That's right.
6  Q.     Run No. 2.  So a week into it, you see a
7  peak again at around 2350 that goes straight down.
8  What's going on there?
9  A.     You're focusing on the wrong peaks.  I'll
10  just say that, but...
11  Q.     Well --
12  A.     So -- okay.  I didn't do this work.  It's
13  uncomfortable being deposed on something that
14  wasn't in my report, I wasn't really prepared to
15  review, and I just had a document thrust in front
16  of me with no references to check.  But I know
17  there can -- we typically purge these things with
18  nitrogen, and there can be some carbon dioxide.
19  This -- this might be in that range because when
20  we do the urethane reactions, there's a big NCO
21  peak at 2200 inverse centimeters, and we watch the
22  size of that peak decrease.  And we have to be
23  careful sometimes about -- it could be -- I think
24  it might be background CO2 that's shifting that up
25  and down.  It looks like it's in that same range,

Golkow Technologies, Inc. - 1.877.370.DEPS

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 74

1  but I'm speculating.  I have to check my
2  references.  But I know we sometimes have to make
3  corrections if it's not completely purged.
4  Q.     What do you do to make corrections?  How
5  do you do that?
6  A.     Well, when you integrate the peak areas,
7  which we didn't do in this study, but when
8  you're -- when you're tracking an NCO reaction and
9  the -- you're watching the NCO peak decrease --
10 I'm just going to pull out my paper because this
11 may take a little while.  Let me find my -- I
12 wonder if it's in here.  It may not be.  Let's
13 see.
14       On page 42 of my CV is where we studied
15 the reactivity of these injectable polyurethanes,
16 and we're still doing this work.  And if we want
17 to measure a reaction rate constant, you have to
18 measure the rate of disappearance of that peak,
19 and so we have to do baseline corrections.  It's
20 an established thing that's done.  You do a
21 baseline correction to correctly integrate the
22 area under those peaks.  And I think this is
23 like -- has something to do with the carbon
24 dioxide that may be in the -- in the environment
25 if it's not completely purged with nitrogen, but I

Page 75

1  can't remember the details.  But I have seen this
2  type of thing before where it can flip up or down
3  and -- but it doesn't have anything to do with a
4  carbonyl or a -- or a hydroxyl group.  It's --
5  but, again, I'd have to...
6  Q.     Okay.  On the right at about 1600 there's
7  another peak that wasn't there before.  What is
8  that?  And I'm referring now to FTIR 34 --
9  A.     Yeah.
10 Q.     -- on page 52 of Exhibit 12.
11 A.     I'd say it's about 1650.  And this is
12 consistent with some -- I'm just going to have to
13 go to some Ethicon documents here, so it's going
14 to take me a few minutes.  If you want to go
15 through these spectra like this, I need some time
16 to -- because I wasn't prepared for it.
17 Q.     Do you know what this peak is as you look
18 at it?
19 A.     It's -- I believe it's the carbonyl.  But
20 I'm going to give you some exact peak numbers that
21 were reported in Ethicon documents for -- for
22 carbonyls, aldehydes, ketones that can form on
23 polypropylene when it's being oxidized.
24 Q.     Okay.  You can do that if you like.  But
25 do you know as you sit here today whether the peak

Page 76

1  that appears on the right at around between 1500
2  and 1800 is a carbonyl peak?  Is that what your
3  testimony is?
4  A.     Wait a minute.  I need to look.  I need to
5  look for a minute.  This isn't a memory test.
6  Q.     It's at week 1.
7  A.     You know, I -- I really -- I'm
8  uncomfortable -- you're just, like, turning the
9  pages in this document.  If we're going to go
10 through this document, I need some time to sit
11 down and look at it because I feel like I'm being
12 ambushed here.  I'm trying to -- you're trying to
13 trap me or catch me in saying something.  I need
14 some time to review this because it's not on my
15 reliance list -- I mean it's not in my report.  I
16 didn't come here prepared to talk about this.  We
17 didn't produce this as evidence.  And this is the
18 first time I've seen this.  I need some time to go
19 through it and refresh myself with it because I
20 don't think it's fair to just have to go through
21 page by page, tell me what this peak is, tell me
22 what this peak is.  I need to have to be able to
23 review that.
24 Q.     Let me ask you this, Doctor.  I'll stop
25 doing that except for a couple, and we'll talk

Page 77

1  about them here in a second.
2  A.     Okay.
3  Q.     I won't put you through this.  But if you
4  look on the upper left-hand corner of these FTIR
5  spectra, you see identifying numbers, correct?
6  A.     What do you mean "identifying"?
7  Q.     PCT-168.  See that?
8  A.     Okay.
9  Q.     What does that mean?
10 A.     I don't know.  You'd have to ask Dr. Dunn.
11 That's a number that he --
12 Q.     Assigned to the test?
13 A.     I assume, but I don't -- I don't know.
14 You have to ask Dr. Dunn why that says PCT-168.  I
15 didn't write that.
16 Q.     Okay.  And as you look over, you see the
17 FTIR, and that's the number of the image, correct?
18 A.     I don't know.  It says 0034.  I don't know
19 what that number is.
20 Q.     Well, then it says -- after 0034, it says
21 what week the test was run, correct?
22 A.     It says week 1, so I'm assuming that was
23 the week 1 sample.
24 Q.     And TVT 5 would be the TVT 5 sample
25 number, correct?

Golkow Technologies, Inc. - 1.877.370.DEPS

8cdf93ad-d87c-4c98-8527-1754ec8ca093

## Scott A. Guelcher, Ph.D.

Page 78

1   A.    I don't know.
2   Q.    That's the bottle which we looked at a
3   minute ago with the number on it?
4   A.    It could be, but I don't know.  This is --
5   Q.    Do you have any other explanation for it?
6   A.    I said I don't know.
7           MR. BOWMAN:  Object to form.
8           THE WITNESS:  I don't know.
9   BY MR. THOMAS:
10  Q.    And run No. 2 means it's the second run on
11  that sample, correct?
12  A.    I don't know.  I don't know what any of
13  this means.  I didn't write it.
14          MR. BOWMAN:  Just for the sake of
15  trying to clear something up, I can -- I can
16  stipulate that PCT-168 is how Dr. Dunn recognized
17  his work done in the Ethicon litigation.
18          MR. THOMAS:  Thank you.
19          MR. BOWMAN:  Okay.
20  BY MR. THOMAS:
21  Q.    Let me go to page 78, please.
22  A.    I thought we were done with this.
23  Q.    I said I needed to ask you a couple of
24  questions.
25  A.    Well, then I need to review this stuff.

