# EXHIBIT H

Brian Flynn, M.D.

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      CHARLESTON DIVISION

4    _____

5    IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEMS PRODUCTS

6    LIABILITY LITIGATION

7    _____

8    MASTER FILE NO. 2:12-MD-02327

9    MDL NO. 2327

10   _____

11   GENERAL CAUSATION RE:  PROLIFT and PROLIFT+M

12   _____

13

14

15           PURSUANT TO NOTICE, the deposition of BRIAN

16   FLYNN, M.D. was taken on behalf of the Plaintiff at

17   Denver Marriott West, 1717 Denver West Boulevard,

18   Golden, Colorado, on April 14, 2016, at 11:52 a.m.,

19   before Melanie L. Giamarco, Registered Merit Reporter,

20   Certified Realtime Reporter, and Notary Public within

21   Colorado.

22

23

24                    GOLKOW TECHNOLOGIES

              877.370.3377 ph/ 917.591.5672 fax

25                     deps@golkow.com
```

Brian Flynn, M.D.

Page 2

```
1              A P P E A R A N C E S
2   For the Plaintiffs:
3      GREG BENTLEY, ESQ.
       SHEA SHAVER, ESQ
4      ZONIES LAW, LLC
       1900 Wazee Street
5      Suite 203
       Denver, Colorado  80202
6
7   For the Defendants Johnson & Johnson and Ethicon:
8      BARRY J. KOOPMANN, ESQ.
       DAVID J. DUKE, ESQ.
9      BOWMAN AND BROOKE, LLP
       150 South Fifth Street
10     Suite 3000
       Minneapolis, Minnesota  55402
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              EXHIBITS (Continued)
2   NUMBER       DESCRIPTION            PAGE
3   Exhibit 7   AUA Update Series 2010 titled:   135
       The Use of Surgical Mesh for
4      Incontinence and Prolapse Surgery:
       Indications for Use, Technical
5      Considerations and Management of
       Complications
6      ETH.MESH.00270760 -
       ETH.MESH02270771
7
    Exhibit 8   Study by Dr. Velemir, et al.,    158
8      titled:  Transvaginal mesh repair
       of i=anterior and posterior
9      vaginal wall prolapse:  a clinical
       and ultrasonographic study
10     ETH.MESH.01192895 -
       ETH.MESH.01192901
11
    Exhibit 9  E-mail string ending 12/19/11 from   168
12     Dr. Flynn to Dr.
       ETH.MESH.08005683 -
13     ETH.MESH.008005684
14  Exhibit 10  Gynecare Prolift Surgeon's    196
       Research Monograph
15
    Exhibit 11  Dr. Flynn's Expert Report re:   231
16     Gynecare Prolift Pelvic Floor
       Repair System
17
    Exhibit 12  Dr. Flynn's Expert Report re:   231
18     Gynecare Prolift+M Pelvic Floor
       Repair System
19
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2   EXAMINATION OF BRIAN FLYNN, M.D.        PAGE
    March 24, 2016
3
    By Mr. Bentley            4, 217, 229
4   By Mr. Koopmann          180, 228
5           EXHIBITS
6   NUMBER       DESCRIPTION          PAGE
7   Exhibit 1   Invoice dated 7/1/15 - 8/31/15    7
       of Dr. Flynn
8
    Exhibit 2   Invoice dated 9/1/15 - 10/2/15    7
9      of Dr. Flynn
10  Exhibit 3   Article published in         102
       International Urogynecology
11     Journal entitled:  Traditional
       native tissue versus
12     mesh-augmented pelvic organ
       prolapse repairs:  providing an
13     accurate interpretation of
       current literature
14
    Exhibit 4   Article published in Obstetrics  108
15     & Gynecology entitled:  Vaginal
       Mesh for Prolapse:  A Randomized
16     Controlled Trial
17  Exhibit 5   Article published in Obstetrics  111
       & Gynecology entitled:
18     Complication and Reoperation
       Rates After Apical Vaginal
19     Prolapse Surgical Repair
20  Exhibit 6   Study published in AJOG       119
       entitled:  Early experience
21     with mesh excision for adverse
       outcomes after transvaginal mesh
22     placement using prolapse kits
23
24
25
```

Page 5

