Exhibit E

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                         AT CHARLESTON

 4    _____

 5    JO HUSKEY AND ALLEN HUSKEY,        CASE NUMBER

 6            Plaintiffs,            2:12-cv-05201

 7        v.

 8    ETHICON, INC., ET AL.,

 9            Defendants.

10        - and -

11    TONYA EDWARDS AND GARY EDWARDS,    CASE NUMBER

12            Plaintiffs,            2:12-cv-09972

13        v.

14    ETHICON, INC., ET AL.,

15            Defendants.

16    _____

17               TRANSCRIPT OF PRETRIAL CONFERENCE

18                      August 13, 2014

19            BEFORE THE HONORABLE JOSEPH R. GOODWIN,

20               UNITED STATES DISTRICT JUDGE

21

22    Court Reporter:          Carol Farrell, CRR, RMR, CCP, RPR
                               (304)347-3188
23                             carol_farrell@wvsd.uscourts.gov

24
      Proceedings recorded by machine stenography; transcript
25    produced by computer.
```

```
 1 │ A P P E A R A N C E S

 2 │ FOR THE HUSKEY PLAINTIFFS:

 3 │ EDWARD A. WALLACE, ESQUIRE
   │ MARK R. MILLER, ESQUIRE
 4 │ Wexler Wallace
   │ 55 West Monroe Street, Suite 3300
 5 │ Chicago, IL  60603

 6 │ FIDELMA L. FITZPATRICK, ESQUIRE
   │ Motley Rice
 7 │ 321 South Main Street, Suite 200
   │ Providence, RI  02903
 8 │
   │ JEFFREY M. KUNTZ, ESQUIRE
 9 │ Wagstaff & Cartmell
   │ 4740 Grand Avenue, Suite 300
10 │ Kansas City, MO  64112

11 │ FOR THE EDWARDS PLAINTIFFS:

12 │ JOHN FABRY, ESQUIRE
   │ Mueller Law LLC
13 │ 404 W. 7th Street
   │ Austin, TX  78701
14 │
   │ FOR THE DEFENDANTS:
15 │
   │ CHRISTY D. JONES, ESQUIRE
16 │ DONNA BROWN JACOBS, ESQUIRE
   │ Butler, Snow, O'Mara, Stevens & Cannada, PLLC
17 │ 1020 Highland Colony Parkway, Suite 1400
   │ Ridgeland, MS  39157
18 │
   │ DAVID B. THOMAS, ESQUIRE
19 │ PHILIP J. COMBS, ESQUIRE
   │ Thomas Combs & Spann
20 │ PO Box 3824
   │ Charleston, WV  25338-3824
21 │
22 │ ALSO PRESENT:

