# EXHIBIT 2

Christopher E. Ramsey, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION

 3

     IN RE: ETHICON, INC.         )  Master File No.
 4   PELVIC REPAIR SYSTEM         )  2:12-MD-02327
     PRODUCTS LIABILITY           )
 5   LITIGATION                   )  MDL No. 2327
     _____  )
 6                                )
     THIS DOCUMENT RELATES TO     )  JOSEPH R.
 7   PLAINTIFFS:                  )  GOODWIN
                                  )  U.S. DISTRICT
 8   Mary Hendrix                 )  JUDGE
         Case No. 2:12-cv-00595   )
 9   Danni Laffoon                )
         Case No. 2:12-cv-00485   )
10   Alfreda Lee                  )
         Case No. 2:12-cv-01013   )
11   Mary Holzerland              )
         Case No. 2:12-cv-00875   )
12   Heather Long                 )
         Case No. 2:12-cv-01275   )
13   Donna Shepherd               )
         Case No. 2:12-cv-00967   )
14   Cheryl Lankston              )
         Case No. 2:12-cv-00755   )
15   _____

16

17

18                     CONTINUED

19                   DEPOSITION OF

20           CHRISTOPHER E. RAMSEY, M.D.

21        Taken on behalf of the Plaintiff

22                   April 7, 2016

23

24
```

Christopher E. Ramsey, M.D.

```
 1   A P P E A R A N C E S
 2

     FOR THE PLAINTIFFS:
 3

     Nate Jones, Esquire
 4   Wagstaff & Cartmell LLP
     4740 Grand Avenue, Suite 300
 5   Kansas City, Missouri 64112
     816.701.1100
 6   njones@wcllp.com
 7

     FOR PLAINTIFF MARY HOLZERLAND:
 8

     Jonathan Orent, Esquire
 9   Motley Rice LLC
     321 South Main Street
10   Providence, Rhode Island 02903
     jorent@motleyrice.com
11

12   FOR PLAINTIFF DONNA SHEPHERD:
13   Matthew C. Barsenas, Esquire
     (Present Telephonically)
14   The Oliver Law Group
     363 West Big Beaver Road, Suite 200
15   Troy, Michigan 48084
     800.939.7878
16   mbarsenas@oliverlg.com
17

     FOR PLAINTIFF CHERYL LANKSTON:
18

     Dawn R. Meade, Esquire
19   (Present Telephonically)
     The Spencer Law Firm
20   4635 Southwest Freeway, Suite 900
     Houston, Texas 77027
21   713.961.7770
     dawnmeade@spencer-law.com
22

23

24
```

Christopher E. Ramsey, M.D.

```
 1

 2   APPEARANCES:  (CONTINUED)

 3   FOR THE DEFENDANTS AND THE WITNESS:

 4   Matthew P. Moriarty, Esquire

     Tucker Ellis, LLP

 5   950 Main Avenue, Suite 1100

     Cleveland, Ohio 44113-7213

 6   216.696.2276

     matthew.moriarty@tuckerellis.com

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Christopher E. Ramsey, M.D.

1     E X A M I N A T I O N

2

                 PAGE

3

 Examination by Mr. Jones        169

4

 Examination by Mr. Moriarty      388

5

 Further Examination by Mr. Jones    396

6

7

8       E X H I B I T S

9

                 PAGE

 *Exhibit 12A, Three Boxes of Materials  170

11 12B and 12C

 Exhibit 13  Invoices 01 - 05    172

12

 Exhibit 14  2015 Form 1099    183

13

 Exhibit 15  Gynecare TVT Tension-free 211

14         Support for Incontinence,

         Instructions for Use

15

 Exhibit 16  Email Chain -     225

16         ETH.MESH.00136905 - -36910

17 Exhibit 17  Email w/ attachment   234

         ETH.MESH.03962012

18

 Exhibit 17B  Carleo's Nightclub website 239

19

 Exhibit 18  Email Chain -     240

20         ETH.MESH.24381539 - -1541

21 Exhibit 19  Email Chain -     249

         ETH.MESH.00999307 - -9311

22

 Exhibit 20  Email - -ETH.MESH.00068712 255

23

24

Christopher E. Ramsey, M.D.

| | | |
|---|---|---|
| 1 | Exhibit 21 | 2006 Performance and Development Plan Summary - Scott Finley - ETH.MESH. 08163751 - -3756 | 257 |
| | Exhibit 22 | Email - -ETH.MESH.03974760 - -4762 | 260 |
| 5 | Exhibit 23 | Email - -ETH.MESH.03974795 | 267 |
| 6 | Exhibit 24 | Email - -ETH.MESH.03974826 | 272 |
| 7 | Exhibit 25 | Email Chain - ETH.MESH.24429137 - -9140 | 276 |
| | Exhibit 26 | Email - ETH.MESH.03974836 - -4838 | 282 |
| 10 | Exhibit 27 | Field Visit Letter - -ETH.MESH.100229615 - -9620 | 284 |
| | Exhibit 28 | Email Chain - ETH.MESH.03971733 - -1734 | 313 |
| 13 | Exhibit 29 | Tennessee Urology Associates Website Printout | 325 |
| | Exhibit 30 | Tennova Hospital Website Printout | 328 |
| 16 | Exhibit 31 | Email Chain - ETH.MESH.07640022 - -0025 | 329 |
| | | Email | 341 |
| | Exhibit 32 | Email Chain - ETH.MESH.07636922 - -6923 | 344 |
| 20 | Exhibit 33 | Email - ETH.MESH.03976076 - -6078 | 346 |
| | Exhibit 34 | Email Chain - ETH.MESH.07636753 - -6755 | 349 |
| 23 | Exhibit 35 | Email Chain - ETH.MESH.11537304 - -7308 | 354 |

Christopher E. Ramsey, M.D.

```
1    Exhibit 36      Email - ETH.MESH.03962477        357

2    Exhibit 37      Email - ETH.MESH.07640076 -      359
                     -0077
3

     Exhibit 38      Ethicon Women's Health and       367
4                    Urology Brand Equity Study,
                     Final Report, January 2010 -
5                    ETH.MESH.03643186 - -

6    Exhibit 39      Article Entitled "Tensile        375
                     properties of five commonly
7                    used mid-urethral slings
                     relative to the TVT
8

9     * Exhibit 12 - Retained by Dr. Ramsey

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Christopher E. Ramsey, M.D.

1                    Continued Deposition of CHRISTOPHER E.

2       RAMSEY, M.D., taken on behalf of the Plaintiff,

3       on April 7, 2016, at 7:48 a.m., at the Hampton Inn

4       Suites Downtown Knoxville, 618 West Main Street,

5       Knoxville, Tennessee, for all purposes under the Federal

6       Rules of Civil Procedure.

7                    The formalities as to caption,

8       certificate, et cetera, are waived.  All

9       objections, except as to the form of the questions,

10      are reserved to the hearing.

11                   It is agreed that Lise S. Matthews,

12      being a Notary Public and Certified Court Reporter

13      for the State of Tennessee, may swear the witness,

14      and that the reading and signing of the completed

15      deposition by the witness is waived.

16

17

18                              *  *  *

19

20

21

22

23

24

Christopher E. Ramsey, M.D.

```
 1              CHRISTOPHER E. RAMSEY, M.D.

 2    was called as a witness, and after having been

 3    previously sworn, testified as follows:

 4

 5    EXAMINATION BY MR. JONES:

 6        Q.      Doctor, we're back on the record.

 7                 Do you understand that?

 8        A.      Yes.

 9        Q.      You're still under oath; do you

10    understand that?

11        A.      Yes.

12        Q.      And you understand we're continuing the

13    deposition of you in regards to your opinions on

14    the TVT, TVT-O, and TVT-Secur device, correct?

15        A.      Yes.

16        Q.      Okay.  Now, you brought with you some

17    materials yesterday; is that correct?

18        A.      The boxes I have over here.

19        Q.      Okay.  And there are three boxes of

20    materials; is that correct?

21        A.      Yes.

22        Q.      And did you prepare those materials or

23    did your attorney?

24        A.      I prepared them with the help of my
```

Christopher E. Ramsey, M.D.

1    attorney.

2        Q.      Okay.  And those are materials that

3    your attorney sent you, correct?

4        A.      Correct.

5        Q.      And then you printed them off and

6    brought them, correct?

7        A.      Correct, yes.

8        Q.      And we'll go ahead and mark those three

9    boxes as Exhibit 12 for the record.

10               (Whereupon Exhibit 12A, 12B and 12C

11   were marked as an exhibit.)

12   BY MR. JONES:

13       Q.      Did you bring any other materials with

14   you?

15       A.      No.

16       Q.      Didn't bring any invoices with you?

17       A.      No.  Other than what we already had

18   yesterday.

19               MR. JONES:  Let's mark those.  Get them

20   out and we'll mark them.

21               MR. MORIARTY:  These are the case-

22   specific invoices.

23   BY MR. JONES:

24       Q.      Okay.  So you brought --

Christopher E. Ramsey, M.D.

```
 1                  MR. MORIARTY:  Either I lost or he has

 2    not invoiced us for the general report.

 3                  MR. JONES:  Okay.

 4                  THE WITNESS:  I haven't invoiced it

 5    yet.

 6    BY MR. JONES:

 7        Q.      You have not invoiced --

 8        A.      No.

 9        Q.      -- sent any invoices to Ethicon in

10    regards to the work you've done for your general

11    expert opinions?

12        A.      Not yet.

13        Q.      Do you intend on sending those

14    invoices?

15        A.      Yes.

16        Q.      And, when you do send those invoices,

17    those will be invoices you have no issues with

18    sharing with us, correct?

19        A.      Not at all.

20        Q.      Okay.  And we'll mark -- you did not

21    bring any invoices as they relate to your time

22    spent forming your general expert opinions in this

23    litigation today, correct?

24        A.      Correct.
```

Christopher E. Ramsey, M.D.

1      Q.      You did bring some invoices related to

2    you forming your opinions on specific cases in this

3    litigation, though, correct?

4      A.      Correct.

5              MR. JONES:  Okay.  We'll mark that as

6    Exhibit 13.

7              (Whereupon Exhibit 13 was marked as an

8    exhibit.)

9    BY MR. JONES:

10     Q.      Is it fair to say Exhibit 13 represents

11   invoices that you've billed thus far in your work

12   for Ethicon as a litigation expert witness?

13     A.      Yes.

14     Q.      Okay.  Did you bring any other

15   materials with you besides those three boxes?

16     A.      No.

17     Q.      Is TVT-Secur within the standard of

18   care, Doctor?

19     A.      Yes.

20             MR. MORIARTY:  Objection.  Form.

21             Go ahead.

22   BY MR. JONES:

23     Q.      It's your position that currently the

24   TVT-Secur device is within the standard of care for

Christopher E. Ramsey, M.D.

```
1    doctors, correct?

2       A.      Yes.

3       Q.      In the United States, doctors can use

4    the TVT-Secur device on patients, correct?

5                    MR. MORIARTY:  Objection.  Form.

6                    THE WITNESS:  If it was available, it

7    would be standard of care.  It's not available, so

8    it can't be used.

9    BY MR. JONES:

10      Q.      So because the TVT-Secur is not

11   available for use by physicians, it is not within

12   the standard of care today, correct?

13      A.      I don't think I would say it's not

14   within the standard of care.  I think that if it

15   was available, it would be in the standard of care.

16      Q.      It's not -- the TVT-Secur device is

17   currently not available for use by surgeons on

18   patients, correct?

19      A.      Correct.

20      Q.      Because surgeons are unable to use the

21   TVT-Secur device on patients, it's not within the

22   standard of care for surgeons to use the device,

23   correct?

24                   MR. MORIARTY:  Objection.  Form.
```

Christopher E. Ramsey, M.D.

1               Go ahead.

2               THE WITNESS:  No, I think it's still

3       within the standard of care.

4       BY MR. JONES:

5         Q.      It's your opinion that the TVT-Secur

6       device is within the standard of care for

7       physicians inside the United States today?

8         A.      Yes.

9         Q.      Okay.  Even though they can't use it,

10      it's within the standard of care; that's your

11      opinion?

12        A.      It's within the standard of care.

13        Q.      Okay.

14        A.      The device is.

15        Q.      Okay.  Is Prolift within the standard

16      of care for physicians to use today?

17              MR. MORIARTY:  Objection.

18              THE WITNESS:  I can't make an opinion

19      on that.  I don't use it.

20      BY MR. JONES:

21        Q.      Okay.  You're not going to be -- you

22      don't have any expertise whatsoever in transvaginal

23      mesh for use in pelvic organ prolapse, correct?

24        A.      Correct.

Christopher E. Ramsey, M.D.

1      Q.     You don't have any experience in use

2   with transvaginal mesh for use -- for treatment of

3   pelvic organ prolapse, correct?

4              MR. MORIARTY:  Objection.  Asked and

5   answered.

6              Go ahead.

7              THE WITNESS:  Correct.

8   BY MR. JONES:

9      Q.     No expertise whatsoever in that field,

10  correct?

11     A.     No.

12     Q.     Okay.  Now, you testified yesterday you

13  spent a total of 95 to 100 hours thus far in this

14  litigation, correct?

15     A.     Correct.

16     Q.     And at what rate are you charging per

17  hour?

18     A.     $500 an hour for review.

19     Q.     Okay.  So that's $500 times 100 hours,

20  and we'll get the total amount of money that you

21  will bill for this case, correct?

22     A.     Correct.

23     Q.     $500 times 100 is $500,000, correct?

24     A.     Not at all.

Christopher E. Ramsey, M.D.

```
1      Q.      No?  How much is it?  50-?

2      A.      Yes.

3      Q.      Okay.  So you'll bill $50,000 total in

4   this litigation, correct?

5      A.      Up to this point.

6      Q.      Up to this point.

7              And you'll continue to do further work,

8   correct?

9      A.      Yes.

10     Q.      Okay.  How much are you charging for

11  your deposition time?

12     A.      $750 an hour.

13     Q.      So that will be in -- in addition to

14  the time you bill to Ethicon for your review of the

15  materials, correct?

16     A.      Correct.

17     Q.      How much did you bill for your time on

18  the two previous cases that you worked on for

19  Ethicon?

20     A.      I'm not certain what I billed.  It was

21  the same rates.  I don't remember what --

22     Q.      Okay.

23     A.      -- what I charged.

24     Q.      On the two prior cases that you worked
```

Christopher E. Ramsey, M.D.

1    for Ethicon on related to transvaginal mesh, you

2    charged $500 an hour, correct?

3        A.      Four- or $500 an hour at that time.

4        Q.      Okay.  And as you sit here today,

5    you're unable to tell us the total amount you

6    charged in those -- in your two prior cases with

7    Ethicon, correct?

8        A.      I don't recall.  I think I have a 1099

9    that we had on one of those, but I'm not -- I'm

10   not --

11       Q.      Did you bring that 1099?

12       A.      I think I have a copy of that.

13       Q.      Okay.  So you did bring other

14   materials.

15              Any other materials, I want to know

16   about them right now.

17       A.      Not that I know of.

18              MR. JONES:  Okay.  Mr. Moriarty, are

19   there any materials besides this 1099 that you

20   brought today that he's not representing?

21              MR. MORIARTY:  He's not representing

22   or --

23              MR. JONES:  Are there any other

24   materials you brought with you so we can get

Christopher E. Ramsey, M.D.

1    through this quicker today?

2                   MR. MORIARTY:  No.

3                   MR. JONES:  No.  Okay.

4    BY MR. JONES:

5      Q.      Other than this 1099, is there any

6    other materials, Doctor, that you brought?

7      A.      No.

8      Q.      Okay.  What is this 1099 that you

9    brought with you today?

10     A.      It's from 2015, tax return, from

11   Johnson & Johnson for $3,800.

12     Q.      Okay.  So the only 1099 you brought

13   with you was for 2015, correct?

14     A.      Correct.  So that must have been the

15   2014 -- I don't -- I honestly don't know what

16   that -- which one that is.  2015 is what the 1099

17   is.

18     Q.      Okay.  And this represents that you

19   were paid $3,800 by Johnson & Johnson, correct?

20     A.      Yes.

21     Q.      What was that $3,800 for?

22     A.      I believe it was for case reviews.

23     Q.      So is it fair to say, starting in the

24   year 2003, up until the year 2014, you had a

Christopher E. Ramsey, M.D.

1    consistent relationship with Ethicon in your role

2    providing consultant physician services, correct?

3              MR. MORIARTY:  Objection.

4              Go ahead.

5              THE WITNESS:  I wouldn't say

6    "consistent."  I think I did one case in that --

7    2014 and one case in 2015.

8    BY MR. JONES:

9       Q.     How about this:  You started -- you

10   start in 2003 acting as a consultant physician for

11   Ethicon, correct?

12      A.     I think I said 2005.

13      Q.     We established yesterday that you

14   worked on the hand-assist device, correct?

15      A.     Correct.

16      Q.     That started in 2003?

17      A.     That's true.

18      Q.     Okay.  So let me say that over.

19             We established yesterday that you

20   started working for Ethicon as a consultant in

21   2003, correct?

22      A.     Correct.

23      Q.     And you worked for Ethicon in 2004 as a

24   consultant, correct?

Christopher E. Ramsey, M.D.

```
1        A.       I can't remember.  I would assume

2    that's correct.  But I don't -- I don't remember.

3        Q.       2004 -- 2005 you worked for Ethicon as

4    a consultant, correct?

5        A.       Possibly.

6        Q.       2006, you worked for Ethicon as a

7    consultant, correct?

8        A.       Yes.

9        Q.       2007, you worked for Ethicon, correct?

10       A.       Yes.

11       Q.       2008, you worked for Ethicon, correct?

12       A.       Yes.

13       Q.       2009, you worked for Ethicon, correct?

14       A.       Yes.

15       Q.       2010, you worked for Ethicon, correct?

16       A.       Correct.

17       Q.       And according to this 1099, in 2014,

18   you performed work for Ethicon, correct?

19       A.       That's 2015.  But --

20       Q.       Okay.

21       A.       -- 2014 too --

22       Q.       So 2015 --

23       A.       -- yes.

24       Q.       2015, you performed work for Ethicon,
```

Christopher E. Ramsey, M.D.

```
 1    correct?

 2       A.      Yes.

 3       Q.      2014, you performed work for Ethicon,

 4    correct?

 5       A.      Yes.

 6       Q.      Same for 2013?

 7       A.      Probably not.

 8       Q.      Probably not.  So we've got from 2003

 9    to 2012 you were a consultant for Ethicon, correct?

10       A.      Correct.

11       Q.      A paid consultant for Ethicon from 2002

12    to -- from 2003 to 2012, correct?  I'll restate

13    that.

14               From 2003 to 2012, you were a paid

15    consultant for Ethicon, correct?

16       A.      Between those years, I was.

17       Q.      Okay.  And then, starting back up in

18    2013, you once again renewed your relationship with

19    Ethicon as a consultant physician, correct?

20               MR. MORIARTY:  Objection.  Asked and

21    answered.

22               THE WITNESS:  2014.

23    BY MR. JONES:

24       Q.      2014.  So following becoming board
```

Christopher E. Ramsey, M.D.

1    certified in urology in 2004, but for two years of

2    your clinical practice, you served as a paid

3    consultant for Ethicon, correct?

4        A.      Intermittently.  I don't know if every

5    year between 2003 and 2005 I actually did every

6    year something for them.  That was --

7        Q.      Following your board certification in

8    urology in 2004, but for two years of your clinical

9    practice, you signed a contract with Ethicon as a

10   paid consultant, correct?

11       A.      I'm not certain if it was every year.

12       Q.      Okay.

13       A.      I don't -- I don't -- I honestly don't

14   know.

15       Q.      Did you bring those contracts with you?

16       A.      No, I did not.

17       Q.      Okay.  And we've asked for those

18   contracts.  And Ethicon has not produced them.

19               Do you know any way for us to get those

20   contracts?

21       A.      I don't have a -- recall --

22       Q.      Do --

23       A.      -- I don't have a way to get those to

24   you.

Christopher E. Ramsey, M.D.

1       Q.      Okay.  Do you have anything to hide in

2    regards to your relationship with Ethicon?

3       A.      Not at all.

4       Q.      There's nothing you have anything to

5    hide with the amount of contracts you signed with

6    Ethicon --

7       A.      No, not at all.

8       Q.      -- correct?

9       A.      If Ethicon has them, then that's the

10   best way to find them.

11      Q.      Okay.  Ask Ethicon for those contracts,

12   correct?

13      A.      Yes.

14              (Whereupon Exhibit 14 was marked as an

15   exhibit.)

16   BY MR. JONES:

17      Q.      We'll mark the one 1099 you did bring

18   as Exhibit 14.

19              Starting in 2012, you were a consultant

20   for AMS, which is a company that manufactures

21   transvaginal mesh, correct?

22              MR. MORIARTY:  Objection.  Asked and

23   answered.

24              Go ahead.

Christopher E. Ramsey, M.D.

```
1              THE WITNESS:  I'm trying -- I don't --

2    I don't think that I did it in 2012, because I just

3    had started doing it toward the end of 2012, the

4    MiniArc-Precise.  So it was probably 2013 that I

5    signed a contract with them.

6    BY MR. JONES:

7        Q.      And but for Astora or AMS ceasing sale

8    of the A- -- or the AMS MiniArc device, March 31st,

9    2016, you were a consultant for AMS, correct?

10       A.      I signed a contract with them.  I never

11   did anything for them, though.

12       Q.      Okay.  But you signed a contract with a

13   mesh company besides Ethicon to act as a paid

14   consultant for them, correct?

15       A.      Correct.

16       Q.      At the time Ethicon contacted you --

17   first -- at the time Ethicon first contacted you to

18   act as a litigation expert witness, were you under

19   contract with AMS?

20       A.      Yes.

21       Q.      Is it true you've placed over 1,000

22   Ethicon mesh products in women?

23       A.      That's the approximate number.

24       Q.      You don't have an exact number?
```

Christopher E. Ramsey, M.D.

```
 1      A.      I don't have an exact number.

 2      Q.      You've never gone back to your records

 3   and tried to get an exact number?

 4      A.      No.

 5      Q.      That's not something Ethicon's asked

 6   you to do?

 7      A.      No.

 8      Q.      Could it be more than 1,500?

 9      A.      I don't think so.

10      Q.      More than 1,200?

11      A.      I don't think so.  I think a thousand

12   is right about -- is correct.  Is approximately --

13   you know, plus or minus 50.

14      Q.      Got it.  Do you know, out of that 1,000

15   Ethicon mesh products you placed, which ones are

16   laser-cut mesh versus mechanical-cut mesh?

17      A.      From my understanding, all these

18   TVT-Securs were laser cut, and some of the TVT

19   Obturators were laser cut, but I'm not sure which

20   ones or when that changed in the TVT Obturator.

21      Q.      Is it fair to say you don't know, out

22   of the 1,000 slings you've placed, which ones are

23   laser-cut mesh and which ones are mechanical-cut

24   mesh?
```

Christopher E. Ramsey, M.D.

```
 1                MR. MORIARTY:  Objection to form --

 2                THE WITNESS:  I would --

 3                MR. MORIARTY:  -- and asked and

 4      answered.

 5                THE WITNESS:  I would say that I know

 6      to a certain degree.  I don't know exactly because

 7      I don't know exactly how many I've done.  But to a

 8      certain degree, I know how many were done laser cut

 9      and how many were not.

10      BY MR. JONES:

11          Q.    When did Ethicon first start selling

12      laser-cut mesh?

13          A.    I am not exactly certain.

14          Q.    Okay.  That would help you determine

15      which slings you put in that were laser-cut mesh

16      versus mechanical cut?

17          A.    Which of the TVT Obturators.

18          Q.    But you don't know when Ethicon first

19      started selling laser-cut mesh?

20          A.    I can't recall.  I've read it but I

21      don't remember.

22          Q.    Do you have any idea?

23          A.    I think around 2006, but I'm not sure.

24          Q.    And what products did they start using
```

Christopher E. Ramsey, M.D.

1    laser-cut mesh in?

2       A.      I know the TVT-O; that's the one that I

3    used.  And then the TVT-Secur when it came out.

4    I'm not sure if they changed the TVT Retropubic or

5    not.

6       Q.      When you were using Ethicon mesh

7    products between the years of 2005 and 2012, were

8    you aware when you implanted an Ethicon mesh

9    product whether it was laser-cut mesh or

10   mechanical-cut mesh during that time period?

11      A.      Yes.

12      Q.      How did you know?

13      A.      Because I had been informed that they

14   had changed the way that it had -- that they had

15   made their laser cut -- the way that they had

16   produced their mesh.

17      Q.      Okay.  What did they tell you?

18      A.      That they stopped using manual cutting

19   and used laser cutting to --

20      Q.      So at some point during your practice,

21   Ethicon came and told you, "We're not using

22   mechanical-cut mesh anymore in TVT-O," correct?

23      A.      Correct.

24      Q.      Did they tell you why they were not

Christopher E. Ramsey, M.D.

1      using mechanical-cut mesh in TVT-O anymore?

2      A.      No.

3      Q.      They just told you they weren't using

4      it anymore, correct?

5      A.      They told me they were doing it a

6      different way.

7      Q.      "A different way" meaning what?

8      A.      Cutting the mesh with a laser as

9      opposed to cutting it manually.

10     Q.      So they come and say, "Dr. Ramsey,

11     we're going to start cutting the mesh in a

12     different way for the TVT-O product," correct?

13     That's what they --

14     A.      Correct.

15     Q.      And they say -- and they don't tell you

16     why they're going to do that, correct?

17     A.      I don't remember them telling me why.

18     Q.      Did you ask them why?

19     A.      I don't think it really mattered to me.

20     Q.      Didn't matter to you at all?

21     A.      No.

22     Q.      Okay.  Is the mesh used in TVT-Secur

23     stiffer than the mesh you've used in TVT-O?

24     A.      No.

Christopher E. Ramsey, M.D.

1      Q.      Not at all?

2      A.      No.

3      Q.      You don't recognize any difference in

4   the stiffness between the mesh used in TVT-Secur

5   and the mesh you used in TVT-O?

6      A.      No.

7      Q.      So when you pick them up and you pull

8   on them, there's no difference?

9      A.      No.

10     Q.      Okay.  So do you have any experience

11   using mechanical-cut mesh with TVT-O?

12     A.      Yes.

13     Q.      Okay.  Any difference between the

14   mechanical-cut mesh in the TVT-O versus the

15   laser-cut mesh in the TVT-O?

16     A.      Not that I could tell, no.

17     Q.      No difference whatsoever when you

18   picked them up and felt them?

19     A.      No.

20     Q.      No difference whatsoever between the

21   mechanical-cut mesh used in TVT-O and the laser-cut

22   mesh used in TVT-O when you simply touched the

23   mesh?

24     A.      Correct.

Christopher E. Ramsey, M.D.

1     Q.      When you stretched the mesh, no

2   difference, correct?

3     A.      No difference.

4     Q.      Okay.  Same stiffness, correct?

5     A.      Correct.

6     Q.      Did you notice any loss of particles

7   from the mesh when you used TVT products?

8     A.      No.

9     Q.      Did you notice any fraying of the mesh

10  when you used TVT products?

11    A.      No.

12    Q.      And have other surgeons ever

13  communicated to you concerns about the mesh used in

14  the TVT products fraying?

15    A.      No.

16    Q.      Losing particles?

17    A.      No.

18    Q.      Curling?

19    A.      No.

20    Q.      Roping?

21    A.      No.

22    Q.      Are you familiar with any of those

23  terms?

24    A.      I'm familiar with the terms.

Christopher E. Ramsey, M.D.

1     Q.      And when did you first become familiar

2   with those terms?

3     A.      When I started reading about the

4   litigation.

5     Q.      And when would that have been?  What

6   year?

7     A.      Probably 2014.

8     Q.      Prior to 2014, you weren't familiar

9   with the terms "curling," "roping," "fraying," or

10   "particle loss" of TVT mesh, correct?

11     A.      Correct.

12     Q.      What's the pore size of the mesh used

13   in TVT-Secur?

14     A.      It's about 1,300 microns, 1,376 maybe.

15     Q.      What are -- what are you basing that

16   on?  Who told you that?

17     A.      The measurements.

18     Q.      Who told you that?

19     A.      There's an article in Moalli that

20   showed the different sizes of the particles -- or

21   sizes of the pores.

22     Q.      Where did Dr. Moalli get that

23   information from?

24     A.      I'm assuming that it's published in --

Christopher E. Ramsey, M.D.

