EXHIBIT 2

Gregory Bales, M.D.

```
 1             UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   AT CHARLESTON
 3    ----------------------------)
                                  )
 4    IN RE:  ETHICON, INC.,      )
      PELVIC REPAIR SYSTEM        ) MDL No. 2327
 5    PRODUCTS LIABILITY          )
      LITIGATION                  ) JOSEPH R. GOODWIN
 6                                ) U.S. DISTRICT JUDGE
      ----------------------------)
 7                                )
      THIS DOCUMENT RELATES TO    )
 8    PLAINTIFFS:                 )
                                  )
 9    Joy Essman                  )
      Case No. 2:12-cv-00277      )
10                                )
      Christine Wiltgen           )
11    Case No. 2:12-cv-01216      )
                                  )
12    Shirley Walker              )
      Case No. 2:12-cv-00873      )
13                                )
      Julie Wroble                )
14    Case No. 2:12-cv-00883      )
                                  )
15    Nancy Jo Williams           )
      Case No. 2:12-cv-00511      )
16                                )
      ----------------------------)
17
18
19             The deposition of GREGORY BALES, M.D.
20    taken before Pauline M. Vargo, an Illinois
21    Certified Shorthand Reporter, C.S.R. No. 84-1573,
22    at the law offices of Drinker, Biddle & Reath,
23    191 North Wacker Drive, Suite 3700, Chicago,
24    Illinois, on April 1, 2016, at 8:02 a.m.
```

```
 1   PRESENT ON BEHALF OF THE PLAINTIFFS:
 2        MOTLEY RICE, LLC
          28 Bridgeside Boulevard
 3        Mount Pleasant, South Carolina  29464
          401.457.7700
 4        BY:  MARGARET THOMPSON, ESQ.
               mmthompsonmd@motleyrice.com
 5
          TOR HOERMAN LAW, LLC
 6        101 West Vandalia Street, Suite 350
          Edwardsville, Illinois 62025
 7        888.508.6752
          By:  STEVEN D. DAVIS, ESQ.
 8             sdavis@torhoermanlaw.com
               JACOB W. PLATTENBERGER, ESQ.
 9             jplattenberger@torhoermanlaw.com
10
     PRESENT ON BEHALF OF THE DEFENDANT:
11
          TUCKER ELLIS, LLP
12        950 Main Avenue, Suite 1100
          Cleveland, Ohio  44113
13        216.592.5000
          BY:  MATTHEW P. MORIARTY, ESQ.
14             matthew.moriarty@tuckerellis.com
15
16
17
18
19
20
21
22
     REPORTED BY:
23
          PAULINE M. VARGO, RPR, CRR
24        Illinois CSR No. 84-1573
```

Gregory Bales, M.D.

```
 1                I N D E X
 2             Friday, April 1, 2016
 3   WITNESS                           EXAMINATION
 4   GREGORY BALES, M.D.
 5      By Ms. Thompson..................Page 7
 6      By Mr. Moriarty..................Page 206
 7      By Ms. Thompson..................Page 213
 8
 9
10
11
12                E X H I B I T S
13   BALES EXHIBIT                    MARKED FOR ID
14   Exhibit 1    Notice to take Deposition of      7
                  Gregory T. Bales, M.D.
15
     Exhibit 2    Defense Expert General Reports    18
16                of Gregory Bales, M.D.
17   Exhibit 3    Ethicon Advisory Board            18
                  Engagement Letter
18                ETH.MESH.09280802 through
                  ETH.MESH.09280808
19
     Exhibit 4    E-Mail Chain, Top E-Mail sent     18
20                4/21/06 from Amy Vie
                  ETH.MESH.07939396 and
21                ETH.MESH.07939397
22   Exhibit 5    6/18/09 E-Mail                    20
                  ETH.MESH.00542924
23
     Exhibit 6    2/26/10 E-Mail                    21
24                ETH.MESH.05740486
```

Gregory Bales, M.D.

```
 1                    E X H I B I T S
 2                      Continued
 3   BALES EXHIBIT                          MARKED FOR ID
 4   Exhibit 7     E-Mail Chain, Top E-Mail sent      55
                   8/15/05
 5                 ETH.MESH.02923305 and
                   ETH.MESH.02923306
 6
     Exhibit 8     Chmielewski, et al., Study,         61
 7                 "Reanalysis of a randomized
                   trial of 3 techniques of
 8                 anterior colporrhaphy using
                   clinically relevant definitions
 9                 of success"
10   Exhibit 9     Sand, et al., Study,               64
                   "Prospective randomized trial of
11                 polyglactin 910 mesh to prevent
                   recurrence of cystoceles and
12                 rectoceles"
13   Exhibit 10    Funk, et al., Study, "Long-term    67
                   outcomes of vaginal mesh versus
14                 native tissue repair for
                   anterior vaginal wall prolapse"
15
     Exhibit 11    Oversand, et al., Study,           68
16                 "Long-term follow-up after
                   native tissue repair for pelvic
17                 organ prolapse"
18   Exhibit 12    Iglesia, et al., Study,            69
                   "Three-Year Outcomes of Vaginal
19                 Mesh for Prolapse"
20   Exhibit 13    Visco, et al., Study, "Vaginal     71
                   mesh erosion after abdominal
21                 sacral colpopexy"
22   Exhibit 14    "GyneMesh II New Mesh Design"      77
                   ETH.MESH.12009028 through
23                 ETH.MESH.12009035
24
```

Gregory Bales, M.D.

```
 1                    E X H I B I T S
 2                      Continued
 3    BALES EXHIBIT                        MARKED FOR ID
 4    Exhibit 15    Abed, et al., Study, "Incidence    81
                    and management of graft erosion,
 5                  wound granulation and
                    dyspareunia following vaginal
 6                  prolapse repair with graft
                    materials: a systematic review"
 7
      Exhibit 16    Jacquetin, et al., Study, "Total   83
 8                  transvaginal mesh technique for
                    treatment of pelvic organ
 9                  prolapse: a 3-year prospective
                    follow-up study"
10
      Exhibit 17    Jacquetin, et al., Study, "Total   85
11                  transvaginal mesh technique for
                    treatment of pelvic organ
12                  prolapse: a 5-year prospective
                    follow-up study"
13
      Exhibit 18    Jacquetin/Cosson Study,            86
14                  "Complications of vaginal mesh:
                    our experience"
15
      Exhibit 19    Lowman, et al., Study, "Does the   92
16                  Prolift system cause
                    dyspareunia?"
17
      Exhibit 20    Weber, et al., Study, "Sexual      94
18                  function and vaginal anatomy in
                    women before and after surgery
19                  for pelvic organ prolapse and
                    urinary incontinence"
20
      Exhibit 21    Cochrane Review, "Transvaginal     105
21                  mesh or grafts compared with
                    native tissue repair for vaginal
22                  prolapse"
23    Exhibit 22    Maher article, "The Transvaginal   109
                    Mesh Decade"
24
```

Gregory Bales, M.D.

```
 1              E X H I B I T S
 2                Continued
 3   BALES EXHIBIT                    MARKED FOR ID
 4   Exhibit 23   Maher paper, "Vaginal mesh      116
                  contraction, definition,
 5                clinical Presentation and
                  Management"
 6
     Exhibit 24   Dietz, et al., Study, "Mesh     122
 7                contraction: Myth or reality?"
 8   Exhibit 25   Abstract 157 by Letouzey        134
                  and De Tayrac
 9
     Exhibit 26   PowerPoint, "Mesh shrinkage:    136
10                How to assess, how to prevent,
                  how to manage?"
11
     Exhibit 27   Gynecare Prolift IFU            199
12
     Exhibit 28   2015 Gynemesh PS IFU            202
13
     Exhibit 29   Urology Times Urology Excerpt   203
14
     Exhibit 30   Ek, et al., Study, "Urodynamic  214
15                Assessment of Anterior Vaginal
                  Wall Surgery: A Randomized
16                Comparison Between Colporraphy
                  and Transvaginal Mesh"
17
     Exhibit 31   Rogowski, et al., Article, "Mesh 215
18                retraction correlates with
                  vaginal pain and overactive
19                bladder symptoms after anterior
                  vaginal mesh repair"
20
21
22
23
24
```

Gregory Bales, M.D.

1                    (The witness was duly sworn.)

2                    GREGORY BALES, M.D.,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                        EXAMINATION

6    BY MS. THOMPSON:

7         Q.     Good morning, Dr. Bales.

8         A.     Good morning.

9         Q.     My name is Margaret Thompson, and I

10   represent the Plaintiffs in the Ethicon MDL.  Is

11   that your understanding?  And we just met, right?

12        A.     That's correct.

13        Q.     And we are here this morning to take

14   your deposition regarding your general opinions

15   regarding the Ethicon prolapse devices.  Is that

16   your understanding as well?

17        A.     That's my understanding.

18               MS. THOMPSON:  And we will go ahead

19        and mark the notice as Exhibit 1.

20               (Bales Exhibit 1 was marked for

21                identification.)

22   BY MS. THOMPSON:

23        Q.     Have you seen the deposition notice?

24   And this may actually not be the most recent one,

Gregory Bales, M.D.

```
1   but I think the only thing that's changed here is
2   the times.
3        A.    Yes, I think I have seen this.
4        Q.    Did you bring anything with you in
5   response to the list of items that you were
6   expected to produce?
7        A.    I have some items.
8        Q.    What did you bring with you?
9        A.    So, I have my general report.  I guess
10  maybe you have it or you want it marked as an
11  exhibit.
12       Q.    I have it also.
13       A.    And I have some of the case-specific
14  things which I'm doing later and such.
15       Q.    Okay.  But nothing else?
16            MR. MORIARTY:  Not true.  We have
17       invoices.
18            MS. THOMPSON:  Okay, good.
19            THE WITNESS:  And we have invoices.
20            MR. MORIARTY:  But these are all case
21       specific.  You can ask him about his invoice
22       for the general report or I can tell you about
23       it.  The bottom line is he hasn't sent that
24       bill yet.
```

Gregory Bales, M.D.

```
1              MS. THOMPSON:  Okay.  I will just ask
2         him about it then.  That's fine.
3              MR. MORIARTY:  But these are
4         case-specific invoices.
5              THE WITNESS:  I'm a little bit behind
6         in some of the invoice notations.
7    BY MS. THOMPSON:
8         Q.   I understand.  Dr. Bales, do you have an
9    estimate of the time that you have spent in the
10   case to this point working on your general opinions
11   in the general report?
12        A.   Strictly just the general?
13        Q.   Yes.
14        A.   You know, I would have to tabulate it
15   exactly, but it has got to be around ten hours,
16   approximately.
17        Q.   And how much are you charging per hour?
18        A.   So my rates for record review and
19   discussions and such, it's 600 an hour and then the
20   depositions, it's 750 an hour.
21        Q.   Have you had your deposition taken
22   before in any matter?
23        A.   In other cases in the past?
24        Q.   Yes.
```

Gregory Bales, M.D.

```
 1        A.     Yes, ma'am.

 2        Q.     How many times?

 3        A.     Probably 30 or 40 over the last 15

 4   years.

 5        Q.     And what was the nature of those

 6   depositions, just in general terms?

 7        A.     Typically it was single case-specific

 8   litigation, you know, on the plaintiff or defense

 9   side, where there was most frequently a surgical

10   misadventure of one sort and I was asked to give an

11   opinion about the surgical case and the outcome and

12   things like that.

13        Q.     So those would be primarily medical

14   malpractice cases?

15        A.     Medical malpractice.

16        Q.     And you have testified on both sides?

17        A.     I have testified on both sides.

18        Q.     And what do you mean -- because I

19   noticed this in your report too.  What do you mean

20   by "surgical misadventure"?

21        A.     It's just a very global term with if

22   there was any, I guess, allegation of, you know,

23   misuse of an instrument, cutting the wrong

24   structure, any type of surgical complication.  So,
```

Gregory Bales, M.D.

1    that's just a very sort of nonspecific term related

2    to any aspect of a surgical procedure where there

3    was some question raised.

4         Q.    So the question would be raised as to

5    whether the doctor was at fault with a complication

6    of one kind or another?

7         A.    Yes.  Typically these are all, yeah,

8    single patient/one doctor type cases and

9    situations.

10        Q.    Are all the opinions that you intend to

11   offer contained in the general report that you

12   issued?

13             MR. MORIARTY:  Objection to form.  Go

14        ahead.

15        Q.    Regarding general opinions.

16             MR. MORIARTY:  Objection.  Go ahead.

17        A.    Well, I will answer all the questions to

18   the best of my ability.  If you ask me things

19   outside the context of things I have already

20   written, I will certainly offer those opinions, but

21   I think most of my opinions will be consistent with

22   what has been written down and produced.

23        Q.    Fair enough.  Are your opinions

24   objective?

Gregory Bales, M.D.

```
 1                    MR. MORIARTY:  Objection.

 2        A.    Yes, I believe my opinions are

 3   objective.  They are opinions to my best ability to

 4   give an opinion based on my own training and to my

 5   best degree of medical certainty, if you will.

 6        Q.    And are your opinions unbiased?

 7                    MR. MORIARTY:  Objection.  Go ahead.

 8        A.    I think my opinions are unbiased.

 9        Q.    When you prepared -- did you prepare the

10   report yourself?

11        A.    I did.

12        Q.    And how did you decide what to include

13   and what not to include in your report?

14                    MR. MORIARTY:  Objection.  Go ahead.

15        A.    Well, as you can guess, you know, there

16   is a voluminous amount of information that can go

17   into a report like this and there is, you know,

18   years and years of documents, scientific papers,

19   research articles, journal articles and abstracts,

20   et cetera.  So, you sort of pick and choose and you

21   try to get a broad array of Level 1 evidence that

22   reflects good science.  That's what I try to

23   include.

24        Q.    Did you receive materials from defense
```

Gregory Bales, M.D.

1    counsel as you were preparing your general report?

2         A.    Well, there was conversations and

3    e-mails about certain papers and abstracts and

4    journals and such and things I looked up on my own.

5         Q.    Did you do any kind of literature search

6    on your own?

7         A.    Yes.  I do literature searches all the

8    time, and I certainly, you know, do literature

9    searches consistently in my occupation, being an

10   academic at the University of Chicago; and

11   certainly I did some literature search and looked

12   back at some of these manuscripts in the

13   preparation of my report.

14        Q.    Did you search for particular products,

15   for example?

16        A.    Well, in general just we started

17   obviously with sort of pelvic organ prolapse, and

18   I'm familiar with a lot of literature just because

19   I have been reviewing it and I review the Journal

20   of Urology and Urology and Neurourology and

21   Urodynamics.  But again, and I looked at some

22   case-specific things regarding the Prolift and, you

23   know, the Ethicon products.

24        Q.    Did you receive any internal Ethicon

Gregory Bales, M.D.

1    documents, corporate documents?

2         A.    Yes, some.

3         Q.    Did you ask for any internal corporate

4    documents on any particular issue?

5         A.    I didn't specifically ask for any.

6         Q.    Why not?

7         A.    I think as a doctor, obviously, most of

8    the opinions I'm asked to give are based on my

9    training and my review of the medical and

10   scientific literature.  So, things internal to a

11   company in terms of e-mails and things like that,

12   that's probably I guess for my purposes I feel a

13   little less relevant, so I didn't specifically ask

14   for those.

15        Q.    Did you think that the internal

16   corporate documents would not alter your opinions?

17   Is that a reason?

18             MR. MORIARTY:  Objection.

19        A.    No, I didn't really give it any thought

20   like that.  As I said, typically when I -- and you

21   asked earlier.  I have been involved in other sort

22   of medical malpractice cases and stuff, and so I

23   usually again rely on, you know, articles and

24   peer-reviewed literature, you know, that's in the

Gregory Bales, M.D.

1    medical and surgical literature.  I don't typically

2    rely on, you know, corporate e-mails or documents

3    like that.  So, honestly, I don't think that

4    typically -- I wouldn't think to typically ask and

5    review all of that.

6         Q.    So, if Ethicon had information that

7    wasn't contained in the medical literature, would

8    that be important to you?

9         A.    Well, that's an awfully broad statement.

10   I guess it would depend on what the nature of that

11   information was.  Can you be more specific?

12        Q.    We may be later on as I maybe show you

13   some things.

14        A.    Okay.

15        Q.    When did you first begin working as a

16   paid consultant for Ethicon?

17        A.    So, probably, if you include sort of

18   some of the work I did with Ethicon 10 or 12 years

19   ago, I used to train some doctors on doing TVT

20   procedures.  That probably started back in 2000,

21   2001, so that would be sort of the introduction.

22        Q.    And have you worked as a paid consultant

23   for Ethicon in every year since then?

24        A.    So, no, definitely not.  Early on when

Gregory Bales, M.D.

```
 1   TVT first came online, a lot of doctors wanted to

 2   use and learn that technique, and I was one of the

 3   earlier doctors and one of the first surgeons in

 4   the Chicagoland area doing TVT.  So, for the first

 5   few years I did do a lot of training and

 6   consulting, but then for a number of years I didn't

 7   do any.

 8        Q.    When did you start working for Ethicon

 9   as a paid consultant on prolapse devices?

10             MR. MORIARTY:  Objection.  Are you

11        talking about litigation?

12             MS. THOMPSON:  No, I'm not talking

13        about litigation.

14   BY MS. THOMPSON:

15        Q.    Why don't you go ahead and tell me what

16   your roles have been with Ethicon outside of

17   litigation.

18        A.    Sure, of course.  So, essentially both,

19   as we just mentioned, with TVT I did some

20   proctoring and consulting.  Essentially it would

21   encompass two things.  Doctors would come to the

22   hospital and watch me do procedures and a couple of

23   times I would go and help a doctor at their

24   facility, and I did that early on in 2000, 2001
```

Gregory Bales, M.D.

1   with TVT and then a few times, nowhere near as

2   much, a handful of times with Prolift.

3       Q.    So you have acted as a consultant,

4   correct?

5       A.    Correct.

6       Q.    Have you taught courses as well?

7       A.    I don't believe I have ever taught a

8   course.

9       Q.    And you proctored individual surgeons?

10      A.    And  proctored individual surgeons, yes.

11      Q.    Have you taught any cadaver labs?

12      A.    I don't think so.  I have taught cadaver

13  labs but I think for other companies.  I don't

14  believe I have ever done that with Gynecare.  I

15  don't remember exactly.  This goes back ten years,

16  but I don't think so for this company.

17      Q.    And have you served on advisory boards?

18      A.    Not to my knowledge, not for this, not

19  for what we are discussing, for Gynecare products.

20  I have been on advisory boards for some drug

21  manufacturers and things like that.

22          MS. THOMPSON:  Go ahead and mark the

23      report as Exhibit 2, please, and let's go

24      ahead and mark this Exhibit 3.

Gregory Bales, M.D.

```
 1                 (Bales Exhibits 2 and 3 were marked

 2                   for identification.)

 3   BY MS. THOMPSON:

 4        Q.    Do you recognize this at all, Dr. Bales?

 5        A.    No, I don't, although, you know, it may

 6   be something that I saw, I don't know, ten years

 7   ago.  But no, it doesn't look familiar to me as I

 8   look at it right now.

 9        Q.    And will you agree with me that that's a

10   advisory board engagement letter and at least your

11   name is listed as a member of the advisory board,

12   but you don't remember being on a specific advisory

13   board for Ethicon, right?

14        A.    I don't.

15              MR. MORIARTY:  Objection, form.

16        A.    It might be as well that, you know, I

17   went to a meeting or, you know, they had a program,

18   if you will, and then they considered that an

19   advisory board, if you will.  But as I said, this

20   must go back a lot of years, so, yeah, no, I'm

21   sorry, I don't remember.

22              MS. THOMPSON:  And Exhibit 4.

23                 (Bales Exhibit 4 was marked for

24                   identification.)
```

Gregory Bales, M.D.

```
 1    BY MS. THOMPSON:
 2        Q.    This is an e-mail exchange about Prolift
 3    Users Forum from 2006.  Did you participate in the
 4    Chicago Prolift Users Forum, to your memory?
 5        A.    Yeah, again, I apologize, my memory
 6    fails me on some of these things, but this was ten
 7    years ago.  If it says I was at a forum one
 8    evening, then I guess I was, if my name is on this.
 9    But as I said, I really, I apologize, I can't
10    remember ten years ago being part of this.
11        Q.    When did you start using Prolift?
12        A.    Probably about 2006, would be my best
13    guess.  I think it came online end of 2005.
14        Q.    And if you did participate in this
15    forum, that would be something that you would
16    expect to be paid for by Ethicon, right?
17              MR. MORIARTY:  Objection.
18        A.    No, not necessarily.  I mean, sometimes
19    you participate in things because you wanted to get
20    an opportunity to listen to other of your
21    colleagues and other experts, and so I wouldn't
22    necessarily expect to be paid, although oftentimes
23    if you participate in things like this you would be
24    paid.
```

Gregory Bales, M.D.

1              MS. THOMPSON:  Exhibit 5.

2                  (Bales Exhibit 5 was marked for

3                   identification.)

4    BY MS. THOMPSON:

5        Q.    This is an e-mail regarding payment for

6    professional education in 2009 for Prolift in the

7    amount of $18,000.  Does that sound like that's

8    something that was -- that you received and were

9    paid for?

10              MR. MORIARTY:  Objection, form and

11         otherwise.

12              MS. THOMPSON:  Let me rephrase that

13         question.  It was a bad question.

14    BY MS. THOMPSON:

15        Q.    Do you recognize this?

16        A.    I don't.

17        Q.    Were you paid $18,000 in 2009 for

18    professional education for Prolift?

19        A.    I don't remember if I was.  I hope I

20    was.  It's quite a bit of money, but I don't

21    remember being paid $18,000 seven years ago.

22              Let me just add again that, you know, I

23    have done proctoring and such for other companies

24    too, and that's why sometimes it's a little hard to

Gregory Bales, M.D.

1    remember my specific relationships with each

2    individual vendor, so just to make that

3    clarification, because I apologize if my memory

4    perhaps doesn't serve me well.

5              MS. THOMPSON:  That's okay, and

6         Exhibit No. 6.

7                   (Exhibit 6 was marked for

8                    identification.)

9    BY MS. THOMPSON:

10        Q.    Showing you, Dr. Bales, a similar

11   document from 2010.  Do you recognize this

12   document?

13              MR. MORIARTY:  Objection.

14        A.    No, I don't.

15        Q.    And do you recall if you were paid

16   $54,000 in 2010 for professional education?

17        A.    No, I absolutely don't recall that at

18   all.  Does this reflect -- I mean, is this a check?

19   Again, I'm not sure what this document is.  I mean,

20   is this a cancelled check?  I mean, I don't recall

21   being paid that amount of money at all.  I hope I

22   wasn't supposed to be paid that amount of money and

23   it wasn't given to me.  No.  I apologize.

24        Q.    As an Ethicon consultant proctoring

Gregory Bales, M.D.

1   surgeons and now being retained as an Ethicon

2   expert, you would agree with me that you probably

3   know more about the Ethicon prolapse products than

4   the average doctor in the community, wouldn't you?

5      A.   Sure. If the average doctor in the

6   community hasn't done these procedures, then I

7   certainly would know more.

8      Q.   Even doctors who have done the

9   procedures, because of your academic position, your

10   consulting positions with Ethicon, your knowledge

11   of the literature, wouldn't you agree that you

12   would know more than the typical community doctor?

13         MR. MORIARTY: Objection.

14      A.   Sure. On balance I would agree that if

15   it's something that a community doctor is less

16   familiar with and less experienced with, I would

17   know more.

18      Q.   I would like to establish the Ethicon

19   products that you actually intend to offer opinions

20   on, so I would like to just go through and tell me

21   whether you feel like your general opinions cover

22   each of these products. Okay?

23      A.   I'm at your disposal, counsel.

24      Q.   Oh, that's nice to hear.

Gregory Bales, M.D.

1           Gynemesh, a piece of mesh used

2    transvaginally.

3              MR. MORIARTY:  You mean Gynemesh PS?

4              MS. THOMPSON:  Gynemesh PS.

5       A.   Are you asking me if I'm going to offer

6    opinions or you would like opinions?

7       Q.   No.  Do you intend to offer opinions on

8    Gynemesh PS?

9       A.   I think I'm here to answer your

10   questions today, which I will do to the best of my

11   ability; and I'm certainly happy to answer and

12   offer opinions on Gynemesh PS, which I'm familiar

13   with.

14      Q.   The Prolift devices?

15      A.   Correct.

16      Q.   Prolift+M?

17      A.   Correct.

18      Q.   Prosima?

19      A.   I've never used Prosima.  I won't be

20   able to tell you very much about Prosima.  I'm

21   familiar with it, but never personally had any

22   experience using it myself.

23      Q.   And I didn't notice any opinions

24   regarding Prosima in your report, so can we assume

Gregory Bales, M.D.

1    that you will not be offering opinions on the

2    Prosima device?

3         A.    I won't, especially if you don't ask

4    anything more about it, so why don't you cross it

5    out.

6         Q.    Thanks.  I will cross it out.

7         A.    Perfect.

8         Q.    So with the products that we just

9    mentioned, is it your opinion generally that each

10   of these products is safe and effective?

11        A.    That would be my opinion.

12        Q.    And is it your opinion generally that

13   each of these products offer advantages over native

14   tissue repairs?

15        A.    Well, they may offer some advantages,

16   and I think we would have to clarify more

17   specifically what we are talking about.  I think

18   that's a little bit too broad for me to just say I

19   agree.

20        Q.    And it was meant as a broad question.

21   Obviously there will be specific instances, but in

22   general, do the products offer advantages in your

23   opinion over native tissue repairs?

24        A.    I think for certain things they offer

Gregory Bales, M.D.

1    advantages.

2         Q.    Is it your opinion generally speaking in

3    the situations that the benefits would outweigh the

4    risks?

5         A.    Yes.

6         Q.    What procedures are you currently

7    performing for pelvic organ prolapse?

8         A.    So the two primary ones are abdominal

9    sacrocolpopexies, and those can be performed either

10   through an open incision or robotically.

11              Also cystocele repairs, native tissue

12   cystocele repairs or bladder prolapse repairs;

13   posterior colporrhaphy or rectocele repairs; and

14   colpocleisis.  I think that encompasses all of

15   them.

16        Q.    And what is colpocleisis?

17        A.    That's typically used for a patient who

18   is much older and not sexually active and perhaps

19   has associated comorbidities and may not be a good

20   candidate for a lengthy surgical procedure where

21   you more or less close off the vaginal opening.

22   So, you prevent the prolapse, but then the vaginal

23   is significantly foreshortened and essentially

24   closed off, so a patient would no longer have the

Gregory Bales, M.D.

1   ability to be sexually active.

2       Q.    Is it your opinion that colpocleisis is

3   a good choice for women who are not sexual active

4   and have no plans to be sexually active in the

5   future?

6       A.    I think it's one of the choices and

7   certainly should be used again in a woman who is

8   not planning to be -- is either not or not planning

9   to be sexually active.

10      Q.    What are the risks of colpocleisis

11  beyond the immediate operative risks?

12      A.    Beyond the immediate operative risks?

13  Well, it's a continuum.  Obviously I think patients

14  can develop infection and bleeding.  Typically that

15  would be more of a risk perioperatively, and you

16  said you want to go kind of past that.

17          The big one is you can still re-develop

18  prolapse, less commonly, but prolapse can still

19  return.  Patients may change their mind and get a

20  new boyfriend, so there is always a small concern

21  that the sexual issues may manifest themselves.

22          And the big one, of course, is pain.

23  Any degree of pain and scarring from any surgical

24  procedure in the vagina could manifest itself and

Gregory Bales, M.D.

