# Exhibit B

Marc R. Toglia, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

------------------------------
IN RE:  ETHICON, INC.,          :MASTER FILE NO.
PELVIC REPAIR SYSTEM PRODUCTS   :2:12-MD-02327
LIABILITY LITIGATION            :MDL 2327
------------------------------
THIS DOCUMENT RELATES TO THE    :
FOLLOWING CASES IN WAVE 1 OF    :
THE MDL 200:                    :
Betty Funderburke               :JOSEPH R. GOODWIN
Case No. 2:12-cv-00957          :U.S. DISTRICT JUDGE
                                :
Patricia Conti                  :
Case No. 2:12-cv-00516          :
                                :
Donna Massey                    :
Case No. 2:12-cv-00880          :
                                :
Amanda Deleon                   :
Case No. 2:12-cv-00358          :
                                :
Wilma Johnson                   :
Case No. 2:12-cv-00809          :
                                :
Harriet Beach                   :
Case No. 2:12-cv-00476          :
                                :
Virginia Dixon                  :
Case No. 2:12-cv-01081          :
                                :
------------------------------


_ _ _
March 24, 2016
_ _ _
DEPOSITION OF MARC R. TOGLIA, M.D.


GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Marc R. Toglia, M.D.

Page 2

1
2                     — — —
                 March 24, 2016
                     — — —
3
4
5       Oral sworn deposition of MARC R. TOGLIA,
6    M.D., held at RADNOR HOTEL, 591 East Lancaster
7    Avenue, Wayne, Pennsylvania, commencing at 1:20
8    p.m., before Margaret M. Reihl, a Registered
9    Professional Reporter, Certified Realtime
10   Reporter, and Notary Public.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1    A P P E A R A N C E S:
2
     WAGSTAFF & CARTMELL, LLP
3    BY:  CHRISTOPHER L. SCHNIEDERS, ESQUIRE
         4740 Grand Avenue
4        Suite 300
         Kansas City, Missouri  64112
5        (816) 701-1145
         cschnieders@wcllp.com
6        Counsel for Plaintiffs
7
8    BUTLER SNOW LLP
     BY:  NILS B. (BURT) SNELL, ESQUIRE
9        500 Office Center Drive
         Suite 400
10       Fort Washington, Pennsylvania  19034
         (267) 513-1884
11       burt.snell@butlersnow.com
         Counsel for Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1                  I N D E X
2    WITNESS:                        Page
     MARC R. TOGLIA, M.D.
3
        By Mr. Schnieders            7
4       By Mr. Snell                 254
5                     — — —
6              E X H I B I T S
7
     TOGLIA DEPOSITION EXHIBITS          MARKED
8
     No. 1    Notice to Take Deposition
9            of Marc Toglia, M.D.        8
10   No. 2    Curriculum Vitae of
             Marc Richard Toglia, M.D.   36
11
12   No. 3    Website printout of
             Urogynecology Associates of
13           Philadelphia               65
14   No. 4    Box of materials relied on    75
15   No. 5    Invoices of Marc R. Toglia,
             (two pages)                77
16   No. 6    Expert Report of Marc R. Toglia,
             M.D.                       77
17
18   No. 7    Marc Toglia Reliance List in
             Addition to Materials Referenced
             in Report                  79
19
20   No. 8    E-mail string, top one dated
             7/21/09
             [ETH.MESH.00585587 through 585589]    90
21
22   No. 9    E-mail string, top one dated
             1/26/10
             [ETH.MESH.01221280 through 01221283]  101
23
24

Page 5

1    No. 10   Gynecare, Gynemesh PS pamphlet
             Released:  03 Feb 2015      137
2
3    No. 11   Gynecare, Gynemesh PS pamphlet
             copyright 2008
             [ETH.MESH.02342218 through 02342249]  141
4
5    No. 12   Slide deck, "KOL Strategy" dated
             February 2008
             [ETH.MESH.01177099]         163
6
7    No. 13   E-mail string, top one dated 11/30/10
             [ETH.MESH.05131435 through 05131436]  177
8    No. 14   Chart, Accurate HCP Report   180
9    No. 15   Chart, HCP Cognos report run 11.17.10
             with all end dates in 2010 & some
10           2011
             [ETH.MESH.17782434]         183
11
12   No. 16   Ethicon Master Consulting Agreement
             [ETH.MESH.05277161 through 05277171]  185
13   No. 17   E-mail dated 2/16/12, with attached
             Master Consulting Agreement for
14           Marc Toglia, M.D.
             [ETH.MESH.09158028]         189
15
16   No. 18   Consulting Agreement Requisition
             Form-Part I, for Marc Toglia
             [ETH.MESH.07635991 through 07636003]  190
17
18   No. 19   E-mail string, top one dated
             11/19/10
             [ETH.MESH.07386591 through 07386592]  194
19
20   No. 20   E-mail string, top one dated
             2/9/09
             [ETH.MESH.07383824 through 07383825]  197
21
22   No. 21   E-mail string, top one dated
             10/3/10
             [ETH.MESH.15186000 through 15186001]  203
23
24

2  (Pages 2 to 5)

Marc R. Toglia, M.D.

**Page 6**

1   No. 22   E-mail dated 4/21/11
            [ETH.MESH.10818812 through 10818813]   206
2
3   No. 23   E-mail string, top one dated
            4/7/10
            [ETH.MESH.09211317 through 092111318]   209
4
5   No. 24   E-mail string, top one dated
            5/6/10
            [ETH.MESH.09217182 through 09217183]   213
6
7   No. 25   TVT Exact:  Editor's Backgrounder
            [ETH.MESH.09210943 through 09210947]   217
8   No. 26   E-mails dated 4/5/10
            [ETH.MESH.09211216]                  221
9
10           No. 27   Roadmap charts
            [ETH.MESH.02229625 through 02229633]   223
11  No. 28   Document titled "Overview"
            [ETH.MESH.03898389 through 03898398]   225
12
13  No. 29   Slide deck, "The Mesh Story"
            [ETH.MESH.16440031]                  234
14  No. 30   ProPublica, Dollars for Docs         248
15                      – – –
16
17
18
19
20
21
22
23
24

**Page 7**

1              ... MARC R. TOGLIA, M.D., having been duly
2         sworn as a witness, was examined and testified
3         as follows ...
4   BY MR. SCHNIEDERS:
5         Q.   Good afternoon, Doctor.
6         A.   Good afternoon.
7         Q.   My name is Chris Schnieders, and I'm
8   here on behalf of the plaintiff steering committee to
9   take your deposition based upon an expert report that
10  you wrote for a couple of products.
11        Do you understand that today?
12        A.   Yes.
13        Q.   Would you please state your name for the
14  record.
15        A.   Mark Richard Toglia.
16        Q.   And I believe, Dr. Toglia, that you have
17  given a deposition related to your TVT report already;
18  is that correct?
19        A.   That is correct.
20        Q.   And you understand that we are here
21  today on the Gynemesh PS and Prolift report that you
22  had written?
23        A.   Yes, I do.
24        Q.   Doctor, I'm going to mark as Exhibit 1

**Page 8**

1   the notice that has asked you to come here today and
2   hand it to you.
3         A.   Sure.
4              (Document marked for identification as
5         Toglia Deposition Exhibit No. 1.)
6   BY MR. SCHNIEDERS:
7         Q.   Have you seen this document before,
8   Doctor?
9         A.   I have.
10        Q.   And we were talking about this briefly
11  beforehand, but you've brought some documents with you
12  here today; is that correct?
13        A.   Yes, I have.
14        Q.   Okay.  I'm going to go through Schedule
15  A, and you just tell me what you brought today that is
16  responsive to those things, and I'm going to ask you
17  some questions on if there are other things that you
18  haven't brought today that are responsive as well,
19  okay?
20        A.   Yes.
21        Q.   Number 1, this is on Page 7, a complete
22  copy of your Curriculum Vitae?
23        A.   I believe that's part of my expert
24  report.

**Page 9**

1         Q.   Number 2, "Any and all documents in your
2   possession, including but not limited to,
3   correspondence, notes, videos, CDs, DVDs, flash or USB
4   drives, photographs, databases or materials in other
5   form provided to you or created by you which relate to
6   your opinions, expected testimony or development of
7   your opinions in this litigation."
8         A.   Yes.
9         Q.   Have you brought everything that you
10  believe that you have is responsive in regard to Number
11  2?
12        A.   Yes.
13        Q.   Number 3, "Any and all documents
14  reviewed by you in preparation for this deposition."
15        A.   Yes, I have.
16        Q.   Okay.  And, Doctor, I believe off the
17  record we had discussed the fact that all you've
18  brought with you today are literature that is in your
19  reliance list and your expert reports; is that correct?
20        A.   Yes.
21        Q.   Okay.  So you have not reviewed any
22  documents in preparation for your deposition here today
23  that were not in your reliance list?
24        A.   I mean, with the understanding that this

3  (Pages 6 to 9)

Marc R. Toglia, M.D.

Page 10

1  is what I do for a living, there's a tremendous amount
2  of stuff that I do read and review, in general, that's
3  on the subject matter, but I believe that the stuff
4  that's in my report is on the reliance list.
5          MR. SNELL: Just for clarification,
6      counsel, are you asking about things he's
7      reviewed since his report or depositions of
8      plaintiffs' experts, things like that, because,
9      obviously, those were not available to him at
10     the pertinent time.
11         MR. SCHNIEDERS: I'm asking for anything
12     at this point with Number 3 that he has
13     reviewed in preparation for this deposition
14     here today.
15 BY MR. SCHNIEDERS:
16     Q.    Does that cover it, Doctor?
17     A.    Essentially, yes. Understand that I
18 also have access to information that is not published
19 and that I am not at liberty to share because I'm an
20 editor for journals and I review for -- so, obviously,
21 I have not brought that, but I don't quote or cite that
22 information in my report.
23     Q.    Are you relying on any unpublished
24 information --

Page 11

1      A.    I'm sorry. I'm not relying upon --
2  sure, I'm not relying upon that information.
3      Q.    Okay. Did you review that information
4  in preparation for your deposition here today?
5      A.    That is information that I have reviewed
6  for my own role outside of this deposition, so not in
7  preparation for this deposition.
8      Q.    Has your counsel been privy to those
9  documents?
10     A.    He has not.
11         MR. SNELL: I'm not his counsel.
12         MR. SCHNIEDERS: I'm sorry.
13         THE WITNESS: I'm sorry. Does that
14     make -- is my intent clear with that?
15 BY MR. SCHNIEDERS:
16     Q.    Well, if we're going to be clear, I
17 think what you're telling me is that you may have come
18 about information outside of this litigation that has
19 not informed your opinions in this litigation in any
20 way, shape or form, correct?
21     A.    Correct.
22     Q.    And you're not relying upon that
23 information to put forth your opinions in this case,
24 correct?

Page 12

1      A.    Yes, that's correct.
2      Q.    So is it fair to say that whatever
3  information this is you're talking about, you didn't
4  review it in anticipation for this deposition?
5      A.    Right.
6      Q.    Did you review any depositions that are
7  not on your reliance list?
8      A.    Again, I've got the Ostergard
9  deposition, which I only recently received, so I don't
10 know if that would be on the list or not, but I did
11 bring the deposition with me.
12         MR. SNELL: Since we're the ones who
13     generated the list, it would not be on there,
14     since the list was -- I took Ostergard's
15     deposition, it was a week or two at least after
16     he produced expert reports, so I do not think
17     it's on there. I haven't even looked.
18         MR. SCHNIEDERS: Well, and I believe,
19     counsel, did we receive a new reliance list
20     yesterday.
21         MR. SNELL: It wasn't a new reliance
22     list. It was, essentially, a corrected one. I
23     think the paralegals attached his sling TVT
24     reliance list to both his TVT report and his

Page 13

1  prolapse report, instead of attaching the right
2  prolapse list to the prolapse report. So it's
3  not amended or updated or anything like that.
4  It's just they stuck the wrong one on the POP
5  report.
6          MR. SCHNIEDERS: Okay. So the list that
7      was produced yesterday was the list as of the
8      date of the issuance of the report?
9          MR. SNELL: Like 29th to 30th of
10     February.
11         MR. SCHNIEDERS: And did you bring a
12     copy of that list that was produced yesterday
13     because I don't know if I have that list to
14     mark as an exhibit here today.
15         MR. SNELL: Do you have a copy?
16         THE WITNESS: This, POP?
17         MR. SNELL: If you want to take that,
18     you can mark it.
19         MR. SCHNIEDERS: We'll get to that in a
20     second.
21         MR. SNELL: But as to your question, I
22     doubt Ostergard's deposition was on this, I
23     don't see it on here.
24 BY MR. SCHNIEDERS:

4 (Pages 10 to 13)

Marc R. Toglia, M.D.

Page 14

1    Q.   Doctor, have you reviewed any documents
2    since your deposition on the TVT report that you hadn't
3    previously reviewed before the TVT report deposition?
4         MR. SNELL:  Form.
5         THE WITNESS:  Yes, the information as it
6    relates to Gynemesh and Prolift were not part
7    of my TVT report.
8    BY MR. SCHNIEDERS:
9    Q.   But you issued those reports at the same
10   time, didn't you?
11   A.   No.  This report was issued February 26,
12   2016.  The other report was issued back in October.
13   Q.   Okay.  Doctor, have you brought --
14   strike that.
15        You haven't brought -- are there any
16   photographs or other images including photographs of
17   the plaintiffs, the plaintiffs' explanted mesh or
18   products taken by you or for you which relate to your
19   opinions in this case?
20   A.   No.
21   Q.   Have you brought any Ethicon products in
22   your possession?
23   A.   I don't have any Ethicon -- oh, Ethicon
24   products, no.

Page 15

1    Q.   "Any and all documents, including time
2    sheets, invoices, time records, billing records which
3    record or document the work performed, time spent or
4    charges made in connection with your expert opinion in
5    this matter."
6    A.   I have my invoices, yes.
7    Q.   And are they here today?
8    A.   I'm sorry.  What is the date of the last
9    invoice?  There should be a date end of February.
10   Q.   Yeah, there's a February 29th of this
11   year.
12   A.   Right.
13   Q.   Is that the most recent invoice?
14   A.   Most recent invoice that I have
15   submitted, correct.
16   Q.   Any communication between you and your
17   counsel -- I'm sorry, strike that.
18        Any communication between you and counsel for
19   the defendants, to the extent such communications
20   relate to your compensation; identify facts or data
21   that you were provided and that you considered in
22   forming your opinions; or identify assumptions that
23   plaintiffs' counsel provided you and that you relied on
24   in forming your opinions.

Page 16

1    A.   No.
2    Q.   How have you communicated with defense
3    counsel in this case?
4    A.   By phone.
5    Q.   Have you ever e-mailed with defense
6    counsel?
7    A.   Not an opinion or the stuff that you
8    just referred to, no.
9    Q.   So nothing about compensation rates or
10   bill sheets or anything like that?
11   A.   No.
12   Q.   Did you collect a retainer in this case?
13   A.   I did not.
14   Q.   Do you typically collect retainers in
15   cases in which you --
16   A.   I do not.
17   Q.   And if you let me finish my questions,
18   I'll let you start off after that, if you don't mind,
19   because otherwise we'll get on top of each other.
20        So, as I sit here, I've got two invoices that
21   are dated January 31st of 2016 and February 29th of
22   2016, and that is all of the time that you have billed
23   to date in the Ethicon Gynecare mesh litigation titled
24   MDL 200?  I'm just reading off of this.

Page 17

1    A.   That is everything I have billed to
2    date.
3    Q.   When were you first contacted to work in
4    this case?
5    A.   End of August 2015.
6    Q.   All right.  Moving through the notice to
7    get through that, Number 10, any and all documents,
8    including consulting agreements, time sheets, invoices,
9    time records, billing records which record or document
10   the work performed, time spent or charges made in
11   connection with consulting related to studies,
12   consulting work, cadaver labs, professional education
13   training and any other work that has been compensated
14   by defendants or expert fees charged to defendant
15   related to any female pelvic mesh product sold by
16   Ethicon for treatment of stress urinary incontinence or
17   pelvic organ prolapse.
18        Did you bring any documents related to
19   Number 10?
20        MR. SNELL:  I'll just note for the
21   record, I that we filed objections as to some
22   of these requests.  Go ahead.
23        THE WITNESS:  I don't believe we've
24   provided any of that.

5 (Pages 14 to 17)

Marc R. Toglia, M.D.

Page 18

1  BY MR. SCHNIEDERS:
2      Q.    Have you provided any of that to defense
3  counsel?
4      A.    I don't have an independent recollection
5  that I have.
6      Q.    Whether you have provided it to defense
7  counsel or not, do you have documents that would fall
8  under category 10?
9      A.    I don't have documents.  If I'm not
10  mistaken, at the TVT deposition we did cover the amount
11  and extent of my participation and compensation from
12  Ethicon.
13     Q.    I appreciate that, Doctor, but as far as
14  the documents that have been requested here at Number
15  10, do you have any responsive documents in your
16  possession?
17     A.    Like I said, they were covered in the
18  TVT deposition, that's all.  That's all I have.
19     Q.    You produced all the documents you had
20  in your possession as part of the TVT deposition?
21     A.    I don't recall the specifics, but I do
22  recall that we went over all that on record, correct?
23         MR. SNELL:  Yeah, I think he did produce
24      whatever he had.

Page 19

1          THE WITNESS:  Right.
2          MR. SNELL:  I think this is the same as
3      what he produced -- whatever he had, he
4      produced.
5          THE WITNESS:  Right, yes.
6  BY MR. SCHNIEDERS:
7      Q.    So you produced consulting agreements?
8      A.    I don't know the answer to that.  I
9  don't recall.
10     Q.    Do you have consulting agreements with
11  Ethicon?
12     A.    None actively, no.
13     Q.    Do you have the paper that reflects the
14  consulting agreement with Ethicon?
15     A.    No, I do not.
16     Q.    You don't keep any of those for your
17  files?
18     A.    No.
19     Q.    Do you keep records of your invoices
20  that you send to Ethicon?
21         MR. SNELL:  Object to form.  Go ahead.
22         THE WITNESS:  I don't have the records,
23      no.  I haven't done consulting with Ethicon in
24      years, and I discard such things after usual

Page 20

1      tax, it might be five years, I can't remember,
2      three to five years I discard them.
3  BY MR. SCHNIEDERS:
4      Q.    Just so we're clear on the record, right
5  now we're talking about things that are outside of
6  litigation, correct?
7      A.    Understood.
8      Q.    And so when is the last time that you
9  consulted outside of litigation with Ethicon?
10         MR. SNELL:  Object.  This is covered in
11      his first deposition, but go ahead.
12         THE WITNESS:  It's to the best of my
13      recollection, and it is a guesstimate at best,
14      2011.  It's not been -- not in my working
15      memory.
16  BY MR. SCHNIEDERS:
17     Q.    Do you recall in the last six months
18  destroying any of these kind of documents?
19     A.    No, I did not.
20     Q.    So is it your testimony here today that
21  you have no documents that are responsive to Number 10
22  in your possession that you have not previously
23  produced as part of your TVT deposition?
24     A.    Yes, it is.

Page 21

1      Q.    Is that because the documents are all in
2  the possession of your practice?
3      A.    I don't believe they are.
4      Q.    Okay.  Well, if we go back, Doctor, and
5  see from the TVT deposition that there wasn't anything
6  produced that's responsive to Number 10 from you, are
7  there responsive documents somewhere that you have?
8      A.    I think I've answered that.  I do not
9  have what you're asking for in my possession, because I
10  have not had any active consulting agreement with
11  Ethicon for more than five years.  I certainly have not
12  destroyed anything since I was contacted by Mr. Snell
13  regarding these matters.
14     Q.    And you were contacted in August of
15  2015?
16     A.    I believe so.
17         THE WITNESS:  Does that sound right to
18      you?
19         MR. SNELL:  I can't testify, but I think
20      you're in the right ballpark.
21         THE WITNESS:  Okay.
22         MR. SNELL:  And this is to the best of
23      your recollection.
24         THE WITNESS:  To the best of my

6 (Pages 18 to 21)

Marc R. Toglia, M.D.

Page 22

```
 1        recollection.
 2   BY MR. SCHNIEDERS:
 3        Q.    How were you contacted by Mr. Snell?
 4        A.    Telephone.
 5        Q.    Did you know Mr. Snell prior to that
 6   conversation?
 7        A.    No, I did not.
 8        Q.    Did you know any of Mr. Snell's partners
 9   prior to that?
10        A.    No, I do not.
11        Q.    Had you ever worked on a legal case
12   prior to Mr. Snell contacting you?
13        MR. SNELL:  Form.
14        THE WITNESS:  I had worked on
15   malpractice cases but not product liability
16   cases.
17   BY MR. SCHNIEDERS:
18        Q.    So you served as an expert witness in a
19   medical malpractice case before?
20        A.    I have.
21        Q.    We'll talk about that in just one
22   moment.
23        MR. SNELL:  Counsel, this was all
24   covered in depth in the TVT deposition.
```

Page 23

```
 1        MR. SCHNIEDERS:  Taking my deposition,
 2   Burt, you can talk about whatever you want.
 3   They're responsive questions.
 4        MR. SNELL:  Actually, no, you're not,
 5   because the parties have an agreement; there
 6   shall not be duplicative discovery of experts.
 7        MR. SCHNIEDERS:  I've looked through the
 8   entire transcript, and I'm very comfortable
 9   that I'm asking the right questions, not to
10   mention the fact that you've given me a whole
11   other reliance list that I got yesterday, so
12   I've got to ask my questions and see what's out
13   there.  There weren't any consulting agreements
14   produced as part of the TVT deposition.
15        MR. SNELL:  I know that because he
16   didn't have any, but I think he told you they
17   were marked.  They were definitely discussed in
18   that deposition.  I don't have the deposition
19   with me, but I know for a fact that they were
20   marked.
21        MR. SCHNIEDERS:  Well, I just read it
22   again last night so -- and those consulting
23   agreements would have been there and, okay, you
24   can look at what's been marked in there, if you
```

Page 24

```
 1   have the transcript.  There weren't any.
 2        MR. SNELL:  I don't have the transcript
 3   with me.
 4        MR. SCHNIEDERS:  Okay.  Let's not waste
 5   time on it, all right.
 6   BY MR. SCHNIEDERS:
 7        Q.    Number 11, "Copies of Schedule C and
 8   Form 1099 of your tax records for the preceding five
 9   (5) tax years, as well as any other documentation that
10   reflects consulting and/or expert fees charged to
11   defendants (with personal information and any other
12   information unrelated to consulting fees redacted)."
13        MR. SNELL:  We objected to that, and
14   this witness will not be producing his tax
15   forms.
16        MR. SCHNIEDERS:  And what's the basis of
17   that objection?
18        MR. SNELL:  Invades his privacy, all the
19   bases we set forth.  Your experts have not
20   produced any of their tax forms.
21   BY MR. SCHNIEDERS:
22        Q.    Number 12, "All correspondence,
23   memoranda, e-mails and/or any other documentation
24   reflecting communications (including written,
```

Page 25

```
 1   electronic and/or oral) with any employees of
 2   defendants related to any female pelvic mesh product
 3   sold by Ethicon, Inc. for treatment of stress urinary
 4   incontinence or pelvic organ prolapse."
 5        Have you produced any such correspondence,
 6   memoranda, e-mails or other documentation, Doctor?
 7        A.    I believe I answered earlier that I
 8   don't have any of those correspondence in my
 9   possession.
10        Q.    What's your current e-mail address?
11        A.    I think that's personal information.
12   That's not a question I'm willing to answer on the
13   record.
14        Q.    Is it @ATT.net address?
15        A.    I'm not going to answer that question.
16        Q.    Is that on counsel's instruction or on
17   your own volition?
18        A.    I don't see how that's relevant to my
19   role.  I'm here to discuss my expert report and my
20   opinions in that regard.
21        Q.    In your communication with sales
22   representatives for the defendant, did you ever use
23   your personal e-mail address?
24        MR. SNELL:  I'm going to object.  This
```

7 (Pages 22 to 25)

Marc R. Toglia, M.D.

Page 26

1    is irrelevant.  This is, I think, covered in
2    the first deposition, and you're about to get
3    into areas that -- well, we'll leave it at
4    that.
5            MR. SCHNIEDERS:  I think I know what
6    you're talking about, and I don't intend to go
7    anywhere near that, so you can relax on that.
8            THE WITNESS:  I'm not trying to be
9    obstructive or difficult, but to the best of my
10   knowledge, I don't recall ever using personal
11   e-mail to respond -- well, I don't, I don't.  I
12   don't remember.  I don't recall.
13   BY MR. SCHNIEDERS:
14       Q.   I'll be fair to you on this, Doctor.
15   I'm not trying to elicit some of what I think you're
16   thinking I'm trying to elicit right now.
17       A.   I understand.
18       Q.   In your first deposition there were some
19   e-mails where you did, and I'm not talking about any
20   specific instance, but there were e-mails back and
21   forth with other people that are involved in Ethicon in
22   their professional capacity?
23       A.   Correct, right, okay, correct.  But I
24   don't have in my possession any of that, those

Page 27

1    transcripts, I don't have any copies or -- I don't have
2    copies of those e-mails.  I haven't used an AT&T
3    address in I don't know how long.
4        Q.   And did -- with your new address which
5    I've also seen on some e-mails, did you go back when
6    you received this notice to review to see if you had
7    any responsive e-mails?
8        A.   I did not have any responsive e-mails.
9        Q.   You looked for them?
10       A.   Yes.  The last -- I mean, the last
11   communications I had with Ethicon had nothing to do
12   with any of the stuff that we're discussing today.
13   They were on projects that were unrelated to any of
14   this.
15       Q.   What projects?
16       A.   They were projects for other products
17   that are not related to Gynemesh or Prolift.
18       Q.   Okay.  They were other products that
19   were made or in production or premarket by Ethicon?
20       A.   They were concepts for potential
21   products within this sphere of female pelvic floor
22   disorders.
23       Q.   Like the Sphinx?
24       A.   Correct.

Page 28

1        Q.   Any others?
2        A.   No, no.
3        Q.   And the Sphinx never made it to market,
4    correct?
5        A.   It never made it past the conceptual
6    stage.  Does that make sense to you?
7        Q.   It does.
8        A.   Okay.
9        Q.   Number 13 is duplicative of some of the
10   other ones.  I'm assuming you are going to tell me that
11   you have produced everything that is responsive to
12   Number 13; is that correct, Doctor?
13       A.   That would be my position, correct.
14       Q.   Number 14, "All documents related to
15   deponent's involvement with Ethicon's professional
16   education, including, but not limited to any and all
17   PowerPoints, course materials, outlines, videos or
18   presentations, live surgical presentations, marketing
19   evaluations created by or provided to deponent related
20   to any female pelvic mesh product sold by Ethicon, Inc.
21   for treatment of stress urinary incontinence or pelvic
22   organ prolapse.
23           Do you have any responsive documents to Number
24   14?

Page 29

1        A.   I do not have any of those items in my
2    possession.
3        Q.   You didn't keep any PowerPoints or
4    anything you put together?
5        A.   No.  To be clear, I never created any of
6    those talks.  There were talks that might have been
7    provided to me.  Once my consulting arrangement changed
8    and I threw things out, I don't really keep that stuff.
9        Q.   They were provided to you by Ethicon,
10   right?
11       A.   Products related, right.  I mean, I
12   think some of them we have -- we have brought, the
13   Prolift professional education materials.  Nothing
14   different than that.
15           MR. SNELL:  Right, but I think he's
16   asking you did you have -- do you have any from
17   back when you were a consultant, not stuff that
18   you reviewed and prepared that's on the thumb
19   drives.
20           MR. SCHNIEDERS:  Right.
21           MR. SNELL:  I think that's what he's
22   asking about.
23           MR. SCHNIEDERS:  That's correct.
24           THE WITNESS:  No, I don't have it.

8 (Pages 26 to 29)

Marc R. Toglia, M.D.

Page 30

BY MR. SCHNIEDERS:
2      Q.    Just so we're clear on the record here,
3  Doctor, you've given talks on behalf of Ethicon, right?
4      A.    Correct.
5      Q.    You've used presentations in those talks
6  at times like PowerPoints, right?
7      A.    That were provided to me by Ethicon.
8      Q.    And those were put together by Ethicon
9  for you to present?
10     A.    Correct.
11     Q.    And you don't have any of those in your
12  possession, as we sit here today, correct?
13     A.    I do not.
14     Q.    Okay.  Number 15, "Any and all materials
15  including, but not limited to, protocols, results,
16  adverse events, minutes for study meeting related to
17  any clinical trials and/or studies of any type related
18  to deponent's work as consultant for defendant in any
19  capacity related to any female pelvic mesh product sold
20  by Ethicon, Inc. for treatment of stress urinary
21  incontinence or pelvic organ prolapse."
22         Do you have any responsive documents, Doctor?
23     A.    I do not.
24     Q.    Are you currently involved in enrolling

Page 31

1  in a clinical trial?
2      A.    I am not.
3      Q.    So just so we're clear, anything that is
4  responsive to Number 15 you've either produced or don't
5  have anymore, correct?
6      A.    Correct.
7      Q.    "16.  Any reports/documents, whether
8  kept in hard copy or electronic form, relating to any
9  other matter involving any female pelvic mesh product
10  for treatment of stress urinary incontinence or pelvic
11  organ prolapse."
12         Do you have any responsive documents to Number
13  16, Doctor?
14     A.    I do not.
15     Q.    You don't keep anything on any other
16  female pelvic products?
17     A.    I do not.
18     Q.    "Any and all documents, including
19  transcripts or statements, between you and any
20  governmental agency regarding any female pelvic mesh
21  product used for treatment of stress urinary
22  incontinence or pelvic organ prolapse."
23         Do you have any responsive documents to Number
24  17, Doctor?

Page 32

1      A.    I do not.
2      Q.    Have you ever reported an adverse event
3  to the FDA?
4      A.    I have.
5      Q.    Do you ever keep a record of that?
6      A.    No.
7      Q.    Have you ever reported an adverse event
8  related an Ethicon product to the FDA?
9      A.    I have.
10     Q.    On how many occasions?
11     A.    I don't know the answer to that.
12     Q.    Ballpark, ten?
13     A.    Ten may be a reasonable guess.
14     Q.    Have you ever reported any adverse
15  events to the FDA for any of the products we're here to
16  talk about today?
17     A.    I have.
18     Q.    Can you tell me which products?
19     A.    Prolift, I'd say three or five.
20     Q.    Any for Gynemesh PS?
21     A.    No.
22     Q.    Any for TVT?
23     A.    Not that I can specifically recall.
24  Hold on.

Page 33

1         In all honesty, most of the reports that I have
2  filed with the MAUDE probably involved non-Ethicon
3  products.
4      Q.    Any particular reason?
5      A.    I think that they reflect what -- these
6  were not products that I personally had implanted, but
7  they were women that I subsequently cared for, and it
8  just simply reflects the nature of my referral
9  practice.
10     Q.    Because as a physician, you have a duty
11  when you find out about an adverse event to report it,
12  regardless of how you come about that information,
13  right?
14         MR. SNELL:  Objection, calls for a legal
15  conclusion.
16  BY MR. SCHNIEDERS:
17     Q.    Was that a yes, Doctor?
18     A.    I have reported events that I have come
19  across as a surgeon.
20     Q.    And my point is just that regardless of
21  whether or not it's your patient or you find out about
22  it from another manner, you would still report an
23  adverse event because you have a duty as a doctor to do
24  that, correct?

9 (Pages 30 to 33)

Marc R. Toglia, M.D.

Page 34

1        MR. SNELL:  Objection, calls for legal
2    conclusion.
3        THE WITNESS:  I'm not so sure about the
4    duty, but my personal practice is to report
5        those events.
6    BY MR. SCHNIEDERS:
7        Q.    And it's fair to say that with regard to
8    types of mesh products that we're talking about here
9    today, and I'm talking about the entire spectrum,
10   regardless of Ethicon or other manufacturers, that
11   you've reported more adverse events for the other
12   manufacturers than Ethicon?
13       MR. SNELL:  Form.
14       THE WITNESS:  I would say that is likely
15   true.
16   BY MR. SCHNIEDERS:
17       Q.    Do you have any recollection of what
18   product you've likely reported the most times as an
19   adverse event?
20       A.    I do.
21       Q.    Which product is that?
22       A.    I believe Apogee Perigee.
23       Q.    Do you have any idea of how many adverse
24   events you reported on that product?

