# Exhibit C

Marc Toglia, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC. | : Master File No. |
| PELVIC REPAIR SYSTEM | : 2:12-MD- |
| PRODUCTS LIABILITY LITIGATION | : MDL 2327 |
| | : |
| | : JOSEPH R. |
| THIS DOCUMENT RELATES TO | : GOODWIN |
| THE CASES LISTED BELOW | : US DISTRICT |
| | : JUDGE |

_____

Mullins, et al. v. Ethicon, Inc., et al.
2:12-cv-02952
Sprout, et al. v. Ethicon, Inc., et al.
2:12-cv-07924
Iquinto v. Ethicon, Inc., et al.
2:12-cv-09765
Daniel, et al. v. Ethicon, Inc., et al.
2:13-cv-02565
Dillon, et al. v. Ethicon, Inc., et al.
2:13-cv-02919
Webb, et al. v. Ethicon, Inc., et al.
2:13-cv-04517
Martinez v. Ethicon, Inc., et al.
2:13-cv-04730
McIntyre, et al. v. Ethicon, Inc., et al.
2:13-cv-07283
Oxley v. Ethicon, Inc., et al.
2:13-cv-10150
Atkins, et al. v. Ethicon, Inc., et al.
2:13-cv-11022
Garcia v. Ethicon, Inc., et al.
2:13-cv-14355

(Caption Continued on Next Page)
-  -  -
October 2, 2015
VIDEOTAPED DEPOSITION MARC TOGLIA, M.D.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

Marc Toglia, M.D.

Page 2

1   CAPTION CONTINUED:
2   Lowe v. Ethicon, Inc., et al.
3   2:13-cv-14718
    Dameron, et al. v. Ethicon, Inc., et al.
4   2:13-cv-14799
    Vanbuskirk, et al. v. Ethicon, Inc., et al.
5   2:13-cv-16183
    Mullens, et al. v. Ethicon, Inc., et al.
6   2:13-cv-16564
    Shears, et al. v. Ethicon, Inc., et al.
7   2:13-cv-17012
    Javins, et al. v. Ethicon, Inc., et al.
8   2:13-cv-18479
    Barr, et al. v. Ethicon, Inc., et al.
9   2:13-cv-22606
    Lambert v. Ethicon, Inc., et al.
10  2:13-cv-24393
    Cook v. Ethicon, Inc., et al.
11  2:13-cv-29260
    Stevens v. Ethicon, Inc., et al.
12  2:13-cv-29918
    Harmon v. Ethicon, Inc., et al.
13  2:13-cv-31818
    Snodgrass v. Ethicon, Inc., et al.
14  2:13-cv-31881
    Miller v. Ethicon, Inc., et al.
15  2:13-cv-32627
    Matney, et al. v. Ethicon, Inc., et al.
16  2:14-cv-09195
    Jones, et al. v. Ethicon, Inc., et al.
17  2:14-cv-09517
    Humbert v. Ethicon, Inc., et al.
18  2:14-cv-10640
    Gillum, et al. v. Ethicon, Inc., et al.
19  2:14-cv-12756
    Whisner, et al. v. Ethicon, Inc., et al.
20  2:14-cv-13023
    Tomblin v. Ethicon, Inc., et al.
21  2:14-cv-14664
    Schepleng v. Ethicon, Inc., et al.
22  2:14-cv-16061
    Tyler, et al. v. Ethicon, Inc., et al.
23  2:14-cv-19110
24      (Caption Continued on Next Page)

Page 3

1   CAPTION CONTINUED:
2
    Kelly, et al. v. Ethicon, Inc., et al.
3   2:14-cv-22079
    Lundell v. Ethicon, Inc., et al.
4   2:14-cv-24911
    Cheshire, et al. v. Ethicon, Inc., et al.
5   2:14-cv-24999
    Burgoyne, et al. v. Ethicon, Inc., et al.
6   2:14-cv-28620
    Bennett, et al. v. Ethicon, Inc., et al.
7   2:14-cv-29624
8
        - - -
9       OCTOBER 2, 2015
        - - -
10
11      Videotape deposition of
12  MARC TOGLIA, M.D., taken pursuant to
13  notice, was held at the law offices of
14  Drinker Biddle and Reath, LLP, One Logan
15  Square, 18th and Cherry Streets, Suite 2000,
16  Philadelphia, Pennsylvania 19103,
17  commencing at 1:26 p.m., on the above
18  date, before Amanda Dee Maslynsky-Miller,
19  a Certified Realtime Reporter and Notary
20  Public in and for the State of
21  Pennsylvania.
22
23
24

Page 4

1   APPEARANCES:
2
3   MOTLEY RICE LLC
    BY: MARGARET M. THOMPSON, MD, JD, ESQUIRE
4   BY: BREANNE V. COPE, ESQUIRE
    28 Bridgeside Boulevard
5   Mount Pleasant, South Carolina 29464
    (843) 216-9000
6   Mthompsonmd@gmail.com
    Bcope@motleyrice.com
7   Representing the Plaintiffs
8
9
10  BUTLER SNOW, LLP
    BY: NILS B. (BURT) SNELL, ESQUIRE
11  500 Office Center Drive
    Suite 400
12  Fort Washington, Pennsylvania 19034
    (215) 513-1885
13  Burt.snell@butlersnow.com
    Representing the Defendant
14
15
16  ALSO PRESENT: Gregory Fields, Videographer
17
        - - -
18
19
20
21
22
23
24

Page 5

1       - - -
2       I N D E X
3       - - -
4
    Testimony of: MARC TOGLIA, M.D.
5
6   By Ms. Thompson        10. 393
    By Mr. Snell           322
7
8
9       - - -
10
        E X H I B I T S
11
        - - -
12  NO.     DESCRIPTION         PAGE
13  Toglia-1   Notice of Videotaped
           Deposition Pursuant to
14         Rule 30 and Document
           Requests Pursuant to
15         Rule 34 of Marc
           Toglia, M.D.        20
16
    Toglia-2   Expert Report of
17         Marc R. Toglia, M.D.    26
18  Toglia-3   Invoices           27
19  Toglia-4   3/19/09 E-mail from
           Marc Toglia to
20         Kathleen Feeney;
           Subject: Re: These events
21         Were approved 3.25
           Proctorship and 4.21
22         Preceptorship       87
23
24

2 (Pages 2 to 5)

Marc Toglia, M.D.

Page 6

1
2          E X H I B I T S
3              - - -
4
   NO.      DESCRIPTION        PAGE
5
   Toglia-5   10/23/08 E-mail from
6          Kathleen Toglia to
           Cindy Pypcznski; Subject:
7          FDA Toglia        99
8   Toglia-6   4/27/09 E-mail from
           Marc Toglia to Kathleen
9          Feeney; Subject: RE:
           Itinerary for TVT
10         Proctorship       108
11  Toglia-7   Bates ETH.MESH 05225354
           05225380-384; TVT
12         Instructions for Use    228
13  Toglia-8   ETH.MESH 08696131-132
           Exhibit C - Clinical
14         Trials         239
15  Toglia-9   ETH.MESH 02026591-595
           Material Safety Data Sheet 279
16
   Toglia-10  Three Thumb drives produced
17         By Marc Toglia, M.D.    279
18  Toglia-11  Selection of Materials
           Produced by Marc
19         Toglia, M.D.      281
20  Toglia-12  ETH.MESH 11843352-364
           Consulting Agreement
21         Requisition Form     296
22  Toglia-13  Spreadsheet       298
23
24

Page 7

1              - - -
2          E X H I B I T S
3              - - -
4
   NO.      DESCRIPTION        PAGE
5
   Toglia-14  ETH.MESH 03617772
6          Consultant Invoice
           Dated 5/28/09      303
7
   Toglia-15  ETH.MESH 10399348
8          4/29/09 E-mail from
           Patricia Beach to Judi
9          Gauld; Subject: FW:
           PROSIMATM Registry    314
10
   Toglia-16  ETH.MESH 11838868-869
11         5/30/07 E-mail from
           Kathleen Feeney to Cindy
12         Pypczinski; Subject: FW:
           Surgery at Lankenau    320
13
   Toglia-17  Level of Evidence Chart  326
14
   Toglia-18  Level of Evidence Pyramid 327
15
   Toglia-19  NICE Urinary Incontinence:
16         The Management of Urinary
           Incontinence in Women   380
17
   Toglia-20  Hernia Repair Surgery,
18         Volker Schumpelick,
           Robert J. Fitzgibbons,
19         Editors        383
20  Toglia-21  The Cochrane Collaboration;
           Mid-Urethral Sling
21         Operations for Stress Urinary
           Incontinence in
22         Women (Review)      383
23
24

Page 8

1              - - -
2      DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    Page  Line   Page Line     Page Line
7    17    22
8
9
10   Request for Production of Documents
11   Page  Line   Page  Line   Page Line
12   53    4      110   17
13   53    8
14
15   Stipulations
16   Page Line    Page Line     Page Line8
17   7     1
18
19   Question Marked
20   Page Line    Page Line     Page Line
21   None
22
23
24

Page 9

1              - - -
2          (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9              - - -
10       THE VIDEOGRAPHER:  We are
11   now on the record.  My name is
12   Gregory Fields.  I'm a
13   videographer for Golkow
14   Technologies.  Today's date is
15   October 2nd, 2015, and the time is
16   1:26 p.m.  This video deposition
17   is being held in Philadelphia,
18   Pennsylvania, in the matter of In
19   Re:  Ethicon, U.S. District Court,
20   Southern District of West
21   Virginia.  The deponent is Marc
22   Toglia.  Counsel will be noted on
23   the stenographic record.  The
24   court reporter is Amanda Miller

3 (Pages 6 to 9)

Marc Toglia, M.D.

Page 10

1  and will now swear in the witness.
2           - - -
3        MARC TOGLIA, M.D., after
4  having been duly sworn, was
5  examined and testified as follows:
6           - - -
7        EXAMINATION
8           - - -
9  BY MS. THOMPSON:
10      Q.  Dr. Toglia, I'm Margaret
11  Thompson, I represent the plaintiffs in
12  their case against Ethicon.
13      And you understood that --
14  you understand that that's why you're
15  here today?
16      A.  Yes, I do.
17      Q.  Could you please state your
18  name for the record?
19      A.  Yes.  Marc Richard Toglia.
20      Q.  And what is your occupation,
21  Dr. Toglia?
22      A.  I'm a physician.
23      Q.  Do you have a specialty?
24      A.  Yes.  I'm board certified in

Page 11

1  female pelvic medicine and reconstructive
2  surgery.
3      Q.  Are you also board certified
4  in OB/GYN?
5      A.  That is correct.  I'm double
6  board certified.
7      Q.  What is your office address
8  currently?
9      A.  It's 1098 West Baltimore
10  Pike, Media, Pennsylvania, Healthcare
11  Center 3, Suite 3404.
12      Q.  And who is your employer?
13      A.  I'm employed by Main Line
14  Healthcare.
15      Q.  Do you have an academic
16  appointment as well?
17      A.  I have several.  I'm an
18  associate professor of obstetrics and
19  gynecology at what we formerly called
20  Thomas Jefferson School of Medicine, is
21  now the Sidney Kimmel School of Medicine.
22      And I'm also an associate
23  professor, clinical associate professor
24  at the Lankenau Institute of Medical

Page 12

1  Research.
2      Q.  So am I understanding
3  correctly that you have a private
4  practice as well as your academic
5  appointment?
6      A.  Yes.
7      Q.  So you're paid by the
8  academic institutions and then you also
9  have -- receive income from your private
10  practice; is that correct?
11      A.  There's no financial
12  compensation for the academic
13  appointments.
14      Q.  For either --
15      A.  For the --
16      Q.  -- one of the academic
17  appointments?
18      Okay.  So your income, then,
19  is derived strictly from your private
20  practice of urogynecology?
21      A.  That is correct.
22      Q.  And would you consider that
23  a specialty practice?
24      A.  It's a subspecialty

Page 13

1  practice.
2      Q.  A subspecialty practice.
3      So you are a referral
4  practice, so to speak?
5      A.  Yes.  I exclusively take
6  care of women that have urinary
7  incontinence and pelvic floor disorders.
8      Q.  And are those patients
9  typically referred to you by other
10  physicians?
11      A.  My patients may come from
12  sisters, mothers, former patients, other
13  physicians.  The bulk of my practice
14  probably comes from other physicians.
15      Q.  And do you do, as part of
16  that subspecialty practice, general GYN
17  as well or restrict it completely to
18  urogynecology?
19      A.  I don't consider my practice
20  general gynecology.  I mean, occasionally
21  a gynecologist may send me a patient for
22  an opinion that might have a general
23  gynecology, but that's not what I hold
24  myself out as.

4 (Pages 10 to 13)

Marc Toglia, M.D.

Page 14

1      Q.   So, typically, you would not
2  be doing annual checkups, Pap smears,
3  mammograms, birth control, that sort of
4  thing that a general gynecologist might
5  do?
6          MR. SNELL:  Hold on.
7      Objection.  Compound.  Overbroad.
8          Go ahead.
9          THE WITNESS:  No.
10 BY MS. THOMPSON:
11     Q.   And when you're treating a
12 patient for a urogynecological condition,
13 we'll get to what those are a little bit
14 later, and that condition is resolved, do
15 you then send that patient back to their
16 general gynecologist or primary care
17 physician?
18     A.   Yes.
19     Q.   And that would be because,
20 one of the reasons, at least, is that
21 physicians don't want to send their
22 patients to a subspecialty and then lose
23 their patients to their care; is that
24 right?

Page 15

1      A.   I don't know that I would
2  agree with that statement.  Let me
3  clarify that.  I take care of chronic
4  disease.
5          So it's not unusual for us
6  to maintain a lifetime relationship with
7  these patients.  But if I understand you
8  correctly, if I were to take care of a
9  specific pelvic floor disorder and that
10 person was to need, say, a mammogram, a
11 Pap smear or some other kind of primary
12 care service, we are not the ones
13 primarily responsible for that, and they
14 would go back to their referring doctor
15 or the doctor of their choosing.
16     Q.   Understood.  And what if the
17 patient's pelvic floor disorder is cured,
18 same thing?
19     A.   Yes.
20     Q.   What hospitals do you
21 currently have privileges at?
22     A.   Currently, I'm privileged at
23 all four of Main Line Healthcare
24 hospitals.  The Main Line Healthcare

Page 16

1  hospital system is located in suburban
2  Philadelphia; it consists of Lankenau
3  Medical Center, Bryn Mawr Hospital, Paoli
4  Hospital and Riddle Hospital.
5      Q.   And do you do surgeries at
6  all four of those facilities as well?
7      A.   No.
8      Q.   Which ones do you perform
9  surgeries at?
10     A.   I will operate at Riddle
11 Hospital, Paoli Hospital and Lankenau
12 Medical Center.  My schedule does not
13 allow me to operate at, say, Bryn Mawr
14 Hospital.  Although I have, from time to
15 time, gone through; but I don't consider
16 that to be a hospital that I would use
17 for surgical procedures.
18     Q.   Do you have privileges or do
19 surgery at any type of surgical center,
20 freestanding surgical center?
21     A.   I do not.
22     Q.   So minor surgeries or those
23 that would be output surgeries are done
24 in the hospital as well?

Page 17

1      A.   I think, technically, the
2  outpatient surgical surgeries are on
3  hospital property, but I think that they
4  are designated as -- you know, there's
5  ambulatory surgery.
6      Q.   Are they on a different
7  floor --
8      A.   No.
9      Q.   -- from the main operating
10 room?
11     A.   It's all -- it's the same.
12 I mean, patients are classified by their
13 status not by physical location.
14     Q.   Okay.  Are you married, Dr.
15 Toglia?
16     A.   I am.
17     Q.   Children?
18     A.   Yes.
19     Q.   How many?
20     A.   I have two children.
21     Q.   What are their ages?
22         MR. SNELL:  Not relevant.
23     Don't answer that question.
24         MS. THOMPSON:  You're

5 (Pages 14 to 17)

Marc Toglia, M.D.

Page 18

1   instructing him not to answer?
2        MR. SNELL: Yes. That's
3   private. About his children? He
4   came here to give opinions on the
5   defect and the question that, that
6   the judge posed about TVT, not to
7   tell you about his children.
8        MS. THOMPSON: I'm just
9   getting to know him.
10       MR. SNELL: No, that's not
11   appropriate. I don't ask your
12   experts about who their children
13   are and their ages and stuff.
14   That is totally inappropriate.
15   BY MS. THOMPSON:
16       Q.   You can go ahead and answer.
17       MS. THOMPSON: Unless you're
18   instructing him not to answer?
19       MR. SNELL: Yes, I'm
20   instructing him not to answer. I
21   think that violates his privacy,
22   is totally outside the scope, is
23   not relevant.
24       MS. THOMPSON: Okay. Object

Page 19

1   to form is sufficient.
2        THE WITNESS: Thank you. I
3   appreciate that. And I agree.
4   BY MS. THOMPSON:
5        Q.   Have you given previous
6   depositions?
7        A.   Yes.
8        Q.   How many?
9        A.   I honestly couldn't tell you
10   off the top of my head. Probably no more
11   than a dozen. I don't think I've given a
12   deposition in over ten years, to the best
13   of my -- my knowledge.
14       Q.   So somewhere in the range of
15   five to twelve, would you ballpark it?
16       A.   Yes.
17       Q.   And what types of cases were
18   those depositions given in?
19       A.   The vast majority of them,
20   if not all of them, were within the realm
21   of female pelvic floor disorders, areas
22   of my expertise, which oftentimes extends
23   into the obstetrical world.
24       Q.   So am I correct those would

Page 20

1   be medical malpractice cases?
2        A.   Most of them are medical
3   malpractice cases.
4        My reason for pausing, I
5   think one actually involved a piercing or
6   tattoo parlor that was involved. And I
7   don't think that's medical malpractice,
8   but there were medical claims.
9        Q.   And did you testify for the
10   defense or the plaintiffs or a mix in
11   those cases?
12       A.   I've done a mix.
13       Q.   Did any of those cases that
14   you have given depositions in relate to
15   mesh products?
16       A.   To the best of my knowledge,
17   no.
18       Q.   Dr. Toglia, did you --
19            - - -
20       (Whereupon, Exhibit
21   Toglia-1, Notice of Videotaped
22   Deposition Pursuant to Rule 30 and
23   Document Requests Pursuant to Rule
24   34 of Marc Toglia, M.D., was

Page 21

1   marked for identification.)
2            - - -
3        MS. THOMPSON: We've marked
4   as Exhibit-1 the notice for your
5   deposition today.
6        MR. SNELL: Thank you.
7   BY MS. THOMPSON:
8        Q.   Have you had a chance to --
9        MR. SNELL: Let me -- I just
10   want to give him the original,
11   that way the ones don't get mixed
12   up.
13       MS. THOMPSON: Sure. Thank
14   you.
15   BY MS. THOMPSON:
16       Q.   Have you had a chance to see
17   this document prior to just now?
18       A.   I have.
19       Q.   When did you first see this?
20       A.   I was given this document,
21   probably, near the end of last week, to
22   the best of my knowledge.
23       Q.   And did you see Schedule A,
24   which is attached to the notice of

6 (Pages 18 to 21)

Marc Toglia, M.D.

Page 22

1    deposition?
2        A.   Yes.
3        Q.   And it asked you to bring,
4    oh, a whole bunch of documents.  And I'm
5    not going to go through these
6    individually.
7             But can you just tell me
8    what you brought with you today?
9        A.   Yes.  To the best of my
10   knowledge, I have brought, as you put it,
11   as a whole bunch of documents, as they
12   relate to Schedule A.
13       Q.   And those are contained in
14   the -- some boxes that you brought to the
15   conference room?
16       A.   Yes.  Some are electronic,
17   the majority of them are copied on paper.
18       Q.   And I think Mr. Snell
19   provided me a flash drive with everything
20   that's in the boxes, correct?
21            MR. SNELL:  As far as I
22       know.  Although, he's brought
23       thumb drives, too.
24            MS. THOMPSON:  Okay.

Page 23

1             MR. SNELL:  So, I mean --
2        and also, I mean, you may want to
3        ask him, but he's done his own
4        research.  So he may have stuff
5        that I don't even have.
6             MS. THOMPSON:  I think I
7        should do that.
8    BY MS. THOMPSON:
9        Q.   Dr. Toglia, could you just
10   go through what you brought here and
11   describe what you have?  Not document by
12   document, but generally speaking.
13       A.   Generally speaking, I have
14   brought the relevant clinical studies and
15   other published research, as well as the
16   legal documents, including the expert
17   reports and depositions.
18       Q.   Did you bring anything with
19   you that is not included on your -- the
20   reliance list that's attached to your
21   report?
22       A.   Obviously, I can't claim to
23   have an independent knowledge of every
24   specific element on that list, but to the

Page 24

1    best of my knowledge, I have done my best
2    to comply and everything is -- is as it
3    is listed.
4             MR. SNELL:  I will make one
5        note, just for a clean record,
6        too, as he did say, since the time
7        he published his report and his
8        reliance materials list, there
9        have been depositions of your
10       experts.  He, obviously, has those
11       and I think he might have even
12       said that.
13            But when she asks you a
14       question you are allowed to take
15       them and look at them and tell her
16       what you reviewed.
17            THE WITNESS:  Understood.
18            MS. THOMPSON:  And we'll
19       maybe take a brief look at it at
20       the break.
21            MR. SNELL:  That's fine.  He
22       brought it here, it's up to you.
23       You can look at it, copy it, do
24       whatever you want.

Page 25

1             MS. THOMPSON:  I appreciate
2        that.
3    BY MS. THOMPSON:
4        Q.   Did you bring any billing
5    records with you today?
6             MR. SNELL:  I have those.  I
7        have them somewhere.
8             Let's go off the record for
9        a second.
10            VIDEO TECHNICIAN:  We are
11       off the record.  The time is 1:38
12       p.m.
13              - - -
14       (Whereupon, a discussion off
15       the record occurred.)
16              - - -
17            VIDEO TECHNICIAN:  We are
18       back on the video record.
19   BY MS. THOMPSON:
20       Q.   Dr. Toglia, I think you
21   brought your report that you prepared in
22   this case --
23       A.   Yes.
24       Q.   -- is that correct?

7 (Pages 22 to 25)

Marc Toglia, M.D.

Page 26

1           - - -
2           (Whereupon, Exhibit
3     Toglia-2, Expert Report of Marc R.
4     Toglia, M.D., was marked for
5     identification.)
6           - - -
7     BY MS. THOMPSON:
8           Q.    And we have marked that as
9     Exhibit Number 2.
10          I believe you have your own
11    copy as well?
12          A.    I do.
13          Q.    Do you have any notes on
14    your copy that you brought with you?
15          A.    I mean, I've got some
16    underlines in pencil.  I may have made a
17    spelling correction.  I don't have any
18    prose of any kind in there.
19          Q.    There's a curriculum vitae
20    attached to that report --
21          A.    Yes.
22          Q.    -- as you recall.
23          Is that a current C.V.?
24          A.    It is.

Page 27

1           Q.    Are there any additions that
2     you would make to that, sitting here
3     today --
4           A.    No.
5           Q.    -- that you can think of?
6           MS. THOMPSON:  So Exhibit-2
7     will be the report and the -- with
8     the C.V.
9           - - -
10          (Whereupon, Exhibit
11    Toglia-3, Invoices, was marked for
12    identification.)
13          - - -
14    BY MS. THOMPSON:
15          Q.    And it looks like you also
16    brought, today, two bills or invoices for
17    your work in this case, and we've marked
18    that as Exhibit Number 3.
19          A.    Thank you.
20          Q.    Do those look familiar?
21          A.    Yes.
22          Q.    And the last date on the
23    invoice is September 24th.
24          Can you approximate how many

Page 28

1     hours you have worked on this case since
2     September 24th?  That would be in the
3     last week or so.
4           A.    Would it be sufficient if I
5     told you that I've probably done -- used
6     a total of about 50 hours in total?
7           Q.    So 50 hours total on this
8     case to date?
9           A.    50 hours --
10          Q.    Approximately?
11          A.    Approximately 50 hours of
12    work on this case.
13          Q.    How many hours did you spend
14    preparing your report, approximately?
15          A.    Approximately 23 years and
16    50 hours.
17          And the reason why I say
18    that, counselor, is that most of the
19    material that I have reviewed, I have
20    reviewed over the span of my career.  And
21    that would include, perhaps, reviewing it
22    prior to being published, watching it be
23    presented at meetings, having read it
24    over and over for my own personal, you

Page 29

1     know, knowledge and interest.
2           And, certainly, many of
3     these articles relate to the subspecialty
4     board certification.
5           Q.    But you haven't billed
6     Ethicon for 23 years, correct?
7           A.    I've told you that I've
8     billed them for 50 hours, counselor,
9     right.  In formulating my opinion.
10          Q.    I'm just trying to break --
11    break it down a little bit --
12          A.    Sure.
13          Q.    -- and try to understand how
14    much of that 50 hours was actually
15    preparing your report.
16          And if you can't -- if
17    you're not -- unable to do that, that's
18    fine.
19          A.    In preparing the report, it
20    probably is, both of these, 10 hours plus
21    33 hours, 43 hours; and the difference is
22    probably split between preparing for the
23    deposition and additional work finalizing
24    the report.

8  (Pages 26 to 29)

Marc Toglia, M.D.

Page 30

1      Q.   So that would include review
2  of literature, for instance?
3      A.   Correct.
4      Q.   When were you first
5  contacted to serve as an expert in this
6  case?
7      A.   If memory serves me right,
8  it was some time in August.
9      Q.   And do you have any
10  correspondence regarding that initial
11  contact?
12      A.   I do not.
13      Q.   Was it a phone call?
14      A.   Correct.
15      Q.   From Mr. Snell or another
16  attorney?
17      A.   From Mr. Snell.
18      Q.   And what did Mr. Snell ask
19  you to do?
20      A.   Mr. Snell apprised me to the
21  existence of the case and that he needed
22  to retain an expert to specifically
23  comment on the claims as they relate to
24  the safety, the design of the TVT

Page 31

1  product.
2      Q.   Did he provide you with
3  materials to review?
4      A.   Mr. Snell provided me with,
5  I believe, the original complaint and, of
6  course, my access to the internal
7  documents from the company and from the
8  plaintiffs' experts and the exhibits.
9      Q.   Did he also provide you with
10  literature?
11      A.   Yes.
12      Q.   And so on your reliance list
13  that's attached to your report, does that
14  include the literature that Mr. Snell
15  provided you?
16      A.   To be completely honest with
17  you, there was very little on that list
18  that I was not already familiar with.
19      Q.   So you were familiar with
20  the majority of the articles on the list.
21  But the list was provided by
22  counsel; is that correct?
23      MR. SNELL:  Correct, yes.
24      THE WITNESS:  Yes.

Page 32

1      MR. SNELL:  I will say that
2  I -- I provided this list.
3      MS. THOMPSON:  Fair enough.
4  BY MS. THOMPSON:
5      Q.   And these were the articles
6  that Mr. Snell provided you with as well?
7      A.   Yes.
8      MR. SNELL:  I will make one
9  note for the record.  He sent
10  articles and things to me that I
11  told paralegals to put on this
12  list, okay?
13      MS. THOMPSON:  Fair enough.
14      MR. SNELL:  So I tried to
15  capture whatever he went out and
16  found, just so you would have it.
17  BY MS. THOMPSON:
18      Q.   So the list would include
19  articles that Mr. Snell provided you,
20  articles that you thought were relevant
21  that you sent back to him, and those were
22  just --
23      A.   Right.  And to be clear,
24  there was a large degree of duplication

Page 33

1  between things that I had already had in
2  my possession and things that were on his
3  list.
4      Q.   And I actually noticed that
5  there were some duplications on the list
6  itself, because of minor variations in
7  the citation or whatever.
8      And, I guess, that might
9  have been the case on some of those,
10  correct?
11      A.   Counselor, I'm sorry, I'm
12  not -- I'm not familiar with what,
13  specifically, you're referring to or what
14  you're --
15      Q.   Okay.  Are all the opinions
16  that you intend to provide at trial
17  contained in this report?
18      A.   Yes.  With the exception of
19  anything that I might discover, you know,
20  between now and then that might be of
21  relevance.
22      Q.   Okay.  And you mentioned
23  depositions that you reviewed.  And some
24  of those are listed on the reliance list,

9 (Pages 30 to 33)

Marc Toglia, M.D.

Page 34

1  if you look on the last page.
2       Are there any that come to
3  mind that you've reviewed in addition to
4  these?
5       A.   I'm not sure that I have
6  what you're referring to as a reliance
7  page.
8       Q.   Attached to your report.
9       A.   Oh, I'm sorry.
10       Yes, I would say the ones
11  that come to mind would be the
12  deposition -- the recent depositions of
13  the plaintiffs' experts, which would
14  include Dr. Blaivas, Dr. Rosenzweig and
15  Dr. Elliott.
16       Q.   So the depositions of Drs.
17  Blaivas, Rosenzweig and Elliott are in
18  addition to the reports listed here?
19       A.   Correct.
20       MR. SNELL:  I'll make a
21       note, for the record, that he may
22       have opinions regarding those
23       expert depositions.
24  BY MS. THOMPSON:

Page 35

1       Q.   Do you have any opinions
2  related to the expert depositions that
3  you reviewed that you can relate to me at
4  this time?
5       A.   I do.
6       Q.   Why don't you go ahead --
7  that are different from what you have in
8  your report?
9       A.   I don't know that I would
10  say different.  They would be, maybe,
11  perhaps, in addition.  That I might have
12  opinions in addition to what I may have
13  expressed in the report, if that makes
14  sense to you.
15       Q.   Sure.  Why don't you go
16  ahead and, to the best of your ability,
17  give me those additional opinions now?
18       A.   Where would you like me to
19  start?
20       Q.   Wherever you want to start.
21       MR. SNELL:  You can -- do
22       you want the depositions?
23       THE WITNESS:  Would it be
24       helpful for you, counselor, if,

Page 36

1       perhaps, I explain to you my
2       methodology, as far as what --
3       what I did in terms of formulating
4       the opinion and what I found, what
5       I -- what I was told was sort of
6       my charge, so to speak?
7  BY MS. THOMPSON:
8       Q.   Sure.
9       A.   I think that will just make
10  what I'm about to say more -- sort of
11  more relevant.
12       So it was my understanding
13  that I was to formulate an opinion
14  whether or not the design of the TVT was
15  reasonably safe for its intended use for
16  the treatment of stress incontinence in
17  women versus whether or not it was
18  defective in its design.
19       In formulating my opinion, I
20  looked at the high-quality studies.  By
21  that I mean those that we would consider
22  to be Level 1 evidence, things such as
23  randomized control trials, systematic
24  reviews, the prospective longitudinal

Page 37

1  registry trials.  All of these would
2  constitute what we would consider to be
3  Level 1 scientific evidence.
4       From there, I reviewed the
5  published position statements from the
6  relevant specialty societies.  And those
7  would be sort of the high-quality data
8  that I used to formulate my opinion.
9       There were additional pieces
10  of works, such as those exhibits -- I
11  don't always know the legal term for
12  these things -- that were provided by
13  your experts, by the plaintiffs' experts
14  that, of course, I would have looked at
15  and considered, because, obviously, they
16  were relevant in that regard.
17       I will tell you, just to be
18  clear, that, in general, things like
19  bench research, in vitro studies, case
20  series, we consider those to be Level
21  5 -- expert opinion, Level 5 studies.
22  And those, typically, are not very
23  relevant or scientifically meaningful,
24  especially when Level 1 evidence exists.

10 (Pages 34 to 37)

Marc Toglia, M.D.

Page 38

1     And so those things, because
2  of their severe limitations, you can
3  never derive clinical inference or
4  medical conclusions, because the evidence
5  is so weak.
6     So while I am familiar and
7  have reviewed those studies and
8  documentations, typically, they don't
9  factor into the formulation of an
10 opinion.
11    In that regard, I would say,
12 as a general statement, I was struck by
13 the fact that all three of the expert
14 reports that I reviewed, and I'm
15 specifically referring to those by Dr.
16 Rosenzweig, Blaivas and Elliott, that
17 they were significantly devoid of similar
18 high-quality Level 1 evidence studies and
19 seemed to spend the majority of their
20 time looking at far less clinically
21 relevant Level 5 studies, such as animal
22 studies, bench research, in vitro
23 studies, unpublished observations, as
24 well as personal experience and expert

Page 39

1  opinion.
2     So as a general statement,
3  my additional opinion is that, you know,
4  the majority of what I've read from these
5  individuals is not of very high
6  scientific quality.
7     And I think that they have,
8  if I can be completely honest,
9  misrepresented data from levels of
10 evidence that do not allow you to make
11 clinical inference or draw conclusions
12 specifically as it would relate to the
13 design and safety of the TVT device and
14 specifically to its intended use for the
15 treatment of female stress incontinence.
16    Q.   Let's go ahead and get to
17 the additional opinions that you have,
18 with that background.
19    A.   Yes.
20    Q.   What are those additional
21 opinions?
22    A.   I think I've given you
23 what -- what those opinions are.  I mean,
24 if you have specific questions, I'm more

Page 40

1  than happy to discuss those with you.
2     Q.   All right.  So it sounds
3  like the additional opinion that you're
4  giving are that the plaintiff experts'
5  reports are devoid of high-quality
6  studies?
7        MR. SNELL:  Objection.  He
8     told you a lot more than that.
9        THE WITNESS:  Yes.  I don't
10    think --
11 BY MS. THOMPSON:
12    Q.   I think that's --
13    A.    -- I can simplify it into a
14 single sentence.
15    Q.   Now, you'll agree with me
16 that a position statement is not a
17 scientific study, correct?
18    A.   A scientific -- I would not
19 agree with that statement.  And let me
20 clarify.
21       A position statement is a
22 summary statement typically based upon a
23 systematic review or independent analysis
24 of Level 1 data.

Page 41

1     Q.   But it's not a scientific
2  piece of literature?  It's not peer
3  reviewed, is it?
4        MR. SNELL:  Objection.
5     Asked and answered.
6        THE WITNESS:  I disagree.
7     They -- they are peer reviewed.
8     All position statements are
9     formulated and then reviewed prior
10    to publication.  In fact, the
11    majority of them, for example,
12    you'll see, are published in
13    peer-reviewed journals.  You
14    cannot be published in a
15    peer-reviewed journal unless you
16    are peer reviewed.
17 BY MS. THOMPSON:
18    Q.   Okay.  Well, let's just
19 consider the AUGS position statement on
20 midurethral slings.
21       You're familiar with that
22 document, correct?
23    A.   Yes.  I have that document
24 here in my possession.

Marc Toglia, M.D.

Page 42

1    Q.   Do you know why that was
2  prepared?
3    A.   Do I know why? Can you --
4  I'm not sure if I understand what
5  you're -- what you're meaning.
6    Q.   What was the purpose for the
7  preparation of that position statement by
8  AUGS?
9    A.   The AUGS position statement
10  was -- was created to, as I stated, to
11  provide a summary statement based upon
12  high-quality scientific evidence in light
13  of -- I'm sorry for putting this,
14  unfounded claims regarding the design
15  defects and similar type statements.
16    Q.   So if I told you that the
17  purpose, the reason that the AUGS
18  position statement was written was to use
19  in courtrooms, in litigation, would you
20  have any reason to doubt that?
21    A.   Yes.
22       MR. SNELL: Hold on. Let
23  me -- let me -- you have to give
24  me a chance to object.

Page 43

1       THE WITNESS: Sorry.
2       MR. SNELL: Objection.
3  Lacks foundation.
4  Go ahead.
5       THE WITNESS: That
6  absolutely was not the reason.
7  BY MS. THOMPSON:
8    Q.   And you're confident of
9  that?
10    A.   I am confident of that, yes.
11    Q.   Okay. And are you familiar
12  with the authors of that position
13  statement?
14    A.   Yes.
15    Q.   Are you familiar with the
16  authors' industry ties?
17    A.   I can't tell you that I know
18  in any great detail what their ties are.
19    Q.   If I told you that they all
20  have conflicts of interest regarding
21  their financial relationship with
22  industry, would you have any reason to
23  doubt that?
24    A.   Yes.

Page 44

1       MR. SNELL: Hold on. Let
2  me -- you have to give me -- these
3  are totally without -- objection.
4  Lacks foundation. Misstates
5  evidence.
6  Go ahead.
7       THE WITNESS: I would not
8  believe what you're saying. Or I
9  don't believe what you're saying.
10  BY MS. THOMPSON:
11    Q.   Is there anywhere in that
12  two-page position statement that mentions
13  complications or risks associated with
14  midurethral slings?
15    A.   May I refer to it?
16       MR. SNELL: Of course.
17       MS. THOMPSON: Sure.
18       MR. SNELL: You can always
19  get it out.
20       That goes for any document
21  she asks you about.
22       THE WITNESS: Of course, it
23  has to be the one that's all the
24  way at the back.

Page 45

1       MR. SNELL: Just so I'm
2  clear on the record, which one are
3  you talking about?
4       MS. THOMPSON: The AUGS
5  position statement on midurethral
6  slings.
7       MR. SNELL: There's a
8  couple.
9       THE WITNESS: There's one.
10  There's --
11       MS. THOMPSON: I'm only
12  familiar with one position
13  statement.
14       - - -
15       (Whereupon, a discussion off
16  the record occurred.)
17       - - -
18       THE WITNESS: Counselor,
19  thank you for waiting.
20       I have in front of me the
21  AUGS/SUFU position statement on
22  mesh midurethral slings. I would
23  ask that you repeat the question
24  to me, please.

12 (Pages 42 to 45)

Marc Toglia, M.D.

Page 46

1    BY MS. THOMPSON:
2        Q.   The question is, in this,
3    actually, three-page position statement,
4    is there any mention of complications or
5    risks associated with midurethral slings?
6        A.   I believe that the purpose
7    of the position statement was to
8    acknowledge the fact that the midurethral
9    sling was recognized as the worldwide
10   standard of care and that the procedure
11   was felt to be safe and effective.
12           I don't believe that this
13   was a document that was intended to
14   address the question that you're asking
15   me.
16       Q.   So the answer is no?
17           MR. SNELL:  Objection.
18       Misstates.
19           MS. THOMPSON:  Well, it's a
20       yes-or-no question.
21   BY MS. THOMPSON:
22       Q.   Is there any mention of
23   complications or risks in this three-page
24   document?

Page 47

1            MR. SNELL:  He just told you
2        it discussed the safety.
3            MS. THOMPSON:  He said --
4        okay.
5    BY MS. THOMPSON:
6        Q.   Let's -- show me where it
7    discusses the safety.
8        A.   Counselor, on Page 2, under
9    Number 4, The FDA has clearly stated that
10   polypropylene midurethral sling is safe
11   and effective in the treatment of stress
12   urinary incontinence.
13           In this document it is
14   explicitly stated, That the FDA -- and
15   I'll just paraphrase, The safety and
16   effectiveness of multi-incision slings is
17   well established in clinical trials.
18       Q.   It still doesn't -- it says
19   it's safe.
20           Does it discuss
21   complications?
22       A.   Counselor, the question that
23   you asked me is whether or not it was
24   safe.  I answered the question.

Page 48

1        Q.   I said -- there's a
2    discussion of safety.  That, to me, is
3    not a discussion of safety.
4            MR. SNELL:  Objection.  That
5        is not a question.  Move to strike
6        the attorney comment.
7    BY MS. THOMPSON:
8        Q.   Are there any complications
9    of midurethral slings discussed in this
10   position paper?
11       A.   Again, that was not the
12   purpose of the paper.  So I am not
13   surprised that there would not be a
14   specific discussion of that in that
15   particular paper.
16           But, again, that was one of
17   a series of papers that AUGS published on
18   that.
19       Q.   So your position is that the
20   purpose of this position statement by
21   AUGS and SUFU was to report on the
22   clinical studies related to midurethral
23   slings, but it was not necessary to
24   comment on any complications or risks

Page 49

1    associated; is that your testimony?
2            MR. SNELL:  Objection.
3            THE WITNESS:  That's
4        not what I --
5            MR. SNELL:  Hold on.
6        Objection.  Misstates testimony.
7            MS. THOMPSON:  I'm asking if
8        that's his testimony.  If it's
9        not, he can tell me it's not.
10           THE WITNESS:  It is not my
11       testimony, counselor.
12           Again, to be clear, a
13       position statement is exactly
14       that, it's a statement on a
15       position.  And the position taken
16       here was specifically and simply,
17       midurethral slings are recognized
18       as the worldwide standard of care
19       for the treatment of stress
20       urinary incontinence.
21           The statement is that the
22       procedure is safe, effective and
23       has improved the quality of life
24       for millions of women.

13 (Pages 46 to 49)

Marc Toglia, M.D.

Page 50

1  BY MS. THOMPSON:
2      Q.   So, then, a position
3  statement is an opinion, correct?
4      A.   A position statement is an
5  opinion.
6      Q.   And I don't think we ever
7  answered my question if there were any
8  complications discussed, but I'd like for
9  you to answer that yes or no.
10      Were -- are any
11  complications discussed in the position
12  statement?
13      MR. SNELL:  Objection.
14  Asked and answered.
15      MS. THOMPSON:  He has not
16  answered it.
17      THE WITNESS:  That wasn't
18  the purpose of the -- of the
19  position statement.
20  BY MS. THOMPSON:
21      Q.   I didn't ask about the
22  purpose.
23      I asked you, are
24  complications or risks discussed in this

Page 51

1  position statement?
2      A.   They are not discussed in
3  the position statement.
4      Q.   Thank you.
5      Let's go back to the
6  Schedule A on the notice of deposition.
7  I want to ask you just about a handful of
8  items to see if you brought them or had
9  them in your possession.
10      Number 13, do you -- did you
11  bring any Ethicon products in your
12  possession?
13      A.   I have no Ethicon products
14  in my possession.
15      Q.   The documents or
16  communications relating to presentations
17  or lectures given to you concerning
18  pelvic mesh, pelvic organ prolapse or
19  stress urinary incontinence, did you
20  bring those items with you?
21      A.   I'm sorry, I'm not -- I'm
22  not --
23      Q.   Number 16.  Sorry.
24      A.   Okay.  I'm sorry.  The

Page 52

1  reason I was confused, you didn't -- you
2  didn't say that I used.
3      You want -- are you -- are
4  you asking about any presentation that is
5  about pelvic mesh or are you specifically
6  saying presentations that I contributed
7  or I presented?
8      Q.   Given or contributed to by
9  you.
10      A.   And the question was, I'm
11  sorry, did I bring?
12      Q.   Did you bring any of those
13  documents relating to presentations or
14  lectures given or contributed to by you?
15      A.   I don't -- I don't -- I
16  don't recall that I have those in my -- I
17  don't have an independent recollection of
18  those being in my possession.
19      Q.   Do you have PowerPoints
20  relating to stress incontinence or mesh
21  products?
22      A.   In general or with me?
23      Q.   In general first.
24      A.   Yes.  I have PowerPoint -- I

Page 53

1  have given PowerPoint presentations in
2  the past.  I do not have any with me.
3      Q.   Could you get those for us
4  and provide those to Mr. Snell?
5      A.   I don't -- I don't know that
6  I have all presentations that I've ever
7  given.
8      Q.   Could you provide to Mr.
9  Snell everything that you have relating
10  to these three areas?
11      A.   I'm sorry, can you -- let me
12  just -- I just want to make sure that I'm
13  clear as far as what three areas.
14      Q.   Pelvic mesh, pelvic organ
15  prolapse and stress urinary incontinence.
16      A.   Counselor, I'm sorry, can
17  you tell me why pelvic mesh is relevant
18  to an analysis of the -- of the TVT
19  design?  Because that's a completely
20  different disease state.
21      Q.   I'm not talking about the
22  disease state.  And I ask the questions.
23  But I'm happy to answer that.
24      A.   Yes.

14 (Pages 50 to 53)

Marc Toglia, M.D.

Page 54

1    Q.   The TVT uses the same
2  material that's used in other pelvic mesh
3  products, correct?
4        MR. SNELL:  Objection.
5        Overbroad.
6        THE WITNESS:  That was not
7        part of my analysis.  My analysis
8        was on the TVT design and safety.
9  BY MS. THOMPSON:
10   Q.   But I'm asking the
11  questions.  And I'm asking you the
12  question.
13       Does the TVT use the same
14  material that's used in other pelvic mesh
15  devices?
16   A.   The base --
17       MR. SNELL:  Same objection.
18       THE WITNESS:  The base
19       material, they're both based upon
20       macroporous polypropylene mesh.
21       I'm not sure I would -- and
22       there's a wide variety of
23       fabrication and materials used.
24       I don't want you to think

Page 55

1        that I think that, say, the mesh
2        that we use for pelvic organ
3        prolapse is simply the exact TVT
4        material expanded to a larger
5        size.
6  BY MS. THOMPSON:
7    Q.   Well, let me ask you this:
8  What is the TVT material?
9    A.   The Gynecare TVTTM is a Amid
10  Type I macroporous polypropylene mesh
11  that is of a knitted design.
12   Q.   Is it lightweight or
13  heavyweight?
14   A.   In my opinion, it is a
15  lightweight mesh.
16       Although I would say this,
17  weight of mesh is dependent upon the
18  volume or surface area.  And I don't
19  really think that anybody -- excuse me, I
20  don't think that I could classify it
21  based on weight, given the fact that it's
22  a 1.1 centimeter strip of material.
23       So the short answer is that
24  it's lightweight.  I am -- I am

Page 56

1  clarifying that to say that, you know,
2  weight is a descriptor that's really
3  based upon surface area or volume.  And
4  there's such a small volume of material
5  that we're talking about that I don't
6  know that anybody would specifically
7  state that that material was of a
8  specific weight.
9    Q.   So it's your opinion that
10  you can't determine whether the mesh used
11  in the Gynecare TVTTM is heavyweight or
12  lightweight?
13       MR. SNELL:  Objection.
14       Misstates.
15       THE WITNESS:  That's not
16       what I said.
17  BY MS. THOMPSON:
18   Q.   Then -- so someone can do it
19  but you can't, is that the answer?
20       MR. SNELL:  Same objection.
21       THE WITNESS:  I didn't say
22       that either.
23  BY MS. THOMPSON:
24   Q.   Okay.  My question, then,

Page 57

1  is, is the mesh used in the Gynecare
2  TVTTM lightweight or heavyweight; choose
3  one of the two, or can't be determined?
4    A.   The TVT -- the TVT device, I
5  would consider to be a lightweight
6  macroporous polypropylene mesh, with the
7  understanding that mesh weight,
8  technically, you have to consider the
9  volume of the material.
10   Q.   Did Ethicon show you any
11  documents that described the TVT mesh as
12  not being macroporous and lightweight?
13   A.   The documentation that I am
14  familiar with would support the -- what I
15  have said, TVT is a lightweight
16  macroporous mesh.
17   Q.   And what are the documents
18  that you're using to base that opinion
19  on?
20   A.   Everything that we are
21  referencing in the report, the materials
22  that we have included here today.
23   Q.   Can you be more specific
24  than that?

15  (Pages 54 to 57)

Marc Toglia, M.D.

Page 58

1    A.   It would take -- it would
2  take hours to go over all of those
3  things.
4    Q.   Have you seen any Ethicon
5  documents stating that the Gynecare TVTTM
6  is large pore lightweight?
7    A.   I -- the TVT is lightweight
8  and large pore.
9    Q.   And you're confident about
10  that position?
11    A.   Counselor, I'm extremely
12  confident in that statement.
13    Q.   I want to talk a little bit
14  about your use of mesh products,
15  including Ethicon products.
16    I believe in your report you
17  stated that you began using the TVT in
18  1999; is that correct?
19    A.   Yes.
20    Q.   And were you trained by
21  Ethicon in the use of that device?
22    A.   I was.
23    Q.   Do you remember who you were
24  trained by?

Page 59

1    A.   I do.
2    Q.   Who is that?
3    A.   Dr. Vince Lucente, one of my
4  colleagues.
5    Q.   And that training took place
6  in early 1999; is that correct?
7    A.   I would be guessing, but I
8  believe it might have been in May of
9  1999.  But I honestly can't tell you
10  when -- when within the year it was.
11    Q.   And was that training done
12  formally through Ethicon or did Dr.
13  Lucente provide a more informal
14  preceptorship to you?
15    MR. SNELL:  Objection.
16  Vague.
17    THE WITNESS:  Dr. Lucente
18  and I are close colleagues.  It is
19  not unusual for us to communicate
20  and get together and work
21  together.
22    So, to be honest, it's --
23  Ethicon did not come to me and
24  say, we want you to go work with

Page 60

1  Dr. Lucente.  Dr. Lucente and I
2  were having a conversation about
3  things that he was working on.  I
4  asked if I could come up and
5  become involved.
6    I'm sure that there may or
7  may not have been a relationship,
8  at that time, between Ethicon and
9  Dr. Lucente regarding my training.
10  I certainly was not aware of that
11  directly.  This is something that
12  Dr. Lucente and I, and other
13  colleagues, would do for each
14  other routinely.
15  BY MS. THOMPSON:
16    Q.   Sure.  So you didn't attend
17  an Ethicon sponsored training session; is
18  that what you're saying?
19    MR. SNELL:  Objection to
20  form.
21    THE WITNESS:  To the best of
22  my recollection, there may or may
23  not have been a presentation
24  given.  My independent

Page 61

1  recollection is that he and I
2  performed maybe four or five cases
3  together.
4    But I honestly can't -- I
5  can't tell you whether there was a
6  formal or informal -- to be honest
7  with you, given our relationships,
8  those lines are blurred.
9  BY MS. THOMPSON:
10    Q.   Sure.  And I understand.
11    A.   Yes.
12    Q.   I'm just trying to find out
13  whether you were given the Ethicon oral
14  presentation, for example, on the new
15  device --
16    MR. SNELL:  Objection.
17  BY MS. THOMPSON:
18    Q.   -- by an Ethicon
19  representative.
20    MR. SNELL:  Objection.
21  Vague.
22    THE WITNESS:  Not to my
23  knowledge.
24  BY MS. THOMPSON:

16 (Pages 58 to 61)

Marc Toglia, M.D.

Page 62

1    Q.   And did you participate in
2  cadaver labs sponsored by Ethicon?
3    A.   Note, in the next ten years,
4  I did a tremendous amount, or a variety
5  of different things.  I'm just not clear
6  if we're referring to that one incidence
7  or -- I mean, this was not a one-time
8  experience.
9    Q.   Understood.  I'm referring
10 now to your training and I think we'll
11 get, later, the training that you gave
12 other doctors.
13   A.   Right.
14   Q.   But it sounds like, to me,
15 and correct me if I'm wrong, you at least
16 don't recall attending a formal training
17 program sponsored by Ethicon --
18   A.   No, no.
19       MR. SNELL:  Objection.
20 Overbroad.
21 BY MS. THOMPSON:
22   Q.   -- prior to using the TVT.
23       MR. SNELL:  Same objection.
24       THE WITNESS:  Maybe I

Page 63

1  didn't -- maybe I wasn't clear.
2       I thought we were talking
3  about what my first exposure was.
4  But, of course, I had formal
5  training from Ethicon prior to me
6  independently performing the
7  procedure in my practice.
8       What I don't recall, and I'm
9  really don't mean to be vague, is
10 whether I did that training first
11 and then worked with Dr. Lucente,
12 whether they may have -- may have
13 simultaneously occurred, or
14 whether I first looked at the
15 procedure with Dr. Lucente and
16 then had the formal training.
17      I do know that prior to
18 doing the training with Dr.
19 Lucente, I did consult with the
20 company prior to the procedure's
21 launch and received education at
22 that level.
23 BY MS. THOMPSON:
24   Q.   Okay.  Fair enough.  So

Page 64

1  sounds like you had both, formal training
2  from the company --
3    A.   Yes.
4    Q.   -- and a preceptorship or
5  whatever you want to call --
6    A.   I wouldn't call it a
7  preceptorship, but I had -- I mean,
8  surgeons learn procedures from other
9  surgeons.
10   Q.   Sure.
11   A.   Right.
12   Q.   And do you still use the
13 Retropubic TVT device in your practice?
14   A.   Yes, I do.
15   Q.   Do you use other retropubic
16 sling products?
17   A.   I do not.
18   Q.   So exclusive to TVT is what
19 you're using now for a retropubic am
20 synthetic sling?
21   A.   I have experience with a
22 wide variety of devices.  But if you were
23 to come to me as a patient and we had
24 determined that an anti-incontinence

Page 65

1  procedure was appropriate, then the
2  retropubic TVT is, 95 percent of the
3  times, the retropubic procedure or
4  midurethral-sling-based procedure that I
5  would use.
6    Q.   Are you doing, currently,
7  any transobturator slings?
8    A.   I do do transobturator
9  slings.
10   Q.   What percentage of your
11 practice, currently, is retropubic and
12 what percentage transobturator?
13   A.   It's probably 95 percent
14 retropubic and about 5 percent at the
15 present time.  It has varied over time.
16   Q.   And over the years, how many
17 TVT or TVT Exact® products have you used?
18   A.   By my best estimates, I
19 would say 2,500 TVT procedures, give me a
20 wide margin of error of probably 300 in
21 either direction, perhaps.
22   Q.   How do you keep track of
23 which products you use?
24   A.   I have a very good memory.

17 (Pages 62 to 65)

Marc Toglia, M.D.

Page 66

1      Q.   So if I wanted to ask you
2  exactly how many of a given product you
3  have used, could you tell me?
4      A.   I could give you an
5  approximate ballpark.
6      Q.   And how would you do that?
7      A.   Through a variety of
8  methods.  But, as I said, I've got a
9  pretty good idea mentally.  If you ask me
10 how many TVT-Securs I did, I would tell
11 you 60.
12     Q.   And that would come from
13 your memory, correct?
14     A.   My memory.  I'd have to go
15 through some office records, some
16 documentation elsewhere.
17     Q.   So what office records would
18 you go through?
19     A.   We have billing data.  You
20 know, I am not telling you that these are
21 things that are readily available to me,
22 if you asked me, can I see this in the
23 next, you know, hour or day.
24         But, certainly, there are --

Page 67

1  there are internal things that we
2  could -- you know, databases that would
3  contain such records.
4      Q.   So you could go to your
5  billing records and tell me whether a TVT
6  or TVT Exact® was used?
7      A.   No, I don't think I could do
8  it through billing records, obviously.
9  Billing records wouldn't tell me that.
10     Q.   What other records would you
11 use?
12     A.   We would have to pull the
13 charts on every patient.  And every --
14 very procedure that's done carries an
15 implant record.  And so someone would sit
16 there with approximately 2,500 charts and
17 go through the implant records.
18         And by looking at the lot
19 number or model number, we would be able
20 to tell -- I mean, obviously, the Exacts®
21 would all be labeled as such and the TVTs
22 and the Obturator would be labeled as
23 such.
24     Q.   And is that what we would

Page 68

1  have to do to determine which -- what
2  complications experienced as well?
3      A.   No.
4      Q.   How would we be able to
5  determine what complications patients
6  have experienced?
7          MR. SNELL:  Objection.
8  Overbroad.  Are you talking about
9  his patients?
10         MS. THOMPSON:  Yes.
11         THE WITNESS:  I'm sorry,
12 what was your question?  I'm not
13 sure I understood it.
14 BY MS. THOMPSON:
15     Q.   How would we determine --
16     A.   You seem -- you seemed to
17 have switched gears.
18     Q.   Well, I was just interested
19 in determining how you figured out what
20 product was used.  And I'm also
21 interested in how you figure out what
22 complications patients experienced.
23         And I'm asking you, how
24 would we determine that?

Page 69

1      A.   I'm sorry, that's not what
2  you asked me originally.  That's a
3  whole -- I would have to start from
4  scratch to --
5      Q.   Okay.
6      A.   You've asked me how -- you
7  asked me what products have I used and
8  what percentage of products that I've
9  used and how it would be that I would
10 determine that number of products.
11     Q.   Yes.
12         Now I'm asking you, how
13 would you determine which complications
14 occurred with various products?
15     A.   I would have to sit down and
16 try and figure that out, counselor.  I
17 can't tell you off the top of my head
18 that I have an accurate way of -- I mean,
19 there may be ways, through the billing
20 system, to capture certain complications
21 based upon -- by diagnosis codes.
22     Q.   Let's go through other
23 Ethicon products.
24         Did you use the TVT-O at

18  (Pages 66 to 69)

Marc Toglia, M.D.

Page 70

1  some point?
2      A.   I did.
3      Q.   About how many TVT-Os did
4  you place?
5      A.   Approximately 2 to 300.
6      Q.   And when did you start using
7  the TVT-O?
8      A.   To the best of my knowledge,
9  I can't remember when -- the product
10 launch was in 2005 or 2002?  Whenever the
11 product was launched, roughly about when
12 I had used the TVT-O.
13     Q.   And how did you learn about
14 the TVT-O?
15     A.   By that point in time, I
16 was -- you know, we -- we attend certain
17 scientific meetings, publications, the
18 usual things that we do in the course of
19 our -- of our practice, my role reviewing
20 manuscripts for publications, my role as
21 an editor of journals.
22         I mean, there's a wide range
23 of ways that topics like this were
24 introduced to us.

Page 71

1      Q.   Did you get information from
2  sales reps?
3      A.   On the TVT-O?  Eventually.
4  I can't tell you that that was maybe
5  my -- if that was my first exposure or
6  not.  To be completely frank, at my level
7  of involvement with the company, sales
8  reps are not a -- that's not a source
9  that I would utilize a high degree.  I
10 usually find out -- I'm educated on stuff
11 before a sales rep is probably aware of
12 it.
13         And, of course, I don't --
14 I'm not at liberty to discuss that with
15 sales reps.
16     Q.   What -- what are you not at
17 liberty to discuss with sales reps?
18     A.   Well, for example, if I'm
19 involved in the -- if I've been consulted
20 upon the design of a new product, you
21 know, sales reps are not well versed or
22 maybe not aware of what things are in
23 development.
24         I'm just saying that most of

Page 72

1  the times, I'm a bit further along in
2  that regard, and my -- you know, my -- I
3  don't rely upon that relationship for
4  that kind of information.
5      Q.   What Ethicon products were
6  you involved in the design, as you've
7  been referring to?
8      A.   Well, I was -- as I
9  mentioned earlier, I was consulted on the
10 original TVT Retropubic.  I offered
11 opinions on the Obturator product at some
12 point in time, the TVT-Secur.  I had
13 significant involvement in the design of
14 the TVT EXACT® product.
15     Q.   And would these have all
16 been prior to the devices going to
17 market?
18     A.   A combination.  Not
19 necessarily the same for each product.
20     Q.   But at least for the
21 original TVT, you were consulted before
22 the product was marketed, I believe you
23 said; is that correct?
24     A.   I recall being a part of

Page 73

1  expert focus groups that discussed the
2  concept that would look at towards am
3  what was the utility, the market need,
4  the viability.
5          Because I'm an educator,
6  it's likely that I was asked questions
7  regarding amor -- about that.
8      Q.   So at least for the sling
9  products, you were involved in the design
10 of the original TVT, the TVT-O, TVT-Secur
11 and TVT EXACT®; is that correct?
12     A.   I don't -- I don't know that
13 I would say design in those.  I was
14 involved in the design for the TVT
15 EXACT®.
16         The TVT product was already
17 set to be launched, so, clearly, it had
18 already been designed.  I'm just saying
19 that I had input and my opinion was
20 sought out prior to the product being
21 launched.
22     Q.   For which of those products
23 were you actually paid by Ethicon to give
24 your opinions as to the devices?

19 (Pages 70 to 73)

Marc Toglia, M.D.

Page 74

1       A.    To the best of my knowledge,
2    I provided paid consultant services on
3    all those products.
4       Q.    And what about Ethicon's
5    prolapse products, were you involved in
6    the design of any of those?
7       A.    I mean, I had involvement in
8    many products, some of which never saw
9    the light of day, as well as the TVT
10   Prolift family of products.
11      Q.    So the PROLIFT® Anterior?
12      A.    Correct.
13      Q.    PROLIFT® Posterior?
14      A.    Correct.
15      Q.    PROLIFT® Total?
16      A.    Yes.
17      Q.    Do you remember the names of
18   any of the other devices that you
19   consulted on?
20      A.    I could probably dredge that
21   from my memory, yes.
22      Q.    All right.  I'll take it.
23      A.    I believe there was a
24   product called the V-Tac product.  I

Page 75

1    believe there was a product called
2    PROSIMA™ product.  Obviously, the
3    PROLIFT® +M was simply a modification of
4    the original PROLIFT® procedure.
5          There was a product that I
6    was the originator of the concept, the
7    proof of concept, the initial engineering
8    that had to do with a post anal sling for
9    treatment of a different pelvic floor
10   disorder known as anal incontinence.
11      Q.    Did that product ever have a
12   name?
13      A.    You know, it had a name in
14   development.  The product never came to
15   market.
16      Q.    What was the name in
17   development?
18      A.    In development, we would
19   refer to that product as the Post-Anal
20   Sling Surgery or PAS.
21      Q.    And to the best of your
22   recollection, were you a paid consultant
23   for your involvement in each of those
24   products as well?

Page 76

1       A.    To the best of my knowledge,
2    yes.
3       Q.    Are you the type of doctor
4    that likes to see data before using a
5    product?
6          MR. SNELL:  Objection.
7    Vague.
8          THE WITNESS:  I would
9    characterize myself as somebody
10   who puts a great deal of
11   importance on sound scientific
12   principles.  Certainly, when
13   high-quality data is available, it
14   is given the weight that it
15   deserves.
16          At different -- you know,
17   the area of urogynecology has
18   evolved tremendously in the past
19   20 years.  I was very fortunate to
20   be within this field at very
21   early -- at a very early phase.
22   So there are certainly procedures,
23   techniques, theories that I was
24   involved with very early on, and,

Page 77

1    obviously, data comes a little bit
2    later.
3    BY MS. THOMPSON:
4       Q.    And you actually were part
5    of a study comparing the retropubic TVT
6    to TVT-Secur; is that correct?
7       A.    That is correct.
8       Q.    Before beginning that study,
9    did you have any data on the TVT-Secur?
10      A.    Yes.
11      Q.    What was that data?
12      A.    So there was the -- as is
13   typical, there are always safety and
14   efficacy studies that are put before --
15   I'm sorry, let me rephrase that.
16          There was preliminary
17   published data, I believe, from the UK or
18   Europe about the initial design and
19   development for the TVT-Secur.  And that
20   would have been some of the data that we
21   were considering.
22          The reason for doing the
23   trial, of course, is that we already had
24   a procedure that was widely practiced and

20 (Pages 74 to 77)

Marc Toglia, M.D.

Page 78

1    widely accepted that had a tremendous
2    amount of data supporting its long-term
3    safety and effectiveness.
4           And with a new product
5    available, we want to specifically
6    compare apples to apples.
7        Q.   So it's your position that
8    there was published literature on the
9    safety and efficacy of the TVT-Secur
10   before it was launched in the U.S.?
11       A.   I don't believe that's what
12   I said.
13       Q.   Okay.  Was there safety and
14   efficacy -- published safety and efficacy
15   studies on the TVT-Secur before it was
16   launched in the U.S.?
17       A.   I don't have independent
18   recollection, as I sit here now, as far
19   as the timing of one versus the other.
20       Q.   So you don't know, one way
21   or the other, whether there were any
22   published data on the TVT-Secur --
23       A.   I'm not saying --
24       Q.   -- before it was launched?

Page 79

1        A.   I'm not saying that I don't
2    know.  I'm just saying that as I sit here
3    in conversing with you now, I cannot, in
4    my mind, say, okay, the TVT-Secur was
5    launched on this particular date and the
6    safety -- excuse me, a clinical trial was
7    published before or after.
8        Q.   What did you tell the
9    patients that enrolled in that study
10   about the safety and effectiveness of the
11   TVT-Secur?
12       A.   Well, I mean, the patients
13   underwent standardized and uniform
14   informed consent that was the same across
15   the entire -- the entire study.  This
16   consent was, of course, approved -- at
17   our -- at our institution it was approved
18   by our own internal -- our IRB.
19           As far as the exact language
20   of that, I can't tell you.  But, you
21   know, essentially, we would explain to a
22   patient that there was an established
23   procedure that was widely practiced and
24   was an accepted first-line therapy for

Page 80

1    stress incontinence and that there was a
2    newer procedure that was FDA approved and
3    that it was our interest in comparing the
4    two products, looking at safety,
5    effectiveness, differences in recovery,
6    everything from activity, the amount of
7    pain medication someone was to take,
8    because we wanted to be able to
9    independently compare the two procedures
10   side by side in a scientific manner that
11   would attempt to minimize bias.
12       Q.   Did you tell patients that
13   the TVT-Secur had never been used in a
14   woman, prior to launching?
15           MR. SNELL:  Objection.
16   Foundation.
17           THE WITNESS:  I don't
18   recall.  I don't recall that I --
19   that I said that, no.
20   BY MS. THOMPSON:
21       Q.   Was the TVT-Secur FDA
22   approved?
23       A.   Yes.  To the best of my
24   knowledge, the TVT-Secur was FDA

Page 81

1    approved.
2        Q.   I want to go back to your
3    relationship with the Ethicon sales reps.
4           Do you recall who the sales
5    rep was that called on you here in
6    Philadelphia when you first began using
7    the TVT?
8        A.   There were several.  I don't
9    know who came first.
10       Q.   Do you remember any of the
11   sales reps that have called on you here
12   in Philadelphia for Ethicon?
13       A.   Yes.
14       Q.   Which ones?
15       A.   There was a woman, Eileen
16   Ghenn.  There was --
17       Q.   I'm sorry, how do you
18   spell Ghenn?
19       A.   Ghenn?  G-H-E-N-N, and
20   that's a guess.
21           I believe there was a
22   Marty -- I can't remember his last name.
23   There was another gentleman whose first
24   name was Tom.  There was a woman by the

21 (Pages 78 to 81)

Marc Toglia, M.D.

Page 82

1  name of Kathleen Feeney.  There was, more
2  recently, a gentleman whose name escapes
3  me.
4         There were -- there were
5  half a dozen or more.  I'm sorry.
6      Q.   And of the ones that you
7  remember their names, can you tell me,
8  for example, Ms. Ghenn, when did she call
9  on you for Ethicon?
10     A.   I honestly couldn't tell you
11  the dates.
12     Q.   Is she still an Ethicon
13  sales rep and still calling on you?
14     A.   No.
15     Q.   And how about Marty, do you
16  recall the time frame she called on
17  you as an Ethicon sales rep?
18     A.   He was in -- he would have
19  been in the beginning.  I can't tell you
20  that he was 1999, 2000, 2001.  My
21  recollection was within the first three
22  or four years, I seemed to have a
23  different rep every year.
24         There's another woman by the

Page 83

1  name of Kathy, I believe.
2         I'm sorry.
3      Q.   That's okay.
4         And Tom, do you remember
5  when Tom was a sales rep?
6      A.   Counselor, I'm sorry, let
7  me -- I can't give you specifics on any
8  of these people.
9      Q.   And that's fine.  It's fine
10  to say --
11     A.   Right.  I don't recall.
12     Q.   -- I don't recall, no, or I
13  don't remember.
14         And how about Ms. Feeney, do
15  you remember when she was a sales rep?
16     A.   To the best of my
17  recollection, Ms. Feeney was my rep for
18  the longest period of time.  Time frame
19  wise, it would -- I would be guessing.  I
20  would say 2005 to 2009, for example.  It
21  might have been a period of two to four
22  years.  I honestly don't know.
23     Q.   How about currently, is
24  there a sales rep that you're familiar

Page 84

1  with?
2      A.   No, there is not.
3      Q.   And Ms. Feeney is no longer
4  working for Ethicon; is that correct?
5      A.   That's correct.
6      Q.   And Kathy, do you remember
7  when Kathy --
8      A.   No.
9      Q.   -- was a sales rep?
10         Generally, did you have a
11  good relationship with the sales --
12  Ethicon sales reps, including the ones
13  that you mentioned?
14     A.   Some better than others.
15     Q.   Which ones were they better
16  with?
17     A.   Again, these are transient
18  people in my life.  I mean, Kathleen
19  Feeney and I had a reasonable
20  relationship.  Eileen Ghenn and I, not so
21  much, that I recall.
22         I mean, there's really
23  nothing of any great meaning to these
24  relationships either way.

Page 85

1      Q.   Did you have loyalty to the
2  sales reps?
3      A.   No, not at all.
4         MR. SNELL:  If you're going
5  to move to a different topic, can
6  we take a break?
7         MS. THOMPSON:  Yeah, this is
8  a good time for a break.
9         MR. SNELL:  We've been going
10  about an hour and-a-half.
11         MS. THOMPSON:  Yes.
12         VIDEO TECHNICIAN:  We are
13  off the record.  The time is 2:41
14  p.m.
15            - - -
16         (Whereupon, a brief recess
17  was taken.)
18            - - -
19         VIDEO TECHNICIAN:  This
20  marks the beginning of Video
21  Number 2.  We are back on the
22  record.  The time is 3:00 p.m.
23  BY MS. THOMPSON:
24     Q.   Dr. Toglia, I do have a few

22 (Pages 82 to 85)

Marc Toglia, M.D.

Page 86

1   more questions about sales reps.
2       A.   Yes.
3       Q.   How did you typically
4   contact the sales rep?
5       A.   I would say most frequently
6   they came to my office, and we would have
7   a face-to-face discussion.  I'm sure that
8   we had e-mail contact.  There was
9   probably cell phone contact with some,
10  when cell phones were, you know, in
11  existence and sort of widely used to for
12  that reason.
13      Q.   Did you ever use sales reps'
14  personal e-mails?
15      A.   I used whatever e-mails they
16  gave me.  So, yes, I'm -- it's -- if
17  they -- maybe if they e-mailed me from
18  their personal e-mail, my reply would
19  simply be back to them.  I can't tell you
20  that I would distinguish between the two.
21      Q.   And what about personal cell
22  phone numbers?
23      A.   I honestly can't tell you
24  whether they had company cell phones,

Page 87

1   personal cell phones.  I gave -- again,
2   whatever contact information might have
3   been presented to me on a business card,
4   I would -- I would assume -- I mean, I
5   was assuming I was calling a business
6   cell.
7       Q.   Did you consider your
8   relationship with the sales rep
9   professional?
10      A.   Yes.
11      Q.   Was the relationship always
12  appropriate with the sales reps, in your
13  opinion?
14      A.   Yes.
15              - - -
16          (Whereupon, Exhibit
17          Toglia-4, 3/19/09 E-mail from
18          Marc Toglia to Kathleen Feeney;
19          Subject: Re: These events were
20          approved 3.25 proctorship and 4.21
21          preceptorship, was marked for
22          identification.)
23              - - -
24  BY MS. THOMPSON:

Page 88

1       Q.   I'm going to hand you
2   Exhibit Number 4.  I'll give you a minute
3   to look at that.
4       A.   Okay.
5           MR. SNELL:  What number are
6   we on?
7           MS. THOMPSON:  4.
8   BY MS. THOMPSON:
9       Q.   Can you describe this e-mail
10  chain with Kathleen Feeney, one of the
11  sales reps that you told us about
12  earlier?
13      A.   Uh-huh.  I don't -- I can't
14  tell you that I have -- it seems to me
15  like there is a variety of different
16  things being discussed over here.
17      Q.   What were the dates of these
18  e-mails?
19      A.   2009.
20      Q.   March of 2009?
21      A.   Yes.
22      Q.   Beginning at the bottom of
23  the first page?
24      A.   Yes.

Page 89

1       Q.   Could you just read what is
2   contained in these e-mails between you
3   and Ms. Feeney?
4       A.   I'm -- she says, I am so --
5   and then she uses a word that I'm just
6   not going to mention out loud -- He's
7   nowhere from being done and wants no
8   help.
9           I think she's referring to
10  another surgeon that she was probably in
11  a case with.  I mean, there's just no
12  context here.  I'm sorry.
13      Q.   Well, this e-mail is from
14  you.
15      A.   I'm sorry?
16      Q.   This e-mail is from you on
17  Thursday, March 19th, 10:46.
18      A.   Okay.
19          I don't know -- I don't know
20  what -- I mean, it sounds like I was -- I
21  was scrubbed in with somebody else.  I
22  honestly couldn't tell you what this --
23  what the context of that was.
24      Q.   So would you read that

23 (Pages 86 to 89)

Marc Toglia, M.D.

Page 90

1  again, knowing that that's you writing
2  the e-mail.
3      A.   Yes.  So, apparently, this
4  says, I am so f'ed, he's nowhere being
5  done and wants no help.  You and I will
6  be having a lunch before my case.
7      Q.   So you're comfortable
8  putting that word in an e-mail to the
9  sales rep, although you're not
10  comfortable stating the word here in this
11  deposition; is that correct?
12      A.   That is correct.
13          MR. SNELL:  Objection.
14      Argumentative.
15          Go ahead.
16  BY MS. THOMPSON:
17      Q.   Okay.  Go ahead and read the
18  next e-mail up.
19      A.   Call me.  Pulling up now.
20  Do you want to meet me outside in front?
21      Q.   That's from Ms. Feeney to
22  you?
23      A.   Yes.
24      Q.   And then the next one?

Page 91

1      A.   Still have not started.
2      Q.   And then the one after that,
3  from Ms. Feeney?
4      A.   Can you do her downstairs?
5      Q.   And then the last one from
6  you to Ms. Feeney?
7      A.   On top?
8      Q.   Yes.
9      A.   The first one?
10      Q.   Yes.
11      A.   No, maybe, though.  Your
12  girlfriend Christine is here and won't
13  leave.  I think she liked her last
14  suggestion too much.
15      Q.   I don't think you read the
16  first sentence correctly.
17          MR. SNELL:  I'm going to
18  object.  He did read it.
19          MS. THOMPSON:  Could you --
20  no.  He read, no, maybe, though,
21  your girlfriend Christine.
22          And it actually reads, the
23  response to, Can you do her
24  downstairs, is, No, maybe you,

Page 92

1  though.
2  BY MS. THOMPSON:
3      Q.   Am I reading that correctly?
4      A.   I don't think so.  I dont
5  know -- no.  I don't -- I don't
6  appreciate what you're implying.  And I
7  can tell you for sure that this has
8  nothing to do with -- with that.
9      Q.   Well, tell -- give me
10  another explanation for why it would be
11  No, maybe, you, though, in response to,
12  Can you do her downstairs?
13      A.   Well --
14          MR. SNELL:  Objection.
15      Argumentative.
16          THE WITNESS:  -- "do her"
17      has nothing to do -- has nothing
18      to do with sex, I can guarantee
19      you that, on any level.
20  BY MS. THOMPSON:
21      Q.   All right.  Provide me the
22  alternative explanation.
23      A.   I don't have the context of
24  what this is.

Page 93

1      Q.   Well, these are your e-mails
2  with Ms. Feeney.
3          What context do you need?
4      A.   I don't know what she's -- I
5  don't know what -- I mean, obviously,
6  there was a -- there's a conversation
7  going on that is not captured in the bulk
8  of this -- of this discussion.
9          I mean, there's hours and
10  hours that go -- they may not even be
11  related.  I mean, there's hours that are
12  between the two.
13      Q.   Was there other
14  correspondence during that hours -- those
15  hours?
16      A.   I would have no idea.
17      Q.   And who is Christine?
18      A.   I think it's another -- I
19  think it's a sales rep for -- like, a
20  pharmaceutical sales rep or a different
21  sales rep.  I have no idea who it is.
22      Q.   Do you think these e-mails
23  with Ms. Feeney are appropriate?
24      A.   I can't tell you that I

24 (Pages 90 to 93)

Marc Toglia, M.D.

Page 94

1  recall -- I don't know the context.  And
2  I don't know that these are related.  And
3  I don't think that they're strung in the
4  manner that you're insinuating.
5      Q.   Do you think these e-mails
6  are professional?
7      A.   I don't think, in this line
8  of conversation, we were discussing
9  anything related to her -- to anything
10  that -- I don't know.  I don't know what
11  these were referring to, to be honest
12  with you.
13      Q.   Did you have any personal
14  phone calls with Ms. Feeney?
15      A.   Yes.  I mean, I'm sure that
16  I spoke with Ms. Feeney on a variety of
17  things.  She may have told me things
18  about her kids, she may have had ideas
19  about job opportunities that she was
20  interviewing for.  I'm sure she asked me
21  about friends, in terms of their health
22  or, you know, she had a sick grandmother
23  or something.
24          I mean, you know, people

Page 95

1  will -- as a physician, people will ask
2  you, you know, personal questions.  And,
3  certainly, as a gynecologist, I suspect
4  that I'm probably asked more personal
5  questions, you know.
6      Q.   Why did you misread that
7  sentence when I asked you to read it?
8      A.   Counselor, I did not misread
9  that.
10          MR. SNELL:  Objection.  Hold
11  on.  Hold on.  That's
12  argumentative.
13          MS. THOMPSON:  I'm just
14  curious --
15          MR. SNELL:  That's
16  argumentative.
17          MS. THOMPSON:  -- about a
18  question.
19          MR. SNELL:  That's
20  argumentative.
21          THE WITNESS:  To the best --
22          MR. SNELL:  And your -- he's
23  already told your insinuation is
24  not whole --

Page 96

1          THE WITNESS:  Right.  And I
2  don't appreciate it either.
3          MR. SNELL:  If you're here
4  to ask him about his opinions, why
5  don't you do that?  Unless you're
6  trying to, like, just be totally
7  argumentative --
8          MS. THOMPSON:  And I
9  didn't --
10          MR. SNELL:  -- that's what
11  you're doing.
12          MS. THOMPSON:  -- insinuate
13  anything --
14          MR. SNELL:  Yes, you did.
15          MS. THOMPSON:  -- or even
16  mention sex.  He did.
17          MR. SNELL:  Yes, you did.
18          MS. THOMPSON:  Did I
19  anything about sex?  I wanted him
20  to read the sentence, and he left
21  out -- it's the only thing he's
22  misread today.  I was just curious
23  if he knew why he did that.
24          MR. SNELL:  To the best of

Page 97

1  my knowledge, I read that sentence
2  exactly.
3  BY MS. THOMPSON:
4      Q.   Well, you know that you did
5  not read it exactly, right?
6          MR. SNELL:  Objection.
7  BY MS. THOMPSON:
8      Q.   Because we read it back to
9  you from the transcript.
10          MR. SNELL:  Argumentative.
11          THE WITNESS:  Counselor, let
12  me state this clearly.  I read
13  that sentence exactly.  Maybe you
14  did not hear me read that exactly.
15          MS. THOMPSON:  Okay.  I can
16  pursue that.
17          Court reporter, could you
18  please read back Dr. Toglia's
19  answer when I asked the question
20  to read the e-mail from himself to
21  Ms. Feeney at the top of the page?
22          MR. SNELL:  I'm going to
23  object.  This is all asked and
24  answered and covered.  I'm sorry.

25 (Pages 94 to 97)

Marc Toglia, M.D.

Page 98

1       MS. THOMPSON:  Are you going
2   to instruct him not to answer?  He
3   said he --
4       MR. SNELL:  I'm not
5   instructing him not to answer.
6   He's told you three times.
7       MS. THOMPSON:  Then he can
8   answer my question that I just
9   asked.
10      Amanda, if you could go
11  ahead and read the question and
12  answer, please.
13      - - -
14      (Whereupon, the court
15  reporter read the following part
16  of the record:
17      "Question:  And then the
18  last one from you to Ms. Feeney?
19      "Answer:  On top?
20      "Question:  Yes.
21      "Answer:  The first one?
22      "Question:  Yes.
23      "Answer:  No, maybe, though.
24  Your girlfriend Christine is here

Page 99

1   and won't leave.  I think she
2   liked your last suggestion too
3   much.")
4       - - -
5   BY MS. THOMPSON:
6       Q.   Is it still your position
7   that you read that sentence -- that
8   e-mail correctly?
9       A.   To the best of my knowledge,
10  I think I answered that.
11      Q.   Okay.
12      A.   Again, I would point out
13  that there is -- one of these -- the
14  initial one is 13:24 and the one above it
15  is 19:19.
16      Q.   Okay.  You answered my
17  question.
18      - - -
19      (Whereupon, Exhibit
20  Toglia-5, 10/23/08 E-mail from
21  Kathleen Toglia to Cindy
22  Pypcznski; Subject: FDA Toglia,
23  was marked for identification.)
24      - - -

Page 100

1   BY MS. THOMPSON:
2       Q.   I'm going to hand you
3   another e-mail, also with Ms. Feeney.
4       Can you identify this
5   e-mail?
6       A.   This appears to be an e-mail
7   from Kathleen Feeney to Cindy Pypcznski.
8       Q.   Would you go ahead and read
9   that, please?
10      A.   Cin, notice the totally
11  different tone.  Also note the timing of
12  this e-mail after I had it out with him
13  on the phone.  Not regarding this, of
14  course, as you saw.  Again, please don't
15  share this with anyone, as he is a great
16  guy, friend and surgeon.
17      Q.   Who is she referring to when
18  she states that she had it out with him
19  on the phone?
20      A.   I don't know.
21      Q.   But it follows an e-mail
22  that you sent to her, correct?
23      A.   I don't know if there was
24  anything in between.  Again, the

Page 101

1   difference in times is dramatic.
2       Q.   My question is just this
3   was --
4       A.   It's a different date, as a
5   matter of fact.
6       Q.   This was provided to us as
7   an e-mail chain.
8       So it does follow an e-mail
9   that you sent to Ms. Feeney, correct?
10      A.   I don't know.
11      Q.   Would you please read --
12  what's the subject of the e-mail from Ms.
13  Feeney to Cindy?
14      A.   It says, FDA, Toglia.
15      Q.   Now, if you would look at
16  the e-mail from you to Ms. Feeney, and
17  the subject is, Stuff.
18      A.   Correct.
19      Q.   And it discusses the FDA,
20  correct?
21      A.   Yes.
22      Q.   And this e-mail was provided
23  as an e-mail chain.
24      Would it be a reasonable

26  (Pages 98 to 101)

Marc Toglia, M.D.

Page 102

1  assumption to make that it was referring
2  to your e-mail below?
3        MR. SNELL: Objection.
4  Calls for speculation. Lacks
5  foundation. Calls for a
6  state-of-mind opinion.
7        MS. THOMPSON: Are you
8  suggesting that Ethicon produced
9  two unrelated e-mails on the
10  same --
11        MR. SNELL: No. You're
12  asking him to speculate about what
13  Kathleen Feeney did, sending
14  something to somebody else with a
15  different subject line, a whole
16  different day later, and you're
17  asking him to speculate that one
18  is connected to the other; when
19  he's already testified, asked and
20  answered, that he can't make that
21  connection.
22        MS. THOMPSON: Okay.
23  BY MS. THOMPSON:
24        Q.  So you sent an e-mail to Ms.

Page 103

1  Feeney that was --
2        MS. THOMPSON: And please
3  object to form only.
4  BY MS. THOMPSON:
5        Q.  You sent an e-mail to Ms.
6  Feeney that was -- that concerned the
7  FDA, and Ethicon has produced an e-mail
8  that is in the same e-mail chain that's
9  from Ms. Feeney to Cindy, that's
10  entitled -- it's titled, FDA Toglia.
11        And she says, Also note the
12  timing of this e-mail after I had it out
13  with him on the phone. Not regarding
14  this, of course, as you saw. Again,
15  please don't share with anyone, as he is
16  a great guy friend and surgeon.
17        Why don't you go ahead and
18  read the e-mail that you sent to Ms.
19  Feeney?
20        MR. SNELL: I'm going to
21  object. And move to strike what
22  she just did. There's not even a
23  question there.
24        THE WITNESS: To the best of

Page 104

1  my knowledge, this has absolutely
2  nothing to do with TVT or --
3  BY MS. THOMPSON:
4        Q.  I just asked you to read --
5  read --
6        A.  -- or the design of TVT.
7        Q.  Excuse me. Dr. Toglia, I
8  just asked you --
9        A.  Yes.
10        Q.  -- to read your e-mail from
11  you to Ms. Feeney.
12        MR. SNELL: You can read it.
13        THE WITNESS: Thanks for the
14  referral. Sorry you have had such
15  a tough week. You know I always
16  have your back. The FDA warning
17  is a big bummer, but I don't think
18  it will affect you much. We will
19  make some mild changes in how we
20  counsel folks. It would be good
21  if we could figure out how much of
22  this is apogee versus other stuff.
23  Could use it as a spin versus -- I
24  don't know what -- gurt, or as an

Page 105

1  excuse to do a few informal
2  dinners with key clients to help
3  diffuse. I do think there is some
4  room -- some -- there are some
5  folks who are at higher risk for
6  pain that it is best to avoid,
7  hence the small drop off in our
8  numbers. Hopefully, your company
9  will lower your projections. I
10  think I may blow off Chicago and
11  just relax.
12  BY MS. THOMPSON:
13        Q.  What was the FDA warning
14  that you were referring to in this
15  e-mail?
16        A.  Well, it's dated 2008, so I
17  am -- I am guessing, and it would be a
18  pure guess that it was an FDA warning --
19  the first FDA safety letter that spoke
20  about vaginal mesh kits.
21        Q.  And in this e-mail, you felt
22  that some mild changes in how you
23  counseled folks would be the way to
24  address that FDA warning?

27 (Pages 102 to 105)

Marc Toglia, M.D.

Page 106

1    A.   No.  Because we were already
2 addressing the FDA warning, the mild
3 change was the fact that we would include
4 the words, "the FDA has issued."
5        But we had always been, with
6 these kits, very up front with our
7 patients and would say, this is a newer
8 procedure, it represents only one --
9 basically, everything that the FDA stated
10 in there, we were independently doing
11 prior to the FDA's recommendations.
12        The minor change would have
13 been that we would now say that there was
14 an FDA and we were provided that
15 reference.
16    Q.   Okay.  And then you mention
17 that there are some folks at higher risk
18 for pain that's best to avoid.
19        Did Ethicon ever tell you
20 that there were patients who would be
21 high risk for pain that you should avoid
22 the use of mesh kits?
23    A.   I would not rely upon
24 Ethicon to tell me that kind of stuff.

Page 107

1        We were -- as we sort of
2 developed through the procedure, we
3 both -- we both -- we both became more
4 aware of groups of patients in whom the
5 product was appropriate, groups of
6 patients in whom we thought the procedure
7 was not ideal.
8        And we -- you know, all
9 surgical procedures have elemental
10 risks --
11    Q.   Excuse me, if you can just
12 ask my -- answer my question, we'll move
13 along a lot faster.
14    A.   I'm sorry?
15    Q.   The question was, did
16 Ethicon tell you that there were patients
17 at high risk for pain that should not use
18 the kits?
19    A.   No.
20    Q.   Thanks.
21        Do you know when Ms. Feeney
22 left Ethicon?
23    A.   I don't know.  2009.  I'm
24 just guessing.  2011.  I don't know.

Page 108

1    Q.   Was she fired?
2    A.   I was never told the reason
3 why she stopped working for the company.
4    Q.   If I told you it was in
5 2009, would you have any reason to
6 disagree with that?
7        MR. SNELL:  Objection.
8 Foundation.
9        THE WITNESS:  No.
10 BY MS. THOMPSON:
11    Q.   I'll give you another e-mail
12 with Ms. Feeney.
13        - - -
14        (Whereupon, Exhibit
15 Toglia-6, 4/27/09 E-mail from
16 Marc Toglia to Kathleen Feeney;
17 Subject: RE: Itinerary for TVT
18 Proctorship, was marked for
19 identification.)
20        - - -
21        MR. SNELL:  Is this 6?
22        MS. THOMPSON:  I believe so.
23        THE WITNESS:  Yes.
24 BY MS. THOMPSON:

Page 109

1    Q.   Would you just read the top
2 e-mail that's from you to Ms. Feeney in
3 April of 2009?
4    A.   I found the name for 5/28.
5 It is Finkelstein.  Sorry for this.  I
6 know it seems unimportant.  I guess I'm
7 just trying to keep myself distracted.
8 Good luck.  Regardless of what happens,
9 you know that I think you're the best and
10 have no questions regarding your moral
11 integrity.  Please call me afterwards.
12    Q.   Can you tell us about the
13 context of this e-mail?
14    A.   I honestly have no idea what
15 any of this refers to.
16    Q.   So you sent Ms. Feeney an
17 e-mail about not having questions about
18 her moral integrity, but you can't
19 remember what that could have referred
20 to?
21    A.   It's dated in 2009.  She may
22 have left the company, was leaving the
23 company, was concerned she was leaving
24 the company.  I was just offering some --

28 (Pages 106 to 109)

Marc Toglia, M.D.

Page 110

1   some support.
2       Q.   But you don't remember
3   anything --
4       A.   I mean --
5       Q.   -- more than that?
6       A.   She could have -- she could
7   have questioned herself or said -- you
8   know, this may not have even been work
9   related.  She could have been having
10  problems at home, and I was just trying
11  to -- to reassure her.
12           I honestly don't.  I
13  honestly don't.  I don't know who
14  Finkelstein is.  I don't know what the
15  name applies to.  I don't know what any
16  of this is in the context of, I'm sorry.
17           MS. THOMPSON:  We'll request
18      any e-mails between you and Ms.
19      Feeney on her personal e-mail.
20  BY MS. THOMPSON:
21      Q.   And if Ms. Feeney gives an
22  explanation for this e-mail, would you
23  have any reason to -- or basis to
24  disagree with her interpretation?

Page 111

1           MR. SNELL:  Objection.  Hold
2       on.  Calls for speculation.  Lacks
3       foundation.
4           MS. THOMPSON:  Form is fine.
5           MR. SNELL:  No, but I'm
6       articulating the form, that's what
7       it is.  There's no problem with
8       that.
9           MS. THOMPSON:  I don't
10      believe -- I don't think that's
11      the case.
12          Yes.
13  BY MS. THOMPSON:
14      Q.   Would you have any reason to
15  disagree?
16      A.   I -- I might.  I don't -- I
17  honestly don't know what -- what we were
18  referring to here.  These are -- these
19  are random snippets, you know.  There's
20  no context.
21      Q.   Well, if -- if you don't
22  recall, then you would not be able --
23  have any basis to disagree with her
24  recollection, then?

Page 112

1           MR. SNELL:  Objection.
2       Calls for speculation.
3           THE WITNESS:  It's possible
4       that her recollection may give me
5       further information.  I don't
6       know.
7   BY MS. THOMPSON:
8       Q.   When you began using the TVT
9   in 1999, what did you provide patients,
10  when you were getting informed consent
11  for the use of the product, regarding
12  risks?
13      A.   So we were very -- I was
14  very clear with my patients, at the time,
15  what the traditional therapies, surgeries
16  were, what the elemental risks were, the
17  fact that -- that in the previous ten
18  years there was a paradigm shift in the
19  understanding of what caused stress
20  incontinence, how stress incontinence
21  might be treated differently --
22      Q.   Dr. Toglia, I'm sorry to
23  interrupt, but I'm just asking you what
24  you told patients about the risks

Page 113

1   associated with TVT?
2       A.   I'm telling you.
3           MR. SNELL:  Objection.  He's
4       being responsive.
5           THE WITNESS:  I'm telling
6       you what that -- what that answer
7       is.
8   BY MS. THOMPSON:
9       Q.   If that's responsive, okay.
10      A.   Okay.  So in that context,
11  we would have gone over the current --
12  the current available choices, we would
13  talk, of course, first, about what was
14  established and what was commonplace and,
15  certainly, what my experience had been.
16          We would talk about the
17  newer procedure, the preliminary
18  experience, the theoretical benefits that
19  might come from the newer procedure.
20          And I would have been very
21  specific with them, as far as what my
22  specific experience was, i.e., this is
23  the third one I've done, this is the
24  fifth one I've done.

29 (Pages 110 to 113)

Marc Toglia, M.D.

Page 114

1    And also within that
2  context, we would have said, thus far in
3  this experience, we would have seen the
4  following outcomes.
5    Q.   What risks did you tell the
6  patient were associated with the TVT --
7    A.   Sure.  I'm sorry.
8    Q.   -- device when you counseled
9  her?
10    A.   Sure.  It's the same
11  elemental risks.  We would have talked
12  about the risks of voiding dysfunction,
13  the risk of possible injury to the
14  vagina, to the bladder, to blood vessels
15  or nerves.  The theoretical risk as it
16  relates to infection.  Any risk that
17  might be unique to the placement of -- of
18  mesh material.
19    It's the same -- it's the
20  same discussion that we had with all of
21  the procedures that we do.
22    Q.   What were the risks that you
23  would have told your patient that are
24  unique to the mesh material?

Page 115

1    A.   In all honesty, and I'm not
2  trying to be difficult, I can't tell you
3  that the risks are unique.  They all
4  carry a risk of bladder injury.  They all
5  carry a risk of urethral injury.
6    Autologous fascial slings
7  can erode, can have wound disruptions,
8  which is a similar risk that, say, a
9  midurethral sling could have.
10    Q.   So is it your opinion that
11  there are no risks that are unique to the
12  mesh material contained in the TVT
13  device?
14    A.   I mean, obviously, exposure
15  of synthetic mesh material, you know, as
16  opposed to exposure of permanent suture
17  material with the Burch, per se, as
18  opposed to, say, exposure of the fascial
19  slings.
20    Q.   So the exposure is the same
21  in all three procedures, it's just the
22  material that's being exposed is the only
23  difference that you can identify?
24    A.   Say that again, please.

Page 116

1    Q.   Is it only the difference in
2  the material that is exposed in the
3  vagina, not the actual fact that TVT can
4  become exposed in the vagina?
5    A.   Well, I think -- I think,
6  you know, again, it's -- what we always
7  do is we will compare one procedure to
8  the next procedure.
9    So, for example, you know, a
10  Burch procedure is done with a
11  laparotomy, okay?  There are certain
12  risks that are more common with a
13  laparotomy, wound infection, wound
14  breakdown, bleeding.
15    There may be other risks
16  that are a little less common with that
17  Burch procedure.
18    At the time I would say,
19  probably bladder injury was a risk that
20  we -- in our experience, was maybe a
21  little less common, although I think
22  Level 1 evidence really suggests that all
23  the risks are within in the same
24  ballpark.

Page 117

1    Q.   Do you get exposure of
2  permanent suture in the vagina with a
3  Burch procedure?
4    A.   Yes.  It's actually one of
5  the more common things that we see.
6    Q.   Do you get bladder erosion
7  with a Burch procedure?
8    A.   Yes.  It's one of the more
9  common things that we see.
10    Q.   How common are bladder
11  erosions with a Burch?
12    A.   Can I refer to one of the
13  systematic review studies?
14    Q.   Sure.
15    A.   So I was hoping to find a
16  more specific -- specific number to give
17  you, but I would say, in general, it's
18  probably in the 3 to 4 percent range that
19  we would see a PROLENE® suture erode into
20  the bladder.
21    Q.   Are PROLENE® sutures used
22  commonly for Burch procedures?
23    A.   Permanent sutures are used
24  commonly --

30 (Pages 114 to 117)

Marc Toglia, M.D.

Page 118

1    Q.   My question is --
2    A.   -- for Burch procedures.
3    Q.   -- are PROLENE® suture used
4  commonly for Burch procedures?
5    A.   PROLENE® sutures is -- is a
6  common choice of a suture for it, yes.
7    Q.   Is that what you use if
8  you're doing a Burch procedure?
9    A.   We would either use PROLENE®
10 or we would use ETHIBOND.  We probably
11 use them equally.
12   Q.   And while you're at it, why
13 don't you look for the incidence of
14 vaginal exposure of suture with a Burch
15 procedure?
16   A.   To answer that question, I
17 think I have to refer to my expert
18 report.
19   Q.   While you're doing that, how
20 about urethral exposure --
21   A.   Counselor, I'm sorry --
22   Q.   -- with a Burch procedure.
23   A.   -- being your typical male,
24 I don't multitask very well.  However, I

Page 119

1  guarantee you --
2    Q.   All right.  I will wait.
3    A.   -- I can do two serial tasks
4  very, very, quickly.
5    Q.   Okay.  I'm just trying to
6  get you out of here earlier.
7    A.   Counselor, I am -- I am at
8  your disposal.  I'm here as long as you
9  would like me to be here.
10   Q.   All right.  That's great to
11 hear.
12       MR. SNELL:  She gets seven
13 hours on the record.
14       THE WITNESS:  You've got six
15 hours, 15 minutes left.
16       Can you read me back the
17 question again, please?
18       - - -
19       (Whereupon, the court
20 reporter read the following part
21 of the record:
22       "Question:  And while you're
23 at it, why don't you look for the
24 incidence of vaginal exposure of

Page 120

1  suture with a Burch procedure?")
2        - - -
3        THE WITNESS:  I recall that
4  there was one trial where, I
5  believe, approximately 5
6  percent -- I might have to find
7  the Novara study.
8        MS. THOMPSON:  Let's just go
9  off the record, Greg, if you don't
10 mind, while he looks for the
11 studies.
12       VIDEO TECHNICIAN:  We are
13 off the record.  The time is 3:32
14 p.m.
15       - - -
16       (Whereupon, a discussion off
17 the record occurred.)
18       - - -
19       VIDEO TECHNICIAN:  We are
20 back on the video record.  The
21 time is 3:41 p.m.
22       THE WITNESS:  Thank you.  I
23 apologize it's taking me so long.
24       So the first study that I

Page 121

1  want to reference with regard to
2  the question of the suture erosion
3  to the bladder is going to be the
4  Cochrane review.  This would be
5  the Lapitan and Cody study, 2012
6  Cochrane review.
7        Data from -- and they're
8  referencing the Albo trial.
9        Data from this trial showed
10 a fivefold higher risk of having
11 sutures pass through the bladder
12 with open colposuspension compared
13 to doing a pubovaginal sling
14 procedure; perforation rate, 3
15 percent.
16       And if you'd like to go off
17 the record again, I'm happy to
18 find the second paper.
19 BY MS. THOMPSON:
20   Q.   That's talking about
21 intraoperative risk, correct, not
22 erosion?
23       Dr. Toglia --
24   A.   Yes?  I'm sorry.

31 (Pages 118 to 121)

Marc Toglia, M.D.

Page 122

1      Q.   -- the passage you just read
2  to me is talking about an intraoperative
3  risk of passing suture through the
4  bladder, correct?
5      A.   Sutures passed through the
6  bladder during open colposuspension.
7      Q.   That's not referring to
8  erosion into the bladder, is it?
9      A.   No, it's not.  I'm sorry.
10      So it wasn't suture -- it
11  wasn't suture exposure in the
12  bladder, was that -- was that not
13  the question?
14      Q.   The question was bladder
15  erosion of suture with a Burch
16  colposuspension.
17      So you'll agree that the
18  sentence you just read doesn't have
19  anything to do with bladder erosion?
20      A.   Counselor, I will agree that
21  the sentence I just read you talked about
22  the passage of suture into the bladder.
23      I'm sorry if I --
24      Q.   And that's not erosion,

Page 123

1  correct?
2      A.   I'm sorry if I misunderstood
3  your question.
4      MS. THOMPSON:  I guess we'll
5  go off the record again.
6      THE WITNESS:  Thank you.
7      VIDEO TECHNICIAN:  We are
8  off the record.  The time is 3:44
9  p.m.
10          - - -
11      (Whereupon, a discussion off
12  the record occurred.)
13          - - -
14      VIDEO TECHNICIAN:  We are
15  back on the record.
16      THE WITNESS:  Thank you.  So
17  with regard to the question of the
18  rate of suture erosion into the
19  bladder, it's my general
20  recollection that there's about a
21  3 to 5 percent risk of suture
22  erosion with the traditional Burch
23  procedure when performed with
24  PROLENE® sutures.

Page 124

1  BY MS. THOMPSON:
2      Q.   And what about the risk of
3  suture erosion into the vagina with a
4  Burch?
5      A.   I would say it's probably in
6  the -- in the same ballpark.
7      Q.   And what about suture
8  erosion into the urethra with a Burch?
9      A.   That should really not
10  occur, because the Burch suspension is
11  not placed at the level of the urethra.
12      Q.   And it's your testimony --
13  but, at least as you're sitting here
14  today, you can't give me a reference for
15  those numbers?
16      A.   Yes.
17      Q.   Yes, you cannot?
18      A.   Yes, I cannot give you a
19  reference for those numbers.  Yes.
20      Q.   Thank you.
21      And is your testimony, then,
22  that there's really no complications that
23  are unique to the -- to a synthetic
24  midurethral sling?

Page 125

1      MR. SNELL:  Objection.
2  Asked and answered.
3      THE WITNESS:  Each procedure
4  has risks.  The majority of those
5  risks, I would say are elemental,
6  are common to the group.  However,
7  each procedures do have risks that
8  are more common, perhaps, and
9  possibly could be unique.
10      For example, with the
11  poly-tetrafluoride sling, there
12  was -- or the Ob Tape sling --
13  BY MS. THOMPSON:
14      Q.   Let me clarify my question
15  and just limit it to synthetic
16  polypropylene slings.
17      A.   Okay.  Thank you.
18      So with -- with reference to
19  the TVT Type I polypropylene sling -- I'm
20  sorry, but I can't think of a risk that's
21  unique to that -- to that compared to the
22  other procedures that we do.
23      Q.   And you'll agree with me
24  that, in terms of significance, the

32 (Pages 122 to 125)

Marc Toglia, M.D.

Page 126

1  severity of a complication is important,
2  correct?
3      A.   I'm not sure that I
4  understand your question.
5      Q.   When you're considering
6  risks associated with a procedure, the
7  severity of that complication is
8  important to you as a physician, correct?
9      A.   Can you tell me what you
10  mean by "severity"?
11     Q.   Well, there are minor
12  complications and there are severe
13  complications, right?
14     A.   But one person's minor
15  complication is a severe complication,
16  and vice versa.
17          Could you be --
18     Q.   Well, there are actually
19  some definitions of the severity of
20  complications.
21          But you'll agree with me
22  that -- are you just really telling me --
23     A.   No, counselor --
24     Q.   -- that you don't understand

Page 127

1  what I mean by the severity of a
2  complication is important?
3      A.   I'm just not sure of the
4  context.
5          So, first of all, I will
6  agree with you that there are less severe
7  complications and there are more severe
8  complications with each of these
9  anti-incontinence procedures.
10     Q.   That was all I'm asking.
11     A.   I'm sorry.
12     Q.   And I wasn't even specific
13  to --
14     A.   Okay.
15     Q.   -- to a device.
16          I was just saying, there are
17  minor complications and severe
18  complications, right?
19     A.   Yes.
20     Q.   And that makes a difference
21  whether you're talking about a rate of
22  minor complications or you're rating --
23  talking about a rate of severe
24  complications?

Page 128

1      A.   I'm sorry.  I understand you
2  now.
3      Q.   Okay.
4      A.   Yes.
5      Q.   All right.
6      A.   So, for example, urinary
7  tract infection is oftentimes cited as a
8  complication.  One can argue that a
9  urinary tract infection would be a less
10  severe type of a complication.
11     Q.   But a urinary tract
12  infection with sepsis and intensive care
13  could be a serious complication?
14     A.   That's a good point,
15  counselor.
16     Q.   Thank you.
17          MR. SNELL:  Can we take a
18  break whenever you get right a
19  stopping point?  Because I need to
20  use the restroom.
21          MS. THOMPSON:  Maybe five
22  minutes.
23          MR. SNELL:  That's fine.
24  BY MS. THOMPSON:

Page 129

1      Q.   Now, when we started this
2  line of questioning, it's been a while,
3  but I think we were talking about what
4  you told your patients in 1999 --
5      A.   Yes.
6      Q.   -- when you first started --
7      A.   I'm sorry, yes.
8      Q.   -- using the TVT.
9          I have a little bit
10  different question and that is now, in
11  2015, when you are using a retropubic TVT
12  device, are there any additional risks or
13  complications that you discuss with your
14  patients, as opposed to what you did in
15  the early years of using the device?
16     A.   Well, now that I'm 17 years
17  into this experience and now that I've
18  done, let's say, well over 2,000 cases,
19  again, I like to talk to my patients
20  about things that might go wrong during
21  the procedure, things that possibly could
22  complicate their postoperative course,
23  things that might occur during the life
24  of that procedure.

33 (Pages 126 to 129)

Marc Toglia, M.D.

Page 130

1    So to speak backwards, what
2 we typically tell our patients these days
3 is that, you know, over the ten-year
4 period, subsequent to, say, having a
5 midurethral sling -- and when I say
6 "midurethral sling," I am referring
7 specifically to the TVT, since that's
8 what I perform, there's about a 3
9 and-a-half percent risk of having to
10 return to the OR for something; that
11 might include failure, that could include
12 difficulty voiding, et cetera.
13    Overall, the risk that we
14 talk to people about, in our hands, are
15 sort of the risk of bladder injuries,
16 about 1 percent; our mesh exposure rate
17 is under 1 percent; our risk of voiding
18 dysfunction is well under 1 percent; our
19 rate of infection has been zero percent
20 over -- over the 17-year experience; the
21 rates of urethral injury, well under 1
22 percent.
23    And I make it a point of
24 saying, look, just because something

Page 131

1 occurs very infrequently, doesn't
2 necessarily mean that when it does occur
3 it's not a significant complication.
4    Q.   Are synthetic sling
5 complications underreported in the
6 literature, in your opinion?
7    A.   Absolutely not.  Again, we
8 have -- we have more than 20 -- excuse
9 me, we have at least, you know, eight to
10 ten long-term registry studies that have
11 followed people for at least five years.
12 Some studies have gone out to ten years.
13 And these are high quality, high level of
14 evidence, of scientific papers.
15    And I would say, you know,
16 ballpark figure, long-term complications
17 are all sub 3 percent.
18    Q.   How many deaths are reported
19 in the literature from the TVT retropubic
20 device?
21    A.   And, again, I don't think
22 that you can derive incidence or
23 prevalence because, you know --
24    Q.   I'm not asking for incidence

Page 132

1 or prevalence.  I'm asking how many are
2 reported?
3    A.   I don't know.  I would -- I
4 would venture -- I don't know.
5    Q.   Are you aware of any --
6    A.   I --
7    Q.   -- reported?
8    A.   I'm aware of, I'm going to
9 say, five to seven deaths.
10    Q.   Reported in the literature,
11 is my question?
12    A.   Oh, reported in the
13 literature -- I don't know how many have
14 been reported in the literature.
15    Q.   Are you aware of any deaths
16 reported in the literature from the TVT
17 device?
18    A.   You know, when I --
19    Q.   The question is, are you
20 aware of any?
21    A.   I'm just trying to explain
22 to you, if I'm aware of five to seven I
23 wouldn't be --
24    Q.   I'm not asking you how many

Page 133

1 you think have occurred --
2    A.   Right.
3    Q.   -- I'm asking you how many
4 have been reported in the literature?
5    A.   In my reading of the
6 literature, I'm saying that I am aware of
7 about five to seven.  I'm just saying
8 that I cannot produce to you what -- in
9 what form or publication they would have
10 been.
11    Q.   And how many do you think
12 have actually occurred?
13    A.   I don't know, counselor.
14    Q.   So you think there are five
15 to seven deaths reported in the
16 literature from TVT?
17    A.   That's the best of my
18 recollection.  But I will tell you that
19 I'm not aware of any personally.
20    Q.   Do you tell your patients
21 that polypropylene degrades in the human
22 body?
23    A.   There is no high-quality
24 evidence that suggests that polypropylene

34 (Pages 130 to 133)

Marc Toglia, M.D.

Page 134

1   degrades in the body.
2       Q.   What does degradation mean
3   to you?
4       A.   Well, again, and I looked
5   this up.  It just -- it depends.  And the
6   definition varies.
7           Degradation is -- to me,
8   means a loss of structural integrity, a
9   loss of function.
10          You can certainly degrade
11  one's morality, that's a different
12  mention, that's obviously not applicable
13  within the setting of the mesh.
14      Q.   Okay.  And it's your opinion
15  that there's no high-quality study that
16  shows -- that mesh degrades?
17      A.   I'm quite certain that there
18  is no high-quality studies that would
19  suggest that the mesh degrades.  It is
20  certainly inconsistent with the body of
21  Level 1 evidence and the long-term
22  registration studies.
23      Q.   Is there high-quality
24  evidence, in your opinion, that states

Page 135

1   that mesh does not degrade?
2       A.   Well, I don't know how we
3   would know that, counselor, because we
4   don't routinely explant mesh that is
5   behaving properly in the body.
6       Q.   Does mesh that's not
7   behaving properly in the body degrade?
8       A.   Again, I'm not aware of any
9   high-quality data.  I can tell you
10  that -- the data is very, very clear and
11  very reassuring that there are no
12  clinical concerns that that phenomenon
13  exists.
14      Q.   That's not my question.  I'm
15  not talking clinically.
16      A.   Yes.
17      Q.   I'm talking about, and I
18  would --
19      A.   Degrading in the body is a
20  clinically-based question.
21      Q.   No.  I'm talking about
22  degradation, not clinical.
23      A.   Okay.
24      Q.   But you mentioned the

Page 136

1   structural composition of the
2   polypropylene.
3           MR. SNELL:  I'm going to
4       object.  That misstates.  He said
5       structural -- well, the record
6       will be clear what he said.  And I
7       think he was responsive with
8       regard to how he defines
9       degradation.
10  BY MS. THOMPSON:
11      Q.   Okay.  I'm going to -- I'm
12  going to define degradation in the
13  chemical sense, and that is a change in
14  the chemical structure of the compound.
15      A.   Okay.
16      Q.   Are there any studies in the
17  literature that tell you that that does
18  not happen with the TVT mesh when placed
19  in a woman's body?
20      A.   Can I ask you to restate
21  that without the double negative, please?
22      Q.   Well, you told me there are
23  no high-quality studies that state that
24  it degrades.  I don't know how to do that

Page 137

1   without the negative.
2           Are there any studies that
3   show you that it does not degrade?
4       A.   The study by Falconer, which
5   I believe was published in 2001, where
6   they did, in fact, go back and take site
7   specific biopsies showed no degradation
8   in the material.
9       Q.   Now, were they looking at
10  that from a chemical composition
11  standpoint?
12      A.   Again, if you would like to
13  give me a minute to locate that study.
14          MS. THOMPSON:  Okay.  We'll
15      go off the record.
16          VIDEO TECHNICIAN:  We are
17      off the record.  The time is 3:58
18      p.m.
19              - - -
20          (Whereupon, a discussion off
21      the record occurred.)
22              - - -
23          VIDEO TECHNICIAN:  We are
24      back on the video record.

35 (Pages 134 to 137)

Marc Toglia, M.D.

Page 138

1    THE WITNESS:  Read me the
2  question one more time, please?
3         - - -
4    (Whereupon, the court
5  reporter read the following part
6  of the record:
7    "Question:  Now, were they
8  looking at that from a chemical
9  composition standpoint?")
10        - - -
11    THE WITNESS:  So, no.  The
12  Falconer study was looking at it
13  from a histologic standpoint.  I'm
14  not aware of any concerns that
15  there might be degradation that
16  would prompt one to do those kinds
17  of studies.
18  BY MS. THOMPSON:
19    Q.   And that study also was
20  biopsying the tissue around the mesh
21  product, not the mesh itself, correct?
22    A.   You are correct, counselor.
23    Q.   So you're not aware of any
24  studies, then, that demonstrates that

Page 139

1  polypropylene mesh does -- or TVT mesh
2  does not degrade in the female body?
3    MR. SNELL:  Objection.
4  Asked and answered.
5    MS. THOMPSON:  Well, he said
6  he would look and he found
7  Falconer, which doesn't apply, so
8  I'm asking if he has any others.
9    MR. SNELL:  I'm going to
10  object.  That's also vague.  You
11  asked him specifically, in the
12  last question, about chemical
13  degradation.  And now you said
14  degradation.  He already said he
15  doesn't think degradation occurs,
16  and he's told you all the reasons
17  why.
18    MS. THOMPSON:  All right.
19  Fair enough.  I'll ask it -- I'll
20  ask again with chemical
21  degradation.
22  BY MS. THOMPSON:
23    Q.   Are you aware of any
24  studies, then, that demonstrate that

Page 140

1  chemical degradation does not occur with
2  polypropylene mesh implanted in the body?
3    A.   I think that the long-term
4  registry trials and the significant lack
5  of chronic problems suggests that there
6  is no chemical degradation of the
7  material.
8    I'm also -- I'm a little
9  bit -- what does it matter if the
10  material degrades if the person is still
11  continent?  You know, it's not that
12  are -- we're suspending somebody from a
13  bridge from this material and loss
14  of the material would compromise that
15  person's position.
16    The procedure is designed to
17  reestablish urethral stability, and it
18  does so effectively in studies that have
19  gone up to 17 years.
20    Q.   So is it your opinion that
21  degradation -- chemical degradation of
22  the material doesn't matter if the woman
23  is still continent?
24    A.   Well, and, again, I'm

Page 141

1  certainly not trying to be difficult, but
2  I'm not certain what you mean by
3  "chemical degradation," what
4  specifically, what we're looking at,
5  we're changing in, we're talking about
6  isomeric change in the compound?  We're
7  talking about racemic change in the
8  compound?  We're talking about
9  nephelation of the compound?  What --
10  what specifically is implied with the
11  term "chemical degradation"?
12    Q.   You're not a chemist, right?
13    A.   I have a degree in
14  biochemistry.  I have done chemical
15  research.
16    Q.   But you don't consider
17  yourself a chemist?
18    MR. SNELL:  Objection.
19    THE WITNESS:  I think I just
20  told you what my --
21  BY MS. THOMPSON:
22    Q.   So you are a chemist?
23    A.   What's that?  I --
24    Q.   You do consider yourself an

36 (Pages 138 to 141)

Marc Toglia, M.D.

Page 142

1    expert in chemistry?
2        A.    Those are different
3    questions.
4        Q.    Do you consider yourself an
5    expert in chemistry?
6        A.    I would consider myself an
7    expert in chemistry, yes.
8        Q.    And -- but you're not
9    familiar -- are you familiar with the
10   term "oxidation"?
11       A.    Of course.
12       Q.    Are you familiar with the
13   term "oxidative degradation"?
14       A.    Yes.
15       Q.    Let's just use oxidative
16   degradation, then, maybe we can --
17       A.    Fair enough.
18       Q.    -- get on the same page
19   here.
20       A.    Sure.
21       Q.    Are you aware of any studies
22   that show that oxidative degradation does
23   not occur with polypropylene mesh placed
24   in the body?

Page 143

1        A.    There are no high-quality
2    evidence studies that suggest that it
3    does occur.  Therefore, my inference
4    would be that it does not occur.
5        Q.    What does oxidative
6    degradation mean to you?
7        A.    Oxidative degradation is the
8    process in which oxygen comes in and will
9    alter the composition; so, you know,
10   you've got nitrous oxide it becomes
11   nitric oxide.
12       Q.    What happens when
13   polypropylene undergoes oxidative
14   degradation?
15            MR. SNELL:  Objection.  It
16       lacks foundation.  He's told you
17       he doesn't believe it does.
18   BY MS. THOMPSON:
19       Q.    So is it your opinion that
20   polypropylene does not undergo oxidative
21   degradation in vitro or in vivo?
22       A.    I'm speaking in vivo; I'm
23   not aware of any high-quality evidence
24   that would suggest that polypropylene

Page 144

1    mesh, within the context of the TVT
2    device and its intended use to treat
3    stress incontinence in women, which was
4    the subject that I was asked to research
5    and form an opinion, undergoes oxidative
6    degradation.
7        Q.    Are you a materials expert?
8        A.    I certainly am a materials
9    expert, yes.  At least --
10       Q.    Are you a polymer expert?
11       A.    I have a better than
12   average, and some would consider to be an
13   expert understanding, of polymer medicine
14   as it relates to my subspecialty field,
15   yes.
16       Q.    Is it your opinion -- well,
17   let me ask you this: What additives go
18   into the mesh that the TVT is comprised
19   of?
20       A.    Can you be more specific?
21       Q.    What additives are added to
22   the polypropylene resin that makes up the
23   TVT?
24       A.    I mean, there's an enormous

Page 145

1    amount --
2        Q.    If you don't know, it's
3    fine.  Just say you don't know.
4            What additives go into the
5    mesh -- to the resin that forms the TVT
6    mesh?
7        A.    I'm not sure I know what
8    you're referring to, in terms of adding
9    oxygen goes into it.
10       Q.    Is the polypropylene that's
11   used in the TVT mesh pure polypropylene?
12       A.    Well, no.  Polypropylene
13   itself is not a pure molecule.  I mean,
14   there are --
15       Q.    What is added to the
16   polypropylene or is nothing added or do
17   you not know?
18       A.    I can't tell you off the top
19   of my head all of the different compounds
20   that would go into the -- you know, the
21   creation and the extrusion of
22   polypropylene.
23       Q.    Did you ever ask anyone at
24   Ethicon what was in the polypropylene?

37 (Pages 142 to 145)

Marc Toglia, M.D.

Page 146

1    A.   I did not ask anybody at
2   Ethicon what was in polypropylene.
3        But that shouldn't imply
4   that I did not read about polypropylene
5   mesh or the base PROLENE® material.
6   These are materials that we have used
7   extensively in the last 40 to 50 years in
8   the area of surgery.
9        Q.   Did Ethicon tell you that
10  its own studies on PROLENE® suture shows
11  that it degrades?
12       MR. SNELL:  Objection.
13  Misstates.  Lacks foundation.
14       THE WITNESS:  I would not
15  rely upon Ethicon to tell me such
16  things.
17       And, again, this is within
18  the context of the TVT design, I'm
19  not aware of -- you know, the
20  animal studies really are not
21  relevant.  We have Level 1
22  evidence to support the long-term
23  safety of these things --
24  BY MS. THOMPSON:

Page 147

1        Q.   I'm not talking about -- if
2   we can get away from the long-term
3   safety.  I'm not discussing the long-term
4   safety.  I'm discussing the material
5   itself.
6        A.   Yes.
7        Q.   If Ethicon has information
8   that the material degrades in the human
9   body, is that something that you, as a
10  doctor, would want to know about?
11       MR. SNELL:  Objection.
12  Lacks foundation.
13       Go ahead.
14       THE WITNESS:  I would not be
15  dependent upon Ethicon --
16  BY MS. THOMPSON:
17       Q.   I didn't ask you --
18       A.   -- for that information.
19       Q.   -- if you depended on it.
20       Is that something that you
21  would like to know, if Ethicon has
22  information that their product degrades,
23  is that something you would want to know,
24  as a physician?

Page 148

1        MR. SNELL:  Objection.
2   Lacks foundation.  Misstates
3   evidence.
4        THE WITNESS:  No, it is not.
5   BY MS. THOMPSON:
6        Q.   It's not something that you
7   would want to know?
8        A.   I would not want to know it
9   from Ethicon, no.
10       Q.   Who would you know it from?
11       A.   Would I know what from?
12       Q.   Who is going to tell you
13  that Ethicon mesh degrades if it's not
14  Ethicon?
15       MR. SNELL:  Objection.
16  Hypothetical.  Calls for
17  speculation.
18       MS. THOMPSON:  Well, he
19  brought it up.  He didn't want to
20  hear it from Ethicon.
21  BY MS. THOMPSON:
22       Q.   I'm asking you, who else
23  would you want to hear it from?
24       MR. SNELL:  You asked him

Page 149

1   the question.  He's already told
2   you he doesn't think it degrades.
3   I don't know -- I don't understand
4   what you're doing.
5   BY MS. THOMPSON:
6        Q.   I'm saying if Ethicon has
7   knowledge that it degrades, is that
8   something you want to know?
9        MR. SNELL:  He's already --
10  objection.  Asked and answered
11  three times.
12       MS. THOMPSON:  Okay.  I
13  thought maybe he would change his
14  opinion on that.
15  BY MS. THOMPSON:
16       Q.   Would patients want to know
17  if the material, the plastic that they're
18  putting in their bodies, degrades?
19       MR. SNELL:  Objection.
20  Calls for speculation.
21       THE WITNESS:  I think the
22  only thing the patients would want
23  to know is whether or not the
24  procedure worked long-term for

38 (Pages 146 to 149)

Marc Toglia, M.D.

Page 150

1  them.
2  BY MS. THOMPSON:
3      Q.   Okay.  So, to you, if the
4  procedure works, it doesn't really matter
5  whether that material degrades or not?
6      A.   Absolutely.
7      Q.   All right.
8      A.   It does not matter to me.
9      Q.   Thank you.
10         MS. THOMPSON:  We'll take a
11  break.
12         VIDEO TECHNICIAN:  We are
13  off the record.  The time is 4:11
14  p.m.
15            - - -
16     (Whereupon, a brief recess
17  was taken.)
18            - - -
19         VIDEO TECHNICIAN:  This
20  marks the beginning of Video
21  Number 3.  We are back on the
22  record.  The time is 4:38 p.m.
23  BY MS. THOMPSON:
24     Q.   Dr. Toglia, when we went on

Page 151

1  our break, I was asking you about what
2  you tell your patients now about
3  polypropylene mesh and the TVT device.
4         Do you remember that?
5      A.   Yes.
6      Q.   Do you tell your patients
7  that polypropylene mesh creates a chronic
8  foreign body reaction in the body?
9      A.   I don't tell them that,
10  because there is no evidence that it
11  causes a chronic foreign body -- counsel,
12  I'm sorry, it's staring right in front of
13  me here.  I did address your question
14  about oxidation --
15     Q.   I didn't ask you any other
16  questions, so Mr. Snell can ask you about
17  that later.
18     A.   Okay.  Thank you.
19     Q.   So it's your opinion that
20  polypropylene mesh does not create a
21  foreign body reaction in the body?
22     A.   My experience, in using
23  polypropylene over the last 17 years, I
24  have never seen an incidence -- an

Page 152

1  instance in which polypropylene mesh
2  caused a chronic foreign body reaction.
3         I feel that that is very
4  consistent with the long-term registries
5  trials --
6      Q.   Okay.
7      A.   -- that it focused on the
8  safety and looked specifically for that
9  kind of problem.
10     Q.   Do you -- if Ethicon had
11  information that the mesh used in the TVT
12  creates a chronic ongoing foreign body
13  reaction, is that information that you
14  would want to know?
15         MR. SNELL:  Objection.
16  Lacks foundation.
17         THE WITNESS:  As a general
18  rule of thumb, I am not dependent
19  upon Ethicon to provide me with
20  any such information.
21  BY MS. THOMPSON:
22     Q.   Is it information that your
23  patients would want to know?
24     A.   I honestly don't believe

Page 153

1  that they would care to know.
2      Q.   Do you tell your patients
3  that polypropylene mesh shrinks up to 30
4  percent?
5      A.   I believe -- well, the
6  discussion is that -- and, again, within
7  the context of the TVT sling, as it was
8  used for stress incontinence, I don't
9  believe that would -- that small amount
10  of lightweight macroporous material, that
11  clinically there is a relevant amount of
12  shrinkage.
13         In the context of other
14  discussions with other base procedures,
15  there is a discussion that has to do with
16  changes in the mesh, as you stated, but
17  not for TVT sling, no.
18     Q.   So the answer is, no, that
19  you don't tell your patients about
20  shrinkage of the TVT sling?
21         MR. SNELL:  Objection.
22  Misstates.
23         MS. THOMPSON:  Will you stop
24  the speaking objections?  Just say

39 (Pages 150 to 153)

Marc Toglia, M.D.

Page 154

1    object, and without --
2         MR. SNELL:  No.  No.  I'm
3    allowed to state the objection to
4    form.  That is a form objection.
5    Misstates.
6         MS. THOMPSON:  Objection to
7    form.  You can't go into all the
8    other stuff that you've been
9    doing.
10   BY MS. THOMPSON:
11        Q.   Go ahead and answer the
12   question, Dr. Toglia.
13        A.   It's my -- it's my expert
14   opinion that the TVT mesh does not, in
15   fact, shrink in vivo.
16        Q.   Do you tell your patients
17   about the possibility of chronic pain
18   syndromes?
19        MR. SNELL:  Hold on.
20   Objection.  Form.
21        MS. THOMPSON:  You can
22   answer, though.
23        MR. SNELL:  Go ahead.
24        THE WITNESS:  In the 17

Page 155

1    years that I have been implanting
2    the TVT mesh for the indication of
3    stress incontinence, in over 2,500
4    patients, let's say, I have never
5    once seen chronic pain syndrome
6    arise from the retropubic TVT
7    sling that we are discussing
8    today.
9    BY MS. THOMPSON:
10        Q.   So you're saying you have
11   never, not one single patient, have you
12   seen a chronic pain syndrome related to
13   the retropubic TVT?
14        A.   That's what I said.
15        Q.   And how would you know?
16        A.   We -- now, my practice is in
17   suburban Philadelphia, we have very high
18   rates of follow-up.  Patients are seen on
19   a regular basis.  They are -- they will
20   contact us with problems.  We tend to see
21   the problems.
22        Q.   When do you see your patient
23   for a postoperative checkup after a TVT?
24        A.   Well, there are a series of

Page 156

1    evaluations that we'll see them for.  The
2    first one is always within the first four
3    months or so -- excuse me, within the
4    first four weeks or so.
5         Usually, there's a second
6    follow-up within three months or so.
7         Subsequent to that, it may
8    be six or 12 months.
9         Again, you know, stress
10   incontinence, unfortunately, rarely
11   happens in isolation.  These are patients
12   that have chronic pelvic floor disorders.
13   I would say, in a large number of our
14   cases, we continue to see those patients
15   annually.
16        Those patients that, at some
17   point -- or, let's say, as you said
18   earlier, were cured of their problem are
19   told that they are welcome to come back
20   with any concern that they might have.
21        Q.   What is your rate of
22   follow-up with patients who receive a TVT
23   sling.
24        A.   Our rate of follow-up is

Page 157

1    above the 90 percentile.
2         Q.   What do you mean by "90
3    percentile"?
4         A.   Excuse me, I apologize.  90
5    percent or higher.
6         Q.   And how is that determined?
7         A.   Because we have records and
8    we follow-up with patients after surgery
9    to make sure that they come in for their
10   scheduled visits.
11        And the ones that don't,
12   that fall through, typically are
13   contacted.
14        Q.   At what point?
15        A.   As I mentioned to you, I
16   think I described for you the parameters
17   for our follow-up.
18        So if somebody -- I mean,
19   obviously, there are -- you know, people
20   go on vacation, have to take care of a
21   loved one.  So if they are not seen, say,
22   at that four-week mark, they're asked to
23   follow up with -- they are scheduled for
24   an appointment, say, within that

40 (Pages 154 to 157)

Marc Toglia, M.D.

Page 158

1    three-month period of time.
2         Q.   So if I requested
3    documentation of your rate of follow-up
4    on your patients who receive TVT devices,
5    could you provide that to me?
6         MR. SNELL:  Objection.  We
7    are not producing any of his
8    clinical records or charts, nor
9    have you produced any such thing
10   like that.
11        Your experts --
12        MS. THOMPSON:  I didn't ask
13   for clinical records and charts.
14   I asked him, could he provide it.
15        And you can answer the
16   question.
17        And that's a speaking
18   objection.
19   BY MS. THOMPSON:
20        Q.   Go ahead, Dr. Toglia.
21        A.   I personally --
22        MR. SNELL:  Actually, I'm
23   objecting and saying that will not
24   be produced.  I'm putting that on

Page 159

1    the record.
2         MS. THOMPSON:  I didn't ask
3    for production, did I?
4    BY MS. THOMPSON:
5         Q.   Go ahead and answer, Dr.
6    Toglia.
7         Could you provide it if I
8    ask for it?
9         A.   I would not provide that.
10        Q.   That wasn't my question.
11        Could it be provided?
12   You've already testified that you don't
13   even know how to keep track of what
14   procedures are done --
15        A.   I disagree with you,
16   counselor.  I told you -- I gave you
17   specific examples --
18        Q.   The record speaks for
19   itself.
20        A.   -- of how --
21        MR. SNELL:  Don't cut him
22   off.  He's telling you -- because
23   you just -- you just threw an
24   insult at him.

Page 160

1         Go ahead and finish telling
2    her.
3         THE WITNESS:  Counselor, you
4    asked --
5         MS. THOMPSON:  And that's a
6    speaking objection.
7         THE WITNESS:  Counselor, you
8    asked me the type of follow-up we
9    have and you specifically asked me
10   what do we do in the situation if
11   someone were to not follow up.
12        And I gave you a very
13   specific answer that the patients
14   are contacted.  And, oftentimes,
15   they are contacted by myself.
16   BY MS. THOMPSON:
17        Q.   Dr. Toglia, if you would try
18   to listen closely to my question, because
19   a lot of your answers, I'm -- I'm sorry
20   I'm losing my patience, are not the
21   answer to the question that I'm asking.
22   So if you just try to listen, we'll get
23   out a lot quicker, okay?
24        A.   I don't always understand

Page 161

1    what it is that you're asking.
2         Q.   Let's make it clear from
3    this point forward, if you don't
4    understand my question, will you ask me
5    to repeat it or rephrase, but not answer
6    a different question, okay?
7         MR. SNELL:  And I'm going to
8    object to counsel's statement.  I
9    think the witness has been
10   responsive.  She just doesn't like
11   his answers.  That's my position.
12        MS. THOMPSON:  I'm loving
13   his answers.  That's fine.
14   BY MS. THOMPSON:
15        Q.   My question is, I asked you
16   about your rate of follow-up --
17        A.   Correct.
18        Q.   -- and you said it was above
19   the 90 percent mark.
20        And I'm asking you, is that
21   something that could be provided, if I
22   requested it?
23        A.   It is probably something
24   that could be provided.

41 (Pages 158 to 161)

Marc Toglia, M.D.

Page 162

1    Q.   And what records would you
2  rely on to produce that?
3    A.   We have medical records
4  within the practice on all of our
5  patients.
6    Q.   So someone would have to go
7  through each record to determine when the
8  patient last saw you, when she was
9  contacted, what problems she was having,
10 correct?
11   A.   That is correct.
12   Q.   Okay.  And are you aware of
13 literature that shows that most patients
14 with mesh complications do not return to
15 the original doctor who implanted the
16 mesh product?
17       MR. SNELL:  Objection.
18 Form.  Foundation.
19       THE WITNESS:  I'm aware of
20 literature that would speak to the
21 opposite.
22 BY MS. THOMPSON:
23   Q.   And what is that literature?
24 If you could tell me, please.

Page 163

1    A.   Well, the first study, off
2  the top of my head, I believe was the
3  Abbott study, in which they commented, in
4  the conclusions, that most people did
5  return to their -- to their original
6  provider initially.
7       And I would say that,
8  regardless, that would be highly atypical
9  for my practice.
10   Q.   How do you know that?
11   A.   Because we have a rate of
12 follow-up that is over 90 percent.
13   Q.   That if you went back and
14 looked at every chart of every patient
15 you've seen, you could determine whether
16 that's true or not?
17       MR. SNELL:  Objection.
18 Misstates.
19 BY MS. THOMPSON:
20   Q.   You can answer it.
21   A.   I thought that I already
22 answered the question, I'm sorry.
23       MR. SNELL:  You did.
24 BY MS. THOMPSON:

Page 164

1    Q.   You can answer it again.
2        MR. SNELL:  Objection.
3  Asked and answered.
4        THE WITNESS:  Can I ask that
5  they simply read my answer back?
6        MR. SNELL:  Yes, you may.
7        - - -
8        (Whereupon, the court
9  reporter read the following part
10 of the record:
11       "Question:  And what records
12 would you rely on to produce that?
13       "Answer:  We have medical
14 records within the practice on all
15 of our patients.
16       "Question:  So someone would
17 have to go through each record to
18 determine when the patient last
19 saw you, when she was contacted,
20 what problems she was having,
21 correct?
22       "Answer:  That is correct.")
23       - - -
24 BY MS. THOMPSON:

Page 165

1    Q.   Do you continue to follow up
2  on patients who have left your practice,
3  one, two, three, four, five, six, seven,
4  eight, nine, ten years after the
5  procedure?
6    A.   If they've left our
7  practice, we would have no access to
8  that.
9        But, as I've stated
10 earlier --
11   Q.   You don't need to state
12 things that you've said earlier.
13       So if a patient has left
14 your practice because, say, they were
15 cured of their stress incontinence at
16 their follow-up visit, that's not a
17 patient that you would continue to
18 contact on a regular basis, is it?
19       MR. SNELL:  Form.
20       THE WITNESS:  So at the
21 point of time, let's say that a
22 patient was cured, I always offer
23 to the patient that since we've
24 done a surgical procedure that

42 (Pages 162 to 165)

Marc Toglia, M.D.

Page 166

1    involves a permanent implant, that
2    it is my advice that they continue
3    to follow-up with us annually or
4    whether they -- any time that they
5    have a concern.
6         I also let them know that
7    I'm not going to harass them into
8    follow-up if they feel that they
9    are doing well.
10        Initially, we saw all of our
11   patients annually.  And after
12   about five, six, seven years,
13   patients would literally say,
14   Doctor, can I say something to
15   you?  I don't know why I have to
16   continue to come, I'm fine, it
17   costs me a co-pay to get here, I
18   have to take time off work.
19   BY MS. THOMPSON:
20        Q.   So the answer to my
21   question, again --
22        A.   Yes.
23        Q.   -- is that you don't contact
24   patients after they've left your

Page 167

1    practice, correct?
2         MR. SNELL:  Objection to
3    form.  Asked and answered.
4         MS. THOMPSON:  He didn't
5    answer my question, Burt.
6         MR. SNELL:  You're asking
7    the same question ten times.  He's
8    already told you all the different
9    things that can happen.
10   BY MS. THOMPSON:
11        Q.   Do you contact your patients
12   after they've left your practice or not?
13        MR. SNELL:  Same objections.
14        THE WITNESS:  I'll say the
15   same thing I said previously.
16        If a patient leaves our
17   practice, and by "leaves our
18   practice," means she informs us
19   that she is no longer requiring
20   our services, it would not be
21   appropriate for us to contact that
22   patient.
23   BY MS. THOMPSON:
24        Q.   All right.  Could you pull

Page 168

1    the Abbott study that you referred to
2    that said strictly the opposite of what I
3    said, that most patients don't return to
4    their original implanting surgeon and
5    show me in that article what you're
6    referring to?
7         A.   I don't think I used the
8    word "strictly."
9         MS. THOMPSON:  We can go off
10   the record, please.
11        VIDEO TECHNICIAN:  We are
12   off the record.  The time is 4:51
13   p.m.
14         - - -
15        (Whereupon, a discussion off
16   the record occurred.)
17         - - -
18        VIDEO TECHNICIAN:  We are
19   back on the video record.  The
20   time is 4:54 p.m.
21        THE WITNESS:  So I just want
22   to clarify if I understand you
23   correctly.
24        So what you asked me was

Page 169

1    whether or not -- you asked me
2    whether there was evidence that
3    patients that had a mesh
4    complication were unlikely to
5    return to their original provider?
6    BY MS. THOMPSON:
7         Q.   I think what I said was the
8    majority of patients with mesh
9    complications do not return to their
10   original implanting doctor.
11        A.   Okay.  So I will correct
12   myself.
13        The Abbott study is not the
14   correct study to look at.  I mis --
15   misremembered, if that's a word, that
16   the Abbott study, the majority -- or half the
17   patients have come from an outside
18   system.
19        I will -- I will now refer
20   to the registry trials, if you'll -- and
21   there are several --
22        Q.   I'm not talking about a
23   patient that's in a trial.
24        A.   No.  Excuse me.  Excuse me.

43 (Pages 166 to 169)

Marc Toglia, M.D.

Page 170

1    I will -- when I say trial --
2           MR. SNELL: Don't interrupt
3    him when he's answering.
4           THE WITNESS: -- I mean
5    study.
6           So there are -- there are --
7    within the close -- excuse me.
8           Within closed healthcare
9    systems, an example would be
10   Kaiser, and the other would be the
11   healthcare systems of, say,
12   Finland and Austria, within those
13   closed systems, they would be able
14   to capture -- and Canada would
15   be -- would be another example,
16   they would be able to capture that
17   patient in the system no matter
18   where they ended up within the
19   system.
20   BY MS. THOMPSON:
21       Q.   Are you in Kaiser?
22       A.   I am not a Kaiser physician.
23       Q.   Are you in Finland?
24       A.   No, I'm not in Finland.

Page 171

1        Q.   Are you in Austria?
2        A.   No.
3        Q.   Are you in Canada?
4        A.   No.
5        Q.   Thank you.
6        A.   But that's not the question
7    that you asked me.
8        Q.   You've answered my question.
9        A.   I'm trying to answer the
10   question, and you're trying to prevent me
11   from answering.
12       Q.   What question is on the
13   table?
14       A.   You asked me whether or not
15   it is true that most patients who
16   experience a complication are not then
17   seen within the same system. And I'm
18   telling you that in those circumstances,
19   of which there is abundant data, some
20   data that goes out to ten years, that
21   that is not a correct statement. Those
22   patients are captured.
23           So, for example, if you're
24   in Finland or Austria and you had a sling

Page 172

1    complication, that -- and you sought
2    medical treatment, those are captured to
3    a high degree of specificity.
4        Q.   And that's not responsive to
5    any question I asked. So we'll move on.
6           MR. SNELL: Move to strike.
7    I think it was totally responsive
8    to the question.
9    BY MS. THOMPSON:
10       Q.   Do you tell your patients
11   that if they have complications that
12   require a removal of the sling, that
13   there may be multiple surgeries to
14   correct that?
15          MR. SNELL: I'm sorry, can
16   you repeat that back?
17   BY MS. THOMPSON:
18       Q.   Do you tell your patients
19   that removal -- if they have
20   complications that require removal of the
21   device, it may take multiple surgeries to
22   correct it?
23       A.   That is -- that is such a
24   highly -- in my practice and experience,

Page 173

1    that is such a highly unlikely
2    occurrence, that that would not -- I
3    would not speak to something that has
4    that low of an occurrence.
5           I would have difficulty
6    thinking of a patient that underwent a
7    TVT sling for the intended purpose of
8    stress incontinence that would have
9    required multiple procedures for that one
10   sole thing.
11          And in that regard, I would
12   speak to the Abbott study, in which they
13   acknowledge that for just sling-related
14   procedures, typical management of medical
15   complications were medical and not
16   surgical and that, in general, were more
17   easily -- easier resolved.
18       Q.   Easier -- more easily
19   resolved than POP mesh?
20       A.   Correct. But --
21       Q.   Can you show me where in
22   Abbott it tells it -- tells you that most
23   of them are medically managed?
24       A.   Okay. Back to the Abbott

44 (Pages 170 to 173)

Marc Toglia, M.D.

Page 174

1   study, on Page 163, last couple column.
2   Additionally, those women with
3   complications after sling-only procedures
4   were treated more often with medical
5   management and rarely required surgical
6   re-intervention.
7            Going --
8        Q.   That's comparing --
9        A.   Going --
10       Q.   That's comparing to the
11   prolapse mesh patients?
12       A.   That was the objective of
13   the Abbott trial.
14            Second point, at the top of
15   that page.  The treatment of stress
16   incontinence has a more predictable and
17   less severe course of complications
18   compared with that of synthetic mesh that
19   is used in the management of pelvic organ
20   prolapse.
21       Q.   Correct, comparatively
22   speaking.
23            And the conclusion of the
24   study, just to clarify is, Most of the

Page 175

1   women who seek management of synthetic
2   mesh complication after POP or SUI
3   surgery have severe complications that
4   require surgical intervention.  A
5   significant proportion require greater
6   than one surgical procedure.
7            Did I read the conclusions
8   to that study correctly?
9        A.   My apologies, I wasn't
10   following you.  Where -- can you tell me
11   what page you're speaking to?
12       Q.   The first page, the
13   conclusions of the study.  Did I read it
14   correctly?  That's the only question I
15   have for you.
16       A.   The comment?
17       Q.   The first page of the study,
18   under conclusions, did I read that
19   correctly?
20       A.   Counselor, I'm trying not to
21   be difficult, but there's not a --
22   there's not a subtitle that starts with
23   conclusions.
24       Q.   In the abstract, it has,

Page 176

1   objectives, study design, results and
2   conclusion on the first page.
3        A.   The pattern of complaints
4   differed by the index of procedure.
5            I mean, I think, you know,
6   you're taking --
7        Q.   Most of the women --
8        A.   You're taking it out of --
9        Q.   Did I read it correctly?
10   Did I read the conclusions correctly?
11   That's the only question on the table.
12       A.   The conclusions --
13            MR. SNELL:  I'm going to
14   object to the form.
15            THE WITNESS:  The
16   conclusions are what are listed
17   under the comment, that's the
18   conclusion.
19   BY MS. THOMPSON:
20       Q.   I didn't ask you --  I asked
21   you, did I read --
22       A.   You're reading the abstract.
23   You're reading an abstracted sentence.
24       Q.   So you cannot answer the

Page 177

1   question --
2        A.   I did answer the question.
3        Q.   -- whether I read it
4   correctly or not?
5        A.   I'm reading it under the
6   conclusion of the paper, okay?  It's
7   right here.  Additionally, those women
8   with complications after sling-only.  We
9   are talking --
10       Q.   Okay.  Let's move --
11       A.   -- about standalone sling
12   procedures --
13       Q.   Let's move on.
14       A.   -- correct?
15       Q.   Let's move on.
16            Do you tell your patients
17   that the polypropylene mesh and TVT
18   device creates chronic inflammation?
19            MR. SNELL:  Objection.
20   Asked and answered.
21            MS. THOMPSON:  No, I asked
22   about chronic foreign body
23   reaction.  Those are two different
24   things.

45 (Pages 174 to 177)

Marc Toglia, M.D.

Page 178

1      MR. SNELL: I stand
2  corrected.  I thought you said
3  that.
4      THE WITNESS:  Based upon our
5  experience in the last 17 years,
6  with nearly 2,500 procedures, we
7  have not observed any chronic
8  inflammation as it relates to the
9  retropubic TVT, and, therefore, we
10  don't speak to them about
11  something that we have not seen.
12  BY MS. THOMPSON:
13      Q.   If Ethicon had information
14  about chronic inflammation, is that
15  something that you, as a doctor, would
16  want to know?
17      A.   As an expert in this field,
18  I would not rely upon Ethicon for that
19  information.  I seek that information
20  myself, formulating that opinion from
21  high-quality studies.
22      Q.   Is that information patients
23  would want to know?
24      A.   I think patients would --

Page 179

1  would love to know that I spend the time
2  seeking out high-quality data and look at
3  long-term studies and rely upon those
4  type of systematic review groups when I
5  present the safety profile of that
6  procedure.
7      Q.   Do any of your patients have
8  complications after a TVT procedure?
9      A.   Patients can have
10  complications after any surgical
11  procedure.
12      Q.   That wasn't my question.
13      Have any of your patients
14  had complications after a TVT procedure
15  that you've performed?
16      A.   Yes.  As I've stated in
17  my --
18      Q.   Okay.  That's -- that's all
19  I need.
20      And what are those
21  complications?
22      A.   The most common complication
23  that we see would be injury of the
24  bladder, which, in our hands, is about 1

Page 180

1  percent.
2      Q.   What else?
3      A.   I believe that we did
4  discuss this earlier on, but it was
5  specific to myself.
6      There's always a risk of
7  bleeding, that is something that is
8  discussed with all patients.  We tell
9  them about our experience with bleeding,
10  that we see it a little more commonly in
11  the younger patients.
12      We talk about the potential
13  risk that, maybe, the symptom improvement
14  may not be as much as they want and that
15  there are occasions where a second
16  procedure might need to be performed.
17      Conversely, we tell people
18  that there is a small risk for voiding
19  dysfunction and that, at times, that will
20  require re-intervention for that reason.
21      There is a risk for vaginal
22  perforation, urethral perforation, nerve
23  injury, bowel injury.  And those are all
24  discussed with the patients.

Page 181

1      We speak about other risks
2  such as pain with sexual intercourse,
3  more specifically, relative to the other
4  procedures, and that in our experience,
5  and according to high-quality data, the
6  rate of dyspareunia is exceedingly low
7  with the retropubic TVT sling.
8      Q.   Is it your opinion that when
9  complications occur it's because the
10  surgeon placed the device improperly?
11      A.   I would say, in most cases,
12  it is a direct result of -- it's user
13  dependent, and I make that point in my
14  paper, in my --
15      Q.   And that would include the
16  complications that you've had with your
17  procedures?
18      A.   Correct.
19      Q.   And how many TVT devices
20  have you removed or performed some kind
21  of revision surgery on?
22      A.   I think it's best to answer
23  that sort of on an annual basis.  Again,
24  understanding that I've been performing

46 (Pages 178 to 181)

Marc Toglia, M.D.

Page 182

1 this procedure over a 17-year period of
2 time.
3          I would say, in the average
4 year, that probably ranges from zero to
5 one.
6      Q.   So only zero to one time per
7 year are you doing any corrective surgery
8 on a TVT device?
9          MR. SNELL:  Objection.
10          Misstates.
11 BY MS. THOMPSON:
12      Q.   Zero to one per year --
13          MR. SNELL:  You're changing
14 your question.  You're asking
15 about TVT Retropubic and then the
16 next question is a TVT device,
17 which can be --
18          MS. THOMPSON:  Sorry.  I'll
19 rephrase it.
20          And, again, if you'll just
21 ask me if you don't understand a
22 question.
23          THE WITNESS:  I understand.
24          MS. THOMPSON:  Then you can

Page 183

1     object to form.  He can ask me if
2     he doesn't understand it.
3          THE WITNESS:  I'm listening
4     to what you're asking.
5          MS. THOMPSON:  Because I
6     think you knew -- I think you knew
7     what I meant when I said that.
8 BY MS. THOMPSON:
9      Q.   So zero to one TVT
10 Retropubic devices are how many you are
11 removing in a typical year; is that
12 correct?
13      A.   Well, I don't think that
14 you're accurate, the word "removal."
15 It's removal or revision.
16          I would say that probably
17 once a year, or so, are we having to
18 surgically revise a TVT device -- excuse
19 me, a TVT procedure.
20          And I'm -- again, for the I
21 remember sake of argument, I'm speaking
22 about the retropubic TVT procedure that
23 we are doing for stress incontinence.
24      Q.   In your report, you said

Page 184

1 that you are considered one of the
2 leading experts in the Greater
3 Philadelphia region on surgical revision
4 of complications related to vaginal mesh
5 procedures.
6          Is that a true -- true
7 statement?
8      A.   That is a true statement.
9      Q.   And why is there a need for
10 experts on surgical revision of
11 complications related to vaginal mesh
12 procedures?
13      A.   I think there are experts
14 required for the management of any kind
15 of surgical revision of problems that can
16 occur.
17      Q.   Now, I've never seen someone
18 say that they are an expert in the
19 surgical management of complications
20 related to a Burch or to autologous
21 fascial sling or to native tissue
22 repairs.
23          Explain to me why an expert
24 is needed for the management of vaginal

Page 185

1 mesh complications.
2          MR. SNELL:  Objection.
3     Form.
4          THE WITNESS:  In that
5     context, I would hold myself out
6     in those fields.  The -- the need
7     to re-intervene is identical,
8     practically speaking, amongst the
9     three most common
10     anti-incontinence procedure,
11     whether that be a Burch -- I
12     probably revise more Burches,
13     fascial slings, bladder neck
14     slings than I do midurethral
15     slings.
16 BY MS. THOMPSON:
17      Q.   So what you intended to say
18 is that you're one of the leading experts
19 on surgical revisions of complications
20 for any pelvic procedures, not vaginal
21 mesh procedures?
22      A.   I don't -- pelvic procedures
23 is a little bit too broad.
24          With regard to prior

47 (Pages 182 to 185)

Marc Toglia, M.D.

Page 186

1    surgical intervention for pelvic floor --
2    surgery for pelvic floor dysfunction, I
3    probably have as much experience as
4    anyone else in the area.  And that is a
5    frequent source for referral.
6        Q.   You, I believe, said in your
7    report that you had done 3,000 patients
8    with TVT, but that may have been all
9    urethral slings, it doesn't make too
10   much --
11       A.   I think --
12       Q.   -- difference for my
13   question.
14       A.   Well, I think 3,000 may
15   refer to everything, including
16   sacrocolpopexy performed with mesh.  I
17   think it's 3,000 mesh related procedures.
18   That would include the entire scope.
19       Q.   Okay.
20       A.   If you just want to accept
21   me at my word, I think that's -- I'm
22   pretty --
23       Q.   We'll go ahead and find it.
24       A.   That one I'm pretty sure of,

Page 187

1    because I said it.
2        Q.   Well, whatever it is, it's
3    in your report.  We can look it up later.
4    You said in those 3,000
5    patients --
6            MR. SNELL:  Where are you
7        at, counsel?  Just so --
8            MS. THOMPSON:  Okay.  I'll
9        have to find it.  I thought I had
10       it underlined.
11           THE WITNESS:  I don't think
12       I said anything beyond the fact
13       that I had experience in 3,000
14       patients.  I don't think I went --
15       I did not go on.
16   BY MS. THOMPSON:
17       Q.   On Page 9, the last
18   sentence.  I have personally used it --
19   and I think that's referring to
20   polypropylene mesh, I guess?
21       A.   That would be correct.
22       Q.   -- as my primary implant
23   material in my patients for over 15 years
24   in more than 3,000 patients --

Page 188

1        A.   That is correct.
2        Q.   -- and have yet to observe a
3    single case -- now I want to go through
4    some of these.
5            How do you define -- define
6    "mesh rejection"?
7        A.   Since I haven't seen a case
8    of that, a case in which there was overt
9    expulsion of the mesh, in which there was
10   complete failure of primary healing, in
11   which there was systemic response of an
12   inflammatory reaction.
13       Q.   So your definition of
14   rejection, then, is overt expulsion and
15   not -- that would not include erosion
16   into any organ, correct?
17       A.   My definition is just,
18   succinctly, would be evidence of overt
19   graft versus host disease.
20       Q.   And what symptoms would the
21   patient present with --
22       A.   Excuse me, host versus
23   graft.
24       Q.   I knew what you meant.

Page 189

1            What symptoms would the
2    patient present with, in your opinion?
3        A.   There could be expulsion of
4    the material, there could be complete
5    failure of primary healing, recurrent --
6    or some kind of systemic response,
7    anaphylaxis.
8        Q.   And by "overt expulsion" you
9    are not referring to erosion into the
10   vagina, the urethra or bladder?
11       A.   Thank you for clarifying
12   that.
13           So rejection is rejection,
14   exposure is a different phenomenon,
15   correct.
16       Q.   And what testing did you do
17   on those 3,000 patients to determine
18   there wasn't a host versus graft
19   condition?
20       A.   I don't think it would be
21   ethical, counselor, for me to test --
22   test -- somehow subject a test on an
23   asymptomatic patient.  And I think that a
24   large body of the literature cited by

48 (Pages 186 to 189)

Marc Toglia, M.D.

Page 190

1  your experts speak to the fact that they
2  were unable to do that kind of testing
3  because of ethical considerations.
4      Q.   You would agree with me,
5  though, that rejection is an immunologic
6  response to a foreign body?
7      A.   I think --
8          MR. SNELL:  Objection to
9  form.
10         Go ahead.
11         THE WITNESS:  I think that's
12  one -- one type of rejection might
13  be immunologic, yes.
14  BY MS. THOMPSON:
15     Q.   And are you aware of
16  literature that tested, immunologically
17  and/or histologically, for a rejection
18  condition?
19         MR. SNELL:  Objection to
20  form.
21         THE WITNESS:  There is no
22  high-quality literature or data
23  that suggests that that phenomena
24  occurs with the TVT device when

Page 191

1  used for the indication of stress
2  incontinence.
3      The long-term registry
4  trials, which have followed out to
5  ten years, as well as the
6  additional data out to 17 years,
7  do not raise any concern,
8  clinically, that those -- that
9  that phenomena exists.
10     Now, I have reviewed the
11  information provided by your
12  experts, in which they were to
13  hypothesize that.  That
14  information is Level 5 evidence.
15     Now, let me just show you
16  that.
17  BY MS. THOMPSON:
18     Q.   I don't need you to show me.
19     A.   No, no --
20     Q.   I didn't ask --
21     A.   -- I do.
22     Q.   -- any question about the
23  level of evidence.
24     A.   But I have to explain to

Page 192

1  you --
2      Q.   Mr. Snell can ask you that
3  question, if you he wants to, at the end.
4      A.   So when you have Level 1 --
5      Q.   I have not asked you that
6  question.
7      A.   Please allow me to finish my
8  answer, counselor.
9          When you have -- because
10  this is -- this is paramount to my
11  methodology.
12         When you have Level 1 data,
13  Level 5 data doesn't count, okay?
14         Additionally, you can never
15  derive clinical implications or draw
16  clinical conclusions from Level 5 data.
17  That is implicit in the weak design of
18  that study.  Every author of those papers
19  makes that disclosure, as far as the --
20  as far as the ramifications.
21         In fact, I will point to
22  Clave, which I cited in my --
23         MS. THOMPSON:  This is
24  really all nonresponsive.  So

Page 193

1  if --
2          MR. SNELL:  No, you asked
3  him do you know of literature.
4  And he's telling you about
5  literature.
6          THE WITNESS:  Yes.
7          MR. SNELL:  And he's
8  saying --
9          MS. THOMPSON:  I'm asked him
10  about literature about immune
11  response to foreign body.
12         MR. SNELL:  He's telling
13  you.  He saw what your experts
14  have pointed to --
15         MS. COPE:  Should I start
16  talking, too?  You seem to speak
17  freely for him.
18         MR. SNELL:  I'm not speaking
19  for him.  You asked me a question,
20  Margaret, I'm going to give you an
21  answer.  Don't ask me a question,
22  then.
23         MS. THOMPSON:  Okay.  I'm
24  going to request more time if he

49 (Pages 190 to 193)

Marc Toglia, M.D.

Page 194

1   is going to continue to not answer
2   my question.
3       THE WITNESS:  Counselor, I
4   am --
5       MS. THOMPSON:  We'll go off
6   the record, and he can look up his
7   literature that he wants to talk
8   about.
9       VIDEO TECHNICIAN:  We are
10  off the record.  The time is 5:15
11  p.m.
12          - - -
13      (Whereupon, a discussion off
14  the record occurred.)
15          - - -
16      VIDEO TECHNICIAN:  We are
17  back on the video record.
18      THE WITNESS:  The literature
19  that we are discussing here is not
20  applicable to TVT, okay?
21  BY MS. THOMPSON:
22      Q.   Okay.  All right.
23      A.   And it does not have
24  sufficient weight or evidence that you

Page 195

1   can draw those conclusions.
2       Q.   Is your opinion that Level 5
3   evidence regarding safety issues is also
4   worthless?
5       MR. SNELL:  Form.
6   Objection.
7       THE WITNESS:  When you have
8   Level 1 evidence on safety, then
9   the Level 5 evidence is not
10  considered to be important.
11  BY MS. THOMPSON:
12      Q.   Do you believe that we have
13  Level 1 evidence on the safety of the
14  TVT --
15      A.   Absolutely.
16      Q.   -- yes or no?
17      A.   Absolutely.
18      Q.   Okay.  There's an article,
19  Wang, I believe it's on your reliance
20  list.
21      A.   Yes.
22      Q.   Do you believe that's not a
23  quality study?
24      A.   That is an extremely

Page 196

1   poor-quality study.
2       Q.   And is there evidence to the
3   contrary, that there is no immune --
4   significant immune response to the
5   polypropylene mesh in the TVT that you
6   are aware of?
7       A.   Can I speak to --
8       MR. SNELL:  Object to form.
9       THE WITNESS:  Can I speak to
10  the Wang study, please?
11  BY MS. THOMPSON:
12      Q.   No, I -- just answer my
13  question, please.
14      And the question is, is
15  there--
16      A.   Hold on.  I'm sorry, I'm
17  going to ask you to pause.
18      You did ask me about the
19  Wang study, I want to make sure --
20      Q.   I asked you if you were
21  aware of it.  I have not asked you any
22  questions about the Wang study, other
23  than, are you aware of it?
24      MR. SNELL:  Actually, no.

Page 197

1   You --
2       THE WITNESS:  You asked me
3   about the quality of the evidence.
4   I'm going to tell you the answer,
5   and I'm going to tell you what I'm
6   basing my answer on.
7   BY MS. THOMPSON:
8       Q.   I asked you -- I'm asking
9   you about the evidence that shows that
10  there is no immune response to the
11  foreign body.  That's what I would like
12  for you to answer, the question, and tell
13  me if you have evidence that there is no
14  immune response to the foreign material
15  in the TVT.
16      A.   The long-term safety
17  studies -- excuse me.  The long-term
18  Level 1 evidence studies speak to the
19  lack of a significant immune response.
20      In addition --
21      Q.   Okay.  Can you --
22      A.   In addition --
23      MR. SNELL:  Don't stop him.
24      THE WITNESS:  -- the

50 (Pages 194 to 197)

Marc Toglia, M.D.

Page 198

1    systematic reviews speak to the
2    fact, and this includes -- and
3    this is consistent with what is
4    stated by the FDA, what is stated
5    by NICE, what is stated by AUA,
6    AUGS, and SUFU, that there is --
7    that polypropylene mesh,
8    macroporous, as used with the TVT
9    device for its intended purpose,
10   is the most biomechanic --
11   biocompatible material.
12       By definition, biocompatible
13   speaks to host tolerance and the
14   lack of immunologic response.
15   BY MS. THOMPSON:
16       Q.   Can you show me, in any of
17   those things that you just rattled off,
18   where it states that there is no
19   immunologic response to polypropylene
20   mesh in the TVT device?
21       MR. SNELL:  Objection to
22   form.
23   BY MS. THOMPSON:
24       Q.   I'm looking for immunologic

Page 199

1    response, which is what rejection or
2    graft versus -- versus host versus graft
3    response is.
4        MR. SNELL:  Objection to
5    form.
6        THE WITNESS:  Can we go off
7    record?
8        MS. THOMPSON:  Off the
9    record, please.
10       VIDEO TECHNICIAN:  We are
11   off the record.  The time is 5:19
12   p.m.
13           - - -
14       (Whereupon, a discussion off
15   the record occurred.)
16           - - -
17       VIDEO TECHNICIAN:  We are
18   back on the video record.
19       THE WITNESS:  Yes.  Again, I
20   am -- I am trying to be extremely
21   respectful of everybody's time,
22   and acknowledge that this is
23   Friday.
24       Unfortunately, the volume of

Page 200

1    material as relates to the TVT
2    device, which has been in
3    development over 20 years, is
4    broad and extensive and worldwide.
5    And, you know, unfortunately,
6    there is a lot of material.
7        And while I'm well versed in
8    it, it still takes me a while to
9    figure out exactly the location of
10   the statements that I have in
11   mind.
12       Why don't you go back off
13   the record?
14       MS. THOMPSON:  I should be
15   the one who directs the
16   videographer, if you don't mind.
17       THE WITNESS:  I'm sorry.
18   I'm just trying -- I'm just trying
19   to be respectful of people's time,
20   and I'm apologizing for the amount
21   of time it's taking.  I'm just --
22   I want you to know I'm not doing
23   this to be obstructive.
24   BY MS. THOMPSON:

Page 201

1        Q.   And, I mean, we can just
2    concede that you have not been able to
3    find anything on that particular issue in
4    the time allotted.
5        A.   If I can -- if I cannot
6    produce this within the next several
7    minutes, I'm happy to move on, again, out
8    of respect for everybody's time.
9        Why don't you go ahead and
10   ask me the question, counselor?
11       Q.   The next question?
12       A.   No.
13       Q.   The previous question that
14   we've been -- are we on the record?
15       MS. THOMPSON:  Are we on the
16   record, Greg?
17       VIDEO TECHNICIAN:  We're on
18   the record.
19       THE WITNESS:  I'm sorry.
20   BY MS. THOMPSON:
21       Q.   Are you ready to move to the
22   next question?
23       A.   Yes.
24       Q.   Hopefully, we won't spend as

Marc Toglia, M.D.

Page 202

1    much time on the other things that you've
2    said you've not seen one single patient
3    out of your 3,000 that have had these
4    particular conditions, you said that you
5    have yet to observe a single case of
6    chronic foreign body reaction.
7            How did you determine that
8    you have not had a single patient, out of
9    3,000, that has had a chronic foreign
10   body reaction to mesh?
11       A.   So clinical suspicions that
12   one might be experiencing a reaction that
13   would be classified as a chronic foreign
14   body reaction would be things like
15   chronic nonhealing of a wound, persistent
16   erythema, fluctuance, pain, chronic
17   drainage.
18       Q.   But you would agree with me
19   that chronic foreign body reaction is a
20   histologic diagnosis, would you not?
21           MR. SNELL:  Form.
22   Objection.
23           THE WITNESS:  I would say
24   that it is -- it is something that

Page 203

1        always has a clinical presentation
2        and then would be confirmed on it.
3            Now, in contrast, we have
4        seen this with other implanted
5        material.  So I am very familiar
6        with the presentation.  In fact,
7        I've published on the
8        presentations within the pelvic
9        floor, in the vaginal space, as it
10       relates to what we referred to, at
11       the time, was chronic
12       granulomatous response to a
13       foreign body within the context of
14       reconstructive pelvic surgery.
15   BY MS. THOMPSON:
16       Q.   I don't think you answered
17   my question.
18           Foreign body reaction is a
19   histologic pathologic diagnosis, correct?
20           MR. SNELL:  Asked and
21   answered.
22           MS. THOMPSON:  If you got
23   the answer, I sure didn't.
24           THE WITNESS:  It is both.

Page 204

1        It is both.
2            MR. SNELL:  Would you read
3    it --
4            THE WITNESS:  It is
5    clinical --
6            MR. SNELL:  Would you read
7    it back?
8            MS. THOMPSON:  No.
9            MR. SNELL:  Go ahead and --
10   go ahead and answer it again.
11   BY MS. THOMPSON:
12       Q.   Okay.  All right.  So of
13   these 3,000 patients that you've never
14   seen a chronic foreign body reaction, are
15   you aware that there's literature that
16   states that 100 percent of women with
17   pelvic mesh in their bodies have a
18   chronic foreign body reaction?
19           MR. SNELL:  Objection.
20   BY MS. THOMPSON:
21       Q.   100 percent?
22           Are you aware of that
23   literature?
24           MR. SNELL:  Objection.  Form

Page 205

1        and foundation.
2            THE WITNESS:  Rephrase your
3        question, please.
4    BY MS. THOMPSON:
5        Q.   Are you aware -- are you
6    aware of literature that states that 100
7    percent of women with pelvic mesh have a
8    chronic foreign body reaction to the
9    mesh?
10           MR. SNELL:  Same objection
11       to form and foundation.
12           THE WITNESS:  If you have a
13       foreign body implanted in your
14       body, chronically, there will
15       always be histologic evidence of
16       the body's reaction surrounding
17       the mesh or the material.
18   BY MS. THOMPSON:
19       Q.   So that's really --
20       A.   That -- that is not germane
21   or related clinically, nor can you take
22   inflammation that just randomly produces
23   that kind of in vitro, again, Level 5
24   evidence, you cannot make clinical

52 (Pages 202 to 205)

Marc Toglia, M.D.

Page 206

1    inference. There's not enough power to
2    that study.
3            The only way that you could
4    make that is by examining Level 1
5    evidence and deriving that.
6        Q.   Is there Level 1 evidence
7    that states that there is not a chronic
8    foreign body reaction to mesh; yes or no?
9        A.   There is -- there is a
10   chronic -- excuse me.
11           There is -- the body does
12   respond, in 100 percent of patients, but
13   there's no negative clinical sequelae.
14       Q.   So your statement that you
15   have not had a single case of chronic
16   foreign body reaction, that's not really
17   what you mean, right?
18       A.   No, clinically based. I'm
19   speaking to clinical medicine, clinical
20   problems.
21       Q.   And you know that for a
22   fact, out of your 3,000 patients?
23       A.   To the best of my knowledge,
24   a patient has never presented to me with

Page 207

1    a chronic or acute medical syndrome in
2    which we could identify, as the source, a
3    chronic inflammatory reaction.
4        Q.   And I think that's a little
5    different from what you stated here --
6        A.   No, counselor.
7        Q.   -- so I appreciate that.
8        A.   No. My -- my -- if I speak
9    to my clinical experience, it's clinical.
10   It's not stuff that I'm doing in a lab.
11   I think that's quite clear.
12       Q.   Is less than Level 1
13   evidence important if you're reporting a
14   death from a minor procedure like the
15   TVT?
16           MR. SNELL: Objection to
17   form.
18           THE WITNESS: Well, I
19   think -- I think you're using -- I
20   think you're using the -- I think
21   that you're using the clinical --
22   clinical evidence pyramid out of
23   context here.
24           All deaths are important.

Page 208

1    There is no non-important death.
2        You don't -- you don't need Level
3        1 evidence to tell you that a
4        death has occurred.
5    BY MS. THOMPSON:
6        Q.   And that's something that
7    you would want to know, correct?
8            MR. SNELL: Objection.
9    BY MS. THOMPSON:
10       Q.   As a doctor and a patient?
11           MR. SNELL: Objection.
12   Form.
13           THE WITNESS: If a patient
14   of mine were to die as a result of
15   one of my procedures, I would
16   absolutely want to know about the
17   occurrence of the death and the
18   cause of death.
19   BY MS. THOMPSON:
20       Q.   I'm talking about published
21   in the literature.
22           Would you want to know other
23   doctors' patients who have died as a
24   result of a TVT or another mesh

Page 209

1    procedure?
2            MR. SNELL: Object to form.
3            THE WITNESS: You know, I
4        think that I would be aware of
5        that, yes.
6    BY MS. THOMPSON:
7        Q.   That wasn't my question,
8    would you be aware of it.
9            Is it something that you
10   would want to know and see published?
11           MR. SNELL: Same objection.
12           THE WITNESS: I don't
13   necessarily think it needs to be
14   published. If someone dies at the
15   hospital next to me, I'm not going
16   to wait until it's published
17   before I think about what had
18   occurred.
19   BY MS. THOMPSON:
20       Q.   Well, what if a patient dies
21   in Atlanta, Georgia, which happened a
22   little while ago, is that something that
23   you would want to know about?
24           MR. SNELL: Objection.

53 (Pages 206 to 209)

Marc Toglia, M.D.

Page 210

1      Form. Vague. Lacks foundation.
2          THE WITNESS: I don't --
3   BY MS. THOMPSON:
4      Q.   From a TVT.
5      A.   I don't know -- I mean, that
6   an isolated case that happened
7   elsewhere -- I mean, would I want to
8   know? I mean, I wouldn't close my ears
9   if someone told me about the problem.
10         But had I not heard about
11  it, I wouldn't say that a foul was
12  committed.
13     Q.   Do you routinely send the
14  specimens that you remove when you -- of
15  mesh for histologic exam?
16     A.   We do routinely send -- send
17  specimens to the lab for identification.
18     Q.   Have you ever looked at the
19  slides?
20     A.   I have not looked at the
21  slides.
22     Q.   You've never looked at an
23  explanted mesh under the microscope?
24     A.   I have never looked at an

Page 211

1   explanted mesh under the microscope.
2      Q.   So you really don't know
3   what they look like, do you, under the
4   microscope?
5      A.   Yes, I do. They are in all
6   these articles. There are clear
7   photomicrographs on there with accurate
8   pathologic descriptions. That's not what
9   you asked me.
10     Q.   But you disagree with the
11  pathological descriptions in the
12  literature?
13     A.   You and I are talking about
14  different things.
15         I have already told you that
16  a foreign material in the body, you will
17  see evidence of that response. You have
18  to see evidence. There -- it's a foreign
19  body and there is -- and there is a
20  thing.
21         But it's not a clinically
22  significant observation.
23     Q.   All right. You agree with
24  me that there are alternatives to

Page 212

1   midurethral slings?
2          MR. SNELL: Form.
3          THE WITNESS: In what
4   context? In the treatment of
5   stress urinary incontinence in
6   women?
7   BY MS. THOMPSON:
8      Q.   In the treatment of stress
9   urinary incontinence?
10     A.   TVT is only one of several
11  procedures that is effective for the
12  treatment of female stress incontinence.
13     Q.   Okay. The Burch procedure
14  would be one of those, correct?
15     A.   That is correct.
16     Q.   And an autologous sling
17  would be one of those, correct?
18     A.   That is correct.
19     Q.   And there are actually
20  nonsurgical treatments for stress urinary
21  incontinence as well, correct?
22     A.   That's correct.
23     Q.   And can we agree that they
24  have equivalent efficacy?

Page 213

1      A.   Across the board, efficacy
2   is similar. Again, you do a
3   meta-analysis, you overweight
4   higher-quality data, you'll get -- you'll
5   get recommendations that say, I favor one
6   or the other.
7          But I think it's a
8   reasonable statement, as presented in the
9   short-term, that the effectiveness, in
10  the short-term across the procedures
11  are -- demonstrate similar efficacy.
12     Q.   Do you know Mickey Curran?
13     A.   Yes.
14     Q.   I believe you've published
15  with him on one of your papers; is that
16  correct?
17     A.   I've published with Mickey
18  on several papers, correct.
19     Q.   I want to read you and
20  statement and I want you to tell me
21  whether you agree with it or not, okay?
22     A.   May I ask who is making the
23  statement?
24     Q.   Well, Dr. Curran is making

Marc Toglia, M.D.

Page 214

1 the statement.
2     A.   Thank you.  I just want to
3 make sure it wasn't me making the
4 statement.
5     Q.   But it wouldn't matter, I
6 guess, for the purpose of whether you
7 agree with it or not.
8         In our opinion, the
9 autologous pubovaginal sling is
10 appropriate for patients with stress
11 urinary incontinence who declined to have
12 synthetic material implanted because of
13 concerns related to long-term placement
14 of synthetic mesh.
15        Would you agree with that
16 statement?
17        MR. SNELL:  Objection to the
18     form.
19        Go ahead.
20        THE WITNESS:  Can you tell
21     me the year that that was
22     published?
23        MS. THOMPSON:  2012, I
24     believe.

Page 215

1         THE WITNESS:  I think that's
2     a relatively reasonable statement.
3 BY MS. THOMPSON:
4     Q.   Reasonable?
5     A.   Yes.
6     Q.   Okay.  Thank you.  I'll just
7 check on that date for you real quick.
8     2012.
9     A.   Okay.  Thank you.
10    Q.   How much are you paid for
11 placing a TVT on average?
12    A.   The reimbursement for the
13 TVT -- there is no -- there is no
14 specific procedure of TVT.  So it's a
15 pubovaginal sling procedure.
16        So if I place an autologous
17 fascial sling or if I do a synthetic
18 midurethral sling, the reimbursement is
19 about the same.  You know, Medicare data,
20 with geographic area factors factored in,
21 in this region, I would say probably the
22 range is $800 to, maybe, $1,200 a
23 procedure.
24    Q.   And how much would you be

Page 216

1 paid for a Burch?
2     A.   I would suspect that the
3 reimbursement for the Burch is likely to
4 be a little bit higher.
5         But I do want to -- I do
6 want to clarify something.  And I suspect
7 that with your background, you would
8 understand what I'm about to say.
9         We're not paid for the
10 procedure.  The reimbursement for, say,
11 the surgery encompasses all services that
12 we provide, 24 hours prior to the
13 procedure for the actual procedure,
14 whatever amount of postoperative care is
15 deemed necessary and pretty much all care
16 out to about 90 days.
17        So the percentage of what I
18 just mentioned that's specific for
19 placing the procedure, it's probably half
20 that, if you're looking for that specific
21 of information.
22    Q.   And how long did it take you
23 to place a TVT?
24    A.   In my hands, a TVT can be

Page 217

1 placed in about 20 minutes.
2     Q.   And how about an autologous
3 sling -- well, let me ask you this first:
4 Are you performing any autologous sling
5 procedures?
6     A.   In our practice, we don't
7 currently perform autologous fascial
8 slings in the last several years, because
9 we reserve those for a certain subset of
10 patients.  And, fortunately, we've not
11 had to go that far down the algorithm.
12    Q.   So it's been several years
13 since you've placed an autologous -- or
14 since you've performed an autologous --
15    A.   That's correct.
16    Q.   -- sling procedure?
17        How about the last time you
18 were -- performed a Burch procedure.
19    A.   The last time I performed a
20 Burch procedure might be 2002.
21    Q.   But you were trained on both
22 of those procedures, correct?
23    A.   Of course.
24    Q.   Do you teach residents and

Marc Toglia, M.D.

Page 218

1   fellows?
2       A.   I do.  I don't teach
3   fellows, excuse me.
4       Q.   You teach residents?
5       A.   Correct.
6       Q.   At Thomas Jefferson?
7       A.   No.  Lankenau Medical Center
8   has an independent residency.
9       Q.   And I presume, since you're
10  not performing a Burch or autologous
11  sling, you're probably not teaching those
12  to the residents currently?
13      A.   To be honest with you,
14  excuse me, I'm sorry.  I may have
15  misspoke, as far as the last time I
16  performed a Burch.
17          When we're having this
18  conversation, I'm thinking of standalone
19  procedures.  There may be combination
20  procedures that we're doing it.
21          I'll be very honest with
22  you, I don't train -- the residents come
23  to me for, really, basic training.  We
24  don't really train them to go on and

Page 219

1   independently perform a procedure like an
2   autologous fascial sling or a Burch.
3   They -- their role, in that kind of a
4   setting, would be more observation or
5   assistance.
6       Q.   Thanks.  I know we talked a
7   lot about studies, and I have a few
8   questions that I want to ask you that I
9   think will be relatively simple.
10          And I know, from talking
11  with you today, that you feel like
12  clinical studies are important, correct?
13      A.   I think that levels of
14  evidence are important.
15      Q.   And you've actually
16  performed and published, including some
17  randomized control trials, correct?
18      A.   That's correct.
19      Q.   And they're -- you would
20  agree with me that they are important so
21  that doctors can make responsible
22  treatment decisions, right?
23      A.   I think that, again, the
24  levels of evidence provided by clinical

Page 220

1   studies are important, yes, in how we
2   practice medicine and how we -- how we
3   make clinical decisions.
4       Q.   And it's important for
5   patients so that they can give informed
6   consent, correct?
7       A.   Yes.
8       Q.   Some noncontroversial
9   questions.
10          And when you're looking at
11  clinical studies, you want to see safety,
12  correct?
13      A.   It depends upon the context
14  of the study.
15      Q.   But in general, as a -- you
16  know, broadly speaking you want to know
17  the product is effective, correct?
18      A.   You know, again, within the
19  context of that part of medicine that I
20  practice as it pertains to surgery, we
21  would phrase it, it's the balance between
22  risk and benefit.
23      Q.   Okay.  So you want
24  studies --

Page 221

1       A.   Surgery -- and safety, of
2   course, would straddle risk and benefit.
3       Q.   I agree.  And that's fine.
4       A.   And it's relative.
5       Q.   And I'm -- I'm happy to talk
6   about to it -- talk it in terms of risk
7   or complications and benefit or --
8       A.   Yes.
9       Q.   -- treatment success.
10          And when you're looking at a
11  study, regardless of the level, you want
12  it to provide accurate information,
13  correct?
14      A.   I'm not sure I understand
15  what you're implying by the term
16  "accurate."
17      Q.   You want the data that's
18  presented to be correct?  You want it to
19  be -- what the study actually found is
20  what you want to read when you're reading
21  the publication, correct?
22          MR. SNELL:  Form.
23          THE WITNESS:  And I
24  apologize, you know, I am an

56 (Pages 218 to 221)

Marc Toglia, M.D.

Page 222

1    editor within this sphere, so --
2    BY MS. THOMPSON:
3        Q.   So you're an editor of IUJ?
4        A.   Correct.
5        Q.   And also Female Pelvic
6    Medicine; is that correct?
7        A.   And Reconstructive Surgery,
8    it's one journal.
9        Q.   I just didn't want to say
10   the whole thing, I'm getting tired.
11       A.   It took several decades to
12   come up with that, so I do appreciate if
13   you do say it.
14       Q.   Okay, I will --
15       A.   You can say FMPRS.
16       Q.   I will from now on.
17       A.   Thank you.  I worked very
18   hard for that, as you can imagine.
19       Q.   When did you last review an
20   article or IUJ?
21       A.   It's within the last few
22   weeks.
23       Q.   Was that a mesh article?
24       A.   The one in the last couple

Page 223

1    of weeks, I do not -- I know I've
2    reviewed some mesh related articles
3    within the past month, but the one in the
4    last couple of weeks -- sometimes there's
5    mesh involved, but that's not the primary
6    objection, so --
7        Q.   Well, you would agree with
8    me, as an editor --
9        A.   Excuse me.  I'm sorry.  I
10   would say within the last three weeks,
11   yes, I have reviewed an article primarily
12   on mesh related procedures in this
13   sphere.
14       Q.   And what was -- what was the
15   gist of that article, if you can divulge
16   it?
17       A.   So as you're well aware, the
18   International Journal is an international
19   journal, and so many of the submissions
20   come from other countries.  Many of the
21   ones that I look at come either from the
22   Middle East or China or one of the
23   southeast, you know, Asian companies.
24       Oftentimes we get

Page 224

1    manuscripts that relate to a particular
2    center or individual's experience with a
3    procedure.  Oftentimes it's some variant
4    of a procedure.  And so, typically, it's
5    looking at -- it's looking at that.
6        Q.   And you can't give -- be any
7    more --
8        A.   Anti-incontinence procedure
9    that involved some kind of mesh related
10   material.
11       And, again, I'm not giving
12   you the name because it doesn't really
13   have a name, it's something that they
14   came up with themselves as an
15   alternative.
16       Q.   Okay.  And you want the
17   studies that you look at to be objective,
18   right?
19       A.   You and I can spend hours
20   talking about whether anything is ever
21   objective in this sphere.  What we hope
22   is that the studies are well defined,
23   such that biases are apparent and that
24   you minimize the unrecognized biases.

Page 225

1    So, yes, we look at that.
2        Q.   So as objective as it can be
3    under the constraints that it might have?
4        A.   And what goes along with
5    that is that the -- that the endpoints,
6    for example, are objective.  You know,
7    that these are not studies, say, for
8    example, somebody picked up a telephone
9    four years or five years later, called up
10   patients and asked them a series of
11   simple questions and then determined
12   that -- determined the rate of success or
13   not success based on that.
14       You would prefer to have
15   objective data.
16       Q.   Okay.  So objective data, to
17   the extent possible, you want to minimize
18   bias or disclose bias, if it exists,
19   correct?
20       A.   Correct.
21       Q.   And you shouldn't decide
22   what the results are going to be before
23   you get the results, correct?
24       A.   You shouldn't, but that's

57 (Pages 222 to 225)

Marc Toglia, M.D.

Page 226

1    often the case.
2         Q.   Would that cause you some
3    concern if you reviewed a study, as an
4    editor of one of those journals, that the
5    results were predetermined?
6         A.   I think that's a
7    different --
8              MR. SNELL:  Form.
9              THE WITNESS:  I'm sorry.
10   I think that's different
11   than what I just interpreted.
12        I don't think -- no, I don't
13   agree -- I don't agree that
14   results are predetermined in the
15   stuff that we look at.  I think
16   that there's always, you know --
17   there's always a bias of what the
18   results mean or what -- you know,
19   what the results mean.
20        So, yes, I mean, my -- my
21   job, as an editor, is to read a
22   study and to determine, did the
23   study have a primary objective,
24   did -- was the design sufficient

Page 227

1    that they could comment on that
2    objective; and, more importantly,
3    when looking at the results, do
4    they accurately interpret
5    the significance of those results.
6    BY MS. THOMPSON:
7         Q.   What would you do if you
8    were an editor and received a paper where
9    the results were predetermined?
10             MR. SNELL:  Form.
11   Incomplete --
12             THE WITNESS:  I don't
13   know -- I don't understand --
14             MR. SNELL:  -- hypothetical.
15             MS. THOMPSON:  Sorry?
16             THE WITNESS:  -- how I would
17   know they were predetermined.
18             MR. SNELL:  Incomplete
19   hypothetical.
20             MS. THOMPSON:  I'm going to
21   give you -- --
22             THE WITNESS:  If the results
23   are predetermined, you wouldn't
24   need a study.

Page 228

1              - - -
2              (Whereupon, Exhibit
3    Toglia-7, Bates ETH.MESH 05225354,
4    05225380-384; TVT Instructions for
5    Use, was marked for
6    identification.)
7              - - -
8    BY MS. THOMPSON:
9         Q.   Dr. Toglia, have you seen
10   this document from Ethicon before?
11             MR. SNELL:  I'm going to
12   object.  This is part of a larger
13   document that has been provided.
14   You're just cutting two pages.
15             MS. THOMPSON:  And we can
16   get the larger document, if you
17   want him to have it for this
18   purpose.
19             MR. SNELL:  I'm sure it's
20   here somewhere in the files.
21             MS. THOMPSON:  Okay.  If you
22   want him to see it, you're welcome
23   to pull it out.
24             THE WITNESS:  Again, I mean,

Page 229

1    I'm not -- I don't know --
2    understand the context of what
3    this is describing.  I'm familiar
4    with the --
5    BY MS. THOMPSON:
6         Q.   Well, let me ask you this:
7    Dr. Toglia --
8         A.   Yes.
9         Q.   -- did you see the contract
10   with -- between Ethicon and Drs. Olmstead
11   and Nielsen?
12             MR. SNELL:  Hold on.
13   Objection.  Foundation and form.
14   And that actually misstates the
15   evidence.
16        Go ahead.
17             THE WITNESS:  I believe that
18   that's outside the sphere of the
19   task that I was given to look at
20   the design and the safety of the
21   TVT device.
22   BY MS. THOMPSON:
23        Q.   I believe Dr. -- Mr. Snell
24   said that you had this -- the contract

58 (Pages 226 to 229)

Marc Toglia, M.D.

| Page 230 | Page 232 |
|---|---|

Page 230

1  that this is the attachment to.
2      A.  I'm not -- I'm not telling
3  you that I'm not familiar with this
4  document or that I may not have perused
5  this document.
6          However, I may not have -- I
7  may not have committed to memory, you
8  know, the details of these things.
9          I mean, I've looked at
10  thousands of things.
11      Q.  Let's read through it.
12      A.  But for intents and
13  purposes, you know, I would not say that
14  I could speak to the details of what you
15  presented to me.
16      Q.  So you're not giving
17  opinions as to the Olmstead studies
18  regarding TVT?
19          MR. SNELL:  Actually,
20      objection.
21          THE WITNESS:  I think I've
22      given opinions within my expert
23      reports.  I'd be happy to pause
24      and point them out to you, if

Page 231

1      you'd like, counselor.
2  BY MS. THOMPSON:
3      Q.  I guess I just misunderstood
4  your answer.
5      A.  Yes.
6      Q.  Let me -- let me just -- so
7  this exhibit states, The results of the
8  clinical trials will be considered
9  acceptable if, first, they do not differ
10  significantly from the results published
11  in the original article.
12          To you, is that an
13  appropriate study design?
14          MR. SNELL:  Objection.
15      Misstates.  Form.
16          THE WITNESS:  This doesn't
17      refer to that, counselor.  This is
18      not -- I mean, this is not saying
19      that it's acceptable to -- for
20      publication, that -- this
21      doesn't -- I mean, the fact that
22      it speaks to the results has
23      nothing to do with the design.
24          I -- may I give you my

Page 232

1      interpretation of what we're
2      looking at here?
3  BY MS. THOMPSON:
4      Q.  No, you don't need to give
5  me your interpretation.  I'll ask you --
6      A.  You've asked me about this
7  document.
8      Q.  -- you a question and you
9  can answer it.
10          So if the investigators were
11  only paid if these objectives were met,
12  would that be an appropriate design for a
13  clinical study?
14          MR. SNELL:  Objection to
15      form.
16          MS. THOMPSON:  That's a
17      hypothetical.
18          THE WITNESS:  Yes, I
19      understand.  My -- let's make sure
20      we're talking about the same
21      studies.
22          My understanding is that
23      this is referring to the
24      multicenter studies on the TVT

Page 233

1      device and that Olmstead did
2      not -- was not a participating
3      site in the multicenter study.
4      But Olmstead was the individual
5      becoming -- who was being paid.
6          Am I correct?
7  BY MS. THOMPSON:
8      Q.  Who told you that?  Or where
9  did you come up with that?
10      A.  Nobody told me that.  That
11  was just -- I'm just asking you, that was
12  kind of my -- that's kind of where I'm
13  coming from.
14          Can you show me the specific
15  study that we're referring to here?
16      Q.  Mr. Snell -- I'm just asking
17  you about this contract.
18      A.  I'm asking me whether you
19  can show me -- I don't know what this is
20  connected to, what study this is
21  connected to.
22      Q.  There have been multiple
23  studies that have been published --
24      A.  Right.

59 (Pages 230 to 233)

Marc Toglia, M.D.

Page 234

1    Q.   -- from the original
2  cohort --
3    A.   Right.
4    Q.   -- correct?
5        MR. SNELL:  Objection.
6  Form.  Vague.
7        THE WITNESS:  I will answer
8  that question.
9        The original -- I don't
10  know -- the original Olmstead
11  study involved, I think, roughly
12  about 50 patients.  I don't -- I'm
13  aware of the longitudinal studies
14  where Nielsen published on the
15  same cohort of patients at a year,
16  two years, five years, seven
17  years, you know, ten years, et
18  cetera, twelve years, et cetera,
19  et cetera, so on, 11.5 years, 17
20  years.
21        That's not -- I'm just
22  clarifying.  That's not the same
23  as Olmstead.  Olmstead's original
24  report was a series of, I think,

Page 235

1  roughly 50 patients that he
2  himself operated on.
3        And I don't believe that
4  this document refers back to that
5  original study.
6  BY MS. THOMPSON:
7    Q.   Is this -- is it an
8  appropriate study design where the
9  investigator is paid if certain criteria
10  are met when the results are published?
11        MR. SNELL:  Objection to
12  form.  Misstates the evidence.
13        THE WITNESS:  I don't --
14        MR. SNELL:  Asked and
15  answered.
16        THE WITNESS:  I don't know
17  how to answer that.  I'm sorry.
18  BY MS. THOMPSON:
19    Q.   So you don't know how to
20  answer a question about you're only going
21  to get paid if you get these results?
22        MR. SNELL:  Hold on.
23  Objection.  Argumentative.
24        MS. THOMPSON:  I'm just

Page 236

1  trying to understand his answer.
2        THE WITNESS:  No, no, I
3  understand.
4        And, counselor, I understand
5  that you are -- here is my problem
6  and my confusion, okay?  You are,
7  at the same time, asking me a very
8  general question about things I do
9  as an editor in science in
10  general.
11        At the same time, you're
12  putting a very specific document,
13  in isolation, and not providing me
14  with the reference study and
15  you're asking me to make a comment
16  in the middle that seems to link
17  one with the other.
18        And I'm telling you, I'm not
19  able to -- I don't know how -- not
20  that I'm -- not that I'm will --
21  I'm not willing to, I don't know
22  how to make an answer about a
23  study that I don't know -- don't
24  know anything about.

Page 237

1  BY MS. THOMPSON:
2    Q.   I'm only talking about the
3  design of a study.
4        Is this an appropriate
5  design of a study?
6        MR. SNELL:  Objection to
7  form.
8        THE WITNESS:  This paper
9  does not address a design of the
10  study.  This paper does not
11  stipulate if the study is not
12  designed to our satisfaction,
13  they'll be no reimbursement.  This
14  study speaks to results.
15  BY MS. THOMPSON:
16    Q.   Okay.  We'll move on.
17    A.   And the results have nothing
18  to do with the design.  Nor do I see a
19  phrase that says, the study has to be
20  designed such that these results must
21  be --
22    Q.   No.  It's just the
23  investigator wasn't paid if the results
24  weren't -- weren't met.

60 (Pages 234 to 237)

Marc Toglia, M.D.

Page 238

1         MR. SNELL: Objection. Move
2    to strike.
3    BY MS. THOMPSON:
4         Q.   Were you shown -- prior to
5    working in this lawsuit, were you shown
6    the material safety data sheet related to
7    the polypropylene used in Ethicon mesh
8    devices?  And you're a chemist, you know
9    what a material safety data sheet is --
10        A.   I do.
11        Q.   -- correct?
12        A.   I do.
13             No. I did not -- I did not
14   previously look at that material.
15             - - -
16             (Whereupon, Exhibit
17        Toglia-8, ETH.MESH 08696131-132,
18        Exhibit C - Clinical Trials, was
19        marked for identification.)
20             - - -
21             THE WITNESS:  We're talking
22        specifically about regulatory
23        paperwork.  This is non-clinical
24        regulatory type stuff.

Page 239

1             MS. THOMPSON:  I don't think
2        there was a question pending, but
3        I don't think -- sorry.  I don't
4        think the material safety data
5        sheet is a regulatory document.
6    BY MS. THOMPSON:
7         Q.   Okay.  Have you seen the
8    material safety data sheet now, since
9    you've been working on this lawsuit?
10        A.   Yes.  This was part of
11   the -- this was part of the materials
12   provided to me.
13        Q.   And I'll direct your
14   attention to Number 10 in the material
15   safety data sheet regarding stability and
16   reactivity.
17        A.   Yes.
18        Q.   Could you read the sentences
19   under incompatibility?
20        A.   The following materials are
21   incompatible with this product.  Strong
22   oxidizers, such as chlorine, peroxides,
23   chromates, nitric acid, perchlorates,
24   concentrated oxygen, sodium hypochlorite,

Page 240

1    calcium hypochlorite, permanganates,
2    chlorine and nitric acid.
3         Q.   And are those compounds
4    found in the human body?
5         A.   Within the context of this
6    type of testing, I would say they are
7    probably not.  And I don't see -- I don't
8    see anything that says that -- that
9    references in concentrations normally
10   found within human tissue.
11        Q.   And under Number 15, other
12   information --
13        A.   Yes.
14        Q.   -- component toxicity, could
15   you read the sentences after that?
16        A.   Sure.  Polypropylene has
17   been tested in laboratory rats by
18   subcutaneous implants of disc or powder.
19   Local sarcomas were induced at the site
20   of implantation.  No epidemiologic
21   studies or case reports suggest any
22   serious chronic health hazards from
23   long-term exposure to polypropylene
24   decomposition products below the

Page 241

1    irritation level.
2         Q.   Did Ethicon perform any
3    studies to determine whether or not the
4    polypropylene used in their mesh devices
5    causes sarcoma in humans?
6         A.   I don't see that -- that
7    discs of polypropylene or powders of
8    polypropylene have anything to do with
9    the TVT device when used for its proper
10   indication of stress incontinence in
11   women.
12             I think that the science in
13   this area, it is well known that the
14   formation of sarcoma is related to form,
15   form material, and that you can't
16   extrapolate from laboratory rats to
17   humans.
18        Q.   So the answer is you're not
19   aware of any studies that Ethicon did to
20   determine whether a TVT mesh could lead
21   to sarcoma?
22        A.   Let me just refer to my
23   report for a second.
24             I think it's fair to say

61 (Pages 238 to 241)

Marc Toglia, M.D.

Page 242

1  that they did not, but I don't see -- I
2  wouldn't understand why that would be --
3  why that would be relevant.
4      Q.  Is this information
5  something you would want to know, as a
6  physician?
7          MR. SNELL:  Objection to
8      form.
9          THE WITNESS:  Maybe if I was
10     a veterinarian caring for rats and
11     I was implanting discs or powders.
12         But this information is not
13     pertinent or clinically relevant.
14 BY MS. THOMPSON:
15     Q.  Is this information about
16 the polypropylene used in the Ethicon
17 pelvic mesh products something that
18 patients should be informed of?
19         MR. SNELL:  Same objection.
20         THE WITNESS:  To the best of
21     my knowledge, polypropylene discs
22     or powders are not used in the TVT
23     product.  And at the same time,
24     the TVT product is not used in

Page 243

1      rats.
2  BY MS. THOMPSON:
3      Q.  But the fact that the disc
4  and powder in rats may cause cancer is
5  irrelevant, in your opinion?
6      A.  I think animal studies have
7  established that -- that it's related to
8  both the -- the animal and the form and
9  that it is not transferable to humans.
10     Q.  Are you familiar with the
11 term "latency period"?
12     A.  Yes.
13     Q.  Do you know what the latency
14 period for exposure and development of
15 sarcoma is thought to be in humans?
16     A.  No, I'm not.
17     Q.  Would it surprise you if
18 it's 30 years?
19         MR. SNELL:  Form.  Vague.
20     Lacks foundation.
21         THE WITNESS:  It probably
22     would surprise me, yes.
23 BY MS. THOMPSON:
24     Q.  Has a TVT been implanted in

Page 244

1  a human for 30 years?
2      A.  If the first clinical trials
3  of a TVT were published somewhere around
4  '96, we would be 20 years.  Did I do that
5  wrong?  I was thinking '86.
6          We are probably a few --
7  we're probably a few years shy of that.
8      Q.  All right.  I'm going to ask
9  you about whether or not you had seen any
10 documents or whether Ethicon had told you
11 about certain things prior to your
12 involvement in this lawsuit, okay?
13     A.  Okay.
14     Q.  Is that -- do you
15 understand?
16         MR. SNELL:  Can I say one
17     thing?  Off the record.
18         VIDEO TECHNICIAN:  We are
19     off the record.  The time is 6:04
20     p.m.
21             - - -
22         (Whereupon, a brief recess
23     was taken.)
24             - - -

Page 245

1          VIDEO TECHNICIAN:  This
2      marks the beginning of Video
3      Number 4.  We are back on the
4      record.  The time is 6:06 p.m.
5  BY MS. THOMPSON:
6      Q.  So, Dr. Toglia, I'm going to
7  ask you some questions about whether you
8  either saw documents or Ethicon told you
9  about certain things.  And this would all
10 be prior to your involvement in this
11 lawsuit.
12     A.  Yes.
13     Q.  Did Ethicon tell you that
14 mechanically cut mesh thins or stretches
15 when it's placed under tension?
16         MR. SNELL:  Form.
17         THE WITNESS:  I don't need
18     Ethicon to tell me about the
19     properties of the material, given
20     that I handle it on a frequent
21     basis.
22 BY MS. THOMPSON:
23     Q.  And other doctors don't need
24 that information either?

62 (Pages 242 to 245)

Marc Toglia, M.D.

Page 246

1      A.   I'm sorry, I don't see the
2  relationship to that -- the question.
3      Q.   Is it your opinion that
4  doctors generally don't need the
5  information that Ethicon has about the
6  mechanically cut mesh thinning --
7      A.   All right.
8      Q.   -- and stretching on
9  tension?
10     A.   So we're no longer talking
11 about what you said that we're going to
12 talk about, which was Ethicon's
13 communication with me on this material?
14 Are we done with that?
15     Q.   Well, on this particular
16 item, I want to know whether you think --
17 you said it's not -- you don't need to
18 hear it from Ethicon.
19     A.   Correct.
20     Q.   I'm asking you, do other
21 doctors need to hear it or would want to
22 hear it from Ethicon?
23         MR. SNELL:  Form.
24         THE WITNESS:  I don't

Page 247

1      know -- I don't know what other
2      doctors would need or want to
3      hear.  I think that, you know, in
4      the -- prior to my involvement in
5      this matter, there were
6      discussions amongst physicians and
7      Ethicon engineers, and other
8      people, where we discussed the
9      properties of mechanically cut
10     mesh and how it behaves under both
11     physiologic and nonphysiologic,
12     you know, circumstances.
13         I would say, again, as a
14     surgeon, the nonphysiologic stuff
15     really is of no clinical meaning,
16     nor do I think that you can infer
17     any kind of clinical importance to
18     that information.
19 BY MS. THOMPSON:
20     Q.   Okay.  And even if Ethicon
21 thought it was clinically important, you
22 didn't feel like you needed to have that
23 information?
24         MR. SNELL:  Form.

Page 248

1          THE WITNESS:  Again, I don't
2      rely upon Ethicon to tell -- to
3      provide me with information as it
4      relates to how I manage patients
5      or the materials that I use.
6  BY MS. THOMPSON:
7      Q.   And you're not -- you do not
8  feel like you can give an opinion as to
9  whether other doctors would want to or
10 need that information?
11     A.   I think that's beyond the
12 scope of what I've prepared, yes.
13     Q.   Okay.  Did Ethicon, and
14 there are going to be a whole bunch of
15 these, so if your answer is the same we
16 can kind of go with that.
17     A.   I don't know what you're
18 going to ask me.
19     Q.   Did Ethicon tell you or show
20 you documents showing fraying of
21 mechanically cut mesh?
22         MR. SNELL:  Form.
23         Go ahead.
24         THE WITNESS:  I've seen

Page 249

1      documents that -- I don't know
2      that I would use the word
3      "fraying," per se.  I think you're
4      implying, you know -- or labeling,
5      per se.
6  BY MS. THOMPSON:
7      Q.   You've never seen documents
8  that use the word "fraying"?
9      A.   No, there are documents that
10 use the word "fraying."
11     Q.   Ethicon documents?
12     A.   There are Ethicon documents
13 that use the word "fraying."  I have seen
14 those documents.
15     Q.   So, at least, people at
16 Ethicon called it fraying?
17     A.   Yeah.  I just -- I just --
18 what's the working definition of fraying?
19 Is your definition of fraying the same as
20 mine?  The same as theirs?
21     Q.   But is that the same, in
22 your opinion, that that -- that
23 information is irrelevant to you in your
24 practice?

63 (Pages 246 to 249)

Marc Toglia, M.D.

Page 250

1  A.  No.  I don't think that's
2  what I'm speaking to.  Information is
3  relevant.  Whether it's relevant that
4  Ethicon absolutely had to communicate
5  one-on-one with me on that particular
6  issue is what I'm speaking about.
7  Q.  I don't -- I don't think I
8  asked about one-on-one.
9  I'm just asking you, is that
10  information that you would have liked to
11  have known, if Ethicon had that
12  information?
13  A.  I did know about that
14  information, and I did receive that
15  information from Ethicon.
16  Q.  Okay.  And did other doctors
17  receive that information --
18  A.  Yes.
19  Q.  -- that mechanically cut
20  mesh frayed?
21  A.  Yes.
22  Q.  Did you teach about that
23  when you were doing your courses or doing
24  your preceptor training?

Page 251

1  A.  Well, again, the fraying
2  occurred at nonphysiologic, you know,
3  forces.  And so, yes, I think that we did
4  talk about mesh, its properties, its
5  behavior, how the -- how -- why it was
6  important to adhere to the well-described
7  steps of the procedure in order for the
8  mesh to perform with -- under the normal
9  physiologic load, under the normal
10  physiologic capacity, and in that
11  capacity, fraying was not a clinical
12  concern.
13  Q.  Who told you that these were
14  nonphysiologic forces?
15  A.  Based upon, you know, my
16  body of knowledge, reading the material,
17  discussing with other experts, you know,
18  having to do a little bit of reading
19  about physiologic forces.
20  I mean, physiologic forces
21  within the pelvic floor, obviously, is
22  somewhat unique to our subspecialty.  I
23  don't expect that people are taught that
24  in medical school, for example.

Page 252

1  Q.  So if Ethicon thought --
2  Ethicon thought they were using
3  physiologically safe, you would
4  disagree with them?
5  A.  I'm sorry?
6  Q.  If Ethicon, when they did
7  their testing, stated that they were
8  using physiologic circumstances, you
9  would disagree with them?
10  MR. SNELL:  Objection to
11  form.  Vague.
12  THE WITNESS:  I would
13  disagree that they were using
14  phys --
15  BY MS. THOMPSON:
16  Q.  The amount of stretch, for
17  example?  The tension applied, for
18  example?
19  A.  I mean, the only --
20  MR. SNELL:  Same objection.
21  THE WITNESS:  I can answer
22  it like this:  I am aware that
23  Ethicon conducted testing looking
24  at the mechanical properties of

Page 253

1  the mesh and that that testing
2  started from no -- you know, no
3  tension through the physiologic
4  range to supraphysiologic range.
5  It was looked -- it was
6  looked upon -- and this is all
7  kind of -- how the material
8  behaves in that regard, to be
9  honest with you, has very little
10  to do with how the material
11  behaves once it's incorporated or
12  placed within the body.
13  But I know that -- I know
14  that they did perform tests.
15  I've seen the results of those
16  tests.  We have probably, in the
17  past, spoken about data that talks
18  about the different meshes, are
19  they similar -- are they
20  different, similar, physiologic
21  load, supraphysiologic load.
22  Those were all fairly freely
23  discussed.
24  BY MS. THOMPSON:

64 (Pages 250 to 253)

Marc Toglia, M.D.

Page 254

1      Q.   What about roping or curling
2  of the TVT mesh, was that something that
3  was discussed with you prior to your
4  involvement in this lawsuit?
5      A.   Well, I can -- again, I can
6  tell you, from using that mechanically --
7  mesh for an extended period of time, you
8  know, the mesh does not rope or curl when
9  it's -- when -- you know, in the context
10  that it has a -- the protective sheath
11  over it.  And we don't place the mesh
12  without the protective sheath.
13          When the meth -- so when
14  you're delivering the mesh in the TVT
15  procedure, the sheath is carrying the
16  mesh.  The mesh is passive.  The mesh is
17  not exposed to the those forces.  It's
18  only after the sheath is positioned that
19  you pull the mesh off.  Somewhat like the
20  magic trick where you kind of -- not that
21  it's a magic trick, where you pull the
22  table cloth and the stack of cups goes
23  undisturbed.
24          The mesh is never, in the

Page 255

1  clinical application of the TVT, as we
2  use it, as I use it for stress
3  incontinence, we don't apply any
4  physiologic force.
5          The only -- the only thing
6  that I would say is that you've got
7  minimal static and rolling friction that
8  does occur as you remove the sheath and
9  the mesh is left behind.
10      Q.   So your -- your testimony is
11  that the mesh, if it is placed flat,
12  remains flat?
13      A.   Correct.
14      Q.   And if Ethicon had evidence
15  to the contrary, is that something that
16  you would like to know about?
17          MR. SNELL:  Form.
18          Go ahead.
19          THE WITNESS:  It wouldn't
20      hurt my feelings if I was not
21      aware of that information.  I
22      don't see how that information is
23      clinically relevant in my world.
24  BY MS. THOMPSON:

Page 256

1      Q.   And would that be the same
2  for other physicians as well?
3      A.   I can't speak to what other
4  physicians might consider to be relevant.
5      Q.   If Ethicon had information
6  that the fraying, roping and curling
7  actually increased the risk of retention,
8  is that information that you would like
9  to have?
10      A.   I -- I would --
11          MR. SNELL:  Form.
12      Foundation.
13          THE WITNESS:  -- say that I
14      know that information independent
15      of that -- I don't need that
16      information -- okay, Ethicon does
17      not implant these meshes in women.
18      I implant these meshes in women.
19      I implant these meshes in over 100
20      women a year for the past 17
21      years.  I am well aware of how
22      this particular material behaves
23      within the body, and I can tell
24      you, when it is done properly,

Page 257

1      there is no roping, there is no
2      curling.
3  BY MS. THOMPSON:
4      Q.   And is that information that
5  other physicians would -- would want to
6  know or need to know from Ethicon?
7          MR. SNELL:  Form.
8          THE WITNESS:  I would say
9      within the context of the
10      instructions for use, which
11      outlined, in great detail, the
12      very specific steps that are to be
13      taken, when performed in that
14      manner, there is no roping or
15      curling of the material.
16          And keep in mind, we're
17      talking about the tension-free
18      placement of the mesh.  So that
19      excludes --
20  BY MS. THOMPSON:
21      Q.   And you'll agree --
22      A.   So that excludes all of the
23  testing that you are referring to,
24  because all those testing refer to

65 (Pages 254 to 257)

Marc Toglia, M.D.

| Page 258 | Page 260 |
|---|---|
| 1  tension, whether it's physiologic or | 1  stating otherwise? |
| 2  nonphysiologic. | 2       MR. SNELL: Objection to |
| 3       Q.   You'll agree with me that | 3  form. Misstates the evidence. |
| 4  the mesh shrinks, contracts? | 4       THE WITNESS: My opinion, as |
| 5       MR. SNELL: Form. | 5  an expert, the TVT mesh is Type I, |
| 6  Overbroad. | 6  regardless if Ethicon were to tell |
| 7       THE WITNESS: As a general | 7  me yes or no. |
| 8  sense, a hernia mesh, there is | 8  BY MS. THOMPSON: |
| 9  shrinkage. Whether there is | 9       Q.   Okay. If Ethicon had |
| 10  shrinkage in a TVT mesh, I don't | 10  information that showed that the fraying, |
| 11  believe that there is clinically | 11  roping and curling causes the pores to |
| 12  significant shrinkage. | 12  collapse or close and render the mesh no |
| 13       Now, of course, because this | 13  longer macroporous, is that information |
| 14  is the most highly biocompatible | 14  that you would like to know about? |
| 15  mesh there is, it allows for the | 15       MR. SNELL: Form. |
| 16  ingrowth of fibroblasts and | 16  Foundation. |
| 17  reticulocytes. It allows for the | 17       THE WITNESS: I don't see |
| 18  infiltration of white cells and | 18  how it's relevant, counselor, |
| 19  angiogenesis. | 19  okay? |
| 20       As the tissue heals against | 20  BY MS. THOMPSON: |
| 21  the mesh, the mesh is going to | 21       Q.   That's -- that's a perfectly |
| 22  change, and that is expected. And | 22  acceptable answer. |
| 23  that was actually the -- the | 23       A.   As a surgeon, is it -- is it |
| 24  original design of the TVT | 24  effective. |

| Page 259 | Page 261 |
|---|---|
| 1  specifically spoke to the fact | 1       Q.   If Ethicon -- and that goes |
| 2  that the mesh would -- the mesh | 2  the same for other doctors as well? |
| 3  would induce collagen formation | 3       A.   I can't speak to what other |
| 4  and other structural changes in | 4  doctors might hold to be important or |
| 5  the area around the mesh. And | 5  what they might comment. |
| 6  that was considered to be an | 6       Q.   If Ethicon has information |
| 7  important part of the clinical | 7  that fraying, roping and curling of their |
| 8  effect. | 8  mesh leads to an increased risk of |
| 9  BY MS. THOMPSON: | 9  erosion, is that information that you |
| 10       Q.   What's your basis for saying | 10  would like to have? |
| 11  TVT is the most highly biocompatible mesh | 11       MR. SNELL: Form. |
| 12  there is? | 12  Foundation. |
| 13       A.   I'm sorry. Macroporous | 13       THE WITNESS: I can tell you |
| 14  polypropylene mesh that is classified as | 14  I have an independent opinion |
| 15  Type I by the Amid classification. Of | 15  that, yes, if the mesh were to |
| 16  which -- | 16  curl, that there might be an |
| 17       Q.   And that's what -- | 17  increased risk of erosion relative |
| 18       A.   -- of which -- | 18  to a mesh that has not curled. |
| 19       Q.   -- you believe TVT is? | 19       Now, the risk of exposure |
| 20       A.   Of which TVT has been the | 20  might go from, say, .6 to .7 |
| 21  most extensively studied. | 21  percent, which is what it has been |
| 22       Q.   And you believe that it is? | 22  in most clinical trials; maybe |
| 23       A.   I know it is, yes. | 23  that might go up to, say, 1.2, 3 |
| 24       Q.   Despite Ethicon documents | 24  percent, 3.2 percent. |

66 (Pages 258 to 261)

Marc Toglia, M.D.

Page 262

1    But I would agree -- I mean,
2    I would say I have had the same
3    observation, and I don't need to
4    hear that from Ethicon, that if
5    the mesh is not placed in a
6    tension-free manner -- the mesh is
7    not going to rope or curl if it's
8    tension free. Because in it's
9    native state, the mesh is not
10   roped or curled.
11   BY MS. THOMPSON:
12       Q.   And I think you've already
13   stated that if it's placed flat, in your
14   opinion, it remains flat?
15       A.   That's correct.
16       Q.   If Ethicon had information
17   that fraying and roping and curling of
18   mechanically cut mesh leads to an
19   increased risk of bridging fibrosis, is
20   that information you would want to have?
21       MR. SNELL:   Form.
22       THE WITNESS:  I would --
23   again, bridging fibrosis, in my
24   opinion, is likely to be a natural

Page 263

1    or an expected outcome.  It's,
2    again, speaking to what the
3    original design -- it was hoped
4    that there would be the induction
5    of collagen, mature collagen
6    formation.
7        And that, yes, I mean, all
8    of these procedures, in the -- in
9    the world of prolapse
10   incontinence, you're kind of
11   hoping that there's a certain
12   degree, again, within a
13   physiologic range, that there's
14   fibrosis, that occurs, absolutely.
15   BY MS. THOMPSON:
16       Q.   In other words, replace with
17   scar?
18       MR. SNELL: Form.
19       THE WITNESS:  I don't know
20   how it is that you're interpreting
21   scar. I'm talking about the --
22   you want it to induce a certain
23   amount of collagen formation; in a
24   very loose sense scarring, sure.

Page 264

1    All surgical procedures result
2    some scarring.
3        Now, whether those -- that
4    scarring occurs from the incision
5    that I've made, whether it occurs
6    from the suture that I've placed,
7    whether it occurs based upon
8    something else I may do, I don't
9    know how I would separate, you
10   know, one from the other.
11       You can -- you will never
12   have no scarring, despite what the
13   TV ads will say.  There's no
14   scarless surgery.
15   BY MS. THOMPSON:
16       Q.   Do you use polypropylene
17   suture in the vagina?
18       A.   Yes.
19       Q.   For what procedure?
20       A.   Again, the vast majority of
21   what I do in the reconstructive world
22   involves some -- some formulation of
23   polypropylene.  Polypropylene sutures are
24   commonly used in all of urogynecology for

Page 265

1    apical vaginal suspensions.
2        Q.   When you place a
3    polypropylene suture, how much suture is
4    left in the body?  What's the length of
5    suture?
6        A.   I would say that the length
7    of suture left behind, understanding
8    that, obviously, we've tied a series of
9    knots, I don't know if you're -- you just
10   want -- I mean, the whole thing, in
11   aggregate, is less than a centimeter.
12       If I were to unwind or untie
13   it and stretch it out, that could be,
14   maybe, 3 centimeters.  But I don't think
15   that's an accurate -- accurate
16   description.  I would say, in general,
17   it's half a centimeter to a centimeter.
18       Q.   And do you have any idea how
19   much -- what the length of suture with
20   filaments would be if you stretched out
21   all the polypropylene in a TVT?
22       MR. SNELL:  Objection to
23   form.
24       THE WITNESS:  I don't have

Marc Toglia, M.D.

Page 266

1    any -- but, again, keep in mind,
2    all the procedures I'm describing,
3    if I'm doing autologous fascial
4    sling, I'm using very long
5    polypropylene sutures.  If I'm
6    doing a Burch suspension, I am
7    using 4 to 6 polypropylene
8    sutures.
9         It's the same.
10   BY MS. THOMPSON:
11        Q.   So it's your opinion that
12   mesh devices like the TVT and sutures are
13   essentially the same?
14        A.   No, that's not what I said.
15   I said the polypropylene material is
16   commonly used in urogynecologic surgery.
17   It is the same -- it is the same
18   material -- it's based upon the same base
19   material whether I'm doing an autologous
20   fascial sling, whether I'm doing a Burch
21   suspension, whether I'm doing an vaginal
22   apical suspension, whether I'm doing a
23   synthetic midurethral sling;
24   understanding that when I say synthetic

Page 267

1    midurethral sling I am specifically
2    referring to the Retropubic TVT device.
3         Q.   Where is the suture placed
4    with an autologous sling?
5         A.   Well, the -- there is an
6    autologous -- excuse me, there is a
7    polypropylene suture typically attached
8    at either end of the sling.  It is
9    passed, in a similar manner, through a
10   vaginal incision, up through the space of
11   Retzius, up through the rectus fascia
12   into the subcutaneous space, analogous to
13   a TVT procedure.  The difference is, it's
14   tied with tension across itself in that
15   manner.
16        Q.   But there's no polypropylene
17   underneath the urethra when you do an
18   autologous sling procedure, is there?
19        A.   Under the urethra?  Well,
20   it's -- unless someone uses a smaller
21   piece of polypropylene to stabilize the
22   mesh under the urethra.  And I have seen
23   that.
24        But I would say, you know,

Page 268

1    the intended procedure, it's the fascia
2    that is below it.
3         Q.   And there's no suture when
4    you are doing a Burch procedure that's
5    placed underneath the urethra, is there?
6         A.   Well, the Burch procedure,
7    as I commented earlier, has nothing to do
8    with the urethra.  It's a procedure that
9    stabilizes the bladder neck.
10        Now, you know, I -- it just
11   occurred to me that, you know, we have
12   used the material of the sling in the
13   field of urogynecology for probably
14   between 30 and 50 years.  You know, it's
15   surprising to me that if the latency for
16   sarcoma is 30 years, we should be seeing
17   those patients.  In fact, we should be
18   seeing those patients now.
19        MS. THOMPSON:  I don't think
20        there was a question about that,
21        so I'll move to strike that answer
22        as nonresponsive.
23   BY MS. THOMPSON:
24        Q.   If Ethicon had information

Page 269

1    that the fraying, roping and curling led
2    to a diminished tissue integration, is
3    that information you would want to know?
4         MR. SNELL:  Form.
5         Foundation.
6         THE WITNESS:  Again, I don't
7         rely upon Ethicon to communicate
8         that information.  But I have had
9         discussions with them.  I'm
10        aware -- they did communicate that
11        information to myself.
12   BY MS. THOMPSON:
13        Q.   And is that information
14   other doctors should or would want to
15   know?
16        A.   I can't speak to what other
17   doctors should or would want to know.
18        Q.   If Ethicon had information
19   that the fraying, roping and curling of
20   mechanically cut mesh led to an increased
21   risk of infection, is that information
22   you would want to know from Ethicon?
23        MR. SNELL:  Form and
24        foundation.

68 (Pages 266 to 269)

Marc Toglia, M.D.

Page 270

1     THE WITNESS:  Again, I would
2  want to know that information from
3  well-designed, high-level studies,
4  especially -- you know, that's
5  where I would seek that
6  information.
7     I'm sorry, if you're
8  satisfied with that answer, may I
9  take a break to go to the
10  bathroom?
11     MS. THOMPSON:  Let me
12  just -- I have about, like, one
13  more question in this section.
14     THE WITNESS:  May I be a
15  little more insistent that I be --
16     MS. THOMPSON:  Yeah, sure.
17     THE WITNESS:  -- allowed to
18  take a break to go to the
19  bathroom?
20     MS. THOMPSON:  Yes, sir.
21     VIDEO TECHNICIAN:  We are
22  off the record.  The time is 6:27
23  p.m.
24          - - -

Page 271

1     (Whereupon, a brief recess
2  was taken.)
3          - - -
4     VIDEO TECHNICIAN:  We are
5  back on the record.  The time is
6  6:40 p.m.
7  BY MS. THOMPSON:
8     Q.   Dr. Toglia, had you reviewed
9  the instructions for use for the TVT when
10  you started using the device?
11     A.   Yes, absolutely.
12     Q.   And did you periodically
13  review the instructions for use as you
14  were teaching courses and acting as a
15  preceptor for Ethicon?
16     A.   I did, yes.
17     Q.   Do you know whether the
18  instructions for use changed over the
19  time period between 1998 and 2015?
20     A.   Yes.  My recollection is
21  that part of the work that I did with
22  them, particularly on the TVT EXACT®
23  product, we re-looked at the instructions
24  for use.  Certain points were felt that

Page 272

1  needed a little bit more emphasis or
2  clarity.  There was, maybe, a little bit
3  more specificity in some areas, a little
4  less specificity in other areas.
5     Q.   Did the adverse reactions
6  section change at all during that time
7  period?
8     A.   I'm not -- I can't give you
9  an independent recollection of that, as
10  we speak.  To me, the instructions for
11  use, I focused on, you know, my -- my
12  focus is actually the instructions on
13  using the device.
14     Q.   But this -- this document
15  would have been provided to physicians at
16  your training courses, correct?
17     A.   I believe so, yes.
18     Q.   In your report, I believe,
19  you stated that, IFU is clear, useful and
20  adequate to describe the procedure and
21  potential risks.
22     Does that sound right?
23     MR. SNELL:  What page are
24  you on?

Page 273

1     MS. THOMPSON:  Page 17, at
2  the top of the page.
3     MR. SNELL:  Thank you.
4  BY MS. THOMPSON:
5     Q.   The IFU and professional
6  education for the TVT are clear, useful
7  and adequate to describe the procedure
8  and potential risks.
9     I'm just reading that from
10  your report.
11     A.   I'm sorry, as usual, I'm a
12  little slower than -- than you all.
13     You're saying it's on Page
14  15?
15     Q.   I think I said 17.
16     A.   Yes.
17     Q.   And then -- and you go on to
18  say that, Risks of SUI surgery are
19  obvious to surgeons and as surgeons, we
20  are expected to be aware of the risk in
21  light of our education, training and
22  experience.
23     A.   Yes.
24     Q.   Do you believe that a

69 (Pages 270 to 273)

Marc Toglia, M.D.

Page 274

```
 1    company --
 2         MR. SNELL:  Let's go off the
 3    record.
 4         VIDEO TECHNICIAN:  We're off
 5    the record at 6:43 p.m.
 6            - - -
 7         (Whereupon, a discussion off
 8    the record occurred.)
 9            - - -
10         VIDEO TECHNICIAN:  We are
11    back on the record.
12    BY MS. THOMPSON:
13         Q.   Do you believe, Dr. Toglia,
14    that a company can assume that doctors
15    know certain risks and avoid warning of
16    the risks as a result?  That's a
17    yes-or-no question.
18         MR. SNELL:  Form.  He
19    doesn't have to answer yes or no,
20    he can answer how he sees fit.
21    BY MS. THOMPSON:
22         Q.   Do you want me to repeat it?
23         A.   Well, I know that -- that
24    this is one of -- you know, as a surgeon
```

Page 275

```
 1    that does anti-incontinence procedure,
 2    I'm doing all the other procedures, this
 3    is an additional procedure that I'm
 4    doing, this procedure is based upon
 5    foundation principles that are somewhat
 6    common to the other procedures.
 7         And so, naturally, it
 8    follows that a risk of, say, bladder
 9    injury or a risk of bleeding, the risk of
10    infections -- again, these are -- these
11    are inherent risk and elemental risks of
12    all surgical procedures.
13         We're not teaching these
14    procedures to non-surgeons to do.  It's
15    not that I'm picking a family practice
16    doctor and saying, here, why don't you do
17    this, you've got some patients.
18         So it's -- I think it's
19    predicated that, you know, a surgeon, you
20    know, that was interested in using a TVT
21    device in lieu of a different procedure
22    that they were presently performing
23    understands the general risks of surgery.
24    I think that's what that statement speaks
```

Page 276

```
 1    to.  That was my intention in making that
 2    statement.
 3         Q.   So you're -- you're speaking
 4    of the general risk of surgery, not those
 5    that are specific to the TVT device?
 6         A.   I'm talking about the risks
 7    that are specific to anti-incontinence
 8    procedures in women.
 9         MS. THOMPSON:  We can stop
10    there.
11         THE WITNESS:  No, keep
12    going.  That's fine.  If you like.
13         MR. SNELL:  I'm hungry.
14         MS. THOMPSON:  We'll stop.
15         VIDEO TECHNICIAN:  We are
16    off the record.  The time is --
17         THE WITNESS:  That's fine.
18         VIDEO TECHNICIAN:  We are
19    off the record at 6:47.
20            - - -
21         (Whereupon, a dinner recess
22    was taken.)
23            - - -
24         VIDEO TECHNICIAN:  We are
```

Page 277

```
 1    back on the record.  The time is
 2    7:24 p.m.
 3    BY MS. THOMPSON:
 4         Q.   Before we get started with
 5    the rest of the questions, Dr. Toglia,
 6    I've looked through the materials that
 7    you've brought.
 8         A.   Yes.
 9         Q.   And it looks to me like that
10    top cardboard box has the materials that
11    were not the ones related to your report
12    and the materials that Mr. Snell provided
13    you.
14         MS. THOMPSON:  So if we
15    could just mark that box -- the
16    contents of that box as an exhibit
17    for the deposition.
18         MR. SNELL:  I don't know if
19    that's accurate, but you can mark
20    whatever you want to.
21         MS. THOMPSON:  That was what
22    I kind of determined.  Everything
23    else looked like it was either
24    depositions or documents or
```

70 (Pages 274 to 277)

Marc Toglia, M.D.

Page 278

1    literature related to the report.
2    So we'll just do that.
3        MR. SNELL:  Well, I did -- I
4    mean, we sent him the depositions
5    after his report and all the
6    exhibits and stuff.
7        MS. THOMPSON:  Yeah, but I
8    don't need to mark those.
9        And then did you say that
10   you brought some thumb drives
11   also?  I didn't see those.
12       THE WITNESS:  It's
13   essentially this -- this material
14   here.
15       MS. THOMPSON:  It's
16   basically this stuff, too?
17       THE WITNESS:  I can
18   guarantee you it's no different.
19       MS. THOMPSON:  Let's mark
20   these.
21       THE WITNESS:  One of them is
22   simply -- one of them is simply
23   the expert reports.
24       MS. THOMPSON:  So the box

Page 279

1    and the two thumb drives.
2            - - -
3        (Whereupon, Exhibit
4    Toglia-9, ETH.MESH 02026591-595,
5    Material Safety Data Sheet, was
6    marked for identification.)
7            - - -
8        (Whereupon, Exhibit
9    Toglia-10, Three Thumb drives
10       produced by Marc Toglia, M.D., was
11       marked for identification.)
12           - - -
13   BY MS. THOMPSON:
14       Q.   Dr. Toglia, I think before
15   the break, we were just beginning to talk
16   about the instructions for use.
17       A.   Yes.
18       Q.   And I believe you said that
19   you reviewed them throughout the time
20   period and up to the present day that
21   you've been using TVT on a -- on some
22   kind of regular basis or --
23       A.   TVT and TVT EXACT®.
24       Q.   TVT and TVT EXACT®, thank

Page 280

1    you.
2        Do you believe that the
3    instructions for use are complete?
4        A.   I believe that the
5    instructions for use do exactly that,
6    they -- they accurately describe the
7    instructions on how the product is to be
8    used.  They provide the step-by-step
9    mechanics of the procedure.
10       Q.   And complete and accurate in
11   terms of the listing of potential risks
12   as well?
13       A.   I'm not sure what you mean
14   by "complete."  I mean, I think it would
15   be impractical to reissue the instruction
16   for use every week or two.  Those are
17   provided inside the box.
18       I don't -- I don't know what
19   form -- you know, what program is used to
20   determine how often to update those.
21       Q.   Do you know if -- I believe
22   I already asked you the question about
23   how often they were updated.  But I can't
24   remember the answer.

Page 281

1        A.   No, you didn't ask me that
2    question.
3        To the best of my knowledge,
4    I'm aware of the initial and then the
5    update that occurred roughly around the
6    time the EXACT® was introduced, I
7    believe.
8        Q.   And are you aware of an
9    update that occurred some time this year?
10       A.   I am aware, yes, I did see
11   that.  There was an update.
12           - - -
13       (Whereupon, Exhibit
14   Toglia-11, Selection of Materials
15       produced by Marc Toglia, M.D., was
16       marked for identification.)
17           - - -
18   BY MS. THOMPSON:
19       Q.   I have marked the TVT
20   instructions for use as Exhibit Number 7.
21   And I just have a few questions for you.
22       A.   This is the original?
23       Q.   This, I believe, is from --
24   from 2000.

71 (Pages 278 to 281)

Marc Toglia, M.D.

Page 282

1      A.   Please, do not ask me to
2   read anything from this.
3      Q.   Oh, yeah, I'm sorry about
4   that.
5      A.   Yeah, in Spanish.
6      Q.   Let me read -- sorry this
7   the smallness of that print.
8      A.   I think this is Turkish.
9      Q.   We're not going to read the
10  Turkish.
11         MR. SNELL:  I have 7 marked
12  as the Olmstead clinical thing.
13  And I think you just said this was
14  7.
15         MS. THOMPSON:  You know
16  what, we had marked this earlier
17  as 7 and then --
18         MS. COPE:  What's the
19  sticker say on it?
20         MS. THOMPSON:  The sticker
21  says -- Dr. Toglia, what does the
22  sticker say?
23         THE WITNESS:  Mine says 7.
24         MS. THOMPSON:  Yeah, we put

Page 283

1   a 7 instead, so let's change it to
2   8.
3            - - -
4         (Whereupon, a discussion off
5   the record occurred.)
6            - - -
7         MS. THOMPSON:  Off the
8   record till we get our exhibit
9   straight.
10        VIDEO TECHNICIAN:  We are
11  off the record.  It's 7:30 p.m.
12           - - -
13        (Whereupon, a discussion off
14  the record occurred.)
15           - - -
16        VIDEO TECHNICIAN:  We are
17  back on the record.
18  BY MS. THOMPSON:
19     Q.   Dr. Toglia, these were how
20  the instructions for use were produced to
21  us, and I apologize for the small print.
22        But I'll read you what I
23  want to ask you about, and if you -- if
24  you can tell at least that it's kind of

Page 284

1   close.  And we will not be reading the
2   Turkish or Spanish or any other language.
3         On the --
4      A.   There's Italian.
5      Q.   And Italian.  Do you know
6   Italian?
7      A.   No.
8      Q.   On the second page, Bates
9   number 380, under TVT device, it states,
10  This bidirectional elastic property
11  allows adaptation to various stresses
12  encountered in the body.
13     A.   Where do you see that?
14     Q.   Under TVT device, the second
15  paragraph, the last sentence.
16     A.   And, I'm sorry, this is from
17  when?
18     Q.   2000.
19     A.   Okay.  I'll accept that.
20     Q.   The bidirectional elastic
21  property allows adaptation to various
22  stresses encountered in the body.
23        Do you know what the basis
24  for that statement is?

Page 285

1         MR. SNELL:  Objection.
2   Completeness.
3         Go ahead.
4         THE WITNESS:  I don't know
5   the direct -- what the direct
6   basis is.
7   BY MS. THOMPSON:
8      Q.   Would you agree that the
9   bidirectional elastic property allows
10  adaptation to various stresses
11  encountered in the body with the TVT
12  device?
13     A.   I would assume that it
14  allows adaptations within two directions,
15  bidirectional.
16     Q.   And is it your understanding
17  that that's what the TVT does, how the
18  TVT behaves?
19        MR. SNELL:  Form.
20        THE WITNESS:  Again, I'm not
21  familiar with the context, so I
22  don't -- can't answer that
23  question, sorry.
24  BY MS. THOMPSON:

72 (Pages 282 to 285)

Marc Toglia, M.D.

Page 286

1    Q.   Did you ever ask Ethicon,
2  during the time that you were serving as
3  a preceptor, what was meant by that
4  statement?
5    A.   I don't believe I ever asked
6  them what was meant by that statement.
7    Q.   On the next page, under
8  instructions for use, the first sentence,
9  The procedure can be carried out under
10 local anesthesia, but it can also be
11 performed using regional or general
12 anesthesia.
13       Do you perform most of your
14 TVTs under local or general?
15   A.   The majority of our
16 procedures, the vast majority, are
17 performed with -- not with general
18 anesthesia.  It's local anesthesia with
19 monitored anesthesia care, which is
20 intravenous sedation.
21       There are times, of course,
22 the patient may request general
23 anesthesia.  There are times that the
24 anesthesiologist might be insistent on

Page 287

1  general anesthesia.
2        I present it as a procedure
3  that we advocate for local with monitored
4  anesthesia care.
5    Q.   And with the MAC anesthesia,
6  the patient is asleep, although not under
7  a full general anesthesia, correct?
8    A.   As you know, sleep is not a
9  medical term.  I would say the patient is
10 not conscious.
11   Q.   If Ethicon had information
12 that the success rate was higher if a
13 local anesthesia was used, is that
14 information that you, as a physician,
15 would like to have?
16       MR. SNELL:  Form.
17 Foundation.
18       THE WITNESS:  I've got to be
19 honest with you, I would not allow
20 Ethicon to -- I mean, I'm the
21 surgeon, I do the procedures, they
22 don't.  I don't think the form of
23 anesthesia has any influence.
24       I think that early on we

Page 288

1  would talk about whether -- how do
2  you -- how do you set the mesh in
3  its final position, whether you
4  use a, quote/unquote, cough test,
5  which, obviously, you couldn't do
6  with general anesthesia, do you
7  simply eyeball it, use a spacer.
8        I think, really, the
9  underlying message was always that
10 you don't tension -- you don't put
11 tension on the mesh or position
12 the mesh in an obstructive manner.
13       I don't believe, nor am I
14 aware, that the success rates are
15 higher.  I don't believe that
16 there are any high-quality studies
17 that randomize people to one or
18 the other.
19 BY MS. THOMPSON:
20   Q.   Is that information that
21 other physicians would like to have, do
22 you believe?
23   A.   I know that in the course of
24 training, when I would train a physician,

Page 289

1  it's something that we would discuss, you
2  know, as -- as an option.
3    Q.   Under adverse reactions,
4  Bates Number 3883 --
5    A.   Yes.
6    Q.   -- the IFU states,
7  Transitory local irritation at the wound
8  site and a transitory foreign body
9  response may occur.  This response could
10 result in extrusion, erosion, fistula
11 formation and inflammation.
12       Is that a correct statement?
13   A.   I would assume if it was
14 included in here, that they believe that
15 that was a correct statement.
16       I can't tell you that I
17 personally have ever witnessed any of
18 that.
19   Q.   And that's because, of your
20 3,000 patients with pelvic mesh, you've
21 never observed a foreign body response,
22 correct?
23       MR. SNELL:  Objection.
24 Misstates.

73 (Pages 286 to 289)

Marc Toglia, M.D.

Page 290

1          THE WITNESS:  I'm speaking,
2    in this case, specific to the --
3    to the TVT procedure.
4          Again, it's at the wound
5    site, so result of the suture
6    material, cautery, how rough you
7    are with the tissue.
8          I don't -- I don't interpret
9    this as having anything to do with
10   the mesh, per se.  I read it
11   literally, which is that there may
12   be local irritation at the wound
13   site and that it is a transient
14   phenomenon.
15   BY MS. THOMPSON:
16       Q.   Under actions, the IFU
17   states, Animal studies show that
18   implantation of PROLENE® mesh elicits a
19   minimal inflammatory reaction in tissues,
20   which is transient and is followed by the
21   deposition of a thin fibrous layer of
22   tissue which can grow through the
23   interstices of the mesh, thus
24   incorporating the mesh into adjacent

Page 291

1    tissue.  The material is not absorbed nor
2    is it subject to degradation or the
3    weakening by the action of tissue
4    enzymes.
5          A.   I believe that's an accurate
6    statement, yes.
7          Q.   I believe that's all the
8    questions I have on the IFU.
9          MS. THOMPSON:  Off the
10         record for a couple minutes,
11         please.
12         VIDEO TECHNICIAN:  We are
13         off the record.  The time is 7:39
14         p.m.
15              - - -
16         (Whereupon, a discussion off
17         the record occurred.)
18              - - -
19         VIDEO TECHNICIAN:  We are
20         back on the record.
21   BY MS. THOMPSON:
22       Q.   Dr. Toglia, I'm going to ask
23   you some questions about your work with
24   Ethicon.

Page 292

1          Do you remember when you
2    first became a paid consultant for
3    Ethicon?
4          A.   As I stated earlier, I do
5    recall, prior to the launch of the
6    product, being part of a focus group in
7    which I was asked to give an opinion on
8    the feasibility of this as a new
9    procedure, and I was paid for that.
10         Q.   And we're talking about the
11   TVT in 1998 or 1999, roughly?
12         A.   To be honest with you, if I
13   had to give you a guess, this was '96,
14   '97.  I'm pretty sure it was '96.
15         Q.   And do you recall when you
16   became a proctor for Ethicon?
17         A.   I'm going to say 2002,
18   perhaps.
19         Q.   And did you have a contract
20   for either of those positions, that
21   you're aware of?
22         A.   Well, the focus group, of
23   course, was a single event.  The -- at
24   some point in time, there would be a --

Page 293

1    there was probably a contract regarding
2    proctoring.  And I recall every year
3    that -- that would be a new and usually
4    different terms.
5          Q.   Do you recall how you were
6    compensated for being a proctor for
7    Ethicon?
8          A.   Yes.
9          Q.   How much were you paid?
10         A.   It depended upon the
11   situation, if I was doing a procedure
12   within my institution, did I have to
13   drive 60 miles, did I get on an airplane.
14   So it would vary.
15              I would -- I would
16   guesstimate maybe $1,500 at the lower
17   end, $2,500, maybe $3,000.  You know,
18   sometimes there would be one person, it
19   might be up to three people.  There was
20   probably a factor for that.
21         Q.   So that was per preceptee or
22   group of preceptees that you were paid
23   between $1,500 and $5,000?
24         A.   No $5,000; $2,500, $3,000.

74 (Pages 290 to 293)

Marc Toglia, M.D.

Page 294

1      Q.    $2,500, I mean.
2      A.    Again, I think the higher
3  end would speak to more than one.  The
4  lower end would speak to location and
5  maybe one.  There wasn't that significant
6  of a difference, I don't recall.  I mean,
7  the highest might have been $3,000.
8           They would classify you.
9  Maybe, in the beginning they would call
10 me a local proctor.  At some point, I was
11 a national proctor.  Physicians might fly
12 in from other locations.  I would -- I'm
13 assuming that the reimbursement may have
14 been a little higher.  I never did a
15 large volume --
16     Q.    Do you know --
17     A.    -- proctoring.
18     Q.    -- offhand how many doctors
19 that you proctored over the years with
20 Ethicon?
21     A.    I don't know offhand the
22 number of doctors I proctored.  If I were
23 to throw out a term, like, fifteen,
24 twenty over a -- over a ten-year period

Page 295

1  of time.
2           And the -- in the context of
3  proctor, I'm talking about a physician
4  that was in the operating room with a
5  patient, not necessarily a lab -- you
6  know, a lab situation, a dry lab
7  situation or anything like that.
8      Q.    We have a contract from 2006
9  that says you would be paid a maximum of
10 $100,000 for the year.
11          Do you recall how much you
12 were actually paid --
13     A.    In 2006?
14     Q.    -- in 2006?
15     A.    In general, it would
16 probably be something like $12,000, maybe
17 $15,000.
18          I would say -- I think the
19 highest I had gotten -- and, again, I
20 mean, a total number and this goes
21 beyond -- was maybe $30,000.  But I have
22 to tell you, that probably includes more
23 of the design work that I may have done.
24     Q.    So in 2006, your estimation

Page 296

1  would be between $12,000 and $30,000 that
2  you were paid by Ethicon?
3      A.    I would say it's probably
4  between $6,000 and $20,000.  I don't know
5  for sure.  It was not, in my estimation,
6  substantial.
7                - - -
8           (Whereupon, Exhibit
9  Toglia-12, ETH.MESH 11843352-364,
10 Consulting Agreement Requisition
11 Form, was marked for
12 identification.)
13                - - -
14          MS. THOMPSON:  We have this
15 marked as an exhibit.  I only have
16 one copy of the contract.  I'm not
17 going to ask any more questions
18 about it, but if you want to look
19 at that, that's fine.
20 BY MS. THOMPSON:
21     Q.    Do you have records of the
22 money that you received from Ethicon for
23 payment for your services?
24     A.    As in payment stubs or -- I

Page 297

1  haven't done anything with them recently.
2  I mean -- I mean, there may have been one
3  case in 2013.  There may have been none
4  for the preceding several years.
5           So, certainly, as we go back
6  five or six years, I don't think I would
7  have -- you know, I would have the
8  original invoices or records, no.
9      Q.    When was the last time you
10 proctored a physician for Ethicon?
11     A.    To the best of my knowledge,
12 there was one physician that I proctored
13 who was within my system, and I want to
14 say that was maybe 2013.  I couldn't -- I
15 mean, to my mind, it seems like it was
16 longer ago than that.
17     Q.    Between 2006 and 2013, did
18 you believe that you had a contract each
19 year with Ethicon for various services?
20     A.    I believe so.  Again, my
21 role within Ethicon changed with time as I
22 looked at different projects or worked on
23 different projects.
24     Q.    We have an Excel spreadsheet

75 (Pages 294 to 297)

Marc Toglia, M.D.

Page 298

1  that shows $30,000 in 2011, $6,000 in
2  2010 and $15,000 in 2013.
3          Does that sound about right?
4          MR. SNELL:  Object to the
5  form.  Foundation.
6          THE WITNESS:  I believe that
7  that's in the range of the numbers
8  that I had -- that I had
9  recollected.
10         MS. THOMPSON:  And we marked
11 that spreadsheet as Exhibit 13, if
12 you want to look at that.
13         THE WITNESS:  Sure.
14            - - -
15         (Whereupon, Exhibit
16 Toglia-13, Spreadsheet, was marked
17 for identification.)
18            - - -
19         MR. SNELL:  This doesn't
20 have a Bates number on it.  Where
21 is it from?
22         MS. COPE:  I can get you the
23 number when we print them out.
24 They're not produced, in Excel

Page 299

1  format, with a Bates number.
2          MR. SNELL:  But it has a
3  Bates number, a document number
4  attached to any native file if
5  it's a produced document --
6          MS. COPE:  And what I'm
7  saying is I can get that --
8          MR. SNELL:  Oh, you can get
9  that?
10         MS. COPE:  -- to you.  But
11 when we print it out --
12         MR. SNELL:  I got you.
13         THE WITNESS:  I'll be honest
14 with you, I can't read any of
15 this.  But I'm happy to accept the
16 figures you threw out.  But please
17 don't ask me to read the details.
18         I can read my -- I can read
19 my name, I see that, I recognize
20 that.
21 BY MS. THOMPSON:
22     Q.   So we don't have time to
23 have you try to read that, correct?
24         Did you ever receive any

Page 300

1  gifts from Ethicon or employees of
2  Ethicon?
3      A.   Not that I'm aware of, no.
4      Q.   Did Ethicon reimburse your
5  travel expenses and travel time while you
6  were working as a consultant for them?
7      A.   Yes.
8      Q.   And were there times that
9  you also gave presentations at dinner
10 meetings for doctors for Ethicon?
11     A.   There might have been.  I
12 don't recall that being a common
13 scenario.  But I would -- I would
14 venture, yes, there probably were
15 meetings that a presentation -- and,
16 again, I would have trouble separating
17 the TVT stuff from something else.
18     Q.   And I believe we have an
19 invoice in 2009 for a $3,000 speaking
20 stipend for dinner meeting and in 2008,
21 $3,095.95 for a dinner speaking meeting.
22         Does that sound like that
23 probably happened?
24     A.   I'm a pretty cheap date, so

Page 301

1  it kind of sounds like something that we
2  might have done.
3      Q.   $3,000 for a dinner
4  presentation doesn't sound that cheap to
5  me.
6      A.   No?
7      Q.   Does it to you?
8      A.   Time away from one's family
9  after one has already worked a ten- or
10 twelve-hour day?  I'd say that's pretty
11 cheap, but that's just my personal
12 opinion.
13     Q.   And at those presentations,
14 you would typically show a PowerPoint?
15     A.   We may have shown a
16 PowerPoint.  It could have been more of
17 an informal discussion.  I mean,
18 PowerPoints are usually one of my
19 preferred methods to lead a discussion.
20     Q.   But you don't remember
21 specifically at the dinner meetings that
22 you did for Ethicon whether there was a
23 PowerPoint involved?
24     A.   I mean, recognizing that

76 (Pages 298 to 301)

Marc Toglia, M.D.

Page 302

1    we're in a public restaurant somewhere in
2    Philadelphia, I could see it going either
3    way, based upon the venue.
4        Q.   Do you remember preparing
5    slide presentations for any talks at
6    Ethicon?
7        A.   I'm sure that I have
8    prepared talks.  I don't -- I don't
9    recall.
10       Q.   And Ethicon would pay for
11   your travel and meals for those meetings
12   as well?
13       A.   They would pay for travel.
14   I'll be very honest with you, I don't
15   usually bill for meals.  I have to eat
16   anyhow, that's not usually something I
17   would bill myself.
18       Q.   I think we already talked
19   about the clinical study agreements that
20   you had with Ethicon for the TVT.
21           Was there also an agreement
22   for --
23       A.   So, I'm sorry, I didn't -- I
24   don't recall I had a study agreement with

Page 303

1    Ethicon.
2           What are you referring to?
3               - - -
4           (Whereupon, Exhibit
5        Toglia-14, ETH.MESH 03617772,
6        Consultant Invoice Dated 5/28/09,
7        was marked for identification.)
8               - - -
9           MR. SNELL:  What number is
10   this?
11          THE WITNESS:  15.
12   BY MS. THOMPSON:
13       Q.   Do you remember an agreement
14   to provide services relating to the
15   PROSIMATM registry?
16       A.   This was not a study
17   agreement.  I think I -- I just simply
18   read material.
19           PROSIMATM was not a
20   procedure I ever performed or performed
21   clinically.  I -- it's a secrecy
22   agreement, which means, I think, they
23   basically talk to me about the procedure.
24   Maybe they had results from a registry

Page 304

1    and I was simply reviewing those results.
2           But I did not participate in
3    a PROSIMATM study.
4        Q.   Do you remember whether you
5    were paid for whatever service you
6    provided for the PROSIMATM registry?
7           MR. SNELL:  Form.
8           THE WITNESS:  I'll be very
9        honest with you, I don't recall
10       really having any involvement with
11       PROSIMATM.
12   BY MS. THOMPSON:
13       Q.   Why not?
14       A.   I don't know.  I don't know
15   whether -- whether I was -- it was
16   something that didn't meet my clinical
17   interest, whether they decided that they
18   were not in need of my services.
19           I remember PROSIMATM as a
20   concept.  I know there was a clinical
21   trial done.  This was not a project that
22   I was active on.
23       Q.   And I can't remember from
24   earlier, did you use the PROSIMATM at

Page 305

1    all?
2        A.   No.  That's what I'm
3    speaking to.
4        Q.   In the TVT versus TVT-S
5    study that you participated in --
6        A.   Yes.
7        Q.   -- were you paid by
8    Ethicon --
9        A.   No.
10       Q.   -- for your participation in
11   that study?
12       A.   No.
13       Q.   I believe the disclosure on
14   that article was that you were
15   preceptor -- preceptor for Ethicon at the
16   time the paper was published?
17       A.   Yes, that would be a
18   separate.
19       Q.   Was that the full extent of
20   your employment with Ethicon?
21          MR. SNELL:  Objection.
22       Form.  He wasn't employed by
23       Ethicon.
24          MS. THOMPSON:  Sorry, my

77 (Pages 302 to 305)

Marc Toglia, M.D.

Page 306

1    fault.
2    BY MS. THOMPSON:
3        Q.   Your financial arrangement
4    with Ethicon?
5        A.   I'm sure you understand that
6    the publication occurred years after the
7    actual study was completed.  I would
8    think that the disclosure came at the
9    time of submission of the manuscript for
10   publication.  So it wasn't during the
11   study.
12           I mean, I think that my
13   relationship with Ethicon was fairly
14   consistent over those -- over that
15   ten-year period of time.
16           So I have no reason to -- I
17   hope you understand the differential I'm
18   trying to make, because I'm trying to be
19   accurate.
20           I assume that I was -- I was
21   a preceptor at the same time -- I mean, I
22   trained some of the -- I trained some of
23   the other investigators in the trial.
24   I'm -- I pretty strongly don't think

Page 307

1    there was -- I charged -- Ethicon did not
2    pay me for any of that nor did they
3    reimburse me for travel.  That's just
4    something that I did because these were
5    my colleagues, if that makes sense to
6    you.
7        Q.   Sure.  And how many times
8    did you do cadaver labs for Ethicon,
9    ballpark?
10       A.   It could be four.  It could
11   be eight.  I would say maybe closer to
12   the four.
13       Q.   For what products did you do
14   cadaver labs?
15       A.   You know, oftentimes,
16   because cadaver labs are so expensive to
17   obtain the materials, it certainly was
18   typical that on one day we might have
19   been working with TVT-Secur, we might
20   have been working with PROLIFT®, we might
21   have been -- I'm sure that we worked with
22   Retropubic and Obturator.
23       Q.   Did I ask you how many
24   PROLIFT® devices you actually placed?

Page 308

1        A.   You have not asked me that.
2        Q.   I didn't think so.
3            Could I ask you that
4    question, how many PROLIFT® devices did
5    you actually place?
6        A.   You know, according to the
7    information that I just sort of tracked
8    upstairs here, it was probably in the
9    vicinity of about 400.
10       Q.   And when did you stop using
11   PROLIFT®?
12       A.   Once it was removed from the
13   market.
14       Q.   Are you aware that your
15   website still includes PROLIFT® as an
16   option for women who have prolapse?
17       A.   I am aware.  And if I had
18   the time or the knowledge to remove it, I
19   certainly would.  But thank you for
20   reminding me of that outdated
21   information.
22       Q.   You're welcome.
23           Did Ethicon also help you
24   advertise your practice?

Page 309

1        A.   There was a brief window of
2    time that Ethicon, in professional
3    education, was interested in helping to
4    raise awareness of pelvic floor
5    dysfunction and the treatments for that.
6            My -- I only -- I only
7    remember one situation in which we placed
8    an ad in a magazine.  I think it
9    corresponded to when I had hired a new
10   partner, and I just was interested in
11   letting people know that our practice had
12   these two physicians.
13           I don't think that that ran
14   for more than three months.  That's my
15   only recollection.  It was kind of a, you
16   know, what do you think of this idea, you
17   know.  I think we just -- we did it on a
18   one-time basis.
19       Q.   But in addition to the money
20   that you were paid by Ethicon for various
21   preceptor trips, dinner presentations, et
22   cetera, they did provide advertisement
23   for your practice?
24           MR. SNELL:  Objection to

78 (Pages 306 to 309)

Marc Toglia, M.D.

Page 310

```
 1      form.
 2          THE WITNESS:  In a sense.  I
 3      mean, it's not that they paid me
 4      and I paid for the ad.  Like, with
 5      the clinical trials, I didn't get
 6      the money, the money was -- would
 7      have been -- would go through our
 8      channels, that's what the Lankenau
 9      Institute of Medical Research
10      does; I believe that they may have
11      been involved with the clinical.
12          So the money went somewhere.
13      It's not -- not money that I
14      touched, so to speak.
15  BY MS. THOMPSON:
16      Q.   Going back to something you
17  mentioned a minute ago.
18          What information did you
19  just check upstairs?
20      A.   I checked in with my wife
21  upstairs, and I looked over my report.
22      Q.   You mentioned that you,
23  after checking the information upstairs,
24  you thought that you had done about 400
```

Page 311

```
 1  PROLIFT® procedures, that's what I was
 2  asking about.
 3      A.   Oh, excuse me --
 4          MR. SNELL:  That's in his
 5      head.
 6          THE WITNESS:  It's just --
 7          MS. THOMPSON:  Oh, I took
 8      it --
 9          THE WITNESS:  No, no.  I'm
10      so sorry.
11          MS. THOMPSON:  Oh, I took it
12      literally.
13          THE WITNESS:  No, no.
14          MS. THOMPSON:  I'm glad we
15      clarified that.
16          MR. SNELL:  That was taken
17      out of context.
18          THE WITNESS:  My apologies.
19  BY MS. THOMPSON:
20      Q.   Dr. Toglia, did you ever
21  complain to Ethicon that its business
22  practices affected the income received by
23  your practice?
24      A.   Oh, I'm sure that I may
```

Page 312

```
 1  have, in frustration, made comments.
 2  I've got to be honest with you, I don't
 3  think it helped or hurt in a significant
 4  sense.
 5          But, occasionally, I
 6  might -- might have gotten my feelings,
 7  you know, hurt.
 8      Q.   Do you remember sending an
 9  e-mail to someone at Ethicon about lost
10  business as a result of some of the sales
11  reps activities, Eileen's specifically?
12      A.   I don't.  I'm aware of an
13  e-mail, I don't -- can't tell you that I
14  remember, at the time, again, sort of the
15  context.
16          But, yeah, there was --
17  there was a point that I was a little
18  grumpy about things.  Although I may have
19  been simply misdirecting my frustration
20  in the wrong direction, more than likely.
21      Q.   And was that because they
22  had trained one of your referral
23  physicians who then became a competing
24  physician?
```

Page 313

```
 1      A.   I mean, this is referring to
 2  Dr. Finnegan.  Dr. Finnegan is a
 3  colleague of mine.
 4          I don't -- I see the
 5  statement.  I understand what that seems
 6  to be.  I can't tell you that I ever felt
 7  like that that hurt my business.  I
 8  think, really, what I -- the message that
 9  I was trying to do here -- the message I
10  was trying to get across here, which I
11  will tell you, at this point, I was
12  completely ineffective, I was simply
13  trying to say, look, if we're going to
14  train physicians, you know, within my
15  department, I would like to be the
16  trainer, in that I would like to have a
17  relationship with people, so if they're
18  doing these procedures and they want
19  advice, I would like to be viewed as --
20  as someone they could speak to.
21          And I think that's really
22  what I was trying to get at, although, I
23  admit, I did not state it -- I did not
24  state it well.
```

79 (Pages 310 to 313)

Marc Toglia, M.D.

Page 314

1    And, to be honest with you,
2  I was being a bit dramatic here.  I have
3  a very cordial relationship with
4  Finnegan.  I don't think he's had any
5  effect on my business whatsoever.
6          - - -
7          (Whereupon, Exhibit
8      Toglia-15, ETH.MESH 10399348,
9      4/29/09 E-mail from Patricia Beach
10     to Judi Gauld; Subject: FW:
11     PROSIMATM Registry, was marked for
12     identification.)
13         - - -
14  BY MS. THOMPSON:
15     Q.   Did Ethicon pay for
16  community education or other events that
17  may have resulted in increased patients
18  or business for you?
19     A.   It was not uncommon -- when
20  you say "paid for," let me, please, just
21  sort of qualify that.
22         So we would -- from time to
23  time, we would give community education
24  events on the hospital campus.  The

Page 315

1  company would provide snacks and
2  refreshments.  I don't think that there
3  was ever a situation where I was paid to
4  give that presentation.  The
5  presentations, typically, were general
6  presentations; I'm going to talk to you
7  about incontinence, whether that be urge
8  incontinent, whether that be stress
9  incontinence; I'm going to talk to you
10  about prolapse.
11         Does that make sense?  But I
12  don't think I was ever paid -- I was
13  never financially rewarded for that.
14  They simply provided snacks and
15  refreshments in that regard.
16     Q.   Are there -- are any of the
17  awards or recognitions that you received
18  the result of nominations from Ethicon?
19     A.   No, not that I'm -- no.  I
20  was never a high priority for them, to be
21  honest with you, given that, you know, we
22  had very well known -- other consultants,
23  I'm sure you must be aware, within a
24  short distance from here.  I was kind of

Page 316

1  like -- in that regard, no.
2     Q.   Do any of the committees or
3  organizations or employers have policies
4  regarding conflict of interest or
5  accepting money from industry sources?
6     A.   You're talking --
7         MR. SNELL:  Form.
8         THE WITNESS:  You're talking
9      about my employment?
10  BY MS. THOMPSON:
11     Q.   Yes.
12     A.   So my employment contracts
13  do have language that allows me to
14  function as a consultant to industry, to
15  publish articles, books, where I might
16  get a royalty.
17     Q.   And the academic
18  institutions with which you're affiliated
19  don't have policies regarding accepting
20  payments from industry?
21     A.   Not as they affect me, since
22  I'm not -- you know, that's usually the
23  case if that's the person who is paying
24  your salary.

Page 317

1         I think it really -- those
2  kind of relationships say, look, you
3  can't sort of double dip.  You can't
4  be -- you can't be getting paid as a
5  physician and, simultaneously, at that
6  same time.
7     Q.   Have you disclosed your
8  financial relationship with Ethicon to
9  committees that you've served on, for
10  example, AUGS?
11     A.   Of course.  We're very
12  transparent.  I mean, the public is
13  aware.  I mean, you've got The Sunshine
14  Act.  There are -- there -- certainly
15  it's public knowledge.
16         It's also public knowledge
17  what, you know, CMS has paid me, which is
18  Medicare.
19     Q.   And you've disclosed your
20  conflict of interest with Ethicon on all
21  your publications since the time that you
22  began working for Ethicon?
23         MR. SNELL:  Form.
24         THE WITNESS:  I don't work

Marc Toglia, M.D.

Page 318

1     for -- I never worked for Ethicon.
2     I don't --
3  BY MS. THOMPSON:
4     Q.   Doing work for Ethicon?
5        MR. SNELL:  Same objection.
6        THE WITNESS:  I have done --
7     I have done contractual work with
8     Ethicon.  I don't know what I -- I
9     don't have any responsibility to
10    report to them what I publish or
11    what else that I do.
12  BY MS. THOMPSON:
13    Q.   Do you disclose the work
14    that you do with Ethicon to residents
15    that you're teaching?
16    A.   Yes.
17    Q.   Has Ethicon ever asked you
18    to attend society meetings and give
19    presentations or be represented at
20    exhibitions at the society meeting?
21    A.   I don't believe I've ever
22    done anything like that for Ethicon.
23    Q.   Dr. Toglia, did you have a
24    sexual relationship with Kathleen Feeney?

Page 319

1     A.   No.
2        MR. SNELL:  Objection.
3  BY MS. THOMPSON:
4     Q.   Did you have an affair with
5     Kathleen Feeney?
6        MR. SNELL:  Same objection.
7        THE WITNESS:  I don't know
8     what you're referring to.
9  BY MS. THOMPSON:
10    Q.   Did you have anything other
11    than a professional relationship with
12    her?
13       MR. SNELL:  Same objection.
14    Argumentative.
15       THE WITNESS:  You know, I
16    mean -- you know, we were friends,
17    in a sense, although it's not a
18    friendship that extended beyond,
19    like, when she left the company.
20    It quickly, you know -- I don't
21    know where you're coming from.
22    This -- Kathleen Feeney is --
23       - - -
24       (Whereupon, Exhibit

Page 320

1        Toglia-16, ETH.MESH 11838868-869,
2     5/30/07 E-mail from Kathleen
3     Feeney to Cindy Pypcznski;
4     Subject: FW:  Surgery at Lankenau,
5     was marked for identification.)
6        - - -
7  BY MS. THOMPSON:
8     Q.   Did you -- did you -- do you
9     recall an e-mail when she was leaving the
10    company in which she provided you with
11    her personal e-mail address?
12    A.   I know that Kathleen Feeney
13    was interested in me, perhaps, writing a
14    letter of recommendation.  I know that
15    she had asked me could she have -- could
16    I be a reference, and in that context
17    there may have been.
18    Q.   Do you remember asking her
19    what she would use as her name when she
20    left Ethicon.  And she said -- replied
21    Kath Toglia?
22    A.   I -- Kathleen would make
23    offhanded comments from time to time.  I
24    can't say I can't remember her ever

Page 321

1     saying that.  But I wouldn't be
2     surprised.  She was teasing me at the
3     time, of course.
4        MS. THOMPSON:  I think
5     that's all the questions I have
6     for you.  Thank you, Dr. Toglia,
7     for your time.
8        MS. COPE:  Sorry, just
9     wanted to clarify.  That one
10    document that didn't have the
11    Bates number, I got the Bates
12    number, if you want to stick that
13    on the exhibit.
14       MR. SNELL:  Let's go off the
15    record.
16       VIDEO TECHNICIAN:  We are
17    off the record.  The time is 8:10
18    p.m.
19       - - -
20       (Whereupon, a brief recess
21    was taken.)
22       - - -
23       VIDEO TECHNICIAN:  This
24    marks the beginning of Video

81 (Pages 318 to 321)

Marc Toglia, M.D.

Page 322

1     Number 5.  We are back on the
2  record.  The time is 8:17 p.m.
3          - - -
4        EXAMINATION
5          - - -
6  BY MR. SNELL:
7     Q.   Dr. Toglia, we're back.  I
8  just have a few follow-up questions,
9  following up on plaintiffs' counsel's
10  questions to you.
11          First of all, I believe you
12  were trying to explain your methodology
13  to plaintiffs' counsel.
14          Can you state your
15  methodology that you utilized in
16  assessing the utility and the safety of
17  the TVT device for its intended use to
18  treat stress urinary incontinence?
19     A.   Yes.  So the question that
20  was put before me is whether or not the
21  TVT was well suited for its intended
22  purpose, which was the treatment of
23  stress urinary incontinence in women,
24  whether or not that -- it achieved that

Page 323

1  intended use, whether or not that was --
2  the device was safe for that use.
3          In order to formulate that
4  opinion, I reviewed the highest levels of
5  evidence that I could find.  As I stated
6  earlier, the highest levels of evidence
7  would include things like randomized
8  control trials, systematic reviews or
9  meta-analysis and, fortunately, there was
10  a tremendous amount of data.
11          Just right behind that would
12  be things like long-term registry
13  studies, the data that came from closed
14  health systems and the like.
15          I would add that the
16  societal guidelines position statements,
17  which are -- in essence, is a different
18  type of a committee that would have done
19  their own systematic review and then
20  formulated an opinion in the same manner.
21  Those are the type of things that I would
22  look at myself.
23          In addition, I looked at the
24  documents provided to me concerning the

Page 324

1  internal Ethicon communications.  I
2  looked at some of the -- the expert
3  opinions provided by the plaintiffs'
4  side.  We looked at, you know, animal
5  studies, in vitro studies.  Although,
6  again, recognizing that those are really
7  Level 5 evidence data, that you really
8  can't draw any clinical inference or --
9  or application directly to the TVT
10  device.  Those were looked at as well.
11     Q.   You saw that plaintiffs'
12  experts cited to a bunch of hernia
13  documents, prolapse documents, animal
14  studies in their reports?
15     A.   Yes, I saw that.  Yes.
16     Q.   And I believe you earlier
17  told plaintiffs' counsel you were shocked
18  at their methodology; is that accurate?
19     A.   I would -- I would --
20        MS. THOMPSON:  Object to
21  form.
22        THE WITNESS:  I was -- I did
23  not find their methodology to be
24  scientifically rigorous.  They did

Page 325

1  not seem to include the Level 1
2  studies, randomized control
3  trials.  They did not refer to the
4  systematic reviews.
5          Their focus seemed to be
6  largely on very low-level, almost
7  insignificant things that really
8  had no direct application to the
9  TVT design, safety or the device
10  when it's used in its intended
11  manner to treat stress urinary
12  incontinence.
13  BY MR. SNELL:
14     Q.   So for these hernia
15  documents or hernia studies that the
16  plaintiffs' experts, like Dr. Elliott,
17  seem to cite on every page of his report,
18  would those even fit on the evidence
19  pyramid, if one was to do a proper
20  methodologic scientific review to assess
21  the safety of TVT for its intended use to
22  treat stress urinary incontinence?
23        MS. THOMPSON:  Object to
24  form.

82 (Pages 322 to 325)

Marc Toglia, M.D.

Page 326

1    THE WITNESS:  Within the --
2    within the context, those would
3    not figure as well.  Those would
4    usually be discarded as being not
5    relevant to the TVT sling, the
6    device or its design.
7  BY MR. SNELL:
8    Q.   You brought these evidence
9  pyramids.
10    MR. SNELL:  I'd like to mark
11    them as exhibits.
12        - - -
13    (Whereupon, Exhibit
14    Toglia-17, Level of Evidence
15    Chart, was marked for
16    identification.)
17        - - -
18    (Whereupon, Exhibit
19    Toglia-18, Level of Evidence
20    Pyramid, was marked for
21    identification.)
22        - - -
23  BY MR. SNELL:
24    Q.   Doctor, Exhibits 17 and 18,

Page 327

1  are those the level of evidence pyramids
2  you brought?
3    A.   Yes.
4    Q.   Are those important in
5  conducting a proper -- strike that.
6    Is utilizing the highest
7  levels of evidence important in assessing
8  the question, is the TVT reasonably safe
9  for its intended use to treat stress
10  urinary incontinence, in your opinion?
11    A.   Absolutely.  I mean, the
12  foundation of any systematic review is to
13  start with your highest level of
14  evidence.  If you have the highest level
15  of evidence, then the lower levels of
16  evidence typically are not given weight.
17    Certainly if they are
18  incongruent -- if the lower evidence --
19  levels of evidence are incongruent with
20  the higher levels of evidence, it just
21  simply validates and verifies the
22  uselessness of those articles.
23    Q.   And I believe you testified
24  your methodology was to look at the

Page 328

1  highest levels of evidence --
2    A.   Of course.
3    Q.   -- and not just one
4  document -- strike that.
5    Not just one guideline or
6  randomized control trial but numerous
7  ones?
8    A.   We looked for consistency of
9  the levels of evidence -- excuse me, we
10  looked for consistency of the independent
11  analyses that had similar levels of
12  evidence.
13    Q.   And did you find consistency
14  in the systematic reviews and
15  meta-analyses that were Level 1 evidence,
16  such as the shunt 2014 SGS study or paper
17  and the AUA guidelines that did a
18  systematic review?
19    A.   They're all very consistent
20  speaking to the safety -- long-term
21  safety, long-term effectiveness of that
22  device.
23    Q.   On Page 18 of your report,
24  you talk about the safety and surgical

Page 329

1  re-intervention being well studied,
2  utilizing national and regional closed
3  systems.
4    Do you see that at the top?
5    A.   Yes, I do.
6    Q.   That's something you were
7  talking to the plaintiffs' counsel about,
8  the significance of the closed systems.
9    Do you recall that?
10    A.   Yes, I -- I started to
11  discuss that.  And the point I was trying
12  to make is that the advantage of the --
13  you know, certainly one of the concerns
14  about following patients or looking for
15  complications is, what's your degree of
16  follow-up and whether or not those
17  patients are somehow excluded.  That's
18  where concerns that relate to things like
19  selection bias could come from.
20    The advantage of looking at
21  data, whether it's Medicare data, like
22  the Thomson Reuters MarketScan data,
23  Kaiser, Canada, some of the other
24  countries, is that people, you know,

83 (Pages 326 to 329)

Marc Toglia, M.D.

Page 330

1  don't drop out of the system and they are
2  able to capture, with a high degree of
3  accuracy, what happens to these
4  individuals over time.
5      Q.   And in Pages 17 through 21,
6  do you identify some of those studies
7  that you reviewed and found to be
8  scientifically reliable and high levels
9  of evidence?
10     A.   Yes, they are -- and they
11  are consistent with the Level 1 data and
12  the systematic reviews.
13     Q.   Earlier, plaintiffs' counsel
14  asked you some questions about the AUGS
15  position statement.
16         Do you recall that in
17  general?
18     A.   Yes.
19     Q.   Can you turn to that?  I
20  just have a few follow-up questions.  I
21  believe it was in one of these multiple
22  binders.
23     A.   Less than one minute, sir, I
24  have it right in front of me.

Page 331

1         Oh, I have to apologize.
2  Okay.
3      Q.   Remember plaintiffs' counsel
4  asked you some questions about the
5  AUGS/SUFU position statement and whether
6  it had any discussion about safety or
7  complications?
8      A.   Yes.
9      Q.   Take a look at Paragraph
10  Number 2.
11         Does the AUGS/SUFU statement
12  have any discussion about an assessment
13  of whether the TVT or midurethral sling
14  is safe?
15         Sorry, numbered Paragraph 2,
16  unless I'm --
17     A.   Numbered paragraph.  Oh, I'm
18  sorry.
19         Number 2 which starts, The
20  monofilament polypropylene mesh is the
21  most extensively studied
22  anti-incontinence procedure in history.
23         So, yes, this particular
24  paragraph -- and the references are

Page 332

1  provided, and I would point out that the
2  references cited do consist of
3  high-quality levels of evidence, which
4  talks about the fact that -- that this
5  particular procedure had been studied as
6  long in follow up than any other
7  procedure and seems to demonstrate
8  superior safety and efficacy.
9      Q.   If you look at Reference
10  Number 8, under Paragraph 1, where it
11  talks about the lightweight monofilament
12  polypropylene sling has demonstrated
13  long-term durability, safety and efficacy
14  for up to 17 years, are they referring to
15  the Ethicon TVT Retropubic sling that
16  assessed?
17     A.   Yes.  That refers to the
18  Nielsen long-term prospective cohort
19  that, I believe, looked at, over a
20  17-year period of time, a group of
21  approximately 90 individuals.
22     Q.   Does that AUGS/SUFU position
23  statement, is it reliant upon Level 1
24  evidence like Cochrane reviews or

Page 333

1  randomized control trials?
2      A.   Yes, it is.
3      Q.   One of the end notes in the
4  overall assessment of the slings is
5  Cochrane review by Ogah, et al.
6      A.   Yes.
7      Q.   Is that a study that you're
8  familiar with?
9      A.   It is.  But that's a
10  meta-analysis.
11     Q.   And what is the significance
12  of that type of meta-analysis and being a
13  Cochrane review, if anything?
14     A.   Sure.  So a meta-analysis
15  seeks to look at as much of the relevant
16  literature.  As well, it will -- it will
17  take all of the randomized control
18  trials, it will sort of combine the data,
19  in a sense, for analysis.  It will draw
20  comparisons to the other procedures or
21  the other approaches.
22     Q.   Okay.  And do those
23  references that the AUGS/SUFU position
24  statement rely upon for the statements in

84 (Pages 330 to 333)

Marc Toglia, M.D.

Page 334

1    that assess the complications with TVT?
2        A.   Yes.
3        Q.   Such that -- and I believe
4    you talk about, in the Ogah study, in
5    your report, you discuss that that
6    Cochrane review discusses multiple
7    complications?
8        A.   It does.
9        Q.   Including that the
10   monofilament and macroporous mesh, like
11   TVT Retropubic, in the treatment of
12   stress urinary incontinence has a lower
13   rate of exposure than the multifilament
14   meshes.
15       Do you recall that from the
16   Ogah Cochrane review?
17       A.   Yes.  And I believe that the
18   majority of the studies that were
19   included in that analyses would have been
20   specifically with the Retropubic TVT
21   device.
22       Although, there was another
23   part of the analysis that would have
24   looked at the Obturator approach as

Page 335

1    compared to the Retropubic approach.
2        Q.   Considering that this
3    AUGS/SUFU position statement, as you have
4    testified, relies on Level 1 systematic
5    reviews and other data, do you believe it
6    is reliable?
7        A.   Absolutely.
8        Q.   Some questions were asked to
9    you -- strike that.
10       And do you believe that the
11   other position statements and the stress
12   urinary incontinence systematic reviews
13   and guidelines by SGS, the American
14   Urologic Association, IUGA, and others,
15   are also reliable?
16       A.   They are -- they are
17   reliable and they're incredibly
18   consistent with each other.
19       Q.   You were asked some
20   questions about complications your
21   patients may have had and how plaintiffs'
22   counsel, what documents she would go
23   to --
24       A.   Sure.

Page 336

1        Q.   -- to look for that.
2        My question to you is this:
3    Did you track your patients' complication
4    rates over time with the TVT Retropubic
5    device?
6        A.   Yes, we did.
7        Q.   How did you do that?
8        A.   We kept notes on the
9    patients.  I mean, most -- you know, when
10   you're dealing with a procedure that, in
11   our hands, had complication rates in the
12   single digits, it's not that hard to make
13   the mental note, you know, that, you
14   know, we saw two episodes of bleeding
15   that required observation.
16       Q.   Did you counsel your
17   patients on your rates of complications
18   you had with the TVT Retropubic device
19   over time as you gained experience?
20       A.   Yes.  I felt an obligation,
21   certainly, as somebody that was well
22   respected in this field and somebody that
23   was able to offer several different
24   options to my patients in this, that we

Page 337

1    would talk to them, again, sort of about
2    our personal experience.
3        You know, when you -- when
4    you work out in the community and you
5    take care of women in the community and
6    you're not necessarily at a university
7    hospital, I have found that women are
8    very much interested in what your
9    personal experience was.
10       Obviously, we were very
11   fortunate to have a high volume of cases.
12   And within that context, I could say to
13   them, you know, regularly, look, I've
14   done 500 of these and, you know, the
15   complications that we have seen are --
16   you know, there have been occasional
17   episodes of bleeding from time to time,
18   either during or after the procedure,
19   things of that nature.
20       Q.   And so when you put in your
21   report, for example, your complication
22   rates, in your hands and -- for example,
23   that your rate of bladder perforation
24   with the TVT Retropubic decreased over

85 (Pages 334 to 337)

Marc Toglia, M.D.

Page 338

1   time as you became more experienced, are
2   those reliable rates?
3       A.   Yes.
4       Q.   Are those based on your
5   firsthand observations and tracking of
6   your complication rates over time with
7   the TVT Retropubic device?
8       A.   They are.
9       Q.   You talked to plaintiffs'
10  counsel about your various different
11  design expertise and work you did with
12  Ethicon on many different products.
13          Do you recall that?
14      A.   I do.
15      Q.   One thing I want to ask you
16  about, I didn't recall if you said it or
17  not, but do you recall the GYNEMESH® M,
18  the ULTRAPROTM mesh product that was used
19  in PROLIFT®?
20      A.   I do.
21      Q.   Do you recall --
22      A.   That was used, excuse me, in
23  PROLIFT® +M.
24      Q.   PROLIFT® +M.  Thank you for

Page 339

1   your correction.
2       A.   Sure.
3       Q.   Do you recall that you were
4   actually one of the surgeons that did the
5   design validation of the GYNEMESH® M
6   mesh, assessing the suitability, safety
7   and efficacy and adequacy of that design?
8       A.   I did participate in some
9   kind of a design validation study, yes.
10      Q.   Do you recall assessing the
11  IFU for that device during the design
12  validation?
13      A.   Yes, I do.
14      Q.   And whether you were asked,
15  is the IFU, clear, cohesive, accurate, do
16  you recall that?
17      A.   Yes.
18      Q.   And did you give opinions to
19  Ethicon in that design validation for the
20  GYNEMESH® M device?
21      A.   I provided them with, you
22  know, constructive feedback.
23      Q.   Some questions were asked of
24  you, I think, about pubovaginal sling

Page 340

1   exposures or wound complications with the
2   Burch.
3           I want to hand you the
4   Schimpf paper.
5           And, actually, first of all,
6   do you have your report handy?
7       A.   I do.
8       Q.   Turn to Page 19, on the
9   second paragraph, where you discuss wound
10  complications occurring with the Burch
11  and autologous fascial sling.
12          Do you see that?
13      A.   The -- you're referring to
14  Novara, et al.?
15      Q.   I'm right here on Page 19?
16      A.   I'm sorry.  Yes.
17      Q.   So in the Schimpf -- I put
18  before you the Schimpf SGS systematic
19  review and meta-analysis.
20          Is that a document you're
21  familiar with?
22      A.   Yes, it is.
23      Q.   Is that a document you
24  reviewed and rely upon?

Page 341

1       A.   Yes, it is.
2       Q.   Is that a document that's
3   reliable, in your opinion, to
4   scientifically assess the safety and
5   utility of the design of the TVT
6   Retropubic device?
7       A.   It's a very reliable
8   device -- very reliable document.
9           This is what -- this is what
10  we were speaking to Level 1 evidence.
11  This is a systematic review -- an
12  independent systematic review.
13      Q.   And the Society of
14  Gynecologic Surgeons, do they have a good
15  reputation within the field of female
16  pelvic medicine?
17      A.   Absolutely.
18      Q.   Do you actually belong to
19  that society?
20      A.   I serve a leadership role.
21  I serve on the executive committee for
22  that society.
23      Q.   And in your role and
24  participation with the society -- let me

86 (Pages 338 to 341)

Marc Toglia, M.D.

Page 342

1  ask you this: Before I contacted you and
2  asked you to analyze the data, had you
3  already been reviewing and analyzing data
4  on the TVT Retropubic device?
5       A.   Yes.
6       Q.   Had you been reviewing data
7  and analyzing data, the different levels
8  of data, on the TVT Retropubic device
9  going back all the way to when you began
10  considering to use it?
11       A.   Yes.  Absolutely.
12       Q.   So let's look at the Schimpf
13  systematic review and meta-analysis.
14            Does that study -- strike
15  that.
16            Looking at the Schimpf
17  systematic review -- review and
18  meta-analysis, does that Level 1
19  systematic review inform you of wound
20  complications and other problems that can
21  occur with the Burch and the pubovaginal
22  sling?
23       A.   It does.
24       Q.   In the table in the Schimpf

Page 343

1  paper, does it identify whether patients
2  with pubovaginal sling or Burch have
3  wound infections, exposure and return to
4  the operating room for erosions?
5       A.   Yes.  Table 3, specifically,
6  addresses the analysis that would look
7  at -- and, again, this was exclusive
8  of -- excuse me, this was inclusive of
9  randomized control trials.
10            So this is a -- this is a
11  summary of the analysis of Level 1 data.
12       Q.   And did the Schimpf
13  systematic review, the summary of Level 1
14  data, identify that the Burch and the
15  pubovaginal sling had exposures or return
16  to the operating room for erosion?
17       A.   Yes.
18       Q.   Did -- go ahead.  I'm sorry.
19       A.   So, specifically, it
20  analyzed the number of studies and the
21  incidence of, say, exposure between three
22  different types of midurethral slings,
23  the traditional, pubovaginal vaginal and
24  the Burch.

Page 344

1            It also looked at return to
2  the operating room specifically to
3  treat -- to treat erosions as well.  It
4  looked at wound infections, hematoma,
5  dyspareunia, various organ injuries.
6       Q.   Did -- did that inform your
7  opinions on the safety of the TVT device
8  for the intended use of the treatment of
9  stress urinary incontinence?
10       A.   Yes.  And, obviously, as you
11  can imagine, I was very reassured by the
12  fact that it was both consistent with my
13  experience, having performed, you know,
14  each of these procedures, and also
15  confirmed my experience and my own review
16  of the literature of the safety and
17  long-term efficacy of this procedure.
18       Q.   You mentioned earlier that
19  there was consistency in the Level 1 data
20  and the longer-term studies, the
21  prospective database studies.
22            Why is that important in
23  conducting a proper scientific
24  methodologic analysis of the question, is

Page 345

1  the TVT safe for its intended use to
2  treat stress urinary incontinence?
3       A.   Well, objectivity.  You
4  know, the reasons why one designs a
5  randomized control trial is that we're
6  trying to eliminate everything from
7  selection bias, having patients that
8  might be sicker in one arm versus the
9  other, more comorbid conditions,
10  variations that might relate individually
11  to a certain -- a particular surgeon or
12  institution.
13       Q.   Plaintiffs' counsel asked
14  you about degradation, and I believe you
15  told her, numerous times, that you didn't
16  believe that the TVT degraded; is that
17  correct or not?
18       A.   Within the clinical use of
19  the TVT for the treatment of stress
20  urinary incontinence, there -- I'm not
21  aware of any reliable data suggesting
22  that there is degradation.
23       Q.   The plaintiffs' counsel
24  asked you a question about were there any

87 (Pages 342 to 345)

Marc Toglia, M.D.

Page 346

1  studies that -- I think the question was,
2  and it may have been a double negative --
3  that did not show oxidative degradation.
4       Do you recall questioning on
5  that?
6       A.   I do.  And the more that I
7  thought about it, I realized that I did
8  address that in my report.
9       Q.   Can you turn to Page 26 of
10  your report?
11      A.   Yes.
12      Q.   There was a paper that the
13  plaintiffs' experts pointed to by Clave.
14      Do you -- have you read that
15  paper?
16      A.   I'm familiar with that
17  study.
18      Q.   And, first of all, is that
19  study a reliable study to assess,
20  scientifically, the TVT and, in
21  particular, for its intended use to treat
22  stress urinary incontinence?
23      A.   I mean, I don't believe that
24  the Clave study looked specifically at

Page 347

1  the TVT device, per se.  So it was a
2  low-level observational study, in vitro,
3  in a sense, in that the -- in that the
4  material was analyzed under a scanning
5  electron microgram and some chemical
6  analysis.
7       Q.   And I believe you earlier
8  testified, for the intended use of
9  treating stress urinary incontinence, is
10  Clave one of the studies that wouldn't
11  even make it onto the level of evidence
12  pyramid because it doesn't specifically
13  focus on the intended treatment of stress
14  incontinence?
15      A.   I don't believe that Clave
16  would be considered in that kind of
17  high-level evidence analysis, in terms of
18  the clinical utility, safety or design of
19  that device.
20      Q.   So back to my earlier -- the
21  reason why I brought you to this study or
22  asked you about it, plaintiffs' counsel
23  asked you about direct oxidation.
24      Even with all the

Page 348

1  limitations and the poor methodology in
2  the Clave study, did they document that
3  they can show oxidation of the
4  polypropylene?
5       A.   They comment directly upon
6  that.  Again, you know, oxidative
7  degradation is a chemical reaction
8  typically reserved for enzymatic changes
9  to, say, amino acids.
10      Again, as I think I stated
11  earlier, it simply involves the insertion
12  of oxygen between carbon -- you know,
13  between carbon molecules within a
14  compound.  In that concept, you know,
15  polypropylene is not an amino acid or an
16  organic compound.
17      But the authors do very
18  specifically state that they were very
19  limited in how they could respond to
20  here -- they say -- they say here that,
21  you know, look, we have to acknowledge
22  that while we offer an opinion -- we
23  offer hypotheses that, maybe, what we're
24  seeing in terms of changes could be the

Page 349

1  result of oxidation.  They said, look, we
2  can't confirm this hypothesis, based upon
3  our methodology or our analysis, whether
4  or not direct oxidation would actually
5  have occurred in vivo.
6       Q.   So you saw they did some
7  analytical chemistry testing on a limited
8  number of samples in the Clave paper, and
9  even with that methodology, they were
10  unable to confirm their hypothesis; is
11  that right?
12      MS. THOMPSON:  Object to
13  form.
14      THE WITNESS:  Again, you
15  know, they -- the way that Clave
16  was set up is they looked under --
17  under a scanning electron
18  microscope, very, very high power.
19  You know, here is the pristine
20  material, here are these -- these
21  expanded small fragments of
22  material.
23      In that paper, if I'm -- if
24  I'm correct, their only definition

88 (Pages 346 to 349)

Marc Toglia, M.D.

Page 350

1    of degradation is this doesn't
2    look like this.
3        And, you know -- and they
4    did not see changes in all
5    specimens.  In fact, they saw
6    changes only in a minority of
7    those implants analyzed.  And, you
8    know, again, you know, they said,
9    look, we acknowledge that we
10   cannot determine whether what we
11   observed somehow altered
12   mechanical properties.  They
13   acknowledge that they could not
14   analyze implants that were in
15   women that had not gone back to
16   the operating room to have a
17   portion removed for some clinical
18   indication.
19       And, certainly, my opinion
20   would follow that as well, simply
21   the observation of surface crack,
22   the minority of specimen does not
23   establish that degradation does
24   occur.

Page 351

1        And, again, as I've stated
2    over and over, you know, that it's
3    unlikely that this could have any
4    kind of mechanical or functional
5    outcome.  But, more importantly
6    is, again, you simply can't infer.
7    You can't clinically infer from a
8    paper such as this, which is just
9    sort of an observation to any kind
10   of effect that it might have when
11   it's used for its typical
12   indication.
13   BY MR. SNELL:
14       Q.   And with regard to the
15   oxidation question, looking at the
16   article, at the bottom of Page 266, it
17   states, Several hypotheses concerning
18   degradation of polypropylene are
19   described below.  None of these --
20       A.   Counselor, I'm sorry, I'd
21   like to follow along with you.
22       Q.   I'm sorry.
23       A.   I'm sorry.  Go ahead.
24       Q.   You can just take it.

Page 352

1        I guess my question for you
2    is, at Page 266, you had mentioned that
3    the authors acknowledged that what they
4    were doing was basically hypothesizing;
5    is that correct?
6        A.   Well, I mean, you know, the
7    authors did make an observation that the
8    material had a different external
9    appearance, albeit under only, you know,
10   very high powered scanning electron
11   microscopy.  And then they start to come
12   up with some ideas that might potentially
13   explain it.
14       And they said, look, you
15   know, we've talked about several
16   hypotheses concerning whether or not, you
17   know, this represents degradation.
18   Again, their definition of degradation
19   is, this doesn't look exactly the same as
20   the pristine state.
21       And they say, you know, none
22   of these hypotheses, particularly they
23   point out the hypotheses of oxidation,
24   could possibly be confirmed in this

Page 353

1    study.
2        Q.   You were asked some
3    questions about whether there is an
4    immunologic reaction, whether there's
5    severe chronic inflammation -- you were
6    asked some questions, Doctor, about
7    whether there was immunologic reaction to
8    the TVT polypropylene mesh device.
9        And I believe one of the
10   things you stated was that the randomized
11   control trials, the Level 1 evidence, the
12   long-term data do not show any type of
13   immunologic response in your opinion.
14       Is that correct or did I
15   misstate that?
16       A.   No, the majority of the
17   studies, the five-year data and ten-year
18   data, you know, where they said, look, we
19   did not observe one instance of clinical
20   inflammation, chronic inflammation,
21   erosion, you know, that speaks to the
22   safety and the lack of a significant
23   adverse immunologic reaction.
24       And, again, I think just --

89 (Pages 350 to 353)

Marc Toglia, M.D.

Page 354

1    as a scientist, as a surgeon, what I
2    would speak to distinguish between are,
3    you know, reactions that the body has
4    that are of no clinical consequence,
5    reactions that the body has that could
6    result in an adverse clinical outcome.
7        Q.   Do you have Dr. Rosenzweig's
8    binder over there somewhere?
9        A.   In my left hand, I have his
10   expert report.  Below me, we have a
11   binder labeled, Company Documents,
12   Rosenzweig.
13       Q.   Let me -- Doctor, if you go
14   back to the middle of -- I know you have
15   a lot of materials in front of you.  But
16   go back to the pile.  Under -- I think
17   it's under your report, where you were
18   looking at the Schimpf paper as one of
19   the exhibits.  Here.
20           Can I take a look at that,
21   Doctor?
22           Let me ask you this: Do you
23   remember, you were asked a question about
24   the Wang study by the plaintiffs'

Page 355

1    counsel, if you read it and its
2    methodology.
3            Do you recall that?
4        A.   I have the Wang study here.
5        Q.   Okay.  And you were going to
6    try to answer plaintiffs' counsel's --
7    strike that.
8            You wanted to make a
9    statement or give your impression of the
10   methodology of the Wang paper; is that
11   correct?
12       A.   Yes.  I offered an opinion,
13   and I wanted to explain my methodology.
14       Q.   Please go ahead and do that.
15       A.   Wang published a -- we would
16   consider -- I mean, he calls this a
17   prospective case-controlled pilot study.
18           Now, you know, within the
19   world of study design, you know, case
20   controlled studies are, by definition,
21   retrospective, not prospective.  Again,
22   case controlled studies are a much lower
23   level of evidence.  If we look at the
24   information that I provided here, a

Page 356

1    typical case controlled study is a Level
2    3.
3            Now, what's incumbent upon a
4    case controlled study is that you have a
5    very appropriate control group for that
6    study.  And the reason for that is that
7    you're trying to minimize selection bias
8    and other forms of bias that could be
9    introduced.  And so, as an investigator,
10   you have to be sure that you're picking a
11   group that is representative of your
12   control.
13           If one group has a certain
14   outcome and you're trying to look at the
15   cause for that outcome, the other group
16   needs to have similar exposure but not
17   the outcome.
18           So, for example, everyone
19   has a sling, the control group has a
20   sling with -- but lacks the particular
21   adverse outcome you're looking for,
22   whereas the affected group has that
23   outcome, itching, let's say, okay?
24           Unfortunately, for some

Page 357

1    reason, the investigators chose a control
2    group that consisted of only about seven
3    women.  And, again, this was a study of
4    700 women that had undergone a procedure.
5    And these were not -- these were not
6    control women, these were women that did
7    have a clinical problem that would
8    involve a removal of the portion of the
9    mesh so it could be compared.  But that's
10   not an appropriate control group.
11           So I look at this study and
12   say, you know, in all fairness, this is a
13   case series as opposed to a case
14   controlled.  And, you know, that does
15   knock down the level of evidence from a 3
16   to, actually, now a Case 4.
17           And, again, the reason why I
18   make that determination is that, you
19   know, we're trying to determine whether
20   or not we can infer clinical outcome,
21   clinical importance.  And, again, as we
22   go down on the scale of evidence, you
23   cannot make that inference.
24       Q.   And in that study, because

90 (Pages 354 to 357)

Marc Toglia, M.D.

| Page 358 | Page 360 |
|---|---|
| 1   of the limitations of that study, can you | 1   fascial sling. |
| 2   make that inference with the Wang study? | 2         Are either one of those |
| 3       A.   No.  You can't make that | 3   medical devices? |
| 4   inference with the Wang study. | 4       A.   They are not medical |
| 5       Q.   Does a study like the Wang | 5   devices, they are surgical techniques. |
| 6   study provide scientifically reliable | 6       Q.   So the Burch and autologous |
| 7   information on the rate of the | 7   fascial sling are not alternative devices |
| 8   complication -- I'm sorry, the incidence | 8   to the TVT, which is a device? |
| 9   of complication? | 9       A.   They are not alternative |
| 10       A.   Sure.  So that's the other | 10   devices to the TVT. |
| 11   thing that -- that, you know, a | 11       Q.   You were asked questions and |
| 12   well-schooled academician would tell you, | 12   shown an MSDS, material safety data |
| 13   is that you don't calculate prevalence or | 13   sheet, on bulk polypropylene. |
| 14   incidence based upon a case-controlled | 14       A.   Yes. |
| 15   study. | 15       Q.   Is that MSDS sheet relevant |
| 16       Q.   And for the case series, | 16   or clinically scientifically reliable to |
| 17   like the Abbott paper that plaintiffs' | 17   assess whether the TVT Retropubic device |
| 18   counsel asked you about earlier, do those | 18   is reasonably safe for its intended use |
| 19   also allow someone to scientifically | 19   to treat stress urinary incontinence? |
| 20   reliably speak to what the incidence of a | 20       A.   No.  That would be a |
| 21   complication is? | 21   conclusion that you would get based |
| 22       A.   In the Abbott trial, I think | 22   solely on your Level 1 levels of |
| 23   the authors correctly pointed out that, | 23   evidence. |
| 24   because they could not place a | 24       Q.   Would the MSDS sheet even be |

| Page 359 | Page 361 |
|---|---|
| 1   denominator, that you could not really | 1   on the levels of evidence? |
| 2   speak to incidence. | 2       A.   They would not. |
| 3       Q.   Do the systematic reviews, | 3       Q.   You made -- you were asked |
| 4   meta-analyses, numerous five-plus year | 4   questions about cancer, sarcoma. |
| 5   data that you referenced show consistency | 5         Do you recall that? |
| 6   in the overall safety and efficacy of | 6       A.   I do recall that.  I do |
| 7   TVT? | 7   believe that I addressed that in my |
| 8       A.   They do. | 8   report. |
| 9       Q.   You earlier mentioned that | 9       Q.   At Pages 25 and 26, it looks |
| 10   all of -- all of that data, and you cited | 10   like you addressed those issues; is that |
| 11   hundreds of different papers, I believe, | 11   correct?  At the bottom of 25? |
| 12   in your report, shows that the PROLENE® | 12       A.   Yes. |
| 13   polypropylene Type I macroporous mesh in | 13       Q.   And in the MSDS sheet, it |
| 14   TVT for the intended use to treat stress | 14   talked about sarcomas in rats where the |
| 15   incontinence is the most biocompatible. | 15   polypropylene was in disc or powder form. |
| 16         What did you mean by that? | 16         Do you recall that? |
| 17       A.   Biocompatible, you know, | 17       A.   Yes, I do. |
| 18   sort of a synonym for that, you would say | 18       Q.   And you made a statement |
| 19   it shows good host tolerability.  That it | 19   about how those data are not pertinent or |
| 20   was capability of existing within host | 20   relevant to the TVT in its configuration |
| 21   tissue with minimal to no adverse | 21   to treat stress urinary incontinence as a |
| 22   reaction. | 22   knitted macroporous mesh? |
| 23       Q.   You were asked questions | 23       A.   Yeah.  The point that I was |
| 24   about the Burch and the autologous | 24   trying to make, and I don't think I |

91 (Pages 358 to 361)

Marc Toglia, M.D.

Page 362

1   stated it very eloquently, is that the
2   investigations that have looked into such
3   claims had focused on the fact that it's
4   really the material composition, it's not
5   polypropylene, per se, but the composite
6   material.
7           And additional studies were
8   done, following those initial ones, that
9   showed, really, no risk of sarcoma
10  formation.
11          I mean, again, as a
12  physician and scientist, these concerns
13  have been addressed by my peers.
14  There's -- number one, to the best of my
15  knowledge, there's never been a reported
16  case of a sarcoma occurring in a patient
17  with a TVT.
18          As I stated that, you know,
19  polypropylene has been a material of
20  choice for 40 to 50 years.  And in that
21  context, there are no cases in women.
22  And my opinion was that, you know,
23  concerns about potential carcinogenesis
24  in women really are not substantiated,

Page 363

1   based upon this clinical experience and
2   the established literature.
3           Q.   And you cite to a paper by
4   King and Goldman, where they did an
5   analysis of the Cleveland Clinic's use of
6   thousands of slings over a long period of
7   time.
8           Do you recall that?
9           A.   I recall that paper.
10          Q.   Was that one of the papers
11  you relied upon for your conclusion that
12  the TVT PROLENE® polypropylene
13  macroporous Type I mesh does not cause
14  cancer or sarcoma in its intended use to
15  treat stress urinary incontinence?
16          A.   That's correct.
17          Q.   Plaintiffs' counsel asked
18  you questions about roping and curling
19  and the mechanical testing of the mesh.
20          Let me ask you, you -- I
21  think you told plaintiffs' counsel this,
22  you've seen the testing where they put
23  the TVT -- or they put some kind of mesh
24  on a bench machine and stretched it?

Page 364

1           MS. THOMPSON:  Object to
2   form.
3           THE WITNESS:  Yes.
4   BY MR. SNELL:
5           Q.   Doctor, have you seen
6   that -- have you seen testing like that?
7           A.   I've seen the reports on the
8   testing like that.
9           Q.   And photographs like the
10  photographs in Dr. Elliott or
11  Rosenzweig's report, where he put in
12  there a piece of mesh that was clamped
13  and it didn't have a sheath or any
14  instruments.
15          Do you recall that?
16          A.   Yes.
17          Q.   All right.  My question to
18  you is, is that photo and the testing of
19  the mesh in that manner scientifically
20  reliably pertinent to the use of TVT and,
21  in particular, its safety in the intended
22  treatment --
23          A.   It's out --
24          Q.   -- of stress urinary

Page 365

1   incontinence?
2           A.   I mean, it's outside the
3   intended use.  So, no, it's not relevant.
4           And, as I stated, you know,
5   the mesh is delivered protected beneath
6   the -- sheath.  Those forces are not
7   directly exerted on the mesh itself.
8           Q.   And is that --
9           A.   But it's specific to the
10  tension-free design, which is where the
11  name TVT comes from, tension-free vaginal
12  tape.  And that speaks to the design and
13  the method in which it's placed.
14          Q.   And in your report, I
15  believe you talk about the importance in
16  the design characteristics of the sheath
17  and what it does?
18          A.   Sure.  I mean, that was very
19  important in the design.
20          And I would point out
21  that's, you know, -- subsequent
22  developments along the area of
23  anti-incontinence procedures all pretty
24  much kept that element of the design

92 (Pages 362 to 365)

Marc Toglia, M.D.

Page 366

1    intact.
2         Q.   And you had mentioned the
3    sheath was important, very important, in
4    your opinion to plaintiffs' counsel; is
5    that correct?
6         A.   Yes.
7         Q.   Why -- so is the sheath a
8    very important design element of the TVT
9    for its intended use to treat stress
10   urinary incontinence?
11        A.   It's elemental in the
12   design.  Without the sheath, you would
13   not have a TVT device.
14        Q.   Okay.  And having placed,
15   you know, well over 1,000 TVT Retropubic
16   devices, did you find the sheath to be
17   integral or elemental in the use of that
18   device to treat stress incontinence as
19   you were utilizing it?
20        A.   Yes.  You know, again, the
21   sheath provided several key elements.
22   One is that it protected the sheath from
23   exposure to the surrounding tissue, to
24   bacteria.

Page 367

1         But I think that, you know,
2    certainly, its greatest utility was to
3    prevent the sheath from changing its
4    configuration.
5         Q.   Plaintiffs' counsel asked
6    you a bunch of hypothetical questions
7    about pore were collapse and curling and
8    fraying and things like that.
9         You recall seeing those
10   terms mentioned in the plaintiffs' expert
11   reports?
12        MS. THOMPSON:  Object to
13   form.
14        THE WITNESS:  Yes, I do.
15   BY MR. SNELL:
16        Q.   You saw where Dr. Elliott,
17   and others, would cite to some paper by
18   Dr. Klinge in a hernia application or a
19   rabbit or a mouse study, different data
20   for those theories they were espousing,
21   correct?
22        MS. THOMPSON:  Object to
23   form.
24        THE WITNESS:  I'm familiar

Page 368

1    with the articles in which
2    portions of mesh, we'll call them
3    sheathless mesh, mesh without
4    sheath, were applied in those
5    applications.
6    BY MR. SNELL:
7         Q.   Those types of documents and
8    that -- I'll call it data or information
9    the plaintiffs' experts relied on, do you
10   find that information scientifically
11   reliable for assessing the question, is
12   the TVT suitable or reasonably safe for
13   its intended use --
14        A.   It's certainly
15   not clinically relevant --
16        Q.   -- to treat stress urinary
17   incontinence?
18        A.   -- to the design of the TVT
19   as it's used for its intended use, no.
20        MR. SNELL:  Let's go off the
21   record.  Let me see.  I think I
22   may be done.
23        VIDEO TECHNICIAN:  We are
24   off the record.  The time is 9:05

Page 369

1    p.m.
2         - - -
3         (Whereupon, a discussion off
4    the record occurred.)
5         - - -
6         VIDEO TECHNICIAN:  We are
7    back on the record.
8    BY MR. SNELL:
9         Q.   And I believe, per your
10   earlier testimony, Doctor, those animal
11   studies or hernia studies, or documents,
12   are not even on the level of evidence if
13   we were trying to look to scientifically
14   reliable relevant evidence to the
15   application of treating stress
16   incontinence; is that correct?
17        A.   They are -- you are correct.
18   And they certainly don't speak to the
19   safety of the procedure.
20        Q.   Last question.
21        Do you have Exhibit 4?
22   Plaintiffs' counsel asked you some
23   questions about this e-mail with Kathleen
24   Feeney, and she insinuated that there

93 (Pages 366 to 369)

Marc Toglia, M.D.

| Page 370 |
| --- |

1  was -- the statement -- here I'll give it
2  to you.
3      A.   Thank you.
4      Q.   -- "can you do her
5  downstairs" had to do with some type of
6  sexual interaction.
7          MS. THOMPSON:  Object to
8      form.  That's not what I
9      insinuated.
10 BY MR. SNELL:
11     Q.   Can you tell, having had
12 time to look and think about this --
13     A.   Sure.
14     Q.   Tell us what, if anything,
15 you believe this pertains to.
16     A.   So Kathleen Feeney had
17 referred either friends of hers, or
18 someone, when they found out what they
19 did for a living, might say, you know,
20 I'm a woman who suffers with stress
21 incontinence, I know you're in this
22 field, what -- which of your doctors
23 would you recommend that I see.  She
24 would -- she would give my name and

| Page 371 |
| --- |

1  number to them.  These people would come
2  to see me as a patient.
3          And oftentimes I'll say,
4  look, I'd say, how did you come to find
5  me.  And they would say, you know, my
6  friend, Kathleen, referred me to you
7  because I have stress incontinence and
8  she says that you're somebody that I
9  would feel comfortable doing my surgery.
10         So in that context, the more
11 that I think about it, a friend of hers,
12 Christine, saw me, and it was a patient
13 that I was going to do her sling for her.
14 My office is on the fourth floor.  OR is
15 downstairs.  Obviously, I operate at two
16 different hospitals.  My recollection is
17 that the friend was closest to that
18 office.
19         So the comment there,
20 clearly, to me, was, you know -- you
21 know, I talked to her about options, and
22 she kept saying, yeah, I want -- I want
23 that procedure that my friend, Kathleen,
24 has mentioned to me.  And so she just

| Page 372 |
| --- |

1  might have responded, I can do you
2  downstairs.
3          Now, to the best of my
4  recollection, Kathleen Feeney had two
5  children of her own.  I may have teased
6  her from time to time, that, so, hey, you
7  know you're going to need a sling, right?
8  So who are you going to have, you know,
9  do your sling?  And she would say, gee, I
10 don't know, Dr. Toglia, I might have you
11 do me, or I might have Dr. So-and-so do
12 me, again, in references to doing her
13 sling.
14     Q.   Did you feel harassed when
15 you were asked those questions by
16 plaintiffs' counsel?
17     A.   I was very much harassed.
18 And I tried to do my best to stay as
19 professional as possible in that regard.
20     Q.   The Ogah -- I want to switch
21 gears, and just, actually, get back to
22 the data.
23     A.   I'm starting to feel like
24 Hillary Clinton here.  But go ahead.

| Page 373 |
| --- |

1      Q.   I want to go back to what
2  you did, reliably assessing the data.
3          The Ogah Cochrane review
4  that was marked, and I'm just referencing
5  Exhibit-5 to Dr. Blaivas's deposition,
6  does that study -- strike that -- does
7  that Cochrane review support your
8  opinions?
9      A.   It certainly does.
10     Q.   Does that study speak to and
11 document, in a reliable scientific Level
12 1 evidence method, of the lower morbidity
13 and the high safety to the TVT?
14     A.   Again, The Cochrane Group,
15 which is an independent group of
16 researchers, physicians, scientists,
17 people with interest in this area, they
18 conduct independent -- it's an
19 international group of individuals.  It's
20 not like there's, like, an office that
21 you would go to and this is the Cochrane
22 office.  There's -- it's sort of a group
23 of individuals with common interests and
24 they perform very high -- high-level,

Marc Toglia, M.D.

Page 374

1    high-quality levels of work. They are
2    widely regarded as one of the reliable
3    sources for this type of Level 1 data.
4        And, exactly, their -- their
5    conclusion is that the minimally invasive
6    synthetic slings, and, again,
7    specifically, they looked at TVT data,
8    does appear to be as effective as the
9    other procedures currently being
10   practiced.
11       Their observation was that
12   there seems to be fewer perioperative
13   complications.  And they went on to list
14   specifically which ones, as well.
15       Q.   Is there a more recent
16   Cochrane review that assesses the
17   usefulness, utility, efficacy and safety
18   of the TVT?
19       A.   I believe earlier this year,
20   led by a gentleman by the name of Ford.
21   In 2015, they updated this, I believe,
22   that -- one of the reasons for this is at
23   the time of the original evaluation,
24   there weren't -- there wasn't a lot of

Page 375

1    good quality data on, say, laparoscopic
2    Burches.  You know, again, the thing that
3    was unique about the TVT, it was
4    minimally invasive.
5        They really were hoping to
6    compare it to a more similar minimally
7    invasive.  It was felt that the tradition
8    pubovaginal sling, Burch procedures were
9    more invasive.
10       So as they gathered more
11   data, they were able to compare the
12   retropubic TVT to the laparoscopic Burch.
13   At the same time, there was better
14   quality data being generated with regard
15   to transobturator approach and the mini
16   sling as well.
17       So, again, they drew a
18   comparison between the retropubic
19   midurethral sling, specifically TVT, and
20   the other two approaches.
21       Q.   You mentioned, I think you
22   said, the NICE guidelines, a little
23   earlier in your testimony?
24       A.   NICE, I would pronounce it

Page 376

1    NICE.  It stands for the National
2    Institutes of Clinical Excellence.  That,
3    actually, I believe, is a government
4    organization in the UK, a group of
5    epidemiologists and other experts that
6    seek to independently evaluate everything
7    from medication to behavioral therapies
8    across the field of medicine, as well as
9    surgical interventions.
10       And those recommendations
11   are typically conveyed to the physicians
12   that are within the UK system.
13       Q.   Is that a document that you
14   reviewed and considered in formulating
15   your opinions?
16       A.   I did.  I mean, I hold that
17   document in the same light as I do the
18   other systematic reviews.
19       Q.   I'm going to hand it to you.
20   And I want to mark it for the record.
21       But the -- you said NICE or
22   is it NICE?  I'm sorry?
23       A.   I'm going to call it NICE.
24       Q.   The NICE guidelines says,

Page 377

1    Use procedures and devices for which
2    there is current high-quality evidence
3    for efficacy and safety.
4        And it's got a Footnote 11.
5    And it says, The guideline only
6    recommends the use of tapes with proven
7    efficacy based on robust RCT evidence.
8        What does that mean?
9        A.   That's what I've been
10   speaking to, that, you know -- once you
11   have high-quality, high-level of
12   evidence, you can pretty much draw your
13   conclusions based on that.
14       You know, if there are no
15   Level 1 studies, you know, then you base
16   recommendations on, say, Level 2.  I
17   guess for extremely rare interventions,
18   it can go lower than that.
19       But the goal is always to
20   sort of sort out the Level 1 evidence,
21   lower level evidence studies will be
22   looked at mostly to see whether or not
23   they -- they agree or are consistent.
24   But they're usually not used in the

95 (Pages 374 to 377)

Marc Toglia, M.D.

| Page 378 |
|---|
| 1  formulation of an -- of an inference. |
| 2      Q.   And they say, At the time of |
| 3  this publication, September 2013, the |
| 4  following met the guideline criteria. |
| 5          And it lists TVT.  I'll just |
| 6  hand it to you. |
| 7      A.   Yes. |
| 8      Q.   Do you believe that that is |
| 9  an accurate statement, based on your own |
| 10  independent scientific analysis of the |
| 11  data, with regard to the safety of the |
| 12  TVT for its intended use to treat stress |
| 13  urinary incontinence? |
| 14      A.   Yes.  I mean, I agree with |
| 15  the statement that, you know, they only |
| 16  recommend the use of tapes that have had |
| 17  proven efficacy. |
| 18          As, I'm sure, everyone is |
| 19  well aware, there are approximately 49 |
| 20  different mesh products available, some |
| 21  have been very well studied, others less |
| 22  so, some hardly at all. |
| 23          And I think they were -- you |
| 24  know, again, they were trying to say, we |

| Page 379 |
|---|
| 1  are -- we are specifically saying that |
| 2  our recommendations and our clinical |
| 3  recommendations should be to those that |
| 4  have robust randomized control trial |
| 5  Level 1 data. |
| 6      Q.   And for the TVT Retropubic |
| 7  device, has any other device to treat |
| 8  stress incontinence been studied as much, |
| 9  as long and as broadly? |
| 10      A.   No.  No.  It is the most -- |
| 11  the retropubic TVT device is the most |
| 12  studied anti-incontinence procedure in |
| 13  our history. |
| 14          I mean, obviously, it's the |
| 15  one that I do most commonly.  And that is |
| 16  certainly based upon, you know, the |
| 17  quality of that data. |
| 18      Q.   That NICE guideline also |
| 19  says to use only a Type I macroporous |
| 20  mesh? |
| 21      A.   Yes, it does. |
| 22      Q.   Is that something you |
| 23  believe is a proper statement, based on |
| 24  the reliable scientific evidence you |

| Page 380 |
|---|
| 1  agreed -- reviewed? |
| 2      A.   Yes, it is. |
| 3      Q.   Is that an opinion you |
| 4  share? |
| 5      A.   I share that opinion. |
| 6          MR. SNELL:  Let's mark that. |
| 7          - - - |
| 8          (Whereupon, Exhibit |
| 9      Toglia-19, NICE Urinary |
| 10      Incontinence: The Management of |
| 11      Urinary Incontinence in Women, was |
| 12      marked for identification.) |
| 13          - - - |
| 14  BY MR. SNELL: |
| 15      Q.   Did you see in the |
| 16  plaintiffs' experts' depositions where it |
| 17  was observed and noted that even one of |
| 18  the plaintiffs' experts, when he finally |
| 19  decided to discuss TVT in the application |
| 20  to treat stress incontinence, Dr. Klinge |
| 21  noted, At present, the gold standard in |
| 22  SUI surgery is the suburethral sling, |
| 23  using either the tension-free vaginal |
| 24  tape, TVT, or the transobturator tape. |

| Page 381 |
|---|
| 1          Did you see that when you |
| 2  reviewed the deposition? |
| 3      A.   I did -- I did note that Dr. |
| 4  Klinge did make that statement. |
| 5      Q.   And he also referenced Amid |
| 6  Type I versus Type III in the Meshia |
| 7  study, where there was a 9 percent rate |
| 8  of erosion with the intravaginal |
| 9  slingplasty, compared to the zero percent |
| 10  with the classical TVT which he referred |
| 11  to as a Type I macroporous monofilament |
| 12  polypropylene mesh. |
| 13          Do you recall that? |
| 14      A.   Yes. |
| 15      Q.   And you believe that the |
| 16  TVT, the retropubic TVT, is the gold |
| 17  standard for the treatment of stress |
| 18  urinary incontinence? |
| 19      A.   I think that the -- yes.  I |
| 20  mean, I think that -- that synthetic |
| 21  midurethral slings are currently the most |
| 22  commonly practiced anti-incontinence |
| 23  procedure. |
| 24          I believe that the AGS |

96 (Pages 378 to 381)

Marc Toglia, M.D.

Page 382

 1  membership, 95 or higher, 99 percent,
 2  have done that procedure.  I believe
 3  within the SUFU, or maybe it's the AUA,
 4  which is sort of our colleagues on the
 5  urology side, it's in the mid to high
 6  80s.
 7         The procedure is -- is the
 8  most common performed worldwide, and
 9  seems to have the highest quality of
10  evidence.
11         MR. SNELL:  Let's mark this
12  as an exhibit, this being the
13  statement by Dr. Klinge
14  acknowledging for the application
15  of stress urinary incontinence
16  treatment, TVT is the gold
17  standard in the macroporous
18  monofilament Amid Type I mesh.
19            - - -
20         (Whereupon, Exhibit
21  Toglia-20, Hernia Repair Surgery,
22  Volker Schumpelick, Robert J.
23  Fitzgibbons, Editors, was marked
24  for identification.)

Page 383

 1            - - -
 2         THE WITNESS:  If I might be
 3  allowed to go off the record to
 4  get a glass of water, please?
 5         MR. SNELL:  Sure.
 6         VIDEO TECHNICIAN:  We are
 7  off the record.  The time is 9:20
 8  p.m.
 9            - - -
10         (Whereupon, Exhibit
11  Toglia-21, The Cochrane
12  Collaboration; Mid-Urethral Sling
13  Operations for Stress Urinary
14  Incontinence in Women (Review),
15  was marked for identification.)
16            - - -
17         (Whereupon, a discussion off
18  the record occurred.)
19            - - -
20         VIDEO TECHNICIAN:  We are
21  back on the video record.
22  BY MR. SNELL:
23     Q.  Doctor, I've put before you
24  Exhibit 21.

Page 384

 1         Just if you can confirm, is
 2  that the Cochrane review that came out
 3  this year that you testified earlier
 4  about?
 5     A.   This is the 2015 Cochrane
 6  review on midurethral sling operations
 7  that was authored by Ford and colleagues.
 8     Q.   And is that a scientifically
 9  reliable Level 1 analysis?
10     A.   The Cochrane review in front
11  of me is thought -- is Level 1
12  meta-analysis, or, in other words, it's a
13  systematic review.
14     Q.   And in that systematic
15  review, did they look at multiple
16  randomized control trials?
17     A.   Yes.  They would look at
18  Obturator versus Retropubic.  They would
19  look at whether you -- devices that were,
20  quote/unquote, bottom to top versus top
21  to bottom.  Obturator, left to right,
22  right to left, or, more accurately, in to
23  out, out to in.
24         And I do believe there was

Page 385

 1  some comparison that looked at types of
 2  materials as it relates to cure and time,
 3  hospital stay, complications, voiding
 4  dysfunctions.
 5     Q.   As you -- strike that.
 6         As you do your analysis in
 7  the body of your report and you comment
 8  on the high degree of efficacy that's
 9  maintained with the TVT device in the
10  intended treatment of stress
11  incontinence, as well as the low
12  complication rates and the lack of many
13  late complications, even out to 17 years,
14  is that of significance to you in your
15  overall assessment as to whether the TVT
16  is safe for the intended use of treating
17  stress urinary incontinence?
18     A.   Absolutely.
19     Q.   Is that data inconsistent
20  with plaintiffs' experts' theories of
21  degradation, cytotoxicity and other claims
22  that there is a high rate of long-term
23  complications?
24         MS. THOMPSON:  Object to

97 (Pages 382 to 385)

Marc Toglia, M.D.

Page 386

1  form.
2      THE WITNESS:  It's not
3  consistent.  I'm not aware, again,
4  of any high-quality long-term
5  studies that suggest that there is
6  a significant -- any significant
7  rate -- clinical significant rate
8  of long-term complications or
9  harm, again, consistently on
10  individual bases, perioperative
11  risks, roughly in the 2 percent
12  range for each individual thing.
13      Long-term, you know, what
14  I -- what I usually sort of
15  summarize to my patients, look,
16  over the next ten years, the
17  likelihood that you might have to
18  have a re-intervention is 3
19  and-a-half percent.
20      Now, in -- if it's a
21  prolapse patient, we say to them,
22  look, you know, sometimes there's
23  a 15 to 40 percent chance of
24  reoperation for prolapse after an

Page 387

1  initial prolapse procedure.
2      These are chronic, you know,
3  conditions, as I mentioned several
4  times.
5  BY MR. SNELL:
6      Q.   And in your report where you
7  analyze the literature and you state, The
8  rates of complications requiring surgery
9  are consistently less than 5 percent
10  across the TVT studies.  Overall, the
11  data from these high-quality long-term
12  studies do not support the claims that
13  TVT places a woman at a significant risk
14  of long-term chronic complications or the
15  need for reoperation as plaintiffs'
16  expert suggest.
17      A.   Yes.
18      Q.   What did you mean by that?
19      A.   Were you reading that from
20  my report?
21      Q.   Yes.  That was at Page 30.
22  I'm sorry, I should have told you where I
23  was reading from.
24      A.   You know, again, I was

Page 388

1  trying to highlight the fact that, you
2  know, we're not -- we're not -- I wasn't
3  asked to do an analysis for nonsurgical
4  treatment to surgical treatment.  We were
5  looking at comparable surgical
6  procedures.
7      So it's important to say,
8  what's the baseline?  All these
9  procedures operate in the same
10  neighborhood, and, roughly speaking, they
11  have -- not only do they have similar
12  rates of effectiveness, but, overall, the
13  rates of complications are elemental.
14  They can occur with any of them.
15      Bleeding with any surgery,
16  obviously; when comparing the different
17  techniques, the risks of bleeding are
18  somewhat -- are somewhat similar.
19  Although, I think the -- the Schimpf --
20  excuse me, the Schimpf paper suggested
21  that, perhaps, the risk was a little
22  lower -- excuse me, the risk was
23  significantly lower, say, with a
24  midurethral sling compared to a Burch.

Page 389

1      Bowel and bladder injuries,
2  again, these all hovers in that sort of 2
3  to 3 percent range.
4      You know, longer -- you
5  know -- and similar things have been seen
6  with other procedures; the needle
7  suspension procedures, the autologous
8  fascial sling, what we traditionally call
9  pubovaginal slings.
10      And, again, as I read
11  through the literature and tried to come
12  up with a number, less than 5 percent
13  seemed, to me, to be a very conservative
14  number that I would feel comfortable
15  discussing with anybody with this
16  procedure.
17      Q.   And did you see, in some of
18  the systematic reviews and guidelines,
19  where the Retropubic TVT midurethral
20  sling had better efficacy or subjective
21  improvement than a Burch or a
22  pubovaginal, such as Schimpf where they
23  saw higher rates of subjective
24  improvement so SGS actually recommends

Marc Toglia, M.D.

Page 390

1    midurethral sling over pubovaginal sling?
2         A.   Yes.  And if I can sort of
3    qualify that.
4         So in my world, we're not
5    curing cancer, okay?  We are -- we are
6    intervening in hopes of improving one's
7    quality of life.  There are two ways you
8    can -- you can assess that result.  You
9    know, you can simply say to the patient,
10   you know, how do you feel?  Do you feel
11   like you have a substantial improvement?
12   Has this resulted in a better quality of
13   life?  And that's what we would call a
14   subjective improvement.
15        Stress incontinence is a
16   complaint, it's a symptom, it's something
17   that someone complains about.  That's
18   speaks to the subjective nature of
19   things.
20        It is also a condition that
21   can be demonstrated on testing; sometimes
22   as simple as saying to a woman, go ahead
23   and cough and I see if urine comes out.
24   That's done in -- a provocative stress

Page 391

1    test is done in a variety of situations,
2    sometimes with formal testing, oftentimes
3    without formal testing.
4         Or you might put a pad on a
5    woman and say, okay, you know, give me
6    100 jumping jacks.  That's objective.
7         So they do tend to look at
8    both subjective and objective.  We argue
9    back and forth with each other, what's
10   more important.  Again, being practically
11   minded, oftentimes we'll say, you know,
12   the patient is happy subjectively, we
13   would give quite a bit of weight to that.
14   So we do break them out separately.
15   Sometimes they'll come up with a
16   composite score.
17        So, fortunately, these
18   trials were well designed and approached
19   the -- they objectively approached both
20   subjective measures and objective
21   measures in both groups.
22        Q.   And you found -- did you
23   find those data reliable in order to
24   be --

Page 392

1         A.   Well, the -- I mean, yes.
2    Many of them used the same methodologies
3    that we use in our own randomized control
4    trial.
5         MR. SNELL:  No more
6    questions.  Thank you.
7         MS. THOMPSON:  I have some
8    follow-up questions.
9         - - -
10        EXAMINATION
11        - - -
12   BY MS. THOMPSON:
13        Q.   First of all, in some of the
14   articles that counsel chose to ask you
15   about, I'm looking at the Ogah 2011
16   Cochrane review.
17        And that's one that you
18   relied on heavily, correct?
19        A.   Well, it's one -- yes, it's
20   one of the studies that's -- that was
21   part of the very large pile of Level 1
22   studies.
23        Q.   And I think we're both
24   looking at the Neurourology and

Page 393

1    Urodynamics summary of the Cochrane
2    study, correct?
3         A.   Yes.  Given this is not 900
4    pages, I'm going to say this is the
5    summary.
6         Q.   Right.  Could you turn to
7    Page 289?  And I'm going to read the
8    paragraph under quality of evidence.
9         The quality of evidence for
10   the majority of trials was moderate, with
11   a minority having low to moderate levels
12   of evidence.  However, the total number
13   of trials, 61, including 7,021 women was
14   high and it was possible to explore the
15   effects of different routes of insertion
16   of the tapes and different tape
17   materials.
18        On the other hand, very few
19   trials reported outcomes after one year
20   and the long-term efficacy and adverse
21   events have yet to be determined.
22        Would you agree that, at
23   least according to the Cochrane review of
24   19 -- of 2011, adverse events were yet to

99 (Pages 390 to 393)

Marc Toglia, M.D.

Page 394

1  be determined?
2       MR. SNELL:  Objection.
3  Misstates the document.
4  BY MS. THOMPSON:
5       Q.   Did I not read that
6  correctly, the document?
7       A.   Um --
8       Q.   No.  First of all -- first
9  of all, did I read that paragraph
10  correctly?
11       A.   You read the paragraph
12  correctly.
13       And I just want -- in
14  forming my answer, we're talking
15  specifically about comparative trials.
16  We're not talking about long-term trials,
17  we're talking about, specifically, trials
18  that randomized women to one approach,
19  Retropubic, versus a different approach,
20  Obturator, and the duration that the
21  trial went on for.
22       This is -- this is an
23  internal comparison between different
24  types of midurethral slings.

Page 395

1       Q.   But the report does say that
2  very few trials reported outcomes after
3  one year and the long-term efficacy and
4  adverse events have yet to be determined,
5  correct?
6       A.   Very few studies that have
7  compared one method to the other.
8       Q.   Okay.  That's what the
9  article states, what I just read,
10  correct?
11       MR. SNELL:  Objection.
12  Asked and answered.
13       MS. THOMPSON:  No.  It's a
14  simple question.
15       THE WITNESS:  Again, the
16  comparative analysis was limited
17  to Retropubic, bottom to top
18  versus top to bottom; Obturator,
19  medial to lateral versus lateral
20  to medial; monofilament versus
21  multifilament; Transobturator
22  versus Retropubic.
23  BY MS. THOMPSON:
24       Q.   That's all true --

Page 396

1       A.   Yes.
2       Q.   -- but Ogah determined that
3  the adverse events have yet to be
4  determined.
5       Reading further in that --
6  in the section that says, Conclusions,
7  implications for practice, the last
8  paragraph states, However, there is
9  little evidence about the long-term
10  effectiveness or the chance of adverse
11  events, such as tape erosions nor is it
12  clear how to treat women after a tape
13  procedure fails.
14       You would agree with me that
15  that was a conclusion that Ogah made in
16  the 2011 Cochrane review?  I'm just
17  reading it.
18       A.   That's fine.  Point to it
19  again.
20       Q.   The last paragraph under,
21  Conclusions, implications for practice.
22       A.   Right.  The last sentence
23  speaks to, you know, should you undergo a
24  midurethral sling, that these particular

Page 397

1  studies analyze -- do not answer the
2  question of what you would do subsequent.
3       Q.   But I did read that
4  paragraph correctly as a conclusion of
5  Ogah in this study?
6       A.   You did.
7       Q.   And then in the next
8  section, Implications for research.
9  There is a need to address some of the
10  limitations of a number of the trials
11  contributed -- contributing to the
12  synthesis, particularly in improving the
13  methodology of the trials or their
14  reporting.  It is highly recommended that
15  clinical trials should be reported
16  following the CONSORT guidelines.
17       Did I read that paragraph
18  correctly?
19       A.   Yes.
20       Q.   So Ogah, at least, states
21  that there is -- that there are
22  limitations to a number of these trials,
23  and that -- particularly, improving the
24  methodology of the trials and the

100  (Pages 394 to 397)

Marc Toglia, M.D.

Page 398

1    reporting, correct?
2            MR. SNELL:  Objection.
3    Form.
4            THE WITNESS:  That's their
5        recommendations.  That their --
6        they would like to see additional
7        trials that would conform to the
8        criteria that they use.
9            And, again, their primary
10        objective is that they want to
11        compare apples with apples.
12    BY MS. THOMPSON:
13        Q.    And the next paragraph, in
14    implications for research, There is a
15    need for more robustly designed, good
16    quality and adequately powered randomized
17    controlled trials with standardized
18    objectives and validated subjective
19    outcomes.  These trials need to have
20    long-term follow-up and adequate
21    reporting of adverse events.
22            Is that one of the
23    implications for research that Ogah lists
24    in the 2011 Cochrane review that you're

Page 399

1    relying on?
2        A.    It's a suggestion.
3        Q.    You'll agree with me that
4    case series can be quite significant if
5    they're reporting a new complication,
6    correct?
7            MR. SNELL:  Objection.
8            THE WITNESS:  I would not
9        agree with that, counselor, no.
10    BY MS. THOMPSON:
11        Q.    So a new complication never
12    reported about, that's published in a
13    case series, you'll agree that those are
14    seen frequently in prestigious journals
15    and considered to be important?
16            MR. SNELL:  Objection.
17    Foundation. Compound.
18            THE WITNESS:  I mean, I
19        think -- I can tell you that in
20        the journals that I work for, they
21        are no longer interested in
22        publishing those with any great
23        frequency because they don't
24        consider them to be high

Page 400

1        quality --
2    BY MS. THOMPSON:
3        Q.    Of a new complication, never
4    reported before?
5        A.    Case series in general.
6        Q.    I'm talking about case
7    series of a new complication that has not
8    previously been reported?
9            MR. SNELL:  Objection.
10            THE WITNESS:  Sure.
11            MR. SNELL:  He's already
12        answered this and said no.
13            MS. THOMPSON:  He said he
14        misunderstood my question.  He
15        thought he -- I was talking about
16        case specific -- case series in
17        general, and I'm talking about
18        case series reporting a new
19        complication.
20            THE WITNESS:  I'm sorry.
21            MS. THOMPSON:  Those are two
22        different things.
23            THE WITNESS:  I'm talking
24        about all case series, which would

Page 401

1        include the type of case series
2        that you're referring to.
3    BY MS. THOMPSON:
4        Q.    Okay.  And just
5    specifically, case series reporting a new
6    complication are deemed important
7    frequently, correct?
8            MR. SNELL:  Objection.
9        Asked and answered.
10            THE WITNESS:  Are deemed
11        important frequently?
12    BY MS. THOMPSON:
13        Q.    Are frequently deemed
14    important in journals?
15            MR. SNELL:  Same objection.
16        Asked and answered.
17    BY MS. THOMPSON:
18        Q.    If you disagree with it,
19    just say you disagree with it.
20        A.    I disagree.
21            I mean, just, again, I -- I
22    serve on the editorial board and those
23    are not manuscripts that we frequently
24    review.

101 (Pages 398 to 401)

Marc Toglia, M.D.

1     Q.    Okay.  Let's look at
2  Schimpf, another one of the articles that
3  counsel chose to ask you about and that
4  you relied on for your opinions, correct?
5     A.    That is correct.
6     Q.    Let's go to the -- to Page
7  71.E18.
8     A.    I'm sorry, obviously, I'm
9  not able to predict what you're going to
10 ask me next, so I don't have it.
11    Q.    I'm going to ask you about
12 the articles that --
13    A.    No, I'm just asking for
14 permission to go off record so I find
15 that article.
16    Q.    It shouldn't take you that
17 long.
18    A.    No, I don't -- I'm just
19 trying to be respectful of everybody's
20 time on a Friday evening.
21    Q.    Do you have Schimpf in front
22 of you?
23    A.    I do.
24    Q.    Okay.  If you could turn to

1  Page 71.E18?
2     A.    Counselor, I'm not sure that
3  we're back on record.
4     Q.    We never went off the
5  record.
6     A.    My apologies.
7     Q.    And I'm reading --
8     A.    I was waiting to hear that.
9  So I did not focus on your question.
10 Could you repeat that, please?
11    Q.    71.E18.  And I'm reading
12 from the paragraph that begins there,
13 Limitations to the study.
14       And Schimpf states here,
15 There was also high variability in
16 reporting of numbers and types of
17 complications in trials, making analysis
18 of AE outcomes challenging.
19       And AE stands for adverse
20 events, correct?
21    A.    I would agree that
22 adverse -- AE stands for adverse events.
23    Q.    While many surgeons and
24 patients are interested in information

1  about postoperative symptoms, such as
2  urgency and de novo urgency, these
3  symptoms were inconsistently reported,
4  thus limiting their analysis.
5        Additionally, data
6  concerning need for re-treatment were
7  sparse and inconsistent, limiting our
8  ability to draw any conclusions on this
9  important question.  Complications were
10 assessed at different time intervals
11 among different trials, and sometimes
12 later trials reporting secondary analysis
13 did not update longer-term AEs.  The vast
14 majority did not use a standard
15 classification for complications, such as
16 the classification system of Dindo, et
17 al.
18       Did I read that correctly
19 about Schimpf's conclusions regarding the
20 reporting of AEs?
21       MR. SNELL:  Objection.
22    Misstates.
23    Go ahead.
24       MS. THOMPSON:  I just asked

1  if I read it correctly.
2  BY MS. THOMPSON:
3     Q.    Did I read it correctly,
4  Doctor?
5     A.    You did, counselor.
6        MR. SNELL:  You said
7    conclusion.  So I'm going to
8    object.  That's my objection.
9  BY MS. THOMPSON:
10    Q.    Are you familiar with the
11 Brubaker paper that was published
12 recently that was critical of two of the
13 randomized surgical trails for urinary
14 incontinence?
15       MR. SNELL:  Form.  Vague.
16       THE WITNESS:  Dr. Brubaker
17    is so prolific, I don't know which
18    one you're talking about.
19 BY MS. THOMPSON:
20    Q.    The title is, Missing Data
21 Frequency and Correlates in Two
22 Randomized Surgical Trials for Urinary
23 Incontinence in Women.
24    A.    I'm not familiar with that,

102 (Pages 402 to 405)

Marc Toglia, M.D.

Page 406

1  no.
2      Q.   So you -- and it's in the
3  IUJ, do you read that journal that you're
4  the editor of?
5      A.   I read that journal.  I
6  can't tell you I read everything that's
7  published within that journal.
8      Q.   Would that have been
9  something interesting to you, to
10  determine that two randomized surgical
11  trials had missing visits and data
12  increasing with time?
13         MR. SNELL:  Objection.
14         Calls for speculation.
15         THE WITNESS:  All -- all
16         clinical trials suffer from that
17         occurrence.
18  BY MS. THOMPSON:
19      Q.   At least somebody at the IUJ
20  thought that was significant enough to be
21  published, correct?
22         MR. SNELL:  You're asking
23         him to comment on something that
24         he doesn't recall seeing?  If

Page 407

1      you've got it --
2  BY MS. THOMPSON:
3      Q.   You can answer.
4         MR. SNELL:  If you've got
5         it, print it out and put it on the
6         record.  I don't care.  But don't
7         ask him to speculate.
8  BY MS. THOMPSON:
9      Q.   You can -- you can answer
10  the question.
11      A.   It was published, so an
12  editor felt that it was worthy of
13  publication.
14      Q.   Are you aware of
15  publications reporting inflammatory
16  tumors associated with the TVT?
17         MR. SNELL:  Objection.
18         Form.  Foundation.  Associated.
19         THE WITNESS:  I'm sorry, I'm
20         not familiar -- I'm not aware of a
21         publication that makes -- makes
22         that claim, no.
23  BY MS. THOMPSON:
24      Q.   Have you ever researched to

Page 408

1  see if there are benign inflammatory
2  tumors associated with TVT?
3         MR. SNELL:  Objection.
4         Relevance.
5         THE WITNESS:  In the
6         research that I did in formulating
7         my opinion, I did not come across
8         such an article.
9  BY MS. THOMPSON:
10      Q.   What is your definition of a
11  medical device?
12      A.   A medical device, I would
13  consider to be -- I think in the United
14  States devices need to be approved by the
15  FDA and the -- excuse me, the specific
16  indication for that device needs to be
17  stated.
18      Q.   You've used the word
19  "approved" several times today.
20         Do you mean cleared?
21      A.   I suspect that I mean
22  cleared.  To me, approved, cleared.
23      Q.   And so you're not claiming
24  to be a regulatory expert, correct?

Page 409

1      A.   I'm familiar with the
2  regulatory process, probably more so than
3  the average citizen.
4      Q.   And, yet, you don't know the
5  difference between cleared and approved?
6      A.   I'm saying that I use both
7  terms interchangeably.
8      Q.   So those two terms are
9  interchangeable in your mind?
10      A.   I mean, approved, to me,
11  means it's approved for use.
12      Q.   Is the answer yes?
13      A.   I consider them in the
14  same -- in the same light.
15      Q.   I'm going to read you the
16  World Health Organization definition of
17  medical device and ask you if you would
18  agree with that definition, okay?
19      A.   Okay.
20      Q.   Medical device means any
21  instrument, apparatus, implement,
22  machine, appliance, implant, reagent for
23  in vitro use, software, material or other
24  similar or related article intended by

103 (Pages 406 to 409)

Marc Toglia, M.D.

Page 410

1  the manufacturer to be used alone or in
2  combination for human beings for one or
3  more of the specific medical purposes
4  of...
5        Does that sound like a
6  definition of medical device -- device
7  that you would agree with?
8        MR. SNELL:  Objection.
9  Foundation.
10       THE WITNESS:  I'll take what
11  you say at face value, counselor.
12  That sounds like a reasonable
13  definition.
14 BY MS. THOMPSON:
15  Q.   Were PROLENE® sutures
16 cleared by the FDA?
17  A.   I don't believe that
18 PROLENE® sutures, per se, are considered
19 a medical device.
20  Q.   That wasn't my question.
21       My question was, were
22 PROLENE® sutures cleared by the FDA as a
23 medical device?
24  A.   I thought that's what I just

Page 411

1  said.  I mean, I don't know.  I'm not
2  aware that they are, A, categorized by a
3  medical device.  If they were categorized
4  by a medical device, I would assume they
5  were cleared.  But I don't know what
6  category sutures fall into.
7  Q.   I'll represent to you that
8  sutures -- PROLENE® suture was cleared by
9  the FDA as a --
10       MR. SNELL:  That is a total
11  misrepresentation.
12 BY MS. THOMPSON:
13  Q.   -- approved by the FDA as a
14 medical device.
15       MR. SNELL:  It was approved
16  as a drug by the FDA, found to be
17  safe and effective.  You know
18  that's a blunt misrepresentation
19  to the witness.  And then
20  re-categorized as a device.
21       MS. THOMPSON:  Forgive me.
22  It was re-categorized as a device.
23 BY MS. THOMPSON:
24  Q.   Would a suture fit the

Page 412

1  medical device that I -- definition that
2  I just read to you from the World Health
3  Organization?
4        MR. SNELL:  Form.
5        THE WITNESS:  I don't -- I'd
6  have to see it again, sort of --
7  in writing, counselor.  That a
8  rather complicated --
9  BY MS. THOMPSON:
10  Q.   Is it a material?
11  A.   A suture is a material.
12  Q.   Does a suture usually come
13 with a needle attached?
14  A.   It may or may not have a
15 needle attached.
16  Q.   If it does have a needle
17 attached, is that an apparatus?
18  A.   I would assume that it could
19 be considered an apparatus.
20  Q.   Is it used for human beings?
21  A.   Yes.
22  Q.   Is it used for a medical
23 purpose?
24  A.   Yes.

Page 413

1  Q.   Wouldn't you agree that that
2  fits the definition of the World Health
3  Organization of a medical device?
4        MR. SNELL:  Objection to
5  form.
6        THE WITNESS:  The way that
7  you described it to me, I would
8  take your word that that's how it
9  is classified.
10 BY MS. THOMPSON:
11  Q.   Okay.  Thank you.
12       Did I hear you correctly
13 that you track your complications in your
14 practice using mental notes?
15       MR. SNELL:  Misstates.
16  Go ahead.
17       THE WITNESS:  We track our
18  complications on -- on
19  spreadsheets, on paper.
20 BY MS. THOMPSON:
21  Q.   And we could request those
22 spreadsheets and papers that track your
23 complications?
24  A.   I don't know that those

104 (Pages 410 to 413)

Marc Toglia, M.D.

Page 414

1 exist beyond a certain period of time.
2 They're not published.
3       Q.   And you don't have those in
4 your office that we can look at?
5       A.   I'm sorry, I do not.
6       MS. THOMPSON:  I have --
7 BY MS. THOMPSON:
8       Q.   Oh, I have another question.
9       If I were to show you
10 internal Ethicon documents that show
11 degradation, show surface cracking, show
12 the clinical significance and show the
13 histological diagnosis of degradation,
14 would you still hold on to your opinion
15 that polypropylene does not degrade?
16       MR. SNELL:  Objection.
17 Foundation.  Form.
18       THE WITNESS:  I would.
19 Because, again, the Level 1
20 evidence on safety would trump
21 lower levels of evidence, which
22 would include in vitro studies
23 that you're referring to or even
24 animal studies.

Page 415

1       MS. THOMPSON:  No further
2 questions.
3       MR. SNELL:  No questions.
4       VIDEO TECHNICIAN:  This
5 concludes the deposition.  We are
6 off the record.  The time is 9:50
7 p.m.
8       - - -
9       (Whereupon, the deposition
10 concluded at 9:50 p.m.)
11       - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 416

1             CERTIFICATE
2
3
4       I HEREBY CERTIFY that the
5 witness was duly sworn by me and that the
6 deposition is a true record of the
7 testimony given by the witness.
8
9
10
         Amanda Maslynsky-Miller
11       Certified Realtime Reporter
         Dated:  October 5, 2015
12
13
14
15
16
17       (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Page 417

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4 over carefully and make any necessary
5 corrections.  You should state the reason
6 in the appropriate space on the errata
7 sheet for any corrections that are made.
8       After doing so, please sign
9 the errata sheet and date it.
10       You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14       It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

105 (Pages 414 to 417)

Marc Toglia, M.D.

Page 418

```
 1        ------
         E R R A T A
 2        ------
 3   PAGE  LINE  CHANGE/REASON
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 420

```
 1        LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 419

```
 1       ACKNOWLEDGMENT OF DEPONENT
 2
         I,_____, do
 3   hereby certify that I have read the
     foregoing pages,  1 - 415, and that the
 4   same is a correct transcription of the
     answers given by me to the questions
 5   therein propounded, except for the
     corrections or changes in form or
 6   substance, if any, noted in the attached
     Errata Sheet.
 7
 8   _____
 9     MARC TOGLIA, M.D.          DATE
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20_____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24
```

106 (Pages 418 to 420)