# Exhibit D

Jaime Sepulveda, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

_____

| | |
|---|---|
| IN RE:  ETHICON, INC., | Master File No. |
| PELVIC REPAIR SYSTEM PRODUCTS | 2:12-MD-02327 |
| LIABILITY LITIGATION, | MDL No. 2327 |
| _____/ | JOSEPH R. GOODWIN |
| THIS DOCUMENT RELATES TO | U.S. DISTRICT JUDGE |

PLAINTIFFS:
Joplin, Deborah Lynn          2:12-cv-00787
Wheeler, Pamela Gray          2:12-cv-00455
Collins, Fran                 2:12-cv-00931
Frye, Jackie                  2:12-cv-01004
Bennett, Dina Sanders         2:12-cv-00497
Miracle, Charlene             2:12-cv-00510
Adams, Joan                   2:12-cv-001203
Grabowski, Louise             2:12-cv-00683
Vignos-Ware, Barbara          2:12-cv-00761
Harter, Beth                    12-cv-00737
Scholl, Sheri                   12-cv-00738
Stubblefield, Margaret          12-cv-00842
Warmack, Roberta                12-cv-01150
Smith, Carrie                 2:12-cv-00258
Thomas (Wyatt), Kimberly      2:12-cv-00499
Georgilakis, Teresa           2:12-cv-00829
Cone, Mary                    2:12-cv-00261
Destefano-Raston, Dina        2:12-cv-01299
Hooper, Nancy                 2:12-cv-00493
Lee, Alfreda                  2:12-cv-01013
Reyes, Jennifer               2:12-cv-00939
Fisk, Paula                   2:12-cv-00848
Sikes, Jennifer               2:12-cv-00501
Swint, Isabel                 2:12-cv-00786
Teasley, Krystal              2:12-cv-00500
Thaman(Reeves), Susan         2:12-cv-00279
Warlick, Cathy                2:12-cv-00276
Sheperd, Donna                2:12-cv-00967

DEPOSITION OF JAIME SEPULVEDA, M.D.

Wednesday, March 30, 2016
8:12 a.m. - 4:33 p.m.
200 South Biscayne Blvd.
Miami Beach, Florida

Jaime Sepulveda, M.D.

---

Page 2

```
 1  APPEARANCES:
 2  On behalf of Plaintiffs:
 3     EDWARDS & DE LA CERDA
        3031 Allen Street, Suite 100
 4     Dallas, Texas 75204
        888.795.3352
 5     BY: PETER DE LA CERDA, ESQUIRE
        peter@edwardsdelacerda.com
 6
       MOSTYN LAW
 7     6280 Delaware Street
        Beaumont, Texas 77706
 8     800.400.4000
        BY: MARK C. SPARKS, ESQUIRE
 9       mark@mostynlaw.com
10
       On behalf of Defendant:
11
       BUTLER SNOW, LLP
12     500 Office Center Drive
        Suite 400
13     Fort Washington, Pennsylvania 19034
        267.513.1884
14     BY: NILS B. SNELL, ESQUIRE
        burt.snell@butlersnow.com
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1  Exhibit 9  Thumb Drive with Materials       49
              Relating to Prolift
 2
    Exhibit 10 Thumb Drive with Materials       50
 3            Relating to RVT-S
 4  Exhibit 11 Medical Literature               51
 5  Exhibit 12 Article: Randomized controlled   52
              trial comparing TVT-O and TVT-S
 6            for the treatment of stress
              urinary incontinence: 2-year
 7            results
 8  Exhibit 13 Curriculum Vitae                 53
 9  Exhibit 14 Reliance List                    54
10  Exhibit 15 General Expert Opinion Report    55
              on Gynemesh PS, Prolift and
11            Prosima
12  Exhibit 16 General Expert Opinion Report    55
              on TVT and TVT-O
13
    Exhibit 17 Invoices                         60
14
    Exhibit 18 Thumb Drive with Presentation    71
15            Material
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1
 2            INDEX
 3  Examination                    Page
 4  Direct    By Mr. De La Cerda     5
    Cross     By Mr. Snell         269
 5
 6  Certificate of Oath            302
    Certificate of Reporter        303
 7
 8
 9
10            EXHIBITS
11  No.                           Page
```

```
12  Exhibit 1  Gynecare Prolift and Gynecare   43
               Gynemesh PS Preceptor
13             Presentation Kit
14  Exhibit 2  Surgeon's Resource Monograph    43
15  Exhibit 3  Medical Literature              44
16  Exhibit 4  Book: Biomechanics: Mechanical  46
               Properties of Living Tissues,
17             Chapter 7
18  Exhibit 5  Book: Introductory              46
               Biomechanics From Cells to
19             Organisms, Chapter 9
20  Exhibit 6  Book: Introductory              47
               Biomechanics From Cells to
21             Organisms, Chapter 12
22  Exhibit 7  Thumb Drive with Materials      49
               Related to TVT and TVT-O
23
    Exhibit 8  Thumb Drive with Materials      49
24             Relating to TVT-S
```

---

Page 5

```
 1            PROCEEDINGS
 2               - - -
 3  Thereupon:
 4            JAIME SEPULVEDA, M.D.,
 5  having been first duly sworn, was examined and
 6  testified as follows:
 7       THE WITNESS: I do.
 8            DIRECT EXAMINATION
 9  BY MR. DE LA CERDA:
10       Q.  Okay. Doctor, could you please state your
11  full name for the record?
12       A.  Jaime L. Sepulveda.
13       Q.  You're a urogynecologist hired by Johnson &
14  Johnson and Ethicon, Inc. to provide opinions in
15  support of TVT, TVT-O, Gynemesh, Prolift and Prosima;
16  correct?
17       MR. SNELL: Form.
18       A.  I have -- I have been subpoenaed to provide
19  expert testimony about these products.
20       Q.  (By Mr. De La Cerda) My name is Peter
21  de al Cerda, I'm one of the attorneys who represents
22  the plaintiffs' group.
23       Do you understand who I am and who I
24  represent?
```

2 (Pages 2 to 5)

Jaime Sepulveda, M.D.

Page 6

1    A.  Yes, I do.
2    Q.  A couple of deposition rules.  As we begin,
3  first of all, we want to try to let each other finish,
4  so allow my question to get out fully before you begin
5  your answer and then I'll allow your answer to get out
6  fully before I begin my next question.  Is that fair?
7    A.  Yes.
8    Q.  And also when you're responding to
9  questions, please do so verbally as opposed to an
10  "uh-huh" or "uh-uh" or a head nod so it is clear on
11  the record.  Okay?
12    A.  Yes.
13    Q.  Also, if you don't understand my question,
14  please ask me to repeat or rephrase it, otherwise,
15  I'll assume that you understood my question.  Is that
16  fair?
17    A.  Yes.
18    Q.  And, of course, if you need a break at any
19  time, please let me know and we'll take a break.  The
20  only thing is if there's a question pending, I ask the
21  question be responded to before we take the break.
22  Okay?
23    A.  I -- I understand.
24    Q.  All right.  This is not the first deposition

Page 7

1  you've given; correct?
2    A.  That's correct.
3    Q.  What other depositions have you given?
4    A.  I have given depositions on Garcia versus
5  Ethicon.
6    Q.  Okay.  Anything else?
7    A.  Yes, I have given deposition in local cases
8  against a physician.
9    Q.  Okay.  So any other mesh cases where you've
10  given a deposition other than Garcia?
11    A.  Only Garcia.
12    Q.  Okay.  And then you've also given
13  depositions, I guess, in medical malpractice cases?
14    A.  Yes.
15    Q.  Okay.  How many of those have you given?
16    A.  I have given two.
17    Q.  Two.  And have you acted as a treater or as
18  an expert in those cases?
19    A.  One was as a treater and the other one was
20  as an expert.
21    Q.  Okay.  And when you acted as the expert,
22  were you for the plaintiff or for the defense?
23    A.  I was for the defense.
24    Q.  And generally speaking, in the case where

Page 8

1  you were the treater, what type of case was that?  I
2  know it's medical malpractice, but what was the
3  subject of that case?
4    A.  That -- that was in 1994, a pelvic mass,
5  specifically a sacral mass.
6    Q.  Okay.  And then how about the one where you
7  acted as the expert for the defense?
8    A.  It was a case of urinary incontinence after
9  a vaginal delivery.
10    Q.  And do you recall approximately when that
11  one was?
12    A.  That may have been three to four years ago.
13    Q.  Did either of those cases involve Butler
14  Snow?
15    A.  No.
16    Q.  Okay.  And then in the Garcia versus
17  Ethicon, you acted as an expert on behalf of Johnson &
18  Johnson and Ethicon; correct?
19    A.  That's correct.
20    Q.  All right.  Any other depos other than the
21  ones you already mentioned?
22    A.  No other depos.
23    Q.  Okay.  A few questions here.  I assume the
24  answers to these are all no, but have you ever had

Page 9

1  your privileges at a hospital revoked, suspended or
2  limited in any way?
3    A.  No.
4    Q.  Have you ever personally been sued for
5  medical malpractice?
6    A.  Yes.
7    Q.  Okay.  And what was the subject of that
8  particular case?
9    A.  It -- it was, again, a chordoma,
10  c-h-o-r-d-o-m-a, a chordoma, which is a tumor on the
11  sacrum.
12    Q.  I see.  Okay.
13    A.  And the other one was an injury to the
14  ureter during the excision of a 20-centimeter pelvic
15  mass.
16    Q.  Okay.  So these are two separate cases;
17  correct?
18    A.  Yes.
19    Q.  In the first case that involved the
20  chordoma, so you were the defendant in that case?
21    A.  Yes.
22    Q.  And was this the one from 1994?
23    A.  Yes.
24    Q.  Okay.  So you actually gave a deposition in

3 (Pages 6 to 9)

Jaime Sepulveda, M.D.

Page 10

1   that case; right?  Is that right?
2       A.  Yes.
3       Q.  And in the second case, the injury to ureter
4   with the pelvic mass, did you end up not giving a
5   deposition in that case?
6       A.  There was no deposition.
7       Q.  Okay.  Without revealing -- I know
8   settlements many times can be confidential.  Without
9   revealing any confidentiality, can you tell us
10  anything about the resolution of those two cases?
11      A.  They were both settled.
12      Q.  Settled, okay.
13          Okay.  So no trial; right?
14      A.  There -- there was no trial and it was for a
15  fully disclosed amount.
16      Q.  Okay.  Any other litigation against you
17  other than those two cases that we talked about, any
18  litigation of any type?
19      A.  No.
20      Q.  Have you ever had a disciplinary action
21  against you by any medical board?
22      A.  No.
23      Q.  Have you ever been arrested or convicted of
24  a crime?

Page 11

1       A.  No.
2       Q.  Okay.  We discussed -- okay.  Other than
3   being retained in the Garcia case as an expert and in
4   this -- in the case where you were retained as an
5   expert that you mentioned before where you did a
6   deposition, have you ever been retained as an expert
7   in litigation, other than those two instances you've
8   already mentioned?
9           MR. SNELL:  Hold on, hold on.  I'm going to
10          instruct you.  To the extent you have not been
11          disclosed, you should be mindful of that and not
12          identify those cases.  To the extent you have not
13          been disclosed, either by deposition, expert
14          report, doing an IME of the plaintiff, under the
15          rules, depending upon where you may have been
16          retained, that is confidential information.
17      A.  I gave testimony on Cavness.
18      Q.  (By Mr. De La Cerda)  Okay.  Other than
19  Cavness, Garcia and then this other case involving
20  urinary incontinence after vaginal delivery, any
21  other cases where you've been designated as an
22  expert?
23      A.  On -- on Ramirez.
24      Q.  Right.  Is there a name to the case where

Page 12

1   you were the expert for the defense on the urinary
2   incontinence after the vaginal delivery?  Do you
3   remember a name?
4       A.  I cannot recall.
5       Q.  Okay.  That would just make it easier to
6   reference, but ...
7           Okay.  In all four of these cases, the
8   Cavness case, the Garcia case, the Ramirez case and
9   the case involving urinary incontinence after vaginal
10  delivery, all four of those cases you were retained by
11  the defense; correct?
12      A.  That's correct.
13      Q.  You've never testified for the plaintiff as
14  an expert; is that right?
15      A.  I have not testified for the -- for a
16  plaintiff.  I have given opinions as part of the State
17  of Florida Prosecution Unit, which is actually known
18  as the Department of Health, Department of Health now.
19  It's work that I have done for years for the
20  Department of Health.
21      Q.  Are these like criminal investigations into
22  doctors or what -- what is it?
23      A.  You know, that's why they eliminated the
24  Prosecution Unit name because it sounds criminal, so

Page 13

1   now we all understand that it's -- it's any complaints
2   that have been brought against a physician in my -- in
3   my specialty, I and the board feels that needs to be
4   reviewed, I review.
5       Q.  Okay.  And how long have you been doing
6   that?
7       A.  Close to 15 years.
8       Q.  15 years.  Okay.
9           Let's talk briefly about your role as a
10  consultant for Ethicon outside of litigation.  Okay?
11  So this word "litigation" is not contemplated, this is
12  just your role as a consultant in what -- helping out
13  what Ethicon does in its normal business.  Okay?
14          So, first of all, in the past, you have been
15  hired as a consultant for Ethicon; correct?
16      A.  Yes.
17      Q.  Okay.  And do you recall when you were first
18  hired as a consultant for Ethicon?
19      A.  It may have been just after the year 2000,
20  2002. I don't recall the specific year.
21      Q.  Okay.  But early 2000s?
22      A.  About -- about that time.
23      Q.  Okay.  And what was the purpose of you being
24  hired on as a consultant when you first started?

4 (Pages 10 to 13)

Jaime Sepulveda, M.D.

Page 14

1    A.  Initially, I was given the opportunity to --
2  to dissect cadavers and to put together the anatomy
3  for the dissection in specimens as it would apply to
4  the use of products.
5    Q.  Okay.  So I'm having a little trouble
6  understanding what that might be.  Explain to me what
7  you would do, then, on a typical day involving that
8  particular role.
9    A.  It changed.  It changed over the -- over the
10  years.  I started dissecting and teaching and being
11  involved with my peers on how to use the different
12  products and it was just an interest that I -- that I
13  had very early in my career about surgical anatomy.
14  So I just expanded that and I was given the
15  opportunity while -- I was given instruments to work
16  in the gallery.
17    Q.  Okay.  Did you have a title when you first
18  began as a consultant for Ethicon?
19    A.  No.
20    Q.  Okay.  Were there defined duties that you
21  had when you first started out as a consultant?
22      MR. SNELL:  Form.
23    A.  No, nothing -- nothing that was defined as
24  different task.

Page 15

1    Q.  (By Mr. De La Cerda)  Okay.  They didn't
2  have, like, a job description that was given to you
3  when you first started?
4    A.  No.
5    Q.  Okay.  And so in this role involving
6  dissecting cadavers, where you were teaching other
7  peers about how to use the Ethicon products, was that
8  a role that remained consistent throughout your time
9  as a consultant for Ethicon or did it change over
10  time?
11    A.  It changed based on the needs that they had,
12  for what -- what they understood was my expertise.
13    Q.  Okay.  So let's do this.  So the beginning
14  is approximately the beginning of the 2000s.  Has that
15  con- -- has that role as a consultant for Ethicon
16  ended or do you continue to be a consultant for
17  Ethicon?
18    A.  No, I don't consult with them anymore beyond
19  the legal.
20    Q.  And so when did your role as a consultant
21  end?
22    A.  Just -- just about the time that the
23  products -- the prolapse products were
24  decommercialized.

Page 16

1    Q.  Okay.  So is that 2012, approximately?
2    A.  Yes.
3    Q.  Okay.  So I guess that's about ten years of
4  acting as a consultant; is that fair?
5    A.  Yes.
6    Q.  Okay.  So the manner in which your role as a
7  consultant changed, was it really in -- in regard to
8  the products themselves, what kind of product you were
9  teaching, or is there some other way in which it
10  changed?
11    A.  It changed.  It changed based on what --
12  whatever was understood that there was a need.
13    Q.  Okay.  Can you give me some examples?
14    A.  Initially, it was seeing the products, how
15  they would work, and nothing -- nothing in terms of
16  experiment or research and development.  It was more
17  on how -- how to reproduce their use in the -- in the
18  operating room.
19    Q.  Mm-hmm.
20    A.  And then I was able to -- to see -- to see
21  how -- how the products were actually implemented
22  in -- in the surgical environment.  And there was a
23  time in which I would just see other surgeons that
24  were consultants.  And then there was a time in which

Page 17

1  I would go to and meet with -- with a group at Ethicon
2  and give a conference on anatomy or I would take them
3  to the lab and show them the anatomy.
4    Q.  Mm-hmm.
5    A.  And then there was a time in which I
6  actually wrote a manual of how to dissect -- dissect a
7  specimen, make the best of that dissection.
8    Q.  Okay.  But tell me about this manual.  What
9  is it that you'd be dissecting -- so tell me, what was
10  the content of this manual?
11    A.  The labs -- the labs using specimens are
12  very unique and they're very -- they're very
13  expensive.
14    Q.  Okay.
15    A.  And the whole setup of getting a good
16  specimen.  And what we call "specimens" is a portion
17  of a person and there -- there are certain things that
18  we have to follow over the years, over the last 25
19  years that I have learned dissecting and understanding
20  the anatomy.  One of the most complex anatomies that
21  you can have in any other -- other part of the body.
22  So when we -- when we did this and there's -- my
23  interest was that, and I verbalized that, that we
24  could make the best use of these specimens in the lab.

5 (Pages 14 to 17)

Jaime Sepulveda, M.D.

Page 18

1    Q.  Mm-hmm.
2    A.  And not only that it would be -- it would be
3 the best use, but also that it would be a systematic
4 approach in the same way that first-year medical
5 students are taught anatomy.
6    Q.  Mm-hmm.  Okay.
7    A.  So to get -- to make that organized and to
8 make that systematic and to make that consistent, then
9 there was -- there was a proposal for a manual.  That
10 was just one part of -- of what could be done in -- in
11 the lab- -- laboratory.
12    Q.  And this was a manual that was done for
13 Ethicon; right?
14    A.  It was done for -- for them, but I think it
15 was -- there were other -- other considerations
16 beyond -- beyond anatomy and probably did not get
17 developed, but I got the -- I got the opportunity to
18 take my pictures and actually put it in -- on my thumb
19 drive with presentations, which you're going to be
20 requesting.
21    Q.  Okay.  Are these cadaver specimens, they're
22 reused for purposes of teaching doctors how to do --
23 how to, for example, implant Ethicon's products;
24 right?

Page 19

1    A.  Well, cadavers are used in sections and,
2 obviously, we're going to -- we're going to use a
3 section that pertains to the procedure that we're
4 doing and they -- they form the basis of teaching
5 anatomy from the first year of medical school.
6    Q.  Do they -- do the cadaver -- I guess the
7 portions of the cadaver that are used to present how
8 to implant products, do they eventually get used, to a
9 certain extent, to where, okay, we can't use this
10 cadaver anymore, like it's been used too much for this
11 particular presentation?
12    A.  You can -- you can always make -- make the
13 best of what you're examining.  So, yeah, if there is
14 a portion that is used, you can always go to different
15 things that you can teach from the -- from the
16 cadaver.  That's highly dependent on the condition of
17 the cadaver.
18    Q.  Yeah.
19    A.  It's highly dependent on how it was
20 prepared.  It's highly dependent on how those
21 individuals that are doing the dissection know how to
22 do it.
23    Q.  Okay.  Okay.  So going back to your role as
24 a consultant for Ethicon and what it is that you did,

Page 20

1 have you now explained all the various things that you
2 did as a consultant on behalf of Ethicon?
3        MR. SNELL:  Form.
4    A.  I -- I actually look at presentations.  In
5 addition to, I look at presentations.  I would make a
6 presentation to -- to different groups within Ethicon.
7    Q.  (By Mr. De La Cerda)  You would do
8 presentations for other physicians about Ethicon's
9 products; is that correct?
10    A.  About Ethicon products and about the
11 condition itself.
12    Q.  Okay.  And did the presentations that you do
13 to other doctors for Ethicon include TVT, TVT-O,
14 Gynemesh, Prolift and Prosima?
15    A.  It was TVT-O, TVT-Secur, Gynemesh, Prosima,
16 and Prolift.
17    Q.  Any reason why you didn't do presentations
18 on regular TVT or TVT-R?
19    A.  I had a -- I had a preference for the
20 transobturator slings.
21    Q.  Had you used in the past a TVT Retropubic
22 for your patients?
23    A.  Yes.
24    Q.  And why is it that you preferred the TVT-O

Page 21

1 over the TVT?
2    A.  I felt I could do the same with less risk.
3    Q.  And what risk are you specifically talking
4 about?
5    A.  Getting to the bladder.  Very rare, but
6 potential getting to the bowel and getting to a major
7 blood vessel.
8    Q.  You've testified before that you've made --
9 you've made about $100,000 a year as a consultant for
10 Ethicon; is that right?
11    A.  That -- I may have testified to that number,
12 yes.
13    Q.  Okay.  And so if we're talking about ten
14 years, we're talking about approximately a million
15 dollars you made as a consultant for Ethicon; correct?
16        MR. SNELL:  Form.
17    A.  No, it doesn't -- doesn't get to that
18 because it wasn't -- it wasn't like a salary.  It was
19 in a -- in a need and there were years that it was
20 $3,000.
21    Q.  (By Mr. De La Cerda)  Do you have an
22 approximation of how much you made total as a
23 consultant for Ethicon?
24    A.  I -- I think the largest and the best year,

6 (Pages 18 to 21)

Jaime Sepulveda, M.D.

Page 22

1  most active year, I may have done about 100.  But
2  that -- that's probably one or two years.
3      Q.  Do you have a range, total, for all the
4  years that you acted as a consultant for Ethicon?
5      A.  Never -- never really counted.
6      Q.  Do you have any documentation of that, of
7  what the numbers might be?
8      A.  My 1099s that I receive or my tax returns.
9      Q.  Okay.  And if Ethicon has records of that,
10  you'd, of course, defer to whatever those records say;
11  right?
12          MR. SNELL:  Objection, form, foundation.
13      A.  As -- as long as they correlate with my
14  1099.
15      Q.  (By Mr. De La Cerda)  Right.  So if they
16  had records of the 1099s, which I assume they do,
17  you would defer to whatever those numbers are;
18  right?
19      A.  I -- I would defer to that.
20      Q.  When you've presented on Ethicon's products,
21  where have those presentations occurred,
22  geographically?
23      A.  You know, it happened mostly here either in
24  Florida or in New Jersey.  Occasionally, I would go

Page 23

1  to -- to other cities, Austin, Toronto, Dallas,
2  Boston.  Never -- never too -- never too far.  I -- I
3  made that decision that I wasn't going to go, let's
4  say, to the Northwest or California maybe once because
5  I have a practice that I have to take care of.
6      Q.  Right.  I guess you have the advantage, too,
7  of being in Miami, doctors would want to come to you
8  for the -- were there many presentations here in
9  Miami, too?
10      A.  There -- there were -- yeah, there were some
11  in Miami, absolutely.
12      Q.  Okay.  When the presentations were out of
13  town, Ethicon, of course, covered your -- your meals,
14  your lodging, your transportation; right?
15      A.  With -- within the -- within the range that
16  was specified for that kind of traveling.
17      Q.  How was that done?  How was the range
18  specified?
19      A.  We -- we were required to take a course on
20  guidelines for -- as consultants for any kind of
21  industry.
22      Q.  Mm-hmm.  And do you recall any of what those
23  guidelines were?
24      A.  I -- I do recall there was -- there were

Page 24

1  specifics on which hotel we could stay and -- and no
2  first class traveling, and there was compensation, if
3  we would drive, for the miles --
4      Q.  Okay.
5      A.  -- and there were also some -- some limits
6  on what we could spend on food, although most of the
7  time food was provided there.
8      Q.  Do you know whether Ethicon believed you to
9  be a good preceptor or teacher on its TVT products?
10      A.  I -- I think that they visualized me as a
11  good surgeon with good common surgical sense.
12      Q.  And I just used the term "preceptor," I need
13  to make sure that's understood.  Could you explain to
14  us what the term -- what your understanding of the
15  term "preceptor" is?
16      A.  The preceptor is -- is a term that was, I
17  believe, from mostly the marketing people.  I never
18  really saw myself as a preceptor.
19      Q.  Mm-hmm.
20      A.  I saw myself as a surgeon.  And if you ask
21  any of my colleagues, they don't see me as a
22  preceptor.  Through the course -- through the years, I
23  have seen doctors that have seen me for every single
24  product and we always ended up talking about the same

Page 25

1  thing, the anatomy and the surgery.
2      Q.  Mm-hmm.  And so preceptor, I guess that's
3  used as some version of saying that someone's a
4  teacher; is that right?
5      A.  I -- I think it was an internal term for --
6  for them, preceptor, and it's -- it doesn't get to the
7  level of a teacher or a professor, it doesn't have
8  that -- that responsibility.  It doesn't have -- it
9  has mostly the role of showing something, of
10  demonstrating.
11      Q.  Okay.  Do you know whether Ethicon ever
12  criticized the way in which you taught other
13  physicians in preceptorships?
14      A.  They -- they did not have a specific
15  criticism and they -- they would ask, whenever they
16  would bring someone to see me operating, that they had
17  a -- that the doctors could get to see as much as they
18  could see in terms of the variety of procedures, but,
19  obviously, that -- the cases are what the cases are.
20      Q.  Yeah.
21      A.  You show what you have.
22      Q.  Ethicon -- I guess, in other words, Ethicon
23  never said -- made you personally aware of any
24  specific criticisms of any type of the manner in which

7 (Pages 22 to 25)

Jaime Sepulveda, M.D.

Page 26

1  you were teaching other doctors how to perform these
2  procedures; right?
3      MR. SNELL: Form.
4      A.  There -- there was -- it was a relationship
5  with -- with a lot of respect for what I did, for what
6  I brought to the -- to their table.
7      Q.  (By Mr. De La Cerda)  Okay.  So the answer
8  is no, you never became aware of any criticisms;
9  right?
10     A.  No.
11     Q.  In August of 2011, you decided to stop
12  preceptorships due to the FDA situation; correct?
13     A.  I -- I -- there was a communication that
14  said we -- we need to look at this and we need to look
15  at what the FDA is saying, and everybody needs to be
16  on the same wavelength.
17     Q.  Mm-hmm.  And so what -- how long did that
18  last, that decision to suspend or interrupt your
19  preceptorships?
20     A.  I don't -- I don't remember exactly how --
21  how long did it last or if I ever went back and did a
22  consultation in other -- other regards.  It's -- it
23  was just a gen- -- probably a general concern from all
24  sides.

Page 27

1      Q.  Okay.  Just to make sure.  So you're unsure
2  whether, in August of 2011 when you decided to stop
3  the preceptorships due to the FDA concern, you're
4  unsure whether you went back to consulting for Ethicon
5  after that point?
6      A.  Yeah, I --
7      MR. SNELL: Objection to form.
8      Go ahead.
9      A.  -- I did -- I did not cut completely at that
10  time and actually it was -- it was me relating, I
11  believe, to Bob Zipfel, who was the professional
12  education manager --
13     Q.  (By Mr. De La Cerda)  You said Bob Zipfel?
14     A.  Zipfel, Z-i-p-f-e-l.
15     -- relating that we -- we need to get clear
16  on the -- on the message and we need to include
17  whatever is out there and be transpiring about it.
18     Q.  And so what was it that you decided, along
19  with Ethicon, to make clear about the message
20  involving this issue?
21     MR. SNELL: Objection, form, Ethicon.
22     A.  As far as I remember from my side, it was
23  let's -- let's look at this.  It was -- that's more of
24  the attitude that I can recall.

Page 28

1      Q.  (By Mr. De La Cerda)  Do you remember ever
2  discussing this FDA issue with doctors during a
3  consultation on behalf of Ethicon?
4      A.  I -- I don't remember that.
5      Q.  Okay.  Do you remember discussing this issue
6  at all with any doctors in regard to Ethicon products?
7      MR. SNELL: Objection, form.
8      Go ahead.
9      A.  I don't -- I don't remember specifics of
10  talking to a specific doctor or being at a conference
11  just talking about -- about this.
12     I don't even remember if it was 2007, 2008,
13  or -- I don't remember which time frame it was.  I
14  am -- you know, I became aware of this, that I say at
15  one point we need to stop or we need to review, we
16  need to revise it, or we need to look at it, but it
17  was never like, oh, no, I'm not teaching anymore, I'm
18  not demonstrating anymore for you.
19     Q.  (By Mr. De La Cerda)  Mm-hmm.
20     A.  That's what I can recall.  That's the best
21  of my recollection right now.
22     Q.  Why is it important when the FDA puts out a
23  warning, like they did in 2011, to investigate and
24  look into what -- the reason behind the warning?

Page 29

1      MR. SNELL: Form.
2      A.  It's because the results and the clinical
3  experience that we're getting was different from what
4  we were seeing in those -- in those reports.
5      Q.  (By Mr. De La Cerda)  Okay.  So the FDA
6  warning came out in July of 2011, was that a
7  surprise to you?
8      A.  It was -- it was a surprise in 2008 and it
9  was in 2011.  What I -- what I thought is evidence is
10  going to come in and is going to show -- it's going to
11  solve this difference that a group of doctors may have
12  with other group of doctors.
13     Q.  You're familiar with the Abbott study that
14  came out -- it came out probably in 2014, I think.
15  Abbott -- the lead author is Abbott, Mickey Karram is
16  one of the authors as well.  And one of the
17  discussions they have is that many times when -- I
18  think about half the time, at least -- when a patient
19  has a complication involving a mesh implant, whether
20  it be a sling or a pelvic organ prolapse mesh, they do
21  not return to the physician that implanted it.
22     Are you aware of that phenomenon?
23     MR. SNELL: I'm going to object to the
24  foundation on that.

8 (Pages 26 to 29)

Jaime Sepulveda, M.D.

| Page 30 | Page 32 |
|---|---|
| 1     Go ahead.<br>2     A.  I -- I've heard about that.  I never<br>3  believed that that's the case.<br>4     Q.  (By Mr. De La Cerda)  Okay.  And why is<br>5  that?<br>6     A.  Because of my own experience, because of<br>7  my -- the experience that I have heard from my<br>8  colleagues.  That's -- that's not what our experience<br>9  is.<br>10     You -- you may have a small percentage that<br>11  may not come back, but in my community, for example,<br>12  we all know, we all communicate.  There are four, five<br>13  board-certified female pelvic medicine in the whole<br>14  stretch all the way to Boca from here.  We know each<br>15  other and -- and the doctors also communicate with us,<br>16  so there is a lot of communication there.<br>17     If there is a loss to follow up, it might be<br>18  on the clinic setting, when you have these clinics,<br>19  other -- other types of settings, but not in the<br>20  private-practice setting.<br>21     Q.  If a patient went to go receive treatment<br>22  for a complication in a different city that's<br>23  something like Dallas, for example, would you<br>24  necessarily find out about that? | 1  study? Like have you actually reviewed it?<br>2     A.  I -- I did not read that study complete, no.<br>3     Q.  Okay.  Then I'm going to move on to another<br>4  subject then.<br>5     Going back to acting as a consultant, have<br>6  you ever acted as a consultant for any other<br>7  pharmaceutical or medical device company?<br>8     A.  For pharmaceuticals, I work for ALZA<br>9  Pharmaceuticals.<br>10     Q.  Is that --<br>11     A.  A-L-Z-A.  When they came -- they came in<br>12  with a new anticholinergic.<br>13     Q.  I'm sorry, what is that?<br>14     A.  ALZA, A-L-Z-A, Pharmaceuticals.<br>15     Q.  And the drug?<br>16     A.  It was Ditropan XL.<br>17     Q.  Ditropan XL.<br>18     And what was that drug for?<br>19     A.  For overactive bladder.<br>20     Q.  How long did you work as a consultant for<br>21  ALZA Pharmaceutical?<br>22     A.  About two years.<br>23     Q.  And do you recall approximately when that<br>24  was? |

| Page 31 | Page 33 |
|---|---|
| 1     A.  I may not -- I may not find out, but I know<br>2  that most of the time it's not even dependent on the<br>3  patient.  They -- they come and they communicate with<br>4  me.  I've had patients that have gone to New York,<br>5  they come back and tell me this was my experience.<br>6     Q.  You mentioned something interesting because<br>7  you're -- and I hear this from physicians every time.<br>8  I think this is our natural inclination.<br>9     You mentioned in your experience you haven't<br>10  seen that happen.  Ultimately, you would agree that<br>11  your personal experience on that issue, on whether<br>12  people come back to the primary physician or not, is,<br>13  at best, only anecdotal.  Do you agree with that?<br>14     A.  It's -- it is definitely a portion that is<br>15  anecdotal.  I do talk to so many of my colleagues and<br>16  if it's anecdotal, it repeats a lot.<br>17     Q.  Yeah, I get that.  I mean, here you are in a<br>18  community where you do actually know all these<br>19  physicians that do this thing and if the general<br>20  consensus is that this is what's happening, it can<br>21  certainly feel like this is the reality of it.  But<br>22  ultimately we've got a study that was done that looked<br>23  at many people -- by the way -- strike that.<br>24     Are you familiar with this study, the Abbott | 1     A.  It was when I was starting the urogyne<br>2  center here, so it may have been '96, '97.<br>3     Q.  Any other medical device or pharmaceutical<br>4  companies that you've acted as a consultant for, other<br>5  than ALZA and Ethicon?<br>6     A.  I -- oh, I worked for Ethicon on the<br>7  laparoscopy area around 1994, internationally.<br>8     Q.  Was that just for one year?<br>9     A.  A year, year and a half, yes.<br>10     Q.  Any other consulting work for pharmaceutical<br>11  or medical device companies?<br>12     A.  You know, I may have -- I may have had<br>13  representatives from one or two companies that say I<br>14  want you to go ahead and teach me how my product works<br>15  and -- and teach me how -- how is it that urge<br>16  incontinence is managed.<br>17     And I may say, okay, and some of them may<br>18  give me a check, which I ended up either giving to the<br>19  Residents Fund in Puerto Rico or did something with<br>20  it, but it was something sporadic.<br>21     Q.  Would these be some of the other mesh<br>22  manufacturers, like Boston Scientific or American<br>23  Medical Systems, companies like that?<br>24     A.  No, I did not -- I -- I never did consulting |

9 (Pages 30 to 33)

Jaime Sepulveda, M.D.

Page 34

1    for any other company on mesh but Ethicon.
2        Q.  Do you remem- -- do you recall the names of
3    the companies that you did this urge incontinence work
4    for?
5        A.  I think it may have been Detrol or --
6        Q.  Detrol?
7        A.  -- Enablex. I don't remember the name of
8    the company.
9        Q.  Okay. And do you recall the approximate
10   years that would have happened?
11       A.  No.
12       Q.  Okay. Now let's get to the part that's
13   always the most tedious. What is it that you brought
14   here today with you?
15       A.  I brought here in compliance with the papers
16   served for the subpoena, I brought my CV --
17           You have a copy?
18       Q.  Yes.
19       A.  -- and a USB, in which I have any file that
20   I had on my computer that when I -- when I was at
21   Ethicon, I just downloaded my presentations.
22       Q.  Okay.
23       A.  And there were some videos of surgeries
24   here.

Page 35

1        Q.  Okay.
2        A.  And I brought my biomechanics books and the
3    book that Ethicon put together for -- about Gynemesh
4    and Prolift, and I did -- the one on Gynemesh is about
5    my slides.
6            And I -- but all the materials that were
7    cited in my report and materials for prolapse, my
8    materials for case specifics for tomorrow,
9    depositions, and the Prolift monograph.
10       Q.  Okay. And that's it?
11       A.  I am missing the white paper on
12   hydrodissection. That I could not find at all. I
13   will make it my business to provide to you.
14       MR. SNELL: Peter, I think we provided --
15   there's thumb drives that my office did, too.
16       MR. DE LA CERDA: Are those all -- those are
17   the case-specific ones?
18       MR. SNELL: Case and general.
19       Q  (By Mr. De La Cerda) Okay. So that we're
20   not taxing the court reporter too much on copying
21   and the like -- first of all, are the materials that
22   you brought, other than the books, are those all
23   copies?
24       A.  Yes.

Page 36

1        Q.  Okay. What -- I guess what I would be most
2    interested in is what you brought that is not on the
3    Reliance List. Because most of -- just about
4    everything on the Reliance List we can find.
5            And so, first of all, these book chapters,
6    are those referenced in the Reliance List, these books
7    that you have listed here in -- here in front of us?
8        A.  No, they're not.
9        Q.  Okay. So are there particular portions of
10   those books that are relevant to your opinions or is
11   it the whole book?
12       A.  I -- I -- there are portions that are
13   relevant to the way I see slings and meshes work.
14       Q.  Okay. Okay. And can you tell us what -- is
15   it a chapter? Is it a particular passage or --
16       A.  They're -- they're chapters.
17       Q.  Okay. And as far as you know, they are not
18   referenced in the Reliance List at all?
19       A.  They're -- they're not, that's why I brought
20   them, and the same with the -- with the USB.
21       Q.  Okay. So, again, first of all, let's do
22   this. Let's separate out the items that are not on
23   the Reliance List so we can make sure and mark and
24   identify those and -- so let's do that.

Page 37

1            So the books that are here, these are the
2    ones not on the Reliance List; right?
3        A.  Yes, sir.
4        Q.  And then you've got -- and I'm going to mark
5    each of these in a second-- the USB that you brought;
6    correct?
7        A.  Yes.
8        Q.  Okay. Anything else, other than those and
9    other than the case-specific USBs that you brought,
10   anything else that is not on the Reliance List?
11       A.  The only one missing that I -- that I didn't
12   bring today that I'm -- made my best effort to bring
13   you is the white paper that I wrote on hydrodissection
14   along with Dr. Lucente and -- yeah.
15       MR. DE LA CERDA: Okay. So as far as
16   marking these, anything -- any particular way you
17   want to -- you want to do this, Burt?
18       MR. SNELL: It doesn't matter. This stuff
19   here is like all general stuff, from his general
20   reports and the Reliance List, and I think it's
21   probably duplicative of the hard copies and also
22   specific citations in the materials. I was just
23   trying to sort out --
24       MR. DE LA CERDA: The case-specific --

10 (Pages 34 to 37)

Jaime Sepulveda, M.D.

