# Exhibit 1

Bruce A. Rosenzweig, M.D.

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   AT CHARLESTON
 3   IN RE: ETHICON, INC.,    :Master File No.
 4   PELVIC REPAIR SYSTEM     :2:12-MD-0237
     PRODUCTS LIABILITY       :
 5   LITIGATION               :MDL No. 2327
     ---------------------------------------------
 6   THIS DOCUMENT RELATES TO :JOSEPH R. GOODWIN
     THE CASES LISTED BELOW   :U.S. DISTRICT JUDGE
 7   ---------------------------------------------
     Mullins, et al. V.       2:12-cv-02952
 8   Ethicon, Inc., et al.
     Sprout, et al. V.        2:12-cv-07924
 9   Ethicon, Inc., et al.
     Iquinto v. Ethicon,      2:12-cv-09765
10   Inc., et al.
     Daniel, et al. V.        2:13-cv-02565
11   Ethicon, Inc., et al.
     Dillon, et al. V.        2:13-cv-02919
12   Ethicon, Inc., et al.
     Webb, et al. V.          2:13-cv-04517
13   Ethicon, Inc., et al.
     Martinez v. Ethicon,     2:13-cv-04730
14   Inc., et al.
     McIntyre, et al. V.      2:13-cv-07283
15   Ethicon, Inc., et al.
     Oxley v. Ethicon,        2:13-cv-10150
16   Inc., et al.
     Atkins, et al. V.        2:13-cv-11022
17   Ethicon, Inc., et al.
     Garcia v. Ethicon,       2:13-cv-14355
18   Inc., et al.
     Lowe v. Ethicon,         2:13-cv-14718
19   Inc., et al.
     Dameron, et al. V.       2:13-cv-14799
20   Ethicon, Inc., et al.
21   Vanbuskirk, et al. V.    2:13-cv-16183
     Ethicon, Inc., et al.
22
23
              SEPTEMBER 22, 2015
24        BRUCE A. ROSENZWEIG, M.D.
```

Bruce A. Rosenzweig, M.D.

Page 2

1  CAPTION CONTINUED:
2  Mullens, et al. V.        2:13-cv-16564
   Ethicon, Inc., et al.
3  Shears, et al. V.         2:13-cv-17012
   Ethicon, Inc., et al.
4  Javins, et al. V.         2:13-cv-18479
   Ethicon, Inc., et al.
5  Barr, et al. V.           2:13-cv-22606
   Ethicon, Inc., et al.
6  Lambert v. Ethicon,       2:13-cv-24393
   Inc., et al.
7  Cook v. Ethicon, Inc.     2:13-cv-29260
8  Stevens v. Ethicon,       2:13-cv-29918
   Inc., et al.
9  Harmon v. Ethicon, Inc.   2:13-cv-31818
10 Snodgrass v. Ethicon,     2:13-cv-31881
   Inc., et al.
11 Miller v. Ethicon, Inc.   2:13-cv-32627
12 Matney, et al. V.         2:14-cv-09195
   Ethicon, Inc., et al.
13 Jones, et al. V.          2:14-cv-09517
   Ethicon, Inc., et al.
14 Humbert v. Ethicon,       2:14-cv-10640
   et al.
15 Gillum, et al. V.         2:14-cv-12756
   Ethicon, Inc., et al.
16 Whisner, et al. V.        2:14-cv-13023
   Ethicon, Inc., et al.
17 Tomblin, et al. V.        2:14-cv-14664
   Inc., et al.
18 Schepleng v. Ethicon,     2:14-cv-16061
   Inc., et al.
19 Tyler, et al. V.          2:14-cv-19110
   Ethicon, Inc., et al.
20 Kelly, et al. V.          2:14-cv-22079
   Ethicon, Inc., et al.
21 Lundell v. Ethicon,       2:14-cv-24911
   Inc., et al.
22 Cheshire, et al. V.       2:14-cv-24999
   Ethicon, Inc., et al.
23 Burgoyne, et al., V.      2:14-cv-28620
   Ethicon, Inc., et al.
24 Bennett, et al., V.       2:14-cv-29624
   Ethicon, Inc., et al.

Page 3

1          - - -

   SEPTEMBER 22, 2015
2          - - -

3

4      The deposition of BRUCE A. ROSENZWEIG,
5  M.D., called for examination, taken pursuant
6  to the Federal Rules of Civil Procedure of the
7  United States District Courts pertaining to the
8  taking of depositions, taken before JULIANA F.
9  ZAJICEK, CSR No. 84-2604, a Certified Shorthand
10 Reporter of said State of Illinois, at the offices
11 of Wexler Wallace LLP, Suite 3300, 55 West Monroe
12 Street, Chicago, Illinois, on September 22, 2015,
13 at 10:05 a.m.
14
15
16
17
18
19
20
21
22
23
24

Page 4

1  PRESENT:
2
3  APPEARED ON BEHALF OF THE PLAINTIFFS:
      WAGSTAFF & CARTMELL LLP
4     4740 Grand Avenue, Suite 300
      Kansas City, Missouri 64112
5     816-701-1100
      BY:  THOMAS P. CARTMELL, ESQ.
6        tcartmell@wcllp.com
7
8  APPEARED ON BEHALF OF THE DEFENDANTS:
      BUTLER SNOW LLP
9     500 Office Center Drive
      Fort Washington, Pennsylvania 19034
10    267-513-1885
      BY:  NILS B. (BURT) SNELL, ESQ.
11       burt.snell@butlersnow.com
12    BUTLER SNOW LLP
      Renaissance at Colony Park
13    1020 Highland Colony Parkway
      Suite 1400
14    Ridgeland, Mississippi 39157
      601-948-5711
15    BY:  PAUL S. ROSENBLATT, ESQ.
         paul.rosenblatt@butlersnow.com
16
17
18
19
20
21
22
23 REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.
24      CERTIFICATE NO. 84-2604.

Page 5

1          I N D E X
2  WITNESS:                    PAGE:
3  BRUCE A. ROSENZWEIG, M.D.,
4     EXAM BY MR. SNELL.................   10
5     EXAM BY MR. CARTMELL................  287
6     FURTHER EXAM BY MR. SNELL...........  295
7
8
9          E X H I B I T S
10 ROSENZWEIG EXHIBIT            MARKED FOR ID
11 No. 1    Notice of Deposition................ 10
12 No. 2    "Minimally Invasive Synthetic      57
13          Suburethral Sling Operations for
14          Stress Urinary Incontinence in
15          Women: A Short Version Cochrane
16          Review," by Ogah, et al.,
17          Neurourology and Urodynamics
18          30:284-291(201) ...................
19 No. 3    The Cochrane Collaboration,        78
20          "Mid-urethral sling operations
21          for stress urinary incontinence
22          in women (Review)," by Ford,
23          et al., The Cochrane Library,
24          2015, Issue 7......................

Bruce A. Rosenzweig, M.D.

1      E X H I B I T S (Continued)
2  ROSENZWEIG EXHIBIT          MARKED FOR ID
3  No. 4   Original Article: "Use of three      115
4       types of synthetic mesh material
5       in sling surgery: A prospective
6       randomized clinical trial
7       evaluating effectiveness and
8       complications", by Okulu, et
9       al., Scandinavian Journal of
10      Urology, 2013; 47: 217-224..........
11  No. 5   "Influence of Different Sling      131
12      Materials on Connective Tissue
13      Metabolism in Stress Urinary
14      Incontinent Women," by Falconer,
15      et al., Int Urogynecol J
16      (2001)(Suppl 2):S19 S23.............
17  No. 6   Book Chapter 56, "Alloplastic      136
18      Implants for the Treatment of
19      Stress Urinary Incontinence and
20      Pelvic Organ Prolapse," by
21      Klinge, et al., from the book
22      Hernia Repair Sequelae..............
23
24

1      E X H I B I T S (Continued)
2  ROSENZWEIG EXHIBIT          MARKED FOR ID
3  No. 10   Study titled: "Modified      170
4       Suburethral Sling Procedure for
5       Treatment of Recurrent or Severe
6       Stress Urinary Incontinence",
7       by Ogundipe, et al..................
8  No. 11   "Sling surgery for stress      209
9       urinary incontinence in women: a
10      systematic review and
11      metaanalysis," by Schimpf, et
12      al., American Journal of
13      Obstetrics & Gynecology.............
14  No. 12   Guideline for the Surgical      228
15      Management of Female Stress
16      Urinary Incontinence: 2009
17      Update.............................
18  No. 13   "Evaluation and management of      234
19      complications from synthetic
20      mesh after pelvic reconstructive
21      surgery: a multicenter study",
22      by Abbott, et al., Feb. 2014
23      American Journal of Obstetrics &
24      Gynecology..........................

1      E X H I B I T S (Continued)
2  ROSENZWEIG EXHIBIT          MARKED FOR ID
3  No. 7   Original Article: "Comparison      144
4       of late complications of
5       retropubic and transobturator
6       slings in stress urinary
7       incontinence", by Petri, et al.,
8       Int Urogynecol J (2012)
9       23:321-325.........................
10  No. 8   Article: "Complications of      146
11      synthetic slings used in female
12      stress urinary incontinence and
13      applicability of the new
14      IUGA-ICS classification", by
15      Petri, et al., European Journal
16      of Obstetrics & Gynecology and
17      Reproductive Biology...............
18  No. 9   "Burch colposuspension: A 10-20      168
19      year follow up", by Alcalay, et
20      al., British Journal of
21      Obstetrics and Gynaecology,
22      September 1995, Vol 102, 740-745....
23
24

1      E X H I B I T S (Continued)
2  ROSENZWEIG EXHIBIT          MARKED FOR ID
3  No. 14   "A histologic and immunohisto-      253
4       chemical analysis of defective
5       vaginal healing after continence
6       taping procedures: A prospective
7       case-controlled pilot study", by
8       Wang, et al., AJOG (2004) 191,
9       1868-74............................
10  No. 15   "Safety considerations for      280
11      synthetic sling surgery", by
12      Blaivas, et al., Volume 12,
13      September 2015, Nature
14      Reviews/Urology....................
15
16
17
18
19
20
21
22
23
24

Bruce A. Rosenzweig, M.D.

Page 10

1    (WHEREUPON, the witness was duly
2    sworn.)
3    BRUCE A. ROSENZWEIG, M.D.,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6    EXAMINATION
7  BY MR. SNELL:
8    Q.   Good morning, Dr. Rosenzweig.  How are you
9  doing?
10    A.   Good morning, sir.  Just fine.  Thank you.
11    Q.   I'm here to take your deposition in the
12  Mullins case which is a multi-plaintiff case currently
13  pending in the Ethicon MDL.
14    You are aware of that, right, Doctor?
15    A.   Yes.
16    (WHEREUPON, a certain document was
17    marked Rosenzweig Deposition Exhibit
18    No. 1, for identification, as of
19    09/22/2015.)
20  BY MR. SNELL:
21    Q.   And I've handed you Exhibit No. 1 which I
22  will represent to be your Notice of Deposition.
23    Have you seen this document before, sir?
24    A.   Yes, I have.

Page 11

1    Q.   The schedule I attached to it, I asked
2  that you bring various materials and documents to the
3  deposition to the extent you have them.
4    Did you bring any materials to today's
5  deposition?
6    A.   I have not submitted a bill yet for the
7  work I've done on this case.  You guys have an
8  up-to-date copy of my CV.  I just supplied a copy of
9  my most recent testimony history.  And so there is
10  nothing else on this list that I have.
11    Q.   Do you have a file for the Mullins case?
12    A.   A file?
13    Q.   A collection of all of the literature and
14  the accompanying documents and things like that that
15  you cite to in your Mullins' expert report?
16    A.   Electronically.
17    Q.   Do you happen to have that with you or is
18  it on a thumb drive that I can get?
19    A.   I know you can get a copy of the thumb
20  drive or probably a Dropbox link.
21    Q.   You said you had not billed for your time
22  in the Mullins case yet.
23    My question is:  How many hours have you
24  spent on the Mullins case?  And your best estimate is

Page 12

1  fine.
2    A.   Yes.  Approximately 35 to 40 hours.  You
3  know, it is difficult to say because, you know,
4  obviously I just gave a TVT retropubic deposition.
5  I've been doing work and keeping up with the
6  literature on other cases.  So, I mean, obviously I
7  didn't really need to replow a lot of the literature
8  I've reviewed or depositions that I've reviewed
9  before, so that's why.  I mean, a best estimate would
10  be about 35 hours.
11    Q.   Fair enough.
12    And just remind me, what is your hourly
13  rate for review and things of that nature?
14    A.   750 an hour for review, $1500 an hour for
15  depositions, and $10,000 a day for trial testimony.
16    Q.   Thank you.
17    Can you briefly and quickly tell me to
18  what professional societies, if any, do you currently
19  belong to today?
20    A.   None.
21    Q.   I know you and I have discussed your
22  practice in past depositions, and I don't want to
23  rehash a lot of old ground, and I will actually ask
24  you this:

Page 13

1    In connection with today's deposition, can
2  I rely upon your prior sworn testimony you've given to
3  me and other lawyers in the Ethicon litigation?
4    A.   Yes, sir.
5    Q.   Okay.  With that being said, it's been a
6  little while since I deposed you and asked you about
7  your stress incontinence work, and I don't want to
8  talk to you about prolapse, because you and I have
9  already talked about that earlier in the summer and
10  I'll respect that.
11    Currently as you sit here today as a
12  surgeon, what stress incontinence surgeries are you
13  performing or offering to your patients?
14    A.   Yes.  It's the same ones we talked about
15  the last time.  My primary operation is the Burch
16  procedure.  I use pubovaginal slings is what I call my
17  rescue operation.  I do periurethral injections for
18  patients.  So those would be the core of my surgical
19  procedures for stress urinary incontinence.
20    Q.   Perfect.
21    You and I have also discussed your
22  practice, you know, what you do generally week to
23  week.
24    As you currently sit here today, can you

Bruce A. Rosenzweig, M.D.

Page 14

1  tell me, has your practice changed significantly?

2      A.   No, sir.

3      Q.   Last Friday I took the deposition of one

4  of the other experts for the Plaintiffs, a Dr. Jerry

5  Blaivas in New York City.

6          My question is do you know Dr. Blaivas?

7      A.   I know of Dr. Blaivas.  I probably met him

8  a couple of times in the past.

9      Q.   Have you ever met him in connection with

10  the litigation or were these meetings where you met

11  him in connection with non-litigation events?

12      A.   Non-litigation events.

13      Q.   Have you read Dr. Blaivas' deposition that

14  he gave to me last Friday?

15      A.   Yes, I have.

16      Q.   When did you receive that deposition?

17      A.   Last weekend.

18      Q.   And I take it Dr. Blaivas' deposition was

19  provided to you by the Plaintiffs, correct?

20      A.   That is correct.

21      Q.   Did you see any misstatements in

22  Dr. Blaivas' testimony or -- strike that.

23          Did you see any testimony by Dr. Blaivas

24  which you believe was inaccurate?

Page 15

1      MR. CARTMELL:  Object to the form.

2  BY THE WITNESS:

3      A.   Not that I specifically recall.

4  BY MR. SNELL:

5      Q.   There have been expert reports served by

6  the defense as well in this matter, Drs. Kenton,

7  Toglia and Woods.

8          Have you seen their expert reports?

9      A.   Not yet.

10      Q.   I'll just say their full names for the

11  record so that you are aware.

12          Kimberly Kenton, she is a urogynecologist

13  here in Chicago?

14      A.   At Northwestern, yes.

15      Q.   Marc Toglia who is in Philadelphia, he is

16  a urogynecologist, and Michael Woods who is in Iowa, I

17  think.

18          My question to you is do you know any of

19  those three experts?

20      A.   I know Dr. Kenton.

21      Q.   Okay.  Have you ever practiced with her?

22      A.   No.

23      Q.   Have you ever seen Dr. Kenton operate?

24      A.   No.

Page 16

1      Q.   Have you ever seen any of Dr. Kenton's

2  patients?

3      A.   There are -- you know, Chicago is not that

4  big of a city, even though, you know, it is the third

5  largest city in the United States, so we all have seen

6  each other's patients from time to time.

7      Q.   As you sit here today, can you think of

8  any TVT patients that Dr. Kenton had who you have

9  seen?

10      A.   Not that I specifically recall.

11      Q.   Can you think of any of Dr. Kenton's

12  patients who have had any type of stress incontinence

13  mesh who you have seen?

14      A.   Not that I specifically recall, but it

15  would not surprise me if I've seen some of her stress

16  incontinence patients, just like it wouldn't surprise

17  me if she has seen some of my stress incontinence

18  patients.

19      Q.   Have you made any referrals to Dr. Kenton

20  for any type of pelvic health condition?  Strike that.

21  That's a terrible question.  It makes no sense.

22          Have you made any referrals to Dr. Kenton

23  for her to see one of your patients?

24      A.   Not that I specifically recall.

Page 17

1      Q.   I will represent to you that the judge in

2  the Mullins case issued an order by which he

3  identified what will be at issue, namely, design

4  defect of the TVT in that claim.  And he provided some

5  language in what the parties should look to in his

6  opinion.

7          My question to you is:  Have you seen the

8  Judge's order on the design defect element and what is

9  to be expected of the parties according to that order?

10      A.   I have not seen that specific order, no.

11      Q.   Changing topics.

12          What is the average length in centimeters

13  of the vagina of a woman who is of the age for which

14  TVT may be considered as an option to treat her stress

15  incontinence?

16      A.   The average length of the vagina is about

17  10 centimeters, in a range of about 8 to 10

18  centimeters.

19      Q.   What, Doctor, in your opinion is the

20  utility, and when I say utility, I mean the usefulness

21  of TVT to the user, like a surgeon like yourself, and

22  to society as a whole in its intended application to

23  treat stress incontinence?

24      A.   What is -- what is the utility?

Bruce A. Rosenzweig, M.D.

Page 18

1    Q.   Yes, sir.  It's usefulness, defined as to
2  the user, like the surgeon or to the public as a
3  whole.
4    MR. CARTMELL:  Object to the form.
5  BY THE WITNESS:
6    A.   It is a surgical treatment for stress
7  urinary incontinence.
8  BY MR. SNELL:
9    Q.   What, if any, are the useful attributes of
10 the TVT device?
11    MR. CARTMELL:  Object to form.
12 BY THE WITNESS:
13    A.   Theoretically, it has a shorter operating
14 time, a shorter hospitalization stay, a shorter
15 perioperative recovery.  However, the significant
16 risks associated with it outweigh those theoretical
17 benefits.
18 BY MR. SNELL:
19    Q.   So focusing on the usefulness, you
20 identified shorter operative time.  And I'll be fair
21 to you.  I heard what you said totally about risk and
22 I'm going to ask you all about risk, but I just want
23 to focus on part one of this decision issue, which is
24 usefulness or utility.

Page 19

1        Shorter operative time, you would agree
2  that the medical literature, including some well
3  respected reviews like Cochrane reviews, do report
4  that with the TVT it does have a shorter operative
5  time compared to other stress incontinence surgeries?
6    A.   Yes, but in a clinically significant
7  sense, a difference between a 20- to 30-minute
8  operation and a 45-minute to an hour operation as far
9  as the risk of being on the operating table, the risk
10 of being under general anesthesia, things such as deep
11 venous thrombosis, you don't see that risk go up until
12 after a two-hour operation.  The risk of respiratory
13 compromise postoperatively, things like atelectasis,
14 things like postoperative pneumonias, you don't see a
15 clinically significant utility in that short of an
16 operative time.
17    Q.   And, so, let me ask you this, based on
18 what you just told me, what would be the articles or
19 studies you are relying on for that statement, that
20 there is -- you don't see a clinically significant
21 benefit translating from the shorter operative time
22 with TVT?
23    A.   Well, the shorter operating time and the
24 parameters that we are talking about, and I used, you

Page 20

1  know, deep venous thrombosis.  If you look at the
2  gynecologic surgery literature, you start to see an
3  increase in the risk of deep venous thrombosis with a
4  longer operating time above the two-hour range.  Once
5  you get up to four hours, you re-dose prophylactic
6  antibiotics.
7        So, while I agree with you that the
8  literature does show a shorter operating time, when
9  you are in -- the operating time that we are talking
10 about, the clinical utility of that might not be
11 clinically significant.
12    Q.   And what literature or studies are you
13 relying on for that statement that the clinical result
14 might not be significant?
15    A.   That's the general gynecologic surgical
16 literature, my clinical experience and my training.
17    Q.   Are there -- there are no particular
18 studies you are relying on?
19    A.   Not specifically.
20    Q.   You are aware the literature -- strike
21 that.
22        You are aware that the medical literature
23 in women, clinical studies in women do report a
24 shorter hospital stay with TVT compared to other

Page 21

1  stress incontinent surgeries?
2    A.   Yes.
3    Q.   And you have read the medical literature
4  that also reports that TVT has a shorter perioperative
5  recovery period than an autologous sling or the Burch
6  colposuspension?
7    A.   Yes.
8    Q.   And you've seen that reported in reliable
9  sources like the Cochrane review as well, correct?
10    A.   Yes.
11        (WHEREUPON, Mr. Paul S. Rosenblatt
12        entered the deposition proceedings.)
13 BY MR. SNELL:
14    Q.   To you as a surgeon, is it desirable to
15 have a shorter perioperative recovery period?
16    A.   If the long-term risks associated with
17 that shorter operative time and shorter recovery time
18 are similar, if you're not giving up long-term adverse
19 events that are significant to the patient, that have
20 a significant impact on the patient, such as the need
21 to return to the operating room to treat a long-term
22 adverse event, if those are similar, than a shorter
23 operating time and a shorter recovery would be more of
24 an economic advantage.  You know, it does cost more

Bruce A. Rosenzweig, M.D.

Page 22

1 money to be in the operating room, it does cost more
2 money to be in the hospital. Getting back to a week
3 or so earlier to productivity is -- you know, would
4 have an economic basis, but that's got to be looked at
5 in comparison to long-term adverse events and
6 significant adverse events that will impact a woman's
7 life.
8    Q.   So focusing on the utility, you've
9 identified that a shorter operative time does have an
10 economic benefit?
11    A.   That is correct.
12    Q.   And a shorter postoperative recovery
13 period does have an economic benefit?
14    A.   That is correct.
15    Q.   And you gave an example that women may
16 return to their normal activities, like their job,
17 sooner, correct?
18    A.   That is correct.
19    Q.   And so that would be a benefit to the
20 potential women who would receive the device, correct?
21    A.   If that is not offset by significant
22 long-term adverse events. So, such as if someone has
23 to return to the operating room to treat a long-term
24 adverse event, then they incur that economic

Page 23

1 disadvantage and then, therefore, you know, the
2 economic advantage of the initial surgery would be
3 washed out by the economic disadvantage of future
4 surgery.
5    Q.   I hear you on risk, but just so we're
6 clear, the shorter postoperative recovery realized by
7 a patient who receives TVT would be an economic
8 benefit to that patient?
9    A.   If you are just looking at it in a vacuum
10 and not looking at the future long-term risk
11 associated with it, then that vacuum would be of an
12 economic advantage with shorter operating time,
13 shorter hospitalization.
14    Q.   To you as the user or intended user -- let
15 me back up.
16       So the intended user of a TVT, the one who
17 wields the TVT is a surgeon, correct?
18    A.   That is correct.
19    Q.   To you as an intended user of TVT, the
20 surgeon, what from your perspective is the benefit or
21 desirability of your patient having a shorter
22 postoperative recovery period?
23    MR. CARTMELL:  Object to the form.
24 BY THE WITNESS:

Page 24

1    A.   Again, the shorter postoperative recovery,
2 the quicker someone can get back to their daily
3 activities of life, take care of their family, get
4 back to work. Is that clinically significant if you
5 are talking about a difference of one to two weeks,
6 I'm not sure that that truly becomes a clinical
7 utility, but it is a theoretical advantage.
8 BY MR. SNELL:
9    Q.   Is there a benefit to you as the intended
10 user of TVT when your patient has a shorter hospital
11 stay?
12    A.   Again, we are -- you know, the theoretical
13 advantages of that would be, again, economic as we
14 talked about. There theoretically would be a -- less
15 exposure to nosocomial or hospital-acquired
16 infections. However, those are significantly reduced
17 in the kind of environment that our gynecologic
18 patients are on versus someone that's on an internal
19 medicine floor.
20    Q.   Anything else you can think of with regard
21 to the benefit for a shorter hospital stay?
22    A.   Those would be the theoretical advantages.
23    Q.   You've read the early papers from the
24 1980s and 1990s by Dr. Petros and Dr. Ulmsten?

Page 25

1    A.   Yes.
2    Q.   So you've seen that they set about with
3 certain goals in mind, namely to have an
4 ambulatory-type stress incontinence procedure that
5 would be minimally invasive and then they worked
6 around those goals?
7    MR. CARTMELL:  Object to the form.
8 BY THE WITNESS:
9    A.   If you have, you know, a specific paper
10 that you want to talk about that sets out those --
11 those goals, it would be important to look at to
12 acknowledge that. What were the goals that they have
13 set out?
14 BY MR. SNELL:
15    Q.   I don't have a specific paper. I'm just
16 saying, are you aware that they had goals that they
17 had set out for the stress incontinence procedure that
18 they worked on developing?
19    MR. CARTMELL:  Object to the form.
20 BY MR. SNELL:
21    Q.   In your general reading of the literature
22 and your knowledge in the field over the past 30
23 years?
24    A.   Right. I would say that they definitely

Bruce A. Rosenzweig, M.D.

1 had goals, No. 1, to treat stress urinary
2 incontinence. We know from Dr. Ulmsten's early
3 reports and also correspondence that Dr. Ulmsten had
4 that he considered doing the procedure under local
5 anesthesia. Paramount for safety and efficacy
6 reasons, we know that one of his early collaborators,
7 Dr. Nilsson, stated that the success rate goes down
8 when it's done under general anesthesia. So to say
9 that he was developing a procedure to be done under a
10 local anesthesia is the type of procedure that he
11 developed and the -- that he significantly recommended
12 unless there were extenuating circumstances that this
13 procedure be done under local anesthesia.
14     Q.   You are aware that one of the goals of the
15 development of what became TVT by Drs. Petros and
16 Ulmsten -- let me back up.
17         Have you ever met Dr. Petros?
18     A.   No, I have not.
19     Q.   He is from Australia?
20     A.   I would -- if that's where he is from. I
21 don't know where he is from.
22     Q.   Okay. Fair enough.
23         You are aware that one of the goals that
24 Drs. Petros and Ulmsten had was to develop what they

1 termed as an ambulatory stress urinary incontinence
2 procedure?
3     MR. CARTMELL: Object to the form.
4 BY THE WITNESS:
5     A.   Again, I know that from Dr. Ulmsten's
6 papers and correspondence that he has had with Ethicon
7 early in the late '90s that the procedure was done
8 under local anesthesia and that it should be done
9 under local anesthesia and that unless there is
10 extenuating circumstances to do it under general
11 anesthesia, he found that local anesthesia was for
12 safety and efficacy reasons. Now, whether his
13 ultimate goal was to do this under an ambulatory
14 setting, I don't recall seeing that written in papers
15 or in other correspondence documents that I've seen.
16 BY MR. SNELL:
17     Q.   Okay. So let's just make sure I get a
18 clean answer. I think you answered my question, but
19 at the very, very tail end.
20         As with regard to Dr. Petros and Ulmsten's
21 goal of having an ambulatory stress urinary
22 incontinence procedure, you do not recall that being
23 discussed in their publications and statements, fair?
24     A.   I don't specifically recall that

1 statement, no.
2     Q.   Do you recognize that Dr. Ulmsten and
3 Dr. Petros had a goal to develop a minimally invasive
4 stress urinary incontinence procedure for women?
5     A.   Well, in theory that is how it's
6 described, but taking a trochar, which is a spear, if
7 you will, that is approximately 6 millimeters in
8 diameter and poking it blindly through the retropubic
9 space, while the incisions that are made are small,
10 there is still an invasiveness to it.
11     Q.   You and I can agree that every stress
12 urinary incontinence surgery has some invasiveness,
13 right?
14     A.   That is correct.
15     Q.   Every incision is invasive, correct?
16     A.   That is correct.
17     Q.   However, the TVT is less invasive compared
18 to an open Burch colposuspension, correct?
19     MR. CARTMELL: Object to the form.
20 BY THE WITNESS:
21     A.   I'll agree with you that the incisions
22 made on the abdominal wall are smaller. You have two
23 1-centimeter incisions which equal 2 centimeters,
24 where in a Burch procedure you can do this in a 4- to

1 6-centimeter incision. So your incisions in the
2 abdominal are greater. However, you don't have a
3 vaginal incision which with the TVT is approximately
4 1.5 centimeters long. So if you add up all of the
5 incisions together, they are fairly equivalent. But I
6 agreed with you that the abdominal incisions are
7 smaller.
8     Q.   How big did you say the abdominal
9 incisions were for TVT?
10     A.   1 centimeter.
11     Q.   Each?
12     A.   Yes.
13     Q.   And how long did you say the incision
14 above the rectus fascia was for an open Burch
15 colposuspension?
16     A.   The skin incision?
17     Q.   The incision, how long is the incision?
18     A.   The skin incision, 4 to 6 centimeters.
19     Q.   How much --
20     A.   Now, depending on if you are doing a
21 concomitant hysterectomy, you might need to make a
22 bigger incision, or if you are doing a concomitant
23 abdominal colposacropexy or some other procedure, but
24 if we are just talking -- and obviously if you are

Bruce A. Rosenzweig, M.D.

Page 30

1  doing those things with TVT, you couldn't do those
2  under local.
3      Q.   Burch is never done under local
4  anesthesia, correct?
5      A.   Oh, it's been done under local.
6      Q.   Have you ever done it under local?
7      A.   I have not personally done it under local,
8  but it has been described in the literature that it
9  can be done under local.
10     Q.   Is the Burch recommended to be done
11  locally?
12     A.   There is no specific recommendation to do
13  it under local or specific recommendation not to do it
14  under local.
15     Q.   When you do the Burch, do you do it under
16  regional block or general anesthesia or is it
17  dependent upon what other concomitant procedures you
18  are going to be doing at the same time, if any?
19     A.   There are a variety of different decisions
20  that can be made about what type of anesthesia you
21  use.
22     Q.   If I can recall correctly, you don't
23  harvest fascia from the fascia lata, a woman's thigh,
24  in your Burch procedure?

Page 31

1      A.   You do not need to harvest fascia for a
2  Burch procedure.
3      Q.   I just realized that when I asked you that
4  question.  Okay.
5      A.   Did you get a good night's sleep last
6  night, Burt?
7      Q.   I did, actually surprisingly.  I think I
8  know a little bit about this stuff.  That was an
9  off-the-wall question.  When it came out, I thought,
10  there's something really wrong there.  I can't put my
11  finger on it.
12     A.   Move to strike as non-responsive.
13     Q.   No, I did get a good night's sleep, for
14  sure.
15          To you as a surgeon, what utility or
16  usefulness is there in having a procedure that is less
17  than -- less invasive at the time of surgery than
18  other alternatives?
19     A.   You can decrease perioperative morbidity
20  theoretically.
21     Q.   When you say "perioperative morbidity", do
22  you mean morbidity while the patient is in the
23  hospital or are you focusing on during the actual
24  procedure itself or is it more than that?

Page 32

1      A.   Well, intraoperative morbidity would be
2  events that happened while the surgical procedure is
3  going on.  Perioperative morbidity is the events that
4  happened after the surgery is done but during the
5  normal 4- to 6-week recovery time.
6      Q.   Before TVT came to the market -- and let's
7  just say we'll talk about the worldwide market, but
8  certainly I'm interested in the United States, so with
9  that caveat.
10          Before TVT came to the market, was there a
11  desirability to have a minimally invasive stress
12  urinary incontinence option to treat women with?
13     MR. CARTMELL:  Object to the form.
14  BY THE WITNESS:
15     A.   Well, there were procedures, such as the
16  needle procedure, the Stamey, the Raz, the four-corner
17  Raz procedure, the Gittes procedure, that were -- the
18  Pereyra procedure, that were variations on the same
19  theme that where a thin needle was placed through the
20  retropubic space which could be done under local
21  anesthesia.  The Gittes operation is one where you
22  could significantly do that under local anesthesia,
23  but all of them could be done under local anesthesia.
24  So, I think that was not a significantly unique

Page 33

1  concept that was being discussed in the incontinence
2  market.
3  BY MR. SNELL:
4      Q.   You do acknowledge, though, that there was
5  a desire coming from surgeons as well as patients who
6  would undergo the surgery that there be a more
7  minimally invasive option --
8     MR. CARTMELL:  Object to the form.
9  BY MR. SNELL:
10     Q.   -- prior to TVT coming to the market,
11  correct?
12     MR. CARTMELL:  Object to the form.
13  BY THE WITNESS:
14     A.   There were the same options.  I mean, you
15  had needle procedures that could be done through a
16  small 1 centimeter or less incision above the pubic
17  bone and a small incision in the vagina.
18  BY MR. SNELL:
19     Q.   And the reason why the needle procedures
20  were in place and as options was because of the desire
21  towards minimally invasive options to treat stress
22  urinary incontinence, correct?
23     MR. CARTMELL:  Object to the form.
24  BY THE WITNESS:

Bruce A. Rosenzweig, M.D.

Page 34

1    A.   It was one of the options that were
2  available.
3  BY MR. SNELL:
4    Q.   You would agree that, as you've told me,
5  the benefit to these needle suspension procedures was
6  that they were minimally invasive compared to the
7  other stress urinary incontinence surgeries, correct?
8    A.   I agreed with you that there was a smaller
9  incision made on the abdominal wall and that you --
10  however the invasiveness of passing a needle blindly
11  through the retropubic space was still present.  What
12  I did agree with you was that these could be done
13  under local.
14    Q.   You are critical of the TVT in that you
15  say there is a blind passage of the trochar through
16  the retropubic space, correct?
17    A.   Passing a 5- to 6-millimeter in diameter
18  trochar through the retropubic space has been
19  associated with intraoperative injuries, such as
20  bladder injury, urethral injury and bowel injury.
21    Q.   Back to my question.
22       You are critical of the TVT in that it has
23  what you term blind passages through the retropubic
24  space with the trochar, correct?

Page 35

1    A.   The size trochar going blindly through the
2  retropubic space does increase the intraoperative
3  risk.
4    Q.   What studies are you relying upon for that
5  statement that the size of the trochar going through
6  the retropubic space increases the risk of
7  complications?
8    A.   Well, when you look at the early
9  literature that showed the reports of bowel injuries
10  and the deaths associated with bowel injuries, when
11  you look at the retropubic literature compared to the
12  other midurethral slings and a quoted bladder
13  perforation rate with retropubic slings is in the 5 to
14  15 percent where it is less than 5 percent for the
15  non-retropubic midurethral slings, that's the
16  literature I'm discussing.
17    Q.   My question is specific to this:
18       What literature, if any, clinical studies
19  in women, are you relying on for the statement that
20  the actual size of the trochar going through the
21  retropubic space increases the risk of complications?
22    MR. CARTMELL:  Object to the form, asked and
23  answered.
24  BY THE WITNESS:

Page 36

1    A.   The studies that I'm relying on are the
2  ones that I've described for you.
3  BY MR. SNELL:
4    Q.   Okay.  I don't think we are communicating.
5  All right.
6       So, trochar can be different sizes,
7  correct?
8    A.   That is correct.
9    Q.   Have you seen any randomized controlled
10  trials or other comparative studies that looked at and
11  that showed that the size of the trochar at 6
12  millimeters as opposed to 4 millimeters or some other
13  size, that that size element affected the complication
14  rate?  Do you understand what I'm asking?  I'm really
15  focused on just size of the trochar, 6 and 4, you
16  know.
17    A.   That did a prospective randomized trial on
18  two different trochar sizes and looked at the specific
19  bladder perforation rate?
20    Q.   Okay.  So now at least we are on the -- we
21  are running down the same track.  Let me reformulate
22  the question.
23    A.   Right.
24    Q.   Are you aware -- and I'm going to ask you

Page 37

1  about comparative studies.
2       Are you aware of any comparative studies
3  that showed that having a larger size trochar for the
4  TVT led to an increased rate of complications that was
5  statistically significantly higher than a smaller size
6  trochar placed in the same manner?
7    MR. CARTMELL:  Just so I'm clear, is the
8  question has that been studied -- has that study been
9  done or has he seen that study?
10    MR. SNELL:  Is he aware of that, has it been
11  done, has he seen that data?
12  BY THE WITNESS:
13    A.   I am not aware of that data.
14  BY MR. SNELL:
15    Q.   You mentioned that with -- strike that.
16       You mentioned compared -- strike that.
17       You mentioned that with the transobturator
18  route of placement of the TVT mesh that there is a
19  lower rate of bladder perforation as compared to the
20  TVT retropubic, correct?
21    A.   That is correct.
22    Q.   And you're also aware that Ethicon makes
23  that design -- strike that.
24       You are aware that Ethicon makes that

Bruce A. Rosenzweig, M.D.

Page 38

1  TVT-O designed trochar -- strike that.
2        You are aware that Ethicon makes the
3  transobturator designed TVT-O passage available to
4  surgeons, correct?
5     A.   That is correct.
6     Q.   And you yourself have testified that there
7  are risks associated specifically with that
8  transobturator passage, correct?
9     A.   That is correct.
10    Q.   And that's reflected in the medical
11 literature, like the Cochrane reviews and other
12 systematic reviews and meta-analyses that you view as
13 reliable, correct?
