IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327<br>MDL 2327 |
| THIS DOCUMENT RELATES TO:<br><br>WAVE 3 CASES<br>LISTED IN EXHIBIT A TO PLAINTIFFS' NOTICE OF ADOPTION | JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE |

**RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF MARIA ABADI, M.D.**

Ethicon, Inc.; Ethicon, LLC; and Johnson & Johnson (collectively, "Ethicon"), submit this response to Plaintiffs' Notice of Adoption of Prior Daubert Motion of Maria Abadi, M.D. for Wave 3 [Dkt. 2795] (adopting Dkt. 1992 (motion) and Dkt. 1993 (memorandum in support)).

**INTRODUCTION**

Dr. Maria A. Abadi, M.D. has been a Board-Certified Anatomic Pathologist and Board-Certified Cytopathologist for nearly 20 years, having completed two fellowships, the first in Gynecological/Surgical Pathology and the second in Cytopathology. *See* Pls.' Motion Ex. C, Abadi Expert Report at 1 [Dkt. 1992-3, p. 3]. Dr. Abadi oversees an average of 13,000 surgical pathology and 15,000 cytopathology specimens per year, of which 60 percent are gynecologic cases. *See id*.

In Wave 1, the Court excluded Dr. Abadi's opinions that critique the opinions of Plaintiffs' expert Dr. Vladimir Iakovlev on reliability grounds. *See In re: Ethicon Inc. Pelvic*

*Repair Sys. Prod. Liab. Litig.*, 2016 WL 4493501, at *2-3 (S.D. W. Va. Aug. 25, 2016).[1] Ethicon respectfully submits that opinion should be reconsidered here for two primary reasons.

First, in its Wave 1 opinion, the Court appeared to accept as true Plaintiff's false statement that Dr. Abadi's opinions are based on her personal review of five mesh samples. *See In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4493501, at *3. As made clear in Dr. Abadi's deposition, her opinions are also based solely on her review of other mesh samples in her clinical practice. Specifically, she testified she has seen **two to three polypropylene pelvic meshes per year, for the last ten years**, in her clinical practice, *outside* the litigation context. Ex. A, 3/29/2016 Abadi Dep. at p. 28:16-22; 170-71. Thus, the actual number of pelvic meshes Dr. Abadi reviewed in her clinical practice prior to becoming involved in this litigation is 20-30, not five. Further, Dr. Abadi explained that in addition to the 20-30 pelvic meshes she has reviewed, she has also reviewed polypropylene hernia meshes in her clinical practice. *Id*. at 171-72. And finally, Dr. Abadi explained that she has reviewed more than a 1,000 pathology samples containing sutures, many of which were made of polypropylene, which also show the same inflammatory response as pelvic mesh made from polypropylene. *Id.* at 171:5-15. This review fully supports Dr. Abadi's opinion that the human body's inflammatory response to polypropylene is the same regardless of where it is implanted. *See id*. at 170:24-171:4.

Second, Dr. Abadi's opinions are not based *solely* on her review of mesh samples. She also bases her opinions on the sources listed in the bibliography of her report. *See* Exhibit C at pp. 13-15; *see also* 3/29/2016 Deposition of Dr. Abadi at 168:23-170:5. Thus, even if the Court

---

[1] In Wave 1, the Court excluded the opinions on pages 7-13 of Dr. Abadi's Report. *See In re: Ethicon, Inc.*, 2016 WL 4493501, at *3. This appears to be an error, mirroring Plaintiff's typographical error in their Motion. [Dkt. 1992, p. 3]. Plaintiffs' motion appears to be directed at Dr. Abadi's opinions on pages 9-13 of her report, not pages 7-13.

should find Dr. Abadi's reliance on mesh samples unreliable, the Court should still assess the reliability of Dr. Abadi's opinions in light of the cited literature. In addition, Dr. Abadi's opinions do not consist simply of her own opinions about the mesh, but rather serve as rebuttal to Dr. Iakovlev's opinions by application of basic principles in the field of pathology. At Appendix B to her Report [Dkt. 1992-3, pp. 31-33], Dr. Abadi specifically outlines her criticisms of Dr. Iakovlev's interpretations of the slide photographs.

For these reasons, and as described further below, Plaintiffs' Motion to Exclude the Opinions and Testimony of Maria Abadi, M.D. should be denied.

