**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: ETHICON, INC.,<br>PELVIC REPAIR SYSTEM<br>PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327<br>MDL 2327 |
| THIS DOCUMENT RELATES TO:<br><br>*All Wave 3 cases listed in Exhibit A to Defendants' motion* | JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE PEGGY PENCE, PH.D.**

The Plaintiffs respectfully request that this Court deny Defendants' motion that seeks to

exclude Dr. Peggy Pence's general opinions.

**INTRODUCTION**

Peggy Pence, Ph.D., RAC, FRAPS is a Ph.D. toxicologist, scientist, and pharmaceutical

and medical device product development, clinical studies, and regulatory affairs specialist.[1] She

has decades of experience in the medical device and pharmaceutical industries, has received

numerous regulatory professional accolades, and has extensive toxicology, pharmacology, and

continuing regulatory education and training.  She has earned peer-reviewed certification of the

Regulatory Affairs Professional Society ("RAPS"),[2] based on her professional experience,

credentials, and training. Beyond being RAPS certified, Dr. Pence is also a RAPS Fellow.[3]

---

[1] Exhibit B., Pence CV

[2] RAPS is the leading international organization for regulatory professionals working to ensure the safety, efficacy, and availability of healthcare products, including medical devices.

[3] The program recognizes professionals with over 15 years of experience for their significant contributions and leadership. RAPS Fellows, *available at* http://www.raps.org/membership-amp-benefits/raps-fellows.aspx (last visited May. 7, 2016).

Dr. Pence seeks to apply her extensive experience to assist the jury in understanding the regulatory requirements and industry practices that form the standard of care for a reasonable medical device manufacturer with regard to testing, labeling and post-market vigilance.

Recently, this Court has ruled that Dr. Pence is qualified to testify in a number of different areas. *In re: Ethicon Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2327, 2016 WL 4493655 (S.D. W. Va. Aug. 25, 2016). Despite this favorable ruling regarding Dr. Pence's testimony, Ethicon asserts challenges to Dr. Pence's testimony that are nearly identical to those asserted previously.[4] Defendants offer no new factual evidence in support of their motion, but instead re-package their arguments and twist the factual record to allege that Dr. Pence has declared that physicians' knowledge is irrelevant to what should be in the IFU.[5] As further explained in this memorandum, this assertion distorts the factual record, and, as this court has already ruled: "an expert's failure to examine a particular source of information is not grounds for exclusion under Daubert if the expert testimony is supported by other 'sufficient facts or data.'" *Id.* at 3. This court has also already ruled that "Dr. Pence considered, for example, medical and scientific literature, the relevant IFUs, and internal Ethicon documents," which is sufficient for the purposes of *Daubert*. *Id.* Defendants offer no new arguments or factual evidence to contradict the court's findings that Dr. Pence considered these sources in rendering her opinions. Dr. Pence has fulfilled her obligation as an expert to state the facts and data supporting her opinions. FED. R. EVID. 702.

Dr. Pence's more than 40 years of extensive professional experience affords her a general understanding of how medical issues interact with the regulatory process. This Court has aptly

---

[4] *See* defendants' motion to exclude Peggy Pence, 2:12-md-02327 document 2075 filed 4/21/2016, *compare with* defendants' motion to exclude Peggy Pence, 2:12-md-02327 document 2759 filed 9/16/16. Paragraphs 1-5 of these motions are identical down to the apparent typographical error referring to Dr. Pence as "Dr. Weber" in Paragraph 3 of both motions.

[5] *See* Def. Mem. to exclude Dr. Pence at 4-6.

observed that a witness may be qualified by "knowledge, skill, experience, training or education." *In re Bard, Inc. Pelvic Repair System Litigation,* 2013 WL 2432918, *30-31 (S.D.W.Va., June 4, 2013), *citing,* FED. R. EVID. 702.  It is that expertise which Dr. Pence seeks to share with the jury.  Dr. Pence can and has testified in cases where evidence of FDA clearance was excluded by the Court as Dr. Pence relies on industry standards, not just FDA regulations and guidance in forming her opinions.[6] This point distinguishes Dr. Pence from Timothy Ulatowski, the Defendants' regulatory expert, whose opinions are all tied directly to the FDA, as described in the motion to exclude his testimony. Because Dr. Pence's testimony would assist the jury in understanding the complex obligations of a device manufacturer and industry standards they should adhere to, it should be admitted into evidence.   Ethicon's motion to exclude Dr. Pence's testimony should be denied.

