# Exhibit L

Peggy Pence Ph. D.

Page 498

- ----          -----------------

CAUSE NO. 2012-CI-18690

JENNIFER RAMIREZ F/K/A JENNIFER ) IN THE DISTRICT COURT
GALINDO,                         )
                                 )
               Plaintiff,        )
                                 )
          vs.                    ) 438th JUDICIAL DISTRICT
                                 )
CESAR REYES, JOHNSON & JOHNSON,  )
INC., AND ETHICON, INC.,         )
                                 )
               Defendants.       ) BEXAR COUNTY, TEXAS
_____)

VOLUME II

- - -

MARCH 31, 2016

- - -

     Videotaped deposition of  PEGGY PENCE, Ph.D.,

Volume II, held in the offices of Lopez

McHugh, LLP,  100 Bayview Circle, Suite 5600, Newport

Beach, California, commencing at 10:16 A.M., on the

above date before Pamela Cotten, CSR, RDR, Certified

Realtime Reporter, Certificate No. 4497.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Peggy Pence Ph. D.

---

Page 499

APPEARANCES:

FREESE & GOSS
BY:  TIM K. GOSS, ESQUIRE
YVETTE DIAZ, ESQUIRE
Suite 200
3031 Allen Street
Dallas, Texas  75204
(214) 761-6610
Fax - (214) 761-6688
tim@freeseandgoss.com
yvette@freeseandgoss.com
Counsel for the Plaintiff

DAVIS, CEDILLO & MENDOZA
BRIAN L. LEWIS, ESQUIRE
McCombs Plaza, Suite 500
755 Mulberry Avenue
San Antonio, Texas  78212
(210) 822-6666
Fax - (210) 822-1151
blewis@dcm.com
Counsel for Johnson & Johnson

SCOTT, CLAWATER & HOUSTON, LLP
CAROL Y. VERBEEK, ESQUIRE
Suite 500
2727 Allen Parkway
Houston, Texas  77019
(713) 650-6600
Fax - (713) 650-1720
cverbeek@schlawyers.com
Counsel for Dr. Cesar Reyes

ALSO PRESENT:

JOHN SISSON, Videographer

---

Page 500

INDEX

Witness:  PEGGY PENCE, PhD (Volume II)
Examination:                    Page
    BY MR. GOSS    -------------------------    506

EXHIBITS

Deposition         Description              Page
Exhibit 10A    Gynecare TVT Obturator      522
               System Package Insert
               Bates Nos. ETH.MESH.02340902
               - 973

Exhibit 47     Copy of Volume II of        509
               Deposition of Joerg Holste,
               D.V.M., Ph.D., Taken
               7/30/2013

Exhibit 48     Volume I of the Deposition  509
               of Joerg Holste, D.V.M.,
               Ph.D., taken 7/29/13

Exhibit 49     GHTF Final Document, Titled:  517
               Essential Principles of
               Safety and Performance of
               Medical Devices," 15 Pages

Exhibit 50     6/3/05 Global Harmonization  525
               Task Force Document Titled
               "Labeling for Medical
               Devices," 10 Pages

Exhibit 51     Printout of Slide Titled     529
               "Adverse Reactions
               Standard," One Page

---

Page 501

EXHIBITS
(Continued)

Deposition         Description              Page
Exhibit 52     Printout of Slide Titled     530
               "Warnings & Precautions,"
               One Page

Exhibit 53     Printout of Slide Titled     534
               "Risk Known by Ethicon at
               the Time of the TVT-O Launch
               Not in the TVT-O IFU,"
               Six Pages

Exhibit 54     Excerpt from 2010 TVT-O IFU,  547
               Warnings & Precautions,
               One Page

Exhibit 55     2010 TVT-O IFU re Adverse    547
               Reactions and Precautions, One
               Page

Exhibit 56     1/8/14 Deposition of Thomas  557
               Barbolt

Exhibit 57     Printout of Slide Titled      558
               "Ethicon Scientist Thomas
               Barbolt," One Page

Exhibit 58     9/11/13 Deposition of David  561
               Robinson, Volume III

Exhibit 59     Printout of Slide Titled     562
               "Ethicon Medical Director
               David Robinson," One Page

Exhibit 60     1/14/14 Deposition of Piet   564
               Hinoul, Volume 4

Exhibit 61     Printout of Slide Titled     565
               "Ethicon Medical Director
               Piet Hinoul," One Page

Exhibit 62     Printout of Slide Titled     567
               "Ethicon Medical Director
               Piet Hinoul," One Page

---

Page 502

EXHIBITS
(Continued)

Deposition         Description              Page
Exhibit 63     Printout of Slide Titled     569
               "Ethicon Medical Director
               Piet Hinoul," One Page

Exhibit 64     Issue Report TVT-O, Open     575
               Date Between 01-Jan-2010 and
               31-Dec-2010
               Bates Nos. ETH.MESH.02656825
               - 834

Exhibit 65     Printout of Slide Titled     581
               "Ethicon Tension-Free
               Vaginal tape MDRs:  Most
               Commonly Reported Adverse
               Events (1999-2010),"
               One Page

Exhibit 66     Printout of Slide Titled     581
               "Ethicon Tension-Free
               Vaginal Tape Obturator MDRs:
               Most Commonly Reported
               Adverse Events (2004-2011),"
               One Page

Exhibit 67     Printout of Slide Titled     585
               "Ethicon Tension-Free
               Vaginal Tape Obturator MDRs:
               Most Commonly Reported
               Adverse Events (2004-2011)
               By Year," One Page

Exhibit 68     6/26/08 GHTF Final Document,  590
               Title:  Principles of
               Conformity Assessment for
               Medical Devices, 32 Pages

Exhibit 69     Printout of Slide Titled     595
               "Ethicon Medical Director
               Piet Hinoul," One Page

2 (Pages 499 to 502)

Peggy Pence Ph. D.

Page 503

1    NEWPORT BEACH, CALIFORNIA - THURSDAY, MARCH 31, 2016
2       10:16 A.M.
3       VIDEO OPERATOR SISSON:  Good morning.  We are now
4    on the record.  My name is John Sisson.  I'm the
5    videographer for Golkow Technologies.
6       Today is March 31, 2016.  It is now 10:16 in
7    the morning.
8       This video deposition is being held in Newport
9    Beach, California, in the matter of Ramirez versus
10   Ethicon, Incorporated, et al., for District Court,
11   438th Judicial District, Bexar County, Texas.  Today we
12   are taking Volume 2 in the deposition of Peggy Pence.
13      Counsel, will you please now identify
14   yourselves for the record.
15      MR. GOSS:  Tim Goss and Yvette Diaz for plaintiff.
16      VIDEO OPERATOR SISSON:  On the phone?
17      MR. LEWIS:  Brian Lewis for Ethicon and Johnson &
18   Johnson.
19      MS. VERBEEK:  Carol Verbeek for Dr. Cesar Reyes.
20      VIDEO OPERATOR SISSON:  Thanks very much.
21      Will our court reporter please now -- reswear
22   the witness.  By the way, our court reporter today is
23   Pam Cotten, my error.
24   ///
25   ///

Page 504

1       PEGGY PENCE, PhD, RAC, FRAPS,
2    called as a witness, and having been first duly sworn
3    by the Certified Shorthand Reporter, was examined and
4    testified as follows:
5
6       MR. GOSS:  We are here for the continuation of
7    Dr. Pence's deposition, but before we do that I
8    understand that Ethicon's lawyer, Brian Lewis, wants to
9    make a statement for the record.
10      MR. LEWIS:  Yes.  This is Brian Lewis.  I'm an
11   attorney for Ethicon and Johnson & Johnson.  I'm with
12   the law firm of Davis, Cedillo & Mendoza in San
13   Antonio, Texas.  I just want to note for the record
14   that by our appearance here today in the continuation
15   of Dr. Pence's second deposition, we are not waiving
16   the objections made by Ethicon's counsel,
17   Ms. Sutherland, during the initial deposition as to the
18   continuation of this deposition, the nature of the
19   deposition and trial deposition, and also the notice
20   for the follow-up destination scheduled for today.  We
21   are also not waiving any of the objections and
22   arguments that are also set forth in the motion that we
23   filed on the 29th of March for a protective order and
24   for a motion to compel additional time to depose
25   plaintiff's expert.  That motion is set for hearing

Page 505

1    tomorrow in the presiding court.
2       With that, we will continue to proceed with
3    this deposition.
4       MR. GOSS:  Okay.  Obviously, that's all for
5    discussion tomorrow, I guess.
6
7           EXAMINATION
8    BY MR. GOSS:
9       Q   Okay.  Good morning, Dr. Pence.
10      A   Good morning, Mr. Goss.
11      Q   And you understand this is the continuation of
12   your deposition testimony?
13      A   Yes, I do.
14      Q   Okay.  I want to -- and just for the record,
15   we are waiting for some of the exhibits -- well, all
16   the exhibits that were used in your deposition last
17   week.  They didn't make it over by 10:00 from the court
18   reporter.  I understand the court reporter firm is
19   going to try to get them here by 10:30.  It is now
20   10:15 or -16 or so.  So I'm going to start a little --
21   a place that might be a little awkward in my outline,
22   then we will pick back up to where we stopped last
23   time.  Okay?
24      A   Sounds fine.
25      VIDEO OPERATOR SISSON:  If you could pause for a

Page 506

1    second.  10:19, we are off the record.
2       (Off-the-record discussion.)
3       VIDEO OPERATOR SISSON:  At 10:20, we are back on
4    the record.
5       MR. GOSS:  Let me also add that, out of fairness,
6    what I am trying to do this morning is I have forwarded
7    to -- as soon as I got the email for the counsel that
8    would be defending the depositions for the defendants,
9    I have forwarded a group of slides and some other
10   things that I wanted to make sure that they had before
11   we got started so as to not be at a disadvantage.
12      I have also informed counsel that if during
13   the deposition there is something that I'm using that
14   you need to see, I will endeavor to get it emailed to
15   you as quickly as possible.  I think I can do it fairly
16   quickly because I think we have got most of the
17   exhibits handy on -- I don't know a lot about
18   computers, but on a hard drive or whatever it is
19   called.
20      Okay.  With that, I'm going to go forward.  I
21   assume, as I understand it, the lawyers on the phone,
22   you have received my first group of documents that I've
23   emailed to you; is that right?
24      MR. LEWIS:  That's correct.
25      MR. GOSS:  Okay.  Carol?

3 (Pages 503 to 506)

Peggy Pence Ph. D.

Page 507

1    MS. DIAZ: Oh, sorry. You were on mute. That's
2    correct.
3    MR. GOSS: Okay. All right. With that, I'll
4    proceed.
5    BY MR. GOSS:
6    Q    Dr. Pence, I would like to talk to you a
7    little bit about heavyweight mesh. Okay?
8    A    Okay.
9    Q    You understand what I'm talking about when I
10   say "heavyweight mesh"?
11   A    Yes, I do.
12   Q    In your investigation of Ethicon, did you
13   review any testimony or internal documents regarding
14   heavyweight mesh versus lightweight mesh?
15   A    Yes, I did.
16   Q    Did you review any testimony from Ethicon as
17   to whether -- the mesh in the Prolene mesh, or TVT-O,
18   that Jennifer Ramirez got, whether that mesh was
19   heavyweight or lightweight?
20   A    Yes, I did.
21   Q    And what did you review, what testimony?
22   A    I reviewed the testimony, for example, of
23   Dr. Joerg Holste, who is in charge of preclinical
24   development, has been with the company for over 30
25   years, and which he testified that the Prolene mesh is

Page 508

1    heavyweight mesh.
2        (The documents referenced below
3        were marked Deposition Exhibits 47 and
4        48 for identification and are appended
5        hereto.)
6    BY MR. GOSS:
7    Q    Okay. I'm going to hand you what's been
8    marked as your Exhibits 47 and 48. I actually probably
9    did this backwards, now that I look at it, but is
10   Exhibit 48 a transcript -- it appears to be a
11   transcript dated July 29th, 2013, given in the MDL in
12   West Virginia for the videotaped deposition of
13   Dr. Holste.
14       Is that a transcript that you reviewed in your
15   investigation in this case?
16   A    Yes, it is.
17   Q    Is that a transcript that you relied on in
18   whole or in part for some of your opinions in this
19   case?
20   A    Yes.
21   Q    Okay. And I'm going to ask you the same
22   questions regarding Exhibit 47, which on its face
23   reflects that it is Volume II of a deposition
24   transcript given in the MDL for Dr. Holste on
25   July 30th, 2013.

Page 509

1        Is that a transcript that you reviewed in your
2    investigation in this case?
3    A    Yes, it is.
4    Q    And did the testimony in that transcript form
5    the basis in whole or in part in any of your opinions
6    in this case?
7    A    Yes.
8    Q    Okay. And to back up a little bit, is
9    Dr. Holste the one whose testimony you said supports
10   your understanding that it was heavyweight mesh?
11   A    Yes.
12   Q    In that regard, I'm going to refer you to the
13   July 29th transcript at page 40, lines 12 through 15,
14   and ask that you read those lines, 12 through 15,
15   question and answer.
16       "Question: And Prolene,
17       old-construction mesh at 100 to
18       110 grams per meter squared is
19       considered a heavyweight mesh; correct?
20       "Answer: Yes."
21   Q    And is that the testimony you relied upon for
22   support of your opinion it's heavyweight mesh?
23   A    Yes.
24   Q    Do you know whether or not the Prolene
25   old-construction mesh that's referenced in the

Page 510

1    testimony that you just read is the same mesh that is
2    used in the TVT-O?
3    A    Yes.
4    Q    Is it?
5    A    Yes, it is.
6    Q    In your investigation, did you see there any
7    discussion as to any of the risks that may be created
8    by heavyweight mesh?
9    A    Yes.
10   Q    And did you review any testimony in that
11   regard?
12   A    Yes.
13   Q    And whose testimony did you review?
14   A    I read, for example, Dr. Holste's testimony.
15   He did testify about that.
16   Q    Okay. I want to refer you to -- I've
17   got an excerpt here for you -- refer you to pages 51
18   through 53 of the July 29th testimony. Is any of that
19   testimony anything that you relied upon in forming your
20   opinions in this case?
21   A    Yes, it is.
22   Q    And on page 51 at line 25, it begins with a
23   question.
24       "One of the reasons" --
25       "Question: One of the reasons that

4 (Pages 507 to 510)

Peggy Pence Ph. D.

