# EXHIBIT D

Howard C. Jordi, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION
Master File No. 2:12-MD-02327

---

IN RE:  ETHICON, INC.          MDL No. 2327
PELVIC REPAIR SYSTEM,
PRODUCTS LIABILITY
LITIGATION

---

This Document Relates to:

Carolyn Lewis, Et Al v. Ethicon, Inc.
Case No. 2:12-CV-04301

---

IN THE DISTRICT COURT, 95th JUDICIAL DISTRICT
DALLAS COUNTY, TEXAS

Linda Batiste,
          Plaintiff,
     v.                          Cause No.
John Robert McNabb, M.D.,        DC-12-14350
Johnson & Johnson and Ethicon, Inc.,
          Defendants.

---

DEPOSITION OF HOWARD C. JORDI, Ph.D.

Wednesday, October 30th, 2013

9:05 a.m.


     Held At:

          Jordi Lab
          200 Gilbert Street
          Mansfield, Massachusetts


REPORTED BY:

Maureen O'Connor Pollard, RPR, CLR, CSR #149108

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

---

Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
3    BY:  BENJAMIN H. ANDERSON, ESQ.
4    ANDERSON LAW OFFICES, LLC
5      1360 West 9th Street, Suite 215
6      Cleveland, Ohio 44113
7      216-589-0256
8      ben@andersonlawoffices.com
9      -and-
10   BY:  DANIEL J. THORNBURGH, ESQ.
11   AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLLC
12     17 East Main Street, Suite 200
13     Pensacola, Florida 32502
14     850-202-1010
15     dthornburgh@awkolaw.com
16
17  FOR THE DEFENDANTS ETHICON, INC., and JOHNSON &
18  JOHNSON:
19   BY:  DAVID B. THOMAS, ESQ.
20   THOMAS COMBS & SPANN, PLLC
21     300 Summers Street, Suite 1380
22     Charleston, West Virginia 25301
23     304-414-1807
24     dthomas@tcspllc.com
25

---

Page 3

1    APPEARANCES VIA SPEAKERPHONE
2  FOR THE PLAINTIFF CAROLYN LEWIS:
3    BY:  CALLE M. MENDENHALL, ESQ.
4    FREESE & GOSS PLLC
5      Regions Harbert Plaza 1901
6      6th Avenue North
7      Birmingham, Alabama 35203
8      205-871-4144
9      calle@freeseandgoss.com
10
11  FOR DEFENDANT DR. JOHN McNABB in the Batiste
12  case:
13   BY:  PHILIPA M. REMINGTON, ESQ. (AM)
14     CHARLES A. ESTEE, ESQ. (PM)
15     THIEBAUD, REMINGTON, THORNTON, BAILEY, LLP
16     1445 Ross Avenue, Suite 4800
17     Dallas, Texas 75202
18     214-954-2210
19     premington@trtblaw.com
20
21
22
23
24
25

---

Page 4

1              INDEX
2  EXAMINATION                    PAGE
3  HOWARD C. JORDI, Ph.D.
4    BY MR. THOMAS                    5
5    BY MR. ANDERSON                286
6            EXHIBITS
7  NO.        DESCRIPTION              PAGE
8  1    Rule 26 Expert Report of Howard
9       Jordi, PhD in the Carolyn Lewis
10      case................................. 6
11  2    Document titled Final Report, Linda
12      Batiste.............................. 7
13  3    De Tayrac and Letouzey article
14      titled "Basic science and clinical
15      aspects of mesh infection in pelvic
16      floor reconstructive surgery......... 54
17  4    Liebert, et al study titled
18      Subcutaneous Implants of
19      Polypropylene Filaments.............. 72
20  5    Group of invoices from Jordi Labs....183
21  6    10/30/13 Final Report for Linda
22      Batiste.............................209
23  7    Group of films.......................267
24
25

---

Page 5

1          P R O C E E D I N G S
2
3        HOWARD C. JORDI, Ph.D.,
4  having been first duly identified and sworn, was
5  examined and testified as follows:
6          DIRECT EXAMINATION
7  BY MR. THOMAS:
8    Q.  Good morning, Dr. Jordi.
9    A.  Good morning.
10   Q.  I introduced myself to you before the
11  deposition.  My name is David Thomas, and I
12  represent the Defendants in the case.  And I'm
13  going to take your deposition in two matters,
14  the Carolyn Lewis matter and the Batiste case
15  from Texas.
16       You understand that?
17   A.  I do.
18   Q.  We're here in your offices in
19  Massachusetts?
20   A.  Yes, we are.
21   Q.  And is Massachusetts your home?
22   A.  It is.
23   Q.  Okay.  Would you state your full name
24  for the record, please?
25   A.  Howard Craig Jordi.

---

2 (Pages 2 to 5)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

---

Page 6

1    Q.  And you're a Dr. Jordi, correct?
2    A.  That's correct.
3    Q.  A Ph.D doctor?
4    A.  A Ph.D doctor.
5    Q.  Not a medical doctor?
6    A.  Not a medical doctor.
7    Q.  And in what area is your Ph.D?
8    A.  Biochemistry.
9    Q.  What is a biochemist?
10   A.  A biochemist is one who studies the
11   reactions of chemicals in the body.
12   Q.  Okay.  Dr. Jordi, I've been provided
13   two reports in this case.  I'm going to mark as
14   deposition Exhibit Number 1 what's been provided
15   to me as your Rule 26 expert report of Howard
16   Jordi, Ph.D in the Carolyn Lewis case.
17   A.  Okay.
18       (Whereupon, Jordi Exhibit Number 1,
19       Rule 26 Expert Report of Howard Jordi,
20       PhD in the Carolyn Lewis case, was
21       marked for identification.)
22       MR. THOMAS:  And I'm going to mark as
23   Exhibit Number 2 what's been provided to me as a
24   document titled Final Report for Linda Batiste.
25

---

Page 7

1        (Whereupon, Jordi Exhibit Number 2,
2        Document titled Final Report, Linda
3        Batiste, was marked for
4        identification.)
5    BY MR. THOMAS:
6    Q.  Okay.  And let me tell you what I did.
7    Those are double-sided copies because I didn't
8    care to --
9    A.  I was going to say it didn't seem
10   thick enough.
11   Q.  It's half as thick as you expected it
12   to be.
13   A.  Yes.
14   Q.  Because I didn't care to carry all
15   those papers with me.  These are the documents
16   that were provided by counsel in the case.
17       Can you review those quickly, or as
18   much time as you need, and confirm for me that
19   those are complete copies of your expert reports
20   in the case?
21       (Witness reviewing documents.)
22       MR. ANDERSON:  I'd just like for the
23   record to reflect that it's an almost 800 page
24   report, and he's trying to leaf through it as
25   best he can and to try to determine if it's

---

Page 8

1    final, rather than looking at each and every
2    page, he's trying to do the best he can in the
3    interest of time.
4        MR. THOMAS:  It's 847 pages, and I'll
5    represent to you that we copied it as best we
6    could and produced it for him, and I'm just
7    trying to get him to identify it as best he can.
8        MR. ANDERSON:  So stipulated.
9        MR. THOMAS:  The Batiste report is
10   some 240 pages, and I don't expect him to go
11   through every page, unless he wants to.  But
12   I'll represent that's a copy of what was
13   supplied to me.
14       MR. ANDERSON:  Right.
15       MR. THOMAS:  I'm trying to just get it
16   identified as best we can.
17       MR. ANDERSON:  Right.  I'm just saying
18   he's leafing through it to do the best he can
19   without taking every page and looking at it in
20   detail.
21   A.  It appears to be complete.
22   BY MR. THOMAS:
23   Q.  Okay.  Dr. Jordi, how do you charge
24   for your time?
25   A.  I bill hourly.

---

Page 9

1    Q.  And what is your hourly rate?
2    A.  350 an hour.
3    Q.  Is your hourly rate the same for
4    whatever work that you do?
5    A.  Yes.
6    Q.  Have you calculated the total amount
7    dollars that you've billed for Exhibit 1, the
8    Lewis report?
9    A.  We'd have to look at the receipts, the
10   billings for that.
11   Q.  Do you have those with you today?
12   A.  I believe we do.
13       MR. ANDERSON:  Yes.
14   BY MR. THOMAS:
15   Q.  And the same for the Batiste matter?
16   A.  Same.
17       MR. THOMAS:  Okay.  Ben, we'll come
18   back to that in a few minutes.
19       MR. ANDERSON:  Sure.
20   BY MR. THOMAS:
21   Q.  Those billing records are readily
22   available, and you can determine how much it
23   cost you to produce Exhibit 1, the report in
24   Carolyn Lewis, and Exhibit 2, the report for
25   Linda Batiste?

---

3 (Pages 6 to 9)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 10

1    A.  I don't know if this has been billed
2  yet, but this one should be.  I think we bill
3  monthly, so it hasn't gone out yet.
4    Q.  When you say "this one," you're
5  referring to Exhibit 2, which is Linda Batiste?
6    A.  Yes, sir.
7    Q.  Okay.  And do you have records that
8  you'd be able to get sometime during the day so
9  that I can tell how much time you have into it
10 that hasn't been billed so I know how much cost
11 there was for the Linda Batiste report?
12       MR. ANDERSON:  I might be able to help
13 you.  In response to your notice of subpoena,
14 the 21 categories, we did our best to try to
15 respond to those, the ones that we thought he
16 could respond to, and as part of that we tried
17 to get as up to date a billing as we could for
18 you, and that would include as much of Batiste
19 as possible, at least up until last week.
20       MR. THOMAS:  Okay.
21       MR. ANDERSON:  So that's -- we've
22 tried.  And I think that you'll be able to look
23 at it, and from the dates be able to tell
24 whether or not it includes anything this week or
25 not.

Page 11

1        MR. THOMAS:  Perfect.
2  BY MR. THOMAS:
3    Q.  For the Carolyn Lewis case, your final
4  report in Exhibit Number 1, is that a complete
5  copy of the report of the opinions that you
6  intend to give in the Carolyn Lewis case?
7    A.  It is.
8    Q.  Do you have any intention of doing any
9  additional work prior to testifying in trial in
10 this case in connection with new opinions for
11 the Carolyn Lewis case?
12       MR. ANDERSON:  I'm just going to
13 object, because as counsel knows, we have a
14 right to do rebuttal reports in this case, so he
15 may not even understand that.  And so with that
16 caveat, that as he sits here today.
17    A.  To my knowledge, this is complete, and
18 this is what I will be using.
19 BY MR. THOMAS:
20    Q.  Same question with respect to Linda
21 Batiste, Exhibit Number 2; does Exhibit Number 2
22 represent a complete report of the opinions that
23 you're prepared to give in the Linda Batiste
24 case?
25    A.  Yes.

Page 12

1    Q.  All right.  Do you understand that
2  there are different products that are at issue
3  in the Lewis case and the Batiste case?
4        MR. ANDERSON:  Objection.
5        Go ahead.
6    A.  The samples that I received I just
7  received and ran by identification numbers
8  without regards to -- certainly the pristine
9  materials were identified.
10 BY MR. THOMAS:
11    Q.  Okay.  Do you have any knowledge --
12 what I'm trying to get at, Doctor, is, I'll
13 represent to you, my understanding anyway, is
14 the Carolyn Lewis case involves a product known
15 as a TVT Classic or a TVT Retropubic, and the
16 Batiste case, Exhibit Number 2, I understand,
17 involves a product known as a TVT Obturator or
18 TVT-O.
19       Do you know that?
20    A.  No.  That wasn't represented to us, as
21 far as I'm concerned.
22    Q.  As far as you're concerned --
23    A.  It's an explant.
24    Q.  Okay.  In the work that you did in
25 these matters, does it concern you at all

Page 13

1  whether this is a TVT Classic or a TVT Obturator
2  or a TVT Retropubic or TVT-O?
3    A.  No.  They're all polypropylene, and in
4  that sense, for that reason, no.
5    Q.  Is it fair to understand, Doctor --
6  just trying to do something to make this easier,
7  believe it or not -- is it fair to understand,
8  Doctor, that the work that you did in analyzing
9  the mesh explants and the mesh controls that's
10 represented in Exhibit Number 1 and Exhibit
11 Number 2 do not depend on the type of product
12 that you were analyzing?
13       MR. ANDERSON:  Objection.
14       Go ahead.
15    A.  As a polymer chemist and having
16 studied polypropylene, among others, for my
17 lifetime of work, basically polypropylene is
18 polypropylene is polypropylene, so it's going
19 to -- if it's polypropylene it's going to have
20 the characteristic reactions of polypropylene.
21 BY MR. THOMAS:
22    Q.  Did the work that you did for Exhibit
23 Number 1 differ from the work that you did in
24 Exhibit Number 2 because of the name of the
25 product that was analyzed in each case?

4 (Pages 10 to 13)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 14

1      A.  Did not.
2         I'm sorry.
3         MR. ANDERSON:  Go ahead.  That's fine.
4    BY MR. THOMAS:
5      Q.  And what were you trying to do when
6    you -- what were you asked to do in Exhibit
7    Number 1?
8      A.  We were asked to compare pristine mesh
9    samples and explant samples and determine
10   whether or not there were differences; and if
11   there were, what they were.
12     Q.  What did you understand to be the
13   differences that you were looking for?
14     A.  I wasn't told to look for any specific
15   differences.  I was told to look for
16   differences, if there were any.
17     Q.  And how did you set out to determine
18   whether there were differences between the
19   explants and the pristine samples that you'd
20   received?
21     A.  Given the knowledge that it was
22   polypropylene, classic tests that we would
23   typically run on any polypropylene would be
24   molecular weight, to see if it degraded in terms
25   of its molecular weight.

Page 15

1         We would look for additive content,
2    because that stabilizes polypropylene.
3         How am I doing speed-wise?
4         So we did additives analysis.
5         We would do DSC to look for
6    crystallinity.
7         We did SEM to look for cracks.
8         We did SEM-EDX to look for elemental
9    composition.  Specifically were looking for
10   differing oxygen levels which would indicate and
11   correlate with oxidation, if present.
12        We did FTIR analysis to look for
13   presence of carbonyls.  And we specifically
14   there wanted to find out whether the flaking
15   material, once we saw it from the SEM, was
16   polypropylene or not, what was the composition,
17   chemical composition of the flakes that were
18   coming off the polypropylene fibers.  I'm trying
19   to think.
20        So we also ran PYMS.  That's another
21   technique to look for additives, presence of
22   additives.
23        I need to --
24        MR. ANDERSON:  Do you want to
25   reference your report?

Page 16

1    BY MR. THOMAS:
2      Q.  Absolutely.
3      A.  Do I need to reference this one,
4    because it's not marked?
5         MR. ANDERSON:  You can look at
6    anything.
7      A.  It's this.  I just want to make sure I
8    have all of the techniques referenced here that
9    I did.
10        We did optical microscopy as well to
11   see if there were any obvious differences, and
12   to just look at the shape of the fibers.
13        GPC.  I think we got them all.
14        MR. ANDERSON:  Did you say GPC?
15     A.  Gel permeation chromatography.  GPC
16   for molecular weight.
17   BY MR. THOMAS:
18     Q.  How did you determine what tests to
19   conduct on the mesh that you analyzed in Exhibit
20   Number 1?
21     A.  I've analyzed these kinds of materials
22   since 1980.  In this particular business we
23   built -- I founded this company, and so it's
24   just years and years of experience.
25   Polypropylene has to be stabilized because it's

Page 17

1    a reactive polymer.  That information goes back
2    at least to the '60s.  So you've got to look for
3    the antioxidants, the presence or lack thereof.
4    GPC is to determine the molecular weight, as I
5    said.  DSC is to determine the melt point and
6    the FLP at melt, which correlates with percent
7    crystallinity.  SEM is a means of looking at the
8    physical shape of the fibers.  So these are just
9    standard techniques that we used.  So we chose
10   standard techniques that I would use for any
11   such type of analysis.
12     Q.  Type of such analysis, what do you
13   mean by that?
14     A.  Well, in our company we analyze any
15   kind of polymer.  So we analyze polystyrene one
16   day, we analyze contact lens materials another
17   day, we analyze polypropylene, some of which
18   have been implanted in the human bodies, hips
19   and so on on another day.  You could really call
20   us a materials lab.
21     Q.  Okay.  What I'm trying to understand
22   is when you got this request from Mr. Anderson
23   and his associates and they asked you to analyze
24   this polypropylene material both as an explant
25   and as a pristine sample, did you go to the

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 18

1  shelf and pull off a list and say "I'm going to
2  do this list of tests"?
3      A.  No, because I already knew it from
4  experience.
5      Q.  Okay.
6      A.  We would do this type of work for any
7  client.
8      Q.  So the tests that you identified for
9  purposes of your report in both Exhibits 1 and
10  Exhibits 2 are based upon your training,
11  education, and experience, as opposed to any
12  reference guide that you may have looked to to
13  determine what tests you may have run, is that
14  fair?
15      A.  Well, I have reference guides.  I mean
16  I have books.  I do continue to -- reading is an
17  ongoing learning technique I continue to use,
18  and always will.
19      Q.  Sure.
20      A.  But no, I wouldn't need to read those
21  books to pop up with the techniques because
22  they're standard in the industry.
23      Q.  Is there a place where I could go
24  to -- if they came to me and said "Mr. Thomas, I
25  want to have these polypropylene tests run on

Page 19

1  this pristine control and this explant, what
2  tests should I run?"  Is there a place where you
3  could direct me to figure out what would be the
4  appropriate tests to identify the differences
5  between the explants and the controls?
6          MR. ANDERSON:  Objection as to form.
7          Go ahead.
8      A.  There's probably chapters like that,
9  books on chemical analysis that would suggest
10  methodologies.
11          Generally you have a body of
12  experience developed over many years, you
13  just -- at this point in my life, I would know
14  that I need to look up additives, for example,
15  but then I would go to the Dr. Müller text which
16  is in our reference list to look up how
17  additives were used in various materials, and I
18  would look under polypropylene, and I would find
19  what additives are typically used for
20  polypropylene specifically.  So I'd know what to
21  look for.
22  BY MR. THOMAS:
23      Q.  And you're referring to a text cited
24  in your report by a Dr. Müller?
25      A.  Dr. Müller, Society of Plastics

Page 20

1  Engineers, yes.
2      Q.  And for what purpose do you cite
3  Dr. Müller, is that the additives analysis?
4      A.  There would be additives analysis,
5  stabilization of various polymers, polypropylene
6  being one of them.
7      Q.  Are there any other texts or
8  authorities upon which you rely to identify the
9  tests that you need to contact on the explants
10  and the pristine samples?
11      A.  To identify the tests needed?
12      Q.  Yes.
13      A.  Well, reading 400 pages of literature,
14  and part of it is just the body of knowledge
15  that you get from reading all of the literature.
16  Everyone in the last -- starting back -- going
17  back to the '60s has used these techniques.
18      Q.  Okay.
19      A.  Some of them, of course, are more
20  modern today, obviously, than they were in the
21  '60s.  Today we have available FTIR microscopy,
22  which we can look at a tiny sample.  We didn't
23  have that available them.  LCMS didn't exist in
24  the '70s and '60s, does now.  So some of these
25  techniques have come along in terms of

Page 21

1  development that are available today that
2  weren't available prior times.  But, again,
3  today it's just -- every paper you read they
4  use -- we use some of the same methods.  LCMS is
5  one of the bright and shining stars today that's
6  come -- really come on strong in the last
7  20 years, 10 to 20 years.
8      Q.  Real simple question, hopefully it's a
9  simple answer.
10          Can you direct me to any authority,
11  textbook, article, whatever you use in your
12  business and in your expertise, that would
13  identify the tests that you would do to detect
14  the differences between an explanted piece of
15  polypropylene mesh and a pristine control of the
16  mesh?
17          MR. ANDERSON:  Objection.  Asked and
18  answered.
19          Go ahead.
20      A.  I don't know of any such text that
21  just has a single page where it lists -- if I
22  want to know about thermal methods, I'd go to
23  Edith Turi that I've cited.  If I want to know
24  about GPC, I'd go to Modern GPC chromatography
25  text that I have.  I have all these individual.

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 22

1      And if you go to -- Odiam, for
2  example, would be another one that's a common
3  text that's used in polymer chemistry training
4  sessions at like University of Connecticut where
5  my son got his doctorate, he took -- he used
6  that text. In that text you will see a chapter
7  on DSC, you will see a chapter on GPC, you'll
8  see a chapter on IR, you'll see all these
9  various techniques.
10      But it might not include every one I
11  used. I don't know that I can say -- I don't
12  think I can say there's any one book that has
13  every single method in it necessarily.
14      Q.  Is it fair to understand, Doctor, that
15  each of these tests that you ran were designed
16  to detect any differences between the control
17  sample of the mesh and the explant sample of the
18  mesh?
19      A.  That was the entire intent of the
20  proceeding, as far as I understood it. It was
21  just to look for differences, if there were any.
22      Q.  Okay. What is degradation?
23      A.  Well, degradation would be the loss of
24  functionalness of, in this case, a polymer for
25  its intended purpose.

Page 23

1      Q.  Okay.
2      A.  That could include things like
3  oxidation, or environmental stress cracking. It
4  could include mechanical degradation. For
5  example, when products are -- waste materials in
6  the manufacturing process are re-used, they make
7  pellets out of the re-used material and they
8  call it regrind, and each regrind cycle tends to
9  degrade the polymer, so that's a type of
10  degradation.
11      Q.  Other than degradation as you've just
12  defined it, did you look for any other
13  differences in the polymer in the control sample
14  as compared to the polymer in the explant?
15      A.  Can I have the question repeated,
16  please?
17      Q.  Sure.
18      Other than the degradation as you've
19  just defined it, did you look for any
20  differences -- I'm going to change the question
21  because I'm going to use a different term.
22      Other than degradation as you've just
23  defined it, did you look for any differences in
24  the polypropylene in the control sample as
25  compared to the polypropylene in the explant

Page 24

1  that you analyzed?
2      A.  Well, SEM would be certainly a major
3  methodology. It gives you a visual observation
4  of -- I'd have to add SEM to the term
5  degradation, but it's a visual measurement as
6  opposed to a chemical measurement.
7      Q.  Okay.
8      A.  But it makes it very obvious if
9  something is degrading or not.
10      Q.  Other than degradation as you have
11  just defined it, and the SEM visual observations
12  that you've just described, did you look for any
13  other differences between the polypropylene in
14  the control samples and the polypropylene in the
15  explanted mesh?
16      A.  I'm not sure I understand how to
17  answer that question. We looked for differences
18  which included all the tests that we've
19  discussed; the molecular weight analysis, the
20  additives.
21      Q.  Don't all -- my question is; all the
22  tests that you ran are designed to determine the
23  extent to which the polypropylene degraded, is
24  that fair?
25      A.  Or could degrade. For example, if

Page 25

1  additives, antioxidants come out of the
2  polypropylene, initially it may not be degraded,
3  so I can't say that's degradation in and of
4  itself.
5      However, once the antioxidants are out
6  of the polypropylene, it is now vulnerable to
7  oxidation. So it's a very valid technique in
8  predicting the longevity, the functionalness of
9  the product.
10      Q.  Okay. So can we define it this way;
11  that the tests that you ran, as you've just
12  identified them, were designed to determine the
13  extent to which the polypropylene in the
14  explanted mesh had degraded as compared to the
15  control, and the extent to which it might
16  degrade in the future?
17      A.  I like that better.
18      Yes.
19      Q.  Okay. And you named three kinds, you
20  named oxidation, environmental stress cracking,
21  and mechanical degradation, is that fair?
22      A.  That's correct.
23      Q.  Your paper, your report discusses a
24  bunch of other types of degradation. Can we
25  focus on these three as being those types of

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 26

1  degradation at which you looked for purposes of
2  both Lewis and Batiste?
3      A.  Well, right.  You would have -- you
4  could have UV light degradation, but that
5  wouldn't be applicable to this case.
6      Q.  The answer to my question, can we
7  limit our questions in this case to oxidation,
8  environmental stress cracking, mechanical
9  degradation, and the SEM visual analysis of
10  these meshes?
11      MR. ANDERSON:  Objection.
12      Go ahead.
13      A.  Well, I want to be able to include
14  FTIR, for example.
15  BY MR. THOMAS:
16      Q.  But FTIR is designed to discuss --
17      A.  Show oxidation.
18      Q.  Right.
19      A.  I think we're in pretty good shape
20  there.
21      Q.  Okay.  All I'm trying to do is make
22  this shorter instead of longer.  And so I'm not
23  trying to trick you at all, believe it or not.
24      All right.  So you received -- first
25  of all, who hired you in this case?

Page 27

1      A.  Mr. Anderson.
2      Q.  And you've already described what
3  Mr. Anderson asked you to do.  And you
4  determined on your own what battery of tests to
5  conduct in order to evaluate the control mesh
6  against the explanted mesh, correct?
7      A.  That's correct.
8      Q.  When you received the samples that you
9  were to compare, I'm talking about the control
10  samples and the mesh explant samples, how did
11  you determine how to prepare those samples for
12  testing?
13      MR. ANDERSON:  Objection.
14      Do you want to talk about the control
15  or the mesh?
16      MR. THOMAS:  Both.
17      MR. ANDERSON:  Okay.
18      MR. THOMAS:  I'll do it first.
19  BY MR. THOMAS:
20      Q.  How did you determine how to prepare
21  your control samples for testing?
22      A.  Well, with the control samples we had
23  more material, boxes came in, and we had
24  pictures in here of the process.  I think that
25  may be the best place to do, is just go look at

Page 28

1      the --
2      (Witness reviewing documents.)
3      A.  So the control samples were received
4  for analysis in sealed packaging.
5  BY MR. THOMAS:
6      Q.  My question is pretty simple, I think.
7  Maybe it's not.  Page 12, you talk about sample
8  preparation.
9      A.  Right.
10      Q.  Where did you go to determine how to
11  prepare your sample for preparation for your
12  analysis?  Did you consult any text, or are
13  there standard methodologies that you use to
14  prepare your samples for the testing that you're
15  going to do?
16      A.  Well, in the case with polymers like
17  this, we have a balance area, we have a standard
18  area with an optical microscope, and we have
19  scalpels, and we have tweezers, and disposable
20  scalpels, and aseptic tweezers, that's just our
21  SOP.
22      And so we would cut the samples, cut
23  off little pieces for various -- because
24  different methods require different amounts of
25  sample.

Page 29

1      Q.  Did you rely on your own internal
2  standard operating procedures for your sample
3  preparations for the tests that you conducted?
4      A.  Yes.
5      Q.  Are the standard operating procedures
6  that you have for Jordi Labs to conduct this
7  analysis in writing?
8      A.  Most of them are, yes.  As far as -- I
9  don't know if we have an SOP, I have to check on
10  that, for actual cutting of the samples.
11      MR. ANDERSON:  He just said
12  "preparation."  So I'm not sure --
13      THE WITNESS:  That is preparation,
14  yes.
15      MR. ANDERSON:  Fair enough.
16  BY MR. THOMAS:
17      Q.  And how would you describe the
18  standard operating procedures for Jordi Labs, if
19  I wanted to identify them to get them at a later
20  time, that you did for sample preparation?
21      A.  I don't know if we have a written for
22  sample preparation as far as just cutting the
23  samples.  We have SOPs like for GPC, how to
24  dissolve the samples, FTIR, how it's put on the
25  instrument for each of those techniques, once

8 (Pages 26 to 29)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 30

1   the samples are passed to each specific analyst.
2   But as far as -- I have a whole pile of SOPs
3   over here for you for each of those methods.
4        Q.  Okay.  Probably what I'll do during
5   lunch.
6        MR. ANDERSON:  That's why the question
7   is a little tough.  When you're saying sample
8   preparation, there's all these different tests
9   that were done, so the question embodies a lot
10  of things.  I didn't want to keep objecting.
11       MR. THOMAS:  I appreciate that.
12  BY MR. THOMAS:
13       Q.  On Page 12 of your report, under
14  "Sample Preparation," you discuss a "Control
15  Experiment."  It says "The control samples were
16  also used as part of a control experiment
17  designed to provide an indication as to the
18  effects of formalin storage."
19       Why did you conduct a control
20  experiment designed to provide indication as to
21  the effects of formalin storage?
22       A.  The samples received from Steelgate
23  came informally, they were shipped to us that
24  way, and we wanted to know what effect formalin
25  would have on pristine polypropylene, or not, as

Page 31

1   the case might be, so we wanted to rule out any
2   potential oxidation caused by formalin of the
3   explants that were slipped to us, so we tried
4   the controls the same way.
5        Q.  What is it about formalin that caused
6   you to be concerned about potential oxidation to
7   the mesh?
8        A.  Nothing specifically.  It's just good
9   lab practice to make sure that you treat -- if I
10  want to compare a pristine mesh with an explant,
11  I want the pristine mesh that I'm calling a
12  standard to be treated identically, period, as
13  much as I possibly can control it, to the
14  explant material.  Since the explant was in
15  formalin, it's wise to put your control in
16  formalin so they're treated identically.  So any
17  differences then seen can't be attributed to the
18  formalin treatment, if there was any.  I didn't
19  know there was or not.  But that is just good
20  lab practice to me.
21       Q.  As a biochemist, are you aware of any
22  chemical reaction issues associated between
23  formalin and polypropylene that may affect the
24  chemical properties of polypropylene?
25       A.  In general, no.

Page 32

1        Q.  Continuing on Page 12, you discuss
2   taking a sample of each control material, about
3   100 milligrams, placing it in formalin,
4   90 milliliters and heat it at 60 degrees
5   centigrade for 48 hours.  "In my experience,
6   this temperature would be expected to provide an
7   accelerated rate of aging and is consistent with
8   other published methods for this purpose."
9        What does that mean?
10       A.  Well, the samples have been sitting in
11  storage at Steelgate for some time, we don't
12  know how long exactly, at least I don't.  The --
13  so if it had been in Steelgate for a month, and
14  we put it in formalin here for a day, it
15  wouldn't be equivalent treatment.  So to get it
16  as close to being equivalent treatment as we
17  could we tried to -- in effect, we tried to
18  accelerate any potential aging by running it at
19  -- like doing the storage at 60 for 48 hours, so
20  it would be more like the treatment that it
21  would have received for, say, a month, or
22  whatever the time was, from Steelgate.
23       Q.  You cite to two references for this
24  process, it's the ASTM Standard D3045, and the
25  Inoue paper, 1961, the Journal of Polymer

Page 33

1   Science on Page 13 of your report.
2        A.  Correct.
3        Q.  Do those two references support using
4   60 degrees centigrade for 48 hours to replicate
5   the aging process of polymer controls?
6        A.  Well, various methods are used.  But
7   in general the principle -- definitely supports
8   the principle.  Various temperatures and times
9   are given for various polymers, and so this was
10  just trying to follow the principles.
11       Q.  What age of explants in formalin does
12  60 degrees centigrade for 48 hours for the
13  controls represent?
14       A.  As to age at room temperature,
15  specifically I don't know.
16       Q.  Okay.  Why did you choose 60 degrees
17  centigrade for 48 hours?
18       A.  Because that was consistent with these
19  two references that would be recommended.  If it
20  doesn't show -- the point being if it doesn't
21  show up in this temperature in this amount of
22  time, it likely isn't going to react.
23       Q.  Okay.  So is it fair to understand
24  that the 60 degrees centigrade for 48 hours is
25  not designed to reflect any specific time that

9 (Pages 30 to 33)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Case 2:12-md-02327  Document 2957-4  Filed 10/11/16  Page 11 of 80 PageID #: 112754

Howard C. Jordi, Ph.D.

Page 34

1  the explants may have been in formalin, but
2  designed to determine if the formalin would have
3  any degradation on the controls at any time?
4      A.  It was determined -- it was an attempt
5  to determine if formalin would react with
6  polypropylene?
7      Q.  And what did your experiment conclude?
8      A.  All the tests, SEM, and all the rest
9  of the tests, FTIR, showed no change.
10      Q.  So is it your conclusion from that
11  analysis that formalin has no chemical impact on
12  polypropylene?
13      A.  That's correct.
14      Q.  Have you done any research to
15  determine the extent to which formalin has any
16  impact on polypropylene?
17      A.  No, I have not.
18      Q.  Formalin is --
19      A.  Other than the test.
20      MR. ANDERSON:  What did you say?
21      A.  Other than this test, of course.
22  BY MR. THOMAS:
23      Q.  Formalin is a mixture of formaldehyde?
24      A.  Yes.
25      Q.  Did you do any research to determine

Page 35

1  the extent to which formaldehyde had any
2  chemical impact on polypropylene?
3      A.  Well, in all the published literature,
4  I looked at all these articles, I read over 400
5  pages, various authors determined -- did various
6  studies of explanted materials.  Everybody in
7  the world, as far as I can see, treats their
8  samples with -- or essentially everyone uses
9  formaldehyde as a preservative.  If you didn't
10  do that, you would allow for potential bacterial
11  growth and things like that that might degrade
12  the polymer.
13      Q.  My question was different.
14      Dr. Jordi, did you do any research to
15  determine the extent to which formaldehyde can
16  have a chemical reaction with and degrade
17  polypropylene?
18      A.  No.
19      MR. ANDERSON:  Objection.
20  BY MR. THOMAS:
21      Q.  A minute ago you said that everyone
22  uses formaldehyde to preserve their -- what?
23      A.  Their explant samples.
24      Q.  Okay.  And do you have an
25  understanding of why everyone uses formaldehyde

Page 36

1  to preserve their explant samples?
2      A.  Because it's a preservative.
3      Q.  When you say "preservative," does that
4  have a chemical meaning to you?
5      A.  It has a more of a biological meaning.
6  The formaldehyde preserves tissue and preserves
7  anything from anything that's in it, from
8  bacterial growth which would degrade biological
9  materials.
10      Q.  Okay.  You said two things there, as I
11  heard it.  I'm going to do the second one first.
12      You said it prevents bacterial growth.
13  Tell me what that means, please.
14      A.  Well, in tissue, if you have -- by
15  itself it just will pick up bacteria from flies
16  landing on it or just from the air, and then it
17  will begin to degrade.
18      Q.  Okay.  So it would be the influence of
19  the outside bacteria growing on the explant that
20  may have an impact on the chemical composition
21  of the explant, is that fair?
22      A.  That's one piece of it.  But another
23  piece would be if there were bacteria in the
24  tissue -- for example, if there were an
25  infection in the mesh that was taken out, that

Page 37

1  would be bacteria, it could continue to grow as
2  well.  I can't sort that out.
3      Q.  Okay.  The other thing you said, as I
4  wrote it down, is that formaldehyde preserves
5  tissue.
6      How does formaldehyde preserve tissue?
7      A.  It makes for an aseptic environment.
8  Bacteria can't grow in it, so hence, there's no
9  degradation.
10      Q.  So it's actually consistent with your
11  second point, and that is it arrests the
12  development of bacteria to prevent any
13  degradation of the explant, is that correct?
14      A.  That's the intent, yes.
15      Q.  Are you aware of any chemical reaction
16  that formaldehyde has with proteins that may be
17  on explants?
18      A.  Absolutely.  Formaldehyde is an
19  aldehyde, and it will react with any things like
20  amines.  It can react with any other reactor
21  group that typical aldehydes with react with.
22      Q.  As a part of your analysis in this
23  case, did you study the impact of formaldehydes
24  on any proteins that may be on explanted meshes?
25      A.  No, we did not.

10 (Pages 34 to 37)

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 38

1      Q.  Did you consider that issue at all in
2  your analysis?
3      A.  No.
4      Q.  Doctor, you identified three types of
5  degradation which you analyzed in connection
6  with your work in Exhibits 1 and 2, and one was
7  oxidation, the second was environmental stress
8  cracking, and the third was mechanical
9  degradation, correct?
10     A.  Yes.
11     Q.  What evidence in your testing for
12  Exhibit 1 for the Lewis case did you find
13  oxidation?
14     A.  For that we're going to have to go to
15  the report.
16         MR. ANDERSON:  Anything you need to
17  reference in your report you can reference it.
18     A.  Well, the first thing we saw -- that
19  we looked at was SEM, and then that's coupled
20  with SEM-EDX, so we'll look at a couple SEM
21  charts first.
22         Page 26 shows a typical explanted
23  sample.  Figure 16 shows transverse cracks of
24  surface polypropylene.
25  BY MR. THOMAS:

Page 39

1      Q.  Let me stop you there, if I can.  Are
2  you finished?
3      A.  Yes.
4      Q.  I don't want to interrupt you.
5         The surface cracking that you just
6  described on the record, this is your visual
7  observation that you talked about before that
8  you believe is evidence of oxidation, is that
9  correct?
10     A.  This is visual evidence of either
11  oxidation or environmental stress cracking, or
12  both, and by itself it can't tell you the
13  difference.
14     Q.  Got you.
15         But it's strictly visual?
16     A.  This one is visual, yes, sir.
17         Figure 22 is another good example.
18     Q.  What page are we on, please?
19     A.  29.  Flaking polypropylene pieces.
20     Q.  Now, you can do whatever you want to,
21  I'm looking for -- perhaps it would be easier
22  this way.  You don't have to do all the figures
23  that talk about visual observations.  What I'm
24  looking for specifically is each type of
25  oxidation that you found in your report, then

Page 40

1  I'll explore each of those in a little more
2  detail rather than going through the report and
3  finding each one.
4         Does that make sense?
5         MR. ANDERSON:  Your question was all
6  the evidence of oxidation, so that made it a
7  little tougher.
8         MR. THOMAS:  I'm sorry.  I'm not very
9  smart sometimes.
10        MR. ANDERSON:  It's not about smart.
11        I think he wants a more general
12  question to begin with, and then he'll go into
13  the --
14     A.  Well, SEM-EDX, for sample, showed --
15  SEM-EDX showed increased oxygen levels in the
16  cracked region that we just talked about.
17  BY MR. THOMAS:
18     Q.  Okay.
19     A.  And you don't want to talk about
20  figures at this point?
21     Q.  No.
22     A.  Just concepts?
23     Q.  Exactly.  Thank you.
24     A.  All right.  I'll try to do my best,
25  sir.

