EXHIBIT 2C

WAVE 1

# EXHIBIT

# C

Prof. Dr. Med. Uwe Klinge

```
1                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
2                     CHARLESTON DIVISION
3

    -------------------------------§
4   IN RE:  ETHICON, INC.,         § MASTER FILE
    PELVIC REPAIR SYSTEM PRODUCTS  § NO. 2:12-MD-02327
5   LIABILITY LITIGATION           §
    _____ §
6                                  § MDL NO. 2327
    THIS DOCUMENT RELATES TO:      §
7   DIANNE M. BELLEW,              § JOSEPH R. GOODWIN
                                   § US DISTRICT JUDGE
8   Case No. 2:13-cv-22473         §
                                   §
9   -------------------------------
10                       - - -
11              November 10, 2014
12                       - - -
13        Videotaped deposition of PROF. DR. MED. UWE
14     KLINGE, held at Quellenhof Hotel, Monheimsallee
15     52, 52062, Aachen, Germany, commencing at
16     9:04 a.m., on the above date, before Tami Cline,
17     Registered Merit Reporter, Certified Realtime
18     Reporter.
19
20
21
                         - - -
22
              GOLKOW TECHNOLOGIES, INC.
23        877.370.3377 ph|917.591.5672 fax
                  deps@golkow.com
24
```

Prof. Dr. Med. Uwe Klinge

## Page 2

APPEARANCES:

ANDERSON LAW OFFICES, LLC
BY:  BENJAMIN HOUSTON ANDERSON, ESQUIRE
1360 West 9th Street
Suite 215
Cleveland, Ohio 44113
216-592-8384
Ben@andersonlawoffices.net
Representing the Plaintiffs

THOMAS COMBS & SPANN, PLLC
BY:  DAVID B. THOMAS, ESQUIRE
300 Summers Street
Suite 1380
Charleston, West Virginia 25301
Dthomas@tcspllc.com
BUTLER SNOW, LLP
BY:  CHAD R. HUTCHINSON, ESQUIRE
1020 Highland Colony
Renaissance at Colony Park, Suite 1400
Ridgeland, Mississippi 39157
601-948-5711
Chad.hutchinson@butlersnow.com
Representing Johnson & Johnson and Ethicon

ALSO PRESENT:

Gregory Fields, Videographer
Julie Filarski, Anderson Law Offices, LLC
Michael Kauffmann, Precision Trial Solutions

## Page 3

- - -
INDEX
- - -

Testimony of:  PROF. DR. MED. UWE KLINGE

DIRECT EXAMINATION BY MR. ANDERSON............. 10
CROSS-EXAMINATION BY MR. THOMAS............... 82
REDIRECT EXAMINATION BY MR. ANDERSON........... 192

E X H I B I T S
(ATTACHED)

EXHIBIT NO.                          PAGE

Klinge Trial     Article entitled "New Objective    121
Deposition 1       Measurement to Characterize the
                 Porosity of Textile Implants,"
                 Bates stamped DX31026.1 through
                 DX31026.8

Klinge Trial     Article entitled "Synthetic and    126
Deposition 2     biodegradable prostheses in
                 pelvic floor surgery," Bates
                 stamped DX3036.1 through
                 DX3036.11

Klinge Trial     Article entitled "The biology      130
Deposition 3     behind fascial defects and the
                 use of implants in pelvic organ
                 prolapse repair," Bates stamped
                 DX30360.1 through DX30360.10

Klinge Trial     Ethicon Final Report, PSE          141
Deposition 4     Accession No. 00-0035, An
                 Exploratory 91-day Tissue
                 Reaction Study of
                 Polypropylene-based Surgical
                 mesh in Rates (PSE ACC.  NO.
                 00-0035)

## Page 4

E X H I B I T S
(CONTINUED)
(ATTACHED)

EXHIBIT NO.                          PAGE

Klinge Trial     Article entitled "Long-term        165
Deposition 5     outcome and quality of life
                 after open incisional hernia
                 repair - light versus
                 heavyweight meshes"

Klinge Trial     Article entitled "Bias-Variation   169
Deposition 6     Dilemma Challenges Clinical
                 Trials:  Inherent Limitations of
                 Randomized Controlled Trials and
                 Meta-Analyses Comparing Hernia
                 Therapies'"

Klinge Trial     Article entitled "Prospective,     173
Deposition 7     Long-Term Comparison of Quality
                 of Life in Laparoscopic Versus
                 Open Ventral Hernia Repair"

Plaintiffs P0036    PowerPoint presentation          41
                 entitled "Stand & Deliver -
                 Pelvic Floor Repair"

Plaintiffs PLT0067  Article entitled                 26
                 "Complications from
                 vaginally placed mesh in
                 pelvic reconstructive
                 surgery"

Plaintiffs PLT0260  Article entitled "Impact of      49
                 Polymer Pore Size on the
                 Interface Scar Formation in
                 a Rat Model"

Plaintiffs PLT0271  Article entitled "The            51
                 lightweight and large porous
                 concept for hernia repair"

Plaintiffs PLT0697  Article entitled "Elongation     60
                 of textile pelvic floor
                 implants under load is
                 related to complete loss of
                 effective porosity, thereby
                 favoring incorporation in
                 scar plates"

## Page 5

E X H I B I T S
(CONTINUED)
(ATTACHED)

EXHIBIT NO.                          PAGE

Plaintiffs PLT0770  Article entitled "New            194
                 Polymer for Intra-Abdominal
                 Meshes - PVDF Copolymer"

Plaintiffs P0777   Ethicon document, Form for        63
                 Test Method
                 Applicability/Suitability,
                 Bates stamped
                 ETH.MESH.01992234 through
                 ETH.MESH.01992237

Plaintiffs P0829   E-mail chain and article          66
                 entitled "New Objective
                 Measurement to Characterize
                 the Porosity of Textile
                 Implants," Bates stamped
                 ETH.MESH.02184130 through
                 ETH.MESH.02184138

Plaintiffs P1087   PowerPoint presentation           68
                 entitled "Thunder: Technical
                 Review, Somerville 28th
                 February 2008"

Plaintiffs 1156    PowerPoint presentation           43
                 entitled "T-Pro (Thunder) -
                 Pipeline Leadership Team
                 (PLT) - State Gate Discovery
                 Initiation, August 25, 2008

Plaintiffs P1437   October 7, 2010, e-mail and       67
                 article entitled "New
                 Objective Measurement to
                 Characterize the Porosity of
                 Textile Implants," Bates
                 stamped ETH.MESH.04945136
                 through ETH.MESH.04945144

Prof. Dr. Med. Uwe Klinge

E X H I B I T S
(CONTINUED)
(ATTACHED)
EXHIBIT NO.                                PAGE

Plaintiff's P1679  PowerPoint presentation      54
entitled "Factors related to
mesh shrinkage - What do we
know? A review of literature
and internal studies"

Plaintiff's P2995  PowerPoint presentation      72
entitled "Mesh Properties -
How important are they?"

Plaintiff's P3184  Letter to Quentin from      199
Christoph Walther, Bates
stamped HMESH_ETH_00379723

Plaintiff's P3355  English Translation of      196
Plaintiff's Exhibit 3354,
Patent for PVDF mesh

Plaintiff's P3356  Page 20 of 1386 from Howard   30
Jordi's expert report
containing photographs

Plaintiff's    Document Bates stamped      64
Demonstrative    ETH-01755
P3357

Plaintiff's    PowerPoint slide titled      17
Demonstrative    "Foreign Body Reaction: More
P3358    Foreign Body =
More Inflammation," Bates stamped
P1005 ETH.MESH.02341454

Plaintiff's    PowerPoint slide entitled      32
Demonstrative    "Patient Injury Due to Mesh
P3359    Inflammation and Contraction"

Plaintiff's    PowerPoint slide, a blowup      62
Demonstrative    referencing PLT0697,
P3360    "Elongation of textile pelvic
floor implants under load is
related to complete loss of
effective porosity, thereby
favoring incorporation in
scar plates"

E X H I B I T S
(CONTINUED)
(ATTACHED)
EXHIBIT NO.                                PAGE

Plaintiff's    PowerPoint slide entitled      74
Demonstrative    "Pores Collapse Under
P3361    Tension," referencing P2995,
ETH.MESH.05237872, PLT 0697,
P1452 - ETH.MESH.000007

Plaintiff's    PowerPoint slide entitled      79
Demonstrative P3362  "Prolift Unsafe/Defective
Mesh Design"

Defendant's DX30064  Article entitled      133
"Classification of
biomaterials and their
related complications in
abdominal wall hernia
surgery"

(RETAINED BY MR. ANDERSON)

Plaintiff's P3363  Prolene suture      20

Plaintiff's P3364  240 meters of polypropylene   21

Plaintiff's P3365  Basketball net      57

- - -

DEPOSITION SUPPORT INDEX

- - -

PAGE

REPORTER'S CERTIFICATE........................ 220

INSTRUCTIONS TO WITNESS...................... 221

WITNESS ERRATA................................ 222

WITNESS ACKNOWLEDGEMENT...................... 223

LAWYER'S NOTES................................ 224

- - -

THE VIDEOGRAPHER:  We are now on the record.
My name is Gregory Fields.  I'm the videographer
for Golkow Technologies.  Today's date is
11/10/2014, and the time is 9:04 a.m.  This video
deposition is being held in Aachen, Germany, in
the matter of In Re: Pelvic mesh, for the
Superior Court of New Jersey, Atlantic County.
The deponent is Uwe Klinge.  Counsel will be
noted on the stenographic record.  The court
reporter is Tami Cline and will now swear in the
witness.

MR. THOMAS:  The court reporter noted that
the taped deposition was being taken in the
Superior Court of New Jersey.  I thought this was
an MDL deposition.

THE VIDEOGRAPHER:  I'm sorry.  I had that as
a --

MR. ANDERSON:  MDL deposition.

THE VIDEOGRAPHER:  This is the MDL?

MR. ANDERSON:  Yeah.

THE VIDEOGRAPHER:  I apologize.

MR. THOMAS:  And only the MDL.  It's not
cross-noticed in New Jersey.

Prof. Dr. Med. Uwe Klinge

Page 10

1    MR. ANDERSON: It's MDL.
2    THE VIDEOGRAPHER: Okay. Okay.
3    THE COURT REPORTER: Would you raise your
4  right hand, please.
5    Do you swear or affirm the testimony you give
6  in this cause will be the truth, the whole truth
7  and nothing but the truth?
8    THE WITNESS: I swear.
9    THE COURT REPORTER: You can put your hand
10  down.
11    PROF. DR. MED. UWE KLINGE, called as a
12  witness by the Plaintiff, having been first duly
13  sworn, testified as follows:
14    DIRECT EXAMINATION
15  BY MR. ANDERSON:
16    Q.  Good morning, Dr. Klinge.
17    A.  Good morning.
18    Q.  Dr. Klinge, please tell the jury what your
19  profession is.
20    A.  I'm an abdominal surgeon and a biomaterial
21  researcher.
22    Q.  Where do you work, Dr. Klinge?
23    A.  I'm working at the University of Aachen.
24    Q.  And is that Aachen, Germany?

Page 11

1    A.  It's Aachen, Germany.
2    Q.  And is that where we are today?
3    A.  Exactly.
4    Q.  Please tell the jury a little bit about
5  Aachen University Hospital.
6    A.  It's a large teaching and research hospital,
7  and it is -- it has an extended research center
8  dealing with medical devices, the development of
9  medical devices.
10    Q.  And would those medical devices include
11  surgical meshes like the Prolift mesh?
12    A.  Yes.
13    Q.  And before we go through the issues in this
14  case, would you please just tell the jury briefly
15  about your education and training as a surgeon?
16    A.  I started my medical training 1977 at this
17  university, and when I finished it, then I started to
18  work in the surgical department at this university
19  for almost now -- almost 30 years. Yeah.
20    Q.  And did you do a surgical residency?
21    A.  Yes.
22    Q.  What years did you do a surgical residency?
23    A.  It started in 1985, and I worked specified as
24  abdominal surgeon -- as a general surgeon in 1993,

Page 12

1  and some years later on I got specified as an
2  abdominal surgeon.
3    Q.  Tell the jury a little bit about your
4  practice of abdominal surgery.
5    A.  While working at this surgical department, I
6  performed some thousands of operations, mainly done
7  for diseases of the abdominal cavity of the intestine
8  of the abdominal wall, but it covers almost all parts
9  of the body.
10    Q.  Have you used synthetic surgical mesh in your
11  surgical practice?
12    A.  Yes, I did.
13    Q.  Did you use hernia meshes in your surgical
14  practice that were manufactured by Ethicon?
15    A.  Yes, I did.
16    Q.  Doctor, what caused you to study the
17  biomaterial science of surgical meshes?
18    A.  When we started to use surgical meshes in the
19  beginning of the '90s, we got aware that we have to
20  face several complications that are related with
21  these mesh materials, mainly at the occasion of some
22  revision operations where we saw what happens to
23  these meshes after getting incorporated; and we
24  wanted to learn more about these meshes to avoid

Page 13

1  these complications.
2    Q.  And when did you first begin that work?
3    A.  We started to think about it in the beginning
4  of the '90s, and the research project really started
5  in 1994.
6    Q.  And as part of your work in looking at the
7  biomaterial science of surgical meshes and trying to
8  relate those to complications, did you work as a
9  consultant for Ethicon?
10    A.  Yes, indeed. When we decided to study meshes
11  and wanted to know what is the impact of the meshes
12  to the damage in the tissue, it was necessary to
13  collaborate with the manufacturer, because for these
14  research, you need a lot of modifications. You need
15  a lot of different designs to find out what is the
16  impact of a specific design to the tissue response.
17  And we have been very happy to find Ethicon as a
18  partner in this research who, during the following
19  ten years, supplied us with a lot of these meshes and
20  a lot of modifications so that we can do all these
21  studies.
22    Q.  And was this collaboration between Aachen
23  University Hospital, where you are here in Aachen,
24  and Ethicon?

Prof. Dr. Med. Uwe Klinge

Page 14

1    A.  Yes.
2    Q.  Okay.  Dr. Klinge, all of your opinions today
3  will need to be to a reasonable degree of medical and
4  scientific certainty.  Do you understand that?
5    A.  Yes.
6    Q.  Have you published articles in the
7  peer-reviewed medical literature that relate to the
8  safety of surgical meshes either for the abdomen or
9  the pelvic floor?
10   A.  Yes, I did.
11   Q.  How many times?
12   A.  With the specific topic of surgical meshes,
13  it's more than 100.
14   Q.  Have you written books and book chapters that
15  relate to the safety of surgical meshes for both the
16  abdomen and the pelvic floor?
17   A.  Yes, I did.
18   Q.  And on how many times?
19   A.  About 50.
20   Q.  Have you been asked to speak at conferences
21  around the world on the topic of surgical mesh
22  complications and safer mesh design for the abdomen
23  and the pelvic floor?
24   A.  Yes, I have been, and I'm still.

Page 15

1    Q.  Have you been asked by Ethicon to speak as an
2  invited lecturer at conferences sponsored by Ethicon?
3    A.  Yes.
4    Q.  On how many occasions?
5    A.  Several dozens.
6    Q.  Have you been invited by Ethicon to speak
7  directly to urogynecologists and urologists regarding
8  surgical meshes for the pelvic floor?
9    A.  Yes, I was.
10   Q.  Doctor, what is Prolene mesh?
11   A.  Prolene mesh is the brand name of a mesh, a
12  plastic net made of polypropylene fibers.
13   Q.  And is there a particular manufacturer that
14  uses the brand name Prolene?
15   A.  It's a brand name from Ethicon.
16   Q.  Are you familiar with the term "Prolene Soft
17  Mesh"?
18   A.  Yes.
19   Q.  And what is Prolene Soft Mesh?
20   A.  It is, again, a brand name from a mesh from
21  Ethicon made of polypropylene fibers.
22   Q.  And you're familiar with the word -- the mesh
23  Gynemesh PS?
24   A.  Yes.  It is -- it is the same textile

Page 16

1  structure as for Prolene Soft.
2    Q.  So Prolene, Prolene Soft and Gynemesh PS, is
3  it your testimony they are all brand names for
4  polypropylene mesh made by Ethicon?
5    A.  Yes.
6    Q.  Okay.  What is the mesh material that's in
7  the Prolift device?
8    A.  It is polypropylene.
9    Q.  And what is the brand name from Ethicon for
10  this polypropylene in the Prolift device?
11   A.  It's Gynemesh PS.
12   Q.  Okay.  Have you reviewed and do you rely upon
13  Ethicon internal documents and depositions of Ethicon
14  witnesses that you reviewed over the course of this
15  case in arriving at your opinions that you are going
16  to offer here today?
17   A.  Yes.
18   Q.  With regard to the Prolift, are you familiar
19  with the weight and surface area, the weave pattern
20  and the pore size --
21   A.  Yes.
22   Q.  -- of Prolift mesh?
23   A.  I'm sorry.
24   Q.  All right.

Page 17

1    A.  Yes, I am.
2    Q.  Generally speaking, how is the Prolift
3  supposed to function?
4    A.  It is supposed to function as a flat layer
5  reinforcing the tissue and the pelvic floor.
6    Q.  Dr. Klinge, I would like to talk to the jury
7  now about the way the tissue in our bodies reacts to
8  a foreign substance like polypropylene.  Now, with
9  your help and at your request, did we prepare some
10  slides for the jury today?
11   A.  Yes.
12   Q.  And would you feel that those would be
13  helpful to you as we are talking about some of your
14  opinions with the jury?
15   A.  Yes.
16      MR. THOMAS:  Let's go off the record a
17  second, please.
18      THE VIDEOGRAPHER:  We are off the record.
19  The time is 9:13 a.m.
20  (A recess was taken from 9:13 a.m. until 9:14 a.m.)
21      THE VIDEOGRAPHER:  We are back on the record.
22  The time is 9:14 a.m.
23          - - -
24      (Plaintiff's Demonstrative Exhibit No. P3358,

Prof. Dr. Med. Uwe Klinge

Page 18

1  PowerPoint slide titled "Foreign Body Reaction: More
2  Foreign Body = More Inflammation," Bates stamped
3  P1005 ETH.MESH.02341454, marked for identification.)
4          - - -
5  BY MR. ANDERSON:
6      Q.  Doctor, I'm showing you the first slide,
7  which is a demonstrative exhibit, which we have gone
8  ahead and labeled as Plaintiff's Exhibit P3358.  Is
9  this slide entitled, "Foreign Body Reaction," a slide
10  that you helped prepare for the jury today?
11      A.  Yes.
12      Q.  What does foreign body reaction refer to?
13      A.  Foreign body reaction mainly consists of an
14  inflammatory reaction and a scar reaction.  And if
15  you -- assume you get a splinter or foreign body into
16  your tissues.  The body tries to get rid of it, and
17  if they -- if the body is not able to get rid of this
18  foreign body, it's sent a lot of white blood cells to
19  this to build a wall to protect the surrounding
20  tissue from this foreign body.  And this
21  inflammatory -- these inflammatory cells are then
22  surrounded by dense scar tissue.
23      Q.  And when we see on this slide "more foreign
24  body equals more inflammation" -- you have put that

Page 19

1  there.  Why have you put that there for the jury?
2      A.  Sorry?
3      Q.  "More foreign body equals more inflammation,"
4  why have we put that there?  Why is that significant
5  to your opinions, Doctor?
6      A.  Yeah.  It was one of our -- or it was
7  confirmed by all of our studies that, of course, the
8  more foreign body you have, the more inflammation you
9  have.  The more surface you have, the more
10  inflammation you have.  So if you have two splinters,
11  you will have more inflammation than if it is only
12  one.
13      Q.  Doctor, I believe by this time in the trial
14  that the jury would have already seen a Prolift
15  anterior mesh.  I -- we have one there on the slide.
16  Did I ask you to calculate the amount of
17  polypropylene fiber that is woven into a Prolift
18  anterior mesh?
19      A.  Yes, I did.
20      Q.  And please tell the jury how much
21  polypropylene suture material is in a Prolift
22  anterior mesh.
23      A.  So it is -- it is about 240 meters of
24  polypropylene fiber that is used in the Prolift

Page 20

1  anterior implant.
2      Q.  Doctor, did I ask you to bring with you to
3  your testimony today a Prolene suture?
4      A.  Yes.
5          MR. ANDERSON:  And, Counsel, for purposes of
6  the record, it's a demonstrative exhibit, which
7  we have premarked as Plaintiff's Exhibit P3363.
8          - - -
9      (Plaintiff's Exhibit No. P3363, Prolene
10  suture, was marked for identification.)
11          - - -
12  BY MR. ANDERSON:
13      Q.  Doctor, is this the Prolene suture you
14  brought here to the deposition today?
15      A.  Yes.  Exactly.
16      Q.  Can you please first show the Prolene suture
17  to the jury?  If you would just lay it on that piece
18  of paper so the -- our kind videographer here can
19  pick up on that.
20      A.  (Complying.)
21      Q.  Thank you.
22          Now, Doctor, you have placed sutures like
23  this in patients?
24      A.  Yes.  This is a typical suture we are using

Page 21

1  in the OR, but usually we made some knots about it
2  and we removed the rest of the fibers.  So, actually,
3  we left 1 to 2 centimeters of this suture in the body
4  when we made a stitch with this material.
5      Q.  So given that you trim this after you do the
6  stitch, show the jury, if you would, how much
7  polypropylene stitch is left.
8      A.  So, of course, it depends from thickness of
9  the tissue, but usually it's not more than this.
10      Q.  What is that?
11      A.  What remains in the tissue after --
12      Q.  About 2 inches?
13      A.  An inch is 2.5 centimeters, so it is -- it is
14  less than one inch.
15      Q.  Okay.  By way of example, Doctor, did I ask
16  you to measure -- you said there was 240 meters of
17  polypropylene material in an anterior mesh?
18      A.  Yes.
19          - - -
20      (Plaintiff's Exhibit No. P3364, 240 meters of
21  polypropylene, marked for identification.)
22          - - -
23  BY MR. ANDERSON:
24      Q.  I will mark this as Plaintiff's

Prof. Dr. Med. Uwe Klinge

Page 22

1  Exhibit P3364.  Did I ask you to measure out 240
2  meters of polypropylene?
3      A.  Yes.  I --
4      Q.  Could you, please -- and did you measure that
5  yourself?
6      A.  Yeah.  I did it myself, and I actually walked
7  20 times in my room or at my house --
8      Q.  Okay.
9      A.  -- to get this -- the length of this suture
10  material.
11      Q.  If you would just lay that on the piece of
12  material next to it.
13      A.  Yeah.
14      Q.  Now, Doctor, we're not as familiar in the
15  United States with the metric system.  How many yards
16  of material does 240 meters relate to?
17      A.  It is equal to 260 yards.
18      Q.  And you know in the US we play football, and
19  a football field is 100 yards long.  So is this more
20  than two and a half football fields of material
21  that's woven into a Prolene anterior mesh?
22      A.  Exactly.  Or if you don't play football, it
23  is three times the height of the Statue of Liberty in
24  New York.

Page 23

1      Q.  Okay.  All right.  Thank you.
2          Doctor, do you have an opinion to a
3  reasonable degree of medical and scientific certainty
4  as to whether there will be a different amount of
5  foreign body reaction and inflammation in a patient's
6  tissues to less than one inch of suture material of
7  polypropylene versus more than two and a half
8  football fields of polypropylene material?  Do you
9  have an opinion?
10      A.  Yes.
11      Q.  And what is that opinion?
12      A.  If you place this huge amount of material in
13  a comparatively small area, you will have a
14  significantly higher intensity and amount of
15  inflammation and scar tissue as a reaction to this
16  huge amount of material.
17      Q.  Okay.  Doctor, we can put those to the side
18  for the moment.
19          I would like to now -- sorry.  I would now
20  like to talk to you about the relationship between
21  this foreign body reaction to polypropylene mesh and
22  a concept known as mesh contraction or mesh
23  shrinkage.  Are you familiar with those terms, mesh
24  shrinkage or mesh contraction?

Page 24

1      A.  Yes.
2      Q.  Just briefly tell the jury in your own words
3  what mesh contraction or mesh shrinkage is.
4      A.  When we are talking about mesh shrinkage, we
5  usually are thinking of the contraction of the scar
6  tissue around the mesh.
7      Q.  And is scar tissue -- is there another -- is
8  fibrosis also another word for scar tissue?
9      A.  Yes.  Fibrosis is -- the fibrosis around the
10  mesh is usually the scar tissue.
11      Q.  So if this piece of paper is the mesh as it's
12  in the body, can you explain to the jury what we're
13  talking about in terms of mesh shrinkage or
14  contraction if that's the implant and the black here
15  is -- the table is the tissue?
16      A.  When the mesh is usually incorporated into
17  the scar tissue, and we know that scar contracts.  It
18  lose a lot of water, and, therefore, when the scar is
19  contracting, it is pushing together the implant like
20  this.  It can be up to 90 percent that the mesh
21  material is reduced by this contraction of the scar.
22      Q.  Have you published in the peer-reviewed
23  literature on the subject of mesh shrinkage and
24  contraction and the resulting clinical consequence to

Page 25

1  patients?
2      A.  Yes, I did.
3      Q.  How many publications over what period of
4  time relate to mesh shrinkage and mesh contraction
5  that you have authored?
6          MR. THOMAS:  Objection, without more
7      specificity into what area of the body.
8  BY MR. ANDERSON:
9      Q.  Doctor, have you published in the
10  peer-reviewed literature on the subject of mesh
11  shrinkage and contraction of polypropylene meshes,
12  like the Prolift mesh, resulting in clinical
13  consequences to patients?
14      A.  Yes.
15          MR. THOMAS:  Same objection.
16  BY MR. ANDERSON:
17      Q.  How many times have you done that, Doctor?
18      A.  It's more than 50.
19      Q.  Doctor, in terms of inflammatory response and
20  this foreign body reaction that we have been talking
21  to, will that -- will there be any difference between
22  a surgical mesh implanted, for instance, in the
23  abdominal wall and these principles versus a surgical
24  mesh implanted in the pelvic floor?

Prof. Dr. Med. Uwe Klinge

Page 26

1    MR. THOMAS: Objection; foundation.
2    THE WITNESS: The wound contraction is not
3 restricted to the abdominal wall.  It happens in
4 the entire body.  The foreign body responds.  The
5 scarring around a foreign body happens in every
6 part of the body, and in this regard the response
7 of the tissue to the -- to a mesh, it's quite
8 similar whether it is in the pelvic floor or
9 whether it's in the abdominal cavity.
10 BY MR. ANDERSON:
11    Q.  Doctor, I now want to explain to the jury
12 what the consequences to the patient are of severe
13 inflammation and contraction of polypropylene mesh
14 like Prolift.  Okay?
15    A.  Yes.
16        - - -
17    (Plaintiff's Exhibit No. PLT0067, Article
18 entitled "Complications from vaginally placed mesh in
19 pelvic reconstructive surgery", was marked for
20 identification.)
21        - - -
22 BY MR. ANDERSON:
23    Q.  I'm handing you what has been marked as
24 Plaintiff's Exhibit 0067.  It is PLT0067.

