**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 MDL No. 2327 |
| THIS DOCUMENT RELATES TO ETHICON WAVE 3 CASES | JOSEPH R. GOODWIN U.S. DISTRICT JUDGE |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO EXCLUDE
CERTAIN GENERAL OPINIONS OF BRUCE ROSENZWEIG, M.D.**

Defendants Ethicon, Inc., Ethicon LLC, and Johnson & Johnson (hereinafter "Ethicon") submit this reply in further support of their motion to exclude certain opinions of Bruce Rosenzweig, M.D.

**I.     The Court should preclude Dr. Rosenzweig from testifying that other synthetic mesh devices are safer alternatives for the surgical treatment of SUI or POP.**

**A.     Ultrapro has never been available for the treatment of SUI or POP.**

According to Plaintiffs, it is "nonsensical" for Ethicon to argue that Ultrapro was not a safer, feasible alternative given that the FDA would not allow it to be placed on the market. Doc. 2931, p. 5. Yet, as noted by one federal district court, if there exists no FDA-approved alternative for the product, "there is no available alternative design of the drug for defendants to adopt." *Wolfe v. McNeil-PPC, Inc.*, 773 F. Supp. 2d 561, 573 (E.D. Pa. 2011).  Plaintiffs do not and cannot explain how it is relevant or appropriate to compare Ethicon's products at issue with a product that was not even marketable due to safety and/or efficacy concerns.

**B.     There is no reliable evidence that a device with Ultrapro mesh would have been equally as effective for treating SUI or POP.**

Plaintiffs ignore Dr. Rosenzweig's own concession that there is insufficient long-term data to measure Ultrapro's safety and efficacy, that "[o]bviously in order to justify the use of a polypropylene-based product like Ultrapro, there would have to be a significant amount of research," that "I would like to see more data on Ultrapro," that "I don't think we have enough information" about Ultrapro, and "I don't think it has been studied long enough." Ex. I to Doc 2047, Rosenzweig 9/22/15 Dep. Tr. at 185:16-20; Ex. K to Doc 2047, Rosenzweig 7/13/15 Dep. Tr. 174:13-17, 198:8-13.  Thus, by Dr. Rosenzweig's own admission, the sole Okulu study cited in his report is insufficient.

Apparently, Dr. Rosenzweig seeks to apply a different and more lax standard to his opinions regarding Ultrapro (and other semi-absorbable meshes) than he does to his opinions regarding Ethicon's devices. Specifically, he attempts to indict Ethicon for launching its devices without having performed "long-term" studies even though Ethicon relied on the best evidence available, while simultaneously heralding Ultrapro as a safer alternative in the absence of long-term studies because Dr. Rosenzweig relied on the much weaker evidence available.  That is classic hypocrisy.

Plaintiffs' attempt to distinguish this case from *Conklin v. Novartis Pharmaceuticals Corp.*, 2012 U.S. Dist. LEXIS 136428 (E.D. Tex. Sept. 18, 2012), is unavailing. The expert in *Conklin* did not, as Plaintiffs suggest, opine that "because safety is better, efficacy is necessarily better."  Rather, he offered the same type of opinion that Dr. Rosenzweig attempts to offer – a lower dose translates into fewer adverse reactions and, therefore, the lower dose is a feasible alternative design. The *Conklin* expert, just like Dr. Rosenzweig here, completely ignored the effect that a lower dose would have on the efficacy of the product.

Plaintiffs want Dr. Rosenzweig to be able to testify that a semi-absorbable mesh would reduce adverse effects while maintaining efficacy. Dr. Rosenzweig, however, admits that he lacks the necessary long-term scientific evidence to arrive at this opinion. While Dr. Rosenzweig may have one study of another product (the Okulu study from Turkey) to "suggest" that a semi-absorbable mesh could effectively treat stress urinary incontinence, that study is not a "long-term" study of the safety and efficacy of semi-absorbable mesh and, therefore, does not meet Dr. Rosenzweig's own standard for valid scientific evidence regarding the safety and efficacy of the product—the same standard he is attempting to use against Ethicon in this case.

Finally, Plaintiffs claim in their response that "[t]here are other studies that support the use of lighter-weight, larger pore meshes to treat SUI" (Doc. 2931, p. 7), but they conveniently fail to identify any portion of Dr. Rosenzweig's reports addressing these studies (which are inapposite).

