# Exhibit A

Joseph M. Carbone, M.D.

```
1              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
2                  CHARLESTON DIVISION
3   IN RE: ETHICON, INC., PELVIC   )  Master File No.
    REPAIR SYSTEM PRODUCTS         )  2:12-MD-02327
4   LIABILITY LITIGATION           )  MDL 2327
    _____
5   THIS DOCUMENT RELATES TO
    PLAINTIFFS:
6
    Diane Kropf
7   Case No. 2:12-cv-01202           JOSEPH R. GOODWIN
                                     U.S. DISTRICT JUDGE
8   Judy Williams
    Case No. 2:13-cv-00657
9
    Myra Byrd
10  Case No. 2:12-cv-00748
11  Angela Coleman
    Case No. 2:12-cv-01267
12
    Susan Thamen (Reeves)
13  Case No. 2:12-cv-00279
14  Donna Zoltowski
    Case No. 2:12-cv-00811
15
16
17       DEPOSITION OF JOSEPH M. CARBONE, M.D.
18                   GENERAL TVT
19             Wednesday, March 16, 2016
20                 Danville, Virginia
21                    5:18 p.m.
22
23  Reported by:  Karen K. Kidwell, RMR, CRR, CLR
24            GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
25               deps@golkow.com
```

Joseph M. Carbone, M.D.

Page 2

1          DEPOSITION of JOSEPH M. CARBONE, M.D.,
2    General TVT, a witness in the above-entitled action,
3    taken on behalf of Plaintiffs, pursuant to the
4    Federal Rules of Civil Procedures before KAREN K.
5    KIDWELL, RMR, CRR, a Certified Shorthand Reporter, at
6    Holiday Inn Express, 2121 Riverside Drive, Danville,
7    Virginia, the 16th day of March, 2016, at 5:18 p.m.
8
9              A P P E A R A N C E S
10
     ON BEHALF OF PLAINTIFFS:
11   WAGSTAFF & CARTMELL LLP
     Nate Jones, Esq.
12   Andrew N. Faes, Esq.
     4740 Grand Avenue, Suite 300
13   Kansas City, MO  64112
     816.701.1100
14   njones@wcllp.com
     afaes@wcllp.com
15
16
     ON BEHALF OF DEFENDANTS ETHICON and
17      JOHNSON & JOHNSON:
     BUTLER SNOW, LLP
18   Paul S. Rosenblatt, Esq.
     1020 Highland Colony Parkway
19   Suite 1400
     Ridgeland, Mississippi  39157
20   601.985.4596
     paul.rosenblatt@butlersnow.com
21
     and
22
     TUCKER ELLIS LLP
23   Matthew P. Moriarty, Esq.
     950 Main Avenue, Suite 1100
24   Cleveland, OH 44113
     216.592.5000
25   matthew.moriarty@tuckerellis.com

Page 3

1              I N D E X
2    WITNESS/EXAMINATION                    Page
3    JOSEPH M. CARBONE, M.D.
4      By Mr. Jones                    4
5
6              E X H I B I T S
7    Number       Description              Page
8    Carbone 1   Notice to Take Deposition of .......5
                 Joseph Carbone M.D.
9
     Carbone 2   Expert Report of Joseph ............5
10               Carbone, M.D. as it relates to
                 Wave 1 TVT Cases
11
     Carbone 3   Curriculum Vitae of Joseph M. ......6
12               Carbone, M.D.
13   Carbone 4   Joseph Carbone Reliance List, ......7
                 in Addition to Materials
14               Referenced in Report, MDL Wave 1
15   Carbone 5   Joseph M. Carbone, MD, ............8
                 Payments from Ethicon, 14
16               pages
17   Carbone 6   Joseph M. Carbone, Invoices .......24
                 for Consulting Services, 4
18               pages
19   Carbone 7   Yellow piece of paper, ...........139
                 placeholder for Flash drive,
20               Dr. Carbone's files (marked
                 but not referred to)
21
22
23
24
25

Page 4

1    WEDNESDAY, MARCH 16, 2016, DANVILLE, VIRGINIA
2              P R O C E E D I N G S
3                   -oOo-
4         JOSEPH M. CARBONE, M.D.
5    being first duly sworn, testified as follows:
6              EXAMINATION
7    BY MR. JONES:
8        Q.  Dr. Carbone, my name is Nate Jones.  I
9    represent the Plaintiffs in this matter.  Have you
10   given a deposition before?
11       A.  Yes, I have.
12       Q.  Are you familiar with how a deposition
13   generally proceeds throughout the time allotted?
14       A.  Generally, yes.
15       Q.  It's a question-and-answer system.  I ask
16   questions; you provide the answers.  If there's any
17   questions that I ask that you don't understand,
18   please tell me, and I'll do my best to rephrase the
19   question.
20          Throughout the day I'll probably ask some
21   very poorly worded questions.  So just do me a favor,
22   bear with me, be patient, and I'll do my best to
23   rephrase those in a way that might be better worded.
24       A.  Likewise.
25       Q.  Okay.  You are under oath.  You understand

Page 5

1    that, correct?
2        A.  Yes, I do.
3        Q.  We'll start off with some of the materials
4    that we've marked as exhibits for the record.
5          (Carbone 1 was marked for identification.)
6    BY MR. JONES:
7        Q.  Exhibit 1 is the notice to take
8    deposition.  Have you seen this document before?
9        A.  I believe it was sent to me earlier today,
10   yes.
11       Q.  Great.  Thanks.
12          (Carbone 2 was marked for identification.)
13   BY MR. JONES:
14       Q.  Exhibit 2 is your expert report Wave 1,
15   TVT cases.  I'll hand that to you.  Do you recognize
16   that as the report you drafted for the TVT line of
17   products in this litigation?
18       A.  Without going through it line by line.
19       Q.  Yeah.
20       A.  Yes, I do.
21       Q.  And then I believe that you signed this
22   report; is that correct?  Your signature?
23       A.  Not this report.
24       Q.  Okay.
25       A.  But a report similar to it.

Joseph M. Carbone, M.D.

1    Q.  That is your report?
2    A.  Yes.
3    Q.  Okay.  You drafted that report?
4    A.  Yes.
5    Q.  Did you have any assistance drafting that
6  report?
7    A.  No.
8    Q.  No?
9    A.  I drafted the report.
10   Q.  Did you type that report?
11   A.  Yes, I did.
12    (Carbone 3 was marked for identification.)
13  BY MR. JONES:
14   Q.  Did you -- I'll go ahead and mark now
15  Exhibit 3 which is your CV.  You already have a copy?
16   A.  Is it the same?
17   Q.  You can hold on to that.  It's the same
18  one.
19   A.  Okay.  And this is the same one here.
20   Q.  Right.
21   A.  Do you want to get this back?
22   Q.  You can have it.
23   A.  Two copies.
24   Q.  Yeah, more copies for you.
25    MR. MORIARTY:  Nate, I don't mean to

1  interrupt you so early, but you just reminded me
2  of something with this Exhibit 1.  There is a
3  case on here that I don't think is his case.  He
4  did not write the case-specific report in the
5  Zoltowski case.
6    MR. JONES:  Is he a general expert -- is
7  he a general expert in that case?  He is.
8  That's why that case is on there.  But I get
9  you.  He didn't draft the case-specific.  Thanks
10  for pointing that out.  He is a general expert.
11    Here's the reliance list, marked as
12  Exhibit 4.
13    (Carbone 4 was marked for identification.)
14  BY MR. JONES:
15   Q.  Okay.  Do you recognize this?
16   A.  Yes.
17   Q.  Okay.  Did you prepare that reliance list?
18   A.  Yes.
19   Q.  Okay.  Did you type up that reliance list?
20   A.  No.
21   Q.  Who typed up that reliance list?
22   A.  Legal counsel.
23   Q.  Okay.  But you did prepare that?
24   A.  Yes.
25   Q.  Okay.  And those -- what is it that --

1  what is your understanding of what is included on
2  that reliance list marked as Exhibit 4?
3    A.  They're the materials that I reviewed in
4  preparation for this deposition.
5    Q.  Sure.  So if an attorney like myself wants
6  to go and look at the materials that you're relying
7  on in this case for your opinions, I should go and
8  look at the reliance list marked as Exhibit 4,
9  correct?
10   A.  Yeah.
11   Q.  Okay.  Is Exhibit 5 you brought with you
12  today, and it's titled "Joseph M. Carbone M.D.,
13  Payments from Ethicon."  I'm going to hand that to
14  you.  It's only one copy.  Did I read that correctly,
15  the title of Exhibit 5?
16   A.  Yes.
17    (Carbone 5 was marked for identification.)
18  BY MR. JONES:
19   Q.  And is it your understanding that the
20  table presented in Exhibit 5 represents the total
21  amount of payments Ethicon has paid you as a
22  consultant?
23    MR. MORIARTY:  Objection.
24    THE WITNESS:  Could you rephrase?
25

1  BY MR. JONES:
2    Q.  Sure.  What does Exhibit 5 represent?
3    A.  The 1099 -- the 1099s from Ethicon.
4    Q.  Okay.  And Exhibit 5 represents the amount
5  of payments you received from Ethicon by year acting
6  as a consultant other than litigation consulting
7  work, correct?
8    A.  Yes.
9    Q.  Okay.  And on some of these columns on
10  Exhibit 5, it says, "Do not have 1099."
11    Is it your understanding that you've
12  looked and Ethicon has looked and the 1099 can't be
13  found for those years?
14    MR. MORIARTY:  Objection.  Form.
15    THE WITNESS:  I've looked for the 1099s.
16  BY MR. JONES:
17   Q.  You've looked for those 1099s and you
18  can't find them?
19    A.  That is true.
20   Q.  You don't know one way or the other
21  whether Ethicon has looked for those 1099s?
22    A.  I don't know one way or the other.
23   Q.  Have you asked Ethicon for this
24  information?
25    A.  I have not.

Joseph M. Carbone, M.D.

Page 10

1    Q.  Have you asked Ethicon at all to help you
2  tally the total amounts of payments they've paid you
3  as a consultant outside of litigation?
4    A.  I have not.
5    Q.  So this is just the work that you've done?
6    A.  Yes.
7    Q.  And you haven't asked anybody else to
8  assist you with this?
9    A.  I asked my wife and my accountant.
10    Q.  But not Ethicon?
11    A.  Yup.
12    Q.  Okay.  If we wanted to fill in some of
13  this missing information that you don't have 1099s
14  for, do you think Ethicon would have that information
15  on file?
16    MR. MORIARTY:  Objection.
17    THE WITNESS:  I wouldn't know.
18  BY MR. JONES:
19    Q.  You wouldn't know?  Every time you got
20  paid for Ethicon, did you invoice Ethicon?
21    A.  To the best of my recollection, yes.
22    Q.  Okay.  And so Ethicon, then, would have
23  those invoices, correct?
24    A.  I would assume so.
25    Q.  Okay.  And so one way to figure out the

Page 11

1  exact total of payments by year would be to ask
2  Ethicon for those invoices that you submitted to
3  them?
4    A.  If they have them, yes.
5    Q.  Okay.  If they have them, that would be a
6  good way of totaling up the payments?
7    A.  If they have them.
8    Q.  Okay.  How did you go about totaling the
9  payments when you didn't have a 1099?
10    A.  At the time I had a 1099.  The -- I
11  submitted it to my accountant.  He submitted it for
12  his taxes.  And, unfortunately, I don't know what he
13  did with the 1099.
14    Q.  But the information is based on what you
15  believe is from a 1099 that no longer is in your
16  possession or you're able to get?
17    A.  Yes.
18    Q.  Okay.  Did you ask the IRS to send you
19  copies of these 1099s?
20    MR. MORIARTY:  Objection.
21    THE WITNESS:  No.
22  BY MR. JONES:
23    Q.  Just roughly, it looks like the first year
24  you acted as a consultant for Ethicon was in 2003,
25  correct?

Page 12

1    A.  According to the records, yes.
2    Q.  You didn't do any work for Ethicon prior
3  to 2003?
4    A.  Not to my recollection.
5    Q.  Okay.  And if Ethicon has records that
6  indicate you did work for them prior to 2003, would
7  you disagree with those records?
8    A.  I would have no reason to disagree.
9    Q.  Okay.  And between the -- did you do any
10  work for Ethicon in 2013?
11    A.  I don't -- I don't recall, but I don't
12  believe so.
13    Q.  Okay.  But according to your accountant,
14  there is no records of any payments from Ethicon to
15  you in 2013?
16    A.  According to my accountant.
17    Q.  Okay.  How about 2014?
18    A.  No.  Same -- same story.
19    Q.  Same story.  No payments from Ethicon to
20  you, according to your accountant, in 2014?
21    A.  According to my accountant.
22    Q.  How about 2015?
23    A.  Same story.
24    Q.  Same story?
25    A.  (Nodding head up and down.)

Page 13

1    Q.  Okay.  I take it that you anticipate
2  payments from Ethicon in 2016 related to litigation
3  consulting work?
4    A.  Does Ethicon pay me?
5    Q.  Do you know one way or the other whether
6  you anticipate payments from Ethicon for your
7  litigation consulting work in 2016?
8    A.  Ultimately, if Ethicon is the one that
9  pays through the lawyers' office, yes.
10    Q.  Okay.
11    A.  I don't know whether it goes from -- comes
12  from the lawyer or straight from Ethicon.  I don't
13  know.
14    Q.  Have you totaled the amount of payments,
15  starting in 2003 and ending in 2012, from Ethicon to
16  you in your role as a consultant?
17    A.  No.  I just got you the sheet.
18    Q.  Okay.  It looks like, a rough estimate,
19  it's going to be around a half a million dollars.  Is
20  that fair?
21    A.  If that's what the sheet says.
22    Q.  Okay.  We'll add it up over break, get an
23  exact number.
24    A.  Sure.  Okay.
25    Q.  So it's fair to say from the year --

Joseph M. Carbone, M.D.

Page 14

1  strike that.
2       It's fair to say, starting in the year
3  2003 through the year 2012, you had a relationship
4  with Ethicon as a consultant physician, correct?
5       A.  Yes.
6       Q.  And it's fair to say from -- starting in
7  the year 2003 through the year 2012, for each of
8  those years, you received payments from Ethicon for
9  your role as a consultant physician, correct?
10      A.  Correct.
11      Q.  It's fair to say, between the years 2003
12 to 2012, every single one of those years, you
13 performed work for Ethicon as a consultant physician,
14 correct?
15      A.  Correct.
16      Q.  It's fair to say before you agreed to be a
17 litigation consultant for Ethicon, you had a ten-year
18 relationship with Ethicon in your role as a
19 consultant physician, correct?
20      A.  2003 till when?
21      Q.  To the end of 2012.
22      A.  Yes.
23      Q.  Do you know how many days -- have you
24 tracked -- strike that.
25      Have you tracked at all how many days out

Page 15

1  of the year on average you do consultant work for
2  Ethicon?
3       A.  No.
4       Q.  You don't know one way or the other how
5  many days in the calendar year 2010 you spent
6  consulting with Ethicon?
7       A.  No.
8       Q.  If someone, perhaps a juror, wanted to
9  know how many calendar days you spent in 2010
10 consulting with Ethicon, would there be a way for
11 them to find that information out?
12      MR. MORIARTY:  Objection.  Go ahead.
13      THE WITNESS:  I wouldn't know.
14 BY MR. JONES:
15      Q.  Okay.  So that's not information you have
16 at access?
17      A.  No.
18      Q.  Is it fair to say that, in your consulting
19 work between the years 2003 and 2012 for Ethicon,
20 some of the events you conducted for Ethicon were
21 marketing events?
22      A.  Yes.
23      Q.  Is it fair to say that, between the years
24 2003 and 2012 in your consulting work for Ethicon,
25 some of your work involved the promotion of Ethicon

Page 16

1  products?
2       MR. MORIARTY:  Objection.
3       THE WITNESS:  How are you defining
4  "promotion"?
5  BY MR. JONES:
6       Q.  We'll say -- how would you define it?
7       A.  Well, if you're saying that I'm endorsing
8  Ethicon products, I did not.  But that's -- I mean,
9  that's what I take from "promotion."
10      Q.  I will -- let's agree that endorsing the
11 products is not included at all in my question when I
12 use the word "promote."
13      A.  Okay.  You just asked me.
14      Q.  Okay.  So having -- now knowing that, is
15 it fair to say, within the years 2003 to 2012 in your
16 role as a consultant for Ethicon, at some point your
17 role included promoting the use of Ethicon products?
18      MR. MORIARTY:  Objection.  Form.
19      THE WITNESS:  Well, again, we struck only
20 one definition of "promotion."  So I can't state
21 until you actually define it for me in a
22 positive manner what "promotion" means, not in
23 an absence of one thing.
24 BY MR. JONES:
25      Q.  Okay.  How about we define it just by the

Page 17

1  dictionary, how it defines it.  Does that work for
2  you?
3       A.  I'm okay with that.  Sure.
4       Q.  Okay.  I'll ask the same question again
5  using the dictionary meaning of "promote."
6       A.  Thank you.
7       Q.  Okay.  Is it fair to say, within 2003 to
8  2012 in your role as a consultant for Ethicon, at
9  some point in time your role as a consultant for
10 Ethicon included promoting the use of Ethicon
11 products?
12      MR. MORIARTY:  Objection.
13      THE WITNESS:  What's the dictionary
14 definition?
15 BY MR. JONES:
16      Q.  "Further the progress of, support or
17 actively encourage."
18      A.  "Actively encourage" I would take issue
19 with.
20      Q.  Okay.  Between the years 2003 to 2012 in
21 your role as a consultant for Ethicon, you never
22 actively encouraged the use of Ethicon products?
23      A.  No.
24      Q.  Okay.  Between the years -- strike that.
25      Did you ever work as a consultant for any

Joseph M. Carbone, M.D.

