# Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON
 2
      ----------------------------  )  Master File No.
 3    IN RE:  ETHICON, INC.,        )  2:12-MD-02327
      PELVIC REPAIR SYSTEM          )
 4    PRODUCTS LIABILITY LITIGATION )  MDL 2327
      ----------------------------  )
 5    THIS DOCUMENT RELATES TO      )  JOSEPH R. GOODWIN
      PLAINTIFFS:                   )  U.S. DISTRICT JUDGE
 6                                  )
      Jeanie Holmes                 )
 7    Case No. 2:12-cv-01206        )
                                    )
 8    Laura Waynick                 )
      Case No. 2:12-cv-01151        )
 9                                  )
      Denise Burkhart               )
10    Case No. 2:12-cv-01023        )
                                    )
11    Pamela Free                   )
      Case No. 2:12-cv-00423        )
12                                  )
      Dorothy Baugher               )
13    Case No. 2:12-cv-01053        )
                                    )
14    Lisa Thompson                 )
      Case No. 2:12-cv-01199        )
15                                  )
      Rebecca Wheeler               )
16    Case No. 2:12-cv-01088        )
                                    )
17    Thelma Wright                 )
      Case No. 2:12-cv-01091        )
18                                  )
      Rocio-Herrera Nevarez         )
19    Case No. 2:12-cv-01294        )
                                    )
20    Debra A. and Donald           )
      Schnering                     )
21    Case No. 2:12-cv-01071        )
                                    )
22    Margaret Kirkpatrick          )
      Case No. 2:12-cv-00746        )
23    ----------------------------  )
24         GENERAL DEPOSITION OF DENISE ELSER, M.D.
```

Denise Elser, M.D.

Page 2

The deposition of DENISE ELSER, M.D., called by the MDL Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and a Certified Shorthand Reporter of the State of Illinois, at the Le Meridien Chicago - Oakbrook Center, Discovery Room, 2100 Spring Road, Oak Brook, Illinois, on March 30, 2016, commencing at 8:06 a.m.

Page 3

APPEARANCES:
ON BEHALF OF THE MDL PLAINTIFFS:
   WAGSTAFF & CARTMELL LLP
   4740 Grand Avenue, Suite 300
   Kansas City, Missouri 64112
   816-701-1100
   BY: ANDREW N. FAES, ESQ.
      afaes@wcllp.com

ON BEHALF OF PLAINTIFF JEANIE HOLMES:
   KABATECK BROWN KELLNER LLP
   Historic Fire Engine Co. No. 28 Building
   644 South Figueroa Street
   Los Angeles, California 90017
   213-217-5000
   BY: DREW R. FERRANDINI, ESQ.
      df@kbklawyers.com

ON BEHALF OF THE DEFENDANTS:
   FRIDAY, ELDREDGE & CLARK, LLP
   400 West Capital Avenue, Suite 2000
   Little Rock, Arkansas 72201-3522
   501-376-2011
   BY: LAURA HENSLEY SMITH, ESQ.
      smith@fec.net

REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968

Page 4

I N D E X
DENISE ELSER, M.D.   EXAMINATION
  BY MR. FAES.................. 5

E X H I B I T S
ELSER DEPOSITION EXHIBIT   MARKED FOR ID
No. 1  Notice to Take Deposition of   8
       Denise Elser, M.D.

No. 2  General TVT and TVT-O Expert   11
       Report of Denise M. Elser, M.D.
No. 3  Reliance List   12
No. 4  curriculum vitae   27

Page 5

   (WHEREUPON, the witness was duly
    sworn.)
   DENISE ELSER, M.D.,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
   EXAMINATION
BY MR. FAES:
  Q.  Good morning, Doctor.
  A.  Good morning.
  Q.  My name is Andy Faes and I represent the Plaintiffs in this case. Do you understand that?
  A.  Yes.
  Q.  And we have never met before, is that correct?
  A.  That's correct.
  Q.  We are here today because you've been identified by Ethicon and Johnson & Johnson as a general causation expert related to the TVT-Retropubic product and the TVT-O in Wave 1 of the Ethicon MDL.
    Do you understand that?
  A.  Yes.
  Q.  Do you understand that I'm here today to ask you about your general opinions related to the

Denise Elser, M.D.

Page 6

1  TVT-Retropubic product and the TVT-O product
2  manufactured by Ethicon?
3     A.   Yes.
4     Q.   Now, when I refer to the TVT-Retropubic,
5  do you understand that I'm referring to the product
6  that was manufactured and initially brought to the
7  market in the United States in October of 1998?
8     A.   Can I clarify? Can I ask you a
9  clarifying question about that, please.
10    Q.   Sure.
11    A.   So, the original product that was
12 brought out had a slight change in that the trocars
13 changed. So, I'm going to assume that you mean
14 either one of those first two products but not the
15 Exact.
16    Q.   Okay. Is that your understanding in
17 this case?
18    A.   Yes.
19    Q.   And when I refer to the TVT-O product,
20 you understand that I'm referring to the product
21 that was manufactured and initially brought to the
22 market in January of 2004 in the United States,
23 correct?
24    A.   Yes.

Page 7

1     Q.   And just as a point of clarification
2  since we were talking about the TVT-Retropubic
3  product, you're not here today to offer any
4  opinions about the TVT Exact product, correct?
5     A.   Not unless you're asking about that.
6     Q.   But you haven't -- as far as you're
7  aware, you haven't been disclosed as a general
8  expert by Ethicon and Johnson & Johnson on the
9  TVT-O Exact product at this time, correct?
10    A.   Not that I know of.
11    Q.   And you understand I take it from your
12 prior depositions that there is actually two
13 versions of the TVT-Retropubic product that
14 continue to be sold, one that has laser-cut mesh
15 and one with a mechanical-cut mesh, correct?
16    A.   Yes.
17    Q.   And the same is true of the TVT-O?
18    A.   Yes.
19    Q.   Are your opinions in this case, meaning
20 the Wave 1 litigation that you're identified in,
21 going to be related to both the mechanical-cut
22 versions of the TVT-Retropubic product and the
23 laser-cut versions?
24    A.   Yes.

Page 8

1     Q.   The same question on the TVT-O, are your
2  opinions in this case, meaning the Wave 1
3  litigation, going to be related to both the
4  mechanical-cut versions and the laser-cut versions
5  of the TVT-O product?
6     A.   Yes.
7     Q.   Doctor, I'm going to hand you -- strike
8  that.
9          I take it that all of the opinions
10 related to the safety and efficacy of those
11 products, the TVT-O and the TVT, both the laser-cut
12 and mechanically-cut versions, are contained in
13 your report, your general report that you've
14 produced in this litigation?
15    A.   Yes.
16         (WHEREUPON, a certain document was
17          marked Elser Deposition Exhibit
18          No. 1, Notice to Take Deposition of
19          Denise Elser, M.D.)
20 BY MR. FAES:
21    Q.   Doctor, I'm going to hand you what's
22 been marked as Exhibit 1 to your deposition. Can
23 you tell me what that is.
