# EXHIBIT KK

Vladimir Iakovlev, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         OF THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    CHARLESTON DIVISION

 4

 5     ----------------------------

                                  )

 6     IN RE: ETHICON, INC., PELVIC ) Master File No.

       REPAIR SYSTEM PRODUCTS        ) 2:12-MD-02327

 7     LIABILITY LITIGATION          ) MDL 2327

                                     )

 8     ----------------------------

       THIS DOCUMENT RELATES TO THE )

 9     FOLLOWING CASES IN WAVE 1 OF ) JOSEPH R. GOODWIN

       MDL 200:                     ) U.S. DISTRICT JUDGE

10                                   )

                                     )

11     DONNA MASSEY                  ) Civil Action No.

                         Plaintiff ) 2:12-cv-0880

12     vs.                           )

                                     )

13     ETHICON, INC., ET AL.         )

                         Defendant. )

14     ----------------------------

15

16                   -------------

17

18     ---  This is the Deposition of VLADIMIR IAKOVLEV,

19     MD, taken at the Hilton Hotel, 145 Richmond Street

20     West, Toronto, Ontario, on the 5th day of March, 2016.

21                   ------------

22

23

24              REPORTED BY:  HELEN MARTINEAU
```

Vladimir Iakovlev, M.D.

```
 1   Donna Loustaunau           )
     v. Ethicon, Inc., et al.   )
 2   Civil Action No. 2:12-cv-00666 )
                                )
 3   Patricia Ruiz             )
     v. Ethicon, Inc., et al.   )
 4   Civil Action No. 2:12-cv-01021 )
                                )
 5   Betty Funderburke          )
     v. Ethicon, Inc., et al.   )
 6   Civil Action No. 2:12-cv-00957 )
                                )
 7   Elizabeth Blynn Wolfe      )
     v. Ethicon, Inc., et al.   )
 8   Civil Action No. 2:12-cv-01286 )
                                )
 9   Barbara Vignos-Ware, et al. )
     v. Ethicon, Inc., et al.   )
10   Civil Action No. 2:12-cv-00761 )
                                )
11   Patti Ann Phelps, et al.   )
     v. Ethicon, Inc., et al.   )
12   Civil Action No. 2:12-cv-01171 )
                                )
13   Dina Sanders Bennett       )
     v. Ethicon, Inc., et al.   )
14   Civil Action No. 2;12-cv-00497 )
                                )
15   Charlene Logan Taylor      )
     v. Ethicon, Inc., et al.   )
16   Civil Action No. 2:12-cv-00376 )
                                )
17   Cynthia Nix               )
     v. Ethicon, Inc., et al.   )
18   Civil Action No. 2:12-cv-01278 )
                                )
19   Barbara Kaiser            )
     v. Ethicon, Inc., et al.   )
20   Civil Action No. 2:12-cv-00887 )
                                )
21   Carol Jean Dimock         )
     v. Ethicon, Inc., et al.   )
22   Civil Action No. 2:12-cv-00401 )
                                )
23   Ana Ruebel               )
     v. Ethicon, Inc., et al.   )
24   Civil Action No. 2:12-cv-00663 )
```

Vladimir Iakovlev, M.D.

```
 1   Jackie Frye                     )
     v. Ethicon, Inc., et al.       )
 2   Civil Action No. 2:12-cv-1004  )
                                    )
 3   Joan Adams                      )
     v. Ethicon, Inc.,  et al.      )
 4   Civil Action No. 2:12-cv-01203 )
                                    )
 5   Sharon Boggs, et al.            )
     v. Ethicon, Inc., et al.       )
 6   Civil Action No. 2:12-cv-00368 )
                                    )
 7   Dina Destefano-Raston, et al.  )
     v. Ethicon, Inc., et al.       )
 8   Civil Action No. 2;12-cv-01299 )
                                    )
 9   Teresa Georgilakis, et al.      )
     v. Ethicon, Inc., et al.       )
10   Civil Action No. 2:12-cv-00829 )
                                    )
11   Donna Hankins, et al.           )
     v. Ethicon, Inc., et al.       )
12   Civil Action No. 2:12-cv-01011 )
                                    )
13   Nancy Hooper, et al.            )
     v. Ethicon, Inc., et al.       )
14   Civil Action No. 2:12-cv-00493 )
                                    )
15   Krystal Teasley                 )
     v. Ethicon, Inc., et al.       )
16   Civil Action No. 2:12-cv-00500 )
                                    )
17   Margaret Stubblefield           )
     v. Ethicon, Inc., et al.       )
18   Civil Action No. 2:12-cv-00842 )
                                    )
19   Cindy Smith                     )
     v. Ethicon, Inc., et al.       )
20   Civil Action No. 2:12-cv-01149 )
                                    )
21   Lois Hoy, et al.                )
     v. Ethicon, Inc., et al.       )
22   Civil Action No. 2:12-cv-00876 )
                                    )
23   Constance Daino, et al.         )
     v. Ethicon, Inc., et al.       )
24   Civil Action No. 2:12-cv-01145 )
```

Vladimir Iakovlev, M.D.

```
 1   Janet Smith, et al.           )
     v. Ethicon, Inc., et al.      )
 2   Civil Action No. 2:12-cv-00861 )
                                   )
 3   Harriet Beach                 )
     v. Ethicon, Inc., et al.      )
 4   Civil Action No. 2:12-cv-00476 )
                                   )
 5   Maria C. Stone, et al.        )
     v. Ethicon, Inc., et al.      )
 6   Civil Action No. 2:12-cv-00652 )
                                   )
 7   Diane Kropf, et al.           )
     v. Ethicon, Inc., et al.      )
 8   Civil Action No. 2:12-cv-01202 )
                                   )
 9   Virginia White, et al.        )
     v. Ethicon, Inc., et al.      )
10   Civil Action No.2:12-cv-00958 )
                                   )
11   Dee McBrayer, et al.          )
     v. Ethicon, Inc., et al.      )
12   Civil Action No. 2:12-cv-00779 )
                                   )
13   Julie Wroble, et al.          )
     v. Ethicon, Inc., et al.      )
14   Civil Action No. 2:12-cv-00883 )
                                   )
15   Sherry Fox, et al.            )
     v. Ethicon, Inc., et al.      )
16   Civil Action No. 2:12-cv-00878 )
                                   )
17   Joyce Justus                  )
     v. Ethicon, Inc., et al.      )
18   Civil Action No. 2:12-cv-00956 )
                                   )
19   Kathleen Wolfe                )
     v. Ethicon, Inc., et al.      )
20   Civil Action No. 2:12-cv-00337 )
     ------------------------------
21
22
23
24
```

Vladimir Iakovlev, M.D.

```
 1  A P P E A R A N C E S:

 2  FOR THE PLAINTIFF AND THE WITNESS:

 3  AYLSTOCK, WITKIN, KREIS, OVERHOLTZ, PLLC

 4  DANIEL J. THORNBURGH, Esq.

 5  17 East Main Street, Suite 200

 6  Pensacola, Florida 32502

 7  Tel. 850.202.1010

 8  Email:  dthornburgh@awkolaw.com

 9

10  FOR THE DEFENDANT:

11  THOMAS COMBS & SPANN, PLLC

12  PHILIP J. COMBS, Esq.

13  P.O. Box. 3824

14  300 Summers Street, Suite 1380

15  Charleston, WV 25301

16  Tel.  304.414.1805

17  Email:  pcombs@tcspllc.com

18

19

20

21

22

23

24
```

Vladimir Iakovlev, M.D.

```
 1                    INDEX OF WITNESSES

 2   WITNESS.                                    PAGE

 3   VLADIMIR IAKOVLEV, MD, affirmed
```

```
 4   Cross-Examination by Mr. Combs.......................8

 5   Re-Direct Examination by Mr. Thornburgh.............83

 6   Further Cross-Examination by Mr. Combs..............97
```

```
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Vladimir Iakovlev, M.D.

```
 1                     INDEX OF EXHIBITS

 2      NO./ DESCRIPTION                                    PAGE

 3

 4      3    Flash drive containing files reviewed            8
             by  Dr. Iakovlev in compiling his
 5           clinico-pathological report re. Donna
             Massey.
 6

 7      1    Clinico-pathological report of Dr.               9
             Vladimir Iakovlev re.  Donna Massey.
 8

 9      4    Document depicting a side view of a             21
             pelvic floor diagram.
10

11      5    Document depicting a pelvic floor               22
             diagram.
12

13      6    Document from East Side Surgery Centre          26
             re. Donna Massey, Bates labelled
14           MASSEYD_EASSC_MDR00002.

15      2    Pathology Report prepared by Dr.                70
             Brownell
16

17

18

19

20

21

22

23

24
```

Vladimir Iakovlev, M.D.

```
 1                    ---  Upon commencing at 8:27 a.m.

 2

 3           (WHEREUPON, the witness was duly affirmed.)

 4

 5                 VLADIMIR IAKOVLEV, MD,

 6         called as a witness herein, having been

 7            first duly affirmed, was examined

 8                and testified as follows:

 9              CROSS-EXAMINATION BY MR. COMBS:

10              Q.  Dr. Iakovlev, I'm going to ask you

11     some questions about Donna Massey's case.  And let's

12     turn to the photographs in your report.  So before we

13     do that just two preliminary things.  One, are all the

14     materials that you had to review in this case included

15     on the flash drive which your counsel just handed me

16     that we've marked as Massey Exhibit 3?

17                    ---EXHIBIT NO. 3:  Flash drive

18                    containing files reviewed by

19                    Dr. Iakovlev in compiling his

20                    clinico-pathological report re. Donna

21                    Massey.

22              THE DEPONENT:  Yes.

23              BY MR. COMBS:

24              Q.  And would all the work be done
```

Vladimir Iakovlev, M.D.

1    during the time period from when you got the chain of

2    custody form, 11/6/2015, until the date of the report?

3                      A.  For the earliest.  If there are two

4    chain of custody forms, and this would be pertinent to

5    all cases.  Sometimes I was getting two specimens.  I

6    could start work with earlier specimen and then receive

7    later specimen.

8                      Q.  But there was just one on the flash

9    drive.

10                     A.  Yes, because I don't know how many

11   were there.  This would be general assumption.  So

12   starts with earliest and then ends with the date I

13   signed.

14                     Q.  And you told us in an earlier

15   deposition that you did not keep your specific time for

16   this case, and that you did not note the specific days

17   on which you worked on it, but that it was your

18   estimate that it would be somewhere between 15 and 20

19   hours.  Is that accurate for this case as well?

20                     A.  Yes.

21                     ---EXHIBIT NO. 1:  Clinico-pathological

22                     report of Dr. Vladimir Iakovlev re.

23                     Donna Massey.

24

Vladimir Iakovlev, M.D.

```
 1                BY MR. COMBS:

 2                Q.  All right.  On figure DN1 what do

 3      you plan on telling the jury about this photograph at

 4      the trial?

 5                A.  Might be easier if we start with

 6      text rather than with pictures because now I have to

 7      explain what's in the text.  Because logically it goes

 8      through pathology description first.  Because I see

 9      that you tend to start with pictures and now we have to

10      spend time to explain.

11                So the excision was done in 2010.  And

12      the pathology material was H&E slides.  And H&E slides

13      were -- there were four slides, A1, A2, A3, and A4 from

14      the description of original pathologist.  And some of

15      the portions were not from the mesh material.  They

16      were submitted in the same jar but clearly they were

17      identified as vulvar lesion.  So this picture depicts

18      the vulvar lesion itself and it's a benign, epidermal

19      inclusion cyst.  It's a reactive condition when hair

20      follicles get trapped.

21                Q.  Anything else that you're going to

22      say about this slide at the trial?

23                A.  No.

24                Q.  Did you check this slide to
```

Vladimir Iakovlev, M.D.

1    determine whether any nerves were implicated in the

2    vulvar lesions?

3                    A.  No.

4                    Q.  Did you stain any of these cysts

5    with S100 or neurofilament or PGP9.5?

6                    A.  No.

7                    MR. THORNBURGH:  Objection.

8                    BY MR. COMBS:

9                    Q.  Let's turn now to DM2.  What will

10   you be saying about that photograph at the trial?

11                   A.  Now this piece is from a different

12   part of the genital organs.  So this is a mesh.  And if

13   we go back to operative report, so "the mesh was

14   visible and palpable and the exposed part was excised."

15   After that they excised the vulvar lesion, sebaceous

16   cyst, or epidurmal inclusion cyst.  So after the mesh

17   was excised the surgeon, operating surgeon excised

18   sebaceous cysts or epidermal inclusion cysts, as I

19   described.

20                   So now we're going to actually the mesh

21   specimen or fragments representing mesh.  And I'm going

22   to tell the jury that this is monofilament, knitted

23   mesh in keeping with Ethicon pelvic organ prolapse mesh

24   type of device.  So in this case it's Prolift.  And she

Vladimir Iakovlev, M.D.

```
 1    had total Prolift anterior and posterior.  And this

 2    piece is coming from the vagina not the vulvar or

 3    external vulva.  And it's incorporated in scar tissue

 4    and some parts of the mesh are exposed through the

 5    surface; and there is granulation tissue with acute

 6    inflammation; and it's incorporated in folded shape by

 7    the scar tissue.  That's it.

 8              Q.  Anything else?

 9              A.  No.  Unless you ask something else.

10    I mean, I can give you a lecture so I'm not limited to

11    what I just said.

12              Q.  Now you received -- well, as we sit

13    here today is there anything else you plan on telling

14    the jury about this photograph?

15              MR. THORNBURGH:  Objection.

16              THE DEPONENT:  I can fill two hours just

17    talking about this photograph, the pathophysiology and

18    everything else.

19              BY MR. COMBS:

20              Q.  Well, if you plan on saying

21    something about that photograph at the trial of this

22    case you need to tell us.

23              A.  It's not that I'm planning it's that

24    what I can.  If somebody ask me a question I will
```

Vladimir Iakovlev, M.D.

