Jerry G. Blaivas, M.D.

Page 1

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF WEST VIRGINIA
3         AT CHARLESTON
4    -----------------------------:
     IN RE ETHICON, INC., PELVIC  :
5    REPAIR SYSTEM PRODUCTS        : MASTER FILE
     LIABILITY LITIGATION         : No. 2:12-MD-02327
6    _____:
                              :
7    THIS DOCUMENT RELATES TO    : MDL 2327
     ALL WAVE 3 CASES           :
8                              : JOSEPH R. GOODWIN
                              : US DISTRICT JUDGE
9    -----------------------------:
10            - - -
11         August 29, 2016
12            - - -
13      DEPOSITION of JERRY G. BLAIVAS,
14   M.D., commencing at 12:00 p.m. on the above
15   date at Urocenter of New York, 445 East 77th
16   Street, New York, New York, before Marie Foley,
17   a Registered Merit Reporter, Certified Realtime
18   Reporter and Notary Public of the State of New
19   York.
20            - - -
21      GOLKOW TECHNOLOGIES, INC.
22      877.370.3377 ph | 917.591.5672 fax
23         Deps@golkow.com
24

Page 2

1    A P P E A R A N C E S:
2
3    MOTLEY RICE, LLC
4    BY: FIDELMA L. FITZPATRICK, ESQUIRE
5       321 South Main St., 2nd Floor
6       Providence, RI 02903
7       401.457.7700
8       ffitzpatrick@motleyrice.com
9       Representing the Plaintiff
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            - - -
2         TRANSCRIPT INDEX
3              PAGE
4    APPEARANCES...................... 2
5    INDEX OF EXHIBITS................. 4
6    EXAMINATION OF JERRY G. BLAIVAS, M.D.:
7    BY: MS. FITZPATRICK............. 6
8    REPORTER'S CERTIFICATE............ 98
9    SIGNATURE PAGE................... 96
10   ERRATA........................... 97
11
12   EXHIBITS WITH ORIGINAL TRANSCRIPT
13
14            - - -
15
16
17
18
19
20
21
22
23
24

Page 4

1            - - -
2         E X H I B I T S
3            - - -
4     NO.        DESCRIPTION           PAGE
5    Blaivas    Rule 26 Expert Report of      8
6    Exhibit 1   Jerry G. Blaivas, M.D.
7
8    Blaivas     Notice To Take Deposition    93
9    Exhibit 2   of Jerry Blaivas, M.D.
10              dated August 25, 2016
11   Blaivas     Amended Notice To Take       93
12   Exhibit 3   Deposition of Jerry
13              Blaivas, M.D. dated August
14              29, 2016
15
16
17
18
19
20
21
22
23
24

1 (Pages 1 to 4)

EXHIBIT A

Jerry G. Blaivas, M.D.

Page 5

1    DEPOSITION SUPPORT INDEX
2
3    DIRECTION TO WITNESS NOT TO ANSWER
4     Page   Line
5     - -none- -
6
7
8    REQUEST FOR PRODUCTION OF DOCUMENTS
9     Page   Line
10    - -none- -
11
12
13   STIPULATIONS
14    Page   Line
15    - -none- -
16
17
18   QUESTIONS MARKED
19    Page   Line
20    - -none- -
21
22
23
24

Page 6

1                - - -
2              1:12 p.m.
3          New York, New York
4                - - -
5    JERRY G. BLAIVAS, M.D., the Witness herein,
6       having been first duly sworn by a Notary
7       Public in and of the State of New York,
8       was examined and testified as follows:
9    EXAMINATION BY
10   MS. FITZPATRICK:
11       Q.   Good afternoon, Dr. Blaivas.
12            You have never been given a
13   deposition in the TVT-Exact Wave case, a
14   general deposition, correct?
15       A.   That's correct.
16       Q.   And has Ethicon previously asked
17   you to provide a date for the deposition
18   in your TVT-Exact Wave report?
19       A.   They have.
20       Q.   Did you offer them the date of
21   today, August 29th, at 12:00 for that
22   deposition?
23       A.   I did.
24       Q.   Did you spend time prior to

Page 7

1    today preparing for that TVT-Exact
2    deposition?
3        A.   Of course.
4        Q.   Did you prepare to discuss the
5    opinions that you have offered
6    specifically in your TVT-Exact report
7    today?
8        A.   I did.
9        Q.   And do many of the opinions that
10   are contained in the TVT-Exact report
11   overlap with the opinions that you have
12   also given in the TVT Retropubic, TVT-O
13   and TVT-S and TVT Abbrevo reports?
14       A.   They do.
15       Q.   In addition to that, there are
16   some new opinions that you offer that are
17   specific to the TVT-Exact as well,
18   correct?
19       A.   Yes.
20       Q.   At some point this morning, were
21   you made aware that Ethicon had
22   unilaterally cancelled your deposition in
23   this TVT-Exact matter?
24       A.   Yes.

Page 8

1        Q.   When was that?
2        A.   Several hours ago.
3        Q.   We are going ahead because
4    Ethicon has waived its right to ask you
5    any questions in relation to your report
6    in that particular product, but I am here
7    representing the plaintiffs and I'm going
8    to ask you a series of questions related
9    to the opinions in your TVT-Exact report,
10   some of which also apply to other products
11   as well.
12            Do you understand that?
13       A.   I do.
14       Q.   Now, you offered a report in the
15   TVT-Exact approximately in April of this
16   year; is that right?
17       A.   Yes.
18            MS. FITZPATRICK:  I'm going to
19       go ahead and mark this as Deposition
20       Exhibit Number 1.
21            (Blaivas Exhibit 1, Rule 26
22       Expert Report of Jerry G. Blaivas,
23       M.D. dated February 1, 2016, was
24       marked for identification, as of this

Jerry G. Blaivas, M.D.

Page 9

1    date.)
2  BY MS. FITZPATRICK:
3    Q.    Doctor, what you have in front
4  of you is a report in the TVT-Exact cases,
5  correct?
6    A.    Correct.
7    Q.    Now, before we get to specifics
8  of some of your opinions, I want to
9  discuss with you some of your
10  qualifications and some of the bases for
11  the opinions that you have offered in this
12  report.
13        You clinically treat women who
14  have stress urinary incontinence, correct?
15    A.    I do.
16    Q.    Approximately how many women
17  have you treated who deal with stress
18  urinary incontinence?
19    A.    Oh, my goodness.  Thousands.
20    Q.    Do you offer surgical
21  alternatives to women who present to you
22  with stress urinary incontinence?
23    A.    Of course.
24    Q.    And what are those surgical

Page 10

1  alternatives?
2    A.    Well, I start with simple
3  advice.  I mean, to start with, all -- I'm
4  sorry, with surgical alternatives?
5    Q.    Surgical alternatives, yes.
6    A.    Okay.  Surgical alternatives, I
7  prefer the autologous sling when the
8  patient is ready for invasive surgery, but
9  I offer everybody periurethral injections
10  to the extent that it's appropriate.
11    Q.    Okay.  And, in addition to your
12  treatment of women who have stress urinary
13  incontinence, do you also treat women who
14  present to you with complications
15  following an implantation of polypropylene
16  midurethral slings?
17    A.    I do.
18    Q.    Can you tell me over the course
19  of your practice approximately how many
20  women you have treated for complications
21  arising after the implantation of
22  polypropylene slings?
23    A.    Well, I've participated in the
24  care of many hundreds and I've operated on

Page 11

1  probably about a hundred.
2    Q.    For those women who present to
3  you with complications or symptoms
4  following the implantation of a
5  polypropylene sling, do you go through a
6  differential diagnosis with them to
7  determine whether the polypropylene
8  midurethral sling is a cause of their
9  symptoms or not?
10    A.    Of course.
11    Q.    And in all of the women who have
12  presented to you with complications
13  following the implantation of the
14  polypropylene midurethral sling, you
15  haven't always concluded that the
16  polypropylene midurethral sling is a cause
17  of those complications, correct?
18    A.    Yes.
19    Q.    Can you tell me what you do to
20  distinguish between complications that are
21  associated with polypropylene midurethral
22  sling versus complications or symptoms
23  that arise just in time following the
24  implantation?

Page 12

1    A.    Are you talking about people who
2  only have had slings?  Because some
3  patients have slings and prolapse repairs.
4    Q.    Either one.  I just want you to
5  describe your methodology that you go
6  through to determine whether the
7  complications are associated with the
8  polypropylene mesh or not.
9    A.    I don't -- I'm not sure I think
10  of it exactly that way.  I define what the
11  complication is and then what the cause
12  could be.  So, just in order of things
13  that can happen, if a patient has
14  difficulty voiding, it could be the sling
15  or it could be what we call an acquired
16  voiding dysfunction, and I make that
17  distinction based on examination of the
18  patient, the urinary flow rate, and
19  examination for obstruction.
20    Q.    Let me ask you for an
21  obstruction case, you don't just
22  necessarily assume that a woman who's had
23  polypropylene midurethral sling who then
24  has an obstruction that the polypropylene

Jerry G. Blaivas, M.D.

