# EXHIBIT A

Jerry G. Blaivas, M.D.

```
 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF
 2            WEST VIRGINIA AT CHARLESTON
                      - - -
 3
 4   IN RE: ETHICON, INC.,      :Master File No.
     PELVIC REPAIR SYSTEM       :2:12-MD-0237
 5   PRODUCTS LIABILITY         :
     LITIGATION                 :MDL No. 2327
 6   ---------------------------------------------
     THIS DOCUMENT RELATES TO :JOSEPH R. GOODWIN
 7   THE CASES LISTED BELOW   :U.S. DISTRICT JUDGE
     ---------------------------------------------
 8
     Mullins, et al. V. Ethicon, Inc., et al.
 9   2:12-cv-02952
     Sprout, et al. V. Ethicon, Inc., et al.
10   2:12-cv-07924
     Iquinto v. Ethicon, Inc., et al.
11   2:12-cv-09765
     Daniel, et al. V. Ethicon, Inc., et al.
12   2:13-cv-02565
     Dillon, et al. V. Ethicon, Inc., et al.
13   2:13-cv-02919
     Webb, et al. V. Ethicon, Inc., et al.
14   2:13-cv-04517
     Martinez v. Ethicon, Inc., et al.
15   2:13-cv-04730
     McIntyre, et al. V. Ethicon, Inc., et al.
16   2:13-cv-07283
     Oxley v. Ethicon, Inc., et al. 2:13-cv-10150
17   Atkins, et al. V. Ethicon, Inc., et al.
     2:13-cv-11022
18   Garcia v. Ethicon, Inc., et al. 2:13-cv-14355
     Lowe v. Ethicon, Inc., et al. 2:13-cv-14718
19   Dameron, et al. V. Ethicon, Inc., et al.
     2:13-cv-14799
20
21            SEPTEMBER 17, 2015
              JERRY G. BLAIVAS, M.D.
22
23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph|917.591.5672 fax
24             deps@golkow.com
```

```
 1   CAPTION CONTINUED:
 2
 3   Vanbuskirk, et al. V. Ethicon, Inc., et al.
     2:13-cv-16183
 4   Mullens, et al. V. Ethicon, Inc., et al.
     2:13-cv-16564
 5   Shears, et al. V. Ethicon, Inc., et al.
     2:13-cv-17012
 6   Javins, et al. V. Ethicon, Inc., et al.
     2:13-cv-18479
 7   Barr, et al. V. Ethicon, Inc., et al.
     2:13-cv-22606
 8   Lambert v. Ethicon, Inc., et al.
     2:13-cv-24393
 9   Cook v. Ethicon, Inc., et al. 2:13-cv-29260
     Stevens v. Ethicon, Inc., et al.
10   2:13-cv-29918
     Harmon v. Ethicon, Inc., et al. 2:13-cv-31818
11   Snodgrass v. Ethicon, Inc., et al.
     2:13-cv-31881
12   Miller v. Ethicon, Inc., et al. 2:13-cv-32627
     Matney, et al. V. Ethicon, Inc., et al.
13   2:14-cv-09195
     Jones, et al. V. Ethicon, Inc., et al.
14   2:14-cv-09517
     Humbert v. Ethicon, Inc., et al.
15   2:14-cv-10640
     Gillum, et al. V. Ethicon, Inc., et al.
16   2:14-cv-12756
     Whisner, et al. V. Ethicon, Inc., et al.
17   2:14-cv-13023
     Tomblin v. Ethicon, Inc., et al.
18   2:14-cv-14664
     Schepleng v. Ethicon, Inc., et al.
19   2:14-cv-16061
     Tyler, et al. V. Ethicon, Inc., et al.
20   2:14-cv-19110
     Kelly, et al. V. Ethicon, Inc., et al.
21   2:14-cv-22079
     Lundell v. Ethicon, Inc., et al.
22   2:14-cv-24911
     Cheshire, et al. V. Ethicon, Inc., et al.
23   2:14-cv-24
24
```

Page 106

1  Q. And when you mention current
2 studies on the autologous fascial sling,
3 what current studies are you referring
4 to?
5  A. I mean, there was just a
6 study by -- I don't remember who the
7 primary author was, the first author was.
8 But there was a study by Roger
9 Dmochowski's group. There's a study by
10 Eric Rovner comparing synthetic slings
11 to -- synthetic slings to autologous
12 fascia slings.
13     And my recollection is that
14 the findings were comparable. But I
15 would really -- I would need to see those
16 papers to answer your question. I mean,
17 to answer with certainty.
18  Q. You didn't cite to Dr.
19 Dmochowski's paper or Eric Rovner's paper
20 in your expert report, correct?
21  A. No.
22  Q. I'm not correct?
23  A. Correct, yes.
24  Q. Oh, thank you.

Page 107

1  A. I thought you said you
2 didn't. Oh, okay.
3  Q. Let's just -- we have a
4 double negative and that's my bad.
5     How about we make it this
6 way: Did you cite to either Dr.
7 Dmochowski's paper or Dr. Rovner's paper
8 in your expert report?
9  A. I did not.
10  Q. Thank you.
11     MR. SNELL: Let's take a
12 break.
13     - - -
14     (Whereupon, a brief recess
15 was taken.)
16     - - -
17 BY MR. SNELL:
18  Q. In your paper that was
19 published this year on midurethral
20 slings, we were discussing the long-term
21 studies that were found, correct?
22  A. Yes.
23  Q. Table 1 says, Long-term
24 follow-up duration of more than five

