# EXHIBIT B

Jerry G. Blaivas, M.D.

|   |   |   |
|---|---|---|
| 1 | UNITED STATES DISTRICT COURT | |
| 2 | SOUTHERN DISTRICT OF WEST VIRGINIA | |
| 3 | AT CHARLESTON | |
| 4 | ------------------------------: | |
|   | IN RE ETHICON, INC., PELVIC : | |
| 5 | REPAIR SYSTEM PRODUCTS : | MASTER FILE |
|   | LIABILITY LITIGATION : | No. 2:12-MD-02327 |
| 6 | _____ : | |
|   | : | |
| 7 | THIS DOCUMENT RELATES TO : | MDL 2327 |
|   | ALL WAVE 3 CASES : | |
| 8 | : | JOSEPH R. GOODWIN |
|   | : | US DISTRICT JUDGE |
| 9 | ---------------------------- | |

10                     - - -

11              August 29, 2016

12                     - - -

13         DEPOSITION of JERRY G. BLAIVAS,

14 M.D., commencing at 12:00 p.m. on the above

15 date at Urocenter of New York, 445 East 77th

16 Street, New York, New York, before Marie Foley,

17 a Registered Merit Reporter, Certified Realtime

18 Reporter and Notary Public of the State of New

19 York.

20                     - - -

21         GOLKOW TECHNOLOGIES, INC.

22      877.370.3377 ph | 917.591.5672 fax

23             Deps@golkow.com

24

Page 14

1  are not caused by the polypropylene
2  midurethral sling?
3     A.  Yes.
4     Q.  And it's fair to say that in
5  your clinical practice, there are times
6  that you diagnose women's complications as
7  being related to the polypropylene
8  midurethral sling that they have?
9     A.  Yes.
10    Q.  When a woman presents to you
11 with a complication that you then
12 determine after examination is caused by a
13 midurethral sling, what treatment options
14 do you offer to that woman?
15    A.  Well, it depends what the
16 complication is.  Generally, and these are
17 very -- you know, it depends what the
18 complication is.  If it's clearly an
19 obstruction from the sling, and when there
20 is an obstruction that's what it usually
21 is, then my recommendation is that we
22 remove the entire suburethral portion of
23 the sling.
24       If the complication is a

Page 15

1  fistula, then we remove all of the sling,
2  all of the sub -- all of the sling that's
3  in the vicinity of the urethra -- excuse
4  me, of the fistula and then repair the
5  fistula.
6        If it's pain, then it depends
7  where the pain is, and again I don't have
8  to go into the particulars, but sometimes
9  we just remove that portion that appears
10 to be related or causing the pain, but
11 sometimes we remove the entire mesh 'cause
12 I think the entire mesh is causing the
13 pain.
14       If it's overactive bladder
15 symptoms, we -- if it's due to urethral
16 obstruction, we remove the suburethral
17 portion.  If we're not -- if it seems like
18 it's in the wall of the bladder but -- or
19 through the wall of the bladder, then we
20 remove all of the sling on that side and
21 sometimes the entire sling.
22    Q.  Is it fair to say based on what
23 you've just told me that the treatment
24 options that you offer are tailored to a

Page 16

1  woman's specific problems?
2     A.  Of course.
3     Q.  And would you say that you try
4  to treat the problems as conservatively as
5  possible, with the least amount of surgery
6  necessary to correct those problems?
7     A.  No, I would say I try to be
8  appropriate.  I mean, sometimes it's
9  appropriate to be conservative.  Sometimes
10 it's appropriate to be radical, but I
11 discuss it with the patient.
12    Q.  Okay.  Now, in addition to your
13 clinical work and your clinical
14 experience, you also have done academic
15 work and published articles concerning
16 mesh and mesh complications, correct?
17    A.  I have.
18    Q.  And most recently you published
19 an article entitled "Safety Considerations
20 for Synthetic Sling Surgery" that was
21 published in the Nature Reviews of Urology
22 in 2015, correct?
23    A.  Yes.
24    Q.  And you were a co-author on that

