# EXHIBIT C

## to Ethicon's Response in Opposition to Plaintiffs' Motion to Exclude Dr. Larry T. Sirls' TVT/TVT-O General Opinions

Larry T. Sirls, II, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2    SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

 3                      Master File No.

                        2:12-MD-02327

 4

      IN RE:  ETHICON, INC., PELVIC

 5    REPAIR SYSTEM PRODUCTS                 MDL 2327

      LIABILITY LITIGATION            JOSEPH R. GOODWIN

 6                                    U.S. DISTRICT JUDGE
      _____

 7

 8

 9

10       The deposition of LARRY T. SIRLS, II, M.D.,

11       Taken at 41000 Woodward Avenue, Suite 200 East,

12       Bloomfield Hills, Michigan,

13       Commencing at 9:33 a.m.,

14       Thursday, July 21, 2016,

15       Before Cheryl McDowell, CSR-2662, RPR.

16

17

18

19

20

21

22

23

24
```

Page 14

1  Doctor Sirls, who put together this
2  binder for you?
3  A. That binder was put together by Butler Snow.
4  Q. Okay. And who chose the articles that went in this
5  binder?
6  A. I did.
7  Q. Okay. And did you communicate to Butler Snow which
8  articles you wanted included here?
9  A. Yeah. In my report we have these references, but
10 then there are additional references that are not in
11 my report that are in that folder.
12 Q. Okay. Is everything that's in here reflected in
13 your reliance list?
14 A. Yes.
15 Q. Okay.
16 A. It should be to the best of my knowledge, it should
17 be, yes.
18 Q. And in the process of putting together your report
19 in this binder, did Butler Snow suggest or direct
20 you to any articles that they published for you to
21 look at or to include in this binder specifically?
22 A. No.
23 Q. Looking at Exhibits 4 and 5, those are internal
24 Ethicon documents.

Page 15

1  Now, Doctor, you didn't have any access
2  to these documents prior to being retained by an
3  expert -- as an expert for Ethicon, correct?
4  A. Yes, correct.
5  Q. Okay. And these are documents that you reviewed in
6  connection with your expert report, correct?
7  A. These are documents that I reviewed to make me
8  understand the process and understand what was going
9  on within the company.
10     It is not part of my expert report. My
11 expert report is based on the literature.
12 Q. Okay. And the types of documents that you've given
13 me in Exhibits 4 and 5, those are not the types of
14 documents that you would customarily rely on to do
15 your work in your peer-reviewed publications,
16 correct?
17 A. These documents inform me, and I find them
18 interesting.
19 Q. Okay.
20 A. It is not something that I use for my report, for my
21 expert report.
22 Q. Okay. So I'm asking you something that's a little
23 bit different.
24     You as a clinician and academic publish a

Page 16

1  number of peer-reviewed articles, correct?
2  A. Yes.
3  Q. And you've published a number of peer-reviewed
4  articles on a wide variety of topics, correct?
5  A. Mostly pelvic reconstructive surgery.
6  Q. Okay. And lots of different subtopics, though,
7  within pelvic reconstructive surgery, correct?
8  A. Yes.
9  Q. And in publishing those articles and prior to
10 working as an expert for Ethicon, you've never
11 consulted internal industry or company documents for
12 any of the academic writings that you personally
13 have done, correct?
14 A. Prior to receiving these documents, I had not
15 reviewed documents like this in my academic work.
16 Q. Okay. And when were you provided with these
17 documents?
18 A. I don't know exactly. Probably seven to nine months
19 ago.
20 Q. Okay. And who selected these internal documents?
21 A. Butler Snow.
22 Q. Okay. And Butler Snow gave you a series it looks
23 like of about a hundred fifty or so internal
24 Ethicon documents, give or take a few, is that

Page 17

1  correct?
2  A. So some of these are internal documents. Some of
3  these are federal regulations. Some of these are
4  publications or abstracts or discussions. Some of
5  these are IFUs.
6     So there are a variety of different
7  materials in those books.
8  Q. Okay. I just want to make sure that I'm
9  conceptually getting that right.
10    Would it be fair to say that what's in
11 Exhibit 8 which are the medical articles, those are
12 the medical articles that you personally selected as
13 reliance for your report, is that right?
14 A. That's part of it, correct.
15 Q. Okay. And then what is included in 4 and 5 are
16 things that the lawyers for Ethicon gave you to
17 review in connection with your expert report, is
18 that right?
19 A. I want to clarify my earlier answer.
20 Q. Sure.
21 A. And that is that in this there are IFUs and things
22 that I had and was aware of and had read before they
23 were given to me.
24 Q. Okay.

Page 26

1  specific last summer, fall, and one for a TVT-O
2  specific that we'll discuss today.
3      Is that the entire --
4  A. To the best of my knowledge, yes.
5  Q. Okay. And what did you do to prepare for your
6     deposition today?
7  A. I reviewed my materials, my report, the binders you
8     see in front of me, met with Mr. Koopmann.
9  Q. Okay. How many hours did you prepare for your
10    deposition?
11 A. For the deposition?
12 Q. Yes.
13 A. Well, I'm probably -- so does that include reviewing
14    all of this?
15 Q. Uh-huh.
16 A. Okay. Include writing up a report?
17 Q. No. Anything you've done specifically to prepare
18    for sitting here today and answering questions.
19 A. Would that include reviewing the documents for the
20    case, correct?
21 Q. Whatever you did.
22 A. So my report, I probably spent close to ninety hours
23    on my report.
24 Q. Okay.

Page 27

1  A. Reviewing additional documents, and I haven't
2     tallied up, so I'm giving you a generality.
3  Q. Sure.
4  A. I could be off a little bit. Reviewing the binders
5     that we see in front of us, the literature,
6     et cetera, another seventy hours or so. And then
7     the case-specific medical records, probably in the
8     thirties that I've done with that, and then I've met
9     with Mr. Koopmann probably somewhere between fifteen
10    and twenty hours.
11 Q. Okay. So if I'm doing my math right, it looks like
