# EXHIBIT A

Harry W. Johnson, Jr., M.D.

```
 1           IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3     Master File No. 2:12-MD-02327      MDL 2327

       _____
 4

       IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS
 5     LIABILITY LITIGATION

       _____
 6

       CONSOLIDATED TRIAL
 7

       MULLINS, ET AL.                    JOSEPH R. GOODWIN
 8

       v. ETHICON, INC., ET AL.        U.S. DISTRICT JUDGE
 9

                                    CASE NO. 2:12-cv-02952
10     _____
11                            Baltimore, Maryland
12                            Thursday, July 14, 2016
13     General TVT Deposition of:
14           HARRY W. JOHNSON, JR., M.D.
15     the witness, was called for examination by counsel
16     for the Plaintiff, pursuant to notice, commencing
17     at 8:22 a.m., at the Kimpton Hotel Monaco Baltimore
18     Inner Harbor, 2 North Charles Street, Baltimore,
19     Maryland 21201, before a Notary Public in and for
20     the State of Maryland, when were present on behalf
21     of the respective parties:
22
23
24
25
```

Harry W. Johnson, Jr., M.D.

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
    JOHN R. CRONE, ESQUIRE
    ANDRUS WAGSTAFF
    7171 West Alaska Drive
    Lakewood, Colorado 80226
    (303) 376-6360
    john.crone@andruswagstaff.com

ON BEHALF OF THE PLAINTIFF JANET WEBB:
(Appearing telephonically)
    CLINTON J. CASPERON, ESQUIRE
    TRACEY & FOX
    440 Louisiana Street
    Suite 1901
    Houston, Texas 77002
    (713) 955-7854
    ccasperon@traceylawfirm.com

ON BEHALF OF THE DEFENDANTS:
    PHILIP J. COMBS, ESQUIRE
    SUSAN M. ROBINSON, ESQUIRE
    THOMAS COMBS & SPANN, PLLC
    300 Summers Street
    Suite 1380
    Charleston, West Virginia 25301
    (304) 414-1800
    pcombs@tcspllc.com
    srobinson@tcspllc.com

Page 3

CONTENTS

EXAMINATION OF HARRY W. JOHNSON, JR., M.D.    PAGE
BY MR. CRONE                    4

EXHIBITS

JOHNSON DEPOSITION EXHIBITS           PAGE
Exhibit 1   Notice of Deposition        11
Exhibit 2   General Expert Report       13
Exhibit 3   Curriculum Vitae            13
Exhibit 4   Reliance List               7
Exhibit 5   Supplemental Reliance List  8

Page 4

PROCEEDINGS

Whereupon,

        HARRY W. JOHNSON, JR., M.D.,

a Witness, called for examination by counsel for

the Plaintiffs, having first been duly sworn, was

examined and testified as follows:

        EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. CRONE:

    Q.  Dr. Johnson, I know we've met, but if you

could state and spell your name for the record,

please.

    A.  Harry Wallace Johnson, Jr.  That's

H-a-r-r-y, Wallace, W-a-l-l-a-c-e, Johnson,

J-o-h-n-s-o-n, Jr., J-r.

    Q.  And you've had your deposition taken

before?

    A.  I have.

    Q.  Okay.  So it's fair to say you understand

the ground rules generally?

    A.  Yes.

    Q.  Okay.  The only thing I'll repeat, then,

is that when I ask a question, if you don't

understand it, please ask me to clarify.  I have no

interest in you answering questions you don't

understand, but if you don't ask to clarify, I'll

Page 5

assume you understood the question.  Fair enough?

    A.  Yes.

    Q.  Okay.  Good.

        So, Dr. Johnson, you've been retained by

the Defendants to offer a general causation opinion

on the TVT product; is that correct?

    A.  That's correct.

    Q.  And you've drafted an expert report

expressing those opinions?

    A.  That's correct.

    Q.  Okay.  And that expert report expresses

opinions on the TVT product?

    A.  That's correct.

    Q.  And on the TVT-O product?

    A.  Yes.

    Q.  Okay.  Would you agree that the Mullins

consolidation involves cases only regarding the TVT

product?

        MR. COMBS:  Dr. Johnson may not know that.

I'll stipulate that it does, but you're welcome to

ask him about it.

        MR. CRONE:  Yeah.

BY MR. CRONE:

    Q.  I mean, do you know that, Dr. Johnson?

    A.  That's my understanding.

Harry W. Johnson, Jr., M.D.

Page 6

1    Q.  Okay.  And so would you agree, then, that
2  any opinions in your general causation report
3  related to the TVT-O product aren't relevant to
4  this -- to the Mullins consolidation litigation?
5    A.  Well, some of my opinions for -- would
6  apply to either product.
7    Q.  Okay.  Yeah, let me ask it a bit more
8  clear.
9      Do you intend to offer any opinions on the
10  TVT-O's safety?
11    MR. COMBS:  Object to form.
12    THE WITNESS:  Well, I would say when I
13  came to this deposition, I thought we were talking
14  about TVT.  If asked questions about TVT-O, I would
15  answer those questions.  Is that what you mean?
16  BY MR. CRONE:
17    Q.  Well, yeah, I also thought we were talking
18  about TVT only.  I'm referring to the opinions
19  expressed in your report relating to the TVT-O.
20      So the question I'm asking is:  Are you
21  intending to offer opinions at any future date on
22  the TVT-O product's safety?
23    MR. COMBS:  Object to form.
24    THE WITNESS:  I'm not sure I completely
25  understand, but what I think you're asking me, if

Page 7

1  I'm going to offer opinions about TVT-O in these six
2  cases.
3  BY MR. CRONE:
4    Q.  That's correct.
5    A.  I'm going to offer opinions about TVT in
6  these six cases.
7    Q.  Okay.  So in these six cases, you won't
8  offer any opinions related to TVT-O's safety or
9  efficacy?
10    A.  Only if a question about TVT-O were to
11  come up.
12    Q.  That's fair enough.
13      So, Doctor, I'm going to hand you some
14  exhibits.  And these are out of order.  And believe
15  it or not, last night I reordered this to try to be
16  more efficient.  So I'm going to mark them out of
17  order, and the first exhibit is your reliance list.
18    MR. CRONE:  If we could mark this as
19  Exhibit 4.
20      (Exhibit 4 was marked for identification
21      and is attached to the transcript.)
22  BY MR. CRONE:
23    Q.  And then I will hand you your supplemental
24  reliance list.
25    MR. CRONE:  And this we'll mark as

Page 8

1  Exhibit 5.
2      (Exhibit 5 was marked for identification
3      and is attached to the transcript.)
4  BY MR. CRONE:
5    Q.  Okay.  So have you seen these two
6  documents in front of you, Exhibit 4 and 5?
7    A.  Yes.
8    Q.  Okay.  And what are these?
9    A.  It's a reliance list and a supplemental
10  reliance list.
11    Q.  Okay.  And so are all of the materials
12  listed in the reliance list and supplemental
13  reliance list materials you relied on in forming
14  your opinions on the TVT product?
15    A.  The materials that I relied on are within
16  this list.
17    Q.  Okay.  And so there are additional
18  materials on the list that you did not rely on?
19    A.  No.  There's -- there are things in this
20  list that I didn't review that I didn't feel were
21  important to me.
22    Q.  Okay.  And so the materials on the list
23  were provided to you by Ethicon's attorneys?
24    A.  By Butler Snow.
25    Q.  Okay.  And Butler Snow is the law firm --

Page 9

1  one of the law firms that represents the Defendants,
2  correct?
3    A.  Yes.
4    Q.  And so they sent over various materials
5  for you to review?
6    A.  I mean, my understanding is they sent
7  everything on these reliance lists.
8    Q.  And then you reviewed some of it, relied
9  on that to form your opinions; is that fair?
10    A.  Yes.
11    Q.  And then some of it you didn't review
12  because you didn't think it was relevant or
13  necessary?
14    A.  Yes.
15    Q.  Okay.  And so what is your understanding
16  of -- how would you define a reliance list?
17    MR. COMBS:  Objection to the form.  Asks
18  for a legal conclusion from a lay witness.
19    THE WITNESS:  It would be materials that I
20  can review and rely on to help me write a report and
21  reference medical literature involving the report
22  that I would be writing.
23  BY MR. CRONE:
24    Q.  Okay.  And so why, then, did you include
25  information on the reliance list that you didn't, in

Page 10

1  fact, rely on in forming your opinions on the TVT
2  product?
3          MR. COMBS:  Objection to form.
4          THE WITNESS:  Well, this list is a list of
5  everything that I was sent, so I just provided a
6  complete list of materials that I was sent.
7  BY MR. CRONE:
8      Q.  But these aren't, in fact -- there are
9  many materials on the list that you did not rely on
10  in forming your opinions on the TVT product; is that
11  fair?
12      A.  Well, there's a lot of things in this
13  reliance list that are referenced in other articles
14  on the reliance list, so it's kind of intermingled.
15      Q.  Okay.  So is it possible -- would it be
16  possible for you, then, to go through Exhibit 4 and
17  5, the reliance list and supplemental reliance list,
18  and pare it down to the -- just the materials you
19  actually did rely upon in forming your opinions on
20  the TVT?
21      A.  Well, I don't think that would be possible
22  because a lot of this material I reviewed and just
23  formed opinions over a long period of time, not
24  specifically for this report.  So I reviewed
25  literature in addition to performing the report

Page 11

1  that's part of this literature --
2      Q.  But you would --
3      A.  -- or medical science.
4      Q.  But you would recognize any materials on
5  there you haven't ever read before, correct?
6      A.  For the most part, yes.
7      Q.  All right.  We'll set those aside.
8          I'm going to hand you what we'll mark as
9  Exhibit 1 now.
10          (Exhibit 1 was marked for identification
11          and is attached to the transcript.)
12  BY MR. CRONE:
13      Q.  So Exhibit 1 is titled Notice to Take
14  Deposition of Dr. Harry Johnson, Jr.  Have you seen
15  this document before?
16      A.  I have seen this.
17      Q.  Okay.  And you've reviewed it?
18      A.  Yes.
19      Q.  Okay.  And this document asked you to
20  bring various documents with you?  To help you out
21  here, it's at page 6.  It starts at page 6 of the
22  document and then goes to the end.  It asks you to
23  bring various documents.  Do you see that?
24      A.  Yes.
25      Q.  Did you bring those documents?

