# EXHIBIT C

1          IN THE UNITED STATES DISTRICT COURT

          SOUTHERN DISTRICT OF WEST VIRGINIA

2               CHARLESTON DIVISION

3    Master File No. 2:12-MD-02327      MDL 2327

    _____

4

    IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS

5    LIABILITY LITIGATION

    _____

6

    CONSOLIDATED TRIAL

7

    MULLINS, ET AL.                    JOSEPH R. GOODWIN

8

    v. ETHICON, INC., ET AL.        U.S. DISTRICT JUDGE

9

                              CASE NO. 2:12-cv-02952

10   _____

11                          Baltimore, Maryland

12                          Thursday, July 14, 2016

13   General TVT Deposition of:

14         HARRY W. JOHNSON, JR., M.D.

15   the witness, was called for examination by counsel

16   for the Plaintiff, pursuant to notice, commencing

17   at 8:22 a.m., at the Kimpton Hotel Monaco Baltimore

18   Inner Harbor, 2 North Charles Street, Baltimore,

19   Maryland 21201, before a Notary Public in and for

20   the State of Maryland, when were present on behalf

21   of the respective parties:

22

23

24

25

Harry W. Johnson, Jr., M.D.

```
 1              A P P E A R A N C E S

 2

 3       ON BEHALF OF THE PLAINTIFFS:

 4            JOHN R. CRONE, ESQUIRE
              ANDRUS WAGSTAFF
 5            7171 West Alaska Drive
              Lakewood, Colorado  80226
 6            (303) 376-6360
              john.crone@andruswagstaff.com

 7

 8        ON BEHALF OF THE PLAINTIFF JANET WEBB:

 9         (Appearing telephonically)

10            CLINTON J. CASPERON, ESQUIRE
              TRACEY & FOX
11            440 Louisiana Street
              Suite 1901
12            Houston, Texas  77002
              (713) 955-7854
13            ccasperon@traceylawfirm.com

14

15       ON BEHALF OF THE DEFENDANTS:

16            PHILIP J. COMBS, ESQUIRE
              SUSAN M. ROBINSON, ESQUIRE
17            THOMAS COMBS & SPANN, PLLC
              300 Summers Street
18            Suite 1380
              Charleston, West Virginia  25301
19            (304) 414-1800
              pcombs@tcspllc.com
20            srobinson@tcspllc.com

21

22

23

24

25
```

Harry W. Johnson, Jr., M.D.

```
 1              C O N T E N T S

 2    EXAMINATION OF HARRY W. JOHNSON, JR., M.D.     PAGE

 3    BY MR. CRONE                                      4

 4

 5                  E X H I B I T S

 6

 7    JOHNSON DEPOSITION EXHIBITS                     PAGE

 8    Exhibit 1    Notice of Deposition               11

 9    Exhibit 2    General Expert Report              13

10    Exhibit 3    Curriculum Vitae                   13

11    Exhibit 4    Reliance List                       7

12    Exhibit 5    Supplemental Reliance List          8

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Harry W. Johnson, Jr., M.D.

```
 1              P R O C E E D I N G S
 2   Whereupon,
 3             HARRY W. JOHNSON, JR., M.D.
 4    a Witness, called for examination by counsel for
 5   the Plaintiffs, having first been duly sworn, was
 6   examined and testified as follows:
 7             EXAMINATION BY COUNSEL FOR PLAINTIFFS
 8   BY MR. CRONE:
 9        Q.   Dr. Johnson, I know we've met, but if you
10   could state and spell your name for the record,
11   please.
12        A.   Harry Wallace Johnson, Jr.  That's
13   H-a-r-r-y, Wallace, W-a-l-l-a-c-e, Johnson,
14   J-o-h-n-s-o-n, Jr., J-r.
15        Q.   And you've had your deposition taken
16   before?
17        A.   I have.
18        Q.   Okay.  So it's fair to say you understand
19   the ground rules generally?
20        A.   Yes.
21        Q.   Okay.  The only thing I'll repeat, then,
22   is that when I ask a question, if you don't
23   understand it, please ask me to clarify.  I have no
24   interest in you answering questions you don't
25   understand, but if you don't ask to clarify, I'll
```

Harry W. Johnson, Jr., M.D.

```
 1   assume you understood the question.  Fair enough?

 2        A.   Yes.

 3        Q.   Okay.  Good.

 4             So, Dr. Johnson, you've been retained by

 5   the Defendants to offer a general causation opinion

 6   on the TVT product; is that correct?

 7        A.   That's correct.

 8        Q.   And you've drafted an expert report

 9   expressing those opinions?

10        A.   That's correct.

11        Q.   Okay.  And that expert report expresses

12   opinions on the TVT product?

13        A.   That's correct.

14        Q.   And on the TVT-O product?

15        A.   Yes.

16        Q.   Okay.  Would you agree that the Mullins

17   consolidation involves cases only regarding the TVT

18   product?

19             MR. COMBS:  Dr. Johnson may not know that.

20   I'll stipulate that it does, but you're welcome to

21   ask him about it.

22             MR. CRONE:  Yeah.

23   BY MR. CRONE:

24        Q.   I mean, do you know that, Dr. Johnson?

25        A.   That's my understanding.
```

Harry W. Johnson, Jr., M.D.

1      Q.   Okay.  And so would you agree, then, that

2  any opinions in your general causation report

3  related to the TVT-O product aren't relevant to

4  this -- to the Mullins consolidation litigation?

5      A.   Well, some of my opinions for -- would

6  apply to either product.

7      Q.   Okay.  Yeah, let me ask it a bit more

8  clear.

9           Do you intend to offer any opinions on the

10 TVT-O's safety?

11          MR. COMBS:  Object to form.

12          THE WITNESS:  Well, I would say when I

13 came to this deposition, I thought we were talking

14 about TVT.  If asked questions about TVT-O, I would

15 answer those questions.  Is that what you mean?

16 BY MR. CRONE:

17     Q.   Well, yeah, I also thought we were talking

18 about TVT only.  I'm referring to the opinions

19 expressed in your report relating to the TVT-O.

20          So the question I'm asking is:  Are you

21 intending to offer opinions at any future date on

22 the TVT-O product's safety?

23          MR. COMBS:  Object to form.

24          THE WITNESS:  I'm not sure I completely

25 understand, but what I think you're asking me, if

Harry W. Johnson, Jr., M.D.

1    I'm going to offer opinions about TVT-O in these six

2    cases.

3    BY MR. CRONE:

4         Q.   That's correct.

5         A.   I'm going to offer opinions about TVT in

6    these six cases.

7         Q.   Okay.  So in these six cases, you won't

8    offer any opinions related to TVT-O's safety or

9    efficacy?

10        A.   Only if a question about TVT-O were to

11   come up.

12        Q.   That's fair enough.

13             So, Doctor, I'm going to hand you some

14   exhibits.  And these are out of order.  And believe

15   it or not, last night I reordered this to try to be

16   more efficient.  So I'm going to mark them out of

17   order, and the first exhibit is your reliance list.

18             MR. CRONE:  If we could mark this as

19   Exhibit 4.

20             (Exhibit 4 was marked for identification

21             and is attached to the transcript.)

22   BY MR. CRONE:

23        Q.   And then I will hand you your supplemental

24   reliance list.

25             MR. CRONE:  And this we'll mark as

Harry W. Johnson, Jr., M.D.

1    Exhibit 5.

2              (Exhibit 5 was marked for identification

3              and is attached to the transcript.)

4    BY MR. CRONE:

5         Q.   Okay.  So have you seen these two

6    documents in front of you, Exhibit 4 and 5?

7         A.   Yes.

8         Q.   Okay.  And what are these?

9         A.   It's a reliance list and a supplemental

10   reliance list.

11        Q.   Okay.  And so are all of the materials

12   listed in the reliance list and supplemental

13   reliance list materials you relied on in forming

14   your opinions on the TVT product?

15        A.   The materials that I relied on are within

16   this list.

17        Q.   Okay.  And so there are additional

18   materials on the list that you did not rely on?

19        A.   No.  There's -- there are things in this

20   list that I didn't review that I didn't feel were

21   important to me.

22        Q.   Okay.  And so the materials on the list

23   were provided to you by Ethicon's attorneys?

24        A.   By Butler Snow.

25        Q.   Okay.  And Butler Snow is the law firm --

Harry W. Johnson, Jr., M.D.

1    one of the law firms that represents the Defendants,

2    correct?

3         A.   Yes.

4         Q.   And so they sent over various materials

5    for you to review?

6         A.   I mean, my understanding is they sent

7    everything on these reliance lists.

8         Q.   And then you reviewed some of it, relied

9    on that to form your opinions; is that fair?

10        A.   Yes.

11        Q.   And then some of it you didn't review

12   because you didn't think it was relevant or

13   necessary?

14        A.   Yes.

15        Q.   Okay.  And so what is your understanding

16   of -- how would you define a reliance list?

17             MR. COMBS:  Objection to the form.  Asks

18   for a legal conclusion from a lay witness.

19             THE WITNESS:  It would be materials that I

20   can review and rely on to help me write a report and

21   reference medical literature involving the report

22   that I would be writing.

23   BY MR. CRONE:

24        Q.   Okay.  And so why, then, did you include

25   information on the reliance list that you didn't, in

Harry W. Johnson, Jr., M.D.

1   fact, rely on in forming your opinions on the TVT

2   product?

3            MR. COMBS:  Objection to form.

4            THE WITNESS:  Well, this list is a list of

5   everything that I was sent, so I just provided a

6   complete list of materials that I was sent.

7   BY MR. CRONE:

8       Q.   But these aren't, in fact -- there are

9   many materials on the list that you did not rely on

10  in forming your opinions on the TVT product; is that

11  fair?

12      A.   Well, there's a lot of things in this

13  reliance list that are referenced in other articles

14  on the reliance list, so it's kind of intermingled.

15      Q.   Okay.  So is it possible -- would it be

16  possible for you, then, to go through Exhibit 4 and

17  5, the reliance list and supplemental reliance list,

18  and pare it down to the -- just the materials you

19  actually did rely upon in forming your opinions on

20  the TVT?

21      A.   Well, I don't think that would be possible

22  because a lot of this material I reviewed and just

23  formed opinions over a long period of time, not

24  specifically for this report.  So I reviewed

25  literature in addition to performing the report

Harry W. Johnson, Jr., M.D.

1    that's part of this literature --

2         Q.   But you would --

3         A.   -- or medical science.

4         Q.   But you would recognize any materials on

5    there you haven't ever read before, correct?

6         A.   For the most part, yes.

7         Q.   All right.  We'll set those aside.

8              I'm going to hand you what we'll mark as

9    Exhibit 1 now.

10             (Exhibit 1 was marked for identification

11             and is attached to the transcript.)

12   BY MR. CRONE:

13        Q.   So Exhibit 1 is titled Notice to Take

14   Deposition of Dr. Harry Johnson, Jr.  Have you seen

15   this document before?

16        A.   I have seen this.

17        Q.   Okay.  And you've reviewed it?

18        A.   Yes.

19        Q.   Okay.  And this document asked you to

20   bring various documents with you?  To help you out

21   here, it's at page 6.  It starts at page 6 of the

22   document and then goes to the end.  It asks you to

23   bring various documents.  Do you see that?

24        A.   Yes.

25        Q.   Did you bring those documents?

Harry W. Johnson, Jr., M.D.