Page 79

1   Q.    Just -- I'm just -- this is the image that
2   appears in your report, in your publication.  Are
3   you not going to answer the questions about it?
4   A.    Is this for Exhibit 9?
5   Q.    Yes.
6   A.    I mean, I need time to review it.  I mean,
7   I didn't really look at this because it wasn't
8   even part of the report.  I mean, it's -- I don't
9   understand the purpose of this.  I mean...
10  Q.    Doctor, if you're not going to answer the
11  question, you tell me, and we'll be fine with it.
12  If you tell me no, then it's no, and I can move
13  on.
14  A.    I can't -- I need time to look at it.  I'm
15  not going to answer yes or no without time.  You
16  put these two things in front of me that I haven't
17  really looked at for months and ask me -- I don't
18  know.  I need -- I need time to look at it and
19  think.  I can't just...
20  Q.    Can you look at the image on page 78,
21  which is FTIR 78, week 5, TVT 28, run 1, and tell
22  me if that's the same image that appears in
23  Exhibit No. 9?
24  A.    I can't tell that it is or it isn't.  I'd
25  have to confirm with Dr. Dunn where that image --

Page 80

1   which one of these spectra it is.  But I'm not
2   just going to look at a picture in this book you
3   just gave me and a small picture from an abstract
4   and say.  I don't know.  I need to review it.
5   Q.    Doctor, I'm not going to argue with you.
6   I hear what you're saying, and I'll stop asking
7   questions.  But for the record --
8   A.    Well, you said that five minutes ago.
9   Q.    Excuse me.  Excuse me.  For the record,
10  these are documents that you produced to us both
11  in the Perry case and today by a link, and so I --
12  I -- I was hoping that we could answer questions
13  about them and -- we'll just have to come back
14  later.
15  A.    That was the Perry case.  This is a
16  different case.  These documents weren't...
17  Q.    They weren't available in the Perry case
18  because you gave them on a thumb drive and we
19  didn't have them to put -- --
20  A.    They were --
21  Q.    -- in front of you.  They were on a thumb
22  drive.
23  A.    They were on a thumb drive -- I don't want
24  to get angry, but he spent two hours going through
25  this with me, and I told him the same thing.  If

Page 81

1   you want to know about these documents, you have
2   to depose Dr. Dunn because I didn't do these
3   measurements, I didn't write these spectra.  I
4   didn't do it.  I got data from Dr. Dunn for -- for
5   this abstract, but I don't know what the source
6   data is.  He's the one that knows all of that.  I
7   said that in Perry.  Nobody wanted to depose
8   Dr. Dunn.  So I don't understand why we're doing
9   this again.  It's a rerun.
10  Q.    Okay.  Let's go to page 188, please.
11  Pages 187 and 188 of Exhibit No. 12 are a report
12  dated November the 6th, 2014, from Professor
13  Bridget Rogers to -- to Russell Dunn.  You've seen
14  that before, correct?
15  A.    Yes.
16  Q.    Are you able to answer questions about the
17  findings on page 188 of Exhibit No. 12?  The XPS
18  findings?
19  A.    No.  I didn't review it.  I need -- if
20  we're going to talk about that, I need a break to
21  review these.  I will answer them if I have time
22  to review them, but I'm not going to answer them
23  right now.  I need time to review it.  This was
24  not -- I'm not relying on this for this case.  It
25  was produced in Perry.  It wasn't brought up in

21 (Pages 78 to 81)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 82

1  trial.  No deposition of Dr. Dunn was taken.  So I
2  don't understand why I'm being asked these
3  questions again.  It doesn't seem reasonable to
4  me.  And if you want to ask me about it, I need
5  time to look through this book, look through my
6  notebook.  I can write down -- write down all the
7  peak numbers and -- and give you a story, but it's
8  going to take me a couple of hours to do that.
9  And I don't -- I don't know that you want to do
10 that today.
11 Q.    Well, I don't want to waste my time or
12 your time.
13 A.    I live here.  I'm here all day til 5:30,
14 so we can do it if you want to.  But I don't want
15 you to be trying to give the impression that I
16 don't know how to read FTIR spectra just by
17 putting a book in front of me that I haven't seen.
18 Q.    Please don't read anything into my
19 questions.  I'm just asking --
20 A.    Well, that's the way it comes across.  I'm
21 sorry, but --
22 Q.    Well, that's not my intention.
23       Let me ask you this question.  Are you
24 able, without spending a couple hours going
25 through this information as you've just described,

Page 83

1  to tell me what it is about the data in Exhibit
2  No. 12 that you believe shows that
3  polypropylene -- excuse me, that Ethicon TVT mesh
4  underwent oxidative degradation that's indicative
5  of chemical induction?  Are you able to do that
6  without spending the time looking at the report?
7        MR. BOWMAN:  Object to form.
8        THE WITNESS:  I'm not willing to do
9  that without reviewing these documents because I
10 did not rely upon them for my opinions.
11 BY MR. THOMAS:
12 Q.    Okay.  It's not my intention to aggravate
13 you or frustrate you.  It is my intention to get
14 the best answers I can based on the information I
15 do -- I'm not going to argue with you.
16 A.    I don't want to argue either, but I -- I'm
17 just not prepared.  I didn't rely on them.
18 They're not in my report.  If you want to ask me
19 questions about it, I need time to review it.  I
20 think that's reasonable.
21 Q.    Okay.  Doctor, I'm going to hand you now
22 what's been marked as Deposition Exhibit No. 13.
23 Deposition Exhibit No. 13 is a study titled
24 "Materials Characterization and Histological
25 Analysis of Explanted Polypropylene, PTFE, and PET