```
1              BRIAN FLYNN, M.D.,
2   after having been duly sworn, was examined and
3   testified as follows:
4
5           P R O C E E D I N G S
6              EXAMINATION
7   BY MR. BENTLEY:
8      Q.  Good morning, Doctor.  My name is Greg
9   Bentley.  We previously met.  We just completed
10  your TVT-O deposition, and we're now moving into
11  the general causation deposition regarding Prolift.
12  Do you understand that?
13     A.  I do.
14     Q.  Okay.  And I represent the plaintiffs in
15  the MDL; do you understand that?
16     A.  Yes.
17     Q.  Doctor, we previously entered some
18  exhibits today for the TVT-O deposition, and now we
19  are starting the Prolift portion.
20     You brought a couple of flash drives
21  previously.  Are those the same flash drives that
22  are applicable to this deposition regarding
23  Prolift?
24     A.  Yes.
25     Q.  You don't have any additional flash
```

Brian Flynn, M.D.

Page 6

1    drives for this deposition?
2        A.  I don't have any additional flash
3    drives.  I do have an additional CD and a few other
4    invoices that are specific to this deposition.
5        Q.  Okay.  And you also brought some binders
6    with what appears to be -- or could you tell me
7    what are in the binders?
8        A.  I have three binders, one is for
9    Prolift, and the other two are for Prolift+M.
10       Q.  Okay.  And you brought a CD.  Do you
11   have an understanding of what's on that CD?
12       A.  It's some Prolift and -- Prolift studies
13   and pelvic organ prolapse studies.  And I have that
14   CD here.
15       Q.  Are those studies that are in addition
16   to what was on the flash drives, or just --
17       A.  I think it repeats.  I believe these
18   studies are also on the flash drive.  But just for
19   completeness, in case they were not, I brought the
20   CD.
21       Q.  Do you have an understanding of when
22   that CD was made?
23       A.  It was sent to me -- I received it on
24   July 29th, 2015.
25       Q.  And then I have in front of me a

Page 7

1    one-page invoice.  Do you have any other invoices
2    for the Prolift and Prolift+M?
3        A.  That's the Prolift+M invoice, and then I
4    have two invoices on Prolift.
5        Q.  Okay.  This was inside one of the
6    binders.  I'll start with the Prolift invoice, if
7    you don't mind.
8        MR. BENTLEY:  We're going to mark this as
9    Exhibit 1.
10       (Exhibit 1 was marked for identification.)
11       Q.  (By Mr. Bentley)  And it looks like you
12   spent 21 hours preparing your Prolift report; is
13   that correct?
14       A.  Well, there's two --
15       Q.  Oh, there's two, I'm sorry.
16       MR. BENTLEY:  We'll mark the -- so for the
17   record, we'll mark the one that's dated July 1 to
18   August 31, 2015, as Exhibit 1.  And we're going to
19   mark the second invoice dated September 1 to
20   October 2, 2015, as Exhibit 2.
21       (Exhibit 2 was marked for identification.)
22       Q.  (By Mr. Bentley)  So on Exhibit 1, you
23   list 21 hours of preparation for the Prolift
24   report, and on Exhibit 2, you list 12 hours.
25       So you spent approximately 33 hours

Page 8

1    preparing your Prolift report; do you agree with
2    that?
3        A.  I do.
4        Q.  And then on Exhibit 1, you have a
5    telephone conference of 1.25 hours and a
6    four-person, right, in-person conference for four
7    hours, so five and a quarter plus 33, so we have 38
8    and a quarter hours in total preparation; would you
9    agree with that?  Do the math.
10       A.  I agree with that.
11       Q.  Okay.  And the last date you have on
12   Exhibit 2 is October 2, 2015.  Subsequent to that
13   date, have you done any work on Prolift?
14       A.  Very little.  Most of the work was done
15   in preparation of this report for a case in the
16   fall, and then before I submitted this this year in
17   2016, I went through the final draft and signed it
18   on February 26, so there was some very minor
19   editing after those dates.
20       Q.  This doesn't include your time at trial
21   for the Prolift, correct?
22       A.  It doesn't include the time here at
23   trial.
24       Q.  Okay.  And you just testified that you
25   don't believe you made any substantive edits to the

Page 9

1    report since the previous report?
2        A.  That's correct.
3        Q.  After October of 2015, have you
4    continued to stay up to date on the medical
5    literature regarding prolapse and Prolift?
6        A.  Yes.
7        Q.  Have you reviewed any new articles
8    specific to Prolift?
9        A.  There may be a few articles.  And they
10   would all be included in my reliance list and on my
11   references on this report.
12       Q.  Okay.  So that was my next question,
13   was, if we compared the reliance list from your
14   previous report to this one, that would identify
15   the new articles that you've reviewed for this
16   report?
17       A.  Yeah, there may be a few other things
18   that don't appear here, but for the most part, it's
19   comprehensive.
20       Q.  Among those potentially few other
21   things, was there anything that was important to
22   you that you would like to add to your reliance
23   list at this point?
24       A.  I've reviewed a number of depositions
25   recently, so I'm not certain if -- I'm looking at

Brian Flynn, M.D.

Page 10

1  the expert report list here, so there'd be some
2  depositions in addition to these reports that I've
3  looked at.
4      Q. And what depositions have you reviewed?
5      A. I've looked at a report from
6  Dr. Ostergard, Dr. Blaivas and Dr. Elliot. I've
7  looked at a number of reports from
8  Doctors Rosenzweig and Margolis, so it's hard for
9  me to know if -- which reports or which depositions
10 because they're from multiple cases, but there may
11 be one from Rosenzweig or from Margolis.
12     Q. And how did you decide to review those
13 specific depositions?
14     A. They were sent to me by Ethicon counsel.
15     Q. Did you request to review any other
16 depositions?
17     A. No, I did not.
18     Q. Have you ever requested to review, say,
19 internal corporate depositions from Ethicon?
20     A. No, I have not.
21     Q. Did these 38 and a quarter hours include
22 any preparation for the Prolift+M at the same time
23 you were doing Prolift?
24     MR. KOOPMANN: Object to form.
25     A. There's a separate invoice for +M.

Page 11

1  There's some carryover from the Prolift report to
2  the +M, so there's a lot less hours on the +M, so
3  it would depend on how you want to characterize
4  that. But, you know, the +M report took me a lot
5  less time because I had recently completed the
6  Prolift report.
7      Q. And have you previously been deposed on
8  Prolift?
9      A. I never have been on either of these
10 products.
11     Q. Have you ever been deposed on a product
12 that's used to treat prolapse?
13     A. No, not as an expert. I have as a
14 treating physician.
15     Q. Now, you submitted your Prolift on
16 February -- strike that.
17        You signed your Prolift report on
18 February 26, 2016; is that correct?
19     A. Yes, that's correct.
20     Q. And did you write that report yourself?
21     A. I did.
22     Q. Did you receive any assistance in
23 writing that?
24     MR. KOOPMANN: Object to form.
25        I'm going to instruct you not to answer that

Page 12

1  question. That calls for work-product information.
2      Q. (By Mr. Bentley) Did you physically
3  type the words that are in your report that's dated
4  February 26, 2016?
5      A. I did.
6      Q. No one else typed any words for you?
7      MR. KOOPMANN: Object to form. Instruct the
8  witness not to answer the question.
9      Q. (By Mr. Bentley) Did you copy and paste
10 any section of this report?
11     A. As I mentioned earlier, the Prolift
12 report did carry over into the +M report, so yes,
13 for the Prolift+M report.
14     Q. So aside from the Prolift and the
15 Prolift+M report, was any of this content copied
16 from some other source?
17     A. Not that I'm aware of.
18     Q. When you submitted your report, you also
19 submitted a reliance list. Are those materials you
20 relied upon in reaching your opinions here?
21     A. Yes.
22     Q. Now, it's fairly extensive. Do you
23 think that you actually reviewed every one of those
24 materials on that list?
25     A. I've at least seen all of them. Some of

Page 13

1  them I've looked at in greater detail than others,
2  but these are articles that I rely on or I may rely
3  on in the future.
4      Q. Had you reviewed some of these articles
5  prior to writing your report?
6      A. Yes, quite a few of the articles and
7  quite a few of the PowerPoints and some of the
8  media that was created.
9      Q. But it's your testimony today that
10 you've reviewed every one of the documents that's
11 listed on this report, or on this list?
12     MR. KOOPMANN: Object to form.
13     A. I think this is a comprehensive list. I
14 have looked at all of these articles, some greater
15 than others.
16     Q. (By Mr. Bentley) On the section titled
17 "Production Materials," there's a number of anatomy
18 videos and instructional videos. Did you watch all
19 of those?
20     A. I can't say for sure if I watched all of
21 them. I've watched a number of them. I did
22 include those on the USB drive, and so there's
23 quite a bit of media there.
24     Q. Okay. As we sit here today, is there
25 any way for you to tell me which ones you actually

Brian Flynn, M.D.

Page 14

1 reviewed and which ones you didn't?
2     A.  Not easily.  Not without having to watch
3 all of them, because they're listed by the Ethicon
4 internal number, and so it's not entitled, so I
5 can't say just by looking at the reliance list.
6     Q.  And how did you come to receive all of
7 these internal Ethicon documents and videos?
8     A.  They were sent to me either
9 electronically by a zip file or on a CD or on a
10 USB.
11     Q.  Did you specifically request any of
12 them?
13     A.  No, I did not.
14     Q.  Are there any documents that you would
15 like to request to see?
16     A.  No.
17     Q.  Do you feel that you've been provided
18 with all the pertinent important documents to reach
19 your opinions in this case?
20     A.  Yes.
21     Q.  So in your report, you have footnotes
22 for a number of different studies; is that correct?
23     A.  Yes.
24     Q.  But I didn't notice any footnotes that
25 cite to an Eth mesh or a production document; is

Page 15

1 that correct?
2     A.  I would have to read the entire report,
3 but let me take a look here.  I can submit this as
4 an exhibit, but there's one, two, three, four, five
5 references at the end that don't have a number or a
6 first author, so . . .
7     Q.  And what are those five references?
8     A.  One is the AUA position statement, the
9 AUGS frequently asked questions, the AUGS position
10 statement, Oxford Levels of Evidence for
11 practitioners, and then Sunoco MDS.
12     Q.  Do you have an understanding that all of
13 those are pubicaly available documents and not
14 internal Ethicon documents?
15     A.  Yes, those are all publicly available.
16     Q.  How did you decide which articles to
17 cite -- strike that.
18         How did you decide which articles and
19 publicly available documents you cited in your
20 report -- how'd you pick which ones to cite to?
21     A.  I try to start with articles that I've
22 read previously that impact my thoughts and
23 opinions and how I practice, ones that are also
24 cited by colleagues, by key opinion leaders, by
25 thought leaders in urology and urogynecology, and

Page 16

1 the ones that I've used to formulate my opinions.
2     Q.  So according to that, did you not use
3 any of the Ethicon production materials to
4 formulate your opinions in this case?
5         MR. KOOPMANN:  Object to form.
6         Sorry.  Go ahead.
7     A.  A lot of the Ethicon documents --
8 there's quite a bit of overlap with the references,
9 and so some of the Ethicon documents, especially
10 the PowerPoint presentations, are heavily
11 referenced.  So there's some overlap there, but I
12 didn't cite that as a unique reference.
13     Q.  (By Mr. Bentley)  Did you formulate your
14 opinions prior to reviewing these Ethicon mesh
15 documents?
16     A.  No, they were given to me, provided to
17 me in advance.  Some of them I had received over
18 the fall of 2015, and maybe more recently, but I've
19 relied on a number of those in formulating
20 opinions.
21     Q.  And which ones have you specifically
22 relied upon to formulate opinions in your report?
23     A.  When I looked at some of the PowerPoint
24 presentations on biomaterials, I think those
25 PowerPoint presentations have a number of the

Page 17

1 references, for instance, like the Dietz paper, the
2 admid classification, some of the Moally papers
3 that are both referenced in the reliance list and
4 also in the Ethicon prof ed literature.
5     Q.  So is it fair to say you used the
6 Ethicon mesh documents to help direct you to the
7 original citations to go to review to formulate
8 your opinions in this report?
9     A.  It would work in both directions.  Many
10 of them I was already familiar with.  Some of them
11 I was not familiar with and did become aware of
12 those documents after looking at the prof ed
13 material.
14     Q.  But none of the Eth mesh documents were
15 important enough to add a footnote citation into
16 your report; is that correct?
17     A.  That's not how I would state that.
18     Q.  Did you add footnote citations for
19 documents that were important to you?
20     A.  I did.
21     Q.  And none of those footnotes include Eth
22 mesh docs; isn't that correct?
23     A.  That's correct.
24     Q.  Doctor, did you ask the attorneys who
25 retained you to provide opinions in this case to

Brian Flynn, M.D.

Page 18

1  provide you with all the documents that demonstrate
2  Ethicon's knowledge as to complications associated
3  with Prolift?
4        A.  No, I did not.
5        Q.  Would you have liked to have seen
6  documents -- strike that.
7             If they exist, would you have liked to have
8  seen documents demonstrating Ethicon's internal
9  knowledge of complications associated with Prolift?
10       A.  Some of it was sent to me.  I didn't
11  have to ask for it.  It's in a lot of those
12  internal documents, including PowerPoint
13  presentations and information that I received from
14  prof ed managers, and so I didn't have to
15  specifically ask for it.
16       Q.  So is it your testimony today that you
17  believe you've received and reviewed all internal
18  documents demonstrating Ethicon's knowledge of
19  complications associated with Prolift?
20       A.  I can't say if I've seen all of it.  I
21  don't have any way of knowing what they've sent me.
22  But I know they've sent me a number of documents
23  pertaining to complications.
24       Q.  And that's information you would have
25  liked to have reviewed; is that correct?

Page 19

1        MR. KOOPMANN:  Object to form.
2        A.  Yeah, I appreciated reviewing that
3  stuff.
4        Q.  (By Mr. Bentley)  I mean, potentially,
5  if there's a document that you didn't see that
6  indicated Ethicon had knowledge about complications
7  associated with Prolift and you didn't review that,
8  if you had seen that, that could have altered your
9  opinions in this case; isn't that true?
10       MR. KOOPMANN:  Object to form.
11       A.  It's potentially true.  It's
12  speculative, but maybe.
13       Q.  (By Mr. Bentley)  Is it fair to say that
14  your opinions in this case are largely based on
15  your own clinical experience and medical literature
16  you reviewed?
17       A.  Yes.
18       Q.  And is it fair to say that your opinions
19  in this case are not really related to -- strike
20  that.
21            Is it fair to say that your opinions in this
22  case are not really based on Ethicon's internal
23  knowledge or what Ethicon did or didn't do?  Is
24  that a fair statement?
25       A.  It's not fair.

Page 20

1        Q.  So which Ethicon documents are you
2  basing your opinions on here?
3        MR. KOOPMANN:  Object to form.
4        A.  As I mentioned earlier, in a number of
5  the PowerPoint presentations during the prof ed
6  events and things that have been shared with me,
7  there's slides on complication data, and so that
8  information was shared when we were preparing for
9  courses and presenting at courses, prof ed courses.
10       Q.  (By Mr. Bentley)  So your opinions on
11  this case are based upon complications rates that
12  were provided to you from Ethicon; is that your
13  testimony?
14       MR. KOOPMANN:  Object to form.
15       A.  I received some complication data and
16  some information.  How complete that is, I don't --
17  I can't answer that question.
18       Q.  (By Mr. Bentley)  And it wasn't
19  important enough to add a footnote citation into
20  your report; is that true?
21       A.  I feel that I have, you know, enough
22  references here, well over a hundred references.  I
23  feel the document's heavily referenced.
24       Q.  I appreciate that, but that wasn't
25  exactly my question, Doctor.

Page 21

1             My question was, the Ethicon internal
2  documents weren't important enough to add a
3  footnote -- strike that.
4             The Ethicon internal complication rates
5  documents weren't important enough to add a
6  footnote citation into your report; is that true?
7        MR. KOOPMANN:  Object to form.
8        A.  Are you talking about the report or the
9  reliance list?
10       Q.  (By Mr. Bentley)  Doctor, you testified
11  that you based your opinions upon some
12  complications data that was provided to you by
13  Ethicon; is that correct?
14       A.  Yes.
15       Q.  Okay.  And my question is, that
16  complications data that was provided to you, why
17  was that not cited in your report?
18       A.  My report is basically primarily on my
19  experience and the review of the medical
20  literature.
21       Q.  Thank you.
22            Doctor, are all of your opinions contained
23  within your report?
24       A.  The overwhelming majority of my
25  opinions.  There may be one I missed or overlooked

Brian Flynn, M.D.

Page 22

1  that's not in the report, but to the best of my
2  knowledge, yes.
3      Q. And as you sit here today, you don't
4  have any other opinions that you anticipate
5  providing to the jury at trial; is that correct?
6      A. Nothing that I anticipate, correct.
7      Q. Have any of your opinions changed since
8  you wrote your report in February -- strike that.
9      Have any of your opinions changed since you
10  signed your report in February of this year?
11      A. That's correct.
12      Q. And you stand by all of your opinions in
13  that report?
14      A. I do.
15      Q. I'd like to explore how you cited to
16  various articles within your report.
17      Just generally, how did you choose which
18  articles you wanted to cite to in your report?
19      MR. KOOPMANN: Object to form.
20      A. So I started out with articles that I
21  was already immediately familiar with, articles
22  that I had used previously in other types of
23  reviews or reports or presentations that I put
24  together, articles that have been important to me
25  long-term over the last 15 years in affecting how I

Page 23

1  think about prolapse and how I manage it, articles
2  that had been provided to me for review by others.
3      As I drafted the article, there were areas
4  that I felt that I needed to do more research on,
5  and articles would then be added in as I saw gaps
6  in the report. And so it was definitely an
7  evolving process. It happened in stages. Some of
8  these articles I've read years ago and reread them
9  and included them. Other ones are articles that
10  I've become aware of just more recently.
11      Q. (By Mr. Bentley) Do you agree that
12  there's a large number of articles that exist out
13  in the public domain that are not cited in your
14  report?
15      A. I agree that there's certainly articles
16  that are not cited in my report. I don't know
17  exactly how many. I'm sure I'm dealing with just a
18  percentage of articles.
19      Q. Certainly. And there's a number of
20  articles that are -- strike that.
21      There's a number of scientific articles that
22  are cited in your reliance list that you don't
23  discuss in your report; would you agree with that?
24      A. I do agree with that, yes.
25      Q. Okay. So I believe you've testified

Page 24

1  that you decided to include certain articles in
2  your report, but based on which articles you
3  thought were important to you; is that fair?
4      A. Yes, that's fair.
5      Q. How did you decide not to include an
6  article in your report?
7      A. Well, if I had never read it before or
8  no one's ever asked me to read it, that wouldn't be
9  included in it. If I did a PubMed research search
10  and it didn't come up, then I wouldn't have
11  included it, if I felt that it was of low-level
12  evidence, if there were some concerns about the
13  methods of the article. I tried to choose articles
14  that supported my opinions, so it's more what I use
15  to make my opinions, not what I decided not to use.
16      Q. So did you make a conscious decision not
17  to include articles that didn't support your
18  opinion?
19      A. Those articles, some of those appear in
20  this report with reference to claims that have been
21  made by plaintiffs and plaintiffs' experts, so
22  those articles are -- many of those are included in
23  this report. So I felt that this was a very
24  balanced report. Naturally, the articles that I
25  rely on to formulate my opinions are going to be

Page 25

1  more heavily emphasized.
2      Q. And you feel it's important to have an
3  objective or balanced approach to presenting your
4  opinions here?
5      A. Well, those words kind of are in
6  contradiction of each other, "balanced" and
7  "opinionated." But, you know, I made opinions
8  based on articles that formulated how I practice,
9  how I teach my residents and fellows, how I see
10  colleagues in the medical community practice, what
11  I've witnessed at scientific meetings. So it's a
12  process, but I tried to choose the articles that
13  were most impactful.
14      Q. You wouldn't want to deliberately just
15  not cite to articles that were contrary to your
16  opinions in this report, would you?
17      A. There's articles that I'm aware of that
18  I did not cite in this report, whether you want to
19  call that deliberate or not deliberate. Like I
20  mentioned earlier, the articles that I cite are
21  articles that I feel are valuable and supportive of
22  my opinions.
23      Q. And I believe you mentioned that one way
24  you evaluate the importance of an article is based
25  off of the level of evidence; is that correct?

Brian Flynn, M.D.

Page 26

1     A. Yes, that's one way.
2     Q. Could you please explain what's your
3 understanding of levels of evidence?
4     A. Yes. And I did reference that. If you
5 look at the levels of evidence for practitioners,
6 you have Level I evidence, which would be the
7 highest level that is systematically used,
8 meta-analyses and RCTs. And then go all the way
9 down to the bottom of the pyramid, Level IV would
10 be, you know, case reports, and so that would be
11 the lowest level of evidence. In between, you have
12 case series, and then prospective studies that are
13 nonrandomized.
14     Q. Okay. And you wouldn't consider your
15 report a systematic review of the totality of
16 literature that exists regarding Prolift, would
17 you?
18     A. It's not a systematic review. That's
19 correct.
20     Q. And likewise, you didn't perform a
21 meta-analysis here, did you?
22     A. I did not.
23     Q. In fact, you're here relying upon other
24 people's systematic reviews and meta-analyses; is
25 that correct?

Page 27

1     A. As well as my own personal experience
2 with this device.
3     Q. Doctor, is one of the bases of your
4 opinions here -- I believe your report states that
5 you're also relying upon your training; is that
6 correct?
7     A. On my training?
8     Q. Training.
9     A. Yes, education, training and clinical
10 practice and experience.
11     Q. During your medical education and
12 subsequent training, when did you first become
13 exposed to training on Prolift?
14     A. On Prolift? Well, Prolift I became
15 aware of early in my practice, sometime in around
16 2003 and 2004. I began clinical practice in 2002
17 after completing my fellowship. So Prolift was not
18 a product that was commercially available when I
19 was a resident or fellow or medical student.
20     Q. When you were a resident or fellow, were
21 there any transvaginal mesh kits available for
22 prolapse?
23     A. Not for prolapse.
24     Q. Okay. So is it fair to say that the
25 total extent of your training on Prolift was

Page 28

1 provided by Ethicon?
2     A. No, that's not fair.
3     Q. Where have you received training
4 specific to Prolift other than through Ethicon?
5     A. From observing colleagues performing the
6 procedure, from my review of the medical
7 literature. A lot of overlap with Prolift came
8 from other products or maybe from other prolapse
9 procedures, and so Prolift didn't develop or evolve
10 inside a vacuum. It came out of other procedures
11 and devices. So I had extensive knowledge on
12 Gynemesh mesh and Prolene soft mesh well before
13 Prolift. And so that's -- it was a process.
14     MR. BENTLEY: Okay. I'm going to strike
15 that as nonresponsive.
16     Q. (By Mr. Bentley) Doctor, my question
17 is, other than training you received from Ethicon,
18 have you received any other training specific to
19 Prolift, formalized training?
20     MR. KOOPMANN: Object to form.
21     A. What would you mean by "formalized
22 training"?
23     Q. (By Mr. Bentley) Well, would you define
24 for me what you consider formal training?
25     A. Formal training? Well, I would say

Page 29

1 formal training would be something that you
2 received in your residency or in your fellowship,
3 something you received a certificate or document
4 supporting your hours that you trained on the
5 device. So for instance, with prof ed events,
6 people may come away with a certificate.
7     Formal training is going to be different
8 depending on who you talk to, but once you finish
9 your residency and fellowship, all physicians in
10 practice look for ways of training on new devices,
11 and that can come from professional medical
12 societies, from industry, from colleagues. So
13 that's how I would define "formal training."
14     Q. Thank you.
15     Have you received any training specific to
16 Prolift from any of the professional medical
17 societies?
18     A. I have not.
19     Q. And you previously testified Prolift nor
20 any of the transvaginal mesh kits for prolapse were
21 available during your residency or fellowship. So
22 other than the training that you've received from
23 Ethicon, have you received any other formal
24 training specific to Prolift?
25     A. No.

Page 30

1    Q. I believe you testified that you used
2 Gynemesh prior to using the Prolift total repair
3 kit; is that fair?
4    A. Yes.
5    Q. Did you receive formalized training from
6 Ethicon on the Gynemesh?
7    A. No.
8    Q. Have you used any other total repair
9 kit -- repair mesh kits for prolapse?
10    A. I think Ethicon had the only total kit
11 in terms of a total Prolift, but I used the
12 anterior kit and the posterior kit by American
13 Medical Systems, the Elevate kit specifically.
14    Q. When did you use the AMS anterior and
15 posterior kits?
16    A. I didn't use them very often, probably
17 less than 20, but that would have been in and
18 around 2007, 2008, maybe later, 2009, but it
19 wasn't -- I didn't do very many of those kits.
20    Q. That was after you had been using
21 Prolift?
22    A. The same time. I never stopped using
23 Prolift. There was one particular hospital that
24 only had the AMS product, and so I did use it
25 there.

Page 31

1    Q. Did you receive formalized training from
2 AMS regarding their products for prolapse?
3    A. Again, the word "formalize" is difficult
4 to characterize. But what I received from American
5 Medical Systems were PowerPoint presentations,
6 videos, brochures, IFUs, things of that matter.
7    MR. KOOPMANN: Can we go off the record one
8 second?
9    (Discussion held off the record.)
10    Q. (By Mr. Bentley) Doctor, we were
11 discussing training, and you mentioned that some
12 training that's available on products could be
13 professional education activities; is that correct?
14    A. Correct.
15    Q. And sometimes those prof ed or
16 professional education activities provide a
17 certificate of completion at the end; is that
18 correct?
19    A. Yes.
20    Q. Have you ever received a certificate for
21 training related to Prolift?
22    A. Yes.
23    Q. Approximately when was that?
24    A. In 2004.
25    Q. And was that certificate given to you by

Page 32

1 Ethicon?
2    A. Yes.
3    Q. So Ethicon certified that you received
4 the training on its Prolift; is that correct?
5    A. They gave me a certificate, yes.
6    Q. Did your hospital require you to present
7 the certificate to be allowed to use the Prolift
8 kit?
9    A. No, they did not.
10    Q. So what purpose -- strike that.
11    What utility did you get from the prof ed
12 certificate regarding Prolift, if any?
13    A. I didn't feel the need to have the
14 certificate. They just provided it to people who
15 attended the course and actively participated and
16 completed the course, so I went and watched another
17 surgeon do a number of Prolift cases and then had
18 reviewed the prof ed material that was provided to
19 me, and we received some lectures, and then also
20 attended a cadaver course.
21    Q. Is it fair to say that the certificate
22 just certifies your attendance at the prof ed
23 activity?
24    A. No, that's not fair.
25    Q. Was there some sort of a test or

Page 33

1 evaluation at the end of the prof ed activity that
2 you had to complete to receive a certification?
3    A. There was no test.
4    Q. What was the -- strike that.
5    What did you have to do to receive the
6 certificate from Ethicon for the Prolift prof ed
7 training activity?
8    A. It would depend on who the individual
9 was and what their level of training was. There
10 was essentially three pathways to training. One
11 pathway was from someone who was very experienced
12 with prolapse kits and maybe were transitioning
13 from one type of kit to another. Then there was
14 the intermediate person who was very experienced in
15 procedures that were similar in terms of
16 graft-augmented repairs and trocar-based repairs.
17 And then there was the surgeon who was doing
18 primarily native tissue repairs. And so each one
19 of those individuals needed a different level of
20 training.
21    Q. And who would determine what level of
22 training was appropriate for that doctor based on
23 those three categories you just presented?
24    A. I think it was primarily up to the
25 individual in terms of what they were requesting

Brian Flynn, M.D.

Page 34

1    and what they felt their needs were.
2        Q.  And then based off of that individual's
3    personal assessment, they would attend whatever
4    training they felt was appropriate; is that
5    correct?
6        A.  There was a dialogue between the trainee
7    and the professional education manager and
8    physicians that attended the courses, and so
9    there's constant feedback that was provided in both
10   directions.  You would ask the individual what
11   procedures have they done currently, what have they
12   done in the past, what things they're comfortable
13   what, what things would they like to learn more
14   about.
15       Q.  And the professional education manager,
16   that would be someone working on behalf of Ethicon
17   to teach about the Prolift product?
18       A.  That's correct.
19       Q.  And you actually taught on Prolift; is
20   that correct?
21       A.  I did.
22       Q.  And in your experience teaching as a
23   preceptor for the Prolift product, did you
24   encounter that difference doctors had different
25   experience in using transvaginal mesh placement for

Page 35

1    treating prolapse?
2        A.  Yeah, I encountered all three levels
3    that I described there of physicians.
4        Q.  And did you have some test inside your
5    head that you had -- strike that.
6        Did you have some requirement in your head
7    that you had to think about before you would give
8    this person a certificate of completing the
9    training program, or was it simply they completed
10   the training program that they felt was appropriate
11   and you certified that they attended that?
12       A.  I was one of the teachers, but I was not
13   anybody that provided grades or a certificate or
14   recommendations on who got the certificate.  That
15   wasn't something that I was part of the
16   decision-making on.
17       Q.  Did you -- strike that.
18       Was there someone present from Ethicon who
19   would record who was in attendance at the training
20   activity?
21       A.  Record who was there?
22       Q.  Yes.
23       A.  Yes.
24       Q.  Other than the preceptor?
25       A.  Absolutely, yes.  The professional

Page 36

1    education manager, the person who arranged the
2    event, so each one of these events had to be
3    scheduled and arranged and attended by an Ethicon
4    personnel.  They were never done in isolation in
5    absence of Ethicon personnel.
6        Q.  I think I've seen some brochures for the
7    training program.
8        So typically how long would a Prolift
9    training program have been?
10       A.  I've seen some last as long as a few
11   days, others a few cases.  It would just depend on
12   whether -- or what level that person was at.  And
13   then there was a lot of self-study that was
14   required before they attended the course before
15   they would be allowed to attend the course.  So I
16   can't say the exact hours.  I can tell you what my
17   own experience was and how many hours I spent
18   training on Prolift.
19       Q.  I'd appreciate that.
20       You're presenting opinions in your report
21   about the adequacy of the training that was
22   provided; is that correct?
23       A.  Yes.
24       Q.  And you're basing that upon your own
25   personal experience; is that correct?

Page 37

1        A.  Both as a trainee and a trainer.
2        Q.  So if, for example, there was a training
3    session for Prolift that was scheduled for, say,
4    eight hours, would you expect that that full eight
5    hours would be actually completed by the person in
6    attendance to receive the certificate?
7        A.  They had to complete the course, yeah.
8    And I don't know who provided the certificate, but
9    my general observation was people who attended the
10   course attended all of the course, from start to
11   finish.
12       Q.  So you've testified and disclosed in
13   your report that another basis for your opinions is
14   your personal experience treating patients; is that
15   correct?
16       A.  Yes.
17       Q.  Approximately how much of your time is
18   spent treating patients?
19       A.  I spend about 85 percent of my time in