23 │ Deborah Marlin, Paralegal
   │ Mueller Law LLC
24 │
25 │
```

─────────────────── PRETRIAL CONFERENCE ───────────────────

1          PROCEEDINGS had before The Honorable Joseph R.

2   Goodwin, Judge, United States District Court, Southern

3   District of West Virginia, in Charleston, West Virginia, on

4   August 13, 2014, at 1:00 p.m., as follows:

5          THE COURT:  How are you?  Madam Clerk or Court

6   Reporter, do you have the appearances?

7          THE COURT REPORTER:  Yes, Your Honor.

8          THE COURT:  All right.  We're here today for a

9   pretrial conference in the matter of *Huskey versus Ethicon*,

10  2:12-cv-5201; also, in the event the *Huskey* case does not go

11  forward, I also conduct this pretrial conference for *Edwards*

12  *versus Ethicon*, 2:12-cv-9972, the backup case.

13          Have the parties filed Lexecon waivers?

14          MR. FABRY:  Yes, Your Honor, for Edwards.  John Fabry

15  for Edwards.  Yes.

16          MS. JACOBS:  I'll have to look back at our first one

17  and see what all it said.

18          THE COURT:  Would you take care of it?

19          MS. JONES:  We'll take care of it, yes.

20          THE COURT:  All right.  I don't have any indication

21  from anybody that *Huskey* will not go forward, but it's my

22  intention, if it doesn't, to try *Edwards*, as I told you, and

23  it's further my intention to try *Edwards* in the near future,

24  regardless, since it is ready.  After this trial, I'll get

25  together with you about maybe some dates in September that we

──────── PRETRIAL CONFERENCE ────────

1    might try it.

2          Let me discuss some of your pending motions.  In

3    *Huskey*, there are two motions to exclude related to

4    Drs. Rosenzweig -- "Zweig"?  Anybody know?

5          MULTIPLE VOICES:  Rosenzweig.

6          THE COURT:  "Zweig"?  All right -- and Guelcher?

7          MR. WALLACE:  Guelcher.

8          THE COURT:  "Guelcher," all right.

9          In *Huskey*, the Rosenzweig motion -- it makes me want

10   to put on a German accent -- is Docket Number 316, and the

11   Guelcher motion, the docket number is 314.

12         In *Edwards*, there is no Rosenzweig motion filed

13   because Ethicon asserts that Dr. Rosenzweig's fourth

14   supplemental report was served only in *Huskey*.  However, there

15   is a motion to exclude related to Dr. Guelcher at Docket 168.

16   In addition, there is a motion to adopt Dr. Guelcher's

17   supplemental reliance list as filed in *Huskey* at Docket Number

18   167, and a motion to adopt Rosenzweig's supplemental expert

19   reports filed in *Huskey* at Docket Number 178.

20         I make the following rulings:

21         As to Rosenzweig, with respect to Ethicon's motion in

22   *Huskey* to exclude the testimony of Dr. Rosenzweig, Ethicon

23   argues that Dr. Rosenzweig's fourth supplemental expert report

24   is untimely because it includes a new opinion that the Abbrevo

25   is a safer alternative design.  I agree.  This opinion is

─ PRETRIAL CONFERENCE ─

1   entirely new and was not contained in Dr. Rosenzweig's

2   original report.  It is, therefore, untimely and not

3   substantially justified or harmless under Federal Rule 37(c).

4   The parties cannot proffer new experts' opinions at this late

5   stage on the eve of trial.  I grant Ethicon's motion to

6   exclude Dr. Rosenzweig's fourth supplemental expert report.

7          Ethicon also moved to exclude Dr. Guelcher's

8   testimony as it relates to a supplemental reliance material

9   list.  I am going to deny that motion.  I find that

10  Dr. Guelcher is not offering new opinions.  This supplement is

11  untimely because it was disclosed after the deadline for

12  pretrial disclosures set out in Federal Rules of Civil

13  Procedure 26(a)(3).  However, the plaintiffs -- the

14  plaintiffs, in fact, are incorrect that Local Rule 16.7

15  governs the timing for these disclosures.

16         However, I find that the late supplement of

17  Dr. Guelcher's reliance materials is substantially justified

18  or harmless under Rule 37(c) in light of Ethicon's apparent

19  late production of documents.  Therefore, I deny Ethicon's

20  motion to exclude testimony by Dr. Guelcher relating to his

21  new supplemental reliance list.  I caution the parties in the

22  future to strictly adhere to deadlines.

23         In the *Edwards* case, the plaintiffs moved to adopt

24  Dr. Rosenzweig's supplemental reliance list as filed in

25  *Huskey*.  Ethicon opposed the motion, arguing that plaintiffs

 1    did not file the report in *Edwards*, and that Dr. Rosenzweig's

 2    fourth supplemental expert report is untimely, because it

 3    includes a new opinion that the Abbrevo is a safer alternative

 4    design.

 5          I need not address Ethicon's first argument because I

 6    agree that Dr. Rosenzweig's opinion is entirely new and was

 7    not contained in Dr. Rosenzweig's original report.  It is,

 8    therefore, untimely and not substantially justified or

 9    harmless.  The parties cannot proffer new expert opinions at

10    this late stage on the eve of trial.  I deny the plaintiffs'

11    motion to adopt Dr. Rosenzweig's supplemental reliance list.

12          In *Edwards*, for the same reason as those stated in

13    *Huskey*, I deny the motion to exclude Dr. Guelcher's testimony

14    as it relates to the supplemental reliance material list.

15          Regarding the motion to adopt Guelcher's supplemental

16    reliance list as filed in *Huskey*, I grant this motion.

17          Dr. Byrkit -- is that how you say it?  Or "Byrkit"?

18    Anybody know?

19          MR. WALLACE:  Generally, Byrkit.

20          THE COURT:  Byrkit.  All right.

21          MR. WALLACE:  Generally.

22          THE COURT:  In *Huskey,* plaintiffs filed a motion to

23    reconsider denial of plaintiffs' motion to permit live trial

24    testimony via contemporaneous transmission in *Huskey*.

25    Plaintiffs originally filed a motion to permit live trial

─── PRETRIAL CONFERENCE ───

1   testimony via contemporaneous transmission of the plaintiffs'

2   implanting physician, Gretchen Byrkit, M.D.  On August 7th,

3   2014, I denied the motion.

4        That same day, plaintiffs moved to reconsider the

5   motion, asserting that on August 1st, Ethicon notified

6   plaintiff of a hard drive belonging to an Ethicon sales rep

7   that contained some references to Dr. Byrkit.  Plaintiffs

8   again assert that live testimony via contemporaneous

9   transmission at trial is the most economical means of

10  obtaining testimony about this additional evidence.  In the

11  alternative, they seek a two-hour deposition to be split

12  between the parties.  Ethicon opposes the motion.

13       There are only three e-mails, exchanges that the

14  plaintiffs rely upon.  Only one mentions Dr. Byrkit in the

15  context of the pricing of the Abbrevo, a product not at issue.

16  And they do point out that one of the e-mails mentions that

17  Dr. Byrkit's partner received training on the TVT-O procedure

18  and that that is relevant on proof regarding when Dr. Byrkit

19  would have read the IFU.  If I recall, she testified that it

20  was sometime around the time she started using it.  Ethicon

21  argues that the document doesn't mention Dr. Byrkit.

22       I find the plaintiffs' argument a stretch.  I've

23  considered the arguments of the parties.  I decline to