```
 1    with the -- with the -- Ethicon has measured it.

 2    The other companies have measured it.  Or he

 3    measured it.  I don't know.

 4        Q.      That's an assumption that you're

 5    making, correct?

 6        A.      I read the article, and there was a

 7    graph in the article.  I can see it pretty clearly

 8    in my brain right now.

 9        Q.      Okay.  And so in that article it says

10    Ethicon provided this measurement, correct?

11        A.      I don't remember what --

12                (Reporter interruption for

13    clarification.)

14    BY MR. JONES:

15        Q.      Ethicon provided -- in the article that

16    you remember so clearly, it says Ethicon provided

17    the pore size measurements, correct?

18        A.      In the article --

19                MR. MORIARTY:  Objection to form.

20                THE WITNESS:  In the article I remember

21    so clearly, I don't remember where they got the

22    information.

23    BY MR. JONES:

24        Q.      Okay.  Okay.
```

Christopher E. Ramsey, M.D.

1               So you would be making an assumption

2      where they got that information from, correct?

3         A.      I'm -- reading the article and the

4      information was presented there.  Now, I'm taking

5      it at their face value, that what they put in there

6      is accurate information.

7         Q.      Okay.

8         A.      That's how you get information.

9         Q.      And you're familiar with this article

10     by Dr. Moalli, correct?

11        A.      Yes.

12        Q.      And you know that Dr. -- you've -- you

13     referred to Dr. Moalli today and yesterday as a

14     male, but you know that Dr. Moalli is a female,

15     correct?

16        A.      I honestly don't know.  I know

17     Dr. Moalli.

18        Q.      Okay.  You know Dr. Moalli?

19        A.      I know Dr. Moalli's name.

20        Q.      Okay.

21        A.      And I don't know her first name --

22        Q.      Okay.

23        A.      -- but I know that.

24        Q.      Between 2006 and 2011, you were a

Christopher E. Ramsey, M.D.

```
1    high-use users of Ethicon mesh products, correct?

2        A.      Correct.

3        Q.      Would you consider yourself a high-use

4    user of the AMS MiniArc-Precise device?

5        A.      I believe I am.

6        Q.      Do you agree with the FDA's position on

7    mini-slings?

8                MR. MORIARTY:  Objection.

9                Go ahead.

10               THE WITNESS:  I guess it depends on

11   what position you're talking about.  I don't -- I

12   don't know if -- that's not -- that's pretty

13   general.

14   BY MR. JONES:

15       Q.      How about this:  You know that the

16   FDA's position is that the safety and efficacy of

17   the TVT-Secur device has not been demonstrated,

18   correct?

19       A.      They -- they represent articles that

20   have shown that it doesn't have as good efficacy in

21   some articles.

22       Q.      Yes or no?  You know that the FDA's

23   position on TVT-Secur is that the safety and

24   efficacy of TVT-Secur has not been demonstrated?
```

Christopher E. Ramsey, M.D.

1          MR. MORIARTY:  Objection.  Form.

2          THE WITNESS:  I don't think that they

3     bring into question the safety.  They bring into

4     question the efficacy.

5     BY MR. JONES:

6     Q.     You know that the FDA's position on

7     TVT-Secur is that the efficacy of TVT-Secur has not

8     been adequately demonstrated, correct?

9     A.     I don't think that they're saying that

10    it has not been adequately demonstrated.  I think

11    they're saying that they would like to see more

12    information to show that it has efficacy.

13    Q.     Do you agree or disagree that the FDA's

14    current position is that the safety of the

15    TVT-Secur device has not been adequately

16    demonstrated?

17          MR. MORIARTY:  Objection.

18          THE WITNESS:  I don't think that's

19    their position.

20    BY MR. JONES:

21    Q.     Do you agree or disagree that the FDA's

22    position is that the efficacy of the TVT-Secur

23    device has not been adequately demonstrated?

24    A.     Again, I think that they have concerns

Christopher E. Ramsey, M.D.

1    that the efficacy needs to be further studied to

2    show that it is efficacious.

3        Q.     And you know that surgeons in the field

4    of urology hold the position that the safety of the

5    TVT-Secur device has not been adequately

6    demonstrated, correct?

7                 MR. MORIARTY:  Objection.  Form.

8                 THE WITNESS:  I don't -- I don't agree

9    with that.  I think they think it's safe.

10   BY MR. JONES:

11       Q.     My question is, you know that some

12   surgeons hold that position, though, correct?

13       A.     I don't know that.

14       Q.     You've never talked to any surgeons

15   whatsoever that hold the position that the safety

16   of the TVT-Secur device has not been adequately

17   demonstrated?

18       A.     I don't think the safety has been

19   brought into question at all.

20       Q.     You've never talked to one surgeon

21   that's questioned the safety of the TVT-Secur

22   device?

23       A.     No.

24       Q.     Have you talked to a single surgeon

Christopher E. Ramsey, M.D.

1     that's questioned the efficacy of the TVT-Secur

2     device?

3         A.      Yes.

4         Q.      And I assume you've talked to surgeons

5     that are concerned that the efficacy of the

6     TVT-Secur has not been adequately demonstrated,

7     correct?

8         A.      Again, I think that surgeons think that

9     it needs to be -- there needs to be further studies

10    showing the efficacy of it.

11        Q.      Surgeons believe there need to be

12    further studies to show the efficacy of the

13    TVT-Secur device, correct?

14        A.      Yes.

15        Q.      Do you know what a 522 order is?

16        A.      I'm aware of it.

17        Q.      You're aware of what it is?

18        A.      Yes, sir.

19        Q.      What is it?

20        A.      It's an order by the FDA to conduct

21    further testing to show efficacy in a product.

22        Q.      That's your understanding of what a 522

23    order is?

24        A.      Yes.

Christopher E. Ramsey, M.D.

1      Q.      How many 522 orders have been issued to

2   Ethicon in regards to transvaginal mesh?

3              MR. MORIARTY:  Objection.  Form.

4              Go ahead.

5              THE WITNESS:  I don't --

6              MR. MORIARTY:  Are you talking about

7   slings or --

8              THE WITNESS:  In general --

9              MR. JONES:  No.  I'm talking about

10  transvaginal mesh.

11             THE WITNESS:  In general?  I'm not

12  certain.

13  BY MR. JONES:

14     Q.      Okay.  How about slings?

15     A.      The only one I know of is with

16  TVT-Secur.

17     Q.      You know that the TVT-Secur device was

18  subject to a 522 order, correct?

19     A.      Yes.

20     Q.      What did the 522 order for the

21  TVT-Secur device say?

22     A.      The FDA wanted Ethicon to conduct

23  studies on the TVT-Secur to show further efficacy,

24  because they were concerned about the efficacy of

Christopher E. Ramsey, M.D.

```
 1    the TVT-Secur.

 2        Q.      What year is this?

 3        A.      That was 2011 or '12.

 4        Q.      In 2012, Ethicon was asked to perform

 5    additional safety studies on the TVT-Secur device,

 6    correct?

 7        A.      No.

 8        Q.      In 2012, Ethicon was asked to perform

 9    additional studies on the TVT-Secur device,

10    correct?

11        A.      Correct.

12        Q.      Ethicon made a decision to not conduct

13    any additional studies on the TVT-Secur device in

14    2012, correct?

15        A.      Correct.

16        Q.      Ethicon made a decision, instead of

17    running additional studies on the TVT-Secur device

18    like requested, they would stop selling the device,

19    correct?

20        A.      Correct.

21        Q.      The reason Ethicon stopped selling the

22    TVT-Secur device in 2012 was because they decided

23    not to run additional testing on the TVT-Secur

24    device, correct?
```

Christopher E. Ramsey, M.D.

1          MR. MORIARTY:  Objection --

2          THE WITNESS:  Correct.

3          MR. MORIARTY:  -- form.

4          Go ahead.

5          THE WITNESS:  Correct.

6     BY MR. JONES:

7     Q.      The decision -- the decision by Ethicon

8     to stop selling the TVT-Secur device in 2012 was a

9     business decision, correct?

10    A.      I believe it was.

11    Q.      We talked about 20 events that you

12    proctored as an Ethicon consultant yesterday; is

13    that correct?

14    A.      Approximately.

15    Q.      Okay.  Of the 20 events that you

16    proctored for Ethicon, how many of those involved

17    TVT-Secur?

18    A.      Probably two-thirds of them.

19    Q.      Two-thirds of your proctoring events

20    for Ethicon involved the TVT-Secur device, correct?

21    A.      Yes.

22    Q.      Did you -- at those proctoring events,

23    did you instruct physicians on how to place the

24    TVT-Secur device?

Christopher E. Ramsey, M.D.

1      A.      Yes.

2      Q.      When you instructed surgeons how to

3  place a TVT-Secur device at Ethicon events, did you

4  ever instruct physicians to place the TVT-Secur

5  device in a way that was inconsistent with the

6  instructions for use?

7      A.      I didn't do any instructions at TVT --

8  at Ethicon events.

9      Q.      At these proctor events where you

10  instructed surgeons on how to place the TVT-Secur

11  device, did you ever instruct the surgeons in a way

12  that was inconsistent with the instructions for use

13  for the TVT-Secur device?

14      A.      No.

15      Q.      Every time you instructed another

16  surgeon on how to place a TVT-Secur device, your

17  instructions were consistent with the instructions

18  for use for the TVT-Secur device, correct?

19      A.      Correct.

20      Q.      Never went off the grid on the

21  TVT-Secur IFU, correct?

22              MR. MORIARTY:  Objection.  Form.

23              Go ahead.

24

Christopher E. Ramsey, M.D.

```
 1    BY MR. JONES:

 2       Q.      Never went rogue?

 3       A.      Never went rogue?

 4       Q.      Correct.

 5       A.      No, never went rogue.

 6       Q.      And there weren't any instructions

 7    that -- on how to place the TVT-Secur device that

 8    you would use at these proctor events that weren't

 9    in the instructions for use for TVT-Secur, correct?

10               MR. MORIARTY:  Objection.  Asked and

11    answered.

12               Go ahead.

13               THE WITNESS:  Correct.

14    BY MR. JONES:

15       Q.      You're familiar with the "TVT-Secur

16    Cookbook"?  Are you familiar?

17       A.      That sounds familiar.

18       Q.      Are you familiar with the "TVT-Secur

19    Pearls"?

20       A.      Yeah, sounds familiar.

21       Q.      I take it you're familiar with the

22    FDA's public health notification on transvaginal

23    mesh?

24       A.      Yes.
```

Christopher E. Ramsey, M.D.

```
1        Q.      Are you familiar with the FDA's 2011

2    panel on transvaginal mesh?

3        A.      The FDA's panel?  I'm not certain about

4    the panel.

5        Q.      Are you aware that in 2011 the FDA

6    convened a panel of experts to weigh in on the

7    safety of transvaginal mesh?

8                MR. MORIARTY:  Objection.

9                Go ahead.

10               THE WITNESS:  I know they had a

11   notification.  I'm not certain how that

12   notification was developed.

13   BY MR. JONES:

14       Q.      And I take it that you're familiar with

15   the FDA's current position on midurethral slings,

16   correct?

17       A.      Yes.

18       Q.      And you understand that the FDA states

19   that the safety of midurethral slings has been

20   shown in clinical trials up to one year, correct?

21       A.      I'm not certain "up to one year."

22       Q.      You're familiar with the FDA's current

23   position on mini-slings, correct?

24       A.      Yes.
```

Christopher E. Ramsey, M.D.

```
 1        Q.        As you sit here today, do you -- does

 2   anything stand out to you in regards to the FDA's

 3   current position on mini-slings that you disagree

 4   with?

 5        A.        No.

 6        Q.        Okay.  Are you familiar with the

 7   Cochrane analysis?

 8        A.        Yes.

 9        Q.        Are you familiar with the Cochrane

10   analysis on mini-slings?

11        A.        Yes.

12        Q.        Are you familiar with the Cochrane

13   analysis on TVT-Secur?

14        A.        Yes.

15        Q.        Do you agree or disagree with

16   Cochrane's conclusions on the safety and efficacy

17   of the TVT-Secur device?

18        A.        I agree with the safety conclusions.

19   The -- and I would say I agree with what they're

20   saying about the efficacy.

21        Q.        Okay.  Does the AUGS position statement

22   apply to mini-slings?

23        A.        I can't remember specifically if it

24   applies to mini-slings or not.
```

Christopher E. Ramsey, M.D.

```
 1        Q.      Do you know who Dennis Miller is?

 2        A.      That's a comedian.

 3        Q.      Do you know who Dennis Miller is in

 4    regards to the AUGS statement?

 5        A.      No.

 6        Q.      Do you know who Howard Goldman is?

 7        A.      No.

 8        Q.      Charlie Nager?

 9        A.      No.

10        Q.      Paul Tulikangas?

11        A.      No.

12        Q.      Eric Robener?

13        A.      No.

14        Q.      Are you aware of the recent Lin

15    articles discussing cancer from a transvaginal

16    mesh?

17                MR. MORIARTY:  Objection.  Go ahead.

18                THE WITNESS:  Not specifically a Lin

19    article.

20    BY MR. JONES:

21        Q.      Have you seen any internal studies by

22    Ethicon where they have tested the mesh used in TVT

23    for degradation?

24                MR. MORIARTY:  I'm sorry.  Could you
```

Christopher E. Ramsey, M.D.

1    read that back?

2               (Whereupon the previously mentioned

3    question was read back by the reporter.)

4               MR. MORIARTY:  Okay, thanks.

5               THE WITNESS:  I've seen so many studies

6    that -- the TVT mesh in general for degradation?

7    BY MR. JONES:

8       Q.    Correct.

9       A.      The information I've seen, it shows it

10   doesn't degrade.

11      Q.      Okay.  I don't want to know about any

12   studies other than the testing that Ethicon's done.

13   Let me limit my question to testing Ethicon has

14   done internally at Ethicon.

15      A.      I can't specifically recall that at

16   this point.

17      Q.      Okay.  Are you familiar with the

18   seven-year dog study Ethicon conducted examining

19   whether Prolene degrades inside the human body or

20   not?

21      A.      I don't know that study.

22      Q.      Are you familiar with the Guidoin study

23   by Ethicon examining whether Prolene sutures

24   degrade inside the human body?

Christopher E. Ramsey, M.D.

```
 1      A.      I can't recall that one.

 2      Q.      Are you familiar with an article by

 3  Professor Clavé discussing whether mesh degrades

 4  inside the human body?

 5      A.      I can't recall that one.

 6      Q.      Are you familiar with any of the

 7  research out of the University of Missouri by

 8  Drs. Costello or Ramshaw discussing degradation of

 9  the mesh inside the human body?

10      A.      No.

11      Q.      Are you familiar with the ICS and IUGA

12  mesh complication classification system?

13      A.      No.

14      Q.      Have you reviewed the material safety

15  data sheet for the TVT mesh?

16      A.      Yes.

17      Q.      And when did you review that?

18      A.      I actually reviewed a little bit of it

19  last night.

20      Q.      Okay.  Before last night, had you

21  reviewed it?

22      A.      Yes.

23      Q.      And since you reviewed it last night,

24  you know that it discusses the presence of sarcomas
```

Christopher E. Ramsey, M.D.

1    in rats exposed to Prolene material, correct?

2              MR. MORIARTY:  Objection.

3              Go ahead.

4              THE WITNESS:  It discusses the

5    potential for sarcoma in rats using sheet Prolene.

6    BY MR. JONES:

7    Q.     You know that oxidizing agents

8    naturally -- naturally occur inside a woman's

9    vagina, correct?

10   A.     Yes.

11   Q.     Do you know at what levels?

12   A.     No.

13   Q.     Do you know what oxidizing agents?

14   A.     Peroxides.  Other than that, not

15   specifically.

16   Q.     You know that in a 2011 FDA public

17   health notification, the FDA stated that

18   complications from transvaginal mesh are not rare,

19   correct?

20             MR. MORIARTY:  Objection.  Form.

21             Go ahead.

22             THE WITNESS:  That's what the statement

23   said.

24

Christopher E. Ramsey, M.D.

```
 1   BY MR. JONES:

 2        Q.     Do you agree or disagree that

 3   complications from transvaginal mesh are not rare?

 4              MR. MORIARTY:  Objection.  And this is

 5   supposed to be about TVT.

 6   BY MR. JONES:

 7        Q.     Go ahead and answer.

 8              MR. MORIARTY:  You're mixing.

 9              Go ahead.

10              THE WITNESS:  I was going to say, are

11   you talking about slings or are you talking about

12   POP mesh?

13   BY MR. JONES:

14        Q.     That's okay.  We'll move on.

15              Well, you know that erosions from the

16   mesh used in TVT are not rare, correct?

17        A.     I would say erosions are very rare.

18        Q.     Do you know who Axel Arnaud is?

19        A.     No.

20        Q.     Would you defer to the expertise of

21   medical directors at Ethicon as to the safety and

22   efficacy of the TVT products?

23        A.     No.

24        Q.     Would you defer to any of the medical
```

Christopher E. Ramsey, M.D.

1    directors at Ethicon as to the adequacy of the

2    warnings in the TVT IFUs?

3        A.      I think that the IFUs are adequate, and

4    so I -- I -- I think that anything that's been

5    discussed inside of Ethicon doesn't really pertain

6    to what would apply to me.

7        Q.      The discussions Ethicon medical

8    directors had inside the company about the warnings

9    in the TVT IFUs are not relevant to you, correct?

10       A.      I think they need to have these

11   discussions and be very candid within themselves

12   about what needs to be put in an IFU before they

13   put it in the IFU.

14               So once it is in the IFU -- and I've

15   looked at the IFU and I think the IFU is

16   adequate -- whatever went on within Ethicon doesn't

17   pertain to me.  I mean, that's all internal

18   business decisions that don't apply to me

19   clinically.

20       Q.      Do you think Ethicon makes business

21   decisions on what to include in its TVT IFUs?

22       A.      I don't think they make business

23   decisions to include what goes in the IFU.

24       Q.      How many times has Ethicon changed the

Christopher E. Ramsey, M.D.

1    TVT-Secur IFU?

2        A.      The TVT-Secur IFU?

3        Q.      Yeah.

4        A.      Honestly, I don't know how many times

5    they've changed the TVT-Secur IFU.

6                MR. JONES:  I'll mark for the record

7    Exhibit 15.

8                (Whereupon Exhibit 15 was marked as an

9    exhibit.)

10   BY MR. JONES:

11       Q.      Take a look at Exhibit 15, Doctor.

12       A.      Okay.

13       Q.      Turn -- what is Exhibit 5?

14       A.      It says "Gynecare TVT" Tension-Free

15   Vaginal Tape, 2015.

16       Q.      Okay.  Do you recognize --

17       A.      It's instructions for use.

18       Q.      You recognize Exhibit 15 as the

19   Gynecare TVT instructions for use, correct?

20       A.      For TVT.

21       Q.      For TVT Retropubic, correct?

22       A.      Does it say "retropubic"?  It just says

23   "TVT vaginal tape."

24       Q.      You recognize Exhibit 15 as the

Christopher E. Ramsey, M.D.

1    Gynecare tension-free vaginal tape IFU, correct?

2         A.      Yes.

3         Q.      Turn to page 4.

4         A.      Okay.

5         Q.      At page 4, you see in the Gynecare TVT

6    IFU the heading "Warnings and Precautions,"

7    correct?

8         A.      Yes.

9         Q.      And on the next page, you see the

10   heading "Adverse Reactions," correct?

11        A.      Correct.

12        Q.      Under "Adverse Reactions" in the TVT

13   IFU, chronic pain is listed, correct?

14        A.      Yes.

15        Q.      Is chronic pain a risk associated with

16   the use of the TVT devices?

17                  MR. MORIARTY:  Objection.

18                  THE WITNESS:  It's associated with any

19   procedure for stress incontinence.

20   BY MR. JONES:

21        Q.      Okay.  I'm not asking about any other

22   procedures but TVT.  So just answer the question.

23                  Is chronic pain a risk associated with

24   the TVT devices?

Christopher E. Ramsey, M.D.

1                    MR. MORIARTY:  Objection.  Asked and

2      answered.

3                    Go ahead.

4                    THE WITNESS:  It's a particular -- it's

5      a potential risk for any vaginal surgery.

6      BY MR. JONES:

7          Q.     Okay.  Yes or no or you can't answer

8      the question?  Yes or no, is chronic pain a

9      potential risk associated with the TVT devices?

10         A.     With other procedures and the TVT

11     device.

12         Q.     I'm not asking about any other TVT --

13     or about any devices but the TVT.  So just answer

14     the question as it relates to TVT, okay?

15                   Yes or no?  Is chronic pain a risk

16     associated with the use of the TVT devices?

17                   MR. MORIARTY:  Objection.  Form.

18                   Go ahead.

19                   THE WITNESS:  Again, you know, any

20     vaginal surgery has a potential for chronic pain.

21     So it's not just with a TVT device.  It's -- it's

22     with any vaginal surgery for stress incontinence.

23     So not just with -- I mean, you're saying --

24

Christopher E. Ramsey, M.D.

```
 1    BY MR. JONES:

 2        Q.      Can you answer the question "yes" or

 3    "no"?  Yes or no, is chronic pain a risk associated

 4    with the TVT devices?

 5                MR. MORIARTY:  Objection.  Form.

 6                Go ahead.

 7                THE WITNESS:  It is associated with the

 8    placement of TVT and other devices.

 9    BY MR. JONES:

10        Q.      The question was can you answer that

11    question "yes" or "no"?  It sounds like you can't,

12    correct?

13        A.      I guess I can't answer your question

14    "yes" or "no."

15        Q.      Okay.  Thank you.

16                Can you answer "yes" or "no" whether

17    pain with intercourse in which some patients

18    never -- may not resolve is a risk associated with

19    the use of TVT devices?

20                MR. MORIARTY:  Objection.  Form.

21                THE WITNESS:  With any --

22                MR. MORIARTY:  Go ahead.

23                THE WITNESS:  With any vaginal

24    procedure.
```

Christopher E. Ramsey, M.D.

```
 1    BY MR. JONES:

 2         Q.      Can you answer that question "yes" or

 3    "no"?

 4         A.      The same as the previous questions.

 5         Q.      So you can't answer "yes" or "no"

 6    whether pain with intercourse which may not resolve

 7    is a risk associated with the use of the TVT

 8    device?

 9         A.      Again, specifically, with the TVT

10    device, it's -- it is with any vaginal surgery.

11         Q.      One or more revision surgeries may be

12    necessary to treat the adverse reactions from TVT

13    devices, correct?

14         A.      And any vaginal surgery.

15         Q.      Did I read that correctly?

16         A.      Yes.

17         Q.      One or more revision surgeries may be

18    necessary to treat these adverse reactions listed

19    in the TVT IFU, correct?

20         A.      That's correct.

21         Q.      "Prolene mesh is a permanent implant

22    that integrates into the tissue.  In cases in which

23    the Prolene mesh needs to be removed in part or

24    whole, significant dissection may be required."
```

Christopher E. Ramsey, M.D.

1              Did I read that correctly?

2      A.      Yes.

3      Q.      Is that listed under the "Adverse

4  Reaction" section in the TVT IFU?

5      A.      Yes.

6      Q.      And do you agree with that statement?

7      A.      Yes.

8      Q.      Explain what "significant dissection"

9  means.

10     A.      In order to dissect out the entire

11  mesh, depending on which TVT was used -- in this

12  case -- I think we're talking about a retropubic

13  procedure -- it would require significant

14  dissection along the vaginal wall and then

15  posterior to the pubic bone and the suprapubic

16  tissues.  So that would be a significant dissection

17  if it would need to be removed.

18     Q.      "Neuromuscular problems, including

19  acute and/or chronic pain in the groin, thigh, leg,

20  pelvic, and/or abdominal area may occur."

21              Did I read that correctly?

22     A.      Yes.

23     Q.      Is that a risk associated with the use

24  of the TVT devices?

Christopher E. Ramsey, M.D.

```
 1              MR. MORIARTY:  Objection.  Form.

 2         Go ahead.

 3              THE WITNESS:  Again, as I said before,

 4    it's a risk with any vaginal surgery.

 5    BY MR. JONES:

 6         Q.    Okay.  And you know that neuromuscular

 7    problems in the abdominal area may occur with every

 8    single pelvic surgery?  Do you know that as you sit

 9    here today?

10         A.    I would say neuromuscular problems can

11    happen with any surgery for stress incontinence

12    that requires the suspension, passing of

13    instruments from above to below or below to above.

14         Q.    That's not the question I asked.

15              I asked about neuromuscular problems in

16    the abdominal area with any pelvic surgery.

17         A.    Not with -- not with every pelvic

18    surgery.

19         Q.    Okay.  "Overcorrection, i.e. too much

20    tension applied to the tape, may cause temporary or

21    permanent lower urinary tract obstruction."

22              Did I read that correctly?

23         A.    Yes.

24         Q.    Is that a risk unique to the TVT
```

Christopher E. Ramsey, M.D.

1     devices?

2          A.       No.

3          Q.       "Mesh extrusion, exposure, or erosion

4     into the vagina or other structures or organs is an

5     adverse reaction associated with the use of TVT

6     devices," correct?

7          A.       Yes.

8          Q.       Is that a risk unique to the TVT

9     devices?

10                  MR. MORIARTY:  Objection.  Form.

11                  THE WITNESS:  I would say that there

12    can be -- that's -- I would say that there can be a

13    mesh -- mesh -- or graft exposure for other types.

14    But as far as mesh exposure, yes, it would be a

15    specific potential complication for the TVT.

16    BY MR. JONES:

17         Q.       Okay.  It can occur with other pelvic

18    mesh surgeries, correct?

19         A.       Mesh.  As we described, graft surgeries

20    too when using autologous graft or other -- other

21    grafts, including porcine and suspension with

22    sutures, permanent sutures that can be exposed or

23    extrude or erode into the vagina.

24         Q.       Is a medical device company required to

Christopher E. Ramsey, M.D.

```
 1    list the frequency of the adverse reactions in the

 2    IFU?

 3        A.      No.

 4        Q.      Should a medical device company list

 5    the frequency of the adverse reactions in the IFU?

 6        A.      No.

 7        Q.      Should a medical company list the

 8    severity of the adverse reactions in the IFU?

 9        A.      No.

10        Q.      Should a medical company list the

11    duration of the adverse reactions listed in the TVT

12    IFU?

13        A.      Not in the IFU, no.

14        Q.      Should a medical device company make

15    any statements about the duration of adverse

16    reactions in the IFU?

17        A.      No.

18        Q.      Should Ethicon make any statements

19    about the specific design features unique to the

20    TVT mesh in the IFU?

21                MR. MORIARTY:  Objection.  Form.

22                Go ahead.

23                THE WITNESS:  The specific design

24    features on how to use it, yes.
```

Christopher E. Ramsey, M.D.

```
1     BY MR. JONES:

2         Q.      What about specific design features

3     that may have an impact on patient safety?

4         A.      Yes.

5         Q.      Ethicon should list the design features

6     of the TVT mesh that may have an impact on patient

7     safety in the IFU, correct?

8         A.      Yes.

9         Q.      Have you learned of any risk associated

10    with the use of the TVT device through peer-

11    reviewed medical literature?

12        A.      Yes.

13        Q.      What risk?

14        A.      That's pretty broad.

15        Q.      Name one.

16               (Reporter interruption for

17    clarification.)

18    BY MR. JONES:

19        Q.      Name one.

20        A.      Repeat the question.

21        Q.      Name one risk that you learned from

22    medical literature associated with the use of TVT

23    devices.