1    create and lead to continued pain and discomfort in

2    the vaginal canal.

3        Q.    Have you ever seen chronic pain related

4    to colpocleisis in your practice?

5        A.    Sure.  Over 21 years I have seen

6    patients who have had that procedure and have pain.

7        Q.    How many cases of chronic pain after

8    colpocleisis have you seen in your practice?

9        A.    I wouldn't be able to quantify for that.

10   It's a small number.

11       Q.    Has it ever been reported in the medical

12   literature, chronic pain after colpocleisis, that

13   you are aware of?

14       A.    I would think that it's been reported

15   that after any vaginal procedure there is pain.

16   I can't cite a specific paper where it has

17   specifically said colpocleisis and chronic pain,

18   but I would imagine it's out there.

19       Q.    But today off the top of your head, you

20   can't cite to any article that would address

21   chronic pain related to colpocleisis procedures?

22       A.    I can't cite a specific paper for you

23   right now.

24       Q.    Can you cite a paper with chronic pain

Gregory Bales, M.D.

1   from cystocele repairs?

2        A.    I'm going to have a hard time citing a

3   specific paper about any questions you ask, because

4   again, I just -- you know, I don't keep specific

5   citations in my head, you know, on a consistent

6   basis.  So, probably any question you ask me to

7   give you a specific citation, I'm not going to be

8   able to do that.  We will have to -- you know, I

9   would have to get back with you and show you the,

10  you know, the specific citation.

11       Q.    How do you keep track of the

12  complications with your patients with procedures

13  that you have performed?

14       A.    Well, I work -- so, I work at the

15  University of Chicago, and we have a training

16  program.  We have three residents a year.  Our

17  residents frequently mine our data, and so we have

18  ongoing databases and stuff.

19            So -- and we have a monthly morbidity

20  and mortality meeting every single month which is a

21  couple hours and is very labor-intensive because we

22  go back through all the cases that have occurred.

23  And again, that's part of our residents' job, is to

24  mine the data and look for complications.

Gregory Bales, M.D.

1           So, we are pretty aware of things.  I

2    mean, some things potentially get missed, but

3    typically that's probably the best way.  And of

4    course, the obvious way are patients coming back to

5    see me every six months or a year, and we keep

6    track in that fashion, of course.

7        Q.    But if a resident isn't mining a

8    complication or it hasn't been presented at an M

9    and M conference, there is no ready access to your

10   complication or your complications rate, is there?

11           MR. MORIARTY:  Objection.  Go ahead.

12       A.    Well, I guess the answer -- again, I'm

13   not quite sure I fully understand, but if the

14   patient had surgery and then never came back or

15   never made me aware of a problem, a complication

16   certainly could have occurred that I'm not aware

17   of.

18       Q.    Well, for example, when I asked the

19   question about chronic pain after colpocleisis, you

20   said it was very few but you couldn't tell me how

21   many.  Would you be able to go back and determine

22   how many patients that you performed a colpocleisis

23   have chronic pain?

24       A.    Well, no.  I have been practicing for 21

Gregory Bales, M.D.

1    years, so I couldn't go back and quantify the

2    number of cases I've done.  I've done, you know,

3    well into the thousands in terms of pelvic floor

4    procedures between prolapse and slings and

5    sacrocolpopexies.

6            So, I couldn't give you the denominator

7    and I couldn't give you the numerator unless I went

8    back and contacted the individual every patient.

9    So, again, you asked me for a specific number, and

10   I wasn't able to provide that.

11       Q.    What Ethicon prolapse products are you

12   currently using?

13       A.    So, I currently primarily used the TVT,

14   which is a sling product, and the TVT obturator,

15   which again is a sling product but the sling is

16   placed in a slightly different fashion.  It's not

17   retropubic but it goes through the obturator

18   foramen.

19       Q.    So you are currently not using any

20   Ethicon products to treat prolapse?

21       A.    I'm not as far as I know.  I think many

22   of them are off the market.  I'm not sure they are

23   available, but no, I'm not.

24       Q.    Do you use Gynemesh PS in your abdominal

Gregory Bales, M.D.

1    sacrocolpopexies?

2        A.    I used Gynemesh PS for my

3    sacrocolpopexies for a long time.  Sometimes I'm at

4    the whim of the University of Chicago.  They

5    sometimes they get other products in, so sometimes

6    it's not up to me.

7             Currently the product they have for that

8    application is the AMS product called IntePro, but

9    again, unfortunately, sometimes the doctors don't

10   have any ability to -- to -- weren't involved in

11   the decision-making.

12       Q.    How many Prolift procedures have you

13   performed over your career, approximately?

14       A.    So, just to clarify, there is total

15   Prolift, there is anterior Prolift and posterior

16   Prolift, so there is sort of three.  You want an

17   estimate based on all those procedures put

18   together?

19       Q.    Why don't you give me all and then break

20   them down as to how many of each.

21       A.    So, I would -- roughly, again it's a

22   rough guesstimate.  This goes back again ten years

23   or so.  Probably several hundred of -- probably

24   several hundred of all of them, and then the

Gregory Bales, M.D.

1    breakdown would be probably 50 percent anterior

2    Prolift, probably 45 percent total Prolift and a

3    very smaller -- a much smaller percentage,

4    5 percent or less of the posterior Prolift.

5         Q.    Have you published any peer-reviewed

6    articles regarding using vaginal mesh for prolapse

7    repairs?

8         A.    Yes.

9         Q.    What are those articles?

10             MR. MORIARTY:   Objection.

11        A.    Again, I mean, I think my CV -- do we

12   have my CV here?  I would have to show you.  I

13   don't remember the exact citation.

14        Q.    Did you bring your CV?

15        A.    I don't think I have a copy of my CV.

16             MR. MORIARTY:   We produced it with the

17        report and reliance list.

18   BY MS. THOMPSON:

19        Q.    Okay.  And do you treat mesh

20   complications in your practice?

21        A.    Absolutely.  More complications than I

22   care to.

23        Q.    What are the most common mesh

24   complications that you treat in your practice?

Gregory Bales, M.D.

1      A.    So, there is a variety.  There is

2   complications of exposures or extrusions where the

3   mesh is sort of exposed and through the vaginal

4   wall, and there is some pain complications that

5   patients see which may or may not always be related

6   to the mesh in any fashion necessarily.  But

7   patients come in with again after pelvic organ

8   prolapse surgeries complaining of pain, and

9   obviously the most common, I guess, is a recurrence

10   of the prolapse, where they are coming in, they

11   have already had a procedure and now it's failed

12   and they need additional surgery.

13      Q.    What type of pain complications do you

14   treat related to mesh?

15      A.    Well, as I said, I don't know if you can

16   sometimes discern what's related to mesh and what

17   isn't, but patients come in and they have pain in

18   their pelvic floor, in their vaginal canal area,

19   and we treat it.  We treat it in combination with

20   our physical therapists, and also we have some

21   wonderful pain specialists.  So, we treat all

22   gamuts of pain with or without or whether or

23   whether they have not had any kind of mesh

24   procedure.

Gregory Bales, M.D.

1      Q.    And you are aware of literature with

2  large case series, in the hundreds of patients,

3  with mesh complications of which pain is frequently

4  one, if not the most, common complication, correct?

5              MR. MORIARTY:  Objection, form.  Go

6      ahead.

7      A.    Yeah.  Can we read that back?  I'm

8  sorry.

9      Q.    You are aware of a large body of

10  literature describing hundreds of patients with

11  mesh complications, of which pain is one of the

12  most common presentations, if not the most common

13  presentation, correct?

14              MR. MORIARTY:  Objection.  Go ahead.

15      A.    There is certainly a lot of literature

16  that patients who have had mesh procedures come

17  back and have pain.  So, yes, on balance I would

18  agree with that.

19      Q.    And are you aware of any articles

20  describing series of patients coming, presenting

21  with pain for other prolapse procedures, native

22  tissue repairs?

23      A.    So, again, patients in a series, looking

24  at patients who have pain after they have had some

Gregory Bales, M.D.

1    type of surgical procedure, not involving mesh?

2        Q.    Right.  Are there any articles in the

3    literature that you are aware of that describe

4    large series of patients presenting with pain after

5    native tissue pelvic prolapse repair procedures?

6        A.    I think, yes.  I think there is

7    obviously significant bodies of literature looking

8    at -- you know, longitudinal studies looking at

9    patients after cystocele repairs, after rectocele

10   repairs, and there is always a small percentage

11   that have pain, so there is definitely --

12       Q.    That was not my question.

13             Are you aware of any article in the

14   medical literature that reports case series of

15   chronic pain or any pain related to native tissue

16   pelvic organ prolapse procedures?

17             MR. MORIARTY:  Objection, asked and

18        answered.

19             MS. THOMPSON:  He answered -- no.  Go

20        ahead and answer it because you did not answer

21        that question.

22       A.    Again, maybe I'm not understanding it

23   properly, but yes, there is literature that

24   certainly underscores that pain occurs after mesh

Gregory Bales, M.D.

1    and non-mesh type pelvic procedures.

2        Q.    My question is, is there an article that

3    describes a series of patients who present with

4    pain after native tissue pelvic organ procedures?

5            I'm not talking about a study where the

6    outcome is success rates or were longitudinal.  I'm

7    talking about case series of pain complications

8    after native tissue pelvic organ prolapse repairs.

9            MR. MORIARTY:  Only pain?

10           MS. THOMPSON:  Well, any complications

11       of which pain is -- if pain is mentioned as a

12       significant factor.

13           MR. MORIARTY:  Objection, asked and

14       answered.  Go ahead.

15       A.    Yeah, I think there is -- yes, there is

16   lots of literature looking at non-mesh based, and

17   one of the outcomes they look at and talk about is

18   pain.

19       Q.    Okay.  I do want you to show me that

20   article that describes series of patients with

21   chronic pain after native tissue prolapse repair,

22   and I will let you look for that at the break and

23   tell me what that is.

24           MR. MORIARTY:  Objection.  He has no

Gregory Bales, M.D.

```
 1          resource with which to do such research.
 2                  MS. THOMPSON:  He can look at his
 3          reliance list.
 4                  MR. MORIARTY:  He can pick it out of a
 5          reliance list, if he can.
 6                  MS. THOMPSON:  He can Google chronic
 7          pain after native tissue pelvic --
 8                  MR. MORIARTY:  He is not doing
 9          research as we sit here today, on or off the
10          record.
11   BY MS. THOMPSON:
12          Q.    As you sit here today, you are not aware
13   of an article that describes a case series of
14   chronic pain after native tissue repairs, are you?
15                  MR. MORIARTY:  Objection.
16          A.    Again, you are going to have to -- you
17   don't have to raise your voice, but you just have
18   to ask the question differently so I understand it.
19   If you are asking me --
20          Q.    All right.  My first question was, you
21   are aware of many articles reporting complications
22   of mesh, of which pain is one of the main ones,
23   describing hundreds of patients who are presenting
24   to mainly tertiary care centers with mesh-related
```

Gregory Bales, M.D.

1    complications including pain?

2         A.    Yes, but -- well, hold it.

3         Q.    So let me ask this question.  I'm asking

4    you, are you aware of similar articles that you

5    know -- you know they are there with mesh -- and

6    I'm sorry to raise my voice, but it's frustrating

7    not to get an answer to my question.  You know the

8    articles are there with mesh.  I'm asking you, are

9    you aware of a similar article with native tissue

10   repairs?

11             MR. MORIARTY:  Objection.

12        A.    Yes.  There is absolutely articles

13   looking at outcomes of non-mesh pelvic surgical

14   procedures that look at outcomes.

15             And in answer to the first part of your

16   question, I'm not aware that there is a specific

17   article that only cites pain.  So what you are

18   discussing, of course, is outcomes, and there is

19   outcomes -- and that's the first part of your

20   question -- that there is outcomes of mesh

21   surgeries and patients complaining of pain,

22   hundreds of patients.  That's one of the

23   complications.  And that same literature exists

24   with non-mesh repairs, and I would be happy -- not

Gregory Bales, M.D.

1    today, but I'm sure I could find a reference at

2    some point for you.

3         Q.    Okay.  I want you to look for that,

4    please, and I would like to be provided with it

5    because I'm certainly not aware of it.

6               Have you removed mesh in your practice?

7         A.    Yes.

8         Q.    What were the indications for the

9    removal of mesh?

10        A.    Typically a -- typically an exposure so

11   that it was -- and the patient was often sexually

12   active and patients who were obviously having some

13   discomfort, both on the part of the patient and

14   obviously the partner.

15        Q.    Have you removed mesh for other

16   complications?

17        A.    I have removed mesh sometimes when there

18   has been mesh inside the urinary tract, inside the

19   urethra, inside the bladder.  So, any mesh in a

20   spot where it doesn't belong, I have removed it.

21        Q.    Have you removed mesh for pain?

22        A.    Well, in the cases I just mentioned mesh

23   is being removed in part because of pain.

24        Q.    So you have only seen pain when it's

Gregory Bales, M.D.

1    been accompanied by exposure or erosion; is that

2    your testimony?

3         A.    Say that -- is there a question there?

4         Q.    You said removed for pain when it is

5    associated with other things and you mentioned

6    exposure, erosion.

7         A.    Right.

8         Q.    Have you ever removed mesh for pain when

9    there was not exposure or erosion?

10        A.    Yes.

11        Q.    And what were those situations?

12        A.    Well, sometimes if there is a recurrence

13   of prolapse or sometimes if there is a patient can

14   just feel discomfort in a location where we think

15   there is some mesh and we feel that is on our

16   differential list for a source of the pain.  So, in

17   some of those situations I remove mesh, and

18   sometimes the mesh has to be removed to do another

19   repair.

20        Q.    Is it your testimony that mesh itself

21   doesn't cause pain unless it's associated with

22   something else?

23        A.    I think -- I think there is a whole lot

24   of factors that cause pain, so you are going to

Gregory Bales, M.D.

1   have -- I'm not quite sure how to answer your

2   question.  So, mesh -- maybe rephrase that again.

3        Q.    Do mesh devices cause pain?

4        A.    Any surgical procedure causes pain,

5   including mesh devices.

6        Q.    That wasn't my question.  Okay.

7             And you will agree with me with any

8   complication there are factors that are important

9   as well as it occurs or it doesn't occur.  For

10  example, the rate at which it occurs is important,

11  right?

12       A.    The rate of how often the complication

13  or how quickly it occurs?

14       Q.    How often.  How often a complication

15  occurs is important, right?

16       A.    Sure.

17       Q.    And how severe the complication is is

18  important, right?

19       A.    Well, I'm the treating doctor, so yeah,

20  any complication is important, and certainly the

21  degree of and severity of the complication is

22  important as well.  Everything is important.

23       Q.    And the responsiveness to treatment is

24  important, right?

Gregory Bales, M.D.

1       A.      Sure.

2       Q.      Whether you can treat the patient or

3  not, whether they can get better with your

4  treatment is important?

5       A.      I would say that's important, sure.

6       Q.      And whether or not the complication is

7  permanent or temporary is important, isn't it?

8       A.      Well, sure.

9       Q.      And is it your testimony here today that

10  considering all those factors that are important to

11  you, pain complications with mesh are no different

12  from pain complications with native tissue repairs;

13  is that your testimony?

14              MR. MORIARTY:  Objection, form.  Go

15      ahead.

16      A.      I think again that's an awfully broad

17  kind of question.  I think -- I think there is pain

18  syndromes, and pain issues before surgery are very

19  difficult to treat and there is a lot of factors

20  that can be involved; and so I think you see that

21  sometimes after patients have had mesh surgeries,

22  non-mesh surgeries, associated hysterectomies,

23  everything.  So, I think it really has to be a

24  little bit more case specific to sort out what's

Gregory Bales, M.D.

1  causing the pain on any individual patient.

2      Q.    I want you to answer my question.

3          Is it your testimony considering the

4  factors, the rate, the severity, the responsiveness

5  to treatment, the permanence, that there is no

6  difference between mesh repairs and native tissue

7  repairs regarding pain?

8          MR. MORIARTY:  Same objection.  Go

9      ahead.

10     A.    Again, there is -- I mean, it depends on

11  what we are talking about in terms of the pain.

12  It's just such a broad statement.  I think in

13  general, yeah, I think it's probably the same, but

14  I also don't think it is a good question because

15  it's so broad.

16     Q.    Do you hold yourself out as an expert in

17  medical device design, Dr. Bales?

18     A.    You know, it's funny.  Whenever I've

19  taken depositions -- you asked me earlier -- people

20  ask are you an expert.  And so, again, I'm a

21  board-certified urologist, so the default answer is

22  always, well, I'm an expert as a urologist, right?

23  So, if you ask me if I'm an expert in other things

24  and you sort of think, well, I'm not

Gregory Bales, M.D.

1   board-certified in other areas, I'm a

2   board-certified urologist, but I'm an expert in

3   things that I do very commonly and things that I'm

4   very experienced in.

5          So, again, medical devices, if the

6   medical device is that I've used and very familiar

7   with and I've held in my hand and I've placed into

8   patients and I have done their surgeries, then yes,

9   I guess I'm considered an expert.

10     Q.    Have you ever designed a medical device?

11     A.    I have not.

12     Q.    Are you a biomaterials expert?

13     A.    Again, sort of the same answer to the

14  previous question.  It depends on what biomaterials

15  I guess we are talking about.  But if we are

16  talking about biomaterials that I'm familiar with,

17  including some of the meshes and things that I've

18  implanted in patients and held in my hand and have

19  done hundreds of times, then I guess I'm certainly

20  very familiar and a lot more knowledgeable than 99

21  percent of people.

22     Q.    Have you ever looked at an explanted

23  mesh device histologically?

24     A.    So, yes, I suspect I have, and I've

Gregory Bales, M.D.

1    certainly seen pictures of the histologic

2    presentations, and yes, I'm sure I have been in our

3    pathology department at least a couple times and

4    looked at some of these things.  But, you know, it

5    will be very difficult for me to describe the

6    histologic appearance.

7         Q.    So you would not consider yourself an

8    expert in pathology?

9         A.    I'm very knowledgeable about pathology,

10   but I'm certainly not an expert and be able to

11   describe the specific pathologic features that a

12   pathologist, a board-certified pathologist would be

13   able to do.

14        Q.    Are you an expert in regulatory affairs?

15        A.    That's such a broad thing, what

16   regulatory affairs are, that again I guess I can't

17   say I'm any kind of expert in regulatory affairs.

18   I'm not sure even what that means.

19        Q.    How about industry standards for

20   warnings?

21             MR. MORIARTY:  Objection, form.

22        A.    So, an expert in industry, you are

23   asking me if I'm an expert in industry standards of

24   warnings.

Gregory Bales, M.D.

```
 1              So, again, I'm not -- I'm not aware of

 2    what those standards may be, so I guess I'm not an

 3    expert in it.

 4         Q.    We are going to go through your report.

 5    I'm going to ask you some questions about some of

 6    your opinions contained in the report.  If you want

 7    to follow along, you are welcome to.

 8              On Page 3 --

 9         A.    Can I just -- let me make sure I'm just

10    working off the same copy.  You said you gave it

11    that.  Was that Exhibit 2?  Was it Exhibit 2?

12         Q.    Exhibit 2, correct.

13         A.    Can I have it just to make sure?  Go

14    ahead.  Thank you.

15         Q.    At the bottom of Page 3 you start out

16    talking about sacrocolpopexy and then you also talk

17    about uterosacral ligament suspensions and

18    sacrospinous ligament fixations.  Do you perform

19    either of those procedures?

20         A.    Yes.

21         Q.    When was the last time you performed

22    either one and which one?

23         A.    A long time ago, a number of years ago,

24    five years ago.
```

Gregory Bales, M.D.

1      Q.      So for apical prolapse typically you

2   would use a sacrocolpopexy?

3      A.      That's correct.

4      Q.      What's the exposure rate for

5   sacrocolpopexy?

6      A.      Again, there is studies that the numbers

7   vary slightly, but I guess probably the best

8   citation, since we were talking about citations,

9   there was a multicenter trial out of JAMA, and

10  again, I can't tell you the specific date and

11  journal number, that I think the exposure rate was

12  about 10 or 11 percent in this one particular

13  study, and I think that included seven-year

14  followup.  I think it was 10, 10.5 percent, I

15  believe.

16          It was mostly urogynecologists in that

17  paper.  It was published about two years ago.

18  That's probably the best paper, I guess.  As I

19  said, I apologize I can't give you the exact

20  citation.  It was JAMA; I can tell you that.

21     Q.      So it's your opinion that the exposure

22  rate with sacrocolpopexy was 10 to 11 percent?

23     A.      Well, again, I just answered your

24  question that the literature suggests that it's 10

Gregory Bales, M.D.

1    to 11 percent.  I don't quote my patients that high

2    a complication rate, but that's the number in the

3    literature.  There is other studies that we could

4    tease out that say it's a little lower or a little

5    higher.

6         Q.    In the paragraph that you said these

7    transvaginal approaches were not without unique

8    risks, you say your sacral ligament suspensions

9    were known to cause ureteral occlusion and

10   4 percent requiring reimplantation in one study.

11   Those were all noted intraoperatively, correct?

12        A.    I believe so because typically, as you

13   know, you check that.  After that procedure you

14   want to make sure usually you give some dye to the

15   patients to make sure you see a ureteric stream

16   into the bladder.  I can't tell you if 100 percent

17   of those were noted intraoperatively or shortly in

18   the postoperative period.

19        Q.    And you would agree that none of those

20   had any permanent sequelae as a result of having

21   the ureteral injury, correct?

22        A.    Oh, no, I wouldn't agree with that at

23   all.

24        Q.    What evidence do you have that any of

Gregory Bales, M.D.

1   those 11 percent of patients had any kind of

2   permanent problems associated with the ureteral

3   occlusion that was corrected at the time of

4   surgery?

5        A.    Well, so I have probably done over 200

6   ureteral re-implants in my career, and I can tell

7   you that patients who have ureteral reimplantations

8   often have postoperative problems, including a

9   reflux, they sometimes have a higher risk of

10  pyelonephritis, they sometimes report pain.

11       Q.    Are you aware of any of the patients in

12  this series that had any kind of permanent sequelae

13  as a result of those ureteral implantations?

14       A.    I am not, but we would have to pull out

15  that paper and see.  But again, I'm basing my

16  answer on my own personal experience of several

17  hundred of these ureteral reimplantations.

18       Q.    You say that the uterosacral ligament

19  suspensions and sacrospinous ligament fixation had

20  a -- you say unfortunately, both had a success rate

21  of only 60 percent at two years.

22             What is the treatment, the retreatment

23  rate from that, those studies, for the same

24  conditions, the same procedures?

Gregory Bales, M.D.

1        A.     Cited in those particular papers?  Is

2   that what you are asking me?

3        Q.     I don't want to look up those papers,

4   but what is generally your knowledge of how many

5   would require retreatment?

6        A.     Oh, I think it's very variable, but I

7   think it depends on obviously the severity of the

8   symptoms.  Not everybody.

9        Q.     Would five percent sound about right?

10       A.     I wouldn't be able to -- five percent

11  overall, that only five percent get retreated?

12       Q.     Yes.

13       A.     That probably is low, but I'm sure you

14  could find -- we would have to pull out the paper,

15  and there are some papers that would suggest it is

16  a low rate and some patients, it's a higher rate.

17  Again, it depends on the severity of the symptoms.

18       Q.     In the Barber study that you quoted in

19  your paper, in your opinion, the retreatment was

20  five percent.  Would that surprise you?

21       A.     I think you are reading it, holding the

22  paper, so it wouldn't surprise me.  I think it

23  sounds like you are reading it right from the text,

24  so that was what they found.

Gregory Bales, M.D.

1    Q.    Are you aware of any comparative trial

2    with -- well, first of all, what Ethicon products

3    are indicated for apical repair, transvaginal

4    apical repair?

5    A.    Now or in the past?

6    Q.    In the past.  There are none now, right?

7    A.    As far as I know, there is none.  For

8    apical repairs it was the total Prolift.

9    Q.    And are you aware of any study with

10   total -- the total Prolift that shows better

11   success rates than uterosacral ligament suspension

12   or sacrospinous ligament fixation, any studies?

13   A.    Off the top of my head, I'm not sure

14   better.  I think equivalent, but we would have to

15   again pull out some of the papers.

16   Q.    So is there any better results from

17   Prolift total compared to the native tissue that

18   you described?

19            MR. MORIARTY:  For apical repair?

20            MS. THOMPSON:  For apical repair.

21            MR. MORIARTY:  Go ahead.

22   A.    Again, I'm not aware that there is truly

23   any real good head-to-head randomized, long-term

24   followup.  But to answer your question, no, I'm not

Gregory Bales, M.D.

1    aware of as I sit here right now.

2         Q.    So I'm curious why you would say

3    unfortunately these procedures have a success rate

4    of only 60 percent at two years when Prolift is no

5    better.  Is that an objective and unbiased

6    statement in your report?

7              MR. MORIARTY:  Objection, form.  Go

8         ahead.

9         A.    So, again, the statement reads that

10   unfortunately, these two procedures had a success

11   rate of 60 percent in two years.  So, that's --

12   again, that's a direct citation from that paper, so

13   I don't know how more unbiased you can be, right?

14   I'm citing this paper and putting in the success

15   rate.  So, I'm only just rehashing what again is in

16   the medical literature.

17        Q.    Does that paper say "unfortunately the

18   success rate of 60 percent"?

19        A.    So you are concerned about the

20   "unfortunately"?

21        Q.    Well, I just didn't notice an opinion in

22   your report that said "Unfortunately, Prolift only

23   has a 60 percent success rate."

24        A.    Prolift isn't perfect either, and again,

Gregory Bales, M.D.

1    that's not the sentence.  But I guess if I had said

2    "The Prolift repairs have a success rate of X," I

3    guess I could have put "unfortunately" in front of

4    that.  It's unfortunate that any surgical procedure

5    is less than 100 percent, so I guess --

6         Q.    But you didn't put that in your report,

7    though, did you?

8         A.    It looks like I didn't.

9         Q.    In the paragraph -- and unfortunately,

10   we don't have time to go through all the

11   literature, but I do want to highlight some of it.

12              So, in your paragraph, your short

13   paragraph about colporrhaphy --

14         A.    Can you tell me where that is?

15         Q.    It is on Page 4.

16         A.    Okay.

17         Q.    You state that high rates of recurrence

18   of 30 percent or more have been reported with

19   colporrhaphy, particularly in the anterior

20   compartment.  What's the recurrence in the

21   posterior compartment in the literature?

22         A.    I think that again, like most of these

23   things that we are going to be discussing, there is

24   going to be various series where the numbers are

Gregory Bales, M.D.

1    going to vary slightly, but it's probably 20 to 30

2    percent, especially if you follow these patients

3    long enough.

4              That's actually, unfortunately, as you

5    know, just not to lecture, but that's actually,

6    unfortunately, one of the problems with our medical

7    literature, is that a lot of these series, the

8    followup is relatively short, so there is not

9    enough papers looking at patients over a long

10   enough period of time where the recurrence rates

11   obviously go up, unfortunately.

12        Q.    So it's your testimony that the failure

13   rate of posterior -- native tissue posterior

14   repairs is 20 to 30 percent?

15        A.    Yes.

16        Q.    Are you aware of any literature where

17   posterior Prolift improves the failure rates in a

18   posterior repair over native tissue?

19        A.    I think -- I think some of the

20   literature that's out there shows it to be

21   equivalent.  Again, I don't think there is a lot of

22   great literature on long-term outcomes with the

23   Prolift, but I don't know if it's better, to answer

24   your question.

Gregory Bales, M.D.