Page 35

1        A.    I do not.
2        Q.    Number 18 says, "Any and all documents
3    relating to an presentations, PowerPoints or lectures
4    regarding any female pelvic mesh product used for
5    treatment of stress urinary incontinence and pelvic
6    organ prolapse."
7        Is your answer the same as it was regarding the
8    materials themselves that you don't have anything in
9    your possession?
10       A.    That is correct.
11       Q.    Lastly, Number 19, "Any demonstrative
12   exhibits, such as graphics or charts, prepared by or on
13   your behalf for use at trial."
14       Do you have any responsive documents?
15       A.    We're talking about other than what has
16   already been provided either in my TVT deposition or
17   currently?
18       Q.    Yes.
19       A.    I have nothing in addition.
20       Q.    You can set that to the side.
21       MR. SCHNIEDERS:  I'm going to do a
22   little housekeeping here because I actually
23   premarked a few things, and I'm going to get
24   off track if I don't do it the right way.

Page 36

1        (Document marked for identification as
2    Toglia Deposition Exhibit No. 2.)
3        MR. SCHNIEDERS:  I'm going to hand you
4    your CV, which I've marked as Exhibit 2.
5    BY MR. SCHNIEDERS:
6        Q.    Doctor, this looks like this was revised
7    at the top right there on 8/13 of 2015; is that
8    correct?
9        A.    Yes.
10       Q.    Is this your most current CV?
11       A.    Yes.
12       Q.    Doctor, you are what's called a
13   urogynecologist, correct?
14       A.    Actually, I am a specialist in female
15   pelvic medicine and reconstructive surgery, which was
16   formerly referred to as urogynecology.
17       Q.    I see in 2013 that you went to get a
18   board certification in female pelvic medicine and
19   reconstructive surgery.
20       Can you tell me what that entailed?
21       A.    I didn't go in 2013.  I went in 2012 and
22   in 2013 I received certification.  So female pelvic
23   medicine and reconstructive surgery is the fourth
24   subspecialty within the specialty of obstetrics and

Page 37

1    gynecology.  It is duly accredited by both the American
2    Board of Obstetrics and Gynecology and the American
3    Urologic Board.
4        This involved -- this is a multipart process
5    culminating in taking and passing a written exam.
6    Prior to that, there were demonstration of adequate
7    case volume and level of training.  For example, you
8    had to be previously board certified either by the
9    American Board of OB-GYN in OB-GYN or the American --
10   the ABU, the American Board of Urology.
11       Q.    And was that a facility locally that you
12   were able to go and do some of this work, or how did
13   that actually work out?
14       A.    Well, the process is guided by the
15   ACGME, the American College of Graduate Medical
16   Education.  The exam itself was taken via computer by
17   local sites throughout the country, locally through
18   some of the different learning centers.
19       Q.    Prior to 2013 when you received the
20   board certification and began your work, did you
21   consider yourself to be a specialist in the area of
22   female pelvic medicine and reconstructive surgery?
23       A.    That's correct.
24       Q.    How many people nationwide hold this

10  (Pages 34 to 37)

Marc R. Toglia, M.D.

Page 38

1    subspecialty, if you know?
2        A.    So in 2013 approximately 750 of us were
3    board certified, and 2014/2015 there might have been
4    the addition of another 100 or so each year.  I
5    couldn't give you the final number.  I'm sure it's
6    something that's readily available, but I'm going to
7    guesstimate we're talking about 1,200 individuals who
8    are currently board certified in the subspecialty.
9        Many others, including some of your experts,
10    did not sit for the boards, but this is still their
11    area of expertise and practice.
12        Q.    Did any pharmaceutical company or device
13    company in any way, shape or form fund or help with
14    your board certification?
15        A.    No, none whatsoever.
16        Q.    They didn't sponsor any programs that
17    had to do with it?
18        A.    No.
19        Q.    Do you have any academic appointments,
20    Doctor?
21        A.    I do.  They're listed on my CV.
22        Q.    And when I say that, are you employed by
23    any of these facilities?
24        A.    I am not.

Page 39

1        Q.    Do you teach any classes?
2        A.    I teach clinically, I give lectures.  I
3    don't teach classes in the sense that a college
4    professor would teach classes.
5        Q.    On Page 2 and, obviously, you know your
6    CV so you probably don't need it to talk through it,
7    but I see that you're a member currently of some
8    professional societies.  I think I know which ones they
9    are, but there was a couple typos later on, so I just
10    want to make clear which of these professional
11    societies are you currently a member of?
12        A.    Sure.  I'm currently a member of the
13    American Urogynecologic Society, the Society for
14    Gynecologic Surgeons, the International Urogynecology
15    Society, which is not on this list, I don't think.  I'm
16    a fellow of the American College of Obstetrics and
17    Gynecology as well.
18        Q.    Okay.  And moving to the next page, it
19    appears that you hold or at least held as of 2015 a
20    vice chair position for the Committee for Government
21    Relations and Coding at the American Urogynecologic
22    Society; is that correct?
23        A.    I'm currently the chair of that
24    committee.

Page 40

1        Q.    Okay.
2        A.    And it's actually the chair of coding.
3        Q.    Okay.  And in your position as vice
4    chair and now chair, what are your duties?
5        A.    I represent the society nationally at
6    meetings such as the CPT, the RUC.  I interact directly
7    with the government through CMS.  I represent the
8    society as a liaison member to the American College of
9    Obstetrics and Gynecology, and I either head or direct
10    certain task forces as they relate to coding and health
11    economics within the sphere of female pelvic medicine.
12        Q.    Okay.  And if I say AUGS, you know what
13    I'm talking about, right?
14        A.    I do.
15        Q.    So your position as vice chair, then
16    chair of this committee with AUGS is tied to this
17    bottom one here, where it says "Member, ACOG Committee
18    of Health Economics and Coding, AUGS Liaison"?
19        A.    Yes.
20        Q.    Okay.  Tell me what AUGS is.
21        A.    AUGS is a professional organization of
22    healthcare providers, which includes physicians,
23    physical therapists, nurse specialists that are
24    interested in promoting excellence in female pelvic

Page 41

1    medicine and reconstructive surgery.
2        Q.    Is it sponsored by any pharmaceutical or
3    device companies?
4        A.    It is not.
5        Q.    What about ACOG, tell me what ACOG is.
6        A.    ACOG is the professional organization,
7    it's the American College and Congress of Obstetrics
8    and Gynecology that is based out of Washington, DC and
9    comprises the professional members, again, doctors,
10    nurse practitioners, other healthcare providers in the
11    specialty of obstetrics and gynecology.
12        Q.    Okay.  And is ACOG sponsored or funded
13    by any pharmaceutical or device companies?
14        A.    No.
15        Q.    And you're sure about that with regard
16    to AUGS and ACOG?
17        A.    I am certain about that.
18        Q.    Down here under Hospital Service it
19    says, "System Chief, Division of Female Pelvic Medicine
20    and Reconstructive Pelvic Surgery, Main Line Health."
21    What is Main Line Health?
22        A.    Main Line Health is the largest health
23    system here in Philadelphia.  It's a not-for-profit
24    system consisting of four hospitals.

11 (Pages 38 to 41)

Marc R. Toglia, M.D.

Page 42

1      Q.    And do you have privileges at all four
2  of those hospitals?
3      A.    I have privileges at all four hospitals.
4      Q.    Is there any particular hospital you do
5  the majority of your procedures at?
6      A.    Yes.
7      Q.    Which one is that?
8      A.    I split my time clinically between Paoli
9  Hospital located in Paoli, Pennsylvania and Riddle
10  Hospital located in Media, Pennsylvania.
11      Q.    If you want to move on, Doctor, to Page
12  4, there is a section at the bottom there that's called
13  "Past Clinical Research Projects."
14      Do you see that?
15      A.    I do.
16      Q.    And it looks to me as if there are nine
17  times in your past in which you've participated in a
18  clinical study; is that correct?
19      MR. SNELL:  Hold on.  Did you say nine?
20      MR. SCHNIEDERS:  That's what I see,
21      because I'm skipping ten, so I'm going to ask
22      him separately.
23      MR. SNELL:  I'm going to object to form.
24  BY MR. SCHNIEDERS:

Page 43

1      Q.    You tell me, because ten seems to be a
2  bit different, because I asked you earlier if you were
3  in the process of enrolling patients, and you told me
4  no.  So let's just start with 1 through 9.  It looks
5  like there were several clinical research projects you
6  were involved with?
7      MR. SNELL:  I'll just note for the
8      record this issue in Number 10 and the
9      statement about currently enrolling patients I
10      know was covered in his prior deposition.
11      MR. SCHNIEDERS:  I'll let you make your
12      objections.  If I can finish my questions
13      before you start them, if you don't mind.
14      MR. SNELL:  Go ahead.  Covered.
15  BY MR. SCHNIEDERS:
16      Q.    So, Doctor --
17      A.    I've participated in ten, and I am not
18  currently enrolling.
19      Q.    Okay.  And tell me why that is?
20      A.    Because this is simply a typographical
21  error, and that was covered in my deposition with the
22  TVT trial.  And my apologies, the problem is I can't
23  make corrections because these belong to the Court.  If
24  I had another copy, I'm happy to correct that for the

Page 44

1  next time, but I realize this comes up, but I don't
2  have my own set of private things that I can correct
3  these things on, but I will tell you that you that is an
4  old trial that has already been published.
5      Q.    And that's my question, Number 10 then,
6  is that the actual trial that you did go on to publish?
7      A.    Yes.
8      Q.    That's listed as Number 23 under your
9  publications?
10      A.    Yes.
11      Q.    Doctor, other than 23, are there any
12  publications that you have ever made with regard to any
13  mesh product?
14      MR. SNELL:  Form.
15      THE WITNESS:  Twenty-four is an
16      editorial that I wrote that talked about
17      sacrocolpopexy, which would involve the mesh,
18      but that is an editorial.
19  BY MR. SCHNIEDERS:
20      Q.    But no other articles other than those
21  two?
22      A.    Article 16 was a study I published with
23  my own patient population.  Some of those patients did
24  have a mesh procedure, although, to the best of my

Page 45

1  knowledge, we did not stipulate what that was.
2      Q.    But fair to say that that article was
3  primarily about polyester sutures?
4      MR. SNELL:  Form.
5      THE WITNESS:  As the title suggests, it
6      was about both long-term surgical outcomes as
7      well as wound complications in that population.
8  BY MR. SCHNIEDERS:
9      Q.    All right, Doctor, I'd like to switch
10  topics now, and I'd like to start with your first work
11  with Ethicon.
12      It's my understanding that you were recruited
13  by Dr. Lucente; is that correct?
14      MR. SNELL:  Objection, asked, and this
15      is all covered in his first deposition.
16      THE WITNESS:  No, I was not recruited by
17      Dr. Lucente.
18  BY MR. SCHNIEDERS:
19      Q.    Well, how would you characterize it?
20      MR. SNELL:  Objection, asked and
21      answered, prior covered.
22      THE WITNESS:  How I was contacted by
23      Ethicon?
24  BY MR. SCHNIEDERS:

12 (Pages 42 to 45)

Marc R. Toglia, M.D.

Page 46

1    Q.    Yes.
2    A.    I don't recall the specifics.  I would
3  have been contacted probably by a product manager.
4    Q.    Approximately what year would that have
5  been?
6    MR. SNELL:  Same objection.  This is all
7    covered in the prior deposition.
8    THE WITNESS:  1999.
9  BY MR. SCHNIEDERS:
10    Q.    Okay.  Had you ever worked for Ethicon
11  prior to being contacted for that consulting?
12    A.    That was the first contact.
13    Q.    Okay.  Prior to 1999 had you worked with
14  other pharmaceutical or device companies?
15    A.    I think I had, yes.
16    Q.    Which companies had you worked with
17  prior to working with Ethicon?
18    A.    Well, I did clinical trials for what we
19  then called Yamanouchi, which is now called Astellas.
20  I did a clinical trial with Eli Lilly, a clinical trial
21  with Pfizer.
22    Q.    Pharmacia?
23    A.    I did some work with Johnson & Johnson,
24  which owns Ethicon, but at the time it was not with

Page 47

1  Ethicon, I don't believe, no.  Realize this is not
2  directly relevant, but whether or not Monistat as a
3  product was Ethicon versus Johnson & Johnson, I don't
4  know.
5    Q.    But that was the product at that time?
6    A.    Correct.
7    Q.    Aside from what's listed in your past
8  clinical research projects and the companies that
9  you've listed as the sponsors, do you recall any other
10  pharmaceutical companies you worked with prior to 1999?
11    A.    Yes, there were a host of them.
12    Q.    Which ones can you name for me?
13    A.    Now you're really taxing my long-term
14  memory.  Rhone-Poulenc Rorer.  As you probably are
15  aware, counselor, many of these companies have been
16  absorbed and renamed.
17    Q.    That is Aventis now, that would be
18  Aventis?
19    A.    Right, correct.  Pharmacia Upjohn,
20  that's probably it.
21    Q.    Other than the ones that are listed in
22  your CV, that would be about it?
23    A.    Correct.
24    Q.    Okay.  Starting in 1999, what was your

Page 48

1  work with Ethicon?
2    MR. SNELL:  Objection, form and covered
3    in prior dep.
4    THE WITNESS:  I think I previously
5    stated that initially I may have participated
6    in some kind of market research that actually
7    probably was prior to '99, let's say '98.  I
8    don't necessarily consider that a consulting
9    relationship.  I was just asked to give
10    feedback from a marketing perspective on the
11    TVT product.  At some point in time, I started
12    to get involved more in the professional
13    education teaching, the TVT technique.
14    Does that answer your question?
15  BY MR. SCHNIEDERS:
16    Q.    Sure, that's the beginning.  So as a
17  preceptor, correct?
18    A.    Correct.  And I also started to serve in
19  an advisory or a consultant role.
20    Q.    What products did you serve as a
21  preceptor for with Ethicon?
22    A.    I would say the TVT family of products,
23  TVT, TVT obturator, TVT Secur, TVT Abbrevo, TVT Exact.
24    Q.    Did you ever serve as a preceptor for

Page 49

1  Gynemesh PS?
2    A.    To the best of my knowledge, no.
3    Q.    Same question with regard to Prolift?
4    A.    Yes.
5    Q.    Have you ever served as a preceptor for
6  any company that was not Ethicon?
7    A.    I don't believe so.
8    Q.    So your relationship with Ethicon would
9  have began with a market research consulting or
10  whatever you want to call that in 1998 and, based upon
11  your recollection, continued till about 2011?
12    MR. SNELL:  Object to form, previously
13    covered.
14    THE WITNESS:  I believe so, yes.
15    MR. SCHNIEDERS:  I'm going to switch
16    topics.  Does anyone want to take a break, or
17    are we okay?
18    MR. SNELL:  Take a five-minute break.
19    (Brief recess taken at 2:09 p.m.)
20    (Deposition resumes at 2:14 p.m.)
21  BY MR. SCHNIEDERS:
22    Q.    Doctor, we're back after a short break.
23    In your current practice, Doctor, what
24  surgeries do you perform for stress urinary

Marc R. Toglia, M.D.

Page 50

1  incontinence?
2  A.  Currently, we perform a combination of
3  midurethral slings, such as TVT Exact, TVT Abbrevo.  We
4  perform periurethral bulking procedures, autologous
5  fascial slings, retropubic urethropexies.
6  Q.  And are there any slings that you use
7  aside from TVT products?
8  A.  There are not.
9  Q.  Have you ever used any sling aside from
10  a TVT product?
11  MR. SNELL:  Objection.
12  BY MR. SCHNIEDERS:
13  Q.  Strike that.  Have you ever used any
14  sling aside from an Ethicon product?
15  MR. SNELL:  Form, previously covered.
16  THE WITNESS:  Yes.
17  BY MR. SCHNIEDERS:
18  Q.  What products have you used in addition?
19  A.  Boston Scientific, Advantage Fit, AMS
20  RetroArc.  Cook had a biologic sling, Surgisis ST,
21  don't quote me on the trade name on that one.  I think
22  that's it.
23  Q.  Fair to say the vast majority of the
24  slings that you've put in have been TVTs?

Page 51

1  A.  I would say 99%.
2  Q.  What nonsurgical remedies are you using
3  for women suffering from stress urinary incontinence
4  currently?
5  A.  Currently, we use biofeedback,
6  electrical stimulation, pelvic floor muscle therapy.
7  We actually have a physical therapist within the
8  practice for that.  Previously, as you can see from my
9  CV, we were involved in the Duloxetine trial.
10  Occasionally, we will use barrier type devices.
11  Q.  When a woman comes into your office with
12  stress urinary incontinence, what's your first line
13  treatment?
14  A.  Well, first line treatment starts with
15  education, pelvic floor muscle exercises, behavioral
16  modification, fluid management.
17  Q.  What current surgeries do you use for
18  pelvic organ prolapse?
19  A.  Again, this is what I do for a living.
20  There's a wide breadth of procedures that we do either
21  abdominal, vaginal, with or without hysterectomy,
22  native tissue plications, graft augmentation,
23  specifically abdominal sacrocolpopexies, obliterative
24  procedures such as colpocleisis,

Page 52

1  c-o-l-p-o-c-l-e-i-s-i-s.
2  Q.  What nonsurgical remedies do you use?
3  A.  Again, we will use physical therapy,
4  pelvic floor muscle rehabilitation, pessaries.
5  Q.  Do you currently use the Gynemesh PS?
6  A.  I do.
7  Q.  How often would you say you currently
8  use the Gynemesh PS?
9  A.  Two days a week.
10  Q.  And is that two surgeries a week, or is
11  that on two days you use it several times?
12  A.  Two days a week I typically do between
13  six and eight surgical procedures a week for
14  incontinence or prolapse.
15  Q.  Okay.  And specific to Gynemesh PS, how
16  often are you using that?
17  A.  I use it two days a week, as I
18  mentioned, perhaps maybe half my surgical repairs,
19  maybe 40%.
20  Q.  40% of surgical repairs of POP?
21  A.  For prolapse.  It varies obviously.
22  Q.  How many pelvic organ prolapse surgeries
23  would you estimate you have performed as a surgeon?
24  A.  Thousands.  I've been in practice for

Page 53

1  nearly 25 years.  I have an annual surgical load that
2  varies probably between 150 and 200 surgical procedures
3  a year.
4  Q.  And how many times do you believe or
5  would you estimate that you used Gynemesh PS for the
6  surgery?
7  A.  I believe that's in my surgical --
8  excuse me.  I believe that's in my report.  Off the top
9  of my -- I just want to verify it.  Off the top of my
10  head, I believe it was 3,000, approximately 3,000
11  within our practices.
12  Q.  And that's specific to Gynemesh PS?
13  A.  I believe so.  I mean, it's Gynemesh and
14  related materials.
15  Q.  Well, I'm going to ask, so how many
16  Prolifts?
17  A.  Prolifts probably number 200 or more.
18  Q.  You say "and related materials," are you
19  including the Prolift within that 3,000 for Gynemesh?
20  A.  I'm sorry, let me try to be more clear.
21  I'm talking about specifically macroporous
22  polypropylene graft material, which would include
23  Gynemesh PS, Prolift predominantly.
24  Q.  Can you explain how that mesh differs

14 (Pages 50 to 53)

Marc R. Toglia, M.D.

Page 54

1    from the TVT mesh?
2        MR. SNELL: Form.
3        THE WITNESS: Yes, I mean, they're both
4    type 1 polypropylene mesh. I believe I covered
5    this in my report. There are differences in
6    terms of both weight and pore size.
7    BY MR. SCHNIEDERS:
8        Q.   And what are the differences in weight
9    and pore size?
10       A.   Again, I believe I've covered that in my
11   reports. Approximately, Gynemesh PS is going to be
12   about 42, 43 grams per meter squared. It's got a pore
13   size of about 2,400 microns.
14       The mesh used for TVT is approximately twice
15   that. I believe the mesh is probably in the
16   neighborhood of 90 grams per meter squared. The pore
17   size is probably around 1,200 microns.
18       Q.   You said 2,400 microns for Gynemesh?
19       A.   2.4 millimeters is the pore size.
20       Q.   Doctor, do you keep track of any
21   complications you have with your mesh surgeries?
22       A.   Yes.
23       MR. SNELL: Form, asked and answered
24   earlier.

Page 55

1    BY MR. SCHNIEDERS:
2        Q.   How do you keep track of that?
3        MR. SNELL: Same objection.
4        THE WITNESS: Are you allowing me to
5    answer?
6        MR. SNELL: You can go ahead and answer.
7    I mean, it's all in the report.
8        THE WITNESS: It's changed throughout
9    the years. Currently, our patients are
10   enrolled in a national registry prospectively,
11   where we keep track of all prolapse surgery.
12       Previously, we would use private
13   databases. Obviously, we have medical records
14   in our office. We have electronic health
15   records in our system. I've been in the same
16   practice now for 19 years.
17   BY MR. SCHNIEDERS:
18       Q.   Okay. And you keep track of all those
19   numbers?
20       A.   The records are all available to us. We
21   review them periodically as we go on.
22       Q.   When you say "periodically," who are
23   "we"?
24       A.   I guess you're looking at we. We would

Page 56

1    be me. It would be me, my partners.
2        Q.   How many partners do you have?
3        A.   I currently have one physician partner
4    and one nurse practitioner partner.
5        Q.   And does your nurse -- or I'm sorry,
6    your physician partner, does she review those along
7    with you?
8        A.   My current partner who has been with me
9    less than two years has not. My previous partner had.
10       Q.   And when you review the data that you
11   have in your office regarding how many you've put in,
12   what kind of report, if anything, do you output as a
13   result of that?
14       A.   It depends. I'll offer as an example,
15   you know, my partner at the time Dr. Fagan and I
16   published the article that we spoke of earlier, in
17   which we, from the database, reviewed nearly 100 women
18   that had undergone prolapse surgery using a specific
19   technique sacrospinous ligament suspension, and we
20   looked at outcomes, we looked at complications,
21   recurrences, re-operations. So temporally we may stop
22   and look at what we've been doing to better understand
23   what the limitations and successes are of those
24   procedures.

Page 57

1        Q.   Okay. And do you reduce what you look
2    at to any sort of a tangible form that you can share
3    with the company or other physicians?
4        MR. SNELL: Object to form.
5        THE WITNESS: I wouldn't share anything
6    with a company. It has nothing to do with a
7    company. It varies. Sometimes we review it
8    internally and we do nothing with it.
9    Sometimes we publish it, sometimes we present
10   it. Sometimes this is done as part of a larger
11   consortium of researches, such as the TVT
12   Secur. Obviously, the prospective registry
13   database is something that we contribute to. I
14   guess in that regard my current partner and I
15   contribute to that database together. Someone
16   else is analyzing that, so it just varies.
17   BY MR. SCHNIEDERS:
18       Q.   Do you keep track of complications as a
19   result of your database?
20       A.   Yes.
21       Q.   And do you review those periodically as
22   well?
23       A.   Yes.
24       Q.   When is the last time you looked at

15 (Pages 54 to 57)

Marc R. Toglia, M.D.

Page 58

1 that?
2      A.   Yesterday.
3      Q.   Forgive me, Doctor, but when you look at
4 this, what are you looking for?  Are you just looking
5 at straight numbers?  What is it that you're seeing?
6      A.   It depends upon the clinical question
7 that at the time we're interested in looking at.  It's,
8 you know, currently we've been looking at voiding
9 function following midurethral slings in our patients,
10 how they are at, say, one month.  You know, we'll look
11 at our rates of retention, need for revision, things
12 like that.
13      Q.   Do you have a number of women that
14 needed revisions that you implanted mesh in?
15           MR. SNELL:  Form.
16           THE WITNESS:  It's a very, very small
17 number.
18 BY MR. SCHNIEDERS:
19      Q.   Well, let me ask you this, Doctor:  Can
20 you tell me how many revisions you've performed in your
21 career?
22           MR. SNELL:  Object.  I think this was
23 covered in prior depo.
24           THE WITNESS:  It was.

Page 59

1           MR. SNELL:  You can go ahead and answer
2 the question.  Let me try and pull up the
3 transcript.
4           THE WITNESS:  I don't have that in my
5 working fund of knowledge.  It's essentially on
6 an annual basis and, again, understand that
7 more the revisions that I do are not patients
8 that I was the implanter so -- but it's about 1
9 to 2%.
10 BY MR. SCHNIEDERS:
11      Q.   One to 2% of your --
12      A.   Of those I implant, correct.
13      Q.   And I've seen you testify on this
14 particular issue before, and you stated that it's your
15 belief that it's physician error when there's a
16 complication; is that correct?
17           MR. SNELL:  I'm going to have to object.
18 I think you may have misstated his testimony.
19           MR. SCHNIEDERS:  Well, he can certainly
20 tell me that, if that's the case.
21           MR. SNELL:  -- in its entirety.  Why
22 don't you show it to him then, because I don't
23 know what you're talking about, to be honest
24 with you.

Page 60

1           MR. SCHNIEDERS:  I'm asking him a
2 question.  If he says I'm not stating it right,
3 then please do, Doctor.  I'll ask the question
4 again.
5           THE WITNESS:  You're asking me a
6 question, and I'm more than happy to answer,
7 but you're not providing me with the foundation
8 or the reference.
9 BY MR. SCHNIEDERS:
10      Q.   Okay.  Let me ask it this way:  Do you
11 believe that when there is a mesh complication that it
12 is the result of physician error?
13           MR. SNELL:  Form, overbroad.
14           Are you talking sling, prolapse or
15 anything?
16           MR. SCHNIEDERS:  I'm asking a question.
17           MR. SNELL:  So overbroad.
18           THE WITNESS:  Would you be okay with
19 substituting operator dependent for physician
20 error?  I don't know that I'm not comfortable
21 with the term "physician error."  I mean, I
22 think it's operator dependent, rather than
23 material related.
24 BY MR. SCHNIEDERS:

Page 61

1      Q.   Okay.  That's fair.
2           So to put it in simpler terms, it's the result
3 of something that was or was not done by the physician,
4 not saying it was negligent or anything like that?
5      A.   I understand.
6      Q.   That was the variable, not the material,
7 correct?
8           MR. SNELL:  Same objection, overbroad.
9           THE WITNESS:  So --
10           MR. SNELL:  Vague as to time and scope.
11 Go ahead.
12           THE WITNESS:  So the background is
13 simply, you know, you've got the surgeon,
14 you've got the patient, and the patient
15 certainly -- the risks for something like
16 retention varies based upon the patient and
17 related co-morbidities.  Understand that pelvic
18 floor disorders rarely exist in isolation;
19 therefore, you can have stress leakage, you can
20 also have bladder dysfunction, voiding
21 difficulty.  So -- and you can have stress
22 leakage and prolapse.  You can have stress
23 leakage, prolapse and voiding dysfunction.  You
24 can have all three of them with pre-existing

16 (Pages 58 to 61)

Marc R. Toglia, M.D.

Page 62

1    neurologic conditions, like Parkinson's,
2    multiple sclerosis, diabetes.
3         So understanding that you've got
4    operator variables and then you have patient
5    variables as well, and then you have
6    technique-related specifics. So they can be
7    any combination, you know, of the above. Most
8    of them, in my experience and in my extensive
9    review of the literature, relate to the ones
10   other than the material itself.
11   BY MR. SCHNIEDERS:
12        Q.    And is it your opinion, Doctor, that
13   with regard to the Ethicon products that you are
14   testifying as an expert in this litigation, that those
15   products do not cause mesh complications?
16        MR. SNELL: Form. Same objections as
17        before.
18        THE WITNESS: There are complications
19        related to Gynemesh and prolapse, such as
20        erosion, that obviously it's the material that
21        has eroded, but it is my opinion, as stated in
22        my report, that this is not inherent in the
23        material itself.
24   BY MR. SCHNIEDERS:

Page 63

1         Q.    Okay. And explain that for me.
2         A.    Sure. I think I have explained it in my
3    report quite extensively that, first of all, all
4    patients who have prolapse have deficient tissue,
5    nonfunctioning muscle and pre-existing issues that any
6    of the surgical techniques that we employ in prolapse
7    surgery come with inherent risks, and I think the
8    literature is quite clear across thousands of studies
9    involving tens of thousands of women that risks are
10   related to surgery as a broad category and not
11   specifically the Prolift or Gynemesh procedure. It's
12   quite clear to me that it's very similar and sometimes
13   lower than the baseline risk of surgery.
14        Q.    So in those women, erosion would have
15   occurred no matter what you put in them, right?
16        MR. SNELL: Objection, form.
17        THE WITNESS: With the understanding
18        that most prolapse surgeries involve either
19        suture or synthetic grafts or biological grafts
20        or combinations thereof, complications such as
21        wound complications, I'll take mesh erosion is
22        simply one type of wound complication, the
23        complications occur equally whether it's
24        sutures or biologic grafts or synthetic grafts,

Page 64

1         and I think the literature more than adequately
2         supports that position.
3    BY MR. SCHNIEDERS:
4         Q.    Doctor, when I say mesh complications,
5    what does that mean?
6         MR. SNELL: Form, calls for speculation.
7         THE WITNESS: I don't know what you mean
8         by that.
9    BY MR. SCHNIEDERS:
10        Q.    What does it mean to you?
11        A.    What does mesh complications mean to me?
12   I guess literally it means any adverse event that may
13   be associated with mesh.
14        Q.    And what adverse events, in your mind,
15   may be associated with mesh?
16        A.    Again, counselor, maybe I didn't make
17   myself clear, given that it is impossible to separate
18   out the other variables, operator dependent variables,
19   patient related risk factors, general techniques
20   regarding prolapse surgery, the risks seem to be
21   similar across the board and independent of the
22   specific techniques.
23        Q.    So when I asked you what mesh
24   complication meant to you, you said it meant any

Page 65

1    adverse event that may be associated with mesh,
2    correct?
3         A.    Yes, I'm just interpreting what you
4    asked me.
5         Q.    That's what you said, those were your
6    words, right?
7         A.    Those were my words.
8         Q.    Okay. And when I ask you what adverse
9    events might be associated with mesh, your answer is
10   there are none?
11        A.    That's not what I said, counselor. I
12   gave you my answer.
13        (Document marked for identification as
14        Toglia Deposition Exhibit No. 3.)
15   BY MR. SCHNIEDERS:
16        Q.    I'm going to show you what I've marked
17   as Exhibit 3, which is a copy of your website's front
18   page. It's several pages long because if you go on the
19   right side of the second page, you'll see there's a
20   section entitled "Questions About Vaginal Mesh?"
21        Do you see that?
22        A.    I do.
23        Q.    Who wrote that?
24        A.    I would say I was probably the author of

17 (Pages 62 to 65)

Marc R. Toglia, M.D.

Page 66

1    that.
2         Q.    Okay.  And at the very beginning there,
3    it's got a link to the position statement from
4    AUGS/SUFU, correct?
5         A.    Correct.
6         Q.    But what I want to go to is down the
7    second to last page, and just so everybody is aware,
8    and you know this, Doctor, everybody else in this room
9    might not, but there's a section where you click for
10   more, and that's where the rest of this language comes
11   from.
12        Does that seem familiar with your website,
13   Doctor?
14        A.    Correct.
15        Q.    So that's why it's several pages longer
16   than the rest of it.
17        But if you go to the last page that has words
18   on it, in the second to last paragraph it says,
19   "Urogynecology Associates maintains a large patient
20   database of women in whom we have performed these
21   procedures, and we are continually reviewing our
22   results.  Our physicians have been involved in clinical
23   research in this area, and, in general, our data
24   suggests a largely positive experience and high patient

Page 67

1    satisfaction."
2         Do you see that?
3         A.    I do.
4         Q.    This database, is that what you are
5    discussing when you say that you review these things on
6    a regular basis?
7         A.    Yes.
8         Q.    And did you think about putting your
9    data into a form that you might be able to bring here
10   today in order to support your opinions?
11        A.    No.
12        Q.    Why not?
13        MR. SNELL:  I'm going to object.  I
14        don't think it's actually called for, but go
15        ahead.
16        THE WITNESS:  You know, I don't think
17        that that would be something that would be --
18        it's not something I could easily put together,
19        you know, quickly.
20   BY MR. SCHNIEDERS:
21        Q.    But you are able to look at it and tell
22   patients that are coming into your office that the data
23   suggests a largely positive experience and high patient
24   satisfaction?