Page 38

1      MR. SNELL:  We sent so many cases to the
2  thumb drives and stuff like that over time.  This
3  is general.  If you want a copy -- I don't even
4  know what's on these.  I know they reproduced --
5  I think they were supposed to reproduce the
6  materials list, but I haven't checked them to
7  see.
8      MR. DE LA CERDA:  Okay.
9      MR. SNELL:  I mean, I agree, I think you
10  ought to mark definitely the stuff that was just
11  kind of general -- general impression, the
12  general stuff that he brought.
13      MR. DE LA CERDA:  Yeah.
14      MR. SNELL:  And if you want to -- mark
15  whatever you want, you know.
16      MR. DE LA CERDA:  Yeah.
17      MR. SNELL:  These just have his reports and,
18  like he said, everything that he cited -- here's
19  some articles in here.  You can tell him, those
20  are probably cited within there.
21      THE WITNESS:  This is cited and this is
22  cited, this is cited, too.  This is a monograph.
23  These two are new.  These two are new.
24      MR. SNELL:  Is there anything in this?

Page 39

1  Here.
2      THE WITNESS:  This is not cited.  Cited,
3  cited.
4      MR. DE LA CERDA:  I think we're going to
5  have to do this the long way.
6      Q.  (By Mr. De La Cerda)  Okay.  All right.
7  So here's what I want to do.  Just to make --
8  because I don't want to miss anything, because it
9  looks like you might have some newer stuff.  Maybe
10  you looked at some additional research or something
11  and found some newer stuff, but what I want to do
12  is, let's just -- I want to stack it by category and
13  then I'll mark each stack.
14      So the easiest way to do it, for me, at
15  least, is do it by -- you know, we do ours like this,
16  too.  We're going to do it by stacks that involve
17  certain subject matters, like, for example, everything
18  you've brought today that is a medical literature,
19  let's put that all into one stack and I'm going to
20  mark that.  Okay?  And then everything you brought
21  today that would be Ethicon documents, internal
22  documents, we'll -- we'll mark that.  And then
23  everything you brought today that would be depositions
24  or testimony that you reviewed and relied on, we'll

Page 40

1  mark that.
2      A.  This -- this is all medical literature.
3      Q.  Okay.  So of the stuff that we've got here,
4  what -- we have a stack here that's medical
5  literature.
6      A.  Yes.
7      Q.  Are any of the binders medical literature?
8      A.  All of it.
9      MR. SNELL:  It's all literature.  It's the
10  stuff cited directly in his reports.
11      MR. DE LA CERDA:  Okay.
12      MR. SNELL:  Do you use footnotes or --
13      THE WITNESS:  Yes, I did.  Every footnote --
14      MR. SNELL:  It should correspond in here.
15      MR. DE LA CERDA:  And then this stack here
16  that I've got is all not in the Reliance List;
17  right?
18      MR. SNELL:  I will say with the -- I'm about
19  99 percent sure that this would have been.  The
20  Prolift monograph, surgeons' monograph is
21  definitely on his materials list and he's
22  referenced that before.  This is his actual --
23  this is your actual preceptor book.  I don't know
24  what you called it.

Page 41

1      THE WITNESS:  It's the book that Ethicon
2  made on Gynemesh and Prolift and they -- and I
3  put together the first one.
4      MR. SNELL:  I think that that's on his
5  materials list, too, but just in case, I mean he
6  brought that.  That's his actual one.
7      The Surgeons' Resource Monograph, I know for
8  a fact, has got to be on there.
9      MR. DE LA CERDA:  So what I'm going to do
10  is --
11      MR. SNELL:  He brought that.  That's
12  obviously his originals.
13      Q.  (By Mr. De La Cerda)  I'm not going to
14  mark these, I'm just going to identify them.
15      So today you brought with you the Gynecare
16  Prolift and the Gynecare Gynemesh Preceptor
17  Presentation Kit; correct?
18      A.  Yes.
19      Q.  And these are your -- this is your original?
20      A.  Yes.
21      Q.  Now, do you have this available at all
22  electronically?
23      A.  No.
24      MR. DE LA CERDA:  Okay.  Do you know if

11  (Pages 38 to 41)

Jaime Sepulveda, M.D.

Page 42

1  these are available electronically?
2       THE WITNESS:  There might be a CD.
3       MR. SNELL:  I think if you open the inside
4  cover, there are CDs.
5       THE WITNESS:  There might be a CD there,
6  yes.
7       MR. DE LA CERDA:  Because what I would like
8  to do is get a copy of this, just electronically,
9  because this -- so it's not copied -- so the
10  court reporter doesn't have to copy it.
11       So how do you want to do that?
12       MR. SNELL:  Do you want -- can I take it?
13       THE WITNESS:  Yeah.  Send it back because
14  it's the only one I have.
15       MR. SNELL:  I mean, there's two ways.  We
16  can either have the court reporter do it and then
17  it's going through multiple people's hands or if
18  you give it to me, I'll make color copies of
19  everything, the cover, the back, the pages, and
20  then I'll burn the CDs.
21       MR. DE LA CERDA:  Okay.
22       MR. SNELL:  I'll basically give you an exact
23  copy of what you're holding and then I'll
24  actually make a copy for myself, because I don't

Page 43

1  have a copy of that exact one, and then I'll give
2  it back to the doctor.
3       MR. DE LA CERDA:  Okay.  So then that --
4       MR. SNELL:  Let's make a record for that, a
5  note for that.
6       MR. DE LA CERDA:  So for the record, then,
7  that will be Exhibit 1.  I'm just going to put
8  this here for now.
9       MR. SNELL:  I will make a note I need to
10  take that and copy it.
11       MR. DE LA CERDA:  So for the record,
12  Exhibit 1 is the Gynecare Prolift and Gynecare
13  Gynemesh PS Preceptor Presentation Kit.
14       (Plaintiff's Exhibit No. 1 was marked for
15  identification.)
16       MR. DE LA CERDA:  Exhibit 2 is going to be
17  Dr. Sepulveda's original Prolift Surgeon's
18  Resource Monograph.
19       (Plaintiff's Exhibit No. 2 was marked for
20  identification.)
21       Q.  (By Mr. De La Cerda)  Now, Exhibit 3, I'm
22  going to mark, these are -- this is medical
23  literature that you've gathered, Dr. Sepulveda;
24  correct?

Page 44

1       A.  Yes.
2       Q.  And this is medical literature that happens
3  not to be on the Reliance List; correct?
4       A.  That's correct.
5       MR. DE LA CERDA:  So I'm marking that as
6  Exhibit 3.
7       (Plaintiff's Exhibit No. 3 was marked for
8  identification.)
9       MR. SNELL:  Just for the record, since,
10  obviously, my firm was the one who made the
11  Reliance List, I do believe that one of those may
12  be on there.
13       MR. DE LA CERDA:  Okay.
14       MR. SNELL:  Like the ACOG committee opinion
15  on vaginal prolapse mesh, I'm pretty sure that's
16  on the materials list, if I even have his
17  materials list.
18       You can keep doing that.
19       MR. DE LA CERDA:  Okay.
20       MR. SNELL:  But I'm pretty sure that would
21  have been sent.
22       MR. DE LA CERDA:  Prosima IFU, I'm sure that
23  was on the Reliance List.
24       MR. SNELL:  All that stuff is on the

Page 45

1  Reliance List.
2       THE WITNESS:  I can take that back.
3       MR. SNELL:  All the professional education
4  slides, those are on there.
5       Q.  (By Mr. De La Cerda)  All of these are
6  also on the Reliance List; right?  Okay.  So I'm not
7  going to mark those.
8       And then, now, books.  Let's go through each
9  of these.
10       First of all, I'm looking at a book called
11  "Biomechanics:  Mechanical Properties of Living
12  Tissues," the Second Edition, published by Springer
13  and the author is Y.C. Fung, F-u-n-g.
14       Do you have specific chapters that you can
15  identify within this book that you rely on?
16       A.  Yes.  Chapter 7.
17       Q.  Okay.  Any others?
18       A.  No, 7.
19       MR. DE LA CERDA:  Okay.  So I'm going to
20  mark this book as Exhibit 4 and then if we can
21  just get a copy of chapter 7, just chapter 7,
22  then the book can be returned.
23
24

Jaime Sepulveda, M.D.

Page 46

1        (Plaintiff's Exhibit No. 4 was marked for
2    identification.)
3        Q.  (By Mr. De La Cerda)  You've also brought
4    a book entitled "Introductory Biomechanics From
5    Cells to Organisms."  The author is -- or authors
6    are C. Ross Ethier, E-t-h-i-e-r, and Craig A.
7    Simmons.  It looks like this is published by
8    Cambridge University Press.
9        Are there any chapters or passages within
10   this book --
11       A.  Yes.
12       Q.  -- that supports your opinions?
13       A.  Chapter 9.
14       Q.  Okay.  Great.  I'll mark this book,
15   "Introductory Biomechanics," as Exhibit 5 and then
16   we'll just get a copy of that particular chapter you
17   referenced, chapter 9.
18       (Plaintiff's Exhibit No. 5 was marked for
19   identification.)
20       MR. DE LA CERDA:  Another book you brought
21   is called "Biomaterials and Biomedical
22   Engineering" published by Trans, T-r-a-n-s, Tech,
23   T-e-c-h, Publications.  This one is edited by W.
24   Ahmed, A-h-m-e-d, N. Ali, A-l-i, and A. Öchsner.

Page 47

1    It's O-umlaut-c-h-s-n-e-r.
2        And I'm marking this book as Exhibit 6.
3        (Plaintiff's Exhibit No. 6 was marked for
4    identification.)
5        Q.  (By Mr. De La Cerda)  Are there any
6    chapters or passages in that book that you rely on?
7        A.  Yes.
8        Q.  What are they?
9        A.  Chapter 12.
10       Q.  Okay.  Thank you.  And then we'll get a copy
11   of that and return the original book to you.
12       Okay.  Now, you've also -- the other
13   material other than the case-specific materials, the
14   other material -- materials you've brought with you
15   have all been cited either in your report or in your
16   Reliance List; correct?
17       A.  That's correct.
18       Q.  Okay.  Great.  Now the last thing I'm going
19   to do --
20       MR. SNELL:  Peter, one thing --
21       MR. DE LA CERDA:  Yes.
22       MR. SNELL:  -- for clarification.  I had
23   mentioned I thought the ACOG physician statement
24   from 2011 on transvaginal POP mesh was in.  It's

Page 48

1    on his materials list.  For some reason these
2    don't have page numbers, but it's under "other
3    materials."
4        MR. DE LA CERDA:  Okay.
5        MR. SNELL:  I put a check next to it.
6        MR. DE LA CERDA:  Okay.  Great.  All right.
7        Q.  (By Mr. De La Cerda)  Now, the last bit of
8    materials that you brought with you are various
9    thumb drives.  What are these thumb drives?
10       A.  These are the thumb drives that have the
11   articles that you see in these binders.
12       Q.  Oh, I see.  Okay.  So actually, it would be
13   nice to go ahead and mark these.  So we have four
14   different thumb drives.  Each of these thumb drives is
15   actually labeled with a product, as well.  So there is
16   Sepulveda TVT - TVT-O, Sepulveda TVT-S, Sepulveda
17   Prolift, and then there's another Sepulveda TVT-S, I
18   don't know if that's just a repeat, but I'll mark each
19   of these with its own sticker.  We're on 6.
20       So I'm marking as Exhibit 7 to your
21   deposition the thumb drive that has Sepulveda TVT and
22   TVT-O and this thumb drive contains reliance materials
23   and materials cited in your report; correct?
24       A.  Yes.

Page 49

1        (Plaintiff's Exhibit No. 7 was marked for
2    identification.)
3        Q   (By Mr. De La Cerda)  Then I'm marking as
4    Exhibit 8, Sepulveda TVT-S, and these are also
5    documents referenced in your Reliance List and your
6    report relating to TVT-S; correct?
7        A.  Yes.
8        (Plaintiff's Exhibit No. 8 was marked for
9    identification.)
10       Q   (By Mr. De La Cerda)  Then I'm marking as
11   Exhibit 9 to your deposition the thumb drive that
12   has -- that's marked Sepulveda Prolift, and these
13   are materials referenced in your Reliance List and
14   your report for Prolift; correct?
15       A.  Yes.
16       (Plaintiff's Exhibit No. 9 was marked for
17   identification.)
18       MR. DE LA CERDA:  Do you know why there is a
19   second TVT-S one?
20       MR. SNELL:  I have no idea.
21       MR. DE LA CERDA:  I'll just mark it as
22   another one.
23       MR. SNELL:  Somebody might have just made
24   two copies.  I can open it up and look at it real

13 (Pages 46 to 49)

Jaime Sepulveda, M.D.

Page 50

1    quick.
2         MR. DE LA CERDA:  I'll just mark it.
3    Then I'm also marking as Exhibit 10 to your
4    deposition a second thumb drive labeled
5    "Sepulveda TVT-S," which I assume is also
6    reliance materials and documents referenced
7    within your report; correct?
8    A.  Yes.
9         (Plaintiff's Exhibit No. 10 was marked for
10   identification.)
11        MR. DE LA CERDA:  Case-specific, they can
12   deal with that.
13        THE WITNESS:  I need to -- to -- I did not
14   remember seeing the Bianchi-Ferraro --
15        THE COURT REPORTER:  I'm sorry, the --
16        THE WITNESS:  I do not remember seeing the
17   Bianchi-Ferraro paper on TVT-Secur and TVT-O.
18        MR. SNELL:  Is it in this pile?
19        THE WITNESS:  I want to double-check that
20   because I --
21        MR. SNELL:  Bianchi-Ferraro?
22        THE WITNESS:  Bianchi-Ferraro, which I
23   referred to in the Garcia deposition.
24        MR. SNELL:  Okay.  This is other literature.

Page 51

1    You want to give that to him.  That's additional.
2         THE WITNESS:  Additional.
3         MR. DE LA CERDA:  Oh, okay.  All right.  I'm
4    also marking as Exhibit 11 medical literature
5    that you've handed to me.
6         (Plaintiff's Exhibit No. 11 was marked for
7    identification.)
8    Q  (By Mr. De La Cerda)  What is this medical
9    literature?
10   A.  That is -- this is medical literature about
11   the -- one case report of clear cell carcinoma of
12   the vagina and there's -- in a patient that has had a
13   midurethral sling.  This is the response to that
14   article.
15   Q.  (By Mr. De La Cerda)  Okay.  So this is
16   all within Exhibit 11.  So the second article within
17   Exhibit 11 is?
18   A.  The response to this article.
19   Q.  Okay.  And the third article within
20   Exhibit 11?
21   A.  This is vaginal -- these are different
22   papers, but they're not directly related to this one.
23   Q.  That's okay.  So these are all -- I guess
24   just to make sure just for purposes of the record,

Page 52

1    Exhibit 11 contains additional medical literature that
2    you're relying on for your opinions; is that right?
3    A.  Yes.
4    Q.  Okay.  We'll just leave it at that and then,
5    of course, if you need to refer to any of it during
6    your deposition --
7    A.  And this is the paper that I was just
8    referring about the Bianchi-Ferraro on TVT-O and
9    TVT-S.
10        MR. DE LA CERDA:  Okay.  So I'll mark this
11   one separately as Exhibit 12.
12        MR. SNELL:  Is that one in your report, do
13   you know?
14        THE WITNESS:  No, but I refer to it on the
15   Garcia deposition.
16        (Plaintiff's Exhibit No. 12 was marked for
17   identification.)
18        MR. DE LA CERDA:  For purposes of the
19   record, Exhibit 12 is a article entitled
20   "Randomized controlled trial comparing TVT-O and
21   TVT-S for the treatment of stress urinary
22   incontinence:  2-year results."
23        Is it okay if I clip --
24   A.  Yes.

Page 53

1    Q.  (By Mr. De La Cerda)  Just for now, and
2    then if you need to look at them, of course.
3    A.  And I gave you a copy of my CV --
4    Q.  Yes.
5    A.  -- without my home address.
6    Q.  Okay.  I've got one here and if you like, I
7    can use this one for the record.
8    A.  Yes, I just made it available to you in
9    case ...
10        MR. SNELL:  Is that the same thing?
11        THE WITNESS:  Yes, that's the one.  The
12   Bianchi-Ferraro has been referred already on
13   this.
14        MR. SNELL:  Footnote 117.
15   Q.  (By Mr. De La Cerda)  Okay.  What I'm
16   going to do is I'm going to mark as Exhibit 13 to
17   your deposition your CV.
18        (Plaintiff's Exhibit No. 13 was marked for
19   identification.)
20   Q  (By Mr. De La Cerda)  So I'm marking as
21   Exhibit 13, that's your -- is that your current
22   curriculum vitae?
23   A.  Yes.
24   Q.  And is that, to the best of your knowledge,

14 (Pages 50 to 53)

Jaime Sepulveda, M.D.

Page 54

1  current?
2      A.  It is -- it is current.
3      Q.  Okay.  Anything else -- anything on it that
4  you know of that needs to be updated, corrected,
5  edited, anything like that?
6      A.  On my report that I'm the principal
7  investigator at the Fibroid Registry research project,
8  that project was completed and closed.
9      Q.  Okay.  And is that the only thing on your CV
10 that you know of that would need to be corrected?
11     A.  It was the only research project that was
12 open.
13         (Plaintiff's Exhibit No. 14 was marked for
14     identification.)
15     Q.  (By Mr. De La Cerda)  Okay.  I'm also
16 marking as Exhibit 14 to your deposition your
17 Reliance List for the general report.
18         This is what I've received as your Reliance
19 List.  Does that appear to be a true and correct copy
20 of it?
21     MR. SNELL:  Is this Exhibit 14?
22     MR. DE LA CERDA:  Yeah.
23     A.  I don't see any discrepancies overall in
24 this list from what I have here.

Page 55

1      Q.  (By Mr. De La Cerda)  Okay.  Great.  Now
2  I'm going to show you what I've marked as Exhibit 15
3  to your deposition.
4         (Plaintiff's Exhibit No. 15 was marked for
5     identification.)
6      Q.  (By Mr. De La Cerda)  Does this appear to
7  be a true and correct copy of your expert report,
8  your general expert report, on Gynemesh, Prolift and
9  Prosima?
10     A.  This is accurate and correct.
11         (Plaintiff's Exhibit No. 16 was marked for
12     identification.)
13     Q  (By Mr. De La Cerda)  Okay.  And now I'm
14 showing you what I've marked as Exhibit 16 to your
15 deposition.  Does this appear to be a true and
16 correct copy of your general expert report on TVT
17 and TVT-O?
18     A.  It is a correct copy.
19     MR. DE LA CERDA:  We've been going now for
20 about an hour.  Are you okay to continue or do
21 you want to take a break?
22     THE WITNESS:  Let's take a bladder break and
23 we'll come back in five.
24     MR. DE LA CERDA:  Sounds good.

Page 56

1         (Thereupon, a recess was taken from
2      9:24 a.m. until 9:26 a.m., after which the
3      following proceedings were held:)
4      Q.  (By Mr. De La Cerda)  All right.  Doctor,
5  we're back on the record.
6         When -- when was it that you were first
7  contacted regarding the general opinions that you have
8  as to these products that we're here today for?
9      A.  For -- for the -- for the MDL, around
10 September.  We spoke around September.
11     Q.  September --
12     A.  Last year.
13     Q.  -- of last year, 2015?
14     A.  Yes.
15     Q.  And do you recall who you talked to first?
16     A.  I -- I spoke to Burt.
17     Q.  Okay.  And was the topic discussed that you
18 would be providing general opinions as to these
19 specific products: TVT, TVT-O, Prosima, Prolift and
20 Gynemesh?
21     A.  That's correct.
22     Q.  And what was the scope of your assignment
23 for this particular -- for your opinions in this case,
24 to your understanding?

Page 57

1      A.  Yes, I understand the scope is to -- to
2  review the literature and -- and go over things that I
3  have read for -- throughout the years.
4      Q.  Were there certain things that you were to
5  focus on within the context of your opinions?
6      A.  The --
7      THE COURT REPORTER:  I'm sorry, did you --
8      MR. SNELL:  Objection, form.  I just say
9      "form," but that means objection, form.  I try to
10     cut down your typing on the record.
11     A.  The randomized controlled trials concentrate
12 in the evidence.
13     Q.  (By Mr. De La Cerda)  What about internal
14 documents, was there any focus that you wanted to
15 place on the substance or the significance of
16 Ethicon's internal documents in forming your
17 opinions?
18     A.  No.  It's -- I have received -- just to be
19 accurate in my response, I received, probably a year
20 ago, internal documents, but not as part of this.
21     Q.  Okay.  So your focus really was and your
22 opinions here was to provide those opinions based on
23 literature as opposed to what was found in the
24 internal documents; is that fair?

15  (Pages 54 to 57)

Jaime Sepulveda, M.D.

| Page 58 | Page 60 |
|---|---|
| 1   MR. SNELL: Form. | 1   A. I can make copies again of it, but I did |
| 2   A. Based on the -- on the evidence, on the | 2   prepare your invoices. My invoices to -- I put it in |
| 3   scientific evidence. | 3   a folder, they were neatly organized, the hours. I -- |
| 4   Q. (By Mr. De La Cerda) As opposed to the | 4   I just cannot find it, honestly cannot find it. |
| 5   internal documents; right? | 5   Q. (By Mr. De La Cerda) Okay. So what we'll |
| 6   A. The internal documents are not -- are not | 6   do is when you do find it, you'll agree to provide |
| 7   included on -- on this review or -- because it's a | 7   that to us? |
| 8   scientific review. | 8   A. Absolutely. |
| 9   Q. I guess you haven't completed all -- well, | 9   Q. Okay. And so -- |
| 10  let me just ask. | 10   MR. SNELL: Why don't we save an exhibit |
| 11       Have you completed all of your work on this | 11   number on the record, and I'll produce that, but |
| 12  case? | 12   I think he probably has a good idea as to how |
| 13  A. Yes. So far from my Reliance List and this | 13   many hours he spent. |
| 14  is -- this is the product. | 14       MR. DE LA CERDA: Okay. So what I'm going |
| 15  Q. Do you currently have any further work | 15   to do is, I'm reserving Exhibit 17 for the |
| 16  planned? | 16   invoices that Dr. Sepulveda has prepared |
| 17  A. As -- as information may be required, | 17   reflecting his work and his opinions for this |
| 18  I'll -- I'll review the papers, I'll review scientific | 18   case. |
| 19  literature, and everything that is coming up. | 19       (Plaintiff's Exhibit No. 17 was marked for |
| 20  Q. So -- but as far as anything specific | 20   identification.) |
| 21  planned, is there any additional -- is there any | 21   Q. (By Mr. De La Cerda) First of all, do you |
| 22  additional task that you have planned? Other than, | 22   have an idea of approximately how many hours you've |
| 23  you know, tomorrow we have depositions for the | 23   spent preparing your opinions? |
| 24  case-specific, but other than the depositions coming | 24   A. It's -- an approximate is about 120 hours. |

| Page 59 | Page 61 |
|---|---|
| 1   up tomorrow, are there any specific tasks that you | 1   Q. And your report mentions that you bill at |
| 2   have planned relating to your opinions in this case? | 2   $500 an hour; right? |
| 3   A. No, this is -- this is my -- my product. | 3   A. Yes. |
| 4       MR. SNELL: I'll make a note for the record. | 4   Q. And so was it -- was that rate the same for |
| 5   As plaintiff's experts' depositions are coming | 5   all 120 hours that you performed -- |
| 6   in, I know there are still depositions going on | 6   A. Yes. |
| 7   today, tomorrow, we'll send those to him, and if | 7   Q. And was -- do you know whether your invoice, |
| 8   he has commentary or his opinions are changed, | 8   did it break down the tasks that you were performing, |
| 9   then, obviously, I'll let you know. | 9   did it break it down by product? |
| 10  Q. (By Mr. De La Cerda) How much have you | 10   A. No, it's all MDL. |
| 11  billed thus far for your general opinions involving | 11   Q. Okay. Was it broken down by, for example, |
| 12  TVT, TVT-O, Prosima, Prolift and Gynemesh? | 12   reviewing documents, meeting -- meetings with defense |
| 13  A. I have -- I have copies of the invoices that | 13   counsel, deposition time? Was it broken down in any |
| 14  I have submitted. | 14   way like that? |
| 15       Is it okay if he has other -- other hours | 15   A. No, it's just for MDL, all the time that |
| 16  from another case, or should I just say the number of | 16   I've spent in putting -- putting together -- putting |
| 17  hours? | 17   the reports together, putting -- for all the different |
| 18       MR. SNELL: Let me see what you're talking | 18   products all into one MDL. |
| 19  about. The invoices -- let me look at them real | 19   Q. Okay. So one block bill of 120 hours -- |
| 20  quick. | 20   A. Right. |
| 21       MR. DE LA CERDA: Do you want to go off the | 21   Q. -- approximately? |
| 22  record for a second? Let's go off the record. | 22   A. That's correct. Around -- approximately. |
| 23       (Discussion held off the record.) | 23   Q. Okay. Now, the types of tasks you would |
| 24       (Mr. Sparks entered the room.) | 24   perform in developing your opinions, what did those |

16 (Pages 58 to 61)

Jaime Sepulveda, M.D.

Page 62

1    include?
2         A.  I have to write the report, I have to
3    proofread -- proofread it, and I update it with the --
4    with the Reliance List.  I -- I do research and
5    whatever papers I -- I find that are relevant, I just
6    submit it and it gets added to the Reliance List.
7         Q.  Okay.
8         A.  I also -- I review the case specifics and
9    that included seven -- seven cases in which -- in
10   which depositions and medical records and summaries
11   were reviewed.
12        Q.  Okay.
13        A.  And then the time, getting together, getting
14   prepared for this.
15        Q.  Anything else that you can think of?
16        A.  That would be at a later time because we got
17   ready yesterday and the time today.
18        Q.  Let's talk a little about what you just
19   mentioned.  Does the 120 -- approximately 120 hours
20   that you mentioned, does that include all of your work
21   for the case-specific?
22        A.  Yes.
23        Q.  Okay.  Do you know approximately how much
24   you spent -- how much time you spent as to each

Page 63

1    case-specific report that you prepared?
2         A.  I -- I probably spend about, just -- just a
3    rough, rough estimate, it's ten hours for each one,
4    each one of them.
5         Q.  And do you know how many case-specific
6    reports you prepared?
7         A.  Seven.
8         Q.  Seven.  Okay.  I know these are rough
9    numbers here, but so seven case-specific reports at
10   about ten hours a piece, it's about 70 hours.  So the
11   balance, the rest of that, would that be dedicated
12   towards your general opinions as to the products
13   involved here?
14        A.  Yes.
15        Q.  Okay.  And you mentioned preparation for
16   your deposition.  When is it that you prepared for
17   your deposition today?
18        A.  Yesterday.
19        Q.  And how long did you prepare?
20        A.  We -- we spend eight, ten hours.
21        Q.  And that's eight to ten hours that you spent
22   with Burt Snell?
23        A.  Yes.
24        Q.  Counsel for Ethicon; right?

Page 64

1         A.  Yes.
2         Q.  Anybody else?
3         A.  No.
4         Q.  In your deposition preparation, you reviewed
5    documents; is that right?
6         A.  Yes.
7         Q.  Okay.  Are those the documents that we have
8    here that we've marked today?
9         A.  Yes.
10        Q.  Okay.
11        A.  And -- yeah, all this has been marked.
12        Q.  Do you have any rough estimate of how much
13   more you anticipate billing before trial?
14        A.  I -- I don't know when it's going to trial.
15   It's -- as they -- as they require, I just -- I'll
16   just review.
17        Q.  Okay.  Have you ever rendered an opinion in
18   litigation that was adverse to Johnson & Johnson or
19   Ethicon, Inc.?
20        A.  No.
21        Q.  Did you take any notes while you were doing
22   your preparation for your opinions?
23        A.  I -- I'm a better highlighter than note
24   taker.

Page 65

1         Q.  Okay.  I can never read my own notes, so I
2    don't -- I don't even take notes.
3              Okay.  So you don't have any handwritten
4    notes regarding your opinions; is that right?
5         A.  No, not on this.
6         Q.  You mentioned the Reliance List.  Was the
7    Reliance List originally prepared and provided to you
8    by Ethicon counsel?
9         A.  It -- it was given by counsel, but I can
10   tell you that most of that Reliance List is trials
11   that are relevant enough that I have read it over
12   time.
13        Q.  Okay.  So then as you performed your own
14   research and found additional articles, you would then
15   submit them to Ethicon's counsel and then they would
16   get added to the Reliance List; is that right?
17        A.  Right.  That's -- whatever I want to add up,
18   I just submit.
19        Q.  And that Reliance List is exhaustive other
20   than a few of the articles that we've identified
21   today, is that right, that have been marked?
22        A.  Right, that's -- this is what includes it.
23        Q.  Does your Reliance --
24             MR. SNELL:  Could I make -- let me just make

17 (Pages 62 to 65)

Jaime Sepulveda, M.D.

Page 66

1    a note on the record.  He did bring another thumb
2    drive with a lot of Ethicon documents and
3    materials that he had in his possession and,
4    obviously, those would go and make up part and
5    parcel of his knowledge base as well.
6         MR. DE LA CERDA:  I'm glad you brought that
7    up because I forgot to mark this thumb drive.
8         THE WITNESS:  Can you just take a look
9    because I want to make sure I brought the right
10   thumb drive.
11        MR. SNELL:  Okay.
12        THE WITNESS:  I just dump it and I really
13   never review it.
14        I'm seeing one of the slides have the name
15   of a patient.
16        MR. SNELL:  How do we deal with that?
17   because it looks like an image.
18        THE WITNESS:  It's an image, yeah, it has a
19   name of a patient.
20        MR. SNELL:  It has to be redacted.
21        THE WITNESS:  Yeah.
22        MR. SNELL:  Why don't we take it off the
23   thumb drive and we can figure out how to redact
24   it.

Page 67

1         So Peter, just for your reference, we're
2    looking at the thumb drive Dr. Sepulveda brought.
3    There is a PowerPoint titled "Pillowing,
4    P-i-l-l-o-w-i-n-g, .ppxt, and it's got patient
5    identification information, so we'll take that
6    off the thumb drive and figure out how to redact
7    that.  It looks like it's images.  I can't even
8    read the name, but obviously once you open up the
9    file in realtime you can see it.
10        MR. DE LA CERDA:  Okay.  So for purposes of
11   the record, we're going to reserve --
12        Did we already reserve 17?
13        THE COURT REPORTER:  Yes, for --
14        MR. SNELL:  I think 17 was invoices.
15        MR. DE LA CERDA:  Okay.  So for purposes of
16   the record, we're going to reserve Exhibit No. 18
17   for a thumb drive that Dr. Sepulveda has brought
18   here today.
19    Q.  (By Mr. De La Cerda)  And, for the record,
20   Dr. Sepulveda, can you tell us, generally speaking,
21   what is on the thumb drive that will be marked as
22   Exhibit 18?
23    A.  It -- it has the presentations that I have
24   used for Prolift throughout the years, and it has the

Page 68

1    presentation on Gynemesh, and it has the surgical
2    videos, and it has pictures of surgery that I have
3    included in those presentations.
4         MR. SNELL:  Did you mention this product?
5         THE WITNESS:  TVT-Secur.
6     Q.  (By Mr. De La Cerda)  And, apparently,
7    there are patient-identifying information on that
8    thumb drive and so that information is going to be
9    redacted and then the thumb drive will be provided
10   at a later date; correct?
11    A.  There is one slide that has the patient ID.
12        MR. SNELL:  What I was going to do is take
13   the file titled "Pillowing" with the
14   patient-protected information off the thumb
15   drive, put it on my local computer, and figure
16   out some time today if this law firm can redact
17   that.
18        MR. DE LA CERDA:  That would be perfect.
19        MR. SNELL:  But you'll have -- I mean, but
20   we'll mark the thumb drive, because I want a copy
21   of it, too.
22        MR. DE LA CERDA:  Okay.
23        MR. SNELL:  I'm just looking for -- is that
24   your data?

Page 69

1         THE WITNESS:  Yes, that's my own data.
2         MR. SNELL:  Tell him about that.
3     A.  I also included data of my own
4    complications.
5     Q.  (By Mr. De La Cerda)  Let's discuss them.
6    Actually, you know what, we'll come to that shortly.
7         MR. SNELL:  Is that the same as the earlier
8    stuff without the patient identifying --
9         THE WITNESS:  No, that's -- I put all the
10   files that have to do with it, so I had the files
11   that I use to prepare the presentation, and I
12   have the actual file slides with the
13   presentation.
14        MR. SNELL:  Did you mention this product?
15        THE WITNESS:  That's TVT-Secur.
16        MR. SNELL:  This one?
17        THE WITNESS:  And there's another
18   presentation on TVT-O.
19        MR. SNELL:  Okay.  Let me pull that one off.
20    Q.  (By Mr. De La Cerda)  Okay.  And we'll
21   come back to the data on your own complications,
22   too.  We'll discuss that in a moment.
23        Okay.  Directing your attention back to
24   Exhibit 16 -- oh, wait.  Is this report -- in

18  (Pages 66 to 69)

Jaime Sepulveda, M.D.

Page 70

1  Exhibit 16 is your general report on TVT and TVT-O;
2  correct?
3      A.   That's correct.
4      Q.   Is this report a complete statement of all
5  general opinions that you'll express as to the TVT and
6  the TVT-O and the reasons for those opinions?
7      A.   That report includes that, up to -- up to
8  today.
9      Q.   So up to today, that report is a complete
10  statement of all general opinions you'll express as to
11  the TVT and TVT-O and the reasons for those opinions;
12  correct?
13          MR. SNELL:  Form.
14          Go ahead.
15      A.   That's correct.
16      Q.   (By Mr. De La Cerda)  Does this report,
17  your Reliance List, and the materials you've brought
18  today include all facts or data considered by you as
19  of today in forming your general opinions about the
20  TVT and the TVT-O?
21      A.   Yes.
22          MR. SNELL:  I took the one file off so you
23  can go ahead and mark that.
24          MR. DE LA CERDA:  All right.  So I am, for

Page 71

1  the record, marking the thumb drive that we've
2  just discussed that Dr. Sepulveda brought as
3  Exhibit 18.
4      (Plaintiff's Exhibit No. 18 was marked for
5  identification.)
6      Q.   (By Mr. De La Cerda)  Okay.  Now, Doctor,
7  directing your attention to Exhibit 15 and that's
8  your report on the Gynemesh, Prolift and Prosima;
9  correct?
10      A.   Yes.
11      Q.   Now, is this report a complete statement of
12  all general opinions you will express as to the
13  Gynemesh, Prolift, and Prosima and the reasons for
14  those opinions as of today?
15      A.   Yes.
16      Q.   And does this report, your Reliance List,
17  and the materials you brought today include all facts
18  or data considered by you in forming your general
19  opinions about the TVT and the TVT-O as of today?
20      A.   Yes.
21      Q.   Okay.  Let's talk a little bit about your
22  practice.  Where do you currently have privileges?
23      A.   At South Miami Hospital, Baptist Hospital,
24  and South Miami Medical Arts Surgery Center.

Page 72

1      Q.   And do you currently perform surgeries to
2  correct stress urinary incontinence?
3      A.   Yes.
4      Q.   Now let's focus over the last ten years.
5          Over the last ten years, what surgeries have
6  you performed to correct stress urinary incontinence?
7      A.   I have performed Burch procedures, TVT,
8  retropubic, and transobturator inside-out.
9      Q.   Is that TVT-O?
10      A.   That's correct, that's TVT-O.
11          And TVT-Secur, TVT-ABBREVO.
12      Q.   Okay.  Any others that you can recall
13  sitting here today?
14      A.   I -- I recall doing 50 outside-in slings.
15      Q.   Fifty outside-in slings.
16      A.   Slings.
17      Q.   Okay.  Do you recall the brand of those?
18      A.   That was from AMS.
19      Q.   AMS.  Is that the Monarc?
20      A.   Monarc.
21      Q.   You mentioned that you performed Burch as a
22  surgery to correct stress urinary incontinence.  What
23  to you would be an indication to perform a Burch as
24  opposed to a synthetic midurethral sling?

Page 73

1      A.   I perform Burches rarely and I cannot -- I
2  cannot really remember off my head my last Burch.
3      Q.   Why do you perform them rarely?
4      A.   Because midurethral synthetic slings work
5  very well.
6      Q.   Performing a synthetic midurethral sling,
7  it's a quicker procedure than a Burch; right?
8      A.   It's just more than -- than quicker.  It
9  performs -- short term and a long term, it performs
10  better than a Burch and it's -- that has been -- has
11  been my experience and that's what's supported by
12  data.
13      Q.   Okay.  So -- but are there any indications
14  to you -- when a patient comes into your office and
15  you're going to perform a surgery to correct the
16  stress urinary incontinence, what indications do you
17  say, I'm going to perform a Burch instead of a
18  synthetic midurethral sling?
19      A.   My first option is a synthetic midurethral
20  sling and I counsel the patients on it.  There may --
21  I may have a patient that may say I want a Burch for
22  one or other reason.
23      Q.   Okay.  So it's the patient making the
24  decision that they prefer a Burch over a synthetic

19 (Pages 70 to 73)

Jaime Sepulveda, M.D.

Page 74

1    midurethral sling as opposed to you recommending the
2    Burch as the first option?
3        A.   My patients are -- I have a well-educated
4    practice and they -- they actually may -- may bring
5    great questions about one or the other.  My experience
6    is that they will follow my -- my recommendations.
7        Q.   Right.  Do you recall any instance where
8    you've recommended a Burch over a synthetic
9    midurethral sling?
10       A.   There -- there was a time about when TVT
11   came in and for one or two years that we spoke in
12   those terms, but once randomized controlled trials
13   came in, it was -- I tell them that that's
14   basically -- is the best evidence that I have.
15       Q.   Your understanding was that at least at one
16   time the Burch was the gold standard for correcting
17   stress urinary incontinence surgically; correct?
18       A.   I -- I'm going to take exception to the
19   "gold standard" term, but there was a time in which
20   the Burch was the correct clinical -- clinical
21   practice.
22       Q.   Would you use the gold standard term to
23   describe a synthetic midurethral sling?
24       A.   I -- I just try to shy away from "gold

Page 75

1    standard."  I think that clinically, it's the --
2    current clinical standard is probably a better -- a
3    better term.
4        Q.   So a current clinical standard is a better
5    term to use than the term "gold standard"; right?
6        A.   I -- I agree.
7        Q.   Did you -- in the last ten years, have you
8    ever used slings using biologic materials?
9        A.   I -- I don't know if it's within the last
10   ten years, but I -- I have used slings using
11   autologous, I have done slings using dermis cadaver
12   material.  I may have used them one time posing, but
13   this is so -- so remote that -- that I cannot tell you
14   how many or which brand did I use.
15       Q.   Do you remember any reasons why you would
16   have used those biologic slings?
17       A.   If I had some-- if I had someone that --
18   that was -- the person that comes to mind is my -- the
19   last pubovaginal sling and it was a smoker with --
20   with bad pressures in the urethra and I used the
21   pubovaginal sling in that patient at that time.
22       Q.   What do you mean by "bad pressures"?
23       A.   Very, very low pressures in the urethra.
24       Q.   Okay.