14    A.   They are on my reliance list, yes.
15    Q.   But you viewed them as reliable, correct?
16    A.   That is correct.
17    Q.   The needle procedures that you identified
18 earlier, like the Stamey, the Gittes, the Raz, those
19 procedures are not recommended by any of the
20 professional societies here in the United States as a
21 first line surgical option to treat stress urinary
22 incontinence, correct?
23    A.   That is correct.
24    Q.   When is the last time you performed one of

Page 39

1  those needle procedures for stress urinary
2  incontinence treatment, if you've ever done one?
3     A.   Well, I've done them before, yes.
4     Q.   I didn't remember we had ever discussed
5  that, but, I mean, that's going way back, so let's --
6  when was the last time you've performed one of these
7  needle suspension procedures for the treatment of
8  stress urinary incontinence, Doctor?
9     A.   Probably in the late '90s.
10    Q.   And you have seen reliable well-done
11 systematic reviews and meta-analyses that report that
12 the efficacy with the needle suspension procedures,
13 such as the Stamey, the Gittes and the Pereyra, is
14 inferior to other stress urinary incontinence
15 surgeries, like the Burch and pubovaginal sling and
16 the midurethral sling, the full-length midurethral
17 sling, correct?
18    A.   I'm not sure whether there are
19 meta-analysis, but there are opinions that have been
20 put forth that the success rate is lower for the
21 needle procedures compared to the Burch, pubovaginal
22 sling and midurethral sling.
23    Q.   Have you reviewed any of the comparative
24 randomized control trials, if any, that look at and

Page 40

1  compare the needle suspension procedures we've been
2  discussing for the treatment of stress incontinence to
3  the Burch, the autologous sling or the full-length
4  midurethral slings?
5     A.   There might be some procedure -- or might
6  be some literature in -- that addresses some
7  comparative studies.  However, I would agree with
8  you -- and remember we got talking about needle
9  procedures when you were asking me about procedures
10 that were done in the '80s and '90s, and so I was
11 describing that.  I would agree with you that most if
12 not -- most urogynecologists do not use needle
13 procedures as first-line therapy unless there is a
14 significant indication for it.
15    Q.   As you sit here today, can you think of
16 any significant indication for one of these needle
17 procedures over and above the use of an alternative
18 like the Burch, a pubovaginal autologous sling or a
19 full-length midurethral sling?
20    A.   Well, I think there are still some pretty
21 good data on the four-corner Raz procedure which is,
22 quote/unquote, a vaginal pubovaginal sling, but the
23 Pereyra, the Gittes, the Stamey, I think that those
24 are -- unless under rare circumstances and rare

Page 41

1  instances would not be considered first-line therapy.
2     Q.   Have you done a systematic review of the
3  medical literature reporting on these needle
4  suspension procedures?
5     A.   I probably did a systematic review of that
6  literature years ago when I was using those
7  procedures, but I must admit I probably have not
8  looked at that literature in -- that specific
9  literature.  You know, obviously I've reviewed the
10 overwhelming majority of midurethral sling literature
11 and Burch literature as we've discussed on several
12 different occasions, but I would admit I have not
13 looked at the needle procedure literature in a while.
14    Q.   You mentioned that you -- was it your
15 recollection or just your kind of general impression
16 that of the needle suspension procedures, the
17 four-corner Raz procedure had the better data?
18    A.   Yes, and it's more of a vaginal
19 pubovaginal sling is what Raz described.
20    Q.   Has the four-corner Raz procedure been
21 studied in a randomized control trial to the
22 pubovaginal autologous sling, the Burch
23 colposuspension or the full-length midurethral sling
24 like TVT that you are aware of?

Bruce A. Rosenzweig, M.D.

Page 42

1    A.   Not that I'm aware of.

2    Q.   Is it desirable to you as a surgeon to

3  have surgical options that have actually been studied

4  in randomized control trials?

5    A.   Randomized control trials would be the

6  highest level of evidence in the study literature, if

7  you will.  It helps in making evidence-based medicine

8  decisions.  And, so, therefore, I would -- I use

9  evidence-based medicine in making my decision-making

10  for patient management and, therefore, would use

11  randomized control trials in making decisions.

12    Q.   In the 1990s, are you aware if there were

13  any systematic reviews and meta-analyses done looking

14  at randomized control trials that assessed the

15  different surgeries to treat stress urinary

16  incontinence?

17    A.   Specifically in the mid-'90s?

18    Q.   Any time in the 1990s.

19    A.   Whether there were -- now, remember, when

20  you do a systematic review, you are looking at mostly

21  randomized control trials.  You -- some systematic

22  reviews add in other well-done cohort studies or

23  comparative studies, but for the vast majority of

24  systematic reviews, randomized control trials are --

Page 43

1  are used and also assessed for their quality.

2         Sitting here today, I quite frankly do not

3  recall if there were specific meta-analyses and

4  systematic reviews that were done.  I do know the

5  current meta-analyses and systematic reviews and

6  Cochrane reviews that, you know, we might touch on

7  today.

8    Q.   Fair enough.

9         You were doing the Burch colposuspension,

10  as I recall, and you've told me this, and I want to

11  make sure I'm correct.  Withdraw.

12         You were doing the Burch colposuspension

13  throughout the 1990s, correct?

14    A.   That is correct.

15    Q.   Were there any randomized control trials

16  that you are aware of that were conducted on the Burch

17  colposuspension in the 1990s that informed your

18  practice?

19    A.   Well, randomized control trials would be

20  randomizing to two different arms.  And while there

21  might have been some studies that looked at a

22  comparison between Burches and pubovaginal slings or

23  Burches and needle procedures, specific randomized

24  control trials in that era I am not aware of right

Page 44

1  now.

2    Q.   You've seen, I take it, the statement in

3  the literature by certain "experts" that there have

4  been over 100 surgeries, different procedures to treat

5  stress urinary incontinence.

6         Are you familiar with that?

7    A.   I've seen that, numbers like that thrown

8  around, yes.

9    Q.   Is that something you learned during your

10  medical school or your gynecologic residency training?

11    A.   That statement that there were over 100

12  incontinence operations?

13    Q.   Yes, Doctor.

14    A.   That specific statement, no.

15    Q.   Do you have an opinion as to how many

16  different stress urinary incontinence surgery options

17  there have been described?

18    A.   There have been a number, but they are all

19  pretty much variations on a similar theme.  I mean,

20  there were the retropubic operation, there were the

21  pubovaginal sling operations, there were the needle

22  procedure operation, so that there was a -- while

23  people might describe a different way of doing a

24  specific part of a specific operation, there were

Page 45

1  pretty much the same categories that we have today.

2    Q.   And when you say "retropubic", you are

3  including in that the lineage of the MMK and the

4  Burch, correct?

5    A.   Well, the MMK, the Burch, the Tanagho

6  modification of the Burch.  Again, a new procedure

7  might be a modification of a procedure and, therefore,

8  you know, might be considered a "new" procedure where

9  it is really just a variation on the same theme.

10    Q.   In all of these -- so the retropubic

11  procedures, the pubovaginal sling procedures and the

12  needle procedures, are those like the top-line

13  branches for doing stress urinary incontinence

14  procedures?

15    A.   We are talking about in that era?

16    Q.   Or in the 1990s, before TVT came about.

17    A.   Those would be the major categories that

18  operations would fall under.  There was the

19  Kelly-Kennedy plication with an anterior colporrhaphy.

20  That would be an operation that, you know, was known

21  to have a fairly low success rate and would be of a

22  utility in certain situations, such as doing a Lefort

23  colpocleisis.  In an older woman you do a

24  Kelly-Kennedy plication to try to prevent that from

Bruce A. Rosenzweig, M.D.

Page 46

1  developing a post-operative stress incontinence.
2      Q.   As I understand it, the Kelly plication is
3  not recommended as a first-line surgical option to
4  treat stress urinary incontinence by any of the
5  professional societies here in the United States who
6  puts out guidelines and analyses regarding stress
7  incontinence procedures, is that correct?
8      A.   I would agree with you there might be
9  certain situations, the one that I just described for
10 you, where it would be a -- a procedure of utility,
11 but I would not recommend it as first-line therapy.
12     Q.   Is there any category of stress urinary
13 incontinence surgery that avoids the retropubic space?
14     A.   Is there any category?
15     Q.   Yes.  You told me there were different
16 categories, retropubic, pubovaginal sling, the needle
17 procedures.
18         My question is:  Do any of those
19 categories of procedures avoid the retropubic space?
20     A.   No.
21     Q.   Is it necessary to enter the retropubic
22 space in order to treat stress urinary incontinence?
23     A.   And we are not dealing with transobturator
24 slings which have been suggested to not enter the

Page 47

1  retropubic space, but if you actually do dissect into
2  the retropubic space, you can find transobturator
3  slings in the retropubic space, so if we are just --
4  we are going to keep that out of our discussion?
5      Q.   Well, let me just make sure I understand
6  that.  Or let me just ask you a clean question, a
7  broader question then.
8          In your opinion is there any stress
9  urinary incontinence surgery that avoids the
10 retropubic space?
11     A.   Again, beside the opinion that -- and
12 possibly some anatomic dissections that would suggest
13 that the transobturator slings avoid the retropubic
14 space, I've dissected them out of the retropubic
15 space.  So those might have migrated into the
16 retropubic space and that was what was causing
17 their -- the patient's complications.  But the ones
18 that we are talking about today, the urethropexies,
19 the midurethral slings, retropubic and the needle
20 procedures all enter the retropubic space.
21     Q.   For the needle suspension procedures that
22 we have been discussing to treat stress urinary
23 incontinence, there is a blind passage of surgical
24 instruments during those procedures, correct?

Page 48

1      A.   That is correct.
2      Q.   During the autologous pubovaginal --
3  strike that.
4          During the autologous pubovaginal sling
5  placement, there is the blind use of surgical
6  instruments in that surgery as well, correct?
7      A.   Not the way I perform it.
8      Q.   So just so I'm clear, the way you
9  performed the autologous pubovaginal sling, there is
10 no part of that surgery where there is a blind use of
11 a surgical instrument?
12     A.   That is correct.
13     Q.   Describe how you do that pubovaginal sling
14 where you avoid the --
15     A.   So we've had this discussion, but I will
16 describe it for you.
17     Q.   Very briefly just so I understand.
18     A.   You make similar to a Burch incision, you
19 harvest the rectus fascia, you bring it down on each
20 side of the urethra, and then you bring it under --
21 one side underneath the urethra and you attach the two
22 ends together.  So it is done through a retropubic
23 incision.
24         Now, you can do a pubovaginal sling with

Page 49

1  instruments that are blindly passed through the
2  retropubic space.
3      Q.   You saw in Dr. Blaivas' testimony he
4  testified that when he does the autologous pubovaginal
5  sling, part of his placement and use of the needles is
6  in a blind fashion, correct?
7      A.   That is correct.  You can use needles, you
8  can use other less -- or another instrument to pass
9  the rectus fascia.
10     Q.   You can use less invasive instruments than
11 the needles to pass the rectus fascia, correct?
12     A.   That is correct.
13     Q.   But Dr. Blaivas for whatever reason
14 chooses to use the more invasive needles, correct?
15     A.   What he described in his deposition is
16 what he described in his deposition.
17     Q.   And that's the more invasive needles
18 compared to the tools you use, correct?
19     A.   Again, I don't use needles or blunt
20 instruments except to create a tunnel underneath the
21 urethra at the bladder neck.
22     Q.   You would agree, and I think you will,
23 that the needles Dr. Blaivas uses are more invasive,
24 correct?

Bruce A. Rosenzweig, M.D.

Page 50

1    A.   And I think now we are agreeing that there
2  is an invasiveness, even if it's a minimally invasive,
3  that passing a needle is an invasive procedure, and I
4  will agree with that.
5    Q.   During your autologous pubovaginal sling,
6  are you tying it up top or are you tying it through a
7  vaginal incision?
8    A.   You can make a vaginal incision to be able
9  to connect the two ends of the pubovaginal sling or
10  you can harvest a full length of pubovaginal sling or
11  rectus fascia.  What I do is I take two ends and bring
12  them together on the side of the urethra so I don't
13  have a suture line underneath the urethra.  But it is
14  all done retropubically, so I don't make an incision
15  in the vagina.
16    Q.   So you do a suprapubic incision and you
17  take the sling and you position it under visualization
18  while you are looking down into the space of Retzius,
19  correct?
20    A.   That is correct.
21    Q.   And is it off to the left side or the
22  right side where you connect the strip of fascia?
23    A.   Being left-handed, I connect things on the
24  left side.

Page 51

1    MR. SNELL:  Okay.  Let's take a break.
2        (WHEREUPON, a recess was had
3          from 11:05 to 11:17 a.m.)
4  BY MR. SNELL:
5    Q.   So before we took our break we were
6  discussing various stress urinary incontinence
7  procedures, and you had told me that the older needle
8  suspension procedures and the autologous fascial
9  sling, there can be passage of needles through the
10  retropubic space, correct?
11    A.   That is correct.
12    Q.   And that occurred before TVT, correct?
13    A.   Yes.
14    Q.   And is it correct that even after TVT was
15  introduced that surgeons using those older needle
16  suspension procedures and the autologous slings if
17  they so chose still use blind passage of instruments
18  through the retropubic space?
19    A.   Well, there are still a number of surgeons
20  and a growing number of surgeons that are using the
21  alternative surgeries to the midurethral sling.  They
22  look at the risk/benefit analysis of midurethral
23  slings and say that the long-term risk associated with
24  midurethral slings outweigh the benefits and have gone

Page 52

1  back to pubovaginal slings or the Burch procedure.  I
2  would agree with you that the needle procedures in and
3  of themselves are not used very much anymore, if at
4  all.
5    Q.   I think you mistook my question, so let me
6  see if I can make it -- because I'm not really
7  interested in percentages or anything like that.  I
8  guess I should have asked a more simple question.
9        Surgeons who chose to do the pubovaginal
10  slings and these needle suspension procedures after
11  TVT even came to the market still would employ the
12  blind passage of the instruments through the
13  retropubic space?
14    A.   In doing those procedures?
15    Q.   Yes, sir.
16    A.   Yes.
17    Q.   So then you would agree that it was
18  consistent with the state of the art when TVT was
19  designed to have surgical instruments pass through the
20  retropubic space?
21    A.   The retropubic space was used to pass
22  instruments to accomplish stress incontinence
23  procedures.
24    Q.   Is that a yes?

Page 53

1    A.   The -- the state of the art?
2    Q.   Yes, it was consistent with the state of
3  the art when TVT was designed to have surgical
4  instruments pass through the retropubic space?
5    MR. CARTMELL:  Object to the form.
6  BY THE WITNESS:
7    A.   Yes, instruments are passed through the
8  retropubic space, yes.
9  BY MR. SNELL:
10    Q.   It was also consistent with the state of
11  the art when TVT was designed to have surgical
12  instruments pass through the retropubic space with a
13  portion of that passage being blind, correct?
14    MR. CARTMELL:  Object to the form.
15  BY THE WITNESS:
16    A.   Procedures are still accomplished with a
17  portion of the procedure or certain procedures done
18  with a blind passage.
19  BY MR. SNELL:
20    Q.   Is that a yes?
21    A.   Yes.
22    Q.   It was consistent with the state of the
23  art when TVT was designed to have vaginal incisions
24  used to carry out the stress incontinent surgery,

Bruce A. Rosenzweig, M.D.

Page 54

1  correct?

2      A.  Yes.

3      Q.  It was consistent with the state of the

4  art when TVT was designed to have multiple incisions

5  utilized to carry out the stress incontinent surgery,

6  correct?

7      MR. CARTMELL:  Object to the form.

8  BY THE WITNESS:

9      A.  Yes.

10 BY MR. SNELL:

11     Q.  Earlier you mentioned bladder perforation

12 in that risk with the retropubic passage.

13         Do you recall that?

14     A.  Yes.

15     Q.  Now, I know you've read the Cochrane

16 review by Ogah from 2008.  Strike that.

17         I know you read the Cochrane review by

18 Ogah from 2009 and it was updated and published in

19 2011, correct?

20     A.  That is correct.

21     Q.  And you recall that in that Cochrane

22 review they looked at were there any significant

23 differences in the comparative studies for doing a

24 bottom-up passage, like a TVT retropubic, compared to

Page 55

1  a top-down passage, correct?

2      A.  Correct, and if you want to get into a

3  discussion any more than that, I'm going to need to

4  see it.

5      Q.  Well, let me ask you this:

6          I take it you don't based on the

7  literature have an opinion that TVT retropubic has a

8  higher rate of bladder perforation than other

9  retropubic midurethral full-length slings?

10     A.  I don't have an opinion about that that it

11 has a higher rate of bladder perforation than other

12 retropubic midurethral slings.

13     Q.  Full-length midurethral slings, correct?

14     A.  And we're specifically talking about the

15 Ogah 2011 Cochrane review?

16     Q.  No.  So let's back up.

17     A.  Okay.

18     Q.  So I know you've told me in that your

19 opinion the retropubic passage has a risk of bladder

20 perforation that's higher than a transobturator

21 passage, correct?

22     A.  That is correct.

23     Q.  So let's set that to the side because

24 we've already talked about transobturator.

Page 56

1          You would agree that the overall data do

2  not show that for retropubic midurethral slings that

3  the rate of bladder perforation with TVT is

4  statistically significant, not only higher than other

5  retropubic full-length midurethral slings?

6      MR. CARTMELL:  Object to the form.

7  BY THE WITNESS:

8      A.  Done bottom up or top down?

9  BY MR. SNELL:

10     Q.  Either way.

11     A.  I -- in the Ogah Cochrane analysis, that

12 review does discuss differences between the risk of

13 bladder perforation, and if we want to talk about that

14 specifically, we can, you know, look at the paper so I

15 can go to the part on that paper where it says and

16 quote the exact number specifically.  There -- from my

17 recall, and we are not making this a guessing game or

18 a memory test, to be able to speak specifically about

19 what the numbers in the Ogah study show, I think it

20 would be helpful to have that study in front of me.

21     Q.  I guess my question, though, is broader

22 than just what Ogah did, although I know you've read

23 and relied on Ogah.

24         My question was:  You don't have an

Page 57

1  opinion that there is a higher bladder perforation

2  rate with the TVT retropubic device as compared to

3  other retropubic midurethral full-length slings,

4  correct?

5      A.  I don't cite that as an opinion in my

6  report.

7      Q.  Fair enough.

8      MR. SNELL:  Can you mark that.

9          (WHEREUPON, a certain document was

10         marked Rosenzweig Deposition Exhibit

11         No. 2, for identification, as of

12         09/22/2015.)

13 BY MR. SNELL:

14     Q.  Doctor, I've handed you Exhibit No. 2

15 which is the Ogah short Cochrane review from 2011.

16 This is one of the papers you read?

17     A.  That is correct.

18     Q.  This is one of the studies you rely on for

19 your opinions, correct?

20     A.  That is correct.

21     Q.  In this Cochrane review they state, a

22 retropubic bottom-to-top route was more effective than

23 the top-to-bottom route?

24     A.  Yes.

Bruce A. Rosenzweig, M.D.

1    Q.   And the bottom-to-top route would be like
2  TVT, correct?
3    A.   That is correct.
4    Q.   Top-to-bottom would being SPARC and other
5  variants?
6    A.   Well, there is a top-to-bottom application
7  of the TVT retropubic, but specifically, particularly
8  on page 287 --
9    Q.   Correct.
10    A.   -- they compare retropubic bottom-to-top
11 approach TVT versus retropubic top-to-bottom approach
12 SPARC. So they specifically looked at those two
13 parameters.
14        And your next statement is going to be
15 adverse effects. The bottom-to-top approach reported
16 fewer adverse events, such as bladder perforation,
17 vaginal erosion, voiding dysfunction and tape erosion
18 than the top-to-bottom approach.
19    Q.   And you would agree that the retropubic
20 approach utilized by the design of TVT does result in
21 more efficacy than a top-to-bottom approach utilized
22 by the design of a product like SPARC?
23    A.   Well, that success rate might be explained
24 by not just the approach that's used but differences

1  in the mesh specifically, such as pore size, weight of
2  the sling, and other parameters. So it's a little bit
3  difficult to just say that it is the bottom-up versus
4  top-down approach that is associated with an increase
5  in efficacy or the decrease in the adverse events that
6  they describe.
7    Q.   Have you formulated an opinion as to
8  whether it is the bottom-up design approach of the TVT
9  retropubic that leads it to have better efficacy than
10 the top-to-bottom design of the SPARC?
11    A.   Specifically the approach?
12    Q.   Yes, sir.
13    A.   No.
14    Q.   Do you know why the TVT bottom-to-top
15 approach had a lower rate of voiding dysfunction,
16 bladder perforation and tape erosions than the
17 top-to-bottom SPARC design?
18    MR. CARTMELL:  I apologize. Would you please
19 restate that question.
20        (WHEREUPON, the record was read
21          by the reporter as requested.)
22 BY THE WITNESS:
23    A.   Specifically comparing two different mesh
24 products that would be a very long discussion about

1  the reasons why there would be a difference in
2  efficacy and complication rates.
3  BY MR. SNELL:
4    Q.   Well, I just want to focus on those three
5  complications.
6        Why does TVT have a lower rate of bladder
7  perforation, voiding dysfunction and tape erosions
8  than the top-to-bottom design employed by SPARC?
9    A.   And, again, that is a long discussion
10 about the differences between the tape and the
11 approach.
12    Q.   What is it?
13    A.   What is it?
14    Q.   What is the answer to my question?
15    A.   Why is there a higher efficacy and a lower
16 complication rate?
17    Q.   No, no, no. You are not focusing on my
18 question, because I've already set efficacy to the
19 side.
20    A.   Okay.
21    Q.   And I'm not asking about safety
22 altogether. I'm asking these parameters --
23    A.   Right.
24    Q.   -- in the Cochrane review.

1        In the Cochrane review why does the TVT
2  with its bottom-up design lead to less voiding
3  dysfunction, bladder perforations and tape erosions
4  than the top-to-bottom design of the SPARC?
5    MR. CARTMELL:  Object to form to the extent that
6  it calls for speculation, lacks foundation and is
7  based on data in studies that he hasn't been provided.
8  I also, you know, just want the record to be clear, I
9  don't think he has offered an opinion in this case, a
10 comparative opinion between the SPARC and the TVT. In
11 other words, he has offered an opinion that the TVT is
12 defective, but you are asking him questions about the
13 SPARC product and reasons why the SPARC product might
14 be defective. And I don't think that's at issue in
15 this case. So I think it is an improper question.
16 BY MR. SNELL:
17    Q.   You can answer. I'm asking about
18 pertinent complications relative to the TVT. That's
19 my position, so.
20    A.   Yes.
21    Q.   So do you need me to reask the question or
22 do you have it in your mind?
23    A.   I don't think that it is related to the
24 bottom-up versus top-down design approach.

Bruce A. Rosenzweig, M.D.

Page 62

1    Q.    What design attribute of the TVT, then,
2  leads it to have less tape erosions than the SPARC?
3      MR. CARTMELL:  Same objections.
4        You are talking about just in these
5  studies or the Ogah study?
6      MR. SNELL:  Yes, as reported in the Ogah
7  Cochrane review.
8  BY THE WITNESS:
9    A.    What is it about the specific design of
10  the TVT --
11  BY MR. SNELL:
12    Q.    Yes, what is it about --
13    A.    -- versus the specific design of the
14  SPARC?
15    Q.    Yes.
16        What is it about the design of the TVT
17  that leads it to have a lower rate of vaginal erosion
18  than the SPARC as reported in the Ogah study?
19      MR. CARTMELL:  Object to the form.
20  BY THE WITNESS:
21    A.    Well, the Ogah study doesn't allow me with
22  the information that they have in reviewing four
23  papers to discuss the differences in design that would
24  account for the differences in the complications that

Page 63

1  were described.
2  BY MR. SNELL:
3    Q.    Now, you earlier told me that you do not
4  believe, though, that it is due to the bottom-up
5  design approach of the TVT as to why those three
6  complications, bladder perforation, voiding
7  dysfunction, vaginal erosions, were lower with TVT
8  compared to SPARC, correct?
9    A.    That specifically, no.
10    Q.    And so what was the methodology by which
11  you made that distinction?
12    A.    The methodology would be reviewing the
13  literature, looking at the way that the studies --
14  individual studies, the Kim study, the Lim study and
15  the Lord study were designed, looking at the
16  methodology that was used, looking at the sample size
17  to determine whether or not the bottom-up approach
18  versus the top-down approach increased the risk of
19  those specific complications.
20    Q.    So you think there is enough data and
21  methodology in those studies that allows you to opine
22  that the difference seen as reported in Ogah is not
23  because of the route, bottom-to-top versus
24  top-to-bottom?

Page 64

1      MR. CARTMELL:  Just let me make it clear for the
2  record.  You are asking him to compare the SPARC to
3  the TVT.  He is not offering an opinion in this case
4  that the SPARC is safer than the TVT or less safe than
5  the TVT.  And his opinions are -- in this case are
6  about the TVT mesh, the trochars, the approach, the
7  procedure.  So you are asking methodology questions
8  related to a topic that's not -- to the SPARC.  And I
9  just don't think that's relevant here.
10      MR. SNELL:  I heard you the first time, Tom.
11      MR. CARTMELL:  I want the record to be very
12  clear because --
13      MR. SNELL:  It is.
14      MR. CARTMELL:  -- because you're asking
15  methodology questions like you're -- there is some
16  opinion that you are going to move to strike from a
17  Daubert standpoint.  But he hasn't been asked to
18  compare the SPARC to the TVT.
19      MR. SNELL:  My position is these are data
20  reporting on complications with the retropubic TVT and
21  this data is certainly relevant.  This is the study he
22  cited to, we've discussed before in other contexts.
23  So that's why I'm asking him questions about it.
24  BY MR. SNELL:

Page 65

1    Q.    I just want to make sure I understand
2  where you are coming from.
3        Do you believe there is enough description
4  data and methodology that you can reliably say that
5  the differences seen in those three adverse effects,
6  of voiding dysfunction, bladder perforation and
7  vaginal erosion, that TVT had the lower rates of those
8  compared to SPARC and that's not due to the bottom up
9  versus top-down approach?
10      MR. CARTMELL:  Same objections.
11  BY THE WITNESS:
12    A.    Specifically looking at the papers that
13  are quoted in the Ogah analysis?
14  BY MR. SNELL:
15    Q.    However you would do it.  I'm just asking
16  you.
17      MR. CARTMELL:  Object to the form.  Also adding
18  it lacks foundation.  I'm not sure if you are asking
19  him just based on this paper or his view of all of the
20  literature.
21      MR. SNELL:  No.  I'm asking about Ogah.
22      MR. CARTMELL:  Ogah only.
23  BY THE WITNESS:
24    A.    Right, from the information that is in the

Bruce A. Rosenzweig, M.D.

Page 66

1  Ogah Cochrane review, there is -- they are reporting
2  on what they -- what the study showed and what was the
3  difference in outcomes between the retropubic TVT
4  bottom up and the top down.  Having reviewed the
5  individual papers, those report information.  Now,
6  you're asking me to go beyond what's in those papers,
7  because if you want to pull out each of the individual
8  papers to see if they opined why there was a
9  difference in these complications, then we can look at
10  each individual one.
11      Q.   No, I don't -- I don't think that that's
12  responsive.  I'm going to move to strike.
13          I'm going to make it as simple as I can.
14  Why does TVT have significantly less voiding
15  dysfunction than SPARC as reported in the Ogah
16  Cochrane review?
17      MR. CARTMELL:  Same objections.
18  BY THE WITNESS:
19      A.   There is no conclusion in the Ogah
20  Cochrane review of why there is less erosion, why
21  there is less voiding dysfunction, and why is there a
22  higher efficacy.
23  BY MR. SNELL:
24      Q.   Based on your review of those underlying

Page 67

1  studies and the Ogah review, are you able to tell me
2  why TVT had a lower rate of vaginal erosion than
3  SPARC?
4      A.   Specifically based on the Ogah review and
5  reviewing those studies, a -- the reason for the
6  difference specifically in those complications -- and
7  it would be more important for me to have each one of
8  those in my hand to make that final statement, but
9  from what I recall, they do not opine as to why there
10  is a difference between those complications.
11      Q.   But my question is:  Do you know why TVT
12  had less vaginal erosions than SPARC?
13      MR. CARTMELL:  Just based on his review of Ogah?
14  BY MR. SNELL:
15      Q.   Based on all of the work you've ever done
16  and your experience and your knowledge and everything
17  that you bring to the table that you are relying on as
18  an expert?
19      MR. CARTMELL:  Okay.  I also want to make it
20  clear because Dr. Rosenzweig has also looked at
21  confidential internal documents from AMS and I'm not
22  sure he is in -- I'm not sure he is allowed to in this
23  deposition talk about any of the opinions he has about
24  the SPARC that are confidential in nature in that

Page 68

1  litigation.
2          So to the extent you might be, you know,
3  violating some protective order or -- I don't think
4  you should talk about specifically that work related
5  to your review of SPARC case.
6  BY THE WITNESS:
7      A.   I don't think I can answer that question
8  without violating protective orders.
9  BY MR. SNELL:
10      Q.   Which protective orders are you
11  referencing?
12      A.   In AMS.
13      Q.   Well, have you ever opined that SPARC has
14  a higher rate of vaginal erosion than TVT?
15      A.   Again, based on the protective orders that
16  I have signed, I don't think I can answer that
17  question.
18      Q.   You have not opined in a deposition or in
19  a court of law that SPARC has a higher rate of erosion
20  than TVT?
21      A.   Not in a deposition or in a court of law.
22      Q.   Have you written a report where you have
23  stated that SPARC has a higher rate of mesh
24  exposure -- strike that.

Page 69

1          Have you written in a report that SPARC
2  has a higher rate of vaginal erosion than TVT?
3      A.   If I recall, I have quoted the Lim paper
4  and the other papers that are quoted in the Ogah
5  review.
6      Q.   For what purpose did you quote those?
7      A.   Comparative purposes, just like what the
8  Ogah review found.
9      Q.   What specific comparative purposes did you
10  site those materials for?
11      A.   As the Ogah review says, that there is a
12  higher rate of vaginal erosions, voiding dysfunction,
13  and tape erosions associated with the SPARC compared
14  to the TVT.
15      Q.   Why did you find it important to cite that
16  part of the Ogah Cochrane review?
17      MR. CARTMELL:  No.  I think he is talking about
18  citing the actual studies, not the -- am I wrong?
19  BY THE WITNESS:
20      A.   No, citing the actual studies.
21  BY MR. SNELL:
22      Q.   So why was it important that you cite
23  those actual studies?
24      A.   Without getting into details about what's

Bruce A. Rosenzweig, M.D.

Page 70

1  in the reports, as those are still active cases, I
2  don't know if it's appropriate for me to discuss that.
3      Q.   These are expert reports you have in other
4  litigation, in the AMS litigation?
5      A.   That is correct.
6      Q.   Do you have copies of those reports?
7      A.   Not with me.
8      Q.   Have you produced those reports that have
9  been disclosed by Dr. Rosenzweig in other mesh
10  litigations?  Not ones he is working on that are
11  exempt from disclosure.  I mean published reports.
12      MR. CARTMELL:  I honestly need to check that
13  because Jeff Kuntz will know that for sure.
14      MR. SNELL:  Okay.  Defense requests all
15  published expert reports concerning slings, stress
16  incontinence slings, and I'll go ahead and make the
17  request for transvaginal mesh that you have published,
18  not the ones that are in progress that are
19  confidential, you know, subject to the work product,
20  but ones you have actually published and have gone to
21  the defense.
22  BY MR. SNELL:
23      Q.   Is it generally accepted in your field,
24  Doctor, that well-designed randomized control trials

Page 71

1  are the gold standard for directing clinical
2  decision-making amongst different options that are
3  studied?
4      A.   Well designed?
5      Q.   Yes, sir.
6      A.   Well run, well randomized, randomized
7  control trials, yes.
8      Q.   For instance, why do groups like the
9  Cochrane review look at randomized control trials?
10      A.   They are a high quality of evidence, but
11  what they do also is they look through the randomized
12  control trials to make sure that they have a large
13  enough sample size, they have appropriate methodology,
14  their randomization technique was appropriate to
15  determine whether or not they are going to add a
16  randomized control trial to their systematic review.
17      Q.   Is it your opinion that the difference in
18  approach, bottom up to top down, is not responsible
19  for the difference in bladder perforation rates as
20  reported in Ogah where TVT had a lower rate than
21  SPARC?
22      MR. CARTMELL:  Same objections.
23  BY THE WITNESS:
24      A.   I have seen a theoretical analysis that

Page 72

1  says that because the top-down approach you have
2  dissected further into the retropubic space and the
3  needle contacts the finger right through perforation
4  of the fascial sheath that it protects the bladder
5  from perforation.  However, when you look at the data,
6  specifically what was in the Ogah study, it shows that
7  the bottom-up approach is associated with less bladder
8  perforations.
9  BY MR. SNELL:
10      Q.   How is that?
11      A.   Theoretically?
12      Q.   Let's start with theoretically, but I'm
13  more interested in really how is that?  But you can
14  tell me theoretically first.
15      A.   The bladder manipulator might do a better
16  job of moving the bladder over to the side so that you
17  have a lower chance of perforating the bladder.
18      Q.   And when you say "the bladder
19  manipulator", you mean when they put the cystoscope in
20  there and turn it to the side or not?
21      A.   No, you don't do that with a cystoscope.
22  You do it with a rod that's placed -- and I'm
23  forgetting the name of that instrument, but it's a rod
24  that's placed into the Foley catheter to manipulate

Page 73

1  the bladder from one side to the other.
2      Q.   Is the rod not placed through a Foley
3  catheter in the design employed for the SPARC?
4      A.   Since specifically today we are talking
5  about the TVT, I've prepared to discuss the TVT.  I am
6  not prepared today to discuss the SPARC.
7      Q.   Do you not know whether a rod is placed
8  through a Foley catheter when carrying out a SPARC?
9      MR. CARTMELL:  You can answer that if you know.
10  BY MR. SNELL:
11      Q.   Yeah, I'm just asking your medical
12  knowledge.
13      A.   I don't recall that.  Again, I've
14  testified before that I've only done the TVT
15  retropubic and not the SPARC procedure.
16      Q.   Okay.  So you would agree, then, that one
17  potential benefit of the design of the TVT is that it
18  uses a rod placed through the Foley catheter to
19  mobilize the bladder in an attempt to minimize the
20  risk of bladder perforation with the retropubic
21  design, correct?
22      A.   With the bottom-up approach?
23      Q.   Yes, sir.
24      A.   Specifically compared to the top-down

Bruce A. Rosenzweig, M.D.

1 approach?

2     Q. How about in general first?

3     A. What we do know is that bladder

4 perforations happen between 5 and 15 percent of the

5 time when we are doing a -- when one is doing a

6 retropubic midurethral sling. The bladder manipulator

7 is an instrument to help mobilize the bladder away

8 from the trochar as it's being passed through the

9 retropubic space, so that is the reason to -- if you

10 will, that that component was designed.

11     Q. Utility and using the bladder manipulator,

12 it attempts to minimize the risk or reduce the risk of

13 bladder perforation when carrying out the retropubic

14 TVT, correct?

15     A. That was the intention, yes.

16     Q. And it's also -- you would agree there

17 is utility to using the bladder manipulator during the

18 TVT retropubic device?

19     A. As opposed to not using it?

20     Q. Yes.

21     A. Yes.

22     Q. You would agree that there is utility in

23 using the bladder manipulator when carrying out the

24 TVT retropubic as compared to using some other form of

1 bladder manipulation, correct?

2     A. And when you are talking about another

3 form of bladder manipulation, are you talking about

4 another instrument or another technique?

5     Q. Either.

6     A. Well, I am not opining that there is a

7 better design for bladder manipulation than the

8 current embodiment. So, therefore, I don't -- I would

9 say using a bladder manipulator is safer than not

10 using a bladder manipulator.

11     Q. You would agree that part of the design of

12 the TVT also -- strike that.

13     You would agree that part of the design of

14 the TVT retropubic device to treat stress urinary

15 incontinence also is the employment of using the

16 cystoscopy to check the bladder, correct?

17     A. That is correct. There was a recent study

18 that showed that with bladder perforation, the risk of

19 mesh protrusion into the bladder was significantly

20 higher than without bladder perforation.

21     Q. And is that study cited in your expert

22 report anywhere?

23     A. I -- it is not cited in the expert report.

24 It's probably on my reliance list.

1     Q. You would agree that there is a benefit

2 and utility to doing the cystoscopy when performing

3 the retropubic TVT?

4     A. That is correct. If one sees the needle

5 or the tape through the bladder, it is appropriate and

6 within the standard to remove the needle and/or the

7 tape from the bladder and then reposition the needle

8 so that you are not in the bladder.

9     Q. What is the significance of a recognized

10 bladder perforation during the time of retropubic TVT

11 placement?