## ARGUMENT

### I. Legal standard

Ethicon incorporates by reference the standard of review for Daubert motions articulated by the Court in *Edwards v. Ethicon, Inc.*, No. 2:12-CV-09972, 2014 WL 3361923, at **1–3 (S.D. W. Va. July 8, 2014). Under Federal Rule of Evidence 702, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

### II. Plaintiffs' motion should be denied.

Plaintiffs make three arguments that Dr. Abadi's testimony should be excluded. First, that she is unqualified to offer any opinions regarding Prolene Soft mesh, related tissue response, or its medical sequalae. Pls.' Memorandum [Dkt. 1993] at 3. Second, that the basis for her opinions regarding tissue response are limited to five explant samples she received from Ethicon's counsel in this litigation, and therefore, her opinions regarding tissue response to Prolene Mesh are unreliable and irrelevant. *Id*. at 5–9. Third, that due to her "limited mesh experience" she cannot critique Dr. Iakovlev's methodology. *Id*. at 7–9. Each of these arguments is without merit.

### A. Dr. Abadi is qualified to render her opinions here.

Plaintiffs argue that Dr. Abadi is unqualified to testify in this litigation because she has only reviewed five mesh samples, handpicked by Ethicon's counsel. *Id.* at 1, 5. As an initial matter, this is simply untrue. Furthermore, it is a gross distortion of Dr. Abadi's qualifications. In its Wave 1 ruling, the Court did not reach the issue of Dr. Abadi's qualifications. *See In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4493501, at *3 (S.D. W. Va. Aug. 25, 2016).

### 1. Dr. Abadi's qualifications include not only two fellowships, but also include vast clinical experience in gynecologic pathology and numerous scientific publications in peer-reviewed journals.

Dr. Maria A. Abadi, M.D., is a Board Certified Anatomic Pathologist and Board Certified Cytopathologist. See Ex. A, Abadi 3/29/16 Dep. Tr. 21:11–22:15. Dr. Abadi obtained her medical degree from the "Luis Razetti" School of Medicine in Venezuela in 1990, and was the Chief Resident in Anatomic Pathology at the Albert Einstein College of Medicine from 1994 to 1995. Unlike Dr. Iakovlev, who has no specialized training in gynecological pathology, Dr. Abadi completed a fellowship in Gynecological/Surgical Pathology at the Albert Einstein College of Medicine from 1995 to 1996, and completed a second fellowship in Cytopathology at the Memorial Sloan-Kettering Cancer Center from 1996 to 1997. *See* Ex. B, Curriculum Vitae of Dr. Abadi at 1.

Dr. Abadi is currently the Vice Chair of the Pathology Department at Jacobi Medical Center. *See* Pls.' Motion Ex. C, Abadi Expert Report at 1 [Dkt. 1992-3, p. 3]. She currently serves as Director of Surgical Pathology and Cytopathology laboratories at Jacobi Medical Center, Albert Einstein College of Medicine, Bronx, New York. *See* Ex. A, Abadi 3/29/16 Dep. Tr. 14:19–15:1. In this capacity, she oversees an average of 13,000 surgical pathology and 15,000 cytopathology specimens per year, of which 60 percent are gynecologic cases. *See* Abadi Expert Report at 1 [Dkt. 1992-3, p. 3]. Dr. Abadi also serves as a Professor in the Pathology

4

Department and an Associate Professor in the Department of Obstetrics and Gynecology and Women's Health at the Albert Einstein College of Medicine. *See* Ex. B, Curriculum Vitae of Dr. Abadi at III. In addition to her clinical work as a pathologist, she is also a published research scientist, and has published 29 peer-reviewed scientific articles. *See id.* at VIII–XI.

>    **2.  Based on her extensive education, experience, knowledge, training, and skill Dr. Abadi is qualified to provide all the opinions in her report.**

Plaintiff's argument is based upon a faulty premise—that a pathologist must be a "mesh pathologist" to render an opinion regarding the body's reaction to mesh. This is simply false. Pathologists review tissue slides every day to determine the body's reaction to foreign bodies. The process by which this assessment is made is the same regardless of the composition of that particular foreign body.