## LEGAL STANDARDS

Federal Rule of Evidence 702 sets forth the basic framework for analyzing the admissibility of expert opinions.  The rule reads, in pertinent part, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

---

[6] *See* Exhibit H., Motion in Limine 5 and 9, *Batiste v. McNabb,* No. DC-12-14350.  *See Also*, Exhibit I., Order (transcript) Granting Motions in Limine 5 and 9 *Batiste v. McNabb,* No. DC-12-14350, which prohibited Ethicon and Johnson & Johnson from introducing evidence referring to the FDA having approved or cleared the TVT-O device, and any evidence related to clearance and/or lack of enforcement regarding the TVT-O device.  Despite the exclusion of this evidence, Dr. Pence was still able to offer testimony regarding standards on medical device labeling and testing, and opinions regarding whether or not Ethicon and Johnson & Johnson complied with those standards with regard to the TVT-O device.

If the witness is suitably qualified, then the *Daubert* inquiry generally breaks down into a two-step analysis.  The first issue is whether the proffered evidence represents "scientific knowledge," meaning that it is supported by appropriate validation.  The second issue is whether the evidence would assist the jury.  *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995). This aspect of the inquiry is often discussed in terms of whether the expert's opinions "fit" the case.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993).

## ARGUMENT

Defendants have moved to exclude Dr. Pence's testimony in the entirety, but have also offered nine areas of testimony which they request be excluded.   Many of the arguments are overlapping and use the same circular logic and reasoning to the point where it is difficult to distinguish the arguments from each other.   Plaintiffs will respond point-by-point, as best it can be done with the overlapping arguments and material.

**I.      Dr. Pence is well qualified to opine about the adequacy of the device IFU's, and her methodology is reliable and admissible.**

As discussed above, Dr. Pence is well qualified to offer opinions regarding the adequacy of the device IFU's.  Since the majority of Defendant's brief focuses on Dr. Pence's methodology rather than her qualifications and credentials, there will be no further discussion of Dr. Pence's qualifications here.

Section 501 of the FDCA deals with misbranding of medical devices. A medical device is misbranded if its labeling is "false or misleading" in any particular manner. FDCA § 502A.  A medical device is also misbranded if its labeling does not bear adequate warnings. FDCA § 502(f)(2). Thus, prescription medical devices, such as the TVT, TVT-O, Prolift, and Prosima (hereinafter, "Mesh Products")  must include information regarding indications,

4

contraindications, side effects and precautions ,which are necessary to allow physicians to administer the device safely.[7]

Ethicon first criticizes Dr. Pence's methodology in reaching her conclusions that the labels for the Mesh Products are inadequate because she "does not account for what physicians already know." However, Defendants cite to no applicable standard which would allow a device manufacturer to omit risk information from a medical device IFU based on what physicians already know. In fact the relevant standards require the device manufacturer to:

> Describe serious adverse reactions and potential safety hazards, limitations imposed by them, and steps that should be taken if they occur. Include an appropriate warning if there is reasonable evidence of an association with the use of the device. A causal relationship need not have been proved.[8]

There is nothing in any regulation, guidance, or industry standard that allows a device manufacturer to omit a warning or adverse event based the fact that doctors may already know about the risk. Moreover, it does not comport with the testimony of Ethicon's own medical director, who testified that physicians should be able to rely on the IFU to accurately disclose the risks associated with the use of the mesh product.[9]

This court has also already ruled that Dr. Pence is qualified to offer testimony about the adequacy of the relevant IFU: "Dr. Pence considered, for example, medical and scientific literature, the relevant IFUs, and internal Ethicon documents," which is sufficient for the purposes of *Daubert*. *In re Ethicon Inc.*, 2016 WL 4493655 at 3. Defendants cite an out-of-context snippet of testimony for the proposition that Dr. Pence has declared physicians'

---

[7] Ex. A., Device Labeling Guidance #G91-1 (Blue Book Memo), FDA office of Device Evaluation, Mar. 8, 1991. *See also,* Ex. C., Final Document: Global Harmonization Task Force. Essential principles of Safety and Performance of Medical Devices, November 2, 2012 (revision of GHTF/SG1/N41:2005).
[8] Ex. A., Device Labeling Guidance #G91-1 (Blue Book Memo), FDA office of Device Evaluation, Mar. 8, 1991. Section V.
[9] Exhibit. D., Testimony of David Robinson, March 14, 2012; 488:11-18. Dr. Robinson was specifically testifying about the Prolift IFU, but in his capacity as medical director, also had oversight for the TVT, TVT-O and Prosima products.

knowledge irrelevant to what should be in the IFU,[10] and then base a lengthy argument on this inaccurate accusation.[11]  This out-of-context snippet of testimony misstates the factual record and is misleading to the Court.