Page 511

```
 1    Ethicon developed a lighter-weight
 2    large-pore mesh was so that less foreign
 3    material would be left behind in the
 4    tissue; correct?
 5        "Answer:  That is correct, yes,
 6        "Question:  Because the more
 7    foreign material that's left in the
 8    tissue, the greater the foreign-body
 9    reaction; correct?"
10        Some objections
11        "Answer:  That is correct, yes.
12        "And if more foreign body that's in
13    the body that creates a greater
14    foreign-body reaction also can create a
15    greater inflammatory reaction; correct?
16        "Answer:  Yes.
17        "And if you have more foreign
18    material causing a greater inflammatory
19    reaction, it can cause complications in
20    patients; correct?
21        "That can be assumed, yes.
22        "Question:  One of the problems
23    that a greater inflammatory reaction can
24    cause in the human tissue to a foreign
25    body like a polypropylene mesh implant
```

Page 512

```
 1    is if there can be more contraction,
 2    sometimes known as mesh shrinkage;
 3    correct?
 4        "Answer:  Yes."
 5        Did I read that correctly?
 6    A   Yes, you did.
 7    Q   And what did you rely upon, with respect to
 8    that testimony, for your opinion, if any?
 9    A   With regard to the fact that the
10    heavier-weight mesh does result in a greater
11    foreign-body reaction, greater inflammatory reaction,
12    and that greater inflammatory reaction, as is noted in
13    the testimony -- and this is also reported in the
14    literature and other places as well, documentation and
15    testimony that I reviewed -- that additional greater
16    inflammatory reaction can result in more -- more of
17    a -- of a contraction.  The tissue around the mesh can
18    compress the mesh and cause a contraction.  That can
19    cause pain.  It could cause other types of
20    complications as well.
21    Q   Does the 2010 IFU reflect whether the mesh is
22    heavyweight or lightweight?
23    A   No, it does not.
24    Q   And would the standard in the industry be for
25    it to reflect heavyweight or lightweight?
```

Page 513

```
 1    A   If it impacts safety and performance, yes,
 2    that would be appropriate.
 3    Q   Based upon Dr. Holste's testimony, would it
 4    impact safety or performance?
 5    A   Yes.
 6    Q   Do you know -- first of all, did you review in
 7    your investigation of Ethicon's files any documents
 8    that reflected whether or not Ethicon had
 9    lighter-weight meshes than Prolene mesh prior to 2010?
10    A   Yes.
11    Q   And what did your investigation determine?
12    A   Yes, the company did have other meshes that
13    were lighter weight.
14    Q   What were those -- some of those other meshes?
15    A   ULTRAPRO, Vypro, for example.
16    Q   Okay.  Were any of those meshes that
17    lighter-weight meshes being used?
18    A   In other products, yes.
19    Q   Did you see anything in your investigation,
20    any documents or testimony in your investigation as to
21    why -- as to why a lighter-weight mesh could not have
22    been used in the TVT-O?
23    A   No.
24    MR. LEWIS:  Objection.  Form.
25    THE WITNESS:  The company would have obviously had
```

Page 514

```
 1    to do the appropriate development work, but, no, they
 2    had the mesh available and could have done the
 3    development work.
 4    BY MR. GOSS:
 5    Q   Did you see whether or not the company did any
 6    development work or clinical testing of any
 7    lighter-weight meshes for the TVT-O?
 8    A   No.
 9    Q   Okay.  Would a reasonable and prudent
10    manufacturer have done those tests?
11    A   Yes.
12    Q   Would those types of tests be mandated by the
13    Global Harmonization Task Force guidelines, for
14    example, the clinical evaluation document that we have
15    looked at?
16    A   In terms of providing a safer alternative, if
17    there is a safer alternative available, it would be
18    appropriate for a company to -- if there is a problem
19    with safety and performance related to the material and
20    the design of the product, it would be appropriate to
21    implement an improved design, yes --
22    Q   And I believe we looked at --
23    MR. LEWIS:  Objection.  Nonresponsive.
24    BY MR. GOSS:
25    Q   I believe we looked at a document early on --
```

5 (Pages 511 to 514)

Peggy Pence Ph. D.

| Page 515 |
|---|

1  the first day of your deposition, from the Global
2  Harmonization Task Force entitled Essential Principles
3  of Safety in Performance of Medical Devices.
4      Do you recall that?
5      A  Yes, I do.
6      Q  Was there anything in that guideline -- which
7  I understand you said were standards in the industry;
8  is that correct?
9      A  Right.
10      Q  Is there anything in that guideline that would
11  require a manufacturer to eliminate risk as reasonably
12  practical?
13      A  Yes.  One is the global standard for medical
14  device development requires that safety and performance
15  information related to a product is fed back into the
16  risk analysis so that there is -- that the benefit --
17  that there's always a favorable benefit-to-risk ratio
18  and that any risks are acceptable, and if one has to
19  mitigate risk when one learns of safety issues.  And
20  the discussion that we are having, one of the ways to
21  mitigate risk with TVT-O would have been to implement a
22  lighter-weight product, lighter-weight mesh.
23      MR. LEWIS:  Objection.  Nonresponsive.
24  BY MR. GOSS:
25      Q  I want to just reference you back to the

| Page 516 |
|---|

1  Global Harmonization Task Force document, just so we
2  can reorient ourselves.  Can you explain what the
3  Global Harmonization --
4      A  Certainly.
5      Q  -- Task Force various guidelines are, what
6  that is and what the various guidelines are?
7      A  Yes.  The Global Harmonization Task Force,
8  often referred to for short as GHTF, was implemented in
9  1992 and had a duration of approximately 20 years.  It
10  had five founding members, one of which was the United
11  States as well as Europe, Japan, Australia, and Canada,
12  if I recall correctly as I sit here today.  And the
13  purpose of that organization was to bring both industry
14  representatives as well as regulators from these
15  various countries, and some additional bodies and
16  entities involved in medical device development later
17  entered the group as well.
18      The idea was to develop a global model for the
19  development of medical devices worldwide, essentially a
20  global standard to enhance patient safety and bringing
21  innovative new medical devices to market efficiently.
22      (The document referenced below was
23      marked Deposition Exhibit 49 for
24      identification and is appended hereto.)
25  ///

| Page 517 |
|---|

1  BY MR. GOSS:
2      Q  Okay.  I'm going to -- as I mentioned before
3  we started the deposition, the exhibits aren't here yet
4  from your prior deposition, so I'm going to mark
5  another one of the Global Harmonization Task Force
6  documents that we used last deposition as one entitled
7  Essential Principles of Safety and Performance of
8  Medical Devices.
9      Do you remember that one?
10      A  Yes.
11      Q  Dated May 20th, 2005, and I would like -- I'm
12  marking this as Exhibit 49.  I'll hand it to you.
13      I'll represent to you that I have highlighted
14  on page 8 and 9 for future use as a potential slide
15  some language I want to talk with you about.
16      But is Exhibit 49 the document -- one of the
17  documents that you have discussed in your deposition
18  last week?
19      A  Yes, it is.  It is one of the guidance
20  documents for GHTF, and it is through a number of
21  guidance documents that GHTF implemented or developed
22  that global model for medical device development that I
23  was mentioning.
24      Q  Okay.  And if you would go to page -- is it 8?
25      A  Eight.

| Page 518 |
|---|

1      Q  Go to page 8, section 5.2 of page 8, where it
2  picks up with, "The manufacturer should apply the
3  following principles in the priority order listed," and
4  it says, the first bullet point on page 8:
5      "Identify known or foreseeable
6  hazards and estimate the associated risk
7  arising from the intended use of
8  foreseeable misuse."
9      The next bullet point:
10      "Eliminate risk as far as
11  reasonably practical through inherently
12  safe design and manufacture."
13      Third bullet point:
14      "Reduce as far as reasonably
15  practical the remaining risk by taking
16  adequate protection measures, including
17  alarms."
18      And the last point:
19      "Inform users of any residual risk."
20      Did I read that right?
21      A  Yes, you did.
22      Q  Okay.  Do any of these apply to your testimony
23  relating to heavyweight and lightweight meshes?
24      A  Yes, they do.
25      Q  Explain, please.

6 (Pages 515 to 518)

Peggy Pence Ph. D.

Page 519

1    A   For example, "Identify known or foreseeable
2   hazards and estimate the associated risk arising from
3   the intended use."  In terms of the heavyweight mesh
4   and the fact that, as Dr. Holste testified and as we
5   were just discussing, that the greater -- that the
6   heavyweight mesh causes a greater foreign-body
7   reaction, a greater inflammatory reaction, which can
8   cause greater contraction and shrinkage which can have
9   complications associated with it, that is relevant to
10   that issue with heavyweight mesh.
11         Secondly, "Eliminating risk as far as
12   reasonably practical through inherently safe design and
13   manufacture."  That goes back to what I was saying a
14   short while ago, that knowing that lighter-weight mesh
15   can reduce the foreign-body -- has the potential to
16   reduce the foreign-body reaction and inflammatory
17   reaction, therefore, may cause reduced complications.
18   That would mean that that would be a safer design.  So
19   that -- that point goes to --
20    Q   Okay.
21    A   -- to that.
22    Q   You are referencing Exhibit 49.  And is it
23   your position these are the written standards in the
24   industry, some of them?
25    A   Yes.  This is the -- this is one of the

Page 520

1   guidance documents, a very key document, Essential
2   Principles of Safety and Performance, that is part of
3   the global model that has been developed for medical
4   devices through the work of the Global Harmonization
5   Task Force.
6    Q   Okay.  Let's move off that subject.  I think
7   that we marked the 2010 IFU last time and, again, the
8   exhibits aren't here -- that's them?
9    MS. DIAZ:  Uh-huh.
10    MR. GOSS:  I'm told that the exhibits just arrived.
11   Let me see those.  So we now have the exhibits.  I see.
12   All right.
13         So, Ms. Court Reporter, I know that you can't
14   type and talk at the same time, so what I've got here
15   is I've got a set of exhibits that go through 46?
16    THE REPORTER:  Yes.
17    MR. GOSS:  And we just picked up with 47.  Okay.
18   All right.  For everybody on the phone, we now have the
19   stack of exhibits, and you all should have copies of
20   those that were provided during the deposition last
21   week.
22   BY MR. GOSS:
23    Q   So, Dr. Pence, I'm going to hand to you -- I'm
24   going to hand you what was marked in your deposition
25   last week, the 2010 IFU for the TVT-O.

Page 521

1         Do you recognize that document?
2    A   Yes, I do.  Thank you.
3    Q   And there was a little bit of discussion about
4   that last week, as I recall; is that right?
5    A   Yes.  To the best of my recollection also,
6   yes.
7    Q   I'm going to mark a -- what was marked as
8   Exhibit 10 was the deposition exhibit for Dr. -- when
9   it was used with Dr. Reyes and it only has the English
10   version of it.  Is that right?
11    A   Yes.
12    MR. GOSS:  So unless someone objects, just so that
13   we have a complete IFU in the record, I'm going to mark
14   the complete IFU as Exhibit 10A.
15         And just for those folks on the phone, all it
16   has done -- all it adds is all the different languages.
17   So 10, which we used last week, is the English -- just
18   up through the English, and I'm going to mark 10A just
19   so we have a complete record.
20         (The document referenced above was
21         marked Deposition Exhibit 10A for
22         identification and is appended hereto.)
23   BY MR. GOSS:
24    Q   Dr. Pence, is Exhibit 10 simply the English
25   version taken out of the whole 10A?

Page 522

1    A   Yes.
2    Q   Okay.  All right.
3         All right.  Now, when I retained you in this
4   case, was one of the things that I asked you to look at
5   the IFU?
6    A   Yes.
7    Q   And I asked you to determine whether or not it
8   was adequate or inadequate?
9    A   That is correct.
10    Q   Did you ever endeavor to do so?
11    A   I did.
12    Q   All right.  Are there professional standards
13   that set forth what should go into an IFU?
14    A   Yes, there are.
15    Q   And are you familiar with those standards?
16    A   Yes, I am.
17    Q   Just to back up a little bit, explain to the
18   jury what the IFU is.
19    A   The IFU stands for Instructions For Use.  It
20   is the cornerstone of risk management because it is the
21   primary communication between the manufacturer and the
22   user of the device, in this case a surgeon.  It
23   provides information on the purpose of the device, what
24   it is to be used for, how -- the patient population,
25   the types of patients in which it is to be used, how it

7 (Pages 519 to 522)

Peggy Pence Ph. D.