Page 41

1      Q.  You're doing fine.
2      A.  DSC showed a decrease in the heat
3  effusion, and a decrease in the melt temperature
4  versus non-cracked material.  That correlates
5  with environmental stress cracking, because the
6  Delta H at melt correlates with the amount or
7  the percentage of crystallinity, and hence the
8  percentage of amorphous materials, which allows
9  things like cholesterol and cholesterol esters
10  and fatty acids to get into the cracking.
11         FTIR microscopy dearly showed -- by
12  using the microscopic version of FTIR, coupled,
13  we were able to actually take IRs of each flaked
14  piece, and this flaked piece clearly showed
15  protein and polypropylene.  And since the
16  polypropylene bands are weaker than carbonyl
17  bands, they're alkyl, absorbance bands versus
18  carbonyl, this chart that I'm looking at of this
19  particular flaked piece would be estimated to be
20  about 75 percent or so polypropylene, maybe
21  25 percent protein.
22     Q.  Okay.
23     A.  Because they're both there.
24     Q.  And just generally for now, we'll go
25  specifically to those issues later.

11 (Pages 38 to 41)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 42

```
1       A.  Okay.  The molecular weight averages
2   that were determined showed basically no
3   difference between cracked samples and pristine.
4       Q.  Help me there.
5       A.  And formalin treated.
6       Q.  That is not evidence of oxidation, is
7   it, the fact that they're the same?
8       A.  Are you asking only for evidence of
9   oxidation?
10      Q.  Correct.
11      A.  Okay.  We'll skip that.
12      Q.  Just so we're clear --
13      A.  Right.
14      Q.  -- the molecular weight analysis you
15  did is not consistent with oxidation?
16      A.  In and of, and by itself it is not.
17      Q.  Thank you.
18      A.  PYMS showed generally a lack of -- or
19  very great minimization of both Santonox R and
20  lauryl thiodipropionate.
21      Q.  Okay.  And those are antioxidants?
22      A.  Those are the two antioxidants that
23  are in the formulation, in the recipe from
24  Ethicon.
25      Q.  Is it fair to understand, though, that
```

Page 43

```
1   the PYMS analysis does not show oxidation, but
2   is part of your earlier analysis about potential
3   future oxidation?
4       A.  That's correct, it is.  Okay.
5       Q.  So the PYMS analysis itself does not
6   show oxidation of the polypropylene in the
7   explants?
8       A.  It shows vulnerability to oxidation is
9   what it shows.
10      Q.  It does not show any oxidation in the
11  explants?
12      A.  In and of itself, no.
13      Q.  Thank you.
14          Have we covered the basics on the
15  oxidation?
16      A.  I think so.
17      Q.  For those places where you found
18  evidence of oxidation, as you've just described
19  and as reflected in your report, were you ever
20  able to measure the extent of antioxidation of
21  the explants that you analyzed?
22          MR. ANDERSON:  Objection.
23          Go ahead.
24      A.  Are you talking about quantitative
25  numbers now?
```

Page 44

```
1   BY MR. THOMAS:
2       Q.  Yes.
3       A.  Generally the percentage of oxygen in
4   oxidized polypropylene, at least initially, is
5   in the low percent range.  So it doesn't take
6   very much increase in oxygen in polypropylene to
7   cause embrittlement, rigidity, and those kind of
8   effects.  Those are caused by presence of
9   ketones and aldehydes as the oxidation goes on,
10  carboxylic acids if it goes far enough.
11      Q.  Doctor, my question is a little more
12  specific than that.
13          Did you attempt to measure the extent
14  of oxidation in any of the mesh implants
15  quantitatively?
16      A.  It would be relative quantitation,
17  comparing control versus explant.
18      Q.  Did you express any measurement of
19  oxidation in the explants compared to the
20  controls in your report?
21      A.  I'm sorry, can you repeat the
22  question?
23      Q.  Did you set forth any opinion as to
24  the extent of oxidation from the explants
25  measured quantitatively in your report?
```

Page 45

```
1          MR. ANDERSON:  Objection.
2          Go ahead.
3       A.  Again, it was a relative thing, so I
4   don't know that I can say.  It would be
5   quantitative.
6          But, for example, pristine
7   polypropylene didn't show any carbonyl to 1760,
8   1740 that we could see.  But the explants did.
9   BY MR. THOMAS:
10      Q.  Did you attempt to measure in that
11  context the extent to which the carbonyl issue
12  had any impact on the ability of the
13  polypropylene to function for its intended
14  purpose?
15      A.  All oxidation is bad.  It's a relative
16  determination.  So you would hope there wouldn't
17  be any carbonyl observed, is what you would look
18  for if the material is good.
19          Your question, I'm sorry.
20      Q.  Might have been a bad question.  Let
21  me see if I can do it again.
22          In your analysis of oxidation, did you
23  ever measure the extent to which the
24  polypropylene in the explanted meshes was
25  degraded in a quantitative way?
```

Howard C. Jordi, Ph.D.

Page 46

1    A.  In a relative quantitative way is all
2  we did.
3    Q.  And tell me what that means.
4    A.  Well, that means if I have a peak for
5  carbonyl, I have -- like if I had no peak in the
6  pristine and I have a peak, a measurable peak in
7  the explant, then I can say with certainty that
8  the explanted material is more oxidized than the
9  pristine.
10    Q.  Are we talking about oxidation to the
11  extent that it compromises the ability of the
12  polymer to function for its intended purpose?
13    A.  The only way I know to answer this is
14  in science we would pool multiple methods.  I
15  have to look at the SEM photographs and look at
16  the carbonyl levels and try to correlate the
17  carbonyl with the degree of damage actually
18  observed physically in the SEM.  So that's the
19  kind of thing what I mean by "relative."
20    Q.  Do you have an opinion as you sit here
21  today, based on your training, education,
22  experience, and review of the materials in this
23  case, of the extent to which the polypropylene
24  in the mesh explants oxidized in the context of
25  the loss of functionalness for its intended

Page 47

1  purpose?
2    A.  Yes, I do.
3    Q.  Okay.  What is that opinion?
4    A.  The material appears degraded, some of
5  it severely degraded.  There's a range from
6  sample to sample.  And in two cases of 23
7  samples that we ran, we didn't see any damage.
8  91 percent of the time we did.
9    Q.  Are you talking now about your visual
10  observations through the scanning electron
11  microscopy?
12    A.  Yes, correlating that, of course, with
13  the carbonyls.
14    Q.  I'm talking about the analysis that we
15  -- strike that.  Let me come back to that.
16        Doctor, let's go back to your sample
17  preparation.  That's what happens when I find
18  rabbit holes.
19        What steps did you take to prepare the
20  explants that you received for analysis?
21        MR. ANDERSON:  Objection.
22        Go ahead.
23    A.  Well, the samples were received at our
24  receiving area, and then they were -- the boxes
25  were photographed, and they were removed, and

Page 48

1  they were handed to the appropriate technician
2  to do the sampling that's described in the
3  photograph.  They're removed -- now you're
4  talking about the actual --
5    Q.  Explants, correct.
6    A.  -- explant.
7        Received tissue bundles.
8    Q.  You're on page?
9    A.  Now I'm on 16.
10    Q.  Thank you.
11    A.  And little pieces were cut off with
12  disposable scalpel.  And the picture on the
13  right -- I'll wait for you to get there if you
14  want.
15    Q.  I'm fine.  Go ahead.
16    A.  Little pieces were cut off, and that's
17  what was then repackaged in formalin for
18  shipment for SEM.
19    Q.  Okay.  As we look on Page 16, there
20  are four photos there in Figure 2.  The top left
21  photo in Figure 2 is the way that you received
22  the sample?
23    A.  Yes.
24    Q.  Dumped out of container, is that fair?
25        MR. ANDERSON:  Objection.

Page 49

1    A.  Yes.
2  BY MR. THOMAS:
3    Q.  I'm sorry, I'm trying to be casual.
4  Excuse me.  That was a bad question.
5  Mr. Anderson is exactly right.
6        Dr. Jordi, is it fair to understand
7  that the top left on Figure 16 reflects the
8  samples as received before you did anything to
9  them?
10    A.  That's correct.
11    Q.  And how did you separate the mesh in
12  the lower left-hand corner in Figure 2 from the
13  tissue that appears on the lower right-hand
14  corner of Figure 2?
15    A.  We utilized forceps to pull the tissue
16  off of the sample.  As you can see, in the left
17  bottom picture there are little bits of tissue
18  left.
19    Q.  Who did that?  Did you do that?
20    A.  Adi Kulcarni.  Took about an hour a
21  sample.
22    Q.  And did you use forceps in each hand,
23  is that how you do that?  Or how do you do that?
24    A.  He just -- he has to hold it, he has
25  to hold it while he pulls tissue off.

13 (Pages 46 to 49)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 50

1    Q.   Hold it in his hand?
2    A.   No.  With forceps.
3    Q.   So you've got the forceps?
4    A.   Two, yes.
5    Q.   Two forceps.
6        Is there a Jordi standard operating
7  procedure about how to remove tissue from mesh?
8    A.   No.
9    Q.   How was it determined how to remove
10 the tissue from the mesh?
11   A.   Well, the technique was to remove the
12 tissue touching the -- as little as possible the
13 mesh itself so that you wouldn't cause any
14 damage to it.
15   Q.   Did you instruct this technician -- is
16 that the right word?
17   A.   No.  He's a Ph.D.
18   Q.   Did you instruct -- what's his name
19 again?  I'm sorry.
20   A.   Adi Kulcarni.
21   Q.   Did you instruct Dr. Kulcarni on the
22 method to separate the mesh from this tissue?
23   A.   No, I did not.
24   Q.   Do you know what procedure he followed
25 or what -- strike that.

Page 51

1        Do you know what methodology he
2  followed in order to protect the integrity of
3  the mesh and the tissue as he separated the two?
4    A.   Well, it was set out, I believe, on a
5  piece of tissue so it wouldn't be contaminated
6  with anything in the area.  It was a clean work
7  area to begin with, and used aseptic forceps.
8    Q.   Is there a standard methodology, of
9  which you're aware, that tells Dr. Kulcarni how
10 to properly separate the mesh from the tissue?
11   A.   I don't think so.  I don't think one
12 exists.  I've never seen one.
13   Q.   Did you discuss with Dr. Kulcarni how
14 to appropriately separate the mesh and tissue?
15   A.   Did I discuss with him how to do it?
16   Q.   Yes.
17   A.   We discussed -- yes, we had
18 discussions.  But, you know, he is a very, very
19 careful worker.
20   Q.   What was the purpose of your
21 discussions with Dr. Kulcarni about how to
22 separate the tissue from the mesh?
23   A.   I wanted to see the samples for
24 myself.  That's all.
25   Q.   Did you have any discussions with

Page 52

1  Dr. Kulcarni about the methodology to separate
2  the tissue from the mesh?
3    A.   No.  It appeared very gentle, as good
4  as we could possibly do.
5    Q.   Okay.  Other than separating the
6  tissue from the mesh, as you've just described
7  in Figure 2 on Page 16 of your report, which is
8  Exhibit Number 1, were there any efforts made to
9  otherwise treat the mesh prior to testing?
10   A.   No.
11   Q.   For the tissue sample that appears in
12 the upper left of Figure 2 on Page 16, was there
13 any discussion about trying to clean that
14 sample?
15   A.   Well, that's what we've just been
16 discussing.  This was how it was cleaned, it was
17 done with forceps.
18   Q.   Okay.  At any time was there a
19 discussion with Dr. Kulcarni about cleaning the
20 mesh that was removed from the tissue to remove
21 proteinaceous material from the mesh?
22   A.   No.
23   Q.   Is it fair to understand, Dr. Jordi,
24 that the mesh that appears on Page 16 in the
25 lower left-hand corner is mesh that has been

Page 53

1  separated from the tissue without further
2  cleaning?
3    A.   That's correct.
4    Q.   Did you ever consider cleaning the
5  mesh that was separated from the tissue in order
6  to -- strike that.
7        Did you ever consider cleaning the
8  mesh that was separated from the tissue prior to
9  conducting your tests that you did in Exhibit 1?
10   A.   At the time this work was done, no.
11   Q.   Before you did your work in Exhibits 1
12 and 2, did you do any research into analysis by
13 other scientists in the methodology for testing
14 explanted meshes?
15   A.   I did.
16   Q.   And what research did you do?
17   A.   I read a number of articles, Clavé and
18 others.
19   Q.   You read Costello?
20   A.   Costello.
21   Q.   Did you read de Tayrac?
22   A.   Yes.
23   Q.   Before you did your testing in this
24 case?
25   A.   No.  It's recent.

14  (Pages 50 to 53)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 54

1          (Whereupon, Jordi Exhibit Number 3,
2      de Tayrac and Letouzey article titled
3      "Basic science and clinical aspects of
4      mesh infection in pelvic floor
5      reconstructive surgery, was marked for
6      identification.)
7      A.   Are you going to de Tayrac?
8  BY MR. THOMAS:
9      Q.   Yes.
10         Let me show you what I marked as
11  deposition Exhibit Number 3.  You have Exhibit
12  Number 3 in the materials that you brought with
13  you today?
14     A.   Yes, I do.  I'm looking for it.  Here
15  it is right here, de Tayrac.
16     Q.   When did you obtain your copy of
17  Exhibit Number 3, which is an article published
18  in the -- by Renaud de Tayrac and Vincent
19  Letouzey, it appears in International
20  Urogynecology Journal in 2011?  When did you
21  first receive that?
22     A.   I don't recall exactly, because I
23  receive so many articles.  I remember reading it
24  fairly recently, within the last two weeks.
25     Q.   Did you have a chance to review

Page 55

1  Exhibit 3 prior to the time that you conducted
2  your work in Exhibits 1 and 2?
3      A.   No.
4      Q.   If you turn to Page 778 of Exhibit 3,
5  read as much as you need to.
6      A.   778?
7      Q.   That's right.  You're on the right
8  page.
9      A.   This is 780 in mine.
10         MR. ANDERSON:  Top right.
11     A.   Got it.  Top left.
12         MR. ANDERSON:  Top left, yes.
13     A.   All right.
14         MR. ANDERSON:  After you finish
15  de Tayrac, can we take a break?
16         MR. THOMAS:  Sure.  Take a break right
17  now if you'd like to.
18         MR. ANDERSON:  Sure.
19         MR. THOMAS:  Let's do that.
20         (Whereupon, a recess was taken from
21      10:13 a.m. to 10:25 o'clock a.m.)
22  BY MR. THOMAS:
23     Q.   Let's go back and make this more
24  clear.  Go to Page 16 of your report.
25         On Page 16 of your report on Figure 2

Page 56

1  in the lower left-hand corner you have the mesh
2  separated from the tissue, correct?
3      A.   Correct.
4      Q.   And you understand when the mesh is in
5  the body -- was in the body it was surrounded by
6  materials in the body?
7      A.   That's right.
8      Q.   Including proteins?
9      A.   And those materials are shown in the
10  bottom right picture.  That is the material
11  removed.
12     Q.   Okay.  Is it your opinion that after
13  the mesh is separated from the tissue that
14  there's no longer any protein material on the
15  mesh?
16     A.   No, I believe there still is some
17  protein on the mesh.  We can see it, we can see
18  tissue, bits and pieces.
19     Q.   All right.  Are you familiar with the
20  term known as biofilm?
21     A.   Yes.
22     Q.   What do you understand a biofilm to
23  be?
24     A.   Well, biofilm would be a covering
25  material that coats things in the body.  As far

Page 57

1  as its chemical composition, I've never seen it
2  described in these papers that I've read any
3  more than to say biofilm.  But obviously
4  protein, probably glycoproteins.
5      Q.   Would you expect a biofilm to surround
6  the mesh that is in the explant samples that you
7  analyzed?
8          MR. ANDERSON:  Objection.
9          Go ahead.
10     A.   I think that's a very distinct
11  possibility that would be there.  Whether it
12  would totally surround it or not, I would have
13  to look at a specific SEM.
14  BY MR. THOMAS:
15     Q.   All right.  Did you make any effort in
16  your sample preparation as reflected on Page 16
17  of Exhibit Number 1 to remove all protein
18  materials or biofilms from the mesh before
19  analysis?
20     A.   No, we did not.  We didn't want to
21  take tremendous efforts in -- effort is not the
22  right word.  But we didn't want to do anything
23  that would try to disturb the mesh.
24         So for SEM, for example, looking at
25  the upper right picture, we cut a piece of

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 58

1  tissue off, and the SEM was actually taken on
2  the fibers imbedded in the tissue so that we
3  didn't have to pull the fibers out.  Because we
4  were afraid that with forceps we might cause
5  scarring of the surface, and we didn't want to
6  cause anything like that if we could avoid it.
7  So that was done to -- we didn't even remove the
8  tissue in that case for the SEM work, because we
9  didn't want to risk injuring the fibers.
10      Now, we had to get the fibers clear to
11 do DSC, FTIR, GPC, so that's why the tissue was
12 removed for those studies.
13     Q.  You are aware that using forceps to
14 separate the tissue from the mesh can impact the
15 physical integrity of the mesh?
16         MR. ANDERSON:  Objection.
17         Go ahead.
18     A.  We were very gentle in how we did
19 this, and it's described in our procedure.  We
20 tried every way we possibly could to take great
21 care to not disturb the mesh.  So with forceps
22 we could grab two pieces of tissue and not ever
23 touch the mesh to pull it apart.
24 BY MR. THOMAS:
25     Q.  Okay.  But you made no further effort

Page 59

1  to clean the mesh to remove any protein or
2  biofilm that remained after removing the mesh
3  with the forceps, correct?
4      A.  Correct.
5      Q.  Now, you've now read de Tayrac, and
6  de Tayrac analyzes the results that Clavé found
7  in his study, correct?
8      A.  That's correct.
9      Q.  And they state on Page 778, "We also
10 experimentally tested Clavé's conclusion
11 regarding a correlation between infection and
12 polypropylene 'degradation'."
13     A.  Where are you, sir?
14     Q.  The very first, Page 778.
15     A.  778.
16     Q.  "Using the same method of mesh
17 infection, we also experimentally tested Clavé's
18 conclusion regarding a correlation between
19 infection and polypropylene 'degradation'."
20        And what de Tayrac did was they washed
21 their mesh with dimethyl sulfoxide and used
22 ultrasonic shock, and then analyzed the
23 explanted mesh by electron scanning microscope,
24 correct?
25     A.  Correct.

Page 60

1      Q.  And de Tayrac finds that the
2  degradation is due to the biofilm, correct?
3      A.  That's what the paper says.
4      Q.  Do you disagree with that?
5      A.  I do.
6      Q.  Why?
7      A.  It's best showing you in my picture.
8  Can I show you a figure?
9      Q.  Okay.
10     A.  Go to the FTIR section of my report,
11 I'll give you a page here in a minute, Page 71,
12 for example.  There's a number of pages.  71 is
13 as good as any, I guess.
14        There's protein here, and as evidenced
15 by the 1653, the 1531, amide 1 and amide 2
16 bands.  But there's also polypropylene, 1445,
17 1377, and then the four little atactic bands
18 that are shown to the right of the 1377 band.
19 And since the alkyl bands are less intense than
20 the carbonyl bands of the protein, or any other
21 carbonyl types, this would be about a 75 percent
22 polypropylene, give or take a little, and maybe
23 25 percent protein, or what you would call
24 biofilm.
25        So this is the stuff that they

Page 61

1  actually removed with their dimethyl sulfoxide
2  their sonication treatment, so it was already
3  gone.
4         But what we did was we actually rolled
5  one of the fibers, and then took the pieces that
6  came off, the same pieces they got off in their
7  Figure 1 shown in section B here, Figure 1, we
8  ran the infrared of the pieces that actually
9  came off, and it wasn't biofilm, it was
10 polypropylene.
11     Q.  Dr. Jordi, do you find any
12 methodological flaw in de Tayrac's decision to
13 wash the explants used in his experiment with
14 dimethyl sulfoxide and using ultrasonic shock?
15     A.  If you have -- I certainly do.  If you
16 take a material that's cracked and crazed as we
17 saw in our SEMs, and as he shows here in his
18 Figure A on Page 778, that material is going to
19 be very susceptible to flaking off.
20        When I look at 778, Figure A, I see
21 what probably is biofilm looking like that cloud
22 material on top of the polypropylene, and the
23 polypropylene underlying it, which was then
24 blown off.  Ultrasonic treatment is kind of --
25 is a shock treatment, and it's like putting a

16 (Pages 58 to 61)

Howard C. Jordi, Ph.D.

Page 62

1  bomb on the polypropylene fiber, so it's going
2  to shake off anything that's loose, which it did
3  very beautifully, we know that's what it does,
4  and it did a beautiful job.
5       Unfortunately, the stuff that came off
6  wasn't biofilm, are at least it wasn't totally
7  biofilm, it wasn't even 50 percent, the majority
8  of it was polypropylene.  At least in my case.
9  I can't speak to their -- without actually doing
10 the IR of the flaked materials in theirs, I
11 can't tell you a percentage, or even an
12 estimate.
13      If they had run an IR, which they
14 didn't do -- I'd like to know why they didn't
15 run an IR to see what it was, they just state
16 that it's biofilm with no proof.
17      Q.  Have you attempted to clean a mesh
18 explant and run the same test that you ran in
19 Exhibit 1 and Exhibit 2 to determine if your
20 findings are consistent with cleaned explanted
21 mesh?
22      A.  Cleaned how?
23      Q.  Let me ask it this way.
24      Is there a way in your training,
25 education, and experience to clean the mesh and

Page 63

1  remove biofilms and proteins to allow for the
2  analysis of the explanted mesh as cleaned?
3       A.  Yes, there is.  I've become aware of
4  this since this original work was done.  It's
5  sodium hypochlorite.
6       Q.  And tell me how you use sodium
7  hypochlorite to clean proteins or mesh before
8  you do the analysis?
9       A.  You just soak the sample, the fiber
10 mesh in this case, in the typically 13 percent
11 chlorine solution of sodium hypochlorite.
12      Q.  Have you done that?
13      A.  We did not do that in this work.
14      Q.  Have you done that at any other time?
15      A.  No.  Not at this point we haven't.
16      Q.  Have you ever gone -- strike that.
17      Have you ever tried to replicate --
18 start over one more time.
19      Dr. Jordi, have you ever tried to take
20 an explanted mesh, remove biofilm or other
21 protein material, and test it to see the extent
22 to which it had degraded?
23      A.  I really didn't need to do that in
24 this case because the SEM photographs were so
25 clear.

Page 64

1       Q.  My question is; have you ever done
2  that?
3       A.  No, not to this point.
4       Q.  And is there any reason other than the
5  FTIR analysis that you've just described on
6  Page 71 and other places in your report --
7       A.  Correct.
8       Q.  -- that supports your opinion that
9  de Tayrac is wrong?
10      MR. ANDERSON:  Objection to form.
11      Go ahead.
12      A.  I think the infrared speaks for
13 itself.  It's -- in my view as a chemist, a
14 polymer chemist, it's pretty locked tight.  You
15 can't get polypropylene infrared bands if
16 polypropylene isn't there.
17 BY MR. THOMAS:
18      Q.  Is that the -- my question is simple.
19 Is that the only information that you have,
20 based on your analysis and work on this case,
21 that confirms for you that de Tayrac is wrong?
22      MR. ANDERSON:  Objection.
23      A.  That de Tayrac is wrong.  I think I
24 would say yes.  I mean we do have other evidence
25 like DSC perhaps, but we have to -- that wasn't

Page 65

1  run here either, so I have no data from the
2  paper with which to judge the question.
3  BY MR. THOMAS:
4       Q.  You rely on the FTIR analysis in your
5  report in Exhibit Number 1 and Exhibit Number 2
6  in support of your belief that de Tayrac's
7  conclusion that what is seen in the SEM is
8  biofilm to be incorrect, is that fair?
9       A.  That's fair.
10      Q.  Back to oxidation.
11      Do you have an opinion about what
12 caused the oxidation that you've identified in
13 your report?
14      A.  I believe there was two major reasons.
15      One was lack of antioxidant, making
16 the polypropylene vulnerable to attack by
17 hydrogen peroxide and other things, from
18 macrophages and so on in the body.
19      And the other was environmental stress
20 cracking, which DSC suggests because of the
21 decrease in the Delta H at melt, and the
22 increase in amorphous content of certain of the
23 polymers, and what seems to happen is some
24 samples seem to have a mix of both, and some
25 would be a preponderance of environmental stress

17 (Pages 62 to 65)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 66

1    cracking and other damage, and another would be
2    caused by classical oxidation mechanism.  And
3    the majority of samples in this case seemed to
4    have both.  But it's possible to have just one
5    or the other as well.
6         Q.  Do you have an opinion as to whether
7    the polypropylene in the Ethicon mesh -- strike
8    that.
9             What is it about the human body, the
10   biochemistry of the human body, that causes the
11   antioxidants to be depleted from the mesh?
12            MR. ANDERSON:  Objection.
13            Go ahead.
14        A.  I don't know if that's the right
15   question.  If I can explain?
16   BY MR. THOMAS:
17        Q.  Please.
18        A.  If I were to put polypropylene mesh in
19   a solvent like methylene chloride or ethanol or
20   propanol or methanol, or any organic solvent,
21   the antioxidants would bleed out at a certain
22   rate.  And the problem here is the mesh is fine,
23   so it's a relatively small-ish diameter so
24   there's not a lot of distance from the internal
25   part of the fiber to the surface.  So if I put

Page 67

1    it in solvent, it's going to bleed out.  If I
2    put it in the body which is full of lipids,
3    cholesterol, phospholipids, cholesterol,
4    cholesterol esters, fatty acids, it's going to
5    be bleeding out there.  But it would bleed out
6    in either place.  It's not really a phenomenon I
7    see that's unique to the human body, it would
8    happen either place, and so it just bleeds out
9    because of the high -- relative high surface
10   area and small diameter.
11        Q.  Do you have an opinion of what
12   specifically it is about the human body that
13   causes the Ethicon polypropylene mesh to leak,
14   leach its antioxidants?
15        A.  I don't think -- as I say, I don't
16   think that is the right question.  It's going to
17   leach wherever it is in any solvent.
18            It wouldn't leach in water, obviously,
19   because it's not soluble, or not wetted by
20   water.  But anything that will wet it, whether
21   it's a fatty acid or whether it's a solvent,
22   fatty acid in the body or a solvent, is going to
23   cause it to remove, I guess, the fatty -- the
24   antioxidants that are bleeding to the surface.
25        Q.  Let me ask it this way.

Page 68

1         Doctor, do you have an opinion as to
2    what substances in the human body cause the
3    Ethicon polypropylene mesh to lose the
4    antioxidants that you've identified in your
5    report?
6             MR. ANDERSON:  Objection.  Asked and
7    answered.
8             Go ahead.
9         A.  It just bleeds, it bleeds out because
10   of the nature of the -- we call it blooming in
11   the industry.  Materials leach out of the
12   polymers that they're in, even in air to some
13   degree, and then they come on the surface and
14   get wiped away.  So this would be a slow
15   process, which is why I believe the papers
16   typically show no initial oxidation.  It has to
17   be in the body for a while before you see the
18   major amounts of these effects.
19   BY MR. THOMAS:
20        Q.  How long?
21        A.  Some of the papers say three months.
22        Q.  Do you have an opinion about how long
23   a mesh has to be in the body before the
24   antioxidants are depleted to the point where the
25   mesh can degrade?

Page 69

1         A.  No, we would have to do a study, a
2    time study to answer that question, where we
3    actually measured -- right now we've just
4    measured levels of antioxidant in the samples
5    received, the explants and the controls.  We
6    would have to do a time study to answer that
7    question where we'd do three months, six months,
8    nine months, a year, five years, however long we
9    wanted to do the study, and measure the amount
10   of the two antioxidants present as a function of
11   time.
12        Q.  Is the sole basis for your opinion
13   that the Ethicon polypropylene mesh at issue in
14   this litigation leaches its antioxidants the
15   testing that's reflected in Exhibits 1 and 2?
16        A.  Yes.
17        Q.  A moment ago I asked you about the
18   causes, I think, of degradation, and you said
19   oxidation in combination with, in some
20   instances, environmental stress cracking?
21        A.  Correct.
22        Q.  We also talked earlier about
23   mechanical degradation.  Is there any evidence
24   of mechanical degradation in your work in either
25   Exhibits 1 and 2?

18  (Pages 66 to 69)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 70

```
1        A.  No.  That's a minor player here.  If
2   any effect, it would have to do during the
3   manufacturing phase.  When the polymer is put
4   through the dye, it will be extruded under
5   stress, that's mechanical force, and that will
6   tend to sheer polymer chains and tend to
7   degrade.  But that's the only application.
8   Certainly in the human body I don't see any
9   major application of stress, mechanical stress.
10       Q.  Okay.  So can we confine our
11  discussion today of degradation in terms of
12  oxidation and environmental stress cracking?
13       A.  I think so.
14       Q.  Dr. Jordi, if the mesh antioxidant
15  additives remained in the mesh, would the mesh
16  be able to perform its function in the body
17  without oxidizing?
18       A.  I think that's suggested in the
19  literature, yes.
20       Q.  Okay.  Do you agree with what the
21  literature says, that is; if the mesh maintains
22  its antioxidants that it's able to perform its
23  function in the body as intended?
24       A.  It certainly would -- I don't know
25  that I can answer the question completely, but
```

Page 71

```
1   it certainly would increase the longevity of the
2   product for sure.
3        Q.  Okay.  Do you have an opinion that the
4   mesh with the antioxidants that stay there is
5   unsafe for its intended purpose without more?
6            MR. ANDERSON:  Objection as to form.
7        Go ahead.
8        A.  Without more?
9   BY MR. THOMAS:
10       Q.  I'm just trying to narrow the scope
11  here. I'm trying to understand.  You've told me
12  that the literature says that if the
13  antioxidants do their job and stay in the mesh,
14  that the mesh then is appropriate for use in the
15  body to perform the function for which it's
16  intended.  Is that fair?
17           MR. ANDERSON:  Objection.
18  Mischaracterizes his testimony.
19  BY MR. THOMAS:
20       Q.  You can answer it if you can.
21           MR. ANDERSON:  Well, my objection
22  stands.  It mischaracterizes his testimony.
23           MR. THOMAS:  I understand.  You said
24  it twice.  Thank you.
25           MR. ANDERSON:  Yes, I did.
```

Page 72

```
1   BY MR. THOMAS:
2        Q.  What are you reading?
3        A.  I am looking at -- I'm looking for a
4   paper that shows the -- I don't know whether
5   it's -- it's either Liebert or Turi, Oswald and
6   Turi.
7        Q.  I'll help you here a little bit.
8            (Whereupon, Jordi Exhibit Number 4,
9            Liebert, et al study titled
10           Subcutaneous Implants of Polypropylene
11           Filaments, was marked for
12           identification.)
13  BY MR. THOMAS:
14       Q.  Let me show you what's been marked as
15  Exhibit Number 4.  Exhibit Number 4, is that the
16  Liebert study to which you were just referring?
17       A.  1976, yes, I believe, yes.
18       Q.  And in Liebert they studied meshes
19  that had been treated with oxidants -- excuse
20  me, treated with antioxidants and meshes that
21  had not, correct?
22       A.  Correct.
23       Q.  And found that those that had been --
24  that had antioxidants added to them did not
25  degrade like those that did not have
```

Page 73

```
1   antioxidants, correct?
2        A.  That's right, showing that, yes.
3        Q.  Is that the basis -- strike that.
4            Is that the literature upon which you
5   rely for your statement just a minute ago that
6   those meshes with antioxidants in them resist
7   degradation?
8        A.  Well, it's that, and it's my lifetime
9   of experience analyzing polypropylenes, and when
10  they degrade and when they don't.
11       Q.  Do you agree with --
12           MR. ANDERSON:  Are you through with
13  your answer?
14           THE WITNESS:  Not quite.
15  BY MR. THOMAS:
16       Q.  I'm sorry.
17       A.  I'm thinking.  I'm sorry.
18       Q.  You take all the time you need.  Never
19  meant to interrupt you.
20       A.  I analyzed -- these are related, but
21  they're all polypropylene, analyzed two other
22  types of materials over my experience that I can
23  recall.
24           One was a seating material at a
25  stadium, that was involved in a stadium seating
```

19 (Pages 70 to 73)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 74

1  in Japan, 100,000 seat stadium.  The seats in
2  one year from installation turned to dust and
3  blew away.  So they had sent me some retains,
4  and I had to analyze it, and the polypropylene
5  was not stabilized.  And so that's part of my
6  lifetime of experience.
7      Another case, the client was suing a
8  motorcycle manufacturer because -- for a
9  defective gas tank.  But he'd hit a brick wall
10 at a very high rate of speed, I don't remember
11 the exact, 75, 80 miles an hour, and the gas
12 tank ruptured and exploded.  And so they were
13 blaming the manufacturer.  So I had to analyze a
14 bit of that.  In that case the stabilizers were
15 present.  And the point was no gas tank is going
16 to survive hitting a brick wall at 75, 80 miles
17 an hour, so -- even though the stabilizer was
18 there.  So it wasn't degraded, molecular
19 weight-wise, it wasn't degraded, the
20 antioxidants were there.
21      And in the other case, it turned to
22 dust and blew away, and the antioxidants were
23 not present.
24      So when I see a lack of antioxidant in
25 essentially basically all these samples, by both

Page 75

1  PYMS and LCMS, it tells me the polymer is
2  exceedingly susceptible to oxidation by hydrogen
3  peroxide, which it would be partially protected
4  from if antioxidants were still there, but
5  they're not there.
6      Q.  Okay.  Is it your opinion that
7  hydrogen peroxide is the material that attacked
8  the mesh that caused it to degrade as is
9  reflected in Exhibits 1 and 2?
10     A.  Well, in the body there are things
11 like ferrous ion, for example, and if -- I can't
12 answer the question with a simple answer
13 because, again, there's multiple causes.
14      If there's any free ferrous ion around
15 you'll get what's called a Fenton reaction,
16 which converts hydrogen peroxide to hydroxyl
17 radicals, which are more damaging than the
18 hydrogen peroxide to begin with in causing
19 degradation of the polypropylene.  It's a free
20 radical initiator step.
21      So if there is, you know, bleeding
22 perhaps, that can be a source of iron, and if
23 there's some ferrous ion around -- of course it
24 has to be free ferrous ion, the body needs
25 protein to bind iron, because it's dangerous in

Page 76

1  their free form.  But the Fenton reaction is
2  well-known.
3      Q.  You call it the Fenton reaction?
4      A.  Fenton reaction, yes.
5      Q.  Okay.  If hydrogen peroxide was the
6  cause of the degradation of the polypropylene
7  mesh, would there be a change in the molecular
8  structure of polypropylene?
9      A.  Repeat the question, please?  I'm
10 sorry.
11     Q.  If the hydrogen peroxide that you
12 described was the cause of the degradation in
13 the polypropylene mesh, would there be a change
14 in the chemical structure of the polypropylene
15 mesh?
16     A.  That's right, there would be.
17     Q.  If there was a free radical that
18 degraded the polypropylene mesh, would there be
19 a change in the chemical construction of the
20 polypropylene mesh?
21     A.  Yes.  You would be inserting oxygen
22 into the chain in the form of either ketone,
23 aldehyde, hydroxide.
24     Q.  And the free ferrous ion which you
25 referred to as the Fenton?