Page 27

1    MR. THOMAS:  This has a sticky on it.  Is
2 that yours?
3    MR. ANDERSON:  What I have done for you,
4 Counsel, is on every one of these documents,
5 since they're multipaged, to make it easier for
6 you to reference them, I flagged the pages for
7 you.
8    MR. THOMAS:  Thank you.
9    MR. ANDERSON:  You're welcome.
10 BY MR. ANDERSON:
11    Q.  Do you recognize this article as something
12 you reviewed in arriving at your opinions in this
13 case?
14    A.  Yes.
15    Q.  And it says -- is this article from the
16 International Urogynecological Journal in 2009
17 significant to your opinions in this case?
18    A.  Yes, it is.
19    Q.  If you will please turn with me to page 529.
20    MR. ANDERSON:  And if you'll highlight --
21 Michael, if you'll highlight the bottom right
22 image.
23 BY MR. ANDERSON:
24    Q.  Doctor --

Page 28

1    MR. THOMAS:  Just note my objection to this
2 before you show the jury what the picture is
3 until we have an adequate foundation for the jury
4 to see the picture.
5 BY MR. ANDERSON:
6    Q.  And you reviewed this article in coming to
7 your opinions in this case?
8    A.  Yes.
9    Q.  And does this article involve the Prolift
10 mesh?
11    A.  Yes.
12    Q.  And if we're looking at this image contained
13 within the article, what are we looking at here,
14 Doctor?
15    A.  It is showing the explanted mesh material
16 that is in -- taken off in several parts, and you see
17 that it is incorporated into a lot of scar tissue,
18 that it is deformed, that it's not laying very flat
19 in this area.
20    MR. THOMAS:  Just show --
21    THE WITNESS:  It's hard to identify the
22 textile structure in this compound of scar.
23    MR. THOMAS:  I just want to show my
24 continuing objection for lack of foundation.

Page 29

1    MR. ANDERSON:  Noted.
2 BY MR. ANDERSON:
3    Q.  As a hernia surgeon, did you remove
4 contracted polypropylene meshes from patients?
5    A.  Yeah.  We did a lot.  And the appearance of
6 these meshes are completely similar to this.  We
7 have -- in these contracted meshes, we have this huge
8 amount of scar tissue.  The advantage in the
9 abdominal wall is that we are able to explant them in
10 total and, whereas in this area, it usually is taken
11 off in parts.
12    Q.  And you say, "in this area."  You removed
13 mesh from the pelvic floor?
14    A.  Yes.
15    Q.  Did you have an opportunity to review
16 Dr. Howard Jordi's expert report in this case?
17    A.  Yes.
18    Q.  Did you see photos in his report of mesh that
19 had been taken out of Ms. Bellew?
20    A.  Yes.
21    Q.  And did you rely on those photos in his
22 report in arriving at your opinions here today?
23    A.  Yes.
24    MR. THOMAS:  Objection.  To my knowledge,

Prof. Dr. Med. Uwe Klinge

Page 30

1 the -- any specific causation testimony of
2 Ms. Bellew is not contained in his report. Am I
3 incorrect?
4     MR. ANDERSON: We're not going to talk about
5 causation.
6     MR. THOMAS: Okay. Show my objection to any
7 plaintiff-specific testimony by Dr. Klinge.
8     MR. ANDERSON: I'll show your objection.
9         - - -
10     (Plaintiff's Exhibit No. P3356, Page 20 of
11 1386 from Howard Jordi's expert report containing
12 photographs, was marked for identification.)
13         - - -
14 BY MR. ANDERSON:
15     Q. I'm handing you what's been premarked as
16 Plaintiff's Exhibit 3356. Is that one of the
17 photographs that you saw from Dr. Jordi's report of
18 explanted mesh from Ms. Bellew?
19     A. Yes, it is.
20     Q. Was this image significant to your opinions
21 in this case?
22     A. Yes.
23     Q. Can you please explain the significance of
24 that image in relation to what we just -- what the

Page 31

1 jury just saw?
2     A. This image --
3     MR. THOMAS: Excuse me. Let me place my
4 objection. I object to this because it is not a
5 disclosed opinion in the report that Ben here --
6 that's at issue in this deposition and also
7 because this witness is designated on general
8 causation issues and not on plaintiff-specific
9 issues.
10 BY MR. ANDERSON:
11     Q. Does the appearance of Ms. Bellew's
12 contracted mesh in -- does the appearance of the mesh
13 in -- from Dr. Jordi's report -- what do you see from
14 that -- from that image, sir?
15     A. On this photograph you see the folding of a
16 mesh that is incorporated into very big amount of
17 scar tissue, and it is a confirmation that this
18 phenomenon is not limited to the abdominal wall, but
19 it happens in every part of the body.
20     Q. Now, Doctor, you have seen the Prolift
21 anterior mesh as it comes out of the box? Have you
22 seen that?
23     A. Yes.
24     Q. How does the Prolift mesh out of the box

Page 32

1 compare to contracted mesh removed due to
2 complications like we've seen in these -- in these
3 recent photographs from the Blandon article as well
4 as this from Ms. Bellew?
5     A. The mesh, when it's taken out of the box,
6 usually is very soft, pliable, flexible, whereas a
7 mesh that is integrated into this scar tissue usually
8 is rigid, stiff, not flexible, not stretchable any
9 longer; and, therefore, it is going to be in sharp
10 contrast to the properties of the surrounding tissue.
11     Q. Doctor, did you prepare a slide for the jury
12 regarding mesh inflammation and contraction and their
13 relation to consequences for the patient?
14     A. Yes.
15         - - -
16     (Plaintiff's Demonstrative Exhibit No. P3359,
17 PowerPoint slide entitled "Patient Injury Due to Mesh
18 Inflammation and Contraction", was marked for
19 identification.)
20         - - -
21 BY MR. ANDERSON:
22     Q. I'm showing you what we have marked as
23 Plaintiff's Exhibit P3359. Is that the slide?
24     A. Yes.

Page 33

1     Q. Okay.
2     MR. ANDERSON: If you could just bring in the
3 first bullet points.
4     MR. THOMAS: Just show my objection to this
5 demonstrative and testimony about this because
6 the patient has not been designated for the
7 quantitative risks of complications in the pelvic
8 floor.
9 BY MR. ANDERSON:
10     Q. Doctor, if we look here to these first two
11 bullet points, can you tell us why you created these
12 for the jury?
13     A. One of our important findings in these years
14 of research together with Ethicon was that this mesh
15 inflammation, this inflammatory region around the
16 foreign body, it's a permanent one. It is -- it
17 doesn't stop after three weeks or four weeks, but it
18 stays there as a chronic wound until the end of the
19 life of the patient; and this chronic wound leads to
20 a permanent tissue irritation.
21     In some patients there's always some sort of
22 scarring that is protecting the surrounding tissues
23 from the foreign body, but in some patients this
24 scarring is very, very severe; and it leads that

Prof. Dr. Med. Uwe Klinge

Page 34

1  almost all the entire area where the mesh was been
2  placed is blocked by this scarring.
3      MR. THOMAS: Just show my objection to any
4  testimony to Bullets 2, 3 and 4 because it calls
5  for testimony about risks in the pelvic floor
6  which is beyond this witness's expertise.
7  BY MR. ANDERSON:
8      Q.  Doctor, over the course of your 20 years of
9  research, how many explants from the abdominal wall
10 have you looked at and analyzed?
11     A.  We have meanwhile several thousand of
12 explanted meshes here that we have had a look to and
13 we try to analyze.
14     Q.  As part of this body of work over the last 20
15 years, how many explanted meshes from the pelvic
16 floor have you analyzed?
17     A.  It's up to 500.
18     Q.  Okay.  So with regard to these thousands of
19 hernia mesh explants from humans that you have
20 analyzed and hundreds of pelvic floor explants that
21 you've analyzed over the course of these 20 years,
22 have you recognized similarities between the
23 contraction of the explanted abdominal wall meshes
24 and the explanted pelvic floor meshes?

Page 35

1      MR. THOMAS: Show my objection to this to the
2  extent it's based upon his review of the
3  Klosterhalfen explants of the pelvic floor which
4  this court has already ruled is inappropriate for
5  him on which to rely for his opinions.
6      MR. ANDERSON: Counsel, how about just saying
7  "objection"?
8      MR. THOMAS: Because I didn't think it would
9  be clear from the record.
10 BY MR. ANDERSON:
11     Q.  Have you personally reviewed pelvic floor
12 explants?
13     A.  Yes.
14     Q.  How many personal -- how many personal
15 reviews of pelvic floor explants have you done,
16 Dr. Klinge?
17     MR. THOMAS: Same objection.
18     THE WITNESS: It's about 50.
19 BY MR. ANDERSON:
20     Q.  Okay.  So of these 50 meshes that have been
21 taken out of women's bodies that you've analyzed and
22 the hundreds, if not thousands, that you've looked at
23 of hernia mesh explants, have you noticed
24 similarities in terms of the tissue response to the

Page 36

1  polypropylene meshes that have been explanted?
2      A.  We always found similar tissue response, and
3  we didn't find any significant difference in the
4  tissue reaction.
5      Q.  And with regard to the first two bullet
6  points on the slide that we were talking about a few
7  minutes ago, mesh inflammation is permanent and in
8  some patients mesh scarring is severe.  Have you
9  arrived at those opinions based upon your 20 years of
10 work, all of your peer-reviewed publications, the
11 conferences you've spoken at around the world, the
12 conferences to urogynecologists and urologists at the
13 request of Ethicon, your review of thousands of
14 hernia mesh explants and your review of hundreds of
15 pelvic floor explants and over 50 that you have
16 reviewed yourself?
17     MR. THOMAS: Objection.
18     THE WITNESS: Yes, exactly.
19     MR. THOMAS: Object to the form of question.
20     THE WITNESS: It is.
21     MR. ANDERSON: Whatever.
22 BY MR. ANDERSON:
23     Q.  Go ahead.
24     A.  The permanence of the mesh inflammation, it's

Page 37

1  a fact and that in some of these cases you have an
2  extended scarring.  It is a fact.  It is not related
3  to some specific location in the body.
4      MR. ANDERSON: Okay.  Let's show the next two
5  bullet points.
6  BY MR. ANDERSON:
7      Q.  Doctor, based upon your review of all of the
8  Ethicon materials and the Ethicon depositions, your
9  review of the scientific literature in this case,
10 your 20 years of experience as a biomaterials
11 researcher, your experience as a hernia surgeon who's
12 treated -- not only implanted but treated
13 complications related to hernia, your review of
14 thousands of hernia mesh explants, your analysis
15 personally of 50 pelvic floor explants, and all of
16 the work that you've done to arrive at your opinions
17 in this case, can you state to a reasonable degree of
18 medical and scientific certainty as to whether or not
19 these two bullet points here are accurate?
20     MR. THOMAS: Object to the form.  Object;
21 goes beyond his expertise and beyond his
22 designation in the report.
23     THE WITNESS: Yes.  It is -- it is a fact
24 that if you have a chronic wound with a lot of

Prof. Dr. Med. Uwe Klinge

Page 38

1  scar tissue, that, of course, you have a higher
2  risk for chronic pain, because of a higher risk
3  for getting nerves that are entrapped into the
4  scar tissue; and in the area of the pelvic floor
5  you have a higher risk of dyspareunia, erosions
6  and organ dysfunction. And, therefore, the
7  extent of inflammation and scarring is a very big
8  concern for the patient's safety. And if you
9  have a lot of inflammation, a lot of scar, this
10  carries a lot of risks for the patients.
11  BY MR. ANDERSON:
12  Q.  Is there any way for a surgeon who is
13  implanting a Prolift mesh or a hernia mesh to know
14  the extent of scarring and contraction that will
15  occur over the patient's life in and around the mesh
16  or a way to control it?
17  A.  Not in regard to the specific response of a
18  patient, but for the general statement that the more
19  material, the more inflammation, then, of course, you
20  can estimate it.
21  Q.  Based upon your years of consulting with
22  Ethicon and all of your work over the last 20 years,
23  and your work with Ethicon, do you have personal
24  knowledge as to whether Ethicon was aware of these

Page 39

1  issues with contraction and inflammation of their
2  polypropylene meshes that you have discussed?
3      MR. THOMAS:  Objection to what Ethicon knew.
4  BY MR. ANDERSON:
5  Q.  Again, based upon your personal knowledge as
6  a consultant with Ethicon, did you have discussions
7  with them about the contraction of their
8  polypropylene meshes?
9  A.  Yes, I definitely know that we have discussed
10  this during our working group meetings with people
11  from Ethicon, exactly this problem of shrinkage, and
12  we have been trying to figure out what are the main
13  reasons. So, yeah, it was a finding from Ethicon as
14  well as from us --
15  Q.  And did you --
16  A.  -- working hand in hand.
17  Q.  I'm so sorry.
18      And in this working hand in hand with Ethicon
19  in coming to these questions regarding mesh shrinkage
20  and its relationship to patient complications, did
21  you publish, while you were a consultant with
22  Ethicon, in the peer-reviewed literature on these
23  issues?
24  A.  Yes.

Page 40

1  Q.  Are these documents significant to your
2  opinions -- strike that.
3      Have you seen in the internal documents and
4  depositions of Ethicon witnesses discussions
5  regarding patient complications related to mesh
6  contraction?
7  A.  Yes.
8  Q.  Are these documents significant to your
9  opinions in this case?
10  A.  Yes.
11  Q.  Have you studied and published in the
12  peer-reviewed literature on the amount of shrinkage
13  or contraction that will occur in the human body to
14  polypropylene surgical meshes?
15  A.  Yes.
16  Q.  What have your studies shown regarding the
17  amount of shrinkage that occurs with polypropylene
18  meshes in the human body?
19  A.  Roughly you have to estimate a shrinkage, a
20  contraction of about 30 to 50 percent, but it depends
21  on the design of the mesh. So it can be much more;
22  it can be a little bit less.
23  Q.  How does the amount of foreign body material
24  in the mesh relate to the amount of mesh shrinkage or

Page 41

1  contraction that will occur in the tissue?
2  A.  The more material, the more inflammation, the
3  more scar, the more contraction, the more shrinkage.
4  Q.  Dr. Klinge, in the internal documents that
5  you have reviewed from Ethicon, have you seen
6  anywhere where they mention or address these concerns
7  over the amount of material with their Prolift mesh?
8  A.  Yes, I did.
9          - - -
10      (Plaintiff's Exhibit No. P0036, PowerPoint
11  presentation entitled "Stand & Deliver - Pelvic Floor
12  Repair", was marked for identification.)
13          - - -
14  BY MR. ANDERSON:
15  Q.  I'm showing you what has been marked as
16  Plaintiff's Exhibit P0036.
17      Is this document something that you have
18  reviewed during your work in this litigation?
19  A.  Yes, I did.
20  Q.  Is it significant to your opinions in this
21  case?
22  A.  Yes.
23      MR. THOMAS:  What is the date of this
24  document?

Prof. Dr. Med. Uwe Klinge

Page 42

1    MR. ANDERSON: It's in your production, and
2    so any Ethicon production, according to the
3    metadata, I believe it's 2008, but we can
4    certainly check that on a break.
5        MR. THOMAS: Thank you. Just note my
6    objection to the use of any company documents
7    after the date of Mrs. Bellew's surgery.
8        MR. ANDERSON: Oh, this is certainly before
9    Ms. Bellew's surgery.
10       MR. THOMAS: I just wanted to make sure.
11   Thank you, Ben.
12   BY MR. ANDERSON:
13       Q. Is this document significant to your opinions
14   in this case?
15       A. Yes.
16       Q. Just explain briefly what this document is,
17   Dr. Klinge.
18       A. It's a PowerPoint presentation from Ethicon.
19       Q. Okay. If you go to page 7 of the document in
20   this Ethicon PowerPoint, you have seen this slide?
21       A. Yes.
22       Q. Okay. Is this important to your opinions?
23       A. Yes, it is important.
24       Q. Can you explain why, please?

Page 43

1        MR. ANDERSON: Blow up the -- yes.
2        THE WITNESS: The topic of this slide is
3    "Improved Tissue Response," and so to get an
4    improved tissue response, the people that make
5    this presentation, they cited my work with
6    Klosterhalfen --
7        MR. ANDERSON: If you could blow that up.
8        THE WITNESS: -- where we wrote down the
9    entire concept of the lightweight and large pore
10   concept, and they figured out that for an
11   improved tissue response, you need a large porous
12   construction to reduce the tissue response. So
13   they are in line completely with what we have
14   found during these years, and they accepted it,
15   obviously.
16   BY MR. ANDERSON:
17       Q. And is this in line -- how does this relate
18   to your opinions regarding the amount of foreign body
19   reaction and the amount of inflammation?
20       A. It's exactly in accordance. So, yeah.
21            - - -
22       (Plaintiff's Exhibit No. 1156, PowerPoint
23   presentation entitled "T-Pro (Thunder) - Pipeline
24   Leadership Team (PLT) - State Gate Discovery

Page 44

1    Initiation, August 25, 2008, was marked for
2    identification.)
3            - - -
4    BY MR. ANDERSON:
5        Q. Okay. I'm showing you what has been marked
6    as Plaintiff's Exhibit 1156.
7            Are you familiar with this document,
8    Dr. Klinge?
9        A. Yes, I am.
10       Q. Is this something that you reviewed during
11   your work in this litigation?
12       A. Yes, I did.
13       Q. And is it significant to your opinions here
14   today?
15       A. Yes, it is.
16       Q. If we turn to page 12 of the document, is
17   this slide significant to your opinions?
18       A. Yes.
19           MR. ANDERSON: Can you blow up the right-hand
20   side of that?
21   BY MR. ANDERSON:
22       Q. Doctor, is this part of the PowerPoint slide
23   significant? And, if so, why?
24       A. In this PowerPoint presentation from 2008

Page 45

1    from Ethicon, it is clearly stated that we need less
2    foreign body material. We need materials that
3    correlate to the physiological characteristics. So
4    it expresses that these people want to have less
5    material to make it safer.
6        Q. Based upon your review of all of the
7    materials in this litigation and all the depositions
8    as well as your years of consulting with Ethicon, did
9    you determine whether or not they ever manufactured a
10   pelvic organ prolapse mesh with mesh that was
11   actually designed for the pelvic floor?
12       A. No, I didn't -- didn't find any -- any
13   information to this.
14       Q. The Gynemesh PS mesh and Prolift, was that
15   designed by Ethicon as a hernia mesh or a pelvic
16   floor mesh?
17       A. To my knowledge, it was designed as a
18   material-reduced hernia mesh.
19       Q. Okay. Dr. Klinge, I want to shift gears here
20   a little and talk to you about another mesh design
21   characteristic, and that is the pores. What are mesh
22   pores?
23       A. A mesh is more or less a net, and the pore is
24   the area in between the filaments.

Prof. Dr. Med. Uwe Klinge

Page 46

1    Q.   Is the size of the pores or these open spaces
2  in the mesh material something that you have studied
3  over the last 20 years, published on in the
4  peer-reviewed literature, consulted with Ethicon
5  about and presented at conferences around the world
6  over the last 20 years?
7    A.   We did it extensively.
8    Q.   Is it also these open spaces or these pores a
9  design principle that you have used to work with
10  manufacturers to design safer meshes?
11    A.   Yes.
12    Q.   Can you tell us what the significance of
13  these pores or open spaces are with regard to the
14  tissue response for patients?
15    A.   The size of a pore means a critical parameter
16  to predict what happens when the tissue is -- or when
17  the mesh is incorporated into the tissue.  If you
18  have very small pores, then the -- or the space in
19  between the fibers is completely filled by scar
20  tissue; and that makes the mesh stiff and rigid,
21  whereas if you have very large pores, large distances
22  between the fibers, the body is able to fill the
23  pores with fat tissue, and then the mesh remains
24  flexible, stretchable.  So the small pores means a

Page 47

1  considerable risk for the patient, whereas the larger
2  the pore, the less of the risk.
3    Q.   Is another way to say the larger the pore,
4  the greater the distance between the fibers of the
5  mesh?
6    A.   Yes.
7    Q.   Okay.  Have you conducted research over the
8  last 20 years, published peer-reviewed studies, and
9  worked as an Ethicon consultant on sufficient pore
10  size or how large these openings need to be in
11  surgical meshes to prevent these patient consequences
12  you are talking about?
13    A.   Yes, we did.
14    Q.   And has that research included analyzing the
15  pore size of meshes that are surgically removed from
16  animal models, abdominal wall, as well as the pelvic
17  floor?
18    A.   Yes.
19    Q.   And from your background, training, research,
20  your peer-reviewed publications, all your work for
21  the past 20 years.  Your consulting work with
22  Ethicon, all the materials that you have reviewed in
23  this case, do you have an opinion to a reasonable
24  degree of medical and scientific certainty as to what

Page 48

1  the critical pore size or open space must be for a
2  surgical mesh implant for both hernia repair and
3  pelvic floor repair in order to be safe in the
4  tissues?
5    A.   Yes.
6    Q.   And what is that opinion?
7    A.   The larger the pores, the safer it is to --
8  the larger the pores, the lower the risk for this
9  bridging; and for polypropylene, the critical figure
10  is about 1 millimeter.
11    Q.   And, again, we're on the metric system, but I
12  know the jury is going to see documents that some of
13  them are in millimeters and some are in microns.  What
14  does 1 millimeter equal in terms of microns?
15    A.   It equals 1,000 microns.
16    Q.   So 1 millimeter equals 1,000 microns?
17    A.   Yes.
18    Q.   So would -- I'm not real good at math, so
19  would 3 millimeters equal 3,000 microns?
20    A.   Exactly.
21    Q.   Okay.  I got that one right.
22       I know that you said you have over 1,000
23  publications in the peer-reviewed literature on the
24  safe design of surgical meshes.  We obviously can't

Page 49

1  go through all of those today, but I did want to show
2  the jury just a couple of your peer-reviewed
3  publications contained in your research on the
4  relationship between inflammation and contraction and
5  adequate mesh pore size for polypropylene meshes.
6  Okay?
7    A.   Yes.
8           - - -
9       (Plaintiff's Exhibit No. PLT0260, Article
10  entitled "Impact of Polymer Pore Size on the
11  Interface Scar Formation in a Rat Model", was marked
12  for identification.)
13           - - -
14  BY MR. ANDERSON:
15    Q.   I'm showing you what we have marked as
16  Plaintiff's Exhibit PLT0260.
17       MR. ANDERSON:  Counsel.
18       If you'll highlight the top.
19  BY MR. ANDERSON:
20    Q.   Is this one of your peer-reviewed
21  publications on polymer pore size?
22    A.   Yes, it is.
23       MR. ANDERSON:  And if we could turn to
24  page 213 and enlarge the left side of the

Prof. Dr. Med. Uwe Klinge

Page 50

1   document down there where it says "loose
2   network."
3   BY MR. ANDERSON:
4   Q.  Doctor, drawing your attention to this part
5   of your peer-reviewed publication from 2002, what
6   does that statement tell us in terms of this
7   relationship between these -- the distance between
8   the fibers and patient complications?
9   A.  In this publication from 2002, we described
10  that we found that if you have larger pores of more
11  than 1, 2 millimeters, then the scar tissue is
12  limited to the fibers and that the pores, the holes
13  in between the fibers, are filled by fat tissue.  So
14  these are the good pores, whereas if you have smaller
15  pores, less than 1 millimeter, you usually have scar
16  tissue linking these fibers strongly to each other
17  and making the entire implant stiff and rigid.
18  Q.  And just to be clear, Doctor, does that mean
19  that every pore from an explanted mesh that is less
20  than 1,000 microns, that every one of them is going
21  to be filled with scar?
22  A.  No.  But the risk is very, very high that
23  these pores are filled by scar tissue; and,
24  therefore, you have to say, the larger the pore, the

Page 51

1   lesser the risk.
2   Q.  So the higher the -- the further the distance
3   of the fibers above 1,000 microns, the less risk of
4   this bridging of the scar tissue?
5   A.  Yeah, less risk and make it more safer, then,
6   for the patient.
7   Q.  Okay.  And if we could just turn to the last
8   page.
9       Who funded this study that you did regarding
10  impact of polymer pore science?
11  A.  These findings were part and as a result of
12  our collaboration in these ten years where we worked
13  together with the people from Ethicon.
14              ---
15      (Plaintiff's Exhibit No. PLT0271, Article
16  entitled "The lightweight and large porous concept
17  for hernia repair", was marked for identification.)
18              ---
19  BY MR. ANDERSON:
20  Q.  I'm now handing you what has been marked as
21  Plaintiff's PLT0271.
22      Do you recognize this as another one of your
23  peer-reviewed publications?
24  A.  Yes.

Page 52

1   Q.  And in this 2005 article, does it discuss
2   your research on inflammation and scarring and its
3   relationship to adequate pore size?
4   A.  Yes.
5       MR. ANDERSON:  If we go to the second page of
6   the article and we blow up this left side, if you
7   could draw up some language there and do the
8   photograph underneath it as well.  Thank you,
9   Michael.
10  BY MR. ANDERSON:
11  Q.  Explain to the jury if this has any
12  significance to you in this relationship of pore size
13  of a mesh and patient complications.
14  A.  So this manuscript basically is a summary of
15  these ten-year works.
16  Q.  Ten-year work with Ethicon you mean?
17  A.  With Ethicon where we wanted to develop safer
18  meshes together with them.  And you see an example of
19  small pore meshes on the left side with the number
20  "A" there.  These are very small pores, and these are
21  all filled up by scar tissue, making this rigid mesh
22  scar compound.
23  Q.  Well, it's not filled with scar tissue in
24  this picture.

Page 53

1   A.  No.  These -- these are images from the
2   textile that you're taking out of the box; but if you
3   are placing these meshes into the tissues, then you
4   will find as a result this integration into thick
5   scar tissue, making this small pore net a high risk
6   device for -- with a high risk for getting
7   complications.
8       On the right side you see what is possible,
9   and that is the development that we, together with
10  Ethicon, realized, that we enlarged -- we make the
11  pores much larger, up to 3 to 5 millimeters.  And if
12  you place this textile construction into the tissues
13  and then look afterwards what happens, you will find
14  a very flexible, thin mesh tissue compound which is
15  integrated into fat tissue.  And, therefore, it is a
16  good example that by reduction of the material to 30
17  percent of this of the left side by making the pores
18  larger, that you can improve significantly the
19  reaction of their surrounding tissue.
20  Q.  So when you were talking about wanting to
21  have this good tissue, this fat tissue in the pores
22  or the open spaces, in the figure to the right in B,
23  would that be the area where it's the open diamond
24  space?

Prof. Dr. Med. Uwe Klinge

Page 54

1    A.  Yes.

2    Q.  That's the area you want the fat tissue to

3 grow?

4    A.  There we want to have this fat tissue,

5 because this fat tissue keeps it flexible,

6 stretchable, elastic.

7              ---

8    (Plaintiff's Exhibit No. P1679, PowerPoint

9 presentation entitled "Factors related to mesh

10 shrinkage - What do we know? A review of literature

11 and internal studies", was marked for

12 identification.)

13              ---

14 BY MR. ANDERSON:

15    Q.  Okay.  I'm going to show you a document,

16 Plaintiff's Exhibit P1679.

17      Have you seen this document before, Doctor?

18    A.  Yes, I've seen it.

19    Q.  And is it something that you saw in this

20 litigation and it is significant to your opinions in

21 this case?

22    A.  Yes, it is.

23    Q.  Okay.  And what is this document, if you

24 would?

Page 55

1    A.  It's an Ethicon document showing or dealing

2 with the factors related to mesh shrinkage.

3    Q.  If we could just turn over, please, to

4 page 12 of this PowerPoint.  And what is the date on

5 the bottom left there?

6    MR. ANDERSON:  If you could blow that up.

7 BY MR. ANDERSON:

8    Q.  What is the date of this PowerPoint, Doctor?

9    A.  It is done in 2007.

10    MR. ANDERSON:  Okay.  Take down the blowup.

11 BY MR. ANDERSON:

12    Q.  And what do we find from this particular

13 slide?

14    MR. ANDERSON:  And if you would highlight the

15 bullet point 2 from this Ethicon PowerPoint.