## II.   The Court should preclude Dr. Rosenzweig from criticizing the cut of TVT mesh.

### A.   Dr. Rosenzweig's opinions are unreliably inconsistent.

Plaintiffs acknowledge that Dr. Rosenzweig is critical of both mechanically-cut mesh and laser-cut mesh. Dr. Rosenzweig should not be allowed to suggest to the jury that his complaints about roping, fraying, and particle loss would be assuaged by laser-cut mesh, when he believes that laser-cut mesh is less safe than mechanically-cut mesh. How can Dr. Rosenzweig be allowed to suggest to the jury in a mechanically-cut mesh case that laser-cut mesh is preferable, when he is unwilling to testify that it is safer?

This is yet another example of claims of a lack of safety based on alternatives which Plaintiffs do not claim would be feasible. Dr. Rosenzweig may not reliably suggest that the

cutting of the mesh is unsafe if he is unwilling to stand behind the other way to cut the mesh and testify that it is safer.

**B.      Dr. Rosenzweig's opinions are unreliable.**

Plaintiffs do not dispute that Dr. Rosenzweig cites no studies in support of his opinion suggesting that laser-cut mesh may be preferable in certain respects and that he has no recollection of ever implanting a patient with laser cut mesh.  Because he cannot rely on personal experience and his opinions are not based on studies, Dr. Rosenzweig's opinions simply do not pass muster under the *Daubert* standard for expert testimony.

**III.    The Court should limit Dr. Rosenzweig's product warning opinions**.

Plaintiffs do not explain how Dr. Rosenzweig's experience with IFUs is meaningfully different than the experiences of any of the other pelvic surgeons in this litigation (whether retained by Plaintiffs or Defendants).  The Court should treat Dr. Rosenzweig consistent with the way it has treated other clinicians and allow him to testify about whether specific risks appear on the IFUs but preclude him from testifying "what information should or should not be included in an IFU."  *See, e.g., In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013), *on reconsideration in part* (June 14, 2013); *In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582220, at *3 (S.D. W. Va. Sept. 1, 2016); *In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4536885, at *2 (S.D. W. Va. Aug. 30, 2016); *In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4500767, at *4 (S.D. W. Va. Aug. 26, 2016).

**IV.    The Court should preclude Dr. Rosenzweig from testifying about alleged mesh degradation and other biomaterials opinions.**

**A.      Degradation**

As an initial matter, when Dr. Rosenzweig uses the term "degradation," he is applying a meaning different from the biomaterials experts in this case. The biomaterials experts use the

term degradation to reference the potential for a change in the mesh material at a molecular, microscopic level. Dr. Rosenzweig is using the term "degradation" to describe mesh material that is broken on a macroscopic level (i.e. mesh that is allegedly broken and visible to the naked eye).

Ethicon does not argue that Dr. Rosenzweig should be prohibited from discussing his clinical observations.  Dr. Rosenzweig claims that he has removed broken mesh from patients. This is his purported clinical experience, and Ethicon will deal with those allegations on cross-examination.  What he should not be allowed to do, however, is testify that his clinical observations are related to degradation.  Dr. Rosenzweig lacks the credentials necessary to form such biomaterials opinions.

Likewise, Dr. Rosenzweig engaged in no methodology to connect his macroscopic observations to any alleged degradation. He should not be permitted to opine that his clinical observations were the result of degradation when he has done nothing to make that determination.

Although Plaintiffs claim that there are "scientific studies" that "support" Dr. Rosenzweig's opinions about degradation (Doc. 2931, p. 12), this assertion is simply incorrect. Plaintiffs' cite to three documents:  (1) Imel, A., *et al.*, In Vivo Degradation of Polypropylene Pelvic Mesh, Biomaterials (2015) ("Imel Article") [Ex. I to Doc. 2163]; (2) an internal document: Pelvic Floor Repair – Surgeon's Feed-back on Mesh Concept ("Surgeon Feedback") [Ex. J to Doc. 2163]; and (3) Jeffrey Blitstein, M.D., *et al.*, *A Novel Composite Sling for the Treatment of Stress Urinary Incontinence: First Clinical Experience*, International Congress of the European Hernia Society, presented June 22, 2001 ("Blitstein Article") [Ex. D to Doc. 2163]. Doc. 2931, pp. 12-13.  Yet, Plaintiffs do not identify in Dr. Rosenzweig's reports where he

addresses any of these documents in formulating his opinion.  As such, they may not be considered.