Page 18

1 other mesh companies?
2    A.  No.
3    Q.  So from the years starting in the year
4 2003 all the way up to today, March 16th, 2016,
5 you've never acted as a consultant physician for any
6 mesh company other than Ethicon, correct?
7    A.  What was the time frame again?
8    Q.  Any time frame.  It was 2003 to today.
9    A.  That I haven't -- I'm sorry.  The
10 negatives are getting me.
11    Q.  How about this?  Have you ever acted as a
12 consultant for any other mesh company besides
13 Ethicon?
14    A.  No.
15    Q.  All right.  It's fair to say that the only
16 mesh company you've ever consulted for is Ethicon?
17    A.  Yes.
18    Q.  Okay.  Have you -- do you currently have
19 any consulting relationships with any companies?
20    A.  Any companies?
21    Q.  Any companies.
22    A.  Yes.
23    Q.  Can you name those companies for us?
24    A.  I believe the one company currently I have
25 a consulting relationship with is Astellas

Page 19

1 Pharmaceuticals.
2    Q.  What's the nature of that consulting role?
3 What are you doing for Astellas?
4        MR. MORIARTY:  Objection.  If there's a
5 secrecy agreement you have to --
6        THE WITNESS:  Oh, I appreciate that.
7 Thank you.
8        MR. MORIARTY:  -- give it the vaguest --
9 give him the vaguest description.
10        THE WITNESS:  I speak for them.  Leave it
11 at that.
12 BY MR. JONES:
13    Q.  Okay.  Can you tell us what product -- how
14 about this?  Strike that.
15        Is there a certain product that's the
16 focus of your consulting role with this company?
17    A.  Yes.
18    Q.  Okay.  Can you tell us the product?  I
19 don't want you to get in any trouble with any secrecy
20 agreements, confidentiality stuff, but having said
21 that, if you're out speaking about it.
22    A.  I don't know that I will get in trouble
23 with anybody.  Having said that, I don't know.
24    Q.  Don't --
25    A.  Don't go there.  Okay.

Page 20

1    Q.  It's not that important.
2    A.  Okay.
3    Q.  Astellas, where are they located?
4    A.  I don't know.  They move around a lot.
5    Q.  Do they -- how did you get involved with
6 Astellas?
7    A.  I see patients that -- I see patients with
8 the condition that their product is designed to
9 treat.
10    Q.  Okay.  Did they contact you or did you
11 contact them?
12    A.  They contacted me.
13    Q.  And I assume you signed -- you're under --
14 you signed an agreement or contract with Astellas to
15 be a consultant for them?
16    A.  I did.
17    Q.  Part of your role as a consultant for
18 Astellas, you go out and you speak about a product
19 that they market, correct?
20    A.  I speak more on the condition that their
21 product treats.
22    Q.  In your role as a consultant for Astellas,
23 when you go out and you do these speaking
24 engagements, what is your hourly rate?
25    A.  I don't know.

Page 21

1    Q.  Okay.  It's fair to say Astellas is paying
2 you in your role as a consultant for them?
3    A.  Yes, sir.
4    Q.  Okay.  You don't know, as you sit here
5 today, what -- what that rate is, but you do know
6 they're paying you money?
7    A.  Yes.
8    Q.  Okay.  Any other companies that you're
9 currently acting as a consultant physician for?
10    A.  No.
11    Q.  Okay.  So we have Astellas; we have
12 Ethicon.  Any other companies besides Astellas and
13 Ethicon that you've acted as a consultant for over
14 the course of your career as a doctor?
15    A.  Yes.
16    Q.  What companies?
17    A.  Pfizer.  Ortho-McNeil.  Watson
18 Pharmaceuticals.  I'm sure I'm leaving some out, but
19 it's been a long time.
20    Q.  As you sit here today, you recall that the
21 names of companies including Astellas, Ethicon,
22 Pfizer, Watson Pharmaceuticals, and Ortho-McNeil as
23 companies you've acted as a consultant for in your
24 career as a doctor?
25    A.  Yes.

Joseph M. Carbone, M.D.

Page 22

1    Q.  There may be others that you just don't
2  recall today?
3    A.  Yes.
4    Q.  Okay.  What type of work do you do for
5  Pfizer?
6    A.  Again, at the risk of not -- well,
7  currently, I don't do any work for Pfizer.
8    Q.  What type of work did you do for Pfizer?
9    A.  I was a speaker.
10    Q.  When you were a consultant for Pfizer, you
11  would be paid money for speaking engagements,
12  correct?
13    A.  Yes.
14    Q.  As you sit here today, do you recall how
15  much Pfizer paid you for your work as a consultant?
16    A.  No.
17    Q.  I'm going to ask the same questions for
18  the other companies, exact same questions.
19    A.  Okay.
20    Q.  Is it fair to say in your role as a
21  consultant for Ortho-McNeil you did speaking
22  engagements which Ortho-McNeil paid you money for?
23    A.  Yes.
24    Q.  As you sit here today, you don't know how
25  much Ortho-McNeil paid you in your role as a

Page 23

1  consultant, correct?
2    A.  No.
3    Q.  Correct that in your role as a consultant
4  for Watson Pharmaceutical, you did speaking
5  engagements which Watson Pharmaceutical paid you
6  money for, correct?
7    A.  Correct.
8    Q.  As you sit here today, you just don't
9  recall how much Watson Pharmaceutical paid you for
10  your role as a consultant for them, correct?
11    A.  Correct.
12    Q.  Have you ever acted as a consultant for
13  Medtronic?
14    A.  Yes.
15    Q.  What do you do for Medtronic or what did
16  you do for Medtronic?
17    A.  I apologize.  I withdraw that.  No, I was
18  not a consultant.
19    Q.  Okay.
20    A.  I apologize.
21    Q.  You've never acted as a consultant
22  physician for the company Medtronic over your course
23  of your medical career, correct?
24    A.  Not that I recall.
25    Q.  Do you do any work with InterStim device?

Page 24

1    A.  I -- yes.
2    Q.  Have you acted as a consultant with the
3  company that markets InterStim?
4    A.  I don't remember.
5    Q.  You think if you asked your accountant
6  what companies you've acted as a consultant for over
7  the course of your medical career and been paid by
8  those companies in your role as consultant, they
9  would have, he or she, would have an answer for you?
10    MR. MORIARTY:  Objection.
11    THE WITNESS:  Yes.
12  BY MR. JONES:
13    Q.  Okay.  Move on to Exhibit 6, which you
14  kindly brought with you today, which there's only one
15  copy so we'll look at it together.  It's titled
16  "Invoice for Consulting Services," correct?
17    A.  Yes.
18    (Carbone 6 was marked for identification.)
19  BY MR. JONES:
20    Q.  It's fair to say Exhibit 6 represents the
21  invoices you've billed for your work as your role as
22  a litigation consultant for Ethicon, correct?
23    A.  Again, I was under the understanding I was
24  working for the drug legal firm.  But I guess if I'm
25  working for Ethicon, as you say, then yes.

Page 25

1    Q.  Is it fair that Exhibit 6 represents
2  invoices that you've billed for your litigation
3  consulting work in this transvaginal mesh litigation?
4  These are the invoices for your expert consulting
5  work, correct?
6    A.  Yeah.
7    Q.  Okay.  But for the missing Prolift invoice
8  that we're going to get and add to Exhibit 6,
9  correct?
10    A.  Yes.
11    Q.  Okay.  Have you totaled these up?
12    A.  Nope.
13    Q.  Okay.  We'll do that on break.
14    How many total hours have you spent in
15  your role as a litigation consultant for Ethicon?
16    A.  That's an interesting question.  How many
17  hours have I spent reviewing all the materials or how
18  many hours have I billed?
19    Q.  Both.
20    A.  I spent a lot more hours reviewing the
21  materials than what I billed.
22    Q.  Okay.  How many?
23    A.  A lot.
24    Q.  A lot?
25    A.  A lot.

Joseph M. Carbone, M.D.

Page 26

1   Q.  More than what you billed for?
2   A.  Yeah.
3   Q.  So if we look at the invoices, we total
4  up all the hours, including with the missing invoice
5  that wasn't brought today, we'll know the total
6  amount of hours you've billed, correct?
7   A.  We'll know the total amount of hours that
8  I've billed, yes.
9   Q.  And then you're saying that you spent more
10 working on the case above and beyond the hours that
11 you've actually billed, correct?
12   A.  Oh, yes.
13   Q.  Okay.  And if we double the amount of
14 hours that you billed?
15     MR. MORIARTY:  Objection.
16 BY MR. JONES:
17   Q.  I just want a general idea of the total
18 amount of time you spent on the case.
19   A.  When I reviewed these articles -- I've
20 been reviewing this material since I was introduced
21 to the mesh in 1998.  So the body of my professional
22 career was spent reviewing these materials.  And in
23 that way, I've been reviewing these materials for
24 over 20 years.
25   Q.  Okay.

Page 27

1   A.  So I would submit that I spent a career of
2  preparing to answer the questions you may ask me.
3   Q.  Okay.  You've spent close to 20 years
4  reviewing materials in support of your opinions in
5  this litigation?
6     MR. MORIARTY:  Objection.  Form.
7     Go ahead.
8     THE WITNESS:  Not continuously.
9  BY MR. JONES:
10   Q.  Okay.  For the past 20 years off and on,
11 you've reviewed -- you have reviewed materials that
12 support your opinions in this litigation?
13   A.  I've read.  I've gone to CME.  I've talked
14 with other clinicians.  I've presented.  I've been
15 involved in -- I've operated.  My knowledge, my
16 training, my experience, my review of the literature,
17 my interaction with other colleagues, all that is the
18 sum of what has gone into, and more -- I'm sure I'm
19 not touching on everything -- is the sum of what I
20 drew upon, if you will, to determine my opinions.
21   Q.  Okay.  And does that include review of the
22 medical literature?
23   A.  Yes.
24   Q.  Okay.  So over the course of the past 20
25 years off and on, you've reviewed medical literature

Page 28

1  related to the topics in your report that you've
2  written, correct?
3   A.  Off and on, yes.
4   Q.  And do you continue to keep up to date
5  with the medical literature on these subjects?
6   A.  I try.
7   Q.  You try?
8   A.  (Nodding head up and down.)
9   Q.  When's the last time you did a literature
10 review?
11   A.  Read an article?
12   Q.  Sure.
13   A.  I read an article last week.
14   Q.  Okay.  What article was that?
15   A.  There was an article -- well, last week I
16 reviewed the article, the Schimph article.
17   Q.  Okay.  How did you find that article?
18   A.  I reviewed it -- well, I had reviewed it
19 in the past in my general reading, and then I
20 reviewed in preparation for this litigation.
21   Q.  Was that article sent to you by Ethicon?
22   A.  Originally, no.
23   Q.  Eventually, Ethicon sent you that article,
24 though?
25   A.  Eventually it was in the materials that

Page 29

1  they sent to me, yes.
2   Q.  Okay.  When's the last time you read an
3  article that Ethicon didn't give you?
4     MR. MORIARTY:  Objection.
5     THE WITNESS:  I read an article -- I
6  probably read an article, again, last week.
7  BY MR. JONES:
8   Q.  Okay.  What article was that?
9   A.  I don't remember.
10   Q.  You don't remember the article you read
11 last week?
12   A.  I don't remember the article I read last
13 week.
14   Q.  So it's fair to say that, when you're
15 keeping up to date with the literature, just because
16 you read an article last week doesn't mean that
17 you're going to recall it on the spot the next week,
18 correct?
19   A.  Repeat your question?
20   Q.  Sure.  You read an article last week.
21   A.  Okay.
22   Q.  You don't recall what the title of the
23 article was today, correct?
24   A.  I don't recall what the title of the
25 article was today, no.

Joseph M. Carbone, M.D.

Page 30

1  Q.  Do you recall what the subject matter of
2  the article was?
3  A.  The subject matter was urodynamics.
4  Q.  Okay.  Do you recall the conclusion?
5  A.  The conclusion was something about --
6  something about patients' anxiety in the setting and
7  affecting the outcomes.
8  Q.  Okay.  Did you read any other articles,
9  besides that one article last week, that Ethicon did
10  not provide you?
11      MR. MORIARTY:  Objection.
12      THE WITNESS:  I don't remember.
13  BY MR. JONES:
14  Q.  Okay.  Do you -- what's your normal
15  customary practice in reviewing medical literature?
16  A.  I received -- I receive journals from
17  Neurourology and Urodynamics.  I receive journals
18  from the Journal of Urology.  I receive the Gold
19  Journal.  I receive some Clinical Review,
20  Contemporary Review, some AUANews, some AUA Updates.
21  And I review them from time to time.
22  Q.  Okay.  So it's fair to say that the
23  journals and newsletters you just listed are ones
24  that you regularly receive?
25  A.  Yes.

Page 31

1  Q.  Okay.  And you may not read them all, but
2  you try to keep up to date on those journals?
3  A.  As best I can.
4  Q.  Okay.  And you consider all of those
5  journals a reasonable authority in your field?
6      MR. MORIARTY:  Objection.  Form.
7      Go ahead.
8      THE WITNESS:  More some than others.
9  BY MR. JONES:
10  Q.  Which ones more so than others?
11  A.  I feel that Neurourology and Urodynamics
12  is one that I feel is authoritative, the Journal of
13  Urology, the Gold Journal.  Some of the other ones,
14  some of the review ones, maybe not so much --
15  Q.  Okay.
16  A.  -- depending on the level of evidence that
17  they present and the articles that they accept.
18  Q.  Sure, sure.  Meaning not all peer-reviewed
19  journal articles are created equal?
20  A.  Correct.
21  Q.  Okay.  Some you might give more weight to
22  than others?
23  A.  Correct.
24  Q.  Based on the methodology used in the
25  article, correct?

Page 32

1  A.  Well, what do you mean by "methodology"?
2  Q.  Based on the authors of the articles.  Is
3  that one thing you take into account?
4  A.  No, not necessarily.
5  Q.  Okay.  Do you take into account the
6  conflict of interest of the articles, of the authors
7  in the articles?
8  A.  Not necessarily.
9  Q.  Okay.  Do you -- when you read a journal
10  article, do you take note whether the authors have a
11  conflict of interest or not?
12  A.  Not necessarily.
13  Q.  Okay.  Why not?
14  A.  I'm looking for articles that adhere to
15  the highest scientific rigor.  I think it's
16  considered Level 1 evidence, randomized control
17  trials.  You know, again, the design -- it not
18  necessarily the methodology, but the design of the
19  study is paramount.
20  Q.  So if you're looking at a journal article,
21  the number one thing you're looking at is the design
22  of the underlying trial or study that's being
23  reported in that article?
24  A.  Rephrase that?  Restate that again?
25  Q.  Sure.  The primary issue you're looking at

Page 33

1  when you review a journal article is the design of
2  the study or trial reported in the article?
3  A.  The primary -- it's not the sole, but it's
4  the primary.
5  Q.  So yes?
6  A.  Yes.
7  Q.  Okay.  Randomized control trials are
8  Level 1 type of evidence, correct?
9  A.  Yes.
10  Q.  Randomized control trials are the highest
11  level of evidence, correct?
12  A.  We now have systematic reviews that fit
13  into the highest level -- Level 1 evidence.  So it's
14  a matter of -- well, they're Level 1 evidence.  Let's
15  leave it at that.
16  Q.  Okay.  When you review a journal article
17  and you do happen to take note that one of the
18  authors has a conflict of interest, does that factor
19  in of how you view the conclusions of the article?
20      MR. MORIARTY:  Objection.
21      THE WITNESS:  If it is a well-designed
22      Level 1 study, then no.
23  BY MR. JONES:
24  Q.  If the journal article is reporting on a
25  study that is not Level 1 evidence and the author has

Joseph M. Carbone, M.D.