24    A.   This is a Notice to Take Deposition.

Page 9

1     Q.   Have you seen that document before
2  today?
3     A.   I have.
4     Q.   Have you brought -- strike that.
5          You see that there is various document
6  requests attached to that deposition.
7          Have you brought any -- any documents or
8  other items with you today in response to that
9  Notice?
10    A.   No.
11    Q.   Have you prepared a bill for your TVT-O
12 and TVT general report in this case?
13    A.   No.
14    Q.   Do you intend to submit a bill for the
15 work that you've done on that report in this case?
16    A.   Yes.
17    Q.   Can you estimate approximately how many
18 hours you've spent preparing the TVT-O and TVT
19 general report in this case?
20    A.   Three to four hours.
21    Q.   Just three to four hours?
22    A.   To amend my prior report.
23    Q.   And which report -- which prior report
24 were you working off of when you amended your TVT

Page 10

1 and TVT-O report that was served in Wave 1?
2   A.  My original general sling report. I
3 don't know if you have a specific name for it or
4 how you want me to describe it.
5   Q.  Do you know as you sit here today which
6 case your previous TVT and TVT-O report that you
7 were working off of to create the report in this
8 case came from?
9   A.  I don't remember which one it was.
10   Q.  So, Doctor, you stated you spent
11 approximately three to four hours creating the
12 general report in this case or updating it.
13       Was that three to four hours all time
14 that you spent drafting the actual report?
15   A.  Looking for some literature and amending
16 the report.
17   Q.  So, of the three to four hours that you
18 spent looking -- strike that.
19       First of all, when you say looking for
20 literature, does the three to four hours include
21 time just spent looking for literature or does it
22 include time actually reviewing literature as well?
23   A.  Both.
24   Q.  So, the three to four hours that you

Page 11

1 have spent in updating your report in the Wave 1
2 cases includes time you spent drafting the report,
3 searching for literature and reviewing literature,
4 is that correct?
5   A.  Yes.
6   Q.  Of the three to four hours that you've
7 spent in those activities, how many of those hours
8 would you say were spent actually drafting the
9 report?
10   A.  I can't -- I can't say exactly how much
11 of that. Most of the time was spent reading the
12 literature.
13   Q.  Doctor, I'm going to hand you what's
14 been marked as Exhibit No. 2 to your deposition.
15       (WHEREUPON, a certain document was
16        marked Elser Deposition Exhibit
17        No. 2, General TVT and TVT-O Expert
18        Report of Denise M. Elser, M.D.)
19 BY MR. FAES:
20   Q.  Can you tell me what that is?
21   A.  It's labeled as the general TVT/TVT-O
22 expert report of mine.
23   Q.  Now, perhaps I missed it. I didn't see
24 a date on that report. Can you tell me on what

Page 12

1 date you completed that report marked as
2 Exhibit No. 2?
3   A.  Give me a minute to look at it.
4       This would be the one that I prepared at
5 the end of February, early March for this -- for
6 these cases.
7   Q.  Can you be any more specific than that?
8 Do you know when you actually finished that report
9 other than -- can you be any more specific than the
10 end of February or the beginning of March?
11   A.  I believe it was the last weekend in
12 February.
13   Q.  And this report in front of you marked
14 Exhibit No. 2, it contains all the opinions that
15 you intend to offer on the TVT and TVT-O products,
16 correct?
17   A.  At this time, although I may amend it if
18 additional information becomes available.
19       (WHEREUPON, a certain document was
20        marked Elser Deposition Exhibit
21        No. 3, Reliance List.)
22 BY MR. FAES:
23   Q.  Doctor, I'm handing you what's been
24 marked as Exhibit No. 3 to your deposition. Can

Page 13

1 you tell me what that is.
2   A.  Labeled as a reliance list in addition
3 to materials referenced in the report for MDL
4 Wave 1.
5   Q.  Does this exhibit -- strike that.
6       Does this document marked as Exhibit 3
7 contain all of the materials you have reviewed and
8 relied upon in reaching your opinions regarding the
9 TVT and the TVT-O in this case?
10   A.  Well, of course my knowledge base is
11 based on many articles I have read over the years,
12 but ones that I specifically cited in my report
13 were included in this list.
14   Q.  Other than your knowledge base that
15 you've required -- strike that.
16       Other than your knowledge base that
17 you've acquired over the years, is there anything
18 other than the materials that are listed in this
19 report marked as Exhibit 3 that you reviewed and
20 relied upon in forming your opinions in this case?
21   A.  Not that I recall at this time.
22   Q.  Doctor, can you tell me if there are any
23 depositions of any company witnesses, Ethicon
24 company witnesses, on the reliance list marked as

Page 14

1 Exhibit No. 3?
2  A. Can you say again? Depositions of whom?
3  MR. FAES: Can we have the Court Reporter read
4 back the question, please.
5        (WHEREUPON, the record was read
6         by the reporter as requested as
7         follows: Q. Doctor, can you tell
8         me if there are any depositions of
9         any company witnesses, Ethicon
10        company witnesses, on the reliance
11        list marked as Exhibit No. 3?)
12 BY THE WITNESS:
13  A. By that you mean employees of Ethicon?
14 BY MR. FAES:
15  Q. Correct. Let me see if I can ask it a
16 different -- actually, I will let you answer the
17 question. Never mind.
18  A. Okay. I don't see depositions of
19 employees on here.
20  Q. Okay. So, let me ask you this. Have
21 you reviewed or relied upon any company depositions
22 of -- strike that.
23      Doctor, have you reviewed or relied upon
24 any depositions of any Ethicon company witnesses in

Page 15

1 forming your opinions in this case?
2  A. I have read them, but I did not cite
3 them in my report.
4  Q. Which ones have you read? Where would I
5 get a list of the company depositions that
6 you've -- that you've read?
7  A. That I would have to look and see which
8 ones I have in my file, but I was not planning to
9 specifically cite them or rely on them. I did not
10 rely on them for this report.
11  Q. So, even though you've reviewed some
12 depositions of Ethicon company witnesses, there is
13 none that you intend to rely upon in forming your
14 opinions in this case, is that correct?
15  A. Yes.
16  Q. Doctor, would you agree that you've been
17 designated either as a general expert or a specific
18 expert or both in 17 Wave 1 cases?
19  A. Well, I think we have to make a
20 distinction between what is designated on the list
21 and which ones I've reviewed.
22  Q. And you understand that on some cases
23 you've been designated just as a general expert,
24 some cases you've been designated as a specific

Page 16

1 expert and some cases it's both. Do you understand
2 that?
3  A. Correct. Okay. I did not count the
4 number. I did not understand it to be 17, but that
5 sounds reasonable.
6  Q. You have no reason to disagree as you
7 sit here today that the number of cases that
8 you're -- have been designated on or working on in
9 Wave 1 is 17?
10  A. Correct.
11  Q. Prior to the 17 Wave 1 cases that you're
12 working on, you've consulted as an expert for
13 Ethicon in litigation in seven other pelvic mesh
14 cases, is that correct?
15  A. Again, I hadn't counted, but that sounds
16 about right.