1    answer it.  I just don't want to limit myself to what I

2    just said.  I mean, if you keep asking questions about

3    this photograph I can answer questions for hours.

4                    Q.  Look, I'm here for nine days for one

5    purpose, to discover what you're going to say at the

6    trial of these cases.  So you need to tell us what that

7    is.

8                    MR. THORNBURGH:  Objection.

9    Argumentative.

10                   THE DEPONENT:  We have two hours per

11   patient so either we talk about one photograph for two

12   hours --

13                   MR. THORNBURGH:  If he wants you to talk

14   about one photograph for two hours talk about one

15   photograph for two hours.

16                   BY MR. COMBS:

17                   Q.  If you plan on saying something at

18   the trial of this case about that photograph you need

19   to tell us.

20                   MR. THORNBURGH:  It's in his reports.

21   You've taken his deposition before.  You know what this

22   represents.  You know that this represents everything

23   that he's given opinions about in other cases.  He's --

24   but if you want to talk about this one picture for two

Vladimir Iakovlev, M.D.

1    hours go for it.

2                    BY MR. COMBS:

3                    Q.  If there's something you're going to

4    say about this photograph tell us what it is.

5                    A.  I'm -- I may not be planning but I

6    can.  The difference is what I can say if I must and

7    what I'm planning to say.

8                    Q.  Well, it doesn't work that you get

9    to come up here and say, I don't know what I'm going to

10   say about it.  I'm not going to tell you what I'm going

11   to say about it.  How it works is I ask you what is

12   your opinion going to be about this photograph at trial

13   and you need to tell us.

14                   A.  I did not say that I don't know.

15                   MR. THORNBURGH:  Why don't we do this,

16   why don't you give him a summary of what this

17   microphotograph demonstrates?

18                   THE DEPONENT:  If you want a summary,

19   yes, if you want entire --

20                   MR. THORNBURGH:  I think he's asked for

21   a summary.

22                   THE DEPONENT:  I give you a summary.

23                   BY MR. COMBS:

24                   Q.  Okay.

Vladimir Iakovlev, M.D.

1                          A.  But that's just a summary.  It's

2     impossible to include everything in one summary that's

3     why it's called a summary.

4                          Q.  Which one of the samples is this

5     photograph from?

6                          A.  What do you mean which one?

7                          Q.  Which one?  You said you received

8     four -- alright -- from the original pathology

9     received.

10                         A.  It's one specimen.

11                         Q.  Which one?

12                         A.  It's one specimen.

13                         Q.  Okay.  Alright.

14                         A.  It's one specimen in one jar.

15                         Q.  Okay.  And it has six tan to grey

16    pieces?

17                         A.  Yes.

18                         Q.  And four slides?

19                         A.  Yes.

20                         Q.  Which one is this?

21                         A.  How do you determine which one?

22    There are six in the same jar, they're mixed.  There is

23    no difference between them because they are already put

24    in the jar.  The only difference I can see is

Vladimir Iakovlev, M.D.

1   microscopic.  Microscopically I clearly see that this

2   is vulvar lesion this is mesh.

3                    Q.  Is this from A1, A2 or A3?

4                    MR. THORNBURGH:  Objection.

5                    THE DEPONENT:  Doesn't matter because

6   it's one specimen.

7                    BY MR. COMBS:

8                    Q.  Can you tell me whether that is from

9   A1, A2, A3 or A4?

10                   A.  No.  This is not the purpose because

11  it's not a separate specimen.  We separate only when

12  it's a separate specimen.  If it's the same specimen

13  that's put in different cassettes you can put it in any

14  order because it's already in one jar.  There would not

15  be a distinction.  You're making an artificial

16  distinction and this is wrong.  This is -- this would

17  be against standards of pathology because once it's in

18  one jar it's one specimen.  There's no difference

19  between any of this.  They're already mixed.

20                   Q.  Here's my question, yes or no.  Can

21  you tell me whether that is from A1?

22                   MR. THORNBURGH:  Objection.

23                   THE DEPONENT:  I will not answer this

24  question the way you ask because it misrepresents the

Vladimir Iakovlev, M.D.

1    way we process specimens.

2                    BY MR. COMBS:

3                    Q.  Can you tell me whether that is from

4    A2?

5                    A.  I just gave you an answer.

6                    Q.  Can you tell me whether it's from

7    A3?

8                    MR. THORNBURGH:  Objection.

9                    THE DEPONENT:  I just gave you an

10   answer.

11                   BY MR. COMBS:

12                   Q.  Can you tell me whether it's from

13   A4?

14                   MR. THORNBURGH:  Objection.

15                   THE DEPONENT:  I just gave you an

16   answer.

17                   BY MR. COMBS:

18                   Q.  So you don't know do you?

19                   A.  I don't want to answer the question

20   you put the way which misrepresents handling of

21   specimens.

22                   Q.  This came in six pieces didn't it?

23                   A.  It came in one jar.  All pieces

24   unlabelled, unmarked.  There was no stitches to

Vladimir Iakovlev, M.D.

1    identify one or the other.

2                    Q.  And how many pieces were in that

3    jar?

4                    A.  Six multiple.

5                    Q.  Okay.

6                    A.  Not labelled.  All of them are the

7    same.

8                    Q.  And the tissue was submitted as A1,

9    A2, A3, and A4 wasn't it?

10                   A.  That's correct.

11                   Q.  Which one of those four is this?

12                   A.  So are we going back?  I mean,

13   you're trying to misrepresent -- are you a pathologist

14   or am I a pathologist.

15                   MR. THORNBURGH:  He's already answered

16   your question, Phil.

17                   MR. COMBS:  No he hasn't.  He said I

18   refuse to answer your question.  That's what the answer

19   was, Dan.

20                   MR. THORNBURGH:  No, that's a

21   misrepresentation.  You're mischaracterizing his

22   testimony.  The record will speak for itself.  He

23   answered the question the best way he was able to

24   answer your question.

Vladimir Iakovlev, M.D.

```
 1                    BY MR. COMBS:

 2                    Q.  Here's the question.  Do you know

 3    whether this is A1, A2, A3 or A4?  That's the question.

 4    And you refuse to answer it so --

 5                    MR. THORNBURGH:  No, he didn't refuse to

 6    answer it.  He answered your question.  Now you're

 7    being argumentative.

 8                    BY MR. COMBS:

 9                    Q.  Do you know whether there is A1, A2,

10    A3 or A4?

11                    MR. THORNBURGH:  You don't need to

12    answer it again.

13                    MR. COMBS:  You haven't answered it yet.

14                    MR. THORNBURGH:  He has answered it.

15                    MR. COMBS:  What's the answer?  You tell

16    me the answer then.  If he's answered it then what's

17    the answer?

18                    MR. THORNBURGH:  It came in one jar.

19                    MR. COMBS:  That's not the question.  I

20    didn't ask him did this come in a jar.  I asked him can

21    you tell me is this A1, A2, A3 or A4?

22                    MR. THORNBURGH:  He said they were not

23    labelled.  They all came in the same jar.

24                    MR. COMBS:  That's not the answer.
```

Vladimir Iakovlev, M.D.

```
 1                    MR. THORNBURGH:  That is the answer.

 2                    THE DEPONENT:  That's intelligent

 3      answer.

 4                    BY MR. COMBS:

 5                    Q.  Okay.  Do you refuse to answer the

 6      question whether this is from A1, A2, A3 or A4?

 7                    A.  Okay.  I can answer it this way.

 8      Since it came in one jar it was not my purpose and

 9      would be wrong to separate the slides because they all

10      come -- but if you insist, if you want me to answer

11      that question for you because this would not be the

12      purpose of my examination.  But if you really want it

13      you can send the slides back, I can look at them and I

14      can say which part of it.  But this would be only for

15      you as a lawyer.  I mean this wouldn't be a

16      pathological question or within the standards of

17      pathology.  Send me the slides I can tell you, but this

18      is irrelevant because they came in one jar.

19                    Q.  Okay.  DM1, is that A1, A2, A3 or

20      A4?

21                    MR. THORNBURGH:  Objection.

22                    THE DEPONENT:  I just gave you an

23      answer.  It would be wrong to separate them because

24      they came in one jar.  It's the same specimen
```

Vladimir Iakovlev, M.D.

```
 1    unlabelled.  If you want me to answer send me the

 2    slides I will give you.  But it is irrelevant.  I don't

 3    want it to sound on the record as if it is relevant.

 4                    BY MR. COMBS:

 5                    Q.  Okay.  As we sit here today you

 6    can't tell me can you?

 7                    MR. THORNBURGH:  Objection.

 8                    THE DEPONENT:  I just gave you full

 9    answer.  I mean how many times can we run around it?

10                    BY MR. COMBS:

11                    Q.  Let's talk about DM2.  You said that

12    the mesh was folded.  Can you tell us when that mesh

13    was folded?

14                    A.  Sometime after it was placed in the

15    body and a few months before it was excised.

16                    Q.  And it could have happened at the

17    time of implantation couldn't it?

18                    MR. THORNBURGH:  Objection.

19                    THE DEPONENT:  It could.

20                    BY MR. COMBS:

21                    Q.  Dr. Iakovlev, let me mark this as

22    Exhibits 4 and 5.

23                    ---EXHIBIT NO. 4:  Document depicting a

24                    side view of a pelvic floor diagram.
```

Vladimir Iakovlev, M.D.

1                    ---EXHIBIT NO. 5:  Document depicting a

2                    pelvic floor diagram.

3          BY MR. COMBS:

4                    Q.  I've handed you Exhibit 4 which is a

5     side view pelvic floor diagram, and I've handed you

6     Exhibit 5 which is also a pelvic floor diagram.  Are

7     you able to put on either one of those exhibits --

8                    MR. THORNBURGH:  I'm going to object to

9     the use of those exhibits.  First of all you haven't

10    provided me with a copy of them.

11                   MR. COMBS:  Well you're welcome to look

12    at them.

13                   MR. THORNBURGH:  Second of all, the

14    models don't represent the patient.

15                   MR. COMBS:  Well you're welcome to look

16    them.  Do you want to take a break and look at the

17    diagrams?

18                   MR. THORNBURGH:  I'll look at them real

19    quick.  I object to the use of these models with this

20    pathologist.

21          BY MR. COMBS:

22                   Q.  Dr. Iakovlev, can you show us where

23    the photograph that you have talked about at DM2 can

24    you show us where that came from?

Vladimir Iakovlev, M.D.

```
1                    MR. THORNBURGH:  Objection.

2                    THE DEPONENT:  These are models not of

3       the patient.  I mean, I said it's coming from vagina

4       and the models don't represent the patient.  I cannot.

5       How can I point something which doesn't reflect what

6       was in real life.

7                    BY MR. COMBS:

8                    Q.  Okay.  Are you able to tell us what

9       part of Ms. Massey's vagina that the tissue that is

10      depicted in DM2 came from?

11                   A.  It's vaginal wall.  So if you want

12      me to --

13                   Q.  Can you tell us what part of the

14      vaginal wall?

15                   MR. THORNBURGH:  Objection.

16                   THE DEPONENT:  The only reliable source

17      would be excising physician for specific location.

18      Vaginal wall I can only go by the records.  And I will

19      not point anything on the diagrams because they do not

20      represent the patient.  They are hypothetical diagrams.

21                   BY MR. COMBS:

22                   Q.  For any of the photographs that you

23      have from DM1 to DM14 will you be providing any

24      testimony at trial as to the location in the patient's
```

Vladimir Iakovlev, M.D.

```
1    body where that tissue sample came from?

2                    MR. THORNBURGH:  Objection.

3                    THE DEPONENT:  Vaginal wall.

4                    BY MR. COMBS:

5                    Q.  Will you be any more specific than

6    that?

7                    A.  We can refer to surgical operative

8    report, and that's the primary source if we have it

9    because I examined the specimen.

10                   Q.  Have you reviewed the surgical

11   operative report?

12                   A.  Yes, I did.

13                   MR. THORNBURGH:  Do you want to give him

14   a copy of it, Phil.

15                   MR. COMBS:  Yeah, I'm going to look for

16   it.

17                   THE DEPONENT:  Just want to put it on

18   the record this diagram would be totally wrong because

19   it misrepresents Ms. Massey's condition at the time of

20   excision.  This is a diagram of a lady with uterus.

21   Ms. Massey had hysterectomy prior to this.

22                   BY MR. COMBS:

23                   Q.  And is -- are any of these samples

24   from the uterine area that didn't exist?
```

Vladimir Iakovlev, M.D.

```
1                    A.  I don't understand your question.

2                    Q.  So is it because there is a uterus

3    on there that you're not able to place where the

4    samples came from?

5                    A.  No.

6                    Q.  It's a different location of the

7    body isn't it?

8                    A.  It's completely different state of

9    the pelvic organs.

10                   Q.  Exactly.  So this section of the

11   body that doesn't even exist in this patient is not in

12   any way keeping you from marking on this diagram is it?

13                   MR. THORNBURGH:  Objection.  You're

14   mischaracterizing what he just told you.

15                   THE DEPONENT:  You're giving me diagram

16   which is not just hypothetical which is wrong.  It's

17   against -- I'm not marking anything.

18                   BY MR. COMBS:

19                   Q.  Here's a Sharpie.  Mark that out and

20   then mark on the diagram where the tissue sample came

21   from?

22                   MR. THORNBURGH:  Objection.

23                   THE DEPONENT:  I'm not marking anything.

24   It doesn't represent the patient.
```

Vladimir Iakovlev, M.D.

```
 1                    BY MR. COMBS:

 2                    Q.  Here is what is marked as Massey

 3      Exhibit 6, what you asked for.

 4                         ---EXHIBIT NO. 6:  Document from East

 5                         Side Surgery Centre re. Donna Massey,

 6                         Bates labelled MASSEYD_EASSC_MDR00002.

 7                    BY MR. COMBS:

 8                    Q.  And looking at that are you able to

 9      tell us now where the tissue sample came from that's in

10      DM2?

11                    A.  So it states, "Mesh erosion at the

12      apex".  So there was apex of the vaginal vault where

13      the erosion was.  That's the excising surgeon

14      description.

15                    Q.  Can you tell us anything more

16      specific than that?

17                    A.  How much more specific can it be.

18      Apex.

19                    Q.  Can you mark that on the diagram?

20                    MR. THORNBURGH:  Objection.

21                    THE DEPONENT:  On what diagram?  Which

22      doesn't represent the patient or represents wrong state

23      of the patient?

24
```

Vladimir Iakovlev, M.D.

```
 1                    BY MR. COMBS:

 2                    Q.  Now, let me ask you this, are all of

 3      the photographs from DM2 to DM14 of the same piece of

 4      the tissue sample that you've described in the

 5      pathology?  Does that question make sense?

 6                    A.  Not really.

 7                    Q.  Okay.  So here's what I want to ask

 8      you.  You said you had six fragments of tissue?

 9                    A.  I didn't say that.  It was described

10      in the pathology report.

11                    Q.  Did you not get six fragments of

12      tissue?

13                    A.  I had slides not six fragments of

14      tissue.

15                    Q.  So let's ask about these

16      photographs.

17                    A.  Okay.

18                    Q.  Are they all from the same slide?

19                    A.  I don't know now.  It's the same

20      specimen.  What the difference?

21                    Q.  That's my question.  Are they all

22      from the same slide?

23                    A.  I don't remember now.

24                    MR. COMBS:  What's the Bates number on
```

Vladimir Iakovlev, M.D.