Page 13

1  sling is the cause or the only cause of
2  that obstruction, correct?
3       A.   Correct.  I mean, we go through
4  a process to make sure that the
5  obstruction is a mechanical obstruction,
6  and if it's a mechanical obstruction, it
7  could be overwhelmingly likely from the
8  sling, but it also could be a urethral
9  diverticulum.  It could also be a Grade 3
10 or 4 prolapse, but sometimes it's just
11 what we call an acquired voiding
12 dysfunction where they get into sort of a
13 bad habit and sometimes it can be a very
14 weak bladder, a weak detrusor contraction.
15      Q.   Is it fair to say, Doctor, in
16 your clinical practice, you employ
17 differential diagnosis and look at each
18 woman individually to determine whether
19 the mesh is or is not a cause of her
20 symptoms in each individual case?
21      A.   Of course.
22      Q.   And is it fair to say in your
23 clinical practice you see some women who
24 have complications and you determine they

Page 14

1  are not caused by the polypropylene
2  midurethral sling?
3       A.   Yes.
4       Q.   And it's fair to say that in
5  your clinical practice, there are times
6  that you diagnose women's complications as
7  being related to the polypropylene
8  midurethral sling that they have?
9       A.   Yes.
10      Q.   When a woman presents to you
11 with a complication that you then
12 determine after examination is caused by a
13 midurethral sling, what treatment options
14 do you offer to that woman?
15      A.   Well, it depends what the
16 complication is.  Generally, and these are
17 very -- you know, it depends what the
18 complication is.  If it's clearly an
19 obstruction from the sling, and when there
20 is an obstruction that's what it usually
21 is, then my recommendation is that we
22 remove the entire suburethral portion of
23 the sling.
24      If the complication is a

Page 15

1  fistula, then we remove all of the sling,
2  all of the sub -- all of the sling that's
3  in the vicinity of the urethra -- excuse
4  me, of the fistula and then repair the
5  fistula.
6       If it's pain, then it depends
7  where the pain is, and again I don't have
8  to go into the particulars, but sometimes
9  we just remove that portion that appears
10 to be related or causing the pain, but
11 sometimes we remove the entire mesh 'cause
12 I think the entire mesh is causing the
13 pain.
14      If it's overactive bladder
15 symptoms, we -- if it's due to urethral
16 obstruction, we remove the suburethral
17 portion.  If we're not -- if it seems like
18 it's in the wall of the bladder but -- or
19 through the wall of the bladder, then we
20 remove all of the sling on that side and
21 sometimes the entire sling.
22      Q.   Is it fair to say based on what
23 you've just told me that the treatment
24 options that you offer are tailored to a

Page 16

1  woman's specific problems?
2       A.   Of course.
3       Q.   And would you say that you try
4  to treat the problems as conservatively as
5  possible, with the least amount of surgery
6  necessary to correct those problems?
7       A.   No, I would say I try to be
8  appropriate.  I mean, sometimes it's
9  appropriate to be conservative.  Sometimes
10 it's appropriate to be radical, but I
11 discuss it with the patient.
12      Q.   Okay.  Now, in addition to your
13 clinical work and your clinical
14 experience, you also have done academic
15 work and published articles concerning
16 mesh and mesh complications, correct?
17      A.   I have.
18      Q.   And most recently you published
19 an article entitled "Safety Considerations
20 for Synthetic Sling Surgery" that was
21 published in the Nature Reviews of Urology
22 in 2015, correct?
23      A.   Yes.
24      Q.   And you were a co-author on that

4 (Pages 13 to 16)

Jerry G. Blaivas, M.D.

Page 17

1  with eight other individuals, correct?
2      A.   Yes.
3      Q.   Can you tell me, first of all,
4  how this article came to be?
5      A.   Well, Nature Reviews in Urology
6  is a highly respected peer review journal,
7  and they, for their reviews they actually
8  solicit authors.  I don't believe you can
9  just submit.  I'm not sure of that.
10         But they asked me to do a review
11 article, and they told me right up front
12 that just because I agreed to do it, it
13 did not mean that it would be automatically
14 accepted.
15     Q.   Now, can you tell us what a
16 review article is?
17     A.   A review article is, there are
18 lots of different types, but basically
19 it's a compilation of many and sometimes
20 all of the articles in the peer review
21 literature about a certain topic.  And
22 then, so the first thing that you do is
23 you -- is you do a literature search and
24 you identify the articles and then you use

Page 18

1  search criteria to eliminate certain
2  articles and then you analyze them based
3  on whatever methodology you choose.
4      Q.   So, let me discuss, you were
5  approached by Nature and asked to conduct
6  a review on the literature available
7  concerning synthetic sling surgery,
8  correct?
9      A.   Yes.
10     Q.   And, I see that we mentioned you
11 have a number of other authors here.
12         Are those authors that you asked
13 to help you with this, or are those
14 authors that Nature assigned to this
15 project?
16     A.   No, I got to select my team.
17     Q.   Can you tell me how you went
18 about selecting the team?
19     A.   Sure.  Well, okay, so, two of
20 the co-authors, Robert Bendavid and
21 Vladimir Latovlev, L-A-T-O-V-L-E-V, are
22 recognized authorities in the field, and I
23 asked them if they would be willing to
24 help me with this.

Page 19

1          One of them, Roger Purohit,
2  P-U-R-O-H-I-T, is my partner, so we
3  operate together and he has a considerable
4  amount of clinical experience.  And then
5  Matt Benden and Gabriel Mekel, M-E-K-E-L,
6  and Michael Stern and Mubashir Billah,
7  B-I-L-L-A-H, and I'll have to spell the
8  other ones, K-O-L-A is the first name and
9  it's O-L-U-G-B-A-D-E, were all students
10 that -- well, actually, Dr. Mekel was
11 doing a fellowship with me and the others
12 are either medical students, or are all
13 medical students.
14     Q.   Okay.  When did Nature approach
15 you about authoring a review on synthetic
16 sling surgery?
17     A.   It was some time after May of, I
18 guess, 20 -- I don't know if it was 2013
19 or -- probably -- or 2014.  I can't
20 remember.
21     Q.   Okay.
22     A.   But it was after the American
23 Urologic Association national meeting.
24     Q.   Did anyone from Nature tell you

Page 20

1  why they selected you or asked you to
2  write this article over others?
3      A.   Well, yes, they had heard --
4  one, they heard about me, they knew of me
5  and they asked around and they asked who
6  would be a good person to do it, and I
7  believe someone had seen me participate in
8  a debate at the annual meeting of the
9  American Urologic Association.
10     Q.   Was there any kind of
11 preconceived outcome that anyone had
12 discussed with you of what they expected
13 your research to show or not show?
14     A.   No.
15     Q.   Now, this article that you did,
16 a review article, does not contain all of
17 the articles available in the medical
18 literature that reference or concern
19 midurethral slings, correct?
20     A.   Correct.
21     Q.   How did you and your co-authors
22 determine and choose the articles that you
23 relied on for this particular piece?
24     A.   Well, two ways.  One, and I'm

Golkow Technologies, Inc - 877.370.3377

Jerry G. Blaivas, M.D.

1  sorry, I don't have all the details in my
2  memory, but there was an answer that I
3  published -- there was another review
4  article that I thought was timely that did
5  a review up to a certain date and then
6  we -- I just decided to do it from about
7  that time to the what was then current,
8  which was 2014.  And I can tell you in a
9  minute what the dates were.
10     Q.    Sure.
11         (Pause.)
12     A.    So, it was from 2007 to 2014.
13         Excuse me, that was for the
14  clinical review, okay.  Dr. Latovlev
15  independently reviewed the pathology which
16  went back many years before that.
17     Q.    One of the things that I want to
18  talk to you about today is the conclusions
19  that you reached concerning the
20  complications and the complication rates
21  associated with midurethral slings.
22         Would that be included in the
23  clinical review that you just mentioned?
24     A.    Yes.

1     Q.    So, you and your co-authors
2  chose articles written from 2007 to 2014,
3  and I think what you mentioned to me
4  before was that there's certain search
5  criteria that you use when conducting your
6  literature search to determine what
7  articles would be included in a review
8  article; is that right?
9     A.    Yes.
10     Q.    And can you tell me what the
11  search criteria that you and your
12  co-authors were?
13     A.    It's a long list.  Shall I read
14  it to you?
15     Q.    Sure.
16     A.    Okay.  So, the search combined
17  the terms, and some of these are just
18  spelling things.  So, there was
19  midurethral slings where "mid" and
20  "urethral" are two words; midurethral
21  slings where "midurethral" is one word;
22  suburethral sling, urethral sling,
23  midurethral slings with a plural, both
24  words again with a plural.  All of the

1  words that I just said also in plural.
2  Follow-up study, other than all of those
3  terms and follow-up study.
4         Also, we used free text searches
5  including the terms urinary
6  incontinence -- excuse me, TVT, tension
7  free vaginal tape, tension free vaginal
8  sling, transobturator tape, transobturator
9  sling, TVT-Obturator, TVT-O, TVT Secure,
10  Minarc, that's M-I-N-A-R-C, Abbrevio,
11  A-B-B-R-E-V-I-O, TOT, suprapubic arc
12  sling, Sparc, S-P-A-R-C, sling,
13  intravaginal slingplasty, IVS sling, RAZ,
14  R-A-Z, sling, Uratape, that's
15  U-R-A-T-A-P-E, ObTape, O-B-T-A-P-E,
16  prepubic sling, prepubic TVT, prepubic
17  tape, Pelvilace, P-E-L-V-I-L-A-C-E,
18  ureter, Aris, A-R-I-S, In-Fast,
19  I-N-F-A-S-T, Monarc I-STOP, urethral
20  reconstruction, urethral vaginal fistula,
21  other spelling of ObTape, Gore-Tex sling,
22  silastic sling, Mersilene sling, Marlex
23  sling, vesicovaginal fistula, Bioarc.  And
24  then -- yeah, so that was the search that

1  we did on the clinical end.
2     Q.    Okay.  And that sounds like
3  quite a number of search terms; is that
4  right?
5     A.    Yes.
6     Q.    Why did you have so many search
7  terms?
8     A.    'Cause we didn't want to miss
9  any articles, and what we did is we would
10  look up -- we started with less search
11  terms and as we read articles, we would
12  see synonyms or new words and then we
13  would add that to the search term.
14     Q.    Did you limit the types of
15  articles you were looking at?  For
16  example, did you only look at randomized
17  control trials or only look at
18  meta-analyses or only look at case
19  studies?
20     A.    No, we did not limit it.
21     Q.    Is it fair to say that you were
22  trying to get as big a cross-section or as
23  big a representation of all of the
24  articles out there and kind of gather them

Golkow Technologies, Inc - 877.370.3377

Jerry G. Blaivas, M.D.