Page 108

1 years, studies --
2  A. Yes.
3  Q. -- of midurethral slings
4 effectiveness.
5     Do you see that?
6  A. Yes, I do.
7  Q. So there are 11 studies
8 mentioned here in Table 1, correct?
9  A. Correct.
10  Q. Were there more than 11
11 studies found that fulfilled these
12 criteria of a follow-up duration of five
13 years or more but for some reason did not
14 make it into Table 1?
15     MS. FITZPATRICK: Objection.
16     THE WITNESS: I honestly
17  don't know. I don't think so, but
18  I don't know for sure. I could
19  find out.
20 BY MR. SNELL:
21  Q. The sixth paper down is a
22 paper by Serati, 2013.
23  A. Yes.
24  Q. It looks like that involved

Page 109

1 transobturator slings.
2     Do you see that?
3  A. Correct.
4  Q. And that had a duration of
5 follow up of 60 months?
6  A. Yes.
7  Q. Were you aware that there's
8 a paper by Serati on the TVT retropubic
9 device with a follow up of greater than
10 ten years using very similar methodology
11 to this paper that you cite regarding
12 transobturator slings?
13     MS. FITZPATRICK: Objection
14  to form.
15     THE WITNESS: No.
16 BY MR. SNELL:
17  Q. That's a paper you've never
18 read?
19     MS. FITZPATRICK: Objection
20  to form.
21     Can you identify the paper
22  specifically for him?
23     MR. SNELL: Yes.
24 BY MR. SNELL:

Page 110

1 Q. The ten-year plus Serati
2 paper on the TVT retropubic device, is
3 that a study you've read?
4 A. No.
5 MS. FITZPATRICK: Do you
6 have a copy of it? Or a cite to
7 it or something like that so we
8 have a clear record of what we're
9 talking about?
10 MR. SNELL: I'm sure we can
11 get a cite.
12 THE WITNESS: Or the year it
13 was published?
14 MS. FITZPATRICK: Or a copy
15 of the paper, too.
16 MR. SNELL: I'm not going to
17 ask him about something he hasn't
18 read, so --
19 MS. FITZPATRICK: I just
20 want to make sure that you're both
21 talking about the same thing. So
22 he needs to see what the paper is
23 and say, yes, I've read it or no,
24 I haven't.

Page 111

1 THE WITNESS: Can you repeat
2 that?
3 MS. FITZPATRICK: I said I
4 want him to show you the article
5 so you can say yes, I've read it
6 or no, I haven't, instead of just
7 asking.
8 BY MR. SNELL:
9 Q. In Table 1, there is no
10 ten-year TVT study, we can agree on that,
11 correct, by Serati, at all?
12 A. Correct.
13 Q. And you don't know whether
14 whoever did the searches came across it
15 and purposely did not put it in there for
16 some reason or another?
17 MS. FITZPATRICK: Objection.
18 THE WITNESS: It is -- I
19 would think that's highly, highly
20 unlikely that they came across it
21 and didn't include it.
22 I mean, I don't know, it
23 might have not met our search
24 criteria. I don't know.

Page 112

1 BY MR. SNELL:
2 Q. Doctor, I don't have a
3 printout, but I'll show it to you.
4 Tension-free Vaginal Tape for the
5 Treatment of Urodynamic Dynamic Stress
6 Incontinence: Efficacy and Adverse
7 Effects at 10-Year Follow Up, published
8 in the European Urology Journal, Volume
9 61, 2012.
10 Have you read that study?
11 A. Can I see it?
12 MS. FITZPATRICK: Can we get
13 a printout of that?
14 MR. ROSENBLATT: Yes.
15 MS. FITZPATRICK: That would
16 be great. Thanks.
17 BY MR. SNELL:
18 Q. Can I come look over your
19 shoulder, because I don't have a copy
20 either?
21 A. Sure.
22 Do you know why it's doing
23 that?
24 Q. I think the connection is

Page 113

1 very slow.
2 A. Oh, you're getting this off
3 the --
4 Q. Yes. It's off the Internet.
5 A. This is what I want to see.
6 No, I don't remember seeing
7 that. And I want to just check one thing
8 here.
9 MR. SNELL: Do you have a
10 copy of this paper, Paul?
11 MR. ROSENBLATT: No. I can
12 get one made.
13 MR. SNELL: We'll come back
14 to that, Doctor.
15 THE WITNESS: Okay.
16 BY MR. SNELL:
17 Q. As far as you recall, you
18 don't remember reading that ten-year
19 paper by Serati at all?
20 A. No. Which doesn't mean I
21 haven't seen it. And I may have it -- I
22 may have seen it.
23 Q. If you'd go to Page 4.
24 A. May I just take one second?

Page 114

1  Q. Let's go off the record,
2 then.
3      - - -
4      (Whereupon, a discussion off
5  the record occurred.)
6      - - -
7      THE WITNESS: In the Nature
8  review article, we originally
9  included the methodology by which
10 we selected and rejected papers
11 and in the -- sorry.
12     I just -- we can go off the
13 record now. They moved it.
14     What I was going to say is
15 that --
16     MS. FITZPATRICK: This
17 should be on the record.
18     THE WITNESS: I was looking
19 for the search criteria, and the
20 editors took it out of the method
21 section. And I just realized they
22 put it in a box on the side. So
23 I'd like to refresh my memory and
24 look at it.