Page 17

1  with eight other individuals, correct?
2     A.  Yes.
3     Q.  Can you tell me, first of all,
4  how this article came to be?
5     A.  Well, Nature Reviews in Urology
6  is a highly respected peer review journal,
7  and they, for their reviews they actually
8  solicit authors.  I don't believe you can
9  just submit.  I'm not sure of that.
10       But they asked me to do a review
11 article, and they told me right up front
12 that just because I agreed to do it, it
13 did not mean that it would be automatically
14 accepted.
15    Q.  Now, can you tell us what a
16 review article is?
17    A.  A review article is, there are
18 lots of different types, but basically
19 it's a compilation of many and sometimes
20 all of the articles in the peer review
21 literature about a certain topic.  And
22 then, so the first thing that you do is
23 you -- is you do a literature search and
24 you identify the articles and then you use

Page 18

1 search criteria to eliminate certain
2 articles and then you analyze them based
3 on whatever methodology you choose.
4 Q. So, let me discuss, you were
5 approached by Nature and asked to conduct
6 a review on the literature available
7 concerning synthetic sling surgery,
8 correct?
9 A. Yes.
10 Q. And, I see that we mentioned you
11 have a number of other authors here.
12 Are those authors that you asked
13 to help you with this, or are those
14 authors that Nature assigned to this
15 project?
16 A. No, I got to select my team.
17 Q. Can you tell me how you went
18 about selecting the team?
19 A. Sure. Well, okay, so, two of
20 the co-authors, Robert Bendavid and
21 Vladimir Latovlev, L-A-T-O-V-L-E-V, are
22 recognized authorities in the field, and I
23 asked them if they would be willing to
24 help me with this.

Page 19

1 One of them, Roger Purohit,
2 P-U-R-O-H-I-T, is my partner, so we
3 operate together and he has a considerable
4 amount of clinical experience. And then
5 Matt Benden and Gabriel Mekel, M-E-K-E-L,
6 and Michael Stern and Mubashir Billah,
7 B-I-L-L-A-H, and I'll have to spell the
8 other ones, K-O-L-A is the first name and
9 it's O-L-U-G-B-A-D-E, were all students
10 that -- well, actually, Dr. Mekel was
11 doing a fellowship with me and the others
12 are either medical students, or are all
13 medical students.
14 Q. Okay. When did Nature approach
15 you about authoring a review on synthetic
16 sling surgery?
17 A. It was some time after May of, I
18 guess, 20 -- I don't know if it was 2013
19 or -- probably -- or 2014. I can't
20 remember.
21 Q. Okay.
22 A. But it was after the American
23 Urologic Association national meeting.
24 Q. Did anyone from Nature tell you

Page 20

1 why they selected you or asked you to
2 write this article over others?
3 A. Well, yes, they had heard --
4 one, they heard about me, they knew of me
5 and they asked around and they asked who
6 would be a good person to do it, and I
7 believe someone had seen me participate in
8 a debate at the annual meeting of the
9 American Urologic Association.
10 Q. Was there any kind of
11 preconceived outcome that anyone had
12 discussed with you of what they expected
13 your research to show or not show?
14 A. No.
15 Q. Now, this article that you did,
16 a review article, does not contain all of
17 the articles available in the medical
18 literature that reference or concern
19 midurethral slings, correct?
20 A. Correct.
21 Q. How did you and your co-authors
22 determine and choose the articles that you
23 relied on for this particular piece?
24 A. Well, two ways. One, and I'm

Page 21

1 sorry, I don't have all the details in my
2 memory, but there was an article
3 published -- there was another review
4 article that I thought was timely that did
5 a review up to a certain date and then
6 we -- I just decided to do it from about
7 that time to the what was then current,
8 which was 2014. And I can tell you in a
9 minute what the dates were.
10 Q. Sure.
11 (Pause.)
12 A. So, it was from 2007 to 2014.
13 Excuse me, that was for the
14 clinical review, okay. Dr. Latovlev
15 independently reviewed the pathology which
16 went back many years before that.
17 Q. One of the things that I want to
18 talk to you about today is the conclusions
19 that you reached concerning the
20 complications and the complication rates
21 associated with midurethral slings.
22 Would that be included in the
23 clinical review that you just mentioned?
24 A. Yes.