12    you spent anywhere between two hundred and five
13    to -- let's say two hundred to two hundred and ten
14    hours total drafting your report, doing the
15    case-specific report, reviewing your medical
16    records, and reviewing the documents for the
17    deposition, is that about right?
18 A. Somewhere in there.
19 Q. Okay. And we've had marked now the most current
20    copy of your CV.
21       And is this a complete and accurate
22    statement of your educational background and your
23    training?
24 A. Yes.

Page 28

1  Q. Okay. Now, you did a fellowship with Doctor Zimmern
2     in Los Angeles from 1992 to 1993, is that correct?
3  A. The lead, the lead physician in the fellowship was
4     Gary Leach. Phillippe Zimmern was an associate.
5  Q. Okay. And how closely did you work with
6     Doctor Zimmern at that time?
7  A. Very closely.
8  Q. Do you currently have a teaching appointment at any
9     educational institution?
10 A. I am the fellowship director at Beaumont Health for
11    female pelvic medicine and reconstructive surgery.
12    I direct urology research for the residency program
13    in the same institution. I'm a professor in urology
14    at Oakland University William Beaumont School of
15    Medicine.
16 Q. Okay. And do you currently act as a peer reviewer
17    for any medical journal?
18 A. Yes.
19 Q. And what medical journal is that?
20 A. The Journal of Urology, the Urology, Neurourology,
21    Urodynamics, Female Pelvic Medicine and
22    Reconstructive Surgery.
23 Q. Okay. Now, you offer your opinions in this case as
24    a clinician and a medical doctor, correct?

Page 29

1  A. Clinician, medical doctor, academician.
2  Q. Okay. And it's based largely on your clinical
3     experience, correct?
4  A. Clinical experience, literature, discussions with
5     friends, colleagues, meetings, et cetera.
6  Q. And you're not holding yourself out as an expert
7     with regard to the material science of
8     polypropylene, correct?
9  A. I have done a lot of literature review on the
10    material science. It's very important in my
11    practice because I use these materials, and I would
12    say that I am a clinical expert in the use of these
13    materials, their outcomes, their complications,
14    et cetera.
15 Q. Okay. Now, you gave a deposition before, correct?
16 A. Yes.
17 Q. And have you reviewed that deposition in preparation
18    for your deposition here today?
19 A. No.
20       MS. FITZPATRICK: Okay. So why don't we
21    go ahead and mark this as Exhibit 9.
22       (Sirls TVT-9 marked and attached.)
23 BY MS. FITZPATRICK:
24 Q. Go ahead and take a look at that, Doctor. I'd like

Page 30

1  you to look at page forty-two, line seven through
2  ten.
3       And you were asked at that time: You
4  don't hold yourself out as an expert with regard to
5  material science of polypropylene mesh, is that
6  correct? And you answered correct.
7       Are you changing your testimony today?
8  A. Yes, I am.
9  Q. Okay. And tell me what you've done between December
10  12th, excuse me, December 14th, 2012, and today that
11  changed you from not being an expert about material
12  science with regard to polypropylene mesh and to now
13  holding yourself out as an expert on that specific
14  topic.
15  A. So during this deposition, this one that we're
16  talking about, it's the first time I've been
17  involved in the process like this, and I was naive
18  and really did not understand the questions so well.
19       In that time it's been three and a half
20  years. These products have come under much more
21  scrutiny, and I have gone to the literature, talked
22  to my friends, et cetera, gone to meetings, and have
23  become much more educated with regard to these
24  materials.

Page 31

1       So I state that I am a clinical expert in
2  the use and clinical evaluation and outcomes of
3  these products.
4  Q. Okay. Well, what I'm trying to get at is I
5  understand that you're here as a clinician to talk
6  about the use and the medical outcomes that come
7  with using specifically the TVT and the TVT-O
8  device, correct?
9  A. Yes.
10  Q. What I'm trying to get at is beyond that, those
11  clinical opinions that you hold and that you've
12  reported here, do you hold yourself out specifically
13  as someone who is an expert in the material of
14  polypropylene itself?
15  A. I have reviewed thousands of pages of documents in
16  preparation, and I have reviewed quite a bit on
17  degradation, FDA regulations, preparation,
18  et cetera.
19       I think that I probably know more about
20  the use of these products than many of the engineers
21  who write these reports because I'm the one who's
22  putting them in patients and evaluating their
23  outcomes. So, yeah, I feel I'm extremely well
24  versed and expert in using these products.

Page 32

1  Q. Okay. But I'm not asking you whether you're an
2  expert in the use of the products and whether you're
3  an expert in the clinical outcomes and implanting
4  them in women.
5       Maybe let me ask you this. How many
6  different kinds of polypropylene are there in the
7  world?
8  A. So polypropylene is a polymer that I want to make
9  sure I understand your question.
10       Do you mean how many makers are there?
11  Q. How many different types?
12  A. I don't understand your question.
13  Q. Do you know that there's different grades of
14  polypropylene?
15  A. What do you mean by different grades?
16  Q. This is what I'm actually trying to get at. It
17  seems to me from your expert report that you are an
18  expert sitting here to tell me about the clinical
19  implications and uses of polypropylene mesh
20  products, particularly the TVT and the TVT-O, in
21  women. That's what I got from your expert report,
22  okay?
23       What I'm trying to get at is whether you
24  are also an expert on the chemical and physical

Page 33

1  properties of polypropylene, polypropylene material
2  generally, not in a clinical setting, but just
3  there's people who specialize in polymers and
4  plastics.
5       Are you one of those people?
6  A. I don't specialize in polymers and plastics.
7  Q. Okay.
8  A. But I'm informed and educated about many of these