Page 12

1      A.  I brought my general report and a
2  literature book.
3      Q.  Okay.
4          MR. COMBS:  And then I have also brought a
5  thumb drive, which is marked Johnson General, which,
6  it's my understanding, would have an electronic copy
7  of the materials on Dr. Johnson's reliance list.
8  BY MR. CRONE:
9      Q.  So the thumb drive has the reliance list
10  materials.  You've brought the general report.
11      A.  Yes.
12      Q.  Anything else?
13      A.  I brought a book of TVT medical
14  literature.
15          MR. CRONE:  Which would be on the thumb
16  drive, right, Phil?
17          MR. COMBS:  It should be.  I mean, I'm
18  always hesitant to answer that because I don't
19  actually make the thumb drives, but if there is
20  anything in that medical literature notebook that is
21  not on the thumb drive, that is an error.
22          MR. CRONE:  Okay.
23          MR. COMBS:  It should have everything that
24  is in the TVT medical literature book and everything
25  that is in the notebook that's in Dr. Johnson's left

Page 13

1  hand.
2          MR. CRONE:  Okay.  Great.
3  BY MR. CRONE:
4      Q.  And did you bring any invoices for work
5  completed thus far?
6      A.  I did not.
7      Q.  Okay.  Have you generated any invoices?
8      A.  I have not.
9      Q.  Why is that?
10      A.  Well, probably the simplest answer is I've
11  been working to get ready for this.  So I'll prepare
12  one afterwards.  I'm happy to share that with you.
13      Q.  Yeah, that would be great.  At a later
14  date would be fine.
15          This ties into it, so I'll just mark this
16  now.  As you know, we have a copy of your CV.  And I
17  think it's just slightly out of date.
18          MR. CRONE:  We'll mark this as Exhibit 3.
19          (Exhibit 3 was marked for identification
20          and is attached to the transcript.)
21  BY MR. CRONE:
22      Q.  And while we're at it, let's get your
23  general report in this matter marked, which is
24  Exhibit 2.
25          (Exhibit 2 was marked for identification

Harry W. Johnson, Jr., M.D.

Page 14

1      and is attached to the transcript.)
2  BY MR. CRONE:
3      Q.  Okay.  So, Doctor, if we can go to page 3
4  of Exhibit 2, which is your expert report.  It's the
5  one just handed to you, Exhibit 2.
6          MR. COMBS:  John, you said page 3?
7          MR. CRONE:  Page 3, yeah.
8          MR. COMBS:  Okay.  Thank you.
9  BY MR. CRONE:
10     Q.  In the middle of the page, it lists your
11 rates there.  Are those rates current?
12     A.  Yes.
13     Q.  So is it your practice, then, to bill --
14 to -- I'll use the term line item bill, if you
15 understand that, when you send an invoice, or how do
16 you generate your invoices?
17     A.  Just like this summary here.
18     Q.  So one line might have a summary
19 indicating you met with somebody or had a telephone
20 call and you would just note the amount of time that
21 took?
22     A.  Yes.
23     Q.  Okay.
24         MR. COMBS:  John?
25         MR. CRONE:  Yes.

Page 15

1          MR. COMBS:  Just before you leave this
2  page --
3          MR. CRONE:  Sure.
4          MR. COMBS:  -- I want to say something
5  about it, but I don't want to interrupt you.
6          MR. CRONE:  Oh, no.  Please go ahead.
7          MR. COMBS:  Well, I just wanted to say, I
8  look at this and I notice an error on page 3 in
9  terms of it listing Dr. Johnson's testimony.
10 Because in 2014, Dr. Johnson did give a deposition,
11 which, you know, obviously the Plaintiffs are
12 familiar with because you have it, but it's in the
13 Huskey/Edwards case.  So it's just an error on that
14 list.
15         MR. CRONE:  Okay.  Yeah, and I was going
16 to get to that, but we might as well clear it up
17 now.
18 BY MR. CRONE:
19     Q.  So you recall giving a deposition in the
20 Huskey/Edwards v. Ethicon case?
21     A.  I do.
22     Q.  Okay.  And when you gave that deposition,
23 you testified accurately in that deposition?
24     A.  To the best of my ability.
25     Q.  Truthfully to the best of your ability?

Page 16

1      A.  Yes.
2      Q.  And so that is an error and should be
3  included in the expert report on that list on
4  page 3?
5      A.  Yes.  I don't -- I don't actually keep a
6  list of cases, but I went through, to the best of my
7  ability, my calendar to generate this list.  So I
8  must have missed that.  I don't --
9      Q.  Okay.
10     A.  It was unintentional.
11     Q.  And do you think with that addition it's
12 complete now, that list?
13     A.  I believe I gave one deposition in the
14 last month not related to this matter that's not
15 listed here.
16     Q.  Okay.  And what sort of matter was that?
17     A.  That was a malpractice case.
18     Q.  Do you know the name of the case?
19     A.  I don't know the name, but I'm happy to
20 provide that to you.
21     Q.  Sure.
22         Dr. Johnson, have you ever acted as a
23 consultant for any matter for Ethicon?
24     A.  With regard to what?  I mean, I prepared
25 the -- I prepared the general report we just

Page 17

1  discussed in the Edwards matter.
2      Q.  No.  I'm referring to things like
3  preceptorships, proctorships, consulting on -- I
4  mean as broad as possible -- consulting on drafting
5  IFUs, patient brochures, that sort of thing.
6      A.  I did on several occasions work as a
7  preceptor.  In other words, Ethicon brought in two
8  or three surgeons to watch me perform a TVT.  I was
9  a faculty member in courses for a company named
10 IMET, I-M-E-T, that I believe -- well, the company
11 taught all different types of surgical procedures,
12 if you will, and TVT was, I believe, taught in that
13 course.  And some of the courses may have been
14 sponsored by Ethicon.  I was just a faculty member
15 in the course but not -- I don't believe that we
16 were -- I wasn't working for Ethicon at the time.  I
17 was teaching a course for the IMET company.
18     Q.  Okay.  So excluding the IMET company work
19 and -- so then acting as a preceptor for Ethicon
20 prior to that, anything else that you did for
21 Ethicon?
22     A.  No.  I was never -- I never contracted
23 with Ethicon to do any sort of teaching in these
24 procedures.  I just agreed a time or two for
25 observation of cases that I was doing.

Harry W. Johnson, Jr., M.D.

Page 18

1    Q.  And when did you conduct these activities?
2    A.  That was in the early 2000s.  I don't
3  know.  Early to mid 2000s.
4    Q.  Would it be as late as 2008?
5    A.  I don't believe so.
6    Q.  So if there were a document out there
7  showing that you did work for Ethicon in 2008, would
8  that be -- would that document be inaccurate?
9    A.  I -- I mean, I suppose it's possible I did
10  something in 2008.  I would have to look at the
11  document.  I don't recall the specific dates.  I
12  just know that I didn't do this very much.  But it
13  was sometime -- I mean, when I did it, it was
14  sometime between -- sometime prior to 2010, I'm
15  sure, fairly sure, but I don't recall the dates
16  exactly.
17    Q.  Can you estimate the total amount Ethicon
18  has paid you for all of your consulting activities?
19  Is it fair if I just call them consulting
20  activities?
21        MR. COMBS:  Just so that I understand, are
22  we talking about as a preceptor?
23  BY MR. CRONE:
24    Q.  Yeah, we're talking about as a preceptor
25  and then anything else -- I know you're having a

Page 19

1  hard time remembering exactly what you may have done
2  and when, but certainly if I use the term
3  "consulting activities," I'm including as a
4  preceptor and anything else you may have done.
5        MR. COMBS:  But -- here's the only thing I
6  want to understand.  Are you talking consulting work
7  and the medicolegal work?
8        MR. CRONE:  No.  No.  I'm sorry.
9        MR. COMBS:  Okay.  That's the part --
10        MR. CRONE:  Okay.  That's a fair question.
11  I understand.
12  BY MR. CRONE:
13    Q.  Not anything related to your retention as
14  an expert.
15    A.  Okay.
16    Q.  So not drafting expert reports or anything
17  like that.  Just this prior consulting work that you
18  discussed in the 2000s, maybe as late as -- you
19  know, prior to 2010, that work that you described.
20  Can you estimate how much you were paid for all of
21  that?
22    A.  I'm not sure that I can give you a real
23  accurate estimate, but I would say, if I -- if I
24  made some sort of guess --
25    Q.  Sure.

Page 20

1    A.  -- without reviewing any sort of
2  historical documents or anything, I would think it
3  would be less than 5- or $10,000.  I just don't
4  recall exactly what I did.
5    Q.  You don't think it could be more than
6  $20,000?
7    A.  I would seriously doubt that.
8    Q.  Okay.  So let's go back to your expert
9  report that's Exhibit 2.  I think you already have
10  it in front of you.  Ethicon -- or the attorneys for
11  Ethicon, I should say, asked you to write this
12  opinion; is that correct?
13    A.  Yes.
14    Q.  And let's look at page 2.  If you look at
15  the second full -- the second full paragraph from
16  the bottom of the page, it starts with:  "I am a
17  very active surgeon."
18    A.  Yes.
19    Q.  The next sentence says you've performed at
20  least 750 polypropylene midurethral slings.  Is that
21  an accurate number?
22    A.  Fairly accurate.
23    Q.  And you're still performing about 50 sling
24  procedures per year?
25    A.  Maybe a little less in the last year or

Page 21

1  two.
2    Q.  And why have you been performing a bit
3  less?
4    A.  Well, I have some more administrative
5  duties, and I had took some time off for a surgical
6  procedure, so it changed --
7    Q.  And then --
8    A.  -- my practice a little bit.
9    Q.  I'm sorry.  I didn't mean to interrupt.
10    A.  That's okay.
11    Q.  The last sentence in that paragraph says
12  you currently use the TVT-O and TVT-Exact.  Why is
13  that?
14    A.  Well, I use what we have at our hospital.
15  So the TVT and the TVT-Exact are essentially the
16  same product, so I use them interchangeably.
17  Actually, I still use the regular TVT.
18    Q.  How often do you still use the regular
19  TVT?
20    A.  Well, I operate at four different
21  hospitals and not everybody has the Exact.  So I
22  would guess it varies from year to year depending
23  where I'm operating.  I don't know if I can give you
24  an exact number.  It just varies from year to year.
25    Q.  That's fine.  No need to guess.

Harry W. Johnson, Jr., M.D.

Page 22

1    If a hospital has the TVT-Exact and the
2 TVT, do you prefer the TVT-Exact?
3    A.  I really don't have a preference.  The
4 difference of the needle is minimal or the passer.
5    Q.  What sort of mesh is in the TVT?
6    A.  Polypropylene Type I Macroporous mesh.
7    Q.  And is that the same type of mesh that's
8 in the TVT-Exact?
9    A.  They're both -- they're both polypropylene
10 mesh.
11    Q.  Do you know if the TVT-Exact polypropylene
12 mesh is Type I Macroporous?
13    A.  I believe it is.
14    Q.  Okay.  Moving ahead to page 3.  The first
15 full paragraph, the sentence starts with:  "The UITN
16 Network."
17    Do you see that sentence?
18    A.  Yes.
19    Q.  And it mentions in that same paragraph
20 that the UITN Network conducted a large,
21 prospective, randomized surgical trial -- or trials.
22 And what -- starting with the first one because --
23 well, first let me ask:  When you say "trials," you
24 mean they conducted more than one study?
25    A.  That's correct.