```
1        A.   I brought my general report and a
2   literature book.
3        Q.   Okay.
4             MR. COMBS:  And then I have also brought a
5   thumb drive, which is marked Johnson General, which,
6   it's my understanding, would have an electronic copy
7   of the materials on Dr. Johnson's reliance list.
8   BY MR. CRONE:
9        Q.   So the thumb drive has the reliance list
10  materials.  You've brought the general report.
11       A.   Yes.
12       Q.   Anything else?
13       A.   I brought a book of TVT medical
14  literature.
15            MR. CRONE:  Which would be on the thumb
16  drive, right, Phil?
17            MR. COMBS:  It should be.  I mean, I'm
18  always hesitant to answer that because I don't
19  actually make the thumb drives, but if there is
20  anything in that medical literature notebook that is
21  not on the thumb drive, that is an error.
22            MR. CRONE:  Okay.
23            MR. COMBS:  It should have everything that
24  is in the TVT medical literature book and everything
25  that is in the notebook that's in Dr. Johnson's left
```

Harry W. Johnson, Jr., M.D.

1    hand.

2              MR. CRONE:  Okay.  Great.

3    BY MR. CRONE:

4         Q.   And did you bring any invoices for work

5    completed thus far?

6         A.   I did not.

7         Q.   Okay.  Have you generated any invoices?

8         A.   I have not.

9         Q.   Why is that?

10        A.   Well, probably the simplest answer is I've

11   been working to get ready for this.  So I'll prepare

12   one afterwards.  I'm happy to share that with you.

13        Q.   Yeah, that would be great.  At a later

14   date would be fine.

15             This ties into it, so I'll just mark this

16   now.  As you know, we have a copy of your CV.  And I

17   think it's just slightly out of date.

18             MR. CRONE:  We'll mark this as Exhibit 3.

19             (Exhibit 3 was marked for identification

20             and is attached to the transcript.)

21   BY MR. CRONE:

22        Q.   And while we're at it, let's get your

23   general report in this matter marked, which is

24   Exhibit 2.

25             (Exhibit 2 was marked for identification

Harry W. Johnson, Jr., M.D.

 1              and is attached to the transcript.)

 2    BY MR. CRONE:

 3         Q.   Okay.  So, Doctor, if we can go to page 3

 4    of Exhibit 2, which is your expert report.  It's the

 5    one just handed to you, Exhibit 2.

 6              MR. COMBS:  John, you said page 3?

 7              MR. CRONE:  Page 3, yeah.

 8              MR. COMBS:  Okay.  Thank you.

 9    BY MR. CRONE:

10         Q.   In the middle of the page, it lists your

11    rates there.  Are those rates current?

12         A.   Yes.

13         Q.   So is it your practice, then, to bill --

14    to -- I'll use the term line item bill, if you

15    understand that, when you send an invoice, or how do

16    you generate your invoices?

17         A.   Just like this summary here.

18         Q.   So one line might have a summary

19    indicating you met with somebody or had a telephone

20    call and you would just note the amount of time that

21    took?

22         A.   Yes.

23         Q.   Okay.

24              MR. COMBS:  John?

25              MR. CRONE:  Yes.

Harry W. Johnson, Jr., M.D.

```
1            MR. COMBS:  Just before you leave this
2   page --
3            MR. CRONE:  Sure.
4            MR. COMBS:  -- I want to say something
5   about it, but I don't want to interrupt you.
6            MR. CRONE:  Oh, no.  Please go ahead.
7            MR. COMBS:  Well, I just wanted to say, I
8   look at this and I notice an error on page 3 in
9   terms of it listing Dr. Johnson's testimony.
10  Because in 2014, Dr. Johnson did give a deposition,
11  which, you know, obviously the Plaintiffs are
12  familiar with because you have it, but it's in the
13  Huskey/Edwards case.  So it's just an error on that
14  list.
15           MR. CRONE:  Okay.  Yeah, and I was going
16  to get to that, but we might as well clear it up
17  now.
18  BY MR. CRONE:
19      Q.   So you recall giving a deposition in the
20  Huskey/Edwards v. Ethicon case?
21      A.   I do.
22      Q.   Okay.  And when you gave that deposition,
23  you testified accurately in that deposition?
24      A.   To the best of my ability.
25      Q.   Truthfully to the best of your ability?
```

Harry W. Johnson, Jr., M.D.

```
1        A.    Yes.
2        Q.    And so that is an error and should be
3    included in the expert report on that list on
4    page 3?
5        A.    Yes.  I don't -- I don't actually keep a
6    list of cases, but I went through, to the best of my
7    ability, my calendar to generate this list.  So I
8    must have missed that.  I don't --
9        Q.    Okay.
10       A.    It was unintentional.
11       Q.    And do you think with that addition it's
12   complete now, that list?
13       A.    I believe I gave one deposition in the
14   last month not related to this matter that's not
15   listed here.
16       Q.    Okay.  And what sort of matter was that?
17       A.    That was a malpractice case.
18       Q.    Do you know the name of the case?
19       A.    I don't know the name, but I'm happy to
20   provide that to you.
21       Q.    Sure.
22             Dr. Johnson, have you ever acted as a
23   consultant for any matter for Ethicon?
24       A.    With regard to what?  I mean, I prepared
25   the -- I prepared the general report we just
```

Harry W. Johnson, Jr., M.D.

1    discussed in the Edwards matter.

2        Q.   No.   I'm referring to things like

3    preceptorships, proctorships, consulting on -- I

4    mean as broad as possible -- consulting on drafting

5    IFUs, patient brochures, that sort of thing.

6        A.   I did on several occasions work as a

7    preceptor.   In other words, Ethicon brought in two

8    or three surgeons to watch me perform a TVT.   I was

9    a faculty member in courses for a company named

10   IMET, I-M-E-T, that I believe -- well, the company

11   taught all different types of surgical procedures,

12   if you will, and TVT was, I believe, taught in that

13   course.   And some of the courses may have been

14   sponsored by Ethicon.   I was just a faculty member

15   in the course but not -- I don't believe that we

16   were -- I wasn't working for Ethicon at the time.   I

17   was teaching a course for the IMET company.

18       Q.   Okay.   So excluding the IMET company work

19   and -- so then acting as a preceptor for Ethicon

20   prior to that, anything else that you did for

21   Ethicon?

22       A.   No.   I was never -- I never contracted

23   with Ethicon to do any sort of teaching in these

24   procedures.   I just agreed a time or two for

25   observation of cases that I was doing.

Harry W. Johnson, Jr., M.D.

1      Q.    And when did you conduct these activities?

2      A.    That was in the early 2000s.  I don't

3   know.  Early to mid 2000s.

4      Q.    Would it be as late as 2008?

5      A.    I don't believe so.

6      Q.    So if there were a document out there

7   showing that you did work for Ethicon in 2008, would

8   that be -- would that document be inaccurate?

9      A.    I -- I mean, I suppose it's possible I did

10  something in 2008.  I would have to look at the

11  document.  I don't recall the specific dates.  I

12  just know that I didn't do this very much.  But it

13  was sometime -- I mean, when I did it, it was

14  sometime between -- sometime prior to 2010, I'm

15  sure, fairly sure, but I don't recall the dates

16  exactly.

17     Q.    Can you estimate the total amount Ethicon

18  has paid you for all of your consulting activities?

19  Is it fair if I just call them consulting

20  activities?

21         MR. COMBS:  Just so that I understand, are

22  we talking about as a preceptor?

23  BY MR. CRONE:

24     Q.    Yeah, we're talking about as a preceptor

25  and then anything else -- I know you're having a

Harry W. Johnson, Jr., M.D.

1  hard time remembering exactly what you may have done

2  and when, but certainly if I use the term

3  "consulting activities," I'm including as a

4  preceptor and anything else you may have done.

5          MR. COMBS:  But -- here's the only thing I

6  want to understand.  Are you talking consulting work

7  and the medicolegal work?

8          MR. CRONE:  No.  No.  I'm sorry.

9          MR. COMBS:  Okay.  That's the part --

10          MR. CRONE:  Okay.  That's a fair question.

11  I understand.

12  BY MR. CRONE:

13      Q.   Not anything related to your retention as

14  an expert.

15      A.   Okay.

16      Q.   So not drafting expert reports or anything

17  like that.  Just this prior consulting work that you

18  discussed in the 2000s, maybe as late as -- you

19  know, prior to 2010, that work that you described.

20  Can you estimate how much you were paid for all of

21  that?

22      A.   I'm not sure that I can give you a real

23  accurate estimate, but I would say, if I -- if I

24  made some sort of guess --

25      Q.   Sure.

Harry W. Johnson, Jr., M.D.

1      A.   -- without reviewing any sort of

2   historical documents or anything, I would think it

3   would be less than 5- or $10,000.  I just don't

4   recall exactly what I did.

5      Q.   You don't think it could be more than

6   $20,000?

7      A.   I would seriously doubt that.

8      Q.   Okay.  So let's go back to your expert

9   report that's Exhibit 2.  I think you already have

10   it in front of you.  Ethicon -- or the attorneys for

11   Ethicon, I should say, asked you to write this

12   opinion; is that correct?

13      A.   Yes.

14      Q.   And let's look at page 2.  If you look at

15   the second full -- the second full paragraph from

16   the bottom of the page, it starts with:  "I am a

17   very active surgeon."

18      A.   Yes.

19      Q.   The next sentence says you've performed at

20   least 750 polypropylene midurethral slings.  Is that

21   an accurate number?

22      A.   Fairly accurate.

23      Q.   And you're still performing about 50 sling

24   procedures per year?

25      A.   Maybe a little less in the last year or

Harry W. Johnson, Jr., M.D.

1   two.

2        Q.   And why have you been performing a bit

3   less?

4        A.   Well, I have some more administrative

5   duties, and I had took some time off for a surgical

6   procedure, so it changed --

7        Q.   And then --

8        A.   -- my practice a little bit.

9        Q.   I'm sorry.  I didn't mean to interrupt.

10       A.   That's okay.

11       Q.   The last sentence in that paragraph says

12   you currently use the TVT-O and TVT-Exact.  Why is

13   that?

14       A.   Well, I use what we have at our hospital.

15   So the TVT and the TVT-Exact are essentially the

16   same product, so I use them interchangeably.

17   Actually, I still use the regular TVT.

18       Q.   How often do you still use the regular

19   TVT?

20       A.   Well, I operate at four different

21   hospitals and not everybody has the Exact.  So I

22   would guess it varies from year to year depending

23   where I'm operating.  I don't know if I can give you

24   an exact number.  It just varies from year to year.

25       Q.   That's fine.  No need to guess.

Harry W. Johnson, Jr., M.D.