Page 84

1  Hernia Meshes from an Individual Patient."
2        Have you seen that before?
3  A.    Yes.
4  Q.    If you go to page 1117 of Exhibit No. 13,
5  are you familiar with this in Figure 3, the
6  ATR-FTIR scan?
7  A.    Yes.
8  Q.    And do you see there the indication
9  that -- the carbonyl peak at 1740?
10 A.    Yes.
11 Q.    And you understand that Wood concludes in
12 this article that the carbonyl peak at 1740 is
13 indicative of polypropylene oxidation and
14 degradation?
15 A.    That's his conclusion, I believe.
16 Q.    Do you agree with that?
17 A.    Yes.
18 Q.    Is -- is that the best evidence that you
19 know of of oxidative degradation and a carbonyl
20 peak at 1740?
21       MR. BOWMAN:  Object to form.
22       THE WITNESS:  No.  As I was saying
23 earlier, these peaks can shift.  I mean, and
24 Dr. Burkley has some notes where he talks about
25 ketoesters, sugar-like species, acrylic species

Page 85

1  that have absorptions in the 16 to 1700 inverse
2  centimeters.  So -- so the peaks can shift.
3  It's -- it's...
4  BY MR. THOMAS:
5  Q.    Do you --
6  A.    It's the nature of the work.
7  Q.    Okay.  Do you know whether Dr. Burkley is
8  correct?  Do you have any independent knowledge of
9  these peaks to know whether Dr. Burkley is correct
10 in those documents?
11       MR. BOWMAN:  Object to form.
12       THE WITNESS:  Others cite these
13 ranges as well.  You can see these carbonyl
14 species in the 1600s, you can see them in the 17.
15 Urethane carbonyl we see in my materials at 1720,
16 1730 inverse centimeters.  But they -- they can --
17 they can shift depending on -- it's just -- that's
18 just the nature.  It's a complex reaction, and
19 there's lots of species that are formed.
20 BY MR. THOMAS:
21 Q.    So of what benefit to you is FTIR if these
22 numbers can shift?
23 A.    Well, you're not going to see -- I mean,
24 if you -- the standard poly -- the pure
25 polypropylene that's not been oxidized is not

22 (Pages 82 to 85)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 86

1  going to show those peaks at those wave numbers.
2  It's going to be, you know, the -- the ones that
3  we saw in that book you were showing me, more
4  1500.  You're not going to see this broad peak at
5  3400 and you're not going to see this carbonyl
6  peak because if it doesn't have any oxygen, you're
7  just not going to see anything there.  When you
8  start seeing peaks show up in that region, that
9  tells you that there's oxidation.
10  Q.    What's the peak for DLTDP?
11  A.    I don't remember.  I'd have to look at --
12  Dr. Burkley had some comments on that.  It may
13  have been in that 1740 region.  I'd have to look.
14  Q.    That's fine.
15  A.    Well, okay.  I found the document,
16  actually.  So Mr. Burkley says that there is a
17  1740 inverse centimeter band due to the -- the
18  DLTDP antioxidant.
19  Q.    Okay.
20  A.    In the --
21  Q.    I'm sorry.
22  A.    In the eight-year sample spectra, he
23  didn't see it in the scrapings because, obviously,
24  it had been degraded by oxidation.  But then he
25  says the 1718 -- and I see this in my own work,

Page 87

1  this 1718 inverse centimeters is a carbonyl band
2  most likely associated with esters like my
3  materials can be associated with acids.  The 1638
4  and the 1618, these are beta ketone esters, acids,
5  acrylics.  It's just -- there's -- there's a
6  number of oxidized species that can absorb in that
7  range.  That's -- that's what I'm saying.
8  Q.    Okay.  The Wood article is the only source
9  that I found in the information that you provided
10  to me that is suggestive of where one would expect
11  to find a carbonyl peak for oxidative degradation.
12  Are you aware of any other studies?
13  A.    Well, there's the Ethicon studies, the
14  Ethicon -- --
15  Q.    I'm not talking --
16  A.    -- documents.
17  Q.    -- about Ethicon papers now.  I'm talking
18  about peer reviewed publications on which you
19  rely.
20       MR. BOWMAN:  Object to form.
21       THE WITNESS:  There's Clavé.  Clavé
22  did FTIR.
23  BY MR. THOMAS:
24  Q.    Okay.
25  A.    I need to look and see where he was seeing

Page 88

1  peaks.
2  Q.    You remember Clavé couldn't confirm
3  degradation by FTIR?  Do you remember that?
4  A.    Well, that's what he said, but I believe
5  it's --
6  Q.    Do you think he's wrong?
7  A.    I'm not saying that he's wrong.  I'm
8  saying that he -- he wrote that.  That's what he
9  wrote in his paper, but I -- I believe that that's
10  absorbing in the -- in the -- I need to find the
11  number.  That's absorbing in that same range.  Let
12  me just find the number.
13  Q.    Let's go -- I'll mark that as -- where are
14  we?  13?
15  A.    But I -- just for the record, I have
16  testified about all this before, these papers.  I
17  have.
18  Q.    You brought it up.  You said Clavé made
19  some finding about oxidative degradation by FTIR.
20  And if you look at page 267 of the study, it says,
21  "Direct oxidation of the polypropylene, the FTIR
22  analysis neither confirmed nor excluded oxidation
23  of polypropylene in the in vivo environment."
24       Correct?
25  A.    That's what he wrote.

Page 89

1  Q.    Okay.
2  A.    But, again, I mean, I -- I've been asked
3  questions about these papers many times.
4  Q.    Okay.  I'm not going to -- and I didn't
5  intend to ask you about it until you brought it
6  up.
7  A.    Well, you brought it up.  You were asking
8  about FTIR.
9  Q.    Okay.  When you and Dr. Dunn did your
10  testing that we talked about in Exhibit No. 12,
11  did you discuss conducting any molecular weight
12  tests?
13  A.    We did, and there -- there just wasn't
14  enough sample.
15  Q.    Okay.  Did you discuss doing any other
16  analytical chemistry tests on the samples?
17  A.    I don't remember.  The FTIR, the XPS, and
18  the SEM seem to be the -- the best we could do
19  with the materials that we had.
20  Q.    Okay.  Did you and Dr. Jordi -- excuse me.
21       Did you and Dr. Dunn ever discuss doing
22  analytical chemistry testing on actual Ethicon
23  mesh explants?
24  A.    I think that we -- I -- I don't know if we
25  actually did for Ethicon.  I can't remember.