20   my clinical practice, which would include doing
21   surgery and seeing patients in the clinic.  While
22   I'm seeing patients in the clinic and doing
23   surgery, I usually have a student or resident
24   fellow with me, so I'm providing education, so a
25   lot of my education overlaps with my clinical

Brian Flynn, M.D.

Page 38

1  practice.
2       Q. And can you approximate how much of your
3  time is spent in surgery versus in clinic?
4       A. It's about 50/50. In a 20-day rotation,
5  I spend 11 days in surgery and nine days in the
6  clinic.
7       Q. And then of your time performing
8  surgery, approximately how much of that is treating
9  prolapse?
10      A. I don't have an exact number, but about
11  50 percent of the time I'm treating men and 50
12  percent the time I'm treating women. And so of
13  the 50 percent of the time I'm treating women, that
14  would deal with incontinence and prolapse and other
15  female pelvic floor disorders.
16      Q. Do you have an estimate how much of your
17  time treating women is spent between incontinence
18  versus prolapse?
19      A. There would be a greater percentage with
20  incontinence.
21      Q. And then you also see patients for
22  complications related to mesh; is that correct?
23      A. I see patients with complications from
24  urogynecologic surgery.
25      Q. Other doctors refer more complicated

Page 39

1  cases to you for mesh complications sometimes; is
2  that fair?
3       A. All sorts of complications.
4       Q. Do you feel that you're referred simple
5  complications also?
6       A. Yes.
7       Q. Do you have an estimate of the time
8  spent treating women of how much of your time is
9  spent treating complications related to mesh?
10      A. In terms of number of cases I do per
11  year?
12      Q. Sure.
13      A. I do somewhere around 35 to as much as
14  45 cases per year.
15      Q. Treating complications related to a mesh
16  product?
17      A. Yes.
18      Q. Approximately how many surgeries do you
19  perform a year?
20      A. About 500.
21      Q. Has that been pretty consistent
22  throughout your career?
23      A. It's increased. As I've gotten older in
24  practice, you become more efficient with your time,
25  and there's a greater request of demand on your

Page 40

1  time, so at least for the last ten years it's
2  between 400 and 500 cases per year. And that would
3  include, you know, major procedures. I'm not
4  including minor procedures that I perform in the
5  office.
6       Q. Would the minor procedures include
7  simple excision of mesh erosion?
8       A. It would not.
9       Q. You would consider that a more
10  complicated case, using your characterization?
11      A. I would separate what I do in the office
12  versus what I do in the operating room, so the
13  minor procedures I do in the office would include
14  transurethral bulking agents, cystoscopies,
15  urodynamics, suprapubic catheter placement,
16  urethral dilations. Those are the procedures that
17  are in that category for office procedures.
18      Q. Do you perform any mesh-trimming
19  procedures in the office?
20      A. Very rarely. I have in the past, and I
21  might trim a suture, but not mesh. I did that for
22  a very brief time and reported on that, and I
23  didn't find that to be effective, so I stopped
24  doing that.
25      Q. When you say it was ineffective, would

Page 41

1  there be a recurrence of the erosion?
2       A. Yeah, the recurrence rate was more than
3  50 percent. It didn't mean that all those patients
4  were symptomatic, but it wasn't effective, so we
5  went to an excision in the operating room.
6  Patients were more comfortable, certainly, when we
7  did that.
8       Q. Do you have an estimate of how many
9  surgeries you do per year to treat prolapse?
10      A. To treat prolapse, probably somewhere --
11  anywhere between 50 and 100. It would depend on
12  the particular year.
13      Q. And you've used a number of different
14  procedures to treat prolapse based on the specific
15  patient; is that correct?
16      A. That's correct.
17      Q. When you were using Prolift, do you have
18  an idea of how many Prolift procedures you were
19  doing per year?
20      A. I have a total. I don't have a
21  breakdown based on year, but if you include Prolift
22  and Prolift+M together, I've done close to 200.
23      Q. Do you have a breakdown between Prolift
24  and Prolift+M for total numbers?
25      A. It's about equal.

Brian Flynn, M.D.

Page 42

1      Q. So you think you've done about a hundred
2   Prolift and about a hundred +Ms?
3      A. Correct.
4      Q. We've previously -- or strike that.
5      I believe you've previously testified that
6   in incontinence products, there was an evolution of
7   your practice and which products you preferred to
8   use; is that fair? As we talked about earlier
9   today, you may have evolved your practice to use
10  Abbrevo more frequently than an obturator, the
11  TVT-O full sling; is that correct?
12     A. That's correct.
13     Q. Did you have a similar evolution in your
14  preferred product to treat between using Prolift
15  versus Prolift+M?
16     A. Yes.
17     Q. And what was that preference?
18     A. Well, when Prolift+M became available,
19  as I mentioned earlier in the other deposition, I
20  tend to be a new adopter, or early adapter of
21  procedures. And so similar for the +M. I was very
22  interested in the technology and the biomaterials
23  of the +M. And the rest of the system looked the
24  same in terms of the trocars and the sheets, the
25  retrieval devices. And so it seemed very logical

Page 43

1   to me, intuitive, that it would be a kit that I
2   would want to try.
3      Q. And approximately when did you begin
4   trying the new product in Prolift+M?
5      A. Let me look at my report, but I believe
6   it was around 2007.
7      (Reviewed document.) So in 2006, excuse me,
8   in 2006, I started using the +M system.
9      Q. In 2006, you believe you began using the
10  +M system; is that correct?
11     A. I'm sorry. 2006 to 2012 is when I used
12  those products. I'd probably say around --
13  probably around 2009 or 2010. Whenever +M became
14  available, I immediately started using it.
15     Q. And once you started using it -- strike
16  that.
17     Once you started using Prolift+M and you
18  became comfortable with it, did that become your
19  preferred prolapse mesh kit?
20     A. It did. I used that almost exclusively.
21  There were some exceptions at certain hospitals.
22  There was a transition between the two products,
23  but eventually it became the only prolapse kit that
24  I used.
25     Q. Doctor, I believe you've testified

Page 44

1   previously that you keep a case log of all of your
2   surgical procedures; is that correct?
3      A. I do.
4      Q. And that would include surgeries where
5   you implant the Prolift product; is that correct?
6      A. Yes.
7      Q. Did you review the case log specifically
8   to see how many Prolift procedures you had
9   performed before you prepared your report?
10     A. I did.
11     Q. So you got an exact number of how many
12  Prolift products you had implanted?
13     A. I had an approximate number. I mean,
14  the case log is nearly complete. I prepare that,
15  for the most part, prospectively, but sometimes
16  cases get cancelled or rescheduled and they may or
17  may not appear on my case log. So I would say it's
18  mostly accurate.
19     Q. Is it fair to say that your case log is
20  one of the bases for your opinions in this case?
21     A. No, it's just a list of the number of
22  cases, but I don't need to know how many cases I've
23  done to prepare my opinions.
24     Q. That's right. Your case log doesn't
25  track complications for Prolift implants; is that

Page 45

1   correct?
2      A. My case log doesn't, but I have, you
3   know, reported -- I have one small study I did on
4   Prolift where I looked at a small cohort of
5   patients that I had treated with Prolift, and that
6   involved a surgical video, and that study kept
7   track of the complications.
8      Q. When was that study?
9      A. I don't remember the exact date, but I
10  think it was around 2009, maybe 2008 or 2009.
11     Q. Is it cited in your report?
12     A. I would have to check. I don't see it
13  here in my bibliography.
14     Q. Do you remember what journal it was
15  published in, if any?
16     A. It was an abstract, so it was in the
17  Journal of Urology. It was presented at the
18  American Urologic Association meeting. The first
19  author would be Pshak, starting with the letter
20  P-s-h-a-k, Thomas Pshak. He was one of the
21  residents who worked with me on the project.
22     Q. And what was the purpose of that study?
23     A. The study was to provide a video to
24  inform and educate urologists on the Prolift
25  procedure, also to perform a short review of our

Brian Flynn, M.D.

Page 46

1    short-term results with the product.
2        Q.  And when you say one of the goals was to
3    perform a short-term review of your -- strike that.
4        When you say that one of the goals was to
5    review your short-term results with the product,
6    what was your end point that you were looking at?
7        A.  The end point?  It was a continuous list
8    of all the cases that we had performed to date, so
9    it included our first case, and then the most
10   recent case that we did before preparing the
11   abstract, so it was as comprehensive as we could
12   make it.  We looked at the outcome in terms of the
13   efficacy and the prolapse resolution rate, and then
14   we looked at the side effects or complications,
15   such as stress urinary incontinence, mesh exposure,
16   mesh perforation into the lower urinary tract.
17       Q.  Do you know if that study is included in
18   these binders that you brought today?
19       A.  It's on the USB.  I know for sure it's
20   on the USB, both the video as well as the abstract.
21       Q.  And do you know what the long-term
22   follow-up was?
23       A.  No, we don't have long-term follow-up.
24       Q.  What was the follow-up in the study that
25   you presented?

Page 47

1        A.  It was minimal.  It was less than a
2    year.
3        Q.  All right.  So other than that abstract
4    that you presented, did you do any other formal or
5    systematic review of your case log regarding the
6    Prolift patients that you had operated on?
7        A.  There was a second abstract that
8    compared healing abnormalities in two groups of
9    patients, patients that had a single-layer closure,
10   meaning we closed the vaginal wall just with one
11   continuous suture, versus patients that had a --
12   what we call a double-layer closure, so we closed
13   two separate layers of the vaginal wall, the deep
14   fibromuscular tissue and then the vaginal
15   epithelium.
16       Q.  Why was that study performed?
17       A.  I felt that a lot of the healing
18   abnormalities were due to inadequacies in wound
19   closure leading to wound dehiscence.  So wound
20   dehiscence will lead to mesh exposure.  And so my
21   thought was that if we can replicate what we do in
22   other surgeries with the multi-layer-closure
23   technique, we can decrease the incidence of mesh
24   exposure.
25       Q.  And did the study show that?

Page 48

1        A.  The numbers were very small, so it was
2    hard to show significant statistical significance,
3    but at least the trend was that, yes, the
4    double-layer closure seemed to be superior, at
5    least in my hands.
6        Q.  Would you agree that the erosion rate
7    for the double-layer closure was zero percent while
8    the single-layer closure was approximately 15
9    percent in your study?
10       A.  I'd have to look at the study again, but
11   that sounds about right in terms of the short-term
12   results.
13       Q.  And what was the length of follow-up in
14   that study?
15       A.  Again, it was fairly short, probably
16   less than a year.
17       Q.  With the Prolift procedure that's
18   discussed in the IFU, does that recommend a
19   single-layer closure or a double-layer closure?
20       A.  I don't believe the IFU makes
21   recommendations on how to close the surgical wound.
22   That's up to the discretion of the physician.  Most
23   physicians, including myself, would close the
24   wound, you know, the way they were taught to.
25       Q.  But in your study, you demonstrated that

Page 49

1    the double-layer closure was much more -- was much
2    safer because it had a lower erosion rate; is that
3    correct?
4        MR. KOOPMANN:  Object to form.
5        A.  What I mentioned, that there was a trend
6    towards better results in that group, but it was a
7    small group with a short-term follow-up, so . . .
8        Q.  (By Mr. Bentley)  Do you know if some
9    doctors are trained to use a single-layer closure?
10       A.  That's how most people are trained.  The
11   single-layer closure can involve an interrupted
12   technique, a running technique, a running locking
13   technique.  It can involve an absorbable suture
14   versus a delayed absorbable suture.  Some people
15   will trim the vaginal wall, others won't.  There's
16   quite a bit of variability in wound closure
17   techniques.
18       Q.  And based on your experience that, you
19   know, there's variability in how people are closing
20   the wound, you did a study to determine whether
21   there was a difference in safety based off of a
22   single-layer closure versus double-layer closure;
23   is that correct?
24       A.  The only end point in the study was the
25   exposure rate.  We didn't look at other factors in

Brian Flynn, M.D.

Page 50

1   terms of safety, but it was just looking at
2   exposure.
3           Q.  Would you consider exposure a safety
4   issue?
5           A.  I would consider it a complication.  And
6   most people would consider complications, you know,
7   not safe.
8           Q.  And exposure obviously can affect the
9   patient's quality of life; isn't that correct?
10          A.  Yeah, that's correct.
11          Q.  And your study demonstrated that the
12  exposure rate or quality of life was affected based
13  upon using the double-layer closure; is that
14  correct?
15          A.  That's not correct.  We never had any
16  quality-of-life data in the study or qualified
17  questionnaires in the study.
18          Q.  So you think that . . .
19          Do you think that Ethicon should have shared
20  with doctors your study results?
21          A.  No.
22          Q.  Do you think that patients would like to
23  have a decreased erosion rate based off of a
24  double-layer closure instead of a single-layer
25  closure?

Page 51

1           A.  I can't say what it's based on, but
2   patients would prefer to have less complications,
3   yes.  That's obvious.  Getting into how we close
4   the wound, that's not something I ever really
5   discuss with patients.
6           Q.  Doctor, when you want to go back and
7   look at your patients to see how, you know, your
8   Prolift patients have -- how they have healed up to
9   see who had erosions or complications or who's
10  doing good, how do you perform that analysis on
11  your patients, or on your patient data?
12          A.  So most patients I tend to see at two
13  weeks postop, at six weeks postop, three months
14  postop, and a year.  During each one of those
15  visits I perform a history and physical exam, and I
16  ask them very pointed questions on how they're
17  doing.  Are they satisfied?  Are they having any
18  issues with incontinence or prolapse?  Are they
19  having issues with infection?  Are they having
20  issues with pain or sexual dysfunction?  I ask them
21  if they're satisfied, if they're glad they did the
22  procedure and had the procedure done.  Are there
23  other things that they're concerned about?  And
24  those are the questions.
25          The physical exam would include a full, you

Page 52

1   know, exam from head to toes primarily focusing on
2   the abdomen and pelvis and the areas that the
3   surgery was performed in.  I check the prior
4   surgical incisions.  I check the entire vaginal
5   wall.  I look at the cervix, if that's present.  I
6   look at the urethra.  I test their urine.  I
7   measure their postvoid residual.  And then based on
8   that initial assessment, I determine if other tests
9   are necessary to evaluate.
10          After a year, I ask them if they have other
11  providers that they're seeing, if they have someone
12  who's performing their annual gynecologic exam, to
13  ask that person if they're comfortable continuing
14  to follow the patient and include that in their
15  exam.  And if they do have someone local, then I
16  would see if they're comfortable following up with
17  that patient.  If not, then they'll continue to
18  follow with me.
19          Q.  That's a fairly extensive list of data
20  points.
21          Do you track those data points in any type
22  of systematic way, or database?
23          A.  No, they get entered into the electronic
24  record.  If we elect to perform a study, a
25  retrospective study looking at a particular

Page 53

1   problem, then the data will be then organized, so
2   the data is being put into the electronic record
3   but not always collected or retrieved or organized
4   or summarized.
5           Q.  And is that how you performed -- or is
6   that how you collected the data for your two
7   abstracts that we just discussed?  You went back
8   and looked at their electronic record; is that
9   correct?
10          A.  That's correct.
11          Q.  Okay.  And other than those two
12  abstracts, have you gone back and reviewed the --
13  some of the electronic data available regarding
14  your Prolift patients other than those two
15  abstracts?
16          A.  Since the FDA Public Health
17  Notification, the FDA has asked physicians to keep
18  track of that.  So if someone comes in with a
19  complication, then I would keep track of that, yes.
20  But I'm not calling people, you know, after a year
21  or sending out a mailing or anything like that.  So
22  if they're coming into my office with a complaint,
23  or if another provider's seeing my patient and
24  there's a complaint, then I would have awareness of
25  that.

Brian Flynn, M.D.

Page 54

1    Q.   Okay.  And I may have not asked a good
2  question.
3        Other than those two abstracts that you've
4  just discussed, have you gone back and reviewed the
5  data that you have in the electronic records for
6  your patients where you've implanted a Prolift?
7  Have you done any type of systematic review of that
8  data since those two abstracts?
9    A.   I have not.
10    Q.   Does your case log track patients that
11  are referred to you from other doctors to treat
12  mesh-related complications?
13    A.   I don't know if "track" would be the
14  right word, but, you know, when we visit with them,
15  we do the best we can to obtain the prior operative
16  report, and we will make a notation of what product
17  they had put in previously, whether they're doing
18  well or not well.  So it's part of our general
19  intake.
20        When someone comes in with any disease
21  process, we ask them if they've had prior
22  surgeries.  What are those surgeries.  We try to
23  get as much detail as we can, including the
24  operative reports on those surgeries, especially if
25  we're going to plan on doing another surgery in a

Page 55

1  similar area.
2    Q.   I think we've previously discussed, your
3  case log doesn't necessarily track all of that
4  information; is that correct?
5    A.   The case log doesn't.  Again, it would
6  come back to doing a specific study.  The study I
7  didn't mention was one that was presented last
8  spring at the American Urologic Association where
9  we looked at 82 complications from prolapse kits
10  that we had managed.
11    Q.   Okay.
12    A.   And Dr. Kirk Anderson, who was my fellow
13  at the time, he had presented that data, those 82
14  patients that we managed.  The overwhelming
15  majority of the patients had been referred to me.
16  Some of the patients were my own patients.
17    MR. BENTLEY:  Are we at a good point for
18  lunch?  Is that right?  I think we're about an hour
19  in.  Is that right?
20    MR. KOOPMANN:  Let's go off the record for a
21  second.
22    (Recess taken from 12:58 p.m. until
23  1:08 p.m.)
24    Q.   (By Mr. Bentley)  Doctor, we're back
25  from a quick break.  Are you ready to go?

Page 56

1    A.   Yes.
2    Q.   Before the break, we were talking about
3  your case log, and I just wanted to wrap up -- I
4  was asking -- I believe you testified that you
5  didn't do any type of systematic review of your
6  case log to prepare for your Prolift report; is
7  that true?
8    A.   That's correct.
9    Q.   And likewise, you didn't do any type of
10  systematic review of your case log for your
11  Prolift+M patients to prepare for that report
12  either; is that true?
13    A.   Correct.
14    Q.   And so in reaching your opinions in this
15  case, you're not relying upon any type of
16  systematic review of your own case log to reach
17  your opinions here; is that fair?
18    A.   That's fair.
19    Q.   And similarly, you're not relying on any
20  type of systematic review of the patients you've
21  treated for erosion or other complications in
22  reaching your opinion here; is that fair?
23    A.   I did mention the one study before the
24  break recently that we looked at 82 complications
25  that we had managed related to prolapse kits, so

Page 57

1  that certainly affects my opinion and my thoughts
2  on this process.
3    Q.   Sure.  Other than that, you haven't done
4  any type of systematic review of the complications
5  you've treated, such as erosion, in preparation for
6  your report or in preparation for this deposition;
7  is that fair?
8    A.   Well, in that review, there's the whole
9  review, the whole -- it's not a review, it's an
10  abstract.  But in the abstract, it focuses on what
11  we did to manage those patients and what techniques
12  worked and what didn't work.
13    Q.   And that abstract's not going to present
14  some type of erosion rate such that you're going to
15  be able to testify based off that abstract what
16  percentage of the patients you treated had an
17  erosion; is that fair?
18    A.   What patients I implanted?
19    Q.   Sure.
20    A.   Yeah, correct.  It won't -- it doesn't
21  reflect my own personal exposure rate on patients I
22  implanted.
23    Q.   And you can't calculate from that
24  abstract an erosion rate for other doctors; is that
25  fair?

Brian Flynn, M.D.

Page 58

1      A. Correct.
2      Q. Doctor, we have briefly discussed a
3  little bit, and I believe you mentioned that
4  another bases for your opinions in this report is
5  the body of medical literature out there; is that
6  true?
7      A. Yes, that's true.
8      Q. And I think you mentioned that you've
9  performed PubMed searches to identify articles
10  regarding prolapse and Prolift; is that true?
11      A. That's true.
12      Q. And did you perform a PubMed search in
13  preparation for reaching your opinions in this
14  case?
15      A. I did.
16      Q. And do you know what the keyword
17  searches you used to perform that search?
18      A. I used the word "Prolift."
19      Q. Okay.
20      A. "Mesh," "mesh kit." I believe that was
21  it. Probably just those two words.
22      Q. Do you have an idea of how many articles
23  that search would have returned?
24      A. With respect to the prolapse search, I
25  would think somewhere around 30 or 40 articles.

Page 59

1  Oftentimes the word "Prolift" doesn't appear in the
2  title even though the article is specifically about
3  that product.
4      Q. I think I misunderstood.
5      Is it your testimony that you performed two
6  different PubMed searches, one using the keyword
7  "Prolift" and maybe a second keyword search using
8  the key words "mesh kit"? Is that accurate?
9      A. I'm not certain if that's accurate, but
10  I know I recalled doing a PubMed search. The exact
11  key words I used, I know I would have at least used
12  those two words. I may have used other words, or
13  similar words.
14      Q. It's fair to say that you didn't have
15  any type of systematic approach to how you were
16  performing your PubMed search; is that true?
17      A. Usually when you put in a search word,
18  you'll get some articles, and then they'll show
19  articles in the column on the right of that that
20  are similar to those articles, and it kind of just
21  leads you to deeper searches. So you put in that
22  search word, and you end up looking at a lot of
23  different articles maybe that aren't immediately
24  from that first search word, but it's sort of a
25  chain reaction once you start looking at PubMed.

Page 60

1      Q. Okay. I appreciate that, but my
2  question was a little different, Doctor.
3      Is it fair to say that you didn't have some
4  type of systematic approach to how you searched
5  PubMed for articles in preparing your report?
6      A. Correct.
7      Q. Okay. And likewise, did you perform any
8  type of systematic search on PubMed to find
9  articles related to Prolift+M in preparing that
10  report?
11      A. I did the same type of search for
12  Prolift and Prolift+M.
13      Q. And subsequent to issuing your reports,
14  have you done any type of systematic search on
15  PubMed in preparation for the deposition today on
16  Prolift or Prolift+M?
17      A. Since issuing these reports?
18      Q. Yes.
19      A. No, I have not.
20      Q. I would assume it's your general
21  practice to read very scientific articles that are
22  published that concern your practice; is that fair?
23      A. Yeah, there's a number of journals that
24  I read commonly. We have a journal club that's
25  part of our practice. We do that at least a few

Page 61

1  times a year at the University of Colorado with our
2  residents and students, and so I am a reviewer for
3  a number of journals, so sometimes articles will be
4  sent to me as a reviewer, so I am looking at the
5  medical literature very commonly.
6      Q. Do those journal club activities
7  discuss, say, mesh-related articles?
8      A. They do. We just discussed one recently
9  a few weeks ago.
10      Q. When, approximately, was the last
11  journal club that you attended?
12      A. That would have been two weeks from
13  tomorrow.
14      Q. And I believe you just testified that
15  you do -- or you attend journal clubs approximately
16  quarterly; is that fair?
17      A. I would say there's at least five or six
18  a year that I attend.
19      Q. Okay. So subsequent to issuing your
20  report on February 26, how many journal clubs have
21  you attended?
22      A. Since February?
23      Q. Yes.
24      A. One or two.
25      Q. Okay. And did those journal clubs

Brian Flynn, M.D.

Page 62

1  identify any important new mesh-related articles
2  that you felt changed or affected your opinions in
3  this case?
4      A.  Well, one article that had come up in my
5  last deposition was the Welk article from Canada.
6  It was a JAMA article, so that was one that -- JAMA
7  is a very large journal that has high readership,
8  and so we felt that that was important to review.
9      Q.  Would you expect that attending these
10 journal clubs would keep you apprised of the
11 important literature that's being put out there
12 regarding your practice and, specifically, Prolift
13 and mesh kits?
14     A.  It's one of many ways.  It's part of the
15 process, that as well as attending scientific
16 meetings and discussion with colleagues, my own
17 personal review of the literature in the journals
18 that I subscribe to.
19     Q.  When you're reviewing these scientific
20 articles regarding Prolift and mesh kits for
21 treating prolapse, is it fair to say that there's
22 strengths and weaknesses with any given article?
23     A.  Yes.
24     Q.  Can you describe for me what strengths
25 you would look for in an article to use to reach

Page 63

1  your opinions in this case?
2      A.  Well, we usually start out by looking at
3  the pure size of the article, how many patients
4  were enrolled.  Then we look at the methods.  Was
5  this prospective or retrospective?  Were patients
6  randomized?  Was there more than one center
7  involved, maybe more than one surgeon involved?
8  Those things factor into what we consider levels of
9  evidence.  Was it an actual study where patients
10 were enrolled, or is it more of a review,
11 systematic review or meta-analyses?
12     So we look at the number of patients, the
13 format of the study.  We look at what journal it
14 was published in to see if the journal was peer
15 reviewed.  That's also important.
16     Sometimes I might know the authors.  People
17 that I know, I tend to follow.  And, you know, I'm
18 interested in reading what they have to write, my
19 mentors, especially, and thought leaders that I
20 respect in SUFU and AUGS.  So it's a process.  But
21 briefly, that's the process that I adhere to.
22     Q.  Do you feel that the articles that you
23 cited in your report met those tests for whether an
24 article is strength -- or has strength?
25     A.  Well, the report has various levels of

Page 64

1  evidence and support.  The reports that we were
2  talking about earlier, my small case series of the
3  double-layer closure and the Prolift video, those
4  were low-level evidence.  Some people call them
5  pilot studies or case series.  We do those studies
6  as way of encouraging scientific research by our
7  residents and fellows.  It gives them an
8  opportunity to present.  But I don't rely on those
9  as heavily as I do on systematic reviews and the
10 meta-analyses.
11     Q.  Would you agree that all of the articles
12 that you have cited in your paper are all from
13 authors that you respect?
14     A.  No, I wouldn't agree with that.
15     Q.  Are there certain authors that you've
16 cited to that you don't respect in your paper?
17     A.  I think that would be too strong of a
18 word.  I mentioned they're some of the authors I
19 know, but I would say overwhelmingly I don't know
20 the majority of these authors personally, so I can
21 say there's a number of authors that I have a
22 personal relationship with that I know, I've met,
23 I've had personal communication with, but 90
24 percent of these authors I've never or I never will
25 meet, so it's hard for me to say if I respect them

Page 65

1  or not.
2      Q.  Aside from the strengths that you just
3  described, are there any weaknesses that you look
4  out for that might discount an article other than
5  the lack of the strengths that we just discussed?
6      A.  Okay.  So if it wasn't in a
7  peer-reviewed journal, I'm concerned that maybe
8  they've attempted to publish it in a peer-reviewed
9  journal and it was turned down, so they went to a
10 second- or third-tier-level journal, so that's
11 something that may be a red flag, although,
12 occasionally, you'll find very good articles in
13 journals that aren't peer reviewed.  It's quite
14 variable.  Just the whole opposite of what I just
15 said.  If it's small numbers, if it's not
16 multi-center, if it's not randomized, if there's
17 not long-term follow-up, you know, those are going
18 to be weaknesses.
19     Q.  Right.  So other than the lack of the
20 strengths that we've discussed, there's no -- you
21 can't identify right now any weaknesses that you
22 look out for other than the strengths or the lack
23 of strengths that we just discussed?
24     A.  Well, getting back to the journals, if
25 it's not a peer-reviewed journal, that's considered

Brian Flynn, M.D.

Page 66

1 a weakness. If the follow-up is short, that's a
2 weakness.
3    Q. Generally, what follow-up are you
4 looking for when you're evaluating that's
5 discussing Prolift and mesh kits to treat prolapse?
6    A. Well, I look primarily at how long the
7 procedure's been performed over how many years. So
8 if the procedure's only been available for a year,
9 then I'm very interested in looking at the
10 short-term follow-up, because that's all you're
11 going to get. That's the best available
12 information that's available to you. TVT product
13 has been available for -- since 1998, so it doesn't
14 make sense for me to look at a study that has less
15 than, say, three- to five-year follow-up, so the
16 longer the product's on the market, the more you're
17 going to rely on long-term follow-up. For newer
18 products, the best you can rely on is short-term
19 follow-up or intermediate follow-up.
20    Q. Right. And my question was specific to
21 Prolift and mesh kits to treat prolapse.
22    What follow-up are you looking for to
23 evaluate whether a study has the strength that you
24 need to rely upon it for your report?
25    A. I'd like to see a minimum of one year.

Page 67

1 And ideally, I'd like to see three years or more.
2    Q. When you're evaluating the strengths and
3 weaknesses of various articles and ultimately
4 reaching a decision of whether or not you're going
5 to include it in your report, is it fair to say
6 that you're not performing any type of
7 epidemiological analysis on the numbers presented
8 in the case? Is that fair?
9    A. I'm not performing the study. I'm only
10 reviewing the study, so it's really up to the
11 author on how they design the study. Then I look
12 at that study, and I use that as the basis of my
13 opinions in this report.
14    Q. Right. So you're not performing any
15 type of follow-up, epidemiological or statistical
16 analysis on the study. You're just taking the
17 study as presented and deciding whether or not it
18 meets your inclusion criteria for your report; is
19 that fair?
20    A. Yeah, that's fair.
21    Q. And, in fact, you're not an expert in
22 doing epidemiological analysis; is that fair?
23    A. I have some expertise in epidemiology.
24 I spend a lot of time reviewing the medical
25 literature, looking at meta-analyses and systematic

Page 68

1 reviews. I understand incidence and prevalence and
2 epidemiologic factors.
3    Q. Sure.
4    A. So it's really not up to me to decide if
5 I'm an expert, but I think I do provide expertise
6 in those areas when discussing papers with my
7 patients, with my residents, the fellows and
8 students that I educate.
9    Q. You don't publish on epidemiological
10 practices; is that fair?
11    A. Not on practices, but it includes --
12 it's in almost every article we write. That's
13 always in the introduction. There's going to be a
14 short blurb on epidemiology of the disease, the
15 prevalence of the disease, who it affects, you
16 know, so that people understand the magnitude of
17 the problem.
18    Q. Of course. And you've never published
19 in any journals like statistics or epidemiology,
20 right?
21    A. On the mathematical methods?
22    Q. Right.
23    A. No, I have not.
24    Q. Of course.
25    Okay. Now, I think you testified that you

Page 69

1 rely upon the studies as presented; is that fair?
2    A. I would need more information on that
3 one.
4    Q. Okay. For instance, if there was a
5 problem with some of the measurements in obtaining
6 the data for a study, you wouldn't know that
7 because you're not getting the patient-level data