24  reconsider.  The motion to reconsider is denied.

25       I've ruled on all motions the parties filed related

─── PRETRIAL CONFERENCE ───

1  to replacement of placeholder documents in both cases.  I rely

2  on the parties to address each and every instance in which

3  they have filed placeholder documents.  I encourage you to

4  review your filings to make sure there are no lingering

5  placeholder documents so that in the event there are appellate

6  proceedings, this doesn't create a problem.

7         Maintaining a good record for appellate purposes is

8  often difficult in my experience in these MDLs, but, as you

9  would find out if you were the appellant or the appellee, for

10  that matter, it may be very important to you in defending or

11  prosecuting the appeal.

12         I may have mentioned before, I inherited a bunch of

13  MDL cases in California that had been sent back to the

14  District Court.  The record was -- I mean, the files were

15  empty.  I really had very little idea of what the MDL judge

16  had done with regard to certain matters, so it was a problem.

17         For future reference, after full and fair

18  consultation with Kate Fife, we're not going to use this

19  practice in the future, filing placeholder documents and then

20  moving to replace them.  For the next bellwether trial, which

21  I think is in December, we will return to the regular practice

22  of filing a motion to seal well in advance of the filing of

23  the motion.  The PTO related to the *Bellew* bellwether case

24  will be amended to reflect this change.

25         By now, I would assume, since these cases have

─ PRETRIAL CONFERENCE ─

1   considerable similarities, I would think most of the issues

2   related to confidential documents should be resolved, at least

3   I'm hoping.

4         Trial protocol, trial time.  Thanks to Kate Fife, my

5   original inclination to reduce the time back to eight days,

6   counting the jury selection day, it will be instead nine days,

7   split evenly between the parties.  But jury selection day on

8   Friday, even if it doesn't take the whole day, will be counted

9   as a full day of trial.

10        The nine days counts jury selection, openings,

11  closings, the presentation of each side's case, bench

12  conferences, objections, lunches, and other breaks.  It does

13  not include jury deliberations.

14        Some of the following things I'm saying I don't feel

15  are necessary with able and experienced counsel, but just so I

16  say them:  I will not tolerate cumulative testimony.  You

17  should use your best witnesses first to offer testimony on a

18  particular topic, because I will not hear cumulative

19  testimony.

20        I do not, nor do I think it appropriate for the jury,

21  to hear how this surgery is done more than once.  We don't

22  need to see it in every version possible:  On paper, via

23  video, by radio or telegraph.  Pick one and go with it.  On

24  each side, of course.

25        And you certainly may use whatever illustrations you

1  need for cross-examination.  I just think once through the

2  surgery is enough if it's a fair depiction of the surgery, and

3  if it's not, somebody object.

4        I'll try to stay out of your case, but I'm not always

5  perfect at it.  I'll do the best I can.

6        If you have an objection, don't argue it; just make

7  it.  Often, we'll hear the grounds at sidebar if it's not

8  apparent to me.

9        Unnecessary things to remind you:  Stand when you

10  examine the witness or address the Court, when making any

11  argument or objection.  When approaching the clerk, the

12  witness or the bench, a "Mother, may I" request.  "May I

13  approach" is appropriate.

14        Feel free to move about the courtroom, any way you

15  want to, any time you want to.  Just don't poach or intimidate

16  the witness unless you have to move close enough to hand a

17  document, then get back.  Try to stay away from blocking the

18  view of the court reporter of the witness.  She needs to see

19  both your face and the witness' face.  So try not to block

20  that.

21        Now, this is a rule that those of you that have tried

22  cases in front of me before know, but you need to write this

23  one down.  If you run out of witnesses, you rest.  That's the

24  end of your case.  So have them all here.  It is not

25  acceptable to say, "Judge, I had an expert witness, I didn't

—— PRETRIAL CONFERENCE ——

1  think we would get anywhere near this close, at this time he's

2  stuck in a fog bank in Cleveland."  Get them all here, ready

3  to go.  It is not an excuse.  "Judge, the plaintiffs told me

4  they were going to take three-and-a-half days or use all their

5  time and they've only been standing up here for three hours.

6  I didn't know to have my witnesses here."  It's not an excuse.

7  You run out of witnesses, your case is over.

8         I expect each side to have a timekeeper.  We'll

9  compare time each day, and I or my law clerks, more likely a

10 law clerk, will be keeping time as well.  But I don't plan to

11 be a referee over time.  Just keep honest time of when

12 somebody started and when they stopped and who has the floor.

13        I'm not going to place any time limits on openings or

14 closings.  I thought about placing a limit on openings of an

15 hour because I can't bear to listen longer than that, but I

16 won't.  I would strongly recommend that you hold your

17 arguments and your openings to an hour each.  A good sermon is

18 12 minutes long, and if it's appropriate for that serious

19 subject, I'm not sure you need that many more minutes to

20 communicate your message.

21        Quite frankly, and this is a little bit pushy on my

22 part, but I've often said that lawyers who can't state their

23 case in a paragraph or two don't have a good case.  I know you

24 have to argue it and I know you have to say what the witnesses

25 said, but no limits.

─────────── PRETRIAL CONFERENCE ───────────

1          We'll sequester the witnesses, except for experts who

2   happen to be available or listening to another expert.

3          Robin Clark has e-mailed with you all, I believe,

4   concerning exhibit stickers and exhibit lists.  Is that right?

5          MR. WALLACE:  Yes, Your Honor.

6          THE COURT:  Okay.  At trial, the Courtroom Deputy,

7   Robin, obviously gets the original document to be marked.

8   Please plan to keep your own set of exhibits and keep them

9   straight.  Sometimes it's -- you can't help it but it becomes

10  problematic when you ask to borrow or look at the originals.

11  This slows things down and you should have at all times a good

12  set of both in front of you.  Whatever the other side has

13  offered, they will have provided you a copy.

14          Any matters to take up with regard to exhibits,

15  besides what I'm going to talk about with Judge Eifert?

16          MS. JONES:  I have a question.

17          THE COURT:  Yes, ma'am.

18          MS. JONES:  And I apologize, Your Honor.  We had some

19  discussion about it and confusion at the last trial.  As to

20  learned treatises, those that come in under 803(18) but that

21  do not go back to the jury --

22          THE COURT:  Um-hum.

23          MS. JONES:  -- my recollection is we had them all

24  marked, but that the preference was not to give them to Robin.

25  Is that correct?

─────────────── PRETRIAL CONFERENCE ───────────────