24        A.      Exposure of the graft.
```

Christopher E. Ramsey, M.D.

1    Q.    All right.  Name another.

2    A.    Specific to the -- to the TVT or just

3    in general for stress urinary incontinence repair?

4    Q.    TVT.

5    A.    Specific to TVT?

6    Q.    Yeah.

7    A.    So exposure of the graft.

8    Q.    Is that it?

9    A.    Specific -- specific to the TVT.

10   Q.    That's the only risk you've learned of

11   through the medical literature?

12   A.    Yes.

13   Q.    And you learned that -- exposure of the

14   mesh as a risk of the TVT device, you learned that

15   through the medical literature?

16   A.    Medical literature, conferences,

17   experience, my clinical experience, discussion with

18   other physicians.

19   Q.    Other than exposure of the mesh, have

20   you learned of any other risk associated with the

21   use of the TVT device?

22   A.    Specific to the TVT device?

23   Q.    Other than exposure of the mesh, have

24   you learned of any risk uniquely associated with

Christopher E. Ramsey, M.D.

1   the use of TVT devices?

2       A.      No other risk.

3       Q.      Have -- at this point, have you been

4   asked by Ethicon to amend your report?

5       A.      Which report?

6       Q.      Your TVT general report.

7       A.      No.

8       Q.      Have you been asked to make changes to

9   any of your other reports?

10      A.      No.

11      Q.      Have you been asked to supplement any

12  reports?

13      A.      No.

14      Q.      Do you know why Ethicon makes their

15  mesh blue?

16      A.      I don't know for sure why.

17      Q.      Why do you think they make their mesh

18  blue?

19      A.      So that if there is an exposure, it's

20  easier to identify and to remove.

21      Q.      But that's not something you know to a

22  reasonable degree of medical certainty, correct?

23      A.      I think that's the reason why.

24      Q.      Hmm?

Christopher E. Ramsey, M.D.

1     A.      I think that's the reason why.

2     Q.      Do you agree that the safety and

3   effectiveness of multi-incision slings is well

4   established in clinical trials that followed

5   patients for up to one year?

6     A.      More than one year.

7     Q.      So you disagree?

8     A.      I agree with that and more.

9     Q.      But as a standalone statement, you

10  think it's unfair to limit it to one year?

11    A.      I think it's -- that statement is

12  correct.

13    Q.      Do you think the safety and

14  effectiveness of single-incision slings is well

15  established in clinical trials?

16    A.      There are clinical trials that show

17  good efficacy of these slings in experienced

18  surgeons.

19    Q.      Okay.  You know that there are clinical

20  trials that show low efficacy of mini-slings,

21  correct?

22    A.      There are both.

23    Q.      You know there are more clinical trials

24  that show inadequate efficacy of mini-slings?

Christopher E. Ramsey, M.D.

```
1        A.       I don't know that there are more

2    articles; I know there are articles.

3        Q.       Fair mix of both, correct?

4        A.       There's -- yes.

5        Q.       There's a balance of both?

6        A.       Yes.

7        Q.       Some articles say good things about

8    mini-slings; some articles say bad things about

9    mini-slings, correct?

10               MR. MORIARTY:  Objection.  Form.

11               THE WITNESS:  I don't know if they say

12   good or bad about them.  I think they talk about

13   how effective they are.  That's, you know, not a

14   qualification of good or bad.

15   BY MR. JONES:

16       Q.       Okay.

17       A.       Evil or saintly.

18       Q.       Have you ever reported any Ethicon mesh

19   complications?

20       A.       No.

21       Q.       No.  Not to Ethicon?

22       A.       Not to Ethicon.

23       Q.       Not to the FDA?

24       A.       No.
```

Christopher E. Ramsey, M.D.

 1      Q.      Do you have a patient registry that

 2   tracks your TVT patients?

 3      A.      I do not.

 4              MR. JONES:  I'll mark for the record

 5   Exhibit 16.

 6              (Whereupon Exhibit 16 was marked as an

 7   exhibit.)

 8   BY MR. JONES:

 9      Q.      I'm not going to ask you too many

10   questions about this, but take a quick look at this

11   document.

12              And to speed us up, I'll direct you to

13   page -- starting at page 3, the email from Andrew

14   Meek, December 1st, 2006.

15      A.      Okay.

16              MR. MORIARTY:  I'm sorry --

17              THE WITNESS:  It's 4, isn't it?

18              MR. MORIARTY:  You said --

19              MR. JONES:  It's on ETH.MESH.00136908.

20              THE WITNESS:  Okay.  Is the -- is the

21   bulk of the email the next page, or is it the one

22   above it?

23   BY MR. JONES:

24      Q.      Yeah.  Yeah.

Christopher E. Ramsey, M.D.

```
 1                MR. MORIARTY:  I'm sorry.  Which one?

 2    Are you talking about this one, Nate, or a

 3    different one?

 4                Okay.  The one at the bottom.

 5                THE WITNESS:  But that goes on to the

 6    next page, right?

 7                MR. JONES:  Right.  Right.  The

 8    doctor's following along.

 9    BY MR. JONES:

10        Q.     All right.  Is this an email dated

11    December 2006, Dr. Ramsey?

12        A.     Where is that?  Which one is that?

13               Yeah.

14        Q.     This email is dated December 2006,

15    right?

16        A.     December 1, 2006.

17        Q.     Thank you.  And the email's sent from

18    Andrew Meek, correct?

19        A.     Yes.

20        Q.     And then on the "To" line, lists the

21    recipients of this December 2006 Ethicon email,

22    correct?

23        A.     Yes.

24        Q.     Okay.  And ceramsey@charter.net is one
```

Christopher E. Ramsey, M.D.

1    of the emails listed in the recipient lines,

2    correct?

3        A.      Where is that?

4                Okay.

5        Q.      And that's an email you currently use

6    or used to use, correct?

7        A.      No.  I use chartertn.net.

8        Q.      Okay.  And were you a TVT-Secur

9    preceptor?

10       A.      Yes.

11       Q.      Okay.  And does this indicate by the

12   ceramsey@charter.net that you would have been an

13   intended recipient of this email?

14       A.      Possibly, but that wasn't my email

15   address.

16       Q.      Okay.  We'll go through some more

17   emails later on in the day with that email address

18   and see if we can get to the bottom of that.

19       A.      Okay.

20       Q.      I'll represent to you that there's

21   emails that you've sent from that email address

22   that will show --

23       A.      Oh, that I have?

24       Q.      Yeah, if that helps you.

Christopher E. Ramsey, M.D.

```
 1      A.      Without "tn"?

 2      Q.      Yeah.  Okay?

 3      A.      Okay.

 4      Q.      So we've got this email dated 2006,

 5   correct?

 6      A.      Yes.

 7      Q.      And the subject line is "TVT-Secur

 8   Preceptor Conference Call."

 9      A.      Okay.

10      Q.      Is that correct?

11      A.      Yes.

12      Q.      It says, "Dear Preceptors, Four months

13   after the launch of TVT-Secur experience has

14   accumulated among you that needs to be shared and

15   taught."

16              Did I read that correctly?

17      A.      Yes.

18      Q.      And then there's a conference call set

19   up for December 14th at 6:00 p.m., correct?

20      A.      It looks like that's what they want to

21   do.

22      Q.      Okay.  Did you participate in that

23   conference call?

24      A.      Not to my recollection.
```

Christopher E. Ramsey, M.D.

1       Q.      "All preceptors are highly encouraged
2    to attend the conference call."
3              Did I read that correctly?
4       A.      Yes.
5       Q.      You don't know whether you attended the
6    conference call or not?
7       A.      I can't -- I can't remember.  It's ten
8    years ago -- or almost ten.
9       Q.      "The larger base of experience we have
10   to draw from and share the information with, the
11   more valuable this forum will be."
12             Did I read that correctly?
13      A.      Yes.
14      Q.      So the more preceptors that
15   participate, the more useful it will be, correct?
16      A.      Correct.
17      Q.      You don't know whether you participated
18   or not, though?
19      A.      I really can't remember.
20      Q.      Do you know who Andy Meek is?
21      A.      I don't -- the name sounds familiar,
22   but I don't remember him.
23      Q.      You don't remember the professional
24   education manager at Ethicon?

Christopher E. Ramsey, M.D.

```
 1      A.      No.

 2      Q.      I asked you earlier if you were

 3   familiar with the TVT-S Cookbook.

 4              Do you recall that question?

 5      A.      Yes, it sounds familiar.

 6      Q.      Okay.  Sounds familiar.

 7              And I also asked you about the

 8   TVT-Secur Pearls.

 9              You said that sounded familiar as well,

10   too, correct?

11      A.      Yes.

12      Q.      And you see part of the agenda for the

13   conference call is "Copy reviewed Pearls\tips,"

14   correct?

15      A.      Correct.

16      Q.      Do you know who Dr. Lucente is?

17      A.      I know the name.

18      Q.      Do you know who Dr. Karram is?

19      A.      I don't recognize that name.

20      Q.      Do you know that Dr. Karram and

21   Dr. Lucente are consultants for Ethicon?

22      A.      I know that Lucente is.  I don't recall

23   Karram.

24      Q.      How do you know Dr. Lucente is a
```

Christopher E. Ramsey, M.D.

1    consultant for Ethicon?

2        A.      I just remember his name involved with

3    the original rollout of the TVT-Secur, just -- it's

4    a distinctive name.  I remember it.

5        Q.      Yeah.  Is he a well-known pelvic floor

6    surgeon?

7        A.      I honestly don't know if he's well

8    known.  I don't know exactly what he does.  I don't

9    even know if he's a gynecologist or a urologist.

10       Q.      Okay.  Okay.  Put that one away.

11               We talked yesterday about Ethicon's

12   sales rep Jason Martin, correct?

13       A.      Yes.

14       Q.      And you met Mr. Martin in 2011,

15   correct?

16       A.      I might have met him beforehand, just

17   in social situations.

18       Q.      Okay.  What is Carleo's in Knoxville?

19       A.      Carleo's?

20       Q.      Carleo's?

21       A.      Carleo's?  Gosh.  I don't remember.  It

22   sounds like a restaurant, but I'm not sure.

23   Carleo's?

24       Q.      Who is Dr. Newport?

Christopher E. Ramsey, M.D.

1      A.      John-Paul Newport.  He's one of my

2  partners.

3      Q.      Did Dr. Newport ever contact you or

4  discuss with you about getting trained on

5  TVT-Secur?

6      A.      He may have.

7      Q.      You don't have any memory of

8  Dr. Newport approaching you about using the

9  TVT-Secur device?

10     A.      Not specifically him approaching me

11 about the TVT-Secur device.

12     Q.      Okay.  And what do you recall?

13     A.      I don't recall.  You know, we were --

14 we're partners, so we see each other frequently and

15 talk about cases frequently, talk about different

16 procedures frequently.  So there's no way I can

17 pinpoint a specific conversation about one device.

18     Q.      Are you currently partners?

19     A.      Yes.

20     Q.      Do you know what products Dr. Newport

21 currently uses?

22     A.      I am actually not certain what he uses.

23     Q.      Is Dr. Congleton a partner of yours?

24     A.      Yes.

Christopher E. Ramsey, M.D.

1     Q.      You understand that Dr. Congleton is

2   also acting as a litigation expert witness for

3   Ethicon in this litigation?

4     A.      Yes.

5     Q.      You understand that Dr. Congleton is

6   also a consultant for Ethicon?

7     A.      Yes.

8     Q.      Are there any other partners that are

9   consultants for Ethicon besides yourself and

10  Dr. Congleton?

11    A.      No, not that I'm aware of.

12    Q.      How about other mesh companies?

13    A.      No, not that I'm aware of.

14    Q.      Any of your partners place more TVT

15  devices than you?

16    A.      More TVTs in general?  Any TVT device?

17    Q.      Yes.

18    A.      Dr. Congleton and Dr. Cameron and

19  Dr. Parker are probably all fairly close in my

20  practice.  Dr. Nicely does as well.  So, I mean,

21  we're all fairly close as to how many we -- we

22  place each year.

23    Q.      If I limit it to TVT-Secur, none of

24  your partners have approached the numbers of

Christopher E. Ramsey, M.D.

```
1    TVT-Securs that you've implanted, though, correct?

2        A.      I don't know how many Dr. Parker did.

3    He did -- he would do TVT-Secur until it was

4    discontinued.  So he was probably fairly similar.

5    He didn't start it as soon as I did.  So overall,

6    probably not, but at the end, I would say yearly he

7    was close to what I was doing.

8        Q.      Did you introduce Dr. Parker to the

9    TVT-Secur device?

10       A.      I may have.

11       Q.      Did you introduce Dr. Newport to the

12   TVT-Secur device?

13       A.      Probably not.  He might have been shown

14   that in residency.  I'm not sure.  I can't remember

15   when he came to our practice, honestly, but it was

16   after 2006.  So he probably already knew about the

17   TVT-Secur.

18              (Whereupon Exhibit 17 was marked as an

19   exhibit.)

20              MR. JONES:  I think we're on Exhibit

21   17.  I think so.

22              MR. MORIARTY:  Do you have an extra?

23   BY MR. JONES:

24       Q.      All right.  Doctor, Exhibit 17 is a
```

Christopher E. Ramsey, M.D.

```
1    2011 email, correct?

2         A.      Yes.

3         Q.      Between Jason Martin and Scott Finley?

4         A.      Okay.

5         Q.      Correct?

6         A.      Yes.

7         Q.      Jason Martin at this point in time was

8    your Ethicon sales representative, correct?

9         A.      Probably.

10        Q.      And Scott Finley is -- was the -- Jason

11   Martin's manager, correct?

12        A.      Yes.

13        Q.      And you've known Scott Finley for a

14   long time, correct?

15        A.      Yes.

16        Q.      And does this indicate that you met

17   Jason Martin at Carleo's for the first time in

18   2011?

19        A.      It looks like that's the -- that's what

20   he says.

21        Q.      Okay.  Do you have any reason to doubt

22   that?

23        A.      No.

24        Q.      Okay.  Jason Martin writes, "Anyway, I
```

Christopher E. Ramsey, M.D.

1    saw Dr." -- "Anyway, I saw Ramsey today in clinic.

2    I didn't bring this up or make any promises.  He

3    told me to get with Dr. Newport because he wants to

4    get proctored on TVT-Secur.  Newport is currently

5    doing the TVT-O that I know of, but wants to learn

6    TVT-Secur."

7              Did I read that correctly?

8    A.     Yes.

9    Q.     Does this indicate that you told Jason

10   Martin that Dr. Newport wanted to get proctored on

11   TVT-Secur?

12   A.     It -- it says that I mentioned that to

13   him.  It doesn't say that was the first time

14   that -- that Newport -- that he wanted to get with

15   Newport.

16   Q.     You told Ethicon that Dr. Newport

17   wanted to get proctored on TVT-Secur, correct?

18   A.     That's what this email says.

19   Q.     And then, following this, eventually

20   you did proctor Dr. Newport on the TVT-Secur

21   device, correct?

22   A.     I probably did.

23   Q.     Now, the last paragraph Jason Martin,

24   your Ethicon sales rep, writes, "FYI, am sponsoring

Christopher E. Ramsey, M.D.

```
 1    their monthly meeting to present data on TVT

 2    Abbrevo, but it's not until June."

 3        A.      Okay.

 4        Q.      Did I read that correctly?

 5        A.      Yes.

 6        Q.      What monthly meeting was Ethicon

 7    sponsoring?

 8        A.      That's our monthly business meeting

 9    that we have.

10        Q.      And this is with your clinic?

11        A.      This is with our -- my group.

12        Q.      Your group?

13        A.      My practice.

14        Q.      Your practice group?

15        A.      Yes.

16        Q.      Tennessee Urology Associates?

17        A.      TUA.

18        Q.      TUA is your practice --

19        A.      Tennessee Urology Associates, yes.

20        Q.      TUA, your practice group, holds a

21    monthly business meeting, correct?

22        A.      Our -- our group -- our pod does, yes.

23        Q.      And at times Ethicon sponsored your

24    practice group's monthly business meeting, correct?
```

Christopher E. Ramsey, M.D.

```
 1              MR. MORIARTY:  Objection.  Form.
 2              THE WITNESS:  We have a dinner that --
 3    that we have before or during the meeting, and
 4    usually we will have a -- somebody -- you know,
 5    some type of -- either a pharmaceutical
 6    representative or a product representative bring us
 7    the dinner, and then they'll give us a little
 8    presentation, little ten-minute presentation before
 9    our meeting.
10    BY MR. JONES:
11        Q.     At your practice group's monthly
12    meetings, it's customary to have a sales
13    representative present information to you, correct?
14        A.     Not over the last couple of years.
15        Q.     Before the last couple of years, it was
16    customary for your practice group to have a monthly
17    business meeting where a sales representative would
18    attend and present information, correct?
19        A.     Sometimes.
20        Q.     Okay.  And before the last couple of
21    years, it was customary for your practice group to
22    hold business meetings where at times Ethicon would
23    sponsor that meeting, correct?
24        A.     At times -- I don't remember how many
```

Christopher E. Ramsey, M.D.

1    times they did it, but it would -- it wouldn't be

2    unusual they would come in one -- once or twice.

3         Q.     Wouldn't be unusual for Ethicon to come

4    in once or twice to your practice group's monthly

5    meetings, correct?

6         A.     Correct.

7         Q.     Wouldn't be unusual for Ethicon to

8    sponsor your practice group's monthly business

9    meeting, correct?

10        A.     Correct.

11        Q.     And Ethicon would bring in dinner at

12   your practice group's monthly meeting, correct?

13        A.     Yes.

14        Q.     Turn to page 2.

15        A.     (Witness complies.)

16        Q.     Does this refresh your recollection of

17   what Carleo's is?

18               MR. MORIARTY:  Objection.  Unless this

19   was an attachment to the email, it shouldn't be

20   part of Exhibit 17.

21               MR. JONES:  Okay.  We'll make it

22   Exhibit 17B.

23               (Whereupon Exhibit 17B was marked as an

24   exhibit.)

Christopher E. Ramsey, M.D.

```
 1              THE WITNESS:  Honestly, I -- I -- I

 2   don't know where Carleo's is.

 3   BY MR. JONES:

 4      Q.      Okay.  But you've been there, though,

 5   correct?

 6      A.      I don't remember going to Carleo's.  I

 7   don't remember the nightclub.

 8      Q.      Okay.  It says, "Carleo's lounge and

 9   nightclub can be perfectly summed up with where

10   southern elegance meets New York decadence."

11              Did I read that correctly?

12      A.      That's their motto, it looks like.

13      Q.      Okay.  And according to Jason Martin,

14   your Ethicon sales rep, you met him in 2011 at

15   Carleo's, correct?

16      A.      I might have been there and he was

17   there and we bumped into each other.  But I don't

18   remember going to Carleo's.  We very rarely go

19   downtown and go to the nightclubs.

20      Q.      Okay.

21      A.      It's too far away.

22      Q.      You can put that away.

23              (Whereupon Exhibit 18 was marked as an

24   exhibit.)
```

Christopher E. Ramsey, M.D.

1    BY MR. JONES:

2        Q.      Exhibit 18.  Exhibit 18 is a 2013

3    Ethicon email, correct?

4        A.      Let's see.  From Jason, yeah.

5        Q.      Correct?

6        A.      Yes.

7        Q.      Okay.  And Jason Martin writes the

8    email part in 2013, correct?

9        A.      Yes.

10       Q.      Okay.  Jason Martin is at this point in

11   time your Ethicon sales representative, correct?

12               MR. MORIARTY:  Are you talking about in

13   2013?

14   BY MR. JONES:

15       Q.      Jason Martin was your Ethicon sales

16   representative, correct?

17       A.      Well, at the time I wasn't using

18   Ethicon products.  So he was "the" Ethicon rep; I

19   wouldn't say "my" Ethicon rep.

20       Q.      In 2013, you weren't using any Ethicon

21   mesh products, correct?

22       A.      No.

23       Q.      Correct?  That is correct?

24       A.      I was not using Ethicon mesh products

Christopher E. Ramsey, M.D.

1    in 2013.

2        Q.      Okay.  You were not using Ethicon mesh

3    products in 2014, correct?

4        A.      Correct.

5        Q.      You were not using Ethicon mesh

6    products in 2015, correct?

7        A.      Correct.

8        Q.      You're not using Ethicon mesh products

9    in 2016, correct?

10       A.      Not yet.

11       Q.      The only reason why you're considering

12   using Ethicon mesh products in 2016 is because

13   Astora or AMS has ceased selling the AMS

14   MiniArc-Precise, correct?

15       A.      Correct.

16       Q.      In 2012, you stopped using Ethicon mesh

17   products, correct?

18       A.      After they ran out of TVT-Secur, I used

19   TVT-O and TVT Abbrevo for a period of time, and I

20   don't know if that was on into -- early 2013 or

21   not.  But pretty close after that.

22       Q.      And Jason Martin writes in this 2000

23   [verbatim] email, "As you both know, Ramsey is a

24   busy surgeon.  According to Mike Lewis, he does

Christopher E. Ramsey, M.D.

```
1    more prostatectomies than anyone in the

2    country. . .  Hello," exclamation point.

3             Did I read that correctly?

4    A.      You did.

5    Q.      You're a busy surgeon, correct?

6    A.      Correct.

7    Q.      And you -- have you done more

8    prostatectomies than anyone in the country?

9    A.      No.

10   Q.      No.  More prostatectomies with the

11   da Vinci robot --

12   A.      No.

13   Q.      -- than anyone else in the country?

14           Do you advertise the use of the

15   da Vinci robot on your practice group's website?

16   A.      I wouldn't call it "advertising."

17   Q.      You wouldn't call your website -- your

18   listing -- strike that.

19           You wouldn't refer to your content on

20   your practice group's website related to the

21   da Vinci robot system as "advertising"?

22   A.      No, I wouldn't.

23           MR. MORIARTY:  Objection.  Form.

24           THE WITNESS:  I wouldn't call it
```

Christopher E. Ramsey, M.D.

1    "advertising."  I call it information.

2    BY MR. JONES:

3        Q.      Okay.  You'd call the content on your

4    website related to the da Vinci robot

5    "information"?

6        A.      Yes.

7        Q.      You wouldn't call it "advertising"?

8        A.      No, I wouldn't call it "advertising."

9    I would call it information on what I provide --

10       Q.      Would you call --

11       A.      -- on my group website.  It's not a --

12   it's not a website that we -- that's paid to -- to,

13   you know, be out on -- on TV and ads and -- it's

14   just a resource for patients to look at if they

15   look me up.

16       Q.      Okay.

17       A.      So they have to -- they have to look

18   for me, as opposed to -- the way I look at

19   advertising is, advertising is looking for

20   patients.

21       Q.      Okay.  They look you up.  They find

22   you.  They go to your website, and then they get

23   the content about the da Vinci robot system,

24   correct?

Christopher E. Ramsey, M.D.

1      A.      There's some information on the

2   da Vinci on there.

3      Q.      And do you consider the information you

4   have on your website related to the da Vinci robot

5   system as marketing information?

6      A.      Again, I don't consider it necessarily

7   marketing or advertisement.  It's not something I'm

8   actively putting out there to enhance my name.

9      Q.      Okay.  But you do list information

10  about the da Vinci robot system when a patient

11  accesses your profile, correct?

12     A.      Correct.

13     Q.      Do you share information with patients

14  that access your website profile about any medical

15  device other than the da Vinci robot system?

16     A.      I think there's information on there

17  about all the separate procedures that I do, and

18  female incontinence is in there as well.

19     Q.      On your website?

20     A.      I believe so.  I haven't looked at my

21  website in a while.  It should list things that

22  I -- under my profile, the type of procedures that

23  I do and I offer.

24     Q.      Okay.  Does it list areas --

Christopher E. Ramsey, M.D.

```
 1      A.      If not, I'll change it.

 2      Q.      Does it list areas of -- of your --

 3   that you specialize in?

 4      A.      It -- I think all the things that I do

 5   surgery in is -- are the things that I specialize

 6   in.

 7      Q.      Does it list areas of special

 8   concentration and emphasis of your clinical

 9   practice?

10      A.      I think the only thing that I -- well,

11   yeah, it's all of them.  Everything -- the list of

12   things that I do are things that I concentrate on,

13   I do.

14              More people in my practice are

15   interested in the robots, so there may be more

16   information about that.

17      Q.      This email in 2013 marked as

18   Exhibit 18, does it indicate that Ethicon is going

19   to visit your practice?

20      A.      He's coming to watch a surgery that I'm

21   doing; so he's coming to the hospital.

22      Q.      Okay.  And this is Ethicon's sales rep

23   that's going to come visit you at the hospital,

24   correct?
```

Christopher E. Ramsey, M.D.

```
 1      A.      Yes.

 2      Q.      Turn to page 2.  Who is Mandy Coffman?

 3      A.      She's my scheduler.

 4      Q.      Okay.  She writes -- she's writing to

 5   Jason Martin, your Ethicon sales rep, correct?

 6      A.      Uh-huh.  Yes.

 7      Q.      She writes, "Good morning, Jason.  I

 8   hope the boys are well."

 9              Did I read that correctly?

10      A.      Yes.

11      Q.      So she's referring, I assume, to Jason

12   Martin's sons; is that correct?

13      A.      In a urology practice, you don't know

14   what "the boys" are.

15      Q.      Okay.  And then she lists your surgery

16   schedule, correct?

17      A.      Yes, for a couple of days.  Yeah.

18      Q.      And she provides your surgery schedule

19   for the next two weeks to the Ethicon sales rep,

20   correct?

21      A.      Yes.

22      Q.      And that's so that the Ethicon sales

23   rep can come by and visit you at the hospital,

24   correct?
```

Christopher E. Ramsey, M.D.

```
 1      A.      Correct.

 2      Q.      In 2013, correct?

 3      A.      Correct.

 4      Q.      How often did -- was an Ethicon sales

 5   rep -- strike that.

 6              How often did you have contact with the

 7   Ethicon sales rep in 2013?

 8      A.      Not very often.  Not specifically

 9   for -- I mean, I knew Jason personally, but for --

10   specifically for a -- professionally, I didn't see

11   them very often.

12      Q.      Okay.  How often personally did you see

13   Mr. Martin?

14      A.      Oh, maybe at a football game, maybe at

15   a get-together with friends.

16      Q.      Okay.

17      A.      He's not what I would consider one of

18   my close personal friends.  He's a good friend, but

19   he's not a close personal friend.

20      Q.      Fair to say that in 2013, Ethicon sales

21   representatives were exchanging emails with your

22   office about your surgery schedule, correct?

23      A.      Not usually.  It's not -- it wasn't a

24   common thing at the time.  But they did.
```

Christopher E. Ramsey, M.D.

```
 1       Q.      In Exhibit 18, your staff at your

 2   clinic is exchanging emails with Ethicon sales reps

 3   about your surgery schedule, correct?

 4       A.      Yes.

 5       Q.      You can put that away.

 6               MR. MORIARTY:  We've been going about

 7   an hour and a half.  Is this a good time for a

 8   break?

 9               MR. JONES:  Yeah.  Let's take a quick

10   break.

11               (Brief recess.)

12   BY MR. JONES:

13       Q.      All right.  Doctor, after a short

14   break, are you ready to proceed?

15       A.      Yes.

16               (Whereupon Exhibit 19 was marked as an

17   exhibit.)

18   BY MR. JONES:

19       Q.      Okay.  I've handed you Exhibit 19.

20   Exhibit 19 is dated August 2006, correct?

21       A.      Yes.

22       Q.      And the subject line is "Secur Cadaver

23   Lab, August 11th, Updated Information," correct?

24       A.      Yes.
```

Christopher E. Ramsey, M.D.

1      Q.      And the email is from Susie Chilcoat,

2    correct?

3      A.      Yes.

4      Q.      She writes, "Hi, all.  I just received

5    the arrival/departure information from J&J Travel."

6              Did I read that correctly?

7      A.      Excuse me.  Where is that?

8      Q.      First sentence, first page.

9      A.      Yes.  Yep.

10     Q.      And then she lists underneath that what

11   appears to be dates and times of flights.

12     A.      Okay.

13     Q.      And if you go about halfway down,

14   you'll see your name --

15     A.      Yes.

16     Q.      -- Christopher Ramsey, is listed; is

17   that correct?

18     A.      Yes.

19     Q.      And with a date of August 10th, 2006,

20   correct?

21     A.      Yes.

22     Q.      Does this indicate that in August 2006

23   you attended a TVT-Secur cadaver lab?

24     A.      It looks like that was what it's

Christopher E. Ramsey, M.D.