1        Q.    So I want to look at some of the --
2   before we look at some of the efficacy literature,
3   let's mark this as the next exhibit.
4                    (Bales Exhibit 7 was marked for
5                     identification.)
6   BY MS. THOMPSON:
7        Q.    You are certainly aware that some
8   doctors feel that mesh complications are more
9   serious than native tissue repair complications,
10  correct?
11                   MR. MORIARTY:  Objection, form.
12       A.    I suspect there is some doctors who feel
13  that way, sure, definitely.
14       Q.    Do you know Linda Cardozo?
15       A.    No.
16       Q.    Do you know her name?
17       A.    I know the name.
18       Q.    I'm going to show you an e-mail from
19  2005.  When was the Prolift marketed, introduced
20  into the market?
21       A.    I think the end of 2005.  I don't
22  remember exactly.  You might know better than me.
23  I want to say it was sometime in 2005, towards the
24  end of 2005.

Gregory Bales, M.D.

1           Actually, here in my report -- let me

2   familiarize myself.  I'm sorry I don't remember

3   everything exactly.  It says it was introduced

4   March 2005, so I think that's correct.

5       Q.    So, this e-mail is from August of 2005.

6       A.    August 2005, okay.

7       Q.    Do you have that e-mail in front of you?

8       A.    Which exhibit number is it?

9             MR. MORIARTY:  7.

10  BY MS. THOMPSON:

11      Q.    This e-mail from Linda Cardozo states --

12  and sent to various individuals, including Ethicon

13  employees.  Is that your understanding from looking

14  at this e-mail?

15            MR. MORIARTY:  Objection.

16      A.    Yeah.  I mean, again, you just handed it

17  to me, so again, I'm not -- I'm trying to figure

18  out --

19      Q.    Dr. Cardozo states that, "It's not that

20  there were a lot of complications, it's severity

21  and type of complications and these were just the

22  perioperative ones.  I still have major concerns

23  regarding the erosion rate and possible problems

24  with dyspareunia, and none of these have been

Gregory Bales, M.D.

1    addressed in the data which we have been given to

2    date."

3              Would you disagree with Dr. Cardozo that

4    as of August 2005 that these problems had not been

5    addressed?

6         A.    I don't -- I apologize.

7              MR. MORIARTY:  Objection.  Go ahead.

8         A.    I don't know Linda Cardozo.  I don't

9    want to opine on what this e-mail is exactly, but

10   it sounds like she has some concerns, and she is

11   entitled to have some concerns, but I don't know

12   what she is citing, I don't know what complications

13   she looked at.  Again, it's hard for me to

14   interpret what this is without more information.

15        Q.    Dr. Bales, I didn't ask you to interpret

16   what Dr. Cardozo was saying or what she was using.

17   I'm asking you, would you disagree with the

18   statement that the problems here discussed had not

19   been addressed in the data provided to date in

20   August of 2005?

21             MR. MORIARTY:  Objection.  Go ahead.

22        A.    Yeah.  In August 2005 I'm not aware of

23   what we were discussing at that time, and that's

24   the only reason.  In order to agree or disagree, as

Gregory Bales, M.D.

1    I said, I have to interpret this a little bit, and

2    again, I just -- I don't remember what -- you know,

3    what specific complications and such.

4              So, again, it's just hard for me to

5    agree or disagree.  Again, I'm not trying to be

6    evasive, but it's just an e-mail, it's just so

7    vague.  I don't know what she is specifically

8    referring to.  She certainly has some concerns.

9         Q.   I know she has concerns.  I'm asking

10   you.  In August of 2005, shortly before you started

11   using the Prolift, did you have any concerns?

12        A.   Counsel, I have concerns about any

13   surgical procedure I do.

14        Q.   Well, you didn't have enough concern

15   that prevented you from using the product, right?

16             MR. MORIARTY:  Objection, form.  Go

17        ahead.

18             MS. THOMPSON:  Well, if he would

19        answer my questions it would be easier.

20             MR. MORIARTY:  He is answering your

21        questions.  You may not like the answers.

22             MS. THOMPSON:  Oh, I like the answers

23        just fine.

24             MR. MORIARTY:  Okay.  So let's just --

Gregory Bales, M.D.

```
1    BY MS. THOMPSON:

2         Q.    Dr. Bales, you began using the Prolift

3    in early 2006, I believe you said, correct?

4         A.    I think that's correct.

5         Q.    If you had had concerns like

6    Dr. Cardozo, you wouldn't have used it, right?

7              MR. MORIARTY:  Objection.

8         A.    No.  That's completely incorrect.  And

9    actually, if you look just a little further, she is

10   even -- I mean, well, it's kind of funny.  As I

11   said, I don't want to try to interpret this too

12   much because I've just said I can't, but if you

13   read another sentence down, she said she wishes to

14   avail herself of the training opportunity.

15             So -- so, it's funny.  It's a little bit

16   almost hypocritical.  If we interpret this -- and

17   as I said, I don't know her and I don't want to

18   speculate, but it seems like she is saying, listen,

19   I'm concerned that there is a lot of problems, but,

20   hey, if we are going to do a -- if we are going to

21   get started on a trial, I want to avail myself of

22   that training opportunity.

23             So, I don't know.  It seems almost it's

24   a little disingenuous to say you're concerned and
```

Gregory Bales, M.D.

```
1    then say but I want to get started using it.  So

2    that's why, again, it is hard for me to interpret

3    this.

4         Q.    Was there any efficacy data when you

5    began using that Prolift device in 2006?

6         A.    There is never -- any new procedure we

7    do, there is never any real good efficacy data on

8    any new procedure.

9         Q.    I want to go over some of the literature

10   on the colporrhaphy and the efficacy, and I'm

11   using -- I'm going to start with the Weber article

12   that you cited in your report; and you are aware,

13   Dr. Bales, that the Weber article from 2001 was

14   re-analyzed with modern definitions of prolapse and

15   success by Chmielewski, correct?

16        A.    Yes.

17        Q.    I'm curious why you cited the 2001 Weber

18   article rather than the 2011.

19        A.    So, I guess if that's a question, again,

20   it's impossible to cite every article that's out

21   there, so I picked certain ones.

22             MS. THOMPSON:  And if you could mark

23        this as Exhibit No. 8.  I just have two copies

24        of this, sorry.
```

Gregory Bales, M.D.

```
 1              (Bales Exhibit 8 was marked for

 2                 identification.)

 3   BY MS. THOMPSON:

 4        Q.    Are you familiar with this paper,

 5   Dr. Bales?

 6        A.    Yes.

 7        Q.    And let's just go to the conclusions,

 8   and could you read the last paragraph for us.

 9        A.    Would you like me to read the entire

10   last paragraph?

11        Q.    Um-hmm?

12        A.    Starting "In conclusion"?

13        Q.    Um-hmm.

14        A.    "In conclusion, this study provides

15   further evidence that success after prolapse

16   surgery depends heavily on the criteria that are

17   used to define treatment success.  In the

18   frequently cited study by Weber, et al., when

19   strict anatomic criteria were used, success was

20   low.  However, when contemporary, clinically

21   relevant criteria for success were used, treatment

22   success was considerably better, with only 11

23   percent of subjects experiencing anatomic

24   recurrence beyond the hymen, 5 percent of subjects
```

Gregory Bales, M.D.

```
1    experiencing symptomatic recurrence, and no
2    subjects requiring surgery for recurrence or
3    complications at one year.
4              "Given this and the excellent safety
5    profile of traditional vaginal prolapse surgery,
6    we conclude that anterior colporrhaphy that is
7    performed in conjunction with other native tissue
8    repairs is appropriate as a primary treatment of
9    symptomatic anterior vaginal prolapse."
10   Q.    And my question is, why did you cite the
11   Weber paper in 2001 when this paper is more recent
12   and more authoritative?
13             MR. MORIARTY:  Objection, form and
14         asked and answered.  Go ahead.
15   Q.    Well, let me just say, is your -- is
16   your -- the reason that you didn't use this paper
17   is you just can't cite everything?  I think that
18   was your answer before.  Is that it --
19   A.    Yeah --
20   Q.    -- why you chose the old paper?
21   A.    Yeah, I apologize.  I chose -- I tried
22   to choose a appropriate synopsis of a variety of
23   different things.  I'm sure there are other papers
24   that I missed that might be more current or what
```

Gregory Bales, M.D.

1    have you.  But again, there is a lot of literature

2    that's out there.  I had to cite certain things.

3         Q.    And you will certainly agree with me

4    that a 5 percent symptomatic recurrence and no

5    subjects requiring additional surgery is very

6    different from the recurrence of 30 percent or more

7    that you cite in your paper, right?

8         A.    So you are asking if 30 is different

9    than 5, and the answer is yes, 30 is different than

10   5.

11        Q.    And you believe that you reported

12   objectively on the success rates with colporrhaphy?

13        A.    Yes.  I think this paper, actually, this

14   later information actually is somewhat of an

15   anomaly; and I think most -- most papers and again,

16   there is, you know, lots of data and lots of

17   studies that aren't cited here, would suggest that

18   the number is higher than 5 percent.  And again,

19   there is going to be a variety based on the paper.

20        Q.    Okay.  Well, let's go to one of the

21   other papers that you cited and Fed Ex'd.  I

22   thought this one was apparently really important,

23   and I just have two copies of this one, I'm sorry

24   to say.

Gregory Bales, M.D.

1          We will mark that as the next exhibit,

2   9, and you are familiar with this paper because you

3   cite it in your paper, in your report, right?

4       A.    Yeah.  Peter --

5            MR. MORIARTY:  It's so big you can

6       hardly miss it.

7            MS. THOMPSON:  The first paper was

8       that -- I have two of these that are large

9       size.  The first one was from Duke.  I thought

10      they just thought it was from Duke that it was

11      important.

12           THE WITNESS:  These guys work with us.

13      They are part of the University of Chicago

14      now, Peter Sand and Roger Goldberg and Janet

15      Tomezsko.

16           (Bales Exhibit 9 was marked for

17              identification.)

18   BY MS. THOMPSON:

19      Q.    I actually want to turn your attention

20   to that discussion of this paper --

21      A.    Okay.

22      Q.    -- by Dr. Shull.  Do you know Dr. Shull?

23      A.    I don't.

24      Q.    Have you seen Dr. Shull cited in Ethicon

Gregory Bales, M.D.

1    documents frequently?

2         A.    I think I'm familiar with that name.  He

3    is not a urologist; he is a urogynecologist.  I

4    think I have seen the name.

5         Q.    And have you looked at his comment

6    regarding Dr. Sand's paper, you will see that, I'm

7    going to read to you from the comment, "They knew

8    from their own experience as well as the experience

9    of other surgeons that the use of nonabsorbable

10   mesh is associated with an unacceptably high rate

11   of complications.  This is not surprising when one

12   considers operating in a clean-contaminated field,

13   the vagina."

14            And this paper used an absorbable mesh,

15   correct, not polypropylene?

16              MR. MORIARTY:  Objection, form.  Go

17       ahead.

18         A.    Yeah, I guess I'm just -- you just

19   read --

20         Q.    Did this paper use absorbable mesh?

21         A.    Yes, correct.

22         Q.    Okay.  And did Dr. Shull describe --

23   well, I'm going to read you something.  Tell me if

24   this is what the paper states.  "In our most recent

Gregory Bales, M.D.

1    series of over 300 women" --

2            MR. MORIARTY:  I'm sorry.  Can you

3        please tell us what you are reading from?

4            MS. THOMPSON:  Several factors are

5        related to long-term outcome.

6            MR. MORIARTY:  We need to know where

7        you are reading from.

8            MS. THOMPSON:  I'm telling you.  In

9        the comments section it says several factors

10       are related to long-term outcome, and I'm

11       reading from number one.

12   BY MS. THOMPSON:

13       Q.   "In our most recent series of greater

14   than 300 women in whom we specifically repaired the

15   transverse portion of the pubocervical fascia,

16   along with other defects, the rate of anterior

17   compartment persistence or recurrence was 7 percent

18   for prolapse halfway to the hymen and 2 percent for

19   prolapse to the hymen.  We used no mesh."

20           You will agree with me that a success

21   rate of 7 percent halfway to the hymen and 2

22   percent for prolapse to the hymen with a native

23   tissue repair is significantly less than the 30

24   percent that you cited in your expert report,

Gregory Bales, M.D.

1    correct?

2              MR. MORIARTY:  Objection, form.

3         A.    I think 30 percent is a more accurate

4    representation of what the experience is nationwide

5    for sure, as you just read.

6              Dr. Shull is a very accomplished

7    urogynecologist who I don't know personally, but

8    he is citing his own work, and he obviously gets

9    excellent results with his native tissue repair.

10             I'm not sure how long these patients

11   were followed, but he cites 7 percent in his

12   experience, and 7 percent is a lower number than

13   30 percent.

14             MS. THOMPSON:  I've just handed

15        another paper.  Would you mark this as Exhibit

16        No. 9.

17             MR. MORIARTY:  10.

18             (Bales Exhibit 10 was marked for

19              identification.)

20   BY MS. THOMPSON:

21        Q.    Dr. Bales, are you familiar with

22   Exhibit 10, a paper by Funk and Visco?

23        A.    Yes.

24        Q.    And this paper looked at 27,809 anterior

Gregory Bales, M.D.

1 prolapse surgeries. The 5-year risk of surgery for

2 recurrent prolapse was similar between vaginal mesh

3 and native tissue groups with 10.4 percent

4 recurrent with mesh and 9.3 recurrent with native

5 tissue. You will agree that those numbers are

6 significantly less than the 30 percent that you

7 cited in your expert report, correct?

8         A.    Yes.

9         Q.    And that there was -- in this paper of

10 27,000-plus patients, there was no difference

11 between mesh and native tissue repairs, correct?

12        A.    Yes, it looks like they are, right,

13 essentially similar.

14              MS. THOMPSON:  And Exhibit No. 11.

15                (Bales Exhibit 11 was marked for

16                 identification.)

17 BY MS. THOMPSON:

18        Q.    Are you familiar with this paper by

19 Dr. Oversand?

20        A.    Yes.

21        Q.    And Dr. Oversand had a satisfaction rate

22 of 94 percent of patients with native tissue

23 anterior repairs and a 5-year reoperation rate of

24 2.6 percent in one group and 8.9 percent in the

Gregory Bales, M.D.

1    other group and concluded that POP surgery using

2    native tissue repair entails low reoperation rates

3    with excellent subjective and objective results and

4    should be the primary -- should be the first choice

5    in treating primary POP providing use of adequate

6    surgical technique as was published in 2013.

7              That's certainly different from what you

8    cited in your expert report, correct?

9              MR. MORIARTY:  Objection, form.

10        A.    Again, the numbers are lower in this

11   paper in terms of the recurrence rates, yes.

12             MS. THOMPSON:  And Exhibit No. 12.

13             (Bales Exhibit 12 was marked for

14              identification.)

15   BY MS. THOMPSON:

16        Q.    Are you familiar with this paper,

17   Dr. Bales?

18        A.    Yes.

19        Q.    And this is the three-year followup on

20   Dr. Iglesia's original Prolift study, correct?

21        A.    Yes.  I'm just trying to see if they are

22   all Prolift people, to make sure on the methods.

23             Yes, okay.

24        Q.    And you are aware that this study was

Gregory Bales, M.D.

1   halted prematurely because of 15.6 percent mesh

2   erosion rate which exceeded their predetermined

3   limit, correct?

4       A.    Yes, it is prematurely halted.

5       Q.    And -- but they continued to follow the

6   patients for efficacy, correct?

7             And these authors concluded that there

8   was no difference in three-year cure rates when

9   comparing patients undergoing traditional vaginal

10  prolapse surgery without mesh with those undergoing

11  vaginal colpopexy repair with mesh, correct?

12      A.    Right.  You can read their conclusion.

13  They saw no difference.

14      Q.    And this paper wasn't included in your

15  expert report, was it?

16      A.    I don't think so.

17      Q.    And it is still your opinion that

18  colporrhaphy has a recurrence of over 30 percent

19  and that mesh repairs are preferable?

20            MR. MORIARTY:  Objection, form.

21      A.    It's my opinion that, yeah, anterior

22  recurrence rates are as high as 30 percent.

23      Q.    Or you said 30 percent or more, not as

24  high as 30 percent.

Gregory Bales, M.D.

1      A.    As high as 30 percent or more than 30

2  percent.

3      Q.    So your opinion is the recurrence, high

4  rates of recurrence of 30 percent or more with

5  colporrhaphy?

6      A.    Yes.  If you follow patients long

7  enough, yes, I believe that's an accurate

8  statement, even though there is certainly papers

9  that we can tease out of the literature, as we are

10  doing, that show the recurrence rate is lower.

11      Q.    But you didn't mention any of those

12  articles in your expert report, correct?

13      A.    The bibliography on the expert report,

14  as you've stated now several times, did not include

15  every single paper in the literature.

16      Q.    And I'm actually using many of your

17  papers that you just took the information that was

18  favorable to your opinions, correct?

19      A.    I appreciate that very much, counsel.

20      Q.    Correct?

21      A.    Correct.

22          MS. THOMPSON:  Another big one,

23  Exhibit 13.

24              (Bales Exhibit 13 was marked for

Gregory Bales, M.D.

```
 1              identification.)
 2   BY MS. THOMPSON:
 3       Q.    We are going to go to the next paragraph
 4   in your report.
 5              MR. MORIARTY:  Well, wait.  Are you
 6         asking him about 13 or his report?  Because I
 7         want to take a second to look at this.
 8              MS. THOMPSON:  Sure, go ahead.  This
 9         is applicable to the next paragraph, but feel
10         free to take a look at it.
11              And I didn't realize this article was
12         highlighted.  I apologize for that.
13   BY MS. THOMPSON:
14       Q.    Dr. Bales, are you familiar with this
15   paper from Duke published in 2000?
16       A.    Yes.
17       Q.    It's titled "Vaginal mesh erosion after
18   abdominal sacrocolpopexy."  In your last paragraph
19   you say, "Due to the shortcomings associated with
20   these native tissue surgical repairs, surgeons
21   began using mesh for the treatment of POP.  It
22   started with the use of mesh in ASC.  After that,
23   in the 1990s, pelvic surgeons began to use mesh
24   transvaginally, in order to take advantage of the
```

Gregory Bales, M.D.

1   fewer complications which result from the use of

2   that approach."

3           You didn't cite anything for that

4   opinion that pelvic surgeons were using mesh

5   transvaginally to take advantage of fewer

6   complications.  I wanted you to look at the Visco

7   paper that did use mesh transvaginally, and

8   Dr. Visco and his colleagues found an unacceptable

9   rate of erosion when they used transvaginal mesh,

10  correct?

11          MR. MORIARTY:  Objection, form.

12  A.    I think --

13  Q.    I'm reading.  "In conclusion, both

14  abdominal sacral colpopexy and abdominal-only

15  sacral colpoperineopexy appear to have a low and

16  comparable rate of vaginal mesh erosion."

17          Their erosion rate was 5.5 percent

18  overall, 3.2 percent in the abdominal

19  sacrocolpopexy group.

20          "Vaginal placement of mesh results in

21  an unacceptably high rate of mesh erosion and a

22  shorter time to erosion than any other form of

23  vault suspension in this study."

24          And these authors abandoned the use of

Gregory Bales, M.D.

1   transvaginal mesh because of the high exposure

2   rate, correct?

3              MR. MORIARTY:  Objection, form.

4        A.    The comparison here, though, was --

5        Q.    Just answer my question.  They abandoned

6   the use of transvaginal mesh because of the high

7   exposure rate, correct?

8              MR. MORIARTY:  One of my objections

9         was form because your question was several

10        minutes long, so I'm not sure what the

11        question was.

12   BY MS. THOMPSON:

13        Q.    The question is short.  These authors

14   abandoned the use of transvaginal mesh because of

15   the high complications rate, correct?

16              MR. MORIARTY:  Objection.

17        A.    Does it say it here?  Does it say they

18   abandoned it?  I don't see that it says they write

19   "we have abandoned use of mesh."  So, I'm not sure

20   how we -- and again, I'm not reading it.  Did they

21   say they've abandoned?  If they say they have,

22   then I guess we could take that at face value, but

23   I'm not sure it says it here.  So, why do you think

24   they have abandoned it?

Gregory Bales, M.D.

```
 1              They are comparing it with the abdominal
 2   sacral colpopexy and they say that it is a higher
 3   rate of mesh erosion compared to the abdominal
 4   sacral colpopexy and the sacral colpoperineopexy,
 5   but I don't see anything about them abandoning
 6   anything.
 7        Q.    While I'm finding that, the authors
 8   thought that mesh erosions may be the only clinical
 9   manifestation of a bacterial contamination.  If
10   this is true, it supports our finding that the rate
11   of mesh erosion was found to be higher in
12   operations with vaginal mesh compared with those in
13   which vaginal sutures were placed, and this may be
14   explained by a greater exposure of the mesh
15   material to the vaginal floor of the vaginal mesh
16   group.
17              Did I read that correctly?
18        A.    You read that exactly.  You read --
19   those three sentences were exactly how it's stated
20   here.
21        Q.    And when was Gynemesh PS introduced to
22   the market?
23        A.    You will have to refresh my memory
24   specifically.  I don't remember the exact date.
```

Gregory Bales, M.D.

1     Q.    Was it 2002?  Does that sound right?

2     A.    That sounds right.

3     Q.    I'm interested in your opinion on Page 5

4  that Prolift --

5     A.    To clarify the sentence we just said, it

6  looks like January 2002.

7     Q.    And I'm reading your opinion.  "The

8  Gynecare Prolift pelvic floor system delivered

9  pre-cut Gynecare Gynemesh PS polypropylene mesh to

10 essentially recreate the normal anatomic pelvic

11 floor."

12          Is it your opinion --

13    A.    I apologize.  Where on 5 is that?  Just

14 so I'm reading with you, where is it?

15    Q.    "With this goal in mind" paragraph.

16    A.    Okay.  I got it.

17    Q.    Is it your opinion that Prolift

18 recreates the normal anatomic pelvic floor?

19    A.    That's the goal.  That's what we try

20 to -- try to approximate.  I don't think --

21    Q.    Does Prolift recreate the normal

22 anatomic pelvic floor?

23    A.    Yes.  That's -- you are attempting to do

24 that.  You are attempting to put everything back in

Gregory Bales, M.D.

1    position and create the normal anatomy, that the

2    bladder is back up in position, the enterocele is

3    corrected and the rectocele, so yes, that's the

4    goal.

5         Q.    I didn't ask if that's the goal.  I

6    asked does Prolift recreate the normal anatomic --

7         A.    Yes.  And let me, I'm just going to add,

8    there is no surgical procedure that everything then

9    is a postoperative situation, so you can't take

10   something that's virgin and do any kind of surgery

11   on it and truly say that it's exactly the same.

12   So, let's just make that clarification.  So, you

13   can make the anatomy normal, but it is still a

14   postoperative situation.  That's the only

15   clarification I will add.

16              MS. THOMPSON:  And I will object as

17         nonresponsive.

18              Exhibit 14.

19              (Bales Exhibit 14 was marked for

20               identification.)

21   BY MS. THOMPSON:

22        Q.    Is this a document that you have seen,

23   Dr. Bales?

24        A.    If this date is correct, it was from

Gregory Bales, M.D.

 1   August 1998.  I may have seen it.  I can't say 100

 2   percent.

 3       Q.    And this was prior to the introduction

 4   of Gynemesh PS for transvaginal use in prolapse,

 5   correct?

 6       A.    Yes, it looks that way.

 7       Q.    And if you will go to the introduction,

 8   will you read the second -- beginning in this

 9   response to this Gynemesh paragraph and then the

10   bullet points underneath.

11       A.     "In response to this Gynemesh, a

12   Prolene (polypropylene) mesh for repair of anterior

13   prolapse was launched in June.  At this time it was

14   recognized that Prolene is far from being the ideal

15   material for this indication.  However, it was

16   decided that the Gynecare Division should launch

17   this product for the following reasons:  To raise

18   awareness of the possibility of using a mesh for

19   prolapse repair."  Next bullet point, "To gain

20   entry into this growing market before competitors;

21   to spend time seeking out key surgeons as product

22   champions and to allow time to carry out further

23   market research into what the ideal product for

24   this indication might be."

Gregory Bales, M.D.

1      Q.    Is there a bullet point about improving

2   outcomes for patients?

3      A.    No.

4      Q.    Did Ethicon at this time have any

5   information that Gynemesh would improve outcomes

6   for patients?

7      A.    I don't know.

8      Q.    If they did, it certainly wasn't

9   mentioned in this document, in the introduction of

10  this document, correct?

11     A.    It's not mentioned in the introduction

12  of this document.

13     Q.    Going to your discussion of the efficacy

14  of Prolift in the anterior compartment you --

15     A.    What page are we on?

16     Q.    5, going into 6.

17     A.    Okay.

18     Q.    You provide a chart listing some of the

19  trials with polypropylene mesh and compared with

20  native tissue repairs, correct?

21     A.    Yes.

22     Q.    And this chart only reflects anatomic

23  cure in the anterior compartment, correct?

24     A.    That's correct.

Gregory Bales, M.D.

1      Q.    And the author of the paper in which

2  this chart was extracted is Dr. Jacquetin, right?

3      A.    Yes, okay.

4      Q.    And Dr. Jacquetin is a patent holder for

5  Prolift, correct?

6      A.    I don't know, I don't know.

7      Q.    You don't know that Dr. Jacquetin and

8  the TVM group?

9      A.    I don't know him.

10      Q.    Okay.  Are you aware that Jacquetin is a

11  consultant for Ethicon?

12      A.    I know that name.

13      Q.    It's your opinion -- I'm skipping over

14  to Page 7 --

15      A.    Page 7, okay.

16      Q.    -- that the only unique risk with

17  Prolift or Gynemesh PS is mesh exposure and

18  erosion, which was well-known to surgeons.  Is that

19  your opinion?

20      A.    Yes.

21      Q.    That the only unique risk is exposure

22  and erosion?

23      A.    Unique risk.

24            MR. MORIARTY:  We have been going an

Gregory Bales, M.D.

1          hour and a half.  Ready for a break?

2                    MS. THOMPSON:  Sure, take a break.

3                    (Recess taken, 9:32 - 9:41 a.m.)

4                    MS. THOMPSON:  Back on.

5     BY MS. THOMPSON:

6          Q.    I had asked earlier, Dr. Bales, your

7     opinion that the only unique risk is mesh exposure

8     and erosion, and for that opinion you cited the

9     Abed paper from 2011, correct?

10         A.    I did.

11                   MS. THOMPSON:  And we will mark this

12         as Exhibit 15.

13                   (Bales Exhibit 15 was marked for

14                    identification.)

15    BY MS. THOMPSON:

16         Q.    And this paper is titled "Incidence and

17    management of graft erosion, wound granulation and

18    dyspareunia following vaginal prolapse repair with

19    graft materials: a systematic review."

20                Why did you not include the dyspareunia

21    that's discussed in this paper when you cited it as

22    your support for the only unique risk with Prolift

23    or Gynemesh PS is mesh exposure and erosion?

24         A.    Well, that sentence is as stated.  I'm

Gregory Bales, M.D.

1   just discussing the unique risk associated with

2   having the mesh, and you know, in other areas we

3   talk about dyspareunia rates and the first

4   paragraph discusses dyspareunia rates and such.

5   So, I didn't include every part of this paper.

6        Q.    Does this paper state that the only

7   unique risk with Prolift or Gynemesh PS is exposure

8   and erosion?

9        A.    I don't know if that exact verbiage is

10  used in this paper.  I would have to refresh my

11  memory.