Page 68

1         A.    That is correct.
2         Q.    And going on to the last paragraph right
3    here it says, finally, our physicians -- just so we're
4    clear, Doctor, it's you and one other partner right
5    now, correct?
6         A.    That's correct.
7         Q.    "Finally, our physicians have extensive
8    experience in the evaluation and management of women
9    who have experienced complications from transvaginal
10   mesh procedures, including the surgical revision or
11   removal of such devices."
12        Do you see that?
13        A.    I do.
14        Q.    When you say "complications from
15   transvaginal mesh procedures," what do you mean when
16   you write that?
17        A.    I mean that if a women previously
18   underwent a transvaginal mesh procedure or really any
19   kind of surgery for pelvic organ prolapse or
20   incontinence, whether it involved sutures or mesh
21   material, that we have experience in evaluating and
22   treating those conditions.
23        Q.    So, as it sits here today with regard to
24   the Ethicon products that you are opining about, the

Page 69

1    products themselves don't cause the complications, it's
2    some mixture of the patient, the doctor and potentially
3    some other variable, correct?
4         MR. SNELL:  Form.
5         THE WITNESS:  It's a combination of all
6         those things.  I mean, if you do surgery
7         without suture, you can't have suture-related
8         problems.  If you do surgery with suture, if
9         it's permanent suture, you know, you can have
10        mesh -- excuse me -- you can have suture
11        related complications or adverse consequences,
12        as I've previously published.  And if you do
13        procedures with biological grafts or synthetic
14        mesh materials, there is a, you know, baseline
15        risk as it is laid out in our report of, you
16        know, percentages of patients that might
17        experience exposure of the material.
18   BY MR. SCHNIEDERS:
19        Q.    If a woman came in to your office and
20   had previously had a Ethicon product, whether it be
21   Gynemesh PS or Prolift or TVT and they had a
22   complication, immediately you would understand that it
23   wasn't that product that caused the complication,
24   correct?

18  (Pages 66 to 69)

Marc R. Toglia, M.D.

Page 70

1    MR. SNELL: Objection, form, incomplete
2    hypothetical, vague.
3        THE WITNESS: I'm not sure that I
4    understand the foundation. If somebody had a
5    Prolift procedure and comes to my office with
6    exposed mesh, it's going to be my assumption
7    that it is the Prolift mesh that is what I'm
8    seeing in the vagina.
9    BY MR. SCHNIEDERS:
10   Q.    But it would be your assumption that the
11   Prolift mesh didn't cause the problem, correct?
12       MR. SNELL: Objection, same objection.
13       THE WITNESS: Wound complications are
14   caused by problems with wound healing.
15   BY MR. SCHNIEDERS:
16   Q.    Not the mesh, correct?
17   A.    Not the mesh, correct.
18   Q.    Okay. Would your opinion be the same if
19   it was a Boston Scientific product?
20   A.    Yes.
21   Q.    So you don't believe that Boston
22   Scientific products can cause complications, the mesh
23   itself?
24       MR. SNELL: Form, overbroad.

Page 71

1        THE WITNESS: I think complications can
2    occur in people who have undergone implantation
3    with these materials. I think that the opinion
4    that I have expressed in my report is that
5    these are known complications that occur with
6    all of our surgeries to similar degrees.
7    BY MR. SCHNIEDERS:
8    Q.    And I guess that's my question. You're
9    saying that these are known complications that can
10   occur with these products, but you're saying that
11   across the board it's not the product causing the
12   complication, correct?
13   A.    It is not the product causing the
14   complication, correct.
15   Q.    It's something else, it's a variable of
16   either the physician, the patient or some combination
17   of those two?
18       MR. SNELL: Form.
19       THE WITNESS: It's always a combination
20   of everything.
21   BY MR. SCHNIEDERS:
22   Q.    But not including the mesh?
23       MR. SNELL: Same objection, form.
24       THE WITNESS: You can't have mesh

Page 72

1    erosion if mesh isn't part of the procedure, so
2    in that context, mesh erosion necessitates
3    previous placement of mesh.
4    BY MR. SCHNIEDERS:
5    Q.    And in that context, does the mesh cause
6    the erosion?
7        MR. SNELL: Form, incomplete
8    hypothetical.
9        THE WITNESS: I think the opinion that I
10   state in my report that the material itself
11   does not cause the complication.
12   BY MR. SCHNIEDERS:
13   Q.    Is there any mesh that causes that sort
14   of complication that's on the market or has been taken
15   off the market in the last ten years?
16       MR. SNELL: Form, vague.
17       THE WITNESS: I think my opinion is
18   limited to, you know, the products being --
19   what I prepared for and what I've written is
20   specific to Prolift and Gynemesh PS. I'm happy
21   to answer those questions as they relate to
22   that.
23   BY MR. SCHNIEDERS:
24   Q.    When you report an adverse event to the

Page 73

1    FDA, you're able to give an opinion as to whether or
2    not the product that you're reporting the adverse event
3    on was the cause or was related, correct?
4    A.    Correct.
5    Q.    Okay. Every time you reported an
6    Ethicon product to the FDA as an adverse event, you
7    said it wasn't related, correct?
8        MR. SNELL: Objection, lacks foundation.
9        THE WITNESS: I don't recall ever saying
10   that I was concerned that the material itself
11   was the problem.
12   BY MR. SCHNIEDERS:
13   Q.    What about when you reported an Apogee?
14   A.    Again, it could be patient selection, it
15   could be patient risk factors, we usually report all
16   those. You know, this was a smoker, obese patient who
17   had previous surgery, you know. I mean, obviously, I
18   don't identify the surgeon individually, but I will
19   make comment whether they came locally, you know, from
20   a local institution, whether they came from another
21   state.
22       Again, my role is not to pass any kind of
23   judgment or make any kind of decision. I'm simply
24   reporting what I'm finding, and I trust it to the FDA

19 (Pages 70 to 73)

Marc R. Toglia, M.D.

Page 74

1  that they're collecting similar information, if it does
2  exist. So I'm simply reporting it in a non-judgmental
3  manner. I'm not offering an opinion to them as far as
4  what I think happened.
5      Q.   Well, there's a subsection of the form
6  that allows for you to say it's related or not related,
7  correct?
8          MR. SNELL: Foundation.
9          THE WITNESS: I don't recall
10         specifically. It's been a number of years
11         since I've had to report something. I wouldn't
12         argue with you if you told me specifically that
13         there was an area that said it was related.
14  BY MR. SCHNIEDERS:
15      Q.   It's been several years since you've
16  reported anything as an adverse event?
17      A.   Two years, I would say. I can't give
18  you an independent recollection of the last time that I
19  reported something of that matter.
20      Q.   When was your last mesh revision
21  surgery?
22      A.   Maybe six months ago.
23      Q.   You didn't report that as an adverse
24  event?

Page 75

1      A.   So my understanding is that the FDA
2  wants us to report on established products that were,
3  you know, approved for the indication. So if somebody
4  took a piece of Surgimesh or some Gortex mesh and had
5  used it vaginally in the repair, and there was erosion
6  of Gortex, which I think might have been the last one
7  that I saw, I would not have reported that to the FDA.
8      But if someone had a manufactured product, like
9  even things like NovaSure ablation or a device, you
10  know, Therma -- whatever the Thermachoice device is or
11  in this case Apogee Perigee, I report those type of
12  cases.
13      Q.   When is the last time you did a revision
14  on a product like that?
15      A.   Within the last year. I couldn't be
16  more specific than that. There are not very common
17  occurrences, fortunately, in our area.
18         (Document marked for identification as
19         Toglia Deposition Exhibit No. 4.)
20  BY MR. SCHNIEDERS:
21      Q.   So housekeeping wise, I think I marked
22  as Exhibit 4 your box of your materials, and, as we
23  said off the record, we're going to -- after the
24  depositions tomorrow, you're going to put all your

Page 76

1  materials in that box and leave that with the court
2  reporter; is that fair, Doctor?
3      A.   We will have copies -- I just want to
4  make sure that I have copies for further.
5          MR. SNELL: He is talking about after
6  the depositions.
7          MR. SCHNIEDERS: After tomorrow.
8          MR. SNELL: Yeah, that's fine. Just
9  make sure it gets back to Dr. Toglia. In TVT
10  last time he had an issue where --
11         THE WITNESS: I didn't get the material
12  for four months. So, unfortunately, counselor,
13  prior experience has got my guard up, and I
14  mean no offense to you.
15         MR. SCHNIEDERS: That's fair, and, of
16  course, you know that has nothing to do with us
17  either.
18         THE WITNESS: I'm willing, but if I seem
19  hesitant or reluctant, once bitten, twice shy,
20  but I plan to be fully cooperative with
21  whatever the Court requests of me.
22  BY MR. SCHNIEDERS:
23      Q.   And then Exhibit 5 I've actually
24  separately marked, this will not go in that box.

Page 77

1          (Document marked for identification as
2  Toglia Deposition Exhibit No. 5.)
3  BY MR. SCHNIEDERS:
4      Q.   Exhibit 5 is your two invoices that you
5  brought here today as well, okay?
6      A.   Sure, yes.
7          (Document marked for identification as
8  Toglia Deposition Exhibit No. 6.)
9  BY MR. SCHNIEDERS:
10     Q.   Moving on to Exhibit 6, although I
11  believe you have a copy of it over there, Doctor, your
12  expert report.
13     A.   Yes.
14     Q.   Doctor, you are here today talking about
15  your general expert report regarding Gynemesh PS and
16  Prolift, correct?
17     A.   That is correct.
18     Q.   And this report, as we established
19  earlier, was issued --
20     A.   February 26, 2016.
21     Q.   And that's your signature that appears
22  on Page 25?
23     A.   That is my signature.
24     Q.   Does this report contain all of your

20  (Pages 74 to 77)

Marc R. Toglia, M.D.

Page 78

1  opinions you intend to offer in this matter?
2      A.   It does.
3      Q.   And, obviously, we've been doing it up
4  to this point, but if you need that to refer or to
5  answer any questions, clearly, go to it and use it.
6      A.   I appreciate that.
7      Q.   I have copies here, just to be -- make
8  sure I've got everything, but I have copies here of the
9  TVT expert report that was marked as part of the
10  previous deposition.
11      I assume nothing about your opinions has
12  changed since the time of your deposition?
13      A.   That's correct.  Nothing has changed.
14      Q.   I will not mark that.
15      So I also have reliance list, which I think we
16  established earlier in the deposition is actually the
17  reliance list for your TVT report, and my confusion
18  came from the fact that it has the same date at the
19  very top there, and it didn't say TVT, so I think we
20  have a copy of your reliance list for the Gynemesh and
21  Prolift report somewhere around here, don't we?
22      A.   Right.  It's not in the exhibit that you
23  marked.
24      MR. SNELL:  You can give that to him and

Page 79

1  mark that.
2      THE WITNESS:  It's been in my report.  I
3  don't know what was provided to you, but my
4  report is accurate.
5      MR. SNELL:  You can give him that.  That
6  way he can mark it.
7      MR. SCHNIEDERS:  I'm just going to mark
8  that reliance list.
9      MR. SNELL:  Sure.
10      MR. SCHNIEDERS:  I'm marking Exhibit 7
11  as that reliance list.
12      (Document marked for identification as
13  Toglia Deposition Exhibit No. 7.)
14  BY MR. SCHNIEDERS:
15      Q.   Doctor, what we've now marked as Exhibit
16  7, I think we established earlier all the materials you
17  brought today with you are somewhere on that list with
18  the exception of one deposition that you've received I
19  think since the TVT -- or I'm sorry -- since the actual
20  report was issued; is that correct?
21      A.   Yes, correct.
22      Q.   And as we sit here today, you don't have
23  any other materials to add to it or that you believe
24  are missing, correct?

Page 80

1      A.   That is correct.
2      MR. SNELL:  If I can say something, I
3  just don't want there to be a misstatement on
4  the record, and maybe I'm misremembering.  I
5  thought you had materials that Ostergard cited
6  in his report too, or did you not have those?
7      THE WITNESS:  I showed this to you
8  earlier, counselor.  This is the -- these are
9  the materials that Dr. Ostergard cited in his
10  report that I don't believe were previously
11  marked.  Earlier you asked me about the
12  educational materials that I did not have them
13  in my personal records, but I did know that
14  they were somewhere here.
15  BY MR. SCHNIEDERS:
16      Q.   And that binder is part of what I'm
17  considering to be Exhibit 4 that's going to go in the
18  box afterwards, fair?
19      A.   That's fair.
20      MR. SNELL:  That makes sense.
21  BY MR. SCHNIEDERS:
22      Q.   And both the deposition and the
23  materials from the Ostergard deposition and expert
24  report are not a part of your reliance list, as it sits

Page 81

1  today, but you have reviewed them?
2      A.   Because they came after the fact.
3      Q.   Okay.  But aside from the materials from
4  the Ostergard expert report and that deposition,
5  everything is on the reliance list?
6      A.   That's correct.
7      Q.   Doctor, who drafted the reliance list
8  for you?
9      A.   The list itself was drafted by
10  Mr. Snell's office with the understanding that much of
11  the material were studies and reports that I provided
12  to them.
13      Q.   Were there any materials that they
14  provided to you that you did not ask for?
15      A.   My recollection is that there were
16  studies that I was familiar with that I may not have
17  had a hard copy of, and I received a hard copy from
18  them, but, in general, you know, you're looking at how
19  I spend many of my nights and weekends over the past 25
20  years, the type of materials that I read.  So much of
21  this is stuff that I've been familiar with for decades
22  or from whenever it was published.
23      Q.   So as I'm looking at your invoices, the
24  last one was billed on February 29th of 2016, which was

21 (Pages 78 to 81)

Marc R. Toglia, M.D.

Page 82

1  right about the same time, if not the same day --
2      A.  Correct.
3      Q.  -- that you issued your report.
4          So does that invoice encompass all the time
5  that you spent up to the time you issued your report?
6      A.  With regard to the general Prolift,
7  Gynemesh report and the case specific reports, yes,
8  separate from the TVT.
9      Q.  Okay.  So are these invoices that I'm
10 looking at that we've marked as Exhibit 5, do they not
11 include your work on TVT?
12     A.  That's correct.
13     Q.  Okay.  There are separate invoices for
14 that?
15     A.  That's correct.
16     Q.  And so you're keeping track of your
17 time, whether you believe you're working on the Prolift
18 side of things or the TVT side of things?
19     A.  Separately, correct.
20     Q.  I think that here as of January 31st of
21 this year, you had 12 hours billed at $400 an hour, and
22 that was to the Ethicon Gynecare mesh litigation MDL,
23 and it says 200, although, obviously, that's not the
24 right MDL.

Page 83

1  Does that look correct.
2      A.  Is it 2000?  What's the --
3      Q.  Well, either way, but that's as of
4  January 31st, that's the date that --
5      A.  Yes.  The inclusive dates are on the
6  list and you can see -- I mean, I know you weren't at
7  the TVT deposition, but we switched -- I switched gears
8  after that, correct.  So I believe it's a total of
9  about 47 hours that was billed by the end of February,
10 if I'm not mistaken.
11     Q.  It's 35 on this one and then it was 12
12 on this one, so 47 hours as of the time that you issued
13 your report that you had spent working specific to
14 these two products we're here today for?
15     A.  Mm-hmm.
16     Q.  Is that a yes?
17     A.  Excuse me, that I've billed for.
18     Q.  That you've billed for?
19     A.  Correct.
20     Q.  Okay.  As we sit here, do you still have
21 uninvoiced time?
22     A.  I do.
23     Q.  How much time would you estimate that
24 you have that has not been billed?

Page 84

1      A.  I want to say maybe an additional 20
2  hours.
3      Q.  And that goes to what my question was,
4  and maybe I wasn't very clear, so I apologize.  You
5  issued your second invoice as of February 29th of 2016.
6          Did that include -- because it says
7  consultation fee, 2/1/16 through 2/29/16, did that
8  include all the work that you had put in up until you
9  signed your expert report?
10     A.  The question that you had asked me
11 previously is what I billed them, and I've given you
12 the information that I billed them.  That would include
13 all the work that I did up until the final date on that
14 bill.  Anything outstanding is subsequent to that date.
15 Is that what you're asking.
16     Q.  Yeah.  So this February 29, 2016 --
17     A.  There's no additional unbilled time for
18 that time.
19     Q.  Okay.  I apologize for being scattered
20 on it.  To make it clear --
21     A.  No, you were quite clear.  You asked me
22 what time I had billed and I answered what time I had
23 billed.  So I was clear on what you asked me,
24 counselor.

Page 85

1      Q.  So then as of March, so from the date
2  that you signed your expert report forward, you've done
3  an additional 20 hours approximately?
4      A.  Approximately.
5      Q.  Did that include deposition preparation
6  time with Mr. Snell?
7      A.  It will.
8      Q.  Did you prepare for today's deposition?
9      A.  Yes.
10     Q.  How long did you spend with Mr. Snell or
11 any of his partners to prepare?
12     A.  Ninety minutes.
13     Q.  So then the other 18 and a half hours or
14 so would have been spent reading literature?
15     A.  No.  Again, not wanting to waste the
16 Court's time, I wanted to read through the report and
17 make some tabular notes, so when you asked me a
18 specific question, I'd be able to find that information
19 quickly, so reading, rereading, rechecking, summary
20 type statistics.  As I was provided, for example,
21 Dr. Ostergard's deposition and materials, reviewing.
22     Q.  I think you testified to this, but just
23 so we're clear, when you met with Mr. Snell and anyone
24 else from his office to prepare, they didn't show you

22 (Pages 82 to 85)

Marc R. Toglia, M.D.

Page 86

1  any documents?
2      A.   I'm not clear.
3      Q.   Did they show you any documents when you
4  were preparing for your deposition?
5      A.   They provided me with Ostergard's.
6      Q.   But that's it?
7      A.   That's the example, yes.
8      Q.   Anything else?
9      A.   Specifically, no, not that I can think
10 of.
11     Q.   Have you ever seen any internal Ethicon
12 documents?
13     A.   I have seen Ethicon documents.  I
14 believe that was covered in the last TVT report.  I do
15 not think I've seen anything additionally since.
16     Q.   The last TVT deposition?
17     A.   Excuse me, the TVT deposition, correct.
18     Q.   So has the defendant ever shown you any
19 internal documents?
20     A.   The ones that I just mentioned.  There
21 were documents provided -- there were documents of
22 internal communication provided to me by Mr. Snell
23 initially that were reviewed relevant to the TVT
24 report.  I mean, obviously, some of the information is

Page 87

1  relevant to the content today, but I've received no
2  additional documents other than the ones that we listed
3  for that report, and I believe they're listed on our
4  reference list here as well.
5      Q.   Anything that you're talking about that
6  you had seen, you would have -- you believed it was on
7  your reliance list for the TVT report?
8      A.   I do believe, yes.
9      Q.   Doctor, earlier you mentioned a product
10 called the Sphinx.
11     Do you recall that?
12     A.   I do.
13     Q.   What was the Sphinx?  Is it Sphinx or
14 the Sphinx?
15     A.   I think the project was just generically
16 called Sphinx, as a pun on the word sphincter, and I
17 believe we covered that during the TVT deposition.
18     Q.   What is the Sphinx?
19     A.   The Sphinx is a large stone structure in
20 Cairo, Egypt.  Sphinx was a project that looked at --
21 Sphinx was a project that looked at whether or not we
22 could extrapolate the integral theory to the posterior
23 compartments specifically for fecal continence.  It's
24 my belief, as it is the belief of others, that the body

Page 88

1  doesn't go out of its way to come up with new
2  mechanisms to control a common function.  So if the
3  body already has a functioning mechanism for the
4  control of urinary -- of urine, that's similar type
5  physiologic mechanisms might exist for fecal control.
6  So we were exploring the feasibility of that, and that
7  has also been explored by other surgeons with other
8  companies.
9      Q.   Doctor, would you say that, in your
10 experience, Prolift and TVT have clearly shown that
11 erosion occurs at the incision line all the time?
12     MR. SNELL:  Form.
13     THE WITNESS:  Can you repeat the
14 question.
15 BY MR. SCHNIEDERS:
16     Q.   Sure.  Would you say that, in your
17 experience, that Prolift and TVT clearly show that
18 erosion occurs at the incision line all of the time?
19     MR. SNELL:  Objection.
20     THE WITNESS:  As a general rule, the
21 exposure that I have seen and that I have read
22 about tend to be in the incision line.  Less
23 commonly, you might see an erosion at other
24 points of tension.  Obviously, there are

Page 89

1  probably situations where the vaginal
2  epithelium was unintentionally breached, and so
3  then you would have exposure of mesh that was
4  subsequently discovered that likely was there
5  initially.
6  BY MR. SCHNIEDERS:
7      Q.   If there's more surface area of a sling
8  that is directly below an incision, is there a higher
9  risk of erosion?
10     A.   More surface area than what?
11     Q.   Than less surface area.
12     MR. SNELL:  Form.
13     THE WITNESS:  I'm not sure that I
14 understand what you're asking me.
15 BY MR. SCHNIEDERS:
16     Q.   Is it better to eliminate as much
17 surface area of sling directly below an incision in
18 order to keep a lower rate of erosion?
19     A.   I don't believe so.
20     Q.   Does a larger surface area of sling
21 directly below an incision increase the risk of
22 erosion?
23     A.   Not that I'm aware of.
24     (Document marked for identification as

23 (Pages 86 to 89)

Marc R. Toglia, M.D.

Page 90

1    Toglia Deposition Exhibit No. 8.)
2  BY MR. SCHNIEDERS:
3      Q.   Let me show you what I've marked as
4  Exhibit 8.  This is an e-mail string from inside of
5  Ethicon.  At the very top you see that there's an
6  e-mail from a gentleman named Gene Kammerer?
7      A.   I do.
8      Q.   Do you know Gene Kammerer?
9      A.   I do.
10     Q.   Who is Gene Kammerer?
11     A.   Gene Kammerer I believe was an engineer
12 consultant that worked with the R&D team at Ethicon on
13 some of their projects.  He's one of the project people
14 that I worked with directly, probably was my most
15 direct contact regarding the Sphinx or PASS procedure
16 as we were considering it.
17     Q.   And you see the subject he's responding
18 to there says: re: Dr. Toglia's comments on Sphinx and
19 PASS.
20     Do you see that?
21     A.   Yes.
22     Q.   Okay.  And we don't need to go through
23 that e-mail.  You're welcome to look at it, if you
24 like, but the very first e-mail is at the very bottom,

Page 91

1  and that's also from Mr. Kammerer, and on the second
2  page it continues, "As you know I have been keeping a
3  dialogue going with some of the advisory panel surgeons
4  regarding our work and the concepts.  Dr. Toglia has
5  responded to the changes we made to the PASS concept
6  and feels adamant that the 2 lateral incisions are
7  crucial to its success.  He has also provided some
8  insight to the customer database which I haven't heard
9  in our market research interviews.  Here are some of
10 his comments," and then you see what at least
11 Mr. Kammerer is saying is a comment from you.
12     Do you see that?
13     A.   Yes.
14     Q.   Okay.  Why don't you read that first
15 paragraph right there regarding the two?
16     A.   Regarding the 2 incisions versus a
17 midline incision, as you know, there are many reasons
18 why I feel that a single midline incision is a bad
19 idea.  Mostly, I am concerned about the erosion of the
20 sling material through the perianal skin.  Our
21 experience with Prolift and TVT clearly show that
22 erosions occur at the incision line all of the time,
23 which is I think what I just stated to you.  The
24 perianal skin is very thin, and the sphincter is

Page 92

1  located very close to the skin.  Therefore, a post anal
2  sling will sit very close to the surface epithelium as
3  well, and a crescent incision will significantly
4  increase the surface area of sling directly beneath the
5  incision and, therefore, the risk for erosion.  A
6  significant erosion rate will be the death of this
7  procedure.
8      Q.   This procedure, as we stated earlier,
9  never made it to market; it was abandoned before it got
10 there, correct?
11     A.   I would like to think that it was placed
12 on a shelf.  Abandoned is kind of a cruel word for the
13 parent of the concept.
14     Q.   Well, at any rate, it's not on the
15 market currently?
16     A.   No.  There are no sling based repairs on
17 the market for this problem.
18     Q.   Okay.  And were you being truthful when
19 you told Mr. Kammerer that the surface area of sling
20 that is directly beneath the incision would increase
21 the rate of erosion?
22     MR. SNELL:  Objection, lacks foundation,
23 assumes --
24     THE WITNESS:  I mean, this was my

Page 93

1  theory, and I'm sorry, I mean, what you asked
2  me earlier was -- I didn't hear you say below
3  the incision.  I simply heard you say below the
4  epithelium.  My point was at least in this
5  location, you know, this is not the same
6  location, by any means, compared to, say, the
7  suburethral or the vagina but in basically the
8  post anal area, it was at least my theory that
9  we would be better off with separate lateral
10 incisions as opposed to a contiguous incision.
11 BY MR. SCHNIEDERS:
12     Q.   Would you agree with this statement that
13 a significant erosion rate would be the death of the
14 procedure?
15     MR. SNELL:  Form, lacks foundation.
16     THE WITNESS:  No.  I think that with
17 regard to this particular concept, which was
18 the PASS procedure, that I was concerned that
19 that would be a significant limitation.
20 Obviously, I had no data because there was no
21 data to support that, but I was -- I don't
22 think you can extrapolate what I'm saying here
23 to anything other than the concept of what we
24 have here.

24 (Pages 90 to 93)

Marc R. Toglia, M.D.

Page 94

```
 1   BY MR. SCHNIEDERS:
 2        Q.    What kind of mesh was used in the
 3   Sphinx?
 4        A.    Well, to be determined.  We tried a
 5   variety of materials.  I can't tell you that we ever
 6   got to that, you know, to the specific platform.
 7        Q.    Isn't it true that you started off with
 8   the concept of the TVT mesh?
 9        A.    Well, we had to play around with
10   something, and what was readily available to Ethicon
11   and Ethicon engineers were the TVT material, and so we
12   did utilize TVT passers and the TVT mesh to see if we
13   could anatomically place that material within that
14   space.
15        Q.    And that's the mesh you were using when
16   you were concerned here in 2009 regarding erosions,
17   correct?
18        A.    One had nothing to do with the other.
19   It had to do more with the type of incision being made,
20   which is different than the type of -- we don't make
21   lateral incisions next to the urethra.
22        Q.    So you wanted to make a different type
23   of incision, correct?
24        A.    Given that we were operating close to
```

Page 95

```
 1   the rectum where stool comes out of, you know, if I
 2   had -- you know, my concept was how can I locate the
 3   incisions a little bit away, away from the actual anal
 4   verge so that it's not in direct contact with the
 5   passage of stool.  Additionally, considering the normal
 6   surface tension when a person sits down that would be
 7   placed on the perianal area, that's much more
 8   susceptible to say midline tension, we were looking at
 9   incisions that were non-midline, but, again, I don't
10   think that this -- I don't think that I'm necessarily
11   commenting on my concerns relative to the other
12   procedures, but I was trying to use terms that they
13   were familiar with based upon their other products.
14        Q.    Like erosion?
15        A.    I'm sorry.
16        Q.    Terms they were familiar with on their
17   other products like erosion?
18        A.    No.  I'm sorry, as far as the location
19   of the incision.  They were used to -- all of their
20   sling products were done through a midline, vertical
21   incision, and I was suggesting in this concept that the
22   incisions be at a right angle to that, obviously in a
23   different location, and I was trying to position -- I
24   was trying to position the incisions away from the anal
```

Page 96

```
 1   verge.  And rather than one contiguous incision, I was
 2   suggesting two smaller incisions.
 3        Q.    Fair to say that you were attempting to
 4   decrease the surface area of sling that was directly
 5   beneath the incision, correct?
 6             MR. SNELL:  Form.
 7             THE WITNESS:  There were many different
 8        things that I was thinking about doing.  And,
 9        again, that's a very different area, the
10        concerns are somewhat different.  The tension
11        lines are different.  We now have the added
12        possibility of stool, you know, close to the
13        incision.  I was simply trying to move the
14        incisions away from the anal verge, as I've
15        already stated.
16   BY MR. SCHNIEDERS:
17        Q.    And that's because your experience with
18   Prolift and TVT clearly shows that the erosion occurs
19   at the incision site all the time?
20        A.    No.  It was for the reasons that I just
21   mentioned.  In my head, I was thinking I want to get
22   these incisions away from the anal verge, away from the
23   path of stool.  I think that there's different surface
24   tension forces next to the anus, and so I at least
```

Page 97

```
 1   wanted to start with the concept would it be feasible
 2   to place the incisions there.
 3             And they would say, well, why, why do you think
 4   that?  And I would, again, try to communicate to them
 5   in their own language, and I would say, well, as you
 6   know, we were aware of circumstances where the slings
 7   are showing exposure, and, you know, the one factor at
 8   the time that was being considered was the location or
 9   type of incision.
10             The French, when they did their TVM products,
11   also were looking at transverse incisions as opposed to
12   midline incisions.
13        Q.    Doctor, yes, no or you can't answer,
14   larger surface area of sling directly beneath an
15   incision increases the risk of erosion?
16             MR. SNELL:  Objection, asked and
17        answered.  You don't have to answer it yes, no
18        or I don't know.  You told him before.
19             THE WITNESS:  I've already stated my
20        answer, counselor.  I'm really trying not to be
21        difficult.  I honestly -- and I realize that
22        you have no expertise in this area of the body,
23        but there were unique challenges working near
24        the rectum, and I was trying to address those,
```

25 (Pages 94 to 97)

Marc R. Toglia, M.D.

Page 98

1    you know, again, just based on theory.  There's
2    no evidence that what I said would have borne
3    out to be true.  It may have turned out that a
4    midline incision was perfectly feasible and/or
5    easier.  I was just starting with a slightly
6    different concept for the reasons that I
7    explained.
8         In addition, there was another product
9    in development for a similar indication, and I
10   was trying to make this one different, you
11   know, in its approach.
12   BY MR. SCHNIEDERS:
13        Q.   So the reason you said the Sphinx at
14   that time was because you were trying to differentiate
15   the product and because you had a theory that
16   potentially the surface area of the sling above the
17   incision site could increase the risk of erosion,
18   correct?
19        MR. SNELL:  Objection, misstates.
20        THE WITNESS:  One of a number -- again,
21   I was trying to explore a unique concept that
22   whether or not this would work to our
23   advantage.  You know, obviously we already had
24   experience with midline incisions.  In general,

Page 99

1    they worked well.  I was trying to come up with
2    a more unique concept.  You know, with two
3    separate incisions, I was hoping that there
4    would be no tension at the midpoint or directly
5    beneath the incision line.
6    BY MR. SCHNIEDERS:
7         Q.   But you weren't concerned about the
8    amount of surface area of the sling beneath the
9    incision, correct?
10        A.   I would say yes.  I would say surface
11   area was really not my concern but, again --
12        Q.   That's what you wrote down here?
13        A.   I understand.
14        MR. SNELL:  Actually, no, you're
15   misstating.  That is not his writing, so don't
16   say he wrote that.
17        THE WITNESS:  That's true, good point.
18        MR. SNELL:  That lacks foundation.
19   BY MR. SCHNIEDERS:
20        Q.   Are you saying that you didn't have a
21   conversation about this topic with Gene Kammerer?
22        A.   No, no.  I'm saying I had a
23   conversation.  I'm just saying I did not write these
24   paragraphs, that these are not my words, okay.  But,

Page 100

1    again, I was trying to explain to them in terms that an
2    engineer, who is familiar with the different product,
3    would understand.  But, obviously, I did not edit --
4    write or edit this information.
5         Q.   Did you ever e-mail with Mr. Kammerer?
6         A.   Yes.
7         Q.   Are you able to testify this wasn't an
8    e-mail that he had cut and pasted into this e-mail that
9    he sent?
10        A.   I have no idea, sir.
11        Q.   And did you go to look in your own
12   personal e-mails to see if you could find this one from
13   2009?
14        A.   I no longer own -- I no longer have --
15   that computer has been destroyed along with all of its
16   material.  I don't own the rights to this concept, so I
17   was informed to discard all of that once the product
18   was abandoned, as you so put it.
19        Q.   And you went through and cleaned out all
20   of your e-mails and deleted all of them at that point?
21        A.   I deleted all of those e-mails and then
22   when I wiped the hard drive on that computer, that just
23   went wherever those bits go, yes.
24        Q.   Sure, sure.  But there's a server

Page 101

1    somewhere where those e-mails probably exist; you know
2    that?
3         A.   I don't know.  I don't know.  I honestly
4    don't know.
5         Q.   What account would you have been using
6    at that time to communicate with Mr. Kammerer?
7         A.   I honestly don't know.
8         (Document marked for identification as
9    Toglia Deposition Exhibit No. 9.)
10   BY MR. SCHNIEDERS:
11        Q.   Let me mark as Exhibit 9 another e-mail
12   from Mr. Kammerer.
13        Is it possible that this e-mail address that
14   you sent him an e-mail from, that's a Verizon address,
15   is that the one you might have been using?
16        A.   It would seem to me that this would be
17   the account that I e-mailed him from, correct.
18        Q.   Do you currently have the Verizon.net
19   e-mail address?
20        A.   Yeah, and I would appreciate for privacy
21   reasons if we didn't go into any more detail than that,
22   given that this is a public document.
23        Q.   I'm assuming he's going to ask to have
24   most of this sealed, to be honest.

26 (Pages 98 to 101)

Marc R. Toglia, M.D.