Page 76

1        A.   It took very little for her to leak.
2        Q.   Okay.  And so why would it be that you would
3    use a biologic sling under those circumstances?
4        A.   I use actually her own fascia and it -- it
5    was -- we didn't have anything -- anything -- we have
6    things that were synthetic but that were not
7    well-studied at that time.
8        Q.   So this would have been, I assume, in either
9    the late '90s or early 2000s?
10       A.   That's a wide range, yes.
11       Q.   Okay.  You mentioned TVT Retropubic, TVT-O,
12   TVT-S, and TVT-ABBREVO that you performed in the last
13   ten years.
14            Do you know approximately how many of each
15   of those you performed?
16       A.   I -- I counted about -- at one time it was
17   about 300 slings a year.
18       Q.   Okay.  And do you know what the breakdown
19   was of those 300 per year as to the TVT Retropubic,
20   TVT-O, TVT-S, and TVT-ABBREVO?
21       A.   It was an evolution from TVT Retropubic to
22   TVT-O to TVT-Secur and then ABBREVO.
23       Q.   Okay.  So over -- over time, you might --
24   you know, you started with a TVT Retropubic, then

Page 77

1    you -- then you preferred the TVT-O, so you would
2    switch to that; is that right?
3        A.   Yes.
4        Q.   And then you would prefer the TVT-S and you
5    would switch to that?
6        A.   Yes.
7        Q.   And then later you preferred the TVT-ABBREVO
8    and switched to that; is that right?
9        A.   Right.
10       Q.   Do you still perform TVT-Os, though, or do
11   you just kind of stick with the TVT-ABBREVO?
12       A.   I do it at the surgery center so we choose
13   one.  And since I do most of the slings, and I'm the
14   medical director for the surgery center, I decide I'm
15   going to use this or that one.  We still have TVT-O on
16   the shelf, but we -- we use TVT -- TVT-ABBREVO.
17       Q.   Okay.  Why would you prefer a TVT-ABBREVO
18   over a TVT-O?
19            MR. SNELL:   Form.
20       A.   I have not found a scientific -- a
21   scientific reason for it except for the fact that --
22   that it's the most recent product and it's -- it's a
23   12-centimeter sling instead of a longer sling.
24       Q.   (By Mr. De La Cerda)  What's the

20  (Pages 74 to 77)

Jaime Sepulveda, M.D.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  significance of it being a shorter sling as opposed
2  to a longer sling?
3      A.  It's -- I decided that if I can do it with
4  12 centimeters, I'm not going to use 19 centimeters
5  when the evidence is good in my practice.
6      Q.  Is -- you agree with the general theory that
7  less foreign body is better when it comes to these
8  types of procedures?
9      MR. SNELL:  Form.
10     A.  No, I think that there are physicians that
11 have a level of comfort with TVT-O or, for that sake,
12 with TVT Retropubic, and that being with a
13 5-millimeter needle, a 3-millimeter needle.
14     Each physician has his own level of comfort
15 and they're going to use what works well for them.  I
16 have not found any scientific evidence that points out
17 to one being better than the other based on that.
18     Q.  (By Mr. De La Cerda)  What about the
19 general -- do you agree with the general
20 proposition, though, that more foreign body will
21 cause more foreign body reaction within the human
22 body?
23     MR. SNELL:  Objection, asked and answered.
24     A.  It assumes -- it assumes that there's -- the

**Page 79**

1  term "foreign body" probably is the same -- in the
2  same area as "gold standard."  They're -- they're very
3  wide, very unscientific.  They -- in terms of the
4  material that you leave in the area, if a physician
5  would come and ask me, "Do you think I should do this
6  because it leaves less material," I could not tell him
7  with certainty, "Yes, you definitely need to move from
8  one to the other."  I have no evidence to support
9  that.
10     Q.  (By Mr. De La Cerda)  And so, ultimately,
11 you switched to the TVT-ABBREVO just because of your
12 personal experience with it?
13     A.  It's easier -- easier to keep on the shelf,
14 the TVT-ABBREVO.  If -- I guess, right now, if there
15 would be -- there would be only TVT-O, I would be
16 perfectly comfortable with it.
17     Q.  Okay.  Do you know whether TVT-ABBREVO comes
18 in laser cut or mechanically cut?
19     A.  Laser -- it comes in laser cut.
20     Q.  TVT-ABBREVO is only laser cut; right?
21     A.  Right.
22     Q.  Do you know whether the Burch procedure is
23 still taught in medical school?
24     A.  I don't know.

**Page 80**

1      Q.  Is the Burch procedure within the standard
2  of care?
3      A.  I think that for a physician that wants to
4  do Burch procedures, that may apply.
5      Q.  You wouldn't criticize another doctor for
6  doing a Burch procedure over a synthetic midurethral
7  sling; right?
8      A.  I would not be -- be critical.  I can share
9  it, the evidence, but there's -- there's no reason for
10 being critical over the Burch procedure.
11     Q.  Are pubovaginal slings using native tissue
12 still taught in medical school, to your knowledge?
13     A.  No, I think they are taught -- I
14 probably don't know, but I don't think they are.
15     Q.  And if a physician performed a pubovaginal
16 sling using native tissue, would you criticize him or
17 her for doing that?
18     A.  That's -- I have to say that's an excellent
19 question because it's -- it probably is the procedure
20 that would prompt me to say, "Listen, you need to
21 reevaluate on how you're taking care of these
22 patients," because that can be a morbid procedure.
23     Q.  So that one is a little more borderline for
24 you?

**Page 81**

1      A.  Yes.
2      Q.  Yeah.
3      A.  And I can -- I can do that well -- I want to
4  think that I can do it well because I did it well at
5  one time, it's just that it's -- in terms of morbidity
6  and seroma and wound complications and obstruction,
7  it's -- it's a different -- different surgery.
8      Q.  Would you consider it to be within the
9  standard of care or no?
10     A.  I -- I think that in certain areas, probably
11 if that's -- we go to areas where they don't have what
12 we have, that could be considered standard of care.
13     Q.  You've never done a study to determine what
14 percentage of medical schools are teaching Burch or
15 pubovaginal slings using native tissue; right?
16     A.  No, I don't know that.
17     Q.  In your career, how many revision or
18 excision surgeries involving synthetic midurethral
19 slings have you performed?
20     A.  I -- I think I have done three.  I may have
21 done more than that.  Just in my mind it's -- it's
22 infrequent enough that I actually -- one of the
23 presentations on the thumb drive is me excising a
24 sling, the pictures.  That's how infrequent it is.

21 (Pages 78 to 81)

Jaime Sepulveda, M.D.

Page 82

1    Q.  So to -- I'm sorry, I didn't want to cut you
2  off.
3    A.  So I actually consent to the patient and I
4  said, "This is unusual."  I consent to the patient to
5  have it removed.
6    Q.  Okay.  So to your recollection, you've done
7  three revision or excision surgeries involving
8  synthetic midurethral slings?
9    A.  I don't want to come into a fault -- faulty
10  mode, but I can recall about three.
11    Q.  Okay.  Of those three, how many were you
12  able to remove the entire sling?
13    MR. SNELL:  Form.
14    A.  On the -- it's probably two of them, the
15  entire -- the entire sling being up -- up to the
16  descending pubic ramus in that area.  I remove the
17  entirety of it.
18    Q.  (By Mr. De La Cerda)  And so that was --
19  that's the portion that is actually under the
20  urethra but not the portion that goes into the pubic
21  ramus; is that right?
22    A.  The portion that gets about -- to about
23  1 centimeter from the obturator internus muscle.
24    Q.  Okay.

Page 83

1    A.  So anything that is beyond the obturator
2  internus muscle, I -- I stay away from that.
3    Q.  Is that because the risk outweighs the
4  benefit of removing that mesh that's beyond the
5  obturator internus muscle?
6    A.  It's -- there are three factors to it.
7    Q.  Okay.
8    A.  The first one is that the orientation of the
9  tape is very misleading to the surgeon.  It comes
10  forward to you and many surgeons, if they're
11  inexperienced, they'll keep digging into the area and
12  cause harm to the lateral side.  That's one -- one of
13  the other reasons.
14    The second reason is that I haven't found
15  any -- anything convincing, and I keep looking for
16  anything that has been written about excising that --
17  that portion of the -- of the tape.
18    And number three is that most of the time,
19  2, 3 percent of the time that we're going to revise a
20  sling for avoiding this function, it makes no -- no --
21  there's no justification, I should say, there's no
22  justification to go beyond that area.
23    Q.  Okay.
24    A.  Beyond the area within the obturator

Page 84

1  internus muscle.
2    Q.  And of these three revisionary excisions --
3  let me first clarify.
4    Are the three revision or excision
5  surgeries, are they all three excision surgeries or
6  revision or both?  How would you characterize them?
7    A.  They are excisions.  I was speaking about
8  removing the whole thing.
9    Q.  So those three were excision surgeries.
10    Were those three patients, patients you had
11  implanted the sling or someone else?
12    A.  I had one that I implanted the sling and two
13  that came from -- came referred to me.
14    Q.  Okay.  So to your recollection, and you've
15  implanted 300 synthetic midurethral slings for the
16  last -- per year for approximately the last ten years;
17  right?
18    A.  Lately, they're -- the number of slings is
19  less.
20    Q.  Okay.  So would a fair estimation be that
21  somewhere between 2- and 3,000 synthetic midurethral
22  slings is what you've implanted?
23    A.  Yes.
24    Q.  Okay.  In the last ten years; right?

Page 85

1    A.  Yeah, over the last ten years, yeah, that
2  would be accurate.
3    Q.  And of those 2- to 3,000 synthetic
4  midurethral slings, your testimony is that you've only
5  excised one of -- you've only, personally, excised one
6  of the slings that you've put in; is that right?
7    A.  Yes.  That I remember, one.  I may -- may
8  have taken a segment or a fiber from another sling
9  that I might have placed.  I haven't kept track of it
10  because the reality is that it's extremely rare.  I'm
11  going to tell you, what happens most of the time is
12  you put the sling, the patient comes in, she's dry,
13  she's happy, she moves on.
14    Q.  What were the reasons why you performed the
15  three excision surgeries that you can recall?
16    A.  One of them was -- was just a tight sling on
17  the patient.  A young patient with a tight sling and
18  she was having difficulty urinating.
19    I recall one -- another one was someone with
20  a sling that was not a mid-urethra, it was higher.
21  The sling was placed higher than the urethra and it
22  wasn't working and I took that one and put one in the
23  urethra.
24    Q.  Any other reason that you can recall?

22 (Pages 82 to 85)

Jaime Sepulveda, M.D.

Page 86

1    A.  No.  I had -- I had one that came in because
2  she had -- she had pain on the area of the insertion
3  of the sling.
4    Q.  Okay.  So you had one with pain -- have you
5  ever removed a synthetic midurethral sling because of
6  an erosion?
7    A.  Yes, I have.  I have removed that erosion
8  and I actually had one that I didn't put in -- put in
9  those three.  Now I recall one that she broke the
10 incision and when I saw the patient coming on the
11 third week, on the third week, I asked her, "How is it
12 working?"  She said, "Well, it's working."
13    And I examine her and she -- she had an
14 exposure on the -- on the sling.  She was honest --
15 honest enough to tell me, "Doctor, I was at home
16 eating, I was choking on food and I threw myself over
17 a chair and I felt -- I felt something."  So she broke
18 the incision line, and I saw it and I said, "Okay,
19 well, I'll -- I recommend that you have this removed."
20    Q.  So is that the -- is your testimony that's
21 the only exposure -- or that circumstance you just
22 mentioned, is that the only exposure where erosion of
23 a synthetic midurethral slings that you had to treat?
24    A.  No, I had a couple of exposures in the -- in

Page 87

1  the past, but it's something that either you give
2  estrogen or you just take the fibers with a tenotomy
3  scissors, which are using in reconstructive surgery,
4  actually they're used in the eye and they have --
5  they're just perfect for this.
6    Q.  I guess my crude understanding of that is
7  it's like an in-office trimming of the exposed mesh;
8  is that right?
9    A.  It's -- you may have a few segments.  In
10 other words, you have not seen the whole incision open
11 up.
12    Q.  Okay.
13    A.  And I -- I do remember a long time ago I saw
14 a patient with a segment on one side.  That's the only
15 one I remember that the exposure was not in the
16 midline on the incision.  And that patient, I tried to
17 convince her to let me take it and she said, "No,
18 you're not going to take anything because it's not
19 bothering me."
20    Q.  So these are -- these are done -- this
21 procedure you just mentioned, this trimming of the
22 sling is done in-office, not under general anesthesia
23 in surgery; right?
24    A.  Right.

Page 88

1    Q.  Have you ever performed an excision surgery
2  or revision surgery because the patient was suffering
3  from dyspareunia?
4    MR. SNELL:  Form.
5    A.  I -- I did one, same one that was having --
6    Q.  (By Mr. De La Cerda)  Pain?
7    A.  -- the pain, yeah.
8    Q.  Got it.  Okay.
9    All right.  The TVTs and the TVT-Os that
10 you've placed, those have involved -- or have been
11 mesh that is mechanically cut mesh and mesh that is
12 laser cut mesh; right?
13    A.  Both.
14    Q.  Did that have anything to do with the time
15 period in which you were implanting it or do you
16 just -- did you stock both or what did that have to
17 do -- any factors that that had to do with?
18    A.  No, I did not have any specific reason to
19 choose one over the other.
20    Q.  Okay.  Over the last ten years you performed
21 surgeries to correct pelvic organ prolapse; right?
22    A.  Yes.
23    Q.  What types of surgeries have you performed?
24    A.  I have performed anterior repairs, posterior

Page 89

1  repairs, enterocele repairs, iliococcygeal suspension,
2  sacral spinous ligamentous suspension, abdominal
3  sacrocolpopexies, robotic sacrocolpopexies, Prolift,
4  graft reinforced repair with biologicals, augmented
5  repairs with Gynemesh, perineoplasty.
6    I think I have mentioned probably all of
7  them.
8    Q.  The anterior and posterior repairs, did
9  those include colporrhaphies?
10    A.  Yes.
11    Q.  Are those synonymous or --
12    A.  Pretty much, yes.
13    Q.  Okay.  Now, all the repairs that you just
14 mentioned, those are all within the standard of care;
15 right?
16    A.  Yes.
17    Q.  Is implanting transvaginal mesh -- strike
18 that.
19    Is implanting synthetic polypropylene mesh
20 transvaginally still within the standard of care?
21    MR. SNELL:  Form.
22    A.  It's still within the standard of care if it
23 will have the product available.
24    Q.  (By Mr. De La Cerda)  As of now, from the

23 (Pages 86 to 89)

Jaime Sepulveda, M.D.

Page 90

1  Ethicon products, Gynemesh is still available;
2  right?
3      A.  Gynemesh is still available.
4      Q.  And do you -- is it your opinion that it's
5  still within the standard of care to implant Gynemesh
6  transvaginally for the treatment of pelvic organ
7  prolapse?
8      A.  I believe it changed, the actual indication
9  or clearance.  I may have read that.
10     Q.  So the indication now is to use it for
11 abdominal sacrocolpopexies; right?
12     A.  Yes.
13     Q.  So is it within the standard of care,
14 though, to implant Gynemesh -- I'm talking about
15 today -- so is it as of today within the standard of
16 care to implant Gynemesh transvaginally for the
17 treatment of pelvic organ prolapse?
18     A.  Not -- not today.
19     Q.  Okay.
20     A.  Based on what I just stated.
21     Q.  Okay.  What was -- what was for you an
22 indication in the past to implant synthetic mesh
23 transvaginally for the treatment of pelvic organ
24 prolapse as opposed to doing one of the other non-mesh

Page 91

1  procedures that you've mentioned?
2      A.  I -- I came to the clinical appreciation
3  that patients that have had a hysterectomy, patients
4  that have had recurrent prolapse, patients that had a
5  high degree of exertion, and patients that have a
6  recurrent compartment or a contralateral compartment
7  defect, those patients benefit from it.
8      I -- that's the general.  I knew that I had
9  patients that have -- I had one shot to take to the
10 operating room and I -- for whatever reason, and those
11 are the most difficult ones because they were more
12 complicated, but on the other side, you wanted to give
13 her the durability of the repair.
14     That's -- that's in general what I -- what I
15 use when I counsel someone on the -- on the use of
16 this synthetic graft.  We started -- we started
17 reading then, around the time that we had Gynemesh,
18 more and more about durability and the repairs,
19 specifically for those apical -- apical defects, so it
20 became very attractive to treat patients on the
21 apical, with apical defects, and when we didn't have
22 to do an incision.
23     Q.  Have you ever performed revision or excision
24 surgeries involving synthetic polypropylene

Page 92

1  transvaginal mesh for pelvic organ prolapse?
2      A.  Yes, I have.
3      Q.  And how many have you done of that?
4      A.  I look at those and they may be in the -- in
5  the 10, 20, maybe right -- right there based on what
6  I saw the last time.
7      Q.  So approximately 10 to 20 in your career
8  revision or excision surgeries involving synthetic
9  polypropylene transvaginal mesh?
10     A.  That's -- that's a ballpark figure, yes.
11 That's a very general figure.
12     Q.  And of those 10 to 20, how many were you
13 able to remove the entire mesh device?
14        MR. SNELL:  Form, foundation.
15     A.  In most of them -- most of them you can
16 dissect the space -- the same space where you place it
17 and you can -- you can remove it.  It's -- if you have
18 it in the muscle, obviously that's -- I already stated
19 that there is no benefit of doing that.  But if you
20 dissect that area, you bring it up and you
21 hydrodissect your segments, you're -- you can remove
22 most of it.
23     Q.  (By Mr. De La Cerda)  Have you ever
24 performed a revision or excision surgery because the

Page 93

1  patient was reporting pain and this is, again, I'm
2  talking about patients with transvaginal mesh for
3  pelvic organ prolapse?
4      A.  You know, pain -- pain is rare after this
5  kind of repair.  What most frequently happen is that
6  you would get in to have -- to remove an exposure, and
7  then you end up -- you would end up removing more from
8  what you thought you were going to remove because you
9  had the plane and you were just dissecting the area
10 and remove it.  Then you ended up reinforcing the area
11 with sutures.
12     There are times in which I -- I -- I say I
13 have to do something to support it and it becomes such
14 a subjective thing that I wish I could have explained
15 this not now, but even when doctors would ask me the
16 same questions and -- and be accurate and precise
17 about it, but no, it's a general -- it's a general
18 idea.  What I'm explaining now is a general idea of
19 what happens in the operating room when you're going
20 to remove it.  So you start small, but you start
21 extending yourself on the dissection.
22     Q.  So of the 10 to 20, though, how many of
23 those did you remove for the reason of that they
24 had -- they were experiencing pain?

24 (Pages 90 to 93)

Jaime Sepulveda, M.D.

Page 94

1     A.  It's -- I think it's rare.  I can't give you
2  a specific number without -- okay, I want to be
3  accurate and precise, but it was rare.  The most
4  recurring reason was an exposure.
5     Q.  Okay.  And did they report exposure with
6  pain or no?
7     A.  No.  No.  They -- most frequent complaint
8  with the exposure was vaginal discharge.
9     Q.  So were the 10 to 20 excision surgeries,
10  were those primarily because of exposures?
11     A.  It's -- it's -- mostly exposure and
12  symptomatic exposures, exposures in which you saw
13  granulation tissue.
14     Q.  Of granulation tissue, okay.
15        Were any of the excision procedures
16  performed specifically because of dyspareunia?
17     A.  No, I don't remember anyone specific on
18  dyspareunia.  I remember taking one Prolift that was
19  dyspareunia and pain.
20     Q.  Have you ever -- have you ever had a patient
21  come to you reporting dyspareunia or pain after having
22  had a transvaginal mesh or pelvic organ prolapse where
23  you believed it was the transvaginal mesh causing the
24  pain or dyspareunia?

Page 95

1     A.  No.  Most of the patients that we see with
2  dyspareunia, in a busy vaginal surgery practice, is
3  without mesh.
4     Q.  So you've never had that happen where you
5  believed the dyspareunia was being caused by the
6  transvaginal mesh; right?
7     A.  By -- specifically by transvaginal mesh, no.
8     Q.  Same question for the -- I don't know if I
9  asked you for the slings, but have you ever had a
10  patient come to you reporting pelvic pain or
11  dyspareunia after having had a synthetic midurethral
12  sling where you believed that it was the sling causing
13  that pain or dyspareunia?
14     A.  No, I -- I saw one sling that was low enough
15  that I -- it could -- that could have been the source
16  of dyspareunia.
17     Q.  Okay.  And I guess really you're thinking
18  it's more the positioning of the sling as opposed to
19  the actual sling; right?
20     A.  Yes.
21     Q.  Okay.  How many Gynemesh PS's have you
22  implanted in your practice, in your career?
23     A.  Over a hundred.
24     Q.  And how many Prolifts have you implanted in

Page 96

1  your career?
2     A.  Definitely more than 100.
3     Q.  Between 100 and 200?
4     A.  Easily.
5     Q.  How many Prosimas have you implanted in your
6  career?
7     A.  I did about 50.
8     Q.  Okay.  Turning -- we've now been going
9  another hour.  Would you like to take a break?
10     A.  Yes, just quick as before.
11        (Thereupon, a recess was taken from
12     10:21 a.m. until 10:29 a.m., after which the
13     following proceedings were held:)
14     Q.  (By Mr. De La Cerda)  Okay.  We are back
15  on the record.
16        Doctor, I wanted to direct your attention
17  back to your CV, please, which is Exhibit 13.  Just a
18  couple quick things.  If you'll turn to the fourth
19  page, the section which is "Courses Presented."
20     A.  Yes.
21     Q.  The entities that I've seen -- well, the
22  entities that are mentioned within this section where
23  you've presented a course, the only entities I've seen
24  mentioned are Johnson & Johnson, Ethicon Endo and

Page 97

1  Ethicon.
2        Are there any other entities mentioned here
3  or no?
4     A.  No, I never worked outside of Ethicon for
5  any another company.
6     Q.  Then under "Research Experience," which is,
7  I guess, a couple pages later, is there -- do you have
8  listed here any research on transvaginal polypropylene
9  midurethral slings or transvaginal polypropylene
10  pelvic organ prolapse mesh?
11     A.  No, I did not do research on transvaginal
12  sling.  I rely on the randomized control trials.
13     Q.  And then under "Presentations and
14  Publications as Author or Coauthor," I didn't see any
15  presentations or publications that involve
16  transvaginal polypropylene midurethral slings or
17  transvaginal polypropylene mesh for pelvic organ
18  prolapse; is that right?
19     A.  Yes, I did not -- I did not publish on
20  transvaginal slings.
21     Q.  We can set that aside for a second.
22        Okay.  You're not a biomedical engineer;
23  correct?
24     A.  I -- I have a very good understanding of

25  (Pages 94 to 97)

Jaime Sepulveda, M.D.

Page 98

1  biomedical engineering.
2      Q.   Okay.  Would you consider yourself a
3  biomedical engineer?
4      A.   I do not get compensated for doing
5  biomedical engineering.
6      Q.   Okay.
7      A.   And I did not graduate from -- with a degree
8  of biomedical engineering.  I do -- I do understand
9  biomedical engineering well.
10     Q.   I saw that you brought some books here that
11  would relate to that, I believe.  What is it that
12  would provide the basis for your belief that you have
13  expertise in biomedical engineering?
14     A.   I have devoted years to understand it, to
15  read about it beyond what any other physician that I
16  ever met have done.
17     Q.   Anything else?
18     A.   I have studied, I have spoken to biomedical
19  engineers, but specifically it's a passion and a
20  dedication that I have had to understand it.
21     Q.   Would you consider yourself an expert on the
22  design of medical devices?
23     A.   It goes right along with the biomedical
24  engineering, with the surgical expertise that allows

Page 99

1  me to see what -- what can save in terms of efficiency
2  in the operating room, what can I do better for my
3  patients.  That's what I use this for.  This allows me
4  to understand the design better.
5      Q.   Have you ever, personally, designed a
6  medical device?
7      A.   I -- not -- not a medical device, but I have
8  my own set of needles that I actually had made.
9      Q.   What were those needles for?
10     A.   For -- to approach the deep space in the
11  pelvis.
12     Q.   Were those used in connection with
13  implanting mesh at all?
14     A.   No, I use them for sutures.
15     Q.   Okay.  Have you ever been involved in the
16  design of a medical device?
17     A.   I -- I did give input to the design.  It was
18  not -- it was not my own patent.
19     Q.   And what device was that?
20     A.   Staplers for -- for -- staplers, a
21  retractor, again, a circumferential needle.
22     Q.   And these are all devices that are used in
23  connection with surgery?
24     A.   Yes.

Page 100

1      Q.   Were you ever designed -- were you ever
2  involved in the design of any transvaginal mesh
3  devices?
4      A.   Not in the devices of the ones that I use.
5      Q.   Do you have any patents on medical devices?
6      A.   No.
7      Q.   Do you know what the standard is for a --
8  that a manufacturer must follow in designing mesh
9  products?
10     A.   I'm -- I became very familiarized with --
11  when I was with Ethicon by my own inquiries.
12     Q.   What standards did Ethicon employ in the
13  design of its mesh products?
14     A.   It's -- it was from the initiation, from
15  what they had an idea of what the device was, what the
16  need was, and then there were -- I know there was a
17  structure for research and development with the
18  running of different -- different trials at different
19  levels.  And I get that information and submit it,
20  along with other information that I was -- in which --
21  that had nothing to do with surgery, but cytotoxicity,
22  paragenicity assays, cell cultures assays, and all
23  this information submitted to the FDA, who would then
24  review it and -- and within its own division for the

Page 101

1  device and then get back to them.
2      Q.   Do you know what a manufacturer researches
3  before a product is designed or released?
4          MR. SNELL:  Form, overbroad.
5      A.   The --
6      Q.   (By Mr. De La Cerda)  Let's take it a
7  little more specific to the mesh products.
8          What did -- what, to your knowledge, did
9  Ethicon research in regard to its mesh products before
10  they were released?
11     A.   I know that they -- they went through their
12  suture -- suture research and -- and I know that they
13  did experiments short term and long term with sutures.
14          I know that there was an opinion acquired
15  from the field on the use of different sutures.  Then
16  there was a -- there was a use on the type of mesh
17  that was used for prolapse on the different types of
18  meshes.  That wasn't done in the United States, that
19  was done in France.
20          And there was also -- the materials were
21  even evaluated in the same -- in the same way that
22  sutures are evaluated, but also in the operating room.
23  I'm aware of that one, too.
24          I'm aware that the needles and the approach

26 (Pages 98 to 101)

Jaime Sepulveda, M.D.

Page 102

1    that was used was evaluated by them before it was even
2    used in the United States. And I know the packaging,
3    the packaging was evaluated. I was able to see how
4    they design the package for the operating room.
5        So all those lines never got to the place
6    where they actually do the knitting of the material,
7    never -- never got to see that, but I know there was a
8    facility for that.
9        So there was a step of -- actually quite an
10   elaborate chain that ended up giving the product.
11   Q. Do you know what types of experts were
12   involved in the design of Ethicon's mesh products?
13   A. I spoke to materials engineers. I actually
14   enjoy very much when I interacted with one of the
15   biomechanical engineers over there that had a doctor's
16   degree on biomaterials and I actually -- and I enjoyed
17   that. I look at different -- they asked me for
18   different types of materials. We look at -- they got
19   my input on fibers.
20       I know that there was another group in
21   France that was using those materials. One thing that
22   I observed is that it would not just go with just one
23   opinion, it was a consensus of different surgeons and
24   different -- different settings.

Page 103

1    Q. Do you remember the names of any of the
2    folks that you interacted with on those issues?
3    A. I can't -- I can't remember because it's
4    over -- over five years and, you know, it's -- it
5    wasn't a friendship that would continue beyond that.
6    It was a work relationship.
7    Q. Do you know what a "design history file" is?
8    A. No.
9    Q. Are you familiar with industry standards
10   that govern medical device design?
11   A. I read at one time, I read that. I read
12   about ISO testing. I read about ISO testing. I read
13   about the different toxicity assays and, actually, at
14   one time I even may have read about the testing that
15   was done for -- for meshes that was using sutures,
16   i.e., I actually research it and read about it.
17   Q. Anything else that you can recall?
18   A. No.
19   Q. I'm sorry, is that --
20   A. I'm sorry. Not at this moment.
21   Q. Are you familiar with regulatory standards
22   that govern medical devices?
23   A. I became -- I became aware of the regulatory
24   standards. I knew about the classifications of

Page 104

1    devices. I had an idea of the classification of the
2    devices and I had an idea, because I use other types
3    of -- of devices that have nothing to do with mesh.
4    Q. What's your understanding of the
5    classifications of devices?
6    A. I knew that heart -- heart monitors and
7    nerve stimulators and intermittent nerve stimulator
8    had a different classification than our meshes had and
9    that surgical instruments would have and that sutures
10   would have. You can -- you can just open -- you go to
11   the operating room and get into one of the boxes of
12   the sutures and you can pull that paper that gives all
13   these different things about the sutures. So it's --
14   I knew I had -- I had an idea of the different -- at
15   least three classifications that were used.
16   Q. Some requiring testing before they go out on
17   the market, some perhaps not; right?
18       MR. SNELL: Form.
19   A. Some methods -- some methods did require
20   different type -- different types of testing,
21   different -- each one had different requirements.
22   Q. (By Mr. De La Cerda) Do you know how
23   pelvic organ prolapse, transvaginal synthetic
24   polypropylene mesh is currently classified?

Page 105

1    A. It's -- I read, recently, the classification
2    for prolapse meshes and for -- they went up to
3    Class 3.
4    Q. And what does that mean to your
5    understanding?
6    A. They are classified as high-risk devices.
7    Q. Do you agree with that?
8    A. I -- I'll -- I agree with the approval that
9    the FDA has and I'm not going to challenge the FDA or
10   their panel on that one.
11   Q. Fair enough. Would you -- are you an expert
12   in polymer chemistry?
13   A. I -- I don't design polymer chemicals. I do
14   understand certain -- the polymers that are used in my
15   specialty.
16   Q. And what polymers would those be?
17   A. When it comes down to polymers used in my
18   specialty, it's polypropylene.
19   Q. Are you an expert in surgical pathology?
20   A. That -- that's an average over the last 25
21   years, I do look at slides.
22   Q. And that would -- that would be the basis
23   for you stating that you had expertise in surgical
24   pathology; is that right?

27 (Pages 102 to 105)

Jaime Sepulveda, M.D.

| Page 106 | Page 108 |
|---|---|

**Page 106**

1    A.  I think that everyone that is a surgeon
2  needs to have an expertise in surgical pathology.
3    Q.  Okay.  So that would be your basis for
4  saying that; right?
5    A.  That's correct.
6    Q.  I didn't ask you this.  What would be your
7  basis for saying you have expertise in polymer
8  chemistry, is it your experience?
9    A.  My experience and what I read, the time that
10  I devote, the time that I have devoted over the years
11  to look at sutures and specifically polypropylene.
12    Q.  Have you ever personally done chemical tests
13  to determine if polypropylene mesh degrades?
14    A.  I have not personally done -- done that
15  testing.  I did -- I did -- I have -- I read about it
16  and have considered that hypothesis.
17    Q.  Have you ever done a microscopic analysis of
18  explanted polypropylene mesh to determine if the mesh
19  degraded personally?
20    A.  Not -- not with the purpose of degradation
21  because I still -- I still looking for what -- what
22  does degradation really mean in the pathology
23  specimen.
24    Q.  Okay.  I'm going to shift gears a little

**Page 107**

1  bit.
2      Would it be fair to say that before a
3  physician decides to utilize a transvaginal
4  polypropylene mesh or sling to treat a patient, that
5  it's necessary for the physician to warn the patient
6  of all known side effects of the product, including
7  severe ones?
8    MR. SNELL:  Objection, form, speculation.
9    A.  I think that before any -- any surgery,
10  there has to be -- there has to be a full
11  understanding of the -- as part of the informed
12  consent.  And when -- when that's happening, there --
13  there are factors that are going to play into it.
14      Yes, ideally, we should be able to clear our
15  patients and get -- get a full understanding of it.
16  There are times in which the patient cannot understand
17  it and we have to find, as physicians and surgeons, a
18  way to get them through the most relevance.  But that
19  including -- includes surgery with or without mesh.
20    Q.  (By Mr. De La Cerda)  Okay.  So do you
21  think that all the known side effects, including
22  severe ones, should be disclosed to patients?
23    MR. SNELL:  Same objection, form.
24    A.  It's all known -- not only side effects, but

**Page 108**

1  essentially what -- what could happen that is within
2  my control that is -- and what's not in my control and
3  patients appreciate that we do that.
4    Q.  (By Mr. De La Cerda)  A physician should
5  warn his patient -- his or her patient of
6  characteristics of the transvaginal mesh or sling
7  product that can significantly increase their risk
8  of severe complications; correct?
9    MR. SNELL:  Form, foundation.
10    A.  On that counseling, the counseling should
11  involve what has been tested.  In other words, the
12  last thing that you want as a patient is to be
13  overwhelmed by just a wealth of data that is not
14  clinically relevant, and we -- we have studies that
15  actually address that.
16    Q.  (By Mr. De La Cerda)  So I think we might
17  be getting to something there.  If -- if a
18  characteristic of a transvaginal mesh or sling
19  product is clinically relevant, should that be
20  disclosed to a patient during the informed consent
21  process?
22    MR. SNELL:  Same objection, foundation.
23    A.  The informed consent addresses that.
24    Q.  (By Mr. De La Cerda)  So is that a "yes"?

**Page 109**

1    A.  That would be in general a yes within --
2  within the parameters of that conversation between the
3  physician and the -- and the patient.  So it would be
4  a yes with a condition that with knowing that that's
5  very unique.  That's a very unique interaction.
6    Q.  Okay.  Do you agree that a physician has a
7  duty to inform his or her patients of the material
8  risks associated with a transvaginal mesh or sling
9  product before it's implanted in the patient?
10    MR. SNELL:  Form, foundation, overbroad.
11    A.  I -- I -- my opinion is that the patient
12  should be informed not only of -- of the mesh, but
13  if -- if surgery is being done with sutures, the
14  patient should know that, too.
15    Q.  (By Mr. De La Cerda)  I mean, what I'm
16  trying to do is use different terms for the risks or
17  complications and in this one I'm using material
18  risks associated with transvaginal mesh or sling
19  product.  Do you think that material risks should be
20  disclosed to the patient?
21    MR. SNELL:  Same objection, vague,
22  immaterial.
23    A.  Just to clarify, are you talking about the
24  material or the material risk?

28  (Pages 106 to 109)

Jaime Sepulveda, M.D.

Page 110

1    Q.  (By Mr. De La Cerda)  That's a good
2  question.
3       Material, that term I'm using -- because
4  there's different ways that we've seen risks and
5  complications associated with mesh products described
6  by physicians.  Sometimes they describe those risks as
7  material risks, not as the material polypropylene, but
8  as being relevant risks.
9    A.  Oh.
10    Q.  They're using that word.
11    A.  I understand.
12    Q.  That's a good question.  Some doctors have
13  used the term "material risk," "Yeah, I disclose it if
14  it was a material risk."
15       Now with that explanation, do you believe
16  that material risks associated with these products
17  should be disclosed during the informed consent
18  process?
19    MR. SNELL:  Same objection.
20    A.  The material risk associated with the whole
21  extent of the procedure should be -- should be
22  disclosed.
23    Q.  (By Mr. De La Cerda)  Okay.  You mentioned
24  the term "clinically relevant."  Is that the same

Page 111

1  thing as clinically significant?
2    A.  Um, clinically relevant is statistically
3  significant.
4    Q.  Could you explain what that means, what your
5  understanding is of that?
6    A.  It's -- with the best level of evidence that
7  we have for what we're doing, explain to the patient
8  this is -- we're going to translate it from the
9  statistically significant to what's common and what's
10  relevant in the surgery.
11    Q.  Okay.  I'm going to try and ask this
12  properly.
13       Do you agree that a physician should warn
14  his or her patients of risks or complications
15  associated with the transvaginal mesh or sling
16  products that are clinically relevant or statistically
17  significant?
18    MR. SNELL:  Form.
19    A.  For the whole extent of the procedure.
20    Q.  (By Mr. De La Cerda)  Including the
21  products, though; right?
22    A.  Including the products.
23    Q.  Okay.  Now, the purpose of warning a patient
24  during the informed consent process is to allow that

Page 112

1  patient to make a determination of whether she wants
2  to undergo the surgery; right?
3    A.  It's -- patients are going -- are going to
4  eventually follow your -- the -- the doctor, the
5  doctor's advice.  But the reason why you do the
6  informed consent, is more than the patient deciding,
7  which many times they -- they cannot decide, it's to
8  empower that patient with the information of this is
9  what I use for my decision, the decision that I
10  recommended to you.
11    Q.  Okay.  Ultimately, though, it is -- the
12  patient has the right to decide one way or another
13  what they want to do; right?
14    MR. SNELL:  Form, overbroad.
15    A.  Patient -- patients may -- may ask more
16  questions or may -- say "I will have a preference,"
17  but in 25 years seeing patients, patients will tell --
18  will ask you, "Doctor, tell me what you -- you think
19  is the best way of doing it and tell me why and how
20  you come to that decision."
21    Q.  (By Mr. De La Cerda)  Okay.  So have you
22  ever had a patient say, after being consented or
23  receiving informed consent, saying, "No, I don't
24  want to have that procedure," as to mesh?

Page 113

1    A.  No, I -- I have not had that experience.
2    Q.  Do you agree it's important for the
3  physician to have as much information about the risks
4  associated with transvaginal mesh or sling product so
5  that the physician can make an informed decision on
6  whether to recommend those products?
7    A.  I think it's important that the physician
8  gets accurate and makes a reasonable effort to get
9  better on what they use and what they do every single
10  day.
11    Q.  Including the information that they are
12  going to communicate to the patient; right?
13    A.  It's especially if you're going to
14  communicate to the patient and -- especially when it
15  has to do with you making a clinical decision.
16    Q.  Do you agree that physicians rely on a
17  transvaginal mesh manufacturer to provide them with
18  information about the risks and complications
19  associated with their transvaginal mesh products?
20    MR. SNELL:  Objection, overbroad and
21  requires speculation.
22    A.  I can't -- I cannot think for all the
23  physicians, but I -- I can tell you that their
24  responsibility is within ourselves before we use any

29 (Pages 110 to 113)

Jaime Sepulveda, M.D.