12     A. Well, as stated in the Osborne paper that

13 came out in 2014, it used to be considered a rather

14 innocuous event. However, looking at this data set,

15 it would warrant another look at the risk of bladder

16 perforation and subsequent placement of a tape lateral

17 or in a different position to avoid bladder

18 perforation since this paper suggests that there is a

19 higher rate of bladder or urethral protrusion when --

20 at a remote time when the bladder is perforated during

21 the accomplishment of a retropubic sling.

22     Q. And is the Osborne 2014 paper something

23 you cite in your expert report?

24     A. Not in my expert report, no.

1     Q. You mentioned that bladder perforation

2 rates were 5 to 15 percent for retropubic midurethral

3 slings.

4     That's something you mentioned before,

5 correct?

6     A. That is correct.

7     Q. In your report, I didn't see it, but did

8 you opine as to what the bladder perforation rate is

9 pertinent to -- in particular to the retropubic TVT

10 device?

11     A. Did I cite that in my report?

12     Q. Yes.

13     A. No, I did not.

14     Q. Have you formulated an opinion as to what

15 is the bladder perforation rate with the Ethicon

16 retropubic TVT device that treats stress urinary

17 incontinence?

18     A. The specific number would fall into the

19 range that I discussed.

20     Q. Can you -- can you -- is there a specific

21 rate of bladder perforation with the Ethicon TVT

22 device that you are holding as an opinion?

23     A. Is there a specific -- I hold the opinion

24 of that it falls within that range that I quoted.

Bruce A. Rosenzweig, M.D.

Page 78

1    Q.   5 to 15 percent?
2    A.   That is correct.
3    Q.   And what studies or data are you relying
4  upon that opinion for?
5    A.   I'm trying to find the exact number in the
6  Ogah study, but reviewing all of the published
7  literature, the rate of bladder perforation falls in
8  the 5 to 15 percent range.
9         (WHEREUPON, a certain document was
10        marked Rosenzweig Deposition Exhibit
11        No. 3, for identification, as of
12        09/22/2015.)
13  BY MR. SNELL:
14    Q.   Doctor, I've handed you Exhibit No. 3.
15  And this is the most recent Cochrane review on
16  midurethral slings.  It is actually from the summer of
17  July of 2015.
18         Have you ever seen this Cochrane review?
19    A.   Yes, I have.
20    Q.   I don't believe this is on your reliance
21  list.  When did you first review this paper?
22    A.   Sometime after July of this year.
23    Q.   Does this paper inform -- strike that.
24         Does the 2015 Cochrane review inform your

Page 79

1  opinions regarding the TVT retropubic device?
2    A.   In what respect?
3    Q.   In any respect.
4    A.   Does this Cochrane review do what to any
5  of my opinions?
6    Q.   Inform your opinions, form the basis of
7  your opinions regarding the TVT retropubic device?
8    A.   This is another piece of literature that,
9  again, I've reviewed and would help form my opinions,
10  yes.
11    Q.   I think I earlier misspoke.  This is on
12  your reliance list.  So that is my apology and my bad.
13    A.   I was pretty sure of it, but, you know,
14  when you have as many citations on that reliance list,
15  it is hard to know exactly what is there and what's
16  not there.
17    Q.   In this most recent Cochrane review, they
18  report out, I was just looking for the rates of tape
19  erosions --
20    A.   Yes.
21    Q.   -- and it says, the overall rate of
22  vaginal tape erosion exposure extrusion was and we get
23  over to 21 out of 1,000 in the retropubic group.
24         Do you see that?

Page 80

1    A.   That is correct.
2    Q.   So that would be a rate of 2.1 percent,
3  correct?
4    A.   That is what is quoted in this Cochrane
5  analysis.
6    Q.   And we were just talking about bladder
7  perforation.  If you look up above in the paragraph
8  above it, I think you are probably familiar with this,
9  where they did the metaanalysis on the rates of
10  bladder perforation, they found that the rate with the
11  retropubic slings was 4.5 percent.
12         Do you see that?
13    A.   That is correct.  And there is a range
14  that it falls in, so it would fall in the range that I
15  gave.
16    Q.   All right.  But this is what I would --
17  guess I should ask you then.
18         I understand you say that there is a range
19  of 5 percent to 15 percent for the TVT retropubic
20  device, correct?
21    A.   That is correct.
22    Q.   And, actually, if we want to be accurate
23  and fair, there is actually a range reported in the
24  literature that drops below 5 percent for bladder

Page 81

1  perforations for the TVT retropubic device, correct?
2    A.   That is correct.
3    Q.   All right.  Fair enough.
4         My question then to you is:
5         Have you come to in your opinion a number
6  which is the rate of bladder perforation specific to
7  the TVT retropubic device?
8    A.   It would fall --
9    Q.   A single number, not falling between
10  X and Y.
11    A.   Well, again, there are a variety of
12  different numbers that are published in all of the
13  literature, not just in the randomized control trial,
14  so I don't think that we are very far off in the rate
15  that we're quoting.  If we want to quote a 5 percent
16  rate versus an 8 percent rate versus a 10 percent
17  rate, I'm comfortable with any of those rates.
18    Q.   You've read Dr. Blaivas, Dr. Iakovlev's
19  review paper from 2015 regarding slings?
20    A.   Yes, I have.
21    Q.   In table 2 -- so you saw in the deposition
22  where I took him through his own paper, correct?
23    A.   Yes, you did.
24    Q.   And table 2 for -- strike that.

Bruce A. Rosenzweig, M.D.

Page 82

1     From table 3 of Dr. Blaivas' systematic
2  review -- strike that.
3         In table 3 of Dr. Blaivas' reported
4  systematic review of retropubic slings, he reports a
5  rate of bladder perforation of 3.7 percent.
6         My question to you is:
7         Assuming what I just told you to be
8  correct, 3.7 percent, would you disagree with that
9  number as to what the overall rate is?
10    A.   No.
11    Q.   In table 3 also Dr. Blaivas reports that a
12  rate of 2.2 percent for mesh exposure, erosion
13  extrusion is applicable to the retropubic sling.
14        My question to you is, assuming what I
15  just told you is correct and referenced in his study,
16  would you agree or disagree with that number?
17    A.   I would not disagree that that's what he
18  quoted in his paper.
19    Q.   Would you disagree with that number as
20  being the accurate reflection of what the overall mesh
21  erosion extrusion rate is with the retropubic TVT?
22    A.   From the studies that he quoted.  Now, we
23  know that many of the studies in the literature are of
24  a short duration and of a poor quality, from Petri's

Page 83

1  study complications -- the majority of complications
2  show up 2 to 5 years after the mesh is placed.  So
3  60 percent of the complications show up after that
4  time.  So while that might be the number that's
5  reported in the literature, more likely than not it is
6  a lower end of what the true rate of complications
7  are.
8         Now, bladder perforations I would say is a
9  much more accurate number because you will know that
10  at the time of surgery with a reasonable degree of
11  medical assuredness.  But if you are quoting a study
12  where the vast majority of the studies that are
13  published in the literature have one-year follow-up,
14  the vast majority of complications from slings will
15  not be seen.  80 percent of them will not be seen
16  until after one year.
17    Q.   Well, actually, Doctor, it's correct that
18  his 2.2 percent mesh exposure erosion rate for
19  retropubic TVT could be an overestimate based on the
20  literature?
21    MR. CARTMELL:  Object to the form, lacks
22  foundation, calls for speculation.
23  BY THE WITNESS:
24    A.   No.

Page 84

1  BY MR. SNELL:
2    Q.   Here is the foundation.
3         You saw, Doctor, that I had to show
4  Dr. Blaivas numerous long-term studies that he didn't
5  account for, correct?
6    A.   I think you showed him three studies that
7  he didn't account for.
8    Q.   I showed him a five-year randomized
9  control trial on TVT?
10    A.   Yes.
11    Q.   And that's long-term, correct?
12    A.   Five years would be -- five to ten years
13  is long-term.
14    Q.   And I showed him the Serati TVT retropubic
15  10-year paper, correct?
16    A.   That is correct.
17    Q.   And I showed him the Heinonen 10.5 year
18  TVT retropubic study?
19    A.   And that study showed a bladder erosion at
20  nine years that required at least two surgeries to
21  fix, yes.
22    Q.   Okay.  So focusing on mesh exposure with
23  TVT --
24    A.   Yes.

Page 85

1    Q.   -- and erosion, by Dr. Blaivas not
2  including those long-term studies that reported there
3  was a lack of mesh erosion and exposure at long-term,
4  Dr. Blaivas actually very well may have overstated the
5  rate of TVT mesh erosion extrusion, correct?
6    MR. CARTMELL:  Object to the form.
7  BY THE WITNESS:
8    A.   Again, the majority of complications show
9  up according to Petri's, Agnew's analysis,
10  Marcus-Braun's analysis show up more than one year
11  after the implantation of the sling.  And, therefore,
12  many of the other studies that are quoted in the
13  literature would miss those complication rates.
14  Dr. Blaivas missed three long-term studies, and so
15  while those might -- and if I remember correctly, the
16  total number of patients in those studies was around
17  300, the vast majority of the women that have had
18  midurethral slings with only one-year follow-up or
19  two-year follow-up, the majority of their
20  complications would have gone missed.
21    MR. SNELL:  Move to strike as non-responsive.
22  BY MR. SNELL:
23    Q.   This Petri study that you referenced that
24  I haven't asked you about, I'm going to ask you about

Bruce A. Rosenzweig, M.D.

Page 86

1  it now, and we'll pull it later, does the Petri study
2  say that it's a good thing or a bad thing to have data
3  beyond one year?
4      A.  It's a good thing.
5      Q.  And you would agree Dr. Blaivas missing
6  five- and ten-year long-term TVT data is a bad thing,
7  correct?
8      MR. CARTMELL:  Object to the form of that.  It
9  calls for speculation, lacks foundation.
10 BY THE WITNESS:
11     A.  I think you discussed that with
12 Dr. Blaivas during his deposition.
13 BY MR. SNELL:
14     Q.  But you would agree that's a bad thing he
15 missed that long-term data, correct?
16     MR. CARTMELL:  Object to the form, lacks
17 foundation, calls for speculation.
18         I don't think Dr. Blaivas admitted that he
19 missed anything.  So that's a misstatement of the
20 testimony.  I think the testimony was that he'd have
21 to talk again to the authors about whether or not they
22 decided intentionally not to include it, isn't that
23 correct?
24     MR. SNELL:  Objection; speaking objection.

Page 87

1  That's malarkey.
2      MR. CARTMELL:  Is that not true?
3      MR. SNELL:  That's not true.  That's malarkey.
4  He went back and tried to find some goofy
5  justification and I called him on those too.
6      MR. CARTMELL:  But he didn't say he missed it,
7  and you are saying that he missed it, so we can't --
8      MR. SNELL:  I'm saying he missed including it in
9  his analysis.
10     MR. CARTMELL:  It doesn't include it, but that
11 doesn't mean that they didn't decide not to include
12 it.
13 BY MR. SNELL:
14     Q.  You would agree that it's a bad thing that
15 Dr. Blaivas did not include that longer term data on
16 the TVT device in trying to formulate a systematic
17 review, correct?
18     MR. CARTMELL:  Object to the form.
19 BY THE WITNESS:
20     A.  As discussed in his deposition, those
21 three studies were not on his reference list.
22 BY MR. SNELL:
23     Q.  Do you agree that's a bad thing?
24     MR. CARTMELL:  Object to the form.

Page 88

1  BY MR. SNELL:
2      Q.  You can either agree, disagree or say I
3  don't have an opinion, and then I'll move on, but I'm
4  entitled to an answer.
5      A.  I don't have an opinion.
6      Q.  Fair enough.
7          What was the device that was studied in
8  the Petri study?
9      A.  They were midurethral slings.
10     Q.  How many of the cohort were TVT retropubic
11 slings?
12     A.  If you have a copy of the Petri study, we
13 can talk about the numbers that were TVT retropubics.
14     Q.  As you sit here, you don't recall?
15     A.  The exact number, no.
16     Q.  We'll try and pull that and we'll just
17 circle back around to this, if that's okay with you.
18     A.  Sure.
19     Q.  I don't want to waste time with something
20 until we get it in front of us then.
21         Is it desirable in your field to have
22 randomized controlled trials upon which to base
23 clinical decisions for the treatment of stress urinary
24 incontinence?

Page 89

1      MR. CARTMELL:  Same objection.
2  BY THE WITNESS:
3      A.  Randomized controlled trials are useful in
4  evidence-based medicine and making decisions about the
5  treatment of patients.
6  BY MR. SNELL:
7      Q.  And that includes the intended treatment
8  of stress incontinence, correct?
9      A.  That is correct.
10     Q.  You would agree that the use of the sheath
11 in the design of the TVT retropubic device provides a
12 benefit or utility?
13     A.  The sheath specifically?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Tell me what benefit and utility the use
17 of the sheath in the TVT retropubic device provides?
18     A.  Without having a sheath, you can tear
19 tissue when pulling the mesh material through the
20 retropubic space.  It can -- it's been theorized that
21 it helps decrease the amount of bacteria that are
22 picked up on the sling material.
23     Q.  Are there any -- are there benefits or
24 utility to the use of the sheath in the TVT retropubic

Bruce A. Rosenzweig, M.D.

Page 90

1 design?
2     A.   There might be other theoretical
3 advantages.  Those would be the main ones.
4     Q.   What are those other theoretical
5 advantages?
6     A.   I said there might be.  I don't recall
7 right sitting here.
8     Q.   Okay.  You don't have an opinion on any
9 other ones?
10     A.   No.
11     Q.   Well, let me ask you this:
12         Because you have placed the TVT retropubic
13 device, correct?
14     A.   Yes.
15     Q.   Tell me how you found the sheath useful in
16 the design of that device when you used it?
17     A.   Again, there -- when placing the TVT
18 device, there was less drag when going through tissue.
19     Q.   What other benefits or attributes did you
20 notice when you personally used the sheath in carrying
21 out placement of the TVT retropubic device?
22     A.   That was the main attribute.
23     Q.   How does dragging a sling through the
24 tissue without the sheath -- strike that.

Page 91

1         So if I'm understanding you, pulling the
2 TVT retropubic device by way of its design to have
3 gone through the tissue but without the sheath can
4 tear the tissue you said?
5     A.   Yes.
6     Q.   And that's obviously an unwanted
7 occurrence, correct?
8     A.   Yes.
9     Q.   Are there any other unwanted occurrences
10 by dragging the mesh without the sheath on it through
11 the tissues?
12     A.   That would be the main one.
13     Q.   As you sit here today, can you think of
14 any other unwanted outcomes of not utilizing the
15 sheath?
16     A.   Again, the theoretical that while you're
17 pulling the tape through the sheath could protect
18 against bacteria getting on the mesh.
19     Q.   Does using the sheath in the design of the
20 TVT also protect the shape of the mesh sling when it's
21 pulled through the tissue?
22     A.   No.
23     Q.   Have you ever actually held the TVT
24 retropubic device on the sheath and tried to pull it

Page 92

1 and change or alter the shape of the mesh?
2     A.   Hold the sheath and pull on the tape?
3     Q.   Yes, hold, clamp and hold onto -- on top
4 of the sheath with the mesh underneath -- let's back
5 up.
6         The sheath sits on the outside of the mesh
7 tape, correct?
8     A.   That is correct.
9     Q.   At the end it is attached to trochars,
10 correct?
11     A.   No.  The mesh is attached to trochars.
12     Q.   Fair enough.
13         Now, my question is, have you yourself
14 clamped the -- with your hands or some other
15 instrument, clamped the sheath of the TVT retropubic
16 device while the mesh is inside?
17     A.   The body?
18     Q.   No.  Inside the sheath.
19     A.   Yes.
20     Q.   And tried to alter the configuration of
21 the mesh?
22     A.   Well, while --
23     MR. CARTMELL:  Object to the form.  I think it's
24 vague and ambiguous, what you mean by tried to alter

Page 93

1 the configuration.
2 BY THE WITNESS:
3     A.   During the implantation process it is
4 recommended not to put an instrument on the TVT until
5 it is through the skin incisions.
6 BY MR. SNELL:
7     Q.   Why is it important to not put an
8 instrument on the sheath until the mesh is through the
9 skin incisions?
10     A.   Well, to clamp it, you can potentially
11 damage the mesh itself.
12     Q.   So I guess my question to you, and I want
13 to back up and see, have you ever held in your hands
14 or clamped on a machine the TVT mesh and the sheath?
15     A.   I have not.  But you know that the sheath
16 is separated in the center.
17     Q.   Yes.
18     A.   So it is not one contiguous thing.  So if
19 you clamp the sheath onto the mesh and you pull it,
20 it's going to separate the -- you are going to pull on
21 the mesh.
22     Q.   How about this:
23         So the separation of the sheath is in the
24 middle, as I understand it.  Is that consistent with

Bruce A. Rosenzweig, M.D.

Page 94

1 your experience?
2     A.   That is correct.
3     Q.   All right.  So if we take and we call
4 them -- can we call it a left and a right half that's
5 under sheath?
6     A.   Yes.
7     Q.   If you were to take part of the left half
8 of the mesh that's under sheath and clamp it with your
9 hands or a machine and try to pull it and stretch it,
10 what would happen?
11    A.   Eventually you would get to the burst
12 point of the plastic and then you would just continue
13 to elongate the mesh.  So you would elongate the
14 sheath and the mesh.
15    Q.   So has anyone done that testing that shows
16 at what point and how much force is required to
17 elongate not only the mesh but the sheath, too, when
18 the mesh is still in the sheath?
19    A.   Well, remember that the sheath is not
20 attached to the trochar.  So when you pull the trochar
21 through, you are actually putting pressure on the mesh
22 and not the sheath.
23    Q.   Okay.
24    A.   So have I seen anybody describe the burst

Page 95

1 point of the sheath itself?
2     Q.   The sheath itself that shows at what point
3 the force is if clamped on the mesh while the sheath
4 is remaining on top of the mesh, at what point that
5 will cause the sheath to tear and the mesh to deform?
6     MR. CARTMELL:  Object to form.
7 BY THE WITNESS:
8     A.   I have not seen that reported in any of
9 the documents that I've looked at from Ethicon.
10 BY MR. SNELL:
11    Q.   Okay.
12    MR. CARTMELL:  I think lunch is here.
13    MR. SNELL:  Is it?
14    MR. CARTMELL:  I think so, if you guys are
15 ready.
16    MR. SNELL:  Yes.  That's good for me.
17        (WHEREUPON, a recess was had
18         from 12:21 to 12:57 p.m.)
19 BY MR. SNELL:
20    Q.   Before lunch, so we are back after lunch,
21 before lunch we were talking about the Ogah Cochrane
22 review and some other data that you had considered,
23 correct?
24    A.   Yes, sir.

Page 96

1     Q.   Let's see if we can summarize our
2 discussion.
3         As you sit here today, you cannot tell me
4 of any difference in design that would account for the
5 statistically significant better efficacy seen with
6 TVT compared to SPARC, correct?
7     MR. CARTMELL:  Same objections as previously
8 stated with respect to comparisons with the SPARC.
9 BY THE WITNESS:
10    A.   Specific comparisons, no.
11 BY MR. SNELL:
12    Q.   In your report you do not specify what the
13 overall rate of mesh exposure is for the TVT
14 retropubic design, correct?
15    A.   In my report I do not quote a number, no.
16    Q.   Have you formulated an opinion as to what
17 the overall rate of mesh exposure is with the TVT
18 retropubic device?
19    A.   Well, we've talked about some numbers
20 earlier today, and I think that those numbers are
21 grossly underestimated.  Many of the studies that we
22 have -- we looked at, we talked about are short-term
23 efficacy studies that don't look at complications.
24 Some of the long-term studies that have been published

Page 97

1 in the literature are phone interviews or surveys that
2 are mailed to patients that cannot capture whether or
3 not they are having an erosion that might not be
4 clinically symptomatic.  I think that many
5 investigators, including Ogah have stated that it is
6 very difficult to know what the true rate of long-term
7 complications are because of underreporting of
8 short-term papers, of poor study design where the
9 studies are not designed to -- to look at long-term
10 complications.  And so I think while the numbers that
11 we talked about are estimates, I would say that the
12 complication rate for erosion is much higher than 2,
13 3, 4 percent, probably higher than even 10 percent.
14    MR. SNELL:  I'm going to move to strike as
15 non-responsive.
16 BY MR. SNELL:
17    Q.   My question was this:
18        Have you formulated an opinion as to what
19 the overall rate of mesh exposure is for the TVT
20 retropubic design?
21    MR. CARTMELL:  Objection; asked and answered.
22 That's what he just told you.
23    MR. SNELL:  I don't think so.  I think that
24 there was literally like a long discussion about all

Bruce A. Rosenzweig, M.D.

Page 98

1  kinds of stuff. It's a yes -- it's a yes, no or I
2  don't have an opinion.
3      MR. CARTMELL: Oh, well, he answered it yes and
4  then gave you his opinion.
5      MR. SNELL: No, he didn't say yes at all. He
6  said, well, we've talked about numbers today and then
7  the discussion goes on and on and on and on.
8      MR. CARTMELL: You just want to know if he has
9  an opinion? But he told you the opinion. He just
10  didn't answer the --
11      MR. SNELL: He is non-responsive, right. That's
12  my objection, non-responsive.
13  BY THE WITNESS:
14      A.  Yes.
15  BY MR. SNELL:
16      Q.  Thank you.
17          So you have an opinion about the rate of
18  mesh exposure for the TVT retropubic device?
19      A.  Yes.
20      Q.  And why did you not include that opinion
21  in your expert report?
22      A.  The specific number?
23      Q.  Yes.
24      A.  Of what -- the -- what my opinion of the

Page 99

1  erosion rate is?
2      Q.  Yes.
3      A.  In my report I did not put specific
4  numbers for any of the complications associated with
5  TVT retropubic.
6      Q.  Fair enough.
7          What effect, if any, did pore size have on
8  TVT's statistically significant lower rate of voiding
9  dysfunction compared to SPARC?
10      MR. CARTMELL: Same objections with respect to
11  comparisons to SPARC.
12  BY THE WITNESS:
13      A.  Again, that would go to things that are in
14  reports and that have protective orders associated
15  with it.
16  BY MR. SNELL:
17      Q.  So it would be in reports that you -- that
18  I don't have, correct?
19      A.  Well, not a direct comparison, no.
20      Q.  You didn't bring the SPARC reports to the
21  deposition today, correct?
22      A.  That is correct. I'm not sure that
23  they've been published yet.
24      MR. CARTMELL: Let me do this. I don't care if

Page 100

1  this is on the record or not, because I don't want to
2  scare him away from answering things. I don't think
3  he can answer things based on protected information
4  related to the SPARC, but if your question was just
5  based on the Ogah study, is that what your question
6  was based on?
7      MR. SNELL: That's what -- yes. I mean, it's
8  really coming from the Ogah study, right.
9      MR. CARTMELL: Then I do think you can answer --
10      MR. SNELL: I can ask this preface -- let's
11  preface it with this, okay, just so...
12  BY MR. SNELL:
13      Q.  Are you aware of any other randomized
14  control comparator studies between TVT and SPARC
15  besides the ones included in the Ogah study or the
16  Ford more recent Cochrane review?
17      A.  There might be one or two other studies
18  that weren't included.
19      Q.  As you sit here today, can you tell me
20  what they are, if they even exist or are you
21  essentially guessing?
22      MR. CARTMELL: Object to form.
23  BY MR. SNELL:
24      Q.  I'm not trying to be smart or anything.

Page 101

1  I'm serious.
2      MR. CARTMELL: He just told you there may be one
3  or two.
4  BY MR. SNELL:
5      Q.  There may be one or two more.
6          Are there one or two more or are you
7  guessing that there may be one or two more?
8      A.  Well, knowing the methodology used in the
9  Cochrane analysis, they would not include lower
10  quality randomized control trials or comparative
11  studies. I would envision that there are other
12  comparative studies that were not included in the Ogah
13  analysis.
14      Q.  So can you tell me what effect, if any,
15  did pore size have on TVT's statistically significant
16  lower rate of voiding dysfunction compared to SPARC?
17      A.  SPARC has a smaller pore size than TVT
18  retropubic.
19      Q.  And that's not some secret confidential
20  information, correct?
21      A.  That is correct.
22      Q.  That's out in the literature, it's in
23  published materials, on the websites, correct?
24      A.  That is correct.

Bruce A. Rosenzweig, M.D.

Page 102

1    Q.   Okay.  And how did the smaller pore size
2  of SPARC lead to higher voiding dysfunction compared
3  to TVT?
4    A.   Well, smaller pore size increases bridging
5  fibrosis, increasing mesh contraction.  And,
6  therefore, as the mesh contracts it becomes under
7  tension and leads to voiding obstruction.
8    Q.   What effect, if any, did the way the mesh
9  was cut have on TVT's significantly lower rate of tape
10  erosion compared to SPARC?
11    MR. CARTMELL:  Same objections.
12  BY THE WITNESS:
13    A.   There is no difference in the method of
14  cutting.
15  BY MR. SNELL:
16    Q.   Okay.  What effect, if any, did the
17  stiffness or elasticity have on TVT's significantly
18  lower rate of tape erosions compared to the SPARC?
19    MR. CARTMELL:  Same objection.
20  BY THE WITNESS:
21    A.   SPARC is stiffer than TVT.
22  BY MR. SNELL:
23    Q.   What effect, if any, did the stiffness or
24  elasticity have on TVT's lower rate of voiding

Page 103

1  dysfunction compared to SPARC?
2    A.   TVT -- SPARC is stiffer than TVT.
3    Q.   Are you saying that because SPARC was
4  stiffer than TVT that's what caused more tape erosions
5  and voiding dysfunction?
6    MR. CARTMELL:  Object to the form.
7  BY THE WITNESS:
8    A.   Stiffness contributed to tape erosions,
9  small pore size would lead to mesh contraction,
10  foreign body reaction, but there is overlap between --
11  there are only certain kinds of complications that can
12  happen in the vagina.  When you look at stiff mesh,
13  stiff mesh, as we talked about several times before,
14  leads to cytotox- -- or apoptosis and cell death.  So
15  a stiffer mesh is going to lead to more cell death
16  than a less stiff mesh.  Smaller pore size is going to
17  increase the amount of bridging fibrosis and scarring
18  which will then lead to more mesh contraction.
19    MR. SNELL:  I'm going do move to strike as
20  non-responsive.  I don't think I got an answer to my
21  question.
22        Can you read back the question?
23        (WHEREUPON, the record was read
24          by the reporter as requested.)

Page 104

1    MR. CARTMELL:  Before you answer it, so I'm
2  clear, are you still talking about in the studies that
3  are identified in -- because there has been no --
4    MR. SNELL:  Yes, yes.
5    MR. CARTMELL:  -- identification what studies
6  you are talking about in this line of questions.
7    MR. SNELL:  Yes.  This is the Cochrane review.
8    MR. CARTMELL:  The 2011 Cochrane review studies?
9  BY THE WITNESS:
10    A.   This information I'm giving you is not
11  from the Cochrane review.
12  BY MR. SNELL:
13    Q.   Okay.  So --
14    A.   That's not in the Cochrane review.
15    Q.   Okay.
16    MR. CARTMELL:  We did not offer him as an expert
17  to give opinions that the TVT is safer than the SPARC
18  or more dangerous than the SPARC.
19  BY MR. SNELL:
20    Q.   I'm asking about the data, the results
21  that showed up in the Cochrane review that you cited
22  to and relied upon.
23    A.   Yes.
24    Q.   And I'm asking you about the design of TVT

Page 105

1  and how things that you've talked about in putting
2  your report, like pore size, stiffness, how that comes
3  to bear on complications in the rates.  So I am
4  talking about Ogah.
5    A.   But that's not in -- that discussion is
6  not in Ogah.
7    Q.   About exactly how pore size affected the
8  numbers?
9    A.   Right.  That's in my report.
10    Q.   Exactly.  Okay.  So I think we are
11  communicating.
12    MR. SNELL:  I don't know what you don't
13  understand, Tom.
14    MR. CARTMELL:  Well, he has given these opinions
15  about pore size affecting erosions and things like
16  that, but you were saying in your questions, I
17  thought, and you just confirmed, that what in Ogah
18  would account for the SPARC erosions being more
19  related -- more than TVT.
20    MR. SNELL:  My question --
21    MR. CARTMELL:  Hold on.  And saying --
22    MR. SNELL:  I didn't say that.  That wasn't my
23  question.
24    MR. CARTMELL:  Without giving him studies, I'm

Bruce A. Rosenzweig, M.D.

Page 106

1  just lost.
2  BY MR. SNELL:
3      Q.   My question was, what effect, if any, did
4  the pore size have?  All right.
5      MR. CARTMELL:  In what?
6      MR. SNELL:  Do you want me to repose?  I've
7  already asked these questions.
8      MR. CARTMELL:  What effect, if any, did the pore
9  size have in what?  In the studies?
10     MR. SNELL:  No, no, no.  That's a speaking
11 objection.
12 BY MR. SNELL:
13     Q.   What effect, if any, did the weight of the
14 mesh have in leading to TVT's statistically
15 significant lower rate of tape erosions compared to
16 SPARC?
17     MR. CARTMELL:  And you are saying in the Ogah
18 study?
19     MR. SNELL:  Oh, my God, Tom.
20     MR. CARTMELL:  Do you have the study so he can
21 look at them?
22     MR. SNELL:  I have it.  I have it.  I have Ogah.
23 I'm asking him what effect, if any.  It is a straight
24 forward question.

Page 107

1  BY MR. SNELL:
2      Q.   So go ahead.
3      A.   There is no difference in weight between
4  SPARC and TVT.
5      Q.   So do you believe that weight had any
6  effect whatsoever on any of the differences seen for
7  TVT versus SPARC?
8      MR. CARTMELL:  Object to the form.
9  BY THE WITNESS:
10     A.   Weight in and of itself?
11 BY MR. SNELL:
12     Q.   Weight of the mesh.
13     A.   No, because they both have the same
14 weight.
15     Q.   What effect, if any, did the inflammatory
16 response have on the lower rate of tape erosion with
17 TVT compared to SPARC?
18     MR. CARTMELL:  Same objections.
19 BY THE WITNESS:
20     A.   What effect did the inflammatory response?
21 BY MR. SNELL:
22     Q.   What effect, if any, did the inflammatory
23 response have on the lower rate of tape erosion seen
24 with TVT compared to SPARC?

Page 108

1      A.   A smaller pore mesh will have a higher
2  inflammatory response than a larger pore mesh.
3      Q.   So are you saying that the SPARC had a
4  high -- a greater inflammatory response than the TVT
5  retropubic device?
6      A.   I'm saying that SPARC has -- it is a
7  stiffer mesh and has a smaller pore size than TVT.
8  Smaller pore size increases inflammation, increases
9  chronic foreign body reaction, increases bridging
10 fibrosis and scarification.  All of which is in my
11 report and all of which you and I have discussed
12 before.
13     Q.   But we haven't gotten down to this level
14 of detail, which is -- let's see if we can make this
15 straight forward.
16         So we know TVT had a significantly lower
17 rate of tape erosion compared to SPARC.  We've already
18 established that, correct?
19     MR. CARTMELL:  Object to the form.  Are -- you
20 need to be clear.  If you are talking about in Ogah or
21 in some other study or in general, it needs to be
22 clear, Burt.
23 BY MR. SNELL:
24     Q.   Did you understand my question or do I

Page 109

1  need to repeat it or rephrase it?
2      A.   Can you rephrase it?
3      Q.   Sure, sure.
4         So we've been discussing the differences
5  seen between TVT and SPARC with regard to the
6  complications reported in the Ogah paper, correct?
7      A.   That is correct.
8      Q.   All right.  And we've talked some about
9  pore size, stiffness, weight, inflammatory response,
10 those characteristics of the mesh, correct?
11     A.   Correct.
12     Q.   Of the different meshes, correct?
13     A.   Of between those two meshes, yes.
14     Q.   There we go.
15         And so for tape erosion I wrote down that
16 you believe that pore size played a role, correct?
17     A.   Pore size played a role, yes.
18     Q.   And for tape erosion, you also wrote that
19 the inflammatory response would have played a role?
20     A.   That is correct, which is related to pore
21 size.
22     Q.   Right.  The stiffness with SPARC being --
23 strike that.
24         SPARC being more stiffer than TVT, you did

Bruce A. Rosenzweig, M.D.

1 not attribute that to playing a role in tape erosions,
2 did you?
3     A.   Yes, I did.
4     Q.   Oh, you did, okay.
5     MR. CARTMELL:  Same objections.
6 BY MR. SNELL:
7     Q.   I don't want to mis- -- I'm serious, I'm
8 trying to get this.
9         Was there anything else that played a
10 difference in your opinion on -- strike that.
11        Was there anything else besides that that
12 you identified that played a role in the difference of
13 tape erosion reported in the Ogah study?
14    A.   Without getting into confidential
15 materials, no.
16    Q.   And you are not prepared to discuss these
17 confidential materials or issues today?
18    A.   No.
19    Q.   So this is the question I have then.
20        So focusing on the three factors that you
21 will identify for me today as playing a role, pore
22 size, inflammatory response and stiffness, how much --
23 how much do each of those account for the difference
24 seen in tape erosion rate?  Do you understand me?

1     MR. CARTMELL:  Object to form.
2 BY THE WITNESS:
3     A.   How much does each of them play?
4 BY MR. SNELL:
5     Q.   Play or account for.  Maybe I can ask the
6 hypothetical.  It will kind of --
7     A.   Okay.
8     Q.   So, if the rate of tape exposure with TVT
9 is 2 percent and the rate with SPARC was 6 percent,
10 there being a 4 percent difference, correct?
11    MR. CARTMELL:  Yeah, do you want him to look at
12 the --
13    MR. SNELL:  No.  This is a hypothetical.
14 BY THE WITNESS:
15    A.   Oh, hypothetically speaking, all right.
16 BY MR. SNELL:
17    Q.   Yeah, hypothetically speaking.
18        So if TVT has a rate of -- hold on.  Now
19 you are making me look because maybe the number is
20 right in here.
21        No, I don't see it in here.  Let's just go
22 with the hypothetical.
23        So hypothetically if the rate of tape
24 erosion with SPARC was 5 percent and the rate with TVT

1 was 2 percent, and that was statistically
2 significantly higher as reported in Ogah, how much --
3 or better yet, can you say how much the pore size
4 played in that difference seen between those two
5 meshes?
6     MR. CARTMELL:  Object to the form.
7 BY THE WITNESS:
8     A.   We know that looking at a smaller pore
9 mesh, such as GYNEMESH PS, versus a larger pore mesh,
10 Ultrapro, there are 50 percent fewer erosions and
11 50 percent fewer complications with the larger pore
12 mesh.  So 50 percent of the change -- the change in
13 pore size can account for approximately 50 percent of
14 the erosions.
15 BY MR. SNELL:
16    Q.   The study and data you are referencing is
17 a paper that did not include the TVT retropubic
18 device, correct?
19    A.   Well, that is, again, we are just
20 discussing pore size right now, okay.  And you
21 asked -- you didn't say in your hypothetical that
22 we're talking about specifically the -- what's quoted
23 in the Moalli paper of the TVT pore size which is
24 13.76 and certain internal documents it is 1100 for

1 the larger pores, 300 for the smaller pores for the
2 TVT, SPARC being less than a millimeter in size.
3         What I'm describing is when you look at a
4 different -- between different meshes of pore size,
5 you see a 50 percent reduction in erosions with a
6 larger pore mesh.  So extrapolating that, a -- the
7 greatest amount of improvement in erosion rate from a
8 theoretical larger pore would be 50 percent, in your
9 hypothetical situation.
10    Q.   And but just so the record is clear too,
11 the study you were referencing to make that
12 hypothetical extrapolation was not a study involving
13 the TVT device, correct?
14    A.   That is correct.  But it is a study that
15 looked at the difference between different pore sizes.
16    Q.   Including Vypro which is the largest pore
17 size, correct?
18    A.   This study did not include Vypro.
19    Q.   Okay.  That study included Ultrapro and
20 Prolene Soft?
21    A.   That is correct.
22    Q.   And you don't recall category No. 1 being
23 Vypro in the Okulu study?
24    A.   Oh, I wasn't referencing the Okulu study.

Bruce A. Rosenzweig, M.D.

Page 114

1    Q.   Okay.  So which one were you talking
2  about?
3    A.   I was talking about the an Lynette study,
4  but if you want to talk about the Okulu study, yes,
5  that was Ultrapro versus GYNEMESH PS for a sling and
6  there were fewer erosions in the -- with the sling
7  made of Ultrapro.
8    Q.   So the study you were referencing was
9  which one?
10    A.   It's the Lynette, part of the Milani
11  papers.
12    Q.   Is that identified in your report?
13    A.   Is that on this reliance list?  No, not
14  that I'm aware of.
15    Q.   The Okulu study which is the one that I
16  thought you were talking about, that's the one that
17  looked at Vypro, Ultrapro and Prolene Soft, right?
18    A.   Right, and you and I have had a discussion
19  about why Vypro has significant --
20    Q.   So I don't have to ask you that again.
21    A.   Excellent.
22    Q.   But we can agree that in Okulu they did
23  not use the TVT retropubic device, correct?
24    A.   That is correct.

Page 115

1    Q.   They didn't use sheaths, correct?
2    A.   That is correct.
3    Q.   They didn't place it tension-free,
4  correct?
5    A.   If you have the Okulu study, I'd -- to
6  look at, I can answer that question about tension.
7    Q.   Do you recall they tied the sutures off up
8  top in the Okulu study in the way that they performed
9  that placement?
10    A.   Just by tying the sutures that doesn't
11  mean that it was placed under tension.