During the course of this MDL, this Court has repeatedly found pathologists to be qualified to provide testimony regarding their findings related to pathology without specific expertise as to the material characteristics of mesh. *See, e.g., Frankum v. Bos. Sci. Corp.*, No. 2:12-CV-00904, 2015 WL 1976952, at *24 (S.D.W. Va. May 1, 2015) (anatomical and clinical pathologist qualified to testify about pathology of mesh material despite lack of training in polymer science or testing of mesh products). Similarly, in the *Bellew* case, plaintiffs raised the identical challenges to Ethicon's expert, Dr. Stanley Robboy. Op. at 37–41, *Bellew v. Ethicon, Inc.*, No. 2:13-cv-22473, Doc. 265 (S.D.W. Va. Nov. 20, 2014). In that case, plaintiffs also claimed that a nationally prominent, fellowship trained gynecological pathologist was unqualified because he "didn't have pelvic mesh experience" and the experience he did have was derived though litigation. *Id.* at 37. This Court rejected the challenge to Dr. Robboy, finding that his testimony was permissible because he had done the following things:

- His opinions were based upon his professional experience gained through his clinical practice.
- He reviewed the plaintiffs' medical records.
- He reviewed the explant samples both grossly and microscopically.

This is exactly what Dr. Abadi did in this case. She formulated her pathology opinions using the standard methods employed by pathologists. Specifically, she examined pathological slides and identified the presence or absence of certain features, which is the precise methodology pathologists follow in their practice. *See Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 532 (S.D.W. Va. 2014) (explaining that a pathologist used "reliable pathology methods" where "he reviewed slides, considered the possible causes[], and came to a diagnostic conclusion").

### B. Dr. Abadi's opinions are reliable.

The crux of Plaintiffs' argument is that Dr. Abadi is both not qualified and her opinions unreliable because her opinions are based solely on her review of five mesh explants. Pls.' Memorandum [Dkt. 1993] at 5. In its Wave 1 Order, the Court appeared to accept this representation. *See In re: Ethicon, Inc.*, 2016 WL 4493501, at *3 ("Dr. Abadi's deposition testimony reveals she based her opinions about the tissue response to mesh on her personal review of five explanted samples.").

There are two major flaws with this argument: (1) Dr. Abadi's experience with mesh extends far beyond her review of the five explant samples given to her by counsel, and (2) Dr. Abadi's opinions are not *solely* based on her review of mesh samples, but rather also rely on medical literature and basic principles of pathology. Her opinions are reliable and should be admitted.

### 1. Plaintiffs' argument that Dr. Abadi has only reviewed five mesh samples from counsel is incorrect.

The assertion that Dr. Abadi has only reviewed five mesh samples is simply untrue. Dr. Abadi's actual testimony was that she has seen two to three polypropylene pelvic meshes per year, for the last ten years, in her clinical practice. Ex. A, Abadi 3/29/16 Dep. Tr. 170–71. Thus, the actual number of pelvic meshes Dr. Abadi reviewed in her clinical practice prior to becoming involved in this litigation was 20 to 30, not five.

In addition to these 20 to 30 pelvic meshes, Dr. Abadi has also reviewed polypropylene hernia meshes in her clinical practice. *Id*. at 171−72. She has also reviewed more than a 1,000 pathology samples containing sutures, many of which were made of polypropylene and demonstrate the same inflammatory response as pelvic mesh made from polypropylene. *Id*. at 171:5–15.

### 2. Dr. Abadi's opinions are reliable and are not based solely on her review of the explant samples provide to her by counsel.

Plaintiffs' assertion that Dr. Abadi bases her opinion "entirely" on reviewing five explanted meshes given to her by defense counsel is simply false. Dr. Abadi reviewed and relied upon a number of sources and publications in preparing her report, including the 25 items listed in the bibliography of her report. *See* Pls.' Motion Ex. C, Abadi Expert Report at 13−15; *see also* Ex. A, Abadi 3/29/16 Dep. Tr. 168:23–170:5. And the nature of her testimony is not simply to offer opinions about the Prolene mesh, but to criticize Dr. Iakovlev's pathology methodology.

Though Dr. Abadi first indicated in her deposition that her tissue response opinion was based on her review of five samples, Ex. A, Abadi 3/29/16 Dep. Tr. at 75:15-77:3, she later clarified that this opinions was based not *solely* on her review of the five samples, but also on her experience with polypropylene mesh in her clinical practice. Dr. Abadi testified:

> Q. Mr. Perdue asked you a number of questions in which he characterized your experience in reviewing pelvic meshes as only having seen a handful of pelvic meshes. In fact, you have seen somewhere between 20 and 30 in your clinical practice, didn't you?