First, earlier in the deposition Dr. Pence explained that she was referring to whether or not she had conducted any surveys of physicians to substantiate her opinions specific to the Ramirez case.[12]  Second, Dr. Pence went on to explain that she relied on the testimony of Dr. Meng Chen, as well as internal documents from Ethicon, for her opinions regarding the adequacy of the warnings in the Instructions for Use.[13]  In addition, Dr. Pence has relied upon deposition testimony of physicians who have been trained in the surgical treatment of SUI and trained in the use of TVT-O to determine whether or not they were aware of frequency data of adverse events.[14]  Dr. Pence has considered that physicians may learn from adverse events in the medical literature but has stated that even where physicians know of a risk, they may not know the incidence or percentage of that risk.[15]  Dr. Pence has also considered the medical literature, which supports her opinion that doctors performing procedures with mesh many not know the complications even with their own patients.[16]  The record shows that Dr. Pence has considered what physicians know about the risks of the product and does not consider that knowledge irrelevant in forming her opinions regarding the adequacy of the Ethicon IFUs.  Defendants have twisted and misrepresented the factual record in making their argument to the contrary, and their entire legal argument is premised on this faulty assumption.  Moreover, any present-day survey of surgeons to determine what risks doctors understood from the medical literature, as opposed

---

[10] See Def. Brief at 4, citing Pence Dep 3-24-16 Tr. 193:5-20.
[11] *Id.* at 4-6.
[12] Exhibit. K.  Transcript of Dr. Pence's March 24, 2016 deposition, 90:12-17
[13] *Id.* at 90:19-92:16
[14] *Id*. at 157:9-22
[15] *Id*. at 135:5-9; 161:2-12
[16] *Id*. at 185:11-186:5

to reading the IFU, would be unreliable because it would be necessarily include all information published on pelvic mesh products currently, and not as of the date of a particular patient's surgery. Thus, Defendants' argument has no merit.

Defendants also attack Dr. Pence for considering GHTF guidelines, claiming that she relies on them *post hoc*. This is simply not the case. The Global Harmonization Task Force (GHTF) was conceived in 1992 to address the growing need for international harmonization in the development of medical devices with two principle aims: (i) enhancing patient safety, and (ii) increasing access to safe, effective and beneficial medical technologies worldwide.[17] During its approximately 20-year existence, GHTF was a partnership between medical authorities and comprised five founding members, including members in the United States.[18] Defendants' brief recognized that this Court has said that Dr. Pence would be allowed to testify to GHTF standards in some contexts in 2015, which means that Dr. Pence's reliance on GHTF cannot be *post hoc*, as she has necessarily reviewed and relied upon those standards before her opinions were issued in this case.[19] Dr. Pence has acknowledged that there are standards other than FDA regulations on which experts can rely, and has incorporated those standards as a basis for her opinions, which is exactly what an expert following sound methodology should do.

Finally, Defendants attack Dr. Pence's opinion that both the Blue Book Guidance issued by the FDA and the GHTF guidance require that the IFU warn of the frequency and severity of the risks. However, this is exactly what Defendants did when they updated the TVT IFU in April of 2015.[20] Ethicon specifically added chronic pain, pain with intercourse which in some

---

[17] Global Harmonization Task Force Archive Website: http://www.imdrf.org/ghtf/ghtf-archives.asp
[18] Ex. C, Final Document: Global Harmonization Task Force. Essential principles of Safety and Performance of Medical Devices, November 2, 2012 (revision of GHTF/SG1/N41:2005).
[19] *See* Defendant's memorandum at 6, citing *Mathison v. Boston Scientific Corp.*, 2015 WL 2124991, *14)S.D. W. Va. May 6, 2015).
[20] Exhibit. G., TVT IFU issued 05-2015.

patients may not resolve, chronic pain in the groin, and one or more revision surgeries may be necessary to treat these adverse reactions to the IFU, among numerous other additions to the adverse reactions section.  Defendants also incorrectly assert that the GHTF standards contain no standard requiring warnings regarding the frequency of risks.[21]  The standards specifically state that a device manufacturer should inform users of any residual risks,[22] and define "risk" as a "combination of the probability of occurrence of harm and the severity of that harm."[23] Therefore, Dr. Pence has applied reliable methodology in stating that industry standards require consideration of the frequency and severity of the risk in the product labeling of a medical device. For these reasons, the Court should reject Defendants' first argument.

## II.    Dr. Pence is well qualified to opine that Ethicon did not meet the post-market vigilance standard of care for the mesh products, her opinion is relevant and her methodology is reliable.

Medical device manufacturers have an obligation, under the Medical Device Reporting ("MDR") regulations, to report to the FDA all suspected adverse incidents involving their medical devices. 21 U.S.C. § 360i(a)(1); 21 CRF Part 803. An "MDR Reportable Event" occurs whenever a manufacturer learns of anything "reasonably suggest[ing]" that its device: (1) "[m]ay have caused or contributed to a death or serious injury," or (2) experienced a non-injurious "malfunction" that "would be likely to cause or contribute to a death or serious injury" if it recurred. 21 C.F.R. § 803.50(a).  MDR reports submitted to FDA are entered into the Manufacturer and User Facility Device Experience ("MAUDE") database.  The MDR program is important because it allows the FDA and manufacturers to identify and monitor significant adverse events so as to detect and correct safely problems with the device.