| Page 523 | Page 525 |
|---|---|
| 1  is to be used, the instructions for its use, and, very<br>2  importantly, safety and risk information.<br>3      Q   Okay.<br>4      A   If I might add, the key purpose, it should<br>5  include all information necessary for the safe and<br>6  effective use of the device.<br>7      Q   Is there any debate about that?<br>8      A   No.<br>9      Q   We discussed the -- remember discussions of<br>10  the blue book last week?<br>11      A   I do.<br>12      Q   I'm going to hand you what has been marked as<br>13  Exhibit 2 and ask you --<br>14      A   Thank you.<br>15      Q   -- is that the blue book?<br>16      A   Yes, it is.<br>17      Q   Please explain what the blue book is.<br>18      A   This is published by the U.S. Food & Drug<br>19  Administration, the FDA, and in particular -- it is a<br>20  guidance document and it is called Device Labeling<br>21  Guidance, given a number, G91-1, and referred to as a<br>22  blue memo.<br>23      Q   Is that a written standard in the industry?<br>24      A   Yes, it is.<br>25  /// | 1  support of your opinions today?<br>2      A   Yes, it is.<br>3      Q   About labeling?<br>4      A   Yes.<br>5      Q   Did you rely upon anything in the blue book in<br>6  support of your opinions today about labeling?<br>7      A   Yes, I did.<br>8      Q   Last week we also, I believe, marked and<br>9  used -- see if I can find it here -- Exhibit 24 and<br>10  Exhibit 25.  Exhibit 24 being a Global Harmonization<br>11  Task Force document regarding Essential Principles of<br>12  Safety and Performance of Medical Devices and<br>13  Exhibit 25 being a Global Harmonization Task Force<br>14  document entitled Clinical Evaluation.<br>15      Did you rely on Exhibits 24 and 25 in giving<br>16  your -- in reaching your opinions that you are going to<br>17  give today regarding labeling?<br>18      A   Yes, I did.<br>19      Q   Okay.  All right.  What I would like to focus<br>20  on is in the IFU, the Adverse Reaction section and the<br>21  Precautions and Warnings sections.<br>22      Have you found those?<br>23      A   Yes.<br>24      Q   All right.  I want to visit with you a little<br>25  bit about this. |

| Page 524 | Page 526 |
|---|---|
| 1      (The document referenced below was<br>2  marked Deposition Exhibit 50 for<br>3  identification and is appended hereto.)<br>4  BY MR. GOSS:<br>5      Q   I'm going to hand you what has been marked as<br>6  your Exhibit 50.  This is a document I believe you<br>7  touched on a bit last week as well.  It is another<br>8  Global Harmonization Task Force document titled<br>9  Labeling for Medical Devices, dated June 3rd, 2005.<br>10      What is this document?<br>11      A   As I mentioned, the GHTF published a number of<br>12  different guidance documents that were arrived at<br>13  through a number of different steps of coordination<br>14  amongst industry representatives, manufacturers that<br>15  means, representatives of manufacturers, and regulators<br>16  from the various countries that I mentioned.<br>17      And this is one of the guidance documents<br>18  that was published by GHTF in final form as one of the<br>19  guidances that is important to the global model for<br>20  development and marketing of medical devices.  And this<br>21  particular one is called Labeling for Medical Devices.<br>22      Q   Is this a written standard in the industry<br>23  regarding labeling?<br>24      A   Yes, it is.<br>25      Q   Is this the same thing that you relied upon in | 1      A   All right.<br>2      Q   First of all, did you undertake an<br>3  investigation to reach an opinion as to whether or not<br>4  the -- those sections were adequate?<br>5      A   Yes, I did.<br>6      Q   Okay.  We are going to get to the facts<br>7  supporting your opinions here shortly, but did you<br>8  reach a conclusion as to whether the Adverse Reaction<br>9  section in the label was adequate?<br>10      A   Yes, I did.<br>11      Q   And what's that conclusion?<br>12      A   It was not adequate.<br>13      Q   And likewise, with respect to the<br>14  contraindications and -- I'm sorry, the Warnings and<br>15  Precautions section, did you reach a conclusion as to<br>16  whether or not that section was adequate?<br>17      A   Yes, I did.<br>18      Q   And what was that opinion?<br>19      A   That section also is not adequate.<br>20      Q   Okay.  So in your investigation to determine<br>21  whether or not the Adverse Reaction section, for<br>22  example, was adequate, what did you do?<br>23      A   I evaluated a number of documents.  Of course,<br>24  I start with the framework of the regulations and the<br>25  applicable standard and guidance documents, which -- |

8 (Pages 523 to 526)

Golkow Technologies, Inc. - 1.877.370.DEPS

Peggy Pence Ph. D.

Page 527

1  some of which we discussed or we just put into evidence
2  here.
3       I start with that framework, and then I looked
4  at company documents with regard to what they knew and
5  when they knew it.  I reviewed deposition testimony
6  about what was known.  I reviewed the medical and
7  scientific literature that was relevant.  I evaluated
8  commercial experience in the context of publicly
9  available information that's on a web -- in a database
10  called MAUDE, Manufacturer and User Facility Device
11  Experience database, referred, again, to as MAUDE,
12  M-A-U-D-E, for short, which includes serious adverse
13  reactions and malfunctions and that can result in
14  serious adverse reactions or be life-threatening that
15  are reported to the FDA.
16       This information is available, again,
17  publicly, so a manufacturer like Ethicon can look at
18  competitor product adverse events that have occurred as
19  well as their own reports and their complaint database.
20  Q  Let me ask you a little bit about that.  Is
21  one of the things you need to know is whether Ethicon
22  knew or should have known about a risk?
23  A  Yes.
24  Q  Okay.  And let me back up a little bit, and
25  let's go to the blue book which is marked as Exhibit --

Page 528

1  A  Two.
2  Q  -- Exhibit 2.  Does the blue book provide for
3  us what should be in the Adverse Reaction section?
4  A  Yes, it does.
5  Q  Okay.  What page of the blue book provides
6  that?
7  A  On this copy it is page 12, section 8.
8  Q  And what is that entitled?
9  A  Adverse Reactions.
10       (The document referenced below was
11       marked Deposition Exhibit 51 for
12       identification and is appended hereto.)
13  BY MR. GOSS:
14  Q  Okay.  I'm going to hand you what -- I want
15  you to keep that in front of you.  I'm going to hand to
16  you a slide that's been marked as Deposition Exhibit 51
17  entitled Adverse Reactions Standard.  I'm going to ask
18  you whether or not -- have you seen this slide before?
19  A  Yes.
20  Q  Okay.  Is that standard set forth in the slide
21  marked as Exhibit 51 the standard that's set forth in
22  the blue book?
23  A  Yes, it is.
24  Q  And what does slide 51 say?
25  A  It says that all adverse reactions reasonably

Page 529

1  associated with the use of the device should be
2  included in the product label.
3       (The document referenced below was
4       marked Deposition Exhibit 52 for
5       identification and is appended hereto.)
6  BY MR. GOSS:
7  Q  Okay.  Now, let's go to the Warnings and
8  Precautions section of the blue book.  I'm going to ask
9  you the same set of questions.
10       I'm going to hand you what's been marked as
11  Deposition Exhibit 52.  The Warnings and Precautions
12  section, I believe, is the page before that Adverse
13  Reaction section in the blue book.
14  A  The warning section is on page 10 in this
15  copy.
16  Q  Okay.  And I'm going to hand you what's been
17  marked as Deposition Exhibit 52, and I'm going to ask
18  you whether or not that accurately sets forth the
19  warnings and precautions section set forth in the blue
20  book.
21  A  Yes.
22  Q  What does that slide titled "Warnings and
23  Precautions" state?
24  A  Shall I read it?
25  Q  Yes.

Page 530

1  A  "Describe serious adverse reactions
2  and potential safety hazards, the
3  limitations in use imposed by them, and
4  the steps that should be taken if they
5  occur."
6       Secondly:  "Include an appropriate
7  warning if there is reasonable evidence
8  of an association of a serious hazard
9  with the use of the device.  A causal
10  relationship need not have been proved."
11       And thirdly:  "Include information
12  regarding any special care to be
13  exercised by the practitioner and/or
14  patient for the safe and effective use
15  of the device."
16  Q  Okay.  And, again, this is from the blue book;
17  is that right?
18  A  Yes.
19  Q  By the way, would slides 51 and --
20  A  52.
21  Q  -- 52 assist you -- if published to the jury,
22  would they assist you in setting forth your testimony?
23  A  Yes.
24  Q  Okay.  Did you --
25  MR. GOSS:  For those of you on the phone, we are

Peggy Pence Ph. D.

Page 531

1  having some trouble with my microphone right now.
2       (Off-the-record discussion.)
3       MR. GOSS:  Okay.  All right.  We are back.
4  BY MR. GOSS:
5       Q   Do you know whether or not -- first of all,
6  strike that.
7           Did you see anything in your investigation
8  that reflected whether or not Ethicon had adopted the
9  blue book definitions you just read as their standard?
10      A   Yes, I did.
11      Q   And what did you review in that regard?
12      A   In particular, the deposition of Susan Lin
13  from the regulatory department at Ethicon.
14      Q   Okay.  I'm going to hand you what I've marked
15  as Exhibit 53, and this is the -- on the front page
16  says it is the August 9th, 2013, Volume III --
17  actually, I'm going to remove that exhibit.  It was the
18  wrong one.  We will get back to the Susan Lin actual
19  deposition itself.
20          But in summary, what do you recall Susan Lin
21  testified to with respect to Ethicon and the blue book?
22      A   That Ethicon had adopted the G91-1 blue book
23  memo on medical device labeling as its standard to
24  follow.
25      Q   And is that what you would expect of a

Page 532

1  reasonable, prudent manufacturer?
2       A   Yes.
3       Q   Okay.  So that's a good thing?
4       A   That's a good thing.
5       Q   All right.  Okay.  So we have gone through the
6  blue book, we have gone through the global marketing.
7  Has the global -- GFTG?
8       A   GHTF.
9       Q   G -- I'm sorry.
10      A   That's okay.
11      Q   GHTF.
12          You have described what needs to be in the
13  Adverse Reaction section.  You -- I believe your
14  testimony was that in order to determine whether or not
15  the 2010 Adverse Reaction section and Precautions and
16  Warnings sections were adequate, you needed to know
17  what Ethicon knew or should have known?
18      A   That's correct.
19      Q   And did you endeavor to do that?
20      A   Yes, I did.
21      Q   Okay.  All right.  I'm going to hand you --
22      MR. GOSS:  And for the folks on the phone, there's
23  a slide that I forwarded to you that's entitled -- it
24  is about a five-page slide entitled "Risk Known by
25  Ethicon at the Time of TVT-O Launch Not in the TVT-O

Page 533

1  IFU," and that's where I'm going with this line of
2  questions.
3       (The document referenced below was
4  marked Deposition Exhibit 53 for
5  identification and is appended hereto.)
6  BY MR. GOSS:
7       Q   I'm going to hand to you -- first of all, did
8  you assist in the preparation of the slide that sets
9  forth the risks known by Ethicon at the time of the
10  TVT-O launch that weren't in the IFU?
11      A   Yes.
12      Q   Would that slide assist you in presenting your
13  testimony to the jury?
14      A   Yes.
15      Q   Okay.  I'm going to hand you what's been
16  marked as Deposition Exhibit 53.
17      A   Thank you.
18      Q   Is that the slide that you assisted in the
19  preparation of?
20      A   Yes.
21      Q   Okay.  Let's kind of figure out where we are
22  on this.
23          So the left side of the slide says "Known
24  Risks," the middle part of the slide says "Source," and
25  the right part of the slide says 2010 TVT dash -- I'm

Page 534

1  sorry, "2010 TVT-O IFU."
2           First of all, what is the middle section,
3  Source?
4       A   On this particular slide the source reflects
5  testimony of senior members of Ethicon's development
6  team for the TVT-O.
7       Q   And are these items under Source items that
8  you relied upon in making a determination as to whether
9  a risk was known or should have been known by Ethicon?
10      A   Yes.  And there is one source here that
11  actually is a document in addition to the others being
12  testimony.
13      Q   Okay.  So let's just walk through the slide.
14          On the first page it says "Dyspareunia."
15  What's dyspareunia?
16      A   A painful sex, painful intercourse.
17      Q   And you have on the slide as your source
18  Catherine Beath, Martin Weisberg.  Who are those
19  people?
20      A   Catherine Beath was head of regulatory
21  affairs, and Martin Weisberg was medical director.
22      Q   Okay.  What's regulatory affairs?
23      A   Regulatory affairs is the part of the company
24  that deals with -- with standards, regulations, and
25  particularly FDA -- in particular FDA matters.

10  (Pages 531 to 534)

Peggy Pence Ph. D.

Page 535

1    Q   So just so we are clear, as we walk through
2  this slide, when you list, for example, Martin
3  Weisberg's testimony, it is next to dyspareunia, what
4  is that telling us?
5    A   It is telling us that he -- he acknowledged
6  that dyspareunia was a known risk.
7    Q   At the --
8    MR. LEWIS: Objection. Form.
9  BY MR. GOSS:
10   Q   At the time of the launch?
11   A   Yes.
12   Q   And when you say "acknowledge," is that what
13  these deposition cites relate to?
14   A   Yes.  This is deposition testimony that
15  confirms that the company knew about these risks.
16   Q   Okay.  So then it says for dyspareunia, for
17  example, 2010 TVT-O IFU, "No."
18     What does that mean?
19   A   That means that there was no listing of an
20  adverse reaction or a warning with regard to
21  dyspareunia in the 2010 IFU that was in use at the time
22  of Ms. Ramirez's surgery.
23   Q   Would a reasonable and prudent manufacturer
24  applying the standards in the industry that we have
25  talked about had included dyspareunia in the Adverse

Page 536

1  Reactions section?
2    A   Definitely.
3    Q   The next one is, "Vaginal scarring leading to
4  significant decrease in quality of life," and the
5  source is Beath deposition testimony.
6      Again, explain to us what that means.
7    A   That, again, means that this was -- there was
8  testimony that this was a known adverse event, a known
9  risk of use of the TVT-O device, and it was not
10  included as a risk in the 2010 IFU, which was the IFU
11  in use at the time of Ms. Ramirez's surgery.
12   Q   And for each of these things that are in
13  yellow, each of these risks in yellow, what does that
14  denote?
15   A   This denotes that these are -- these are
16  complications that Ms. Ramirez has been reported to
17  have experienced.
18   Q   Okay.  And let's just go down this.  So
19  recurrence of incontinence.  First of all, what is
20  that?
21   A   Incontinence, Ms. Ramirez had surgery for
22  stress urinary incontinence, which is an involuntary
23  leakage of urine with intra-abdominal pressure such as
24  is caused by coughing or exercise, jumping, for
25  example, and the TVT-O device is intended to treat

Page 537

1  stress urinary incontinence.  So recurrence of
2  incontinence would be a failure of performance of the
3  device for its intended use.
4    Q   And should that have been --
5    MR. LEWIS: Objection.
6  BY MR. GOSS:
7    Q   Should that have been in the TVT-O IFU in
8  2010?
9    A   Yes.
10   Q   And would a reasonable and prudent
11  manufacturer applying the standards in the industry
12  have put it in the Adverse Reaction section of the IFU?
13   A   Yes.
14   Q   Okay.  And what do you rely upon in support of
15  their knowledge?
16   A   In this case, as cited here, Ms. Beath's
17  deposition testimony.
18   Q   Okay.  Let's just continue going down this.
19     "Inflammation/chronic foreign-body reaction."
20  First of all, what is that?
21   A   We were discussing earlier the chronic
22  foreign-body reaction.  The inflammation that results
23  from that.  Because polypropylene is plastic, it is a
24  foreign body.  When it is implanted in the body, the
25  body mounts a foreign-body reaction to it, and it is --

Page 538

1  in contrast to what the TVT-O IFU actually said, that
2  foreign-body reaction and inflammation can be chronic
3  and that can be associated with risk.
4      And so that was confirmed by the testimony of
5  Dr. Hinoul, Piet Hinoul, also a medical director, and
6  Dr. Weisberg, who we talked about also, a medical
7  director.
8    MR. LEWIS: Objection. Nonresponsive.
9  BY MR. GOSS:
10   Q   Who confirmed that?
11   A   Dr. Hinoul, Dr. Piet Hinoul, and Dr. Weisberg.
12   Q   Who is Dr. Piet Hinoul?
13   A   Worldwide medical director at one point, if I
14  recall correctly.
15   Q   What's a medical director?
16   A   In key -- in -- a physician.
17   Q   Okay.
18   A   He is a doctor, a physician, at Ethicon with a
19  key role in product development providing medical input
20  into product development, reviewing -- reviewing safety
21  risk information, evaluating from a medical standpoint
22  the safety and efficacy of products.
23     There are a number of different roles that
24  people in -- that physicians in medical affairs will
25  play.