Page 77

1      A.  It's not just a free -- if you would
2  like I'll give you the reaction.  Do you want
3  that?
4      Q.  Yes.
5      A.  Fe2+ plus hydrogen peroxide goes to,
6  an arrow, Fe3+ +HO- -- that's hydroxide, that's
7  harmless, but here's the problem --  +HO., which
8  is the radical, hydroxy radical, that is many
9  more times damaging to polypropylene than the
10 initial hydrogen peroxide.
11     Q.  Okay.
12     A.  Now, I can't sort out which one is --
13     Q.  That's fine.  You're consulting a
14 paper there.  What's the paper you're
15 consulting?
16     A.  "Mechanisms of polymer degradation in
17 implantable devices" by Williams.
18     Q.  That's David Williams?
19     A.  David Williams.
20     Q.  That's the one cited in your --
21     A.  Yes, sir.
22     Q.  Okay.  The last reaction you described
23 is called the Fenton reaction, is that right?
24     A.  Right.
25     Q.  Does the Fenton reaction causing

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 78

1  degradation of polypropylene alter the chemical
2  structure of the polypropylene?
3      A.  Does the hydroxide -- or the Fenton
4  reaction cause, is that what you're asking.
5      Q.  Yes.
6      A.  Sure it does, because that's the
7  production of the hydroxy radicals which causes
8  the actual change.
9      Q.  Any other potential sources of
10  oxidation to the polypropylene mesh given the
11  leaching of antioxidants that you've described?
12          MR. ANDERSON:  Objection as to form.
13          Go ahead.
14      A.  You could also have what's called a
15  more general version of the Fenton reaction,
16  would be the Haber-Weiss, H-A-B-E-R - W-E-I-S-S,
17  reaction.
18  BY MR. THOMAS:
19      Q.  Are you consulting the Williams
20  article again?
21      A.  Yes.  That would be include cuprous
22  ion as well as ferrous ion, could include
23  titanium is another one, titanium 3 or vanadium
24  4 is another possibility.  Those are not
25  commonly found, we're not going to worry about

Page 79

1  those in the body.
2      Q.  Titanium and vanadium aren't going to
3  be found in the body, are they?
4      A.  No.  It's cuprous and ferrous.
5      Q.  Are all of the potential methods of
6  degradation for the polypropylene mesh that
7  you've identified in the human body in the
8  Williams article that you're consulting?
9      A.  Well, they're certainly in there.
10  Other authors describe that as well.
11      Q.  Okay.  Are there any other methods
12  described by other authors?
13      A.  Other methods?
14      Q.  Yes.  Have we covered all the bases in
15  the Williams article?
16      A.  Well, you could get R., which is the
17  radical form of polypropylene, just from heat to
18  some degree, so that's why heat would cause
19  radical formation also.
20      Q.  How much heat would require --
21      A.  I don't think the human body, we'd
22  have to worry too much in the human body.  We're
23  talking processing now.
24      Q.  How much heat does it take to degrade
25  polypropylene, do you know?

Page 80

1      A.  Those are described in actual tests in
2  the Dr. Müller book, timed experiments.
3      Q.  Do you know?
4      A.  Well, it depends on the temperature.
5  And it varies with the environment, the oxygen
6  environment and the temperature actually used.
7  Some are run at 200 degrees, some are run at
8  100 degrees.
9      Q.  Do you know the temperature at which
10  the polypropylene that's used in the Ethicon
11  mesh will degrade?
12      A.  I know in general terms that the
13  higher the temperature, the faster it will
14  degrade.  That's what I know.  Which is
15  uniformly true.
16      Q.  Do you have an opinion as you sit here
17  today of the temperature at which the Ethicon
18  mesh used in the TVT device will degrade?
19      A.  Without testing, no.  And it would
20  depend on whether the antioxidants are there or
21  not, that will affect the temperature.
22      Q.  Is it possible to measure the amount
23  of hydrogen peroxide that is in a person around
24  the mesh implant?
25      A.  We have techniques that will allow us

Page 81

1  to measure hydrogen peroxide.  We have hydrogen
2  peroxide test strips, for example, but you can't
3  stick those into an implant very well.  So I
4  don't know, I've never seen it talked about or
5  done anywhere.
6      Q.  Are you able to test for the presence
7  of hydrogen peroxide on the explants that you
8  analyzed?
9      A.  You could try to use those test strips
10  and see if -- the strips turn blue if -- but
11  likely, it's been stored in the formaldehyde in
12  getting to us, so it's all going to be washed
13  off anyway.
14      Q.  Do you know, as you sit here today,
15  whether you can test the explanted mesh samples
16  that you received to determine the presence of
17  any of the materials that you've just identified
18  that could contribute to the degradation of the
19  mesh?
20      A.  Well, no, I don't think so, not as
21  received.
22      Q.  You don't know, or you don't think you
23  could?
24      A.  You can't, because --
25      Q.  I didn't hear you.  I'm sorry.  You

21 (Pages 78 to 81)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 82

1  cannot?
2      A.  Cannot.
3      Q.  Thank you.
4      A.  Because it's not there, it's been
5  treated with formaldehyde when we get it, so
6  it's not the way it was in the body --
7      Q.  Okay.
8      A.  -- at the time of excision.
9      Q.  So is it fair to understand that it's
10  your opinion that you're not able to test these
11  mesh explants for materials that may have been
12  in the body that you believe caused or
13  contributed to the degradation of the mesh?
14          MR. ANDERSON:  Objection to form.
15      Materials in the body, or chemicals in
16  the body?
17          MR. THOMAS:  Thank you, Ben.
18          MR. ANDERSON:  Just to be clear.
19  BY MR. THOMAS:
20      Q.  Doctor, is it fair to understand it's
21  your opinion that because of the placement of
22  the explants in formaldehyde, that one is unable
23  to test for chemicals in the body that may have
24  caused or contributed to the degradation of the
25  mesh?

Page 83

1      A.  That question would require a lot of
2  research.  But it's possible, for example, that
3  we could -- certainly we could look for iron in
4  the tissue, or we could look for copper in the
5  tissue, which would be consistent with the
6  Haber-Weiss reaction, which would have produced
7  the hydrogen peroxide in the first place.  So we
8  could see telltale signs.  In that sense, we
9  might be able to see something.
10      Q.  Doctor, as you sit here today, is
11  there a test that you know of that could be
12  performed on these explanted meshes to determine
13  which chemical substance in the body caused or
14  contributed to any degradation of this mesh?
15      A.  If it's hydrogen peroxide produced in
16  the macrophages, we can't test for it because
17  it's not there.
18      Q.  Okay.  Anything else?
19      A.  If it's caused by the Fenton reaction
20  or the Haber-Weiss, yes, we could take that
21  tissue, and we could dissolve it, and then run
22  ion chromatography and determine parts per
23  billion levels of iron and the copper.
24      Q.  What would that tell you?
25      A.  It would tell us the potential levels

Page 84

1  of metals that would be the catalyst for the
2  Haber-Weiss reaction or the Fenton reaction.
3      Q.  If you had that information, how would
4  you use that to determine the extent to which
5  those chemicals caused or contributed to the
6  degradation of the mesh?
7      A.  Well, the greater the concentration of
8  the iron and copper, copper 2 and iron -- copper
9  1 and iron 2, the greater the damage would be.
10      Q.  Okay.
11      A.  It should correlate.  But it's
12  complicated, because if those metals were tied
13  up by the typical proteins in the body that are
14  supposed to tie up copper and iron so they are
15  not -- they don't kill us, you have to figure
16  out a way to -- and as I sit here, this is just
17  research, I'm unable to answer the question
18  completely, I would have to be sure that the
19  iron we determined was free ferrous ion in the
20  body and free cuprous, or it wouldn't be
21  damaging even if present.
22          Sorry, that's my answer.
23      Q.  Okay.  Let me see if I can finish
24  this.
25          Is it fair to understand, Doctor, as

Page 85

1  you sit here today you don't know of a test that
2  would enable you to determine which chemicals in
3  the body caused or contributed to any
4  degradation of the mesh explant samples?
5      A.  No.  We just know that macrophages
6  have been shown to -- in superoxide and hydrogen
7  peroxide.
8      Q.  Okay.  You said "no" to my question.
9      A.  I'm sorry.  Correct.
10      Q.  Is it true, is it fair to say that, as
11  you sit here today, that you don't know of any
12  tests that would allow you to determine which
13  chemicals in the body may have caused or
14  contributed to any degradation of the mesh
15  explant samples?
16      A.  Again, from my reading the literature
17  and seeing the production of hydrogen peroxide
18  and superoxide, that has to be one of the
19  mechanisms, and the other ones could be.  I
20  don't know how to answer the question.
21      Q.  But the question is; it's fair to
22  understand, as you sit here today, that you do
23  not know of any test that you could perform to
24  determine which chemicals in the body may have
25  caused or contributed to any degradation of the

22 (Pages 82 to 85)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 86

1  polypropylene mesh in these explants?  You don't
2  know of one?
3      A.  Seeing the oxidation, I couldn't tell
4  you whether it was caused by the Fenton
5  reaction, the Haber-Weiss reaction, or hydrogen
6  peroxide, that's true, if that's what you want.
7      Q.  Thank you.
8          Or any other substance, there's not a
9  test that you can do to tell us what caused it?
10     A.  No.  All I can say is I'm looking at
11 the fact of the degradation.  It had to happen,
12 so I'd be looking for -- as to what specifically
13 caused it, I have to agree.
14     Q.  Thank you.
15     A.  I can't answer.
16         MR. THOMAS:  We can take a quick break
17 if you don't mind.
18         (Whereupon, a recess was taken from
19         11:06 a.m. to 11:15 a.m.)
20 BY MR. THOMAS:
21     Q.  Doctor, what is environmental stress
22 cracking?
23     A.  Environmental stress cracking is the
24 degradation of a polymer from imbibing, or the
25 absorption of materials, in this case like

Page 87

1  cholesterol, cholesterol esters, fatty acids,
2  into the interstitial space between the polymer
3  chains which causes it to swell, creating
4  stress, which eventually ruptures some of the
5  polymer chains, causing degradation.
6      Q.  Is it your opinion in this case that
7  the mesh explants that you analyzed exhibit
8  environmental stress cracking?
9      A.  Sorry.  Repeat the question, please?
10     Q.  Is it your opinion in this case that
11 the mesh explants that you analyzed show
12 environmental stress cracking?
13         MR. ANDERSON:  Objection.  Asked and
14 answered.
15         Go ahead.
16     A.  When I look at SEM photographs and see
17 the cracking, I can't tell just from looking at
18 the cracking whether it was oxidative damage or
19 environmental stress cracking that caused that
20 damage, or a combination of both.
21         DSC is one of the best techniques to
22 suggest that, because we can measure the melt
23 point, and we can measure the Delta H at melt
24 which correlates to the amount of crystallinity.
25 So as the Delta H of melting goes down, the

Page 88

1  amount of crystallinity goes down.  Delta H of
2  melt goes down, the percent crystallinity goes
3  down, the percent amorphous goes up, which then
4  that material, the amorphous material, is what
5  is susceptible to environmental stress cracking.
6  BY MR. THOMAS:
7      Q.  Doctor, do you have an opinion in this
8  case as to whether the mesh explants that you
9  analyzed show environmental stress cracking?
10     A.  I think as one of the components I
11 have an opinion, because we saw a drop in the
12 Delta H at melt, of the explants.
13     Q.  Is it your opinion that the drop in
14 the Delta H in the DSC testing is proof of
15 environmental stress cracking?
16     A.  It's just like the lack of
17 antioxidants.  It's consistent with, it's not by
18 itself proof of.  But it's proof of the
19 susceptibility of the polymer to environmental
20 stress cracking.
21         Then I have to go back still,
22 ultimately back to the SEMs, because the fact is
23 not in question.  It's occurring, we can see it.
24 The question is why, and that way we have to --
25 now we have to look at a series of data to make

Page 89

1  our best judgment.  I think in many cases the
2  damage is caused by both.
3      Q.  So just so I'm clear, your opinion
4  that the mesh that you've analyzed in the
5  explants has undergone environmental stress
6  cracking is due to your visual observation on
7  the SEM images and the DSC data, correct?
8      A.  Right.
9      Q.  Is there any other information that
10 you determined from your report, or your work in
11 this case, that you rely upon for your opinion
12 that the explanted mesh underwent environmental
13 stress cracking?
14     A.  Any other data from my report, that
15 was the question?
16     Q.  Yes.
17     A.  No.
18     Q.  All right.  Do you agree that pelvic
19 organ prolapse is well-known for its high
20 resistance to environmental stress cracking?
21     A.  Yes.  But the fact of the matter is
22 the Delta H is going down, so something is
23 causing that amorphous region to increase.
24     Q.  And the Delta H you're talking about
25 is the melting point as measured by the DSC

23 (Pages 86 to 89)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 90

1  measurements, correct?
2     A.  The melting point goes down, and the
3  Delta H at melt goes down.  And again, there's
4  variability from sample to sample.  So some
5  samples have more component of potential, I'll
6  describe it as potential environmental stress
7  cracking, and other samples from less potential.
8  The same way I would describe the lack of
9  antioxidant to be potential oxidation.
10       In all cases we are seeing the
11 degradation through SEM of the polypropylene.
12 That's just a fact.  And we know it's
13 polypropylene because the infrared spectrum is
14 that of polypropylene, the flakes.
15    Q.  What's crazing?
16    A.  Small cracks.
17    Q.  What does crazing have to do with
18 environmental stress cracking?
19    A.  Well, it's the start of the process.
20 When you have a little bit of cholesterol ester
21 you have just little cracks, little start, it's
22 moving in, the process is beginning.
23    Q.  Are you familiar with a concept known
24 as crack initiation?
25    A.  That's what crazing does, is initiates

Page 91

1  the forming of the larger cracks.
2     Q.  So when you have smaller cracks and
3  things get in there, then the cracks get bigger?
4     A.  Basically.
5     Q.  What's crack propagation?
6     A.  Once a material starts to crack, it's
7  like a rip in a garment, it's going to just --
8  once the rip starts, it's easier to continue it.
9     Q.  Are you familiar with a concept known
10 as fast crack propagation?
11    A.  No, I'm not.
12    Q.  Do you know the extent to which
13 environmental stress cracking in polypropylene
14 could be expected to be slow or fast, or there
15 in small forms forever?  Do you have any idea of
16 the relative -- strike that.  That's a terrible
17 question.
18       Doctor, do you have any ideas about
19 the expected progress of crack propagation in
20 polymers?
21       MR. ANDERSON:  Objection to form.
22       Go ahead.
23    A.  It would depend on the environment
24 again.  Again, if some patients have more,
25 there's more cholesterol esters that can get in,

Page 92

1  fatty acids and the like, then the process would
2  be more rapid than they would if there weren't
3  as much cholesterol, cholesterol esters in a
4  given patient.  That depends on the patient's
5  disease state, for example, their weight.
6  BY MR. THOMAS:
7     Q.  Do you have an opinion in this case
8  about the expected rate of crack propagation in
9  the mesh implanted in Carolyn Lewis?
10    A.  No.
11    Q.  Do you have an opinion about the
12 expected mesh -- excuse me, crack propagation of
13 the mesh implanted in Linda Batiste?
14    A.  Well, the fact of the matter is I can
15 see the cracks, I'm looking at them with SEM.
16 That's all I can say.
17    Q.  Very specific question.
18       Do you have an opinion about the
19 expected time for the crack propagation in Linda
20 Batiste?
21    A.  No, I don't.
22    Q.  Are you able to analyze the mesh
23 explants and determine how long the mesh has
24 been cracked?
25    A.  No.  Just the fact that it is.

Page 93

1     Q.  Are you able to analyze the mesh
2  explants that you've reviewed in this case and
3  determine or measure the extent of the cracking?
4     A.  Well, visually it's quite obvious
5  that --
6     Q.  I'm talking about quantitatively.
7     A.  There is no way to do that short of
8  looking at the pictures, that I'm aware of.  I
9  don't know anybody using a scale.
10    Q.  Do you have an opinion in this case,
11 first of all the Carolyn Lewis case, about the
12 extent to which any degradation in her -- strike
13 that.
14       Do you have an opinion in the Carolyn
15 Lewis case about the extent to which any
16 environmental stress cracking impacts the
17 functionality of the polypropylene mesh for its
18 intended purpose?
19    A.  Let me look at the -- I have to look
20 at the DSC data.
21    Q.  This is very specific.  This is
22 Carolyn Lewis.
23    A.  Correct.
24       (Witness reviewing document.)
25    A.  Okay.  What's the question, please,

24 (Pages 90 to 93)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 94

1  again?
2  BY MR. THOMAS:
3     Q.  Do you have an opinion in the Carolyn
4  Lewis case about the extent to which any
5  environmental stress cracking impacts the
6  functionality of the polypropylene mesh for its
7  intended purpose?
8     A.  I do not.
9     Q.  Do you have an opinion in the Carolyn
10  Lewis case about the extent to which any
11  oxidation impacts the functionality of the
12  polypropylene mesh for its intended purpose?
13          MR. ANDERSON:  Objection as to form.
14     A.  Of oxidation effects the --
15  BY MR. THOMAS:
16     Q.  Correct.
17     A.  Now I have to go through and look and
18  see if --
19          (Witness reviewing document.)
20     A.  Well, the infrared spectrum on Page 71
21  is a Carolyn Lewis sample.  It has a carbonyl
22  band, so the little band that's in front of the
23  amide 1 is a sign of oxidation.
24  BY MR. THOMAS:
25     Q.  That's not my question, Doctor.  Let

Page 95

1  me ask it again.  Very specific question.
2          Do you have an opinion in the Carolyn
3  Lewis case about the extent to which any
4  oxidation impacts the functionality of the
5  polypropylene mesh for its intended purpose?  Do
6  you have a specific opinion in that regard?
7     A.  My opinion would be it appears
8  oxidized, so yeah, it would be degraded.
9     Q.  Does it have any have oxidation -- do
10  you have an opinion about whether the Carolyn
11  Lewis mesh explant has oxidation that impacts
12  the functionality of the polypropylene mesh for
13  its intended purpose?
14     A.  Any oxidation is bad.  I see carbonyl
15  is oxidation, so yes, my answer is yes, I have
16  an opinion.
17     Q.  What is the opinion?
18     A.  It's damaged.
19     Q.  How does the damage that you observed
20  affect the ability of the polypropylene mesh to
21  function in its intended purpose?
22     A.  Well, something had to cause it to
23  have it removed.  I'm looking at the pictures,
24  it's flaking, I'm looking at the oxidation, it's
25  oxidized.  I don't know how else to answer the

Page 96

1  question.
2     Q.  Based upon your review of the mesh in
3  this case and your analysis in this case, tell
4  me how the oxidation of the mesh in Carolyn
5  Lewis impacts the functionality of the
6  polypropylene mesh for its intended purpose?
7  How does it do it?
8     A.  When you get ketones in the polymer,
9  aldehydes in the polymer as reflected in these
10  carbonyls, you -- that leads to ultimately to
11  chain -- what we call chain beta scission, chain
12  scission, which is degradation.  And besides, it
13  causes embrittlement in its own right.  Very low
14  levels of oxygen incorporated into polypropylene
15  causes a material to become rigid which is
16  classic of this.
17     Q.  What is it about your work in this
18  case that causes you to have the opinion that
19  the oxidation of the mesh in Carolyn Lewis
20  impacts the functionality of that mesh for its
21  intended purpose?
22     A.  Oxidation is bad.  We see it.
23     Q.  Okay.  Are you able to measure the
24  amount of oxidation that occurred in Carolyn
25  Lewis quantitatively?

Page 97

1     A.  No.
2     Q.  Can you tell me anything more than
3  oxidation is bad in support of your opinion that
4  the work in this case shows that the mesh
5  implanted in Ms. Lewis was not able to perform
6  its intended function?
7     A.  The antioxidants were missing.  The
8  material is not protected.  I think we see -- we
9  go over and look at EDX results, if I can
10  find --
11          (Witness reviewing document.)
12  BY MR. THOMAS:
13     Q.  You can look all you want to.  Do you
14  want to continue your answer?  I don't think you
15  answered my question, but you can do whatever
16  you think you need to do.
17          MR. ANDERSON:  He's trying to ask you
18  what about the oxidation in Carolyn Lewis, in
19  your opinion, affects the function of the device
20  for its intended purpose.
21     A.  All oxidation affects the function.
22          MR. ANDERSON:  How is what he's asking
23  you.
24     A.  It makes it more rigid.  It makes it
25  more brittle eventually.  It causes it to flake.

25 (Pages 94 to 97)

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 98

BY MR. THOMAS:
1
2     Q.  How much oxidation is required for the
3  mesh to be more rigid?
4     A.  I can't answer that question sitting
5  here, but it's not very much from reading the
6  literature.  1 percent increased oxygen would
7  probably do it.
8     Q.  How much oxidation is required to make
9  the polypropylene more brittle?
10    A.  It's a process.  It's not a single
11 point.  So I felt this material in my fingers, I
12 could feel the rigidity in it compared to the
13 straight.
14    Q.  Very simple question.  How much
15 oxidation is required, Doctor?
16    A.  I don't know.
17    Q.  How many oxidation is required to
18 cause the polypropylene to flake?
19    A.  Anywhere from none to a lot, because
20 it depends if it was environmental stress
21 cracking you wouldn't necessarily to have
22 oxidation for environmental stress cracking, or
23 it could be totally related to oxidation, or it
24 could be a mix.
25    Q.  Dr. Jordi, you report in Exhibit 1 and

Page 99

1  2 the observation of cracking perpendicular to
2  the extrusion lines in the mesh?
3     A.  Yes.
4     Q.  And what are extrusion lines?
5     A.  Well, you just can see them in the --
6  I think they're little -- probably caused by
7  miniature, if you want to call it, defects in
8  the dye.
9         Page 25 is a typical example.  You can
10 see the lines moving along the line of
11 extrusion.
12    Q.  Extrusion is a process by which the
13 fibers are formed?
14    A.  I believe so, yes.
15    Q.  Are you familiar with the extrusion
16 process?
17    A.  Not a lot.
18    Q.  Okay.
19    A.  I'm more an analyst.
20    Q.  Are you comfortable with calling the
21 extrusion lines the grain of the fiber?
22    A.  Sure.
23    Q.  Okay.  And when we talk about the
24 perpendicular cracks, we're talking about the
25 cracking that you observed being perpendicular

Page 100

1  to the extrusion lines, or the grain of the
2  mesh?
3     A.  Correct.
4     Q.  Have you analyzed the extent to which
5  perpendicular cracking is consistent with the
6  chemical structure of the mesh?
7     A.  Repeat the question, please?
8     Q.  Have you analyzed the extent to which
9  perpendicular cracking is consistent with the
10 chemical structure of the mesh?
11        MR. ANDERSON:  Objection as to form.
12        Go ahead.
13    A.  When you put a material through the
14 dye, you'll be aligning the polymer chains along
15 the line of the fiber so that only -- you
16 basically only have London-London forces of the
17 CH2 groups and CH3 groups in the polymer
18 backbone holding the polymer together, so it
19 will be more easily cracked -- if you bend it
20 it's going to tend to crack vertically to the
21 direction of the fiber.
22 BY MR. THOMAS:
23    Q.  Okay.  Is that something you studied
24 before I asked you the question, or you just
25 answered that question based upon your

Page 101

1  knowledge?
2     A.  Based on my knowledge.
3     Q.  Okay.  Did you study, as a part of
4  your analysis of this case, the extent to which
5  cracking would be expected along the grain or
6  extrusion lines of the mesh as compared to the
7  perpendicular angle that's called out in your
8  report?
9         MR. ANDERSON:  Objection as to form.
10    A.  Again, I have to have it repeated.
11 Sorry.
12 BY MR. THOMAS:
13    Q.  Did you study, as a part of your
14 analysis of this case, the extent to which
15 cracking would be expected along the grain or
16 extrusion lines of the mesh as compared to the
17 perpendicular angle that's called out in your
18 report?
19    A.  Well, what's called out in my report
20 was what we observed.
21        Did I study differences?  It's not a
22 perfect thing.  You can see cracks in other
23 directions, too, sometimes, it's just a majority
24 seems to be in the vertical.
25    Q.  Okay.

26 (Pages 98 to 101)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 102

1     A.  And furthermore, you can see these --
2  the grain, as you call it, is running right
3  through these cracks, so that's further
4  information to suggest that these -- this
5  cracked region is not biofilm, it's
6  polypropylene, because it's got the same grain
7  in it the original polypropylene did in the
8  cracked pieces.  If it was biofilm, those marks
9  should go away.  They don't, they're there.
10     Q.  Have you analyzed the issue of
11  environmental stress cracking to determine
12  whether environmental stress cracks would run
13  with the extrusion lines or the grain as opposed
14  to the perpendicular manner in which you call
15  out in your report?
16     A.  Have I analyzed that?  No.
17     Q.  The crazing that you've talked about
18  are the areas in the mesh that are furthest away
19  from the crystals in the mesh, is that fair, in
20  the amorphous regions?
21     A.  In the amorphous regions, yes.
22     Q.  And the crazing that you've talked
23  about is the small cracks that form in this
24  amorphous region, correct?
25     A.  Yes.

Page 103

1     Q.  Knowing what you do about
2  polypropylene, and the chemical structure of it,
3  and the crazing that you've just described,
4  wouldn't it be more likely that any
5  environmental stress cracking would occur with
6  the grain or along the extrusion lines of that
7  mesh as opposed to perpendicular to the mesh?
8     A.  The -- if you -- well, first of all,
9  the fact of the matter is it's vertical to it.
10  I mean that's just a fact for the vast majority
11  of them.
12     Q.  I'm asking you based upon your
13  knowledge as a biochemist, your knowledge of
14  polypropylene, and your knowledge of the
15  chemical structure, and the way that you've
16  described the environmental stress cracking as
17  we've been through it, isn't it more logical to
18  conclude that environmental stress cracking
19  would occur along the grain or the extrusion
20  lines as opposed to perpendicular to those
21  lines?
22     A.  If you wanted -- if you picture long
23  chains going this way of polymer, and then you
24  bent it this way, then it's going to tend to
25  crack here because those chains are going to

Page 104

1  come apart in the amorphous region.  They don't
2  have as much force holding them together.  You
3  have to literally rupture chemical bonds.
4       I don't see what you're saying, I'm
5  sorry.
6     Q.  So is it your testimony that to have
7  the oxidation or environmental stress cracking
8  necessary to cause the cracking on Page 40 in
9  Figure 44 of your report, Exhibit 1, requires a
10  rupture of the chemical bond?
11     A.  I would think that would be true on
12  the surface, yes.
13     Q.  Okay.
14     A.  Has to be.
15     Q.  And every place that you see this
16  cracking in the scanning electron microscopy,
17  the images that you've talked about, in order to
18  get the cracking that you describe shown in the
19  SEM images requires a breaking of the chemical
20  bond; fair?
21     A.  I think so.
22     Q.  Let's go to your report, Exhibit
23  Number 1.  Let's go to the PYMS data.
24       MR. ANDERSON:  Page 80 you're showing?
25       MR. THOMAS:  Page 80.

Page 105

1     A.  Okay.
2  BY MR. THOMAS:
3     Q.  Tell me what the PYMS technique is.
4     A.  Stands for pyrolysis mass
5  spectroscopy.  The sample is heated, and until
6  it fractures the bonds in the polymer releasing
7  everything, small molecules and so on, and then
8  those fragments are put through a GC column,
9  then they're monitored by a mass spectrometer.
10       We tend to do a two step method as
11  well where we heat the sample to 300C, which
12  tends not to fragment the polymer, and that
13  releases additives so we can see additives
14  without being overwhelmed by polymer fragments.
15       One of the disadvantages of a PYMS by
16  itself is that when you burn the polymer, in
17  this case polypropylene, you get a massive
18  amount of polypropylene fragment ions which
19  tends to overwhelm the ability of a detector to
20  sense sometimes certain ions, like the
21  antioxidants, like Santonox, at least at the
22  levels that we want to detect it at.
23     Q.  As I understand your report and your
24  earlier discussion, you used the PYMS analytical
25  technique to determine the extent to which

27 (Pages 102 to 105)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 106

1  additives in the Ethicon polypropylene mesh are
2  present?
3       A.  That's right.  I mean that's one of
4  two.  We use the LCMS as well.
5       Q.  Start with this one.  Tell me how you
6  do that.
7       A.  How you determine --
8       Q.  Right.
9       A.  You -- well, you would first, if
10 you're looking for Santonox R, you would shoot a
11 standard of Santonox R, and then you would look
12 for the ions that you get.  Santonox R gives
13 ions at 358 and 343 atomic mass units, so you
14 would plot those ions and look at them as shown
15 on figure -- well, the ions aren't shown in
16 Figure 82, but the chromatogram is.
17      Q.  Let's back up a minute.
18          When you're doing this test, do you
19 test both the explants and the controls?
20      A.  Absolutely.
21      Q.  And why do you do that?
22      A.  Because you want to look for
23 differences again.  First of all, we want to be
24 sure that the pristine has it in it, and it did.
25 And then we want to see whether or not the

Page 107

1  explants have it in it.
2       Q.  Okay.  Did you test the formalin
3  controls as a part of the PYMS test?
4           (Witness reviewing document.)
5       A.  It's not shown here.  I'm going to
6  have to go in the original data.  A lot of the
7  stuff that was in the original data is not in
8  this part.
9       MR. ANDERSON:  Go to the original
10 data.
11      MR. THOMAS:  Is that all data that's
12 been produced to us already?
13      A.  It's all here, except you've got it on
14 dual sided.  It's all here.  So I have twice as
15 much paper.
16 BY MR. THOMAS:
17      Q.  While you look for that, I'm going to
18 go to the restroom.
19          (Pause.)
20      A.  Repeat the question.  I'm sorry.  I
21 think I've got pretty close.
22 BY MR. THOMAS:
23      Q.  Did you test the formalin control as a
24 part of the PYMS test?
25      A.  I didn't see it, no.

Page 108

1       Q.  Why not?
2       A.  We didn't think it would have any
3  effect on the results.
4       Q.  Why?
5       A.  It's not an extracting solvent.  It's
6  going to dissolve polypropylene, so it's not
7  going to have any rapid effect on an extraction.
8       Q.  Why do you say that?
9       A.  Well, the polypropylene is solid.  It
10 doesn't leach out additives quickly unless you
11 put it in proper solvent extraction methods.  Or
12 this case it was simply there, we didn't do an
13 extraction method, that's the LCMS, we just
14 simply put it in the sample holder and shoot it.
15      Q.  Have you analyzed the extent to which
16 formaldehyde is an oxidant?
17      A.  No.
18      Q.  And to the extent formaldehyde is an
19 oxidant, you'd expect formalin to be an oxidant,
20 wouldn't you?
21      A.  Right.
22      Q.  To the extent that formalin is an
23 oxidant, it would be appropriate to test the
24 polypropylene pristine samples in formalin as a
25 part of your PYMS analysis, wouldn't it?

Page 109

1       A.  It certainly could be done, but we
2  didn't do it.
3       Q.  Because if you found that the
4  antioxidants were substantially reduced in the
5  formalin control sample, that would impact your
6  opinions, wouldn't it?
7       A.  Yes.
8       Q.  Why?
9       A.  Well, then we would imply that the
10 formalin extracted the polypropylene additives
11 out.
12      Q.  Have you analyzed at all in connection
13 with your work in this case the extent to which
14 formalin will extract the antioxidants from the
15 polypropylene mesh used in the TVT device?
16      A.  We didn't do any work with formalin,
17 so no.
18      Q.  So what your findings in the PYMS
19 section of the report show is only the pristine
20 mesh compared to the explanted mesh treated in
21 formalin?
22      A.  That's correct.
23      Q.  Now, the next step you take in the
24 antioxidant analysis is your LCMS work, correct?
25      A.  Correct.

28 (Pages 106 to 109)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 110

1    Q.  That's on Page 84 of your report.
2    A.  Got it.
3    Q.  And in this work, you did testing on
4  the control samples, didn't you?
5    A.  Yes.
6    Q.  And you did test work on the formalin
7  control samples, didn't you?
8    A.  Yes.
9    Q.  Turn to Page 96, please, of your
10  report.  Table 19.
11    A.  19 starts on Page 95, just so you
12  know.
13    Q.  Thank you.  Take your time and look at
14  both of them if you want to, both pages.
15    A.  Okay.
16    Q.  Let's just talk about it.
17      Page 95 begins at Table 19, and it's
18  called "Santonox R Relative Quantification," and
19  on the left you show sample, on the right you
20  show peak area.
21      What are you trying to show in this
22  table?
23    A.  The relative amounts of Santonox R in
24  the various fibers.
25    Q.  And Santonox R is one of the

Page 111

1  antioxidants in the mesh?
2    A.  That's correct.
3    Q.  And the Santonox R is put in the mesh
4  to protect against the oxidation that you're
5  critical of in this mesh?
6    A.  Yes.
7    Q.  And it's your opinion that the
8  Santonox R leaches out of the mesh, making it
9  more vulnerable to oxidation and environmental
10  stress cracking, correct?
11    A.  Making it, yeah, more susceptible to
12  oxidation.
13    Q.  All right.  So on the left you have
14  the numbers of your samples, correct?
15    A.  Yes.
16    Q.  And on the right you have the peak
17  area of Santonox R.  What does the peak area
18  mean?
19    A.  It's just we're plotting -- you can
20  see the photograph here of the peaks for
21  Santonox R right above it, retention time.
22    Q.  Okay.  So what does the chart on Page
23  95 represent above this table, the LCMS
24  extracted ion chromatograms, and you have all
25  the numbers of the samples, what does that mean?

Page 112

1    A.  A lot of -- that's overlay of peaks of
2  Santonox R for -- where Santonox R loops at 11.6
3  minutes about.
4      And extracted ion simply means we know
5  we have the 357 ion that shows up, so we tune
6  the instrument to see, or to record only the 357
7  ion, which is specific to Santonox R, ignoring
8  all the other impurities, anything else that
9  might also be co-eluting.  So it makes the
10  method specific.
11    Q.  So how does the LCMS work?
12    A.  The liquid is put in from a column
13  into the detector and made into a mist, and a
14  voltage is applied, and you get ions.  The ions
15  are put through quadripoles, which bends them.
16  Then it goes through a big tube called a time of
17  flight.  When it starts going up the tube, a
18  clock starts, hits the top, starts coming down,
19  and when it reaches the detector at the bottom,
20  it hits the other clock, measures literally the
21  time between the start and the impact on the
22  detector.  And then that time is related to the
23  mass.  It gives you a very accurate mass, which
24  is the point of CUTO, giving you very accurate
25  mass.

Page 113

1    Q.  What does peak area mean that's
2  reported in Table 19?
3    A.  Just integrate the area under the
4  curve that's observed.
5    Q.  Then you compare the peak area that
6  you found for the explant samples against the
7  control samples to determine the extent to which
8  the Santonox R has been reduced, is that
9  correct?
10    A.  That's correct.
11    Q.  So, for example, in 13674, the peak
12  area is 315,246?
13    A.  Correct.
14    Q.  And you compare that to your control
15  sample, 3398135, of 2,324,899, that's your
16  pristine control sample?
17    A.  That's pristine control.  There's some
18  variability there.
19    Q.  And you'd conclude from that that the
20  explant sample has a substantially diminished
21  amount of Santonox R, correct?
22    A.  That's correct.
23    Q.  The ranges in your control samples are
24  as high as 5,418,177, and as low as 2 thousand
25  324,899, correct?

29 (Pages 110 to 113)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 114

1      MR. ANDERSON: Objection. Million.
2      MR. THOMAS: Thank you.
3      A.  Millions, yes.  But you're right.
4  BY MR. THOMAS:
5      Q.  If you look at the formalin treated
6  control samples on Page 96 at Table 19, the
7  formalin treated control samples have less
8  Santonox R than the regular control samples,
9  don't they?
10     A.  They do.
11     Q.  Did you make any analysis to determine
12 why?
13     A.  I would assume that that -- you have
14 to assume by the data that that means that
15 the -- because it was the same 3405405 was
16 analyzed before and after the formalin
17 treatment, so formalin treatment extracted some
18 of the antioxidant.
19     Q.  Let's look at that, because the
20 formalin treated control sample is 3405405, and
21 it says 2,216,989.
22     A.  Right.
23     Q.  If you go up to the control sample
24 with the same lot number, that means it's the
25 same material, just with no formalin, correct?