16    THE WITNESS:  The people who made this, they

17    acknowledge that the pore size has to be more

18    than 1 millimeter to avoid this fibrotic bridging

19    or this dangerous scarring of the holes.

20 BY MR. ANDERSON:

21    Q.  Okay.  So fibrotic bridging, fibrosis relates

22 to what?

23    A.  Scar.

24    Q.  And bridging relates to what?

Page 56

1    A.  Bridging means that the scar is filling out

2 completely the pores, the room in between the fibers,

3 which means a risk.

4    Q.  A risk -- what type of risk, Doctor?

5    A.  A risk for contraction of the scar and the

6 mesh and pain and erosion and dysfunction.

7    Q.  As the pore sizes of a mesh in use are

8 greater than 1 millimeter or 1,000 microns, in your

9 opinion will that reduce the risk of contraction?

10    A.  Yes.

11    Q.  And with pore sizes in use that are less than

12 1,000 microns, or 1 millimeter, in your opinion will

13 that increase the risk of mesh shrinkage or

14 contraction?

15    A.  Definitely, yes.

16    MR. THOMAS:  Just show my objection to

17    leading questions.

18 BY MR. ANDERSON:

19    Q.  Go ahead.

20    A.  So definitely.  A pore size below

21 1 millimeter will increase the risk for scar bridging

22 and will increase the risk for complications.

23    Q.  Dr. Klinge, I now want to talk about another

24 concept with you, and that's about how and when it is

Page 57

1 important to measure the pores of meshes like

2 Prolift.  I know that you asked me to bring a

3 basketball net here today to help provide at least a

4 simple explanation to begin with of the importance of

5 the pore measurements; is that correct?

6    A.  Yes.

7    MR. ANDERSON:  Okay.  Just for demonstrative

8    purposes and for the record, we have marked the

9    basketball net as Plaintiff's Exhibit P3365.

10              ---

11    (Plaintiff's Exhibit No. P3365, Basketball

12 net, was marked for identification.)

13              ---

14    MR. ANDERSON:  Are you ready?  Okay.  Thank

15    you.

16 BY MR. ANDERSON:

17    Q.  So, Doctor, explain what you're trying to

18 show the jury here with regard to pore size and pore

19 measurement.

20    A.  So we know that the pore size is critical for

21 the tissue reaction.  We want to have large pores.

22 When you are taking out a net of the box, then the

23 pores may be sufficient; but if you have it in use,

24 if you implanted it and if the surgeon puts some even

Prof. Dr. Med. Uwe Klinge

Page 58

1  slight forces to it, you see that you have this
2  collapse of pores, that even very small pores can get
3  very, very small. And, therefore, by applying these
4  forces to a net, it can make a large pore net to a
5  small pore net and, thereby, increases the risks
6  considerably.
7      Q.  So in your opinion, in terms of patient
8  safety, when is it important to look at the greatest
9  distance between the fibers? Before it goes in the
10 body or after?
11     MR. THOMAS:  Objection.
12     Q.  Or after it's used?
13     MR. THOMAS:  Objection; foundation, expertise
14 designation.
15 BY MR. ANDERSON:
16     Q.  Go ahead, Doctor.
17     A.  You have to take into account that any force
18 can lead to a pore collapse, and if you want to use a
19 mesh in an area where these forces may occur, then,
20 of course, you have to analyze the pore size in use.
21     Q.  Doctor, did you do testing on the Prolift
22 mesh to determine what would happen to the Prolift
23 pores when stretch forces are applied, for instance,
24 when the Prolift is going to be implanted in a woman?

Page 59

1  Did you do testing?
2      A.  We did it.
3      Q.  Please explain just generally the testing
4  that you were involved in regarding looking at the
5  pores after forces are applied to them.
6      A.  In 2005 I met with a colleague of mine from
7  the technical university, Prof. Dr. Thomas Mühl, and
8  we wanted to develop a machine that makes it possible
9  to really measure pore sizes and to really give a
10 measurement what happens to the pores when applying
11 some forces to it. We want to have a measurement
12 that is reproducible, that is objective, and that is
13 reliable. And this has not been done before and,
14 therefore, we developed this machine and finally
15 could finish our work in 2007.
16     Q.  Was that work published in the peer-reviewed
17 literature?
18     A.  Yes. We publish everything and didn't want
19 to restrict it because we -- we want to make it
20 public so that everyone can use this way to optimize
21 his research and development.
22     Q.  And when was that information published in
23 the peer-reviewed literature?
24     A.  We published this, the technique, the

Page 60

1  machine, the details of it in 2007, and later on some
2  of the results in 2013.
3      Q.  And do those peer-reviewed publications cover
4  all of the protocols and the test methods and the
5  setup and analysis of the testing?
6      A.  Yes. In every detail.
7      Q.  And did one of those publications actually
8  involve testing of the Prolift device on this machine
9  in order to investigate the pores after stretch is
10 applied?
11     A.  Yes, it is.
12     Q.  And were you involved in the development of
13 the testing and the protocols and parameters for the
14 pore testing for that 2013 article looking at the
15 Prolift mesh?
16     A.  Yes, I was involved in all of this, and I was
17 the medical doctor who was responsible for the
18 interpretation and analysis of this data.
19     Q.  Did the testing that was published by you in
20 2013 include testing on the Prolift arms?
21     A.  Yes, it did.
22              - - -
23     (Plaintiff's Exhibit No. PLT0697, Article
24 entitled "Elongation of textile pelvic floor implants

Page 61

1  under load is related to complete loss of effective
2  porosity, thereby favoring incorporation in scar
3  plates", was marked for identification.)
4              - - -
5  BY MR. ANDERSON:
6      Q.  I'm showing you what has been marked as
7  Plaintiff's Exhibit PLT0697. Doctor, is this that
8  2013 publication regarding your testing of the
9  Prolift device?
10     A.  Yes, it is.
11     MR. ANDERSON:  If you would hit that. Yeah.
12 BY MR. ANDERSON:
13     Q.  And if you could please go with me to page 5.
14 And we have blown up the left-hand side and have some
15 images as well as the figure box below that.
16         What are we seeing here, Doctor, in terms of
17 the testing in this scientific research that you did?
18     A.  In the upper part you are just seeing an
19 image of the Gynemesh PS or the Prolift mesh without
20 applying any tension to it. You see the black lines.
21 These are the fibers, and the room in between these
22 are the pores.
23     Q.  And, Doctor, how much force was applied to
24 the Prolift arms that we're seeing in this testing

Prof. Dr. Med. Uwe Klinge

Page 62

1  that was published in 2013?
2      A.   So, yeah, I forgot to explain.  The lower
3  image shows the same structure when applying some
4  force to it.  So you see the same change as you see
5  with the basketball net.  When you apply some forces
6  to it, you find -- you see a collapse of the pores.
7  The pores -- the force that we applied in this
8  experiment was 4.9 newton.  That is around one pound.
9      Q.   How did you determine what forces you were
10 going to place on the Prolift arms during this
11 testing that's published in 2013?
12     A.   We had been looking to the many Ethicon
13 internal documents, and we wanted to keep below their
14 limits what they assume to be reasonable limits, and
15 we found two references, at least two references.
16     Q.   And when you're saying references, are you
17 talking about references in the Ethicon documents to
18 the foreseeable amounts of forces that would be
19 placed on the arms during the implantation of the
20 Prolift?
21     A.   Yes.
22           ---
23      (Plaintiff's Demonstrative Exhibit No. P3360,
24 PowerPoint slide, a blowup referencing PLT0697,

Page 63

1  "Elongation of textile pelvic floor implants under
2  load is related to complete loss of effective
3  porosity, thereby favoring incorporation in scar
4  plates", was marked for identification.)
5           ---
6  BY MR. ANDERSON:
7      Q.   Okay.  And we created a slide, I think, to
8  help the jury with that demonstrative, Plaintiff's
9  Exhibit 3360.
10          MR. ANDERSON:  If you could just put in those
11 two references.
12 BY MR. ANDERSON:
13     Q.   And, Doctor, are these the two references
14 from the Ethicon documents regarding two different
15 estimated forces that may be placed on the arms?
16     A.   Yes.  In these two documents you find either
17 5 pounds in the one document or even 12 pounds in the
18 other, and so we wanted to be below this range, not
19 to show that there is a collapse with extremely high
20 forces, but we want to know what happens to pores
21 when applying just 1 pound.
22           ---
23      (Plaintiff's Exhibit No. P0777, Ethicon
24 document, Form for Test Method

Page 64

1  Applicability/Suitability, Bates stamped
2  ETH.MESH.01992234 through ETH.MESH.01992237, was
3  marked for identification.)
4           ---
5  BY MR. ANDERSON:
6      Q.   I'm showing you, Doctor, what the plaintiffs
7  have marked and is noted on the slide as Plaintiff's
8  0777, is this the document where they estimated
9  approximately 5 pounds of force?
10     A.   Yes, it is.
11     Q.   And does 2.3 newtons per centimeter estimate
12 to about 5 pounds of force?
13     A.   Yes.
14           ---
15      (Plaintiff's Demonstrative Exhibit No. P3357,
16 Document Bates stamped ETH-01755, was marked for
17 identification.)
18           ---
19 BY MR. ANDERSON:
20     Q.   Okay.  And then showing you what has been
21 marked as Plaintiff's Exhibit P3357, is this the
22 document that you referenced in terms of Ethicon
23 stating that you could estimate 12 pounds of force by
24 the surgeon being placed on the Prolift arms during a

Page 65

1  Prolift procedure?
2      A.   Exactly.
3      Q.   Okay.  Thank you.
4          Doctor, what is the significance of your
5  findings with regard to the mesh that we see that has
6  had 1.1 pounds of force applied to it in terms of the
7  tissue response in the patient?
8      A.   It clearly demonstrates and confirms that you
9  have a change of the pore size when applying some
10 force to it and that even very low forces can lead to
11 very, very small pore mesh -- meshes; and, therefore,
12 the application of slight forces changing the
13 appearance of a mesh like this will increase risks.
14     Q.   Okay.  Well, put it simply, what does that
15 mesh on the bottom mean to the patient?
16          MR. THOMAS:  Objection; foundation,
17 expertise.
18 BY MR. ANDERSON:
19     Q.   Yeah.  I think we've laid your foundation for
20 expertise.  Go ahead, Doctor.
21     A.   The mesh will mean increased risk for scar
22 bridging, shrinkage, contraction, pain, erosion.
23     Q.   Okay.  In your review of the internal Ethicon
24 documents in this case, did you determine whether

Prof. Dr. Med. Uwe Klinge

Page 66

1  Ethicon's scientists had considered your and
2  Dr. Mühl's pore testing publications and the effects
3  of mesh pore size under strain?
4      A.  Yes, I did.
5          - - -
6          (Plaintiff's Exhibit No. P0829, E-mail chain
7  and article entitled "New Objective Measurement to
8  Characterize the Porosity of Textile Implants," Bates
9  stamped ETH.MESH.02184130 through ETH.MESH.02184138,
10  was marked for identification.)
11         - - -
12  BY MR. ANDERSON:
13     Q.  Let's pull up the two documents so the jury
14  can see what we're talking about.
15         I'm handing you what has been premarked as
16  Plaintiff's Exhibit P0829.  Have you seen this
17  document before, Dr. Klinge?
18     A.  Yes, I've seen.
19     Q.  Is this something you considered and reviewed
20  in arriving at your opinions in this case?
21     A.  Yes.
22         MR. ANDERSON:  If we could blow up the top
23  part of this and also show the attachment that
24  goes with this article -- with this internal

Page 67

1  Ethicon e-mail.  Yes.
2  BY MR. ANDERSON:
3      Q.  Explain what the significance is to you of
4  this e-mail in 2008 as well as the attachment.
5          MR. THOMAS:  Objection; calls for Ethicon's
6  state of mind.
7          THE WITNESS:  They are circulating our
8      manuscript that we published in 2005 as a
9      sophisticated method to measure porosity, so they
10     have been aware of it.
11         - - -
12         (Plaintiff's Exhibit No. P1437, October 7,
13  2010, e-mail and article entitled "New Objective
14  Measurement to Characterize the Porosity of Textile
15  Implants," Bates stamped ETH.MESH.04945136 through
16  ETH.MESH.04945144, was marked for identification.)
17         - - -
18  BY MR. ANDERSON:
19     Q.  Okay.  Let me show you another document which
20  is Plaintiff's Exhibit 1437, which is another e-mail,
21  an Ethicon e-mail, this one dated 2010, from a
22  Dr. Joerg Holste to a Dr. Juergen Trzewik.  Do you
23  know Dr. Joerg Holste?
24     A.  Yes, I know.  He is a leading scientist in

Page 68

1  Hamburg, Ethicon.
2      Q.  Did you work with him in the last 20 years?
3      A.  He was a member of the working group that has
4  been working together with us.
5      Q.  And if we see the attachment to this e-mail,
6  two years later what do you find here, Doctor?
7          MR. THOMAS:  Objection; postdates
8      Ms. Bellew's surgery, and there is nothing here
9      to comment on other than the fact it's just a
10     transmittal letter.
11  BY MR. ANDERSON:
12     Q.  Go ahead, Doctor.
13     A.  In 2010 they again circulated it to the
14  members of their research groups.
15         - - -
16         (Plaintiff's Exhibit No. P1087, PowerPoint
17  presentation entitled "Thunder: Technical Review,
18  Somerville 28th February 2008", was marked for
19  identification.)
20         - - -
21  BY MR. ANDERSON:
22     Q.  I'm showing you what has been marked as
23  Plaintiff's Exhibit P1087.
24         Have you seen this document before,

Page 69

1  Dr. Klinge?
2      A.  Yes, I've seen it.
3      Q.  And is it significant to your opinions in
4  this case today?
5      A.  Yes, it is.
6      Q.  And what generally is this document?
7      A.  It's a technical review from Ethicon.
8      Q.  And what year is this dated?
9      A.  It's made from 2008.
10     Q.  If you would turn, please, over to page 21 of
11  Plaintiff's Exhibit 1087.  Is this slide of the
12  PowerPoint something you've seen before?
13     A.  Yes, I've seen it.
14     Q.  And is this significant to your opinions with
15  regard to a pore collapse and pore deformation and
16  its relation to patient injury?
17     A.  Yeah.
18     Q.  Okay.  What do you see here, Doctor, that you
19  would like to point out to the jury?
20         MR. ANDERSON:  Highlight 4.
21     A.  So in this definition of the requirements to
22  improve, as it is said in the subtitle, "Improving
23  lives by advancing the standard of care in tissue
24  repair," they identify it as an important point to

Prof. Dr. Med. Uwe Klinge

Page 70

1  improve this -- these results, shrinkage and
2  stiffening; and they defined a pore size of more than
3  3 millimeter as being essential, and for the first
4  time they mentioned a pore size of 1 millimeter under
5  stretch. So they acknowledged that you have to look
6  to the pore size and use additionally to the pore
7  size in the box or without any forces.
8      MR. THOMAS: Objection; move to strike. Goes
9  beyond what the document says.
10 BY MR. ANDERSON:
11     Q. I want to go back to a document previously
12 used, which was Plaintiff's Exhibit 1156. We looked
13 at this with the jury a little earlier today, and --
14     MR. THOMAS: Can you give me just a second,
15 please?
16     MR. ANDERSON: Sure.
17     MR. THOMAS: Thank you. I have it now.
18 BY MR. ANDERSON:
19     Q. Okay. If you go to page 13 of this 2008
20 Ethicon PowerPoint, have you seen this slide before,
21 Doctor?
22     A. Yes, I've seen it.
23     Q. And is that significant to your opinions in
24 this case?

Page 71

1      A. Yes.
2      MR. ANDERSON: Okay. Highlight the left-hand
3  side of this picture.
4  BY MR. ANDERSON:
5      Q. What are we seeing here, Doctor?
6      A. So in this image you see the same phenomenon
7  as we have seen in -- with the basketball net, that
8  when applying some forces, the pores collapse and you
9  will create a small pore mesh.
10     Q. We see the word "effective porosity" there.
11 What's that refer to?
12     A. Effective porosity, that's exactly the term
13 that we were able to define with the testing that we
14 do a lot of, Professor Mühl. So they adopted this
15 terminology in --
16     Q. Just explain that real simply for the jury,
17 what effective pores would be.
18     A. So effective pores means that is the area of
19 the good pores roughly. So the good pores are those
20 with fat. If you start with half of the pores are
21 filled by fat in the upper line, then it's going to
22 zero in the lower if you applied some force to it.
23 So you only have small pores, noneffective, poor
24 pores, risky pores in the lower part when you apply

Page 72

1  the force to it.
2      Q. Thank you, Doctor.
3              - - -
4      (Plaintiff's Exhibit No. P2995, PowerPoint
5  presentation entitled "Mesh Properties - How
6  important are they?" was marked for identification.)
7              - - -
8  BY MR. ANDERSON:
9      Q. Going -- I want to show you now Plaintiff's
10 Exhibit P2995. Is this a document that you have
11 reviewed and relied upon in this litigation?
12     A. Yes, I did.
13     Q. And what is this, Doctor?
14     A. This is a PowerPoint presentation from
15 Ethicon.
16     Q. And if we would go to slide 25 of this
17 presentation by Ethicon.
18     A. Yes.
19     Q. Is that significant to your opinions that
20 you're offering here regarding pore size and pore
21 deformation after stretch is applied?
22     A. Yes, it is.
23     Q. Okay. Please explain for the jury.
24     A. Because this figure wants to express in the

Page 73

1  title already that large pores become very small
2  under stress, and it was in contrast to the previous
3  one, which was a drawing. It shows that was an
4  Ethicon experiment showing or trying to demonstrate
5  what happens to the textile structure to the pores
6  when applying a force to it.
7      Q. As part of your review of the materials in
8  this case, did you see the Ethicon video of a Prolift
9  anterior actually being implanted in a woman?
10     A. Yes, I did.
11     Q. And is that video significant to your
12 opinions in this case?
13     A. Yes, it is.
14     Q. Okay. I don't want to have to show the jury
15 the entire video because they may have already seen
16 it, but did you ask me to create some screenshots
17 from that video?
18     A. Yes.
19     Q. Okay. And did we create a slide showing
20 these videos --
21     A. Yes.
22     Q. -- these screenshots for the jury?
23     A. Sorry.
24     Q. Sorry. Yes?

Prof. Dr. Med. Uwe Klinge

Page 74

1    A.  Yes.
2              - - -
3         (Plaintiff's Demonstrative Exhibit No. P3361,
4    PowerPoint slide entitled "Pores Collapse Under
5    Tension," referencing P2995, ETH.MESH.05237872, PLT
6    0697, P1452 - ETH.MESH.000007, was marked for
7    identification.)
8              - - -
9    BY MR. ANDERSON:
10   Q.  Okay.  I'll put up this next slide which
11   we'll use for demonstrative as P3361.  Just one
12   second.  Go ahead.
13       MR. THOMAS:  Before you show that to the
14   jury, are you representing that this is
15   Ms. Bellew's surgery?
16       MR. ANDERSON:  If I did, I would have said
17   that.
18       MR. THOMAS:  That's why I show my objection
19   to this not being representative of Ms. Bellew's
20   surgery.
21       MR. ANDERSON:  It's okay.  It's your
22   document.
23   BY MR. ANDERSON:
24   Q.  So showing you Plaintiff's Exhibit P3361,

Page 75

1    over to the right is that a screen shot from a DVD
2    produced by Ethicon of Ethicon surgeons implanting a
3    Prolift anterior into a woman?
4    A.  Yes.
5    Q.  Okay.  So you asked me to put these three
6    images together.  Why did you ask me to do that?  Why
7    do you think that's important for the jury to see,
8    Doctor?
9    A.  Because it makes very clear that we have to
10   deal with a realistic problem.  On the left you see
11   the image from the Ethicon study where they just
12   described it.
13       In the middle you see an image of our testing
14   where we tried to measure it to quantify the
15   consequences to different forces.
16       And on the right you see exactly the same
17   deformation, the same roping of the arms during the
18   OR.  So the collapse of pores is a real phenomenon.
19   Q.  So whether we can take the Ethicon document
20   that says 5 pounds of force is placed by the surgeon
21   on the arms during implant or 12 pounds of force
22   during implant, this image to the right, is this the
23   resulting characterization of the mesh arm after
24   either 5 or 12 pounds of force are placed on it?

Page 76

1    A.  Obviously the forces in the OR when in use
2    are too high for this specific design of this mesh,
3    leading to this roping, even in this teaching video.
4        MR. THOMAS:  Objection; move to strike,
5    beyond the area of expertise and not a disclosed
6    opinion.
7        MR. ANDERSON:  It certainly was disclosed
8    opinions, and the videos are in his reliance
9    materials.  And he talked about initial force, 12
10   pounds of force.  He talks about 5 pounds of
11   force.  He says that when you use the applied
12   loads that Ethicon used that you get to see pore
13   deformation.  He said that you see it from
14   Ethicon's documents, his documents and the DVD.
15   BY MR. ANDERSON:
16   Q.  Okay.  So if we can just zoom in on this
17   Ethicon DVD on the right-hand side produced by
18   Ethicon in this litigation, is that significant to
19   your opinions?  Is that what you were discussing with
20   the jury of how the mesh is curled and roped and
21   deformed?
22   A.  Yes.
23       MR. THOMAS:  Same objection.
24       THE WITNESS:  Exactly.  So this is not longer

Page 77

1    any large pore mesh design.  This rope will be
2    integrated into dense scar tissue and nothing --
3    nothing else, and it will become stiff and rigid.
4    BY MR. ANDERSON:
5    Q.  Is that appearance of the arm right there, is
6    that what it looks like when it comes out of the
7    Ethicon box?
8    A.  No, definitely not.
9        MR. ANDERSON:  Okay.  You can take that down.
10   Oh, actually, bring that back up.
11   BY MR. ANDERSON:
12   Q.  Do you have an opinion to a reasonable degree
13   of medical and scientific certainty as to whether the
14   mesh arms that the jury is seeing in the right-hand
15   picture would result in unnecessary risk to the
16   tissues?
17       MR. THOMAS:  Objection; beyond his area of
18   expertise.
19       THE WITNESS:  The appearance of such a mesh
20   in this roping form means a considerable risk,
21   and because it is -- there is no need for this,
22   it is an unnecessary risk.
23   BY MR. ANDERSON:
24   Q.  And would that unnecessary risk involving the

Prof. Dr. Med. Uwe Klinge

Page 78

1 tissue response, would that risk be the same with
2 mesh of this appearance whether it was in the
3 abdominal tissue, the pelvic tissue or the tissue
4 under your armpit?
5     MR. THOMAS: Same objection.
6     THE WITNESS: A mesh curled like this,
7 getting these small pores like this one will
8 result everywhere in the body in a scar mesh
9 compound that is stiff and rigid and not flexible
10 any longer.
11     MR. ANDERSON: You can take that down.
12 BY MR. ANDERSON:
13 Q. After your review of all the materials in
14 this case regarding Ethicon's meshes for treating
15 pelvic organ prolapse, all of your work that you've
16 done in the scientific literature, conferences you've
17 spoken at around the world, the conferences you've
18 spoken as an invited lecture by Ethicon, and your
19 work as a hernia surgeon both implanting and
20 explanting polypropylene meshes, your work in
21 reviewing thousands of hernia mesh explants from
22 humans, your review of looking at explants from
23 pelvic floor -- from the pelvic floor in women, do
24 you have an opinion to a reasonable degree of medical

Page 79

1 and scientific certainty as to whether the Prolift
2 was a safe design or an unsafe defective design?
3     MR. THOMAS: Objection.
4 A. I have --
5     MR. THOMAS: Excuse me. Just let me base my
6 objection to the foundation that he's laid. Go
7 ahead.
8 BY MR. ANDERSON:
9 Q. Do you?
10 A. I have.
11 Q. Okay. And what is that opinion, Dr. Klinge?
12 A. The Prolift carries unnecessary risk and,
13 therefore, it's unsafe.
14 Q. Doctor, did we prepare a slide for the jury
15 regarding your opinions of what you consider to be
16 the critical design defects in the Prolift?
17 A. Yes.
18         - - -
19     (Plaintiff's Demonstrative Exhibit No. P3362,
20 PowerPoint slide entitled "Prolift Unsafe/Defective
21 Mesh Design", was marked for identification.)
22         - - -
23     MR. ANDERSON: Okay. If we could show that.
24 That is Plaintiff's Demonstrative 3362.

Page 80

1 BY MR. ANDERSON:
2 Q. Is this the PowerPoint that you wanted me to
3 prepare, Doctor?
4 A. Yes.
5 Q. Okay. You have a point there, "Less
6 Material = Safer," under the heading "Prolift
7 Unsafe/Defective Mesh Design." What do you mean by
8 this first bullet point?
9 A. It became clear from all our work that less
10 material would reduce the risk of inflammation and
11 scarring, so less material will make it safer and
12 there is no need for this amount of material as it is
13 used for the Prolift.
14 Q. Okay. Let's go to your next point.
15 A. From all our work, it is evident and clear
16 and undoubted that large pore -- larger pores will
17 make it safer. They will help that the pores are
18 filled by fat tissue, keeping it flexible. So,
19 therefore, larger pores would make it safer, and
20 there is no need for the small pores of the Prolift.
21 Q. And your third point?
22 A. The pores have to resist a collapse when
23 applied, some forces that we have seen that these
24 forces have been applied. And, therefore, a mesh

Page 81

1 design that avoids this collapse under forces would
2 be much safer, and there is no need that you bring in
3 a mesh that shows this roping. There is no need,
4 and, therefore, all these three points are
5 unnecessary risks.
6 Q. After all of your review of the thousands of
7 pages of depositions, the internal Ethicon documents,
8 all the things that we've been just covered
9 throughout your testimony today as well as your work
10 with Ethicon as a consultant for ten years and over
11 20 years of work in the field, do you have an opinion
12 to a reasonable degree of medical and scientific
13 certainty as to whether the Prolift was safely
14 designed to be permanently implanted in a woman's
15 pelvis?
16 A. Yes.
17     MR. THOMAS: Objection; foundation,
18 expertise.
19 BY MR. ANDERSON:
20 Q. Now answer the question.
21 A. Yes.
22 Q. And what is that opinion, Doctor?
23     MR. THOMAS: Same objection.
24 BY MR. ANDERSON:

Prof. Dr. Med. Uwe Klinge

Page 82

1  Q.  Now go.
2  A.  Because it carries unnecessary risk.  It is
3  designed unsafe and defective.
4      MR. ANDERSON:  Thank you.  No further
5  questions at this time.
6      THE VIDEOGRAPHER:  We are off the record.
7  The time is 10:22 a.m.
8  (A recess was taken from 10:22 a.m. until 10:33 a.m.)
9      THE VIDEOGRAPHER:  This marks beginning of
10  Video Number 2.  We are back on the record.  The
11  time is 10:33 a.m.
12          CROSS-EXAMINATION
13  BY MR. THOMAS:
14  Q.  Good morning, Dr. Klinge.
15  A.  Good morning.
16  Q.  You're an expert that's been retained by
17  Mr. Anderson in this case; is that correct?  Expert
18  witness?
19  A.  Yes.
20  Q.  And you're paid for the time that you spend
21  working on this matter?
22  A.  Yes.
23  Q.  And you're paid at the rate of $500 an hour;
24  is that right?