 In any event, none of these three documents are "scientific studies" demonstrating that alleged degradation, particle loss, or fraying causes adverse events in women. Examining the documents individually reveals, in addition, that these documents are not what Plaintiffs represent them to be.

The first paper – the Imel Study – did <u>not</u> test TVT Device or Prolene mesh. *See* Ex. I to Doc. 2163, Imel Article at 4. Rather, the Imel Article studied the performance properties of Boston Scientific Corporation's Pinnacle and Obtryx pelvic repair meshes. *Id.* More importantly, the Imel Article <u>never</u> concluded that degradation, particle loss, or fraying in the competitor products' mesh caused adverse events in women. *See generally id.*

The second document is not a "scientific study" at all. Instead, it is a collection of hearsay statements recorded in a company document. *See* Ex. J to Doc. 2163, Surgeon Feedback at 2. The document plainly states that it is a compilation of "[f]eed-back . . . obtained through conversations and interviews with 21 surgeons." *Id.* One surgeon, Dr. Hilton, commented on particle loss – not degradation or fraying – and stated that he was concerned that "[t]he small particles migrate and cause pain during intercourse." *Id.* at 8.

This is not a statement from an Ethicon employee, but rather the statement of a third-party. Plaintiffs are attempting to use it for the truth of the matter asserted. Accordingly, the statement is hearsay.  Moreover, not only is it a hearsay statement but it is opinion testimony. There is no indication in the statement regarding the methodology applied by Dr. Hilton when arriving at that opinion.

In fact, when Dr. Hilton later conducted his own scientific studies on the subject of the safety and efficacy of TVT, he concluded that the product was safe and effective.  Ex. A hereto, K. Ward & P. Hilton, *Prospective multicentre randomised trial of tension-free vaginal tape and colposuspension as primary treatment for stress incontinence*, BMJ vol. 325 (July 13, 2002); Ex. B hereto, K.L. Ward & P. Hilton, *Tension-free vaginal tape versus colposuspension for primary urodynamic stress incontinence: 5- year follow up*, BJOG (Oct. 26, 2007).

The third document cited by Plaintiffs – the Blitstein Article – did <u>not</u> study the mesh from Defendants' devices.  Ex. D to Doc. 2163, Blitstein Article at 2. Instead, it looked at a semi-absorbable mesh. *Id.* Additionally, the Blitstein article does not conclude that degradation, particle loss, or fraying leads to an adverse event. In fact, the article is silent on degradation, particle loss, and fraying. Plaintiffs cite the Court to a statement in the article regarding curling. But even then, the article does not conclude that curling leads to adverse events in women. Instead, it says that "[t]he mesh [i.e. not TVT but the semi-absorbable mesh studied] will also tend to curl acting as a non-expandable rigid circular bridge." *Id.* at 4.

As noted in Ethicon's initial brief, the Court implicitly found that Dr. Rosenzweig is unable to establish a link between alleged degradation and any clinically adverse event, reasoning that "[a] *single expert* need not provide all the pieces of the puzzle for their testimony to be useful to the jury in determining the ultimate issues in the case."  *In re: Ethicon Inc., Pelvic Repair Sys. Prod. Liab. Litig.,*  2016 WL 4500765, at *4 (S.D. W. Va. Aug. 26, 2016) (emphasis added).  Here, in response to Ethicon's motion, <u>Plaintiffs do not identify a single other expert</u> who can connect the dots and link the alleged degradation that Dr. Rosenzweig describes with clinical harm.  As such, and for the same reasons that the Court excluded these opinions by Dr. Daniel Elliott in the Wave 1 cases, the Court should exclude Dr. Rosenzweig's opinions here.

*See In re: Ethicon Inc., Pelvic Repair Sys. Prod. Liab. Litig.,* 2016 WL 4500768, at *3 (S.D. W. Va. Aug. 26, 2016).

### B.     Cytotoxicity

Conspicuously absent in Plaintiffs' response is the identification of any study relied upon by Dr. Rosenzweig connecting cytotoxicity with any clinical harm in women using Ethicon's products at issue.  Further, despite Ethicon's challenge in its initial brief, Plaintiffs could not identify any other expert retained in this litigation who can "complete the puzzle" and reliably link cytotoxicity with clinical harm.  Consequently, Dr. Rosenzweig's opinions on this topic are unreliable, irrelevant, prejudicial, and inadmissible.