Page 34

1 a conflict of interest, how does that factor into how
2 you view the conclusions in the article?
3        MR. MORIARTY:  Objection.  Form.
4        Go ahead.
5        THE WITNESS:  Repeat the question.
6 BY MR. JONES:
7     Q.  Sure.
8     A.  Because I want to make sure I answer it
9 specifically for you.
10    Q.  Sure.  When the article reports on a study
11 or trial that is not Level 1 evidence and one of the
12 authors has a conflict of interest, how does that
13 factor into how you view the conclusions in the
14 article?
15       MR. MORIARTY:  Objection.  Form.
16       Go ahead.
17       THE WITNESS:  I view the study as a
18 non-Level 1 study.  So I guess my best answer
19 for you is studies don't exist in a vacuum.  And
20 regardless of the author, you got to compare a
21 level -- a low-level study -- this is called
22 low-level study -- to a high-level study
23 regardless of the author, regardless of their
24 relationship, and just look at the methodology,
25 the conclusions, and is it a Level 4 study?  If

Page 35

1 it's a level 4 study, you don't weight it as
2 high as a Level 1 study.  And, you know, the
3 method -- the method is the key.
4        So I don't know how to answer your
5 question.
6 BY MR. JONES:
7     Q.  Do -- is it fair to say that when you
8 review a journal article, you do note whether the
9 authors have a conflict of interest or not?
10       MR. MORIARTY:  Objection.  Form.
11       Go ahead.
12       THE WITNESS:  It's written there.  Yeah, I
13 read it.
14 BY MR. JONES:
15    Q.  Past that, it doesn't factor in at all?
16    A.  I guess I got to answer the same way.
17 Past that, I got to look at the data and the method
18 by which the data has been analyzed.
19    Q.  Okay.  Brings up a good point.  Is it
20 important to know how the data's been analyzed when
21 you review a journal article?
22    A.  That it conforms to a Level 1 standard,
23 that's what I want to know.
24    Q.  If it hasn't conformed to a Level 1
25 standard, what does that mean to you as a -- someone

Page 36

1 holding themselves out as an expert in this
2 litigation?
3     A.  Well, it means that I don't put as much
4 weight in a Level 4 study, or a low-level study, than
5 I do a high-level study.
6     Q.  Is -- are studies that are not, as you
7 call them, Level 1 evidence low-level studies?
8     A.  I'm sorry?
9     Q.  Are studies that are not Level 1 evidence
10 low-level quality of studies?
11       MR. MORIARTY:  Objection.
12       THE WITNESS:  Well, it's a spectrum.  So I
13 can't -- you know, it's not a dichotomy.  So I
14 would say lower.
15 BY MR. JONES:
16    Q.  Okay.  Are you familiar with the concept
17 of milestone payments?
18    A.  I'm sorry?
19    Q.  Are you familiar with the concept
20 milestone payments in the context of study -- studies
21 and trials and analyzing data?
22    A.  No, I'm not familiar with that.
23    Q.  You've never heard the term "milestone
24 payment"?
25    A.  I have not.

Page 37

1     Q.  I want to turn back to your reliance list,
2 go over some specific things that you've listed on
3 your reliance list.  I want you to turn to the very
4 last page.
5     A.  I don't have a copy of it.
6     Q.  Sorry.  Your attorney stole it from you.
7 Last page titled "Expert Reports."
8     A.  Yes.
9     Q.  Okay.  And you've listed one, two, three,
10 four, five, six, seven, eight, nine, ten, 11, 12, 13,
11 14, 15, 16, 17 expert reports from plaintiff experts
12 that you've reviewed, correct?
13    A.  Yes, sir.
14    Q.  And did you review all of those?
15    A.  At one point or another, I did.
16    Q.  Okay.  And you read them from start to
17 finish?
18    A.  At one point or another I did.
19    Q.  Okay.  And did you review -- you
20 understand that those reports have reliance lists as
21 well, like yours, as well?
22    A.  I imagine they do.
23    Q.  And did you review all of the reliance
24 materials on their reliance list as well as the
25 reports?

Joseph M. Carbone, M.D.

Page 38

1    A.  No.
2    Q.  Okay.  So when you reviewed these expert
3  reports, you just read the report; you didn't review
4  the underlying reliance materials that they
5  submitted.  Correct?
6    A.  Correct.
7    Q.  Okay.  How long did it take you to review
8  these 17 expert reports?  Estimate.
9    A.  Couple of days.
10    Q.  Couple days?
11    A.  Yeah.
12    Q.  So the guesstimate is 16 hours?
13    A.  Over a period of days, yeah.
14    Q.  Okay.  So roughly speaking, 16 hours to
15  review these 18 reports?
16    A.  I'd say probably about 18 to 20 if you
17  give an hour a report, yeah.
18    Q.  How about 15 to 20 hours?  Is that fair?
19    A.  Fair enough.
20    Q.  Okay.  15 to 20 hours reviewing these 18
21  plaintiff expert reports, correct?
22    A.  Correct.
23    Q.  How much time did you spend drafting your
24  report, your TVT report?
25    A.  Drafting, I believe --

Page 39

1    MR. MORIARTY:  Exhibit --
2    MR. JONES:  The invoices?
3    MR. MORIARTY:  6.
4  BY MR. JONES:
5    Q.  You got an answer for me?
6    A.  I think around five hours.
7    Q.  Five hours drafting the TVT report.  How
8  many hours drafting Prolift report?  Keep in mind,
9  Doctor, that's just what you billed for, not what you
10  actually did.
11    A.  Right.
12    Q.  So don't short-change yourself.
13    A.  I probably say about the same.
14    Q.  Okay.  Five hours for your Prolift report.
15  How much time for -- how many case-specific reports
16  have you drafted?
17    A.  Five.
18    Q.  Five?  Did Ethicon ask you to work on any
19  other cases besides those five?
20    A.  No.
21    Q.  So Ethicon only asked you to work on five
22  cases, correct?
23    A.  Correct.
24    Q.  And you agreed to work on five cases?
25    A.  Correct.

Page 40

1    Q.  And you drafted a report in each of those
2  five cases specific to those plaintiffs, correct?
3    MR. MORIARTY:  Objection.  Objection.
4    THE WITNESS:  Repeat it again?
5  BY MR. JONES:
6    Q.  For each of those five cases, you wrote a
7  report, correct?
8    MR. MORIARTY:  Objection.
9  BY MR. JONES:
10    Q.  Where you reviewed their medical records?
11    A.  Yeah.
12    Q.  You wrote a case-specific report in each
13  of those five cases?
14    MR. MORIARTY:  Objection.
15  BY MR. JONES:
16    Q.  Yes?
17    A.  Yes.
18    Q.  Yes.  Okay.  How much time did you spend
19  writing those five case-specific reports?
20    A.  Less time than the --
21    MR. MORIARTY:  Do you want him to look at
22    the invoices or just give it off the top of his
23    head?
24    THE WITNESS:  Two or three hours.
25  BY MR. JONES:

Page 41

1    Q.  Two or three hours?
2    A.  Not as much as the general reports.
3    Q.  Okay.  For those five.  Okay.  How much
4  time reviewing the materials that Ethicon sent you?
5    A.  Including these?
6    Q.  Everything.  Everything Ethicon sent you.
7  We're taking out the -- the time that you spent
8  reviewing the expert reports, we're taking out the
9  time you spent drafting your TVT report, your Prolift
10  report, and your case-specific reports.
11    A.  Wait, wait.  What are we taking out?
12    Q.  Okay.  We're --
13    A.  I'm just trying to --
14    Q.  Yeah.  I know.
15    A.  It's a lot of math here.
16    Q.  I know.  I told you.  I warned you at the
17  beginning I was going to do a horrible job.
18    A.  All right.  I'm with you.
19    Q.  So we've got nailed down 15 to 20 hours
20  reviewing expert reports of plaintiff experts.  Okay?
21    A.  Which were part of the --
22    Q.  Your big review.
23    A.  Well, in addition to some of the case
24  reports.
25    Q.  Okay.

Joseph M. Carbone, M.D.

## Page 42

1    A.  That was included in some of the review of
2  case reports.
3    Q.  Okay.
4    A.  Okay.  I'm with you.  So 16 is there.
5    Q.  All right.
6    A.  Keep going.
7    Q.  Everything else that Ethicon sent you, how
8  much time did you spend reviewing that?
9    A.  Well, it's hard to say because a lot of
10  the articles I had seen before.  So not a vast amount
11  of time.  I don't know.  Those materials back there,
12  I was able to go through relatively quickly.  I'd say
13  three or four hours looking through them, with the
14  understanding that a lot of them I had already seen.
15    Q.  Okay.  And you're talking about medical
16  literature primarily?
17    A.  That was all medical literature.
18    Q.  All medical literature.  Did you review
19  any internal Ethicon documents?
20    A.  Some of it is.
21    Q.  Some?
22    A.  Yeah.
23    Q.  Okay.  How many?
24    A.  Not -- a minority.
25    Q.  Very small amount of internal Ethicon

## Page 43

1  articles for you to review?
2    A.  A minority.  How do you define "very
3  small," right?
4    Q.  Did you review more than 100 internal
5  documents?
6    A.  No.
7    Q.  Did you review more than 50?
8    A.  I don't think so.
9    Q.  Okay.  If you want -- I think I've looked
10  at your reliance list.  There's about 10 --
11    A.  Yeah.
12    Q.  -- 10 --
13    A.  Yeah.
14    Q.  So 10 or 15 internal documents, okay.
15    A.  Yeah.  Not many at all.
16    Q.  Just so the record -- you reviewed a total
17  of 10 to 15 internal Ethicon documents, correct?
18    A.  See the reliance list.  Yeah.
19    Q.  Fair to say that the bulk of the materials
20  that you're relying on for your opinions in this case
21  come from the medical literature and your clinical
22  experience, correct?
23    A.  My knowledge, my training, my experience,
24  the medical literature, my interaction with
25  physicians, the totality of my career.

## Page 44

1    Q.  But not the internal Ethicon corporate
2  documents?
3    A.  No.
4    Q.  Okay.  Do you know -- did you review any
5  internal Ethicon design documents?
6    A.  I'm sure I may have or may have not.  I
7  don't recall specific Ethicon -- what did you say?
8    Q.  How about, did you review the design
9  specifications for any of the products that we're
10  discussing here today?
11    A.  I don't remember specifically.
12    Q.  As you sit here today, you don't have any
13  recollection reviewing the design specifications for
14  the TVT line of products for the Prolift, correct?
15    A.  I do not have any specific recollection of
16  those things.
17    Q.  Do you know what a -- do you know what --
18  who the company MedScan is?
19    A.  MedScan?  No.
20    Q.  Do you know who Provincia is?
21    A.  No.
22    Q.  Do you know what an FMEA is?
23    A.  FEMA?
24    Q.  FMEA.
25    A.  Oh, FMEA.  No.

## Page 45

1    Q.  Okay.  Do you know what a DDSA is?
2    A.  No.  I'm sorry.  No.
3    Q.  I read in your report that you met
4  Dr. Ulmsten; is that correct?
5    A.  I did.
6    Q.  Tell us a little bit about that.
7    A.  It was a weekend course.  He was in at the
8  course.  I was fortunate enough, having trained with
9  Dr. Klutke, to ride his coattails, so to speak, to
10  get an opportunity to meet with Dr. Ulmsten.  I can't
11  remember if we went to dinner or not.  But I got an
12  opportunity to really spend some time with him and
13  interact with him.  I felt it was more than just
14  meeting, hi, handshake with him.  I interacted with
15  him.
16    Q.  This is at -- when you were at Washington
17  University at St. Louis or at --
18    A.  No, it was a weekend meeting.  Yeah.
19    Q.  Okay.  And do you recall where?
20    A.  Miami.
21    Q.  Miami?
22    A.  Okay.
23    Q.  So you got the opportunity to meet
24  Dr. Ulmsten in Miami in what year?
25    A.  It was early on in my career.  I can't

Joseph M. Carbone, M.D.

Page 46

1 remember specifically. It was -- it was maybe early
2 2000s. It was after my residency.
3     Q. Okay. So sometime around early 2000, you
4 got the opportunity to meet the inventor of the TVT
5 Retropubic device, Dr. Ulmsten, in Miami, correct?
6     A. Yes.
7     Q. And how long -- did you do a cadaver lab
8 course with him or did he teach you -- was it an
9 educational seminar or more of an opportunity to meet
10 the guy?
11     A. Well, it was an educational meeting. But
12 in addition to learning from him in general, I got to
13 interact with him personally.
14     Q. Okay. Sometime around early 2000 you met
15 Dr. Ulmsten and had the opportunity to get training
16 and educational insights from the inventor of the TVT
17 Retropubic, correct?
18     A. Yes.
19     Q. And I take it then that you took that
20 training and educational insight that you got from
21 Dr. Ulmsten in 2000 and applied it in your practice
22 moving forward, correct?
23     A. Yes.
24     Q. Did you also get the chance to meet
25 Dr. de Leval?

Page 47

1     A. No.
2     Q. Did you ever travel to Liege, Belgium?
3     A. No.
4     Q. Did you -- were you ever invited to travel
5 to Liege, Belgium, to meet Dr. de Leval?
6     A. No.
7     Q. Did you ever travel to France for any
8 Ethicon-related activities?
9     A. Yes.
10     Q. Did Ethicon pay for you to travel to
11 France?
12     A. I can't remember -- I know my travel was
13 covered, but I don't remember if I was paid.
14     Q. Okay. When was that?
15     A. 2006 or so. Early, late, mid-2006.
16     Q. Okay. Sometime around 2006, Ethicon paid
17 for your travel to France, correct?
18     A. Yes.
19     Q. And what did you do in France?
20     A. I worked with Dr. Cosson.
21     Q. When you went to France sometime in 2006,
22 did Ethicon employees also attend?
23     A. Yes.
24     Q. Do you recall which Ethicon employees
25 attended?

Page 48

1     A. The one that I remember is Bob Zipfel,
2 Robert Zipfel.
3     Q. How long have you known Bob Zipfel?
4     A. Oh, ten, twelve years.
5     Q. How do you know Mr. Zipfel?
6     A. Mr. Zipfel worked for Ethicon.
7     Q. How did you meet?
8     A. Probably one of the programs.
9     Q. Okay. Do you consider him a friend?
10     A. I consider him a friend.
11     Q. Seems like you guys have a lot of
12 communications --
13     A. Yes, I do.
14     Q. -- back and forth?
15     A. Yes, I do.
16     Q. Okay. You still communicate to this day?
17     A. Yes, we do.
18     Q. Frequently?
19     A. Define "frequently."
20     Q. How often do you communicate with him?
21     A. Not frequently.
22     Q. It can get circular at times.
23     A. I know it can.
24     Q. It's the fun.
25     A. Two or three times a year.

Page 49

1     Q. How about this?
2     A. Not frequently.
3     Q. Okay. What does Bob Zipfel do at Ethicon?
4     A. Now?
5     Q. Sure.
6     A. I don't believe he's employed at Ethicon
7 anymore.
8     Q. When did he do?
9     A. You know, all I can say is he wasn't a
10 representative, a field representative. I really
11 don't know what he did, but I know he wasn't a field
12 representative.
13     Q. Okay. How do you know he wasn't a field
14 representative?
15     A. I just know he didn't -- well, I didn't
16 think he was. I don't think he called on any
17 physicians. I'm sorry. I don't think he was a sales
18 representative. I misspoke.
19     Q. Okay. Did any sales representatives also
20 attend this trip?
21     A. Not that I recall.
22     Q. Okay. Who is your current sales rep from
23 Ethicon?
24     A. I don't know.
25     Q. Do you have one?

Joseph M. Carbone, M.D.

Page 50

1    A.   I don't know.
2    Q.   Okay.  Do you recall any Ethicon sales
3 representatives over the course of your career here
4 in Danville?
5    A.   Yes.
6    Q.   Who?
7    A.   I believe my first was Lara Fawell.  My
8 second was Andrew Margolis.  And then the -- kind of
9 rolled over.
10    Q.   Turnover after --
11    A.   Turnover was pretty frequent.  I know
12 there was a guy, a couple of guys, and a girl -- I'm
13 sorry.  A woman.
14        Apologize, Karen.
15    Q.   The first individual you listed, was that
16 your first sales rep?  What was her name again?
17 Sorry.
18    A.   Lara Fawell.
19    Q.   Okay.  Lara, was she your first sales rep
20 from Ethicon?
21    A.   From Ethicon, yeah.  From Ethicon, yes.
22    Q.   Okay.  So sometime around 2000 when you
23 came to Danville, she was your sales rep?
24    A.   2000, 2001, she was, yes.
25    Q.   How long was she your sales rep for?

Page 51

1    A.   You know, I can't remember.  At some point
2 she was reassigned, relocated.
3        MR. JONES:  Let's take a break,
4    five-minute break.  Fine with you guys?
5    (A recess transpired from 6:18 p.m. until
6    6:30 p.m.)
7        MR. JONES:  Let's get back on the record.
8 BY MR. JONES:
9    Q.   Doctor, you had the opportunity to do a
10 fellowship at UCLA under Dr. Shlomo Raz, correct?
11    A.   Yes.
12    Q.   That is a well-respected fellowship,
13 correct?
14    A.   To some.
15    Q.   Do you have respect for Dr. Raz?
16    A.   I do.
17    Q.   Is Dr. Raz well respected in the field of
18 urology?
19    A.   To some.
20    Q.   Are you familiar with any of the textbooks
21 that Dr. Raz has authored in the field of urology?
22    A.   Yes.
23    Q.   Have -- do you own any of those textbooks?
24    A.   Yes.
25    Q.   Do you refer to them for expertise and

Page 52

1 advice in the field of urology?
2    A.   Let's say I refer to them.
3    Q.   Okay.  Are you also aware of journal
4 articles that Dr. Raz has authored?
5    A.   Yes.
6    Q.   Have you actually -- has been on --
7 coauthored an article together?
8    A.   Yes.
9    Q.   Okay.  Maybe two?
10    A.   One or two.
11    Q.   Do you have any disagreements with Dr. Raz
12 in the field of urology?
13        MR. MORIARTY:  Objection.  Form.
14        Go ahead and answer.
15        THE WITNESS:  Not knowing every opinion
16    that Dr. Raz has, I can't tell you.
17 BY MR. JONES:
18    Q.   On mesh, the use of mesh.
19    A.   Not knowing every opinion Dr. Raz has on
20 the use of mesh, I can't tell you.
21    Q.   Okay.  But it's fair to say you have a lot
22 of respect for Dr. Raz in the field of urology?
23    A.   Yes.
24    Q.   He trained you?
25    A.   Yeah.