17  Q. Well, let's go through them. You have
18 worked on the Corbett case, correct?
19  A. Yes.
20  Q. You have worked on the Bellew case,
21 correct?
22  A. Yes.
23  Q. You have worked on the Budke case,
24 correct?

Page 17

1  A. Yes.
2  Q. You have worked on the Edwards case,
3 correct?
4  A. Yes.
5  Q. You have worked on the Huskey case,
6 correct?
7  A. Yes.
8  Q. You've worked on the Wicker case,
9 correct?
10  A. Yes.
11  Q. You have worked on the Carlino case,
12 correct?
13  A. Yes.
14  Q. So, that's seven cases, right?
15  A. That's seven.
16  Q. Are there any other ones that you can
17 think of sitting here today that you've worked not
18 including the Wave 1 cases?
19  A. No.
20  Q. So, if you have worked on seven cases
21 prior to Wave 1 and you've been designated on 17
22 cases, you'd agree that you've worked on 24 cases
23 for -- at least 24 cases for Ethicon as a
24 litigation consultant, correct?

Page 18

1   A.   Well, to be very specific, I've not
2  worked on all of the 17 listed. I am listed as a
3  general expert. That does not mean that I have yet
4  worked specifically on those cases.
5   Q.   But you understand -- do you understand
6  that when you're declared as a general expert in a
7  case and you file a general report such as the
8  report marked in front of you, Exhibit No. 2, you
9  don't consider yourself to have worked on that case
10 as a general expert?
11  A.   Well, this must be legal semantics.
12 It's not a language I usually use. I have not
13 specifically worked on those cases yet. I have
14 worked on a general report being applied to these
15 cases.
16  Q.   Okay. Well, let me ask it this way.
17 Assuming that filing a general report in a case is
18 deemed to be worked or retained as an expert on
19 this case, you would agree that at this point you
20 have worked on at least 24 cases for Ethicon in
21 pelvic mesh litigation, correct?
22  A.   Yes.
23  MS. SMITH: You have used "worked on,"
24 "retained"; and then you just changed it to just

Page 19

1  "worked on."
2   MR. FAES: Okay.
3   MS. SMITH: I think -- that's the --
4  "retained" is I think different.
5   MR. FAES: Is that an objection?
6   MS. SMITH: Yes.
7   MR. FAES: Okay. Duly noted.
8  BY MR. FAES:
9   Q.   Doctor, have you been paid for each of
10 the seven cases that you worked on prior to Wave 1?
11 And I can go through the list again if you want one
12 by one but --
13  A.   I have.
14  Q.   And you expect to be paid for the 17
15 Wave 1 cases that you're working on for Ethicon,
16 correct?
17  MS. SMITH: Object to the form.
18 BY THE WITNESS:
19  A.   Yes.
20 BY MR. FAES:
21  Q.   Do you have an estimate of how much time
22 you've spent on each of the case-specific reports
23 that you've issued in the Wave 1 case?
24  A.   Including since the report was written?

Page 20

1   Q.   Yes.
2   A.   It would be about six to seven hours per
3  case.
4       (WHEREUPON, there was a short
5        interruption.)
6  BY MR. FAES:
7   Q.   Just so I understand your testimony, you
8  estimate at this time that you have spent
9  approximately six to seven hours on each of the 12
10 cases where you're designated as a specific --
11 case-specific expert?
12  A.   Yes.
13  Q.   Is your hourly rate for records review
14 still $500 an hour?
15  A.   No. It's now 650.
16  Q.   When did that change?
17  A.   January 1.
18  Q.   Of this year?
19  A.   Yes.
20  Q.   That's a $150 an hour increase, correct?
21  A.   Yes.
22  Q.   Why did you make that change?
23  A.   January 1?
24  Q.   I said why. Why. Sorry.

Page 21

1   A.   Why.
2   Q.   My apologies. Why did you make that
3  change?
4   A.   As I've gained more experience in
5  reviewing these cases and writing reports and
6  surveying what other experts were being paid, I
7  felt an increase was reasonable.
8   Q.   Is your hourly rate for depositions
9  still $600 an hour for the first six hours?
10  A.   No, that increased as well.
11  Q.   What's that right now?
12  A.   I don't have it in front of me. It
13 probably went up by the same increment.
14  Q.   Is that contained anywhere within your
15 report that we could find?
16  A.   I submitted it to someone, but I can
17 easily produce that later for you.
18  Q.   Okay.
19  MR. FAES: I'd ask that counsel get us that
20 information because I did not see it in the expert
21 report and I don't believe it's been disclosed
22 anywhere.
23 BY MR. FAES:
24  Q.   Is your rate for trial testimony still

Denise Elser, M.D.

Page 22

1  $4,000 a day?
2     A.    No.
3     Q.    And what is it now?
4     A.    8,000.
5     Q.    And I assume that your answer to why you
6  changed that rate would be the same as the answer
7  for why you changed your hourly rate for records
8  review?
9     A.    Yes.
10    Q.    All of the work that you've done in the
11 12 cases in Wave 1, would that have been done after
12 January 1 of this year and subject to your new 650
13 an hour review rate?
14    A.    Yes.
15    Q.    And the time you spent actually writing
16 the report, that's also billed at your hourly
17 review rate of $650 an hour, is that correct?
18    A.    Correct.
19    Q.    Do you recall how much you've billed in
20 the Wicker case?
21    A.    No.
22    Q.    Do you recall if it was $21,000?
23    A.    I don't recall what it was.
24    Q.    Do you recall what you billed in the

Page 23

1  Bellew case?
2     A.    No.
3     Q.    Do you recall whether or not it was in
4  excess of $74,000?
5     A.    I don't.
6     Q.    Do you recall how much you billed in the
7  Corbett case?
8     A.    No.
9     Q.    Do you recall if it was in excess of
10 $31,000?
11    A.    I don't recall.
12    Q.    Do you recall what you billed in the
13 Budke case?
14    A.    No.
15    Q.    Do you recall if the bill in that case
16 was greater than $60,000?
17    A.    I don't.
18    Q.    Do you recall what you billed in the
19 Edwards case?
20    A.    No.
21    Q.    Do you -- have you -- you said you have
22 submitted your bill in the Carlino case, correct?
23    A.    Yes.
24    Q.    Do you recall what your total bill was

Page 24

1  in that case?
2     A.    To my best recollection, it was
3  $80,000ish.
4     Q.    Do you recall approximately how many
5  hours you spent on that case?
6     A.    No.
7     MR. FAES:  Counsel, just for the record we
8  would request that that information be produced.
9           And just so you're aware, we are in
10 discussions with counsel with regard to kind of a
11 global agreement with our experts and their experts
12 regarding all the payments they have received so
13 far in this case.  But we believe we are entitled
14 to that information, and we would ask that it be
15 produced.
16 BY MR. FAES:
17    Q.    Doctor, could you take a look at your
18 reliance list again.  What exhibit number is that?
19    A.    3.
20    Q.    As before, was this reliance list
21 created by your attorneys?