 1     Exhibit 6?  I gave you my copy.

 2                    MR. THORNBURGH:  EASSC underscore

 3     MDR00002.

 4                    BY MR. COMBS:

 5                    Q.  Dr. Iakovlev, what do you plan on

 6     telling the jury about DM3a and 3b at the trial?

 7                    A.  Everything I just told you about the

 8     previous picture, plus there is an erosion site.

 9                    Q.  I apologize, I didn't hear what you

10     said.

11                    A.  Erosion site.

12                    Q.  Thank you.

13                    A.  So 3b is a higher power with most

14     likely configuration of the mesh plain that shows the

15     curled edge is being exposed.

16                    And then DM4 is high power of the

17     exposure site with dense acute inflammation, which is

18     typical for infected wound.

19                    Q.  So for DM3a and 3b same question

20     regarding the folding.  You do not know whether that

21     folding happened at the time of implantation do you?

22                    A.  That's correct.

23                    MR. THORNBURGH:  Objection.

24

Vladimir Iakovlev, M.D.

```
1                    BY MR. COMBS:

2                    Q.  And the lines that are on 3b those

3       are the yellow lines that you added onto the picture

4       with your computer program?

5                    A.  Yes.

6                    Q.  On DM4 was there anything else that

7       you plan to tell the jury at the trial of the case?

8                    MR. THORNBURGH:  Objection.

9                    THE DEPONENT:  I just told you

10      everything.

11                   BY MR. COMBS:

12                   Q.  And you said that this tissue was

13      infected.  Were any cultures done that established

14      there was an infection?

15                   A.  Again, you misrepresent the -- again

16      you misrepresent the field of pathology and how we do

17      anatomical pathology.

18                   Yesterday I gave you a short lecture

19      about neutrophils and acute inflammation and connection

20      with bacterial infection, that's my answer.

21                   Q.  You have the excision report from

22      Dr. Richards, which you've asked me to provide you.

23      It's over there marked as Exhibit 6.  Did Dr. Richards

24      diagnose Ms. Massey as suffering from an infection?
```

Vladimir Iakovlev, M.D.

```
 1                     MR. THORNBURGH:  Objection.

 2                     THE DEPONENT:  He diagnosed her with

 3     mesh erosion.

 4                     BY MR. COMBS:

 5                     Q.  Did Dr. Richards diagnose Ms. Massey

 6     as suffering from an infection?

 7                     MR. THORNBURGH:  Objection.

 8                     THE DEPONENT:  Erosion means infection.

 9     This is as a given.  Again you misrepresent the

10     diagnosis.

11                     BY MR. COMBS:

12                     Q.  So it's your testimony that the word

13     "erosion" in an operative report means infection?

14                     MR. THORNBURGH:  Objection.

15                     THE DEPONENT:  My testimony is mesh

16     erosion is invariably associated with infection, and

17     every physician knows that.  The extent of infection,

18     is it just local or extensive, would be different.  But

19     it's a given, if there is a wound there is infection.

20     It's a basic and established fact of medicine.

21                     BY MR. COMBS:

22                     Q.  And so is it your testimony that

23     every medical record that has the word "erosion" that

24     that means that that patient also suffered an
```

Vladimir Iakovlev, M.D.

1     infection?

2                         MR. THORNBURGH:  Objection.

3                         THE DEPONENT:  Every physician will

4     understand.  If there is an erosion there is an

5     infection.

6                         BY MR. COMBS:

7                         Q.  Now, did the treating pathologist,

8     Dr. Brownell, diagnose Ms. Massey with having an

9     infection?

10                        A.  Again you are misrepresenting the

11    field of pathology trying to teach me medicine.  There

12    is no word of "infection" here but this doesn't mean

13    that he or she?

14                        Q.  Dr. Mark Brownell.

15                        A.  He did not see acute inflammation.

16                        Q.  Do you disagree with the treating

17    pathologist's diagnosis in this case?

18                        A.  No.  I mean, I described the same

19    features I just expand more.

20                        Q.  Dr. Iakovlev, what do you plan on

21    saying at the trial of this case about DM5?

22                        MR. THORNBURGH:  Objection.

23                        THE DEPONENT:  It's another site of

24    erosion, larger magnification, dense acute

Vladimir Iakovlev, M.D.

 1    inflammation.  This is pus.  That's what I call pus on

 2    the -- that's how pus looks under the microscope.

 3                    BY MR. COMBS:

 4                    Q.  Anything else?

 5                    A.  No.

 6                    Q.  Dr. Brownell did not diagnose acute

 7    inflammation did he?

 8                    MR. THORNBURGH:  Objection.

 9                    THE DEPONENT:  Well, the picture speaks

10    for itself.  If he didn't see it, or he didn't include

11    it, or he didn't think that it was relevant that's a

12    different question but you see the picture.

13                    BY MR. COMBS:

14                    Q.  In any event that wasn't part of his

15    diagnosis was it?

16                    MR. THORNBURGH:  Objection.

17                    THE DEPONENT:  I don't know why.  I

18    mean, don't ask me why it's not there.

19                    BY MR. COMBS:

20                    Q.  Dr. Iakovlev, let me ask you now

21    about DM6, what do you plan on saying about that at the

22    trial of the case?

23                    A.  Now this is a deeper part.  The mesh

24    is in the scar tissue deeper away from the erosion site

Vladimir Iakovlev, M.D.

1    and there is foreign body type inflammation.  This is a

2    different inflammation, it's a more specific against

3    foreign bodies.

4                    Q.  Dr. Iakovlev, is DM6 from the same

5    slide as DM2, 3 and 4?

6                    A.  I don't remember now.  Why does it

7    matter?  You make it sound as if it matters.

8                    Q.  Do you know?

9                    A.  I don't remember.

10                   MR. THORNBURGH:  Objection.

11                   THE DEPONENT:  My answer was I don't

12   remember because it doesn't matter.

13                   BY MR. COMBS:

14                   Q.  Dr. Iakovlev, help me understand

15   what you're calling out with the arrows on DM6.  So

16   you've -- you say "foreign body type" and "chronic

17   inflammation"?

18                   A.  So there is a mix.  There is some

19   lymphoplasmacytic or mostly lymphocytes, and then

20   closer to the fibers there is microphages.  So this is

21   likely a transition between erosion infected on one

22   side and deeper side.  So the very top eroded side will

23   have acute inflammation, and then when we go deeper in

24   the tissue there will be more chronic inflammation,

Vladimir Iakovlev, M.D.

1    lymphoplasmacytic inflammation.  And then if we go down

2    the mesh fibres will be sounded by foreign body types.

3    So this would be a transitional sort or zone.

4                    Infection doesn't spread completely

5    along the mesh, it spreads to specific level; and then

6    I don't see acute inflammation or chronic inflammation.

7                    Q.  Dr. Iakovlev, what do you plan on

8    saying about figure DM7 at the trial of this case?

9                    MR. THORNBURGH:  Objection.

10                   THE DEPONENT:  There is a nerve inside a

11   mesh pore.  This nerve wasn't there.  It grew into the

12   mesh after mesh placement so now it's trapped by

13   position.  It's a healthy nerve.  There is nothing --

14   no nerve disease in it it's just -- its position is

15   abnormal.

16                   BY MR. COMBS:

17                   Q.  And will you be testifying at the

18   trial of the case that the nerve is distorted?

19                   A.  No.

20                   Q.  Will you be testifying that this

21   nerve exhibits a traumatic neuroma?

22                   A.  No.  There is some inflammation

23   around it.

24                   Q.  You have an arrow that is pointing

Vladimir Iakovlev, M.D.

1    to the nerve and you write under it "nerve."  To the

2    left of the nerve there are two features.

3                    A.  There are two capillaries.

4                    Q.  Are those vessels?

5                    A.  Yes, small vessels.

6                    Q.  Are those vessels associated with

7    that never?

8                    A.  Yeah, it's a small neurovascular

9    bundle.

10                   Q.  If that nerve is associated with

11   those vessels does that tell you anything about what

12   type of nerve it is?

13                   MR. THORNBURGH:  Objection.

14                   THE DEPONENT:  I think we went through

15   this.  The nerves are mixed.  Is that what you're

16   trying to -- are we going back to the sensory motor

17   issue or -- I don't understand your question.

18                   BY MR. COMBS:

19                   Q.  Here is my question.  Does the fact

20   that that nerve is associated with those two vessels

21   tell you anything about the function of that nerve?

22                   MR. THORNBURGH:  Objection.

23                   THE DEPONENT:  I told you it's mixed

24   nerve and we talked about it yesterday.

Vladimir Iakovlev, M.D.

 1                    BY MR. COMBS:

 2                    Q.  So it's your belief that's a mixed

 3    nerve?

 4                    A.  Yes.

 5                    Q.  Let's talk about DM8.  What do you

 6    plan on telling the jury at the trial of this case

 7    about DM8?

 8                    A.  That's similar feature.  There is

 9    vessel, small neurovascular bundle in the mesh pore.

10                    Q.  Will you be testifying that it's

11    distorted?

12                    A.  Not really it's entrapped in the

13    mesh pore but I don't see distortion, in this level.  I

14    mean, I don't know what's 1 millimeter away.

15                    Q.  And will you be testifying that this

16    exhibits any features of a traumatic neuroma?

17                    A.  No.

18                    Q.  Anything else that you plan on

19    telling the jury about DM8?

20                    MR. THORNBURGH:  Objection.

21                    THE DEPONENT:  No.

22                    BY MR. COMBS:

23                    Q.  Which slide is DM8 from?

24                    MR. THORNBURGH:  Objection.

Vladimir Iakovlev, M.D.

```
 1                    THE DEPONENT:  Are we going to ask that

 2      question for each figure?  I told you I don't remember

 3      and it doesn't matter that's why I don't remember.

 4                    BY MR. COMBS:

 5                    Q.  Is DM7 and -- DM7 and DM8 the same

 6      slide?

 7                    MR. THORNBURGH:  Objection.

 8                    THE DEPONENT:  DM7 and DM8 are not

 9      slides they're pictures.

10                    BY MR. COMBS:

11                    Q.  Excuse me, pictures of a slide.  Are

12      they pictures of the same slide?

13                    A.  I don't remember because it didn't

14      matter.

15                    Q.  Would you describe the nerves and

16      nerve twigs depicted on DM7 and DM8 as being normal

17      nerves and nerve twigs?

18                    MR. THORNBURGH:  Objection.

19                    THE DEPONENT:  Morphologically they are

20      normal, the location is abnormal.

21                    BY MR. COMBS:

22                    Q.  Dr. Iakovlev, what do you plan on

23      telling the jury about the picture at DM9?

24                    A.  There are nerve twigs within scar
```

Vladimir Iakovlev, M.D.

1      tissue in the mesh, mesh scar plate.

2                      Q.  Anything else?

3                      MR. THORNBURGH:  Objection.

4                      THE DEPONENT:  It's a summary.  The

5      nerves are there, the tissue is innervated.

6                      BY MR. COMBS:

7                      Q.  Do the nerve twigs appear normal?

8                      MR. THORNBURGH:  Objection.

9                      THE DEPONENT:  Relatively yeah, the

10     position is abnormal.

11                     BY MR. COMBS:

12                     Q.  Do they exhibit any distortion?

13                     MR. THORNBURGH:  Objection.

14                     THE DEPONENT:  No, not really.

15                     MR. THORNBURGH:  Objection.

16                     BY MR. COMBS:

17                     Q.  Do they exhibit any features that

18     you would define as exhibiting a traumatic neuroma?

19                     A.  No.

20                     Q.  DM10.  What do you plan on telling

21     the jury about that slide?

22                     MR. THORNBURGH:  Objection.

23                     THE DEPONENT:  There is a bundle of

24     small nerve twigs somewhere inside the mesh that shows

Vladimir Iakovlev, M.D.

1    density of innervation inside the mesh.  All these

2    nerve twigs grew into this spaces which were created by

3    placement of the mesh.

4                     BY MR. COMBS:

5                     Q.  Are those nerve twigs associated

6    with vessels?

7                     A.  Well, there is one vessel right

8    inside.  I wouldn't classify it as neurovascular bundle

9    because there are multiple twigs all around.  Some of

10   them have some vessels beside them, some of them don't.

11                    Q.  Does the fact that these nerve twigs

12   are associated with a vessel tell you anything about

13   the function of that nerve?

14                    MR. THORNBURGH:  Objection.

15                    THE DEPONENT:  Well, these twigs are

16   very small and they're all spreading.  Some of them may

17   start getting only one function, either motor or

18   sensory.

19                    BY MR. COMBS:

20                    Q.  So you believe that these twigs

21   would have a motory (sic) or sensory function?