Page 25

1  up before you got started with this
2  process?
3       A.    Yes.  I just remembered there
4  was actually, there was one exclusion
5  criteria that we used.  If an article by
6  the same authors seemed to include the
7  same patients in a different study, we
8  would have used the most -- either the
9  most recent one or the most appropriate
10  one.  We tried not to count the same
11  patients twice.
12      Q.    Okay.
13      A.    So if one author had a
14  patient -- had a study that showed the
15  patients at one year, five years, 10
16  years, 15 years and 20 years, and they had
17  complications, we wouldn't count the
18  complications five times.  We'd only count
19  the complications once.
20      Q.    Okay.  Is it fair to say that
21  you were attempting to count each patient
22  one time and not duplicate those patients
23  or those complications in your analysis at
24  all?

Page 26

1       A.    Exactly.
2       Q.    And the method that you used to
3  do that by only using one article from a
4  series, is that a standard acceptable way
5  of achieving that goal when doing medical
6  or scientific research?
7       A.    You know, I don't know.
8       Q.    Tell me why you thought that it
9  was an appropriate way to achieve that
10  result.
11      A.    Because I wanted to be sure on
12  the one hand that we captured every
13  complication, but on the other hand we
14  didn't count anybody twice 'cause we were
15  looking to get as precise a number for
16  both -- for complications as we could.  We
17  didn't want to overestimate; we didn't
18  want to underestimate.
19      Q.    Okay.  And that's for the
20  clinical portion, and clinically you
21  looked at both the safety of the product,
22  correct, the complications?
23      A.    Yes.
24      Q.    And you also looked at the

Page 27

1  efficacy of the product, correct?
2       A.    Yes.
3       Q.    Was there different criteria
4  that you looked at for articles relating
5  to efficacy?
6       A.    Yes.  For articles for efficacy
7  we only included those articles that
8  measured efficacy, that had appropriate
9  follow-up, and we did have criteria for
10  that.
11      Q.    Is that different from -- it
12  sounds like you had more exclusion
13  criteria for the efficacy articles than
14  you did the complication/safety articles;
15  is that right?
16      A.    Yes.
17      Q.    Is there anything else that you
18  excluded beyond, from your literature
19  search, beyond the subsequent articles or
20  the multi-reported cases?
21      A.    Yes.  The only other exclusion
22  was non-human subjects.
23      Q.    Did you in any way cherry pick
24  or look only for reports or articles that

Page 28

1  dealt with high rates of complications?
2       A.    No.
3       Q.    Did you only look for articles
4  that reported low rates of complications?
5       A.    No.  We intend -- to the best of
6  our ability, we picked every article in
7  the literature in that time period.
8       Q.    And that are articles that
9  reflected some lower rates of
10  complications, correct?
11      A.    Of course.
12      Q.    And articles that reflected
13  higher rates of complication, correct?
14      A.    Yes.
15      Q.    And fair to say it included case
16  studies?
17      A.    Yes, it did.
18      Q.    It included randomized control
19  trials?
20      A.    Yes.
21      Q.    It included meta-analyses?
22      A.    Yes.
23      Q.    Is there anything at all that
24  you or your co-authors did to limit or

Golkow Technologies, Inc - 877.370.3377

Jerry G. Blaivas, M.D.

Page 29

1  exclude certain articles or certain
2  findings in articles that would otherwise
3  have been encompassed in your search
4  terms?
5      A.   Only for the efficacy studies.
6      Q.   Okay.  Now --
7      A.   And that -- but those were a
8  search term, so we -- so I guess the
9  answer is no, we did not.  Okay.
10     Q.   Now, could somebody look at what
11 you've reported in Table 1 relating to the
12 efficacy issues and extrapolate in any way
13 what you did there and apply it to the
14 complication tables that you reflected in
15 Table 2, 3, 4 and 5?
16     A.   No, you couldn't because they
17 didn't apply -- none of these -- well,
18 most of these studies did not have any
19 scientifically valid prospective way of
20 looking at complications.  This was just
21 for efficacy.
22     Q.   Is there any way that someone
23 could --
24         MS. FITZPATRICK:  Let me ask it

Page 30

1  a different way.
2      Q.   Is it correct that there are
3  articles that you considered for your
4  safety considerations or complication
5  rates that are not reflected in the table
6  concerning efficacy?
7      A.   Probably not because we would
8  always -- no, because we would -- we
9  would -- if there was even one
10 complication, we would -- we would have
11 included it.
12     Q.   But just because you had it, and
13 I think what you're telling me is all of
14 your efficacy articles were included in
15 your complication analysis, and I'm
16 actually asking the opposite.
17         Were all of the articles that
18 you considered for the complication part
19 all used also to look at efficacy?
20     A.   No.
21     Q.   So you can't say that simply
22 because something isn't on the Table 1
23 that you didn't rely on it, use it,
24 conclude anything about it or consider it

Page 31

1  as part of your safety considerations and
2  complication considerations; is that
3  right?
4      A.   To the contrary;  we would have
5  used it.
6      Q.   Okay.  Now, this article went
7  through the peer review process, correct?
8      A.   Very much so.
9      Q.   Can you tell me what you mean by
10 that?
11     A.   Well, the peer review process
12 itself is designed to insure that the
13 highest standards of scientific
14 methodology were used in the paper and
15 very specifically that the results and the
16 conclusions follow from the methodology;
17 i.e. that the conclusions follow from the
18 methods.
19     Q.   Is there anything that was
20 different about the Nature peer --
21         MS. FITZPATRICK:  Strike that.
22     Q.   You've worked as a peer reviewer
23 before, correct, for other journals?
24     A.   Yes.

Page 32

1      Q.   And you've also been editor of a
2  journal that is a peer review journal,
3  correct?
4      A.   Yes.
5      Q.   Can you tell me generally in the
6  medical and scientific community how
7  individuals get selected as peer
8  reviewers?
9      A.   Sure.  They get selected by a
10 process of usually by a committee of
11 experts that picks other experts that they
12 think contribute to the peer review
13 process.  So they have to show -- they
14 have to be held in high regard as experts
15 that can give a fair and unbiased
16 appraisal of submissions.
17     Q.   Do you know of any peer review
18 publication that has considered the
19 opinions of attorneys from medical device
20 manufacturers as part of peer review
21 process?
22     A.   No, I do not.
23     Q.   Why aren't attorneys for medical
24 device manufacturers qualified to serve as

Golkow Technologies, Inc - 877.370.3377

Jerry G. Blaivas, M.D.

Page 33

1  peer reviewers for a medical journal?
2      A.    Well, the most obvious reason is
3  that their opinions were likely to be
4  biased or that they have a major conflict
5  of interest and they don't fulfill our
6  criteria for being an expert.  They're
7  lawyers;  they're not experts in
8  scientific research.
9      Q.    Is it fair to say that the peer
10  review process is designed to have
11  neutral, objective, experienced
12  individuals assessing the methodology and
13  the conclusions that are reached in
14  medical and scientific journals?
15      A.    Of course.
16      Q.    That process is designed to
17  insure that the methodology that is used
18  is something that is recognized and
19  acceptable in the medical and scientific
20  community, correct?
21      A.    Yes.
22      Q.    In your experience as both a
23  peer reviewer and as an editor of a peer
24  review journal, what happens in the

Page 34

1  process if an article is presented that
2  does not use established accepted
3  methodology in the scientific and medical
4  community?
5      A.    Well, as a general rule, it's
6  rejected.  On rare occasions, someone
7  comes up with such a novel approach that
8  even though that it wasn't known before,
9  it might become -- it might be acceptable.
10      Q.    Do you believe that the peer
11  review -- let me ask you this.
12          Tell me about the peer review
13  process that you went through for your
14  Nature article.
15      A.    This was the most rigorous peer
16  review that I've ever been part of.  I
17  mean, we -- this article took more time
18  and more effort than any article I've ever
19  written, and I, you know, I've done
20  hundreds and hundreds.  So it was a very
21  labor intense project.  We read all of the
22  articles, and then when we wrote the
23  articles, we submitted it and they had a
24  number of questions, concerns, suggested

Page 35

1  revisions and it went back and forth a
2  number of times to be sure that we -- that
3  our -- to be sure, quite honestly, that
4  our, as I mentioned a few minutes ago is
5  that our results and conclusions were
6  clearly supported by the methodology and
7  that they were scientifically sound.
8      Q.    Do you believe, Doctor, that the
9  fact that your article in Nature Review
10  survived the peer review process
11  establishes that the methodology that you
12  and your co-authors used in that, in
13  drafting that article, was scientifically
14  reliable?
15      A.    I do.
16      Q.    Would it be widely considered in
17  your medical community that an article
18  such as yours that has gone through such a
19  rigorous peer review process has
20  demonstrated appropriate medical and
21  scientific methodology?
22      A.    Yes.
23      Q.    Has anybody in the medical
24  community or at Nature questioned your

Page 36

1  methodology in connection with that
2  article at any time prior to its
3  publication?
4      A.    Well, they asked questions about
5  it in the review process, but I don't --
6  but afterwards, no, I don't -- I'm not
7  aware of anybody questioning it.
8      Q.    And are you comfortable that the
9  Nature Review Urology looked closely at
10  the methodology that you and your
11  co-authors used to reach the conclusions
12  that you did in that review paper?
13      A.    I'm quite confident of that.
14      Q.    We're going to talk in a little
15  bit specific about some of the conclusions
16  in that article and I'm going to ask you
17  more specifically how you reached the
18  conclusions that you did.
19          But, in addition to the
20  conclusions that you reached in that
21  article, you also rely on your clinical
22  experience for an independent basis of
23  your TVT-Exact report, correct?
24      A.    Yes.