Page 115

1 BY MR. SNELL:
2  Q. You're looking at the last
3 page of --
4  A. Page 21.
5  Q. Correct.
6     The last page of the paper,
7 before the references?
8  A. Yes.
9  Q. Under the color box that
10 says, Review criteria?
11 A. Yes.
12    We're on the record?
13 Q. Yes. We're on the record.
14 A. Unfortunately, they edited,
15 because of their journal guidelines, to
16 the point where I can't find the
17 information that I need to see whether or
18 not I would have seen that article or
19 rejected it or not.
20    So I will not have an
21 independent recollection of whether I saw
22 it or not.
23 Q. Just so we can agree,
24 though, it says, This says a search was

Page 116

1 done and they used terms, TVT
2 tension-free vaginal tape, tension free
3 vaginal sling.
4  Correct?
5  A. Correct.
6  Q. And the search was done,
7 limited to human patients, clinical data,
8 correct?
9  A. Correct.
10 Q. And this review was done in
11 August 2014?
12 A. Correct.
13 Q. And we just looked at the
14 Serati ten-year TVT study, and in the
15 title, it talks about tension-free
16 vaginal tape, correct?
17 A. Correct.
18 Q. And it was published in a
19 well-respected European urology journal
20 in 2012.
21    We saw that, right?
22 A. Correct.
23 Q. And it was in human women
24 with ten years or more duration of

Page 117

1 follow-up, correct?
2  A. Well, I haven't seen -- I
3 saw the title. I didn't read the -- look
4 at the paper. But in the title it says
5 ten years, yes.
6     MS. FITZPATRICK: If you're
7  going to ask him questions about
8  the article specifically, can we
9  get a copy?
10    MR. SNELL: I'm going to get
11 a copy.
12 BY MR. SNELL:
13 Q. But as you sit here, you
14 have no idea, then, why that paper did
15 not make it into the table that you
16 reported in your article of long-term
17 five-year studies?
18 A. That's correct.
19 Q. And there very well could be
20 other studies of five-years duration, or
21 more, with the TVT that, for reasons
22 unbeknownst to you, do not show up in
23 that table, correct?
24    MS. FITZPATRICK: Objection.

**Page 190**

1     Q. Yes.
2     A. Yes, this was Burch. I'm
3 quite certain about that, because I was
4 shocked to see it. But it was so long
5 ago that I read it, I couldn't possibly
6 tell you when.
7     Q. Considering that you
8 included the five-year TVT-O study by
9 Serati in that table but you didn't
10 include this ten-year TVT study, as you
11 sit here now, I know I asked you this
12 earlier, but do you know why that was not
13 captured?
14     MS. FITZPATRICK: Objection.
15     Asked and answered.
16     THE WITNESS: I am going to
17     find out. I don't know why.
18 BY MR. SNELL:
19     Q. This study is consistent
20 with your review, in particular with
21 regard to the rate of dyspareunia
22 long-term with TVT, correct?
23     MS. FITZPATRICK: Objection.
24     THE WITNESS: A dyspareunia

**Page 191**

1     rate of zero? No. It's not -- we
2     don't have -- not a zero
3     dyspareunia rate. It's no
4     dyspareunia.
5 BY MR. SNELL:
6     Q. Right. Maybe I messed the
7 question up.
8     Actually, this study by
9 Serati, the ten-year follow-up, is
10 actually consistent with what you wrote
11 in the AUA stress incontinence
12 guidelines, correct, with regard to
13 dyspareunia rates?
14     A. That's correct, yes. I
15 thought you were referring to our Nature
16 article.
17     Q. And this study by Serati,
18 that you didn't include in the Nature
19 article, is inconsistent with what you
20 wrote in your review article, correct?
21     A. In what way?
22     Q. Because it reports zero
23 dyspareunia and you say there's more,
24 correct?

**Page 192**

1     A. Yes.
2     - - -
3     (Whereupon, Exhibit
4     Blaivas-13, Heinonen Paper, was
5     marked for identification.)
6     - - -
7 BY MR. SNELL:
8     Q. I have another one for you.
9 I'm not going to go through all of the
10 ones, but I'm going to give you a couple
11 of them.
12     I've handed you Exhibit 13.
13 This is a paper by Heinonen. This is a
14 10.5 year follow-up with Ethicon TVT.
15     Do you see that?
16     A. Let me just take a look.
17     Q. Sure. And I think we can be
18 pretty brief about this one.
19     This is a long-term study on
20 TVT, correct, Doctor?
21     A. Yes.
22     Q. This paper was not
23 identified in that long-term study table
24 either in your review, correct?

**Page 193**

1     A. That's correct.
2     Q. In this study, there was
3 about 28 percent loss to follow up,
4 correct? 138 of 191 patients were able
5 to be evaluated?
6     A. If you did the math, that
7 looks about right. Okay.
8     Q. They say 72 percent.
9     Do you see that?
10     A. I do.
11     Q. So that's within that range
12 of what's to be expected at ten years,
13 correct?
14     A. Yes.
15     Q. And these authors concluded
16 that the TVT was effective and safe even
17 after ten years, correct?
18     A. Yes. We've agreed that it's
19 effective.
20     The safe, just give me a
21 moment, I'm checking.
22     Okay.
23     Q. Do you know why you didn't
24 cite to this paper either in your table

Jerry G. Blaivas, M.D.

Page 194

1  of long-term TVT studies?
2      A.   I do not.
3      Q.   They reported three --
4  strike that.
5          They reported three
6  patients, 2.3 percent, had late-onset
7  adverse events, correct?
8      A.   Where is that, please?
9      Q.   It's in the very front.
10     A.   Okay. I mean, I was looking
11 in the methods, and there's nothing in
12 the methods that I can see about
13 adverse -- about any mechanism to
14 follow-up for adverse events. So let me
15 just --
16     Q.   Well, you see, if you look
17 under the methods, the fourth paragraph
18 above, when they brought these women back
19 in for this 10.5 year follow-up visit --
20     A.   Where are you now?
21     Q.   Right here. Right above
22 results. They did a gynecologic exam, a
23 stress test, they reviewed the hospital
24 records.