Page 22

1  Q. So, you and your co-authors
2  chose articles written from 2007 to 2014,
3  and I think what you mentioned to me
4  before was that there's certain search
5  criteria that you use when conducting your
6  literature search to determine what
7  articles would be included in a review
8  article; is that right?
9  A. Yes.
10  Q. And can you tell me what the
11  search criteria that you and your
12  co-authors were?
13  A. It's a long list. Shall I read
14  it to you?
15  Q. Sure.
16  A. Okay. So, the search combined
17  the terms, and some of these are just
18  spelling things. So, there was
19  midurethral slings where "mid" and
20  "urethral" are two words; midurethral
21  slings where "midurethral" is one word;
22  suburethral sling, urethral sling,
23  midurethral slings with a plural, both
24  words again with a plural. All of the

Page 23

1  words that I just said also in plural.
2  Follow-up study, other than all of those
3  terms and follow-up study.
4      Also, we used free text searches
5  including the terms urinary
6  incontinence -- excuse me, TVT, tension
7  free vaginal tape, tension free vaginal
8  sling, transobturator tape, transobturator
9  sling, TVT-Obturator, TVT-O, TVT Secure,
10  Minarc, that's M-I-N-A-R-C, Abbrevio,
11  A-B-B-R-E-V-I-O, TOT, suprapubic arc
12  sling, Sparc, S-P-A-R-C, sling,
13  intravaginal slingplasty, IVS sling, RAZ,
14  R-A-Z, sling, Uratape, that's
15  U-R-A-T-A-P-E, ObTape, O-B-T-A-P-E,
16  prepubic sling, prepubic TVT, prepubic
17  tape, Pelvilace, P-E-L-V-I-L-A-C-E,
18  ureter, Aris, A-R-I-S, In-Fast,
19  I-N-F-A-S-T, Monarc I-STOP, urethral
20  reconstruction, urethral vaginal fistula,
21  other spelling of ObTape, Gore-Tex sling,
22  silastic sling, Mersilene sling, Marlex
23  sling, vesicovaginal fistula, Bioarc. And
24  then -- yeah, so that was the search that

Page 24

1  we did on the clinical end.
2  Q. Okay. And that sounds like
3  quite a number of search terms; is that
4  right?
5  A. Yes.
6  Q. Why did you have so many search
7  terms?
8  A. 'Cause we didn't want to miss
9  any articles, and what we did is we would
10  look up -- we started with less search
11  terms and as we read articles, we would
12  see synonyms or new words and then we
13  would add that to the search term.
14  Q. Did you limit the types of
15  articles you were looking at? For
16  example, did you only look at randomized
17  control trials or only look at
18  meta-analyses or only look at case
19  studies?
20  A. No, we did not limit it.
21  Q. Is it fair to say that you were
22  trying to get as big a cross-section or as
23  big a representation of all of the
24  articles out there and kind of gather them

Page 25

1  up before you got started with this
2  process?
3  A. Yes. I just remembered there
4  was actually, there was one exclusion
5  criteria that we used. If an article by
6  the same authors seemed to include the
7  same patients in a different study, we
8  would have used the most -- either the
9  most recent one or the most appropriate
10  one. We tried not to count the same
11  patients twice.
12  Q. Okay.
13  A. So if one author had a
14  patient -- had a study that showed the
15  patients at one year, five years, 10
16  years, 15 years and 20 years, and they had
17  complications, we wouldn't count the
18  complications five times. We'd only count
19  the complications once.
20  Q. Okay. Is it fair to say that
21  you were attempting to count each patient
22  one time and not duplicate those patients
23  or those complications in your analysis at
24  all?

Page 26

1  A. Exactly.
2  Q. And the method that you used to
3  do that by only using one article from a
4  series, is that a standard acceptable way
5  of achieving that goal when doing medical
6  or scientific research?
7  A. You know, I don't know.
8  Q. Tell me why you thought that it
9  was an appropriate way to achieve that
10 result.
11 A. Because I wanted to be sure on
12 the one hand that we captured every
13 complication, but on the other hand we
14 didn't count anybody twice 'cause we were
15 looking to get as precise a number for
16 both -- for complications as we could. We
17 didn't want to overestimate; we didn't
18 want to underestimate.
19 Q. Okay. And that's for the
20 clinical portion, and clinically you
21 looked at both the safety of the product,
22 correct, the complications?
23 A. Yes.
24 Q. And you also looked at the