9  issues with polypropylene materials.
10  Q. Okay. Great. Tell me about the different grades of
11  polypropylene.
12  A. What I can tell you is that prolene mesh is
13  different than polypropylene because it's treated,
14  right, with antioxidants.
15  Q. And what are those antioxidants?
16  A. Santanox and DTL-DP.
17  Q. And tell me how a manufacturer decides what
18  concentration of antioxidants should be used in a
19  particular polypropylene product.
20  A. I don't know that.
21  Q. Okay. Tell me the difference between the
22  polypropylene that is used for an Ethicon product
23  versus a polypropylene that is used for a Boston
24  Scientific product.

Page 42

1  A.  Our hospital has a policy on all material explants,
2      and it goes to the pathology lab and we get a
3      pathology report. They do not study the
4      polypropylene for degradation.
5  Q.  Okay. So in your clinical practice, you don't have
6      any experience in reviewing pathology or looking at
7      pathology microscopically for degradation, is that
8      right?
9  A.  I have not done it in my clinical practice on
10     materials that I've explanted.
11 Q.  Okay. Have you done it in another way in your
12     clinical practice?
13 A.  Clinical practice to me means reading the literature
14     and understanding things. So it's just in the
15     literature and discussions. That's where my
16     information's coming from.
17 Q.  Maybe this is where we're talking a little past each
18     other. Just by way of shorthand, when I talk about
19     your clinical practice, I'm talking about your
20     actual treatment of women, okay? When we talk about
21     your academic practice, I'm talking about your
22     knowledge of the literature and the articles you
23     write and all of that type of stuff. So I want to
24     focus solely on your clinical practice.

Page 43

1      There's nothing in your clinical practice
2      of treating women where you've done anything to
3      specifically look for or study degradation of
4      polypropylene mesh explants, correct?
5  A.  Correct.
6  Q.  And so your knowledge comes from reading somebody
7      else's articles in the medical and scientific
8      literature, is that right?
9  A.  Yes.
10 Q.  Okay. You started using the TVT device in 2005,
11     correct?
12 A.  Yeah. It may have been 2004. I'm sorry. It's in
13     that time period.
14 Q.  Okay. And prior to using a new medical device, you
15     personally as a physician would want to be convinced
16     that the device was safe and effective, correct?
17 A.  Yes.
18 Q.  Okay. And you wouldn't use personally a medical
19     device that didn't have a proven track record of
20     safety?
21 A.  Well, so that's where surgery is a little bit
22     different than, for example, medications that can be
23     powered and randomized in large studies. In surgery
24     we will often do procedures that do not have a large

Page 44

1      clinical experience because they're logical to us,
2      they're intuitive, and we think that it may be an
3      upgrade over what we're doing.
4         For example, I'm starting a study next
5      month where I'll be implanting a device that's never
6      been done before like this, and I'll be the first
7      one doing it. There's no data on that.
8  Q.  Okay. Is that part of a clinical trial?
9  A.  In that case it will be.
10 Q.  Okay. And that's a case where you tell the women or
11     men who are getting this new device that they are
12     part of a clinical trial, correct?
13 A.  That is correct.
14 Q.  And you'll tell them that they are getting a device
15     that doesn't have an established record of safety,
16     correct?
17 A.  That's correct.
18 Q.  And you'll tell them they are getting a device that
19     doesn't have an established record of efficacy,
20     correct?
21 A.  So let me also back up to your prior question on
22     safety. When we do these, we have typically very
23     similar things that have been done that have been
24     shown to be safe and effective. So we're not going

Page 45

1      in and doing something that we don't have a concept
2      of safety and efficacy for.
3         Similarly, when we do surgical implants,
4      from my first TVT or my first TOT, they were not in
5      a clinical trial, and I had to tell my patient,
6      look, this is my first one, but this is why I'm
7      doing this, it's logical.
8  Q.  And so with your first TVT and TVT-O that you did,
9      prior to implanting those devices, did you do a
10     review of the medical and scientific literature to
11     satisfy yourself that the procedures and the devices
12     were safe?
13 A.  Yeah, that's a really good question because, as you
14     know, the procedures were developed in '96, '97,
15     '98, and I did not put my first one until 2004,
16     2005. So I was very cautious and I waited and
17     watched the literature.
18        We're talking about TVT, right?
19 Q.  Yes.
20 A.  TOT was later, 2001, 2002, 2003. So, you know, I
21     was very cautious and watched the literature. So I
22     did do that exactly before, before I implanted it in
23     my first clinical patient, and I was very
24     comfortable.

Page 46

1  Q. Okay. So it was important to you that you had
2     scientific data before implanting the TVT device
3     into women, correct?
4  A. Again, there are different degrees of comfort and
5     different amounts of data that are necessary before
6     a surgeon feels comfortable doing something.
7         But, yeah, typically before I'm going to
8     do it on my patient, I will have some literature,
9     some discussions, some meetings, some information
10    that makes me feel comfortable moving ahead.
11 Q. And you did that with the TVT device, right?
12 A. I did.
13 Q. And you did that with the TVT-O device, right?
14 A. I did.
15 Q. What literature did you rely on to satisfy yourself
16    that the TVT was safe before you started using it?
17 A. The literature that would have been published at
18    that time. I don't recall what was published at
19    that time in that time period. I was watching very
20    actively because I was skeptical, I was very