Page 23

1    Q.  Okay.  And so when was the first one
2 conducted?
3    A.  It started sometime around the early
4 2000s.
5    Q.  Okay.  And were those studies -- or
6 trials.  I'm sorry.  Were those trials looking at
7 the TVT product?
8    A.  Initially we looked at Burch versus
9 fascial sling.
10    Q.  Okay.  Then skipping ahead to the next
11 trial, then, which products did that -- or
12 procedures did that look at?
13    A.  TVT, TVT-O, and Monarc.  It was looking at
14 retropubic versus obturator.  And obturator used two
15 different -- there was two different slings that
16 were used in the obturator arm that were based on
17 surgeon preference.
18    Q.  And the TVT uses the retropubic procedure,
19 correct?
20    A.  That's correct.
21    Q.  Let's skip over to your CV, which is
22 Exhibit 3.  And I understand this is just a bit out
23 of date, so let's skip to what we know is a bit out
24 of date.
25    On page 2, under specialty boards,

Page 24

1 Diplomate, American Board of OB/GYN, the
2 recertification stops at 2013.  Were you then
3 recertified in 2014, 2015, and 2016?
4    A.  Yeah, I'm currently recertified.  In 2014,
5 I missed the deadline for a test so I had to file
6 for a re-entry test, which I took and passed, to put
7 me back on the yearly schedule.
8    Q.  And you're unaware if during that time you
9 missed a test and then filed the paperwork for the
10 re-entry test the certification lapsed in that
11 period?
12    A.  I'm not sure on that.  The test was due by
13 December 31st, and I completed it, I think, around
14 the beginning of April.  So the March-April time
15 frame.
16    Q.  Okay.  Skipping to page 5.
17    A.  The --
18    Q.  Oh, I'm sorry.  Go ahead.
19    A.  The one thing I would say in the specialty
20 boards that's not there, also in -- I was certified
21 in female pelvic medicine and reconstructive surgery
22 last year, which is a subspecialty certification
23 within the board of OB/GYN.
24    Q.  Okay.  And how does that differ from the
25 prior certifications?

Page 25

1    A.  The OB/GYN certification is for general
2 OB/GYN.  It's an examination that you take after you
3 complete your residency followed by an oral
4 examination.  And then the recertification is a
5 yearly -- you have a choice of recertification every
6 seven years or ten years depending on when your
7 first certification was or you can choose the yearly
8 certification.  In 2000, the yearly certification
9 started, and you can choose that by choice.
10    In 2013, the board developed a
11 subspecialty certification in female pelvic medicine
12 and reconstructive surgery for people that had
13 either extensive experience or fellowship training
14 in pelvic floor issues.  And they had a -- offered
15 an examination for subspecialty certification
16 starting in 2013.  And now that's the certification
17 that people would take in addition to their OB/GYN
18 certification as a subspecialist.
19    In OB/GYN, there are four subspecialties,
20 and this is the latest and fourth one that was
21 added.  There's maternal-fetal medicine,
22 reproductive endocrinology, oncology, and now female
23 pelvic medicine and reconstructive surgery.
24    Q.  Okay.  And the female pelvic medicine and
25 reconstructive surgery certification, that would

Harry W. Johnson, Jr., M.D.

Page 26

1  relate to performing procedures to repair
2  incontinence?
3      A.  That's one of the things that it refers
4  to.
5      Q.  It would also refer to prolapse repairs
6  and other things of that nature?
7      A.  Basically things that affect the pelvic
8  floor function of the bladder, vagina, bowels,
9  rectum-type thing, and surgical procedures therein,
10  evaluation, treatment, that type of thing.
11     Q.  Okay.  So let's skip to page 5.  Under
12  research grant, do you see the first one listed
13  there talks about the UITN grant?  And who provided
14  that grant money?
15     A.  The National Institute of Health.
16     Q.  Was it all from the National Institute of
17  Health, all of the grant money?
18     A.  That's my understanding, yes.
19     Q.  Okay.  On page 6 -- let's skip to page 6,
20  Doctor.  Well, no need.
21        On page 7, at the bottom, there's a
22  column -- or excuse me -- a heading listed invited
23  speeches, presentations.  The first one begins in --
24  that's listed is 1994.  The last one listed, on page
25  9, is in 2001.  Is this list up to date?

Page 27

1      A.  Probably not.  This is from 2014.
2      Q.  Okay.  How many additional presentations
3  or speeches do you think you've given that aren't on
4  this list?
5      A.  I don't think there's very many, but I'm
6  happy to provide you with an updated CV.
7      Q.  That would be great.  Thanks.
8        Okay.  Let's go to page 4 of your expert
9  report, and that's Exhibit 2.  Okay.  The very first
10  sentence at the top of page 4 reads:  "Urinary
11  incontinence affects up to 50 percent of women with
12  range of 10 to 70 percent."
13        What does that mean?
14     A.  That means that a lot of women leak urine
15  on average.
16     Q.  So up to 50 percent of women suffer from
17  leakage?
18        MR. COMBS:  Object to form.
19        THE WITNESS:  Well, that's a -- what I was
20  talking about there is there's an average.  So
21  50 percent may be an average, but the range may be
22  10 to 70 percent.  I think it -- I might understand
23  the semantics you're asking me.  If it affects up to
24  50 percent, how can the range be 10 to 70 percent?
25

Page 28

1  BY MR. CRONE:
2      Q.  Well, I think I understand now.  I think
3  you're saying that the average is 50 percent,
4  correct, but the range could be 10 -- as low as 10
5  up to 70?  Is that fair?
6      A.  Yeah.  There's a lot of different numbers
7  reported in the literature and this is kind of an
8  average.  That was my meaning here.
9      Q.  Okay.  I understand.
10        When thinking about trials or studies --
11  so this question will apply to both.  It's compound,
12  I understand that.  We'll take it one at a time.
13        Would you agree that the results of any
14  given -- let's just say study first -- may vary
15  wildly based on methodology, just as a general
16  proposition?
17     A.  I agree there can be variability based on
18  methodology.
19     Q.  And would you agree to that same general
20  proposition with regard to trials?
21     A.  Yes.
22     Q.  And the third full paragraph on page 4, at
23  the second-to-last sentence of that, it starts with:
24  "Urinary incontinence is a prevalent condition with
25  significant medical, social, and psychological

Page 29

1  ramifications."
2        Do you see that sentence?
3      A.  Yes.
4      Q.  And then the next sentence says:  "It is a
5  symptom and not a diagnosis and is seen in all age
6  groups."
7        What do you mean by it is a symptom and
8  not a diagnosis?
9      A.  Well, there's a lot of different things
10  that can cause urinary incontinence.  So the symptom
11  is leakage, but the cause is not the leakage.  A lot
12  of different medical conditions can cause leakage,
13  if you will.
14     Q.  Can you give just one example of that?
15     A.  Well, I mean, let's say you have a
16  dementia patient that can't control her bladder.
17  She has urinary incontinence.
18     Q.  So in your view, then, the patient suffers
19  from dementia and a symptom of that dementia is
20  urinary incontinence?
21     A.  In that case, yes.
22     Q.  Are there cases where urinary incontinence
23  is a diagnosis in and of itself?
24     A.  Well, there's different types of urinary
25  incontinence.  So there can be -- for example, a

Harry W. Johnson, Jr., M.D.

Page 30

1 fistula or a hole in the bladder can cause
2 incontinence. You can have a bladder that doesn't
3 work where the patient has overflow incontinence; or
4 you can have stress incontinence, which is leakage
5 with an increasing intraabdominal pressure or
6 non-function of the urethral sphincter; or you can
7 have urge incontinence which can be neurologically
8 based where the bladder is -- a common term is
9 overactive bladder where the muscle contracts and
10 urine is released without the patient wanting to
11 release urine, in other words, incontinence instead
12 of voiding.
13    Q. Okay. So, Doctor, I think I understand.
14 So in those instances -- let's take the fistula, for
15 example. The fistula is the cause and the stress
16 urinary -- or the incontinence is the symptom of the
17 fistula?
18    A. Exactly.
19    Q. Okay. Skipping to page 5, the very last
20 paragraph, second sentence -- this is under a
21 heading that says nonsurgical options. You say:
22 "Up to 50 percent of women may improve enough to
23 forego surgical treatment initially. However,
24 greater than 90 percent of these patients remain
25 incontinent and greater than 60 percent may

Page 31

1 subsequently seek surgical management."
2    Why is that the case?
3    A. Well, nonsurgical management doesn't
4 always work or it may work and then the patient gets
5 worse and looks for another form of treatment. I
6 think worsening incontinence is a complaint that
7 people often come in with seeking options for
8 treatment and they may move to a surgical treatment.
9    Q. So a patient with incontinence would
10 likely try a nonsurgical option prior to trying a
11 surgical option?
12    A. Well, certainly that's one of the options
13 for the patient depending on the type of
14 incontinence. Now, of course you know that a
15 nonsurgical treatment, for example, for a fistula
16 has a low chance to work. So I think you have to be
17 specific about what the problem is to say whether
18 the treatment would work or not.
19    Q. Sure. Let's take stress urinary
20 incontinence.
21    A. Okay.
22    Q. Would a nonsurgical option -- would it be
23 appropriate to first try a nonsurgical option if a
24 patient had SUI?
25    A. That's certainly an appropriate initial

Page 32

1 treatment in addition to a surgical treatment.
2    Q. Sticking with that example, if a patient
3 had SUI -- and SUI stands for stress urinary
4 incontinence, correct?
5    A. That's right.
6    Q. If a patient had SUI and tried a
7 nonsurgical procedure first, do you know what the
8 success rates are for nonsurgical treatments of SUI?
9 And by success rates, I mean both objective and
10 subjective.
11    A. I would say on average in the literature,
12 at best, it would be 50/50. There is certainly some
13 variability in success. And a lot of it depends on
14 the degree of the problem and also associated
15 conditions with the problem whether that would work
16 or not, and that's why you have a wide range of
17 variability.
18    Q. Do you know what or which literature
19 supports that opinion, the at best 50/50 success
20 rate opinion?
21    A. I can't point you to a specific document
22 right off the top of my head.
23    Q. And let's go to the next page, page 6, and
24 start at the top. The letters A through G there,
25 there you're listing nonsurgical options for SUI; is

Page 33

1 that correct?
2    A. Yes.
3    Q. And that success rate we just discussed,
4 50/50 with variability based on severity of the SUI,
5 does that apply to all of these collectively?
6    A. Well, it's based on variability of the
7 severity of the incontinence as well as associated
8 conditions, so it's difficult to define which ones
9 it would work best in. But I don't believe any of
10 them have a success rate in general over 50 percent.
11    Q. And if the patient chooses a surgical
12 option, would you agree that the goal, then, is to
13 achieve long-term continence with low rates of
14 complications related to the surgery?
15    A. That would be optimal.
16    Q. That would be optimal.
17    A. Yeah, of course we want to perform
18 procedures that work in the long term to maintain
19 continence.
20    Q. And so if you performed a procedure that
21 provided the patient with long-term incontinence
22 with low rates of complications, would you consider
23 that procedure to be safe?
24    MR. COMBS: Object to the form. John, I
25 think you just accidentally misstated the question.