```
 1              If a hospital has the TVT-Exact and the
 2    TVT, do you prefer the TVT-Exact?
 3         A.   I really don't have a preference.  The
 4    difference of the needle is minimal or the passer.
 5         Q.   What sort of mesh is in the TVT?
 6         A.   Polypropylene Type I Macroporous mesh.
 7         Q.   And is that the same type of mesh that's
 8    in the TVT-Exact?
 9         A.   They're both -- they're both polypropylene
10    mesh.
11         Q.   Do you know if the TVT-Exact polypropylene
12    mesh is Type I Macroporous?
13         A.   I believe it is.
14         Q.   Okay.  Moving ahead to page 3.  The first
15    full paragraph, the sentence starts with:  "The UITN
16    Network."
17              Do you see that sentence?
18         A.   Yes.
19         Q.   And it mentions in that same paragraph
20    that the UITN Network conducted a large,
21    prospective, randomized surgical trial -- or trials.
22    And what -- starting with the first one because --
23    well, first let me ask:  When you say "trials," you
24    mean they conducted more than one study?
25         A.   That's correct.
```

Harry W. Johnson, Jr., M.D.

1      Q.   Okay.  And so when was the first one

2    conducted?

3      A.   It started sometime around the early

4    2000s.

5      Q.   Okay.  And were those studies -- or

6    trials.  I'm sorry.  Were those trials looking at

7    the TVT product?

8      A.   Initially we looked at Burch versus

9    fascial sling.

10      Q.   Okay.  Then skipping ahead to the next

11    trial, then, which products did that -- or

12    procedures did that look at?

13      A.   TVT, TVT-O, and Monarc.  It was looking at

14    retropubic versus obturator.  And obturator used two

15    different -- there was two different slings that

16    were used in the obturator arm that were based on

17    surgeon preference.

18      Q.   And the TVT uses the retropubic procedure,

19    correct?

20      A.   That's correct.

21      Q.   Let's skip over to your CV, which is

22    Exhibit 3.  And I understand this is just a bit out

23    of date, so let's skip to what we know is a bit out

24    of date.

25           On page 2, under specialty boards,

Harry W. Johnson, Jr., M.D.

1   Diplomate, American Board of OB/GYN, the

2   recertification stops at 2013.  Were you then

3   recertified in 2014, 2015, and 2016?

4        A.   Yeah, I'm currently recertified.  In 2014,

5   I missed the deadline for a test so I had to file

6   for a re-entry test, which I took and passed, to put

7   me back on the yearly schedule.

8        Q.   And you're unaware if during that time you

9   missed a test and then filed the paperwork for the

10  re-entry test the certification lapsed in that

11  period?

12       A.   I'm not sure on that.  The test was due by

13  December 31st, and I completed it, I think, around

14  the beginning of April.  So the March-April time

15  frame.

16       Q.   Okay.  Skipping to page 5.

17       A.   The --

18       Q.   Oh, I'm sorry.  Go ahead.

19       A.   The one thing I would say in the specialty

20  boards that's not there, also in -- I was certified

21  in female pelvic medicine and reconstructive surgery

22  last year, which is a subspecialty certification

23  within the board of OB/GYN.

24       Q.   Okay.  And how does that differ from the

25  prior certifications?

Harry W. Johnson, Jr., M.D.

1      A.   The OB/GYN certification is for general

2   OB/GYN.  It's an examination that you take after you

3   complete your residency followed by an oral

4   examination.  And then the recertification is a

5   yearly -- you have a choice of recertification every

6   seven years or ten years depending on when your

7   first certification was or you can choose the yearly

8   certification.  In 2000, the yearly certification

9   started, and you can choose that by choice.

10           In 2013, the board developed a

11   subspecialty certification in female pelvic medicine

12   and reconstructive surgery for people that had

13   either extensive experience or fellowship training

14   in pelvic floor issues.  And they had a -- offered

15   an examination for subspecialty certification

16   starting in 2013.  And now that's the certification

17   that people would take in addition to their OB/GYN

18   certification as a subspecialist.

19           In OB/GYN, there are four subspecialties,

20   and this is the latest and fourth one that was

21   added.  There's maternal-fetal medicine,

22   reproductive endocrinology, oncology, and now female

23   pelvic medicine and reconstructive surgery.

24      Q.   Okay.  And the female pelvic medicine and

25   reconstructive surgery certification, that would

Harry W. Johnson, Jr., M.D.

```
 1   relate to performing procedures to repair

 2   incontinence?

 3        A.   That's one of the things that it refers

 4   to.

 5        Q.   It would also refer to prolapse repairs

 6   and other things of that nature?

 7        A.   Basically things that affect the pelvic

 8   floor function of the bladder, vagina, bowels,

 9   rectum-type thing, and surgical procedures therein,

10   evaluation, treatment, that type of thing.

11        Q.   Okay.  So let's skip to page 5.  Under

12   research grant, do you see the first one listed

13   there talks about the UITN grant?  And who provided

14   that grant money?

15        A.   The National Institute of Health.

16        Q.   Was it all from the National Institute of

17   Health, all of the grant money?

18        A.   That's my understanding, yes.

19        Q.   Okay.  On page 6 -- let's skip to page 6,

20   Doctor.  Well, no need.

21             On page 7, at the bottom, there's a

22   column -- or excuse me -- a heading listed invited

23   speeches, presentations.  The first one begins in --

24   that's listed is 1994.  The last one listed, on page

25   9, is in 2001.  Is this list up to date?
```

Harry W. Johnson, Jr., M.D.

```
 1         A.    Probably not.  This is from 2014.

 2         Q.    Okay.  How many additional presentations

 3    or speeches do you think you've given that aren't on

 4    this list?

 5         A.    I don't think there's very many, but I'm

 6    happy to provide you with an updated CV.

 7         Q.    That would be great.  Thanks.

 8               Okay.  Let's go to page 4 of your expert

 9    report, and that's Exhibit 2.  Okay.  The very first

10    sentence at the top of page 4 reads:  "Urinary

11    incontinence affects up to 50 percent of women with

12    range of 10 to 70 percent."

13               What does that mean?

14         A.    That means that a lot of women leak urine

15    on average.

16         Q.    So up to 50 percent of women suffer from

17    leakage?

18               MR. COMBS:  Object to form.

19               THE WITNESS:  Well, that's a -- what I was

20    talking about there is there's an average.  So

21    50 percent would be an average, but the range may be

22    10 to 70 percent.  I think it -- I might understand

23    the semantics you're asking me.  If it affects up to

24    50 percent, how can the range be 10 to 70 percent?

25
```

Harry W. Johnson, Jr., M.D.

BY MR. CRONE:

1  BY MR. CRONE:

2      Q.   Well, I think I understand now.  I think

3  you're saying that the average is 50 percent,

4  correct, but the range could be 10 -- as low as 10

5  up to 70?  Is that fair?

6      A.   Yeah.  There's a lot of different numbers

7  reported in the literature and this is kind of an

8  average.  That was my meaning here.

9      Q.   Okay.  I understand.

10          When thinking about trials or studies --

11  so this question will apply to both.  It's compound,

12  I understand that.  We'll take it one at a time.

13          Would you agree that the results of any

14  given -- let's just say study first -- may vary

15  wildly based on methodology, just as a general

16  proposition?

17      A.   I agree there can be variability based on

18  methodology.

19      Q.   And would you agree to that same general

20  proposition with regard to trials?

21      A.   Yes.

22      Q.   And the third full paragraph on page 4, at

23  the second-to-last sentence of that, it starts with:

24  "Urinary incontinence is a prevalent condition with

25  significant medical, social, and psychological

Harry W. Johnson, Jr., M.D.

1    ramifications."

2              Do you see that sentence?

3    A.   Yes.

4    Q.   And then the next sentence says:  "It is a

5    symptom and not a diagnosis and is seen in all age

6    groups."

7              What do you mean by it is a symptom and

8    not a diagnosis?

9    A.   Well, there's a lot of different things

10   that can cause urinary incontinence.  So the symptom

11   is leakage, but the cause is not the leakage.  A lot

12   of different medical conditions can cause leakage,

13   if you will.

14   Q.   Can you give just one example of that?

15   A.   Well, I mean, let's say you have a

16   dementia patient that can't control her bladder.

17   She has urinary incontinence.

18   Q.   So in your view, then, the patient suffers

19   from dementia and a symptom of that dementia is

20   urinary incontinence?

21   A.    In that case, yes.

22   Q.   Are there cases where urinary incontinence

23   is a diagnosis in and of itself?

24   A.    Well, there's different types of urinary

25   incontinence.  So there can be -- for example, a

Harry W. Johnson, Jr., M.D.

1  fistula or a hole in the bladder can cause

2  incontinence.  You can have a bladder that doesn't

3  work where the patient has overflow incontinence; or

4  you can have stress incontinence, which is leakage

5  with an increasing intraabdominal pressure or

6  non-function of the urethral sphincter; or you can

7  have urge incontinence which can be neurologically

8  based where the bladder is -- a common term is

9  overactive bladder where the muscle contracts and

10  urine is released without the patient wanting to

11  release urine, in other words, incontinence instead

12  of voiding.

13      Q.   Okay.  So, Doctor, I think I understand.

14  So in those instances -- let's take the fistula, for

15  example.  The fistula is the cause and the stress

16  urinary -- or the incontinence is the symptom of the

17  fistula?

18      A.   Exactly.

19      Q.   Okay.  Skipping to page 5, the very last

20  paragraph, second sentence -- this is under a

21  heading that says nonsurgical options.  You say:

22  "Up to 50 percent of women may improve enough to

23  forego surgical treatment initially.  However,

24  greater than 90 percent of these patients remain

25  incontinent and greater than 60 percent may

Harry W. Johnson, Jr., M.D.

```
 1    subsequently seek surgical management."

 2              Why is that the case?

 3         A.   Well, nonsurgical management doesn't

 4    always work or it may work and then the patient gets

 5    worse and looks for another form of treatment.  I

 6    think worsening incontinence is a complaint that

 7    people often come in with seeking options for

 8    treatment and they may move to a surgical treatment.

 9         Q.   So a patient with incontinence would

10    likely try a nonsurgical option prior to trying a

11    surgical option?

12         A.   Well, certainly that's one of the options

13    for the patient depending on the type of

14    incontinence.  Now, of course you know that a

15    nonsurgical treatment, for example, for a fistula

16    has a low chance to work.  So I think you have to be

17    specific about what the problem is to say whether

18    the treatment would work or not.

19         Q.   Sure.  Let's take stress urinary

20    incontinence.

21         A.   Okay.

22         Q.   Would a nonsurgical option -- would it be

23    appropriate to first try a nonsurgical option if a

24    patient had SUI?