23 (Pages 86 to 89)

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 90

1  Q.    You did for other manufacturers.  We
2  talked about them before.  I'm not going to plow
3  that ground again.
4  A.    We did do for -- there was another report
5  where we did that, but I don't -- I can't remember
6  specifically if we had a discussion about doing
7  that for an explant for an Ethicon case.  I can't
8  remember.
9  Q.    Do you know Howard Jordi?
10 A.    Yes.
11 Q.    Have you met Dr. Jordi?
12 A.    I've not met him.  I know who he is.
13 Q.    Have you read his reports?
14 A.    It's been a while.
15 Q.    Have you read his expert witnesses reports
16 that he submitted against Ethicon?
17 A.    I believe so, but not recently.
18 Q.    Okay.  And you're aware of the molecular
19 weight testing that he conducted on the Ethicon
20 meshes?
21 A.    I don't remember his molecular weight
22 testing.
23 Q.    What -- what testing do you remember that
24 he conducted?
25 A.    I thought he did some pathology similar to

Page 91

1  what Dr. Iakovlev did, but I don't -- I don't
2  remember the details of what -- I know he talked
3  about oxidation, but I just can't remember the
4  details of what he did.
5  Q.    Do you know he's an expert witness in this
6  case?
7  A.    I didn't know that, but...
8  Q.    Did you know he submitted a report in this
9  case?
10 A.    If he had, I don't remember looking at it.
11 Q.    Do you know the extent to which findings
12 that he makes in the work that he's done on
13 Ethicon mesh are consistent or inconsistent with
14 your work?
15       MR. BOWMAN:  Object to form.
16       THE WITNESS:  I don't know.
17 BY MR. THOMAS:
18 Q.    Do you know the extent to which the
19 findings that he made in his work in this
20 litigation are consistent or inconsistent with the
21 work of Dr. Iakovlev?
22       MR. BOWMAN:  Object to form.
23       THE WITNESS:  I don't know that
24 either.
25

Page 92

1  BY MR. THOMAS:
2  Q.    Let's go back to Exhibit No. 9, please.
3  Dr. Guelcher, in Exhibit No. 9 we talked a minute
4  ago about the oxidative media in which you placed
5  these TVT meshes for a period of up to six weeks.
6  A.    Mm-hmm.
7  Q.    What would happen if this oxidative media
8  in that form was placed in the body?
9       MR. BOWMAN:  Object to form.
10      THE WITNESS:  What do you mean if it
11 were placed in the body?
12 BY MR. THOMAS:
13 Q.    If -- if you cut somebody open in the
14 pelvic floor and placed this oxidative media in
15 the pelvic floor, what would it do to tissue in
16 the body?
17      MR. BOWMAN:  Object to form.
18      THE WITNESS:  Why would you do that?
19 This -- that's not what it's intended to do.  It's
20 intended to simulate the privileged
21 microenvironment between the adherent macrophage
22 and the biomaterial surface.  So it doesn't -- you
23 would never -- it's a -- it's a -- to just pour it
24 in the pelvic floor, I don't -- I don't get it.
25

Page 93

1  BY MR. THOMAS:
2  Q.    Well, whether you get it or not, do you
3  have a -- do you have any idea about what would
4  happen if you introduced this oxidative solution
5  into the tissue in the pelvic floor?
6       MR. BOWMAN:  Object to form.
7       THE WITNESS:  It would oxidize
8  tissue.
9  BY MR. THOMAS:
10 Q.    It would kill tissue?
11 A.    That's what -- I mean...
12 Q.    Yes?
13 A.    I mean, it would react.  I don't
14 know what -- I don't want to use the word kill
15 tissue, but it -- there would be a reaction with
16 the tissue.
17 Q.    And what kind of reaction would take
18 place?
19 A.    An oxidative reaction.
20 Q.    And what would that do to the tissue?
21 A.    I don't know.  I've never done it.  I
22 don't -- I don't know why anybody would do that.
23 That's not what this medium is intended to do.
24 Q.    Well, it is trying to replicate the in
25 vivo conditions, correct?

24  (Pages 90 to 93)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 94

1   A.    No, that's not what I said.  I said it's
2   replicating the privileged microenvironment
3   between an adherent macrophage and a surface that
4   it's attached to.  That's what's in my report.
5   Q.    So just so I'm clear, this oxidative...
6   A.    Well, that's what it says here:
7   "Simulates the microenvironment between an
8   adherent macrophage and the biomaterial surface."
9   Q.    So --
10  A.    So it's contained at a very specific
11  location.  It's not just dumped all over the body.
12  Q.    Okay.  So it does not replicate what
13  happens when mesh is placed in the body; is that
14  fair?
15  A.    No, that's not fair at all.
16          MR. BOWMAN:  Object to form.
17          THE WITNESS:  I've already answered
18  the question.  It replicates -- when mesh is
19  placed in the body, the surface is populated by
20  adherent macrophages, and there's a privileged
21  microenvironment between that macrophage and that
22  polymer surface, and that area is exposed to a --
23  a medium like this.  That's what this is -- this
24  is what Dr. Anderson showed in the '90s, is that
25  he could reproduce in vivo oxidation by using

Page 95

1   accelerated in vitro test in this medium.  I don't
2   know how else to say it.
3   BY MR. THOMAS:
4   Q.    Okay.  But you agree it's a bad idea to
5   introduce this oxidative media into the body just
6   by itself?
7          MR. BOWMAN:  Object to form.
8          THE WITNESS:  There's no reason to do
9   it.
10          MR. THOMAS:  Okay.
11          THE WITNESS:  That's not the purpose
12  of the test.
13  BY MR. THOMAS:
14  Q.    Doctor, do you know what protein
15  adsorption is?
16  A.    Yes.
17  Q.    What is protein adsorption?
18  A.    Well, proteins adsorb to a surface.
19          MR. THOMAS:  That's A-D, adsorb, as
20  opposed to absorb.
21          THE WITNESS:  Proteins adsorb to a
22  surface.  If you implant a biomaterial, there's
23  proteins that adsorb to the surface.
24  BY MR. THOMAS:
25  Q.    And those proteins adsorb to the