8 for the study; is that fair?
9    A. I don't think I can respond to that. If
10 you can repeat that again. I'm sorry.
11    Q. Sure. For example, if there was a
12 problem with the reliability of the POPQ
13 measurement in a study, would you want to know that
14 before concluding whether or not that study was
15 reliable upon which you could reach your opinions?
16    A. I have no reason to believe the POPQ
17 wouldn't be reliable. It's something that's been
18 well-standardized and utilized in many studies.
19    Q. I'm sorry.
20    If there was a problem with how the POPQ was
21 collected in a specific study and it didn't say
22 that in the publication, you wouldn't know that by
23 your review, say, in your journal club of that
24 study; is that true?
25    A. Some authors mention who did the POPQ,

Brian Flynn, M.D.

Page 70

1  and others don't, so it's a stronger study,
2  generally, if it's a third party, meaning the
3  person who didn't do the surgery does the POPQ, for
4  instance, like the surgeon's nurse or partner or
5  physician assistant. And oftentimes surgeons will
6  mention that. You'll see that more commonly in
7  more recent reports.
8      Q. Let me back up.
9      Could you define POPQ for me?
10     A. POPQ is the pelvic organ prolapse
11 quantitation score. It's something that had been
12 described at least 15 years ago. I remember
13 learning about it when I was a fellow at Duke
14 University. I studied there under George Webster
15 and Cindy Amundsen, Allison Widener and other great
16 thought leaders, and so they taught me how to do
17 the POPQ.
18     What it involves is using what we call a
19 measuring stick. This looks like a popsicle.
20 Sometimes there's markings on a metal stick. And
21 that would be inserted into the vagina and used to
22 take measurements, including the total vaginal
23 length, the length of the genital hiatus, the
24 perineal body. And then there's points on the
25 anterior wall and the posterior wall, AA, AB, PA

Page 71

1  and PB. And so you end up putting the numbers in
2  what looks like a tic tac toe board, you know, so
3  you have some cross hairs with nine boxes, and then
4  you put your measurements in there. The idea is
5  that's a more scientific way of quantitating
6  surgical outcomes compared to, say, mild, moderate,
7  severe prolapse or stage one, two, three, four.
8      So the whole idea of POPQ was to be able to
9  get individual measurements in all the different
10 compartments. And it's something that's been
11 popularized and standardized. When I prepared for
12 my exam and my certificate and my board
13 certification in female pelvic medicine and
14 reconstructive surgery, I had to learn about POPQ
15 and statistics and epidemiology and all these
16 things. So I learned it as a fellow, and then I
17 relearned it again when I was preparing for the
18 exam, and I use it in my practice.
19     Q. Right. So essentially, it's a way of
20 measuring the stage of prolapse, is that fair, to
21 sum it up?
22     A. More than just stage. I think it gives
23 you more detail beyond stage than, say, the Baden
24 Walker. It tells you which compartments
25 specifically are prolapsed.

Page 72

1      Q. Okay. And it can be used to gauge
2  whether there was recurrence after a woman was
3  treated for prolapse; is that true?
4      A. Yes, that's true.
5      Q. And going all the way back to my
6  hypothetical, if there was a problem at the
7  data-collection level when the doctors were
8  determining the POPQ after they treated the woman
9  for prolapse, if there was a problem in that data
10 collection and you didn't know about that, you
11 wouldn't have that information available to you
12 when you read the study; is that fair? You can't
13 tell patient-level data from most of the studies
14 unless the authors put it in there; isn't that
15 fair?
16     MR. KOOPMANN: Object to form.
17     A. I mean, the authors will put it in
18 there, and generally, if it's from a peer-reviewed
19 journal, we're going to believe it.
20     Q. (By Mr. Bentley) Do you know if, during
21 the peer review process, if most journals review
22 all of the patient-level data?
23     A. No, the reviewers -- as a reviewer, I
24 can say, when I review papers, I don't see the
25 actual spreadsheets. I see the manuscript. I see

Page 73

1  tables. I see graphs, figures. If something
2  doesn't seem right to us, we'll send it to an
3  in-house person for statistical review to make sure
4  that the statistics make sense if they're using a
5  complicated statistical model. And then we have an
6  opportunity to send feedback to the authors and ask
7  them to respond to our comments. And if those
8  responses are not satisfactory, then we don't
9  publish the article.
10     Q. Sure.
11     Doctor, in your career, have you ever been
12 involved in writing or preparing warnings for a
13 medical device?
14     A. Have I ever prepared a warning?
15     Q. Yes.
16     A. No. I've prepared a response to a
17 warning, but I've never written a warning.
18     Q. Do you have an opinion as to what
19 warnings are required to go into an IFU?
20     A. Yeah, I have some general requirements
21 on what the FDA would like to see in an IFU and
22 other types of literature.
23     Q. Okay. Let's break that down.
24     What are your general requirements for what
25 you expect to be in an IFU regarding warnings?

Brian Flynn, M.D.

Page 74

1     A. I want to hear if there's information on

2  toxicity. I want to hear if there's information on

3  carcinogenesis. I want to hear about complications

4  that might be unique to that product that's not

5  part of ordinary urogynecologic practice, so things

6  that don't happen with everyday surgery that maybe

7  is more specific or unique to that product. Those

8  are the warnings that I'm interested in seeing.

9     Q. So is it your opinion that warnings

10  don't need to be included in the IFU if doctors

11  generally know about the risks already?

12     A. You have to separate what's fundamental

13  surgical knowledge with urogynecologic surgery

14  versus what's more product-specific and related to

15  the product.

16     Q. Okay. And is that standard for warning

17  based on Dr. Flynn's general requirements or are

18  you basing that upon some other standard?

19     A. That's based on the standard that was

20  taught to me as a resident fellow and the standard

21  that I see used in my practice and the practice

22  that I participate in with my partners and the

23  students and residents that we train. So it's not

24  my own personal standards. It's the standards that

25  the professional societies that I belong to adhere

Page 75

1  to, as well as my partners and colleagues around

2  the country.

3     Q. Is that standard based upon some FDA

4  rule?

5     A. I think that the FDA gives us

6  information and gives us guidelines. I've reviewed

7  guidelines from the FDA about what they'd like to

8  see.

9     MR. BENTLEY: I'm going to strike --

10     A. But they're not rules.

11     MR. BENTLEY: So I'm going to strike as

12  nonresponsive. My question is a little different.

13     Q. (By Mr. Bentley) Is your standard that

14  you just discussed based upon some FDA rule?

15     MR. KOOPMANN: Object to form.

16     A. I can speak to standards and guidelines.

17  I don't know if that substitutes for rules.

18     Q. (By Mr. Bentley) We don't want you to

19  guess.

20     A. Okay.

21     Q. Just -- you don't know of any FDA rule

22  that you're assigned to right now that supports or

23  that is -- strike that.

24     The general requirement that you just

25  discussed, do you know if that's based on any

Page 76

1  specific FDA rule as you sit here today?

2     A. I do.

3     Q. And what rule is that specifically based

4  on?

5     A. Well, I think if you look at the FDA

6  Public Health Notifications, the two that were

7  published, I believe 2008 and 2011, I could be off

8  on the years, but the FDA specifically gave a

9  notification to physicians on certain things, so

10  those are things that I think are important for us

11  to consider as surgeons in our discussions with

12  patients when gaining informed consent.

13     Q. Doctor, I'm going to strike as

14  nonresponsive.

15     My question is, what rule are you referring

16  to with regard to your requirement as to what's

17  required in an IFU regarding warnings, not a Public

18  Health Notification?

19     A. Okay. I'm sorry if I missed the

20  question. I'm also familiar with the FDA

21  recommendations that were put out in the '90s in

22  the blue book, and they gave some general

23  guidelines, some would call them rules, on what

24  should be included in, you know, medical literature

25  or IFUs.

Page 77

1     Q. That's fine.

2     And so is it your testimony today you don't

3  know any specific statute or law that mandates what

4  warnings need to be included in an IFU? Is that

5  fair?

6     A. That's fair.

7     Q. Is there any internal Ethicon standard

8  that you're aware of that sets out what warnings

9  need to be included in an IFU?

10     A. I'm not aware of any internal standards.

11  I believe they would just adhere to the industry

12  standards.

13     Q. So you don't know that Ethicon has its

14  own internal standards that mandate what it has to

15  warn about in labels?

16     A. No, I'm not aware of what their internal

17  standards are.

18     Q. Would you have liked to have reviewed

19  those internal standards in reaching your opinions

20  today in this case regarding the adequacy of

21  Ethicon's warnings regarding its own product?

22     MR. KOOPMANN: Object to form.

23     A. No.

24     Q. (By Mr. Bentley) You don't care what

25  Ethicon's internal standards are regarding its

Page 78

1    warnings?
2        A.  I do care.  I think that they're a very
3    reputable company, and I believe that they would
4    adhere to whatever industry standards are.
5        Q.  So you would expect that Ethicon
6    followed its own standard in deciding what warnings
7    needed to be included in its IFU for its product
8    such as Prolift?
9        A.  Yeah, the --
10       MR. KOOPMANN:  Object to form.
11       A.  -- internal and external standards.
12       Q.  (By Mr. Bentley)  But you don't know
13   what those standards are because you haven't
14   reviewed them?
15       MR. KOOPMANN:  Object to form.
16       A.  No.  I don't know.
17       Q.  (By Mr. Bentley)  And as you sit here
18   today, other than toxicity and carcinogenesis, what
19   other warnings would you want or expect to be in a
20   Prolift IFU?
21       A.  I think what I mentioned also was unique
22   complications to Prolift that maybe don't occur
23   with ordinary urogynecologic surgery.
24       Q.  Right.  And that's my question.  What
25   complications do you think -- based off of that

Page 79

1    definition or that explanation, what
2    complications -- you as Dr. Flynn, using your
3    general requirements that we discussed, what
4    warnings, in addition to the toxicity and
5    carcinogenesis, would you want or expect to be in
6    the label for Prolift?
7        A.  I would like some information on
8    patients that were contraindicated to the
9    procedure, so for instance, if the patient's
10   pregnant, if the patient has bleeding diathesis, if
11   the patient has chronic vaginal infection or -- you
12   know, those are things that, you know, I certainly
13   would want to be aware of.  Other things I'd want
14   to know about is the risk of mesh exposure or
15   healing abnormalities, injury or damage to
16   surrounding structures like the bladder or the
17   urethra or the bowel, nerves, blood vessels.  So I
18   want to know what organs can be injured.  I want to
19   know what the exposure rate is.  I would want to
20   know, obviously, if there's any concerns about the
21   product causing cancer or causing any untoward side
22   effects to the patient.
23       Q.  Doctor, I believe you testified that
24   you'd want Ethicon to include warnings that were
25   unique to the product and the label; is that fair?

Page 80

1        A.  Yes.
2        Q.  And you just told me that you would like
3    to know that there's a risk of damage to the
4    nerves, to blood vessels or bowel.  Is that -- are
5    those risks unique to the Prolift device?
6        A.  They can be, or they can be part of
7    ordinary surgery, but you'll see both
8    possibilities.
9        Q.  But you would like for those risks to be
10   included in the label; is that true?
11       MR. KOOPMANN:  Object to form.
12       A.  I think that those risks that I
13   mentioned are ones that I've seen in the IFUs for
14   the various products, the Ethicon products that I'm
15   familiar with.
16       Q.  (By Mr. Bentley)  But are those risks
17   inherent with general surgery other than the
18   Ethicon products?
19       A.  Yes, they can occur with general
20   surgery, native tissue repairs and other
21   graft-augmented repairs, sacrocolpopexy.
22   Certainly, any surrounding structures can be
23   damaged when you're operating near or around them.
24       Q.  Right.  And you want those risks to be
25   warned of in the Prolift label; is that correct?

Page 81

1        A.  Yeah, that's correct.
2        Q.  Using your method or your general
3    requirements for determining what warnings should
4    go into a label, how did you decide that those
5    risks that are also inherent with general surgery
6    were appropriately put in the IFU for Prolift, as
7    you just testified?
8        A.  I think that what's unique with, say,
9    Prolift compared to a native tissue repair is the
10   graft material and then the devices that are used
11   to place the graft material, the inserters or
12   tunnelers, you know, those devices.
13       Q.  I'm sorry.  I'm just not understanding,
14   I guess.
15       How is it that these risks that you're
16   discussing that are inherent with general surgery
17   you expect them to be in the Prolift IFU, such as
18   potential risk for injury to bowels, to nerves and
19   to blood vessels?  Why do you think that these
20   general risks of surgery are appropriately put in
21   the IFU for Prolift?
22       A.  Because that's what I've seen in other
23   IFUs that I've reviewed.  It seems to me like that
24   is may be a standard that exists for, say, the TVT
25   product or other types of mesh kits.

Brian Flynn, M.D.

Page 82

1    Q. So your method for deciding whether or
2  not these risks should be included in the IFU is
3  based on what you reviewed in other IFUs; is that
4  true?
5    A. That's part of it, yes.
6    Q. And in addition to that, what else is
7  your opinion based upon?
8    A. It's based upon my own personal
9  experience and things that maybe you felt that you
10 didn't have a way of knowing based on your current
11 experience or education.
12   Q. Okay. And we've previously discussed
13 that you're aware that different doctors have
14 different experience levels with these mesh
15 products; isn't that fair?
16   A. That's correct.
17   Q. And so maybe including some
18 complications that you're aware of as more of a
19 specialized expert in your field might be helpful
20 for some other doctors that aren't as highly
21 trained; would you agree with that?
22   A. Yes.
23   Q. Doctor, prior to writing your report,
24 did you already hold the opinion that Prolift was
25 safe and effective?

Page 83

1    A. Yes. I used it for a number of years in
2  my practice, and so I wouldn't have used it for
3  that many years if I didn't feel it was safe and
4  effective.
5    Q. Is Prolift currently on the market?
6    A. Prolift is no longer on the market.
7    Q. Do you have an understanding of why
8  Prolift is no longer on the market?
9    A. I have some understanding, but it was a
10 decision that Ethicon made to voluntarily no longer
11 offer the product.
12   Q. Did Ethicon receive a 522 order from the
13 FDA regarding its Prolift product, if you know?
14   A. I don't know if they did or not, but I
15 do know that they made that decision voluntarily to
16 no longer offer the product.
17   Q. Do you know what a 522 order is?
18   A. I do.
19   Q. Could you tell me?
20   A. 522 -- five hundred and twenty-two,
21 five-two-two -- is a code in the FDA regulatory
22 system as opposed to, say, 510 or 510(k), so
23 there's different ways the products go through
24 regulatory. And the 522 was ordered on mini-slings
25 and transvaginal prolapse kits. The 522 requires

Page 84

1  analysis of post-market or -- devices that are
2  currently on the market, so these are devices that
3  are already approved, and they ask the
4  manufacturers to prospectively collect data on the
5  devices and then to -- I think they have two years
6  or so to report to the FDA on what they find.
7    Q. So is it your testimony that a 522 order
8  requires the manufacturer of a device to perform
9  additional post-market studies to determine the
10 safety of its device?
11   A. Yes.
12   Q. And if Ethicon was ordered by the FDA to
13 perform 522 studies, does that affect your opinion
14 in this case?
15   A. No.
16   Q. Do you know if Ethicon chose to withdraw
17 the Prolift product from the market instead of
18 doing the 522 studies?
19   MR. KOOPMANN: Object to form.
20   A. I don't know what their motivation was.
21   Q. (By Mr. Bentley) Would you have liked
22 for Ethicon to do additional safety studies?
23   MR. KOOPMANN: Object to form.
24   A. I would have liked to see Prolift or
25 Prolift+M stay on the market.

Page 85

1    Q. (By Mr. Bentley) When the FDA issued
2  its 522 order to Ethicon regarding its Prolift
3  product, do you know if Ethicon submitted studies
4  that already existed to the FDA in an attempt to
5  get out of having to do additional studies?
6    MR. KOOPMANN: Object to form.
7    A. I'm not aware of what sort of internal
8  strategies they had for dealing with the 522s.
9    Q. (By Mr. Bentley) Do you know if Ethicon
10 submitted the very studies you're relying upon --
11 in this report to reach your opinions, do you know
12 if Ethicon submitted those very studies to the FDA
13 to get out of the 522 study requirement?
14   A. I don't know.
15   MR. KOOPMANN: Object to form.
16   Q. (By Mr. Bentley) Assuming that
17 happened, if the FDA then reviewed those studies
18 and still determined that Ethicon needed to do
19 additional studies pursuant to a 522 order, would
20 that have affected your opinion in this case?
21   A. No.
22   Q. So you don't think it's of any
23 importance that the FDA might have reviewed the
24 same studies that you reviewed and determined that
25 the safety and effectiveness of the Prolift has not

Brian Flynn, M.D.

Page 86

1   been established?
2       MR. KOOPMANN: Object to form.
3       A. That misstates what I said. I think
4   that the FDA has, you know, some goals and some
5   things that they need to attend to -- but how I
6   prepare my report, was that the question? And the
7   way I prepared my report was, aside from the 522
8   orders, whether the 522s were ordered or not
9   ordered, I would have prepared the report the same
10  way. It didn't affect how I thought about the
11  product.
12      Q. (By Mr. Bentley) Do you have any
13  understanding of whether or not the FDA employs a
14  number of epidemiology experts to review safety
15  data for products that it's monitoring?
16      A. I don't know who the FDA has on their
17  staff. No, I don't.
18      Q. Would you expect the FDA to have very
19  highly trained and skilled professionals to review
20  safety data?
21      A. Yes. I know a lot of them are
22  physicians.
23      Q. And we've already discussed that you
24  didn't perform an entire full systematic review of
25  the literature; isn't that fair?

Page 87

1       MR. KOOPMANN: Object to form.
2       A. I don't think that's fair, no.
3       Q. (By Mr. Bentley) What level of evidence
4   would you consider your report in the sections that
5   review the literature on Prolift? Would you --
6   could you characterize what level of evidence using
7   the Oxford Levels of Evidence for me?
8       A. The report has all four levels of
9   evidence. When I get into the sections on the
10  systematic reviews, such as the Cochrane review,
11  you know, and the RCTs, those would be highest
12  levels of evidence. When I talk about my own
13  personal experience with the device, my background
14  and maybe some of the pilot studies, that would be
15  the lowest levels of evidence. So it's a long
16  report with various levels of evidence.
17      Q. But the section specifically reviewing
18  the medical literature available for Prolift, you
19  wouldn't consider your section reviewing that
20  literature to be a systematic review, right?
21      A. That's correct.
22      Q. Would you think that the FDA would be
23  better enabled to do a systematic review of the
24  medical literature than you?
25      MR. KOOPMANN: Object to form.

Page 88

1       A. This is not a systematic review. It's a
2   report. I think I've testified to that.
3       Q. (By Mr. Bentley) My question: Do you
4   think the FDA is equipped and qualified to do a
5   thorough systematic review of the medical
6   literature regarding Prolift?
7       A. Of course, yes.
8       Q. And so in doing that analysis, if the
9   FDA determined that the studies you relied upon in
10  this report are not sufficient to establish the
11  safety and effectiveness of Prolift, you don't give
12  that conclusion by the FDA any importance in your
13  report?
14      MR. KOOPMANN: Object to form; foundation.
15      A. I wouldn't use the words "any
16  importance." It's just one of many pieces of
17  information that I use to formulate my opinion.
18      Q. (By Mr. Bentley) If that had happened,
19  would that be important for you to review at least?
20      A. I can't answer that. I mean, we're
21  speaking in the hypothetical. I don't believe it's
22  happened, so I can't answer that one way or
23  another.
24      Q. Because you haven't been provided any
25  documents demonstrating what Ethicon provided to

Page 89

1   the FDA; is that fair?
2       A. That's fair.
3       Q. And if, in fact, that had happened and
4   you had been provided with those documents showing
5   that Ethicon provided to the FDA the same studies
6   you relied upon, and the FDA concluded it's not
7   enough to establish safety and effectiveness of
8   Prolift, and they still ordered Ethicon to do 522
9   studies -- if you had been given all that
10  information, would that maybe have affected your
11  opinion in this report?
12      MR. KOOPMANN: Object to form.
13      A. No, I don't think so.
14      MR. BENTLEY: Could we take lunch?
15      MR. KOOPMANN: Sure.
16      (Recess taken from 1:48 p.m. until
17  2:48 p.m.)
18      Q. (By Mr. Bentley) Doctor, we're back
19  from a short lunch break. Are you ready to go?
20      A. Yes.
21      Q. When you're discussing with your
22  patients whether to use the Prolift implant to
23  treat prolapse, would you perform a risk-benefit
24  analysis with the patient?
25      A. I wouldn't call it analysis, but a

Brian Flynn, M.D.

Page 90

1  risk-benefit discussion.
2      Q. And you would discuss the potential
3  complications with the procedure with the patient?
4      A. I would.
5      Q. And in your report, it's your opinion
6  that Prolift has a favorable risk-benefit analysis;
7  is that correct?
8      A. That's correct.
9      Q. And in reaching that opinion, you
10 evaluated all the potential risks associated with
11 Prolift; is that correct?
12     A. Correct.
13     Q. And you balance those against the
14 potential benefits; is that correct?
15     A. Yes.
16     Q. And when you're talking about benefits
17 of the Prolift, is one of the aspects of that
18 analysis how Prolift compares in success rates
19 regarding occurrence as compared to other
20 procedures to treat prolapse?
21     A. Yes.
22     Q. And one of the other major alternative
23 procedures to treating prolapse is native tissue
24 repair; is that correct?
25     A. Yes.

Page 91

1      Q. And it's your opinion that Prolift is
2  significantly more efficacious than a native tissue
3  repair; is that correct?
4      A. Yes.
5      Q. And in your report, actually on page 8,
6  you cite to the 2013 Cochrane review by Maher for
7  that very proposition; is that correct?
8      A. Yes.
9      Q. And I think we've previously discussed
10 you believe that the Cochrane review to be a high
11 level of evidence, according to the Oxford Levels
12 of Evidence; is that correct?
13     A. Yes, that's correct.
14     Q. When you discuss with your patients the
15 risk-benefit analysis of Prolift, do you also tell
16 them that you believe that Prolift is more
17 efficacious than native tissue repair?
18     A. I do.
19     Q. And when you're discussing the risks
20 associated with Prolift, do you discuss with your
21 patients the potential for Prolift to induce a
22 foreign-body reaction?
23     A. I don't use those words specifically. I
24 talk to them about having postoperative pain or
25 exposure.

Page 92

1      Q. Okay. Do you have an understanding of
2  whether or not Prolift and the polypropylene mesh
3  that Prolift is made of induces a foreign-body
4  reaction in the body when implanted?
5      A. I have opinions on that, yes.
6      Q. Okay. Do you agree that there is a
7  foreign-body reaction associated with the
8  implantation of Prolift in polypropylene meshes to
9  treat prolapse?
10     A. Yes. Any foreign body is going to cause
11 a foreign-body reaction.
12     Q. Sure. And some foreign bodies might
13 have a higher degree of foreign-body reaction as
14 compared to other foreign bodies; is that fair?
15     A. Yes.
16     Q. And with a foreign-body reaction, does
17 the body sometimes create a scar plate as a
18 consequence of that process?
19     A. Yes.
20     Q. And, in fact, in your practice, have you
21 seen patients have complications from mesh-related
22 implants where the patient has, in fact, suffered
23 from a rigid or hardened scar plate? Is that fair?
24     A. Yes.
25     Q. And sometimes you have to remove that

Page 93

1  hardened scar plate where the body has become
2  encapsulated in the mesh and it's become a hard
3  scar in the body; is that correct?
4      A. That's correct.
5      Q. And that scar plate process can, in
6  fact, lead to other complications, such as pain; is
7  that correct?
8      A. I mean, it can lead to a variety of
9  complications, including pain.
10     Q. And absent that mesh implant, there's
11 not going to be a foreign-body reaction to a mesh.
12 Makes sense, right?
13     A. If there's no foreign body, then there
14 wouldn't be a foreign-body reaction, but there is
15 some reaction to surgery, and especially if there's
16 permanent sutures being used.
17     Q. Right. And, of course, the surface area
18 of the polypropylene mesh, or the total
19 polypropylene material used in a Prolift implant is
20 substantially greater than that used -- or that in
21 a suture; is that correct?
22     A. Yes, that's correct.
23     Q. Do you have any understanding of the
24 relative size comparison to a Prolene suture versus
25 how much polypropylene mesh is placed in the body

Brian Flynn, M.D.

Page 94

1    with a Prolift mesh implant?
2         A. I never have seen a comparison. I mean,
3    with the suture-based repair with permanent
4    stitches, it'd probably be anywhere from three to
5    six sutures being used. You know, the Prolift
6    implant is obviously much bigger than that.
7         Q. Approximately how long would one of
8    those sutures be where you say that you use
9    approximately three to five sutures?
10        A. Well, they're very long, but then you
11   tie them together and you cut the knot. So how
12   long is the knot? Less than a centimeter.
13        Q. Okay. And do you have any understanding
14   or appreciation of how much length of polypropylene
15   goes into making the Prolift mesh that's
16   permanently implanted in the woman's body?
17        A. I do.
18        Q. How much is that?
19        A. I believe, going from right to left,
20   it's somewhere around 8 to 10 centimeters.
21        Q. And that's for the entire implant,
22   correct?
23        A. For the anterior implant.
24        Q. Okay. And my question was a little
25   different.

Page 95

1         The Prolift implant is actually knitted
2    together using polypropylene-extruded resin; is
3    that correct?
4         A. It uses fibers of the polypropylene,
5    and, yes, it is knitted together.
6         Q. Okay. And my question is, do you know
7    or have an understanding of how much fiber, how
8    much polypropylene fiber goes in -- that is knitted
9    together to make the Prolift mesh material?
10        A. In terms of weight?
11        Q. No, total length.
12        A. Total length? Well, I mentioned you
13   have 8 centimeters right to left, and I believe
14   it's somewhere around 10 to 15 centimeters anterior
15   to posterior.
16        Q. I apologize. It's probably a bad
17   question.
18        But how much do you -- if you know, do you
19   have an understanding of what length of
20   polypropylene fiber it takes to knit together to
21   make the approximately 8-centimeter Prolift
22   implant?
23        A. I don't know the number.
24        Q. Do you have any estimate or idea of
25   whether it's substantially more than a couple

Page 96

1    centimeters of Prolift -- I'm sorry, of Prolene
2    suture?
3         A. Yes, it's certainly -- you know, it's 8
4    centimeters wide, so it's easily at least 8
5    centimeters.
6         Q. And that 8 centimeters is comprised of
7    however much Prolene fiber it took to knit together
8    to make that implant, right?
9         A. Yes.
10        Q. Okay. And assuming that there's a
11   foreign-body reaction to the polypropylene suture,
12   would you also expect that there's a foreign-body
13   reaction to the polypropylene that's used in the
14   Prolift mesh implant?
15        A. It's the same material, so you'd have a
16   similar reaction.
17        Q. Except for you have a much larger
18   quantity of the material in the human body when you
19   implant the Prolift mesh implant as opposed to a
20   couple of sutures, correct?
21        A. Correct.
22        Q. And related to that, you would expect
23   that the foreign-body reaction would be greater
24   because there's more material for the body to be
25   reacting to. Would you agree with that?

Page 97

1         A. I would agree to that.
2         Q. Okay. In your experience, have you ever
3    had to remove a hardened scar plate that has
4    happened as a consequence to the body having a
5    chronic and persistent foreign-body reaction to a
6    suture?
7         A. Well, I can't say how it happened, but I
8    removed scar plates.
9         Q. And would the scar plate that's
10   associated with a suture-foreign-body-reaction
11   process be substantially smaller than the removed
12   tissue and mesh from a Prolift implant?
13        A. Yes.
14        Q. So the Prolift revision surgery to take
15   out the mesh, including a section of the tissue
16   that's ingrown into it, would be much more invasive
17   and much more serious than removing the counterpart
18   for a suture; is that correct?
19        A. Yes, that's correct.
20        Q. Do you discuss that increased risk with
21   your patients?
22        A. I discuss all the complications. I
23   discuss the need for revision surgery and removal.
24   I don't think I go into that much detail on how a
25   revision would be done. I tend to focus more on

Brian Flynn, M.D.

Page 98

1    how the original or initial surgery would be done.
2         Q.  Do you think a patient would be
3    interested to know what the level of severity is
4    associated with treating a complication with the
5    Prolift procedure as compared to what level of
6    revision surgery might be associated with, say, a
7    native tissue repair using suture?
8         A.  I think that's probably more information
9    than most patients desire.
10        Q.  You don't think a patient's concerned
11   about the level of severity of a revision surgery?
12        A.  No.
13        Q.  Does the level of revision -- strike
14   that.
15        Does the severity of a revision surgery lead
16   to further complications?
17        A.  Well, any time a surgery is going to
18   take longer or be more invasive, there's going to
19   be increased risks.
20        Q.  Approximately what's the size of removal
21   when you have to take out a substantial portion of
22   the Prolift that's been integrated into the body?
23   Approximately, in your experience, what's the size
24   of the mesh and tissue piece that you take out?
25        A.  Every case is different, but generally

Page 99

1    we will take out the part that extruded or exposed.
2    I use those words interchangeably.  And then we
3    usually will take out a 1- to 2-centimeter rim of
4    mesh that goes beyond the exposed area.
5         Q.  And if there's not an erosion, but the
6    patient's still suffering from pain, do you
7    sometimes remove a larger section of the tissue and
8    mesh?
9         A.  We try to do what's called pain mapping,
10   and then we try to focus on where that pain
11   localizes to.  And then if we can identify a
12   problem there, for instance, the scar plate, as you
13   mentioned, then that's the area we're going to
14   focus on.  So every one of these cases is a little
15   bit different depending on what's the indication
16   for revision.
17        Q.  In your experience, what's been the
18   average, if you can say size of tissue and mesh,
19   that you've had to remove when the removal
20   procedure is not related to an erosion, when it's
21   more related to an ongoing pain complication?
22        A.  I would say somewhere between 3 to 4
23   centimeters.  You know, it'd be maybe like a square
24   or a rectangle.  Three by 4 centimeters would be a
25   pretty extensive dissection.

Page 100

1         Q.  Is it true that sometimes, in your
2    experience, removing sections of the mesh and
3    tissue that you decide you can't remove all the
4    mesh you want in one procedure because it might be
5    too invasive?  Sometimes you may just do the
6    anterior removal portion first; is that correct?
7         A.  We try to focus on -- you're talking
8    about a patient that has more than one mesh
9    implanted in them?
10        Q.  Yes.
11        A.  We try to remove the one that's
12   bothering them the most.  And oftentimes it's hard
13   to discern where their pain's coming from, but we
14   tend to try to do the mapping and remove the mesh
15   that's bothering them in that area.  So that'd be
16   very unusual if we would remove, say, more than one
17   mesh in a single operation, yes.
18        Q.  Do you have an opinion of whether or not
19   mesh contracture or mesh folding can contribute to
20   a patient suffering from ongoing pain?
21        A.  I do.
22        Q.  And what's your opinion?
23        A.  Well, I think, as it states in the IFU,
24   that mesh contracture can lead to pain and lead to
25   having a revision.  So there's contracture in

Page 101

1    surgery that we consider ordinary, say, up to 20
2    percent.  Something more than 20 percent,