```
 1          THE COURT:  That's correct.  I don't see any need.
 2   They would be read out loud as used, so I don't think there's
 3   any need to give them to Robin.  Anybody disagree with that?
 4          MS. JONES:  I don't think so.  I mean, I think that
 5   they're marked on the exhibit list and you can refer to them
 6   by exhibit number --
 7          THE COURT:  Exactly.
 8          MS. JONES:  -- and whatever, we'll still have a
 9   reference for appellate purposes --
10          THE COURT:  Yes.
11          MS. JONES:  -- if we need to.  I just wanted to
12   confirm that.
13          THE COURT:  Absolutely.
14          You may show clips, no testimony, and documents in
15   your openings to the extent they're not otherwise
16   objectionable.  It's helpful to share copies of the documents
17   that you're going to use in your opening with the court
18   reporters.
19          I should tell you that -- well, you know this.
20   Original exhibits shouldn't have any writing or highlighting
21   on them by counsel.
22          There was a suggestion by somebody that we limit each
23   side to 50 exhibits, that each side reasonably in good faith
24   intends to use at trial.  I'm not going to put a formal limit
25   on them, but I would say 50 is God's plenty.  It will be up to
```

PRETRIAL CONFERENCE

1    you.

2          Let me be clear.  I don't intend to have a box of

3    documents or a huge file marked as, "Your Honor, may I have

4    this marked as Exhibit 17?"  I'm not going to introduce or

5    allow to be introduced boxes and huge files.  If you can't lay

6    a foundation for each and every relevant part, it can't be

7    admitted as one exhibit.  In other words, we need to know what

8    the exhibit is.  This may have particular relevance to the

9    plaintiffs.

10          I'm just going to make this up:  "Ladies and

11   gentlemen, I hand you, Mr. Witness, what's been marked for

12   identification these three bankers boxes full of stuff and ask

13   you what they are.

14          "Well, those are copies of the clinical trial records

15   that we performed on the rats and the pigs and the chickens."

16          I'm not going to let you put those things in.  You

17   may have the witness testify as to what they did or didn't do.

18   You may even have the witness answer about how many pages

19   there are of records relating to that.  But it is not

20   acceptable to have a jury take bankers boxes full of documents

21   back to the room and expect that they will fairly consider

22   what's in those boxes.  In other words, an exhibit has to be

23   offered to prove an essential element of the tort alleged or

24   in defense.

25          Having said all that, I realize there are going to be

─ PRETRIAL CONFERENCE ─

 1  times when that sort of issue is going to come up, and I'll

 2  just have to deal with it when it does.

 3       The next topic is medical records, and the parties

 4  requested that I talk about this.  Who wants to talk first?

 5  Plaintiffs' side?

 6       MS. FITZPATRICK:  Certainly, Your Honor.

 7       There are -- we have compiled jointly medical records

 8  that go back in time all the way to 1999 and then up through

 9  the present time.  And I have been in the process of dealing

10  with the defendants.  We believe that the medical records that

11  should be admitted at trial are the medical records that are

12  relevant or related to the TVT-O surgery and the injuries that

13  she sustained, that the medical records certainly going back

14  to 1999 on issues such as a sinusitis and antibiotics, but

15  even the medical records on things like the back surgeries

16  that you had excluded Dr. Pramudji from testifying about and

17  the like should be sorted out.

18       Our concern is there are voluminous medical records

19  here that are not relevant.  I'm thinking of the bankers

20  boxes.  We're talking many bankers boxes of medical records,

21  and that we would like to have those focused down to the

22  medical records that are related causally to the injuries that

23  she has in this case.  And I've been trying to work that out

24  with --

25       THE COURT:  Before the other side replies, this is a

--- PRETRIAL CONFERENCE ---

1   perfect example.  It may well be that records other than the

2   ones that you have identified may have relevance, if, for

3   example, the plaintiff had previous pelvic pain and now is

4   complaining of pelvic pain.  I mean, there's common sense

5   involved here as to what medical records have relevance.

6   Somebody that went to see the doctor for a cold or for a

7   sprained ankle or something like that, we don't need those

8   medical records.  I think -- I don't see how it would be too

9   hard for you all to agree as to what comes in.

10          MS. FITZPATRICK:  Well, we have been in the process

11  of doing that, and I did provide to the defendants a list by

12  Bates number of the medical records that we did not ultimately

13  believe were relevant.  And to the extent that certainly if it

14  deals with pelvic pain or issues like the diverticulosis that

15  Your Honor has ruled do come into trial, those are all

16  included in the medical records.

17          It's the other conditions that we don't believe any

18  treating physician or any expert has been able to opine is

19  causally related to or linked in any way to the current pelvic

20  issues that she's having.  And we haven't been able to have

21  that discussion.  We've been trying to schedule the time to

22  actually go through those medical records and determine --

23          THE COURT:  Well, since you all haven't talked about

24  it, I'll stop talking about it.  I'll wait until you finish.

25          Did you want to say something?

1        MS. JONES:  I think that -- I think that the issue,

2   Your Honor, will come up in the context before Judge Eifert.

3   There is a very clear, defined disagreement in that we do

4   believe that Ms. Huskey's past medical treatment, insofar as

5   it has been identified to potentially relate to explain her

6   pain or is one of those things that her doctors has

7   considered, including such things as her prior back surgery

8   and whatever, should come in, and we've got the authority

9   that -- the legal authority that they'll have in front of

10  Judge Eifert tomorrow to support that.  Whether that means

11  necessarily that all of the documents, I mean, I'm not sure

12  that -- it's important to get the testimony.  Whether or not

13  you necessarily need all of the medical records might be a

14  whole different issue.

15        THE COURT:  Okay.  I'll say a little bit more about

16  Judge Eifert and the discussion we've had -- because she's

17  taking care of this for me tomorrow, as you know.

18        MS. JONES:  Um-hum.

19        THE COURT:  -- in a minute.  But somebody also asked

20  me to talk about a literature list.  Is that something beyond

21  what you just talked about?

22        MS. JONES:  I think --

23        MR. WALLACE:  Go ahead, Christy.

24        MS. JONES:  Mr. Wallace and I have talked about it.

25  I think that the issue was it's not so much a matter of

---
PRETRIAL CONFERENCE
---

1    discussing it, is that we have had a discussion about trying

2    to limit the literature and exclude certain things so that --

3    and we all recognize that something may come up that's not

4    anticipated.  But the reality of it is we probably can come up

5    with a shorter list.  And I think that that's what --

6              MR. WALLACE:  Well, that's the idea.

7              MS. JONES:  -- the issue is.

8              MR. WALLACE:  I think what we were thinking was

9    something like the 63 RCTs, plus another 50 articles.  I mean,

10   there is just no way, in a nine-day trial including jury

11   selection, to get through even just the barest fraction of

12   those articles.  So it just wouldn't make sense to have 1900

13   articles listed on the list.

14             THE COURT:  No, I certainly -- I certainly agree.

15             MR. WALLACE:  So --

16             THE COURT:  There is no chance that I'm going to put

17   the jury through medical school.

18             MR. WALLACE:  Thank you, Your Honor.

19             THE COURT:  So we'll -- I'm sure you can agree --

20   agree on the low side.

21             Proffers should be coordinated with the court

22   reporters and done in the presence of opposing counsel and one

23   of my law clerks.  There's been some discussion, particularly,

24   I think from the defendants, about proffering evidence related

25   to the 510(k) issue.  I believe that I have definitively ruled