```
 1    referring to.

 2         Q.     Okay.  And it looked like -- looks like

 3    from -- according to this document, your airfare

 4    was out of Knoxville to Atlanta, correct?

 5         A.     Yes.

 6         Q.     And then on to Orlando, correct?

 7         A.     If that's MCO.

 8         Q.     Okay.  Turn to the second page.  She

 9    writes, "Pick up at hotel, take to Celebration

10    Health Center.  Bus will wait."

11               Did I read that correctly?

12         A.     Yes.

13         Q.     So it indicates that this event in 2006

14    was in Celebration, Florida, correct?

15         A.     Correct.

16         Q.     And Ethicon would have a car ready to

17    pick you up at the airport, correct?

18         A.     Correct.

19         Q.     And then, if you look at the bottom of

20    page 2 --

21         A.     Mine's different than yours.  Okay.

22         Q.     If you look at the bottom of page 2,

23    now that we're on the same page together --

24         A.     Yes.
```

Christopher E. Ramsey, M.D.

```
1      Q.      -- she writes, "Wanted to give you some

2   additional information on the upcoming Secur

3   cadaver lab at Celebration Health on Friday,

4   August 11th.  I'm attaching below the hotel

5   confirmation numbers.  Please be sure to check

6   in -- please check to be sure you and your doctors

7   have a room."

8              Did I read that correctly?

9      A.      Yes.

10     Q.      And on page 3 it appears that there's a

11  dinner at Old Hickory Steakhouse in the Gaylord

12  Palms.

13             Did I read that correctly?

14     A.      Yes.

15     Q.      Yeah.  And the hotel is -- let's go off

16  the record real quick.

17             (Brief recess.)

18             (Mr. Orent joins the deposition.)

19  BY MR. JONES:

20     Q.      Okay, Doctor, we're looking at

21  Exhibit 18, which is a 2006 email discussing the

22  TVT-Secur cadaver lab in Celebration, Florida,

23  correct?

24     A.      Yes.
```

Christopher E. Ramsey, M.D.

1    Q.     Okay.  And it's discussing a dinner at

2    the Old Hickory Steakhouse in the Gaylord Palms,

3    correct?

4    A.     Yes.

5    Q.     And the hotel listed for this event is

6    the Gaylord Palms in Kissimmee, Florida, correct?

7    A.     Yes.

8    Q.     And then, underneath that, she writes,

9    "If your doctor has booked their airline tickets

10   through J&J Travel, limo arrangements have been

11   made for them through Concord Limo."

12          Did I read that correctly?

13   A.     Yes.

14   Q.     And that indicates that Johnson &

15   Johnson has set up limo arrangements to provide

16   transportation for the consultant physicians from

17   the airport to the hotel, correct?

18   A.     Yes.

19   Q.     And then she writes, "Please have your

20   doctors meet in the lobby and be transported to

21   Celebration Health by bus."

22          Did I read that correctly?

23   A.     Yes.

24   Q.     And you'll see below this that there's

Christopher E. Ramsey, M.D.

```
 1    a list of additional names and flight information,

 2    correct?

 3        A.      Yes.

 4        Q.      Scott Finley is one of the names

 5    listed, correct?

 6        A.      Correct.

 7        Q.      So that indicates that Mr. Finley was

 8    at this event in 2006, correct?

 9        A.      I don't know if he was at it or not,

10    but he was on this list.  So. . .

11        Q.      Okay.  According to Exhibit 18,

12    Johnson & Johnson had booked airfare for him to be

13    at this event in 2006, correct?

14        A.      Correct.

15        Q.      Okay.  And Mr. Finley you know as an

16    Ethicon sales representative and Ethicon division

17    manager, correct?

18        A.      Yes.

19        Q.      And then, if you continue to go down

20    that list, you'll see your name, Chris Ramsey,

21    listed, correct?

22        A.      Correct.

23        Q.      Who is Bob Zipfel?

24        A.      I have no idea.
```

Christopher E. Ramsey, M.D.

```
1        Q.      You don't know who Robert Zipfel is?

2        A.      No.

3        Q.      Okay.  You can put Exhibit 18 away,

4   Doctor.

5                Exhibit 19 is a 2007 Ethicon email,

6   correct?

7                MR. MORIARTY:  Before you go any

8   further, shouldn't this be 20?

9                MR. JONES:  Good work.  Exhibit 20.

10  Thank you.

11               (Whereupon Exhibit 20 was marked as an

12  exhibit.)

13  BY MR. JONES:

14       Q.      Exhibit 20 we'll mark for the record,

15  is a January 2007 email, correct?

16       A.      Yes.

17       Q.      Okay.  And it reads in part, "Today,

18  however, I got a call from an administrative

19  assistant in Dr. Chris Ramsey's office asking how

20  she can return the model since the doctor doesn't

21  want it.  I wasn't really sure what to tell her, so

22  I've taken her contact information and told her I

23  would get back to her after I contacted you."

24               Did I read that correctly?
```

Christopher E. Ramsey, M.D.

1      A.      Yes.

2      Q.      Okay.  Why did you not want the

3    TVT-Secur device model that Ethicon sent your

4    office?

5      A.      I do remember this thing.  It was

6    gigantic.  It was very realistic and -- and

7    cumbersome, and there's no way I could take it

8    around with me.

9              So I -- they had smaller models that I

10   had used in the past that you could hold in your

11   lap.  And this thing was enormous.

12             So I really didn't want to use it in my

13   proctoring.  I liked their other, smaller models

14   that they had.

15     Q.      Okay.  It's fair to say that in 2007

16   and -- sometime in 2006 or 2007, Ethicon sent you a

17   model to be used in TVT-Secur training activities,

18   correct?

19     A.      Correct.

20     Q.      And the model they sent you was not

21   adequate or too cumbersome for you to use in your

22   TVT training activities?

23     A.      It was too adequate.

24     Q.      Too adequate?

Christopher E. Ramsey, M.D.

```
1        A.      Too adequate.

2        Q.      You didn't want it, though --

3        A.      I didn't want it.

4        Q.      -- because it was too adequate?

5        A.      Big.  It was like a female pelvis, is

6    what it was.

7        Q.      It was a female pelvis?

8        A.      (Witness moves head up and down.)

9        Q.      Okay.  Exhibit 21.

10              (Whereupon Exhibit 21 was marked as an

11   exhibit.)

12   BY MR. JONES:

13       Q.      I'm not going to spend too much time on

14   this one.  Exhibit 21 is a performance and

15   development plan summary final review for Scott

16   Finley for the year 2006.

17       A.      Okay.  There's a lot of information on

18   this.  What are you looking specifically for?

19       Q.      I'll direct you.

20              Page 2.  It reads, "Brought on two

21   new" -- "Brought on board two new preceptors:

22   Ramsey, TVT, McCauley."

23              Did I read that correctly?

24       A.      Yes.
```

Christopher E. Ramsey, M.D.

1      Q.      And then under "Management Comments,"

2   it reads "Booth captain at AUA."

3              Did I read that correctly?

4      A.      Where is that?

5              Yes.  Okay.

6      Q.      And what does a booth captain at AUA

7   mean to you?

8      A.      I don't know what a booth captain is.

9   He might have been at the AUA in 2006.

10     Q.      When you went to the AUA convention,

11  were Ethicon employees there?

12     A.      Last year?  Yes, there were.

13     Q.      Did you interact with them there?

14     A.      Ethicon?  I did not.

15     Q.      Which company representatives did you

16  interact with at AUA?

17     A.      Intuitive, Medtronic, Dorner, AmnioFix.

18  The -- there's a MRI fusion-guided transrectal

19  biopsy device that's available that I saw.

20              I went to most of the booths in

21  there --

22     Q.      Okay.

23     A.      -- but those are the ones specifically

24  that I remember.

Christopher E. Ramsey, M.D.

```
1       Q.      You go out to dinner with employees

2    from those companies?

3       A.      I had a -- I had a lunch with

4    Intuitive.

5       Q.      Intuitive, you're a consultant for,

6    correct?

7       A.      Right.

8       Q.      Intuitive took you out to lunch while

9    you were at AUA, correct?

10      A.      And Medtronic.

11      Q.      Medtronic -- Medtronic and Intuitive

12   took you to lunch when you were at AUA?

13      A.      And we had a dinner with AmnioFix and a

14   presentation with AmnioFix.

15      Q.      Fair to say that multiple medical

16   device companies were present at AUA, correct?

17      A.      Yes.

18      Q.      Multiple medical device companies

19   interacted with you at AUA, correct?

20      A.      Yes.

21      Q.      Multiple medical device companies took

22   you out for meals at AUA, correct?

23      A.      Those were associated with

24   presentations.
```

Christopher E. Ramsey, M.D.

1      Q.      Okay.  Multiple medical device

2    companies took you out for meals associated with

3    presentations at AUA, correct?

4      A.      Yes.

5      Q.      Did Scott Finley bring you on board as

6    an Ethicon preceptor?

7      A.      I can't remember if it was Scott Finley

8    or his predecessor that did that.  But I don't

9    remember.

10      Q.      Who was his predecessor?

11      A.      I don't remember that either.  I know

12    Todd Kelly was a -- was a representative for Scott,

13    but I don't know if there was someone in between or

14    not.  I don't remember who brought me on.

15              MR. JONES:  Let's mark Exhibit 22.

16              (Whereupon Exhibit 22 was marked as an

17    exhibit.)

18    BY MR. JONES:

19      Q.      Exhibit 22 is a 2007 Ethicon email,

20    correct?

21      A.      Yes.

22      Q.      And it's an email between Michael Lewis

23    and Scott Finley, correct?

24      A.      Looks like it.

Christopher E. Ramsey, M.D.

```
 1      Q.      And you know Michael Lewis and Scott

 2   Finley in their roles as Ethicon sales

 3   representatives, correct?

 4      A.      Yes.

 5      Q.      And Scott Finley emails Mike Lewis in

 6   2007 and attaches a sample request form, correct?

 7      A.      Yes.

 8      Q.      And if you look at the attachment --

 9      A.      What did you say?  Sample request form?

10   It says "Event Request Form."

11      Q.      Event request form, sorry.  Scott

12   Finley attaches an event request form to this 2007

13   email, correct?

14      A.      Okay.  Yes.

15      Q.      And if we look at the attachment, it's

16   entitled as "Event Request Form," correct?

17      A.      Yes.

18      Q.      "Date submitted:  August 14th, 2007,"

19   correct?

20      A.      Yes.

21      Q.      "Product Platform:  TVT-Secur,"

22   correct?

23      A.      Yes.

24      Q.      "Name of requested preceptor:  Chris
```

Christopher E. Ramsey, M.D.

1      Ramsey," correct?

2          A.      Yes.

3          Q.      And then it reads, "Business case,

4      including targeted accounts," correct?

5          A.      Yes.

6          Q.      What does it mean when it states

7      "Business case, including targeted accounts"?

8          A.      I don't know, honestly.  Doesn't even

9      describe what he's talking about there.  I don't

10     know.

11         Q.      Did you ever target other doctors for

12     Ethicon in your roll as a consultant physician for

13     them?

14              MR. MORIARTY:  Objection.

15              THE WITNESS:  No, I didn't target

16     anybody.

17     BY MR. JONES:

18         Q.      Does this indicate that in 2007 Ethicon

19     would fill out event request forms for you to

20     provide services related to the TVT-Secur device?

21         A.      I'm not sure what they did to do that.

22     But it looks like that's what -- that's what

23     happened there.

24         Q.      Okay.  Was an Ethicon sales

Christopher E. Ramsey, M.D.

1    representative present at the Ethicon proctor

2    events you did?

3        A.      Most likely.

4        Q.      Okay.  So every time you did a

5    consulting activity for Ethicon, an Ethicon sales

6    representative was present, correct?

7        A.      They may not have been there with a

8    observation.  With the proctoring, they would be

9    there.

10       Q.      Every proctor event you did for

11   Ethicon, an Ethicon sales representative was

12   present, correct?

13       A.      That's right.

14       Q.      Can the mesh used in the TVT line of

15   products be a cause of chronic pain?

16               MR. MORIARTY:  Objection.  Form.

17               Go ahead.

18               THE WITNESS:  I don't think the mesh is

19   the cause of the chronic pain.

20   BY MR. JONES:

21       Q.      Can it be a cause of chronic pain?

22       A.      I don't think the mesh is a cause of

23   chronic pain.

24       Q.      Can it ever be a cause of chronic pain?

Christopher E. Ramsey, M.D.

1      A.      I don't think it is.

2      Q.      Okay.  Mesh -- the mesh used in the TVT

3   line of products in your opinion can never be a

4   cause of chronic pain in women, correct?

5      A.      I don't believe the mesh is the cause

6   of chronic pain in women.

7      Q.      And the mesh used in the TVT line of

8   products in your opinion can never be the cause of

9   chronic pain in women, correct?

10      A.      It's not the cause of chronic pain.

11      Q.      Okay.  The mesh used in the TVT line of

12   products in your opinion cannot be a cause of

13   dyspareunia, correct?

14      A.      I don't think that the mesh is a cause

15   of dyspareunia.

16      Q.      Never, correct?

17      A.      I've never seen it.

18      Q.      Ever?

19      A.      I have not, not in my clinical

20   practice.

21      Q.      You've never read about it either, have

22   you?

23      A.      I've read about it in certain articles

24   that suggest it, but I don't -- I don't think

Christopher E. Ramsey, M.D.

1    that's the case.

2        Q.      Okay.  You've read in medical journal

3    articles that the mesh used in the TVT line of

4    products can be a cause of dyspareunia, correct?

5        A.      In some articles they suggest that it

6    can be.

7        Q.      You disagreed with those articles,

8    correct?

9        A.      Yes.

10       Q.      Okay.  And can the mesh used in the TVT

11   line of products be a cause of discomfort for

12   women?

13       A.      Yes, it can be.

14       Q.      Okay.  Can the mesh used in the TVT

15   line of products cause irritation to women's

16   vaginal tissues?

17       A.      With an exposure, there can be some

18   irritation.

19       Q.      When the mesh used in the TVT line of

20   products is exposed, it can cause irritation to

21   women, correct?

22       A.      Correct.

23       Q.      It can cause discomfort to women,

24   correct?

Christopher E. Ramsey, M.D.

1      A.      Correct.

2      Q.      It can cause pain to women, correct?

3      A.      With exposure.

4      Q.      It can cause dyspareunia for women,

5   correct?

6      A.      It -- it -- very rarely.

7      Q.      But it can, correct?

8      A.      It potentially can.

9      Q.      It can also cause injuries to the

10  woman's sexual partner, correct?

11     A.      Yes.

12     Q.      Does the inflammatory response to the

13  mesh used in the TVT products ever stop after the

14  mesh is implanted inside the woman?

15     A.      I think, after a certain time, the body

16  doesn't react to the mesh anymore once it's

17  incorporated itself into -- incorporated the mesh

18  into itself.

19     Q.      After -- oh.

20             Do you have any idea of when the mesh

21  incorporates into the tissue in a woman?

22     A.      I don't know for certain.  It's around

23  three to six months.

24     Q.      After three to six months, the body

Christopher E. Ramsey, M.D.

1    stops reacting to the mesh inside of it, correct?

2       A.      I believe so.

3       Q.      After three to six months, the body no

4    longer has a foreign body reaction to the mesh,

5    correct?

6       A.      Correct.

7       Q.      What are you relying on to support

8    those opinions?

9       A.      Mostly my own clinical experience in

10   seeing patients after -- after surgery and

11   following up long term.  But I've seen -- and

12   that's the main thing.

13      Q.      And you've already stated that you

14   don't -- you've not created a patient registry for

15   your TVT patients, correct?

16      A.      Correct.

17      Q.      And you don't report your mesh

18   complications to anyone, correct?

19      A.      I have not.

20              MR. JONES:  I'll mark Exhibit 23.

21              (Whereupon Exhibit 23 was marked as an

22   exhibit.)

23   BY MR. JONES:

24      Q.      The only thing I'm going to ask about

Christopher E. Ramsey, M.D.

```
 1    Exhibit 23 is, does this indicate that on

 2    October 26th, Friday, 2007, that you did a

 3    TVT-Secur course for Ethicon?

 4       A.      I would say I did a proctoring event

 5    there.

 6       Q.      Okay.  Well, "List of Courses" and

 7    "Course Captain" is what's listed in this email,

 8    correct?

 9       A.      Yes.

10       Q.      And it's written by Scott Finley,

11    correct?

12       A.      Yes.

13       Q.      He's division manager, correct?

14       A.      Yes.

15       Q.      And he writes, "Courses and course

16    captains," correct?

17       A.      Correct.

18       Q.      And for -- for courses and course

19    captains, he lists "Chris Ramsey and Mike Lewis,

20    October 26th, 2007," correct?

21       A.      Correct.  This looks more like probably

22    what I would do as an observation.  I would have a

23    couple of surgeons come in and watch me do a case,

24    is probably what this was.
```

Christopher E. Ramsey, M.D.

1      Q.      And Ethicon would pay you for that,

2   correct?

3      A.      Correct.

4      Q.      And those would be surgeries that you

5   would also bill the patient for, correct?

6      A.      Correct.

7      Q.      So you would be paid by Ethicon for

8   those surgeries to observe, correct?

9      A.      I would be paid by Ethicon to explain

10  what I was doing to several surgeons in the middle

11  of my case.

12     Q.      Okay.  With an Ethicon sales rep

13  present, correct?

14     A.      Typically.

15     Q.      Well, here we know he was present,

16  correct?

17     A.      We don't know he was present.  He

18  was --

19     Q.      He's listed as a course captain,

20  correct?

21     A.      Right.

22     Q.      So here we know at this occasion, Mike

23  Lewis, your Ethicon sales rep, was listed as a

24  course captain, correct?

Christopher E. Ramsey, M.D.

1      A.      Yes.

2      Q.      Okay.  And Ethicon would pay you --

3   when they came and observed you, Ethicon would pay

4   you for your time that other surgeons observed your

5   procedure, correct?

6      A.      Correct.

7      Q.      And you would pay Ethicon for the

8   products you used during that time, correct?

9      A.      No, I would not pay Ethicon.

10      Q.      Ethicon gave you the products for free

11   that you used at these events?

12      A.      I've never paid for the products from

13   Ethicon.

14      Q.      Ethicon billed you -- billed you for

15   the products you used at these --

16      A.      They don't bill me; they bill the

17   hospital.

18      Q.      They billed your hospital, correct?

19      A.      Correct.

20      Q.      Okay.  You didn't get these free of

21   charge; your hospital didn't get these free of

22   charge, correct?

23      A.      I don't know about that.  I know I have

24   gotten some free of charge in the past.  I don't

Christopher E. Ramsey, M.D.

```
 1    know if these were given free or charge of not.

 2         Q.      Ethicon has given you slings free of

 3    charge in the past?

 4         A.      When I've -- when I first started

 5    using, I think that they were allowing me to use it

 6    at first for several surgeries to make sure that I

 7    liked it and that I wanted to continue to use it.

 8               I think so.  I don't remember that,

 9    honestly.  But I think so.

10         Q.      Subject line of this email is "Prof ed

11    courses and spending."

12         A.      Okay.

13         Q.      Did any of your sales reps ever

14    communicate to you budget concerns with the Ethicon

15    professional education program?

16         A.      No.

17         Q.      Never?

18         A.      No.

19         Q.      Never in an email?

20         A.      I -- I don't remember.

21         Q.      Okay.

22         A.      It wasn't their typical policy to talk

23    to me about what was going on in their -- within

24    their inner workings.
```

Christopher E. Ramsey, M.D.

1              MR. JONES:  Okay.  Let's mark

2    Exhibit 23.

3              (Whereupon Exhibit 24 was marked as an

4    exhibit.)

5              MR. MORIARTY:  24.

6              MR. JONES:  Thank you, Counselor.

7              MR. MORIARTY:  That's all I'm good for,

8    is occasional numeric sequence.

9              MR. JONES:  You're good at it, though.

10   Thank you, though.  I do appreciate it.

11   BY MR. JONES:

12      Q.      Okay.  Exhibit 24.  I want to read

13   middle of the email -- October 26th.

14   "October 26th, TVT-Secur, Chris Ramsey, Knoxville.

15   Dr. Ramsey is a urologist who will help with any

16   urology customers that you may have, including

17   dinner programs."

18              Did I read that correctly?

19      A.      Yes.

20      Q.      And this is a 2007 Ethicon email

21   drafted by Scott Finley, correct?

22      A.      Correct.

23      Q.      Scott Finley was division manager and

24   Ethicon sales rep for you, correct?

Christopher E. Ramsey, M.D.

```
 1      A.      Correct.

 2      Q.      Okay.  And does this indicate that his

 3   impression was that you would do dinner programs

 4   for Ethicon?

 5      A.      Yes.  Usually I would just be meeting

 6   with them at dinner and discussing the products.  I

 7   didn't have a formal presentation arrangement.

 8      Q.      You met with Ethicon employees for

 9   dinner to discuss the TVT-Secur device, correct?

10      A.      Yes.

11      Q.      How many times?

12      A.      I have no idea how many times.

13      Q.      Ethicon pay for those dinners?

14      A.      Yes.

15      Q.      Every time?

16      A.      Yes.

17      Q.      Where did they occur?

18      A.      Restaurant.

19      Q.      Where?

20      A.      I don't recall the restaurants.

21      Q.      In Knoxville?

22      A.      Yes.

23      Q.      Was it always with Chris Finley -- or

24   Scott Finley?
```

Christopher E. Ramsey, M.D.

```
 1      A.      No, not always with Scott Finley.

 2      Q.      Who else did you meet with?

 3      A.      Probably Mike Lewis.

 4      Q.      Mike Lewis and Scott Finley would take

 5  you out to dinner to discuss TVT-Secur, correct?

 6      A.      Yes.

 7      Q.      And did you communicate to them that

 8  you were willing to help with any urology

 9  customers?

10      A.      Yes.

11      Q.      And this would have been in the 2006 to

12  2011 time frame, correct?

13      A.      Probably.

14      Q.      So from 2006 to 2011, you told Ethicon

15  you would help out with any urology customers on

16  the TVT-Secur device --

17              (Reporter interruption for

18  clarification.)

19  BY MR. JONES:

20      Q.      From 2006 to 2011, you communicated to

21  Ethicon you would help with any urology customers

22  on the TVT-Secur device?

23      A.      Correct.

24      Q.      And from 2006 to 2011, Ethicon sales
```

Christopher E. Ramsey, M.D.

1    representatives and division managers would take

2    you out to dinner to talk about the TVT-Secur

3    device, correct?

4        A.      Occasionally.

5        Q.      You can put that one away.

6                Do you know who Dr. Jeffrey Dale is?

7        A.      Dale or Dell?

8        Q.      Dell.

9        A.      Dell.  Yes.

10       Q.      Okay.  Who is he?

11       A.      He's a urogynecologist in Knoxville.

12       Q.      Do you refer patients to Dr. Dell?

13       A.      No.

14       Q.      Have you ever?

15       A.      Not that I recall.  May have one or

16   two, but I sure don't do it very often.

17       Q.      Okay.  Is Dr. Dell an Ethicon

18   consultant as well?

19       A.      I'm not aware of it.

20       Q.      Do you have any interactions with

21   Dr. Dell?

22       A.      Pass him in the hall.  Physician's

23   lounges.  We're cordial.

24       Q.      In your role as a consultant for

Christopher E. Ramsey, M.D.

1    Ethicon, did you consider yourself a business

2    partner with Ethicon?

3                MR. MORIARTY:  Objection.  Asked and

4    answered yesterday.

5                THE WITNESS:  I don't think that I

6    consider myself a business partner.

7                MR. JONES:  I'll mark the next

8    exhibit 25.

9                (Whereupon Exhibit 25 was marked as an

10   exhibit.)

11   BY MR. JONES:

12       Q.      Turn you to page 2, the bottom of

13   page 2 of Exhibit 25.

14                This is a 2007 Ethicon email, correct?

15       A.      Yes.

16       Q.      The subject line is "Health care

17   compliance training requirements for preceptors,"

18   correct?

19       A.      Yes.

20       Q.      And it says, "Dear Health Care

21   Providers, Ethicon, Incorporated, has developed a

22   health care compliance training course and

23   certification for business partners who interact

24   with health care professionals on our behalf."

Christopher E. Ramsey, M.D.

1                    Did I read that correctly?

2       A.      Yes.

3       Q.      "As a professional contracted to train

4    or speak to other health care professionals on

5    Ethicon's behalf, you have been identified as a key

6    individual who must complete health care training

7    compliance" -- "health care compliance training."

8                    Did I read that correct?

9       A.      Yes.

10      Q.      And did you complete this health care

11   compliance training?

12      A.      I don't remember if I did or didn't.  I

13   may have.

14      Q.      Okay.  If it was required per your

15   contract, you would have completed it, correct?

16      A.      Yes.

17      Q.      "As per your contract terms, you have

18   agreed to participate in such training scheduled by

19   the company."

20                    Did I read that correctly?

21      A.      Is that still on the first page?

22              Yeah.

23      Q.      Yes, I did?

24      A.      Yes.  That's what it says there.

Christopher E. Ramsey, M.D.

```
 1        Q.      And this is Ethicon communicating that
 2   you as a consultant is a business partner of
 3   Ethicon, correct?
 4        A.      That's what they're saying.
 5        Q.      Do you disagree with that?
 6        A.      I don't consider myself a partner of
 7   theirs.
 8        Q.      But you understand that Ethicon
 9   considered you a business partner of theirs in your
10   role as a consultant?
11        A.      I don't --
12                MR. MORIARTY:  Objection.
13                Go ahead.
14                THE WITNESS:  I don't know if they
15   considered me a business partner.  That's the terms
16   that they used.
17   BY MR. JONES:
18        Q.      The term they used inside the company
19   was that you were a business partner, correct?
20        A.      That's the term that they use.  I
21   consider myself a consultant.
22        Q.      Now, this email where they've described
23   you as a business partner eventually gets emailed
24   to you, correct?
```

Christopher E. Ramsey, M.D.

1       A.      I don't know -- does it?  Is that on

2    there?

3                Yes, they have my name there.

4       Q.      Okay.  So you received this email,

5    correct?

6       A.      I don't know if I received it or not.

7       Q.      Your email address is listed as a

8    recipient of this email, correct?

9       A.      My name is.  It doesn't have the email

10   address.

11      Q.      Okay.  "Chris Ramsey M.D. email,"

12   correct?

13      A.      That's what it says.

14      Q.      Okay.  Along with other physicians that

15   are listed as recipients, correct?

16      A.      Correct.

17      Q.      And it writes, "Dear Preceptor" -- and

18   this is from Bob Zipfel, correct?

19      A.      Yes.

20      Q.      He writes "Dear Preceptor," correct?

21      A.      Yes.

22      Q.      You were a preceptor, correct?

23      A.      I was.

24      Q.      During this time period, correct?

Christopher E. Ramsey, M.D.

```
 1      A.      Yes.

 2      Q.      Okay.  "Please take note of this very

 3   important email sent by Patti Logan on September

 4   11.  Completion of this quick assessment is

 5   required."

 6              Did I read that correctly?

 7      A.      Yes.

 8      Q.      And so this communication where Ethicon

 9   has referred to you as a business partner is then

10   sent out to a list of preceptors, correct?

11      A.      Yes.

12      Q.      And you're listed in the recipient

13   email line, correct?

14      A.      Correct.

15      Q.      So according to the email recipient

16   list, you received this email in which Ethicon

17   referred to you as a business partner, correct?

18      A.      My name's on it.  Again, I don't know

19   if I received it or not.

20      Q.      Your name's listed as a recipient of an

21   email where Ethicon referred to you as a business

22   partner of theirs, correct?