12       Q.    Well, obviously it wouldn't because it

13  discusses graft erosion, wound granulation and

14  dyspareunia following prolapse with graft

15  materials, right?

16       A.    Right, and my point in writing my report

17  is that those other type complications can be seen

18  with or without the presence of mesh, which is one

19  of the reasons.  Again, we describe the unique risk

20  being the presence of the mesh and the exposure and

21  the erosion, so I guess just to clarify that.

22       Q.    But you have already said that the

23  rates, the incidence, the severity, the permanence

24  and responsiveness to treatment are all important

Gregory Bales, M.D.

```
 1   when you are talking about adverse events or

 2   complications, right?

 3        A.    Yes, it's all important.

 4        Q.    And at least in this review, the

 5   dyspareunia rate associated with graft materials

 6   was 9.1 percent, correct?

 7        A.    That's correct.

 8        Q.    We were talking also about Jacquetin,

 9   who is an Ethicon consultant, and I will represent

10   to you that he is a patent holder on Prolift.

11             MR. MORIARTY:  Is this one for me or

12        is this the only one?

13             MS. THOMPSON:  Some of these I just

14        have two copies of, I apologize.

15             MR. MORIARTY:  Are you marking it?

16             MS. THOMPSON:  Yeah, I will go ahead

17        and mark it.

18             THE WITNESS:  So I guess we are up to

19        16.

20             (Bales Exhibit 16 was marked for

21              identification.)

22   BY MS. THOMPSON:

23        Q.    Are you familiar with this paper,

24   Doctor --
```

Gregory Bales, M.D.

```
 1        A.    Yes.

 2        Q.    -- Bales?  And actually, which did I

 3   give you?

 4        A.    You have too many papers.

 5        Q.    I do.  I actually meant to give you a

 6   different one, but we will go ahead and talk about

 7   this one.  This is a paper, the 2013 --

 8        A.    2009.

 9        Q.    This is the 2010 Jacquetin paper, the

10   three-year followup.

11              And you will agree with me, in this

12   paper the anatomical failure rate was 20 percent at

13   three years, correct, in the results section?

14        A.    Correct.  You are reading right from the

15   paper.

16        Q.    Yep.  And Dr. Jacquetin found that,

17   listing results of the abstract summary, correct,

18   listed that or stated that a significant number of

19   patients, 41 percent, ceased sexual activity by

20   three years, correct?

21        A.    That's what his results were.

22        Q.    And that de novo dyspareunia was

23   reported by 8.8 percent, correct?

24        A.    Correct.
```

Gregory Bales, M.D.

1    Q.    And that would be consistent also with

2  the paper we just looked at previously, at the Abed

3  paper, correct?

4           MR. MORIARTY:   Objection.   Are you

5      just talking about the dyspareunia rate?

6           MS. THOMPSON:   Just the dyspareunia.

7      Sorry.

8    A.    Yes.

9    Q.    If we go to the Jacquetin 2013 paper --

10 we will mark this one too, 17.   I think you are

11 familiar with this one because it is cited in your

12 expert report, correct?

13   A.    Correct.

14          (Bales Exhibit 17 was marked for

15            identification.)

16 BY MS. THOMPSON:

17   Q.    And this Jacquetin paper with the

18 followup of the TVM, total transvaginal mesh

19 series, this is the one that your chart was derived

20 from, correct?

21   A.    Yes.

22   Q.    And in this paper, in the results

23 section of the abstract, Dr. Jacquetin reports 16

24 percent with mesh exposure for which 8 resections

Gregory Bales, M.D.

1    needed to be performed, 7 exposures still ongoing

2    at the 5-year endpoint, all asymptomatic, correct?

3    I'm reading that correctly?

4         A.    You are reading that correctly, yes.

5         Q.    And only 33 out of 61, 54 percent,

6    sexually active patients at baseline remained so at

7    5 years in his study, correct?

8         A.    That's correct.

9         Q.    And de novo dyspareunia was reported by

10   10 percent, correct?

11        A.    That's correct.

12        Q.    And you are aware that Jacquetin also

13   published a paper based on the experience titled

14   "Complications of Vaginal Mesh"?

15        A.    Do you have it?  Did you want to go over

16   it?

17        Q.    I need a helper.

18        A.    Maybe this young fella.

19             MS. THOMPSON:  It is just a short

20        paper.  I do have one additional copy, and we

21        will mark that as Exhibit 18.

22                  (Bales Exhibit 18 was marked for

23                   identification.)

24

Gregory Bales, M.D.

1    BY MS. THOMPSON:

2        Q.    Do you need a moment to look at that, or

3    are you familiar with this paper?

4        A.    Yeah, I'm familiar.  I'm skimming it

5    over, but if I need more time I won't answer your

6    question and I will ask for a few more minutes, but

7    you can ask your question.

8        Q.    This paper is based on Jacquetin's

9    experience with removal of 160 explant -- implants,

10   correct?

11       A.    I will need just a second to confirm

12   that number.

13             Yeah, I mean, it seems that he is just

14   discussing more broadly everything about some of

15   his experiences and citing some other work, but

16   then on Page 895 he discusses that the French

17   experience is 160 implants that were removed by his

18   group, yep.

19       Q.    And under the complications he lists

20   infections, correct, on Page 894?

21       A.    Correct.

22       Q.    And he lists exposures and erosions,

23   correct?

24       A.    Yep.

Gregory Bales, M.D.

1     Q.    And he lists retractions, correct?

2     A.    That's correct.  We are reading, yes,

3  those are the three things.

4     Q.    And he describes the average shrinking

5  of 25 to 30 percent in experimental surgery, and it

6  may reach 40 percent of the initial surface of the

7  implant in patients after surgery.

8          MR. MORIARTY:  Is that a question?

9     Q.    And therefore, many surgeons will use

10  large implants to cover defects and anticipate

11  scarring, shrinkage and puckering.  Is that what

12  Dr. Jacquetin describes in this paper?

13          MR. MORIARTY:  Objection, form.

14     Q.    Did I read it correctly?

15     A.    I think that bullet point you read

16  exactly, so that's what he has written here, yeah.

17     Q.    And we will talk about your opinions on

18  shrinkage in a minute, but at least Dr. Jacquetin

19  listed that retraction as a complication of the

20  mesh devices he studied, correct?

21     A.    Sure, and you left out -- right, and he

22  describes on a rat's abdominal wall and then he is

23  guesstimating based -- he says it may reach

24  40 percent on patients.  So, it sounds like at

Gregory Bales, M.D.

1   least on the experimental side it's on the rat's

2   abdominal wall, but you read the rest of the

3   sentence accurately.

4        Q.    So, you think when he says -- sorry.

5   So, you think when he says, therefore, many

6   surgeons will use large implants to cover defects

7   and anticipate scarring, shrinkage and puckering he

8   is talking about rat surgeons?

9             MR. MORIARTY:  Objection, form.

10            MS. THOMPSON:  Well, I'm just asking

11        if that's what he meant, what he said.

12            MR. MORIARTY:  You asked him if you

13        read that exactly, and you didn't.  You

14        skipped the part about the rats, so he was

15        just pointing out what you skipped.

16            MS. THOMPSON:  I don't think I did.

17            MR. MORIARTY:  That's why I objected

18        to form.  You skipped the part about the rats.

19            MS. THOMPSON:  Well, I didn't intend

20        to skip.

21   BY MS. THOMPSON:

22        Q.    You don't think the second sentence is

23   applying to rats, do you, Dr. Bales?

24        A.    Well, the second sentence specifically

Gregory Bales, M.D.

1    says patients; the first sentence definitely says

2    rats.  So, I guess that was the only clarification.

3         Q.    So you think the 40 percent would refer

4    to patients, human patients, right?

5         A.    Well, again, I mean, he is not citing

6    any specific study here.  It sounds like he is

7    surmising it may reach.  I don't --

8         Q.    But he is talking about humans, right?

9         A.    He says in patients, so I would assume

10   that means patients.

11        Q.    And when he says many surgeons will use

12   large implants to cover defect and anticipate

13   scarring, shrinking and puckering, he is talking

14   about human patients also; agree?

15        A.    I suspect, although again, it's a very

16   general statement, and I'm not sure which surgeons

17   he is referring to or anything, how large.  I mean,

18   it's just kind of a very general statement.  I

19   imagine he is referring to surgeons operating on

20   humans.  I don't want to over-infer.

21        Q.    Okay.  I want appreciate that.

22                   (Mr. Jake Plattenberger entered the

23                    deposition proceedings.)

24                   MR. MORIARTY:  Can we help you?

Gregory Bales, M.D.

```
1              MR. DAVIS:  He is with me.
2  BY MS. THOMPSON:
3       Q.   Going back to your report, Dr. Bales, on
4  page -- the bottom of Page 7, let's go to Page 7,
5  in the first paragraph, dyspareunia rates were very
6  acceptable.  What is an acceptable dyspareunia rate
7  for you following any type of surgery?
8       A.   Well, obviously, it would be better
9  certainly for patients not to have dyspareunia, but
10  any -- I guess we all have a different opinion.
11              I'd tell you my opinion would be any
12  type of vaginal surgery we are doing, if we are
13  getting dyspareunia rates under 10 percent, it's
14  probably very acceptable.  But again, that's very
15  sort of general, and again, a lot of patients, as
16  we just cited on some of the previous studies,
17  don't remain sexual active.  A fair majority of the
18  patients aren't sexual active.
19              But to answer your question, I guess
20  anywhere in the low teens to less than 10 percent
21  would be acceptable for a vaginal surgical
22  procedure like this.
23       Q.   And you would agree that there is a
24  likelihood that at least some of those patients who
```

Gregory Bales, M.D.

1    are no longer sexually active and are not included

2    in the study are not sexually active because of

3    pain, correct, for whatever reason?

4         A.    It could be.  It's hard to say.

5         Q.    But it would be reasonable to assume

6    that, correct?

7         A.    I don't like to assume, but for whatever

8    reason, patients sometimes aren't sexually active.

9         Q.    Become not sexually active after

10   Prolift, correct?

11        A.    Sure.  The studies bear that out.

12               MS. THOMPSON:  Number 19.

13                  (Bales Exhibit 19 was marked for

14                   identification.)

15   BY MS. THOMPSON:

16        Q.    And this is the Lowman paper that you

17   cited in your report, correct?

18        A.    Yep.

19        Q.    And Dr. Lowman looked specifically at

20   dyspareunia with Prolift, correct?

21               MR. MORIARTY:  Objection.

22        Q.    Well, the title is "Does the Prolift

23   system cause dyspareunia," correct?

24        A.    Yeah.  This was, it looks like, a chart

Gregory Bales, M.D.

1    review.  They went back, and they were trying to

2    assess dyspareunia rates.

3         Q.    And Dr. Lowman is a consultant for

4    Ethicon; would you agree with that?

5         A.    I have no knowledge of him being a

6    consultant of Ethicon.  He may or may not be.

7         Q.    I believe it is a she.

8         A.    A she.  "Joy" is probably a better

9    female name, so I should --

10        Q.    Or maybe it's not.  I'm not sure.

11              And Dr. Lowman has a chart on Page 707e4

12   that lists the rates after various pelvic organ

13   prolapse procedures of de novo dyspareunia,

14   correct?

15        A.    Sure.  Which chart is it, which one?

16        Q.    Page 707e4.

17        A.    Table 4, I got it.  Table 4, you mean?

18        Q.    Correct.  And did you go back and look

19   at these articles to see if those numbers were

20   correct?

21        A.    To see what numbers are correct?

22        Q.    The numbers that she provided in this

23   table for the other procedures.

24        A.    Did I recheck her work?

Gregory Bales, M.D.

1        Q.    Did you look at the articles that she

2   cited in Table 4?

3        A.    So, when I read over the articles, I

4   don't always look at all the cited articles

5   within -- that are embedded within the article.

6   Sometimes I do and sometimes they were previously

7   cited and are in part of the list.

8        Q.    So the answer is no.  I mean, that's

9   okay.  Did you look at the articles that were cited

10  in Table 4?

11       A.    Yeah.  I don't remember looking at each

12  and every one, but I may have skimmed through them

13  and I may have.

14       Q.    Well, let's just look at one of them,

15  the Weber paper on anterior/posterior colporrhaphy.

16  Okay?

17       A.    Okay.  Whatever you want.

18            MS. THOMPSON:  And that's Exhibit 20.

19               (Bales Exhibit 20 was marked for

20                 identification.)

21  BY MS. THOMPSON:

22       Q.    And this study cited by Dr. Lowman in

23  her paper looks at sexual function after native

24  tissue prolapse repairs, correct?

Gregory Bales, M.D.

1      A.    Yes.   I mean, it looks at sexual

2  function and vaginal anatomy, assessing sort of

3  both those things, vaginal dimensions and such.

4      Q.    And Dr. Weber looked at dyspareunia

5  before and after surgeries, correct?

6      A.    Yes.   It's a questionnaire, obviously,

7  right?  You don't see that.  You ask the patients,

8  and it looked like patients reported preoperatively

9  and then postoperatively.

10      Q.    And are you aware that in this paper

11  dyspareunia was persistent in only one of the 14

12  women?

13            MR. MORIARTY:  Objection.

14      Q.    You can go ahead and look at the paper

15  if you want to.  I'm reading dyspareunia was

16  persistent in one woman on Page 1612.

17      A.    Yeah, I mean in the interest of time, I

18  mean, it would be nice to study this a little more

19  closely, but it looks like there were six patients

20  who on their preoperative questionnaire had

21  dyspareunia, and one of those six

22  postoperatively -- again, these were the patients

23  who reported dyspareunia preoperatively -- one of

24  the six it was maintained, persisted.

Gregory Bales, M.D.

```
1         Q.    And if you use that statistic, 1 out of
2    75 would be 1.3 percent, correct?
3              MR. MORIARTY:  Objection.  Go ahead.
4         A.    One out of 75 is 1.3 percent?
5         Q.    Correct.
6         A.    Yeah, that's mathematically correct.
7         Q.    So would you agree with me that
8    Dr. Lowman saying that the dyspareunia rate of 19
9    point -- 19.0 percent is really accurate?
10             MR. MORIARTY:  Objection, form.
11        A.    Where did you get the 75 a moment ago?
12        Q.    There is 75 patients in the study.
13   Dr. Lowman says 14 of 75 have de novo post-op
14   dyspareunia.  What she doesn't mention, that only
15   one of those had persistent dyspareunia, correct?
16        A.    Yeah, but it developed it, so 14 had new
17   dyspareunia.
18        Q.    But all resolved spontaneously, correct,
19   except for one?
20             MR. MORIARTY:  Objection.
21        A.    Well, there was only 6.  Of those 6
22   patients, 5 of the 6, so at least in this study,
23   they apparently resolved.
24        Q.    Okay.  So only 1 out of 75 ended up with
```

Gregory Bales, M.D.

1   persistent dyspareunia, correct, after native

2   tissue repairs?

3       A.    Well, not really.  You are comparing

4   apples and oranges.  I mean, the first group, it's

5   a different subset of patients.  If you report the

6   6 who had dyspareunia beforehand, so in that group

7   5 out of 6, which is about 83 percent, resolved; 1

8   out of 6, so 16.66 percent, persisted.

9           So, if you look at that subset, and then

10  it's apples and oranges, you can't lump them all

11  together.  The patients who didn't have

12  dyspareunia, then you can look at their dyspareunia

13  rates after surgery, but I don't think it's fair to

14  use the -- you are mixing up the numerator and the

15  denominator there, I think.

16      Q.    I am looking at Dr. Lowman who says that

17  14 of the 75 patients in Dr. Weber's study had

18  de novo post-op dyspareunia.  I'm just saying how

19  many of those patients had persistent dyspareunia.

20      A.    Well, yes, those --

21      Q.    Out of 75 according to Dr. Lowman?

22      A.    Correct.  So, it looks like 14 out of

23  75, it was not persistent.  It started after the

24  procedure, yes, I would agree with that, if that's

Gregory Bales, M.D.

1  what you are saying.

2      Q.   Persistent doesn't mean it starts after

3  the procedure.  Persistent means it lasts beyond

4  the term of the study, correct?

5      A.   Well, in this and how it's used here is

6  the dyspareunia that was present before the

7  surgery, that's the persistence that Dr. Weber is

8  talking about in this paper.

9      Q.   Okay.  It says, reading from Page 1611,

10 "With dyspareunia defined as pain with sexual

11 activity occurring usually or always, the

12 prevalence was 8 percent before surgery, 6 of 80

13 women, and 19 percent after surgery, 15 of 80.

14 Dyspareunia was persistent in one woman, developed

15 as a new symptom in 14 and resolved in 5."

16          So, Dr. Lowman's numbers of 19 -- or 14

17 out of 75 are incorrect, right?

18              MR. MORIARTY:  Objection.

19     A.   No.  How is that incorrect?  That's

20 exactly what's reported here.

21     Q.   We will just disagree on that one.

22     A.   I mean, de novo means it started, so it

23 developed in 14, 14 in the 75.  That's what's

24 reported there.  But I'm happy to disagree.  If you

Gregory Bales, M.D.

1   want to agree to disagree, that's fine, but I think

2   those numbers are exactly right.

3        Q.    Is it your opinion that the dyspareunia

4   that's known to occur with vaginal mesh procedures

5   is no different from dyspareunia that occurs in

6   native tissue repairs in regards to rates,

7   severity, permanence and responsiveness to

8   treatment?

9              MR. MORIARTY:  Objection to form.

10       A.    Can we repeat that back, please?  I'm

11  sorry.

12       Q.    Is it your opinion that the dyspareunia

13  that occurs with mesh repairs as reported in the

14  literature is no different from dyspareunia

15  occurring after native tissue repairs when you

16  consider rates, severity, responsiveness to

17  treatment and permanence?

18             MR. MORIARTY:  Objection, form.  Go

19       ahead.

20       A.    Yeah, I don't think there is a

21  tremendous difference.  I think dyspareunia is

22  dyspareunia, and it's very hard to quantitate

23  dyspareunia.  To some degree we attempt to in some

24  of these studies, but on balance I think they are

Gregory Bales, M.D.

1   similar.

2        Q.    Your opinion is dyspareunia is

3   dyspareunia?

4        A.    Well, dyspareunia just means pain with

5   intercourse, and I think it's very hard to

6   quantitate pain with intercourse, so that's what

7   I'm implying.

8        Q.    You don't think there is a difference

9   between some irritation that might occur with

10  vaginal atrophy and women who have pain that's so

11  severe that they will be in bed for three days

12  afterwards with pain or are unable to even attempt

13  sex?  Are those equivalent to you?

14            MR. MORIARTY:  Object form.

15       A.    So -- so -- so --

16       Q.    Are those equivalent to you?

17            MR. MORIARTY:  He is trying to answer

18       your question.

19       A.    Let me clarify.  Again, dyspareunia is

20  historically very difficult for us to quantify.  It

21  is without -- obviously, you make a very simple

22  analogy.  Of course a woman who has very mild pain

23  is not the same as a woman who has, you know,

24  horrific pain with intercourse.

Gregory Bales, M.D.

1            So, there is a scale, of course, but my

2   point was when you are trying to compare and

3   discern whether it's from associated with a

4   hysterectomy or a native tissue repair or a mesh, I

5   think on balance those can be the same.  And that

6   was the question you asked me.  You didn't ask me

7   is dyspareunia from patient to patient exactly the

8   same.

9        Q.   But you answered dyspareunia is

10   dyspareunia.

11        A.   Meaning, again, that -- let me clarify

12   that.  Dyspareunia needs to be taken seriously, and

13   that's my only point, that when dyspareunia occurs,

14   it's something that if a person has pain with

15   intercourse, we need to take that seriously.

16            So, I don't -- I don't say, oh, it's

17   mild or major.  Dyspareunia is a serious problem

18   for a woman, and that's why if you have

19   dyspareunia, it's bad and it's something we will

20   try to correct.  That's the point I was trying to

21   make, and I probably didn't answer it very

22   articulately.

23        Q.   Dyspareunia may not always be bad; some

24   dyspareunia is very easy to treat, correct?

Gregory Bales, M.D.

1     A.    Yes, but it's still bad.  It may be easy

2   to treat, but it doesn't mean it's not bad.

3     Q.    Do women with vaginal atrophy ever have

4   severe, horrific vaginal pain with intercourse?

5          MR. MORIARTY:  Object.

6     A.    Yes.

7     Q.    That cannot be treated easily with local

8   estrogen therapy?

9     A.    That's the first thing we do with those

10   patients with atrophic changes, and very often that

11   can solve the problem, but not always.

12     Q.    Do you treat women with dyspareunia that

13   don't have a urologic source?

14     A.    Yes.

15     Q.    You treat women with atrophic vaginitis

16   when that's the only condition they are presenting

17   with?

18     A.    Yeah.  So, they typically would come see

19   me because maybe they had a kidney stone or they

20   have had a urinary tract infection, and then in

21   taking their history we find out they also have

22   dyspareunia.  We do a vaginal exam, and if they

23   have atrophic vaginitis, of course we treat it.

24          That's part of our history-taking and

Gregory Bales, M.D.

1    thorough physical exam.  There is no urologic cause

2    for dyspareunia.  I mean, bladder pain and

3    dyspareunia are slightly distinct, right, so

4    dyspareunia --

5         Q.    Or postoperative urologic surgery?

6         A.    Correct.

7         Q.    So, your opinion that the quality of

8    dyspareunia and vaginal pain that occurs after mesh

9    surgery is no different from that that can occur

10   with other prolapse surgery?

11        A.    Yes.  It may not be any different at

12   all.

13        Q.    And you are ignoring the dozens of

14   articles that would say something differently,

15   correct?

16             MR. MORIARTY:  Objection, form.  Go

17        ahead.  It's argumentative.

18        A.    I'm not sure they say anything a whole

19   lot differently.  There is papers that cite pain

20   and dyspareunia after any type of vaginal surgeries

21   and stuff; and certainly among those, as you stated

22   earlier, are papers now looking at experiences with

23   vaginal mesh procedures.

24        Q.    Can you cite any paper that would

Gregory Bales, M.D.

1    support your opinion that the pain associated with

2    vaginal mesh is no different -- and we are

3    considering all the factors, not that just that it

4    occurs.  Can you cite any paper that says that pain

5    that occurs after mesh procedure is no different

6    from that occurring with any other native tissue

7    repairs?

8         A.    I'm not sure there has been a

9    comparative study, so I can't say that.

10        Q.    It doesn't even have to be a comparative

11   study.  Has anybody offered an opinion that the

12   mesh pain after mesh surgery is no different when

13   you consider all the factors that we have talked

14   about, the native tissue repairs?

15            MR. MORIARTY:  Objection.  Go ahead.

16        A.    So, if I see a patient who has vaginal

17   pain and fibromyalgias and says she can't get near

18   her husband and she is on the verge of divorce and

19   she is coming to see me because she was told I'm a

20   pelvic floor reconstructive guy and what can I

21   offer her and that woman has never had vaginal mesh

22   surgery, any surgery, and she has horrific

23   dyspareunia that's affecting her marriage, that

24   woman's dyspareunia is no different than a patient

Gregory Bales, M.D.

1   who has had mesh and comes in and complains of the

2   exact same pain.

3        Q.    How many postmenopausal women do you see

4   with new onset of dyspareunia due to pelvic floor

5   myalgia?

6        A.    That would be hard for me to quantitate

7   the number.  A fair number.

8        Q.    When was the last time you saw someone,

9   new onset, menopausal, pelvic floor myalgia,

10  horrific dyspareunia, in your practice?

11       A.    Probably Monday.

12       Q.    I would like to see her records.

13            MR. MORIARTY:  Motion to strike.

14       Q.    You cited the Maher Cochrane reviews on

15  pelvic organ prolapse repairs in your paper?

16            MR. MORIARTY:  Are you talking about

17       in his report?

18            MS. THOMPSON:  In his report, sorry,

19       in your report, and the Cochrane 2016 review

20       of pelvic organ prolapse, and we can go ahead

21       and mark this.

22            (Bales Exhibit 21 was marked for

23              identification.)

24

Gregory Bales, M.D.

1   BY MS. THOMPSON:

2        Q.    And I'm just giving you the summary of

3   the review, and let's look at the key results.

4   The Cochrane review 2016 states that overall the

5   quality of the evidence ranged from very low to

6   moderate.  The main limitations were poor reporting

7   of study methods, inconsistency and imprecision,

8   correct?

9              MR. MORIARTY:  I'm sorry.  I hate to

10        stop you.  Could you tell me exactly where you

11        are reading?  Obviously you are on the last

12        page.

13             MS. THOMPSON:  The very last sentence

14        of the last page.

15             MR. MORIARTY:  Oh, you are under main

16        results.  I thought you said under key

17        results.

18             MS. THOMPSON:  That what I was reading

19        was just quality of the evidence on the last

20        page.

21   BY MS. THOMPSON:

22        Q.    Did I read that correctly, Dr. Bales?

23        A.    Yeah, I'm sorry.  I was on Page 2.  I

24   was reading under main results.

Gregory Bales, M.D.

1    Q.    Under quality of the evidence on Page 3,

2  "Overall the quality of evidence ranged from very

3  low to moderate.  The main limitations were poor

4  reporting of study methods, inconsistency and

5  imprecision."  Did I read that correctly?

6              MR. MORIARTY:  I object.  I don't know

7       where you are, what you are reading.  I don't

8       see a section called quality --

9              MS. THOMPSON:  Plain language summary

10      on the very last page.

11             MR. MORIARTY:  Okay.  So you are on

12      the fourth page of this document under now

13      "Quality of Evidence" at the very end?

14             MS. THOMPSON:  That's where I have

15      been the whole time.

16  BY MS. THOMPSON:

17     Q.    "Overall, the quality of the evidence

18  ranged from very low to moderate.  The main

19  limitations were poor reporting of study methods,

20  inconsistency and imprecision."

21             Did I read that correctly?

22     A.    Yes.

23     Q.    And did the authors conclude -- I'm back

24  on the previous page on author's conclusions.

Gregory Bales, M.D.

```
 1                  "The authors conclude that the

 2   risk/benefit profile means that transvaginal mesh

 3   has limited utility in primary surgery.  While it

 4   is possible that in women with higher risk of

 5   recurrence the benefits may outweigh the risk,

 6   there is currently no evidence to support this

 7   position."

 8                  Did I read that correctly?

 9        A.     You read it perfectly.

10        Q.     And in the last paragraph, "In 2011,

11   many transvaginal permanent meshes were voluntarily

12   withdrawn from the market and the newer lightweight

13   transvaginal permanent meshes still available had

14   not been evaluated within an RCT.  In the meantime,

15   these newer transvaginal meshes should be utilized

16   under the discretion of the ethics committee."

17                  Did I read that correctly?

18        A.     Yes.  You read it fine.

19        Q.     In 2016 the authors of the Cochrane

20   study, with Prolift having been on the market for

21   11 years and Gynemesh on the market for 16 years,

22   are stating that these meshes should only be

23   utilized under the discretion of an ethics

24   committee, correct?
```

Gregory Bales, M.D.

```
 1              MR. MORIARTY:  Objection.
 2      Q.    Is that not what the authors concluded?
 3      A.    The authors' conclusion says as you read
 4  them.  They state new or transvaginal meshes should
 5  be utilized under the discretion of the ethics
 6  committee.  That's what's written here.  And it's
 7  14 years with the Gynemesh, 2002 to 2016, 14 years.
 8      Q.    What did I say?
 9      A.    16.
10      Q.    I stand corrected.
11              MR. MORIARTY:  And you said like 11 to
12      12 for Prolift.
13              MS. THOMPSON:  Well, it was introduced
14      in 2005, so that would be 11.
15              MR. MORIARTY:  And taken off the
16      market in 2012.
17              MS. THOMPSON:  I intended to say 11
18      years after it was introduced to the market.
19      If I said 11 years of use, I am mistaken.
20      There are certainly women who have had it for
21      11 years.
22              We will mark this next as 22.
23                  (Bales Exhibit 22 was marked for
24                   identification.)
```

Gregory Bales, M.D.