Page 102

1          MR. SNELL:  We'll go ahead and seal
2     anything personal.
3          THE WITNESS:  I apologize, but there are
4     concerns about identity theft and information
5     that I have.
6     BY MR. SCHNIEDERS:
7          Q.    I'm not going to e-mail you, I promise.
8          A.    Yes.  So, again, this represents sort of
9     my emotional response perhaps, and, again, remember as
10    the parent to the concept, I was a little bit resistant
11    to people wanting to change my concept because I
12    thought that I had thought them out pretty clearly.
13         Q.    So, Dr. Toglia, if you go to the e-mail
14    down below where you're actually e-mailing to
15    Mr. Kammerer, and the subject is re: checking in,
16    because I think if you go back there was originally an
17    e-mail from you asking if the project was dormant?
18         A.    Sure.
19         Q.    But if you see here the third, and this
20    is I think what you're talking about your emotional
21    response to the way that they were approaching the
22    project perhaps, but that third line starting
23    "Ethicon," could you read that sentence or that
24    paragraph there?

Page 103

1          A.    I'm happy to.  Let me just make sure I
2     understand you clearly.  You want me to begin reading
3     the paragraph entitled "another key concept."
4          Q.    No.  The one that starts with "Ethicon
5     has enjoyed."
6          A.    Oh.  Ethicon has enjoyed its greatest
7     success with simple, straightforward thin sling - the
8     TVT.  Attempts to develop more comprehensive mesh
9     solutions have far -- have not only been far less
10    successful, but as a class have had serious
11    complications and are rapidly falling out of favor.
12         Q.    What mesh solutions, comprehensive mesh
13    solutions were you talking about there?
14         A.    I honestly don't know.  This is from six
15    years ago.  These may have been other concept projects
16    that -- at one point I sat down with them and we went
17    over eight to ten new concepts for other projects
18    within this sphere.  Obviously, I would think in my
19    mind if it was an existing project, I would have used
20    the existing product's name.
21         Q.    How many comprehensive mesh solutions
22    can you think of that have had serious complications?
23         A.    As a class, I don't know of any actually
24    at this point.

Page 104

1          Q.    Well, then what did you mean?
2          A.    I might have been referring specifically
3     to the IVS Tunneller.  You know, the IVS Tunneller,
4     this was a concept that also involved the tunneling of
5     mesh through several compartments over a long period of
6     time, and the IVS Tunneller was also in its initial
7     form both anterior and posteriorly involved similar
8     type concepts.  So now that I sort of reinvigorate my
9     brain, I wouldn't be surprised if I'm referring to the
10    IVS Tunneller in this statement.
11         Q.    You're referring to the IVS Tunneller
12    with regard to Ethicon because it says Ethicon products
13    right there?
14         A.    I didn't say that Ethicon's attempts, I
15    just said attempts.  The bottom line is that I don't
16    recall, as I sit here, specifically what I was
17    referring to in this e-mail.  I'm sorry.
18         Q.    So it could be that you're talking about
19    things like Gynemesh PS, correct?
20         MR. SNELL:  Objection, lacks foundation.
21         THE WITNESS:  I highly doubt this had
22    anything to do with the Gynemesh PS.
23    BY MR. SCHNIEDERS:
24         Q.    Could have been Prolift, right?

Page 105

1          MR. SNELL:  Same objection.
2          THE WITNESS:  I honestly don't think it
3     had to do with Prolift, in all honesty.
4     BY MR. SCHNIEDERS:
5          Q.    Explain for the jury what the Tunneller
6     does.
7          A.    Explain to you?
8          Q.    To the jury, you're talking to the jury
9     right now.
10         A.    Am I talking to the jury right now?  Is
11    that who I'm talking to?
12         MR. SNELL:  You can just answer his
13    questions to the best of your ability.
14    Sometimes lawyers say things --
15         THE WITNESS:  I'm sorry.  Got you.  I
16    mean, I'm just very literal, and I just want to
17    make sure I don't misstate anything.  Well, I
18    mean, obviously, to deliver a product to its
19    destination and whether it's laparoscopy or
20    cannulas for TVT, cannulas for Prolift, you
21    have to have a way to deliver the product to
22    its final destination, and, again, the PASS
23    concept involved placing a mesh sling below the
24    anal sphincter and towing it up, if I remember

27 (Pages 102 to 105)

Marc R. Toglia, M.D.

Page 106

1      correctly, through the obturator space as a
2      point of exit.
3   BY MR. SCHNIEDERS:
4      Q.   And what were the serious complications
5   that were related to that?
6      A.   There weren't anything.  The PASS
7   concept never was done in a live person.
8      Q.   So, sitting here today, you can't think
9   of any comprehensive mesh solutions that were developed
10  as a class that have had serious complications and are
11  rapidly falling out of favor that you might have been
12  referencing in January of 2010?
13     MR. SNELL:  Objection, asked and
14  answered.
15     THE WITNESS:  Yes, I mean, again, I
16  cannot tell you what I specifically had in mind
17  behind that statement.  I was clearly, as you
18  can see from the overall emotional tone of the
19  letter, of the e-mail that I was being very
20  emotionally resistant to the idea that we
21  change anything.  We hadn't even done anything
22  with it yet.  I wanted to test the original
23  idea, as I had laid it forth to see what the
24  feasibility was, and I was not open at the time

Page 107

1      to making changes.
2   BY MR. SCHNIEDERS:
3      Q.   But sitting here today, you're sure that
4   it's not Prolift that you were talking about?
5      A.   I don't recall it as being Prolift at
6   the time, no.
7      Q.   And you're sure it's not Gynemesh PS
8   that you're talking about?
9      A.   You know, I think I would have listed it
10  by name.  I listed their success by name.  I think if I
11  had a specific concern, I would have listed that as
12  well.
13     Q.   You didn't mention Tunneller there, did
14  you?
15     A.   No.  I was talking about just the
16  overall where we were conceptually, you know, at the
17  time.
18     MR. SCHNIEDERS:  Maybe now is a good
19  time to take a break.
20     (Brief recess taken at 3:27 p.m.)
21     (Deposition resumes at 3:38 p.m.)
22     MR. SCHNIEDERS:  We're back after a
23  short break.
24     MR. SNELL:  Let's mark that last portion

Page 108

1   confidential.  Let's mark the whole thing.  For
2   the purpose of whoever is going to be reviewing
3   this on this issue, there are discussions about
4   intellectual property concepts, thoughts by the
5   doctor and what not which he has concerns about
6   it falling into other people's hands.  That is
7   the basis and the purpose.
8      THE WITNESS:  Thank you.
9   BY MR. SCHNIEDERS:
10     Q.   Doctor, are you doing any current
11  research on polypropylene meshes?
12     A.   I mean, I consider the reviews that I do
13  here where, you know, basically systematic review is a
14  type of, you know, research project.  In terms of --
15  I'm not currently engaged in any clinical trials of
16  that material.
17     Q.   Are you engaged in any attempts to
18  publish any retrospective data or anything like that?
19     A.   My current role in that arena is that,
20  you know, since I serve as an editor of two journals,
21  my energy is spent actually reviewing studies and
22  manuscripts submitted for publications, much of which
23  is on the subject matter that we're discussing today,
24  but I have no -- I have nothing pending to be

Page 109

1   published.
2      Q.   Have you ever written anything on the
3   Burch procedure?
4      MR. SNELL:  Form.
5      THE WITNESS:  There may be mention in a
6   book chapter, but I have not published on my
7   personal experience with that procedure
8   independent from a more general discussion.
9   BY MR. SCHNIEDERS:
10     Q.   Have you ever written anything on
11  biologic tissue slings?
12     A.   I have not.
13     Q.   You would agree that you're not an
14  academic physician, correct?
15     MR. SNELL:  Form.
16     THE WITNESS:  I would not agree with
17  that, no.
18  BY MR. SCHNIEDERS:
19     Q.   Explain, please.
20     A.   Much of the work that I do is equivalent
21  to what you do in academics.  I was previously employed
22  at an academic institution.  I'm simply not employed by
23  an academic institution.  Obviously, I have
24  appointments at an academic institution.  Our current

28 (Pages 106 to 109)

Marc R. Toglia, M.D.

Page 110

1    institution involves -- does have a residency, so I am
2    directly involved in teaching and the creation of
3    academic curriculum, resident education, resident
4    teaching. I do speak nationally in postgraduate
5    medical educations through venues such as AUGS, Society
6    of Gynecologic Surgeons. Those are academic endeavors.
7          Q.   But you also have a private clinical
8    practice, correct?
9          A.   Correct.
10         Q.   So insofar as you are a private clinical
11   physician, in that portion of your life, that would not
12   be academic medicine, correct?
13         MR. SNELL: Objection.
14         THE WITNESS: I disagree. Again, before
15   I came here today, I was in the operating room
16   in my private practice. I had a resident with
17   me and a medical student with me. That is
18   academic in nature. We are discussing and
19   teaching. So it's all of the above.
20   BY MR. SCHNIEDERS:
21         Q.   I may have asked this before, so forgive
22   me if I have. Are you currently under contract as a
23   consultant for any pharmaceutical or device company?
24         A.   You did not ask that before. I

Page 111

1    currently consult with a pharmaceutical company. I had
2    a consulting -- an active consultant agreement with a
3    medical device company that if we wait another week
4    will no longer exist.
5          Q.   So would that be AMS?
6          A.   That would be, very good.
7          Q.   And who is the pharmaceutical company
8    you consult with currently?
9          A.   So it would be Astellas Pharma whom I've
10   consult with since 1994, I believe, unrelated to what
11   we're discussing today.
12         Q.   And would that be the longest standing
13   relationship you have in consulting with a
14   pharmaceutical or a device company?
15         A.   I believe so.
16         Q.   Have you continuously worked for
17   Astellas since 1994?
18         A.   I have never worked for Astellas.
19         Q.   Point taken. Have you continuously
20   worked with Astellas since 1994?
21         A.   Yes, intermittent relationship.
22   There are periods of time, different cycles of the
23   economy where they are more interested, less
24   interested. It varies widely. I would say, as a

Page 112

1    general rule, my involvement in the past several years
2    has been fairly minimal.
3          Q.   You would agree that less rigidity with
4    regard to mesh is better, correct?
5          MR. SNELL: Form, overbroad, lacks
6    foundation.
7          THE WITNESS: I would not agree.
8    BY MR. SCHNIEDERS:
9          Q.   Okay. Explain to me why not.
10         A.   I'm not sure what the foundation is that
11   you're asking me. Less better for what?
12         Q.   Less likely to cause or impair -- strike
13   that.
14         Less likely to impair sexual function?
15         MR. SNELL: Same objection, incomplete
16   hypothetical.
17         THE WITNESS: Yeah, it's more
18   complicated than that, counselor. Please keep
19   in mind that we don't have any cutoffs or
20   agreements, there are no expert consensus as
21   far as what's lightweight, what's not
22   lightweight, what's rigid, what's less rigid,
23   you know. These are just sort of a continuum
24   of ideas. You know, everything is relative.

Page 113

1    You know, is this lightweight, well, it might
2    be lighter than something previously, not as
3    light as something later. But, in general, my
4    objection is that we don't have cutoffs, no one
5    has ever published, you know, this is heavy,
6    this is light. There's no expert consensus.
7    People do throw around the terms relatively,
8    this is lighter weight mesh, this is
9    lightweight, but I don't know what the cutoffs
10   are, and the same would apply to rigidity.
11         Q.   So there are cutoffs, you just don't
12   know what they are?
13         MR. SNELL: Objection.
14         THE WITNESS: If I don't know -- if I
15   don't know what they are, how would I know that
16   there were cutoffs?
17   BY MR. SCHNIEDERS:
18         Q.   You said but I don't know what the
19   cutoffs are, and the same would apply to rigidity.
20   That implies that there are cutoffs somewhere, right?
21         MR. SNELL: I'm going to object.
22         THE WITNESS: No.
23         MR. SNELL: Hold on. You have to let me
24   object. You're actually misstating his

29 (Pages 110 to 113)

Marc R. Toglia, M.D.

Page 114

1    testimony.  His testimony he did say there is
2    no cutoff.
3            MR. SCHNIEDERS:  I'm again going to read
4    because I don't need you to speak for the
5    witness.
6            MR. SNELL:  I'm not speaking, but you
7    are misstating his testimony --
8            MR. SCHNIEDERS:  I'm reading from it
9    right here.
10           MR. SNELL:  His answer was 21 lines
11   long.
12           MR. SCHNIEDERS:  He said I don't know
13   what the cutoffs are and the same would apply
14   to rigidity.
15           MR. SNELL:  No, his answer was 20 lines
16   longer than the little thing you pulled out of
17   there.
18           MR. SCHNIEDERS:  Whatever.
19   BY MR. SCHNIEDERS:
20       Q.    Are there cutoffs?
21       A.    There are currently no established
22   cutoffs, there are no definitions, and there is no
23   expert consensus.
24       Q.    But, theoretically, there are cutoffs

Page 115

1    somewhere, right?
2            MR. SNELL:  Form, hypothetical.
3            THE WITNESS:  No.
4    BY MR. SCHNIEDERS:
5        Q.    No?
6        A.    There are no established, universally
7    accepted definitions, cutoffs, consensus of opinion.
8        Q.    Doctor, listen to my question.  I said
9    theoretically, there are cutoffs.  I didn't say they
10   were established, universally accepted cutoffs.  I said
11   theoretically there would be cutoffs, right?
12           MR. SNELL:  Objection, vague, calls for
13   speculation.
14           THE WITNESS:  I don't know how further
15   to answer that.  I'm sorry.
16   BY MR. SCHNIEDERS:
17       Q.    Why hasn't AUGS filed a consensus
18   statement on what levels of rigidity are acceptable?
19       A.    I can't answer that question.  I can't
20   speak for AUGS.
21       Q.    Are you a member of that society?
22       A.    Yes.
23       Q.    Have you ever gone to them and said why
24   don't we put out a consensus statement on this?

Page 116

1        A.    No, I have not.
2        Q.    Did you go to them and have any input in
3    their position statement regarding vaginal mesh?
4        A.    I did not have any direct input into
5    that statement.
6        Q.    Did you ever review a draft of that
7    statement?
8        A.    I don't believe that I reviewed a draft
9    of that statement.
10       Q.    Were you ever circulated a draft of that
11   statement?
12       A.    I might have been circulated a draft of
13   that statement.  I don't independently recall that.
14       Q.    And not to -- honestly not to make you
15   uncomfortable, but had you received a draft of that
16   statement, would that have been to that Verizon e-mail
17   address?
18           MR. SNELL:  Objection.
19           THE WITNESS:  I don't know.  I don't
20   know.  That would be one of the more common
21   addresses that I might receive material, but I
22   didn't receive it.
23   BY MR. SCHNIEDERS:
24       Q.    You didn't receive it, or you don't know

Page 117

1    if you received it?
2        A.    I think it's the same thing.  I do not
3    recall that I have ever received a draft, to the best
4    of my knowledge, of that statement, of the proposed
5    statement.
6        Q.    Sorry didn't mean to interrupt.
7            Do you know who the authors are of that
8    statement?
9        A.    I do.
10       Q.    Do you know them personally?
11       A.    I do.
12       Q.    Do you consider yourself to be friends
13   with those gentlemen?
14       A.    They are colleagues of mine.
15       Q.    Are they people you would see socially
16   as well or just professionally?
17       A.    I think those lines are blurred in my
18   area, as I'm sure yours are in yours.  You know, we have
19   social events at our academic meetings, our scientific
20   meetings.  I don't believe I was in any of their
21   wedding parties or went on vacation or sat in a Jacuzzi
22   with any of them, but I would say, certainly, you know,
23   I think it would be accurate to say that we have
24   collegial relationships that are both social and

30 (Pages 114 to 117)

Marc R. Toglia, M.D.

Page 118

1   academic.
2       Q.   Have you ever discussed authoring
3   anything with any of them?
4       A.   I would have to look at the
5   comprehensive list of the people on that if you want to
6   share that with me.
7       Q.   We can cover that in a moment.
8       A.   Yeah.
9       Q.   You are not an expert in chemical
10  engineering, correct?
11          MR. SNELL:  Form.  This is covered in
12      the earlier deposition.
13          MR. SCHNIEDERS:  And I am aware and
14      that's why I'm asking it.
15  BY MR. SCHNIEDERS:
16      Q.   Do you hold yourself out as an expert in
17  chemical engineering?
18      A.   I think -- no, I don't hold myself out
19  in a general sense in chemical engineering.  I think I
20  have expertise in this particular arena in front of any
21  audience that I might be asked to participate as it
22  relates to polypropylene mesh being used for its
23  intended purpose.
24      Q.   You're not an expert in pathology,

Page 119

1   correct?
2          MR. SNELL:  Objection.
3          THE WITNESS:  I'm -- I don't have any
4      certification in pathology.  I have certainly
5      an in-depth knowledge and, again, you know, if
6      we were to go to the Villanova game together,
7      I'd probably know more than the majority of
8      people at that game.
9   BY MR. SCHNIEDERS:
10      Q.   But you would defer to a pathologist,
11  correct?
12      A.   I don't know what you mean by "defer."
13  I mean, if we had a disagreement, I wouldn't stand up
14  and say you're a pathologist, you're absolutely right.
15  No, I wouldn't defer in that regard.
16      Q.   So you believe that you have an equal
17  expertise as a pathologist?
18      A.   I don't know where you're getting this
19  from.  I never made that statement.
20      Q.   You would agree that a pathologist has a
21  greater expertise in pathology than you do?
22          MR. SNELL:  Form.
23          THE WITNESS:  Yes, I would say, in a
24      general sense, a pathologist has a more

Page 120

1       in-depth level of knowledge than I.
2   BY MR. SCHNIEDERS:
3       Q.   You agree you're not an expert in
4   polymer chemistry, correct?
5           MR. SNELL:  Objection, asked and
6       answered in earlier deposition.
7           THE WITNESS:  I think relative to the
8       topic at hand, I would be considered by many to
9       possess expertise in polymer chemistry.
10  BY MR. SCHNIEDERS:
11      Q.   Relative to a jury, but not relative to
12  a polymer chemist, correct?
13          MR. SNELL:  Same objections.
14          THE WITNESS:  You know, in terms of the
15      application of this material within the human
16      body, I've got a pretty good understanding of
17      the working of polymer, yes.  I have a degree
18      in biochemistry.  I've been reviewing this
19      material extensively.  I am certainly reading
20      materials that are beyond what the average
21      gynecologist or even urogynecologist female
22      pelvic medicine or urologist would have
23      reviewed.
24  BY MR. SCHNIEDERS:

Page 121

1       Q.   When was that degree in biochemistry?
2       A.   1985.
3       Q.   And when is the last class you took in
4   biochemistry?
5       A.   Well, I mean, I'm constantly reading
6   material.  Obviously at this stage of the game I don't
7   pay to enroll in college courses, but my -- you know,
8   foundation of my knowledge did not end when I graduated
9   from college.
10      Q.   When is the last class you took in
11  biochemistry?
12      A.   I took a class in medical school in
13  biochemistry.
14      Q.   About what year would that have been?
15      A.   That would have been 1986, '87.
16      Q.   You've never done bench research on
17  polypropylene, correct?
18      A.   I have not.
19      Q.   You've never done lab research on
20  polypropylene, correct?
21      A.   I have not.
22      Q.   You've never done any sort of
23  pathological analysis on explanted polypropylene, have
24  you?

31 (Pages 118 to 121)

Marc R. Toglia, M.D.

Page 122

1          MR. SNELL: Form.
2          THE WITNESS: I have not. Understand
3     that I've done lab work as it pertains to my
4     consultation with polypropylene products in
5     medical, you know -- in the medical arena.
6     BY MR. SCHNIEDERS:
7          Q.   When you explant mesh, what do you do
8     with that mesh?
9          A.   The majority, depending upon -- you
10    know, depending upon the situation, the majority of
11    that material is sent to pathology for identification
12    and labeling.
13         Q.   Okay. You don't do that yourself, you
14    send it to a pathologist?
15         A.   Well, I'm operating on a patient, so I
16    can't do both things, so I will send that to the
17    pathologist.
18         Q.   Could you?
19         A.   Could I what?
20         Q.   Could you do what the pathologist does?
21         A.   Given that what the pathologist does is
22    typically measure the dimensions of the material and
23    simply reports that I have in front of me a 2 by 1
24    centimeter piece of blue mesh, that I can do, correct.

Page 123

1     I can't tell you that in the medical world that there's
2     any further analysis being done routinely.
3          Q.   You've never published any opinion that
4     polypropylene does not cause a foreign body reaction,
5     correct?
6          A.   Well, that's a double negative so -- and
7     I do want to answer you accurately, so if you can
8     restate that question without a double negative, I
9     would appreciate it.
10         Q.   Have you ever published an opinion that
11    polypropylene does not cause a foreign body reaction?
12         A.   Of course, polypropylene causes a
13    foreign body reaction. Any foreign material implanted
14    in the body will cause a foreign body reaction. That's
15    what foreign body reaction is by definition.
16         Q.   You are not an expert on warnings,
17    correct?
18         MR. SNELL: Objection.
19         THE WITNESS: I don't hold myself out to
20         offer an expert opinion on warnings, although I
21         have, you know, ample experience in, you know,
22         reading about them and reading those materials.
23    BY MR. SCHNIEDERS:
24         Q.   You're not a biomechanical engineer,

Page 124

1     correct?
2          A.   I am not, no.
3          Q.   I think we're going to get sideways
4     here. You are not an expert on the design of medical
5     devices, correct?
6          MR. SNELL: Objection, covered in his
7          first deposition extensively.
8          THE WITNESS: I have worked on the
9          design of medical devices. I have worked on
10         the design and redesign of existing devices, as
11         well as the device -- the medical device that
12         we referred to earlier as the PASS device.
13    BY MR. SCHNIEDERS:
14         Q.   And have you ever designed a device that
15    made it to market?
16         A.   I have not.
17         Q.   I don't say that to cruel.
18         A.   No, I apologize. I had -- and, again,
19    I'm a relatively humble person. I had extensive input
20    into the design of the TVT Exact, which is currently on
21    the market.
22         Q.   You had extensive input into the design
23    before it went to market?
24         A.   Correct.

Page 125

1          Q.   Do you know what standards a
2     manufacturer must follow in designing mesh products?
3          A.   I have a general awareness, a general
4     awareness only.
5          Q.   But you couldn't cite us CFRs or
6     statutes or anything like that, correct?
7          A.   I couldn't cite it, no.
8          Q.   Have you ever seen the statutes that
9     relate to the responsibilities a manufacturer holds in
10    designing a product?
11         A.   I don't recall, no.
12         Q.   Have you ever reviewed any of Ethicon's
13    standard operating procedures relating to design?
14         A.   I do not believe so.
15         Q.   Do you know what a clinical expert
16    report is?
17         A.   I believe this is the second one that
18    I've issued in this arena, if I'm not mistaken. Is
19    this what we're referring to?
20         Q.   What you've issued is a clinical expert
21    report, that's your definition of it?
22         A.   Yes.
23         Q.   Do you know what a design history file
24    is?

32 (Pages 122 to 125)

Marc R. Toglia, M.D.

Page 126

1    A.    In a general sense.
2    Q.    What is it?
3    A.    You know, when a manufacturer sets out
4  to design a product, they would keep track of the
5  history of that development and they would keep track
6  of the communications between the different parties and
7  the steps along that -- along that design.
8    Q.    All right, Doctor.  So earlier we were
9  talking about two days that you put in the Gynemesh PS
10 on your operating days.
11        What days are your operating days currently?
12   A.    How is this relevant to the testimony
13 that I'm giving?  I operate two days a week.  Is that
14 not sufficient information?
15   Q.    If you really don't want me to know what
16 day, it's fine.
17   A.    Yes, thank you.
18   Q.    Two days a week?
19   A.    Correct.
20   Q.    And that's every week?
21   A.    Correct.
22   Q.    And how many surgeries do you do on
23 those two days, typically?
24   A.    Sure, I previously answered that on

Page 127

1  average, I'll do between six and eight procedures, and
2  they are virtually all related to pelvic floor
3  disorders.
4    Q.    Are there any surgeries that you're
5  doing currently that are not related to pelvic floor
6  disorders?
7    A.    There may be some surgeries that are
8  more general gynecology in nature.  For example, if a
9  woman is sent to me with prolapse and she tells me she
10 has bleeding, I may first have to do a D&C or a biopsy
11 or some other general thing prior to completing the
12 treatment for the prolapse.  So I would say it's within
13 the sphere of gynecologic surgery and urogynecologic
14 surgery.
15   Q.    So vast majority of your procedures
16 currently are going to be a TVT product or the Gynemesh
17 PS, correct?
18   A.    No.  The vast majority of my procedures
19 are prolapse and incontinence.  Procedures, the
20 prolapse procedures could be native tissue plication,
21 obliterative procedures, Gynemesh or sacrocolpopexy
22 procedures.  The majority of my incontinence procedures
23 are retropubic TVT procedures, specifically TVT Exact.
24   Q.    So out of approximately 12 surgeries

Page 128

1  that you perform weekly, how many of those surgeries
2  are likely to be Gynemesh PS?
3    A.    I didn't say I did 12 surgeries a week,
4  for clarification.  I said I did between six and eight
5  procedures a week.
6    Q.    Oh, I thought that was per day.
7    A.    No, I'm sorry.
8    Q.    Okay.  Six to eight per week?
9    A.    Correct.
10   Q.    So spread out over the two days?
11   A.    Correct, right.
12   Q.    And of those six to eight, how many are
13 Gynemesh PS, typically?
14   A.    I would say it may range from two to
15 four.
16   Q.    And with the understanding that,
17 typically, it's going to be TVT Exact, how many are
18 TVT?
19   A.    Again, I would say as an average range
20 two to four, it could be five.  It could be four to
21 five in a single day.
22   Q.    So these are procedures that on a weekly
23 basis you are discussing with patients and then
24 performing, correct?

Page 129

1    A.    I would say on a daily basis, whether
2  it's in the office or in the operating room, I am in
3  constant, you know, dialogue, examinations that would
4  involve these type of products, absolutely.
5    Q.    So specific, and, you know, I guess we
6  haven't said this, but is the Prolift on the market
7  right now?
8    A.    It is not.
9    Q.    Why is that?
10   A.    The manufacturer decided to withdraw the
11 product from the market.
12   Q.    Was there FDA action that preceded that?
13   A.    It's my understanding that the FDA
14 wanted to require very specific research at certain
15 endpoints.  Moving forward the company felt that they
16 had already invested a significant amount of resources
17 and felt that they had already adequately demonstrated
18 what the FDA was asking for, but the FDA was not
19 satisfied with what had been provided and wanted
20 everything to sort of be redone.
21   Q.    And, to your understanding, what did
22 Ethicon do in response to that?
23   A.    Again, I wasn't involved at that level
24 in the decision-making itself.  It's my understanding

33 (Pages 126 to 129)

Marc R. Toglia, M.D.

Page 130

1    that they chose to withdraw the products, the family of
2    products on the market.
3        Q.    Rather than perform the studies that the
4    FDA was asking for?
5        A.    I mean, I don't know that it's a rather
6    than.  They just decided to withdraw the products.
7        Q.    And the defendants haven't made you
8    privy to any of the internal communications regarding
9    this business decision, have they?
10       MR. SNELL:  Who?  Answer to your
11   recollection.
12       THE WITNESS:  To my recollection, I
13   don't remember being privy to that information,
14   no.
15       MR. SCHNIEDERS:  Do you have a --
16       MR. SNELL:  Well, I mean, he has the 522
17   orders and the back and forth of what the FDA
18   said, if that's what you're talking about.  I
19   should have objected because your question was
20   a little vague.  I wasn't quite sure what you
21   were talking about exactly.
22       MR. SCHNIEDERS:  I said internal -- you
23   got real time right there, just read it.  It
24   says and the defendants haven't made you privy

Page 131

1    to any of the internal communications regarding
2    this business decision, have they, and I think
3    the answer is no, to your recollection.
4        MR. SNELL:  I don't know.  I haven't
5    looked through everything Ostergard has, and
6    there's a huge binder, and if it's in his
7    stuff, it's been given to him.
8        THE WITNESS:  But, no, I have not.
9    BY MR. SCHNIEDERS:
10       Q.    Okay.
11       A.    In my recollection is that I have not.
12   I don't recollect, rather.  I'm sorry.
13       Q.    And the most recent things that you
14   might have read would have been Ostergard, correct?
15       A.    I don't recall reading any of that in
16   Ostergard, but, no.
17       Q.    Have you asked the defendant for any of
18   those internal communications?
19       A.    I have not.
20       Q.    Why not?
21       A.    I don't consider them to be relevant to
22   my generating the expert report.
23       Q.    You're not curious what their
24   decision-making process was in to why they wouldn't do

Page 132

1    extra testing?
2        MR. SNELL:  Form, foundation.
3        THE WITNESS:  I have no curiosity in
4    that domain.  I have plenty of other work to
5    occupy my time.
6    BY MR. SCHNIEDERS:
7        Q.    But, as we sit here today, and we've
8    established from your expert report you believe that,
9    for instance, the Prolift is a safe product when used
10   according to its indications, correct?
11       A.    I think that we have over 3,000 clinical
12   trials involving tens of thousands of women with data
13   collected out to seven years that more than adequately
14   supports the use of Prolift for the treatment of
15   prolapse in women as an effective product, correct.
16       Q.    But you don't know why the defendant
17   pulled the product, if that's the case, correct?
18       MR. SNELL:  Form, foundation, asked and
19   answered.
20       THE WITNESS:  I'm assuming like much in
21   life, it was a business decision.  They
22   balanced potential revenue versus whatever
23   investments, and but no.
24   BY MR. SCHNIEDERS:

Page 133

1        Q.    It was a money decision?
2        A.    I don't know.
3        MR. SNELL:  Same objection.
4        THE WITNESS:  I don't know, sir.  I'm
5    sorry.
6    BY MR. SCHNIEDERS:
7        Q.    We've established in the six to eight
8    procedures per week, at least several of them are going
9    to involve the products that you are testifying in this
10   litigation?
11       A.    That is correct.
12       Q.    So take me through when you have a woman
13   that comes in with pelvic organ prolapse and you've
14   determined that Gynemesh PS would be a suitable
15   surgical placement for her, what do you tell her about
16   the risks and benefits?
17       A.    Specifically, the discussion is the
18   same.  Women with prolapse have a certain set of
19   baseline symptoms.  Obviously, they have both symptoms,
20   they frequently have bladder or bowel dysfunction.  The
21   majority of them have pre-existing sexual dysfunction.
22   We explain to them the intent and the limitations of
23   surgery in general in correcting those problems.  I try
24   to set realistic expectations as far as what is likely

34 (Pages 130 to 133)

Marc R. Toglia, M.D.

Page 134

1  to get better, what may not get better, and then we
2  start to go through their options.
3        As I go through their options, I try to, in a
4  fairly nondirective manner, to guide them to a decision
5  based very much on the information that we're reading
6  in my report.  You know, these are the different
7  procedures at our disposal.  These are the different
8  approaches.  Some of these approaches may include
9  hysterectomy or not hysterectomy.  Some may involve
10  simple tissue plication.  Some are done abdominally,
11  some are done vaginally, some are done as a combination
12  of both.  Some may involve the placement of mesh
13  surrounding the vagina, and we go over what these
14  women's priorities are, what their concerns are, what
15  they hope to accomplish.  We look at their ages, their
16  co-morbidities, and I try to help them on an individual
17  level to make a decision that's best for them.
18        Q.   And on the topic of mesh and more
19  specifically Gynemesh PS comes up, what do you tell
20  them the risks are of that procedure?
21        A.   Again, the conversation is largely, you
22  know, all prolapse surgery come with very similar risks
23  in terms of whether or not it will be successful,
24  whether or not you will develop normal bladder

Page 135

1  emptying, abnormal bladder emptying, could you
2  experience chronic pain, could you experience pain with
3  sexual intercourse.  I can't tell you that I -- you
4  know, I don't necessarily distinguish from one to the
5  other in a general sense.
6        Obviously, if we're going to implant mesh, I
7  speak to them about the fact that polypropylene mesh is
8  the most widely used material in our field, that
9  there's experience that goes back decades.  That, in
10  general, this is the consensus standard of care
11  material used throughout the world, and obviously we
12  talk to them a little bit about our personal experience
13  in our practice and over my 24, 25 years of clinical
14  practice.
15        Q.   So when you're talking to a woman about
16  placement of Gynemesh PS, do you tell her that it's
17  possible that she will have chronic pain following the
18  surgery?
19        A.   To be honest with you, we rarely see
20  pain as a consequence of these procedures.  I certainly
21  will say that there's always the potential for pain.
22  Again, I don't believe that it's the mesh itself.  To
23  be honest with you, most of the pain that we see is
24  certainly more related to the plication parts of the

Page 136

1  procedure.
2        Rarely do I think the mesh has anything to do
3  with that.  You know, I think certainly if you look at
4  the report, counselor, vaginal length tends to be
5  longer when we use the mesh, sex tends to be more
6  comfortable when we use the mesh.  The incidence of
7  pain is no higher than it is with the other techniques.
8  The incidence of dyspareunia in most studies is
9  extremely low, you know, certainly 10% is the summary
10  incident that we will talk about.  In randomized
11  trials, it's been as low as 3%.
12        Native tissue repairs, in my opinion and in the
13  literature that I've reviewed, often times have
14  dyspareunia rates that are far higher, 15%, 25%.
15  Again, it's a complicated discussion.  The majority of
16  these people have some degree of pain with sex prior to
17  surgery.  We have to speak about the likelihood that
18  that pain will improve.  There are some women that have
19  no pain.  We talk about the chance or the rates of de
20  novo dyspareunia.  It's not a black-and-white kind of
21  discussion, and it's typically a discussion that takes
22  place over three or four visits.
23        MR. SCHNIEDERS:  I will object and move
24  to strike as nonresponsive.