Page 114

1  product.
2      Q.  (By Mr. De La Cerda)  Do you agree the
3  transvaginal mesh manufacturers are at least one
4  source of information that a physician can rely on
5  in obtaining information about their risks and
6  complications of transvaginal mesh products?
7          MR. SNELL:  Objection, speculation.
8      A.  It might be at the low end of the -- of the
9  evidence that we gather.
10     Q.  (By Mr. De La Cerda)  You're not saying
11 that a physician shouldn't rely on information from
12 a transvaginal mesh manufacturer about the risks and
13 complications of those products; right?
14         MR. SNELL:  Form, overbroad.
15     A.  I think that a physician needs to rely on
16 the best evidence, best clinical evidence, not just in
17 any sort of marketing communication or sales
18 communication.  They need to know that the decision to
19 do surgery is a scientific process and they need to
20 read that.
21     Q.  (By Mr. De La Cerda)  If -- but certainly
22 if a transvaginal mesh manufacturer is providing a
23 serious warning about its products, even if that
24 warning hasn't played out in the scientific

Page 115

1  literature, I mean, that's still something that
2  needs to be considered; right?
3          MR. SNELL:  Form, overbroad.
4      A.  There's a degree of information that you
5  need to consider.  You -- you have -- you're a doctor
6  and you have the scientific information because that
7  allows you to analyze information better.  So in that
8  regard, what we're going to see is information that is
9  relevant because they're at the highest level of
10 evidence, information that is less relevant because
11 they are the lowest one, but there's a -- there's a
12 hierarchy -- did I say that word okay? -- there is a
13 hierarchy of information and we're going to go for the
14 highest one.
15     Q.  (By Mr. De La Cerda)  Okay.  Let's take a
16 silly example for a second.  If the manufacturer of
17 transvaginal mesh knows that there's a
18 one-in-a-million chance that it explodes inside a
19 human body, but that is never played out in the
20 RCTs, never, ever been seen by anyone other than the
21 manufacturer, does that information need to be put
22 out to the public and told to physicians?
23         MR. SNELL:  Objection.  I'm going to have to
24 object, incomplete, purely speculative,

Page 116

1  hypothetical.
2      Q.  (By Mr. De La Cerda)  The answer is of
3  course; right?
4          MR. SNELL:  I don't know about that.  I
5      mean, that's the doctor's answer, but my
6      objection is incomplete hypothetical, purely
7      speculative.
8          Go ahead.
9      A.  The explosion thing is a little out there.
10 It's -- we have not seen any devices that actually
11 explode for prolapse or incontinence.  I don't know
12 for the other ones.
13         The point I'm trying to come across is, to
14 answer your question, when we look at information, we
15 look at randomized control trials.  Now, randomized
16 control trials in cohort studies, even case control
17 studies, you can go down to a list and you're going --
18 the methodology is what allows you to give
19 recommendations and form your counseling.
20     Q.  (By Mr. De La Cerda)  So even if the
21 manufacturer knows of severe life-altering
22 complications associated with its products, if that
23 severe life-altering complication hasn't played out
24 in the randomized control trials, you believe that

Page 117

1  physicians shouldn't place much weight on that?
2      A.  I think as humans -- as humans, if we see
3  that there is any -- any danger for anyone, for any
4  other human being, we'll just go and say it,
5  regardless of who we work for.  And at the end it's
6  not a company, it's a group of people working.  So the
7  human -- the human nature is to -- the human thing is
8  to actually do that, and that's our nature.  But
9  that's different from having -- making a clinical
10 decision.
11     Q.  Okay.  So, ultimately, should information
12 like that, if it's known to manufacturer, but it
13 hasn't played out in the randomized control trials,
14 should information like that about severe
15 life-altering complications be communicated to a
16 patient during the informed consent process?
17         MR. SNELL:  Form, asked and answered.
18     A.  What we're going to use to counsel patients
19 is randomized control trials.  And if -- if the
20 question is if the manufacturer should disclose it,
21 I -- I -- my opinion is probably most people would go
22 ahead and disclose it, but in terms of making a
23 clinical decision, we're going to use for the best
24 evidence that we have.

30 (Pages 114 to 117)

Jaime Sepulveda, M.D.

Page 118

```
 1      Q.  (By Mr. De La Cerda)  And I understand, I
 2  definitely understand.  I guess what I'm trying to
 3  get at, though, is:  Should that information be
 4  communicated to the patient during the informed
 5  consent process or not?
 6      A.  Only the information that is backed by good
 7  science.
 8      Q.  Okay.  So the answer is; no, right?
 9      MR. SNELL:  Objection, asked and answered.
10      A.  If it's not -- if it's not backed by
11  science, it plays no role in the counseling of a
12  patient.
13      Q.  (By Mr. De La Cerda)  Including if the
14  manufacturer has discovered severe life-altering
15  complications that it knows of, even though it
16  hasn't been played out in the randomized control
17  trials and the medical literature; right?
18      A.  Our counseling --
19      MR. SNELL:  Same objection.
20      A.  Our clinical counseling is evidence-based.
21      Q.  (By Mr. De La Cerda)  Okay.  And evidence
22  from the manufacturer wouldn't necessarily count --
23  well, the finding of a manufacturer as to a severe
24  life-altering complication wouldn't count as
```

Page 119

```
 1  evidence under the framework that you're using;
 2  right?
 3      A.  The -- the findings, whatever findings, that
 4  being from a physician, that being from a patient,
 5  that being from -- from a manufacturer or anybody
 6  else, a group -- whatever findings needs to be
 7  corroborated by evidence, that's why we have studies,
 8  that's why we have a well-placed methodology for
 9  evidence.
10      Q.  And so the medical -- well, the studies are
11  going to be the foundation of that evidence, not some
12  information from the manufacturer; right?
13      A.  Any -- any -- any radical information, that
14  being of things being too good or too bad need to be
15  evaluated on the light of a randomized control trial,
16  needs to be evaluated on if there is no randomized
17  control trial, needs to be evaluated based on the type
18  of the study that we have and the clinical experience.
19      Q.  Do you consider a permanent injury a severe
20  side effect?
21      A.  A permanent injury is different from a side
22  effect.
23      Q.  Okay.  So what -- so you don't believe that
24  a permanent injury is a severe side effect or they're
```

Page 120

```
 1  just totally different?
 2      A.  They're -- there's side effects and there's
 3  injuries.
 4      Q.  Okay.
 5      A.  And the side effect has more to do with what
 6  pertains to one particular product and an injury could
 7  be from anything that is used in surgery.
 8      Q.  Do you consider a permanent injury a severe
 9  injury?
10      MR. SNELL:  Form, incomplete hypothetical.
11      A.  I apologize for that.
12      Can you please repeat that?
13      (The requested portion of the record was
14  read back by the reporter.)
15      A.  There could be permanent effects of surgery
16  that are not necessarily severe and severe that are
17  not exactly permanent.
18      Q.  (By Mr. De La Cerda)  Do you consider a
19  risk or complication that requires additional
20  surgeries a severe side effect?
21      A.  Based on the -- on the -- on the evidence on
22  which -- which has a classification is not considered
23  severe, is not considered severe if he needs just to
24  go back to the operating room.
```

Page 121

```
 1      Q.  So that's not severe in your eyes.
 2      A.  Yeah.
 3      Q.  Do you consider risk or complication that
 4  seriously alters a patient's quality of life a severe
 5  side effect?
 6      A.  It could be -- that side effect could be for
 7  improvement of a quality of life, that could be --
 8  that's an effect on the side or a side effect, the way
 9  we usually recognize it, can be deteriorating to the
10  quality of life.  I will have to look at the specific
11  situation and look at the specific data on it.
12      Q.  Okay.  Let's shift gears.  The content and
13  substance of the professional education sponsored by
14  Ethicon on it's TVT, TVT-O, Gynemesh, Prolift and
15  Prosima did not and does not contradict the content
16  and substance of the IFUs for these products; correct?
17      MR. SNELL:  Form, overbroad.
18      A.  The content of the -- of these programs use
19  the IFU.
20      Q.  (By Mr. De La Cerda)  They don't
21  contradict it; right?
22      A.  No, there is -- there is actually -- in the
23  presentations that you're going to see, they -- they
24  work -- they work together.
```

Jaime Sepulveda, M.D.

Page 122

1    Q.   Okay.  Now, I figured the most efficient way
2  to do this, because now we'll get into the substance
3  of the various issues that you've opined on, there are
4  many of these issues that can be grouped together as
5  to all the products and I think that will be the
6  fastest way to get through it, so that's what I'm
7  going to do.
8        So, for example, I'm about to ask you about
9  the IFU.  I'm going to ask you about -- these are
10  general questions about the IFUs of the TVT, TVT-O,
11  Gynemesh, Prolift and Prosima.  I think we can do it
12  all at once.
13    A.   Yes.
14    Q.   First of all, are you familiar with the
15  contents of the various versions of the IFUs for the
16  TVT, TVT-O, Gynemesh, Prolift and Prosima?
17    A.   I'm aware that they're -- they have changed
18  in 2015.
19    Q.   And you're generally aware of the contents,
20  right, of those -- of those various IFUs?
21    A.   Yes, there are IFUs that actually might be
22  able to tell you separate steps.
23    Q.   Okay.  Do you intend to offer an opinion as
24  to whether the warnings in the IFUs for the TVT,

Page 123

1  TVT-O, Gynemesh, Prolift and Prosima were sufficient
2  to apprize doctors of the risks of those products?
3    A.   Yes, I will -- I will give an opinion on
4  that.
5    Q.   And your opinion will be that they were
6  sufficient warnings; right?
7    A.   Yes, that will be my opinion.
8    Q.   Do you know what standards Ethicon applied
9  in terms of what needed to be included in the warnings
10  in the IFUs for the TVT, TVT-O, Gynemesh, Prolift and
11  Prosima?
12    A.   That's the standards apply?
13    Q.   Yes.
14    A.   I'm aware of certain standards that were
15  used for the IFU.
16    Q.   Okay.  And what were those?
17    A.   The area on side effects, on warnings,
18  procedure steps, and the specifics on informing about
19  the need for specialized training to perform these
20  procedures.
21    Q.   Do you know what -- do you know whether
22  there's any -- are there specific, like, written
23  standards, though, that you're aware of that Ethicon
24  used in deciding exactly what warnings would go in

Page 124

1  there, what adverse reactions would go in there, and
2  what procedure steps would go in there?  Do you know
3  if there's any written standards that Ethicon relied
4  on?
5    A.   I'm -- I'm aware of that.  As for many
6  products, they -- the ones that are disclosed are the
7  ones that are specific to that product.
8    Q.   Okay.
9    A.   In other words, they're not comprehensive
10  guides on incontinence or -- or prolapse care.
11    Q.   Okay.  Have you ever, in your career, been
12  involved in writing or preparing an IFU for a medical
13  device?
14    A.   I have not written an IFU.  I read -- I read
15  IFUs through most of my career.
16    Q.   Have you ever studied the question of what
17  risks and complications were known to doctors across
18  the country with various background and levels of
19  experience with regard to the use of the TVT, TVT-O,
20  Gynemesh, Prolift and Prosima?  Did you ever study
21  that question?
22    A.   The risk with mesh were, with these
23  procedures in general, were addressed in a variety of
24  ways.  And those were -- there were communications

Page 125

1  from the American College of OB/GYN, there were
2  meetings that -- there were journals, there were so
3  many different -- different venues that we have grown
4  used to read and understand.
5        The IFU, we -- we all expected that it was
6  going to give us one specific set, but the other set
7  on the evidence, we expected that from our -- our
8  scientific data.
9    Q.   So back to the question, though:  Did you
10  ever study -- ever perform a study or ever study or do
11  questionnaires that determine what doctors actually
12  knew about these products, about the risks and
13  complications of those products?  Did you ever perform
14  a study like that?
15    A.   There was -- to my -- to my knowledge,
16  there's no -- not a study that have address -- address
17  it.
18    Q.   And you, personally, haven't done a study
19  either; right?
20    A.   No, I have not done -- done a study.  I have
21  examined forms on evaluation of surgical skills that
22  at one time I use.
23    Q.   Okay.  But on this specific question, you
24  haven't actually performed a specific study looking at

32 (Pages 122 to 125)

Jaime Sepulveda, M.D.

|  | Page 126 |
|---|---|

1  what doctors actually knew about the risks and
2  complications associated with transvaginal mesh
3  products?
4      A.  I have not performed such study.
5      Q.  Do you agree that a surgeon should be able
6  to solely rely on the warnings and description of risk
7  and complications in the IFUs for the TVT, TVT-O,
8  Gynemesh, Prolift and Prosima?
9          MR. SNELL:  Form, incomplete.
10     A.  We -- we don't rely just on the IFU.
11     Q.  (By Mr. De La Cerda)  Do you agree that a
12  surgeon should be able to just rely on the IFU or do
13  you disagree?
14         MR. SNELL:  Same objection, asked and
15     answered.
16     A.  I -- I disagree that a surgeon should be --
17  rely just on the IFU.
18     Q.  (By Mr. De La Cerda)  Should the IFUs for
19  the TVT, TVT-O, Gynemesh, Prolift and Prosima
20  include the frequency, duration and severity of
21  risks associated with those devices?
22         MR. SNELL:  Same objection, lacks
23     foundation.
24     A.  No.  As complete as an IFU could be, as

|  | Page 127 |
|---|---|

1  complete as an IFU may want to be, it would not be
2  able to address all of them.  It may comply with what
3  we expect from the IFU, but it will not be able to
4  address every single -- every single risk that has to
5  do with a surgery that is much more complicated than
6  what an IFU can address.
7      Q.  (By Mr. De La Cerda)  The IFUs for the TVT
8  TVT-O, Gynemesh, Prolift and Prosima should include
9  all known material risks associated with these
10  products; right?
11         MR. SNELL:  Form, asked and answered.
12     A.  It should -- it should include all -- all
13  unknown risks about the material, but not necessarily
14  will address all known material risk.
15     Q.  (By Mr. De La Cerda)  The IFUs for the
16  TVT, TVT-O, Gynemesh, Prolift and Prosima should
17  include all characteristics of these products that
18  can significantly increase the risk of severe
19  complications; right?
20         MR. SNELL:  Object to form, lacks
21     foundation.  This was asked and answered earlier.
22     A.  Is the -- the instructions for use for the
23  device, it addresses one area.  The -- the rest is
24  based on the data.

|  | Page 128 |
|---|---|

1      Q.  (By Mr. De La Cerda)  So is that a no?
2      A.  No, that's not necessarily a no.  Actually,
3  that's -- that's exactly -- the IFU cannot -- cannot
4  be a comprehensive guide.
5      Q.  So what -- what characteristics of these
6  products -- strike that.
7          Do you believe that the IFUs for the TVT,
8  TVT-O, Gynemesh, Prolift and Prosima sufficiently
9  address any characteristics of those products that
10  could significantly increase their risk of severe
11  complication?
12         MR. SNELL:  Objection.
13     A.  As it pertains to the product, yes.
14     Q.  (By Mr. De La Cerda)  The information in
15  the IFUs for the TVT, TVT-O, Gynemesh, Prolift and
16  Prosima should be truthful; correct?
17     A.  Yes.
18     Q.  The information in the IFUs for the TVT,
19  TVT-O, Gynemesh, Prolift and Prosima should be
20  accurate; correct?
21     A.  Yes.
22     Q.  The information in the IFUs for the TVT,
23  TVT-O, Gynemesh, Prolift and Prosima should be
24  complete; correct?

|  | Page 129 |
|---|---|

1          MR. SNELL:  Objection, form.  Prior
2      testimony.
3      A.  It is complete -- it is complete for the
4  product.  That's my -- my opinion.
5      Q.  (By Mr. De La Cerda)  The information in
6  the IFUs for the TVT, TVT-O, Gynemesh, Prolift and
7  Prosima should be fair and balanced about the risks
8  and benefits of these products?
9          MR. SNELL:  Same objection.
10     A.  It -- it should be fair and balanced for
11  what pertains to the product.
12     Q.  (By Mr. De La Cerda)  Once an IFU is out
13  there and -- for physicians to review, if Ethicon
14  learned of a risk or complication that was not
15  previously warned about in the IFU and it was a
16  significant risk or complication in terms of the
17  harm it caused to women, do you know whether or not
18  Ethicon had an obligation to get that information in
19  the IFU?
20         MR. SNELL:  Objection, hypothetical, legal
21     standard.
22     A.  As long as it's evidence-based, yes.
23     Q.  (By Mr. De La Cerda)  Have you compared
24  the differences between the IFUs for the TVT, TVT-O,

33 (Pages 126 to 129)

Jaime Sepulveda, M.D.

Page 130

1    Gynemesh, Prolift and Prosima, are you aware of the
2    differences between them?
3        A.   I have -- I have read those -- read those --
4    and I have read them many times and I have use it to
5    explain the procedure.
6        Q.   And so you've seen that over time there's
7    been some updates to the IFUs; right?
8        A.   Yes, I have seen that.
9        Q.   Is there a single long-term randomized
10   control trial for TVT, TVT-O, Gynemesh, Prolift or
11   Prosima with safety as a primary end point?
12       A.   I -- I -- they don't -- they're not all
13   included.  There is a randomized control trial that
14   explains about safety of Gynemesh, there is a
15   randomized control trial that explains for Prolift.
16       For each one of them, there's -- safety have
17   been included.  Not only have those randomized control
18   trials explain about safety, they have -- it has
19   spoken specifically about the percentage and the
20   clinical significance of each one of the
21   complications.
22       Q.   Are any of the studies that you're
23   referencing there, has the primary end point, though,
24   been safety in the study?

Page 131

1        A.   The safety -- the safety was evaluated on --
2    on Gynemesh.
3        Q.   Do you know what the name of that study was?
4        A.   Yes, yes.
5        Q.   There is another one over here too.
6        A.   Gynemesh.  Gynemesh on the -- okay.  So --
7    so on the -- to begin with the mesh, we have the
8    Flood, F-l-o-o-d, paper on the use of Marlex.
9        Q.   And what does that study show?
10       A.   That's for the anterior colporrhaphy
11   reinforced with Marlex mesh for treatment of
12   cystocele.
13       Q.   Is this one of the studies that shows it has
14   a primary end point of safety?
15       A.   It's not titled "safety," but they -- they
16   conclude on that study that this is safe to use.  And
17   then there's Nicita, Giulia.
18       Q.   How do you spell that?
19       A.   Giulia Nicita, N-i-c-i-t-a.
20       Q.   And what is that study?
21       A.   And it shows exactly applications in terms
22   of they were able to save -- to do it with safety.
23       So to be accurate to the response to your
24   question, there's no study that says safety of

Page 132

1    Gynemesh on -- or safety of Marlex in the use -- use
2    on -- for cystocele repair.
3        There's -- there are multiple studies -- I
4    can go on with the list -- that cites safety as one of
5    the -- of the things that they study.
6        Q.   So the point of this -- by the way, this is
7    not my question.  I never -- this question, to me,
8    never really gets me anywhere.
9        But the point is that all the studies that
10   have been done on any of these mesh products, the
11   number one end point is, is it effective; right?  Is
12   it effective and then, by the way, was it safe, too?
13       None of these studies is like number one
14   thing safety; right?
15       MR. SNELL:  Objection, overbroad.
16       A.   The -- there's even a better level of
17   evidence that speaks about safety and is when you
18   compare the use of any of these products with what
19   has -- with the -- with the safety profile when you
20   don't use the product.  And that's where the
21   randomized control trial comes into -- into play.
22       The randomized control trials has the
23   capability of evaluating something that I have use
24   without mesh and compare it with something with mesh.

Page 133

1    And that has been used -- that has been reported for
2    Gynemesh, it has been reported for Prolift, it has
3    been -- was reported for -- for TVT and TVT-O, and it
4    was so -- so consistently demonstrated that when it
5    came to Prosima, it became a cohort study.
6        Q.   (By Mr. De La Cerda)  Is it -- is it your
7    opinion that the studies show that any time that
8    mesh products have been compared to whatever the
9    alternative was, a non-mesh alternative, that the
10   mesh products have been shown to be safer than the
11   non-mesh alternative?
12       A.   It's -- it has been shown not to have
13   statistically significantly increased in the number of
14   complications or the frequency of these complications.
15       Q.   Right.  But that's a good point.  So it's
16   been shown to be as safe; right?  And really, the
17   differentiating factor is whether it's more effective;
18   is that fair?
19       A.   It has been shown to be as safe and in some
20   situations, it has been shown -- it has shown to be
21   even safer.
22       Take, for example, the use in the initial
23   study of Marcus Carey on mesh, on Prosima, and
24   straight -- and the known use of an implant.

34 (Pages 130 to 133)

Jaime Sepulveda, M.D.

Page 134

1    When you compare, you see that the three
2  patients that he had to operate for vaginal stenosis
3  were the ones that did not have a mesh. So there you
4  have an instance in which there was more complications
5  with -- by not using mesh than by using the mesh.
6    Is that directly related to the mesh? And
7  that's something that could be addressed with a
8  randomized control trial.
9    When we do sutures, suture repairs, and we
10  call them "native tissue repairs," in a randomized
11  control trial or even when we do a cohort of sutures,
12  we see complications on sutures in 36% of uterosacral
13  ligament suspension, we see suture complications in
14  sacrospinous ligament fixations, and when they're
15  compared with mesh, there is -- there is much less.
16    Q.  So on the issue of whether -- you know, the
17  FDA came out with an opinion about -- they actually
18  described that repairs with pelvic organ prolapse mesh
19  are no more effective and might be more dangerous than
20  the alternative non-mesh repairs; right?
21    MR. SNELL:  Objection to foundation.
22    A.  That -- that was the -- that was an opinion
23  that they came in, in the small panel, analyzing the
24  data, I don't know, for two, three days, but that's

Page 135

1  not -- I don't know for how many days they analyze it.
2  I don't even know what papers they consider.
3    But the preponderance of the evidence in the
4  randomized control trial is that it's not more
5  dangerous.
6    Q.  (By Mr. De La Cerda)  Okay.  So on that
7  particular -- I'm sorry.
8    A.  I apologize.  I'll just turn it off.
9    Q.  So on that particular issue, you disagree
10  with the FDA; right?
11    MR. SNELL:  Form, foundation.
12    I think that's misleading because there's
13  two different time periods, Counsel.
14    A.  I -- I disagree -- I disagree with -- with
15  the FDA opinion based on everything else that I review
16  and that I present on my report.
17    Q.  (By Mr. De La Cerda)  All right.  Let's
18  shift gears a little bit and talk some about this is
19  a TVT and TVT-O issue.
20    You're aware that the TVT and the TVT-O can
21  either be mechanically cut into its sling shape or
22  laser cut into its sling shape; right?
23    A.  It can -- the edges can be mechanically cut
24  or laser cut or personically cut.

Page 136

1    Q.  You're aware that Ethicon had evidence as
2  early as 2006 that after elongation, mechanically cut
3  mesh has a greater tendency than laser cut mesh to
4  degrade, lose particles, lose structure, rope, fray
5  and curl; right?
6    MR. SNELL:  Form.  Form, foundation.
7    Go ahead.
8    A.  What -- what I saw in a picture was an
9  uniaxial test done in a sling beyond the capabilities
10  of a sling and beyond any forces that could be placed
11  on a sling when used properly.
12    Q.  (By Mr. De La Cerda)  But you also saw in
13  those pictures that at least under those
14  circumstances, the mechanically cut mesh as compared
15  to the laser cut mesh had a tendency to lose
16  particles, lose structure, rope, fray and curl;
17  correct?
18    A.  They -- they show particles that we -- we
19  have seen over -- over time, not only on that, but
20  also in sutures.  They -- in a picture, I saw a
21  picture of it, and I saw the pictures of uniaxial
22  testing and I saw the communications about it, but
23  that's as much as I can say, I saw it.
24    Q.  And you know that that information was in

Page 137

1  the files of Ethicon at least as of 2006; right?
2    A.  I -- I don't know the time when the
3  information was.
4    Q.  Have you personally seen a TVT or TVT-O that
5  has lost particles, lost structure, roped, frayed or
6  curled in your practice?
7    A.  The only time that I have seen it stretch
8  like that is when I'm actually -- one that I was
9  removing that I put a lot of force into it.  That's --
10  that's a way much force that any patient could ever
11  generate with a sneeze or cough.
12    Q.  You mentioned the one patient that you had
13  that you're removing the sling where it's too tight?
14    A.  Right.
15    Q.  Is this the person you were talking about?
16    A.  That might be the same person; I cannot tell
17  you with certainty.
18    Q.  So when the mesh was placed too tightly, you
19  saw -- would you call that roping or what was it that
20  you actually saw?
21    A.  I -- I -- I started dissecting it and I saw
22  that she still had some -- and the only way I can -- I
23  can recall it is because I actually saw those pictures
24  yesterday in one of the -- of the slide sets.

35 (Pages 134 to 137)

Page 138

1 And all I could -- all I could see was that
2 I actually had to -- had to pull on it from inside,
3 normal attachment.  This was not roped, this was not
4 curled, this not -- there's no such thing that I could
5 describe in telling in general terms or in scientific
6 terms.  I -- this was one -- one anecdotal case in
7 which I -- that's the only one that looks like the
8 dimensions stretch -- stretch on that device.
9 Q.  So would your testimony be that you've never
10 seen a TVT or TVT-O mechanically cut, lose particles,
11 lose structure, rope, fray or curl in your own
12 practice?
13 A.  No, because it has a plastic sheath.
14 Q.  So you've never seen that yourself?
15 A.  No.
16 Q.  Should the mechanically cuts -- strike that.
17 Excuse me.
18 Should mechanically cut meshes tendency
19 to -- in comparison to laser cut mesh -- so should
20 that tendency to degrade, lose particles, lose
21 structure, rope, fray or curl be included in the IFU
22 for the TVT and TVT-O or no?
23 MR. SNELL:  Objection, foundation.
24 A.  I don't find a need to include that because

Page 139

1 that's something that has not been demonstrated
2 consistently.
3 Q.  (By Mr. De La Cerda)  Is that -- is that
4 your basis for that opinion or are there
5 additional -- is there additional information that
6 provides a basis for that opinion?
7 A.  I have not seen any scientific evidence that
8 the mesh curls or ropes or -- or -- or frays.  Nothing
9 that I can -- I can tell you that, okay, this is --
10 we -- we saw this observation on this patient and we
11 have reported it consistently or out of this number of
12 procedures that we did, this number actually showed
13 that.  And if it happened, what is -- how does that
14 translate into the clinical -- and I keep talking with
15 my hands because -- that will never get into the
16 deposition, but the -- on the -- I have not seen that
17 be reported or how that can translate into clinical --
18 into clinical behavior.
19 Q.  So on this issue, the basis for your opinion
20 is really the absence of information supporting this
21 information should be in the IFU; right?
22 A.  And the fact that there are multiple
23 randomized control trials well -- well-designed
24 control trials, surgical trials by good surgeons

Page 140

1 within groups that are well-respected within my
2 specialty, that have not describe, not in a single
3 time, not in any of these papers, that there is such a
4 thing happening.
5 Q.  If mechanically cut mesh's tendency in
6 comparison to laser cut mesh to degrade, lose
7 particles, lose structure, rope, fray and curl is
8 clinically significant or clinically relevant, should
9 it be included in the IFU for the TVT and TVT-O?
10 A.  It --
11 MR. SNELL:  Objection.  Hold on, give me a
12 minute.
13 Objection, improper hypothetical based on
14 the particle.
15 A.  It would have -- it would have to be
16 reported.  It would have to be reported by
17 something -- by something dependent by randomized
18 control trial.
19 If -- any attributes that being on any of
20 the polar sides of things -- things working at one
21 level or another in both sides of the spectrum needs
22 to be validated by scientific testing.
23 Q.  (By Mr. De La Cerda)  This is a question
24 that I'll have throughout several of these opinions.

Page 141

1 I want to make sure to say it in a way that you
2 would agree with, because I want you to define for
3 me what it would require for this information to
4 suddenly be required to be in the IFU.
5 And so what -- what would be required from
6 your perspective for the information about the
7 differences between a mechanically cut and laser cut
8 mesh on the issue of degradation, loss of particles,
9 loss of structure, roping, fraying, curling, what
10 would it take for that information to suddenly be
11 information that needs to be in the IFU?
12 MR. SNELL:  Objection, same objection as
13 before.
14 A.  To make it to the -- to the IFU, needs to be
15 something that is independent of -- of just -- just
16 the technique beyond what's described in the IFU.  If
17 you see something like a device or a suture breaking,
18 it needs -- the IFU should say, do not make it so
19 tight or place a spacer under the urethra in the case
20 of slings.  The IFU says that.
21 So -- so -- and the insertion of the needle
22 or the removal of the plastic sheath is being done,
23 there needs to be instructions in the IFU for the
24 appropriate placement.  So this -- this is not about

36 (Pages 138 to 141)

Jaime Sepulveda, M.D.

Page 142

1    saying this mesh curls or ropes or -- that's not --
2    that's not what the -- what I expect from IFU.  What I
3    expect is give me the proper technique so I don't put
4    this material to this extremes that would cause it to
5    behave this way.
6        Q.  (By Mr. De La Cerda)  So I understand
7    the -- first it would need to be independent of the
8    technique, but if the roping, fraying, curling, loss
9    of structure, if it's clinically relevant and
10   statistically significant, that would need to be in
11   the IFU; right?
12       MR. SNELL:  Objection, improper
13           hypothetical, vague.
14       A.  And to the -- and to the level that it would
15   say, okay, this is -- this is how it happens in the
16   clinical setting, not just in a machine.
17       Q.  (By Mr. De La Cerda)  And I guess that
18   would be encompassed though -- I mean, if it's
19   statistically significant through randomized control
20   trials -- let me think about that.  So it would need
21   to be shown through randomized control trials that
22   actually involve human implants, not just benched-up
23   testing or whatever it is in the lab; right?
24       A.  If you blind -- if you blind this study in a

Page 143

1    way that physicians don't know which type of mesh
2    they're -- they're using, you could -- that would be a
3    good start.
4        Q.  Okay.  Do you know if Ethicon ever performed
5    a test like that, where they compared laser cut mesh
6    versus mechanically cut mesh actually implanted in
7    women?
8        A.  I -- I don't see anyone placing any human
9    through the stress that a machine could do -- could do
10   that.
11       Q.  But Ethicon never performed a study like
12   that; right?
13       A.  I'm going to give you a better -- that was a
14   very unclear answer what I just gave you.
15       I don't see -- I don't see an implant being
16   stressed to the forces that could be done in uniaxial
17   testing.  Uniaxial testing doesn't always translate
18   into the behavior in the human body.
19       The IFU was good in addressing the area that
20   was most important on the urethra and the design was
21   good in addressing the placement and the -- and the
22   confirmation of the mesh with the minimum of the
23   formation.
24       Q.  But back to the question.  Ethicon never

Page 144

1    performed a study comparing mechanically cut mesh
2    versus laser cut mesh in -- actually in women; right?
3        A.  It's --
4        MR. SNELL:  Foundation.
5        Go ahead.
6        A.  It's -- I'm not aware of any study that was
7    performed like that, in that model.
8        Q.  (By Mr. De La Cerda)  If mechanically cut
9    mesh, TVT or TVT-O, loses particles when its
10   implanted in a woman, is there potential for those
11   lost particles to migrate into the woman's vaginal
12   wall and cause pain?
13       A.  That's a hypothesis.  It has never been
14   demonstrated.
15       Q.  Do you know if it's possible or no?
16       A.  It's medically -- it's medically --
17   medically possible, which is way below that within
18   the -- within the settings of certain medical
19   probability.
20       Q.  Okay.  Still on this mechanically cut versus
21   laser cut issue.  You agree that mesh -- that mesh and
22   polypropylene slings that is too stiff or rigid can
23   increase the risk of complications like erosion,
24   voiding dysfunction, and urethral obstruction; right?

Page 145

1        MR. SNELL:  Form.
2        A.  No -- no study has been able to corroborate
3    that.
4        Q.  (By Mr. De La Cerda)  So would you
5    disagree with that statement?
6        A.  I -- I would disagree to that statement
7    based on the fact that there's no evidence confirming
8    it.
9        Q.  You know that in 2004, Ethicon tested laser
10   cut mesh and found it to be more rigid or stiffer than
11   mechanically cut mesh; right?
12       A.  Regardless of the findings that Ethicon may
13   have found, I'm not aware that they found one way or
14   the other, and with all the research, it would not
15   surprise me that they may have found one way or the
16   other.  The question is if that has any -- any
17   translation to clinical symptoms and the ans- -- of is
18   the ones you described, and my answer to that is no
19   evidence of it.
20       Q.  Okay.  So that leads to the next question
21   and this is a question I'm going to have with all
22   these opinions, but should laser cut mesh's greater
23   stiffness or rigidity in comparison to mechanically
24   cut mesh be included in the IFUs for the TVT and

Jaime Sepulveda, M.D.

Page 146

1  TVT-O?
2      MR. SNELL:  Objection, lacks foundation.
3      A.  No -- no -- there's no evidence that it
4  could work one way or the other.  Why would they
5  include it in the IFU?
6      Q.  (By Mr. De La Cerda)  Okay.  So let's talk
7  about the bases for why it doesn't need to be
8  included in the IFU.  What is your basis for that?
9      A.  It's a -- the use of a laser cut or
10  mechanical cut meshes do not translate into your
11  procedure being performed any differently and they --
12  with laser cut or without or with mechanical cut, what
13  you need to be aware is not to place a sling under
14  excessive tension, which is something that we have
15  learned even before there was mesh, not to place a
16  sling under excessive tension, follow good surgical
17  principles.  And if there was any question about that,
18  then doctors could have -- could have requested to be
19  trained on it, but I would not include something on
20  the IFU that would just confuse the issue on how to --
21  how to perform the procedure.
22      Q.  Okay.  If laser cut mesh has greater
23  stiffness or rigidity in comparison to mechanically
24  cut mesh, is clinically relative and statistically

Page 147

1  significant, should it be included in the IFUs for the
2  TVT and TVT-O?
3      MR. SNELL:  Objection, lacks foundation,
4  improper hypothetical.
5      A.  There's -- there's no correlate it
6  clinically.  So my answer to that is no, I would not
7  expect them to write in the IFU.
8      Q.  (By Mr. De La Cerda)  So this is a
9  hypothetical.  I'm saying assume that it's
10  discovered to be clinically relevant and
11  statistically significant, under those circumstances
12  would it then be proper to put it in the IFU?
13      MR. SNELL:  Same objection.
14      A.  If it's clinically -- clinically relevant or
15  statistically significant, then it may have been
16  included on the IFU if it pertains to the performance
17  of the procedure.
18      Q.  (By Mr. De La Cerda)  Now, you're aware
19  that -- you know Ulmsten is the original -- one of
20  the original inventors of the TVT; right?
21      A.  Yes.
22      Q.  You know a couple of the guys that studied
23  TVT with him were Nilsson and Falconer, you remember
24  those names being mentioned in the studies?

Page 148

1      A.  Yes.
2      Q.  And you're aware that Nilsson and Falconer
3  opposed the use of laser cut mesh because it did not
4  have the same stretch profile of mechanically cut
5  mesh.  Are you aware of that?
6      MR. SNELL:  Form.
7      Go ahead.
8      A.  I am not aware of their internal
9  conversations about it.
10      Q.  (By Mr. De La Cerda)  And does that have
11  any effect on your opinion one way or the other?
12      A.  It doesn't.  Whatever -- whatever
13  interaction they had, I would consider just a healthy
14  scientific exercise, but until there's data supporting
15  its use and there's data showing that there is a
16  difference in performance, there is no need to make a
17  difference -- to make a different recommendation.
18      Q.  What is the proper way to tension the TVT
19  device?
20      A.  It's -- it's to do it tension-free and
21  tension-free means that there is preservation of the
22  width of the sling up to 75 percent.
23      Q.  I think I missed something.  What did you
24  mean -- can you explain that again?

Page 149

1      A.  By the time that I finish doing my
2  procedure, the width on my TVT needs to be at least
3  1.1 -- at least 75 percent of 1.1-centimeter, that's
4  not just with TVT --
5      Q.  Okay.
6      A.  -- that's with any sling that I may place.
7      Q.  Where is that information in the IFU?
8      A.  That's not going to be in the IFU because
9  that's an observation of Jaime Sepulveda.
10      Q.  Do you believe that Ethicon is responsible
11  to tell physicians how to properly tension the TVT?
12      A.  There's -- there's -- there's information on
13  the IFU about not overtensioning.
14      Q.  There's information about that, but is there
15  information, like an exact measurement on how to
16  tension?  For example, I liked your example of
17  75 percent of 1.1 centimeters.
18      Does Ethicon have a responsibility to
19  communicate to physicians an exact way in tensioning
20  the TVT?
21      MR. SNELL:  Form.
22      A.  I think that Ethicon make every possible
23  effort through their -- through their education
24  programs to -- to emphasize good practices in doing a

38 (Pages 146 to 149)

Jaime Sepulveda, M.D.

Page 150

1  sling.  Ethicon is not re-inventing our technique to
2  do a continence procedure.
3      Q.  (By Mr. De La Cerda)  When you taught on
4  behalf of Ethicon regarding slings, did you discuss
5  this issue of the 75 percent of 1.1 centimeters
6  indicating proper tensioning?
7      A.  That's a concept that we all have -- have --
8  we, as surgeons, we know we don't want to bring it
9  tighter than that.  But we learned that with the
10  pubourethral slings.
11     Q.  Okay.  So are you saying no, you didn't
12  personally discuss that issue or because everyone
13  already knew it anyway?
14     A.  Right.  This is -- this is a common surgical
15  knowledge, which Ethicon may or may not have known.  I
16  don't know if they -- if they knew it.  This is just a
17  personal observation.
18     Q.  So you believe that Ethicon properly
19  instructs physicians on how to tension the TVT; right?
20     A.  They -- they cover that in the IFU.
21     Q.  Do you agree that the strongest unmet need
22  with the TVT is the ability to adjust tension both
23  intraoperatively and post-operatively?
24     MR. SNELL:  Form.

Page 151

1      A.  Well, there's no -- no way to assess
2  post-operatively.  You're going to close and there's
3  no -- no study that says how you're going to tension
4  it.  We try to make an inference with biomechanics.
5      Q.  (By Mr. De La Cerda)  But do you agree
6  with that statement?  That the strongest unmet need
7  of the TVT's ability to adjust tension both
8  intraoperatively or post-operatively, do you agree
9  or disagree with that statement?
10     A.  I --
11     MR. SNELL:  Form.
12     Go ahead.
13     A.  I would agree to an extent, but it's so --
14  so vague that I cannot tell you that I agree
15  completely with it.
16     Q.  (By Mr. De La Cerda)  Do you agree that
17  the mesh and TVT may be too wide?
18     MR. SNELL:  Form.
19     A.  I don't -- no, I think it has shown to be of
20  the -- of the right -- of the right width to work
21  clinically.
22     Q.  (By Mr. De La Cerda)  Do you agree that
23  there is no calibration to let you know when you
24  have the tension right?