12    Q.   Let's give him the study just so we are
13  clear.
14         (WHEREUPON, a certain document was
15          marked Rosenzweig Deposition Exhibit
16          No. 4, for identification, as of
17          09/22/2015.)
18  BY MR. SNELL:
19    Q.   So on page 219 of Exhibit 4, the Okulu
20  study, they report on their operative technique,
21  correct?
22    A.   That is correct.
23    Q.   And there are a lot of differences between
24  that technique and the TVT retropubic technique,

Page 116

1  correct?
2    A.   That is correct, but it does not say that
3  they placed it under tension.
4    Q.   Including, let's see, they made an
5  A-shaped incision -- inverted A-shaped incision to the
6  interior vaginal wall, correct?
7    A.   That is correct.
8    Q.   You don't do that with the TVT, correct?
9    A.   That is correct.
10    Q.   And then they made some patch that was 3
11  by 4 centimeters in most patients, correct?
12    A.   That is correct.
13    Q.   And that is not done with the TVT,
14  correct?
15    A.   That is correct.
16    Q.   And if we look down, it talks about all of
17  the different tools and Kishner needles, prolene
18  sutures that were used, correct?
19    A.   Yes.
20    Q.   What are Kishner needles and how do they
21  compare to Stamey needles that I've heard of?
22    A.   I have not used a Kishner needle, but I
23  would assume that it was similar to a Stamey needle.
24    Q.   It says, "After confirmation that the

Page 117

1  bladder and urethra were normal, the prolene sutures
2  were ligated crosswise in the suprapubic region,"
3  correct?
4    A.   That is correct.
5    Q.   What does that mean?
6    A.   That the sutures were tied to one another.
7    Q.   Up top in the -- above the rectus fascia?
8    A.   That is correct.
9    Q.   "Special attention was paid not to create
10  much tension on the mesh material."
11         Do you see that?
12    A.   That is correct.
13    Q.   Do you know what methodology they would
14  have used to not create much tension on the mesh
15  material when they utilized the tying off of the
16  prolene sutures?
17    A.   It was probably the similar methodology
18  used to avoid tension with the TVT.
19    Q.   Dr. Blaivas testified that when he does
20  his autologous slings, he'll put a single finger
21  breadth and tie the sutures over top.
22         Do you recall seeing that?
23    A.   Yes.
24    Q.   Is that how -- withdrawn.  I think you and

Bruce A. Rosenzweig, M.D.

Page 118

1  I have covered this before.
2      A.  That is correct.
3      Q.  So your earlier testimony, I think it was
4  one or two depositions ago, about how you view
5  obstruction of the lumen of the urethra is the
6  methodology by which you tension your fascial slings?
7      A.  Yes.
8      Q.  That hasn't changed?
9      A.  And I tell my patients that they have a
10  higher risk of voiding obstruction because of the way
11  I do it because they have a much more severe form of
12  stress urinary incontinence.
13      Q.  But you haven't changed the way you
14  tension your fascial slings, correct?
15      A.  No.
16      Q.  Okay.  In Ogah, do you have that Ogah
17  paper?
18      A.  Yes.
19      Q.  They report that monofilament tapes like
20  the TVT has significantly higher objective cure
21  compared to multifilament tapes and fewer tape
22  erosions.
23          Do you see that?
24      A.  What page are you --

Page 119

1      Q.  This is on the very front of Exhibit 2 in
2  the Background and the Results section in particular.
3      A.  Yes.
4      Q.  Now, have you also cited to that portion
5  of the Cochrane review in an expert report?
6      A.  Regarding multifilament tapes versus
7  monofilament tapes?
8      Q.  Yes, sir.
9      A.  And there is higher objective cure rates
10  compared to multifilament tapes and fewer erosions?
11      Q.  Yes.
12      A.  I've referenced the Ogah analysis but not
13  that specific phraseology.
14      Q.  Do you agree or disagree with that
15  conclusion coming out of Ogah that multifilament tapes
16  had a higher objective cure compared to multifilament
17  tapes?
18      MR. CARTMELL:  I think you misspoke?
19      MR. SNELL:  Did I?  Okay.  I can clean it up.  I
20  want to break it down and not have it compound.
21  BY MR. SNELL:
22      Q.  Do you agree with Ogah's reporting that
23  monofilament tapes had a significantly higher
24  objective cure rate than the multifilament tapes?

Page 120

1      A.  That was statistically significant
2  according to their review.
3      Q.  Is that consistent or inconsistent with
4  your opinions?
5      A.  That is consistent with my opinions.
6      Q.  And the monofilament tapes have fewer tape
7  erosions compared to the multifilament tapes in Ogah,
8  correct?
9      A.  That was not statistically significant.
10      Q.  It was 1.3 versus 6 percent, correct?
11      A.  Yes, but the confidence interval crossed
12  1, touched and crossed 1, so that's not statistically
13  significant.
14      Q.  Do you believe that the multifilament
15  tapes have more tape erosions than monofilament tapes?
16      A.  That's what Ogah says and their data shows
17  a 1.3 versus a 6 percent.  I don't think my opinion is
18  inconsistent with that.
19      Q.  You are aware that Petros and Ulmsten
20  analyzed different types of mesh, like Mersilene,
21  before determining to use the prolene mesh in TVT?
22      A.  Mersilene is a multifilament mesh.
23      Q.  But the answer to my question is, yes, you
24  are aware of that?

Page 121

1      A.  Yes.
2      Q.  And is it correct that it was state of the
3  art when TVT was designed to treat stress incontinence
4  to use a monofilament mesh?
5      A.  It was?
6      Q.  State of the art.
7      MR. CARTMELL:  Objection to form.  Sorry.
8  BY THE WITNESS:
9      A.  If there is that quote, I would like to
10  see the paper where that is it quoted from.
11  BY MR. SNELL:
12      Q.  I'm not asking you for a quote.  I'm
13  asking you, was it state of the art when TVT was
14  designed to use a monofilament mesh for the intended
15  use of treating stress urinary incontinence?
16      MR. CARTMELL:  Object to the form.
17          Do you understand what state of the art
18  means?
19  BY THE WITNESS:
20      A.  Yeah, I'm -- that's what I'm having -- you
21  know, can you --
22      MR. CARTMELL:  If you don't understand, you need
23  to tell him.
24  BY THE WITNESS:

Bruce A. Rosenzweig, M.D.

Page 122

1  A.  Yes, can you define for me what you mean
2  by state of the art?
3  BY MR. SNELL:
4  Q.  How about this, you tell me, what is state
5  of the art in your field of stress urinary
6  incontinence surgery?
7  MR. CARTMELL:  Object to form.
8  BY MR. SNELL:
9  Q.  When that term is used, something being
10  state of the art, what does it mean?
11  MR. CARTMELL:  Object to form.
12  BY THE WITNESS:
13  A.  I think different people have different
14  meanings and, therefore, they should define them so
15  that people know what they mean by state of the art.
16  State of the art could imply talking about
17  all of the embodiments that are out there, state of
18  the art could be that this is a unique embodiment,
19  state of art could be that this is the preferred
20  embodiment, so.
21  BY MR. SNELL:
22  Q.  How about this, state of the art, that's
23  going to be the highest level of general development
24  of a device in your field at that particular time?

Page 123

1  A.  I would not agree with that.
2  Q.  Okay.  And why would you say that?
3  A.  Well, first of all, the device had just
4  been "pioneered".  We know in 1999 that right before
5  the device was coming onto market that Ethicon had
6  already started a TVT improvement project because of
7  problems that were noted with TVT:  sharp edges, the
8  risk of erosion, the risk of particle loss.  And,
9  therefore, it's very difficult to say something is
10  the -- what was the quote again?
11  Q.  State of the art --
12  A.  No.  The highest level of?
13  Q.  State of the art refers to the highest
14  level of general development of a device at a
15  particular -- pertinent time.
16  A.  Right.  So if they are already starting to
17  modify the device, as I've stated in my report, it's
18  very difficult for it to be state of the art if they
19  are already finding that the embodiment has
20  significant defects associated with it which can lead
21  to harm to patients.
22  MR. SNELL:  I'm going to move to strike.  I
23  don't think that that's responsive.
24  BY MR. SNELL:

Page 124

1  Q.  Do you -- let me ask you this then.
2  Do you believe that any time a device
3  manufacturer looks at improving or altering their
4  product, that means that the then existing product is
5  defective or deficient in some manner?
6  A.  If they are improving a defect, then the
7  device is defective.  If it's a defect that will cause
8  harm, a device is defective.  So if you have a patient
9  that's developing pain from sharp edges, you have
10  particles falling off that can erode through the
11  vagina, if you are having difficulty tensioning the
12  device and you are talking about developing a spacer
13  device so that tensioning which is very critical to
14  this to avoid a voiding obstruction, overactive
15  bladder, urethral erosion, yes.
16  Q.  You mentioned pain -- let me back up and
17  get back to my question.
18  When TVT was designed, what was the
19  preferred type of mesh to use for the treatment of
20  stress urinary incontinence as between monofilament or
21  multifilament?
22  MR. CARTMELL:  Object to the form.  It misstates
23  the evidence.
24  Are you talking about the time TVT first

Page 125

1  came to market and was the first product for SUI?
2  MR. SNELL:  When it was designed.  I'm focusing
3  on the design factor for the intended use.
4  BY MR. SNELL:
5  Q.  When TVT was designed, what was the --
6  MR. SNELL:  What did I say, can you read the
7  question back.
8  (WHEREUPON, the record was read
9  by the reporter as requested.)
10  MR. CARTMELL:  Object to the form.
11  BY MR. SNELL:
12  Q.  Can you answer that question?
13  A.  There was no preferred embodiment of
14  monofilament versus multifilament.
15  Q.  When was it that monofilament mesh for the
16  treatment of stress urinary incontinence for a
17  midurethral sling became desired?
18  MR. CARTMELL:  Object to the form, misstates the
19  evidence.
20  BY THE WITNESS:
21  A.  When did a monofilament midurethral sling
22  first become desired?
23  BY MR. SNELL:
24  Q.  So, let me back up.

Bruce A. Rosenzweig, M.D.

Page 126

1    A.   After it was marketed by Ethicon.

2    Q.   That's fine, but I'm actually asking for a

3 scientific opinion, not some marketing opinion.

4    A.   Well, and that is a marketing opinion.

5    Q.   I'm not being smart.

6    A.   Very shortly before -- or right after the

7 device came out, marketing was already talking about

8 making this the -- making this device the gold

9 standard.  So it was marketing that drove this to

10 becoming the, quote/unquote, as your question was, the

11 preferred embodiment of a monofilament midurethral

12 sling.  Before that slings were placed at the bladder

13 neck as pubovaginal slings.

14    Q.   I know.  I know all of that, but that's

15 not responsive to my question.  My question is focused

16 on the science.

17        You told me that in your opinion there was

18 not a preference for monofilament over multifilament

19 at the time TVT was designed, correct, or did I

20 mishear you?

21    MR. CARTMELL:  No.  You heard him.

22 BY THE WITNESS:

23    A.   No.  There was -- Gore-tex was used,

24 Mersilene was used, Marlex was used.  There were a

Page 127

1 variety of different embodiments to -- that were used

2 to treat stress urinary incontinence as a pubovaginal

3 sling.

4 BY MR. SNELL:

5    Q.   And you had seen in the literature that

6 Gore-tex had been reported to have rates of mesh

7 exposure higher than 10 percent in the application of

8 treating stress urinary incontinence, correct?

9    A.   Yes, but remember it was placed in a

10 different way in a different fashion.  It was

11 purposely placed under tension to treat recurrent

12 severe stress urinary incontinence.

13    Q.   And you had seen reports in the literature

14 where Mersilene as used to treat in the application of

15 stress urinary incontinence had more than 10 percent

16 rates of mesh exposure too, correct?

17    A.   That is correct.

18    Q.   And that was not under a different

19 implantation technique, that was actually at the

20 midurethral by Petros, correct?

21    A.   If you have that specific report by Petros

22 to look at, I would appreciate seeing that so I can

23 give you an honest, complete and sincere answer.

24    Q.   How about this, as you sit here today, I

Page 128

1 know you made the caveat about Gore-tex and its

2 intended use for stress urinary incontinence --

3    A.   As a pubovaginal sling.

4    Q.   -- as a pubovaginal sling.

5        Before TVT was brought to market,

6 Mersilene had been reported in the application of

7 stress urinary incontinence to have 10 percent or

8 higher rates of mesh exposure, correct?

9    A.   Do you have that study so I can take a

10 look at it?

11    Q.   I don't have it on me to be honest with

12 you.

13    A.   Then I can't answer that question.

14    Q.   You don't know one way or the other?

15    A.   You are talking about a very specific

16 paper that you don't have on you, so I can't look at

17 that to be able to discuss that specific number that

18 you gave me.

19    Q.   I'm not asking you about a specific study.

20 I'm saying in your review of the literature, and you

21 know the literature prior to TVT being brought to

22 market, prior to 1998 there were reports in the

23 medical literature that Mersilene had a rate of

24 exposure more than 10 percent when utilized for a --

Page 129

1 as a sling to treat incontinence?

2    A.   But you said utilized as a midurethral

3 sling.

4    Q.   Okay.  Let me just drop that.  I want to

5 get to the more basic question.

6    A.   We know from the Ogah analysis that

7 multifilament tape had a higher erosion rate of

8 approximately 6 percent.  So we can use that as a more

9 modern number.

10    Q.   I'm interested in before TVT.

11        So you are aware from reviewing the

12 medical literature and practicing in the field, before

13 TVT came to market in 1998 -- hold on, I get to ask

14 the questions --

15    A.   Okay.

16    Q.   -- that Mersilene had been reported to

17 have mesh exposure rates of higher than 10 percent in

18 the literature?

19    A.   If you are talking about pubovaginal

20 slings, we have to talk about the application because

21 we are not -- you know, these could have been placed

22 just like I placed Gore-tex slings under more tension

23 to treat recurrent severe stress urinary incontinence

24 which is going to have more complications because it

Bruce A. Rosenzweig, M.D.

Page 130

1 is treating a different group of patients.

2     MR. SNELL:  Move to strike as non-responsive.

3         Can you read the question back?

4         (WHEREUPON, the record was read

5         by the reporter as requested.)

6     MR. CARTMELL:  Asked and answered.

7 BY THE WITNESS:

8     A.   For pubovaginal slings placed at the

9 bladder neck under tension to treat recurrent severe

10 stress urinary incontinence, yes.

11 BY MR. SNELL:

12    Q.   So the answer is yes?  I was just looking

13 for a yes.  I'm fine with your caveats, but you gave

14 me a yes there?

15    MR. CARTMELL:  Object to the form.

16 BY THE WITNESS:

17    A.   Yes.

18    MR. SNELL:  Why don't we take a break.

19        (WHEREUPON, a recess was had

20        from 1:41 to 2:01 p.m.)

21 BY MR. SNELL:

22    Q.   So we were talking before we took a break

23 about the use of different meshes and the intended

24 application of stress urinary incontinence before TVT

Page 131

1 was brought to the market.

2         I want to hand you a study.

3         (WHEREUPON, a certain document was

4         marked Rosenzweig Deposition Exhibit

5         No. 5, for identification, as of

6         09/22/2015.)

7 BY MR. SNELL:

8    Q.   Doctor, we've marked as Exhibit No. 5 a

9 paper published in 2001, the lead author is Falconer,

10 regarding the Influence of Different Sling Materials

11 on Connective Tissue Metabolism in Stress Urinary

12 Incontinent Women.

13        Do you see that?

14    A.   Yes.

15    Q.   Is this the paper that you've read and you

16 are familiar with?

17    A.   Yes.

18    Q.   Okay.  Down at the bottom of the first

19 page on the right side it says, "During the

20 development of the TVT procedure different sling

21 materials were used, such as Teflon, Gore-tex,

22 Mersilene and Marlex."

23        Do you see that?

24    A.   Yes, sir.

Page 132

1    Q.   Is that consistent or inconsistent with

2 your understanding of the development of TVT?

3    A.   I think that is consistent since

4 Dr. Ulmsten is one of the authors on this paper.

5    Q.   It said, "All of these materials caused a

6 significant amount of tape rejection."

7        Do you see that?

8    A.   Yes.

9    Q.   Is that consistent or inconsistent with

10 your review of the literature?

11    A.   That would be consistent.

12    Q.   It says, "In a previous study Mersilene

13 tape was found to induce a significant inflammatory

14 reaction in paraurethral tissues with a significant

15 increase in collagen solubility by pepsin."

16        Do you see that?

17    A.   Yes.

18    Q.   And it has a citation to Study No. 8, lead

19 author Falconer, published in the International Urogyn

20 Journal in 1996, correct?

21    A.   Yes.

22    Q.   Is that a study you've read?

23    A.   I've seen that study before, yes.

24    Q.   And does that study indeed show Mersilene

Page 133

1 tape induced a significant inflammatory reaction in

2 the paraurethral tissues?

3    A.   If I recall correctly, that's what the --

4 a paraphrasing of what the study showed.

5    Q.   Is that consistent with your review of the

6 study though?

7    A.   If my -- if I recall correctly, that is a

8 paraphrasing of what the study showed.

9    Q.   What are the paraurethral tissues?

10    A.   The paraurethral tissues would be the

11 connective tissue surrounding the urethra.

12    Q.   Just so we are clear, it is spelled

13 p-a-r-a urethral, correct?

14    A.   That is correct.

15    Q.   Because I've heard you say periurethral.

16 Is that something different or is it okay to mix

17 paraurethral with periurethral?

18    A.   I am not sure that there is a profound

19 difference between para meaning lateral to and peri

20 meaning surrounding in clinical application.

21    Q.   And in this study they found that there

22 was a significant inflammatory reaction induced by the

23 Mersilene mesh compared to the minimal reaction

24 induced by the prolene tape in these stress

Bruce A. Rosenzweig, M.D.

Page 134

1  incontinent women, correct?

2      A.   That's what this study found, yes.

3      Q.   And they do various types of analyses, and

4  on page 21 they report that there was practically no

5  tissue reaction at all seen two years after TVT

6  surgery when prolene mesh was used, citing Figure 3,

7  correct?

8      A.   That's what they cite, yes.

9      Q.   And Figure 3 looks like the histology,

10 correct?

11     A.   It is an H&E staining of the tissue that

12 they obtained by a punch biopsy.

13     Q.   An H&E staining is a way of staining

14 pathology?  I call it histology.

15     A.   It would be a histological staining, yes.

16     Q.   Okay.  And these authors, they report

17 that -- at the very last, it says, "The reports of no

18 tape rejections after TVT operations with prolene mesh

19 support these experimental findings, suggesting

20 prolene mesh to be a suitable tape material for TVT

21 surgery," and they cite to number 14, the TVT European

22 Experts Meeting in Cannes, 2001.

23          Do you see that?

24     A.   Yes.

Page 135

1      Q.   Were you at that meeting?

2      A.   No, I was not.

3      Q.   But sometime around 2001 is when you began

4  using the TVT?

5      A.   In 2004.

6      Q.   Okay.  All right.  Fair enough.

7          So I want to circle back around to our

8  discussion.  Would you agree that based on the medical

9  literature that existed in the field of stress urinary

10 incontinence at the time -- strike that.

11          Would you agree based on the medical

12 literature in the field of stress urinary incontinence


14 I'm getting tongue-tied here.

15          Would you agree that the medical

16 literature -- are you with me, Doc?

17     A.   Um-hum.

18     Q.   Okay.  Would you agree with me, Doctor,

19 that the medical literature in the field for the

20 intended use of stress urinary incontinence treatment

21 supported the use of a monofilament mesh over a

22 multifilament mesh?

23     MR. CARTMELL:  Object to the form.

24 BY THE WITNESS:

Page 136

1      A.   Specifically related to a multifilament

2  like Mersilene, yes.

3      MR. SNELL:  Let's mark that.

4          (WHEREUPON, a certain document was

5          marked Rosenzweig Deposition Exhibit

6          No. 6, for identification, as of

7          09/22/2015.)

8  BY MR. SNELL:

9      Q.   Exhibit 6 has been handed to you.  I'll

10 represent to you it's out of a book, book chapter by

11 Klinge and others.  I'm sure you read about this and

12 saw that I discussed this with Mr. Blaivas in his

13 deposition, correct?

14     A.   Yes.

15     Q.   And I think you and I have touched on this

16 paper at the time of the Perry trial but not in any

17 real substantive context?

18     A.   No, I think I've discussed this paper

19 before with either yourself or one of your colleagues,

20 or this book chapter, if you will.

21     Q.   Book chapter, thank you.

22          Let's see -- then let me just cut right to

23 the chase.

24          So you know Klinge is one of the

Page 137

1  Plaintiffs' experts, right?

2      A.   That I'm aware of, yes.

3      Q.   And you know Dr. Klinge has said all types

4  of things about hernia meshes and prolapse meshes,

5  correct?

6      MR. CARTMELL:  Object to form.

7  BY THE WITNESS:

8      A.   He has published a lot of articles about

9  hernia mesh and prolapse mesh.

10 BY MR. SNELL:

11     Q.   And when he published here with regard to

12 the TVT, he calls it the gold standard in SUI surgery,

13 correct?

14     A.   As of 2009, most likely when he wrote the

15 book chapter, having written book chapters before, it

16 does take a significant amount of time from the time

17 you actually put pen to paper on a book chapter until

18 it gets published.  So I would say that these probably

19 were his opinions in maybe 2008.  The paper -- the

20 book chapter was published in 2010.

21     Q.   Have you discussed this book chapter with

22 Dr. Klinge?

23     A.   I have not had any discussions Dr. Klinge.

24     Q.   So you are discussing this was his opinion

Bruce A. Rosenzweig, M.D.

Page 138

1 in 2008?

2     A.   As I stated before, my experience from
3 publishing book chapters, it does take about 1 or 2
4 years from the time you actually have written the
5 chapter until it actually ends up in a book.

6     Q.   But for in his case and in his book, you
7 don't know, fair?

8     A.   That is correct.

9     Q.   Okay.  And Dr. Klinge, he reports that --
10 and he cites to a paper by Meschia that looked at Amid
11 type III mesh versus the TVT, right?

12     MR. CARTMELL:  Where are you?

13 BY THE WITNESS:

14     A.   It's the final paragraph.

15        A prospective control trial by Meschia
16 showed that vaginal erosions with the Amid type III
17 mesh for the intervaginal slingplasty was as high as 9
18 percent in two-year follow-up, which is significantly
19 higher than 0 percent in the same trial.

20 BY MR. SNELL:

21     Q.   Okay.  And so my question for you is:

22        How is it that an Amid type III mesh could
23 have so much higher rate of erosion than the TVT
24 retropubic mesh?

Page 139

1     A.   The --

2     MR. CARTMELL:  Are you talking about in that
3 study specifically?

4     MR. SNELL:  Broader than that.

5 BY MR. SNELL:

6     Q.   How can that happen?

7     MR. CARTMELL:  Object to the form.

8 BY THE WITNESS:

9     A.   It would be important to look at that
10 study specifically to be able to tell you exactly what
11 mesh that they were looking at to determine how there
12 would be a difference in the erosion rates between the
13 two, how the mesh was placed, how the study was
14 designed to be able to discuss that.

15 BY MR. SNELL:

16     Q.   As you sit here today, you don't know how
17 the mesh used in the IVS, the -- that's the product by
18 Tyco, right?

19     A.   Well, intravaginal slingplasty was used to
20 describe sling procedures before the term "midurethral
21 sling" came out.

22     Q.   Reference 13 by Meschia, Tension-Free
23 Vaginal Tape and Intravaginal Slingplasty For Stress
24 Urinary Incontinence, a Multicenter Randomized Trial,

Page 140

1 American Journal of Obstetrics and Gynecology, 2007,
2 volume 195, pages 1338 to 1342.

3        Have you read that study?

4     A.   I have read that study, yes.

5     Q.   Okay.  And as you sit here, do you recall
6 what type of mesh was used besides TVT?

7     A.   Specifically sitting here today, I do not
8 recall which mesh was used in that study.

9     Q.   And Amid type III mesh would be what type
10 of mesh?

11     A.   Well, type I is micropore -- excuse me --
12 macropore, so according to Amid in 1997 describing a
13 pore size greater than 75 microns, we know that from
14 recent discussions from Klosterhalfen and Klinge's
15 group and also a recent IUGA discussion that that
16 classification is outdated and that the old 75 micron
17 cutoff between type I and type II mesh, type II mesh
18 being a pore size less than 75 microns.

19     Q.   Can I stop you right there?

20     A.   Yes.

21     Q.   And say objection, move to strike.

22        My question was very simple --

23     MR. CARTMELL:  Wait.

24     MR. SNELL:  No, no, hold on, Tom.

Page 141

1     MR. CARTMELL:  He was answering.

2     MR. SNELL:  No.

3 BY MR. SNELL:

4     Q.   My question was very simple:

5        What is an Amid type III mesh?

6     A.   It would be a multifilament mesh with a
7 combination of microporous and macroporous mesh.

8     Q.   What Dr. Klinge reported here in 2010 in
9 this book chapter where TVT retropubic was found to
10 have a much lower rate of erosion than the Amid type
11 III mesh, is that consistent or inconsistent with what
12 Ogah reported in the Cochrane review?

13     A.   That is not inconsistent.

14     Q.   You say Dr. Blaivas acknowledged that TVT
15 is the gold standard?

16     A.   That TVT is the gold standard, if you have
17 that part of his deposition, I would like to see that.

18     Q.   Let me see if I can rephrase it then.

19        Were you aware that Dr. Blaivas agreed
20 that TVT and the autologous pubovaginal sling were the
21 gold standard for the treatment of stress urinary
22 incontinence?

23     MR. CARTMELL:  Object to the form.

24 BY THE WITNESS:

Bruce A. Rosenzweig, M.D.

Page 142

1    A.   TVT specifically or midurethral slings in
2  general?
3  BY MR. SNELL:
4    Q.   TVT.
5    A.   Specifically?
6    Q.   Yes.
7    A.   If you have his deposition, I would like
8  to see that specific quote.
9    Q.   Well, you told me that you read his
10 deposition.  Did you recall reading that he testified
11 to that?
12   A.   That specific quote, which is a very
13 specific part of the deposition, I know that you asked
14 him questions about that, but I would like to see that
15 specific quote before I say that's what he said.  What
16 he said in his deposition I think will be able to
17 speak for itself.
18   Q.   Fair enough.
19   MR. CARTMELL:  That would be highly unusual.
20 BY MR. SNELL:
21   Q.   I will agree with that.  We'll move on.
22 His testimony will stand for itself.
23      And just so I'm clear, you haven't had any
24 conversations with Mr. Blaivas, have you?

Page 143

1    A.   No, I have not.
2    MR. CARTMELL:  If he did say that, though, he
3  will be swiftly moved to the bench.  The bench.
4  BY MR. SNELL:
5    Q.   You would agree that TVT is -- I want to
6  focus specifically on a TVT retropubic full-length
7  sling, okay.
8       You would agree that the TVT retropubic
9  device is at least as effective as the Burch
10 colposuspension?
11   A.   Yes.
12   Q.   You would agree that the TVT retropubic
13 device is at least as effective as the autologous
14 pubovaginal sling, correct?
15   A.   Yes.
16   Q.   And you would agree having -- strike that.
17      You would agree that having that level of
18 efficacy for a stress incontinent surgery is desirable
19 to you as a surgeon, right?
20   A.   What level of efficacy?  The efficacy that
21 the Burch pubovaginal sling and the midurethral sling
22 has?
23   Q.   Yes, because you've just agreed, right,
24 that TVT is -- and the retropubic TVT is at least as

Page 144

1  effective as those two other options?
2    A.   Yes.
3    Q.   So my question to you is:
4       To you as a surgeon having that level of
5  effectiveness is something that is very desirable,
6  correct?
7    A.   Yes.
8    Q.   It's desirable not only to you as the
9  surgeon who offers a surgery, but it's also desirable
10 to the patients to have the potential to have a
11 positive efficacious outcome, correct?
12   A.   Yes, as long as the long-term adverse
13 events are -- do not significantly change the
14 risk/benefit ratio making the risk of the procedure
15 outweigh the benefits of the procedure.
16   MR. SNELL:  Let's take a break.
17      (WHEREUPON, a recess was had
18       from 2:21 to 2:24 p.m.)
19      (WHEREUPON, a certain document was
20       marked Rosenzweig Deposition Exhibit
21       No. 7, for identification, as of
22       09/22/2015.)
23 BY MR. SNELL:
24   Q.   Doctor, you've been handed Exhibit No. 7.

Page 145

1       And just so I understand it, this is the
2  study by Petri that you had earlier referenced to me
3  in one of your answers?
4    A.   Well, there is this one and there is
5  actually another one in the European Journal of
6  Obstetrics and Gynecology.
7    Q.   So which one were you referencing?
8    A.   They both have very similar data.
9    Q.   What are the differences in those two
10 papers?
11   A.   Without having the papers in front of me
12 to compare them directly, it would be difficult to say
13 what are the specific differences between the two.
14   Q.   The other paper you said was published in
15 what journal?
16   A.   I think it's European Journal of
17 Obstetrics and Gynecology.
18   Q.   Was it published after or before this
19 paper that I've handed you as Exhibit 7?
20   A.   I think it was published after this
21 journal.
22   Q.   And this is the study that you
23 referenced -- this is one of the Petri studies that
24 you referenced?

Bruce A. Rosenzweig, M.D.

Page 146

1    A.   That is correct.

2    Q.   For the proposition that more of the
3  complications were seen between the first and the
4  fifth year following insertion of the tape, correct?

5    A.   I think that the other study has a better
6  bar graph to show that.  This one shows about
7  50 percent of the complications at 1 to 5 years.

8    MR. SNELL:  Okay.  Let's mark this one.  I think
9  I have what you are talking about, Doctor.

10    (WHEREUPON, a certain document was
11    marked Rosenzweig Deposition Exhibit
12    No. 8, for identification, as of
13    09/22/2015.)

14  BY MR. SNELL:

15    Q.   So I've marked as Exhibit 8 another paper
16  by lead author Petri out of the European Journal of
17  Obstetrics and Gynecology and Reproductive Biology.

18    Is that the other paper that you were
19  referencing?

20    A.   That is correct.

21    Q.   And what they did in both of these
22  studies, they have similar numbers, is that they
23  looked at complications of midurethral slings that
24  were managed at a tertiary referral center?

Page 147

1    A.   Yes.

2    Q.   And one of the caveats they note in these
3  papers, and I want to direct your attention to Exhibit
4  No. 7, the first Petri paper we looked at?

5    A.   Oh, yes, sir.

6    Q.   Under the methodology, they state that,
7  "Most of the patients were referred from other centers
8  for the management of complications of midurethral
9  slings.  Therefore, we were unable to assess the
10  incidence of complications due to lack of a
11  denominator."

12    Do you see that?

13    A.   Yes, sir.

14    Q.   Is that an important methodologic caveat
15  to this study?

16    MR. CARTMELL:  Object to the form.

17  BY THE WITNESS:

18    A.   Well, when looking at complications
19  particularly when they are referred from other
20  institutions, what they are doing is they are
21  highlighting the fact that they are not going to take
22  the number of slings that they did at their
23  institution as the denominator.  So they don't --
24  can't say what the total number of slings were at

Page 148

1  these other institutions in order to get a
2  denominator.  So it is not a methodological flaw in
3  the study.  They are just acknowledging the fact that
4  they are reporting a case series on complications.

5  BY MR. SNELL:

6    Q.   Okay.  Fair enough.

7    So what these papers do is report a case
8  series on complications, correct?

9    A.   That is correct.

10    Q.   If they did know the -- strike that.

11    If they did know how many midurethral
12  slings had been placed from the centers that refer
13  cases to them, that will be -- then you could try to
14  compute incidence?

15    A.   Well, actually, in a paper by Marcus-Braun
16  they did that.  They looked at the incidence of their
17  complications and their volume of surgery in the same
18  time that they were reporting their complications and
19  they found that 10 percent of their slings and meshes
20  required a surgical correction of a complication.

21    Q.   Is this paper by Braun in your -- is it
22  cited in your report?

23    A.   It's in the reliance list.

24    Q.   But is it mentioned in the body of your

Page 149

1  report as having any particular importance?

2    A.   Not by -- it's talking about your -- it
3  was answering your -- it is on my reliance list, but
4  answering your question about trying to get a
5  denominator, that is one of the studies that actually
6  did get a denominator and came up with the 10 percent
7  surgical risk of a complication.

8    Q.   But you've read other studies that
9  reported a lower rate of a surgical reoperation with a
10  midurethral sling, correct?

11    MR. CARTMELL:  With a what?

12    MR. SNELL:  With the midurethral sling.

13  BY MR. SNELL:

14    Q.   Like Johnson Funk, like the paper by Whelk
15  that just came out in JAMA Surgery, you're aware, and
16  I think you have even listed those, correct?

17    A.   Which study are you talking about?

18    Q.   Johnson Funk reports a 3.7 percent rate of
19  reoperation with TVT over a nine-year period?

20    A.   That study has -- was recently published,
21  yes.

22    Q.   So, I mean, you can point to a study like
23  you just referenced that had a 10 percent rate, but
24  you acknowledge there are other studies that have

Bruce A. Rosenzweig, M.D.

Page 150

1 lower rates of reoperation?
2     A.   And if we want to talk about the specifics
3 of that study, just like --
4     Q.   Yes or no?
5     MR. CARTMELL:  He gets to answer and then you
6 can strike it.
7         Go ahead.
8 BY MR. SNELL:
9     Q.   I mean, I'm looking for a yes or no.
10     MR. CARTMELL:  No, no, let him -- go ahead,
11 answer.
12 BY THE WITNESS:
13     A.   We will see different -- there are other
14 studies that show different rates.
15 BY MR. SNELL:
16     Q.   Fair enough.  Fair enough.
17         The SPARC device we talked about earlier,
18 am I correct you never used that device?
19     A.   That is correct.
20     Q.   And you never tried the top-to-bottom TVT
21 retropubic device?
22     A.   That is also correct.
23     Q.   Why didn't you ever try the SPARC?
24     A.   The TVT retropubic was what was available

Page 151

1 to us.
2     Q.   Okay.  Would you agree that a potential
3 benefit with the TVT retropubic device compared to a
4 top-to-bottom retropubic midurethral sling is that
5 with the bottom-to-top design you can more precisely
6 place the tape under the midurethra?
7     A.   No.
8     Q.   Would you agree that you can more easily
9 place it under the midurethra?
10     A.   No.
11     Q.   Okay.  Have you ever placed -- done any
12 top-to-bottom retropubic midurethral or any other type
13 of non-autologous sling?
14     A.   Yes.
15     Q.   What would that have been?
16     A.   That would be the study that we did on
17 pubovaginal slings using Gore-tex.
18     Q.   Okay.  And you went from top-to-bottom?
19     A.   That is correct.
20     Q.   Was that the paper published in the 1980s?
21     A.   '90s.
22     Q.   '90s.
23         What did that study show?
24     A.   Well, again, that was a pubovaginal sling

Page 152

1 that was placed specifically for recurrent severe
2 stress urinary incontinence.
3     Q.   Was this a study that was completed before
4 TVT became available and on the market?
5     A.   That is correct.
6     Q.   Okay.  Why were you using Gore-tex in that
7 application when you already had autologous tissue
8 arguably available to you?
9     A.   Well, we were comparing it to fascia lata
10 slings.
11     Q.   I guess my question, why were you even
12 comparing Gore-tex to fascia lata slings at that time?
13     A.   We were looking at its utility to treat
14 stress urinary incontinence.
15     Q.   And what did you conclude?
16     A.   If we could -- if you have a copy of the
17 paper, I haven't looked at it for a while.
18     Q.   As you sit here today, do you have a
19 general recollection of what you concluded in that
20 study?
21     A.   I actually haven't seen that paper in a
22 while.  It is from I think '91 or '92, so.
23     Q.   We'll see if we can pull it.
24         Should we hold off on any questions about

Page 153

1 that until we can get it and then we can circle back
2 around?
3     A.   Um-hum.
4     Q.   You are still at the same hospital as last
5 time when you deposed you, correct?
6     A.   Yes, sir.
7     Q.   Are some surgeons there still electing to
8 use midurethral slings made of polypropylene like the
9 TVT retropubic device?
10     A.   Yes, sir, but fewer than before.
11     Q.   So if I understand your opinions, in a
12 nutshell you believe that the risk of TVT outweigh the
13 benefit?
14     A.   Significantly outweigh the benefits, yes.
15     Q.   Okay.  And what specifically is it about
16 the design of the TVT retropubic device used for the
17 application of stress urinary incontinence that you
18 believe is defective in design?
19     A.   I've outlined that in my report.
20     Q.   So let's just run through and make sure I
21 have all of the categories.
22     A.   Okay.
23     Q.   What page are you on just so -- I'll pull
24 the report too.