7

> A. Yes, I have.
>
> Q. Have you also seen hernia meshes?
>
> A. Yes, I have seen hernia meshes.
>
> Q. For how long?
>
> A. For the 20 years that I have been practicing.
>
> Q. And is your opinion also based upon your experience in the foreign body response to those hernia meshes?
>
> A. Yes. My opinions are based on what is my experience on foreign body reaction, not only related to the mesh, the pelvic meshes, but in general. Hernias, foreign bodies, sutures, et cetera.

Ex. A, Abadi 3/29/16 Dep. Tr. 170:6-171:4 (counsel's objections omitted).

Indeed, figures 5, 6, and 7 in Appendix A of Dr. Abadi's report include images of polypropylene sutures which are not part of this litigation, included to demonstrate that the body's reaction to the polypropylene is similar, whether mesh or suture. *See* App'x A to Abadi Report [Dkt. 1992-3, pp. 22-24]; *see also* Ex. A, Abadi 3/29/16 Dep. at 156:3-157:22 (testifying that the suture sample was "independent from Ethicon, just to illustrate that the reaction for the suture is the same as the same mesh").

Further, even if it were true that Dr. Abadi's tissue response opinion was based solely on her review of the five samples (which it is not), that would not be grounds for excluding the entirety of Dr. Abadi's opinions on pages 9-13 of her Report.  Dr. Abadi's opinions do not consist entirely of opinions about the tissue response to mesh.  Rather, as made clear in her report and deposition, Dr. Abadi offers detailed and specific criticisms of Dr. Iakovlev's methodology and conclusion applying fundamental precepts of pathology.

In its Wave 1 Order, the Court found that Dr. Abadi alluded to her review of Dr. Iakovlev's photographs "without providing any qualitative or quantitative information about the slides she reviewed . . . ." **To the contrary, at Appendix B to Dr. Abadi's report, she outlines in detail her critiques of Dr. Iakovlev's methodology on a slide-by-slide basis [Dkt. 1992-3,**

8

**pp. 31-33]**. These opinions are not entirely mesh-specific, and thus are not solely derived on Dr. Abadi's review of mesh samples, but rather involve the application of basic pathology principles.

More specifically, Dr. Abadi will inform the jury that it is impossible for a pathologist to conclude that a particular finding caused clinical complications in a patient based solely on a review of pathologic slides. Dr. Iakovlev's assertions that he can make such causal conclusions have no basis in the field of pathology. *See, e.g.*, Ex. C, Susan Lester, Manual of Surgical Pathology 3 (2010) ("It has been shown that pathologists cannot accurately predict clinical information from the glass slides alone."). In short, Dr. Abadi's testimony will demonstrate that Dr. Iakovlev's analysis is methodologically flawed and inaccurate.

In her Report, Dr. Abadi explains at length the basis for her opinion in regard to each area in which she attacks Dr. Iakovlev's methodology: (1) pain and nerve damage, Pls.' Motion Ex. C, Abadi Expert Report at 9–10 [Dkt. 1992-3]; (2) mesh stiffening, contraction, and shrinkage, *id*. at 10; (3) deformation and mesh migration, *id*. at 9–10; (4) polypropylene degradation, *id*. at 11–12; (5) degenerative calcifications, *id*. at 12; and (6) mucosal erosion and tissue edema, *id*. at 12. Dr. Abadi also points out numerous errors in the photographs Dr. Iakovlev uses to support his faulty methodology on these topics. *See* Pls.' Motion Ex. C, Abadi Expert Report, at App'x B (critiquing photo sets 1(a) through 20(b)) [Dkt. 1992-3, pp. 31-33].