---

[21] Def. Memorandum at 9
[22] Ex. C, Final Document: Global Harmonization Task Force.  Essential principles of Safety and Performance of Medical Devices, November 2, 2012 (revision of GHTF/SG1/N41:2005). Page 9.
[23] *Id.*  at 8.

### a. Dr. Pence is qualified to offer an opinion on whether an adverse event should have been reported to the FDA.

As Dr. Pence has explained, a manufacturer can withhold a report if it has "information that would lead a person who is qualified to make a medical judgment reasonably to conclude that a device did not cause or contribute to a death or serious injury." 21 CFR 803.20(c)(2).. Section 803.20(c)(2) expressly states that "persons qualified to make a medical judgment" include not only physicians but "nurses," "biomedical engineers" and "risk managers." *Id.*

Dr. Pence has functioned as a risk manager for "years and years" of her career.[24] Indeed, Dr. Pence explains that her professional work involves reviewing adverse event data and determining whether MDR reports should be submitted to the FDA.[25] Thus, Dr. Pence was able to apply the same standards in arriving at her opinion as to the reportability of TVT reports as she regularly applies when making the same determinations for her clients.[26]

Simply stated, Dr. Pence does not require a medical degree to offer an opinion on whether an event is outside of the MDR reporting requirements. Dr. Pence has medical and scientific knowledge as a toxicologist and as a clinical development regulatory scientist that she was able to apply to issue reports in the context of the MDR reporting regulations.[27]

### b. Dr. Pence's testimony regarding Ethicon's failures to submit required MDR reports is relevant and reliable.

Dr. Pence's opinion that Ethicon failed to comply with post-marketing vigilance standards is reliably derived from her experience and applies regulatory standards to existing facts. Here, Dr. Pence has thoroughly explained the reporting requirements applicable to MDRs. In particular, Dr. Pence explains that a manufacturer is obligated under the FDA regulations to

---

[24] Exhibit. E. Transcript of Dr. Pence's November 11, 2013 deposition, 228:6-9
[25] *Id.* at 226:1-7; 228:1-5
[26] *Id.* at 228:6-15
[27] *Id.* at 228:24-229:4

report to the FDA any information reasonably suggesting that its device either (1) caused or contributed to a death or serious injury, or (2) malfunctioned in a manner that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.[28]  After applying these regulatory standards to the Issue Reports received by Ethicon, it is Dr. Pence's expert opinion that Ethicon failed to report to the FDA events that were MDR reportable.

In support of her opinion that Ethicon failed to file required MDR reports, Dr. Pence noted that Ethicon submitted only 70% of the issue reports it received to the FDA as MDR Reports. [29]  Meanwhile, Ethicon withheld approximately 30% of the Issue Reports from the FDA under the rationale that they were "not reportable."[30]  After a review of non-submitted reports, Dr. Pence offered thirty-nine examples of adverse events that fit the regulatory reporting criteria but that were not submitted to the FDA as MDRs by Defendants.[31]  Importantly, Ethicon does not fault Dr. Pence's methodology in evaluating the seven expansively detailed incidents as "reportable."  Instead, Ethicon challenges Dr. Pence's characterization of the incidents detailed in her Report as being "representative" of the rationales applied by Ethicon in the other thirty-two instances.  Even if Ethicon were correct (which is not the case), this quibbling over the underpinnings of Dr. Pence's opinion go to the weight of her opinion, not to its admissibility. *Jones v. Otis Elevator Co.*, 81 F.3d 655, 663 (11th Cir. 1988).

### c.  Dr. Pence's testimony regarding Ethicon's failures to submit required MDR reports is relevant.

The purpose of the MDRs is to enable the FDA to have a complete picture of the safety profile for products.[32]  As the CDRH Director, Office of Compliance, Timothy Ulatowski has

---

[28] Def. Ex. D.  Dr. Pence's TVT Report, Oct. 14, 2013
[29] *Id.*
[30] *Id.* at 174:15-16
[31] Def. Ex. D.  Dr. Pence's TVT Report, Oct. 14, 2013
[32] Ex. E. Transcript of Dr. Pence's November 11, 2013 deposition; 186:22-24

explained, MDR reports are the principle method used to assimilate product information and take action.[33] The FDA depends on manufacturers' compliance with MDR reporting requirements so that the Agency can perform its work in post-market surveillance and in identifying potential safety signals. In other words, compliance with the MDR reporting regulations is necessary to the protection of the public's health. The MDR requirement does not exist to cause manufacturers busy work. It is critical to ensuring the safety of medical devices.