11 (Pages 535 to 538)

Peggy Pence Ph. D.

Page 539

1      Q   The slides that we marked as Exhibits 51 and
2  52 setting forth the adverse reaction standard and
3  warnings and precautions standard, and I believe you
4  testified that those came from the blue book, would
5  these be in compliance with the Global Harmonization
6  Task Force requirements as well?
7      A   Yes.
8      Q   Okay.
9      A   Thank you.
10     Q   Okay.  Let's go to -- let's go to the next
11  one.  First of all, the inflammation and chronic
12  foreign-body reaction, should that have been in the
13  2010 IFU, that risk?
14     A   What it says in the 2010 IFU is that
15  inflammation may result and there may be a transit --
16  may result -- let me see if I can find the specific
17  language.
18        That "transitory local irritation at the wound
19  site and a transitory foreign-body reaction may occur,
20  and this response could result in inflammation."  And
21  there it says transitory, meaning brief.  It does not
22  mean chronic; so that is misleading.
23     Q   Okay.  Let's go to -- should -- should the
24  belief -- strike that.
25        The risk of chronic foreign-body reaction,

Page 540

1  should that have been disclosed in the IFU?
2      A   Yes.  Definitely.
3      Q   And would a reasonable and prudent
4  manufacturer applying the standards in the industry
5  have done so?
6      A   Yes.
7      Q   Was it in the IFU?
8      A   No.
9      Q   Okay.  Urinary tract infection, what's a
10  urinary tract infection?
11     A   It is infection of -- could be infection of
12  the bladder, the urinary tract.
13     Q   Who is your source for your opinion that
14  Ethicon knew or should have known about urinary tract
15  infections prior to launch?
16     A   Dr. --
17  MR. LEWIS:  Objection.  Form.
18  THE WITNESS:  Dr. Piet Hinoul.
19  BY MR. GOSS:
20     Q   Okay.  And is there anything regarding the
21  risk of urinary tract infection in the 2010 IFU?
22     A   No, there is not.
23     Q   Would a reasonable and prudent manufacturer
24  applying the standards in the industry have included
25  urinary tract infection risk in the Adverse Reactions

Page 541

1  section of the 2010 IFU?
2      A   Yes.
3      Q   And, again, everything in yellow is something
4  that Jennifer Ramirez has alleged that she has
5  experienced; is that correct?
6      A   That is correct.
7      Q   The next known risk, "nerve damage that can
8  cause lifelong pain."
9        First of all, what's that?
10     A   It could be some type of damage to the nerve.
11  It could be irritation of the nerve.  It could be
12  during implantation of the device, an impact on the
13  nerve.
14        There are different types of damage to the
15  nerve that could occur, but that nerve damage could be
16  long-term and result in pain and other types of
17  complications.
18     Q   Is there anything in the IFU relating to
19  long-term nerve damage that could cause lifelong pain?
20     A   No.  There is not.
21     Q   Would a reasonable and prudent manufacturer
22  applying the standards in the industry have included
23  that in the IFU?
24     A   Definitely.
25     Q   Chronic pain is the next one.

Page 542

1        What does that mean?
2      A   Chronic pain means long-term pain that just
3  doesn't go away after a short period of time.
4      Q   And the source is the Weisberg deposition
5  testimony.  Again, who is Weisberg?
6      A   Medical director at Ethicon, a physician.
7      Q   Is chronic pain listed as an adverse reaction
8  in the 2010 IFU?
9      A   No, it is not.
10     Q   And would a reasonable and prudent
11  manufacturer applying the standards in the industry
12  have included chronic pain in the 2010 IFU?
13     A   That definitely should have been included as a
14  risk, yes.
15     Q   The next one, "Chronic groin, thigh, leg,
16  pelvic and/or abdominal pain."
17        Would your testimony for that be the same as
18  your testimony for chronic pain?
19     A   Yes.
20     Q   And the next one, "One or more revisions may
21  be necessary to treat adverse reactions."
22        Would your testimony for that be the same as
23  your testimony for chronic pain?
24     A   Yes.
25     Q   And the "Adverse reactions may not resolve,"

12 (Pages 539 to 542)

Peggy Pence Ph. D.

Page 543

1  what does that mean?
2      A    That means that even with treatment, some of
3  the adverse reactions that have been reported can occur
4  with the implantation of the TVT-O device may not be
5  cured, may not go away.
6      Q    And is that something -- was that included in
7  the 2010 IFU?
8      A    No.
9      Q    Is that something that a reasonable and
10 prudent manufacturer applying the standards in the
11 industry would have included in the 2010 IFU?
12     A    Yes, it should have been.
13     Q    Moving on, "Additional surgeries to treat
14 adverse reactions may not resolve those adverse
15 reactions."
16         That's similar to the one we just talked
17 about?
18     A    That's correct.
19     Q    Would your testimony be the same?
20     A    Yes.
21     Q    "De novo urinary retention."
22         What is that?
23     A    Basically the bladder does not empty all of
24 its -- all of the urine.
25     Q    And was that a risk that your investigation

Page 544

1  uncovered that Ethicon knew about?
2      A    Yes.
3      Q    And would your testimony be the same for
4  de novo urge incontinence?
5      A    Yes.
6      Q    And for de novo urinary frequency?
7      A    Yes.
8      Q    And what's your source for all three of those?
9      A    Here, as noted, Dr. Weisberg's deposition
10 testimony.
11     Q    And were those three things addressed in the
12 2010 TVT-O IFU?
13     A    No, they were not.
14     Q    Are those three things something that a
15 reasonable and prudent manufacturer, applying the
16 standards of the industry at that time, would have
17 included in the IFU?
18     A    Definitely.
19     Q    Okay.  Let's go to this last one in yellow.
20 Again, what's the yellow?
21     A    These are complications that Ms. Ramirez has
22 reported as having experienced or is experiencing.
23     Q    And the last one on this page, "Roping,
24 fraying and particle loss," is that what we talked
25 about during your deposition last week?

Page 545

1      A    Yes.
2      Q    Okay.  You cite as your source an email from
3  Gene Kammerer dated August 26, 2006, regarding LCM
4  versus MCM, and a PowerPoint.
5          Is that the PowerPoint that we discussed last
6  week during your deposition?
7      A    Yes.  And there are other documents with
8  regard to roping and fraying and particle loss as well.
9      Q    And is the PowerPoint that -- discussing -- is
10 the PowerPoint that is reflected there the same
11 PowerPoint that's been marked as Exhibits 31 and 32?
12     A    Yes.
13     Q    Okay.  All right.  The last page of this --
14 the last page of this slide has some other known risks,
15 and I see they are not in yellow.  Does that mean that
16 these are not things that you understand Jennifer
17 Ramirez has complained about?
18     A    That's correct.
19     Q    Okay.  But is your testimony the same -- with
20 respect to venous thrombosis, abscess formation,
21 hematuria, and mesh erosion leading to significant
22 decrease in quality of life, is your testimony about
23 those risks the same as what we just discussed with the
24 others?
25     A    Yes.

Page 546

1      Q    Okay.  I would like to focus a little bit on
2  the -- a little bit on the statements that are in the
3  IFU.  Okay.  And let's go to -- I'm going to --
4  sometimes these IFUs are a little small in the writing.
5  I'm not sure this one is much better.
6          MR. GOSS:  Do the folks on the phone have what I'm
7  about to give?
8          MS. DIAZ:  Yes.
9  BY MR. GOSS:
10     Q    I'm handing you the Warnings and Precautions
11 sections of the IFU and the Adverse Reactions and
12 Actions section of the IFU.
13         MR. GOSS:  For the folks on the phone, you should
14 have these in the stuff we sent you when we got
15 started.
16         I'm marking them as a combined -- actually,
17 I'm going to mark the Warnings and Precautions section
18 as 54, the Adverse Reactions and Actions sections as
19 Exhibit 55.
20         (The documents referenced above
21         were marked Deposition Exhibits 54 and
22         55 for identification and are appended
23         hereto.)
24 BY MR. GOSS:
25     Q    I'm going to hand to you what's been marked as

13 (Pages 543 to 546)

Peggy Pence Ph. D.

Page 547

1    Exhibit 54. Would this slide assist you in your
2    testimony before the jury?
3        A   Yes, thank you.
4        Q   Is it a little easier to read?
5        A   It is much easier to read.
6        Q   Okay. And would your testimony be the same
7    for Exhibit 55?
8        A   Yes.
9        Q   Okay. So let's talk about -- let's talk about
10   54 first. Again, we have given the definitions of what
11   should go in here. Is there -- in this Exhibit 54
12   regarding warnings and precautions, is it mostly
13   precautions or is it warnings? What in here would
14   actually be a warning?
15       MR. LEWIS: Objection. Form.
16       MR. GOSS: Let me strike that question.
17   BY MR. GOSS:
18       Q   For instance, "Ensure that the tape is placed
19   with no tension under the mid-urethra."
20           Is that considered a warning or a precaution?
21       A   Yes.
22       Q   Okay. What -- did you view all of these as a
23   representation of some risk?
24       MR. LEWIS: Objection. Form.
25       THE WITNESS: These are appropriate. They are

Page 548

1    appropriate in terms of for what they state except
2    where they are misleading, if I may say it that way.
3    BY MR. GOSS:
4        Q   Okay. Are there any --
5        MR. LEWIS: Objection. Form.
6    BY MR. GOSS:
7        Q   Are there any warnings or precautions that
8    were actually in the 2010 TVT-O IFU that you found to
9    be misleading?
10       A   Yes.
11       Q   Which ones?
12       A   Just go down the list. The first one that I
13   see is the fifth up from the bottom.
14           "Transient leg pain lasting 24 to
15           48 hours may occur and can usually be
16           managed with mild analgesics."
17       Q   Okay. And why do you find that misleading?
18       A   Because while that may be true in a number of
19   patients, there is clinical evidence to -- reports in
20   the literature, for example, that in fact,
21   documentation and data that Ethicon had that shows that
22   leg pain does not always resolve in 48 hours and, in
23   fact, sometimes it is persistent and it may require
24   opiate analgesics, for example. And it may affect gait
25   and walking.

Page 549

1        So that is misleading. It leads the reader to
2    believe that any pain that is based on implantation of
3    the TVT-O will go away in a couple of days.
4        Q   Is that --
5        A   With regard to leg pain, I should say.
6        MR. LEWIS: Objection. Nonresponsive. Everything
7    beginning with "leads the reader."
8    BY MR. GOSS:
9        Q   Does that understate the risk?
10       A   Yes.
11       Q   What are -- what, if anything, is improper
12   about understating risk?
13       A   It is misleading. It is false. It is
14   misleading. It puts in the mind of the reader a level
15   of comfort, if you will, that the risk is minor when in
16   some patients that risk is not minor.
17       Q   Does that affect public safety?
18       A   Yes, it does.
19       Q   Anything else in this Warnings and Precautions
20   section that you found misleading or understating risk?
21       A   Let me just read through them quickly, if I
22   might.
23           No.
24       Q   Just so we are clear about what the exercise
25   was that we just went through, is it your opinion that

Page 550

1    Deposition Exhibit 53, are these risks in the Warnings
2    and Precautions section?
3        A   Some of them should have gone in the Warnings
4    and Precautions section, yes.
5        Q   Okay. Where should the others have gone?
6        A   In the Adverse -- all of them should be in --
7    all of those that affect patient safety should -- that
8    are risks to the patient, I should say -- basically all
9    of them except the fraying and the particle loss should
10   have been listed in Adverse Reactions. And the fraying
11   and particle loss, the adverse reactions that those can
12   cause should go in the Adverse Reactions section.
13       Q   Okay.
14       A   And then those that are serious and
15   potentially chronic, those also get included in
16   warnings.
17       Q   Okay. And so what I'm asking you to do now is
18   step away from just that and let's look at what's
19   actually in the IFU.
20       A   Right.
21       Q   And I'm asking you to identify for me the
22   things that you found risk and whether or not they
23   understated risk or were misleading.
24           Do you understand that?
25       A   I do understand, yes.

14 (Pages 547 to 550)

Peggy Pence Ph. D.