Page 115

1      A.  That's right.
2      Q.  And the peak area there is 4,012,675,
3  correct?
4      A.  Yes.
5      Q.  Can't you conclude from that that the
6  formalin is extracting the Santonox R from this
7  mesh sample?
8      A.  You can.  Not completely, but it is.
9      Q.  Okay.  Is there any other explanation
10 for what's going on there?
11     A.  I don't think so.
12     Q.  Now, if you look at the other formalin
13 control sample, lot number 3422128, it shows a
14 peak area of 1,019,604.  And if you compare that
15 to the same control sample without formalin, the
16 number is 4,550,748, correct?
17     A.  Yes, you're right.
18     Q.  And it's more than four times the
19 amount of Santonox in the pristine sample than
20 there is in the formalin sample, correct?
21     A.  Correct.
22     Q.  And you have to conclude that the
23 reason why there's less in the formalin treated
24 sample is because the formalin extracted out
25 that Santonox R, correct?

Page 116

1      A.  That's the only explanation I can
2  think of.
3      Q.  But you didn't study the extent to
4  which formalin impacts the antioxidants in the
5  mesh as a part of your analysis in this case,
6  correct?
7      MR. ANDERSON:  Objection as to form.
8      Go ahead.
9      A.  No.
10 BY MR. THOMAS:
11     Q.  It's correct that you did not?
12     A.  I did not.
13     Q.  Thank you.
14     Now, if you look at the same table,
15 Table 19, you look at lot 3422128.
16     A.  Where are we now?
17     Q.  Under "Control Samples," same table,
18 Table 19 on Page 96.
19     A.  Okay.
20     Q.  You see that there's a control sample
21 which is lot number 3422128.  Do you see that?
22 And a value of 4,550,748.  Do you see that?
23     A.  I see it.
24     Q.  And then there is another -- a
25 duplicate of that same control sample also

Page 117

1  tested.  Do you see that?
2      A.  Yes.
3      Q.  And for that duplicate, that's the
4  same piece of mesh, isn't it?
5      A.  It's a different sample, but it would
6  be the same piece of mesh, yes.
7      Q.  And that's a duplicate of the same
8  test with the 4,550,748 test, right?
9      A.  Right.
10     Q.  And the value that you get for the
11 duplicate sample is 5,418,177, correct?
12     A.  Correct.
13     Q.  Do you have any explanation for the
14 difference in peak areas between these two, what
15 should be duplicate samples?
16     A.  It should be duplicate samples, but
17 it's a different -- it's actually a different
18 region in the mesh.  So it could be due to the
19 fact that the antioxidant is not completely
20 evenly distributed in the mesh, so there's
21 regions of higher and lower concentration.
22     Q.  Do you know?
23     A.  No.  I'd have to run a series of
24 tests.  That's what it's suggestive of.
25     Q.  Does the fact that the control sample

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 118

1  and the duplicate control sample of the pristine
2  mesh tested almost a million DAs apart, does
3  that cause you any concern at all?
4      A.  Well, if it's different it's
5  different.  I can't control that.
6      Q.  Okay.  Does the fact that the control
7  sample lot 3422128, the duplicate, shows a peak
8  area of 5,418,177, and the formalin treated
9  control sample for the same piece of mesh is
10  less than 20 percent of that value, does that
11  have any concern -- cause you any concern about
12  the opinions you have in the case?
13      A.  Where are we here?  Sorry.
14      Q.  Okay.  We're at Table 19, Page 96.
15  You have --
16      A.  Duplicate.
17      Q.  You have your duplicate lot for
18  3422128, the value is 5,418,177.  And the same
19  piece of mesh treated with formalin is less than
20  20 percent the concentration of Santonox R as
21  you found in your pristine sample.
22      A.  Yes.  It looks like formalin is
23  extracting it, as we said before.
24      Q.  Why didn't you note that in your
25  report?

Page 119

1      MR. ANDERSON:  Objection.
2      A.  I did.  It's in the table.
3  BY MR. THOMAS:
4      Q.  Why didn't you discuss it in your
5  report?
6      A.  Well, there's normally experimental
7  error, I can't -- it's possible that this
8  million is there because -- instead of 2 million
9  because, again, we hit a region of lower
10  concentration of the Santonox R, that could be
11  part of the reason.  Because we see spread in
12  the other control values as well.
13      Q.  Doctor, isn't the best evidence based
14  upon the work that you did in this case that the
15  formalin is extracting the antioxidants from the
16  mesh?
17      MR. ANDERSON:  Objection as to form.
18  Go ahead.
19      A.  Well, it is extracting some of the
20  Santonox R.  However, even at the lowest level
21  for the majority of these samples, like 13416,
22  13418, 13421, there's 67,000 counts to 100,000
23  counts, which is 10 to 15 times less than even
24  the lowest for formalin control.
25  BY MR. THOMAS:

Page 120

1      Q.  You had samples in the formalin
2  control for how long?  48 hours at 60 degrees
3  centigrade?
4      A.  Yes.
5      Q.  Did you make any effort to correlate
6  the aging by that amount to the samples that are
7  contained in Table 19 to determine whether
8  they're equivalent?
9      A.  No.
10      Q.  It would be appropriate in any
11  scientific analysis to make sure that when
12  you're comparing formalin exposure, you want
13  them to be equal to make sure that they reflect
14  accurate values?
15      A.  Well, the only way to do that, it
16  would be rather impossible in this case, it
17  would have had to have been implanted in tissue,
18  and had to have been implanted and stored in the
19  formaldehyde for -- you know, like we'd have to
20  take controls.  I don't know how we'd put
21  controls in tissue.  There's all kinds of
22  possible requirements to do that technically.
23      Q.  Is it fair to conclude based on the
24  data in your report, at least with respect to
25  lot number 3422128, the duplicate sample, and

Page 121

1  the formalin control sample, that the formalin
2  is responsible for extracting over 80 percent of
3  the Santonox R?
4      A.  Given the spread on the data, it's
5  certainly -- it is suggestive of that.  But
6  again, it could be 40 percent or 60 percent or
7  50 percent because it could be a different
8  region of the fiber itself.  We have normal
9  spread if we run a duplicate like above.
10      Q.  Let's go above.  It's -- even if you
11  go to the duplicate above --
12      A.  That's what -- that's not 80 percent
13  difference from the duplicate, it's 20 percent.
14      Q.  It's almost 50 percent, isn't it?
15      A.  No.  4,550,000 versus 5,400,000.
16      Q.  But those are not formalin treated?
17      A.  No, but that shows the natural
18  variability of the mesh.
19      Q.  But you only -- okay.
20      The only data that you have on your
21  tests under the LCMS of these explanted meshes
22  are contained in this report, correct?
23      A.  That's correct.
24      Q.  And these are the data upon which you
25  rely for your opinions in this case?

31 (Pages 118 to 121)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 122

1      A.  That's correct.
2      Q.  And you could have tested other
3   regions in the mesh to determine the extent to
4   which the antioxidants varied across the mesh,
5   correct?
6      A.  Theoretically.  We did a huge amount
7   of work to begin with, so it's all a relative --
8   what you're capable of doing in the required
9   time and all the rest of it, so it's just a
10  judgment call.
11     Q.  The reason why you did testing was to
12  have the data points upon which you could
13  predicate your opinions?
14     A.  That's right.
15     Q.  And these are the only data points
16  that you have upon which to predicate your
17  opinions?
18     A.  That's right.
19        MR. ANDERSON:  Well, objection to
20  form.
21     A.  Not the only, but it's one of.
22  BY MR. THOMAS:
23     Q.  For this issue, for the LCMS data?
24     A.  For Santonox R for the LCMS data, for
25  the lauryl thiodipropionate, for example.

Page 123

1      Q.  As a scientist who works in
2   biochemistry and uses this type equipment, does
3   the variability in the data in Table 19 on
4   Page 96 suggest to you the need to do additional
5   testing to confirm the extent to which formalin
6   was involved in the extraction of the
7   antioxidants?
8      A.  That would be a good idea, sure.
9      Q.  Because the data as expressed here is
10  not reliable, is it?
11     A.  Well, that's a relative term.  I think
12  we certainly got nowhere near the levels seen in
13  the explants.
14     Q.  Is it still your opinion that to a
15  reasonable degree of scientific certainty that
16  formalin has no impact on the Santonox R in the
17  mesh as implanted in a person?
18     A.  As implanted in a person, I don't --
19     Q.  Bad question.
20        Is it still your opinion to a
21  reasonable degree of scientific certainty that
22  the formalin had no impact on the measurement of
23  antioxidants in the meshes analyzed by you, the
24  explants?
25        MR. ANDERSON:  Objection.

Page 124

1      A.  It did not remove at all.  It didn't
2   remove it to the same levels as seen in the
3   explants.
4   BY MR. THOMAS:
5      Q.  But it's true to a reasonable degree
6   of scientific certainty as reflected by your
7   data that the formalin removed more than
8   80 percent of the antioxidants as expressed in
9   that data?
10        MR. ANDERSON:  Objection.
11     A.  I have to look at the numbers.
12        (Witness reviewing document.)
13     A.  The samples -- that's true.  And in
14  the samples as received, we had like 1, 2 or
15  3 percent left, not 80 percent.  We only had --
16  so it had 97, 98, 99 percent removed in the
17  explants we received.  Still greater.
18  BY MR. THOMAS:
19     Q.  But you don't know how long those
20  explants were exposed to formalin, do you?
21     A.  No, I do not.
22     Q.  And the length of time those explants
23  may have been exposed to formalin would impact
24  the extent to which the formalin extracted the
25  antioxidants, correct?

Page 125

1      A.  Presumably.
2      Q.  Well, absent any testing showing you
3   otherwise, that would be the logical conclusion
4   from this data, wouldn't it?
5      A.  Yes.
6        MR. THOMAS:  Let's eat.
7        (Whereupon, a luncheon recess was
8        taken at 12:15 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 126

1	AFTERNOON SESSION
2	1:12 O'CLOCK P.M.
3
4	BY MR. THOMAS:
5	Q.  Let's spend a little time with your
6	report, Dr. Jordi.
7	A.  Okay.
8	Q.  The report in the Lewis case.  Let's
9	go back to Page 16 again.
10	Table 2 on Page 16, it begins on Table
11	-- on Page 15, I guess, to be fair.
12	A.  Yes.
13	Q.  Table 2 represents what?
14	A.  Table 2 represents a grid of the tests
15	that were run.
16	Q.  There is a number of sample
17	identification numbers beginning with 13400 that
18	run to 13421.  I assume you did all of those
19	tests at once, or about the same time?
20	A.  About the same time.  We received the
21	Lewis case a little bit later, so it was run a
22	little bit later.
23	Q.  Is it your practice to number the
24	testing that you do in your labs sequentially?
25	A.  Yes.

Page 127

1	Q.  Is there any significance to the
2	numbers, other than the time that you do it?
3	A.  I don't believe so.  It's just the
4	standard SOP numbering.
5	Q.  Okay.  When did you do the testing for
6	13400 to 13421, over what period of time.  I
7	don't think you'll find it in your report.  I've
8	got the bills here if that helps.
9	MR. ANDERSON:  Lab notebooks would
10	help, too.
11	A.  Lab notebooks would probably be
12	better.
13	BY MR. THOMAS:
14	Q.  Okay.
15	(Witness reviewing documents.)
16	A.  Looks like about the start was 9/9.
17	MR. ANDERSON:  Look at your lab
18	notebooks instead of saying "about."
19	THE WITNESS:  I did look at the lab
20	notebook there.
21	These were all these samples that are
22	in that grid, so 9/11, 9/13.
23	BY MR. THOMAS:
24	Q.  Just from the bills I looked at, it
25	appears that the work that has been done in this

Page 128

1	case has been done since -- the testing work
2	itself has been done since September.  Does that
3	seem about right?
4	A.  Yes.
5	Q.  Okay.  In Table 2 on Page 15 there's
6	identification of the sample, weight, fibers.
7	Is that molecular -- what is the weight for
8	that?  What does that mean?
9	A.  That was the amount of fibers that
10	were able to be extracted.  So when you look at
11	the picture of the -- on Page 16 at the bottom
12	left, those fibers after they were removed from
13	tissue were weighed.
14	Q.  Okay.  Is there any weight of a tissue
15	that you have?
16	A.  No.  We had no plans for analysis of
17	the tissue.
18	Q.  Did you retain the mesh fibers that
19	are in Figure 2?
20	A.  Well, we would have if there were any
21	to maintain.  There may be tidbits of a couple
22	of them.  But with all the testing that was
23	done, we were extremely sample constrained.
24	Q.  How about the tissue samples, did you
25	retain any of the tissue samples?

Page 129

1	A.  No.  We had no further use for the
2	tissue.
3	Q.  Under the 13674, you understand that
4	to be the Carolyn Lewis sample?
5	A.  Yes, I do.
6	Q.  There's no weight taken there.  Do you
7	know why?
8	A.  It was an oversight.  It's
9	7.62 milligrams.  It's in the book.
10	Q.  Okay.  So it's in your lab notebook,
11	but never made it to your report?
12	A.  That was a glitch.  It should have
13	made it to the report.  It didn't make it to the
14	report.
15	Q.  What's the significance of --
16	A.  It's 7.62 if you want to write it in
17	so you've got the exact number.
18	Q.  What is the significance of that
19	number to your analysis?
20	A.  The milligrams?
21	Q.  Yes, the weight of the fibers that you
22	receive.
23	A.  It's just a fact of what we got.
24	Q.  That's what I figured.
25	As I look at the sample, explant

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 130

1  sample analysis chart, it lists the tests done
2  on each sample, correct?
3      A.  Correct.
4      Q.  You didn't do all of the tests on all
5  the samples?
6      A.  Correct.
7      Q.  Why?
8      A.  Some cases there just wasn't enough
9  sample to do them all.  And other cases we --
10 like we ran SEM and optical microscopy on all
11 the samples.  SEM-EDX, once we've seen increased
12 oxygen six times, we didn't feel it was
13 necessary to run them all.  It's already a huge
14 report.  The volume of work was so great that we
15 made choices when we had acquired what we
16 considered a significant level of work.  Once I
17 prove something six times, I don't need to prove
18 it seven, eight, nine, ten times.  Part of it
19 was lack of sample, part of it was we'd run
20 enough to be consistent to show the point of the
21 various analyses.
22     Q.  Did the expense of the test have
23 anything to do with it, the expense of each of
24 the tests?
25     A.  I'm sure that wasn't the overriding --

Page 131

1  that wasn't the overriding thing.
2      Q.  Did you determine which fibers to test
3  with which test, or were you directed in that
4  regard?
5      A.  No.  We discussed that, and we just
6  made a choice of statistical significance.
7      Q.  Who made that decision?
8      A.  Well, my son Mark and I.
9      Q.  Okay.  What considerations did you
10 have in determining, for example, to do all of
11 the OM and SEMs, but only some of the SEM-EDX?
12     MR. ANDERSON:  Objection.  Asked and
13 answered.
14     Go ahead.
15     A.  We just didn't feel it was -- we had
16 showed the point, and we just thought we had
17 done enough work.  And we had a huge work
18 product to begin with.
19 BY MR. THOMAS:
20     Q.  Okay.  Is there a reason -- strike
21 that.
22     Let's go to Page 19.  Page 19 in the
23 middle of the page, it reads this.  "It is my
24 opinion to a reasonable degree of scientific
25 certainty based upon my experience and my

Page 132

1  background in polymer science, this level of
2  degradation will have a strong impact on fiber
3  mechanical properties, including stiffness,
4  elasticity, and resistance to break."
5      What level of degradation are you
6  describing in that sentence?
7      A.  We're describing the very obvious
8  cracking seen in the SEM photographs.
9      Q.  Okay.  So the level that you're
10 describing there relates solely to what you
11 observed in the SEM photographs, images?
12     A.  At this point, yes.
13     Q.  All right.  "Will have a strong impact
14 on fiber mechanical properties."  What does that
15 term mean to you?  How much is strong?
16     A.  Well, we weren't able to run physical
17 testing that we normally would run, because we
18 didn't have enough material, but we could feel,
19 one way is to feel it.  The material explanted
20 material had a much more rigid feeling to it, I
21 guess the best word is rigid, rigid feeling to
22 it than the controls.
23     Q.  Okay.
24     A.  It was very obvious.
25     Q.  Is that the only information that you

Page 133

1  have that the level of degradation that you
2  observed would have a strong impact on fiber
3  mechanical properties?
4      A.  No.  If I looked at the actual flaking
5  and the cracking and so on and so forth, that's
6  got to have a massive effect.  It's a large --
7  it covers the entire region of some of the
8  fibers.
9      Q.  Okay.  You call it strong, you said
10 massive.  What does that mean?
11     A.  Well, the best way I can show it is
12 with a picture.
13     Q.  Okay.
14     A.  Do you want to see one?
15     Q.  You've showed them to me, and I've
16 seen them.
17     In terms of quantifying, placing a
18 number on the impact on the mechanical
19 properties, you're not able to do that, is that
20 fair?
21     A.  I think you could certainly say it was
22 great -- very greatly cracked or moderately
23 cracked, something like that in general.
24 Putting a number score on it would be difficult,
25 yes.  But it certainly is not hard to look at a

Howard C. Jordi, Ph.D.

Page 134

1  sample that's grossly cracked and see that it's
2  grossly cracked.
3     Q.   You say that it's "going to have a
4  strong impact on fiber mechanical properties,
5  including stiffness."
6         What impact will this degradation have
7  on stiffness?
8     A.   Cracking, the cracking to me is
9  indicative of some -- is a form of degradation,
10 at least it's a result of the chemical
11 degradation, results in a physical splintering
12 that we see.  So that when it's largely cracked,
13 that also implies that the material underneath
14 it is probably cracking, too.  And I prove that
15 by showing the SEM-EDX and showing the increased
16 oxygen levels in the level underneath the
17 cracks, that's the next layer that will crack.
18    Q.   Thank you, Doctor.
19         My question is; what level of --
20 strike that.
21         What amount of stiffness is impacted
22 by the level of degradation that you observed in
23 the SEM images?  What's the -- how can you
24 quantify the level of stiffness?
25    A.   I can just feel it.  I'm sorry, I

Page 135

1  can't give you a number.
2     Q.   And just so it's clear, the only thing
3  that you have to go on about the stiffness is
4  holding the explant in your hands?
5     A.   In the gloved hands.
6     Q.   Okay.
7     A.   And -- yes.
8     Q.   Comparing it to --
9     A.   To the control.
10    Q.   -- the control.
11         Did you compare that to the formalin
12 control, or just the control?
13    A.   I think we felt them all.
14    Q.   I didn't see any reference in your
15 report to the formalin control.
16         Do you have a -- is it your practice
17 when you test the formalin controls to reference
18 that in your report?
19    A.   Reference what in the report?
20    Q.   The fact that you did it.
21         If you go on Page 17, it's where you
22 talk about handling it.  Page 17 says "It was
23 noted during sample preparation that a readily
24 apparent difference in fiber stiffness existed
25 between the control samples and the explanted

Page 136

1  fiber mesh."
2         There's nothing in there that I saw
3  that suggested that you compared the formalin
4  control samples.  Do you recall testing the
5  formalin control samples in the same way that
6  you tested the control samples and the explants?
7     A.   It's not specifically mentioned, but
8  we felt them.
9     Q.   Okay.  And it's your recollection and
10 testimony that the explanted samples felt
11 stiffer than the control samples?
12    A.   Most definitely.
13    Q.   And did you arrive at any conclusions
14 about what caused that stiffness?
15    A.   At the time it was done, we hadn't
16 done the other testing, so I had no reason or
17 cause.  After all the work that's done and
18 reported here in this report, the infrared
19 showed oxidation, the SEM-EDX shows oxidation,
20 the lack of antioxidants would suggest
21 susceptibility to oxidation, and so on.
22    Q.   Okay.  The sentence also references
23 elasticity.  Was the elasticity also something
24 that you observed in the handling of the mesh?
25    A.   Right.  If you bent the original --

Page 137

1  the pristine mesh it would come -- pop right
2  back to shape.  And the other, you had to apply
3  more force to get it bent, and it would come
4  back and sometimes would stay partially bent, or
5  sometimes would crack.
6     Q.   Is it the handling of the mesh the
7  only basis for your opinion that the explanted
8  mesh was less elastic than the control?
9     A.   As a comment here, yes, because that's
10 a point where we were running SEM.
11    Q.   And likewise, with the resistance to
12 break, did you observe that in your handling as
13 well?
14    A.   That's right.
15    Q.   And is it fair to understand that it's
16 your handling of the explanted mesh as compared
17 to the control mesh that's the basis for your
18 opinion that the explanted mesh had less
19 resistance to break than the control mesh?
20    A.   Yes.  The control mesh never broke.
21    Q.   Did you ever investigate any
22 alternative potential causes to more stiffness,
23 less elasticity, or more resistance to break?
24    A.   No.  We were going after chemical
25 analysis of the polypropylene and the

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 138

1  differences, if any.
2      Q.  Did you ever consider any other
3  chemical contributions to increased stiffness --
4  strike that.
5          Did you ever consider whether formalin
6  could contribute to increased stiffness, less
7  elasticity, or less resistance to break?
8      A.  We felt it.  The same, it felt the
9  same.
10     Q.  Did you consider that at the time?
11     A.  If it had been different it would have
12 been reported.  The fact that it was a formalin
13 treated control would be part of the control
14 package.
15     Q.  Well, the formalin treated control
16 observations weren't even called out in your
17 report, right?
18     A.  That's right, they weren't.
19     Q.  Okay.  Did you ever consider the
20 extent to which formalin and a chemical reaction
21 with the proteins on the mesh could lead to an
22 increased stiffness, a reduced elasticity, or a
23 reduced resistance to break?
24     A.  No.
25     Q.  Down in the middle of that paragraph

Page 139

1  you say "Sharp or protruding surfaces could
2  result."
3          Do you have an opinion to a reasonable
4  degree of scientific certainty that any sharp or
5  protruding surfaces resulted from any of these
6  pieces of mesh?
7      A.  Where are we reading here?
8      Q.  Right in the middle of that paragraph.
9          MR. ANDERSON:  Page 19.
10     A.  Oh, 17.  All right.  Which paragraph?
11         MR. ANDERSON:  You're on 18.  He
12 wanted 19.  He's going to keep going through
13 this paragraph, so here's where he is right now.
14     A.  "Sharp protruding..."
15         (Witness reviewing document.)
16     A.  Okay.  Question again, please?
17 BY MR. THOMAS:
18     Q.  Do you have an opinion to a reasonable
19 degree of scientific certainty that any sharp or
20 protruding surfaces resulted on any of the mesh
21 explants that you reviewed in vivo?
22         MR. ANDERSON:  Objection to form.
23     A.  We saw the sharp edges in the SEM
24 photos.
25 BY MR. THOMAS:

Page 140

1      Q.  How do you know that's the way it was
2  inside the body?
3      A.  Well, it was in the tissue when it
4  came, and we didn't take it out of the tissue
5  when we sent it -- when we ran the SEM, so we
6  didn't do anything different than it was in the
7  body environmentally.  We did that on purpose.
8      Q.  You didn't do anything differently,
9  but the doctors did something differently when
10 they removed the mesh, didn't they?
11     A.  Well, they took it out of the body,
12 yes.
13     Q.  What else did they do?
14     A.  Put it in formalin.
15     Q.  Okay.  Do you know what impact the
16 formalin has on the proteins and other -- strike
17 that.
18         Do you have any knowledge or
19 information about what formalin does to the
20 materials in the body that surround the mesh?
21         MR. ANDERSON:  Objection to form.
22     A.  It will react with the tissue, but it
23 will not react -- we ran controls in formalin
24 here, and we showed it didn't change the SEM.
25 BY MR. THOMAS:

Page 141

1      Q.  But the ones you ran in formalin
2  didn't have any tissue on them.
3          MR. ANDERSON:  Wait a minute, Dave, in
4  fairness let him finish his answer.
5          MR. THOMAS:  You're right.
6      A.  We ran formalin treated controls here
7  to see if it would do anything obvious to the
8  pristine.  It did not.
9  BY MR. THOMAS:
10     Q.  But the formalin controls that you ran
11 didn't have any tissue on them.
12     A.  That's correct.  So what?
13     Q.  And my question is whether you know
14 whether formalin will react with the tissue on
15 the mesh so as to impact the appearance in the
16 SEM images.  Do you know that?
17     A.  Absolutely not.  It will react with
18 the tissue, absolutely.  It's irrelevant.  It's
19 not going to react with the mesh.  It will
20 react -- not react with the mesh in the tissue,
21 it will react with the tissue which we removed,
22 so it's no longer there when we did the testing.
23     Q.  Is it your testimony there was no --
24     A.  There was tissue on when the SEMs were
25 run.  We didn't want that removed because didn't

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 142

1  want to in any way disturb the mesh in any way
2  that we could possibly avoid, so we tried our
3  very best not to cause anything, any changes.
4  So we ran the SEMs in the tissue, which we could
5  do.
6      Q.  What is your area of expertise that
7  allows you to give the opinion that "Prolene
8  mesh in the TVT products degrades, cracks, and
9  releases polypropylene particulates into the
10  surrounding tissue after implantation, causing
11  an increased inflammatory response"?  Are you
12  trained to give that opinion?
13      A.  I certainly am.  I'm a polymer
14  chemist, a biochemist, and we actually saw the
15  shards, we saw how easily the shards came off,
16  and then we actually took an infrared of it to
17  show that they were polypropylene.  So we
18  actually did it and we saw it.
19      Q.  That's not -- that's a good answer.  I
20  should have asked a better question.
21          What's your training, education, and
22  experience that allows you to give the opinion
23  that those pieces that you claim break off
24  caused an increased inflammatory response?
25      A.  What's my basis?

Page 143

1      Q.  Yes.  What's your training?
2      A.  I'm a biochemist.
3      Q.  As a part -- have you analyzed the
4  effect of polymer degradation in humans prior to
5  this litigation?
6      A.  I worked on bio-implantable polymers
7  when I was in the Army at Walter Reed Army
8  Medical Center, polylactic acid, polyglycolic
9  acid copolymers.
10      Q.  Was your work there --
11          MR. ANDERSON:  He's not finished.
12          Go ahead.
13      A.  We were replacing parts of jaws in
14  animals with a goal of being able to replace a
15  blown off jaw on a soldier, put a piece of
16  implantable material in the jaw, and then we
17  wanted the tissue to grow into it, so we put
18  things in the PLA-PG polymer so tissue would
19  tend to grow in, and ultimately the jaw would be
20  replaced with new jaw, and it worked fairly
21  well.
22  BY MR. THOMAS:
23      Q.  Was it your job to determine the
24  extent to which the implant would be accepted by
25  existing tissue?

Page 144

1      A.  That was well understood in that we
2  had very little response.  Because in that case,
3  unlike this case, we had a polymer in polylactic
4  and polyglycolic acid which degraded to lactic
5  acid and glycolic acid, both of which are normal
6  body chemicals that don't cause a tissue
7  response of any consequence.
8      Q.  Was it your job to determine the
9  extent to which the jaw implant would integrate
10  into the tissue?
11      A.  To observe it.
12      Q.  Was it your job to determine the
13  adequacy of the design of the jaw implant to be
14  accepted by the tissue?
15      A.  Well, we worked as a team.  There was
16  a number of us.
17      Q.  But there were other people whose
18  primarily responsibility was to determine the
19  extent to which the implant was compatible with
20  existing tissue, wasn't it?
21      A.  That work had been done prior, it had
22  been shown to be compatible.
23      Q.  But that was not your job?
24      A.  No.
25      Q.  Somebody else did that work?  Another

Page 145

1  expertise was required to make that finding,
2  correct?
3      A.  Right.
4      Q.  And so --
5      A.  But it's not unreasonable to observe
6  polypropylene shards coming off, which are
7  little knives.  They're going to cut the tissue
8  when they come off in it.  You can see it under
9  microscope, and that's going to cause bleeding
10  and an inflammatory response.
11      Q.  How big are these shards you're
12  talking about?
13      A.  Well, let's go look at a picture.
14  We've got a scale on it.  They vary.
15      Q.  How big is that one?  What page are
16  you on?
17      A.  69.
18      Q.  How big is it?
19          MR. ANDERSON:  Which piece?  There's
20  pieces all over the place.
21          MR. THOMAS:  The piece he has
22  highlighted right there.
23          MR. ANDERSON:  Okay.
24      A.  Well, the mesh itself is, what, 70,
25  80 microns, so it's got to be -- this is a good

37 (Pages 142 to 145)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 146

1    size piece, so it's probably 20 microns,
2    10 microns, 20 microns, depends on the piece.
3    BY MR. THOMAS:
4        Q.   And it's your opinion that that cuts
5    tissue?
6        A.   Absolutely.  If it's got sharp edges
7    like this and you're moving around and
8    exercising, it's got to drive it into
9    whatever --
10       Q.   What have you done to study the extent
11   to which a shard as depicted on the Page 69 is
12   going to have any impact at all in terms of
13   inflammatory response in a human?
14       A.   I leave that to the doctors, the
15   surgeons, and so on, and the doctors.  I'm not
16   a -- I'm a biochemist and a polymer chemist.
17       Q.   Right.  So the extent to which any of
18   these edges that you've described, cracks that
19   you've described, or platelets or shards that
20   you've described are going to have any health
21   impact on any patient is for somebody else to
22   comment on, is that fair?
23       A.   The doctors have to do that, yes.
24       Q.   Thank you.
25           Let's go to Page 42 of your report,

Page 147

1    please.
2        A.   Got it.
3        Q.   I'm interested in the figure that's on
4    the lower half of the page.  I guess it's Figure
5    48.
6           Based on your work in this case, what
7    does Figure 48 show?
8        A.   It shows a large -- this is atypical.
9    It shows a large longitudinal crack in the
10   underlying polypropylene coated by what appears
11   to be tissue.
12       Q.   Okay.  Which parts -- I look at that
13   and I think of bark on a tree.  And there's
14   areas on either side, and then an interior that
15   I would think of as exposed wood on a tree and
16   the rest would be the bark, and I'm trying to
17   use it as kind of a descriptive thing.
18           Is the area surrounding the interior
19   portion -- that's not going to make any sense at
20   all on the record, I understand that.  Are we
21   talking about the same thing?  Is that the
22   tissue that's surrounding it?
23       A.   Yes.  This would be the polypropylene
24   in here (indicating).
25       Q.   Let me give you a red pen.  Why don't

Page 148

1    you draw a circle around what you've described
2    as the polypropylene.
3           MR. ANDERSON:  On his copy?  Do you
4    want to put it on -- let's put it on the record
5    copy.
6           MR. THOMAS:  That's what I thought he
7    was looking at.  I'm sorry.
8        A.   It would be the same page.
9    BY MR. THOMAS:
10       Q.   So we're on Page 42 of Exhibit 1.
11       A.   Yes.
12           MR. ANDERSON:  You're going to write
13   on this.
14   BY MR. THOMAS:
15       Q.   So why don't you draw a circle around,
16   if you don't mind, those areas --
17       A.   Circle?
18           MR. ANDERSON:  Listen to him.
19   BY MR. THOMAS:
20       Q.   Outline the area that you believe is
21   polypropylene.
22       A.   (Witness complies).
23           I'm having a hard time writing
24   exactly, but you give my drift.
25   BY MR. THOMAS:

Page 149

1        Q.   Doesn't have to be exact.
2        A.   Looks like a crack there.
3        Q.   Okay.
4        A.   Something on that order.
5        Q.   And so thank you for doing that.
6           You've drawn in red the area inside of
7    which is the polypropylene.  Does the area
8    outside of that represent tissue or protein?
9        A.   I believe so.
10       Q.   Okay.
11       A.   It doesn't match -- you can see when
12   polypropylene cracks it gives these sharp sides
13   and jagged edges, whereas this is more -- tissue
14   is more nebulous.
15       Q.   What is it about the polypropylene
16   structure that causes it to crack in the manner
17   you just described?
18           MR. ANDERSON:  Objection to form.
19           Go ahead.
20       A.   It's developed brittleness from lack
21   of antioxidants and oxidation and/or stress
22   cracking.  The two work together in any given
23   sample.
24   BY MR. THOMAS:
25       Q.   Will degradation alter the melting

38 (Pages 146 to 149)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 150

1  point of polypropylene?
2      A.  Yes.
3      Q.  Will degradation always alter the
4  melting point of polypropylene?
5      A.  I think it depends on the severity of
6  the oxidation, the degradation.
7      Q.  How much degradation or oxidation is
8  required to alter the melting point of
9  polypropylene?
10     A.  Well, a lot of things affect the
11 melting point of polypropylene.  I'll show you.
12 This is again from one of the books in my --
13 Turi, on thermal methods.  Here's a chart, it
14 details polypropylene, and I've got melt points
15 all the way from 106 to 114 degrees to
16 176 degrees, depending on the percent
17 crystallinity.  Percent crystallinity affects
18 the melt point.
19     Q.  Did you determine the melt point of
20 the mesh that you analyzed in this project?
21     A.  Yes.
22     Q.  What did you determine the melt point
23 to be, do you remember?
24     A.  I'd have to go to the table.  There
25 were different values.

Page 151

1      Q.  We'll get to that.
2          You use a reference point in your
3  report of 175.
4      A.  That's for a typically crystalline
5  polypropylene material.
6      Q.  The actual melting point of the
7  polypropylene you analyzed was lower than that?
8      A.  It was all lower, which tells me it
9  was -- after the manufacturing process it was
10 like 165, I think, roughly, and then it went
11 down from there.
12     Q.  Okay.
13     A.  It varies as a function of molecular
14 weight, it varies as a function of
15 crystallinity.
16         Do you want to keep this together?  Do
17 you know where the start is for this?  This is
18 mine.
19         MR. ANDERSON:  I think he flipped it
20 over, so we'll just have to figure it out.
21         THE WITNESS:  I don't want to get us
22 all mixed up.
23         MR. ANDERSON:  There we go.
24     A.  We've got it ready if we need it for
25 something else.

Page 152

1  BY MR. THOMAS:
2      Q.  We've got too many papers working
3  here.  I apologize.
4          What is a plasticizer?
5      A.  It's generally a low molecular weight
6  material that's put inside of a plastic to make
7  it more flexible.
8      Q.  Do you agree that fat and body tissue
9  will be a plasticizer on polypropylene?
10     A.  Yes, not on, though, in.  Only in.  It
11 has to get in.
12     Q.  What does that mean when the fat and
13 body tissue soften the polypropylene?
14     A.  It just becomes softer, because --
15 that's connected with the environmental stress
16 cracking, that's going to get into the polymer
17 and start swelling the chains.
18     Q.  Are you familiar with the concept
19 known as toughness?
20     A.  Yeah.
21     Q.  What is toughness?
22     A.  It's resistance to wear.
23     Q.  Is implanted mesh tougher than
24 pristine mesh?
25     A.  Not seen the measurements, so I don't

Page 153

1  know.
2      Q.  Have you ever analyzed the question of
3  whether implanted mesh is tougher than pristine
4  mesh?
5      A.  No.
6      Q.  What does it mean if implanted mesh is
7  tougher than pristine mesh?
8      A.  Well, it just means it might be
9  tougher in the sense of, I would use the term --
10 I'm more like using the term rigid in this case,
11 that would probably also be considered as part
12 of this tougher thing.  But it also would make
13 it -- if it's more rigid, it's going to make it
14 more difficult to move in the body, and the
15 patient will have more difficulty doing exercise
16 and the like with that type of thing.
17     Q.  If it's tougher --
18     A.  It's tougher --
19     Q.  -- it's less resistant to be brittle
20 and break, isn't it?
21     A.  Well, we also -- yes, but we also have
22 to consider based on our -- again, back to our
23 SEM photographs, we also have to consider there
24 appears to be two distinctive layers here,
25 there's a surface layer which is cracking and

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 154

1   there's an underlying layer which is -- has not
2   yet cracked. So the bulk material could be
3   tougher, while the surface layer is more
4   brittle, at the same time.
5       Q. Okay.
6       A. So I don't know what to make of your
7   term because you're lumping it in the bulk, you
8   know, as the entire fiber. And I'm looking at
9   two fibers, the surface region and then the
10  underlying region, which is not cracked yet.
11      Q. Just to be clear, they are both parts
12  of the same fiber, aren't they?
13      A. They almost look like two separate
14  fibers.
15      Q. Okay.
16      A. And there's publications which
17  indicate the same.
18      Q. Did you cite those papers in your
19  report?
20      A. Yes.
21      Q. Which papers are we talking about now?
22      A. Well, let's see if I can find it for
23  you quick. You'll have to bear were me while I
24  find it.
25          (Witness reviewing document.)