Page 83

1  A.  Yes.
2  Q.  How much money have you been paid to work on
3  this case?
4      MR. ANDERSON:  Objection.  You mean Bellew?
5      MR. THOMAS:  Yes.
6      MR. ANDERSON:  The Bellew case.
7      THE WITNESS:  It's about $20,000, included
8  the tax.  In Germany you have to reduce it almost
9  by half.
10  BY MR. THOMAS:
11  Q.  Okay.  And in preparation for your deposition
12  today, you met with Mr. Anderson?
13  A.  Yes.
14  Q.  And how many days did you meet with
15  Mr. Anderson?
16  A.  Three days.
17  Q.  Okay.  And how many hours did you spend with
18  Mr. Anderson in preparation for your deposition?
19  A.  Six hours a day.
20  Q.  So about 18 hours?
21  A.  Maybe.
22  Q.  So about $9,000; correct?
23  A.  Yeah.
24  Q.  All right.  Now, from the mid-1990s to 2006,

Page 84

1  you were a practicing surgeon with a focus on
2  abdominal hernia repairs; correct?
3  A.  No.  Ah.
4  Q.  What?
5  A.  Yeah.  So I just understand.  I was an
6  abdominal surgeon with the focus on hernia surgery.
7  That is okay, yeah.
8  Q.  Okay.  Fine.  Thank you.
9      And I'm not trying to trick you.  If you
10  don't understand my question, let me know, and I'll
11  try to rephrase it.  I know that English is not your
12  first language, and I'll do the first I can.
13  A.  And I am not sure every time.
14  Q.  And I speak West Virginian.  I don't speak
15  German.
16      Doctor, you've not performed surgery since
17  2006, have you?
18  A.  Not in humans.
19  Q.  Okay.  And prior to 2006, you treated
20  hernias?
21  A.  Yes.
22  Q.  And a hernia is essentially an organ pushing
23  through the abdominal wall; correct?
24  A.  Not always.

Page 85

1  Q.  Why can you not describe a hernia as an organ
2  pushing through the abdominal wall?
3  A.  Because there are hernias, for example, close
4  to the esophagus, through the diaphragm, where you
5  have a hernia, but it is not a defect in the
6  abdominal wall.
7  Q.  Okay.  Well, you could repair hernias with
8  sutures; is that correct?
9  A.  You can try to repair it by sutures, yes.
10  Q.  And sutures are sometimes called stitches?
11  A.  Yes.
12  Q.  And sutures and stitches are the Prolene that
13  you showed to the jury on direct examination;
14  correct?
15  A.  There are many kind of different sutures,
16  different suture materials, and one of the suture
17  material is Prolene.
18  Q.  And when you repair a hernia with sutures,
19  you basically put the tissue back in place and then
20  support it with the stitches; correct?
21  A.  The stitches are supported to keep the
22  approximation of the tissues together, yeah.
23  Q.  Okay.  And you can also treat hernias with
24  surgical mesh; correct?

Prof. Dr. Med. Uwe Klinge

Page 86

1    A.   Yes.
2    Q.   And you can repair hernias with polypropylene
3  mesh; correct?
4    A.   Yes.
5    Q.   There are about 20 million surgical mesh
6  implantations every year; true?
7    A.   That is said by Saunders in his reference.
8  Whether it's true, I didn't count it.
9    Q.   And abdominal hernia repair is the most
10  frequently performed operation and surgery; correct?
11    A.   That is correct.
12    Q.   And the use of mesh to repair hernias is an
13  important option for patients; true?
14    A.   Yes.
15    Q.   Polypropylene is the most widely used mesh
16  for hernia repair; true?
17    A.   That should be true.
18    Q.   And mesh implants made of polypropylene have
19  been used in the human body since 1963; true?
20    A.   That is true.
21    Q.   And Ethicon began selling Prolene mesh for
22  hernia repair in 1974?
23    A.   Yeah.
24    Q.   And the Prolene mesh that's used to repair

Page 87

1  hernias is the same material that is used to make
2  Prolene soft in the Prolift; correct?
3    A.   Please, can you --
4    Q.   Prolene mesh used in hernia repair is made of
5  the same polypropylene material that is used to make
6  Prolene soft for use in the Prolift?
7    A.   I think so, yeah.
8    Q.   Now, you started implanting polypropylene
9  mesh for hernia repair in the early 1990s; true?
10    A.   Yes.
11    Q.   And you performed about 200 hernia repairs
12  using mesh; correct?
13    A.   Yes.
14    Q.   Now, a minute ago you showed the jury
15  Plaintiff's Exhibit 3364, which is the amount of
16  polypropylene that, if taken apart, the Prolift would
17  have in it; correct?
18    A.   Yes.
19    Q.   Well, just so it's clear, you never implant
20  polypropylene in that form into a body, do you?
21    A.   No.
22    Q.   The polypropylene is woven or knitted into a
23  mesh so it can be implanted; correct?
24    A.   Yes.

Page 88

1    Q.   And we don't have a Prolift here, but the
2  Prolift itself does not look like Exhibit 3364;
3  correct?
4    A.   Yes.
5    Q.   Now, the hernia meshes that you used to
6  repair hernias are often bigger than the meshes used
7  in the pelvic floor to repair a pelvic organ
8  prolapse; correct?
9    A.   The meshes can be bigger, but the area for
10  implantation is completely different.
11    Q.   So are you telling the jury that implanting a
12  mesh in the abdominal area is different from
13  implanting a mesh in the pelvic floor?
14        MR. ANDERSON:  Objection.
15        THE WITNESS:  Yes.
16        MR. ANDERSON:  Go ahead.
17  BY MR. THOMAS:
18    Q.   Stay with me, though, for a minute.  But the
19  amount of mesh that you implant in the abdominal area
20  to repair hernias is often much more than the amount
21  of mesh that's used in this anterior Prolift that you
22  have described in P3364; correct?
23    A.   It was correct before we developed together
24  with Ethicon these large pore meshes, which have a

Page 89

1  reduced amount of material.  We could reduce the
2  amount of polypropylene to 30 percent of these
3  heavyweight small pore meshes, and, therefore, it is
4  difficult.  It depends from -- from the specific size
5  of the mesh.  Then you can do this calculation and
6  look whether it exactly fits or whether it's a little
7  bit more.
8    Q.   Meshes that you used before 2006 to implant
9  into humans for the repair of hernias had more
10  polypropylene in them than the polypropylene that you
11  showed the jury in 3364; correct?
12    A.   2006 you said?
13    Q.   Before 2006.  You implanted meshes --
14    A.   We --
15    Q.   -- some meshes that had more polypropylene
16  than is present in 3364.
17    A.   After our development of Vypro of these large
18  pore meshes with Ethicon, we only use these
19  material-reduced methods; and, therefore, the use of
20  this huge amount of material was very, very rare.
21    Q.   You know today that mesh is used in the
22  repair of hernias by a doctor every single day, in
23  Germany, in the United States, everywhere around the
24  world that has more mesh than is present in 3364,

Prof. Dr. Med. Uwe Klinge

Page 90

1 don't you?
2    A.  I know that in Germany 90 percent -- more
3 than 90 percent of the meshes used for hernia repair
4 are large pore meshes.
5    Q.  And what meshes are those specifically?
6    A.  These are Ultrapro.  Ultrapro is the leading
7 from Ethicon.
8    Q.  Okay.  Are you saying Ultrapro is appropriate
9 for the pelvic floor?
10    A.  No.
11    Q.  So just so your testimony is clear, it's not
12 your opinion that Ultrapro is an appropriate mesh to
13 treat pelvic organ prolapse in the pelvic floor;
14 true?
15    A.  If you stick to the third point we presented
16 there, that it has to prevent a pore collapse -- and
17 Ultrapro obviously does not prevent a pore collapse
18 when applied to forces; therefore, it is not the best
19 idea to use Ultrapro in this -- for this indication,
20 yes.
21    Q.  It's true that you do not have the opinion
22 that Ultrapro is a reasonable alternative design for
23 the use of mesh in the treatment of pelvic organ
24 prolapse; true?

Page 91

1    MR. ANDERSON:  Objection to form.
2    THE WITNESS:  As it carries unnecessary risk,
3 I am sure that it is not a safe alternative.
4 BY MR. THOMAS:
5    Q.  Okay.  Now, when you started implanting mesh
6 for hernia repair, you didn't understand all of the
7 biomechanical demands of the abdomen; true?
8    A.  It is a permanent learning that I have when I
9 started surgery.  I don't know, but I permanently
10 learned about it.  And we learned a lot about these
11 meshes, and, of course, when we started to make this
12 research, we didn't know everything.
13    Q.  Are you able to answer my question yes or no?
14 Let me ask it again.
15    When you started implanting mesh for hernia
16 repair, you didn't understand all of the
17 biomechanical demands of the abdomen; true?
18    A.  What do you think of "all"?
19    Q.  Doctor, let me hand you your deposition that
20 you gave.
21    I'm sorry.  It's the wrong one.
22    No.  I was right.
23    MR. ANDERSON:  Thank you, Counsel.
24 BY MR. THOMAS:

Page 92

1    Q.  Turn to page 89 of the deposition, please.
2    MR. ANDERSON:  I think you gave me two
3 copies, Counsel.  Yeah.  You gave me --
4    MR. THOMAS:  I think there's two days.
5    MR. ANDERSON:  Oh, you're going to need both.
6    THE WITNESS:  98?
7 BY MR. THOMAS:
8    Q.  Page 89, line 16.  You there?
9    "QUESTION:  And, Doctor, in the early '90s
10 the physicians didn't understand all of the
11 biomechanical demands of the abdomen; is that
12 correct?
13    "ANSWER:  There was limited knowledge about
14 the biomechanics of the abdomen."
15    Did I read that correctly?
16    MR. ANDERSON:  Excuse me.  I will object.
17 That is not the same question you asked.  You
18 asked, "Do you know everything," and here you
19 changed the question from this to what it was in
20 the deposition.  So if we were at sidebar, I
21 would have pointed that out to the judge.
22    MR. THOMAS:  And I understand your objection.
23 BY MR. THOMAS:
24    Q.  Did I read that correctly?

Page 93

1    A.  Yeah.
2    Q.  Okay.
3    MR. ANDERSON:  It's an inappropriate use of
4 the deposition, so that's my objection.
5    MR. THOMAS:  And you stated it clearly.
6 BY MR. THOMAS:
7    Q.  And, Doctor, it's clear that in the '90s
8 physicians didn't understand all of the biomechanical
9 demands of the abdomen; true?
10    A.  There was limited knowledge about the
11 biomechanics of the abdomen.  Still open questions.
12    Q.  Okay.  And when you were performing hernia
13 surgery, it was important for you that the patient
14 understand whether the benefits of that hernia
15 surgery outweighed the risks of that hernia surgery;
16 correct?
17    A.  That is correct.
18    Q.  And it's your job as a doctor to explain the
19 risks of hernia surgery to the patient so the patient
20 can make that informed decision; correct?
21    A.  Yes.
22    Q.  And it's true, Doctor, that any surgery has
23 risks?
24    A.  Which type of risks do you think?

Prof. Dr. Med. Uwe Klinge

Page 94

1    Q.   Well, is it true that every hernia surgery
2  has risks?
3    A.   Has some risks.
4    Q.   And it's your job to tell a patient about
5  those risks so that they can make a decision about
6  whether to have the surgery; correct?
7    A.   I have to tell him not that there are
8  possible ways to get some complication, but I have to
9  give him the information that he gets a good estimate
10 how big the risk is, whether there is an alternative
11 with a less risk and what is the benefit.
12   Q.   And --
13   A.   So is it a necessary risk or is it an
14 unnecessary risk?  And all this together I have to
15 discuss with the patient.  It is not so simple to say
16 there are some risks.
17   Q.   And you tell the patient that there is a
18 lifelong risk of infection from that mesh implant,
19 wouldn't you?
20   A.   From the moment we know there is a -- that we
21 learn that there was this permanent inflammation that
22 you have a lifelong risk for infection.  You have an
23 implant.  They received an implant.  It's not a
24 tissue repair.  They received a plastic implant for

Page 95

1  the rest of their lives.
2    Q.   And anytime you have a plastic implant,
3  there's a risk, a lifelong risk of an infection;
4  true?
5    A.   Yes.
6    Q.   And that would be for a hip or for a knee
7  just as well as a mesh; correct?
8    A.   But the numbers are different, and it is
9  different to treat it.
10   Q.   Answer to my -- Doctor, it's fair to say that
11 there's a lifelong risk of infection from mesh, just
12 like there's a lifelong risk of infection from a hip
13 implant or a knee implant?  Yes or no.
14      MR. ANDERSON:  Objection; beyond the scope of
15 cross -- beyond the scope of direct.
16      THE WITNESS:  If you are thinking of the
17 principal possibility of a lifelong risk to get
18 an infection, yes.
19 BY MR. THOMAS:
20   Q.   Thank you.
21      And when you're talking to a patient about
22 the risks of hernia repair, you talk to a patient
23 about the risk of a late onset of chronic pain;
24 correct?

Page 96

1    A.   This topic surely is mentioned with the
2  patient, that chronic pain may be a serious
3  complication after operation, yes.
4    Q.   And when you say late onset, that means that
5  this pain does not manifest itself until after the
6  surgery sometime; correct?
7    A.   Yes.
8    Q.   And you also tell patients that hernia mesh
9  is difficult to remove; true?
10   A.   Yes.
11   Q.   And you talk to a patient about a risk of
12 hernia recurrence?
13   A.   Yes.
14   Q.   And a hernia recurrence means that the mesh
15 repair did not work and the hernia repair comes back;
16 correct -- excuse me, the hernia comes back; is that
17 correct?
18   A.   There are different definitions of
19 recurrence, and where the hernia comes back, whether
20 it's really a problem that the mesh doesn't work,
21 whether it's a new hernia that is for the patient a
22 recurrence.  So it is not so simple, but we are
23 discussing the manifestation of another hernia
24 despite using a mesh.

Page 97

1    Q.   And a patient needs to know that there's a
2  risk that the surgery won't work; correct?
3    A.   Yes.
4    Q.   And you talk to a patient who is looking at a
5  potential hernia repair with mesh about the risk of
6  mesh shrinkage; correct?
7    A.   Yes.
8    Q.   And any mesh will have a shrinkage or
9  contracture rate of at least 20 percent; correct?
10   A.   At least 20 percent?  The difference is the
11 extent of this one.
12   Q.   Any -- any mesh -- it's true that any mesh
13 will have a shrinkage or contracture rate of at least
14 20 percent; correct?
15   A.   There may be some conditions where it's a
16 little bit lower, but, yeah, sure, more or less it
17 is.  You have to assume a contraction of 20 percent.
18   Q.   And when you were treating patients for
19 hernia repairs, you explained all of these risks to
20 the patient so the patient would understand?
21   A.   But in a completely different way.
22   Q.   Is that true?
23   A.   I explained these risks to the patients.
24   Q.   So when you used polypropylene mesh for

Prof. Dr. Med. Uwe Klinge

Page 98

1    hernia repair, you believed that the benefits of that
2    mesh outweighed any risks to your patient; true?
3        A.   In some specific patients in some specific
4    conditions where we are discussing the alternatives,
5    we are discussing the risks of the patient's
6    conditions, the risk of the procedure, the risk of
7    the biomaterials, all this together will end up in
8    the risk-benefit ratio.  And when you have all this
9    information, how often something occurs, then you can
10   discuss it with the patient and you can make your
11   decision, yes.
12       Q.   Well, when you recommended mesh to a patient
13   for the repair of their hernia, you believed that the
14   mesh that you were going to use, the benefits of that
15   mesh outweighed the risk to the patients; true?
16       A.   In those patients where I am using meshes, I
17   have been using meshes, the decision of me and the
18   patient was that in this case the use of a specific
19   mesh in a specific way outweighs the risks.
20       Q.   Okay.  Now, over the last 20 years, there are
21   millions of people on earth walking around with mesh
22   in their body, and a large percentage of those meshes
23   are either polypropylene or they contain
24   polypropylene; true?

Page 99

1        A.   Sure.
2        Q.   Yeah.  Now, you've never treated the
3    plaintiff in this case; correct?
4        A.   That is correct.
5        Q.   And you've never examined the plaintiff in
6    this case; correct?
7        A.   That is correct.
8        Q.   And you have never rendered any medical
9    diagnosis specific to the plaintiff in this case;
10   correct?
11       A.   That is correct.
12       Q.   And you have never examined the actual mesh
13   explanted from the plaintiff in this case; correct?
14   Other than the photograph you looked at?
15       A.   I think so, yeah.
16       Q.   Now, I want to look at that photograph that
17   Mr. Anderson showed you.  Do you have it in front of
18   you?  Exhibit P3356.
19            Do you have that, Dr. Klinge?
20       A.   Yes.
21       Q.   Now --
22       A.   I see.
23       Q.   In the top left-hand corner -- you understand
24   this to be a mesh explant from Mrs. Bellew?

Page 100

1        A.   Yes.
2        Q.   And the top left-hand corner, is that the
3    area of mesh that you were describing in your direct
4    examination?
5        A.   Yes.
6        Q.   And that mesh has -- is covered with tissue;
7    correct?
8        A.   Yes.
9        Q.   And that mesh has been stored in
10   formaldehyde; correct?
11       A.   Yes.
12       Q.   And you have not measured that mesh to
13   determine the extent to which any pores in that mesh
14   have collapsed, have you?
15       A.   Not specifically this mesh.
16       Q.   Thank you.
17            As a matter of fact, you have not performed
18   any analysis on the mesh specific to Ms. Bellew;
19   correct?
20       A.   Specifically, yeah.
21       Q.   Now, you have not ever performed surgery for
22   the repair of pelvic organ prolapse; correct?
23       A.   That is correct.
24       Q.   And we talked about the Prolift before.

Page 101

1    You've never used a Prolift in any surgery; correct?
2        A.   That is correct.
3        Q.   And do you know the tools that are used to
4    place Prolift?
5        A.   I've seen it on the video.
6        Q.   There's a trocar?
7        A.   Yes.
8        Q.   And there's a cannula; correct?
9        A.   Yes.
10       Q.   You've never placed a mesh with trocars, have
11   you?
12       A.   No.
13       Q.   You've never placed a mesh with cannulas,
14   have you?
15       A.   No.
16       Q.   You've never placed a mesh using the same
17   tools as Prolift; correct?
18       A.   That is correct.
19       Q.   Now, you were shown Exhibit 3361.  Could you
20   get that in front of you, please.
21            MR. THOMAS:  Could you pull that up, please,
22       3361, so the jury can see it?
23   BY MR. THOMAS:
24       Q.   And this is the slide that you talked about

Prof. Dr. Med. Uwe Klinge

Page 102

1  on direct examination, and this is a surgical
2  procedure involving the Prolift; correct?
3      A.  Yes.
4      Q.  And it uses cannulas; correct?
5      A.  Yes.
6      Q.  And it uses trocars; correct?
7      A.  Yes.
8      Q.  And you've never used either one of those;
9  correct?
10     A.  Yes.
11     Q.  And you understand that the mesh is to be
12  placed tension-free inside the body; correct?
13     A.  What do you mean by is said or --
14     Q.  Do you know that -- do you know that a
15  surgeon is to place the Prolift in the body
16  tension-free?  Do you know that?
17     A.  There are some ideas that it should be done
18  tension-free, but obviously it is not possible to
19  place it tension-free; therefore, there is no
20  measurement that it is done tension-free.  There
21  is -- it's not a fact.
22     Q.  But you have not done one; correct?
23     A.  Yes.
24     Q.  It's correct that you have not done one?

Page 103

1      A.  It is correct that I never did it.
2      Q.  Okay.  You've never tried to place mesh
3  tension-free inside a woman; correct?
4      A.  I -- the abdominal wall surgery, the use of
5  meshes, is supposed to be in a tension-free area.  We
6  know that's -- and I did it in woman.
7      Q.  Okay.  But not in a pelvic floor?
8      A.  Not in the pelvic floor.
9      Q.  Okay.  And when the Prolift is placed, it
10  goes through cannulas; correct?
11     A.  Yes.
12     Q.  And that allows for the smooth passage of the
13  mesh through the cannulas; correct?
14     A.  It is supposed that you need some forces,
15  according to the internal documents from Ethicon.  It
16  is supposed that you need some forces to do so.
17     Q.  And you don't know what this mesh looks like
18  inside of the person on whom this surgery is being
19  performed, do you?
20     A.  In the video you have it -- a view from
21  inside, and it appears -- though the quality is not
22  very good for these slides, but it appears as if
23  these -- this mesh in the video is looking curled
24  even inside; and from all the explants that we were

Page 104

1  able to investigate, we saw this deformation, this
2  roping in all of these explants, wherever they were
3  taken.  It's not a phenomenon that is outside the
4  body.  It's inside the body.
5      Q.  You've not seen it yourself, have you,
6  Doctor?
7      A.  In this case, not.
8      Q.  Okay.
9      A.  Only in the video I've seen it.
10     Q.  And the only video that you've seen of a
11  Prolift repair is the one that you just discussed;
12  correct?
13     A.  That is a video made by Ethicon --
14     Q.  Okay.
15     A.  -- as a teaching video.
16     Q.  And you don't have any basis to give an
17  opinion as to what the mesh looks like in the body,
18  do you?
19         MR. ANDERSON:  Objection.
20         THE WITNESS:  If you --
21  BY MR. THOMAS:
22     Q.  Is that yes or no?  You can tell me yes or no
23  and then tell me what it is.
24     A.  Please then.

Page 105

1      Q.  Do you have any basis to understand what the
2  mesh looks like in the body after it's implanted?
3      A.  I have a basis, yes.
4      Q.  And what is that?
5      A.  This basis is our explants, our -- the
6  visualization of many operations that have been shown
7  on the conference where you see it that is the
8  appearance of the arms for Prolift total, Prolift
9  posterior.  When you're looking to all of these
10  teaching videos, you always will see that the mesh is
11  not longer laying there in a flat way, but they
12  showed this roping.  You can find it almost every --
13  in every video and every transmission of an
14  operation.
15     Q.  On the outside?
16     A.  No.  Before -- sometimes you are able to see
17  the arms before closing all wounds, or sometimes you
18  may make some laparoscopy looking from inside.
19     Q.  Now, you're not an expert in pelvic floor
20  surgery with regards to the surgical procedure used
21  to treat pelvic organ prolapse; true?
22     A.  In regard to surgical procedure, it's true.
23     Q.  And you're not a specialist for finding the
24  best indication for a mesh in the pelvic floor; true?

Prof. Dr. Med. Uwe Klinge

Page 106

1  A.  That is true.
2  Q.  And you've never consulted with Ethicon on
3  issues of pelvic organ prolapse; true?
4  A.  That is true.
5  Q.  Now, you're not an obstetrician; true?
6  A.  Please, what?
7  Q.  You're not an obstetrician?
8  A.  What is an obste --
9  Q.  Baby doctor.
10  A.  No, I'm not a baby doctor.
11  Q.  You're not an obstetrician?
12  A.  Okay.  Yeah.  Yeah.
13  Q.  You're not a gynecologist?
14  A.  I'm not.
15  Q.  You're not a urologist?
16  A.  I'm not.
17  Q.  And you're not a urogynecologist; correct?
18  A.  I'm not.
19  Q.  And you've never completed a fellowship or
20  residency in those fields; correct?
21  A.  That is correct.
22  Q.  And you have never studied the pelvic
23  forces -- pelvic floor forces in a human; correct?
24  A.  We tried.  We tried in some research projects

Page 107

1  to define the -- or to learn about the anatomy and
2  the forces.
3  Q.  But you -- did you ever complete the study of
4  pelvic forces in the human?
5  A.  We completed some of the studies, and I guess
6  some of this already has been published in a
7  peer-reviewed literature, but of course we are not
8  finished with all our studies in this field.
9  Q.  Let me show you another transcript of
10  testimony, please, and direct your attention to page
11  3497.
12  A.  47?
13  Q.  3497, line 15.
14  A.  3497.
15  MR. ANDERSON:  And I'll just place an
16  objection on the record.  This is outside the
17  scope of direct.  Didn't talk about pelvic
18  forces.
19  What's your page?
20  MR. THOMAS:  3497.
21  BY MR. THOMAS:
22  Q.  Do you have it, Doctor?
23  A.  Yes.
24  Q.  Line 15.

Page 108

1  "QUESTION:  You've not studied the pelvic
2  floor forces in a human; correct?
3  "ANSWER:  That is correct."
4  Did I read that correctly?
5  A.  Yes.
6  Q.  Thank you.
7  Now, you agree that mesh is an important
8  option for patients in pelvic floor repair; correct?
9  A.  In some patients, yes.
10  Q.  And you agree that polypropylene is an
11  appropriate use in pelvic floor if you have the right
12  construction of that polypropylene; correct?
13  A.  If it's a right construction for this
14  specific purpose, yeah, it can be.
15  Q.  Okay.  And 91 percent of all gynecological
16  nonabsorbable meshes are polypropylene; correct?
17  A.  It should be, correct.  We never -- I never
18  analyzed or counted it.
19  Q.  Now, over the years you talked about your
20  work from Ethicon.  Ethicon paid you for your work,
21  didn't they?
22  A.  In the years from 2000 to 2005, yes.  In the
23  years before, no.
24  Q.  And you received royalties from Ethicon for

Page 109

1  sales of Vypro; correct?
2  A.  In these -- this is the payment you're
3  talking of.  This is in the years from 2000 until
4  2005.  I got something like royalties for the selling
5  of Vypro and Ultrapro.
6  Q.  And so every time Ethicon sold a Vypro and an
7  Ultrapro, you earned money; correct?
8  A.  Yes.
9  Q.  You earned about 20,000€ a year from
10  royalties from Ethicon from 2000 to 2005; is that
11  correct?
12  A.  That is correct.
13  Q.  Now, you received no royalties for the sales
14  of Prolene mesh; correct?  Prolene Soft Mesh.
15  A.  Yes.
16  Q.  I want to go back to another exhibit that you
17  talked about on direct, and it's Plaintiff's Exhibit
18  0697.  Do you have that?
19  A.  Not yet.
20  Q.  0697 is your 2013 study.
21  Do you have that now?
22  A.  Yes.
23  Q.  And Plaintiff's Exhibit 0697 was published in
24  2013?

Prof. Dr. Med. Uwe Klinge

Page 110

1    A.  Yes.
2    Q.  Now, in this study in 2013, you compare
3  Prolift and Prolift+M with DynaMesh; correct?
4    A.  That is correct.
5    Q.  And you and Mr. Mühl tested this -- these
6  meshes on the same machine that you conducted your
7  test back in 2007; correct?
8    A.  Yes.
9    Q.  And the machine that you developed in 2007
10  was fabricated in part by a company known as FEG;
11  correct?
12    A.  Please, can you -- can you please repeat it.
13      MR. THOMAS:  Can you read that back, please.
14      THE COURT REPORTER:  "And the machine that
15    you developed in 2007 was fabricated in part by a
16    company known as FEG; correct?"
17      THE WITNESS:  I don't think they fabricated
18    any part of this machine.
19  BY MR. THOMAS:
20    Q.  And what do you base that on?
21    A.  Because the FEG makes meshes and doesn't make
22  any computer hardware, photograph, image maker, so
23  nothing -- no component of this machine can be done
24  by the FEG.