### V.     The Court should preclude Dr. Rosenzweig from testifying about duties allegedly owed by a manufacturer.

Plaintiffs have conceded that Dr. Rosenzweig will not opine about testing, adverse event reporting, or training.

### VI.     The Court should preclude Dr. Rosenzweig from testifying about certain alleged complications associated with TVT-Abbrevo.

Plaintiffs ask the Court to reconsider its Wave 1 ruling and allow Dr. Rosenzweig to testify about certain alleged complications associated with TVT-Abbrevo.  Plaintiffs do not dispute that the only support for this assertion in Dr. Rosenzweig's TVT-Abbrevo report is a single internal company document. *See* Ex. D to Doc 2047, TVT-Abbrevo Report at 13; Ex. P to Doc 2047, ETH.MESH.09911296.  In their response, Plaintiffs claim that this is also supported by other sources that are not mentioned at all by Dr. Rosenzweig in his report.  *See* Doc. 2931, pp. 14-15.  There simply is far too great of an analytical gap in Dr. Rosenzweig's analysis which is not supported by reliable evidence, and the Court should make the same determination in this wave of cases as it did with the Wave 1 cases.

**VII.    The Court should exclude Dr. Rosenzweig's marketing opinions.**

Plaintiffs do not challenge the Court's exclusion of Dr. Rosenzweig's improper marketing opinions.

**VIII.   The Court should preclude Dr. Rosenzweig from testifying about MSDS sheets.**

Regardless of his lack of qualifications, neither Dr. Rosenzweig nor Plaintiffs have suggested what methodology Dr. Rosenzweig used at arriving at his opinion that a legitimate danger was presented by the information set forth in the MSDS sheets.  Indeed, Plaintiffs do not identity any scientific testing that shows that any oxidation or degradation causes any clinical harm.   Accordingly, these opinions are irrelevant, prejudicial, a waste of time, potentially confusing, and should be excluded.

**IX.    The Court should not allow other opinions that are beyond Dr. Rosenzweig's expertise and/or otherwise improper.**

Plaintiffs generally agree that the Court should extend its other rulings in the Wave 1 cases to this wave of cases, but they suggest that the Court should allow them to present evidence of irrelevant complications allegedly associated with Ethicon's devices (such as cancer) that a particular Plaintiff does not even have.  The Court should continue to apply that exclusion.  It would be highly prejudicial for Plaintiffs to be permitted to discuss inapplicable alleged complications, and Ethicon would be forced to allot valuable trial time to demonstrating that its products do not, in fact, cause complications that the Plaintiff does not even have.

**CONCLUSION**

For the foregoing reasons and those set forth in Defendants' initial briefing, Defendants respectfully request that the Court limit Dr. Rosenzweig's testimony in these cases.

Respectfully Submitted,

*/s/ Christy D. Jones*
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS  39158-6010
(601) 985-4523
christy.jones@butlersnow.com

*/s/ David B. Thomas*
David B. Thomas (W.Va. Bar #3731)
Thomas Combs & Spann PLLC
300 Summers Street
Suite 1380 (25301)
P.O. Box 3824
Charleston, WV 25338
(304) 414-1807
dthomas@tcspllc.com

COUNSEL FOR DEFENDANTS
ETHICON, INC., ETHICON LLC, AND
JOHNSON & JOHNSON

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 MDL No. 2327 |
| THIS DOCUMENT RELATES TO ETHICON WAVE 3 CASES | JOSEPH R. GOODWIN U.S. DISTRICT JUDGE |

I hereby certify that on this day I electronically filed the foregoing document with the Clerk of the Court using CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ Christy D. Jones
Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS  39158-6010
(601) 985-4523
christy.jones@butlersnow.com

/s/ David B. Thomas
David B. Thomas (W.Va. Bar #3731)
Thomas Combs & Spann PLLC
300 Summers Street
Suite 1380 (25301)
P.O. Box 3824
Charleston, WV 25338
(304) 414-1807
dthomas@tcspllc.com

COUNSEL FOR DEFENDANTS
ETHICON, INC., ETHICON LLC, AND
JOHNSON & JOHNSON

33244502v1