Page 53

1    Q.   Okay.  Was Dr. -- do you know Eric
2 Comiter?
3    A.   Yeah, I do.
4    Q.   Was he out there at the same time or
5 different time?
6    A.   Different time.
7    Q.   Okay.  After or before?
8    A.   I believe it was before.
9    Q.   Okay.  Do you know where he practices
10 currently?
11    A.   Currently, no.
12    Q.   You haven't talked to him in a while, it
13 sounds like?
14    A.   No.
15    Q.   Okay.  You did author -- you and
16 Dr. Comiter coauthored a journal article together,
17 though, correct?
18    A.   I don't remember.
19    Q.   Okay.  We'll go over the CV later and go
20 through them all.
21    A.   Okay.
22    Q.   Tell us how you got from UCLA to Danville.
23        MR. MORIARTY:  Well, there goes your two
24    and a half hours.
25        Go ahead.

Joseph M. Carbone, M.D.

Page 54

1      THE WITNESS: Could you be more specific?
2  I mean -- you know, I can -- you know, I
3  interviewed.  I -- I interviewed a lot of
4  positions.  I looked at academic opportunities.
5  I looked at private opportunities.  I looked at
6  large cities.  I looked at medium-size cities.
7  I looked at small cities.  I really didn't
8  restrict my search.
9      I came through Danville.  Obviously
10  was a community -- or it's -- I shouldn't say
11  obviously.  I mean, it was a community in need,
12  it seemed to me, that it was a community in need
13  of someone with my knowledge, training, and
14  background and that I could provide a meaningful
15  service to the community with my skills.  And,
16  you know, after really giving it very
17  considerable thought with my wife, we decided to
18  relocate here.
19  BY MR. JONES:
20      Q.  Okay.  Been here ever since, correct?
21      A.  Yes.
22      Q.  And at that point in time in 2000, did you
23  start your own company in Danville?
24      A.  My own company.
25      Q.  Your own practice?

Page 55

1      A.  I joined a practice.  I joined an existing
2  practice.
3      Q.  Joined an existing practice?
4      A.  Yes.
5      Q.  And at the time, was that called the
6  Danville Urologic Clinic, now operating as
7  Southside -- or South -- what's the name of the
8  clinic that you practice at right now?
9      A.  Southside Urology & Nephrology.
10      Q.  Is that the same clinic you joined in
11  2000 --
12      A.  Yes.
13      Q.  -- when you came to Danville?  What is the
14  Piedmont Institute for Incontinence?
15      A.  It's called the Piedmont Institute for
16  Continence and Urinary Control.
17      Q.  Okay.
18      A.  It's the name I gave my specific aspect of
19  the practice.
20      Q.  Is that a separate company that you've set
21  up?
22      A.  No.
23      Q.  When Ethicon pays you as a consultant, do
24  they pay you or the clinic?
25      A.  They pay me.

Page 56

1      Q.  Personally?
2      A.  Yes.
3      Q.  You haven't set up an LLC or a side
4  company to accept payment, consultant payments?
5      A.  No.
6      Q.  Okay.  What I want to do now -- should be
7  fairly uncontroversial -- is I want to get the lay of
8  the land for what mesh products you've used, when you
9  used them, and how many times you used them.
10      A.  Okay.
11      Q.  And I think it might be easier to set out
12  a little chart here.  But let's start with Ethicon
13  products.  We'll start with the TVT line.
14      How many times have you used TVT
15  Retropubic?
16      A.  May I use a pen -- I'm just trying to,
17  again, math.
18      MR. ROSENBLATT:  This isn't a written
19  deposition.
20  BY MR. JONES:
21      Q.  Sorry.  He says you can't use a pen.
22      A.  Okay.  That's fine.
23      Q.  I was trying to make it easier.
24      A.  Be patient with me as I do my math in my
25  head.

Page 57

1      Q.  He'll probably let you use a pen so long
2  as I don't see it, though.  Right?
3      A.  No, I don't need to go there.  Which ones
4  was it the one you were asking?
5      Q.  TVT Retropubic?
6      A.  Maybe 300.
7      Q.  300.  Okay.
8      O.  I'm going to go through them all.
9      A.  I know.  I'm with you.  I've got a number
10  here, and I'm trying to figure out, based on the
11  year, how many apparently I did.  Let me give you
12  that number.  Hold on.
13      MR. MORIARTY:  Is there a question
14  pending?
15  BY MR. JONES:
16      Q.  There is.
17      A.  Change that to about 400.
18      Q.  TVT-R?
19      A.  Retropubic, yeah.
20      Q.  Okay.
21      A.  I don't know.  300 to 400.
22      Q.  300 to 400?
23      A.  Yeah, that's fine.
24      Q.  And the question pending was TVT-O.
25      A.  200 to 300.

Joseph M. Carbone, M.D.

Page 58

1    Q.  Okay.  TVT-Secur?
2    A.  200.
3    Q.  TVT Abbrevos?
4    A.  What is my total right now?  400.
5    Q.  Okay.  And Exact?
6    A.  Probably about 100.
7    Q.  Okay.
8    A.  Let me look at my numbers.
9    Q.  Yeah, sure.
10   A.  That's about right, give or take a couple
11   hundred.
12   Q.  Give or take, rough estimates?
13   A.  Yeah.
14   Q.  Years.
15   A.  Okay.
16   Q.  Years and years.  So let's start with TVT
17   Retropubic, since that's the oldie but goodie.
18   A.  Started in -- hmm, 2004.  Four years.
19   Q.  2004 you started?
20   A.  No, no.
21   Q.  No.
22   A.  I started here in 2000.  So about four
23   years.
24   Q.  Okay.  TVT-O next.
25   A.  Uh-huh.  I did that probably until -- I

Page 59

1    did it a while.  The Secur came out what -- in,
2    trying to remember.
3    Q.  '6 or '7?
4    A.  '6 or '7.  Maybe picked it up in '7.
5    Probably did it until like 2007, 2008.
6    Q.  Okay.  Then Secur, sometime 2007?
7    A.  2008.  And I did it until Abbrevo came
8    out, which is like in 2010, I think.  And I've done
9    it pretty well since mostly.  Majority of Abbrevos
10   have been since 2010.
11   Q.  And Exact?
12   A.  I use, with the Abbrevo, since -- you
13   know, throughout the course since the -- I did the
14   Os, since it came out.
15   Q.  When did Exact come out?
16       MR. ROSENBLATT:  2010.
17       THE WITNESS:  Yeah, that's what I thought.
18       And I did -- I apologize.  To clarify, I
19   did some Os, Rs, S, you know.
20   BY MR. JONES:
21   Q.  There's some overlap?
22   A.  There's overlap.
23   Q.  This is roughly speaking.
24   A.  Yeah.
25   Q.  All right.  So sounds like today, your

Page 60

1    sling of choice is the TVT Abbrevo?
2    A.  Yes.
3    Q.  Do you still use the TVT Retropubic today?
4    A.  No.
5    Q.  Is it fair to say you stopped using the
6    TVT Retropubic in 2004 but for limited use here and
7    there after 2004?
8    A.  No.  It's not fair to say.  I -- I
9    wouldn't want to say but for limited use.  I would
10   say -- my practice evolved.  That's the best I can
11   explain it to you.
12   Q.  How about this?  Your sling of choice
13   between 2000 and 2004 was the TVT Retropubic device,
14   correct?
15   A.  Oh, absolutely.
16   Q.  Your sling of choice from 2004 to 2007 or
17   2008 was the TVT Obturator, correct?
18   A.  Yes.
19   Q.  Your sling of choice from 2007 or 2008
20   till 2010 was the TVT-Secur, correct?
21   A.  Yes.
22   Q.  Your sling of choice from 2010 till today
23   is the TVT Abbrevo?
24   A.  Right.
25   Q.  Correct?

Page 61

1    A.  Right.
2    Q.  You currently also use, in conjunction
3    with the TVT Abbrevo, the TVT Exact device, correct?
4    A.  Yes.
5    Q.  Okay.
6    A.  And throughout the -- no, that's it.
7    Fine, yes.
8    Q.  Okay.  And I take it you also used other
9    Ethicon products besides their transvaginal mesh
10   products, correct?
11   A.  Yes.
12   Q.  What products would those include?
13   A.  For a brief period of time, I used the
14   Monitor device.  I used the Prolift device, and I use
15   the Prosima.  I never can pronounce that.  Prosima.
16   Q.  I still haven't gotten it right.
17   A.  Prosima device, Prosima.
18   Q.  That's what I like to call it.  Monitor,
19   Prolift, Prosima.  How did Morcellator?
20   A.  No.
21   Q.  Never used the Morcellator?
22   A.  I may have during my residency.
23   Q.  Okay.  What about Prolift+M?  Did you ever
24   use that product?
25   A.  No.

Joseph M. Carbone, M.D.

Page 62

1    Q.  Okay.  Why not?
2    A.  My hospital didn't buy it.
3    Q.  Okay.  Why not?
4    A.  You'd have to ask my hospital.
5    Q.  Did you ever try to persuade your hospital
6  to buy that product?
7        MR. MORIARTY:  Objection.  Go ahead.
8        THE WITNESS:  Persuade.  What do you mean
9    by "persuade"?
10  BY MR. JONES:
11    Q.  Did you ever ask your hospital to purchase
12  Prolift+M?
13    A.  Initially, yes.  Yes, I did.
14    Q.  Okay.  And they said no?
15    A.  They said no.
16    Q.  You don't know why they said no?
17    A.  I can't say with certainty why they said
18  no.
19    Q.  Okay.  What is it that you can't say with
20  certainty that might be why they said no?
21        MR. MORIARTY:  Objection.  Form.
22        Otherwise, go ahead.
23        THE WITNESS:  Well, simply speculating, I
24    think they were looking at dollars and cents.
25  BY MR. JONES:

Page 63

1    Q.  It was a business decision?
2    A.  Business decision.
3    Q.  Okay.  That's a good point.  Who makes the
4  decision of what products are available at your
5  hospitals?
6    A.  The surgeon and the materials manager.
7    Q.  You -- do you, as a surgeon, make the
8  final decision of what products are available at the
9  hospitals you operate at?
10    A.  What do you mean by "final"?
11    Q.  Well, we just went through, you asked the
12  hospital to purchase Prolift+M.  They said no.
13    A.  Okay.
14    Q.  To me, that indicates they're the ones
15  making the final decision not you.
16    A.  No, that's not necessarily the case.  I
17  mean, I really didn't push that hard.  I mean, one
18  might argue that I didn't -- I didn't aggressively
19  pursue it, so maybe I made the final decision.
20    Q.  Okay.  So there's times when you ask your
21  hospital to purchase a product that you push harder
22  than other products, correct?
23    A.  Those were my words.
24    Q.  That's fair, right?  There's some products
25  you feel more strongly about than others when you go

Page 64

1  to your hospital purchasing board?
2    A.  Yes.
3    Q.  Okay.  What about Y-mesh, Ethicon Y-mesh,
4  Artisyn Y-mesh?  Did you ever use that one?
5    A.  I don't believe so.
6    Q.  Okay.  What about, did you ever use
7  Gynemesh PS flat mesh?
8    A.  Not in my own practice.  I may have at
9  UCLA.  I don't know.
10    Q.  Okay.  But not in your own practice?
11    A.  Not in my own practice.
12    Q.  Okay.  How many Prolifts?
13    A.  Roughly 200.
14    Q.  How many Prosimas -- or Prosimas?
15    A.  50, not that many.
16    Q.  Not that many.  50.
17        When did you stop using Prolift?
18    A.  When it was no longer available.
19    Q.  When was that?
20    A.  When --
21    Q.  Let me stop you.  Meaning when Ethicon
22  stopped -- when Ethicon stopped selling Prolift is
23  when you stopped using it?
24    A.  Yes.
25    Q.  Okay.  That would have been related to the

Page 65

1  FDA 522 orders issued on Ethicon, as far as you know?
2        MR. MORIARTY:  Objection.  Go ahead.
3        THE WITNESS:  I don't know.
4  BY MR. JONES:
5    Q.  You don't know one way or the other.  Do
6  you know what a 522 order is?
7    A.  I don't know specifically why they
8  stopped --
9    Q.  Selling Prolift?
10    A.  -- selling it.
11    Q.  No one at Ethicon ever told you why they
12  stopped selling Prolift?
13    A.  There was a lot of speculation, but I
14  couldn't say with certainty why.
15    Q.  Did anybody ever tell you any reason --
16  did any -- strike that.
17        Did any Ethicon employee tell you a reason
18  why Ethicon stopped selling Prolift?
19    A.  Repeat it again?  I just want to make sure
20  I understand your question.
21    Q.  Here's what I'm getting at.
22    A.  Yeah.
23    Q.  I just want to know, is there a single
24  Ethicon employee --
25    A.  Any.

Joseph M. Carbone, M.D.

Page 66

1    Q.  -- that said, "Hey, Dr. Carbone, here's
2    why we're going to stop selling Ethicon -- or Ethicon
3    Prolift mesh."
4    A.  No.
5    Q.  Okay.  No Ethicon sales rep said,
6    "Dr. Carbone, here's Ethicon's reason why we're not
7    going to sell Ethicon Prolift mesh anymore"?
8    A.  Not without prefacing it with "I think."
9    Q.  Okay.
10   A.  Not with any definitive -- you had a
11   declarative statement there.  I never got a
12   declarative statement from anybody.
13   Q.  What did they tell you they thought?
14       MR. MORIARTY:  Objection.
15       Go ahead.
16       THE WITNESS:  They thought that -- how
17   shall I put this?  They thought that the company
18   had done a tremendous number of FDA-approved
19   randomized control trials and now they were
20   being asked to repeat, at their expense, a
21   litany of randomized control trials that were
22   already FDA-approved in the first place, and it
23   wasn't worth it.
24       But again, one rep, said "I think."
25   BY MR. JONES:

Page 67

1    Q.  One Ethicon sales rep in their role as a
2    sales representative for Ethicon told you they
3    thought Prolift mesh was not going to be sold by
4    Ethicon for the reasons you just stated, correct?
5    A.  Let me -- let me ask you.  What did you
6    mean by "in their role as a" --
7    Q.  Meaning this was -- they weren't saying,
8    "Hey, I'm an Ethicon sales rep, but tonight we're
9    going to go bowling and hang out and have a few beers
10   and I'm going to tell you personally why I think it
11   is."
12       MR. MORIARTY:  Objection.  Because I have
13   no idea if there's even a question there.
14       Go ahead and answer if you understand.
15   BY MR. JONES:
16   Q.  Yeah, we're just trying -- you get what I
17   mean, right?
18   A.  Right.  I don't think they were telling me
19   that as an official -- in their role as an official
20   Ethicon representative.
21   Q.  Kind of maybe information they were
22   telling you in the context of a personal relationship
23   between you and the sales rep?
24   A.  Again, what are you saying "personal"?  I
25   mean --

Page 68

1    Q.  Outside the business relationship.
2    A.  I would -- I would agree with that.
3    Q.  The information the sales -- Ethicon sales
4    rep shared with you related to what they thought the
5    reason --
6    A.  Hang on.  You're going to have to slow
7    down on me.
8    Q.  Sure.  The information an Ethicon sales
9    rep shared with you related to the reason this
10   Ethicon sales rep believed Ethicon stopped selling
11   Prolift was outside of your business relationship
12   with this Ethicon sales rep?
13       MR. MORIARTY:  Objection.  Form.
14       THE WITNESS:  Insofar as I followed you
15   with that question, I would have to generally
16   agree.  But I can't because I really didn't
17   follow it all that well.
18   BY MR. JONES:
19   Q.  Okay.  The information that Ethicon sales
20   rep shared with you was outside of your business
21   relationship with that sales rep.
22   A.  Yes.
23   Q.  Okay.  When did you start using Prolift?
24   A.  Around 2006.
25   Q.  When did you start using Prosima?

Page 69

1    A.  Again, I can't remember specifically.  I
2    didn't do that many.  When did it come out?
3    Q.  Say 2008.
4    A.  2009.
5    Q.  Okay.  2008-2009?
6    A.  2008-2009.
7    Q.  How come you didn't do very many?
8    A.  I -- I like the product.  I felt the --
9    there were advantages, disadvantages.  I felt one of
10   the advantages was the trocharless insertion; one of
11   the disadvantages was the trocharless insertion.  And
12   so I tried it.
13   Q.  Sounds like Prosima in theory was a good
14   idea; in practice, maybe not so much?
15       MR. MORIARTY:  Objection.
16       Go ahead.
17       THE WITNESS:  I can't say I didn't do it
18   because it wasn't a good idea.  I just didn't do
19   all that many.
20   BY MR. JONES:
21   Q.  Okay.  Did you have any failures with
22   Prosima?
23   A.  Yes.
24   Q.  Okay.  How many?
25   A.  I can't remember specifically to the

Joseph M. Carbone, M.D.