22    MS. SMITH:  Object to form.
23 BY THE WITNESS:
24    A.    With edits by myself.

Page 25

1  BY MR. FAES:
2     Q.    So, you would agree that this list was
3  primarily created by your attorneys in this case
4  but you reviewed it and edited it as necessary, is
5  that correct?
6     MS. SMITH:  Object to form.  We're not
7  representing her for the record.  We are not her
8  attorneys.
9  BY MR. FAES:
10    Q.    Well, let me see if I can state it
11 another way.  I will strike that and ask a
12 different question.
13          Would you agree that attorneys for
14 Ethicon and Johnson & Johnson primarily created
15 that list but you reviewed it and made edits to it
16 as necessary?
17    A.    Yes.
18    Q.    Doctor, were you given free access to
19 all of the Ethicon and Johnson & Johnson company
20 documents in this case?
21    MS. SMITH:  Object to form.
22 BY THE WITNESS:
23    A.    I wouldn't know what all the documents
24 are.  So, I couldn't answer if I had free access.

Page 26

1  BY MR. FAES:
2      Q.  Well, let me see if I can ask it a
3  different way.
4          Do you believe that if you had asked to
5  see any particular Ethicon or Johnson & Johnson
6  company documents, if you made that request of
7  Ethicon and Johnson & Johnson's attorneys, do you
8  believe that request would be granted?
9      MS. SMITH:  Object to the form.
10 BY THE WITNESS:
11     A.  I don't know if there are certain
12 documents they have that are confidential that I
13 would be denied, but I did not ask to see any.  So
14 I find that question not applicable.
15 BY MR. FAES:
16     Q.  Okay.  So, just to make sure I
17 understand your testimony.  You have not asked
18 specifically to see any Ethicon or
19 Johnson & Johnson internal company documents in --
20 strike that.
21         Just to be clear, you have not asked to
22 see any internal Ethicon or Johnson & Johnson
23 company documents in order to form your opinions in
24 this case regarding the TVT and TVT-O, correct?

Page 27

1      A.  That's correct.
2      Q.  You didn't feel that there was anything
3  in Ethicon or Johnson & Johnson's internal files
4  that could be helpful to you in reaching your
5  opinions in this case on whether or not the TVT or
6  TVT-O is defectively designed?
7      MS. SMITH:  Object to form.
8  BY THE WITNESS:
9      A.  Correct.
10 BY MR. FAES:
11     Q.  Doctor, I'm going to hand you what's
12 been marked as Exhibit No. 4 to your deposition.
13         (WHEREUPON, a certain document was
14         marked Elser Deposition Exhibit
15         No. 4, curriculum vitae.)
16 BY MR. FAES:
17     Q.  Can you tell me what that is?
18     A.  It's my CV dated December -- oh, 2016.
19 I think that should be 2015.
20     Q.  Was that CV actually updated in
21 December of 2015?  Is that the last time it was
22 updated?
23     A.  Yes.
24     Q.  Is that your current, albeit incorrect

Page 28

1  with regard to the date, CV, most currently and
2  updated CV that you've prepared?
3      A.  Well, the address is blacked out.  So, I
4  can't tell because we moved in December.  But I
5  think that would be the most updated.
6      Q.  And it's fair to say you will probably
7  have to make another update soon to correct the
8  date, right?
9      A.  Yes.  Thanks for pointing that out.
10     Q.  Now, in November of this year you -- was
11 that the last time you were deposed with regard to
12 TVT and TVT-O that you recall or November of last
13 year?
14     MS. SMITH:  You're doing the same thing.
15     MR. FAES:  Strike that.
16     THE WITNESS:  I have set everybody off with
17 that date problem.
18 BY MR. FAES:
19     Q.  In November of last year you were
20 deposed regarding the TVT and TVT-O device,
21 correct?
22     A.  I don't remember the date, but that
23 seems like about the time I had the last
24 deposition.

Page 29

1      Q.  Do you recall if that was the last time
2  you were deposed regarding the TVT and TVT-O
3  device?
4      A.  I believe it was.
5      Q.  Now, in November of last year you
6  testified that you were still using the Elevate
7  device to treat pelvic organ prolapse, correct?
8      A.  Yes.
9      Q.  Is that -- that's no longer the case,
10 correct?
11     A.  Well, we have a few more on the shelf,
12 but that will no longer be the case in the very
13 near future.
14     Q.  And that's because the Elevate is no
15 longer going to be available from the manufacturer,
16 correct?
17     A.  That's correct.
18     Q.  Do you plan -- strike that.
19         When the Elevate is no longer available,
20 i.e., when the stock runs out, do you plan to use
21 any other mesh kits for the treatment of pelvic
22 organ prolapse?
23     MS. SMITH:  Wait a minute.  This is TVT and
24 TVT-O.  We are not getting into pelvic organ

Page 30

1 prolapse.  That's another day.
2     MR. FAES:  Actually, it's not and it's
3 relevant to the opinions in our case because it's
4 pelvic mesh made of polypropylene.  I promise you
5 I'm not going to go that deep into it, but I think
6 these questions are appropriate.
7         She relies on her clinical experience to
8 form her opinions regarding the TVT and TVT-O and
9 her experience with polypropylene mesh inserted in
10 the pelvic space is relevant to her opinions.  So,
11 I'm going to let the question stand.
12         I don't know if you're going to instruct
13 the witness not to answer or not.  That's up to
14 you.  If you instruct the witness not to answer,
15 then we might have to come back and take it up with
16 Judge Eifert.
17         But that's my position is that a limited
18 number of questions on her clinical use is
19 appropriate.  She's relying on her clinical
20 experience for her opinions in this case and that
21 clinical experience involves the use of
22 polypropylene in the vagina, which includes pelvic
23 organ prolapse mesh.
24     MS. SMITH:  Under your theory, any question

Page 31

1 regarding any pelvic organ prolapse would be
2 appropriate, and I don't think that's what the
3 agreement was in this limited updated deposition.
4         I will let her answer that one and
5 hopefully that will be the end of it.
6 BY MR. FAES:
7   Q.   You need the question read back to you,
8 Doctor?
9   A.   Yes, please.
10         (WHEREUPON, the record was read
11         by the reporter as requested as
12         follows:  Q.  When the Elevate is
13         no longer available, i.e., when the
14         stock runs out, do you plan to use
15         any other mesh kits for the
16         treatment of pelvic organ
17         prolapse?)
18 BY THE WITNESS:
19   A.   I haven't decided yet whether it would
20 be a mesh kit or I will formulate my own mesh to
21 place vaginally.
22 BY MR. FAES:
23   Q.   Has -- other than the Elevate, has your
24 use of the devices for the treatment of stress

Page 32

1 urinary incontinence -- strike that.
2         Other than the Elevate device, has your
3 use of polypropylene mesh devices for the treatment
4 of stress urinary incontinence or pelvic organ
5 prolapse changed since you were last deposed in
6 November of 2015?
7   A.   Well, I've also been using the MiniArc
8 sling, and that will no longer be available.  So,
9 my practice will be changing.