22                    A.  Some of them may be limited to only

23   one function.  It would be hard to say.  They're

24   getting smaller and smaller.

Vladimir Iakovlev, M.D.

1               Q.  And does the fact that these twigs

2    are associated with particular vessels tell you

3    anything about their function?

4               MR. THORNBURGH:  Objection.

5               THE DEPONENT:  What do you mean

6    particular vessel?  I don't understand this question.

7               BY MR. COMBS:

8               Q.  I believe that.

9               MR. THORNBURGH:  Hold on.  Objection.

10   Argumentative.  Ask a better question.

11              BY MR. COMBS:

12              Q.  I'm sure I can ask a better

13   question.

14              A.  There is a vessel right in the

15   middle and there is like 15, 20 twigs.

16              Q.  Are any of the twigs associated with

17   that vessel?

18              A.  There are some around it.

19              Q.  And what's the function of those

20   twigs?

21              A.  I said they are getting so small

22   they might be getting into either sensory or motor

23   only.

24              Q.  Do you know?

Vladimir Iakovlev, M.D.

```
 1                      A.  Some of them are just -- it's
 2      impossible.  I mean, they're myelinated.  Some of them
 3      can be like small fibers.  It's obvious there's only
 4      one fiber.
 5                      Q.  Dr. Iakovlev, let me ask you now
 6      collectively about the photographs that you've labelled
 7      DM7 through DM10.  Did you consult a neuropathologist
 8      regarding any of features in those photographs?
 9                      MR. THORNBURGH:  Objection.
10                      THE DEPONENT:  Oh, I think we're going
11      to be getting back to this question again and again.
12                      So neuropathologists are specialized
13      pathologists who specialize in examination of brain
14      tumors of neurodegenerative diseases of the brain and
15      peripheral nerves and muscle biopsies.  They do not
16      look at soft tissue.  They do not look at explanted
17      foreign bodies.  So to show explanted mesh to a
18      neuropathologist who doesn't do general surgical
19      pathology might be as beneficial as showing the slides
20      to a resident.
21                      "Neuro" sounds like for nonpathologist
22      as if it would be representing somebody who knows about
23      nerves but the specimen is actually all about the mesh
24      as a foreign body.
```

Vladimir Iakovlev, M.D.

```
 1                    Assuming if you go to pharmacy and a

 2      chemist is working there.  So a chemist might be

 3      knowledgeable about chemistry.  Can he do polymer

 4      science?  It's just a play on words.

 5                    But in reality, as I said,

 6      neuropathologist-s do not look at soft tissue,

 7      explanted vaginal meshes.  Most of them will have no

 8      idea what they're looking at if you give them explanted

 9      vaginal mesh.  So to show any images or consult with

10      them would have no benefit.

11                    BY MR. COMBS:

12                    Q.  So is the answer that you didn't

13      show any of the photographs from DM7 to DM10 to a

14      neuropathologist?

15                    A.  I just gave you an answer, full

16      answer.

17                    Q.  Is the answer no?  You gave me a

18      long answer but you didn't answer whether you did or

19      didn't?

20                    A.  I gave you correct answer.

21                    Q.  Did you consult with a

22      neuropathologist regarding DM7 to DM10, yes or no?

23                    MR. THORNBURGH:  Objection.

24                    THE DEPONENT:  I gave you correct
```

Vladimir Iakovlev, M.D.

```
1    answer.

2                    BY MR. COMBS:

3                    Q.  Yes or no?

4                    MR. THORNBURGH:  He's answered this

5    question.

6                    THE DEPONENT:  I gave you correct

7    answer.

8                    BY MR. COMBS:

9                    Q.  Is the answer no?

10                   A.  The answer is there would be no

11   benefit to showing it to neuropathologist and I explain

12   to you why.

13                   Q.  And because you believe there was no

14   benefit that means you didn't, right?

15                   MR. THORNBURGH:  Objection.

16                   BY MR. COMBS:

17                   Q.  You to say yes or no so she can type

18   it.

19                   A.  Yes.

20                   Q.  Did you count the nerve density for

21   any sections of the sample for Ms. Massey?

22                   A.  Don't know if I completed the

23   synoptic notes or not.  I could have.  I don't remember

24   now.
```

Vladimir Iakovlev, M.D.

1                    Now, with all this nerve density just

2      recently we published an article comparing hernia

3      meshes explanted for recurrence and for pain.  And I

4      figure out that those which were explanted for pain had

5      much higher nerve density.  And when I checked, it was

6      just preliminary check, with transvaginal meshes all of

7      the explants I had had nerve density higher than those

8      hernia meshes which developed pain.

9                    So now all of these meshes they fall

10     into category of at the risk for pain if you can see

11     the nerve density.  So measuring nerve density from

12     this point is not as beneficial as I thought it could

13     be initially.  But with this new data I mean it's clear

14     that all of them are at risk of pain.

15                    So, as I said, you can take any of the

16     specimens, nerve density is beyond what would be

17     required to develop pain, at least that's what the

18     scientific data shows.

19                    Q.  Did you prepare a synoptic report

20     for this case?  I wasn't provided one so I assume the

21     answer is no.

22                    MR. THORNBURGH:  Objection.

23                    THE DEPONENT:  I don't remember now.

24

Vladimir Iakovlev, M.D.

```
 1                    BY MR. COMBS:

 2                    Q.  If you had prepared one would you

 3     have provided it to us?

 4                    A.  I can provide it.  I just need to

 5     print it out from St. Michael's Hospital system.

 6                    Q.  I mean is it -- if it's completed

 7     did you not provide it to counsel?

 8                    A.  They were sent -- some of them were

 9     sent.  I mean, I can repeat it.  I can do it -- it's my

10     notes.  It's not my report.  It just copies whatever I

11     provided.

12                    MR. THORNBURGH:  So I think what he's

13     saying is that he's going to go to St. Michael's and

14     see if there's a synoptic report, and if there is one

15     he'll produce it.

16                    THE DEPONENT:  That's correct.

17                    BY MR. COMBS:

18                    Q.  Alright.  Well there hasn't been one

19     provided to us in this case?

20                    A.  I'll check.  If it's there I will

21     provide -- I will provide all of the synoptics I

22     completed by this date for wave 1 specimens.

23                    Q.  And I just want to make sure that I

24     understand.  Do you believe there are synoptic reports
```

Vladimir Iakovlev, M.D.

```
1     for wave 1 specimens that you haven't provided?
2                    MR. THORNBURGH:  Objection.
3                    THE DEPONENT:  I did not copy them on
4     USB drives.  If you want them I can give to them.
5                    BY MR. COMBS:
6                    Q.  So they're completed but not
7     provided to us?
8                    MR. THORNBURGH:  So what he's saying, in
9     fact what he said multiple times, is he doesn't know.
10    He's completed some synoptic reports for some wave 1
11    but he is not sure if he's got one for this plaintiff.
12    And he'll go to St. Michael's and see if there's a
13    synoptic report and produce it Monday?
14                   THE DEPONENT:  Monday, yeah sure.  I can
15    do it Monday.
16                   BY MR. COMBS:
17                   Q.  Did anybody ask you to provide
18    those?
19                   A.  No, because they are internal
20    documentation of St. Michael's.  I just track data and
21    do my research on them.  My opinions are in this
22    report.
23                   Actually I do synoptic reports after the
24    expert report.  I go through the expert report and I
```

Vladimir Iakovlev, M.D.

1    see what I've already done and then I copy it and then

2    I add extra measurements, which I don't need to

3    formulate my opinions.  It's research.  It's internal

4    documentation of St. Michael's Hospital.  It's a

5    duplication of whatever is in the expert report

6    already.

7              Q.  Did you score the foreign body

8    reaction for Ms. Massey?

9              A.  Again, I can check if it was -- if I

10   completed synoptic report I did, but now I don't

11   remember if I completed the synoptic report.

12             Q.  I'm not sure if you did or didn't

13   answer this question so let me just ask it again.  I

14   asked you if you had counted the nerve density for

15   Ms. Massey.  And I don't think you answered that

16   question.  Do you know whether you counted the nerve

17   density?

18             A.  I answered that question.  As I

19   said, if I completed synoptic notes it was counted, if

20   I didn't I didn't count.

21             Q.  As we sit here today you don't

22   remember whether you did or didn't?

23             A.  That's correct.  And I told you why,

24   because at this point it's -- well, at any point it was

Vladimir Iakovlev, M.D.

1    not basis of my opinions.

2                   Q.   So at the trial of Ms. Massey's case

3    there will be no testimony offered by you regarding

4    nerve density?

5                   MR. THORNBURGH:  Objection.

6                   THE DEPONENT:  Just a general

7    description, as I told you.  The testimony will be that

8    nerve density within transvaginal explanted meshes is

9    so high that all of them are at risk for development of

10   pain.

11                  BY MR. COMBS:

12                  Q.  And you told us earlier that's based

13   upon your comparison to hernia explants in the hernia

14   paper that you recently published?

15                  A.  Including that paper, but there is

16   more to that.  There is large scientific data and

17   research in the mesh explants.

18                  MR. COMBS:  And, Dan, you know, and

19   we've tried not to go into general issues but I'm going

20   I have to ask him this now since he's the one that

21   brought it up.

22                  MR. THORNBURGH:  He's been deposed

23   multiple times on his scientific opinions concerning

24   nerve density.

Vladimir Iakovlev, M.D.

1              MR. COMBS:  Well, he's never been

2    deposed on that paper he said he just published.

3              MR. THORNBURGH:  He has been deposed

4    because it was an abstract before it became published.

5    And I've sat through depositions where he's been

6    deposed on the exact same data.

7              MR. COMBS:  I was at his last deposition

8    and it wasn't in this litigation.

9              MR. THORNBURGH:  Well, the depositions

10   where I've covered him you haven't been there.  Burt

11   Snell was there and Burt Snell asked him questions

12   about it, or could have asked him questions about it.

13             MR. COMBS:  What case was that?

14             MR. THORNBURGH:  I think Bilieu [ph].

15             THE DEPONENT:  That paper was accepted

16   in the fall.  An abstract was accepted long before

17   that.  So --

18             MR. THORNBURGH:  You guys have had that.

19             THE DEPONENT:  Recently it doesn't mean

20   yesterday.

21             BY MR. COMBS:

22             Q.  Well are there any -- is the basis

23   of your opinion for Ms. Massey's case are there any

24   asymptomatic vaginal explants that you are comparing

Vladimir Iakovlev, M.D.

1    the nerve density to?

2                    MR. THORNBURGH:  Objection.

3                    THE DEPONENT:  To this date I was

4    checking if I have asymptomatic or painless -- or

5    patients who did not complain or did not report pain

6    which was entered in the record.  The number was so

7    small that statistically would be difficult to compare.

8    I mean it would be probably invalid the power of that

9    study.  Because most, over 90 percent, of women

10   complain of some degree of pain.  It's just -- because

11   the number is so small who do not complain that when I

12   try to compare data I would never reach a P value.

13                   BY MR. COMBS:

14                   Q.  Your 90 percent number --

15                   MR. THORNBURGH:  Hold on a second, Phil.

16   This is beyond the scope of the agreement.  Don't try

17   to act like this is some new thing.  You had an

18   opportunity to ask him questions about this same data

19   last time you deposed him.  Burt asked him questions

20   about this.

21                   MR. COMBS:  Last time I deposed him it

22   was a case specific deposition in the Carolino [ph]

23   case.

24                   MR. THORNBURGH:  So is this.  This is a

Vladimir Iakovlev, M.D.

1     case-specific deposition in this case.

2                    MR. COMBS:  Dr. Iakovlev is the one that

3     is bringing it up.

4                    MR. THORNBURGH:  No, you asked him.

5                    THE DEPONENT:  There was consolidated

6     deposition.  It was general.  The data was there at the

7     time.  All of these questions could have been asked at

8     consolidated deposition.

9                    MR. THORNBURGH:  I'm not going to allow

10    it, Phil.

11                   MR. COMBS:  Alright.  You will live by

12    the same agreement.

13                   MR. THORNBURGH:  What's that?  Yeah, I

14    will live by the same agreement.  I know that.  Of

15    course.  I don't violate agreements.

16                   MR. COMBS:  Well, if you think I

17    violated an agreement by asking a follow-up question

18    about an issue that Dr. Iakovlev testified about you're

19    welcome to take any action you want about that.

20                   MR. THORNBURGH:  You were doing to best

21    you could to try to sneak in some general questions.

22    And I've given a lot of latitude to both you and to

23    Andy.

24                   MR. COMBS:  You haven't to me.

Vladimir Iakovlev, M.D.

1            MR. THORNBURGH:  Yes I have.  Andy asked

2    general questions for 15 or 20 minutes yesterday.

3            MR. COMBS:  Well, that wasn't me.

4            MR. THORNBURGH:  He's your colleague.

5            MR. COMBS:  Well, we'll let the record

6    reflect what it reflects on that.  I wasn't here.

7            BY MR. COMBS:

8            Q.  Dr. Iakovlev, in any of the slides

9    that you examined for Ms. Massey, did you see any mesh

10   filaments within nerve ganglia?

11           A.  I don't think I saw any nerve

12   ganglia.  Let me check if I saw any nerve ganglia.  No,

13   it doesn't -- I didn't describe nerve ganglia so I did

14   not see them.

15           Q.  And no staining with PGP9.5 or

16   neurofilament?

17           MR. THORNBURGH:  Objection.

18           THE DEPONENT:  No.

19           BY MR. COMBS:

20           Q.  Dr. Iakovlev, I want to ask you now

21   about the photographs that are labelled DM11a through

22   DM14.  So just collectively what do those photographs

23   represent and then I'll ask you about each one.

24           A.  They represent a long-established

Vladimir Iakovlev, M.D.

1    phenomenon that polypropylene degrades, in line with

2    the Ethicon studies.  That would be a summary.

3                    Q.  For any of these photographs DM11a

4    through DM14, will you be able to tell me which slide

5    they came from?