Jerry G. Blaivas, M.D.

Page 37

1      Q.    And including those portions
2   that overlap with the other polypropylene
3   midurethral sling products that you've
4   offered reports on, correct?
5      A.   Yes.
6      Q.    In addition to your Nature
7   article, in addition to your clinical
8   experience, did you also rely on
9   peer-reviewed literature which was
10  identified both in the footnotes of your
11  report and then in the reliance list that
12  you provided with that report?
13     A.   I did.
14     Q.    In selecting that peer-reviewed
15  literature for inclusion in your report or
16  your reliance list, were there any
17  articles that you just dismissed out of
18  hand and refused to consider when reaching
19  the opinions that you have in this case?
20     A.   I don't dismiss them out of
21  hand.  I mean, there's some that I don't
22  agree with the methodology.
23          I mean, are you asking in
24  general?

Page 38

1      Q.    Would you ever look at an
2   article and say well, there's only a .1
3   complication rate, so I'm not even going
4   to look or consider that article?
5      A.   No, I don't do that.
6      Q.    Tell me what you do when you
7   look at articles to determine that you
8   think, or what weight you should be giving
9   to those particular articles.
10     A.   Generally, first thing I do is
11  look at the results of the -- basically I
12  basically look at the conclusions first
13  and then I look at the methodology and
14  say -- confirm that the conclusions could
15  be justified by the methodology.  If the
16  methodology is such that it can't even
17  answer the questions that the conclusions
18  concluded, I would still look at the
19  paper, but I would -- I would tend to not
20  read that in great depth.  And then if the
21  two go hand in hand, then I look at the
22  results and make sure that the results
23  follow from the methods as well.
24     Q.    In your both clinical and

Page 39

1   academic practice, do you regularly and
2   routinely read articles that appear in the
3   medical and scientific literature about
4   polypropylene slings?
5      A.   I do.
6      Q.    Are those also brought to your
7   attention by colleagues of yours?
8      A.   Yes.
9      Q.    Do you consider all of those
10  articles as part of --
11          MS. FITZPATRICK:  Excuse me.
12     Q.    Do you consider all of those
13  articles prior to reaching the conclusions
14  that you've set forth in your expert
15  report?
16     A.   I consider them, yes.
17     Q.    Okay.  Now, I want to ask you a
18  couple of questions, specifically about
19  what's in your report.
20          In paragraph 17 of your report
21  that you have in front of you, you note
22  that it is common for trocars to puncture
23  the bladder or urethra during trocar
24  passage.

Page 40

1      A.   Yes.
2      Q.    Do you see that?
3      A.   I do.
4      Q.    Looking at your Nature article,
5   you also looked at incidents of bladder
6   and transvaginal trocar perforation, some
7   of the complications that were reported in
8   the medical literature, correct?
9      A.   I do.
10     Q.    Let's start with do you rely on
11  any of your clinical experience for your
12  opinion that it is common for trocars to
13  puncture the bladder or urethra during
14  trocar passage?
15     A.   I do.
16     Q.    And how does your clinical
17  experience specifically support your
18  opinion that it is common for trocars to
19  puncture the bladder or urethra during
20  trocar passage?
21     A.   Well, from my clinical
22  experience, when I -- first of all, I talk
23  to a lot of my peers and colleagues about
24  it and I simply ask them in the hospital.

Jerry G. Blaivas, M.D.

Page 41

1    I -- in over two thousand cases that I've
2    done without mesh, there's only been one
3    time that I perforated the -- the bladder,
4    and when that happened, I was personally
5    really taken aback and I kind of made a
6    big deal about it.  And the resident said,
7    "What are you doing?  Why are you so
8    upset?"  I said, "Geez, well, we just
9    perforated the bladder."  And the resident
10   said, "Well, yeah, happens all the time
11   with -- it happens all the time with the
12   midurethral slings."  That's one -- that's
13   one point of information.
14          Second is, as I mentioned, I
15   talk to my colleagues and my peers a lot
16   about this stuff and they, virtually all
17   of them, almost all of them say that it
18   does happen periodically that they
19   perforate the bladder.
20   Q.    But --
21   A.    And then --
22   Q.    Sorry.  Go ahead.
23   A.    And then finally, I've seen
24   hundreds of patients that have had

Page 42

1    complications from slings, and when I
2    review those operative notes, they not
3    infrequently say that they perforated the
4    bladder.
5    Q.    Okay.
6    A.    And then took it out and passed
7    it again.
8    Q.    But you don't rely just on the
9    anecdotal stories from colleagues or
10   looking at your report to reach your
11   opinion that it's common for trocars to
12   puncture the bladder or urethra during
13   passage, correct?
14   A.    Of course not.
15   Q.    What else do you rely on for
16   that opinion?
17   A.    On the published literature.
18   Q.    Can you identify any
19   peer-reviewed published literature that
20   you have seen that you rely on to support
21   your opinions that it's common for these
22   punctures to happen?
23   A.    Sure.  There's an article by
24   Albo, I think it was -- I think it was

Page 43

1    2012, that was reported in the Journal of
2    Urology that found an incidence of, I
3    forget the exact number, either five or
4    six percent were perforated.  And in the
5    AUA guidelines, Roger Dmochowski published
6    that in, he was the lead author, in 20 --
7    actually, I don't remember the year, but
8    that also had a similar incidence of about
9    five or six percent.
10   Q.    Are those the only articles that
11   you rely on?
12   A.    No, there's many other ones.
13   Q.    And are many of those articles
14   also cited in your reliance list --
15   A.    Yes.
16   Q.    -- that you provided in this
17   case?
18   A.    Yes.
19   Q.    Do you believe that there's
20   sufficient peer-reviewed published
21   literature to support the opinion that
22   it's common for trocars to puncture the
23   bladder or urethra during trocar passage?
24   A.    Well, common is in the eyes of

Page 44

1    the beholder, but I think there's ample
2    literature to show that it happens on the
3    order of magnitude of five percent.  In
4    series it's as high as 20 or 30 percent.
5    Q.    And is that something that you
6    also looked at in connection with your
7    Nature Review article?
8    A.    Yes.
9    Q.    Can you tell me what you did in
10   your Nature Review article to look at this
11   incidence of trocar puncture of the
12   bladder or urethra?
13   A.    Well, that we just compiled all
14   the articles in the literature because
15   there wouldn't be a case report -- all of
16   the -- all of the articles that were
17   reviewed and we just averaged the -- we
18   gave a range and an average and a mean of
19   how often it was perforated.
20   Q.    Okay.  So, let me stop you there
21   because I want to talk a little bit more
22   about the methodology that you used not
23   just for calculating trocars, but for
24   calculating all of the rates of

11 (Pages 41 to 44)

Jerry G. Blaivas, M.D.

Page 45

1    complications.
2            Was bladder or urethra puncture
3    during trocar passage one of the
4    complications that you looked at and
5    considered in your Nature Review article?
6        A.    It was.
7        Q.    What I'd like you to do is to
8    walk me through you and your co-authors
9    compile all of the literature that you can
10   find from an extensive literature search
11   that report any complications or any
12   incident of complications from either an
13   individual patient or a patient cohort; is
14   that correct?
15       A.    Yes.
16       Q.    And you looked for everything
17   you could find; is that right?
18       A.    Yes.
19       Q.    And you didn't exclude any
20   articles unless it was a multiple
21   reporting of the same cohort?
22       A.    Or non-humans.
23       Q.    Or non-humans, okay.
24            And your reason for excluding

Page 46

1    multiple reports of the same cohort is you
2    didn't want to double count injuries, so
3    therefore potentially inflating the rates
4    of complications that you were looking at;
5    is that right?
6        A.    Yes.
7        Q.    You were attempting to keep it
8    one patient counted for one time
9    throughout this analysis that you did,
10   correct?
11       A.    Yes.
12       Q.    So you and your colleagues have
13   this massive medical literature in front
14   of you.
15            What did you do with that
16   information to reach the conclusions that
17   you reached in your article concerning the
18   existence of certain complications and
19   then the incidence of those complications?
20       A.    Well, for the incidence we
21   counted every single complication.  So, to
22   make it simple, if there were only two
23   articles, one had a hundred patients and
24   no, in this instance, perforations and one

Page 47

1    was a case report of one complication with
2    no denominator because it's just a case
3    report, we would use the one as the
4    numerator and the denominator would be the
5    101.
6        Q.    Okay.
7        A.    But of course this was done in
8    hundreds of papers, so it was much more
9    complicated than that.
10       Q.    So let me, as a non-scientist
11   and non-medical person, let me see if I'm
12   right in my understanding.
13            You took and counted every
14   patient who was included in all of those
15   articles and you counted them all up and
16   that became your denominator, the total
17   number of people who have been studied,
18   reported, considered in some way in the
19   medical literature as potentially, or as a
20   subject in a study about mesh
21   complications; is that right?
22       A.    Yes.
23       Q.    And then you took that entire
24   denominator and then what you did is you

Page 48

1    went through and you added up each, for
2    example in this case, each incident of
3    bladder or urethral trocar perforation
4    that you could find anywhere in that
5    medical literature; is that right?
6        A.    Yes.
7        Q.    What did you do with those two
8    numbers to reach the percentages in the
9    conclusions that you reached?
10       A.    Well, we just added them up.  So
11   the numerator is the number and the -- the
12   numerator divided by the denominator is
13   the percent.
14       Q.    And that's the methodology that
15   was reviewed by the neutral peer reviewers
16   for Nature Journal of Urology, correct?
17       A.    Yes.  I mean, we also did -- we
18   did it another -- the other way we did it
19   is we looked at the range and the averages
20   for each -- for when there's a -- when
21   there were a series.
22            So, if there were two series and
23   one had, you know, a hundred patients with
24   zero perforations, another one had a

Jerry G. Blaivas, M.D.