Page 195

1          And it says, This was done
2  to acquire information on later
3  acquired...adverse events after the TVT
4  operation.
5          Correct?
6      A.   Yes, that would account for
7  some complications. It would not account
8  for the most impactful complication,
9  which is chronic pain. You wouldn't,
10 likely, go to the hospital for that.
11         But I accept the rest of it.
12     Q.   Well, none of these patients
13 reported chronic pain when they were
14 assessed at 10.5 years, did they?
15     A.   I didn't see -- I looked,
16 and I'll look again, but I don't see
17 anything in the methodology where they
18 were asked about that.
19         General quality of life and
20 the stuff that -- this was all -- so far
21 as I can see, was -- all of these were
22 questionnaires. I don't see anything
23 that wasn't a questionnaire.
24         And there are no

Page 196

1  questionnaires -- I know most of these
2  questionnaires, most of these
3  questionnaires would ask specifically
4  about dyspareunia or pelvic pain.
5      Q.   Did you see that they did
6  gynecologic exams?
7      A.   Yes, but that's not --
8  that's not a measure of pain.
9      Q.   Well, during -- you do
10 gynecologic exams, correct?
11     A.   Yes.
12     Q.   And you know that when you
13 do a gynecologic exam, you can elicit a
14 painful response from the patient,
15 correct?
16         MS. FITZPATRICK: Objection.
17         THE WITNESS: Yes.
18 BY MR. SNELL:
19     Q.   Do these authors, at 10.5
20 years, report that they elicited any type
21 of painful response from any patient
22 during their gynecologic exam?
23     A.   I don't see any methodology
24 that would ask for that. I mean, the way

Page 197

1  all these studies are done, eventually
2  this stuff becomes a table, and the table
3  is going to be a score and there's going
4  to be a score for each of the symptoms.
5  And unless there's a score for pain or a
6  score for dyspareunia, even if the
7  patient had it and even if they told
8  someone, there isn't a mechanism that I
9  can see in the methods to discover that.
10     Q.   So the different
11 questionnaires, it's your statement that
12 none of those questionnaires would have
13 assessed pain or the impact of
14 incontinence on sexual function?
15     A.   Even if -- I mean --
16     Q.   It's a yes-or-no question.
17     A.   What's that?
18         MS. FITZPATRICK: Objection.
19 Objection. You can answer it any
20 way you need to, to fully,
21 completely and truthfully answer
22 the question.
23         THE WITNESS: Please
24 rephrase the question. Not

Page 198

1    rephrase, just restate it.
2    BY MR. SNELL:
3        Q.   Do any of the questionnaires
4    that they used assess sexual function in
5    any manner?
6        MS. FITZPATRICK: Objection.
7        THE WITNESS: None of the
8    ones that I recognize do. I mean,
9    it's -- none of the ones that I
10   recognize do, is the answer to the
11   question.
12   BY MR. SNELL:
13       Q.   This paper was published in
14   the International Journal of Urology.
15       Are you familiar with that
16   journal?
17       A.   Yeah. Yes, I am.
18       Q.   Is that a good journal?
19       MS. FITZPATRICK: Objection.
20       THE WITNESS: I think
21   it's -- yeah, I think it's an
22   adequate journal.
23   BY MR. SNELL:
24       Q.   Is this a good study or a

Page 199

1    poor study? How would you characterize
2    this study that wasn't included in the
3    table of your review?
4        A.   I would characterize this as
5    a very good study. Both of these are
6    very good studies.
7        Q.   Do you have any idea why
8    this wasn't included?
9        A.   I do not.
10       Q.   Are you going to attempt to
11   try to figure out why these ten-plus year
12   TVT studies were left out of the table
13   and which other ones may have been left
14   out, too?
15       MS. FITZPATRICK: Objection.
16       THE WITNESS: I've already
17   started doing that.
18       But, in context, this review
19   is not about efficacy, it's about
20   complications. So there
21   wouldn't -- this -- neither of
22   these papers, as far as I'm
23   concerned, adds very much to our
24   understanding of the incidence and

Page 200

1    consequence of complications.
2        That was the purpose of --
3    that was the purpose of the
4    review.
5              - - -
6        (Whereupon, Exhibit
7    Blaivas-14, 2014 Laurikainen
8    Article, European Association of
9    Urology, was marked for
10   identification.)
11             - - -
12   BY MR. SNELL:
13       Q.   Doctor, I'm handing you a
14   five-year randomized control trial by
15   Laurikainen, published in the European
16   Association of Urology, January 2014.
17       Do you see that?
18       A.   I do.
19       Q.   This is another study that
20   didn't show up in that table in your
21   review article, correct?
22       A.   Yeah, my -- I'm pretty sure
23   that this one is after our -- even though
24   it says 2014, I'm pretty sure this was

Page 201

1    after our review dates.
2        And this one I have seen,
3    though. This one, I do remember seeing
4    this one before.
5        Q.   It's interesting that you
6    say that, because, Doctor, earlier we
7    looked at the review criteria, and it
8    states that the systematic review was
9    done in August 2014, which is, you know,
10   eight months after this was published,
11   correct?
12       A.   I was looking, I don't see
13   the actual publication.
14       Q.   It says on the left,
15   Published online, January 30, 2014.
16       A.   Then I don't have an
17   explanation. I don't know what the exact
18   date of our cutoff was.
19       Q.   But the search was done,
20   actually, in August 2014, which is months
21   after this was published?
22       A.   Okay.
23       Q.   We can agree to that,
24   correct?