Page 27

1  efficacy of the product, correct?
2  A. Yes.
3  Q. Was there different criteria
4  that you looked at for articles relating
5  to efficacy?
6  A. Yes. For articles for efficacy
7  we only included those articles that
8  measured efficacy, that had appropriate
9  follow-up, and we did have criteria for
10 that.
11 Q. Is that different from -- it
12 sounds like you had more exclusion
13 criteria for the efficacy articles than
14 you did the complication/safety articles;
15 is that right?
16 A. Yes.
17 Q. Is there anything else that you
18 excluded beyond, from your literature
19 search, beyond the subsequent articles or
20 the multi-reported cases?
21 A. Yes. The only other exclusion
22 was non-human subjects.
23 Q. Did you in any way cherry pick
24 or look only for reports or articles that

Page 28

1  dealt with high rates of complications?
2  A. No.
3  Q. Did you only look for articles
4  that reported low rates of complications?
5  A. No. We intend -- to the best of
6  our ability, we picked every article in
7  the literature in that time period.
8  Q. And that are articles that
9  reflected some lower rates of
10 complications, correct?
11 A. Of course.
12 Q. And articles that reflected
13 higher rates of complication, correct?
14 A. Yes.
15 Q. And fair to say it included case
16 studies?
17 A. Yes, it did.
18 Q. It included randomized control
19 trials?
20 A. Yes.
21 Q. It included meta-analyses?
22 A. Yes.
23 Q. Is there anything at all that
24 you or your co-authors did to limit or

Page 29

1  exclude certain articles or certain
2  findings in articles that would otherwise
3  have been encompassed in your search
4  terms?
5  A. Only for the efficacy studies.
6  Q. Okay. Now --
7  A. And that -- but those were a
8  search term, so we -- so I guess the
9  answer is no, we did not. Okay.
10 Q. Now, could somebody look at what
11 you've reported in Table 1 relating to the
12 efficacy issues and extrapolate in any way
13 what you did there and apply it to the
14 complication tables that you reflected in
15 Table 2, 3, 4 and 5?
16 A. No, you couldn't because they
17 didn't apply -- none of these -- well,
18 most of these studies did not have any
19 scientifically valid prospective way of
20 looking at complications. This was just
21 for efficacy.
22 Q. Is there any way that someone
23 could --
24    MS. FITZPATRICK: Let me ask it

Jerry G. Blaivas, M.D.

Page 30

1  a different way.
2  Q. Is it correct that there are
3  articles that you considered for your
4  safety considerations or complication
5  rates that are not reflected in the table
6  concerning efficacy?
7  A. Probably not because we would
8  always -- no, because we would -- we
9  would -- if there was even one
10 complication, we would -- we would have
11 included it.
12 Q. But just because you had it, and
13 I think what you're telling me is all of
14 your efficacy articles were included in
15 your complication analysis, and I'm
16 actually asking the opposite.
17     Were all of the articles that
18 you considered for the complication part
19 all used also to look at efficacy?
20 A. No.
21 Q. So you can't say that simply
22 because something isn't on the Table 1
23 that you didn't rely on it, use it,
24 conclude anything about it or consider it

Page 31

1  as part of your safety considerations and
2  complication considerations; is that
3  right?
4  A. To the contrary; we would have
5  used it.
6  Q. Okay. Now, this article went
7  through the peer review process, correct?
8  A. Very much so.
9  Q. Can you tell me what you mean by
10 that?
11 A. Well, the peer review process
12 itself is designed to insure that the
13 highest standards of scientific
14 methodology were used in the paper and
15 very specifically that the results and the
16 conclusions follow from the methodology;
17 i.e. that the conclusions follow from the
18 methods.
19 Q. Is there anything that was
20 different about the Nature peer --
21     MS. FITZPATRICK: Strike that.
22 Q. You've worked as a peer reviewer
23 before, correct, for other journals?
24 A. Yes.

Page 32

1  Q. And you've also been editor of a
2  journal that is a peer review journal,
3  correct?
4  A. Yes.
5  Q. Can you tell me generally in the
6  medical and scientific community how
7  individuals get selected as peer
8  reviewers?
9  A. Sure. They get selected by a
10 process of usually by a committee of
11 experts that picks other experts that they
12 think contribute to the peer review
13 process. So they have to show -- they
14 have to be held in high regard as experts
15 that can give a fair and unbiased
16 appraisal of submissions.
17 Q. Do you know of any peer review
18 publication that has considered the
19 opinions of attorneys from medical device
20 manufacturers as part of peer review
21 process?
22 A. No, I do not.
23 Q. Why aren't attorneys for medical
24 device manufacturers qualified to serve as