21    skeptical.
22        But, let's see. It was Nilsson, Ulmsten,
23    and then the people in the states. Who were the
24    early TVT people? Maybe Dennis Miller, maybe Vince

Page 47

1     Lucente. I don't recall who were the major
2     publishers in that time period.
3         Also at the meetings, the meetings are
4     very important for us. People come up, they give
5     their presentation, we're able to talk informally,
6     and that helps me quite a bit.
7  Q. Okay. And did you receive information from Ethicon
8     prior to using the TVT?
9  A. So what I would have done is I would have had to had
10    some training by Ethicon and/or some mentoring by
11    Ethicon before doing that. I would have gone to a
12    cadaver lab or would have gone to a surgeon's home
13    site and observed or done both.
14        I apologize. I don't recall because it's
15    just been so long ago. But I recall doing all of
16    these things, cadaver labs, visiting surgeons,
17    watching them do them.
18        I had done a lot of surgeries, so I was
19    pretty comfortable with these techniques. We use
20    trocars all the time when we do slings and other
21    things.
22 Q. I'm asking you specifically, though, about Ethicon.
23 A. Okay.
24 Q. Okay. What information did you receive from Ethicon

Page 48

1     prior to implanting your first TVT?
2  A. So what the information I probably would have
3     received from Ethicon at that time would have been
4     probably a booklet or a slide deck on the procedure.
5     Of course, there's the IFU.
6         And primarily it's the literature, my
7     friends. I don't rely as much on slide decks, IFUs,
8     as I do on these other sources of information.
9  Q. Okay. But you do look at the information, I think
10    you previously testified that you look at the
11    information the medical device manufacturer would
12    give you prior to implanting their product, correct?
13 A. Yeah. It may not be important to me, but, yeah, I
14    look at it.
15 Q. And you would expect that Ethicon would fully
16    disclose to you all of the risks that it knew of, it
17    knew were associated with the TVT product, correct?
18        MR. KOOPMANN: Object to form.
19        THE WITNESS: As a surgeon who had done,
20    I don't know, a thousand slings before I did my
21    first TVT, I really don't need Ethicon telling me
22    the risks and complications of sling procedures.
23    They would have to tell me something that would not
24    commonly be known to me.

Page 49

1  BY MS. FITZPATRICK:
2  Q. So a medical device -- so your testimony is a
3     medical device manufacturer does not have a
4     responsibility to tell physicians who are using its
5     product of the risks it knows are associated with
6     the product, is that what you're saying? There's no
7     obligation to do that?
8         MR. KOOPMANN: Object to form.
9  BY MS. FITZPATRICK:
10 Q. I mean, they either have to tell you or they don't.
11    I just want to know which one you think it is.
12 A. I think that they should tell us risks that would
13    not commonly be known to surgeons and that would be
14    unique to their device.
15 Q. And you realize, Doctor, that not everybody who's
16    used a TVT has the same level of experience
17    implanting a thousand slings before they started
18    using a TVT device, correct?
19 A. Probably.
20 Q. And not every physician has the opportunity that you
21    do to go to all of these meetings and to meet with
22    all of your colleagues, correct?
23 A. I'm not sure. Probably.
24 Q. Okay. And you realize that where you practice and

Page 54

1 the mid-urethral sling which is why the whole world
2 went to mid-urethral slings.
3 Q. Your hands are not everybody's hands, though,
4 correct?
5 A. Yes.
6 Q. And you recognize there are reported complications
7 that are unique to mesh slings that are not reported
8 in association with fascial slings, correct?
9 A. Those complications in my mind would be entirely
10 mesh related --
11 Q. Okay.
12 A. -- and nothing else.
13 Q. And nobody -- not everybody has the same results
14 with polypropylene mid-urethral slings that you
15 have, correct?
16 A. Interestingly, as I look at the meta-analyses, the
17 data that I see is pretty consistent with my
18 experience.
19 Q. Okay. So you're pretty middle of the road, you get
20 the same results that other people do, is that
21 right?
22 A. Yeah. I would say that my results are similar to
23 what we see in the very large studies.
24 Q. Okay.

Page 55

1 A. Some, you know, some differences, but --
2 Q. Well, we will -- I want to look at some of those in
3 a little bit.
4 A. Okay.
5 Q. But before we get there, so you do fascial slings.
6 What retropubic slings do you use?
7 A. I use the TVT Exact.
8 Q. And what obturator slings do you use?
9 A. I use the Abbrevo.
10 Q. And the Abbrevo is a different or a modified version
11 of the TVT-O, is that right?
12 A. I look at the Abbrevo as an upgraded product. When
13 you come out, when you have experience and you have
14 time to reflect and think about the technologies,
15 the next generation is often slightly improved over
16 the first. So --
17 Q. Is the Abbrevo an updated improvement over the
18 traditional TVT-O in your opinion?
19 A. I like the Abbrevo. It's my sling of choice now for
20 many, many reasons. In fact, it's my primary sling
21 of choice. I prefer that over retropubic slings.
22 But if the Abbrevo were off the market
23 tomorrow and all we had was TVT-O, I would use that.
24 Q. Okay. Well, let's say how many sling surgeries do

Page 56

1 you do a year?
2 A. I'm not sure. A hundred. I don't know. Two
3 hundred. I'm not sure.
4 Q. Okay. Let's try to just break it down. How many
5 roughly percentage-wise if you can give me, how many
6 of the slings that you implant are the Abbrevo?
7 A. So my obturator approach, it's about ninety percent
8 of what I do.
9 Q. Okay. And about how many are the retropubic?
10 A. The remaining. Well, maybe nine percent to probably
11 one percent, maybe two percent fascial slings at
12 this time.
13 Q. Okay. And you agree with me the fascial sling is
14 within the standard of care even though it's not