Harry W. Johnson, Jr., M.D.

Page 34

1  You might just want to rephrase it or restate it.
2  BY MR. CRONE:
3      Q.  No.  I'll clear it up.
4      A.  What I heard was -- instead of continence
5  was a surgical procedure to give you incontinence.
6      Q.  Oh, no.  I'm sorry.  I understand that's
7  never the goal.
8          (A discussion was held off the record.)
9  BY MR. CRONE:
10     Q.  If the procedure produced long-term
11  continence, not incontinence, with low rates of
12  complications, would you consider that procedure to
13  be safe?
14     A.  So a procedure with a low rate of
15  complications is very good.  I'm not sure what you
16  mean by safe.  All operations carry risk.
17     Q.  Sure, they all carry risk.  I'm trying
18  to -- what I'm trying to get at is how you define
19  safety.  So let's go back to the question I asked.
20         You perform an SUI surgical procedure.
21  After that occurs, there's long-term continence, low
22  rates of complications.  Would that be an
23  efficacious procedure?
24         MR. COMBS:  Object to form.
25         THE WITNESS:  Again, I'm not exactly sure

Page 35

1  what you mean by that.
2  BY MR. CRONE:
3      Q.  How do you define the term or the word
4  "efficacy"?
5      A.  Well, if the procedure works or not would
6  be my understanding of efficacy.
7      Q.  Okay.  And so would a procedure that
8  produces long-term continence be efficacious under
9  your definition?
10     A.  Well, I would like a procedure that gives
11  long-term -- of course the procedure we're doing is
12  for continence, to restore a patient to continence,
13  and the best procedure would be a procedure that
14  provided long-term continence.
15     Q.  And if it did, that would be -- that would
16  signify that the procedure was efficacious?
17     A.  Well, it would signify to me that it's a
18  good procedure that's achieving the result that we
19  are intending to try to obtain.
20     Q.  So now I'll ask the safety question again.
21  How do you define whether or not a procedure is
22  safe, an SUI surgical procedure?
23     A.  All procedures that we perform in stress
24  urinary incontinence that are surgical procedures
25  have known adverse events, whether -- so I don't

Page 36

1  know that I -- you know, what I would want is a
2  procedure that has a low incidence of adverse
3  events.
4      Q.  So if a procedure had a high incidence of
5  adverse events, that's not the type of procedure you
6  would want to perform?
7      A.  Well, again, a procedure may have a large
8  number of possible adverse events as a surgical
9  procedure, and I think I would look at each one
10  individually to decide whether -- what I thought
11  about the procedure.
12     Q.  Okay.  And adverse events can be reported
13  to the FDA; is that correct?
14     A.  Yes.
15     Q.  Adverse events are studied and compiled in
16  the medical literature; is that correct?
17     A.  Yes.
18     Q.  So with any given SUI procedure -- let's
19  take the TVT procedure specifically.  You could look
20  at the TVT procedure, look at the medical literature
21  and determine the -- how many adverse events are
22  associated with that type of procedure; is that
23  correct?
24     A.  I would look at the medical literature,
25  especially meta-analysis-type papers that could

Page 37

1  provide me with adverse events that had been
2  reported in the medical literature and how often and
3  what they were.
4      Q.  Sure.  And if they -- if there were a
5  great number of adverse events, you would not want
6  to perform the procedure; is that correct?
7          MR. COMBS:  Object to form.
8          THE WITNESS:  No.
9  BY MR. CRONE:
10     Q.  Okay.
11     A.  That's not correct.  I don't know if
12  I'm --
13     Q.  No, I understand.  So let's just -- let's
14  be more specific.
15         If there were adverse events in 5 percent
16  of all TVT procedures performed, would that be too
17  high for you to consider performing the TVT
18  procedure?
19     A.  Well, I think you would look at the --
20  what the adverse events are and you would compare it
21  to current procedures that are also done for the
22  procedure -- or the other procedures that are done
23  for surgical treatment, say, for the same or similar
24  patient and decide what you thought about the
25  procedure as compared to the current surgical

Harry W. Johnson, Jr., M.D.

1  treatment of that problem.
2      Q.  So what types of adverse events would you
3  look for?
4      A.  Well, I think the best thing for TVT would
5  be to refer you to the Schimpf meta-analysis to look
6  at the different adverse events that can occur or
7  that have been studied in the medical literature and
8  their incidence as compared to other procedures.
9      Q.  Sure, but the question I'm asking is when
10  you're doing this analysis, what types of adverse
11  events do you look for?
12      MR. COMBS:  Object to form.
13      THE WITNESS:  Well, again, in this
14  situation, I would refer to large databases that
15  have looked at large numbers of patients rather than
16  an individual experience.  I mean, I can talk about
17  my experience, but it's better -- I think it's much
18  better decision making to look at the current
19  medical literature and compare it with your
20  experience.
21  BY MR. CRONE:
22      Q.  Okay.  And what types of adverse events
23  does the medical literature report with -- just in
24  relation to the TVT product or the TVT procedure?
25      A.  Well, if you look at the Schimpf

1  meta-analysis, the things that are reported
2  comparing the different types of procedures for
3  surgery for stress urinary incontinence, they report
4  what you could consider -- actually, they report
5  a lot of different adverse events.  Some could be
6  considered minor; some could be considered more
7  major.
8      But the things that they reported in
9  general were urinary tract infection, bowel injury,
10  nerve injury, ureteral injury, vascular injury,
11  overactive bladder, urgency, retention of urine
12  lasting less than six weeks, retention of urine
13  lasting greater than six weeks, return to operating
14  room for urinary retention, groin pain, leg pain,
15  bladder perforation, urethral perforation, vaginal
16  perforation, deep vein thrombosis.
17      And in that, they compared -- when
18  possible, they compared that to the different
19  procedures that are currently or recently performed
20  for the treatment of stress incontinence, which
21  included procedures with mesh and included
22  procedures that did not use mesh, and they compared
23  the adverse events to each other or looked at the
24  differences or provided the differences.
25      Q.  Okay.  In your mind, off of that list you

1  just gave me, which ones are serious?  I think you
2  used the word "serious."  If I'm mischaracterizing
3  that, I apologize.
4      A.  Well, I don't mean to downplay any adverse
5  event.  Of course anything that happens with a
6  patient we take seriously.  But certainly there are
7  things that are more difficult to treat.  For
8  example, bowel injury would be a very significant
9  injury.
10      Q.  Okay.  Then was it your testimony that
11  there isn't a rate of adverse events with regard to
12  the TVT procedure at which you would say I can no
13  longer perform this procedure generally, it's always
14  a case- or a patient-specific analysis?
15      MR. COMBS:  Object to form.
16      THE WITNESS:  Well, I think generally you
17  would look at a patient.  And one of the ways you
18  may decide is depending on associated pathologies or
19  conditions if a procedure in that particular
20  patient -- depending on what other procedures you're
21  doing, is one procedure better than the other.  No
22  surgical procedure is without surgical risk.
23  BY MR. CRONE:
24      Q.  And are there any surgical procedures that
25  are with so much risk that you would never perform

1  them?
2      A.  Are we talking about with urinary
3  incontinence?
4      Q.  Urinary incontinence, yes.
5      A.  Well, historically there have been over
6  100 procedures described in the literature for
7  treatment of urinary incontinence.  I certainly have
8  not performed 100 different procedures.  The
9  procedures that are current I believe are safe and
10  have good outcomes and long-lasting results and are
11  acceptable treatments for patients with stress
12  incontinence.
13      Q.  What's your basis for the opinion that
14  historically there have been 100 procedures to treat
15  SUI?
16      A.  My reading and general understanding of
17  published literature, textbooks, historical
18  perspectives.
19      Q.  Are you familiar with the Monarc --
20      A.  I am.
21      Q.  -- product?
22      Would you use the Monarc product today?
23      A.  I don't use the Monarc product.
24      Q.  And why is that?
25      A.  Well, first, I was never trained with the

Harry W. Johnson, Jr., M.D.

Page 42

1  Monarc product. And personally, I like the
2  inside-out procedure. So I just have never used the
3  Monarc. That was part of the TOMUS study. But my
4  choice was not to be trained in that and not use the
5  Monarc.
6      Q. Okay. Is the Monarc still on the market?
7      A. I don't use the Monarc, so I'm -- I'm not
8  sure of the answer to that question.
9      Q. Are you aware of any products that were
10  designed to treat SUI that are -- were introduced to
11  the market and subsequently taken off of the market?
12     A. I know there are some. I don't know that
13  I could give you a complete list.
14     Q. Do you know why they were taken off the
15  market?
16     A. Some of the -- some of the sling materials
17  that were used early on were found not to be good
18  materials, such as Gore-Tex. Some weaves of mesh
19  such as -- one that comes to mind is the ObTape --
20  were removed from the market for reasons of not
21  working well, more complications.
22     Q. They were removed for safety reasons,
23  correct?
24     A. That's my understanding, yes. And I
25  should add some of the biologics were removed as

Page 43

1  well.
2      Q. You mentioned the TOMUS study a minute
3  ago. Can you give a general overview of what the
4  TOMUS study was and what it was designed for?
5      A. The TOMUS study was designed to look at
6  equivalence of retropubic versus obturator slings.
7      Q. Do you know what products they looked at?
8      A. Yes.
9      Q. What products?
10     A. TVT, TVT-O, and Monarc.
11     Q. Do you know what general conclusions the
12  TOMUS study reached?
13     A. That they were fairly equivalent.
14     Q. Have there been any meta-analyses
15  performed on the TOMUS study?
16        MR. COMBS: Object to form.
17        THE WITNESS: You can't really perform a
18  meta-analysis on the TOMUS study.
19  BY MR. CRONE:
20     Q. Let me ask it a different way. Are you
21  aware of any -- in the medical literature of anybody
22  performing a re-analysis of the results of the TOMUS
23  study?
24     A. Well, there certainly were follow-up
25  studies or longer-term analyses of the TOMUS data.