25         A.   That's certainly an appropriate initial
```

Harry W. Johnson, Jr., M.D.

1    treatment in addition to a surgical treatment.

2         Q.   Sticking with that example, if a patient

3    had SUI -- and SUI stands for stress urinary

4    incontinence, correct?

5         A.   That's right.

6         Q.   If a patient had SUI and tried a

7    nonsurgical procedure first, do you know what the

8    success rates are for nonsurgical treatments of SUI?

9    And by success rates, I mean both objective and

10   subjective.

11        A.   I would say on average in the literature,

12   at best, it would be 50/50.  There is certainly some

13   variability in success.  And a lot of it depends on

14   the degree of the problem and also associated

15   conditions with the problem whether that would work

16   or not, and that's why you have a wide range of

17   variability.

18        Q.   Do you know what or which literature

19   supports that opinion, the at best 50/50 success

20   rate opinion?

21        A.   I can't point you to a specific document

22   right off the top of my head.

23        Q.   And let's go to the next page, page 6, and

24   start at the top.  The letters A through G there,

25   there you're listing nonsurgical options for SUI; is

Harry W. Johnson, Jr., M.D.

1    that correct?

2         A.    Yes.

3         Q.    And that success rate we just discussed,

4    50/50 with variability based on severity of the SUI,

5    does that apply to all of these collectively?

6         A.    Well, it's based on variability of the

7    severity of the incontinence as well as associated

8    conditions, so it's difficult to define which ones

9    it would work best in.  But I don't believe any of

10   them have a success rate in general over 50 percent.

11        Q.    And if the patient chooses a surgical

12   option, would you agree that the goal, then, is to

13   achieve long-term continence with low rates of

14   complications related to the surgery?

15        A.    That would be optimal.

16        Q.    That would be optimal.

17        A.    Yeah, of course we want to perform

18   procedures that work in the long term to maintain

19   continence.

20        Q.    And so if you performed a procedure that

21   provided the patient with long-term incontinence

22   with low rates of complications, would you consider

23   that procedure to be safe?

24             MR. COMBS:  Object to the form.  John, I

25   think you just accidentally misstated the question.

Harry W. Johnson, Jr., M.D.

1    You might just want to rephrase it or restate it.

2    BY MR. CRONE:

3         Q.   No.  I'll clear it up.

4         A.   What I heard was -- instead of continence

5    was a surgical procedure to give you incontinence.

6         Q.   Oh, no.  I'm sorry.  I understand that's

7    never the goal.

8              (A discussion was held off the record.)

9    BY MR. CRONE:

10        Q.   If the procedure produced long-term

11   continence, not incontinence, with low rates of

12   complications, would you consider that procedure to

13   be safe?

14        A.   So a procedure with a low rate of

15   complications is very good.  I'm not sure what you

16   mean by safe.  All operations carry risk.

17        Q.   Sure, they all carry risk.  I'm trying

18   to -- what I'm trying to get at is how you define

19   safety.  So let's go back to the question I asked.

20             You perform an SUI surgical procedure.

21   After that occurs, there's long-term continence, low

22   rates of complications.  Would that be an

23   efficacious procedure?

24             MR. COMBS:  Object to form.

25             THE WITNESS:  Again, I'm not exactly sure

Harry W. Johnson, Jr., M.D.

1    what you mean by that.

2    BY MR. CRONE:

3         Q.   How do you define the term or the word

4    "efficacy"?

5         A.   Well, if the procedure works or not would

6    be my understanding of efficacy.

7         Q.   Okay.  And so would a procedure that

8    produces long-term continence be efficacious under

9    your definition?

10        A.   Well, I would like a procedure that gives

11   long-term -- of course the procedure we're doing is

12   for continence, to restore a patient to continence,

13   and the best procedure would be a procedure that

14   provided long-term continence.

15        Q.   And if it did, that would be -- that would

16   signify that the procedure was efficacious?

17        A.   Well, it would signify to me that it's a

18   good procedure that's achieving the result that we

19   are intending to try to obtain.

20        Q.   So now I'll ask the safety question again.

21   How do you define whether or not a procedure is

22   safe, an SUI surgical procedure?

23        A.   All procedures that we perform in stress

24   urinary incontinence that are surgical procedures

25   have known adverse events, whether -- so I don't

Harry W. Johnson, Jr., M.D.

```
1   know that I -- you know, what I would want is a
2   procedure that has a low incidence of adverse
3   events.
4        Q.   So if a procedure had a high incidence of
5   adverse events, that's not the type of procedure you
6   would want to perform?
7        A.   Well, again, a procedure may have a large
8   number of possible adverse events as a surgical
9   procedure, and I think I would look at each one
10  individually to decide whether -- what I thought
11  about the procedure.
12       Q.   Okay.  And adverse events can be reported
13  to the FDA; is that correct?
14       A.   Yes.
15       Q.   Adverse events are studied and compiled in
16  the medical literature; is that correct?
17       A.   Yes.
18       Q.   So with any given SUI procedure -- let's
19  take the TVT procedure specifically.  You could look
20  at the TVT procedure, look at the medical literature
21  and determine the -- how many adverse events are
22  associated with that type of procedure; is that
23  correct?
24       A.   I would look at the medical literature,
25  especially meta-analysis-type papers that could
```

Harry W. Johnson, Jr., M.D.

1    provide me with adverse events that had been

2    reported in the medical literature and how often and

3    what they were.

4          Q.   Sure.  And if they -- if there were a

5    great number of adverse events, you would not want

6    to perform the procedure; is that correct?

7               MR. COMBS:  Object to form.

8               THE WITNESS:  No.

9    BY MR. CRONE:

10         Q.   Okay.

11         A.   That's not correct.  I don't know if

12   I'm --

13         Q.   No, I understand.  So let's just -- let's

14   be more specific.

15              If there were adverse events in 5 percent

16   of all TVT procedures performed, would that be too

17   high for you to consider performing the TVT

18   procedure?

19         A.   Well, I think you would look at the --

20   what the adverse events are and you would compare it

21   to current procedures that are also done for the

22   procedure -- or the other procedures that are done

23   for surgical treatment, say, for the same or similar

24   patient and decide what you thought about the

25   procedure as compared to the current surgical

Harry W. Johnson, Jr., M.D.

1    treatment of that problem.

2        Q.   So what types of adverse events would you

3    look for?

4        A.   Well, I think the best thing for TVT would

5    be to refer you to the Schimpf meta-analysis to look

6    at the different adverse events that can occur or

7    that have been studied in the medical literature and

8    their incidence as compared to other procedures.

9        Q.   Sure, but the question I'm asking is when

10   you're doing this analysis, what types of adverse

11   events do you look for?

12           MR. COMBS:  Object to form.

13           THE WITNESS:  Well, again, in this

14   situation, I would refer to large databases that

15   have looked at large numbers of patients rather than

16   an individual experience.  I mean, I can talk about

17   my experience, but it's better -- I think it's much

18   better decision making to look at the current

19   medical literature and compare it with your

20   experience.

21   BY MR. CRONE:

22       Q.   Okay.  And what types of adverse events

23   does the medical literature report with -- just in

24   relation to the TVT product or the TVT procedure?

25       A.   Well, if you look at the Schimpf

Harry W. Johnson, Jr., M.D.

 1   meta-analysis, the things that are reported

 2   comparing the different types of procedures for

 3   surgery for stress urinary incontinence, they report

 4   what you could consider -- actually, they report

 5   a lot of different adverse events.  Some could be

 6   considered minor; some could be considered more

 7   major.

 8          But the things that they reported in

 9   general were urinary tract infection, bowel injury,

10   nerve injury, ureteral injury, vascular injury,

11   overactive bladder, urgency, retention of urine

12   lasting less than six weeks, retention of urine

13   lasting greater than six weeks, return to operating

14   room for urinary retention, groin pain, leg pain,

15   bladder perforation, urethral perforation, vaginal

16   perforation, deep vein thrombosis.

17          And in that, they compared -- when

18   possible, they compared that to the different

19   procedures that are currently or recently performed

20   for the treatment of stress incontinence, which

21   included procedures with mesh and included

22   procedures that did not use mesh, and they compared

23   the adverse events to each other or looked at the

24   differences or provided the differences.

25          Q.   Okay.  In your mind, off of that list you

Harry W. Johnson, Jr., M.D.

1   just gave me, which ones are serious?  I think you

2   used the word "serious."  If I'm mischaracterizing

3   that, I apologize.

4        A.   Well, I don't mean to downplay any adverse

5   event.  Of course anything that happens with a

6   patient we take seriously.  But certainly there are

7   things that are more difficult to treat.  For

8   example, bowel injury would be a very significant

9   injury.

10       Q.   Okay.  Then was it your testimony that

11  there isn't a rate of adverse events with regard to

12  the TVT procedure at which you would say I can no

13  longer perform this procedure generally, it's always

14  a case- or a patient-specific analysis?

15            MR. COMBS:  Object to form.

16            THE WITNESS:  Well, I think generally you

17  would look at a patient.  And one of the ways you

18  may decide is depending on associated pathologies or

19  conditions if a procedure in that particular

20  patient -- depending on what other procedures you're

21  doing, is one procedure better than the other.  No

22  surgical procedure is without surgical risk.

23  BY MR. CRONE:

24       Q.   And are there any surgical procedures that

25  are with so much risk that you would never perform

Harry W. Johnson, Jr., M.D.

1    them?

2         A.   Are we talking about with urinary

3    incontinence?

4         Q.   Urinary incontinence, yes.

5         A.   Well, historically there have been over

6    100 procedures described in the literature for

7    treatment of urinary incontinence.  I certainly have

8    not performed 100 different procedures.  The

9    procedures that are current I believe are safe and

10   have good outcomes and long-lasting results and are

11   acceptable treatments for patients with stress

12   incontinence.

13        Q.   What's your basis for the opinion that

14   historically there have been 100 procedures to treat

15   SUI?

16        A.   My reading and general understanding of

17   published literature, textbooks, historical

18   perspectives.

19        Q.   Are you familiar with the Monarc --

20        A.   I am.

21        Q.   -- product?

22             Would you use the Monarc product today?

23        A.   I don't use the Monarc product.

24        Q.   And why is that?

25        A.   Well, first, I was never trained with the

Harry W. Johnson, Jr., M.D.

1    Monarc product.  And personally, I like the

2    inside-out procedure.  So I just have never used the

3    Monarc.  That was part of the TOMUS study.  But my

4    choice was not to be trained in that and not use the

5    Monarc.

6        Q.    Okay.  Is the Monarc still on the market?

7        A.    I don't use the Monarc, so I'm -- I'm not

8    sure of the answer to that question.

9        Q.    Are you aware of any products that were

10   designed to treat SUI that are -- were introduced to

11   the market and subsequently taken off of the market?

12       A.    I know there are some.  I don't know that

13   I could give you a complete list.

14       Q.    Do you know why they were taken off the

15   market?

16       A.    Some of the -- some of the sling materials

17   that were used early on were found not to be good

18   materials, such as Gore-Tex.  Some weaves of mesh

19   such as -- one that comes to mind is the ObTape --

20   were removed from the market for reasons of not

21   working well, more complications.

22       Q.    They were removed for safety reasons,

23   correct?

24       A.    That's my understanding, yes.  And I

25   should add some of the biologics were removed as

Harry W. Johnson, Jr., M.D.

1    well.

2         Q.   You mentioned the TOMUS study a minute

3    ago.  Can you give a general overview of what the

4    TOMUS study was and what it was designed for?

5         A.   The TOMUS study was designed to look at

6    equivalence of retropubic versus obturator slings.

7         Q.   Do you know what products they looked at?

8         A.   Yes.

9         Q.   What products?

10        A.   TVT, TVT-O, and Monarc.

11        Q.   Do you know what general conclusions the

12   TOMUS study reached?

13        A.   That they were fairly equivalent.

14        Q.   Have there been any meta-analyses

15   performed on the TOMUS study?

16             MR. COMBS:  Object to form.

17             THE WITNESS:  You can't really perform a

18   meta-analysis on the TOMUS study.

19   BY MR. CRONE:

20        Q.   Let me ask it a different way.  Are you

21   aware of any -- in the medical literature of anybody

22   performing a re-analysis of the results of the TOMUS

23   study?

24        A.   Well, there certainly were follow-up

25   studies or longer-term analyses of the TOMUS data.

Harry W. Johnson, Jr., M.D.

 1     Q.    Prior to the TOMUS study being conducted,

 2  was there a paper published in the medical

 3  literature explaining the need for the TOMUS study?

 4     A.    Well, the UITN talked about the need for

 5  the TOMUS study to compare the two approaches to see

 6  if there was a difference.

 7     Q.    And was that study called TOMUS: Design

 8  and Methodology published in 2008?  Does that seem

 9  familiar?

10     A.    That's -- that was a published publication

11  to describe how the study was performed.

12     Q.    Were you involved in drafting that?

13     A.    I was on the TOMUS committee -- or I mean

14  I'm on the urinary treatment -- the UITN, I was a

15  founding member of that, and I was involved in

16  designing the TOMUS study.

17     Q.    Okay.  So in that 2008 paper titled Design

18  and Methodology, you would agree with the statement

19  in there that said:  "There are currently no

20  adequately powered trials with sufficient length of

21  follow-up comparing the efficacy or safety of the

22  transobturator and retropubic MUS"?

23          MR. COMBS:  Can one of you two repeat that

24  question?

25          MR. CRONE:  Sure.  I'll repeat it.

Harry W. Johnson, Jr., M.D.

1    BY MR. CRONE:

2        Q.   So as a basis for the need for the TOMUS

3    study and the Design and Methodology paper published

4    in 2008 by the UITN, would you agree with the

5    statement that:  "There are no current" -- "There

6    are currently no adequately powered trials with

7    sufficient length of follow-up comparing the

8    efficacy or safety of the transobturator and

9    retropubic MUS"?

10       A.   If you don't mind, can I look at the paper

11   with that sentence and just see what context it's in

12   in that paragraph?

13       Q.   Unfortunately, I can't find it in the

14   study and will run short on time.  So let me just

15   ask the question simpler.

16            In 2008 did you hold the opinion that more

17   studies were needed on the safety and efficacy of

18   the transobturator and retropubic approaches to SUI

19   repair?

20       A.   Well, I would say as a UITN investigator,

21   we're constantly investigating, trying to figure out

22   what sort of treatments were best for urinary

23   incontinence, stress urinary incontinence, and we

24   tried to add to the literature comparing different

25   treatments.

Harry W. Johnson, Jr., M.D.