Page 96

1   biomaterial surface before the macrophages get
2   there, don't they?
3          MR. BOWMAN:  Object to form.
4          THE WITNESS:  Well, they -- they
5   mediate cell attachments, so the proteins adsorb
6   first and then the cells can attach.
7   BY MR. THOMAS:
8   Q.    Okay.  And is the adsorption a chemical
9   reaction?
10  A.    Well, adsorption can be physical or
11  chemical.  It can be a -- physisorption would be a
12  weak bonding, like van der Waals forces, ionic
13  interactions.  That could be a reversible, we
14  call, physisorption.  Chemisorption is when it
15  adsorbs and there's a chemical reaction.  So it
16  could be either one.
17  Q.    Have you studied the extent to which
18  proteins adsorb onto TVT PROLENE mesh upon
19  implantation in the body?
20  A.    Have I studied that?  What do you mean by
21  that?
22  Q.    Just that.  Have you looked at that issue?
23  A.    Have I looked at it?
24  Q.    Yes.
25  A.    Well, I mean, there are -- it's a

Page 97

1   well-known fact that protein adsorbs to many
2   polymers.
3   Q.    And you would expect --
4   A.    So it's in the Ethicon documents.  It's in
5   the papers.  I've published papers with protein
6   adsorption data.  It's -- it's a well-known
7   phenomenon.
8   Q.    And you would expect upon implantation for
9   proteins to adsorb and bind to the PROLENE
10  polypropylene, correct?
11  A.    Yeah.  They would adsorb to the surface.
12  Q.    And create a bond with the surface that
13  varies in strength depending on the circumstances
14  of the adsorption, correct?
15  A.    That's reasonable.
16  Q.    And that that bond will keep those
17  proteins on the polypropylene until they're
18  removed?
19          MR. BOWMAN:  Object to form.
20          THE WITNESS:  I mean, it's reverse --
21  if it's reversible adsorption, there's an
22  equillibrum.  So the amount of protein in
23  concentration in the liquid is going to have an
24  effect on the amount of protein that's adsorbed on
25  the surface if it's a physisorption.  And, you

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 98

1  know, they would -- when you remove the tissue,
2  you're most likely removing these proteins, and
3  this is -- this is what Dr. Iakovlev was doing,
4  removing the tissue.
5  BY MR. THOMAS:
6  Q.    Dr. Iakovlev --
7  A.    I don't know what you're asking.
8  Q.    Dr. Iakovlev doesn't remove any tissue
9  when he does his tissue samples, does he?
10  A.    I was referring to the -- to the XPS
11  measurements that we did. He manually dissected
12  them so we could do the XPS. That's what I was --
13  the context of what I was saying.
14  Q.    Okay. But until these adsorbed proteins
15  are removed from the polypropylene, they're bound
16  to the polypropylene, aren't they?
17  A.    Yes. And you can remove them. There was
18  some work done at Ethicon removing them with
19  solvents. And the conclusions in those documents
20  is there's a mix of protein and oxidized
21  polypropylene on the surface. This idea that
22  the -- and that the -- that the polymer is
23  degrading, oxidizing, it becomes porous, and then
24  proteins can get trapped in there. And so the
25  conclusions from a lot of Mr. Burkley's studies is

Page 99

1  it's a mixed of protein and oxidized
2  polypropylene.
3        MR. THOMAS: Move to strike
4  everything after "yes."
5        THE WITNESS: Why?
6        MR. THOMAS: Because the rest of it's
7  not responsive.
8        MR. BOWMAN: And just FYI, he's
9  asking you questions, you're not allowed to ask
10  him --
11        THE WITNESS: Okay. I'm sorry. I
12  thought we were talking about protein adsorption.
13        MR. BOWMAN: I have to amend my
14  stipulation earlier. PCT-168 actually refers to
15  Dr. Dunn's file on Boston Scientific, not Ethicon.
16  I apologize for that.
17  BY MR. THOMAS:
18  Q.    Okay. I have to ask the question then.
19  Is PCT-168 testing Ethicon meshes or Boston
20  Scientific meshes?
21  A.    I don't know. That's Dr. Dunn's numbering
22  system. I don't -- I don't know what --
23  Q.    They call it TVT.
24  A.    I mean, if you really want to know, you
25  should depose Dr. Dunn about it. I don't --

Page 100

1  that's what I said in December. I don't know.
2  Q.    Okay. Doctor, you -- do you have an
3  opinion that the Ethicon TVT should be
4  significantly changed or modified in its design?
5        MR. BOWMAN: Object to form.
6        THE WITNESS: I believe that the TVT
7  is a heavyweight mesh. We know that the foreign
8  body reaction associated with heavyweight mesh can
9  be more severe. And so, you know, it's going --
10  all these -- the more polypropylene that's there,
11  the more foreign body reaction, oxidation,
12  degradation, is going to be present.
13  BY MR. THOMAS:
14  Q.    Are you of the opinion that there should
15  be a different material used?
16  A.    I've never expressed an opinion about
17  different materials to be used for mesh.
18  Q.    Okay. Do you have -- strike that.
19        Are you prepared to offer an opinion at
20  all in this case that the Ethicon device needs to
21  be changed or modified in its design?
22        MR. BOWMAN: Object to form. Can we
23  just get specific to the device you're talking
24  about?
25        THE WITNESS: Yeah.

Page 101

1        MR. THOMAS: The Ethicon TVT device.
2        THE WITNESS: Could you repeat the
3  question?
4  BY MR. THOMAS:
5  Q.    Dr. Guelcher, do you have the opinion that
6  Ethicon should change or modify the TVT device,
7  and if so, how?
8  A.    Well, I -- I thought I just answered that.
9  It's a -- it's a heavyweight mesh. Ethicon's own
10  documents even point to the fact that a
11  lighter-weight mesh would elicit a less intense
12  inflammatory response, oxidation, degradation,
13  less mesh is better. This is a concept that I've
14  testified about previously. It's in the
15  documents.
16  Q.    Okay. Do you have an opinion as to how
17  that change in design should be made?
18  A.    I don't believe that opinion was expressed
19  in my report other than just to say a
20  lighter-weight mesh would -- less mesh is better.
21  I mean, there's a -- but I didn't really talk
22  about that. I mean, I would say that a
23  lighter-weight mesh would be expected to invoke
24  less inflammation, less foreign body reaction,
25  less oxidation, less degradation.