3    especially if it's a 50 percent or 100 percent,
4    then that's going to be more likely to cause pain.
5         Q.  So you would agree that mesh contracture
6    can cause pain?
7         A.  I would agree with that, yes.
8         Q.  And would you agree that polypropylene
9    mesh through the foreign-body reaction process
10   does, in fact, contract?
11        A.  It can contract by a variety of
12   different ways.  That's one of them.  But I believe
13   that it's not so much the mesh that contracts, it's
14   the soft tissue around the mesh that contracts.
15        Q.  Through the healing process, through the
16   foreign-body reaction, is that correct?
17        A.  Yeah.
18        Q.  And it's your opinion that that is
19   actually warned about in the IFU?
20        A.  Yeah, it is warned about in the IFU.
21        Q.  And you think, appropriately so, it
22   should be warned about in the IFU because that is a
23   complication unique to mesh implants?
24        MR. KOOPMANN:  Object to form.
25        A.  You could have contracture with other

Brian Flynn, M.D.

Page 102

1    surgeries, but I think that that's something that
2    we are concerned about, maybe more concerned about
3    with mesh.
4        Q. (By Mr. Bentley) Doctor, as we
5    previously discussed, one of the benefits that you
6    believe is associated with Prolift is the fact that
7    it's more efficacious than native tissue repair; is
8    that correct?
9        A. That is correct.
10       Q. I'm going to hand you what's being
11   marked as Exhibit 3.
12       (Exhibit 3 was marked for identification.)
13       Q. And Exhibit 3 is a study by Stanford.
14   Are you familiar with this study? I'll represent
15   to you that it's, in fact, on your reliance list,
16   but I don't believe it's cited in your report.
17       But my question was, are you familiar with
18   Stanford's 2012 study?
19       A. I haven't read this recently. There's
20   other articles that I'm probably more intimately
21   familiar with, so . . .
22       Q. Okay. Using your criteria for
23   evaluating whether a study has strength --
24   appropriate strength and weakness, would you
25   consider this to be peer-reviewed literature?

Page 103

1        A. In the National Urogynecology Journal?
2    Yes, I'm a reviewer for this journal. I publish in
3    this journal. It is peer-reviewed material.
4        Q. It's a respectable journal; is that
5    correct?
6        A. Yes, it's respectable.
7        Q. Okay. I just want to draw your
8    attention briefly to the abstract. If you turn to
9    the right-hand column about midway through, you can
10   see where it says, "When similar outcome measures
11   are compared, the published anatomic success rates
12   of POP," that's pelvic organ prolapse, right?
13       A. Yeah. I'm sorry, where are you reading?
14       Q. On the second column on the right in the
15   middle of that first paragraph.
16       A. Okay.
17       Q. Do you see where it starts, "...when
18   similar outcome measures"?
19       A. I do.
20       Q. It says, "When similar outcome measures
21   are compared, the published anatomic success rates
22   of POP," or pelvic organ prolapse, "of anterior and
23   apical compartmental surgery are similar for NT,"
24   or native tissue, "and MA," or mesh-augmented
25   "repairs"; do you see that?

Page 104

1        A. I do.
2        Q. And so the author's essentially saying
3    are, Hey, we think native tissue is as efficacious
4    as mesh-related repairs.
5        Do you agree with that?
6        A. I agree that that's what the authors are
7    saying. I don't agree with their conclusion, no.
8        Q. Okay. And in your report, you don't
9    discuss this article, right?
10       A. Right.
11       Q. So there's no way for me to know why you
12   disagree with this conclusion; is that fair?
13       A. No, there's no way for you to know.
14       Q. Could you tell me why you think this
15   study is not reliable and you don't agree with the
16   conclusions?
17       MR. KOOPMANN: Object to the form.
18       Q. (By Mr. Bentley) Strike that.
19       Do you think this study is reliable, or have
20   an opinion one way or the other?
21       A. I don't have an opinion. I'm not that
22   familiar with this study.
23       Q. But as you said, this is a reliable
24   journal, correct?
25       A. Correct.

Page 105

1        Q. But you just disagree with the
2    conclusions, correct?
3        A. I cite in my report the meta-analyses
4    and the systematic reviews that I rely on, such as
5    the Cochrane review, and the Cochrane review has a
6    contrary result.
7        Q. Okay. So if the Cochrane review had
8    looked at this article and come to the similar
9    conclusion as Stanford, would that affect your
10   opinion?
11       A. I'm not certain that the Cochrane
12   review, at least the 2016, didn't look at this.
13   The more recent Cochrane review by Maher may have
14   included this. I'd have to go and read all the
15   references in the Cochrane review to see if this
16   was included.
17       Q. But my question is, if the Cochrane
18   review reached a similar conclusion as to what
19   Stanford did in 2012, namely the native tissue
20   repair is as efficacious as mesh-augmented repairs
21   such as Prolift, would that affect your opinions in
22   your report?
23       A. No.
24       MR. KOOPMANN: Object to form.
25       A. It would not.

Brian Flynn, M.D.

Page 106

1    Q.  (By Mr. Bentley)  Doctor, have you
2   testified today extensively that you relied upon
3   the Cochrane review?
4        A.  Yes, I have.
5        Q.  And if the Cochrane review changed their
6   conclusion, that would not affect your opinion in
7   this case?
8        A.  I would have to read that report and see
9   why they changed their opinions.  I seriously doubt
10  they're going to change their opinion based on one
11  article.
12       Q.  Sure.  If they happened to, say, change
13  their opinion based on more articles, would that
14  further affect your opinion in this case?
15       A.  I mean, if there's a greater level of
16  evidence, then you're going to consider that more
17  heavily.
18       Q.  As you sit here, can you give me any
19  reason as to why you discount the strength of this
20  study?
21       A.  It's not so much that I discount the
22  strength of this, it's that I rely more heavily on
23  other systematic reviews that are larger that
24  included a greater number of studies.
25       Q.  You rely more heavily on studies that

Page 107

1   support your opinion; is that correct?
2        MR. KOOPMANN:  Object to form.
3        A.  That works both directions.  The studies
4   that I rely on formulate my opinions.  Those two
5   things are interchangeable.
6        Q.  (By Mr. Bentley)  Right.  But you don't
7   present any argument or analysis as to why you
8   think that this study by Stanford is any less
9   credible than the studies that you rely upon that
10  happen to support your opinion; is that fair?
11       A.  Let's see.  This is just one study.  I'd
12  be interested to see other studies like this, but I
13  feel comfortable with the studies I've relied on.
14       MR. BENTLEY:  Okay.  I'm going to strike
15  that as nonresponsive.
16       Q.  (By Mr. Bentley)  My question, Doctor,
17  you don't present any argument or analysis as to
18  why you think this study by Stanford is any less
19  credible than the studies that you rely upon that
20  happen to support your opinion; is that fair?
21       MR. KOOPMANN:  Object to form.
22       A.  That's fair.
23       Q.  (By Mr. Bentley)  I'm going to hand you
24  what's being marked as Exhibit 4, which is a study
25  by Iglesia.

Page 108

1        (Exhibit 4 was marked for identification.)
2        Q.  And I think that Iglesia, again, is on
3   your list materials but not cited in your report.
4        My question is, are you familiar with the
5   Iglesia study?
6        A.  Yes, I am.
7        Q.  And is this from a respectable journal?
8        A.  Yes, it is.
9        Q.  Do you know of any problems offhand with
10  this study?
11       A.  I do.
12       Q.  What are those problems?
13       A.  I think the experience of Dr. Iglesia in
14  terms of her ability to do a mesh-augmented repair
15  has been called into serious question by a number
16  of people.  She's a very experienced native-tissue
17  surgeon, a very inexperienced mesh surgeon.  So I
18  think if you take someone that's done thousands of
19  native tissue repairs and compare the results with
20  the first ten or twenty Prolift kits that they've
21  done, the results are not going to be the same as
22  what other more experienced mesh implanters would
23  report.
24       Q.  And Doctor, does that cut both ways,
25  that an experienced surgeon with extensive

Page 109

1   experience in native tissue repair might be more
2   successful at using native tissue repair as opposed
3   to less-experienced surgeons with native tissue
4   repair?
5        A.  Yes.  I think we get good at the
6   operations that we do commonly and that we're
7   comfortable with.
8        Q.  And as we discussed, there are certain
9   complications associated with a mesh-based repair
10  that are not inherent in a native tissue repair; is
11  that true?
12       A.  Yeah, there's a few.
13       Q.  And looking at the Iglesia study under
14  the abstract on the first-page results, it states,
15  "Sixty-five women were recruited from January 2007
16  to August 2009, when the study was halted due to
17  predetermined stopping criteria for vaginal mesh
18  erosion at a median follow-up of 9.7 months."
19       My question is, does that concern you, that
20  this study was halted for meeting a -- for
21  exceeding the threshold for erosions?
22       A.  It does concern me that they were having
23  more complications than what others had reported.
24       Q.  And then in the "Conclusion" section
25  there, it says, "At 3 months, there is a high

Brian Flynn, M.D.

Page 110

1   vaginal mesh erosion rate (15.6%) with no
2   difference in overall objective and subjective cure
3   rates."  And you disagree with that statement --
4   strike that.
5       "At 3 months, there's a high vaginal mesh
6   erosion rate (3.6%) with no difference in overall
7   objective and subjective cure rates."
8       My question is, that doesn't agree with your
9   opinions in this case, does it?
10      MR. KOOPMANN: Object to form.
11      A.  I used primarily the systematic reviews
12  and Cochrane reviews to formulate my opinions, and
13  this is of a lower level of evidence, and it
14  doesn't affect my opinions.
15      MR. BENTLEY:  And I'm going to strike that
16  as nonresponsive.
17      Q.  (By Mr. Bentley)  My question was, the
18  conclusions reached in this study are contrary to
19  your opinions in this report, correct?
20      MR. KOOPMANN: Object to form.
21      A.  It's contrary to some of my opinions.
22      Q.  (By Mr. Bentley)  And nowhere in your
23  report do you discuss the weaknesses of this study;
24  is that true?
25      A.  That's true.

Page 111

1       Q.  And nowhere in your report do you
2   discuss the criticisms you have of Dr. Iglesia's
3   ability to use a mesh-based implant; is that true?
4       A.  Not in this report, but I did -- I have
5   discussed that in other places, other people have,
6   yes.
7       Q.  Did you discuss that anywhere in your
8   Prolift+M report?
9       A.  No.
10      Q.  Do you disclose that opinion of
11  Dr. Iglesia's surgical ability anywhere in any of
12  your reports in the mesh litigations involving
13  Ethicon?
14      A.  No.
15      Q.  I'm going to hand you what's being
16  marked as Exhibit 5.  And this is a study by
17  Dr. Diwadkar, dated 2009, from Obstetrics and
18  Gynecology.
19      (Exhibit 5 was marked for identification.)
20      Q.  And I believe this is another study that
21  is, in fact, on your reliance materials but, again,
22  not cited in your report.
23      My question, Doctor:  Are you familiar with
24  this study?
25      A.  I don't have much familiarity with this

Page 112

1   study.
2       Q.  And if you'll turn your attention,
3   please, to the "Conclusion" section in the
4   abstract, the authors conclude, the "Rate of
5   complications requiring reoperation and the total
6   reoperation rate was highest for vaginal mesh kits
7   despite a lower reoperation rate for prolapse
8   recurrence and shorter overall follow-up"; do you
9   see that, Doctor?
10      A.  Yes.
11      Q.  And does that conclusion affect your
12  opinions in this case?
13      A.  No.
14      Q.  Does that conclusion support or
15  contradict your conclusions in this case?
16      A.  My report doesn't have conclusions.  My
17  report is a number or a series of opinions that
18  I've offered.  I don't think it's a, like, a paper
19  or a manuscript where I got introduction methods,
20  results and conclusions.  It's not written that
21  way.
22      Q.  Okay.  Thank you.
23      In your report, you state one of your
24  opinions is that Prolift is more efficacious than
25  native tissue repair; is that correct?

Page 113

1       A.  That's correct.
2       Q.  And by efficacious, I mean that there
3   would be less recurrence of the prolapse with the
4   Prolift prolapse repair kit as compared to a native
5   tissue repair; is that correct?
6       A.  That's correct.
7       Q.  Okay.  And the conclusion here from
8   these authors is stating that there's actually a
9   higher reoperation rate with the vaginal mesh kits
10  as compared to other surgical procedures; is that
11  correct?
12      A.  That's correct.
13      Q.  And so my question is, this conclusion
14  is actually contrary to your opinions reached in
15  your report; isn't that correct?
16      A.  That's correct.
17      Q.  And in your report, do you discuss any
18  reason as to why this study is any less credible
19  than the other studies that you cite to in support
20  of your opinion?
21      A.  No.
22      Q.  As you sit here today, do you have any
23  reason to question the strength of this study?
24      MR. KOOPMANN:  Do you want him to read it?
25      MR. BENTLEY:  It's on his reliance list.

Brian Flynn, M.D.

Page 114

1  He's already reviewed it.  If you want to go off
2  the record, I'm happy to --
3       MR. KOOPMANN:  If you want to ask him
4  specific questions about a document, then I
5  think --
6       MR. BENTLEY:  My question was --
7       MR. KOOPMANN:  -- you ought to read it on
8  the record.
9       Q.  (By Mr. Bentley)  As you sit here today,
10  Doctor, do you have any understanding or
11  appreciation of a reason why this study is any less
12  credible than the other studies cited in your
13  report in support of your opinion?
14       A.  I'd have to go off the record and review
15  the article, but as I sit here right now, I'm not
16  that familiar with the article, so I can't
17  criticize the article because I'm not familiar with
18  it.
19       Q.  But the article does reach a conclusion
20  that's contrary to your opinion, right?
21       MR. KOOPMANN:  Object to form; asked and
22  answered.
23       A.  Yeah, the conclusion here says that the
24  rate of complications requiring reoperation was
25  higher.

Page 115

1       Q.  (By Mr. Bentley)  Do you think patients
2  would like to know that when they're deciding
3  whether or not to undergo a surgical implant of the
4  Prolift device?
5       A.  Patients want to know what the risks and
6  benefits of the procedure are.  That's what we
7  discuss with them every day when we do our informed
8  consents.
9       Q.  So is that a yes to my question, Doctor?
10       MR. KOOPMANN:  Object to form.
11       A.  Patients want to know risks, you know,
12  so you have to gather that from as much information
13  as you can collect.  There's no way you can be
14  aware of every single article in the medical
15  literature.
16       Q.  (By Mr. Bentley)  But this article is
17  actually on your reliance list, so presumably you
18  are aware of it, correct?
19       A.  I am, but some articles I'm more
20  familiar with than others.
21       Q.  And my question was, simply, patients
22  would want to know that there may be a higher
23  reoperation rate with Prolift mesh as opposed to
24  other surgical techniques to treat prolapse; is
25  that fair?

Page 116

1       A.  That's fair.
2       Q.  Doctor, would you be critical of Ethicon
3  if they had warned of this increased risk in the
4  IFU?
5       A.  I don't have any criticisms for Ethicon
6  in regards to the IFU.
7       MR. BENTLEY:  I'm going to move to strike as
8  nonresponsive.
9       Q.  (By Mr. Bentley)  My question, Doctor,
10  is, would you have been critical of Ethicon if they
11  had chosen to warn of this increased risk of
12  reoperation in the Prolift IFU?  Would you have
13  been critical of Ethicon for including that
14  information in the IFU?
15       A.  I'm not -- I wouldn't be critical, no,
16  they -- no.
17       Q.  Would it be helpful for some doctors
18  that weren't aware of this article to know that
19  information when they were doing an informed
20  consent with their patients?
21       MR. KOOPMANN:  Object to form.
22       A.  I don't think it'd be helpful.
23       Q.  (By Mr. Bentley)  You don't think it'd
24  be helpful for some doctors to know there's a
25  higher risk of reoperation with Prolift-based

Page 117

1  repairs as compared to other surgical procedures?
2       A.  I think I've already answered that
3  question, but I think, again, you have to go
4  through the risks and benefits of the procedure.
5  What I discuss with patients is that the benefit of
6  the graft-augmented repair is, in my opinion and
7  that of many others in the systematic reviews like
8  the Cochrane review, is that you get a better
9  subjective and objective cure rate.  There is a
10  higher risk of graft exposure when you're using a
11  graft, whether it's mesh or a biological.  You're
12  going to have potential for healing abnormalities.
13  I discuss that with patients, yes.
14       MR. BENTLEY:  I'm going to strike as
15  nonresponsive, Doctor.
16       Q.  (By Mr. Bentley)  My question,
17  specifically, though, is, the information based in
18  this study that indicates that there's a higher
19  reoperation rate with Prolift-based repairs, do you
20  think that would have been helpful for doctors to
21  know to inform their patients during the
22  risk-benefit discussion so they can get informed
23  consent as to the procedure to implant a Prolift
24  device?
25       MR. KOOPMANN:  Object to form.

Brian Flynn, M.D.

Page 118

1    A.  No, I don't think this article would
2  have been helpful to them.
3    MR. KOOPMANN:  Can we go off the record for
4  a second?
5    (Discussion held off the record.)
6    Q.  (By Mr. Bentley)  Doctor, is the risk of
7  reoperation a serious risk for patients?
8    A.  Serious risk?
9    Q.  Yeah, that was a bad question.  Sorry.
10  Are there risks inherent with any surgery?
11    A.  Yes.
12    Q.  And so having an additional surgery
13  presents additional risks; is that correct?
14    A.  Having a reoperation?
15    Q.  Sure.
16    A.  Yes.
17    Q.  And likewise, not having a reoperation
18  is probably safer than having a second surgery.
19  Would you agree with that?
20    A.  It would depend on the particular
21  disease.  Some people need a reoperation.  If they
22  don't, then their health made be, you know, more in
23  harm than not having the reoperation.  You have to
24  look at each patient individually.
25    Q.  Right.  And we're here discussing

Page 119

1  Prolift and prolapse, which, I'm sure you're aware,
2  having a second surgery in the pelvis to treat
3  recurrence of prolapse -- is that a good idea or a
4  bad idea, generally?
5    A.  Having a second surgery to reoperate for
6  prolapse?
7    Q.  Yeah.
8    MR. KOOPMANN:  Object to form.
9    A.  That's something we generally try to
10  avoid.  That's what we're trying to do here by
11  using a graft-augmented repair.
12    Q.  (By Mr. Bentley)  And the study that we
13  just looked at showed that there's a higher risk of
14  reoperation using the mesh-based repair kit, right?
15    A.  In this study, yes.
16    Q.  Doctor, I'm going to hand you what's
17  being marked as Exhibit 6.  And this is an article
18  by Dr. Ridgeway in the American Journal of
19  Obstetrics and Gynecology.
20    (Exhibit 6 was marked for identification.)
21    Q.  And this is, again, on your reliance
22  materials and not cited in your report.
23    My question is, are you familiar with this
24  study?
25    A.  Yes, I'm familiar with this study.

Page 120

1    Q.  And if you'll turn to the fifth page,
2  you can see the "Clinical Implications" section.
3  Are you with me?  It'll be the last page.  And
4  under "Clinical Implications" on the last page, it
5  states, "Transvaginal mesh plates with prolapse
6  kits can lead to debilitating complications such as
7  chronic pain, dyspareunia, symptomatic mesh
8  erosion, and vesicovaginal fistula that may require
9  extensive mesh excision"; did I read that
10  correctly?
11    A.  Yes.
12    Q.  And would you agree that those are
13  potential complications with using transvaginal
14  mesh-based repair kits such as Prolift?  Would you
15  agree with that statement?
16    A.  Yes.
17    Q.  And the second clinical implication is,
18  "Surgeons who place transvaginal mesh using
19  prolapse kits may be unaware of complications
20  because most patients seek care from a different
21  physician"; did I read that correctly?
22    A.  Yes.
23    Q.  And I believe you've testified,
24  actually, that you treat complications from other
25  surgeons who have implanted products; is that

Page 121

1  correct?
2    A.  Yes.
3    Q.  And so sometimes maybe the other doctor
4  might not know about the complication; is that
5  correct?
6    A.  A small percentage.  I would say most of
7  the time the referrals I receive from other doctors
8  are from the implanting surgeon.
9    Q.  Okay.  So do you agree or disagree with
10  this second clinical implication that we just
11  reviewed, that sometimes surgeons may not know that
12  their patient had complications?
13    A.  Well, sure, there might be a few
14  patients here or there that you might not be aware
15  of, but I think the overwhelming majority of
16  patients and surgeons are still connected.
17    Q.  Right.  And so this leads to the reason
18  of why you probably want to warn about things in
19  the IFU so everyone can have full knowledge.  Would
20  you agree with that?
21    MR. KOOPMANN:  Object to form.
22    A.  I think the IFU is adequate, and I think
23  there was enough warning there.
24    MR. BENTLEY:  I'm going to move to strike as
25  nonresponsive.

Brian Flynn, M.D.

Page 122

1    Q. (By Mr. Bentley) My question was,
2  because of this clinical implication that some
3  surgeons don't know about their complications,
4  would you agree that it's reasonable to include the
5  complications associated with Prolift in the IFU so
6  that all the doctors have all the information
7  available to them? Would you agree with me that
8  that's reasonable?
9    MR. KOOPMANN: Object to form.
10    A. No, I don't -- I don't agree with the
11  statement.
12    Q. (By Mr. Bentley) So you don't think
13  it's a good idea to put all of the complications
14  associated with Prolift in the IFU?
15    A. I think that the complications that are
16  stated in the IFU are adequate. I think there's
17  enough information on complication data there.
18    Q. Do you know if the IFU cites any
19  specific data?
20    A. Does it cite specific data? It lists,
21  it itemizes potential risks, but IFUs are not
22  heavily referenced.
23    Q. So there's no specific data citing the
24  IFU?
25    A. I'd have to look at the Prolift IFU to

Page 123

1  be certain, but I'm not aware of major references
2  in the IFU. In the Prolift monograph, certainly
3  there's plenty of references of complications and
4  information that surgeons should be aware of.
5    MR. BENTLEY: I'm going to strike after
6  "references in the IFU."
7    Q. (By Mr. Bentley) Doctor, are you aware
8  of any regulation or law that prohibits Ethicon
9  from adding evidence or data to the IFU?
10    A. Each time evidence is added to the IFU,
11  my understanding is that the IFU then has to go
12  back through the regulatory and get approved again.
13  So it's not an easy process to add or subtract
14  things from an IFU.
15    Q. It's your testimony today that the IFU
16  gets approved by the FDA?
17    A. Maybe "approved" is not the right word,
18  but it's reviewed, you know, by regulatory
19  agencies. The IFU is a public document.
20    Q. Does the FDA have authority to force a
21  medical device manufacturer such as Ethicon to
22  change their IFU?
23    MR. KOOPMANN: Object to form.
24    A. I don't know the answer to that.
25    Q. (By Mr. Bentley) And you don't know if

Page 124

1  the FDA approves IFUs?
2    A. I know they require an IFU. I don't
3  know how much it goes beyond that to say if this
4  was adequate or written properly.
5    Q. And you don't know if there's some law
6  or regulation prohibiting Ethicon from, say, adding
7  risk rates to the IFU to better inform doctors and
8  thereby facilitate the informed consent process?
9    A. I'm not aware of, one way or the other.
10    Q. Would you be critical if Ethicon added
11  more information to the IFU such as maybe
12  complication rates?
13    MR. KOOPMANN: Object to form.
14    A. I don't have an opinion on that either
15  way.
16    Q. (By Mr. Bentley) Would that have been
17  helpful for some doctor, do you think?
18    A. Not necessarily.
19    Q. Why don't you think it'd be helpful?
20    A. I don't think a lot of physicians read
21  the IFU. And with that said, I think people rely
22  more on their education, their training, what
23  they've learned from colleagues and courses, so I
24  think the IFU's one of many things they rely on,
25  but I don't think it's the top of the list.

Page 125

1    Q. Do you in your personal practice review
2  the IFU?
3    A. I do.
4    Q. How frequently do you do that?
5    A. I do that on all new products that I
6  use. And if there's a change to the IFU, then I
7  would re-review it.
8    Q. How do you become aware if there's a
9  change to the IFU?
10    A. Various ways. It might be reported to
11  me by some representative from that manufacturer.
12  I may get a written correspondence or an e-mail --
13    Q. So unless --
14    A. -- or it might be some personal
15  communication between me and one of the
16  representatives.
17    Q. So is it your testimony today that you
18  review an IFU when you're encountering new product
19  or when some representative from the company tells
20  you there's been a change? Is that your testimony?
21    A. That's my testimony.
22    Q. Doctor, do you believe that there's been
23  an evolution in understanding of the complications
24  associated with polypropylene prolapse repair kits
25  such as Prolift?

Brian Flynn, M.D.

Page 126

1  A. I do.
2  Q. And what do you think the evolution has
3  shown?
4  A. I think it's an evolving material
5  science. There's new information that's discovered
6  and looked at and reviewed.
7  Q. And has the science shown that maybe
8  larger pore, lighter weight mesh is associated with
9  reduced complications?
10  A. The data's very mixed.
11  Q. Do you have any understanding as to what
12  the purpose for -- or what the purpose was of
13  Prolift+M?
14  A. The goal of Prolift+M was to leave less
15  foreign body behind in the patient.
16  Q. And that has a clinical -- that has
17  clinical significance to you, correct?
18  A. Potential.
19  Q. Okay. And what's the potential clinical
20  significance of leaving less foreign body mesh
21  material in the body?
22  A. The idea of having less foreign body
23  would be less foreign-body reaction, and that there
24  would be less pain or exposure associated with the
25  device.

Page 127

1  Q. And from your experience, do you think
2  that that is, in fact, true?
3  A. No, it's not true. In my experience, it
4  was something that seemed very intuitive, but the
5  literature has not shown that.
6  Q. So you don't think there is any benefit
7  to using Prolift+M that left less mesh and foreign
8  body in the patient's body?
9  A. The systematic reviews and the
10  retrospective studies don't show that, so the
11  complication rate between Prolift+M and Prolift
12  were not significantly different.
13  Q. So there's no benefit to using Prolift+M
14  as opposed to Prolift?
15  A. I don't see any benefit.
16  Q. Okay. But in your practice, you
17  switched away from using Prolift to Prolift+M; is
18  that correct?
19  A. That's correct.
20  Q. I'm just not understanding. So why
21  would you switch to a new product if there's no
22  benefit?
23  A. As I mentioned earlier, I'm an early
24  adopter of new products. And intuitively, it
25  seemed like it would be a good idea, looking at the

Page 128

1  Ultrapro data from hernia surgery, and so it was
2  something that many surgeons were attracted to. We
3  tried it. I did about a hundred of each, and then
4  the Pro product was no longer being offered, but at
5  least, when preparing this Prolift and Prolift+M
6  report, my review of the literature, my own
7  personal experience is I didn't see a clinical
8  significant difference between how the two products
9  performed in terms of efficacy or safety.
10  Q. So do you think there's better data
11  associated with Prolift versus Prolift+M?
12  A. There's certainly -- Prolift is a much
13  more widely studied product. There was a greater
14  number of articles to review and systematic
15  reviews.
16  Q. So taking that into account, and taking
17  into account your testimony that there's no benefit
18  to Prolift+M, why would you use Prolift+M today if
19  it was still available?
20  A. I don't think that was my testimony. My
21  testimony was I think I would use either product,
22  Prolift or Prolift+M, if either of them was still
23  available, because they were equivalent products.
24  So there are patients that I feel would be ideal
25  for either of those products.

Page 129

1  Q. If there's no benefit to Prolift+M, how
2  can you decide if a patient's ideal for Prolift or
3  Prolift+M?
4  A. What I mentioned is I would be pleased
5  with either product. They're both good products.
6  They were equivalent, according to the literature
7  and according to my own personal experience, so I'm
8  not saying I favor +M over Prolift. If you ask the
9  question in reverse, I would be just as pleased to
10  have used Prolift, you know, last week or -- you
11  know, compared to +M.
12  Q. Even though Prolift had more data
13  available?
14  A. Prolift had more data, but I think there
15  was enough data available on +M, and I had enough
16  personal experience with +M, to feel that it was at
17  least performing equally.
18  Q. Doctor, do you think that mesh
19  contracture is a clinically significant
20  complication for the patient?
21  A. It would depend on the degree of
22  contracture.
23  Q. Can mesh contracture be a clinically
24  significant outcome for a patient?
25  A. It can be.

Brian Flynn, M.D.

Page 130

1  Q. And that could lead to maybe revision
2  surgery where you have to remove part of the mesh?
3  A. Correct.
4  Q. Do you have an understanding of how mesh
5  contracture leads to pain for a patient?
6  A. I think that the theories -- there's a
7  number of theories that have been proposed, one of
8  which is that the contracture can lead to, you
9  know, an exaggerated foreign-body response. And so
10  if someone has a sensation that they have a foreign
11  body in them, then that's going to cause pain.
12  Q. It's your testimony that a foreign-body
13  response is essentially what the pain is that a
14  patient's experiencing?
15  A. No, I mentioned that -- you asked me
16  if -- how contracture can cause pain.
17  Q. Right.
18  A. And I said that's one of the factors.
19  Contracture can cause pain by eliciting a
20  foreign-body response.
21  Q. Is there any other way that you know of
22  that contracture can cause pain?
23  A. Yes.
24  Q. How is that?
25  A. Well, the scar plating that was

Page 131

1  mentioned earlier in the deposition. The scar
2  plating can lead to a stiff area in the vagina that
3  can cause pain. It could also place soft tissue
4  under tension, and soft tissue under tension can
5  cause pain.
6  Q. Could it also entrap nerves, for
7  example?
8  A. I'm not aware of that. There may be
9  some potential for it, but I have not seen that
10  clinically personally, or seen that in the
11  literature.
12  Q. Can mesh contracture also lead to
13  dyspareunia?
14  A. Yes.
15  Q. Can mesh contracture also lead to
16  painful intercourse for a woman's partner?
17  A. Yes.
18  Q. And mesh contracture can lead to
19  shortening of the vaginal canal?
20  A. Yes.
21  Q. In your experience, how would you treat
22  a patient suffering from the serious complications
23  we discussed associated with mesh contracture? In
24  your experience, how would you approach treating
25  that patient?

Page 132

1  A. Well, there would be a variety of ways.
2  The first thing we'd start off with is vaginal
3  estrogen to try to soften the vaginal mucosa to
4  make it more supple.
5  Second treatment would be pelvic floor
6  massage or physical therapy to try to reduce the
7  muscle from being under tension. Oftentimes it's
8  really just tension, not contracture; it's hard to
9  separate those two things, and they can happen
10  independent of each other.
11  And then if the nonoperative management
12  doesn't work, then one can consider revision
13  surgery.
14  Q. Is it your testimony that treatment with
15  estrogen cream can improve mesh contracture where
16  there's not an erosion present?
17  A. "Mesh contraction" may be too specific
18  of a term. It's hard to separate. When I see a
19  patient that has a mesh implant regardless of an
20  exposure or no exposure that has pain, if the
21  mucosa feels thin over the graft material, then
22  we're going to prescribe vaginal estrogen.
23  Q. Can estrogen cream treat a hardened scar
24  plate?
25  A. No.

Page 133

1  Q. When there's no erosion present but a
2  patient's still suffering from pain, can estrogen
3  cream treat that pain?
4  A. It can treat vaginal atrophy and
5  dryness. That may be contributing to the pain.
6  Most of the pain is multi-factorial.
7  Q. Isn't it true that usually you have to
8  treat those types of complications with surgical
9  intervention?
10  A. No, that's not how I would describe it.
11  Q. In your experience, Doctor, have you
12  seen situations where the mesh can become infected?
13  A. Have I seen infected mesh?
14  Q. Yes.
15  A. Yes.
16  Q. And, in fact, do you have a theory that
17  infection leads to pain?
18  A. I think it's one of many theories, but
19  yeah.
20  Q. Do you not hold that theory anymore?
21  A. No, I do hold that theory. It's a
22  theory that others have proposed. I've read that
23  in the medical literature.
24  Q. Is there some reason why you don't
25  discuss that potential complication in your report

Brian Flynn, M.D.

Page 134

1    in this case?
2         A.  I believe I discussed it in my TVT
3    report, but I don't see that I discussed it here in
4    the Prolift report.
5         Q.  Do you think that the theory that mesh