```
                    ─── PRETRIAL CONFERENCE ───
```

 1   as a legal matter on the 510(k) issue, and under Rule 103(b),

 2   I don't know what would be proffered, but I would ask.

 3           MS. JONES:  What I anticipate, Your Honor, is that --

 4   our appellate lawyers suggest to us that what we need to

 5   proffer are, in fact, the documents and the, if you will, the

 6   declarations that we actually filed earlier to support the

 7   motions that related to preemption and so forth.  We actually

 8   need to make the affirmative proffer in the case in chief to

 9   preserve the appellate error, so I'm being told.

10           THE COURT:  Are they already in the record as

11   exhibits to the summary judgment motion?

12           MS. JONES:  They're in the record already.

13           THE COURT:  Um-hum.

14           MS. JONES:  But I am told by those who claim to know

15   more than I do that --

16           THE COURT:  Tell them to give me a brief on why,

17   after I have ruled definitively on this legal issue, they are

18   still entitled to do that.  And I'll tell them I promise to

19   read their brief.

20           MS. JONES:  Well, I just -- I mean, that's fine.

21           THE COURT:  Yeah.

22           MS. JONES:  That's the only reason for it.  We don't

23   intend to reargue it with Your Honor.

24           THE COURT:  Right.

25           MS. JONES:  It's simply a matter of I have to

PRETRIAL CONFERENCE

1  preserve my record, and that's the sole purpose for doing

2  that.  If we don't need to do it and if there is a way that we

3  can figure out, Your Honor, that it's un- -- because I know

4  that we have had some discussions with Kate, if there is a way

5  that we can figure out how to do this so it's applicable

6  across the board, so that I don't have to continue to make

7  that motion, which I know what Your Honor is going to say, and

8  I'm not sure I can come up with --

9        THE COURT:  If I haven't ruled on it in some respect,

10 I think it's perfectly appropriate to make a proffer.  If, on

11 the other hand, I've made a definitive ruling on the issue,

12 it's unnecessary to make a proffer.  So...

13       MS. JONES:  Well, I'm going to tell my appellate

14 lawyers that --

15       THE COURT:  Just tell them --

16       MS. JONES:  -- and if my appellate lawyers think that

17 that's not right, I'm going to tell them to give us a brief,

18 and then we'll figure out the best way to deal with it.  How

19 about that?

20       THE COURT:  And I want you to have as complete a

21 record as you want to have.  (Indicating.)

22            (Discussion held off the record.)

23       THE COURT:  Back on the record.

24            (Laughter.)

25       THE COURT:  Let's see.  Who's going to -- is there

 1   something about the statuses -- the status of the witnesses I

 2   need to know?

 3        MR. WALLACE:  Well, I think we gave the Court a

 4   pretty good idea of the witnesses that we'd be calling.  We

 5   understand your issue about cumulative witnesses.  There is

 6   going to be a lot of medical testimony in this case.  The

 7   issue, though, is when, for example, Dr. Rosenzweig will speak

 8   to general causation, as you have known and seen him before.

 9   There are a couple of other additional expert witnesses that

10   you've allowed.

11        We've looked at your *Daubert* order.  The only thing I

12   would -- we're not going to be cumulative, Your Honor.  If we

13   decide to bring a third medical expert witness, it will be on

14   a discrete issue having to do with a discrete function of this

15   lady's pelvic floor.  And I think in many cases, a urologist

16   is not the person to speak about those issues.

17        So you've ruled both on Dr. Steege and Dr. Carey, and

18   to the extent that those witnesses are called, we'll be

19   calling those witnesses, quite frankly, later in the case.  So

20   we'll be careful is what I'm saying, and I've heard everything

21   you've had to say about it.

22        THE COURT:  I appreciate that.

23        Here's what I'm saying in particular, and I think I

24   put this in the *Daubert* rulings.  Just because somebody passes

25   a *Daubert* test doesn't mean that their testimony wouldn't be

───── PRETRIAL CONFERENCE ─────

1    cumulative, when offered with other people who passed the

2    *Daubert* test.  So you might have ten experts who qualify under

3    *Daubert*, but only perhaps one of them will be allowed to

4    testify as to a particular subject matter.  I didn't mean by

5    my order in the *Daubert* motions to suggest that the testimony

6    of all of these witnesses was admissible in that sense, only

7    in -- only that it was reliable under the Federal Rules of

8    Evidence and under the Supreme Court's standards.

9            MR. WALLACE:  Thank you, Your Honor.

10           MR. THOMAS:  Your Honor, one more thing on that.

11           THE COURT:  Yes.

12           MR. THOMAS:  Can we confirm that Drs. Dunn and

13   Dr. Pandit are withdrawn?

14           MR. WALLACE:  Yes.

15           MR. THOMAS:  Thank you.

16           MR. WALLACE:  And I will rely on my conversation with

17   Christy with respect to the witnesses she may -- you may or

18   may not be bringing.

19           MS. JONES:  Yeah.

20           MR. WALLACE:  I want to make sure we're on the same

21   page.

22           MS. JONES:  We're on the same -- I have no reason to

23   change what I told you the other day, in terms of who we were

24   likely to call --

25           MR. WALLACE:  Okay.

---------------------PRETRIAL CONFERENCE---------------------

1          MS. JONES:  -- and that we would identify anybody for

2    you if that changed.

3          MR. WALLACE:  Okay.

4          THE COURT:  Like motions in limine, designations of

5    depositions and things, videotapes have proven to be more and

6    more difficult and more and more prominent in the trials of

7    civil causes.  I have no doubt said to you when I got out of

8    law school, I had never heard of a motion in limine.  And I

9    still receive in all the cases, and this one was no exception,

10   motions in limine which are basically, "Judge, how about

11   ruling on this evidence right now?"

12         I'd rather just rule on it at a trial.  And as you

13   can tell from my rulings, I saved several things to decide in

14   the context in which it's offered, whether it should come in

15   or not.  We tried an *Ethicon* case -- *Lewis*?  Is that the name

16   of it?

17         MS. JONES:  Yes, sir.

18         THE COURT:  And we had considerable difficulty with

19   the agreements and disagreements over exhibits and the

20   designations of depositions, some of which is perfectly

21   understandable because exactly what you're going to offer and

22   exactly how you're going -- exactly the order of proof, you

23   can't decide far in advance.  On the other hand, the

24   overwhelming bulk of what you're going to do you already know,

25   and we should try to resolve any of these disputes early.

1      So I know you have a hearing tomorrow morning before

2  Judge Eifert, and she will resolve all of the objections

3  related to the deposition designations, and I will adopt, have

4  some good cause and reversible error and whatever else you

5  might reserve, her rulings.

6      I expect all objections in video depositions and/or

7  written depositions to be resolved when you appear for trial

8  on August 25th.  Any additional time attributed to this will

9  go against both sides two times over.  So if it takes five

10 minutes, it will be counted as ten.

11     I feel like the first trial, for reasons that I am

12 unaware of, and that the lawyers are too polite to tell me,

13 there just was too much disagreement, so if you're going to

14 fight it out, poor Judge Eifert is going to have to hear it

15 tomorrow and not at trial.

16     I hope that you will have narrowed down for Judge

17 Eifert the objections that remain.  You're all smart, able and

18 effective lawyers.  You know the Federal Rules of Evidence.

19 Her time is valuable.  She's done all this added work on this

20 MDL in addition to her regular work.  Don't waste her time.

21 Present only true disputes that you in good faith believe

22 are -- have considerable merit.

23     I've told her not to send you back -- I've told her,

24 rather, that she should send you back to your hotels or your

25 offices tomorrow if you haven't made sufficient progress on

 1   these designations and show up with boxes full of stuff to

 2   talk to her about.

 3         In the proposed pretrial order, Ethicon proposes the

 4   parties be required to provide opposing counsel with the