23      A.      No.  That's -- the one that says that

24   is to the Ethicon employees.  The one that was sent
```

Christopher E. Ramsey, M.D.

1    to me doesn't say that I'm a business partner.

2         Q.      Okay.  It was in the email below it,

3    correct?

4         A.      Right.

5         Q.      That was forwarded to you, correct?

6         A.      I don't know if -- was that forwarded

7    to me?  I don't know if it was forwarded to me or

8    not.

9         Q.      You don't know what "FW" means in a

10   subject line?

11        A.      But I don't know the -- if this -- if

12   this whole thing was forwarded to me or not.  I

13   don't know what was sent to me.

14        Q.      Okay.  It says "Forward:  Health care

15   compliance training requirement for preceptors,"

16   correct?

17        A.      Right.  But I don't know if everything

18   below this was sent to me or not.

19        Q.      And then the email -- I'll represent to

20   you this is how it was produced.

21        A.      Okay.

22        Q.      And in the email below it, it was

23   included, okay?

24        A.      Okay.

Christopher E. Ramsey, M.D.

1      Q.      So in 2007 you're listed as a recipient

2  of an email that includes language that calls you a

3  business partner for Ethicon, correct?

4      A.      It looks like it.

5      Q.      Okay.  We'll move on.

6              (Whereupon Exhibit 26 was marked as an

7  exhibit.)

8  BY MR. JONES:

9      Q.      Exhibit 26.  And this is a 2000

10 [verbatim] email from Scott Finley, correct?

11     A.      From Scott Finley or to?

12             MR. MORIARTY:  Do you have an extra?

13 BY MR. JONES:

14     Q.      From Scott Finley, correct?

15     A.      It looks like it's from Mike Lewis.

16     Q.      Yeah.  An email between Mike Lewis and

17 Scott Finley in 2007, correct?

18     A.      Yes.

19     Q.      Discussing TVT-S preceptorships,

20 correct?

21     A.      Yes.

22     Q.      He writes, "I am working with Fleet and

23 Dave to get a date from Ramsey.  They are both

24 saying they have two docs they want to send.  We

Christopher E. Ramsey, M.D.

1    may end up sending Ramsey to Fleet's territory for

2    a proctorship."

3              Did I read that correctly?

4    A.      Yes.

5    Q.      Does that indicate that Ethicon has two

6    doctors they want to send to you in 2007 to be

7    trained on TVT-S?

8    A.      Not to me necessarily.  They just have

9    two docs that they want to have trained.

10   Q.      Okay.  Two doctors are indicating they

11   want training on TVT-Secur?

12   A.      Correct.

13   Q.      And Ethicon's either going to send you

14   to them or they're going to pay for those doctors

15   to come to you, correct?

16   A.      I honestly don't know.

17   Q.      They're considering using you in 2007

18   to train these doctors?

19   A.      It looks like it.

20   Q.      So in 2007, in your role as a

21   consultant physician for Ethicon, you would --

22   Ethicon would pay for you to travel to other

23   surgeons and train them on the TVT-Secur device?

24   A.      I did that one time that I remember,

Christopher E. Ramsey, M.D.

1    going out of town.  I don't remember if I did -- I

2    may have done it more, but I don't remember.  I

3    remember one going up to Kentucky once.

4        Q.      Ethicon would pay for surgeons in 2007

5    to travel to you to watch you perform the TVT-S

6    procedure, correct?

7        A.      I don't think they paid them.  I think

8    they paid their way.  I don't think they actually

9    paid them a fee to come watch me.

10       Q.      Ethicon paid for their travel for

11   them --

12       A.      Probably.

13       Q.      Okay.

14               -- to be trained by you on TVT-Secur,

15   correct?

16       A.      Probably.  I don't know what they did

17   with the people that came to see me.

18               MR. JONES:  You can put that away.

19               Okay.  Let's mark Exhibit 27.

20               (Whereupon Exhibit 27 was marked as an

21   exhibit.)

22   BY MR. JONES:

23       Q.      I'm just going to ask you questions

24   about the bottom of page 1, where it says "Ramsey,"

Christopher E. Ramsey, M.D.

```
 1     and about the title of the document.

 2               Exhibit 27 is a field visit letter,

 3     correct?

 4          A.    Yes.

 5          Q.    Exhibit 27 is a field visit letter with

 6     a sales rep named Mike Lewis, correct?

 7          A.    Yes.

 8          Q.    Division manager Scott Finley, correct?

 9          A.    Yes.

10          Q.    And January 2008 is the field visit

11     date, correct?

12          A.    Okay.

13          Q.    And at the bottom of page 1, under the

14     heading "Negative Trend," the second bullet point

15     reads, "TVT is on a negative trend due to volume

16     issues."

17               Did I read that correctly?

18          A.    Yes.

19          Q.    "TVT is on a negative trend due to

20     volume issues, economic factors listed above, and

21     competitive issues."

22               Correct?

23          A.    Okay.

24          Q.    "This product line needs a great deal
```

Christopher E. Ramsey, M.D.

```
1    of focus in Quarter 1 and Quarter 2 of 2008 to get

2    it moving forward."

3              Did I read that correctly?

4    A.      Yes.

5    Q.      Now, Mike Lewis is your Ethicon sales

6    rep, correct?

7    A.      At that time, yes.

8    Q.      "Plan:  Conduct effective field

9    marketing programs with busy users and convert the

10   two or three competitive sling users that exist in

11   your territory."

12             Did I read that correctly?

13   A.      Yes.

14   Q.      "You will need to focus on your key

15   users to defend your business and drive growth from

16   these very busy surgeons, i.e., Ramsey, Dell,

17   Nicely, Parker, Cameron, Bell, Hartline, Morgan,

18   and Ruby."

19             Did I read that correctly?

20   A.      Brown, not --

21   Q.      Brown.  Okay.

22             Were you a key user in 2008 of the

23   TVT-Secur device?

24   A.      I don't know if I was a key user.  I
```

Christopher E. Ramsey, M.D.

1    was a busy user.

2        Q.      You were a very busy user of the

3    TVT-Secur device, correct?

4        A.      Again, I don't know what qualification

5    for that, busy, but --

6        Q.      According to your sales representative,

7    you were a key user and a very busy user of the

8    TVT-Secur device in 2008, correct?

9        A.      Including several other people.

10       Q.      Several other people, including some of

11   which are your partners, correct?

12       A.      Correct.

13       Q.      Which ones listed here are your

14   partners?

15       A.      Nicely, Parker, and Cameron.

16       Q.      Four of these surgeons listed on

17   Exhibit 27 as key users and very busy surgeons of

18   the TVT-Secur device are part of your practice

19   group, correct?

20       A.      Yes.

21       Q.      In 2008 did you increase your use of

22   TVT-Secur?

23       A.      I have no idea how -- how much -- you

24   know, what my volume was.

Christopher E. Ramsey, M.D.

1      Q.      Do you recall there being a negative

2   trend with the use of TVT products in 2008?

3              MR. MORIARTY:  Objection.

4              THE WITNESS:  I have no idea about

5   their internal issues.  You know, for me, I don't

6   think it was any change.  It was business as usual

7   for me.

8   BY MR. JONES:

9      Q.      Okay.  Did you try to drive growth at

10  all?

11     A.      No.

12     Q.      Okay.  Did you ever feel like Ethicon

13  sales representative Mike Lewis was trying to drive

14  growth of TVT sales?

15     A.      He was -- was he trying to drive

16  growth?  Not through me.  Not by me.

17     Q.      We'll put that one away.

18             TVT-Secur device, when did you start

19  using it?

20     A.      2006.

21     Q.      When did you stop using it?

22     A.      Probably end of 2012, when they ran out

23  of them.

24     Q.      And you used it a total of how many

Christopher E. Ramsey, M.D.

1    times?

2        A.      Around 400, is what I think I

3    represented.

4        Q.      Okay.  And you performed an independent

5    literature search prior to using the TVT-Secur

6    device in 2006, correct?

7        A.      There wasn't a whole lot of independent

8    literature on the market at the time, because I was

9    one of the first users in the country to use it.

10   But I did review their studies that they had.  I

11   went to their -- their breakout session that showed

12   the information about TVT-Secur, how it worked, how

13   it was put in.

14       Q.      Okay.  At the -- in 2006, when you

15   first started using this TVT-Secur device, there

16   was not a -- a lot of clinical study data on the

17   product, correct?

18       A.      Correct.

19       Q.      There was limited clinical study data

20   on TVT-Secur in 2006 when you started using it,

21   correct?

22       A.      On the Secur device, yes.

23       Q.      Were there any long-term safety studies

24   on the TVT-Secur device in 2006?

Christopher E. Ramsey, M.D.

```
1      A.      Long-term safety studies?  Yes.

2      Q.      Which ones?

3      A.      The ones that discussed TVT mesh in

4   general.

5      Q.      Does the --

6      A.      You asked about safety.  So --

7      Q.      Does the Ulmsten -- or do you know what

8   the Ulmsten 17-year data study is?

9      A.      I'm familiar with it.

10      Q.      Does that apply to the -- was that done

11   on the -- which product was that done on?

12      A.      TVT Retropubic.

13      Q.      Does that apply to the TVT Exact

14   device?

15      A.      I'm not certain.

16      Q.      Does that apply to the TVT Abbrevo

17   device?

18      A.      No.

19      Q.      Does that apply to the TVT-Secur

20   device?

21      A.      No.

22      Q.      Does it apply to the TVT Obturator

23   device?

24      A.      No.
```

Christopher E. Ramsey, M.D.

1      Q.      What clinical studies were available in

2    2006 specifically on the TVT-Secur device?

3      A.      I can't remember if they -- if some of

4    the original surgeons who helped develop it had

5    studies specific to the TVT-Secur.  Honestly, I

6    can't remember what it -- what it showed.

7      Q.      There wasn't much, though?

8      A.      No, there was -- there wasn't a lot

9    of -- of data.  I think there was a couple of

10   implanted -- several -- and, again, I don't know

11   how many -- but many had followed them over a

12   certain period of time.  Again, I don't how long it

13   was.

14     Q.      Is there a learning curve to the TVT-S

15   device?

16     A.      Yes.

17     Q.      What is the learning curve?

18     A.      It's different for everybody.

19     Q.      What is the estimate of the learning

20   curve?

21     A.      It's completely different for

22   everybody.  There's no way to put a learning curve.

23   It's -- it's really -- depends on your familiarity

24   with the -- with the technique -- with midurethral

Christopher E. Ramsey, M.D.

1    slings in the first place, with stress urinary

2    incontinence surgeries in the first place, and then

3    your comfort level with using the device.

4        Q.      Okay.  What was your learning curve

5    with TVT-S?

6        A.      I think that I started feeling pretty

7    comfortable with it after about ten -- ten

8    patients.

9        Q.      What do you mean, you felt "comfortable

10    with it" after ten patients?

11              MR. MORIARTY:  Objection.  Form.  He

12    said "very comfortable."

13    BY MR. JONES:

14        Q.      What do you mean by "very comfortable"?

15        A.      There was some issues early on removing

16    the trocar device, the placement device.  And that

17    was difficult to -- to get used to at first.

18              I don't think that I really had a whole

19    lot of problem with efficacy.  It was just placing

20    the device in a comfortable manner, getting it in

21    the right spot, and then removing the device.

22        Q.      Fair to --

23        A.      Once I got it figured out, it was just

24    a piece of cake, once I got it figured out.

Christopher E. Ramsey, M.D.

```
 1      Q.      Once you -- fair to say that other

 2   surgeons are likely to have a higher learning curve

 3   than ten patients?

 4      A.      Maybe.  I can't speak to them.

 5      Q.      You can't speak to the learning curve

 6   for any other physician, correct?

 7      A.      I think everybody's learning curve is

 8   going to be different.

 9      Q.      So you can't speak to their learning

10   curves?

11              MR. MORIARTY:  Objection.

12              THE WITNESS:  Some might be faster than

13   me.  Some, you know, are slower than me.

14   BY MR. JONES:

15      Q.      What was your experience in TVT-Secur

16   proctorships with surgeons who participated in

17   their learning curves?

18      A.      I guess I don't know what you mean,

19   what my experience was.

20      Q.      The surgeons that you interacted with

21   in these proctors -- proctorships, what was their

22   learning curve --

23      A.      Oh, I don't know --

24      Q.      -- on TVT-S?
```

Christopher E. Ramsey, M.D.

1    A.      -- I don't know what their learning

2    curves would have been.  I didn't follow up with

3    them unless they had questions to ask me, and I

4    don't remember anybody calling me.

5    Q.      When did you first start using the

6    TVT-O device?

7    A.      TVT-O?  I think around 2004 or 2005.

8    Q.      When did you stop using the TVT-O

9    device?

10   A.      2006, when I -- when I started using

11   the TVT-Secur.

12   Q.      So you used the TVT-O for about a year

13   or two?

14   A.      Probably two, maybe two or three years.

15   Q.      How many did you put in?

16   A.      Around 300.

17   Q.      You put 300 TVT-Os in in two or three

18   years?

19   A.      Yeah.  Yes.

20   Q.      Prior to -- how many TVT Retropubics?

21   A.      Not very many.  Twenty-five or 50 is

22   what I had represented in my report.  That's

23   including residency and into practice.

24   Q.      Okay.  Take off residency.

Christopher E. Ramsey, M.D.

1           How many TVT Retropubics?

2      A.     Probably 25.  Half.  Half of that.

3      Q.     Half of the TVT Retropubics you placed

4   were during your residency, correct?

5      A.     Probably.

6      Q.     When did you stop using the TVT

7   Retropubic device?

8      A.     I kind of used it on and off throughout

9   the -- after residency.  I would use pubovaginal

10  sling with bone anchors probably more than I used

11  the TVT --

12     Q.     Okay.  When did you stop using the TVT

13  Retropubic device?

14     A.     When I started using the TVT-O.

15     Q.     So 2004, 2005, correct?

16     A.     2003, 2004, 2005.

17     Q.     You've used Abbrevo, correct?

18     A.     I have, probably maybe ten times.

19     Q.     Ten times, what -- what years?

20     A.     End of 2012 and 2013.

21     Q.     Did you also do maybe a couple of

22  TVT-Os then?

23     A.     Probably, yes.

24     Q.     In addition to the 300 that you put in

Christopher E. Ramsey, M.D.

1    in the two-or-three-year period earlier?

2        A.      Sure.  You can add that into my

3    total --

4        Q.      Okay.

5        A.      -- experience.

6                (Reporter interruption for

7    clarification.)

8    BY MR. JONES:

9        Q.      Several TVT-Os in 2012 or 2013,

10   correct?

11       A.      Yes.

12       Q.      By 2005, how many Ethicon mesh products

13   had you put in?

14       A.      By '05?  Maybe 200, 250.

15       Q.      And then, starting in 2012 or 2013, you

16   start using AMS mesh products, correct?

17       A.      Just the MiniArc-Precise.

18       Q.      You started using it in 2012?

19       A.      End of 2012.

20       Q.      How many?

21       A.      How many of those?  Probably 180 or so,

22   180 to 200.

23       Q.      Have -- other than the sling products

24   we just discussed, have you implanted any other

Christopher E. Ramsey, M.D.

1    sling products in women?

2        A.      I did -- we did SPARCs in residency as

3    well.  I don't think I used any of the Bard or

4    Boston products that I remember.  Maybe a couple

5    Monarcs.

6        Q.      Is the mesh used in SPARC the same as

7    the mesh as -- used in TVT?

8        A.      It's polypropylene mesh.  It's very

9    similar.

10       Q.      Any difference in the tensioning of the

11   AMS SPARC device with the TVT-O or TVT Retropubic

12   device?

13       A.      I tension them the same way.

14       Q.      Any difference in the design of the

15   mesh used in AMS SPARC with regards to tensioning?

16       A.      No, not with regards to tensioning.

17       Q.      Any added product features of the AMS

18   SPARC mesh that help a surgeon tension the AMS

19   SPARC mesh?

20       A.      Compared to TVT?

21       Q.      Correct.

22       A.      I don't think there was any advantage

23   one way or the other.

24       Q.      Any differences from --

Christopher E. Ramsey, M.D.

1      A.      From the tensioning, no.

2      Q.      Never used the Bard mesh product,

3   correct?

4      A.      No.

5      Q.      Never used the Boston Scientific mesh

6   product, correct?

7      A.      No.

8      Q.      Ever use the Boston Scientific Solyx

9   device?

10      A.      I don't think so.  I don't -- so,

11   again, I don't know which company makes, you know,

12   these -- Solyx does sound familiar.  I don't think

13   I've used it.  I've looked at it.  I don't remember

14   much about it.  I don't --

15      Q.      Okay.  What did you think of the

16   design?

17      A.      I don't remember much about it.

18      Q.      Okay.

19      A.      I really -- I don't think I used it.  I

20   can't remember using it.

21      Q.      Okay.  You've -- and you've never used

22   hernia mesh outside of your residency, correct?

23      A.      No.

24      Q.      And never used mesh for pelvic organ

Christopher E. Ramsey, M.D.

1    prolapse, correct?

2       A.      No.

3       Q.      You used TVT-S from 2006 to 2012 400

4    times, correct?

5       A.      Approximately.

6       Q.      How many times did you use it in 2006?

7       A.      Oh, I have no idea how I broke that

8    down.

9       Q.      Haven't broken that down?

10      A.      It's fairly similar, probably.  You

11   know, it's a six-year period, so, you know,

12   probably 50 to 75 a year or 50 to 100 a year,

13   depending on how busy I was.  I know some years I

14   was more busy than others.  But it would be between

15   75 to 100 a year.

16      Q.      Does it sound right that 2008 would

17   have been the year you used TVT-Secur the most?

18      A.      I have -- couldn't tell you.

19      Q.      Couldn't tell us?

20      A.      Couldn't tell you.

21      Q.      Couldn't tell us the exact number of

22   TVT-Securs either --

23      A.      No.

24      Q.      -- correct?

Christopher E. Ramsey, M.D.

```
 1                 Okay.  Same for TVT-O?

 2      A.      Correct.

 3      Q.      Couldn't tell us the exact number,

 4   correct?

 5      A.      I couldn't tell you.

 6      Q.      Can't tell us --

 7      A.      I couldn't tell you.

 8      Q.      -- the amount of times that you used it

 9   per year?

10      A.      No.

11      Q.      Okay.  And the same for TVT Retropubic,

12   correct?

13      A.      Correct.

14      Q.      Have you ever attempted to do an

15   analysis of your precise complication rate with TVT

16   Retropubic?

17              MR. MORIARTY:  Objection.

18              THE WITNESS:  I recently looked at how

19   many revision surgeries that I've done over the

20   last three years, is all I could come up with,

21   compared to my placement surgeries.

22   BY MR. JONES:

23      Q.      So that's a no -- correct? -- to my

24   question?
```

Christopher E. Ramsey, M.D.

1     A.      So the last three years, I did.

2     Q.      Well, TVT Retropubic, you haven't put

3   in in the last three years?

4     A.      You said Retropubic.

5     Q.      Yeah.

6     A.      I apologize.  I thought you were --

7     Q.      Can we read that question back.

8     A.      Yeah, please.  Thank you.

9           (Whereupon the previously mentioned

10  question was read back by the reporter.)

11          THE WITNESS:  Okay.  No.

12          MR. JONES:  Thanks.

13  BY MR. JONES:

14    Q.      Have you ever tried to do a precise --

15  have you ever tried to study or analyze your

16  complication rate with the TVT-O device?

17    A.      No.

18    Q.      With the TVT-S device?

19    A.      No.

20    Q.      Outside of the last three years, you

21  have no data related to your revision rates,

22  correct?

23    A.      I have no precise data.

24    Q.      No data that you can provide me,

Christopher E. Ramsey, M.D.

1     though, correct?

2         A.      I -- I could -- I guess I could look

3     back into my medical records over the last 12 years

4     and probably come up with that, if I -- if I had

5     to, but I don't have that data right now.

6         Q.      But you haven't done that, correct?

7         A.      No.  I don't --

8         Q.      And Ethicon hasn't asked you to do

9     that, correct?

10        A.      No, sir.

11        Q.      Do you know what your loss to follow-up

12    rate is with your transvaginal mesh patients?

13        A.      I would say it's fairly -- I mean, as

14    far as loss to follow-up that I had planned on

15    following up in the future, or just I don't see

16    them any more because they don't need to come back

17    to see me?

18        Q.      Both.

19        A.      Well, I mean, for loss to follow-up,

20    would be pretty low.  There are patients who don't

21    come back after surgery because they follow up with

22    their GYNs on their own accord.  I always want them

23    to come back.  But most patients do come back, and

24    I'm able to follow them for the first several

Christopher E. Ramsey, M.D.

 1    months after surgery.

 2        Q.      Some patients don't come back?

 3        A.      Some patients don't.  Very few don't.

 4        Q.      But you don't know your precise rate of

 5    how many patients?

 6        A.      It would be -- it would be less than 10

 7    percent that don't follow up.

 8        Q.      Do you know what the average rate among

 9    surgeons is for loss to follow-up rate --

10        A.      No -- I don't.

11        Q.      -- with transvaginal mesh patients?

12        A.      No idea.

13        Q.      So when you say it's very low, what are

14    you comparing it to?

15        A.      Seems low to me.

16        Q.      Seems low to you?

17        A.      Yes.

18        Q.      But you're not making a comparison

19    to --

20        A.      Correct.

21        Q.      -- any other known rates, correct?

22        A.      Correct.

23        Q.      Just something that in your head seems

24    very low, correct?

Christopher E. Ramsey, M.D.

1      A.      Right.  Yes, sir.

2      Q.      And this is going to be painful, but,

3   so the record's clear, 2006 to 2012, you implanted

4   about 400 TVT-S devices, correct?

5      A.      Correct.

6      Q.      From 2000- -- from 2003 or 2004 through

7   2006, you implanted 300 TVT-O devices, correct?

8      A.      Correct.

9      Q.      From 2000 to 2003, you implanted 25 to

10  50 TVT Retropubic devices, correct?

11     A.      Correct.

12     Q.      In 2012 or 2013, you implanted about 10

13  TVT Abbrevos, correct?

14     A.      Correct.

15     Q.      And in that same period, you implanted

16  several TVT-O devices, correct?

17     A.      Correct.

18     Q.      You don't know whether those TVT-O

19  devices were -- used mechanical-cut mesh or

20  laser-cut mesh, correct?

21     A.      I think they were probably laser-cut

22  mesh because of the date.

23     Q.      That's true.

24             Those -- you believe the TVT-O devices

Christopher E. Ramsey, M.D.

1    you placed in 2012 or 2013 were laser-cut mesh,

2    correct?

3        A.       Probably.

4        Q.       In 2012, you started using AMS

5    MiniArc-Precise, correct?

6        A.       Correct.

7        Q.       From 2012 to today, you've implanted

8    180 AMS MiniArc-Precise --

9        A.       Around that, yes.

10       Q.       Did you do an independent literature

11   search on AMS MiniArc-Precise before you started

12   using it?

13       A.       I looked at the data.  I looked at some

14   of the data.  The sling was put in very similar to

15   the TVT-Secur, so I felt very comfortable with it.

16       Q.       Okay.  What are -- do you consider the

17   AMS MiniArc-Precise safer than the TVT-Secur

18   device?

19       A.       No.

20       Q.       Do you consider the TVT-Secur device

21   safer than the AMS MiniArc device?

22       A.       No.

23       Q.       Do you consider AMS -- Ethicon --

24   strike that.

Christopher E. Ramsey, M.D.

1              Do you consider Ethicon transvaginal

2    mesh products safer than AMS transvaginal mesh

3    products?

4              MR. MORIARTY:  Objection.  Form.

5              Go ahead.

6              THE WITNESS:  No.

7    BY MR. JONES:

8        Q.    What are the differences between the

9    AMS MiniArc-Precise and the TVT-Secur device?

10       A.    As far as the mesh?  As far as the

11   instruments to place it?  Do you mean how to put it

12   in?

13       Q.    Tell me -- start with the mesh.

14       A.    Well, the mesh is polypropylene.  It's

15   very similar.

16       Q.    Just tell me the differences.

17       A.    The pore sizes are a little smaller, I

18   believe.

19       Q.    Pore size is smaller with AMS?

20       A.    A little bit smaller.  A little bit

21   smaller.

22             I think the weight is the same.  The

23   length is about the same.  I'm not sure if the

24   width is exactly the same or not.  But there might

Christopher E. Ramsey, M.D.

1    be a millimeter difference, I'm not sure.

2       Q.      Are the fixation principles the same?

3       A.      They're different.

4       Q.      Okay.  Explain the differences between

5    the way you fixate the TVT-Secur device in place

6    compared to the AMS MiniArc-Precise.

7       A.      So they're -- they're placed -- in my

8    hands, they're placed the same way.  The fixation

9    device in the -- in the MiniArc-Precise uses an

10   absorbable anchor that is put in behind the pubic

11   bone.  That's where it receives its initial tension

12   and its support.

13              And in the TVT-Secur it uses what they

14   call a Vicryl fleece jacket.  It's also absorbable.

15   It's placed basically in the same place.

16              So their anchoring methods are a little

17   different.

18      Q.      Okay.  Do those anchoring meth- --

19   strike that.

20              Did the difference in anchoring methods

21   between the AMS MiniArc-Precise and TVT-Secur

22   affect the efficacy of those devices?

23      A.      I think they were very similar.

24      Q.      Did the difference in anchoring

Christopher E. Ramsey, M.D.

1    principles affect the safety of those devices?

2        A.      No.  They're both absorbable.

3        Q.      You're familiar with the Cochrane

4    analysis on mini-slings, correct?

5        A.      I'm familiar with them.

6        Q.      Do you know who Joy de los Reyes is?

7        A.      I've met her.  I -- I know her, but

8    I -- I haven't spoken to her in years.

9        Q.      Okay.  You met with her, correct?

10       A.      Yes.

11       Q.      Where did you meet with her?

12       A.      I don't remember.  Probably -- maybe at

13   a meeting, maybe.

14       Q.      Okay.  What does she do at Ethicon?

15       A.      I don't know what her job was.

16               (Mr. Orent leaves the deposition.)

17               THE WITNESS:  She was just a nice lady

18   that I talked to.

19   BY MR. JONES:

20       Q.      She does seem like a nice lady.

21               Do you -- did you ever express to

22   Ethicon your interest in getting more involved in

23   teaching nationally?

24       A.      I -- if -- I don't recall a

Christopher E. Ramsey, M.D.

1    conversation like that.  A national teaching?  I

2    don't recall that.  I've never really had big

3    aspirations, that I can remember, to do that.

4              But, you know, maybe because I -- I

5    thought I did have a fairly unique experience with

6    TVT-Secur that I could help.  But I don't honestly

7    recall that.

8    Q.     Okay.  What is your fairly unique

9    experience with TVT-Secur?

10   A.     Well, I thought I had good results with

11   it, better than some of the reported results.  I

12   thought that I did it very safely and -- and

13   efficiently.  And the things that I could -- that I

14   did, I could probably show other physicians to help

15   them learn how to do it in a more efficient manner

16   to improve their efficacy.

17   Q.     Okay.  It's fair to say that you felt

18   your results with TVT-Secur were better than what

19   other surgeons were reporting --

20   A.     Some other surgeons, yes.

21   Q.     And it's fair to say that, among

22   surgeons, there was a concern with the results they

23   were seeing with TVT-Secur, correct?

24              MR. MORIARTY:  Objection.  Form.

Christopher E. Ramsey, M.D.

```
 1                 Go ahead.

 2                 THE WITNESS:  Some surgeons had had

 3     concern with that, yes.

 4     BY MR. JONES:

 5         Q.      And some surgeons after the launch of

 6     TVT-Secur were concerned with whether or not they

 7     were getting adequate results with their use of

 8     TVT-Secur, correct?

 9                 MR. MORIARTY:  Objection.  Form.

10                 Go ahead.

11                 THE WITNESS:  Some were concerned with

12     their -- with their efficacy results.

13     BY MR. JONES:

14         Q.      And these -- these surgeons discussed

15     those issues at conferences, correct?

16         A.      I'm sure they did.  I don't

17     specifically remember them.

18         Q.      These surgeons discussed those issues

19     with you, though, correct?

20         A.      I've had discussions with surgeons

21     about that, yes.

22         Q.      And these surgeons also reported these

23     concerns in the medical literature as well,

24     correct?
```

Christopher E. Ramsey, M.D.

```
 1      A.      Not the ones I spoke to.