1                    MS. THOMPSON:   I just have one copy of

2        this.

3   BY MS. THOMPSON:

4        Q.    And this is a paper by the same author,

5   Maher.

6        A.    Same author; what do you mean, same

7   author?

8        Q.    As the Cochrane review.

9        A.    Yes, okay.

10        Q.    And going to Page 4 of this article,

11   peer-reviewed article --

12        A.    Yes, ma'am.

13        Q.    These are the authors of the Cochrane

14   review that you cited in your paper, state the data

15   on transvaginal -- first of all, when was this

16   published?

17        A.    It looks like it was September 2013.

18        Q.    The authors state the data on

19   transvaginal mesh --

20        A.    Can we clarify where on the page are you

21   reading?

22        Q.    Page 4 of 8 at the top of page.

23        A.    At the top, okay.  After "FDA 2011"?

24        Q.    "The data on transvaginal mesh

Gregory Bales, M.D.

1    outcomes" --

2         A.    Yes.

3         Q.    -- "from these systematic reviews are

4    not as reassuring for the safety and efficacy of

5    transvaginal mesh as data presented from initial

6    case reports published by authors with a financial

7    COI..."

8              That means conflict of interest, right?

9              MR. MORIARTY:  Objection, form.

10        A.    That's what conflict of interest --

11        Q.    Does "COI" mean conflict of interest in

12   this context?

13        A.    Yes.

14        Q.    "...with the product being evaluated."

15             Did I read that correctly?

16        A.    Yes.

17        Q.    And then it discusses the FDA 2011

18   transvaginal mesh alert.  You are familiar with

19   that document, correct?

20        A.    Correct.

21        Q.    And it says, "Unfortunately," reading

22   that paragraph that starts, "Unfortunately, much of

23   the current data on POP surgery presented in our

24   systematic reviews fails to allay concerns outlined

Gregory Bales, M.D.

1    in the September 2011 FDA transvaginal

2    polypropylene mesh report that found the safety of

3    transvaginal meshes has not been established;

4    depending on the compartment, the efficacy of

5    transvaginal meshes has not been established to be

6    more effective than traditional repairs; vaginal

7    mesh from POP repair should be reclassified from

8    class II to class III to ensure premarket analysis

9    includes a non-mesh control arm; currently marketed

10   vaginal mesh products should undergo premarket

11   evaluation to better explain" --

12        A.    Postmarket.

13        Q.    Sorry.  Thank you.

14              -- "postmarket evaluation to better

15   explain the risk/benefit of mesh versus POP repair

16   without mesh; and safety and efficacy of mesh at

17   sacral colpopexy had been established."

18              Do you disagree with these conclusions

19   made by Maher, the author of the Cochrane reviews

20   on prolapse mesh use?

21        A.    Which specific ones?  The entire --

22        Q.    The ones I just read from this paper.

23              MR. MORIARTY:  Objection, form.  Go

24        ahead.

Gregory Bales, M.D.

```
 1        A.    Yeah, I have some disagreements on some
 2    of them.  I mean, basically, if you want, we can go
 3    over them one by one.  There is five bullet points.
 4             The safety of transvaginal meshes has
 5    not been established.  Well, there has been a
 6    wealth of studies on transvaginal meshes.  We have
 7    been talking about them in a number of the studies.
 8    So, I think the safety has been established, and we
 9    could argue about, you know, each of the papers,
10    but there is a lot of data out there, so --
11        Q.    So, you disagree, that the safety has
12    been established.  You disagree with the authors of
13    this paper and the Cochrane reviews, correct?
14        A.    That's a different question.  I thought
15    we were talking about this right now.
16        Q.    Well, I'm just saying since that's their
17    opinion in this paper, you would disagree with the
18    authors on that point, correct?
19             MR. MORIARTY:  Objection, asked and
20        answered.
21        A.    Yes.  I thought we would go point by
22    point.
23        Q.    And so you would disagree with the FDA
24    as well on that point, correct?
```

Gregory Bales, M.D.

1      A.    No.  I think -- well, the FDA report was

2    from 2011, and I think the FDA report in 2011 just

3    acknowledged that it was still early; and as you

4    know, with that FDA report, it's cited that there

5    is a variety of different complications that we

6    need to be aware of.  And to specifically this says

7    the safety has not been established, I mean, yes, I

8    would disagree.  If you have a lot of patients and

9    a lot of experience on safety, then to some degree

10   I would disagree; I think it has been established.

11   I think you have studies out there.

12      Q.    And do you disagree that depending --

13   the second bullet.

14      A.    Well, let's go through it.  "Depending

15   on the compartment the efficacy of transvaginal

16   meshes has not been established to be more

17   effective than traditional repairs."  I think there

18   is still, you know, better studies that need to

19   occur, but for sure there is conflicting results on

20   the effectiveness and whether transvaginal meshes

21   are better.  I would be fine with that, so, and as

22   it says, depending on the compartment there is a

23   lot of factors that, you know, like what specific,

24   whether you are doing rectocele, cystoceles, what

Gregory Bales, M.D.

1    have you.

2            Vaginal mesh repairs --

3        Q.    Another point.  But you will agree with

4    me, there is no studies that establish superiority

5    of vaginal mesh for effectiveness in the posterior

6    or apical compartments?

7                MR. MORIARTY:  Objection.  Go ahead.

8        A.    Yeah, there is not a lot of good head-to

9    head studies that suggest it's superior.

10       Q.    Are there any?

11       A.    There are studies that suggest it's

12   equivalent.

13       Q.    Not superior?

14       A.    Not superior.  "Vaginal mesh for pelvic

15   organ prolapse repair should be reclassified."

16   Again, I don't -- you know, that's sort of not my

17   area of knowledge base in terms of what goes into

18   the classification scheme, if you will, so I don't

19   have a good opinion on that.

20             "Currently marketed vaginal mesh

21   products should undergo a postmarket evaluation,"

22   that's okay, I mean, but I don't have a strong

23   opinion of that one way or the other.

24             And the last bullet point, "Safety and

Gregory Bales, M.D.

1   efficacy of mesh at sacral colpopexy had been

2   established."  As we stated, I mean, again, there

3   is a lot of data on sacral colpopexy, so I would

4   agree that has been established, but as I said, I

5   also would agree that the first point, there is at

6   least data now that has established to some degree

7   the safety and efficacy.

8           So, I hope that was clear.  I just

9   wanted to make sure you understood sort of --

10      Q.    Were there any studies when Prolift was

11  introduced in 2005 establishing safety and efficacy

12  of the device?

13      A.    Well, it was a new device, so I'm not

14  aware that again it was being trialed and such,

15  so...

16      Q.    So the answer would be no?

17      A.    So, no.

18      Q.    And finally, are you familiar with this

19  paper?

20              MS. THOMPSON:  And we will mark that

21      as Exhibit 23.

22              (Exhibit 23 was marked for

23                  identification.)

24

Gregory Bales, M.D.

1    BY MS. THOMPSON:

2         Q.    Are you familiar with this paper titled

3    "Vaginal Mesh Contraction, Definition, Clinical

4    Presentation and Management"?

5         A.    Yes.

6         Q.    And one of the two authors of this paper

7    is also the author of the Cochrane reviews that you

8    cited in your paper as well?

9         A.    Maher.

10        Q.    Maher.  Is it your opinion that vaginal

11   mesh contraction is not unique to vaginal mesh

12   devices?

13        A.    It is not -- say that again.

14        Q.    You've given the opinion that the only

15   complication unique to vaginal mesh devices is

16   exposure and erosion, and I'm asking you is vaginal

17   mesh contraction not unique to vaginal mesh

18   devices?

19        A.    I guess anything having to do with the

20   mesh itself is unique to the mesh.  We could argue

21   about the extent of contracture, if you will.  But

22   if the mesh changes at all, it's only going to

23   change if the mesh is present.  So, again, I'm not

24   sure that's a complication, but it's a behavior of

Gregory Bales, M.D.

1    the mesh.  Maybe that's more accurate.

2         Q.    Vaginal mesh contraction characterized

3    by severe vaginal pain, aggravated by movement,

4    dyspareunia in all sexually active women and focal

5    tenderness over contracted portions of the mesh on

6    vaginal examination, commonly involving the lateral

7    fixation arms, you have a question about whether

8    that's a complication or not?

9         A.    I don't have a question.  If the pain

10   exists, I have a question how much is specifically

11   due to contracture, which is what you were just

12   talking about.

13        Q.    Well, these authors are reporting

14   vaginal mesh contraction.  Do you question their

15   report?

16        A.    I mean, their report is their report.

17        Q.    And it certainly wasn't included in your

18   expert report, was it?

19        A.    It was not.

20        Q.    Vaginal mesh contraction characterized

21   by severe vaginal pain, dyspareunia in all women

22   and focal tenderness over contraction.  In fact,

23   you say it's not even established that mesh

24   contracts to any clinical significant degree;

Gregory Bales, M.D.

1    correct?

2         A.    That's what I said.

3         Q.    You certainly consider vaginal mesh

4    contraction a significant clinical condition,

5    correct?

6              MR. MORIARTY:  Objection.  Go ahead.

7         A.    I guess that we can argue about how much

8    and how relevant contracture, how much it occurs,

9    how well it's measured, and if that truly is

10   clinically significant.  Certainly these authors

11   feel that they felt some of the pain that they are

12   seeing is related to contracture.

13        Q.    And you are aware that there are dozens,

14   literally, of articles describing mesh contracture

15   and the clinical symptoms, primarily pain,

16   associated with it, correct?

17        A.    I'm aware that both those things exist,

18   and I'm certainly aware that mesh contractures

19   occur, just like mesh contractures occur in

20   inguinal hernias and ventral hernia and whatever,

21   yes.

22        Q.    Okay.  We are talking about vaginal mesh

23   contractions, right?

24        A.    Yes, and I'm aware that they contract a

Gregory Bales, M.D.

```
 1   little bit.

 2       Q.    A little bit?

 3       A.    Well, I don't think it's certain.  It's

 4   very unclear how much they contract.  It hasn't

 5   been -- it's not well-studied, in percentages and

 6   things like that.  But yes, that we can say it's

 7   safe to say vaginal meshes can contract.  I will

 8   certainly agree to that.

 9       Q.    Okay.  Well, you state in your report,

10   and I'm just questioning whether this is objective

11   and unbiased, that there is no medical literature

12   conclusively establishing that mesh contracts with

13   vaginal use to clinically significant degrees.

14             So, Maher's paper is not conclusive to

15   you that it occurs?

16             MR. MORIARTY:  Objection, form.  Go

17       ahead.

18       A.    Again, there is two different points you

19   are saying there.  We are saying that --

20       Q.    I first read your statement and then I

21   want to --

22             MR. MORIARTY:  Don't cut him off.  He

23       needs to answer your question.

24             MS. THOMPSON:  I apologize.
```

Gregory Bales, M.D.

```
1              MR. MORIARTY:  If you don't like the
2        answer, you can follow up.
3              MS. THOMPSON:  I'm just trying to get
4        through because I have three hours to cover
5        about 12 products.
6              THE WITNESS:  It contracts.
7              MR. MORIARTY:  Three, I believe.
8              MS. THOMPSON:  Anterior, posterior,
9        total, six, seven, eight.
10             MR. MORIARTY:  Prolift, Gynemesh PS.
11             MS. THOMPSON:  Prolift, anterior,
12       posterior, total, which he said was three
13       different products, Plus M.  Well, okay.
14       That's three products that would give me seven
15       hours.  Okay.  Go ahead.
16       A.    That meshes, and we are talking about
17  vaginal meshes, contract, to the extent of their
18  clinical relevance, I guess I'm not -- I'm not --
19  I'm not convinced that we have a good understanding
20  of the clinical relevance.
21       Q.    So in the literally dozens of papers
22  that talk about contraction, retraction, shrinkage,
23  you are not convinced that that's a clinically
24  significant condition?
```

Gregory Bales, M.D.

1        A.      I'm not convinced that in all those

2    patients it's simply -- it's as simple as saying a

3    little contraction occurred, and that's what's

4    causing all the pain.  I think that it's not very

5    well defined.  That's my opinion.

6        Q.      Okay.  The one paper you did out of the

7    literally dozens of papers that discussed this,

8    including the FDA, as a clinically significant

9    condition that is unique to mesh, the one paper you

10   selected to include in your expert report is Dietz.

11   My question is --

12       A.      So you are happy with this one, that I

13   included this one?

14       Q.      Oh, let's talk about this one.

15       A.      Okay.  Please.

16       Q.      Did you find this paper on your own or

17   were --

18               MR. MORIARTY:  Is this marked?

19               MS. THOMPSON:  Let's mark that as the

20       exhibit next.

21               (Bales Exhibit 24 was marked for

22                identification.)

23   BY MS. THOMPSON:

24       Q.      My question, first of all, is this a

Gregory Bales, M.D.

1    paper you found on your own literature search, or

2    was this something that was furnished to you by

3    defense counsel?

4         A.    I don't recall.  I think I found it on

5    my own.

6         Q.    And this is the one you chose out of

7    dozens, if not hundreds, of articles that discuss

8    mesh shrinkage, contraction, retraction and the

9    clinical significance, correct?

10              MR. MORIARTY:  Objection, form.

11        A.    This is one that's cited in my Herrera

12   report.

13        Q.    Let's look at this report from 2011.

14   You are aware that Dr. Dietz is a consultant for

15   mesh manufacturers, correct?

16        A.    Yes.  Well, I'm just reading it.

17   Actually, I didn't remember that, but I'm reading

18   underneath on the first page here.  It says he has

19   acted as a consultant for various vendors, so yes,

20   I guess he is.

21        Q.    And Dr. Dietz used translabial

22   ultrasound in this study, correct?

23        A.    Correct.

24        Q.    Wouldn't that transvaginal ultrasound be

Gregory Bales, M.D.

1    more accurate in assessing mesh in the pelvic

2    floor?

3         A.    You know, I don't do translabial

4    ultrasounds, so I'm not sure how well it penetrates

5    to be able to assess it.  I'm assuming that whether

6    it is translabial or transvaginal, they were able

7    to get dimensions, but I don't know enough about

8    translabial ultrasound.

9         Q.    Aren't most of the papers that you've

10   seen or have you seen any looking at ultrasound to

11   assess mesh shrinkage using transvaginal

12   ultrasound?

13        A.    Yes.  Loyola has published some papers

14   here in Chicago, Dr. Mueller.  So, yes, I'm aware

15   of that technique, and there has been some reports

16   on that.

17        Q.    And Dr. Dietz did the first scan in his

18   paper at a minimum of three months, so the first

19   scan was done three months following the placement

20   of the surgery -- the placement of the mesh,

21   correct?

22        A.    It looks like the study design, it was

23   between 3 and 52 months.

24        Q.    And it's true that folding, wrinkling,

Gregory Bales, M.D.

 1    crumpling of mesh is often the explanation for the

 2    phenomenon of mesh contraction, correct?

 3         A.    So it folds and that causes the

 4    contractures?  Repeat the question.

 5         Q.    Is it you are not aware of the folding

 6    and wrinkling of the mesh causing the reduction in

 7    size of the mesh tissue complex?  You are not aware

 8    of that phenomenon?

 9         A.    I'm not aware that a fold then causes it

10    to contract per se, no.

11         Q.    But at three months, you will agree with

12    me that the mesh is already encased in tissue or

13    scar, correct?

14         A.    Yeah.  It might still be going on to

15    some degree.  I mean, obviously it's an evolving

16    process and there might still be scar tissue being

17    laid down.

18         Q.    But you will agree with me if you are

19    looking at mesh shrinkage, you don't start after

20    three months; you start at when the device was

21    placed because the majority of the shrinkage is

22    going to occur before implant of tissue, correct?

23         A.    I don't know that.  I don't know if we

24    know that.

Gregory Bales, M.D.

```
1        Q.    So you don't know that, all right.

2        A.    I don't know if anybody knows that.

3        Q.    Let's look at the results.

4        A.    That's why this study was being done.

5        Q.    Okay.  Let's look at the results.

6              18 of 40 at this followup, 45 percent,

7   considered themselves cured.  Are those good

8   results?

9        A.    Can I find where you said what

10  specifically the -- in the results?

11       Q.    18 on Page e3, 18 of 40 considered

12  themselves cured at this followup, 45 percent.  Are

13  those good results for outcomes?

14             MR. MORIARTY:  Objection, form.

15       Q.    Are those good results?

16       A.    That sentence reads 18 to 40 considered

17  themselves cured and 18 of 40 felt improved, so if

18  36 out of 40 felt cured or improved, that's pretty

19  good results.

20       Q.    I asked about 18 of 40 considered

21  themselves cured; is that a good result?

22             MR. MORIARTY:  Objection.

23       A.    Well, you can't -- you can't -- you

24  can't ask it like that, counselor.
```

Gregory Bales, M.D.

1      Q.    I can ask it any way I want to,

2  Dr. Bales.

3      A.    True.

4      Q.    I was going to ask you about the 18 out

5  of 40 later that felt improved, but 18 of 40

6  consider themselves cured; would you consider that

7  a good result?

8           MR. MORIARTY:  Objection, asked and

9      answered.

10          MS. THOMPSON:  Okay.  We will just

11     take your answer then.

12     A.    Don't you see, if 18 of the 40 were

13  cured and everybody else was worse, that wouldn't

14  be a good result, but if 18 out of 40 are cured and

15  another 18 are improved, that's 36 are cured or

16  improved.

17          I don't know what the scale they were

18  using, so that's funny you are asking me these

19  questions that are sort of taken out of context.  I

20  can't give a simple yes-or-no answer.  So, I think

21  it is important.  I guess you want it to be

22  accurate, right?  You want my responses to be

23  accurate, so we should -- we should -- we should

24  probably allow me to explain.

Gregory Bales, M.D.

1    Q.    Okay.  So let's clarify this a little

2   bit.  The objective prolapse recurrence rate, 16 of

3   40, 40 percent, in this study, would that be a good

4   result?  Objective prolapse recurrence, 40 percent

5   in this study, correct?

6    A.    Correct.

7    Q.    Subjective recurrent lump, 27.6 percent,

8   correct?

9    A.    2.5 times 11, okay.  Yes, that's what

10  they are reporting.

11   Q.    And the authors state that folding or

12  warping of the mesh during or immediately after

13  implantation could occur, correct?

14   A.    Where are you reading that?

15        If you pick out this sentence in the

16  middle of the paper, I don't know how to answer

17  your question.  You've got to tell me where you are

18  reading it.

19   Q.    "One small longitudinal study suggested

20  that most of the difference between in vitro and in

21  vivo mesh dimensions was due to surgical technique,

22  i.e., folding and warping of the mesh during or

23  immediately after implantation."

24        Did I read that correctly on Page e3?

Gregory Bales, M.D.

```
 1        A.     Where on e3 are you reading it?

 2        Q.     Last full paragraph.

 3               "One small longitudinal study suggested

 4   that most of the difference between in vitro and in

 5   vivo mesh dimensions was due to surgical technique,

 6   i.e. folding and warping of the mesh during or

 7   immediately after implantation."

 8               MR. MORIARTY:  And what's your

 9       question?

10       Q.     My question is, if folding and warping

11   of the mesh occurred during or immediately after

12   surgery, it would not be depicted as a change in

13   the dimensions of the mesh when the first scan is

14   done at three months, correct?

15       A.     I don't know.

16       Q.     You don't know?  If it occurs

17   immediately after surgery would you be able to tell

18   the difference if the first scan is done at three

19   months?

20       A.     I mean, I don't know enough about the

21   sensitivity of that or how -- again, I just don't

22   have a whole lot of familiarity with translabial

23   ultrasound to say.

24       Q.     Well, this is the one study you picked
```

Gregory Bales, M.D.

1    out of all the dozens, hundred studies describing

2    shrinkage of mesh.  I'm just asking you opinions on

3    why this was the conclusive study or whether it

4    just supported --

5         A.    I mean, it was one of the studies.

6         Q.    What you --

7         A.    All the studies -- again, there is a

8    body of literature and you have to pick out certain

9    studies, and so this is one of the ones that was

10   included.  I mean, there is --

11        Q.    So of all the dozens and every single

12   other study conclusively shows that mesh shrinks,

13   this is the one that you picked?

14             MR. MORIARTY:  Objection, form.  Go

15        ahead.  Argumentative.  You just want to argue

16        with him all day.

17        A.    I don't think there was a question

18   there.  This is the study I picked.

19        Q.    What is the dimension of the Perigee

20   that was used in this study when it was inserted?

21   Or if you will take my word for it, it's 5 by 3.7

22   centimeters.  Does that sound right?

23        A.    So, it's in the materials and methods.

24   Your Perigee was I guess an American Medical

Gregory Bales, M.D.

1    Systems product.  This isn't even an Ethicon

2    product.  Sure, I would believe this.  They

3    describe that.  I guess they measured it, and it's

4    5 by 3.7 centimeters.

5        Q.   Well, you chose the paper about Perigee,

6    not me, right?

7             MR. MORIARTY:  Objection,

8        argumentative.  What does that have to do with

9        anything?

10            MS. THOMPSON:  Well, he was

11       questioning that it wasn't even an Ethicon

12       product, and I was just bringing to his

13       attention that he was the one that picked a

14       non-Ethicon paper when there were other

15       Ethicon papers he could have chosen.

16            MR. MORIARTY:  I thought you were

17       asking about the dimensions of the Perigee.

18            MS. THOMPSON:  I am.

19   BY MS. THOMPSON:

20       Q.   Now, if you go to the chart on Page e3

21   giving the dimensions, the lower mesh margin.

22       A.   Table 1 or Table 2?

23       Q.   Table 1.  And the mesh link, those

24   measurements are significantly different, smaller

Gregory Bales, M.D.

1    than 5 by 3.7, correct?

2         A.    So, the coronal mesh diameter was 3.71

3    and then 3.77, so that actually is I think just the

4    same as the 3.7.  Is that --

5         Q.    Well, the lower mesh margin would be the

6    width, correct, and the mesh length would be the

7    length, correct?

8              And you get something like 1, between 1

9    and 1.45 for the width and you get 3.28 to 3.41 for

10   the length, correct?  I'm just reading numbers.

11        A.    I apologize.  We are going to have to go

12   off the record for a second.  I need to look at

13   this.  I haven't familiarized myself with this in a

14   little while, and you are asking me all these --

15        Q.    Are the numbers 1 and 3.4 less than 3.7

16   and 5?

17        A.    I can't answer any questions about it.

18   If you can give me a few minutes to read this over.

19        Q.    So this was a paper you chose, but you

20   are not at this time able to answer any questions

21   about the dimensions?

22        A.    The very detailed, specific questions

23   you are asking about one of the 50 papers that I've

24   cited, I want to answer your questions --

Gregory Bales, M.D.

1        Q.    Excuse me.

2              MR. MORIARTY:  Stop cutting him off,

3        please.  Even the court reporter has told you

4        to stop it.

5              MS. THOMPSON:  I'm sorry.

6        A.    I want to answer your questions

7   accurately, and if you want to get into the minutia

8   of this little paper, which, again, it was cited

9   and so I'm perfectly willing to do it, but you are

10  going to have to give me a minute to better

11  understand it, because this is a paper that was on

12  something that I don't typically do and while the

13  other papers I'm much more familiar with because I

14  do the surgeries, I don't do the ultrasounds, and

15  you are asking me about numbers and how they were

16  interpreted.  I need a few minutes to look it over.

17  I can do that, if you want.

18       Q.    I don't want to spend the time because

19  my time is so limited, but you certainly would need

20  time to understand this paper, the one paper that

21  you cited on shrinkage, correct?

22       A.    I would need a lot of time, but you are

23  asking me again how to interpret their tables and

24  how the dimensions were being measured, and I need

Gregory Bales, M.D.

1    a few minutes to read over their methods.  I'm

2    happy to do that.

3         Q.    It's only a four-page paper, right?

4         A.    You are the one who says we don't have

5    time.  I have plenty of time.

6         Q.    Let's go ahead and look at some

7    shrinkage information on Ethicon products.  Okay?

8         A.    Okay.

9              MS. THOMPSON:  We will mark this as

10   25.

11              (Bales Exhibit 25 was marked for

12                 identification.)

13   BY MS. THOMPSON:

14        Q.    And I'm looking specifically at the

15   abstract 157 by the authors Letouzey and De Tayrac,

16   among others.  Are you aware that these authors are

17   part of the TVM group in France?

18        A.    Yeah.  I think I recognize the

19   Levaillant.  I'm not perhaps pronouncing that, the

20   Levaillant name.

21        Q.    And this study actually used Gynemesh,

22   correct?

23        A.    Yes.

24        Q.    And it was placed under the bladder in a

Gregory Bales, M.D.

1    tension-free procedure, correct?

2         A.    Correct.

3         Q.    And the results of this study showed

4    that ultrasound evaluation reconstruction has been

5    shown to -- a typo -- has been showed a mean

6    contraction of 30 percent, 65 percent, 85 percent

7    at a mean followup of 3 years, 6 years and 8 years

8    respectively, correct?  Did I read that correctly?

9         A.    Yes.

10        Q.    85 percent at 8 years is certainly not

11   any clinically significant degree, as you stated in

12   your report, is it?

13        A.    Well, you know, it is interesting.  If

14   we read just a little further, there was no

15   significant correlation between mesh position and

16   clinical outcomes.  So actually, it seems to

17   indicate by their results that while it's

18   contracted, it hasn't affected outcomes.  So, I

19   guess it's not clinically significant if you

20   believe this one abstract.

21        Q.    Did the mesh shrink in this abstract by

22   Dr. Tayrac?

23        A.    Well, according to the ultrasound

24   measurements, you just stated the numbers,

1    30 percent, 65 percent, et cetera.

2              MS. THOMPSON:  We will mark this as

3         Exhibit 26.

4              (Bales Exhibit 26 was marked for

5              identification.)

6    BY MS. THOMPSON:

7         Q.   Did you look at any Ethicon documents

8    regarding mesh shrinkage and the clinical

9    significance?

10        A.   Yes, I looked at some documents.

11        Q.   Did you look at this document that I

12   just marked as Exhibit 26 that says, "Mesh

13   shrinkage:  How to assess, how to prevent, how to

14   manage?" by authors Velemir, Fatton and Jacquetin,

15   also part of the TVM investigating group on

16   Gynemesh and Prolift?  Have you seen this document?

17        A.   I may have.

18        Q.   Go ahead and look through it, if you

19   would like, and let me know when you are ready.

20        A.   Well, I don't know what to be ready for,

21   so I'm not sure if I'm ready.

22        Q.   I want to ask you some questions, but I

23   will direct you to the right place.

24        A.   When you don't know what to expect, it

Gregory Bales, M.D.

1    is hard to know if you are ready.

2         Q.    Fair enough.  And this entire document,

3    it looks like it was a workshop, is postoperative

4    specific complications following transvaginal mesh

5    repair of pelvic organ prolapse, etiology,

6    prevention and management; and the entire -- I

7    don't know how many pages it is but it's long -- is

8    about mesh shrinkage, correct?

9         A.    I don't know.  I didn't have time to go

10   through every single page just now.

11        Q.    Well, the title is "Mesh Shrinkage," so

12   you can probably assume that the document is about

13   mesh shrinkage, right?