Page 137

1  BY MR. SCHNIEDERS:
2        Q.   Doctor, when you are talking to a women
3  about placement of Gynemesh PS, do you tell her it's
4  possible that she will have chronic pain following the
5  surgery?
6        MR. SNELL:  Objection.  I think he's
7  asked and answered that.
8        THE WITNESS:  Okay.  So the Gynemesh is
9  only one part of the surgical procedure that
10  I'm doing.  So we are talking -- I talk to them
11  about the overall risk of the surgical
12  intervention.  If we're going to do a
13  hysterectomy and a sacrocolpopexy with mesh and
14  a posterior repair, I'm talking about the
15  overall likelihood of complications.
16        MR. SCHNIEDERS:  Mark as Exhibit 10 the
17  IFU for Gynemesh PS.
18        (Document marked for identification as
19  Toglia Deposition Exhibit No. 10.)
20  BY MR. SCHNIEDERS:
21        Q.   Doctor, are you familiar with this
22  document?
23        A.   I am familiar with the IFU, yes.
24        Q.   For the jury's benefit, what does the

35 (Pages 134 to 137)

Marc R. Toglia, M.D.

Page 138

1  IFU tell a doctor?
2       A.   The IFU stands for information for use.
3  It's a document that will explain everything from the
4  material you use, how it's sterilized what the intended
5  uses are, situations in which it might be used.  There
6  is a listing of precaution and adverse events that are
7  known and some suggestions to the surgeon to keep in
8  mind when the surgeon is coming up with a surgical
9  plan.
10      Q.   And this is the 2015 version of this IFU
11 because you understand that this IFU is updated
12 February of 2015, correct?
13      A.   That is my understanding, correct.
14      Q.   Do you make it a habit as a surgeon to
15 read the IFUs for all products that you're placing?
16      A.   I am pretty much an instruction reader
17 in general.  I even read the instructions to my VCR and
18 my phone, although, obviously, I missed the part about
19 the voice speaking, but, yes, I am -- I do read, and
20 largely, you know, I do teach, so I want to make sure
21 that what I say is consistent with the IFU.
22      Q.   Just excited you still have a VCR.
23      A.   I know, right.
24      Q.   If you go to the indications, what are

Page 139

1  the indications for Gynemesh PS?  It's on the second
2  page.
3       A.   With the understanding that as a
4  surgeon, I've got the ability to use things as I see,
5  you know, fit for what I'm working on.  Specifically,
6  we use Gynemesh for the correction of pelvic organ
7  prolapse.  What it says here specifically that it's
8  being used as a bridging material for apical, vaginal
9  and uterine prolapse.  This one here that you've given
10 me specifically, in my opinion, is referring to an
11 abdominal approach.
12      Q.   Okay.  And was Gynemesh previously
13 indicated for only an abdominal approach?
14      A.   My understanding back in 2002, when
15 Gynemesh -- Gynemesh PS received its indication, it was
16 not stated in the same language, it was stated in a
17 much more general sense that it could be used for
18 prolapse, and the implication was either abdominally or
19 vaginally.
20      Q.   And is it your -- do you have the --
21 strike that.
22      Are you aware that that indication was changed
23 at the same time that Prolift was removed from the
24 market?

Page 140

1       A.   I'm aware through my review of these
2  materials.  I can't tell you at the specific moment
3  that it was removed from the market that I was abruptly
4  aware of that.
5       Q.   So there wasn't an Ethicon rep that was
6  coming by your office to let you know?
7       A.   I mean, in general, I'm an expert in
8  this area.  I possess far more expertise than
9  representatives.  I can't tell you that I really depend
10 upon the sales rep, in general.  I know most things way
11 before and beyond what any of the sales reps, so I
12 cannot tell you that I have -- you know, that that's
13 a -- where I depend upon the information from.
14      Q.   But fair to say that the IFU is a
15 document that's intended to give surgeons additional
16 information about a product, including safety
17 information, correct?
18      A.   It's a document that provides guidance.
19      Q.   If you go to the third page under
20 adverse reactions, and I can mark the other IFU, if you
21 like, Doctor but if you have a recollection, do you
22 recall that -- well, actually, let's just do it this
23 way.
24      Strike that.

Page 141

1       (Document marked for identification as
2  Toglia Deposition Exhibit No. 11.)
3  BY MR. SCHNIEDERS:
4       Q.   I'm marking as Exhibit 11 the previous
5  IFU for Gynemesh PS, although I apologize that it's got
6  a lot of other languages in there along with it.  But
7  the English version should be right out front.
8       So, Doctor, if you go to what we've marked now
9  as Exhibit 11, that is the version of the IFU for
10 Gynemesh PS that was in effect previous to this
11 February of 2015.
12      Does that look consistent with your
13 recollection?
14      MR. SNELL:  Give me a second to look at
15 it.  Okay.  Go ahead.
16      THE WITNESS:  Sure.  The date on here is
17 September 15, 2008.  I agree with you that this
18 one preceded this one.
19 BY MR. SCHNIEDERS:
20      Q.   If you look at the second page, would
21 you look at the indication there for Gynemesh PS as of
22 2008?
23      A.   Yes, I do see that paragraph.
24      Q.   And that's a different indication than

Marc R. Toglia, M.D.

Page 142

1    what is in place in February of 2015, correct?
2           MR. SNELL:  Foundation.
3           THE WITNESS:  I would say the
4    indications to me seem similar.  The wording
5    has been changed.  In both they mention that
6    the material is used for bridging material for
7    the treatment of prolapse.  One mentions
8    vaginal wall.  The other one is more inclusive
9    of apical, vaginal and uterine.  So, I mean,
10   the language is slightly different.  My opinion
11   is the intent is pretty much the same.
12   BY MR. SCHNIEDERS:
13          Q.    But the previous version of the IFU
14   didn't infer an abdominal approach, correct?
15          A.    Correct.
16          Q.    Whereas the February 2015 IFU does,
17   correct?
18          A.    Correct.
19          Q.    Okay.  Doctor, if you go to the third
20   page of both IFUs, you'll find the section that's
21   called adverse reactions, and you can see just by
22   looking at it at first glance, that the adverse
23   reactions section in 2015 is much longer than it was in
24   the previous version, correct?

Page 143

1           A.    Yes.
2           Q.    And under -- in the previous version it
3    states potential adverse reactions are those typically
4    associated with surgically implantable materials,
5    including infection, potentiation, inflammation,
6    adhesion formation, fistula formation, erosion,
7    extrusion and scarring that results in implant
8    contraction.
9           Did I read that correctly?
10          A.    Yes, you did.
11          Q.    And that's the only thing that's listed
12   under adverse reactions in the previous IFU, correct?
13          A.    Yes.
14          Q.    If we go to the more recent IFU, I
15   believe that that bullet point essentially that I just
16   read with a few additional terms appears as the first
17   bullet point in adverse reactions.
18          Does that look like a fair reading?
19          A.    I agree.
20          Q.    And then there's several -- there's
21   eight more bullet points that follow in adverse
22   reactions, correct?
23          A.    Yes.
24          Q.    And I missed two.  There's two more on

Page 144

1    the next page as well, so ten more, correct?
2           A.    Yes.
3           Q.    Okay.
4           A.    Well, and then there are other adverse
5    reactions, but I'm with you, counsel.  I'm following
6    along with you.
7           Q.    Okay.  So that second bullet point there
8    that starts with "as with any implants," could you read
9    that, Doctor?
10          A.    As with any implant, a foreign body
11   response may occur.  This response could result in
12   extrusion, exposure -- excuse me -- erosion, exposure,
13   fistula formation and/or inflammation.
14          Q.    And the third bullet point there that
15   begins with "potential adverse reactions," could you
16   read that?
17          A.    Potential adverse reactions are those
18   typically associated with pelvic organ prolapse repair
19   procedures, including pelvic pain, pain with
20   intercourse, which in some patients may not resolve.
21          Q.    If you go to the bullet point that
22   begins with "excessive contraction," could you read
23   that, Doctor.
24          A.    "Excessive contraction or shrinkage of

Page 145

1    the tissue surrounding the mesh, vaginal scarring,
2    tightening and/or shortening may occur."
3           Q.    And what would happen if there was
4    excessive contraction or shrinkage of the tissue
5    surrounding the mesh?
6           A.    I guess it would vary, depending upon
7    where specifically we were talking about that.
8           Q.    As the expert here, Doctor, tell me what
9    are the different alternatives.
10          A.    As the expert I can tell you I've never
11   observed shortening or shrinking or scarring, but,
12   again, I'm speaking to, you know, in the anterior
13   compartment, there could be some influence on bladder
14   function.  At the apical end of things, I would think
15   that it could affect sexual intercourse.  In the
16   posterior compartment, there could be events there,
17   although, again, I point out in my report, I evaluated
18   this extensively, and there's no evidence from the
19   literature that these types of events are occurring
20   with any greater frequency with these products as
21   compared to other types of repairs, and that is
22   inferred in the paragraph I believe that you read
23   yourself, that these are risks typically associated
24   with pelvic organ prolapse repair.

37 (Pages 142 to 145)

Marc R. Toglia, M.D.

Page 146

1    Q.    Actually, that's the first paragraph.
2    A.    Sorry.  Third bullet point, "Potential
3  adverse reactions are those typically associated with
4  pelvic organ prolapse repair procedures."
5    Q.    And obviously excessive contraction or
6  shrinkage of the tissue surrounding the mesh, vaginal
7  scarring, tightening and/or shortening is not something
8  that is caused by pelvic organ prolapse, correct?
9    A.    Pelvic organ prolapse or pelvic organ
10  prolapse repair procedures?
11    Q.    Fair enough.  The repair procedure.
12    A.    It is, and, again, if you read through
13  my report, these are common adverse events that are
14  associated.  That's why it says that.  It says
15  potential reactions and it says typical, not unusual,
16  typically associated with pelvic organ prolapse repair
17  procedures.  And, again, I have cited several very
18  reputable sources analyzing over 100 studies involving
19  10, 11,000 patients suggesting low incidence of these
20  things and incidences that are not any different than
21  what is typically associated with pelvic organ prolapse
22  repair that does not involve mesh.
23    Q.    Regardless of whether it's caused by
24  pelvic organ prolapse repair or by the mesh, you've

Page 147

1  never seen it either way, right?
2    A.    That's not what I've said, sir.  I said
3  that, in my experience, as I stated in my report, I've
4  never seen the mesh cause shrinkage or scarring above
5  or beyond what we would typically see.
6    Q.    Do you see the second to last bullet
7  point that says "neuromuscular problems, including
8  acute and/or chronic pain in the groin, thigh, leg,
9  pelvic and/or abdominal area may occur"?
10    A.    I do see that.
11    Q.    Do you agree with that statement?
12    A.    I agree, yes, that with pelvic organ
13  prolapse repair procedures that we do that those
14  problems can occur.  They can occur with suture based
15  repairs.  They can occur with mesh based repairs.  If I
16  could refer you to the study, and I'm sorry, some of
17  these names I have trouble pronouncing, he did
18  sacrospinous ligament suspension, Qatawneh, okay, he
19  points out, for example, temporary sciatic neuralgia,
20  this is on Page 15 of my report, pointed out that about
21  I believe it was 11% of patients in either group
22  experienced sciatic neuralgia.
23    Actually, Barber et al. in what's the OPTIMAL
24  trial, and the OPTIMAL trial is included in the

Page 148

1  materials I provided for you, and these were suture
2  based repairs, nerve pain was observed in one arm,
3  6.9%, in the second arm 12.4%.
4    Q.    Okay.  In your risk-benefit discussion
5  with a patient who is potentially going to have a
6  Gynemesh PS placed, do you tell her that excessive
7  contraction or shrinkage of the tissue surrounding the
8  mesh, vaginal scarring, tightening and/or shortening
9  may occur?
10    A.    Again, we don't do these procedures in
11  isolation, so I speak to them about the total
12  procedure.  In general, that's not been our experience
13  to see that, but I do explain to them that sometimes
14  surgery can result in pain, either pain during sex or
15  even pain not related to sex.  And, obviously, they
16  have an incision in the vagina.  It's -- the incision
17  is obviously going to be tender initially.  That
18  tenderness usually resolves over time; however, there
19  are instances in which the pain will persist.  I don't
20  specifically say it's the product that causes those
21  procedure because based upon the records -- excuse me,
22  the literature that I have reviewed and my own personal
23  experience in 25 years, that has not been what we have
24  observed or is what's been reported.

Page 149

1    Q.    Do you tell that woman that potentially
2  is going to have Gynemesh placed that neuromuscular
3  problems, including acute and/or chronic pain in the
4  groin, thigh, leg pelvic and/or abdominal area may
5  occur.
6    A.    I think that's what we just address, in
7  general I tell them that is part of the risks of
8  surgery in general for pelvic organ prolapse, that they
9  are uncommon problems, and, again, if it's a patient
10  with fibromyalgia, they probably have a little bit
11  higher risk because they're already sort of predisposed
12  to that.  Again, it may vary based upon age.  So it's
13  really a general discussion that is sort of tuned for
14  that individual, but, overall, I am covering the
15  general topics as listed in -- that we've just been
16  discussing from the IFU.
17    Q.    But your discussion with women that are
18  undergoing surgery to correct pelvic organ prolapse is
19  the same, regardless of whether you're placing a mesh
20  or you're doing any other surgery, correct?
21    A.    Yes, because the risks are the same.
22  Incidence of dyspareunia, pain, defecatory dysfunction,
23  voiding dysfunction, incontinence, in general is not
24  different percentage-wise between the procedures, and

38 (Pages 146 to 149)

Marc R. Toglia, M.D.

Page 150

1  that is sort of the sum and basis of the report that
2  I've generated for this purpose.
3      Q.    Do you tell a woman that potentially is
4  to receive a Gynemesh PS product that at some point
5  another surgeon or you may have to go in there and
6  remove the mesh?
7      A.    In general, I inform the woman that the
8  mesh is permanent, that the good news is is that,
9  typically, if we get a satisfactory result, that result
10 is long lasting.  I explain to them that typically the
11 literature has supported that repairs done with mesh
12 are typically superior to the results without mesh, and
13 that certainly has matched our personal experience in
14 this field in the last 25 years, but, yes, if they were
15 to develop pain that there may be a risk of
16 re-intervention.  Typically, that risk of
17 re-intervention is low in our practice.  It's probably
18 5%.
19     The literature would suggest that the risk of
20 re-intervention is in the low teens, again, depending
21 risk factors.  What's the patient's age, is she a
22 smoker, is she obese.  So sometimes I do fine-tune that
23 and say I would consider you to be somebody at a little
24 bit higher risk than what I'm explaining to you right

Page 151

1  now or somebody that I believe are a little bit lower
2  risk, but, again, it's always part of that general
3  discussion about the surgery in general because we
4  rarely go in and just sort of do one thing and nothing
5  else.
6      Q.    But it's fair to say that if mesh is
7  never placed, that you don't have to go in and remove
8  mesh if there's a complication, correct?
9      A.    If mesh is not placed, then you don't
10 have to go in to remove mesh.  If suture is placed, you
11 may have to go in to remove sutures, and, again, in our
12 experience, those occur with equal likelihood.
13     Q.    With sutures there's equal likelihood
14 that another intervention would be necessary?
15     A.    Correct.  In fact, I published a paper
16 in which the likelihood re-intervention to remove
17 sutures exceeded 30%, and that is certainly -- that is
18 probably three times the incidence of us having to go
19 back to deal with mesh-related wound -- I'm just going
20 to classify these are all types of wound complications.
21 So whether the wound opens up, whether there's a suture
22 that's exposed, whether the wound opens up and mesh is
23 exposed, that's a wound complication.
24     In our practice and supported by the

Page 152

1  literature, they occur at least with equal frequency.
2  In our hands, they occurred three times higher with
3  suture based repairs.
4      Q.    Did you ever approach Ethicon and ask
5  that Gynemesh's mesh be less rigid?
6      A.    I don't know.  I'm concerned because you
7  seem to be reading from something while you're asking
8  me that question, but I honestly don't know.  I'm sure
9  I offered them opinions, again, in a theoretical sense
10 whether it was Prolift+M, whether it was Prolift,
11 whether it was Gynemesh, there were subtle variations,
12 there were other products from other companies, I may
13 have had ideas about what I thought.
14     I mean, my recollection is that I said to them,
15 look, at least in my observation, I find that, you
16 know, Prolift+M is a more rigid material.  At the time
17 of implantation, that may be beneficial, it's a little
18 easier to work with if it's rigid; however, it could,
19 in fact, maybe be associated with more wound
20 complications, and I would let them know that just so
21 they can just include that in the information that
22 they're receiving.
23     You know, again, I tended to be an early
24 adopter of these procedures, and I felt a

Page 153

1  responsibility as an early adopter to provide early
2  feedback.
3      Q.    What is your understanding of what a KOL
4  is?
5      A.    A KOL is a term that means key opinion
6  leaders, and it's a term used by industry to identify
7  people that they considered to be key opinion leaders.
8  What they specifically mean by that and what I might
9  think about that may not be the same thing.
10     Q.    Would you have considered yourself to be
11 a KOL for industry?
12     A.    I mean, I think they might consider me
13 to be a KOL.  You know, I mean, certainly, at this
14 point in time, I've been doing this for a long time, I
15 do a high clinical volume, I'm a relatively
16 straightforward and approachable person, and I'm pretty
17 liberal with my opinions, but I would say -- sorry to
18 give you a long-winded answer, I know that
19 organizations have considered me to be a key opinion
20 leader in this area.
21     Q.    What is -- in medicine, what's a
22 conflict of interest?
23     MR. SNELL:  Form, overbroad.
24     THE WITNESS:  Exactly.  You know, I

39 (Pages 150 to 153)

Marc R. Toglia, M.D.

Page 154

1    mean, there are very many different forms of
2    conflict of interest. I mean, you know, I'd
3    have to get -- have a specific situation.
4    BY MR. SCHNIEDERS:
5        Q.   Well, when drafting an article, is it
6    part of the canon that physicians will disclose
7    potential conflicts they might have that could
8    potentially affect their opinion?
9        MR. SNELL: Form, vague, also undefined
10   as to scope and time.
11       THE WITNESS: You know, I think there's
12   a fine line between bias and conflict of
13   interest, however, you know. For example, in
14   the TVT Secur trial, I revealed to the
15   publishing journal and the people reviewing the
16   manuscript that, you know, yes, I have taught
17   this procedure and I have been compensated for
18   that time.
19       I'll tell you, quite honestly, I don't
20   think the results of that trial was of any
21   benefit to the company, you know. The company
22   did not pay for that trial directly. It
23   involved their products, so my involvement was
24   based on my experience. My involvement was not

Page 155

1    based upon the fact that I had a relationship
2    with the company, but I understand that some
3    people might view that as a negative, so I did
4    disclose that.
5    BY MR. SCHNIEDERS:
6        Q.   Well, what's the purpose of disclosing
7    conflicts in literature?
8        MR. SNELL: Same objection.
9        THE WITNESS: You know, I think when you
10   read something, you're trying to understand
11   where that person is coming from and whether or
12   not they may be otherwise motivated. You know,
13   if I own stock in a company, I could run around
14   and say -- you know, if I own stock in
15   Volkswagen and I drove a Volkswagen, I might
16   tell Bert and yourself and anybody else what a
17   great car, I've never driven a better car, and
18   I own stock in this company because I've got a
19   conflict, in a sense. So that's how I would
20   view a conflict. I might be otherwise
21   motivated in revealing that information.
22   BY MR. SCHNIEDERS:
23       Q.   As a physician, when you're reading
24   literature how do you factor in potential conflicts?

Page 156

1        A.   You know, it's just one of a host of
2    variables. Everybody clearly has a bias, you know, or
3    a prejudice, you know, many of which might be based
4    upon personal experience. So, you know, even if
5    there's no industry related conflict, you know, there's
6    always bias involved, and it's just one thing to keep
7    in mind and it's a very -- you have to balance, you
8    know, that with everything else that you're reading.
9        Q.   And is that something that you as a
10   reviewer of literature do when you're reviewing
11   studies, for instance, in this case?
12       A.   We look at their disclosures, you know.
13   We looked at funding for the study direct. We look at
14   what the authors would reveal as potential conflicts.
15   I can't tell you that that is -- that commonly changes
16   the overall value of the report or what's being said.
17   The results typically speak for themselves. There are
18   a number of internal controls.
19       So, for example, when you randomize somebody to
20   one intervention or the other, you're looking to
21   minimize bias. When you do a randomized trial that
22   might involve over 50 surgeons across five different
23   countries, as had been done, for example, with Prolift,
24   you will also minimize those biases as well. When

Page 157

1    things are blinded to the patient, you're trying to
2    minimize the bias. If the patient knew that they were
3    having the same procedure that maybe their sister had
4    and their sister had a great result, for example.
5        Obviously it's a little harder to blind a
6    surgeon. You can't blind them to do the actual
7    procedure, I don't think that would be safe, but
8    sometimes the person who is doing the evaluation of the
9    result might be blinded to what the surgeon did. That
10   was the case, for example, I believe with the TVT Secur
11   trial, it was sort of single blinded in that regard.
12       Q.   Is it significant to you when you review
13   literature how much money one of the authors might have
14   made from a company that study benefits?
15       A.   Typically, no.
16       Q.   Is there a threshold where it does
17   become important, for instance, if they make $500,000?
18       A.   I'm not aware -- I don't have a
19   threshold, no.
20       Q.   So not a million dollars?
21       A.   I don't have a threshold.
22       Q.   $10 million?
23       A.   I don't know how I can say I don't have
24   a threshold any differently. You know, again, from

Marc R. Toglia, M.D.

Page 158

1    where I sit, as you can tell from my report, I'm more
2    interested in the -- what we call sort of the summary
3    or the pooled analysis of data. I'm not going to hold
4    any single study as being the Holy Grail. I'm looking
5    for consistencies between studies. I'm factoring in
6    thing like biological plausibility to what's being
7    offered. I'm looking very specifically at levels of
8    evidence, you know, reproducibility of the results.
9    Those are far more important to me than who was paid
10   what for what and why.
11        Q.   Who other than authors of a study should
12   hold editorial power over the study?
13        MR. SNELL: Form.
14        THE WITNESS: You know, again, all
15        studies are different. You know, some
16        studies -- you know, if somebody is paying for
17        a study to be performed, and, again, that's an
18        arrangement made between the investigator and
19        the source of the research, you know, for
20        example, the NIH if they're going to sponsor a
21        study, they oftentimes will insist that that
22        study be available at no cost in a public forum
23        to anybody who might want.
24             Certainly, in some of these studies that

Page 159

1        were directly funded by the company, the
2        company wanted to have access to those results.
3        I don't know that it is common for there to be
4        any undue influence, but, again, that sort
5        of -- you know, you would think that once a
6        study was published, it's sort of passed
7        certain bars of professionalism to get to that
8        point.
9    BY MR. SCHNIEDERS:
10        Q.   Just so I'm clear because you just said
11   after published, I'm talking about before it's
12   published when it's still a draft manuscript?
13        A.   Sure. I'm sorry. What I was saying if
14   a study becomes published, you would assume this would
15   have been vetted. It varies, it varies widely, you
16   know, in our experience, as far as how much influence.
17   Sometimes it's simply they want to be aware of the
18   data. You know, sometimes they may want to contribute
19   information. I'm not sure exactly what you're
20   implying.
21        Q.   I'm just asking is it appropriate for a
22   pharmaceutical or a device company to have a draft copy
23   of a study and add or subtract words from it prior to
24   it being published?

Page 160

1        MR. SNELL: Objection, vague, lacks
2    foundation, incomplete hypothetical.
3        THE WITNESS: I think if -- I think that
4    typically that is an agreement and a decision
5    that is made before the study actually begins
6    and, therefore, is kind of sort of removed from
7    the actual results of the study, so it varies
8    widely. You know, as an investigator you have
9    to decide your level of comfort of that
10   involvement.
11        You know, you appear to be maybe too
12   young to have children in college, but it's the
13   same argument, if I'm paying for my son to go
14   to college, do I deserve to know, you know, his
15   shenanigans, his grades, potential issues, you
16   know. Again, there are agreements between you
17   and your child, between you and the school,
18   same thing in here. But those are usually
19   clearly defined at the time that there's an
20   agreement to fund the study and it varies.
21   BY MR. SCHNIEDERS:
22        Q.   In your study that was funded by
23   Ethicon, did they have editorial control?
24        A.   My study was not funded by Ethicon.

Page 161

1        Q.   It wasn't?
2        A.   Not directly, no.
3        Q.   What do you mean "not directly"? That
4    sounds like a qualifier.
5        A.   My study was not -- again, I was not the
6    study designer, but the study was funded by -- the
7    funding is listed on the actual study, I believe it was
8    the foundation, and I'm sorry if I'm forgetting the
9    exact terms, the foundation of women's health. I did
10   not receive any compensation, and I don't -- it was
11   founded by the foundation, and it was a randomized
12   study between seven sites. So I would violently object
13   to you telling me that that study was funded by Ethicon
14   because it was not.
15        Q.   And not sure if I'm clear, are you
16   saying you didn't get compensated at all for that
17   study, or you didn't get compensated by Ethicon?
18        A.   I was not compensated by Ethicon for
19   that study.
20        Q.   But the foundation, they compensated
21   you, right?
22        A.   The -- excuse me, the study compensated
23   my practice for the data collection and the clinical
24   nurse coordinator and stuff like that.

41 (Pages 158 to 161)

Marc R. Toglia, M.D.

Page 162

1    Q.   Did you get paid anything yourself?
2    A.   I mean, in my employment all monies go
3   into a pool. We subtract expenses from revenue. The
4   money doesn't come to me directly labeled or traceable
5   from any one site.
6    Q.   So, clearly, if Ethicon didn't fund your
7   study, it would be inappropriate for them to have a
8   draft copy and make edits on that, right?
9    A.   Those are two completely separate
10  issues.
11   Q.   How so?
12       MR. SNELL:  Objection, asked and
13  answered.
14       THE WITNESS:  Again, I was not part of
15  the -- that discussion. I did not discuss the
16  study with Ethicon. I don't -- was not part of
17  that discussion. My understanding is that they
18  saw a copy of the results. I do not believe
19  that they had any influence. I will tell you
20  that that particular study won two first prizes
21  as best surgical paper of the year, both one
22  nationally, one internationally. That is not
23  something that occurs with an industry -- you
24  know, an industry sponsored study.

Page 163

1   BY MR. SCHNIEDERS:
2    Q.   So that was not an industry sponsored
3   study, correct?
4    A.   Again, I was not -- I did not design the
5   study. I am not employed by the foundation that I
6   mentioned, so that was not directly funded by Ethicon.
7   The foundation collects money from various sources,
8   including people like myself that would make a
9   contribution. The pooled resources of the foundation
10  funded studies. The studies were designed by the
11  investigators. The company had no influence on the
12  study design. The company had no influence on the
13  study results. The company had no influence on the
14  writing of the manuscript and they certainly had no
15  influence in the presentation or the submission of the
16  data. I hope I've clarified that for you because you
17  seem to be a little misinformed in that regard.
18       (Document marked for identification as
19       Toglia Deposition Exhibit No. 12.)
20  BY MR. SCHNIEDERS:
21   Q.   Doctor, I'm showing you what I'm marking
22  as Exhibit 12, which is a PowerPoint that came from
23  Ethicon and it's entitled "KOL Strategy."
24   A.   Uh-huh.

Page 164

1    Q.   So a moment ago when we were talking
2   about KOLs, we discussed the fact that that means key
3   opinion leader within the industry, correct?
4    A.   That's my assumption. I can't tell you
5   that anyone has ever -- I've kind of figured that out
6   myself. Obviously, it doesn't stand for Knights of
7   Columbus, but I'm assuming that that's what that means.
8   I have no objection if you tell me that that's what
9   that means.
10   Q.   That's my understanding as well.
11       If you see on the front page of this, this is
12  from February of 2008, you see that?
13   A.   And this is coming specifically from
14  where?
15   Q.   This is from Ethicon.
16   A.   But where specifically within Ethicon?
17  This is marketing, this is R&D, this is --
18   Q.   We would have to get the Bates number
19  and tell you whose file it was in, but it's from one of
20  their internal files.
21   A.   Sure.
22   Q.   So if you go to the third page --
23  probably marketing, typically.
24   A.   I would agree with that. I'm sorry that

Page 165

1   I led you to that statement.
2    Q.   Typically, KOLs work with marketing,
3   right?
4    A.   I mean, I was a KOL that worked -- like,
5   my involvement, say, with Astellas, which is more
6   Astellas global international, my involvement is not
7   marketing. It's more R&D, and, you know -- and as
8   we've been discussing, much of my relationship and
9   interest with Ethicon has been R&D.
10   Q.   So if we got to this third page that
11  says "KOL Categorization," there's a circle with
12  several other circles surrounding it?
13   A.   Yes.
14   Q.   It starts off it's got the KOL here in
15  the middle in the blue circle, and then it's got all
16  these different categories, it appears, that whoever
17  put this PowerPoint together feels fall within that KOL
18  categorization.
19       You see that?
20   A.   Yes.
21   Q.   And there's things like society or
22  influencer, expert user, advocacy/PR, faculty. Are
23  those all things that you've seen in other KOLs that
24  were with Ethicon as well as you?

42 (Pages 162 to 165)

Marc R. Toglia, M.D.

Page 166

1       MR. SNELL:  Foundation.
2       THE WITNESS:  You know, I got to be
3   honest with you, I was not someone that was,
4   you know, involved at all levels.  I did my
5   little piece and stuck to my little piece.  To
6   me, I look at this, and I'm like, what is a
7   KOL?  Well, a KOL could be any of these things,
8   or all of these things would contribute to a
9   KOL.  You know, some of these people could be
10  physicians, advocacy, could be some of these
11  advocacy groups that are out there, the
12  incontinence -- National Incontinence Society.
13  BY MR. SCHNIEDERS:
14      Q.   Do you consider AUGS to be an advocacy
15  group?
16      A.   AUGS is an advocacy group, yes.
17      Q.   If you go to next page, there is a title
18  that says "Objective," and there it says, "Engage KOLs
19  across the spectrum of functional expertise to partner
20  with EWH&U in supporting organizational objectives."
21      Did I read that correctly?
22      A.   You did.
23      Q.   And EWH&U stands for Ethicon, correct,
24  women's health?

Page 167

1       A.   It stands specifically for Ethicon
2   women's health and urology.
3       Q.   So the group putting this together at
4   Ethicon feels that KOLs can be brought in in order to
5   support organizational objectives, correct?
6       MR. SNELL:  Calls for speculation.
7       THE WITNESS:  Again, you know, my
8   role -- and, again, my role as a KOL person of
9   influence was infinitesimal.  I was not as --
10  as they would say, I was not in the starting
11  lineup.  You know, I take it for what it reads,
12  that the objective of this project was to
13  engage KOLs across the spectrum, meaning that
14  we're not just going to focus on surgeons, you
15  know, we're just not going to focus on
16  inventors.  We're looking for a broad range of
17  individuals that might be able to help us.
18  BY MR. SCHNIEDERS:
19      Q.   If you keep going, skip the next page,
20  next two pages actually and there should be something
21  that says "Categories" at the top.  There you go.
22      A.   Yes.
23      Q.   And it's got several different
24  specialities, for lack of a better term.