Page 152

1      A.  That's -- that's part of the art of surgery
2  that I described before.
3      Q.  So you do agree with that; right?
4      A.  Repeat that.
5      Q.  So do you agree with, quote, there is no
6  calibration to let you know when you have the tension
7  right, close quote?
8      A.  No, we know -- we know when the tension is
9  right.  We have experience -- enough experience to
10  know when the tension is right.
11         It's extremely subjective, but I can tell
12  you if you, at the end of your surgery, you see that
13  width that goes underneath, that width that has been
14  shown study after study, that effective, if you
15  know that is not the width you have at the end of your
16  surgery, you overtensioned it.
17     Q.  But there's not like a general calibration
18  for that; right?  Or is there?  I mean, is the general
19  calibration the 75 percent of 1.1 centimeters, is that
20  the general calibration for everybody or no?
21     MR. SNELL:  Form.
22     A.  It's a visual inspection.
23     Q.  (By Mr. De La Cerda)  So is that a yes?
24     MR. SNELL:  Objection, asked and answered.

Page 153

1      A.  Yeah, that's a general calibration that is
2  been used -- I'm sorry, Burt.
3      MR. SNELL:  I said, objection, asked and
4  answered.
5      Go ahead and answer it.
6      Q.  (By Mr. De La Cerda)  Do you agree that
7  there is no -- quote, there is no consensus on the
8  amount of tension needed and many feel that the
9  tension will vary based on patient presentation and
10  patient anatomy?  Do you agree with that?
11     MR. SNELL:  Form.
12     A.  It's -- I would have to agree that it
13  changes from patient to patient and that's one of the
14  biggest challenges not only in this proceeding, any
15  surgery.
16     Q.  (By Mr. De La Cerda)  Are you going to
17  offer the opinion that tensioning of the TVT sling
18  is the same regardless of whether the sling is made
19  of mechanically cut mesh or laser cut mesh?
20     A.  You're going to visually see at the end of
21  your procedure and you know if you tensioned it right
22  when you look at it.
23     Q.  So tensioning might change as long as the
24  width that you're looking for is correct?

39 (Pages 150 to 153)

Jaime Sepulveda, M.D.

Page 154

1    A.  I just say visually see.  I don't know how
2  another way you're going to see if it's not visually.
3    Q.  Right.
4    A.  But it's -- what I -- my opinion is that
5  once you -- once you place a sling, that being laser
6  cut or mechanically cut, at the end of your procedure,
7  that sling needs to look the way -- in a way that it
8  covers the mid urethra to an extent of at least .75 to
9  1-centimeter.
10    Q.  Do you agree that a responsible medical
11  device company would determine the proper way to place
12  a device before putting that product on the market?
13        MR. SNELL:  Form.
14    A.  They -- they have no way -- we have no way
15  to -- to -- to communicate that to each other.  That
16  is -- that is the hard part of surgery.
17        I think that when they say, "Do not
18  overtension it," and when they say, "You need to have
19  experience in continence procedures," and when they
20  say, "This is not a comprehensive guide for continence
21  care," I think that's accurate and fair and as a
22  surgeon you understand that.
23    Q.  (By Mr. De La Cerda)  And so this question
24  is really more of a general proposition, though.

Page 155

1  Would you agree that a responsible medical device
2  company would determine the proper way to place a
3  device before putting that product on the market?
4        MR. SNELL:  Same objection, asked and
5  answered.
6    A.  That's where -- that's where all the studies
7  with cadavers come in.
8    Q.  (By Mr. De La Cerda)  So the answer is
9  yes; right?
10    A.  Yes, the device company does that.
11    Q.  Okay.  Shifting gears to a new issue.
12        Before I do that, are you okay?  Do you want
13  to take a break at all?
14    A.  No, I'm okay, if you guys are okay.
15        MR. SNELL:  What time are we going to have
16  lunch?
17        MR. DE LA CERDA:  Yeah, it's almost noon.
18  Do you want to do it now.
19        MR. SNELL:  If he's fine, I'm fine.
20        (Thereupon, a recess was taken from
21  11:47 a.m. until 12:00 p.m., after which the
22  following proceedings were held:)
23    Q.  (By Mr. De La Cerda)  So we're back on the
24  record.

Page 156

1        There's a fault question on -- earlier we
2  discussed your work as a consultant for Ethicon and we
3  briefly discussed what you estimated to be what you
4  had received from Ethicon in compensation for that.
5        In another case, the Raviola case, which you
6  may recall, there was actually a production of the
7  payments and it was produced in a -- hard copy --
8  and this question is probably really for Burt.
9        MR. DE LA CERDA:  If I forward that to you,
10  can you send that to us in like an Excel or
11  whatever it originally came in because the print
12  is tiny?
13        MR. SNELL:  Okay.  Yeah, I mean -- well, I
14  can do my best.
15        MR. DE LA CERDA:  Okay.
16        MR. SNELL:  I've been trying to send
17  e-mails.  My e-mail is not working.  It's not
18  letting me send stuff.  I have something
19  important to send.  It's not related to this
20  deposition.  I've been trying all morning.  Is
21  the Internet --
22        MR. DE LA CERDA:  It's coming off and on for
23  me.
24        I'm forwarding this to you and then if we

Page 157

1  can get the native version.  It looks like it was
2  an Excel that was then printed off, but the type
3  on it is really small and then that will
4  provide -- this is what Ethicon shows its records
5  of payments and then that can kind of settle that
6  issue.
7        THE WITNESS:  Yeah, it was actually
8  presented on the Cavness trial.
9        MR. DE LA CERDA:  Oh, okay.
10        THE WITNESS:  It was in very small -- very
11  small letters.
12        MR. DE LA CERDA:  Okay.
13        THE WITNESS:  And just as clarifying that
14  number, what was allocated to pay me, not actual
15  payments.
16        MR. DE LA CERDA:  Okay.  So we'll have to
17  clear that up, but if, Burt, you can take a look
18  at getting us that version, thanks.
19    Q.  (By Mr. De La Cerda)  Okay.  All right.
20  The issues that I'm about to discuss will relate to
21  TVT, TVT-O, Gynemesh, Prolift and Prosima, so I'm
22  going to do it all at once.
23        First, you're aware that the TVT and TVT-O
24  are made of Prolene mesh, which is constructed of

40  (Pages 154 to 157)

Jaime Sepulveda, M.D.

Page 158

1    knitted filaments of extruded polypropylene strands,
2    identical in composition to that used in Prolene
3    polypropylene nonabsorbable surgical suture; correct?
4        A.   I agree with that.
5        Q.   You're also aware that the mesh in Gynemesh,
6    Prolift, and Prosima is Prolene Soft, which is also
7    constructed of knitted filaments of extruded
8    polypropylene identical in composition to Prolene
9    polypropylene suture; correct?
10       A.   To a -- to a -- identical in composition,
11   yes.
12       Q.   And the IFUs for the TVT, the TVT-O,
13   Gynemesh, Prolift and Prosima all characterize Prolene
14   as inert; correct?
15       A.   They -- they characterize it as that word
16   inert, yeah.
17       Q.   They state: "This material, when used as a
18   suture, has reported to be nonreactive and retain its
19   strength indefinitely in clinical use"; right?
20       A.   I -- I'm aware of that statement, yes.
21       Q.   They also -- the IFUs for those products
22   also state: "The material is not absorbed nor is it
23   subject to degradation or weakening by the action of
24   tissues enzymes"; right?

Page 159

1        A.   That's a statement on the IFU.
2        Q.   The mesh in these products not being -- or
3    strike that.
4            The mesh in these products being nonreactive
5    or inert or not subject to degradation, that's a
6    property or those are properties that are desirable
7    for an implant designed for a human body; right?
8        MR. SNELL:  Form, overbroad.
9        A.   That -- that is -- that is a characteristic
10   that we did not see in other types of materials and
11   that we're pursuing when we placed those sutures.
12       Q.   (By Mr. De La Cerda)  Okay.  Why would you
13   want a human -- an implant designed to be implanted
14   in humans to be inert or nonreactive or not subject
15   to degradation?
16       MR. SNELL:  Objection, overbroad.
17       Go ahead.
18       A.   The degradation has to -- has to do with --
19   the way we interpret degradation has to do with
20   absorbables or partially absorbable sutures.
21           The way that non- -- nonreactive means that
22   there's no reaction to hydrolysis.
23           And the way that it was described as non- --
24   nondegraded is it was that there was no loss on the

Page 160

1    strength of the suture on testing that was done before
2    placing it on a patient.
3        Q.   (By Mr. De La Cerda)  Okay.  So why would
4    it be desirable for a human implant to have those
5    characteristics that it doesn't degrade, that it's
6    inert, that it's nonreactive?
7        MR. SNELL:  Same objection.
8        Go ahead.
9        A.   It is -- it translates, theoretically, on
10   the durability of the repair.
11       Q.   (By Mr. De La Cerda)  Because these mesh
12   implants are intended to be permanent implants;
13   correct?
14       A.   They're intended to -- to last a lifetime if
15   you can make it interact in a way that it can last a
16   lifetime.  In other words, if the host doesn't change,
17   you'll want that implant to work and give you
18   durability.
19       Q.   Now you're aware that as early at 1987,
20   Ethicon had evidence of degradation of Prolene in the
21   human body; correct?
22       A.   I -- I don't believe that they call it
23   degradation in the sense that we interpret
24   degradation.  There's -- there's degradation from the

Page 161

1    biomechanical point of view and there's degradation
2    from what we see in normal life of degradation.
3        Q.   Okay.  So what is it that you believe that
4    Ethicon saw in terms of degradation in 1987?
5        A.   Well, what they saw -- what they saw is
6    purely a microscopic study.  If there will be
7    degradation, there will be a significant impact on the
8    durability of the effect of the sling or in the
9    durability of the repair.
10       Q.   In the context of safety, though -- strike
11   that.
12           If Prolene has a tendency to degrade in a
13   human body, would that indicate that it's not inert?
14       MR. SNELL:  Form, improper hypothetical.
15       A.   If it would degrade, it would dissolve.  And
16   if it would dissolve, it would just lose all its
17   effect.  So whatever -- whatever conclusion is met of
18   degradation is on hypothetical grounds and not based
19   on the evidence that we have.
20       Q.   (By Mr. De La Cerda)  What evidence are
21   you referencing?
22       A.   The durability of a procedure for
23   incontinence on prolapse.
24       (Brief interruption and off the record discussion.)

41 (Pages 158 to 161)

Jaime Sepulveda, M.D.

Page 162

1    Q. I can't remember if you were finished with
2  your response. If you could read it back.
3        (The requested portion of the record was
4        read back by the reporter.)
5    A. Let me clarify this. The reason why I
6  generalize it on incontinence on prolapse is because
7  we're talking about more than one product here.
8    Q. (By Mr. De La Cerda) Yes, yes.
9        And all these products have, within their
10 mesh -- one mesh is called regular Prolene or just
11 Prolene and the other one is called Prolene Soft, but
12 both meshes are made of essentially woven Prolene
13 suture. It's the same material as Prolene; right?
14    MR. SNELL: Objection.
15    A. No, it's not woven.
16    Q. (By Mr. De La Cerda) How is it made then?
17    A. It's knitted.
18    Q. Knitted, okay.
19        But it's all made of knitted polypropylene
20 that's identical in composition to Prolene; correct?
21    A. It's knitted -- it's knitted extruded
22 polypropylene.
23    Q. It's identical in composition to Prolene
24 suture; right?

Page 163

1    A. It is -- it has been shown to have the same
2  level of crystallinity as Prolene suture.
3    Q. If there were findings as to Prolene suture,
4  would those findings, the characteristics of Prolene
5  suture, have relevance to meshes that are also made of
6  extruded polypropylene that's identical in composition
7  to Prolene suture?
8    MR. SNELL: Form, vague.
9    A. I did not get that one. Sorry.
10        (The requested portion of the record was
11        read back by the reporter.)
12    A. As it pertains to composition, the evidence
13 shows that TVT-O and Prolene sutures, that's the
14 extent of the evidence, has -- has the same
15 crystallinity. When we define crystallinity, is the
16 most accurate way to evaluate that one material is
17 like the other.
18    Q. (By Mr. De La Cerda) Well, what I'm
19 saying, though, is if there is a finding about a
20 characteristic of Prolene sutures like, for example,
21 degradation, if Prolene sutures degrade in the human
22 body, can we also say or is that evidence of that
23 Prolene mesh would also degrade in the human body?
24    MR. SNELL: Form.

Page 164

1    A. And there is -- first of all, there is
2  more -- there are three -- there are three parts to
3  that question. The first one is the concept of
4  degradation. And if Prolene would degrade, all the
5  Burches that we did with polypropylene would
6  eventually fail. And all the -- and most of the
7  slings that we did with polypropylene would eventually
8  fail clinically.
9        And we know that the evidence points out
10 that that's -- that's not the case. That's the first
11 part of degradation.
12        Number two is polypropylene, the way it
13 defines degradation on a dog or in a rabbit or in a
14 Himalayan or a Wistar rat or a Himalayan -- Himalayan
15 rabbit, the way it's defined cannot be translated
16 to -- to a -- to a person because they're completely
17 different hosts and the stresses that are placed on --
18 on those implants are completely different.
19        The immunologic reaction is different and
20 the cellular level is different, cellular findings are
21 different. And, finally, is the concept that -- that
22 Prolene and -- would -- would degrade and create
23 anything beyond what the sling would create. No, they
24 stay -- they're both exactly the same, the same. Not

Page 165

1  exactly, but they're both very similar implants.
2        So those are the three -- three aspects to
3  your question, and I know it's an extremely elaborate
4  answer for probably a much more straightforward
5  question. But there's -- the concept of degradation,
6  I would have to accept that concept to agree with
7  your -- with what you just presented.
8    Q. (By Mr. De La Cerda) I think step one is
9  we need to define what we're talking about by
10 degradation.
11        We know that in 1987 there was a study done
12 by Ethicon on explanted Prolene suture from humans;
13 right?
14    A. On explanted and not -- I believe it's from
15 the dog study.
16    Q. There is one of humans, too. Have you seen
17 that one?
18    A. No, I haven't -- haven't. I'm not aware of
19 that one.
20    Q. Okay. If there's a study from 1987 on --
21 and these are Prolene sutures explanted from humans,
22 if those show the cracking and degrading that's
23 indicative of degraded polypropylene, that's the kind
24 of degradation that I'm talking about.

42 (Pages 162 to 165)

Jaime Sepulveda, M.D.

Page 166

1    A.  Are you referring to the eye study?
2    Q.  I'm sorry?
3    A.  To the eye study.  Are you referring to the
4    polypropylene being removed from the eye?
5    Q.  Vascular -- I believe they were implanted in
6    the heart.  Unfortunately, I didn't bring that study
7    with me.  I assumed you would already be aware of it.
8         My understanding is they were explanted from
9    the hearts of the patients.  They were Prolene sutures
10   explanted from the heart of human patients.
11        Are you aware of that one?
12   A.  No, I'm not aware.  I know there is a study
13   on blood vessels and I know that there is a study
14   of -- on the eye and I know about the dog study.
15   Q.  Okay.
16        MR. SNELL:  For clarification purposes, you
17        have -- maybe if you knew -- I can tell you -- I
18        know what the name of it is.  I mean, if that
19        would ring a bell with him.
20        MR. DE LA CERDA:  Professor --
21        MR. SNELL:  Gudion, blood vessels.
22        THE COURT REPORTER:  Can you spell that one?
23        MR. DE LA CERDA:  I think it's G-u-d-o-i-n
24   or something like that.  That's the professor's

Page 167

1    last name.
2    Q.  (By Mr. De La Cerda)  Does that ring a
3    bell?
4    A.  It's -- I am -- I read that.  I do recall
5    reading it and I do recall that it was a very thin
6    polypropylene suture that was hand tied, but
7    there's -- I don't know how that translate to
8    degradation.
9    Q.  (By Mr. De La Cerda)  Okay.  So the
10   finding in that study was at the surface, that there
11   was cracking on the surface of the suture; right?
12   And that when they tested the material from the
13   cracking, that it was indicative of oxidative
14   degradation to polypropylene; right?
15        MR. SNELL:  I'm going to object on
16        foundation.
17        Go ahead.
18   A.  I cannot confirm that, no.
19   Q.  (By Mr. De La Cerda)  Okay.  Well, what
20   I'm trying to do is define the degradation I'm
21   talking about.  And I think this is even in the
22   studies that discuss it, degradation, and there have
23   been in the studies discussion of the surface of
24   polypropylene has some sort of cracking that's going

Page 168

1    on and when they look at that cracking, it's
2    believed to be polypropylene that's cracking and
3    degrading.
4         Now you've seen studies that have discussed
5    that issue; right?
6    A.  I'm -- I'm aware of the paper by Clavé.
7    Q.  Okay.
8    A.  By one of the Clavés, by the way, not --
9    Q.  Is there a brother, like an evil twin?
10   A.  So I am aware of that paper and in that same
11   paper they cite the UV -- ultraviolet degradation, but
12   I am also aware that that paper was about normal
13   samples.
14        I'm also aware that the number of
15   low-density polypropylene study was less than -- I
16   believe it was a quarter of the sample and -- I don't
17   have to believe it, I actually have it here.
18   Q.  You're welcome to pull out anything you'd
19   like to review.
20        What I'm trying to get at -- I'm just trying
21   to get us to agree at least on a definition of
22   degradation that I'm going to ask you about.  And what
23   I'm trying to say is that's the version of degradation
24   I'd like to ask you about.

Page 169

1         Now, I know you're already going to tell me
2    that's not clinically significant.  I know you're
3    going to tell me it's not going to matter.  I know
4    that.  What I'm trying to first get is let's get an
5    agreement on that's the degradation I'm talking about
6    and then we can go through the -- to kind of finish up
7    the questions because you'll end up telling me that it
8    doesn't need to be in the IFU.
9         So focusing, first, on the degradation, the
10   version that I'm talking about is the cracking, the
11   surface cracking that happens of the polypropylene
12   that's at least been seen and reported on in some of
13   the studies.  Is that version of degradation, is that
14   clinically significant or clinically relevant such
15   that it needs to be in the IFU for the TVT, TVT-O,
16   Gynemesh, Prolift and Prosima?
17        MR. SNELL:  Objection, lacks foundation.
18        Go ahead.
19   A.  The way it stands right now, with the
20   studies that I have seen, specifically the ones on --
21   in general polypropylene -- the ones on the eye, I
22   believe I saw that.  The way it stands right now, that
23   type of degradation has not been shown on the -- on
24   actual samples of slings.  It has been shown in

43 (Pages 166 to 169)

Jaime Sepulveda, M.D.

Page 170

1  abnormal samples, not in slings that work or come --
2  or have the clinical results that we have seen on
3  reports and it have -- it have not been shown in
4  any -- any studies having a clinical impact.
5      Q.  (By Mr. De La Cerda)  Okay.  What do you
6  mean by "abnormal slings"?
7      A.  If there is a sling that has an exposure,
8  and especially slings that are exposed to a surface,
9  then that will be abnormal sample.
10     Q.  Okay.  Exposed to what kind of surface?
11     A.  To the vagina or the bladder or the bowel.
12     Q.  Okay.  So is there something that's
13  happening during that exposure that -- that your
14  belief is causing this phenomenon of degradation?
15         MR. SNELL:  Objection.  Hold on.
16     Misstates -- I don't think he testified, Counsel,
17     that he believes in degradation.  I think you're
18     taking what he said -- I think you're misstating
19     his answer.
20         Go ahead.
21     A.  The -- what we see in abnormal slings is
22  that a biofilm is created and this biofilm is -- has
23  been seen in catheters, it has been seen in IUDs, it
24  has been seen in other implants that are exposed to

Page 171

1  air.
2      Q.  (By Mr. De La Cerda)  Okay.  So is that --
3  is that your explanation of what you believe is
4  actually being seen when we see this cracking?
5      A.  That -- that is -- that is actually what --
6  what I see, the only correlation that I can put
7  together with the cracking.
8         There's no other explanation based on what I
9  know and what I have researched that mechanical stress
10  retrieval or a biofilm.
11     Q.  Okay.  We know -- well, you know that raw
12  polypropylene without any antioxidants would degrade
13  in the human body.  Do you know that or no?  Or do you
14  believe that or no?
15     A.  No, there's no evidence that there's
16  degradation.
17     Q.  Okay.  Do strong oxidizers like peroxide, do
18  those affect raw polypropylene or no?
19     A.  The only report that I was able to find on
20  it was in containers, which is different from this --
21  it's the same hydrocarbon, but different containers on
22  a surface outside.
23     Q.  Okay.
24     A.  Actual containers that were used for

Page 172

1  storage.  This is completely different from -- from
2  what is used in slings in prolapse.  So there's --
3  it's a hypothesis.  That's probably upgrading it to a
4  hypothesis.
5      Q.  Ultimately you believe, though, that the
6  cracking that's seen when the studies are discussing
7  degradation is really a biofilm and not the
8  polypropylene itself; right?
9      A.  I -- I don't know if it's the biofilm or
10  it's a matter of technique or if it's a stressor that
11  was placed on the sample on retrieval.  We -- we don't
12  know that.  And most -- most importantly, we know that
13  probably any -- regardless of the reason why it
14  happens, it doesn't translate in any physical outcome,
15  in a clinical significant outcome.
16     Q.  What about the erosions, though?  So you
17  mentioned that they were abnormal meshes that had
18  eroded and were exposed to air, isn't the fact there
19  is an erosion, isn't that some sort of clinical --
20  clinically significant event?
21         MR. SNELL:  Form.
22     A.  No, the exposed segment of the sling doesn't
23  mean that it eroded.  The most frequently -- the
24  most -- normally, the most frequent reason why you see

Page 173

1  an exposed sling or a mesh is because there's a bone
2  healing that -- the dehiscence of the wound, there is
3  a dehiscence of the wound, there is a disorder of the
4  wound healing.
5         So we have seen disorders of wound healing
6  in patients that have prolapse even before we place --
7  we replace it, and we actually have seen it with
8  sutures.  Not only with polypropylene sutures, we have
9  seen it with polyester sutures, specifically, and we
10  have seen it with GORE-TEX sutures.
11         And there's actual clinical evidence that
12  shows these abnormal wound healing occurring on the
13  presence of these sutures, and also with native
14  tissue.  So this is not that the sling work itself
15  around and erode.  This is an incision that has been
16  open.
17     Q.  (By Mr. De La Cerda)  And is there any --
18  and what's responsible for the poor wound healing or
19  the wound healing issue?
20     A.  There are a variety of factors.  These are
21  defects in the fibromuscular layer, specifically, as I
22  place -- as I wrote in my report, loss of tensile
23  strength in the abdominal sutures that put the wound
24  together.

44  (Pages 170 to 173)

Jaime Sepulveda, M.D.

Page 174

1    Number two, there are mechanical factors.
2    Number three, there are actual wound-healing
3  factors, such as immune disorders, poor tissue
4  healing, cigarette smoking, and finally hematomas,
5  just to mention a few.
6    And these conditions may predispose a wound
7  to open and expose the graft. It may predispose the
8  wound not to heal properly over a suture and it may
9  predispose the wound not to heal properly just over
10  native tissue.
11    Q. Have you -- are you aware of an exposure and
12  erosion ever happening not related to a wound healing
13  issue?
14    A. No, that's -- that's -- is a problem of
15  wound healing.
16    Q. And that's it?
17    A. And that's what I see consistently.
18    Q. But it's your belief that that's the only
19  reason why there might be an exposure or erosion is
20  because of wound healing; right?
21    A. It is the most viable factor of the three
22  fact- -- of the three -- of the interaction between a
23  graft on a host, is the most viable factor is the
24  host. And the -- the sling's consistent. Or the --

Page 175

1  or the polypropylene is a consistent material. And
2  there's obviously the third one, which is the
3  insertion, the technique, but if you really look at
4  technique being constant, it's always a wound healing
5  issue.
6    Q. So one of the problems could be the doctor's
7  fault, the other problem could be the patient's fault
8  because of their body and their wound healing, but
9  third issue can't be the implant because it is what it
10  is and it's --
11    A. I would not simplify just with it being a
12  fault. We -- this is not -- these are not issues that
13  are just -- that just happened with -- with mesh.
14  We -- we know that these issues go way -- for any
15  prosthetic material, way back before any prosthetic
16  material. We know that these issues happen with
17  polyester sutures in uterosacral ligament suspensions.
18  We know that there are instances in which there has
19  been no mesh, there being a suture and the suture had
20  to be removed. And we know there are instances in
21  which we don't use a mesh at all and that incision
22  opens up. The most viable aspect is the host.
23  There's definitely a variation on the insertion
24  technique and I think that by now we all have evidence

Page 176

1  that those with the most experience have the lowest
2  rate of -- lowest rate of problems. Not only this
3  surgery, any other surgery, but the most consistent
4  part is the prosthesis, the polypropylene.
5    Q. Do you believe that mesh degrading or
6  breaking down can lead to an erosion or exposure or
7  no?
8    MR. SNELL: Foundation.
9    A. There's -- there's no evidence that that's
10  the case.
11    Q. (By Mr. De La Cerda) Do you believe that
12  polypropylene can become brittle?
13    A. How -- how do we define brittle?
14    Q. That's a good question.
15    A. You're going to probably --
16    Q. What's your understanding of the term
17  "brittle"?
18    A. Brittle is weak. Brittle could be friable.
19  Decreased tensile strength to put it in exact terms.
20    Q. So using that explanation of what brittle
21  means to you, do you believe that polypropylene can
22  become brittle?
23    A. No.
24    Q. Okay. So now let's get to the question

Page 177

1  about your opinion. Should Prolene's tendency to
2  degrade in the human body be included in the IFUs for
3  the TVT, TVT-O, Gynemesh, Prolift and Prosima?
4    MR. SNELL: Lacks foundation, misstates,
5    opinion testimony.
6    A. There's -- there's nothing to place the
7  result of degradation.
8    Q. (By Mr. De La Cerda) And your basis for
9  that opinion is what?
10    MR. SNELL: Asked and answered.
11    A. That degradation has not been defined in a
12  reproducible scientific way to have -- to be present
13  or, if present, to have any consequences in clinical
14  outcomes.
15    MR. DE LA CERDA: All right. I think that's
16    a good break point. It's 12:30.
17    (Thereupon, a lunch recess was taken from
18    12:30 p.m. until 1:20 p.m., after which the
19    following proceedings were held:).
20    Q. (By Mr. De La Cerda) All right. Doctor,
21  we're back on the record. There is one question I
22  wanted to ask you on the degradation issue.
23    If Prolene's tendency to degrade the human
24  body is clinically significant, clinically relevant

45 (Pages 174 to 177)

Jaime Sepulveda, M.D.

| Page 178 | Page 180 |
|---|---|
| 1 and statistically significant, should that information<br>2 be included in the IFUs for the TVT, TVT-O, Gynemesh,<br>3 Prolift and Prosima?<br>4      MR. SNELL: Objection, foundation, form.<br>5      Go ahead.<br>6    A. Any -- any significant clinical response<br>7 that deviates from what's reported in randomized<br>8 control trials should be -- should be a matter of<br>9 addressing it, regardless if there is a degradation<br>10 there underneath or not. And there -- there are<br>11 systems in place that allows for that reporting, more<br>12 than one system, actually.<br>13    Q. (By Mr. De La Cerda) So any risk or<br>14 complication that's clinically significant,<br>15 clinically relevant and statistically significant,<br>16 any risk or complication that's like that should be<br>17 included in the IFU, do you agree with that?<br>18      MR. SNELL: Form, foundation, misstates.<br>19    A. If there's -- anything that is clinically<br>20 significant, statistically significant, let's say we<br>21 have a voiding dysfunction that is higher than would<br>22 happen with a Burch procedure, if we have pain, any<br>23 type of an incidence of urge incontinence or urge<br>24 incontinence, incidents of any -- that should be | 1 elution method showed cell lysis and toxicity;<br>2 correct?<br>3    A. There was one other place, and I was able to<br>4 see that on company documents. There was one other<br>5 place in which they saw that there was a little<br>6 cytotoxicity, but when it was -- it could never be<br>7 reproduced, actually, when it was redone in the<br>8 agarose, in the agarose form, there was -- in the<br>9 agarose overlay method, it was not -- it was not<br>10 cytotoxicity.<br>11     And this is significant because the -- when<br>12 you do a drug elution test, essentially, you're<br>13 immersing the cells on a pool of this -- of this<br>14 polypropylene. It will be -- it's a huge amount.<br>15 It's an amount that you, on purpose, make it -- make<br>16 it toxic. The toxicity -- the toxicity is -- is<br>17 supposed to affect a lot more than this.<br>18     One of the biggest drawbacks of cytotoxicity<br>19 assays is that you cannot have a positive control. So<br>20 when you put agarose on it, you neutralize and you<br>21 make it more real. You neutralize it and make it more<br>22 real.<br>23    Q. In one of those two testing methods<br>24 cytotoxicity was shown; right? |

| Page 179 | Page 181 |
|---|---|
| 1 addressed. If it's different from the RCTs. But if<br>2 you're going to challenge what's reported on RCTs,<br>3 then you need to come up with a similar number of<br>4 patients and you need to have some statistical<br>5 validity to it.<br>6    Q. (By Mr. De La Cerda) Okay. Moving on to<br>7 a new issue and this one involves TVT and TVT-O.<br>8     What does cytotoxicity mean?<br>9    A. It means in the -- in experiment, the number<br>10 of cells that are not viable after exposure to an<br>11 agent is lower than the expected of the benchmark we<br>12 established.<br>13    Q. The definition you gave me, which, by the<br>14 way, is very accurate in a certain sense. It's funny,<br>15 so you told me exactly what the scientific definition<br>16 is. The other thing I was asking -- that I was<br>17 thinking in my mind is cytotoxicity, what does that<br>18 word mean, literally?<br>19     MR. SNELL: Form.<br>20    A. It means it will -- it means toxicity to the<br>21 cell.<br>22    Q. (By Mr. De La Cerda) Right. And you're<br>23 aware that the cytotoxicity assessment of the<br>24 Ulmsten Prolene polypropylene sling, using the ISO | 1    A. It was in one plate. It was not<br>2 scientifically significant to it. When normal<br>3 polypropylene was -- was examined on L929 mouse<br>4 fibroblast cells, there was no cytotoxicity.<br>5    Q. Have you studied what happens to tissues<br>6 when it's exposed to a cytotoxic substance?<br>7    A. Yes, I have.<br>8    Q. And can you explain what those studies were?<br>9    A. Before going to OB/GYN, I did a fellowship<br>10 on molecular pharmacology, and I did a flow cytometry<br>11 and cytotoxicity assays, that's what I did every day.<br>12    Q. Okay.<br>13    A. And we use different agents. So there's --<br>14 one thing that we know that tissue configures a<br>15 protection different from cells. Tissue makes --<br>16 makes the viability of cells coming -- mediating by<br>17 whatever response that you may have to a cytotoxic<br>18 agent.<br>19     So far, and there has not been any evidence<br>20 that polypropylene is a cytotoxic in the muscle that<br>21 been by biopsy or by any other -- other test.<br>22    Q. Would you agree that necrotized tissue<br>23 surrounding mesh could lead to erosion or exposure of<br>24 the mesh? |

46 (Pages 178 to 181)

Jaime Sepulveda, M.D.

Page 182

1    A.  If you see a necrotic tissue in an incision,
2  it's a wound dehiscence.
3    Q.  So do you agree or disagree with that
4  statement -- or that question?
5      MR. SNELL:  Form.
6    A.  That -- you will have to repeat it.  I'm
7  sorry.
8    Q.  (By Mr. De La Cerda)  Would you agree that
9  necrotized tissue surrounding the mesh could lead to
10  an erosion or exposure of the mesh?
11    A.  If it's at the wound, yes, it can lead to
12  that.
13    Q.  Should the cytotoxicity assessment of the
14  Ulmsten polypropylene sling showing cytotoxicity be
15  included in the TVT or TVT-O IFUs?
16      MR. SNELL:  Form, misstates.
17    A.  Once you have a pyrogenicity assays and once
18  you have a drug elution and agarose test, if your
19  testing is negative, you just submit it to the FDA.
20  It doesn't have to be included as cytotoxic because it
21  will be -- it will be inaccurate.
22    Q.  (By Mr. De La Cerda)  So the answer is no;
23  right?
24    A.  No.

Page 183

1    Q.  And what would be your basis for that
2  opinion?
3    A.  My -- the review of the -- the review of the
4  cytotoxicity assays that were made available to me
5  through company documents.
6    Q.  Okay.  And which ones were those?
7    A.  The ones on TVT.
8    Q.  And those included the ISO agarose diffusion
9  method?
10    A.  That includes -- there are two types of
11  tests that were done.  There was the agarose, the drug
12  elution, and pyrogenicity and to check for the
13  inflammatory reaction also of injected polypropylene.
14    Q.  Any other bases for this opinion?
15    A.  This is -- this is the basis for the
16  opinions.
17    Q.  Do you know what the significance is of mesh
18  being heavyweight as opposed to lightweight?
19    A.  There's -- there's -- the difference --
20  difference in weight -- in the weight, essentially.
21    Q.  And it's really a description of density,
22  right, not actual mass?
23    A.  It has -- it has to do with how much per a
24  square -- square millimeter is, how much does it weigh

Page 184

1  in terms of grams per square millimeters.
2    Q.  And so do you have an understanding of what
3  the significance in terms of risks and
4  complications --
5    A.  I -- I misspoke.
6    Q.  Okay.
7    A.  I misspoke.  It's not per square millimeter.
8  It is per square meter.
9    Q.  Okay.
10    A.  I can double-check that.
11    Q.  Do you have any understanding of what the
12  significance is in terms of risks and complications
13  when you look at lightweight mesh versus heavyweight
14  mesh?
15      MR. SNELL:  Form.
16      Go ahead.
17    A.  The heavy -- heavyweight meshes with -- not
18  only just with the weight, but with all the other --
19  the other factors, including fiber size, pore -- pore
20  diameter, and method of coming together, either being
21  knitted or woven, had to do with the tolerability and
22  biocompatibility of the implant.
23    Q.  (By Mr. De La Cerda)  So let's get back to
24  my question, though.  Is there a difference in terms

Page 185

1  of risks and complications for a patient between
2  lightweight and heavyweight mesh?
3      MR. SNELL:  Form.
4    A.  Not to the point that has been clinically
5  demonstrated.
6      In theory, we could -- in theory, there is a
7  difference.  In the lab, when we use large portions we
8  can infer that, but that has not been shown in the
9  clinical arena of incontinence.
10    Q.  (By Mr. De La Cerda)  Okay.  So now --
11  okay.
12      First of all, let's discuss, what is the
13  theory of the difference -- the theory of the
14  significance as to risks and complications when you
15  compare lightweight versus heavyweight mesh?
16    A.  It's the biomechanical behavior is
17  different.  The biomechanical behavior is different
18  not only for that type of preparation, but it's also
19  different for the caliber of the sutures.
20      In other words, if I use a thinner suture,
21  that being polypropylene or any other material, it
22  will -- it can behave differently.  It has a tendency
23  to behave differently than a lightweight mesh or a
24  heavyweight mesh.

47 (Pages 182 to 185)

Jaime Sepulveda, M.D.

| Page 186 | Page 188 |
|---|---|
| 1    Q.  Okay.  In what ways? | 1        MR. SNELL:  Form, foundation. |
| 2    A.  In the testing, when you stretch it, when | 2        Go ahead. |
| 3  you fold it, when you place it and have fibroblast | 3    A.  I think that their conclusions are very, |
| 4  growing along the lines of stress of the implant. | 4  very hypothetical at best. |
| 5    Q.  Okay.  What about in terms of foreign body | 5    Q.  (By Mr. De La Cerda)  Okay.  Would you use |
| 6  reaction, is there a difference between lightweight | 6  standard Prolene in the correction of pelvic organ |
| 7  and heavyweight mesh? | 7  prolapse? |
| 8    A.  We used to believe that there was much more | 8    A.  We did.  Actually, we didn't just use |
| 9  on the heavyweight meshes, much more foreign body | 9  Prolene, we use Mersilene.  We used Marlex.  We used a |
| 10  reaction.  But has been found is that that initial | 10  variety of materials before this, before we actually |
| 11  reaction of the acute inflammatory -- of the acute | 11  use it for slings. |
| 12  inflammatory process and eventually of the chronic | 12        We didn't use it for slings because by the |
| 13  inflammatory process leads to the creation of | 13  time that midurethral slings came in, we have that |
| 14  fibroblast. | 14  200-micron -- actually 196-micron fiber with a pore |
| 15        What biomechanically has been concluded is | 15  size of 1500, and it was -- it was something -- it was |
| 16  that that level of stress, the level of stress in | 16  something that we knew that would match the thinnest |
| 17  these implants, the level of tension or forces that | 17  sutures that we could use for a Burch. |
| 18  are applied to these implants, behave differently and | 18    Q.  To be sure I've got an answer to that |
| 19  that seems to determine how fibroblasts grow. | 19  particular question, though, the answer is yes, you |
| 20        So the heavyweight and the lightweight | 20  would use standard Prolene mesh in the surgical |
| 21  behave differently.  There has not been a single study | 21  correction of pelvic organ prolapse; is that right? |
| 22  that shows, at a microscopic level, 80,000, 100,000 | 22    A.  Yes. |
| 23  samples, but we do have clinical studies that show | 23    Q.  Okay. |
| 24  that number of women.  So in terms of the clinical | 24    A.  I could consider using it.  There are other |

| Page 187 | Page 189 |
|---|---|
| 1  behavior, it's probably less difference than what we | 1  factors that may not lead me to use it, but the weight |
| 2  could see microscopically.  In terms of the acute | 2  of the mesh is not the only factor. |
| 3  inflammatory reaction, the difference between | 3    Q.  So you would disagree with anyone that would |
| 4  200-micron of fiber and a 300-micron fiber is probably | 4  say that using Prolene mesh in the treatment of pelvic |
| 5  not that much. | 5  organ prolapse is too dangerous and risky.  You |
| 6    Q.  So do you disagree with the theory that | 6  disagree with that; right? |
| 7  lightweight mesh is safer for patients than | 7    A.  I would disagree with that, yes. |
| 8  heavyweight mesh for use in the pelvic floor? | 8    Q.  Have you ever read the deposition of Jorge |
| 9        MR. SNELL:  Form. | 9  Holste? |
| 10        Go ahead. | 10    A.  I may have read it and if I did, I probably |
| 11    A.  I think that's a very broad statement to say | 11  read it over a year ago. |
| 12  lightweight meshes for sure are safer.  That is a very | 12    Q.  Head of the preclinical department of |
| 13  elementary statement that -- for much more complicated | 13  Ethicon for 30 years, german guy, he opined that |
| 14  issue. | 14  Prolene mesh is heavyweight mesh. |
| 15    Q.  (By Mr. De La Cerda)  Okay.  Are you | 15        Does that ring any bells? |
| 16  familiar with Closterhofen, Clinga?  Are you | 16        MR. SNELL:  Foundation on that one. |
| 17  familiar with Todd Heniford?  Are you familiar with | 17    A.  Prolene mesh, the way they classify is |
| 18  these physicians' and scientists' opinions about the | 18  heavy -- heavyweight mesh.  There were a number of |
| 19  safety of lightweight mesh versus heavyweight mesh? | 19  materials that I'm aware that they work with and they |
| 20    A.  I am familiar with their work. | 20  classify according to weight.  From the engineering |
| 21    Q.  Okay.  Do you disagree with their | 21  point of view, that might be accurate.  From a |
| 22  conclusions about lightweight mesh being safer for a | 22  surgical point of view, there are a lot of other |
| 23  patient as compared to heavyweight mesh? | 23  factors that have to be considered. |
| 24    A.  I think that their -- | 24    Q.  (By Mr. De La Cerda)  Okay.  Do you agree |

48 (Pages 186 to 189)

Jaime Sepulveda, M.D.