Bruce A. Rosenzweig, M.D.

Page 154

1    A.   We can go to page 4 and 5 where in general
2  my expert opinions can be summarized as following.
3    Q.   So we have numbered paragraphs with
4  letters A, B, C, D, E, F on page 4, carrying over G,
5  H, I, J page 5, correct?
6    A.   That is correct.
7    Q.   And that's a summary of your opinions?
8    A.   That is correct.
9    Q.   In your opinion should Ethicon's TVT
10 retropubic device be significantly changed or modified
11 in its design?
12   MR. CARTMELL:  Object to the form.
13 BY MR. SNELL:
14   Q.   And if you have such an opinion, tell me
15 how it should be changed?
16   A.   The use of a -- and we are talking about
17 an embodiment of something that is currently available
18 on the market, right?
19   Q.   No.
20   A.   So the design should be a device that uses
21 a partially absorbable mesh with -- such as Ultrapro
22 which has been shown to have less stiffness, large
23 enough pore size, light enough weight to decrease the
24 risk of the -- long-term risks of the procedure to a

Page 155

1  level where the risk/benefit analysis is not
2  significantly skewed to the risk.
3    Q.   How many studies are there that you are
4  aware of that analyzed the TVT retropubic device with
5  the meshes currently in it?
6    A.   How many studies are there?
7    Q.   Yes, sir.
8    A.   There are a lot.
9    Q.   How many randomized control trials are
10 there for the TVT retropubic device using the prolene
11 polypropylene mesh?
12   A.   High quality, long term?
13   Q.   No, no, altogether.
14   A.   Altogether, over 100.
15   Q.   Okay.  And now, so how many of those TVT
16 retropubic device randomized control trials do you
17 believe are high quality?
18   A.   If you look at the assessment of the
19 literature that's out there, the majority are of a
20 moderate quality to low quality.  They are short-term
21 studies.  They have a low number of subjects in each
22 of the groups.  They are looking mostly at efficacy.
23 Safety is not a primary endpoint for any of the
24 long-term studies that I have seen.  They are all

Page 156

1  looking at safety.  Many of these studies --
2    Q.   What did you just say?  I'm sorry.  I
3  missed that last?
4    MR. CARTMELL:  He meant efficacy, I think.  I
5  think you misspoke.  You said they are all looking at
6  safety.
7  BY THE WITNESS:
8    A.   Right.  They are all looking at efficacy,
9  not safety as an endpoint.  Many of these studies, if
10 not the majority of these studies, exclude -- have an
11 exclusion criteria that makes this a highly selected
12 group of women instead of what is the real life
13 patient that comes into the office with a stress
14 incontinence picture.
15 BY MR. SNELL:
16   Q.   Now, I think you might have misspoke
17 there.  You said there is not safety as an endpoint in
18 these studies, but we just looked at the Cochrane
19 review that reported on differences of certain safety
20 parameters, like erosion, voiding dysfunction, bladder
21 perforation?
22   A.   As a primary endpoint.
23   Q.   Fair enough.
24       Are there any Burch studies that you are

Page 157

1  aware of that have safety as a primary endpoint that
2  the study was powered on?
3    A.   No.
4    Q.   Are you aware of any autologous
5  pubovaginal sling studies where safety was the primary
6  endpoint by which the study was powered on?
7    A.   No.
8    Q.   Are you aware of any stress urinary
9  incontinence studies by which safety was the variable
10 that the primary endpoint was powered on?
11   A.   No.
12   Q.   And in the Cochrane reviews and various
13 guidelines, like the AUA guidelines, the Society of
14 Gynecologic Surgeons analyses, they do analyze
15 complications and safety problems, correct?
16   MR. CARTMELL:  Object to form.
17 BY THE WITNESS:
18   A.   They discuss complications, yes.
19 BY MR. SNELL:
20   Q.   And they actually discuss surgical
21 treatments of some complications as well, correct?
22   A.   Yes.  There is a new classification for
23 the IUGA-ICS classification for mesh complications.
24   Q.   But you're also aware that, for example,

Bruce A. Rosenzweig, M.D.

Page 158

1 the SGS Systematic Review and Guidelines looked at
2 complications requiring a trip back to the operating
3 room, for not just midurethral slings but also Burch
4 and fascial slings too, right?
5 A. Yes, and in that review it found that
6 while the safety -- excuse me -- while the subjective
7 and objective cure rate of the Burch procedure was the
8 same as the midurethral sling, long-term adverse
9 events which required return to the operating room was
10 much higher in the midurethral sling group.
11 Q. Okay. We'll get to that.
12 And I think your -- what you referenced
13 earlier that, you know, one of the good things about
14 Cochrane reviews and these other systematic reviews is
15 they look at an overall, assess the quality of
16 evidence on the endpoint that they are looking at,
17 correct?
18 MR. CARTMELL: Object to the form.
19 BY MR. SNELL:
20 Q. Let me rephrase. Maybe that was a bad
21 question.
22 One of the benefits to the Cochrane
23 reviews and the other systematic reviews is to the
24 extent they do, they analyze and comment on the

Page 159

1 quality of evidence of the underlying studies, right?
2 A. That's what they do, and Ogah and that
3 study in 2011 found that the quality of evidence was
4 low to moderate for the midurethral sling studies.
5 Q. Tell me where it shows low to moderate?
6 A. "The quality of evidence for the majority
7 of trials was moderate..."
8 Q. What page are you on?
9 A. This is page 289 under Quality of
10 Evidence. However, with a minority of low to
11 moderate.
12 So if we're starting out the majority
13 being moderate, we have a number being low to
14 moderate, that puts it in the low-to-moderate range.
15 Only 61 out of 7,000, which is less than 1 percent,
16 were high quality.
17 "On the other hand, very few trials
18 reported outcomes after 1 year, and the long-term
19 efficacy and adverse effects have yet to be
20 determined."
21 So they are acknowledging that there is no
22 long-term data to -- or there isn't enough long-term
23 data to really talk about complications.
24 Later on they say that, "In order to truly

Page 160

1 get complications studied in this review show the" --
2 Q. Keep going.
3 A. That was actually look -- "major
4 complications such as nerve, bowel, vascular injury,
5 hematomas, are uncommon and unlikely to be picked up
6 in small randomized control trials. The true
7 incidence is more likely to be determined from
8 registries and voluntary reporting registries or data
9 banks."
10 Unfortunately the registries for the TVT
11 are short term, and as stated on such as the Austrian
12 registry, the Dutch registry, the Scandinavian
13 registry, they don't look at many of the
14 complications, such as pain.
15 Q. The Scandinavian registry by Svenningsen
16 in 2013 reported on a mean follow-up of more than 10
17 years in over 500 patients coming out of that
18 registry, correct?
19 A. If you have a copy of that, we can talk
20 about that specifically.
21 Q. Let me ask you this:
22 Are you familiar with that study?
23 A. I have reviewed that study.
24 Q. Are you aware that that study reports on

Page 161

1 complications at a mean follow-up of over 10 years?
2 A. If you have a copy of that study, we can
3 talk about it more specifically.
4 Q. Do you know, though, if that study reports
5 on complications at a mean follow-up of greater than
6 10 years?
7 A. It does talk about complications.
8 Q. Okay. You were just reading from the Ogah
9 2011 Cochrane review, correct?
10 A. That is correct.
11 Q. For the Cody 2015 Cochrane review, do you
12 have that handy? That's Exhibit 3.
13 A. Okay.
14 Q. And here they say that they included 81
15 trials evaluating over 12,000 women, correct?
16 A. Yes.
17 Q. They assess the quality of evidence and
18 the quality of most outcomes was moderate, correct?
19 A. Yes. Mainly due to risk of bias or
20 imprecision. So they even acknowledge that there is a
21 significant amount of bias in the quality of
22 midurethral sling data.
23 Q. Well, they acknowledge there is a
24 potential for bias, correct?

Bruce A. Rosenzweig, M.D.

Page 162

1    A.   No.  They say -- not potential.  For the
2  risk of bias.
3    Q.   Well, when they say "risk of bias", you
4  know they are not -- what type of bias do you
5  understand that to be?
6    A.   Um --
7    Q.   Hold on.  Withdrawn.  Let's go this way.
8         Have you looked at Lapitan and the other
9  systematic Cochrane reviews for Burch and pubovaginal
10  sling?
11    A.   Yes.
12    Q.   What's the overall quality of evidence
13  that's cited by Lapitan's Cochrane review for the
14  Burch colposuspension?
15    A.   It would be about the same as this.
16    Q.   Same as midurethral slings?
17    A.   Yes.
18    Q.   What's the overall level and rating of
19  evidence -- strike that.
20         What's the overall quality of the evidence
21  as reported in Rehman's most recent Cochrane review on
22  the pubovaginal autologous sling?
23    A.   I don't have that in front of me, so I
24  can't comment exactly what they say, but I can tell

Page 163

1  you that there would not be a major risk of bias
2  because there is -- there are no consultants for Burch
3  procedures or pubovaginal slings.  There are no
4  funding for studies unless you are doing an NIH study
5  for pubovaginal slings or Burch procedures.  So
6  someone is not working as a paid consultant, is not
7  getting -- or being paid except for maybe an NIH grant
8  for doing those studies.
9    Q.   Are there other forms of bias in those
10  non-mesh studies?
11    A.   Well, there can be a selection bias, but
12  that would be taken out by doing a randomized control
13  trial.  We talked about this before, retrospective
14  studies, you can have a selection bias based on the
15  fact that you want to show a certain outcome or your
16  idea is that a certain outcome happens more quickly.
17  You could have a statistical bias where you just did
18  not have enough power to it.  So there are other
19  biases, not just financial.
20    Q.   You can have a reporting bias, right?
21    A.   That is correct.
22    Q.   Particularly on complications where the
23  surgeon maybe does not want to report all of his or
24  her complications, correct?

Page 164

1    A.   Well, that would be, again, if they are
2  reporting on a new procedure that they want to get
3  known for.  I don't think that a surgeon is going to
4  have a particular problem reporting complications
5  unless they are, again, pioneering a new procedure.
6    Q.   There is a bias in that some endpoints,
7  safety endpoints may not be tracked, correct?
8    A.   That is correct.  If you don't ask about a
9  complication, you might not find it.
10    Q.   It says here in this 2015 Cochrane review
11  that midurethral sling operations have been the most
12  extensively researched surgical treatment for stress
13  urinary incontinence in women.
14         Do you see that?
15    A.   Yes.
16    Q.   Do you agree with that?
17    A.   I've agreed -- I stated before there are a
18  lot of papers on midurethral slings.  We've talked
19  about before that there is a moderate quality of
20  evidence because of bias and imprecision of the
21  studies.
22    Q.   But my question -- move to strike -- is
23  very straight forward.
24         It says, "Midurethral sling operations

Page 165

1  have been the most extensively researched surgical
2  treatment for stress urinary incontinence in women."
3         Do you agree with that?
4    A.   That is what is written, yes.
5    Q.   But do you agree with that?
6    A.   There are a large number of studies, yes.
7    Q.   For example, you are not aware of the
8  Burch colposuspension having more studies assessing it
9  as compared to the number of studies on the TVT?
10    A.   There are not more, no.
11    Q.   Are you aware of any ten-year studies, ten
12  years of duration or more studies, that assess the
13  autologous pubovaginal sling?
14    A.   I know that you asked Dr. Blaivas that
15  question and he was not aware of any.
16    Q.   But are you, that's my question?
17    A.   I don't have any more information than
18  what he has.
19    Q.   Okay.  Are you aware of any studies that
20  assess the autologous pubovaginal sling at a period of
21  five years or more?
22    A.   Yes.
23    Q.   Besides the extended sister trial?
24    A.   There are several others, but that's the

Bruce A. Rosenzweig, M.D.

1 main study, the extended sister.
2     Q.    So, I think we can agree that whether it's
3 a TVT or a Burch or an autologous pubovaginal sling,
4 there is less data once one -- once one goes beyond
5 one-year follow-up for all of those surgeries,
6 correct?
7     MR. CARTMELL:  Object to the form.
8 BY THE WITNESS:
9     A.    Most studies are -- would be short-term
10 studies.
11 BY MR. SNELL:
12     Q.    That's a yes?
13     A.    Yes.
14     Q.    For example, there is not some unknown
15 anomaly in the literature that I'm aware of that shows
16 that there are many more long-term studies defined as
17 you define it, 5, 10 years or more, for autologous
18 slings than there are studies of a duration of one
19 year or less, correct?
20     MR. CARTMELL:  Object to the form.
21 BY THE WITNESS:
22     A.    For autologous slings, no.
23 BY MR. SNELL:
24     Q.    And the same would hold true for the Burch

1 colposuspension?
2     MR. CARTMELL:  Same objection.
3 BY MR. SNELL:
4     Q.    There are many more studies that look at
5 the Burch over a shorter period of time than long-term
6 as you define long-term?
7     A.    There are a number of studies that talk
8 about the long-term results of Burch that we've gone
9 over on a number of different occasions.  Unlike the
10 Schimpf 2014 SGS study, there are a few more direct
11 comparisons, randomized control trials between Burch
12 and TVT that were not listed in that review.  But I
13 would agree that there usually are more short-term
14 studies than there are long-term studies.
15     Q.    Have you done an assessment of the
16 literature to try to figure out what is the average or
17 expected loss to follow-up at 10 years following the
18 index stress urinary incontinence surgery?
19     A.    What is the expected loss to follow-up?
20     Q.    Yes.  What is the average or expected loss
21 to follow-up at 10 years?  So just to -- so we are on
22 the same page --
23     A.    Yes.
24     Q.    -- I'm sure you read in Dr. Blaivas'

1 deposition, we talked about a couple of studies and --
2     A.    The Serati paper with an 8 percent loss to
3 follow-up.
4     Q.    Yeah, but I want to put that one to the
5 side.  So let's go to the Burch because I know you do
6 the Burch.
7           You know who Stuart Stanton, Alcalay,
8 Monga, Ash Monga are?
9     A.    Yes.
10     Q.    And they published out of Stanton's
11 theories of Burch colposuspensions, correct?
12     A.    The 10- to 20-year follow-up, yes.
13     Q.    Perfect.
14           And you saw in that study that the loss to
15 follow-up was around 60-plus percent?
16     A.    Again, to state that with assuredness, I
17 would need to see the paper.
18           (WHEREUPON, a certain document was
19           marked Rosenzweig Deposition Exhibit
20           No. 9, for identification, as of
21           09/22/2015.)
22     MR. CARTMELL:  You are getting very duplicative.
23     MR. SNELL:  I don't think I asked him about
24 follow-up.

1 BY MR. SNELL:
2     Q.    Just very briefly in this study we've
3 discussed various aspects of it, my focus though is on
4 the loss to follow-up issue.
5           In here they report that a little less
6 than one-third of the patients were followed up at
7 long term, correct?
8     A.    I would say that that is probably a
9 fairly -- just adding up the numbers of the ones that
10 didn't reply, change their address or had died, that
11 number seems to be accurate.
12     Q.    Okay.  So obviously there can be
13 significant loss to follow-up in ten years and on
14 because of a variety of reasons?
15     A.    That is correct.
16     Q.    And that's true whether it's a midurethral
17 sling like the TVT or the Burch colposuspension that
18 you like, correct?
19     A.    That is correct.
20     Q.    So circling back around, my question to
21 you was:
22           Had you formulated an opinion or did you
23 have an opinion on what is the average or expected
24 rate of loss to follow-up at 10 years and beyond?

Bruce A. Rosenzweig, M.D.

Page 170

1    MR. CARTMELL: Object to the form.
2    BY MR. SNELL:
3    Q.   And I'm trying to make it easy.  I mean,
4    if you have it, fine.  If you don't have the opinion,
5    fine, I'll move on.
6    A.   I don't have an opinion about that.
7    Q.   Okay.  And you can put that to the side.
8    A.   Okay.
9         (WHEREUPON, a certain document was
10        marked Rosenzweig Deposition Exhibit
11        No. 10, for identification, as of
12        09/22/2015.)
13   BY MR. SNELL:
14   Q.   Exhibit 10, Doctor, is the paper we were
15   going to come back to where you and some others looked
16   at Gore-tex versus autologous fascia lata, correct?
17   A.   That is correct.
18   Q.   And what did this study show?
19   A.   The conclusions of the study was that
20   Gore-tex patches were more advantageous than fascia
21   lata because it does not require a second surgery but
22   may be associated with more obstructive complications.
23   Q.   When you said "it does not require a
24   second surgery," what were you talking about there?

Page 171

1    A.   An incision to harvest the fascia lata.
2    Q.   So as between TVT and autologous
3    pubovaginal sling, that's a benefit for TVT that it
4    does not require the second surgery to harvest,
5    correct?
6    A.   Specifically using the fascia lata.
7    Q.   That's, yes, specifically using the fascia
8    lata?
9    A.   Yes.  You don't have to use, you know,
10   exclusively fascia lata.  You can use rectus fascia.
11   Q.   Okay.  And a benefit of TVT is that you
12   don't have to harvest rectus fascia either, correct?
13   A.   You don't have to harvest rectus fascia.
14   Q.   Is that a yes?
15   A.   Well, the way I do it you're making your
16   incision at the level of the rectus fascia.  So you
17   get to the rectus fascia, you've used that to fashion
18   your pubovaginal sling.
19   Q.   Oh, so I understand, I think.  Maybe I'm
20   wrong though.
21       So the way you do it, you actually incise
22   the rectus fascia, but you don't completely harvest it
23   and take it out?  I'm confused.
24   A.   No, you leave -- you -- you harvest -- you

Page 172

1    make an incision through the skin.  You get down into
2    the rectus fascia.  You take your piece of fascia lata
3    off of that.  So it's just extending the fascial
4    incision by the extra centimeter in order to get the
5    rectus fascia and then you will bring that down
6    underneath the urethra and attach it to the rectus
7    fascia at the level of the midline.  So you are not
8    making a separate incision because you are going
9    through the rectus fascia to accomplish your -- your
10   access into the space of Retzius.
11   Q.   You are taking the -- normally the rectus
12   fascia is in the same plane, is that right?
13   A.   Yes.
14   Q.   And then what you do is you excise or cut
15   it and you bring it down below the midurethra?
16   A.   Yes.
17   Q.   But you don't totally detach it at the
18   ends?
19   A.   No, you do, but you bring it together.
20   You attach it to the underlying rectus fascia of the
21   midline.  Maybe you need to go to medical school.
22   Q.   I think I do.
23       And so in this study you all found that
24   Gore-tex, I guess the efficacy in Gore-tex was

Page 173

1    comparable to the fascia sling?
2    A.   Yes.
3    Q.   What about safety?
4    A.   If we look at some of the complications
5    associated with Gore-tex, there was more obstruction
6    associated with the Gore-tex sling.
7    Q.   Did you continue to use Gore-tex as a
8    sling after this study?
9    A.   For a short period of time afterwards.
10   Q.   What was it that made you stop using
11   Gore-tex?
12   A.   I think that some of the long-term
13   complications from Gore-tex I did not find to be
14   acceptable.
15   Q.   What were those?
16   A.   You can -- Gore-tex does not integrate
17   very well.  I think that most of us, you know, stopped
18   using Gore-tex for the use in the pelvis in the early
19   to mid-'90s based on experience with it.
20   Q.   Gore-tex is one of those type III meshes?
21   A.   It is a type IV.
22   Q.   Type IV.
23   A.   There are virtually no pores in Gore-tex.
24   Q.   Now, you had earlier said that you

Bruce A. Rosenzweig, M.D.

Page 174

1 believed that the design of TVT should have used a
2 partially absorbable mesh like Ultrapro, correct?
3     A.   That's an embodiment, yes.
4     Q.   And what clinical studies in women for the
5 application of stress incontinence, if any, are you
6 relying on for that statement?
7     A.   We have the Okulu study which used
8 Ultrapro and showed to have a higher success rate,
9 lower complication rate, than a stiffer, larger pore,
10 heavier weight mesh.  You -- the -- the work from the
11 Moalli group, there were multiple studies on mesh
12 stiffness showing the complications associated with a
13 stiffer mesh.  There are more complications associated
14 with a heavier weight mesh.  There are more
15 complications associated with a smaller pore mesh.
16 So, if you design a mesh that is lighter weight,
17 larger pore, less stiff, smaller filament size, you
18 will have fewer complications and have a better
19 risk/benefit ratio.
20     Q.   How many randomized control trials are you
21 aware of that have evaluated Ultrapro and the intended
22 use of stress urinary incontinence?
23     A.   There is the Okulu study.
24     Q.   So one study?

Page 175

1     A.   That is correct.
2     Q.   And that's the Okulu study we discussed
3 earlier today?
4     A.   That is correct.
5     Q.   That was in 2003?
6     A.   Yes.
7     Q.   So for your statement that the lighter
8 weight, larger pore mesh should have been used, you
9 can cite to a single clinical study in women with the
10 application of stress urinary incontinence, the Okulu
11 study?
12     MR. CARTMELL:  Object to the form.
13 BY THE WITNESS:
14     A.   Well, there are other studies showing the
15 why you would move to a -- in a pelvic floor
16 application to a larger pore, lighter weight, smaller
17 filament, less stiff mesh.
18 BY MR. SNELL:
19     Q.   But the larger pore, lighter weight, less
20 stiff theory that you are talking about has only been
21 tested in one study you can point me to for the
22 application of stress urinary incontinence?
23     MR. CARTMELL:  Object to the form.
24 BY MR. SNELL:

Page 176

1     Q.   Correct?
2     A.   Specifically for stress urinary
3 incontinence, yes, but for -- but to show why that is,
4 there are multiple studies that show why it's
5 advantageous in the pelvic floor to have a larger
6 pore, lighter weight, less stiff mesh because of
7 processes that lead to cell death, that lead to smooth
8 muscle dysfunction, that lead to more erosions, that
9 lead to more complications.
10     Q.   The Moalli papers you are referring to are
11 not in women who received Ultrapro and who received
12 Ultrapro for stress urinary incontinence and were
13 followed over one or more years, correct?
14     A.   The multiple studies by the Moalli group
15 that looks at the stiffness of mesh and the
16 consequence of stiffness of mesh are in an animal
17 model.  There is basic science research that shows the
18 difference between the stiffness of mesh.  There are
19 multiple other clinical studies that show the decrease
20 in complications associated with a lighter weight,
21 larger pore mesh compared to a medium weight, smaller
22 pore mesh.
23     Q.   And just so I'm clear, all of the Moalli
24 papers you cited are animal model papers?

Page 177

1     A.   That is correct, the half a dozen or more
2 are animal model papers, yes.
3     Q.   Chimpanzees, rabbits, any specific
4 species, monkeys?
5     A.   No.  They are upper level primates.
6     Q.   In the hierarchy of evidence, where do
7 animal studies fit in compared to prospective
8 randomized control trials in women or prospective
9 observational cohorts or retrospective or prospective
10 epidemiologic observational studies or case series in
11 women?
12     A.   If you are looking at a risk and you are
13 trying to answer what is the mechanism behind the
14 risk, then using an animal model is the most
15 appropriate way to find that.
16     Q.   There can be differences in findings for
17 animals across the species, correct?
18     A.   Yes, but the use of an upper level primate
19 would be the closest to looking at the basic science
20 in a female.
21     Q.   What is the basis for that statement?
22     A.   It's -- they are the closest species to us
23 as far as our genetic makeup, our bipedal mobility, so
24 that if you are -- you know, if you are going to use

Bruce A. Rosenzweig, M.D.

Page 178

1 an animal model, using an upper level primate would be
2 the closest model that we have to using it in humans.
3     Q.   You mentioned other studies utilizing the
4 lighter weight, larger pore mesh.  I take it you were
5 referring to prolapse or hernia studies?
6     A.   Well, all of the slings that --
7 midurethral slings that are currently on the market,
8 just like the SPARC that we were talking about before,
9 SPARC just like the TVT retropubic is a heavy weight,
10 small pore stiff mesh.  So, therefore, because there
11 is a slight difference in the erosion rate between
12 SPARC and TVT, it is still a heavy weight, stiff,
13 small-pore mesh just like the TVT and, therefore, will
14 have the same defect of a heavy weight, small pore,
15 stiff mesh as the TVT.
16     Q.   Now, I thought you have testified under
17 oath before that the laser cut form of cutting the TVT
18 mesh leads to a stiffer mesh?
19     A.   No.  It in- -- well, it does increase the
20 stiffness of an already stiff heavyweight mesh.
21     Q.   And you've also testified that a laser cut
22 TVT mesh has a higher risk of exposure, correct?
23     A.   The laser cut TVT compared to the
24 mechanical cut TVT does have a higher rate of

Page 179

1 exposure.
2     Q.   And you're familiar with prolapse studies
3 using Ultrapro mesh that found exposure rates of
4 upwards of 14 to 15 percent, correct?
5     A.   When Ultrapro --
6     Q.   That's a yes or no.  Are you aware of
7 those studies or no?
8     MR. CARTMELL:  Let him answer and then you
9 can --
10     MR. SNELL:  No, no, no.  I'm going to ask
11 because this is going to the judge.
12 BY MR. SNELL:
13     Q.   I'm going to ask you for a yes or no and
14 then you can explain all you want to.  I'm just
15 saying, you're aware?
16     A.   I'm aware of a Milani study that showed a
17 10 percent risk of erosion with Ultrapro.
18     Q.   Are you aware that when they reported the
19 median term outcomes that the rate of exposure was
20 greater than 14 percent in that same cohort using
21 Ultrapro for a different application?
22     A.   That is correct.
23     Q.   Okay.
24     A.   However, when head-to-head Ultrapro with

Page 180

1 GYNEMESH PS, there were half of the erosions with
2 Ultrapro.
3     MR. SNELL:  Let's take a break.  I think we are
4 moving things along here.
5         (WHEREUPON, a recess was had
6             from 3:15 to 3:33 p.m.)
7 BY THE WITNESS:
8     A.   Before we get started, I think I might not
9 have completely understood your question about the
10 design and, you know, obviously what I would design
11 out are the things that I've outlined in my report,
12 the roping, fraying, curling, degradation, contraction
13 of the mesh.
14     Now, obviously the best way to do that is
15 with the alternatives that I've been describing, the
16 Burch procedure, the pubovaginal sling procedure.  If
17 it was a -- I mean, I used Ultrapro as an example
18 since that is an example that is on the market.
19 Obviously in order to justify the use of a
20 polypropylene-based product like Ultrapro, there would
21 have to be a significant amount of research to be able
22 to make sure that the amount of polypropylene that's
23 leftover in Ultrapro, it is large -- a lighter weight,
24 larger pore, smaller filament size is "biocompatible"

Page 181

1 with tissue.
2     If you look at a single suture of
3 polypropylene, that is probably below the minimal
4 amount of polypropylene that is biocompatible with the
5 body, just like when you look at flu vaccines, a flu
6 vaccine has heavy metals in it, such as mercury and
7 others.  There is a minimal amount of -- of things
8 like heavy metals and other toxic substances that is
9 still biocompatible, even though at higher levels it
10 becomes bioincompatible.
11     And, so, therefore, there would need to be
12 a significant amount of research to look at the --
13 whether the amount of polypropylene in Ultrapro is
14 still at the level of biocompatibility.  The research
15 does seem to show that it is, as we've talked about
16 before in other depositions, but that would also need
17 to have, you know, a significant amount of research to
18 be able to say if that is the case.
19 BY MR. SNELL:
20     Q.   Well, you and I both know from looking at
21 the literature that there can be exposures and
22 dyspareunia with the Ultrapro mesh followed in women
23 implanted with that mesh for pelvic floor indications,
24 specifically pelvic organ prolapse, right?

1     A.   That is correct.
2     Q.   And what is the minimum amount of prolene
3   polypropylene that is biocompatible?
4     A.   Well, again, we know that heavyweight,
5   small pore, large filament mesh that curls, degrades,
6   ropes, frays is not biocompatible.  A single suture of
7   polypropylene is biocompatible.  So there is in
8   between that a level of polypropylene that would be
9   minimal enough to be biocompatible.
10    Q.   So my question is:
11         What is the minimal amount of prolene
12  polypropylene that is biocompatible?  And if you know
13  that, what is the methodology by which you have -- you
14  can identify for me that minimum amount?
15    A.   Well, the methodology would be the
16  risk/benefit analysis that shows the least amount of
17  risk for the benefit.  From what I see with Ultrapro,
18  the studies that look at the stiffness of Ultrapro,
19  that look at the percentage of complications being
20  half of that of the next category of weight would show
21  me that Ultrapro comports with that biocompatibility.
22    Q.   So the Ultrapro mesh regardless of its
23  size to you is biocompatible, correct?
24    A.   The -- irregardless of the size?

1     Q.   Yes.
2     A.   Of the amount of mesh?
3     Q.   Yes.
4     MR. CARTMELL:  Objection.
5   BY THE WITNESS:
6     A.   Well, we are talking about using it as a
7   sling.
8   BY MR. SNELL:
9     Q.   No, no, no.  My question was:
10         What is the minimum amount of prolene
11  polypropylene that is biocompatible?
12    A.   As a sling.
13    Q.   No, no.
14         I want to know what's the minimum amount
15  of prolene polypropylene that is biocompatible in the
16  body?
17    MR. CARTMELL:  Well, he is testifying about
18  slings.
19    MR. SNELL:  Hold on.  Don't do a speaking
20  objection.
21  BY MR. SNELL:
22    Q.   Because I'm asking that because you said
23  two things.  You said we have essentially two ends of
24  the spectrum.  A single polypropylene suture, yes, I

1   believe that's biocompatible.  The mesh, and you keep
2   talking about heavyweight, large pore, small pore
3   mesh, no, that's not.  I want to know where is it
4   that -- what is the minimum amount of prolene
5   polypropylene that is biocompatible?
6     A.   For a sling?
7     Q.   No.  This is in the body in general
8   because you've now raised two different spectrum.
9   Because the sling doesn't use the prolene suture by
10  itself, right?
11    A.   That is correct.  You have a --
12    Q.   And then for the other end --
13    A.   -- you have hundreds of yards of
14  polypropylene.
15    Q.   The other end of the spectrum, you were
16  referring to prolapse or hernia mesh or some other
17  application, right?
18    A.   I was looking at that as a sling
19  application.
20    Q.   Okay.  Fine.
21         So between the spectrum then, can you tell
22  me, what is the minimum amount of prolene
23  polypropylene that's biocompatible?
24    A.   Somewhere at the level of Ultrapro or less

1   as a sling.
2     Q.   And so what clinical studies in women
3   allow you to make that statement for the application
4   of stress incontinence besides the Okulu that we've
5   already talked about?
6     A.   And all of the other research about
7   Ultrapro as a -- being implanted in both the female
8   pelvis and in animal models.
9     Q.   There is no randomized control trials
10  comparing TVT to Ultrapro in the application of TVT's
11  treatment of stress incontinence, right?
12    A.   That is correct.
13    Q.   You've never used Ultrapro as a sling to
14  treat stress incontinence?
15    A.   That is correct.
16    Q.   There are no long-term studies utilizing
17  Ultrapro in women to treat stress urinary
18  incontinence, correct?
19    A.   Long-term, the Okulu study I think it was
20  three years.
21    Q.   So I would be correct that there are no
22  long-term studies utilizing Ultrapro in the treatment
23  of stress urinary incontinence, correct?
24    A.   That is correct.

Bruce A. Rosenzweig, M.D.

Page 186

1    Q.   In the Okulu paper, that single paper
2  tested Ultrapro in limited numbers of women, correct?
3  We looked at the paper.  The numbers are what they
4  are, right?
5    A.   That is correct.
6    Q.   Certainly you would agree with me that TVT
7  has been studied in hundreds of times more women than
8  Ultrapro for the application of stress incontinence,
9  correct?
10    A.   That is correct.
11    Q.   And you, therefore, do not know the
12  five-year-plus complication rates with Ultrapro when
13  utilized in the application of stress urinary
14  incontinence treatment, correct?
15    A.   That is correct.  But that is why I say
16  that the safest design is using the Burch procedure
17  which has been shown to have the same efficacy of the
18  midurethral sling and lower long-term adverse events,
19  such as returning to the operating room for erosion,
20  returning to the operating room for obstruction,
21  returning to the operating room for pain, and
22  returning to the operating room for overactive
23  bladders.
24    Q.   We can agree that the Burch is not a

Page 187

1  design, it is a surgery, correct?
2    MR. CARTMELL:  Object to the form.
3  BY THE WITNESS:
4    A.   It is a surgical procedure to treat stress
5  urinary incontinence.
6  BY MR. SNELL:
7    Q.   The Burch is not a medical device, right?
8    A.   It is not a medical device.
9    Q.   The autologous pubovaginal sling is not a
10  medical device, correct?
11    A.   If you use a collagen-based pubovaginal
12  sling, that would be a medical device.
13    Q.   No.  I said the autologous?
14    A.   Autologous, that is not a medical device.
15    Q.   Right.  That strips the woman's own tissue
16  out and uses that, correct?
17    A.   It uses a piece of the patient's own
18  tissue.
19    Q.   Do you have any plans of testing or doing
20  a well-designed, well-carried out randomized control
21  trial assessing Ultrapro for the application of stress
22  urinary incontinence treatment in women?
23    A.   I have not filed a grant application for
24  that, nor an IRB approval for that.

Page 188

1    Q.   Ultrapro uses the prolene polypropylene,
2  that specific compound that's also used in TVT, right?
3    A.   That is correct.
4    Q.   And one of your opinions you've told me
5  before is you believe prolene polypropylene degrades,
6  correct?
7    A.   Yes.
8    Q.   And actually part of what you cite on as
9  relief for that opinion are suture studies involving
10  prolene sutures, right?
11    A.   Yes.
12    Q.   At what rate does Ultrapro degrade?
13    A.   Because it is lighter weight, larger pore,
14  less stiff mesh, it's going to degrade less than a
15  heavyweight thicker filament mesh.
16    Q.   And what studies in women use -- assessing
17  stress incontinence show that?
18    A.   Assessing stress incontinence?
19    Q.   Yes.
20    A.   There aren't any.
21    Q.   What studies in women show that Ultrapro
22  degrades less than the prolene mesh in TVT?
23    A.   What studies show that Ultrapro degrades
24  less than the heavyweight mesh in TVT?

Page 189

1    Q.   What study -- yeah, what studies in women
2  show that the Ultrapro mesh as you've stated degrades
3  less than the mesh in TVT?
4    A.   The Clave study shows that heavyweight
5  mesh has a higher degree of degradation than lighter
6  weight mesh.  The heavyweight mesh would be the mesh
7  used in TVT, the lighter weight mesh would be mesh
8  analogous to Ultrapro.
9    Q.   But there was degradation even in the
10  lighter weight Ultrapro arm in Clave, right?
11    A.   That is correct.
12    Q.   And there was degradation, as you have
13  opined, in the arm that would have had the TVT mesh,
14  correct?
15    A.   That is correct.
16    Q.   And you and I have discussed this, but
17  overall about 1/3 of the polypropylene cohort had
18  those pictures of surface cracking, right?
19    A.   No.  Over half of the -- or approximately
20  half of the heavyweight mesh are degradation and only
21  about 25 percent of the lighter weight mesh are
22  degradation.
23    Q.   How was it that some of the lighter weight
24  mesh still degraded?

Bruce A. Rosenzweig, M.D.

Page 190

1  A.  How is it?
2  Q.  Yeah.
3  A.  Well, we know from the suture studies that
4  mesh will continue to degrade.
5  Q.  So even the lighter weight mesh degrades
6  in your opinion?
7  A.  Yes.
8  Q.  And that's a defect in the lighter weight
9  mesh too, correct?
10  A.  Yes.
11  Q.  And in your opinion, let me ask you this,
12  explain to me how the Burch colposuspension is an
13  alternative design to TVT?  What is it about TVT --
14  strike that.  Let me just back up and just ask you
15  this simple question.
16  Did I hear you correct to say that the
17  Burch colposuspension is an alternative design to the
18  TVT retropubic device for the treatment of stress
19  urinary incontinence?
20  A.  It is not a device as we said.  It is an
21  alternative.
22  Q.  It is an alternative surgical option that
23  surgeons can turn to if they so choose, correct?
24  A.  And it's been shown to have the same

Page 191

1  efficacy but less long-term adverse events.
2  Q.  Is the answer to my question yes?
3  A.  It is a surgical device.  It is a surgical
4  procedure, yes.
5  Q.  Do any of the gynecologic surgeons at Rush
6  use Ultrapro to treat stress urinary incontinence?
7  A.  No.
8  Q.  Did I understand you to say that the
9  autologous pubovaginal sling is an alternative design
10  to the retropubic TVT for the treatment of stress
11  urinary incontinence?
12  A.  It is an alternative surgical procedure.
13  Q.  And it is one that surgeons can freely
14  employ if they so choose, correct?
15  A.  That is correct.
16  Q.  Just like the Burch, correct?
17  A.  That is correct.
18  Q.  And whether or not a surgeon can do a
19  Burch procedure or an autologous fascial sling is
20  ultimately determined between the surgeon, his or her
21  patient, and the facility where it would be carried
22  out, correct?
23  A.  I don't think that the facility where it
24  is going to be carried out is part of that discussion.

Page 192

1  I don't understand what you mean by the facility where
2  it is being carried out.
3  Q.  Well, wouldn't the surgeon have to be
4  credentialed to do the Burch to do it at that
5  hospital?  That is to say, I couldn't walk into Rush
6  and do a Burch because I'm not credentialed, right?
7  A.  Right, but that's more of the surgeon than
8  the facility.  That's why I didn't understand the
9  facility.
10  Q.  So when I said "facility", I meant as long
11  as the surgeon is credentialed to do that -- whatever
12  type of stress incontinent surgery he decides to
13  proceed with, that's between him and the facility, the
14  hospital?