With respect to Dr. Iakovlev's opinions that pelvic mesh causes pain and nerve damage, Dr. Abadi explains that the presence of inflammatory cells or scar tissue does not correlate with pain. *See* Pls.' Motion Ex. C, Expert Report at 9 [Dkt. 1992-3, p. 11]; *see also* Hill et al., Histopathology of excised midurethral sling mesh, 26 Int'l Urogynecology J. 591–595 (2015) (referenced in Dr. Abadi's bibliography at 14, attached as Ex. D). She further explains why the histological examination of explanted mesh material does not correlate with the pain that is (or is

not) experienced by the patient. *See* Pls.' Motion Ex. C, Abadi Expert Report at 9 [Dkt. 1992-3, p. 11]. She also points out the flaws in Dr. Iakovlev's use of pathological stains to identify nerves, particularly his extrapolation of findings from H&E and S-100 stains, and explains that these stains cannot identify nerve receptors and, therefore, do not permit a pathologist to draw the conclusions asserted by Dr. Iakovlev. *Id*. at 9–10. Furthermore, she explains that Dr. Iakovlev draws conclusions about nerves in histological slides based upon their appearance post-processing, which, of course, is markedly different than their appearance in vivo. *Id*. at 10; *see also id*. at App'x B, critique of fig. sets 3 & 4. Dr. Abadi also criticizes Dr. Iakovlev's conclusions for lacking any comparison to a control, which was the basis for this Court's exclusion of Dr. Iakovlev's opinion in Wave 1. *See id.* at 11; *see also In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2327, 2016 WL 4582228, at *1 (S.D. W. Va. Sept. 1, 2016).

The bases for Dr. Abadi's opinions in the remaining five areas in which she critiques Dr. Iakovlev's methodology are also spelled out in her report at pages 10 through 12 and Appendix B. In regard to mesh "stiffening, contraction and shrinkage" she explains that mesh contraction is caused by the normal processes of wound healing and not an alleged defect in the mesh as claimed by Dr. Iakovlev. Pls.' Motion Ex. C, Abadi Expert Report at 10.

In regard to alleged "Deformation and Mesh Migration," Dr. Abadi points out the difference between the histological presentation of the mesh post-explantation and explains why it cannot be used to draw conclusions about the qualities of the mesh in vivo. Obviously, once the mesh has been excised by cutting and/or cauterization by the explanting surgeon and then treated with chemicals to preserve the sample, the mesh is no longer in the same condition as it was in vivo. Yet, Dr. Iakovlev presents pictures of the explanted mesh and uses these pictures to draw conclusions about its in vivo characteristics. *See id.* at 10–11; *see also id*. at Appendix B,

critique of fig. sets 10 & 11. Dr. Abadi explains that in most of Dr. Iakovlev's slides the mesh isn't even present, having been removed by the cutting blade during the microtoming process. Abadi Expert Report at 11. Because the mesh is not even present, Dr. Iakovlev uses Photoshop to highlight his pictures and pretend that they display mesh when they do not. Dr. Iakovlev's contention that he can look at a pathology slide and infer that mesh curled or deformed in the human body prior to explantation is baseless.

As an initial matter, Dr. Iakovlev fails to follow the standard methodology used by pathologists for determining how a specimen is oriented in the human body. Additionally, as Dr. Abadi explained in her deposition testimony, there is a process by which surgeons and pathologists can position tissue as it was oriented in vivo. This involves tagging the tissue to show its orientation and then the pathologist pins the tissue to a board to ensure that its orientation remains the same during tissue processing To ascertain how a specimen was oriented in vivo, a pathologist must (i) identify anatomical landmarks and (ii) consult markers provided by the explanting surgeon. Ex. E, William Westra, et al., Surgical Pathology Dissection at 4 (2003); Ex. C, Lester at 7. Specifically, the surgeon must use sutures, tags, or a diagram to designate the orientation (i.e., anterior, posterior, medial, lateral, superior, and inferior positioning) of the specimen. See Ex. E, Westra at 4; Ex. C, Lester at 7. The failure to adhere to this methodology at the time of explantation limits, if not eliminates, the pathologist's ability to determine the in vivo orientation of the specimen and renders conclusions as to its in vivo appearance speculative. *See* Ex. E, Westra at 4; Ex. C, Lester at 7.

Dr. Iakovlev did not follow this methodology in developing his folding opinions. Indeed, in Wave 1, Plaintiffs could not even offer any argument as to the reliability of Dr. Iakovlev's methodology for this opinion, and it was excluded. *In re: Ethicon Inc. Pelvic Repair Sys. Prod.*

11

*Liab. Litig.*, No. 2327, 2016 WL 4582228, at *1 (S.D. W. Va. Sept. 1, 2016). As Dr. Abadi explained, "if [a mesh] comes [out] folded, it has nothing to do with the way it was positioned in vivo" because the explanting surgeon subjects the explant to a variety of forces during the removal. *See* Ex. F, Abadi 3/31/16 Dep. Tr. 99:19–101:9 (explaining that without information from the surgeon, orientation of a specimen is "all speculation"). As Dr. Abadi will point out at trial, Dr. Iakovlev fails to follow this standard methodology. Pls.' Motion Ex. C, Abadi Expert Report at 10–11.