### d. Ethicon's mischaracterizations of Dr. Pence's testimony do not render that testimony inadmissible.

Ethicon's argument that Dr. Pence offers improper legal conclusions misunderstands both the nature of Dr. Pence testimony and the law.[34] Dr. Pence is not offering a legal conclusion. Dr. Pence is merely informing the jury of the FDA regulations that form the medical device industry's standard of care, and then applying her expertise to opine whether Ethicon complied, or failed to comply, with those standards. Numerous cases hold that an expert may opine as to whether the defendant violated the standard of care in fields where specialized knowledge is necessary to understand the defendant's particular obligations.[35] *E.g. Grossman v. Barke,* 868 A.2d 561, 566 (Pa. Super. Ct. 2005) (when a claim "encompasses matters not within the ordinary knowledge and experience of laypersons ... [a] plaintiff must present expert testimony to establish the applicable standard of care [and] the deviation from that standard. . .");

---

[33] Exhibit J. Ulatowski,TA., Risk Management: A Regulatory Perspective, Presentation, Beijing, October 2008

[34] To the extent that Ethicon's argument could be read as asking the Court to exclude broad swaths of unspecified testimony as "legal opinions," this Court should decline such request. *In re Levaquin Prod. Liab. Litig.,* MDL No. 08–1943, 2010 WL 4676973, at *3 (D. Minn. Nov. 9, 2010) ("Motions that lack specificity and are 'essentially repetitive of well-established rules of evidence' are not generally granted."); *Metzger v. American Fidelity Assur. Co.,* 2007 WL 4342082, *3 (W.D. Okla., Dec. 07, 2007)(declining to exclude expert testimony as a legal conclusion where the moving party did not set forth what specific testimony it sought to exclude).

[35] Indeed, a "witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Peckham v. Con'l Cas. Co.,* 895 F.2d 830, 837 (1st Cir. 1990); *First Nat'l State Bank of N.J. v. Reliance Elec. Co.,* 668 F.2d 725, 731 (3rd Cir. 1981).

*Holbrook v. Woodham,* 2007 WL 2071618 (W.D. Pa. July 13, 2007) (whether a defendant failed to comply with applicable safety regulations and industry codes are questions that will necessitate expert testimony because lay jurors do not commonly understand such professional obligations). *See also Peck v. Horrocks Engineers, Inc*., 106 F.3d 949 (10th Cir. 1997) (expert testimony is needed to establish a specialized standard of care and to assess whether that standard has been breached).

Understanding the FDA regulations that set the standards for the medical device industry, and determining the facts which are significant in identifying whether that standard was met, requires specialized knowledge and experience. *In re Fosamax*, 645 F. Supp. 2d 192 (S.D. N.Y. 2009), *see also, Lellebo v. Zimmer, Inc.*, 2005 WL 288596, at *5 (D. Minn. Feb. 16, 2005). Without Dr. Pence's testimony, the jury would be left to determine whether Ethicon acted as a reasonable pharmaceutical company without guidance as to the governing regulations and industry standards, or any assistance in determining which medical events or information was pertinent to that determination.

Defendants' claims that Dr. Pence's opinions about their failure to submit a 510(k) notification for Prolift have no relevance are belied by the fact that Ethicon wants to present evidence that the Prolift was (eventually) cleared by the FDA. However, for the following reasons, Defendant's argument does not warrant exclusion of evidence that Defendants fell below the industry standard of care prior to marketing the Prolift. Evidence regarding compliance with industry standards and regulations is relevant to Plaintiffs' negligence claims and requests for punitive damages. *Horne v. Owens–Corning Fiberglas Corp.*, 4.F.3d 276, 281 (4th Cir. 1993) (Evidence of industry standards as well as noncompliance with, or nonexistence of, internal testing procedures are admissible in products liability cases). Expert testimony

12

addressing compliance or non-compliance with industry standards and regulations can assist the jury in determining whether a defendant acted as a reasonably prudent manufacturer. *Lemons v. Novartis Pharmaceuticals Corp.*, 2012 WL 965977, at *5 (W.D.N.C. Mar. 21, 2012) ("Certainly, where labeling of a pharmaceutical product is at issue, [expert regulatory] testimony will assist the trier of fact in understanding the complexity of the FDA's regulatory scheme and the role of [the defendant] in complying with that regulatory scheme."); *Fosamax*, 645 F. Supp. 2d at 190-91 n.16 (holding that an expert (1) "may offer testimony embracing an ultimate issue of fact that the jury will decide" and (2) "is permitted to draw a conclusion from a set of observations based on extensive and specialized experience," including conclusions about a manufacturer's conduct); *Lellebo*, 2005 WL 388598, at *5; *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, 2010 WL 1796334 *12-14 (N.D. Ohio May 4, 2010) (permitting plaintiffs' regulatory expert to testify regarding general FDA regulatory requirements and procedures and offer opinion as to whether defendant complied with regulatory requirements).