Page 551

1    Q   Okay.  Let's go the Adverse Reaction section
2    which is Exhibit 55.
3    A   Right.
4    Q   Let's just take them one at a time.
5        "Punctures or lacerations of
6    vessels, nerves, bladder, or urethra, or
7    bowel may occur during needle passage
8    and may require surgical repair."
9        Is that misleading or does that understate
10   risk?
11   MR. LEWIS:  Objection.  Form.
12   THE WITNESS:  I don't see a problem with that one.
13   BY MR. GOSS:
14   Q   Okay.
15       "Transitory local irritation at the
16   wound site and transitory foreign-body
17   response may occur.  This response could
18   result in extrusion, erosion, fistula
19   formation, or inflammation."
20       Does that understate the risk?
21   A   Yes, it does.
22   Q   Is that misleading?
23   A   Yes, it is.
24   MR. LEWIS:  Objection.  Form.
25   ///

Page 552

1    BY MR. GOSS:
2    Q   Why is that?
3    A   It is misleading because, as we were talking
4    earlier, the foreign-body response is not transitory.
5    It is chronic.  And the inflammation that can then
6    result is chronic.  So this, again, leads the reader to
7    believe that it is brief and it will go away, and
8    indeed that's -- the documentation testimony supports
9    that is not the case.
10   Q   Let's go to the next one.
11       "As with all foreign bodies,
12   Prolene mesh may potentiate an existing
13   infection.  The plastic sheaths
14   initially covering the Prolene mesh are
15   designed to minimize the risk and
16   contamination."
17       Is that misleading or an understatement of
18   risk?
19   MR. LEWIS:  Objection.  Form.
20   MR. GOSS:  Tell me what that is so I can cure it.
21   MR. LEWIS:  Lack of foundation.  Really, lack of
22   foundation.
23   MR. GOSS:  Okay.  All right.  I'll stick with my
24   question.
25   ///

Page 553

1    BY MR. GOSS:
2    Q   You can answer it.
3    A   In terms of potentiating existing infection,
4    that is fine, but what it doesn't say is infection can
5    result.  So it is not just -- it understates that
6    infection de novo, a new infection may occur.
7    Q   The last one there:
8        "Overcorrection, too much tension
9    applied to the tape, may cause temporary
10   or permanent lower urinary tract
11   obstruction."
12       Does that -- is that misleading or does it
13   understate risk?
14   MR. LEWIS:  Objection.  Form.
15   THE WITNESS:  No, because here it actually states
16   that the lower urinary tract obstruction can be
17   permanent.
18   BY MR. GOSS:
19   Q   Okay.  There was some discussion last week
20   between you and Ethicon's counsel about whether or not
21   duration, frequency, and severity is required to be in
22   the IFU.
23       Do you recall that?
24   A   Yes, I do.
25   Q   At times throughout this IFU, did Ethicon

Page 554

1    endeavor to put in duration, frequency, or severity?
2    A   Yes, it did.
3    Q   And typically was it when they were trying to
4    minimize risk or identify the seriousness of risk?
5    A   Yes.
6    MR. LEWIS:  Object to form.
7    THE WITNESS:  More often when they were trying to
8    minimize risk.
9    BY MR. GOSS:
10   Q   Okay.
11   A   The only time "permanent" is used is in this
12   last one.
13   Q   Okay.  Let's go under the Actions section.
14       "Animal studies show that
15   implantation of Prolene mesh elicits a
16   minimal inflammatory reaction..."
17       Again, is minimal a time -- does that address
18   severity, duration, intensity?
19   A   Yes, it does.
20   Q   Okay.  It "elicits a minimal inflammatory
21   reaction in tissues, which is transient."
22       Again, is that dealing with severity,
23   frequency, permanency?
24   A   Yes, it does.
25   Q   "...and is followed by the

15 (Pages 551 to 554)

Peggy Pence Ph. D.

| Page 555 |
|---|

1  deposition of a thin fibrous layer of
2  tissue that can grow through the
3  interstices" --
4      Is that right?
5  A   Yes.
6  Q   -- "of the mesh, thus incorporating
7  mesh into the adjacent tissue."
8      This is -- this is what I want you to focus
9  on:
10     "The material is not absorbed, nor
11 is it subject to degradation or
12 weakening by the action of tissue
13 enzymes."
14     Does that -- is that misleading or does it
15 underplay risk?
16     MR. LEWIS:  Objection.  Form.
17     THE WITNESS:  It is both.
18 BY MR. GOSS:
19     Q   Okay.  Explain.
20     A   It is false and misleading and underplays the
21 risk because Ethicon has in its own files, as well as
22 there are publications, showing that polypropylene is
23 indeed subject to degradation.
24     Q   Did you see -- in your investigation into
25 Ethicon's conduct, did you see any discussions by

| Page 556 |
|---|

1  Ethicon internally regarding degradation?
2  A   Yes, I did.
3  Q   Did you read any testimony by Ethicon
4  scientists regarding degradation?
5  A   Yes.
6  Q   Do you understand Thomas Barbolt to be a
7  scientist at Ethicon?
8  A   Yes.
9  Q   Did you read any testimony of Thomas Barbolt?
10 A   Yes, I did.
11     (The document referenced below was
12 marked Deposition Exhibit 56 for
13 identification and is appended hereto.)
14 BY MR. GOSS:
15     Q   I'm going to hand you what's been marked as
16 Exhibit 56 to your deposition.  And this is a
17 deposition transcript dated January 8th, 2014, for
18 Thomas A. Barbolt, Ph.D., given in the MDL.
19     Is this document, 56, one of the deposition
20 transcripts that you reviewed in your investigation of
21 Ethicon's conduct?
22 A   Yes, it is.
23     Q   And is that something that you relied upon in
24 whole or in part for giving your opinions?
25 A   Yes.

| Page 557 |
|---|

1      (The document referenced below was
2  marked Deposition Exhibit 57 for
3  identification and is appended hereto.)
4  BY MR. GOSS:
5      Q   I'm going to ask you -- I'm going to direct
6  you to page 409 for this transcript, in particular
7  beginning with line 1 of page 409 through line 13 of
8  page 409.  And I'm going to also hand you Deposition
9  Exhibit 57, which is a slide of that deposition
10 testimony.
11     Will this slide assist you in your -- have you
12 seen this slide before?
13 A   Yes, I have.
14     Q   Will it assist you in giving your testimony to
15 the jury?
16 A   Yes.
17     Q   Okay.  Would you please read the slide for me.
18 A   Yes.
19     "Question:  And that's Ethicon's
20 position as you -- as the spokesperson
21 for Ethicon, it is Ethicon's position
22 that degradation, surface degradation,
23 can occur; correct?
24     The witness states, Dr. Barbolt, "Yes."
25     "Question:  And this was known well

| Page 558 |
|---|

1  in advance of this statement that the
2  material is not absorbed nor is it
3  subject to degradation; correct?
4      "Answer:  Yes.  This is from 1992."
5  Q   And why do you find that important, if at all?
6  A   It is important because what's included --
7  this is stating that from 1992 the company was aware
8  that polypropylene is subject to degradation, yet in
9  the IFU, again, the primary communication between the
10 company and the doctor, which is supposed to give the
11 doctor all the information necessary to use the product
12 safely and effectively and to make decisions as to what
13 is the best treatment to use for a particular patient,
14 that's not what is stated in the IFU.
15     Q   And then picking up with lines 21 through
16 lines 4 on the next page, could you read that, please,
17 from the slide.
18 A   "Question:  Okay.  And, number two,
19 we know from what we have seen in the
20 internal studies by Ethicon that the
21 Prolene and the TVT mesh is susceptible
22 to surface degradation; correct?  Yes,
23 Doctor?
24     "Answer:  Yes."
25 Q   And why is that important, if at all?

16 (Pages 555 to 558)

Peggy Pence Ph. D.

Page 559

1    A   Again, it shows --
2    MR. LEWIS: Objection. Form.
3    THE WITNESS:  -- that the information in the IFU
4    was false and misleading.
5    BY MR. GOSS:
6    Q   Okay.
7    A   And that's in violation of the standard of
8    care.
9    Q   Okay. Thank you. All right.
10   MR. LEWIS: Objection. Nonresponsive.
11   BY MR. GOSS:
12   Q   I want to talk a little bit -- we have been
13   through the IFU, I want to talk with you a little bit
14   about some -- the knowledge, if any, that Ethicon had
15   regarding chronic pain and dyspareunia.
16       You have spoken a little bit about transitory.
17   What does transitory mean?
18   A   Brief.
19   Q   And we have spoken a little bit about chronic.
20   What does chronic mean?
21   A   Persistent, long-term.
22   Q   Is chronic just the opposite of transitory?
23   A   Yes.
24   Q   Okay. Did you review any testimony from
25   Ethicon scientists prior to 2010 when Jennifer Ramirez

Page 560

1    was implanted with the TVT-O where those scientists
2    discussed whether or not potential adverse reactions
3    were transitory?
4    A   Yes.
5    Q   And did you review David Robinson's testimony?
6    A   Yes.
7    Q   Who is David Robinson?
8    A   He is also a physician and medical director at
9    Ethicon.
10   Q   Did you review Piet Hinoul's testimony?
11   A   Yes.
12   Q   Who is Piet Hinoul?
13   A   Another physician, medical director as well,
14   at Ethicon.
15   Q   Did you review James Hart's testimony?
16   A   Yes.
17   Q   Do you recall who James Hart was?
18   A   He was also a medical director.
19       (The document referenced below was
20       marked Deposition Exhibit 58 for
21       identification and is appended hereto.)
22   BY MR. GOSS:
23   Q   Okay. Okay. I'm going to first hand you
24   what's been marked as Exhibit 58. It says it is the
25   deposition of David Robinson, Volume III, dated

Page 561

1    September 11th, 2013.
2       Is this one of the deposition transcripts that
3    you reviewed in forming your opinions in this case?
4    A   Yes, it is.
5    Q   And let me refer you to page 355. just a
6    moment.
7       Okay. Let me refer you to page 1139,
8    beginning with line 20, and through 1140, page 1140,
9    ending with line 16. Okay. I'm sorry, 1139, line 15
10   is where I want you to pick up.
11      I'm going to ask you whether or not you read
12   that -- if that testimony is any testimony that you
13   reviewed and relied upon in forming your opinions in
14   this case.
15   A   Yes.
16      (The document referenced below was
17      marked Deposition Exhibit 59 for
18      identification and is appended hereto.)
19   BY MR. GOSS:
20   Q   And why don't you read the question and answer
21   to the jury -- let me do it this way. Let me show you
22   what's been marked as Exhibit 59. Is this a slide that
23   you have reviewed that would assist you in your
24   testimony to the jury?
25   A   Yes.

Page 562

1    Q   Okay. And is that the testimony -- the
2    testimony that you relied upon in the deposition
3    exhibit?
4    A   Yes.
5    Q   Okay. Why don't you read that for the jury,
6    please.
7    A   "Question: Now, we talked some
8       about the fact that women who have the
9       TVT implanted can suffer from what's
10      called dyspareunia or, in other words
11      painful sex; correct?
12         "Answer: Yes.
13      "Question: Did you warn physicians
14      that patients could have implantation of
15      the TVT mesh and that could cause
16      permanent painful sex?
17         "Answer: We did warn against organ
18      damage, the word 'intercourse' and
19      'pain' did not appear."
20   Q   Why is that important, if at all?
21   A   Because one cannot infer from organ damage
22   permanent painful sex. The permanent painful sex, that
23   potential risk, needed to be stated in the IFU.
24   Q   All right. I'm going to shift gears to
25   another deposition. Let's shift gears again.

17 (Pages 559 to 562)

Peggy Pence Ph. D.

Page 563

1     A   Is this a good time for a quick break?
2     Q   Right.  I think we have been going for almost
3  an hour and 15 minutes.  Why don't we take about a
4  ten-minute break.  Is that fine?
5     MR. LEWIS:  That sounds fine.
6     MS. VERBEEK:  Sounds good.
7     VIDEO OPERATOR SISSON:  This will end Disk 1,
8  Volume II, in the deposition of Peggy Pence.  11:37, we
9  are off the record.
10        (Recess taken.)
11    VIDEO OPERATOR SISSON:  At 11:52 we are back on the
12  record with the beginning of Disk 2, Volume II, in the
13  deposition of Peggy Pence.
14        Counsel, after you.
15    MR. GOSS:  Thank you.
16  BY MR. GOSS:
17    Q   Okay.  Dr. Pence, we are back on the record.
18  There was some discussion before we went off the record
19  about the IFU and Ethicon's knowledge regarding chronic
20  foreign-body reactions and chronic inflammatory
21  responses.
22        Do you recall that line of questioning?
23    A   Yes, I do.
24        (The document referenced below was
25    marked Deposition Exhibit 60 for

Page 564

1     identification and is appended hereto.)
2  BY MR. GOSS:
3     Q   Okay.  I'm going to hand you what's been
4  marked as Exhibit 60.
5         Did you review the deposition of Piet Hinoul
6  dated January 14th, 2014, that's been marked as
7  Deposition Exhibit 60 in forming your opinions in this
8  case?
9     A   Yes, I did.
10    Q   And is that deposition transcript in whole or
11  in part something that you relied upon to form your
12  opinions?
13    A   Yes, it is.
14    Q   I'd ask you to turn to page -- page 11 -- I'm
15  sorry, page 1144.  Okay.  And refer you to lines 11,
16  12, and 13.
17        Do you see there?
18    A   Yes, I do.
19    Q   Does it start out "foreign-body reaction"?
20    A   Yes.
21        (The document referenced below was
22    marked Deposition Exhibit 61 for
23    identification and is appended hereto.)
24  BY MR. GOSS:
25    Q   Okay.  Would you please read those -- first of

Page 565

1  all, let me mark as Exhibit 61 a slide.  I believe you
2  have seen this slide before, Exhibit 61?
3     A   Yes.
4     Q   Would that assist you in describing -- would
5  that assist you in your testimony to the jury?
6     A   Yes.
7     Q   What is that slide?
8     A   It is -- it is testimony from Dr. Piet Hinoul.
9     Q   Is it testimony that's before you in the
10  transcript?
11    A   Yes.
12    Q   Okay.  Would you please read the testimony
13  that you relied upon of Dr. Hinoul.
14    A   From the slide?
15    Q   Yes.
16    A   The question is:
17        "The foreign-body reaction or the
18    foreign-body response is chronic;
19    correct?
20        "Answer:  Yes.  It is a chronic --
21    it is a chronic foreign-body reaction."
22    Q   And why, if at all, do you find that
23  important?
24    A   Again, because as we noted earlier in the IFU,
25  it says that it is transitory, not chronic, and, as we

Page 566

1  discussed earlier, chronic foreign-body
2  response/chronic inflammation can also lead to
3  complications that may be chronic.
4     Q   Okay.  In that same deposition transcript I'm
5  going to ask you to turn to page 1156, lines 1 through
6  9.  Are you there?
7     A   Yes.
8     Q   And is that testimony testimony that you
9  relied upon in forming your opinions in this case?
10    A   Yes, it is.
11        (The document referenced below was
12    marked Deposition Exhibit 62 for
13    identification and is appended hereto.)
14  BY MR. GOSS:
15    Q   And I'm going to hand you what's been marked
16  as Deposition Exhibit 62.  Is that a slide that
17  reflects that deposition testimony?
18    A   Yes, it is.
19    Q   Would that assist you in your testimony before
20  the jury?
21    A   Yes.
22    Q   Could you please read for the jury what
23  testimony you relied upon in forming your opinions?
24    A   Okay.  Again, this is Dr. Piet Hinoul's
25  testimony.  The question to Dr. Hinoul is:

18 (Pages 563 to 566)

Peggy Pence Ph. D.