Page 155

1       A. I've got it, I think. This is paper
2   ASIO journal, 1998, Page 199, Mary Celine,
3   "Comparison of in vivo behavior of
4   polyvinylidene fluoride and polypropylene
5   sutures used in vascular surgery."
6           She's discussing stress cracking at
7   this point. She says "The reason for stress
8   cracking phenomenon in oriented polypropylene
9   monofilaments has been explained by their
10  pronounced skin/core structure." Those are two
11  phases I'm talking about.
12      Q. Let me stop you there.
13          What is oriented polypropylene
14  monofilaments? What does that mean?
15      A. It means it's gone through the dye and
16  it's oriented longitudinally. We can see those
17  lines where it's been pulled through the dye, or
18  pushed.
19      Q. Does that suggest a stress cracking
20  phenomenon occurs through the extrusion lines?
21      A. Well, her purpose here is not to talk
22  about that at the moment. It's talking about
23  the bi-component structure.
24      Q. I understand that.
25          But as you read that, does that

Page 156

1   suggest that the stress cracking phenomenon is
2   oriented along the extrusion lines?
3       A. No. It doesn't say one way or the
4   other. It just says "stress cracking phenomenon
5   in oriented." She's just discussing oriented
6   polypropylene. She doesn't say where the cracks
7   are.
8       Q. Okay. I understand. Go ahead.
9       A. "Has been explained by their
10  pronounced skin to core structure. This
11  bi-component structure is created by the
12  differential cooling rates between the external
13  and internal layers of the monofilaments." When
14  it comes out of the dye, the surface cools
15  faster than the inner core. The faster cooling
16  outer surface is going to be less crystalline
17  than the inner core which stays warm longer, has
18  more time to form crystals as it's cooling. So
19  you wind up with two structure types in the
20  filament when you're done.
21      Q. Are you suggesting by this testimony,
22  Doctor, that it's only the outside of the
23  polypropylene mesh that's degrading, and the
24  inside is fine?
25          MR. ANDERSON: Objection.

Page 157

1           Go ahead.
2       A. I'm not suggesting any such thing.
3           I'm suggesting that the outer core is
4   chemically less crystalline, and hence more
5   stress cracking susceptible, than the inner
6   part. The inner part would still be susceptible
7   over time depending on the degree of
8   implantation in the body to oxidation.
9           We have two different things going on
10  at the same time, two layers. There are
11  actually two different kinds of polypropylene,
12  although that wasn't the intent in the
13  manufacture I'm sure, but that's what you wind
14  up with.
15  BY MR. THOMAS:
16      Q. Each of which will require a breakdown
17  in the polymer to degrade as described?
18      A. Each of which --
19      Q. Sorry.
20          Each of which would require a
21  breakdown in the polypropylene in order to
22  degrade as described?
23      A. Right. And the surface layer being
24  less crystalline would also bleed out its
25  antioxidants faster, it's more amorphous, and so

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 158

1  it's going to tend to degrade first.  And that's
2  what we invariably see in the SEMs, we see a
3  surface cracking and removal.
4      Q.  In your analysis of these explanted
5  meshes, did you ever see a crack all the way
6  through the mesh?
7      A.  I don't think we did.  But I've read
8  about them in the literature, I just never saw
9  one in the 23 samples we ran, 24 with Batiste.
10     Q.  Do you have any recollection -- strike
11 that.
12         Do you know the greatest crack that
13 you observed in any of the meshes that you
14 reviewed?
15     A.  Do I --
16     Q.  Are you able to point to me the
17 biggest crack on any of the meshes and quantify
18 for me how much that crack is compared to the
19 rest of the mesh?  I don't want -- if you don't
20 know it, I don't want you to go look.
21     A.  There is a range, certainly.
22     Q.  Can you quantify in measurement?
23     A.  Standing here without looking at the
24 pictures, no.
25     Q.  Is there anything about the pictures

Page 159

1  that allows you -- strike that.
2         Did you measure the cracks as a part
3  of your work in this case?
4      A.  No.  Actually the entire surface was
5  cracked in many cases, so the entire surface
6  would simply come off.
7      Q.  Let's go to Page 60 of your report,
8  please.
9         This is the differential scanning
10 calorimetry?
11     A.  Calorimetry.
12     Q.  Calorimetry.  Thank you.  We've talked
13 around this a lot today.
14         Would you tell me exactly what this is
15 and what it measures?
16     A.  DSC is a technique that -- where you
17 put energy into a pan, against a standard pan in
18 the other side, and you measure the rate of heat
19 absorption or dissipation of a sample as the
20 temperature rises or drops.  You can both heat
21 and cool it.
22     Q.  Okay.  And tell me how you set out to
23 measure those things with the DSC methodology?
24     A.  Well, a portion of the sample was put
25 into the tube, into the sample pan, and then the

Page 160

1  temperature was raised in a heat cycle which is
2  listed in Table 4, heating conditions.  First
3  heat we went from minus 90C to 200C at 10
4  degrees C per minute.  Then we cooled from 200
5  back to minus 90 at 10 degrees C per minute.
6  And then we reheated a second heat from minus 90
7  to 210 degrees C per minute.
8         The first heating cycle looks at the
9  form of the material as received.  And then the
10 second heating cycle looks at the innate
11 material itself, heat history of the material
12 erased, so all the samples then go to what's
13 called a common heat history.  They may not all
14 have a common heat history in the first heat
15 cycle, but, of course, that's the way they
16 actually are in the body so that's the most
17 important one to look at is the Delta H and the
18 melting point, the first melting point in the
19 first Delta H.
20     Q.  In Table 5, did you provide data for
21 all of your explant samples?
22     A.  Let's see.  No, there's 15 samples, we
23 had 23.  So there were seven that weren't run.
24     Q.  Is there a reason why you didn't test
25 them all?

Page 161

1         MR. ANDERSON:  Objection.  Asked and
2  answered.
3         Go ahead.
4      A.  I remember we didn't need to run all
5  the samples to show the trends, number one.
6         And number two, some of these cases
7  there simply wasn't enough material to run.
8  BY MR. THOMAS:
9      Q.  Let's go to Page 66, please, the FTIR
10 microscopy.  Let's talk about what FTIR
11 microscopy is.  Tell me what that is, please.
12     A.  An FTIR microscope, FTIR instrument,
13 you radiate the sample with infrared radiation.
14 Each type of chemical bond in a molecule will
15 absorb infrared radiation at a different wave
16 length.  So when you run across a range of wave
17 lengths, typically from 4,000 reciprocal
18 centimeters to 5 or 600 reciprocal centimeters
19 you get a picture, a literal picture, to a
20 chemist anyway, a picture of the bonds in the
21 molecule that you're looking at.
22     Q.  Now, when you do FTIR analysis, do you
23 generally have a reference against which to
24 measure what you find to match up?
25     A.  That's always run with references.  We

41 (Pages 158 to 161)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 162

1   always run -- to make sure the instrument is
2   running fine, usually a polystyrene standard is
3   run to make sure all the bands come out where
4   they should come out. And then CO2 is removed
5   with a nitrogen purge so you don't have an
6   artificial CO2 peak. That's SOP. That's all in
7   the SOP.
8       Q.  Okay.  Do you then have a
9   polypropylene reference point against which to
10  compare your findings that you shoot here to see
11  how they match up?
12      A.  Well, we have polystyrene --
13  polypropylene reference spectra, so -- and we
14  run the standard polypropylene mesh, which is,
15  in fact, pure polypropylene.  So we compare
16  that.
17          Number one, the polystyrene shows the
18  instrument is behaving good, up to standard, and
19  then the polypropylene is run, it's compared to
20  a known polypropylene spectrum.  So if we were
21  to run the mesh and the peaks looked funny we
22  would have caught that.  Although that's never
23  happened, because if the polystyrene standard
24  comes out right, it's telling you the machine is
25  working normally.

Page 163

1           But even if it did for some crazy
2   reason, between the time we ran the standard and
3   the time we ran the polypropylene, we'd
4   immediately flag it because we have
5   polypropylene standard spectra around.
6       Q.  Is the goal of running the FTIR to
7   determine the extent to which what you're
8   testing matches up against what you're looking
9   for; that is, particularly here that you're
10  testing the explanted mesh to determine the
11  extent to which it's consistent with the
12  polypropylene that's supposed to be in the mesh?
13      A.  Yes.
14      Q.  And there are standards against which
15  you measure what your findings are?
16      A.  Correct.
17      Q.  And there will be a standard -- there
18  are a number of different companies that make
19  standard polypropylene spectra against which you
20  could measure your findings?
21      A.  Yes.  But we don't need that because
22  we use the spectra, or the known spectra from
23  like Sadtler Library of spectra, I will simply
24  look up what I'm getting versus a known
25  standard, and those two have to match.  If they

Page 164

1   don't match I know I've got a problem, and I
2   stop and fix it, we don't continue.
3       Q.  Believe it or not, I think we're
4   saying the same thing.
5       A.  Hopefully so.
6       Q.  I don't use the same words you do.
7       A.  If you'd like to see the standard,
8   I've got in my book over there.  I'll be glad to
9   show it to you.
10      Q.  Which standard did you use, the
11  Sadtler?
12      A.  The Sadtler.
13      Q.  I don't need to see it.
14          Do you call that a standard?  What's
15  the technical term for that?
16      A.  No, I call it a check.  It is a type
17  of -- it's part of our SOP.  But the standard is
18  the polystyrene, it's always run.
19      Q.  The Sadtler reference that you talked
20  about --
21      A.  Is polypropylene.
22      Q.  And it would be the same sort of
23  spectrum that appears on Page 67 of your report?
24      A.  Exactly.
25      Q.  And you would measure the Sadtler

Page 165

1   standard for polypropylene against what you find
2   to see if it matches what you find?
3       A.  That's right.  In other words, for
4   isotactic polypropylene, which is what Prolene
5   is, we have 841, 973, 997, and 1166 bands, those
6   are the isotactic bands.  It's a fingerprint, we
7   call it, of polypropylene, and particularly of
8   isotactic polypropylene.
9       Q.  Do you know of any polypropylene
10  standards that have a spectra for oxidized
11  polypropylene?
12          MR. ANDERSON: Objection.
13          Go ahead.
14      A.  I've seen them.
15  BY MR. THOMAS:
16      Q.  Did you attempt to -- where did you
17  see them?
18      A.  The Sadtler Library.  There's a
19  chapter on polypropylenes, and some of them are
20  oxidized and some aren't.
21      Q.  Okay.  Have you read about FTIR
22  spectra for oxidized polypropylene?
23      A.  I've just seen them in the Sadtler
24  Library.
25      Q.  Did you consider utilizing spectra for

42 (Pages 162 to 165)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 166

1  oxidized polypropylene when you conducted your
2  FTIR analysis in Lewis and Batiste?
3      A.  No.  I used more of the literature,
4  the Clavés, the Ostergards, and Wood, the
5  current Wood paper and others.  They all run
6  infrared of polypropylene.
7      Q.  Why didn't you use the standards which
8  have oxidized polypropylene against which to
9  measure your findings?
10     A.  Well, those were -- those were bulk
11 polypropylenes, this is fiber.  So I didn't
12 really have any fiber standard spectra to use
13 anyway.  So I guess I could have used them,
14 wouldn't have hurt, wouldn't have made any
15 difference, I don't think.
16     Q.  Why not?
17     A.  Because I already had them from the
18 other literature.
19     Q.  But you are measuring something
20 different with oxidized polypropylene than you
21 are with regular polypropylene by your own
22 definition, correct?
23     A.  Right.  As shown in the literature I
24 already have.
25     Q.  The literature you're talking about is

Page 167

1  Clavé?
2      A.  Yeah, Clavé and there's others.  Wood
3  is another one, that's 2013.
4      Q.  Is that contained in your report?
5      MR. ANDERSON:  Yes.
6      A.  I think so.
7  BY MR. THOMAS:
8      Q.  May I see that, please?
9      A.  Sure.  If you want, I'll make you a
10 copy.
11     Q.  We'll take care of that later.
12     Just for the record, this is the
13 Journal of Material Science, 2013, 24:1113-1122,
14 A.J. Wood, "Materials Characterization,
15 Historical Analysis of Explanted" -- I've seen
16 this before -- "Polypropylene PTFE and PET
17 Hernia Meshes."
18     You're referring to the FTIR spectra
19 on Page 1117, is that correct?
20     A.  Yes, sir.
21     Q.  And 1118?
22     A.  Yes, that's part of the paper.
23     Q.  So you relied on this rather than the
24 standards in Sadtler or others that may have
25 FTIR spectra for oxidized polypropylene,

Page 168

1  correct?
2      MR. ANDERSON:  Objection.  Form.
3      Go ahead.
4      A.  I certainly could have used those.  I
5  don't see it makes any difference.  I'm using
6  published literature, recent published
7  literature here, so I feel very safe.  I mean I
8  could have used the Sadtler Library, sure.
9  BY MR. THOMAS:
10     Q.  Well, if the Sadtler Library gave you
11 a different result, you'd be concerned, wouldn't
12 you?
13     A.  But it's not going to.  I'm confident
14 sitting here it's not going to give me a
15 different result.  I'll go get the spectra and
16 show you, glad to.
17     Q.  The range of absorption regions
18 identified by you as being indicative of
19 oxidation are 1730 to 1680, is that correct?
20     A.  Right.  That would include acids
21 around 1700, ketones around 16 -- 1710, 15, and
22 then aldehydes around 1730, esters around 1740.
23     Q.  Do you have anything -- did you find
24 anything in your FTIR analysis of evidence of
25 oxidation in the range of 1730 to 1680?

Page 169

1      A.  It was covered up by the protein that
2  was in the coating, or part of -- I guess you
3  could say coating the fiber pieces.
4      Q.  So is the answer no?
5      A.  The answer is no.
6      Q.  Now, when you run these FTIR samples,
7  you set the machine, the machine reads it, and
8  then the machine is what identifies those areas
9  that are significant and calls them out with
10 numbers, is that right?
11     A.  The frequencies of each band, yes, the
12 machine calls out, yes.
13     Q.  The frequencies of each band?
14     A.  Yes.
15     Q.  So the numbers that appear, for
16 example, on Page 69, along with the spectra
17 there, those numbers are placed there by the
18 machine based upon your calibration of the
19 machine about what's significant.  Is that fair?
20     A.  Well, it's simply identifying -- the
21 machine identifies the peaks and labels the
22 numbers.  I have to interpret what it means.
23     We also have -- the computer these
24 days can make estimates and look for matches,
25 too.

43 (Pages 166 to 169)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 170

1     Q.  Okay.  On Page 69, you've identified
2 this area at 1757 as being significant, is that
3 right?
4     A.  Right.  There's also another region
5 I'd like to mention, it's a little bit subtle,
6 is that shoulder that's at the base of the 1656
7 peak, towards the left side of it, that would be
8 the 1740.  The machine didn't pull it out
9 because there's not a baseline, not a valley in
10 there for it to see.  The machine requires a
11 valley to see.  But the human eye can see it.
12     Q.  I see.
13         So that shoulder is something --
14     A.  That's the 1740.
15     Q.  -- that the machine didn't find, but
16 you find?
17     A.  Right.  The human brain can still be a
18 machine occasionally.
19     Q.  I see.
20     A.  And if I had taken this sample and
21 treated it with sodium hypochlorite, for
22 example, then we would have gotten rid of the
23 1656 and the 1541 bands, which are the protein
24 bands, because we have destroyed the protein or
25 the biofilm that was part of the particle or

Page 171

1 coating the particle, the bulk of which was
2 polypropylene.  And then I would have seen only
3 polypropylene, what's left.
4         This figure that's shown here
5 represents -- keep in mind the carbonyl bands
6 are much stronger than alkyl bands.  So the fact
7 that they're roughly the same size suggests to
8 me that this material, as I'm looking at it
9 here, is about 75 percent polypropylene and
10 25 percent protein, thereabouts, plus or minus a
11 little.  And it's oxidized, because I have the
12 1740 and the 1757.  And there may be a 1730 and
13 a 1715 that I can't see because it's buried
14 under the 1656 band, which I could see if in the
15 future we choose to do any more -- like sodium
16 hypochlorite.
17     Q.  Page 72.  "Molecular weight is often a
18 crucial factor in determining material
19 properties."
20         Did I read that correctly?
21     A.  Yes, you do.
22     Q.  What is molecular weight?
23     A.  It's really a measure of the number of
24 repeat units in a given polymer molecule.
25 Monomer is the starting material, usually a

Page 172

1 liquid or gas, in the case of polypropylene, and
2 then as they monitor units, fuse together, the
3 chains become longer and longer, and then you
4 have eventually a polymer -- generally the start
5 of what we call a polymers around, it's a bit of
6 a range, but we generally consider anything
7 above 2000-ish molecular weight of daltons to be
8 a polymer, albeit a very low molecular weight
9 polymer.  Most commercial polymers are hundreds
10 of thousands to millions.
11     Q.  Of what significance to molecular
12 weight is a breakdown of the polypropylene
13 polymer, a change in the polypropylene polymer,
14 will it change the molecular weight?
15         MR. ANDERSON:  Objection to form.
16         Go ahead.
17     A.  I'm sorry, can I rehear it again?
18 BY MR. THOMAS:
19     Q.  The polypropylene polymer is broken,
20 the chain is broken.
21     A.  Okay.
22     Q.  Will that change the molecular weight?
23     A.  It will lower it.
24     Q.  Page 80.  After doing your analysis,
25 you conclude in your scientific opinion that

Page 173

1 "The control and explant samples do not show a
2 significant difference in molecular weight."
3         Correct?
4     A.  That's correct.
5     Q.  Doesn't that mean that there's no
6 evidence in your molecular weight analysis that
7 polypropylene is degrading?
8     A.  It might seem so at first
9 consideration.  But remember, the only part of
10 the polymer that seems to be degrading based on
11 the SEM photos is the surface.
12         So GPC is a bulk technique, I had to
13 dissolve the inside undamaged region as well as
14 the broken pieces, but I get one sample.  The
15 total mixture dissolved.
16         So number one, the effect of the
17 damaged surface -- my point here is I think if
18 we could measure the surface we would see a loss
19 in molecular weight, but I had no way to get
20 enough pieces to measure the molecular weight of
21 only the surface pieces like I did for the
22 infrared spectra.
23     Q.  Aren't you speculating what you find?
24     A.  I am.
25     Q.  Until you have the opportunity to test

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 174

1  as you've described, the fact that your
2  molecular weight testing does not show a
3  significant difference in molecular weight
4  suggests that there's no degradation of the
5  polypropylene. That's the best scientific
6  conclusion you can reach in this data, isn't
7  that true?
8      A.  It's one of the conclusions, yes.
9      Q.  It's --
10     A.  It's not the only one.
11     Q.  It's fair to say -- okay.
12         Now, has Jordi Labs analyzed
13  polypropylene mesh for other manufacturers?
14     A.  I don't run the day-to-day operations
15  anymore, so I would have no way to answer that
16  question. I don't know what has come in.
17     Q.  Do you know?
18     A.  I do not know.
19     Q.  Do you know whether Jordi Labs
20  analyzed Bard mesh that was at issue in the West
21  Virginia litigation?
22     A.  I don't know.
23     Q.  Do you know whether Bard mesh has
24  antioxidants in it?
25     A.  I haven't been requested to analyze,

Page 175

1  so I don't know.
2      Q.  Do you know whether Bard mesh loses
3  its molecular weight upon testing?
4      A.  I haven't seen the Bard mesh, so no.
5      Q.  You've not seen the work that Jordi
6  Labs did for Plaintiffs in the Bard litigation
7  where they -- where Jordi Labs, your company,
8  testified the Bard mesh without antioxidants had
9  showed a loss in molecular weight, is that true?
10         MR. ANDERSON: Objection to form.
11  Assumes facts not in evidence.
12     A.  Say again?
13  BY MR. THOMAS:
14     Q.  You've not seen the work that Jordi
15  Labs did for Plaintiffs in the Bard litigation
16  where they, where Jordi Labs, your company,
17  testified the Bard mesh without antioxidants
18  showed a loss in molecular weight?
19         MR. ANDERSON: Same objections.
20     A.  I'm unaware. I don't know.
21         MR. THOMAS: Are you saying it didn't
22  happen?
23         MR. ANDERSON: I'm saying the way you
24  asked this question, the way you posited it as
25  something that's true rather than asking him if

Page 176

1  he knows it is an inappropriate form of a
2  question.
3      MR. THOMAS: Okay.
4      MR. ANDERSON: If you think somebody
5  from Jordi Labs testified there, then I think
6  that would differ from reality.
7      MR. THOMAS: I wasn't talking about
8  Jordi Labs testifying.
9      MR. ANDERSON: That's what it says.
10     MR. THOMAS: Got you.
11  BY MR. THOMAS:
12     Q.  Dr. Jordi, are you aware that Jordi
13  Labs conducted analysis on Bard mesh for use by
14  the Plaintiffs in the Bard mesh litigation?
15         MR. ANDERSON: Objection. Asked and
16  answered.
17     A.  I am not.
18  BY MR. THOMAS:
19     Q.  If Jordi Labs had analyzed
20  polypropylene mesh used for pelvic floor
21  implants and found a loss of molecular weight in
22  that mesh, would that be relevant to your
23  opinions in this case?
24         MR. ANDERSON: Objection.
25         Go ahead.

Page 177

1      A.  I don't have enough information from
2  just that question to answer it. I'd have to
3  know what the antioxidants were, what the levels
4  were, and so on.
5  BY MR. THOMAS:
6      Q.  Okay. Are you suggesting by your
7  testimony in this case that the polypropylene in
8  the Ethicon mesh depolymerizes?
9      A.  In the Ethicon mesh?
10     Q.  Yes.
11     A.  It obviously hasn't depolymerized if
12  the molecular weight is the same.
13     Q.  So you're not testifying that it's
14  depolymerized?
15         MR. ANDERSON: Objection.
16     A.  No. What I think is going on is two
17  effects. I think we have an oxidative
18  phenomenon, which I can show you in my report --
19  I have the report in here somewhere. I can find
20  it quick.
21         (Witness reviewing document.)
22     A.  Page 6, it's possible to have -- R
23  prime is the radical form of polypropylene. So
24  if you get two radical polypropylene molecules
25  that physically couple, that will double the

45 (Pages 174 to 177)

c4e16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 178

1  molecular weight initially.  It's degradation,
2  but it's actually going to increase the
3  molecular weight.  At the same time we've got
4  beta scission going on, which is decreasing
5  molecular weight.  And initially the two effects
6  can more or less cancel out, and you don't see a
7  net change.
8          Eventually yes, it will depolymerize,
9  but apparently this material hasn't gone that
10  far.
11  BY MR. THOMAS:
12      Q.  It's the same across every sample that
13  you tested?
14      A.  Yes, in this case, in this particular
15  set of samples it was.
16      Q.  And it's the same with the Burkley
17  seven year dog study?
18      A.  Yes.  That's what Dan Burkley said,
19  yes.
20      Q.  Every time you've tested the molecular
21  weight of Ethicon's mesh or gone back and
22  retested the molecular weight of Ethicon's mesh,
23  the molecular weight hasn't changed in a
24  significant manner?
25      A.  No, we don't see it -- it's true, we

Page 179

1  do not see a --
2      Q.  As a matter of fact, there's never
3  been a time where you've analyzed Ethicon mesh
4  used in these TVT products that shows a change
5  in molecular weight?
6          MR. ANDERSON:  Objection.  Asked and
7  answered.
8          But answer it again.
9      A.  That's true.  That's correct.
10  BY MR. THOMAS:
11      Q.  Dr. Jordi, during lunch I was provided
12  with invoices from your office to Mr. Anderson.
13  I'll read these into the record, if you don't
14  mind.
15      A.  That's fine.
16      Q.  Do you want me to do it so you can see
17  so I do it right?
18          MR. ANDERSON:  What are you trying to
19  point out, just amounts?
20          MR. THOMAS:  Just the dates and
21  amounts.
22  BY MR. THOMAS:
23      Q.  On August the 12th, 2013, invoice
24  7783, for $11,250.
25          August the 28th, 2013, invoice number

Page 180

1  7846, amount of $5,000.
2          Invoice number 7881 on September 11,
3  2013, in the amount of $100,418.74.
4          Invoice number 7882 dated
5  September 11, 2013, in the amount of $13,980.42.
6          Invoice 7883, dated September 11,
7  2013, in the amount of $203,470.
8          Invoice number 7918 dated
9  September 23rd, 2013, in the amount of $45,375.
10          Invoice number 7882 dated
11  September 11, 2013, in the amount of $13,980.42.
12          Invoice number 7884 dated
13  September 11, 2013, in the amount of $6,122.94.
14          Invoice number 7984 dated October
15  the 10th, 2013, in the amount of $28,130.
16          And invoice number 8035 dated
17  October 28, 2013, in the amount of $28,876.05.
18          To the best of your knowledge, is that
19  the total of the billing that you've made in
20  connection with your work in this case?
21      A.  To this point, yes.  There's no other
22  bills.  I'm sure there will be another one
23  coming.
24      Q.  Obviously in your work in this case
25  you've analyzed a number of different explant

Page 181

1  samples?
2      A.  Correct.  23; 24 with Batiste.
3      Q.  Are you able to tell from these
4  invoices the extent to which your work has
5  focused on the Carolyn Lewis case, or is all of
6  this for the Carolyn Lewis case?
7          MR. ANDERSON:  I'm not sure I
8  understand the question.  It could be more legal
9  in nature, so due to that I will object.
10  BY MR. THOMAS:
11      Q.  Are you able to look at these bills
12  and tell me the extent to which you worked on
13  the Lewis specific matter, for example, perhaps
14  the time when you received the Lewis explant
15  separate and apart from the others that you
16  analyzed, and determine the cost that you
17  incurred in analyzing the Lewis explant?  I
18  don't know if you can or not.
19          MR. ANDERSON:  I'm just going to
20  object to the form, because I think you've mixed
21  two different things.  One is you're asking how
22  much of the work was case specific, and he's a
23  general expert as well as looking at the
24  specific explant of Ms. Lewis.
25          So if you want us to look at the bill

46 (Pages 178 to 181)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 182

1   and see just how much the cost was of the
2   testing and the analysis for just Lewis, we will
3   try to do that. But to mix that up and to say
4   how much of the cost related to just Ms. Lewis,
5   as you know at the trial he's going to be
6   talking about all of these things.
7        So I just want to make sure we're on
8   the same page and that's clear, because your
9   question was not.
10       MR. THOMAS: Thank you. I thought my
11  question was clear, but that's good.
12  BY MR. THOMAS:
13       Q. Can you tell me the extent to which --
14       MR. ANDERSON: We agree to disagree.
15       MR. THOMAS: I understand. I'm going
16  to try to ask the question better now.
17  BY MR. THOMAS:
18       Q. Can you look at these invoices,
19  Dr. Jordi, and tell me about the Lewis specific
20  analysis that you did, and the cost of that?
21       MR. ANDERSON: We'd have to get more
22  material to be able to do that. We tried to
23  bring everything in here to be able to do that,
24  we've got lab notebooks to when those days would
25  be as opposed to the billing. The problem is

Page 183

1   the billing is through a time period, so we'd
2   have to try to look and match up the time period
3   in the lab notebook to when it was received with
4   the time period on the invoice. We're happy to
5   take the time to try to do that.
6        MR. THOMAS: I'd like to use my time
7   better than that.
8        I'm going to mark these invoices
9   collectively as Exhibit Number 5.
10       MR. ANDERSON: Sure.
11       (Whereupon, Jordi Exhibit Number 5,
12       Group of invoices from Jordi Labs, was
13       marked for identification.)
14  BY MR. THOMAS:
15       Q. Dr. Jordi, what are your opinions with
16  respect to the mesh explant of Carolyn Lewis?
17  If you're going to your report, tell me where
18  you're going, please.
19       A. As soon as I get there and find
20  something, I will.
21       Page 71. So that's the infrared, one
22  of the shards from Carolyn Lewis. Sample 13674
23  showing carbonyl band highlighted there in
24  yellow.
25       There's a second shoulder you can see

Page 184

1   there next to it. That would be the 1740.
2        Q. Let's go one at a time.
3        The first one you said a minute ago,
4   the carbonyl band where?
5        A. Around 1759. Some of these, there's
6   no valley there, so the machine didn't actually
7   label it. If you go to the next page, 72, it's
8   very similar, you'll see there it does have a
9   slight valley, so the machine calls it 1761. I
10  think we showed another one that was 1757. It's
11  in that region, all of them.
12       Q. Is there any discussion in your report
13  anywhere, specifically text, about your findings
14  with respect to Carolyn Lewis?
15       MR. ANDERSON: You mean in one place?
16       MR. THOMAS: Anywhere.
17  BY MR. THOMAS:
18       Q. About "this is what I find wrong with
19  Carolyn Lewis based on this analysis."
20       MR. ANDERSON: He's pointing to one
21  right now. I don't understand.
22       MR. THOMAS: I understand that, Ben.
23  BY MR. THOMAS:
24       Q. Do you explain anywhere --
25       A. I explain the principles in the

Page 185

1   conclusions. It applies to all the explanted
2   samples, including Carolyn Lewis, but not
3   specifically Carolyn Lewis.
4        Q. Okay. So there are no specific
5   opinions in your report that relate to Carolyn
6   Lewis, is that fair?
7        MR. ANDERSON: Objection to form.
8        THE WITNESS: Answer?
9        MR. ANDERSON: You can answer.
10       A. Not that I -- no.
11  BY MR. THOMAS:
12       Q. Okay. So it's correct that there are
13  no specific opinions to Carolyn Lewis in your
14  report, correct?
15       MR. ANDERSON: Objection.
16       A. Well, there are.
17       MR. ANDERSON: That's unfair.
18       Go ahead.
19       A. There are, because it's the photos.
20  You want it text, but it's in the presence of
21  the printed results.
22  BY MR. THOMAS:
23       Q. Okay. But you don't describe anywhere
24  in your report what, for example, Figure 81
25  means to you in your interpretation, correct?

47 (Pages 182 to 185)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 186

1      A.  I describe in general what all these
2  figures like this mean.  So if it's a carbonyl
3  for Carolyn Lewis, or it's a carbonyl for any of
4  the other explants, it's the same meaning.
5      Q.  I see.
6      So when you point out this shoulder on
7  Page 71 in Figure 81 that's not marked in any
8  way, that's something that you see on the
9  drawing, that you're the one who identifies that
10  and can only testify to that because you can see
11  it; fair?
12      MR. ANDERSON:  Objection to the form
13  of the question.
14      Go ahead.
15      A.  Well, due to my experience reading
16  FTIRs, yes, I can see it.  Anyone else with
17  equivalent experience would see it, too.
18  BY MR. THOMAS:
19      Q.  Well, I'm lawyer and a history major,
20  would you expect me to be able to figure that
21  out?
22      MR. ANDERSON:  No comment.
23      A.  No comment.
24  BY MR. THOMAS:
25      Q.  Okay.  Certainly not apparent to

Page 187

1  somebody without your training as to what is
2  shown in Figure 81.  Would you agree with that?
3      A.  Without training, none of us could
4  read an infrared.  We all have to learn it.
5      Q.  What else do you have specific in your
6  report to Carolyn Lewis?
7      A.  Well, see if I can find the SEM and
8  the SEM-EDX.  See if we can find the SEM.  We
9  can just work our way through.
10      Page 48 is the SEM.
11      Q.  Okay.  Let's stop there.
12      On Page 48 you have Figure 59, and
13  that's -- what does that represent?
14      A.  That's the tissue with the mesh
15  imbedded in the tissue.
16      Q.  Okay.
17      A.  And then the picture 60 is of the
18  actual region that they were -- we were able to
19  get -- I was able to a photo micrograph of
20  the fiber.
21      Q.  Do you know which part of Figure 59 is
22  depicted in Figure 60?
23      A.  No, not specifically.
24      Q.  What is it about Figure 60 that
25  suggests to you that there's degradation in the

Page 188

1  Carolyn Lewis mesh?
2      A.  The cracking.
3      Q.  That's the perpendicular cracking?
4      A.  The perpendicular cracking.  And then
5  we also have a parallel flaking which you can
6  see at the top, at the bend where it goes --
7  particles getting ready to come off.  And
8  there's also tissue on top of that.
9      Q.  Now, is this the portion of the mesh
10  that you tested with FTIR analysis?
11      A.  It is not.
12      Q.  Okay.
13      A.  Remember, we didn't want to cause any
14  stress or strain on these meshes, so we simply
15  sent it imbedded in tissue.  For the IR you must
16  remove the tissue in order to get the spectrum.
17      Q.  Okay.  What else do you have for
18  Carolyn Lewis?
19      A.  Okay.  SEM-EDX, let's find that chart.
20  58, Page 58.
21      Q.  On Figure 71, you have -- is that a
22  different image still than the one that was on
23  48?
24      A.  Yeah.  It is, yes.
25      Q.  All right.  And the J8041 means what?

Page 189

1      A.  That's the job number.
2      Q.  Okay.
3      A.  13674 is sample number.
4      Q.  And what does this show you?
5      A.  The boxes are the regions that were
6  tested.  So like Spectrum 3, if you go down to
7  the -- you can see the pink box at the top for
8  Spectrum 3, right?  Now, if you go down below
9  you'll see in yellow Spectrum 3, upper right
10  corner of the bottom box.
11      Do you see that?
12      Q.  Yes.
13      A.  That's just telling you that the
14  yellow spectrum is this region of the specimen,
15  region 3.  And so you'll see you have a peak, a
16  fairly large peak for oxygen, a huge peak for
17  carbon, sodium, aluminum which is just a sample
18  pan that doesn't mean anything, phosphorus and
19  sulfur are at fairly large peaks on this region
20  of the spectrum.
21      Now, that's the cracked region, and
22  has a large amount of oxygen.  But we also
23  thought that the cracked region also, well,
24  uniformly showed higher oxygen levels, but it
25  also showed higher, many times, phosphorus and

48 (Pages 186 to 189)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 190

1  sulfur levels.  So that could mean phosphate and
2  sulfate which also contain oxygen, so the
3  increased oxygen in that region could have been
4  from buffers as well as just literally the
5  oxidation type oxygen.
6       So you want to go to region of the
7  polymer that wasn't cracked, there's Spectrum 4.
8  And that is the red one.  It's hard to read in
9  the picture but it's -- the red is Spectrum 4.
10  Now you see -- you still see an oxygen peak,
11  although it's lower in the Spectrum 3, but now
12  the sodium is almost totally gone, and the
13  phosphorus and sulfur are basically gone
14  completely.
15       So what this is telling me is even in
16  the non-cracked region, I have a higher than
17  baseline level of oxygen.  If you want to see
18  that in another --
19       Q.  Before you do that, may I ask you
20  another question?
21       A.  Sure.
22       Q.  I don't want to interrupt you.
23       A.  Go ahead.
24       Q.  Spectrum 4 shown in red, are you
25  suggesting that what you're testing in Spectrum

Page 191

1  4 is pure polypropylene?
2       A.  Yes.
3       Q.  Okay.  Without any kind of
4  contamination at all?
5       A.  We got away from the -- you can see
6  this white material here, which would be the
7  polypropylene -- which would be tissue.
8       Q.  Okay.
9       A.  Which you might call biofilm.  We'll
10  have to agree to disagree or agree to agree and
11  use both terms interchangeably.  So I wanted to
12  get away from that as much as possible, so we
13  ran a cleaner spectra -- cleaner region that
14  didn't have cracks in it.
15       Now, when I look at this, I see this
16  cracked material in many places is flaked off.
17  You can see the edge over here on the right
18  where the piece has actually come off and it's
19  gone.  You can see the edge where it was.  And
20  the same is true on the other side.  But on this
21  left side of it, it's clean.  And then left of
22  it up there's really nothing but straight --
23  pretty much straight clean-ish polypropylene.
24  So we ran a spectrum of that, and we still saw
25  increased oxygen.  But no increased phosphorus

Page 192

1  or sulphur.  That is the increased oxygen that I
2  call oxidation.
3       Q.  Okay.  Again, so Spectrum 3 is meant
4  to be testing the oxidized polypropylene,
5  correct?
6       A.  Right.  That's why we ran it there
7  first.
8       Q.  Spectrum 4 is designed to testify --
9  excuse me.
10       Spectrum 4 is designed to test what
11  you believe to be clean polypropylene?
12       A.  Let's phrase it this way.
13       Not yet degraded.  Not yet cracked.
14  But I didn't know whether -- if it has increased
15  oxygen in it, that means it's on its way to
16  cracking.
17       What I believe is happening is layer
18  after layer after layer of this stuff is going
19  to crack depending on the implantation time.
20  The first layer is going to go quickest because
21  it's -- remember the outer layer is less
22  crystalline, remember the paper I showed you
23  earlier, and so it's going to go first.  And
24  when it peels off, as some of it's flaked off
25  here, then we expose more underlying fresh

Page 193

1  surface, which then begins to itself oxidize as
2  reflected in the increased oxygen even in that
3  region, which is the red peak for oxygen.
4       Q.  What is Spectrum 2?
5       A.  We just didn't show it.
6       Q.  Did you run the data?
7       A.  Yeah, I could show it.  I could get
8  it.  I don't have it with me.
9       Q.  It's not in your report?
10       A.  It might be.  Do you want to see if I
11  can find it?
12       Q.  Just curious, yes.
13       A.  Glad to try.  If we don't have it, we
14  certainly can get it.
15       Q.  It won't be in the controls, will it?
16       A.  That doesn't mean anything, because
17  I've got -- this is LCMS.  It's not in exact.
18       Here we go.  Now I've got --
19       (Witness reviewing document.)
20       MR. ANDERSON:  We'll go off the record
21  while we're looking.  Is that okay with you,
22  Dave?
23       MR. THOMAS:  Yes.
24       (Off the record discussion.)
25       (Whereupon, a recess was taken from

49 (Pages 190 to 193)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 194

1      2:47 p.m. to 2:53 p.m.)
2      A.   He's got a box on the Spectrum 2 so
3  I'm almost sure it's run, so we'll just have --
4  if you want that spectrum, I don't see it in
5  the -- number one, the reason it's not there is
6  because it's also on a cracked region just like
7  Spectrum 3 is, so what it's going to look like
8  is the higher -- the one in yellow, it's just a
9  duplicate of the one in yellow.
10 BY MR. THOMAS:
11     Q.   I understand, Doctor.  So for reasons
12 I'm sure you understand, I'd like to have a copy
13 of it.
14     MR. ANDERSON:  Yes.
15 BY MR. THOMAS:
16     Q.   Just so the record is clear, you've
17 searched your files that you brought with you --
18     A.   I can't find it.
19     Q.   -- and you're unable to find the
20 Spectrum 2 data that appears on Page 58 of
21 Exhibit 1?
22     MR. ANDERSON:  Is that correct?
23     A.   That's correct.
24 BY MR. THOMAS:
25     Q.   Thank you.