Page 111

1    Q.  Okay.
2    A.  So I think they -- Professor Mühl bought it
3  from -- or has made it from their own engineers from
4  the university.
5    Q.  Okay.  Have you read the depositions of
6  Professor Mühl?
7    A.  I guess I have, yeah.
8    Q.  Okay.  Did you recall any testimony he gave
9  in that regard?
10    A.  No.
11    Q.  All right.  When you did your testing back in
12  2005 to 2007 and you developed this machine, did you
13  do it in conjunction with the FEG?
14    A.  Yes.  It was a -- it was a funded project by
15  the ministry together with the FEG and Professor
16  Mühl, yeah.
17    Q.  And the FEG manufactures meshes?
18    A.  Yes.
19    Q.  And the FEG makes PVDF meshes; correct?
20    A.  Yes.
21    Q.  And PVDF meshes are the meshes that you
22  compare -- used to compare the other meshes in the
23  study; correct?
24    A.  We made a comparison between this specific

Page 112

1  Gynemesh PS from polypropylene to a DynaMesh made of
2  PVDF in this specific -- two specific meshes.
3    Q.  And just so the jury understands, DynaMesh is
4  manufactured by FEG; correct?
5    A.  Yes.
6    Q.  And you, at the time of this study, were a
7  paid consultant for FEG; correct?
8    A.  Yes.
9    Q.  Now, in the first paragraph of this study --
10  excuse me, in the abstract in this study, you note on
11  the right side --
12      MR. THOMAS:  Can you bring that up, please?
13    It's 0697.
14      MR. KAUFFMANN:  Which page?
15      MR. THOMAS:  Front page.  Excuse me.  Let's
16    go to page -- the third page of that article.
17    Under Prolift+M system Gynemesh and Ultrapro,
18    first sentence.
19  BY MR. THOMAS:
20    Q.  "Without any strain, the effective porosity
21  was 57.5 percent, and the majority of pores had a
22  diameter of larger than 100 microns" -- "1,000
23  microns."
24      Correct?

Page 113

1    A.  Prolift+M, yeah.  Yeah.  You read it
2  correctly.
3    Q.  Okay.  And back on the first page in the
4  abstract on the right side, you identify the fact
5  that Prolift in tension-free can be considered a
6  large pore Class I mesh; correct?
7    A.  Yes.  It's one of bigger -- it has one of the
8  biggest pores of all mesh available.
9    Q.  And down at the bottom you say that both
10  meshes -- this is on the right side of the first
11  page.
12      "Both meshes can be classified as large pore
13  Class I mesh with an effective porosity that is
14  sufficient to prevent bridging of scar tissue
15  throughout the entire pore."
16      Correct?
17    A.  I didn't -- didn't -- couldn't follow where
18  you have been reading.
19    Q.  I'm down --
20      MR. ANDERSON:  You changed.  He was down in
21    the abstract.  You're moving down.
22  BY MR. THOMAS:
23    Q.  Down on the right side, about two-thirds of
24  the way on the right.  "The Gynemesh PS is identical

Prof. Dr. Med. Uwe Klinge

Page 114

1 to the Prolene Soft Mesh for hernia repair, and the
2 textile structure of the Prolift+M system is copied
3 from the Ultrapro hernia mesh."
4    A. Is identical, yes.
5    Q. "Both meshes can be classified as large pore
6 Class I mesh with an effective porosity that is
7 sufficient to prevent bridging of scar tissue
8 throughout the entire pore."
9     That's true?
10    A. You read -- no, that's not true, but you read
11 it correctly. It's not true if you applied some
12 forces to it.
13    Q. Okay. Well, this --
14    A. This is just restricted to the situation
15 where you don't apply any forces.
16    Q. Okay. And it's only if you apply forces to
17 it that, as far as you're concerned, it loses the
18 adequate pore size to prevent against this bridging;
19 correct?
20    A. Then, yes, it's correct that this mesh then
21 change to a small pore, dangerous high risk device.
22    Q. All right. Now, the testing that you have in
23 Exhibit 0697, you were retained as a plaintiff's
24 expert at this time; correct?

Page 115

1    A. I did not understand this.
2    Q. You were a plaintiff's -- you were an expert
3 for Mr. Anderson at the time you did the work on this
4 paper; correct?
5    A. Yes.
6    Q. And you were paid for your time in connection
7 with this work; correct?
8    A. Yes.
9    Q. And you didn't disclose that in the study
10 that you were an expert for plaintiffs in litigation
11 against Ethicon at the time that you did this study;
12 correct?
13    A. Yes.
14    Q. And it's also correct that you didn't
15 disclose in this study that you were a consultant for
16 the FEG; correct?
17    A. Yes.
18    Q. And it's also correct that you show in this
19 article that the -- or purport to show that the
20 DynaMesh retains a better effective porosity than the
21 Ethicon mesh under strain; correct?
22    A. We showed that there is an option to do it
23 without collapse of the pores, and this is done by
24 the DynaMesh. That was shown in the article.

Page 116

1    Q. Where is your basketball net?
2    A. We don't have ball.
3    Q. Don't need a ball.
4    A. Okay.
5     MR. ANDERSON: Would you like to use my net,
6 Dave?
7     MR. THOMAS: I would, please.
8 BY MR. THOMAS:
9    Q. I don't remember what number we attached to
10 this net, but I want to ask you some questions about
11 the net.
12     You used the net to describe to the jury
13 forces that are present in the pelvic floor; correct?
14    A. No. I want to demonstrate what happens to a
15 pore if you applied some forces.
16    Q. Okay.
17    A. And you see the pore collapse. That is a
18 fact.
19    Q. Now, when you tested the mesh like you did in
20 Exhibit 0697, you attached one end of the mesh to one
21 point and then pulled it in one direction; correct?
22    A. Yes.
23    Q. And if you could show that to the jury. Hold
24 one end and pull.

Page 117

1    A. (Complying.)
2    Q. And that's how -- that's how you tested it in
3 your study; correct?
4    A. Yeah. Similar to the way Ethicon did it.
5     MR. THOMAS: Move to strike after "yes."
6 BY MR. THOMAS:
7    Q. And you applied weights of 100 grams to 1,000
8 grams to the other end of the mesh in order to get
9 your results; correct?
10    A. If you're talking of this study, yes.
11    Q. Now, in the body, mesh undergoes forces from
12 multiple directions, doesn't it?
13    A. It depends whether it functions as a
14 replacement of ligaments or whether it is a function
15 as a flat area, but, of course, you always have
16 forces from all sides wherever you are in the world.
17 But if you are thinking of ligaments, the relevant
18 forces are -- should be -- or should -- it should be
19 possible to estimate them if you're thinking of
20 uniaxial, from one direction.
21    Q. And when you place the mesh in the body --
22 spread out the net --
23    A. (Complying.)
24    Q. -- tissue goes into the pores; correct?

Prof. Dr. Med. Uwe Klinge

Page 118

1    A.  Yes.

2    Q.  And it's applied tension-free so that the
3 tissue in the pores is what actually holds the mesh
4 into place; correct?

5        MR. ANDERSON:  Objection.

6        Go ahead.

7        THE WITNESS:  Yes.

8 BY MR. THOMAS:

9    Q.  And you've not done any testing of mesh with
10 tissue in it, have you?  Excuse me.  Strike that.

11       You have not done any effective porosity
12 testing of mesh with tissue in it, have you?

13   A.  We didn't do -- it is impossible to do it
14 with this machine, to have a testing of the effective
15 porosity, a measurement of the effective porosity
16 with tissue inside.

17   Q.  Okay.  And you know that it's possible to
18 design a test that tests the forces on the mesh from
19 multiple directions, don't you?

20   A.  I know that there are experimental settings
21 doing this, but it is a -- it is impossible to model
22 the situation in a pelvis in -- with any of these
23 settings completely.  It's -- every time --
24 everything is just an arbitrary trial that you can

Page 119

1 try to model it, but it's not -- never perfect.

2    Q.  But you agree it's possible to construct a
3 test that measured forces applied in different
4 directions of the mesh; correct?

5    A.  You can make a setting where you apply some
6 forces from two directions, but it never reflects a
7 situation of a mesh that is incorporated into tissue.
8 Never.

9    Q.  So when --

10   A.  There's no way.

11   Q.  When you -- you can design a -- strike that.

12       When mesh is implanted in the human body, the
13 stresses that are applied to that mesh are both
14 lengthwise, top to bottom, diagonally; correct?

15   A.  It depends from the location and of the
16 function and of the size of the mesh whether the
17 model has to include these differences or whether
18 it's possible to just think of one direction, and all
19 mechanical testing setups are insufficient or
20 computer simulations until now are insufficient to
21 model this.

22   Q.  Well, it's true that there are a variety of
23 forces that are applied to a mesh in placement in the
24 pelvic floor; correct?

Page 120

1    A.  Yes.

2    Q.  And it's not only the one directional force
3 that you used in your test model; correct?

4    A.  The one direction force is the best
5 approximation for the ligaments, for the arms.

6    Q.  But my --

7    A.  Not for the others.  I agree.  Not for the
8 flat mesh area.  Then it is not the best way.

9    Q.  And it's possible to design a test that
10 allows for mesh being pulled in multiple directions
11 and also to account for weight on the top of the
12 mesh?

13   A.  As I said, no.  Not sufficiently.  You can
14 design such a test where you put forces from various
15 directions, but the interpretation of these results
16 is very difficult; and overall as a setup to reflect
17 the situation in the body, it is insufficient.

18   Q.  As a matter of fact, the test that you did in
19 both 2007 and 2013 is insufficient to determine the
20 extent to which this test can be applied to the
21 development of better meshes; correct?

22   A.  No.

23   Q.  Let me show you -- go back to your study,
24 Plaintiff's 0697.

Page 121

1        In 2013, the last sentence of the abstract,
2 it says, "The clinical studies have to prove whether
3 devices with high porosity as well as high structural
4 stability can improve the patient's outcome."

5        Did I read that correctly?

6    A.  Yes.

7    Q.  And in 2007 --

8        MR. THOMAS:  Can I have a sticker, please.

9        I'm going to mark this as Klinge Trial
10 Deposition Exhibit Number 1.

11            - - -

12       (Klinge Trial Deposition Exhibit No. 1,
13 Article entitled "New Objective Measurement to
14 Characterize the Porosity of Textile Implants," Bates
15 stamped DX31026.1 through DX31026.8, was marked for
16 identification.)

17            - - -

18 BY MR. THOMAS:

19   Q.  Let me show you what I have marked as Klinge
20 Trial Deposition Exhibit Number 1.

21       MR. ANDERSON:  Thank you.

22   Q.  Klinge Trial Deposition Exhibit Number 1 is
23 the first study that you and Professor Mühl conducted
24 back in 2007; correct?

Prof. Dr. Med. Uwe Klinge

Page 122

1   A.   Yes.
2   Q.   And in this study, you and Professor Mühl did
3   uniaxial testing on DynaMesh and other meshes
4   manufactured in Europe; correct?
5   A.   Yes.
6   Q.   And you found in 2007 that the DynaMesh
7   retained its effective porosity and the other meshes
8   did not; correct?
9   A.   No.
10   Q.   Not true?
11   A.   No, that's not true.
12   Q.   Did DynaMesh retain its effective porosity?
13   A.   Yes, but Sofradim light as well.
14   Q.   Okay.   And at the end of the study in 2007,
15   you say that, in the abstract, "Further in vivo
16   studies have to investigate whether the preservation
17   of a high effective porosity under stress may help to
18   improve biocompatibility of textile implants."
19       Is that correct?
20   A.   Yes.
21   Q.   And "in vivo studies" means studies in
22   animals?
23   A.   Amongst all, but more or less the most
24   important way to learn what happens to the meshes is

Page 123

1   the analyses of explanted materials from humans.
2   Q.   Okay.   The study says further in vivo
3   studies.   That means studies of mesh in animals;
4   correct?   Isn't that what that means?
5   A.   I guess at that time we thought that -- this
6   was a setting in a lab without any tissue, without
7   any biology, and we said this testing from the lab
8   has to be transferred to the biology, and this --
9   therefore, we said we need this in vivo studies, and
10   there's no specification to animal or reduction to
11   animals.
12   Q.   There have been no in vivo studies to
13   investigate whether the preservation of a high
14   effective porosity under stress may help to improve
15   biocompatibility of textile implants, has there?
16   A.   Not before, because this was the presentation
17   of this -- this conception.
18   Q.   And in 2013 in Exhibit 0697, you repeat, the
19   clinical studies have to prove whether devices with
20   high porosity as well as high structural stability
21   could improve the patient's outcome.   There's still
22   no clinical studies that prove wherefore devices with
23   high porosity as well as high structural stability
24   can improve the patient's outcome, are there?

Page 124

1   A.   The problem that they are not there are
2   because the old meshes, the small pore meshes, as
3   Prolift, they all belong to the category of these
4   small pore thing.
5   Q.   Okay.
6   A.   How we don't have sufficient explants from
7   large pore materials with a high structural stability
8   in the moment, but we are still collecting these
9   materials.
10   Q.   Can you answer my question yes or no?   Let me
11   ask it again.
12       In 2013, Doctor, you state in this study,
13   "Clinical studies have to prove whether devices with
14   high porosity, as well as high structural stability,
15   can improve the patients' outcome."
16       There's still no clinical studies that prove
17   whether devices with high porosity as well as high
18   structural stability can improve the patients'
19   outcome; true?
20   A.   There are no comparative clinical studies at
21   all.
22   Q.   Thank you.
23       Now, Doctor, in this study in both 2007 and
24   in 2013, you identified 1,000 microns or 1 millimeter

Page 125

1   as the standard of effective porosity in
2   polypropylene; correct?
3   A.   Yes, that is what we used.
4   Q.   But you used 600 microns for PVDF; correct?
5   A.   Yes.
6   Q.   Now, it's true in the context of effective
7   porosity, if a pore is reduced by even 10 microns, to
8   990 microns, it does not get counted in a porosity
9   calculation; correct?
10   A.   That is correct.
11   Q.   And so it's only pores with 1,000 microns in
12   all directions that are included in the effective
13   porosity calculation; correct?
14   A.   That depends on the polymer.   If you have
15   another polymer where you know that it behaves a
16   little bit better, then it is very easy to change the
17   machine.   It is objective, reproducible, reliable.
18   So if you, as a manufacturer, have a polymer where
19   you know that it is -- critical diameter would be
20   only 900 microns, yeah, then you can make these
21   measurements with your critical diameter.
22   Q.   Okay.   And the machine --
23   A.   Our data, we, up to now -- we just had the
24   data of 1,000 for polypropylene and 600 for PVDF,

Prof. Dr. Med. Uwe Klinge

Page 126

1  but -- yeah.
2      Q.  But you didn't -- those are the only two
3  measurements you took, at 1,000 for polypropylene and
4  600 for PVDF; correct?
5      A.  Measurements, there have been a lot, but
6  these are the two, yeah.  If you applied this
7  measurement to this machine for polypropylene, you
8  can put in only one range.
9      Q.  Okay.
10     A.  One limit.
11     Q.  You know, other scientists disagree with your
12  1,000 figure for polypropylene, don't they?
13     A.  I'm not aware of anyone who said that the
14  pore size and the bridging does not happen, no.
15     Q.  Okay.
16     A.  And I don't know any measurements showing
17  that it is different.
18        MR. ANDERSON:  Keep this separate.
19             ---
20        (Klinge Trial Exhibit No. 2, Article entitled
21  "Synthetic and biodegradable prostheses in pelvic
22  floor surgery," Bates stamped DX3036.1 through
23  DX3036.11, was marked for identification.)
24             ---

Page 127

1  BY MR. THOMAS:
2      Q.  Let me show you what's been marked as Klinge
3  Trial Exhibit Number 2.  It's an article by Deprest
4  and others.
5      A.  Yes.
6      Q.  Are you familiar with this article?
7      A.  I think a long time ago I read it.
8      Q.  And this is an article in 2005?
9      A.  Yes.
10     Q.  About the same time that you came out with
11  your article about 1,000 millimeters; correct?
12     A.  Obviously.
13     Q.  And do you know Dr. Deprest?
14     A.  Yes, very well.
15     Q.  And he's writing about synthetic and
16  biodegradable prostheses in pelvic floor surgery;
17  correct?
18     A.  Obviously, yeah.
19     Q.  If you turn to page 4 of Klinge Trial
20  Deposition Exhibit 2, there's a description of Type I
21  meshes.  Do you see that?
22     A.  Yes.
23     Q.  And it includes in Type I meshes, described
24  them as totally microporous; correct?

Page 128

1      A.  He used another classification.
2      Q.  Okay.  That's my point.  He describes the
3  synthetic implant materials for Prolene and Marlex as
4  totally microporous; correct?
5      A.  That is correct.
6      Q.  And he disagrees with your classification?
7      A.  No.  No.  There is no -- not any data showing
8  that the bridging doesn't occur.  There is not any
9  data that 1 millimeter is not a critical limit.  The
10  only thing that happens is he used the classification
11  of Amid, who was produced when we start -- before we
12  started our joint collaboration with Ethicon, and at
13  that time there hasn't been any large pore mesh.  So
14  Amid was not able to consider these large pore meshes
15  in his classification.  So when using this old
16  classification, of course, you will have a mix of
17  these terms.
18     Q.  Okay.
19     A.  But it doesn't -- is relevant in any way to
20  the fact that small pores have an increased risk,
21  makes it unsafe and are filled by scar tissue.
22     Q.  Go to the bottom.
23     A.  So no.
24     Q.  I'm sorry.  Go to the bottom of page 4.

Page 129

1      A.  Yeah.
2      Q.  And Dr. Deprest says that, "Pore sizes
3  greater than 75 microns allow for rapid ingrowth of
4  fibroblasts and vascular elements necessary to anchor
5  the implant within the native tissue."
6        That's what he says, isn't it?
7      A.  Yes.
8      Q.  Okay.  Is that correct?
9      A.  The fact is --
10     Q.  Is it correct?
11        MR. ANDERSON:  Is what correct?
12  BY MR. THOMAS:
13     Q.  Is that statement correct?  Do you agree with
14  that?
15     A.  The statement is only correct if you assume
16  that you need a pore size of 75 microns to allow scar
17  to get integrated.  Our point is that we want to
18  separate the integration of fat and scar, and,
19  therefore, you need a completely different size of
20  the holes.  If you are agreed that you want to have
21  scar in your implant, then, of course, yeah, this is
22  correct.
23     Q.  So you --
24     A.  But it's a completely mix-up of the -- and

Prof. Dr. Med. Uwe Klinge

Page 130

1  there is no fact to it.  It is a citation of Amid's
2  classification and nothing more.
3      Q.  Okay.  You could have changed the settings on
4  your effective porosity testing to measure for 75
5  microns; correct?
6      A.  Everyone can do it.  Yeah.
7      Q.  But you didn't do that?
8      A.  No.
9      Q.  Let me show you now what's been marked as --
10  and, by the way, he was joined in that study by eight
11  other people on the study; correct?  On the first
12  page you can count the people who were involved in
13  the study.
14      A.  Yeah.
15              - - -
16      (Klinge Trial Deposition Exhibit No. 3,
17  Article entitled "The biology behind fascial defects
18  and the use of implants in pelvic organ prolapse
19  repair," Bates stamped DX30360.1 through DX30360.10,
20  was marked for identification.)
21              - - -
22  BY MR. THOMAS:
23      Q.  Let me show you now what I have had marked as
24  Klinge Trial Exhibit Number 3.  And this is a --

Page 131

1  another paper a year later by Dr. Deprest; correct?
2      A.  Yes.
3      Q.  It's in 2006.  This is a year after your
4  paper; correct?
5      A.  Yes.
6      Q.  And if you'll go to page 3 of this trial
7  Exhibit 3, once again, he cites to the Amid
8  classification; correct?  Down on the right, lower
9  right-hand corner?
10      A.  Yes.
11      Q.  And you see the classification of implants
12  where it talks about macroporous -- that's with an
13  a -- that's greater than 75 microns.  Do you see
14  that?
15      A.  Yeah.
16      Q.  And it says in the lower right-hand side
17  that, "Pore sizes greater than 75 microns allow for
18  rapid ingrowth of fiberglass and vascular elements
19  necessary to anchor the implant within the native
20  tissue.  Peak ingrowth is reached at pore size around
21  400 to 500 microns."
22          Did I read that correctly?
23      A.  Yeah.
24      Q.  You didn't --

Page 132

1      A.  The next sentence.
2      Q.  Yes.  Larger --
3      A.  "Larger pores limit the fibrosis process to
4  perifilament region and the pores get filled with
5  fat."
6      Q.  Right.  But you didn't do any testing on your
7  effective porosity machine at 400 to 500 microns, did
8  you?
9      A.  We didn't make a calculation exactly with
10  this one, no.
11      Q.  Okay.  And do you agree with Dr. Deprest that
12  in the use of implants in pelvic organ prolapse
13  repair that peak ingrowth is reached at pore size
14  around 4- to 500 microns?  Do you agree with that?
15      A.  If you are -- this is while you are coming
16  from tissue engineering, and it is not the value that
17  helps us to define whether you have fat and scar
18  tissue.  Therefore, it is no argument against the
19  relevance of effective porosity for the clinical
20  outcome.
21      Q.  Okay.  But you didn't measure at 4- or 500
22  microns, which is the peak level identified by
23  Dr. Deprest, did you?
24      A.  In what -- in what sense should --

Page 133

1      Q.  Yeah.  You didn't conduct those tests on --
2      A.  If --
3      Q.  -- either DynaMesh or on polypropylene in the
4  tests you did with Professor Mühl; correct?
5      A.  If we place a mesh into this machine and
6  defined the critical size of, let's say, 200 microns,
7  yeah, there will never be an effective pore -- pore
8  that will be filled by fat tissue.
9      Q.  My --
10      A.  We know this, yeah.
11      Q.  My point is, Doctor, you didn't test at the
12  areas identified by Dr. Deprest as being the peak
13  ingrowth for tissue as cited in the exhibit I just
14  gave you.  You've not done that, have you?  True?
15      A.  But in the --
16      Q.  Is it true?
17      A.  We never modified this testing with these
18  data, yes, that is true.
19      Q.  Okay.
20      A.  But it doesn't make any sense.
21              - - -
22      (Defendant's Exhibit No. DX30064, Article
23  entitled "Classification of biomaterials and their
24  related complications in abdominal wall hernia

Prof. Dr. Med. Uwe Klinge

Page 134

1    surgery," Bates stamped DX30064.1 through DX30064.7,
2    was marked for identification.)
3                  - - -
4    BY MR. THOMAS:
5        Q.   All right.  And you know that there are some
6    people -- let me show you what's been marked as
7    Defendant's Exhibit 30064, and 30064 is the Amid
8    paper from 1997.  You recognize that?
9            MR. ANDERSON:  I'm sorry, Counsel.  Is this
10   going to be a defense exhibit?  Because the other
11   ones you used a defense exhibit for Klinge.  Do
12   you want it to be a Klinge exhibit?  Because
13   you --
14           MR. THOMAS:  I know that.  And just for your
15   benefit and my admission, I didn't realize when I
16   marked them that they had numbers on them.  All
17   I'm trying to do is not create new numbers if I
18   can.
19           MR. ANDERSON:  Okay.
20           MR. THOMAS:  And we'll change -- we'll change
21   the numbers at a later time if I have to.
22           MR. ANDERSON:  So that it correlates with
23   your exhibit numbers.  Okay.  That's fine.
24           MR. THOMAS:  I'm just trying to identify them

Page 135

1    as best I can.
2            MR. ANDERSON:  Yeah.
3    BY MR. THOMAS:
4        Q.   Now, Doctor, I've shown you Defendant's
5    Exhibit 30064, and this is the Amid paper that we
6    have been talking about, isn't it?
7        A.   Yes.
8        Q.   And this is what has been known as the Amid
9    classifications since 1997; correct?
10       A.   Yes.
11       Q.   And you know that there's some people that
12   still follow the Amid classification; correct?
13       A.   I personally will follow it when -- when
14   looking at the risk for infection and material
15   infection, I -- it's still proper to follow this
16   classification.  If you want to separate the bridging
17   fibrosis, the scarring of the pores, it is not
18   appropriate.
19       Q.   But that's you.  You know that there are some
20   scientists who still follow the Amid class at this
21   indication?
22       A.   Depends on the purpose why.
23       Q.   Okay.  Thank you.
24       A.   What do you want to have with the -- yeah.

Page 136

1        Q.   It's fair to understand, Doctor, that the two
2    studies that you did with Professor Mühl that we've
3    had marked one as Plaintiff's 0697 and the other as
4    Klinge Trial Exhibit Number 1, are not, standing
5    alone, able to replicate what happens in the human
6    body; correct?
7        A.   They are able to replicate some aspects.
8        Q.   Okay.  But the whole point of these studies
9    is to give people a starting point so that you can
10   use this information to develop a better model to
11   understand what happens in the human body; correct?
12       A.   It helps to predict the risk for rigid
13   fibrosis without any forces and what happens to your
14   textile, to your device when you applied some forces.
15   Therefore, it gives a measure so that you can
16   optimize the design of the meshes, yeah.
17       Q.   Uniaxial forces only; correct?
18       A.   Uniaxial forces, yeah.  And you can modify
19   the forces.  You can modify the diameter depending on
20   the polymer you are using.  So a very standardized
21   technique, open for everyone.
22       Q.   And so when you go back to Plaintiff's 0697
23   and you go to page 5 --
24           MR. ANDERSON:  Hold on.  Let's get 06 --

Page 137

1    that's not it.
2            MR. THOMAS:  It's the 2013 study.
3            MR. ANDERSON:  Yeah.  But I moved stuff.
4    Here.
5            THE WITNESS:  Five.
6    BY MR. THOMAS:
7        Q.   Are you there?  The porosity of the
8    Gynemesh PS and the Gynemesh -- and the DynaMesh, I'm
9    sorry, are measured, on the very top of that article.
10   Do you see that?
11       A.   Where are you?
12       Q.   Is that textile porosity where it says
13   porosity at percentage?
14       A.   I guess it's the textile porosity.
15       Q.   Okay.  Do you know what it is?
16       A.   The textile porosity is the area that is not
17   covered by the ligaments.
18       Q.   Okay.
19       A.   So maybe this is the easiest definition of
20   this one.
21       Q.   Do you know under Gynemesh where it's 62.9,
22   do you know what that represents?
23       A.   Where you are?
24       Q.   Under porosity at the top in the figure, in

Prof. Dr. Med. Uwe Klinge

Page 138

1  Figure 3 on the far left.  Doctor -- Doctor, if you
2  look at page 5 --
3      A.  Yeah.
4      Q.  -- of Exhibit 0697, I'm looking at
5  Gynemesh PS with no force, zero newtons per
6  centimeter, under arm 1, and there's a figure 62.9.
7      A.  Yeah.
8      Q.  What does that mean?
9      A.  That means when you made an image, that 67 --
10  62.9 percent of this area is not covered by
11  filaments.
12      Q.  Okay.  And that's arm 1; correct?
13      A.  That's arm 1.
14      Q.  And then arm 3 is 60.1; correct?
15      A.  Yeah.
16      Q.  And if you compare that with DynaMesh arm 1,
17  that is equal to or greater than the value for
18  DynaMesh; correct?
19      A.  Yes.
20      Q.  Okay.  Now, you agree that biocompatibility
21  of long-term implantable devices can be defined as
22  the ability of the device to perform its intended
23  function with the desired degree of incorporation in
24  the host without eliciting any undesirable, local or

Page 139

1  systematic effects in the host?
2      A.  Yes.
3      Q.  And you know of no studies -- strike that.
4         You agree that Prolene Soft Mesh has a better
5  biocompatibility than the Prolene mesh used in hernia
6  repair?
7      A.  It depends on the specific design and -- of
8  the different -- it depends from the location and --
9      Q.  Do you have an opinion --
10      A.  -- to place it.
11      Q.  Do you have an opinion about whether Prolene
12  Soft Mesh has a better biocompatibility than Prolene?
13      A.  I cannot answer it.  I have an opinion, but
14  it cannot be answered just by yes or no.
15      Q.  Okay.
16         MR. ANDERSON:  I have the same objection.
17  Outside the scope of direct.
18  BY MR. THOMAS:
19      Q.  And you know of no studies in a randomized
20  controlled trial which compare the biocompatibility
21  of Prolene Soft Mesh with another mesh; correct?
22      A.  There is no way to make a clinical trial
23  where this question with sufficient statistical
24  power.