Page 70

1 Prosima device. I kind of lumped all -- I can't
2 remember specifically to the Prosima device.
3    Q. What other device?
4    A. What do you mean by that?
5    Q. You're saying -- did you have failures
6 with Prolift as well?
7    A. I did.
8    Q. How many?
9    A. Let's say between Prosima and Prolift, 20,
10 25.
11    Q. Okay. Do you have an exact number?
12    A. No.
13    Q. Have you ever endeavored to do a survey or
14 study of your exact complication rate?
15      MR. MORIARTY: Objection. Go ahead.
16      THE WITNESS: Not my exact complication
17   rate.
18 BY MR. JONES:
19    Q. Okay. How about have you ever done a
20 survey or study to discover your exact failure rate?
21      MR. MORIARTY: Objection. Form.
22      THE WITNESS: Not my exact failure rate.
23
24 BY MR. JONES:
25    Q. So you can't tell us one way or the other

Page 71

1 your precise success rate with the use of mesh,
2 correct?
3    A. Not --
4      MR. MORIARTY: Objection.
5      THE WITNESS: -- my precise.
6 BY MR. JONES:
7    Q. Have you ever attempted to create a
8 registry with your mesh patients? A registry that
9 tracks your patients, say, five years down the road?
10    A. No.
11    Q. If the TVT-Secur device was still sold by
12 Ethicon today, would you use it?
13      MR. MORIARTY: I'm sorry. Could you just
14   read that back?
15      (Whereupon the Court Reporter read the
16     previous question.)
17      MR. MORIARTY: Thank you.
18      THE WITNESS: Not likely.
19 BY MR. JONES:
20    Q. Why not?
21    A. I like the device fair enough. I think it
22 had a good success and safety profile in my hands. I
23 feel more confident with the Abbrevo that I get the
24 ends of the mesh into the exact position that I want
25 them in in the obturator fascia.

Page 72

1    Q. Why don't you currently use the TVT
2 Retropubic device?
3    A. The retropubic device that I use is the
4 Exact.
5    Q. Why don't you use the TVT Retropubic
6 device?
7      MR. MORIARTY: Objection.
8      Go ahead.
9      THE WITNESS: Because the TVT Exact is
10   available.
11 BY MR. JONES:
12    Q. Do you prefer the TVT Exact device over
13 the TVT Retropubic device?
14    A. Yes.
15    Q. Why?
16    A. Just is more comfortable in my hands.
17    Q. Are there any differences between the mesh
18 used in the TVT Exact device and the mesh used in the
19 TVT Retropubic device?
20    A. I don't recall if the TVT Retropubic
21 device had the blue mesh.
22    Q. Other than the color -- the dye, the blue
23 color dye in the mesh -- are there any other
24 differences between the TVT Retropubic device and the
25 TVT Exact device?

Page 73

1    A. I believe that the Exact device has a
2 laser cut, and I don't think the previous TVT device
3 was laser-cut. I think it was mechanically cut
4 still.
5    Q. Okay. Is there a difference between TVT
6 laser-cut mesh and TVT mechanical-cut mesh?
7      MR. MORIARTY: Objection. Go ahead.
8      THE WITNESS: Well, in the way it's cut.
9 BY MR. JONES:
10    Q. Is there a clinical difference between the
11 two?
12    A. Is there a -- no.
13    Q. Okay. When you -- is there a difference
14 in your hands between the TVT laser cut mesh and TVT
15 mechanical cut mesh?
16    A. No.
17    Q. Can -- if you picked them both up, could
18 you tell a difference between the two?
19      MR. MORIARTY: Objection. I assume you
20   mean without reading on the package which it
21   might be? With that assumption --
22 BY MR. JONES:
23    Q. If you picked them up?
24      MR. MORIARTY: They might be in a package.
25      MR. JONES: Oh, okay. Thanks.

Joseph M. Carbone, M.D.

Page 74

1    MR. MORIARTY: Sure. No problem. Thanks.
2    Go ahead.
3  BY MR. JONES:
4    Q.  Yeah, just answer it.
5    A.  Yeah.  I could feel the difference.
6    Q.  You can feel the difference between the
7  two?
8    A.  Yes.
9    Q.  What's the difference?
10    A.  One has a little -- the edges feel
11  different.
12    Q.  What's the difference in the edges between
13  the TVT mechanical-cut mesh and the TVT laser-cut
14  mesh?
15    A.  It's hard to describe because they're not
16  that much different.  I guess the laser-cut has more
17  of a -- a beaded feel, whereas the other one doesn't
18  have that beaded feel.
19    Q.  Define "beaded feel."
20    A.  Yeah.
21    Q.  Here's the deal, Dr. Carbone.  At some
22  point, a juror may listen to this testimony.
23    A.  Yeah, I understand.
24    Q.  Explain to the juror what you mean by the
25  laser-cut mesh used in TVT has a beaded feel compared

Page 75

1  to the mechanical-cut mesh using TVT.
2    A.  It feels smoother.
3    Q.  Is there a difference in stiffness between
4  the TVT laser-cut mesh and TVT mechanical-cut mesh?
5    A.  Not that I can feel.
6    Q.  So when you pick up TVT mechanical mesh
7  and compare it to TVT laser-cut mesh, you can't
8  ascertain any difference in stiffness?
9    A.  No.
10    Q.  Okay.  The only difference when you hold
11  the TVT mechanical-cut mesh in your hand and compare
12  to the TVT laser-cut mesh is the edge of the mesh,
13  correct?
14    A.  Pretty much, yes.
15    Q.  And the way you've described it is the TVT
16  laser-cut mesh as compared to the TVT mechanical-cut
17  mesh has a beaded feel or smoother feel to the edge
18  in the mesh, correct?
19    A.  Correct.
20    Q.  Currently you use TVT Exact, which uses
21  laser-cut mesh, correct?
22    A.  Yes.
23    Q.  Do you know the pore size of the laser-cut
24  mesh used in TVT Exact?
25    A.  Greater than 75 microns.

Page 76

1    Q.  Do you know the pore size Exact
2  measurement?  What's the -- how about this?  That was
3  one of my horrible questions.
4    A.  I didn't -- you're using that word
5  "exact."  Is that "Exact" with a capital E or "exact"
6  with a lowercase?
7    Q.  Thanks, thanks.  That's another one of my
8  horrible questions.
9    MR. ROSENBLATT: I'm keeping a list.
10    MR. JONES:  It's going to be a long list,
11  Paul.
12  BY MR. JONES:
13    Q.  What is the pore size of the TVT laser-cut
14  mesh?
15    A.  Greater than 75 microns.
16    Q.  Is the TVT -- is the pore size of the TVT
17  laser-cut mesh greater than a thousand microns?
18    MR. MORIARTY: Greater than a thousand
19    microns?  Objection.
20    Go ahead.
21    THE WITNESS:  I don't believe so.
22  BY MR. JONES:
23    Q.  You don't believe so?  Okay.
24    A.  Huh-uh.
25    Q.  Do you know the effective porosity of the

Page 77

1  TVT laser-cut mesh?
2    A.  Greater than 75 microns.
3    Q.  Are you familiar with the term "effective
4  porosity"?
5    A.  No.
6    Q.  Do you know the pore size of the TVT mesh
7  after tension is placed on the mesh?
8    MR. MORIARTY:  Objection.
9    Go ahead.
10    THE WITNESS:  Hmm.  No.
11  BY MR. JONES:
12    Q.  Is the pore size of the TVT mesh greater
13  than 500 microns?
14    A.  No.
15    Q.  Is the pore size of the TVT mesh greater
16  than 250 microns?
17    A.  No.
18    Q.  Is the pore size of the TVT mesh greater
19  than 125 microns?
20    MR. MORIARTY:  Objection.
21    Go ahead.
22    THE WITNESS:  Not that I believe.
23
24  BY MR. MORIARTY:
25    Q.  Do you know the density of the TVT mesh?

Joseph M. Carbone, M.D.

Page 78

1    A.  No.
2    Q.  Do you know the stiffness of the TVT mesh?
3    A.  No.
4    Q.  Do you know the antioxidants that Ethicon
5  uses in the TVT mesh?
6    A.  The antioxidants?
7    Q.  Sure.  Do you know whether or not Ethicon
8  adds antioxidants to the TVT mesh or not?
9    A.  Aren't antioxidants used in all Prolene?
10  I believe antioxidants are used in all Prolene, and I
11  don't know what antioxidants are used.
12    Q.  There you go.  That's my question.  You
13  don't know what antioxidants are used in TVT mesh,
14  correct?
15    A.  Correct.
16    Q.  Okay.  Do you know the name of the resin,
17  polypropylene resin, used in TVT mesh?
18    A.  The resin?
19    Q.  (Nodding head up and down.)
20    A.  No.
21    Q.  Do you consider yourself a materials
22  expert?
23    A.  Well, what do you mean by "materials
24  expert"?
25    Q.  Do you -- will you be -- do you consider

Page 79

1  yourself an expert in the properties of the TVT mesh?
2    A.  I believe that I am an expert in the
3  clinical properties of the TVT mesh.  If you ask me
4  do I have a Ph.D. in material science?  No, I don't.
5  Have I spoken with material scientists?  Yes.  Have
6  I, you know, interacted with them?  Have I talked to
7  them about the Amid classification?  Have I taught on
8  the mesh itself?  Have I used -- most importantly,
9  have I used the mesh -- my experience with the mesh
10  clinically and how it works in vivo?
11         I would say that I have an expert -- I
12  have a -- a knowledge and a -- I have knowledge and
13  training and experience that would allow me to
14  provide expert opinion in that context.
15    Q.  Does the TVT mesh degrade inside a woman?
16    A.  I don't believe so.
17    Q.  Have you reviewed any test by Ethicon of
18  the mesh used in TVT that concludes the mesh does
19  degrade?
20    A.  Say it again?
21    Q.  Sure.  Have you reviewed any medical
22  literature that disagrees with you that mesh does not
23  degrade inside a patient?
24    A.  I have not reviewed any Level 1 material
25  randomized controlled trials to that effect.

Page 80

1    Q.  Okay.  That's not -- I didn't ask about
2  Level 1.  I'm just asking about any medical
3  literature.
4      MR. MORIARTY:  Objection.
5      Go ahead.
6      THE WITNESS:  Geez.  I guess I'm sure, as
7  I've gone around -- I mean, I've done a lot of
8  review.  I'm sure there is very low-evidence
9  material out there that would suggest that.
10  BY MR. JONES:
11    Q.  Okay.  So it's fair to say that in your
12  review, you've come across medical literature that
13  concludes mesh degrades inside the patient, correct?
14    A.  When you say "inside the patient," are you
15  talking about explanted materials or are you talking
16  about materials that are still inside the patient?
17    Q.  Either.  We'll go with explant.  How about
18  that?
19    A.  Well, there's literature -- not good
20  literature -- there's literature that suggests that
21  TVT or -- yeah, polypropylene TVT mesh might degrade.
22  Yeah.
23    Q.  Is there -- do you recall what literature
24  is that?  Do you recall any authors, titles?
25    A.  No.

Page 81

1    Q.  Can you name one as you sit here today?
2    A.  As I sit here today, I cannot recall
3  specifically.
4    Q.  Clavé.  Does that ring a bell for you?
5    A.  Clavé.  Name sounds familiar, yeah.  I
6  think, yeah.
7    Q.  You think that's one of them?
8    A.  Yeah.
9    Q.  Probably?
10    A.  Probably.
11    Q.  Okay.  Have you reviewed any testing done
12  by Ethicon on the mesh which discusses degradation of
13  mesh?
14      MR. MORIARTY:  Objection.
15      Go ahead.
16      THE WITNESS:  Now I guess I'm going to go
17  back to your question, and I clarified it
18  before.  In vivo?
19  BY MR. JONES:
20    Q.  In vivo.
21    A.  Ethicon -- repeat your question.
22    Q.  Have you reviewed any Ethicon testing of
23  mesh in vivo that suggests the mesh degrades?
24    A.  I don't recall.
25    Q.  Okay.  How about not in vivo?

Joseph M. Carbone, M.D.

Page 82

1    MR. MORIARTY: Objection to form.
2    THE WITNESS: I don't recall if it was --
3  I mean, again, your whole question was
4  Ethicon -- not medical literature now. You're
5  talking about Ethicon-related documents?
6  BY MR. JONES:
7    Q. Correct.
8    A. Ex vivo degradation. Not that I recall.
9    Q. Okay. Is degradation of the mesh inside a
10  patient a potential risk?
11    MR. MORIARTY: Objection. Form.
12    Go ahead.
13    THE WITNESS: What do you mean by
14  "potential"?
15  BY MR. JONES:
16    Q. Could it happen?
17    A. I mean, I can't -- let me put it this way.
18  I can't say as an expert that it can happen. I can
19  speculate it could happen. But I can't say that I
20  have any evidence, as a materials expert in the
21  context that I talked to you about, that it degrades
22  in the body.
23    Q. Okay. Would it be speculation for you as
24  an expert to say it absolutely does not degrade
25  inside the body?

Page 83

1    MR. MORIARTY: Objection.
2    THE WITNESS: You got a lot of negatives
3  there.
4    MR. MORIARTY: Objection to form.
5    THE WITNESS: Yeah. Could you restate the
6  question?
7  BY MR. JONES:
8    Q. Sure. You get what I'm getting at. You
9  said, it's speculation for me as an expert to say
10  it's a potential risk that the mesh degrades.
11    A. Okay.
12    Q. My question is, is it speculation for you
13  as an expert to say the mesh absolutely does not
14  degrade in vivo?
15    MR. MORIARTY: Objection. Form.
16    THE WITNESS: In the context of my
17  expertise on mesh and its use in the patient, I
18  believe -- I will render the opinion to a
19  reasonable degree of medical certainty that it
20  does not degrade.
21  BY MR. JONES:
22    Q. Okay. Have you ever reviewed explanted
23  mesh samples from patients?
24    A. What do you mean by "reviewed"?
25    Q. Looked at them.

Page 84

1    A. Yeah, I've looked at them.
2    Q. Never seen any signs of degradation on any
3  mesh explants you've looked at from patients?
4    A. What do you mean by "signs"?
5    Q. Has the material broken down whatsoever?
6    A. I haven't seen any signs.
7    Q. Okay. Is the TVT mesh inside the patient
8  inert?
9    MR. MORIARTY: Objection. Form.
10    THE WITNESS: Again, what do you mean by
11  "inert"? I mean -- let me just ask, what do you
12  mean by "inert"? What time frame are you
13  talking about as being inert?
14  BY MR. JONES:
15    Q. The time frame that the mesh is inside the
16  patient, which --
17    A. Okay. Let me answer it to you this way.
18  Initially, there is an inflammatory reaction. The
19  body responds by having neutrophils and macrophages
20  and fibroblasts to lay down collagen covering and
21  incorporating into the mesh. And once that has been
22  incorporated, I believe it's inert.
23    Q. Okay. For -- and it's inert for as long
24  as the mesh is inside the patient, correct?
25    A. In my -- yes, yes, yeah.

Page 85

1    Q. Is there a difference in the inflammatory
2  response between TVT mesh and Prolift mesh?
3    A. Is there a difference in the inflammatory
4  response? No.
5    Q. Does pore size affect the inflammatory
6  response?
7    A. Many things affect it. Pore size is one
8  of them.
9    Q. Does the density of the mesh affect the
10  level of the inflammatory response?
11    A. I don't believe Amid's classification
12  included density.
13    Q. Does the amount of mesh affect the
14  inflammatory response?
15    A. Say it again.
16    Q. Does the amount of mesh affect the
17  inflammatory response inside the patient?
18    A. The -- no, not the inflammatory response.
19    Q. Okay. Is less mesh a benefit to the
20  patient?
21    MR. MORIARTY: Objection. Form.
22    THE WITNESS: I guess I got to ask you
23  what you mean by "benefit."
24  BY MR. JONES:
25    Q. Is a smaller piece of mesh implanted in a

Joseph M. Carbone, M.D.

Page 86

1  woman's vagina safer for the woman?
2      A.  Again, you know, there's --
3      Q.  Less complications?
4      A.  Fewer complications.  Well, the -- the
5  reason I can't give you -- and I'm not trying to be
6  difficult.  But the reason why I can't give you a
7  straight answer to that question is most of the -- or
8  the -- the Level 1 clinical data has to do not only
9  with just the mesh, but the procedures that are --
10  that utilize the mesh.
11      So when you say complications, you see,
12  you can't separate the two.  So I can't give you, you
13  know, is less mesh -- the technique is important too.
14      Q.  Okay.  If the technique is the same, is
15  less mesh implanted in a woman's vagina safer for
16  that woman in that she will have likelihood of less
17  complications?
18      MR. MORIARTY:  Objection.  Go ahead.
19      THE WITNESS:  In general, I would agree
20  with that statement.
21      MR. JONES:  Okay.  You guys want to take a
22  break and eat?
23      (A recess transpired from 7:21 p.m. until
24      7:49 p.m.)
25  BY MR. JONES:

Page 87

1      Q.  Back on the record.  Doctor, ready to
2  proceed?
3      A.  Yes, sir.
4      Q.  Great.  Thanks.
5      We noticed in your prior testimony, you
6  had listed Farmer versus Willard, September 2014, a
7  video deposition, correct?
8      A.  Yes.
9      Q.  Okay.  What is Farmer versus Willard
10  about?
11      A.  It was a medical malpractice case -- which
12  one was the v and which one was the -- so Willard was
13  the physician, Farmer was the patient.  He had
14  epididimo-orchitis.  He didn't -- Willard treated him
15  but didn't have him scheduled for follow-up.
16      Patient presented a long time later on
17  with a scrotum -- an acute scrotum, needed an
18  orchiectomy.  And they felt that Willard should have
19  had him follow up earlier.  And I agreed.
20      Q.  You acted as an expert in the matter of
21  Farmer versus Willard, correct?
22      A.  Yes, a plaintiff's expert.
23      Q.  You were expert for the plaintiff?
24      A.  Yes.
25      Q.  Other than Farmer versus Willard and the

Page 88

1  current litigation that we're discussing here today,
2  have you ever acted as an expert in litigation?
3      A.  Expert in -- no.
4      Q.  No.  So besides the transvaginal mesh
5  litigation that we're discussing here today and
6  Farmer versus Willard, you've never acted as an
7  expert witness in any litigation, correct?
8      A.  I have reviewed cases -- if I recall
9  correctly, this was asking for what depositions I
10  have provided.  That's not the question that you
11  asked I understand now?
12      Q.  Correct.
13      A.  So the question you're asking is what?
14      Q.  Cases you've acted as an expert.
15      A.  Acted.  I have acted in many more.
16      Q.  Okay.  Many more.  How many?
17      A.  Probably about 15 to 20.
18      Q.  How many?
19      A.  15 to 20.
20      Q.  Okay.  15 to 20 cases you've acted as an
21  expert in.  Have you issued reports in those cases?
22      A.  No.
23      Q.  Okay.  Did those cases involve
24  transvaginal mesh?
25      A.  No.