10   Q.   How long have you been using the
11 MiniArc?
12   A.   For a few years.  I don't know exactly
13 how long.
14   Q.   Okay.  Do you know what you plan to use
15 instead in place of the MiniArc when it no longer
16 becomes available to treat your patients with
17 stress urinary incontinence?
18   A.   No, I have not made that decision yet.
19   Q.   Is Exact -- is the TVT -- strike that.
20         Is the TVT Exact still your sling of
21 choice for the treatment of stress urinary
22 incontinence?
23   A.   That is the one I use most often.
24   Q.   So, is the answer yes, it's your -- it's

Page 33

1 your sling of choice for most patients?
2   A.   For most patients.
3   Q.   Okay.  You have testified before that
4 you do not use the Gynemesh PS product, correct?
5   A.   By that you mean the freestanding mesh
6 product?
7   Q.   Yes.
8   A.   I have used it in rare occasions
9 recently.
10   Q.   When have you used it recently?
11   A.   When there was no mesh kit available at
12 a hospital and I wanted a vaginal mesh.
13   Q.   So, you used it for pelvic organ
14 prolapse, not for stress urinary incontinence,
15 correct?
16   A.   Correct.
17   Q.   Have you ever used the Gynemesh PS
18 product for the treatment of stress urinary
19 incontinence?
20   A.   I don't believe so.
21   Q.   Do you have any reason to believe that
22 the Gynemesh PS product would not be effective for
23 the treatment of stress urinary incontinence?
24     MS. SMITH:  Object to form.

Page 34

1  BY THE WITNESS:
2     A.  Yes.
3  BY MR. FAES:
4     Q.  And why is that?
5     A.  Because of how thin it is and the size
6  of the pores.
7     Q.  So, you believe that the Gynemesh PS
8  product is too thin and the pores are too large to
9  effectively treat stress urinary incontinence, is
10 that correct?
11    A.  They may be and I've not considered
12 using it for incontinence.
13    Q.  Have you reviewed or are you aware of
14 any clinical literature that actually studies the
15 Gynemesh PS used for the treatment of stress
16 urinary incontinence?
17    A.  I would have to check my list.  I don't
18 recall anything at this moment.
19    Q.  But sitting here today, if there are
20 studies out there that have looked at the use of
21 Gynemesh PS for the treatment of stress urinary
22 incontinence, it's fair to say that sitting here
23 today you don't know what the results of those
24 studies are, correct?

Page 35

1     A.  Right.
2     Q.  Do you know that the Gynemesh PS product
3  is made from the same Prolene polypropylene raw
4  material as the TVT sling?
5     A.  I imagine it is, yes.
6     Q.  Sorry.  I need to backtrack a minute
7  just so I don't forget to ask you later.
8         How many times would you say that you
9  have used Gynemesh PS in the past year?
10    A.  Once or twice.
11    Q.  And do you recall if it was once or
12 twice or you just don't know sitting here today if
13 it was once or twice?
14    A.  Most likely just once that I had to use
15 it or I decided to use it.
16    Q.  Do you recall in that case whether or
17 not you implanted the Gynemesh PS product
18 transvaginally or abdominally?
19    A.  Vaginally.
20    Q.  Do you recall if that occurred before or
21 after May of 2015?
22    A.  I don't.  I think it was after.
23    Q.  Do you recall if you reviewed the
24 Gynemesh PS IFU prior to using the Gynemesh PS in

Page 36

1  that surgery that's occurred within the last year?
2     A.  I did not review the IFU in the last
3  year.
4     Q.  Do you know whether or not Gynemesh PS
5  is still indicated for transvaginal placement?
6     A.  According to the IFU?  No, I have not
7  reviewed it.
8     Q.  So, you don't know sitting here today
9  one way or the other if according to the IFU the
10 Gynemesh PS is indicated for transvaginal
11 placement?
12    A.  No.
13    Q.  Assuming that the Gynemesh PS is no
14 longer indicated for transvaginal placement, given
15 that it is made from the same raw Prolene
16 polypropylene material as what the TVT sling is
17 made from, would that have any effect or bearing on
18 your decisions or on your opinions in this case?
19    MS. SMITH:  Object to form.
20 BY THE WITNESS:
21    A.  No.
22 BY MR. FAES:
23    Q.  So, assuming that the FDA required
24 Ethicon and Johnson & Johnson to remove the

Page 37

1  transvaginal use indication as a condition of
2  keeping it on the market, that wouldn't affect your
3  opinion in any way regarding the safety and
4  efficacy of the TVT and TVT-O even though they're
5  made from the same raw material?
6     MS. SMITH:  Object to form.
7     THE WITNESS:  That means I'm still answering,
8  right?
9     MS. SMITH:  Yes.
10 BY THE WITNESS:
11    A.  No, it would not.
12 BY MR. FAES:
13    Q.  You don't think the fact that the
14 transvaginal use indication has been removed for
15 the Gynemesh PS is an indication that the FDA
16 thinks that the material may not be safe for
17 placement in vaginal tissues?
18    MS. SMITH:  Object to form.
19 BY THE WITNESS:
20    A.  No.
21 BY MR. FAES:
22    Q.  You don't think the fact that the
23 transvaginal use indication has been removed from
24 the Gynemesh PS IFU is an indication that Ethicon

Page 38

 1  feels the material may not be safe for use in
 2  vaginal tissues?
 3      MS. SMITH:  Object to form.
 4  BY THE WITNESS:
 5      A.  I don't know what they think.
 6  BY MR. FAES:
 7      Q.  Doctor, are you currently peer reviewer
 8  on any peer-reviewed journals?
 9      A.  Yes.
10      Q.  Which one?
11      A.  The Green Journal, American Journal of
12  Ob-Gyn, International Urogynecologic Journal and
13  the Female Pelvic Medicine Journal.
14      Q.  Any others?
15      A.  Not that I recall.
16      Q.  Do you understand the need for reviewers
17  and authors to disclose conflicts of interests when
18  publishing clinical data in a peer-reviewed medical
19  journal?
20      A.  I understand.
21      Q.  Do you understand that they do that
22  because without that disclosure there can be an
23  impression of bias, correct?
24      A.  Yes.

Page 39

 1      Q.  Would you agree that it's a pretty
 2  fundamental concept in the medical literature that
 3  anything that can even appear to be a bias should
 4  be disclosed?
 5      MS. SMITH:  Object to form.
 6  BY THE WITNESS:
 7      A.  Can you say that again?
 8  BY MR. FAES:
 9      Q.  Would you agree with me that it's a
10  pretty fundamental concept with regard to
11  peer-reviewed medical literature that anything that
12  can even appear to be a bias should be disclosed?
13      MS. SMITH:  Object to form.
14  BY THE WITNESS:
15      A.  I think that's too broad of a statement.
16  BY MR. FAES:
17      Q.  Okay.  Where was I wrong?
18      A.  Well, it can get extremely detailed.
19  So, if you own mutual funds that own stocks of
20  medical device, are you expected to disclose that?
21  No.  Would someone think that's a bias?  They
22  might.  But at this time certain things are not
23  within the guidelines of what is disclosed.