6                    MR. THORNBURGH:  Objection.

7                    THE DEPONENT:  I wouldn't because it

8    doesn't matter.

9                    BY MR. COMBS:

10                   Q.  But can you?

11                   A.  I just gave you an answer.

12                   Q.  You said you wouldn't.

13                   A.  I wouldn't be able.

14                   Q.  Alright.

15                   MR. THORNBURGH:  He just answered.

16                   MR. COMBS:  Let's go off the record for

17   a second

18                   ---  Off the record at 9:20 a.m.

19                   ---  Back on the record at 9:20 a.m.

20                   BY MR. COMBS:

21                   Q.  Dr. Iakovlev, for any of the

22   photographs that are from DM11a to DM14, can you tell

23   us from what fragment of the sample that those came

24   from?

Vladimir Iakovlev, M.D.

```
 1                    MR. THORNBURGH:  Objection.

 2                    THE DEPONENT:  Well, although it's an

 3       irrelevant question I wouldn't be able to answer that

 4       because it's irrelevant.

 5                    BY MR. COMBS:

 6                    Q.  Okay.

 7                    A.  And I wasn't focusing on the fact

 8       which fragment it was coming from.

 9                    Q.  For any of the photographs that are

10       from DM11a to DM14 can you tell us from what part of

11       Ms. Massey's body that that piece of tissue came from?

12                    MR. THORNBURGH:  Objection.

13                    THE DEPONENT:  Vagina.

14                    BY MR. COMBS:

15                    Q.  Anything more specific than that?

16                    A.  Like postal code?  No.

17                    Q.  I apologize, I didn't hear what you

18       said.

19                    A.  I cannot be more specific.  I mean,

20       there is no landmarks or something like I said like

21       postal code that we use.  I mean, that's -- I don't

22       understand.  How can I point?  What would be the

23       reference?  Anatomical landmark?  You're asking the

24       question which is impossible to answer.
```

Vladimir Iakovlev, M.D.

1                    Q.  Alright.  So at the trial of this

2     case you will not provide any testimony stating that

3     any of the photographs that are from DM11a to DM14 come

4     from any specific portion of Ms. Massey's vagina?

5                    MR. THORNBURGH:  Other than the vaginal

6     wall.  He just testified to that.

7                    MR. COMBS:  Yeah, okay.

8                    BY MR. COMBS:

9                    Q.  Vaginal wall, that's fine.  If it

10    can be narrowed down any more than that tell me and if

11    not we'll move on.

12                    A.  As a trained physician and a

13    pathologist that description of "vaginal wall" is

14    sufficient.  And that's as far as I will go.  I can't

15    -- it's somewhere vaginal wall.  From the apex by

16    explanting surgeon and doesn't have to be more

17    specific.

18                    Q.  Let's turn now to DM11a and DM11b.

19    What is it you plan to tell the jury about those

20    photographs?

21                    MR. THORNBURGH:  You want A through B?

22                    BY MR. COMBS:

23                    Q.  I said DM11a and DM11b.

24                    MR. THORNBURGH:  Objection.

Vladimir Iakovlev, M.D.

1                    THE DEPONENT:  This is a very thick

2     degradation layer.  It's so thick it started cracking

3     along the surface or along the interface between the

4     degradation core right through the degradation layer.

5     This is a remarkable example of -- which doesn't happen

6     that often.  It's brittle.

7                    BY MR. COMBS:

8                    Q.  Anything else?

9                    MR. THORNBURGH:  Objection.

10                   THE DEPONENT:  I can say many things if

11    you ask.  I don't understand what -- I mean, as I said

12    I can give you a lecture about polypropylene

13    degradation.

14                   BY MR. COMBS:

15                   Q.  I want to hear the lecture you're

16    going to give the jury about this photograph at the

17    trial?

18                   MR. THORNBURGH:  Objection.

19                   THE DEPONENT:  I thought we agreed that

20    I will give you a summary of the picture.

21                   BY MR. COMBS:

22                   Q.  Dr. Iakovlev, I didn't agree to

23    that.  If you're going to talk about this photograph at

24    the trial I want to know what it is you're going to say

Vladimir Iakovlev, M.D.

```
 1                    MR. THORNBURGH:  Objection.

 2                    MR. COMBS:  If you think that's not a

 3      fair thing to ask an expert then you're welcome to

 4      object all you want, Dan.

 5                    BY MR. COMBS:

 6                    Q.  If you're going to talk about this

 7      photograph and you're going to tell the jury about this

 8      photograph I just want to know what you're going to say

 9      about it.  Tell us.

10                    MR. THORNBURGH:  Objection.

11                    THE DEPONENT:  As I said, I can describe

12      everything which I've done in my publications and this

13      would be a summary for general opinions.

14                    Specifically for this photograph I gave

15      you a summary.  This is a good example of really thick

16      degradation bark which cracks along the interface.  It

17      shows brittleness.

18                    BY MR. COMBS:

19                    Q.  How thick is the bark?

20                    A.  This one is thick.  I think this one

21      is getting close to 7 microns, 6, 7.

22                    Q.  And when you give us that number of

23      6 to 7 microns is that based upon a -- any type of

24      measurement or is that just a visual assessment?
```

Vladimir Iakovlev, M.D.

```
 1                    MR. THORNBURGH:  Objection.

 2                    THE DEPONENT:  Well today it's a visual

 3        assessment because I measured it so many times,

 4        hundreds of times, probably thousands by now, so I can

 5        appreciate.  But what I do is I use an eye-piece

 6        micrometer in the microscope.

 7                    BY MR. COMBS:

 8                    Q.  As we sit here today do you remember

 9        whether you conducted a measurement of this degradation

10        bark?

11                    MR. THORNBURGH:  Objection.

12                    BY MR. COMBS:

13                    Q.  That is probably not a very good

14        question.

15                    MR. THORNBURGH:  Objection.  He just

16        gave you one.

17                    BY MR. COMBS:

18                    Q.  But have you done any measurement

19        other than just your visual assessment?

20                    A.  It's the same thing.  If I do

21        specific numbers I record them in my notes.

22                    Q.  In the synoptic report?

23                    A.  In the synoptic report.  Because I

24        do multiple measurement and I select the median number
```

Vladimir Iakovlev, M.D.

1    and I enter it there.

2              Q.  You talked about cracking along the

3    interface and I wasn't sure what you meant by that.

4              A.  That's exactly what I meant.  This

5    longitudinal crack.

6              Q.  Okay.

7              A.  Because usually the tracking is

8    perpendicular to the interface or to the surface.  Now

9    it's running along, and not just along it's -- usually

10   it's a peeling off of degradation bark from the core,

11   but in this case it cracked through the degradation

12   bark.  It's so thick that it delaminated and there are

13   two layers of degradation bark now.

14             Q.  And just so that the record is

15   clear, could you take a highlighter or Sharpie or

16   something and just mark that so the record will be

17   clear?

18             A.  Sure.

19             Q.  So you've drawn the green line along

20   what you described as a longitudinal crack?

21             A.  Yes.

22             Q.  Thank you.

23             A.  Longitudinal in terms of parallel to

24   the surface or parallel to this interface.  Because

Vladimir Iakovlev, M.D.

1    another term "longitudinal" is frequently used.

2    Longitudinal to the axis of the fiber, so that's

3    different.  I'm just trying my best to describe the

4    position.

5                    Q.  In any event, you took the

6    highlighter and you marked what you're describing?

7                    A.  Okay.

8                    Q.  So regardless of the descriptive

9    term I think the record is clear what you're referring

10   to.

11                   A.  Okay.

12                   Q.  Now, what is it that you plan on

13   telling the jury about 11b?

14                   MR. THORNBURGH:  Objection.

15                   THE DEPONENT:  11b is the same field,

16   the same fiber in polarized light.  And you can see

17   that it's -- although it has reduced refractile

18   properties or birefringence it's still much brighter

19   and different color than tissue proteins.

20                   BY MR. COMBS:

21                   Q.  Anything else?

22                   A.  No.

23                   Q.  DM12.

24                   A.  This is a separated degradation

Vladimir Iakovlev, M.D.

```
 1    bark.  The nondegraded core floated away during

 2    processing and degradation bark remained adherent to

 3    the tissue because of its rough surface and adherence

 4    to the surrounding tissues.  It shows cracking,

 5    indicating its brittleness, and it still retains its

 6    optical properties of polypropylene.

 7                     Q.  Alright.  DM13, what do you plan on

 8    telling the jury about that photograph?

 9                     A.  This is an interesting phenomenon.

10    So you can see that there were free particles in the

11    tissue.  They have their own nondegraded core and

12    degradation layer and they are embedded in the tissue.

13    So these particles were introduced into the body with

14    the mesh during surgery.  So there was dust or

15    fragments of fibers on the mesh.  It wasn't clean.

16    This was probably defect of some manufacturing process

17    when the particles still remain adherent to the mesh.

18    And they just became embedded and became degraded the

19    same way as nonfragmented fibers.

20                     Q.  And what is the basis for your

21    opinion that these particles were implanted at the time

22    of the original surgery?

23                     A.  Well, first of all they have

24    macrophages and they are embedded in tissue, that's the
```

Vladimir Iakovlev, M.D.

1    first feature.  The second feature, they have their own

2    nondegraded core and degradation layer outside.  So

3    they had to be in the body in that shape for as long as

4    the fiber -- if you check the thickness of the

5    degradation layer.  Like, if you compare this

6    degradation layer and this.  So if you compare

7    thickness of the degraded layer it's comparable.

8              So judging by the thickness the

9    fragments and the mesh fibers were degrading in

10   parallel.  I mean, they were implanted at the same

11   time, they stayed there and they just kept degrading so

12   the thickness was growing.

13             Q.  Dr. Iakovlev, can you hand me

14   Exhibit 1 so I can see the marks that you've made?

15             Alright.  So that the record is clear on

16   this, is it alright if I mark the top one as "A" and

17   the bottom one as "B"?  Or you can do it if you want.

18             A.  Sure, go ahead.

19             Q.  So we're on page 25 of Exhibit 1.

20   And you had made two drawings on that.  And I've marked

21   them as "A" and "B".

22             MR. COMBS:  And, Dan, I'm going to come

23   around so we can talk about this for a second?

24             MR. THORNBURGH:  Let me see the markings

Vladimir Iakovlev, M.D.

1    that you've made please.

2                   MR. COMBS:  Sure.

3                   MR. THORNBURGH:  So you're marking the

4    fiber as "A" and then the particles that fell off

5    during implantation as "B"?

6                   MR. COMBS:  Well, that's not my

7    interpretation of it but that's Dr. Iakovlev's

8    testimony about it, yes.

9                   BY MR. COMBS:

10                  Q.  So, Dr. Iakovlev, I just want to

11   make sure the record is clear on this point.  What is

12   it that you have marked in "A"?

13                  A.  This is a separated degradation bark

14   from the fiber.

15                  Q.  And the three lines that you've

16   drawn in relation to A is that your measurement of the

17   width of it?

18                  MR. THORNBURGH:  Objection.

19                  THE DEPONENT:  Thickness.

20                  BY MR. COMBS:

21                  Q.  Thickness, okay.  And what is it

22   that you've drawn in relation to B?

23                  A.  This is indicating thickness of the

24   degradation layer on the loose fragments.

Vladimir Iakovlev, M.D.

1                       Q.   And what is it you're using to

2     measure the degradation layer of the loose fragment on

3     B?

4                       A.   I'm not measuring it, I'm showing

5     the thickness.

6                       Q.   And what are you using to define the

7     thickness?   Just that you see the blue or --

8                       MR. THORNBURGH:   Objection.

9                       THE DEPONENT:   Yeah.

10                      BY MR. COMBS:

11                      Q.   I just wonder what are all the

12    things you're relying on to say that is the thickness?

13                      MR. THORNBURGH:   Objection.

14                      THE DEPONENT:   Blue.   The color.

15    Degraded polypropylene absorbs dyes, that's why you can

16    measure it.

17                      BY MR. COMBS:

18                      Q.   So your testimony is that because

19    you can see the thickness of blue that that would

20    indicate that that's the thickness of the degradation

21    layer?

22                      A.   Yes.   In any case I mean both have

23    blue color, both have approximately the same thickness.

24                      Q.   Anything else that you're relying on

Vladimir Iakovlev, M.D.

1    to say that the thickness of the degradation is the

2    same between A and B?

3                    MR. THORNBURGH:  Objection.

4                    THE DEPONENT:  The usual assessment.

5    And I said "approximately" the same.  I did not say

6    exactly the same.

7                    BY MR. COMBS:

8                    Q.  Okay.  I mean I wasn't -- if I

9    misuse your words I apologize.  So the testimony is

10   that they're approximately the same?

11                   A.  Yeah.

12                   Q.  For the sample that's in photograph

13   25 are you able to tell me what fragment of the

14   pathological sample that came from?

15                   MR. THORNBURGH:  Objection.

16                   THE DEPONENT:  I think you asked that

17   question specifically for this.  Well, it was not my

18   purpose to memorize and provide this because it

19   wouldn't contribute.  Would be meaningless.

20                   BY MR. COMBS:

21                   Q.  So is the answer no?

22                   A.  I gave you an answer.  It wasn't my

23   purpose and I cannot say now.

24                   Q.  Can you tell me which slide this

Vladimir Iakovlev, M.D.

1    comes from?

2                        MR. THORNBURGH:  Objection.

3                        THE DEPONENT:  Same answer.  I can tell

4    you because it was not my purpose to memorize or to

5    record it.

6                        BY MR. COMBS:

7                        Q.  Can you tell me where in

8    Ms. Massey's vagina this came from with any more

9    specificity than vaginal wall?

10                       MR. THORNBURGH:  Objection.

11                       THE DEPONENT:  No more specificity

12   required.  I cannot tell you.

13                       BY MR. COMBS:

14                       Q.  Did Ms. Massey have any revision

15   surgeries between her implant and the explant for which

16   you have pathology samples?