Page 49

1    hundred patients with 20 percent, you
2    know, we would say that the range in the
3    different series was zero to 20 percent
4    and the mean of the series was whatever
5    the numbers comes to.
6        Q.    So you have two different ways
7    that you've gone about this analysis and
8    the two different methodologies.
9            The first is the adding up all
10   of the individual women who are identified
11   and doing the numerator and the
12   denominator, and you did that specifically
13   for each complication individually,
14   correct?
15       A.    Yes.
16       Q.    So you'd calculate the number of
17   women who had a bladder perforation
18   separately from the number of women who
19   had a urethral erosion, separate from the
20   number of women who had a pain
21   complication; is that right?
22       A.    Yeah, we'd count each of them
23   separately, yeah.
24       Q.    And you also broke that down

Page 50

1    between transobturator slings and
2    retropubic slings, correct?
3        A.    Yes.
4        Q.    So, in addition to doing that
5    and reflecting those calculations and that
6    methodology, what you also did is you
7    reported on the ranges that you saw from
8    the various articles?
9        A.    For the series.
10       Q.    Just for the series, not for the
11   case reports, but for the series that --
12   let me ask you this.
13           Did you look at articles that
14   reflected rates of complications for each
15   of these identified symptoms across a
16   series of patients?
17       A.    I'm sorry, I lost my train of
18   thought.  Say that again.
19       Q.    Sure.
20           Did you also look at the rates
21   of complications that were quantified by
22   other authors in series that they had
23   published in peer-reviewed medical
24   journal?

Page 51

1        A.    We did.
2            I need a minute just to look at
3    this because one of --
4            MS. FITZPATRICK:  Let's just
5        take a quick break.
6            THE WITNESS:  Can I just finish
7        my thought?
8            MS. FITZPATRICK:  Sure.
9        A.    So, one of the things that
10   happened in the review process is there
11   were so many revisions that the -- that we
12   ended up, the reviewers -- the editors
13   ended up excluding some things, some of
14   the data that we had, and as I was
15   talking, I wasn't sure which of it finally
16   got into the article because we -- because
17   there were so many revisions and no one's
18   ever asked me in this much detail about
19   it.
20           So I'm remembering it, the
21   review process, but not exactly what
22   the -- whether that got into the final
23   document.  So I'm going to look at that.
24           MS. FITZPATRICK:  Why don't you

Page 52

1        take a quick look at that.  We'll just
2        go off the record and come back when
3        you're ready.
4            (Recess taken.)
5    BY MS. FITZPATRICK:
6        Q.    Before we took a break, Doctor,
7    you were going to check on that question
8    you had.
9            Did you come up with an answer
10   to that question?
11       A.    Yes.  Thankfully, it is in the
12   final paper.
13       Q.    So, does that alleviate any
14   question you had about that particular
15   issue and you've satisfied yourself that
16   it is reflected accurately in the final
17   paper?
18       A.    Yes.  I think I might have said
19   the mean, median and range and it looks
20   like the table only has the median and
21   range.  It's a minor correction.
22       Q.    Okay.  So, I want to talk about
23   that.  Why don't you tell me what table
24   you're referring to so we can --

13 (Pages 49 to 52)

Jerry G. Blaivas, M.D.

1      A.    I just picked a random one,
2    Table 2.  It says "Complications of
3    retropubic or transobturator slings."
4      Q.    Okay.  So, tell me what Table 2
5    is.
6      A.    It's a list of complications
7    that were reported in all of the papers
8    that we read.
9      Q.    So, did you go into this process
10   looking only for certain complications, or
11   did you include all of the complications
12   that you saw reflected in the medical
13   literature?
14     A.    All of the complications
15   reflected in the medical literature.
16     Q.    So you didn't exclude anything
17   at all that you saw as far as a
18   complication?
19     A.    No.
20     Q.    So, what you've identified
21   here --
22     A.    I'm sorry.  It might not be in
23   the table.
24     Q.    Okay.

1      A.    But between the table and the
2    text, we didn't intentionally exclude
3    anything.
4      Q.    Okay.  So if something isn't in
5    the table, it may be in the text.  The
6    table is just a representation and it's
7    just for ease of looking at what would be
8    significant or common complications; is
9    that right?
10     A.    Yes.
11     Q.    I want to try and understand
12   what you are doing here.
13          So, if we start with, let's
14   stick with bladder perforation.  You have
15   under here pelvic organ perforation, you
16   have bladder, you have N 19411.
17          What is that?
18     A.    That's the total number of
19   patients that were -- when we added up all
20   the patients, there were 19,000 -- that we
21   reviewed, there were 19,411 that we --
22   that where the authors presented data to
23   allow us to understand whether or not they
24   had a perforation.

1      Q.    And then you have next to it:
2    "Complication percentage of patients 579."
3      A.    That's the number of patients --
4    let's see here.
5      Q.    Is that the numerator?
6      A.    That should be the numerator.
7      Q.    Okay.  And then next to that
8    you've got:  "Incidence mean range 2.9"
9    and you got:  "0 to 16.1."
10          Can you explain that to me?
11     A.    Yes, it means that when we added
12   them all up, the mean was 2.9 and the
13   range was 0 to 16, which is actually my
14   memory was pretty close to that from
15   before.  So that some papers had zero,
16   reported zero complications and some
17   reported as many as 16 percent.
18          MS. FITZPATRICK:  Just give me
19   one second.
20          (Discussion held off the record.)
21   BY MS. FITZPATRICK:
22     Q.    So, Doctor, we were talking
23   about Table 2 and I had a question for you
24   about the column that has the denominator.

1           Why is the denominator different
2    for each of these complications if you
3    considered all of these articles and all
4    of the cases in reaching your conclusions?
5      A.    Because not every paper had the
6    methodology to answer the question about
7    complications.
8           So for example, one article
9    might give us the number of patients that
10   they -- that had perforation of the
11   bladder and when we'd have the
12   denominator, so we could do that, we could
13   present that data.  That same patient --
14   that same paper might not have even
15   mentioned the word "urinary fistula," for
16   example.  So we don't know if any of those
17   patients had fistulas or not.  So we can't
18   include -- we don't include it as a zero.
19   We say we just don't know.  So we
20   excluded, we would have excluded that --
21   those number of patients from the
22   denominator when we're talking about
23   fistulas.
24     Q.    Okay.  So, it's fair to say, or

Jerry G. Blaivas, M.D.

Page 57

1  correct me if I'm wrong, when you looked
2  at each of these articles, you then sorted
3  them by which articles reported on which
4  complications; is that right?  So you'd
5  put all of the articles that dealt with
6  bladder perforation and you looked at
7  those as a subset for your analysis on
8  bladder perforation specifically, correct?
9      A.   Yes.
10     Q.   And then you again went back to
11 the full pool of articles and you looked
12 for all of the articles that mentioned
13 vaginal perforation and you made a subset
14 of those articles and made your
15 calculations based on those?
16     A.   Yes.
17     Q.   Is that right?
18     A.   Yes.
19     Q.   And that's how you reach the
20 numbers which is the complications
21 percentage of patients that is reflected
22 in the middle column; is that right?
23     A.   Yes.
24     Q.   And that was one way that you

Page 58

1  went about calculating the percentage of
2  patients who have a potential complication
3  based on what's available in the medical
4  literature; is that right?
5      A.   Yes.
6      Q.   Now, the next column is
7  "Incident mean range."
8           That's the second way that you
9  went about also checking on the reports of
10 complications and the incidence of
11 complications, correct?
12     A.   Yes.
13     Q.   Can you explain to me how the
14 methodology for reaching the incidence
15 differs from the methodology used for
16 reaching the complications?
17     A.   Sure.  In the first case, we
18 counted every single patient, every single
19 patient was counted once.  In the
20 incidence, where it says "Incidence mean
21 and range," those -- that we only
22 considered series of patients.  So that
23 doesn't include any of the patients
24 with -- that were case reports.  It

Page 59

1  doesn't include any of the patients, for
2  example, that were just a paper on
3  complications.
4           So the numbers in these two
5  columns, even though they both represent
6  means or averages, the numbers could be
7  very different because they're different
8  populations of papers.
9      Q.   So, this was the way that you
10 and your co-authors went about presenting
11 the full gamut of information based on two
12 statistical analyses, correct?
13     A.   Exactly.
14     Q.   And you reported on both the
15 complications and the incidence without
16 consideration to what was higher or lower?
17 You made sure everything was reported
18 here, correct?
19     A.   Exactly.
20     Q.   In some of these, the numbers
21 are fairly comparable, right?
22     A.   Yes.
23     Q.   And in some of them there's some
24 divergence in the percentage of patients

Page 60

1  that you had and the mean.
2           How do you account for that?
3      A.   Because in the series, they may
4  not have mentioned a certain complication.
5  So for example, if you're looking at that
6  same column, if you look at neurologic
7  symptoms within six weeks, in the middle
8  column we counted every single patient
9  where they mentioned it.  Now, it looks
10 like there were only 42 patients in that
11 particular group where they said these
12 patients had these complications.  Whereas
13 in the other article, they could have had
14 a paper with a thousand patients in it,
15 but they didn't even mention whether or
16 not there was a neurologic complication,
17 so we couldn't count that.
18     Q.   And in any event, let me look at
19 the range.  So, tell me what the range is.
20     A.   Well, the range is -- describes
21 what the minimum complication rate was in
22 one series and the maximum in another --
23 in other series, and the reason that we
24 did that is one of the critiques that you

Jerry G. Blaivas, M.D.