Page 322

need another one, correct?
A. No. That's what I was saying before. I mean, we've seen many patients that have had -- had an intervention and are okay for a couple of years and then need another one.
I mean, that's my practice. And I see that commonly.
Q. I understand. I understand that that can occur.
But I'm talking about probability.
A. We specifically looked -- was that a question? You did not ask a question yet, I'm sorry.
Q. My question was focused on probability.
I will give you that patients can go back for a second reoperation. I'm talking about probability and what the actual data showed.
In this study -- let me see, I think it's reported in here. For the

Page 323

sling cohort, less than half had to have a second surgery.
Is that consistent with your recollection of this study?
A. Yes. But the follow-up was -- the follow-up for all of these things is too short for there to be any meaningful conclusion about whether or not they needed another operation.
Q. Well, based on the data, though, it was more likely than not that one surgery would suffice in this study for the sling patients?
A. I just -- I just said what my opinion was.
Q. In the sling procedure, it said 23 percent had more than one surgery. So to that -- that, to you, does not mean -- 23 percent of the women who had these tertiary care center treatments had to have more than one surgery.
That does not mean, to you, that it's more likely than not that a

Page 324

patient will need just one surgery?
A. No, that's correct, it's not clear to me.
Q. Is it important to you to know whether or not a patient you're treating for mesh removal is involved in litigation?
A. No, not really.
Q. Have you evaluated the medical literature with regard to potential bias by financial gain to patients involved in litigation and how they report their symptoms to doctors?
MS. FITZPATRICK: Objection.
THE WITNESS: No.
BY MR. SNELL:
Q. Are you aware if there is literature, though, on that topic?
A. No.
Q. Haven't you written in the past that patients involved in litigation have a financial incentive to make claims?
MS. FITZPATRICK: Objection.

Page 325

THE WITNESS: I haven't written that, no.
BY MR. SNELL:
Q. You haven't?
In your opinion, does the TVT adequately treat stress urinary incontinence?
MS. FITZPATRICK: Objection.
THE WITNESS: In terms of efficacy, yes.
BY MR. SNELL:
Q. And in your opinion, I take it you believe that the pubovaginal sling also adequately treats stress incontinence?
A. Yes.
Q. Apparently, over lunch, or some time, you called someone to try to get information about why papers were left off of your review?
A. I did.
Q. Who did you call?
A. My previous -- actually, one of the authors of the paper, I think it

Page 326

1  was Matt Benedon. But he's a previous
2  research coordinator.
3      Q.  Where is he at now?
4      A.  He's still in New York, but
5  he doesn't work for me anymore.
6      Q.  And what did you ask Matt?
7      A.  Why those weren't there.
8      Q.  What did he say?
9      A.  That we used -- if the same
10 author wrote a previous paper using the
11 same cohort of patients, he only included
12 the one with the latest -- our
13 methodology was to only include the one
14 the latest date.
15         So, for example, one of the
16 papers we didn't -- I forget who the
17 first author was, but the senior author
18 was Nilsson, we did not include the
19 five-year paper, we included the
20 seventeen-year paper. There was a series
21 of papers.
22         So there were three that --
23 that was one.
24         The Serati, or whatever that

Page 327

1  one was, the 2013 paper was -- the
2  five-year follow-up was published later
3  than the ten-year follow-up, because the
4  ten-year follow-up was just TVT --
5      Q.  Can I stop you right there?
6      A.  Yes.
7      Q.  First of all, the cohort of
8  patients in Nilsson's study that's been
9  reported out to 17 years, that I know you
10 cited, is not the same cohort of people
11 in the prospective randomized five-year
12 control trial; you and I know that,
13 right?
14     A.  They're different -- no,
15 they are different papers, right.
16     Q.  They are different cohorts
17 of patients, right?
18     A.  Let me see the paper. Which
19 one are you talking about?
20     Q.  I'll take these one by one.
21        The first one you mentioned
22 with Nilsson, that's the Laurikainen
23 five-year RCT.
24        Where is your paper at?

Page 328

1      A.  We may -- let me see the
2  paper.
3         MS. FITZPATRICK: This is my
4      copy of it. I don't know what
5      number it is.
6  BY MR. SNELL:
7      Q.  You said one with Nilsson.
8  I think that's the one where Nilsson is
9  on.
10     A.  Give me one second.
11     Q.  Can I look over your
12 shoulder? I can't find mine in that big
13 stack.
14        Yes, this is Nilsson, okay.
15     A.  You're correct about that.
16 But that's the explanation. They thought
17 when the computer -- you know, the way we
18 did it, it pulled it up as the same
19 author, and they thought it was the same
20 cohort.
21     Q.  But it's clearly not,
22 correct?
23     A.  It's clearly not, correct.
24     Q.  And it should have been

Page 329

1  included, correct?
2      A.  Yes, it should have.
3      Q.  And Serati, those are two
4  different cohort of patients because the
5  ten-year study was TVT patients and the
6  five-year were TVT-O patients, correct?
7      A.  And TVT. One of them had
8  TVT and TOT, I thought.
9         Well, let me see the two
10 papers, and we'll see.
11        MS. FITZPATRICK: I've only
12     got one. I think we only have one
13     marked, and I'm not sure what it
14     is.
15 BY MR. SNELL:
16     Q.  Do you have it in front of
17 you there, Doctor?
18     A.  I must.
19        MS. FITZPATRICK: Is it
20     Number 12? Here. That's the only
21     one we have. We don't have the
22     second one, I don't think, the
23     2013.
24        THE WITNESS: I need to see

Jerry G. Blaivas, M.D.

Page 330

1  the other one, the one that --
2  this is what year? I need to see
3  the one that was printed -- what
4  year is this?
5       This is 2012. We need to
6  see the one from 2014. The same
7  author had a paper in 2014.
8       MS. FITZPATRICK: 2013.
9       THE WITNESS: 2013.
10 BY MR. SNELL:
11      Q. But that was a group of
12 TVT-O patients that were only analyzed at
13 five years?
14      A. Can I just see it?
15      Q. I don't have it, but we have
16 it on the computer here.
17      A. Let me see in the table --
18 hold on.
19      Let me just see in our
20 table. I'll be able to tell just by
21 looking in the table.
22      Q. I think the simple thing is
23 this. I think you should be able to
24 agree with me that a ten-year group of