Page 33

1  peer reviewers for a medical journal?
2  A. Well, the most obvious reason is
3  that their opinions were likely to be
4  biased or that they have a major conflict
5  of interest and they don't fulfill our
6  criteria for being an expert. They're
7  lawyers; they're not experts in
8  scientific research.
9  Q. Is it fair to say that the peer
10 review process is designed to have
11 neutral, objective, experienced
12 individuals assessing the methodology and
13 the conclusions that are reached in
14 medical and scientific journals?
15 A. Of course.
16 Q. That process is designed to
17 insure that the methodology that is used
18 is something that is recognized and
19 acceptable in the medical and scientific
20 community, correct?
21 A. Yes.
22 Q. In your experience as both a
23 peer reviewer and as an editor of a peer
24 review journal, what happens in the

Page 34

1 process if an article is presented that
2 does not use established accepted
3 methodology in the scientific and medical
4 community?
5   A.  Well, as a general rule, it's
6 rejected. On rare occasions, someone
7 comes up with such a novel approach that
8 even though that it wasn't known before,
9 it might become -- it might be acceptable.
10   Q.  Do you believe that the peer
11 review -- let me ask you this.
12       Tell me about the peer review
13 process that you went through for your
14 Nature article.
15   A.  This was the most rigorous peer
16 review that I've ever been part of. I
17 mean, we -- this article took more time
18 and more effort than any article I've ever
19 written, and I, you know, I've done
20 hundreds and hundreds. So it was a very
21 labor intense project. We read all of the
22 articles, and then when we wrote the
23 articles, we submitted it and they had a
24 number of questions, concerns, suggested

Page 35

1 revisions and it went back and forth a
2 number of times to be sure that we -- that
3 our -- to be sure, quite honestly, that
4 our, as I mentioned a few minutes ago is
5 that our results and conclusions were
6 clearly supported by the methodology and
7 that they were scientifically sound.
8   Q.  Do you believe, Doctor, that the
9 fact that your article in Nature Review
10 survived the peer review process
11 establishes that the methodology that you
12 and your co-authors used in that, in
13 drafting that article, was scientifically
14 reliable?
15   A.  I do.
16   Q.  Would it be widely considered in
17 your medical community that an article
18 such as yours that has gone through such a
19 rigorous peer review process has
20 demonstrated appropriate medical and
21 scientific methodology?
22   A.  Yes.
23   Q.  Has anybody in the medical
24 community or at Nature questioned your

Page 36

1 methodology in connection with that
2 article at any time prior to its
3 publication?
4   A.  Well, they asked questions about
5 it in the review process, but I don't --
6 but afterwards, no, I don't -- I'm not
7 aware of anybody questioning it.
8   Q.  And are you comfortable that the
9 Nature Review Urology looked closely at
10 the methodology that you and your
11 co-authors used to reach the conclusions
12 that you did in that review paper?
13   A.  I'm quite confident of that.
14   Q.  We're going to talk in a little
15 bit specific about some of the conclusions
16 in that article and I'm going to ask you
17 more specifically how you reached the
18 conclusions that you did.
19       But, in addition to the
20 conclusions that you reached in that
21 article, you also rely on your clinical
22 experience for an independent basis of
23 your TVT-Exact report, correct?
24   A.  Yes.

Page 37

1   Q.  And including those portions
2 that overlap with the other polypropylene
3 midurethral sling products that you've
4 offered reports on, correct?
5   A.  Yes.
6   Q.  In addition to your Nature
7 article, in addition to your clinical
8 experience, did you also rely on
9 peer-reviewed literature which was
10 identified both in the footnotes of your
11 report and then in the reliance list that
12 you provided with that report?
13   A.  I did.
14   Q.  In selecting that peer-reviewed
15 literature for inclusion in your report or
16 your reliance list, were there any
17 articles that you just dismissed out of
18 hand and refused to consider when reaching
19 the opinions that you have in this case?
20   A.  I don't dismiss them out of
21 hand. I mean, there's some that I don't
22 agree with the methodology.
23       I mean, are you asking in
24 general?