15 your preferred surgical intervention, correct?
16 A. Yes.
17 Q. All right. So you offered a report on the TVT-O
18 specifically.
19 What are the differences between the
20 TVT-O and the Abbrevo product that you use?
21 A. So, first of all, let me just qualify that. In our
22 field we tend to -- TVT-O has become kind of a very
23 generic term. So sometimes I'll say TVT-O and what
24 I mean is obturator sling.

Page 57

1 Q. Okay.
2 A. Okay. Just to qualify that.
3 Q. Okay. That's fair enough.
4 I want to talk very specifically about
5 not TOT, not the transobturator slings generally but
6 the Ethicon TVT-O device.
7 A. Okay.
8 Q. Okay. So the difference between the Ethicon TVT-O
9 device and the Ethicon Abbrevo device.
10 A. Yes.
11 Q. What are the differences?
12 A. The differences are first that the Abbrevos or
13 Abbrevos are all laser-cut mesh.
14 That's not as important to me clinically.
15 The most important thing to me clinically is it's a
16 shorter length.
17 Q. And having a shorter length, it doesn't go as far
18 out into the groin and thigh, correct, as the
19 traditional TVT-O?
20 A. Correct.
21 Q. Okay. And what in your opinion is the advantage of
22 having the shorter length of the Abbrevo versus the
23 TVT-O?
24 A. That's actually a really important issue, and the

Page 58

1  concern is groin pain, and clinically, I see this
2  very infrequently but I still worry about it because
3  this is a quality of life procedure, and I'm trying
4  to make sure my patients are happy when we're done.
5      And although I see, again, I would say
6  extremely infrequent groin pain that lasts more than
7  a few weeks, if I can try and minimize that by
8  having a mesh band that does not go through the
9  adductor muscle group, then that's intuitive to me.
10 Q. Do you believe that the -- so your primary reason is
11 you believe that there's a decrease in the chance of
12 a long-term groin pain in a woman.
13      Is that sort of my layperson's
14 interpretation of what you're saying?
15 A. So it was really an intellectual decision because
16 clinically I was not seeing problems with groin
17 pain. I mean, it was very, very infrequent. We
18 talk about it in the literature, we see it in
19 conferences, and it had my attention. The numbers
20 are very low, but I worry about it. You worry.
21 That's what I do.
22      So when the shorter mesh came out, I
23 looked at it, I said this is logical. Maybe if I
24 have one patient in a thousand who has that

Page 59

1  complication and I can prevent that one patient in a
2  thousand from having it, I'd like to do that.
3  Q. Okay. And is there anything else that recommends
4  the Abbrevo over the TVT-O device to you?
5  A. No.
6  Q. Okay. Do you even implant the TVT-O at all, or do
7  you just use the Abbrevo at this point?
8  A. At this point I use the Abbrevo. If we don't have
9  it, I'll use a TVT-O.
10 Q. Okay. And when did you change from the TVT-O to the
11 Abbrevo?
12 A. I'm sorry. I'm not sure. A few years ago, a couple
13 few years ago.
14 Q. Okay. Now, so a woman comes in to see you and she
15 needs a surgical intervention for stress urinary
16 incontinence. You offer her three potential
17 procedures, the Abbrevo, the TVT Exact, and the
18 fascial sling.
19      Those are your three options, is that
20 right?
21 A. Well, there's another surgical option that's
22 periurethral injection.
23      But we're -- I'm assuming that we're
24 talking about a patient with simple, straightforward

Page 60

1  stress incontinence, and if that's the case, those
2  are the three procedures we discuss.
3  Q. Okay. And why do you use the TVT Exact over just
4  the TVT-O?
5  A. There's two scenarios where I might do that. Number
6  one is if the patient has had a prior mid-urethral
7  sling, there's some data, not great data, but
8  there's some data that argues that a retropubic
9  vector improves overcomes over the obturator vector
10 in that specific subgroup.
11      The second reason would be if the patient
12 has dyspareunia or pelvic pain, and what I would do
13 in that patient is on exam, I would feel their
14 pelvic floor muscles, and if they have any evidence
15 of pelvic floor muscle pain or discomfort, I would
16 not use an obturator sling in that patient.
17 Q. Okay. I think I misspoke. I was going to ask you
18 that question too, so you already gave me that.
19      Why would you use a TVT Exact over the
20 TVT-R?
21 A. I thought you said TVT-O.
22 Q. I apparently did. I just misspoke.
23 A. Okay.
24 Q. So --

Page 61

1  A. TVT-R. I like the curve of the trocar and the hand
2  movement, but that's personal preference. I've used
3  them both.
4      Some people really like the big trocar.
5  They feel they can guide it easier and have more
6  control over it. I happen to like the other trocar.
7  It's just personal preference.
8  Q. Okay. And so let's go back to the question that I
9  asked and you answered. The primary reason -- I
10 just want to get this in my mind. A woman comes in
11 to you for a surgical intervention, okay?
12      Is your -- generally your first
13 recommendation that they have the Abbrevo sling, and
14 you only go to the TVT Exact or the fascial sling if
15 there's some kind of reason why you don't think that
16 the Abbrevo is particularly suited for that woman,
17 is that right?
18 A. Yeah. There are a few things that I look at, but if
19 there are none of the risk factors that I am
20 considering, my first choice is an inside-out
21 obturator sling which is the Abbrevo.
22 Q. Okay. And the risk factors that you discussed were
23 women who already have some type of pelvic floor or
24 pelvic muscle discomfort or dyspareunia, is that

Page 62

1 right?
2 A. Yes.
3 Q. And is there any other risk factor that you can
4    identify for me that would have you recommend the
5    Exact over the Abbrevo?
6 A. Yes. That is in a patient who will have had prior
7    mid-urethral sling, and those patients, again,
8    there's some literature, mostly case series and
9    things, not great, no Level I evidence, that argues
10   that the retropubic vector in those patients may be
11   better than the obturator vector, but studies like
12   that, you know, that are not large they've been