Page 44

1      Q. Prior to the TOMUS study being conducted,
2  was there a paper published in the medical
3  literature explaining the need for the TOMUS study?
4      A. Well, the UITN talked about the need for
5  the TOMUS study to compare the two approaches to see
6  if there was a difference.
7      Q. And was that study called TOMUS: Design
8  and Methodology published in 2008? Does that seem
9  familiar?
10     A. That's -- that was a published publication
11  to describe how the study was performed.
12     Q. Were you involved in drafting that?
13     A. I was on the TOMUS committee -- or I mean
14  I'm on the urinary treatment -- the UITN, I was a
15  founding member of that, and I was involved in
16  designing the TOMUS study.
17     Q. Okay. So in that 2008 paper titled Design
18  and Methodology, you would agree with the statement
19  in there that said: "There are currently no
20  adequately powered trials with sufficient length of
21  follow-up comparing the efficacy or safety of the
22  transobturator and retropubic MUS"?
23        MR. COMBS: Can one of you two repeat that
24  question?
25        MR. CRONE: Sure. I'll repeat it.

Page 45

1  BY MR. CRONE:
2      Q. So as a basis for the need for the TOMUS
3  study and the Design and Methodology paper published
4  in 2008 by the UITN, would you agree with the
5  statement that: "There are no current" -- "There
6  are currently no adequately powered trials with
7  sufficient length of follow-up comparing the
8  efficacy or safety of the transobturator and
9  retropubic MUS"?
10     A. If you don't mind, can I look at the paper
11  with that sentence and just see what context it's in
12  in that paragraph?
13     Q. Unfortunately, I can't find it in the
14  study and will run short on time. So let me just
15  ask the question simpler.
16        In 2008 did you hold the opinion that more
17  studies were needed on the safety and efficacy of
18  the transobturator and retropubic approaches to SUI
19  repair?
20     A. Well, I would say as a UITN investigator,
21  we're constantly investigating, trying to figure out
22  what sort of treatments were best for urinary
23  incontinence, stress urinary incontinence, and we
24  tried to add to the literature comparing different
25  treatments.

Harry W. Johnson, Jr., M.D.

Page 46

1       You know, the literature really is -- for
2   this particular procedure is huge.  There are
3   probably over 2,000 articles published for TVT,
4   TVT-O-type procedures.  What we tried to add to the
5   literature was a large randomized controlled trial
6   which adds to the smaller trials that had been done
7   before the TOMUS study, and that was to try to
8   increase our knowledge of the two procedures to see
9   if they were equivalent.
10      Q.  But in 2008, before that large randomized
11  controlled trial performed by UITN did you believe
12  that there were -- there were not at the time, 2008,
13  adequately powered trials to study safety and
14  efficacy of the midurethral sling procedures
15  available at the time?
16      A.  Yeah, we performed the TOMUS study through
17  an RFA from the NIH to look at treatments for
18  urinary incontinence, which included mesh as well as
19  non-mesh treatments.  And that's why our first study
20  was with Burch and fascial sling.  Our second study
21  was with the mesh slings.  The idea was to add to
22  the medical literature a large randomized controlled
23  trial that was very robust to try to test the theory
24  of whether these procedures were equal or not.
25      And as part of that study, one of the

Page 47

1   things we looked at were adverse events to try to
2   decide -- or actually to see what adverse events
3   occurred with a large group of treating physicians.
4   I believe there was 53, something like that.  And
5   that's what we tried to do was to add literature to
6   the medical science and literature at that time
7   regarding those procedures.
8       Q.  And I understand that portion of your
9   answer, but the question I'm asking is much more
10  specific.
11      So at the time, 2008, before the UITN
12  randomized controlled study was performed, was one
13  of the reasons that UITN wanted to perform that
14  procedure due to the fact that there weren't
15  adequately powered trials on the SUI products?
16      MR. COMBS:  Object to form.
17      THE WITNESS:  Well, we powered our trial
18  to answer a specific question regarding this.  There
19  were a significant number of trials in the medical
20  literature performed by doctors from all over the
21  world as well as registries for the procedure.  And
22  just like any other procedure, we're always looking
23  and testing hypotheses to see if there's something
24  better or how we're doing.  That's what it was
25  designed to do.

Page 48

1       We felt that our study answered another
2   question in the performance of these procedures and
3   that, if you will, the procedures were equivalent.
4   BY MR. CRONE:
5       Q.  And so were those prior --
6       A.  Relatively equivalent.
7       Q.  Were those prior trials or studies
8   adequately powered?
9       MR. COMBS:  Object to form.
10      THE WITNESS:  I would have to look at the
11  studies.  But, I mean, we're talking about 2008,
12  which is eight years ago, so I don't want to
13  misspeak and say there was something or wasn't
14  something prior to 2008.  But certainly in 2008,
15  what we did added to the medical literature.
16  BY MR. CRONE:
17      Q.  Well, you're a founding member of UITN,
18  correct?
19      A.  That's correct.
20      Q.  So this 2008 paper that came out, you
21  would have reviewed it?
22      A.  Yes.
23      Q.  And if you didn't agree with an opinion
24  expressed in it, you would have expressed your
25  disagreement?

Page 49

1       A.  We reviewed the paper as a group and came
2   to an agreement of what to publish, yes.
3       Q.  Okay.  The same 2008 paper also says:
4   "New surgical therapies for the treatment of stress
5   urinary incontinence are developed and offered as a
6   standard of care without adequate scientific
7   evaluation of their effectiveness or safety."
8       Do you agree with that statement as of
9   2008?
10      A.  Again, I'd like to look at the paper to
11  see what the context of that sentence --
12      Q.  Well, let's set the paper aside.  In 2008,
13  did you think that new surgical treatments for SUI
14  were being introduced into the marketplace without
15  adequate scientific evaluation of their safety or
16  efficacy?
17      MR. COMBS:  Object to form.
18      THE WITNESS:  Well, I think that the
19  procedures certainly had studies -- I mean, in this
20  paper, we're talking about TVT, TVT-O, and Monarc.
21  And we're talking about procedures that had been
22  done before.  And subsequently some of those
23  products have been removed from the market.  And
24  certainly they had some problems that weren't known
25  at the time of their introduction.  And as surgeons

Harry W. Johnson, Jr., M.D.

Page 50

1  used these products, such as ObTape, Gore-Tex, we
2  found problems with it and they were removed from
3  the market.
4  BY MR. CRONE:
5      Q.  When is the appropriate time to
6  investigate for problems with a product?  Let's take
7  the TVT product specifically.  Prior to introduction
8  to the marketplace or after?
9          MR. COMBS:  Object to form.
10         THE WITNESS:  In general, products, drugs,
11 medical treatments have to be tested in patients to
12 figure out whether they can be used in patients.  So
13 you would try the product in a clinical trial, if
14 you will, where you have a hypothesis and you test
15 it as far as the treatment goes.  Some products are
16 comparable to previous products and may be used on
17 the market without going through a clinical trial
18 like that.
19 BY MR. CRONE:
20     Q.  Okay.
21     A.  Although, I mean, everything is really
22 looked at.
23     Q.  And so if I proffer to you that in 2008
24 the UITN thought SUI products were being introduced
25 into the marketplace, specifically the TVT, TVT-O,

Page 51

1  and the Monarc, without adequate prior scientific
2  evaluation of their effectiveness or safety, do you
3  agree with the UITN's position?
4          MR. COMBS:  Object to form and foundation.
5          THE WITNESS:  Well, first, as I've already
6  said, I was part of the UITN.
7  BY MR. CRONE:
8      Q.  That's correct.
9      A.  So I do agree with the UITN.  We felt at
10 the time that the best and the safest products at
11 the time were the retropubic sling -- that was
12 TVT -- the obturator sling -- that was TVT-O -- and
13 the Monarc sling -- that was an obturator sling as
14 well -- were the products that we would test.
15         The UITN was made up of 53 physicians, the
16 majority of which were fellowship trained in pelvic
17 floor procedures and medical treatment of patients.
18 Half were urogynecologists and half were
19 gynecologists who came into the room with a lot of
20 different ideas about how to treat patients with
21 stress urinary incontinence.
22         We looked at the different procedures that
23 were available to patients and decided what areas
24 that we needed to try to investigate to add to the
25 literature and improve the treatment of urinary

Page 52

1  incontinence.  For that reason, we started with the
2  more historical procedures which were non-mesh --
3  that's the fascial sling and the Burch
4  colposuspension -- because these were two procedures
5  that historically had been done for -- well, the
6  Burch for probably around 50 years and the sling in
7  some form for a hundred years.
8          And we didn't feel that those -- that
9  those two procedures had been adequately
10 investigated for outcomes, adverse events, and
11 treatments of women.  So then we moved to -- once we
12 did that to establish a baseline, we moved to the
13 fascial sling, which is the TVT and TVT-O, which had
14 a significant body of literature at the time, but we
15 felt that the size of our study and the power of our
16 study would show that -- I don't mean show.  What I
17 mean is wanted to try to figure out whether the
18 procedures were equivalent and then look at adverse
19 events and problems that may occur.
20     Q.  Okay.  If I can -- I want to stop there
21 and ask a question.
22     A.  Oh.
23     Q.  And so the study ultimately showed that
24 they were equivalent?
25     A.  Relatively.

Page 53

1      Q.  Relatively.  And --
2      A.  I mean, there's some differences.
3  There's -- the nature of the procedures are
4  different, so the adverse events would be a little
5  different.
6      Q.  Sure.  But I mean, when you say
7  "equivalent," do you mean in terms of safety,
8  efficacy, adverse events?  What type of equivalence
9  are you referring to?
10     A.  Well, I think all those: safety, efficacy.
11 The adverse events, again, are different.  The TOMUS
12 group came out with a paper on the adverse events
13 that occurred during TOMUS, and that information is
14 incorporated in the Schimpf meta-analysis --
15     Q.  Sure.
16     A.  -- for adverse events.
17     Q.  Do you know a Dr. Linda Brubaker?
18     A.  Yes.
19     Q.  What is your opinion of Dr. Linda
20 Brubaker's professional abilities as a medical
21 doctor?
22     A.  I have a very high opinion of
23 Dr. Brubaker.
24     Q.  Are you aware of a -- of a paper she
25 published titled Adverse Events over Two Years After

Harry W. Johnson, Jr., M.D.