```
 1              You know, the literature really is -- for
 2    this particular procedure is huge.  There are
 3    probably over 2,000 articles published for TVT,
 4    TVT-O-type procedures.  What we tried to add to the
 5    literature was a large randomized controlled trial
 6    which adds to the smaller trials that had been done
 7    before the TOMUS study, and that was to try to
 8    increase our knowledge of the two procedures to see
 9    if they were equivalent.
10         Q.   But in 2008, before that large randomized
11    controlled trial performed by UITN did you believe
12    that there were -- there were not at the time, 2008,
13    adequately powered trials to study safety and
14    efficacy of the midurethral sling procedures
15    available at the time?
16         A.   Yeah, we performed the TOMUS study through
17    an RFA from the NIH to look at treatments for
18    urinary incontinence, which included mesh as well as
19    non-mesh treatments.  And that's why our first study
20    was with Burch and fascial sling.  Our second study
21    was with the mesh slings.  The idea was to add to
22    the medical literature a large randomized controlled
23    trial that was very robust to try to test the theory
24    of whether these procedures were equal or not.
25              And as part of that study, one of the
```

Harry W. Johnson, Jr., M.D.

1    things we looked at were adverse events to try to

2    decide -- or actually to see what adverse events

3    occurred with a large group of treating physicians.

4    I believe there was 53, something like that.  And

5    that's what we tried to do was to add literature to

6    the medical science and literature at that time

7    regarding those procedures.

8        Q.   And I understand that portion of your

9    answer, but the question I'm asking is much more

10   specific.

11        So at the time, 2008, before the UITN

12   randomized controlled study was performed, was one

13   of the reasons that UITN wanted to perform that

14   procedure due to the fact that there weren't

15   adequately powered trials on the SUI products?

16        MR. COMBS:  Object to form.

17        THE WITNESS:  Well, we powered our trial

18   to answer a specific question regarding this.  There

19   were a significant number of trials in the medical

20   literature performed by doctors from all over the

21   world as well as registries for the procedure.  And

22   just like any other procedure, we're always looking

23   and testing hypotheses to see if there's something

24   better or how we're doing.  That's what it was

25   designed to do.

Harry W. Johnson, Jr., M.D.

```
 1              We felt that our study answered another

 2   question in the performance of these procedures and

 3   that, if you will, the procedures were equivalent.

 4   BY MR. CRONE:

 5       Q.   And so were those prior --

 6       A.   Relatively equivalent.

 7       Q.   Were those prior trials or studies

 8   adequately powered?

 9              MR. COMBS:  Object to form.

10              THE WITNESS:  I would have to look at the

11   studies.  But, I mean, we're talking about 2008,

12   which is eight years ago, so I don't want to

13   misspeak and say there was something or wasn't

14   something prior to 2008.  But certainly in 2008,

15   what we did added to the medical literature.

16   BY MR. CRONE:

17       Q.   Well, you're a founding member of UITN,

18   correct?

19       A.   That's correct.

20       Q.   So this 2008 paper that came out, you

21   would have reviewed it?

22       A.   Yes.

23       Q.   And if you didn't agree with an opinion

24   expressed in it, you would have expressed your

25   disagreement?
```

Harry W. Johnson, Jr., M.D.

1      A.   We reviewed the paper as a group and came

2   to an agreement of what to publish, yes.

3      Q.   Okay.  The same 2008 paper also says:

4   "New surgical therapies for the treatment of stress

5   urinary incontinence are developed and offered as a

6   standard of care without adequate scientific

7   evaluation of their effectiveness or safety."

8           Do you agree with that statement as of

9   2008?

10     A.   Again, I'd like to look at the paper to

11   see what the context of that sentence --

12     Q.   Well, let's set the paper aside.  In 2008,

13   did you think that new surgical treatments for SUI

14   were being introduced into the marketplace without

15   adequate scientific evaluation of their safety or

16   efficacy?

17          MR. COMBS:  Object to form.

18          THE WITNESS:  Well, I think that the

19   procedures certainly had studies -- I mean, in this

20   paper, we're talking about TVT, TVT-O, and Monarc.

21   And we're talking about procedures that had been

22   done before.  And subsequently some of those

23   products have been removed from the market.  And

24   certainly they had some problems that weren't known

25   at the time of their introduction.  And as surgeons

Harry W. Johnson, Jr., M.D.

1   used these products, such as ObTape, Gore-Tex, we

2   found problems with it and they were removed from

3   the market.

4   BY MR. CRONE:

5       Q.   When is the appropriate time to

6   investigate for problems with a product?  Let's take

7   the TVT product specifically.  Prior to introduction

8   to the marketplace or after?

9           MR. COMBS:  Object to form.

10          THE WITNESS:  In general, products, drugs,

11  medical treatments have to be tested in patients to

12  figure out whether they can be used in patients.  So

13  you would try the product in a clinical trial, if

14  you will, where you have a hypothesis and you test

15  it as far as the treatment goes.  Some products are

16  comparable to previous products and may be used on

17  the market without going through a clinical trial

18  like that.

19  BY MR. CRONE:

20      Q.   Okay.

21      A.   Although, I mean, everything is really

22  looked at.

23      Q.   And so if I proffer to you that in 2008

24  the UITN thought SUI products were being introduced

25  into the marketplace, specifically the TVT, TVT-O,

Harry W. Johnson, Jr., M.D.

1    and the Monarc, without adequate prior scientific

2    evaluation of their effectiveness or safety, do you

3    agree with the UITN's position?

4              MR. COMBS:  Object to form and foundation.

5              THE WITNESS:  Well, first, as I've already

6    said, I was part of the UITN.

7    BY MR. CRONE:

8         Q.   That's correct.

9         A.   So I do agree with the UITN.  We felt at

10   the time that the best and the safest products at

11   the time were the retropubic sling -- that was

12   TVT -- the obturator sling -- that was TVT-O -- and

13   the Monarc sling -- that was an obturator sling as

14   well -- were the products that we would test.

15             The UITN was made up of 53 physicians, the

16   majority of which were fellowship trained in pelvic

17   floor procedures and medical treatment of patients.

18   Half were urogynecologists and half were

19   gynecologists who came into the room with a lot of

20   different ideas about how to treat patients with

21   stress urinary incontinence.

22             We looked at the different procedures that

23   were available to patients and decided what areas

24   that we needed to try to investigate to add to the

25   literature and improve the treatment of urinary

Harry W. Johnson, Jr., M.D.

```
 1   incontinence.  For that reason, we started with the

 2   more historical procedures which were non-mesh --

 3   that's the fascial sling and the Burch

 4   colposuspension -- because these were two procedures

 5   that historically had been done for -- well, the

 6   Burch for probably around 50 years and the sling in

 7   some form for a hundred years.

 8           And we didn't feel that those -- that

 9   those two procedures had been adequately

10   investigated for outcomes, adverse events, and

11   treatments of women.  So then we moved to -- once we

12   did that to establish a baseline, we moved to the

13   fascial sling, which is the TVT and TVT-O, which had

14   a significant body of literature at the time, but we

15   felt that the size of our study and the power of our

16   study would show that -- I don't mean show.  What I

17   mean is we wanted to try to figure out whether the

18   procedures were equivalent and then look at adverse

19   events and problems that may occur.

20       Q.   Okay.  If I can -- I want to stop there

21   and ask a question.

22       A.   Oh.

23       Q.   And so the study ultimately showed that

24   they were equivalent?

25       A.   Relatively.
```

Harry W. Johnson, Jr., M.D.

1     Q.   Relatively.  And --

2     A.   I mean, there's some differences.

3  There's -- the nature of the procedures are

4  different, so the adverse events would be a little

5  different.

6     Q.   Sure.  But I mean, when you say

7  "equivalent," do you mean in terms of safety,

8  efficacy, adverse events?  What type of equivalence

9  are you referring to?

10    A.   Well, I think all those: safety, efficacy.

11 The adverse events, again, are different.  The TOMUS

12 group came out with a paper on the adverse events

13 that occurred during TOMUS, and that information is

14 incorporated in the Schimpf meta-analysis --

15    Q.   Sure.

16    A.   -- for adverse events.

17    Q.   Do you know a Dr. Linda Brubaker?

18    A.   Yes.

19    Q.   What is your opinion of Dr. Linda

20 Brubaker's professional abilities as a medical

21 doctor?

22    A.   I have a very high opinion of

23 Dr. Brubaker.

24    Q.   Are you aware of a -- of a paper she

25 published titled Adverse Events over Two Years After

Harry W. Johnson, Jr., M.D.

1    Retropubic or Transobturator Midurethral Sling

2    Surgery: Findings From The TOMUS Study?

3         A.   I am aware of that paper.

4         Q.   It's on your reliance list, isn't it?

5         A.   I believe it is.

6         Q.   Okay.  In that -- in Dr. Brubaker's paper,

7    she concludes that adverse events are common after

8    midurethral sling implants after looking at data

9    from the TOMUS study.  Do you agree with that

10   conclusion?

11        A.   Again, I'd like to look at the paper to

12   see exactly the context of that sentence and the

13   paragraph that it's written.

14        Q.   Well, you're aware of the results of the

15   TOMUS study?

16        A.   Yes.

17        Q.   You cite to them in your expert report,

18   correct?

19        A.   Yes.

20        Q.   So do you not know enough about the TOMUS

21   study to give an opinion today as to whether or not

22   adverse events are common after MUS procedures?

23             MR. COMBS:  Object to form.

24             THE WITNESS:  Well, I think the better way

25   to answer that question would be there are adverse

Harry W. Johnson, Jr., M.D.