26 (Pages 98 to 101)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 102

1  Q.    Do you have an opinion that any mesh
2  product could be reasonably safe and effective for
3  its intended use in the pelvic floor?
4         MR. BOWMAN:  Object to form.
5         THE WITNESS:  I think I've testified
6  to, and it's in the report, that the pelvic floor
7  is very different from the abdominal wall.  These
8  meshes behave differently in the pelvic floor than
9  they do in the abdominal wall, and -- and more
10 testing needs to be done to evaluate their safety
11 in the pelvic floor.
12 BY MR. THOMAS:
13 Q.    So is it fair to understand that you do
14 not have an opinion that any mesh product could be
15 reasonably safe and effective for its intended use
16 in the pelvic floor?  You don't have that opinion
17 today?
18 A.    Not without further testing.
19        I -- I should clarify my answer.  I don't
20 believe it would be safe unless it were tested to
21 make sure that it was safe because of the problems
22 with polypropylene oxidation, degradation.
23 Q.    Is it fair to understand that whatever
24 design modifications are made in order to reduce
25 the risks as you've identified them in your

Page 103

1  report, that design modification will have to be
2  tested before it will be used in humans?
3  A.    What I testified in Perry is I would have
4  liked to have seen more testing done in in vitro
5  oxidative medium in large animals.  This could be
6  done in the sheep models.  You could do -- compare
7  abdominal wall to the pelvic floor.  There could
8  be more preclinical testing that would be done.
9  That's what's in the report.
10 Q.    I'm not really after what you've testified
11 before.
12 A.    Okay.
13 Q.    This is really a different question.
14 You've told me ways in which you think Ethicon
15 should change the design of its product.  You've
16 also told me that you think there should be
17 testing done on any change in the design of the
18 product before it would be introduced into use; is
19 that fair?
20 A.    That's fair.
21 Q.    Okay.  And the testing that you describe
22 would be both clinical, preclinical, in vitro, a
23 variety of tests to make sure that this change of
24 design would be safer than the existing TVT
25 design, fair?

Page 104

1  A.    Yeah.
2  Q.    And you'd also expect this change in
3  design to be subject to review by the FDA; is that
4  fair?
5  A.    I'm not -- I can't speak about what -- I'm
6  not really -- it's not in my report about what FDA
7  should and should not do.  I mean, I understand
8  that FDA reviews biomedical device applications.
9  I understand that.  But I'm not -- I don't want to
10 speculate about what FDA would do or would not do.
11 Q.    You would expect FDA, though, to look at
12 any change in design?
13 A.    It would have to be submitted as a -- as
14 a -- either a 510(k) or a PMA that would be
15 reviewed by FDA.
16 Q.    Okay.  So the FDA could make whatever
17 determinations they needed to make in the change
18 of the design and the safety and efficacy of the
19 product, fair?
20 A.    Say that again.  I didn't quite catch what
21 you meant.
22        MR. THOMAS:  I need your help.
23        (Reporter read back requested
24 material.)
25        THE WITNESS:  Well, FDA would not

Page 105

1  change the design.  They would ask the company,
2  say, for more information, but they wouldn't -- I
3  don't think that FDA designs products.
4  BY MR. THOMAS:
5  Q.    But they would review the design in the
6  context of the safety and efficacy for the
7  patients it was intended to treat, fair?
8  A.    They would review those data, yeah.
9  Q.    Okay.
10        MR. THOMAS:  I need to take a break
11 again.  Excuse me.
12        (Luncheon recess observed.)
13 BY MR. THOMAS:
14 Q.    Doctor, the testing that's done in
15 Exhibit 12 is -- is good, sound, reliable testing,
16 isn't it?
17 A.    Yes, I believe so.
18 Q.    And the conclusions that you've -- strike
19 that.
20        The results that are contained in Exhibit
21 12 you believe to be scientifically valid results?
22 A.    Yes.
23 Q.    And the comments that you made to the
24 International Urogynecological Association about
25 those findings were fair and accurate at the time

27 (Pages 102 to 105)

Golkow Technologies, Inc. - 1.877.370.DEPS

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 106

1  that you gave them, weren't they?
2  A.    I believe so.
3  Q.    Why aren't you relying on this testing for
4  your report?
5          MR. BOWMAN:  Objection to form.
6          THE WITNESS:  We haven't published it
7  yet.
8  BY MR. THOMAS:
9  Q.    Okay.  Is that the sole reason?
10  A.    Probably the main reason.
11  Q.    Do you plan to publish these -- this data?
12  A.    We're discussing it.
13  Q.    Have you prepared a manuscript?
14  A.    It's in draft form, but we're -- we're
15  deciding what to do.
16  Q.    Has it been submitted to any journals?
17  A.    We submitted it to the IUGA, the
18  International -- since we had a podium
19  presentation, we submitted it to the -- the
20  International Urogynecology Journal.
21  Q.    Okay.  And are they considering it or did
22  they refuse it?
23  A.    They didn't want to publish it.  We didn't
24  have -- yeah, they didn't want to publish it.
25  Q.    Why not?

Page 107

1  A.    We didn't have much clinical data.
2  Q.    Have you submitted it to any other
3  journals?
4  A.    No.
5  Q.    Is there a manuscript form that you
6  submitted to the International Urogynecological
7  Association?
8  A.    There's a PDF that we uploaded to the --
9  the submitted manuscript.
10  Q.    Do you have a file of information that you
11  maintain concerning your submission of this data
12  to the IUGA journal?
13  A.    I have documents related to that, I
14  believe.
15  Q.    Okay.  Now, for Exhibit No. 10, which is
16  the paper that you co-authored with Dr. Iakovlev
17  and Dr. Bendavid, I believe you said your
18  responsibility there was limited to the
19  myeloperoxidase; is that fair?
20  A.    I didn't say it was limited to it.  I said
21  that -- I believe what I said was that my primary
22  contribution, it was my -- I suggested that we
23  stain for myeloperoxidase, and Dr. Iakovlev
24  stained for myeloperoxidase.  We saw positive
25  staining.  And based on that contribution, he

Page 108

1  believed that I should be a co-author on the
2  paper.  But I -- I did -- yeah, it's...
3  Q.    Did you have any involvement in the peer
4  review process for the paper?
5  A.    Dr. Iakovlev handled all of that as a
6  corresponding author.
7  Q.    Do you have -- maintain a file about the
8  submission of this paper to different journals?
9  A.    I don't know what I've got on that.
10  Q.    Was this paper submitted to multiple
11  journals?
12  A.    I believe -- I believe it was submitted to
13  other journals.
14  Q.    Do you know which ones they were submitted
15  to?
16  A.    No, I don't remember right now.
17  Q.    Were there comments made on the journal
18  submission?
19          MR. BOWMAN:  Object to form.
20          THE WITNESS:  Well, we -- I mean,
21  I'm -- there were -- I don't remember what --
22  exactly what happened with those other reviews.
23  That was a while ago.
24  BY MR. THOMAS:
25  Q.    Do you maintain a file of the comments