6    infection leads to pain is applicable to the
7    Prolift implant?
8         A.  Yes, I do.
9         Q.  Do you think that would be important for
10   patients to know that's a potential complication?
11        A.  That's a complication we discuss with
12   patients with every surgery we do, the risk of
13   infections.
14        Q.  You discuss the potential for
15   infection-related pain with your patients?
16        A.  I mention to them any time I place a
17   foreign body, that the foreign body can potentially
18   become infected, whether that's silicone or
19   polypropylene, whatever the implant is.
20        Q.  And do you discuss that you have a
21   theory that the infection leads to pain?
22        A.  I discuss with them the consequences of
23   infection, pain being one of them, mesh revision
24   being another one, so it's one of many reasons why
25   one would revise an implant.

Page 135

1         Q.  Do you think that's information that
2    would have been helpful to be in the IFU?
3         MR. KOOPMANN:  Object to form.
4         A.  I believe it's in the IFU.  I think
5    infection is discussed in the IFU.
6         Q.  (By Mr. Bentley)  Is the clinical
7    significance of infection which causes pain in the
8    IFU?
9         A.  Now you're connecting a lot of thoughts
10   there, so I don't think it's written in that
11   manner, but I think it's reasonable knowledge that
12   most surgeons would understand, that infection can
13   cause pain.
14        Q.  Would you have been critical of Ethicon
15   for putting that information in the IFU?
16        A.  No, I wouldn't have been critical.
17        Q.  Doctor, I'm going to hand you what's
18   being marked as Exhibit 7.
19        (Exhibit 7 was marked for identification.)
20        Q.  And there is a paper by Terlecki and
21   yourself published in the AUA Update Series '10.
22   I'm sure you're familiar with this -- presumably
23   familiar with this article.  It's listed on your
24   reliance materials, but, again, it's not listed in
25   your report.

Page 136

1         My question is, why don't you discuss your
2    own article discussing these very issues in your
3    report?
4         A.  This article here was an overview of the
5    controversy of incontinence and prolapse surgery,
6    so this article was in response to the FDA Public
7    Health Notification.  And I was solicited by the
8    American Urologic Association to write this article
9    to help urologists understand what was in the FDA
10   PHN.  So that's why this was written.  This is
11   something that I didn't rely on for this Prolift
12   report because this is not specific to Prolift.
13        Q.  The title of the article is, "The Use of
14   Surgical Mesh for Incontinence and Prolapse
15   Surgery:  Indications for Use, Technical
16   Considerations and Management of Complications"; is
17   that correct?
18        A.  That's correct.
19        Q.  And Prolift is a surgical mesh kit
20   that's used for treatment of prolapse, correct?
21        A.  Correct.
22        Q.  So this article deals with the very
23   issues that you discuss in this report; isn't that
24   correct?
25        A.  That's correct.

Page 137

1         Q.  Do you stand by your words in this
2    article that you're a co-author of?
3         A.  I do, but again, this is similar to the
4    Urology Times article.  The AUA updates are a lower
5    level of evidence.  They reflect my opinions.  This
6    is not a peer-reviewed publication.  The AUA update
7    series is not something that's published.  It's
8    available to members of the American Urologic
9    Association.
10        Q.  Right.  But you stand by your words in
11   this article, right?
12        A.  Yes, I do.
13        Q.  If you could please turn to Bates number
14   0764, or on the article, it says page 133.
15        A.  Okay.
16        Q.  On the left-hand column, talking about
17   complications, about halfway down, it says "Vaginal
18   Wall Extrusion," and then in bold you write,
19   "Vaginal wall extrusion occurs more commonly with a
20   reinforced synthetic repair than a biological
21   repair"; did I read that correctly?
22        A.  Yes.
23        Q.  And you still think that; isn't that
24   true?
25        A.  I do.

Brian Flynn, M.D.

Page 138

1    Q. That's what the evidence shows; isn't
2  that correct?
3    A. That's correct.
4    Q. And do you discuss that with your
5  patients?
6    A. I do.
7    Q. And do you think Ethicon should have
8  warned about that in the IFU?
9    MR. KOOPMANN: Object to form.
10   A. Are you asking me if Ethicon should have
11 compared and contrasted their products to other
12 people's products in their IFU?
13   Q. (By Mr. Bentley) Well, if you know and
14 Ethicon was aware that there's a higher risk of
15 erosion with Prolift as compared to other repairs,
16 do you think that would have been helpful
17 information to include in the IFU?
18   MR. KOOPMANN: Object to form.
19   A. I don't believe that's the purpose of
20 the IFU, so no.
21   Q. (By Mr. Bentley) Remind me. What's
22 your idea of what the purpose of the IFU is?
23   MR. KOOPMANN: Object to form.
24   A. The purpose of the IFU is to make a
25 reasonable surgeon aware of unique complications,

Page 139

1  and maybe more common complications, describe
2  organs that can be injured, the things that we
3  mentioned earlier in the deposition. And I believe
4  mesh extrusion is listed in the IFU, so I believe
5  that's adequate.
6    Q. (By Mr. Bentley) Okay. On the next
7  column over, middle of the page, bolded, it says,
8  "Patient factors that may lead to an increased risk
9  for extrusion include age, estrogen status, prior
10 radiation, active vaginal infection, smoking,
11 obesity, immunosuppression, diabetes and
12 concomitant hysterectomy"; did I read that correct?
13   A. Correct.
14   Q. And do you still hold that opinion?
15   A. I do.
16   Q. Do you know if that information's
17 conveyed in the IFU for doctors?
18   A. I don't believe so.
19   Q. Do you think it would have been helpful
20 for doctors to know that there are certain patient
21 factors that may affect the risk for extrusion?
22   MR. KOOPMANN: Object to form.
23   A. These factors that are listed are
24 factors that would affect any wound healing, and so
25 this is common knowledge. I think any reasonable

Page 140

1  surgeon would understand someone who has
2  immunosuppression, diabetes, smoking, these are
3  risk factors for healing abnormalities. They're
4  not unique to polypropylene mesh. And so I believe
5  a reasonable surgeon would understand these risk
6  factors.
7    MR. BENTLEY: I'm going to move to strike as
8  nonresponsive.
9    Q. (By Mr. Bentley) Doctor, my question
10 was, simply, do you think that this information
11 would have been helpful for doctors to have in the
12 IFU?
13   MR. KOOPMANN: Object to form.
14   A. No, I don't. I don't believe it would
15 be helpful.
16   Q. (By Mr. Bentley) Going down to the next
17 paragraph, in bold, you continue, "Any adverse mesh
18 implantation features that can be mitigated
19 preoperatively should be addressed before stress
20 urinary incontinence or pelvic organ prolapse
21 surgery." Do you agree with that?
22   A. I do.
23   Q. Do you think it would have been helpful
24 for Ethicon to tell doctors how they can mitigate
25 complications preoperatively?

Page 141

1    A. No, I don't think that was Ethicon's
2  responsibility.
3    Q. You don't think it's Ethicon's
4  responsibility to inform doctors how to decrease
5  potential complications and increase the efficacy
6  of the products that it sells to be permanently
7  implanted in women's bodies?
8    MR. KOOPMANN: Object to form.
9    A. I think it's the job of the professional
10 medical societies and the responsibility of the
11 physician to be educated properly on basic
12 fundamental surgical knowledge.
13   Q. (By Mr. Bentley) So you don't think
14 Ethicon should share information it's aware of
15 regarding how to decrease complications or increase
16 efficacy of its products?
17   MR. KOOPMANN: Object to form.
18   A. No, I think the information would have
19 been redundant.
20   MR. BENTLEY: Move to strike after "No."
21   Q. (By Mr. Bentley) Further down on the
22 page under "Urinary tract erosion," it states --
23 strike that.
24   Future down the page under "Urinary tract
25 erosion," you state, "A rare but dreaded

Brian Flynn, M.D.

Page 142

1    complication of graft-based stress urinary
2    incontinence and pelvic organ prolapse surgery is
3    erosion into the bladder, urethra or rectum.  The
4    complication can occur regardless of graft
5    composition but is certainly more common with
6    synthetic material"; did I read that correctly?
7         A.  Yes, you read that correctly.
8         Q.  Do you still hold that opinion?
9         A.  I do.
10         Q.  Do you know if that's included in the
11   IFU?
12         MR. KOOPMANN:  Object to form.
13         A.  I think that it warns about risks to
14   surrounding structures, including bladder, urethra
15   and the rectum, and so it mentions about
16   perforation of visceral structures, et cetera, so
17   yes, I think it's mentioned in the IFU.
18         Q.  (By Mr. Bentley)  Does the IFU convey
19   the severity of that complication as you state in
20   your paper?
21         A.  No, that's not the role of the IFU.
22         Q.  Turning to the next page, on the right
23   column towards the bottom of the page under
24   "Complications unique to mesh kits," you state, in
25   bold, the second sentence, "Disadvantages of a kit

Page 143

1    include the expense, blind needle passage,
2    unfamiliarity of procedure steps, and potential for
3    marketing to inexperienced pelvic surgeons who may
4    overestimate the usefulness of the kit"; did I read
5    that correctly?
6         A.  Yes.
7         Q.  Do you still hold that opinion?
8         A.  I do.
9         Q.  In your report, have you explained how
10   that opinion affects the risk-benefit profile of
11   the Prolift product?
12         A.  I'm not certain what you're asking me
13   there.
14         Q.  That was probably a bad question.
15         In your report, do you discuss this opinion
16   discussing the disadvantages of a mesh kit that are
17   unique to the mesh kit?  Do you discuss all of
18   those complications in your report?
19         A.  I don't believe I discuss expense in the
20   report.  Unfamiliarity of procedure steps, I don't
21   itemize all those, no.
22         Q.  Would those complications associated
23   with a mesh kit also be applicable to Prolift+M
24   kit?
25         A.  Any surgical kit.

Page 144

1         Q.  Is that a yes?
2         A.  Yes.
3         Q.  On the next page, Doctor, the bottom is
4    135, in the column on the right, the second bolded
5    sentence says, "We have noticed an escalation in
6    the severity of such complications and have had to
7    adopt an increasingly complex and aggressive
8    approach to these healing abnormalities.  Our
9    salvage protocol is designed to manage complex
10   graft complications and prevent the need for a
11   reoperation"; did I read that correctly?
12         A.  Yes.
13         Q.  And does that refer to what we discussed
14   earlier about the escalation of understanding of
15   the complications associated with mesh-based
16   repairs for prolapse?
17         A.  I don't believe we've discussed
18   escalation earlier.
19         Q.  Has there been an escalation in the
20   severity of such complications, as you state here
21   in this paper?
22         A.  It's hard to say.  I certainly have seen
23   a number of complications in my practice.  I don't
24   know if that is reflective of the referral nature
25   of my practice, being in one location for a longer

Page 145

1    time.  It's hard to say.  But, you know, we saw an
2    increase in the number of complications.  That's
3    something that I've reported on up until around
4    2011, 2012 when we began to see a plateau.  And we
5    continue to see that plateau.  So the number of
6    complications that I've been managing for the last
7    four to five years has been relatively stable.
8         Q.  And Doctor, my question is, Doctor, in
9    your report, do you discuss your statement here
10   that you've seen an increase or an escalation in
11   the severity of such complications?  Do you discuss
12   that in your report?
13         A.  No.
14         Q.  Is there any reason why you didn't
15   discuss your observation that there's been an
16   increase or an escalation in the severity of
17   mesh-related complications in your report?
18         A.  As I mentioned earlier, the report is
19   specific to Prolift and Prolift+M.  It's not
20   specific to management of transvaginal mesh
21   complications.
22         Q.  You don't think that management of
23   Prolift-related or Prolift+M-related complications
24   is relevant to your opinions in your report?
25         A.  I think it's relevant, but I don't think

Brian Flynn, M.D.

Page 146

1 that's the focus of the report.

2 Q. You don't think the severity of

3 complications in the attendant revision surgery

4 affects the risk-benefit profile of the Prolift or

5 Prolift+M medical device?

6 A. I believe I've discussed the

7 risk-benefit profile in the report.

8 Q. But in -- I'm sorry. Go ahead.

9 A. So I'm comfortable with what I have

10 reported here. I have an entire section

11 overviewing complication prevention and management.

12 If you look on page 30, "Complication Prevention

13 Management," so I feel that this report is adequate

14 and comprehensive. There's a section on safety of

15 the product. That includes three to four pages on

16 safety. The clinical data summary on page 32 has a

17 table that I cut and paste from the Prolift

18 monograph, including information on various

19 complications, the total of the complications, the

20 number of patients in these studies. So I believe

21 that this report is quite adequate in commenting on

22 complications.

23 Q. My question wasn't in any way about the

24 adequacy of your report.

25 My question was, simply, do you feel that

Page 147

1 this statement, your words from your 2010 paper

2 that you've seen an escalation in the severity of

3 mesh-related complications, does that affect the

4 risk-benefit profile of the Prolift mesh implant to

5 treat prolapse?

6 A. No, I don't believe so.

7 Q. You don't think the severity of

8 complications affects the risk-benefit profile of a

9 medical device?

10 A. That's a complex statement, but I think

11 that what I mentioned earlier is that I believe

12 that escalation that I was witnessing was just

13 reflective of the referral network that I had

14 developed, so these complications were being

15 referred to me. And in retrospect, I think that

16 was what was happening. I don't think the

17 complications were happening more commonly, or the

18 incidence or prevalence was changing in any way, it

19 was just where the patients were being referred to

20 and the willingness of physicians in the local

21 community to manage these patients.

22 Q. So it's your testimony that you weren't

23 aware of the escalation and severity of mesh

24 complications until you happened to be referred

25 some patients in your personal clinical practice?

Page 148

1 A. I was aware of the complications. I

2 think the choice of the word "escalation" was a

3 poor choice of words, really, on my part.

4 Q. In the next sentence, you talk about

5 your salvage protocol.

6 Do you discuss your salvage protocol with

7 patients when you're giving an informed consent as

8 to whether to implant a meshed-based repair?

9 A. No. As I mentioned earlier, I focus on

10 the implant surgery and the risks and benefits of

11 that surgery. I don't talk about subsequent

12 surgeries.

13 Q. So in your discussion of risks, you

14 don't think it's relevant to discuss that you have

15 to use a mesh -- strike that.

16 In your discussion of the risks in doing

17 informed consent with a patient, you don't think

18 it's relevant to discuss the severity of the

19 revision surgery that you've termed a "salvage

20 protocol"? You don't think that's relevant in the

21 risk-benefit discussion?

22 MR. KOOPMANN: Object to form; compound,

23 asked and answered.

24 A. I don't think it's a benefit. And I

25 didn't come up with the term "salvage protocol."

Page 149

1 Q. (By Mr. Bentley) But this is your

2 paper, right?

3 A. It is, but the word "salvage" you'll see

4 repeatedly in the medical literature. Dr. Jerry

5 Blaivas uses that word. A number of people use

6 that word when describing the use of the

7 pubovaginal sling. Some people use the word

8 "terminal procedure." It has a lot of words that

9 are attached to it, but "salvage" is not a word

10 that I came up with.

11 Q. But it's bolded in your paper, right?

12 A. It's bolded in my paper.

13 Q. Okay. On the next page, Doctor, if you

14 could look at the left-hand column of page 136, the

15 second bolded section, you state, "However,

16 dyspareunia and pelvic pain can occur in complete

17 absence of extrusion, erosion or infection. In

18 these cases, it is thought to be due to tension on

19 the graft, graft contracture, superficial graft

20 placement or nerve injury."

21 Do you still hold that opinion, Doctor?

22 A. Yes, that's the opinion I just stated

23 earlier in regards to graft contracture and

24 tension, and muscle under tension, et cetera.

25 Q. And those are indeed complications that

Brian Flynn, M.D.

Page 150

1  can happen with the Prolift or Prolift+M implant;
2  isn't that correct?
3      A. Correct.
4      Q. Yet, in your report, the only unique
5  complication I believe you discuss is mesh
6  exposure.
7         Is there any reason why you don't detail
8  these other complications in your report as unique
9  complications to the Prolift or Prolift+M?
10      A. I believe I discuss more than that in
11  the report.
12      Q. Okay. Turn to page 26 of your Prolift
13  report discussing the IFU. In that first paragraph
14  under Section A, you have a sentence that states,
15  the IFU, "It warns of the only unique complication
16  with the device," and you have a dash, and it says,
17  "mesh exposure"; do you see that?
18      A. I do.
19      Q. Is there any reason why you didn't
20  discuss the other complications we just reviewed in
21  your paper from 2010 in your report in this case?
22      A. Well, because I was trying to separate
23  complications that are unique to the graft versus
24  complications that occur with ordinary
25  urogynecologic surgery. So if you do a native

Page 151

1  tissue repair, you can end up with contracture in
2  the vagina. You could end up with muscle under
3  tension, superficial sutures. Certainly you can
4  entrap the nerve when doing procedures like
5  sacrospinous ligament fixation. So again, I'm just
6  trying to separate the -- what's unique to the
7  graft material versus what's not unique.
8      Q. Is there a unique foreign-body response
9  profile to the polypropylene mesh used in Prolift
10  as compared to native tissue repair?
11      A. Yes.
12      Q. And you don't discuss that in your
13  report; isn't that correct?
14      A. I think mesh exposure can happen by
15  foreign-body response. Mesh exposure can occur by
16  a variety of different mechanisms, but that's one
17  of them.
18      Q. And you don't discuss that in your
19  report, isn't that correct, the unique foreign-body
20  response to polypropylene or Prolift-based prolapse
21  repair?
22      A. I'm not certain if I used the word
23  "unique," but I believe there's an entire section
24  looking at inflammation after Prolift, claims of
25  cytotoxicity, claims of degradation, the risks and

Page 152

1  benefits, so there's quite a bit in those sections.
2  And I think that those sections outline the
3  potential foreign-body response.
4      Q. Your summary in your paper on -- your
5  summary in Exhibit 7, your 2010 paper, towards the
6  end of that paragraph in bold, you state,
7  "Therefore, reinforced pelvic floor repairs should
8  only be performed in well-selected patients after
9  they provide informed consent." Does that apply to
10  Prolift implants? Is Prolift a mesh-based pelvic
11  floor repair?
12      A. This report was written in 2010, so it
13  would apply to patients going forward that would
14  have a reinforced repair after the FDA Public
15  Health Notification and after, you know, ten or so
16  years of experience with pelvic floor kits.
17      Q. So you think Prolift or Prolift+M would
18  still be appropriate in carefully selected
19  patients?
20      A. In carefully selected patients, yes.
21      Q. Do you think the IFU should have maybe
22  conveyed that information that Prolift is only
23  appropriate in well-selected patients?
24      MR. KOOPMANN: Object to form.
25      A. When the IFU was written, I think it did

Page 153

1  a good job at the time in detailing the risks and
2  benefits. No one really knew at the time who the
3  right -- who was the perfect, you know, correct
4  patient, properly selected patient or that
5  well-selected patient.
6      Q. (By Mr. Bentley) But as more
7  information was collected and as you came to know
8  more about which patients this was more appropriate
9  for, that information should have been conveyed in
10  the IFU; isn't that correct?
11      MR. KOOPMANN: Object to form.
12      A. No, that's not correct.
13      Q. (By Mr. Bentley) You don't think it's
14  helpful for Ethicon to tell doctors which patients
15  are appropriate for implantation of its medical
16  devices?
17      MR. KOOPMANN: Object to form.
18      A. I don't think that's Ethicon's
19  responsibility. I think it's the responsibility of
20  professional medical societies and the
21  responsibility of the individual.
22      Q. (By Mr. Bentley) Do you think that it's
23  Ethicon's responsibility to inform physicians how
24  to safely use its products?
25      MR. KOOPMANN: Object to form.

Brian Flynn, M.D.

Page 154

1     A.  I think it's to inform them how to
2  safely use their products.  That goes back to the
3  IFU.  I think the IFU is one of many mechanisms
4  that are used to inform patients and physicians --
5  I'm sorry, to inform physicians on the product, but
6  it's not the only -- the only piece of information.
7     Q.  (By Mr. Bentley)  And that wasn't my
8  question.
9     My question is, do you think that it's
10  Ethicon's responsibility to inform physicians how
11  to safely use its products?
12     A.  Yes.
13     Q.  And if Ethicon had some information that
14  it knew would help physicians use its products more
15  safely, Ethicon should have shared that information
16  with those physicians, correct?
17     MR. KOOPMANN:  Object to form.
18     A.  I believe they did share the
19  information, as much information as they had.  It's
20  reflected in the Prolift monograph and other
21  efforts that they made to share information with
22  the physicians.
23     Q.  (By Mr. Bentley)  And is it your
24  testimony that all the information shared in the
25  monograph is also in the IFU?

Page 155

1     A.  No, the monograph is a much longer
2  document.  It's a supplement to the IFU.
3     MR. BENTLEY:  Can we take a short break?
4     MR. KOOPMANN:  Sure.
5     (Recess taken from 4:07 p.m. until
6  4:21 p.m.)
7     Q.  (By Mr. Bentley)  Doctor, we're back
8  from a short break.  Are you ready?
9     A.  Yes.
10     Q.  If you could please turn back to what we
11  marked as Exhibit 3, it was a Stanford study from
12  2012.  And if you could turn to page 24.  The page
13  number's in the top left corner.
14     A.  Yes.
15     Q.  On page 24, on the right-hand column,
16  there's a section titled "Anterior compartment"; do
17  you see that on the right-hand column?
18     A.  Yes.
19     Q.  The second paragraph starts, "A careful
20  review of publications looking at success for
21  anterior colporrhaphy reveals that for many years,
22  the reported primary outcome for successful
23  treatment was the correction of stress urinary
24  incontinence."
25     Have you ever read any data or seen a study

Page 156

1  that suggested that?
2     A.  I'm not reading that.  Were you reading
3  the first sentence?
4     Q.  The second paragraph, "A careful review
5  of publications looking at success for anterior
6  colporrhaphy reveals that for many years, the
7  reported primary outcome for successful treatment
8  was the correction of stress urinary incontinence";
9  did I read that correctly?
10     A.  Yes.
11     Q.  Okay.  And were you aware that many of
12  the studies discussing the success of native tissue
13  were actually looking at whether the prolapse
14  successfully treated for a correction of SUI?
15     A.  Yes, the Kelly plication, for instance,
16  was a repair that was done for stress urinary
17  incontinence.
18     Q.  Were you aware -- I'm sorry.  Go ahead.
19     A.  Yes, so I was aware of that, yes.
20     Q.  Were you aware that that would have
21  reduced the overall success rate attributed to
22  native tissue repair for recurrence of prolapse as
23  opposed to prolapse and stress urinary
24  incontinence?
25     A.  I am aware that some of that was

Page 157

1  included.  How it affected it, I don't -- I'd have
2  to review each article to see if it had lower
3  outcomes and pull the average down.
4     Q.  Okay.  And you haven't performed that
5  analysis, right?
6     A.  I have not.
7     Q.  If you turn to page 25, the
8  "Conclusions" section, under the first paragraph
9  under "Conclusions," the last sentence states, "The
10  overall success rates of native tissue and mesh
11  augmentation repairs when recurrent prolapse is the
12  primary outcome measure are very similar"; did I
13  read that correctly?
14     A.  Yes.
15     Q.  And do you have an opinion as to whether
16  or not that statement is correct?
17     A.  I do.
18     Q.  And what's your opinion?
19     A.  That it's not correct.
20     Q.  But you haven't performed the reanalysis
21  that you just previously testified that you would
22  need to do to know whether or not these statements
23  are correct, fair?
24     A.  I don't need to perform it.  It's been
25  performed in the Cochrane reviews and other

Brian Flynn, M.D.

Page 158

1  reviews.  Those reviews adjust for these sort of
2  variables.  That's the strength of systematic
3  reviews.  So it can adjust for these minor details.
4      Q.  Okay.  And if you turn the page, please,
5  to page 26, at the top, the second sentence states,
6  "One recent prospective randomized study reported
7  no difference in the mesh augmentation and native
8  tissue groups, but the study was stopped early due
9  to a high incidence of mesh erosion/exposure
10  (15%)."  And that refers to footnote 78.  If you'll
11  turn to footnotes, you'll see that footnote 78 is,
12  in fact, the Iglesia study that we previously
13  looked at; is that correct?
14      A.  That's correct.
15      Q.  And so that's another study showing
16  that, in fact, native tissue repair is similarly
17  efficacious as mesh-augmented repair; is that
18  correct?
19      A.  We've already been through that study.
20      Q.  Right.  Doctor, I'm going to hand you
21  what's being marked as Exhibit 8.
22      (Exhibit 8 was marked for identification.)
23      Q.  And this is a study from a number of
24  people.  The first author is Velemir.  And I
25  believe this is also on your reliance list and not

Page 159

1  discussed in your report.
2      My question is, are you familiar with this
3  study?
4      A.  I have some familiarity with this study.
5  I'm familiar with the work of Dr. Jacquetin.  I
6  believe he did a lot of the original Prolift
7  studies.
8      Q.  He was, in fact, part of the original
9  French TVM group that came up with the Prolift
10  device; is that correct?
11      A.  I believe he was part of that group,
12  along with Dr. Clave and others.
13      Q.  Okay.  And Dr. Clave's published on
14  foreign-body reaction to the mesh; is that correct?
15      A.  That's correct.
16      Q.  And what level of mesh contracture would
17  need to exist for you to determine that it's
18  clinically significant, approximately?
19      A.  What I've seen reported in various
20  articles is 20 percent or more.
21      Q.  20 percent or more of mesh contracture
22  would lead to clinically significant outcomes; is
23  that correct?
24      A.  Potentially, yes.
25      Q.  If you could turn to page -- I don't see

Page 160

1  page numbers, so it would be the second-to-last
2  page of Exhibit 8 that we're looking at.
3      A.  Where there's some pictures?
4      Q.  Yes.
5      A.  Mm-hmm.
6      Q.  In that first paragraph on the left-hand
7  column, in the bold, they state, "They compared the
8  initial length of the implanted mesh and
9  sonographically measured mesh length 6 weeks
10  postoperatively, observing a decrease in the mesh
11  length of 60%"; do you see that?
12      A.  I do.
13      Q.  And this is from, actually, the creators
14  of the Prolift product; is that correct?
15      A.  Well, I don't know the other authors
16  besides Jacquetin.
17      Q.  Okay.  If you would turn to the second
18  page of the article, on the left-hand column, the
19  first full paragraph starts, "Between 2000 and 2005
20  our team participated in the development of the
21  tension-free vaginal mesh technique.  Over time it
22  appeared that mesh retraction was probably a
23  contributing factor to recurrence, postoperative
24  pain and dyspareunia"; do you see that?
25      A.  I do.

Page 161

1      Q.  And do you think that it's of importance
2  that the creators of this technique are actually
3  reporting on mesh contracture leading to these
4  complications?  Is that important to you?
5      A.  Well, yeah, it is important to me.
6      Q.  And is it important to you that these
7  authors are reporting that they're observing up to
8  60 percent mesh contracture with the Prolift
9  technique that they came up with?
10      A.  I don't know if they're using the word
11  "contracture."  They talk about a decrease in mesh
12  length of 60 percent anterior meshes.  It just says
13  "decrease in length."  They don't say how that
14  happened.
15      Q.  Is that important to you, Doctor?
16      A.  A decrease in length?
17      Q.  Right.
18      A.  Yes, that's important.
19      Q.  And that's above your 20 percent
20  threshold; is that correct?
21      A.  That's correct.
22      Q.  And do you think that it would be
23  important for doctors to know that the inventors of
24  the Prolift technique who observe mesh shrinkage or
25  contracture of up to 60 percent of the overall

Brian Flynn, M.D.

Page 162

1 length -- would that be important for doctors to
2 know?
3      A. Yes.
4      Q. Would that maybe affect the informed
5 consent process when discussing risks and benefits
6 of this product?
7      A. No.
8      Q. Doctor, do you know when Prolift and
9 Prolift+M were pulled from the market?
10      A. I don't believe they were ever pulled
11 from the market. I believe that Ethicon stopped
12 offering the product sometime around 2012.
13      Q. And you've testified that if these
14 products were still on the market, you'd still be
15 implanting them today; isn't that correct?
16      A. That's correct. That's what I stated in
17 my report.
18      Q. What products are you currently using
19 today to treat prolapse?
20      A. I perform native tissue repairs, as I
21 always have. I continue to perform transvaginal
22 graft-augmented repairs, but I use biological
23 material to do that, and with permanent sutures
24 using the Capio device. And then I perform
25 sacrocolpopexy using polypropylene mesh.

Page 163

1      Q. Did you use polypropylene-mesh-based
2 kits such as Prolift and Prolift+M up until the
3 time that they were discontinued by Ethicon?
4      A. I don't remember the exact date, but
5 close to it, yes. I believe my last case was
6 sometime in February of 2012, and I think in July
7 of 2012 was when Prolift and Prolift+M were no
8 longer being offered, so there was a five-month
9 difference.
10      Q. Why did you stop using these products
11 five months prior to them being discontinued?
12      A. For the most part, it was based on
13 changing practice patterns.
14      Q. So your report states that you would
15 still continue to be using these products today if
16 they were available, correct?
17      A. Correct.
18      Q. But prior to their discontinuation, you
19 changed your practice pattern such that you quit
20 using them; is that correct?
21      A. Not that I quit. I started using other
22 procedures. It was a very contentious time after
23 the FDA Public Health Notification. It created a
24 lot of controversy in the media and amongst
25 patients, and so it made the conversations with

Page 164

1 patients very difficult, very time-consuming, very
2 challenging in many ways. I think the emphasis
3 from industry was starting to change towards
4 sacrocolpopexy and other procedures, so as I
5 mentioned earlier in the deposition, that I've
6 continually evolved and adopted new procedures.
7 And the robotic-assisted laparoscopic
8 sacrocolpopexy with Y meshes were really what was
9 starting to come into favor at the time.
10      Q. So I guess I don't understand. How is
11 it that you would still today be using these
12 products if you have continued to evolve and use
13 newer products? Which is it, Doctor?
14      A. Well, as I mentioned earlier in the
15 deposition, I might evolve to have my primary
16 procedure or my preferred procedure, but I still
17 like to have a lot of options as a surgeon, and so
18 it's rare that I ever stop or discontinue doing
19 another procedure altogether. So I perform
20 graph-augmented repairs, sacrocolpopexy and native
21 tissue repairs. I've done that for the 15 years
22 I've been in practice. And so I've been very
23 consistent in what I do.
24      There are patients that I see that are not
25 appropriate for sacrocolpopexy. They've failed

Page 165

1 native tissue. They've failed graft-augmented
2 repair with biologicals, and they would be good
3 candidates for a Prolift or a Prolift+M.
4      Q. That's a very specific patient profile;
5 isn't that right?
6      A. That's one of many patients I see in my
7 practice, yes.
8      Q. But that specific profile you just
9 described, you still consider Prolift would be an
10 appropriate option for that patient, or Prolift+M;
11 is that correct?
12      A. That's correct.
13      Q. Would you agree that other surgical
14 techniques are more appropriate for a first-line
15 treatment of prolapse as opposed to Prolift or
16 Prolift+M?
17      MR. KOOPMANN: Object to form.
18      A. Primary versus recurrent is just one of
19 the many factors. I look at other factors like the
20 patient's tissue quality, the stage of prolapse,
21 the POPQ store, what their risk-benefit tolerance
22 is. So it's one of many factors that goes into the
23 decision-making of whether or not I'm going to do
24 native tissue on a primary repair or
25 graft-augmented on the primary repair.

Brian Flynn, M.D.

Page 166

1    Q. (By Mr. Bentley)  And using a
2  graft-augmented repair, is it correct to state that
3  you wouldn't necessarily use a polypropylene-based
4  mesh kit such as Prolift or Prolift+M on every