 5   actual video testimony they intend to play at trial, not just

 6   names and witnesses, no less than 48 hours prior to the

 7   testimony being played.

 8         If I were Ethicon, and I had experienced the *Lewis*

 9   trial, I would have made that suggestion as well.

10   Nevertheless, I don't think it's fair to the plaintiffs to

11   make that as a hard and fast rule.  But it is a very strong

12   suggestion that you work out the problems in advance on these

13   issues.  I'm not going to tell you how to try your case or in

14   what order you should offer witnesses or what pieces you

15   should offer, but the objectionable parts should be resolved.

16   If there's an objection, don't bring it to court.

17         So every -- at the end of every trial day, you need

18   to provide the other side with the names of witnesses that you

19   intend to present the next day.  I think that's reasonable,

20   and I think both sides can do that.

21         MS. JONES:  I actually think we agreed to be a little

22   bit more generous and do it in the morning before if that's

23   acceptable.

24         THE COURT:  The more generous you are, the better it

25   suits me.  I just --

---

PRETRIAL CONFERENCE

---

1        MR. WALLACE:  Judge, we have started off on the right

2   foot.

3        THE COURT:  Yeah.  Does this cover that video

4   transcript protocol issue you raised this morning with Kate?

5        MR. WALLACE:  It does to -- to about 99 percent of

6   it.

7        I think that the -- it was our suggestion on the

8   video protocol, what we think should happen is when we play

9   our testimony in our case in chief, we understand that it's

10  Your Honor's practice that if the doctor was there, that there

11  would go ahead and be a direct exam.  So we're not asking that

12  it be played in their case in chief.  What we're suggesting,

13  though, is that we play our part and then it flips over to

14  their video feed and then there's an announcement that it's

15  now the cross exam or whatever of Dr. So-and-so or witness

16  so-and-so.  I would assume that's acceptable?

17       THE COURT:  In other words, present the entire

18  witness' testimony at the same time by taking the --

19       MR. KUNTZ:  Yes.  And just for clarification, and I

20  think we did this in *Lewis*, we'll play in our cut any counters

21  that are within that cut but when it flips to your direct

22  exam, I think we did this, you stand up and say, "We're now

23  going to play the direct exam."

24       MS. JONES:  That's fine.  We just play it all at the

25  same time.  Just we are responsible for our designations other

—— PRETRIAL CONFERENCE ——

1 than what's included in that portion that --

2          MR. KUNTZ:  Exactly.

3          MS. JONES:  -- that they're playing.  I think that we

4 can work that out.

5          THE COURT:  Good.

6          We're going to have a pool of approximately 30 to 34

7 jurors.  That ought to be plenty.

8          Oh, you had something else?

9          MS. JONES:  Well, on the jurors, we gave to Kate a --

10 the identification of a client of the Thomas Combs firm that,

11 presumably, Your Honor would excuse because he is a client of

12 the firm and, presumably, the plaintiffs would not want him

13 there.

14          MR. WALLACE:  Depends on how happy the client is at

15 this point.

16          THE COURT:  That's a good point.  He may not be very

17 happy at all.

18          MR. WALLACE:  We might want some discovery on that

19 issue.

20          THE COURT:  Depends on who he's got.  Does he have

21 Susan Arnold, by any chance?

22          MS. JONES:  Absolutely does.

23          THE COURT:  Well, in that event, you may have raised

24 an issue of importance.

25          (Laughter.)

—PRETRIAL CONFERENCE—

1          THE COURT:  I'll excuse that juror.

2          MS. JONES:  One other question, Your Honor, while

3    we're talking about jurors.  Before -- and I apologize.  I

4    don't think it's in the order before.  But last time, you

5    asked that we prepare written questions, additional

6    questions --

7          THE COURT:  Yeah.

8          MS. JONES:  -- for -- based upon the questionnaires

9    that we got and to have them there --

10         THE COURT:  Uh-huh.

11         MS. JONES:  -- at sidebar if you wanted to.  Do you

12   want us to follow that same procedure?

13         THE COURT:  I think so.  I mean, it worked pretty

14   well, I thought.  I didn't always ask all the questions but --

15   did you find a problem with it?  I'll do something

16   different if you --

17         MS. JONES:  I didn't find a problem with it, except

18   that we did it, and the plaintiffs did not in that case.  And

19   I just -- I think we ought to be on the same wavelength, and I

20   appreciate --

21         MR. WALLACE:  Should we just try to create a joint

22   list?

23         MS. JONES:  No, no, no.  It's not a --

24         MR. WALLACE:  Oh.

25         MS. JONES:  It was just that we looked at the

─── PRETRIAL CONFERENCE ───

1  questionnaires, and anticipating that some would be called at

2  sidebar, we went up there with written questions of what we

3  thought, based upon what we knew --

4         THE COURT:  The juror might have a medical condition

5  that was revealed on the thing that I wouldn't have explicitly

6  covered in the voir dire or that one side or the other might

7  want to explore further.  So if you have -- if you have

8  individual written questions that you think you might want to

9  ask based on the jury questionnaire, and you can look at the

10  voir dire I did in *Lewis* to know what I'm going to ask because

11  it will be pretty much the same with the inclusion of some of

12  your suggestions in this case, I think we can move fairly

13  quickly through it.  Does that work all right for you?

14         MR. WALLACE:  Yes, Your Honor.

15         THE COURT:  Okay.

16         MS. FIFE:  It does help to have copies for the judge

17  and each side.

18         THE COURT:  The supplemental juror questionnaire is

19  almost ready and they should be ready tomorrow, Friday at the

20  latest.  The jury administrator will contact you with that

21  information.  I'm going to provide you with that case-specific

22  voir dire and my standard voir dire the morning of trial,

23  although it will be very similar to *Lewis*.

24         I'll hear any objections.  I would refer you to, not

25  only the *Lewis* case but the *Cisson* case which was a case

---
PRETRIAL CONFERENCE
---

 1   against Bard.  And I'll take the questions you submitted in

 2   your joint -- proposed joint pretrial order.

 3          I wish that the Marshal Service in the building were

 4   a little more flexible, but it's not.  So the building opens

 5   at 8.  I'm afraid if you get here, you're just going to be

 6   standing outside waiting because they won't let you in until

 7   they have the CSOs at their posts, at the magnetometer.  You

 8   can access the courtroom at 8:30.  I hope that you can do it a

 9   little bit earlier than that, but that's when I can assure you

10   it will be open.  And it is at 8:30 every morning that we will

11   take up any matters that you want to take up before the jury

12   gets there.  And that includes on day one, if you think of

13   something we haven't talked about today and you want to talk

14   about it at 8:30, we'll talk about it at 8:30 Friday or 8:30

15   the following day of trial.

16          We'll take -- the typical day runs 8:30 to noon with

17   a one-hour break for lunch.  Mid-morning, I take a 15-minute

18   break.  The afternoon session starts at 1 and goes to 5:00, or

19   as soon thereafter as it logically can conclude.  If a witness

20   is within a minute of finishing their testimony, we'll

21   probably -- well, if you finish with a witness and it's one

22   minute till 5, then we'll stop.  If you finish with a witness

23   and it's 15 till 5, I'll ask you to call your next witness.

24   In other words, we're going to use the whole day.  And when I

25   tell you I'll take a 15-minute break, I won't take longer.

—— PRETRIAL CONFERENCE ——

1   When I say I'll take an hour for lunch, I won't take longer.

2   I'll stick to the schedule.  And I ask you to do the same.

3         We have the rooms on either side of the entry to the

4   courtroom.  They'll be open from 8:30 until 5.  Again, I hope

5   it's a little before 8:30.  They'll be locked for you each

6   night.

7         I understand from your pretrial memorandum that

8   you've been in touch with the IT staff and I assume you've

9   completed the certification required by the local rules.

10         I'll be in another trial, surprisingly, the week of