 2      Q.      Okay.  What surgeons did you speak

 3   with?

 4      A.      Usually just local --

 5      Q.      Local surgeons?

 6      A.      -- local surgeons.

 7      Q.      Okay.  And local surgeons were

 8   communicating to you that they had concerns about

 9   their results with TVT-Secur correct?

10      A.      Yes.

11      Q.      Who is Dr. McCauley?

12      A.      Lowell McCauley is a gynecologist.

13      Q.      Local?

14      A.      Yes.

15      Q.      Doesn't practice with your group?

16      A.      No.

17      Q.      Was he one of the surgeons that

18   expressed concerns with his results with TVT-Secur?

19      A.      I don't remember if he expressed

20   results -- concerns or not.  I honestly don't

21   remember.  I didn't keep track of his results.  We

22   don't really talk that often.

23      Q.      You would have done -- in your role as

24   a consultant for Ethicon, you would have done
```

Christopher E. Ramsey, M.D.

1    consulting events in 2008, correct?

2        A.    I would have proctored patients or

3    doctors in 2008.

4        Q.    In 2008 you did proctor events for

5    Ethicon, correct?

6        A.    Yes.

7        Q.    Okay.  Do you recall how many?

8        A.    No.

9        Q.    We've already established in 2007 you

10    did proctor events for Ethicon, correct?

11        A.    Yes.

12        Q.    Okay.  Every year from 2005 to 2012 you

13    did proctor events for Ethicon, correct?

14            MR. MORIARTY:  Objection.

15            THE WITNESS:  I don't remember if I did

16    them in 2012 or not.  I wasn't doing -- you know,

17    in the last couple -- the last years before they

18    stopped doing TVT-Secur, I didn't do as many

19    proctoring events, and I can't remember how many I

20    did.  So I can't remember how many I did in '12 or

21    '11.  I may have done one or two.  Again, I don't

22    remember.  You may have that information.  I don't

23    know.

24            MR. JONES:  Okay.  Exhibit 28.

Christopher E. Ramsey, M.D.

```
 1              (Whereupon Exhibit 28 was marked as an

 2     exhibit.)

 3     BY MR. JONES:

 4          Q.      Exhibit 28 is a 2008 Ethicon email

 5     between Scott Finley and Mike Lewis, correct.

 6          A.      Yes.

 7          Q.      Subject line is "Ramsey dinner,"

 8     correct?

 9          A.      Okay.

10          Q.      Correct?

11          A.      Yes.

12          Q.      And then the email is then forwarded on

13     to -- to Bob Zipfel, correct?

14          A.      Yes.

15          Q.      Scott Finley writes, "Bob, attached is

16     the dinner request that I discussed with you.

17     We've been working on this for a while and feel

18     this is a great step in reaching out to the urology

19     market in Atlanta.  Will keep the cost to a

20     minimum.  If they don't get the commitment for

21     attendees, we will move to postpone."

22              Did I read that correctly?

23          A.      Yes.

24          Q.      And Mike Lewis writes, "I wasn't sure
```

Christopher E. Ramsey, M.D.

1    whether to list this as an awareness dinner or a

2    training dinner."

3         A.        Okay.

4         Q.        Correct?

5         A.        Correct.

6         Q.        And this is in 2008, correct?

7         A.        Yes.

8         Q.        And it appears that in 2008 Ethicon was

9    considering using you in Atlanta at a dinner

10   presentation, correct?

11        A.        They -- they considered it.  I don't

12   remember if I did it.

13        Q.        Okay.  But you know that in 2008

14   Ethicon considered using you for a dinner event in

15   the urology market in Atlanta, correct?

16        A.        Right.  Correct.

17        Q.        And as you sit here today, you're not

18   able to tell us that you did not participate in

19   this 2008 dinner event in Atlanta, correct?

20        A.        I can't remember if it went on or not.

21   I don't remember the event.

22        Q.        And this would have been a dinner

23   event, though, correct?

24        A.        Yes.

Christopher E. Ramsey, M.D.

```
 1        Q.       And if there are invoices in Ethicon's

 2    internal files related to this dinner event

 3    evidencing that you attended, you won't disagree

 4    with those, correct?

 5        A.       I would not if there were invoices for

 6    that.

 7        Q.       And this would be a dinner event above

 8    and beyond the 20 or so proctor events that we

 9    talked about yesterday?

10        A.       Yes.  It doesn't look like this was a

11    proctoring event.  It would have been a discussion.

12        Q.       Okay.  So when you talked about

13    "proctor events," you're not including any

14    potential dinner events that you did for Ethicon,

15    correct?

16        A.       I don't think so.  I don't know how

17    many I did.  Honestly, I don't know the number of

18    any of that off the top of my head.

19        Q.       Okay.

20        A.       So I don't know.

21        Q.       Did you discuss with Ethicon

22    potentially conducting dinner events for Ethicon in

23    2008?

24        A.       Maybe.  I don't specifically recall it.
```

Christopher E. Ramsey, M.D.

1    Q.      How were you -- when you did proctor

2    events, how were you paid?

3    A.      They would send me a check to my house.

4    Q.      They would send you a check to your

5    house made out to Chris Ramsey, correct?

6    A.      Correct.

7    Q.      Then were you paid based on the number

8    of surgeons that attended?

9    A.      I don't know the answer to that,

10   honestly.  I don't know how I was paid for that.  I

11   think that I would be paid for each -- if I was

12   proctoring a case, if I was watching a surgeon

13   proctor and helping him with that, I would be paid

14   for each individual case.

15           And I don't know if it was a fixed cost

16   for the first one and then a lower cost for the

17   next ones; I'm not sure.

18           With the observations, I probably got

19   paid for each physician that came in --

20   Q.      Okay.

21   A.      -- but I'm not sure.  It was a smaller

22   fee for that.

23   Q.      It makes sense you'd get paid -- the

24   more physicians that attended, the more you would

Christopher E. Ramsey, M.D.

1    get paid, correct?

2        A.      It's possible.  I'm sure it's in my

3    contract how that was laid out, and I'm not sure.

4        Q.      That's a good point.  Let's go back to

5    your contracts.  Exhibit 5.

6                MR. MORIARTY:  Now we're going

7    backwards.

8    BY MR. JONES:

9        Q.      Okay.  Exhibit 5 we marked yesterday as

10   the 2006 contract between you and Ethicon, correct?

11       A.      Yes.

12       Q.      Okay.  And what is the total contract

13   amount listed?

14               MR. MORIARTY:  Objection.  Form.

15               THE WITNESS:  I don't know.  Where does

16   it say that?

17   BY MR. JONES:

18       Q.      (Indicating.)

19       A.      So $250 for one hour day -- occasion --

20   $50 -- oh, is that -- "shall not exceed 50,000 per

21   year."  Okay.

22       Q.      Okay.  Read that into the record, will

23   you, that sentence?

24       A.      It says, "The parties agree that

Christopher E. Ramsey, M.D.

1    compensation paid to the consultant shall not

2    exceed 50,000 per year except as being mutually

3    agreed by the parties."

4        Q.      So the 2006 contract you entered with

5    Ethicon, the maximum amount of payments allowed was

6    $50,000, correct?

7        A.      Correct.

8        Q.      Let's look go ahead and look at Exhibit

9    6.

10               MR. MORIARTY:  Is that the other

11   contract?

12               MR. JONES:  Yeah.  I'll give it to him.

13               MR. MORIARTY:  I just need to know what

14   it was.

15               You marked more contracts than you gave

16   me.

17               MR. JONES:  Hmm?

18               MR. MORIARTY:  You marked more

19   contracts in the exhibit stack than you gave me.  I

20   don't need them.

21               MR. JONES:  Okay.

22               MR. MORIARTY:  I just need to keep it

23   straight.

24

Christopher E. Ramsey, M.D.

1    BY MR. JONES:

2        Q.      Okay.  Take a look at Exhibit 6.  I'll

3    direct you to one of the last pages of Exhibit 6

4    that I'm folding over for your convenience.

5               Exhibit 6 is a consulting agreement

6    between you and Ethicon, correct?

7        A.      Correct.

8        Q.      For the year 2008, correct?

9        A.      Where do you see the date?

10              Yep.  Yes.

11       Q.      Turn to the -- read into the record the

12   sentence starting with "The parties agree."

13       A.      -- "that compensation paid to the

14   consultant shall not exceed $50,000 per year"?

15       Q.      Correct.

16              Does this indicate that in 2008 the

17   maximum amount of payments allowed under your

18   consultant contract was $50,000?

19       A.      Yes.

20       Q.      Let's look at Exhibit 7.

21              When -- when you were a consultant for

22   Ethicon, were you allowed to use any of your own

23   materials in those proctorships?

24       A.      I didn't use any of my own materials.

Christopher E. Ramsey, M.D.

```
 1    I don't have any materials of my own.

 2        Q.      And Ethicon had to approve any

 3    statements that you made during those proctorships,

 4    correct?

 5        A.      Yes.  Specifically to the surgery.  I'm

 6    sure I said other things to the doctors.

 7        Q.      Okay.  I want you to look at Exhibit 7,

 8    which we marked yesterday as a contract between you

 9    and Ethicon dated 2009, correct?

10        A.      Okay.  Yes.

11        Q.      And I want you to turn to page 718,

12    Heading Number 12.  I want you to read the

13    underlined sentence into the record.

14              MR. MORIARTY:  Let me see it first,

15    please.

16              THE WITNESS:  "You shall not make any

17    representation relating to company's products or to

18    company's clinical outcomes unless such

19    representations have been reviewed and approved in

20    advance by company."

21    BY MR. JONES:

22        Q.      Is that a term you agreed to in that

23    contract?

24        A.      Yes.
```

Christopher E. Ramsey, M.D.

1    Q.     And did you follow that?

2    A.     Yes.

3    Q.     And is that something that you followed

4   throughout the term of your consulting --

5    A.     Yes.

6    Q.     -- relationship with Ethicon?

7    A.     Yes.

8    Q.     Did you know that internally Ethicon

9   considered TVT-Secur a failed product?

10          MR. MORIARTY:  Objection.  Form.

11          Go ahead.

12          THE WITNESS:  I didn't know that.

13  BY MR. JONES:

14    Q.     You've never seen any document where

15  Ethicon employees referred to TVT-Secur as a failed

16  product?

17    A.     No.

18    Q.     You've never seen any internal

19  documents where the engineers who worked on the

20  design of TVT-Secur referred to it as a failed

21  product?

22    A.     No.

23    Q.     Have you seen any presentations by

24  Ethicon related to TVT-Secur discussing the lessons

Christopher E. Ramsey, M.D.

```
1     learned from their failures with TVT-Secur?

2     A.     Not in -- no, I have not.

3     Q.     Are you familiar at all with the

4  TVT-Secur world registry being shut down?

5     A.     No.  No.

6     Q.     So you're not familiar with the

7  TVT-Secur world registry at all?

8     A.     I'm familiar with the term, but I

9  didn't know it was shut down.

10    Q.     Okay.  And do you know how long it was

11  in existence?

12    A.     No.

13    Q.     Do you know -- you don't know why --

14  you don't know that it was shut down, so you don't

15  know why it was shut down, correct?

16    A.     Correct.

17    Q.     Do you know what the adverse event rate

18  was in the TVT-Secur world registry?

19    A.     I couldn't quote it.  I'd have to look

20  at it.

21    Q.     If it was higher than 15 percent, that

22  would be something that would stand out to you,

23  correct?

24           MR. MORIARTY:  Objection.  Are you
```

Christopher E. Ramsey, M.D.

```
 1    talking about efficacy rate?  Or something else?

 2    BY MR. JONES:

 3        Q.      Let's go with the -- if the erosion

 4    rate in the TVT-Secur world registry was above 15

 5    percent, would that stand out to you?

 6        A.      Well, then, I guess we have to discuss

 7    what "erosion" is as opposed to "exposure."

 8        Q.      We're including the three e's.

 9        A.      And what are those?

10        Q.      You don't know what the three e's are?

11        A.      I have no -- I would assume -- we've

12    talked about "exposure" and "erosion."  What's the

13    third one?

14        Q.      You don't know what the third one is?

15        A.      No.

16        Q.      Okay.  As someone holding yourself out

17    as an expert in transvaginal mesh litigation, you

18    don't know what the third "e" is?

19        A.      I've never heard of the term "the three

20    e's" before.

21        Q.      Okay.  You've never heard of the term

22    "three e's"?

23        A.      No.

24        Q.      Okay.
```

Christopher E. Ramsey, M.D.

```
 1                MR. MORIARTY:  Neither have I,

 2     actually.

 3                (Reporter interruption for

 4     clarification.)

 5                MR. MORIARTY:  I said neither have I,

 6     actually, if that matters.

 7     BY MR. JONES:

 8        Q.      May be why he hasn't heard of it.

 9                Have you heard of the term "extrusion"?

10        A.      I've heard the term "extrusion."

11        Q.      Okay.  What does that term mean?

12        A.      To me, extrusion means that the mesh

13     has come out.

14        Q.      Of what?

15        A.      Out of the vagina.

16        Q.      Is it similar to an erosion?

17        A.      No.  I would say an -- an erosion is

18     where the mesh actually erodes into a different

19     area of the body outside of the vagina.

20        Q.      Okay.  Now that we know what the three

21     e's are, would it -- would -- if the exposure,

22     extrusion, or erosion rate was above 15 percent in

23     the TVT-Secur world registry, would that stand out

24     to you?
```

Christopher E. Ramsey, M.D.

1    A.      I don't think it would be that high.

2    Q.      I didn't ask that question.

3            I asked, if it was, would that stand

4    out to you?

5    A.      It would be interesting to see.

6    Q.      Okay.  Do you know one way or other

7    what the erosion rate is in the TVT-Secur world

8    registry?

9    A.      I couldn't tell you.

10   Q.      Do you know what the failure rate is?

11   A.      There are multiple failure rates.  But

12   in the registry, I don't know.

13           MR. MORIARTY:  When it's convenient,

14   let's take a quick break.

15           MR. JONES:  Let's take a quick break.

16   Let's take a quick break.

17           (Brief recess.)

18   BY MR. JONES:

19   Q.      Doctor, after a short break, we're back

20   on the record.  Are you ready to proceed?

21   A.      Yes.

22           (Whereupon Exhibit 29 was marked as an

23   exhibit.)

24

Christopher E. Ramsey, M.D.

```
 1    BY MR. JONES:

 2         Q.      I've marked Exhibit 9 [verbatim], which

 3    is a printout from Tennessee Urology Associates'

 4    website.

 5              Do you recognize this?

 6         A.      Yes.

 7         Q.      Is this your website?

 8         A.      It looks like it.  It's brand new.

 9         Q.      Okay.  And under -- at the bottom of

10    page 1, under "Da Vinci Surgery Providers," there's

11    a paragraph explaining background information about

12    yourself, correct?

13         A.      Right.

14         Q.      It reads, "Dr. Ramsey's practice has a

15    special concentration in robot-assisted

16    laparoscopic procedures," correct?

17         A.      Yes.

18         Q.      And does it state anywhere on this

19    website that you have a special concentration in

20    treatment of female SUI?

21         A.      Well, this is the da Vinci surgery page

22    on our -- on our website.  And under a bio of

23    myself, there should be -- and if there's not, I

24    need to correct it because this is -- it's a
```

Christopher E. Ramsey, M.D.

```
 1    relatively -- we have a new website that we have

 2    through our company.

 3             Our old website had all the procedures

 4    we used to use, and this is new.  So I haven't

 5    looked at it since this has been done.  But it

 6    should say all the things that I provide, including

 7    stone surgery, treatment of the cancers --

 8        Q.     Okay.

 9        A.     -- erectile dysfunction, stress

10    incontinence.

11             So -- but this is a specific link on

12    that.  This isn't just my page; this is a -- the

13    da Vinci page for patients who are interested in

14    that part.

15        Q.     Okay.  Your website profile is listed

16    in the da Vinci surgery website on Tennessee

17    Urology Associates, correct?

18        A.     Say that one more time.

19        Q.     Your profile is listed on the da Vinci

20    surgery website on Tennessee Urology Associates,

21    correct?

22        A.     I guess I don't know what you mean by

23    "the da Vinci surgery website."

24        Q.     The da Vinci section.
```

Christopher E. Ramsey, M.D.

```
 1      A.      The section, yes.

 2              MS. MEAD:  Madam Court Reporter?

 3              (Off-the-record discussion.)

 4   BY MR. JONES:

 5      Q.      So at least according to this exhibit,

 6   nowhere do you list any special concentration or

 7   emphasis --

 8              (Off-the-record discussion.)

 9   BY MR. JONES:

10      Q.      All right.  Doctor, let's proceed.

11              According to Exhibit 29, which is a

12   section of the Tennessee Urology Associates

13   website, you don't list any special concentration

14   in treating female SUI, correct?

15      A.      It wouldn't be on that page.

16      Q.      Okay.  If -- if it is on the website, I

17   can go there and pull it; we'll find it, right?

18      A.      If it is on there, yeah.

19      Q.      Okay.

20      A.      And if it it's not, I want to know so I

21   can get it updated --

22      Q.      That's fine.

23      A.      -- so thanks for checking.

24              (Whereupon Exhibit 30 was marked as an
```

Christopher E. Ramsey, M.D.

1    exhibit.)

2    BY MR. JONES:

3        Q.      Let's look at Exhibit 30.  Tell me what

4    Exhibit 30 is.

5        A.      It's a Tennova Hospital.  It's one of

6    the local hospital chains.

7                    MR. MORIARTY:  Do I get one?

8                    MR. JONES:  Yeah.

9    BY MR. JONES:

10       Q.      Do you practice there?

11       A.      That's where I do some of my surgeries.

12       Q.      Okay.  Anywhere on this website does it

13   state you have a special concentration in treating

14   female SUI?

15       A.      It does not.

16       Q.      Okay.  It does state you have a special

17   concentration in robotic-assisted -- robotic-

18   assisted laparoscopic surgery, though, correct?

19       A.      Yes.

20       Q.      You can put that aside.

21               (Whereupon Exhibit 31 was marked as an

22   exhibit.)

23   BY MR. JONES:

24       Q.      Do you believe that in -- serving as a

Christopher E. Ramsey, M.D.

1    consultant for Ethicon for a period of six or seven

2    years presented any potential perceived conflict of

3    interest when you agreed to be a litigation expert

4    witness for Ethicon?

5        A.     I don't think so.

6        Q.     None whatsoever?

7        A.     No.

8        Q.     Would you agree that under the current

9    standards, you need to disclose as a potential

10   conflict of interest for yourself your role as a

11   consultant with Ethicon?

12              MR. MORIARTY:  Objection.  To disclose

13   in what setting?

14              THE WITNESS:  To whom?

15   BY MR. JONES:

16       Q.     Disclose to patients.

17              MR. MORIARTY:  Objection.

18              Go ahead and answer.

19              THE WITNESS:  No, I don't.

20   BY MR. JONES:

21       Q.     Disclose to other surgeons?

22       A.     I don't have an ethical need to

23   disclose it to other surgeons, no.

24       Q.     You don't have an ethical need to

Christopher E. Ramsey, M.D.

1    disclose it to patients, that you're a consultant

2    for Ethicon?

3        A.      I don't have to, no.

4        Q.      Okay.  When you're counseling patients

5    on whether an Ethicon mesh product is appropriate

6    for them, you don't feel any ethical need to tell

7    them that you were an Ethicon consultant, correct?

8        A.      I have told them that.  I don't use it

9    as a routine part of my discussion with surgery,

10   though.  In certain patients, I do.

11       Q.      So you didn't feel the ethical need to

12   tell them that, correct?

13       A.      Not every patient, no.

14       Q.      If you were going to write a journal

15   article today, you would have to disclose as a

16   potential conflict of interest your work as a

17   consultant for Ethicon and your work as a

18   consultant for AMS, correct?

19       A.      If I was going to do it today, I don't

20   think that I would have to disclose my work as a

21   consultant for Ethicon right now, since I'm not

22   proctoring any of their surgeries right now.  But

23   for AMS, I would.

24       Q.      Okay.  If you wrote today a journal

Christopher E. Ramsey, M.D.

1    article on transvaginal mesh for the treatment of

2    SUI, you would disclose as a potential conflict of

3    interest your consultant relationship with AMS,

4    correct?

5         A.     Correct.

6         Q.     If you wrote a journal article today on

7    treating SUI with transvaginal mesh, you would not

8    disclose your relationship with Ethicon currently?

9               MR. MORIARTY:  Objection.

10              THE WITNESS:  I don't have a current

11   relationship with Ethicon.

12   BY MR. JONES:

13        Q.     You wouldn't disclose that you're a

14   litigation expert witness for Ethicon in a journal

15   article you were writing on treating SUI with

16   transvaginal mesh?

17        A.     I don't think that I would have to -- I

18   would consult an attorney -- or I would consultant

19   the people who knew that type of thing.  I do not

20   think that I would need to because I've never seen

21   anybody else do that in their -- in their

22   disclosures, that they are involved in litigation.

23        Q.     You've never seen a conflict of

24   interest disclosure in a medical journal article

Christopher E. Ramsey, M.D.

1   where an author has disclosed that they're a

2   litigation expert witness?

3       A.      Not that I recall.

4       Q.      If you wrote a journal article today in

5   the context of treating female SUI with

6   transvaginal mesh, would you need to disclose your

7   past consulting relationship with Ethicon?

8       A.      I don't -- I don't know if I would need

9   to do that.  I don't think I need to do that.  I

10  think it's just current at the time of the article.

11          If it related maybe to procedures that

12  I had done with them, I would probably do that.

13      Q.      Okay.  So if you wrote a journal

14  article today on the TVT-Secur device, you would

15  disclose in your conflict of interest statement

16  that you previously served as a consultant for

17  Ethicon, correct?

18      A.      Yes.

19      Q.      Why?

20      A.      I think that's the ethical thing to do,

21  let the -- as we discussed the same thing

22  yesterday, that it allows the reader to see who

23  wrote the article and what potential biases they

24  have in writing the article so they can come to

Christopher E. Ramsey, M.D.

1    their own conclusion about the validity of the

2    results I would come up with.

3        Q.      So in a journal article you would write

4    on the TVT-Secur device, you would feel the need to

5    disclose as a potential conflict of interest your

6    past consulting work for Ethicon, correct?

7        A.      Not necessarily.

8        Q.      Would you disclose it?

9        A.      If it was in relation to TVT-Secur

10   devices that I've used -- if it was specifically

11   with TVT, not specific with transvaginal mesh.

12       Q.      Okay.  So you're writing a journal --

13       A.      Yes, sir.

14       Q.      -- article today on TVT-Secur device.

15   Got me?

16       A.      Yes.

17       Q.      Would you feel an ethical need to

18   disclose as a potential conflict of interest in

19   your TVT-Secur article that you had been a

20   consultant for Ethicon --

21       A.      Previously --

22       Q.      -- in prior years?

23       A.      I would.  Previously.

24       Q.      And that's because your consulting work

Christopher E. Ramsey, M.D.

1    for Ethicon in prior years related to TVT-Secur,

2    correct?

3        A.      Correct.

4        Q.      And because your prior consulting work

5    for Ethicon involved TVT-Secur, you would feel an

6    ethical need to disclose as a potential conflict of

7    interest your role as a consulting physician on

8    TVT-Secur, correct?

9        A.      That's a pretty long sentence.  Can you

10   read that back again?  I lost you after the

11   first --

12       Q.      I think I. . .

13              Let me strike that.

14              Your potential -- your consulting work

15   for Ethicon in relationship to TVT-Secur presents a

16   potential conflict of interest for a reader of a

17   TVT-Secur article that you would write today?

18              MR. MORIARTY:  Objection.  Form.

19              Go ahead.

20              THE WITNESS:  A reader could

21   potentially see that as a bias.

22   BY MR. JONES:

23       Q.      When did you first learn that Ethicon

24   was going to stop selling the TVT-Secur device?

Christopher E. Ramsey, M.D.

1     A.     I think the letter came out in May of

2  '12.

3     Q.     May 2012 is when you first learned

4  Ethicon would stop selling the TVT-Secur device,

5  correct?

6     A.     Yes.

7     Q.     You know that in January 2012 Ethicon

8  received the 522 order on TVT-Secur, correct?

9     A.     I can't remember the exact date.

10    Q.     But you know in 2012 Ethicon's

11 TVT-Secur device was subject to a 522 order?

12    A.     Yes.

13    Q.     And I take it you continued to use

14 TVT-Secur after May 2012, correct?

15    A.     Correct.

16    Q.     And you continued to use the TVT-Secur

17 device after you were made aware that there was a

18 522 order on the TVT-Secur device, correct?

19    A.     Yes.

20    Q.     And on those patients that you

21 implanted the TVT-Secur device with, after you

22 learned the TVT-Secur device was subject to a 522

23 order, did you tell them?

24    A.     No.  Unless they asked a question.

Christopher E. Ramsey, M.D.

1      Q.      You didn't tell your patients the

2  TVT-Secur device was subject to a 522 order when

3  you implanted it in them?

4      A.      No.

5      Q.      Did you tell those patients that

6  Ethicon had decided to stop selling the device?

7      A.      Towards the end, when I knew I was

8  going to run out, I would explain to the patient

9  that if -- if this TVT-Secur was not available,

10  then I would use a different device.  That's what

11  I'm doing with MiniArc-Precise.

12          So I would explain, if this is

13  available, this is what I'm going to use, because I

14  like it.  I get good results with it.  If it's not

15  available, here's the one we're going to use.

16          So I would consent them for both there

17  towards the end.  But when I knew it was still in

18  supply, I did not tell them that it was not going

19  to be available after August or whenever it was

20  going to stop being made.

21      Q.      Some patients that you implanted the

22  TVT-S in, you didn't tell them that Ethicon had

23  already told you that they would stop selling the

24  TVT-S device, correct?

Christopher E. Ramsey, M.D.

1      A.      Correct.  After May.

2      Q.      We talked a little bit about the 2011

3   FDA panel or advisory -- advisory committee

4   earlier.

5      A.      Okay.

6      Q.      You're just not aware of the nature of

7   the 2011 FDA panel, correct?

8      A.      The panel that came up with it, I don't

9   know who was on it or how they came up with the

10   statement -- they had -- their warning that came

11   out, that's what I'm aware of.  I read that letter.

12     Q.      Okay.  And are you aware of the 2011

13   FDA advisory committee?

14     A.      I'm aware of the name.  I don't know

15   who was on it or how that was --

16     Q.      Have you read -- are you familiar with

17   the meeting that took place?

18     A.      I'm not aware of the meeting.

19     Q.      Are you aware of the meeting minutes?

20     A.      No.

21     Q.      Have you reviewed a summary of that

22   meeting?

23     A.      Not that I'm aware of.

24     Q.      Have you reviewed any reports or

Christopher E. Ramsey, M.D.

```
1    testimony from Ethicon that occurred at that

2    meeting?

3        A.      No.

4        Q.      Has Ethicon showed you any internal

5    documents that they have related to that meeting?

6        A.      I don't remember seeing those.

7        Q.      Has Ethicon showed you the FDA file for

8    that meeting?

9        A.      No.

10       Q.      Okay.  Do you understand what the

11   Freedom of Information Act is, request is?

12       A.      I'm aware of it.

13       Q.      Okay.

14       A.      Never done one.

15       Q.      Okay.  Ethicon has never shown you the

16   Freedom of Information Act request that they filed

17   for the 2011 FDA advisory committee meeting?

18       A.      No.

19       Q.      Okay.  You've never seen it, correct?

20       A.      No.

21       Q.      Are you familiar with what conclusions

22   the FDA advisory committee made with regards to

23   mini-slings?