14             MR. MORIARTY:  Your question was

15        whether every page of the thing was about mesh

16        shrinkage, so don't get frustrated by his

17        answer when he hasn't assessed because I'm

18        looking at the third page and it isn't about

19        shrinkage.  So, I understand your frustration,

20        but if your question is going to be that

21        way...

22   BY MS. THOMPSON:

23        Q.    Okay.  Let's just go through several of

24   these pages.  All right.  It gives a definition of

Gregory Bales, M.D.

1    mesh shrinkage on page -- the second page,

2    reduction of the mesh area after tissue

3    incorporation, correct?

4         A.    That's what it lists as the definition.

5         Q.    And it also says it's often associated

6    with mesh thickening and folding, correct?

7         A.    That's the third bullet point there,

8    yes, often associated with mesh thickening and

9    folding.

10        Q.    Would you disagree that mesh shrinkage

11   is often associated with mesh thickening and

12   folding?

13        A.    That hasn't been my experience.

14        Q.    So you would disagree with Ethicon that

15   mesh shrinkage is often associated with mesh

16   thickening and folding?

17             MR. MORIARTY:   Objection, objection to

18        form.

19        Q.    You can answer.

20        A.    It hasn't been my experience that I have

21   seen in my own patients a lot of mesh thickening

22   and folding, so I don't know who I'm disagreeing

23   with, but you asked me what my opinion is, and I

24   haven't seen that.

Gregory Bales, M.D.

1    Q.    And do you have any peer-reviewed

2 literature that would tell you that mesh shrinkage

3 is not associated with mesh thickening and folding?

4    A.    I guess we will have to go through and

5 find some literature.  Again, there is lots of

6 literature that there is mesh contraction, but

7 specifically regarding the folding and how the

8 folding is measured, I'm not aware of any

9 literature telling me that or showing me that or

10 quantifying that.

11    Q.    I'm asking are you aware of literature

12 that says it's not associated with thickening and

13 folding, not that it is.

14         MR. MORIARTY:  Objection, asked and

15     answered.

16    Q.    Two different questions.

17    A.    I guess I'm not sure that there is

18 literature specifically talking about the folding

19 and the thickening.

20    Q.    Okay.  Would you agree that mesh

21 shrinkage is well-documented in animal studies with

22 a range of 15 to 65 percent?

23    A.    Yes, there is animal studies that show

24 that.  I would agree with that statement.

Gregory Bales, M.D.

1          Q.     Would you agree that mesh shrinkage is a

2     phenomenon experienced by abdominal surgeons?

3          A.     When using mesh for what procedures?  So

4     use mesh for ventral hernias, for instance, or what

5     specifically?

6          Q.     I'm just reading.  Do you agree with the

7     statement from Drs. Velemir, Fatton and Jacquetin

8     of the TVM group in France investigating Gynemesh

9     and Prolift that mesh shrinkage is a phenomenon

10    experienced by abdominal surgeons?

11         A.     Well, I guess I don't disagree, I don't

12    agree.  I'm not sure what they are referring to

13    there, so I don't want to just --

14         Q.     So you can't answer that question?

15         A.     Again, let me finish.  As a blanket

16    statement I just want to say I agree.  I'm just not

17    sure what they are referring to.

18         Q.     And do you agree with the statement that

19    mesh shrinkage is a phenomenon which has become a

20    rising concern in urogynecology since the

21    widespread use of vaginal mesh?

22         A.     I think it's a concern for

23    urogynecologists, urologists.  Anybody who is using

24    vaginal mesh, it would be a concern.

Gregory Bales, M.D.

1    Q.    Except it's your opinion that it has not

2  been shown that vaginal mesh contraction is of any

3  clinical significance, correct?

4    A.    Right.  That's a different question,

5  right.  So, we are always concerned about these

6  complications and risks and whether or not there is

7  any clinical significance.  It's my opinion right

8  now that I'm not sure what the clinical

9  significance is.

10    Q.    Well, you said you don't believe there

11  is clinical significance, correct?

12    A.    Correct.

13    Q.    All right.  So it hasn't been a --

14    A.    For instance -- just let me finish.  For

15  instance, the previous exhibit indicated that there

16  was again that mesh contracture but no difference

17  in clinical outcome.  So, that's a prime example of

18  what I believe, so, anyway...

19    Q.    Well, you said that contraction hasn't

20  been conclusively established?

21    A.    Contraction.

22    Q.    Going to the next page, what did we

23  learn from abdominal wall repair studies?

24        "Several complications associated with

Gregory Bales, M.D.

1  the use of mesh may be due to chronic inflammatory

2  reaction to the mesh or a loss of compliance after

3  degradation of the material."

4          Do you agree or disagree with that

5  statement by these authors, published by Ethicon?

6              MR. MORIARTY:  Objection, form.

7              I'm sorry.  Did you say published by

8      Ethicon?  There is nothing that says this is

9      an Ethicon document.  It's from some IUGA

10     seminar.

11             MS. THOMPSON:  I apologize.  By the

12     authors that were the Ethicon investigators of

13     the Gynemesh and Prolift products.

14  BY THE WITNESS:

15     A.    It would be nice to see it in the

16  context, but basically complications -- let's read.

17  The bullet point says several complications may --

18  may be due to chronic inflammatory reaction to the

19  mesh or loss of compliance.

20          So, I guess I would agree with that,

21  although it would be nice to know specifically in

22  what context they are talking about and what -- you

23  know, in what type of surgeries and what have you,

24  but on balance I guess I would agree with that

Gregory Bales, M.D.

1    statement.

2    BY MS. THOMPSON:

3        Q.    And actually going to the bullet point

4    above that, mesh repair reduces the rate of

5    recurrence compared with traditional suture repair

6    and works by both direct mechanical sealing,

7    sublay, and induction of a scar plate formation.

8              Do you agree with the statement that

9    mesh repair induces a scar plate formation?

10       A.    I -- yeah, I agree with that statement

11   100 percent.  For abdominal wall repairs,

12   mechanical sealing, right, the synthetic, the mesh

13   is there and also scar happens and further

14   reinforces the repair.  I agree with urethra.

15       Q.    Is a scar plate a good thing to have in

16   the vagina?

17             MR. MORIARTY:  Objection.  Go ahead.

18       A.    Well, I'm not sure exactly I guess what

19   the difference is between a scar and a scar plate,

20   right.  I guess it's kind of maybe a poor term.  I

21   think scarring is something that occurs after we do

22   surgery.  So, obviously, less scarring is better

23   than more scarring, but again, I'm not sure what we

24   mean by a scar plate.

Gregory Bales, M.D.

1        Q.     You are not familiar with the term "scar

2    plate" used in mesh literature extensively?

3        A.     I'm very familiar with the term.  I'm

4    just not sure how it differs from just a scar and

5    what it conveys in terms of the size of the scar

6    and the thickness of the scar, any of that.  Again,

7    it's not a very good term in terms of what it

8    conveys.  So, I say you have a scar plate.  What

9    does that mean?  You have a 1 centimeter, you have

10   a 5 centimeter scar?

11       Q.     So you don't know what the term "scar

12   plate" means?

13       A.     I think I just indicated that I know

14   exactly what a scar plate is.  A scar plate is

15   simply just a scar, and there is no absolute

16   literature saying what the -- it's not a good term

17   because it doesn't mean any specific size or

18   thickness or anything.

19              So, I'm familiar with the term, we use

20   the term a lot, but it doesn't necessarily indicate

21   the size of the scar or what significance it may

22   have clinically.

23       Q.     So is it your opinion that "scar" and

24   "scar plate" mean the same thing?

Gregory Bales, M.D.

1      A.    Yes.

2      Q.    And then mesh shrinkage, and again we

3  are talking about what did we learn from abdominal

4  wall repair studies.  "Mesh shrinkage folding and

5  migration may result in some cases in a recurrent

6  hernia and also pain," do you agree or disagree

7  with that statement, that mesh shrinkage folding

8  and migration may cause pain?

9           MR. MORIARTY:  Objection, form.

10     A.    I don't agree or disagree.

11     Q.    You don't agree or disagree?  You can't

12  answer the question whether shrinkage, folding and

13  migration can cause pain?

14     A.    Well, I suppose if it says "may," I

15  suppose it could.  Again, I would need to know the

16  clinical context.  It's such a generic thing, mesh

17  migration.  So if the mesh moves a little bit, it's

18  going to cause pain.  If you put mesh in somebody,

19  they can get pain. I guess I'm not sure how to

20  answer that.

21     Q.    So you have trouble answering the

22  question of whether you agree with the statement by

23  these authors that mesh shrinkage, folding,

24  migration may cause pain?

Gregory Bales, M.D.

```
1              MR. MORIARTY:  Objection, form.  Go

2       ahead.

3       A.    I have trouble not knowing specifically

4  what they are referring to.  I don't want to make a

5  blanket statement yes.

6       Q.    Okay.  Let' go to the next page.

7              MR. MORIARTY:  Time for a break,

8       unless you have to get to that next page

9       before the break.

10             MS. THOMPSON:  No, I don't have to get

11      to the next page.

12             MR. MORIARTY:  I think you have an

13      hour left.

14             MS. THOMPSON:  I will be fine with an

15      hour.

16             (Recess taken, 11:02 - 11:16 a.m.)

17  BY MS. THOMPSON:

18      Q.    Dr. Bales, let's go to the -- I think

19  it's the next page, "What is specific to vaginal

20  surgery?"  And these authors state, "Poor knowledge

21  of the vagina in vivo response to the materials."

22  Do you agree or disagree that there is poor

23  knowledge of the vaginal in vivo response to the

24  materials?
```

Gregory Bales, M.D.

1    A.    Oh, I think we are learning more and

2    more.  I don't know exactly what the timeframe was

3    on this, but for sure it's newer, right, that we

4    are putting these materials into the vagina, so I

5    think we have an evolving knowledge.  I guess that

6    would be more correct to say.

7    Q.    When the Prolift was on the market,

8    Gynemesh and Prolift for transvaginal use, was

9    there poor knowledge of the vaginal in vivo

10   response to the materials?

11   A.    I think there was limited knowledge.

12   Q.    So you take exception with the word

13   "poor" but agree that it was limited?

14   A.    I would use the term, yeah, "limited."

15   I wouldn't be comfortable saying "poor."  It is

16   limited.

17   Q.    Do you agree that the vagina has an

18   important vascularity and endogenous microflora

19   that may have an impact on host tissue response and

20   biomechanical properties of grafts used in pelvic

21   reconstructive?

22   A.    Yeah, I agree with that 100 percent.

23   Q.    Going to the next page, "What do we

24   observe with mesh repair in our field?"  And the

Gregory Bales, M.D.

1   statement is "Mesh shrinkage may be associated

2   with," bullet points, "stiffness/tenderness at

3   vaginal examination."  Would you agree with that?

4              MR. MORIARTY:  Objection, form.  Go

5      ahead.

6      Q.   Would you agree with mesh shrinkage may

7   be associated with stiffness and tenderness at

8   vaginal examination?

9              MR. MORIARTY:  Same objection.

10     A.   I guess I would agree.  May be

11  associated, I guess I could agree with that

12  statement.

13     Q.   Would you agree that mesh shrinkage may

14  be associated with discomfort, pain during

15  intercourse?

16             MR. MORIARTY:  Same objection.

17     A.   I guess I would just underscore again

18  that I don't know how easy it is to determine

19  whether mesh shrinkage is what's causing discomfort

20  and pain after intercourse, so that's why.  So, I

21  guess may, may be associated, sure.  I guess I

22  could on balance say that's okay.

23     Q.   And you certainly agree that there are

24  many papers where the authors are able to make the

Gregory Bales, M.D.

1    connection between the shrinkage, retraction,

2    contraction and pain; you just are not able to,

3    correct?

4              MR. MORIARTY:  Objection, form.  Go

5         ahead.

6         A.    Yes, I'm not able to.

7         Q.    Do you agree with the statement mesh

8    shrinkage may be associated with pelvic pain?

9              MR. MORIARTY:  Same objection.

10        A.    I think it was the same thing we said

11   before.  There is -- when patients have pain,

12   specifically the mesh being possibly shrinking or

13   is shrinking, is that the cause of the pain, I

14   guess it can be hard to say.  So, that's my only

15   concerning about making that blanket statement.

16        Q.    Do you agree or disagree with the

17   statement mesh shrinkage may be associated with

18   urinary or defecatory dysfunctions?

19             MR. MORIARTY:  Same objection.

20        A.    I -- yeah, I guess I'm not sure if the

21   mesh -- yeah, I guess I'm not prepared to say mesh

22   shrinkage causes urinary or defecatory dysfunction,

23   so no.

24        Q.    Do you disagree or agree with the

Gregory Bales, M.D.

1    statement mesh shrinkage may be associated with

2    prolapse recurrence?

3              MR. MORIARTY:  Form objection.  Go

4         ahead.

5         A.    I would say that mesh shrinkage or mesh

6    loosening, so yes, I would agree with that, could

7    be associated with prolapse recurrence.  I would

8    say yes to that statement.

9         Q.    And these authors cite three papers to

10   support the statements that they make on this page

11   of this presentation, correct?

12        A.    I guess.  I mean, it looks like these

13   are slides, right?  I mean, again, it seems to me

14   that maybe this was IUGA, right.  It was at a

15   meeting and these are just copies of slides, I

16   think, so these obviously are the papers they cite.

17   I would have to go back through those papers are,

18   but sure, it looks like they are giving those

19   citations.

20        Q.    Yeah, and my question was just the

21   authors cite three papers.

22        A.    Citations are definitely there.

23        Q.    And I'm using the word "presentation" on

24   when we are talking about this document, if that's

Gregory Bales, M.D.

1  acceptable to you.

2      A.    That's what it seems like it is.

3      Q.    I actually counted approximately 25

4  articles cited in this presentation by these three

5  authors, correct?  Would you agree that's something

6  in that neighborhood from your perusing the

7  document?

8      A.    I would believe you if you said you

9  counted them and there is 25.

10     Q.    I said approximately, so don't hold me

11  to an exact number either.

12          Okay.  The next page, "Why does mesh

13  shrinkage happen?"  The bullet points, "An unclear

14  etiology" is the first one.  The second is

15  "Shrinkage should not be considered as a

16  complication of the biomaterial but as a

17  consequence of the incorporation of the mesh to a

18  scar tissue," and the third, "Biomaterials, even

19  polypropylene, are not inert" with a exclamation

20  point.

21          Do you agree with these authors who gave

22  these three bullet points as why does mesh

23  shrinkage happen?

24              MR. MORIARTY:  Objection, form.

Gregory Bales, M.D.

1      A.    Again, there is three.  Mesh shrinkage,

2 they say it's unclear, there is an unclear

3 etiology.  I agree with that.

4           Shrinkage should not be considered a

5 complication of the biomaterial but more

6 incorporation of the mesh to scar tissue, I guess I

7 would agree with that, although I think they --

8 they -- they cite their first bullet point that

9 there is an unclear etiology and then they say,

10 well, it's because of this.  So, I think it's still

11 perhaps a little bit unclear.

12          And biomaterials, even polypropylene, I

13 would not agree are not insert.  They cause some

14 response, some host response.

15     Q.    On the next page, histological sequence

16 after mesh incorporation, and it gives basically a

17 pathological process by which it happens, correct?

18     A.    They discuss, right, how a immune

19 response occurs, there is inflammation and then

20 some of the wound contracture; yeah, they do.

21 That's what the slide is.

22     Q.    And there are two articles cited on this

23 page as well, correct?

24     A.    Yes.

Gregory Bales, M.D.

1    Q.    It says mesh contraction essentially

2    takes place during the first two months, correct?

3    A.    That's what it says here.

4    Q.    So, if this were true, the Dietz paper

5    who looks at shrinkage or contraction beginning at

6    three months would not provide very much

7    information on any shrinkage or contraction that

8    takes place in the first two months, correct?

9          MR. MORIARTY:  Objection.

10   A.    Well, it might still be beneficial

11   because, remember, they knew the starting point

12   incident, and if the contraction occurs in the

13   first two months, it's not going to re-expand.

14   So, if you look at it at any point after two

15   months, you will still be able to determine that

16   the contracture occurred, so it may still provide

17   very valuable information.

18   Q.    Well, you understand that the Dietz

19   paper took two points in time; the first point was

20   after three months and the second point was

21   sometime after three months?

22   A.    Some time after that, correct.

23   Q.    So you are not going to detect any

24   shrinkage that occurs in the first two months, are

Gregory Bales, M.D.

1   you, doing it in that method?

2          MR. MORIARTY:  Objection, asked and

3      answered.  Go ahead.

4      A.    Yes.

5          MR. MORIARTY:  He just gave you an

6      answer to that very question.

7      A.    In a perfect world it would be nice if

8  you had the preoperative measurements and then

9  sequential and serial measurement at two weeks,

10  four weeks, six weeks, and you could really learn a

11  little bit about that.

12          So, I'm not immediately familiar with

13  these two citations, so I can't know how they

14  decided that the mesh contraction, what data they

15  have to support that it occurs essentially in the

16  two first two months.

17      Q.    Okay.  And I didn't ask you about the

18  data that they have, but if you assume that mesh

19  contraction essentially takes place during the

20  first two months, as stated in this presentation,

21  then a study that has their first point after three

22  months and compares it with another point past the

23  three months wouldn't be able to tell you anything

24  about the contraction that takes place in the first

Gregory Bales, M.D.

1   two months, would it?

2          MR. MORIARTY:  Objection, asked and

3      answered.  Go ahead.

4      A.    That's a tremendous "if," right?  But

5   sure, if you are looking for an event and if the

6   event happened before you are looking for it, you

7   are not going to be able to tell.

8      Q.    Okay, all right.  Thank you.

9          And the patients -- the authors state,

10  "However, some observations support the idea of a

11  chronic inflammation which persists several years."

12  Do you agree with that statement?

13     A.    It's such a vague statement I'm not sure

14  how to agree or disagree.  Some observations, what

15  observations?  I don't know what they are talking

16  about, so I don't want to agree or disagree.

17     Q.    Let's go to the page that says "How to

18  assess mesh shrinkage?  Clinical assessment."

19     A.    Okay.  I'm on that page.

20     Q.    And one is "Transvaginal palpation of

21  the mesh."  Do you agree that transvaginal

22  palpation of the mesh is a method to assess mesh

23  shrinkage?

24     A.    It's certainly a method that's used.  I

Gregory Bales, M.D.

1    agree with that.

2         Q.    What is VAS of a vaginal pain?

3         A.    That stands for visual analog scale.

4    Typically you have a scale oftentimes from 1 to 100

5    and you ask a patient to put in a notation, zero

6    being no pain, 100 being I guess the most severe

7    pain you've ever had and they mark it on a piece of

8    paper, and that's how you measure it then, so it's

9    graded 30, 60, 90, depending on that scale.  So,

10   that's what a VAS scale is.

11        Q.    And do you agree that VAS of vaginal

12   pain is a method for assessment of mesh shrinkage?

13        A.    No.  VAS is a method for assessing

14   vaginal pain.  VAS doesn't tell you anything about

15   mesh shrinkage.

16        Q.    I guess these authors thought it was a

17   way of quantifying the vaginal pain associated with

18   mesh shrinkage.  Would that be your assumption?

19        A.    Obviously they would have been talking

20   as they presented these slides, so it's a little

21   hard to say.  It looks like they are trying to make

22   a comparison or a correlation, but again, the VAS

23   is completely unrelated to anything about the

24   anatomy of the mesh.  It's strictly just -- it's a

Gregory Bales, M.D.

1    pain scale that the patient describes.

2        Q.    But they wouldn't be talking about

3    vaginal pain from some other source, would they, on

4    this slide about how to assess mesh shrinkage?

5        A.    I'm not sure what they would be doing.

6        Q.    Really?

7        A.    Well, again, I didn't give the

8    presentation.

9        Q.    Okay.  And the third bullet point on how

10   to assess mesh shrinkage is "Assessment of sexual

11   outcome."  Do you agree that that would be a method

12   of detecting, assessing mesh shrinkage?

13       A.    Again, I'm not sure about the

14   correlation.  I think it's very important to assess

15   pain scales and sexual outcomes, but again, I'm not

16   quite sure where they are going with this in terms

17   of correlating with mesh shrinkage.

18       Q.    And then the fourth bullet point is "Use

19   of a specific classification."

20             You are aware that the ICS published a

21   methodology for determining mesh-related

22   complications and grading them, classifying and

23   grading them?

24       A.    Yes.

Gregory Bales, M.D.

1    Q.    And you are aware that the ICS

2    classification of mesh complications does give a

3    grading system for mesh contraction and shrinkage?

4    A.    Yes.

5    Q.    So do you believe that that's what they

6    are referring to under specific classification, or

7    what is specific classification and method to

8    assess mesh shrinkage?

9    A.    Correct me if I'm wrong, we would have

10   to look that up again.  It has been around for I

11   think a couple years.  There is a good paper from

12   the Cleveland Clinic that used that scale and an

13   experience of about 25 or 30 patients.  But as I

14   said, I'm not sure that classification scale

15   specifically pertains to mesh shrinkage.  That

16   scale just has to do with patients' symptoms and,

17   you know, their vaginal exam.

18          I'm not sure part of that scale -- I

19   would have to pull it up -- also measures or talks

20   about the shrinkage that may have occurred.

21   Q.    We will pull that up if I have time at

22   the end.

23          So, the next couple of pages provide

24   methods for classification, and the first is by an

Gregory Bales, M.D.

1    author Debodinance that grades it four ways:  Mesh

2    palpable but not sensitive, moderate shrinkage

3    and/or little symptomatic, severe shrinkage and/or

4    symptomatic with sensitive palpation, and then

5    grade 4, painful mesh palpation.

6              Would you agree that those are all --

7    those would be degrees of or a way to grade mesh

8    shrinkage on examination?

9         A.    Well, sure.  I guess that's what this

10   grading scale is for.  Again, how accurate it is,

11   that's why, as we had discussed earlier, certain

12   practitioners now were incorporating transvaginal

13   and translabial ultrasound to try to have a more

14   objective scale to utilize to try to assess what's

15   occurred there with mesh shrinkage.

16        Q.    And the next one is a mesh shrinkage

17   classification by Cosson and Fatton, which I

18   believe are also members of the Ethicon TVM group

19   in France, correct?

20             MR. MORIARTY:  Objection.  Go ahead.

21        A.    I don't know if they are members of any

22   group or what have you.

23        Q.    And then they give another

24   classification system that's 1 through 5, with

Gregory Bales, M.D.

1   asymptomatic being grade 1; spontaneous pain, grade

2   5; and then a less than 50 percent or greater than

3   50 percent degree of protection.  Would you agree

4   that would be another way to classify mesh

5   shrinkage?

6        A.    Well, there is nothing in the grading

7   scale that talks about shrinkage, so I'm not sure

8   how you use this scale.

9        Q.    Well, it at least says degree of

10  retraction, "A" or "B."

11       A.    So where does the "A" or "B" go?  Is "B"

12  the ones that goes in 3, 4, 5 and then "A" in 1 and

13  2?

14       Q.    I believe -- well, this is a method of

15  classification regardless of how you interpret it,

16  correct?

17       A.    Yeah.  I mean, it looks like it's mostly

18  using pain, though.  I guess I'm not sure if you

19  told me this woman who was a Grade 3 and the other

20  was a Grade 4, what's that going to tell us about

21  the mesh shrinkage.

22       Q.    But it's a method of classification,

23  correct?

24       A.    Right, but you asked about the mesh

Gregory Bales, M.D.

1    shrinkage.  So, I don't know how I would use -- how

2    -- you said one is a 3 and one is a 4, one is a 3,

3    one is a 5.  If you told me that, then how does it

4    tell us what degree of mesh shrinkage is there?

5         Q.    Then going to the next page, which is

6    "Our Experience," and that would mean the

7    experience of the authors, correct, who are the

8    TVM, Ethicon Gynemesh and Prolift investigators,

9    correct?

10        A.    I mean, I guess.  Again, you are just

11   showing me these pieces of paper.  You know, it's

12   not part of a scientific paper.  I'm not 100

13   percent sure what this is, but I guess.  It just

14   says "Our Experience."  Whose experience?  Maybe

15   these three guys, I guess.  I don't know.

16        Q.    Object.  If there are three presenters

17   of this and they say "our experience," would you

18   not assume that the experience they are talking to

19   is their own?

20        A.    Yes, but is it the three, is it one of

21   them?  Sure.

22        Q.    You do know that these three authors are

23   members of the TVM group, correct?

24        A.    You told me that, yes, and I think --

Gregory Bales, M.D.

1      Q.    And you don't know that?

2      A.    I don't know that for a fact because I

3  don't know that.

4      Q.    But you wouldn't know that if I hadn't

5  told you?

6      A.    That's correct.

7      Q.    Okay.  And we have already discussed

8  that Dr. Jacquetin is the patent holder on Prolift,

9  correct?

10          MR. MORIARTY:  Objection, form.

11     A.    You told me that.  I didn't know that.

12  I don't have any reason to doubt.

13     Q.    And they actually state here that it is

14  perspective, so whoever it is, I would assume "our

15  experience" is referring to the authors, but

16  whatever.

17          The prospective control of 107 patients

18  operated on between 2005 and 2006 with Prolift,

19  right?  I read that correctly?

20     A.    Yeah.  You read everything just fine

21  typically.

22     Q.    Okay.  Let's go to their results.  Okay?

23     A.    Sure.

24     Q.    The next page.  And they are giving the

Gregory Bales, M.D.

1   number of shrinked mesh and the mean shrinkage,

2   tenderness at palpation and the mean VAS in case of

3   tenderness, correct, is what is provided in this

4   table?

5       A.   That's what it looks like, correct.

6       Q.   And their conclusion was a mean 15 to 25

7   percent of shrinkage was perceived in 60 to 90

8   percent of cases, correct?

9       A.   Yes.  That's what they are saying here.

10      Q.   That's their results that they are

11  reporting in this presentation, correct?

12      A.   It looks that way.

13      Q.   And then if we go to the next page --

14      A.   Let me just point out, it doesn't

15  explain what scale they used or how they assessed

16  it per se, but those are the numbers they are

17  citing here.

18      Q.   Okay.  And then the next page is

19  "Clinical impact of mesh shrinkage," and it appears

20  that they are reporting on the same series of

21  patients.  Agree?

22      A.   I guess.

23      Q.   And the first bullet is, "Spontaneous

24  pelvic/perineal pain related to severe mesh

Gregory Bales, M.D.

1   shrinkage present in three patients, 2.8 percent,

2   with a mean VAS of 5/10."

3              Did I read that correctly?

4        A.    Yes.

5        Q.    The second bullet point is, "Tenderness/

6   pain at vaginal examination associated with mesh

7   shrinkage present in 21 patient, 19.6 percent, with

8   a mean VAS of 5 out of 10."

9              Did I read that correctly?

10       A.    Yes.

11       Q.    And of the 13 patients sexually active,

12  eight patients did not have dyspareunia, four

13  patients had unchanged dyspareunia and one patient,

14  de novo dyspareunia, correct?

15       A.    That's correct.

16       Q.    And eight patients sexually inactive,

17  including one because of de novo dyspareunia,

18  correct?

19       A.    Correct.

20       Q.    And then the next several pages are

21  ultrasonic evaluation of mesh shrinkage, correct?

22       A.    Yeah.  It looks like that's what they

23  are trying to do, yep.

24       Q.    And it looks like it's from several

Gregory Bales, M.D.

1    different authors; you would agree, correct?

2         A.    Why do you think it's several different

3    authors?  Is there a citation?

4         Q.    I at least see one that's from Tunn,

5    T-u-n-n.  I see one from Velemir, V-e-l-e-m-i-r.  I

6    see one that's from Shek, S-h-e-k.  I think there

7    are actually more than one study from Velemir.