Page 168

1       A.   Sure.
2       Q.   The top one is "Incontinence/Pelvic
3   Floor Specialist (UroGyn, GYN)," and of these groups,
4   and you can look at it, by all means, but that's
5   probably the group that you would identify most
6   specifically with, right?
7       A.   Yes.
8       Q.   If you go to the next page, it starts
9   off with -- it's got a title, it says "Incontinence
10  (UroGyn, Gyn)," and then it's got different categories,
11  as you can see, in the top.  It's got "Prof Ed
12  Faculty," which is professional education, right?
13      A.   Yes.
14      Q.   And under that it says "National TVT
15  Preceptor," and you're at one point a national TVT
16  preceptor, weren't you?
17      A.   Yes, I do believe that I was categorized
18  as a national preceptor.
19      Q.   And there's a category called
20  "Published," and under that it says "Published in peer
21  reviewed journals."  Is that read correctly there?
22      A.   I'm sorry.  I was looking at a different
23  page, and I apologize for not paying attention.
24      Q.   So right next to Prof Ed, there's a

Page 169

1   category called "Published."
2       A.   Yes.
3       Q.   And under that it says -- under where it
4   says "Description/Criteria," it says "Published in peer
5   reviewed journals."  Did I read that right?
6       A.   Yes.
7       Q.   And then if you go all the way, there's
8   "Academic" and then there's "Inventor."
9       A.   Yes.
10      Q.   And there's "Emerging," and then there's
11  "Expert User."
12      A.   Okay.
13      Q.   And "Description/Criteria" is "High
14  utilization of product (EWH&U and Competitive)."
15      Did I read that correctly?
16      A.   Yes.
17      Q.   Okay.  And what does that mean to you as
18  far as high utilization of product?
19      A.   My interpretation is given that this was
20  a marketplace that had 49 slings, my interpretation is
21  that if 99% of what you did in this sphere was with our
22  product, as opposed to I dabbled with everybody's
23  product, I would interpret that to mean, you know, that
24  that's where high utilization.

43 (Pages 166 to 169)

Marc R. Toglia, M.D.

Page 170

1    Q.    And then there's "Advocacy/PR/Policy"
2  and the criteria there is "Practice in top 25 media
3  market, academic/society affiliation," and last one is
4  "Society Leadership or Influencer, leadership role in
5  AUA, AUGS SUFU" --
6    A.    Sure.
7    Q.    "AAGL, ACOG, General Influencer."
8    A.    Uh-huh.
9    Q.    If you go to the next page, then it puts
10 some names here with the group. I'm sure you're
11 shocked by that.
12   A.    I have no vested interest and could care
13 less. This is their opinion. It means nothing to me.
14 I could care less where -- I'm just laughing as far as,
15 you know, they have me listed as an inventor, you know.
16   Q.    They do?
17   A.    Yeah, see that.
18   Q.    They have you listed under inventor
19 actively engaged in the creation of new products?
20   A.    Right. How come I'm not in the top ten?
21   Q.    And then -- well, you are in the top ten
22 on several of these.
23   A.    No, I'm not. Not on this one I'm not.
24 This is TVT.

Page 171

1    Q.    Under "Expert User, High utilization of
2  product," you're actually in bold there, if you see
3  that down at the bottom?
4    A.    I have no idea what that means. I'm
5  actually on that list twice.
6    Q.    You are, you are.
7    A.    Yes, I don't know. I mean, again, I
8  don't know how to interpret this, in all fairness.
9  Competitive in my mind is, you know, maybe Boston
10 Scientific would be interested in this person, so this
11 is somebody that, you know, other people might be of
12 interest. That's how I would look at competitive.
13       High utilization, I mean, you know my history
14 with the company, I've used their products extensively,
15 more so than any other things. So to me that speaks to
16 the fact that I was an early adopter, and I've remained
17 engaged throughout that period of time. That's how I
18 look at it.
19   Q.    And if you look at this across the way,
20 then you'll see that there's probably some names that
21 are very familiar to you as well?
22   A.    I will tell you almost everybody on this
23 list is familiar to me.
24   Q.    And specifically Vincent Lucente who is

Page 172

1  someone that you are a colleague of here in the area,
2  right?
3    A.    Yes.
4    Q.    And then I believe that in that same
5  column there, Mickey Karram was an author along with
6  you in your study?
7    A.    Correct, right.
8    Q.    Under academic I think Dr. Iglesia was
9  an author with you as well?
10   A.    Yes.
11   Q.    Sokol is that someone that you're
12 familiar with?
13   A.    Well, that's an interesting thing. The
14 Sokols are twins, and they are both urogynecologists,
15 and this does not distinguish which Sokol we're talking
16 about.
17   Q.    Both of them happen to be defense
18 experts in this litigation, so it could be either one
19 of them.
20       And then if you go across --
21       MR. SNELL: Who for?
22       MR. SCHNIEDERS: I don't know the answer
23 to that.
24       MR. SNELL: I didn't know that. That's

Page 173

1  news to me.
2        THE WITNESS: I'm sorry. Are you
3  testifying?
4        MR. SNELL: No, he made a statement on
5  the record, so I want to understand it. I
6  don't know if Eric and the other Sokol are
7  experts, whatever.
8        MR. SCHNIEDERS: I can find out for you.
9  I was told that they were.
10 BY MR. SCHNIEDERS:
11   Q.    And then over on the far right, you see
12 that there are some members of the various advocacy
13 groups, AUA, AUGS. Do you see over there, do you know
14 Rebecca Rogers?
15   A.    I do.
16   Q.    Do you know Dee Fenner?
17   A.    I do.
18   Q.    Do you know Anton Bueschen?
19   A.    I do not.
20   Q.    John Barry?
21   A.    I do not.
22   Q.    Are you a member of AUA?
23   A.    I'm not a urologist. I am not.
24   Q.    But fair to say that there's many names

44 (Pages 170 to 173)

Marc R. Toglia, M.D.

Page 174

1  on here that you're familiar with and that are
2  colleagues of yours, correct?
3      A.   They are.  Again, I don't know the
4  context.  I don't know that this is just simply a list
5  of people to be aware of.  So Rebecca Rogers probably
6  at the time that this was published was the president
7  maybe of AUGS.  Maybe this is someone that they just
8  want people to be aware of the names or if they saw
9  them, they would introduce themselves.  Maybe this is
10  somebody that they were hoping to have a better
11  relationship with.  I think -- I mean, the fact that
12  they considered me to be an inventor I think they're
13  being very generous or liberal in how they're -- I
14  think they're just categorizing people, which is
15  certainly innately human to take things and put them
16  into nice little boxes.
17      Q.   Interesting.  But as of February of
18  2008, you had done some consulting with Ethicon, hadn't
19  you?
20      A.   I had, yes.
21      Q.   And if you go there's several pages of
22  these types of categories, the one I was reading off of
23  was "Incontinence."  The next one is "Incontinence
24  (Urologist)," and then after that there's a section

Page 175

1  called "Pelvic Floor Specialist," which is also a
2  specialty that I believe you would probably hold
3  yourself out as holding, correct?
4      MR. SNELL:  Form.
5      THE WITNESS:  You know, I mean, the
6      specialty has gone by many names.  I think here
7      they were trying to be inclusive, you know, of
8      urology, at the time what we called
9      urogynecology, colorectal, perhaps.
10  BY MR. SCHNIEDERS:
11      Q.   But if you look at the page where you'll
12  have some names that are pelvic floor specialists on
13  the next page from where you are, I believe, you made
14  the list.  You're an expert user down there?
15      A.   I am.  Where am I?  Oh, there we are.
16      Q.   Third from the bottom down there.
17      A.   It's a miss -- I don't know who
18  Dr. Tolia is, but that could be me.
19      Q.   I think it's you.
20      A.   I would not object to that.
21      Q.   And do you know a Dr. Fagan?
22      A.   He was my partner.
23      Q.   That would make a lot of sense.
24      A.   Yeah.

Page 176

1      Q.   And then there's some other names that
2  we saw on the other page, but then there's a couple new
3  ones under "Published" and "Academic."  You see a
4  couple that are Goldman.
5      You see that?
6      A.   On the same page?
7      Q.   On the same page.  If you go to
8  "Published," the second -- sorry, the third name down
9  and on "Academic" is Goldman?
10      A.   Yes.
11      Q.   Do you know Howard Goldman?
12      A.   I do.
13      Q.   Howard Goldman was one of the authors of
14  the AUGS mesh statement, correct?
15      A.   I will accept that if you tell me that,
16  yes.  I don't have a visual picture of the author list.
17      Q.   And just so --
18      A.   Are we certain that that's the same
19  Goldman?  It's fairly common.
20      MR. SNELL:  How about object,
21      foundation.  Go ahead and lay that for me.
22  BY MR. SCHNIEDERS:
23      Q.   So to spell it out for all of you, my
24  next question on the next page under "Expert User,"

Page 177

1  it's spelled out as Howard Goldman.  What is the group
2  CCF?  Do you know what the group CCF is?
3      A.   I can guess.  I can't tell you that I
4  recognize those initials.
5      Q.   Well, I'm not going to hold you to it.
6  I'm just curious, can you guess for me?
7      A.   My guess would be Cleveland Clinic
8  Foundation.
9      Q.   And does Howard Goldman work at
10  Cleveland Clinic?
11      A.   I believe so.
12      MR. SNELL:  Can we take a break in a
13      minute?
14      MR. SCHNIEDERS:  I'm switching topics,
15      so let's take a break.
16      (Brief recess taken at 5:02 p.m.)
17      (Deposition resumes at 5:12 p.m.)
18  BY MR. SCHNIEDERS:
19      Q.   I'm going to mark as Exhibit 13 an
20  e-mail chain that you were included on, Doctor.
21      (Document marked for identification as
22      Toglia Deposition Exhibit No. 13.)
23  BY MR. SCHNIEDERS:
24      Q.   Do you recall earlier when we were

45 (Pages 174 to 177)

Marc R. Toglia, M.D.

Page 178

1  discussing the concept of whether or not funding from
2  industry or other funding might lead to a conflict of
3  interest.
4      Do you recall that discussion?
5      A.   I do.
6      Q.   Okay.  You can take a minute, if you
7  want, to read that bottom e-mail so you have some
8  context here, and I'm going to ask you if you recall
9  this?
10      A.   I mean, I'm aware of the -- you know,
11  the discourse between two of my colleagues.  Are you
12  asking me specifically am I aware of the e-mail or just
13  of the circumstances?
14      Q.   Either one.
15      A.   I'm aware of the circumstances.  I don't
16  recall whether this was covered in the TVT deposition
17  or not.
18      Q.   You guys covered a lot of stuff that
19  never made it to the record, and that's impressive.
20  You were on this e-mail?
21      A.   Well, I was copied on this e-mail, okay,
22  right.
23      Q.   Right.  And what, to your knowledge, was
24  this consternation about?

Page 179

1      A.   If I remember correctly, and this, of
2  course, is going back for six years, and this is a
3  relatively minor issue that I think Dr. Iglesia had
4  either responded in a letter to the editor, it could
5  have even have been -- you know, when we present things
6  at national meeting, we allow people to get up, make
7  comments, suggestions.  So in one of these forums, she
8  was trying to -- and I can't remember which way it
9  went, whether it was Lucente initially commenting to
10  Iglesias on her work or whether it was Iglesias
11  commenting to Lucente, but all I can tell you is that I
12  recall that there was some friction and really just
13  collegial -- or not collegial, but discourse between
14  two colleagues about that interaction.
15      Q.   Fair to say that Dr. Iglesias inferred
16  that Dr. Lucente's superior outcomes were perhaps due
17  to financially driven bias?
18          MR. SNELL:  Objection, calls for pure
19      speculation what somebody else thought.
20          THE WITNESS:  I don't know.  I'm sorry,
21      but I don't know what study or whether this was
22      written comments, comments in the cafeteria,
23      comments with someone on the podium.
24  BY MR. SCHNIEDERS:

Page 180

1      Q.   Do you know why you would have been
2  included on this e-mail?
3      A.   I don't, no.
4      Q.   And Dr. Lucente is a colleague of yours.
5  Do you consider him to be a friend as well, or is it
6  somewhere in that blurred line?
7      A.   I think it's fair to say that -- I've
8  known Vince since he was a fellow, so we go back at
9  least 25 years.  Vince is certainly both a colleague
10  and a friend of mine, as is Dr. Iglesias, who I've
11  known for about the same amount of time as well, I knew
12  her when she was a fellow as well.
13      Q.   Fair enough.  Set that to the side.
14      A.   You understand that Dr. Lucente and I
15  are both Italian, and so sometimes that may influence
16  the tone in which we respond to other people, and we're
17  both from New York.
18          (Document marked for identification as
19      Toglia Deposition Exhibit No. 14.)
20  BY MR. SCHNIEDERS:
21      Q.   Give you what's been marked as Exhibit
22  14.  Unfortunately, this is the method by which we get
23  this information a lot of times.  I want you to look at
24  this, and I'll give you an opportunity if you need to

Page 181

1  vet it in any way, shape or form as I go through some
2  of these, but I will tell you if I found one that's a
3  duplicate, but this is a report that was given to us as
4  part of a larger spreadsheet and it's been reduced just
5  down to your name instead of the thousands of columns
6  and everything like that, and it shows that from
7  March 1st of 2008 through February 2nd of 2010 that
8  Ethicon paid you $152,000.
9      Do you have any reason to dispute that?
10          MR. SNELL:  I'm going to object.  That
11      is purely without foundation.  You're making a
12      bald-faced assumption based on contract
13      amounts.  Do not make a statement on the record
14      that Ethicon paid him that amount of money
15      without proper foundation.  And this was
16      explicitly covered in the first deposition too.
17          MR. SCHNIEDERS:  I've got several of
18      these.
19          MR. SNELL:  You know how much he was
20      paid.  You know how much he was paid.  You have
21      the productions of how much he was paid.
22          MR. SCHNIEDERS:  I have this.
23          MR. SNELL:  No, no, no.  You have the
24      productions of how much he was paid in each

46 (Pages 178 to 181)

Marc R. Toglia, M.D.

Page 182

1    year.
2         MR. SCHNIEDERS:  Make your objections.
3         MR. SNELL:  Don't make a ridiculous --
4    lacks foundation.
5         MR. SCHNIEDERS:  Then make the lacks
6    foundation objection.
7         THE WITNESS:  I don't -- I never
8    received $81,000 from Ethicon in any given
9    year.  If I looked at this, I would say it's
10   more like the number to the far left.  I mean,
11   I don't know what the two columns mean, but to
12   be honest with you, and we did cover this in
13   the other deposition, you know, the most I ever
14   got paid from Ethicon in a given year might
15   have been $31,000, but, no, $81,000 no;
16   $45,000, no.
17   BY MR. SCHNIEDERS:
18       Q.   Okay.  So this is incorrect, this
19   spreadsheet?
20       A.   I don't know what this represents, so
21   how do I say if it's correct or incorrect.  I just see
22   numbers on a page.  I don't -- and I'm being very
23   honest with you, that does not resemble anything in my
24   working memory.

Page 183

1         Q.   Okay.  So, sitting here today, your
2    testimony is that $152,000 for that time period doesn't
3    look like that was the right amount?
4         A.   Over the course of two -- over the
5    course of two years.
6         Q.   From March 1st of '08 through
7    February 2nd of 2010.
8         A.   No, this suggests that between -- that
9    between -- right, March 1st of 2008 to March 1st, 2009
10   they paid me $81,000, no, no, not even -- not even --
11   no.
12        Q.   You dispute that amount?
13            MR. SNELL:  He already told you.
14            THE WITNESS:  Yes.
15            (Document marked for identification as
16   Toglia Deposition Exhibit No. 15.)
17   BY MR. SCHNIEDERS:
18        Q.   I'm going to mark as Exhibit 15 the next
19   spreadsheet we had for this.  I actually handwrote the
20   Bates number on that one since they come from the Excel
21   spreadsheet.
22            This one covers -- and it just had end dates on
23   this spreadsheet, but the end dates are September 23rd
24   of 2010 through November 5th of 2011, and that covers

Page 184

1    $153,000.  As you can see the requesters, the contract
2    amounts are different than what you just saw, as are
3    the dates.  So is it your testimony -- that in 2010 and
4    2011 that this $153,000 is incorrect?
5         MR. SNELL:  Form, lacks foundation.
6         Go ahead.
7         THE WITNESS:  I honestly don't recognize
8    any of this.  I can tell you that often times
9    in the contract, there was a ceiling, so it
10   would say something like, in a given year, you
11   know, your compensation will not exceed, and so
12   these numbers like $30,000, $10,000, in my
13   mind, might have been a ceiling.  I just, you
14   know, I mean, if you said to me, you know, in
15   your relationship with Ethicon between 1999 and
16   2011 was your total compensation the 153?  I
17   mean, maybe.  I mean, is this just accounting
18   on how they sort of -- but, yeah, I don't know.
19   BY MR. SCHNIEDERS:
20        Q.   That's fine.  I just want to get your
21   testimony on it.  That's fine.
22            MR. SNELL:  You've already testified in
23   the first deposition.
24            THE WITNESS:  Yes, I did.  Okay.  That's

Page 185

1    fine.
2         MR. SNELL:  You don't have to accept it.
3         MR. SCHNIEDERS:  Nobody is accepting.  I
4    said all I said we're doing is getting your
5    testimony.
6         THE WITNESS:  That's fine.
7         (Document marked for identification as
8    Toglia Deposition Exhibit No. 16.)
9    BY MR. SCHNIEDERS:
10        Q.   Exhibit 16 is Master Consulting
11   Agreement.  This one covers the time period that starts
12   on February 1st of 2011 and ends on March 31st of 2012.
13   It may have been a few years since you've looked at one
14   of these doctor, but if you go back to Exhibit A,
15   that's where it talks about what the fees are
16   associated with it?
17        A.   I'm sorry.  Would you mind giving me a
18   few more minutes to just --
19        Q.   If you look at Exhibit A, there's boxes
20   checked that cover this contract right here, and the
21   first one is --
22        A.   I apologize.  I'm not with you.  Can you
23   tell me again where you are.
24        Q.   Exhibit A.

47 (Pages 182 to 185)

Marc R. Toglia, M.D.

Page 186

1     A.    Sure.
2     Q.    It's about three-fourths of the way
3  through this, I would say.  The bottom number on the
4  Bates number ends with 167.
5     A.    Yes, okay.  Sorry.  Go ahead.
6     Q.    Under A it says, "Consultant agrees to
7  perform the Services below for which the 'Yes' box is
8  checked for the compensation set forth therein."
9  Company-sponsored speaker programs is checked yes, and
10 then if you read through there it says, "Consultant
11 shall present scientific, clinical and related
12 professional information by speaking at
13 Company-sponsored seminars and meetings as requested by
14 Company.  Consultant shall disclose to attendees that
15 he is being compensated by Company for the
16 presentation.  Consultant shall make such presentations
17 on 8 occasions.  The presentation will review stress
18 urinary incontinence procedures.  For each such
19 speaking engagement, Company shall pay consultant
20 $3,000 per 8 hour day plus reasonable out-of-pocket
21 expenses.
22       And I'll tell you that eight times 3,000 is
23 $24,000.  It says no under Subsection 2.  It says no
24 under Subsection 3.  Under Subsection 4 it says

Page 187

1  "Preceptorship/Surgical Training, yes.  Consultant
2  shall allow visiting surgeons and visiting Company
3  sales representatives to observe surgical procedures
4  involving the practice of stress urinary incontinence,
5  the clinical uses of stress urinary incontinence family
6  of products and to consult with Consultant regarding
7  such procedures applicable to patient confidentiality
8  and consent requirements.  In particular, Consultant
9  agrees he or she shall secure appropriate patient
10 consent to the presence of any third party during
11 surgical training programs as necessary.  Consultant
12 shall allow such visits up to 9 occasions, and Company
13 shall pay consultant $3,000 for each such session per 8
14 hour day."
15       And that adds up, if you take nine times 3,000,
16 to 27,000.
17       If you go to the next page, it's checked no on
18 Number 5, 6, 7.  On 8 Other, it's checked as yes, and
19 it says, Consultant shall perform other services
20 designated below for, and it has a dollar sign and it
21 says varies per hour, and the description of services
22 is faculty training meetings and educational
23 summits/forums.  Negotiated rate to be no more than a
24 maximum of $375 rate/per hour.

Page 188

1       And then it goes down to say "B. The parties
2  agree that compensation paid to consultant shall not
3  exceed $54,000 per contract term, except as may be
4  mutually agreed in writing by the Parties."
5       Do you see that?
6     A.    Yes.
7     Q.    Do you recall this contract?
8     A.    Yes.
9     Q.    So with counsel's caveat that these --
10 saying that these are agreed maximums, not payments
11 that are made out, I'm keeping a running list of these
12 amounts here.
13    A.    All right.  Can I point out that the
14 numbers you provided on this list for the period of
15 time covered in this contract greatly exceed this
16 $54,000, which is one of the reasons why I don't
17 believe that this represents actual compensation.
18    Q.    Sure, but you can also point out the
19 fact that the dates and contracts often coincide at the
20 same time because there's different consulting
21 agreements that you signed at different times with
22 different people, correct?
23       MR. SNELL:  Form, foundation.
24       THE WITNESS:  Can I disagree with you,

Page 189

1  because this document specifically refers to
2  this as a Master Consulting Agreement, and
3  everything on this list right here is
4  designated under the Master Consulting
5  Agreement.  So these two documents don't agree.
6  I mean, this is a completed document, and I
7  have recollection.  I have no idea where these
8  numbers came from.
9  BY MR. SCHNIEDERS:
10    Q.    Fair to say that you don't believe in
11 any given year you made over $100,000 from Ethicon?
12    A.    I think $31,000 was the highest I made,
13 and I will tell you that that was when we were working
14 on the PASS study.  That had nothing to do with other
15 stuff.
16       (Document marked for identification as
17       Toglia Deposition Exhibit No. 17.)
18 BY MR. SCHNIEDERS:
19    Q.    I'll keep going through and you can
20 disagree with me on the numbers, that's fine, I'm just
21 putting them on the record.  This is 17.
22    A.    Fine.
23    Q.    And this is part of an e-mail that is
24 titled Action Required with some numbers 2012 Master

48 (Pages 186 to 189)

Marc R. Toglia, M.D.

Page 190

1   Consulting Agreement, Marc Toglia, MD, Incontinence
2   Annual, and it's some other contract numbers there.
3       It says under here under line items, Number 1,
4   Marc Toglia, MD, and then it says consulting fee. It's
5   got a contract ID number, which if you want to
6   reference it on the spreadsheet over there doesn't show
7   up anywhere, and it's got an amount of $14,250. I'm
8   not asking if it's accurate. I'm asking if I read that
9   correctly.
10      A.   This is for 2012. I don't recall
11  receiving -- I don't know that I received any
12  compensation from them. I think this might be the
13  amount that I was approved, the maximum amount. I have
14  no idea. I have no idea what this refers to.
15      Q.   And you see down at the bottom that the
16  total cost of this contract is $15,000.
17      Do you see that?
18      A.   Yes.
19      Q.   You can set that to the side. Give you
20  what I'm marking as Exhibit 18, which is another
21  consulting agreement.
22      (Document marked for identification as
23  Toglia Deposition Exhibit No. 18.)
24  BY MR. SCHNIEDERS:

Page 191

1       Q.   This takes a slightly different form
2   than the one we were looking at that was the master
3   agreement, correct?
4       A.   Yes.
5       Q.   Although, if you go through, you'll see
6   that when it gets to the third page, it starts to look
7   a little bit more like the Master Consulting Agreements
8   that we've seen before. On this one the agreement
9   shall commence on April 1st, 2012 and then it goes
10  through March 31st of 2013.
11      It is nearly identical in content. If you go
12  to the page where you signed it, you signed it on
13  February 6th of 2012.
14      Do you see that?
15      A.   Yes.
16      Q.   And Paul Parisi who is countersigned, do
17  you know who Paul Parisi is?
18      A.   He is an individual that worked for
19  Ethicon.
20      Q.   And on this one on the Exhibit A, it
21  appears that there was a yes checked next to
22  company-sponsored speaking program again, and it was
23  for one occasion for $3,000, and then the Number 4 the
24  preceptorship/surgical training was checked as well,

Page 192

1   and that was for four occasions at $3,000, and then
2   moving to the end, everything else was checked no, and
3   "The Parties agree that compensation paid to consultant
4   shall not exceed $15,000 per contract term, except as
5   may be mutually agreed by the Parties."
6       Do you see that?
7       A.   Yes.
8       Q.   So I will tell you that I have gone to
9   add up the amounts, and the amounts that I've added up
10  from the spreadsheets and from these contracts we've
11  been looking at after going through to make sure that
12  the contract numbers didn't duplicate was $389,000?
13      A.   Sir, this was --
14          MR. SNELL: You got to let me object.
15  Objection, lacks foundation.
16          MR. SCHNIEDERS: Everybody has to let me
17  ask my question first. That's how this works.
18          THE WITNESS: Fair enough.
19  BY MR. SCHNIEDERS:
20      Q.   I have gone through and added up the
21  amounts from the spreadsheets and from the contracts
22  and made sure that they didn't duplicate any contract
23  numbers, and it comes up to an amount of $389,000. I
24  think what you're going to tell me is that you were

Page 193

1   never paid $389,000 from Ethicon?
2          MR. SNELL: My objection is lacks
3   foundation, misstates the evidence.
4          THE WITNESS: What do you think that
5   number represents? I don't understand. That
6   was the maximum that I could have done. I can
7   tell you, say specifically the first thing
8   talked about giving presentations at a national
9   meeting, or, you know, I can't -- other than --
10  I can't tell you that I ever was asked to give
11  that kind of a presentation. So even though it
12  says I could have given that presentation,
13  pretty much the only thing that I ever did in
14  prof ed was teach cadaver labs, which maybe
15  occurred once or twice a year, okay, or I
16  precepted an individual, which, on average, may
17  have occurred two to six times a year. That
18  was probably -- you know, again, this might
19  have been an allowance. You know, the company
20  was approving a maximum amount. That does not
21  reflect what I was paid by the company.
22  BY MR. SCHNIEDERS:
23      Q.   I think you said, I just was looking at
24  the record, you said that probably the most you ever

49 (Pages 190 to 193)

Marc R. Toglia, M.D.

Page 194

1  got paid in any given year was 31,000?
2       A.    My -- yes, my recollection from the
3  earlier deposition, and, again, this may not be
4  accurate, my recollection was that in 2011, I received
5  $31,000, and my recollection is that that related to
6  the period of time that I was working on product
7  development.  It did not reflect preceptor time,
8  lecturing time.  That was never a big part of my role
9  with the company.
10      Q.    Okay.  I'm going to mark as Exhibit 19
11  this e-mail string.
12           (Document marked for identification as
13      Toglia Deposition Exhibit No. 19.)
14  BY MR. SCHNIEDERS:
15      Q.    We can certainly look at the top e-mail
16  here in a moment, but it doesn't pertain to what we're
17  here to talk about, but if you go down to the bottom,
18  Ronald Horton writes an e-mail.
19           Do you know who Ronald Horton is?
20      A.    No.
21      Q.    But it says he's with ETHUS, which I
22  believe is Ethicon US.  He's written it to a Marti
23  Heckman, Alyson Wess, Lissette Caro-Rosado, Paul Parisi
24  and Matt Henderson.

Page 195

1       A.    Right.
2       Q.    Now, we've already talked about Paul
3  Parisi.
4            Do you recognize any of those other names?
5       A.    Vaguely.
6       Q.    And the subject is KOL Usage, which, as
7  we established before, is a term used in industry?
8       A.    Yes.
9       Q.    And it means most likely key opinion
10  leader, and Ronald Horton writes, "All, please see the
11  below list of highly used KOLs and the total pay they
12  have received this year."  This is written on Friday,
13  November 19th, 2010?
14      A.    Uh-huh.
15      Q.    And if you look at the second page, it
16  says Toglia total, $153,000.
17      A.    No.
18      Q.    So someone at US group product director
19  for uterine health, Ronald Horton believes that you
20  were paid $153,000 in 2010?
21           MR. SNELL:  Object on the foundation,
22      calls for speculation.  Also, I think this
23      e-mail was marked and covered in the earlier
24      deposition, but go ahead, tell him what you

Page 196

1  think about that.
2            THE WITNESS:  I'm sorry.  Me tell him
3      what I think about --
4            MR. SNELL:  You can answer.  I'm not
5      sure if there's a question.  The question was
6      so someone at US group, product director Ronald
7      believes you were pay $153,000.
8            MR. SCHNIEDERS:  In 2010.
9            MR. SNELL:  In 2010.
10           THE WITNESS:  I'm pretty confident that
11      I didn't receive anything like that, sorry.
12  BY MR. SCHNIEDERS:
13      Q.    So this e-mail is just wrong?
14      A.    I don't know, sir.  I was not part of
15  this e-mail.
16      Q.    Well, I understand that, Doctor.  What
17  I'm saying is it says that you were paid $153,000 in
18  2010.  You're saying you weren't, so it's wrong, right?
19           MR. SNELL:  Lacks foundation.
20           THE WITNESS:  Yes, I'm telling you that
21      I did not receive that compensation.
22  BY MR. SCHNIEDERS:
23      Q.    Does that mean that your group received
24  that compensation?

Page 197

1       A.    No.
2       Q.    Did anyone on your behalf receive that
3  compensation?
4       A.    No, not to my knowledge.
5            MR. SCHNIEDERS:  Marking as Exhibit 20
6      this e-mail string.
7            (Document marked for identification as
8      Toglia Deposition Exhibit No. 20.)
9  BY MR. SCHNIEDERS:
10      Q.    I'll let you familiarize yourself with
11  it, the e-mail from Joy de los Reyes on down is the one
12  I'm talking about.  The very bottom one is an e-mail
13  from you.
14           So, Doctor, this is an e-mail that you wrote
15  from your e-mail address that we will make sure doesn't
16  show up anywhere it's not supposed to, to Melissa
17  Chaves.
18           Are you familiar with Melissa Chaves?
19      A.    I recognize the name.  I honestly
20  can't -- I don't know what role she plays in the
21  company.
22      Q.    The subject is "thanks," and it says,
23  Melissa, I wanted to thank you again for including me
24  on the sling discussion panel yesterday.  I very much

Marc R. Toglia, M.D.

Page 198

1    enjoy working on these types of panels and did
2    appreciate what the others had to say on the other
3    approaches. It's fascinating how different approaches
4    work equally well in different hands. Thought it went
5    very well, and I received a lot of positive feedback
6    afterwards from the audience. I think that everyone
7    felt that it was fairly balanced, and several folks
8    mentioned that they were glad to see that Ethicon is
9    still very much supportive of the retropubic design, as
10   many feel it is still your best product.
11          That said, it has occurred to me that your
12   company spends virtually no time on TVT-R training, and
13   this is something you may want to consider revisiting,
14   especially as you look to bring surgeons back to the
15   TVT family of products.
16          Now, when you said "bring surgeons back to the
17   TVT family of products," what did you mean?
18      A.   Okay. So my recollection of the
19   contents of this discussion is that Ethicon held a
20   meeting of faculty members. As part of that meeting,
21   they asked three of us to volunteer to do a
22   debate-style discussion. I represented the retropubic
23   approach. Another doctor represented the obturator
24   approach. The third doctor represented the TVT Secur

Page 199

1    approach. They then presented us with a patient case
2    and then asked us to defend why we would choose
3    whatever approach we were assigned to. My recollection
4    is that I was assigned to the retropubic approach. It
5    was kind of a debate style amongst colleagues.
6    Everybody I thought did a very good job of defending
7    the position that they were asked to represent.
8          Again, it was a -- it was a debate so we were
9    just asked to defend our position, and at the end of
10   that debate, people commented to me that they thought
11   that my argument for that particular case for the
12   debate was very convincing. As you well know, the
13   majority of what I do in my clinical practice is the
14   TVT retropubic approach. As my expert report
15   previously illustrated, I believe that that is the
16   product that has the most data of any procedure for
17   incontinence in our history and that that represents
18   very solid data, and so obviously I feel very strongly
19   that that is the procedure of choice. That's my
20   opinion.
21          So I was commenting to them that, you know, my
22   opinion was that they should spend more time, you know,
23   training and talking about this thing, and I just
24   simply told them that I would be happy to participate

Page 200

1    in further -- they wanted to invite me to give a
2    further debate or another talk in front of my
3    colleagues that I enjoyed participating in that type of
4    activity.
5       Q.   So you wrote this in order to help
6    Ethicon bring surgeons back to the TVT family of
7    products, right?
8          MR. SNELL: Objection, misstates.
9          THE WITNESS: No, no. I just -- you
10   know, I just thanked them. I was not paid
11   separately to participate in the debate. I was
12   just thanking them for thinking of me as a --
13   as somebody who could speak in a debate fashion
14   on this topic. And, again, my feeling was is
15   that the TVT sling had the most data out there
16   relative to other retropubic products, and I
17   felt quite confident that this was the product
18   that was -- according to the data, had the most
19   efficacy and safety and just, you know, the
20   amount of data presented and that I thought
21   that they -- if they focused on presenting that
22   data the way that I did in the debate, that
23   hopefully others would also see that the TVT is
24   the best procedure based upon sound science for

Page 201

1    the treatment of stress incontinence across the
2    entire spectrum of the disease, mixed
3    incontinence, plain stress incontinence, repeat
4    surgery, et cetera.
5       Q.   And you wrote here, "Certainly, users of
6    other retropubic products could be persuaded, and
7    perhaps those using obturator approaches could be asked
8    if they would like to add the retropubic approach for
9    their more complicated patients, (eg expand upon their
10   skill set, now that they are comfortable with TOT.)
11   From there, it might be easier to re-explore the
12   possibility of them using your brand of obturator
13   sling."
14   So it's a sales pitch, right?
15          MR. SNELL: Objection.
16          THE WITNESS: I was speaking to a
17   salesperson. I again was trying to use
18   language. I don't sell anything myself. I
19   have no vested interest in what they get
20   revenue wise. I certainly don't see any of it.
21   I was just defending TVT retropubic as the gold
22   standard in our field and just wanted to let
23   them know that I thought that that was -- you
24   know, in my opinion, as a minor player, you

51 (Pages 198 to 201)

Marc R. Toglia, M.D.