Page 190

1  or disagree that heavyweight mesh causes greater
2  foreign body reaction than lightweight mesh?
3      MR. SNELL: Form.
4      A. There might have -- there could be in
5  existence something that says that increases the
6  number of neutrophils, but I have not found any -- any
7  utility on clinical care on predicting the behavior of
8  TVT.
9      Q. (By Mr. De La Cerda) So do you agree or
10 disagree with that statement?
11     A. I -- I could not agree or disagree with
12 that. That's so general and I would be speculating on
13 it.
14     Q. Okay. Do you agree or disagree that leaving
15 less mesh material in the patient's body is important
16 because it will reduce the amount of inflammation and
17 foreign body reaction?
18     A. That's --
19     MR. SNELL: Hold on. You have to give me a
20 chance to object.
21     Overbroad and incomplete hypothetical.
22     A. That's more than a scientific approach.
23 That's a very attractive approach. And that's -- as
24 surgeons, we don't always base what we do on -- on

Page 191

1  science, but also on common sense backed by science.
2      And, yeah, if I can take care of something
3  with less mesh, I probably would be attracted to it.
4  On the other side, we have to respect as surgeons
5  that say, "Well, you know, I will use the full-length
6  sling because it has the longest evidence behind it."
7  So in that regard, you're using more material, but you
8  have more evidence behind it.
9      Q. (By Mr. De La Cerda) Do you agree or
10 disagree that reducing the inflammatory reaction of
11 the body will also reduce the risk of contraction or
12 shrinkage of the mesh?
13     MR. SNELL: Same objection.
14     A. We don't -- we don't know that and I could
15 not agree with something that, in general, as a
16 specialty, we don't -- we don't know.
17     The reduced inflammatory reaction may not
18 work for the best. There's a chain of events that
19 happens during the inflammatory process and that leads
20 ultimately to the creation of a fibroblast angle that
21 is what gives the support beyond the implant.
22     Q. (By Mr. De La Cerda) It's scarring;
23 right?
24     A. It is -- it is not a scar. Scar is the most

Page 192

1  simplistic way of looking at it because a scar does
2  not have the same viscoelastic capabilities of tissue.
3  So you have to -- when you say a scar, it's not
4  necessarily a scar in the way that we see scars. It's
5  viscoelastically it's different.
6      That's why someone can urinate after they
7  have a sling placed and they don't have retention.
8  That's how someone can have normal flows, someone can
9  be continent, at the same time also can go and
10 urinate.
11     Q. Are you familiar with the term "fibrotic
12 bridging"?
13     A. I've heard the term "fibrotic bridging,"
14 yes.
15     Q. What's your understanding of that term?
16     A. It's the growth of a fibroblast from one
17 segment to the next.
18     Q. Do you agree or disagree that heavyweight
19 meshes induce more fibrotic bridging tissue reaction
20 causing more shrinkage during maturing of the
21 collagenous tissue?
22     MR. SNELL: Form, foundation.
23     A. I saw it described at one time. I didn't
24 see anything that could conclude it. I did not see a

Page 193

1  paper that could conclude it. I'm welcome to look at
2  anything that says that fibrotic bridging is
3  significantly more. The first thing I would like to
4  know is how you're going to measure it.
5      Q. (By Mr. De La Cerda) Okay. So I guess
6  you don't have enough information to either agree or
7  disagree; is that right?
8      MR. SNELL: Object, misstates.
9      A. I have -- I have enough information to -- to
10 not agree or disagree with it. And that -- the
11 information that I have is that from one segment to
12 the other, just looking at two segments and the
13 fibroblast that grow between, at one point in time
14 that's not enough to make that conclusion, that
15 fibrotic bridging would cause contraction or
16 anything -- or anything similar like that.
17     There's -- in one of the papers that I gave,
18 there are two papers that I submitted today about the
19 effect of stress on fibroblast growth, and I think
20 that's more complete than fibrotic bridging.
21     Q. (By Mr. De La Cerda) So is it fair to say
22 that you disagree with that statement then?
23     A. I -- I cannot say one way or the other
24 fibrotic bridging. If I would have to commit to

49 (Pages 190 to 193)

Jaime Sepulveda, M.D.

Page 194

1 agreeing or disagreeing with it, I think that fibrotic
2 bridging is, again, very hypothetical -- hypothetical
3 statement. I also believe that I can change my
4 opinion based on what I read.
5    Q. Okay. So as you sit here today, though, I
6 think -- I think what you're saying, as you sit here
7 today, is you would have to disagree because you
8 believe there's not enough evidence to support the
9 statement? I mean, is that what you're saying?
10    A. There's not enough evidence to support
11 fibrotic bridging. It's a concept that is
12 interesting. It's a concept that can be studied.
13 It's a concept that has to be taken into the context
14 of what -- how fibroblast grow under stress.
15    Q. Are you aware that Ethicon's own scientists
16 and consultants have opined that Prolene mesh, the
17 same mesh in the TVT and TVT-O, is heavyweight as
18 opposed to being lightweight?
19       MR. SNELL: Lacks foundation.
20    A. I -- I -- I haven't seen the opinion of each
21 one of them.
22    Q. (By Mr. De La Cerda) Okay. So you're not
23 aware?
24    A. I'm not aware.

Page 195

1    Q. Should a discussion of whether Prolene mesh
2 is heavyweight be included in the IFUs for the TVT and
3 the TVT-O?
4       MR. SNELL: Form, foundation.
5    A. No, I don't think that -- I actually believe
6 that most doctors, if you tell them heavyweight --
7 about heavyweight and lightweight meshes, they have
8 had to be educated on it.
9       I know that the great majority of them are
10 probably going to look at me and say, "Okay, Jaime, so
11 you're telling me about heavyweight and lightweight
12 and all these different aspects, tell me how does this
13 translate in the care of my patients?" And I would
14 disagree with -- with any statement that makes
15 anything firm about heavyweights or lightweights
16 because the fact is that the model to a study have not
17 been found.
18    Q. (By Mr. De La Cerda) Okay. And so your
19 opinion is that it doesn't need to be included in
20 the IFU; right?
21    A. No, I don't think that has any -- any place
22 in the IFU.
23    Q. And your basis for that is what? I don't
24 want to put words in your mouth.

Page 196

1       What would be your basis for not having to
2 include it in the IFU?
3    A. Number one, it's not evidence -- the concept
4 of whatever implications they may have clinically is
5 not evidence-based and, number two, there are no
6 clinical implications that you can attribute to it.
7    Q. Okay. Part of your report discusses the
8 MSDS. So you've reviewed the MSDS for the raw
9 polypropylene that goes into making the Prolene and
10 the TVT, TVT-O, Gynemesh, Prolift and Prosima?
11    A. I saw the MSDS about raw -- raw material.
12    Q. Right. You're familiar with what a Material
13 Safety Data Sheet is?
14    A. I learned about Material Safety Data Sheet
15 along the lines of this -- of this litigation.
16    Q. Okay. So you know that the Material Safety
17 Data Sheet states that raw polypropylene is
18 incompatible with strong oxidizers, such as peroxides;
19 correct?
20    A. I read that in the MSDS.
21    Q. And as a physician, you know that peroxides
22 are present in the human body; right?
23       MR. SNELL: Form.
24    A. I am not aware of anyone measuring the

Page 197

1 levels of peroxide.
2    Q. (By Mr. De La Cerda) Well, as a physician
3 you know that the human body produces hydrogen
4 peroxide as part of the inflammatory process; right?
5    A. I just have not seen a quantitative assay of
6 it.
7    Q. Okay. So you know it happens, you just
8 don't know what quantitatively it amounts to; right?
9    A. I'm not aware of any quantitative study.
10    Q. And the implantation of the TVT, TVT-O,
11 Gynemesh, Prolift and Prosima causes an inflammatory
12 process; correct?
13    A. The inflammatory process being defined as a
14 cellular process.
15    Q. Should the fact that raw polypropylene that
16 goes into making the Prolene, the TVT, the TVT-O,
17 Gynemesh, Prolift and Prosima is incompatible with
18 peroxides according to the MSDS, should that
19 information be included in the IFU?
20       MR. SNELL: Form.
21    A. No, it should not be included and based --
22 no, it shouldn't be included.
23    Q. (By Mr. De La Cerda) You already know my
24 next question.

50 (Pages 194 to 197)

Jaime Sepulveda, M.D.

Page 198

1      What's the basis for not including that
2  information?
3      A.  No raw material is being asserted on humans.
4      Q.  Okay.  Anything else?
5      A.  No.
6      Q.  Okay.  You're also -- you addressed this in
7  your report.  You're also aware that the MSDS states:
8  "Polypropylene has been tested in laboratory rats by
9  subcutaneous implantation of disks or powder, local
10  sarcomas were induced at the site of implantation."
11      Do you recall that verbiage that's from the
12  MSDS?
13      A.  From the MSDS.
14      Q.  What does -- what does that verbiage mean?
15      A.  It's a disk, it's a disk of basically raw
16  polypropylene.  And the way I see it is there are two
17  factors to it.  Number one, the size and the volume of
18  the polypropylene that's being inserted, in addition
19  to the nature of this polypropylene.  I cannot speak
20  about this being even remotely similar to what we use
21  on -- on TVT-O and what we use in Prolene sutures
22  because there is not -- there has been no
23  chromatography, no crystallinity assays, no
24  temperature assays on any of this disk.  So I don't

Page 199

1  have that information available.
2      That being said, you can also consider --
3  you should also consider the host in which most of the
4  time is Wistar rats, Wistar rats or Himalayan rabbits.
5  I had the opportunity to work with Wistar rats.  They
6  have a very, very peculiar immune system.
7      Q.  When there is an indication that a substance
8  can cause cancer in animals, like rats, what does that
9  possibly indicate for humans?
10      MR. SNELL:  Form, speculation.
11      A.  It has very, very little implications unless
12  you are consistently prove that these causes -- causes
13  cancer.
14      Now, this is -- these are -- it's very
15  important to define that these are two different
16  materials.  The raw preparations are different from
17  the preparations used in -- in sutures.  They're two
18  different things.
19      Q.  (By Mr. De La Cerda)  Chronic inflammation
20  has been linked to cancer; hasn't it?
21      A.  That's -- that's not even a theory.  That's
22  a hypothesis, actually.
23      Q.  Okay.  If mesh -- strike that.
24      Ethicon -- I need to go back for just a

Page 200

1  second.
2      You're aware of no test performed by Ethicon
3  to determine whether the surface cracking or
4  degradation, or whatever you want to call it, that's
5  been -- that is seen under -- under microscope of the
6  mesh, whether it's biofilm or whatever you believe it
7  is, you've never seen a test by Ethicon to determine
8  whether that particular characteristic is clinically
9  significant to patients; right?
10      A.  No, there are only three reports that I'm --
11  that I'm aware of.
12      Q.  Okay.  And you're aware of no test by
13  Ethicon to determine whether the weight of Prolene
14  mesh causes more complications in patients in
15  comparison to lightweight mesh; correct?
16      MR. SNELL:  Form, foundation.
17      A.  There's no -- no basis to generate that --
18  that study.
19      Q.  (By Mr. De La Cerda)  What do you mean by
20  that?
21      A.  No one has come out with the actual question
22  in terms -- in the question on the hypothesis of it or
23  the theory of it.
24      Q.  Okay.

Page 201

1      A.  In other words, just because we think that
2  there's a scientific study that we can do doesn't mean
3  that that needs to be done.
4      Q.  Okay.  But Ethicon -- Ethicon, itself,
5  hasn't performed that study; right?
6      A.  I -- I am -- I am not familiar with the
7  specific studies that they have performed on that
8  specific area.
9      Q.  You're aware of no study performed by
10  Ethicon to determine whether polypropylene could be
11  linked to cancer; right?
12      A.  I -- I am not familiar of that, but I know
13  about the dog study that -- in which they -- sutures
14  were evaluated at about eight years and there was
15  no -- no reported cancer that I'm aware of.
16      Q.  Okay.  You brought one study with you here.
17  I think it was a case report of cancer and
18  polypropylene.  What was it?  You mentioned it briefly
19  when we were looking through your materials.
20      A.  It is -- the first case reported of a clear
21  cell carcinoma in the surrounding area to the -- to
22  the incision for the midurethral sling.
23      I also brought the response from two experts
24  to that specific case report.

51 (Pages 198 to 201)

Jaime Sepulveda, M.D.

Page 202

1    Q.  What did that study -- did that study have
2   some sort of conclusion about what might be causing
3   that clear cell carcinoma?
4    A.  No, it does not have a conclusion.  There's
5   a hypothesis and that's as far as they can get about a
6   hypothesis about inflammation, I believe.
7    Q.  And so that's one discussion of inflammatory
8   process being at least hypothesized as being
9   responsible for this particular cancer; right?
10    A.  Yeah, unfort- -- I don't want to say
11   unfortunately, it's not unfortunate.  It's -- this is
12   not an actual study.  This is a case report.
13    Q.  Case report.
14    A.  One case report.  And as we have gone
15   through so many times today, the overwhelming data --
16   there are papers that -- there are articles that
17   describe the continued use of polypropylene in
18   midurethral sling with the incidence of cancer in that
19   population or the frequency of cancer in that
20   population being actually zero.
21    Q.  Okay.  So then the question about your
22   opinion, should this warning that's included in the
23   MSDS -- or this verbiage that's included in the MSDS
24   regarding the subcutaneous implant of disk or powder

Page 203

1   where local carcinomas were induced at the site of
2   implantation, should that information be included in
3   the IFUs for the TVT, the TVT-O, Gynemesh, Prolift and
4   Prosima?
5    A.  The answer is no, and the basis of that is
6   that is not relevant to the product that is being
7   implanted.
8    Q.  Has -- are you aware of any studies that
9   Ethicon's done comparing the raw polypropylene with
10   the manufactured version that is actually implanted in
11   humans, any test of any kind?
12    A.  Raw -- raw polypropylene is not used in
13   humans.  Raw polypropylene is actually not even used
14   on containers.  It has very -- it doesn't have an
15   actual use.  It's raw material.
16    Q.  And so you're aware of no studies, though,
17   where Ethicon's tested raw polypropylene versus the
18   finished manufactured product of any type; right?
19    A.  No, I'm not familiar with any studies using
20   raw polypropylene.
21    Q.  Okay.  Shifting gears a little bit.
22         You agree that as a scien- -- a scientist or
23   a physician should not go into a research study with a
24   desire to achieve a specific result; correct?

Page 204

1    A.  I -- I -- I'll have to read that.  If you
2   can be blinded to your study, that would be optimal,
3   but that's not possible in every -- in every design.
4    Q.  So are you saying that a scientist in a
5   re- -- scientist and a physician -- it's okay for
6   that -- strike that.
7         It's okay for a scientist and a physician to
8   go into a research study with the desire to achieve a
9   specific result?
10    A.  No, I think that the design of the study
11   would actually protect the study from any desire that
12   anyone could have.
13    Q.  So should or should not the scientist and
14   the physician go into a study with the desire to
15   achieve a specific result?
16         MR. SNELL:  Form, overbroad.
17    A.  I don't -- I don't believe that anyone
18   should go into any study hoping or wishing for a
19   specific result.  That's not what the methodology of a
20   science is for.
21    Q.  (By Mr. De La Cerda)  You agree that a
22   scientist and a physician should not design a
23   research project for medical publication with the
24   specific purpose of a single result; correct?

Page 205

1         MR. SNELL:  Form.
2    A.  It's -- there's no science if you are trying
3   to get it or achieve a specific result.
4    Q.  (By Mr. De La Cerda)  You can't go into a
5   medical scientific research trying to answer a
6   question with any preconceived biases; right?
7         MR. SNELL:  Form, overbroad.
8    A.  There's -- we -- we have seen that there --
9   there's some preconceived biases, but they become
10   clearly evident.
11    Q.  (By Mr. De La Cerda)  But you shouldn't go
12   in with any preconceived biases, that's what you
13   shouldn't do; right?
14    A.  You don't -- you don't do that as a
15   scientist.
16    Q.  Right.  Do you agree it's not ethical for
17   researchers performing clinical trials to be paid if
18   and only if the clinical trials have certain results?
19         MR. SNELL:  Form, overbroad.
20         Go ahead.
21    A.  I have no basis to judge anyone that has
22   good science, good knowledge, and to be compensated
23   for it.
24    Q.  (By Mr. De La Cerda)  No, and I -- well,

52 (Pages 202 to 205)

Jaime Sepulveda, M.D.

Page 206

1  that's excellent, but my question is a little
2  different.
3       What I'm saying is whether you believe it's
4  ethical for researchers performing clinical trials to
5  be paid if and only if they produce a study with
6  specific results.
7       MR. SNELL: Same objection.
8       Q. (By Mr. De La Cerda) So not the fact
9  they're being paid, just the fact they only get paid
10 if you give me these results?
11      A. Well, it's -- you're going -- if I'm going
12 to acquire a product from you, and I'm going to make
13 an investment on that product, I'm going to pay you
14 based on what you show me with your -- with your
15 product.
16      Now, you can -- you can actually do that.
17 You can sell me a product that may not perform as I
18 expect, but if I try that product and I see that
19 consistently works in ways that are the same or better
20 as you present it, you can go back and say that was
21 not an issue there.
22      Q. Okay. So you can go back in time and say it
23 was okay, it wasn't unethical to do that?
24      A. It's -- you can go back in time and say it's

Page 207

1  not a matter of ethical or not ethical. I know that
2  there was a truth -- a truthful interaction and that
3  what this physician or anyone in that calculating
4  innovation shows me was -- was real, was actually
5  accurate.
6       Q. Okay. You mean that you can at least agree
7  that has a potential to create bias, doesn't it,
8  in the study?
9       A. I -- but you can -- you cannot put that on
10 the person that is trying to bring it in. There has
11 to be a level of -- of understanding and backtracking.
12      In other words, if you -- and I'm going to
13 allow myself to place an example. If you try to sell
14 me a medical device, I will have a hard time buying it
15 from you. But when -- if you try to sell me a legal
16 product, I might be more attracted to buy from you and
17 I might believe that you may deliver that legal
18 product.
19      That has nothing to do with science. I
20 deviated into what -- just to illustrate a point just
21 to answer your question.
22      Q. You're aware, of course, that Ulmsten was
23 the inventor of original TVT; right?
24      A. Yes.

Page 208

1       Q. And you've seen the Ulmsten and Nilsson
2  studies that Ethicon touts as long-term support for
3  their TVT line of slings; right?
4       MR. SNELL: Form.
5       A. They also wasn't just the inventor of the
6  TVT. At that time he brought the most innovative kind
7  of approach to incontinence. I mean, we -- we were --
8  until that time, we were doing continence procedures
9  in the urethrovesical junction, we were using sutures,
10 we were placing things under tension, we were using
11 absorbable materials that didn't work long term,
12 materials that were not pliable and they came up and
13 changed the way we were thinking about continence
14 care. Continence care became different because of
15 Ulmsten and Petros.
16      Q. (By Mr. De La Cerda) Getting back to the
17 question. You've seen the studies that Ethicon
18 touts as support for their TVT line of slings;
19 right? You've seen those, the Ulmsten/Nilsson
20 studies; right?
21      MR. SNELL: Form.
22      Go ahead.
23      A. I've seen the Ulmsten studies, I've seen
24 Nilsson, I've seen Falconer, I've seen Petros.

Page 209

1       Q. (By Mr. De La Cerda) You've seen it in
2  the marketing materials for Ethicon that they
3  frequently site to those studies as being support
4  for the use of their slings; right?
5       A. For that -- for that specific use, yes.
6       Q. And you've relied on these studies to
7  support your practice of using the TVT line of
8  products; right?
9       A. I rely on that and I rely more than that on
10 large studies. And the fact is that it has been
11 reproduced over and over again.
12      Q. Did Ethicon ever inform you that Professor
13 Ulmsten's company, MedScan, the company that owned the
14 rights to the TVT, was promised $400,000 if and only
15 if it produced a study with the TVT showing certain
16 results?
17      MR. SNELL: Form.
18      A. There's my interaction with -- or any
19 surgeon's interaction for that sake at that time,
20 would never get into that.
21      Q. (By Mr. De La Cerda) So you haven't heard
22 that?
23      A. No, I -- I saw -- I saw that as one of the
24 claims, through all these documents, but really

53 (Pages 206 to 209)

Jaime Sepulveda, M.D.

Page 210

1    didn't -- didn't matter much to me.
2        Q.   Okay.  So that particular fact doesn't
3    matter to you?
4        A.   No.
5        Q.   Okay.  Shifting gears a little bit.  Should
6    a medical device company put profits above patient
7    safety?
8            MR. SNELL:  Form, speculation.
9            THE COURT REPORTER:  I'm sorry, form --
10           MR. SNELL:  Form, speculation.  Put
11       overbroad in there, too.
12       A.   Safety and results bring you profits.
13       Q.   (By Mr. De La Cerda)  So is the answer no?
14       A.   No.
15       Q.   Should a medical device company rush a
16   product to market with the primary purpose being to
17   defend its market share?
18       A.   There's -- when you have a good product and
19   you have enough market share, yeah, you want to make
20   sure that you keep it and you keep it with quality.
21       Q.   So the answer is yes to that one?
22           MR. SNELL:  Form.
23       A.   On that one -- on that regard, on the
24   general form of that question, yes.

Page 211

1        Q.   (By Mr. De La Cerda)  What clinical
2    studies were done of the TVT-O before it was
3    released onto the market?
4        A.   There was -- there were a variety of
5    studies.  There was the Mulberry study --
6            THE COURT REPORTER:  The --
7            THE WITNESS:  The Mulberry.
8        A.   -- and there was -- there were cadaver
9    studies, and there were studies on outside-in
10   transobturator slings.
11       Q.   Was one of the studies by de Leval?
12       A.   By Delorme first and then de Leval.
13       Q.   Delorme was outside-in; right?
14       A.   Right.
15       Q.   And then de Leval was inside-out?
16       A.   Right.
17       Q.   De Leval is considered the inventor of the
18   TVT-O; is that right?
19       A.   Yes.
20       Q.   And do you know whether the results of
21   de Leval's clinical studies were included in the
22   application for clearance submitted to the FDA for the
23   TVT-O?
24       A.   I'm not familiar with what was exactly

Page 212

1    submitted.  I cannot recall it right now.  I can go
2    back and check what was submitted, but I'm not
3    familiar with it.
4        Q.   If he had performed a study, do you believe
5    that that study should have been submitted along with
6    the information about the TVT-O to the FDA?
7            MR. SNELL:  Form, calls for regulatory
8        opinion, outside the regulatory scope.
9        A.   I think it goes to whatever -- whatever the
10   FDA feels that it requires from the company or
11   whatever the company fulfills in its obligations to
12   the FDA.
13       Q.   (By Mr. De La Cerda)  How about you as a
14   physician, before you're going to use a product,
15   would you want to know all the clinical studies that
16   are out there about that product before you start
17   implanting it?
18       A.   I actually gave -- I have given testimony
19   today that I trust that the FDA is going to do what's
20   best in that regard.
21       Q.   Do you have any understanding of what the
22   clearance process involves, 510(k) clearance?
23       A.   Yes.  I do have an understanding of it.
24       Q.   Do you know whether the FDA requires

Page 213

1    clinical studies before a product is 510(k) cleared?
2        A.   I think that they have made -- I don't
3    think, I'm aware that they have made a decision to put
4    in place a mechanism that works exactly with a 510(k).
5            Now, am I someone to criticize or favor --
6    or favor that?  I probably could sit in my big chair
7    and decide that, but the reality is that there's
8    people with expertise in regulatory affairs at the FDA
9    and people with expertise on regulatory affairs at
10   Ethicon, and they're the ones that need to come
11   together on that.
12       Q.   I guess the issue that I'm really asking
13   about is what you want to know as a doctor.  Before
14   you ever implant a product, do you want to know that
15   if there are clinical studies on that product before
16   you've implanted it, do you want to know what those
17   clinical -- what the findings were of those clinical
18   studies before you implant the product?
19       A.   I'm aware of clinical products and design.
20   I'm aware of these studies, but you can present all
21   these studies and one final part is going to be what
22   the FDA regulatory process comes -- comes and tells
23   me.
24       Q.   What I'm saying, though, is you, as an

54 (Pages 210 to 213)

Jaime Sepulveda, M.D.

Page 214

1    implanting physician, okay, a product is presented to
2    you by a medical device company and there are clinical
3    studies out there that are about this particular
4    product. You're going to want to know all the
5    clinical studies that are out there about that product
6    before you implant it; right?
7        MR. SNELL: Form, asked and answered.
8        Go ahead.
9        A. I want to know -- I want to know the studies
10   and I want to know -- obviously, I want to know more
11   than just the studies. I want to know the
12   biomechanics of it, I want to know all these things.
13   But that's -- ultimately, it comes down to that
14   process between the -- between Ethicon and the FDA.
15       Q. (By Mr. De La Cerda) Okay.
16       A. And I'm going to trust the product that
17   comes out from it.
18       Q. Okay. Let's shift gears a little bit.
19          You're aware that the IFUs for the Gynemesh,
20   Prolift and Prosima state: "The mesh remains soft and
21   pliable and normal wound healing is not noticeably
22   impaired"; right?
23       MR. SNELL: Foundation on that.
24       Do you have that IFU? I'm not sure if you

Page 215

1    made a correct statement across all those IFUs.
2        Do you mind taking a break?
3        MR. DE LA CERDA: That's fine. Let's do
4    that.
5        (Thereupon, a recess was taken from
6    2:11 p.m. until 2:18 p.m., after which the
7    following proceedings were held:)
8        Q. (By Mr. De La Cerda) Doctor, just for the
9    sake of showing you, this is the Gynemesh -- sorry,
10   I didn't bring a copy of it -- so that's the
11   Gynemesh IFU. The part that I'm referencing is at
12   the bottom, I think it's the second-to-last
13   sentence. It starts with "the mesh remains
14   pliable."
15       MR. SNELL: Soft and pliable.
16       Why don't you ask him to read it just so the
17   record is clear.
18       MR. DE LA CERDA: Yeah, sure.
19       Q. (By Mr. De La Cerda) Can you read that,
20   Doctor?
21       A. "The mesh remains soft and pliable and
22   normal wound healing is not noticeably impaired. The
23   material is not absorbed, nor is subject to
24   degradation or weakening by the action of tissue

Page 216

1    enzymes."
2        Q. (By Mr. De La Cerda) So that statement is
3    included, of course, in the Gynemesh IFU and the
4    Prolift and Prosima IFUs, which also use Gynemesh;
5    right?
6        A. Yes.
7        Q. Now, you're aware that Gynemesh PS is
8    Prolene Soft, except for it's used in the pelvic
9    application as opposed to hernia application; right?
10       A. It's -- Pro- -- Prolene Soft, yes.
11       Q. Are you aware that in 2001, Ethicon had in
12   its files a conclusion that Gynemesh PS was too stiff
13   for use in vaginal tissues?
14       MR. SNELL: Form, foundation.
15       A. It's -- I read something about that from
16   some investigator, but it was -- it was an opinion
17   about being too stiff. I think it was at the -- at
18   the risk of -- I'm not remembering well or -- I'm not
19   speaking accurately, may have been an investigator's
20   opinion.
21       Q. (By Mr. De La Cerda) Okay. Are you aware
22   that Ethicon also had in its files a conclusion that
23   Prolene Soft should not be pursued as a mesh used in
24   pelvic floor repair because it was too stiff for use

Page 217

1    in vaginal tissues?
2        MR. SNELL: Same objection.
3        A. No, I'm not -- I'm not aware of that and
4    that's not what was eventually done.
5        Q. (By Mr. De La Cerda) Do you know whether
6    scar contracture around the mesh can occur with the
7    Gynemesh?
8        A. There's -- there's -- there's this -- again,
9    hypothesis that scar contraction could happen around
10   the mesh. So to that -- to that specific issue, I ask
11   what is the objective measurement of a scar
12   contraction or the mesh contraction. I wanted to see
13   where -- where's the evidence to it?
14          Because when we repair these -- repair these
15   patients with permanent sutures, when we place
16   polypropylene in the uterosacral ligaments or in the
17   sacrospinous ligament, we didn't see any contraction
18   of those fibers. So where is the evidence? No one
19   could ever bring me evidence of a contraction on the
20   mesh.
21       Q. Okay. Do you know if that -- if this scar
22   contracture around Gynemesh was a problem that Ethicon
23   engineers were trying to solve?
24       A. I -- I don't even know if they try to solve

55 (Pages 214 to 217)

Jaime Sepulveda, M.D.

Page 218

1    it because I did not see a problem with contraction.
2        Q.  Okay.  So you're also not sure, though,
3    whether Ethicon was trying to solve this problem?  You
4    probably don't believe it's a problem.  That's what it
5    sounds like you're saying, that it's not a problem,
6    but my question is really are you aware whether
7    Ethicon was trying to solve what it perceived to be a
8    problem with contracture of scar tissue around
9    Gynemesh?
10           MR. SNELL:  Foundation.
11       A.  I don't -- I don't see in which model they
12   would try to solve it.
13       Q.  (By Mr. De La Cerda)  Okay.  But are you
14   aware if they were trying to solve this or not?
15       A.  No, I'm not aware of them trying to solve
16   contractions of any -- any type, any type of implants.
17       Q.  If scar contracture exists around Gynemesh,
18   would that translate into complications for a patient?
19           MR. SNELL:  Form.
20       A.  More than a complication for a patient.  The
21   contraction would just tell me that I have to -- I
22   have to make adjustments in my surgery and that brings
23   a whole new set of variables in my -- in my surgery.
24       Q.  (By Mr. De La Cerda)  Do you know whether

Page 219

1    or not physicians were asking Ethicon for a mesh
2    which would be better than Gynemesh on the issue of
3    scar contracture?
4        A.  I -- I believe that there was always the --
5    the idea that we could always have innovation on the
6    type of implants that we would have.  Although
7    Gynemesh had more evidence than any other implant.
8    There was more evidence, there are more papers
9    published on Gynemesh than native tissue for specific
10   compartments.  We have that.  We all -- we all did
11   have an understanding that there was going to be a
12   progression on the innovation of the product.  So if
13   there is a course to do that, that's -- that's
14   something that I think every physician would want to
15   see.
16       Q.  And Ethicon did that -- they did just that,
17   didn't they?
18       A.  They -- they actually invited me and give
19   me -- with other doctors, tell me what -- what this --
20   what would you like to see in -- in the next
21   generation.
22       Q.  They innovated so well that they even
23   developed a mesh, other than Gynemesh, that they
24   thought was safer than Gynemesh; right?

Page 220

1            MR. SNELL:  Actually, hold on.  Objection,
2        foundation, misstates company intent.
3        A.  I don't -- I don't think that that's what
4    they concluded, that it was safer.  I don't think that
5    there is anyone that actually came and say, "Okay,
6    this is safer," or, "We have more evidence to say that
7    it's safer, but you may have to adjust it," or "It may
8    not contract or they will contract."  I don't -- I
9    don't think it got to that point.  I think that we had
10   what we had with Gynemesh.
11       Q.  (By Mr. De La Cerda)  Okay.  Did you ever
12   do a presentation on the benefits of lightweight
13   mesh over heavyweight mesh?
14       A.  I did make presen- -- many presentations on
15   how -- on the benefits of lightweight mesh, and that
16   was a prevailing -- the prevailing thought at that
17   time and I still would make a presentation and say
18   there are some benefits on lightweight mesh.  There
19   are -- there's some benefits on having less implant,
20   in having less mesh.
21           The question is when we have all this -- all
22   these different -- different things that we wish for,
23   how much science do I have behind it?  And during
24   those -- those presentations, there's always the

Page 221

1    discussion of:  Is this really what we want?  Do we
2    want bigger pores?  Do we want a lighter --
3    lightweight meshes?  Do we want lighter meshes?
4            I'm not saying that it's going to be a bad
5    thing.  It's probably going to be a good thing, but I
6    don't have the science to back it up.
7        Q.  You mentioned that you did present on some
8    of the benefits of lightweight mesh or using less
9    mesh.  What would those benefits be?
10       A.  It's a -- the benefits is that you have less
11   inflammatory response, you have less cellular
12   response, you have a better layout of fibroblast and
13   that's the hypothesis behind all this.
14           But none of those things that we, as a
15   group, thought as -- as physicians thought that was
16   going to be better, wasn't necessarily going to be
17   better.  These were things that were not statements.
18   These were things that we have it here and we have
19   this product and it's worth looking to it and it's
20   worth using it and, you know, if I'm going to have --
21   use something heavier or something light, I probably
22   go with something light because it's more innovative.
23       Q.  It's a reasonable theory to believe that the
24   lightweight mesh is safer for a patient than the

56 (Pages 218 to 221)

Jaime Sepulveda, M.D.

Page 222

```
 1   heavyweight mesh; right?
 2      A.  No.  That's not --
 3         MR. SNELL:  Lacks foundation.
 4         Go ahead.
 5      A.  No.  That's not what we can conclude with
 6   it.  We're not talking -- Gynemesh proved to be safe.
 7   Gynemesh proved to be effective.  This is a totally
 8   different set of considerations, scientifically it's a
 9   totally different set of considerations.
10      Q.  (By Mr. De La Cerda)  Let's do it this
11   way.  What I want to do is work from possibility all
12   the way up to truth.  Okay?
13         Possibility, hypothesis, theory and we'll
14   just say reality or truth.  Okay?
15         Is it possible -- do you agree it's possible
16   that lightweight mesh is safer for patients than
17   heavyweight mesh?
18         MR. SNELL:  Calls for speculation.
19      A.  That's -- that's possible.
20      Q.  (By Mr. De La Cerda)  Okay.  Now let's
21   take the next step.
22         Would it be a fair hypothesis that
23   lightweight mesh is safer than heavyweight mesh?
24      A.  That's a hypothesis, period.  Not fair, not
```

Page 223

```
 1   unfair, it's just a hypothesis that we would have to
 2   test.
 3      Q.  Okay.  Is it a fair -- based on what you
 4   know, is that a hypothesis that could be confirmed?
 5      A.  Well, that's a hypothesis that has much less
 6   evidence behind it than -- than using Gynemesh.
 7      Q.  The step where you would stop the
 8   progression, though, would be a theory.  You don't
 9   believe there's enough to support the theory that
10   lightweight mesh is safer for patients than
11   heavyweight mesh; is that right?
12      A.  These were -- these were considerations that
13   were entertained not at that time.  They still
14   entertain a scientific meeting.  It doesn't mean that
15   we're going to go -- go out and start using the
16   lightest weight mesh.  It doesn't mean -- because we
17   understand meshes a lot better now as -- as
18   physicians.  As surgeons, as scientists, we understand
19   it better.
20         Now, we knew that what we had would -- would
21   give durability.  We knew that what we had would
22   give -- would be a good product to use for
23   reinforcement on augmented repairs.  There was --
24   there was some concept along the lines that were not
```

Page 224

```
 1   as explored as is being explored now.  And based on --
 2   on those concepts that were unexplored, we made
 3   inferences on how we would take the next mesh to be.
 4         That doesn't take the fact that what we had
 5   behind us was data from Gynemesh.
 6      Q.  Do you agree that scar contracture can cause
 7   recurrence of prolapse?  This is in terms of if scar
 8   contracture is happening around Gynemesh, can that
 9   cause recurrence of prolapse?
10         MR. SNELL:  Foundation.
11      A.  Are you talking about the same side or
12   opposite side or just in general?
13      Q.  (By Mr. De La Cerda)  In general.
14      A.  No, that's not the biggest factor on a
15   recurrence of a prolapse.
16      Q.  I'm just going to go through a little list
17   right here.
18         Do you agree that scar contracture around
19   Gynemesh can cause pain?
20      A.  Contractions of scarring always have the
21   potential to decrease the pliability of not only a
22   mesh augmented repair but of any -- any repair.
23      Q.  That was actually going to be my next
24   question.
```

Page 225

```
 1         First of all, the pliability can lead to
 2   pain?  Like reduced pliability can lead to pain in a
 3   patient; is that right?
 4      A.  If there's less pliability and there are a
 5   number of factors to -- for a repair being less
 6   pliable, but if there is less pliability and the
 7   tissue is placed under -- under stress, yeah, you
 8   would -- you would feel more that it would be more
 9   pliable.
10      Q.  Could the scar contracture lead to erosion?
11      A.  No.
12      Q.  How about discomfort during sex?
13      A.  Less, less pliability could make things feel
14   not -- not as soft, not as elastic.
15      Q.  Would you agree that for a mesh to be
16   successfully used for the treatment of pelvic organ
17   prolapse it should be soft and compliant with a
18   woman's vaginal tissues?
19      A.  And that is -- that is an excellent question
20   because I would like to define, which I didn't have to
21   define before in the medical arena, I didn't have to
22   define as much what soft and pliable and elastic is.
23         I have tried to come to -- to the conclusion
24   that there is a level of the formation of stress that
```

57 (Pages 222 to 225)

Jaime Sepulveda, M.D.