15  A.  That is correct.
16  Q.  Are you aware of whether some
17  gynecologists are no longer even trained on the Burch
18  in their residency?
19  MR. CARTMELL:  Object to the form.
20  BY THE WITNESS:
21  A.  I know my institution, my residents are
22  trained on the Burch procedure.
23  BY MR. SNELL:
24  Q.  Are you aware of other residencies where

Page 193

1  they are not trained on the Burch procedure?
2  A.  Not that I'm aware of.
3  Q.  Are you aware of any other residencies --
4  strike that.
5  Are your residents trained on the
6  autologous fascial sling?
7  A.  Yes.
8  Q.  Are you aware of any other residencies
9  where the residents are not trained on the autologous
10  fascial sling?
11  A.  Not that I'm aware of.
12  Q.  Okay.  Have you decided to sit for the
13  subspecialty Female Pelvic Medicine and Reconstructive
14  Surgery Boards?
15  A.  No, I have not.
16  Q.  Have you purchased or looked at any of the
17  course study materials for that program?
18  A.  No, I have not.
19  Q.  Do you have an understanding as to whether
20  or not knowledge of midurethral slings is tested in
21  that subspecialty certification?
22  A.  More likely than not it would be.
23  Q.  Do you believe Ultrapro is cytotoxic?
24  A.  Yes.  However, as I talked about before,

Bruce A. Rosenzweig, M.D.

Page 194

1 there -- just like the mercury in flu vaccines, there
2 would be a minimal level of cytotoxicity which would
3 not have clinical significance.
4     Q.    And what methodology allows you to make
5 that statement?
6     A.    Well, the same methodology where it is
7 determined that there is a minimal concentration of
8 mercury, of arsenic, of any toxic compound that the
9 body can be exposed to.
10    Q.    So where has Ultrapro been tested and it
11 has determined what particular concentration of
12 Ultrapro will lead to cytotoxicity?
13    A.    Well, we know that when TVT was tested
14 back in the late '90s, it was found to be moderately
15 to severely cytotoxic, particularly in the Scotland
16 study, so that that would be the basis of
17 cytotoxicity.
18    Q.    What Scotland study are you referring to?
19    A.    The Scotland cytotoxicity study that is
20 referenced in my report.
21    Q.    Help me out here.  So are you talking
22 about the petri dish studies that were made up and
23 were reported to the FDA in connection with the TVT
24 510(k)?

Page 195

1     A.    Yes.
2     Q.    My question for you is:
3          Have you reviewed cytotoxicity results for
4 Ultrapro mesh?
5     A.    Specifically for Ultrapro mesh?
6     Q.    Yes.
7     A.    Not that I've seen.
8     Q.    When attempting to use Ultrapro in the
9 design of TVT and the sling to treat stress urinary
10 incontinence, you are aware that the Monocryl in the
11 Ultrapro sticks to the sheaths?
12    MR. CARTMELL:  Object to the form.
13 BY THE WITNESS:
14    A.    Stick to?
15 BY MR. SNELL:
16    Q.    The sheath.
17    A.    Which sheath?
18    Q.    The sheath that goes over top of the TVT.
19    A.    If the polypropylene sticks to the sheath
20 in Ultrapro, it is going to stick to the sheath in TVT
21 too.
22    Q.    Let me ask you this question then.
23          Do you know whether or not when you put
24 Ultrapro in the configuration of a sling and you put a

Page 196

1 sheath on it, like one is utilized with TVT, and you
2 sterilize it, does the Monocryl stick to the sheath?
3     A.    I have not seen any indication that that
4 is the case.
5     Q.    Would it be important to you -- I'm going
6 to ask you a hypothetical.
7          Hypothetically assume for me that the
8 Monocryl sticks to the sheath and when the sheath is
9 pulled off deploying the sling, the Monocryl comes
10 apart and it unravels and interferes with the
11 integrity of the sling.
12         Would that be an impairment in the utility
13 of the sling potentially?
14    MR. CARTMELL:  Object to the form.
15 BY THE WITNESS:
16    A.    Then another delayed absorbable material
17 like PDS could be used and then more likely than not
18 it wouldn't stick to the sheath.
19    MR. SNELL:  Move to strike.
20         Can you read back my question?
21         (WHEREUPON, the record was read
22          by the reporter as requested.)
23 BY THE WITNESS:
24    A.    And I said, yes, and, therefore, a --

Page 197

1     MR. SNELL:  Hold on.  Did he say yes in the
2 beginning?
3         (WHEREUPON, the record was read
4          by the reporter as requested.)
5 BY MR. SNELL:
6     Q.    So you didn't say yes.
7     A.    I apologize.  I meant to say yes and then
8 answer with the rest of the answer that I gave.
9     Q.    Okay.  How many randomized trials --
10 strike that.
11         How many randomized control trials are
12 there assessing PDS in the application of a stress
13 urinary incontinent sling?
14    A.    It has not been studied.
15    Q.    Would you agree with me that laser cut is
16 not safer than mechanically cut mesh?
17    A.    Laser cut mesh has a different set of
18 harms that it causes.  It makes the mesh stiffer, the
19 mechanical cut mesh.  The mechanical cut mesh ropes,
20 frays, curls, twists.  There is particle loss
21 associated with it.  The mechanical cut mesh decreases
22 the roping, fraying and curling but makes the mesh
23 stiffer.
24    Q.    And you've told me before under oath and

Bruce A. Rosenzweig, M.D.

Page 198

1  you testified actually to a California jury that a
2  stiffer laser cut mesh can lead to more retention.
3       Do you recall that?
4  A.   If that's what I stated, yes.
5  Q.   That's an opinion you hold, correct?
6  A.   If that's what I stated, yes.
7  Q.   Can you say to a reasonable degree of
8  medical certainty that laser cut mesh is safer than
9  mechanically cut for the application of stress urinary
10 incontinence treatment?
11 A.   Mechanical cut mesh ropes, frays, curls,
12 has particle loss associated with it.  It twists.  It
13 has sharp edges.  Laser cut mesh is stiffer than
14 mechanical cut mesh but it also contracts, degrades,
15 undergoes a chronic foreign body reaction, chronic
16 inflammation.  They both have different harms that are
17 caused by the cutting process.
18      MR. SNELL:  I'm going to have to move to strike.
19      Can you read back my question?
20 BY MR. SNELL:
21 Q.   And if you can answer it yes or no and
22 then explain.
23      (WHEREUPON, the record was read
24       by the reporter as requested.)

Page 199

1  BY THE WITNESS:
2  A.   It is safer because it does not rope,
3  fray, curl and have particle loss.
4  BY MR. SNELL:
5  Q.   And what's your methodology for that
6  statement?
7  A.   The methodology for that statement is my
8  clinical experience with mechanical cut mesh, the
9  materials that I've reviewed in this litigation,
10 internal documents, the documents that discuss the
11 decrease in the roping, fraying, curling associated
12 with laser cut mesh that was documented in the
13 internal documents that I reviewed.
14 Q.   What clinical studies in women for the
15 application of stress urinary incontinence show that
16 laser cut mesh is safer than mechanically cut mesh?
17 A.   As far as roping, fraying, curling?
18 Q.   So maybe my question wasn't clear.
19      What clinical studies in women for the
20 application of stress urinary incontinence show that
21 the laser cut mesh is safer than the mechanically cut
22 mesh in TVT?
23 A.   As it relates to roping, fraying, curling
24 and particle loss?

Page 200

1  Q.   At all.  Because roping, fraying, curling,
2  particle loss are not complications, are they?
3  A.   No.  They cause erosion, pain and
4  dyspareunia.
5  Q.   Right.  And you already told me before
6  laser cut mesh has a higher risk of erosion than
7  mechanical cut mesh, right?
8  A.   Because it is stiffer, yes.
9  Q.   Right.  So that leaves pain and
10 dyspareunia, correct?
11      MR. CARTMELL:  Object to form.
12 BY THE WITNESS:
13 A.   Well, mechanical cut mesh causes erosion
14 for a different reason than laser cut mesh.
15 BY MR. SNELL:
16 Q.   Right.  So what studies in women show that
17 the mechanical cut mesh has a higher rate of erosion
18 than the laser cut?
19 A.   When laser cut is compared to the
20 mechanical cut mesh in the Hinoul, H-i-n-o-u-l, TVT
21 study, there was a higher rate of erosion than the
22 laser cut mesh.
23 Q.   So my question was:
24      What studies in women for the stress

Page 201

1  incontinence application showed that mechanically cut
2  mesh leads to more erosions than laser cut mesh?
3  A.   The only study that directly compared
4  laser cut mesh with mechanical cut mesh showed a
5  higher rate of erosion in the laser cut mesh.
6  Q.   Okay.  What clinical studies in women for
7  the application of stress incontinence show a
8  statistically significant higher rate of pain seen
9  with the mechanically cut mesh compared to the laser
10 cut TVT mesh?
11      MR. CARTMELL:  Can you restate that?  I
12 apologize.
13      MR. SNELL:  I'm going to have her read it back
14 because I think it's a good question.
15      (WHEREUPON, the record was read
16       by the reporter as requested.)
17 BY THE WITNESS:
18 A.   Besides the one study that I referenced,
19 there are no known direct comparisons between laser
20 cut mesh and mechanical cut mesh that looks at safety
21 outcomes.
22 BY MR. SNELL:
23 Q.   What one study are you referencing?
24 A.   The Hinoul study in the Journal of

Bruce A. Rosenzweig, M.D.

Page 202

1 Urology.

2    Q.   The Hinoul study did not show mechanically
3 cut TVT mesh had a higher rate of pain than the laser
4 cut mesh, correct?

5    A.   Well, you were looking at an obturator
6 sling versus a mini-sling, and so there would be --
7 there was higher pain associated with the obturator
8 sling, which was the mechanical cut mesh.

9    Q.   Let me restate.

10       The Hinoul study that you referenced as
11 the only study that you are aware of is a
12 transobturator versus TVT-Secur mini-sling randomized
13 trial, right?

14    A.   That is correct.

15    Q.   Okay.  So for the application of the TVT
16 retropubic device, am I correct that you are not aware
17 of any randomized control trials in women looking at
18 stress urinary incontinence that show a statistically
19 significant higher rate of pain for the mechanically
20 cut TVT compared to a laser cut TVT?

21    A.   That is correct, and the reason for that
22 is it was not studied in women.  Doctors were told
23 that mechanical cut mesh and laser cut mesh were the
24 same.  There were no clinical studies to show whether

Page 203

1 or not mechanical cut mesh versus laser cut mesh was
2 safer in a randomized control trial.

3    Q.   Have you seen in any of the professional
4 organization statements and guidelines and
5 meta-analyses that they have reported that mechanical
6 cut TVT mesh has statistically significant higher
7 rates of pain than the laser cut TVT mesh?

8    A.   As we know from the internal documents,
9 most doctors don't know whether they are getting
10 mechanical cut mesh or laser cut mesh.  Most doctors
11 don't even know that there is a difference between
12 mechanical -- that there is a mechanical cut mesh
13 versus laser cut mesh.

14    MR. SNELL:  Move to strike his answer to my
15 question.

16 BY MR. SNELL:

17    Q.   Is the answer to my question no?

18    MR. CARTMELL:  What was your question again?

19    MR. SNELL:  You have to read it back.  I'm
20 sorry, Madam Court Reporter.

21       (WHEREUPON, the record was read

22        by the reporter as requested.)

23    MR. CARTMELL:  Object to the form.  I think you
24 are insinuating that's in the statements and that's

Page 204

1 nowhere to be found in any statement.

2 BY MR. SNELL:

3    Q.   My question is:

4       Have you seen that, whether that's in
5 those statements?

6    A.   No, for the reason that I have stated.

7    Q.   Are you aware of any randomized control
8 trials in women that report that the mechanically cut
9 TVT retropubic mesh has a statistically significant
10 higher rate of dyspareunia compared to laser cut TVT
11 retropubic mesh?

12    A.   No, for the reasons that I stated earlier.

13    Q.   Are you aware of any clinical studies
14 suggesting an increase rate of pain with sex
15 attributable to laser cut mesh?

16    A.   Yes.

17    Q.   Which studies are those?

18    A.   Those are the Neumann studies.

19    Q.   What does that study report with regard to
20 the laser cut mesh?

21    A.   It's a TVT-Secur, TVT-Obturator study that
22 showed 9 percent dyspareunia with laser cut mesh.
23 Secur compared to the TVT and the Neumann states that
24 the laser cutting leading to stiffness of the mesh

Page 205

1 increases dyspareunia.

2    Q.   So there was a 9 percent dyspareunia rate
3 with the laser cut mesh?

4    A.   That is correct.

5    Q.   And that would have been the Secur, the
6 TVT-Secur arm?

7    A.   That is correct.

8    Q.   The TVT-O arm was mechanical cut in the
9 Neumann paper?

10    A.   That we don't know.

11    Q.   What was the rate of dyspareunia with the
12 TVT-O arm in Neumann?

13    A.   To state that with assuredness, I would
14 need it.

15    Q.   Does 0 percent sound right?

16    A.   That is correct.

17    Q.   Have you cited the Neumann study in laser
18 cut cases for the proposition that laser cut mesh has
19 a higher risk of dyspareunia than mechanical cut?

20    A.   That those studies are on my reliance
21 list.

22    MR. SNELL:  Move to strike.

23 BY MR. SNELL:

24    Q.   Have you cited the Neumann study for the

Bruce A. Rosenzweig, M.D.

Page 206

1 proposition that laser cut mesh has a higher risk of
2 dyspareunia compared to mechanical cut?
3     A.   In what?
4     Q.   In any reports or testimony or litigation
5 you've given.
6     A.   I have not authored a Secur report, nor
7 have I been given a deposition.
8     Q.   So you've never cited to the Neumann paper
9 as a source for an opinion that laser cut mesh has a
10 higher risk of dyspareunia than mechanical cut?
11     A.   Not that I recall.
12     MR. SNELL:  Okay.  Let's take another break.
13         (WHEREUPON, a recess was had
14         from 4:08 to 4:12 p.m.)
15 BY MR. SNELL:
16     Q.   Doctor, you're aware that here in the
17 United States more surgeons utilize the TVT
18 mechanically cut mesh than the laser cut mesh, right?
19     A.   Yes.
20     Q.   And you know that TVT retropubic device
21 that we've been talking about here today has been
22 studied in recurrent stress incontinence series of
23 women?
24     A.   Yes.

Page 207

1     Q.   You are aware that the TVT retropubic
2 device has been studied in a series of patients who
3 have what's termed mixed incontinence?
4     A.   Yes.
5     Q.   And you're aware that in those -- in
6 various studies that have analyzed TVT retropubic's
7 use in patients with mixed incontinence, a significant
8 percentage of those patients' mixed incontinence --
9 strike that.  Let me rephrase it.
10         You are aware that a significant
11 percentage of the women who have mixed incontinence
12 after implantation with the TVT retropubic have
13 improvement in their urge symptoms?
14     A.   And what do you mean by "significant"?
15     Q.   Statistically significant improvement
16 based on different scales and questionnaire
17 assessments that are standard in your field.
18     A.   There are women that their urgency
19 symptoms get better, there are women whose urgency
20 symptoms get worse and there are women whose urgency
21 symptoms stay the same.
22     Q.   It is a utility of TVT that some of those
23 urgency symptoms get better in women, correct?
24     MR. CARTMELL:  Object to the form.

Page 208

1 BY THE WITNESS:
2     A.   That is true for any surgical procedure
3 for stress urinary incontinence, a certain percentage
4 of women's overactive bladder gets better, a certain
5 percentage gets worse and a certain percentage stays
6 the same.
7 BY MR. SNELL:
8     Q.   And TVT has been studied in patients who
9 have ISD?
10     A.   That is correct.
11     Q.   And TVT has been studied in patients who
12 are overweight or obese, correct?
13     A.   That is correct.
14     Q.   And to your knowledge, Ultrapro, PDS,
15 Vypro, none of those lighter weight, larger pore
16 meshes have been studied as much as the TVT retropubic
17 mesh in any of those cohorts, retropubic -- I'm
18 sorry -- recurrent stress incontinence, mixed
19 incontinence, ISD or the obese and overweight,
20 correct?
21     A.   That is correct.
22     Q.   You earlier mentioned Schimpf, so I just
23 want to mark that.
24         (WHEREUPON, a certain document was

Page 209

1         marked Rosenzweig Deposition Exhibit
2         No. 11, for identification, as of
3         09/22/2015.)
4 BY MR. SNELL:
5     Q.   So this a systematic review and
6 recommendations along with recommendations by the
7 Society of Gynecologic Surgeons?
8     A.   That is correct.
9     Q.   This is a paper you've read before?
10     A.   Yes.
11     Q.   Was there any of the surgeons out of the
12 Chicago area involved in this paper that you
13 recognize?
14     A.   It does not look so.
15     Q.   Fair enough.
16         And as we were earlier saying, the
17 paper -- it actually compared the midurethral sling,
18 particularly the TVT retropubic, to the Burch and the
19 autologous fascial sling, correct?
20     A.   That is correct.
21     Q.   And for the Burch, the midurethral sling
22 and the Burch essentially came out even on efficacy,
23 right?
24     A.   Yes.  It states for the midurethral sling

Bruce A. Rosenzweig, M.D.

| Page 210 |
|---|
| 1 versus Burch, it showed no significant difference |
| 2 between the objective cure rates. |
| 3     Q.   And if you look at Table 1, it's got all |
| 4 of these different randomized controlled trials in |
| 5 there.  You can see that the original retropubic TVT |
| 6 midurethral sling is the most studied of all of the |
| 7 procedures, correct? |
| 8     A.   In the comparison? |
| 9     Q.   In all of the comparisons, right? |
| 10     A.   That is the one that is used the most in |
| 11 the comparisons, yes. |
| 12     Q.   And that's consistent with your overall |
| 13 analysis of the literature, that the original |
| 14 retropubic TVT midurethral sling has been studied |
| 15 against other surgeries more than any other potential |
| 16 type of mesh for the application of stress |
| 17 incontinence? |
| 18     A.   Yes. |
| 19     Q.   And as you I think mentioned earlier, |
| 20 there was equal efficacy between the Burch and the |
| 21 midurethral sling, correct? |
| 22     A.   Yes. |
| 23     Q.   And they said the decision should balance |
| 24 on potential adverse events and concomitant surgeries |

| Page 211 |
|---|
| 1 as to whether a doctor may choose to proceed with a |
| 2 midurethral sling like the TVT or with the Burch, |
| 3 correct? |
| 4     A.   That is correct. |
| 5     Q.   And then for the women considering the |
| 6 pubovaginal sling versus the midurethral sling, they |
| 7 say the metaanalysis of subjective cure favored the |
| 8 midurethral sling, correct? |
| 9     A.   Over the pubovaginal sling? |
| 10     Q.   Yes, sir. |
| 11     A.   Yes. |
| 12     Q.   And so they recommended midurethral sling, |
| 13 correct? |
| 14     A.   Yes. |
| 15     Q.   And in that analysis as well, the original |
| 16 TVT retropubic device we've been talking about was the |
| 17 most assessed device, correct? |
| 18     A.   Correct. |
| 19     Q.   For comparison of the pubovaginal sling |
| 20 like Dr. Blaivas likes to do primarily and the Burch |
| 21 that you look as a primary procedure, they reported |
| 22 that slings were favored by both subjective and |
| 23 objective cure? |
| 24     A.   That's what they state, yes. |

| Page 212 |
|---|
| 1     Q.   And so they recommended pubovaginal slings |
| 2 to maximize cure outcomes, correct? |
| 3     A.   And if you looked at -- |
| 4     Q.   First can you just say yes or no? |
| 5     A.   Yes. |
| 6     MR. CARTMELL:  No, just let him answer.  You |
| 7 know, I deal with this constantly with this guys, |
| 8 okay.  Your witnesses, corporate witnesses, 25 of them |
| 9 I've taken.  They never say yes first, okay.  They go |
| 10 on forever.  And I get told repeatedly, you have to |
| 11 let him answer the question, okay.  He doesn't have to |
| 12 do what you want him to do.  You can move to strike |
| 13 it, okay. |
| 14     MR. SNELL:  We are wasting time if I have to |
| 15 move to strike it. |
| 16     MR. CARTMELL:  No, we are not.  Don't interrupt |
| 17 him. |
| 18        All right.  Go ahead and answer the |
| 19 question. |
| 20     MR. SNELL:  How about this, quick putting |
| 21 speaking objections on the record that you know are |
| 22 blatantly and boldly improper, Tom.  I give you a lot |
| 23 of leeway.  I'm just asking for a yes and I'm more |
| 24 than happy for him to explain whatever he wants. |

| Page 213 |
|---|
| 1     MR. CARTMELL:  You just interrupted him, and you |
| 2 have multiple times.  All I want you to do is let him |
| 3 answer and then move to strike if you feel like you |
| 4 need to. |
| 5     MR. SNELL:  That's fine.  And don't tell me |
| 6 about time, because if you want to give me these |
| 7 long-winded answers and then try to come around at the |
| 8 end, that's fine, we are going to be moving to strike, |
| 9 but I think it was a simple question. |
| 10     MR. CARTMELL:  Go ahead, answer the question. |
| 11     MR. SNELL:  Madam Court Reporter, can you read |
| 12 back the question so the doctor has it fresh in his |
| 13 mind. |
| 14        (WHEREUPON, the record was read |
| 15        by the reporter as requested.) |
| 16 BY THE WITNESS: |
| 17     A.   Yes.  However, two of the four studies |
| 18 that were used were not autologous fascial sling |
| 19 studies.  They were Gore-tex pubovaginal slings and |
| 20 one was a dura mater pubovaginal sling. |
| 21 BY MR. SNELL: |
| 22     Q.   When you read this systematic review, I |
| 23 take it you didn't go and alter your decision to stick |
| 24 with the Burch as your primary stress incontinence |

Bruce A. Rosenzweig, M.D.

Page 214

1  operation, right?
2      A.   No, but this I did agree with why
3  pubovaginal sling as a rescue operation to treat
4  severe stress -- severe stress urinary incontinence.
5      Q.   Do you think by not following this
6  guideline and going to pubovaginal autologous --
7  strike that.
8          Do you recommend -- strike that.
9          Do you believe that by not following the
10 guideline of utilizing the pubovaginal sling first
11 above Burch that you are practicing contrary to the
12 standard of care in your field?
13     MR. CARTMELL:  Object to the form.  It misstates
14 the document.
15 BY THE WITNESS:
16     A.   Again, the document says that compared to
17 midurethral slings, Burch has the same efficacy.
18 BY MR. SNELL:
19     Q.   I'm not talking about that.  I'm talking
20 about pubovaginal and Burch.
21     A.   I use the pubovaginal sling and I use that
22 in patients who need a greater degree of efficacy.
23     Q.   So you think you use the pubovaginal sling
24 consistent with these guidelines?

Page 215

1      A.   It is a procedure that gives you better
2  efficacy in the hands of patients that have recurrence
3  of stress urinary incontinence.
4      Q.   So you don't read this Schimpf
5  metaanalysis to recommend pubovaginal slings over the
6  Burch then, is that correct, yes or no?
7      MR. CARTMELL:  You can answer it how you want
8  to.
9  BY THE WITNESS:
10     A.   It states, we recommend pubovaginal slings
11 to maximize cure rate.  And I recommend pubovaginal
12 slings to maximize cure rate in patients that have
13 recurrence of stress urinary incontinence.  So I'm
14 using the recommendations the way they are -- the
15 recommendations -- you know, consistent with these
16 recommendations.
17 BY MR. SNELL:
18     Q.   Okay.  So you think you are practicing
19 within the standard of care then in the way you offer
20 the pubovaginal sling to your patient cohorts?
21     A.   Yes.
22     Q.   And this systematic review and
23 metaanalysis by Schimpf found for dyspareunia the
24 retropubic sling had a lower rate than the pubovaginal

Page 216

1  sling, correct, yes or no?
2      A.   According to this, yes.
3      Q.   With regard to wound infections, this
4  study -- strike that -- this systematic review and
5  metaanalysis found the retropubic sling had a lower
6  rate than both the pubovaginal sling and the Burch,
7  correct?
8      A.   That perioperative complication, yes.
9      Q.   What types of wound infections are avoided
10 with the use of the retropubic TVT device in the
11 treatment of stress urinary incontinence?
12     A.   A wound infection in the perioperative
13 period.
14     Q.   This systematic review also reported that
15 the Burch had a higher rate of bowel injury than
16 retropubic TVT sling, correct?
17     A.   Yes, and they included a study on
18 laparoscopic Burches which -- or actually three
19 studies on laparoscopic Burches because the open Burch
20 is not performed into the peritoneal cavity where a
21 laparoscopic Burch is placing a trochar in through the
22 peritoneal cavity.  The three laparoscopic Burch
23 papers would comprise the -- if not all, the majority
24 of bowel injuries.

Page 217

1      Q.   Remind me, do you do the -- you don't do
2  the laparoscopic Burch?
3      A.   No.
4      Q.   Is it because you don't want to get into
5  the bowel and have that perioperative morbidity from
6  that significant type of potential complication?
7      A.   That is one and also I don't find it as
8  effective.
9      Q.   What are the negative attributes of doing
10 a laparoscopic Burch?
11     A.   It is a longer operation, you have to
12 insufflate the peritoneum, you have the risks
13 associated with a laparoscopic procedure, such as
14 putting a trochar in -- well, if you do it as an open
15 procedure, you have a direct visualization of the
16 trochar going in.  Not everybody utilizes the open
17 trochar insertion technique and, therefore, would be
18 placing a trochar blindly, but the majority of
19 surgeons are using the -- exclusively using the open
20 technique for insufflating.
21     Q.   This bowel injury, the one event out of
22 the 32 patients, is it your testimony that you are
23 certain that was a report of a series of patients who
24 underwent laparoscopic Burch?

Bruce A. Rosenzweig, M.D.

1    A.   It would be more likely than not that that
2   was due to the laparoscopic procedure.
3    Q.   As you sit here today, though, you don't
4   know the exact study that they were referencing?
5    A.   Not specifically, no.
6    Q.   In this SUS systematic review and
7   metaanalysis, there was a lower rate of ureteral
8   injury with the retropubic sling as compared to the
9   pubovaginal sling in the Burch, correct?
10    A.   That's what they state, yes.
11    Q.   How does one injure the ureter under
12   direct visualization in the open Burch procedure?
13    A.   Well, again, having done a significant
14   number of Burch procedures and not having injured the
15   ureter, one would probably be putting the stitches in
16   the wrong place.
17    Q.   Is it below the standard of care to have a
18   ureteral injury in an open Burch procedure?
19    A.   No, as long as it is recognized and timely
20   repaired.
21    Q.   Well, under direct visualization,
22   shouldn't a surgeon not hit the ureter?
23    A.   Well, you actually don't see the ureter
24   during the Burch procedure, so that if there is

1   scarring or some other anatomic variation, one could
2   get the ureter by -- without knowing that they were
3   putting the sutures through the ureter, which is why
4   we do cystoscopies after the procedures.
5    Q.   Well, one option, you could dissect down
6   to the level of the ureters to make sure that you are
7   not putting your sutures through them, right?
8    A.   Right, but that would increase morbidity.
9    Q.   How?
10    A.   By dissecting down to the ureters, you can
11   devitalize the ureter.  You can disrupt its blood
12   flow.
13    Q.   I take it then in your Burch procedure --
14   strike that.
15        When you do the Burch, do you dissect down
16   to the level of the ureters?
17    A.   No, because I do a modification of the
18   Burch where the stitches are placed far enough lateral
19   where they would not be anywhere near the ureters.
20    Q.   But it's not against the standard of care
21   to place the stitches at some other location where the
22   ureter could be sutured?
23    A.   That is correct.
24    Q.   In the systematic review and metaanalysis

1   for retention lasting less than six weeks as well as
2   retention lasting more than six weeks, the pubovaginal
3   sling in the Burch had higher rates compared to the
4   retropubic TVT, correct?
5    A.   That is correct.
6    Q.   And there is utility in the TVT having
7   less retention postoperatively before six weeks and
8   then after six weeks, correct?
9    A.   Yes.  However, the study also found that
10   return to the operating room for urinary retention was
11   much higher in the retropubic sling group so that this
12   shows that the -- any retention from the Burch
13   procedure resolved on its own and did not require
14   return to the operating room, which would be a
15   significant adverse event, which is summarized in the
16   conclusions that the Burch procedure may result in
17   lower rates of long-term adverse events such as return
18   to the operating room for retention or erosion, return
19   to the operating room for overactive bladders or
20   return to the operating room for groin pain.
21    Q.   They said may, correct?
22    A.   That is correct.
23    Q.   The pubovaginal sling had a higher rate of
24   return to the operating room for urinary retention

1   than the Burch, correct?  Than the Burch, correct?
2    A.   That is correct.
3    Q.   And the retropubic TVT sling, correct?
4    A.   That is correct.
5    Q.   And that's the utility of the TVT as
6   compared to the pubovaginal sling, correct?
7    MR. CARTMELL:  Object to the form.
8   BY THE WITNESS:
9    A.   It is also a utility of the Burch.
10    MR. SNELL:  Move to strike.
11   BY MR. SNELL:
12    Q.   Can you answer my question yes or no?
13    A.   Yes.
14    Q.   And then if you have a caveat, you can add
15   it now.
16    A.   It is also a utility of the Burch.
17    Q.   Fair enough.  I want you to get your fair
18   answer in.  I would just like a responsive answer
19   first, that's all.
20        For bladder perforation, the pubovaginal
21   rate was 2.3 percent, the Burch was 2.8 percent, and
22   the retropubic sling was 3.6 percent, correct?
23    A.   That is correct.
24    Q.   Now, the Burch looked at 10 studies and

Bruce A. Rosenzweig, M.D.

Page 222

1 the retropubic sling had 41 studies, correct?
2    A.   That is correct.
3    Q.   So bladder perforation was actually for
4 all of the different options one of the more commonly
5 assessed complications, right?
6    A.   That is correct.
7    Q.   And the retropubic was about .8 percent
8 higher than the Burch, right?
9    A.   Yes.
10    Q.   But the Burch is an open procedure, right?
11    A.   Unless you are doing it laparoscopically.
12    Q.   Fair enough.
13       And how many of those -- strike that.
14       Have you done an analysis to ascertain how
15 many of those 19 bladder perforation events reported
16 in the Burch arm were -- occurred in the open or the
17 laparoscopic Burch series?
18    A.   No, I have not.
19    Q.   Even under direct visualization in an open
20 Burch, you can still perforate the bladder, right?
21    A.   That is correct.
22    Q.   Have you done that?
23    A.   No.
24    Q.   Is it against the standard of care if a

Page 223

1 surgeon perforates the bladder during an open Burch?
2    A.   As long as it is recognized and timely
3 repaired.
4    Q.   No, it's not?
5    A.   It is not as long as it is recognized and
6 timely repaired.
7    Q.   And why is that?
8    A.   Because any surgical procedure, an injury
9 to a vital organ can happen.  As long as it's
10 repaired, it would not -- recognized and repaired, it
11 would not fall below the standard of care.
12    Q.   Well, if part of the justification for
13 doing a Burch procedure to a patient is this is an
14 open procedure and I can see down and see what I'm
15 doing better than the blind steps that may be
16 accommodated by doing a pubovaginal sling, like
17 Dr. Blaivas does, or a midurethral TVT sling, but that
18 surgeon hits one of those organs while doing this open
19 procedure, that's not against the standard of care?
20    A.   As long as it is recognized and repaired.
21    Q.   Deep vein thrombosis was also lower with
22 the retropubic TVT than the pubovaginal sling or the
23 Burch, correct?
24    A.   That is correct.

Page 224

1    Q.   Have you ever had a DVT in your patient
2 when you were doing a Burch?
3    A.   No, I have not.
4    Q.   When one does a longer open stress
5 incontinence surgery, does that increase the risk of a
6 DVT?
7    A.   As I stated earlier, it depends on how
8 much longer the procedure is.
9    Q.   What if the patient has a coagulation
10 disorder?
11    A.   Then that patient would be anticoagulated.
12    Q.   So it wouldn't matter?
13    A.   It would matter, but that patient would be
14 anticoagulated for either procedure.
15    Q.   Vaginal perforation occurred in 2. --
16 .2 percent of the Burch group.
17       How did -- how do you perforate the vagina
18 when you are doing the Burch?
19    A.   When you are trying to elevate the bladder
20 neck in order to place your stitches, you can put up
21 your finger through the vagina or you can have your
22 stitch create a defect in the vagina.
23    Q.   When you were doing the TVT retropubic
24 device, did you see any -- strike that.

Page 225

1       So if we go back in time when you were
2 doing the TVT retropubic device, did you observe that
3 you had less blood loss during the procedure as
4 compared to your Burch colposuspension?
5    A.   No.
6    Q.   Have you seen it reported in the
7 literature that there is less blood loss with the TVT
8 retropubic compared to a Burch or a pubovaginal sling?
9    A.   In the Schimpf paper, estimated blood loss
10 of greater than 200 cc's, the highest was the
11 retropubic.  Transfusion was higher for retropubic and
12 pubovaginal slings than the Burch.  Hematomas were
13 higher in retropubic than the Burch and pubovaginal
14 slings.
15    Q.   I think you misspoke.
16       So in the Schimpf, the estimated blood
17 loss greater than 200 ml, they did not include data on
18 Burch or pubovaginal sling, correct?
19    A.   They -- there was no reports of a blood
20 loss greater than 200 ml's.
21    Q.   For transfusion, the Burch had a lower
22 reported rate, 0 versus 0.4 percent for retropubic,
23 but the pubovaginal had a higher rate than both at 1.9
24 percent, correct?

Bruce A. Rosenzweig, M.D.

Page 226

1    A.    That is correct.
2    Q.    And then for a hematoma -- and what's a --
3 and a hematoma is a large collection of blood?
4    A.    That is correct.
5    Q.    Somewhere where you don't really want it
6 to be?
7    A.    That is correct.
8    Q.    And for that hematomas, the retropubic
9 actually had a lower rate than the Burch and the
10 pubovaginal sling, correct?
11    A.    I did misspeak.
12    Q.    That's okay.
13        Doctor, the Demerci paper, have we
14 studied -- have we covered this paper?  I think we
15 have.
16    A.    Four times.
17    Q.    Four times, yeah.
18        That's a study that's got dyspareunia and
19 long-term follow-up with the Burch colposuspension,
20 right?
21    A.    According to what the title is, but we
22 don't really -- there is no numbers that actually talk
23 about long-term follow-up.
24    Q.    I think you misspoke now.

Page 227

1    A.    We've already talked about it.
2    Q.    So whatever you testified before you'll
3 stand by?
4    A.    Yes.
5    Q.    And if I attach the study and it reports
6 the cohort assessed at 1.5 years and the cohort
7 assessed at 4 years, you will maintain that they
8 didn't report on longer term follow-up?
9    A.    They report on longer term follow-up, but
10 they don't talk about there is a difference between
11 what was reported at one point versus what was
12 reported at another point.  That's what we talked
13 about before.
14    Q.    Right.  They unfortunately or fortunately,
15 they just say that there were a number of patients who
16 had dyspareunia, and you and I don't know whether that
17 occurred at 1.5 years or 4 years or somewhere in the
18 middle, right?
19    A.    Right.  What we do know from the Schimpf
20 paper is that the adverse event of returning to the
21 operating room for groin pain was higher in the
22 midurethral sling group compared to the Burch group.
23    Q.    I'm not seeing, Doctor, where there was
24 return to the operating room for groin pain?

Page 228

1    A.    It's listing the long-term adverse events
2 where they list returning to the operating room.  So,
3 Burch procedure may result in lower rates of return to
4 the operating room for retention, erosion, overactive
5 bladder symptoms and groin pain.  That is Table 4.
6    Q.    Right.  But I'm looking at the actual
7 data.  And I didn't see where they reported return to
8 the operating room for groin pain?
9    A.    Well, that's what the Table 4 states.
10    Q.    I know it states that and it says may, but
11 I'm asking you then, where are the data in this report
12 that shows what rate Burch had a return to the OR for
13 groin pain, the percentages?
14    A.    That I don't see.
15    Q.    I didn't see that either.
16        (WHEREUPON, a certain document was
17        marked Rosenzweig Deposition Exhibit
18        No. 12, for identification, as of
19        09/22/2015.)
20 BY MR. SNELL:
21    Q.    Have you reviewed these updated AUA stress
22 incontinence guideline tables?
23    A.    I have reviewed these, yes.
24    Q.    Was the first time you reviewed these

Page 229

1 after Dr. Blaivas' recent deposition?
2    A.    I can't recall when the first time I saw
3 this was.
4    Q.    You are aware that the AUA published their
5 stress incontinence guidelines around 2009, 2010 and
6 these are the updated tables that were revised as of
7 2012?
8    A.    The copyright date is 2009 on this.
9    Q.    If you look at page 4, you see that this
10 was revised in 2012?
11    A.    That is correct.
12    Q.    And so if we look at Table A16 where we
13 are now focusing on complication rates with
14 prolapse -- let me just rephrase that.  That was bad.
15        Table A16 reports complication rates of
16 various stress urinary incontinence surgeries when
17 those surgeries were done without concurrent prolapse,
18 correct?
19    A.    That is correct.
20    Q.    Compared to the earlier tables where you
21 have concurrent prolapse data referenced in it
22 Appendix A11, correct?
23    A.    That is correct.
24    Q.    So if we're focusing on Appendix A16, the

Bruce A. Rosenzweig, M.D.