In addition, Dr. Abadi will explain that the methodology employed by Dr. Iakovlev to detect the purported degradation of Prolene lacks any foundation in the field of pathology.

Specifically, Dr. Abadi will testify that, although Dr. Iakovlev claims he can identify degraded Prolene using certain histological stains and polarized light, these tools simply do not work in the manner Dr. Iakovlev claims as a matter of fundamental pathology. *Id*. at 11. Dr. Abadi will explain that pathologists routinely use chemical stains that identify acidic nucleic acids or basic proteins by forming chemical bonds with those substances, as well as immunohistochemical stains that distinguish between cells and identify cell components. *Id*.; *see also id.* at App'x B, critique of fig. sets 13–19. For example, Dr. Abadi will explain that the layer of purported degraded polypropylene accepts Periodic Acid Shiff Stain. Id. at 11; see also id. at App'x B, critique of fig. sets 13–19. This means that the outer layer of the purportedly degraded Prolene contains protein and is not degraded Prolene at all—as claimed by Dr. Iakovlev. Dr. Abadi also explains that there is no basis in science—much less in the field of pathology—for Dr. Iakovlev's assertion that a pathologist can use these tools to identify degradation in polymers. *Id*. Dr. Abadi uses the tools of the pathologist, the review of tissue samples using stains, and a light microscope to opine that even if Dr. Iakovlev is correct that there is a 1 to 5

12

micron-thick layer of degraded polypropylene shown in his slides, that layer has no clinical significance for the patient. *Id*. at 11. As Dr. Abadi explains, there is no difference between the tissue reaction in areas where the alleged degradation layer is present and in areas where the alleged degradation layer is not present. *Id*.

The final two areas where Plaintiffs challenge Dr. Abadi's critique of Dr. Iakovlev—degenerative calcifications and mucosal erosions—are similarly flawed. As an initial matter, it defies logic that Plaintiffs argue that a fellowship trained gynecological pathologist like Dr. Abadi is not qualified to testify about these anatomical features in vaginal tissue while arguing that Dr. Iakovlev—who has no specialized training in degenerative calcifications and mucosal erosions—is qualified to opine about these anatomical features. In any event, Dr. Abadi's report explains the basis for her testimony and methodology critiquing Dr. Iakovlev on these topics. *Id*. at 12; *id*. at App'x B, critique of fig. set 20-a-20b.

In sum, Dr. Abadi's opinions are not solely derived from a review of explant samples, but rather represent an application of basic pathology principles garnered from Dr. Abadi's many years of experience in the field. All of these opinions—from Dr. Abadi's review of Dr. Iakovlev's pathology photographs to her testimony regarding the generally accepted methods used by pathologists—are clearly within the scope of Dr. Abadi's expertise derived from her extensive education, training, and experience. Plaintiffs' arguments to the contrary are without merit, and should be rejected.

## CONCLUSION

For these reasons, Ethicon requests that the Court deny Plaintiffs' motion to exclude the expert testimony of Dr. Abadi and grant such other and further relief as the Court deems proper.

Respectfully submitted,

*/s/ David B. Thomas*
David B. Thomas (W.Va. Bar #3731)
Thomas Combs & Spann PLLC
300 Summers Street
Suite 1380 (25301)
P.O. Box 3824
Charleston, WV 25338
(304) 414-1800
dthomas@tcspllc.com

*/s/ Christy D. Jones*
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS 39158-6010

COUNSEL FOR DEFENDANTS ETHICON, INC.; ETHICON, LLC; AND JOHNSON & JOHNSON

## CERTIFICATE OF SERVICE

I, Christy D. Jones, certify that on this day, I electronically filed this document with the Clerk of the Court using the CM/ECF system which will send notification of this filing to CM/ECF participants registered to receive service in this MDL.

*/s/ Christy D. Jones*
Christy D. Jones