If nothing else, Dr. Pence's opinions are relevant to rebut the Defendants' claims that they acted as a reasonable manufacturer in marketing the Prolift device, if Defendants are allowed to introduce evidence that the device was ultimately cleared. Moreover, Dr. Pence's opinions that Ethicon should have submitted a 510(k) for the Prolift prior to marketing the device in 2005 are consistent with the opinions of the FDA's reviewers, who told Ethicon exactly that in 2007.[36]

For these reasons, the Court should reject Defendants' second argument.

### III.   Dr. Pence is qualified to offer opinions about the adequacy of Ethicon's testing of its mesh products.

A common criticism of the 510(k) clearance process is that it fails to impose firm and rigorous standards for testing and labeling medical devices. Yet, the absence of specific and

---

[36] Exhibit. F.  Correspondence from FDA to Ethicon, August 10, 2007

detailed testing requirements as a condition for clearance to market the device does not mean that a manufacturer can neglect all testing of its product.  To the contrary, a medical device manufacturer must conform its testing practices to the standards of a reasonable manufacturer in the medical device industry.  Thus, the customs and practices of an industry are proper subjects for expert testimony." *Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 54–55 (1st Cir. 2006). Indeed, the customary practices of industry members are recognized as a factor that the jury may consider in evaluating strict liability and negligence claims.  *Bartlett v. Mutual Pharm. Co.*, 742 F. Supp. 2d 182, 188 (D.N.H. 2010), *rev'd on other grounds by Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).

As a forty-year veteran of the regulatory process who is experienced from the manufacturer's perspective, Dr. Pence is uniquely qualified to opine about the factors and considerations that go into a manufacturers' decisions as to what testing is necessary.  The committee notes to Rule 702 contemplate that an expert may be qualified on the basis of experience, and that an expert's experience may be "the predominant, if not sole, basis for a great deal of reliable expert testimony."  FED. R. EVID. 702, advisory committee notes (2000). Consistent with Rule 702's directive, an expert who had worked for three major drug companies and the FDA was permitted to testify about the standards of care in the medical industry. *Bartlett*, 742 F. Supp. 2d at 195.  The foundation for that testimony was the expert's own experience.  *Id.; see also Forrestal v. Magendantz*, 848 F.2d 303, 308 (1st Cir. 1988) (affirming admission of doctor's expert testimony "based on his own knowledge and experience").

That same sort of testimony – reliably grounded in years of professional experience as an industry insider – is what Dr. Pence seeks to share with the jury. Dr. Pence can call upon her extensive experience to inform the jury how known information regarding persistent FBR,

chronic inflammation, mesh degradation and cytotoxicity (among other things) is viewed by a

reasonable medical device manufacturer when considering what testing to perform on its

product.  Through her experience developing drugs and devices and bringing them to market, Dr.

Pence is able to inform the jury that the practice within the medical device industry is to consider

what is known about the product and its components and predicates, to look at the existing

medical literature regarding the product or similar products, and to assess what additional

information needs to be obtained through testing to determine if the product is safe for its

intended use.  This methodology is the same one employed by Dr. Pence when advising medical

companies regarding the testing needed to bring their products to market.

Dr. Pence has stated, and Defendants have acknowledged, that she relies, on part, in

GHTF standards which state "clinical data can be in the form of scientific medical literature and

commercial experience as well as clinical studies."[37]  That Ethicon might prefer a different

standard and disagree whether there is enough available literature to establish a favorable risk-

benefit profile are issues that goes to the weight of the evidence, not to the testimony's

admissibility.  *Kellogg v. Wyeth*, 2012 WL 2970621, (D. Vt. July 20, 2012) (complaint that

expert's testimony regarding the industry standard of care for pharmaceutical labeling was not

adequately grounded in objective regulatory standards went to the weight of the evidence but not

its admissibility).  Likewise, Ethicon's internal standards acknowledge the manufacturer's

responsibility for the safety of the persons using its products, which confirms the presence of an

industry standard beyond the minimal testing requirements of the 510(k) process.

Dr. Pence has reliably applied the GHTF standards to the facts of this case.  In just one

example, Dr. Pence has explained how she applies the GHTF standards to reach her conclusion

that those standards were not followed in the development of the TVT-O product with regard to

---

[37] Def. Memorandum at 13, citing Pence 3-9-16 Dep. Tr. 75:8-11; Def. Ex. H.

clinical testing of lighter-weight meshes.  Dr. Pence explained that the global standard for a manufacturer to eliminate risk as reasonably practical through inherently safe design, by taking adequate protection measures, and by informing users of residual risk.[38]  Dr. Pence testified that if there is a problem with the safety and performance related to the material and the design of the product, it is appropriate to do development work and clinical testing of different (lighter-weight) meshes.[39]  Dr. Pence explained that the GHTF standards required a manufacturer such as Ethicon to eliminate risk as reasonably practical by testing and implementing a lighter-weight mesh product.[40]  In another example, Dr. Pence discusses that Ethicon has not performed a clinical study to distinguish between laser cut mesh and mechanically cut mesh.[41]  Dr. Pence has shown that she has reliably applied the GHTF standards to determine whether Ethicon met those standards with regard to testing— specifically, Ethicon's failure to eliminate risk as is reasonably practical and take adequate protection measures through pre-market testing and clinical studies.