Page 567

1    "And scientists who are expert in
2  this field the most expert people in the
3  world --
4    "Answer:  Mm-hmm.
5    "Question:  -- would agree that
6  there is a chronic inflammatory response
7  to the --
8    "Answer:  Yes.
9    "Question:  -- TVT mesh; correct?
10   "Answer:  Correct."
11   Q   Okay.  And why, if at all, did you find that
12  important?
13   A   Again, it substantiates that the -- what we
14  were discussing earlier.  It supports that the
15  inflammatory reaction is chronic, it is supported by
16  scientists who are expert in the field, and Dr. Hinoul
17  testifies that that is the case, and it is -- the
18  chronic inflammatory response is not what's stated in
19  the IFU.
20   Q   And is that -- that information -- the
21  testimony that -- the two pieces of testimony that you
22  just read, did your investigation determine whether or
23  not that was information that Ethicon had in its
24  possession at the time of launch?
25   A   Yes.

Page 568

1    Q   Okay.
2    MR. LEWIS:  Objection.  Form.
3    (The document referenced below was
4    marked Deposition Exhibit 63 for
5    identification and is appended hereto.)
6  BY MR. GOSS:
7    Q   Let me see the transcript again.
8    I'm going to hand you back Dr. Hinoul's
9  testimony that you previously stated that you reviewed,
10  and I'm going to ask you to turn to page 1170, lines 1
11  through 6, of that testimony.  I'm going to ask you to
12  review that testimony and tell the jury whether that is
13  something that you relied upon in forming your opinions
14  in this case.
15   A   Page 1170; is that correct?
16   Q   That's correct.
17   A   Okay.
18   "Question:  And the doctor would be
19  expected to believe, pursuant to what it
20  states here, that the inflammatory
21  reaction is only transient because
22  that's all it says; correct?
23   "Answer:  Correct."
24   Q   Is that what's reflected in Exhibit 63, and
25  would Exhibit 63 assist you in your -- giving your

Page 569

1  testimony to the jury?
2    A   Yes.
3    Q   Okay.  Why did you find -- and, again, read
4  Exhibit 63.
5    A   "Question:  And the doctor would
6  be expected to believe, pursuant to what
7  it states here, that the inflammatory
8  reaction is only transient because
9  that's all it says; correct?
10   "Answer:  Correct."
11   Q   And why is that important?
12   A   Again, because the IFU is misleading.  The IFU
13  doesn't tell the doctor that the -- there is the -- a
14  chronic inflammatory reaction, chronic foreign-body
15  response, and, therefore, it is -- again, it is
16  misleading to the doctor in terms of having all the
17  information necessary for safe and effective use of the
18  device and for making a decision as to whether or not
19  this device is the appropriate treatment for the
20  patient's stress urinary incontinence.
21   MR. LEWIS:  Objection.  Nonresponsive.
22  BY MR. GOSS:
23   Q   Okay.  This morning, as you will remember, I
24  wanted to start back up where we left off last time,
25  but we didn't have the exhibit here.

Page 570

1    Do you recall?
2    A   Yes, I do.
3    Q   So I'm going to back up a little bit and
4  discuss where we left off last week.
5    Do you remember some discussion at the end of
6  the deposition last week about a particular lot of mesh
7  that had some problems?
8    A   Yes.
9    Q   Okay.  And one of the things we did last week
10  was we marked the surgical record for Jennifer Ramirez.
11   Do you recall that?
12   A   I do.
13   Q   Let me see if I can find this stack.  I'm
14  going to hand you what's been marked as Exhibit 19.
15  And, again, tell the jury what is Exhibit 19?
16   A   This is a one-page document.  It is the
17  surgery implant record from Baptist Health System with
18  the sticker on it from the TVT-O device that was
19  implanted in Ms. Ramirez.
20   Q   Okay.  And then what does it say is the lot
21  number for that?
22   A   The lot number of TVT-O is 3405428.
23   Q   And what is the 810081 number?
24   A   That is the product number that designates
25  that the material is TVT-O.

19 (Pages 567 to 570)

Peggy Pence Ph. D.

Page 571

1    Q   And, in your investigation into Ethicon files,
2  did you see any documents where Ethicon had received
3  any complaints about that particular lot number that is
4  Jennifer Ramirez's lot number?
5    A   Yes, I did.
6    Q   And we touched on this a little bit last week,
7  but do you recall the presentation set forth in
8  Exhibit 42 of last week?
9    A   Yes, I do.
10   Q   And what is that document?
11   A   This is a PowerPoint presentation entitled
12  "Particle and TVT-O Blisters."
13   Q   And what do you understand that document is
14  reflecting?
15   A   It is discussing the particle loss that has --
16  complaints of particle loss that have been reported to
17  Ethicon, in particular for the mechanically cut TVT-O
18  device.
19   Q   Is Jennifer Ramirez's lot number one of the
20  lot numbers for which they had complaints?
21   A   Yes, it is.
22   Q   And how do you know that?
23   A   Because, as I just read, the lot number that
24  was implanted in her is 3405428, and on this PowerPoint
25  presentation in a listing of complaints that number

Page 572

1  is -- is identified.
2    Q   Okay.  And you have talked generally about
3  there were complaints.  How many complaints were there?
4    A   For her particular lot, there were two.
5    Q   Okay.  And what -- were there other complaints
6  for other lots?
7    A   Yes.
8    Q   And how many were there?
9    A   This designates six different complaints.
10   Q   Okay.  And were they different complaints or
11  were they making the same allegation?
12   A   They were all making the allegation of foreign
13  matter in the TVT-O blisters.
14   Q   Okay.  What does that mean "foreign matter in
15  a blister"?  Explain to the jury what a blister is.
16   A   What they are talking about, the blister is
17  the packaging in which the device -- the plastic
18  container, if you will, in which the device is
19  packaged, and that is opened --
20   Q   Okay.
21   A   -- to remove the device, and foreign matter is
22  something in the packaging that is not supposed to be
23  there.
24   Q   What was the foreign matter they were
25  complaining about?

Page 573

1    A   What turned out to be the foreign matter, for
2  example, in the case of Ms. Ramirez, was particles
3  lost.  We talked earlier about fraying and particle
4  loss from the mechanically cut mesh.  It is particles
5  lost from that.
6    Q   And was it in the open or unopened package?
7    A   Unopened package.
8    Q   Okay.  Is the package clear?
9    A   Yes.
10   Q   Okay.  And I gather then what you are saying
11  is that you can see particle loss through the unopened
12  clear package?
13   A   Yes.
14   Q   And how is that -- were those complaints
15  resolved?
16   A   The complaints were reported to Ethicon, and
17  Ethicon, for example, they -- the same hospital that
18  reported the two complaints for the lot number that was
19  implanted in Ms. Ramirez also reported two other lot
20  numbers that had the same issue in a complaint which
21  then was investigated, and the results of the
22  investigation were recorded in an Issue Report.
23   Q   Okay.  What's an Issue Report?
24   A   An Issue Report is once -- it is the form at
25  Ethicon in which they document the complaint and

Page 574

1  results of their investigation of a particular
2  complaint and whether or not that investigation results
3  in a determination that the complaint should be
4  reported as a Medical Device Report meaning that it is
5  a report of a serious injury or a life-threatening
6  injury or a malfunction that, if it were to recur,
7  could result in a serious or life-threatening injury.
8    MR. GOSS:  The folks on the phone, I'm asking my
9  associate.  Have we sent them the Issue Report?
10   MS. DIAZ:  Yeah, we did.
11   MR. GOSS:  So this was in --
12   MS. DIAZ:  Uh-huh.
13     (The document referenced below was
14   marked Deposition Exhibit 64 for
15   identification and is appended hereto.)
16  BY MR. GOSS:
17   Q   Okay.  I'm going to mark as Exhibit 4 [sic] a
18  document entitled Issue Report.
19     Dr. Pence, can you please explain to the jury
20  what this is?
21   A   Yes.  This is the Issue Report that is
22  associated with complaint CC1007, 005, which is the
23  complaint that Ethicon received for the particular lot
24  number that was implanted in Ms. Ramirez.
25   Q   Okay.  And did you rely upon this Issue Report

20 (Pages 571 to 574)

Peggy Pence Ph. D.

Page 575

1  in forming your opinions in this case?
2      A   Yes.
3      Q   Okay.  Is there anything in particular in the
4  Issue Report that you relied upon?
5      A   Yes.
6      Q   What is that?
7      A   There was a confirmation.  For example, there
8  is a question asked in the Issue Report: "Was it
9  determined that a device-related or patient-related
10  event actually did occur?"  And the answer was "Yes."
11      MR. GOSS:  Let the record reflect that is from
12  Bates page 02656826, question 2.
13  BY MR. GOSS:
14      Q   Why did you find that important?
15      A   Because it confirms that there was an issue
16  with -- that the complaint was confirmed, if you will.
17      Q   Is there anything else in this document that
18  you relied upon in forming your opinions?
19      A   Yes.  On question 9.  The question -- Bates
20  number ending in 827, the question is:
21      "Does the information reasonably suggest that
22  the device failed to meet its performance specification
23  or otherwise failed to perform as intended?"
24      And the response is, "Yes."
25      Q   And why, if any -- strike that.

Page 576

1      Why did you find that important, if at all?
2      A   Again, it is confirmation in the investigation
3  of this complaint that the device failed to meet its
4  performance specifications according to those that were
5  investigating the complaint.
6      Q   Anything else in this report that you found
7  important to your opinions?
8      A   Yes.  The next question:
9      "Does information or a medical
10  rationale exist that states no
11  possibility of death or serious injury
12  occurring as a result of any recurrence
13  of the malfunction?"
14      And the response is, "No."
15      Q   What does that mean?
16      A   Basically the reason that this is important is
17  because, as I believe we discussed previously last
18  week, that Ethicon had not undertaken any investigation
19  to determine whether or not lost particles or the
20  fraying that results in the lost particles would have a
21  safety impact on the patient.
22      Q   What page number were you reading from, Bates
23  page?
24      A   Bates ending in 827.
25      Q   Okay.  I'm going to ask you about -- kind of

Page 577

1  speed things up a little bit here.  Let me ask you
2  about the test results on page -- it is page 350 of 723
3  of this document that has the last three Bates numbers
4  831.  It says:
5      "Test results.  The blister
6  contains some particles.  These
7  particles come from the mesh and are
8  inferior to three millimeters in length.
9  These kind of particles are not
10  considered as foreign matter."
11      My question is what's the significance, if
12  any, of three millimeters?
13      MR. LEWIS:  Objection.  Form.
14      THE WITNESS:  That was a determination, a cutoff,
15  that Ethicon made to decide when particle loss was an
16  issue.  I did look to see if I could identify any
17  evidence as to why three millimeters, why that was a
18  cutoff and not two millimeters, for example.  And I was
19  not able to find any evidence supporting why three
20  millimeters was used as a cutoff.
21  BY MR. GOSS:
22      Q   Did you see any discussion of any scientific
23  or clinical basis for the use of three millimeters as a
24  cutoff?
25      A   No, I did not.

Page 578

1      Q   Would a reasonable and prudent manufacturer
2  arbitrarily set a cutoff of three millimeters?
3      A   No.
4      Q   And if that's what -- if there is no
5  scientific basis or clinical basis for saying the
6  cutoff is at three millimeters or whether or not
7  particles are clinically significant, would that be a
8  violation of standards in the industry?
9      A   Absolutely.
10      Q   Okay.  Let's move on a little bit.  Let's
11  shift gears to the MAUDE database.
12      Tell the jury what the MAUDE database is.
13      A   The MAUDE database -- MAUDE stands for
14  Manufacturer and User Facility Device Experience
15  database.  It is the database into which medical device
16  reports are submitted and the information for those
17  medical device reports is recorded therein.  It is
18  publicly available -- and when I'm talking about
19  medical device reports, those are reports of serious or
20  life-threatening injuries to patients or device
21  malfunctions which, if they were to recur, could result
22  in serious or life-threatening injuries to the patient.
23      Post -- it is for postmarketing safety
24  information, and it is from -- postmarketing adverse
25  event reporting is a mechanism which is used to

21 (Pages 575 to 578)

Peggy Pence Ph. D.

Page 579

1    continue to evaluate postmarketing safety and
2    performance of a medical device. It is a part of risk
3    assessment and ongoing risk analysis so that any
4    performance or safety issues that occur are evaluated
5    and fed back into the risk analysis on an ongoing basis
6    for a medical device that is in commercial use to
7    determine if anything needs to be done to mitigate any
8    risk. For example, changes in labeling or additional
9    testing.
10       Q    Okay. And so did you undertake to review the
11   MAUDE database?
12       A    Yes, I did.
13       Q    And is that reflected in your report?
14       A    Yes, it is.
15       Q    Okay. And I think we marked your report as
16   Exhibit 7 last week, and Exhibit 7 here -- I'm sorry,
17   it is not Exhibit 7. It is -- I'm going to refer you
18   to Exhibit 3, which is your report. And you recall
19   your report had a number of tables that reflected the
20   results of your analysis of the MAUDE database?
21       A    Yes, I do.
22       Q    Okay. And did you assist in the preparation
23   of some slides that reflect those findings and those
24   tables?
25       A    Yes.

Page 580

1         (The document referenced below was
2    marked Deposition Exhibit 65 for
3    identification and is appended hereto.)
4    BY MR. GOSS:
5        Q    Okay. I'm going to mark -- I'm going to mark
6    as Deposition Exhibit 65 a slide. I'm going to ask you
7    if this reflects the information that was set forth in
8    one of your tables.
9        A    Yes, it does.
10       Q    And will this slide assist you in giving your
11   testimony to the jury?
12       A    Yes.
13       Q    Okay. What is Exhibit 65?
14       A    Exhibit 65, on the left-hand side is a
15   tabulation of the --
16       Q    First of all, what is it entitled?
17       A    Oh. Sorry. "Ethicon Tension-Free Vaginal
18   Tape MDRs," standing for Medical Device Reports, "Most
19   Commonly Reported Adverse Events from 1999 to 2010."
20       Q    Okay. I'm going to now -- give me one second.
21   I'm going to hand you -- what was that last number?
22       A    65.
23         (The document referenced below was
24   marked Deposition Exhibit 66 for
25   identification and is appended hereto.)