Page 195

1      Okay.  We were talking about evidence
2  that you had specific to Carolyn Lewis.
3      A.   So the net result here is that we have
4  oxygen in the clean looking, undegraded looking
5  region of the fiber that's under the cracked
6  region suggesting that it's beginning to oxidize
7  as well, but it's not enough yet that it's
8  actually cracked.
9      Q.   Okay.
10     A.   So we'll go to DSC.
11     Okay.  So the first thing you do is
12 look at Table 5, then look at the heat effusion.
13 First heat is 69.77 joules per gram.
14     Do you see that?
15     Q.   No.
16     A.   Table 5, last entry in the table,
17 under heat effusion for TM.
18     Q.   What page are you on?
19     A.   Page 63.
20     Q.   I'm sorry, I was on 62.
21     A.   Go up.  First table, Table 5.
22     Q.   Okay.
23     A.   Last line of that table, and then the
24 middle entry is 69.77.
25     Q.   I have that.  That's on Page 63 at the

Page 196

1  bottom of Table 5 for sample ID number 13674.
2      A.   Correct.  So -- and now we compare
3  that with the first heat effusion for the
4  control samples, you can see that they range
5  from 93, 79, 82, 86.  Table 7 probably says it
6  best.  We do -- for the samples, we had a couple
7  samples that didn't show any cracking on the
8  average of -- FLP for those samples was 86.6
9  kilograms per gram -- or joules per gram, sorry.
10 And moderate cracking at 81.2, and highly
11 cracked at 75.1.  And here we're at 69.77, so
12 we're in that highly cracked region in terms of
13 this measurement.
14     Q.   Does this DSC testing that you did,
15 which you used to suggest that this is evidence
16 of oxidation, does this also capture the extent
17 to which there are any impurities in the sample?
18     A.   I would say, number one, it doesn't
19 necessarily correlate with oxidation, although
20 it could.  But it also correlates with possible
21 stress cracking.
22     Q.   Okay.
23     A.   Because there's less crystallinity.
24     Q.   Let me ask this question again.
25     You are using this DSC data to suggest

Page 197

1  that the lower melting point reflects either
2  oxidation or stress -- environmental stress
3  cracking.  Does it also capture any impurities
4  that may have been in the sample?
5      A.   If there were impurities in the
6  sample, they would also tend to lower the melt
7  point.
8      Q.   Okay.  Are you able to tell from this
9  DSC testing the extent to which the values
10 reflect oxidation, environmental stress
11 cracking, as opposed to impurities?
12     A.   No.
13     Q.   All right.  Now, what is it about
14 Ms. Lewis's values that suggest to you that
15 there's oxidation or environmental stress
16 cracking going on?
17     A.   The value of her heat effusion is very
18 low, 69.77.
19     Q.   And you're unable to tell me the
20 extent to which that is oxidation and
21 environmental stress cracking as opposed to
22 impurities?
23     A.   Well, I don't think -- we're not
24 talking about oxidation, we're talking about
25 environmental stress cracking.  They're two

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

<table>
<tr><td>

Page 198

1  different, totally different mechanisms for
2  degradation of the polymer.  Both are
3  degradation, but one is physical mechanical
4  degradation where the chains are forced to part
5  and they crack, and the other is actual literal
6  oxidation.  They're different.
7        Q.  Let me ask the question different,
8  because that wasn't what I was trying to get at.
9        It's fair to say you don't know the
10 extent to which impurities in the test sample
11 may have contributed to the low heat effusion
12 values for Carolyn Lewis as reflected on Table 5
13 on Page 63, correct?
14       A.  Correct.
15       Q.  Thank you.
16       What else do you have for Ms. Lewis?
17       A.  FTIR.  Page 71, Figure 81, Figure 82.
18 We have, again, the carbonyl that are 1760
19 and another one around -- the shoulder is about
20 1740, that's under that large 1653 amide 1 band.
21       Q.  Okay.  Let me stop you here for a
22 second.
23       Figure 81 says "Microscopy images
24 showing particles recovered from explant sample
25 13674 (particle 1)."

</td><td>

Page 200

1  Table 18, Page 92.  The control samples showed
2  anywhere from 71 million counts to 92 million
3  counts.  In this case, we also ran formalin
4  treated control samples which showed levels that
5  were right in the middle of the controls, some
6  were higher, some were lower, fit the normal
7  range for controls, indicating formalin didn't
8  extract the lauryl thiodipropionate.
9        So the level for Ms. Lewis was 611,000
10 compared to 80 million, so it's about in the 2
11 percent range left for the lauryl
12 thiodipropionate antioxidant compared to the
13 controls, and the formalin controls.
14       Q.  Okay.  Let's talk about Page 92 for a
15 minute.
16       Here you have control samples again?
17       A.  Right.
18       Q.  Why do you do a duplicate control like
19 you do on 3422128?  Do you have do that as a
20 test?
21       A.  Yes.  A test to see how reproducible
22 the material itself might be.
23       Q.  Okay.  Or how reliable your test might
24 be?
25       A.  Well, I suppose that's another way to

</td></tr>
<tr><td>

Page 199

1        How many particles did you remove from
2  Ms. Lewis's explant?
3        A.  Didn't count them.  Lots.  The surface
4  sluffs off.
5        Q.  Did you analyze any others?  This is
6  noted as particle 1.  That suggests to me that
7  there are others that are identified?
8        A.  Right.
9        No.
10       Q.  No what?  No, you don't know, or no --
11       A.  No, it wasn't the only one analyzed.
12       Q.  Do you still have the others?
13       A.  I don't know.  I have to check.
14       Q.  Was it your practice to keep those
15 things following an experiment like this?
16       A.  If there was anything to keep, yes.
17 It was very, very minimal samples here.
18       Q.  Are you able to tell me how many
19 particles there are --
20       A.  No.
21       Q.  -- from Ms. Lewis's sample?
22       A.  I'm not.
23       Q.  Anything else from Ms. Lewis?
24       (Witness reviewing document.)
25       A.  The amount of lauryl thiodipropionate,

</td><td>

Page 201

1  look at it.
2        Q.  And --
3        A.  But we ran standards, and we get the
4  same -- we make the injection standards twice,
5  we get the same area, so that's not --
6        Q.  My point being is that for control
7  sample 3422128, you've got 71,633,460, and then
8  you test exactly the same mesh in a different
9  place in the mesh in the duplicate control and
10 you get 96 thousand 522 --
11       A.  96 million, yes.
12       Q.  Thank you.
13       -- 96,522,909, which is about
14 40 percent more than your other control.
15       A.  We could be extracting regions of the
16 mesh that have flaked off the polypropylene that
17 we see flaked off in the IR, and what we're
18 extracting here is a residual, call it clean
19 mesh.
20       Q.  You don't know why there's a
21 40 percent difference in the test of the same
22 mesh?
23       A.  No.  But I would suspect there's a
24 change in the mesh, either because the mesh
25 itself isn't uniform, or because maybe it's

</td></tr>
</table>

Howard C. Jordi, Ph.D.

Page 202

1   because the polypropylene, the cracked
2   polypropylene is gone in that region at that
3   point, and we are just extracting the enriched
4   area only.
5        Q.   Okay.
6        A.   I think that would easily account for
7   that difference.
8        Q.   But do you have a scientific
9   explanation for the reasons why the same piece
10  of mesh tests differently by some 28 million
11  DAs?
12       MR. ANDERSON:  Other than what he just
13  testified to?
14  BY MR. THOMAS:
15       Q.   Scientific explanations or reasonable
16  scientific certainty, do you have the answer to
17  the question?
18       A.   I think I just gave it, my estimate of
19  the --
20       Q.   Is that your opinion to a reasonable
21  degree of scientific certainty what happened, or
22  are you just positing it as something you need
23  to test?
24       A.   I think it's reasonable, yes.
25       Q.   Reasonable degree of scientific

Page 203

1   certainty, is that the answer to the problem?
2        A.   Yes.  I think it's reasonable degree
3   of scientific certainty with this one.  Because
4   we didn't extract -- the formalin didn't do
5   anything to the polymer in this case, showing me
6   it's not coming out of the polymer -- at least
7   the formalin isn't able to extract it out of the
8   polymer because you're right in the heart of the
9   average.
10       Q.   Well, if you look at 3405405, the
11  control is 79, and the formalin control is 10
12  million less, isn't it?  And the same with
13  3422128, you've got 96,522,000, and the control
14  was 17 million less, isn't it?
15       A.   Do you have any idea, though, what --
16  how the ratios are working out here?  You're
17  talking about a 20 percent change down here, and
18  I'm talking about a 100-fold change up above.
19       Q.   I know that.
20       A.   It's irrelevant.
21       Q.   Except we don't know how long these
22  mesh explants were in formalin, do we?
23       A.   We put these other ones in formalin
24  and nothing happened.
25       Q.   For two days, right?

Page 204

1        A.   True.
2        Q.   Okay.  Anything else on Carolyn Lewis?
3        A.   I think we've pretty well covered it.
4             I think I can show you -- well, one
5   other thing that might be of interest if we look
6   at Table -- go back and look at that table for a
7   minute longer, and just pick arbitrarily 13411,
8   it has 12 million area counts for --
9        Q.   What page are you on, please?
10       A.   Same page, 92.
11       Q.   I put mine away.  I have to figure out
12  the pages.
13       A.   Okay.
14       Q.   Okay.
15       A.   So now that's a relatively higher
16  level than any of the others, isn't it, for the
17  antioxidants, so what would I expect to see?  I
18  would expect to see less cracking in that sample
19  if I went back and my theory is right, my
20  scientific opinion is right.  So let's go look
21  at the SEM photograph for 13411, which will be
22  the actual degree of cracking, and just see if
23  it correlates or not.
24       Q.   What page is it?
25       A.   I'm looking.  I'm getting close.  It's

Page 205

1   37.
2        Q.   Page 37?
3        A.   Right.  I would expect to see a low
4   degree of cracking due to the high level of
5   antioxidant still there, and there it is.  It's
6   minimally cracked.
7        Q.   That's the one photo you have of all
8   this mesh?
9             MR. ANDERSON:  What?
10  BY MR. THOMAS:
11       Q.   Strike that, I'm sorry.
12            So you point to Figure 38 on Page 37
13  as suggesting that -- suggesting what?
14       A.   Minimal, this is what we would call
15  minimal cracking.
16       Q.   Okay.
17       A.   And it correlates with a high level of
18  antioxidant.  So it's being protected, doesn't
19  react, doesn't crack.  Or it doesn't crack as
20  much, it obviously is still cracking some, but
21  it's minimal.
22       Q.   Anything else for Carolyn Lewis?
23       A.   No.
24       Q.   Let's go now to the Batiste report.
25       A.   Okay.

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 206

1     Q.  The Batiste report has been marked as
2  Exhibit Number 2.
3        MR. THOMAS:  Just for the record, I
4  just got this late Monday night, and I've had a
5  chance to go through it a little.  We'll reserve
6  on this.  I know you disagree with that, but we
7  may reserve to come back to ask more questions
8  about this report at a later time.
9        MR. ANDERSON:  I mean I do object to
10  it, because there was an agreement made between
11  Christy Jones and Rich Freese, and they agreed
12  that in the -- in order to help both sides,
13  because everyone has a lot going on, that there
14  was an agreement that you guys wanted to take --
15  in fact, your attorneys from -- or the attorneys
16  from Butler Snow -- I have to put this on the
17  record.  If you're going to say you're going to
18  reserve the right, I'm going to object and I'm
19  going to put the reasons on.
20        Attorneys from Butler Snow reached out
21  and said "any of the same experts who are going
22  to be in both Lewis and Batiste, we'd like to
23  try to take their depositions at the same time
24  so we don't have to come back and everybody fly
25  around the country and do them at different

Page 207

1  times."  So we agreed to try to do that.
2        Also the agreement was that within 48
3  hours of the depo we would get -- we said we'd
4  try within 48 hours of the depo, which we did,
5  to send over the Batiste results.
6        And that was the agreement between the
7  parties.
8        MR. THOMAS:  I understand.  I just --
9        MR. ANDERSON:  So I don't see how you
10  can then reserve your right after your side has
11  already made an agreement, and we're doing it
12  exactly the way your side wanted to.
13        MR. THOMAS:  I'm not sure anybody
14  contemplated getting 278 pages, but I get it.  I
15  just need to make that statement.
16        MR. ANDERSON:  After getting a
17  thousand on the others, I would think that would
18  be reasonable.  But go ahead with your
19  questions.
20  BY MR. THOMAS:
21     Q.  Doctor, when did you prepare the final
22  report of Linda Batiste?  It's dated October
23  the 28th, 2013, would that be it?
24     A.  The final date I have is October 30th,
25  2013.  It's the same.  You've got --

Page 208

1     Q.  (Indicating).
2        MR. ANDERSON:  28th.
3     A.  Should be the 28th?  I guess.  We were
4  all -- this was just taken out of the patient, I
5  believe, most recently, so we've been working on
6  it.
7  BY MR. THOMAS:
8     Q.  Please understand I've got to mark
9  that one, too, just in case there's something
10  different.
11     A.  I don't think you're going to be
12  finding any differences.
13     Q.  I'm hopeful I won't.
14        MR. ANDERSON:  Not a lot I would bet
15  on, but that one I will bet you there's
16  absolutely no differences in that report other
17  than that date.
18        MR. THOMAS:  Just for the record, I'm
19  marking as Exhibit Number 6 what Dr. Jordi had
20  in his file as being the final report for Linda
21  Batiste dated October 30th, 2013.  The one that
22  was produced to us that's been marked as
23  Exhibit 2 is October 28th.
24
25

Page 209

1        (Whereupon, Jordi Exhibit Number 6,
2        10/30/13 Final Report for Linda
3        Batiste, was marked for
4        identification.)
5  BY MR. THOMAS:
6     Q.  Mine is two-sided, and it's twice as
7  big as yours.
8     A.  Yes, sir.  No.
9        MR. ANDERSON:  This is the rest of the
10  data.
11     A.  This is the rest of it.
12  BY MR. THOMAS:
13     Q.  Just for the record, I didn't realize
14  there was a second set.  So we have all of it,
15  the data makes it twice as big as mine, as it
16  should be.  Thank you.
17        Okay.  Doctor, do you intend to rely
18  on the testing that you did in the Carolyn Lewis
19  case in support of your opinions in the Batiste
20  case?
21     A.  Yes.  They're the same, the same
22  analyses, yes.
23     Q.  My question is a little different.
24        You did 22 plus, 22 or 23 --
25     A.  23.

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 210

1    Q.  -- 23 explant analyses of other
2  patients --
3    A.  Yes.
4    Q.  -- that are not included in your
5  analysis in the Batiste case.
6    Do you intend as a part of your
7  opinions in Batiste to rely on your work that
8  you did in Carolyn Lewis?
9    MR. ANDERSON:  I can tell you as his
10 attorney that's exactly what we're going to do,
11 because there is no report requirement in Texas.
12    MR. THOMAS:  Just asking.
13    MR. ANDERSON:  Let me just finish,
14 because he may not understand the legal
15 ramifications and what's going on as between a
16 state court requirement and a Federal Court
17 requirement.  And there is no reporting
18 requirement in Texas state court.
19    But we did agree, even though there is
20 no reporting requirement, that we would provide
21 data to make it easier for you guys to take a
22 deposition, even though we don't have to provide
23 a report.  So we did that, and we gave it to you
24 48 hours before the depo, like you asked.
25    So is he going to rely on all of his

Page 211

1  opinions in this case in Texas?  You bet.
2    MR. THOMAS:  Thank you.
3  BY MR. THOMAS:
4    Q.  The testing that you did in the
5  Batiste case differs from the testing that you
6  did in the Carolyn Lewis case, I think.
7    A.  In what way?
8    Q.  I don't think you did as much.
9    A.  Let me see.
10    (Witness reviewing document.)
11 BY MR. THOMAS:
12    Q.  I don't think you did the PYMS in
13 Batiste.
14    A.  Yeah, we did, it's right here
15 (indicating).
16    MR. ANDERSON:  Page 44.
17    A.  Page 44.
18 BY MR. THOMAS:
19    Q.  That shows you how close we are.
20 Thank you.  I apologize.
21    A.  We did the GPC.
22    MR. ANDERSON:  There's no question
23 pending right now.
24 BY MR. THOMAS:
25    Q.  Was it your goal, Doctor, to do the

Page 212

1  same testing for Ms. Batiste as you did for the
2  analysis in Exhibit 1?
3    A.  Yes.
4    Q.  Is it appropriate to use the -- strike
5  that.
6    Can we rely on your analysis in
7  Exhibit Number 1 with respect to the various
8  tests that we've talked about all day today in
9  understanding how you conducted the test for
10 Linda Batiste?
11    A.  It was run the same way.
12    Q.  So any discussions that we've had
13 today about your methodology, your controls,
14 your results in the Carolyn Lewis report,
15 Exhibit Number 1, would apply equally to the
16 Linda Batiste report, Exhibit 2?
17    A.  Yes.
18    Q.  All right.  For Linda Batiste, you
19 have a series of fiber mesh control samples.
20 Are these new mesh control samples different
21 from the mesh control samples you analyzed in
22 Carolyn Lewis?
23    (Witness reviewing documents.)
24    A.  They're the same.
25 BY MR. THOMAS:

Page 213

1    Q.  Okay.  And how can you tell they're
2  the same; by the test numbers?
3    A.  Same numbers.  Table 1 on both.
4    Q.  All right.
5    A.  Page 6 versus Page 13 in the
6  Exhibit 1.
7    Q.  Not that this makes any difference to
8  the ultimate test, do you know whether they were
9  all TVT Classics or TVT-Os?
10    MR. THOMAS:  Or do you know the answer
11 to that?
12    MR. ANDERSON:  Three TVT, three TVT-O.
13    MR. THOMAS:  Thank you.
14    MR. ANDERSON:  That's borne out in the
15 photographs in some of the extra stuff we
16 haven't gone through, for obvious reasons.
17    MR. THOMAS:  Thank you.
18 BY MR. THOMAS:
19    Q.  I'm looking at the "Summary of
20 Results."
21    A.  Page, please?
22    Q.  Page 3.  It says "A series of mesh
23 control samples and one explant sample received
24 by Jordi Labs."
25    Just for the record, we just

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 214

1  established that the mesh control samples are
2  the same control samples that you used for your
3  comparisons with Carolyn Lewis in Exhibit 1,
4  correct?
5      A.  Correct.
6      Q.  And the explant sample is for Linda
7  Batiste who is the Plaintiff in the Texas
8  action, right?
9      A.  Correct.
10     Q.  "Upon handling, it was observed that
11 the explant sample showed some decreased
12 elasticity as compared to the control fiber mesh
13 samples."
14        Again, this represents the same
15 reporting that you made in the Carolyn Lewis
16 case about your handling of the mesh explant as
17 compared to the control?
18     A.  That's right.
19     Q.  And do you have any recollection in
20 the Batiste matter for comparing the explant to
21 the formalin control samples?
22     A.  Formalin control sample, no, I don't.
23 I felt the explanted material was rigid, and the
24 pristine felt very friable.
25     Q.  Okay.  Next paragraph, "Cracking in

Page 215

1  the explant sample was observed to propagate in
2  a direction perpendicular to the fiber draw
3  direction.  It was noted to be primarily on the
4  fiber surface."
5        That's the same finding that you made
6  for Carolyn Lewis?
7      A.  Yes, that will be reflected in the
8  photos, SEM graphs.
9      Q.  "Analysis" -- I'm down in next
10 paragraph now -- "analysis of the explanted
11 fiber mesh by GPC-HT indicated that large scale
12 molecular weight degradation had not occurred in
13 the samples."
14        The same finding that you had in
15 Carolyn Lewis?
16     A.  Absolutely.
17     Q.  And when you say "large scale," the
18 fact of the matter is you found no significant
19 change in molecular weight; true?
20     A.  In this sample we didn't see a change
21 in the -- oh, molecular weight you're saying?
22     Q.  Yes.
23     A.  No, no change in molecular weight.
24     Q.  Okay.  Now, here, different from
25 Carolyn Lewis, you find that "the differential

Page 216

1  scanning calorimetry analysis showed no change
2  in crystallinity for the cracked explant sample
3  compared with the control samples."
4        What does that mean?
5      A.  That means that the crystallinity
6  didn't change, and the sample won't be more
7  likely to be subjected to environmental stress
8  cracking.
9      Q.  Okay.
10     A.  Any damage we see would have to be
11 oxidative type damage.
12     Q.  So can we eliminate from the Linda
13 Batiste analysis any environmental stress
14 cracking?
15     A.  Yes, you can eliminate the DSC data if
16 you want, because it's going to say there's no
17 change.
18     Q.  Okay.  So you have no molecular weight
19 change and no DSC change?
20     A.  That's correct.  In this one sample.
21     Q.  I understand.
22        Do you know when Ms. Batiste had her
23 surgery to remove her explant?
24     A.  I don't know the exact date, no.  It
25 was recent, within the last couple weeks,

Page 217

1  something like that.
2      Q.  Last sentence of the last paragraph
3  before you get to the table of contents, "It was
4  found that the explant sample showed
5  significantly less signal for the antioxidants
6  as compared to the control sample, under 2
7  percent for Santonox R and dilauryl
8  thiodipropionate."
9      A.  That's right.
10     Q.  What does that mean?
11     A.  That means that 98 percent of it was
12 gone.
13     Q.  Got it.
14     A.  This time we know for a fact, because
15 the surgery was just performed, that it wasn't
16 sitting in Steelgate for months.
17     Q.  Okay.
18     A.  Because it was -- the surgery was
19 performed, and it was immediately forwarded to
20 us as rapidly as possible.  So it would have
21 just been a matter of days at room temperature
22 before we got it and could start our work, as
23 opposed to I really didn't know how long the
24 other ones, other samples had been at Steelgate
25 when we started that, but here it has to be

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 218

1    short.
2        Q.   Do you know the percentage of
3    formaldehyde in which the material was stored?
4        A.   I do not.
5        Q.   Did you follow the same sample
6    preparation methods we've described?
7        A.   Yes, in terms of removal of tissue and
8    using forceps and disposable --
9        Q.   Why did you choose the control samples
10   that you did in Table 1 on Page 6?  Is that the
11   same ones that you chose before?
12       A.   Same ones, yes.
13       Q.   The reason why I asked is because
14   Table 1 on Page 13 shows a number of additional
15   tests being conducted on the other controls.
16       A.   On page what?
17       Q.   Right here.  Compare this chart to
18   this chart.  They should be the same, shouldn't
19   they?
20           MR. ANDERSON:  Yes, they are.
21           MR. THOMAS:  Right here.  All this
22   data is not on this chart.
23           MR. ANDERSON:  Oh, the data, I thought
24   you said the tests that were run.
25       A.   They weren't.  That means that these

Page 219

1    were run again.  And the rest of these were not
2    run again.
3    BY MR. THOMAS:
4        Q.   So --
5        A.   We did another FTIR micro, we did
6    another DSC, another GPCT.
7        Q.   Does this mean you repeated the test
8    for the first two categories, the OM and the
9    SEM?
10       A.   I need to see the billing.
11       Q.   How much of this testing did you do
12   yourself; any of it?
13       A.   I don't -- these days I don't do much
14   myself.  I just supervise the lab personnel.
15       Q.   Is it fair to understand that for both
16   Linda Batiste and Carolyn Lewis that others did
17   the work for you and reported to you and
18   prepared your report, and you're testifying
19   based on other --
20       A.   I prepared the report.  They gave me
21   their individual results.
22       Q.   Okay.  And you are preparing the
23   report and testifying based on the work of
24   others?
25       A.   Correct.

Page 220

1        Q.   And the others would be reflected in
2    the lab notebooks?
3        A.   Lab notebooks.
4        Q.   And billings?
5        A.   Billings.
6        Q.   Do you know the answer to the question
7    about why Page 6 shows in Table 1 the control
8    sample analysis chart is different than it is in
9    Carolyn Lewis which appears on Page 13?
10       A.   I'd have to refer to the lab
11   notebooks.  Maybe it's in the lab notebooks.  Do
12   you want me to do that?
13       Q.   Well, to the extent that there's other
14   testing -- well, strike that.  We'll come back
15   to that.
16           Look at your lab notebooks and see if
17   you did new testing.
18       A.   Let's see.  That would have had to
19   have been --
20           MR. ANDERSON:  That's the old ones.
21           (Witness reviewing documents.)
22       A.   10/29.
23           MR. ANDERSON:  Here you go.  This is
24   Batiste.
25       A.   Scalpel -- yeah, that's Batiste.

Page 221

1            MR. ANDERSON:  You're looking to see
2    about the OM and SEM, I think.
3            MR. THOMAS:  The reason why the
4    difference of charts.
5            MR. ANDERSON:  Yes.
6            (Witness reviewing documents.)
7        A.   So this is all Batiste.  There's no
8    indication of any reruns of those standards, of
9    the controls in here, so...
10   BY MR. THOMAS:
11       Q.   Is it just an omission?
12       A.   I think it may just be an omission.
13       Q.   Okay.
14       A.   3422128.
15           Yeah, I think X is up here, that's
16   correct.  I think it's an omission.  We'll have
17   to correct the table.
18       Q.   Okay.
19       A.   It would have been the same data.
20       Q.   Do you remember, given that this
21   report is dated today --
22       A.   I'll tell you what we can do.  We can
23   pick a control sample here and just see if the
24   picture is identical.
25       Q.   Okay.

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 222

1    A.  That will be a good indication.
2        I'm sorry, can we go off the record a
3    second?
4        MR. ANDERSON:  We don't have to go off
5    the record.  Just don't talk while you're
6    looking.
7        (Witness reviewing document.)
8        A.  That picture looks identical, Figure 4
9    looks identical to Figure 5 here, which is the
10   same control.
11   BY MR. THOMAS:
12       Q.  Just for the record, you're referring
13   to Exhibit Number 1, Page 20, Figure 4, to
14   Exhibit Number 2, Page 12, Figure 5?
15       A.  Right.
16       Q.  So it's your best judgment, based upon
17   your review of those documents, that you're
18   using the same control information for both
19   studies?
20       A.  Here would be a more definitive
21   picture.
22       MR. ANDERSON:  Just answer his
23   question.
24       A.  I'm sorry.
25   BY MR. THOMAS:

Page 223

1        Q.  So it's your best judgment, based upon
2    your review of those documents, you're using the
3    same control information for both studies?
4        A.  It looks that way.  159, you see --
5        MR. ANDERSON:  Do you feel like you've
6    answered his question that you're using the same
7    controls?
8        THE WITNESS:  Yes.
9        MR. ANDERSON:  Okay.  Then we'll move
10   on to the next one.
11   BY MR. THOMAS:
12       Q.  Now if you go to Page 9, Page 9,
13   Figure 3, does this depict the Batiste mesh as
14   first received by you and then separated into
15   tissue and mesh as you did with the mesh in
16   Carolyn Lewis?
17       A.  It does.
18       Q.  And did you follow the same
19   procedures?
20       A.  We did.
21       Q.  And did Mr. --
22       A.  Adi Kulcarni.  Yes, I watched him do
23   it.
24       Q.  Okay.  Do you recall making any
25   findings different -- I'm up to Page 11 right

Page 224

1    now -- any findings different for Linda Batiste
2    about your observations of the mesh?
3        A.  Anything different?
4        Q.  From what you found with Carolyn
5    Lewis.
6        A.  Oh, sure, we've already specified one
7    difference.  The DSC didn't show --
8        Q.  That was a bad question.
9        A.  -- the decreased Delta H.
10       Q.  Let me start over again.  Strike that.
11   I better do it the right way.
12       Let's go to Page 8 -- excuse me.  I'm
13   sorry.  Page 14, Figure 8.
14       In a number of places in Exhibits 1
15   and 2 there will be figures with numbers that
16   are shown on there.  Here on Figure 8 there's
17   Figures 1, 2, 3 and 4 in red on the mesh.
18       Do these represent places where, what,
19   scanning electron microscopy was conducted, or
20   do you know?
21       A.  I don't know.
22       Q.  So like on the next page, on Page 15,
23   Figure 10, there are red numbers 1, 2, 3, 4.  Do
24   you know what those represent?
25       A.  Well, I can look at the EDX and see if

Page 225

1    the numbers -- if we have four sites on EDX,
2    that would be the likely -- if there's going to
3    be any correlation, that's what it would be, go
4    find this sample number.
5        Q.  When you say "EDX," the data that you
6    have in your EDX analysis?
7        A.  Yeah.  But I don't know, with a
8    control like this, I don't know why that would
9    -- it would make no sense, so I doubt it.  But
10   we can check one sample.
11       Q.  Check to make sure.
12       A.  13161.
13       It's not here.  I don't know what it
14   means.
15       Q.  Okay.  And just so we're clear, if you
16   go back to Carolyn Lewis, let's go to Page 24 of
17   Carolyn Lewis.  Figure 11, again samples 13162,
18   and there are numbers in red, 1, 2, 3, 4, do you
19   know what those represent?
20       A.  No, I do not.
21       Q.  Okay.  If you go to Page 18, please,
22   of Batiste, Exhibit 2, Figure 16.  Is this the
23   photograph -- strike that.
24       What is that?  What is Figure 16?
25       A.  That's an optical micrograph.

57 (Pages 222 to 225)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 226

1    Q.  What is that?
2    A.  Photograph of not the SEM, but just a
3  regular optical microscope of the fiber mesh
4  with tissue imbedded in it.
5    Q.  And what is Figure 17?
6    A.  That's a low amplification SEM.
7    Q.  Of the same thing that's depicted in
8  Figure --
9    A.  Right.
10    Q.  Excuse me.
11      Is what's depicted in Figure 17 the
12  same thing that's depicted in Figure 16, just by
13  different medium?
14    A.  By different methods.
15    Q.  Methods.
16    A.  SEM versus optical.
17    Q.  And as you look at Figure 22 on
18  Page 21, and Figure 23, how would you describe
19  what you see in Figure 22?
20    A.  It looks like greatly cracked material
21  where some of the material has actually flaked
22  off, getting clear under regions underneath.
23    Q.  In your cast of characters -- excuse
24  me.
25      In your description that you used in

Page 227

1  Exhibit Number 1 as not cracked, moderately
2  cracked, or cracked, where does this fit?
3    A.  These photos here I would call
4  severely cracked.
5    Q.  Considerably cracked?
6    A.  Considerably or severely, you could
7  use either word.
8    Q.  Okay.  Let me ask this question.
9      You've used a number of different ways
10  today to characterize the cracking that you've
11  seen, and you've broken them down into
12  categories in different places in your report.
13      What categories of cracking do you
14  deem to be relevant to your analysis on a
15  comparative basis across these mesh?
16      MR. ANDERSON:  Objection.  Asked and
17  answered way long ago.
18      But answer the question again.
19    A.  Minimally, not cracked, minimally,
20  moderately, and then major cracking, or
21  extensive cracking.
22  BY MR. THOMAS:
23    Q.  What qualifies -- how would you
24  describe something that's minimally cracked?
25    A.  Where I just would see like -- I did

Page 228

1  show you that one a while ago in the other set
2  where the material was correlated with that
3  large antioxidant level.  Was it 411, 411 or
4  something like that?
5    Q.  That's exactly right.
6    A.  I think it was 411.  Yes, 411.  That's
7  minimally.
8    Q.  What page is that?
9    A.  37.
10    Q.  That's in Exhibit 1.
11      And that's your visual observations,
12  you correlate that the cracking shown on Page 37
13  in Figure 38, sample 13411, is minimal cracking;
14  fair?
15    A.  Fair.
16    Q.  All right.  What is moderately
17  cracked?
18    A.  That might be moderate right there
19  (indicating).
20    Q.  What page?
21    A.  38.
22    Q.  Page 38.  Are we in Exhibit 1?
23    A.  These are arbitrary categories, of
24  course, that's why it's very difficult to put
25  absolute numbers on these.  But that certainly

Page 229

1  is cracked more than the 411 sample.
2    Q.  So on Page 38, sample 13412, you
3  describe as being moderately cracked.
4      What is it about Exhibit 40 on Page 38
5  of Exhibit Number 1 that qualifies that as
6  moderately cracked?
7    A.  Particularly on the right side of the
8  picture, the cracks are somewhat weak looking,
9  they're not deep into the sample.
10      Now, there are a couple of places
11  there, this is what makes this so difficult,
12  there are a couple of places on the left side
13  where I would call it certainly more severe
14  cracking, what they're not -- they don't
15  represent a large portion of the surface.
16    Q.  So the cracks that you're referring to
17  are less than a micron in width?
18    A.  Scale is 100-micron, yes, in that
19  order.
20    Q.  And for Ms. Batiste on Page 21,
21  Figures 21 and 23, how would you describe that
22  cracking?
23    A.  Page what now?
24    Q.  21.
25    A.  Well, you have to look at several of

58 (Pages 226 to 229)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 230

1  these photos taken together to get kind of like
2  an average.
3      Q.  Okay.
4      A.  If I look at -- if I look at Page 20,
5  I might call it moderate.  But if I look at
6  Page 21, these are different regions of the same
7  sample, I'm going to call that severe, because
8  of flaking.
9      Q.  Is it the flaking that makes it
10  severe?
11      A.  Flaking, yeah, because the actual
12  polymer is degraded so badly it's coming off the
13  surface.
14      Q.  All right.
15      A.  It's also the depth.  If you want to
16  see the depth, Page 23 shows you the deep
17  cracking that hasn't yet flaked, but you can see
18  it's just dying to flake off on Page 23.
19      Q.  Just so the record is clear, that's a
20  higher magnification than the early ones?  It's
21  450 times, right?  Page 23 is 400 times, is that
22  right?
23      A.  Yeah.  So I would call this moderate
24  to severe.
25      Q.  And is it the number of cracks?

Page 231

1      A.  Number of cracks, the depth of the
2  cracks, and whether or not it's flaked all enter
3  into the -- flaking tends to --
4      Q.  How are you able to measure the depth
5  of the cracks?  Or is this just by total
6  eyeballing it?
7      A.  It's total eyeballing at this point,
8  because you can't really -- until you see the
9  pieces come off, and then they look like they're
10  several microns.
11      Q.  As a practical matter, isn't it
12  impossible to measure the depths of these cracks
13  because they're so small?
14      A.  Well, to get an accurate measurement,
15  right, looking at this photograph I can't tell
16  you exactly how many.  But the depth is at least
17  as great, it would appear here, as the width.
18      Q.  So a little less than a micron?
19      A.  Well, I would say that's more like 2
20  microns, that crack.
21      Q.  Okay.
22      A.  Some of -- this one might be 2 to 3,
23  some of them are 1.  They're variable.
24      Q.  Okay.  And you would expect a similar
25  depth to that 1 to 3 microns?