Page 140

1      Q.  Okay.
2      A.  There's no way.
3      Q.  So the answer is there are no studies?
4      A.  There are no studies proving the safety or
5  the superiority of any of these devices.
6      Q.  Now, Doctor, when we talked about in vivo
7  studies, we're talking about studies conducted in
8  animals; correct?
9      A.  It's one part, yeah.
10      Q.  And you used rats in studies to help
11  determine types of inflammatory reactions which occur
12  with implanted meshes, haven't you?
13      A.  In this collaboration that we started
14  together with Ethicon, we used rats, rabbits and
15  other animals.  So depending on the specific
16  question, we need different models.
17      Q.  And the reason why you did that was so that
18  you could place mesh in animals and study the tissue
19  response to that mesh; correct?
20      A.  Yes.
21      Q.  And you also used rats in studies to
22  determine the extent to which mesh integrates into
23  the tissues of the rat?
24      A.  As I told you, we use rats, rabbits, but we

Page 141

1  confirmed all these results by looking at the human
2  explants.
3      Q.  And the reason why you wanted to -- strike
4  that.
5         You used rats in studies to determine the
6  extent to which the mesh implanted into the rat
7  integrates into the tissues; correct?
8      A.  I didn't get the entire question.
9      Q.  Let me ask it again.
10         In your experience, you use rats in studies
11  to determine the extent to which the mesh implanted
12  in the rats integrates into the tissues of the rats;
13  correct?
14      A.  Yes.
15      Q.  Okay.  And you know that Ethicon has
16  conducted tissue reaction and tissue integration
17  studies where Ethicon implanted mesh in animals,
18  don't you?
19      A.  Yes, I know.
20      Q.  And you have reviewed some of those studies;
21  correct?
22      A.  Yes.
23                    - - -
24         (Klinge Trial Exhibit No. 4, Ethicon Final

Prof. Dr. Med. Uwe Klinge

Page 142

1  Report, PSE Accession No. 00-0035, An Exploratory
2  91-day Tissue Reaction Study of Polypropylene-based
3  Surgical Mesh in Rates (PSE ACC. NO. 00-0035), was
4  marked for identification.)
5           - - -
6  BY MR. THOMAS:
7     Q.  I'm going to show you what I have marked as
8  Klinge Trial Exhibit Number 4.
9        Dr. Klinge, Klinge Trial Exhibit Number 4 is
10 a document titled -- document dated July 11, 2001.
11 It's a final report, and it's titled, "An Exploratory
12 91-Day Tissue Reaction Study of Polypropylene-Based
13 Surgical Mesh in Rats."
14       You've seen that before, haven't you?
15    A.  I think I saw it, yeah.
16    Q.  And you reviewed that in connection with your
17 work in this litigation, didn't you?
18    A.  Yes.
19    Q.  And you did not see this study before this
20 litigation; correct?
21    A.  That is correct.
22    Q.  And Ethicon conducted this study in the
23 period 2000 to 2001; correct?
24    A.  It should be correct.

Page 143

1     Q.  And let's go to page 2 of 27 of this study.
2     A.  Two of 27.
3     Q.  See under "Summary"?  Right there under
4  "Summary."
5        The first line, "A subcutaneous implantation
6  study was conducted to assess the tissue reaction
7  profile and qualitative integration of several
8  different constructions of polypropylene surgical
9  meshes."
10       Tell the jury what a subcutaneous
11 implantation study is.
12    A.  A subcutaneous implantation study, then you
13 usually place small pieces of a mesh in the
14 subcutaneous area beneath -- underneath the skin on
15 top of the muscles, so it's laying in fat.  It can be
16 done very easily.  And, yeah, and then you are able,
17 then, after some time that you can explant the
18 material and look to the tissue reaction to this.
19    Q.  Okay.  And you can look to both the tissue
20 reaction, which is the -- how the body reacts to the
21 mesh; correct?
22    A.  Yes.
23    Q.  And the qualitative integration of the mesh.
24 That means the extent to which the tissue integrates

Page 144

1  into the mesh; correct?
2     A.  You have to define it very carefully what --
3  what type of tissue, what are -- which cells you are
4  looking at, what happens in the pores, which is your
5  area of interest.  So research is not so simple just
6  to say we are making it and looking to this, no.
7     Q.  Okay.
8     A.  It is --
9     Q.  You understood that this study placed mesh
10 under the skin of rats --
11    A.  Yeah.
12    Q.  -- in order to look at the tissue reaction to
13 that mesh as well as to analyze the extent to which
14 the tissue integrated into the mesh.  You understand
15 that was a goal of this study?
16    A.  Yeah.  We did it several time ourselves
17 but --
18    Q.  Same type --
19    A.  -- we know the limitations of this very, very
20 well.
21    Q.  I understand.  But you've done this same type
22 of study yourself with different animals and
23 different meshes?
24    A.  And for some other purposes with this

Page 145

1  specific hypothesis, yeah.
2     Q.  Okay.  And if you turn the page, please, it
3  talks about materials.  Do you see that?
4     A.  There we are.
5     Q.  We're on page 3 of 27 --
6     A.  Yeah.
7     Q.  -- of Klinge Trial Exhibit Number 4.
8     A.  Uh-huh.  Bard, Surgipro, Prolene and Prolene
9  Soft, Vypro.
10    Q.  And there are listed there seven different
11 meshes that are tested; correct?
12    A.  Yes.
13    Q.  And the Bard mesh that's tested there is a
14 competitor's mesh, isn't it?  Bard mesh is not made
15 by Ethicon?
16    A.  No, no, no.
17    Q.  Excuse me.  Bard mesh is not made by Ethicon;
18 correct?
19    A.  That is correct.
20    Q.  Thank you.
21       And that's what you referred to as a small
22 pore heavyweight mesh; correct?
23    A.  Yes.
24    Q.  Surgipro mesh, likewise, is a mesh

Prof. Dr. Med. Uwe Klinge

Page 146

1  manufactured by a competitor; correct?
2      A.  Yes.
3      Q.  Now, Prolene mesh is a -- is the hernia mesh
4  used by Ethicon that has a pore size smaller than the
5  Prolift mesh; correct?
6      A.  How -- what is your definition of the pore
7  size and how it is measured?  What is the pore size
8  of the Prolift mesh?  So it is insufficient.  We know
9  it meanwhile to give just one figure.
10     Q.  Without tension it is clear that the pore
11 size of the Prolene mesh used in hernia repair is
12 smaller than the --
13     A.  The area of affected pores maybe.
14     Q.  Let me ask the question again, and let me
15 finish it before you give an answer.
16     A.  Sorry.
17     Q.  Doctor, it's true that the area of the pore
18 for the Prolene mesh used in hernia repair is smaller
19 than the pore size without tension of the pore size
20 of the Prolene polypropylene mesh used in Prolift?
21     MR. ANDERSON:  Objection.
22     THE WITNESS:  Again, it would be necessary to
23 make a testing of the effective porosity for the
24 Prolene mesh.  I didn't do it, so I know -- I

Page 147

1      don't know it.
2  BY MR. THOMAS:
3      Q.  I'm not talking about effective porosity.
4  I'm not -- I'm talking about porosity at rest without
5  tension.
6      A.  The textile porosity --
7      Q.  Yes.
8      A.  -- you mean.
9      Q.  Well, if you want to call it textile
10 porosity, that's fine.
11     A.  But this is essential, because we are
12 sticking to the effective porosity.  We wanted to
13 know what happens to the tissue.  The textile
14 porosity is not relevant, so --
15     Q.  Okay.  To you.
16     A.  There are no figures about this.
17     Q.  Okay.  The company used, in its study,
18 Prolene mesh, which is the same mesh used in hernia
19 repair.  You agree with that?
20     A.  There has been a Prolene mesh used in hernia
21 repair, though there are some modifications.  It is
22 not clear which modification exactly was used here,
23 but, yeah.
24     Q.  Okay.  And the company also tested Prolene

Page 148

1  Soft Mesh; correct?
2      A.  Yes.
3      Q.  And the company tested Vypro mesh.  You see
4  that?
5      A.  Yes.
6      Q.  And it tested three different kinds of Vypro
7  mesh.  Do you see that?
8      A.  Yes.
9      Q.  And Vypro mesh is the mesh that you helped
10 Ethicon develop; correct?
11     A.  Yes.
12     Q.  And Vypro mesh is the mesh that you
13 characterize as being lightweight large pore;
14 correct?
15     A.  Yes.
16     Q.  And the company in Klinge Trial Exhibit
17 Number 4 compared the tissue reaction and tissue
18 integration of all seven of these meshes; correct?
19     A.  Yeah.
20     Q.  And they implanted these meshes in rats for
21 7 days, 28 days, 63 days, and 91 days; correct?
22     A.  Yeah, that is correct.
23     Q.  And after each of these time frames, some of
24 the rats were killed, sacrificed, and then the mesh

Page 149

1  removed so it could be analyzed; correct?
2      A.  Yeah.
3      Q.  And when you removed the mesh from the animal
4  to be analyzed, how do you prepare samples?  What's
5  the proper way to prepare samples?
6      A.  Usually the tissue sample is fixed in
7  formaldehyde, and then later on it is -- it is put
8  into a paraffin so that you can make some sections of
9  it, and then later on it's stained.
10     Q.  And so the formaldehyde is added to the
11 samples upon withdrawal not only as a preservative
12 but to fix the tissue in place; correct?
13     A.  To stop the degradation of the tissues.  If
14 you don't use formaldehyde and you're storing some
15 tissue at home, you will see a catastrophe.  It will
16 be destroyed within some few days.
17     Q.  And after the mesh is then cut into slides
18 from the paraffin, a study pathologist looked at
19 these slides; correct?
20     A.  Someone is looking sometime, yeah.
21     Q.  Well, you know that a pathologist in this
22 case looked at the slides.  Do you know that?
23     A.  In this case, yeah.  But it's not necessary
24 that it has to be a pathologist.

Prof. Dr. Med. Uwe Klinge

Page 150

1    Q.   But a pathologist is what?  What's a
2  person -- what's a pathologist do?
3    A.   A pathologist is someone who has the training
4  to investigate tissues that are extracted by some
5  surgical means or from some tissues, and there he was
6  trained to identify the changes in these tissues.
7    Q.   Now, you didn't work at the institute of
8  pathology at your hospital, did you?
9    A.   No.
10   Q.   And you don't -- you didn't do a residence in
11 pathology, did you?
12   A.   No.
13   Q.   And you had no fellowship in pathology, did
14 you?
15   A.   No.
16   Q.   As a matter of fact, you're not permitted to
17 sign pathology reports at your hospital; correct?
18   A.   That is correct.
19   Q.   Now --
20   A.   But in research, the examination never is
21 done by the pathologist but by the researcher
22 themselves.
23     MR. THOMAS:  Object.  Move to strike
24   everything after "that's correct."

Page 151

1  BY MR. THOMAS:
2    Q.   Let's go to page 2.  And page 2, the third
3  line down under "Summary," the summary finds, "The
4  inflammatory reaction among the different
5  constructions was relatively similar, ranging from
6  minimal to mild in intensity and, thus, were all
7  considered to be biocompatible."
8      Did I read that correctly?
9    A.   Yes.
10   Q.   If you go to page 9, first line of the second
11 paragraph on page 9, page 9 of 27 up at the top.
12 "Study found that all of the meshes had sufficient
13 porosity to allow for integration with surrounding
14 connective tissue."
15     Did I read that correctly?
16   A.   Yes.
17   Q.   And, Doctor, when people conduct studies,
18 they make these slides that you referred to with the
19 tissue samples; correct?  So that they can be looked
20 at under a microscope, that's what you do; correct?
21   A.   Again?
22   Q.   When studies, like Klinge Trial Exhibit
23 Number 4, conducted the tissue that's removed from
24 the slices, the paraffin, it's made into slides to

Page 152

1  put under a microscope; correct?
2    A.   Yeah.
3    Q.   And it's the microscopic observation by the
4  person looking at it that causes him to reach the
5  conclusions that they express in the report; correct?
6    A.   No, not always.  You have to look to the
7  microscopical appearance of the explants as well.  So
8  the microscopical mainly is an explanation of what
9  happens, but for the patient it's more important what
10 happens clinically.
11   Q.   You've never looked at the slides that this
12 study generated in Klinge Trial Exhibit Number 4,
13 have you?
14   A.   I never got the slides from this study from
15 study from Barbolt.  I've seen it.
16   Q.   And you know they're still available, don't
17 you?
18   A.   What?
19   Q.   You know they're still available, don't you?
20   A.   They are still available?
21   Q.   Yes.  You haven't looked at it?
22   A.   I didn't get it, yes.
23     THE WITNESS:  Is it possible to get?
24 BY MR. THOMAS:

Page 153

1    Q.   Let's go to Plaintiff's Exhibit 271.  That's
2  your 2005 paper.
3      MR. ANDERSON:  That's not it.
4  BY MR. THOMAS:
5    Q.   And this is a paper that you prepared with
6  Dr. Klosterhalfen and Dr. Junge?
7    A.   That is correct.
8    Q.   And would you call this a review article?
9    A.   Yes.
10   Q.   And you're kind of reviewing the state of
11 medicine and science on the concept of lightweight
12 and large pore mesh for hernia repair in this paper;
13 correct?
14   A.   Please can you repeat the question, the
15 details?
16     MR. THOMAS:  Can you read that back, please.
17     THE COURT REPORTER:  "And you're kind of
18 reviewing the state of medicine and science on
19 the concept of lightweight and large pore mesh
20 for hernia repair in this paper; correct?"
21     THE WITNESS:  And "you're kind"?
22     MR. THOMAS:  I'm sorry.
23     THE WITNESS:  I don't understand the first
24 words.

Prof. Dr. Med. Uwe Klinge

Page 154

1     MR. THOMAS:  That's my fault.  I apologize.
2  BY MR. THOMAS:
3     Q.   The purpose of this article,
4  Plaintiff's 2071, is to review the state of science
5  and medicine on the mesh concept known as lightweight
6  and large porous for hernia repair?
7     A.   Yes, that is --
8     Q.   Thank you.
9     A.   -- true.
10    Q.   And in here you talk not only about old
11 meshes but also new meshes; correct?
12    A.   The new generation mesh, yeah.
13    Q.   And in the abstract, which is on the first
14 page of 2071, you state that:  "All experimental
15 evidence and first clinical data indicate the
16 superiority of the lightweight large porous mesh
17 concept with regard to a reduced number of long-term
18 complications and particularly increased comfort and
19 quality of life after hernia repair."
20       Correct?
21    A.   That is correct.
22    Q.   And what you're referring to there are your
23 initial results; correct?
24    A.   What is your definition of "initial"?

Page 155

1     Q.   Well, there's certainly --
2     A.   It is what we know to this time point.
3     Q.   There are no long-term studies available to
4  determine the extent to which lightweight large pore
5  mesh behaves better than small pore heavyweight mesh,
6  as you've described them in this study, at the time
7  that you published this study?
8     A.   At this time, no, not to my knowledge.
9     Q.   Okay.  Let's go to page 112, please.
10       I don't think that's the right page, Doctor.
11 112.
12       MR. ANDERSON:  112?
13       MR. THOMAS:  Under --
14       MR. ANDERSON:  You're reading off of your
15    exhibit number, but you said go to Plaintiff's
16    Exhibit, so ours doesn't have your -- do you have
17    your trial exhibit number?
18       MR. THOMAS:  I'm looking at this number right
19    here, 112.  Is that different than yours?
20       MR. ANDERSON:  Yeah.  Maybe yours is
21    different.  Let's see.  Did you -- did you give
22    me your exhibit?
23       MR. THOMAS:  You already -- it's already in
24    the record, so I didn't.

Page 156

1     MR. ANDERSON:  Yeah.  But your version is
2  different from this version because you've got
3  yours stamped at the bottom.
4     THE WITNESS:  Do you have the pages?
5     MR. ANDERSON:  And we don't have the stamped.
6     THE WITNESS:  We don't have the same pages.
7     MR. THOMAS:  I'll do it from your document.
8  Let me see if I can find the page.  I wonder why
9  it's different.
10 BY MR. THOMAS:
11    Q.   Let's go to page 10 of Exhibit 0271, please.
12       Do you have page 10?
13    A.   Yes.
14    Q.   On page 10 you and your coauthors begin
15 talking about the new generation of lightweight large
16 porous meshes, Vypro and Vypro II; correct?
17    A.   Yes.
18    Q.   And is the purpose of this discussion to talk
19 about the promise of Vypro and Vypro II in hernia
20 repair; correct?
21    A.   The purpose of what?
22    Q.   The promise.
23    A.   Promise?
24    Q.   The future potential benefits of Vypro -- let

Page 157

1  me ask the question again.
2       On page 10 of Exhibit 0271, there is a
3  paragraph titled "The New Generation: Lightweight
4  Large Porous Meshes."  Correct?
5     A.   Yes.
6     Q.   And in that paragraph, series of paragraphs,
7  you discuss Vypro and Vypro II?
8     A.   Yes.
9     Q.   And those -- Vypro I is the mesh that you
10 helped develop with Ethicon for hernia repair;
11 correct?
12    A.   Yes.
13    Q.   And Vypro II was a subsequent development of
14 Vypro again in hernia repair; correct?
15    A.   Yes.
16    Q.   And the bottom of that paragraph or that
17 section says that, "First clinical trials confirm the
18 expected superiority of the lightweight large porous
19 mesh concept concerning quality of life after hernia
20 repairs."
21       What does "quality of life after hernia
22 repair" mean?
23    A.   It depends from the -- from the trial that
24 you are doing.  Quality of life -- to measure quality

Prof. Dr. Med. Uwe Klinge

Page 158

1 of life, there are different tools depending on the
2 investigator.  It can be looking to foreign body
3 sensation.  It can be looking to pain.  It can be
4 looking to serious complications.  So a lot of these
5 things.  And there are some attempts to quantify
6 them.  There are some questionnaires, as SF-36, which
7 gives a lot of data.  So you try to quantify quality
8 of life to know what happens to the patient.
9     Q.  Okay.  And is the quality of life an
10 appropriate end point for a study to determine
11 whether a mesh implanted in the body is functioning
12 appropriately?
13     A.  It's usually a secondary end point.  It's --
14     Q.  Secondary to recurrence?
15     A.  Yes.
16     Q.  Okay.
17     A.  Usually.
18     Q.  All right.  But it's an important end point
19 to understand how a patient's quality of life has
20 been affected by the hernia repair; correct?
21     A.  It's one way to measure this.
22     Q.  And at this time there are no long-term
23 studies on Vypro and Vypro II to determine the
24 quality of life for these patients after hernia

Page 159

1 repair; true?
2     A.  So far I remember the long term is there one,
3 two years maybe.  I don't know exactly the Brinkman
4 study when it came up, when it was published there.
5 It was about three years, so it depends from what you
6 are thinking of long term.
7     Q.  And under polypropylene, next paragraph down,
8 you say, "Most manufacturers have added to their
9 range of polypropylene heavyweight mesh small porous
10 mesh modifications, lightweight large porous
11 adaptation."
12     Correct?  Did I read that correctly?
13     A.  Yeah.  Yes.
14     Q.  And if you go to the last sentence in that
15 section it says, "However, clinical trials have yet
16 to confirm the promising preclinical results."
17     Now, what does that mean?
18     A.  That means that at that time we hoped that it
19 is possible to make the clinical trial and to
20 demonstrate that one material is superior to another
21 just by operating 150 patients in this direction
22 or -- and 150 patients with another mesh, and we did
23 some prospective clinical trials with Ethicon
24 together to get this information; but we learned that

Page 160

1 it is not possible at all to do this confirmation at
2 clinical studies.
3     Q.  At the time that you published Exhibit 2075,
4 there were no clinical trials available to confirm
5 the promising preclinical results of the lightweight
6 large porous polypropylene mesh that most
7 manufacturers have added; correct?
8     A.  So it is correct --
9     Q.  Thank you.
10     A.  -- in regard to comparing studies.
11     Q.  Okay.
12     A.  It is not correct in regards to the analysis
13 of explants.
14     MR. THOMAS:  All right.  Move to strike
15 everything after "it's correct."
16 BY MR. THOMAS:
17     Q.  You also discuss on page 11 of Exhibit 0271
18 Ultrapro; correct?
19     A.  Yes.
20     Q.  And Ultrapro is the mesh that you understand
21 to be the predominant mesh used in hernia repair in
22 Germany; is that correct?
23     A.  So far I know, yes.
24     Q.  And at the end of your discussion of

Page 161

1 Ultrapro, you say, "Overall the Monocryl
2 polypropylene composite Ultrapro is currently the
3 member of the lightweight large porous mesh family
4 with the lowest foreign body reaction and optimized
5 handling.  The first clinical studies produced
6 encouraging results to move forward with this mesh
7 concept."
8     Correct?
9     A.  Yes.
10     Q.  And I believe you've already told me that you
11 do not think that Ultrapro -- strike that.
12     Ultrapro is the same mesh as Prolift+M;
13 correct?
14     A.  Prolift+M used the Ultrapro.
15     Q.  Okay.  And you do not believe that Ultrapro,
16 known as Prolift+M, is appropriate for use in the
17 pelvic floor; correct?
18     A.  This work is focused on the tension-free
19 situation in the abdominal wall without applying any
20 forces to it.  At that time we didn't think that
21 someone is using this mesh for a situation where you
22 applied some forces; and, therefore, Ultrapro is
23 still the mesh I think with the largest pores and,
24 therefore, with a pretty nice tissue integration if

Prof. Dr. Med. Uwe Klinge

Page 162

1 applied without any force and tension and if it's
2 laying flat.
3     Q.  Is it your opinion that Ultrapro should not
4 be used for abdominal hernia repair?
5     A.  For abdominal hernia repair there is, of
6 course, an indication to use it.
7     Q.  Okay.  And so is it your opinion that
8 Ultrapro is appropriate for abdominal hernia repair,
9 but the same mesh in Ultrapro, which is in Prolift+M,
10 is not appropriate in the pelvic floor?
11    A.  It doesn't matter in what tissue you are
12 using it.  It is -- you should use it in a
13 tension-free way so that it's laying as an area, as a
14 flat mesh there.  If you apply some tension -- and we
15 made ourselves experiments using the Ultrapro close
16 to the diaphragma where we applied some tension to it
17 and got disappointing results with the Ultrapro.  So
18 it depends on the specific indication function of
19 these devices.
20    Q.  And surgical technique?
21    A.  If you are free -- if you are free, of
22 course, with the surgical technique you can do every
23 complication that is imaginable, but there are some
24 procedures that need some forces, and in these cases

Page 163

1 this mesh is not a good alternative.  It's not a safe
2 alternative.
3     Q.  And when you speak about "this mesh," you're
4 talking about Ultrapro?
5     A.  Ultrapro.
6     Q.  Okay.
7     A.  Yeah, you talk.
8     Q.  Is there any mesh that you've identified
9 that's appropriate for use in the pelvic floor for
10 the repair of pelvic organ prolapse?
11    A.  I cannot give a general statement to this.  I
12 know that there are textile constructions and design
13 for meshes that are more resistant to the collapse,
14 but it depends on the indication of the specific
15 situation.  There is never one device for all
16 diseases in the pelvic floor.  No, it's not done.  It
17 has to be very carefully designed for the specific
18 purpose.
19    Q.  And you've not designed a specific mesh for
20 the treatment of pelvic organ prolapse; true?
21    A.  No.  I'm only asked sometimes whether this
22 fits our -- whether the device of the FEG, where I am
23 a consultant, fits to these principles of less
24 material, large pores and stability of the structure.

Page 164

1     Q.  You answered my question no, so I need to
2 answer it again -- ask it again.
3         It's true that you have never designed a mesh
4 for the treatment of pelvic organ prolapse; true?
5     A.  I was involved in the design process in
6 regards to the question whether the textile design
7 fulfills these requirements, but, of course, I'm not
8 entirely manufacturing or designing meshes for the
9 pelvic floor.
10    Q.  And can you identify for me any mesh
11 available in the United States today that is -- where
12 the benefits outweigh the risk for the treatment of
13 pelvic organ prolapse?
14    A.  You cannot answer this question because it's
15 a general statement.  It doesn't make any sense.
16    Q.  Okay.  Since the work that you've done --
17 strike that.
18        Since your 2005 article that you've just
19 described, there have been long-term studies
20 comparing lightweight large pore mesh against small
21 pore heavyweight mesh, haven't there?
22    A.  There has been published several studies,
23 yeah.
24                    - - -

Page 165

1        (Klinge Trial Deposition Exhibit No. 5,
2 Article entitled "Long-term outcome and quality of
3 life after open incisional hernia repair - light
4 versus heavyweight meshes", was marked for
5 identification.)
6                    - - -
7 BY MR. THOMAS:
8     Q.  Let me show you what's been marked as Klinge
9 Trial Exhibit Number 5.  It's a research article
10 titled "Long-Term Outcome and Quality of Life After
11 Open Incisional Hernia Repair, Light Versus
12 Heavyweight Meshes."  First author is Ladurner.  Have
13 you seen this study?
14    A.  I guess I have seen it, yeah.
15    Q.  And this is a long-term study of up to 72
16 months after incisional hernia repair with
17 lightweight meshes compared to heavyweight meshes;
18 correct?
19    A.  Yeah.
20    Q.  And the heavyweight mesh is a Prolene mesh.
21 The lightweight mesh is your Vypro mesh; correct?
22    A.  Yes.
23    Q.  And the two groups were equal in body mass
24 index, age, gender and hernia size; correct?

Prof. Dr. Med. Uwe Klinge

Page 166

1    Is that correct?
2    A.  Age and gender you said?
3    Q.  If you look in the abstract, see in the
4  abstract?
5    A.  Yeah.
6    Q.  It says right in the middle under "Methods,"
7  "The two groups were equal in BMI," which is body
8  mass index, "age, gender and hernia size."  Correct?
9    A.  Yeah.  I'm looking to the data there, so
10  hernia size almost -- it's -- yeah.
11    Q.  Okay.  And it finds in the conclusions, "In
12  this study the health-related quality of life based
13  upon FS36 survey after open incisional hernia repair
14  with light or heavyweight meshes is not related to
15  the mesh type in the long-term follow-up."
16    Did I read that correctly?
17    A.  You read this correctly.
18    Q.  And what that means is that the kind of mesh
19  that was used in the hernia repair did not affect the
20  long-term quality of life in the patients in this
21  study; true?
22    A.  No.  Because it is ridiculous to take this
23  study with 12 patients in one group and 12 patients
24  in the other and to make a read out with the FS36.