Page 89

1      Q.  Is today the first time you have ever
2  given expert testimony as an expert in a transvaginal
3  mesh case?
4      A.  To the best of my recollection, yeah.
5      Q.  Is this case the first time you've ever
6  acted as an expert in litigation in a case involving
7  transvaginal mesh?
8      A.  Again, acted as an expert in transvaginal
9  litigation mesh -- or transvaginal mesh litigation?
10      Q.  (Nodding head up and down.)
11      A.  And that means both the TVT polypropylene
12  Prolene mesh and the -- okay -- and the Prolift
13  polypropylene mesh.
14      Q.  Any mesh in transvaginal --
15      A.  To the best of my recollection, none of
16  the med mal -- and they were all med mal -- cases
17  that I reviewed were -- involved TVT polypropylene or
18  Prolift polypropylene mesh.
19      Q.  Okay.  Great.  Perfect.  Is this case the
20  first time you've acted as an expert in the design
21  and safety of a device?
22      A.  Expert in the design and safety.  I mean,
23  the -- what do you mean by "expert"?  I think we've
24  had this discussion before with respect to the expert
25  in the materials.  But now you're talking about

Joseph M. Carbone, M.D.

Page 90

1 design and safety; is that correct?  Different?
2     Q.   (Nodding head up and down.)
3     A.   So I ask again the same question.  What do
4 you mean by "expert in design and safety"?
5     Q.   You don't have -- you don't understand my
6 question of whether -- are you an expert in this case
7 on the design of the TVT device?
8         MR. MORIARTY:  Objection.
9         Go ahead.
10        THE WITNESS:  Insomuch as -- I'm not an
11 engineer.  Okay?  But insomuch as I'm familiar
12 with the design, I've used the design, I've been
13 trained, I have experience with the design, I've
14 read the literature regarding the design, I've
15 used it clinically, I feel like I am an expert.
16 But -- in that context, I believe I'm an expert.
17 I'm not -- I'm saying that I'm not an engineer.
18 I can't speak with any --
19 BY MR. JONES:
20    Q.   Okay.  Here's my question.
21    A.   Go ahead.
22    Q.   Have you ever been asked by a medical
23 device company prior to Ethicon in this case to be an
24 expert in litigation?
25    A.   Repeat it.  Seriously.  Just want to make

Page 91

1 sure I get it right.
2     Q.   Have you ever been asked by a medical
3 device company other than Ethicon to be an expert in
4 litigation?
5     A.   To the best of my recollection, I don't
6 believe any of the medical malpractice cases involved
7 medical devices.
8     Q.   Now I've got to ask you again.  Yes or no.
9 To the best of your recollection, has a medical
10 device company other than Ethicon ever asked you to
11 act as an expert in litigation?
12    A.   Is it the same question?
13    Q.   Yes or no?
14    A.   Was my answer inadequate?
15    Q.   Yes or no?
16    A.   Not that I recall.
17    Q.   Okay.  Perfect.
18    A.   Okay.
19    Q.   We went back and we did tally up the
20 payments from Exhibit 5.
21    A.   Okay.
22    Q.   So you have Exhibit 5 in front of you, and
23 we added up those payments from Ethicon to you
24 between the years 2003 to 2012.  And the total I'll
25 represent to you is $452,398.

Page 92

1         Do you have any reason to disagree with
2 that?
3     A.   I have no reason to disagree with that.
4     Q.   Okay.  And am I correct in saying, between
5 the years 2003 to 2012, Ethicon paid you, according
6 to Exhibit 5, $452,398?
7         MR. MORIARTY:  Objection.
8         Go ahead.
9         THE WITNESS:  As a consultant, yes.
10 BY MR. JONES:
11    Q.   Did they pay you any other money outside
12 of your role as consultant?
13    A.   No.
14    Q.   So between the years 2003 to 2012, Ethicon
15 paid you 452,398, correct?
16    A.   Correct.
17    Q.   Okay.  When did Ethicon first contact you
18 to be an expert in this case?
19    A.   You know, I don't remember.  Obviously
20 sometime before 2003.
21    Q.   When did -- I probably did a bad job
22 asking that question.
23    A.   I apologize.
24    Q.   That's on me.  Ethicon -- I assume Ethicon
25 contacted you and said, "Hey, we've got this

Page 93

1 litigation going on.  We want you to be an expert."
2     A.   Oh, I apologize.
3     Q.   Let me reask the question so the record's
4 clear.
5     A.   Go ahead.
6     Q.   When did Ethicon first contact you to be
7 a -- to ask you to be an expert in this litigation?
8     A.   May of last year.  Sometime in the spring,
9 I believe.
10    Q.   When did you first start working on the
11 case?
12    A.   Sometime after May of last year some --
13 you know, in the spring of last year, summer of last
14 year.
15    Q.   Okay.  When did you draft your TVT report?
16    A.   Earlier this year, probably maybe January,
17 February.
18    Q.   Are all the opinions you intend to offer
19 in this case contained within your report?
20        MR. MORIARTY:  Objection.
21        Go ahead.
22        THE WITNESS:  Well, I -- I suppose it's
23 what you ask me.  Okay.
24 BY MR. JONES:
25    Q.   What opinions do you intend to offer in

Joseph M. Carbone, M.D.

Page 94

1 this case? Perfect opportunity.
2      MR. MORIARTY: Objection. And objection
3 form.
4      Go ahead and answer if you can. If you
5 can.
6 BY MR. JONES:
7      Q. Yeah. The question is, what opinions are
8 you offering in this case? Can you answer that?
9      A. My opinions for this case -- well, the
10 opinions that I intend to render in this case -- I
11 certainly may not be limited to just this report --
12 will be that the product of TVT or the TVT pelvic --
13 or the Prolene polypropylene mesh, they were not
14 defective.
15      Q. Okay. Any other opinions you'll be
16 rendering in this case?
17      MR. MORIARTY: Objection. Form.
18      Go ahead.
19 BY MR. JONES:
20      Q. This is my only opportunity. Like you
21 just said, heh, if they're not in my report, you get
22 to ask me. Here's my only opportunity to ask you.
23      So tell me, besides the opinion that
24 you're rendering that the TVT device is not defective
25 nor is the Prolene mesh defective, what are the other

Page 95

1 opinions you're going to be offering in this case?
2      MR. MORIARTY: And besides what's in his
3 report?
4      THE WITNESS: Well, see, that's it. I
5 mean, everything that's in my report I will be
6 presenting.
7 BY MR. JONES:
8      Q. Okay.
9      A. In addition to whatever you may choose to
10 ask me.
11      Q. And I'm asking you right now. Please tell
12 me what opinions you're going to be offering in this
13 case that you haven't included in your report.
14      MR. MORIARTY: Objection. Form.
15      Go ahead.
16      THE WITNESS: Okay. If you're not going
17 to be asking me anything more, then the opinions
18 that I'm going to be rendering are in this
19 report.
20 BY MR. JONES:
21      Q. Okay. Do you have any intention to
22 supplement your report? Have you been asked to?
23      A. I have not been asked to.
24      Q. Okay. So at this point, you've not been
25 asked by Ethicon to supplement your report?

Page 96

1      MR. MORIARTY: Objection.
2      Go ahead.
3      THE WITNESS: At this point in time, I
4 have not been asked to supplement my report. I
5 suppose if new information becomes available, I
6 reserve the right to supplement my report. But
7 based on the current information available to me
8 today, my opinions are included in my report.
9 BY MR. JONES:
10      Q. Okay. Thank you. Perfect. Have you ever
11 seen in your practice TVT mesh fray?
12      A. I guess my question is -- I mean, that
13 term is thrown around so much. What do you mean by
14 "fray"?
15      Q. Did you review the expert report of
16 plaintiff's expert Bruce Rosenzweig?
17      A. I don't recall specifically. May I see
18 the --
19      Q. I don't have the report with me. Do you
20 know -- can you tell the jury what TVT mesh fraying
21 means to you?
22      A. What it means to me? Okay. When put
23 under extreme stressors, okay, the -- I mean, extreme
24 ex vivo supraphysiologic stressors, you'll see some
25 of the ends of the material, I guess, become loose.

Page 97

1 And that's what fraying means to me.
2      Q. Okay. Perfect. We've use that definition
3 moving forward.
4      A. Okay.
5      Q. Have you ever seen fraying without extreme
6 stress or supraphysiological forces placed on the
7 mesh?
8      A. Hmm. I have not seen it fray under no
9 tension, but that wasn't your question.
10      Q. No, it wasn't.
11      A. I haven't seen it fray under -- what did
12 you ask again?
13      MR. JONES: Can you read it back for him?
14      (Whereupon the Court Reporter read the
15      requested question.)
16      THE WITNESS: No.
17 BY MR. JONES:
18      Q. Okay. Is fraying of TVT mesh inherent in
19 the design of the mesh?
20      A. Inherent. I mean, I'm serious. I want to
21 make sure I get your answer right. What do you mean
22 by "inherent"?
23      Q. Are you familiar with any internal
24 documents that discuss whether fraying is inherent in
25 the design of TVT mesh?

Joseph M. Carbone, M.D.

Page 98

1      A.  I've reviewed a lot of documents, and I
2  don't remember seeing one that says the word
3  "inherent."  I mean, if you'd like me to, I can
4  review something for you.
5      Q.  Okay.  That wasn't in one of the 10 or 15
6  documents?
7      A.  Not that I recall.
8      Q.  Okay.  Do you know who Marty Weisberg is?
9      A.  I recall hearing the name, but I don't
10  think -- I don't remember meeting him.
11      Q.  Okay.  Do you know what he -- does he work
12  for Ethicon?
13      A.  I believe he worked -- I don't know if he
14  works for Ethicon now, but I think he worked for
15  Ethicon in the past.
16      Q.  Do you know what his role was at Ethicon?
17      A.  No.
18      Q.  Do you know who Dan Smith is?
19      A.  Dan Smith, I met, yes.
20      Q.  Okay.  Do you know what his role at
21  Ethicon is?
22      A.  No, I don't know his role.
23      Q.  Okay.  Do you know who Gene Kammerer is?
24      A.  No.
25      Q.  Do you know Laura Angelini is?

Page 99

1      A.  I don't recall that name.
2      Q.  Do you know who David Robinson is?
3      A.  Yes, I do -- I do know -- I remember
4  meeting David Robinson.
5      Q.  Okay.  Do you know who Dan Lamont is?
6          MR. MORIARTY:  Objection.  Now you're just
7      throwing out country music.
8          THE WITNESS:  I don't remember that name.
9      I'm sorry.  Good.  I'm glad.  No, I don't
10      remember Dan Lamont.
11  BY MR. JONES:
12      Q.  We'll move on.  I'm done with the name
13  game.
14      A.  Thank you.
15      Q.  All right.  We'll go back to -- is
16  particle loss a risk of TVT mesh?
17          MR. MORIARTY:  Objection.  Form.
18          THE WITNESS:  Again, you know, you have to
19      define for me how -- these terms are very
20      loosely used.  What do you define by "particle
21      loss"?
22  BY MR. JONES:
23      Q.  The mesh losing particles, hence the name
24  "particle loss."  That's all my definition is.
25      A.  Right.  I got you.

Page 100

1          MR. MORIARTY:  Objection.
2  BY MR. JONES:
3      Q.  So let me reask the question again.
4      A.  Okay.  Go ahead.
5      Q.  Have you ever -- is particle loss a risk
6  of TVT mesh?
7          MR. MORIARTY:  Objection.  Form.
8          THE WITNESS:  You know, not when placed
9      appropriately.
10  BY MR. JONES:
11      Q.  Have you ever experienced particle loss of
12  the TVT mesh when you've used TVT mesh?
13      A.  No, because I've not put it under any
14  significant tension -- any tension.
15      Q.  Since -- you've used the TVT line of
16  products since 2003, correct?
17      A.  Yes.
18      Q.  Since your use of the TVT line of products
19  since 2003, you've never seen particle loss with TVT
20  mesh?
21      A.  I have.
22      Q.  Okay.  Explain.
23      A.  When you apply excessive tension to the
24  mesh, supraphysiologic stressors, you stretch it out
25  like that (indicating), there's going to be -- what

Page 101

1  do you call it?
2      Q.  Particle loss?
3      A.  Particle loss.
4      Q.  Since your use of TVT mesh dating back to
5  2003, have you ever experienced particle loss when
6  you've used TVT mesh?
7          MR. MORIARTY:  Objection.  Form.
8      Go ahead.
9          THE WITNESS:  Have -- again, have I -- go
10      ahead.  Say it again.
11  BY MR. JONES:
12      Q.  Since 2003 --
13      A.  Got it.
14      Q.  -- have you experienced particle loss when
15  you used TVT mesh?
16      A.  No, because I didn't place my meshes under
17  tension.
18      Q.  You have never experienced particle loss
19  with TVT mesh since 2003, correct?
20          MR. MORIARTY:  Objection.  Asked three
21      times.
22      Go ahead.
23          MR. JONES:  Maybe just twice.
24          THE WITNESS:  Okay.  Say it again because
25      I want to make sure I answer okay.

Joseph M. Carbone, M.D.

Page 102

1 BY MR. JONES:
2    Q.  See this happens.
3    A.  That's fine.  Go ahead.
4    Q.  So maybe I'm going to ask it again.
5    A.  All right.
6    Q.  All right.  Since 2003 --
7    A.  Right.
8    Q.  -- in all your use of TVT mesh, you've
9 never personally experienced particle loss?
10        MR. MORIARTY:  Objection.  Asked and
11    answered.
12        THE WITNESS:  No, because I don't put it
13    in under tension.
14        MR. JONES:  I have to move to strike
15    everything after the word "no."  Okay.
16        Next question.  It's just legal, legal
17    crud is what it is.
18        MR. ROSENBLATT:  It doesn't mean anything.
19        MR. JONES:  Doesn't mean anything to you,
20    probably not going to mean anything to any of us
21    either.
22 BY MR. JONES:
23    Q.  All right.  Moving forward.  Since 2003,
24 in your use of TVT mesh, have you ever experienced
25 TVT mesh roping or curling?

Page 103

1    A.  Since 2003, have I experienced, in my use
2 of TVT mesh, roping or curling?
3    Q.  (Nodding head up and down.)
4    A.  No.
5    Q.  Since 2003, in your use of TVT mesh, have
6 you ever seen the mesh deform without
7 supraphysiological tension?
8    A.  No.
9    Q.  Can TVT mesh cause chronic pain?
10        MR. MORIARTY:  Objection.  Form.
11        THE WITNESS:  I mean, I guess -- I kind of
12    feel like Bill Clinton here.  What do you mean
13    by "cause"?  Because if you use it in a broad, a
14    very broad sense, anything can cause chronic
15    pain, in a very broad sense.
16 BY MR. JONES:
17    Q.  I'm going to ask the question in a
18 yes-or-no form, and then I'm going to ask if you can
19 answer it yes or no.
20        Yes or no:  Can TVT mesh cause chronic
21 pain in women?
22        MR. MORIARTY:  Objection.  Form.
23        THE WITNESS:  I cannot answer that
24    specific question.
25 BY MR. JONES:

Page 104

1    Q.  Okay.  Yes or no:  Can TVT mesh cause
2 chronic dyspareunia?
3        MR. MORIARTY:  Objection to form.
4        THE WITNESS:  Again, I cannot answer that
5    specific question.
6 BY MR. JONES:
7    Q.  Yes or no:  Can TVT mesh cause chronic
8 voiding dysfunction in women?
9        MR. MORIARTY:  Same objection.
10        THE WITNESS:  Again, I mean, the way
11    you're asking it, I cannot answer that question.
12 BY MR. JONES:
13    Q.  Yes or no:  Can TVT mesh cause nerve
14 damage in women?
15        MR. MORIARTY:  Objection.
16        THE WITNESS:  Again, the way you're asking
17    it, I cannot answer that question.
18 BY MR. JONES:
19    Q.  Yes or no:  Can TVT mesh cause death in
20 patients?
21        MR. MORIARTY:  I'm sorry.  Cause what?
22        MR. JONES:  Death.
23        MR. MORIARTY:  D-E-A-T-H.
24        MR. JONES:  D, starts with a D.
25        MR. MORIARTY:  D-E-A-T-H?

Page 105

1        THE WITNESS:  D-E-A-T-H?
2        MR. JONES:  Yes.
3        MR. MORIARTY:  Objection.
4        THE WITNESS:  You know what?  In the form
5    that you're asking it, I can't answer that
6    question.
7 BY MR. JONES:
8    Q.  Okay.  Do you tell your patients when
9 you -- before you implant a TVT device or Ethicon
10 mesh product, that you have consulted for Ethicon
11 since 2003?
12    A.  Now?
13    Q.  We'll start with now.
14    A.  No.
15    Q.  Have you ever?
16    A.  Yes.
17    Q.  When?
18    A.  When I was consulting for Ethicon and TVT.
19    Q.  Okay.  So between 2003 -- between 2003 and
20 2012, you told your patients you were an Ethicon
21 consultant?
22    A.  It was my usual practice.
23    Q.  Currently, you don't tell -- currently,
24 what do you tell your patients?
25    A.  I don't tell them I'm a consultant.