24      Q.  Doctor, have you ever done any research

Page 40

 1  or any study to determine how stiff or whether
 2  there is a difference in stiffness between
 3  laser-cut mesh and mechanically-cut mesh?
 4      A.  I have not done such a study.
 5      Q.  Have you ever seen any internal Ethicon
 6  studies or documents related to the laser-cut mesh
 7  being stiffer than mechanically-cut mesh?
 8      A.  I have at some time seen such documents.
 9      Q.  And how did those documents inform your
10  opinion -- opinions in this case?
11      A.  They have not.
12      Q.  So, you gave them no weight in
13  forming -- strike that.
14          So, the internal and -- strike that
15  again.
16          The internal Ethicon studies or
17  documents related to laser-cut mesh being stiffer
18  than mechanically-cut mesh, you gave those
19  documents no weight or bearing in forming your
20  opinions and conclusions in this case regarding the
21  TVT-O and TVT?
22      MS. SMITH:  Object to form.
23  BY THE WITNESS:
24      A.  Right.  What happens in the lab in an

Page 41

 1  artificial setting is not important to me compared
 2  to how the sling reacts clinically and how it
 3  performs.
 4  BY MR. FAES:
 5      Q.  Okay.  My question was actually a little
 6  bit different than that.
 7          My question was:  Did you give the
 8  internal Ethicon studies or documents related to
 9  the laser-cut mesh being stiffer or not stiffer
10  than the mechanically-cut mesh any weight or
11  bearing in forming your opinions in this case
12  regarding the TVT or TVT-O device?
13      A.  No.
14      MS. SMITH:  Object to form.
15  BY MR. FAES:
16      Q.  Are you aware of how long it took
17  Ethicon to get the TVT-O product to market?
18      A.  No, I am not.
19      Q.  So, it's fair to say you haven't
20  reviewed any internal Ethicon documents discussing
21  that, or at least if you have, you can't recall
22  them as you sit here today?
23      A.  That would be correct.
24      Q.  Have you ever published any of the

Page 42

1  opinions that you're giving in this litigation in a
2  peer-reviewed medical journal?
3      MS. SMITH: Object to form.
4  BY THE WITNESS:
5      A.  I think "any" is a broad statement.  I
6  have written about a general article on
7  incontinence and would have included some opinions
8  on slings.  So, I don't -- I have not written
9  specifically about, say, my general report in this.
10 BY MR. FAES:
11     Q.  Let me ask it a different way because
12 obviously you have been deposed many times before.
13         Have you ever published any of the
14 opinions you are giving in this litigation in a
15 peer-reviewed medical journal within the last two
16 years?
17     A.  I don't think so.
18     Q.  Okay.  Doctor, I want to ask you a
19 couple questions about specific things that you
20 have said in your report in this case.  The first
21 thing I'm going to ask you about is on page 36.
22 You don't necessarily need to look at it, but I
23 just wanted you to be aware of where I am so you
24 can follow along if you want.

Page 43

1          On page 36 of your report you state that
2  "Unlike the multi-filament mesh like the Ultrapro,
3  which was tested and failed as a sling in cadaver
4  labs, was rejected by two-thirds of surgeons as a
5  sling concept, and has not been studied like the
6  TVT-O or TVT with the volume of RCTs, metaanalyses,
7  systematic reviews and other long-term follow-up,
8  the 1.1 centimeter strip of macroporous,
9  monofilament polypropylene mesh used in TVT and
10 TVT-O is the most suitable for use in treating
11 SUI."
12         Do you see that?
13     A.  Yes.
14     Q.  I may have left out a word or two in my
15 reading, but did any errors in my reading affect
16 the substance of that opinion?
17     A.  I don't think so.
18     Q.  Okay.  Now, you state that the Ultrapro
19 is a multi-filament mesh.  Is that just an error or
20 do you believe that the Ultrapro mesh is a
21 multi-filament mesh?
22     A.  That was what I believed.
23     Q.  Do you still believe it's a
24 multi-filament mesh as you sit here today?

Page 44

1      A.  I would have to double-check that.  But,
2  yes, that's what I believed.
3      Q.  Do you have an opinion on whether or not
4  a mesh needs to be multi-filament or monofilament
5  to be considered a Type 1 mesh under the Amid
6  standards?
7      A.  The Type 1 mesh is monofilament.
8      Q.  Well, you know the Ultrapro mesh was
9  used in the Prolift+M product for the treatment of
10 pelvic organ prolapse, correct?
11     MS. SMITH: Object to form.
12 BY THE WITNESS:
13     A.  Yes.
14 BY MR. FAES:
15     Q.  Okay.  It also states in this opinion
16 that the Ultrapro mesh was tested and failed as a
17 sling in cadaver labs.
18         What cadaver labs are you referring to?
19     A.  So, I will have to take -- amend what I
20 said earlier about company documents because I did
21 get this information from a company document that
22 there was a cadaver lab and surgeons were asked to
23 rate what they thought of Ultrapro as using it as a
24 sling in cadavers.

Page 45

1      Q.  Do you recall the date of those cadaver
2  labs where it stated it failed as a sling?
3      A.  I don't.
4      Q.  Do you recall the reasons why those
5  cadaver labs stated that the Ultrapro sling failed?
6      A.  One reason was the inability to
7  sterilize the Ultrapro in the plastic sheath
8  because it stuck to the sheath and the sheath could
9  not be removed without distorting the sling.
10     Q.  Do you know whether or not Ethicon
11 engineers took the results from the cadaver labs
12 that you saw and made changes to the sling product
13 using the Ultrapro and ultimately fixed that
14 problem?
15     A.  I don't know that.
16     Q.  If that is -- assuming that is indeed
17 the case, would that change your opinion in this
18 case that the sling with the Ultrapro mesh was
19 rejected and -- strike that.
20         If that were indeed true, would that
21 change your opinion that the Ultrapro mesh
22 ultimately failed as a sling in cadaver labs?
23     A.  If they fixed the sticking to the sheath
24 problem, but not how thin the sling is and its

Page 46

1 inability to handle the stress at the urethra, no,
2 it would not change my opinion.
3     Q.   If, after making changes to the TVT
4 product which used the Ultrapro mesh after these
5 cadaver labs, the product was reevaluated and was
6 not rejected by two-thirds of surgeons using the
7 device, would that change any of your opinions in
8 this case?
9     MS. SMITH:  Object to form.
10 BY THE WITNESS:
11     A.   I would still not say it's adequate
12 without being tested clinically.
13 BY MR. FAES:
14     Q.   But would it change your opinion
15 regarding whether it was rejected by two-thirds of
16 surgeons as a sling concept if a later -- if a
17 later evaluation by surgeons actually found a much
18 higher acceptance rate?
19     MS. SMITH:  Object to form.
20 BY THE WITNESS:
21     A.   It might.  I would have to see what they
22 said.
23 BY MR. FAES:
24     Q.   Let me ask you this:  Are you familiar

Page 47

1 with the TVT-O-PA or, as it's also called, the TOPA
2 product?