17                       MR. THORNBURGH:  Objection.

18                       THE DEPONENT:  Yes, there was excision.

19                       BY MR. COMBS:

20                       Q.  And are you able to --

21                       MR. THORNBURGH:  And the reason for my

22   objection is because it was a cop out.

23                       ---  Off the record at 9:37 a.m.

24                       ---  Back on the record at 9:38 a.m.

Vladimir Iakovlev, M.D.

```
 1                    BY MR. COMBS:

 2                    Q.  Are you able to tell us the location

 3    of the first revision that Ms. Massey had?

 4                    A.  Somewhere in the apex.

 5                    Q.  Any more specificity than that?

 6                    A.  No.

 7                    Q.  Dr. Iakovlev, what is it that you

 8    plan on telling the jury about the photograph in DM14?

 9                    MR. THORNBURGH:  Objection.

10                    THE DEPONENT:  DM14?

11                    BY MR. COMBS:

12                    Q.  Yes, sir.

13                    A.  There is another small, loose

14    particle in the tissue.  That one is very small.  It's

15    birefringent.  It appears to be embedded in the tissue.

16                    Q.  Are DM13 and DM14 pictures of the

17    same tissue?  I probably didn't ask that very well.

18    But here's what I ask, is it your testimony that DM14,

19    where you describe a loose particle in the tissue, that

20    that's different than DM13?

21                    A.  Yes, these particles are different.

22                    Q.  Okay.

23                    A.  So what I think could have -- what

24    my opinion would be of interpretation of this particle
```

Vladimir Iakovlev, M.D.

```
 1      that this is a much smaller particle.  DM13 shows

 2      larger particle which have been in the body for long

 3      time because degradation layer is so thick.

 4                    Now, regarding the particle on DM14 it's

 5      a very small one.  For that one the likely explanation

 6      would be that part of degradation bark became dislodged

 7      during previous excision, because it's just one small

 8      fragment.  The bark cracked and became embedded in the

 9      tissue.  It's a bit different because the entire

10      particle is degraded.

11                    Q.  I just want to make sure I

12      understand.  When you say the entire particle is

13      degraded you're talking about DM14?

14                    A.  Yes.

15                    Q.  And so --

16                    A.  It has some color into it but,

17      again, it's so small it would be difficult to draw firm

18      conclusions about the origin of that particle.

19                    Q.  How big is that particle

20      approximately?

21                    A.  That particle is roughly 6, 7

22      microns long and only 1 micron thick.

23                    Q.  If we're looking at the bottom

24      picture on DM14 approximately how far would what you
```

Vladimir Iakovlev, M.D.

```
 1    described as the particle be from what you have

 2    described as the degradation layer?

 3                   A.  Could you repeat the question?

 4                   Q.  Yeah.  I'm trying to figure out how

 5    many microns from here to here?

 6                   A.  About 30 microns, 25.

 7                   Q.  Anything else that you plan on

 8    telling the jury about DM14?

 9                   MR. THORNBURGH:  Objection.

10                   THE DEPONENT:  Mostly it's a good

11    example of degradation bark which peeled off the fiber.

12    I mean that's one of the good examples.

13                   BY MR. COMBS:

14                   Q.  How thick is the degradation layer

15    in this picture?

16                   A.  Again without a micrometer I can

17    only estimate.  My estimate would be 6, 7 microns.

18                   Q.  Let's see if we can shortcut some of

19    this.  If I ask you questions regarding the location of

20    this I'm going to ask you a compound question and see

21    if we can move on here.

22                   If I ask you questions about what

23    fragment this was from, what slide this was from and

24    where in Ms. Massey's body this piece of tissue was
```

Vladimir Iakovlev, M.D.

1  from would your answers be the same as they were in

2  regard to DM13?

3             A.  Yeah.  It's from one of the

4  fragments of the same jar.

5             MR. COMBS:  This is a good place to take

6  a break.

7             ---  Break taken at 9:45 a.m.

8             ---  Upon resuming at 10:05 a.m.

9             BY MR. COMBS:

10            Q.  Dr. Iakovlev, you have listed on

11 your chronology that Ms. Massey had a revision on

12 December 29, 2006.  You do not have any pathology from

13 that revision do you?

            A.  I don't.  From what I understand

14 there was no pathology in the examination at that time.

            ---EXHIBIT NO. 2: Pathology Report

15 prepared by Dr. Brownell.

16            Q.  And the pathology that you have is

17 from the December 3rd, 2010, sample which is what we

18 marked as Exhibit 2?

19            A.  That's correct.

20            Q.  Dr. Iakovlev, there were no

21 depositions on Massey Exhibit 3.  Is it accurate that

22 you did not review any depositions in this case?

23            A.  Yes.

24            Q.  So that would include you haven't

Vladimir Iakovlev, M.D.

1    read the deposition of the plaintiff or of any of the

2    treating physicians?

3                   A.  That's correct.

4                   Q.  Have you reviewed any expert reports

5    submitted by the plaintiff or the defense regarding

6    Ms. Massey's case?

7                   A.  No.

8                   Q.  Dr. Iakovlev, during this case you

9    have not had any contact with any of Ms. Massey's

10   treating physicians have you?

11                  A.  That's correct.

12                  Q.  You were not present in the

13   operating room for the implant or either of the two

14   revisions were you?

15                  A.  That's correct.

16                  Q.  Never saw the mesh in vivo in Ms.

17   Massey's case?

18                  A.  That's correct.

19                  Q.  Played no role in preparing the

20   specimen for pathological review at the East Side

21   Surgery Center?

22                  A.  That's correct.

23                  Q.  Do you know anything about the

24   protocol for preparing the specimen from East Side

Vladimir Iakovlev, M.D.

```
 1    Surgery Center?

 2                   A.  From the microscopic examination the

 3    histology was in acceptable range.  So my conclusion is

 4    that their protocol was within acceptable standards.

 5                   Q.  The specimen would have been handled

 6    with forceps wouldn't it?

 7                   A.  At one point probably likely.

 8                   Q.  Fixed in formalin?

 9                   A.  That's correct.

10                   Q.  Dehydrated?

11                   A.  That's correct.

12                   Q.  Cleaning agents added to it?

13                   A.  What do you mean "cleaning"?

14                   MR. THORNBURGH:  Objection.

15                   BY MR. COMBS:

16                   Q.  Was xylene added to it?

17                   A.  Yes, but it's not cleaning agent.

18                   Q.  Tell me the function of xylene?

19                   A.  Xylene would have been added there.

20                   Q.  And xylene would have been added to

21    the sample?

22                   A.  Tissue is soaked in xylene as one of

23    the steps.

24                   Q.  And I apologize, I made a mental
```

Vladimir Iakovlev, M.D.

1    typo.  I said cleaning instead of clearing.

2                    A.  Oh, okay.

3                    Q.  And then embedded in paraffin and

4    then microtomed?

5                    A.  That's correct.

6                    Q.  And you told us that you received

7    four slides in this case, is that correct?

8                    MR. THORNBURGH:  Objection.

9                    THE DEPONENT:  I received stained and

10   unstained slides.  I didn't type it in -- I can check

11   with chain of custody form what I received.  There were

12   slides of four blocks.

13                   BY MR. COMBS:

14                   Q.  Just give me a second and I'll pull

15   up the chain of custody.  Here you go, Doctor?

16                   A.  Actually I can answer your question

17   regarding what block the mesh specimen is coming from.

18                   Q.  Okay.

19                   A.  It was described as and was

20   submitted in cassette A4.  If you really want an answer

21   that's an answer.

22                   Q.  Alright.  And how many slides did

23   you receive?

24                   A.  So I received four slides.  Wait a

Vladimir Iakovlev, M.D.

1    second, I think one chain of custody form didn't scan

2    for whatever reason.  I would have to check, double

3    check.  There could have been two chain of custody

4    forms.  Two slides in one shipment and two slides in

5    the other one.

6                    Q.  Will you review that and if you find

7    an additional chain of custody form just provide it to

8    Mr. Thornburgh?

9                    A.  Because I remember seeing it.  From

10   what I remember they came in two different packages.

11   For whatever reason they became separated, that's my

12   recollection.  Yes, my recollection is that they were

13   separated.  This is one of the chain of custody forms.

14                   Q.  Okay.  And so you believe for

15   Ms. Massey's case there was another chain of custody

16   form?

17                   A.  Yeah.  My recollection is I got

18   complete case but it was separated into two shipments.

19                   Q.  And if there is a second chain of

20   custody form will you provide that to Mr. Thornburgh so

21   he can provide it to us?

22                   A.  I will.

23                   Q.  Now, were any portions of this

24   sample tested with any analytical chemistry?

Vladimir Iakovlev, M.D.

```
 1                    A.  No.

 2                    Q.  Was your examination limited to the

 3      light microscope?

 4                    A.  Yes.

 5                    Q.  Did you perform any other tests of

 6      any type?

 7                    MR. THORNBURGH:  Objection.

 8                    THE DEPONENT:  No, just histology.

 9                    BY MR. COMBS:

10                    Q.  Will you be testifying to the jury

11      in this case that Ms. Massey's mesh migrated?

12                    A.  Some parts of the mesh migrated.  I

13      cannot tell you the degree but my testimony will be

14      that mesh can migrate and some parts migrated.  I

15      cannot tell you the degree of migration.  Is it

16      microns, millimeters or centimeters?

17                    Q.  And can you tell me which parts of

18      Ms. Massey's mesh migrated?

19                    A.  No, I cannot.

20                    Q.  So you will not be able to tell me

21      how far it migrated or which portion of it migrated?

22                    A.  No.  This is conclusion based on my

23      knowledge, experience and research in implantable

24      meshes.  Because I know that meshes can migrate
```

Vladimir Iakovlev, M.D.

1       therefore I assume that all of them migrate to a

2       degree.  Is it micron, millimeters or centimeters?  It

3       depends on the case.  Some parts migrate more and some

4       parts migrate less.

5                       Q.  Just this case, Donna Massey, can

6       you tell me how far it's your opinion that it migrated?

7                       A.  This case is not an exception.  I

8       cannot tell you the degree of migration of the mesh but

9       I can testify to reasonable degree of medical certainty

10      some parts of the mesh migrated.

11                      Q.  Dr. Iakovlev, will you be testifying

12      in this case that Ms. Massey had any arteries or

13      vessels that were obliterated?

14                      A.  I did not see it in the slides but I

15      cannot rule it out because I know that it can happen

16      around the implanted meshes.

17                      Q.  There are no depictions in any of

18      the photographs that you prepared and attached to your

19      report of any obliterated vessels or arteries are

20      there?

21                      A.  That's correct.

22                      Q.  And as we sit here today do you

23      remember observing any obliterated vessels or arteries

24      in any portions of the slides that you reviewed?

Vladimir Iakovlev, M.D.

```
1                    A.  No.

2                    Q.  Dr. Iakovlev, will you be making any

3    claim in this case that Ms. Massey has suffered from

4    any urinary symptoms as a result of the mesh?

5                    A.  Now this is the clinical part.

6    Clinical symptoms I'm not making opinions or claims.  I

7    just copy what was in the records.  You have to give me

8    a second to go through my summary.  (Witness looking at

9    summary.)  No.

10                   Q.  Dr. Iakovlev, I want to ask you some

11   questions about the clinico-pathological correlation

12   that you performed in this case.  You've never examined

13   Ms. Massey have you?

14                   MR. THORNBURGH:  Objection.

15                   THE DEPONENT:  That's correct.

16                   BY MR. COMBS:

17                   Q.  And never talked to Ms. Massey?

18                   A.  That's correct.

19                   Q.  You've had no doctor-patient

20   relationship with Ms. Massey have you?

21                   MR. THORNBURGH:  Objection.

22                   THE DEPONENT:  I examined her specimen,

23   that's the extent of my involvement with her.

24
```

Vladimir Iakovlev, M.D.

1                        BY MR. COMBS:

2                        Q.  And you examined that specimen as

3        part of the legal process didn't you?

4                        A.  Yes, that's correct.

5                        Q.  In this case it's my understanding

6        that and you told us earlier that you plan to offer

7        testimony regarding degradation, is that correct?

8                        A.  That's correct.

9                        Q.  And in your report you talk about

10       the brittleness of the mesh.  And I just want to know

11       how you appreciated that brittleness?

12                       A.  By changes of behavior in the

13       histological slides.  So the nondegraded core does not

14       crack and degradation bark cracks.

15                       Q.  Just based upon your observations

16       from the slides?

17                       A.  That's correct.

18                       Q.  Dr. Iakovlev, earlier we introduced

19       as Exhibit 2 the pathology report prepared by

20       Dr. Brownell.  Dr. Brownell made no findings that Ms.

21       Massey suffered from pain or dyspareunia did he?

22                       MR. THORNBURGH:  Objection.

23                       THE DEPONENT:  Dr. Brownell is a

24       pathologist.  Pain and dyspareunia are clinical

Vladimir Iakovlev, M.D.

1    diagnosis.  I wouldn't expect him and he didn't.

2                    BY MR. COMBS:

3                    Q.  And Dr. Brownell made no findings

4    regarding degradation in his pathology report did he?

5                    A.  He didn't do any testing for

6    degradation.  He did not describe if he did either way.

7                    Q.  And Dr. Brownell examined Ms.

8    Massey's slides under the microscope didn't he?

9                    A.  That's correct.

10                   Q.  And that's the same thing you did

11   isn't it?

12                   A.  That's correct.

13                   Q.  And you did not do any additional

14   testing other than examining that slide under the

15   microscope did you?

16                   A.  That's correct.

17                   Q.  And based upon his observation Dr.

18   Brownell did not draw any conclusions that the mesh had

19   degraded did he?

20                   MR. THORNBURGH:  Objection.

21                   THE DEPONENT:  I don't know it doesn't

22   say either way.

23                   BY MR. COMBS:

24                   Q.  You do not know whether Ms. Massey's

Vladimir Iakovlev, M.D.

1    treating physicians have drawn any conclusions

2    regarding whether the mesh degraded do you?

3                    A.  I don't.

4                    Q.  Dr. Iakovlev, will you be offering

5    testimony at the trial of this case regarding the

6    causes of Ms. Massey's pain and dyspareunia?