Page 61

1  might apply to this kind of scientific
2  literature is, well, if you just do an
3  average -- if you just do an average, it
4  doesn't tell you about the difference
5  between perhaps, this is a perhaps, people
6  that are really expert surgeons might get
7  a zero complication rate and novices
8  might, you know, get a 15 percent
9  complication rates.
10        So this gives you the range of
11  what you might expect with the same
12  surgeon or groups of surgeons doing the
13  operation.
14     Q.   In looking at both your
15  percentage of patients, as well as the
16  mean that you have reported in this
17  article, all of those fall within below
18  the highest reported incident rate on the
19  range; is that right?
20     A.   Sure.  That makes sense.
21     Q.   So, does that reflect that your
22  article is not reporting the highest
23  possible rates of complications associated
24  with any of these complications?

Page 62

1     A.   To the contrary.  We describe in
2  the paper that we believe this represents
3  the least possible number of complications.
4     Q.   And it's well below --
5        MS. FITZPATRICK:  Well, strike
6     that.  I think I already asked you
7     that.
8     Q.   Now, this methodology that
9  you've just described, the two different
10  types of methodology, you used that same
11  methodology for each of the complications
12  that you reported in this medical article;
13  is that correct?
14     A.   We did.
15     Q.   Is it fair to say that this
16  medical article is -- identifies all of
17  the complications that you were able to
18  see that are reported in the medical
19  literature, correct?
20     A.   From 2007 to 2014, yes.
21     Q.   Now, what I want to ask you is
22  you identify in your Nature Review article
23  specific types of complications.
24        Are those complications that you

Page 63

1  have also seen with mesh synthetic sling
2  patients in your clinical practice or
3  through your academic experience?
4     A.   Yes.
5     Q.   In doing this work in 2014 and
6  2015, did you see any complications that
7  were reported here that you didn't also
8  have some clinical experience with?
9     A.   Give me a moment.
10        (Pause.)
11        I'm amazed to say that no, I've
12  seen every one of these complications.
13     Q.   And do you rely on your clinical
14  experience for your opinions that the
15  TVT-Exact and the Ethicon midurethral
16  slings can cause these types of
17  complications in women?
18     A.   They do.
19     Q.   In addition to your clinical
20  experience and in addition to what you
21  have presented in the Nature Review
22  article, do you also rely on other
23  peer-reviewed literature from other
24  authors to support your opinions that each

Page 64

1  of these complications is associated with
2  the polypropylene midurethral slings?
3     A.   I mean, it's not a question that
4  the answer is "yes."
5     Q.   Sometimes we ask stupid
6  questions.
7     A.   Okay.
8     Q.   It's 'cause we have to.
9        Now, you walked me through the
10  complication rates for retropubic slings,
11  and what I want to talk to you about is
12  your -- you've reached some opinions on
13  the risk of negative outcome after
14  synthetic midurethral sling implantation
15  for surgery is greater than or equal to 15
16  percent.
17        Do you recall that?
18     A.   I do.
19     Q.   Can you tell me the methodology
20  that you and your co-authors used to
21  determine that the overall risk of a
22  negative outcome after synthetic
23  midurethral sling implantation surgery is
24  greater than or equal to 15 percent?

Jerry G. Blaivas, M.D.

Page 65

1    A.    Sure.  First we looked at the
2  reported incidence that we already
3  described.  Then we took the chances of
4  the failure of the sling, which would be a
5  negative consequence.  So we took the
6  first number was the complications as we
7  reported them.  The second number was the
8  chances of just failure, like any
9  operation can fail.  The third was the
10  failure for stress incontinence after an
11  operation -- after a complication from a
12  sling, okay.  And the fourth -- let me get
13  my numbers right.  I think it's the
14  fourth.  The fourth was the incidence of
15  refractory overactive bladder, and what we
16  did with that was that we made, again, a
17  very conservative estimate, okay.  So we
18  took the number of reported de novo
19  overactive bladder patients and we said
20  that a certain percentage of them are
21  likely to be refractory.  And because the
22  trouble is there is no data on that.
23  There's no data that says, that we could
24  find, that says that if you operate on

Page 66

1  them and they have de novo overactive
2  bladder and you treat them, X number would
3  get better.  So I don't have the exact
4  number, but we picked the number of de
5  novo overactive bladder patients and then
6  we took a percentage of that, of patients
7  that are likely to be refractory, and when
8  you add all those numbers up -- then we
9  added a couple of -- there were a few
10  things like bowel injuries and fistulas
11  that are very rare, but we added in a
12  number of that and added all of those up,
13  the methodology, it's in the paper
14  someplace.
15    Q.    And that's the same methodology?
16    A.    Yeah.
17    Q.    Just so I understand, if I'm
18  looking at box 1 on page 8 of your
19  article.
20    A.    Okay.
21    Q.    It says:  "Complications
22  requiring surgery."
23         Is this the list of
24  complications that you would consider a

Page 67

1  serious complication for the purposes of
2  calculating that 15.3 percent number?
3    A.    Yes.
4    Q.    Is it fair to say that, or am I
5  accurate in saying that that list of
6  complications, plus the number of sling
7  failures, the percentage of women whose
8  slings simply don't work for them, you
9  calculated that total --
10    A.    No, no, that's in there.  The
11  recurrent and/or persistent stress
12  incontinence.
13    Q.    Okay.
14    A.    That number is -- that's where
15  the number comes from.
16    Q.    Okay.  Thank you for clarifying
17  that.
18         So, when you say there's a total
19  incidence of serious complications is 15.3
20  percent, is it accurate to say that's the
21  calculation of the overall risk to a woman
22  that one of these things could happen to
23  her if she has a polypropylene midurethral
24  sling implanted?

Page 68

1    A.    I would say it another way.
2  That there's a, I believe, at least a 15
3  percent chance of having a negative
4  outcome from the sling, from putting the
5  sling in.
6    Q.    And the negative outcomes would
7  be one of those things that you have
8  identified in Box 1?
9    A.    Yes.
10    Q.    But it's not your testimony, for
11  example, that 15.3 percent of women who
12  have a midurethral sling will have chronic
13  pain?
14    A.    No.
15    Q.    Or that 15.3 percent will have a
16  urethral obstruction, correct?
17    A.    Correct.
18    Q.    It's just the overall chances of
19  having one of these negative outcomes?
20    A.    Yes.
21    Q.    Now, going back in time, you
22  published this article in late 2015; is
23  that right?
24    A.    Yes.

17 (Pages 65 to 68)

Page 69

1    Q.    And it was based on medical
2  records 2007 through 2014; is that right?
3    A.    Yes.
4    Q.    And do you recall that in the
5  summer of 2014, you testified in front of
6  Judge Goodwin in the Southern District of
7  West Virginia in a case involving Mrs. Joe
8  Husky; is that right?
9    A.    I have a remote memory of it,
10  yes.
11    Q.    Well, I put you on the stand,
12  so.
13    A.    No, I did it.
14    Q.    So I know that you did it.
15    And at that time, you had not
16  done the statistical analyses and this
17  analysis that's reflected in your Nature
18  article, correct?
19    A.    I'm sorry, what was the date?
20    Q.    Summer of 2014.
21    A.    Correct.
22    Q.    So, since you testified in Mrs.
23  Husky's case in the summer of 2014, have
24  you done additional work that you rely on

Page 70

1  as the basis for your current opinions
2  reflected in this expert report on the
3  incidence of individual complications rate
4  and the overall complication rate?
5    A.    Well, of course.  That's what
6  this paper is.
7    Q.    And this information wasn't
8  available to you and you had not done this
9  analysis at the time of Mrs. Husky's
10  trial, correct?
11    A.    Correct.
12    Q.    Ethicon has made a statement
13  that you may not -- I'm going to quote
14  you:  "Dr. Blaivas may not, quote, merely
15  a year later, quote, purport to be certain
16  about TVT complication rates."
17    Can you tell me why you can be
18  certain about complication rates in August
19  of 2015 when you couldn't be certain about
20  complication rates in the summer of 2014?
21    A.    Because we did such an
22  exhaustive search of the literature and
23  this is our best estimate of the minimum
24  complication rate.  I emphasize that.

Page 71

1    Q.    And when you call it an
2  estimate, it's an estimate that is based
3  on two different scientifically reliable
4  means for calculating the rates of
5  complication; is that right?
6    A.    Yes.
7    Q.    And those are the ones that are
8  reflected in Tables 2, 3, 4 and 5 of the
9  report?
10    A.    I'll take your word for it.
11  Yes.
12    Q.    I just want to make sure that
13  I'm right.
14    A.    Okay.
15    Q.    Dr. Blaivas, do you believe that
16  the conclusions that you reached in your
17  report and in your Nature article assume
18  the worst case scenario?
19    A.    No.  As I said, I think it
20  assumes the best case scenario.
21    Q.    And do you believe that it errs
22  on the side of opining as to a higher
23  complication rate to better protect a
24  patient?

Page 72

1    A.    No.  I think if anything, it
2  errs on the lower complication rate.
3    Q.    And is that reflected in the
4  fact that both the complication percentage
5  and the incidence that you report out are
6  lower than the highest rates that you saw
7  in the research that you did?
8    A.    Well, in part, but not --
9    MS. FITZPATRICK:  Take a break.
10    (Discussion held off the record.)
11    MS. FITZPATRICK:  Can you read
12  back the question and answer?
13    (The requested portion of the
14  record was read by the Court Reporter.)
15    A.    Yeah, because we don't expect it
16  to be the highest rate reported, but we
17  know that the studies, that the majority
18  of the studies don't follow the patient
19  long enough to account for all the
20  complications and that there's no registry
21  and there isn't -- and they don't -- there
22  isn't a methodology to specifically look
23  for complications.  So because of those
24  three things alone, it's very likely that

Jerry G. Blaivas, M.D.