Page 331

1  women who got TVT implanted is not the
2  same group who had five-year follow-up
3  after a TVT-O implanted?
4       A. Of course. But --
5       Q. In your paper, you cited to
6  this five-year TVT-O paper, and I'll give
7  you that, it's in there, but the ten-year
8  TVT group was not in there?
9       A. Just let me check one thing.
10      That's correct. And that
11 was -- that was just an error. But the
12 error was because it was the same author
13 with mesh slings. And our methodology
14 said that if it was -- they mistakenly
15 thought it was the same cohort.
16      Q. Clearly, it's important to
17 capture ten-year TVT studies that are out
18 there in the published literature and
19 journals like European Urology, correct?
20      MS. FITZPATRICK: Objection.
21      THE WITNESS: Not to -- not
22 in a safety consideration for
23 synthetic sling study that is
24 already -- there's plenty of data

Page 332

1  on. This doesn't change the
2  conclusions one bit.
3  BY MR. SNELL:
4       Q. I thought you said that
5  there is less long-term ten-year data on
6  TVT?
7       A. Including this. I already
8  went through the fact that the
9  methodology to look at the kinds of
10 complications that we saw is not
11 sufficient. It didn't seek it out.
12      I mean, it didn't have a
13 way -- I mean, again, I agree that 8
14 percent is a great loss to follow up.
15 But the problem is, it's not so great --
16 it's great for efficacy. But it's not so
17 great looking for complication that
18 occurs in 1 or 2 percent of patients.
19      So if only one -- there's
20 only one patient, one or two patients
21 that had that complication, they were
22 more likely to be in the
23 loss-to-follow-up group according to --
24 or -- they were very likely to be, I

Page 333

1  couldn't say that they were more likely
2  to be.
3       They are at least one-third
4  more likely to be in that group because
5  we know at least one-third of the
6  patients don't go back to their original
7  doctors.
8       So that an 8 percent loss to
9  follow up, although extraordinarily
10 commendable for an efficacy study, is not
11 so commendable to look for something that
12 happens 1 or 2 percent of the time.
13      Q. The problem with what you
14 just said, though, Doctor, is when you
15 said we know a third of the patients
16 don't go back to their doctors, we know
17 that in Serati, 92 percent of them went
18 back to their doctors, right?
19      MS. FITZPATRICK: Objection.
20      THE WITNESS: That's right.
21 But 8 percent did not.
22 BY MR. SNELL:
23      Q. But 8 percent and a third is
24 a big difference, isn't it?

Page 334

1  MS. FITZPATRICK: Objection.
2  THE WITNESS: Well, no, no.
3  I actually stand by what I said.
4  I don't think I need to say it
5  again.
6  BY MR. SNELL:
7  Q. So in Serati's paper, where
8  only 8 percent didn't go back to the
9  doctor, why are you telling me that we
10 know a third of patients don't go back to
11 their doctor?
12 MS. FITZPATRICK: Objection.
13 Mischaracterizes his testimony.
14 THE WITNESS: The reason I
15 said that is there's a chance that
16 the -- let's say these -- I forget
17 the numbers now, but these were,
18 like, 60 patients or 70 patients.
19 So 60 patients, if one -- we
20 would not expect there to be more
21 than one, say, erosion out of
22 that. That would be -- you know,
23 that would, or urethral
24 obstruction that required -- say

Page 335

1  requiring surgery would be 1 or 2
2  percent. Okay.
3  So there only -- in that 8
4  percent, the one patient could
5  have been the one patient who had
6  the complication, and that one
7  patient, it would be more likely
8  that that person would be in the
9  loss-to-follow-up group than in
10 the not loss-to-follow-up group.
11 BY MR. SNELL:
12 Q. How is it that you can say
13 that that one patient is more likely in
14 the loss-to-follow-up group than the 92
15 percent of the patients who did return?
16 MS. FITZPATRICK: Objection.
17 THE WITNESS: I already
18 explained my rationale for that.
19 BY MR. SNELL:
20 Q. I don't understand it.
21 It would seem to me that
22 sheer statistical 92 percent probability
23 that they would come back?
24 MS. FITZPATRICK: Objection.

Page 336

1  BY MR. SNELL:
2  Q. I'm really trying to
3  understand your methodology and your
4  statement there.
5  MS. FITZPATRICK: Objection
6  to the form of the question.
7  THE WITNESS: I'll try to
8  say it again.
9  I didn't say they're more
10 likely to be in that group. I
11 didn't say that they are more
12 likely to be in that group. It's
13 just that I think that -- maybe I
14 did say that. If I did, I
15 misspoke.
16 I said there's a chance that
17 they could be in the group. And
18 since the complications we're
19 talking about are so uncommon,
20 okay, I don't think it's fair to
21 say that if a complication didn't
22 occur in the 92 percent of the
23 patients that were followed up,
24 that, therefore, it never

Page 337

1  occurred. That's all I'm saying.
2  BY MR. SNELL:
3  Q. Okay. We can agree that in
4  Serati's paper, where 92 percent of the
5  patients did come back and they didn't
6  report any de novo dyspareunia and they
7  did not see any exposure, that's actually
8  a good thing for those patients who came
9  back and were able to be evaluated?
10 A. I'm going to split it
11 between the dyspareunia and the erosion.
12 All the patients were
13 examined, so I'll give you that.
14 But the dyspareunia, if you
15 don't ask about it and you don't know if
16 the patient is sexually active, you can't
17 make a comment about dyspareunia, in my
18 judgment. If they say they have
19 dyspareunia, you can make a comment. If
20 you did not say specifically, do you have
21 sex and does it hurt, I don't think you
22 can say -- you can make a comment.
23 Q. But when the authors report
24 there was no de novo dyspareunia, that

Page 338

1  means they asked about it, they assessed
2  it, right?
3      A.   If that were the case, it
4  would be in the methods.  And if it
5  wasn't -- if they asked about it and did
6  not put it in the methods, then it's
7  their fault for not putting it in the
8  methods.  And if they didn't ask about
9  it, then they can't conclude it.
10         And I don't even like
11 talking about this because I think it's
12 very good paper.  I don't mean to malign
13 the authors at all.  This is an excellent
14 paper, but just not with respect -- they
15 did the best they could with this stuff.
16 But it's not good enough to satisfy me
17 that if the patients don't complain of
18 pain, they don't have it.
19         I haven't -- I made my
20 statement.
21     Q.   Regardless, that's a paper
22 that should have been in your review,
23 right?
24     A.   Yes.