Page 58

1  went about calculating the percentage of
2  patients who have a potential complication
3  based on what's available in the medical
4  literature; is that right?
5      A.  Yes.
6      Q.  Now, the next column is
7  "Incident mean range."
8          That's the second way that you
9  went about also checking on the reports of
10 complications and the incidence of
11 complications, correct?
12     A.  Yes.
13     Q.  Can you explain to me how the
14 methodology for reaching the incidence
15 differs from the methodology used for
16 reaching the complications?
17     A.  Sure.  In the first case, we
18 counted every single patient, every single
19 patient was counted once.  In the
20 incidence, where it says "Incidence mean
21 and range," those -- that we only
22 considered series of patients.  So that
23 doesn't include any of the patients
24 with -- that were case reports.  It

Page 59

1  doesn't include any of the patients, for
2  example, that were just a paper on
3  complications.
4          So the numbers in these two
5  columns, even though they both represent
6  means or averages, the numbers could be
7  very different because they're different
8  populations of papers.
9      Q.  So, this was the way that you
10 and your co-authors went about presenting
11 the full gamut of information based on two
12 statistical analyses, correct?
13     A.  Exactly.
14     Q.  And you reported on both the
15 complications and the incidence without
16 consideration to what was higher or lower?
17 You made sure everything was reported
18 here, correct?
19     A.  Exactly.
20     Q.  In some of these, the numbers
21 are fairly comparable, right?
22     A.  Yes.
23     Q.  And in some of them there's some
24 divergence in the percentage of patients

Page 60

1  that you had and the mean.
2          How do you account for that?
3      A.  Because in the series, they may
4  not have mentioned a certain complication.
5  So for example, if you're looking at that
6  same column, if you look at neurologic
7  symptoms within six weeks, in the middle
8  column we counted every single patient
9  where they mentioned it.  Now, it looks
10 like there were only 42 patients in that
11 particular group where they said these
12 patients had these complications.  Whereas
13 in the other article, they could have had
14 a paper with a thousand patients in it,
15 but they didn't even mention whether or
16 not there was a neurologic complication,
17 so we couldn't count that.
18     Q.  And in any event, let me look at
19 the range.  So, tell me what the range is.
20     A.  Well, the range is -- describes
21 what the minimum complication rate was in
22 one series and the maximum in another --
23 in other series, and the reason that we
24 did that is one of the critiques that you

Page 61

1  might apply to this kind of scientific
2  literature is, well, if you just do an
3  average -- if you just do an average, it
4  doesn't tell you about the difference
5  between perhaps, this is a perhaps, people
6  that are really expert surgeons might get
7  a zero complication rate and novices
8  might, you know, get a 15 percent
9  complication rates.
10         So this gives you the range of
11 what you might expect with the same
12 surgeon or groups of surgeons doing the
13 operation.
14     Q.  In looking at both your
15 percentage of patients, as well as the
16 mean that you have reported in this
17 article, all of those fall within below
18 the highest reported incident rate on the
19 range; is that right?
20     A.  Sure.  That makes sense.
21     Q.  So, does that reflect that your
22 article is not reporting the highest
23 possible rates of complications associated
24 with any of these complications?

**Page 66**

1  them and they have de novo overactive
2  bladder and you treat them, X number would
3  get better. So I don't have the exact
4  number, but we picked the number of de
5  novo overactive bladder patients and then
6  we took a percentage of that, of patients
7  that are likely to be refractory, and when
8  you add all those numbers up -- then we
9  added a couple of -- there were a few
10 things like bowel injuries and fistulas
11 that are very rare, but we added in a
12 number of that and added all of those up,
13 the methodology, it's in the paper
14 someplace.
15     Q.  And that's the same methodology?
16     A.  Yeah.
17     Q.  Just so I understand, if I'm
18 looking at box 1 on page 8 of your
19 article.
20     A.  Okay.
21     Q.  It says: "Complications
22 requiring surgery."
23         Is this the list of
24 complications that you would consider a

**Page 67**

1  serious complication for the purposes of
2  calculating that 15.3 percent number?
3     A.  Yes.
4     Q.  Is it fair to say that, or am I
5  accurate in saying that that list of
6  complications, plus the number of sling
7  failures, the percentage of women whose
8  slings simply don't work for them, you
9  calculated that total --
10    A.  No, no, that's in there. The
11 recurrent and/or persistent stress
12 incontinence.
13    Q.  Okay.
14    A.  That number is -- that's where
15 the number comes from.
16    Q.  Okay. Thank you for clarifying
17 that.
18        So, when you say there's a total
19 incidence of serious complications is 15.3
20 percent, is it accurate to say that's the
21 calculation of the overall risk to a woman
22 that one of these things could happen to
23 her if she has a polypropylene midurethral
24 sling implanted?