13   proven wrong before.
14       For example, you know, when we looked at
15   the retropubic versus the obturator sling, one of
16   the big issues was if a patient has ISD, if they
17   have severe leakage, is the retropubic sling tighter
18   or not than the obturator, and I have to say I
19   thought that it was, and I was in a group that
20   thought that it was. There's papers that said it
21   was, some papers said that it wasn't.
22       So when we did our large six hundred
23   patient prospective randomized trial and then we
24   evaluated those patients according to leak point

Page 63

1    pressures which is a severity of urethral
2    dysfunction, we found that both slings worked
3    exactly the same.
4        So that was the first really big study to
5    inform us as a field that the obturator sling works
6    as well as the retropubic sling in patients with
7    severe dysfunction, so that's not something that I
8    use.
9        Interestingly, when I go to the meetings,
10   everybody at the meetings will say retropubic slings
11   are tighter, and that's because they're not reading
12   the literature.
13 Q. Okay. So I want to go back to my question.
14    Dyspareunia, pelvic floor muscle dysfunction, that's
15    one risk factor that would have you recommend the
16    TVT-R to a small subgroup of your -- subpopulation
17    of your patients, right?
18 A. So the retropubic sling instead of an obturator?
19 Q. Right. Prior mid-urethral sling, you would go to a
20    retropubic over the obturator in that case, correct?
21 A. For now until that's proven to be wrong.
22 Q. Okay. Anything else, any other risk factors that
23    would have you recommend to a woman that she have a
24    retropubic as opposed to an Abbrevo device?

Page 64

1 A. Nothing that I can think of right now.
2 Q. Okay. And then you also do a very small number of
3    fascial slings, is that correct?
4 A. Yes.
5 Q. Are those ever -- do you ever recommend a fascial
6    sling to a patient?
7 A. I do.
8 Q. Okay. And in what candidates would you recommend a
9    fascial sling or a polypropylene mid-urethral sling?
10 A. So the brilliant thing about the mid-urethral sling
11    is that it's tension free. That was just a critical
12    advance, and it's changed. It's been the single
13    most important thing that has improved the side
14    effect profile of these procedures.
15       The fascial slings are placed at the
16    bladder neck, not the mid-urethra, and historically
17    they have been what we call compressive and which
18    means obstructive which means that the patients have
19    higher urgency rates and higher UTI rates, all of
20    which are proven in the literature.
21       So when I have a patient whose urethra is
22    mobile, it's moving, then I can put a mid-urethral
23    sling in them. The urethra moves, hits the sling,
24    and it works. Dynamic kinking is what we would call

Page 65

1    that in the literature.
2        But when a patient is scarred and the
3    urethra is not moving, then I have to take my sling
4    and I have to take my sling to the urethra and
5    compress it, and that, I'm going to place fascia
6    because we don't put mesh under tension. Mesh under
7    tension could erode into the urethra.
8        So a fascial sling is typically under a
9    little bit more compression, and what we know is
10   commonly we're obstructing these patients which
11   leads, again, to a whole another set of side effects
12   which sometimes for a patient is more bothersome
13   than their leakage in the first place. So it gets
14   to be a very tricky, tricky population.
15 Q. Okay. Now, regardless of what procedure you're
16    doing, the Abbrevo, the TVT Exact, or the fascial
17    sling, you discuss the options with your patients,
18    correct?
19 A. Yes.
20 Q. And you give them informed consent, correct?
21 A. Yes.
22 Q. And what -- let's start with the Abbrevo. What are
23    the risks that you tell your patients about that can
24    be associated with the use of the Abbrevo device?

Page 90

1  That is unique to this.
2       Prolene may potentiate existing
3  infection. The next one's on obstruction. We know
4  that. Acute or chronic pain, any surgery we do can
5  do that. Voiding dysfunction, that goes up with the
6  bullet above. I don't know why they split that into
7  two different bullets. Pain with intercourse, we
8  know about that. Neuromuscular problems, again,
9  same idea. We know about that. Recurrence,
10 bleeding, revisions, and then the last one, a
11 permanent implant that integrates into the tissue.
12 So that is unique to this when they talk about mesh.
13      However, if I have to go in and take the
14 Burch sutures out that eroded into a bladder or
15 fascial sling is out that is obstructing, that can
16 be a very difficult dissection as well.
17 Q. Let me ask you based on these adverse reactions that
18 you just reviewed, is there any reason that you know
19 of from your medical and clinical point of view, any
20 reason that those adverse reactions that are
21 identified in the post 2015 IFU could not have been
22 included in the pre-2015 IFU?
23      MR. KOOPMANN: Object to form,
24 foundation.

Page 91

1       THE WITNESS: So my understanding when
2  you look at both federal regulations and guidelines
3  on IFUs, it has to be something that is unique, that
4  is unique to the procedure and not commonly known.
5       And that's kind of where the whole
6  argument is here is that these things are commonly
7  known. The only thing that is unique here are the
8  ones that specifically deal with mesh. We know
9  removing it's hard, but mesh exposure is unique to
10 these products, yes.
11 BY MS. FITZPATRICK:
12 Q. It's not my question.
13 A. I'm sorry.
14 Q. Is there any reason based on your medical
15 knowledge and your clinical knowledge, is there
16 any reason why any or all of these adverse
17 reactions that are identified in the 2015 IFU
18 could not have been listed in the pre-2015 IFU?
19 Are these new things that people didn't know about
20 until 2015?
21      MR. KOOPMANN: Object to form.
22      THE WITNESS: So I can't really comment
23 on what the people at Ethicon were thinking when