Page 54

1 Retropubic or Transobturator Midurethral Sling
2 Surgery: Findings From The TOMUS Study?
3     A. I am aware of that paper.
4     Q. It's on your reliance list, isn't it?
5     A. I believe it is.
6     Q. Okay. In that -- in Dr. Brubaker's paper,
7 she concludes that adverse events are common after
8 midurethral sling implants after looking at data
9 from the TOMUS study. Do you agree with that
10 conclusion?
11    A. Again, I'd like to look at the paper to
12 see exactly the context of that sentence and the
13 paragraph that it's written.
14    Q. Well, you're aware of the results of the
15 TOMUS study?
16    A. Yes.
17    Q. You cite to them in your expert report,
18 correct?
19    A. Yes.
20    Q. So do you not know enough about the TOMUS
21 study to give an opinion today as to whether or not
22 adverse events are common after MUS procedures?
23    MR. COMBS: Object to form.
24    THE WITNESS: Well, I think the better way
25 to answer that question would be there are adverse

Page 55

1 events that occur after either the TVT or the TVT-O
2 or the Monarc procedure. And by common, that means
3 all the different adverse events that can occur.
4 And I think that it's probably more helpful for me
5 to look at the -- how often they occur and what
6 the -- what the adverse event is.
7 BY MR. CRONE:
8     Q. Dr. Brubaker also says: "Over a period of
9 24 months, 42 percent of all study participants
10 experienced at least one adverse event, including
11 12 percent that experienced at least one serious
12 adverse event."
13    Do you disagree with that conclusion?
14    A. Well, that was a conclusion based on all
15 the adverse events that they looked at. Some of the
16 nonserious adverse events could be things like
17 urinary tract infections or some pain
18 postoperatively which resolves, which we know with
19 every procedure you get some postoperative pain.
20 There are some more serious adverse events that are
21 events that will resolve as the patient recovers.
22    So to -- I think really that you need to
23 look at the paper and look at the adverse events
24 that you're talking about when you make that
25 statement -- a blanket statement like that.

Page 56

1     Q. Well, Dr. Brubaker said that 12 percent of
2 the 42 percent of all study participants had
3 experienced serious adverse events. So she's saying
4 42 percent experienced adverse events. 12 percent
5 of those experienced serious adverse events. Do you
6 agree with that conclusion?
7     MR. COMBS: Yeah, Dr. Johnson, you've got
8 that paper in your med lit binder if you want to
9 look at it. It's at well-powered RCT's tab 3.
10 BY MR. CRONE:
11    Q. And while you're looking for that in your
12 notebook, Dr. Johnson, the serious adverse events
13 were defined in the TOMUS study, weren't they?
14    A. Yes.
15    Q. Okay. To help speed it along, I can
16 direct you to page 3 under results, first paragraph,
17 third full sentence that starts: "Over a period of
18 24 months." That's what I'm looking at there.
19    A. Page 3?
20    Q. Page 3, correct.
21    A. And which paragraph are you at?
22    Q. You know, we have different page numbers,
23 so that's not -- it's under the results. It's near
24 the beginning. It's under a heading called results.
25    MR. COMBS: It's page 4, right here

Page 57

1 (indicating).
2     MR. CRONE: Thanks, Phil.
3     THE WITNESS: Well, in this paper, they
4 describe -- they classify the serious adverse events
5 versus all adverse events. And, again, there
6 were -- you know, there was an incidence of adverse
7 events, but the incidence of each adverse event was
8 really low. And a lot of these adverse events are
9 events that you can see with any surgical procedure,
10 so they're not specific to a mesh procedure --
11 BY MR. CRONE:
12    Q. Well, only --
13    A. -- not all of them.
14    Q. Well, only mesh procedures were involved
15 in the TOMUS study, though, correct?
16    A. Right, but the TOMUS procedures are
17 surgical procedures of the pelvic floor. So these
18 adverse events occur with any procedure for the
19 treatment of stress incontinence.
20    Q. Sure. But the TOMUS study only looked at
21 procedures involving TVT, TVT-O, and Monarc,
22 correct? I mean, the TOMUS study didn't study all
23 pelvic floor procedures?
24    A. No, but they looked at adverse events that
25 occur with all pelvic floor procedures.

Harry W. Johnson, Jr., M.D.

Page 58

1    Q.  I don't understand, actually.
2    A.  Okay.
3    Q.  I thought the TOMUS study looked at the
4  TVT, the TVT-O, and Monarc procedures and collected
5  data therefrom.
6    A.  They did.  We -- the adverse events that
7  you look at are adverse events that can occur with
8  any surgical procedure.  And maybe I could give you
9  an example --
10    Q.  I think that would help.
11    A.  -- that may clarify it for you.
12        So, for example, pulmonary embolus occurs
13  with any surgical procedure, postoperative
14  bleeding --
15    Q.  Sure.  Let me stop you there.
16        But the data that was collected from the
17  TOMUS study didn't look at any other procedures,
18  correct?  So if a pulmonary embolism occurred in a
19  heart surgery, it's not even collected in the data
20  in the TOMUS study; is that fair?
21    A.  No.  No, it's not fair.  Just looking at
22  the list of serious adverse events that were
23  collected in the TOMUS study, these are -- a lot of
24  these are events or adverse events that can occur in
25  any surgical procedure.  And that was one of the

Page 59

1  reasons that we looked at this, is to see if the
2  rate of occurrence is similar to other procedures.
3    Q.  Sure.  Sure.  So you're comparing those
4  rates, but the data collected from the TOMUS
5  procedure -- let's just -- let's just ask a few
6  specific questions.
7        In the TOMUS study, no heart procedures
8  were performed, correct?
9        MR. COMBS:  I didn't hear your question.
10  BY MR. CRONE:
11    Q.  No procedures involving the heart were
12  performed in the TOMUS trial?
13    A.  That's correct.
14    Q.  Okay.  And, in fact, the only procedures
15  that were performed in that randomized controlled
16  trial were procedures relating to TVT implantation,
17  TVT-O implantation, and Monarc implantation,
18  correct?
19    A.  For the slings that were --
20    Q.  That's correct.
21    A.  Just for the slings.
22    Q.  And so any data regarding adverse events
23  and serious adverse events from those procedures
24  came from naturally a TVT procedure, a TVT-O
25  procedure, or a Monarc procedure, correct?  I'm not

Page 60

1  talking about what the data is being compared to.
2  I'm talking about the data from those procedures
3  performed in the TOMUS study.
4    A.  Yeah, so a lot of these adverse events
5  were adverse events that are known to occur with any
6  surgery.
7    Q.  Sure.
8    A.  And there are some adverse events in here
9  that are specific for mesh procedures -- sling
10  procedures such as TVT or TVT-O, but not all the
11  adverse events are specific for TVT, TVT-O.  But in
12  the study, they looked at all the adverse events
13  that occurred whether they're specific for TVT-O,
14  TVT, or not.
15    Q.  Yeah, that makes sense.  So let's just --
16  let me give you a hypothetical.
17        Let's say Dr. Brubaker looks at the
18  results from the TOMUS study and she sees three
19  bladder perforations occurred among all trial
20  participants.  That would mean those three bladder
21  perforations occurred in either a TVT procedure, a
22  TVT-O procedure, or a Monarc procedure, correct?
23    A.  In this study, yes.
24    Q.  Okay.  And so you have no reason, then, to
25  disagree with Dr. Brubaker's conclusions in her

Page 61

1  paper that we're looking at now and discussing now?
2    A.  Well, again, when she's talking about
3  common, the majority of the adverse events that
4  occurred were adverse events that can occur with any
5  procedure, and because of that, they occurred with
6  this procedure, if that --
7    Q.  Yeah, I'll be more specific.  I think that
8  will be more helpful.
9        So you don't disagree when she says 253
10  out of the 597 study participants experienced at
11  least one adverse event?
12    A.  If you look at the serious adverse events
13  and the adverse events data, that's the percentage,
14  but, again, the percentage is not regarding adverse
15  events that are specific for TVT, TVT-O.  And the
16  majority of the adverse events occurred in the less
17  serious category, which are not specific.
18    Q.  But you agree that 253 adverse events
19  occurred?
20    A.  As listed in the SAEs and the AEs data
21  table.
22    Q.  And that would constitute 42 percent of
23  the study participants, correct?  I can get a
24  calculator out if you want to check her math.
25    A.  No.  That's what was reported for adverse

Harry W. Johnson, Jr., M.D.

Page 62

1  events, which included all adverse events, serious
2  and nonserious.
3      Q.  And so, then, that would make adverse
4  events common among these procedures.  Do you agree
5  with that?
6          MR. COMBS:  Object to form.
7  BY MR. CRONE:
8      Q.  I'll be more specific.
9          As adverse events are defined in the
10 study, if they occur in 42 percent of the procedures
11 performed in the study, that would mean adverse
12 events are common.  That's Dr. Brubaker's
13 conclusion.  I'm asking if you agree with that.
14     A.  I agree with that in respect to the
15 adverse events as described.  And the adverse events
16 that are described, the majority of them are adverse
17 events that can occur with any surgical procedure,
18 so they're not -- I just want to make it clear that
19 we're not talking about specific adverse events to
20 the mesh slings.  It could include Burch,
21 pubovaginal.  A lot of these adverse events occur
22 with all different procedures.
23     Q.  Sure.  I think what you're saying -- and
24 correct me if I'm wrong -- is that these adverse
25 events aren't unique to the mesh slings, they can

Page 63

1  happen with other procedures; is that fair?
2      A.  That's correct.
3      Q.  Okay.
4          (A discussion was held off the record.)
5          (A recess was taken.)
6  BY MR. CRONE:
7      Q.  Dr. Johnson, could you turn to page 11 of
8  your expert report, which is Exhibit 2.  The very
9  last paragraph, first sentence reads:  "TVT was
10 introduced in the United States by Ethicon in 1998
11 after receiving 510 clearance by the FDA."
12         Do you see that sentence?
13     A.  Yes.
14     Q.  What is 510 clearance -- or excuse me --
15 510(k) clearance?
16     A.  I'm not an expert on government forms, but
17 my general understanding is that's what you go
18 through with the FDA to introduce a product to the
19 market.
20     Q.  Okay.  So you don't have any experience in
21 assisting medical device manufacturers with
22 obtaining 510(k) clearance?
23     A.  I don't.
24     Q.  Let's skip to page 13, the first full
25 paragraph that starts with:  "Since 2000" -- I'll

Page 64

1  read the first sentence -- the TVT procedure has
2  been rapidly accepted and has become the gold
3  standard for treatment of stress urinary
4  incontinence."
5          Do you see that sentence?
6      A.  I do.
7      Q.  What does gold standard mean?
8      A.  That would be the most commonly performed
9  procedure for treatment of urinary incontinence or
10 the most widely accepted common treatment.
11     Q.  So if there's treatment for SUI -- and in
12 this case, we're referring to the TVT treatment --
13 if it's the most common or the most widely accepted,
14 then it's the gold standard?
15     A.  It's the most commonly performed procedure
16 in the world, TVT is.
17     Q.  So that makes it the gold standard?
18     A.  I think so.
19     Q.  Okay.  Any other factors that would make a
20 procedure gold standard or not?
21     A.  Well, I think this procedure was looked at
22 where they compared it to -- and this would include
23 TVT, TVT-O procedures.  So they looked at --
24     Q.  I'm only interested, just so you know, in
25 the TVT procedure.