```
 1    events that occur after either the TVT or the TVT-O

 2    or the Monarc procedure.  And by common, that means

 3    all the different adverse events that can occur.

 4    And I think that it's probably more helpful for me

 5    to look at the -- how often they occur and what

 6    the -- what the adverse event is.

 7    BY MR. CRONE:

 8         Q.   Dr. Brubaker also says:  "Over a period of

 9    24 months, 42 percent of all study participants

10    experienced at least one adverse event, including

11    12 percent that experienced at least one serious

12    adverse event."

13              Do you disagree with that conclusion?

14         A.   Well, that was a conclusion based on all

15    the adverse events that they looked at.  Some of the

16    nonserious adverse events could be things like

17    urinary tract infections or some pain

18    postoperatively which resolves, which we know with

19    every procedure you get some postoperative pain.

20    There are some more serious adverse events that are

21    events that will resolve as the patient recovers.

22              So to -- I think really that you need to

23    look at the paper and look at the adverse events

24    that you're talking about when you make that

25    statement -- a blanket statement like that.
```

Harry W. Johnson, Jr., M.D.

```
1      Q.   Well, Dr. Brubaker said that 12 percent of
2  the 42 percent of all study participants had
3  experienced serious adverse events.  So she's saying
4  42 percent experienced adverse events.  12 percent
5  of those experienced serious adverse events.  Do you
6  agree with that conclusion?
7           MR. COMBS:  Yeah, Dr. Johnson, you've got
8  that paper in your med lit binder if you want to
9  look at it.  It's at well-powered RCT's tab 3.
10 BY MR. CRONE:
11      Q.   And while you're looking for that in your
12 notebook, Dr. Johnson, the serious adverse events
13 were defined in the TOMUS study, weren't they?
14      A.   Yes.
15      Q.   Okay.  To help speed it along, I can
16 direct you to page 3 under results, first paragraph,
17 third full sentence that starts:  "Over a period of
18 24 months."  That's what I'm looking at there.
19      A.   Page 3?
20      Q.   Page 3, correct.
21      A.   And which paragraph are you at?
22      Q.   You know, we have different page numbers,
23 so that's not -- it's under the results.  It's near
24 the beginning.  It's under a heading called results.
25           MR. COMBS:  It's page 4, right here
```

Harry W. Johnson, Jr., M.D.

1    (indicating).

2              MR. CRONE:  Thanks, Phil.

3              THE WITNESS:  Well, in this paper, they

4    describe -- they classify the serious adverse events

5    versus all adverse events.  And, again, there

6    were -- you know, there was an incidence of adverse

7    events, but the incidence of each adverse event was

8    really low.  And a lot of these adverse events are

9    events that you can see with any surgical procedure,

10   so they're not specific to a mesh procedure --

11   BY MR. CRONE:

12        Q.   Well, only --

13        A.   -- not all of them.

14        Q.   Well, only mesh procedures were involved

15   in the TOMUS study, though, correct?

16        A.   Right, but the TOMUS procedures are

17   surgical procedures of the pelvic floor.  So these

18   adverse events occur with any procedure for the

19   treatment of stress incontinence.

20        Q.   Sure.  But the TOMUS study only looked at

21   procedures involving TVT, TVT-O, and Monarc,

22   correct?  I mean, the TOMUS study didn't study all

23   pelvic floor procedures?

24        A.   No, but they looked at adverse events that

25   occur with all pelvic floor procedures.

Harry W. Johnson, Jr., M.D.

1      Q.   I don't understand, actually.

2      A.   Okay.

3      Q.   I thought the TOMUS study looked at the

4  TVT, the TVT-O, and Monarc procedures and collected

5  data therefrom.

6      A.   They did.  We -- the adverse events that

7  you look at are adverse events that can occur with

8  any surgical procedure.  And maybe I could give you

9  an example --

10     Q.   I think that would help.

11     A.   -- that may clarify it for you.

12          So, for example, pulmonary embolus occurs

13  with any surgical procedure, postoperative

14  bleeding --

15     Q.   Sure.  Let me stop you there.

16          But the data that was collected from the

17  TOMUS study didn't look at any other procedures,

18  correct?  So if a pulmonary embolism occurred in a

19  heart surgery, it's not even collected in the data

20  in the TOMUS study; is that fair?

21     A.   No.  No, it's not fair.  Just looking at

22  the list of serious adverse events that were

23  collected in the TOMUS study, these are -- a lot of

24  these are events or adverse events that can occur in

25  any surgical procedure.  And that was one of the

Harry W. Johnson, Jr., M.D.

1    reasons that we looked at this, is to see if the

2    rate of occurrence is similar to other procedures.

3         Q.   Sure.  Sure.  So you're comparing those

4    rates, but the data collected from the TOMUS

5    procedure -- let's just -- let's just ask a few

6    specific questions.

7              In the TOMUS study, no heart procedures

8    were performed, correct?

9              MR. COMBS:  I didn't hear your question.

10   BY MR. CRONE:

11        Q.   No procedures involving the heart were

12   performed in the TOMUS trial?

13        A.   That's correct.

14        Q.   Okay.  And, in fact, the only procedures

15   that were performed in that randomized controlled

16   trial were procedures relating to TVT implantation,

17   TVT-O implantation, and Monarc implantation,

18   correct?

19        A.   For the slings that were --

20        Q.   That's correct.

21        A.   Just for the slings.

22        Q.   And so any data regarding adverse events

23   and serious adverse events from those procedures

24   came from naturally a TVT procedure, a TVT-O

25   procedure, or a Monarc procedure, correct?  I'm not

Harry W. Johnson, Jr., M.D.

1  talking about what the data is being compared to.

2  I'm talking about the data from those procedures

3  performed in the TOMUS study.

4       A.   Yeah, so a lot of these adverse events

5  were adverse events that are known to occur with any

6  surgery.

7       Q.   Sure.

8       A.   And there are some adverse events in here

9  that are specific for mesh procedures -- sling

10  procedures such as TVT or TVT-O, but not all the

11  adverse events are specific for TVT, TVT-O.  But in

12  the study, they looked at all the adverse events

13  that occurred whether they're specific for TVT-O,

14  TVT, or not.

15       Q.   Yeah, that makes sense.  So let's just --

16  let me give you a hypothetical.

17            Let's say Dr. Brubaker looks at the

18  results from the TOMUS study and she sees three

19  bladder perforations occurred among all trial

20  participants.  That would mean those three bladder

21  perforations occurred in either a TVT procedure, a

22  TVT-O procedure, or a Monarc procedure, correct?

23       A.   In this study, yes.

24       Q.   Okay.  And so you have no reason, then, to

25  disagree with Dr. Brubaker's conclusions in her

Harry W. Johnson, Jr., M.D.

1    paper that we're looking at now and discussing now?

2         A.   Well, again, when she's talking about

3    common, the majority of the adverse events that

4    occurred were adverse events that can occur with any

5    procedure, and because of that, they occurred with

6    this procedure, if that --

7         Q.   Yeah, I'll be more specific.  I think that

8    will be more helpful.

9              So you don't disagree when she says 253

10   out of the 597 study participants experienced at

11   least one adverse event?

12        A.   If you look at the serious adverse events

13   and the adverse events data, that's the percentage,

14   but, again, the percentage is not regarding adverse

15   events that are specific for TVT, TVT-O.  And the

16   majority of the adverse events occurred in the less

17   serious category, which are not specific.

18        Q.   But you agree that 253 adverse events

19   occurred?

20        A.   As listed in the SAEs and the AEs data

21   table.

22        Q.   And that would constitute 42 percent of

23   the study participants, correct?  I can get a

24   calculator out if you want to check her math.

25        A.   No.  That's what was reported for adverse

Harry W. Johnson, Jr., M.D.

```
 1   events, which included all adverse events, serious

 2   and nonserious.

 3        Q.   And so, then, that would make adverse

 4   events common among these procedures.  Do you agree

 5   with that?

 6             MR. COMBS:  Object to form.

 7   BY MR. CRONE:

 8        Q.   I'll be more specific.

 9             As adverse events are defined in the

10   study, if they occur in 42 percent of the procedures

11   performed in the study, that would mean adverse

12   events are common.  That's Dr. Brubaker's

13   conclusion.  I'm asking if you agree with that.

14        A.   I agree with that in respect to the

15   adverse events as described.  And the adverse events

16   that are described, the majority of them are adverse

17   events that can occur with any surgical procedure,

18   so they're not -- I just want to make it clear that

19   we're not talking about specific adverse events to

20   the mesh slings.  It could include Burch,

21   pubovaginal.  A lot of these adverse events occur

22   with all different procedures.

23        Q.   Sure.  I think what you're saying -- and

24   correct me if I'm wrong -- is that these adverse

25   events aren't unique to the mesh slings, they can
```

Harry W. Johnson, Jr., M.D.

1   happen with other procedures; is that fair?

2       A.   That's correct.

3       Q.   Okay.

4            (A discussion was held off the record.)

5            (A recess was taken.)

6   BY MR. CRONE:

7       Q.   Dr. Johnson, could you turn to page 11 of

8   your expert report, which is Exhibit 2.  The very

9   last paragraph, first sentence reads:  "TVT was

10  introduced in the United States by Ethicon in 1998

11  after receiving 510 clearance by the FDA."

12           Do you see that sentence?

13      A.   Yes.

14      Q.   What is 510 clearance -- or excuse me --

15  510(k) clearance?

16      A.   I'm not an expert on government forms, but

17  my general understanding is that's what you go

18  through with the FDA to introduce a product to the

19  market.

20      Q.   Okay.  So you don't have any experience in

21  assisting medical device manufacturers with

22  obtaining 510(k) clearance?

23      A.   I don't.

24      Q.   Let's skip to page 13, the first full

25  paragraph that starts with:  "Since 2000" -- I'll

Harry W. Johnson, Jr., M.D.

1    read the first sentence -- the TVT procedure has

2    been rapidly accepted and has become the gold

3    standard for treatment of stress urinary

4    incontinence."

5            Do you see that sentence?

6        A.   I do.

7        Q.   What does gold standard mean?

8        A.   That would be the most commonly performed

9    procedure for treatment of urinary incontinence or

10   the most widely accepted common treatment.

11       Q.   So if there's treatment for SUI -- and in

12   this case, we're referring to the TVT treatment --

13   if it's the most common or the most widely accepted,

14   then it's the gold standard?

15       A.   It's the most commonly performed procedure

16   in the world, TVT is.

17       Q.   So that makes it the gold standard?

18       A.   I think so.

19       Q.   Okay.  Any other factors that would make a

20   procedure gold standard or not?

21       A.   Well, I think this procedure was looked at

22   where they compared it to -- and this would include

23   TVT, TVT-O procedures.  So they looked at --

24       Q.   I'm only interested, just so you know, in

25   the TVT procedure.

Harry W. Johnson, Jr., M.D.

1      A.    Right.

2      Q.    So --

3      A.    I mean, but we just talked about that the

4   TOMUS compared the two and they were relatively

5   equivalent.  That's the only reason I bring that up.

6      Q.    I understand.

7      A.    But I understand.

8            So it's the most commonly performed

9   procedure for stress incontinence in the world.

10  It's been approved by -- or endorsed by all

11  professional organizations that look at pelvic floor

12  treatment.  It's the most studied procedure probably

13  in history regarding treatment of urinary

14  incontinence.

15     Q.    And what's your basis for that opinion,

16  that it's the most studied procedure in history for

17  the treatment of urinary incontinence?

18     A.    Well, there's over 2,000 studies that have

19  been -- or are in the literature regarding --

20     Q.    Are those all listed in your reliance

21  report?

22     A.    I don't know that there's 2,000 listed in

23  there, but that's my reading of historical

24  perspective of treatment of urinary incontinence.

25     Q.    How many studies are there just on the

Harry W. Johnson, Jr., M.D.