Page 109

1  that you received on the -- what you submitted to
2  the journals?
3  A.    I don't know.  I don't...
4  Q.    Did -- did you share your draft of
5  Exhibit 9 with plaintiff's counsel before it was
6  published in the International Urogynecological
7  Journal?
8  A.    Well, I submitted it.  I wrote a -- I
9  wrote the abstract and I submitted -- I don't
10  remember sending it to plaintiff's counsel before
11  I submitted it.  I can't remember, but I don't
12  think I did.
13  Q.    Did you discuss your plans to submit this
14  abstract to the International Urogynecological
15  Association with plaintiff's counsel before you
16  did so?
17  A.    I don't remember.  I decided to do it
18  maybe -- when the workshop came up, I think, is
19  when I decided to submit the abstract.  It's not a
20  meeting that I'd normally go to, so I just -- I
21  don't remember the timing of everything.
22  Q.    Okay.  But at the same time that you were
23  having the meeting with plaintiff's counsel to
24  plan for the workshop is the same time that you
25  planned to submit this abstract; is that fair?

28 (Pages 106 to 109)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 110

1  A.    No, I don't believe so because the
2  workshop was -- the workshop was probably -- it
3  was a proposal to include in a meeting. By the
4  time I submitted that abstract, the sessions had
5  already been determined.
6  Q.    Okay. So you had already signed --
7  A.    The workshop was first, I think.
8  Q.    Okay.
9  A.    That's typical.
10 Q.    All right. Exhibit No. 10, the article
11 that you co-authored with Dr. Iakovlev and
12 Dr. Bendavid?
13 A.    Yes.
14 Q.    Did -- do you know whether this article
15 was reviewed by plaintiff's counsel before it was
16 submitted?
17 A.    I don't know who -- like I said,
18 Dr. Iakovlev is the corresponding author. I
19 don't -- I -- I don't know what he did there.
20 Q.    On page -- on -- go back to Exhibit No. 9
21 real quick. On page 2 under "Disclosure Block,"
22 did you decide what to include under the
23 disclosure block?
24 A.    I'm looking for it.
25        No. Well, okay. I need to explain that.

Page 111

1  I -- I'm going by my memory, but these are -- all
2  the meetings have different requirements. I think
3  that this one may have had specific blocks that I
4  could choose from. That's probably why -- I --
5  that says "consulted" and "consulting fee."
6  Those -- those look like fields that I had to
7  select, is what I -- but I don't remember what I
8  did exactly.
9  Q.    What did you intend to convey when you
10 said you were a consultant?
11 A.    Well, I think consultant is probably what
12 I had to select to choose expert witness.
13 Q.    Was there --
14 A.    I --
15 Q.    I'm sorry.
16 A.    I'm sorry. I don't think that I chose --
17 I can't remember, but I -- this -- that doesn't
18 look like words that I would use to describe my
19 activities, which probably tells me that there was
20 a field that I had to fill out, and that was the
21 closest. That's -- that's my best guess, but I
22 don't -- I don't really remember.
23 Q.    Was there an opportunity to disclose that
24 you were a testifying expert for the plaintiffs in
25 the mesh litigation?

Page 112

1  A.    I don't remember. That's -- I -- I don't
2  know that it was that detailed.
3  Q.    At the time of this publication and for
4  years prior to that time, Dr. Dunn had also been a
5  consultant who would testify as an expert, hasn't
6  he?
7  A.    That's right.
8  Q.    Do you know why he didn't disclose
9  anything?
10 A.    That's an error. And I don't -- when I
11 presented this talk, I had a disclosure slide. I
12 don't know why it says nothing to disclose. It
13 may have been that he had to fill that out and
14 didn't realize it. I don't -- I don't know.
15 That's an error. But I did clarify that point --
16 Q.    Is the --
17 A.    -- in the talk.
18 Q.    I'm sorry.
19 A.    Yeah.
20 Q.    Is the disclosure slide one of the ones
21 that you produced to me?
22 A.    Well, it's -- it's in the -- it's -- you
23 have slides for the AIChE presentation and for the
24 IUGA presentation, and I believe there's a
25 disclosure slide that says we were testifying

Page 113

1  in -- in -- in the litigation.
2  Q.    Okay. Whatever slides you used in your
3  presentation have been produced to me today?
4  A.    Yeah, I believe so. I -- I produced
5  those.
6  Q.    Doctor, I've tried mightily not to
7  reinvent the wheel and go through the opinions
8  that you've given in previous depositions. Have
9  we covered all of the opinions that you're
10 prepared to give in this case?
11 A.    Let me look at them one more time to be
12 sure. I want to be accurate.
13        I believe so.
14 Q.    Okay. The only question I have is on
15 page 17 of your report.
16 A.    Okay.
17 Q.    You talk about the failure modes and
18 effects analysis.
19 A.    Yes.
20 Q.    That's the first time I've seen that in
21 any of your reports. Is that new? Dr. Dunn
22 testified about it in the Huskey case.
23 A.    He was -- he was deposed on -- I don't
24 believe he --
25 Q.    He gave a deposition --

Scott A. Guelcher, Ph.D.

Page 114

1  A.    Yes.
2  Q.    -- in that case. That's what I meant.
3  I'm sorry.
4  A.    Oh, that's what you -- okay. I
5  understand. Yeah. I think that may have been the
6  first -- I can't remember if that's the first time
7  I wrote that or not, if it's in another report.
8  Q.    You cite no documents in connection with
9  that opinion. Are you prepared to offer that
10  opinion at trial?
11        MR. BOWMAN: Object to form.
12        THE WITNESS: I -- I don't intend to
13  speak about failure modes and effects analysis at
14  trial.
15  BY MR. THOMAS:
16  Q.    Okay. So is it fair for me to be able to
17  eliminate from your opinion the paragraph
18  beginning "finally" to the end?
19  A.    Not -- just that sentence that addresses
20  FMEA --
21  Q.    Okay.
22  A.    -- is -- is not something that I would
23  testify about at trial.
24        I would not testify about FMEA.
25  Q.    Very good.