5  patient that came to you?  You might look at other
6  grafts as being more appropriate for that first
7  prolapse surgery; is that correct?
8    A. Yeah, I've never looked at it that way.
9  I've always offered a variety of procedures based
10  on the indications.
11    Q. Do you feel that other graft-based
12  repairs are efficacious for some patients that
13  present with prolapse for a first-line treatment
14  surgical option?
15    A. Yeah, there's certainly a number of
16  patients that I treat with graph augmentation
17  primarily.
18    Q. Do you feel that that -- strike that.
19    Do you know if the IFU warns -- strike that.
20    Do you know if the IFU indicates that
21  Prolift should only be used for select patients,
22  like you've just described, as a first-line
23  surgical treatment for prolapse?
24    A. The IFU does not -- it's not intended to
25  guide surgeons on which patients they should

Page 167

1  select.  That's up to the surgeon and the patient.
2    Q. And similarly, you don't know if the IFU
3  guides -- strike that.
4    Similarly, the IFU doesn't guide surgeons as
5  to whether or not Prolift+M and other
6  polypropylene-based prolapse mesh kits is
7  appropriate for first-line surgical treatment of
8  prolapse.  The IFU doesn't state that; is that
9  correct?
10    A. That's correct.
11    Q. Would you have been critical if Ethicon
12  shared that information with the IFU surgeons?
13    A. No, I wouldn't have been critical.
14    Q. Generally, it's advantageous to provide
15  information regarding the patient profile that's
16  appropriate for a surgical option in the IFU.
17  Would you agree that that's helpful and appropriate
18  to put in the IFU?
19    MR. KOOPMANN:  Object to form.
20    A. No, I'd disagree.  I've stated this many
21  times that I don't think that's the role of the
22  IFU.
23    Q. (By Mr. Bentley)  And I appreciate that.
24  That wasn't my question exactly, though.
25    Do you think it's helpful to have that

Page 168

1  information in the IFU, to have the appropriate
2  patient profile described in the IFU if that
3  information's available?
4    A. No, it's not helpful.  It goes well
5  beyond the scope of the IFU.
6    Q. Are you aware of any law or regulation
7  that states that the scope is limited such that you
8  can't include patient profile information in the
9  IFU?
10    A. There's no law, but I believe the
11  standard is to just put what's essential.
12    Q. Essential to using the product safely,
13  is that correct?
14    A. That's correct, and helping physicians
15  identify the product.
16    Q. Are there other patient factors that
17  make Prolift or Prolift+M more appropriate for one
18  patient as opposed to a biological graft?
19    A. Yeah, there's a long list of factors
20  that we use in the decision-making.
21    (Exhibit 9 was marked for identification.)
22    Q. I'm going to hand you what's being
23  marked as Exhibit 9.  And this is an e-mail from
24  yourself to Jonathan Fernandez, dated December
25  19th, 2011.  Do you see that?

Page 169

1    A. I do.
2    Q. Do you recall sending this e-mail to
3  Jonathan Fernandez?
4    A. I don't.
5    Q. Up at the top there, that's your e-mail
6  address; isn't that correct?
7    A. That's correct.
8    Q. Do you have any reason to doubt that you
9  sent this e-mail in 2011?
10    A. I don't.
11    Q. And in the body of the e-mail, you
12  begin, "Jon, All is well with me, although my
13  practice is really changing from mesh kits to
14  Biologicals, ASC and spending time trying to help
15  J&J in a class action vs. Prolift PS"; did I read
16  that correctly?
17    (Announcement over the intercom.)
18    Q. (By Mr. Bentley)  And you continue,
19  "Ultimately I suspect J&J will pay out millions.  I
20  am glad Biosurgery is keeping you busy"; is that
21  correct?
22    A. That's correct.
23    Q. Okay.  So in December of 2011, it
24  appears that you conveyed to Jonathan Fernandez at
25  Ethicon that you were switching to biologicals; is

Brian Flynn, M.D.

1    that correct?
2        A. That's correct.
3        Q. Okay. And this is approximately eight
4    months before Prolift and Prolift+M are
5    discontinued; isn't that correct?
6        A. That's correct.
7        Q. And is it still your opinion that today
8    you would be -- strike that.
9        Further down in the e-mail, you start out
10   with, "I am starting to look at the AMS products in
11   Coloplast products again as it was our relationship
12   that keep me with Ethicon for the past few years."
13   And you state, "Ethicon is just way too slow to
14   change their prolapse product line"; did I read
15   that correctly?
16       A. That's correct.
17       Q. And do you have any understanding as to
18   what you meant by "Ethicon was too slow to change
19   their prolapse product line" that you stated in
20   this e-mail?
21       A. I do.
22       Q. And what is that understanding?
23       A. I had recommended to Ethicon that they
24   spend more time developing some of the biological
25   products similar to AMS and Coloplast and Boston

1    Scientific because it seemed to me that that's
2    where the market was going, and also towards
3    sacrocolpopexy. And they did not seem to be
4    developing products for either of those procedures.
5        Q. And it was your recommendation that they
6    should go into biological products; isn't that
7    correct?
8        A. I thought it would be helpful, yes.
9        Q. And just to be clear, biological
10   products are not Prolift or Prolift+M, right?
11       A. Correct.
12       Q. Doctor, in your report, you cite to the
13   2013 Cochrane review; isn't that correct?
14       A. That's correct.
15       Q. Are you aware that there's a 2016
16   Cochrane review?
17       A. I am.
18       Q. When did you become aware of that?
19       A. Probably within the last few months, a
20   few months from when it was published.
21       Q. Did we discuss earlier as to the whether
22   or not you were aware of any new articles that were
23   relevant to Prolift?
24       A. We did.
25       Q. And is there a reason why you didn't

1    tell me about the Cochrane 2016 review?
2        A. I believe my answer was that there may
3    be some new articles. I wasn't absolute on that.
4    I believe I stated that there were some articles
5    that have been recently published that I may or may
6    not be aware of.
7        Q. And so were you aware of the Cochrane
8    2016 review when you earlier testified about which
9    articles you had reviewed subsequent to preparing
10   your Prolift and Prolift+M reports?
11       A. I did, and I believe I've already cited
12   the 2016 Cochrane review a number of times in
13   today's deposition.
14       Q. Is there a reason that the 2016 Cochrane
15   review did not make it onto your reliance list?
16       A. This reliance list was prepared
17   primarily for the Delacruz case, which was in the
18   fall of 2015, so the reliance list was not updated,
19   I don't think, after that date, so it probably was
20   not updated on any literature in 2016.
21       Q. Doctor, do you have your reliance list
22   available in front of you?
23       A. I do.
24       Q. I think it was previously entered in the
25   TVT-O deposition. I don't have another copy. I'm

1    not sure.
2        MR. KOOPMANN: It's right there.
3        Q. (By Mr. Bentley) On the second page of
4    your reliance list after the title page, at the
5    top, it says, "Flynn, Brian." That's you, right?
6        A. Yes.
7        Q. Okay. It says, "Materials list, updated
8    February 28, '16"; is that correct?
9        A. That's correct.
10       Q. So what you just testified to is this
11   materials list was, in fact, not updated in
12   February of this year like this document purports
13   that it was?
14       A. I can't say either way. There's a large
15   volume of articles on this reliance list. If it
16   says it was updated, it was updated, but the 2016
17   review was missed.
18       Q. Are there any other documents that you
19   know of that were missed?
20       A. Anything published probably after
21   October 2015 could have been potentially missed.
22       Q. So it's completely inaccurate that this
23   document says that it was updated in February of
24   this year?
25       MR. KOOPMANN: Object to form.

Brian Flynn, M.D.

| Page 174 |
| --- |

1    A. No, that's not how I would describe it.

2    Q. (By Mr. Bentley) Doctor, what date was

3    your expert report signed?

4    A. It was signed in February of 2016, I

5    believe.

6    Q. Do you know if the 2016 Cochrane review

7    was published prior to you executing your report in

8    this case?

9    A. I believe it was.

10   Q. Doctor, you've previously testified that

11   the Cochrane reviews are important pieces of

12   evidence in this case; isn't that true?

13   A. That's true.

14   Q. So can you explain to me why you don't

15   think it was important to include the 2016 Cochrane

16   review regarding prolapse in your report?

17   MR. KOOPMANN: Object to form; misstates his

18   testimony.

19   A. I do think it's an important document.

20   Q. (By Mr. Bentley) And potentially the

21   2016 Cochrane review, which you think is an

22   important document, could change your opinions in

23   this case; isn't that correct?

24   A. I don't think it's going to change my

25   opinions very much, no.

| Page 175 |
| --- |

1    Q. Could it have changed your opinions in

2    this case?

3    A. Could it have? There's always a

4    possibility, but I think it's unlikely that it

5    would have.

6    Q. Would you have liked an opportunity to

7    adequately review the 2016 Cochrane review before

8    reaching your opinions in this case?

9    MR. KOOPMANN: Object to form.

10   A. Not necessarily. I feel that I had a

11   wealth of information on a product that was very

12   well-studied.

13   Q. (By Mr. Bentley) Do you know if the

14   2016 Cochrane review included a number of studies

15   that weren't included in the 2013 review?

16   A. I don't know the answer to that.

17   Q. Do you know if the 2016 Cochrane review

18   included nine studies that weren't included in your

19   reliance materials in preparation for this report?

20   A. I wasn't aware of that.

21   Q. Do you know if you reviewed the Dahlgren

22   study? I'll represent to you it's not on your

23   reliance list, but as you've testified, we can't

24   rely upon your reliance list, so my question to you

25   is, do you know, or are you familiar with the

| Page 176 |
| --- |

1    Dahlgren study?

2    MR. KOOPMANN: Object to form.

3    A. I don't believe I'm familiar with it.

4    Q. (By Mr. Bentley) Are you familiar with

5    the Delroy study?

6    A. Which study?

7    Q. The Delroy study.

8    MR. KOOPMANN: How do you spell that?

9    MR. BENTLEY: D-e-l-r-o-y.

10   A. I don't believe so.

11   Q. (By Mr. Bentley) Okay. Are you

12   familiar with the Lamblin study, L-a-m-b-l-i-n?

13   A. I would have to look at the article to

14   be certain.

15   Q. So you're not familiar with it as you

16   sit here today?

17   A. Correct.

18   Q. Are you familiar with the Qatawneh,

19   Q-a-t-a-w-n-e-h, study?

20   A. No.

21   Q. Are you familiar with the Robert study

22   published in 2014?

23   A. No.

24   Q. Are you familiar with the Rudnicki study

25   published in 2014? R-u-d-n-i-c-k-i.

| Page 177 |
| --- |

1    A. No.

2    Q. Are you familiar with the Sung 2012

3    study? S-u-n-g.

4    A. I'd have to go back and look at the

5    reliance list.

6    Q. I'll represent to you that that study's

7    not on your reliance list. As you sit here today,

8    are you familiar with it?

9    A. Probably not familiar with it, then.

10   Q. Do you think you need to add that study

11   to your reliance list?

12   A. I don't know one way or another.

13   Q. Are you familiar with the 2014 Tamanini,

14   T-a-m-a-n-i-n-i, study?

15   A. As I stated earlier, there's a number of

16   studies out that I can't possibly cite every single

17   study in this report or on this reliance list.

18   Q. So is it your testimony that you haven't

19   reviewed all the relevant literature related to

20   Prolift and Prolift+M?

21   MR. KOOPMANN: Object to form.

22   A. That's not my testimony.

23   Q. (By Mr. Bentley) Do you know if you've

24   reviewed all the relevant Prolift and Prolift+M

25   expert -- strike that.

Brian Flynn, M.D.

Page 178

1    Do you know if you've reviewed all the
2 relevant Prolift and Prolift+M literature in
3 preparing your report and your opinions in this
4 case?
5    A.  I reviewed enough information to stand
6 behind my opinions in this report.
7    Q.  And do you know if you reviewed or are
8 you familiar with the Turgal 2013 study?
9 T-u-r-g-a-l.
10   A.  I'm not familiar with that study.
11   Q.  If any of those studies had reached
12 conclusions that were contrary to your opinions in
13 this case that you've presented in this report,
14 would that have affected your opinions here?
15   A.  I don't think so.
16   Q.  Is there anything out there in the
17 medical literature that you haven't reviewed that
18 could possibly change your opinions here?
19   A.  There's always possibilities, but I
20 think it's unlikely.
21   Q.  And you just testified that those nine
22 studies that you haven't reviewed, that you don't
23 think any of those would have affected your
24 opinions here; is that correct?
25   A.  I think my opinion was that it's

Page 179

1 unlikely that it would.
2    Q.  And if the 2016 Cochrane review, which
3 you've testified that you've reviewed, if they
4 identified these new studies that they thought were
5 important to list -- if the Cochrane review thought
6 these studies were important to list out as being
7 new additions to their studies since 2013, you
8 don't agree that those studies were important in
9 reaching your opinion here; is that fair?
10   A.  That's fair.
11   Q.  Are you aware that the 2016 Cochrane
12 review that you testified that you reviewed has
13 reached conclusions that the risk of mesh might not
14 be outweighed by the benefits associated with
15 recurrence in using Prolift or Prolift+M mesh kits?
16   MR. KOOPMANN:  Object to form.
17   A.  I'm aware of that, yes.
18   Q.  (By Mr. Bentley)  And that doesn't
19 affect your opinion here?
20   A.  I think I've stated my opinions very
21 well, so I don't have any other opinions in regards
22 to that.
23   Q.  So it doesn't affect your opinion?
24   A.  No.
25   Q.  Okay.  And are you aware that the

Page 180

1 Cochrane 2016 review concludes that limited
2 evidence suggests that absorbable mesh may reduce
3 rates of recurrent prolapse on examination compared
4 to native tissue repair, but there was insufficient
5 evidence on absorbable mesh for us to draw any
6 conclusions for other outcomes?  Are you aware of
7 that?
8    A.  That the outcomes of absorbable mesh?
9    Q.  That there's limited evidence regarding
10 other outcomes associated with absorbable mesh.
11   A.  I never used absorbable mesh, and I
12 don't really talk about it in my report.
13   Q.  Are you aware that Prolift+M has an
14 absorbable mesh component?
15   A.  It has a component, but it's -- you
16 know, I thought you were referring to purely
17 absorbable meshes like Vicryl mesh or Dexon mesh.
18   Q.  So do you disagree with the conclusions
19 in the 2016 Cochrane review?
20   MR. KOOPMANN:  Object to the form.
21   A.  I used the earlier Cochrane review to
22 formulate my opinions in this report.
23   Q.  (By Mr. Bentley)  And the additional
24 literature that we've discussed that you haven't
25 reviewed doesn't affect or alter your opinions; is

Page 181

1 that correct?
2    A.  It does not.
3    Q.  And as you sit here today, do you have
4 any critiques or criticisms of the 2016 Cochrane
5 systematic review of the literature regarding
6 transvaginal mesh or grafts compared with native
7 tissue repair for vaginal prolapse?  Do you have
8 any criticisms or critiques of the systematic
9 review published in 2016?
10   A.  No.
11   Q.  And you've previously testified that
12 this is, in fact, one of the highest levels of
13 evidence available; is that correct?
14   A.  That's correct.
15   MR. BENTLEY:  I have no further questions
16 right now, Doctor.  Thank you.
17        EXAMINATION
18 BY MR. KOOPMANN:
19   Q.  Dr. Flynn, if the 2016 Cochrane review
20 that plaintiffs' counsel's been asking you about
21 says that awareness of prolapse at one to three
22 years was less likely after mesh repair, is that
23 consistent with the opinions set forth in your
24 report?
25   MR. BENTLEY:  Objection; leading.

Brian Flynn, M.D.

Page 182

1    A. I believe so. Yes, it is.
2    Q. (By Mr. Koopmann) And if the 2016
3 Cochrane review that plaintiffs' counsel asked you
4 questions about says that rates of repeat surgery
5 for prolapse were lower in the mesh group, would
6 that be consistent with your opinions regarding the
7 safety and efficacy of the Prolift and Prolift+M
8 devices?
9    MR. BENTLEY: Objection; form.
10    A. Yes, it would.
11    Q. (By Mr. Koopmann) That statement is
12 saying that mesh repairs help patients avoid the
13 risks of reoperation that plaintiffs' counsel asked
14 you about earlier; isn't that right?
15    MR. BENTLEY: Objection; misstates, form,
16 leading.
17    A. That is correct.
18    Q. (By Mr. Koopmann) And if the 2016
19 Cochrane review says that recurrent prolapse on
20 examination was less likely after mesh repair,
21 would that be consistent with your opinions
22 regarding the Prolift and Prolift+M's safety and
23 efficacy?
24    MR. BENTLEY: Objection; form.
25    A. Yes, it would.

Page 183

1    Q. (By Mr. Koopmann) And if the 2016
2 Cochrane review by Dr. Maher and colleagues says
3 that there was no evidence of a difference between
4 the native tissue repair group and the mesh repair
5 group and the rates of de novo dyspareunia, would
6 that be consistent with your opinions regarding the
7 safety and efficacy of the Prolift and Prolift+M
8 products?
9    MR. BENTLEY: Objection.
10    A. Yes, that would be.
11    Q. (By Mr. Koopmann) The question -- or
12 plaintiffs' counsel asked you questions about this
13 e-mail that you sent to Jonathan Fernandez. Do you
14 recall these questions?
15    A. I do.
16    Q. Did you suggest that Ethicon pursue
17 blockage products or abdominal sacrocolpopexy
18 products because you thought those were safer than
19 transvaginal mesh products?
20    MR. BENTLEY: Objection.
21    A. No.
22    Q. (By Mr. Koopmann) The Velemir study
23 that plaintiffs' counsel asked you about that was
24 marked as Exhibit 8, that was published in the
25 Ultrasound in Obstetrics and Gynecology journal?

Page 184

1    A. Correct.
2    Q. So it was published for the whole world
3 to see?
4    A. I think very few people would see that.
5 It's not a widely published or distributed journal.
6    Q. But any doctor interested in learning
7 about transvaginal mesh repair of anterior and
8 posterior vaginal wall prolapse could find that
9 article?
10    A. Yes --
11    MR. BENTLEY: Objection.
12    A. -- they could.
13    Q. (By Mr. Koopmann) Your article that you
14 co-authored with Dr. Terlecki written in the AUA
15 update series in 2010, were you paid to write that
16 article?
17    A. A very small fee, yes.
18    Q. Do you recall what it was?
19    A. $250. And I split that with
20 Dr. Terlecki.
21    Q. $250 per hour?
22    A. No, total.
23    Q. And how long would you say you spent
24 writing this article with Dr. Terlecki?
25    A. Well, the article's about 5,000 words,

Page 185

1 and we probably spent between 40 and 50 hours
2 writing the article.
3    Q. And did anyone from Ethicon ever talk to
4 you after they saw the article and ask you why you
5 wrote this article?
6    MR. BENTLEY: Objection.
7    A. Nobody talked to me before or after the
8 article.
9    Q. (By Mr. Koopmann) Did Ethicon continue
10 to consult with you after the publication of this
11 article?
12    A. Yes. As I stated earlier in the
13 deposition, I presented an exhibit of my consulting
14 relationship going through 2011. I did the
15 TVT-Abbrevo video in 2011 after that article. I
16 was part of the TVT Exact launch, so I still
17 continued to consult after that publication.
18    Q. And did you keep all of the $250 that
19 you were paid for writing this article we marked as
20 Exhibit 7?
21    A. No, I shared half of it with my fellow,
22 Ryan Terlecki.
23    Q. So you got $125, he got $125?
24    A. That's correct.
25    Q. And so if you took 40 hours to write the

Brian Flynn, M.D.

Page 186

1    article at -- for $125, that'd be about $3 per hour
2    you got for writing this article; is that about
3    right?
4         MR. BENTLEY:  Objection.
5         A.  That's right.  We don't write these
6    articles for monetary gain.
7         Q.  (By Mr. Koopmann)  Why did you write
8    this article?
9         A.  Well, first off, I was asked to write it
10   by the American Urologic Association.  The American
11   Urologic Association was getting a number of phone
12   calls from its members about how it should
13   interpret and respond to the FDA Public Health
14   Notification of 2008.  They asked us to provide
15   useful information.  The AUA Update series is a CME
16   series, so that's a CME document, that's why
17   there's questions and answers at the end of the
18   document.  That's why there's parts bolded so
19   people who read the document can read all of it or
20   some of it.  Most of the questions in that paper
21   come from the bolded area, so we're asked to
22   intentionally bold a certain percentage of the
23   paper.  So that was intended as an instrument to
24   educate my colleagues, residents, fellows,
25   physicians in practice about polypropylene mesh,

Page 187

1    about incontinence, prolapse, and the FDA Public
2    Health Notification.
3         Q.  (By Mr. Koopmann)  And plaintiffs'
4    counsel asked you some questions about a sentence
5    that says, "Patient factors that may lead to an
6    increased risk for extrusion include age, estrogen
7    status, prior radiation, active vaginal infection,
8    smoking, obesity, immunosuppression, diabetes, and
9    concomitant hysterectomy"; do you remember that?
10        A.  I do.
11        Q.  And the next sentence you wrote says,
12   "Many patients with adverse implantation features
13   also have weak connective tissue and are at high
14   risk for failure if a graft is not used," is that
15   right?
16        A.  That's correct.
17        Q.  Do you still stand by that opinion today
18   as well?
19        A.  I do.
20        Q.  In the summary of this article that's
21   been marked as Exhibit 7, you say in bold print,
22   "Surgeons with diverse backgrounds have been able
23   to achieve excellent results in primary and
24   secondary repairs for SUI with polypropylene mesh.
25   Similarly, mesh reinforcement reduces the incidence

Page 188

1    of delayed failures after POP surgery while
2    transvaginal placement minimizes postoperative
3    morbidity."  Do you still stand by those opinions?
4         MR. BENTLEY:  Objection.
5         A.  I do.
6         Q.  (By Mr. Koopmann)  Or that statement, I
7    should say.
8         MR. BENTLEY:  Objection.
9         A.  I do, very much so.
10        Q.  (By Mr. Koopmann)  And you went on to
11   say, "Superior cure rates with mesh are contrasted
12   with the introduction of unique and sometimes
13   serious graft complications.  Therefore, reinforced
14   pelvic floor repairs should only be performed in
15   well-selected patients after they provide informed
16   consent"; is that right?
17        MR. BENTLEY:  Objection; leading.
18        Q.  (By Mr. Koopmann)  That's what you said?
19        A.  That's what I said.
20        Q.  Do you feel like you were objective in
21   writing this report?
22        MR. BENTLEY:  Objection.
23        Q.  (By Mr. Koopmann)  Or this article?
24        A.  Absolutely.  I disclosed my conflicts of
25   interest on the front page.  The article was

Page 189

1    reviewed by three reviewers.  I responded to the
2    reviews.  And I do feel that this article was an
3    objective piece of information.
4         Q.  And do you think it is the case that
5    native tissue repairs for pelvic organ prolapse
6    should only be performed in well-selected patients
7    after they provide informed consent?
8         MR. BENTLEY:  Objection; form, leading.
9         A.  Yes.  Any time you perform any kind of
10   surgery, you want to make sure you properly select
11   your patient regardless what the surgery is and
12   what procedure you select.  You want to be very
13   careful in that procedure selection.
14        Q.  (By Mr. Koopmann)  The article marked as
15   Exhibit 6 by Dr. -- lead author, or first listed
16   author, Beri Ridgeway, that's titled "Early
17   experience with mesh excision for adverse outcomes
18   after transvaginal mesh placement using prolapse
19   kits," is that right?
20        A.  That's correct.
21        Q.  That's from December 2008?
22        A.  Yes.
23        Q.  So that's eight years old at this point,
24   almost?
25        MR. BENTLEY:  Objection.

Brian Flynn, M.D.

Page 190

1    A. Correct.
2    Q. (By Mr. Koopmann) You were asked some
3    questions about RCT by Dr. Cheryl Iglesia, Andrew
4    Sokol and others that was marked as Exhibit 4.  Do
5    you recall those questions?
6    A. I do.
7    Q. In preparing your opinions regarding the
8    Prolift and Prolift+M devices, did you also review
9    and rely on RCT by Andrew Sokol and Cheryl Iglesia
10   and others on their one-year outcomes following
11   native tissue repair versus mesh repair?
12       MR. BENTLEY:  Objection; form, leading,
13   compound.
14       A. Yeah, that's cited in my report, the one
15   one-year objective and functional outcomes of
16   randomized clinical trial of vaginal mesh for
17   prolapse.
18   Q. (By Mr. Koopmann) And they studied 32
19   women who had a mesh repair and 33 women who had a
20   traditional repair; is that right?
21       MR. BENTLEY:  Same objection.
22       A. Yes, that's correct.
23   Q. (By Mr. Koopmann) And they found that
24   the quality of life improved and did not differ
25   between the two groups, 96.2 percent in the mesh

Page 191

1    group and 90.9 percent in the no-mesh group; is
2    that right?
3        MR. BENTLEY:  Same objection.
4        A. That's correct.
5    Q. (By Mr. Koopmann) Those are the
6    percentages of the subjects that reported a cure of
7    bulge symptoms; is that right?
8        MR. BENTLEY:  Same objection.
9        A. Yes, that's correct.
10   Q. (By Mr. Koopmann) They also reported
11   that postoperative subjective quality-of-life
12   measurements showed statistically significant
13   improvements from baseline for both the mesh and
14   no-mesh groups for almost all quality-of-life
15   measurements and did not differ between the two
16   groups one year after the procedure; is that right?
17       MR. BENTLEY:  Objection.
18       A. Yes, that's right.
19   Q. (By Mr. Koopmann) And is that
20   consistent with your opinions regarding the safety
21   and efficacy of the Prolift device?
22       MR. BENTLEY:  Objection.
23       A. It is.
24   Q. (By Mr. Koopmann) The authors also
25   noted based on their one-year follow-up in this RCT

Page 192

1    that sexual function based on the prolapse and
2    incontinence sexual questionnaire scores was
3    similar before the procedure between mesh and
4    no-mesh groups, and improved significantly in both
5    groups 12 months after the procedure; is that
6    right?
7        MR. BENTLEY:  Objection.
8        A. Yes, that's right.
9    Q. (By Mr. Koopmann) And they found that
10   there was no significant difference between the
11   groups with regards to sexual function 12 months
12   after the procedure; is that right?
13       A. Yes, that's right.
14   Q. They also noted that in the group of
15   patients who did not have mesh, 15 percent had
16   apical Gor-Tex suture exposures; is that right?
17       MR. BENTLEY:  Objection.
18       A. That's correct.
19   Q. (By Mr. Koopmann) And two women
20   complained of vaginal discharge and required suture
21   removal in the office at six and nine months after
22   the procedure?
23       MR. BENTLEY:  Objection.
24       A. Correct.
25   Q. (By Mr. Koopmann) They found no

Page 193

1    statistically significant differences between the
2    mesh and no-mesh groups with respect to long-term
3    complications, did they?
4        MR. BENTLEY:  Objection.
5        A. That's correct.
6    Q. (By Mr. Koopmann) And, in fact, even
7    based on their three-month outcomes that were
8    reported on Exhibit 4, they noted that subjective
9    quality-of-life measurements did not differ between
10   the two groups at baseline or three months
11   postoperatively; is that right?
12       MR. BENTLEY:  Objection.
13       A. That's right.
14   Q. (By Mr. Koopmann) The "Adverse
15   Reactions" section of the Prolift IFU indicates
16   that potential adverse reactions are those
17   typically associated with surgically implantable
18   materials, including infection potentiation,
19   inflammation, adhesion formation, fistula
20   formation, erosion, extrusion, and scarring that
21   results in implant contraction; is that correct?
22       MR. BENTLEY:  Objection; form, foundation,
23   leading.
24       A. That's correct.
25   Q. (By Mr. Koopmann) And do you think that

Brian Flynn, M.D.

## Page 194

1  pelvic floor surgeons would know, based on that
2  sentence that I just read, that that pain is a
3  possibility with the implantation of a Prolift
4  device?
5      MR. BENTLEY:  Objection; form, leading,
6  foundation, speculation.
7      A.  Yes, absolutely.
8      Q.  (By Mr. Koopmann)  And is it fundamental
9  medical and surgical knowledge that pain can result
10  after any surgery, whether it's a mesh surgery or
11  nonmesh surgery?
12      MR. BENTLEY:  Objection.
13      A.  Any kind of surgery, yes.
14      Q.  (By Mr. Koopmann)  And is it fundamental
15  medical knowledge that if pain results after a
16  surgery, it could be mild or moderate or severe?
17      MR. BENTLEY:  Same objection.
18      A.  That's correct.
19      Q.  (By Mr. Koopmann)  And is it also
20  fundamental medical knowledge that if pain results
21  after a surgery, that the pain could be temporary
22  or permanent?
23      MR. BENTLEY:  Objection.
24      A.  That's correct.
25      Q.  (By Mr. Koopmann)  Permanent pain can

## Page 195

1  result after a native tissue repair, can it?
2      MR. BENTLEY:  Objection.
3      A.  Correct.
4      Q.  (By Mr. Koopmann) Can dyspareunia result
5  after a native tissue repair?
6      A.  That's correct.
7      Q.  Can an infection occur in a native
8  tissue repair?
9      MR. BENTLEY:  Objection.
10      A.  Correct.
11      Q.  (By Mr. Koopmann)  The IFU also notes
12  that punctures or lacerations of vessels, nerves,
13  bladder, urethra or bowel may occur during Gynecare
14  Prolift guide passage and may require surgical
15  repair; is that right?
16      A.  Yes, that's right.
17      Q.  And does that sentence also tell you and
18  other surgeons that pain could result from
19  implantation of the Prolift device?
20      MR. BENTLEY:  Objection.
21      A.  That's correct.
22      Q.  (By Mr. Koopmann)  Did you discuss the
23  Prolift Surgeon's Resource Monograph at
24  professional education events?
25      A.  Yes, we did.

## Page 196

1      MR. KOOPMANN:  Mark this as whatever the
2  next exhibit is, please.
3      (Exhibit 10 was marked for identification.)
4      Q.  (By Mr. Koopmann)  Handing you what's
5  been marked as Deposition Exhibit 10, do you
6  recognize this document?
7      A.  I do.
8      Q.  What is it?
9      A.  This is a Gynecare Prolift Surgeon's
10  Resource Monograph.  This is a document that was
11  published by high-volume Prolift users to help
12  physicians in practice understand some of the
13  technical pearls that some of the surgeons that had
14  done a significant amount of Prolift procedures to
15  share their experience with the device.
16      Q.  And this was provided by Ethicon?
17      A.  It was.
18      Q.  And was it made available to pelvic
19  floor surgeons?
20      MR. BENTLEY:  Objection.
21      A.  Yes, it was.  That was the intent of the
22  report.
23      Q.  (By Mr. Koopmann)  Is there anything
24  like this Surgeon's Resource Monograph that exists
25  for native tissue repairs?

## Page 197

1      MR. BENTLEY:  Objection.
2      A.  No.
3      Q.  (By Mr. Koopmann)  Does this Surgeon's
4  Resource Monograph discuss various complications
5  possible with the Prolift surgery?
6      MR. BENTLEY:  Objection.
7      A.  It does.  And I've used one of the
8  tables from the monograph in my report.
9      Q.  (By Mr. Koopmann)  Like the table at
10  page 10?
11      A.  That's correct.
12      Q.  And that provides a citation to eight
13  studies in the top table setting forth how many
14  patients were involved in the studies, what the
15  follow-up period was, what the exposure rates were,
16  what the success rates were, and some of the other
17  complications that occurred in connection with the
18  use of the Prolift devices, correct?
19      MR. BENTLEY:  Objection.
20      A.  That's correct.  It has a total of 549
21  patients, six-month follow-up, exposure rate
22  between 2.6 and 6.2 percent, 81 to 100 percent
23  success, and then injuries, including rectal
24  injury, 1.7; bleeding, 1.3; retention, 6.7;
25  cystotomy, 1.7.

Brian Flynn, M.D.

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  Q. (By Mr. Koopmann) Some of the exposure
2  rates reported are -- you know, the Rivera study
3  shows an 11.7 exposure rate?
4  MR. BENTLEY: Objection.
5  A. That's correct.
6  Q. (By Mr. Koopmann) The page opposite
7  that, there's a discussion of dyspareunia and
8  vaginal pain that can occur; is that correct?
9  A. That's correct.
10  Q. Is this a document that you found
11  helpful in your practice?
12  MR. BENTLEY: Objection.
13  A. It is.
14  Q. (By Mr. Koopmann) Have you seen a
15  decrease in efficacy in the patients that you've
16  treated for pelvic organ prolapse, let's say for
17  cystoceles, since you stopped using Prolift and
18  Prolift+M?
19  MR. BENTLEY: Objection.
20  A. Can you repeat the question?
21  Q. (By Mr. Koopmann) Have you seen a
22  decrease in efficacy in the patients that you've
23  treated for pelvic organ prolapse, let's say for
24  cystoceles, since you stopped using Prolift and
25  Prolift+M?

**Page 199**

1  MR. BENTLEY: Same objection.
2  A. Yes, I have.
3  Q. (By Mr. Koopmann) And is that one of
4  the reasons that you would still like to have the
5  ability to use Prolift or Prolift+M in certain
6  patients?
7  MR. BENTLEY: Objection; form, leading.
8  A. Correct.
9  Q. (By Mr. Koopmann) And is the same true
10  for rectocele repairs?
11  MR. BENTLEY: Objection.
12  A. Correct.
13  Q. (By Mr. Koopmann) One of the studies
14  you cited in your report is the 2013 Cochrane
15  review by Dr. Maher and others; is that correct?
16  A. That's correct.
17  Q. And one of the things that study
18  noted -- well, first of all, that's something you
19  relied on in forming your opinions regarding the
20  Prolift and Prolift+M devices?
21  A. Yes.
22  Q. And in that study, the authors noted
23  that standard anterior repair was associated with