11   August 19th.  For purposes of setup in the courtroom, you may

12   set up Thursday afternoon, before 3:30, or Friday afternoon

13   after we finish jury selection.

14         Now, I'm not saying that it's a dead certainty that

15   any case is going to go to trial, but this one's been pending

16   for a couple years and I've ruled on almost every issue in the

17   case and there's one little issue remaining and they want to

18   try it.  So do I think it's really going to go to trial?  No,

19   I don't.  But the lawyers promised my law clerks it is.  But

20   it's not that I don't believe them.  It's just I don't think

21   it will.

22         I think most of you met Carol.  Ms. Farrell is my

23   outstanding court reporter.  She has attained Tony Rolland,

24   who is an outstanding court reporter, to assist her and

25   provide you with daily copy.  There won't be realtime

---
PRETRIAL CONFERENCE
---

1    available.  I ask you to -- they're very good court reporters,

2    so you don't have to dictate slowly, but you shouldn't give it

3    the machine gun treatment either.  And particularly be aware

4    to -- of the court reporters' job to make a good record for

5    you when you're reading.  Lawyers have a tendency, as we all

6    do, when we read aloud to go fast.  Don't turn your back on

7    her when you're talking.

8            The Local Rule 83.15(e) only allows attorneys to

9    bring cell phones, laptops and iPads into the courtroom for

10   purposes of note-taking.  However, the use of a wireless

11   communications device for the purposes of transmitting and/or

12   receiving data while in the courtroom is prohibited.  That

13   doesn't mean it's prohibited in those counsel rooms or

14   outside.  You should put -- when you're in the courtroom, cell

15   phones should be on airplane mode.

16           And as an exception to the local rule, I will permit

17   your support staff, whom you believe need access to computers,

18   cell phones and the like, to bring them in as well, if you'll

19   provide Kate with a list of those persons that she can give to

20   the marshals.  And the staff working in the rooms in the back

21   can obviously access the internet, access legal research and

22   so forth.  Can't do it from in the courtroom.  Those of you

23   who are more -- well, all of you that are more computer

24   literate than I am know that it shows up on my cell phone if

25   there's a wireless device on in my courtroom.  I don't expect

─────────── PRETRIAL CONFERENCE ───────────

1  there to be wireless devices on unless there's some reason for

2  them wanting to be on.  I held myself in contempt once because

3  my phone rang, and I'm here to confess on the record that I

4  did not end up sentencing or fining myself.

5          (Laughter.)

6          THE COURT:  We'll be providing tap water during the

7  trial.  You can bring your own water if you wish.  Some people

8  are still afraid of Charleston water.  I can tell you that I

9  drink it and haven't had a problem, but then I'm old.  It may

10 take a long time to get me.

11         The stipulations you made in the proposed joint

12 pretrial order, I need your suggestions as to the point in

13 trial when you would like for me to read those stipulations,

14 if you could agree on that.

15         MR. WALLACE:  I believe most of them related, Your

16 Honor, to evidentiary issues, so if there's a few that we'll

17 read, we'll make sure we confer with each other and get that

18 to you.

19         THE COURT:  Whatever -- whatever, however you want it

20 to get into the record, just let me know.

21         MS. JONES:  All right.

22         THE COURT:  On Page 10 of the proposed pretrial

23 order, I believe that Ethicon's statement of the law with

24 respect to the design-defect, consumer-expectation test is

25 incorrect.  Ethicon states, "In a case such as this where the

--- PRETRIAL CONFERENCE ---

1    learned intermediary doctrine applies, the relevant consumer

2    is the learned intermediary, not the patient or the average

3    layperson."

4           The Illinois Supreme Court considered this very issue

5    in relation to a catheter connection and said that the

6    patient "could have reasonably expected that her IV catheter

7    connection, if properly designed and manufactured, would be

8    safe for use for its intended purpose.  She was the person who

9    would be harmed if the device failed."

10          That's *Hansen versus Baxter Healthcare*, 198 Ill.2d

11   420 at Page 435.  That Court then upheld liability on design

12   defect where the evidence showed that the device did not

13   perform as the ordinary patient would expect.

14          In a separate Illinois Supreme Court case, the Court

15   applied the consumer-expectation test to the patient where she

16   claimed that a prosthetic knee was defective.  That's

17   *Haudrich*, H-A-U-D-R-I-C-H, *versus Howmedica*,

18   H-O-W-M-E-D-I-C-A, 169 Ill.2d 525 at 542.  Quoting from that

19   case:  "Sufficient evidence was presented to support a finding

20   that the device failed to perform in a manner reasonably

21   expected in light of its nature and intended function, and

22   subjected the plaintiff to an unreasonable risk of harm beyond

23   that contemplated by an ordinary person."

24          Now, my additional comment to that is the learned

25   intermediary doctrine is, generally speaking, a doctrine which

--- PRETRIAL CONFERENCE ---

1  defines the duty to warn in -- the duty to warn, and it's a

2  failure-to-warn issue in the usual case.  So in the

3  design-defect case, the learned intermediary doctrine, I

4  think, was incorrectly applied as stated in that brief, and

5  also holds -- as a matter of passing interest, and simply to

6  clutter the record, I add that the courts have not been

7  extraordinarily helpful to counsel in some of the discussions

8  of the intermediary doctrine, learned intermediary doctrine,

9  referring to it sometimes as an affirmative defense, other

10 times in terms of duty and so forth and so on.

11        Several District Courts, even in an MDL case, I

12 believe, got it wrong.  And I'm issuing an opinion shortly

13 that will say that.  So, for whatever it's worth, that's my

14 opinion.  Doesn't hurt to have some legal rulings in a case in

15 case you lose.  You might want them.

16        Anything else?  Any questions about anything?  I

17 really do want to stay out of your case.  Just behave

18 yourselves and act like the good lawyers you are and I'll do

19 my best.

20        MS. JONES:  Your Honor.

21        THE COURT:  Yes, ma'am.

22        MS. JONES:  I do have a couple of issues --

23        THE COURT:  Sure.

24        MS. JONES:  -- that we have discussed or not

25 discussed, and one of those is, I have to just be candid with

─ PRETRIAL CONFERENCE ─

1   Your Honor, as a result of the issues that have been raised in

2   some of the spoliation motions, despite the fact that Your

3   Honor has ruled on that and that's out now, we have inhouse

4   counsel who are concerned about, if they show up here in the

5   courtroom, if they're going to be subpoenaed in the courtroom

6   and called on that issue, and we have asked for an agreement

7   that we won't be having inhouse counsel subpoenaed or

8   called if they --

9           THE COURT:  If the issue has been ruled upon and

10  anybody tries to raise it again, I will act appropriately.

11          MS. JONES:  Okay.

12          THE COURT:  I don't think anybody will do that.

13          MR. WALLACE:  And I think I just heard that.

14          (Laughter.)

15          MS. JONES:  I don't think so.  I mean, it's just --

16  it's a legitimate --

17          THE COURT:  It is.

18          MS. JONES:  -- question for inhouse counsel.

19          MR. WALLACE:  And as counsel for Huskey, we have no

20  interest in doing that.

21          MS. JONES:  Thank you.

22          (Discussion held off the record between the law clerk

23  and the Court.)

24          THE COURT:  Judge Eifert hasn't ruled on your motion

25  for reconsideration, I'm told by Kate.

─────────────── PRETRIAL CONFERENCE ───────────────

1            MS. JONES:  That's true, but it's been for awhile

2     so --

3            THE COURT:  Whatever's going on --

4            THE LAW CLERK:  Maybe that's never going to be ruled

5     on.

6            MS. JONES:  I don't anticipate that that's --

7            THE COURT:  I don't think it will be a problem.

8            MS. JONES:  There is one other issue, Your Honor,

9     that I raised and, frankly -- well, two other issues.

10           One, we had to -- and this relates to the IT

11    department.  If you'll remember, and I'm sure Kate does, last