24       A.      I can't remember the exact wording
```

Christopher E. Ramsey, M.D.

1    about mini-slings.

2        Q.      What was the general wording?

3        A.      There was concern about efficacy of the

4    mini-slings.

5        Q.      In 2011, a panel of experts was

6    convened, and that panel expressed concerns about

7    the efficacy of mini-slings, correct?

8        A.      Again, I'm not sure what the panel

9    said.  I just know what the statements --

10       Q.      You're not sure what the panel said in

11   2011, correct?

12       A.      Correct.

13       Q.      And because you're not sure what the

14   panel said in 2011, that's not information you

15   would have told your patients, correct?

16       A.      Correct.

17       Q.      And I take it in 2011 you weren't

18   following these meetings of the advisory committee,

19   correct?

20       A.      I wasn't following them.

21       Q.      Okay.  You weren't keeping up to date

22   with the advisory committee meetings in 2011,

23   correct?

24       A.      Not the advisory meetings.

Christopher E. Ramsey, M.D.

1            MR. JONES:  All right.  Got to do this.

2    Exhibit 31.

3            (Whereupon Exhibit 31 was marked as an

4    exhibit.)

5    BY MR. JONES:

6       Q.     Take a look at the email.  Just going

7    to ask you whether that was in your email and what

8    you sent, and whether that clears up an issue you

9    raised earlier today.

10      A.     (Reviews document.)

11      Q.     All right.  This is a 2009 email sent

12   by you, correct?

13      A.     Yes.

14      Q.     And does this refresh your memory now

15   that this was an email address used by you?

16      A.     It does, but I still don't remember it

17   being charter.net.

18      Q.     Got it.

19      A.     I haven't used it in a long time.

20      Q.     Got it.  But you're not disputing that

21   you sent an email from this account, correct?

22      A.     No.

23      Q.     And this is a 2009 email from you with

24   a subject line titled "TVT-O dinners," correct?

Christopher E. Ramsey, M.D.

1      A.      Yes.

2      Q.      Who is -- who is Julie Ramsey?

3      A.      That's my wife.  I took -- I put

4   anything I do past her before I do it.

5      Q.      She's got the chartertn.net email

6   address, but you don't, correct?

7      A.      She has a chartertn.net and I have --

8   she has a charter.net, I have a chartertn.net, is

9   what I remember.

10     Q.      Okay.  But --

11     A.      But we've switched to Gmail.

12     Q.      But not according to this email,

13  correct?

14     A.      Yeah.

15     Q.      All right.  This indicates that you

16  were going to do a TVT-O dinner in Greeneville,

17  Tennessee, correct?

18     A.      It looks like it.

19     Q.      In 2009, correct?

20     A.      Yes.

21     Q.      In 2009 you did a TVT-O dinner event in

22  in Greeneville, correct?

23     A.      I don't know if I did it.  But that was

24  one that -- that they were asking me about.  I

Christopher E. Ramsey, M.D.

```
 1    don't remember doing -- honestly, I don't remember

 2    doing it.

 3        Q.      You write -- you write back, "I can do

 4    any date except August 26th.  Mike Lewis has me

 5    going to Greeneville on September 16th," correct?

 6        A.      Yes.

 7        Q.      So you went to Greeneville for Ethicon

 8    on September 16th, correct?

 9        A.      I don't remember going to Greeneville.

10        Q.      According to this exhibit, your Ethicon

11    sales rep sent you to Greeneville on September

12    16th, correct?

13        A.      That was -- looks like the plan, but I

14    don't remember it.

15        Q.      Okay.  And the plan was for a TVT-O

16    dinner on August 26th, correct?

17        A.      That looks like that's what the plan

18    was.

19        Q.      Okay.  So the plan was for you to do a

20    TVT-O dinner event August 26th, 2009, correct?

21        A.      Looks like it, yes.

22        Q.      And then, a few weeks later, the plan

23    was for you to do a event in Greeneville on

24    September 16th, 2009, correct?
```

Christopher E. Ramsey, M.D.

1      A.      That was the plan.

2      Q.      So that would have been two Ethicon

3   events in less than three weeks, correct?

4      A.      If they occurred.

5      Q.      Okay.  You were planning on doing two

6   Ethicon events in 2009 in less than three weeks,

7   correct?

8      A.      Looks like we were trying to coordinate

9   that or organize that.

10     Q.      Okay.  You were trying to do two

11  different Ethicon events in three weeks in 2009,

12  correct?

13     A.      I was, again, trying to coordinate

14  that, yes.

15             MR. JONES:  Okay.  You can put that one

16  away.

17             (Whereupon Exhibit 32 was marked as an

18  exhibit.)

19             MR. MORIARTY:  Exhibit 32.

20             MR. JONES:  Exhibit 32.

21             THE WITNESS:  This says 33.

22  BY MR. JONES:

23     Q.      I'll mark for the record Exhibit 32,

24  which is an email -- Ethicon email dated July 2009,

Christopher E. Ramsey, M.D.

```
 1    correct?

 2       A.      Yes.

 3       Q.      Scott Finley wrote this email, correct,

 4    the top email?

 5       A.      Yes.

 6       Q.      He writes, "I'm looking at utilizing

 7    Chris Ramsey to go after urologists in Atlanta,

 8    Greeneville, and Charleston for TVT-O."

 9               Did I read that correctly?

10       A.      Yes.

11       Q.      Did you ever consider yourself as

12    "going after" urologists in Atlanta, Greeneville,

13    and Charleston for TVT-O?

14       A.      I would never have put it that way.

15       Q.      You would never have used the term

16    "going after" urologists in other markets for

17    Ethicon products, correct?

18       A.      Correct.

19       Q.      Scott Finley stated you were going

20    after urologists in different markets for TVT-O,

21    correct?

22       A.      Repeat that again.

23       Q.      Scott Finley stated you were -- they

24    wanted to utilize you to go after urologists in
```

Christopher E. Ramsey, M.D.

1    other markets for TVT-O, correct?

2         A.      That was his wording, yes.

3         Q.      Okay.  And Scott Finley was your

4    Ethicon sales rep at one time or another, correct?

5         A.      Correct.

6         Q.      And he was also your division sales rep

7    manager, correct?

8         A.      Correct.

9         Q.      And he stated he wanted to use you to

10   go after other -- other urologists in Atlanta,

11   Greeneville, and Charleston for TVT-O, correct?

12        A.      That's what he said.

13        Q.      Okay.  In 2011, why did you stop using

14   TVT-Secur?

15        A.      I didn't.

16        Q.      Did your use of TVT-Secur decrease in

17   2011?

18        A.      I don't think so.

19        Q.      At all?

20        A.      Not that I know.  Not -- not

21   consciously, it didn't.

22             MR. JONES:  I'll mark Exhibit 33.

23             (Whereupon Exhibit 33 was marked as an

24   exhibit.)

Christopher E. Ramsey, M.D.

```
1    BY MR. JONES:

2       Q.      It's dated January 25th, 2011, correct?

3       A.      Okay.  Yes.

4       Q.      And this is an email from Jason Martin

5    to Scott Finley, correct?

6       A.      Yes.

7       Q.      Jason Martin was Ethicon's sales rep

8    for you, correct?

9       A.      Yes.

10      Q.      And Scott Finley was your Ethicon sales

11   rep division manager, correct?

12      A.      Correct.

13      Q.      And the subject line is "Field ride

14   agenda and opportunity win/losses," correct?

15      A.      Yes.

16      Q.      Okay.  And Mr. Martin emails his

17   manager, Scott, and says, "Here's my agenda for

18   opportunity wins and losses.  We can discuss more

19   next week," correct?

20      A.      Yes.

21      Q.      "We have a 7:45 appointment with

22   Dr. Ramsey tomorrow," correct?

23      A.      Yes.

24      Q.      Seems like Mr. Martin and Mr. Finley
```

Christopher E. Ramsey, M.D.

1    were going to come visit you in 2011 at your

2    hospital, correct?

3        A.      Yes.

4        Q.      The second page is the attached field

5    ride agenda.

6        A.      Right.

7        Q.      "Day 1, Ramsey appointment, 7:45 at

8    office.  Discuss Abbrevo and Secur," question mark,

9    question mark.  Parenthetical, "Why no cases on

10   Secur?"

11            Did I read that correctly?

12       A.      Yes.

13       Q.      Why no cases on TVT-Secur, Dr. Ramsey,

14   in 2011, in January?

15       A.      I have no idea what he means by that

16   line.  I don't know what it's in reference to.

17       Q.      Day 2 -- Day 2, fourth bullet point --

18   go ahead.  I cut you off.

19       A.      No, no.  Go ahead.

20       Q.      Day 2, fourth bullet point says

21   "Promote dinner program."

22            Do you know what that means?

23       A.      I'm sure there's some type of dinner

24   program that he wants to get surgeons to go to.

Christopher E. Ramsey, M.D.

1    Q.    Okay.  You can put that one away.

2          So what do you think he was referring

3    to when I cut you off earlier about why no

4    TVT-Secur cases?

5    A.    I can't speak to that at all.  I have

6    no idea.  I don't remember stopping them -- or not

7    doing -- I remember continuing doing them.  That

8    was the procedure that I used of choice and

9    continued to do it.

10   Q.    The TVT-Secur is your sling of choice,

11   correct?

12   A.    It was my sling of choice.

13   Q.    Today, what's your sling of choice?

14   A.    Today still the MiniArc-Precise.

15   Q.    Today your sling of choice is the AMS

16   MiniArc-Precise, correct?

17   A.    Yes.

18   Q.    For the last eight years, your sling of

19   choice has been the mini-sling, correct?

20   A.    The mini-sling, yes.

21          (Whereupon Exhibit 34 was marked as an

22   exhibit.)

23   BY MR. JONES:

24   Q.    Exhibit 34.  I just want to direct your

Christopher E. Ramsey, M.D.

1    attention to the bottom of page 1.

2        A.      Okay.

3        Q.      Okay.  And now we're going to start at

4    the very last page.

5               This is an email in 2009 to you,

6    correct?

7        A.      Yes.

8        Q.      Scott Finley's copied on the email,

9    correct?

10       A.      Yes.

11       Q.      Subject line is "TVT-O dinners,"

12   correct?

13       A.      Yes.

14       Q.      And Ethicon writes to you, Dr. Ramsey,

15   and says, "Let me know five Thursdays that you're

16   available to travel and deliver TVT-O dinner

17   lectures in Scott Finley's division," correct?

18       A.      Correct.

19       Q.      "Your flights would need to depart on

20   Thursday afternoon and you could fly home the first

21   thing Friday morning.  You will be compensated for

22   one full day per your 2009 Ethicon consulting

23   agreement."

24               Did I read that correctly?

Christopher E. Ramsey, M.D.

```
 1      A.      Yes.

 2      Q.      And then he follows up 16 minutes later

 3   and writes, "Or five Wednesdays, since you are off

 4   on Thursdays."

 5              Did I read that correctly?

 6      A.      Where is that?  Second page?

 7      Q.      Last page.

 8      A.      Last page?

 9              Yes.

10      Q.      What does he mean, "You're off on

11   Thursdays"?

12      A.      Thursday is my day off.

13      Q.      Okay.  Then you get -- you jump five

14   days forward to July 11th, 2009, and he emails you

15   again.

16              He says, "Hi, Dr. Ramsey, are you

17   interested in delivering TVT-O dinner

18   presentations?"

19              Did I read that correctly?

20      A.      Yes.

21      Q.      And you write back, "Yes, I am."

22              Did I read that correctly?

23      A.      Yes.

24      Q.      In 2009 you were interested in giving
```

Christopher E. Ramsey, M.D.

```
1    TVT-O dinner presentations on behalf of Ethicon,

2    correct?

3        A.      Yes.

4        Q.      You write on 2009, July 14th, to

5    Ethicon, "I'm not ignoring you," exclamation point.

6    "I'm still trying to coordinate with my wife and

7    work.  Mike, can you remind me when we are going to

8    Greeneville?  Bob, what are the open dates again?

9    Thanks."

10               Did I read that correctly?

11       A.      Yes.

12       Q.      And do you recall how many dinner --

13   TVT-O dinner events you ended up doing for Ethicon

14   in 2009?

15       A.      I don't remember at all.

16       Q.      You just know that you were interested

17   in doing them?

18       A.      Yes.

19       Q.      What is a TVT-O dinner event?

20       A.      It's a dinner event where I'll sit down

21   with a couple of docs and we'll just talk about

22   surgery.

23       Q.      And it's a marketing event, correct?

24               (Reporter interruption for
```

Christopher E. Ramsey, M.D.

```
 1    clarification.)

 2    BY MR. JONES:

 3        Q.      These events are marketing events,

 4    correct?

 5        A.      It would be a marketing event for

 6    Ethicon, yes.

 7        Q.      Okay.  And you were interested in

 8    participating in marketing events for Ethicon in

 9    2009, correct?

10                MR. MORIARTY:  Objection.  Form.

11                Go ahead.

12                THE WITNESS:  I was interested in

13    discussing the surgery.

14    BY MR. JONES:

15        Q.      Okay.  You were interested in

16    participating in dinner events for Ethicon in 2009,

17    correct?

18        A.      Yes.

19        Q.      On the TVT-O, correct?

20        A.      Yes.

21        Q.      And in 2009, TVT-O was not your sling

22    of choice, correct?

23        A.      Correct.

24        Q.      But you were still interested in doing
```

Christopher E. Ramsey, M.D.

1    dinner events on TVT-O in 2009 for Ethicon,

2    correct?

3       A.      Yes.

4               MR. JONES:  Exhibit 35.

5               (Whereupon Exhibit 35 was marked as an

6    exhibit.)

7               THE WITNESS:  Which page is that?

8    BY MR. JONES:

9       Q.      Page 2.  Exhibit 35 is an Ethicon 2009

10   email with the subject line "Consulting fees for

11   Dr. Lucente," correct?

12      A.      Okay.

13      Q.      And it reads in part, "Hi, Melissa.  I

14   was able to find Dr. Katherine Cameron.  She was

15   trained by the following:  March 28th, 2008, Chris

16   Ramsey, TVT-Secur preceptorship."

17              Did I read that correctly?

18      A.      Yes.

19      Q.      All right.  Did you train Dr. Katherine

20   Cameron on the TVT-Secur?

21      A.      Looks like I did, yes.

22      Q.      And Dr. Katherine Cameron is one of

23   your partners, correct?

24      A.      Correct.

Christopher E. Ramsey, M.D.

1      Q.      You guys practice in the same clinical

2   practice group?

3      A.      Yes.

4      Q.      You trained her on TVT-S in 2008,

5   correct?

6      A.      Correct.

7      Q.      And you trained Dr. Newport on TVT-S,

8   as well, correct?

9      A.      I probably did.

10      Q.      Any other of your partners you trained

11   on TVT-Secur?

12      A.      I probably trained Dr. Parker and

13   Dr. Nicely.

14      Q.      And fair to say that, for Dr. Parker,

15   Nicely, Cameron and Newport, you introduced them

16   to -- introduced them to the TVT-Secur device?

17      A.      I would say I trained them on how to

18   use it.

19      Q.      Did those doctors that you're partners

20   with thereafter adopt TVT-Secur?

21      A.      Well, I think Dr. Parker did.  I don't

22   think Dr. Newport did.  I can't remember if

23   Dr. Nicely did.  And I'm not sure about Cameron

24   either.

Christopher E. Ramsey, M.D.

```
 1        Q.       Okay.  Dr. Newport, why did Dr. Newport
 2   not adopt TVT-Secur after you trained him on
 3   TVT-Secur?
 4        A.       I don't know.  I think he felt more
 5   comfortable with the TVT-O.
 6        Q.       And that goes back to some surgeons had
 7   concerns about their results with TVT-Secur,
 8   correct?
 9                 MR. MORIARTY:  Objection.  Form.
10                 THE WITNESS:  No.  I think it has
11   everything to do with just their individual
12   preference.
13                 MR. JONES:  Okay.  Let's go on to the
14   next one.
15   BY MR. JONES:
16        Q.       Did you do TVT-Secur events in 2010 for
17   Ethicon?
18        A.       Possibly.
19        Q.       More likely than not, did you do events
20   for Ethicon in 2010?
21        A.       If you show me one I did.  I don't
22   remember.
23        Q.       I'm trying to save time.  Trying to
24   save time.
```

Christopher E. Ramsey, M.D.

```
1      A.      Yeah.

2      Q.      So more likely than not, in 2010 you

3  did events in 2010 as a consultant, correct?

4      A.      Correct.

5      Q.      Okay.  Same for 2012:  More likely than

6  not you did events for Ethicon as a consultant in

7  2012, correct?

8      A.      I honestly don't remember 2012.

9              MR. JONES:  We'll mark Exhibit 36.

10             (Whereupon Exhibit 36 was marked as an

11  exhibit.)

12  BY MR. JONES:

13     Q.      Take a look at Exhibit 36.

14             MR. MORIARTY:  You got one for me, sir?

15             MR. JONES:  Oh, yeah.  Sorry, sir.

16             THE WITNESS:  Okay.

17  BY MR. JONES:

18     Q.      Did you do TVT-Secur consulting events

19  for Ethicon in 2012?

20     A.      Yes.  Looks like I trained Dr. Newport

21  in 2012.  That's why I don't remember it, because

22  it looks like it was supposed to be 2011 but he had

23  had a baby.

24     Q.      Did you ever have -- Ethicon ever take
```

Christopher E. Ramsey, M.D.

1    you to Ruth's Chris Steakhouse in Knoxville?

2       A.      Possibly.

3       Q.      More likely than not, Ethicon took you

4    to Ruth's Chris Steakhouse in Knoxville, correct?

5       A.      Yes.

6       Q.      On multiple occasions, correct?

7       A.      I don't know how many occasions.

8       Q.      Okay.  As you sit here today, you can't

9    tell us how many times Ethicon took you to Ruth's

10   Chris Steakhouse in Knoxville, correct?

11      A.      I haven't been to Ruth's Chris

12   Steakhouse that many times in my life here in

13   Knoxville.  So I would say it's not more than one

14   or two.

15      Q.      Okay.

16      A.      But I don't know.

17      Q.      Fair to say that you received in

18   2009 -- when -- you expressed interest in doing

19   TVT-O dinner events in 2009 for Ethicon, correct?

20      A.      Yes.

21      Q.      Is it fair to say that, more likely

22   than not, you would have received TVT-O dinner

23   presentation materials leading up to those dinner

24   events, correct?

Christopher E. Ramsey, M.D.

1      A.      I'm not sure what materials I would

have been given, because I usually don't use a

whole lot of materials.

4              (Whereupon Exhibit 37 was marked as an

exhibit.)

6    BY MR. JONES:

7      Q.      Exhibit 37.  Take a look at that.

8      A.      Right.

9      Q.      2009 email to you, correct?

10     A.      Correct.

11     Q.      And it -- the email contains a TVT-O

dinner PowerPoint, correct?

13     A.      Yes.

14     Q.      For your upcoming dinners, correct?

15             That's what it says in the email,

correct?

17     A.      Where does it say --

18     Q.      "TVT dinner PowerPoint is for your

upcoming dinners"?

20     A.      Yes.

21             MR. MORIARTY:  Do you have one for me?

22             MR. JONES:  Sorry.  Always.  Always.

23    BY MR. JONES:

24     Q.      TVT family of products, preceptorship

Christopher E. Ramsey, M.D.

```
 1    PowerPoint, correct?

 2    A.      Yes.

 3    Q.      TVT-O dinner PowerPoint, correct?

 4    A.      Yes.

 5    Q.      Prolift+M preceptorship PowerPoint,

 6    correct?

 7    A.      Yes.

 8    Q.      Prolift+M materials science PowerPoint,

 9    correct?

10    A.      Yes.

11    Q.      Prolift+M complications PowerPoint,

12    correct?

13    A.      Yes.

14    Q.      Prolift+M dinner PowerPoint, correct?

15    A.      Yes.

16    Q.      These are all sent to you, correct?

17    A.      Correct.

18    Q.      In 2009?

19    A.      Yes.

20    Q.      By Bob Zipfel?

21    A.      Yes.

22    Q.      Bob Zipfel is professional education

23    manager at Ethicon, correct?

24    A.      I guess so.
```

Christopher E. Ramsey, M.D.

1      Q.      According to this email, he is,

2   correct?

3      A.      Yes.

4      Q.      And according to this email, these were

5   sent to your home address, correct?

6      A.      Correct.

7      Q.      Okay.  Did you go to Sonoma,

8   California, or Napa Valley?

9      A.      Sorry.  It was sent to my -- my office

10  address.

11     Q.      It was sent to your office address?

12     A.      Correct.

13     Q.      Okay.  "It is probably better if you

14  send things to my home address."

15     A.      That's where they wanted to send it,

16  was there.  I'm not sure where I got it, but. . .

17     Q.      No.  This is you writing.

18     A.      Right.  Right.  No, I understand.

19     Q.      "However, it's probably better if you

20  send things to my office [verbatim] address," and

21  you list your home address there; is that correct?

22     A.      Correct.

23     Q.      Okay.  Did you go to Napa Valley to the

24  Ethicon summit?

Christopher E. Ramsey, M.D.

```
1       A.      No.  I've never been to Napa Valley.

2       Q.      Did you get invited to it?

3       A.      I may have been.

4       Q.      You just decided it wasn't important

5   for you to go?

6       A.      I decided I couldn't go.

7       Q.      You wanted to go; you just couldn't go,

8   right?

9       A.      No, not necessarily.  It's a long way

10  away.  I don't think that I could arrange time for

11  it.

12      Q.      Okay.

13      A.      So --

14      Q.      It wasn't something that you were able

15  to arrange time for and attend, correct?

16      A.      Correct.

17      Q.      And did you have any interest in

18  attending the summit in Sonoma, California in 2011

19  Ethicon held?

20      A.      I don't know if I have interest in it

21  or not.  I'm not a wine drinker.

22      Q.      Okay.  Did you get invited to the

23  Ethicon summit in Long Beach, California, in 2010?

24      A.      I may have been.
```

Christopher E. Ramsey, M.D.

```
1        Q.      Did you attend?

2        A.      I don't think so.  I'm sure I didn't.

3        Q.      Okay.  Same reason:  That's a long way

4    to go?

5        A.      Correct.

6        Q.      Long way to travel, right?

7        A.      Correct.

8        Q.      You would have to take time away from

9    your patients, correct?  Time away from your

10   family, correct?

11       A.      Correct.

12       Q.      Did the FDA ever approve the TVT-Secur

13   device?

14              MR. MORIARTY:  Objection.  Form.

15              Go ahead.

16              THE WITNESS:  Yes.

17   BY MR. JONES:

18       Q.      Did the FDA approve the TVT-O device?

19       A.      Yes.

20       Q.      The TVT Retropubic device, did the FDA

21   approve that?

22       A.      Yes.

23       Q.      Did the FDA approve the Prolift device?

24       A.      I assume they did.  I never used it,
```

Christopher E. Ramsey, M.D.

```
 1   so --

 2       Q.      Okay.  I'll strike that question.

 3   Withdraw that question.  Won't use that one.

 4               Never attended any of the annual

 5   Ethicon summits, outside of the one time you

 6   visited New Jersey, correct?

 7       A.      Not that I remember.

 8       Q.      Okay.  Not that you remember, so it's

 9   possible?

10       A.      I didn't.

11       Q.      Okay.  You didn't?

12       A.      (Witness moves head up and down.)

13       Q.      Last couple questions.  Are you

14   familiar with the article "TVT-Secur single-

15   incision sling after 5 years of follow-up:  The

16   promises made and the promises broken"?

17       A.      I may have read that.  I'm not

18   certain --

19       Q.      Sort of a significant title, "promises

20   made and promises broken."

21       A.      Who wrote it?

22       Q.      Francois Haab.

23       A.      Haab.  I'm not familiar with that,

24   but --
```

Christopher E. Ramsey, M.D.

```
 1      Q.      Okay.

 2      A.      -- I'm not -- I'm not very familiar

 3   with the article.  I may have read it.

 4      Q.      If it's not on your reliance list,

 5   you're not relying on it, correct?

 6      A.      If it's not on my reliance list, I

 7   probably did not read it.

 8      Q.      Okay.  But a title like that, promises

 9   made and promises broken with TVT-Secur, would be

10   kind of -- sticks out, correct?

11      A.      Sure.  What journal was that in?  Does

12   it say?

13      Q.      "Urology."

14      A.      Okay.

15      Q.      2012.

16      A.      Okay.

17      Q.      Not familiar with it?

18      A.      Not off the top of my head.

19      Q.      Not on your reliance list?

20      A.      I don't know.

21      Q.      Feel free, if you want to take -- go

22   off the record and look at your reliance list and

23   see if it's on there.

24              THE WITNESS:  Do you have my reliance
```

Christopher E. Ramsey, M.D.

```
 1    list?

 2                MR. MORIARTY:  Have you already looked?

 3                MR. JONES:  It's not on there.

 4                THE WITNESS:  Okay.  It would take me a

 5    while to look through it.

 6    BY MR. JONES:

 7        Q.     So if you'll -- you can look at another

 8    time, but based on the representation that it's not

 9    in your reliance list, it's an article that you

10    won't be relying on, correct?

11        A.     Correct.

12        Q.     Okay.  And you're not familiar with it,

13    correct?

14        A.     No, I don't remember the article.

15        Q.     Okay.  Have you read any TVT-Secur

16    articles by Dr. Newman?

17        A.     Newman?  Not that I know of.

18        Q.     Okay.  Have you seen any -- has Ethicon

19    shown you any internal memos or communications from

20    Dr. Newman about the TVT-Secur device?

21        A.     I wouldn't know.

22        Q.     None that stand out as you sit here

23    today?

24        A.     I don't recollect Dr. Newman.
```

Christopher E. Ramsey, M.D.

1      Q.      Okay.

2      A.      I may recollect the content of it, but

3  I don't recollect the name.

4      Q.      Okay.  Well, it would stand out if

5  Ethicon showed you communications from Dr. Newman

6  stating that TVT-Secur was --

7              (Reporter interruption for

8  clarification.)

9  BY MR. JONES:

10     Q.      -- that TVT-Secur was unsafe, correct?

11     A.      I don't remember any article -- any

12  documentation from Dr. Newman.

13     Q.      Okay.  You don't remember any article

14  from Dr. Newman on TVT-Secur --

15     A.      No.

16     Q.      -- correct?

17              You don't remember any memos or

18  communications from Dr. Newman to Ethicon regarding

19  TVT-Secur, correct?

20     A.      Not specifically Dr. Newman, no.

21              MR. JONES:  We'll mark this as the next

22  exhibit, 38.

23              (Whereupon Exhibit 38 was marked as an

24  exhibit.)

Christopher E. Ramsey, M.D.

1    BY MR. JONES:

2        Q.      Briefly look at it.  Just tell me if

3    you've seen it before.  That's the only question I

4    have.

5        A.      (Reviews document.)

6                MR. JONES:  Here you go, Counselor.

7                THE WITNESS:  I don't remember anything

8    called "brand equity study."

9    BY MR. JONES:

10       Q.      Okay.  And if that ETH.MESH number is

11   not on your reliance list, it's not a document that

12   you're going to be relying on, correct?

13       A.      I don't think I would rely on it.

14       Q.      Okay.  Are you aware -- did Ethicon

15   show you any documents related to TVT-Secur

16   performance in Australia?

17       A.      I've seen that.

18       Q.      You've seen that?

19       A.      Yes.

20       Q.      What happened?

21       A.      They were having -- they were having

22   results that weren't as good as they wanted.

23       Q.      Okay.  Prior to a 522 order being

24   issued in the United States with TVT-Secur, Ethicon

Christopher E. Ramsey, M.D.

1    had stopped selling TVT-Secur in other countries

2    already, correct?

3        A.      That's my understanding.

4               MR. MORIARTY:  Objection.

5               Go ahead.

6    BY MR. JONES:

7        Q.      Prior to the 522 order, Ethicon had

8    already stopped selling TVT-Secur in other

9    countries, correct?

10              MR. MORIARTY:  Objection.

11              Go ahead.

12              THE WITNESS:  I'm not sure the exact

13   dates they stopped selling them.  I'm not sure.

14   BY MR. JONES:

15       Q.      Prior to Ethicon ceasing sale of the

16   TVT-Secur device inside the United States, Ethicon

17   had already stopped selling the device in

18   Australia, correct?

19              MR. MORIARTY:  Objection.

20              Go ahead.

21              THE WITNESS:  I'm -- again, I'm not

22   certain of the date they stopped selling it in

23   Australia.

24

Christopher E. Ramsey, M.D.

1    BY MR. JONES:

2        Q.      You just know they stopped selling it

3    in Australia?

4        A.      Correct.

5        Q.      You know that it was a product recall

6    in Australia, correct?

7        A.      I don't know that it was a product

8    recall.

9        Q.      You didn't hear that --

10       A.      No.

11       Q.      -- before today?

12       A.      No.

13       Q.      You never -- you didn't know before

14   today that Ethicon has issued a product recall on

15   TVT-Secur?

16       A.      I don't remember it being called a

17   product recall.

18       Q.      You don't remember seeing any documents

19   discussing a recall of TVT-Secur in Australia?

20       A.      Not a recall, just that they weren't

21   going to sell it anymore.

22       Q.      And why weren't they going to sell it

23   anymore?

24       A.      I think that they had doctors that were

Christopher E. Ramsey, M.D.