8         A.    Okay.  And there is one, Lemmery, it

9    looks like.  Okay.

10        Q.    And these all use transvaginal introital

11   ultrasound, correct, unlike Dr. Dietz?

12        A.    I guess, yes.

13        Q.    It says "How to assess?

14   Ultrasonography," and it says "Transvaginal

15   introital ultrasound," right?

16        A.    That's what it says on that first page.

17        Q.    It doesn't mention ultrasound by any

18   other technique, does it?

19        A.    No, not that I can see.

20        Q.    And it says ultrasonography can give

21   objective measurement of length, configuration and

22   thickness, correct?

23        A.    That's what it says.

24        Q.    And it can give a better understanding

Gregory Bales, M.D.

1  of recurrence and postoperative pain or

2  dyspareunia.  I'm reading that correct, right,

3  correctly?

4      A.    You are reading it correctly.

5            I guess just to make clear, just because

6  you are reading it and I agree hat you are reading

7  everything accurately doesn't mean I agree or

8  disagree with any of these things, right?

9      Q.    I understand.

10     A.    I'm just agreeing with your ability to

11 read it.

12     Q.    That's right, and I may ask followup

13 questions later, but I will ask you if you agree or

14 disagree when that's what I want to know.

15     A.    Terrific.

16     Q.    Understanding that you are not an expert

17 in ultrasound evaluation of pelvic -- of mesh in

18 the pelvic floor, you would agree that many of

19 these ultrasound images in this presentation show

20 folded, wrinkled or bunched mesh, would you not?

21           MR. MORIARTY:  Objection.

22     A.    Why do you think that?  Based on what?

23     Q.    Okay.  Let's go to the first page,

24 anterior mesh.  Is the mesh in that picture lying

Gregory Bales, M.D.

1    flat?

2         A.    Well, as I said, I don't do these

3    ultrasounds.  If this line represents the mesh,

4    that line between the bladder, the translucent

5    bladder image and then the probe, you know, it's

6    perfectly straight.  I don't know.  I mean, there

7    is obviously contours in the vaginal wall.  I'm not

8    sure I see a fold there, if that's exactly -- if

9    that's what the mesh is there, that white line.

10        Q.    Is it lying flat?

11        A.    Well, it may be lying --

12             MR. MORIARTY:  Objection.  He just

13        answered the same question.

14             MS. THOMPSON:  He didn't.

15             MR. MORIARTY:  Yeah, he did.

16             MS. THOMPSON:  All right.

17        A.    If it's a bumpy surface, it may be lying

18   perfectly flat on a bumpy surface.

19        Q.    Let's go to the total monobloc mesh, and

20   look in the picture upper right-hand side.  Is that

21   piece of mesh lying flat?

22             MR. MORIARTY:  Objection.  Just let

23        the record reflect someone has drawn lines

24        over the ultrasound image in these PowerPoint

1          slides.

2     BY MS. THOMPSON:

3          Q.    Are you not able to interpret these

4     ultrasounds?  If so, we will just move on.

5          A.    I'm happy to try, but I think it's wrong

6     to assume that like the one that shows that "U,"

7     right, kind of in a "U" configuration, that might

8     be a sling, and that's exactly what you expect it

9     to look like, it looks like a "U," and it's lying

10    perfectly flat because the "U" represents the

11    proximal urethra, and that's exactly what it should

12    look like.

13              So, right, I don't expect it to be a

14    straight line.  The vagina is not filled with

15    straight lines.  The vagina has, you know, curves

16    and folds, and obviously the slings will always

17    be -- you know, they should look like that, it

18    should look like a "U."

19              So, I apologize I'm not more

20    knowledgeable about this, but I can't answer

21    whether it's flat or not.  That might be perfect.

22         Q.    On that page that says total monobloc

23    mesh, you are saying that the image on the

24    right-hand side could be a sling?

Gregory Bales, M.D.

1      A.     Yes.   I don't know.

2      Q.     And then the page that is the link of

3  the Sonomorphological Evaluation of Polypropylene

4  Implants by Tunn, is the mesh on the left-hand side

5  of that lying flat?

6            MR. MORIARTY:  I'm sorry.  Where are

7       you?

8            THE WITNESS:  Next one.

9            MR. MORIARTY:  Okay.  Thank you.

10     A.     So, there is two on this page.  There is

11 a left-sided one and a right-sided one.  This one

12 isn't as clear to me.  I guess I don't know.  I

13 don't want to comment.

14     Q.     Okay.  And the results from Dr. Tunn's

15 study state that the decrease of the length size of

16 60 percent, states that there is a decrease of the

17 length size of 60 percent for the anterior mesh and

18 of 65 percent for the posterior mesh.

19            Is that a significant amount of

20 shrinkage in your opinion?

21            MR. MORIARTY:  Objection.  Go ahead.

22     A.     I guess I would only say I would

23 correlate that with -- with the anatomic exam, and

24 so I don't know whether it's significant or not.  I

Gregory Bales, M.D.

1    don't think I need to see it correlated with the

2    objective anatomic exam, vaginal exam and also

3    patient symptoms.

4         Q.     I'm not asking about exam and symptoms.

5    I'm asking about is Dr. Tunn's findings that the

6    mesh shrinks, and we have defined that as decrease

7    in length size, 60 percent in the anterior and 65

8    percent of the posterior mesh.  Is that a

9    significant amount of shrinkage?

10             MR. MORIARTY:  Objection, asked and

11         answered.

12        A.     Well, again, the mesh is only there to

13   help the cystocele or the rectocele.  So, if that

14   shrinkage isn't causing any problems, then it's not

15   significant, and I just don't know if -- again,

16   there is no correlation with the anatomy or the

17   patient symptoms and such, so I'm not sure how to

18   interpret it.  It's just a number.

19        Q.     And he also found that the mesh

20   supported 40 percent of the length of the anterior

21   vaginal wall and 50 percent of the length for the

22   posterior mesh.  Is that significant?

23        A.     Same response to the previous question.

24   I don't know.

Gregory Bales, M.D.

1        Q.     On the following page, the paper by

2    Dr. Shek, who looked at 46 patients with

3    transobturator anterior mesh and concluded that

4    patients with good clinical results had mesh well

5    spread out, minimal folding and both effective

6    anchoring arms, would you agree that that's what

7    would occur in patients with good clinical results?

8        A.     Well, it says "patient."  It's not

9    plural.  It says "patient," so a patient with good

10    clinical results, and I guess a good clinical

11    result is desirable.

12             It's nice to see that this one patient

13    with a good clinical result, it looks like the mesh

14    is where he expects it to be, there is minimal

15    folding and the anchoring arms seem to be

16    effective.  But as I said, I just don't know if

17    that means if it's -- if the reason for the

18    clinical results is because it looks so good on

19    ultrasound.

20        Q.     So you think that only one of the 46

21    patients he looked at had the good clinical result?

22             MR. MORIARTY:  Objection.

23        A.     No.  I didn't say that.

24        Q.     Well, you said it referred to one

Gregory Bales, M.D.

1    patient.

2                MR. MORIARTY:  Well, it does.  It's

3         singular right on the page you are reading

4         from.

5                MS. THOMPSON:  Okay.  Well, we will

6         just go with that then.  We will assume one

7         out of 46 patients had the good clinical

8         result.

9                MR. MORIARTY:  Objection, form and

10        otherwise.  You can't assume that.  You just

11        asked him about what's printed on this page.

12        You haven't given him the study.

13               MS. THOMPSON:  I suspect that's a

14        typo, but if he believes that refers to one

15        patient, it is on the record.

16   BY MS. THOMPSON:

17        Q.   Going to the next page, Shek study, in

18   that one a patient with recurrent cystocele had

19   dislodgment of the superior arm and voiding

20   dysfunction.  Would you agree that dislodgment of a

21   arm of Perigee could cause recurrence and voiding

22   dysfunction?

23               MR. MORIARTY:  Objection.  Go ahead.

24        A.   I don't think the -- I would disagree.

Gregory Bales, M.D.

```
 1    I don't think the arm causes it.  I think the

 2    recurrent cystocele can cause voiding dysfunction

 3    and whether the recurrent cystocele is because of

 4    the dislodgment of one of the arms, I guess I'm not

 5    sure.

 6         Q.    Velemir on the next page in this paper

 7    states that recurrences are associated with severe

 8    mesh retraction.  Would you agree that recurrences

 9    are associated with severe mesh retraction?

10         A.    I'm sorry, counsel.  Which page?  This

11    next one, Velemir?

12         Q.    The results at the top of the page,

13    Velemir.

14         A.    I'm sorry.

15         Q.    "Recurrences after transvaginal mesh

16    repair are associated with severe mesh retraction

17    and loss of mesh support on the distal part of the

18    vaginal walls."

19               Would you agree that recurrences are

20    associated with severe mesh retraction?

21         A.    I guess they may be associated with some

22    mesh retraction, but I think the more important

23    thing is the second part of that sentence, loss of

24    mesh support.  So, I think it's the support, not so
```

Gregory Bales, M.D.

1    much whether the mesh is contracted a little.  I

2    think it is the actual support that is more

3    essential to the recurrence.

4         Q.    Do you use sutures to fix -- when you

5    used Prolift, did you use sutures to fix the

6    device?

7         A.    On a case-by-case basis.  There

8    wasn't -- sometimes we would supplement things by

9    helping it sort of spread out if the anatomy

10   necessitated it, so there wasn't a always suture

11   use or always no suture use.

12        Q.    I'm going to skip ahead to the "Reduce

13   mesh exposition 10 rules."

14        A.    How far along are we?

15        Q.    I don't know.  Past all the ultrasounds.

16        A.    Okay.  "How to prevent expert opinion,"

17   is that it?

18        Q.    No, the next one, "Reduce mesh

19   exposition."

20        A.    Got it.

21        Q.    What is mesh exposition?

22        A.    Extrusion, exposure.

23        Q.    Do you agree that experienced surgeons

24   have less, a lower exposure rate than inexperienced

Gregory Bales, M.D.

1    surgeons?

2              MR. MORIARTY:  Objection, form.

3         A.    I would like to think so.  Obviously you

4    need to get some studies of inexperienced surgeons

5    and correlate that with the experienced surgeons,

6    but I think in general probably experienced

7    surgeons tend to get better outcomes.

8         Q.    And you would agree that most of the

9    peer-reviewed literature is published by

10   experienced surgeons, correct?

11        A.    Not always, but a lot of it is, sure.

12        Q.    And because of that, you oftentimes

13   don't see results in the peer-reviewed literature

14   of less experienced community surgeons, correct?

15        A.    I think it's safe to say that all the

16   results that occur of any procedure between

17   experienced or inexperienced surgeons, not

18   everything makes its way into the -- into the

19   literature.

20        Q.    Let's talk about Prolift in particular.

21   Are any of the Prolift studies published by

22   inexperienced community surgeons?

23              MR. MORIARTY:  Objection.

24              MS. THOMPSON:  It's a good question,

Gregory Bales, M.D.

```
 1        actually.

 2              MR. MORIARTY:  It's a great question

 3        but not for this setting, so I will object to

 4        it, form and otherwise, but you can answer it.

 5        A.    Well, you know, I don't -- I will just

 6   answer by saying I don't know what absolute number

 7   you go from inexperienced to experienced, and we

 8   can argue about that all day, right, and so you

 9   would have to look at it.  But there is a lot of

10   studies, and really, without looking at every

11   single one of them it would be hard to say.

12              I think your point earlier, generally

13   more experienced surgeons have more results to

14   write about and generally write up their

15   experiences.  So, less experience, whether you are

16   in an academic institution or in private practice,

17   probably write up their experience less just

18   because they have smaller numbers; and when we try

19   to publish papers, a greater experience allows you

20   to get the paper published.

21        Q.    Let's narrow it down a little bit.  Are

22   any of the Prolift RCTs published by community

23   physicians?

24        A.    So, for instance, Peter Sand here in
```

Gregory Bales, M.D.

1    Chicago, he works at Evanston Hospital.  He is in

2    private practice, so he is considered a community

3    doctor even though he has got a fellowship.  So, it

4    depends on how you define these things.  Again, I

5    don't know if it is a good terminology to use

6    community or --

7         Q.    Are any of the Prolift RCTs published by

8    community surgeons?

9              MR. MORIARTY:  Objection, asked and

10        answered.

11        Q.    He talked about Peter Sand.  Peter Sand

12   hasn't published an RCT on Prolift, has he?

13        A.    Well, he published on a lot of

14   experiences with mesh-type procedures.

15        Q.    Has he published an RCT on Prolift?

16   That was the question.

17        A.    I don't think so.  He has published on

18   Boston Scientific's product.

19        Q.    I will ask again.  Have any of the

20   Prolift RCTs been published by community

21   physicians?

22        A.    I'm not sure.

23        Q.    And if that's what you are relying on

24   for your data, you would not be able to determine

Gregory Bales, M.D.

1  data that would be coming from community surgeons,

2  correct?

3      A.    No.  Why is that?

4          MR. MORIARTY:  What's what you are

5      relying on data?

6      Q.    If you are relying on Prolift RCTs for

7  data, you would not be able to determine what the

8  data would be if reported by community physicians,

9  correct?

10     A.    Well, we just said we are not sure

11  whether some of the community physicians have

12  published [overlapping and indistinguishable

13  speaking].

14     Q.    Assuming that -- that no RCTs have been

15  published on Prolift by community physicians, you

16  wouldn't be able to tell what the community

17  physician experience would be compared to the

18  physicians who are publishing the RCTs, correct?

19     A.    Well, no.  You wouldn't have RCTs but

20  we -- you know, we get community experiences all

21  the time.  We see their patients because they get

22  sent into academic centers.  We go out to --

23     Q.    With complications, right?

24     A.    Sometimes there are complications.  We

Gregory Bales, M.D.

 1    go out to, you know, dinner and we have, you know,

 2    meetings and we have a Chicago Urologic Society.

 3    We talk about this all the time.

 4              So, I think at least in Chicagoland the

 5    community urologists have a lot of input into sort

 6    of our -- you know, what we discuss and stuff, so

 7    we have some sense about that.  But I guess, no, if

 8    they are not -- the RCTs, if they are not producing

 9    any RCTs, then obviously we are not going to get

10    that information on RCTs.

11         Q.    Do you agree that there is a knowledge

12    gap between community mesh users and academic

13    physicians who are taking care of mesh

14    complications, as is well published in the medical

15    literature?

16         A.    That the knowledge gap is well

17    published?

18         Q.    A knowledge gap.

19         A.    You say there is a knowledge gap that's

20    well published?

21         Q.    Yes.  Do you believe there is a

22    knowledge gap as is published in the literature?

23         A.    Well, I think that's an awfully broad

24    statement to make.  I think some community guys,

Gregory Bales, M.D.

1    there may be a knowledge gap, but, you know, I

2    don't know if it's universal.

3         Q.    I didn't ask if it's universal.  Is

4    there a gap?

5         A.    Well, again, yes.  So, no; there is a

6    gap in some places, there is not a gap in other

7    places.  So, you know, again, you have to say

8    where.  I mean, there is some excellent -- some

9    doctors I trained who have had a wealth of

10   experience working with me and work at Christ

11   Hospital, you know, seven miles down the road; and

12   so he is a community urologist but he is excellent,

13   has a wealth of experience.  So, I'm not sure.

14   There wouldn't be a gap between he and I.

15        Q.    Moving to the page -- well, "Use large

16   mesh taking into consideration a global mesh

17   shrinkage of 40 percent."  Do you see that page?

18             MR. MORIARTY:  Where are you?

19             MS. THOMPSON:  Two pages from where we

20        were.

21   BY MS. THOMPSON:

22        Q.    Well, let's go to the next page.  So,

23   the next page is how to prevent mesh shrinkage, and

24   that would be modulate the mesh characteristics,

Gregory Bales, M.D.

1   and it includes mesh size, pore size, quantity of

2   materials, other including textile structure, weave

3   configuration and fiber diameters.

4       A.    What is this referring to?  It says how

5   to prevent.  What are they preventing here?  What

6   is it?

7       Q.    Well, don't you think they are talking

8   about mesh shrinkage since it's how to prevent?

9       A.    Well, the previous slide was on mesh

10  exposure, so why do you think it --

11      Q.    Okay.  Well, let's say either one.

12  Let's say mesh exposure or shrinkage, how to

13  prevent, modulate the mesh characteristics.  Do you

14  believe that mesh characteristics have something to

15  do with mesh exposure or mesh shrinkage?

16      A.    I think the quality of the mesh has a

17  lot to do with outcomes.

18      Q.    The next page, "Use large mesh taking

19  into consideration a global mesh shrinkage of 40

20  percent."  Is 40 percent mesh shrinkage that you

21  need to take into consideration significant?

22      A.    Again, we talked a little bit about that

23  before.  No, I don't know where that 40 percent

24  number comes from.

Gregory Bales, M.D.

1    Q.    We are going through this paper with 25

2    citations, all of which are discussing shrinkage

3    and the clinical implications; and the only paper

4    you provided in your expert report was one from

5    Dietz, the only paper in the literature that

6    questions the phenomenon of mesh shrinkage.  Why is

7    that?  I can't understand it.

8              MR. MORIARTY:  Objection, form.  Go

9       ahead.

10    A.    Again, counselor, you know, if I had --

11    if I probably had more time I probably would have

12    included more resources and references, but, you

13    know, we picked out some of the papers we did, and

14    certainly you are allowed to be critical of some of

15    them.  But you know, it's a published paper in the

16    peer-reviewed literature, and obviously it's been

17    peer reviewed.  You know, we selected it, so I

18    don't --

19    Q.    It was one paper that supported your

20    opinion, correct?

21              MR. MORIARTY:  Objection.  Go ahead.

22    A.    Yes.

23    Q.    And who is "we"?

24    A.    Well, again, it's my work, but as you

Gregory Bales, M.D.

1    know, it was, you know, put together and looked at

2    by some of the other attorneys and such.   But

3    again, it's my work, it's my report.

4         Q.    And then the next page, "Influence of

5    mesh porosity on tissue reaction and mesh

6    shrinkage."  Would you agree that mesh porosity has

7    an effect on tissue reaction and mesh shrinkage?

8         A.    Yes.

9         Q.    And there are three publications

10   supporting that, correct?

11        A.    I'm sure there is more, but there are

12   three cited here in this, on this slide.

13        Q.    And the next page, "Influence of mesh

14   quantity."  Do you agree that lightweight meshes

15   may have greater biocompatibility and may reduce

16   patient complaints?

17        A.    Yes, I would agree with that.

18        Q.    And less material equals less host

19   tissue response; do you agree with that?

20        A.    Correct.

21        Q.    And there are four citations for those

22   statements, correct?

23        A.    Yeah, it looks like maybe three on that

24   one.  Is there three?

Gregory Bales, M.D.

1      Q.      Three.  Sorry.  I meant three.

2      A.      That's okay, counsel.  We have been

3   going for three hours.  That's no problem.

4      Q.      We are on the next page.  We'll skip how

5   to prevent the future.

6              "How to manage dyspareunia, shrinkage

7   and bands," and it gives the various methods of

8   treating dyspareunia, shrinkage and bands.

9              Did you see anything in the information

10  that Ethicon provided to physicians that advised

11  physicians on management of the mesh complications

12  with their products?

13     A.      Anything like a -- what specifically?

14     Q.      Like if you talked anything about

15  removing mesh or managing mesh complications.

16     A.      I don't think so.

17     Q.      Going to "Mesh excision, Our

18  experience," and I'm going to assume that's the

19  experience of the authors of this presentation, but

20  whichever, they report 121 surgical procedures

21  performed by vaginal mesh complications in our unit

22  from 1997 to 2006.  That's what it says, right?

23     A.      That's what it says.

24     Q.      And most cases were referred.

Gregory Bales, M.D.

1              Is it your experience that most cases of

2     mesh complications are referred rather than treated

3     by the original implanting surgeon?

4         A.    You know, I'm not 100 percent sure the

5     denominator, but I can tell you my personal

6     experience is that the vast number, the much higher

7     percentage of the mesh complications I have taken

8     care of have been referred in.  They are not my own

9     patients.

10        Q.    And you are aware that the medical

11    literature also supports that most referrals into

12    tertiary academic centers are coming from someone

13    other than the original implanting surgeon,

14    correct?

15        A.    Well, sure.  It wouldn't be a referral

16    then if it was your own patient.

17        Q.    No.  I'm saying the referrals are not

18    coming from the original implanting surgeon; they

19    are coming from someone other than the original

20    implanting surgeon.

21             MR. MORIARTY:  Objection.  You mean

22        like lawyers, or what are you talking about?

23        Doctors?

24             MS. THOMPSON:  Doctors other than the

Gregory Bales, M.D.

1          original implanting surgeon.

2          A.    I didn't know that.  Is there literature

3     to support that?  I didn't know that.

4          Q.    Yes, there is.

5          A.    Okay.

6          Q.    And so in their experience here, of the

7     121 surgical procedures to remove -- and we don't

8     have a denominator at least on this page that we

9     are looking at, correct?

10         A.    Sure.

11         Q.    And probably not in the procedure since

12    most of them were referred.

13               Pain is the reason for the surgical

14    procedures in 19.8 percent, at least in this

15    experience, correct?

16         A.    Yes.  That's what it says here.

17         Q.    And removing mesh can be a morbid

18    procedure, correct?

19         A.    It can be.

20         Q.    And it's not something that you would

21    take lightly, remove a patient's mesh for lots of

22    reasons, correct?

23         A.    Well, it depends on the patient and the

24    amount of mesh, but in general, sure, it's a

Gregory Bales, M.D.

1  complication.  And again, I like to think that any

2  procedure we do we take seriously, but for sure.

3       Q.    Because it could create a recurrence of

4  the condition, correct?

5       A.    Absolutely.

6       Q.    It could not alleviate the symptoms that

7  the patient is presenting with, correct?

8       A.    Depending on the symptoms it may not.

9       Q.    And at least in some procedures removing

10 the mesh requires extensive dissection and

11 sometimes damage to adjacent organs, correct?

12      A.    Well, I guess there was a risk of damage

13 to the adjacent organs.  I like to think that in

14 the academic centers where people have experience

15 we are generally not damaging adjacent organs,

16 but...

17      Q.    What about in nonacademic centers where

18 the physicians don't have the experience that you

19 do?

20      A.    I'm not sure what's going on in those

21 places.

22      Q.    And you have never seen anything

23 published by community doctors that are taking care

24 of mesh complications or removing mesh either,

Gregory Bales, M.D.

```
1    correct?
2        A.    Yes, I can't say I have, but there is a
3    lot of literature out there.  There may be some of
4    those papers were community doctors, possibly.
5        Q.    Going to the "Concerns raised by mesh
6    removal."
7        A.    Yep.
8        Q.    Let's go to the second bullet point.
9    "Severe mesh retraction often requires a complete
10   removal of the mesh to relieve symptoms and avoid
11   multiple procedures."  Would you agree with that?
12       A.    It may.  It's a very broad statement.
13   I'm not sure you can say that it always requires
14   complete removal of the mesh.
15       Q.    Well, the statement was often requires,
16   so not may and not always.  Would you agree that
17   severe mesh retraction often requires a complete
18   removal of the mesh?
19       A.    I don't know.  What does often mean?
20   What percentage of the time?
21       Q.    So you can't answer that question,
22   whether you agree or disagree with that statement?
23       A.    Well, no.  I agree that it may require a
24   complete removal.  I just didn't want to quantitate
```

Gregory Bales, M.D.

1    the frequency.

2        Q.    My question wasn't whether it may.  My

3    question is do you agree with the statement severe

4    mesh retraction often requires a complete removal

5    of the mesh to relieve symptoms and avoid multiple

6    procedures?

7        A.    Wait.  So as I said, if it said "may"

8    and not "often" I would agree with it.  I don't

9    know what the difference is between "may" and

10   "often."

11       Q.    So you can't answer the question if you

12   use the word "often" because you don't know what

13   "often" means; is that what you are saying?

14       A.    Correct.

15       Q.    And that's fine.  I just want to make

16   sure we have the correct opinion.

17       A.    I agree.  I'm just trying to be accurate

18   with my statements.

19       Q.    Okay.  Three, "If the arms of the mesh

20   are involved in the symptoms, the dissection has to

21   be carried out quite laterally so the arms can be

22   transected as deep as possible."

23            Do you agree with that statement?

24       A.    I agree with that statement.

Gregory Bales, M.D.

1    Q.    The next one, "Complete resection may

2    induce prolapse recurrence and vaginal distortion/

3    shortening which can be taken into consideration

4    before and during the surgery."  Do you agree with

5    that statement?

6    A.    I agree with that statement.

7    Q.    Okay.  Let's go to the conclusion page,

8    the next page.  "Conclusion.  Mesh shrinkage is

9    real."  Does that contradict your opinions given in

10   your expert report?

11        MR. MORIARTY:  Objection.

12   A.    I think all along I have told you that I

13   believe mesh shrinkage can occur.  At issue I think

14   between you and I was how clinically relevant it

15   is.

16   Q.    Let's read your exact statement, which

17   is "There is no medical literature conclusively

18   establishing that mesh contracts with vaginal use

19   to clinically significant degrees."  Is that still

20   your opinion?

21   A.    Yes.

22   Q.    Despite these 25 papers cited in this

23   describing significant mesh contraction and the

24   clinical implications, you still will go with your

Gregory Bales, M.D.

1    opinion based on Dr. Dietz's article only there is

2    no medical literature conclusively establishing

3    that mesh contracts with vaginal use to clinically

4    significant degrees?

5              MR. MORIARTY:  Objection, form.  Go

6         ahead.

7         Q.    Are you maintaining this opinion?

8         A.    I'm maintaining that opinion.

9         Q.    And mesh shrinkage occurs during the

10   scarring and remodeling process; do you agree with

11   that?

12        A.    Yes.

13        Q.    May result in an unpredictable way in

14   severe complications, including dyspareunia, pain

15   and recurrence; I guess you disagree with that

16   statement?

17             MR. MORIARTY:  Objection, form.  Go

18        ahead.

19        A.    Well, yes, I guess I would disagree with

20   that.  I guess it's unpredictable.  I would agree

21   that everything is unpredictable here with mesh

22   shrinkage and these complications.

23        Q.    Do you agree that mesh shrinkage may

24   require mesh removal?

Gregory Bales, M.D.

1      A.    In and of itself, a small degree of

2   shrinkage, I don't know why then it would

3   necessitate mesh removal.  I think you would have

4   to have other symptoms to require mesh removal:

5   Recurrence of the prolapse, pain, infection,

6   exposure, et cetera.

7      Q.    I'm just asking whether you agree with

8   the statement mesh shrinkage may require mesh

9   removal.  Do you disagree or agree with that

10  statement?

11     A.    I disagree with that.  Why would it?

12     Q.    Mesh shrinkage must be taken into

13  consideration during patient counseling before

14  surgery; do you agree or disagree with that

15  statement?

16     A.    I think as opposed to or as it relates

17  to outcomes, I think patient counseling should

18  include comments about the mesh, the implications

19  of the mesh and what may occur with the mesh after

20  the fact.