Page 202

1     know, in this world for them, that this is
2     where I thought I was most passionate about,
3     and, again, I was speaking to the data and the
4     science, that to me this was a no brainer. You
5     know, you should try to reengage people based
6     on the science and the data.
7          Q.    And you offered to do a dinner talk on
8     the merits, correct?
9          A.    Yes. That might have been with other
10    members of her team. I don't know.
11         Q.    Sure. But you're compensated for dinner
12    talks as a teacher, correct?
13         A.    If I was speaking to -- I mean, I was
14    not -- like I said, I was not compensated for this
15    participation. If I had dinner with them locally, I
16    don't get paid for that kind of stuff. Again, I'm just
17    an advocate for the TVT retropubic approach. I thought
18    that I made a strong argument why the data supports the
19    retropubic approach as the best procedure. I got a lot
20    of positive feedback that my analysis was very
21    convincing, and given that that's one of my strengths,
22    the ability to read the data as I presented here
23    independently and articulate a comparison, I was simply
24    offering that, and that's all I remember.

Page 203

1          Q.    Okay.
2               MR. SCHNIEDERS: I'll object and move to
3     strike that last answer as nonresponsive, and,
4     Doctor, if we don't keep it down to -- because
5     I'm running out of time but...
6               THE WITNESS: I'm sorry that you don't
7     like my answer, but that's my answer.
8     BY MR. SCHNIEDERS:
9          Q.    I asked you if you were compensated for
10    dinner meetings. I don't think that was responsive.
11         A.    I don't think I've ever been
12    compensated. I don't think I've ever been compensated
13    for a dinner meeting. I don't think I've ever been
14    invited to participate in a dinner meeting.
15             (Document marked for identification as
16    Toglia Deposition Exhibit No. 21.)
17    BY MR. SCHNIEDERS:
18         Q.    This is Exhibit 21.
19             MR. SNELL: I'm reading the transcript
20    where he does say.
21    BY MR. SCHNIEDERS:
22         Q.    So, anyway, this is Exhibit 22, and this
23    is another e-mail chain and, again, if you look at the
24    very top, it's got Ronald Horton on it again, who we

Page 204

1     just saw on that other e-mail regarding the top used
2     KOLs, but down below that, there's an e-mail from a
3     gentleman named Scott Jones.
4          Do you know Scott Jones?
5          A.    Yes.
6               MR. SNELL: Counsel, I think you
7     identified this as Exhibit 22, but I think it's
8     21, just so we get a clear record. You started
9     off on 21 and then you said 22.
10             MR. SCHNIEDERS: It's 21.
11    BY MR. SCHNIEDERS:
12         Q.    So under here it says there's a heading
13    that says "Convention Updates," and then it says, "AUGS
14    was another huge success."
15         Does AUGS have a convention every year?
16         A.    No. AUGS has an annual scientific
17    meeting.
18         Q.    Okay.
19         A.    Understand that industry looks at these
20    things different than how we look at it.
21         Q.    I can believe that.
22         A.    Right.
23         Q.    "The day prior to the official meeting
24    start, we hosted 2 educational events for urogyn

Page 205

1     fellows. These events are part of our fellowship
2     education strategy being led by Jen Paradise, and
3     fellow directors are taking of EWHU's involvement."
4     And then the second bullet point or a line point there
5     says, "The Prosima & TVT Exact symposium was well
6     attended and highlights another success led by
7     Dr. Toglia & Dr. Garris."
8          Do you remember presenting at the Prosima and
9     TVT Exact symposium at AUGS in 2010?
10         A.    I would have presented the TVT Exact
11    module of that. I would not have presented the
12    Prosima.
13         Q.    And you would have been there on behalf
14    of Ethicon, correct?
15         A.    Typically, if I'm remembering the event,
16    I think this was a industry sponsored lunch, and during
17    the lunch hour, they provided lunch for whatever it is,
18    20 or 30 participants, and I would have given, you
19    know -- as you know, I was involved in the development
20    of TVT Exact, and so I would have provided some kind of
21    an update, you know, or some kind of just general
22    educational talk, as we've provided here.
23         Q.    And you would have been compensated for
24    that, correct?

52 (Pages 202 to 205)

Marc R. Toglia, M.D.

Page 206

1     A.    Yes, I would have thought so.
2     Q.    And this was in 2010, which was the year
3   that we saw the e-mail where they say you were paid
4   $153,000, correct?
5         MR. SNELL:  Foundation.
6         THE WITNESS:  I will -- what's the date
7   here?  I would say the event occurred in 2010.
8         (Document marked for identification as
9   Toglia Deposition Exhibit No. 22.)
10  BY MR. SCHNIEDERS:
11    Q.    I'm going to hand you what I'm marking
12  as Exhibit 22.  This is an e-mail from a gentleman
13  named Kevin Frost.
14        Do you know Kevin Frost?
15    A.    I do not.
16    Q.    The subject is "2011 Incontinence &
17  Pelvic Floor Recap," and then it begins, "Hello all,
18  the 2011 Ethicon Women's Health & Urology Incontinence
19  and Pelvic Floor Summit was recently held in Sonoma,
20  California (March 31-August 2nd)."
21        Are you familiar with the incontinence and
22  pelvic floor summit that Ethicon would hold annually?
23    A.    Yes.
24    Q.    And was it typically in Sonoma, or did

Page 207

1   it move around?
2     A.    No.  I only attended a handful of them.
3   This was the only one that I had -- I don't know if
4   they had ever been there before.  I had only been to
5   one that was in Sonoma.
6     Q.    Just so we're clear on the record here,
7   if you go back to exhibit -- it's the e-mail that's
8   talking about training around the TVR.  You see this
9   one, Doctor, Bates ends with 3824.
10        What exhibit is that, Doctor?
11    A.    Exhibit 20 is an e-mail from 2009.
12    Q.    Okay.  So in Exhibit 20, if you'll see
13  there it says under the subject "RE: thanks TVTR Prof
14  Ed training/summit comments."
15        Is it possible that when you met Ms. Chaves
16  that that was at the summit?
17    A.    Excuse me?
18    Q.    Is it possible that when you met
19  Ms. Chaves and then wrote this e-mail that was just
20  after the summit?
21    A.    I'm sorry.  I thought the summit was
22  2011.  This is 2009.
23    Q.    The summit was every year from my
24  understanding, and you said that you only went to it

Page 208

1   periodically, so I'm showing you from 2009, you go down
2   here where it says Dr. Toglia regarding a TVT panel at
3   the summit?
4     A.    Oh, okay.  I see.  I'm sorry.  Yes.
5     Q.    And that's in February of 2009?
6     A.    Yes.
7     Q.    So you would have been there in February
8   of 2009, and then looking at the document we're looking
9   at now, this is 2011, correct?
10    A.    Yes.
11    Q.    And if you go down it says in the middle
12  there a breakdown of this year's attendees are as
13  follows, 31 gyns, 31 urogyns (including 4 fellows), 19
14  urologists.  And then at the very bottom, it says, "a
15  special thanks to the following customers who served as
16  meeting moderators," and it lists you along with three
17  other doctors.
18        Do you see that?
19    A.    Yes.  I'm sorry, there are three more
20  names on the other page.  I understand your point.
21    Q.    There are three on this page, and then
22  there's three additional on the other page?
23    A.    Three others besides myself, yes.
24    Q.    And it refers to you as a customer.  Do

Page 209

1   you know why the company would refer to you as a
2   customer?
3     A.    I don't, because I use their products,
4   perhaps.
5     Q.    At the end of the day they're selling
6   doctors on using the products, not the patient, right?
7         MR. SNELL:  Form, foundation.
8         MR. SCHNIEDERS:  I'll withdraw.
9   BY MR. SCHNIEDERS:
10    Q.    You see where it says customers, and
11  it's referring to you and some other of your
12  colleagues, correct?
13    A.    Yes.  I don't know, but I don't
14  understand why I'm referred to as a customer.
15    Q.    Okay.  Set that to the side.
16        MR. SCHNIEDERS:  I'm going to mark this
17  Exhibit as 23.
18        (Document marked for identification as
19  Toglia Deposition Exhibit No. 23.)
20  BY MR. SCHNIEDERS:
21    Q.    This will be a very brief question,
22  Doctor, and I just want to call your attention to it.
23  It says under the subject, "Let me know your
24  thoughts... this is a draft."  So this e-mail that

53 (Pages 206 to 209)

Marc R. Toglia, M.D.

Page 210

1    we're looking at right here, the second doesn't show
2    that it went to you, but the bottom one down here, the
3    draft itself was a draft of an e-mail to you.
4        Do you see that?
5        A.    Okay.
6        Q.    And it's from a woman named Rhonda
7    Peebles.
8        Do you know Rhonda Peebles?
9        A.    Yes.
10       Q.    In that she says, "I am excited to
11   announce that Ethicon Women's Health & Urology received
12   approval for a new TVT sling, Gynecare TVT Exact, and
13   will be launching very quickly.  We are putting
14   together 2 key customer events to introduce the product
15   and would love for you to be a part of the launch.  You
16   were one of the initial physicians to be exposed to the
17   product via our customer labs last fall so your input
18   would be invaluable."
19       Do you recall if you attended that event?
20       A.    I don't even know that I ever received
21   this e-mail.  I don't think I attended either of those.
22   I don't recall.
23       Q.    Okay.  That's fair.  Set it aside.
24       Now, would you consider yourself when you're

Page 211

1    working on behalf of Ethicon, not for Ethicon, but on
2    behalf of Ethicon or any other device company to be a
3    salesperson for them?
4        A.    Not at all.
5        Q.    Okay.  Are you an advocate for them?
6        A.    I'm an advocate for women's health.  I'm
7    an advocate for women that suffer with pelvic floor
8    disorders, and I'm for anything that I can do that
9    helps to increase the awareness of these conditions and
10   treatments for it.  As you know, this is a major public
11   health burden, and there are more women that suffer
12   from incontinence and prolapse than we currently have
13   manpower to care for.
14       Q.    Earlier when you were talking about the
15   TVT-R panel that you had been part of, you said you
16   were advocating for that approach because you believe
17   that's the best approach, right?
18       A.    Understand, I was assigned it, right.
19   So if I had been assigned obturator, my assignment was
20   the same and I would have presented my argument in that
21   regard.  That said, I'm sure that they chose me for
22   TVT-R because they knew that despite the fact that
23   other products had been developed, despite the fact
24   that I had participated in trials with TVT Secur and

Page 212

1    that I taught all three products, that my personal
2    practice was still very much aligned with the
3    retropubic approach, right.
4        Q.    And, similarly, your belief in the TVT
5    product has made you an advocate for it because you
6    believe it's the safest option, right?
7        A.    Well, I believe that the experience and
8    the publications support the safety and the
9    effectiveness of that product and that it is the most
10   vigorous scientific data that we have for any product
11   in the history of incontinence treatment.
12       Q.    But -- and you've advocated for that
13   product and other products you believe in to fellow
14   surgeons when they were talking about it, right?
15       MR. SNELL:  Form.
16       THE WITNESS:  Specifically that product,
17   yes.
18   BY MR. SCHNIEDERS:
19       Q.    But you would never consider anything
20   that you've done to be advertising for Ethicon, right?
21       A.    No.
22       MR. SCHNIEDERS:  Off the record.
23       (Brief recess taken at 5:59 p.m.)
24       (Deposition resumes at 6:02 p.m.)

Page 213

1    BY MR. SCHNIEDERS:
2        Q.    We're back on the record after a short
3    break.  Doctor, I'm going to mark as Exhibit 24 an
4    e-mail chain.
5        (Document marked for identification as
6    Toglia Deposition Exhibit No. 24.)
7    BY MR. SCHNIEDERS:
8        Q.    And this is from, again, Rhonda Peebles,
9    who we just saw an e-mail from her a moment ago, right?
10       A.    Yes.  I'm sorry, just reviewing this.
11       Q.    And it's to a Lindsay Froelich.
12       Do you know her?
13       A.    Do not, no.
14       Q.    All right.  It starts off, "Sorry for
15   the delay.  I've been swamped with launch meeting
16   planning.  Feel free to put time on my calendar the
17   week of the 17th to discuss further, Rhonda."
18       And this is in response, if you go to the
19   second page, to questions that Ms. Froelich was asking
20   with regard to TVT Exact.
21       And so answers several.  Under Number 3, a
22   question she's asked is "Is there any clinical data
23   that will be published or presented this year?"  And
24   Rhonda Peebles writes back, "There is no specific

54 (Pages 210 to 213)

Marc R. Toglia, M.D.

Page 214

1    clinical data.  Exact will leverage data from TVT
2    classic."
3          Is that an accurate statement, to your mind?
4          MR. SNELL:  Foundation, speculation.
5          THE WITNESS:  I'm sorry, I don't -- I
6    don't see it.  Is there two pages?
7    BY MR. SCHNIEDERS:
8      Q.   There are two pages.
9      A.   Okay.
10      Q.   But it's the front page you need look
11   at.  You don't need to go back and forth with the
12   questions.  They're written above each spot.  So go to
13   the first page.
14      A.   Oh, I'm sorry.
15      Q.   That's okay.  If you go to question 3,
16   you'll see the question and the answer.
17      A.   Okay.  Sure.  What's your question?
18      Q.   So the question written there "Is there
19   any clinical data that will be published or presented
20   this year?  Answer, there is no specific clinical data.
21   Exact will leverage data from TVT classic."
22          Do you believe that statement to be true?
23      A.   I'm not aware whether data was -- I'm
24   not aware of data being presented that year.

Page 215

1      Q.   Okay.  When she says "Exact will
2    leverage data from TVT classic," what does that mean to
3    you?
4          MR. SNELL:  Objection to form.
5          THE WITNESS:  How would I know what
6    Ms. Peebles was meaning?  I mean, the product
7    is the same.  The mesh itself is the same.  The
8    modifications that we made to the product is we
9    changed the handle design.  We made the trocar
10   thinner.  We made the handle disposable.  Other
11   than that, there really is no difference.  It's
12   sort of -- was sort of a refresh of the
13   product.
14   BY MR. SCHNIEDERS:
15      Q.   Under question 5, What do you hope to
16   achieve through PR with this program?  Answer,
17   increased awareness during the launch phase.
18      6.  What are the important
19   magazines/newsletters you would like to see cover this
20   product?  Answer, Urology and OB-GYN throw-away
21   journals.
22      7.  There are major medical meetings -- strike
23   that.  7.  Are there major medical meetings where you
24   will be unveiling/displaying this product?  And it

Page 216

1    lists AUA, AUGS and ICS-IUGA, the advocacy groups,
2    correct?
3      A.   Yes.
4      Q.   And then are any important advocacy
5    groups you'd like to reach at launch?  Do you have any
6    relationships with them already?  Good question, we
7    should discuss.
8          And lastly on 9, who do you recommend as
9    internal and external (KOLs) spokespeople for media
10   interviews?  Internal, Dr. Aaron Kirkemo.
11          Do you know Aaron Kirkemo?
12      A.   Dr. Kirkemo was a -- one of the medical
13   directors for Ethicon women's health at the time.
14      Q.   Okay.  And then Howard Goldman, the
15   urologist from Cleveland Clinic that we discussed
16   earlier --
17      A.   Yes.
18      Q.   -- that is also one of the authors on
19   the AUGS mesh position statement?
20          MR. SNELL:  Form.
21          THE WITNESS:  Yes.
22   BY MR. SCHNIEDERS:
23      Q.   And it says, "although the CC may not
24   allow doctors to participate in PR."

Page 217

1      A.   Yes.
2      Q.   And then lastly it mentions Dr. Marc
3    Toglia, urogyn, Philadelphia.
4          You see that?
5      A.   Yeah.
6      Q.   Do you recall being approached by Ms.
7    Peebles to be a spokesperson for TVT Exact?
8      A.   Yes, I recall that I was asked to help
9    with an article that addressed urinary incontinence in
10   women, treatment options in women, yes.  You understand
11   that, again, I was fairly involved in the development
12   of the TVT Exact product and served as -- I think the
13   video on the surgical steps is myself, you know,
14   demonstrating the procedure, so yes.
15          MR. SCHNIEDERS:  I'm going to mark as
16   Exhibit 25.
17          (Document marked for identification as
18   Toglia Deposition Exhibit No. 25.)
19   BY MR. SCHNIEDERS:
20      Q.   This document that is titled "TVT Exact:
21   Editor's Backgrounder (Gynecology).
22      A.   Mm-hmm.
23      Q.   If you look, do you know what a
24   backgrounder is, Doctor?

Marc R. Toglia, M.D.

Page 218

1    A.    I do not.
2    Q.    Are you familiar with the publication
3  Gynecology?
4    A.    No. I don't think that that was the
5  publication. I think it's the subject.
6    Q.    Do you recall what publication this
7  appeared in?
8    A.    Cosmopolitan, Red Book, I think it was a
9  consumer magazine, Reader's Digest. I honestly -- I
10  vaguely recall that it was a direct-to-consumer thing.
11    Q.    And do you recall that you were the
12  spokesperson within it?
13    A.    I don't think that I would say that I
14  was a spokesperson. I think that I contributed some
15  quotes.
16    Q.    I think it starts off the title is
17  "Gynecare TVT Exact: Building on the Legacy of
18  Gynecare TVT," and it says, according to Marc Toglia,
19  MD, chief of urogynecology for the Main Line Health
20  System in suburban Philadelphia, gynecologic surgeons
21  now have a new option when retropubic placement of a
22  midurethral sling is the treatment of choice in women
23  with stress urinary incontinence. Gynecare TVT Exact.
24    You see that?

Page 219

1    A.    Mm-hmm.
2    Q.    It goes on, "Gynecare TVT Exact retains
3  cardinal features of the Gynecare TVT retropubic
4  system, including the laser-cut mesh, protective
5  sheath, trocar geometry, and rigid needle design of the
6  original Gynecare TVT. TVT Exact is engineered with
7  enhancements designed to further reduce tissue and
8  organ damage."
9    Now, the portion that was already written for
10  you, did you write that?
11    A.    I don't believe so.
12        MR. SNELL: Form.
13  BY MR. SCHNIEDERS:
14    Q.    Going on to the next page, about two
15  lines down, I guess on Line 3 it says -- is the next
16  part that I see that you appear in the article, Doctor.
17  It says, Dr. Toglia noted that a good outcome of
18  minimally invasive surgery to place suburethral sling,
19  whether through the retropubic, transobturator, and I'm
20  not even going to get that one. I'll let you read
21  this. Why don't you read this.
22    A.    Well, it's obturator. It's spelled
23  wrong or ischiorectal space, begins with the surgeon's
24  precision and control.

Page 220

1    Q.    And did you write the passage that your
2  -- this quote from you right here?
3    A.    I don't know. It just says that
4  Dr. Toglia noted, so I may have had a discussion and an
5  interview, and they may have paraphrased me. I
6  honestly don't know.
7    Q.    If you go to the next page at the top,
8  Line 1 it says, "Dr. Toglia observed that there has
9  been a great deal of concern about synthetic meshes.
10  And there's good reason for physicians and patients to
11  exercise due diligence when considering a suburethral
12  sling to treat SUI."
13    Do you agree with that statement?
14    A.    I was referencing the FDA safety warning
15  at the time.
16    Q.    And, to be fair, that was the FDA safety
17  warning of 2008, correct?
18    A.    I believe so, yes.
19    Q.    So the FDA safety warning of 2011 hadn't
20  come out at that point, right?
21    A.    Sure. I mean, to be fair, I don't see a
22  date, but, you know, I will assume, let's say, for
23  argument sake that this was in the same time frame as
24  when the product was being launched. That would be my

Page 221

1  assumption.
2    Q.    I can show you a little bit more
3  specifically.
4    A.    I think we're saying the same thing.
5    Q.    I agree.
6    A.    I don't want to waste anybody's time.
7        (Document marked for identification as
8    Toglia Deposition Exhibit No. 26.)
9  BY MR. SCHNIEDERS:
10    Q.    Marking this as Exhibit 26. Doctor,
11  this is another e-mail from Ms. Peebles. I'm sorry.
12  The top of it is an e-mail from Ms. Peebles to someone
13  at a group called idanda.com, something like that, and
14  it says "OB-GYN backgrounder...I'll give you a call,"
15  and then underneath it is an e-mail from you to
16  Ms. Peebles.
17    A.    Okay.
18    Q.    And it looks like it says, "Rhonda, here
19  you go," and it appears that at least part of the quote
20  that we just saw in that backgrounder is written right
21  there.
22    Do you recall if you typed up -- do you recall
23  typing up an e-mail and sending it to Rhonda to give
24  her a quote?

56 (Pages 218 to 221)

Marc R. Toglia, M.D.

Page 222

1      A.   I don't recall it, but I think it speaks
2  for itself and, certainly, you know, I'm sort of
3  reading through this, and I'm saying to myself, I never
4  would have said ischiorectal, we don't use that
5  passage, and I obviously read this for factual accuracy
6  and I was responding to her and making suggestions.
7      Q.   And did you notice what you called the
8  subject there when you sent it back to her?
9      A.   TVT ad.
10      Q.   TVT ad?
11      A.   TVT ad.
12      Q.   Is that an advertisement for TVT?
13      A.   I was probably whatever they were --
14  whatever they were referencing it to me.
15      Q.   Well, I don't -- to be fair, and this is
16  how they produced it to us, and we all know how e-mail
17  works, it usually says re: or forward or something
18  before that if you're just replying.  That looks like
19  a subject you picked out?
20      MR. SNELL:  Objection, foundation.
21      THE WITNESS:  Okay.  Again, my
22  recollection was there was a short article in
23  some consumer journal.  It might have been
24  Reader's Digest.  It might have been

Page 223

1  Cosmopolitan, you know.  I was glad to see them
2  being raising awareness directly to women, you
3  know, telling them that there were treatment
4  options for stress incontinence.
5  BY MR. SCHNIEDERS:
6      Q.   To be fair, they were only talking about
7  their product, right?
8      A.   I don't know.  I mean, I don't know the
9  content of the entire article, but I would not -- I
10  would suspect that they would just talk about theirs.
11  I don't know what the rest of the article entailed.
12      Q.   It's an ad for TVT?
13      A.   I don't know that it's an ad for TVT.  I
14  just referred to it as TVT ad.  I don't know why I
15  referred to it as TVT ad.
16      (Document marked for identification as
17  Toglia Deposition Exhibit No. 27.)
18  BY MR. SCHNIEDERS:
19      Q.   I'm going to mark as Exhibit 27 a
20  spreadsheet that was given to us.  Don't worry about
21  the front page.  It's extremely hard to read, but we're
22  not going there.  It's going to be several pages in.
23      A.   Okay.
24      Q.   So the first page at the top lots like

Page 224

1  it says Gynecare Interceed, and obviously it's talking
2  about the barrier product, and then it goes forth, and
3  each page has a different product on it.  The product
4  that I want to call attention to is on Page 9631 are
5  the last four numbers of the Bates.  It's not perfect,
6  but it's better to read than the other pages.
7      A.   Okay.
8      Q.   At the top you see it says "Gynecare TVT
9  Exact Tension-free Support for Incontinence Roadmap"?
10      A.   Uh-huh.
11      Q.   And then it's got several different
12  categories on the left-hand side that say Strategy,
13  Sales Targeting, Launches, Marketing Tools, Key
14  Messages, Awareness, Contracting/Promotions and Prof Ed
15  Support.
16      Under "Launches" it says Gynecare TVT Exact,
17  Gynecare TVT Abbrevo launched May 2010 and
18  February 2011 respectively.
19      You see that?
20      A.   Mm-hmm.
21      Q.   And then under "Marketing Tools" it says
22  Gynecare TVT Exact, and it lists marketing tools on the
23  right-hand side, Gynecare TVT Exact sales aid, Gynecare
24  TVT Exact slim jim, Gynecare TVT Exact procedural

Page 225

1  video, Gynecare TVT Exact procedure steps flash card.
2  And then the female patient article featuring
3  Dr. Toglia is listed as a marketing tool.
4      If you go down to "Awareness," you see that
5  scientific meeting presence, and there's several
6  different advocacy groups that are all going to be
7  presented to, including AUGS, correct?
8      MR. SNELL:  Objection, foundation,
9  advocacy groups.
10      THE WITNESS:  Yeah, I wouldn't use the
11  word advocacy groups.  These are professional
12  organizations, but I see what they're saying.
13  I don't have any involvement in that.
14      (Document marked for identification as
15  Toglia Deposition Exhibit No. 28.)
16  BY MR. SCHNIEDERS:
17      Q.   I've marked as Exhibit 28 this document,
18  it's titled "Overview," and it's got a paragraph at the
19  top that says on January 30th, 2012 an approved
20  communication (VP of sales & marketing, RBDs, director
21  of communication GPD, PD were briefed on this
22  communication) went out to approximately 300 surgeons
23  who specialize in pelvic surgery (many of whom are
24  faculty for EWHU) notifying them of the following.

57 (Pages 222 to 225)

Marc R. Toglia, M.D.

Page 226

1    Bullet point reads, in 2012, we will continue to
2    facilitate these types of important discussions in a
3    variety of formats but will not be holding a one-time,
4    formal summit meeting.  Instead, we plan to utilize
5    other interactive mediums and venues that will allow
6    for more frequent and meaningful dialogue with you and
7    your colleagues.
8         There was a very loud and emotional response to
9    this notification, which has provided the EWHU
10   organization the opportunity to re-evaluate how we will
11   need to communicate with this group regarding the FAD
12   mesh situation.
13        See what you've just read there?
14        A.   Yes.
15        Q.   Do you know what the FAD mesh situation
16   is?
17        A.   No.
18        Q.   Okay.  This is January 30th of 2012 is
19   what it says, and that's just after the FDA had
20   released their bulletin in 2011, correct?
21        A.   Mm-hmm.
22        Q.   Sorry.  I messed up the question, and
23   then you said uh-huh.  Was that correct?
24        A.   I'm sorry, that is correct.  I mean, I

Page 227

1    assume that's yes.
2         Q.   So it's reasonable to say, although we
3    don't know sitting here, but that probably means the
4    FDA mesh situation, because I don't know what FAD
5    means?
6         A.   I don't know that, sir.  I don't know
7    that.  I can't speak to that.
8         Q.   I appreciate that, but we do know that
9    this is, from a temporal standpoint, just after the FDA
10   released its bulletin, correct?
11             MR. SNELL:  Form.
12             THE WITNESS:  I don't know.  All I know
13        is this communicates that a discussion that
14        they were considering not holding another
15        summit.
16   BY MR. SCHNIEDERS:
17        Q.   And in 2011 the FDA's release is
18   ultimately what precipitated several products being
19   pulled from the market by Ethicon, correct?
20             MR. SNELL:  Lacks foundation.
21             THE WITNESS:  I don't know the
22        relationship between the two, in all honesty.
23        I was not part of that decision.
24   BY MR. SCHNIEDERS:

Page 228

1         Q.   And you haven't been provided any
2    documents on that either?
3              MR. SNELL:  Objection, misstates earlier
4         testimony.
5              THE WITNESS:  I don't have an answer for
6         your question.
7    BY MR. SCHNIEDERS:
8         Q.   So if you go down it says, "Key
9    Takeaways," and it's in bold face-to-face "meetings are
10   being requested by the majority of respondents.  They
11   want a forum to vent, share & brainstorm on the future.
12   Lack of understanding on the current situation & EWHU's
13   position needs to be clarified."
14        Third bullet point, "A feeling that the company
15   is supporting them needs to be delivered.  Interactive
16   meetings have a role but second to face-to-face."
17        Do you recall receiving a communication that
18   would have told you that they were not going to have a
19   summit in 2012?
20        A.   Vaguely.
21        Q.   If you go to the second page, there's a
22   title that says "Feedback from Surgeons."
23        A.   Okay.
24        Q.   And then there are numbers and the first

Page 229

1    one is Bob Shull.
2         Do you know Bob Shull?
3         A.   I do, yes.
4         Q.   Second one is Doug Grier.
5         Do you know Doug Grier?
6         A.   I do not, no.
7         Q.   And Mike Vardy, then Neena Agarwala and
8    then there you are, Doctor, Marc R. Toglia, M.D.,
9    Number 5.
10        Do you see that?
11        A.   Yes.
12        Q.   And what you've written here is, "Given
13   the current controversies and challenges that we
14   physician are facing with regards to the use of vaginal
15   mesh, I would like to argue that we need this type of
16   meeting now more than ever.  The future for vaginal
17   mesh seems somewhat uncertain, however, many of us
18   still believe that it serves a vital, albeit more
19   limited role."
20        Continues on, "Ethicon's role in providing
21   peer-to-peer support with regards to new and innovative
22   products is what has separated your company from the
23   rest of the field.  Ethicon's willingness to partner
24   with and support surgeons in this regard has been

Marc R. Toglia, M.D.

Page 230

1    second to none.
2        I would ask you to reconsider this decision.
3    If cost and travel are a major deterrent, I might
4    suggest that you consider a lower cost venue, such as
5    Philadelphia, or returning to Florida.  I am sure that
6    many of us would be willing to sacrifice the bells and
7    whistles to simply get together and meet again."
8        Did I read that correctly?
9    A.    Yes.
10   Q.    Going back to the first page statement,
11   you wrote, "The future for vaginal mesh seems somewhat
12   uncertain, however, many of us still believe that it
13   serves a vital, albeit more limited role."
14       What did you mean by "a vital, albeit more
15   limited role"?
16   A.    Well, you know, obviously the FDA's
17   statement was going to be interpreted differently by
18   many people, including people of your profession, sir,
19   and obviously this was going to create challenges
20   really in how we speak to people, you know, patients,
21   women, women that had it implanted previously, people
22   that were currently planning on implanting it.
23       At the time I don't believe that I was aware of
24   any plans to pull the product.  The FDA warning --

Page 231

1    yeah, the FDA warning also -- I mean, most of us
2    involved at this level were not aware of the numbers of
3    complications that had been reported to the FDA.  I
4    think we were surprised because, according to the
5    literature that we were reading and our own experience,
6    we were not seeing that complications but also the FDA
7    was not very clear.  The distinction -- their initial
8    statement seemed to sort of blend stress incontinence
9    with prolapse repair, whereas many of us thought that
10   they were referring specifically to prolapse repair.
11       And so in the past, the summit meeting was an
12   opportunity to bring people together and foster
13   discussions, and I was pointing out to them that, you
14   know, in that regard, it was still very variable to
15   bring us all together so that we could discuss, you
16   know, how are we going to counsel patients moving
17   forward, how do we counsel patients that have been
18   implanted and are doing well but have concerns.  You
19   know, immediately people were saying that there was a
20   recall, when, in fact, there wasn't a recall.
21       Again, most of us were reading the literature,
22   literature supported that this was a safe procedure
23   with excellent safety and efficacy.  Our own experience
24   would support that, mirror that as well.  So it seemed

Page 232

1    a little bit out of sync.
2        And, you know, again, Ethicon is based in New
3    Brunswick, New Jersey, which is a stone's throw from
4    Philadelphia.  I was just saying to them, look, let's
5    still have this meeting, it could be a quick meeting.
6    You know, let's just get the usual group together,
7    wherever it might be convenient.  Again, most of the
8    users, my understanding, were East Coast users.  That's
9    why I said Philly or New Jersey.
10       Now, I'm sorry, and I apologize, I realize I'm
11   off track.  So, yes, as the science has supported,
12   anterior Prolift works extremely well in the anterior
13   vaginal compartment, and the literature states quite
14   clearly that the anatomic results are superior compared
15   to native tissue repair.
16       Prolift in the posterior compartment, that data
17   was not as robust, and so when I said limited -- vital
18   but limited role, vital meaning the most common
19   problem, the one that causes women the most symptoms is
20   anterior prolapse, and the data and experience clearly
21   demonstrate that this is a safe and effective
22   technique.
23       So the question in my mind was is that what we
24   concentrate on, do we concentrate on anterior Prolift

Page 233

1    as opposed to posterior Prolift.  Certainly, those of
2    us that were looking at things from a pooled analysis
3    were reaching the conclusion that the posterior
4    compartment, dyspareunia was a problem with all the
5    repairs.  It wasn't clear to us -- it seemed to us that
6    it was similar between the two, although we were
7    getting these reports.  So I was just advocating that,
8    and I think it's supported by my report, that at the
9    apex and anteriorly, this was a safe and effective
10   technique in the product, and that's what I meant by
11   vital because that's the most common, the most
12   bothersome, limited, let's concentrate on the anterior
13   and the apex.
14   Q.    What did you mean by "Ethicon's
15   willingness to partner with and support surgeons"?
16   A.    Again, many of us felt there was great
17   value in these summit meetings.  I recall that at one
18   or more of these meetings, some of the key inventors of
19   both the TVT and the TVM were brought in from Europe,
20   and we were allowed to listen to them discuss the
21   development of the product.  We were able to ask them
22   very clinical questions.  So I remember asking one of
23   the TVT individuals who had published on it what do you
24   tell patients when they can return to work and exercise

59 (Pages 230 to 233)

Marc R. Toglia, M.D.