Page 226

1  is required. You cannot have so much deformation that
2  the prolapse comes out, but you still have to have
3  some firmness to your repair. In other words, you
4  drive your car, you need your shock absorbers to give
5  some give, to give some, but you don't want your shock
6  absorbers to be bouncing all over the place. It would
7  be as uncomfortable as no bouncing at all.
8       So when I -- when I take my car for a shock
9  absorbers check, they have something that actually
10  measures it and they can adjust it. They can adjust
11  the damper and give. We don't have that in the
12  vagina.
13      Q. Ethicon certainly never tested that issue;
14  did they?
15      MR. SNELL: Objection, lacks foundation.
16      A. The vaginal pliability, I think that there
17  was some papers about designing a device -- there was
18  a paper, actually, Dr. Willy Davila, I believe, was
19  testing a device for vaginal pliability; and that
20  would be very useful in getting an actual number,
21  getting an actual measurement that we can take from.
22      Q. (By Mr. De La Cerda) Is that something
23  that Ethicon did?
24      A. No, I think -- I don't think -- I'm not

Page 227

1  aware of Ethicon doing that.
2       Q. Would you agree that clinically there may be
3  an impact of increased rigidity with any given mesh as
4  it may increase vaginal stiffness post-operatively
5  with a potential to impair sexual function?
6       A. I -- I misspoke on my last answer. I want
7  to correct that.
8       When I say Ethicon never -- never did that,
9  I cannot conclude that because I'm not aware if they
10  did or if they didn't, but I'm just -- that's what I'm
11  aware of, that I don't know if they did or didn't.
12      Q. That's fair.
13      Let me go back to my question, the next
14  question. Would you agree that clinically there may
15  be an impact of increased rigidity with any given mesh
16  as it may increase vaginal stiffness post-operatively
17  with a potential to impair sexual function?
18      MR. SNELL: Form, speculation, incomplete
19  hypothetical.
20      A. There's -- the papers that we have does
21  not -- does not suggest or indicate rigidity. If
22  there is a shrinkage or rigidity, it was not
23  demonstrated on the measurements of total vaginal
24  length. When you measure total vaginal length, not on

Page 228

1  one but in two, three studies with comparing different
2  repairs and native tissue repairs to mesh augmented
3  repairs, the vaginal length stays exactly at the
4  same -- at the same length.
5       Q. (By Mr. De La Cerda) Should Ethicon's
6  conclusion -- strike that.
7       Should information about the concerns of
8  physicians and at least some within Ethicon that
9  Gynemesh was too stiff or too rigid for vaginal
10  tissues, should that information be included in the
11  IFU or no?
12      MR. SNELL: Form, asked and answered.
13      A. No, I don't think it needed to be
14  included and the fact is that surgeons have the
15  options of doing augmented repairs or doing --
16  continue doing native tissue repairs. And they will
17  have whatever concern they may have with one or the
18  other, they have the option of doing one or the other.
19  No one mandated to do a mesh repair or a native tissue
20  repair at a certain time. But if you went by the data
21  and went by the durability and went by the evidence
22  about -- with Gynemesh, you have -- you were empowered
23  with information to decide one way or the other.
24      Ethicon does not tell surgeons who --

Page 229

1  actually, they never told me, I can tell you that, and
2  they would never tell anyone, "You have to do this
3  repair with this type of material." And I don't think
4  they would include that in the IFU and they would not
5  include that on any communication because it's up to
6  the surgeon to decide that.
7       Q. (By Mr. De La Cerda) So would that be the
8  basis for why that information is not -- does not
9  need to be included in the IFU, according to your
10  opinion?
11      A. If the information on the -- on the IFU has
12  to do with the product itself and if there's no
13  evidence of the product performing one way or the
14  other, I would not expect anyone to misrepresent it
15  one way or the other. In other words, I don't --
16  don't misrepresent it saying that it performs better,
17  don't misrepresent it saying that it performs worse.
18  Just give me what the evidence shows.
19      Q. Would you agree that any future meshes
20  developed by Ethicon for pelvic organ prolapse should
21  be less rigid than Gynemesh?
22      A. I don't -- I don't know if it's going to be
23  any development, I don't know if it's -- it's going to
24  be on the same rate of damage. I think that --

58 (Pages 226 to 229)

Jaime Sepulveda, M.D.

Page 230

1      THE COURT REPORTER: On the same?
2      A.   On the same rate of -- on the same rate
3  of -- when I say "rate," on the same elasticity or
4  pliability of Gynemesh.
5      I don't know if it's going to be the same
6  stiffness or not.  I just don't know what they're
7  going to do with the next generation.
8      Q.   But my question is, though, is:  If they are
9  going to develop the next generation, do you agree
10  that that next generation should be less rigid than
11  Gynemesh?
12      MR. SNELL:  Objection, foundation.
13      A.   I think we will have to first establish a
14  way of rigidity in -- once in the vagina and not just
15  on the testing that we have, biomechanical testing.
16      We know that biomechanical testing as
17  accurate and as elaborate and as complicated as it can
18  be, it doesn't always predict the -- the rigidity in
19  the vagina, because we don't know how to measure
20  rigidity in the vagina.  We don't know how you're
21  going to measure it.
22      Q.   Let me shift gears a little bit.
23      Okay.  You understand before a medical
24  device can be marketed in the United States, the FDA

Page 231

1  requires that the device receive some level of
2  clearance or approval before that marketing happens;
3  right?
4      A.   Yes.
5      Q.   You're aware that Prolift wasn't cleared for
6  marketing in the United States by the FDA until
7  May 15, 2008; right?
8      MR. SNELL:  Form.
9      A.   There were some -- some dates in there, but
10  I don't have the dates complete.
11      Q.   (By Mr. De La Cerda)  You understand that
12  Prolift was marketed in the United States for
13  approximately three years before it received
14  clearance.  Do you understand that?
15      MR. SNELL:  Form, foundation.
16      A.   Yeah, it's -- it may have been marketed,
17  yes.  I don't -- I don't know -- I cannot give you an
18  accurate answer on that.
19      Q.   (By Mr. De La Cerda)  Should the fact that
20  Prolift wasn't cleared for marketing in the United
21  States been included in the Prolift IFUs in place
22  prior to May 15, 2008?
23      MR. SNELL:  Form, foundation, misstates the
24      regulatory --

Page 232

1      A.   Marketing -- marketing a device -- marketing
2  a device doesn't mean that you cannot -- you cannot
3  sell it.  I don't think it has the relationship of one
4  with the other.  If you -- if marketing means someone
5  visited me and giving me a brochure and telling me all
6  these things about the product, I really want to look
7  at the evidence.  I will be courteous and I will
8  listen to it, but I will go to -- with the evidence.
9      And the evidence was, at that time and still
10  today, that -- that the materials used were as good as
11  a native tissue and was more durable.
12      Q.   (By Mr. De La Cerda)  So you're telling me
13  that doctors didn't need to know before they put in
14  a Prolift if it hadn't even been cleared by the FDA
15  until May 15, 2008?
16      MR. SNELL:  Same objections.
17      Q.   (By Mr. De La Cerda)  Because there
18  were -- there were hundreds, if not thousands, of
19  Prolifts put in before it was ever cleared.  Do you
20  understand that?
21      MR. SNELL:  Same foundation, objection.
22      A.   I'm not -- I'm not aware of that specific --
23      Q.   (By Mr. De La Cerda)  We can -- we don't
24  even have to have a number.  If one was put in

Page 233

1  before it was ever cleared by the FDA, do you think
2  it's okay for a doctor to not know that it wasn't
3  cleared by the FDA before he puts it in to a
4  patient?
5      MR. SNELL:  Same objection.
6      A.   It had a 510(k) approval; correct?
7      Q.   (By Mr. De La Cerda)  May 15, 2008.  So
8  for three years it didn't.
9      Have you ever seen the correspondence
10  between Ethicon and the FDA about that clearance
11  issue?
12      MR. SNELL:  Same objection, foundation.
13      A.   I'm not aware of that, no.
14      Q.   (By Mr. De La Cerda)  Are you aware of the
15  510(k) being rejected a couple times?
16      MR. SNELL:  Actually misstates the evidence,
17  foundation as well.
18      Q.   (By Mr. De La Cerda)  You haven't seen any
19  of that correspondence?
20      A.   Not -- not on that specific issue, no, I
21  have not seen it.
22      Q.   All right.
23      A.   But if you give it to me, I'll check it out.
24  I'll give an opinion on it.  That's -- that's ...

59 (Pages 230 to 233)

Jaime Sepulveda, M.D.

Page 234

1    Q.  So let's take the simple fact this product
2   was marketed in the United States before it ever had
3   clearance.  Now, before a doctor ever implants the
4   product, do you think it's fair for him not to know
5   that the product he's implanting hasn't even been
6   cleared by the FDA?
7        MR. SNELL:  Same objection, misstates the
8     evidence and the foundation as to the clearance.
9     A.   If it's -- I don't want to give you an
10   opinion on something that I haven't seen.
11    Q.  (By Mr. De La Cerda)  As you sit here
12   today, you have not reviewed any of the
13   correspondence between the FDA and Ethicon regarding
14   the clearance of the Prolift under the 510(k)
15   process; right?
16    A.   I -- I know that Prolift was cleared and I
17   know that there was -- the product had been sold.  I
18   just don't know the specifics of when was it cleared
19   and the dates as you're referring to.
20    Q.  What I want to try to get at now is, as you
21   sit here today, are you going to provide any opinions
22   about the Prolift and the timing of its clearance and
23   what effect that might have on warnings to doctors?
24    A.   As we sit here today, I cannot give you an

Page 235

1   opinion about something that I have not read.
2    Q.  Okay.  And so you know today is my
3   opportunity to question you about this issue.  This
4   isn't a new issue, it's been around since 2008.  So if
5   you're telling me today that you don't have -- you're
6   not prepared to provide an opinion on that issue,
7   that's great.  That sends me down one road.
8        If you're telling me today that you do have
9   an opinion, then that's why -- then I would like to
10   ask questions about it.  But if you're not going to
11   opine -- if you don't intend to opine on the effect of
12   the timing of the clearance of the Prolift through the
13   510(k) process and that effect on what should be
14   warned or what should be told to doctors about the
15   Prolift, then that's fine and we can move on to the
16   next subject.
17    A.   No, I can -- I can look at those papers and
18   I cannot give you an opinion at this time about papers
19   that I have not seen.
20    Q.  Are those papers in your Reliance List?
21    A.   No, I don't think they're in my Reliance
22   List.  If they would be, I would have read it.
23        THE WITNESS:  Oh, you didn't --
24        MR. DE LA CERDA:  I'm actually the nice one.

Page 236

1   Out of all the plaintiff's guys you meet, I'm the
2   nice one.
3        MR. SPARKS:  Hey.
4        MR. DE LA CERDA:  He's a nice one, too.
5    Q  (By Mr. De La Cerda)  Let's switch gears a
6   little bit.
7        Do you agree with the FDA's viewpoint that
8   there is a need for more rigorous studies regarding
9   the safety and efficacy of transvaginal mesh kits?
10    A.   The --
11        MR. SNELL:  Hold on.  You said -- can you
12     read that last -- he said transvaginal --
13        THE COURT REPORTER:  Mesh kits.
14        MR. SNELL:  I'm going to object, overbroad,
15     to the extent you're including Prolift
16     midurethral slings.
17        MR. DE LA CERDA:  And I'm not, so I do want
18     to be clear about that.
19        When I'm using this term "transvaginal mesh
20     kits," it's transvaginal mesh for the correction
21     of pelvic organ prolapse.
22        So let me go back.  Let me read the question
23     one more time.
24    Q.  (By Mr. De La Cerda)  Do you agree with

Page 237

1   the FDA's viewpoint that there is a need for more
2   rigorous studies regarding the safety and efficacy
3   of transvaginal mesh kits, meaning transvaginal mesh
4   for the correction of pelvic organ prolapse?
5    A.   No, I disagree with that recommendation.
6    Q.  (By Mr. De La Cerda)  Okay.  And why is it
7   that you disagree?
8    A.   I disagree because there was a wealth of
9   data on -- on the use of transvaginal mesh that has
10   been determined by more than 400 surgeons -- 400
11   active surgeons that it was adequate.
12        The decision of the FDA, with all due
13   respect to the organization or to whoever put the time
14   and put their effort in sitting on that committee, did
15   not -- did not translate on or did not convey the
16   experience of all the surgeons.
17    Q.  Did you ever actually see the FDA's 522
18   orders that were issued with regard to Gynemesh,
19   Prolift and Prosima?
20    A.   I did -- I did read about those, yes.
21    Q.  Do you know what these orders required of
22   Ethicon?
23    A.   Yes.  I -- I read about the requirements and
24   I also read at one time the response of Ethicon to the

Jaime Sepulveda, M.D.

Page 238

1   FDA.
2       Q.  That was my next question.  Do you know what
3   is it that Ethicon did in response to the 522 orders?
4       A.  They -- they made a statement along the
5   lines of what I just mentioned, that there were
6   studies, not only RCTs, not only -- but also cohort
7   studies that show the benefits in durability, it
8   showed the safety profile, it showed risk and
9   complications, very well delineated in ways that no
10  other repair had been addressed.
11      Q.  Did you also see any information regarding
12  Ethicon's estimate on the cost to have complied with
13  the 522 orders?
14      A.  I did not see the exact cost, but I know
15  that any -- any study is costly.
16      Q.  And Ethicon ultimately decided not to
17  perform what was discussed within the 522 orders;
18  correct?
19      A.  That's -- that's what I -- I -- I saw from
20  the -- from that process, from that specific process.
21      Q.  Ultimately, Ethicon decided to pull those
22  products from the market; right?  Prolift and Prosima
23  were pulled from the market; correct?
24      A.  Yes.

Page 239

1       Q.  And then Gynemesh, the indication was
2   changed from -- well, I guess before there were two
3   indications, then they changed it to just one.  So now
4   the indication for transvaginal implant was removed
5   and now it's just abdominal sacrocolpopexy; is that
6   right?
7       A.  That's correct.
8           MR. SNELL:  I'm going to object.  Wait.
9   Wait.
10          THE WITNESS:  Okay.
11          MR. SNELL:  Objection, foundation, misstates
12  the evidence and the clearance.
13          So go ahead.
14      Q.  (By Mr. De La Cerda)  So that's -- is that
15  your understanding of what was done is that Prolift
16  and Prosima were pulled from the market but Gynemesh
17  wasn't, just its indication was changed?
18          MR. SNELL:  I'm going to have to object.  I
19  didn't hear "pulled from the market."  Same
20  objection, misstates the evidence.
21          If you take my basis, I'm sure you can get a
22  clean question and answer.
23      Q.  (By Mr. De La Cerda)  What I'll do is I'll
24  ask it this way:  When Ethicon invented a word

Page 240

1   called "decommercialization" and labeled that as
2   what it did for the Prolift and the Prosima, point
3   is ultimately Prolift and Prosima they stopped
4   selling; right?
5           MR. SNELL:  Form, predicate.
6       A.  Yes.
7       Q.  (By Mr. De La Cerda)  Gynemesh they
8   changed the indication; right?
9       A.  That's -- yeah, I became aware of that.
10      Q.  And that avoided Ethicon having to comply
11  with the studies required in the 522 orders; correct?
12          MR. SNELL:  Objection, speculation.
13      A.  I don't agree with that --
14      Q.  (By Mr. De La Cerda)  Why not?
15      A.  -- last statement.  Because I'm not -- I'm
16  disagreeing on the basis that there's -- they could
17  not continue without doing the 5- -- the 522s.  I
18  think that a fair trial of this would have been to at
19  least be on the committee that the FDA had.  And there
20  was actually the voice of surgeons saying these are --
21  this is the evidence and part of the evidence was
22  presented on a communication.  It was signed by over
23  400 surgeons and still that was ignored.
24          And that has less to do with what Ethicon

Page 241

1   could do, the way I look at it, the way I appreciate
2   it, and more to the fact that the FDA decided no, this
3   is the way it's going to be, 522s or -- or not.  So
4   what could they do?
5       Q.  This is an interesting point that's come up
6   in my mind.  Why is it that the physicians didn't
7   petition Ethicon to comply with the 522 orders?  If
8   the product was so good, why don't the physicians say,
9   "Hey, Ethicon, this stuff is great, do the 522 orders,
10  we know it's going to turn out great, we all win"?
11          Why was there no petition for Ethicon to do
12  that?
13          MR. SNELL:  Calls for speculation.
14      A.  I -- I don't know.  That's exactly -- I'm
15  going to -- I'm going to probably answer it that way
16  because it calls for speculation.
17      Q.  (By Mr. De La Cerda)  Ultimately, if the
18  product's great, why didn't Ethicon do the studies?
19          Have you ever been provided a rationale as
20  to why Ethicon decided not to do the 522 studies?
21      A.  No, there was no -- no rationale and we
22  still cannot find a rationale for that, for not
23  complying with the 522.  I think that you can -- you
24  cannot tell a company how they're going to go about

61 (Pages 238 to 241)

Jaime Sepulveda, M.D.

Page 242

1  their -- running their business.  Although I would
2  like, yeah, to have that power to tell everyone to run
3  their business, it's not like I'm going to be listened
4  on that.  And there are other considerations that they
5  may have.
6          I can tell you that from a surgeons'
7  perspective, yeah, we could have been compelled --
8  going along the statement that you just made, we could
9  have been compelled to go to Ethicon and I think that
10  that was conveyed at some point, but there's no -- no
11  way to go about it when you're imposed a 522 just off
12  like that.
13          And I think that part of it -- just to
14  elab- -- elaborate on that -- part of it was that we
15  saw -- we signed that petition, we signed that letter,
16  we say, "Please reconsider this.  Let's find another
17  method to do this.  There has to be a better method to
18  do this."  And I think ten years from now we're going
19  to look back on this and we're going to say that was
20  an inadequate method.  It was too rigid and we have to
21  find other methods to have these devices available to
22  surgeons.
23      Q.  Is it necessarily a bad thing, though, for
24  clinical studies to be required before another

Page 243

1  transvaginal pelvic organ prolapse mesh is put on the
2  market?  I mean, is that a bad thing?  Isn't that a
3  good thing because it can ensure safety for patients?
4          MR. SNELL:  Form.
5      A.  I could -- let me tell you, I'm -- by now,
6  you know that I have done research in one way or
7  another for 25 years and I sponsor individuals to do
8  research and I believe in research and I believe in
9  evidence.
10          I can -- I will never be able to say, "Oh,
11  no, we don't need another study."  I think that
12  everybody wants another study, but the fact is that
13  are we going to put individuals through a study when
14  we have evidence from -- from before, multiple
15  randomized control trials, how fair is that to do
16  another study with women when we have evidence of how
17  it works?
18      Q.  (By Mr. De La Cerda)  Do you know if any
19  of the hospitals that you have privileges at had any
20  Prolift or Prosima devices leftover after Ethicon
21  stopped selling those products?
22      A.  No, that's -- in my -- my hospital, there
23  was -- it was not there.  Basically the communication
24  came in and the communication is clear and that was

Page 244

1  it.
2      Q.  What do you mean by the "communication"?
3  Did Ethicon say, "Hey, take it off your shelves"?
4      A.  No, we have a product manager in the
5  operating room and any of us that have -- any surgeon
6  that receives a letter would go and send it right away
7  to the product manager.
8      Q.  And what did the letter say?
9      A.  That's the decommercialization letter.
10      Q.  Okay.
11      A.  And that was it.
12      Q.  And so at the time it was decommercialized
13  did those products then get pulled from the shelves of
14  the hospital?
15      A.  Yeah, that's it, they're in a separate cart
16  and the cart doesn't work anymore.  I actually tried
17  to find one a few -- a few months later, I couldn't
18  find it.  No, that goes to a facility, gets destroyed,
19  that's it.
20      Q.  Okay.  Here's a few statements, I want to
21  see if you agree with them.
22          Do you agree serious complications
23  associated with surgical mesh for transvaginal repair
24  of pelvic organ prolapse are not rare?

Page 245

1      A.  They are rare.
2      Q.  They are rare?
3      A.  They are rare.
4      Q.  So you disagree with that statement?
5      A.  I disagree with the statement that they are
6  not rare.
7      Q.  Do you agree that there is no evidence that
8  transvaginal repair with mesh provides any added
9  benefit compared to traditional surgery without mesh?
10      A.  That's inaccurate and it's not supported by
11  evidence.
12      Q.  So you disagree with that one?
13      A.  I do.
14      Q.  Do you agree that it's not clear that
15  transvaginal repair with mesh is more effective than
16  traditional non-mesh repair in all patients with
17  pelvic organ prolapse and it may expose patients to
18  greater risk?  Do you agree or disagree with that?
19      A.  I disagree with that.
20      Q.  Do you agree that mesh used in transvaginal
21  pelvic organ prolapse repair introduces risks not
22  present in traditional non-mesh surgery for pelvic
23  organ prolapse repair?
24      A.  I -- in a general sense, I disagree with

62 (Pages 242 to 245)

Page 246

1   that except with a fact that the risk is inherent to
2   the implant only.
3       Q.  Which would be exposure; right?
4       A.  Which would be mesh exposure.
5       Q.  Mesh exposure.  Mesh exposure.
6       Okay.  Do you agree mesh placed abdominally
7   for a pelvic organ prolapse repair results in lower
8   rates of mesh complications compared to transvaginal
9   pelvic organ prolapse surgery with mesh?
10      A.  I don't agree -- I don't agree with that.
11  And the basis for my disagreement with it isn't only
12  the clinical -- the clinical evidence, but also my
13  experience.
14      Q.  Do you agree that native tissue repairs have
15  similar outcomes to synthetic mesh without the risks
16  inherent in mesh use?
17      MR. SNELL:  Form, vague.
18      A.  They -- the evidence shows in randomized
19  control trials that native tissue repairs have
20  other -- other risks.
21      Q.  (By Mr. De La Cerda)  So you would
22  disagree with this statement; right?
23      A.  Yes, I would.
24      Q.  Do you agree or disagree the native

Page 247

1   tissue -- strike that.
2       Do you believe it would be a reasonable
3   decision for a doctor to stop using the Prosima device
4   following the July, 2011, FDA warning?
5       MR. SNELL:  Incomplete hypothetical,
6   speculation.
7       A.  I think that there's a -- I mean, I will
8   have to think for all the other surgeons, but I think
9   it's reasonable whenever you have a letter from an
10  organization like the FDA and you -- all of us not
11  being completely -- completely aware of that process
12  on how it came through, it comes as a surprise that we
13  don't have a problem.  I think it comes as a surprise
14  not only for us, it comes as a surprise for the
15  patients.
16      Q.  (By Mr. De La Cerda)  So it would be
17  reasonable for a doctor to do that?
18      A.  I think it's reasonable for anyone to think
19  that there's something wrong and it requires a lot of
20  reading and a lot of research to really be in tune
21  with the reality.
22      Q.  And so it would also be reasonable for a
23  doctor to stop using the Prolift and the Gynemesh
24  transvaginally after that July, 2011, FDA warning;

Page 248

1   correct?
2       MR. SNELL:  Same objection, speculation,
3   incomplete hypothetical.
4       A.  It's a -- it's reasonable on the basis of
5   human nature.
6       Q.  (By Mr. De La Cerda)  At any point after
7   the July, 2011, FDA warning, did you decide to stop
8   using Prosima, Prolift or Gynemesh transvaginally?
9       A.  I think that everyone look at it and
10  everyone stop using it for the wrong reasons, less
11  because of evidence, and more because of the -- of the
12  fear of being involved in litigation, which is real,
13  and being involved in a situation having to explain
14  themselves when there is not a clear -- a clear
15  picture about the reality of it.
16      Q.  But you did stop using Prosima, Prolift and
17  Gynemesh transvaginally at some point after the July,
18  2011, FDA warning; right?
19      A.  I -- I think I continue using what -- what
20  it did, it did happen is that I communicated, "Listen,
21  we need to take a look at this," but I continued using
22  it.
23      Q.  You continued implanting it?
24      A.  Yes.

Page 249

1       Q.  Until they were pulled from the market or
2   stopped, they were stopped selling or
3   decommercialized; right?
4       A.  Yes, once you have -- you have that, I
5   don't -- I don't want to use it.
6       Q.  Do you agree -- do you agree that surgical
7   mesh to repair pelvic organ prolapse is a high-risk
8   device?
9       A.  It's a --
10      MR. SNELL:  Foundation.
11      Go ahead.
12      A.  It's a game like talking about 522, some
13  510(k)s, high risk, low risk, it's not -- it's not
14  scientifically accurate.
15      I do agree that if you're going -- if you're
16  going to use it, you need to be well-trained on it,
17  and you just don't start doing prolapse or continence
18  procedures because a device is easy to use.  You still
19  have to be trained and read what's behind all that.
20  That's my opinion of how I run my professional career.
21  It's my -- my profession.
22      That's how we do it on credentialing in my
23  hospital, that's going to be up to the credentialing
24  institutions and the physicians to decide how much

63 (Pages 246 to 249)

Jaime Sepulveda, M.D.

Page 250

1  training they will -- they will have.
2    Q.  (By Mr. De La Cerda)  And so at this
3  point, you can't tell me whether you can label
4  surgical mesh to repair pelvic organ prolapse as
5  high risk; right?
6    A.  Yeah, it's labeled high risk and there's
7  communication from the FDA labeling it high risk.
8  What I -- I can tell you is that the terminology of
9  high risk or low risk brings other implications. If
10  you look at the evidence, I will say, "Well, you know,
11  it's really a risky procedure like any surgery."
12    Q.  And so you're not going to offer testimony
13  that the Gynemesh implanted transvaginally or the
14  Prosima or Prolift are low-risk devices, are you?
15    MR. SNELL:  Objection, misstates his prior
16  testimony.
17    Go ahead.
18    A.  I will not go with low risk or high risk. I
19  think that whole terminology is so -- is so
20  nonspecific. What's -- if I -- if you compare it to a
21  heart surgery, if you compare it to -- to any other --
22  an appendectomy, there's always risk. So I cannot
23  classify one way or the other.
24    There's -- there's -- I believe that there

Page 251

1  is more to that high-risk, low-risk classification
2  than what we can actually explain on the frame of a
3  deposition.
4    Q.  (By Mr. De La Cerda)  Do you know whether
5  or not Ethicon did an internal risks analysis to
6  determine risk scores for the pelvic organ prolapse
7  mesh devices? Like whether they were going to --
8  whether Ethicon was going to label them low,
9  moderate, high risk?
10    A.  I'm not aware of them doing that and
11  actually, there's -- there was an effort, not by
12  Ethicon but by the professional societies to use the
13  Dindo classification and modify it for -- for
14  prolapse. So that's -- that tells you the extent.
15    The reason why I'm explaining is it tells
16  you the extent of how elaborate the process is. I
17  don't think that Ethicon probably -- I think they were
18  too busy with other things to develop anything,
19  anything like that.
20    Q.  Let's switch gears a little bit here.
21    Are you okay on breaks?
22    A.  I'm good.
23    Q.  Okay. We are getting close. Okay.
24    If a synthetic graft product like Prosima

Page 252

1  does not do better than a native tissue repair in
2  terms of safety and efficacy, do you think it should
3  be introduced to the market?
4    MR. SNELL:  Foundation.
5    Go ahead.
6    A.  The -- the basis for Prosima for any other
7  procedure, they don't do well with whatever benchmark
8  that you use, you need to reconsider, you need -- you
9  have a choice in the market, obviously, but there's --
10  that's not what we saw with Prosima. The cohort
11  studies done on Prosima follow the experience with
12  Prolift and it showed that it was better than native
13  tissue repairs.
14    Q.  (By Mr. De La Cerda)  You're aware that
15  Ethicon was told by some of its top consultants it
16  did not make sense to use the Prosima in people with
17  lesser degrees of prolapse given the outcomes?
18    A.  Any consultant may have an opinion. That's
19  something that -- that's something that Ethicon always
20  foster for anyone to give an opinion. And it's not
21  like we were that shy of giving an opinion because we
22  actually offer plenty of it.
23    Q.  Would you disagree with that -- this
24  particular opinion?

Page 253

1    A.  I disagree.
2    Q.  Do you agree or disagree with the following
3  statement:  There is no authoritative paper to support
4  that Prosima outcomes are superior or even comparable
5  to colporrhaphy?
6    A.  I disagree with that, and the papers are
7  authoritative and within the context of evidence
8  previously gathered by the use of Gynemesh and
9  Prolift.
10    Q.  So if the primary investigator for the
11  Prosima trial which studied whether or not the product
12  was effective for Grade II and III rectocele and
13  cystoceles made that statement, you would disagree
14  with her?
15    A.  I'm not aware -- are you speaking about
16  Dr. Zyczynski?
17    Q.  I guess ultimately -- you know, what I'll
18  do, I'll just withdraw the question. I think you've
19  already answered anyway.
20    You disagree with the prior statement, so I
21  think you answered that anyway.
22    A.  I'm going to refer to her on first name
23  because I think that she will be okay with it. Her
24  first name is Halina, H-a-l-i-n-a.

64 (Pages 250 to 253)

Page 254

1      Q.  If the overall consensus of a medical device
2   company's consultants and experts is that it would be
3   a mistake to launch a device on the market, do you
4   think it would be wrongful for the company to launch
5   that device anyway?
6      A.  The --
7          MR. SNELL:  Wait.  Hold on.  Objection,
8      speculation, incomplete hypothetical.
9      A.  The fact that you are a scientist doesn't
10  always mean that you're going to know marketing.
11  That's -- there's more than one person making those
12  decisions.
13     Q.  (By Mr. De La Cerda)  So you don't believe
14  that it would necessarily be wrongful for a company
15  to launch a product under those circumstances; is
16  that right?
17         MR. SNELL:  Same objection.
18     A.  I think there's more than one opinion that
19  needs to be considered, especially in a multicenter
20  study.
21     Q.  If the overall consensus of a medical device
22  company's scientists and experts is that it would be a
23  mistake to launch the device on to a market, do you
24  think that doctors or patients who are provided the

Page 255

1   device should be told the company's scientists and
2   experts think that the device is a mistake?
3          MR. SNELL:  Form, foundation, incomplete
4      hypothetical.
5      A.  Yeah, I don't think that any company is
6   going to tell you, "Yeah, I'm going to release it and
7   it's mistake."
8          No, the evidence is there and -- and the
9   evidence was so very clear with Prosima.  It was
10  presented in modules, it was presented on the number
11  of patients, it was presented in a multicenter study.
12  It had all the qualities of a good cohort study.
13     Q.  (By Mr. De La Cerda)  So you don't think
14  that a doctor or -- a doctor who's implanting a
15  Prosima or a patient who's going to receive a
16  Prosima wants to know before that Prosima is put in
17  that at some point the top consultants and experts
18  at the company believe that Prosima was a mistake,
19  they believe it was a reckless product, that they
20  believe if they put the product out on the market
21  they were going to stop working with Ethicon, you
22  don't think any of that information should be
23  provided to doctors or patients?
24     A.  No.

Page 256

1          MR. SNELL:  Hold on.  You've got to give me
2      a chance.
3          Form, foundation.
4          Go ahead.
5      A.  No, it's -- I don't think that's -- that
6   that should be considered.  I think that the
7   scientific evidence supersedes whoever feels that it's
8   in so much power to say, "Oh, it's reckless because I
9   say it's reckless."
10         Well, this is the evidence, this is the
11  scientific evidence, this is the multicenter evidence.
12  If you insist on calling it reckless or giving an
13  irresponsible opinion, which is what it is, then it's
14  up to you, but this is the evidence on this device.
15     Q.  (By Mr. De La Cerda)  So Marcus Carey, you
16  know, is the inventor of Prosima; right?
17     A.  Yes.
18     Q.  And you know he received -- he would receive
19  royalties each time the Prosima was sold; right?
20         MR. SNELL:  Foundation.
21     A.  I -- I'm aware that he got paid for his
22  work.
23     Q.  (By Mr. De La Cerda)  Do you know how much
24  he got paid?

Page 257

1      A.  No.
2      Q.  Do you know he was the lead author on the
3   Prosima study done by Ethicon prior to launch?
4      A.  There was the first one and then there was
5   another study.
6      Q.  Do you know what his success rate was with
7   the Prosima in that first study?
8      A.  It's -- on the -- the first study was
9   around -- above the hymenal ring, I believe it was in
10  the '70s.
11     Q.  What about below?  Below the -- I just lost
12  the word.  Hymenian, is that what you said?
13     A.  Hymenal ring.
14     Q.  Hymenal ring.
15         MR. SNELL:  Let me caution you.  If you have
16      a study, you should pull it out and look at it.
17      He's not asking you to guess.  I mean, we have
18      all this stuff here, you can look at it.
19         THE WITNESS:  Okay.
20         MR. SNELL:  I don't know where you have it,
21      but I would assume it's in one of these things.
22     A.  This is it.  This is the study.
23     Q.  (By Mr. De La Cerda)  Okay.  So go back to
24  the question.  Do you know what his success rate was

65 (Pages 254 to 257)

Jaime Sepulveda, M.D.

Page 258

1    with the Prosima in his first study?
2        A.   Let me look through it and I'll --
3    73.9 percent.
4        Q.   And you say that is above or below the
5    hymenal ring?
6        A.   That's about the hymenal ring.
7        Q.   And how about below the hymenal ring?
8        A.   The rest of it.
9        Q.   What do you mean "the rest of it"?
10       A.   The other percentage.
11       Q.   So it's 70/30?
12       A.   Yes, it's 70 -- yes, it's 73.9 versus
13   20-something.  Either one, yeah.
14       Q.   Do you think the fact that he was the
15   inventor of the product introduced bias in that study?
16       THE WITNESS:  Let me point out -- do you
17   see -- you saw that, right?
18       MR. SNELL:  Okay.
19       A.   Please repeat the question.
20       Q.   Sure.
21       Do you think the fact that he was the
22   inventor of the Prosima introduced bias into that
23   study?
24       A.   No.

Page 259

1        Q.   Why not?
2        A.   I have no reason to believe that he would be
3    bias with it.
4        Q.   Do you know whether Ethicon thought there
5    was a fair amount of spin going on regarding Dr. Carey
6    reporting of his clinical data?
7        A.   Fair amount of?
8        Q.   Spin.  Have you ever heard that term "spin,"
9    spinning the data, spinning the information?
10       A.   No, no.
11       Q.   Like the politicians do?
12       A.   I have no reason to believe that
13   Professor Carey had any deviations from what he would
14   honestly do.
15       Q.   Do you know whether Ethicon believed that
16   Dr. Carey was spinning the data?
17       A.   No.  No, I don't -- I'm not aware of that.
18       Q.   The inventor of Prolift, Dr. Cosson,
19   C-o-s-s-o-n --
20       A.   Cosson.
21       Q.   Cosson.
22       MR. SNELL:  Misstates, lacks foundation.
23   You've got the wrong person.
24       Q   (By Mr. De La Cerda)  Is he the inventor of

Page 260

1    Prolift?
2        A.   It was a group.
3        Q.   It was a group, right.
4        A.   It was a group.
5        Q.   You've relied on -- have you relied on data
6    and literature published by Dr. Cosson and the TVM
7    group to support your conclusions that Prolift is safe
8    and effective?
9        MR. SNELL:  Same objection.
10       A.   Well, there was a TVM and there was Prolift.
11   And TVM was a precursor, but is different from the
12   product on Prolift.
13       Q  (By Mr. De La Cerda)  Okay.  Do you know if
14   Dr. Cosson receives royalties for the Prolift or
15   received?
16       A.   No, I don't -- I'm not aware of what he
17   received.
18       Q.   Do you believe that an inventor who receives
19   royalties for selling his invention can be potentially
20   biased when publishing data regarding his invention?
21       MR. SNELL:  Speculation.
22       A.   I don't -- I don't see them being biased.  I
23   have no reason to believe that would be the case.
24       Q.   (By Mr. De La Cerda)  You're very

Page 261

1    trusting.  You're very trusting.
2        A.   This is high caliber -- high-caliber
3    investigators.
4        Q.   Well paid, too.
5        You're aware that Ethicon had an alternative
6    mesh to Gynemesh PS that they believe would cause
7    fewer compli- -- fewer serious complications at least
8    as early as 2006; right?
9        MR. SNELL:  Foundation, misstates the
10   evidence.
11       A.   Could you please repeat that?
12       Q.   (By Mr. De La Cerda)  Sure.
13       Are you aware that Ethicon had an
14   alternative mesh to Gynemesh PS that they believed
15   would cause fewer complications at least as early as
16   2006?
17       MR. SNELL:  Same objections.
18       A.   No, I'm not aware of that, any mesh like
19   that, but I'm also aware that there's very low
20   likelihood that there was any evidence strong enough
21   for Prolene polypropylene.
22       Q.   (By Mr. De La Cerda)  What do you mean by
23   that?
24       A.   The evidence on Prolene polypropylene, on

66 (Pages 258 to 261)

Jaime Sepulveda, M.D.

Page 262

1   the behavior of the material, it's -- it was
2   well-established by the time Gynemesh PS came in.
3       Q.  So you don't believe it's possible that
4   Ethicon can have evidence that it had a mesh different
5   from Gynemesh that they believe was safer than
6   Gynemesh?
7           MR. SNELL:  Objection, same objection.
8       A.  I believe it's possible to have another
9   mesh.  What I don't believe is that the mesh could be
10  based to be safer or with more evidence.
11      Q.  (By Mr. De La Cerda)  Okay.  I'm going to
12  ask you whether you agree with the following
13  statements.
14          Do you agree that physicians should be
15  aware -- made aware of all of the significant safety
16  risks associated with the product in the IFU?
17          MR. SNELL:  Objection, asked and answered.
18  I think he's testified three times on this.
19      A.  The -- the risk of the IFU should pertain to
20  the device.  There is no place in the IFU to make a
21  more comprehensive guide for incontinence, nor should
22  the IFU replace training, expertise and textbook
23  reading.
24      Q.  (By Mr. De La Cerda)  But you agree that

Page 263

1   all significant safety risks associated with the
2   product should be included; right?
3           MR. SNELL:  Objection, misleads prior
4       testimony.
5       Go ahead.
6       A.  With the -- with the product specifically
7   associated to the device and -- and -- and the mesh.
8       Q.  (By Mr. De La Cerda)  Is that a "yes"?
9           MR. SNELL:  Objection, asked and answered.
10      A.  To the device and mesh, yes.
11      Q.  (By Mr. De La Cerda)  Okay.  Do you agree
12  that a manufacturer of a medical device that would
13  be implanted in a woman's body is required --
14  actually, strike that.
15          Do you agree that an IFU should never
16  exclude known hazards or complications?
17          MR. SNELL:  Objection, I think this is all
18      asked and answered.  He's given the same opinions
19      numerous times.
20      Go ahead.
21      A.  The IFU should talk about the things that
22  are inherent to the device.  It's -- it's a guide
23  about the device.
24      Q.  (By Mr. De La Cerda)  Can't -- is it okay

Page 264

1   for it to exclude known hazards or complications?
2           MR. SNELL:  Form.
3       Q.  (By Mr. De La Cerda)  There are
4   circumstances where I think you believe that it can
5   exclude known hazards and complications; right?
6           MR. SNELL:  Same objections.
7       A.  Things that are not at risk to the patient.
8       Q.  (By Mr. De La Cerda)  No, I mean -- okay.
9           If it's a known hazard or complication to it
10  that could happen to a patient, should it ever be
11  excluded from an IFU?
12          MR. SNELL:  Same objection.
13      A.  If it's -- if the complication or the side
14  effect is the same as it would happen with a native
15  tissue repair, I believe that it does not have to be
16  included on the IFU.
17      Q.  (By Mr. De La Cerda)  Okay.  Do native
18  tissue repairs result in chronic foreign body
19  reaction?
20      A.  Yes.
21      Q.  How is that?
22      A.  There's a reaction to sutures.  There's the
23  plication of tissue that dehisce.  There is the
24  formation of hematomas or granulomas.  There are the

Page 265

1   inherent conditions of the host that could cause it,
2   such as atrophy, autoimmune disorders, lichen planus.
3   So there are a number of conditions that can make a
4   native tissue repair not work, not work well or have
5   granulation tissue or have chronic -- chronic
6   inflammation.
7       Q.  Chronic inflammation.  Okay.
8           Do you agree that if a patient undergoes the
9   TVT procedure under general anesthetic, it has the
10  potential to put the patient at increased risk for
11  urinary retention or urethral erosion?
12      A.  No.
13      Q.  And why is that?
14      A.  Initially, the idea was that when you put a
15  midurethral sling, which is tension free, that you
16  have to adjust it so the patient would not be on
17  retention.
18          It was -- it was later described that that
19  may have been true for previous slings that were used
20  ideally for vesical junction, but not for midurethral
21  slings.  Eventually, the data proved that to be
22  correct, because the rate of voiding dysfunction was
23  below 1 percent.
24          So one of the -- one of the things that that

67 (Pages 262 to 265)

Jaime Sepulveda, M.D.