Page 230

1 Burch colposuspension, you see it's dead center in the
2 page that begins with, "The retropubic suspensions"?
3    A.   Yes.
4    Q.   And for the Burch there was -- it reports
5 6 percent of patients with pain, correct?
6    A.   Yes.
7    Q.   And that's -- that's not over in the
8 laparoscopic suspension table, that's in the Burch
9 suspension table, right?
10   A.   Yes.
11   Q.   And 3 percent of those patients had sexual
12 dysfunction, correct?
13   A.   Yes.
14   Q.   And if you look over to the midurethral
15 slings, the rate of pain for synthetic at the
16 midurethra was 1 percent, correct?
17   A.   Yes.
18   Q.   So if you just flip back three pages.
19        So according to the AUA stress
20 incontinence guidelines, the rate of pain and sexual
21 dysfunction were lower with the synthetic sling at the
22 midurethra compared to the Burch colposuspension,
23 correct?
24   A.   That's what they reported.

Page 231

1    Q.   And data that reports the synthetic
2 midurethral sling having a lower rate of pain and
3 sexual dysfunction than the Burch would be a benefit
4 for the midurethral sling, correct?
5    MR. CARTMELL:  Object to form.
6 BY THE WITNESS:
7    A.   Again, we don't have the references that
8 are associated with it to go back and look at what
9 these studies were, but the way this is reported, that
10 would be a benefit.
11 BY MR. SNELL:
12   Q.   Just like you were quick to point out that
13 in the Schimpf paper there was 1 to 2 percent
14 difference in the rate of return to the operating room
15 from voiding dysfunction, right?
16   A.   That is correct.
17   Q.   And so you are certainly aware that there
18 are data out there that are contrary to your opinion
19 that the risks outweigh the benefits of the TVT,
20 correct?
21   MR. CARTMELL:  Object to the form.
22 BY THE WITNESS:
23   A.   I -- when you look at the studies on
24 complications and the studies like the Petri study,

Page 232

1 the Abbott study, the Agnew study that look at the
2 risks of sling procedures and the time where it takes
3 the complications to show up, there may be data that
4 is looking short term and does not track all of the
5 complications.
6 BY MR. SNELL:
7    Q.   However, I think you already told me, but
8 papers like the Petri paper and the Abbott, those are
9 case series of women who have complications who are
10 referred to a tertiary care center, correct?
11   A.   That is correct.
12   Q.   And the own text of those studies, they
13 say we don't know what the denominator is, therefore,
14 we cannot draw any conclusions as to the incidence of
15 these complications, correct?
16   MR. CARTMELL:  Object to the form.
17 BY THE WITNESS:
18   A.   They do not have a denominator, that is
19 correct.
20 BY MR. SNELL:
21   Q.   And they acknowledge, that, therefore,
22 they cannot state what the incidence of these
23 complications are with the midurethral sling, correct?
24   MR. CARTMELL:  What paper are you talking about?

Page 233

1    THE WITNESS:  Petri.
2    MR. SNELL:  Petri.
3 BY MR. SNELL:
4    Q.   That's correct, right, Doctor?
5    MR. CARTMELL:  Object to the form.
6 BY THE WITNESS:
7    A.   That is correct.
8 BY MR. SNELL:
9    Q.   And, actually, Abbott, they also say that
10 they cannot state what the incidence of those
11 complications are because they do not have a
12 denominator, correct?
13   MR. CARTMELL:  Object to the form.
14 BY THE WITNESS:
15   A.   That is correct.
16 BY MR. SNELL:
17   Q.   And they actually state that that is a
18 "very important" limitation to the Abbott study,
19 right?
20   MR. CARTMELL:  Do you have the study?
21 BY THE WITNESS:
22   A.   Do you have a copy of the Abbott to --
23 BY MR. SNELL:
24   Q.   Yeah, let's get it out.  I wouldn't

Bruce A. Rosenzweig, M.D.

Page 234

1  misrepresent it to you.
2       (WHEREUPON, a certain document was
3       marked Rosenzweig Deposition Exhibit
4       No. 13, for identification, as of
5       09/22/2015.)
6  BY MR. SNELL:
7    Q.   So, Doctor, we've pulled out the Abbott
8  paper you were referring to, correct?
9    A.   Yes.
10   Q.   And if you'd turn back to page e7, they
11 begin talking about all of the limitations on the
12 study, right?
13   A.   Yes.
14   Q.   And they say, "Perhaps most importantly,
15 there is no denominator," right, "for the total number
16 of patients who underwent an SUI or POP procedure with
17 synthetic mesh.  Thus, we can make no comments about
18 the rate at which such complications occur."
19       I read that correctly?
20   A.   That is correct.
21   Q.   And that's consistent with the disclaimer
22 and the limitation referenced in the Petri study that
23 you've already acknowledged, right?
24   A.   That is correct.

Page 235

1    Q.   And what this paper also states is that,
2  "those women with complications after a sling-only
3  procedure were treated more often with medical
4  treatment first and rarely required surgical
5  reintervention," correct?
6    A.   What page are you on?
7    Q.   The page just before that, e6.  Do you
8  need me to -- I can direct you there.  I don't want
9  you to think I'm making something up.  It is on the
10 right column.
11   A.   Yes.
12   Q.   So that's what the authors state, correct?
13   A.   That's what they state, yes.
14   Q.   And if we turn back to the AUA guidelines
15 for the autologous slings, you don't use bone anchors,
16 right?
17   A.   That is correct.
18   Q.   People don't really use bone anchors
19 anymore anyways, right?
20   A.   No.
21   Q.   That's a rarity.
22       So autologous slings without bone anchors,
23 that's the first column under Slings.  Do you see
24 that?

Page 236

1       MR. CARTMELL:  What page?
2  BY THE WITNESS:
3    A.   Without bone anchors?
4  BY MR. SNELL:
5    Q.   Yeah.
6    A.   Yes.
7    Q.   So -- and just so we are all clear, we are
8  looking at these tables of A16, first they address the
9  retropubic suspensions, then the slings, particularly
10 autologous and bone anchors, and then later they get
11 to midurethral slings, right?
12   A.   Yes.
13   Q.   So the autologous fascial slings without
14 bone anchors, the rate of pain was 10 percent,
15 correct?
16   A.   That is correct.
17   Q.   And that was higher than both the Burch
18 and the midurethral sling, correct?
19   A.   Yes.
20   Q.   And have you found a rate of pain higher
21 with autologous slings compared to your Burches?
22   A.   No.
23   Q.   Okay.  The autologous fascial sling
24 without bone anchors had a rate of sexual dysfunction

Page 237

1  of 8 percent, correct?
2    A.   That is correct.
3    Q.   And that's a bit higher than the Burch
4  suspension and the midurethral sling, correct?
5    A.   What's quoted in this monograph, yes.
6    Q.   And you're aware that Dr. Blaivas was one
7  of the doctors involved in formulating and drafting
8  this monograph, right?
9    A.   His name is on the panel, yes.
10   Q.   And so if one were to look at and rely
11 upon these updated stress incontinence guidelines from
12 the AUA, they would stand for the conclusion that with
13 an evidence-based approach like the AUA took, the rate
14 of pain and sexual dysfunction is lower with
15 midurethral slings than the Burch and the pubovaginal
16 sling --
17       MR. CARTMELL:  Objection.
18 BY MR. SNELL:
19   Q.   -- without bone anchors, correct?
20       MR. CARTMELL:  Object to the form.
21 BY THE WITNESS:
22   A.   Again, on this monograph it doesn't
23 describe the review that they did, the papers that
24 they looked at, so without that it would be difficult

Bruce A. Rosenzweig, M.D.

Page 238

1 to state with a reasonable degree of assuredness that
2 there -- that that conclusion is valid.
3 BY MR. SNELL:
4    Q.   And that's not an analysis that you've
5 done yet, correct?
6    A.   That -- an analysis of the studies that
7 they've looked at?
8    Q.   Yes.  You have not done an analysis of the
9 methodology of the AUA stress incontinence guidelines
10 to say that their results that they've reported are
11 incorrect?
12    MR. CARTMELL:  I just want to make it clear.
13 You are asking him if he did an analysis of what the
14 AUA committee did?
15    MR. SNELL:  Yes.
16 BY THE WITNESS:
17    A.   It is not described in here, so it would
18 be difficult to use a methodology such as reviewing
19 the papers, looking at the quality of papers, seeing
20 what papers that were looked at and were not looked to
21 draw the same conclusions that they did.
22 BY MR. SNELL:
23    Q.   I don't want you to get caught up in
24 Exhibit 12 that I have a given you because this is an

Page 239

1 excerpt from a document that's about 500 plus pages.
2    MR. CARTMELL:  Well, that may be part of the
3 problem because you gave him one excerpt of a 500
4 page --
5    MR. SNELL:  You are doing a speaking objection.
6    MR. CARTMELL:  I want the record to be
7 specifically clear that you have given him a
8 5-page document --
9    MR. SNELL:  Yes, I did.
10    MR. CARTMELL:  -- or whatever, six, seven
11 page document from a 500-page document that he has not
12 been entitled to review today.
13    MR. SNELL:  Oh, wait.  Let's just make the
14 record clear.  Stop giving speaking objections.
15    MR. CARTMELL:  That's not an objection.  It is a
16 statement for the record.
17    MR. SNELL:  That's a speaking objection.
18 BY MR. SNELL:
19    Q.   Doctor, you told me that you had reviewed
20 the updated AUA stress urinary incontinence
21 guidelines, didn't you?
22    A.   Yes.
23    Q.   From 2012, right?
24    A.   Yes.

Page 240

1    Q.   You actually have read the 2009
2 guidelines, lead author Dmochowski, right?
3    A.   Yes.
4    Q.   And that was published in the AUA's
5 journal, correct?
6    A.   Yes.
7    Q.   And did you assess their methodology in
8 that paper?
9    MR. CARTMELL:  Object to the form.  It is vague
10 and ambiguous.  What do you mean assess their
11 methodology?  It makes no sense.
12 BY MR. SNELL:
13    Q.   Did you assess their methodology in their
14 systematic review?
15    A.   To look at all of the individual papers to
16 determine the quality of papers, which ones were
17 included and which ones weren't, I probably did that
18 at the time.  I don't remember that specifically.
19    Q.   And for complications, do you recall that
20 they link to the AUA's website for the data tables
21 that I have printed out here?
22    A.   Yes.
23    Q.   And you've been on the AUA's website and
24 you've looked at that 500-plus page document that

Page 241

1 updates the 2009 report, correct?
2    A.   Yes.
3    Q.   Have you actually printed out the
4 500-page tables?
5    A.   No.
6    Q.   But you've at least looked at them, right?
7    A.   Yes.
8    Q.   You certainly haven't brought them here
9 today, have you?
10    A.   No, I have not.
11    MR. CARTMELL:  And that's was my point for the
12 record is what you gave him is not the entire thing.
13 That's the only point I'm making is he doesn't have it
14 here today to look at.
15    MR. SNELL:  That's not my fault.  I asked you to
16 bring your file and everything and you didn't bring
17 it.  So that's my fault, Tom.  I'm not printing out
18 1500 pages of documents.
19    MR. CARTMELL:  I wasn't attributing fault to
20 anybody.  I was just making the point that it is not
21 here.  You are asking very specific questions about a
22 document that is not here.
23 BY MR. SNELL:
24    Q.   When you went back and you read the

Bruce A. Rosenzweig, M.D.

Page 242

1  update, the 2012 update to the AUA guidelines, that
2  500-plus page document, did you look at the AUA
3  panel's description of their methodology for how they
4  came to calculate these complication rates?
5      A.   I don't recall specifically what they
6  stated.  If we have that, it would be important to
7  look at so I can answer the question.
8      Q.   My question was:
9           When you read the updated AUA guidelines
10 from 2012, did you read the panel members' description
11 of how they calculated and assessed these complication
12 rates?
13     A.   I looked at that.  I don't recall
14 specifically what they described.
15     Q.   Fair enough.  Okay.
16          But you do recall it being described in
17 the body of that very large document?
18     A.   More likely than not, yes, it was there.
19     Q.   And as you sit here, you do not recall any
20 problems with their methodology as they described it?
21     A.   Not that I recall.
22     Q.   Fair enough.
23     MR. SNELL:  All right.  Let's go off the record.
24          (WHEREUPON, a recess was had

Page 243

1           from 5:00 to 5:03 p.m.)
2      MR. SNELL:  Let's go on the record.
3  BY MR. SNELL:
4      Q.   Those studies in the AUA's stress
5  incontinence guidelines updated in 2012 do report
6  benefits with the midurethral sling over pubovaginal
7  and Burch for some complications, agreed?
8      MR. CARTMELL:  Object to the form.
9  BY THE WITNESS:
10     A.   Perioperative complications for the Burch,
11 yes.
12 BY MR. SNELL:
13     Q.   And actually, dyspareunia and pain and
14 sexual dysfunction were all higher with the
15 pubovaginal sling and the Burch compared to the
16 midurethral sling, correct?
17     MR. CARTMELL:  Object to the form.
18 BY THE WITNESS:
19     A.   Only in the AUA 2012 update.
20 BY MR. SNELL:
21     Q.   I believe you are wrong.  If you want to
22 look at Schimpf, you'll see that the rate of
23 dyspareunia was higher with the Burch and the
24 pubovaginal sling than the TVT midurethral retropubic

Page 244

1  sling.
2      MR. CARTMELL:  Object and move to strike the
3  statement of counsel.  If you want to ask him
4  questions, then do that.
5  BY THE WITNESS:
6      A.   In the Schimpf paper there was no reports
7  of dyspareunia in the Burch and no reports of
8  dyspareunia in the retropubic.
9  BY MR. SNELL:
10     Q.   There was a higher rate of dyspareunia
11 with the pubovaginal sling, correct?
12     A.   That is correct.
13     Q.   And those are benefits in light of the
14 TVT's design and in particular how the design is
15 carried out and placed in a woman, correct?
16     MR. CARTMELL:  Wait, wait.  Object to the form,
17 misstates the evidence, misstates his prior testimony
18 misstates the article.
19 BY THE WITNESS:
20     A.   This study showed 0 dyspareunia for the
21 retropubic slings, which I think is -- from what other
22 studies have shown, such as the highest -- one of the
23 highest rates of complications from slings, such as
24 the Abbott paper, the Petri paper is pain and

Page 245

1  dyspareunia, it is very unlikely to see 0 percent
2  dyspareunia for the retropubic sling.
3      MR. SNELL:  Object and move to strike.
4  BY MR. SNELL:
5      Q.   In the Schimpf paper they are reporting on
6  incidence, right?
7      A.   That is correct.
8      Q.   They have an enumerator and a denominator,
9  right?
10     A.   That is correct.
11     Q.   Not to beat a dead horse, but we've
12 already agreed, I thought, that Abbott and the Petri
13 papers don't have denominators and don't talk about
14 incidence, right?
15     MR. CARTMELL:  Object; asked and answered.
16 BY THE WITNESS:
17     A.   They talk about the number of patients
18 that have a complication, that is correct.
19 BY MR. SNELL:
20     Q.   But they don't talk about the incidence,
21 right?
22     A.   That is correct.
23     Q.   So in these papers, the retropubic DVT
24 midurethral sling had a lower rate of dyspareunia than

Page 246

1 the pubovaginal, and that would be attributable to its
2 design, correct?
3    A.   But it was --
4    Q.   Can you answer yes or no and then give
5 me --
6    MR. CARTMELL:  No, no.  We are going to walk out
7 of here.
8    MR. SNELL:  That's fine.  I'll go right to the
9 judge.
10    MR. CARTMELL:  Stop interrupting him.
11    MR. SNELL:  I'll go right to the judge.
12    MR. CARTMELL:  I'm so fine with you going to the
13 judge.  Call him right now, all right.  You are going
14 to stop interrupting him.  You do it again, we're
15 done.  Let him answer the question.  Then if you want
16 to move to strike, then I'm going to let you do that
17 or you can ask it again.  I'm tired of you
18 interrupting him, all right.
19    MR. SNELL:  Did you not -- let me ask you this:
20       Did you not tell him Judge Eifert's orders
21 and instructions about being responsive, answering yes
22 or no and then you can give caveats until the cows
23 come home?  Does he know that or not?
24    MR. CARTMELL:  No, you --

Page 247

1    MR. SNELL:  If he doesn't know that, I'm not
2 going to take it out on him.  I'm going to let him
3 answer however he wants to answer.
4    MR. CARTMELL:  You weren't there for Judge
5 Eifert's instruction.  I was on the phone with Judge
6 Eifert.  Your side has misstated what Judge Eifert has
7 said for months, if not years, okay.  So don't tell me
8 what she said.
9       The rule is this.  You ask him a question,
10 he answers it.  Just because you don't like his answer
11 doesn't mean you get to interrupt him in the middle of
12 it, which you've done multiple times today.  So let
13 him --
14    MR. SNELL:  I want to hear my question.
15    MR. CARTMELL:  -- give a response and then if
16 you don't like it, you can strike it, and I've given
17 you leeway all day to ask it again.
18    MR. SNELL:  Can you, Madam Court Reporter, can
19 you read back my question.
20       (WHEREUPON, the record was read
21        by the reporter as requested.)
22 BY MR. SNELL:
23    Q.   Okay.  Now answer, please, however you
24 want to answer.

Page 248

1    A.   No.
2    Q.   And why do you say no?
3    A.   It's attributable to studies not reporting
4 dyspareunia, studies not having a long-term follow-up
5 to show dyspareunia, and we know that patients
6 complained of dyspareunia after retropubic slings, and
7 to say that there are -- there is no dyspareunia after
8 retropubic sling is not realistic.  And they only cite
9 two studies out of all of the studies on retropubic
10 slings to quote the rate of dyspareunia.
11    Q.   So if I understand you correctly, you
12 don't disagree that the retropubic sling in this
13 analysis had a lower rate of dyspareunia than the
14 pubovaginal sling?
15    A.   The two studies that they looked at that
16 showed -- that reported on dyspareunia compared to the
17 five papers on pubovaginal slings is not
18 representative from what we've described before as the
19 body of literature on retropubic slings.  I'm not
20 disputing what the table shows.  I'm just disputing
21 that that is representative of the data.
22    MR. SNELL:  Move to strike as non-responsive.
23 BY MR. SNELL:
24    Q.   In the AUA guidelines, in the updated

Page 249

1 table in particular that we were looking at, A16,
2 there is a 16 -- strike that -- there is a 6 percent
3 rate of bladder injury with the Burch suspension,
4 correct?
5    A.   That's what the table states.
6    Q.   And the laparoscopic Burch had a 5 percent
7 rate of bladder injury, correct?
8    A.   That's what this table states.
9    Q.   And so according to the AUA's analysis,
10 the rate of bladder injury with the Burch is roughly
11 the same, 5, 6 percent, whether you do it open or
12 laparoscopically?
13    A.   That is correct.
14    Q.   And is that a finding that you disagree
15 with?
16    A.   I would say that from my -- I would say
17 that it would be higher for the laparoscopic Burch but
18 probably not significantly higher.
19    Q.   If there is a bladder injury during the
20 laparoscopic Burch, can that be serious?
21    A.   If it's not recognized and timely
22 repaired.
23    Q.   If there is retention after a Burch
24 colposuspension, an open Burch colposuspension or a

Bruce A. Rosenzweig, M.D.

Page 250

1 laparoscopic Burch that requires the surgeon to make a
2 modification to the Burch, does the surgeon need to do
3 that by opening the retropubic space or can that be
4 done transvaginally?
5    A.   If --
6    Q.   So if there is a problem with retention
7 postoperatively following either type of Burch
8 colposuspension and you have to take down the Burch --
9 is that something that you've ever had to do?
10    A.   Yes.
11    Q.   Okay.  Is that accomplished transvaginally
12 or do you have to reopen up the retropubic area?
13    A.   You can do it either way.
14    Q.   How do you do it?
15    A.   I've done it vaginally and I've done it
16 open before.
17    Q.   Do both ways work the same?
18    A.   If you are trying to do a urethrolysis, a
19 urethrolysis probably would be better done open.
20    Q.   And why would that be?
21    A.   You can get better exposure and a better
22 dissection.
23    Q.   I know you've told me in the past
24 complications that you believe can flow from

Page 251

1 degradation of the mesh.
2        My question to you is:
3        Have any of those complications been
4 reported to be due to degradation in any prospective
5 study in women undergoing treatment for stress urinary
6 incontinence?
7    A.   Have the studies on treatment for
8 complications of stress urinary incontinence stated
9 that there is degradation of the -- of the mesh?
10    Q.   I think you are changing my question
11 around.
12    A.   Well, I was asking for clarification --
13    Q.   Okay.  Fair enough.
14    A.   -- because I didn't understand it.
15    Q.   That's fair.
16    A.   Which is why when I repeated it back it
17 became even more convoluted, so.
18    Q.   You threw me off there.  Let me see if I
19 can rephrase it.  Thank you for that.
20        So you've testified, and I'm not going to
21 rehash it, that you believe that degradation can lead
22 to certain complications.  I think one of them is
23 erosion or exposure.
24        My question is this:

Page 252

1        Are you relying on any prospective studies
2 in women undergoing TVT implantation for stress
3 incontinence that report that the complication was due
4 to degradation of the mesh?
5    A.   Wang 2004.
6    Q.   Say it again?
7    A.   Wang 2004, American Journal of Obstetrics
8 and Gynecology.  Recurrent erosions were associated
9 with mesh degradation, fragmentation of the mesh, and
10 Dr. Wang concluded that this needed to be looked at on
11 a prospective basis.
12    Q.   And was Wang 2004 reported or cited in
13 your --
14        MR. CARTMELL:  Yes, and you've gone through it
15 with him before in prior depositions.
16 BY THE WITNESS:
17    A.   Yes, we have gone through this before in
18 prior depositions.
19 BY MR. SNELL:
20    Q.   So this is the only study you can cite to
21 for the proposition that in women with clinical
22 follow-up with TVT used for the application of stress
23 incontinence that degradation leads to complications?
24    A.   You said prospectively.  This was a

Page 253

1 prospective study, yes.
2    Q.   Okay.  Correct me if I'm wrong, but in
3 that study they did not do a multivariate analysis of
4 patient factors and surgeon factors in the assessment
5 of which factors after assessment were statistically
6 significantly associated with the 2.4 percent rate of
7 defective vaginal healing?
8        MR. CARTMELL:  I'm going to give you a little
9 bit of leeway here, that question, but you have gone
10 through this study more than once with this doctor.
11 Judge Eifert has been very clear that you are not
12 supposed to be duplicative in your questioning of
13 these experts.  You've done it a bunch already today,
14 so I'm shutting it down after that question.
15 BY THE WITNESS:
16    A.   May I see the study to see if that is
17 specifically described?
18 BY MR. SNELL:
19    Q.   Sure.
20        (WHEREUPON, a certain document was
21        marked Rosenzweig Deposition Exhibit
22        No. 14, for identification, as of
23        09/22/2015.)
24 BY THE WITNESS:

Bruce A. Rosenzweig, M.D.

Page 254

1    A.   The answer to that question is no.
2   BY MR. SNELL:
3    Q.   There was no --
4    A.   But if I can explain, Dr. Wang, as we have
5   talked about before, was part of the initial 510(k)
6   submission, his data.  He is one of the largest users
7   of slings.  So I would doubt that surgeon factor would
8   be a significant cause of the erosions in this case.
9    Q.   Well, mesh erosions can happen to
10  experienced skilled surgeons, certainly, right?
11   A.   That is correct because of the
12  characteristics of the mesh.
13   Q.   And his 2.4 percent rate is not outside of
14  the overall body of literature, correct?
15   A.   This is the recurrent erosions, not the
16  simple-to-treat erosions.
17   MR. SNELL:  Move to strike.
18  BY MR. SNELL:
19   Q.   This 2.4 percent is not outside the
20  overall medical literature reporting on mesh
21  exposures, correct?
22   MR. CARTMELL:  Objection; asked and answered.
23  BY THE WITNESS:
24   A.   For recurrent erosions, no.

Page 255

1   BY MR. SNELL:
2    Q.   And this study does not tell us what was
3   the percentage of degradation, if any, that occurred?
4    A.   In the patients with defective healing,
5   the inflammatory process was accompanied by pronounced
6   peri-filamentous fibrosis and foreign body reaction.
7   The histology showed mesh filaments were fragmented
8   and surrounded by palisading histiocytes.
9    MR. SNELL:  Objection; move to strike.
10  BY MR. SNELL:
11   Q.   So this study does not tell us the
12  percentage of mesh degradation, correct?
13   A.   It does not give a specific number, no.
14   Q.   It does not tell us the total volume of
15  mesh degradation in this 2.4 percent of women,
16  correct?
17   A.   Correct.
18   Q.   It does not compare and tell us what the
19  histologic findings were in the 700-plus women who did
20  not a mesh exposure, did it?
21   A.   The histologic findings?
22   Q.   Yes.
23   A.   No.
24   Q.   Because you don't do histologic findings

Page 256

1   in women who don't have exposure and don't have
2   complications, do you?
3    A.   We reviewed a paper earlier that did, but
4   in the majority of cases, no.
5    Q.   Are there any clinical studies assessing
6   TVT in women with stress urinary incontinence that
7   reports that cytotoxicity of the mesh is a cause of
8   their -- any reported complications?
9    A.   Erosion is a sign of cytotoxicity.
10   MR. SNELL:  Move to strike.
11  BY MR. SNELL:
12   Q.   You are telling me stuff I already know
13  you've told me before.  I'm trying to be respectful
14  with Tom over hear screaming at me.
15   MR. CARTMELL:  You've asked that question you
16  just asked too.
17   MR. SNELL:  I haven't asked that question.
18   MR. CARTMELL:  Yes, you have.
19   MR. SNELL:  Read back my question, please.
20       (WHEREUPON, the record was read
21        by the reporter as requested.)
22   MR. CARTMELL:  Objection; asked and answered.
23  If you need to tell him again, tell him again.
24  BY THE WITNESS:

Page 257

1    A.   Erosion is a sign of cytotoxicity.
2    MR. SNELL:  I'll move to strike again.
3   BY MR. SNELL:
4    Q.   I'm asking you for clinical studies, all
5   right.  Are there clinical studies -- I'm not asking
6   you what your opinion is about whether erosion is a
7   sign of cytotoxicity or not.
8        So can you not --
9    MR. SNELL:  Can you reread my question one more
10  time.
11       (WHEREUPON, the record was read
12        by the reporter as requested.)
13  BY THE WITNESS:
14   A.   No.
15  BY MR. SNELL:
16   Q.   You earlier stated that erosion is a sign
17  of cytotoxicity in your opinion.  Just so I'm clear,
18  were you referring to mesh exposure or the erosion of
19  the mesh into the bladder or urethra?
20   A.   Either one.  And the scientific studies
21  that show that are the Moalli papers on apoptosis and
22  cell death associated with heavyweight mesh.
23   Q.   Those are not papers in women though,
24  right?

Bruce A. Rosenzweig, M.D.

Page 258

1    A.    That is correct.

2    Q.    I'm trying to think of a way to ask this

3 question.

4        If a woman -- if a woman has a mesh

5 erosion or mesh exposure -- strike that.

6        Let's say there was a study and an

7 analysis done and it reported a 2.2 percent rate of

8 vaginal mesh exposure, okay.

9        You are with me so far?

10   A.    Yes, sir.

11   Q.    And numbers similar to that that

12 Dr. Blaivas reported in Table 3 of his 2015 review

13 article for retropubic slings, okay?

14   A.    Which is probably an underestimate of the

15 total number of erosions, but go ahead.

16   Q.    So if we extrapolate that out, let's say

17 that will be 22 women out of 1,000 women, correct?

18   A.    That have been followed up to find their

19 erosion, yes.

20   Q.    So here is my question.  So if we take

21 those 22 women, is there a scientifically reliable

22 study or studies in women who have received the mesh

23 that would allow one to say which of those 22 women

24 had the erosion or exposure because of cytotoxicity or

Page 259

1 was it due to some other reason?

2        Do you understand my question?

3    A.    Yes.  It could be due to degradation, it

4 could be due to mesh contraction, chronic foreign body

5 reaction, chronic inflammation or cytotoxicity.  For

6 me to sit around and say what percentage would be

7 cytotoxicity, what percentage would be degradation,

8 that is impossible to do.  We know all of those

9 mechanisms can lead to mesh erosion or mesh exposure,

10 however we want to describe that.

11   Q.    But as you sit here, you can't say which

12 of those particular mechanisms, you call it

13 degradation, contraction, inflammation, cytotoxicity,

14 produce an exposure in a particular woman?

15   MR. CARTMELL:  Object to the form.

16 BY THE WITNESS:

17   A.    Also I would add roping and fraying along

18 with that.

19 BY MR. SNELL:

20   Q.    So roping and fraying.  You can't say for

21 all of those mechanisms which one leads to a mesh

22 exposure in a particular woman, correct?

23   MR. CARTMELL:  Object.  Are you asking -- for

24 clarification, are you asking about in a study or are

Page 260

1 you asking about --

2    MR. SNELL:  You are giving a speaking objection,

3 Tom.  Knock it off.

4    MR. CARTMELL:  No.  I need to know what you are

5 talking about.

6    MR. SNELL:  Knock it off.

7    MR. CARTMELL:  It makes no sense.  You were

8 talking about a study, you were saying hypothetically

9 there is 2.2 percent rate.  If you are asking him in a

10 particular patient that's in front of him or he's

11 treating, can he figure that out, or are you asking

12 him in a study by looking at a paper?  That's what --

13 it's vague and ambiguous, it lacks foundation, it

14 calls for speculation until you tell him that.

15 BY MR. SNELL:

16   Q.    You have identified different potential

17 mechanisms by which you believe exposures can occur,

18 namely, degradation, contraction, chronic

19 inflammation, cytotoxicity, roping and curling?

20   A.    And fraying.

21   Q.    And fraying.  So we've got seven, right?

22   A.    Yes.

23   Q.    Can you say which of those mechanisms

24 caused an exposure in a particular woman?

Page 261

1    A.    In a particular woman, no.

2    Q.    Can you say which of those mechanisms

3 caused an exposure in a group of 20 women who had

4 exposures?

5    A.    If I had the mesh under a microscope where

6 we could see that there was roping, fraying, curling,

7 particle loss, degradation, contraction and

8 deformation, then any one of those would have caused

9 that.

10   Q.    So you would need the mesh to be assessed

11 under a microscope?

12   A.    To know the exact mechanism, it would be

13 very helpful to see what the microscopic findings

14 were.

15   Q.    Because -- and are you saying a scanning

16 electron microscope or just the regular pathology

17 microscope?

18   A.    The SEM would be able to tell you if there

19 is degradation.  The lower power microscope can show

20 you if there is roping, fraying, curling and

21 contraction of the mesh.

22   Q.    Well, the SEM shows the surface

23 irregularities on the mesh, correct?

24   A.    No.  It shows breaking of the mesh,

Bruce A. Rosenzweig, M.D.

Page 262

1 flaking of the -- or fragmentation of the mesh. We've
2 had this discussion before about surface
3 irregularities, Burt. Oh, excuse me. Sir.
4    Q.   That's okay. Oh, I think you're -- with
5 all respect, I think you are actually changing what
6 you had told me before.
7    A.   No, not at all.
8    Q.   You have not mentioned breaking of the
9 mesh. So let me back up.
10        When you and I have discussed
11 degradation -- and we've discussed degradation and
12 your support for it that you believe comes out of the
13 human data from Clave, right?
14    A.   And all of the other references that are
15 in my report, yes.
16    Q.   But I'm not worried about dogs and all of
17 that stuff, all right. I'm talking about in humans
18 for a pelvic application, particularly stress
19 incontinence, and you've told me --
20    A.   There are more than just the Clave study
21 on my reliance list of meshes. There is the Zimmer
22 paper, there is a variety of other pathologic papers
23 that look at the -- the cracking, fragmentation of the
24 mesh looked at under an SEM.

Page 263

1    MR. CARTMELL: And you have talked about all of
2 that in prior depositions.
3 BY MR. SNELL:
4    Q.   I have talked to you, but there was no
5 discussion about breaking of the mesh.
6    MR. CARTMELL: That's a misstatement of his
7 prior testimony.
8 BY THE WITNESS:
9    A.   Completely in half?
10 BY MR. SNELL:
11    Q.   Yes, the breaking of the mesh, unless
12 I'm -- unless -- and I'm not trying to mess with you.
13 I'm serious.
14    A.   Breaking as I described it before?
15    Q.   Yeah. So in the Clave paper and Philippe
16 Zimmer's paper that didn't find oxidation, in none of
17 the human papers data assessing stress incontinence
18 meshes did they show the mesh breaking?
19    A.   And what your --
20    Q.   Is that correct or not?
21    MR. CARTMELL: Let him answer the question.
22 BY THE WITNESS:
23    A.   What you are saying is broken in half or
24 that it's broken on the surface? That's what I'm

Page 264

1 saying.
2 BY MR. SNELL:
3    Q.   Okay. So, yeah, broken in half, broken
4 such that it would impair its functionality?
5    A.   Well, I've seen that clinically where the
6 mesh has come out broken, yes.
7    MR. SNELL: Move to strike.
8    MR. CARTMELL: And he has testified to that
9 multiple times.
10    MR. SNELL: Move to strike.
11 BY MR. SNELL:
12    Q.   I know. I'm not asking about what you did
13 clinically. I know what you did. I'm talking -- I'm
14 trying to get clarification on the clinical
15 literature.
16    A.   This is the same --
17    Q.   On the clinical literature.
18    A.   This is the same testimony I have a given
19 before.
20    Q.   Well, I need to be clear before I leave
21 here.
22    MR. CARTMELL: This is just an attempt to rehash
23 old material you've gone through with him.
24    MR. SNELL: No.

Page 265

1    MR. CARTMELL: You are more than six hours into
2 this and about four of it is stuff you've covered in
3 the past.
4    MR. SNELL: No. This -- Tom, this needs to
5 be -- I just want to be clear.
6 BY MR. SNELL:
7    Q.   Because I know what you've said, you've
8 seen it break when you went back on your patients and
9 stuff. I'm not fussing with you on that.
10    MR. CARTMELL: And he has testified that
11 Iakovlev's papers have shown breakage --
12    MR. SNELL: Are you testifying now? I think you
13 are.
14    MR. CARTMELL: I am telling you what his
15 testimony has been in the past because you are not
16 supposed to keep covering that.
17    MR. SNELL: I think you are. You are speaking
18 and you are literally testifying for him.
19    MR. CARTMELL: I am telling you --
20    MR. SNELL: You are augmenting the record for
21 him. Why don't you go ahead and supplement some more.
22    MR. CARTMELL: I am telling you because you are
23 not supposed to be going over what you have gone
24 through in the past. Do you want me to get his

Bruce A. Rosenzweig, M.D.

Page 266

1  deposition out and show you where it is?
2      MR. SNELL:  Show me where he says that it broke
3  such that it impaired its utility.  That's a specific
4  question on design, right?
5      MR. CARTMELL:  Do you want me to find it?
6      MR. SNELL:  I don't care.  You can look for all
7  you want to.  This is my question so I know this
8  before I leave here on degradation.
9  BY MR. SNELL:
10     Q.   In the clinical studies in the literature
11 involving women with a stress incontinence sling, are
12 you saying that those data report breakage of the mesh
13 such that it would impair the utility of the device?
14     A.   Well, the patient ended up with a
15 complication, so that impaired the utility of the
16 device.
17     Q.   I feel like we are going around here.  I
18 don't want to go around.
19     All of the patients in Clave had
20 complications, yet only a third or half had supposed
21 cracking, right?
22     A.   Well, the ones that had their mesh removed
23 less than three months did not have cracking,
24 fragmentation.  The ones after had a significantly

Page 267

1  higher rate.
2      Q.   But you can't point to the fact that the
3  patient had a complication and say it must have been
4  degradation because she had a complication when half
5  of the cohort didn't even have degradation as assessed
6  by Clave.
7      Do you understand me?
8      MR. CARTMELL:  Object.  Asked and answered.
9  You've gone over Clave for hours at trial and multiple
10 times in depositions.
11 BY THE WITNESS:
12     A.   And we discussed before that the patients
13 that had their mesh removed in less than three months
14 did not show degradation.
15     MR. SNELL:  Move to strike as non-responsive.  I
16 don't know what to do with that.  We'll just move on.
17     MR. CARTMELL:  I'm not going to let him answer
18 any more questions about Clave.
19     MR. SNELL:  I'm just going to move on because I
20 think it's not responsive at all.
21 BY MR. SNELL:
22     Q.   Do you know what volume of the TVT mesh
23 must degrade before it can produce an exposure?
24     A.   Mesh filaments fragmented and surrounded

Page 268

1  by palisading histiocytes and multinucleated giant
2  cells is enough to cause mesh exposure.
3      MR. SNELL:  Move to strike.
4  BY MR. SNELL:
5      Q.   Do you know what volume of the TVT mesh
6  degrading is enough to produce a mesh exposure?
7      MR. CARTMELL:  Objection; asked and answered.
8      If you need to tell him again, then go
9  right ahead.
10 BY MR. SNELL:
11     Q.   Do you know what volume I mean?  When I
12 say "volume", you're a scientist, a doctor, you know
13 what volume is.  I'm not talking about histologic
14 slides.  I'm talking about volume.
15     A.   Are you talking about the percent
16 fragmentation?
17     Q.   Yes, volume, what volume of TVT mesh
18 degrades -- must degrade in order to produce an
19 exposure from that degradation?