Dr. Pence's testing opinions are based on specific industry standards and supported by reliable methodology.  Accordingly, prior decisions excluding failure-to-test opinions do not preclude a decision in this case to admit testing opinions from Dr. Pence that rely on specific, articulable industry standards, as well as Ethicon internal standards.  While the defendants may disagree with Dr. Pence's conclusions, that does not make them inadmissible.

**IV.    Dr. Pence's Opinion that the mesh products' labeling did not support adequate consent are relevant and admissible.**

This argument seems largely cumulative of Defendants' argument that Dr. Pence is not qualified to opine about what warnings Ethicon should place in the product IFU.  The fact that Dr. Pence is not a surgeon or medical doctor does not mean she has no expertise regarding what

---

[38] Ex. L. Transcript of Dr. Pence's March 31, 2016 deposition; 518:1-24
[39] *Id*. at 514:5-21
[40] Id. at 515:1-22
[41] Id. at 598:25-599:8

additional information physicians need to adequately consent their patients.[42]  Dr. Pence's

opinions in this regard are rooted in industry standards, which set forth what is required to be in

an IFU, as well as her experience as a risk manager.  As doctors are the intended audience for the

IFU, it logically follows that FDA and industry guidance regarding the content of the IFU is

designed to inform doctors of the risk of the device and the procedure, so they can pass that

information on to their patients.

Lastly, Ethicon objects to this opinion as either a) cumulative, or b) seeking to inject

irrelevant issues into the case.  To the extent that Ethicon objects to the opinions of Dr. Pence as

cumulative, that is a matter of trial management, not a basis for ruling Dr. Pence's testimony

inadmissible prior to trial.  Plaintiffs are aware of no case, and Ethicon has cited none, where an

expert's otherwise relevant and reliable testimony was ruled inadmissible at the pre-trial stage

because it overlapped with other expert testimony that had not yet even been presented to the

jury.  On the issue of relevance, The risks attendant to the mesh products are relevant to the

physician and patient's risk analysis, the patient's right to make an informed decision regarding

their care, and to the question of whether Ethicon complied with the standard of care required of

a reasonably prudent manufacturer when supplying warnings about its product.

**V.     Dr. Pence's opinion that Ethicon obtained clearance to market the Prosima
        based on false or misleading statements to the FDA is both relevant and
        admissible.**

A 510(k) submission requires a truthful and accurate statement to be signed by an

employee of the sponsor.  21 CFR § 807.87(k).  This signature states in relevant part:  "I certify

that in my capacity as (the position held in the company) of (company name), I believe to the

best of my knowledge that all data and information submitted in the premarket notification are

---

[42] As noted previously, 21 CFR 803.20(c)(2).. Section 803.20(c)(2) expressly states that "persons
qualified to make a medical judgment" include not only physicians but "nurses," "biomedical engineers"
and "risk managers."

truthful and accurate and no material fact has been omitted." *Id*.  The key part of this requirement is that no material fact can be omitted from the 510(k).  Whether or not the Defendant omitted material facts to the FDA regarding the Prosima device or other mesh products in its 510(k) application is relevant to whether Ethicon acted as a reasonable manufacturer when marketing the mesh products.  Dr. Pence is not opining as to whether Defendants broke the law or trying to enforce the FDA's regulatory scheme; she is merely articulating the industry standard that no material information be omitted from an application to market a medical device, then articulating how Defendants deviated from that standard.

Dr. Pence's opinion that the Prosima would not have been cleared by the FDA if the FDA had different or additional information is not sheer speculation; rather, it is Dr. Pence's opinion supported by her more than 40 years in the medical device industry, and is supported by reliable methodology.  The mere fact that Defendants disagree with Dr. Pence's conclusion does not make the opinion inadmissible.  An expert witness may properly testify about or comment on any documents and exhibits in evidence, and may explain "the regulatory context in which they were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *Fosamax*, 645 F. Supp. 2d at 192; *Forman v. Novartis Pharmas. Corp.*, 794 F. Supp. 2d 382, 384 (E.D.N.Y. 2011) (finding methodology of reviewing certain regulatory filings, internal documents, and medical literature, then applying the relevant FDA regulations and procedures to it is reliable and permitted to render opinions on the reasonableness of a defendant's conduct).

Accordingly, Dr. Pence's methodology is reliable and does not, in any way, run afoul of the admissibility criteria espoused by the Supreme Court in *Daubert*.  Because Dr. Pence's methodology is reliable and accepted, her testimony should be admitted.