Page 581

1    BY MR. GOSS:
2        Q    I'm going to hand you Deposition Exhibit 66.
3    As I understand it 65 -- 65 includes TVT prior to
4    TVT-O; correct?
5        A    Correct.
6        Q    Okay. I'm going to hand you what's been
7    marked as Exhibit 66 and ask you if this is a slide
8    that will assist you in the giving of your testimony to
9    the jury.
10       A    Yes.
11       Q    And what is that exhibit?
12       A    This exhibit is similar to the one that we
13   were just discussing, but this one is specific to
14   TVT-O. It is entitled Ethicon Tension-Free Vaginal
15   Tape Obturator MDRs: Most Commonly Reported Adverse
16   Events 2004 to 2011." The reason it starts in 2004 is
17   because that's consistent with the time frame of the
18   marketing of the TVT-O.
19       Q    Okay. All right. Let me walk you through
20   Exhibit 66.
21       A    Okay.
22       Q    All right. Again, this is the commonly
23   reported adverse events from 2004 through 2011; right?
24       A    Yes.
25       Q    The -- the first event, pain, let's just walk

Page 582

1    across this. What's the 175 number?
2        A    That's the total number of medical device
3    reports that included a report of pain.
4        Q    And then what is -- and is that a total number
5    from 2004 through 2011?
6        A    Yes.
7        Q    Okay. And I see it goes all the way down for
8    erosion, urinary problems, et cetera; right?
9        A    That's correct.
10       Q    And those are all events?
11       A    Yes.
12       Q    Okay. What is -- the numbers in red, what are
13   those?
14       A    That number reflects what the actual incidence
15   could be if -- based on consideration that we know that
16   there's underreporting of events --
17       Q    How do we know that?
18       A    -- to the MAUDE database.
19            It is published in the scientific medical
20   literature, and there is a report, for example, from
21   FDA that Congress -- that reflects that Congress
22   estimates that, for medical devices, as few as 1 in 100
23   actual occurrences of medical device adverse events may
24   be reported.
25       Q    So just walk me through this for pain.

Peggy Pence Ph. D.

Page 583

1     A   Okay.
2     Q   So if there's 175 actual -- I'm sorry, if
3  there are 175 reported events to the MAUDE database --
4     A   Right.
5     Q   -- based upon the studies and the
6  congressional reports that you have just discussed,
7  what would they estimate to be the potential adverse
8  events that are actually out there relating to pain?
9     A   17,500.
10    Q   Okay.  And so for erosion with 159 reports,
11 what's the potential number of reports based -- if you
12 extrapolate based upon this literature that you have
13 just discussed and the congressional information that
14 you discussed, what's the potential erosion adverse
15 events?
16    A   15,900.
17    Q   And let's go to sexual dysfunction and walk us
18 across the chart for that one.
19    A   There were 57 reports of sexual dysfunction,
20 and that would be using the 1 in 100.  There would be
21 potentially 5,700 actual reports of sexual dysfunction.
22    Q   And if it were 10 in 100, what would it be?
23    A   It would be --
24    Q   The next column?
25    A   Oh, I'm sorry.  You are talking about

Page 584

1  10 percent.  Yes.
2     Q   Yes.
3     A   It would be 570.
4     Q   So the column with 1 percent assumes 1 percent
5  would get reported, and the column with 10 percent on
6  the far end assumes 10 percent would be reported?
7     A   That's correct.
8     Q   Vaginal scarring, walk us across on that one.
9     A   Vaginal scarring, there were 23 reports.
10 If -- if 1 in 100 only were reported, there would be
11 2300 actual reports.
12    Q   Okay.  All right.  So -- and that's Exhibit
13 Number?
14    A   66.
15       (The document referenced below was
16    marked Deposition Exhibit 67 for
17    identification and is appended hereto.)
18 BY MR. GOSS:
19    Q   Okay.  I'm going to hand you what's been
20 marked as Exhibit 67 and ask you to describe -- first
21 of all, is Exhibit 67 a slide that you helped assist in
22 preparing?
23    A   Yes.
24    Q   And will that assist you in your testimony?
25    A   Yes.

Page 585

1     Q   Okay.  Let's talk about Exhibit 67.  Again, is
2  this the information that was in one of your tables in
3  your report?
4     A   Yes.  In an exhibit to my report, yes.
5     Q   And is the information gathered from the MAUDE
6  database?
7     A   That's correct.
8     Q   Okay.  And so what is this exhibit?
9     A   This is a breakdown of the 57 reports of
10 sexual dysfunction that we identified in the MAUDE
11 database into what those 57 reports -- the terms that
12 were reported, the actual description of the events
13 that were reported in those 57 reports.
14    Q   Okay.  And so we know that Jennifer Ramirez
15 had her surgery in 2010?
16    A   Correct.
17    Q   So if we -- and this relates to sexual
18 dysfunction; right?
19    A   Yes.
20    Q   Would that include dyspareunia?
21    A   Yes.
22    Q   Would it include the complaints that she --
23 one of the complaints that she is making?
24    A   That's correct.
25    Q   And can we determine from this table and this

Page 586

1  report the number of actual reports that were made from
2  2010 and prior to 2010?
3     A   There were 17 reports of dyspareunia to the
4  MAUDE database prior -- through 2010.
5     Q   Let's just talk about the number of total
6  reports first.
7     A   Oh, I'm sorry.
8     Q   Would it be 57 minus the 33 from 2011?
9     A   That's correct.
10    Q   So would the 24 total dysfunction reports from
11 2010 and prior?
12    A   Yes.
13    Q   And walk us across -- for example, in 2008
14 where there were six reports, walk us across that line
15 and tell us what that is.
16    A   There were six total reports, and in those six
17 total reports there were three reports of dyspareunia,
18 or painful sex, five reports of impaired physical
19 relationship, so that there were a total of eight
20 events reported in those six reports.
21    Q   What's the difference in dyspareunia and
22 impaired physical relationships?
23    A   The dyspareunia is actual painful sex.
24       Impaired physical relationship means that
25 the -- the patient is experiencing some impact on the

23 (Pages 583 to 586)

Peggy Pence Ph. D.

Page 587

1   relationship with their -- with their partner as a
2   result of what their -- the sexual dysfunction they are
3   experiencing.
4       Q   Okay.  Then on the right-hand side the only
5   1 percent reporting, is that, again, based upon the
6   testimony you just gave us relating to a potential of
7   only 1 percent reporting rate in the United States?
8       A   Yes, that's correct.
9       Q   And so if there were a total of 6200 total
10  report -- I'm sorry, the 6200 potential reports, that
11  includes from 2004 through 2011?
12      A   Yes.  And I might clarify that the 6200 is
13  actual events because --
14      Q   I got it.
15      A   The 57 is the numbers of patients --
16      Q   Right.
17      A   -- which 100 would be 5700 patients, but
18  patients experience multiple events.
19      Q   Okay.  If you subtracted the 2011 -- if you
20  added up just 2004 through 2010 potential reports of
21  sexual dysfunction, would it be 2800?
22      A   Yes.
23      Q   Okay.  Is that something that a reasonable and
24  prudent manufacturer should consider significant?
25      A   Yes.

Page 588

1       Q   And what -- with this information, what would
2   a reasonable and prudent manufacturer do?
3       A   Factor this into the risk analysis and
4   mitigate risk and certainly include it in a warning.
5       Q   Did you ever see anywhere where Ethicon
6   considered the information on either Exhibits 67 -- 66,
7   67, or 65 and did a risk analysis and consider that in
8   connection with the changing of a warning?
9       A   No.
10      Q   Okay.
11      MR. LEWIS:  Objection.  Form.
12  BY MR. GOSS:
13      Q   Would a reasonable and prudent manufacturer
14  have done so?
15      A   Yes, definitely.
16      Q   And was it a violation of the standard of care
17  as set forth in the Global Harmonization Task Force
18  documents for Ethicon not to have done so?
19      A   Absolutely.
20      Q   All right.  Let's talk a little bit about
21  postmarket surveillance.  Explain to the jury what
22  postmarket surveillance is.
23      A   Postmarket surveillance encompasses just the
24  type of information that we were talking about,
25  complaint reporting, medical device reports, commercial

Page 589

1   experience with the product once it is on the market.
2   So it includes the complaints that we have been talking
3   about, medical device reports, reports in the
4   scientific and medical literature.  It can also include
5   postmarketing studies and assessment of those with the
6   idea being that once the product is on the market and
7   the product has wide use, the company has the
8   responsibility to constantly be assessing safety and
9   performance to ensure that there always remains a
10  favorable benefit-to-risk ratio for use of the device
11  and that the risks are acceptable.  And when safety
12  issues arise, or performance issues arise, that that
13  information is factored back into a risk analysis and
14  appropriate actions are undertaken, such as I mentioned
15  earlier, changing labeling, doing new studies to better
16  understand the safety profile of the product.
17      MR. LEWIS:  Objection.  Nonresponsive.
18  BY MR. GOSS:
19      Q   Okay.  Does the Global Harmonization Task
20  Force documents set forth some standards regarding
21  postmarket surveillance?
22      A   Yes.
23      MR. GOSS:  Give me one second, I apologize.
24      (The document referenced below was
25      marked Deposition Exhibit 68 for

Page 590

1   identification and is appended hereto.)
2   BY MR. GOSS:
3       Q   Dr. Pence I'm going to hand you what's been
4   marked as Deposition Exhibit 68.  I actually think this
5   is a document we used last time; I just couldn't find
6   it in the pile of exhibits.  And I'm going to ask you
7   what is Exhibit 68?
8       A   Exhibit 68 is a guidance document -- final
9   guidance document produced by the Global Harmonization
10  Task Force entitled Principles of Conformity Assessment
11  for Medical Devices.
12      Q   And what is it dated?
13      A   June 26th, 2006.
14      Q   And is this a standard -- does this document
15  reflect standards in the industry?
16      A   Yes, it does.
17      Q   I'll reference you to page 9 of that document
18  where it discusses systems for postmarket surveillance.
19  It says 5.1.2.
20      A   Yes.
21      Q   What is that about?  Tell me what that means.
22      A   This is stating that a medical device
23  manufacturer, prior to actually commercializing its
24  product, must have in place as part of what in the
25  industry we call the quality management system a

24 (Pages 587 to 590)

Peggy Pence Ph. D.

Page 591

1  process to assure the continued conformity of the
2  device to the essential principles of safety and
3  performance.  And part of the essential principles of
4  safety and performance means that one must all -- as I
5  was saying earlier, one must always assure, meaning the
6  company must always assure that there is a favorable
7  benefit-to-risk ratio for the device and that risk must
8  be acceptable.  And so they must have a system in place
9  to assess the continued conformity of the device to the
10  essential principles of safety and performance,
11  basically to ensure that the product continues to have
12  a favorable benefit-to-risk ratio throughout the
13  postmarketing phase of the product.
14      Q.  Okay.  So, as I understand it, a manufacturer
15  simply needs to have a system in place to monitor its
16  products.  Is that one thing?
17      A.  Yes, and that includes what I was discussing a
18  little bit earlier, complaint handling, the postmarket
19  vigilance reporting, like the medical device reports
20  that we were just discussing, and then taking
21  appropriate actions based on the findings from
22  postmarket surveillance.
23      Q.  Was that standard in the industry even before
24  the Global Harmonization Task Force final document came
25  out?

Page 592

1      A.  Yes.
2      Q.  Okay.  Let me ask you about that.
3          I mean, as I understand the Global
4  Harmonization Task Force document, I mean that was --
5  were those guidelines typically combining standards in
6  the industry that already existed to try to uniform --
7  make them uniform?
8      A.  To harmonize them across the different
9  regions, yes.
10      Q.  Was its intent to come up with new standards?
11      MR. LEWIS:  Objection.  Form.
12      THE WITNESS:  It was basically evaluating the
13  standards that existing -- existed and ensuring that
14  all the participating parties could agree on the most
15  optimal framework from global medical device
16  development.
17  BY MR. GOSS:
18      Q.  Let me ask you with respect to Ethicon's
19  conduct in its postmarket surveillance conduct, did you
20  review any testimony in your investigation reflecting
21  Ethicon's ability to monitor its laser-cut,
22  mechanically cut, mesh products?
23      A.  Yes, I did.
24      MR. LEWIS:  Objection.  Form.
25      MR. GOSS:  What's the objection -- elaborate on

Page 593

1  that so I can cure it.
2      MR. LEWIS:  Foundation.  Calls for speculation.
3      MR. GOSS:  Okay.
4  BY MR. GOSS:
5      Q.  You can answer the question.
6      A.  Yes, I did.
7      Q.  Okay.  And did you review the deposition of
8  Piet Hinoul?
9      A.  Yes, I did.
10      Q.  I'm going to hand you what has previously been
11  marked in this deposition as Exhibit 40, and this is
12  what was identified last week as the March 27, 2014,
13  deposition -- I'm sorry, trial proceedings testimony of
14  Piet Hinoul in the Linda Batiste trial in Dallas,
15  Texas.
16          Do you recall his testimony in that?
17      A.  Yes, I do.
18      Q.  Is that testimony something that you reviewed
19  in preparation for your opinions?
20      A.  Yes.
21      Q.  Do they form the basis of your opinions?
22      A.  Yes.
23      Q.  Okay.  I want you to look at page 41, line 13
24  through 20, and then lines -- page 43, lines 6 through
25  16.  So let's start with 41, lines 13 through 20.

Page 594

1          Do you see where it picks up with.
2  "Question:  Right.  And there is"?
3      A.  Correct.
4      Q.  Okay.  I want you to read that excerpt, but
5  then I want you to also go to page 43, lines 6 through
6  16, where it picks up with, "Question:  Because your
7  company..."
8          Do you see that?
9      A.  Yes.
10      Q.  And what's our next slide, 69 -- next exhibit,
11  69?
12      THE REPORTER:  Yes.
13      (The document referenced below was
14      marked Deposition Exhibit 69 for
15      identification and is appended hereto.)
16  BY MR. GOSS:
17      Q.  Are both those excerpts excerpts that you
18  relied upon in forming your opinions?
19      A.  Yes, that's correct.
20      Q.  And -- I'm going to hand you what's been
21  marked as Deposition Exhibit Number 69.  Is that a
22  slide that you assisted in the preparation of?
23      A.  Yes.
24      Q.  Would that assist you in giving your testimony
25  to the jury?

Peggy Pence Ph. D.