Page 232

1      A.  Somewhat.
2      Q.  And that's for severe cracking?
3      A.  Well, it's severe.  If I just saw one
4  of those cracks and nothing else and it was
5  clean everywhere else, like if all I saw was
6  this --
7      Q.  What you're doing now is you're --
8      A.  I'm covering up the cracks.  But I'm
9  showing you the rest of the fiber.  In this case
10  the whole fiber isn't damaged, just the left
11  side.
12      Q.  That's Figure 26?
13      A.  22 -- Figure 25, sorry.
14      Q.  Figure 25 on Page 22 of Exhibit 2?
15      A.  Correct.
16      Q.  Okay.  Figure 25 on Page 22 of
17  Exhibit 2, the cracks that you see on the left
18  side, again are 1 to 3 microns wide.  That's 600
19  times magnification, that's even higher?
20      A.  But you've got the scale here of --
21      Q.  You changed the page again on me.
22  Which one are you looking at now?
23      A.  Page 23, 26.
24      Q.  Okay.  Figure --
25      A.  450X.

Page 233

1      Q.  Page 23, 450X, Figure 26.
2      A.  So that crack there on the -- the big
3  crack in the middle of the left side of that
4  picture looking at the scale has got to be on
5  the order of --
6      Q.  5 microns?
7      A.  -- 5-micron, something like that.
8      Q.  No way to tell from this how deep it
9  is?
10      A.  You can tell from the -- now you can
11  tell because it's bent upwards.  The actual
12  thickness of the polypropylene piece that's
13  about to break off looks like it's 1 to
14  2 microns.
15      Q.  Okay.  But the depth there is not
16  going to be any more than five microns?
17      A.  No.
18      Q.  Probably less?
19      A.  On that order, yes.
20      Q.  Okay.  So that's severe cracking?
21      A.  Yes, because it runs, covers the
22  entire --
23      Q.  Okay.  Let's go to Page 29, Figure 33.
24      You're conducting the SEM-EDX analysis
25  here, correct?

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 234

1      A.  Yes.  Correct.
2      Q.  And how would you describe the
3  cracking that you see in Figure 33?
4      A.  Moderate in that particular piece.
5      Q.  All right.  And Spectrum 2 and
6  Spectrum 3 are shown.
7         Is there a Spectrum 1?
8      A.  No.  Usually just shows two pieces, I
9  don't know why we had three on here.
10     Q.  Do you usually start numbering at 2?
11     A.  I don't know why that was done.  It's
12  2, he may have had a 1 somewhere else, or just
13  didn't renumber them.
14     Q.  If there's a 1, it doesn't show up on
15  the data that appears here, correct?
16     A.  Right.  The box and the number
17  correlates with the spectrum you see below.
18     Q.  Right.
19         What's the difference between 34 and
20  35?
21     A.  Just a scale-up.
22     Q.  Okay.
23     A.  So we can see the minor elements
24  better.
25     Q.  I see.

Page 235

1         DSC, we decided there was no change,
2  so there's no evidence of environmental stress
3  cracking?
4      A.  Let me just look at the numbers, but I
5  believe that's correct.
6         (Witness reviewing document.)
7      A.  That's correct.
8  BY MR. THOMAS:
9      Q.  So any oxidation that's occurring --
10  strike that.
11         So any of the cracks that we see in
12  Linda Batiste is going to be due to straight
13  oxidation?
14     A.  I believe that's correct.
15     Q.  And do you know what caused the
16  oxidation in Linda Batiste's mesh?
17     A.  Well, one cause would be the lack of
18  antioxidant in the fiber, if we find that, which
19  we have to go look at the LCMS analysis
20  primarily.
21         The other would be the IR results for
22  carbonyls to see if we had oxidation there.
23         Those are the two primary -- well, and
24  the third is the one I just showed you was EDX,
25  Because that oxygen in the clean regions by EDX,

Page 236

1  this peak here, that's in the region that isn't
2  cracked.
3      Q.  My question is not what the proof of
4  it is.  My question is what caused it.
5         What caused the oxidation?
6      A.  What caused the oxidation.  Well, that
7  would probably be due to the inflammation, among
8  other things, that's in the human body.  If the
9  material isn't protected by antioxidants and
10  it's exposed to macrophages and hydrogen
11  peroxide and so on, if there was inflammation,
12  and shards were coming off the particle and
13  inflammation is caused to increase that --
14     Q.  Are you guessing, or is that your
15  opinion?
16     A.  That's published literature.
17     Q.  It's your opinion that published
18  literature stands for the proposition that in
19  the face of inflammation, that polypropylene
20  mesh without antioxidants will degrade?
21     A.  Yes.
22     Q.  And what literature is that?
23     A.  Well, it goes back to --
24     Q.  Is that the Liebert article?
25     A.  Liebert article, it goes back to

Page 237

1  Oswald and Turi article, as early as '65.
2      Q.  Okay.
3      A.  Williams talks about it in a number of
4  articles.
5      Q.  It's ultimately premised on the
6  suggestion that the antioxidants in the Ethicon
7  mesh have leached out and are gone, correct?
8      A.  Correct.
9      Q.  Right.
10         And it's only if the antioxidants are
11  leached out and gone that your theory is
12  correct?
13     A.  I don't know that it would mean you
14  couldn't oxidize polypropylene even in the
15  presence of antioxidants.  You certainly can.
16  But it retards it.
17     Q.  But you've not studied that question.
18  Your theory and opinion is that the antioxidants
19  have leached out, therefore the mesh is
20  degraded?  That's your opinion to a reasonable
21  degree of certainty?
22     A.  It would be a fact in my mind, because
23  we're looking at the actual lack thereof.
24     Q.  Okay.
25     A.  Not assuming lack of, I'm looking to

60  (Pages 234 to 237)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 238

1    see if we see a lack of.
2        Q.  I understand.
3        But that's your opinion to a
4    reasonable degree of scientific certainty how
5    this degradation occurred; that is, that the
6    antioxidants leached out leaving the mesh
7    defenseless, and that is the reason why the mesh
8    degraded?
9        A.  Yes.
10       Q.  Page 34 --
11       A.  Yes, sir.
12       Q.  -- on Exhibit 2.
13       This same value is in Exhibit 1, the
14   typical value for the melt point of
15   polypropylene?
16       A.  Where are you?
17       Q.  I'm right in the middle of the page on
18   Page 34.
19       A.  34.  Okay.  Right.
20       Q.  Is it your opinion that the typical
21   value for polypropylene melting is 175 degrees
22   C?
23       A.  Again, that comes out of the book we
24   looked at earlier this morning, Turi.
25       Q.  Do you know whether that is the

Page 239

1    typical melt point for the polypropylene mesh
2    that Ethicon manufactured and sold?
3        A.  No.  We measured, we measured that as
4    well.  That's the controls.  It's 165-ish.
5        Q.  Okay.  My point is; you're not
6    suggesting because it's 165 instead of 175 from
7    the literature that it's more susceptible to
8    environmental stress cracking or degradation,
9    are you?
10       A.  I'm suggesting it's less crystalline.
11       Q.  Okay.  Are you suggesting it's more
12   susceptible to environmental stress cracking
13   because --
14       A.  Than the native pellet polypropylene
15   from which the fiber was manufactured, yes, I
16   am.
17       Q.  And are you suggesting that it's more
18   susceptible to oxidation because its melting
19   point is 165 as opposed to 175 and 80
20   polypropylene pellets?
21       A.  Yes.
22       Q.  Page 43 in your molecular weight
23   analysis.
24       A.  Okay.
25       Q.  It says in the middle of the

Page 240

1    paragraph, "After you don't find a difference in
2    molecular weight, the environmental stress
3    cracking mechanism does not require a decrease
4    in molecular weight."
5        I think we've already decided that the
6    mesh -- any mesh degradation for Ms. Batiste is
7    not due to environmental stress cracking; fair?
8        A.  Right.
9        Q.  Okay.
10       A.  So that's why I state we observed
11   cracking in the explant samples due to oxidation
12   in the fiber surface, in this particular sample.
13       Q.  In the PYMS analysis on Page 34.
14       A.  Page 34?
15       Q.  I'm sorry, 44.  Thank you.
16       A.  Okay.
17       Q.  Am I correct that there's no analysis
18   of the Santonox antioxidant?
19       A.  Right.
20       Q.  Why not?
21       A.  As I mentioned this morning, in PYMS
22   when you -- if you'll look at Page 45, Figure
23   46, the antioxidants, you'll see a large --
24   you'll see the control is the blue, and you'll
25   see a large red peak righter blue is eluting.

Page 241

1    What that is mostly is polypropylene fragment
2    ions, and it was overwhelming the signal for
3    Santonox R, so we really couldn't get an
4    accurate reading.
5        Q.  Tell me what that means.  I don't know
6    how that works.  I don't understand.
7        A.  Well, in LCMS you extract the
8    additives, and then you shoot a solution of the
9    extract, so you don't have the polymer to worry
10   about at all.
11       In PYMS you put the entire sample in,
12   the solid polypropylene piece, or a bit of
13   actual fiber, and then you burn it basically,
14   pyrolize it, and then the pieces go into the GC
15   system column and get separated.  But there are
16   sometimes hundreds of thousands of pieces, and
17   sometimes for materials you want to analyze they
18   just get overwhelmed, the material I want to
19   analyze for is overwhelmed by the background is
20   what it's called.
21       So any estimate we would have made
22   here, we would have got a large peak, it doesn't
23   mean anything because it's got all these other
24   ions in it, which just is flooding the system in
25   that particular time point.

61 (Pages 238 to 241)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 242

1        Now, for the other antioxidate, the
2   lauryl thiodipropionate --
3        Q.   Let me just interrupt for a minute.
4        Could you have changed your test or
5   changed your materials to test again for
6   Santonox in an effort to capture the
7   concentration of Santonox?
8        A.   You can run single ion, extracted ion
9   chromatography, we call it, that helps.  In this
10  case it didn't help enough.
11       Q.   Why does it work in the Carolyn Lewis
12  case for all the samples that you've tested
13  there, but doesn't for Linda Batiste?
14       A.   Don't have an answer for that.  I just
15  know this is characteristic of PYMS.  LCMS gives
16  -- in this case because we don't have the
17  background, we don't have the degree of
18  problems.
19       Q.   Just so I understand --
20       A.   It doesn't always not work either,
21  it's a matter of a judgment call.
22       Q.   But you got PYMS testing and results
23  in all but four of the samples you tested in
24  Exhibit 1, correct?  That's on Page 15 and 16.
25       A.   Oh, Exhibit 1?

Page 243

1        Q.   Yes.
2        A.   Well, I know that one thing that's
3   happened since this work was done was a column
4   had to be changed out.
5        Q.   What does that mean?
6        A.   Well, the column eventually goes, and
7   we have to cycle it out.  So another column
8   is -- this is not the same column that was run
9   for the prior samples.  So the selectivity is
10  slightly different.  And I'm telling you that
11  the -- I'm sure of this, that it's being buried
12  under polypropylene fragments.
13       Q.   So are you telling me that the results
14  that you've obtained in Exhibit Number 1 for the
15  PYMS data are different from the results that
16  you obtained for the Linda Batiste sample in
17  Exhibit 2?
18       A.   It's a different column, so the
19  selectivity is a little bit different.
20  Quantitation of additives is much more difficult
21  than PYMS than it is -- it's good for detection
22  and confirming the presence of things, it's not
23  good for quantitating anything.
24       Q.   LCMS --
25       A.   LCMS is much better, in general.

Page 244

1        Q.   All right.  At this time for the LCMS
2   test beginning on Page 46, there's no formalin
3   control data, is there?
4        A.   No.
5        Q.   So the tests that you conducted in
6   LCMS would not show the extent to which formalin
7   may have confounded your findings?
8        A.   For the Santonox R, that would be
9   true.  But for the lauryl thiodipropionate, the
10  standards we've already run clearly were not
11  extracted by the formalin.
12       Q.   You didn't do a formalin control test
13  for Linda Batiste to determine the extent to
14  which formalin would impact your LCMS findings;
15  true?
16       A.   Well, we did it, but it's in reference
17  one.  Remember we're going to use these data
18  together.  Because we already have two formalin
19  controls in the -- what do you call -- the
20  Exhibit 1.
21       Q.   Okay.
22       A.   So yes, we have controls of formalin.
23       Q.   So whatever --
24       A.   Page 92 --
25       Q.   -- whatever conclusions might be drawn

Page 245

1   from the formalin control samples and their
2   impact on the antioxidants that may have been
3   present in the mesh apply equally to your
4   findings for Linda Batiste?
5        A.   That's correct.
6        Q.   Now, the control sample that you
7   choose here on Page 50 is 3422128, and that will
8   be, again, from the controls on Page 96 of
9   Exhibit 1, correct?
10       A.   Okay.  What am I -- on Page 50?
11       Q.   On Page 50, Table 12.
12       A.   Okay.  3422128.
13       Q.   You show that Santonox quantitation,
14  correct?
15       A.   In that table.
16       Q.   Why did you choose the 4,430,284
17  figure as the control against which you compare
18  Santonox?
19       A.   It's in the middle.  Hang on, let me
20  check this again.
21       Q.   I don't see that value in the controls
22  on Page 96.  It should be there, shouldn't it?
23       A.   3422128.
24       Q.   That value is different, isn't it?
25       A.   Yes.

62 (Pages 242 to 245)

Golkow Technologies, Inc. - 1.877.370.DEPS

Howard C. Jordi, Ph.D.

Page 246

1      Q.  Do you know why that is?
2      A.  That would indicate to me that he
3  reran the control.  We extracted it.
4      Q.  I thought we decided a moment ago they
5  didn't.
6      A.  Most of the tests they didn't.  I can
7  check that.
8      Q.  Okay.  So what this says is that we
9  have yet a third value for this --
10     A.  Standard.
11     Q.  -- control --
12     A.  Control.
13     Q.  -- test.
14        Not standard, it's a control?
15     A.  Control.
16     Q.  So the value here of 4430284, you
17 think is a new test of mesh tested with Carolyn
18 Lewis?
19     A.  Correct.
20     Q.  As you sit here today, do you know any
21 other new tests that were conducted for Linda
22 Batiste in order to do -- on the controls that
23 were used to compare the Linda Batiste mesh
24 samples?
25     A.  Let's check the control in Table 11

Page 247

1  just to see.  All right.  Let's go back.
2  34221228.
3      Q.  What page are you on, please?
4      A.  92 and 49.  It's the number of -- it's
5  the same standard run for the lauryl
6  thiodipropionate, but the number is different
7  again.  So it's certainly right on the same
8  range, but it means it's rerun, same thing.
9      Q.  So the dilauryl has also been rerun?
10     A.  The standard has, yes, along with the
11 actual sample.
12     Q.  Where are you looking to see that?
13     A.  Table 11, lot 3422128, Page 49.
14     Q.  And that's a value -- you have two of
15 those values from the first one on Page 92, and
16 on Page 92 of Exhibit Number 1 you obtained a
17 value of 71,633,460?
18     A.  Mm-hmm.
19     Q.  And a duplicate result of 96,522,909,
20 and this is a third value for the same piece of
21 mesh at 82,091,505.
22     A.  Right, between the other two.
23     Q.  Okay.  So do you know of any other new
24 control testing conducted for Linda Batiste?
25     A.  I do not.

Page 248

1      Q.  Would it be -- do you know why this
2  new control testing was conducted for Linda
3  Batiste?
4      A.  Well, the response of the detectors,
5  the HPLC type, LCMS detectors can change over
6  time, so it would just be good lab practice,
7  since this was run at a different time from the
8  other samples, to rule out any change that way.
9  Whereas an SEM photograph is an SEM photograph,
10 it wouldn't matter, so there would be no need to
11 rerun those.
12     Q.  Tell me again what it means to change
13 the column.
14     A.  Well, when you're doing
15 chromatography, columns wear out, and you have
16 to periodically change them.  The peaks get
17 broad, they get narrower, materials start to
18 bleed into -- peaks start to bleed into one
19 another, and it's just time to change the
20 column.  It's just normal -- what we call normal
21 maintenance, like changing the oil in a car.
22     Q.  How do you determine when it's
23 appropriate to change the column?
24     A.  You have standards that you run, and
25 you look for resolution standards.  And when the

Page 249

1  resolution no longer meets the minimum standard,
2  it's time to change it.  It's part of the SOP.
3      Q.  How often do you change the column?
4      A.  When?  I don't know how to answer
5  that.
6      Q.  Every 2,000 miles?
7      A.  It's when it fails, when it fails a
8  test.
9      Q.  Okay.
10     A.  It's checked every time we run samples
11 to see that the minimum resolution is there, or
12 it's changed.
13     Q.  Before you sat down to give your
14 deposition today, did you realize that the
15 controls had had additional testing conducted on
16 them?
17     A.  These controls here?
18     Q.  In Exhibit 2 for Linda Batiste.
19     A.  No.  In all honesty, no.
20     Q.  Okay.  Fair to understand that a
21 doctor would have to give any opinion about the
22 extent to which any degradation in the mesh that
23 you have found would cause Ms. Batiste any
24 physical harm or other health problems?
25     A.  No, I would defer to them for the

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 250

1  actual physical type damage, it's not -- it's
2  beyond, out of my field.
3        MR. THOMAS:  I'm going to want copies
4  of everything but the Burkley deposition.  The
5  lab notebooks, the articles, and the SOPs.
6        MR. ANDERSON:  Just leave them all
7  there for right now.
8        MR. THOMAS:  What's the best way to do
9  that, Ben?
10        MR. ANDERSON:  Good question.  The lab
11  notebooks obviously can't leave, so we would
12  just have to run copies of those for you.  All
13  the other things we can run copies for you.  Or
14  we can give them to madame court reporter and
15  have her run some copies.
16        MR. THOMAS:  I don't care just as long
17  as I get them.  Whatever makes sense.  I think
18  you and I can figure this out.
19        MR. ANDERSON:  Okay.
20  BY MR. THOMAS:
21     Q.  Doctor, you brought a number of things
22  with you to the deposition today including a
23  number of books, a copy of the deposition of Dan
24  Burkley.
25        I have here three laboratory

Page 251

1  notebooks.  What are these?
2     A.  These are the laboratory notebooks
3  telling the sample preparation and what was done
4  to the samples, and by who, and on what date.
5     Q.  What's the purpose of a laboratory
6  notebook?  What are you trying to capture in a
7  laboratory notebook?
8     A.  We're trying to capture when things
9  were done so that we know who did what so we can
10  go ask questions of proper people so we have a
11  paper trail for the way the sample was handled.
12     Q.  Is it fair to understand one of the
13  goals of a lab notebook is to provide enough
14  information so that somebody coming behind you
15  can understand what you did and recreate it if
16  necessary?
17     A.  Yes.  Absolutely.
18     Q.  And the lab notebook has a number of
19  names in here.  Are these the people who's
20  samples were tested, do you know?
21     A.  You'll have to show me the specifics.
22        (Witness reviewing document.)
23     A.  Yes, those are the sample --
24        MR. ANDERSON:  Hand it back to him.
25  "Yes" answers the question.

Page 252

1  BY MR. THOMAS:
2     Q.  Do you know whether all of the samples
3  were tested?
4     A.  No.  Some of the samples weren't
5  tested.
6     Q.  Do you know why some weren't tested?
7     A.  There were several that weren't, two
8  or three maybe that weren't tested because they
9  were mixtures of multiple products, and we
10  didn't want to run those.
11     Q.  Okay.  Is there any way to tell from
12  the entries in the lab notebook, to your
13  knowledge, about the reasons why certain ones
14  weren't tested?
15     A.  Here's one that wasn't run and it
16  wasn't run because -- I'm assuming it wasn't run
17  because sample received with no formalin.  We
18  didn't run it.  We didn't know what would happen
19  to the sample in the absence of preservatives so
20  we just didn't run it.
21     Q.  And who was that?
22     A.  We have several here.  Cynthia
23  Simpson, and Alma Sarcia.
24        MR. ANDERSON:  Garcia.
25     A.  Garcia.  Sorry.  JPG240-241,

Page 253

1  JPG1362-1363.
2  BY MR. THOMAS:
3     Q.  And did you have anything to do with
4  the decision not to test those products?
5     A.  Well, it would be standard operating
6  procedure that if something comes in in a
7  non-standard format in a situation as -- well,
8  any situation, we wouldn't run it without the
9  client's approval.  We'd have to go back to them
10  and see if they still wanted to run it, because
11  otherwise --
12     Q.  Did you, in fact, raise that issue
13  with anybody about whether the sample should be
14  tested because it did not come in formalin?
15     A.  I think the analysts probably got
16  together and discussed it, yeah.
17     Q.  Did you have any role in the
18  decision --
19     A.  No, I didn't.  That's standard
20  operating procedure.
21     Q.  Let me finish my question, please.
22        Did you ever any role in the decision
23  not to test the mesh samples that did not come
24  in formalin?
25     A.  No.

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 254

1      Q.   Were you aware before reading the
2  laboratory notebook today during your deposition
3  that a decision was made not to test some of the
4  mesh samples because they didn't have formalin?
5      A.   Yeah, we've discussed that.
6      Q.   Who have you discussed it with?
7      A.   Adi Kulcarni who has been involved in
8  this, and my son Mark.
9      Q.   What did you discuss about that?
10     A.   Just that we didn't feel it was fit to
11 run because they were different, they didn't
12 match normal composition.
13     Q.   Why?  They looked different?
14     A.   They were dry, yeah.
15     Q.   Okay.  Do you know if they'd ever been
16 in formalin?
17     A.   I assume they had, but I have no way
18 to know that.  They're supposed to send them to
19 us in formalin, so you've got to assume they
20 were sent in formalin at some point.
21     Q.   Okay.
22     A.   And it was lost.  We don't know when.
23          MR. ANDERSON:  Don't assume things
24 that you don't know.  If you know the answer,
25 then you say I know the answer.

Page 255

1          THE WITNESS:  I don't know the answer.
2          MR. ANDERSON:  If you don't know the
3  answer, please say I don't know the answer,
4  okay?
5  BY MR. THOMAS:
6      Q.   How many samples did you receive
7  without formalin that you didn't test?
8          (Witness reviewing document.)
9      A.   Looks like two.
10 BY MR. THOMAS:
11     Q.   And you identified one of them.
12 What's the other one?  Can you identify that for
13 me, please?
14         MR. ANDERSON:  He said both those
15 names.
16     A.   I said both.
17 BY MR. THOMAS:
18     Q.   I'm sorry.  Thank you.
19         Who runs your lab?
20     A.   My son and his business partner.
21     Q.   What's his business partner's name?
22     A.   Patrick Burke.
23     Q.   Is he the person -- is your son the
24 person responsible for all testing conducted by
25 Jordi Labs?

Page 256

1      A.   Today he is, yes.
2      Q.   Has he been for the last two years?
3      A.   Yes.
4      Q.   So any testing that would have come in
5  Jordi Labs to test polypropylene mesh would have
6  been overseen by your son Mark?  Is that his
7  name?
8      A.   Yes.
9      Q.   To the extent that questions I asked
10 you before about other mesh that has been
11 analyzed by Jordi Labs, the person who would
12 know about that is your son Mark?
13     A.   Yes.  Not me.
14     Q.   How long has it been since you've had
15 hands-on responsibility in the lab?
16     A.   Four, five years now.
17     Q.   And what do you do here at Jordi Labs?
18     A.   I'm involved in R&D, and I act as an
19 expert witness.  I review jobs as requested.  We
20 try to have three or four or five people review
21 every job that goes out to look for errors, that
22 kind of thing.  I'm working in developing new
23 products.
24     Q.   How much of your time is spent
25 consulting as an expert witness?

Page 257

1      A.   Well, generally it's a sideline, this
2  case being a little bigger than most that we've
3  seen.
4      Q.   In the last three months, how much of
5  your time has been occupied by this case?
6      A.   Three months, probably 50 percent.
7      Q.   Okay.  What have you done the other 50
8  percent of the time?
9      A.   Well, as I said, I'm reviewing jobs,
10 I'm working on developing new products, which
11 I've been doing for years.
12     Q.   In the last two years, have you had
13 any responsibility for supervising the
14 activities in the lab?
15     A.   In the last two years?
16     Q.   Yes.
17     A.   No.
18     Q.   All right.  And you rely on your son
19 to make sure that that goes off and the work
20 gets done as it needs to get done?
21     A.   Right.
22     Q.   Is Jordi Labs privately held?
23     A.   Yes, it is.
24     Q.   How many shareholders in Jordi Labs?
25     A.   Two.

65 (Pages 254 to 257)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 258

1    Q.  Who are they?
2    A.  My son and his business partner.
3    Q.  You no longer are an owner of Jordi
4  Labs?
5    A.  No.  My son.  I wanted to get out in
6  time from the ownership situation.
7    Q.  Okay.  And when did that happen?
8    A.  I don't remember exactly.  It's four
9  or five years.
10    Q.  How many employees does Jordi Labs
11  have now?
12    A.  Again, I don't know exactly.  It
13  changes every day.  I'd say 25, 26, around
14  there.
15    Q.  Do you know what percentage of the
16  Jordi Labs work is legal consulting on legal
17  cases?
18    A.  Well, generally it's a small
19  percentage.  As I say, right now it's a bigger
20  percentage because of the nature of this case,
21  but it's an unusual situation.
22    Q.  In this stack of documents are a
23  number of reports from an Evans Analytical
24  Group.
25    A.  Right.

Page 259

1    Q.  Tell me what those are, please.
2    A.  The FTIR microscope work was done by
3  Evans in California, and the SEM, SEM-EDX was
4  done by Evans Group in Minnesota.
5    Q.  Is that because you don't have the --
6    A.  We don't have those instruments.
7    Q.  How did you happen to choose the Evans
8  Analytical Group to perform this testing?
9    A.  We've worked with a company called
10  Chemir in the past, they were bought out by
11  Evans, and they're, I think, about a $7 billion
12  company, and they're a very well respected lab,
13  so we utilize their technique that we don't
14  have.
15    Q.  Is it the FTIR data --
16    A.  FTIR microscope.
17    Q.  Okay.  So for the FTIR and the
18  scanning electron microscope work, you ship that
19  out?
20    A.  That's correct.
21    Q.  And how did you transport the samples?
22    A.  They were sent by our office staff
23  following the regulations that we -- procedures
24  that were set up and described to us to handle
25  and to keep chain of custody.

Page 260

1    Q.  Do you specifically know how that
2  happened?
3    A.  Not exactly, I don't.
4    Q.  Okay.  That's fine.
5      And what did you do to assure that
6  Evans Analytical Group and -- what's the other
7  company?
8      MR. ANDERSON:  They're both Evans.
9    A.  They're both Evans, different
10  divisions.
11  BY MR. THOMAS:
12    Q.  Sorry.  Strike that.
13      What did you do to assure that the
14  Evans Analytical Group was capable of performing
15  the work that you asked them to do?
16    A.  We've been working with a gentleman at
17  Chemir, and we've been referring jobs back and
18  forth for years at various times, and he is --
19  he's really our contact with Evans.  We've had
20  tremendous results for a number of years working
21  with -- both ways, he sends a lot of work here,
22  we send some -- we send a lot of work his way.
23    Q.  So the FTIR -- strike that.
24      So all of the data done by Evans was
25  added to your report without change or input

Page 261

1  from you?
2    A.  Yes.  Basically you have those
3  results.  Any changes you can see there.  I'm
4  sure there were a few verbal changes, but
5  essentially it's the IR spectra, the IR spectra.
6  We certainly wouldn't have -- we wouldn't even
7  have the capability of changing those spectra.
8    Q.  Okay.  Has Jordi Labs ever had an
9  electron microscope?
10    A.  No.
11    Q.  Has Jordi Labs ever had the capability
12  to do the FTIR analysis?
13    A.  Yes.
14    Q.  When did you have that?
15    A.  Oh, probably -- well, we've had it
16  since basically day one of the company at
17  various units.  Classical FTIR.  Now we have the
18  Diamond ATR system.
19    Q.  You still have it?
20    A.  Absolutely.
21    Q.  Why do you ship this out to Evans?
22      MR. ANDERSON:  Micro.
23    A.  Micro.
24  BY MR. THOMAS:
25    Q.  I'm sorry.  Okay.

66 (Pages 258 to 261)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 262

1      Has Jordi ever had the capability to
2  do the kind of work that Evans did on the FTIR?
3      A.  No, we have never had an FTIR
4  microscope system.
5      Q.  Who is Scott Bowman?
6      A.  He's the gentlemen that transfers jobs
7  back and between us and Evans, or he sends us
8  work, we send him work.
9      Q.  Does he work for Jordi or work for
10  Evans?
11      A.  He works for himself.
12      Q.  Pretty good gig.
13      A.  It's worked out extremely well for us
14  and extremely well for him.  We love his
15  expertise and his ability to get us in touch
16  with the best people.
17      Q.  He's not a -- is he a technical guy?
18      A.  Absolutely is.
19      Q.  Does he do any technical work?
20      A.  No, he just basically is --
21      Q.  He's a broker?
22      A.  He's a broker, a very good one.
23      Q.  So on these SEM analysis reports here
24  that you got apparently from Evans --
25      A.  He may --

Page 263

1      MR. ANDERSON:  Hold on.
2  BY MR. THOMAS:
3      Q.  -- the numbers appear that I asked you
4  about, you didn't know where they came from?
5      A.  Right.
6      Q.  Is it likely that the numbers that I
7  asked you about in both reports on the SEM
8  images, likely those were put on there by Evans,
9  or do you know?
10      A.  They would have had to have been put
11  on by Evans because we couldn't have done it.
12      Q.  Okay.
13      A.  It's their pictures.
14      Q.  Do you have these in an electronic
15  format?  I'm sure you do.  Digital format?
16      A.  I'm sure we can get them.  Adi, again,
17  would know, handles that kind of thing for me.
18      Q.  Did you do all the other testing
19  in-house?
20      A.  Yes, we did.
21      Q.  The documents that I'm going through
22  now are Jordi SOPs, is that correct?
23      A.  Yes.
24      Q.  And these would be the internal
25  procedures that you have that instruct folks in

Page 264

1  how to conduct the tests that you did?
2      A.  That's right.
3      Q.  Diamond Shamrock Corporation, is this
4  a standard for polypropylene, or can you tell by
5  looking at it?
6      A.  Let me take a look.  I can't read it
7  from there.
8      Q.  (Handing).
9      A.  Yes, that's the polypropylene standard
10  spectrum.  Isotactic.
11      Q.  When we talked before, I thought we
12  decided you didn't use a standard against which
13  to compare your results, that you used your own
14  training, education, literature.
15      A.  There's no way for me to keep track of
16  everything these people are doing out here now.
17  I'm telling you the polystyrene is the one
18  that's used.
19      Q.  Do you know the extent to which the
20  people in the lab used that Diamond Shamrock
21  standard for polypropylene in connection with
22  their work on the opinions in Exhibit 1 or 2?
23  Do you know?
24      A.  No, because these -- this isn't an SOP
25  anyway.  This is just a bunch of spectra.  I'm

Page 265

1  not sure why that's even in there, it's not SOP.
2      Q.  Okay.  Just for the record, it's a
3  multi-page document copyrighted 1980, 1981, 1993
4  for Sadtler, and it's Diamond Shamrock
5  Polypropylene.
6      What's the document I just gave you
7  there, do you know?  Do you recognize that?
8      A.  It's another polypropylene spectrum,
9  J7904.
10      Oh, let me see the other one again,
11  please.
12      Q.  (Handing).
13      (Witness reviewing document.)
14      A.  These appear to be spectra of the
15  explants done on our instrument which were
16  polypropylene.  We saw lots of noise.  This is
17  why we chose to go with the FTIR microscope
18  route.  We had to look at the total samples,
19  number one.
20      Number two, the samples wouldn't lay
21  flat on our Diamond, and they tended to want to
22  bounce around because they were rigid, and so it
23  was difficult to get a good spectrum, it was
24  lots of noise, so we went to where we could go
25  to a high sensitivity technique where we could,

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 266

1  number one, hone in on the cracked regions.
2  When you run a sample with an instrument like
3  this, you're running can the total sample, so
4  you're diluting the effect on the cracked
5  regions, you'd be running a combination of
6  cracked and uncracked regions.  When we use the
7  IR microscope, you can hone in on any specific
8  region of the fiber we want, that's the
9  advantage.  So we decided to go with that
10  technique because it offered us -- for what we
11  needed for this work, it's a far better
12  methodology.
13      Q.  Before I showed you these documents,
14  were you aware that Jordi Labs had tried to
15  analyze in-house --
16      A.  Yes, I was.
17      Q.  -- the FTIR spectra for these
18  explants?
19      A.  Yes, I was.
20      Q.  Okay.  And you tried it, and the
21  documents you just looked at are the documents
22  that you generated in-house from your results of
23  your analysis, correct?
24      A.  That's -- I'm sorry, go ahead, ask the
25  question again.  I'm sorry.

Page 267

1      Q.  I will mark as Exhibit Number 7 the
2  documents you've just been looking at.
3          (Whereupon, Jordi Exhibit Number 7,
4          Group of films, was marked for
5          identification.)
6  BY MR. THOMAS:
7      Q.  And the first page is the Diamond
8  Shamrock standard from Sadtler, S-A-D-T-L-E-R,
9  and then attached to that are FTIR spectra that
10  you all ran in-house with your own capability,
11  at which point you determined that you weren't
12  generating the specificity of the data you
13  needed to make your analysis so you contracted
14  it out for microscopic FTIR?
15      A.  That's correct.
16      Q.  Is that fair?
17      A.  That's fair.
18      Q.  Mark that as Exhibit Number 7.
19          MR. THOMAS:  I won't mark the lab
20  notebooks.
21          The rest of what I have here are
22  miscellaneous SOPs, the Evans reports, and the
23  Evans reports.  Do you want the court reporter
24  to have those, or how do you want to do this?
25          MR. ANDERSON:  What we can do is we

Page 268

1  can find out if those are extra copies.  If
2  those are extra copies, she can take them with
3  her.  If they're not, then we'd like to leave
4  them here so that we can make copies, or we can
5  have you take them and make copies.  I think I
6  need to make sure they're not originals.
7          MR. THOMAS:  Here's what I'd like to
8  have, you tell me if I can have it.  I'd like to
9  have a hard copy and a digital copy.
10          MR. ANDERSON:  Well, I'd like to have
11  a million bucks and retire tomorrow, so if you
12  can deliver I will.
13          MR. THOMAS:  You can't retire on a
14  million dollars, I know you.
15          MR. ANDERSON:  It will last me a
16  couple months.
17          MR. THOMAS:  That wouldn't keep you in
18  Red Bull.
19          MR. ANDERSON:  If you're getting
20  digital -- well, hopefully they have it in
21  digital, then we'll give it to madame court
22  reporter and it will be an exhibit to the depo.
23  If -- that will still be in digital for you, so
24  you need a hard copy.  We'll do the best we can.
25  If it's digital --

Page 269

1          MR. THOMAS:  Digital is my first
2  choice, I'll print my own copy.  The hard copy
3  allows me to know I have everything.  Not
4  because I'm suggesting you're going to do
5  anything with it.
6          MR. ANDERSON:  No, it's easier.  I'm a
7  hard copy guy, too.  Why don't we figure that
8  out after the depo.
9  BY MR. THOMAS:
10      Q.  I'd also like a color copy of your
11  studies that you have.
12      A.  You'd like a what, sir?
13      Q.  Color copy so I can capture the
14  highlighting in your studies.  Because you
15  brought with you today a notebook of studies
16  upon which you rely for your opinions in the
17  case.
18      A.  Articles, yes.
19      Q.  And you have highlighting and writing
20  on them, correct?
21      A.  Mostly highlighting, yes.
22      Q.  I want versions of those that capture
23  the highlighting.
24          MR. ANDERSON:  Absolutely.
25      A.  Fair enough.

68  (Pages 266 to 269)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 270

1        MR. ANDERSON:  We need to take a
2   break.  Let's take a break.
3        (Whereupon, a recess was taken from
4        4:39 p.m. to 4:56 p.m.)
5   BY MR. THOMAS:
6        Q.   Doctor, attached to Exhibit 1 is a
7   part of -- oh, right after your primary report,
8   is your CV.  I'm just going to ask you some
9   questions about your career.  You can look at
10  the CV if you want to.  I imagine you know it
11  pretty well.
12       A.   Where is it here?  What page?
13       Q.   It's after Page 102.  I bet you it's
14  in the back of that.
15       A.   Appendix.  Conclusion.
16       MR. ANDERSON:  After Page 102?
17       MR. THOMAS:  That's where I have it.
18  It will be in that copy right there.
19       A.   All right.  That's fine.
20       MR. THOMAS:  We've got it here, Ben.
21       A.   Okay.
22  BY MR. THOMAS:
23       Q.   All right.  Tell me about your
24  education after college, Dr. Jordi.  I mean
25  after high school.