Page 167

1  It is so tremendously underpowered that this
2  statement, of course, is not confirmed by these data.
3  It's ridiculous to discuss this.
4    Q.  Well, it's certainly what this study reports;
5  correct?
6    A.  You read it correctly.
7    Q.  Okay.  And it's published in the
8  peer-reviewed literature?
9    A.  Yes.  Maybe -- yeah.  BMC should be peer
10  reviewed, yes.
11    Q.  Okay.  But you disagree with the findings in
12  Exhibit Number 5; correct?
13    A.  No.  The findings they describe, but the
14  conclusion, it is underpowered.  You cannot state
15  this.  So the findings, when they measured it, yeah,
16  it can be correct.  But to take 12 patients in one
17  group and 12 in the other and come up with this
18  conclusion, it is dangerous to do so.
19    Q.  And the reason why is because you want to
20  have more subjects in the study or perhaps even a
21  registry to allow you to have more data upon which to
22  make certain findings; correct?
23    A.  The reason is coming from the statistics,
24  that you need a certain amount of data to come with

Page 168

1  this conclusion; and it is not justified.  And the
2  statistical power is just one measure.  Yeah, you
3  have to consider this.  It's not because I want to
4  have it.
5    Q.  Let's --
6    A.  And, therefore, it is so difficult to make a
7  clinical trial comparing two different devices in
8  similar patients.
9    Q.  Let's --
10    A.  And, therefore, we need an alternative
11  registry.  Yes, I'm sure.
12    Q.  Registries is the better way to go?
13    A.  It offers the option to accumulate data from
14  a long -- of very many patients over a long period,
15  and, of course, the data of the registries over the
16  time will help us to understand it.
17    MR. THOMAS:  Let's take a break and change
18  the tape.
19    THE VIDEOGRAPHER:  We are off the record.
20  The time is 12:21 p.m.
21  (A recess was taken from 12:21 p.m. until 12:33 p.m.)
22    THE VIDEOGRAPHER:  This marks beginning of
23  Video Number 3.  We are back on the record.  The
24  time is 12:33 p.m.

Page 169

1  BY MR. THOMAS:
2    Q.  Doctor, before we were -- broke, we were
3  talking about the limitations in randomized
4  controlled trials, about them not being sufficiently
5  powered; correct?
6    A.  Yes.
7    ---
8    (Klinge Trial Exhibit No. 6, Article entitled
9  "Bias-Variation Dilemma Challenges Clinical Trials:
10  Inherent Limitations of Randomized Controlled Trials
11  and Meta-Analyses Comparing Hernia Therapies", was
12  marked for identification.)
13    ---
14  BY MR. THOMAS:
15    Q.  Let me hand you what I have marked as Klinge
16  Trial Exhibit Number 6.  Klinge Trial Exhibit
17  Number 6 is a paper you have just published on this
18  topic, isn't it?
19    A.  Yes.
20    Q.  And on the first page, I guess it's a 2014
21  paper, titled "Bias-Variation Dilemma Challenges
22  Clinical Trials: Inherent Limitations of Randomized
23  Controlled Trials and Meta-Analyses Comparing Hernia
24  Therapies."  And in this paper you criticize

Prof. Dr. Med. Uwe Klinge

Page 170

1  randomized controlled trials and meta-analyses;
2  correct?
3      A.  I showed the limitation of these --
4      Q.  Yes.
5      A.  -- or some questions.
6      Q.  And the ultimate conclusion of this paper,
7  Klinge Trial Exhibit Number 6, is that registries
8  provide better information than do randomized
9  controlled trials or meta-analyses; correct?
10     A.  Not correct.  If you believe that better is
11  sufficient than -- that is not the purpose to have
12  better data, but we need other data, and registries
13  are able to provide additional data that will help us
14  to define what is the outcome of the patients, yes,
15  additionally.
16     Q.  Go to page 787 of Trial Exhibit Number 6.
17         You see that?  You see in the middle of the
18  second paragraph it begins, "Observational studies
19  nowadays can best be done with the help of
20  registries, would provide a structure and a set of
21  variables that are known to reflect all major
22  influences on the patients' outcome.  In this regard,
23  it uses the same variables as the RSCT but did not
24  restrict its data acquisition to a small group of

Page 171

1  study patients."
2         Did I read that correctly?
3      A.  Yes.
4      Q.  And the purpose of that is to talk about more
5  robust data set from a greater number of patients?
6         MR. ANDERSON:  Objection.  RSCTs are outside
7      the scope of direct.
8         But go ahead, Dr. Klinge.
9         THE WITNESS:  So I'm not sure whether it's
10     possible to reduce robust database, whether this
11     covers all the questions that we address in this
12     article.
13  BY MR. THOMAS:
14     Q.  Do you conclude from this article that using
15  data from a long-term registry with a large number of
16  patients with more data is better than doing the
17  randomized controlled trials that have been used in
18  the past?
19     A.  I would never say that it is better in a
20  general term.  It will help us to define the outcome
21  of the patients, better than in -- with all the
22  limitations of randomized controlled trials, and this
23  is expressed on several pages there.
24     Q.  Okay.

Page 172

1      A.  So registries should be done additionally to
2  randomized controlled trials depending on the
3  question, depending on the setting.
4      Q.  And registries, just for the benefit of the
5  jury, are sets of data that are accumulated as people
6  go through hernia surgeries, and data is completed at
7  the time of the surgery; correct?
8      A.  The data are not complete yet.  Registries
9  have the advantage that you can include various kinds
10  of patients, not only restricted to some standard
11  patients, and you can include a follow-up of various
12  times, very long period.  There is -- in clinical
13  studies, you usually finish after one day or one year
14  or two years.  So the registry offers a lot of more
15  options to made a post-market surveillance quality
16  control of devices; and, therefore, I think it is
17  very interesting from manufacturer if they are
18  interested in making their follow-up of their
19  patients.
20     Q.  Okay.  Let me show you what's been marked as
21  Klinge Trial Exhibit Number 6.
22         THE COURT REPORTER:  It should be 7.
23         MR. THOMAS:  Seven.  I'm sorry.  Let me mark
24     on it 7.  Let me have that back, Doctor, please.

Page 173

1             - - -
2         (Klinge Trial Exhibit No. 7, Article entitled
3  "Prospective, Long-Term Comparison of Quality of Life
4  in Laparoscopic Versus Open Ventral Hernia Repair",
5  was marked for identification.)
6             - - -
7  BY MR. THOMAS:
8      Q.  Doctor, let me show you what I have marked
9  now as Klinge Trial Exhibit Number 7.
10         Klinge Trial Exhibit Number 7 is a 2012
11  study, first author Colavita, titled "Prospective,
12  Long-Term Comparison of Quality of Life in
13  Laparoscopic Versus Open Ventral Hernia Repair."
14         Have you seen this before?
15     A.  I have seen it, but it's some time ago.
16     Q.  Okay.  And if you look down at the methods,
17  patients in this study were drawn from the
18  international hernia registry; correct?
19     A.  Yes.
20     Q.  And it's 30 centers in the United States,
21  Canada and Europe and Australia; correct?
22     A.  Yes.
23     Q.  And in this study the authors looked at a
24  total of 710 hernia repairs; correct?

Prof. Dr. Med. Uwe Klinge

Page 174

1    A.  Yes.
2    Q.  And looked at the long-term comparison of
3  quality of life for these 710 hernia repairs;
4  correct?
5    A.  Yes.
6    Q.  And they used what's known as the Carolinas
7  Comfort Scale.  Are you familiar with that?
8    A.  Yes, I know it.
9    Q.  And that's -- is that similar to the SF-36
10  questionnaire that we talked about in the previous
11  study?
12    A.  It is another tool.
13    Q.  Okay.  Do you recognize the Carolinas Comfort
14  Scale as a way to determine the quality of life in a
15  population of patients?
16    A.  It is a way to measure it, yeah.
17    Q.  Okay.  At the time this study was published
18  in 2012, if you look at the first page under the
19  abstract and conclusion, to your knowledge was this
20  the largest prospective quality of life study
21  comparing laparoscopic ventral hernia repair with
22  open ventral hernia repair, or do you know?
23    A.  I think that's -- that is true.
24    Q.  Okay.  And so what these authors did was go

Page 175

1  to the registry and get the data that you have just
2  described in your previous answers in order to make
3  their analysis of a bigger population with more data
4  for their findings; true?
5    A.  They are going to a registry, but the
6  registry is not only registry because it has name.
7  You have to go into the details, look at what
8  variables are recorded.  That was outlined in the
9  previous paper for me.
10    Q.  If you go to page 719 of Klinge Trial Exhibit
11  Number 7, first paragraph on the left, midway down,
12  the authors conclude from this study, "There was no
13  difference in mesh sensation symptoms between
14  heavyweight or lightweight polypropylene mesh.  As
15  mentioned earlier, both were used with similar
16  frequency and laparoscopic and open repairs."
17       Did I read that correctly?
18    A.  Yes.
19    Q.  So across this population of 710 hernia
20  repairs, comparing lightweight mesh as opposed to
21  heavyweight mesh, they found no difference as to mesh
22  sensation; correct?  Is that correct?
23    A.  They described that they found -- yeah.
24    Q.  Okay.  And if you go to page 721 of the same

Page 176

1  study, first full paragraph on the left, it says, "In
2  multivariant analysis, mesh weight had no effect on
3  pain, activity limitation, mesh sensation, or overall
4  symptoms in the present study."
5       Did I read that correctly?
6    A.  You read this correctly.
7    Q.  And it follows down to the end of that
8  paragraph and it says, "In a recent small comparative
9  study of open ventral hernia repair with light and
10  heavyweight mesh, no difference was seen in quality
11  of life using SF-36 with long-term follow-up."
12       And that's the study that we looked at a
13  minute ago, the Ladurner study; correct?
14    A.  Twenty-seven, if this is here, the reference,
15  27?  Yeah, you're right.
16    Q.  The results of this study, Klinge Exhibit 7,
17  confirms these findings -- this long-term study from
18  the registry, Klinge Exhibit Number 7, confirms the
19  randomized controlled trials, the Ladurner study,
20  that we talked about before.  That's what this study
21  finds; correct?
22    A.  It confirms that the insufficiency of this
23  study to detect any differences.  It is not possible
24  to prove something by doing these studies, and,

Page 177

1  therefore, there is a tremendous flaw in the
2  interpretation of these data.  You are not allowed to
3  say that this study proves that result is similar.
4  It is -- it is not justified to do so.
5    Q.  Okay.  Let's --
6    A.  Even if it's done and even if it's published,
7  no.
8    Q.  So you disagree with the findings in Klinge
9  Exhibit Number -- Trial Exhibit Number 7?
10    A.  The interpretation, yeah.  It's completely
11  not justified.
12    Q.  Now, Dr. Klinge, you have contended for years
13  that traditional use of hernia repair are
14  overengineered -- excuse me.  Start over again.
15  Strike that.
16       Doctor, you have contended for years that
17  traditional meshes used for hernia repair are
18  overengineered and is stronger than is necessary for
19  the treatment of hernia repair; correct?
20    A.  We found this, yeah.
21    Q.  And you have argued that a lighter weight
22  larger pore mesh is better to accomplish the same
23  treatment of hernia repair; correct?
24    A.  Is better to?

Prof. Dr. Med. Uwe Klinge

Page 178

1    Q.  Yes.
2    A.  I didn't get every word of your question.
3    Q.  Let me ask it again.
4    A.  Yes.
5    Q.  You have contended that a manufacturer can
6  design a lighter weight larger pore mesh to
7  accomplish the same repair of a hernia as you can
8  with a traditional heavyweight mesh; correct?
9    A.  No.
10   Q.  What did I miss?  You can't get the same
11 repair with a lighter weight larger pore mesh?
12   A.  If you're believing that you can exactly the
13 same type of repairs with a heavyweight mesh and a
14 large pore lightweight meshes, no, that's not true.
15 There are indications for the different meshes.
16   Q.  Still appropriate --
17   A.  What we said is that you can improve the
18 tissue integration by reduction of the material,
19 making the pores larger, and that -- therefore, we
20 developed together with Ethicon these large pore
21 meshes, and this was confirmed in many animal trials,
22 human explants.
23   Q.  Let's go back to P1087, please.
24      MR. ANDERSON:  Did you say 1087?

Page 179

1      MR. THOMAS:  Yes.  It's the PowerPoint.
2      MR. ANDERSON:  I know.  We just have a stack
3  of documents, so I have to find it.
4      MR. THOMAS:  Strike that.  I'm not going to
5  do that one anyway.
6      MR. ANDERSON:  Okay.
7      MR. THOMAS:  Let's go to P0260, which is a
8  2002 study with Dr. Klinge and Dr. Klosterhalfen.
9      MR. ANDERSON:  Okay.
10 BY MR. THOMAS:
11   Q.  Doctor, on direct examination you discussed
12 Plaintiff's Exhibit 0260 in connection with your
13 earlier work on talking about the impact of polymer
14 pore size on the interface scar formation in a rat
15 model; correct?
16   A.  That is correct.
17   Q.  And you used this article to talk about your
18 findings about what happens with the smaller pore
19 heavyweight mesh, correct, as compared to the
20 heavyweight large pore mesh?
21   A.  Yes.
22   Q.  And in this study, the lightweight large pore
23 mesh that you use as a comparator is your Vypro mesh?
24   A.  Yes.

Page 180

1    Q.  And that's the mesh that you helped develop
2  with Ethicon?
3    A.  Yes, with a pore size of 3 to 5 millimeter.
4    Q.  And you compared Vypro against the
5  heavyweight monofilament Marlex; correct?
6    A.  In this article we took Marlex --
7    Q.  Correct.
8    A.  -- as an example of a small pore mesh.
9    Q.  And the Marlex pore size is not the same as
10 the Prolene Soft pore size, is it?
11   A.  There are differences.
12   Q.  Yes.  The Marlex mesh is typically reported
13 as a 0.6 millimeter mesh, isn't it?
14   A.  Roughly it is assumed that it has smaller
15 pores.
16   Q.  And the Prolene Soft Mesh is typically
17 described as a mesh with about 2.5 millimeters;
18 correct?
19   A.  I don't want to say that it is possible to
20 reflect the pore size just by one figure.  You know
21 all the limitations of all these techniques, yeah.
22   Q.  They are certainly different, aren't they?
23 The Marlex and the Prolene Soft Mesh are very
24 different in their characteristics?

Page 181

1    A.  Yes.  The soft Prolene mesh is more open than
2  the Marlex.
3    Q.  Okay.  Doctor, you cannot point to a mesh
4  today for use in the pelvic floor that has no risks
5  of infection, can you?
6    A.  There is no study -- if you -- no risks means
7  no complication at all?  No, there is no way.
8      MR. ANDERSON:  I'll just say objection;
9  outside the scope of direct.
10 BY MR. THOMAS:
11   Q.  And, Doctor, you do not know of any mesh
12 construction that leads to a lower -- strike that.
13      Doctor, you do not know of any mesh
14 construction for use in the pelvic floor that leads
15 to a lower erosion rate than Prolift; correct?
16   A.  I know that there are -- that there are ways
17 to reduce the risk.  There are no clinical
18 comparative studies, to my knowledge.
19   Q.  Doctor, you know of -- you do not know of any
20 mesh construction today for use in the pelvic floor
21 that leads to a lower erosion rate than Prolift;
22 correct?
23      MR. ANDERSON:  Objection; asked and answered.
24      THE WITNESS:  A mesh construction which

Prof. Dr. Med. Uwe Klinge

Page 182

1  follows our criteria reducing the material,
2  making it larger, it will reduce the erosion
3  rate, but there is no comparative study
4  available.
5  BY MR. THOMAS:
6      Q.  Let me ask the question again, Doctor.
7      Are you aware of any mesh construction for
8  use in the pelvic floor that leads -- strike that.
9      Are you aware of any mesh constructions
10 available for use today in the pelvic floor that
11 leads to lower erosion rates than Prolift?
12     MR. ANDERSON:  Objection; asked and answered
13 for the third time.
14     THE WITNESS:  As I don't know any comparative
15 study directly comparing different mesh
16 structures, I only can say that there are mesh
17 structures with lower risk than the Prolift.
18 BY MR. THOMAS:
19     Q.  But you are --
20     A.  For erosion.
21     Q.  But you are aware of no studies that prove
22 that point; correct?
23     A.  No clinical studies proving this.
24     Q.  Is that true?

Page 183

1      A.  That is true.
2      Q.  Okay.  And you are aware of no mesh
3  construction that causes less chronic pain in the
4  pelvic floor than Prolift; true?
5      A.  No clinical study comparing different mesh
6  materials and showing differences are available up to
7  now.
8      Q.  And you're aware of no mesh design for use in
9  the pelvic floor that provides lower contracture
10 rates than the Prolift; true?
11     A.  No, that's not true.  I'm well-aware of mesh
12 criteria for a safer mesh design as we outlined it,
13 less material, larger pores and no pore collapse.
14 This will make a safer mesh design.
15     Q.  Are you aware of any mesh design available
16 for use today in the pelvic floor that provides lower
17 contraction rates than the Prolift?
18     A.  There are mesh constructions which are closer
19 to these criteria for mesh design -- for safe mesh
20 design.
21     Q.  Are you aware of any comparative studies
22 which show that there is a mesh available for use in
23 the pelvic floor today that provides lower
24 contracture rates than the Prolift?

Page 184

1      A.  No comparative studies are available, to my
2  knowledge.
3      Q.  Okay.  Can you name one mesh on the market
4  today that you think that the benefits outweigh the
5  risks for use in treatment of pelvic organ prolapse?
6      A.  No.  And to answer this question, it is
7  impossible in this general statement.  It depends on
8  the patient.  It depends on the indication.  Then you
9  have to specify which implant under which conditions.
10 So it is not possible to answer this question.
11     MR. THOMAS:  Let's take a break for a second.
12     THE VIDEOGRAPHER:  We are off the record.
13 The time is 12:55 p.m.
14 (A recess was taken from 12:55 p.m. until 1:00 p.m.)
15     THE VIDEOGRAPHER:  We are back on the record.
16 The time is 1:00 p.m.
17 BY MR. THOMAS:
18     Q.  Doctor, can you tell the jury one product on
19 the market for the treatment of pelvic organ prolapse
20 that you think is better than the Prolift?
21     A.  In regard to the effective porosity, for
22 example, and the strain, I know that DynaMesh has a
23 device that is superior to the Prolift.
24     Q.  And the DynaMesh is not -- is that the only

Page 185

1  one that you think is better for use in the pelvic
2  floor --
3      A.  I know --
4      Q.  -- than the Prolift?
5      A.  I know there is a huge variety.  I'm not sure
6  which is -- what is on the market, actually, but I
7  know that there are various designs of meshes; but we
8  didn't make a systematic testing of all devices that
9  are on the market or have been on the market.
10     Q.  And the DynaMesh is not available for sale in
11 the United States; correct?
12     A.  I think so, but I'm not informed about the --
13     Q.  You think that it is available?
14     MR. ANDERSON:  Let him finish his answer, if
15 you wouldn't find.
16     Go ahead.
17     THE WITNESS:  I think it is not available,
18 but I'm not knowing all the details which product
19 is in which country on the market.
20 BY MR. THOMAS:
21     Q.  Let me --
22     A.  I'm not involved in this business.
23     Q.  Let me ask the question this way so it's
24 clear.  We had some interruptions.

Prof. Dr. Med. Uwe Klinge

Page 186

1    You don't know whether DynaMesh, manufactured
2  by FEG, is available for sale in the United States,
3  do you?
4    A.  I don't know.
5    Q.  Okay.  And you said that DynaMesh is better
6  than Prolift from the perspective of effective
7  porosity?
8    A.  As we measure it, as we can show with our
9  measurements it has a higher effective porosity, it
10  has a higher stability when put to strain.
11    Q.  But you agree that there are no clinical
12  long-term studies that prove the superiority of the
13  DynaMesh over the Prolift for the treatment of pelvic
14  organ prolapse?
15    A.  There are at all no comparative studies
16  showing the superiority of any of these, and, again,
17  it is not possible to do so.  I don't see a good way
18  to do so.
19    Q.  And you're aware of no studies that
20  demonstrate that PVDF mesh, which is DynaMesh, is
21  superior to the polypropylene mesh used in Prolift;
22  correct?
23    A.  We know from many histological studies that
24  the tissue reaction to PVDF is better than the tissue

Page 187

1  reaction to the polypropylene, less inflammation,
2  less scarring when you are using the PVDF.
3    Q.  And the PVDF -- strike that.
4    You're aware of no studies in humans that
5  demonstrate that PVDF mesh is superior to
6  polypropylene mesh used in Prolift for pelvic floor
7  repair; correct?
8    A.  Our studies in human explants always
9  confirmed the superiority of PVDF as a polymer to be
10  integrated in tissue.
11    Q.  And is this in hernia explants?
12    A.  This is in hernia explants.
13    Q.  And these -- this is the hernia explants that
14  you've reviewed with Dr. Klosterhalfen in his
15  collection?
16    A.  Yes.
17    Q.  And have you looked at any PVDF mesh explants
18  from the pelvic floor?
19    A.  Up to now I never saw one.
20    Q.  Okay.
21    A.  Which is a good sign.
22    Q.  And just so the record is clear, you don't
23  maintain your own collection of mesh removed from the
24  pelvic floor; correct?

Page 188

1    A.  I don't have an own -- at the moment I don't
2  have an own collection of pelvic floor meshes.
3    Q.  You collect hernia meshes; correct?
4    A.  We had collected, but meanwhile the -- all
5  the tissue samples are stored in a biotissue bank
6  from the university from the institute for pathology
7  centrally where they are stored under GCP conditions.
8    Q.  Okay.  But you've never asked your department
9  that deals with the pelvic floor to preserve and
10  collect meshes that have been removed in explants;
11  correct?
12    A.  No.  It's no longer an issue that I -- that
13  I'm asked to collect these.  They are sent all to
14  this bio bank; and when you want to make a research,
15  then you can ask for getting these samples.
16    Q.  Now, to your knowledge, there's only one mesh
17  manufacturer in the world that makes mesh made of
18  PVDF for the treatment of pelvic organ prolapse;
19  correct?
20    A.  In the moment, I think this is true.
21    Q.  And that's FEG?
22    A.  This is true.
23    Q.  And that's the German mesh manufacturer
24  headquartered here in Aachen?

Page 189

1    A.  Yes.
2    Q.  And you helped PVDF -- excuse me.  Strike
3  that.
4    You helped FEG develop its PVDF mesh, didn't
5  you?
6    A.  Yes.
7    Q.  And you're named on the patent for PVDF mesh?
8    A.  Yes.
9    Q.  You've done research for FEG since 1994;
10  correct?
11    A.  That is correct.
12    Q.  And Dr. Oberlinski is one of FEG's owners;
13  correct?
14    A.  That is correct.
15    Q.  And he used to work with you at the
16  university; correct?
17    A.  This again?
18    Q.  He used to work -- Dr. Oberlinski used to
19  work at the university, didn't he?
20    A.  When we started our collaboration, he worked
21  for the institute for textile engineering at the
22  university, but then later on he changed to the
23  company.
24    Q.  It was Dr. Oberlinski who first told you that

Prof. Dr. Med. Uwe Klinge

Page 190

1  there are several textile options available to change
2  mesh?
3      A.  Yes.
4      Q.  Now, you've been a paid consultant by FEG
5  since 1998 or 1999.  Is that true?
6      A.  No.  I guess it was later on.  It was after
7  the contract finished with the -- with Ethicon.
8      Q.  And to this day you're compensated annually
9  by FEG; correct?
10     A.  Correct.
11     Q.  And they pay you about 30,000€ a year?
12     A.  Yeah.
13     Q.  They determine how much they'll pay you each
14 year depending on how well the company does that
15 year; correct?
16     A.  Yes.
17     Q.  And you've spoken at conferences sponsored
18 solely by FEG; correct?
19     A.  Yes.
20     Q.  And you do that routinely?  You regularly
21 attend conferences around the world on behalf of FEG;
22 correct?
23     A.  I routinely attend conferences, and I am
24 invited all over the world.  Most of these, far most

Page 191

1  of these invitations are not linked to the FEG.  So
2  it is an exception if I do it on the -- on the
3  invitation of the FEG.  This is a rare exception.
4      Q.  And your picture is on the FEG website, isn't
5  it?
6      A.  Maybe.  To be fair, I never have looked to
7  this website.  I didn't saw any need to do so.
8      Q.  And you're going to teach next week in
9  Baden-Baden at a class sponsored by FEG, aren't you?
10     A.  Yeah.
11     Q.  The International Masterclass for
12 Laparoscopic Hernia Repair; correct?
13     A.  Yes.
14     Q.  And that's a seminar sponsored by the FEG?
15     A.  Yeah.  It was an invitation by Professor
16 Berger, who was the former head of the German
17 Society, and we did it for the fourth time or the
18 fifth time.
19     Q.  And the agenda for the hernia session is on
20 the FEG website, isn't it?
21     A.  As I told you, I'm not a visitor of this
22 website.
23        MR. THOMAS:  That's all the questions I have.
24 Thank you, Doctor.

Page 192

1         MR. ANDERSON:  Okay.  Take a short break.
2         THE VIDEOGRAPHER:  We are off the record.
3  The time is 1:10 p.m.
4  (A recess was taken from 1:09 p.m. until 1:31 p.m.)
5         THE VIDEOGRAPHER:  We are back on the record.
6  The time is 1:31.
7            REDIRECT EXAMINATION
8  BY MR. ANDERSON:
9      Q.  Dr. Klinge, do you remember when counsel was
10 asking you some questions about the PVDF mesh and
11 PVDF fibers?
12     A.  There has been several questions, but I
13 remember.
14     Q.  Okay.  If we could go to Plaintiff's Exhibit
15 697 right here.  It's the Otto article.  If we could
16 go over a few pages to the mesh.
17        MR. ANDERSON:  No.  Blow up the top part.
18 Actually, no, no.  Next page.
19        MR. KAUFFMANN:  Next page?
20        MR. ANDERSON:  Okay.  Yeah.  Blow up the
21 whole top part.
22 BY MR. ANDERSON:
23     Q.  Doctor, the mesh on the far right side, the
24 DynaMesh, is that the mesh that you were talking with

Page 193

1  counsel about that's made by FEG?
2      A.  Yes.  This is a PVDF mesh made by FEG.
3      Q.  And does FED -- FEG make meshes made out of
4  this PVDF material for pelvic organ prolapse?
5      A.  Yes.
6      Q.  And just explain quickly for the jury what
7  PVDF is as a polymer, as a material.
8      A.  PVDF is a plastic material like -- as
9  polypropylene is, but it has -- it consists of two
10 fewer atoms.  So it has some other molecules inside,
11 and it has more stability than the polypropylene.
12     Q.  How long have you known about PVDF as an
13 alternative polymer to polypropylene for surgical
14 meshes?
15     A.  We, actually, started to think about it in
16 1997.  When we finished the Vypro, we knew that it
17 was possible to made a mesh with large pores.  But
18 Vypro consists of five filaments, and to reduce
19 further on the risk for bacterial infection, we
20 wanted to construct it as a monofilament.  And,
21 therefore, we have been looking for the best material
22 for the construction of a monofilament large pore
23 meshes.  And there it came up that PVDF may be the
24 best.