Joseph M. Carbone, M.D.

Page 106

1     Q. Okay. Do you tell them that you're a
2 litigation consultant for Ethicon?
3     A. No.
4     Q. Okay. Do you agree that one of the risks
5 of the TVT mesh is chronic pain?
6     A. I don't attribute it to the mesh.
7     Q. Is that a no?
8     A. I guess we'd say that's no.
9     Q. Do you agree that one of the risks of the
10 TVT mesh is chronic dyspareunia?
11     A. I don't attribute it to the mesh.
12     Q. Is that a no?
13     A. That's a no.
14     Q. Do you agree one of the risks of the TVT
15 device is chronic pain in women?
16     A. I don't attribute it to the device.
17     Q. Is that a no?
18     A. That's a no.
19     Q. Do you agree that one of the risks of the
20 TVT device is chronic dyspareunia?
21     A. I do not attribute it to the device.
22     Q. Is that a no?
23     A. That's a no.
24     Q. Do you agree one of the risks of the TVT
25 mesh is erosion of the mesh through the woman's

Page 107

1 vaginal tissues?
2     A. Restate the question.
3     Q. Sure.
4     MR. JONES: Can you read it back?
5     (Whereupon the Court Reporter read the
6     previous question.)
7     THE WITNESS: The risk of using any mesh
8     is potential erosion.
9 BY MR. JONES:
10     Q. That's a yes, correct?
11     A. That's a yes.
12     Q. Do you agree that TVT mesh that erodes
13 through a woman's vaginal tissue can cause pain to a
14 woman?
15     A. I don't attribute that to the mesh, no.
16     Q. Do you agree TVT mesh that erodes through
17 a woman's vaginal tissue can cause dyspareunia?
18     A. I don't attribute that to the mesh.
19     Q. Do you believe TVT mesh that erodes
20 through a woman's vaginal tissue can cause discomfort
21 to the woman?
22     A. That's pretty broad. What do you want to
23 say is discomfort? I mean, how are you describing
24 "discomfort"?
25     Q. We'll just leave that at that question.

Page 108

1     All right. Is the TVT Retropubic the gold
2 standard?
3     A. Well --
4     MR. MORIARTY: Objection.
5     Go ahead.
6     THE WITNESS: I have to defer to the AUA,
7 AUGS, and SUFU that have described the
8 polypropylene mid-urethral sling as the gold
9 standard for the treatment --
10     Now, wait a second. What was your
11 question?
12 BY MR. JONES:
13     Q. Right.
14     A. There you go.
15     Q. Is TVT Retropubic the gold standard? Yes
16 or no. To you. I'm asking you.
17     A. Oh, me?
18     Q. Yeah.
19     A. Me. I wouldn't specifically say the
20 Retropubic.
21     Q. In your opinion, is the TVT-Secur the gold
22 standard?
23     A. I wouldn't say specifically the Secur.
24     Q. In your opinion, is the TVT Obturator the
25 gold standard?

Page 109

1     A. I would not say specifically the
2 Obturator.
3     Q. In your opinion, is the TVT line of
4 products the gold standard?
5     A. I would not specify it has to be TVT.
6     Q. What is the gold standard, in your
7 opinion?
8     A. In my opinion, the gold standard is the
9 polypropylene mid-urethral sling.
10     Q. Are you a member of AUGS?
11     A. Yeah.
12     Q. When did you join?
13     A. I don't remember.
14     Q. Are you a current member?
15     A. Yes.
16     Q. Are you a current member of SUFU?
17     A. Yes.
18     Q. When was the last time you went to an AUGS
19 convention?
20     A. Hmm. I don't really go to AUGS.
21     Q. When's the last time you went to -- have
22 you ever been to an AUGS convention?
23     A. No. I recently joined since I became
24 board-certified in pelvic reconstructive surgery.
25     Q. You joined AUGS in 2013?

Joseph M. Carbone, M.D.

Page 110

1  A.  Yeah.
2  Q.  Have you ever attended a SUFU convention?
3  A.  Yeah.
4  Q.  How long have you been a member of SUFU?
5  A.  I've been a member of SUFU since my
6  fellowship, somewhere around that time.
7  Q.  Okay.  Do you know Dennis Miller?
8  A.  Yes.
9  Q.  How do you know Dennis Miller?
10  A.  I met him during conferences.
11  Q.  Do you and Dennis Miller consult together
12  for Ethicon?
13  A.  Do I?
14  Q.  Have you and Dennis Miller ever acted as
15  consultants together for Ethicon?
16  A.  I believe we were at similar venues, the
17  same venues.
18  Q.  Do you know Howard Goldman?
19  A.  Yes.
20  Q.  How do you know Howard Goldman?
21  A.  I know him professionally from the
22  Cleveland Clinic, and I also know him as a preceptor.
23  Q.  For Ethicon?
24  A.  For Ethicon.
25  Q.  Dr. Goldman and you acted as consultant --

Page 111

1  both acted as consultants for Ethicon?
2  A.  I believe so.
3  Q.  Okay.  How about Erik Rodner?
4  A.  I know Erik Rodner from the Ross
5  fellowship.
6  Q.  Were you guys there at the same time?
7  A.  He was earlier.
8  Q.  Charles Nager?
9  A.  Who?
10  Q.  Do you know Charles Nager?  Am I
11  pronouncing his name right?  Dr. Nager?
12  A.  The name doesn't ring a bell.  I don't --
13  Q.  Has any medical society endorsed the use
14  of the TVT line of products?
15  MR. MORIARTY:  Objection.  Form.
16  THE WITNESS:  Well, there's two issues
17  about that question that I need clarified.
18  Number one, you specified the TVT line of
19  products.  And endorsed.
20  So I know they haven't specified the TVT
21  line of products.  And by saying "endorsed," I
22  don't know what you mean by that.
23
24  BY MR. JONES:
25  Q.  Supported -- so how about this?  None --

Page 112

1  not a single medical society has specifically called
2  out the TVT line of products in any of their society
3  statements, correct?
4  A.  I don't believe so.
5  Q.  Okay.  Do you know what the forces are in
6  the pelvis that are placed on the mesh after it's put
7  in place?
8  MR. MORIARTY:  Objection.  Form.
9  THE WITNESS:  You know, I'm sure I've read
10  them somewhere, but I don't recall.
11  BY MR. JONES:
12  Q.  Okay.  Do you know the average time for a
13  medical device to go from the initial stage of
14  development to being marketed?
15  A.  I don't.
16  Q.  Have you familiar with the principle of
17  Stage-Gates in the design development process?
18  A.  No.
19  Q.  Do you have any idea how long it takes to
20  get a medical device to market?
21  A.  No.
22  Q.  Have you reviewed any internal documents
23  that discuss Ethicon's --
24  A.  I'm sorry.  What?
25  Q.  -- that has discussed Ethicon's average

Page 113

1  time for a medical device to market?
2  A.  No.
3  Q.  Have you reviewed any internal documents
4  related to how the TVT Obturator was developed to
5  market?
6  A.  Did you ask internal documents?
7  Q.  (Nodding head up and down.)
8  A.  I reviewed a few, but I don't recall
9  specifically something about that, no.
10  Q.  None specifically that spoke to the time
11  it took to get TVT-O to market?
12  A.  No.
13  Q.  Have you reviewed the contract between
14  Ethicon and Dr. Ulf Ulmsten?
15  A.  No.
16  Q.  Are you aware of the oxidizing agents
17  naturally occurring inside a woman's vagina?
18  MR. MORIARTY:  Objection.  Form.
19  Go ahead.
20  THE WITNESS:  Well, am I aware there are?
21  Yes.  What they specifically are, I can't say
22  with certainty.  I mean --
23
24  BY MR. JONES:
25  Q.  Sure.  But you're aware there's oxidizing

Joseph M. Carbone, M.D.

Page 114

1  agents inside a vagina?
2      A.  Yeah.
3      Q.  And are you aware of what levels they
4  occur at?
5      A.  No.
6      Q.  Okay.  And have you ever reviewed the
7  material safety data sheet for the Prolene material
8  used in TVT mesh?
9          MR. MORIARTY:  Objection.
10         Go ahead.
11         THE WITNESS:  I'm sorry.  What?
12  BY MR. JONES:
13     Q.  The material safety data sheet for the
14  Prolene material used in TVT mesh.
15     A.  I mean, I've heard about it, but I've
16  never actually seen it.
17     Q.  Okay.  That's not something Ethicon --
18  Ethicon provided to you?
19     A.  I've heard about it, but I've never seen
20  it.
21     Q.  So no?
22     A.  No.
23     Q.  If you have your CV in front of you?
24     A.  Yep.
25     Q.  First question, you've redacted the

Page 115

1  address for Southside Urology.
2          What is the address of Southside Urology,
3  just for the record?
4      A.  Okay.  There's a PO box and a mailing
5  address.  I don't know what the PO box is.  The
6  mailing address is 1040 Main Street, Danville,
7  Virginia 24541.
8      Q.  Is -- do you list the same address for the
9  Piedmont Continence Institute?
10     A.  Piedmont Institute for Continence and
11  Urinary Control, yes.
12     Q.  Where did you grow up?
13     A.  Born in Brooklyn.  Till fifth grade.
14  Moved to New Jersey, through high school.  Went to
15  St. Louis for medical school, residency -- for
16  undergrad, medical school and residency.  Year in Los
17  Angeles, and here in Danville.
18     Q.  Have you done any studies for Ethicon?
19     A.  Early on -- and I mean, like in 2000, I
20  may have done a study.  I don't even remember the
21  details of it.
22     Q.  Okay.  Have you done -- other than that,
23  have you done any study for Ethicon that you recall?
24     A.  Not that I recall.
25     Q.  Have you ever done a study on the TVT-O

Page 116

1  mesh for Ethicon?
2      A.  Not that I recall.
3      Q.  Do you have a site coordinator set up for
4  studies like that that you would use?
5      A.  No.
6      Q.  Okay.  You listed lab director from 2012
7  to present at Southside Urology.  What does lab
8  director entail?
9      A.  We have a CLIA-certified lab as part of
10  the practice, and one of the clinicians basically
11  gets specially trained to oversee the lab,
12  CLIA-trained.
13     Q.  What does CLIA-trained mean?
14     A.  C-L-E-A.  Clinical Laboratory something
15  Association.  I don't know.
16     Q.  Okay.  Are you conducting any current
17  research on polypropylene mesh?
18     A.  No.
19     Q.  Have you ever published any peer review
20  articles on TVT mesh?
21     A.  I may have early on in my career as
22  general reviews.
23     Q.  Have you ever published any article on the
24  TVT device in a peer-reviewed journal?
25     A.  Could you repeat the question?  I want to

Page 117

1  get it right.
2      Q.  Yeah.  I'm just getting them -- just
3  getting to the bottom of what you've published, what
4  you've written on, what you haven't.
5      A.  I gotcha.
6      Q.  If it helps, I'll cut it off at 2002.  I'm
7  look at your résumé right now.
8      A.  All right.
9      Q.  Have you ever published any peer-reviewed
10  article on TVT mesh?
11     A.  Since 2002?  Is that what you meant by cut
12  it off from 2002?
13     Q.  Sure.
14     A.  Like, from 2002 onward?
15     Q.  Sure.
16     A.  No.
17     Q.  What is the 2002 article that you
18  published on TVT mesh?
19     A.  Where is that?  There's my reports.  Are
20  you looking at the same CV I am?
21     Q.  Just don't steal all my awesome notes on
22  it.
23     A.  I'm sorry.  I apologize.  These are
24  lectures, courses.
25     Q.  If you can go to the next page.

Joseph M. Carbone, M.D.

Page 118

1    A.  2002.  This is April 2000.
2    Q.  Is that a different CV?
3    A.  No, but this article --
4        MR. MORIARTY:  No, but the question seemed
5    to build in 2002.
6  BY MR. JONES:
7    Q.  Yeah, the question is --
8        MR. MORIARTY:  And this is 2000.
9        THE WITNESS:  This is an article from
10   2000.
11 BY MR. JONES:
12   Q.  I'm asking you what article are you
13 referencing in 2002 that you published on TVT?
14   A.  Oh, I didn't reference an article.  Did I?
15 I apologize if I mis --
16   Q.  Okay.  What article are you referencing at
17 all that you published on TVT?
18   A.  Oh, the Comiter article may have included
19 TVT.
20       What I'm saying is, if you're asking me
21 have I had an article solely on TVT?  No.  I said, in
22 the context of a review article, I perhaps discussed
23 TVT, and that's the review article I remembered, was
24 the 2000 April, Surgical Treatment of Female Stress
25 Urinary Incontinence (Reading) -- Contemporary

Page 119

1  Urology.  And I'm sure at that point we talked about
2  TVT.
3    Q.  Is that a peer-reviewed journal?
4    A.  Contemporary Urology, I think is.
5    Q.  Is it still published today?  Is it still
6  around?
7    A.  I believe so.  I believe so.
8        MR. MORIARTY:  That's why it's called
9    contemporary -- Contemporary Urology.
10       MR. JONES:  In 2000?
11       MR. MORIARTY:  It's still contemporary.
12       THE WITNESS:  That's the article I was
13   referring to.  In answer to your question, that
14   was the -- in answer, direct answer to your
15   question, that article probably included TVT in
16   it.
17 BY MR. JONES:
18   Q.  Got it.  Other than the 2000 review
19 article in the Contemporary Urology journal, have you
20 ever published anything on the TVT mesh?
21   A.  No.
22   Q.  Other than the 2000 article that's a
23 review article, have you ever published anything on
24 polypropylene mesh?
25   A.  No.

Page 120

1    Q.  Have you ever studied polypropylene mesh
2  and reported on it in a peer review journal?
3    A.  So you used the word "and."  So studied
4  and reported?
5    Q.  (Nodding head up and down.)
6    A.  No.
7    Q.  Have you ever published any peer review
8  journal articles on the Burch procedure other than
9  the 2000 review article?
10   A.  No.
11   Q.  Do you have any current research ongoing
12 today on any product?
13   A.  No.
14   Q.  Do you consider yourself an academic
15 physician?
16       MR. MORIARTY:  Objection.  Form.
17       THE WITNESS:  Well, "define academic."
18 BY MR. JONES:
19   Q.  Are you an expert in chemical engineering?
20   A.  No.
21   Q.  Expert in pathology?
22   A.  Well, I'll even go back to the other
23 question.  Define "expert."  I mean, am I an expert
24 in pathology?  Do I have a Ph.D. in pathology?  Or
25 have I -- have I, I do I know pathology as I practice

Page 121

1  it in my practice?  Have I reviewed pathologic
2  slides?  Have I done a lab rotation for a year at
3  Washington University looking at pathology?  In that
4  context, I have expertise in pathology.
5    Q.  Have you ever reviewed pathology slides of
6  TVT mesh?
7    A.  I may have gone down to the pathology
8  department and looked at some of my explants, yes.
9    Q.  Okay.  You don't have any specific
10 recollection of which explants you reviewed?
11   A.  No.
12   Q.  Do you have any records of the pathology
13 slides that you reviewed?
14   A.  I mean --
15   Q.  Do you know what --
16   A.  There are clinical records of all the
17 pathology that I've submitted.
18   Q.  Do you know one way or the other, any way
19 in determining what pathology slides you reviewed
20 related to TVT mesh?
21   A.  Oh, I see what you're saying.
22   Q.  Right.
23   A.  So specifically the ones I reviewed.  No.
24 I mean, I -- there's -- there's reports on all of
25 them.  There's pathologic report on everything.

Joseph M. Carbone, M.D.

Page 122

1    Q. Okay. But if we wanted to know which ones
2  you looked at, no dice, not going to happen?
3    A. I can't provide you with that.
4    Q. Okay. Do you have any background in
5  polymer chemistry?
6    A. Again, I don't have a Ph.D., no.
7    Q. Have you ever done bench research on
8  polypropylene mesh?
9    A. Bench research? No.
10   Q. Lab research on polypropylene mesh?
11   A. Lab research? No.
12   Q. Your opinion that TVT mesh does not
13 degrade in vivo, have you ever attempted to have that
14 opinion published in a peer review journal?
15   A. No.
16   Q. Any of the opinions that you'll be
17 offering in this litigation, have you ever attempted
18 to have published in a peer review journal?
19   A. No.
20   Q. Are the opinions you're offering in this
21 litigation solely for litigation purposes?
22      MR. MORIARTY: Objection.
23
24 BY MR. JONES:
25   Q. I'll withdraw it.

Page 123

1       Are you an expert on warnings?
2    A. I'm sorry?
3    Q. I'll withdraw that last question. Are you
4  an expert on warnings?
5    A. Warnings?
6    Q. Warnings related to TVT mesh.
7    A. Warnings related to TVT mesh. I'm trying
8  to consider what an expert in warnings would be.
9  Again, I don't know what an expert in warnings would
10 be.
11   Q. Have you ever drafted an IFU?
12   A. No.
13   Q. Do you rely in your normal course of
14 practice as a physician on IFUs?
15   A. Do I rely?
16   Q. (Nodding head up and down.)
17   A. No.
18   Q. Do you review IFUs before you use the
19 product?
20   A. Yes.
21   Q. Okay. Always?
22   A. Which product?
23   Q. Any product.
24   A. It is my usual practice to review IFUs
25 before using a new product.