3     A.   The TOPA?
4     Q.   Um-hmm.
5     A.   That's an Ethicon product?
6     Q.   Yes.
7     A.   No.
8     Q.   Are you familiar with it?  You're not
9 familiar with it?
10     A.   No.
11     Q.   Well, I'll represent to you that the
12 TVT-O-PA or TOPA product was a product being
13 developed by Ethicon for the treatment of stress
14 urinary incontinence which utilized the Ultrapro
15 mesh rather than the standard polypropylene mesh
16 that's used in the TVT.  Okay?
17         So, assuming that to be true, do you
18 know whether or not professionals at Ethicon
19 described the TVT-O-PA as substantially equivalent
20 to the TVT-O?
21     MS. SMITH:  Object to form.
22 BY THE WITNESS:
23     A.   I don't know.
24 BY MR. FAES:

Page 48

1     Q.   If they did, would that change any of
2 your opinions in this case regarding the use of
3 Ultrapro in a sling?
4     MS. SMITH:  Object.
5 BY THE WITNESS:
6     A.   If -- sorry.  Go ahead.
7     MS. SMITH:  Object to form.
8 BY THE WITNESS:
9     A.   If Ethicon employees said it was
10 substantially equivalent, no, that would not change
11 my opinion.
12 BY MR. FAES:
13     Q.   If Ethicon employees told the FDA that
14 the TVT-O-PA sling was substantially equivalent to
15 the TVT-O, would that change any of your opinions
16 in this case regarding the use of the Ultrapro mesh
17 in the sling?
18     A.   No.
19     MS. SMITH:  Object to form.
20 BY MR. FAES:
21     Q.   Have you seen any studies in the
22 published literature utilizing the Ultrapro mesh
23 for the treatment of stress urinary incontinence in
24 patients?

Page 49

1     A.   Not that I recall.
2     Q.   Are you familiar with the Scion product
3 that was developed by Ethicon, S-c-i-o-n?
4     A.   Is that a car?
5     Q.   I think it's also a car, but it's also a
6 TVT-O sling that was under development by Ethicon.
7     A.   No.
8     Q.   Your answer is no.  Were you ever
9 invited to evaluate the TVT-O-PA sling in a cadaver
10 lab by Ethicon?
11     A.   Not that I know of.
12     Q.   Do you know whether or not Ethicon did
13 indeed invite many people who were preceptors at
14 the time like yourself to evaluate the TVT-O-PA
15 product in cadaver labs?
16     A.   I don't know.
17     Q.   Same question on Scion.  I'm assuming
18 since you don't know what it is -- well, they might
19 not have told you the name.
20         Were you ever invited by Ethicon to
21 evaluate the Scion prototype in any cadaver labs?
22     A.   Not that I recall.
23     Q.   Were you ever invited by Ethicon to
24 evaluate any prototypes for the treatment of stress

Page 50

1  urinary incontinence in cadaver labs?
2     A.   Not that I recall.
3     Q.   Doctor, on page 37 of your report you
4  state that you've reviewed photographs of the mesh
5  being stretched 50% and it's your opinion that this
6  is a laboratory scenario as the mesh is not
7  similarly stretched during implantation.
8          Do you see that?
9     A.   Yes.
10    Q.   Is that an opinion you intend to offer
11 in this case?
12    A.   Yes.
13    Q.   And you believe you can offer that
14 opinion to a reasonable degree of medical
15 certainty?
16    A.   Yes.
17    Q.   What amount of stress do you believe the
18 TVT or TVT-O mesh is subjected to during
19 implantation?
20    A.   And are you asking how much does it
21 stress or how much pressure is put on it?
22    Q.   Let's first start with how much do you
23 believe it stretches during implantation?
24    A.   It should stretch minimally, if at all.

Page 51

1     Q.   Do you know what percentage -- you say
2  minimally.  Strike that.
3          You say minimally.  Do you have a
4  percentage in mind of the percentage that you think
5  it stretches during implantation?
6     A.   No.
7     MS. SMITH:  Object to form.
8  BY MR. FAES:
9     Q.   Same question regarding stretch in the
10 human body.  How much stretch do you think the TVT
11 mesh is subjected to once it's placed in the human
12 body?
13    MS. SMITH:  Object to form.
14 BY THE WITNESS:
15    A.   Do you mean not during implantation?
16 BY MR. FAES:
17    Q.   Correct.  Not during the procedure.
18 After implantation once it's in there.
19    A.   So, after it's implanted, can it
20 stretch?
21    Q.   Yes.  First of all, can it stretch?
22    A.   No.
23    Q.   You don't believe it can stretch at all?
24    A.   I believe it can stretch, but it's

Page 52

1  very -- it's very difficult to stretch it, to move
2  it even if you try.
3     Q.   So, you believe it can stretch, but it's
4  difficult, correct?
5     A.   Yes.
6     Q.   Do you believe -- strike that.
7          Do you have an opinion on what
8  percentage the mesh does actually stretch once it's
9  placed in the human body?
10    MS. SMITH:  Did you say percentage?
11    MR. FAES:  Yes.
12    MS. SMITH:  Object to form.
13 BY THE WITNESS:
14    A.   No.
15 BY MR. FAES:
16    Q.   You don't have a percent -- strike that.
17         You don't have an opinion on how much
18 the TVT mesh elongates when it's surgically placed
19 in terms of percentage, correct?
20    MS. SMITH:  Object to form.
21 BY THE WITNESS:
22    A.   Correct.
23 BY MR. FAES:
24    Q.   And you don't have any opinion on what

Page 53

1  percentage the TVT mesh may stretch once it's in
2  the human body in terms of percentage, correct?
3     A.   Correct.
4     Q.   Do you have an opinion as to the amount
5  of force that the TVT mesh is subjected to during
6  implantation?
7     A.   I would have to look at references, but
8  I don't have that at the top of my head right now.
9     Q.   Do you have an opinion of how much force
10 the TVT mesh is subjected to once it is placed in
11 the body?
12    A.   Same answer.
13    MR. FAES:  Can I go off the record.  I think I
14 have got like literally five minutes or less than
15 five minutes.  I want to get organized for three
16 minutes and then go back on.  Is that okay?
17    MS. SMITH:  Yes.
18    MR. FAES:  Okay.  Let's just go off the record
19 for just a second.
20         (WHEREUPON, a recess was had
21          from 9:00 to 9:03 a.m.)
22 BY MR. FAES:
23    Q.   Doctor, we're back on the record after a
24 short break.  Are you ready to proceed?

Page 54

1   A.  Yes.
2   Q.  Doctor, would you agree that it's
3   important to have a mesh that's compliant with
4   vaginal tissues for the treatment of stress urinary
5   incontinence?
6       MS. SMITH:  Object to form.
7   BY THE WITNESS:
8   A.  Yes.
9   BY MR. FAES:
10  Q.  In fact, you want the mesh to elongate
11  and mimic the natural vaginal tissues, correct?
12  A.  We want it to have some elasticity,
13  correct.