7                    A.  Yes, I will.

8                    Q.  And what will your testimony be

9    regarding the causes of pain and dyspareunia in Ms.

10   Massey's case?

11                   A.  Yes, I will.  And I will describe

12   the morphological changes around the mesh which are

13   related to pain symptoms.

14                   Q.  Anything else?

15                   A.  That's a summary.

16                   Q.  Dr. Iakovlev, you do not have any

17   medical records for Ms. Massey after 2013 do you?

18                   A.  If it's not on the thumb drive I

19   didn't.  My last entry is 2013.

20                   Q.  Do you know whether Ms. Massey

21   currently has dyspareunia?

22                   A.  I don't.

23                   Q.  Do you know whether Ms. Massey's

24   partner currently has any pain with intercourse?

Vladimir Iakovlev, M.D.

1                    A.  I don't.

2                    Q.  In your summary at page 5 you state

3       kind of in the middle, "Dyspareunia is mild and

4       positional at best."   What does it mean "positional at

5       best"?

6                    A.  I did not state that, I copied it

7       from the records.

8                    Q.  What does it mean?

9                    A.  You have to ask the provider who

10      entered it.

11                   Q.  You would not be able to tell us as

12      we sit here today what that means?

13                   A.  I can give you my interpretation but

14      I mean if you really want to know what the provider

15      meant you have to ask the provider.

16                   MR. COMBS:  Let's take a break.

17                   ---  Break taken at 10:28 a.m.

18                   ---  Upon resuming at 10:31 a.m.

19                   BY MR. COMBS:

20                   Q.  Dr. Iakovlev, I asked you earlier

21      about your reference in your chronology about

22      positional dyspareunia in 2013 and you told me that's

23      just what the medical record said.  I want to ask you

24      now about the location of Ms. Massey's pain during

Vladimir Iakovlev, M.D.

1    intercourse.  Are you able to put on the diagram for me

2    on Exhibit 4 or 5 where the location of her pain was

3    during intercourse?

4                    MR. THORNBURGH:  Objection.

5                    THE DEPONENT:  Well we can begin that

6    the diagram doesn't represent the state of the patient.

7    It's a hypothetical patient with uterus intact.

8                    BY MR. COMBS:

9                    Q.  Sure.  Well if you want you can

10   cross out the uterus.  So would you be able to put on

11   any location on either 4 or 5 the location of Ms.

12   Massey's pain during intercourse?

13                   MR. THORNBURGH:  Objection.

14                   THE DEPONENT:  I'm afraid I cannot mark

15   anything on that diagram without misrepresenting Ms.

16   Massey.

17                   BY MR. COMBS:

18                   Q.  Alright.  Same question for Ms.

19   Massey's husband.  Are you able to point out for us on

20   a diagram where the mesh was that you say was causing

21   him to have partner dyspareunia during intercourse?

22                   MR. THORNBURGH:  Objection.

23                   THE DEPONENT:  My answer would be the

24   same.  Since the diagram doesn't represent Ms. Massey I

Vladimir Iakovlev, M.D.

1    cannot point to the area.  And this would be best to be

2    asked of the treating physician who was examining her

3    at the time.

4                    BY MR. COMBS:

5                    Q.  It's your understanding, Dr.

6    Iakovlev, that the implant in this case occurred on

7    August 22nd, 2005?

8                    A.  Can you repeat the question?

9                    Q.  Is it your understanding that the

10   implant in this case occurred on August 22nd, 2005?

11                   A.  Yes, that's what date was in the

12   record.

13                   Q.  And the revision for which you don't

14   have the pathology, that would have occurred on

15   December 29th, 2006?

16                   A.  That's correct.

17                   Q.  And that would have been

18   approximately four years before the revision for which

19   you do have the pathology, the December 3rd, 2010?

20                   A.  Approximately, yes.

21                   Q.  Thank you, Dr. Iakovlev.  I don't

22   have any more questions about Ms. Massey's case at this

23   point.

24                   DIRECT EXAMINATION BY MR. THORNBURGH:

Vladimir Iakovlev, M.D.

```
 1                    Q.  Doctor, I have a couple of follow-up

 2      questions.  I'll be as brief as possible.

 3                    Dr. Iakovlev, there were some questions

 4      by defense counsel concerning a number of the pictures

 5      or images, microphotographs, that you took of certain

 6      slides that you received.  Do you recall that

 7      questioning?

 8                    A.  Yes, I do.

 9                    Q.  And defense counsel asked you which

10      mesh fragment these images were taken from, do you

11      recall that?

12                    MR. COMBS:  Objection.

13                    THE DEPONENT:  Yes, I do.

14                    BY MR. THORNBURGH:

15                    Q.  And if I understand your testimony

16      correctly you received some slides, correct?

17                    A.  That's correct.

18                    Q.  And they were slides of the mesh

19      that was explanted from Mrs. Massey, correct?

20                    A.  That's correct.

21                    Q.  And if you, for example, wanted to

22      -- needed to identify where -- which slide figure DM2

23      came from what could you do?

24                    A.  I could either check with the
```

Vladimir Iakovlev, M.D.

1    pathology report who grossed it, or more accurate

2    assessment would be just to take a slide, look at it

3    and then I can pinpoint exactly where it's coming from.

4                    Q.  So those slides are labelled?

5                    A.  Yes.

6                    Q.  So all you'd have to do is look at

7    the labelled slides and determine where DM2 came from?

8                    A.  Yeah.  I would need pathology

9    report, grossing description and pathology -- and

10   slide.

11                   Q.  And you provided those slides -- or

12   you mailed those slides to defense counsel or defense

13   counsel's expert pathologist, is that accurate?

14                   A.  I mailed it to Mr. Snowden.

15                   Q.  So once Mr. Snowden returns those

16   slides could you easily identify where these images

17   contained within your report were -- which slides those

18   images were taken from?

19                   A.  Yeah.  I can square exactly the area

20   where they were taken from.

21                   Q.  Is it fair to say that you can

22   easily trace back where those images were taken from

23   once Mr. Snowden returns those slides?

24                   A.  Yes.

Vladimir Iakovlev, M.D.

1                    Q.  And have you requested that

2    Mr. Snowden return those slides to you?

3                    A.  Yes.

4                    Q.  Is it your understanding that

5    Mr. Snowden has agreed to return those slides after

6    March 16th?

7                    MR. THORNBURGH:  Object to form.

8                    THE DEPONENT:  Hope soon after.

9                    BY MR. THORNBURGH:

10                   Q.  Did you hear that yesterday?

11                   A.  Yes.

12                   Q.  Yesterday we had a conversation and

13   Mr. Snowden confirmed that those slides would be

14   returned soon after March 16th, correct?

15                   A.  That's correct.

16                   Q.  Is it your understanding that

17   defense counsel and or their experts also received some

18   slides of their own?

19                   A.  I have to check because some slides

20   were just in one set.  Because sometimes they were

21   recuts and sometimes there was just one set of slides

22   which was exchanged.

23                   Q.  Defense counsel went through your

24   microphotographs that are contained within your expert

Vladimir Iakovlev, M.D.

```
1    report and asked you basically a summary of the

2    opinions that you will have regarding each one of these

3    microphotographs at trial.  Do you recall that?

4                    A.  Yes, I do.

5                    Q.  In addition to your testimony that

6    you provided on cross-examination does figure DM2

7    demonstrate encapsulation of Mrs. Massey's mesh in a

8    dense scar plate?

9                    A.  That's correct.

10                   Q.  Does figure DM2 demonstrate bridging

11   fibrosis?

12                   A.  That's correct.

13                   Q.  Does figure DM2 demonstrate

14   migration and/or folding of the mesh?

15                   A.  It does demonstrate folding.

16                   Q.  And does DM2 demonstrate

17   inflammation?

18                   A.  It does.

19                   Q.  Chronic and acute?

20                   A.  Yes.

21                   Q.  And are those some of the things

22   that you -- some of the opinions you can share during

23   the trial in this case?

24                   A.  That's correct.  And I can answer
```

Vladimir Iakovlev, M.D.

1      more questions as long as you ask.  I can talk about it

2      for hours.

3                     Q.  Does DM2 correlate with the clinical

4      records demonstrating that Mrs. Massey was experiencing

5      erosions?

6                     A.  That's correct.  Demonstrates

7      erosion.

8                     Q.  Is that another opinion that you can

9      share with the jury regarding DM2?

10                    A.  That's correct.

11                    Q.  Does DM2 correlate with the clinical

12     records demonstrating not only erosion but also

13     dyspareunia and hispareunia?

14                    A.  That's correct.

15                    Q.  Is that an additional opinion that

16     you can share with the jury at trial concerning DM2?

17                    A.  That's correct.

18                    Q.  Defense counsel asked you a number

19     of questions concerning your opinions that there was an

20     infection at the site of the erosion.  Do you recall

21     that line of questioning?

22                    A.  Yes, I do.

23                    Q.  And defense counsel had suggested in

24     his questioning that none of Mrs. Massey's treating

Vladimir Iakovlev, M.D.

1    physicians ever diagnosed her with an infection.  Do

2    you recall that line of questioning?

3                    MR. COMBS:  Object to form.

4                    THE DEPONENT:  I do.

5                    BY MR. THORNBURGH:

6                    Q.  And if you turn in your expert

7    report to, for example, page 3?

8                    A.  Yes.

9                    Q.  Strike that.  If you turn to page 5

10   to the record from Dr. Croak, October 4th, 2013, do you

11   see that?

12                   A.  Yes.

13                   Q.  And do you see about five lines down

14   it says, "Some vaginal discharge that has been ongoing

15   since original mesh was placed.  She states it is

16   yellow/brown, not malodorous, not bloody."  Do you see

17   that?

18                   A.  Yes.

19                   Q.  And did your findings concerning the

20   acute inflammation at the site of the erosion, which

21   transitioned as deeper into the tissue, does that

22   correlate be Dr. Croak's findings of these symptoms?

23                   A.  Yes, it does.  There is discharge

24   and the source of discharge is granulation tissue which

Vladimir Iakovlev, M.D.

1    formed at the exposure site.

2                    Q.  Would it be a misrepresentation for

3    defense for Ethicon to suggest that none of Mrs.

4    Massey's treating physicians had recorded these

5    symptoms of infection?

6                    MR. COMBS:  Object to form.

7                    THE DEPONENT:  Yes.  I mean because

8    granulation tissue forms around chronic wounds.

9                    BY MR. THORNBURGH:

10                   Q.  And did your review of the pathology

11   material that you received confirm the same?

12                   A.  Yes.

13                   MR. COMBS:  Object to form.

14                   BY MR. THORNBURGH:

15                   Q.  Figure DM3a on page 13.

16                   A.  Yes.

17                   Q.  Does your image in DM3a correlate

18   with the clinical findings of Mrs. Massey's physicians?

19                   A.  It does.

20                   Q.  Does it demonstrate an erosion?

21                   A.  It does.

22                   Q.  Does it correlate with her reported

23   problems of pus or discharge?

24                   A.  Yes.

Vladimir Iakovlev, M.D.

1                    Q.  Does it correlate with Ms. Massey's

2       report to her physicians of exposed mesh?

3                    A.  Yes, it does.

4                    Q.  What about dyspareunia?

5                    A.  Yes, it does.

6                    Q.  What about hispareunia?

7                    A.  It does.

8                    Q.  What about pain?

9                    A.  It does.

10                   Q.  Does DM3a demonstrate inflammation?

11                   A.  It does.

12                   Q.  Dense scarring?

13                   A.  Yes.

14                   Q.  Infection?

15                   A.  Yes.

16                   Q.  Bridging fibrosis?

17                   A.  Yes.

18                   Q.  Encapsulation of the mesh and scar

19      tissue?

20                   A.  Yes.

21                   Q.  Are these among the opinions that

22      you will share with the jury at trial?

23                   A.  Yes.

24                   Q.  Concerning DM3a?

Vladimir Iakovlev, M.D.

```
 1                    A.  Yes.

 2                    Q.  Figure DM3b on page 14.

 3                    A.  Yes.

 4                    Q.  Does DM3b also correlate with the

 5       clinical findings of Ms. Massey's physicians?

 6                    A.  Yes.

 7                    Q.  Pain?

 8                    A.  Yes.

 9                    Q.  Dyspareunia?

10                    A.  Yes.

11                    Q.  Hispareunia?

12                    A.  Yes.

13                    Q.  Erosion?

14                    A.  Yes.

15                    Q.  Infection?

16                    A.  Yes.

17                    Q.  Scarring?

18                    A.  Yes.

19                    Q.  Folding of the mesh?

20                    A.  Yes.

21                    Q.  Migration of the mesh?

22                    A.  Yes.

23                    Q.  Erosion of the mesh.

24                    A.  Yes.
```

Vladimir Iakovlev, M.D.

```
 1                    Q.  Encapsulation in the scar plate?

 2                    A.  Yes.

 3                    Q.  Bridging fibrosis?

 4                    A.  Yes.

 5                    Q.  The need for additional surgery to

 6      remove the mesh?

 7                    A.  Yes.

 8                    Q.  Complications as a result of the

 9      mesh?

10                    A.  Yes.

11                    Q.  Are those additional opinions that

12      you can share with the jury at the time of trial?

13                    A.  Yes.

14                    Q.  DM4 on page 15.

15                    A.  Yes.

16                    Q.  Again, does this image

17      demonstrate -- correlate with the clinical findings of

18      Ms. Massey's physicians?

19                    A.  Yes.

20                    Q.  Erosion?

21                    A.  Yes.

22                    Q.  Infection?

23                    A.  Yes.

24                    Q.  Inflammation?
```

Vladimir Iakovlev, M.D.

```
 1                    A.  Yes.

 2                    Q.  Chronic and acute?

 3                    A.  Yes.

 4                    Q.  Pain?

 5                    A.  Yes.

 6                    Q.  Dyspareunia?

 7                    A.  Yes.

 8                    Q.  Hispareunia?

 9                    A.  Yes.

10                    Q.  Bridging fibrosis?

11                    A.  Yes.

12                    Q.  Scarring?

13                    A.  Yes.

14                    Q.  Shrinkage?

15                    A.  Yes.

16                    Q.  Mesh-related complications?

17                    A.  Yes.

18                    Q.  Is that the same for DM5?

19                    A.  That's correct.

20                    Q.  Is that the same for DM6?

21                    A.  Yes.

22                    Q.  Is that the same for DM7?

23                    A.  Yes.

24                    Q.  Is that the same for DM8?
```

Vladimir Iakovlev, M.D.