Page 73

1 the complication rate that we reported is
2 an underestimate of the real number of the
3 complications.
4     Q.    Now, Ethicon claims that your
5 Review article cherry-picked data in
6 failing to take into account long-term
7 studies finding TVT complication rates to
8 be much lower.  And they then refer to the
9 articles that are identified in Table 1
10 and states that at Table 1 of the article,
11 the authors collected 11 studies
12 purportedly meeting the criteria for
13 inclusion.
14         Do those articles have to do
15 with efficacy or your conclusions about
16 efficacy, or do they have to do with the
17 overall rates of complications?
18     A.    The methodology was primarily
19 geared towards efficacy.
20     Q.    So, is it accurate to say that
21 simply because something was not included
22 in Table 1, it is incorrect for Ethicon to
23 say that you did not take into account
24 long-term studies that find TVT

Page 74

1 complication rates to be lower?
2     A.    I'm sorry, there was a couple of
3 negatives in there.  I'm not sure about
4 that.
5     Q.    Okay.  Ethicon attempts to use
6 the fact that there were certain articles
7 that you did not consider for efficacy as
8 evidence that you did not use those
9 articles for consideration of safety.
10         Is that accurate?
11     A.    It's not accurate.
12     Q.    Why not?
13     A.    Because one thing I already
14 alluded to is that we only counted the
15 patients once.  So if a patient -- I mean,
16 for example, I know one of the articles in
17 there -- when I say "know," let me just
18 double check.
19         (Pause.)
20         For example, the Nielson
21 article -- no, this doesn't answer your
22 question.  Excuse me.
23         The answer is "no" because some
24 of the papers that they cited in that --

Page 75

1 in that deposition or, I think it was a
2 deposition, were papers that were
3 duplicate, so they used the same patients
4 twice, and I already testified that when
5 that happens, we only counted the
6 complication once.
7         And the second thing is that if
8 an article did not mention a complication,
9 that it wasn't included.  They didn't say
10 that they even looked for it.
11         And then thirdly, I do remember,
12 again I don't remember the specifics, but
13 there was one or two articles that didn't
14 come up in our search, and I don't know,
15 you know, we did a very methodical search,
16 but we searched thousands of papers and
17 it's not unexpected that one or two
18 wouldn't come up with a search.
19     Q.    And is that something that
20 routinely happens in peer-reviewed
21 articles?
22     A.    Sure.
23     Q.    Does it call into question the
24 reliability of a peer review article?

Page 76

1     A.    I don't believe so.
2     Q.    Now, defendants claim that your
3 opinion that the TVT has a minimal
4 complication rate takes into account
5 prolapse devices.
6         Did you look at articles or
7 consider statistics on prolapse devices
8 when reaching your complication rate in
9 this paper?
10     A.    We did not look at -- if a paper
11 had -- it's possible that some of the
12 papers had patients with both prolapse and
13 slings, but in the review process, we
14 would have made our best effort to only
15 include those patients that had to do with
16 sling -- that where the complication was
17 from a sling.
18     Q.    Is it fair to say that Ethicon's
19 claim that you included prolapse devices
20 in calculating your complication rate is
21 untrue?
22     A.    To the best of our ability to
23 make the distinction, it's untrue.
24         MS. FITZPATRICK:  Can we go off

Jerry G. Blaivas, M.D.

Page 77

1    the record for a second?
2        (Discussion held off the record.)
3    BY MS. FITZPATRICK:
4        Q.    Dr. Blaivas, you participated in
5    the committee at the AUA that considered
6    the safety and efficacy of midurethral
7    slings, correct?
8        A.    Yes.
9        Q.    Can you tell me what you did in
10   that respect, what you personally did?
11       A.    Well, we all -- it was a
12   complicated process, similar to what I
13   testified before.  We did a literature
14   search.  We had inclusion criteria.  We
15   selected papers that had to do with the
16   surgical management of urinary
17   incontinence in women.  We selected the
18   papers and we tabulated the data on safety
19   and efficacy, very similar to what we did
20   in the Nature Review article for that
21   column in the right where we looked at the
22   incidence and the range.  And we did that
23   for all of the known treatments to stress
24   incontinence at the time, surgical

Page 78

1    treatments.
2        Q.    You didn't author those
3    guidelines, correct?
4        A.    Well, I was one of eleven
5    authors.
6        Q.    Do those guidelines reflect your
7    personal opinions or the position of the
8    AUA?
9        A.    It reflected the opinions of the
10   AUA.
11       Q.    Did you disagree with some of
12   those opinions?
13       A.    Yeah, I disagreed with some of
14   the conclusions.
15       Q.    And did you express that during
16   your meetings and to others?
17       A.    I did.
18       Q.    Is it fair to say that this
19   though ended up being a consensus paper
20   that doesn't fully and accurately reflect
21   your personal views on the safety and
22   efficacy of midurethral slings?
23       A.    That's correct.  I was one
24   eleven -- I had one-eleventh of the vote.

Page 79

1        Q.    Now, did the AUA conclude that
2    mesh products are suitable surgical
3    alternatives?
4        A.    They did.
5        Q.    What is your opinion as to
6    whether mesh products are suitable
7    surgical options?
8        A.    I think they're suitable
9    surgical options in a small percentage of
10   patients who accept the known risks and
11   complications and weigh the risks and
12   benefits.  But as I said, I contend that
13   it's almost impossible to do that because
14   those risks are not well-described and not
15   well-known by either the doctors or the
16   patients.
17       Q.    When you say it's a suitable
18   surgical option in, did you say a limited
19   number of patients?
20       A.    Yes.
21       Q.    Can you tell me what you mean by
22   that?
23       A.    Well, I think in a -- first of
24   all, in patients that are not going to

Page 80

1    be -- that have no intention of being
2    sexually active and whose life expectancy
3    isn't that long, so, you know, older
4    women, particularly those that can't
5    withstand the rigors of an open operation,
6    that are not going to be sexually active,
7    particularly those that are obese will be
8    a much bigger operation to do an
9    autologous sling.  I think those patients
10   are reasonable candidates once -- if they
11   accept and are informed of the risks.
12       Q.    Do you believe though that
13   midurethral polypropylene slings are a
14   safe first line surgical option for all
15   women who suffer from stress urinary
16   incontinence?
17       A.    Well, I don't think it's my job
18   to decide for another patient.  I don't
19   believe -- for the patient.  I think the
20   patient and the -- the patient needs to be
21   informed of the risks and benefits, and if
22   they were informed of the risks and
23   benefits, I think they would realize that
24   it's not safe and it's not worth the risk.

Jerry G. Blaivas, M.D.

Page 81

1        I might not have answered.  What
2   was the actual question?
3        Q.    You had said that you believed
4   it was an appropriate surgical option for
5   a limited number of patients.  You
6   identified who those patients were.
7        What I was asking was do you
8   believe that the Ethicon midurethral
9   slings are a suitable safe surgical option
10  as a first line treatment for all women
11  who have stress urinary incontinence?
12       A.    I do not.
13       Q.    And is that based on your
14  clinical experience in treating women who
15  have mesh-related complications?
16       A.    Yes.
17       Q.    And is it based --
18       A.    Excuse me.  And my knowledge of
19  how likely they are to occur.
20       Q.    Is it based on your review of
21  the medical literature discussing the
22  potential complications and the incidence
23  of complications that are associated with
24  midurethral slings?

Page 82

1        A.    Yes.
2        Q.    And that includes a review of
3   literature that reports few complications
4   and literature that reports many
5   complications, correct?
6        A.    Yes.
7        Q.    And you take into account for
8   your opinions medical articles that report
9   low rates of complications when reaching
10  your opinions, correct?
11       A.    Yes.
12       Q.    And you took all of those into
13  account, to the best of your ability, when
14  conducting your Nature Review, correct?
15       A.    I did.
16       Q.    And you didn't exclude any such
17  reports simply because they had a low
18  incidence of complication reported in
19  them, correct?
20       A.    Correct.
21       Q.    Do you also base that opinion on
22  your clinical experience in implanting
23  autologous slings or doing non-mesh
24  surgery for SUI patients?

Page 83

1        A.    Yes.
2        Q.    Do you also base your opinion on
3   medical literature concerning the
4   complications associated with the
5   autologous fascial sling and other
6   non-mesh surgeries to correct SUI?
7        A.    I do.
8        Q.    Now let's go back to the AUA.
9        Does the AUA recognize an
10  autologous fascial sling as a suitable
11  surgical option for women who have stress
12  urinary incontinence?
13       A.    It does.
14       Q.    Does it recognize other non-mesh
15  procedures as suitable surgical options
16  for women who have stress urinary
17  incontinence?
18       A.    It does.  Yes, it does.
19       Q.    And what are those?
20       A.    Autologous fascial sling, a
21  Burch, it doesn't really -- also
22  Marshall-Marchetti-Krantz, and other
23  retropubic kind of operations and
24  midurethral -- excuse me, periurethral

Page 84

1   injections, and homologous and xeno --
2   homologs and xenografts.
3        Q.    Does the AUA conclude that the
4   or look at --
5        MS. FITZPATRICK:  Strike that.
6        Q.    Does the AUA conclude that the
7   polypropylene midurethral sling is a safer
8   surgical option to some of the non-mesh
9   surgeries?
10       A.    It does not.
11       Q.    And does the AUA guidelines that
12  you were involved with suggest that
13  physicians such as yourself and others
14  should only consider polypropylene
15  midurethral slings as a suitable surgical
16  option for --
17       A.    It does not.
18       Q.    In that respect, do you agree
19  with the AUA that these non-mesh
20  procedures are suitable surgical options
21  for women who have stress urinary
22  incontinence?
23       A.    Of course.
24       Q.    Separate and apart from what's

21 (Pages 81 to 84)

Jerry G. Blaivas, M.D.