Page 339

1      Q.   And you were about to --
2  were you about to give me some
3  justification for why the other paper
4  didn't show up in there?
5      A.   Which one was that?
6      Q.   Heinonen, 10.5 years,
7  follow-up, no long --
8      A.   Which one?
9      Q.   Heinonen, 10.5 years --
10     A.   I need to see it.
11         MS. FITZPATRICK:  This one.
12 BY MR. SNELL:
13     Q.   No late tissue reaction
14 exposure, where they did vaginal
15 examinations with speculum?
16     A.   This just missed the table,
17 it's in the paper.  This is referenced,
18 it's part of our data.  We just -- it
19 didn't get in the table.
20     Q.   In your paper, you reported
21 there were only 11.
22         That one obviously should
23 have been in there as well?
24     A.   Yeah.  But we did use it as

Page 340

1  data and we did use it for calculations.
2  It just didn't make -- it just didn't get
3  in that table.
4      Q.   So there is much more five
5  year long-term data in the literature
6  than what you put in that table, correct?
7      A.   Well, there are three.
8      Q.   Three that I showed you
9  today?
10     A.   Yes.
11     Q.   There could be 12 more?
12         MS. FITZPATRICK:  Objection.
13         THE WITNESS:  I don't know.
14 But if there are, let's not
15 discuss them today.
16 BY MR. SNELL:
17     Q.   Is part of your methodology
18 based on case series?
19     A.   Yes.
20     Q.   Do you give more weight to
21 case series than randomized control
22 trials or systematic reviews?
23     A.   I give weight to anything
24 that documents a complication.  I don't

Page 341

1  give weight to someone that doesn't
2  comment on -- you know, on complications.
3         So most of the studies,
4  many -- I would say -- I could say that
5  most of the studies don't even have
6  anything in their methodology to accrue
7  complications, other than -- than patient
8  reported.
9          So if the patient says --
10 said that it hurt, something hurts, they
11 would accept it.  But they don't -- if
12 they don't prompt for it, they don't
13 check for it, I don't give that any
14 credence at all.
15     Q.   Nilsson, 17-year paper?
16     A.   Yes.
17     Q.   Are you critical of the loss
18 to follow up in that paper as being
19 something outside the norm for a 17-year
20 data set or is that within the norm of
21 what you would expect at 17 years?
22     A.   Again, the loss to follow
23 up, I think, was acceptable for that
24 period of time.  But some of the stuff

Jerry G. Blaivas, M.D.