**Page 68**

1     A.  I would say it another way.
2  That there's a, I believe, at least a 15
3  percent chance of having a negative
4  outcome from the sling, from putting the
5  sling in.
6     Q.  And the negative outcomes would
7  be one of those things that you have
8  identified in Box 1?
9     A.  Yes.
10    Q.  But it's not your testimony, for
11 example, that 15.3 percent of women who
12 have a midurethral sling will have chronic
13 pain?
14    A.  No.
15    Q.  Or that 15.3 percent will have a
16 urethral obstruction, correct?
17    A.  Correct.
18    Q.  It's just the overall chances of
19 having one of these negative outcomes?
20    A.  Yes.
21    Q.  Now, going back in time, you
22 published this article in late 2015; is
23 that right?
24    A.  Yes.

**Page 69**

1     Q.  And it was based on medical
2  records 2007 through 2014; is that right?
3     A.  Yes.
4     Q.  And do you recall that in the
5  summer of 2014, you testified in front of
6  Judge Goodwin in the Southern District of
7  West Virginia in a case involving Mrs. Joe
8  Husky; is that right?
9     A.  I have a remote memory of it,
10 yes.
11    Q.  Well, I put you on the stand,
12 so.
13    A.  No, I did it.
14    Q.  So I know that you did it.
15        And at that time, you had not
16 done the statistical analyses and this
17 analysis that's reflected in your Nature
18 article, correct?
19    A.  I'm sorry, what was the date?
20    Q.  Summer of 2014.
21    A.  Correct.
22    Q.  So, since you testified in Mrs.
23 Husky's case in the summer of 2014, have
24 you done additional work that you rely on

Jerry G. Blaivas, M.D.

Page 70

1  as the basis for your current opinions
2  reflected in this expert report on the
3  incidence of individual complications rate
4  and the overall complication rate?
5      A.   Well, of course.  That's what
6  this paper is.
7      Q.   And this information wasn't
8  available to you and you had not done this
9  analysis at the time of Mrs. Husky's
10 trial, correct?
11     A.   Correct.
12     Q.   Ethicon has made a statement
13 that you may not -- I'm going to quote
14 you: "Dr. Blaivas may not, quote, merely
15 a year later, quote, purport to be certain
16 about TVT complication rates."
17          Can you tell me why you can be
18 certain about complication rates in August
19 of 2015 when you couldn't be certain about
20 complication rates in the summer of 2014?
21     A.   Because we did such an
22 exhaustive search of the literature and
23 this is our best estimate of the minimum
24 complication rate.  I emphasize that.

Page 71

1      Q.   And when you call it an
2  estimate, it's an estimate that is based
3  on two different scientifically reliable
4  means for calculating the rates of
5  complication; is that right?
6      A.   Yes.
7      Q.   And those are the ones that are
8  reflected in Tables 2, 3, 4 and 5 of the
9  report?
10     A.   I'll take your word for it.
11 Yes.
12     Q.   I just want to make sure that
13 I'm right.
14     A.   Okay.
15     Q.   Dr. Blaivas, do you believe that
16 the conclusions that you reached in your
17 report and in your Nature article assume
18 the worst case scenario?
19     A.   No.  As I said, I think it
20 assumes the best case scenario.
21     Q.   And do you believe that it errs
22 on the side of opining as to a higher
23 complication rate to better protect a
24 patient?