24 they --

Page 92

1  BY MS. FITZPATRICK:
2  Q. I'm not asking you that. I'm asking, you are a
3     clinician and a medical doctor.
4  A. Yeah.
5  Q. I'm not asking you -- there's no way you can know
6     what Ethicon was thinking.
7  A. Right.
8  Q. I'm asking from a purely medical point of view, what
9     was known in the medical community about potential
10    adverse reactions to the TVT device. Is there any
11    reason based on that body of knowledge that you have
12    that any of these adverse reactions could not have
13    been identified in an IFU prior to 2015?
14 A. So, I apologize, but, you know, your question could
15    not have -- I'm getting thrown off by that.
16 Q. Is there anything new here that physicians didn't
17    know prior to 2015?
18 A. No. In fact, I would argue that we could probably
19    still have the same four bullet points here, and I
20    would still be comfortable with that.
21 Q. Or we could also argue that each of these adverse
22    reactions could have made it into the earlier IFU
23    because they were known as potential complications
24    and adverse events with the TVT, right? It could

Page 93

1  have gone either way?
2  A. But this is just, I mean, I don't know who selected
3     these things. We don't have blood clot on here. We
4     could have gotten into blood clot.
5  Q. We could go down to the other adverse reactions as
6     well.
7  A. Yeah.
8  Q. I'm just asking you, Doctor, I don't care which IFU
9     you like better.
10 A. Okay.
11 Q. I'm just asking you, is there any reason that you
12    know of based on your knowledge of the medical and
13    scientific literature that what Ethicon chose to put
14    into its IFU in 2015 could not have been
15    incorporated into an earlier version of the IFU
16    based on medical and scientific knowledge? That's
17    all.
18 A. You know, it's the could not. It's like a double
19    negative.
20       So, so are you saying that Ethicon could
21    have put these in earlier IFUs, is that a simpler
22    way of saying it?
23 Q. Could Ethicon have put these adverse events into
24    early IFUs?

Page 126

1 weight? Do you recall that?
2 A. So there's the Amid study which is the original
3 study on pore size, Type I, Type II, Type III, Type
4 IV.
5     I also looked at Pam Moalli's paper from
6 2008 --
7 Q. And is it your --
8 A. -- and many other articles and documents looking at
9 pore size.
10 Q. That Moalli paper that you just referenced, that
11 contains a table in it that lists the density and
12 pore size of various incontinence slings?
13 A. Yes.
14 Q. And that's something you've reviewed?
15 A. Yes.
16 Q. You testified earlier today that you've explanted
17 some polypropylene mesh slings or portions of some
18 polypropylene mesh slings, is that right?
19 A. That's correct.
20 Q. And when you had occasion to do that, did you look
21 at the mesh that you explanted?
22 A. Yes.
23 Q. In that gross examination of the mesh, did you
24 observe any degradation?

Page 127

1 A. It looked normal to me.
2 Q. And does your outcomes with your patients in whom
3 you've implanted a mid-urethral polypropylene sling
4 like the TVT or TVT-O inform your opinion about
5 whether or not the mesh in those slings degrades?
6 A. Yeah. I find it just, I find it so interesting to
7 read these internal documents on mesh degradation
8 because it was a surprise to me and because
9 clinically I just have not seen any evidence of this
10 at all.
11     We have long-term studies looking at
12 patients looking at their clinical outcome, clinical
13 outcome meaning continued improvement in symptoms
14 but also meaning lack of progression of scar tissue,
15 pain, discomfort, et cetera. So I just don't see
16 any clinical evidence that this is an issue.
17 Q. There was some discussion earlier about what
18 literature you relied on at the time that you
19 started to use the TVT and at the time that you
20 started to use the TVT-O.
21     Do you recall that generally?
22 A. Yes, yes.
23 Q. Did you also rely on the TVT literature that existed
24 as something that made you feel comfortable that the

Page 128

1 TVT-O devices was safe and effective when you
2 started using the TVT-O?
3 A. Yeah. So when the TVT-O came out, the idea was that
4 it's the exact same mesh, it's the exact same
5 location, it's just a different way of getting it
6 there, and we were very comfortable with that.
7 Q. Do you offer the Burch procedure as a stress urinary
8 incontinence treatment to your patients today?
9 A. I do not.
10 Q. Why not?
11 A. So we did a large prospective randomized trial on
12 Burch, and it just, it's not, it's not durable.
13 It's not effective. So when I would do it before,
14 it was only when we were in the abdomen, and it was
15 there, it was easy, we were in the abdomen, we would
16 do a Burch.
17     But now when they're in the abdomen, if
18 they need an anti-incontinence procedure, I'd do a
19 mid-urethral sling. So I'll let them finish in the
20 belly, close, then I'll go vaginally and I will do
21 mid-urethral sling because they're more effective,
22 and I think that they have a better safety profile.
23 Q. Have you actually seen lower rates of groin pain or
24 leg pain with your TVT Abbrevo patients than you did

Page 129

1 with your TVT-O patients?
2 A. No. I really haven't. I haven't formally studied
3 it, but anecdotally in my, just evaluation of my
4 patients, I have not seen that. We do look at these
5 patients when we do our trials.
6     I don't have a prospective sling database
7 but I have retrospective sling databases, and we
8 have not seen a difference.
9 Q. Does the TVT Abbrevo use the exact same mesh as the
10 TVT-O?
11 A. No. The Abbrevo is a laser-cut mesh.
12 Q. But apart from the cutting technique, is it the same
13 mesh?
14 A. Yes, it's the same mesh.
15 Q. And there's laser-cut TVT-O mesh, correct?
16 A. There is, that's correct.
17 Q. In addition to mechanically cut TVT-O devices?
18 A. That's correct.
19 Q. But the mesh in the TVT Abbrevo and the TVT-O is the
20 same polypropylene?
21 A. Yes, it's the same weave, monofilament.
22 Q. It's the same weight or density?
23 A. Same weight, same pore size. It's a hundred grams