Page 65

1      A.  Right.
2      Q.  So --
3      A.  I mean, but we just talked about that the
4  TOMUS compared the two and they were relatively
5  equivalent.  That's the only reason I bring that up.
6      Q.  I understand.
7      A.  But I understand.
8          So it's the most commonly performed
9  procedure for stress incontinence in the world.
10 It's been approved by -- or endorsed by all
11 professional organizations that look at pelvic floor
12 treatment.  It's the most studied procedure probably
13 in history regarding treatment of urinary
14 incontinence.
15     Q.  And what's your basis for that opinion,
16 that it's the most studied procedure in history for
17 the treatment of urinary incontinence?
18     A.  Well, there's over 2,000 studies that have
19 been -- or are in the literature regarding --
20     Q.  Are those all listed in your reliance
21 report?
22     A.  I don't know that there's 2,000 listed in
23 there, but that's my reading of historical
24 perspective of treatment of urinary incontinence.
25     Q.  How many studies are there just on the

Harry W. Johnson, Jr., M.D.

Page 66

1 TVT? Or let's broaden that a little bit. At least
2 looking at -- how many studies are there that look
3 at the TVT's safety as a primary end point?
4     MR. COMBS: Object to form.
5     THE WITNESS: Well, I talk about in here
6 that there's more than 100 randomized controlled
7 trials. I don't think that I can give you an exact
8 number on that, but most randomized controlled
9 trials would look at adverse outcomes of a
10 procedure.
11 BY MR. CRONE:
12     Q. But trials have a primary objective
13 usually, correct?
14     A. They do.
15     Q. And then they may have secondary
16 objectives; is that your understanding?
17     A. Much as the adverse event paper for TOMUS
18 was secondary.
19     Q. Sure. Sure.
20     And so how many TVT studies, if you know,
21 studied TVT with safety as the primary end point or
22 outcome for the study?
23     MR. COMBS: Object to form.
24     THE WITNESS: I can't -- I can't answer
25 that. I don't know the answer to that question.

Page 67

1 BY MR. CRONE:
2     Q. Do you know --
3     A. I would say most studies look at adverse
4 outcomes.
5     Q. But not as a primary outcome?
6     A. Well, you know, usually when you're --
7 usually when you're doing a study, you're looking at
8 the outcome that you expect for treatment --
9     Q. So you're looking at --
10     A. -- and then associated with that would be
11 adverse outcomes.
12     Q. And I didn't mean to interrupt. I'm
13 sorry.
14     So you're looking primarily at subjective
15 and objective cure rates, correct, as a primary
16 outcome?
17     A. When you're performing the procedure. And
18 then associated with that would be adverse outcomes.
19     Q. Okay. So you're not aware -- of these 100
20 studies on TVT that you cite here, you're not aware
21 if even a single one looked at safety as a primary
22 outcome rather than objective and subjective cure
23 rates?
24     MR. COMBS: Object to form.
25     THE WITNESS: Well, I think just the way

Page 68

1 that we perform these trials in the literature, we
2 look for the outcome of treatment. And then with
3 that, what you would call a secondary would be
4 adverse outcomes that occur with that treatment.
5     But generally, we wouldn't design it the
6 other way around. But you're still looking at the
7 same questions if you reverse those, if you will.
8 BY MR. CRONE:
9     Q. Okay. I understand your answer.
10     Are you aware of two societies, AUGS and
11 SUFU?
12     A. I am.
13     Q. Okay. And you know what those acronyms
14 stand for --
15     A. Yes.
16     Q. -- AUGS and SUFU?
17     In your expert opinion, you cite their
18 position statement on TVT as basis for your ultimate
19 conclusion that TVT is safe; is that correct?
20     MR. COMBS: Object to form.
21 BY MR. CRONE:
22     Q. And I can direct you to the bottom of page
23 14 of your expert report. You also cite to some
24 other societies. I'm just asking about AUGS and
25 SUFU specifically.

Page 69

1     And I'm not asking you to actually look at
2 the position statement, just the bottom of page 14
3 of your expert report. I'm asking you if the
4 purpose of your citation to AUGS and SUFU is that
5 their statements support your conclusions in this
6 expert report that the TVT is a safe product.
7     A. They do.
8     Q. Okay. Who funds the operations of AUGS?
9     A. I just know that I pay dues as a member.
10 I would assume that that's -- I'm not aware of the
11 financials.
12     Q. The same with SUFU?
13     A. Well, I'm not a member of SUFU, but I --
14     Q. A member of AUGS?
15     A. -- assume it's the same.
16     Q. Do you know who drafted the AUGS
17 statement?
18     A. Yes.
19     Q. Do you know who drafted the SUFU
20 statement?
21     MR. COMBS: Object to the form.
22 BY MR. CRONE:
23     Q. And just to be clear, I'm referring to the
24 statements that you cite in your expert report. Not
25 any statement drafted by AUGS, just the ones you

Harry W. Johnson, Jr., M.D.

Page 70

1  cite.
2      A.  Each statement has the drafters listed at
3  the end.
4      Q.  Okay.  If those drafters were all mesh
5  manufacturer consultants, would it change your
6  opinion as to the objectivity of those statements?
7          MR. COMBS:  Object to form and foundation.
8          THE WITNESS:  My reading of the statements
9  is that they're based on the medical literature.
10 BY MR. CRONE:
11     Q.  Sure.  And that's not my question.  My
12 question is if you learn that all of the -- that the
13 drafters of those statements were all consultants
14 for mesh manufacturers, would you question their
15 objectivity?
16         MR. COMBS:  Object to form and foundation.
17         THE WITNESS:  I think what I would do is
18 read the statement and see if they were based on the
19 medical literature, such as --
20 BY MR. CRONE:
21     Q.  But you've already read the statements.
22     A.  Yes, I have.
23     Q.  And we already know that you agree with
24 the conclusions in those statements.  I'm asking if
25 you found out -- if I just proffer to you today that

Page 71

1  the authors of those statements are all mesh
2  manufacturer consultants, would that lead you to
3  question their objectivity in drafting those
4  statements?
5      A.  Well, the -- each statement is provided
6  with the medical literature that it's based on,
7  which is not -- which is what is used to make those
8  conclusions.  And I'm familiar with this literature.
9  And that's why I agree with it regardless of what
10 the authors do with any company that they work with.
11 I think that the -- this is a statement that's not
12 based on one person's opinion.
13     Q.  Well, if you author a medical article or
14 conduct a trial, something that's going to be
15 published, and you had a potential conflict of
16 interest, you would disclose that, wouldn't you?
17     A.  I would disclose that, yes.
18     Q.  And was there any sort of disclosure in
19 the AUGS and SUFU statements about potential
20 conflicts of interest?
21     A.  Not that I'm aware of.
22     Q.  Is it your opinion that the -- well, let's
23 back up.
24         The TVT product uses polypropylene mesh,
25 correct?

Page 72

1      A.  Yes.
2      Q.  Is it your opinion that that mesh is
3  lightweight?
4      A.  Yes.
5      Q.  Do you know who Dr. Mang Chen is?
6      A.  No.
7      Q.  Do you know who Dr. Brigette Hellhammer
8  is?
9      A.  No.
10     Q.  If I told you that she was an Ethicon
11 employee and that on September 1st, 2013 in a
12 deposition she stated that the TVT mesh is
13 heavyweight, would you disagree with that?
14         MR. COMBS:  Object to form.
15         THE WITNESS:  I'd have to look at the
16 paper and see what you're talking about.
17 BY MR. CRONE:
18     Q.  She stated that the TVT mesh is
19 heavyweight.  Do you disagree with her?
20     A.  I'd have to look and see -- I don't know
21 what you're referring to or what sort of --
22     Q.  Well, you just testified that the TVT mesh
23 is lightweight.  What's the basis for that opinion?
24     A.  That's the description of the mesh.
25     Q.  Okay.  So if an Ethicon doctor said it was

Page 73

1  heavyweight, why would you disagree with that
2  conclusion?
3      A.  I don't know why they said it.
4      Q.  They were asked is it heavyweight or
5  lightweight.  They said heavyweight.  Would you
6  disagree?
7      A.  I don't know what they were comparing it
8  to.
9      Q.  You've opined that the IFU for the TVT was
10 adequate; is that correct?
11     A.  Yes.
12     Q.  And that's prior to the 2015 IFU change;
13 is that correct?
14     A.  Yes.
15     Q.  And is it your opinion that that IFU
16 disclosed all potential risks --
17         MR. COMBS:  Object to form.
18 BY MR. CRONE:
19     Q.  -- associated with the TVT procedure and
20 product?
21         MR. COMBS:  Sorry about that.  Object to
22 form.  I interrupted the question.
23         MR. CRONE:  That's okay.
24         THE WITNESS:  I'm sorry.  I --
25

Harry W. Johnson, Jr., M.D.

Page 74

BY MR. CRONE:

1  BY MR. CRONE:
2      Q.  In reading your expert report, I
3  understood it to say that you hold the opinion that
4  the TVT IFU prior to the 2015 change was adequate
5  because it disclosed all risks associated with the
6  product; is that correct?
7          MR. COMBS:  Object to form.
8          THE WITNESS:  I think it was adequate.
9  BY MR. CRONE:
10     Q.  And why was it adequate?
11     A.  It disclosed the major known risks.
12     Q.  What if it failed to disclose risks that
13  were known to Ethicon, would it still be adequate?
14         MR. COMBS:  Object to form.
15         THE WITNESS:  I would have to look at that
16  and compare the two.
17  BY MR. CRONE:
18     Q.  Okay.  So if Ethicon knew that the -- that
19  the TVT was subject to degradation and it's not on
20  that IFU, would the IFU still be adequate?
21         MR. COMBS:  Objection to the form and
22  foundation.
23         THE WITNESS:  I've never seen degradation
24  in a patient.
25

Page 75

1  BY MR. CRONE:
2      Q.  I know you've never seen degradation, but
3  if that risk was known to Ethicon and it was not on
4  that IFU, would the IFU still be adequate?
5      A.  I would have to see evidence that
6  degradation was significant.
7      Q.  The same question for particle loss.
8      A.  I would have to see medical evidence that
9  particle loss was significant.
10     Q.  Same question for contraction.
11     A.  I would have to see medical evidence that
12  contraction was significant.
13     Q.  Same question for recurrent urinary tract
14  infections.
15     A.  Recurrent urinary tract infections occur
16  with all pelvic floor surgeries, so I would have to
17  see medical evidence that that was significant.
18  That's a known risk of all surgeries.
19     Q.  But it's not on the IFU, the TVT IFU?
20         MR. COMBS:  Object to form.
21         THE WITNESS:  Again, it's a known risk of
22  all surgeries.
23  BY MR. CRONE:
24     Q.  How about dyspareunia?
25     A.  A known risk of all pelvic floor