```
 1   TVT?  Or let's broaden that a little bit.  At least
 2   looking at -- how many studies are there that look
 3   at the TVT's safety as a primary end point?
 4            MR. COMBS:  Object to form.
 5            THE WITNESS:  Well, I talk about in here
 6   that there's more than 100 randomized controlled
 7   trials.  I don't think that I can give you an exact
 8   number on that, but most randomized controlled
 9   trials would look at adverse outcomes of a
10   procedure.
11   BY MR. CRONE:
12       Q.   But trials have a primary objective
13   usually, correct?
14       A.   They do.
15       Q.   And then they may have secondary
16   objectives; is that your understanding?
17       A.   Much as the adverse event paper for TOMUS
18   was secondary.
19       Q.   Sure.  Sure.
20            And so how many TVT studies, if you know,
21   studied TVT with safety as the primary end point or
22   outcome for the study?
23            MR. COMBS:  Object to form.
24            THE WITNESS:  I can't -- I can't answer
25   that.  I don't know the answer to that question.
```

Harry W. Johnson, Jr., M.D.

1    BY MR. CRONE:

2        Q.   Do you know --

3        A.   I would say most studies look at adverse

4    outcomes.

5        Q.   But not as a primary outcome?

6        A.   Well, you know, usually when you're --

7    usually when you're doing a study, you're looking at

8    the outcome that you expect for treatment --

9        Q.   So you're looking at --

10       A.   -- and then associated with that would be

11   adverse outcomes.

12       Q.   And I didn't mean to interrupt.  I'm

13   sorry.

14            So you're looking primarily at subjective

15   and objective cure rates, correct, as a primary

16   outcome?

17       A.   When you're performing the procedure.  And

18   then associated with that would be adverse outcomes.

19       Q.   Okay.  So you're not aware -- of these 100

20   studies on TVT that you cite here, you're not aware

21   if even a single one looked at safety as a primary

22   outcome rather than objective and subjective cure

23   rates?

24            MR. COMBS:  Object to form.

25            THE WITNESS:  Well, I think just the way

Harry W. Johnson, Jr., M.D.

1    that we perform these trials in the literature, we

2    look for the outcome of treatment.  And then with

3    that, what you would call a secondary would be

4    adverse outcomes that occur with that treatment.

5            But generally, we wouldn't design it the

6    other way around.  But you're still looking at the

7    same questions if you reverse those, if you will.

8    BY MR. CRONE:

9        Q.   Okay.  I understand your answer.

10           Are you aware of two societies, AUGS and

11   SUFU?

12       A.   I am.

13       Q.   Okay.  And you know what those acronyms

14   stand for --

15       A.   Yes.

16       Q.   -- AUGS and SUFU?

17           In your expert opinion, you cite their

18   position statement on TVT as basis for your ultimate

19   conclusion that TVT is safe; is that correct?

20           MR. COMBS:  Object to form.

21   BY MR. CRONE:

22       Q.   And I can direct you to the bottom of page

23   14 of your expert report.  You also cite to some

24   other societies.  I'm just asking about AUGS and

25   SUFU specifically.

Harry W. Johnson, Jr., M.D.

```
 1                And I'm not asking you to actually look at

 2    the position statement, just the bottom of page 14

 3    of your expert report.  I'm asking you if the

 4    purpose of your citation to AUGS and SUFU is that

 5    their statements support your conclusions in this

 6    expert report that the TVT is a safe product.

 7         A.   They do.

 8         Q.   Okay.  Who funds the operations of AUGS?

 9         A.   I just know that I pay dues as a member.

10    I would assume that that's -- I'm not aware of the

11    financials.

12         Q.   The same with SUFU?

13         A.   Well, I'm not a member of SUFU, but I --

14         Q.   A member of AUGS?

15         A.   -- assume it's the same.

16         Q.   Do you know who drafted the AUGS

17    statement?

18         A.   Yes.

19         Q.   Do you know who drafted the SUFU

20    statement?

21              MR. COMBS:  Object to the form.

22    BY MR. CRONE:

23         Q.   And just to be clear, I'm referring to the

24    statements that you cite in your expert report.  Not

25    any statement drafted by AUGS, just the ones you
```

Harry W. Johnson, Jr., M.D.

1   cite.

2      A.   Each statement has the drafters listed at

3   the end.

4      Q.   Okay.  If those drafters were all mesh

5   manufacturer consultants, would it change your

6   opinion as to the objectivity of those statements?

7           MR. COMBS:  Object to form and foundation.

8           THE WITNESS:  My reading of the statements

9   is that they're based on the medical literature.

10  BY MR. CRONE:

11     Q.   Sure.  And that's not my question.  My

12  question is if you learn that all of the -- that the

13  drafters of those statements were all consultants

14  for mesh manufacturers, would you question their

15  objectivity?

16          MR. COMBS:  Object to form and foundation.

17          THE WITNESS:  I think what I would do is

18  read the statement and see if they were based on the

19  medical literature, such as --

20  BY MR. CRONE:

21     Q.   But you've already read the statements.

22     A.   Yes, I have.

23     Q.   And we already know that you agree with

24  the conclusions in those statements.  I'm asking if

25  you found out -- if I just proffer to you today that

Harry W. Johnson, Jr., M.D.

1   the authors of those statements are all mesh

2   manufacturer consultants, would that lead you to

3   question their objectivity in drafting those

4   statements?

5       A.   Well, the -- each statement is provided

6   with the medical literature that it's based on,

7   which is not -- which is what is used to make those

8   conclusions.  And I'm familiar with this literature.

9   And that's why I agree with it regardless of what

10  the authors do with any company that they work with.

11  I think that the -- this is a statement that's not

12  based on one person's opinion.

13      Q.   Well, if you author a medical article or

14  conduct a trial, something that's going to be

15  published, and you had a potential conflict of

16  interest, you would disclose that, wouldn't you?

17      A.   I would disclose that, yes.

18      Q.   And was there any sort of disclosure in

19  the AUGS and SUFU statements about potential

20  conflicts of interest?

21      A.   Not that I'm aware of.

22      Q.   Is it your opinion that the -- well, let's

23  back up.

24           The TVT product uses polypropylene mesh,

25  correct?

Harry W. Johnson, Jr., M.D.

1      A.   Yes.

2      Q.   Is it your opinion that that mesh is

3  lightweight?

4      A.   Yes.

5      Q.   Do you know who Dr. Mang Chen is?

6      A.   No.

7      Q.   Do you know who Dr. Brigette Hellhammer

8  is?

9      A.   No.

10      Q.   If I told you that she was an Ethicon

11  employee and that on September 1st, 2013 in a

12  deposition she stated that the TVT mesh is

13  heavyweight, would you disagree with that?

14          MR. COMBS:  Object to form.

15          THE WITNESS:  I'd have to look at the

16  paper and see what you're talking about.

17  BY MR. CRONE:

18      Q.   She stated that the TVT mesh is

19  heavyweight.  Do you disagree with her?

20      A.   I'd have to look and see -- I don't know

21  what you're referring to or what sort of --

22      Q.   Well, you just testified that the TVT mesh

23  is lightweight.  What's the basis for that opinion?

24      A.   That's the description of the mesh.

25      Q.   Okay.  So if an Ethicon doctor said it was

Harry W. Johnson, Jr., M.D.

```
 1   heavyweight, why would you disagree with that

 2   conclusion?

 3        A.   I don't know why they said it.

 4        Q.   They were asked is it heavyweight or

 5   lightweight.  They said heavyweight.  Would you

 6   disagree?

 7        A.   I don't know what they were comparing it

 8   to.

 9        Q.   You've opined that the IFU for the TVT was

10   adequate; is that correct?

11        A.   Yes.

12        Q.   And that's prior to the 2015 IFU change;

13   is that correct?

14        A.   Yes.

15        Q.   And is it your opinion that that IFU

16   disclosed all potential risks --

17             MR. COMBS:  Object to form.

18   BY MR. CRONE:

19        Q.   -- associated with the TVT procedure and

20   product?

21             MR. COMBS:  Sorry about that.  Object to

22   form.  I interrupted the question.