Page 115

1        And I think everything else is stuff
2  that's been covered in prior depositions. Is that
3  to the best of your knowledge?
4  A.    To the best of my knowledge, yes.
5        MR. THOMAS: I'm going to stop. I'm
6  going to hold the deposition open pending some
7  issues, but we may or may not -- I may or may not
8  seek to return. But those are all the questions I
9  have right now.
10        MR. BOWMAN: Can -- do you mind --
11  what the issues are? Can you tell me what they
12  are?
13        MR. THOMAS: Questions about those
14  documents, the test results that he's not able to
15  talk about without review. And I -- I probably
16  won't come back, but I -- I just don't know until
17  I think about it. And you may have a rebuttal
18  report anyway that may solve all that problem
19  depending on what you see today.
20        MR. BOWMAN: You know, I have very
21  little, I think, in -- in terms of redirect. I
22  think I'll just go now, if that's all right.
23        MR. THOMAS: That's fine.
24        MR. BOWMAN: Okay.
25

Page 116

1        E X A M I N A T I O N
2  BY MR. BOWMAN:
3  Q.    So, Dr. Guelcher, you've looked at
4  Exhibit 12, the folder for PCT-168?
5  A.    Yes.
6  Q.    And you've already testified that you
7  hadn't reviewed this prior to today?
8  A.    That's right.
9  Q.    You also testified that you're not relying
10  on anything in this document for the opinions that
11  you're expressing at trial; is that right?
12  A.    Yes, that's correct.
13  Q.    Can I ask you, do you know what Ethicon
14  product was examined for this report?
15  A.    I believe it was a TVT laser-cut mesh.
16  Q.    And is it your understanding that your
17  reports being offered in this case are -- are --
18  do they -- do they at all apply to the laser-cut
19  mesh?
20  A.    No. My understanding, it's machine cut.
21  Q.    Have you at any time ever held in your
22  hand, examined, or looked at a -- to your
23  knowledge, a -- a mechanical-cut TVT?
24  A.    Not to my knowledge.
25  Q.    Do you know, is -- besides the fact that

Page 117

1  Dr. Dunn took the FTIR and that Dr. Rogers
2  compiled the data for the XPS test, and besides
3  what you've already testified about the protocol
4  for the solution used for this testing, is there
5  anything else that you can tell us in regards to
6  Exhibit 12?
7  A.    Not at this time, no.
8  Q.    Doctor, in your report, did you ever, and
9  have you -- and are you offering any opinion as to
10  a specific material or design of the product that
11  could be used instead of what you understand to be
12  the design of the mechanical-cut TVT?
13  A.    No, I'm not referring to a specific
14  design.
15        MR. BOWMAN: I think that's all I
16  have.
17        MR. THOMAS: Thank you. That's all I
18  have.
19        We have a couple of things we need to
20  do. We're going to take Exhibit 8, which is the
21  thumb drive. We need to figure out a way to get a
22  copy of this so that Dr. Guelcher doesn't lose his
23  notebook.
24        Last time we did that and got it back
25  to you promptly. Are you comfortable with that?

30 (Pages 114 to 117)

8cdf93ad-d87c-4c98-8527-1754ec8ca093

Scott A. Guelcher, Ph.D.

Page 118

1       THE WITNESS:  That's fine, as long as
2    I can get it back.
3           MR. HUTCHINSON:  Before we go off the
4    record, can we talk for just one second?
5           MR. THOMAS:  Hang on just a minute.
6       (Brief recess observed.)
7           MR. THOMAS:  That's all.  Thank you,
8    Doctor.
9           THE WITNESS:  Okay.
10          MR. THOMAS:  Good to see you again.
11          THE WITNESS:  Thank you.
12          MR. BOWMAN:  Thank you.
13          Do you wish to read and sign the
14   transcript?
15          THE WITNESS:  I'll read.
16   I'll look at it.  Yes.
17          MR. BOWMAN:  Is that a 30-day window?
18          MR. THOMAS:  I believe so.
19          THE WITNESS:  Okay.
20          MR. THOMAS:  And I believe I have
21   your address.
22          MR. BOWMAN:  And I think I just want
23   to formally object to extending the deposition or
24   holding it out, just -- just to get it out there.
25          MR. THOMAS:  That's fine.  Thank you

Page 119

1    all for your cooperation.
2           MR. BOWMAN:  All right.  Thank you.
3       (Proceedings adjourned at 12:32 P.M.)
4           FURTHER DEPONENT SAITH NOT.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1           REPORTER'S CERTIFICATE
2
3           I certify that the witness in the
4    foregoing deposition, SCOTT GUELCHER, PH.D., was
5    by me duly sworn to testify in the within entitled
6    cause; that the said deposition was taken at the
7    time and place therein named; that the testimony
8    of said witness was reported by me, a Shorthand
9    Reporter and Notary Public of the State of
10   Tennessee authorized to administer oaths and
11   affirmations, and said testimony, pages 1 through
12   121 was thereafter transcribed to typewriting.
13          I further certify that I am not of
14   counsel or attorney for either or any of the
15   parties to said deposition, nor in any way
16   interested in the outcome of the cause named in
17   said deposition.
18          IN WITNESS WHEREOF, I have hereunto
19   set my hand the 21st day of September 2015.
20
21
22   _____
23   GARY SCHNEIDER, RMR, CRR, TLCR No. 676
24   My commission expires:  1/9/2018
25

Page 121

1           E R R A T A
2
3           I, SCOTT GUELCHER, PH.D., having read
     the foregoing deposition, Pages 1 through 121,
4    taken September 15, 2015, do hereby certify said
     testimony is a true and accurate transcript, with
5    the following changes, if any:
6    PAGE   LINE     SHOULD HAVE BEEN      REASON
7    ____  ____   _____   _____
8    ____  ____   _____   _____
9    ____  ____   _____   _____
10   ____  ____   _____   _____
11   ____  ____   _____   _____
12   ____  ____   _____   _____
13   ____  ____   _____   _____
14   ____  ____   _____   _____
15   ____  ____   _____   _____
16   ____  ____   _____   _____
17   ____  ____   _____   _____
18          _____
19          SCOTT GUELCHER, PH.D.
20
21          _____
22   Notary Public
     My commission expires: _____
23
24
25

31 (Pages 118 to 121)

8cdf93ad-d87c-4c98-8527-1754ec8ca093