24  more anterior compartment prolapse on examination
25  than for any polypropylene permanent mesh repair;

**Page 200**

1  is that right?
2  MR. BENTLEY: Objection; form, foundation,
3  leading.
4  A. Yes, that's correct.
5  Q. (By Mr. Koopmann) And they also noted
6  that awareness of prolapse was also higher after
7  the anterior repair as compared to the
8  polypropylene mesh repair; is that right?
9  MR. BENTLEY: Same objection.
10  A. Yes, that's correct.
11  Q. (By Mr. Koopmann) They also noted,
12  however, the reoperation rate for prolapse was
13  similar at 14 out of 459, 3 percent, after the
14  native tissue repair compared to 6 out of 470, 1.3
15  percent, after the anterior polypropylene mesh
16  repair, and no differences in quality-of-life data
17  or de novo dyspareunia were identified; is that
18  right?
19  MR. BENTLEY: Same objection.
20  A. That's correct.
21  Q. (By Mr. Koopmann) And the mesh erosion
22  rate reported there was 11.4 percent?
23  MR. BENTLEY: Same objection.
24  A. Yes.
25  Q. (By Mr. Koopmann) Which was 64 out of

**Page 201**

1  563 patients?
2  MR. BENTLEY: Same objection.
3  A. That's correct.
4  Q. (By Mr. Koopmann) And then surgical
5  interventions were performed in 6.8 percent of the
6  patients?
7  MR. BENTLEY: Objection.
8  A. That's correct.
9  Q. (By Mr. Koopmann) You relied on an
10  article by Dr. Svabik, and others, that's in RCT
11  regarding Prolift use; is that right?
12  A. Yes, that's correct.
13  Q. And that study looked at 142 patients
14  who were post hysterectomy and underwent surgery
15  for prolapse. Seventy-two of them were diagnosed
16  with an avulsion injury and were offered
17  participation in the study, and the 70 patients --
18  and 70 patients were randomized in two groups, 36
19  in the Prolift group and 34 in the sacrospinous
20  fixation group; is that right?
21  MR. BENTLEY: Objection; form, foundation,
22  leading.
23  A. That's correct.
24  Q. (By Mr. Koopmann) And on clinical
25  examination at one year follow-up, they observed

Brian Flynn, M.D.

Page 202

1    one case of anatomical failure in the Prolift group
2    and 22 cases of anatomical failure in the
3    sacrospinous fixation group; is that right?
4          MR. BENTLEY:  Same objection.
5          A.  That's correct.
6          Q.  (By Mr. Koopmann)  So the anatomical
7    failure rate in the Prolift group was 3 percent,
8    and the anatomical failure rate in the native
9    tissue repair group was 64 percent?
10         A.  That's correct.
11         MR. BENTLEY:  Objection.
12         Q.  (By Mr. Koopmann)  And that difference
13   was statistically significant?
14         MR. BENTLEY:  Objection.
15         A.  Yes, it was.
16         Q.  (By Mr. Koopmann)  Is this an article
17   that you relied on in forming your opinions
18   regarding the safety and efficacy of the Prolift
19   device?
20         A.  Yes.
21         Q.  They also reported that sexual activity
22   was not influenced by the type of surgery; is that
23   right?
24         MR. BENTLEY:  Objection.
25         A.  That's correct.

Page 203

1          Q.  (By Mr. Koopmann)  You also relied on an
2    article by -- an RCT by lead author with the last
3    name da Silveira; is that correct?
4          A.  That's correct.
5          Q.  And in that study, they looked at 184
6    women with POPQ stage 3 or 4 prolapse who were
7    randomly assigned to undergo surgical treatment
8    using either native tissue repair or synthetic mesh
9    repair with Prolift; is that right?
10         MR. BENTLEY:  Objection.
11         A.  Yes, that's correct.
12         Q.  (By Mr. Koopmann)  And at one year,
13   follow-up anatomical cure rates were better in the
14   mesh group in the anterior compartment; is that
15   correct?
16         MR. BENTLEY:  Objection.
17         A.  Yes, that's correct.
18         Q.  (By Mr. Koopmann)  And also significant
19   improvement in patient quality of life scores at
20   one year follow-up were observed in each group; is
21   that right?
22         MR. BENTLEY:  Objection.
23         A.  Yes, that's right.
24         Q.  (By Mr. Koopmann)  And between group
25   comparisons of changes in the patient

Page 204

1    quality-of-life scores revealed greater improvement
2    in the mesh group; is that right?
3          MR. BENTLEY:  Objection.
4          A.  Yes, that's right.
5          Q.  (By Mr. Koopmann)  They also noted on
6    page -- well, it's the second-to-last page, I don't
7    know if it's numbered, "On analysis of this study,
8    one must take into account that, although the
9    tested mesh product, Prolift, has been withdrawn
10   from the world market, its material has the optimal
11   properties of a mesh for pelvic floor repairs"; is
12   that right?
13         MR. BENTLEY:  Objection.
14         A.  That's right.
15         Q.  (By Mr. Koopmann)  They included a
16   table, numbered Table 6, that set forth
17   complications and complaints at one-year follow-up,
18   and it indicated that 6.2 percent of the native
19   tissue patients had dyspareunia at one-year
20   follow-up, and 3.4 percent of the patients had
21   dyspareunia in the mesh group; is that right?
22         MR. BENTLEY:  Objection.
23         A.  Yes, that's right.
24         Q.  (By Mr. Koopmann)  And pain was
25   experienced by 8.6 percent of the women in the

Page 205

1    native tissue group at one-year follow-up, but only
2    2.3 percent in the mesh group; is that also right?
3          MR. BENTLEY:  Objection.
4          A.  Yes, that's right.
5          Q.  (By Mr. Koopmann)  Is it fair to say
6    that there are randomized control trials regarding
7    the Prolift device that report both very positive
8    things about the Prolift device and not-so-positive
9    things about the Prolift device?
10         MR. BENTLEY:  Objection; form.
11         A.  Yes, that's correct.
12         MR. BENTLEY:  Compound, leading,
13   speculation.
14         Q.  (By Mr. Koopmann)  And you took all of
15   those randomized control trials into account, the
16   ones cited in your report, in forming your opinions
17   in this case; is that correct?
18         A.  Yes, I did.
19         MR. BENTLEY:  Objection.
20         Q.  (By Mr. Koopmann)  And you discussed in
21   your report some randomized control trials that
22   you're relying on in support of your opinions
23   regarding the Prolift and Prolift+M devices by
24   authors such as Halaska, Withagen, Carey and
25   Altman; is that right?

Brian Flynn, M.D.

Page 206

1    A. Yes.
2    Q. And you hold the opinions set forth in
3  your Prolift and Prolift+M reports to a reasonable
4  degree of medical certainty?
5    A. I do.
6    Q. Why is it that you didn't ask to see
7  internal corporate depositions of Ethicon
8  personnel?
9    A. Because I didn't think it was relevant
10  to me in formulating my opinions in preparing this
11  report.
12    Q. Did you rely on higher-level evidence
13  than internal corporate depositions?
14    A. I did. Depositions are not levels of
15  evidence. They're a person's response to questions
16  that they were asked. We relied on randomized
17  control trials, meta-analyses and systematic
18  reviews primarily in preparation of this report.
19    Q. Is it true that sometimes two authors
20  setting out to review a body of literature, let's
21  say, for purposes of a systematic review of
22  literature end up reviewing somewhat different
23  bodies of literature for whatever reason?
24    MR. BENTLEY: Objection; form, date,
25  speculation, foundation.

Page 207

1    A. Absolutely. There can be biases even in
2  systematic reviews. And so just like I've been
3  questioned about why I selected which articles to
4  review here, the reviewers of a systematic review
5  have the ability to pick and choose which articles
6  they want to include in their systematic review.
7    Q. (By Mr. Koopmann) You talked earlier
8  about your case log, and I think you indicated
9  essentially that when you have patients return to
10  you after surgery, you ask them how they're doing,
11  and various questions, including whether they're
12  happy that they had their procedure; is that
13  accurate?
14    A. That's accurate.
15    Q. When you had patients return to you
16  after Prolift surgeries, what did they generally
17  report to you regarding whether they were happy
18  that they had the procedure?
19    MR. BENTLEY: Object.
20    A. The overwhelming majority of them were
21  happy that they had the procedure done. Many of
22  these patients had had prolapse that was very
23  bothersome to them. Many of them were recurrent
24  patients and had been unable to have their prolapse
25  resolved with other procedures such as native

Page 208

1  tissue repair, sacrocolpopexy and graph-augmented
2  repairs with biologicals.
3    Q. (By Mr. Koopmann) Even if you didn't do
4  a systematic review of your case log, do you,
5  nonetheless, have a good understanding of the
6  complication rates that you saw in your practice
7  using the Prolift and Prolift+M devices?
8    MR. BENTLEY: Objection; form, foundation,
9  speculation.
10    A. Yes, I am aware.
11    Q. (By Mr. Koopmann) And are those
12  complication rates the same ones that you would
13  report to patients who asked you about
14  complications when considering possibly having a
15  Prolift or Prolift+M surgery?
16    MR. BENTLEY: Same objection.
17    A. Yes. When most surgeons are discussing
18  risks and benefits of a procedure with their
19  patients, they're using both their own personal
20  experience and then what the medical literature
21  shows.
22    Q. (By Mr. Koopmann) Was the literature
23  search that you performed for purposes of the
24  preparation of your Prolift and Prolift+M
25  reports -- was it the same basic methodology that

Page 209

1  you use in doing literature searches for purposes
2  of your clinical practice?
3    MR. BENTLEY: Objection.
4    A. Yes, clinical practice and publications.
5    Q. (By Mr. Koopmann) Is there any reliable
6  literature that you're aware of that suggests that
7  Gynemesh PS or Ultrapro mesh is toxic or
8  carcinogenic?
9    MR. BENTLEY: Objection.
10    A. I don't believe that the reports that
11  suggest that are valid, so the answer is no.
12    Q. (By Mr. Koopmann) Erosion rates for
13  Prolift or Prolift+M are set forth in the published
14  medical literature; is that correct?
15    MR. BENTLEY: Objection.
16    A. Correct. It's widely stated in the
17  medical literature, in this report and in various
18  RCTs and systematic reviews.
19    MR. BENTLEY: Strike after "literature."
20    Q. (By Mr. Koopmann) Cochrane reviews,
21  like the 2013 Maher Cochrane review that you
22  reviewed and relied on in forming your opinions,
23  they study and take into account and analyze all
24  literature on a certain subject regardless of
25  whether it reports excellent or poor outcomes using

Brian Flynn, M.D.

Page 210

1  a certain surgical intervention; is that true?
2       MR. BENTLEY: Objection to form; foundation,
3  leading, compound.
4       A. Correct. The goal of a systematic
5  review is to select articles that meet a certain
6  criteria for inclusion, and whether those report
7  positive or negative outcome shouldn't influence
8  the selection of those articles.
9       Q. (By Mr. Koopmann) Can adding
10 information to an IFU potentially be unhelpful?
11      MR. BENTLEY: Objection; form, foundation.
12      A. Yes.
13      Q. (By Mr. Koopmann) How so?
14      A. Well, if there's too much information in
15 the IFU, just like that package insert you get at
16 your pharmacy, you're less likely to read it. So
17 there's a danger of information overload,
18 especially in today's era. So I think that that
19 information may not be looked at if there's too
20 much information there, or surgeons might not read
21 it in its entirety.
22      MR. BENTLEY: Move to strike, speculation.
23      Q. (By Mr. Koopmann) If too much
24 information is included in an IFU, do you think it
25 could potentially obscure other important

Page 211

1  information?
2       MR. BENTLEY: Objection; form, foundation,
3  speculation.
4       A. Yes, I think the important information
5  may be overlooked if the person reading the IFU is
6  not reading every word of the IFU.
7       Q. (By Mr. Koopmann) Do you need
8  information included in an IFU that you learned in
9  medical school and residency?
10      A. No.
11      Q. Do you need all surgical complications
12 to be included in an IFU?
13      MR. KOOPMANN: Objection.
14      A. I do not, nor is that even possible or
15 relevant.
16      Q. (By Mr. Koopmann) Can vaginal
17 shortening occur after a native tissue repair?
18      MR. BENTLEY: Objection.
19      A. Yes.
20      Q. (By Mr. Koopmann) Can dyspareunia occur
21 after a native tissue repair?
22      A. Yes.
23      MR. BENTLEY: Objection; asked and answered,
24 form, foundation.
25      Q. (By Mr. Koopmann) Can infection occur

Page 212

1  after a native tissue repair?
2       MR. BENTLEY: Same objection.
3       A. Yes, it can.
4       Q. (By Mr. Koopmann) Pull up your Prolift
5  report. You've got it in front of you.
6       Plaintiffs' counsel asked you earlier why
7  you didn't reference or discuss infection in your
8  Prolift report. Do you remember that?
9       MR. BENTLEY: Objection; misstates.
10      A. I do.
11      Q. (By Mr. Koopmann) Turn to page 14,
12 please. The bottom paragraph there, you talk about
13 how native tissue repairs can cause infection; is
14 that right?
15      A. Correct.
16      Q. And if you'll turn to -- I'm sorry.
17 Okay. You're on 14?
18      A. Yes.
19      Q. Okay. That question was actually about
20 page 10.
21      A. Okay.
22      Q. Did you talk about the risk of infection
23 with native tissue repairs?
24      A. Yes. It says, "In summary, native
25 tissue repairs can cause numerous complications,

Page 213

1  such as bleeding, infection, dyspareunia, pain,
2  injury to surrounding organs, including bladder,
3  bowel, rectum, or ureter. More damage or
4  entrapment can occur leading to chronic pain,
5  chronic groin or buttock pain."
6       Q. Now turn to page 14, please. The
7  second-to-last full paragraph, you indicate the
8  pore size of Gynemesh PS is about 2.5 millimeters,
9  or 2,500 microns, which easily accommodates the
10 cells and small blood vessels needed to access the
11 pores, promote tissue integration and reduce the
12 risk of infection; is that correct?
13      A. That's correct.
14      Q. So you're noting there that there is a
15 risk of infection with the Gynemesh PS; is that
16 true?
17      A. That's true.
18      Q. And turn to page 20, please. You note
19 in the last sentence of the first paragraph that
20 the DeLande Sheere study reported surgery due to
21 mesh infection occurred in .2 percent of the
22 patients in that study; is that right?
23      A. That's right.
24      Q. Can pelvic pain occur after native
25 tissue repair?

Brian Flynn, M.D.

Page 214

1    A. Yes.
2    Q. Is it a good idea for a doctor to try to
3  mitigate factors that could cause a wound
4  complication before doing a native tissue surgery?
5    A. Yes.
6    Q. So for instance, if a patient was a
7  smoker and came to you and the two of you agreed
8  that she was going to have a native tissue surgery
9  for her pelvic organ prolapse, it would be a good
10  idea to counsel her to stop smoking for that
11  reason, and others?
12    MR. BENTLEY: Objection; form, leading.
13    A. For that reason, and others. I talk
14  about smoking cessation with all my patients
15  regardless of the surgeries.
16    Q. (By Mr. Koopmann) Is it a surgeon's
17  responsibility to make sure he or she is familiar
18  with the steps for implanting a medical device?
19    MR. BENTLEY: Objection; form, foundation.
20    A. Yes.
21    Q. (By Mr. Koopmann) Can contracted scar
22  tissue occur in a native tissue repair?
23    MR. BENTLEY: Objection; form, foundation.
24    A. Yes.
25    Q. (By Mr. Koopmann) If that occurs in a

Page 215

1  native tissue repair, can it cause pain?
2    MR. BENTLEY: Objection.
3    A. Yes.
4    Q. (By Mr. Koopmann) Can excessive tension
5  from sutures used in a native tissue repair cause
6  pain?
7    MR. BENTLEY: Objection.
8    A. Yes.
9    Q. (By Mr. Koopmann) Can nerve injury
10  result from a native tissue repair?
11    A. Yes.
12    Q. And that could cause pain?
13    A. Yes.
14    Q. You performed some professional
15  education for Ethicon regarding Prolift; is that
16  right?
17    A. Yes, that's correct.
18    Q. Did you also do it for Prolift+M?
19    A. Yes.
20    Q. Why did you do that?
21    A. Because I enjoy teaching. It's always
22  been a big part of my practice, teaching medical
23  students, residents and physicians in practice. I
24  think we have an obligation to help physicians in
25  practice learn how to do new procedures. I felt

Page 216

1  that I had expertise that I could offer others.
2  Especially as a urologist, there's less urologists
3  that are trained and familiar with prolapse
4  repairs. And I tend to network well with
5  urologists. And I had a number of people request
6  that I help educate them on the product.
7    Q. Did you teach your residents or fellows
8  at the University of Colorado how to implant
9  Prolift devices?
10    A. I did.
11    Q. Did you teach your residents or fellows
12  at the University of Colorado how to implant
13  Prolift+M devices?
14    A. Yes, I did.
15    Q. Did Ethicon pay you to do that teaching?
16    A. No, they did not.
17    Q. Why did you teach your residents and
18  fellows at the University of Colorado to implant
19  Prolift and Prolift+M devices, among other prolapse
20  procedures?
21    A. Because it's an important part of their
22  education and training. Residents and fellows,
23  when they graduate, in their own practice will see
24  women with incontinence and prolapse. I want them
25  to feel well-prepared in performing the

Page 217

1  contemporary procedures.
2    Q. Do you know whether the TVM group
3  evaluated a larger pore lightweight mesh in the
4  development of what became Prolift?
5    MR. BENTLEY: Objection.
6    Q. (By Mr. Koopmann) Other than Gynemesh
7  PS?
8    MR. BENTLEY: Objection.
9    A. I believe the TVM group looked at
10  multiple meshes before they evolved to what they
11  felt was the ideal mesh.
12    Q. (By Mr. Koopmann) And they felt
13  Gynemesh PS was the ideal mesh?
14    MR. BENTLEY: Objection.
15    A. That's correct.
16    Q. (By Mr. Koopmann) Do you think that the
17  complications reported in the IFUs for the Prolift
18  and Prolift+M devices are consistent with the
19  complications that you saw in your clinical
20  practice using those devices?
21    MR. BENTLEY: Objection.
22    A. Yes, that is consistent.
23    Q. (By Mr. Koopmann) Did you base your
24  opinions today regarding the adequacy of the
25  warnings in the Prolift, the Prolift+M IFUs on all

Brian Flynn, M.D.

Page 218

1  of your experience, education, training and review
2  of the literature?
3       MR. BENTLEY:  Objection.
4       A.  That is correct.
5       Q.  (By Mr. Koopmann)  Is Gynemesh PS the
6  most studied mesh for use in prolapse surgery?
7       MR. BENTLEY:  Objection; form, foundation,
8  speculation.
9       A.  Yes, it is.
10      MR. KOOPMANN:  Those are all the questions I
11 have for you, Dr. Flynn.
12           EXAMINATION
13 BY MR. BENTLEY:
14      Q.  Dr. Flynn, just a couple follow-ups.
15          In the 2016 Cochrane review that you've
16 reviewed prior to today, the authors concluded that
17 transvaginal permanent mesh kits such as Prolift
18 are associated with higher rates of reoperation for
19 prolapse, stress urinary incontinence or mesh
20 exposure, and higher rates of bladder injury at
21 surgery and de novo urinary incontinence.  Do you
22 agree with that conclusion?
23      A.  I would have to separate all those
24 statements.  There's a lot there to agree or
25 disagree with.

Page 219

1       Q.  Okay.  Do you agree that permanent mesh
2  kits for prolapse like Prolift are associated with
3  higher rates of reoperation for prolapse?
4       A.  No, I don't agree with that.
5       Q.  And in your report, you haven't given us
6  any reason to your methodology in reaching a
7  disagreement with the systematic review of Cochrane
8  that was published in 2016; isn't that correct?
9       A.  That's not correct.
10      Q.  I'm sorry.  Where in your report do you
11 give us any type of analysis as to why you disagree
12 with this 2016 Cochrane review's conclusions?
13      A.  Because I think I cite other Cochrane
14 reviews from Maher as well as other systematic
15 reviews suggesting that just the opposite, that the
16 incidence of reoperation is lower with
17 graft-augmented repair such as Prolift when
18 compared to native tissue repair.
19      MR. KOOPMANN:  Object to the form of that
20 last question.
21      Q.  (By Mr. Bentley)  Do you have any
22 knowledge or understanding as to what this 2016
23 Cochrane review is the largest study ever performed
24 to collect and review -- strike that.
25          Do you have any knowledge or understanding

Page 220

1  that this is the most recent and largest systematic
2  review of all the available prolapse and
3  Prolift-related literature?
4       A.  I don't have knowledge if that's the
5  largest.  As meta-analyses are published, the more
6  recent ones tend to have more data as they collect
7  more data, as more studies are published, so that's
8  a general observation I would have.
9       Q.  And this is more recent than the 2013
10 Cochrane review that you cite in your report; isn't
11 that correct?
12      A.  That's correct.
13      Q.  And this study, in fact, has
14 approximately nine additional studies that weren't
15 included in the 2013 Cochrane view; isn't that
16 correct?
17      MR. KOOPMANN:  Object to form; asked and
18 answered.
19      A.  Yeah, that's correct.
20      Q.  (By Mr. Bentley)  Do you agree with the
21 authors of the 2016 Cochrane review that concluded
22 that permanent mesh implants such as Prolift are
23 associated with a higher reoperation rate for
24 stress urinary incontinence?  Do you agree with
25 that statement?

Page 221

1       A.  I don't agree with the statement.
2       Q.  And in your report, have you provided
3  any type of analysis or reason as to why you
4  disagree with that statement?
5       A.  Yeah, I think I've stated to the
6  contrary, from my review of other medical
7  literature.
8       Q.  Right.  But in your report, you haven't
9  explained why you disagree with the 2016 Cochrane
10 review's conclusions that it's -- that mesh kits
11 such as Prolift are associated with a higher
12 reoperation rate for stress urinary incontinence;
13 isn't that correct?
14      MR. KOOPMANN:  Object to form.
15      A.  That's correct.
16      Q.  (By Mr. Bentley)  Doctor, do you agree
17 with the 2016 Cochrane author's conclusion that
18 permanent mesh is associated with higher rates of
19 reoperation for mesh exposure?
20      MR. KOOPMANN:  Object to form.
21      A.  Compared to what?
22      Q.  (By Mr. Bentley)  To nonpermanent mesh
23 implants such as the --
24      A.  Yes, I agree with that.
25      Q.  Do you agree with the authors of the

Brian Flynn, M.D.

Page 222

1    2016 Cochrane review -- do you agree with their
2    conclusions that Prolift and permanent mesh kits
3    are associated with a higher rate of bladder injury
4    at surgery and de novo stress urinary incontinence?
5        A. When compared to native tissue repairs?
6        Q. Yes.
7        A. Yes.
8        Q. And the authors of the 2016 Cochrane
9    review also conclude that the risk-benefit profile
10   means that transvaginal mesh has limited utility in
11   primary surgery. Do you agree with that statement?
12       A. No, I do not.
13       Q. But as you've previously testified,
14   there's a narrower patient profile that you think
15   is appropriate for using Prolift or Prolift+M as a
16   primary surgery, right?
17       A. Yes.
18       Q. And I believe you testified that system
19   reviews have a preset inclusion and exclusion
20   criteria for which studies -- or how they're going
21   to approach which studies to analyze; is that
22   correct?
23       A. They should, yes.
24       Q. And you don't have a preset inclusion
25   criteria for which studies you analyze in your

Page 223

1    report; isn't that correct?
2        A. I have criteria. I mentioned those
3    criteria earlier.
4        Q. And what were the criteria -- strike
5    that.
6        And do you have a preset exclusion criteria
7    for which studies you didn't discuss in your
8    report?
9        A. I have an inclusion criteria, I guess
10   you can flip that and make it exclusion, but as I
11   mentioned earlier, I look for studies that are
12   well-designed of high levels of evidence, that are
13   from reputable peer-reviewed journals, that have a
14   large cohort of patients, preferably multi-center
15   studies, et cetera.
16       Q. And did we discuss a couple of studies
17   that you felt were reputable and important studies
18   that could have met your inclusion criteria?
19       MR. KOOPMANN: Object to form.
20       A. We discussed studies that I didn't
21   include in my report, yes.
22       Q. (By Mr. Bentley) Would they have met
23   your inclusion criteria?
24       A. I would have to look at them more
25   specifically. I didn't have time to look at those.

Page 224

1    They may have; they may not have.
2        Q. Doctor, we previously discussed that you
3    hold a theory that mesh pain might be related to
4    infection; is that correct?
5        A. It's one of possible many theories, yes.
6        Q. And my previous questions were, where in
7    your report do you discuss this theory that the
8    pain that many of these patients are suffering
9    might be attributable to mesh-related infection?
10   Do you discuss that anywhere in your report?
11       A. No.
12       Q. And that's not discussed in the IFU,
13   right?
14       A. Infection's discussed in the IFU.
15   Pain's discussed in the IFU.
16       Q. But the theory that the pain is being
17   caused by a mesh-related infection, that's not
18   discussed, right?
19       A. IFU's not going to discuss theories.
20       Q. It's not discussed in the IFU, right?
21       A. It's not discussed.
22       Q. Doctor, you testified about the 2011
23   Altman RCT earlier; do you remember that?
24       A. I do.
25       Q. And was that an important study to you?

Page 225

1        A. It was.
2        Q. Do you know if there were systematic
3    problems with the POPQ measurements in that study?
4        A. I'd have to take a look at the study
5    again if you want to go through that. I would be
6    surprised to hear that.
7        Q. As you sit here today, you don't have
8    any knowledge regarding that, though?
9        A. No.
10       Q. Do you know who Dr. Jeffrey Drazen is?
11       A. No, I do not.
12       Q. I'll represent to you that Dr. Drazen
13   was the editor in chief of the New England Journal
14   of Medicine and that he was deposed in the Ethicon
15   litigation. Do you know if you've reviewed his
16   deposition testimony?
17       A. No, I have not.
18       Q. So if I told you that he testified that
19   there were issues with the POPQ measurements, you
20   would have no information one way or the other if
21   that was correct or not?
22       MR. KOOPMANN: Object to form; foundation.
23       A. As I mentioned earlier, I'd be surprised
24   to hear that experienced surgeons would have
25   problems measuring -- taking POPQ measurements.

Brian Flynn, M.D.

Page 226

1    Q. (By Mr. Bentley) Would it affect your
2  opinions on your evaluation of the reliableness of
3  the Altman study if you learned that there were,
4  indeed, problems with the measurements of the POPQ?
5    MR. KOOPMANN: Object to form.
6    A. Was he a reviewer of that article, or
7  did he write a published editorial on that article?
8    Q. (By Mr. Bentley) I'm going to re-ask my
9  question, Doctor.
10    If Dr. Drazen testified that there were,
11  indeed, problems with the POPQ measurements in the
12  Altman 2011 study, assuming that, would that affect
13  your evaluation of whether or not that study was
14  reliable?
15    A. No, it would not.
16    Q. You don't care if there were problems
17  with the POPQ measurement in the study you relied
18  upon?
19    A. The fact that Dr. Drazen has that
20  opinion in his deposition doesn't make that
21  statement true. That's his opinion. I don't
22  believe that's the opinion of Dr. Altman and his
23  coauthors, that they had problems measuring POPQ.
24    Q. And Doctor, you testified earlier about
25  the Prolift Surgeon's Resource Monograph; do you

Page 227

1  remember that?
2    A. I do.
3    Q. And I believe you testified that the
4  monograph contains some technical pearls; is that
5  correct?
6    A. Technical pearls, that's correct.
7    Q. And what's the purpose of providing
8  technical pearls to surgeons?
9    A. Technical pearls are to help newer
10  surgeons gain insight that's only relevant after
11  doing a certain number of cases. So it's a way of
12  more experienced surgeons sharing information with
13  others.
14    Q. And you believe that's helpful, right?
15    A. Yes, it's helpful.
16    Q. Do you have any legal basis for why
17  Ethicon couldn't have included that information in
18  the IFU procedural steps?
19    MR. KOOPMANN: Object to form.
20    A. This is a 25-page document that was
21  collected years after Prolift was launched, and
22  it's just a wealth of information on the
23  experience. So there's no way this could have been
24  included in the IFU at its onset. So I don't know
25  how this could have been included in the IFU.

Page 228

1    Q. (By Mr. Bentley) And the initial IFU,
2  you don't know how this could be included; is that
3  your testimony?
4    A. That's my testimony, yes.
5    Q. But once the Prolift came to market and
6  the information that's provided in this monograph
7  was obtained, do you know of any reason why Ethicon
8  couldn't have provided that information in an
9  updated IFU?
10    A. I think they did a good job providing
11  the information in the form of the Prolift
12  monograph. That's more than what you would see
13  with any other product like Elevate or Bard
14  Avaulta. I've never seen anything like this
15  monograph for any other mesh kit on the market,
16  whether it's for prolapse or incontinence.
17    MR. BENTLEY: I'm going to strike as
18  nonresponsive.
19    Q. (By Mr. Bentley) Doctor, my question
20  is, is there any legal reason why Ethicon could not
21  have updated the Prolift IFU with the technical
22  pearls that are detailed in the Surgeon's Resource
23  Monograph?
24    MR. KOOPMANN: Object to form; asked and
25  answered.

Page 229

1    A. I'm not aware of any legal reasons, but
2  I think there's a lot of practical reasons why it
3  would not have been in an IFU.
4    MR. BENTLEY: I'm going to strike after
5  "legal reasons."
6    Q. (By Mr. Bentley) Doctor, do you have
7  any understanding as to whether every surgeon that
8  implanted the Prolift received the monograph that
9  you reviewed?
10    A. I don't have a way of knowing that, no.
11    Q. Is the monograph included with every
12  Prolift or Prolift+M product as it's sold?
13    A. I don't know the answer to that.
14    Q. But the IFU you know is provided with
15  the Prolift or Prolift+M with every product sold,
16  right?
17    A. The IFU, yes.
18    MR. BENTLEY: I have no further questions.
19  Thank you.
20    MR. KOOPMANN: Just a couple follow-ups,
21  Dr. Flynn.
22    EXAMINATION
23  BY MR. KOOPMANN:
24    Q. Do you think there's a surgeon in
25  America who is unaware that an infection can cause

Brian Flynn, M.D.

Page 230

1  pain?
2      MR. BENTLEY:  Objection; speculation, form
3  and foundation, asked and answered.
4      A.  No.
5      Q.  (By Mr. Koopmann)  If somebody cuts
6  their finger and that cut, that little cut on their
7  finger gets infected, will that cause pain?
8      MR. BENTLEY:  Objection; argumentative.
9      A.  Yes.
10     MR. BENTLEY:  Form.
11     Q.  (By Mr. Koopmann)  Did you ever hear of
12  the Altman 2011 RCT being retracted by the New
13  England Journal of Medicine?
14     A.  No.
15     Q.  Is that something that happens from time
16  to time with an article if there's some significant
17  problem with an article?
18     MR. BENTLEY:  Objection; form and
19  foundation, speculation, vague.
20     A.  Yes, it does happen.  I've seen articles
21  be retracted from the literature when new
22  information's been discovered.
23     MR. KOOPMANN:  No further questions.
24     (Discussion held off the record. )
25          EXAMINATION

Page 231

1  BY MR. BENTLEY:
2      Q.  Doctor, I'm handing you what's titled
3  "Expert Report Re:  Gynecare Prolift Pelvic Floor
4  Repair System."  It's a report dated February 26,
5  2016, and it appears to have your signature on this
6  last page.  Does that look like your report entered
7  in this litigation?
8      A.  Yes, it does.
9      Q.  And I'm handing you a similar report
10  titled "Prolift+M."  Does that look like your
11  report regarding the Prolift+M products in this
12  litigation?
13     A.  It does.
14     MR. BENTLEY:  Thank you.
15     MR. KOOPMANN:  Are you going to mark those
16  as exhibits?
17     MR. BENTLEY:  Please mark those as 11 and
18  12.  Prolift will be 11, +M will be 12.
19     (Exhibits 11 and 12 were marked for
20  identification.)
21     (Whereupon, the deposition was concluded at
22  5:50 p.m. on April 14, 2016.)
23
24
25

Page 232

1
2
3
4
5      I, BRIAN FLYNN, M.D., do hereby certify that
6  I have read the foregoing transcript and that the
7  same and accompanying amendment sheets, if any,
8  constitute a true and complete record of my
9  testimony.
10
11
12
13          _____
14          Signature of Deponent
15
           ( ) No Amendments
16             ( ) Amendments Attached
17         Subscribed and sworn to before me
18  this _____ day of _____, 2016.
19
20     Notary Public: _____
21     Address: _____
22                _____
23     My commission expires: _____
24     Seal:
25

Page 233

1
2
3               MLG
4
5
6          REPORTER'S CERTIFICATE
7  STATE OF COLORADO          )
                              ) ss.
8  COUNTY OF DENVER           )
9
10     I, MELANIE L. GIAMARCO, do hereby certify that I am
11  a Registered Professional Reporter and Notary Public within
12  the State of Colorado; that previous to the commencement of
13  the examination, the deponent was duly sworn by me.
14     I further certify that this deposition was taken in
15  machine shorthand by me at the time and place herein set
16  forth, that it was thereafter reduced to typewritten form, and
17  that the foregoing constitutes a true and correct transcript
18  of the proceedings had.
19     I further certify that I am not employed by, related
20  to, nor of counsel for any of the parties herein, nor
21  otherwise interested in the result of the within litigation.
22     In witness whereof, I have affixed my signature and
23  seal this 18th day of April, 2016.
24
25

Brian Flynn, M.D.

Page 234

1              Melanie L. Giamarco
2              Registered Professional Reporter
3              Registered Merit Reporter
4              Certified Realtime Reporter
5  My commission expires:  August 25, 2017.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25