12    time we had to come get specific information -- permission

13    from you to place the television screen where we did, which,

14    as you'll recall, was at the end of the jury panel.  Do we

15    have permission to represent --

16           THE COURT:  Yes.

17           MS. JONES:  -- to the IT folks that you have given

18    us --

19           THE COURT:  Yes.

20           MS. JONES:  -- permission to place those things as we

21    need --

22           THE COURT:  Yes.

23           MS. JONES:  -- to?

24           And then one other issue that I hope won't be an

25    issue.  I have not talked with counsel about it, but this

─────────── PRETRIAL CONFERENCE ───────────

1   issue has arisen in other litigation and I just want to give

2   Your Honor a heads-up.

3          Throughout the course of the trial, it's likely that

4   there will be the TVT exemplar used in the course of the case,

5   and we obviously don't have any objection to that being used

6   as a demonstrative.  But we don't think -- we think it's

7   properly a demonstrative and not one that goes back to the

8   jury room because we don't think it's appropriate for jurors

9   to be doing experiments with it and that they're not

10  healthcare providers and it's not --

11         THE COURT:  You might want to brief that because --

12         MS. JONES:  Yeah.

13         THE COURT:  -- there is a defective design claim and

14  there will be testimony with regard to certain particular

15  physical characteristics of the device, I assume.  And the

16  jury might properly want to examine the device in that regard.

17         MS. JONES:  And that's the reason that I raise it,

18  because we would at least like to raise it with the Court so

19  that we don't have a discussion with it in front of the jury

20  at the appropriate time.

21         THE COURT:  Why don't you give me what you've got on

22  that from both sides.  I'm sure you want to.

23         MR. WALLACE:  We do, Your Honor.

24         THE COURT:  And I'm sure you don't.  And I know -- I

25  know what you're talking about.  You're talking about jurors

─── PRETRIAL CONFERENCE ───

1  taking it back there and stretching it and turning it sideways

2  and all that.

3          MS. JONES:  Exactly.

4          THE COURT:  Give me, you know, three pages, four

5  pages, five pages, whatever, that I can read and, what, by

6  tomorrow evening?  You have extra lawyers around here

7  anywhere?  Tomorrow evening all right?  Or Friday?

8          MS. JONES:  How about Friday?

9          THE COURT:  Friday is fine.  I'm not going to read it

10  until next week so --

11          MS. JONES:  Well, that's fine.  It's just one of

12  those issues that, frankly, I don't want to raise in front of

13  a jury.

14          THE COURT:  I understand.  I understand.  I'm leaning

15  toward letting it go back there, so talk me out of that.

16          MS. JONES:  I understand that.  We'll do our best.

17          THE COURT:  Okay.  All right.  Anything else you

18  think we need to brief or --

19          MR. WALLACE:  No, Your Honor.

20          While I'm here, would you mind if --

21          MS. JONES:  Oh.

22          MR. WALLACE:  Go ahead.

23          MS. JONES:  I'm sorry.

24          MR. WALLACE:  I interrupted.  If, just by chance, if

25  you had anybody to show us the inside of the well, I actually

—PRETRIAL CONFERENCE—

 1   haven't been inside --

 2            THE COURT:  Oh, absolutely, yes.

 3            MR. WALLACE:  -- since the first time we showed up.

 4            THE COURT:  You can go through the courtroom.  We'll

 5   open it up and you can go roam around all you want.

 6            MR. WALLACE:  Thank you.

 7            MS. JONES:  In light of the schedule, and in light of

 8   the fact that Friday is going to be charged against us

 9   regardless --

10            THE COURT:  Um-hum.

11            MS. JONES:  -- is there any reason that we couldn't

12   open on Friday afternoon?

13            THE COURT:  Well, do you want to?

14            MR. WALLACE:  I have to think about that.  Especially

15   if -- I mean --

16            THE COURT:  It gives -- it might give you some extra

17   time.  I'm just counting it as a trial day because it's going

18   to be a whole day as far as I'm concerned.  So --

19            MR. WALLACE:  My issue is I was bringing witnesses

20   here to -- to prepare for the coming week.

21            MS. JONES:  The only reason I ask, because my

22   recollection is that we had a jury, I think, before lunch the

23   last time.

24            THE COURT:  That would not be unusual.  That would

25   not be unusual.  Certainly, we would have a jury by early

1  afternoon, mid-afternoon.

2        MS. JONES:  Which, you know, I'm just --

3        THE COURT:  You all talk about it.

4        MS. JONES:  That would give us an opportunity to --

5        THE COURT:  You know, I'm sure both sides, out of an

6  abundance of caution, would like to have as much time as you

7  can.  So see what you can come up with.  I'm willing to work.

8  I'll stay there till 5:00 if you all want to do it.  I hadn't

9  planned to do anything other than select a jury but --

10        MS. JONES:  Well, I mean, frankly, just sitting here

11  thinking about it, as we were going through it --

12        THE COURT:  What we could do --

13        (Discussion held off the record.)

14        THE COURT:  Anything else you need?  Sean, will you

15  go open up the courtroom?

16        THE LAW CLERK:  Sure.

17        THE COURT:  If you all go back through that way --

18        MS. COHEN:  Your Honor, just the second Monday of

19  trial is Labor Day, and I'm just assuming we are not in

20  session that day.  Is that right?

21        THE COURT:  We are not.  But that we will have the

22  five days -- we'll go through, I guess, that next -- nine

23  days, five days the following week and Tuesday, Wednesday

24  Thursday, Friday of the next week, would make it nine, right?

25  Or, no, Friday would be one.  We would be finished Thursday.

──────────── PRETRIAL CONFERENCE ────────────

 1          MS. COHEN:  Thursday.

 2          THE COURT:  Is that right?  I can't add.  I would

 3   have gone to med school if I could do that.

 4          MS. FIFE:  Six, seven, eight, nine, through

 5   Wednesday.

 6          THE COURT:  You all figure it out.

 7          MS. COHEN:  Yeah, that would be eight days.

 8          THE COURT:  We're not going to try it on Labor Day.

 9          MS. FIFE:  Through Wednesday of the second week would

10   be the ninth day, counting Friday the first.  Friday, all five

11   days in the next week, Monday, Tuesday, Wednesday, that's nine

12   days.

13          MS. COHEN:  Okay.  But we don't have court Monday

14   because of Labor day.

15          MS. FIFE:  Correct.

16          THE COURT:  Tuesday, Wednesday, Thursday.

17          MS. COHEN:  So it would be Tuesday, Wednesday,

18   Thursday.

19          MS. FIFE:  Yes.

20          MS. COHEN:  So Thursday will be closings and whatever

21   else.

22          THE COURT:  Right.  The only thing that doesn't count

23   is deliberations, so it may well be that you'll get them

24   confused enough, they stay out on Friday.

25          MS. FIFE:  Wait.  Friday, all five.

─────── PRETRIAL CONFERENCE ───────

1        THE COURT:  It's right.  They got it right.

2        MS. COHEN:  Yeah.

3        THE COURT:  It's nine days counting Friday.

4        Sean, do you want to take anybody who wants to hang

5   out in the courtroom?

6        MS. FIFE:  Show you the rooms of that, off of the

7   courtroom.

8        THE COURT:  And anything -- if you need anything,

9   like from the IT people or whatever, within reason, and you

10  can't get ahold of me or Kate, just tell them I said it was

11  okay.

12        MR. WALLACE:  Thank you, Your Honor.

13        THE COURT:  Okay?

14        (The proceedings concluded at 2:07 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                        **REPORTER'S CERTIFICATE**

2

3        I, **Carol Farrell, CRR, RMR, CCP, RPR,** Official Court

4    Reporter of the United States District Court for the Southern

5    District of West Virginia, do hereby certify that the

6    foregoing proceedings are a true and accurate transcript of

7    the testimony as taken stenographically by and before me at

8    the time, place, and on the date hereinbefore set forth.

9        I further certify that I am neither related to any of the

10   parties by blood or marriage, nor do I have any interest in

11   the outcome of the above matter.

12

13   **/S/ Carol Farrell, CRR, RMR, CCP, RPR**

14

15

16

17

18

19

20

21

22

23

24

25