```
 1    concerned about the efficacy of it, and probably it

 2    wasn't economical for them to sell it there any

 3    more.

 4        Q.      Ethicon stopped selling TVT-Secur in

 5    part because of concerns about the efficacy of the

 6    device from surgeons, correct?

 7              MR. MORIARTY:  Objection.

 8              THE WITNESS:  I would say that's true.

 9    BY MR. JONES:

10        Q.      Okay.  Are you familiar with project

11    Zion?

12        A.      That doesn't sound familiar.

13        Q.      Project Topa?

14        A.      No.

15        Q.      Are you -- are you familiar with any

16    projects at Ethicon where they used lighter mesh

17    than TVT for treatment of SUI?

18        A.      Not for treatment of SUI, I don't know

19    that.

20        Q.      Okay.  How about for treatment outside

21    of SUI?

22        A.      I'm not familiar with it.

23        Q.      Okay.  Are you familiar with any

24    projects where Ethicon investigated making the mesh
```

Christopher E. Ramsey, M.D.

```
 1    used in TVT softer?

 2        A.      No.

 3        Q.      Are you aware of any projects at

 4    Ethicon where Ethicon invested making the --

 5    investigated making the TVT mesh lighter or less

 6    dense?

 7        A.      No.

 8        Q.      Are you aware of any projects at

 9    Ethicon where Ethicon investigated making the mesh

10    used in TVT partially absorbable?

11        A.      No.  Not for sling.

12        Q.      Okay.  You are for POP, though,

13    correct?

14        A.      I've heard.  I don't know much about

15    it, though.

16        Q.      Okay.  And what have you heard about

17    it?

18        A.      I just know -- I just know they had

19    some sort of absorbable material, maybe Vicryl,

20    that was involved in it.

21        Q.      Okay.  Why would a company want to

22    market partially absorbable mesh?

23               MR. MORIARTY:  Objection.  Form.

24               Go ahead.
```

Christopher E. Ramsey, M.D.

```
 1                THE WITNESS:  I don't know why they

 2     would want to do that for -- for specifically

 3     stress urinary incontinence.  I don't -- for other

 4     reasons, I don't know.  Again, I'm not familiar

 5     with those procedures.

 6     BY MR. JONES:

 7          Q.     You don't know why a company would want

 8     to decrease the weight of their mesh used to treat

 9     SUI?

10          A.     No.

11          Q.     Do you know why a company would want to

12     make the pores larger in the mesh to treat SUI?

13          A.     No.

14          Q.     Do you know why a company would want to

15     make the mesh used to treat SUI softer?

16          A.     No.

17          Q.     Do you know why a company would want to

18     make the mesh used to treat female SUI less stiff?

19          A.     No.

20          Q.     Do you believe the TVT-Secur device

21     damaged the brand name of Ethicon?

22          A.     I'm not certain about that.

23          Q.     You don't know who Aaron Kirkemo is,

24     right?
```

Christopher E. Ramsey, M.D.

1              (Reporter interruption for

2      clarification.)

3              MR. JONES:  Aaron Kirkemo.

4              MR. MORIARTY:  Objection.  Asked and

5      answered yesterday.

6              THE WITNESS:  No.

7      BY MR. JONES:

8      Q.      You didn't learn about who he was last

9      night, did you?

10     A.      No.  I went to bed last night.

11     Q.      Well, you did look at the material

12     safety data sheet, though, correct?

13     A.      I did that.  Yeah.  Well, it was an

14     article with Moalli.  It wasn't specifically --

15     Q.      Okay.  You looked at the cancer article

16     with Moalli?

17     A.      Yes.  No, no.  Yesterday, I looked at

18     the -- at the pore size comparing the

19     different. . .

20     Q.      Okay.  Yesterday after the deposition

21     you looked at the Moalli article discussing pore

22     size, correct?

23     A.      Correct.

24     Q.      Okay.  What else did you look at after

Christopher E. Ramsey, M.D.

1    yesterday's deposition?

2        A.      I looked through my -- end of the case-

3    specific -- my case-specific reports just to

4    refresh my memory.  I've forgotten them all now.

5        Q.      But other than the case-specific

6    reports, you just looked at the Moalli 2008

7    article?

8        A.      Right.

9        Q.      I think we can get out that article

10   real quick.

11              MR. JONES:  Exhibit 39.

12              (Whereupon Exhibit 39 was marked as an

13   exhibit.)

14   BY MR. JONES:

15       Q.      Is Exhibit 39 the Moalli article you

16   referenced last night?  Yes or no?

17       A.      I need to look to see if it is, because

18   I just looked at part of it.

19              Yes, it is.

20       Q.      I take it you read this article in full

21   last night?

22       A.      No, I did not read it in full.

23       Q.      Have you ever read this article in

24   full?

Christopher E. Ramsey, M.D.

```
 1       A.      I've read the article in full.

 2       Q.      Okay.  You have read this article in

 3    full before, correct?

 4       A.      Yes.

 5       Q.      And you -- you looked at it again last

 6    night, correct?

 7       A.      Yes.

 8       Q.      And you're going to be relying on this

 9    article for your opinions in this case, correct?

10       A.      Correct.

11       Q.      Are there any statements in this

12    article -- go ahead and take some time to look at

13    this article because I'm going to ask you about a

14    couple specific statements.

15       A.      Well, go ahead and ask me the question.

16    I'll have to read the whole thing again, if you're

17    going to ask me -- if you want to ask me specific

18    questions, go ahead and ask me specific questions,

19    and if I need to read it, I'll read it.  But if you

20    want me to read it now, it's going to take a little

21    while, because I'm not a really fast reader.

22       Q.      Okay.  I'll try to ask you about

23    specific statements and see if that will help us.

24               Turn to page 656, the second page.  Top
```

Christopher E. Ramsey, M.D.

1    left-hand corner, 656.

2              Are you with me?

3    A.      Yes.

4    Q.      Okay.  "One of the primary problems in

5    using the TVT is that, as a result of its low

6    stiffness, the mesh easily deforms when tensioning

7    under the urethra.  Specifically, pulling the sling

8    gently results in thinning of the mesh,"

9    parenthetical, "permanent deformation, and fraying

10   at the tanged edges."

11             Did I read that correctly?

12   A.      Yes.

13   Q.      Do you agree or disagree with that

14   statement?

15   A.      Well, that's why they have the -- the

16   outer sheath, to prevent that from happening.  But

17   that's what you want, is a low-stiffness sling, I

18   would think.

19   Q.      Okay.  You want a low-stiffness sling,

20   correct?

21   A.      Yeah, a sling that has low stiffness.

22   Q.      Okay.  Why do you want a sling with low

23   stiffness?

24   A.      So that it fits the vagina and -- more

Christopher E. Ramsey, M.D.

```
1    comfortably for the patient, more comfortably for

2    the physician as it goes in, so that it's not

3    stiff.  It molds to the curvature of the tissue.

4        Q.      You don't want stiff mesh rubbing up

5    against a woman's vaginal tissues, correct?

6        A.      Not necessarily that's rubbing up

7    against the vaginal tissue.  The stiffer the mesh

8    is, the less compliant it's going to be, and it's

9    not going to fit, again, like I said, to the

10   curvature of the vaginal tissue.

11       Q.      The stiffer the mesh is for treatment

12   of SUI, the less compliant it will be with the

13   woman's anatomy, correct, and tissue?

14       A.      The stiffer the mesh?

15       Q.      Yeah.

16       A.      I would think that's -- yeah.

17       Q.      Correct?

18       A.      That's -- that's true.

19       Q.      Stiffer, the stiffer the mesh, the less

20   compliant it is with a woman's vaginal tissue,

21   correct?

22       A.      (Indicating.)

23       Q.      Is that fair?

24       A.      Yes.
```

Christopher E. Ramsey, M.D.

1      Q.      Okay.  One of the primary problems in

2  using the TVT is that -- a result of its low

3  stiffness, the mesh easily deforms.

4              Do you agree that the mesh easily

5  deforms with TVT?

6      A.      If you pull on the mesh itself, tighten

7  it, it will change its shape.

8      Q.      Okay.  And is Dr. Moalli talking about

9  mechanical-cut mesh or laser-cut mesh in this

10  article?

11      A.      I'm not certain which one.

12      Q.      You don't have any idea what she's

13  talking about?

14      A.      I would have to read the article to see

15  which one --

16      Q.      All right.  Well, let's go off the

17  record real quick, and you figure out whether she's

18  talking about laser-cut mesh or mechanical-cut

19  mesh.

20      A.      (Reviews document.)

21              (Brief recess.)

22  BY MR. JONES:

23      Q.      Okay.  We're back on the record now,

24  Doctor.

Christopher E. Ramsey, M.D.

1      A.      Okay.

2      Q.      You've had some opportunity to review

3   this article again, correct?

4      A.      Yes.

5      Q.      Do you know what "tanged edges" means?

6      A.      I believe it's that they're having them

7   heat sealed, that they are mechanically cut.  So I

8   think we're talking about mechanical-cut mesh.

9      Q.      Okay.  So more likely than not, based

10  on your opinion, this article is talking about

11  mechanical-cut mesh --

12     A.      Correct.

13     Q.      -- TVT, correct?

14     A.      Yes.

15     Q.      Okay.  Let's go back to page 656, which

16  is the second page.  "Consequently, various

17  companies have modified polypropylene sling meshes

18  for easier placement by heat sealing the midportion

19  of the sling that lays flat under the urethra

20  (Boston Scientific) or placing a patented

21  tensioning suture along the longitudinal axis

22  (AMS)."

23              Did I read that correctly?

24     A.      Yes.

Christopher E. Ramsey, M.D.

1      Q.      The TVT does not have a tensioning

2   suture, correct?

3      A.      No.  I've never used the AMS product

4   with tensioning sutures, so I don't know how it

5   works, honestly.

6      Q.      Okay.  And you've used the AMS SPARC,

7   though, correct?

8      A.      In residency.

9      Q.      Okay.  You've used the AMS Monarc a

10  couple times, correct?

11     A.      Probably.

12     Q.      Okay.  I want to continue reading.

13              "Although the modifications have

14  simplified the technical aspects of sling

15  placement, it is not clear how these changes affect

16  the biomechanical behavior of the sling and,

17  ultimately, clinical outcomes."

18              Do you agree with that statement?

19     A.      No, I don't think that the

20  modifications simplified or made the technical

21  aspects of the sling simple or less simple or more

22  simple or easier or harder.

23     Q.      Okay.  Do you believe that

24  modifications such as heat sealing the mesh may

Christopher E. Ramsey, M.D.

1      ultimately affect the clinical outcome?

2          A.      No.

3          Q.      So you disagree with Dr. Moalli that

4      changing the way you cut the mesh may impact the

5      clinical outcome for patients?

6                  MR. MORIARTY:  Objection.  Form and

7      otherwise.

8                  THE WITNESS:  That's what they're

9      trying to find in here, is if it does.  You know,

10     if it may, it may.  They want to try to find out if

11     it does.

12     BY MR. JONES:

13         Q.      Okay.  "In" -- "Indeed, to date, most

14     outcome data failed to distinguish between

15     different type" -- "different types of sling

16     meshes, most likely because the basic biomechanical

17     properties of most sling properties have not been

18     defined."

19                 Did I read that correctly?

20         A.      You read it correctly.

21         Q.      Thanks.  Do you agree or disagree with

22     that?

23         A.      I don't know if I necessarily agree

24     with that statement or not.  I think that the

Christopher E. Ramsey, M.D.

1    different meshes seem to have fairly similar

2    outcomes, whether or not they have different

3    biochemical properties or not.  Didn't seem to

4    affect the clinical outcomes.

5            So, again, this is a supposition that

6    she's making, and I'm -- I'm not sure if that's

7    correct or not.

8       Q.    Okay.  Have you been shown internal

9    testing by Ethicon that discusses whether laser-cut

10   mesh used in TVT is three times stiffer than

11   mechanical-cut mesh used in TVT?

12      A.    I haven't seen it's three times

13   stiffer.

14      Q.    You haven't seen that testing?

15      A.    No.

16      Q.    Okay.  Ethicon didn't show that to you?

17      A.    I haven't seen it.

18      Q.    "It is knowledge of the properties of

19   the sling material that surgeons have the greatest

20   knowledge deficit and consequently are completely

21   dependent on the mesh information supplied by a

22   representative of the vendor."

23            Did I read that correctly?

24      A.    I don't know where you are.

Christopher E. Ramsey, M.D.

```
 1      Q.       Page 656.  It's highlighted.  Lucky.

 2      A.       Where is that?

 3      Q.       "It is troubling" -- or "It is

 4  knowledge."

 5      A.       Okay.

 6      Q.       "It is knowledge of the properties of

 7  the sling material that surgeons have the greatest

 8  knowledge deficit and consequently are completely

 9  dependent on the mesh information supplied by a

10  representative of the vendor."

11             Did I read that correctly?

12      A.       Yes, you read it correctly.

13      Q.       Do you agree with that statement?

14      A.       I would say that they say "completely

15  dependent."  I don't think it's completely

16  dependent.  I think there are studies that are --

17  on these type of things that are available if you

18  want to look at them or find them.

19      Q.       If we take out "completely," do you

20  agree with that statement?

21      A.       I would say it's partially dependent.

22      Q.       "It is knowledge of the properties of

23  the sling material that surgeons have the greatest

24  knowledge deficit."
```

Christopher E. Ramsey, M.D.

```
 1                    Do you agree with that?

 2          A.      No.   I think surgeons know what the

 3     properties of the slings are.

 4          Q.      So you disagree with that?

 5          A.      Yes.

 6          Q.      You disagree with Dr. Moalli, correct?

 7          A.      I disagree with the statement she made.

 8          Q.      You disagree with the statement

 9     Dr. Moalli makes in this peer-reviewed medical

10     journal, correct?

11          A.      Yes.

12          Q.      And you've never published in any

13     peer-reviewed medical journal on female SUI,

14     correct?

15          A.      No.

16          Q.      "Even more problematic is that many of

17     the representatives have little knowledge of the

18     biomechanical factors that may be relevant and tend

19     to focus on aspects of the sling which facilitate

20     the operation for the surgeon."

21                    Did I read that correctly?

22          A.      Yes.

23          Q.      Do you agree or disagree with that

24     statement?
```

Christopher E. Ramsey, M.D.

```
1              MR. MORIARTY:  Objection.

2              Go ahead.

3              THE WITNESS:  I guess I don't know what

4    she means by "representatives."  I don't know if

5    she's --

6    BY MR. JONES:

7        Q.     Ethicon sales reps.

8              Do you agree or disagree?

9        A.     I think that they know what -- what the

10   biomechanical factors are.

11       Q.     So you disagree here with Dr. Moalli as

12   well, correct?

13       A.     Yes.

14       Q.     Okay.  Turn to page 661.  "Gynemesh was

15   different from that of all the other samples

16   tested.  Gynecare samples permanently elongated by

17   17 plus or minus within the margin of error 4

18   percent, indicating that, although very little

19   force applied, there is irreversible deformation of

20   the TVT."

21              Did I read that correctly?

22       A.     Yes.

23       Q.     Do you agree that Gyne- -- do you agree

24   that Dr. Moalli in her testing found that Gynecare
```

Christopher E. Ramsey, M.D.

1    mesh was different from that of all other samples

2    she tested?

3       A.      In this one respect.  Reading the

4    article, she says that they're all very similar.

5    So in this one respect there is a difference.

6       Q.      Okay.  Okay.  Then turn to page 663.

7    You stole my highlighted copy.  How -- second

8    column on the right.  "In contrast, a high-

9    stiffness material may not yield," parenthetical,

10   "elongate, with the application of even high

11   loads," parenthetical, "a very heavy cough, and

12   consequently would have an increased likelihood of

13   erosion into the bladder or urethra."

14              Did I read that correctly?

15      A.      Where is that?  That's not part of the

16   highlighted part.

17      Q.      Yeah, I know.  Forget the -- below the

18   highlighted.  Yeah.  "In contrast."

19      A.      "In contrast, the high-stiffness

20   material may not yield"?

21      Q.      Yeah.

22      A.      Okay.

23      Q.      "In contrast, a high stiffness material

24   may not yield," parenthetical "elongate, with the

Christopher E. Ramsey, M.D.

```
1    application of even high loads," parenthetical, "a

2    very high" -- "a very heavy cough, and consequently

3    would have an increased likelihood of erosion into

4    the bladder or urethra."

5        A.      Yes.

6        Q.      I read that correctly?

7        A.      Correct.

8        Q.      Do you agree or disagree with that

9    statement?

10       A.      I agree with that statement.

11               MR. JONES:  Okay.  I think that's all

12   the questions I have.

13               MR. MORIARTY:  Let me just ask you a

14   couple.

15

16   EXAMINATION BY MR. MORIARTY:

17       Q.      On this page 663 of the Moalli article

18   that he was just talking about, in the second

19   column, is -- are Moalli and her coauthors

20   speculating about possible benefits that the

21   stiffness profile of this -- of these meshes have

22   regarding clinical complications like erosion?

23       A.      I'm sorry.  Say that --

24               MR. JONES:  Object to form.
```

Christopher E. Ramsey, M.D.

```
 1                    THE WITNESS:  -- first part of the

 2    question again.

 3    BY MR. MORIARTY:

 4        Q.      Page 663 --

 5        A.      Right.

 6        Q.      -- on the second column, are Moalli and

 7    her coauthors speculating about possible benefits

 8    that this stiffness profile would have regarding

 9    clinical complications?

10                    MR. JONES:  Objection.

11    BY MR. MORIARTY:

12        Q.      By lowering the rate of erosions of a

13    sling?

14                    MR. JONES:  Same objection.

15                    THE WITNESS:  Yes.

16    BY MR. MORIARTY:

17        Q.      Okay.  And at page -- at the second

18    page of this article, does it say that for

19    simplicity of data presentation, they used the

20    Gynecare TVT as the gold standard and defined the

21    behavior of five newer versions relative to it?

22        A.      Correct.

23        Q.      Is "Urology" a journal that you

24    receive?
```

Christopher E. Ramsey, M.D.

```
 1      A.      I -- yes.  I -- our group receives it.

 2   I don't receive it personally, but our practice

 3   receives it.

 4      Q.      Do you periodically review it for

 5   articles of interest?

 6      A.      Yes.

 7      Q.      So if there was an article in that

 8   journal in 2012 about promises made and promises

 9   broken with TVT-S, is it possible that you reviewed

10   that article back then?

11      A.      It's possible.

12      Q.      When the 522 order came out, did FDA

13   say that the remaining stocks couldn't be used?

14      A.      No, they did not say that.

15              MR. JONES:  Objection.

16   BY MR. MORIARTY:

17      Q.      Was it recalled?

18              MR. JONES:  Objection.

19              THE WITNESS:  No.

20   BY MR. MORIARTY:

21      Q.      Did FDA ever say it was unsafe or

22   ineffective?

23      A.      No.

24      Q.      In your experience and from your review
```

Christopher E. Ramsey, M.D.

```
 1    of the Level 1 medical literature, is the erosion

 2    rate of -- of any of the TVT products, Retropubic,

 3    Obturator, or Secur, higher than 10 percent?

 4        A.      No.

 5        Q.      Mr. Jones asked you some questions

 6    about one of the contracts and whether you had to

 7    get approval of all the things you discussed with

 8    the doctors in a proctoring session.

 9             Do you remember that?

10        A.      Yes.

11        Q.      In a proctoring session, would you

12    routinely discuss the published medical literature?

13        A.      Yes.

14        Q.      You were asked some questions about

15    complication rates.  I want to follow up on that.

16             Throughout the years of your practice,

17    have you consistently had meetings with your

18    partners about things affecting the practice,

19    including types of surgeries you do and

20    complication rates?

21             MR. JONES:  Objection.

22             THE WITNESS:  Yes.

23    BY MR. MORIARTY:

24        Q.      Over the course of your career, have
```

Christopher E. Ramsey, M.D.

1    you consistently thought about and analyzed your

2    own results in comparison with published medical

3    literature?

4              MR. JONES:  Objection.

5              THE WITNESS:  Yes.

6    BY MR. MORIARTY:

7         Q.     Is that true even though you haven't

8    kept a registry and kept detailed information about

9    that?

10        A.     Yes.

11             MR. JONES:  Objection.

12   BY MR. MORIARTY:

13        Q.     Did you ever in your surgical practice

14   notice a difference in performance or outcomes

15   between laser- or mechanically-cut mesh?

16        A.     No.

17             MR. JONES:  Objection.

18   BY MR. MORIARTY:

19        Q.     Mr. Jones asked you some questions

20   about long-term safety studies regarding TVT.  I

21   want to follow up on that.

22             So far as the mesh itself is concerned,

23   the mesh used in the TVT Retropubic, Obturator, and

24   Secur, does long-term data about the mesh apply

Christopher E. Ramsey, M.D.

```
 1   across the different types?

 2                  MR. JONES:  Objection.

 3                  THE WITNESS:  Yes.

 4   BY MR. MORIARTY:

 5      Q.      Is erosion a risk of all polypropylene

 6   mesh implants?

 7      A.      Yes.

 8      Q.      Not just Ethicon products?

 9      A.      Correct.

10      Q.      In your own personal experience, was

11   TVT-Secur safe?

12      A.      Yes.

13      Q.      Was it effective?

14      A.      Yes.

15      Q.      Were your complication rates less

16   than -- I'm sorry.

17                  Were your erosion rates less than 2 or

18   3 percent --

19                  MR. JONES:  Objection.

20   BY MR. MORIARTY:

21      Q.      -- with TVT-Secur?

22      A.      Yes.

23                  MR. JONES:  Objection.

24
```

Christopher E. Ramsey, M.D.

1    BY MR. MORIARTY:

2        Q.      You were asked some questions yesterday

3    about these advisory board documents that were

4    exhibits, like 9, 10, and 11.

5                Had you ever actually seen those

6    particular documents before yesterday?

7        A.      No, I don't remember them.

8        Q.      You were asked some questions yesterday

9    about the safety profile of mini-slings versus

10   Obturator and Retropubic.  I'll follow up on that.

11               What is the theoretical safety

12   advantage that Secur had over Retropubic or

13   Obturator?

14       A.      The introducers didn't have to pass

15   through the Obturator canal or behind the pubic

16   bone, so there would be directly less risk of

17   damaging the Obturator nerve or vessels or

18   potentially, with the Retropubic device, damaging

19   bowel, bladder -- it would be less likely to damage

20   the bladder.

21       Q.      Okay.

22       A.      Smaller piece of mesh.

23       Q.      So when you have used medical devices

24   other than TVT, TVT Obturator and TVT-Secur, have

Christopher E. Ramsey, M.D.

1    you from time to time reviewed their instructions

2    for use?

3        A.      Yes.

4        Q.      And is that greater body of information

5    that you gained by reviewing IFUs of other products

6    part of the body of information that you have in

7    which you form opinions in this case about

8    Ethicon's IFUs?

9                MR. JONES:  Objection.  Asked and

10   answered.

11               THE WITNESS:  Yes, I do.

12   BY MR. MORIARTY:

13       Q.      The opinions that you intend to express

14   about the safety and efficacy of the TVT products,

15   are those opinions that you have held for many

16   years while you were using those devices?

17       A.      Yes.

18       Q.      Are those just opinions you came up

19   with for purposes of litigation?

20               MR. JONES:  Objection.

21               THE WITNESS:  No.

22   BY MR. MORIARTY:

23       Q.      Do you have some experience in

24   reviewing pathology slides or pathology reports

Christopher E. Ramsey, M.D.

1    from the surgeries that you perform?

2        A.    Yes.

3              MR. JONES:  Objection.

4              THE WITNESS:  Yes, I do.  And I

5    continue to review pathology results on prostate

6    cancer cases.  We were trained that in residency,

7    too.

8              MR. MORIARTY:  Okay.  That's all I

9    have.

10

11   FURTHER EXAMINATION BY MR. JONES:

12       Q.    Just one or two questions.

13             MR. MORIARTY:  Before you start, if

14   it's going to be one or two, I won't do the math on

15   your time, but you actually are getting close to

16   seven hours.

17             MR. JONES:  Okay.  Okay.  I appreciate

18   that.  It won't be long.

19   BY MR. JONES:

20       Q.    You listed a -- as one of the potential

21   safety advantages of TVT-Secur being the use of a

22   smaller piece of mesh, correct?

23       A.    Yes.

24       Q.    Why is using a smaller piece of mesh in

Christopher E. Ramsey, M.D.

```
 1    TVT-Secur a potential safety benefit?

 2        A.      I think that there would be less

 3    inflammation caused by a smaller piece of mesh.

 4        Q.      Less mesh equals less inflammation

 5    inside the woman, correct?

 6        A.      I think that goes to reason.

 7        Q.      And just for verification, you will be

 8    relying on the AMS MiniArc-Precise IFU in this

 9    litigation, correct?

10        A.      I'll be relying on my -- my

11    experience --

12        Q.      Experience --

13        A.      -- with IFUs in general.

14        Q.      So we can ask you about your experience

15    reviewing the AMS MiniArc-Precise at trial,

16    correct?

17        A.      Yes.

18        Q.      Okay.  And we can ask you about the

19    contents of the AMS MiniArc-Precise IFU, correct?

20        A.      Yes.

21        Q.      And how those compare against the

22    contents of the TVT-Secur IFU, correct?

23        A.      Yes.

24        Q.      Do you standby the testimony that you
```

Christopher E. Ramsey, M.D.

1    gave last night under oath?

2       A.      Last night?  Excuse me?

3       Q.      Do you stand by the testimony you gave

4    last night under oath?

5       A.      Oh, yes.

6       Q.      You don't -- nothing you want to

7    change?

8       A.      No.

9       Q.      Is TVT-Secur the gold standard?

10      A.      Is TVT-Secur the gold standard now?

11      Q.      Yes.

12      A.      No.

13              MR. JONES:  That's it.  I've got more,

14   but I won't.

15              MR. MORIARTY:  Okay.  We're done.

16              (Proceedings concluded at 12:27 p.m.)

17

18

19

20

21

22

23

24

Christopher E. Ramsey, M.D.

```
 1              C E R T I F I C A T E
 2    STATE OF TENNESSEE )
      COUNTY OF DAVIDSON )
 3              I, Lise S. Matthews, RMR, CRR, CRC, LCR
      353, Licensed Court Reporter and Notary Public, in
 4    and for the State of Tennessee, do hereby certify
      that the above deposition was reported by me, and
 5    the transcript is a true and accurate record to the
      best of my knowledge, skills, and ability.
 6              I further certify that I am not related
      to nor an employee of counsel or any of the parties
 7    to the action, nor am I in any way financially
      interested in the outcome of this case.
 8              I further certify that I am duly
      licensed by the Tennessee Board of Court Reporting
 9    as a Licensed Court Reporter as evidenced by the
      LCR number and expiration date following my name
10    below.  I further certify that this transcript is
      the work product of this court reporting agency and
11    any unauthorized reproduction and/or transfer of it
      will be in violation of Tennessee Code Annotated
12    39-14-104, Theft of Services.
                IN WITNESS WHEREOF, I have hereunto set
13    my hand and affixed my notarial seal this _____
      day of _____, 2016.
14

15

      _____
16    Lise S. Matthews, RMR, CRR, CRC
      LCR 353 Expiration Date 6/30/2016
17    Notary Public Commission Expires
      March 6, 2018
18

19

20

21

22

23

24
```