21     Q.    I assume you would not counsel your

22  patients on mesh shrinkage since you don't believe

23  that there is any literature that establishes that

24  it contracts with vaginal use to clinically

Gregory Bales, M.D.

```
 1    significant degrees, correct?

 2         A.    That's correct.  I specifically don't

 3    talk about shrinkage as one of my concerns and side

 4    effects and complications.

 5              MR. MORIARTY:  You have seven or eight

 6         minutes left.  I'm on analog.

 7              MS. THOMPSON:  Okay.  I trust you will

 8         let me go a few minutes beyond that.

 9              MR. MORIARTY:  Don't necessarily

10         assume that.

11              MS. THOMPSON:  Considering we have

12         three products and I am entitled to three plus

13         two, plus two and I only agreed to a limited

14         time for the Doctor.

15              MR. MORIARTY:  I negotiated a time

16         with Fidelma because there was a disagreement

17         over how much time we got.  Does that

18         necessarily mean I have to give you a bunch

19         more time?

20              MS. THOMPSON:  So that's seven minutes

21         on the record that I have left?  You didn't

22         count right?

23              MR. MORIARTY:  I subtracted breaks.  I

24         took a break at 90 minutes, 90 minutes, and we
```

Gregory Bales, M.D.

1        are counting down to 60 minutes.

2                MS. THOMPSON:  I will do my best to

3        finish in seven minutes.

4                MR. MORIARTY:  I will give you an

5        extra minute or two if you are right in the

6        middle of something, but...

7                MS. THOMPSON:  Wow.  That's hard core.

8                MR. MORIARTY:  Well, I have been held

9        to the same time limits in every deposition.

10               MS. THOMPSON:  I have certainly given

11       my defense counsel some latitude, particularly

12       when there is this much to cover in the three

13       hours or whatever it is, so, but I will try --

14       we are wasting time, so can we take off --

15               MR. MORIARTY:  We have six more hours

16       after you are done.

17               MS. THOMPSON:  I understand.

18               And if we can subtract that couple

19       minutes for the discussion, that would be

20       nice.  I actually just have a few more

21       questions.

22  BY MS. THOMPSON:

23       Q.    What does mesh degradation mean to you?

24       A.    What does it mean to me?

Gregory Bales, M.D.

1       Q.     Um-hmm.

2       A.     Well, that the mesh may -- I guess the

3    term "degrade" just means it may sort of fracture

4    and fragment and come apart a little bit.

5       Q.     And is it your opinion that

6    polypropylene mesh in the Prolift and Gynemesh

7    products does not degrade?

8       A.     My opinion would be that it does not

9    degrade to any clinically relevant degree.

10       Q.     And if you were shown Ethicon documents

11    that contradict that, would that change your

12    opinion?

13               MR. MORIARTY:  Objection, form.  Go

14       ahead.

15       A.     No.

16       Q.     And what is the basis for your opinion

17    that polypropylene mesh as used in the Ethicon

18    products does not degrade?

19               MR. MORIARTY:  Objection, form.  Go

20       ahead.

21       A.     So, primarily my hundreds of cases that

22    I have done and the other probably 150 cases of

23    going back in mesh-related complication cases and

24    such, and it's just never been my experience that

Gregory Bales, M.D.

1    degradation has -- is a reason for any -- any -- is

2    a cause of any clinical significance.

3        Q.    Is there any peer-reviewed literature

4    that would tell you that polypropylene mesh in

5    Ethicon products does not degrade?

6        A.    I don't think there is good literature

7    supporting that it does or does not that has any

8    clinical significance.

9        Q.    What have you done in your clinical

10   practice to test for degradation?

11       A.    Well, obviously we go back sometimes

12   when we go back and reoperate and so you find the

13   mesh, and it's never been my experience that the

14   mesh is gone or has fragmented or is no longer in

15   place.  Again, it always scars in pretty well and

16   it always seems like the mesh is pretty intact, so

17   that's why it --

18       Q.    Does the fact that it's not gone mean it

19   hasn't degraded?

20       A.    Well, if it degrades, you would expect

21   it, right, to fragment and be apart and not still

22   be a continuous body and have the same degree of

23   cohesiveness.

24       Q.    Have you ever looked at degradation

Gregory Bales, M.D.

1    histologically in mesh samples?

2        A.    I have been shown pictures and stuff,

3    and there has been some literature on that a little

4    bit.  But as I said, I don't disagree that perhaps

5    some degradation may occur.  The thing is whether

6    it occurs to the extent that it is of any clinical

7    relevance.  Histologically or under the microscope,

8    you know, you might be able to see a few fragments

9    or what have you, but I don't think that equates to

10   any appreciable concern clinically and surgically.

11       Q.    What would be the latency period between

12   placement of mesh and the development of a

13   malignancy if it were to occur?

14       A.    The latency period?

15       Q.    Yes.  Do you know what latency period

16   means?

17       A.    I do.

18       Q.    Okay.  What would be the latency period

19   as published?

20       A.    Well, I mean, obviously a latency period

21   could be anything, right?  You can have a mesh --

22   you know, we have been putting these things in

23   since, what, 2005, 2006 we said.  So, you know,

24   maybe there is latency period of 40 or 50 years.

Gregory Bales, M.D.

1    I just don't know, but I don't think there is any

2    literature to support that there is any concerns

3    about a latency period and the development of

4    carcinogenesis.

5        Q.    If the latency period was 30 years, we

6    have not been using transvaginal mesh long enough

7    to be able to appreciate whether there is a

8    malignancy potential or not, correct?

9        A.    That's absolutely correct.

10       Q.    Going to your opinions regarding your

11   opinions the IFU, it's your opinion that the IFU is

12   not intended to serve as a comprehensive guide,

13   correct?

14       A.    The IFU is not a comprehensive guide.

15       Q.    And is it also your opinion that all of

16   the -- well, I will just read it.  Isn't it your

17   opinion that the Prolift IFU adequately warned of

18   all risks and potential complications associated

19   with the Prolift?

20       A.    I think on balance the IFU was thorough.

21       Q.    So it did warn of all risks and

22   potential complications associated with the

23   Prolift?

24       A.    Well, one risk of doing vaginal surgery

Gregory Bales, M.D.

1    or any surgery is a patient can have a heart attack

2    or a patient could die from the anesthetic.  So,

3    the IFU didn't discuss that, so no, the IFU wasn't

4    100 percent comprehensive because there is always

5    complications that can occur that aren't cited.

6         Q.    Did the IFU discuss chronic pain?

7         A.    We will have to pull out the IFU so I

8    can read it.  There has been several variations and

9    several versions of the IFU, right?  So it changed

10   a little bit.

11            MS. THOMPSON:  Mark that.

12               (Bales Exhibit 27 was marked for

13                 identification.)

14   BY MS. THOMPSON:

15        Q.    Is this a Prolift IFU that I just handed

16   you and marked as Exhibit 27?  Does it contain

17   anything regarding chronic pain?

18        A.    Yes.  It discusses inflammation and, you

19   know, scarring.

20        Q.    Is inflammation and scarring the same as

21   pain?

22        A.    Well, it causes pain.  It doesn't use

23   the terminology "pain."

24        Q.    Well, it does use the terminology

Gregory Bales, M.D.

1    "transient leg pain may occur and can usually be

2    managed with mild analgesics," but my question is

3    does it say anything about chronic pain?

4              MR. MORIARTY:  Objection, form.

5    BY MS. THOMPSON:

6         Q.    I don't have very much time.  If you

7    could try as best you can to answer.

8         A.    Well, there is ten bullet points, so I'm

9    just -- so no, I don't think so.

10        Q.    Or else I can go off the record each

11   time you are thinking.

12        A.    I don't think so.

13        Q.    Okay.

14        A.    I guess not.

15        Q.    Is there anything that discusses a need

16   for multiple corrective surgeries or any corrective

17   surgery?

18        A.    No.

19        Q.    Is there anything that mentions that the

20   complications may be permanent?

21        A.    It doesn't say anything about permanent

22   complications.

23        Q.    What's the rate of exposure with

24   Prolift?

Gregory Bales, M.D.

```
 1        A.    Again, there is various rates, and it

 2   depends whether there was an associated

 3   hysterectomy, so it's not at simple as just saying

 4   Prolift across the board.

 5             I think there is risk factors that can

 6   make a higher incidence occur.  So, in general it

 7   can be anywhere from, you know, 1 to 15 to 20

 8   percent, but as I said, there is multiple factors:

 9   Atrophic changes in the vagina, history of

10   radiation.  So, it's hard to just come up with just

11   one number.

12        Q.    You discuss in your report several

13   patient conditions that increase risk, including

14   smoking, poorly controlled diabetes, early return

15   to exercise, lifting or vaginal sexual activity --

16   I'm on Page 7 and 8 -- and noncompliance with

17   estrogen supplementation, and then also younger

18   age, higher parity and concomitant hysterectomy.

19             Is there anything in the IFU about those

20   conditions being risk factors for Prolift

21   complications?

22        A.    I don't think it discusses a whole lot

23   about potential risk factors.

24        Q.    Do you believe -- I'm going to hand you
```

Gregory Bales, M.D.

1   the Gynemesh.

2               MR. MORIARTY:  So we are already past

3        the time.

4               MS. THOMPSON:  I would like to have

5        five more minutes.  I have one more exhibit

6        after this.

7               MR. MORIARTY:  Five minutes less for

8        Jake and Steve.

9               MR. PLATTENBERGER:  We will give up

10        five minutes, won't you, Steve?

11               MS. THOMPSON:  I'm going to be much

12        more hard core with my defense counsel.

13               (Bales Exhibit 28 was marked for

14                 identification.)

15   BY MS. THOMPSON:

16        Q.    I will represent for the sake of time

17   that this is the 2015 Gynemesh IFU, and you know

18   that in this IFU that transvaginal use of Gynemesh

19   is not included in this IFU, correct?

20        A.    Yes, okay.

21        Q.    And you will agree with me also that

22   there is a much longer list of adverse reactions in

23   the 2015 Gynemesh IFU than are in the Prolift,

24   correct?

Gregory Bales, M.D.

1        A.     Yeah, there is a lot more bullet points.

2        Q.     Dr. Bales, do you believe that mesh

3    complications are overexaggerated or exaggerated?

4                 MR. MORIARTY:  Objection, form.  Go

5        ahead.

6        A.     I don't know if I can say one way or the

7    other.

8        Q.     You can't say one way or the other

9    whether mesh complications are exaggerated?

10       A.     Well, so let me answer that as

11   accurately as I can.  I think there are some

12   patients who overexaggerate their complications,

13   but, you know, complications with mesh surgeries

14   and any surgery, there is complications that occur,

15   and so I don't know if we can say exaggerated or

16   overexaggerated.  So, as I said, it depends on a

17   case-by-case, patient-to-patient basis.

18                 For sure there are patients who I see

19   commonly who have heard about the litigation and

20   certainly overestimate the risk of having had the

21   mesh.  I guess that's as accurate as I could be.

22                 MS. THOMPSON:  If we could go ahead

23       and mark that as 29.

24                 (Bales Exhibit 29 was marked for

Gregory Bales, M.D.

```
 1                   identification.)

 2    BY MS. THOMPSON:

 3         Q.    Do you remember seeing this in Urology

 4    Times Urology titled "FDA warning on mesh held

 5    little surprise for urologists"?

 6         A.    Yeah.

 7         Q.    And do you see that you are one of the

 8    several urologists quoted in this what we sometimes

 9    call throw-away journal, correct?

10         A.    You are disparaging me now.  Come on.

11              MR. MORIARTY:  No.  She is disparaging

12         the journal.

13         Q.    Under "Concerns exaggerated?" it says,

14    "Although he knows there can be complications,

15    Gregory Bales, M.D..."

16              That's you, right?

17         A.    That's me.

18         Q.    And that's your picture, right?

19              "...suggests that some of the concerns

20    may be exaggerated for external reasons."

21              Did I read that correctly?

22         A.    Yes.

23         Q.    And is that your opinion still to this

24    day?  I'm not sure when this was published.  2012.
```

Gregory Bales, M.D.

1      A.    Yeah.  I think I just indicated a few

2   moments ago that some of the patients definitely

3   exaggerate their complications, so yes.

4      Q.    And the quote, "At least here in

5   Chicagoland, we have a lot of radio and television

6   ads by attorneys, so it's on the patients' minds.

7   I try to be proactive and have a discussion before

8   surgery.  We don't have an inordinate number of

9   complications with mesh, and I believe it gives

10  some patients a better long-term outcome."

11         Was that a quote that came from you?

12  You weren't misquoted on that?

13     A.    I don't think so.

14     Q.    And a little further down you say,

15  "Patients with significant atrophic changes won't

16  do us well and those patients at higher risk for

17  erosion."

18         You would agree with me that all

19  menopausal women have some degree of atrophic

20  changes unless they are on estrogen replacement,

21  correct, or local estrogen therapy?

22     A.    Yes, postmenopausal to varying degrees.

23     Q.    And so that you really can't use a mesh

24  device and count on a woman not having atrophic

Gregory Bales, M.D.

1    changes, correct, if she lives long enough to go

2    into menopause?

3         A.    Correct, and again, atrophic changes

4    vary from person to person considerably; and as you

5    just acknowledged, we can supplement their vaginal

6    tissue with hormonal cream and stuff to rid the

7    patient of those atrophic changes.

8         Q.    Is there anything in the Ethicon

9    Gynemesh Prolift -- let met start over.

10             Is there anything in the Prolift IFU

11   that states that patients with significant atrophic

12   changes won't do as well?

13        A.    I don't believe so.

14             MS. THOMPSON:  That's all I have.

15             EXAMINATION

16   BY MR. MORIARTY:

17        Q.    Okay.  Doctor, I want to hand you

18   Exhibits 5 and 6.  Do you believe that you were

19   paid those amounts in those years?

20        A.    No, I don't remember being paid this

21   amount in these years.

22        Q.    Do you know whether you signed

23   consulting contracts with Ethicon that had those

24   numbers as a maximum amount that could be paid in

Gregory Bales, M.D.

1    those years?

2         A.    I remember signing contracts and I don't

3    remember the amounts, but that certainly could be.

4         Q.    Is there any Level 1 evidence that

5    Prolift surgery results in more pain than native

6    tissue repairs?

7         A.    No.

8         Q.    Typically do articles published in the

9    literature just report pain as an endpoint of the

10   study?

11        A.    Do they report that?

12        Q.    Pain as the endpoint of the study, as

13   the main outcome of the study.

14        A.    Not typically.

15        Q.    Prior to the use of mesh for --

16   transvaginal mesh for pelvic organ prolapse in the

17   early 2000s, was there literature regarding

18   anterior colporrhaphy, posterior colporrhaphy,

19   abdominal sacrocolpopexy and other surgeries which

20   report as part of their studies pain as a

21   complication?

22        A.    Yes.  We talked about that earlier.

23        Q.    Is abdominal sacrocolpopexy primarily a

24   surgery for apical prolapse?

Gregory Bales, M.D.

```
1        A.    Yes.

2        Q.    Can you take a look at Exhibit 11,

3   please.

4              MR. MORIARTY:  Well, you know what?

5        Do you mind if I use this one so he doesn't

6        have to dig for it?

7              MS. THOMPSON:  That's fine.

8   BY MR. MORIARTY:

9        Q.    This is Exhibit 11 that Margaret asked

10  you about, the Oversand study.  Do you remember

11  those questions?

12       A.    Yes.

13       Q.    And this is about long-term followup

14  after native tissue repairs only; is that correct?

15       A.    Okay.

16       Q.    In the charts that report the results

17  from their surgeries, do they have columns for

18  complications like de novo urinary incontinence?

19       A.    Yes.

20       Q.    Do they have columns for urinary

21  retention?

22       A.    Yes.

23       Q.    Do they have columns for dyspareunia?

24       A.    Yes.
```

Gregory Bales, M.D.

```
 1          Q.     In the dyspareunia column, are the rates
 2   across this chart 8.3, 10.7 and 9.1 percent?
 3          A.     Yes.
 4          Q.     In this other chart on the following
 5   page, Table 3, do they report de novo incontinence
 6   and dyspareunia here?
 7          A.     Yes.
 8          Q.     Are the dyspareunia rates in Table 3
 9   similar to the ones in Table 2?
10          A.     Yes.
11          Q.     Are the dyspareunia rates reported in
12   this article similar to the dyspareunia rates
13   reported in other articles about native tissue
14   repair and in articles about the Prolift?
15          A.     Yes.
16          Q.     Just because a surgeon may have concerns
17   about a procedure or a device, does that mean that
18   the risks of the surgery or the device outweigh the
19   benefits?
20          A.     No.
21          Q.     Does it mean just because a surgeon may
22   have concerns about something mean that the surgery
23   or the device is unreasonably dangerous?
24          A.     No, not at all.
```

Gregory Bales, M.D.

1      Q.    Margaret asked you some questions about

2  Exhibit 23.

3           MR. MORIARTY:  You are not offended if

4      I use your first name, are you?

5           MS. THOMPSON:  No, I'm not.  I was

6      going to say something cute, but I couldn't

7      think of it.

8  BY MR. MORIARTY:

9      Q.    Do you remember some questions about

10  this vaginal mesh contraction article?

11     A.    Yes.

12     Q.    How many patients are in the study?

13  There are 17.

14     A.    Okay.

15     Q.    And is there anything in this paper that

16  describes in any scientific way the methodology

17  they used to attribute the clinical complaints of

18  pain or dyspareunia to mesh contraction?

19     A.    No, it doesn't look like that was

20  resulted.

21     Q.    Okay.  Thank you.  I just want to ask

22  you a couple questions about Exhibit 26.  Do you

23  remember this PowerPoint that we went through

24  extensively?  I want you to go to this page that

Gregory Bales, M.D.

1   you weren't asked about called "The frequence of

2   mesh shrinkage."

3        A.    How far in is that?

4        Q.    It is about four pages in, five pages

5   in.  Let's use this.

6        A.    I got it.

7        Q.    Does it say on the slide that the

8   frequence is unknown?

9        A.    The first bullet point says unknown.

10        Q.    Is there then a question in the second

11   bullet point about the clinical relevance of mesh

12   shrinkage?

13        A.    It says, reading bullet point, "Clinical

14   relevance of mesh shrinkage?"  It says, "Always a

15   certain degree of mesh shrinkage, asymptomatic in

16   most cases. "

17        Q.    Is that consistent with your experience,

18   that mesh shrinkage if it exists is asymptomatic in

19   the majority of cases?

20        A.    That's been my experience.

21        Q.    There is another page further back in

22   this.  Let me find it.  I think I dog-eared the

23   page.  It is called "How to manage?  Dyspareunia,

24   shrinkage and bands."  Do you remember being asked

Gregory Bales, M.D.

1    about this page?

2         A.    Yes.

3         Q.    Does one of the bullet points say, "Mesh

4    excision improves patient's symptoms in most

5    cases"?

6         A.    That's what it says.

7         Q.    Is that consistent with your experience?

8         A.    Yes.

9         Q.    When you gave your opinions to a

10   reasonable degree of medical probability, is your

11   understanding of that term that that has to do with

12   likelihood and probabilities and more likely than

13   not?

14        A.    Yes, that's my understanding.

15        Q.    Is "may" a term that in your

16   understanding is consistent with probability and

17   more likely than not?

18        A.    In the context of what statement?

19        Q.    In this context is "may" likelihood or

20   is "may" speculation?

21             MS. THOMPSON:  I object to the form.

22        A.    Well, I think it may depend on what

23   specifically I was saying, I guess, so I'm not sure

24   I can answer that 100 percent.

Gregory Bales, M.D.

1    Q.   But would you agree with me that if you

2  are saying something may happen that it's possible

3  it could happen?

4             MS. THOMPSON:  Object, leading.

5    A.   My terminology, "may" would be

6  consistent with "possible," not yes.

7    Q.   Not probable?

8    A.   Not probable.  "May" would be a low

9  likelihood, possible.

10             MR. MORIARTY:  That's all I have.

11             MS. THOMPSON:  I have a couple of

12       followup questions.

13             MR. MORIARTY:  Wait.  Is there

14       redirect when you have already used all your

15       time?

16             MS. THOMPSON:  I think Kersey would

17       allow me to address a couple of points you

18       make, and they can hopefully be very short

19       questions.

20             FURTHER EXAMINATION

21  BY MS. THOMPSON:

22    Q.   You are aware that there is Level 1

23  evidence showing that mesh repairs have a higher

24  incidence of de novo stress urinary incontinence,

Gregory Bales, M.D.

```
1    correct?

2         A.    Depending on the study.  Once again,

3    there is a broad --

4         Q.    Are you familiar with the Ek study?

5         A.    Yeah.  Which one?

6              MS. THOMPSON:  We can go ahead and

7         mark this as an exhibit.

8                   (Bales Exhibit 30 was marked for

9                    identification.)

10              MR. MORIARTY:  Do you have a copy for

11         me?

12              MS. THOMPSON:  I do.

13              THE WITNESS:  Okay.

14   BY MS. THOMPSON:

15        Q.    And this is randomized, controlled trial

16   results, correct?  First sentence under "Materials

17   and Methods."

18        A.    Correct.

19        Q.    And the conclusion is just "Trocar

20   Guided..."

21              And that's Prolift, correct?  Prolift is

22   trocar guided, correct?

23        A.    Prolift is trocar guided.

24        Q.    "...transvaginal mesh of anterior
```

Gregory Bales, M.D.

1  vaginal wall prolapse results in a lowering of

2  MUCPs and increases the risk for de novo stress

3  urinary incontinence compared to colporrhaphy."

4          Did I read that correctly?

5      A.    You did.

6      Q.    And that would be Level 1 evidence of an

7  increased incidence of stress urinary incontinence

8  de novo after trocar-based mesh, correct?

9      A.    It would be, although a very small

10 experience, 20-plus patients in either group.

11          MS. THOMPSON:  And let's mark this as

12      the next one, whatever it is.

13              (Bales Exhibit 31 was marked for

14              identification.)

15          MR. MORIARTY:  Is this the last one?

16          MS. THOMPSON:  It is.

17 BY MS. THOMPSON:

18      Q.    Are you familiar with the paper by --

19          MR. MORIARTY:  Please stop.  I need to

20      look at it because you don't have a copy for

21      me.

22          MS. THOMPSON:  And I'm just reading

23      from this.  "A significant correlation was

24      found between mesh retraction and the severity

Gregory Bales, M.D.

1          of vaginal pain.  Mesh retraction did not

2          differ between patients with de novo SUI

3          symptoms and those without this complication,

4          and this was done with Prolift."

5                    MR. MORIARTY:  Objection.  Is that a

6          question?

7    BY MS. THOMPSON:

8          Q.    Did I read it correctly?  And this study

9    was using Prolift, correct?  You can look in the

10   abstract under "Methods."

11         A.    Prolift, Prolift anterior mesh.

12         Q.    And I'm going to read a statement.

13                "A significant correlation was found

14   between mesh retraction and the severity of vaginal

15   pain."  So at least in this paper a correlation was

16   found between mesh retraction and vaginal pain,

17   correct?

18                    MR. MORIARTY:  Objection, form.  Go

19         ahead.

20         A.    Evidently, yes.

21         Q.    And this wasn't included in your expert

22   report, was it?

23         A.    No.

24                    MS. THOMPSON:  No other questions.

Gregory Bales, M.D.

```
 1              (WHEREUPON, discussion was

 2              had off the record.)

 3    BY MS. THOMPSON:

 4         Q.    Matt, Dr. Bales, I would like to ask you

 5    which products you intend to offer opinions on in

 6    the sling cases because that will help us keep our

 7    time down tomorrow if we can narrow that down.

 8         A.    Sure.

 9         Q.    I think counsel told me you were

10    planning on testifying regarding TVT retropubic

11    slings and that would include Exact and mechanical

12    cut and laser cut, correct?

13         A.    Okay.

14         Q.    And then the TVT-O?

15         A.    Correct.  Also, I could be asked about

16    Secur.

17         Q.    Okay.  So you intend to give opinions

18    about TVT Secur?

19         A.    Well, I'm going to answer your

20    questions.

21         Q.    How about Abbrevo?

22         A.    Never used Abbrevo.

23         Q.    So you would not be offering opinions on

24    Abbrevo?
```

Gregory Bales, M.D.

1              MR. MORIARTY:  Well, you said all of

2        the retropubics.  TVT retropubic or classic,

3        correct?

4              THE WITNESS:  Yeah.  I mean

5        the Abbrevo --

6              MR. MORIARTY:  TVT-O, TVT-S and any

7        others?

8              THE WITNESS:  No.  The Abbrevo and the

9        Exact, as you know, are essentially TVTs with

10        just a shortening of the --

11   BY MS. THOMPSON:

12        Q.    I agree.  I just wanted to make sure I

13   had the products so I know what.

14              So TVT, because I think Mr. Moriarty

15   told me earlier you were probably not testifying

16   about TVT Secur.  So, TVT retropubic, all

17   varieties, TVT-O but not Abbrevo and TVT Secur?

18        A.    Yes, fine.

19              MS. THOMPSON:  I got it.

20              THE WITNESS:  But again you call the

21        shots.  You ask the questions.

22              MR. MORIARTY:  Let's go off the

23        record.  We don't need to do this on the

24        record.

Gregory Bales, M.D.

```
1              MS. THOMPSON:  No, we don't.

2                 (At 12:36 p.m. the deposition was

3                  concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Gregory Bales, M.D.

```
 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2               I, PAULINE M. VARGO, a Certified
    Shorthand Reporter of the State of Illinois,
 3  C.S.R. No. 84-1573, do hereby certify:
 4               That previous to the commencement of the
    examination of the witness, the witness was duly
 5  sworn to testify the whole truth concerning the
    matters herein;
 6
                 That the foregoing deposition transcript
 7  was reported stenographically by me and thereafter
    reduced to typewriting under my personal direction;
 8
                 That the reading and signing of said
 9  deposition was reserved by counsel for the
    respective parties and the witness;
10
                 That the foregoing constitutes a true
11  record of the testimony given by said witness
    before this reporter;
12
                 That I am not a relative, employee,
13  attorney or counsel, nor a relative or employee of
    such attorney or counsel for any of the parties
14  hereto, nor interested directly or indirectly in
    the outcome of this action.
15
                 CERTIFIED TO THIS 6th DAY OF APRIL,
16  A.D., 2016.
17
                    _____
18                  Pauline M. Vargo, RPR, CRR
                    Illinois Certified Shorthand
19                  Reporter No. 84-1573
20
21
22
23
24
```

Gregory Bales, M.D.

```
1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition over

4     carefully and make any necessary corrections.  You

5     should state the reason in the appropriate space on

6     the errata sheet for any corrections that are made.

7                         After doing so, please sign the errata

8     sheet and date it.  It will be attached to your

9     deposition.

10                        It is imperative that you return the

11    original errata sheet to the deposing attorney

12    within thirty (30) days of receipt of the

13    deposition transcript by you.  If you fail to do

14    so, the deposition transcript may be deemed to be

15    accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

Gregory Bales, M.D.

```
 1                   - - - - - -

                    E R R A T A

 2                   - - - - - -

 3      PAGE   LINE   CHANGE

 4      _____  _____   _____

 5      REASON:  _____

 6      _____  _____   _____

 7      REASON:  _____

 8      _____  _____   _____

 9      REASON:  _____

10      _____  _____   _____

11      REASON:  _____

12      _____  _____   _____

13      REASON:  _____

14      _____  _____   _____

15      REASON:  _____

16      _____  _____   _____

17      REASON:  _____

18      _____  _____   _____

19      REASON:  _____

20      _____  _____   _____

21      REASON:  _____

22      _____  _____   _____

23      REASON:  _____

24
```

Gregory Bales, M.D.

1    ACKNOWLEDGMENT OF DEPONENT

2

3              I,_____, do

4    hereby certify that I have read the foregoing

5    pages, and that the same is a correct transcription

6    of the answers given by me to the questions therein

7    propounded, except for the corrections or changes

8    in form or substance, if any, noted in the attached

9    Errata Sheet.

10

11          _____

12       GREGORY BALES, M.D.                    DATE

13

14

15

16

17

18

19

20

21

22

23

24