Page 234

1   and stuff like that.  So we found the summit to be
2   invaluable as an opportunity for colleagues to get
3   together to further discuss the topic and specifically
4   to listen to experts both nationally and
5   internationally.
6       Q.   But you would agree that it was an
7   uncertain time for mesh, correct?
8           MR. SNELL:  Object, form.
9           THE WITNESS:  I would not agree.  I
10          think at the time I think the FDA's mesh
11          message, excuse me, was uncertain because,
12          again, initially they didn't draw -- they
13          didn't -- they said -- I'm sorry.  I lost my
14          train of thought.
15  BY MR. SCHNIEDERS:
16      Q.   The uncertainty you were referring to
17  was what the FDA's position was; is that what you're
18  telling me?
19      A.   It was unclear whether the additional
20  cases reported were sling related cases versus vaginal
21  mesh related cases, as well as what products were
22  involved.
23          (Document marked for identification as
24  Toglia Deposition Exhibit No. 29.)

Page 235

1   BY MR. SCHNIEDERS:
2       Q.   Marking as Exhibit 29 a PowerPoint.
3   Doctor, do you recall this PowerPoint?
4       A.   I don't know if I ever gave this power
5   point in a meeting or not.
6       Q.   On the second page of the document you
7   see it's titled "The Mesh Story."
8       Do you see that?
9       A.   Yes.
10      Q.   And it's got your name on it as Director
11  of Urogynecology, Main Line Health System,
12  Philadelphia, PA right?
13      A.   Yes.
14      Q.   Are you familiar with The Mesh Story,
15  was that verbiage you ever used?
16      A.   No.
17          MR. SNELL:  Do you have a date on this
18  document?
19          MR. SCHNIEDERS:  What's that?
20          MR. SNELL:  Do you have a date for this?
21          MR. SCHNIEDERS:  I didn't look, to be
22  honest.
23          MR. SNELL:  That's okay.
24  BY MR. SCHNIEDERS:

Page 236

1       Q.   You see on the bottom right-hand corner,
2   it's got Ethicon Women's Health & Urology logo, right?
3       A.   Yes.
4       Q.   We can go off the record, and you can
5   look over that for a second, if you'd like to, Doctor.
6           MR. SCHNIEDERS:  Let's go off the record
7   so he can look at the PowerPoint.
8           (Brief recess taken at 6:33 p.m.)
9           (Deposition resumes at 6:34 p.m.)
10  BY MR. SCHNIEDERS:
11      Q.   Doctor, I think you were saying that you
12  may have worked on this, you're just not sure, right?
13      A.   I don't recognize this.
14      Q.   Okay.  But suffice it to say, it's got a
15  Bates number, it was produced to us, and it's titled
16  "The Mesh Story," and it's got your name on it, right?
17      A.   Correct.
18      Q.   It could possibly be one of those slide
19  decks that was made by Ethicon for a presentation they
20  wanted you to give?
21      A.   I would suspect so, yes.
22      Q.   Okay.  And, typically, when you would
23  give PowerPoints on behalf of Ethicon, would you do so
24  with Ethicon's logo on it?

Page 237

1       A.   Typically, I am presenting material
2   prepared by Ethicon in compliance with the FDA
3   regulations, and I would disclose at the beginning that
4   I was up there to speak on behalf of the company to
5   present the company slides.
6       Q.   Okay.  And so if you go to the second
7   page, it says "Content."
8       A.   Yes.
9       Q.   And it gives a few things about -- and
10  the context, even though it's not dated, and, frankly,
11  it was my fault for not looking at the Bates number and
12  custodian, but the context would tell us that this has
13  got to be after a recent FDA notice, I suspect; is that
14  fair?
15      A.   I think so.  I'm -- I would think that
16  this is after the October 2008.
17      Q.   So you see the content there it says,
18  "What does the FDA notice tell us?"  And then "Why is
19  our mesh different?"  And is that how you talk in
20  PowerPoints that you give on behalf of Ethicon --
21      A.   No.
22      Q.   -- you say our mesh?
23      A.   No, I have no ownership.  I have no
24  ownership.  That would be an example of something that

Marc R. Toglia, M.D.

Page 238

1  I might strike through and say, you know, you need to
2  be specific that this is Ethicon.
3      Q.    And it says, "How does it work? Why is
4  it designed this way? What does that mean
5  physiologically?"
6      A.    Yes.
7      Q.    Going on to the next page it says
8  "Navigating the Mesh Maze."
9      Did you ever call it the mesh maze?
10     A.    No.
11     Q.    Bullet point it says, "We have to deal
12 with competing messages surrounding mesh."
13     Do you agree with that statement?
14     A.    I don't know what that means. I read
15 that as conflicting, but I don't know what that means.
16     Q.    Okay. And it says, "Goal is safe and
17 effective treatment for patients with SUI."
18     A.    Yes.
19     Q.    And it says, "FDA has issued a Public
20 Health Notification warning about risks of mesh."
21     A.    Yes.
22     Q.    "Patients are concerned about mesh
23 implant. We have to help our customers to understand
24 how to minimize their risk."

Page 239

1      It says our customers right there. Do you
2  recall from the document we saw before that physicians
3  are referred to internally as customers?
4      A.    Yeah, I don't know that that's what this
5  refers to. Again, I'm quite certain this is not
6  something that I ever presented myself because I would
7  not -- I would never have used the term customer in any
8  form. I not have used the our on the previous page. I
9  would not have used our customers.
10     This may have been an outline or a markup of
11 something that they were thinking about. I can't tell
12 you I ever saw this. I have no recollection of seeing
13 this. This is certainly not something I've presented.
14     Q.    But fair to say that it says we have to
15 help our customers to understand how to minimize their
16 risk. Fair reading of that is that Ethicon is trying
17 to help doctors that use their products to minimize
18 their risk, right?
19         MR. SNELL: Foundation.
20         THE WITNESS: I don't agree, no.
21 BY MR. SCHNIEDERS:
22     Q.    What do you think it means?
23     A.    I don't know the context, sir.
24     Q.    Okay. Well, that's fair.

Page 240

1      A.    As a surgeon, I look at this as we need
2  to talk about women and help women to understand and --
3  I mean, I'm really lost. I'm so sorry. I have no
4  idea.
5      Q.    Does it make you mad that Ethicon put
6  your name on something like this?
7      A.    No. I mean, I don't -- again, this may
8  have been an idea that they floated by me. I don't
9  know.
10     Q.    So the next slide goes on and talks
11 about the FDA alert, October of 2008.
12     And then the next slide basically breaks down
13 what that alert said, FDA Recommendations, be vigilant
14 for potential adverse events (erosion, infection).
15 Watch for perforation from tools. Inform patients that
16 mesh implantation is permanent and that some
17 complications may require additional surgery that may
18 or may not correct the complication. Inform patients
19 about potential for serious complications affecting
20 QOL, quality of life (dyspareunia, scarring). Provide
21 patient with a written copy of the patient labeling.
22     Do you provide your patients with written
23 copies of the patient labeling?
24     A.    I think that -- again, I think what

Page 241

1  they've done here is they have provided a summary of
2  what the FDA had written. In our practice, we do have
3  readily available each of the FDA safety warnings. We
4  have the position statements from our organization. We
5  have brochures from Ethicon on the TVT, which would
6  include the labeling information. So those are
7  discussed and, when appropriate, offered to the
8  patient.
9      Q.    If you go to the next page it says, "We
10 should be counseling patients differently about mesh.
11 When selecting a sling 'what's left behind' matters
12 more than the delivery system."
13     What does that mean to you, Doctor?
14     A.    To me what this means, and I think
15 you'll get your answer towards the end of this
16 presentation, is that the majority of the science
17 demonstrating the safety and efficacy of the TVT
18 product is specifically based upon the TVT product.
19 However, other companies that have similar products are
20 sort of borrowing from research that was done on TVT,
21 and so I think what we were speaking to here is the
22 fact that we have a wealth of data on TVT specifically.
23     And so when we talk to people about sling
24 choices, and, remember, there are 49 slings on the

61 (Pages 238 to 241)

Marc R. Toglia, M.D.

Page 242

1  market or were on the market, what do we tell people,
2  what do we tell, do we tell them we're going to do a
3  sling, we're going to do a synthetic sling, we're
4  specifically using one versus another.
5       You know, this was -- the use of implants --
6  we've used implants from the '50s, but it was becoming
7  more commonplace. So as a surgeon, our process for
8  informed consent and discussion was evolving. We all
9  had different methods. When we would go to the summit
10  meeting, different people would say, this is how I
11  present the information, this is how I present the
12  information, this is what I tell the patient, and I
13  think that that's probably what they were -- I think
14  that they were specifically saying, look, we have the
15  data, we've got -- at the time we have 40 some odd
16  clinical trials specifically with our product, whereas
17  competitors may have less than ten products.
18       Q.    And here it says "meshes are different
19  and should be assessed by their own clinical outcomes,"
20  which fits in with what you're saying right now, right?
21       A.    Mm-hmm.
22       Q.    And then the fourth category there it
23  says, "In a category of slings where 'Level I Evidence'
24  exists with proven safety and efficacy, why accept a

Page 243

1  mesh without outcomes data?"
2       Level 1 evidence is something that you say
3  quite a bit, right?
4       A.    Yes.
5       Q.    And the next page, "All meshes are not
6  equal." And then it goes on to show the pictures of
7  the different meshes, "All are polypropylene...but
8  meshes have differences."
9       Do you recall this slide?
10       A.    I mean, this slide has come and gone
11  throughout the history of these discussions as far as
12  specifically how these products are knitted.
13       Q.    And do you believe that AMS or Boston
14  Scientific or Bard's mesh is different than Ethicon's?
15       MR. SNELL: Form.
16       THE WITNESS: I don't have much
17  experience using those products. Again -- I
18  just, again, I'm an evidence-based guy, and you
19  can see just clinically my entire experience, I
20  stick with what seems to have the most
21  evidence, so they're all polypropylene, they
22  all are Type I Amid meshes, macroporous. You
23  know, I'm not aware of major differences
24  between them.

Page 244

1  BY MR. SCHNIEDERS:
2       Q.    Do you believe that AMS or Boston
3  Scientific or Bard's mesh can cause complications?
4       A.    I don't, no, based upon my extensive
5  review of the literature and the report that I've
6  presented previously. It's not the material.
7       Q.    It goes on it says, "What are the
8  mechanical properties of an ideal sling design?" And
9  it's got four bullet points and tell me if you agree
10  with these, that it "incorporates into tissue."
11       Do you agree?
12       A.    Sorry. I lost my place.
13       Q.    It's right after the pictures of the
14  mesh. It's titled "What are the mechanical properties
15  of an ideal sling design?"
16       Do you see it, Doctor?
17       A.    I do. I mean, I believe that these are
18  points for discussion. So, you know, is it important,
19  you know, how a sling incorporates into the tissue, is
20  it important the stiffness, is there a relationship
21  between stiff and non-stiff? These are all the things
22  that we were exploring.
23       Obviously, we were all comfortable that the
24  introduction of midurethral slings was a major advance

Page 245

1  in this field. We were aware of what was being
2  reported to the FDA, so we were saying to ourselves,
3  okay, we're on the front line, let's dig into this. I
4  can't tell you that we drew any direct conclusions, but
5  these were the questions that we were asking.
6       Q.    But, sitting here today, you can't point
7  to those four things as the properties of an ideal
8  sling design?
9       A.    I'm sorry, I mean, yes. Obviously, it
10  is important how the sling incorporates itself into
11  tissue. You know, to me it just speaks to
12  biotolerability, and, yes, that's important as well.
13  Remember that around this period of time there were a
14  couple slings, ObTape, was taken off the market,
15  had a very, very different design. The original
16  Protogen sling, which is the precursor, was taken off
17  the market. I vaguely remember that somebody had a
18  silicone-coated sling that was not used, you know,
19  after a while. So, again, obviously, these type of
20  things facilitate discussion.
21       Q.    If you go two more slides down, it says,
22  "Gynecare TVT Tension-free Support for Incontinence
23  Mesh: Unique Properties." It says, "Measurable
24  differences from other polypropylene meshes, largest

62 (Pages 242 to 245)

Marc R. Toglia, M.D.

Page 246

1    pore size, lowest stiffness, highest elongation."
2        A.    Are those important to you as a physician?
3        A.    Again, I did not write this information,
4    you know, what we considered to be important clinically
5    and what the literature supports is that we're using a
6    macroporous product.  I mean, is there a difference
7    between 1,100 and 1,300 clinically?  I don't believe
8    so.  Is there a significance to stiffness?  I don't
9    know.  Elongation, I don't know either.  Is it true
10   that the TVT mesh has the largest pore size?  Yes.
11   That it has the lowest stiffness?  You know, my
12   recollection, yes.  I think those statements are
13   supported by the title.  I don't think it speaks to any
14   kind of clinical.
15       Q.    Significance?
16       A.    Application, clinical significance,
17   clinical difference.
18       Q.    Can you go back two pages to the page
19   that looks like the chart like this?
20       A.    Right.
21       Q.    You see there under the asterisk at the
22   bottom it says, AMS mesh was tested without tensioning
23   suture.  In another study comparison when measured with
24   the tensioning suture SPARC has a stiffness of

Page 247

1    .53 nanograms per milliliter and Gynecare TVT
2    Tension-free Support for Incontinence has a stiffness
3    of .23 nanograms per milliliter.  This is a highly
4    significant difference, and it gives a P value there.
5        You see that?
6        A.    Yes.
7        Q.    So, apparently, it wasn't you, but
8    whoever put this PowerPoint together and put your name
9    on it felt that that was an important difference,
10   right?
11       A.    Well, you know, yes.  I mean, there's --
12   but there's a difference between clinically significant
13   and the fact that -- I mean, that the numbers are
14   highly significant difference.  As we go through this,
15   as we had -- as you brought up earlier this afternoon,
16   there was a document that suggested that I participated
17   in a luncheon discussion at a meeting.  It may be that
18   this was something that was being considered for that
19   venue.  I don't know.  I have no recollection that this
20   is actually what I presented, but perhaps there's a
21   relation -- we don't have a date for this.
22       Q.    Finishing up, there's a page that is
23   right before what I've called the footnotes or the
24   credits I guess at the end, it's titled -- it says

Page 248

1    "Prolene polypropylene mesh is highly inert."
2        You see that page, Doctor?
3        A.    Mm-hmm.
4        Q.    And then it says, "treated over
5    1.5 million patients," and then it says "longest term
6    follow-up of any mesh at 11.5 years," and "The most
7    'Level I Evidence' with 41 RCTs."  Now, that bottom
8    cite, Number 7, if you go over to the references, it
9    says there was a PubMed search, and you can see PubMed
10   search was from 1/26 of '09 through 2/20 of '09, which
11   gives us a time frame for when this would have
12   occurred.  I'm assuming you didn't run that PubMed
13   search, right?
14       A.    That is correct.
15           MR. SCHNIEDERS:  Let me take five.
16           (Brief recess taken at 6:51 p.m.)
17           (Deposition resumes at 6:57 p.m.)
18           (Document marked for identification as
19   Toglia Deposition Exhibit No. 30.)
20   BY MR. SCHNIEDERS:
21       Q.    I have just marked as Exhibit 30 a
22   ProPublica document or it comes from the ProPublica
23   database where you can type in doctors' names and it
24   shows some of the payments they've received from the

Page 249

1    past couple of years.
2        Are you familiar with this type of document?
3        A.    I am, I am.
4        Q.    If you go to the second page, they don't
5    print out very nicely every time, but on the second
6    page it states that from August of 2013 through
7    December of 2014, you received a total of 137 payments
8    for 45,967 -- $45,976.
9        Does that sound about right to you or sound
10   high, sound low?
11       A.    And, again, not wanting to be
12   argumentative, I take issue with the 137 payments.  I
13   think that if somebody brought lunch to my office or to
14   my office staff, that perhaps that might be counted as
15   a payment.
16       Q.    I think, in fact, it is.  If you look
17   under down here other types of payments, it's going to
18   tell you exactly what it was.
19       A.    Right.  I think also I do recall, and it
20   may not be specifically this time period, that Pfizer
21   had floated a study by me.  We submitted the
22   information to the Lankenau Institute of Medical
23   Research.  They paid that institute $2,000 for their
24   review of the protocol.  We would not participate, but

63 (Pages 246 to 249)

Marc R. Toglia, M.D.

Page 250

1  it was reported as income to me, but I never saw that
2  income.
3      Q.   So I'm going to ask you -- it lists
4  through every single payment here and talks it through.
5      A.   Sure.
6      Q.   I'm not going to ask you about each
7  individual payment.
8      A.   Sure.
9      Q.   I want to highlight or mention the
10 company that's listed just to see if that's something
11 that sounds right, like you would have received
12 something from that company?
13     A.   I mean, I see stuff on here that I
14 clearly had no involvement with, but go ahead.
15     Q.   That's fine, just tell me as we go
16 along.
17     A.   Sure.
18         MR. SNELL:  Note my continuing objection
19 as to the foundation, accuracy of this
20 document, and move motion in limine to preclude
21 this document.
22         Go ahead.
23 BY MR. SCHNIEDERS:
24     Q.   Astellas Pharma US, I think we talked

Page 251

1  about them earlier; is that right?
2      A.   Yes.
3      Q.   AMS?
4      A.   I'm sorry.  The question is specifically
5  is did I?
6      Q.   Do you recall consulting for American
7  Medical Systems Inc.?
8      A.   Yes.  Some of them, for example, Elevate
9  is AMS.  I never consulted.  That is not a consulting
10 thing, $19.  That was maybe a lunch, I don't know.  I
11 honestly don't know.
12     Q.   Uroplasty, Inc. do you recall that?
13     A.   Yes.
14     Q.   Is Uroplasty, Inc. a device
15 manufacturer?
16     A.   Uroplasty was a device manufacturer.
17 They were renamed Cogentix, C-o-g-e-n-t-i-x, and I
18 consulted with them on productional education slide
19 development.
20     Q.   There were a handful of Ethicon on here.
21 There's one on March 25th of 2014, which is Page 14 of
22 44 at the top.  It says uterine surgery for $107?
23     A.   I'm sorry, where?
24     Q.   If you go to the numbering up here,

Page 252

1  Number 14, and it's the top one.
2      A.   I'm sorry.  And this was which year?
3      Q.   March 25th of 2014.
4      A.   Got you.  I mean, there's probably
5  another physician in my office.  At that time there
6  were two other physicians in my practice, and they
7  might have been talking to them about either the
8  morcellator product, that wouldn't be me.  That's not
9  something that I would have likely participated in.
10     Q.   And I would note that and consistent
11 with what you said earlier that Astellas seems to be
12 the name that comes up the most often.
13         Does that sound right to you?
14     A.   Yes, during this time period, probably
15 the work that I did was with overactive bladder having
16 participated in some of the research previously.
17     Q.   Looks like there was food related to a
18 drug called Toviaz from Pfizer.
19         Do you recall that?
20     A.   Yeah, that's food provided to my office
21 staff.  I may or may not have been there.
22     Q.   Same thing with regard to Warner
23 Chilcott for a drug called Enablex?
24     A.   Yes.

Page 253

1      Q.   Noven Pharmaceuticals for a drug called
2  Brisdelle?
3      A.   That's not me.  Brisdelle I believe is a
4  birth control pill.  That's not accurate.  I never sat
5  in on a lunch for -- no, I'm sorry, Brisdelle, PMS
6  treatment perhaps.  Again, probably marketed towards my
7  junior partner.  Forteo, not me.
8      Q.   Forteo?
9      A.   No, not me.  I have no idea what
10 Xartemis is, never heard of that.
11     Q.   Is that the one that's Mallinckrodt?
12     A.   I have no idea.
13         Adhesion prevention, I don't recognize that at
14 all.
15     Q.   Allergen for Botox?
16     A.   I've never used Botox.  I don't believe
17 that would be myself either.  This is not that
18 accurate.
19     Q.   Just so you're aware, for your own sake,
20 you can go and contest anything that's not accurate.
21     A.   I appreciate that.  Thank you.  Yes.
22     Q.   If you do feel that way.
23         That's the majority of the companies there.
24         Lastly, Doctor, when you give a risk-benefit

64 (Pages 250 to 253)

Marc R. Toglia, M.D.

Page 254

1    discussion to any of your female patients about the
2    potential of receiving a TVT device or receiving
3    Gynemesh PS, do you disclose to them that you had a
4    financial relationship with Ethicon?
5        A.    I do.
6        Q.    And what do you tell them?
7        A.    I tell them that I have been involved
8    with professional education, research study, that I've
9    consulted on designs, development of such products. I
10   disclose as much as, you know, they're interested in
11   hearing.
12       Q.    No amounts, I assume, right?
13       A.    I don't tell them specific amounts.
14   Obviously, these are all public records. You can find
15   out how much Medicare paid me last month if you wanted
16   to.
17           MR. SCHNIEDERS:  Doctor, I think my time
18       is up. I have no further questions. Thank you
19       for your time.
20   BY MR. SNELL:
21       Q.    Doctor, I'm just going to ask a few
22   follow-up questions on a couple topics.
23           Doctor, I'll represent to you that depositions
24   of the plaintiffs' experts are ongoing. I know you've

Page 255

1    been provided Dr. Ostergard's deposition, but there are
2    many other depositions going on, and it will be, I'll
3    represent, sent to you.
4            Could you plan to reserve the right to issue
5    any new or updated opinions based on depositions of the
6    plaintiffs' experts?
7            MR. SCHNIEDERS:  Object to the form.
8            THE WITNESS:  Yes, I would say that
9        sounds fair.
10   BY MR. SNELL:
11       Q.    And will you look at any new studies
12   that come out that you may or may not find to be
13   pertinent to your opinions?
14           MR. SCHNIEDERS:  Object to the form.
15           THE WITNESS:  Yes, I read this
16       literature frequently so...
17   BY MR. SNELL:
18       Q.    You were asked questions about if you
19   were provided company documents. Besides the IFUs, the
20   professional education materials, the slide decks, the
21   videos and all the stuff that are on the thumb drive
22   somewhere that we're going to put in the box as
23   Exhibit 4, I just want to call to your attention. So
24   in Dr. Ostergard's materials that were provided to you,

Page 256

1    are there company documents and things of that nature
2    as well?
3            MR. SCHNIEDERS:  Object to the form.
4            THE WITNESS:  I mean, obviously, the
5        Prolift documents, these are slides on Prolift,
6        so, yes. There are various e-mails.
7    BY MR. SNELL:
8        Q.    You were asked about your expertise in
9    various areas. Let me ask you about that.
10           Do you believe you're an expert in how the
11   chemical polypropylene the polymer performs in pelvic
12   surgery in a woman?
13           MR. SCHNIEDERS:  Object to form.
14           THE WITNESS:  Yes, I do believe I'm an
15       expert in that.
16   BY MR. SCHNIEDERS:
17       Q.    Besides, obviously, your testimony that
18   you've utilized polypropylene over many decades before
19   pelvic surgery, have you also researched that topic in
20   the reliable scientific medical literature?
21           MR. SCHNIEDERS:  Object to the form.
22           THE WITNESS:  Yes, I have.
23   BY MR. SNELL:
24       Q.    Have you analyzed the design of the

Page 257

1    devices that utilize the Ethicon polypropylene?
2            MR. SCHNIEDERS:  Object to the form.
3            THE WITNESS:  Yes, I have.
4    BY MR. SNELL:
5        Q.    You were asked if you're an expert in
6    polymer chemistry. Do you believe you're an expert in
7    that field?
8            MR. SCHNIEDERS:  Object to the form.
9            THE WITNESS:  As it pertains to what
10       we're discussing here and its intended use,
11       yes, I am.
12   BY MR. SNELL:
13       Q.    And before you even went to medical
14   school, I think you testified you have a degree in
15   biochemistry as well?
16       A.    Correct.
17       Q.    Do you believe you have a very good
18   working knowledge and understanding of chemistry?
19       A.    Yes, I have.
20       Q.    Including the chemistry of polypropylene
21   and what -- the atoms or molecules it's made up of?
22       A.    That's correct. I did research as an
23   undergraduate in silastic plastic delivery systems.
24       Q.    You talked some in this deposition about

65 (Pages 254 to 257)

Marc R. Toglia, M.D.

| Page 258 | Page 260 |
|---|---|

**Page 258**

1  your consulting and evaluation of the development and
2  design of sling and prolapse devices.
3       In your earlier deposition, you recall covering
4  that subject as well?
5       A.   I do, yes.
6       Q.   Do you stand by your testimony from your
7  earlier deposition in the Mullens case about the
8  various design and development work you did?
9            MR. SCHNIEDERS:  Object to the form.
10           THE WITNESS:  Yes, I believe we covered
11      that pretty extensively.
12  BY MR. SNELL:
13      Q.   Do you recollect in that testimony you
14  discussed that you were involved in the design
15  validation of the Gynemesh M mesh?
16           MR. SCHNIEDERS:  Object to the form.
17           THE WITNESS:  Yes.
18  BY MR. SNELL:
19      Q.   And is that a prolapse mesh similar to
20  Gynemesh PS?
21           MR. SCHNIEDERS:  Object to the form.
22           THE WITNESS:  Yes.
23  BY MR. SNELL:
24      Q.   Do you recollect testifying and telling

**Page 259**

1  the lawyers under oath that in your role as being one
2  of the design validation surgeons, you assessed the
3  suitability, safety, efficacy and adequacy of the
4  design of that product?
5            MR. SCHNIEDERS:  Object to the form.
6            THE WITNESS:  I did, yes.
7  BY MR. SNELL:
8       Q.   Do you also recall and recollect your
9  testimony that in the design validation activities you
10  performed on the prolapse mesh for Ethicon, you also
11  assessed the instructions for use as to its suitability
12  and clarity and how it laid out instructions?
13           MR. SCHNIEDERS:  Object to the form.
14           THE WITNESS:  Yes, I did.
15  BY MR. SNELL:
16      Q.   Do you recollect that you testified that
17  in connection with your evaluation of the IFU for the
18  prolapse device, you were asked whether it was clear or
19  cohesive or accurate?
20           MR. SCHNIEDERS:  Object to the form.
21           THE WITNESS:  Yes, I did.
22  BY MR. SNELL:
23      Q.   And besides the prolapse mesh, I think
24  you testified here today and you testified earlier, you

**Page 260**

1  have consulted and evaluated the design of other
2  Ethicon pelvic floor products over various time
3  periods?
4            MR. SCHNIEDERS:  Object to the form.
5            THE WITNESS:  Yes, I have.
6  BY MR. SNELL:
7       Q.   For example, you testified about your
8  design evaluation and your work with the TVT Exact
9  product for stress urinary incontinence?
10           MR. SCHNIEDERS:  Object to the form.
11           THE WITNESS:  Yes, starting from the
12      concept of the design all the way through the
13      engineering, all the way through the
14      suitability of the product and the professional
15      education component of that, which included the
16      teaching, the filming of the video
17      demonstrating the technique.
18  BY MR. SNELL:
19      Q.   And would that professional education
20  also include the instructions for use?
21           MR. SCHNIEDERS:  Object to the form.
22           THE WITNESS:  Yes, it did include the
23      instructions for use.
24  BY MR. SNELL:

**Page 261**

1       Q.   And so do you believe you're an expert
2  and qualified to opine on the adequacy of the
3  instructions for use for the Gynemesh PS and Prolift
4  and the TVT product?
5            MR. SCHNIEDERS:  Object to the form.
6            THE WITNESS:  Yes, I will agree with
7      that.
8  BY MR. SNELL:
9       Q.   And did you actually teach the IFU
10  during your professional education activities for
11  various products in addition to the discussions or I
12  think you called them proctorships as well?
13           MR. SCHNIEDERS:  Object to the form.
14           THE WITNESS:  Yes, I did.
15  BY MR. SNELL:
16      Q.   And I think we've seen or you produced
17  earlier, as I recall, slide decks, maybe more than one.
18  Do you recollect during your professional education
19  activities talking to pelvic floor surgeons about the
20  potential risk and how to utilize and insert these
21  devices?
22           MR. SCHNIEDERS:  Object to the form.
23           THE WITNESS:  Yes.  We specifically
24      would go over techniques, strategies to

66 (Pages 258 to 261)

Marc R. Toglia, M.D.

Page 262

1    minimize, strategies to recognize the
2    potential.
3    BY MR. SNELL:
4        Q.    You were asked about the TVT Secur
5    randomized control trial.
6        Do you recollect that?
7        A.    I was asked about the security trial,
8    which compared TVT retropubic with TVT Secur.
9        Q.    Was your site paid by Ethicon?  I just
10   want to understand, because I think there was
11   questioning about that, and I got a little unclear.
12       A.    I understand.
13           MR. SCHNIEDERS:  Object to the form.
14           THE WITNESS:  My recollection is that we
15   were paid by the Cleveland Clinic.  I might
16   have earlier mentioned that the money came from
17   the foundation, but I do believe that the
18   actual payments came through the Cleveland
19   Clinic Foundation.
20   BY MR. SNELL:
21       Q.    You were asked questions about whether
22   you were an expert in pathology.  Let me ask you this:
23   In your review of the medical literature, have you
24   reviewed the pathology papers with the

Page 263

1    photomicrographs, such as the Clave study?
2           MR. SCHNIEDERS:  Object to the form.
3           THE WITNESS:  Yes, I've reviewed the
4    studies as we've listed them involving the
5    scanning electron microscopy using the Fournier
6    method of analysis, the optical method of
7    analysis as well, the histologic -- several
8    histologic studies.
9    BY MR. SNELL:
10       Q.    And based upon your medical education
11   and training, were you able to adequately evaluate
12   those pathologic studies?
13           MR. SCHNIEDERS:  Object to the form.
14           THE WITNESS:  Yes, I think I have an
15   excellent working knowledge of those topics.
16           MR. SNELL:  That's all I have.  Thank
17   you for your time.
18           (Witness excused.)
19       (Deposition concluded at 7:17 p.m.)
20           ---
21
22
23
24

Page 264

1    C E R T I F I C A T I O N
2        I, MARGARET M. REIHL, a Registered
3    Professional Reporter, Certified Realtime
4    Reporter, Certified Shorthand Reporter,
5    Certified LiveNote Reporter and Notary Public,
6    do hereby certify that the foregoing is a true
7    and accurate transcript of the testimony as
8    taken stenographically by and before me at the
9    time, place, and on the date hereinbefore set
10   forth.
11       I DO FURTHER CERTIFY that I am
12   neither a relative nor employee nor attorney
13   nor counsel of any of the parties to this
14   action, and that I am neither a relative nor
15   employee of such attorney or counsel, and that
16   I am not financially interested in the action.
17
18
19   ---------------------------------
     Margaret M. Reihl, RPR, CRR, CLR
20   CSR #XI01497  Notary Public
21
22
23
24

Page 265

1        - - - - -
2        E R R A T A
3        - - - - -
4    PAGE LINE CHANGE
5    ____ ____ _____
6    REASON: _____
7    ____ ____ _____
8    REASON: _____
9    ____ ____ _____
10   REASON: _____
11   ____ ____ _____
12   REASON: _____
13   ____ ____ _____
14   REASON: _____
15   ____ ____ _____
16   REASON: _____
17   ____ ____ _____
18   REASON: _____
19   ____ ____ _____
20   REASON: _____
21   ____ ____ _____
22   REASON: _____
23   ____ ____ _____
24   REASON: _____

67 (Pages 262 to 265)

Marc R. Toglia, M.D.

Page 266

1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, MARC R. TOGLIA, M.D., do hereby
4     certify that I have read the foregoing pages,
5     and that the same is a correct transcription of
6     the answers given by me to the questions
7     therein propounded, except for the corrections
8     or changes in form or substance, if any, noted
9     in the attached Errata Sheet.
10
11
12

     _____
13   MARC R. TOGLIA, M.D.          DATE
14
     Subscribed and sworn to before me this
15
     _____ day of _____, 2016.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24