Page 266

1    experience validated is something that they didn't
2    know, not even the inventor actually knew that, which
3    is that there is some viscoelasticity to the implant
4    itself.
5         MR. DE LA CERDA:  Okay.  What I'd like to do
6    now is take a break and review my notes and
7    then --
8         MR. SNELL:  I'm ready for another bathroom
9    break.
10         MR. DE LA CERDA:  We'll go off the record,
11    thank you.
12         (Thereupon, a recess was taken from
13         3:24 p.m. until 3:45 p.m., after which the
14         following proceedings were held:)
15    Q.    (By Mr. De La Cerda)  Okay.  Doctor, we're
16    back on the record.
17         There was one thing you mentioned that I
18    wanted to make sure was clear.  When we were talking
19    about the compensation you had received as a
20    consultant and then we had a discussion about trying
21    to get --
22         MR. SNELL:  I haven't gotten that either.
23         MR. DE LA CERDA:  That's fine.  That's fine.
24    Get a better version.

Page 267

1         MR. SNELL:  People are running around like
2    on your side, too, like all over the place.
3    Q.    (By Mr. De La Cerda)  There was a
4    discussion about trying to get -- there's a
5    spreadsheet that has listed out some of this
6    information and you mentioned, "Well, it might only
7    be money that was allocated for me, but not
8    necessarily money that I made."
9         Do you remember discussing that?  You might
10    not have used the term --
11    A.    Yes.
12    Q.    -- "allocated."
13    A.    Yes, they did their own allocations for what
14    they were going to spend.  It was a budget, internal
15    thing from Ethicon, a budget planning.  So it could --
16    my point is that it could say a number -- it would
17    never be higher than that number, but it was -- it
18    could be lower than that.
19    Q.    So the numbers in the spreadsheet may just
20    be what would have been an allocation or a budget for
21    you for that year and it couldn't be higher, but it
22    might be lower?
23    A.    But it might be lower, yes.  It cannot be
24    over that number.

Page 268

1    Q.    Okay.  Okay.  And then have you had a chance
2    to review that on your own, that spreadsheet?
3    A.    I saw it before -- before the Cavness trial
4    and I saw it at the Cavness trial.
5    Q.    And are you sure one way or the other
6    whether those numbers are allocated versus real
7    numbers?
8    A.    They're -- I know they're not real numbers
9    because I would have -- I would have remembered that.
10    Q.    Yeah.
11    A.    The number is -- is high, and I don't
12    remember having 1099s that were that high.
13    Q.    Okay.  Okay.  Have you understood all of my
14    questions today?
15    A.    Yes, sir.
16    Q.    Have you answered them truthfully and to the
17    best of your ability?
18    A.    Absolutely.
19    Q.    Is there any testimony that you would like
20    to go back and change at this point?
21    A.    No.
22         MR. DE LA CERDA:  Okay.  I'll pass the
23    witness.
24

Page 269

1         CROSS-EXAMINATION
2    BY MR. SNELL:
3    Q.    Doctor, I want to go through some topics and
4    I'm actually going to go in the order that
5    Mr. de la Cerda covered things just to make sure we're
6    all clear on the record here about where you intend to
7    testify and the bases and whatnot.
8         Do you recall at the beginning of the
9    deposition you were asked by Mr. de la Cerda about
10    that Abbott study where some of the patients didn't
11    return back to the implanting surgeon for care of a
12    complication?
13    A.    Yes.
14    Q.    All right.  In formulating your opinions on
15    the devices we've been discussing today, are there
16    studies in databases that have captive audiences that
17    look at treatment over time regardless of whether it's
18    the implanter, explanter, or someone else?
19    A.    No, there's -- one of the -- one of the
20    things that we have with these type of procedures is
21    that there have been tracks on Medicare databases,
22    they -- and we have other -- other -- other databases
23    that I -- and the citations I put, the Kaiser
24    Permanente, that's --

68 (Pages 266 to 269)

Jaime Sepulveda, M.D.

Page 270

1    Q.  Why don't we go there because that's what I
2  was going to ask you about.  If you turn to page 14
3  and 15 --
4    A.  Yes, I got it.
5    Q.  -- of your TVT, TVT-O report.  Do you
6  identify different database studies that assess
7  reoperation complication management regardless of who
8  actually is doing that surgery?
9    A.  Right.
10   Q.  Okay.
11   A.  The Canadian registry, there is Medicare,
12 and there's Kaiser Permanente.
13   Q.  So -- and did you find those studies to be
14 reliable?
15   A.  That is -- that is reliable.
16   Q.  So let's take the first one that I'm looking
17 at, it's reference No. 45 in your report, Jonsson
18 Funk, J-o-n-s-s-o-n, Funk.  It's the nine-year study
19 where the rate of removal for mesh urethrolysis was
20 3.7 percent.
21   A.  Yes.
22   Q.  Do you have a recollection as to whether
23 that study contained, you know, over a 100,000
24 patients or --

Page 271

1    A.  There was -- I know for a fact it's over
2  80,000 patients, close to -- close to 100,000
3  patients.  Most importantly, that rate of -- of
4  revision was about 3 percent.
5    Q.  And did you see a similar rate as to about
6  3 percent in different database studies and other
7  studies like the Cochrane reviews and randomized
8  control trials?
9    A.  Consistently you go from one paper to
10 another to another and it's 3 percent.  It's 2 percent
11 on one, 3 percent.  The maximum I have seen is
12 5 percent.  But the number that is most consistently
13 repeated is 3 percent.  And that's -- that's accurate
14 to cite to the patients.
15   Q.  So in the Abbott study, let me ask you this.
16 Do you recall that it was a case series based on
17 tertiary referral centers by Dr. Karram, who I think
18 plaintiff's counsel mentioned, and a couple other
19 doctors?
20   A.  Yes, there are probably two papers that say
21 patients would not follow through.  The first one is
22 about the -- a review about randomized control trials
23 or any follow up in which patients do not show up,
24 they tend to be considered as -- in the group that did

Page 272

1  not respond to therapy, to treatment, or to the
2  intervention.
3    The second is that paper that you just
4  mentioned, but the overwhelming data is so high in
5  other areas, in other databases that we don't go by
6  specific papers like that.
7    Q.  So the case series, can -- when you
8  formulated your opinions, did you pay attention and
9  put more effort -- more emphasis on higher level data?
10   A.  Not only formulate my opinions.  In
11 everything I read, I need -- I need to know what is it
12 that I'm reading.  And I put that scale, that bridge,
13 some people see it as a pyramid, some people see it as
14 a list.  We know that case series are at the bottom,
15 randomized control trials reviews are on the top.
16   Q.  The first study, the Jonsson Funk study, can
17 you identify, just for the record, how many patients
18 did that involve in the assessment?
19   A.  It's 188,454 eligible women.
20   Q.  And then the other footnotes, 46, 47, 48,
21 and 49, were those also the different databases you
22 mentioned?
23   A.  Right.  The Canadian, the Canadian also has
24 good reliability because the Canadian does have -- has

Page 273

1  a tracking because of their socialized system.  They
2  have tracking.  They are known to be able to track a
3  variety of conditions, and this is just another one
4  that they -- that they are -- they report.
5    Q.  And so I guess my question is:  Did you find
6  these database studies from different databases, based
7  on the volume of patients assessed and the
8  methodologies, to be more reliable than a case series
9  in a limited number of patients?
10   A.  Absolutely, besides these are up in the
11 hierarchy.
12   Q.  You were asked some questions about what you
13 did in formulating your opinions and you've talked
14 about and testified that you reviewed the medical
15 literature.  I want to make sure we're clear here.
16    Did you also look at various Ethicon company
17 documents and correspondence?
18   A.  Yes, I -- I -- I did.  I just -- in the
19 order -- in the order that I read them, I -- I read
20 them most remotely.  In other words, I -- it has been
21 more time since I read than from this.
22   Q.  Did you specifically identify in your report
23 Ethicon documents on topics that Mr. de la Cerda asked
24 you about, like mechanical cut versus laser cut, and

69 (Pages 270 to 273)

Jaime Sepulveda, M.D.

Page 274

1 degradation and pore size and things like that in your
2 reports?
3     A.  Well, by -- through the -- through my
4 testimony today, I address.  There is no way I would
5 have been able to address it if I wouldn't have read
6 it.
7     Q.  I think you testified to this and you can
8 tell me if I'm correct or wrong.
9         Did you earlier testify that based on all of
10 your analyses and the bases you talked about here
11 today, that you have not identified any
12 characteristics of the mesh that are a safety risk?
13     A.  Yeah, I don't -- I don't think that there
14 are concerns about safety on -- on -- on any of the
15 products that we were using.  If I would have thought
16 there were concerns about safety to begin with, I
17 wouldn't have used them.
18     Q.  And besides the medical literature and the
19 high-level data that you have referenced, do you also
20 rely on your clinical experience?
21     A.  There's -- my experience is important, the
22 data is important, and the caliber of the data is
23 important.  Not only that, my experience and the
24 experience of the people that I -- that I talk to.

Page 275

1         You see, it's -- in medicine, we still -- we
2 still value very much the experience, the experience
3 of our colleagues, so I use that and I use also the
4 experience of -- my own experience and the experience
5 of those that investigate.  People -- people that are
6 extremely talented are looking at studies.
7     Q.  And at the end, though, in formulating your
8 opinions and coming to your final conclusions about
9 the safety and efficacy of Gynemesh PS, Prolift, TVT,
10 TVT-O, did you put more weight into the randomized
11 level on control trials than individual experience or
12 case series?
13     A.  Randomized control trial is what -- what we
14 wish we would have on everything.  But once you have a
15 few randomized control trials, you can build up with
16 other -- with the other studies.  You cannot just do
17 the reverse, you have to build up on the strongest
18 ones.
19     Q.  You were asked a lot of questions about your
20 opinions on IFUs and you told Mr. de la Cerda various
21 grounds and bases for your opinions and you talked
22 about how you had reviewed IFUs over many years and
23 numerous times.
24         Let me ask you this.  In your professional

Page 276

1 education role, did you teach and cover the IFU with
2 other pelvic surgeons specific to these devices we
3 talked about today?
4     A.  We could -- we could make -- the answer is
5 yes.  We could make any presentation and present any
6 slide, but at the end when we're working together in
7 the specimen and they collaborate, it's the IFU, the
8 one that comes out.
9         And as a -- as a preceptor or as a teacher,
10 you need to know that IFU by -- by steps and know not
11 only what it says, but what it really says in terms of
12 mechanics.  That's important for all -- all products.
13     Q.  And how many of the cadaver labs or these
14 labs that you did included covering the IFU with the
15 surgeons?
16     A.  Every single -- every single lab.
17     Q.  How many cadaver labs did you do on these
18 products?  Your best estimate is fine.
19     A.  The VCS here did about six cadaver labs
20 locally.  We had -- we used to go to Orlando and it
21 was very convenient for me because when I would miss
22 the plane, because I was seeing patients, I would just
23 drive up there, and it's -- and it was six in the max
24 year, maybe eight.

Page 277

1     Q.  Would there be just one surgeon at this
2 event or would there be multiple?
3     A.  No, multiple surgeons.  There was more than
4 one -- one preceptor.
5     Q.  Do you have an estimate as to the number of
6 pelvic floor surgeons you would have worked with and
7 trained and went through the IFU with?
8     A.  I never -- never saw more than four.  And if
9 I will have two, that would be good.  We -- we started
10 with the IFU.  We would teach the device and after
11 that, one of the opportunities that we have in the
12 cadaver lab is that we could dissect and get an
13 in-depth view of what -- where the devices went by
14 using the IFU.  So it was the ultimate test for an IFU
15 and the test is on performance of the procedure.
16     Q.  You were asked questions about TVT and these
17 products and you expressed the opinion that you don't
18 think that the devices rope, curl, degrade, et cetera.
19         Did you -- so let me -- so with that
20 preface, did you look at the literature to see whether
21 any of the studies in the patients reported a
22 difference or a hypothesis as to a difference as to
23 laser cut versus mechanical cut mesh?  Are there any
24 studies that describe it?

70 (Pages 274 to 277)

Page 278

1    A.  There is not -- there are no actual studies
2  that define one way or the other.
3        There is actually the well-designed
4  randomized control trials, like the TOMUS, which is
5  evaluating midurethral sling, transobturator and
6  retropubic.  And what -- in that specific study, which
7  is an excellent study, it's one of the pillars of what
8  we do, it's -- we -- we found out there was no
9  description of one or the other; and I have the
10 impression that both were used and there was never any
11 difference on it.
12    Q.  For the mechanical versus laser cut, do you
13 cover that in-depth in your report on pages 23 through
14 25?
15    A.  Yes.
16    Q.  Do you have -- is there a TVT-Secur report
17 over there?
18    A.  Yeah.
19    Q.  Do you recall a study by the name -- maybe
20 the first author's name was Neuman that looked at
21 TVT-O versus TVT-Secur and it reported percentages of
22 complications for erosion and dyspareunia and there
23 was a difference seen on dyspareunia which the authors
24 reported may have been to -- may have been due to

Page 279

1  laser cut mesh.  Do you recollect that?
2    A.  That's Dr. Menahem Neuman's study.  He's in
3  Israel and he study -- he studied TVT-Secur.
4    Q.  What page are you on?
5    A.  That's 44.
6    Q.  And was that the only study that you were --
7  that you found in your investigation in the clinical
8  application of these products on women that suggested
9  there may be a difference between the two?
10   A.  There's a -- there's another -- another
11 study that Bianchi-Ferraro and on the -- both of them,
12 there are TVT-Os and TVT-Securs compared and there's
13 no difference on them.  That's -- this is just -- this
14 is just illustrate that mechanical cut and laser cut,
15 unless you put it on extreme conditions, way beyond
16 the stressors that would be found on the pelvis, there
17 is no significant difference on the behavior.
18   Q.  Page 45 on the Neuman study, you wrote that
19 the authors theorized that the laser cut mesh was to
20 blame for higher dyspareunia, but there is no
21 scientific data confirming that.
22   A.  There is no scientific data and that is just
23 an opinion and that's -- that's what we -- we have to
24 define what's science, what's an opinion.  Sometimes

Page 280

1  you see a study that has good science, but then it
2  becomes an opinion at the end.
3    Q.  Do you recall Mr. De al Cerda asking you
4  about a hypothetical that if laser cut mesh was three
5  times stiffer or more stiffer than mechanical cut mesh
6  would it lead to more complications and he may have
7  even mentioned exposure.  Do you recall?
8    A.  Yeah, I do recall.
9    Q.  My question to you is:  So in that study by
10 Neuman, did the laser cut mesh have a significantly
11 different rate of erosion than the mechanical cut
12 mesh?
13   A.  There's -- the rate of erosions were -- was
14 lower on the Secur.  It was zero versus a 1.4 on the
15 TVT-O.
16   Q.  Have you found any reliable, convincing
17 clinical study evidence that, in your mind,
18 establishes that there is a significant difference in
19 laser and mechanical cut mesh when implanted with the
20 TVT devices in women?
21   A.  There has been no study up to now and,
22 obviously, I'm giving you the opinion that I will
23 welcome any study that makes a difference between --
24 between the two of them.

Page 281

1        The Cochrane database, actually, did not
2  define that.  There is no other study that has defined
3  it.
4    Q.  Do you have an opinion as to whether the
5  weight, pore size, and width of the TVT mesh is proper
6  in that device for the treatment of stress urinary
7  incontinence?
8    A.  For which device specifically?
9    Q.  For the TVT, TVT-O devices, do you believe
10 that the mesh is the proper weight, pore size, and
11 width?
12   A.  Yes, and that's -- that's -- that's a mesh
13 that has the evidence behind it.
14   Q.  And when you say "the evidence," are you
15 talking about the various evidence that you put into
16 your reports?
17   A.  Yeah, we have come to the point, even the
18 communication from the FDA, most recent one, just --
19 just speaks about the standard for continence care
20 being a midurethral sling.
21   Q.  You were asked a question by plaintiff's
22 counsel about the lighter weight mesh and larger pore
23 mesh.
24        Has any lighter weight or larger pore mesh

71 (Pages 278 to 281)

Jaime Sepulveda, M.D.

<table>
<tr><td>

Page 282

1    been studied as much or demonstrated to be as useful
2    and safe as the mesh in TVT for the application of
3    stress incontinence?
4        A.   For -- for stress incontinence specifically,
5    there is no other mesh that has been tested to the
6    extent -- actually, there's no other continence
7    procedure material that have been tested to the extent
8    of TVT.
9        Q.   And is that all different types of studies
10   or just randomized control trials?
11       A.   There are all types of studies that -- but
12   predominantly randomized control trials as -- and
13   we're talking about devices for urinary incontinence.
14       Q.   You were asked a lot of questions about
15   degradation.  Do you believe that the available data
16   shows that the Prolene mesh degrades?
17       A.   No.
18           MR. DE LA CERDA:  Form.
19       Q.   (By Mr. Snell)  And did you review
20   specifically studies referenced by plaintiff's
21   counsel and others, you went and looked for like the
22   Clavé paper, that purportedly raised this issue of
23   degradation?
24       A.   That is one descriptive paper in which we --

</td><td>

Page 284

1    demonstrate degradation?
2        A.   No, the samples -- the samples were poorly
3    treated to the point that they -- they were not given
4    a good for analysis.
5            Classically, explant -- explanted tissue --
6    I'm sorry, explanted graft is not a good -- it's not a
7    good sample to begin with, much less when you put it
8    through -- through spectroscopy, spectroscopy or
9    chromatography and much less through thermal --
10   thermal changes.
11       Q.   Were there -- in the Clavé paper, did you
12   see that the authors acknowledged that there was no
13   control group to compare?
14       A.   No, that's not a control -- control study.
15   That's barely a descriptive study.
16       Q.   Did you find any of the data that purported
17   to raise this issue of the hypothesis degradation to
18   be reliable?
19       A.   No, I have not seen one yet that proves
20   degradation with any definition that I've been given
21   of degradation.
22       Q.   Mr. de la Cerda asked you about cytotoxicity
23   and your report -- your report, I believe, covers that
24   pretty much in-depth.

</td></tr>
<tr><td>

Page 283

1    we can actually look at 26 samples of low density.
2    That's 26 samples out of close to over 2 million --
3    between 2 million and 3 million slings that I don't
4    think you can reliably give any opinion on that and
5    actually, if it would degrade, I would expect it to
6    perform worse, and that's not the evidence that we
7    have.
8        Q.   Is there evidence, long-term data, that
9    shows sustained durability and low complications in
10   your view?
11       A.   Yes.  There is data at five years, ten years
12   and now I believe there is data bordering on the 15
13   years.
14       Q.   And is that data, in your opinion,
15   consistent or inconsistent with the degradation
16   theory?
17       A.   No.
18       Q.   What's that?
19       A.   It's not consistent with the degradation
20   theory.  It's actually inconsistent.
21       Q.   In the Clavé study, did you see that besides
22   the fact that a minority of the mesh is -- had this
23   surface cracking on SEM, when they actually did the
24   chemical analytical testing, did those tests

</td><td>

Page 285

1        A.   Yes.
2        Q.   And you talked with Mr. de la Cerda about
3    the various Ethicon documents and testing you've
4    reviewed and your opinion about the different types
5    and what those studies show or don't show.
6        A.   Yes, I -- I reviewed the -- Ethicon actually
7    ask a third-party lab to do it.  It's a third-party
8    lab in Germany and the reports are clear on all the
9    assays.
10       Q.   And I think Mr. de la Cerda asked you to
11   identify, you know, the bases for your opinion for
12   your cytotoxicity opinions and you identified those
13   documents in your analysis.
14           Let me ask you this.  Is the basis for your
15   cytotoxicity opinions also your personal experience on
16   assessing cytotoxicity issues?
17           MR. DE LA CERDA:  Leading.
18       A.   Yeah, well, I assess cytotoxicity with word
19   in science starting to see cytotoxicity in -- in 1985,
20   from 1985 to 1986, that's all I did in the lab.  And
21   it's -- I did that -- I actually presented it at a
22   conference on -- on pharmaco -- on molecular
23   pharmacology.  And that's -- that's my experience with
24   it.

</td></tr>
</table>

72 (Pages 282 to 285)

Jaime Sepulveda, M.D.

Page 286

1    Q.   (By Mr. Snell)  So you have personal
2  experience in cytotoxicity analyses?
3    A.  I have done bench -- I have done bench work
4  on cytotoxicity.
5    Q.   Did you also evaluate the clinical
6  literature on these devices to see whether they
7  documented or raised a phenomenon that you would
8  attribute to cytotoxicity?
9    A.  I went through all these documents and I
10  read the results on each one of them and I -- I'm in a
11  good position to see what -- what the assays show.
12    Q.   In your opinion, is the TVT mesh cytotoxic?
13    A.   No.
14    Q.   You were asked about clinical data that was
15  available before TVT-O -- the TVT-O device was
16  marketed.  Do you recall just covering that topic with
17  Mr. de la Cerda?
18    A.   Yes.
19    Q.   Was there data on -- clinical data, clinical
20  studies on the TVT device before TVT-O went to market?
21    A.   There was clinical data, yes.
22    Q.   Is that data relevant, in your opinion, to
23  TVT-O?
24    A.   Yes, it is.

Page 287

1    Q.   Is it the same mesh?
2    A.   It's the same implant.
3    Q.   You were asked about the MSDS sheet that you
4  looked at for the raw polypropylene and a statement in
5  it to the effect that the raw polypropylene -- I don't
6  remember the specific, but it had something to do with
7  compatibility.
8      My question to you is this:  Is the TVT
9  compatible with the female human body implanted --
10  implantation in the pelvis for treatment of stress
11  incontinence?
12    A.   It is biocompatible.  It has been
13  demonstrated that it's biocompatible and it has no
14  similarity to raw polypropylene.
15    Q.   That was going to be my next question.  Is
16  raw polypropylene implanted in the TVT process -- TVT
17  device?
18    A.   It's a -- it's a different thing.  Totally
19  different -- different type of material.
20    Q.   There was a discussion about sarcoma
21  formation in rats when raw polypropylene was implanted
22  in disk or powder form.  Do you recall that?
23    A.   Yes.
24    Q.   Is TVT disk or powder form?

Page 288

1    A.   No.  And TVT has not been as to a sarcoma
2  and there is actual -- actually a publication about
3  it.
4    Q.   I think in your report at page 26 you go
5  through some of the different epidemiologic studies
6  with regard to the polypropylene slings and cancer and
7  sarcoma.
8    A.   On the --
9    A.   On the --
10    A.   Which one of the reports?
11    Q.   Probably be TVT, TVT-O report, page 26.
12    A.   Yes.
13    Q.   The top paragraph where you state:  "The
14  available data does not show any causal links between
15  polypropylene and cancer," and then you have numerous
16  footnote citations.
17    A.   Actually, the evidence is for lack of the
18  carcinogenic.
19    Q.   And as part of Exhibit 11 there is a paper
20  by the lead author Linder where there was over 2,000
21  midurethral sling patients who were analyzed.  I'll
22  just hand it to you.  We'll make sure we put it back
23  into Exhibit 11.
24    A.   Yes.

Page 289

1    Q.   Is that one of the studies that form the
2  basis of your opinion that the data show
3  noncarcinogenic --
4    A.   The rate of cancer in these patients was
5  reported to be below baseline.
6    Q.   Have you seen any studies utilizing the
7  Prolene polypropylene in any of these devices we
8  discussed today that show a statistically significant
9  elevated risk of sarcoma formation or cancer in women
10  over and above the expected background rate?
11    A.   No.
12    Q.   And in that study by Linder you just
13  mentioned, is it correct that 49 of the 50 patients
14  had cancer already a baseline?
15    A.   Yeah, that's -- that's the only -- it's 2
16  out of 2,474.  That's what makes for .0- -- 08.
17  That's extremely low.  That's actually lower than the
18  reported -- one of the cases was an ovarian cancer and
19  that's lower than the reported rate of ovarian cancer.
20    Q.   Let me put that back in Exhibit 11.  Make
21  sure we don't lose that.
22      You were asked questions by Mr. de la
23  Cerda -- I'm going to circle back around to the
24  lighter weight, larger pore mesh theory.

73 (Pages 286 to 289)

Jaime Sepulveda, M.D.

Page 290

1     Do you know whether actually the TVM group
2  evaluated a larger pore, lighter weight mesh in the
3  development of what became Prolift --
4     MR. DE LA CERDA:  Leading.
5     Q.  (By Mr. Snell)  -- that was besides
6  Gynemesh PS?
7     A.  They did.  They did and it's in my Reliance
8  List.  Professor Jack Tanny evaluated the IFUs of
9  different meshes with absorbable components and with
10  large pore size.  Their first conclusion and that's
11  non- -- the first conclusion wasn't Dr. -- Professor
12  Berrocal, B-e-r-r-o-c-a-l.
13     Professor Berrocal's paper in which the
14  statement was clear the TVM group decided that no
15  absorbable meshes were going to be used.  And when a
16  combination was used without a partial absorbable
17  partial polypropylene, they decided that the pore size
18  being so large did not work.
19     Q.  Did you see whether or not the surgeons
20  evaluating the different meshes also evaluated a mesh
21  called Vipro?
22     A.  They did.  That's exactly what they did.
23     Q.  Is that a large pore, lightweight mesh as
24  well?

Page 291

1     A.  Yeah, it's a large -- large pore.  You can
2  get pores as high as 5-, 6,000 microns.
3     Q.  Did that mesh demonstrate better efficacy or
4  tolerability than the Gynemesh PS?
5     A.  No, actually it was -- the performance was
6  worse.
7     Q.  You've heard of the mesh Ultrapro,
8  obviously.  Mr. de la Cerda talked to you today about
9  presentations concerning the potential benefits of
10  lighter weight or larger pore meshes.
11     A.  Yes.
12     Q.  Does the Ultrapro mesh also have a risk of
13  mesh exposure?
14     A.  We had -- when we say "we," as the surgeons
15  doing these procedures, we expected that it was going
16  to be less mesh exposure.  We actually found that it
17  was exactly the same.
18     Q.  And same thing for dyspareunia or pain?
19     A.  Yes.
20     Q.  In your Prolift report -- do you have that
21  handy?  Let's go to page 10 and 11.
22     A.  Yes.
23     Q.  Before we actually get to that, let me ask
24  you this.

Page 292

1     Did you see any clinical studies that you
2  found to be reliable that showed that a larger pore or
3  lighter weight mesh than Gynemesh PS was more
4  effective or safer than Gynemesh PS in the Prolift,
5  Prosima or Prolapse application?
6     A.  No, it was -- it remained on a hypothesis.
7  It remained just as a hypothesis and just we -- we all
8  consider at one point that when we we're talking, I'm
9  talking again about the surgeons, the word preceptors
10  and the other surgeons, which one is going to have the
11  longest data behind it and it was polypropylene.
12     Q.  You mentioned earlier, told Mr. de la Cerda,
13  based on your review of the most reliable data that
14  actually the Gynemesh PS and Prolift had a lower risk
15  of wound complications in native tissue.  Do you
16  recall that?
17     A.  Yes.
18     Q.  And I think you also testified that based on
19  your analysis, there was a lower rate or risk of
20  vaginal stenosis requiring surgery for the Gynemesh PS
21  compared to native tissue and you mentioned the Carey
22  study?
23     A.  That is correct.  That's accurate.
24     Q.  Was that the same Carey study we were

Page 293

1  looking at earlier?
2     A.  Yes.
3     Q.  Do you know where that is?  I want to ask
4  you a question about it.
5     A.  That is in the --
6     Q.  My question is:  Do you have it over there
7  somewhere?  I just want to ask you a question about
8  it.
9     Oh, here it is.
10     A.  It is the paper before the last one on the
11  top to the left.
12     Q.  So page 1384, does that report and what you
13  referenced in that randomized control trial that there
14  was a higher rate of reoperation for vaginal stenosis
15  in native tissue compared to the mesh?
16     A.  That's correct.
17     Q.  Do you remember Mr. de la Cerda asked you
18  did Ethicon ever test the pliability of the mesh?
19     A.  Yes, I do recall that.
20     Q.  Now, pliability of the mesh, I think you
21  told Mr. de la Cerda, that could be related to
22  stenosis or pain.
23     A.  Well, it's -- one thing is that the
24  pliability and the other thing is about the

74 (Pages 290 to 293)

Jaime Sepulveda, M.D.

Page 294

1  contraction or shrinkage and what we were talking was
2  along the lines of what mesh contraction or mesh can
3  increase the pliability. Pliability of a tissue or
4  the elasticity of the tissue has more to do with the
5  tissue itself.
6      Now, the question is, if the mesh could add
7  to this and the answer is every clinical indication of
8  shrinkage or -- or elasticity does not hold the test
9  of clinical evaluation. If there would be a
10  shrinkage, there would be an actual contraction. The
11  vagina would be shorter. And there is no -- there's
12  no study that demonstrates that the vagina is shorter
13  on this -- on all patients that have been repaired
14  with mesh.
15      We have had instances in which the vagina is
16  shorter with native tissue repair because there's no
17  augmentation with the mesh. So -- and that
18  communication is not just on my opinion, that's part
19  of the communication that was sent to the FDA.
20      Q. Are you talking about the paper that was
21  endorsed by hundreds of pelvic surgeons?
22      A. Yes.
23      Q. At page 10 and 11 of your report you talk
24  about the Cochrane review and then the randomized

Page 295

1  control data do not show a statistically significant
2  difference in de novo dyspareunia, de novo pelvic
3  pain, vaginal pain, change in sexual function, or
4  change in vaginal length or vaginal caliber.
5      A. That's the latest Cochrane review, that's
6  exactly what it demonstrates.
7      Q. And did you also assess the randomized
8  control trials to see if that was an accurate
9  statement, specifically for Gynemesh PS and Prolift?
10      A. Yeah, there's a -- there's an actual --
11  there's a -- there are randomized control trials and
12  there is the Lowman paper in which mesh is placed
13  transabdominally, sacrospinously on fixations,
14  uterosacral suspensions, anterior/posterior repairs,
15  they were all evaluated for the incidence of
16  dyspareunia.
17      Q. You mention that the urine analysis was
18  consistent with the findings by Dietz and Maher, who
19  did a systematic review and found no difference in
20  post-operative or de novo dyspareunia or change in
21  sexual function. Do you see that?
22      A. Yes.
23      Q. And that citation is number 24?
24      A. 24.

Page 296

1      Q. Is that a high-level of evidence, a
2  systematic review metanalysis?
3      A. That is at the highest level.
4      Q. And is that what your opinions are based
5  upon?
6      A. Yes.
7      Q. You were asked questions by Mr. de la Cerda
8  about characterization of mesh as high risk or low
9  risk, and I think you basically disagreed and said you
10  prefer to kind of evaluate it on its own terms. Is
11  that correct or not?
12      A. I -- I saw the classification of low risk or
13  high risk to be restrictive and the question is if
14  this -- if this procedure is done with mesh have a
15  higher risk over native tissue repairs.
16      Q. Did he -- I'm sorry, go ahead.
17      A. And the answer to that is every time we look
18  at that randomized control trial, the answer to that
19  is no.
20      Q. So my question is this: Have you put in
21  your report and will you be prepared to discuss at
22  trial how Prolift, Prosima, Gynemesh PS comparing
23  risk, whether it's less risky or higher risk than
24  native tissue repair for things that we talked about

Page 297

1  today with Mr. de la Cerda like recurrence, wound
2  complications, pain, change in vaginal shape, length,
3  things like that?
4      MR. DE LA CERDA: Form.
5      A. Surgery has risk. Surgery has multiple
6  risk. Surgery for prolapse has specialized risk that
7  we face every single time that we work with mesh or
8  without mesh. We haven't had a mesh now for a few
9  years and patients still having the same kind of
10  complications that they had with the exception of a
11  mesh exposure because there's no mesh.
12      Incisions still dehisce the same way,
13  incisions still separate, challenges of wound healing
14  are still seen, granulation tissue is still seen, and
15  actually what we're seeing now is a higher rate of
16  hysterectomies with -- with shorter vaginas.
17      Q. (By Mr. Snell) Do you plan to discuss at
18  trial how the rates and risks with the Gynemesh PS,
19  Prolift, Prosima compare to the rates and risks with
20  native tissue?
21      MR. DE LA CERDA: Form.
22      A. Yes.
23      Q. (By Mr. Snell) For example, in your
24  report, you -- so for your Prolift report, page 9,

75 (Pages 294 to 297)

Jaime Sepulveda, M.D.

<table>
<tr><td>

Page 298

1 you have -- you have multiple studies that show the
2 efficacy of Prolift and Gynemesh PS compared to
3 native tissue.  Do you see that?
4     A.  Yes.
5     Q.  Do you plan to talk about the different
6 rates and risks of recurrence for mesh-based repair,
7 particularly I'm focused on Ethicon Gynemesh PS and
8 Prolift, Prosima compared to native tissue.
9         MR. DE LA CERDA:  Form.
10     A.  Yes.
11     Q.  (By Mr. Snell)  And do you plan to discuss
12 rates of wound complications, sexual function and
13 dyspareunia for Ethicon's meshes compared to native
14 tissue?
15         MR. DE LA CERDA:  Form.
16     A.  Yes, I plan -- I plan to testify on those.
17     Q.  (By Mr. Snell)  And have you evaluated and
18 investigated those issues?
19     A.  I have thoroughly evaluated.  I have -- I
20 run randomized control trial after randomized control
21 trial.  I have highlighted the areas that I feel are
22 most important and I have summarized them today on
23 my -- on my testimony.
24     Q.  And have you also identified those --

</td><td>

Page 300

1
2             CERTIFICATE OF OATH
3
4 STATE OF FLORIDA   )
  COUNTY OF BROWARD   )
5
6     I, JODY L. WARREN, Registered Professional
7 Reporter, Florida Professional Reporter, Notary
  Public in and for the State of Florida at Large,
8
9 certify that the witness, JAIME SEPULVEDA, M.D.,
  personally appeared before me on 3/30/16 and was
10
  duly sworn by me.
11
12         DATED this 11th day of April, 2016.
13
14
15
16     _____
17     JODY L. WARREN, RPR, FPR
       Notary Public, State of Florida at Large
       My Commission Expires 2/28/19
18     My Commission No. FF 188650
19
20
21
22
23
24

</td></tr>
<tr><td>

Page 299

1 examples of those data in your reports, as well?
2     A.  I am -- I am ready to go on presented on the
3 numbers.
4     Q.  Lastly, Mr. de la Cerda asked you about if
5 you had any plans for further work in the formulation
6 or analysis.  Obviously, you're being deposed today
7 and tomorrow and I will represent to you that there
8 are transcripts not yet available for plaintiffs'
9 experts and some of plaintiffs' experts are not being
10 deposed until even after you.
11         Do you plan to review those transcripts when
12 they're provided to you and assess them?
13     A.  I will -- I will evaluate them.  I'll assess
14 them, and I'm looking forward to see the scientific
15 validity of it.
16         MR. SNELL:  Okay.  That's all I have.
17         MR. DE LA CERDA:  Nothing further from me.
18         MR. SNELL:  Thank you.
19         THE COURT REPORTER:  Do either of you need a
20 rough draft on this?
21         MR. SPARKS:  Yeah, I put my email on --
22         MR. DE LA CERDA:  Yeah, I'll take one, too.
23         (Thereupon, the taking of the deposition
24 was concluded at 4:33 p.m. )

</td><td>

Page 301

1             CERTIFICATE OF REPORTER
2
3     I, JODY L.WARREN, Registered Professional
4 Reporter, Florida Professional Reporter, certify
5 that I was authorized to and did stenographically
6 report the deposition of JAIME SEPULVEDA, M.D., the
7 witness herein on 3/30/16; that a review of the
8 transcript was requested; that the foregoing pages
9 are a true and complete record of my stenographic
10 notes of the deposition by said witness.
11     I further certify that I am not a relative,
12 employee, attorney, or counsel of any of the
13 parties, nor am I a relative or employee of any of
14 the parties' attorney or counsel connected with the
15 action, nor am I financially interested in the
16 action.
17     DATED this 11th day of April, 2016.
18
19
20
21     _____
22     JODY L. WARREN, RPR, FPR
       Notary Public, State of Florida at Large
23
24

</td></tr>
</table>

76 (Pages 298 to 301)

Jaime Sepulveda, M.D.

| Page 302 |
| --- |

```
 1         - - - - -
           E R R A T A
 2         - - - - -
 3
 4   PAGE LINE  CHANGE
 5   ____ ____ _____
 6     REASON: _____
 7   ____ ____ _____
 8     REASON: _____
 9   ____ ____ _____
10     REASON: _____
11   ____ ____ _____
12     REASON: _____
13   ____ ____ _____
14     REASON: _____
15   ____ ____ _____
16     REASON: _____
17   ____ ____ _____
18     REASON: _____
19   ____ ____ _____
20     REASON: _____
21   ____ ____ _____
22     REASON: _____
23   ____ ____ _____
24     REASON: _____
```

| Page 304 |
| --- |

```
 1         LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
```

| Page 303 |
| --- |

```
 1
 2       ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, and that the same is
 7   a correct transcription of the answers
 8   given by me to the questions therein
 9   propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   JAIME SEPULVEDA, M.D.        DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.
20   My commission expires:_____
21
22   _____
     Notary Public
23
24
```

77 (Pages 302 to 304)