20     A.   According to Pariente, there is an 8.5
21 percent of particle loss from mesh.  I would say that
22 that is probably a good percentage.
23     Q.   Okay.  Pariente is not even a study that
24 looked at meshes that had been in women, correct?

Page 269

1      A.   That is correct.
2      Q.   Fair enough.
3      MR. SNELL:  Let's go off the record.
4          (WHEREUPON, a recess was had
5           from 5:39 to 5:47 p.m.)
6  BY MR. SNELL:
7      Q.   I'm trying to make this short so we can
8  short-circuit a lot of stuff.
9      So you know how we've looked at
10 metaanalyses and the clinical literature by Cochrane
11 review and others, Novara, I know you know all of
12 those papers, and in some of those papers they do
13 assess, and so we've discussed some of them today
14 where they've found that the multifilament mesh had a
15 higher rate of erosions or the bottom-to-top had a
16 higher rate, correct?
17     MR. CARTMELL:  Objection; asked and answered.
18 We are not going to rehash Cochrane.  You went over it
19 for an hour.
20 BY MR. SNELL:
21     Q.   I'm not going to rehash, but you've seen
22 that, correct?
23     A.   I've seen that.
24     Q.   So for all of these mechanisms that you've

Bruce A. Rosenzweig, M.D.

Page 270

1 identified, degradation, contraction, chronic
2 inflammation, cytotoxicity, roping, curling, fraying,
3 okay, have you seen each of those mechanisms assessed
4 in a reliable multivariate model that determines with
5 the TVT and stress incontinence treatment that one or
6 more of those variables plays a role in causing a
7 complication?
8     A.   Using a multivariate analysis?
9     Q.   Yes.
10    A.   To say in the Cochrane analysis or the
11 Novara analysis?
12    Q.   Or in the clinical literature overall that
13 you've reviewed.
14    A.   They haven't done multivariate analysis.
15    Q.   Have they done univariate analyses in the
16 clinical literature that you've reviewed that have
17 reported that one of those seven mechanisms was a
18 statistically significant cause of a complication?
19    A.   In a prospective fashion?
20    Q.   Let's take prospective first, yes.
21    A.   Because there are retrospective studies
22 that have shown that, you know, that we've talked
23 about the Clave study, the Zimmer study that looked at
24 degradation.  We know that cytotoxicity, meaning cell

Page 271

1 death, when you see an erosion, there are plenty of
2 studies that report erosions, that you see erosions,
3 that is evidence of cytotoxicity.
4     MR. SNELL:  I'm going to respectfully move to
5 strike.
6        Can you reread the question?
7        (WHEREUPON, the record was read
8         by the reporter as requested.)
9     MR. SNELL:  And he said, In a prospective way?
10 And my answer was, Yes, let's talk about prospective
11 first.
12 BY THE WITNESS:
13    A.   Not that I've seen in the literature.
14 BY MR. SNELL:
15    Q.   You have seen studies in the clinical
16 literature for TVT that assess factors like type 2
17 diabetes and whether after statistical analysis type 2
18 diabetes was a statistically significant factor in
19 causing exposures, correct?
20    A.   If you have a paper that you'd like to
21 talk about, I'd like to see that.
22    Q.   I don't have a particular one.
23        Have you seen that, though?
24    A.   If you have a specific paper that talks

Page 272

1 about that there is a -- that diabetes was
2 statistically significant in an individual patient or
3 there are studies that talk about patient factors.
4     Q.   Right.
5     A.   Okay.  And they opine about patient
6 factors.
7     Q.   And they assess patient factors with
8 univariate and multivariate models to determine
9 whether there is a statistically significant increased
10 rate of a complication based on those factors,
11 correct?
12    A.   There are studies like that for POP mesh.
13    Q.   You are not aware of any studies like that
14 for stress incontinence mesh, particularly the TVT
15 retropubic device?
16    A.   If you have a particular study that you
17 want to talk about?
18    Q.   I don't.  I'm just asking your knowledge.
19    A.   There -- again, there are POP mesh studies
20 that look at that, there are other papers that talk
21 about patient factors as being -- and their
22 association with complications.
23    MR. SNELL:  Move to strike.
24 BY MR. SNELL:

Page 273

1     Q.   Straight forward question.
2        Have patient factors been assessed in
3 studies assessing exposure and other complications
4 with the TVT retropubic device?
5     A.   Patient factors have been assessed.
6     Q.   Okay.  And what patient factors are
7 significant in increasing the rate of mesh exposure
8 with the TVT retropubic design for treating stress
9 incontinence?
10    A.   Specifically in the retropubic design?
11    Q.   Yes.
12    A.   From what I recall is that studies that
13 have looked at patient factors have looked at
14 midurethral slings in general.
15    Q.   So you are unable to point to any
16 particular patient factors that increase the rate of
17 mesh exposure with the TVT retropubic design?
18    A.   Specifically?
19    Q.   Yes, sir.
20    A.   There are patient factors that have been
21 associated with complications from midurethral slings
22 in general.
23    Q.   But is there an answer to my question?
24    A.   Again, individual factors have been

Bruce A. Rosenzweig, M.D.

Page 274

1  associated with complications, patient factors.
2      Q.   But my question is very -- is focused on
3  the TVT retropubic design.  Can you point to any that
4  are specific to that design?
5      A.   To the design itself?
6      Q.   Yes.
7      A.   Are you talking about the heavyweight
8  small pore?
9      Q.   No, no, I don't want to hear the same
10 litany of things.
11      What I'm asking for is what are the
12 patient factors that statistically significantly lead
13 to an increase rate of exposure with the TVT
14 retropubic design?
15      A.   Statistically significant increase in
16 exposure?
17      Q.   Yes, the patient factors.
18      A.   Those factors haven't been elucidated
19 statistically significant.
20      Q.   So when you say there are patient factors
21 that have been examined for midurethral slings in
22 general, are there particular patient factors that
23 have been found to statistically significantly
24 increase the risk of exposure?  And, if so, which ones

Page 275

1  are they in your opinion?  And if you don't have an
2  opinion, just tell me and I'll move on.
3      A.   Statistically significant, I don't have an
4  opinion about that.
5      Q.   Fair enough.
6      If a larger weight, larger pore mesh were
7  used as an alternative design for TVT such as you
8  earlier stated, like Ultrapro, you will acknowledge
9  that there is a risk that with five or ten years of
10 duration or more, that product could have lower
11 efficacy rates than had been demonstrated in trials
12 with the TVT retropubic design, correct?
13      MR. CARTMELL:  Object to the form.
14 BY THE WITNESS:
15      A.   More likely than not, no.
16 BY MR. SNELL:
17      Q.   What's the basis of that statement?
18      A.   That there was -- when you look at it for
19 POP mesh, there is no difference in efficacy in the
20 short term it's been studied.
21      MR. SNELL:  Move to strike as non-responsive.
22 BY MR. SNELL:
23      Q.   My question was focused on the longer
24 term, not short term.

Page 276

1      You will acknowledge that there is a risk
2  that if Ultrapro were used in the TVT configuration
3  and it were studied out to five and ten or more years,
4  that there is a risk that it may not work as well as
5  TVT, yes or no?
6      A.   No.
7      Q.   And what is the basis for that statement,
8  considering you've already told me there is no
9  five-plus year data with Ultrapro in the application
10 of stress incontinence?
11      A.   Well, the three-year data --
12      MR. CARTMELL:  Object to the form of the
13 question.  It is a statement by counsel.  I move to
14 strike it.  You can ask him questions.
15 BY THE WITNESS:
16      A.   The three-year data showed excellent
17 efficacy.  I can't see that degrading in two years
18 after that.
19 BY MR. SNELL:
20      Q.   The three-year data in Ultrapro versus
21 prolene?
22      A.   Yes.
23      Q.   Not DVT as we've discussed?
24      A.   That is correct.

Page 277

1      Q.   What would be your methodology -- do you
2  believe that the ten-year data on Ultrapro as a sling,
3  would that be comparable to TVT?
4      A.   Yes.
5      Q.   What's your methodology for that
6  statement?
7      A.   To see the degradation curve with over
8  three years, it does not look like it's any different
9  from the TVT data, so my methodology is looking at the
10 information that we have and assessing if there was a
11 change in the degradation curve from TVT.  And,
12 therefore, since there is none that it would be a
13 similar degradation curve longer.
14      Q.   You're basing this on the single Okulu
15 study?
16      A.   Well, the part that degrades in Ultrapro
17 is degraded long before we got to the three-year data.
18 So if the efficacy is still there three years, it
19 should follow the same curve as the TVT data.
20      Q.   Why would you study a product beyond three
21 years then?
22      A.   Why --
23      Q.   Why study a product beyond three years?
24      A.   Well, when it is studied after three

Bruce A. Rosenzweig, M.D.

Page 278

1 years, you will see that the efficacy will hold up.
2    Q.   But that hasn't been demonstrated in the
3 reliable scientific studies?
4    A.   The Okulu study has not been carried out
5 past three years.
6    Q.   And that has not been demonstrated in any
7 reliable scientific study that you are aware of in the
8 entire world, correct?
9    A.   The Okulu study has not been carried out
10 past three years.
11    MR. SNELL:  Move to strike.
12 BY MR. SNELL:
13    Q.   Can you answer my question yes or no?
14    A.   The Okulu study has not been carried out
15 past three years.
16    MR. CARTMELL:  That answers your question.  Move
17 on.
18    MR. SNELL:  So you can't say yes or no, okay.
19 Mark the record on this question.
20    MR. CARTMELL:  Can you tell us how long we've
21 been going, please?
22    THE COURT REPORTER:  Six hours and 10 minutes.
23 BY MR. SNELL:
24    Q.   In your opinion are there situations in

Page 279

1 which the TVT device should not be used which are not
2 identified in the contraindications in the IFU?
3    A.   What was known back in 1999 that it should
4 be used with caution in patients that have had prior
5 vaginal surgery, prior vaginal infections and vaginal
6 scarring.
7    Q.   You earlier mentioned Dr. Iakovlev, or I
8 think counsel did, in supplementing your answer.
9         Do you rely on Dr. Iakovlev, his expertise
10 in the review of pathology?
11    A.   Do I rely on his expertise?
12    Q.   Yes.
13    A.   In what respect?
14    Q.   For any opinions he has stated with regard
15 to pathology.
16    A.   Yes.
17    Q.   For example, let's go ahead and mark it so
18 we have a clear record then.
19    MR. CARTMELL:  You are going to mark his paper,
20 Iakovlev's paper that you have gone over with him
21 before?
22    MR. SNELL:  No, no, no.  I'm going to mark
23 Blaivas, Blaivas and Iakovlev.
24    MR. CARTMELL:  You've gone over that with him.

Page 280

1    MR. SNELL:  I haven't gone over that with him.
2 It was just published like a couple of weeks ago.
3 BY THE WITNESS:
4    A.   We already talked about that earlier
5 today.
6    MR. SNELL:  I didn't mark it.
7    MR. CARTMELL:  But you've talked about it.
8        (WHEREUPON, a certain document was
9         marked Rosenzweig Deposition Exhibit
10         No. 15, for identification, as of
11         09/22/2015.)
12 BY MR. SNELL:
13    Q.   That's been marked as what, Doctor?
14    A.   15.
15    Q.   I just want to do something real quick for
16 the record.  This is the paper that you and I earlier
17 discussed by Dr. Blaivas, Dr. Iakovlev and some
18 others, correct?
19    A.   Yes.
20    Q.   And this is something you've reviewed,
21 right?
22    A.   Yes.
23    Q.   Is this a paper that you are relying on
24 for your opinions?

Page 281

1    A.   It is a paper I've reviewed.
2    Q.   Okay.  So you are not relying on this
3 paper by Dr. Iakovlev and Blaivas and others for your
4 opinions?
5    MR. CARTMELL:  Object to the form.
6 BY THE WITNESS:
7    A.   For my opinions in my report?
8 BY MR. SNELL:
9    Q.   For your opinions, yes, in your report.
10    A.   I don't reference this in my report.
11    Q.   Okay.  Is there anything unreasonable that
12 I found in Dr. Blaivas and Iakovlev's report?
13    A.   No.
14    Q.   All right.  And part of that report goes
15 through histologic pictures and findings.
16        I guess my question for you is:
17        Would you rely on Dr. Iakovlev's analysis
18 of those histology and pathology findings?
19    A.   To describe what he found during those
20 histological?
21    Q.   Exactly.
22    A.   Yes.
23    Q.   Do you know why you weren't allowed to
24 be -- or asked to be on this paper?

Bruce A. Rosenzweig, M.D.

Page 282

1    A.   Why I --
2    Q.   Strike that.  I've lost something there
3 actually.
4         Were you asked to be an author to this
5 paper that we've marked as Exhibit 15?
6    A.   No.
7    Q.   Why not, do you know?
8    A.   I have no idea.
9    Q.   You've met Dr. Iakovlev, right?
10   A.   No, I have not.
11   Q.   Never?
12   A.   No.
13   Q.   Okay.  Fair enough.  I'm not going to ask
14 you any more about that one.
15        MR. CARTMELL:  Would you give me one of those?
16        MR. SNELL:  Did I give you one, yeah.  I should
17 have.  If not, there it is.  Let me just make sure it
18 doesn't have a bunch of highlights and notes on it.
19 15.
20        Let me take a break.
21        (WHEREUPON, a recess was had
22          from 6:05 to 6:11 p.m.)
23 BY MR. SNELL:
24   Q.   Just a couple of quick questions and then

Page 283

1 I'll let you go.
2         So I noticed one of your opinions was that
3 you were critical of the way that the TVT would be
4 tensioned?
5    A.   Yes.
6    Q.   And you've described that, so I don't want
7 to rehash it.
8         How would you recommend that the TVT would
9 be tensioned, or do you have an opinion on that?
10   A.   I think as I've stated in my report that
11 it is impossible to describe tensioning.  There have
12 been several different descriptions on how to tension
13 a device, such as putting an instrument between the
14 sling and the urethra using was the DeLevao method of
15 using a Babcock.  However, there -- there is always
16 going to be some element of tension on the sling once
17 you're done placing it inside the female vagina.
18   Q.   So if you are writing the IFU for TVT, you
19 wouldn't have any special language on tensioning of
20 the device?
21        MR. CARTMELL:  Object to the form.
22 BY THE WITNESS:
23   A.   Well, I would not be putting in that it is
24 tension-free.

Page 284

1         (WHEREUPON, Mr. Paul S. Rosenblatt
2           exited the deposition proceedings.)
3 BY MR. SNELL:
4    Q.   Describing how to carrying out the
5 tensioning or de-tensioning, what words would you use?
6    A.   No. 1, I would acknowledge that getting a
7 tension or putting it in would be impossible to
8 tension, to let the patient know that it is impossible
9 to tension the device, that if there is a -- problem
10 with over tensioning, that the device might need to be
11 incised or excised completely to treat their urinary
12 symptoms.  Even after removing the device or a piece
13 of the device, it might not treat their symptoms.
14        MR. SNELL:  I respectfully move to strike.
15 BY MR. SNELL:
16   Q.   Would you describe -- what words would you
17 use to tell the surgeon how to tension or de-tension
18 the device?
19   A.   Again, I would describe that it is
20 impossible to know exactly how much tension or lack of
21 tension there is on the device.  And to explain to the
22 doctor what the consequences are of not enough tension
23 or too much tension so that they can give that
24 information to the patient.  As I've described the way

Page 285

1 I do my pubovaginal slings, I tell my patients I am
2 putting this to give a degree of obstruction of their
3 urethra and that they run the risk of needing a future
4 operation to treat that so that the -- patient has
5 information that it might be impossible to exactly
6 know the right place under the urethra in the
7 midurethra to place the sling and, therefore, these
8 are the risks that are associated with that part of
9 the procedure.
10   Q.   So you wouldn't attempt in the IFU to say,
11 place the sling loosely at the midurethra, use some
12 type of blunt surgical instrument to make sure the
13 mesh is placed loosely?
14   A.   All of those -- you know, whether you use
15 a Babcock, whether you use a device, all of those have
16 to be acknowledged as giving a best estimate that they
17 are -- that it cannot be tensioned reliably, it CANNOT
18 be -- it is not going in tension-free, that it is not
19 tensioned when you need it, that this is a defect of
20 the device that you cannot appropriately tension the
21 device reliably, reproducibly, and that these are the
22 consequences of that, as I've stated in my report.
23        MR. SNELL:  I'm going to object.  I think that
24 was non-responsive again.  I'm just going to move on.

Bruce A. Rosenzweig, M.D.

Page 286

1 BY MR. SNELL:
2    Q.   Have you analyzed the literature and seen
3 any studies or do you know of data that reports on the
4 percentage of surgeons in the urogynecology or
5 gynecology field who rely upon an Instructions for
6 Use?
7    A.   Have I seen it published in a -- in an
8 article about the number of doctors that rely on
9 Instructions for Use?
10    Q.   Yes, the percentage of doctors, you know,
11 who rely or do not rely on the Instructions for Use?
12 And the reason I'm asking is you were involved in the
13 Lewis case, you know Dr. Boreham said, "I don't rely
14 on the IFU," right?
15    MR. CARTMELL:  Object to the form.
16 BY THE WITNESS:
17    A.   If I recall, that's what she testified to.
18 BY MR. SNELL:
19    Q.   Okay.  Fair enough.  So that's where my
20 question is coming from.
21       Have you seen actually any, you know,
22 data, any literature that's been peer reviewed or any
23 surveys put out by AUGS, AUA, SUFU or anybody else who
24 you would recognize as having an authoritative voice

Page 287

1 in the field of female pelvic medicine who have
2 presented that data that says, Okay, this is the
3 percentage of surgeons doing TVT retropubic or
4 synthetic midurethral slings who rely on IFUs?
5    A.   I don't think that study has been done.
6    Q.   And have you seen or are you aware of any
7 similar studies that report on how surgeons interpret
8 the adequacy of IFUs for stress incontinence devices?
9    A.   I have not seen any studies like that.
10    MR. SNELL:  Okay.  That's all I have.  Thank
11 you.
12       EXAMINATION
13 BY MR. CARTMELL:
14    Q.   I have a few follow-ups, Doctor.
15       You were just asked about your opinion
16 that's in your report related to tensioning of the
17 device.
18       Do you recall that?
19    A.   Yes.
20    Q.   Now, your opinion in this case, and it's
21 in your report, is that the TVT retropubic at issue in
22 this case is defective, correct?
23    MR. SNELL:  Objection; leading.
24 BY THE WITNESS:

Page 288

1    A.   That is correct.
2 BY MR. CARTMELL:
3    Q.   Do you have an opinion that the benefits
4 are outweighed by the risks?
5    MR. SNELL:  Same objection.
6 BY THE WITNESS:
7    A.   That is correct.
8 BY MR. CARTMELL:
9    Q.   So are you planning to offer an opinion
10 that you could rewrite the IFU in a way that would
11 make the product not defective?
12    A.   One of the ways to rewrite the IFU
13 today -- oh, specifically about --
14    MR. SNELL:  Don't interrupt him.  He is
15 answering your question.  I want to hear this answer.
16 Go ahead.
17 BY THE WITNESS:
18    A.   One of the ways to make the IFU not
19 defective is by adding all of the risks, known risks
20 and adverse events that are associated with the TVT
21 device that I have outlined in my report, including
22 frequency, severity, treatability and longevity of
23 complications.
24 BY MR. CARTMELL:

Page 289

1    Q.   Okay.  But my question is, are you
2 offering --
3    MR. SNELL:  I'm going to object that that's not
4 responsive to Tom's question.
5 BY MR. CARTMELL:
6    Q.   Are you offering an opinion that you could
7 rewrite the IFU with respect to tensioning and make
8 the product not defective?
9    A.   No.
10    Q.   Okay.  All right.
11       You were asked about whether or not in a
12 particular woman you could offer an opinion about
13 whether or not degradation caused an erosion or
14 complication.
15       Do you remember that?
16    A.   Yes.  I thought it was a particular woman
17 in a study, not a particular woman that I'm seeing in
18 my office.
19    Q.   You have offered testimony in the past,
20 and is your testimony in this case that in a
21 particular woman you can, in fact, make a
22 determination or offer an opinion regarding whether or
23 not degradation is leading to complications?
24    MR. SNELL:  Objection; leading.

Bruce A. Rosenzweig, M.D.

Page 290

1  BY THE WITNESS:
2      A.   Yes, you can feel that the mesh is firm,
3  hard, brittle.  You can look at it and see flaking and
4  fragmentation, and it can be examined under the
5  microscope to see cracking and fragmentation.
6  BY MR. CARTMELL:
7      Q.   You were asked whether or not there were
8  any prospective studies that actually have looked at
9  whether or not mesh in a sling is degrading and
10 causing erosions, I think, is that right?
11     A.   Yes.
12     Q.   Okay.  And I think you did talk about the
13 Wang study, is that right?
14     MR. SNELL:  Objection; leading.
15 BY THE WITNESS:
16     A.   That is correct.
17 BY MR. CARTMELL:
18     Q.   Now, and I think you said that maybe there
19 are no other prospective studies that discuss that.
20         What is your understanding of why is that
21 that you don't believe a randomized controlled
22 prospective study to look at whether or not mesh is
23 degrading and causing erosions has been done?
24     MR. SNELL:  Objection; leading, lacks

Page 291

1  foundation.  Go ahead.
2  BY THE WITNESS:
3      A.   Well, that would necessitate taking mesh
4  out of asymptomatic women and that would be a very
5  difficult study to do.  It would be questionable,
6  ethical about operating on someone that is
7  asymptomatic, to take a piece of their sling out who
8  are not having complications from it.
9          But there is a wealth of studies that have
10 looked at women that have complications, looked at
11 their mesh under the microscope and have seen
12 degradation that has caused the complications that
13 they now have.
14 BY MR. CARTMELL:
15     Q.   So are there a wealth, as you say, of
16 studies that have looked at actual mesh that has been
17 removed from women's bodies to see if, in fact, the
18 mesh is degrading?
19     A.   That is correct.
20     Q.   And you've identified all of those in your
21 report, correct?
22     A.   That is correct.
23     Q.   Or in the reliance list?
24     A.   On my reliance list, yes.

Page 292

1      Q.   And those are prospective in nature, is
2  that right?
3      MR. SNELL:  Objection; leading, misstates.
4  BY MR. CARTMELL:
5      Q.   Or excuse me.
6      MR. SNELL:  Misstates as well.
7      MR. CARTMELL:  I misstated that.
8  BY MR. CARTMELL:
9      Q.   Those are retrospective, is that correct?
10     A.   That is correct.
11     Q.   And, in fact, are there multiple studies
12 now and papers that have discussed that in women who
13 have pain, including dyspareunia or erosions, doctors
14 have then and pathologists have then removed the mesh
15 to determine whether or not there is degradation of
16 the mesh?
17     A.   Yes.
18     MR. SNELL:  Form, leading.
19 BY MR. CARTMELL:
20     Q.   And are there studies that you have cited
21 to in your report and that you have referred to on
22 your reliance list that actually have looked at and
23 found that women who are having pain and erosions
24 have a high rate of mesh that has degraded and

Page 293

1  deformed, roped, curled, folded mesh, those types of
2  things?
3      MR. SNELL:  Objection; form, and leading.  Go
4  ahead.
5  BY THE WITNESS:
6      A.   Yes.
7  BY MR. CARTMELL:
8      Q.   And are those papers papers that you rely
9  on and that you were not asked about today but they
10 are in your report and on your reliance list?
11     A.   Yes, that's correct.
12     MR. SNELL:  Same objections.
13 BY MR. CARTMELL:
14     Q.   You said when you were asked about whether
15 there is a specific prospective study in women who
16 were receiving mesh slings that have found
17 cytotoxicity was causing erosions, you said, erosions
18 are -- what did you say?
19     A.   Well, erosion is evidence of cell death
20 which is cytotoxicity.
21     Q.   Why did you say that in response to the
22 question by --
23     A.   Well, that is objective --
24     MR. SNELL:  Form.  Go ahead.

Bruce A. Rosenzweig, M.D.

Page 294

1 BY THE WITNESS:
2    A.   -- evidence that cytotoxicity took place,
3 that the cells around either the vagina or the urethra
4 were killed by the cytotoxic event so that now the
5 mesh is either exposed in the vagina, in the bladder
6 or in the urethra.
7 BY MR. CARTMELL:
8    Q.   So are there prospective studies in women
9 who have had mesh, mesh slings inserted that show
10 evidence of cytotoxicity?
11    MR. SNELL:  Form.
12 BY THE WITNESS:
13    A.   Yes.  Every study that talks about mesh
14 erosion either into the vagina, urethra or bladder is
15 documenting cytotoxicity.
16 BY MR. CARTMELL:
17    Q.   So why then when you were asked whether or
18 not there are prospective studies that have discussed
19 cytotoxicity in women who have had slings and whether
20 they cause erosions, why did you say no?
21    A.   Well, they do not use the word
22 "cytotoxicity".
23    MR. CARTMELL:  Okay.  Thank you.  That's all I
24 have.

Page 295

1       FURTHER EXAMINATION
2 BY MR. SNELL:
3    Q.   You just said that every study where mesh
4 exposure is reported documents cytotoxicity, is that
5 correct?
6    A.   Yes.
7    Q.   And what's your methodology for the
8 statement that every mesh exposure is due to
9 cytotoxicity?
10    A.   I will --
11    Q.   Because that's a misstatement?
12    A.   I will clarify my answer or amend my
13 answer.
14       After the vaginal wall has healed, any
15 mesh exposure is evidence that cell death has occurred
16 which is cytotoxicity.
17    Q.   Okay.  And which of those studies report
18 that there was actual necrotic tissue?
19    A.   That was not associated with a pathology
20 report?
21    Q.   Right.
22    A.   If they didn't report a pathology report,
23 then they more likely than not would not have reported
24 necrosis.  Now, the necrosis could have already

Page 296

1 happened and the signs of necrosis have been
2 subsequently disappeared and all you are left with is
3 the defect where living tissue had been before and the
4 mesh is now exposed.
5    Q.   In what percentage of exposures does that
6 mechanism you just spoke to occur?
7    A.   Well, if in all of the ones where you see
8 an exposure, okay.  Now, if you see active necrosis,
9 then that is a cytotoxicity that is happening more
10 contemporaneously with the exposure.  Many times
11 patients don't come in once their exposure is acutely
12 occurring, and so you would see the old evidence of
13 cytotoxicity, which is exposure, meaning the cells
14 have died remote and all you are left with is the
15 stigmata of the cell death.
16    Q.   In what percentage of exposures that occur
17 is active necrosis found?
18    A.   From my clinical experience, I've seen
19 active necrosis in a third to a half of mesh
20 exposures.
21    Q.   In the medical literature, what percentage
22 of mesh exposure cases are found to be from active
23 necrosis?
24    A.   I -- that word "active necrosis" is not

Page 297

1 described in the -- in many studies.
2    Q.   In the medical literature --
3    A.   Now, there are retrospective reviews such
4 as pathology studies that talk about whether there is
5 active necrosis or if that there is signs of necrotic
6 tissue, but we would have to pull out each individual
7 retrospective review on mesh explants to be able to
8 say whether by the time the pathologist got there they
9 saw necrosis.
10    Q.   You haven't put in your report what those
11 pathology series showed with regard to the rate of
12 active necrosis, correct?
13    A.   No, I have not.
14    Q.   All right.  I believe you earlier said,
15 too, that -- in response to Mr. Cartmell's question
16 that there were studies that reported that women had
17 complications and the authors found some degradation.
18 And I think you were referring to, again, the Clave
19 paper?
20    MR. CARTMELL:  Objection; form.
21 BY THE WITNESS:
22    A.   Could you repeat that, please?
23 BY MR. SNELL:
24    Q.   Sure.  Maybe I'm unclear.

Bruce A. Rosenzweig, M.D.

Page 298

1    What were you referring to, what studies
2 or data, when you told Mr. Cartmell that in women who
3 have complications you know it's from the degradation?
4    MR. CARTMELL: Object to the form. It misstates
5 the testimony.
6 BY THE WITNESS:
7    A.   The studies that are on my reliance list
8 that describe the pathological specimens. We
9 discussed Clave, we discussed Zimmer, we discussed --
10 there are papers by Iakovlev and others that describe
11 degradation associated with the review of the
12 specimens that show degradation.
13 BY MR. SNELL:
14    Q.   In none of those papers did they remove
15 mesh from a cohort of women who didn't have any
16 complications to see whether this cracking would be
17 found in them too, correct?
18    A.   That is correct, and that would be, as I
19 responded to Mr. Cartmell's question, that would be a
20 difficult study to perform.
21    Q.   So this cracking could be seen out there
22 in women who do not have complications, correct?
23    A.   That is correct. But that doesn't mean
24 that they are not going to have complications.

Page 299

1    Q.   You said that you could tell if
2 degradation -- strike that.
3       Did you tell Mr. Cartmell that you
4 could -- strike that.
5       Did you tell Mr. Cartmell that if a woman
6 had an exposure you could ascertain whether it was
7 caused by degradation as compared to all of the other
8 potential causes and patient factors and surgeon
9 factors if you felt that the mesh was firm, hard,
10 brittle, flaking or cracking?
11    A.   That is degradation, yes.
12    Q.   No. I'm asking you, in a particular
13 woman, if you see that the mesh is firm, hard,
14 brittle, flaking or cracking, you assumed that that
15 exposure is because of degradation?
16    A.   That is degradation, yes.
17    Q.   Is the answer -- I just want to make sure
18 I get a yes or no.
19    A.   And that degradation was either the
20 primary cause or one of the causes of that woman's
21 exposure.
22    Q.   And what methodology would allow you to
23 say whether it was the primary or secondary cause?
24    A.   The methodology that I am seeing a

Page 300

1 complication, that these complications were reported
2 in the literature, that when you see a complication of
3 erosion, pain, dyspareunia and the mesh is explanted
4 that there is degradation that's going on. So with a
5 reasonable degree of medical certainty that
6 degradation played the primary or a contributory
7 factor in the complication that the woman had.
8    Q.   And in the women who in the studies
9 reported complications yet there was no degradation or
10 cracking seen, how do you factor that into your
11 methodology?
12    A.   Well, then that would be a complication
13 that was caused by contraction, chronic foreign body
14 reaction, chronic inflammation, roping, fraying,
15 curling, one of those other causes which can lead to
16 complications from a defective product.
17    Q.   If you saw cracking and flaking, that
18 would be -- then you would think the exposure is due
19 to degradation?
20    A.   That is correct.
21    Q.   Regardless of inflammation or all of these
22 other factors that you are out there seeing?
23    A.   Well, there is inflammation that was going
24 on because you have a degraded product, you are having

Page 301

1 an increase in chronic foreign body reaction. This is
2 a circular process that the degradation is increasing
3 the chronic foreign body reaction. It is increasing
4 the surface area of the mesh that is leading to
5 further degradation.
6    Q.   Do any of the IFUs for stress urinary
7 incontinence devices set forth for all of the
8 different potential complications the frequency,
9 severity and longevity?
10    A.   Do?
11    MR. SNELL: Can you read it back, Madam Court
12 Reporter.
13       (WHEREUPON, the record was read
14        by the reporter as requested.)
15 BY THE WITNESS:
16    A.   There is references to the longevity of
17 certain complications, such as transient foreign body
18 reaction, transient local inflammation, but
19 specifically to the extent of telling what the
20 frequency is of individual complications and severity
21 of individual complications, the longevity and
22 treatability of individual complications, those have
23 not been described in the TVT IFUs.
24    MR. SNELL: Move to strike. My question went

Bruce A. Rosenzweig, M.D.

Page 302

1 beyond the TVT IFU.
2        Can you read the question back?
3        MR. CARTMELL:  Are you asking about other
4 products?
5        MR. SNELL:  Yes, for any -- you have to listen
6 to the question.
7        MR. CARTMELL:  You didn't say anything about
8 other products.
9        MR. SNELL:  Okay.  Well, just -- can you read
10 the question back?
11        (WHEREUPON, the record was read
12         by the reporter as requested.)
13 BY THE WITNESS:
14    A.   For the TVT, TVT-O, TVT-Secur, TVT
15 Abbrevo, no.
16 BY MR. SNELL:
17    Q.   For all of the other stress incontinence
18 devices?
19        MR. CARTMELL:  Other manufactures?
20 BY MR. SNELL:
21    Q.   Other manufactures, do you know whether or
22 not they state the frequency, severity --
23        MR. CARTMELL:  If you know exactly what all of
24 the others say, then you can answer.  If you don't

Page 303

1 know, don't speculate.
2 BY THE WITNESS:
3    A.   I will not speculate on all of the other
4 IFUs.
5 BY MR. SNELL:
6    Q.   You don't know as you sit here today,
7 correct?
8    A.   I know about the ones that I've described
9 before.
10    Q.   Can you just answer my question yes or no?
11 I'm literally looking for an honest answer.  Can you
12 as you sit here today tell me that other
13 manufacturers' stress incontinence IFUs report
14 frequency, severity, treatability and longevity for
15 complications associated with their stress
16 incontinence devices, yes or no?  That's all I want no
17 know.
18    A.   Each individual complication?
19    Q.   Yes, sir.
20    A.   The ones I have seen, no.
21        MR. CARTMELL:  You are now going beyond the
22 scope of my cross with questions like that which is
23 not allowed, so I'm about to shut you down.
24        MR. SNELL:  No, no.  He went into frequency,

Page 304

1 severity.  I'm circling back around.
2        MR. CARTMELL:  I didn't ask him about IFUs.
3 BY MR. SNELL:
4    Q.   Now, if you don't feel in a particular
5 woman that the mesh is firm or hard or brittle,
6 flaking or cracking, if you don't feel that or if it's
7 not described, then one can't reliably say
8 scientifically that her exposure was due to
9 degradation, correct?
10        MR. CARTMELL:  Object, misstates his prior
11 testimony.  He has talked in multiple depositions
12 about degradation.  You are getting into things we've
13 already talked about.  He has given testimony on
14 degradation at trial and on that exact same subject of
15 whether or not --
16        MR. SNELL:  You've reopened all of this stuff up
17 with your like these big, broad, sweeping questions
18 that you do in your direct.
19        MR. CARTMELL:  No.
20 BY MR. SNELL:
21    Q.   All right.  Let me make it more simple
22 then.  I'm going to focus on Mr. Cartmell's question
23 and your answer.
24        In a particular woman where you don't feel

Page 305

1 that the mesh is firm, hard, brittle, flaking or
2 cracking but she has an exposure, how do you determine
3 what is the cause of that exposure?
4        MR. CARTMELL:  Same objection.  He has testified
5 to that multiple times at other trials and other
6 depositions about how he goes about determining what
7 the specific cause is of an erosion.  That's been gone
8 over multiple times.
9        MR. SNELL:  No.
10        MR. CARTMELL:  Yes.
11        MR. SNELL:  When has he gone over that?
12        MR. CARTMELL:  He has gone over it at trial.
13 You've said multiple times in depositions you can't
14 tell whether it's the roping or the curling or the
15 fraying or the degradation.
16        MR. SNELL:  He answered my question and now he
17 is changing his answer.
18        MR. CARTMELL:  No, he is not.
19        MR. SNELL:  Yes, he is.
20        MR. CARTMELL:  What you are doing is you are
21 trying to ask it multiple times to try to get a
22 different answer.
23        MR. SNELL:  No, I'll withdraw that question and
24 we'll see.

Bruce A. Rosenzweig, M.D.

| Page 306 |
| --- |

1  BY MR. SNELL:
2      Q.   I can rely on prior statements you've
3  made, correct?
4      A.   Yes, sir.
5      Q.   Fair enough.
6      MR. SNELL:  That's it.  Let's shut it down.
7          (Time Noted:  6:39 p.m.)
8          FURTHER DEPONENT SAITH NOT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| Page 307 |
| --- |

1          REPORTER'S CERTIFICATE
2      I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
3  a Certified Shorthand Reporter, do hereby certify:
4          That previous to the commencement of the
5  examination of the witness herein, the witness was
6  duly sworn to testify the whole truth concerning the
7  matters herein;
8          That the foregoing deposition transcript
9  was reported stenographically by me, was thereafter
10  reduced to typewriting under my personal direction and
11  constitutes a true record of the testimony given and
12  the proceedings had;
13          That the said deposition was taken before
14  me at the time and place specified;
15          That I am not a relative or employee or
16  attorney or counsel, nor a relative or employee of
17  such attorney or counsel for any of the parties
18  hereto, nor interested directly or indirectly in the
19  outcome of this action.
20          IN WITNESS WHEREOF, I do hereunto set my
21  hand on this 24th day of September, 2015.
22
23
24          JULIANA F. ZAJICEK, Certified Reporter

| Page 308 |
| --- |

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.  It will be
10  attached to your deposition.
11          It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24

| Page 309 |
| --- |

1          - - - - - -
          E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5      REASON:  _____
6  ____  ____  _____
7      REASON:  _____
8  ____  ____  _____
9      REASON:  _____
10  ____  ____  _____
11      REASON:  _____
12  ____  ____  _____
13      REASON:  _____
14  ____  ____  _____
15      REASON:  _____
16  ____  ____  _____
17      REASON:  _____
18  ____  ____  _____
19      REASON:  _____
20  ____  ____  _____
21      REASON:  _____
22  ____  ____  _____
23      REASON:  _____
24  ____  ____  _____

Bruce A. Rosenzweig, M.D.

Page 310

1     ACKNOWLEDGMENT OF DEPONENT
2
            I,_____, do
3   hereby certify that I have read the
    foregoing pages, and that the same
4   is a correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7

    _____
8   BRUCE A. ROSENZWEIG, M.D.        DATE
9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24

Page 311

1         LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____