**VI.    Dr. Pence's Opinion that Ethicon did not act in the interest of patient safety is relevant and reliable.**

Ethicon states that the entire premise of Dr. Pence's opinion is faulty because the decision to stop selling products did not constitute recalls of the products, nor was it mandated by the FDA.  This is not a premise of Dr. Pence's opinion; Dr. Pence has merely opined that the available evidence supports that the device should have been removed from the market sooner. Dr. Pence's opinion that Ethicon should have acted more quickly to remove the Prosima from the market is rooted in the development challenges and failures of the Prosima, detailed in her expert report, including the clinical evaluation of the prototype by the inventor, the marketing clearance of the device achieved with no clinical data submission, the concerns regarding the Prosima voiced by Ethicon employees and consultants once the device was launched, and the high number of MDR's reported to the FDA on the mesh used in the Prosima, the Gynemesh PS.[43]

Dr. Pence  should be permitted to set forth the factual basis for her opinion that Ethicon had a duty that it failed to fulfill.  For example, a medical device manufacturer's regulatory obligation to submit an MDR arises when the manufacturer gains awareness that a device may have caused or contributed to a death or serious injury.  21 CFR § 803.10; 803.20. It is therefore permissible for Dr. Pence to explain that Ethicon had received adverse event reports, as well as concerns from Ethicon's own employees and consultants, regarding concerns over the safety of the Prosima.  Ethicon itself memorialized these as internal issue reports and memorandums.  They provide a factual foundation for Dr. Pence's opinion that Ethicon should have known that the Prosima had an unfavorable risk profile and should have been removed it from the market sooner.

---

[43] Def. Ex. E, Dr. Pence's Prosima report, Mar. 3, 2016, 19-21, 29, 31-32

Thus, Dr. Pence appropriately set forth the documents and testimony demonstrating Ethicon's  awareness  of the Prosima risks, which then triggered Ethicon's obligation to remove the product from the market.  Simply stated, no Ethicon credo or order from the FDA is necessary to conclude that Ethicon was aware of adverse event reports, the lack of clinical data, or of risks acknowledged by its researchers and executives.  Ethicon's characterization of such evidence as an opinion regarding Ethicon's credo or internal policies is simply an effort to hamstring Dr. Pence from referencing the factual support for her opinions.  As such, Ethicon's argument should be denied.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion and permit Dr. Pence's testimony to the extent stated in her reports.  Dr. Pence is an extremely well qualified and knowledgeable expert who has devoted countless hours to the study of pelvic mesh products, and can still offer her opinions even if evidence of FDA clearance and other FDA actions is excluded by this Court, as she relies on other standards in forming her opinions including the GHTF guidelines and industry standards.   She should be permitted to give her opinions regarding the adequacy of the IFUs, the failure of testing, and the failure to meet the post-market vigilance standard of care for Ethicon's mesh products.


Dated:  October 11, 2016

Respectfully submitted,

*/s/Thomas P. Cartmell*

Thomas P. Cartmell, Esq.
Jeffrey M. Kuntz, Esq.
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone:      (816) 701-1100
Facsimile:      (816) 531-2372
tcartmell@wcllp.com
jkuntz@wcllp.com

*/s/ D. Renee Baggett*

Bryan F. Aylstock, Esq.
D. Renee Baggett, Esq.
Aylstock, Witkin, Kreis and Overholtz, PLC
17 East Main Street, Suite 200
Pensacola, FL 32563
Telephone:      (850) 202-1010
Facsimile:      (850) 916-7449
rbaggett@awkolaw.com
baylstock@awkolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document on October 11, 2016, using the

Court's CM-ECF filing system, thereby sending notice of the filing to all counsel of record in

this matter.

*/s/Thomas P. Cartmell*
Attorney for Plaintiffs

## INDEX OF EXHIBITS

**Exhibit A:** Device Labeling Guidance #G91-1 (blue book memo)

**Exhibit B:** Dr. Pence's CV

**Exhibit C:** Final Document: Global Harmonization Task Force.  Essential principles of Safety and Performance of Medical Devices, November 2, 2012 (revision of GHTF/SG1/N41:2005).

**Exhibit D:** Transcript of Dr. David Robinson, March 14, 2012

**Exhibit E:** Transcript of Dr. Pence's January 1, 2013 Deposition

**Exhibit F:** Correspondence from FDA to Ethicon, August 10, 2007

**Exhibit G:** TVT IFU, released April, 2015

**Exhibit H:** Motion in Limine 5 and 9, *Batiste v. McNabb,* No. DC-12-14350.

**Exhibit I:**  Order (transcript) Granting Motions in Limine 5 and 9 *Batiste v. McNabb,* No. DC-12-14350

**Exhibit J:** Ulatowski,TA., Risk Management: A Regulatory Perspective, Presentation, Beijing, October 2008

**Exhibit K:** Transcript of Dr. Pence's March 24, 2016 Deposition

**Exhibit L**: Transcript of Dr. Pence's March 31. 2016 Deposition