Page 595

1    A   Yes.
2    Q   Okay.  And does that slide reflect the
3  testimony in Pete Hinoul's trial testimony that you
4  just reviewed for pages 41, lines 13 through 20, and
5  43, lines 6 through 16?
6    A   Yes.
7    Q   Okay.  Would you please read that to the jury?
8    A   "Question:  Right.  And there
9  is a lot of reports that you get
10  internally from doctors or patients
11  saying, 'I've had an erosion' or 'My
12  patient has had an erosion,' and it
13  turns out that you, your company,
14  doesn't ever know if it's laser-cut mesh
15  or mechanically cut mesh; correct?
16    "Answer:  If you don't know the
17  identification number, you wouldn't
18  know.  I agree.
19    "Question:  Because your company
20  doesn't necessarily have all of the
21  information from the reports on which it
22  is laser-cut or mechanically cut mesh?
23    "Answer:  Right.
24    "Question:  You cannot do analysis
25  accurately or say you have done an

Page 596

1  analysis accurately to determine whether
2  or not there's an increase or decrease
3  of erosions related to laser-cut mesh;
4  correct?
5    "Answer:  That's right."
6    Q   What's the importance, if any, of what you
7  just read?
8    A   The importance of this is that the company was
9  not evaluating -- in this case it is discussing
10  erosion, but it would be applicable to other adverse
11  events as well, to distinguish the safety profile of
12  laser-cut mesh versus the mechanically cut mesh that
13  was implanted in Ms. Ramirez.
14    Q   Does that violate the Global Harmonization
15  Task Force document you just discussed regarding
16  postmarket surveillance systems?
17    A   Yes.
18    Q   Why is that?
19  MR. LEWIS:  Objection.  Form.
20  THE WITNESS:  For example, because we know that
21  from testimony and documentation we have discussed
22  previously that the mechanically cut mesh has a defect
23  of fraying and particle loss, and in order to evaluate
24  whether or not that has an impact on patient safety,
25  one needs to be following that versus laser-cut mesh or

Page 597

1  doing testing a variety of ways in which that can be
2  assessed, and without those mechanisms in place and an
3  appropriate investigation, then elucidating,
4  understanding the safety profile is not possible.
5  BY MR. GOSS:
6    Q   And I guess, along those lines, what I really
7  want to direct you to and for you to direct your
8  response to is the standards set forth in the Global
9  Harmonization Task Force documents, the one we just
10  looked at, 5.1.2, regarding systems and safety items
11  and monitoring systems in place.  Does the testimony
12  that you just read from Piet Hinoul regarding the
13  ability or inability to track laser-cut mesh or
14  mechanically cut mesh complaints, is that violative of
15  the Global Harmonization Task Force requirements
16  regarding systems for postmarket surveillance?
17    A   Yes.
18    Q   Okay.  Why is that?
19    A   Because one -- according to the GHTF document
20  that we were reading, in order to be able to assess the
21  product you have to have postmarket systems in place,
22  and there was the mechanically cut mesh product and the
23  laser-cut mesh product and as a result you needed to
24  have a system in place for both to be able to track
25  postmarkets and do an appropriate postmarket

Page 598

1  surveillance.
2    Q   Let's shift gears a little bit.  You spoke a
3  little bit last week, you mentioned a registry.  Was
4  there a permanent registry -- strike that.
5    First of all, what is a registry?
6    A   A registry is a type of clinical study in
7  which patients who are implanted, in this case patients
8  who would be implanted with the TVT-O, would be
9  enrolled and if they consented to be enrolled would be
10  enrolled and followed long-term to determine how the
11  product performed and whether -- and what safety issues
12  might arise in the women who participated in the
13  registry.  It provides -- its key purpose would be to
14  provide long-term safety data.
15    Q   Okay.  Tell me, was there ever a permanent
16  registry for TVT mesh?
17    A   No.
18    Q   Would a reasonable and prudent manufacturer
19  have instituted a permanent registry?
20    A   A long-term registry, absolutely, yes.
21    Q   Is that part -- appropriate postmarket
22  surveillance?
23    A   That would be, especially for a permanent
24  implant, absolutely.
25    Q   There's some questions that you received last

26 (Pages 595 to 598)

Peggy Pence Ph. D.

Page 599

1    week regarding whether there were over 1,000 studies on
2    TVT.
3        Do you remember that?
4        A   Yes, I do.
5        Q   The studies that were referenced, do any of
6    those distinguish between laser-cut mesh versus
7    mechanically cut mesh?
8        A   No.
9        Q   Have you ever seen a study that Ethicon has
10   performed to distinguish between laser-cut mesh and
11   mechanically cut mesh?
12       A   Not directed specifically to that question,
13   no.
14       Q   Were all these studies that are in that big
15   number that's thrown out there, were they all -- do
16   they all have safety as their end point?
17       A   No.
18       Q   What were -- tell the jury what an end point
19   is.
20       A   The end point is basically what you are
21   evaluating, what you are trying -- the outcome you are
22   going to evaluate at the end of a clinical study.
23       Q   So all these -- this big number that's thrown
24   out of the number of studies, they are not all studying
25   safety?

Page 600

1        A   No.  They were -- much more focused on
2    efficacy evaluations.
3        Q   What does that mean, "efficacy evaluations"?
4        A   Whether or not the product works and is
5    effective for its intended purpose, in this case for
6    stress urinary incontinence.
7        Q   Does an efficacy evaluation evaluate safety?
8        A   No.
9        Q   Okay.  Were some of those studies investigator
10   studies?
11       A   Yes.
12       Q   What does that mean?
13       A   Investigator initiated?
14       Q   Yeah.
15       A   Most of them were investigator-initiated
16   studies, to the best of my recollection as I sit here
17   today.  That means that a physician who is utilizing
18   the product implements a study in his patients or
19   groups with another physician or several physicians to
20   evaluate their patients in a study and report that
21   data, but it is initiated by the investigator, not the
22   company, in this case Ethicon.
23       MR. GOSS:  Hey, everyone on the phone, if I can
24   take five minutes -- a five-minute break to go through
25   my notes, I think I might be just about done.  So do

Page 601

1    y'all mind taking five minutes?
2        MR. LEWIS:  That's fine.
3        MS. VERBEEK:  Sounds good.
4        MR. GOSS:  Let me take five minutes, give me a
5    chance to go through, and I think we may be within five
6    minutes of being done.
7        VIDEO OPERATOR SISSON:  12:47, we are off the
8    record.
9        (Recess taken.)
10       VIDEO OPERATOR SISSON:  Back at 12:55, we are back
11   on the record.
12   BY MR. GOSS:
13       Q   Couple things, Dr. Pence.  I think when we
14   went off the record you had discussed
15   investigator-initiated studies?
16       A   Yes.
17       Q   And you described what that is.  Why is it
18   significant if the study is an investigator-initiated
19   study, if at all?
20       A   It is different from a company-initiated study
21   where the company actually monitors it because when a
22   company conducts a study, a company is required to meet
23   a certain set of standards, which we call good clinical
24   practices, and there are checks and balances in those
25   standards, one of which is that the company is required

Page 602

1    to monitor the investigation and, for example, the
2    data.  The -- people actually go to the site where the
3    study is being conducted and they check the data that's
4    in the patient record versus the information that's
5    being reported and assure that it is accurate and it is
6    complete, and we know from the literature, for example,
7    that there is underreporting of safety information in
8    publications, and so there is a different standard that
9    is required to be met when a company oversees a product
10   to ensure that, once again, the data is accurate and
11   complete.
12       Q   So some studies are stronger than others.
13       A   Yes.
14       Q   You were asked last week about the number of
15   cases you have testified in relating to Ethicon.
16       A   Yes.
17       Q   I think you said a handful or something, I
18   don't remember the exact number.  Fewer than ten?
19       A   Yes.
20       Q   Do you know how many lawsuits are actually
21   pending in the multi-district litigation against
22   Ethicon?
23       A   Over 30,000 is my understanding.
24       Q   Okay.  I gather you haven't testified in
25   30,000 lawsuits?

27 (Pages 599 to 602)

Peggy Pence Ph. D.

Page 603

1    A   No, I haven't.
2    Q   Do you know -- I retained you in Ms. Ramirez's
3  case; right?
4    A   Yes.
5    Q   Do you know whether your testimony is going to
6  be used in other cases and potentially spread out among
7  other cases? Do you know one way or another?
8    A   I don't.
9    Q   Has anybody suggested that to you?
10   A   It is my understanding that may be the case,
11 yes.
12   Q   Okay. Just to wind this up, we have talked
13 now for a couple days about your opinions. I started
14 off with these questions, and I'm going to end with
15 these questions.
16       Have you reached an opinion whether Ethicon
17 violated the standard of care by failing to conduct
18 appropriate testing to support the safe and effective
19 use of the TVT-O -- the TVT obturator system?
20   A   Yes.
21   Q   What is that opinion?
22   A   They violated the standard of care and did not
23 do the appropriate testing.
24   Q   Did you reach an opinion whether the labeling
25 for the TVT obturator system was inadequate?

Page 604

1    A   Yes, I did.
2    Q   Due to failure to warn?
3    A   Yes.
4    Q   And what is that opinion?
5    A   The labeling was inadequate.
6    Q   Have you reached an opinion as to whether the
7  label was false or misleading?
8    A   Yes.
9    Q   And what is that opinion?
10   A   The labeling was false and misleading.
11   Q   Did you reach an opinion as to whether Ethicon
12 failed to meet the postmarket vigilance standard of
13 care in management of risk?
14   A   Yes.
15   Q   And what is that opinion?
16   A   Ethicon failed to meet the postmarketing
17 vigilance standard of care.
18   Q   And have all the opinions that you have given
19 in your deposition been to a reasonable degree of
20 scientific and professional certainty?
21   A   Yes.
22   MR. GOSS:  That's all I have.
23       I understand that we have got a hearing
24 tomorrow to determine, among other things, whether this
25 deposition is going to continue for substantially

Page 605

1  longer than what has gone so far. Obviously, I'm going
2  to pass the witness at this point and I'm going to
3  reserve my -- I'm not waiving any position that I might
4  have in the event that Ethicon is given more time to
5  examine the witness.
6       With that being said, I pass the witness.
7    MR. LEWIS:  Ethicon and Johnson & Johnson will
8  reserve their right to ask further questions pending
9  the ruling from the court in the hearing that's going
10 to take place tomorrow on the deposition.
11   MS. VERBEEK:  We will reserve for trial.
12   MR. GOSS:  Okay. Thank you all for your
13 cooperation today.
14   THE REPORTER:  Who is taking a copy? Mr. Lewis,
15 you are taking a copy?
16   MR. LEWIS:  That's correct. Do we have a standing
17 order?
18   THE REPORTER:  I believe you do. I just --
19   MR. LEWIS:  Okay.
20   THE REPORTER:  I probably shouldn't have asked you.
21   MR. LEWIS:  Yeah, I'll take a copy.
22   THE REPORTER:  And, Ms. Verbeek, are you taking a
23 copy?
24   MS. VERBEEK:  Yes, electronic only.
25   THE REPORTER:  Okay. Is everybody taking a rough

Page 606

1  draft or nobody taking -- well, I think defense gets a
2  rough draft, plaintiff. And, Ms. Verbeek, do you need
3  a rough draft as well?
4    MS. VERBEEK:  No.
5    THE REPORTER:  And are we expediting?
6    MR. GOSS:  Yes.
7    THE REPORTER:  Everyone needs an expedite?
8    MS. VERBEEK:  Yes.
9    MR. LEWIS:  Yes.
10   VIDEO OPERATOR SISSON:  At one o'clock, we are off
11 the record.
12 (The deposition proceeding was adjourned at 1:00 P.M.)
13
14            --ooOoo--
15
16
17
18
19
20
21
22
23
24
25

28 (Pages 603 to 606)

Peggy Pence Ph. D.

Page 607

```
 1
 2
 3                    CERTIFICATE
 4                        OF
 5          CERTIFIED SHORTHAND REPORTER
 6
 7          The undersigned Certified Shorthand Reporter
       of the State of California does hereby certify:
 8          That the foregoing proceeding was taken before
       me at the time and place therein set forth, at which
 9     time the witness was duly sworn by me;
            That the testimony of the witness and all
10     objections made at the time of the examination were
       recorded stenographically by me and were thereafter
11     transcribed, said transcript being a true and correct
       copy of my shorthand notes thereof;
12          That the dismantling of the original
       transcript will void the reporter's certificate.
13
14          In witness thereof, I have subscribed my name
15     this date:_____.
16
17
18          _____
19          PAMELA COTTEN, CSR, RDR
            Certificate No. 4497
20          Certified Realtime Reporter
21
22
23          (The foregoing certification of
       this transcript does not apply to any
24     reproduction of the same by any means,
       unless under the direct control and/or
25     supervision of the certifying reporter.)
```

Page 608

INSTRUCTIONS TO WITNESS

```
 1
 2
 3          Please read your deposition over carefully and
 4     make any necessary corrections.  You should state the
 5     reason in the appropriate space on the errata sheet for
 6     any corrections that are made.
 7          After doing so, please sign the errata sheet
 8     and date it.
 9          You are signing same subject to the changes
10     you have noted on the errata sheet, which will be
11     attached to your deposition.
12          It is imperative that you return the
13     original errata sheet to the deposing attorney within
14     thirty (30) days of receipt of the deposition
15     transcript by you.  If you fail to do so, the
16     deposition transcript may be deemed to be accurate and
17     may be used in court.
18
19
20
21
22
23
24
25
```

Page 609

```
 1              ------
 2            E R R A T A
 3              ------
 4     PAGE  LINE  CHANGE
 5     ____ ____ _____
 6        REASON:  _____
 7     ____ ____ _____
 8        REASON:  _____
 9     ____ ____ _____
10        REASON:  _____
11     ____ ____ _____
12        REASON:  _____
13     ____ ____ _____
14        REASON:  _____
15     ____ ____ _____
16        REASON:  _____
17     ____ ____ _____
18        REASON:  _____
19     ____ ____ _____
20        REASON:  _____
21     ____ ____ _____
22        REASON:  _____
23     ____ ____ _____
24        REASON:  _____
25
```

Page 610

ACKNOWLEDGMENT OF DEPONENT

```
 1
 2
 3          I,_____, do hereby
 4     certify that I have read the foregoing pages, and that
 5     the same is a correct transcription of the answers
 6     given by me to the questions therein propounded, except
 7     for the corrections or changes in form or substance, if
 8     any, noted in the attached Errata Sheet.
 9
10
11     _____
12     PEGGY PENCE, PhD. (VOLUME II)        DATE
13
14     Subscribed and sworn to
       before me this
15
16     _____day of_____,20___.
17     My commission expires:_____
18     _____
19     Notary Public
20
21
22
23
24
25
```

29 (Pages 607 to 610)