Page 271

1        A.   I went to Northern Illinois University
2   in DeKalb, Illinois, worked on my bachelor's
3   degree in chemistry, graduated in the summer of
4   1967.
5        Was offered a graduate position there,
6   an NIH fellowship, so I stayed there and worked
7   on my doctorate degree.  I finished that in
8   1973, and actually officially graduated in
9   January of '74, but I'd already left and was
10  already in the US Army at Walter Reed by that
11  point.
12       Q.   You worked at Walter Reed for how many
13  years?
14       A.   A little over three years.
15       Q.   What did you do at Walter Reed?
16       A.   It was a lab tech chemist position.  I
17  worked with, as I mentioned, the biodegradable
18  implants, polylactic and glycolic acid
19  copolymers.  We had an another project for
20  purification of eugenol, which is used by
21  dentists.  I worked on developing methods of
22  purifying eugenol.
23       Q.   You were employed at this time as an
24  analytical chemist?
25       A.   Basically.

Page 272

1        Q.   And your job as an analytical chemist
2   was to do the lab work associated with any
3   issues that might arise?
4        A.   Whatever came up.  Whatever projects
5   they wanted support for.
6        Q.   All right.  And the extent to which
7   any of these products may be appropriate for use
8   in humans would be something beyond what you
9   were doing in the lab on the bench?
10       A.   Yes.
11       Q.   Okay.  What did you do -- you were
12  next employed for six months at Waters
13  Associates.  What were you have doing there;
14  more of the same analytic chemist group?
15       A.   Basically Waters at that time was,
16  still is a great company, but by my standards,
17  my personality, I like a company that's
18  personable with their customers.  They had a
19  philosophy at that time that they would work to
20  solve the customer's separation need and earn
21  the sale of the HPLC instrument through
22  providing the solution of their separations
23  problem, and so my job was to develop those
24  methods.  The sales rep would come in and say
25  "this guy wants to separate such and such, and

Page 273

1   get me a method so we can sell the instrument."
2        Q.   Okay.
3        A.   At that time liquid chromatography was
4   nowhere near as advanced as it is now, so if a
5   guy wanted to separate something, likely there
6   was no published methods available many times,
7   so then we would get involved.
8        Q.   So were your years -- or your time at
9   Waters dealing primarily with liquid
10  chromatography?
11       A.   Yes, or columns.
12       Q.   Or columns.
13       Does that include your entire time at
14  Waters up until February, 1980?
15       A.   Yes.  Developed amino acid, worked on
16  developing an amino acid analyzer, first
17  generation amino acid analyzer.  And then they
18  sent me places to install amino acid analyzers,
19  like they sent me to Germany, they sent me to
20  Chicago.
21       Q.   Continuing in the analytical chemistry
22  area?
23       A.   Yeah, it was amino acid analysis at
24  this point, that was the specialty at that point
25  in time.  It always kept changing depending on

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 274

1  the needs of the company, of course.
2      Q.  Then you went for a short time to LC
3  Laboratories?
4      A.  I'm looking at the order of these
5  pages here.
6      Q.  You go back to front, I think.
7      A.  There's Army.  The pages aren't
8  listed.
9      MR. ANDERSON:  Is this it here?
10     A.  Where are we here?
11 BY MR. THOMAS:
12     Q.  Hopefully February, 1980 to September,
13 1980, it looks like you were employed by LC
14 Laboratories as a senior chemist?
15     A.  That's right.
16     Q.  You managed the complete polymer GPC
17 program?
18     A.  Right.  I was working at the time with
19 a Waters 150C, which is a high temperature GPC
20 system running high temperature samples, among
21 other things, and I was responsible for
22 maintaining that instrument.
23     And we also were a contract lab, so we
24 got all kinds of projects.  Whatever the
25 customers sent in they wanted us to do, we did,

Page 275

1  just like we have here now.
2      Q.  Same kind of internal analytical work?
3      A.  Yes.
4      Q.  Okay.
5      A.  It might be prep, it might be
6  developing analytical method, it might be
7  polymer formulation, whatever, whatever it was.
8      Q.  And then from October of 1980 until
9  July, 2008 you ran your own show?
10     A.  That's right.  Remember I told you
11 four or five years, that's where it is.  2008 we
12 turned it over to Mark.
13     Q.  Has the business of Jordi Labs largely
14 been the same over the time frame it's operated?
15     A.  Yes.  But we're continuing to add
16 instrumentation.  So some of the instruments we
17 don't have now, if you come back in a few years,
18 lord willing, we will have.  Like we're thinking
19 about an FTIR microscope system, we're thinking
20 about an SEM system.  We just invested in a QTOF
21 GC system which should be in within the next few
22 months to match the LCMS QTOF system, which
23 gives you more accurate mass and better ability
24 to get more accurate mass and more accurate
25 identification of unknowns.

Page 276

1      Q.  How would you describe the business of
2  Jordi Labs today?
3      A.  We're an analytical testing lab,
4  material science, some expert witness testimony,
5  it's not the major thrust by any stretch,
6  product development.  Because the other side of
7  the business that I developed during my time is
8  several dozen products, fluorinated gel that I
9  patented that's selling.
10     Q.  What does a fluorinated gel do?
11     A.  Well, in chromatography, as you run
12 fast -- liquid chromatography, or any
13 chromatography, as you run faster you'll tend to
14 get less efficient plates.  Plates is a
15 narrowness of the peaks coming off, and the
16 narrower they are the better, the more things
17 separated the narrower they are.
18     So with the fluorinated gel, solvents,
19 it's like Teflon surface chemistry, solvents
20 tend not to wet it.  Since solvents don't wet
21 surface, they don't create drag, and that's what
22 broadens the peaks.  And so now I can run
23 something at 10 mils a minute instead of one mil
24 a minute, I can run at one-tenth the time on
25 that kind of column.

Page 277

1      I developed a polyamide type column,
2  we call it Extreme.  It's a column that runs
3  things in water, polar solvents, so today our
4  polyamides, nylons, proteins, can be run on the
5  Extreme material.
6      I have a standard line of DVD resins
7  that I've developed.  Those are selling well.
8      And basically there's a whole product
9  line.  There's SFE product, solid face
10 extraction cartridges.
11     Q.  Is it fair to describe your business
12 as a lab that offers analytical chemistry
13 services to those who might need it?
14     A.  Yes.
15     Q.  And whatever other products you all
16 might develop on your own?
17     A.  The products we developed are no
18 like -- I would say we probably have a million
19 dollar column inventory here, if we had to go
20 out and buy them all, but we save a good portion
21 of that money by making them ourselves.  And as
22 a side bonus, we sell them on the side and make
23 money from the sale of them, too, as products.
24 That was my business model.
25     And when I successfully developed

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 278

1    methods for clients, then they would say -- they
2    might say "okay, now you run $100,000 worth or
3    $200,000 worth of samples, I want to take that
4    in-house, sell me the column, turn-key method."
5    They've already seen my methods here, they've
6    seen the results, they just take the column and
7    start running.  But now I don't use the total
8    business, I have a column customer instead of a
9    sample customer.
10       Q.   So when you talk about the methods,
11   you're talking about methods of analytical
12   chemistry that you come up with for your
13   customers?
14       A.   Yes.
15       Q.   Prior to your deposition today, have
16   you ever testified or consulted in a medical
17   device case?
18       A.   I have testified.  I don't think, I
19   don't recall -- well, I have been involved with
20   polypropylene implants, artificial hips,
21   artificial knees, polyethylene, I believe.  I've
22   been involved with contact lenses.  I don't --
23   I've been involved in the legal cases, many
24   times they don't go to court, they settle, so
25   you say testify, testifying has been less, of

Page 279

1    course, than the work for -- because people will
2    come to me and not even tell me it's a legal
3    case, then they'll see the results and then tell
4    me they want to do more and now they'll tell me
5    it's a legal case.
6        Q.   What did you do in connection with
7    knee implants?
8        A.   I just ran GPC, additives.
9        Q.   Analytical testing?
10       A.   Just to see if the polymer was
11   degraded over periods of time, if the additives
12   were still there, just like we're doing now.
13       Q.   Did you give any deposition testimony
14   in any cases involving knee implants?
15       A.   It's been 20 years ago.  I don't
16   recall.  I remember running the work, but I
17   don't remember what -- how deep into it we got.
18       Q.   Did you work for the Plaintiff or the
19   Defendant?
20       A.   I worked for the manufacturer,
21   whether --
22       Q.   Do you remember who that was?
23       A.   No, I don't.
24       Q.   What about hip implants, what work did
25   you do on hip implants?

Page 280

1        A.   The same type of thing, molecular
2    weight, additives.
3        Q.   How long ago did you do the hip
4    implant work?
5        A.   The same thing.
6        Q.   20 years ago?
7        A.   20 years ago-ish.
8        Q.   Have you done anything in the last ten
9    years in hip implants?
10       A.   No, I haven't seen it recently.
11       Q.   Do you remember who you worked with on
12   hip implants?
13       A.   No.
14       Q.   Did you give any depositions in hip
15   implant litigation?
16       A.   I don't think so.
17       Q.   Do you know whether Jordi Labs works
18   on any current hip implant litigation?
19       A.   No.  No, I shouldn't say -- I have to
20   say I don't know because I really don't know
21   what the current workflow is.  I don't talk to
22   the customers anymore directly.  I used to know
23   that intimately, but I don't now.
24       Q.   Contact lenses, have you done any work
25   on contact lenses in the last 15 years?

Page 281

1        A.   I couldn't name the customers.  I
2    suspect we have because we've worked on
3    methacrylate type gels, and hematype gels which
4    are used in that kind of product.
5        Q.   In a litigation context?
6        A.   No, just analysis.
7        Q.   For the knees, hips, and contact
8    lenses that you just identified, do you recall
9    giving any deposition testimony in any of those
10   cases?
11       A.   No.
12       Q.   Have you ever testified as an expert
13   in a medical device case before today?
14       A.   I don't believe so.
15       Q.   Have you ever done any work for the
16   FDA?
17       A.   No.
18       Q.   Ever done any work for Johnson &
19   Johnson?
20       A.   I think we probably have, because
21   we've worked for almost all the major
22   corporations over the years.
23       Q.   Do you have a specific recollection of
24   working for Johnson & Johnson or any of its
25   subsidiaries?

71 (Pages 278 to 281)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 282

1    A.  I have a recollection, but I couldn't
2  even tell you what we did.
3    Q.  Are you familiar with a company known
4  as Ethicon?
5    A.  Yes.
6    Q.  Do you have any recollection of ever
7  working with Ethicon?
8    A.  The name sure sounds familiar.
9    Q.  Do you know the business of Ethicon?
10   A.  Well, I do, I mean I know one part of
11 it at least now, these meshes.  I don't know, I
12 don't have what else they might be involved in.
13   Q.  Do you know any business interests
14 that Ethicon has beyond the mesh that's involved
15 in the litigation about which you're testifying
16 today?
17   A.  Other than the mesh?
18   Q.  Right.
19   A.  No.
20   Q.  And the only reason you know about the
21 mesh and its relationship to Ethicon is because
22 you're involved in this case, is that fair?
23   A.  That's right.
24   Q.  We talked earlier about work that
25 Jordi Labs may be doing in litigation involving

Page 283

1  Bard.  Do you know whether Jordi Labs is doing
2  work involving the meshes of any other
3  manufacturer?
4    A.  I don't have any idea.
5    Q.  Do you have an engagement letter with
6  the Plaintiffs in this case?
7    A.  No.
8    Q.  Do you know whether Jordi Labs has an
9  engagement letter with the Plaintiffs in the
10 case?
11   A.  Well, we have -- we send out
12 quotations, and those have to be signed.
13   Q.  Okay.
14   A.  Somehow.
15   Q.  For work that's been done in this
16 case, you should have on your file a contract or
17 agreement?
18   A.  That would be -- the way the work is
19 handled is it goes through a project manager,
20 and the project manager would have that quote.
21 He generates the quotes, and then it's approved
22 by Mark and others.
23   Q.  Do you know who the project manager
24 is --
25   A.  Greg.

Page 284

1    Q.  -- for this work?
2    A.  What's Greg's last name?  I can look
3  it up.
4       MR. ANDERSON:  Elsdon.
5    A.  Elsdon.
6  BY MR. THOMAS:
7    Q.  And what kind of file materials would
8  the company typically keep that would govern the
9  relationship that it has with a customer, an
10 engagement or purchase order or a contract of
11 some sort outlining the work you're going to do?
12   A.  There has to be some kind of
13 paperwork, otherwise we wouldn't begin work.
14   Q.  Anything else?
15   A.  Not very formal, other than that.
16   Q.  On the invoices we talked about
17 earlier that I marked as an exhibit, there were
18 a number of surcharges for rush work.  Are you
19 familiar with those?
20   A.  Yes.
21   Q.  What happened?  Why were the
22 surcharges made?
23   A.  Well, like in the Batiste case, the
24 sample was explanted recently, and we had to be
25 ready for the deposition today, so in order to

Page 285

1  do that it had to be done on a rush basis or it
2  wouldn't be ready.  Normal turnaround is ten
3  days.
4    Q.  Do you have a pricing policy that
5  determines the extent to which you markup work
6  for surcharges?
7    A.  Yeah, they do.  It's maybe double.  I
8  don't -- again, I don't control that.  But I'm
9  familiar with it.
10   Q.  For example, on invoice 7881, there's
11 a surcharge for rush analytical surfaces of
12 $35,000.
13       Would that be a charge in addition to
14 what it ordinarily costs?
15   A.  Yes.
16   Q.  And again on 7883, 9/11/2013, there's
17 another surcharge for $67,813?
18   A.  Yes.
19       We're basically set up --
20       MR. ANDERSON:  There's no question.
21       THE WITNESS:  Sorry.
22       MR. ANDERSON:  No question pending.
23       MR. THOMAS:  I'm finished.  Thank you.
24       MR. ANDERSON:  All right.  I need to
25 take a break, take a few minutes and sit and

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 286

1  talk, and we'll be back on here as soon as we
2  can.
3        (Whereupon, a recess was taken from
4        5:16 p.m. to 5:49 p.m.)
5        CROSS EXAMINATION
6  BY MR. ANDERSON:
7        Q.  Dr. Jordi, I'm just going to ask you a
8  few questions.  I know it's been a long day, but
9  I just have a few follow-up questions to some of
10 the things Mr. Thomas asked you.  Okay?
11       A.  Okay.
12       Q.  Doctor, all of the testing that we've
13 been discussing all day long that was performed
14 by Jordi Labs, are all those tests industry
15 standard?
16       A.  Yes.  Routine.
17       Q.  In performing these tests, the ones
18 that were done at Jordi Labs, were standard
19 operating procedures here at Jordi Labs
20 followed?
21       A.  Yes.
22       Q.  Were lab notebooks carefully collected
23 and each step written down by --
24       A.  Yes.
25       Q.  Let me finish.

Page 287

1        -- by Jordi Labs?
2        A.  Yes.
3        Q.  And was all of the testing that we've
4  described today done at your direction?
5        A.  Yes, I requested these tests.
6        Q.  Is it standard or non-standard in your
7  industry for someone to assign work or to send
8  work of this nature, this type of testing, to
9  someone else to perform the testing?
10       A.  It's standard procedure because
11 nobody, almost nobody has enough, except the
12 giants, has enough money to have all the
13 instruments.
14       Q.  So when Mr. Thomas was questioning you
15 about some of the jobs you sent to Evans, and
16 you said sometimes Evans sends jobs to you, is
17 that standard in your industry?
18       A.  Absolutely.
19       Q.  Therefore, was it standard for you to
20 send some of the FTIR microscopy and other tests
21 out to Evans to have them send you the results?
22       A.  Yes.
23       Q.  In preparing your report in this case
24 and providing your opinions, is it fair to say
25 that you assigned these projects to folks at

Page 288

1  Jordi Labs, and they brought results back to
2  you, and you interpreted those results?
3        A.  That's right.
4        Q.  Is that also standard in your
5  industry?
6        A.  Absolutely.
7        Q.  In talking about your opinions
8  regarding the degradation of the meshes from
9  Ms. Batiste, Ms. Lewis, and the other women
10 whose explant samples you reviewed today, do you
11 have an opinion as to whether or not those
12 meshes would degrade even if there were
13 antioxidants present in the polypropylene?
14       MR. THOMAS:  Object to the form of the
15 question.
16       A.  It's possible that they could if the
17 amount of peroxide, superoxide, other oxidants,
18 the irritation, the inflammation was great
19 enough in a given patient.
20 BY MR. ANDERSON:
21       Q.  You said "possible," so we have to
22 correct that.
23       Do you have an opinion to a reasonable
24 degree of medical certainty as to whether or not
25 the meshes in Ms. Batiste, Ms. Lewis, and others

Page 289

1  could still degrade showing the cracking on SEM
2  and showing SEM-EDX analysis of the particles to
3  be polypropylene even if there was antioxidants
4  present in the mesh?
5        MR. THOMAS:  Object to the form of the
6  question.
7        MR. ESTEE:  Object to form.
8        A.  It's certainly -- the antioxidants can
9  be overcome if you throw enough oxidant at the
10 polymer.
11 BY MR. ANDERSON:
12       Q.  Is the sole basis for stating that
13 antioxidants can leach from polypropylene just
14 your work done in this case, or are there other
15 bases for that opinion?
16       MR. THOMAS:  Object to the form of the
17 question.
18       A.  Certainly additives bloom at varying
19 rates depending on their compatibility with the
20 polymer system they're put in.  So Santonox R
21 can bloom, most any additive can bloom at some
22 rate, and the less compatible it is with the
23 polymer the faster it will bloom, and hence the
24 faster it will be lost.  So polymers can lose
25 their antioxidants even if they're stabilized

73 (Pages 286 to 289)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 290

1  initially.  In fact, they all do at some rate.
2  BY MR. ANDERSON:
3      Q.  And is that knowledge that you just
4  expressed based only upon the studies that you
5  did here, or is that something that you brought
6  with you before this litigation?
7          MR. THOMAS:  Object to the form of the
8  question.
9      A.  No, the -- over 30 years of experience
10  and articles I've read, books I've read, other
11  samples I've analyzed, it can be -- they can
12  lose their antioxidants, as well as we showed it
13  in the study.  But that certainly isn't the only
14  reason I believe they're lost.
15  BY MR. ANDERSON:
16      Q.  Right at the end of some of the
17  questioning there was some -- Mr. Thomas asked
18  you some questions about some rush charges on
19  the bills.
20          Do you remember those?  Do you
21  remember those questions?
22      A.  Yes, sir.
23      Q.  Is it standard in your industry if
24  someone asks you to do a quick turnaround on
25  testing that you charge a rush charge?

Page 291

1      A.  Absolutely is.
2      Q.  So that wasn't something just special
3  to me, that's something your company does all
4  the time?
5      A.  We -- yes.  Absolutely.
6      Q.  Do other companies in your industry do
7  the same thing?
8      A.  Absolutely.
9      Q.  Does your dry cleaners do it, too?
10  Withdraw the question.
11          And why is it that your company would
12  charge a rush fee?
13      A.  We have to turn away other work, we
14  have to put other projects on hold, potentially
15  if we get enough of this type of thing, angering
16  some clients.  So it's a difficult management
17  decision on how to handle it.
18      Q.  Does it put an increase on your
19  workload for your employees?
20      A.  Absolutely.
21      Q.  Let me take you back to a part of your
22  testimony regarding cleaning the material or,
23  let's call it, preparing the fibers prior to
24  certain testing being done at Jordi Labs.
25          Do you remember that part of your

Page 292

1  questioning?
2      A.  Mm-hmm.
3      Q.  Yes?
4      A.  Yes.
5      Q.  There was some question by Mr. Thomas
6  as to whether or not you should have used sodium
7  hypochlorite in order to clean the materials.
8          Do you remember that part of the
9  questioning?
10      A.  Yes.
11          MR. THOMAS:  Object to the form of the
12  question.
13          MR. ANDERSON:  I'm trying to redirect
14  the witness back to that area of the
15  questioning.
16  BY MR. ANDERSON:
17      Q.  By not applying sodium hypochlorite to
18  the fibers in order to remove some of the
19  proteins, would that change any of your opinions
20  with regard to whether or not the meshes in
21  Ms. Lewis, Ms. Batiste, and the other women
22  whose explanted meshes you looked at degraded on
23  SEM analysis?
24      A.  No.  The fact is that you could
25  clearly see the degradation, it had no bearing

Page 293

1  whatsoever.
2      Q.  What change, if any, would applying
3  sodium hypochlorite have to any of the test
4  results that you obtained for Ms. Lewis,
5  Ms. Batiste, and the other women?
6      A.  It would have removed the protein from
7  the surface of the mesh so that the infrared
8  spectrum would -- the protein bands in the
9  infrared spectrum would have gone away.
10      Q.  Whether or not those bands are present
11  or not present, can you still see other evidence
12  of oxidation on those bands?
13      A.  We still saw the 1760 band and the
14  1740 shoulder in spite of that.  So they're both
15  still there, both of which indicate oxidation.
16      Q.  You were shown by Mr. Thomas Jordi
17  Exhibit 3, that was this Renaud de Tayrac and
18  Letouzey article.
19          Do you recall that?
20      A.  Yes, I do.
21      Q.  Were the meshes that were --
22      A.  I got it.
23      Q.  Were the meshes that were explanted
24  and analyzed in that study coming from women?
25      A.  No, it says in Figure 1 they were

Golkow Technologies, Inc. - 1.877.370.DEPS

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 294

1  coming from Wistar rats.
2      Q.  From rats, is that what you said?
3      A.  Yes.  Wistar rats.
4      Q.  And when animal studies are used in a
5  preclinical model, do they typically use healthy
6  rats?
7      A.  Yes.
8      Q.  Was the explanted tissue coming from
9  these women coming from healthy tissue?
10         MR. THOMAS:  Object to the form of the
11  question.
12     A.  From here, from this figure?
13  BY MR. ANDERSON:
14     Q.  From the women whose explanted meshes
15  you looked at.  I'll withdraw -- that's okay,
16  I'll withdraw the question.
17         He used D -- well, these authors used
18  DMSO as well as ultrasonic treatment in order to
19  remove what they claim to be just the proteins
20  from the fibers.
21         Do you recall that?
22     A.  I do.
23     Q.  Do you believe that's a scientifically
24  valid method in which to determine what is
25  flaking off of the meshes?

Page 295

1      A.  I do not.
2      Q.  And why is that?
3      A.  If you use sonication you're using a
4  battering ram to knock the cracked material off,
5  and so if you knock the material off you're
6  removing the very thing that you want to look
7  at.  They did not -- now, if they had run
8  infrared or some other technique to look at the
9  structure of the material coming off chemically,
10  it would have been helpful, but none of that was
11  done.  So it was just blasted clean, and say it
12  never was polypropylene, but we know it was
13  polypropylene because we looked at it in our
14  particles, and we saw that it was polypropylene.
15  Of course it did have some protein in it, but it
16  was mostly polypropylene.
17     Q.  So do you find this article to be
18  scientifically reliable with regard to whether
19  or not TVT mesh degrades in women?  Do you find
20  this article to be scientifically valid with
21  regard to whether or not the TVT meshes degrade
22  in women?
23     A.  I do not.  I think -- I'm surprised it
24  was published without some requirement to do
25  structural analysis to prove their claim.

Page 296

1  There's no proof there by any chemical testing.
2      Q.  Do you recall during part of your --
3  during part of the questioning by Mr. Thomas, he
4  was asking you whether or not you or someone at
5  Jordi Labs performed any analysis on hydrogen
6  peroxide or any other products of inflammation
7  that may have occurred in the women's tissue
8  before these meshes were explanted?  Do you
9  remember that part of your testimony?
10     A.  I do.
11     Q.  Are you aware of any test out there
12  that would allow you to look at the products of
13  inflammation in and around mesh fibers that have
14  been explanted and put into formalin and shipped
15  to you for analysis?
16     A.  Absolutely not, because it's been
17  washed away.
18     Q.  Would it matter to your opinions
19  regarding the degradation of these meshes in
20  this case whether or not hydrogen peroxide was
21  present in the body at that time?
22     A.  No, it would not, because the damage
23  was observed in SEM and other techniques, like
24  IR.
25     Q.  Do you, to a reasonable degree of

Page 297

1  medical -- to a reasonable degree of medical
2  certainty --
3         MR. THOMAS:  Scientific certainty.
4  BY MR. ANDERSON:
5      Q.  What did I say?  Medical?  It's been a
6  long day.
7         Doctor, do you have an opinion to a
8  reasonable degree of scientific certainty as to
9  whether or not you need to know whether hydrogen
10  peroxide, superoxides, or any other mediators or
11  inflammatory products that would have been
12  produced in the body were present on the meshes
13  by the time you analyzed them in order to
14  determine whether or not these meshes degraded?
15     A.  I don't see why we'd need to determine
16  that.
17     Q.  And why is that?
18     A.  It wouldn't matter.  We see the
19  degradation, the oxidation has already occurred,
20  we don't need to say hydrogen peroxide or
21  hydroxide radicals at this point, we need to see
22  the chemical damage that's been done to the
23  material.  It either has or has not occurred.
24     Q.  Do you recall some questioning by
25  Mr. Thomas where you were looking at the FTIR

75 (Pages 294 to 297)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 298

1  microscopy, and there was a picture of one of
2  the shards of polypropylene that had come off
3  one of the meshes?
4      A.  Yes.
5      Q.  Do you recall that?  Don't cut me off
6  if you can.
7          Do you recall that?
8      A.  Yes.
9      Q.  Do you recall that he asked you how
10  many of these particles came off of the fibers?
11  Do you remember that?
12      A.  Yes.
13      Q.  Did you feel the need to count each
14  and every particle that came off of those fibers
15  in order to allow you to make an opinion as to
16  whether or not those FTIR microscopy analyses
17  showed that the shards contained polypropylene?
18      A.  I saw no need, because you can look at
19  the cracked region, and if it came off in bits
20  and pieces, each piece would be the same.  It
21  all looks identical.
22      Q.  And just give us an estimate of how
23  many of these particles were falling off just
24  one of these small pieces of fibers; are we
25  talking tens, twenties, dozens?

Page 299

1      A.  I have no idea.
2      Q.  It's that many?
3          MR. THOMAS:  Object to form.
4      A.  In some cases, like this case, this
5  article --
6  BY MR. ANDERSON:
7      Q.  No, we're going to focus on in this
8  case.
9      A.  Okay.
10      Q.  The amount of material.  Let's focus
11  on that.
12          In the photographs that were done by
13  Evans on the FTIR microscopy when they showed
14  the various pieces, did you need to test 10, 20,
15  30 of those pieces to confirm the results that
16  you had on your FTIR microscopy?
17          MR. THOMAS:  Object to the form of the
18  question.
19      A.  No.  I mean they're all the same.
20  BY MR. ANDERSON:
21      Q.  Do you recall being asked a question
22  as to how much oxidation is required to cause
23  the polypropylene fibers to begin to flake?  Do
24  you recall that part of your questioning?
25      A.  Yes.

Page 300

1      Q.  How much oxidation was required for
2  Ms. Lewis, Ms. Batiste, and these other 21
3  women?
4      A.  Enough to cause the flaking that was
5  observed.
6          MR. THOMAS:  Object to form of the
7  question.  Move to strike.
8          MR. ESTEE:  Object to form.
9  BY MR. ANDERSON:
10      Q.  How much oxidation was required for
11  the mesh samples for Linda Batiste, Carolyn
12  Lewis, and all the other women whose meshes you
13  observed in order to flake?
14          MR. THOMAS:  Object to the form of the
15  question.
16          MR. ESTEE:  Form.
17      A.  That's an impossible question for me
18  to answer.  I know that there was enough because
19  it did flake and it was observed in the SEM.
20  BY MR. ANDERSON:
21      Q.  If polypropylene fibers flake in the
22  manner in which those that you observed in this
23  testing flaked and peeled off, would that allow
24  this mesh to function for its intended purpose?
25          MR. THOMAS:  Object to form of the

Page 301

1  question.
2          MR. ESTEE:  Object to form.
3      A.  I would think it would cause
4  irritation in the body, so I would think not.
5  That is a question primarily for the medical
6  doctors to answer as far as the damage it might
7  or might not do.  But it certainly can't be good
8  to be putting knife edges in tissue.
9  BY MR. ANDERSON:
10      Q.  Is it your understanding that these
11  are supposed to be permanently implanted in a
12  woman's pelvic tissues?
13      A.  Yes.
14      Q.  Given the amount of degradation that
15  you've seen in your testing, do you believe that
16  it would perform its intended purpose of being
17  permanently implanted in these women's bodies
18  without causing some problems with the polymer
19  structures?
20          MR. THOMAS:  Object to form of the
21  question.
22      A.  Absolutely not.
23  BY MR. ANDERSON:
24      Q.  Explain what you mean by that.
25      A.  Well, these shards come off, they're

76 (Pages 298 to 301)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 302

1  going to cause inflammation, and it's going to
2  be a problem.
3          MR. THOMAS:  Move to strike.
4  BY MR. ANDERSON:
5      Q.  Had these meshes continued to be in
6  these women's bodies, would you -- strike that.
7          Is degradation of polymer, like you've
8  seen in this testing, progressive?
9          MR. THOMAS:  Object to form of the
10 question.
11     A.  Yes.  It definitely is.  It starts on
12 the surface and apparently works its way in, as
13 we've seen by SEM-EDX presence of oxygen in the
14 second underlying layer.
15 BY MR. ANDERSON:
16     Q.  So do you have an opinion to a
17 reasonable degree of scientific certainty as to
18 whether or not the longer these mesh fibers are
19 in the body the more degradation will occur?  Do
20 you have an opinion on that?
21     A.  I think the data shows that it's going
22 to degrade like the layers of an onion, layer
23 after layer.
24     Q.  You were asked some questions about --
25 from Mr. Thomas as to whether or not you used a

Page 303

1  standard over here for polypropylene, for FTIR,
2  or a standard over here.  Do you remember that
3  part of your questioning?
4      A.  Right.
5      Q.  Do you need an FTIR for polypropylene
6  -- sorry.  Strike that.
7          Do you need an FTIR standard for
8  polypropylene in order to determine whether or
9  not the polypropylene in these meshes oxidized
10 and degraded?
11     A.  Absolutely not.
12     Q.  Please explain that.
13     A.  Because we have -- the carbonyl is
14 going to show up at 1740, 1730, 17 whatever, 15,
15 or 1700 depending on the form, or a mix of all
16 of those, and that's going to be there in a
17 polypropylene.  So if the carbonyl shows up,
18 it's going to be separate from the bands of the
19 polypropylene.  Polypropylene doesn't have any
20 bands there.
21     Q.  Do you recall, if you could just turn
22 to Pages 67 and 69 of your report, you were
23 looking at some FTIR micro with Mr. Thomas?
24     A.  Yes.
25     Q.  And you were asked some questions as

Page 304

1  to whether or not you found anything in the
2  FTIR, evidence of oxidation at band 1730 to
3  1680.
4          Do you recall that?
5      A.  Yes.
6      Q.  Does it matter to you whether or not
7  you can find evidence of oxidation in the FTIR
8  at 1730 to 1680 in order to hold the opinion
9  that this mesh degraded in this woman's body?
10     A.  Not really, because the fact is it did
11 degrade and we saw it in the SEM.  That's just
12 simply a fact.
13     Q.  Is all of the testing that was done
14 for Carolyn Lewis and Linda Batiste contained in
15 the reports that you've provided?
16     A.  Was all of the testing?
17     Q.  Is all of the testing that was done at
18 your direction provided in the reports that
19 you've given today for both Linda Batiste and
20 Carolyn Lewis?
21     A.  Well, with the possible exception of
22 the --
23     Q.  Let me see if I can withdraw that.
24          Is all the testing that forms the
25 basis of your opinions that the mesh degraded in

Page 305

1  Linda Batiste and Carolyn Lewis available in the
2  reports that you've provided today?
3      A.  Yes.
4          MR. THOMAS:  Object to the form of the
5  question.
6  BY MR. ANDERSON:
7      Q.  In other words, if you wanted to speak
8  to the results for all of the testing that was
9  done showing degradation as you've described
10 previously here for the jury for Carolyn Lewis
11 and Linda Batiste, you'd be able to point us to
12 each one of those testing as Mr. Thomas went
13 through with you today, correct?
14         MR. THOMAS:  Object to form.
15         MR. ESTEE:  Form.
16         MR. ANDERSON:  Form.
17     A.  That's correct.
18 BY MR. ANDERSON:
19     Q.  Based on your knowledge, training,
20 background, experience, your work history with
21 polymers as you described it here today, your
22 work as a biochemist and a polymer chemist, and
23 all of the materials that you reviewed in this
24 case, including the testing that was done at
25 your direction, do you have an opinion to a

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

| Page 306 | Page 308 |
|---|---|

**Page 306**

1  reasonable degree of scientific certainty as to
2  whether or not the polypropylene mesh, Prolene
3  mesh TVT implanted in Carolyn Lewis, degraded
4  while in her body?
5       MR. THOMAS: Object to the form of the
6  question.
7       MR. ESTEE: Object to form.
8  BY MR. ANDERSON:
9    Q.  Do you have an opinion?
10   A.  I absolutely do.
11   Q.  What is that opinion?
12       MR. THOMAS: Objection to form.
13       MR. ESTEE: Form.
14   A.  It's obvious, you can see the
15  cracking.
16  BY MR. ANDERSON:
17   Q.  And do you have an opinion to a
18  reasonable degree of scientific certainty based
19  upon your knowledge, training, background,
20  education, all of your work history for greater
21  than 30 years, 40 years, your work here at Jordi
22  Labs, as well as all of the materials that
23  you've reviewed in this case, including the
24  testing that was done for the explant sample for
25  Linda Batiste, as to whether or not the mesh in

**Page 308**

1       MR. ESTEE: No.  We will reserve any
2  questions until the time of trial.
3       MR. THOMAS: Thank you.
4       (Whereupon, the deposition was
5  concluded at 6:11 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 307**

1  Linda Batiste degraded in her body?
2       MR. THOMAS: Objection.
3       MR. ESTEE: Form.
4    A.  It did degrade.  I saw the damage.
5  BY MR. ANDERSON:
6    Q.  And what is the basis for that, the
7  damage that you saw, the testing that you saw?
8       MR. THOMAS: Objection.
9    A.  We saw increased carbonyls in the
10  infrared.  We saw the increased oxygen in
11  SEM-EDX.  We saw the lack of antioxidants, which
12  would predispose the polymer to oxidation.
13  BY MR. ANDERSON:
14   Q.  Did the SEM photos also support your
15  opinions in that regard?
16   A.  They were the -- they were proof
17  positive really.  That just shows it's fact, it
18  happened.  We can argue about how it happened,
19  but it's definitely a fact that it did happen.
20       MR. ANDERSON: I don't have anything
21  further.
22       MR. THOMAS: Anybody on the phone?
23       MR. ESTEE: I'm sorry?
24       MR. THOMAS: Do you have any
25  questions?

**Page 309**

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.            )
3       I, MAUREEN O'CONNOR POLLARD, RPR, CLR,
4  and Notary Public in and for the Commonwealth of
5  Massachusetts, do certify that on the 30th day
6  of October, 2013, at 9:05 o'clock, the person
7  above-named was duly sworn to testify to the
8  truth of their knowledge, and examined, and such
9  examination reduced to typewriting under my
10  direction, and is a true record of the testimony
11  given by the witness.  I further certify that I
12  am neither attorney, related or employed by any
13  of the parties to this action, and that I am not
14  a relative or employee of any attorney employed
15  by the parties hereto, or financially interested
16  in the action.
17       In witness whereof, I have hereunto
18  set my hand this 1st day of November, 2013.
19
20  _____
21  MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22  Realtime Systems Administrator
23  CSR #149108
24
25

78 (Pages 306 to 309)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b

Howard C. Jordi, Ph.D.

Page 310

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign
9  the errata sheet and date it.  It will be
10  attached to your deposition.
11        It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 312

ACKNOWLEDGMENT OF DEPONENT

1
2        I,_____, do
3  hereby certify that I have read the
    foregoing pages, and that the same
4  is a correct transcription of the answers
    given by me to the questions therein
5  propounded, except for the corrections or
    changes in form or substance, if any,
6  noted in the attached Errata Sheet.
7
    _____
8  HOWARD C. JORDI, PH.D.        DATE
9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
25

Page 311

1        - - - - - -
          E R R A T A
          - - - - - -
2
3  PAGE  LINE  CHANGE
4  _____
5    REASON: _____
6  _____
7    REASON: _____
8  _____
9    REASON: _____
10  _____
11    REASON: _____
12  _____
13    REASON: _____
14  _____
15    REASON: _____
16  _____
17    REASON: _____
18  _____
19    REASON: _____
20  _____
21    REASON: _____
22  _____
23    REASON: _____
24  _____
25    REASON:

Page 313

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

79 (Pages 310 to 313)

c4fe16e6-b44c-42f4-9fee-58154b0c1b1b