Prof. Dr. Med. Uwe Klinge

Page 194

1    And we approached Ethicon to join this
2  activity further on.  We asked for some grants to do
3  this research, and, fortunately, we got the
4  permission to do this project by our university and
5  we got some further grants to work on PVDF meshes;
6  but, unfortunately, Ethicon denied to develop meshes
7  made of PVDF, though they provided us with one PVDF
8  mesh that is made by Ethicon.
9    Q.  So did Ethicon have an opportunity to work
10  with you and FEG to develop PVDF meshes during this
11  time period?
12    A.  Obviously they had a mesh, but they didn't
13  want to go into this project to develop PVDF meshes,
14  but they were asked, but they denied.  They didn't
15  want to do so.
16    Q.  Have you studied the differences in the
17  tissue reaction in patients' tissue of polypropylene
18  versus a PVDF?
19    A.  Yeah.  We did a several --
20    Q.  Okay.
21    MR. ANDERSON:  Pull up Plaintiff's Exhibit
22  770, which may help us with this discussion.
23    - - -
24    (Plaintiff's Exhibit No. PLT0770, Article

Page 195

1  entitled "New Polymer for Intra-Abdominal Meshes -
2  PVDF Copolymer", was marked for identification.)
3    - - -
4  BY MR. ANDERSON:
5    Q.  I'm showing you what's been marked as
6  Plaintiff's Exhibit 0770.  Is this some of the
7  research that you were just describing where you were
8  looking at tissue response to PVDF?
9    A.  Yes.
10    Q.  Okay.  Tell the jury what your conclusions
11  were after looking at this PVDF study.
12    A.  In this study, this study clearly confirms
13  that the tissue reaction to the PVDF is better than
14  for the polypropylene.
15    Q.  Who provided you with the PVDF meshes for
16  testing in this study?
17    A.  It was a PVDF mesh made by Ethicon.
18    MR. ANDERSON:  Let's go to the end of the
19  document under the conclusion section.  Go back.
20  There.  "This study was supported..."
21    No.  Down below.  Next paragraph.
22  BY MR. ANDERSON:
23    Q.  Is this what you're discussing, that this
24  PVDF study was, in fact, supported and funded by

Page 196

1  Ethicon?
2    A.  Yes.
3    Q.  Okay.
4    MR. ANDERSON:  Let's go to Exhibit 3354.  Oh,
5  it's the wrong one.  I need the translation.
6    - - -
7    (Plaintiff's Exhibit No. P3355, English
8  Translation of Plaintiff's Exhibit 3354, Patent for
9  PVDF mesh, was marked for identification.)
10    - - -
11  BY MR. ANDERSON:
12    Q.  I'm showing you what has been marked as
13  Plaintiff's Exhibit 3355.  What is this, Doctor?
14    A.  This is a patent from Ethicon.
15    Q.  Okay.  And what's it a patent for?
16    A.  It's a patent for a PVDF mesh.
17    Q.  Is this something that you've reviewed and
18  relied upon in forming some of your opinions here?
19    A.  Yes.
20    Q.  If you'll turn over to page 12.
21    MR. THOMAS:  Show my objection to this
22  witness offering any testimony about this
23  document.  It's well beyond the scope of his
24  expertise.  The document speaks for itself.

Page 197

1  There's nothing special he can bring to the
2  issues raised by this patent.
3    MR. ANDERSON:  Yeah.  And I didn't ask him
4  anything about PVDF on direct.  You chose to.
5  You opened the door.  We're going to drive
6  through it.
7  BY MR. ANDERSON:
8    Q.  Okay.  So if you will look at page 12 under
9  claims.
10    A.  Yes.
11    Q.  What does it say with regard to the pore
12  sizes for PVDF mesh?
13    A.  Basic structure should have a pore size with
14  a range of 1.5 to 8.0 millimeter, so to be extremely
15  large, covering 90 percent of the total area of the
16  pores.
17    Q.  Okay.  Let's go to Plaintiff's Exhibit 1087,
18  which you've already seen.  Plaintiff's Exhibit 1087.
19  He can have it.  I gave him a copy.  Plaintiff's
20  Exhibit 1087.
21    You're okay.  You don't need to go there.
22  It's going to come up on the screen.
23    Is this a document we reviewed earlier during
24  your direct examination?

Prof. Dr. Med. Uwe Klinge

Page 198

1    A.   Yes.
2    Q.   Okay.  From 2008?
3    A.   From 2008.  Ethicon document.
4    Q.   Okay.
5         MR. ANDERSON:  If you'd go to the slide.
6         MR. KAUFFMANN:  Got it.
7         MR. ANDERSON:  Yes.  Blow up that bottom
8    left.
9    BY MR. ANDERSON:
10   Q.   In this Ethicon presentation, what is this?
11   A.   This is a PVDF copolymer mesh.
12   Q.   And do you know -- and based upon your review
13   of the patent and your review of these documents, did
14   Ethicon have a brand name for this PVDF mesh?
15   A.   No.  I don't think that they marketed it.
16   Q.   No.  Not marketed it but --
17   A.   Yeah.
18   Q.   -- did they have a brand name for it?
19   A.   Brand name was Pronova.  Pronova was the name
20   of this.
21   Q.   Do you have any information as to whether or
22   not Ethicon ever chose to sell their Pronova mesh
23   made out of PVDF?
24   A.   So far I know, they never brought it to the

Page 199

1    market.
2    Q.   And from your reading of the PowerPoint, what
3    was the discussion and the reason for this PowerPoint
4    being given at Ethicon?
5         MR. THOMAS:  Objection; state of mind,
6    knowledge of Ethicon.
7    BY MR. ANDERSON:
8    Q.   What was discussed in this Thunder PowerPoint
9    by Ethicon?
10        MR. THOMAS:  Same objection.
11        THE WITNESS:  The entire project was to
12   evaluate whether the use of PVDF would make a
13   safer approach -- would make a safer device for
14   the use in the pelvic floor.
15              ---
16        (Plaintiff's Exhibit No. P3184, Letter to
17   Quentin from Christoph Walther, Bates stamped
18   HMESH_ETH_00379723, was marked for identification.)
19              ---
20   BY MR. ANDERSON:
21   Q.   Let's look at Plaintiff's Exhibit 3184.  This
22   is a document that you have seen before, Dr. Klinge.
23        MR. ANDERSON:  If you'll highlight the
24   section that says "In extremely, this patient,"

Page 200

1    right there.
2         MR. THOMAS:  That's not what it says.  I
3    object to showing this document to the jury,
4    admission of this document and any testimony
5    about this document.  The document speaks by
6    itself, and this witness is not qualified, with
7    no foundation to give any comment about the
8    document.
9    BY MR. ANDERSON:
10   Q.   Dr. Klinge, did you, in fact, have this
11   document in your own files when you worked with
12   Ethicon?
13   A.   Yes.
14   Q.   And did you produce that to Ethicon when they
15   requested all of your files?
16   A.   Yes.
17   Q.   So this is a document that you received while
18   you were consulting with them?
19   A.   Yes.
20   Q.   Great.  And underneath there it says
21   Christoph Walther.  Is that one of the Ethicon
22   employees that you would have worked with?
23   A.   Yes.
24   Q.   And in the middle there where it says,

Page 201

1    "Pronova monofilaments are an extremely good
2    candidate as implant material, very high flexibility
3    and low bending stiffness" --
4    A.   Yes.
5    Q.   -- "and without loss of tensile strength in
6    contrast to polypropylene and long-term stability --
7    long-term stability in human body."
8         Do you agree with those statements by
9    Ethicon?
10   A.   Yes.
11   Q.   Do you have an opinion as to whether or not
12   polypropylene mesh is -- creates greater inflammatory
13   reaction in tissues than PVDF mesh?
14   A.   Polypropylene in general produces more
15   inflammation, more scarring than PVDF.
16   Q.   You were asked by Mr. Thomas on
17   cross-examination whether polypropylene has been used
18   in the human body for hernia mesh since 1962.  Do you
19   remember that question?
20   A.   Yes.
21   Q.   And has polypropylene been used in the human
22   pelvis of women for pelvic organ prolapse since 1962?
23   A.   No.  It's less than ten years.
24   Q.   He also pulled out the -- that 240 meters of

Prof. Dr. Med. Uwe Klinge

Page 202

1  suture material and asked you whether or not that
2  much material goes into some of the meshes in the
3  hernia -- for hernia repair.  Do you remember that
4  part of your questioning?
5      A.  Yes.
6      Q.  Is there a difference between that amount of
7  material in the abdominal wall than that amount of
8  material in a woman's vaginal space?
9      A.  Definitely.  The use of a mesh in the
10  abdominal wall, we don't have to consider some
11  forces.  It's laying there flat, usually beneath the
12  muscles.  You don't have any tension to any arms or
13  something like this.  There are less nerves.  There
14  are no organs with direct contact to the mesh that
15  can be damaged by this.  So it is more easy -- if you
16  have some complications, some infection, it is
17  quite -- much more easy to remove it and to repair
18  the damage after a mesh complication.
19      Q.  Easier to remove the hernia than the pelvic
20  organ prolapse, is that what you're saying?
21      A.  It is easier to remove the mesh.
22      MR. THOMAS:  Let me move to strike his
23  testimony about mesh in the pelvic floor as being
24  beyond the area of his expertise.

Page 203

1      MR. ANDERSON:  You sure asked him a lot of
2  questions about it, but okay.  Let's move on.
3  BY MR. ANDERSON:
4      Q.  You were asked some questions about
5  consenting your patients when you were a hernia
6  surgeon.  Do you remember that?
7      A.  Yes.
8      Q.  And you were asked questions about what risks
9  you would pass along to your patients; correct?
10      A.  Yes.
11      Q.  Can you pass along a risk if you're not told
12  about it by the manufacturer?
13      A.  No.
14      Q.  If you were a surgeon who's implanting a new
15  surgical device, do you expect the manufacturer to
16  pass along information they have about serious
17  adverse events that could affect that risk-benefit
18  discussion with your patients?
19      A.  Definitely.
20      MR. THOMAS:  Objection; foundation, beyond
21  the scope.
22      MR. ANDERSON:  It's direct response to the
23  cross-exam.
24  BY MR. ANDERSON:

Page 204

1      Q.  Go right ahead, Doctor.
2      A.  When using -- when I would use a new device,
3  I'm dependent on the information that is provided by
4  the manufacturer for the long-term risks or for the
5  risks that are connected to this device.  There is no
6  other way to get this information.
7      Q.  If you're a surgeon that's putting in what
8  you characterize as a relatively new device, if the
9  manufacturer knew that there was a serious long-term
10  risk of chronic debilitating pain, would you expect
11  them to pass that information along to you?
12      A.  Yes, I would.
13      MR. THOMAS:  Objection to foundation.
14      THE WITNESS:  And in parallel, he has to stop
15  selling it.
16  BY MR. ANDERSON:
17      Q.  And if a manufacturer was aware of serious
18  adverse events of life-altering untreatable erosions,
19  would you expect them to pass that along to you as a
20  surgeon?
21      MR. THOMAS:  Objection.
22      A.  Yes.
23      MR. THOMAS:  Argumentative.
24  BY MR. ANDERSON:

Page 205

1      Q.  Okay.  Wait until he does his objection --
2      A.  Sorry.
3      Q.  -- and then you can answer because it's
4  messing up the record, and it's harder for her to
5  type.
6      A.  Sorry.
7      MR. THOMAS:  Do you want to ask the question
8  again?
9      MR. ANDERSON:  I think I liked it.
10      THE COURT REPORTER:  You might need to --
11      MR. ANDERSON:  Because he interrupted me?
12      MR. THOMAS:  I didn't want mean to.
13      MR. ANDERSON:  Well, you already did.
14      MR. THOMAS:  I'm sorry.  Doing the best I
15  can, man.
16  BY MR. ANDERSON:
17      Q.  If a manufacturer is aware of serious
18  lifelong risk of recurrent erosions that can't be
19  treated, would you, as a surgeon, want to know that?
20      A.  Yes.
21      Q.  If a manufacturer is aware that their product
22  can create a serious adverse long-term risk of
23  dyspareunia or painful sexual relations, would you
24  expect them to pass that along to you?

Prof. Dr. Med. Uwe Klinge

Page 206

1    A.  Yes.
2    Q.  If a manufacturer was aware that in certain
3  patients, like young patients or sexually active
4  patients, that in those patients they shouldn't have
5  that device implanted, would you expect them to pass
6  that along to you?
7    A.  Yes.
8      MR. THOMAS:  Just show my objection to the
9  whole line as being beyond his whole line of
10  expertise as a hernia surgeon.
11      MR. ANDERSON:  And that's fine because, just
12  for the judge's purposes when we go to argue
13  this, Mr. Thomas asked numerous questions about
14  passing on the risk-benefit information and that
15  the manufacturer didn't need to tell him these
16  things because he already knew it; and so let's
17  go through some of the things on redirect of what
18  he would like to know from the manufacturer, and
19  so that's what I'm attempting to do now.  So
20  we'll note your objection and my response.
21  BY MR. ANDERSON:
22    Q.  If the manufacturer is aware that their
23  device should not be used with certain patients,
24  certain indications, would you expect them to pass

Page 207

1  that information along to you?
2    A.  Yes.
3      MR. THOMAS:  Objection; vague.
4      THE WITNESS:  Yes, of course.
5  BY MR. ANDERSON:
6    Q.  For instance, if a manufacturer knew that a
7  particular type of hernia or a particular type of
8  prolapse, it would be inappropriate to treat with
9  that device, would you expect them to pass that along
10  to you?
11      MR. THOMAS:  Objection; compound.
12      THE WITNESS:  Yes.
13  BY MR. ANDERSON:
14    Q.  Mr. Thomas said something on cross about the
15  Prolift being implanted tension-free.  You've seen
16  the DVD; correct?
17    A.  Yes.
18    Q.  You've seen the internal documents by
19  Ethicon?
20    A.  Yes.
21    Q.  Is there any way that a Prolift can actually
22  be implanted tension-free in a woman?
23      MR. THOMAS:  Objection; not an expert in the
24  surgical procedure.

Page 208

1      THE WITNESS:  There is no way to place it
2  completely tension-free, and I believe there is
3  no one who will really think of it as an option.
4  BY MR. ANDERSON:
5    Q.  When you saw those arms being pulled through
6  the woman's groin from her vaginal incision, was
7  there tension being placed on those arms?
8    A.  Definitely.  Uniaxial tension, as it was done
9  in our measurements and it was done -- as it was done
10  in the drawings from Ethicon and in the study done by
11  Ethicon.
12    Q.  And Mr. Thomas mentioned that when you did
13  your uniaxial testing with Professor Mühl that you
14  held one end and you pulled on the other end;
15  correct?
16    A.  Yes.
17    Q.  Is that exactly what the surgeon was doing in
18  that DVD video with the arms?
19    A.  Yes.
20    Q.  You were asked some questions about your
21  testing with Professor Mühl by Mr. Thomas about
22  whether or not this -- the porosity setup and
23  investigation you had done accounted for pelvic floor
24  forces.  Do you remember that?

Page 209

1    A.  Yes.
2    Q.  As you looked at the pores in the DVD and the
3  tension placed on the mesh arms by the surgeon, are
4  those pores deformed before any forces from the
5  pelvis are being placed on the mesh?
6      MR. THOMAS:  Objection.  Again, not familiar
7  with the surgical procedure and what's going on
8  inside.
9      THE WITNESS:  In these arms there is no
10  interference with some other forces from the
11  pelvic floor, and there is no interference with
12  some ingrowing tissue which will occur later on.
13  BY MR. ANDERSON:
14    Q.  So were the pores irreversibly deformed on a
15  Prolift arm even before the woman's vaginal incision
16  is closed?
17    A.  Yes.
18      MR. THOMAS:  Objection.  That's beyond the
19  scope of this witness's ability to testify, any
20  expertise, any disclosed opinions or testing.
21  BY MR. ANDERSON:
22    Q.  And your answer was?
23    A.  Yes.
24    Q.  Thank you.

Prof. Dr. Med. Uwe Klinge

Page 210

1    He also -- Mr. -- the counsel also pointed
2   out from these articles -- he pointed out to two
3   sections on the 2007 article and the 2013 article,
4   these sections that says clinical studies have to
5   prove whether or not effective porosity and meshes
6   with high effective porosity will actually result in
7   improved patient complications.  Do you remember
8   that?
9    A.  Yes.
10    Q.  And he asked you, "You haven't done any
11   clinical studies to look at this, have you?"  Do you
12   recall that question?
13    A.  Yes.
14    Q.  Are you a mesh manufacturer, Doctor?
15    A.  No.
16    Q.  After Ethicon circulated these two e-mails in
17   2008 and again in 2010, circulating your and Mühl's
18   testing, did you see anywhere in the Ethicon
19   documents where they did any clinical studies to look
20   at pore deformation?
21    A.  No, I didn't find any hint for this.
22    Q.  Do you see anywhere in the documents, all the
23   thousands of documents you reviewed, all the
24   depositions of all the Ethicon witnesses you

Page 211

1   reviewed, or any scientific literature where Ethicon
2   ever looked at what the impact on patients would be
3   after forces were placed on the arms?  Do you see
4   that anywhere?
5    A.  No.
6    Q.  You were asked why your machine was set for
7   1,000 microns for polypropylene in terms of a
8   critical limit of the distance between the fibers,
9   and you were asked why PVDF was set at 600 microns.
10   Do you remember that?
11    A.  Yes.
12    Q.  Why?
13    A.  The basis for these two figures, 600 and
14   1,000 microns, have been our investigations of the
15   tissues, because we have seen that around the fiber
16   made of PVDF, the inflammatory reaction is -- is
17   attenuated and there is less scar and that the pores
18   are filled with fat even when the size of the hole of
19   the pore is only 600 microns.  And, therefore,
20   because this -- this measurement by Professor Mühl
21   was intended to predict the risk for these scar
22   contraction and scar integration in the pores;
23   therefore, we adopted this to 600 microns for PVDF
24   and 1 millimeter for polypropylene.  It fits to our

Page 212

1   experimental results.  And if you have another
2   polymer, yeah, you have to adopt it to this polymer
3   after having the -- making this investigation.
4    Q.  Thank you.  Let me go to another question
5   he -- series of questions you were asked.
6    He put two articles in front of you by Jan
7   Deprest, and counsel said, "Are you aware of other
8   scientists out there who may disagree with your 1
9   millimeter?"  Do you remember that part of the
10   questioning?
11    A.  Yes.
12    Q.  Those two articles by Jan Deprest, is Jan
13   Deprest an Ethicon consultant?
14    A.  So far I know, yes.
15    Q.  And if Jan Deprest said that 75 microns is
16   efficient for good, healthy tissue ingrowth and it
17   will resist scar plates, is that consistent or
18   inconsistent with Ethicon's own documents?
19    MR. THOMAS:  Object to the form of the
20   question.  Object to foundation.
21    THE WITNESS:  It will be inconsistent.  If
22   you really believe that it is possible to -- or
23   the ingrowths of healthy tissue is possible for
24   these low pore size, then it would be

Page 213

1   inconsistent.  The Ethicon people clearly stated
2   it on several pages in several documents that we
3   have to consider a pore size of 3 millimeters or
4   at least 1 millimeter and far beyond.
5   BY MR. ANDERSON:
6    Q.  And was the product that was developed by you
7   and Ethicon, the Vypro mesh, did it have pore sizes
8   less than 75 microns?
9    A.  No.
10    Q.  Did it have pore sizes larger than 1,000
11   microns?
12    A.  So the pores -- the area of the large pores
13   is considerably higher, and the diameter of these
14   pores is between 3 and 5 millimeter.
15    Q.  Have you seen anywhere in the Ethicon
16   documents out of all of the ones you've reviewed or
17   out of the ten years of consulting with them or all
18   of the depositions that you saw anywhere where
19   Ethicon said, "At 75 microns we can prevent fibrotic
20   bridging"?
21    A.  Nowhere.
22    Q.  You were asked another series of questions
23   about whether there were any RCTs that you could
24   point to randomized controlled trials of Prolift in

Prof. Dr. Med. Uwe Klinge

Page 214

1  order to prove the safety of its device. Do you
2  remember that?
3      A.  Yes.
4      Q.  You were asked whether you had conducted any
5  studies or knew of any studies, randomized controlled
6  trials, to prove the safety of Prolift. Do you
7  remember that?
8      A.  Yes.
9      Q.  Do you see anywhere where Ethicon conducted
10  their own safety studies in order to look as to
11  whether or not this amount of material was actually
12  necessary to support a woman's pelvic organs?
13      A.  No.
14      Q.  Did you see anywhere where Ethicon did any
15  clinical trials to determine whether or not the pore
16  sizes of Gynemesh PS were necessary to be that size
17  in order to support pelvic organ prolapse?
18      A.  No.
19      Q.  Did you see anywhere where Ethicon justified
20  or clinically studied that it was necessary for them
21  to have pores that would collapse and look like the
22  deformed pores on the DVD in order to be safely
23  implanted in a woman?
24      MR. THOMAS:  Objection; argumentative.

Page 215

1  BY MR. ANDERSON:
2      Q.  Did you see that?
3      A.  No.
4      Q.  You were asked a whole lot of questions about
5  this 91-day rat study, so let's talk about a rat
6  study if we could.  That was an internal Ethicon
7  study; correct?
8      A.  Yes.
9      Q.  Done by Ethicon scientists?
10      A.  Yes.
11      Q.  Was it peer-reviewed in the peer-reviewed
12  publications?
13      A.  No.
14      Q.  The size of the piece of mesh, can you just
15  show the jury what the size of the piece of mesh
16  would be that went into the back of these little
17  rats?
18      A.  It's usually the size of the fingertip or the
19  nail.
20      Q.  Okay.  So we have a piece of mesh the size of
21  our fingernail going into the back of a rat for 91
22  days.  That's what this study was; correct?
23      A.  Yes.
24      Q.  Is that going into healthy tissue?

Page 216

1      A.  It's healthy tissue in healthy rats.
2      Q.  Is it being used with trocars and cannulas to
3  pull it in there?
4      A.  No trocars.
5      Q.  Is it going in through a transvaginal
6  incision of the rat?
7      A.  No, nothing like this.
8      Q.  Is it being permanently implanted in the
9  rat's tissue?
10      A.  It's only implanted for 90 days.
11      Q.  Were any forces placed on the mesh during the
12  implanting or being forced -- any forces on the mesh
13  after implantation?
14      A.  No.  When placing in the subcutaneous area,
15  you don't have any forces.
16      Q.  Is the subcutaneous skin in the back of a rat
17  the same as the delicate pelvic tissues of a woman?
18      A.  No.  It is -- the tissue reaction of pure fat
19  is attenuated.
20      Q.  When Prolift or any other pelvic organ
21  prolapse mesh is put into a woman's tissue, is that
22  because it's healthy or unhealthy?
23      MR. THOMAS:  Objection.
24      THE WITNESS:  Unhealthy.

Page 217

1  BY MR. ANDERSON:
2      Q.  And is it being permanently implanted or
3  implanted for 91 days?
4      A.  It's permanently for years hopefully.
5      Q.  And are these rats having sexual relations
6  while they have the mesh in their back?
7      MR. ANDERSON:  I would like to withdraw that
8  question.
9      THE WITNESS:  I think so.
10  BY MR. ANDERSON:
11      Q.  Let me ask you this, Doctor.
12      Would it be safe to take a three-month study
13  of a piece of mesh that's the size of your fingernail
14  that was in the back of a rat where no trocars were
15  used in healthy tissue, not going through a
16  transvaginal incision, with no forces placed on the
17  mesh, in order to say this study will tell you that
18  Prolift can be safely implanted in a woman's vagina
19  for the rest of her life?
20      A.  It would be very dangerous to take this study
21  as a proof for safety.  This is not justified.  And
22  if you'll remember to the results, there wasn't no --
23  there wasn't a significant difference among the
24  meshes.  Meanwhile, you have hundreds of studies

Prof. Dr. Med. Uwe Klinge

Page 218

1 showing that the material has an impact on the tissue
2 ingrowth. So if you make your own study and seeing
3 no difference in these small group of animals, then
4 you should think of exchanging the people who are
5 responsible for this study. It is -- yeah.
6     Q. So counsel asked you on cross-examination --
7 he said, "You have not designed a device that was
8 designed for the -- for pelvic organ prolapse." Do
9 you remember that question?
10    A. I remember it.
11    Q. Has Ethicon ever designed a mesh that was
12 specifically designed for the pelvic floor?
13    A. No.
14    Q. You were asked three different questions that
15 I want to go to, Doctor. You were asked at the
16 beginning of your cross-exam, "91 percent of all
17 surgical meshes on the market today are made of
18 polypropylene." Do you remember that question?
19    A. Yes.
20    Q. And do you remember the question of, "Can you
21 think of any product on the market today that is
22 safer than Prolift for pelvic organ prolapse?" Do
23 you remember those questions?
24    A. Yes.

Page 219

1     Q. Is Prolift or Prolift+M still on the market
2 today?
3         MR. THOMAS: Objection.
4         THE WITNESS: So far I know, it is not longer
5 on the market.
6         MR. ANDERSON: I don't have any other
7 questions.
8         MR. THOMAS: We need to consult.
9         THE VIDEOGRAPHER: We are off the record.
10 The time is 2:01 p.m.
11    (A recess was taken from 2:01 p.m. until 2:02 p.m.)
12        MR. THOMAS: That's all the questions I have.
13        (Whereupon, the deposition concluded at
14 2:02 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 220

1         C E R T I F I C A T E
2
3     I, Tami Cline, Registered Merit Reporter,
4 Certified Realtime Reporter, and Florida Professional
5 Reporter, do hereby certify that, pursuant to notice,
6 the deposition of PROF. DR. MED. UWE KLINGE was duly
7 taken on November 10, 2014, at 9:04 a.m. before me.
8         The said PROF. DR. MED. UWE KLINGE was duly
9 sworn by me according to law to tell the truth, the
10 whole truth and nothing but the truth and thereupon
11 did testify as set forth in the above transcript of
12 testimony. The testimony was taken down
13 stenographically by me. I do further certify that
14 the above deposition is full, complete, and a true
15 record of all the testimony given by the said
16 witness.
17
18    _____
19    Tami Cline, RMR, CRR, FPR
20
21    (The foregoing certification of this
22 transcript does not apply to any reproduction of the
23 same by any means, unless under the direct control
24 and/or supervision of the certifying reporter.)

Page 221

1         INSTRUCTIONS TO WITNESS
2
3
4         Please read your deposition over carefully
5 and make any necessary corrections. You should state
6 the reason in the appropriate space on the errata
7 sheet for any corrections that are made.
8
9         After doing so, please sign the errata sheet
10 and date it. It will be attached to your deposition.
11
12        It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the deposition transcript by
15 you. If you fail to do so, the deposition transcript
16 may be deemed to be accurate and may be used in
17 court.
18
19
20
21
22
23
24

Prof. Dr. Med. Uwe Klinge

| Page 222 |
|---|

1           - - - - - -

2           E R R A T A

3           - - - - - -

4  PAGE  LINE  CHANGE

5  ____  ____  _____

6     REASON: _____

7  ____  ____  _____

8     REASON: _____

9  ____  ____  _____

10    REASON: _____

11 ____  ____  _____

12    REASON: _____

13 ____  ____  _____

14    REASON: _____

15 ____  ____  _____

16    REASON: _____

17 ____  ____  _____

18    REASON: _____

19 ____  ____  _____

20    REASON: _____

21 ____  ____  _____

22    REASON: _____

23 ____  ____  _____

24    REASON: _____

| Page 224 |
|---|

1              LAWYER'S NOTES

2  PAGE  LINE

3  _____ _____  _____

4  _____ _____  _____

5  _____ _____  _____

6  _____ _____  _____

7  _____ _____  _____

8  _____ _____  _____

9  _____ _____  _____

10 _____ _____  _____

11 _____ _____  _____

12 _____ _____  _____

13 _____ _____  _____

14 _____ _____  _____

15 _____ _____  _____

16 _____ _____  _____

17 _____ _____  _____

18 _____ _____  _____

19 _____ _____  _____

20 _____ _____  _____

21 _____ _____  _____

22 _____ _____  _____

23 _____ _____  _____

24 _____ _____  _____

| Page 223 |
|---|

1           ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4  acknowledge that I have read the foregoing pages, 1

5  to 224, and that the same is a correct transcription

6  of the answers given by me to the questions therein

7  propounded, except for the corrections or changes in

8  form or substance, if any, noted in the attached

9  Errata Sheet.

10

11

12 _____       _____

13 PROF. DR. MED. UWE KLINGE              DATE

14

15

16

17

18 Subscribed and sworn to before me this

19 ____ day of _____, 20___.

20 My Commission expires: _____

21

22 _____

   Notary Public

23

24