Page 124

1    Q. Thank you. Do you -- are you aware the
2  industry standards that govern what warnings must be
3  in an IFU?
4    A. The industry standards? No, I don't know
5  that --
6    Q. Do you agree that all material risks
7  related to the TVT mesh must be included in the IFU?
8      MR. MORIARTY: Objection. Form.
9      THE WITNESS: I guess define "material
10   risk."
11 BY MR. JONES:
12   Q. It's in your report. How do you use it?
13 I'm using your term.
14   A. I understand. I just wanted to know on
15 how you were using it in your question.
16      (Off record discussion.)
17   Q. I wish I could let you take all day,
18 Doctor, but we're on a tight time frame.
19   A. I apologize. I just don't see where I
20 write on this TVT IFU section the term "material
21 risk." If you would like to point out to me
22 specifically where I'm using it, I'll be happy to cut
23 to the chase for you.
24   Q. Yeah. Why don't you go to page 4? First
25 sentence, page 4.

Page 125

1    A. Oh. That's under the section of informed
2  consent. Okay. Let me look at that.
3    Q. So I'm using your term "material risk."
4  Okay?
5    A. Okay. But that --
6    Q. See that? You see the words?
7    A. But that -- yeah, I see the word right
8  there.
9    Q. All right. Let me ask my question.
10   A. Go ahead.
11   Q. Is it your opinion that the TVT IFU should
12 include all material risks associated with the
13 device?
14      MR. MORIARTY: Objection.
15      THE WITNESS: And I know we're under a
16   time restraint, so I'll respect that by
17   answering I can't answer your question, because
18   I use the term "material risk" in my discussion
19   on informed consent between surgeon and
20   patients, not on the discussion in an IFU. I
21   use the term differently.
22      So if you want to define what you mean by
23   "material risk in an IFU," I'll be happy to try
24   to answer your question.
25 BY MR. JONES:

Joseph M. Carbone, M.D.

Page 126

1    Q.  Same what you mean in your report when
2  you're discussing it in that section.  That's what I
3  mean.
4        A.  Oh, I understand.
5        Q.  So same question, yes or no.  Does the IFU
6  for the TVT need to include all material risks
7  associated with the device?  Yes or no or I can't
8  answer the question?
9            MR. MORIARTY:  Objection.  Form.
10           Go ahead.
11           THE WITNESS:  I can't answer the question
12   for IFUs.
13  BY MR. JONES:
14       Q.  Does the TVT IFU need to include all risks
15  associated with the device?  Yes or no or I can't
16  answer the question?
17           MR. MORIARTY:  Objection.  Form.  Go
18   ahead.
19           THE WITNESS:  No.
20  BY MR. JONES:
21       Q.  What risk must be included in the TVT IFU?
22       A.  The material -- I'm sorry.  The risk
23  unique to the device.  The risks unique to the
24  device.
25       Q.  All --

Page 127

1        A.  The risks unique to the proper use of the
2  device.
3        Q.  It's your opinion all risk unique to the
4  TVT device, specifically proper use of the TVT
5  device, must be included in the TVT IFU, correct?
6            MR. MORIARTY:  Objection.  Form.
7            THE WITNESS:  Read it back again.  I just
8   want to make sure.
9            MR. JONES:  I'm going fast because I'm on
10   a tight --
11           THE WITNESS:  I'm with you.  I'm sorry.  I
12   apologize.  I want to make sure it's right.
13           MR. JONES:  Can you read that question
14   back?
15           (Whereupon the Court Reporter read the
16           requested question.)
17           THE WITNESS:  All risks unique to the TVT
18   device.
19           Yeah, I think that's -- if that's what I
20   said, yeah, that's what I mean.
21  BY MR. JONES:
22       Q.  It's your opinion that, the risks
23  associated with the device is caused by improper use
24  of the device, that risk does not need to be in the
25  IFU, correct?

Page 128

1        A.  Correct.
2        Q.  Okay.  What risks are unique to the TVT
3  device that need to be in the TVT IFU?
4            MR. MORIARTY:  Objection.  Form.
5            Go ahead.
6            THE WITNESS:  The unique risks to the TVT
7   device is erosion of the mesh material.
8  BY MR. JONES:
9        Q.  Is erosion of the mesh material the only
10  unique device -- or unique risk associated with the
11  TVT device?
12       A.  In my opinion, yes.
13       Q.  If erosion is the only risk listed in the
14  TVT IFU, is the TVT IFU adequate, in your opinion?
15           MR. MORIARTY:  Objection.  Form.
16           THE WITNESS:  I know you're on a time
17   constraint, but I'd like to look specifically at
18   the TVT IFU that you're speaking about.
19           MR. MORIARTY:  He just asked a
20   hypothetical.
21           THE WITNESS:  I'm sorry?  What --
22           MR. JONES:  I think that was an objection.
23   I'm not for sure, though.
24           MR. MORIARTY:  I did object.
25           MR. JONES:  That was an objection?

Page 129

1            MR. MORIARTY:  No.  I objected before I
2   got out of my seat.
3            MR. JONES:  Okay.  I was talking about
4   what you said just then.
5  BY MR. JONES:
6        Q.  I'll ask the question again.
7        A.  Go ahead.
8        Q.  Okay.
9        A.  Go ahead.
10           MR. MORIARTY:  No, wait.
11           MR. JONES:  Let me ask my question.  Is
12   that okay?
13           MR. MORIARTY:  Yeah.
14  BY MR. JONES:
15       Q.  Is erosion the only unique risk associated
16  with the TVT device?  Yes or no?
17           MR. MORIARTY:  Objection.  Form.
18           Go ahead.
19           And asked and answered.
20           THE WITNESS:  Yes.
21  BY MR. JONES:
22       Q.  Okay.  If the TVT IFU device only includes
23  erosion as the unique risk associated with TVT --
24       A.  You got a lot detail there.  If the TVT
25  IFU --

Joseph M. Carbone, M.D.

Page 130

1    Q.  -- only includes erosion as a risk of the
2  device, is the IFU adequate?
3    A.  -- only includes erosion of the TVT
4  device.  I mean, in a sense, yeah.
5    Q.  In the cadaver labs in educational courses
6  that you've done for Ethicon, have you ever taught
7  anything that is contradicted by the product IFU?
8    A.  Not that I'm aware of.
9    Q.  So it's fair to say the information you
10  give to surgeons in these educational labs and
11  seminars are consistent with the content in the
12  instructions for use for that device?
13    A.  Yes.
14    Q.  Have you ever appeared in any marketing
15  videos for Ethicon?
16    A.  I don't recall.  I don't recall being
17  asked either.
18    Q.  Okay.  You have no recollection of Ethicon
19  getting your approval for your use of -- of your
20  likeness in their marketing videos?
21    A.  No, not that I'm aware.
22    Q.  Okay.  Describe to the jury what a normal
23  week in the life of Dr. Carbone is.
24    A.  Define "normal."
25    Q.  Limiting it to -- here's what I'm looking

Page 131

1  for.
2    A.  Okay.  Thanks.
3    Q.  What you do when you go in as a doctor
4  Monday through Friday, or Monday through Sunday.
5    A.  I kind of feel like you told me I was
6  under a time constraint.
7    Q.  How about this?  What percentage of your
8  practice is related to evaluating patients with
9  stress urinary incontinence?
10    A.  25 to 30 percent.
11    Q.  What percentage of your practice as an
12  urologist involves treating males?
13    A.  30 percent.
14    Q.  Okay.  What percentage of your practice
15  involves operating on patients with stress urinary
16  incontinence?
17    A.  I guess you'd -- I'd have to ask you, is
18  this before all the litigation or since all the
19  litigation?
20    Q.  Today.
21    A.  Today.
22    Q.  Today, how about -- let me ask the
23  question.  Today, what percentage of your practice
24  involves operating on patients related to stress
25  urinary incontinence?

Page 132

1    A.  20 to 25 percent.
2    Q.  Before 2011, what percentage of your
3  practice was related to operating on patients for
4  stress urinary incontinence?
5    A.  Maybe 30, 35 percent.
6    Q.  Over the past three years, your usage of
7  transvaginal mesh has decreased, correct?
8    A.  Yes.
9    Q.  Over the past three years, your usage of
10  TVT mesh has decreased, correct?
11    A.  Yes.
12    Q.  You no longer use transvaginal mesh to
13  treat pelvic organ prolapse whatsoever, correct?
14    A.  Correct.
15    Q.  Have you ever used any mesh products
16  transvaginally since the year 2000 that are not made
17  by Ethicon?
18    A.  No.
19    Q.  Do you treat mesh complications?
20    A.  Yes.
21    Q.  What percentage of your practice is
22  related to mesh -- treating mesh complications?
23    A.  A very small amount.  Less than 5 percent.
24    Q.  How many -- have you removed mesh from a
25  patient before?

Page 133

1    A.  Yes.
2    Q.  How many times?
3    A.  I can't give you an exact count.  Slings?
4  I'm sorry?
5    Q.  I was telling him to cut me off on time
6  whenever.
7    A.  I apologize.  I thought you were talking
8  about the question.
9    Q.  Sorry.
10    A.  40 or 50, I guess, in -- now, what -- let
11  me ask you.  What is the time frame you're asking?
12    Q.  Your entire career.
13    A.  What did I say?
14    Q.  40 or 50.
15    A.  40 or 50.  Yeah, that's right.  That's
16  about right.
17    Q.  Of those 40 to 50 mesh products you have
18  removed from women, how many are Ethicon mesh
19  products?
20    A.  Most of them.  I can't give you a number.
21    Q.  In your role as a consultant for Ethicon,
22  have you trained sales representatives for Ethicon?
23    A.  Yes.
24    Q.  Have you participated in what's called the
25  Gynecare sales school?

Joseph M. Carbone, M.D.

Page 134

1    A.  I think that's what I was referring to,
2 yes.
3    Q.  Okay.  How long did you participate in the
4 Gynecare sales school?
5    A.  I don't remember how many -- I don't
6 remember, but I did participate.
7    Q.  Explain to the jury what your role in the
8 Gynecare sales school was.
9    A.  What I did at the Gynecare sales school
10 was to discuss the condition that was appropriate --
11 I'm sorry -- the conditions that the product was
12 intended to be used for.
13    Q.  Did you see your role in the Gynecare
14 sales school as assisting in the education of Ethicon
15 sales reps?
16    A.  Assist.  What do you mean by "assist"?
17 Like taught them about the pathophysiology of the
18 disease, rare -- I mean, that's what I taught them
19 about.
20    Q.  And when you taught Ethicon sales reps in
21 the Gynecare sales school, did you do your best to
22 deliver accurate information to Ethicon sales
23 representatives?
24    A.  On the disease process, yes.
25    Q.  Did you ever describe the obturator space

Page 135

1 to Ethicon sales reps in the Gynecare sales school as
2 the black hole of the vagina?
3       MR. MORIARTY:  Objection.
4       THE WITNESS:  No.
5 BY MR. JONES:
6    Q.  Okay.  Is it true that in the year 2010 in
7 your role as a consultant for Ethicon, over 50 days
8 out of the calendar year you performed consultant
9 work for Ethicon?
10    A.  I'm sorry.  50 days in 2010?
11    Q.  (Nodding head up and down.)
12    A.  I wouldn't have -- I -- I don't have an
13 accurate number on that.  I can't say either way.
14    Q.  Okay.  Is it true that in the year 2010,
15 in your role as a consultant for Ethicon, you were
16 paid $100,000?
17    A.  What year was that?
18    Q.  2010.
19    A.  No.
20    Q.  Have you ever participated in Project
21 Scion for Ethicon?
22    A.  No, it doesn't ring a bell.
23    Q.  Okay.  Have you ever evaluated partially
24 absorbable mesh in Ethicon cadaver labs?
25    A.  Evaluated?

Page 136

1    Q.  (Nodding head up and down.)
2    A.  Not that I recall.
3    Q.  Have you ever given feedback to Ethicon on
4 partially absorbable mesh?
5    A.  No.
6    Q.  Do you know who Dr. Aaron Kirkemo is?
7    A.  Yeah, I do.
8    Q.  You don't have any recollection of having
9 conversations with Dr. Kirkemo about partially
10 absorbable mesh used in TVT?
11    A.  No, I -- well, there may have been
12 conversations, but I don't -- your first question was
13 regarding feedback.  But I may have had conversations
14 with him.
15    Q.  Okay.  No feedback from any innovation
16 council or cadaver lab on partially absorbable mesh
17 used in TVT that you recall as you sit here?
18    A.  That I recall, no.
19    Q.  How many Ethicon annual summits have you
20 attended?
21    A.  I don't remember.
22    Q.  Did you attend Ethicon annual summit in
23 NAPA Valley?
24    A.  Yes.
25    Q.  Okay.  How many days were you in NAPA

Page 137

1 Valley for the Ethicon summit?
2    A.  Was it a weekend?  I don't know.
3    Q.  Do you recall what year it was?
4    A.  No.
5    Q.  Did you go -- did you go to the Ethicon
6 summit in NAPA Valley by yourself?
7    A.  No.  There were other people there.
8    Q.  Okay.  Did you travel with any of your
9 family members?
10    A.  I don't think so.
11    Q.  Didn't take your wife?
12    A.  I don't believe so.
13    Q.  Did you attend the Ethicon annual summit
14 in Kissimmee, Florida?
15    A.  Maybe.
16    Q.  Attend --
17    A.  I don't know.  Because there's a lot of
18 programs that are done, kind of at Walt Disney World.
19 So I don't remember if it was specifically an Ethicon
20 program.
21    Q.  I'm going to name a list of cities --
22    A.  Okay.
23    Q.  -- and you tell me whether Ethicon has
24 paid for your travel to those cities as part of your
25 role as a consultant for the company.

Joseph M. Carbone, M.D.

Page 138

1    A.  Okay.
2    Q.  NAPA Valley?
3    A.  Yes.
4    Q.  Miami?
5    A.  Yes.
6    Q.  Orlando Walt Disney World?
7    A.  I don't recall.
8    Q.  Salt Lake City?
9    A.  Yes.
10   Q.  Chicago?
11   A.  I don't recall.
12   Q.  Las Vegas?
13   A.  I don't recall.  I don't think so.
14   Q.  San Diego?
15   A.  I don't recall.
16   Q.  Paris, France?
17   A.  Yes.
18   Q.  New York City?
19   A.  I don't recall.
20   Q.  How many times have you visited Ethicon
21  headquarters?
22   A.  I don't remember.
23   Q.  More than five?
24   A.  Yes.
25   Q.  More than ten?

Page 139

1    A.  You're getting foggy now.  I'm not sure.
2    Q.  It's fair to say you've visited Ethicon
3  headquarters more than five times?
4    A.  Yes.
5    Q.  The Gynecare sales school where you spoke
6  to Ethicon sales representatives, was that at Ethicon
7  headquarters?
8    A.  Yes.
9    Q.  Where are Ethicon's headquarters?
10   A.  New Jersey.
11      MR. JONES:  I think that is all the time I
12  have, Dr. Carbone.  That wraps up the three
13  hours of the TVT deposition.  I think we'll take
14  a break.
15      (Off record discussion.)
16   (Carbone 7 was marked for identification and
17  not referred to.)
18      (Time: 9:00 p.m.)
19      (Signature reserved.)
20
21
22
23
24
25

Page 140

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24
25

Page 141

1        - - - - - -
2        E R R A T A
3        - - - - - -
4
5  PAGE  LINE  CHANGE
6  ____  ____  _____
7      REASON: _____
8  ____  ____  _____
9      REASON: _____
10  ____  ____  _____
11      REASON: _____
12  ____  ____  _____
13      REASON: _____
14  ____  ____  _____
15      REASON: _____
16  ____  ____  _____
17      REASON: _____
18  ____  ____  _____
19      REASON: _____
20  ____  ____  _____
21      REASON: _____
22  ____  ____  _____
23      REASON: _____
24  ____  ____  _____
25      REASON: _____

Page 142

1     ACKNOWLEDGMENT OF DEPONENT

2

3         I,_____, do

4  hereby certify that I have read the

5  foregoing pages, and that the same is

6  a correct transcription of the answers

7  given by me to the questions therein

8  propounded, except for the corrections or

9  changes in form or substance, if any,

10 noted in the attached Errata Sheet.

11

12

13 _____

14 JOSEPH M. CARBONE, M.D.      DATE

15

16

17 Subscribed and sworn

18 to before me this

19 _____ day of _____, 20____.

20 My commission expires:_____

21

22 _____

23 Notary Public

24

25

Page 143

1       C E R T I F I C A T E

2

3       I, Karen K. Kidwell, RMR, CRR, in and for

4  the Commonwealth of Virginia, do hereby certify that

5  there came before me on Wednesday, March 16, 2016, the

6  person hereinbefore named, who was by me duly sworn to

7  testify to the truth and nothing but the truth of his

8  knowledge concerning the matters in controversy in this

9  cause; that the witness was thereupon examined under

10 oath, the examination reduced to typewriting under my

11 direction, and the deposition is a true record of the

12 testimony given by the witness.

13       I further certify that I am neither attorney

14 or counsel for, nor related to or employed by, any

15 attorney or counsel employed by the parties hereto or

16 financially interested in the action.

17       This the 18th day of March, 2016.

18

19

20       _____

21       Karen K. Kidwell, RMR, CRR

22       Notary Public #7625774

23 My Commission Expires: 9/30/2019

24

25