14  Q.  In fact, you believe that the elasticity
15  of the TVT-O -- strike that.
16      You believe that the elasticity of the
17  TVT device is in fact one of the things that makes
18  it successful.  Would you agree with that?
19  A.  Yes.
20  Q.  Would you agree with me that if
21  polypropylene meshes are different, that the data
22  can't be transferred from one mesh to the other?
23      MS. SMITH:  Object to form.
24  BY THE WITNESS:

Page 55

1   A.  Yes.
2   BY MR. FAES:
3   Q.  For example, if a mesh is three times
4   stiffer than another mesh, the clinical data from
5   the less stiff mesh cannot be used to support the
6   safety and efficacy of the stiffer mesh.  Would you
7   agree with that?
8       MS. SMITH:  Object to form.
9   BY THE WITNESS:
10  A.  I think, yeah, I agree that you need to
11  collect data on the different types of mesh.
12  BY MR. FAES:
13  Q.  Would you agree that meshes with higher
14  stiffness have the potential to increase tissue
15  erosions in the treatment of stress urinary
16  incontinence?
17      MS. SMITH:  Object to form.
18  BY THE WITNESS:
19  A.  Has the potential.
20  BY MR. FAES:
21  Q.  Do you know if Ethicon has ever done a
22  study where the primary endpoint is -- strike that.
23      Do you know if Ethicon has ever done a
24  study where the primary endpoint is to determine

Page 56

1   whether or not laser-cut mesh is stiffer and less
2   safe than mechanically-cut mesh?
3   A.  I don't know.
4   Q.  Would the results of such a study, if it
5   were done, be important to you?
6   A.  It would depend on the study.
7   Q.  Would you agree that if the study were
8   done correctly and appropriately and the study
9   showed that there was indeed a difference between
10  the safeness of the mechanically-cut mesh and the
11  laser-cut mesh, the results would be important to
12  you?
13      MS. SMITH:  Object to form.
14  BY THE WITNESS:
15  A.  Again, I would need to see the study to
16  see if I thought it was clinically relevant because
17  it could be performed correctly and still not have
18  clinical meaning.
19  BY MR. FAES:
20  Q.  Would you agree that if there was ever a
21  study where the primary endpoint was to determine
22  whether or not the laser-cut mesh is stiffer and
23  less safe than the mechanically-cut mesh, that the
24  results of such a study could potentially be

Page 57

1   important to you depending what the results were?
2       MS. SMITH:  Object to form.
3   BY THE WITNESS:
4   A.  Potentially.
5   BY MR. FAES:
6   Q.  Doctor, do you know what the standard is
7   that a manufacturer must follow in designing mesh
8   products?
9   A.  No.
10  Q.  Do you know what responsibilities a
11  manufacturer holds in designing mesh products?
12      MS. SMITH:  Object to form.
13  BY THE WITNESS:
14  A.  No.
15  BY MR. FAES:
16  Q.  Do you know what kinds of things a
17  company researches before a product is designed or
18  released?
19  A.  No.
20  Q.  Would you agree that surgery rates for
21  stress urinary incontinence have increased since
22  the introduction of the TVT?
23  A.  Yes.
24  Q.  Would you agree that your surgery rate

Page 58
1 increased following your adoption of the TVT?
2   MS. SMITH:  Object to form.
3 BY THE WITNESS:
4   A.  Not necessarily.
5 BY MR. FAES:
6   Q.  Would you agree your surgery rate for
7 stress urinary incontinence increased following
8 your adoption of the TVT?
9   MS. SMITH:  Object to form.
10 BY THE WITNESS:
11   A.  I have to answer that without a yes or a
12 no.  It also was introduced early in my career when
13 my volumes were increasing anyway, so I wouldn't
14 want you to say that they increased because of TVT.
15     I think TVT sped up the process for how
16 long we waited for a woman to have severe
17 incontinence before we offered surgery but not
18 necessarily the overall volume in my practice.
19 BY MR. FAES:
20   Q.  Let me ask you this way.  If a physician
21 were solely doing the laparoscopic Burch procedure
22 for the treatment of stress urinary incontinence,
23 it's unlikely that that surgeon could -- would be
24 physically able to do as many surgeries as a

Page 59
1 physician who primarily used TVT for the treatment
2 of stress urinary incontinence, correct?
3   A.  Well, you can't do as many in an OR day,
4 but it also depends how many patients you are
5 seeing in the practice, how many are presenting
6 with the problem.
7   MS. SMITH:  You are down to your two.
8   MR. FAES:  Two questions or two minutes?
9   MS. SMITH:  Two questions.  Whatever.
10 BY MR. FAES:
11   Q.  Do you think that synthetic mesh
12 products are designed to increase surgery rates?
13   MS. SMITH: I'm sorry.  Say that again.
14 BY MR. FAES:
15   Q.  Do you think that synthetic mesh
16 products are designed to increase surgery rates?
17   MS. SMITH:  Object to form.
18 BY THE WITNESS:
19   A.  No.
20 BY MR. FAES:
21   Q.  Doctor, what is the proper way to
22 tension a TVT device?
23   A.  Well, there are a number of ways that
24 are considered acceptable how to tension it.  Are

Page 60
1 you talking about TVT-Retropubic or TVT-Obturator
2 because those are a bit different?
3   MS. SMITH:  With all due respect.
4   MR. FAES:  One last question.
5   MS. SMITH:  This isn't anything new or updated
6 since her last.
7   MR. FAES:  I'm going to ask one more question.
8   MS. SMITH:  If it's updated, but if it's going
9 back and rehashing, no.
10   MR. FAES:  I don't think it's rehashing.  I
11 don't think she's been asked this.  It's my last
12 question.
13   MS. SMITH:  I know, but the point is you're
14 only supposed to be dealing with new information
15 since your last deposition.  But ask it and let's
16 see.
17 BY MR. FAES:
18   Q.  Do you know whether or not there is a
19 difference in the way a mechanically cut TVT mesh
20 should be tensioned versus a laser-cut TVT mesh?
21   A.  No.
22   Q.  So, you believe they should be tensioned
23 the same?
24   A.  Yes.

Page 61
1   MR. FAES:  That's all the questions I have
2 since I'm out of time.  Thank you.
3   MS. SMITH:  No questions.  She does want to
4 read and sign.
5     (Time Noted:  9:11 a.m.)
6     FURTHER DEPONENT SAITH NAUGHT.

Page 62

I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

It was requested before completion of the deposition that the witness, DENISE ELSER, M.D., have the opportunity to read and sign the deposition transcript.

_____
CORINNE T. MARUT, Certified Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 63

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 64

- - - - - -
E R R A T A
- - - - - -

PAGE   LINE   CHANGE
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____
____   ____   _____
       REASON: _____

Page 65

ACKNOWLEDGMENT OF DEPONENT

I, DENISE ELSER, M.D., do hereby certify under oath that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
DENISE ELSER, M.D.          DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____ Notary Public

Denise Elser, M.D.

Page 66

```
 1              LAWYER'S NOTES
 2    PAGE  LINE
 3    ____  ____  _____
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```