1                    A.  Yes.

2                    Q.  Is that the same for -- alright.  So

3       for all these images, DM1 through DM8, are those all

4       opinions that you may share with the jury concerning

5       those images?

6                    A.  That's correct.

7                    Q.  Page 25.

8                    A.  Yes.

9                    Q.  DM13.

10                   A.  Yes.

11                   Q.  Of your expert report.

12                   A.  Yes.

13                   Q.  Are there macrophages surrounding

14      those particles?

15                   A.  Yes.

16                   Q.  Does that demonstrate that the

17      macrophages were attempting to attack and surround

18      those particles?

19                   A.  Yes.

20                   Q.  So in addition to the degradation

21      does the presence of that immunological response

22      indicate that those particles had -- were embedded in

23      the tissue and were embedded at the time of

24      implantation?

Vladimir Iakovlev, M.D.

```
1                    MR. COMBS:  Object to form.

2                    THE DEPONENT:  Yes.  They were embedded

3     at -- before excision surgery.

4                    BY MR. THORNBURGH:

5                    Q.  Are those particles experiencing the

6     same immunological or tissue response as the fibers

7     that are also located in DM13?

8                    A.  That's correct.  They have exactly

9     the same behavior.  They are attacked by the immune

10    response of the body, and the polypropylene degrades

11    the same way as larger fibers.

12                   Q.  Is that additional evidence that

13    this material -- these particles is polypropylene?

14                   A.  Yes, it is.

15                   Q.  Is that additional opinions that you

16    will be able to share at the trial in this case?

17                   A.  Yes.

18                   Q.  And did all of the images that you

19    took from DM1 through DM14 do those images, or your

20    pathological findings relating to those slides that you

21    reviewed, correlate with Mrs. Massey's clinical

22    physicians' diagnosis?

23                   MR. COMBS:  Object to form.

24
```

Vladimir Iakovlev, M.D.

```
 1                    BY MR. THORNBURGH:

 2                    Q.  Let me ask a better question.  Do

 3     your pathological findings correlate with the diagnosis

 4     made by Mrs. Massey's physicians who elected or had

 5     recommended the removal of this mesh?

 6                    A.  That's correct.  I was just looking

 7     at these images one more time.  This fragment has split

 8     so I would like to mark the thickness of the other

 9     fragment from here to there, if we want to be really

10     precise.

11                    And it appears that this fragment has

12     split so this measure -- I will mark some more

13     measurements just to point -- because the fragments are

14     irregular so -- or triangular.  The measurements can be

15     taken from different parts.  So I'll just mark other

16     parts for other measurements which can be taken from

17     these images.  So this will be more accurate now.  If

18     it's flat you can measure anywhere and it's still flat.

19     But if it's triangular it's -- you have to measure

20     sides I guess.

21                    Q.  I have no further questions.

22                    FURTHER CROSS-EXAMINATION BY MR. COMBS:

23                    Q.  Dr. Iakovlev, you testified in

24     response to Mr. Thornburgh's questioning that the
```

Vladimir Iakovlev, M.D.

1    pathological slides showed acute inflammation.  In fact

2    the treating pathologist did not make that finding did

3    he?

4                    A.  He didn't make a description.  We

5    cannot say now if he made the finding or not.

6                    Q.  His finding was chronic inflammation

7    wasn't it?

8                    A.  No.  It's actually misrepresentation

9    what he says.  He says, "Mesh with foreign body

10   granulation and chronic inflammation."  So he describes

11   inflammation in relation to the mesh.  He does not

12   describe inflammation in relation to the exposure site.

13                   Q.  And made no finding anywhere in this

14   report that any inflammation was acute did he?

15                   A.  He did not mention the erosion site.

16   He did not give a description.  You are correct.

17                   Q.  Dr. Iakovlev, you -- is it your

18   testimony that Ms. Massey suffered from an infection?

19                   A.  Yes.

20                   Q.  Are you going to present that

21   testimony to the jury in this case?

22                   A.  Yeah, it's a frank pus at the site

23   of erosion.  These are the images.  This is DM5.  It's

24   frank pus on the surface.

Vladimir Iakovlev, M.D.

1          Q.  Are you Board certified in

2     infectious disease?

3          A.  No.  I'm Board certified in

4     pathology and we diagnose these conditions under

5     microscope.

6          Q.  And has any culture ever been taken

7     of that discharge that you had?

8          A.  I answered that question.  You asked

9     it already.

10         Q.  And the answer was no?

11         A.  No.

12         Q.  In Mr. Thornburgh's questioning he

13    asked you about your entry on October 4th, 2013.  Do

14    you remember that question?

15         A.  I mean not my entry, my copy from

16    the record.

17         Q.  Sure.  Okay.  Where you have copied

18    a medical record?

19         A.  Yes.

20         Q.  And in that you copied, "She denies

21    any infection associated with the mesh."  Didn't you?

22         A.  That's her interpretation.  She.

23    She.  It's not the diagnosis.

24         Q.  And you haven't read Dr. Croak's

Vladimir Iakovlev, M.D.

```
1     deposition have you?

2                    A.   No.

3                    Q.   And you have reviewed Dr. Croak's

4     medical record haven't you?

5                    A.   Yes, I did.

6                    Q.   And Dr. Croak made no finding that

7     she suffered from an infection?

8                    A.   Well, yellow/brown discharge.

9                    Q.   Did Dr. Croak diagnose Ms. Massey as

10    suffering from an infection?

11                   A.   I don't know but he describes

12    yellow/brown discharge.  This is purulent discharge to

13    me.

14                   Q.   Did Dr. Croak prescribe any

15    antibiotic therapy for Ms. Massey?

16                   A.   I don't know.  We can check.  But

17    treatment for erosion is excision of the mesh,

18    antibiotics will not help.

19                   Q.   And you don't know what Dr. Croak's

20    testimony on that point was nor do you know what his

21    clinical treatment was do you?

22                   A.   I don't.  I mean, why do I need a

23    clinician?  This is frank pus.  If clinicians -- even

24    if he says there's no infection, if clinicians were
```

Vladimir Iakovlev, M.D.

```
 1    right why would we have pathologist?  I mean, we would

 2    be out of job if clinicians could diagnose these things

 3    on their own.  I mean, they would be able to diagnose

 4    cancers and other conditions.  The whole pathology

 5    would be redundant.  I am the final answer for these

 6    questions and this is frank pus.

 7               Q.  Do you have an infectious disease

 8    specialist at St. Michael's Hospital?

 9               A.  If infectious diseases would not

10    need pathologists to identify some microorganisms why

11    would we be there?

12               Q.  Do you know whether there was an

13    infectious disease specialist at the hospital where

14    Ms. Massey's procedure was performed?

15               A.  Why would you need infectious

16    disease?  Infectious diseases are involved in very

17    severe infections, sepsis and other conditions.  For

18    vulvar infection or vaginal infection associated with

19    foreign body you need urogynecologist to excise it.

20    Why are you bringing this up?  I mean, again -- okay,

21    anyways.

22               Q.  Dr. Iakovlev, I want to ask you some

23    questions about your testimony regarding DM13 which you

24    said were the particles.  Was it your testimony that
```

Vladimir Iakovlev, M.D.

1    there are macrophages around what you describe as

2    particles?

3                    A.  Yes.

4                    Q.  And is it your testimony that that

5    shows that these particles were present from the date

6    the mesh was implanted in 2005?

7                    MR. THORNBURGH:  Objection.

8                    THE DEPONENT:  Well, that's my

9    interpretation considering all features.

10                   BY MR. COMBS:

11                   Q.  If a foreign body is implanted in

12   the body how long does it take for macrophages to

13   respond to it?

14                   A.  Not long.  Days.  But then it can

15   stay for years.

16                   Q.  And if this had -- if this particle

17   had been lodged in Ms. Massey's tissue any time more

18   than a couple of days before it was explanted there

19   would be macrophages around it wouldn't there?

20                   A.  The macrophages are not the only

21   feature I'm reliant on.

22                   Q.  That's my question.

23                   A.  So you're trying to represent -- the

24   macrophages are not the dating of the particles.

Vladimir Iakovlev, M.D.

1    Macrophages are confirming that they were present in

2    vivo and there was vital reaction.  For dating I'm

3    reliant on their appearance and the bark thickness and

4    other features.  So let's not misrepresent the role of

5    macrophages.

6                    Q.  Well it was Mr. Thornburgh that

7    asked you that question.

8                    MR. THORNBURGH:  Well --

9                    BY MR. COMBS:

10                   Q.  If the presence of macrophages

11   showed you that that had been present since the implant

12   surgery.  And that doesn't show that does it?

13                   MR. THORNBURGH:  That mischaracterizes

14   my question.  The additional feature of macrophages.

15                   THE DEPONENT:  Macrophage is just one of

16   the features.  There are many features and macrophages

17   is one of the important features to confirm that they

18   were present before the surgery, but other features

19   help with dating.

20                   BY MR. COMBS:

21                   Q.  And the revision surgery for Ms.

22   Massey's mesh, the first revision, the one that you

23   don't have the pathology for, happened approximately

24   four years before this explant that you do have a

Vladimir Iakovlev, M.D.

1    slides for?

2                    A.  That's correct.  I wouldn't expect

3    that degree of degradation within four years.  And

4    that's -- I'm telling you this as a researcher who

5    published on polypropylene degradation and review.

6                    Q.  So what is your testimony regarding

7    the thickness of the degradation for the particle?

8                    A.  Well, see, the particles are

9    triangular.  They are split within and some parts are

10   even thicker than the bark of the fiber.  And as I said

11   they are triangular.  This is assessment based on the

12   image.  So if we try to restore the shape of this

13   particle, assuming this will correspond to at least the

14   same thickness as the bark around the fiber.  And now

15   if we try to restore the shape before it cracked here,

16   this fragment, again it would be at least the same

17   thickness.

18                    So this particle had been degrading for

19   much longer than four years.  That's my assessment

20   based on thickness of the bark, because this can be

21   used as a scale and assessment restoration of the shape

22   of the particle before it cracked.

23                    Q.  Have you measured the thickness of

24   the degradation layer, as you describe it, for the

Vladimir Iakovlev, M.D.

1      particle with any micrometer?

2                      A.  I probably did, I don't remember

3      now.

4                      Q.  Is there anything in your report

5      that would show us any measurement regarding that

6      particle?

7                      A.  I didn't record that.  This is just

8      my conclusion now.

9                      Q.  Is there any place in your report

10     where you have provided any opinion regarding the

11     length of time that the particle that's -- that you're

12     pointing out in DM13 had been implanted in the body?

13                     MR. THORNBURGH:  Objection.

14                     THE DEPONENT:  I don't remember now.

15     See, another thing is that there is a summary here

16     because there are two images, one smaller particle, one

17     larger particle.  So if I try to time particles on DM13

18     and the particle in DM14 the timing will be different.

19                     Clearly this small particle did not

20     absorb as much dye.  That particle could be even

21     dislodged during that excision.  So I did not provide

22     the summary of dating for specific particles in my

23     report.  But if you ask me specifically dating of

24     particles for each image I can give you an answer, and

Vladimir Iakovlev, M.D.

1    I just gave it.

2                    BY MR. COMBS:

3                    Q.  Alright.  No more questions.

4                    MR. THORNBURGH:  Alright.  No questions.

5                    ---  Whereupon the examination was

6    completed at 11:04 a.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Vladimir Iakovlev, M.D.

```
 1                     REPORTER'S CERTIFICATE

 2

 3                     I, HELEN MARTINEAU, CSR, Certified

 4     Shorthand Reporter, certify;

 5                     That the foregoing proceedings were

 6     taken before me at the time and place therein set forth

 7     at which time the witness was put under oath by me;

 8                     That the testimony of the witness and

 9     all objections made at the time of the examination were

10     recorded stenographically by me and were thereafter

11     transcribed;

12                     That the foregoing is a true and

13     accurate transcript of my shorthand notes so taken.

14

15

16                     _____

17                     PER:  HELEN MARTINEAU

18                     CERTIFIED SHORTHAND REPORTER.

19

20

21

22

23

24
```

Vladimir Iakovlev, M.D.

```
 1                 -   -   -   -   -   -

                    E R R A T A

 2                 -   -   -   -   -   -

 3

 4      PAGE   LINE   CHANGE

 5      _____  _____   _____

 6          REASON:  _____

 7      _____  _____   _____

 8          REASON:  _____

 9      _____  _____   _____

10          REASON:  _____

11      _____  _____   _____

12          REASON:  _____

13      _____  _____   _____

14          REASON:  _____

15      _____  _____   _____

16          REASON:  _____

17      _____  _____   _____

18          REASON:  _____

19      _____  _____   _____

20          REASON:  _____

21      _____  _____   _____

22          REASON:  _____

23      _____  _____   _____

24          REASON:  _____
```

Vladimir Iakovlev, M.D.

```
 1
 2           ACKNOWLEDGMENT OF DEPONENT
 3
 4           I,_____, do
 5     hereby certify that I have read the
 6     foregoing pages, and that the same is
 7     a correct transcription of the answers
 8     given by me to the questions therein
 9     propounded, except for the corrections or
10     changes in form or substance, if any,
11     noted in the attached Errata Sheet.
12
13
14     _____
15      VLADIMIR IAKOVLEV, M.D.          DATE
16
17
18     Subscribed and sworn
       to before me this
19     _____ day of _____, 20____.
20     My commission expires:_____
21

       _____
22     Notary Public
23
24
```