Page 85

1  reflected in the AUA, do you believe that
2  the non-mesh surgical options, and
3  particularly the autologous fascial sling,
4  are safer procedures for women who have
5  stress urinary incontinence generally?
6      A.   I do.
7      Q.   Tell me what the basis for that
8  opinion is.
9      A.   Well, because the autologous
10  slings simply don't have any of the
11  devastating kind of complications that we
12  talk about.  For practical purposes, no
13  refractory pain and there's, for practical
14  purposes, no erosion, and for practical
15  purposes, there's no fistulas.  I mean,
16  the really serious complications, the
17  autologous sling does not have.
18      Q.   Now, Ethicon has asserted that
19  you base your opinions on the benefits of
20  autologous slings solely on your own
21  unreliable personal experiences.
22          Is that correct?
23      A.   I wonder why they call my
24  published peer-reviewed articles

Page 86

1  unreliable, but no, that's not correct.
2      Q.   What else do you base it on?
3      A.   The peer review literature and
4  speaking with my associates.
5      Q.   Okay.
6      A.   My colleagues.
7      Q.   Is there any specific -- let me
8  ask you this.
9          When reaching your opinions
10  concerning the safety of autologous
11  fascial slings, did you consider all
12  reported medical articles that you had
13  seen concerning the complications rates
14  associated with autologous fascial slings?
15      A.   I did.
16      Q.   And that formed one basis of
17  your opinions, correct?
18      A.   Yes.
19      Q.   And you didn't simply adopt or
20  form your opinion based on reading of a
21  single article, correct?
22      A.   Correct.
23      Q.   Did you look at the totality of
24  the articles out there that supported your

Page 87

1  opinions?
2      A.   I looked at the totality, but I
3  also looked at the severity of the
4  complications and there's no question in
5  my mind that the severity of the
6  complications on average are much worse in
7  synthetic slings than in autologous
8  slings.
9      Q.   Okay.
10      A.   And also the ease with which
11  they can be corrected are much easier and
12  predict -- more predictable in the
13  autologous sling compared to the mesh
14  sling.
15      Q.   Okay.  Now, you offered opinions
16  concerning mesh degradation, shrinkage and
17  other deformation, correct?
18      A.   Yes.
19      Q.   Have you seen deformed mesh that
20  you've explanted from women?
21      A.   Of course.
22      Q.   Have you seen mesh that's shrunk
23  that you've explanted from women?
24      A.   Well, I've seen the mesh scar

Page 88

1  complex.
2      Q.   And mesh degradation, have you
3  seen mesh falling apart when you take it
4  out of women?
5      A.   I have.
6      Q.   Is your clinical experience in
7  observing each of these phenomenon a basis
8  for your opinion that each of those things
9  can happen?
10      A.   Yes.
11      Q.   In addition to your clinical
12  experience, is this an issue that you also
13  studied in your Nature Review article?
14      A.   Yes.
15      Q.   Did you rely on the conclusions
16  that you reached in your Nature Review
17  article as a separate basis for your
18  conclusions about mesh degradation,
19  shrinkage and deformation?
20      A.   I did.
21      Q.   And can you tell me what you and
22  your co-authors did to study mesh
23  degradation, shrinkage, and deformation in
24  your Nature Review article?

Golkow Technologies, Inc - 877.370.3377

Jerry G. Blaivas, M.D.

Page 89

1    A.   Well, Dr. Latovlev actually that
2  did that.  I mean, he wrote that part of
3  the article, and he himself has done
4  extensive studies both of a explanted mesh
5  looking at the gross specimen for
6  stiffness and deformation, looking at the
7  light microscopic and also the
8  ultramicroscopic characteristics of the
9  mesh, and he concluded based on his own
10  work and that of many others in the
11  literature that mesh degrades in vivo.
12    Q.   Did he also conclude that mesh
13  shrinks in vivo?
14    A.   Yes.
15    Q.   And did he also conclude that
16  mesh can deform in vivo?
17    A.   Yes.
18    Q.   So you talked about what Dr.
19  Latovlev did in your paper.
20      Is there additional literature
21  in the peer review that you are aware of
22  that establishes that mesh can degrade,
23  shrink and deform?
24    A.   Yes, there's a lot of -- there

Page 90

1  are a number of studies in the literature.
2    Q.   Have you cited to those as part
3  of your reliance list in this case?
4    A.   I have.
5    Q.   And those are the basis for your
6  opinions?
7    A.   Yes.
8    Q.   I want to go back to just a
9  general question.
10      Ethicon has raised questions
11  about the methodology that you have used
12  to reach your opinions in this case.
13    A.   I'm sorry, I missed the first
14  part of your sentence.
15    Q.   Ethicon has raised issues with
16  the methodology that you have used to
17  reach your opinions in this case.
18      Did you rely on your clinical
19  experience as part of your basis for each
20  of the opinions that you hold?
21    A.   I did.
22    Q.   And did you rely on your own
23  peer-reviewed literature as part of the
24  basis for the opinions?

Page 91

1    A.   I did.
2    Q.   And did you rely on other peer
3  review literature as part of the basis for
4  your opinions in this case?
5    A.   I did.
6    Q.   Is it fair to say that each of
7  your opinions depends on all three of
8  those aspects of your experience as its
9  bases?
10    A.   It did, but when I heard your
11  question, I'm trying to understand.
12  There's no controversy about whether these
13  things exist except for possibly the
14  degradation.  Everything's well documented
15  in the literature.  I think the only thing
16  they could possibly contest is how often
17  that occurs, but the published literature,
18  exclusive of anything that I said, I mean,
19  we -- you know, we cited the New England
20  Journal of Medicine, the Journal of
21  Urology, the most reputable journals, you
22  know, show, for example, a five to six
23  percent incidence of perforation.  Every
24  review article has shown one or two

Page 92

1  percent, at least, urethral obstruction,
2  revision surgery.  Those things are
3  indisputable.  There's no controversy
4  about that.
5      The only thing -- the only thing
6  they could possibly argue with is the
7  actual incidence.
8    Q.   And you've laid out for us what
9  your methodology in calculating that
10  incidence is, correct?
11    A.   I think in much greater detail
12  than any of the other articles that talk
13  about complications.
14    Q.   Let me just go back.
15      Now, Ethicon is not here at this
16  deposition today, correct?
17    A.   Correct.
18    Q.   Now, this deposition was
19  originally noticed by Ethicon, and you are
20  here in deposition today because Ethicon
21  asked you to be in deposition, correct?
22    A.   Correct.
23    Q.   And if Ethicon had chosen to
24  show up for this deposition, they could

Jerry G. Blaivas, M.D.

Page 93

1  have asked you any questions that they
2  wanted based on your TVT-Exact report,
3  correct?
4      A.   Yes.
5      Q.   And they chose not to do so
6  today?
7      A.   I believe so.
8          MS. FITZPATRICK:  That's all
9  that I've got.
10         I just would like to mark as
11  Exhibit 2 the original notice of
12  deposition of Dr. Blaivas from Ethicon
13  that was dated August 25th, 2016.
14         (Blaivas Exhibit 2, Notice To
15  Take Deposition of Jerry Blaivas, M.D.
16  dated August 25, 2016, was marked for
17  identification, as of this date.)
18         MS. FITZPATRICK:  And mark as
19  Exhibit 3 the amended notice to take
20  the deposition of Dr. Blaivas that we
21  filed today, August 29th, immediately
22  following Ethicon's withdrawal of its
23  notice.
24         (Blaivas Exhibit 3, Amended

Page 94

1  Notice To Take Deposition of Jerry
2  Blaivas, M.D. dated August 29, 2016,
3  was marked for identification, as of
4  this date.)
5  BY MS. FITZPATRICK:
6      Q.   Doctor, looking at this, which
7  is Exhibit 3, the subject matter is
8  general opinions regarding midurethral
9  sling products.  We focused today on your
10  TVT-Exact report, correct?
11     A.   Yes.
12     Q.   And some of those opinions are
13  unique to the TVT-Exact, correct?
14     A.   Yes.
15     Q.   But some of those opinions will
16  span all of your polypropylene midurethral
17  sling products, correct?
18     A.   Yes.
19     Q.   Including your opinions on the
20  methodology that you used in both your
21  Nature article and the methodology that
22  you used in your report, correct?
23     A.   Yes.
24     Q.   And that's common to all

Page 95

1  reports, but also to the TVT-Exact?
2      A.   Yes.
3          MS. FITZPATRICK:  Now I'm done.
4          (Time noted:  3:14 p.m.)

Page 96

1          A C K N O W L E D G M E N T
2
3  STATE OF          )
4                     :ss
5  COUNTY OF         )
6
7          I, JERRY G. BLAIVAS, M.D., hereby
8  certify that I have read the transcript of
9  my testimony taken under oath in my
10  deposition of August 29, 2016; that the
11  transcript is a true and complete record
12  of my testimony, and that the answers on
13  the record as given by me are true and
14  correct.
15
16
17     _____
                JERRY G. BLAIVAS, M.D.
18
19  Signed and subscribed to before me this
20  _____ day of _____, 2016.
21
22  _____
23  Notary Public, State of
24

Golkow Technologies, Inc - 877.370.3377

Jerry G. Blaivas, M.D.

Page 97

1          E R R A T A
2   PAGE / LINE / CHANGE   /   REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Page 98

1          C E R T I F I C A T E
2   STATE OF NEW YORK
3   COUNTY OF NEW YORK
4
5          I, Marie Foley, RMR, CRR, a
6   Certified Realtime Reporter and Notary
7   Public within and for the State of New
8   York, do hereby certify:
9          THAT JERRY G. BLAIVAS, M.D., the
10  witness whose deposition is hereinbefore
11  set forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14         I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I am
17  in no way interested in the outcome of
18  this matter.
19         IN WITNESS WHEREOF, I have
20  hereunto set my hand this 3rd day of
21  September, 2016.
22
23         _____
24             MARIE FOLEY, RMR, CRR

Page 99

1          LAWYER'S NOTES
2   PAGE / LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

Golkow Technologies, Inc - 877.370.3377