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                       AT CHARLESTON
3     IN RE: ETHICON, INC.,    :Master File No.
4     PELVIC REPAIR SYSTEM     :2:12-MD-0237
      PRODUCTS LIABILITY       :
5     LITIGATION               :MDL No. 2327
      ------------------------------------------
6     THIS DOCUMENT RELATES TO :JOSEPH R. GOODWIN
      THE CASES LISTED BELOW   :U.S. DISTRICT JUDGE
7     ------------------------------------------
      Mullins, et al. V.        2:12-cv-02952
8     Ethicon, Inc., et al.
      Sprout, et al. V.         2:12-cv-07924
9     Ethicon, Inc., et al.
      Iquinto v. Ethicon,       2:12-cv-09765
10    Inc., et al.
      Daniel, et al. V.         2:13-cv-02565
11    Ethicon, Inc., et al.
      Dillon, et al. V.         2:13-cv-02919
12    Ethicon, Inc., et al.
      Webb, et al. V.           2:13-cv-04517
13    Ethicon, Inc., et al.
      Martinez v. Ethicon,      2:13-cv-04730
14    Inc., et al.
      McIntyre, et al. V.       2:13-cv-07283
15    Ethicon, Inc., et al.
      Oxley v. Ethicon,         2:13-cv-10150
16    Inc., et al.
      Atkins, et al. V.         2:13-cv-11022
17    Ethicon, Inc., et al.
      Garcia v. Ethicon,        2:13-cv-14355
18    Inc., et al.
      Lowe v. Ethicon,          2:13-cv-14718
19    Inc., et al.
      Dameron, et al. V.        2:13-cv-14799
20    Ethicon, Inc., et al.
21    Vanbuskirk, et al. V.     2:13-cv-16183
      Ethicon, Inc., et al.
22
23
                       SEPTEMBER 24, 2015
24    CONTINUED DEPOSITION OF JERRY G. BLAIVAS, M.D.
```

Golkow Technologies, Inc.              Page 357

Jerry G. Blaivas, M.D.

| | | |
|---|---|---|
| 1 | CAPTION CONTINUED: | |
| 2 | Mullens, et al. V. Ethicon, Inc., et al. | 2:13-cv-16564 |
| 3 | | |
| 4 | Shears, et al. V. Ethicon, Inc., et al. | 2:13-cv-17012 |
| 5 | Javins, et al. V. Ethicon, Inc., et al. | 2:13-cv-18479 |
| 6 | Barr, et al. V. Ethicon, Inc., et al. | 2:13-cv-22606 |
| 7 | Lambert v. Ethicon, Inc., et al. | 2:13-cv-24393 |
| 8 | Cook v. Ethicon, Inc. | 2:13-cv-29260 |
| | Stevens v. Ethicon, Inc., et al. | 2:13-cv-29918 |
| 9 | Harmon v. Ethicon, Inc. | 2:13-cv-31818 |
| 10 | Snodgrass v. Ethicon, Inc., et al. | 2:13-cv-31881 |
| 11 | Miller v. Ethicon, Inc. | 2:13-cv-32627 |
| | Matney, et al. V. Ethicon, Inc., et al. | 2:14-cv-09195 |
| 12 | Jones, et al. V. Ethicon, Inc., et al. | 2:14-cv-09517 |
| 13 | Humbert v. Ethicon, Inc., et al. | 2:14-cv-10640 |
| 14 | Gillum, et al. V. Ethicon, Inc., et al. | 2:14-cv-12756 |
| 15 | Whisner, et al. V. Ethicon, Inc., et al. | 2:14-cv-13023 |
| 16 | Tomblin v. Ethicon, Inc., et al. | 2:14-cv-14664 |
| 17 | Schepleng v. Ethicon, Inc., et al. | 2:14-cv-16061 |
| 18 | Tyler, et al. V. Ethicon, Inc., et al. | 2:14-cv-19110 |
| 19 | Kelly, et al. V. Ethicon, Inc., et al. | 2:14-cv-22079 |
| 20 | Lundell v. Ethicon, Inc., et al. | 2:14-cv-24911 |
| 21 | Cheshire, et al. V. Ethicon, Inc., et al. | 2:14-cv-24999 |
| 22 | Burgoyne, et al., V. Ethicon, Inc., et al. | 2:14-cv-28620 |
| 23 24 | Bennett, et al., V. Ethicon, Inc., et al. | 2:14-cv-29624 |

1    Continued transcript oF JERRY G. BLAIVAS,

2    M.D., called for Oral Examination in the

3    above-captioned matter, said deposition taken by and

4    before SILVIA P. WAGE, a Certified Shorthand

5    Reporter, Certified Realtime Reporter, Registered

6    Professional Reporter, and Notary Public for the

7    States of New Jersey, New York, Pennsylvania and

8    Delaware, at the offices of URO CENTER, 445 East

9    77th Street, New York, New York, on Thursday,

10   September 24, 2015, commencing at 2:48 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 370

1  Q. I would not misrepresent some data to
2  you.
3  A. No.
4  Q. Is that okay?
5  A. Yeah, I agree.
6  Q. A P-value of less than .03 is
7  statistically significant, correct?
8  A. Yes.
9  Q. Okay. And there was a significant
10 decline in subjective cure that was seen in the IVS
11 cohort, correct?
12 A. Correct.
13 Q. Vaginal erosions were tracked in the
14 study as well, right?
15 A. Yes. Well, it -- it wasn't tracked.
16 It says that it was defined as -- it doesn't
17 actually say how they determined that.
18 Q. You see they say that vaginal
19 erosions were found in 11.8 percent of women in the
20 IVS group and none in the TVT group, correct?
21 A. Yes.
22 Q. And under the results follow-up,
23 you'll see the median follow-up in this study was
24 78 months, correct?

Page 371

1  A. Let me just see. I just want to
2  check one thing out.
3     Yeah, I'm not finding the numbers lost to
4  follow-up.
5     MR. SNELL: [MOTION] Move to strike.
6  Q. You see my question was, Doctor --
7  and I have very limited time -- the median length of
8  follow-up in the TVT group was 78 months, correct?
9  A. Yes.
10 Q. Alright. And you'll see, actually,
11 all of Page 706, they have a whole section on the
12 treatment of these vaginal erosions.
13 A. Yes.
14 Q. And that flows all the way over to
15 the next page, Table 5, where they identify all the
16 different presenting symptoms in women with vaginal
17 erosions, correct?
18 A. Yes.
19 Q. Including how treatment was necessary
20 or not in the women who had the vaginal erosions,
21 correct?
22 A. Yes.
23 Q. And, just to reiterate, and all of
24 these patients with erosions were in the IVS group,

Page 372

1  correct?
2  A. Yes.
3  Q. And the IVS mesh is not a Type 1
4  macroporous monofilament polypropylene mesh,
5  correct?
6  A. The which?
7  Q. The IVS mesh is not a Type 1
8  monofilament --
9  A. No, it's not.
10    (There is a discussion off the record.)
11 A. Excuse me. It's not. It's not.
12 Q. Just so we have a clear record now,
13 the IVS where there was over an 11 percent rate of
14 vaginal exposure seen is not a Type 1 macroporous
15 monofilament polypropylene mesh like TVT retropubic,
16 correct?
17 A. Correct.
18 Q. Alright. And do you have any idea
19 why this paper wasn't cited in your review?
20    MS. FITZPATRICK: Objection.
21 A. I assume it was likely an exclusion
22 criteria based on our very detailed methodology. I
23 don't know.
24 Q. You don't know that as you sit here

Page 373

1  today?
2  A. No.
3     (Deposition Exhibit Blaivas 26, Long-term
4  Results of the Tension-free Vaginal Tape Procedure
5  in an Unselected Group: A 7-year Follow-up Study
6  authored by Andreas Reich, Frauke Kohorst, Rolf
7  Krelenberg and Felix Flock, was marked for
8  identification.)
9  Q. Exhibit 26, you see this is long-term
10 results of the TVT procedure in an unselected group
11 of patients, seven-year follow-up, correct?
12 A. Let me look at it. I mean, I'm
13 seeing this for the first time.
14 Q. Fair enough. Let me ask you this.
15    This is, actually, published in the Journal
16 of Urology, correct?
17 A. Yes.
18 Q. That's a journal you get, right?
19 A. Yes, I get it.
20 Q. Is that the journal to my left here
21 on the bookcase?
22 A. It is.
23 Q. Okay. Fair enough.
24    MR. SNELL: Go off the record.