Page 72

1      A.   No.  I think if anything, it
2  errs on the lower complication rate.
3      Q.   And is that reflected in the
4  fact that both the complication percentage
5  and the incidence that you report out are
6  lower than the highest rates that you saw
7  in the research that you did?
8      A.   Well, in part, but not --
9          MS. FITZPATRICK:  Take a break.
10         (Discussion held off the record.)
11         MS. FITZPATRICK:  Can you read
12 back the question and answer?
13         (The requested portion of the
14 record was read by the Court Reporter.)
15     A.   Yeah, because we don't expect it
16 to be the highest rate reported, but we
17 know that the studies, that the majority
18 of the studies don't follow the patient
19 long enough to account for all the
20 complications and that there's no registry
21 and there isn't -- and they don't -- there
22 isn't a methodology to specifically look
23 for complications.  So because of those
24 three things alone, it's very likely that

Page 73

1  the complication rate that we reported is
2  an underestimate of the real number of the
3  complications.
4      Q.   Now, Ethicon claims that your
5  Review article cherry-picked data in
6  failing to take into account long-term
7  studies finding TVT complication rates to
8  be much lower.  And they then refer to the
9  articles that are identified in Table 1
10 and states that at Table 1 of the article,
11 the authors collected 11 studies
12 purportedly meeting the criteria for
13 inclusion.
14         Do those articles have to do
15 with efficacy and your conclusions about
16 efficacy, or do they have to do with the
17 overall rates of complications?
18     A.   The methodology was primarily
19 geared towards efficacy.
20     Q.   So, is it accurate to say that
21 simply because something was not included
22 in Table 1, it is incorrect for Ethicon to
23 say that you did not take into account
24 long-term studies that find TVT

Page 74

1 complication rates to be lower?
2  A. I'm sorry, there was a couple of
3 negatives in there. I'm not sure about
4 that.
5  Q. Okay. Ethicon attempts to use
6 the fact that there were certain articles
7 that you did not consider for efficacy as
8 evidence that you did not use those
9 articles for consideration of safety.
10     Is that accurate?
11  A. It's not accurate.
12  Q. Why not?
13  A. Because one thing I already
14 alluded to is that we only counted the
15 patients once. So if a patient -- I mean,
16 for example, I know one of the articles in
17 there -- when I say "know," let me just
18 double check.
19     (Pause.)
20     For example, the Nielson
21 article -- no, this doesn't answer your
22 question. Excuse me.
23     The answer is "no" because some
24 of the papers that they cited in that --

Page 75

1 in that deposition or, I think it was a
2 deposition, were papers that were
3 duplicate, so they used the same patients
4 twice, and I already testified that when
5 that happens, we only counted the
6 complication once.
7     And the second thing is that if
8 an article did not mention a complication,
9 that it wasn't included. They didn't say
10 that they even looked for it.
11     And then thirdly, I do remember,
12 again I don't remember the specifics, but
13 there was one or two articles that didn't
14 come up in our search, and I don't know,
15 you know, we did a very methodical search,
16 but we searched thousands of papers and
17 it's not unexpected that one or two
18 wouldn't come up with a search.
19  Q. And is that something that
20 routinely happens in peer-reviewed
21 articles?
22  A. Sure.
23  Q. Does it call into question the
24 reliability of a peer review article?

Page 76

1  A. I don't believe so.
2  Q. Now, defendants claim that your
3 opinion that the TVT has a minimal
4 complication rate takes into account
5 prolapse devices.
6     Did you look at articles or
7 consider statistics on prolapse devices
8 when reaching your complication rate in
9 this paper?
10  A. We did not look at -- if a paper
11 had -- it's possible that some of the
12 papers had patients with both prolapse and
13 slings, but in the review process, we
14 would have made our best effort to only
15 include those patients that had to do with
16 sling -- that where the complication was
17 from a sling.
18  Q. Is it fair to say that Ethicon's
19 claim that you included prolapse devices
20 in calculating your complication rate is
21 untrue?
22  A. To the best of our ability to
23 make the distinction, it's untrue.
24     MS. FITZPATRICK: Can we go off

Page 77

1 the record for a second?
2     (Discussion held off the record.)
3 BY MS. FITZPATRICK:
4  Q. Dr. Blaivas, you participated in
5 the committee at the AUA that considered
6 the safety and efficacy of midurethral
7 slings, correct?
8  A. Yes.
9  Q. Can you tell me what you did in
10 that respect, what you personally did?
11  A. Well, we all -- it was a
12 complicated process, similar to what I
13 testified before. We did a literature
14 search. We had inclusion criteria. We
15 selected papers that had to do with the
16 surgical management of urinary
17 incontinence in women. We selected the
18 papers and we tabulated the data on safety
19 and efficacy, very similar to what we did
20 in the Nature Review article for that
21 column in the right where we looked at the
22 incidence and the range. And we did that
23 for all of the known treatments to stress
24 incontinence at the time, surgical