24 per liter squared.

Page 130

1  Q. Does the mesh used in the two devices lay under the
2     urethra at the same spot?
3  A. It does. We do that on purpose.
4  Q. Does the TVT Exact use the exact same mesh as the
5     TVT with the exception of the cutting technique?
6  A. Yes, yes, it is.
7  Q. But, again, with the TVT there's also laser-cut mesh
8     available, is that your understanding?
9  A. That's correct.
10 Q. And is the TVT Exact mesh the same weight and pore
11    size as the TVT mechanically cut mesh?
12 A. Yes, it is.
13 Q. And that mesh lays under the urethra at the same
14    place?
15 A. Yes.
16 Q. I'm going to ask you a couple of follow-up questions
17    about Exhibit 11 and 12. 11 is the TVT IFU before
18    2015, and 12 is the TVT IFU before 2015.
19 A. Okay. I have them both.
20 Q. Which one do you have in front of you right now that
21    you're looking at?
22 A. I have the TVT-O one.
23 Q. Okay. So if you look at the TVT-O marked as
24    Exhibit 12, there was some discussion earlier about

Page 131

1     the adverse reaction section.
2        Do you recall that?
3  A. Yes.
4  Q. Right above the adverse reaction section, there's a
5     section that says warnings and precautions, is that
6     right?
7  A. Yes.
8  Q. And if you look at the fifth bullet point from the
9     bottom of that list of warnings and precautions, it
10    says: Transient leg pain lasting twenty-four to
11    forty-eight hours may occur and can usually be
12    managed with mild analgesics, is that correct?
13 A. Correct, yes.
14 Q. And then if you look at the Exhibit 11 which is the
15    TVT IFU, before 2015, you don't see that same
16    notation of transient leg pain, do you?
17 A. That's correct.
18 Q. So in that respect, would you agree that these TVT
19    and TVT-O IFUs before 2015 do set forth a different
20    risk profile?
21        MS. FITZPATRICK: Objection.
22        THE WITNESS: Yeah. I apologize for
23    that. I will tell you that the print is so small, I
24    can hardly see it even with my glasses on.

Page 132

1        However, I did not review that carefully
2     enough before talking about that this morning, and
3     it does clearly say that.
4  BY MR. KOOPMANN:
5  Q. And the TVT-O IFU on the first page, one of the
6     things it says in a paragraph at the top of the
7     first substantive page I'll call it that says
8     English at the top, it says: The device should be
9     used only by physicians trained in the surgical
10    treatment of stress urinary incontinence and
11    specifically in implanting the Gynecare TVT
12    obturator device, is that correct?
13 A. Yes, that's correct.
14 Q. And if you go to the TVT IFU marked as Exhibit 11,
15    it also says: The device should be used only by
16    physicians trained in the surgical treatment of
17    stress urinary incontinence and specifically in
18    implanting the Gynecare TVT device, is that correct?
19 A. Yes, that's correct. And really, all these
20    decisions are not -- these decisions are all made by
21    the local hospitals, universities, et cetera, who do
22    privileging, chairman of the department. That's how
23    we decide who can implant and who cannot implant.
24    It's a local decision made by the administrations

Page 133

1     and departments at the local hospitals.
2  Q. Is the fact that data can change over time one of
3     the reasons surgeons continue to do studies and
4     systematic reviews and meta-analyses?
5  A. Yeah, and I alluded to that in talking about how the
6     literature develops, and we learn more and more
7     things as time goes on.
8  Q. And is a continuing review of the literature
9     something that surgeons do as part of their
10    practice?
11 A. It's what we constantly do. In fact, in programs
12    like ours, we have a journal club every month
13    specifically to look at the new literature to keep
14    ourselves updated.
15 Q. Can a risk profile of a device change over time?
16 A. Absolutely, especially as we learn more about it and
17    we're informed.
18 Q. The additional adverse reactions and other adverse
19    reactions that counsel went over earlier with you in
20    the 2015 IFUs for the TVT and TVT-O which have been
21    marked as Exhibits 13 and 14 respectively, in your
22    opinion was there any reason that those additional
23    adverse reactions that were not seen in prior
24    versions of the IFU needed to be included in the

Page 158

1  products versus AMS products, and what you told me,
2  I did not do one at my institution but I
3  participated in the overall study.
4  A. Yeah. So, so we did not do it at Beaumont, you're
5  right. I participated in the study that pulled the
6  data and looked at it on the national level.
7  Q. Those weren't your patients, right?
8  A. Some of them were but not all of them, no.
9  Q. You didn't do it at Beaumont?
10 A. We did not do a study at Beaumont where we compared
11 Ethicon versus AMS or somebody else.
12 Q. And those are your patients who you haven't done a
13 study in your patients at Beaumont that compared
14 Ethicon to another manufacturer, right?
15 A. But what we did is we participated in the study that
16 compared AMS and Ethicon on a national level.
17 Q. Okay.
18 A. But not on a local level.
19       MS. FITZPATRICK: That's all that I have.
20 Thank you.
21
22       (Deposition concluded at 12:50 p.m.)
23
24

Page 159

1  STATE OF MICHIGAN   )
                       )SS.
2  COUNTY OF LIVINGSTON )
3           CERTIFICATE OF NOTARY PUBLIC
4           I certify that this transcript
5  is a complete, true, and correct record of the
6  testimony of the deponent to the best of my ability
7  taken on Thursday, July 21, 2016.
8           I also certify that prior to
9  taking this deposition, the witness was duly sworn
10 by me to tell the truth.
11          I also certify that I am not a
12 relative or employee of a party, or a relative or
13 employee of an attorney for a party, have a contract
14 with a party, or am financially interested in the
15 action.
16
17
18
19
20
   _____
21
   Cheryl McDowell, CSR-2662, RPR
22 Notary Public, Livingston County
   State of Michigan
23 Commission Expires September 13, 2019
24