Page 76

1  surgeries.
2      Q.  So should dyspareunia have been listed on
3  the IFU?
4      A.  Well, that's a general, known complication
5  of all pelvic floor surgeries.
6      Q.  There's nothing unique about the TVT
7  product that could cause dyspareunia?
8      A.  The TVT product is a pelvic floor surgery
9  just like a pubovaginal sling, Burch,
10  anterior/posterior repair, vaginal hysterectomy.
11  All of these things cause dyspareunia.
12     Q.  Are all of the potential complications
13  listed in the IFU complications that could occur in
14  any pelvic floor surgery?
15     A.  No.
16     Q.  Which ones aren't?
17     A.  Complications specific to the mesh.
18     Q.  So exposure?
19     A.  Yes.  Well, I should say exposure of mesh,
20  because you can have exposure of sutures from a
21  Burch colposuspension or you can have exposure of a
22  biologic material used for a sling.  So they're
23  different, but they're not -- the mesh exposure is
24  specific for mesh exposure.
25     Q.  Sure, but the IFU then also lists

Page 77

1  transitory local irritation at the wound site.
2  Couldn't that occur with any pelvic floor surgery?
3      A.  Yes.
4      Q.  So if that's listed on the IFU, wouldn't
5  it also be appropriate to list recurrent urinary
6  tract infections?
7          MR. COMBS:  Object to form.
8          THE WITNESS:  Again, it's not specific.
9  It wouldn't be -- it's not specific for a mesh
10  procedure, but it's something that can occur with
11  any pelvic floor surgery, which a mesh procedure is.
12  So it wouldn't be wrong to list it.
13  BY MR. CRONE:
14     Q.  And so then it also wouldn't be wrong to
15  list dyspareunia?
16         MR. COMBS:  Object to form.
17         THE WITNESS:  You could list that.
18  BY MR. CRONE:
19     Q.  Sure.  And you could list recurrent UTIs?
20     A.  Well, again, that's probably the most
21  common adverse event with pelvic floor surgeries.
22  It occurs with that as well as all other surgeries.
23     Q.  You could list permanent pelvic pain?
24     A.  Pelvic pain occurs with all pelvic floor
25  surgeries.  I mean, not in everybody, but it is a

Harry W. Johnson, Jr., M.D.

Page 78

1  known risk.
2      Q.  You can list obstruction?
3      A.  That's a known risk of a sling surgery or
4  a colposuspension whether it's with mesh or without.
5      Q.  Have you ever explanted a TVT?
6      A.  I have.
7      Q.  Okay.  Have you ever had a pathology
8  report done on any of the explants?
9      A.  Everything that I take out of a patient I
10 send to pathology for examination, I mean, to the
11 best of my ability.
12     Q.  And how many mesh explant -- TVT explant
13 procedures have you performed?
14     MR. COMBS:  Could you -- I didn't pay
15 enough attention to the question.  Can you just read
16 that back to me?
17     (Pending question read.)
18     MR. COMBS:  Thank you.
19     THE WITNESS:  I don't know that I could
20 give you a specific number because I've taken out
21 all types of mesh products, which includes TVT as
22 well as other products, obturator slings, so --
23 BY MR. CRONE:
24     Q.  Well, let's lump them all together.
25     A.  Okay.  I can be sure it's over, I think,

Page 79

1  50 to 60.
2      Q.  And of those 50 to 60, did you conduct
3  your own evaluation of the mesh ever or did you send
4  it off to pathology when you could?
5      A.  When I remove it, usually it's placed
6  informal and then sent to pathology.  I mean, I look
7  at it to make sure that it's mesh and not --
8      Q.  Sure.
9      A.  -- so that I know what I've taken out.  I
10 don't do a pathologic examination.
11     Q.  Sure.  So you look at it with your eyes,
12 but you don't put it under a microscope; is that
13 fair?
14     A.  That's fair.
15     Q.  Okay.  Are you an expert in biofilm
16 creation?
17     A.  I'm not.
18     Q.  Okay.  Are you a pathologist?
19     A.  No, I'm not.
20     Q.  Are you a chemist?
21     A.  I am not.
22     Q.  Any expertise in polymers?
23     A.  No.
24     Q.  Toxicology?
25     A.  No.

Page 80

1      Q.  Radiology?
2      A.  What do you mean by that?
3      Q.  Are you a radiologist?
4      A.  I'm not a radiologist.
5      Q.  Engineer of any type?
6      A.  No.
7      Q.  Any expertise in polypropylene
8  specifically?
9      MR. COMBS:  Object to form.
10     THE WITNESS:  Only as a physician that has
11 used polypropylene mesh and polypropylene suture
12 extensively.
13 BY MR. CRONE:
14     Q.  Okay.  Do you hold the opinion that the
15 TVT product does not cause a foreign body reaction?
16     A.  I would say one of the reasons that we use
17 polypropylene mesh, which is TVT, and polypropylene
18 suture is that there's minimal reaction in the body.
19     Q.  Over the long term?
20     A.  Yes.
21     Q.  Okay.  Fraying and particle loss, are you
22 of the opinion on whether or not those occur with
23 TVT?
24     A.  I'm not exactly sure what you mean by
25 fraying.  Particle loss I have read about.  But I

Page 81

1  don't believe that particle loss or fraying are
2  significant in my practice as far as medical
3  outcome.
4      Q.  If I told you that on your reliance list
5  you list Ethicon company documents in which Ethicon
6  doctors admit that fraying occurs, that particle
7  loss occurs --
8      MR. CRONE:  Counsel, forgive me for the
9  compound nature of this question.  I'm just trying
10 to finish this up.
11 BY MR. CRONE:
12     Q.  -- would that change your opinion if
13 you -- I know you didn't review all those documents.
14 If you reviewed those documents, might that change
15 your opinions in this report?
16     MR. COMBS:  Objection to form and
17 foundation.
18     THE WITNESS:  If I felt there was reliable
19 medical data that showed that it was significant or
20 had a consequence.
21 BY MR. CRONE:
22     Q.  Are you going to review those Ethicon
23 company documents?
24     A.  Again, I would like to see medical
25 scientific evidence of the significance.

Harry W. Johnson, Jr., M.D.

| Page 82 |
| --- |

1    Q.  I mean, those were already provided to
2  you.  So I'm proffering to you now that those
3  documents disagree with your conclusions and asking
4  if you're going to review those.
5    A.  Well, I would say if you're saying that, I
6  probably should review them and look at them, see if
7  I agree with that statement.
8    Q.  And then you're open to the possibility
9  that your opinion may change?
10    MR. COMBS:  All right.  We have to be at
11  two hours now.
12    MR. CRONE:  Can he just answer that
13  question and then that will be it?
14    THE WITNESS:  Of course I would look at
15  any medical data and make an opinion of that data.
16    MR. CRONE:  Okay.  Thank you, Doctor.
17    THE WITNESS:  And can I just clarify one
18  thing?
19  BY MR. CRONE:
20    Q.  I won't tell you no.
21    A.  When we were talking about disclosures
22  with the statements, I was thinking back to the
23  question that you asked me about if there was a
24  document about consulting for Ethicon as late as
25  2008.  And just as I'm thinking about that through

| Page 83 |
| --- |

1  my mind, I know that I filled out disclosures for
2  articles for the New England Journal of Medicine,
3  and I would have listed that.
4    But I don't know the amounts of any -- off
5  the top of my head, as it was eight years ago, the
6  amount that I listed as a proctor for Ethicon.  But
7  I don't think that it was a large amount.  But I
8  just don't know -- I know that I've disclosed that,
9  but I don't know what the amount is.  I don't want
10  you to -- I don't want to imply to you that I know
11  that amount, because I don't.
12    Q.  Yeah, I think I understand.  So you would
13  have disclosed that for the purpose of disclosing
14  any potential conflict of interest, is that what
15  that's about?
16    A.  Yeah.  I just want to make sure that I
17  haven't misstated something about a consultant --
18    Q.  Oh, sure.
19    A.  -- thing where I really didn't do very
20  much and I can't -- I can't completely recall.  But
21  I do know that I filled out disclosures before.
22    Q.  Okay.  Understood.
23    MR. CRONE:  Thank you.
24    (A discussion was held off the record.)
25    MR. COMBS:  Okay.  No questions.

| Page 84 |
| --- |

1    (A discussion was held off the record.)
2    THE WITNESS:  Rustan versus Cooper.
3    (Off the record at 11:02 a.m.)

| Page 85 |
| --- |

1    CERTIFICATE OF NOTARY PUBLIC
2    I, Samara J. Zink, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me to
6  testify to the truth, the whole truth, and nothing
7  but the truth concerning the matters in this case.
8    I further certify that the foregoing
9  transcript is a true and correct transcript of my
10  original stenographic notes.
11    I further certify that I am neither
12  attorney or counsel, nor related to or employed by
13  any of the parties to the action in which this
14  deposition is taken; and furthermore, that I am
15  not a relative or employee of any attorney or
16  counsel employed by the parties hereto, nor
17  financially or otherwise interested in the outcome
18  of this action.
19
20
21
22    _____
          Samara J. Zink
23        Notary Public in and for the
          State of Maryland
24
25  My commission expires:  February 28, 2017

Harry W. Johnson, Jr., M.D.

Page 86

1        - - - - - -

         E R R A T A

2        - - - - - -

3

4  PAGE  LINE  CHANGE

5  ____  ____  _____

6     REASON: _____

7  ____  ____  _____

8     REASON: _____

9  ____  ____  _____

10    REASON: _____

11 ____  ____  _____

12    REASON: _____

13 ____  ____  _____

14    REASON: _____

15 ____  ____  _____

16    REASON: _____

17 ____  ____  _____

18    REASON: _____

19 ____  ____  _____

20    REASON: _____

21 ____  ____  _____

22    REASON: _____

23 ____  ____  _____

24    REASON: _____

25

Page 88

1          LAWYER'S NOTES

2  PAGE LINE

3  ____ ____ _____

4  ____ ____ _____

5  ____ ____ _____

6  ____ ____ _____

7  ____ ____ _____

8  ____ ____ _____

9  ____ ____ _____

10 ____ ____ _____

11 ____ ____ _____

12 ____ ____ _____

13 ____ ____ _____

14 ____ ____ _____

15 ____ ____ _____

16 ____ ____ _____

17 ____ ____ _____

18 ____ ____ _____

19 ____ ____ _____

20 ____ ____ _____

21 ____ ____ _____

22 ____ ____ _____

23 ____ ____ _____

24 ____ ____ _____

25 ____ ____ _____

Page 87

1

2        ACKNOWLEDGMENT OF DEPONENT

3

4        I,_____, do

5  hereby certify that I have read the

6  foregoing pages, and that the same is

7  a correct transcription of the answers

8  given by me to the questions therein

9  propounded, except for the corrections or

10 changes in form or substance, if any,

11 noted in the attached Errata Sheet.

12

13

14 _____

15 HARRY W. JOHNSON, JR., M.D.      DATE

16

17

18 Subscribed and sworn
   to before me this

19 _____ day of _____, 20____.

20 My commission expires:_____

21

22 _____
   Notary Public

23

24

25