23             MR. CRONE:  That's okay.

24             THE WITNESS:  I'm sorry.  I --

25
```

Harry W. Johnson, Jr., M.D.

1  BY MR. CRONE:

2      Q.   In reading your expert report, I

3  understood it to say that you hold the opinion that

4  the TVT IFU prior to the 2015 change was adequate

5  because it disclosed all risks associated with the

6  product; is that correct?

7          MR. COMBS:  Object to form.

8          THE WITNESS:  I think it was adequate.

9  BY MR. CRONE:

10     Q.   And why was it adequate?

11     A.   It disclosed the major known risks.

12     Q.   What if it failed to disclose risks that

13 were known to Ethicon, would it still be adequate?

14         MR. COMBS:  Object to form.

15         THE WITNESS:  I would have to look at that

16 and compare the two.

17 BY MR. CRONE:

18     Q.   Okay.  So if Ethicon knew that the -- that

19 the TVT was subject to degradation and it's not on

20 that IFU, would the IFU still be adequate?

21         MR. COMBS:  Objection to the form and

22 foundation.

23         THE WITNESS:  I've never seen degradation

24 in a patient.

25

Harry W. Johnson, Jr., M.D.

1    BY MR. CRONE:

2         Q.   I know you've never seen degradation, but

3    if that risk was known to Ethicon and it was not on

4    that IFU, would the IFU still be adequate?

5         A.   I would have to see evidence that

6    degradation was significant.

7         Q.   The same question for particle loss.

8         A.   I would have to see medical evidence that

9    particle loss was significant.

10        Q.   Same question for contraction.

11        A.   I would have to see medical evidence that

12   contraction was significant.

13        Q.   Same question for recurrent urinary tract

14   infections.

15        A.   Recurrent urinary tract infections occur

16   with all pelvic floor surgeries, so I would have to

17   see medical evidence that that was significant.

18   That's a known risk of all surgeries.

19        Q.   But it's not on the IFU, the TVT IFU?

20             MR. COMBS:  Object to form.

21             THE WITNESS:  Again, it's a known risk of

22   all surgeries.

23   BY MR. CRONE:

24        Q.   How about dyspareunia?

25        A.   A known risk of all pelvic floor

Harry W. Johnson, Jr., M.D.

1    surgeries.

2         Q.   So should dyspareunia have been listed on

3    the IFU?

4         A.   Well, that's a general, known complication

5    of all pelvic floor surgeries.

6         Q.   There's nothing unique about the TVT

7    product that could cause dyspareunia?

8         A.   The TVT product is a pelvic floor surgery

9    just like a pubovaginal sling, Burch,

10   anterior/posterior repair, vaginal hysterectomy.

11   All of these things cause dyspareunia.

12        Q.   Are all of the potential complications

13   listed in the IFU complications that could occur in

14   any pelvic floor surgery?

15        A.   No.

16        Q.   Which ones aren't?

17        A.   Complications specific to the mesh.

18        Q.   So exposure?

19        A.   Yes.  Well, I should say exposure of mesh,

20   because you can have exposure of sutures from a

21   Burch colposuspension or you can have exposure of a

22   biologic material used for a sling.  So they're

23   different, but they're not -- the mesh exposure is

24   specific for mesh exposure.

25        Q.   Sure, but the IFU then also lists

Harry W. Johnson, Jr., M.D.

1    transitory local irritation at the wound site.

2    Couldn't that occur with any pelvic floor surgery?

3         A.    Yes.

4         Q.    So if that's listed on the IFU, wouldn't

5    it also be appropriate to list recurrent urinary

6    tract infections?

7              MR. COMBS:  Object to form.

8              THE WITNESS:  Again, it's not specific.

9    It wouldn't be -- it's not specific for a mesh

10   procedure, but it's something that can occur with

11   any pelvic floor surgery, which a mesh procedure is.

12   So it wouldn't be wrong to list it.

13   BY MR. CRONE:

14        Q.    And so then it also wouldn't be wrong to

15   list dyspareunia?

16             MR. COMBS:  Object to form.

17             THE WITNESS:  You could list that.

18   BY MR. CRONE:

19        Q.    Sure.  And you could list recurrent UTIs?

20        A.    Well, again, that's probably the most

21   common adverse event with pelvic floor surgeries.

22   It occurs with that as well as all other surgeries.

23        Q.    You could list permanent pelvic pain?

24        A.    Pelvic pain occurs with all pelvic floor

25   surgeries.  I mean, not in everybody, but it is a

Harry W. Johnson, Jr., M.D.

1    known risk.

2         Q.    You can list obstruction?

3         A.    That's a known risk of a sling surgery or

4    a colposuspension whether it's with mesh or without.

5         Q.    Have you ever explanted a TVT?

6         A.    I have.

7         Q.    Okay.  Have you ever had a pathology

8    report done on any of the explants?

9         A.    Everything that I take out of a patient I

10   send to pathology for examination, I mean, to the

11   best of my ability.

12        Q.    And how many mesh explant -- TVT explant

13   procedures have you performed?

14             MR. COMBS:  Could you -- I didn't pay

15   enough attention to the question.  Can you just read

16   that back to me?

17             (Pending question read.)

18             MR. COMBS:  Thank you.

19             THE WITNESS:  I don't know that I could

20   give you a specific number because I've taken out

21   all types of mesh products, which includes TVT as

22   well as other products, obturator slings, so --

23   BY MR. CRONE:

24        Q.    Well, let's lump them all together.

25        A.    Okay.  I can be sure it's over, I think,

Harry W. Johnson, Jr., M.D.

1    50 to 60.

2        Q.   And of those 50 to 60, did you conduct

3    your own evaluation of the mesh ever or did you send

4    it off to pathology when you could?

5        A.   When I remove it, usually it's placed

6    informal and then sent to pathology.  I mean, I look

7    at it to make sure that it's mesh and not --

8        Q.   Sure.

9        A.   -- so that I know what I've taken out.  I

10   don't do a pathologic examination.

11       Q.   Sure.  So you look at it with your eyes,

12   but you don't put it under a microscope; is that

13   fair?

14       A.   That's fair.

15       Q.   Okay.  Are you an expert in biofilm

16   creation?

17       A.   I'm not.

18       Q.   Okay.  Are you a pathologist?

19       A.   No, I'm not.

20       Q.   Are you a chemist?

21       A.   I am not.

22       Q.   Any expertise in polymers?

23       A.   No.

24       Q.   Toxicology?

25       A.   No.

Harry W. Johnson, Jr., M.D.

1      Q.    Radiology?

2      A.    What do you mean by that?

3      Q.    Are you a radiologist?

4      A.    I'm not a radiologist.

5      Q.    Engineer of any type?

6      A.    No.

7      Q.    Any expertise in polypropylene

8  specifically?

9            MR. COMBS:  Object to form.

10           THE WITNESS:  Only as a physician that has

11  used polypropylene mesh and polypropylene suture

12  extensively.

13  BY MR. CRONE:

14     Q.    Okay.  Do you hold the opinion that the

15  TVT product does not cause a foreign body reaction?

16     A.    I would say one of the reasons that we use

17  polypropylene mesh, which is TVT, and polypropylene

18  suture is that there's minimal reaction in the body.

19     Q.    Over the long term?

20     A.    Yes.

21     Q.    Okay.  Fraying and particle loss, are you

22  of the opinion on whether or not those occur with

23  TVT?

24     A.    I'm not exactly sure what you mean by

25  fraying.  Particle loss I have read about.  But I

Harry W. Johnson, Jr., M.D.

1    don't believe that particle loss or fraying are

2    significant in my practice as far as medical

3    outcome.

4         Q.   If I told you that on your reliance list

5    you list Ethicon company documents in which Ethicon

6    doctors admit that fraying occurs, that particle

7    loss occurs --

8              MR. CRONE:  Counsel, forgive me for the

9    compound nature of this question.  I'm just trying

10   to finish this up.

11   BY MR. CRONE:

12        Q.   -- would that change your opinion if

13   you -- I know you didn't review all those documents.

14   If you reviewed those documents, might that change

15   your opinions in this report?

16             MR. COMBS:  Objection to form and

17   foundation.

18             THE WITNESS:  If I felt there was reliable

19   medical data that showed that it was significant or

20   had a consequence.

21   BY MR. CRONE:

22        Q.   Are you going to review those Ethicon

23   company documents?

24        A.   Again, I would like to see medical

25   scientific evidence of the significance.

Harry W. Johnson, Jr., M.D.

1      Q.   I mean, those were already provided to

2  you.  So I'm proffering to you now that those

3  documents disagree with your conclusions and asking

4  if you're going to review those.

5      A.   Well, I would say if you're saying that, I

6  probably should review them and look at them, see if

7  I agree with that statement.

8      Q.   And then you're open to the possibility

9  that your opinion may change?

10         MR. COMBS:  All right.  We have to be at

11  two hours now.

12         MR. CRONE:  Can he just answer that

13  question and then that will be it?

14         THE WITNESS:  Of course I would look at

15  any medical data and make an opinion of that data.

16         MR. CRONE:  Okay.  Thank you, Doctor.

17         THE WITNESS:  And can I just clarify one

18  thing?

19  BY MR. CRONE:

20      Q.   I won't tell you no.

21      A.   When we were talking about disclosures

22  with the statements, I was thinking back to the

23  question that you asked me about if there was a

24  document about consulting for Ethicon as late as

25  2008.  And just as I'm thinking about that through

Harry W. Johnson, Jr., M.D.

1    my mind, I know that I filled out disclosures for

2    articles for the New England Journal of Medicine,

3    and I would have listed that.

4         But I don't know the amounts of any -- off

5    the top of my head, as it was eight years ago, the

6    amount that I listed as a proctor for Ethicon.  But

7    I don't think that it was a large amount.  But I

8    just don't know -- I know that I've disclosed that,

9    but I don't know what the amount is.  I don't want

10   you to -- I don't want to imply to you that I know

11   that amount, because I don't.

12        Q.   Yeah, I think I understand.  So you would

13   have disclosed that for the purpose of disclosing

14   any potential conflict of interest, is that what

15   that's about?

16        A.   Yeah.  I just want to make sure that I

17   haven't misstated something about a consultant --

18        Q.   Oh, sure.

19        A.   -- thing where I really didn't do very

20   much and I can't -- I can't completely recall.  But

21   I do know that I filled out disclosures before.

22        Q.   Okay.  Understood.

23             MR. CRONE:  Thank you.

24             (A discussion was held off the record.)

25             MR. COMBS:  Okay.  No questions.

Harry W. Johnson, Jr., M.D.

1                    (A discussion was held off the record.)

2                    THE WITNESS:  Rustan versus Cooper.

3                    (Off the record at 11:02 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Harry W. Johnson, Jr., M.D.

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2         I, Samara J. Zink, the officer before whom

 3    the foregoing deposition was taken, do hereby

 4    certify that the witness whose testimony appears in

 5    the foregoing deposition was duly sworn by me to

 6    testify to the truth, the whole truth, and nothing

 7    but the truth concerning the matters in this case.

 8         I further certify that the foregoing

 9    transcript is a true and correct transcript of my

10    original stenographic notes.

11         I further certify that I am neither

12    attorney or counsel, nor related to or employed by

13    any of the parties to the action in which this

14    deposition is taken; and furthermore, that I am

15    not a relative or employee of any attorney or

16    counsel employed by the parties hereto, nor

17    financially or otherwise interested in the outcome

18    of this action.

19

20

21

22                     _____

                       Samara J. Zink

23                     Notary Public in and for the

                       State of Maryland

24

25    My commission expires:  February 28, 2017
```

Harry W. Johnson, Jr., M.D.

```
 1              -  -  -  -  -  -

                E R R A T A

 2              -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____   _____

 6         REASON:   _____

 7    _____  _____   _____

 8         REASON:   _____

 9    _____  _____   _____

10         REASON:   _____

11    _____  _____   _____

12         REASON:   _____

13    _____  _____   _____

14         REASON:   _____

15    _____  _____   _____

16         REASON:   _____

17    _____  _____   _____

18         REASON:   _____

19    _____  _____   _____

20         REASON:   _____

21    _____  _____   _____

22         REASON:   _____

23    _____  _____   _____

24         REASON:   _____

25
```

Harry W. Johnson, Jr., M.D.

1

2            ACKNOWLEDGMENT OF DEPONENT

3

4            I,_____, do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _____

15    HARRY W. JOHNSON, JR., M.D.        DATE

16

17

18   Subscribed and sworn

     to before me this

19   _____ day of _____, 20____.

20   My commission expires:_____

21

     _____

22   Notary Public

23

24

25

Harry W. Johnson, Jr., M.D.

```
 1                    LAWYER'S NOTES

 2     PAGE  LINE

 3     _____  _____  _____

 4     _____  _____  _____

 5     _____  _____  _____

 6     _____  _____  _____

 7     _____  _____  _____

 8     _____  _____  _____

 9     _____  _____  _____

10     _____  _____  _____

11     _____  _____  _____

12     _____  _____  _____

13     _____  _____  _____

14     _____  _____  _____

15     _____  _____  _____

16     _____  _____  _____

17     _____  _____  _____

18     _____  _____  _____

19     _____  _____  _____

20     _____  _____  _____

21     _____  _____  _____

22     _____  _____  _____

23     _____  _____  _____

24     _____  _____  _____

25     _____  _____  _____
```