# EXHIBIT F

Konstantin Walmsley, M.D.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

- - -

IN RE: ETHICON, INC.    :  Master File
PELVIC REPAIR SYSTEM    :  No.
PRODUCTS LIABILITY      :  2:12-MD-02327
LITIGATION              :
                        :  MDL NO. 2327
_____     :
                        :
MARY K. WARD, et al     :
                        :
      v.                :  CASE NO.
                        :  2:12-cv-02198
ETHICON, INC., et al.   :
                        :

- - -

August 11, 2016
- - -

Expert deposition of
KONSTANTIN WALMSLEY, M.D., taken pursuant
to notice, was held at Courtyard Marriott
West Orange, 8 Rooney Circle, West
Orange, New Jersey, beginning at 9:03
a.m., on the above date, before Kimberly
A. Cahill, a Federally Approved
Registered Merit Reporter and Notary
Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph| 917.591.5672
deps@golkow.com

Konstantin Walmsley, M.D.

Page 2

```
 1    APPEARANCES:
 2
 3    MOTLEY RICE LLC
      BY:  HAYLEIGH T. STEWART SANTRA, ESQUIRE
 4    28 Bridgeside Boulevard
      Mt. Pleasant, South Carolina  29464
 5    (843) 216-9373
      hstewart@motleyrice.com
 6    Representing the Plaintiffs
 7
      THOMAS COMBS & SPANN, PLLC
 8    BY:  SUSAN M. ROBINSON, ESQUIRE
      (via telephone)
 9    300 Summers Street
      Suite 1380
10    Charleston, West Virginia  25301
      (304) 414-1808
11    srobinson@tcspllc.com
      Representing the Defendants Johnson &
12    Johnson and Ethicon
13
14
15
16                    -   -   -
17
18
19
20
21
22
23
24
```

Konstantin Walmsley, M.D.

Page 3

```
 1                       -   -   -
 2                    I N D E X
 3                       -   -   -
 4
 5   Testimony of:   KONSTANTIN WALMSLEY, M.D.
 6
       By Ms. Robinson                 8
 7     By Ms. Santra                 118
 8
                        -   -   -
 9
                    E X H I B I T S
10
                        -   -   -
11
12   NO.              DESCRIPTION            PAGE
13
       Walmsley       Notice of             6
14     (Ward)-1       Deposition of
                      Konstantin
15                    Walmsley, M.D.
16     Walmsley       Rule 26 Expert        6
       (Ward)-2       Report of
17                    Konstantin
                      Walmsley, M.D.
18
       Walmsley       11/20/15 Curriculum   6
19     (Ward)-3       Vitae of Konstantin
                      Walmsley
20
       Walmsley       Document Titled       6
21     (Ward)-4       "Materials
                      Reviewed"
22
       Walmsley       6/17/16 Encounter     7
23     (Ward)-5       Summary for Mary
                      Ward
24
```

Konstantin Walmsley, M.D.

Page 4

| | | | |
|---|---|---|---|
| 1 | Walmsley | Transcript of the | 7 |
| | (Ward)-6 | 7/28/16 Deposition | |
| 2 | | of Geoffrey | |
| | | DeLeary, M.D. | |
| 3 | | | |
| | Walmsley | Draft Transcript of | 7 |
| 4 | (Ward)-7 | the 8/8/16 | |
| | | Deposition of | |
| 5 | | Robert Highland, | |
| | | M.D. | |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Konstantin Walmsley, M.D.

Page 5

```
1                        -  -  -

2              DEPOSITION SUPPORT INDEX

3                        -  -  -

4

5    Direction to Witness Not to Answer

6    Page Line      Page Line       Page Line

7    117  24

8

9    Request for Production of Documents

10   Page Line      Page Line       Page Line

11   31   18       33    5

12

13   Stipulations

14   Page Line      Page Line       Page Line

15

16

     Question Marked

17

     Page Line      Page Line       Page Line

18

19

20

21

22

23

24
```

Konstantin Walmsley, M.D.

Page 6

1                     −  −  −

2                 (Deposition Exhibit No.

3        Walmsley (Ward)-1, Notice of

4        Deposition of Konstantin Walmsley,

5        M.D., was marked for

6        identification.)

7                     −  −  −

8                 (Deposition Exhibit No.

9        Walmsley (Ward)-2, Rule 26 Expert

10       Report of Konstantin Walmsley,

11       M.D., was marked for

12       identification.)

13                    −  −  −

14                (Deposition Exhibit No.

15       Walmsley (Ward)-3, 11/20/15

16       Curriculum Vitae of Konstantin

17       Walmsley, was marked for

18       identification.)

19                    −  −  −

20                (Deposition Exhibit No.

21       Walmsley (Ward)-4, Document Titled

22       "Materials Reviewed", was marked

23       for identification.)

24                    −  −  −

Konstantin Walmsley, M.D.

Page 7

1           (Deposition Exhibit No.

2      Walmsley (Ward)-5, 6/17/16

3      Encounter Summary for Mary Ward,

4      was marked for identification.)

5                  -  -  -

6           (Deposition Exhibit No.

7      Walmsley (Ward)-6, Transcript of

8      the 7/28/16 Deposition of Geoffrey

9      DeLeary, M.D., was marked for

10     identification.)

11                 -  --  -

12          (Deposition Exhibit No.

13     Walmsley (Ward)-7, Draft

14     Transcript of the 8/8/16

15     Deposition of Robert Highland,

16     M.D., was marked for

17     identification.)

18                 -  -  -

19          KONSTANTIN WALMSLEY, M.D.,

20     after having been duly sworn, was

21     examined and testified as follows:

22                 -  -  -

23          EXAMINATION

24                 -  --  -

Konstantin Walmsley, M.D.

Page 8

```
 1    BY MS. ROBINSON:
 2          Q.    Doctor, will you please
 3    state your full name for the record?
 4          A.    Konstantin Walmsley.
 5          Q.    You understand that you're
 6    under oath and you've sworn to tell the
 7    truth here today just as if you were
 8    sitting in a court of law; is that
 9    correct?
10          A.    Yes, ma'am.
11          Q.    Doctor, you have been hired
12    by the Motley Rice firm in the case
13    involving Ms. Mary Ward; is that correct?
14          A.    That's correct.
15          Q.    And she was implanted with
16    the TVT mid-urethral sling device in June
17    of 2005; correct?
18          A.    Yes.
19          Q.    And that is an Ethicon
20    product; correct?
21          A.    Yes.
22          Q.    What were you asked to do
23    specifically with regard to Mrs. Ward's
24    case?
```

Konstantin Walmsley, M.D.

1          A.     I was asked to review

2     medical records relating to her care.   In

3     addition, I was asked to perform an

4     independent medical examination of this

5     patient, and I was also asked to generate

6     a report based on my findings.

7          Q.     And did you do that?

8          A.     Yes, I did.

9          Q.     When were you first

10    contacted by Motley Rice?

11         A.     Originally, in early April.

12         Q.     Early April and in 2016?

13         A.     When you say contacted by

14    Motley Rice, are you regarding -- are you

15    talking about Mrs. Ward specifically or

16    about other work?

17         Q.     That's a good question.   So

18    with regard to Mrs. Ward specifically,

19    when were you first contacted by Motley

20    Rice?

21         A.     That was probably more in

22    the late May to early June scenario,

23    somewhere around there.

24         Q.     And you say, sometime in

Konstantin Walmsley, M.D.

Page 10

```
 1    April, you were first contacted.  Were
 2    you first contacted by Motley Rice to
 3    offer opinions involving mesh litigation?
 4         A.    That's the first time they
 5    asked me to provide opinions regarding
 6    Ethicon-based mesh litigation.
 7         Q.    Have you offered opinions
 8    for Motley Rice in cases involving other
 9    mesh products?
10         A.    I have not.
11         Q.    So has your testimony been
12    limited only to -- so far, has your
13    testimony been limited only to Ethicon
14    products?
15         A.    With regards to Motley Rice,
16    yes, that's true.
17         Q.    And have you offered expert
18    services for any other law firms suing
19    companies that manufacture mesh?
20              MS. SANTRA:  I'm going to
21         object to the form as this is
22         general in nature and we're here
23         for the case-specific opinions on
24         Ms. Ward.
```

Konstantin Walmsley, M.D.

Page 11

1           THE WITNESS:  Should I
2      answer the question?
3           MS. ROBINSON:  Yes --
4           MS. SANTRA:  You can answer.
5           MS. ROBINSON:  -- go ahead
6      and answer the question, Doctor.
7           THE WITNESS:  I'm sorry.
8      Yes.
9   BY MS. ROBINSON:
10          Q.    And what other products have
11  you offered expert testimony about,
12  mesh-related products?
13          MS. SANTRA:  Object to the
14      form.
15          THE WITNESS:  Bard, Bard
16      Avaulta, and Bard Align TO; Boston
17      Scientific, I believe the Uphold
18      device, the AMS Elevate device --
19  BY MS. ROBINSON:
20          Q.    Any others?
21          A.    As I sit here today, I don't
22  recall any others.
23          Q.    When did you first start
24  consulting as an expert in mesh

Konstantin Walmsley, M.D.

Page 12

1    litigation overall?

2            MS. SANTRA:  I object to the

3            form.  Susan, does this have

4            anything to do with Ms. Ward?  I'm

5            going to have to at some point

6            instruct him not to answer.

7            MS. ROBINSON:  Can he answer

8            that question?

9            MS. SANTRA:  Sure.

10           THE WITNESS:  I believe

11           roughly around 2013.

12   BY MS. ROBINSON:

13           Q.    Doctor, part of my reason

14   for asking this question is because in

15   the past and currently, I've never been

16   provided with a list of the testimony

17   that you have provided in your cases, and

18   I keep trying to get counsel to provide

19   me with that list, but I don't have it.

20           Have you ever prepared a

21   list of the testimony that you have given

22   in the last four years?

23           A.    Yes.

24           Q.    Have you provided that list

Konstantin Walmsley, M.D.

Page 13

1    to Motley Rice?

2         A.    Yes.

3         Q.    Do you know why it was not

4    produced to me as a part of Mrs. Ward's

5    report?

6              MS. SANTRA:  I object to the

7              form.  Susan, I can get that for

8              you today.

9              MS. ROBINSON:  Okay.  If you

10             can e-mail that to me while we're

11             doing the deposition, that would

12             be great.

13             MS. SANTRA:  Okay.  I'll

14             have to...

15   BY MS. ROBINSON:

16        Q.    So, Doctor, Exhibit No. 1 in

17   front of you is your Notice of

18   Deposition; correct?

19        A.    Yes.

20        Q.    And that's a familiar form

21   to you; is that correct?

22        A.    Yes.

23        Q.    And it requests that you

24   bring certain documents and records to

Konstantin Walmsley, M.D.

Page 14

1    the deposition.  Did you bring anything

2    with you today?

3         A.    The only thing I brought

4    with me today was my computer on which I

5    have most of the document requests you've

6    asked for in this form.

7         Q.    Other than the medical

8    records that are listed on -- let me go

9    ahead and your -- Exhibit No. 2 in front

10   of you should be your report; is that

11   correct?

12        A.    Yes.

13        Q.    And on page 2 of your

14   report, it continues onto page 3, there

15   is a list of medical records you reviewed

16   in Mary Ward's case.

17             Do you see that?

18        A.    Yes.

19        Q.    Other than those medical

20   records, have you reviewed any other

21   materials in preparation for her -- I'm

22   sorry.  Strike that.  Let me reask that

23   question.

24             Other than these medical

Konstantin Walmsley, M.D.

Page 15

1   records, have you reviewed any other

2   medical records that you utilized to

3   formulate your opinions in Ms. Ward's

4   case?

5          A.    I have reviewed some

6   additional medical records that were

7   provided to me by counsel.

8          Q.    And what medical records

9   would these additional records be?

10             MS. SANTRA:  I can -- I can

11             send you a link to the records

12             we've sent Dr. Walmsley, if that

13             is helpful.

14             MS. ROBINSON:  When you say

15             "link," what are you referring to?

16             MS. SANTRA:  A share file

17             link to the -- all the records

18             that we have sent Dr. Walmsley.

19             MS. ROBINSON:  Okay.

20   BY MS. ROBINSON:

21          Q.    And, Doctor, were -- these

22   additional records that you're talking

23   about today, were they received after you

24   wrote your report and formulated your

Konstantin Walmsley, M.D.

Page 16

1    opinions?

2            A.    Yes.

3            Q.    Did those medical records

4    that you reviewed after writing your

5    report change your opinions in any

6    respect?

7            A.    No.

8            Q.    Now, on page 3 of your

9    report, it lists that you reviewed the

10   depositions of Mary Ward and Jeffrey

11   Ward; correct?

12           A.    Yes.

13           Q.    Since writing your report

14   and formulating your opinions in this

15   case, have you reviewed any other

16   deposition testimony?

17           A.    Yes.

18           Q.    Have you reviewed the

19   deposition testimony of Dr. DeLeary?

20           A.    Yes.

21           Q.    And you understand he was

22   her -- the physician that implanted the

23   TVT device; correct?

24           A.    Yes.

Konstantin Walmsley, M.D.

Page 17

1          Q.    Did anything that you read

2    in Dr. DeLeary's deposition alter your

3    opinions in any way?

4          A.    No, ma'am.

5          Q.    Did anything you read in Dr.

6    DeLeary's deposition strengthen or weaken

7    your opinions in any way?

8                MS. SANTRA:  Object to form.

9                THE WITNESS:  No, not

10          especially.

11   BY MS. ROBINSON:

12         Q.    When you say "not

13   especially," is there anything in

14   particular you have in mind when you make

15   that qualification?

16         A.    Well, it was a little bit of

17   a broad question insofar as I'm thinking

18   of elements that were weakening or

19   elements that were strengthening; and I

20   definitely didn't find any elements that

21   would weaken it, but as I sit here today

22   and think about the other part of that

23   question, I don't specifically remember

24   any elements of that deposition that

Konstantin Walmsley, M.D.

Page 18

1  would have, let's say, galvanized a

2  particular opinion I put forth in my

3  report.

4          Q.     Okay.

5                 With regard to Dr. Highland,

6  have you had the opportunity to review

7  his transcript?

8          A.     Yes.

9          Q.     Did the deposition testimony

10  of Dr. Highland change or alter your

11  opinions in any way?

12          A.     Not especially, no.

13          Q.     And when you say "not

14  especially," again, what do you mean by

15  that qualification?

16          A.     There weren't any particular

17  findings or passage in his deposition

18  that would lead me to say, to a

19  significant degree, well, maybe this

20  calls to question my opinion in my

21  report.

22                 And the flip-side is true.

23  There was nothing in his deposition that

24  would otherwise have gone the other way

Konstantin Walmsley, M.D.

Page 19

1    around there.

2            Q.    Have you read any other

3    deposition testimony --

4            A.    I have not.

5            Q.    Have you seen the expert

6    report of Dr. Matthews?

7            A.    Yes.

8            Q.    You did not file a rebuttal

9    to her expert report; is that correct?

10           A.    That's correct.

11           Q.    Other than, obviously, you

12   and Dr. Matthews disagree as to ultimate

13   opinions, was there anything in Dr.

14   Matthews' report that caused you specific

15   concern?

16               MS. SANTRA:  Object to form.

17               THE WITNESS:  No.

18   BY MS. ROBINSON:

19           Q.    Exhibit 2, which is your

20   final report, does it contain all of your

21   opinions and the basis for those opinions

22   that you intend to give in this case?

23           A.    Yes.

24           Q.    Now, Exhibit No. 4 in front

Konstantin Walmsley, M.D.

Page 20

1    of you has been identified as your

2    reliance materials.  Can you describe for

3    me just in general what that material is?

4           A.    Yes.  So it's a three-page

5    document listing materials reviewed, in

6    part depositions of medical providers and

7    also depositions of patients and perhaps

8    their spouses, instructions for use, the

9    plaintiff fact sheet, incorporated

10   materials, and then also about a

11   two-and-a-half-page list of medical

12   literature.

13          Q.    Is there any specific

14   medical literature that you have

15   identified on Exhibit No. 4 that you

16   relied upon in Mrs. Ward's case?

17                MS. SANTRA:  Object to form.

18                THE WITNESS:  Well, I mean,

19          I really relied upon the whole

20          body of work, so -- I mean, if

21          you're asking me is there one

22          particular article that is by far

23          and away the one standout article

24          that I think strengthens Mrs.

Page 21

```
 1          Ward's report, it would be hard
 2          for me to identify just one
 3          article.
 4   BY MS. ROBINSON:
 5          Q.    Okay.
 6               And another part of that
 7   question I would ask you is whether there
 8   is any one particular complaint or injury
 9   that Mrs. Ward suffered that, in the
10   review of your material, that you relied
11   more upon one particular literature than
12   another?
13               MS. SANTRA:  Object to form.
14               THE WITNESS:  That's a bit
15          of a challenging question only
16          because I've never kind of had a
17          question like that posed to me in
18          that fashion.
19               And it's very hard for me as
20          I sit here today to point to one
21          or two articles that would
22          necessarily correlate with the one
23          particular symptom that I would
24          pick out as being the most
```

Konstantin Walmsley, M.D.

Page 22

1       compelling symptom based on the

2       literature.

3           And the reason I say that is

4       because, I mean, generally

5       speaking, as it relates to Mrs.

6       Ward, she has pelvic pain.  She

7       has dyspareunia and she has

8       voiding dysfunction.

9           And the articles in my

10      reliance list, some of them focus

11      on mesh retraction.  Some of them

12      focus on clinical complications.

13      Some of them focus on

14      mesh-specific properties such as

15      retraction and such.

16           So it's difficult for me to,

17      first off, point to one particular

18      complaint she has that I think is

19      the most compelling complaint and

20      then, second off, you know,

21      identify one, two, or three

22      articles that speak to that

23      particular complaint, because they

24      all kind of interweave as I form

Konstantin Walmsley, M.D.

Page 23

1          my opinions.

2     BY MS. ROBINSON:

3          Q.    Doctor, when was mesh

4     retraction or contracture first reported

5     on in the medical literature?

6               MS. SANTRA:  Object to form.

7          This goes to general opinion.

8               THE WITNESS:  Well, that's a

9          very difficult question to answer,

10          because with regard to my

11          references, for example, many of

12          my references that discuss mesh

13          retraction date to a period of

14          time after 2009-2010.

15               That being said, I'm sure if

16          I was put to task, I could find

17          articles that go back to prior

18          times that describe mesh

19          contraction.

20     BY MS. ROBINSON:

21          Q.    Doctor, are you aware of any

22     literature that describes mesh retraction

23     as early as the 1980s?

24          A.    As we sit here today, I am

Konstantin Walmsley, M.D.

1    not aware of that.

2          Q.    Are you aware of any

3    scientific literature that reports upon

4    mesh retraction as early as the 1990s?

5                MS. SANTRA:  Object to form.

6          This is general again.

7                MS. ROBINSON:  Well, I'm

8          specifically asking you about your

9          reliance list and the material you

10         relied upon for Mrs. Ward's case,

11         and I believe that --

12               MS. SANTRA:  You're asking a

13         very general question about what

14         literature came out in 1990.

15               MS. ROBINSON:  You know,

16         there is no real prohibition about

17         me asking him general questions.

18         I mean, the prohibition is about

19         me going over material that he's

20         testified to ad nauseam on

21         multiple occasions.  I don't and

22         haven't seen where he's testified

23         about this material.

24               So your objection, while I

Konstantin Walmsley, M.D.

Page 25

```
 1          appreciate it, isn't -- you know,

 2          just because it's a general

 3          question doesn't mean it's

 4          prohibited.

 5               And, Doctor, I'm asking you

 6          specifically whether physicians

 7          who were implanting mesh as of

 8          2005 would have known that mesh

 9          retraction and contracture was

10          reported in the medical

11          literature.

12               MS. SANTRA:  Object to form.

13               You can answer.

14               THE WITNESS:  That's

15          obviously a different question

16          insofar as now we're dealing with

17          a different time period; correct?

18               MS. ROBINSON:  Well, yeah,

19          but that's essentially what I'm

20          getting at.  Okay?

21     BY MS. ROBINSON:

22          Q.    And so let's step back again

23     and let me ask the question.

24               In the years of -- in the
```

Konstantin Walmsley, M.D.

Page 26

1   1990s, was mesh retraction reported in

2   the medical literature?

3                   MS. SANTRA:   Object to form.

4                   THE WITNESS:   You know, in

5           the 1990s, I was finishing medical

6           school and just about to, you

7           know, start my urology residency.

8           So certainly realtime back then,

9           it was not something I faced or

10          dealt with in clinical practice

11          and, you know, when I first

12          started using pelvic mesh for the

13          management of stress urinary

14          incontinence, which was in

15          2000-2001, my knowledge of mesh

16          retraction currently -- I mean, it

17          existed back then.   It existed

18          primarily because my teaching

19          implanting surgeons and even key

20          opinion leaders who were at some

21          of the sling workshops I attended

22          described that there was a mesh

23          contraction process of about 10 to

24          20 percent depending upon the

Konstantin Walmsley, M.D.

1          sling used.

2                So I don't know if that

3          answers your question as it

4          relates to is there medical

5          literature speaking to that, but

6          it was certainly common knowledge

7          to me in my training that this was

8          a phenomenon that not only

9          existed, but called for us to use

10         tension-free placement.

11    BY MS. ROBINSON:

12         Q.    And you're a urologist;

13    correct?

14         A.    Yes, ma'am.

15         Q.    And your training was as a

16    urologist; correct?

17         A.    With an additional year of

18    fellowship training that was female

19    urology-specific, yes.

20         Q.    And do you have any reason

21    to believe that other urologists who were

22    performing stress urinary incontinence

23    surgical procedures would not have been

24    aware of the fact that there was mesh

Konstantin Walmsley, M.D.

Page 28

1    contracture and retraction in the year

2    2005?

3                    MS. SANTRA:  Object to form.

4                    THE WITNESS:  Well, I mean,

5            I can only speak for myself.  This

6            was my breadth of education and

7            experience.  You know, perhaps

8            there were other urologists that

9            looked at different medical

10           literature or had a different

11           basis of understanding, but it was

12           understood to me in that fashion.

13   BY MS. ROBINSON:

14           Q.    And that the contracture

15   could be up to 20 percent?

16           A.    Yeah, the description was

17   anywhere from 10 to 20 percent

18   contraction.  That was really, to my

19   understanding, multifactorial.  It wasn't

20   simply just the actual mesh itself

21   contracting.  It wasn't the fact that the

22   polypropylene wasn't inert, but it also

23   related to wound healing and wound

24   contraction, which can cause a shrinkage

Konstantin Walmsley, M.D.

Page 29

1  effect as well.

2          Q.     And has your understanding

3  about that changed in any respect up to

4  today?

5          A.     To some extent, yes.

6          Q.     In what way?

7          A.     In that I didn't correlate,

8  at least not back in 2005, the mesh

9  retraction properties and their effects

10 on things such as vaginal pain.

11         Q.     And is that the only way?

12         A.     Also with overactive bladder

13 symptoms.  It wasn't just pain, per se.

14 It was voiding dysfunction.

15         Q.     Were you aware in 2000 and

16 -- 2000 and 2001 and 2005 that such

17 things as pain and voiding dysfunction

18 could be associated with the placement of

19 a TVT?

20                MS. SANTRA:  Object to form.

21                THE WITNESS:  Yes.

22 BY MS. ROBINSON:

23         Q.     And so what you're telling

24 me is that you had not fully appreciated

Konstantin Walmsley, M.D.

Page 30

1    the mechanism of the mesh through the

2    contracture or retraction vis-a-vis the

3    pain and the overactive bladder; is that

4    what you're saying?

5            MS. SANTRA:  Object to form.

6            THE WITNESS:  I guess --

7        yeah, I guess what I'm saying --

8        and perhaps this is the same way

9        of saying it in different words --

10       is that inasmuch as I was aware of

11       the properties of mesh retraction,

12       I wasn't necessarily aware that

13       that particular process led to end

14       results, some of those end results

15       being pain and voiding

16       dysfunction.

17   BY MS. ROBINSON:

18       Q.    But you were also aware --

19   while you were not specifically aware of

20   the properties, you were, in fact, aware

21   of the end result could be the risk of

22   implanting TVT would be pain as well as

23   voiding dysfunction; correct?

24           MS. SANTRA:  Object to form.

Konstantin Walmsley, M.D.

Page 31

1           THE WITNESS:  That was an

2        understanding of that surgery at

3        that time, that's correct.

4   BY MS. ROBINSON:

5        Q.    So, Doctor, your C.V. is in

6   front of you and it's marked as Exhibit

7   No. 3?

8        A.    Yes.

9        Q.    And I believe it's dated as

10  of November of 2015.  Do you have a more

11  recent C.V.?

12       A.    I actually do have one that

13  I don't believe I've actually submitted

14  as yet, but I recently updated it, not on

15  the basis of my urological practice, but

16  on the basis of some of my

17  extracurricular activities.

18           MS. ROBINSON:  And,

19        Hayleigh, I would request a copy

20        of his updated C.V.

21           THE WITNESS:  I can do that.

22           MS. SANTRA:  Sure.

23  BY MS. ROBINSON:

24       Q.    Doctor, between the time

Konstantin Walmsley, M.D.

Page 32

1     period of November of 2015 up until

2     today, have you written any articles

3     regarding stress urinary incontinence?

4              A.     No.

5              Q.     Have you written any

6     articles regarding mesh?

7              A.     No.

8              Q.     Or polypropylene.

9              A.     No.

10             Q.     Have you written any

11    articles on pelvic floor dysfunction

12    whatsoever in that time period?

13             A.     No.

14             Q.     Are there any -- other than

15    you said some of your activities, are

16    there any other substantive materials or

17    work that you would have done between

18    November 2015 and today that reflect on

19    your expertise here testifying as a

20    urologist in a stress urinary

21    incontinence case?

22             A.     No.

23             Q.     Is your fee still $500 an

24    hour for the work you perform?

Konstantin Walmsley, M.D.

Page 33

1          A.     Yes.

2          Q.     Have you submitted any

3    invoices in Mrs. Ward's case?

4          A.     I have.

5               MS. ROBINSON:  Hayleigh, can

6          I get a copy of the invoices that

7          have been submitted?

8               MS. SANTRA:  Yes.

9    BY MS. ROBINSON:

10         Q.     Can you give me an estimate

11   of how much time you've spent overall in

12   Mrs. Ward's case to date?

13         A.     Yes, I can.  I spent roughly

14   eight hours reviewing the initial salvo

15   of medical records and another roughly

16   three hours preparing the report; and

17   then in terms of my additional review for

18   this deposition, I've spent roughly an

19   additional three hours reviewing some

20   additional medical records, depositions,

21   and then Dr. Matthews' expert report.

22         Q.     How long did the IME take?

23         A.     Roughly 45 minutes.

24         Q.     And I understand that you

Konstantin Walmsley, M.D.

Page 34

1    bill through your practice for that?

2         A.    My practice bills for that

3    service, that's correct.

4         Q.    Approximately how much does

5    that service cost?

6         A.    $350.

7         Q.    Do you anticipate spending

8    any more time on Mrs. Ward's case until

9    such time as it may be set for trial?

10        A.    Possibly in terms of

11   reviewing the deposition.  That would be

12   the only additional work at this point I

13   could envision.

14        Q.    And that's your own

15   deposition you're talking about.  Right?

16        A.    Yes, ma'am.

17        Q.    Doctor, let's turn to

18   Exhibit No. 5, please.

19        A.    (Witness complies.)

20        Q.    That's your medical

21   examination of Mrs. Ward; is that

22   correct?

23        A.    Yes, ma'am.

24        Q.    And that is a five-page

Konstantin Walmsley, M.D.

Page 35

1    document?

2          A.    Yes.

3          Q.    Did Mrs. Ward fill out any

4    patient questionnaires before her

5    examination by you?

6          A.    No.

7          Q.    Did you make any handwritten

8    notes either of your review of her

9    medical records prior to writing your

10   report or during her medical examination?

11         A.    I did not.

12         Q.    Did Mrs. Ward bring any

13   documentation to her appointment with

14   you, either things like voiding diaries,

15   her medical records, anything of that

16   nature?

17         A.    No.

18         Q.    You examined her in your

19   office in New Jersey; is that correct?

20         A.    Yes.

21         Q.    She did not make any

22   complaints to you of having any

23   difficulty due to any physical

24   limitations or pain in traveling to North

Konstantin Walmsley, M.D.

Page 36

1    Carolina -- or from North Carolina to be

2    examined by you; is that correct?

3              MS. SANTRA:  Object to form.

4              THE WITNESS:  I don't

5         specifically recall such.

6    BY MS. ROBINSON:

7         Q.    If she had made any such

8    complaints and they were relevant to her

9    mesh litigation, that's something you

10   would have noted in your medical exam

11   report; is that correct?

12        A.    I would think so, yes.

13        Q.    Before you saw her for your

14   medical examination, what material had

15   you reviewed in her case?

16        A.    Nothing.

17        Q.    You had not reviewed any of

18   her medical records before June 17th of

19   2016?

20        A.    Generally speaking, what I

21   like to try to do -- I don't do this with

22   every patient, but I almost would prefer

23   to see them and perform the IME in the

24   absence of any medical records just so I

Konstantin Walmsley, M.D.

Page 37

1    could have a more innocent, if you will,

2    blank slate kind of opinion of the

3    patient.

4         Q.    And you have a specific

5    recollection in this case you didn't

6    review anything before her examination.

7         A.    I don't specifically

8    recollect reviewing records before this

9    particular individual, no.

10        Q.    Can you tell me how the

11   examination is conducted?  What happens

12   first and so forth?

13        A.    Certainly.  So the patient

14   comes to the office.  There is an

15   inventory or intake of the patient

16   performed by my medical assistant.

17   During that time, the patient's pharmacy

18   information is taken, the medications

19   they're taking are recorded, vital signs

20   are measured, the past medical and past

21   surgical history is noted in the

22   electronic health record.

23             There is inventory of social

24   history, family history, and review of

Konstantin Walmsley, M.D.

Page 38

1    systems that's provided by my medical

2    assistant, and then the urine analysis is

3    also -- the dipstick, that is, is -- that

4    data is entered.

5              Once that's done, the

6    patient comes back to an examination room

7    and then I will come in and interview the

8    patient.  During the interview, I,

9    generally speaking, document and record

10   as much information as possible and

11   certainly the information that I feel is

12   relevant.

13             After the interview is

14   completed and all the questions have been

15   asked, I step out of the room, have the

16   patient change, come back and perform a

17   chaperoned examination of the patient

18   that's documented and, in certain

19   instances, will also check the -- what's

20   called the postvoid residual of that

21   patient, in other words, how much urine

22   is left behind in their bladder after

23   they pee.

24             Following the physical

Konstantin Walmsley, M.D.

1    examination having been performed, I then

2    complete the independent medical record

3    with an assessment and, if applicable, a

4    plan.

5           Q.    You say, "if applicable, a

6    plan."

7           A.    Correct.

8           Q.    What do you mean by that?

9           A.    Well, in a lot of instances,

10   when I see patients such as Mrs. Ward,

11   I'm not necessarily their treating

12   physician, so I don't necessarily

13   actively manage the problems they pose to

14   me.

15          Q.    So the plan would be if you

16   have -- in the ordinary course of your

17   work, if you're seeing a patient that

18   you're treating, a plan would be what are

19   the next steps essentially.

20          A.    That's correct.

21          Q.    Could that plan include

22   follow-up testing in order to confirm

23   your preliminary diagnosis?

24          A.    In certain instances.

Konstantin Walmsley, M.D.

Page 40

1        Q.     And with regard to patients

2    that you're seeing as an expert, are --

3    do you formulate such a plan for them?

4        A.     Usually not.

5        Q.     So in Mrs. Ward's case,

6    would there be any follow-up testing that

7    you would recommend, that you did not

8    recommend, if she had been your patient?

9             MS. SANTRA:  Object to form.

10            THE WITNESS:  Not

11            necessarily.

12   BY MS. ROBINSON:

13       Q.     And what's the qualification

14   you have on that?

15       A.     Well, I mean, certainly

16   gaining more information on a patient can

17   be helpful in certain instances.  So, you

18   know, for example, if a treating

19   physician taking care of Mrs. Ward

20   decided to, let's say, order a

21   urodynamics test or perform cystoscopy or

22   recommend that, I wouldn't necessarily

23   fault the physician for ordering that

24   type of test or evaluation.

Konstantin Walmsley, M.D.

Page 41

1            As it relates to me, I'm not
2    sure if either of those two tests as an
3    example would have led to either a change
4    in my opinion or, if I was actively
5    treating the patient, a change in my plan
6    of treating her.
7            So speaking for my own
8    personal instance as a treating
9    physician, which I'm not in this case, if
10   you're asking me if I would have ordered
11   those types of tests or any additional
12   tests, I probably would not have.
13        Q.    Are there any tests that if
14   you were a treating physician that you
15   would have ordered for her?
16            MS. SANTRA:  Object to form.
17            THE WITNESS:  Not right
18        away, but possibly, yes.
19   BY MS. ROBINSON:
20        Q.    And what possibly would you
21   have ordered later?
22        A.    I might have found, for
23   example, in her, a urodynamics test to be
24   helpful.

Konstantin Walmsley, M.D.

Page 42

1      Q.      And for what reason?

2      A.      Well, one thing interesting

3   about Mrs. Ward is, she has fairly severe

4   incontinence and it's mixed incontinence.

5   She describes having urinary urgency

6   incontinence, but also stress

7   incontinence.

8              If conservative measures at

9   treating her incontinence were not to

10  work, a urodynamics test might help

11  explain the real nature of her voiding

12  dysfunction as far as, for example, which

13  type of incontinence predominates.

14     Q.      You indicated she has severe

15  incontinence.  How do you classify her

16  current complaints of incontinence as

17  severe?

18     A.      So her incontinence is

19  severe to my mind on two findings, on two

20  bases:  First off, it's a significant

21  quality of life bother for her.  Second

22  off, it's different and worse, in fact,

23  than it was prior to her sling surgery by

24  account of the patient.

Konstantin Walmsley, M.D.

Page 43

```
 1          Q.     And when you say different
 2   and worse by account of the patient,
 3   you're saying, is that based solely upon
 4   her description of her current
 5   complaints?
 6          A.     Well, I guess it's about her
 7   description and her relating that to me
 8   and my documentation of such.  I mean,
 9   she told it to me in our IME that it was
10   worse and I believe she also stated that
11   in her deposition.
12          Q.     But you have not done any
13   testing that would -- well, strike that.
14   Let me ask this question.
15          A.     Sure.
16          Q.     She had a cystoscopy prior
17   to her sling procedure in 2005; is that
18   correct?
19          A.     Yes, she did.
20          Q.     Did she have urodynamics at
21   that time as well?
22          A.     Yes, she did.
23          Q.     If you had performed those
24   two tests, is there any way in comparing
```

Konstantin Walmsley, M.D.

Page 44

1    those two tests that you would be able to

2    make an objective determination as to

3    whether her problems today are different

4    or worse than they were in 2005?

5         A.    I think it's possible to do

6    that, yes.

7         Q.    But that has not been done;

8    correct?

9              MS. SANTRA:  Object to form.

10             THE WITNESS:  Not by me, it

11        has not.

12   BY MS. ROBINSON:

13        Q.    And how is it possible?  Can

14   you please describe for me what might be

15   shown today if you were to perform those

16   two tests?

17        A.    Well, obviously it's very

18   hard for me to know that since they've

19   not been done, but I mean, the way those

20   tests, if they were performed today,

21   could possibly be helpful is if they

22   showed different findings from what was

23   seen in 2005.

24        Q.    And those findings could

Konstantin Walmsley, M.D.

Page 45

1   relate to showing you whether at this

2   point in time her overactive bladder

3   symptoms are worse today than what they

4   were in 2005; is that correct?  Is that

5   one way?

6            MS. SANTRA:  Object to form.

7            THE WITNESS:  I think they

8        could help, but, you know,

9        urodynamics tests are a little bit

10       challenging because we're asking

11       -- what we're trying to do is

12       essentially recapitulate normal

13       bladder function in patients who

14       are essentially sitting on a

15       commode.

16            The only issue is, they're

17       sitting on a commode with

18       catheters in their urethras and

19       recti.  They have patches on them.

20       They're being visualized, so it

21       can provide a lot of helpful

22       information.

23            But there are nuances to

24       doing the procedure that sometimes

Konstantin Walmsley, M.D.

Page 46

1          make the kind of comparison or

2          differentiation you're speaking of

3          somewhat more difficult to put

4          forth.

5    BY MS. ROBINSON:

6          Q.    Okay.  Let's go back to

7    Exhibit No. 5, please.  Do I understand

8    then in looking at this report that

9    everything up to the HPI was information

10   that the patient provided to your

11   assistant?

12         A.    Yes, with the exception of

13   medications.  The medications are

14   automatically populated because of

15   electronic reviews of pharmacy

16   prescribing, so the medications are

17   auto-populated, but everything else is

18   provided by my medical assistant.

19         Q.    And who was your medical

20   assistant in this case?

21         A.    Quite frankly, I don't

22   remember who it was.  It was one of three

23   people.

24         Q.    When you look at page 1 of

Konstantin Walmsley, M.D.

Page 47

1    this report, under US, bladder, does that

2    reflect that an ultrasound was performed

3    of her bladder?

4            A.    Yes.

5            Q.    And that's something that

6    you performed yourself?

7            A.    Yes.

8            Q.    Did you do that after she

9    had voided?

10           A.    Yes.

11           Q.    How long after she had

12    voided?

13           A.    Probably within about 15

14    minutes.

15           Q.    And her postvoid residual is

16    15 milliliters; is that correct?

17           A.    Yes.

18           Q.    What does that show?

19           A.    That shows that she empties

20    her bladder fairly well, very well.

21           Q.    I'm sorry?  I missed that

22    last part.

23           A.    It indicates that she

24    empties her bladder very well.

Konstantin Walmsley, M.D.

Page 48

1          Q.     And does that indicate to

2     you that she does not have any

3     obstruction of her bladder or urethra?

4          A.     Not necessarily.

5          Q.     Can you explain that to me?

6          A.     Yes.  So postvoid residual

7     can be really a reflection of two

8     different phenomena, one being the degree

9     of obstruction or restriction at the

10    level of the bladder outlet.  The other

11    can be a reflection of bladder strength,

12    the muscular strength of the bladder that

13    allows the bladder to push fluid out.

14         Q.     So with regard to

15    obstruction of the bladder outlet, is

16    that something that -- well, let me just

17    ask it this way:  Based on your

18    examination of Mrs. Ward, does she have

19    obstruction of her urethra?

20         A.     It's hard to answer that

21    question.  I think it's possible.

22         Q.     But you're not able to

23    testify to a reasonable degree of medical

24    certainty that Mrs. Ward's urethra is

Konstantin Walmsley, M.D.

Page 49

1    obstructed by the TVT; is that correct?

2         A.    I would agree with that.

3         Q.    With regard to her bladder

4    strength, are you able to say that --

5    well, what does this test tell you with

6    regard to her bladder strength, if

7    anything?

8         A.    Well, it certainly indicates

9    to me that her bladder is not

10   underactive.

11        Q.    Does it tell you anything as

12   to whether her bladder is overactive, the

13   postvoid residual test?

14        A.    It can be part -- it can be

15   part of the data needed to confirm that,

16   yes.

17        Q.    And does this amount of

18   postvoid residual show any indication

19   that she has overactive bladder?

20        A.    It's supportive of that.

21        Q.    How is it supportive of

22   that?

23        A.    When I come across a patient

24   who has symptoms and/or signs of

Konstantin Walmsley, M.D.

Page 50

1    overactive bladder, for example, urgency

2    urinary incontinence, certainly seeing

3    urgency urinary incontinence in someone

4    who has a low postvoid residual as

5    opposed to a high postvoid residual is

6    more supportive and reflective of an

7    overactive bladder condition in the

8    proper clinical context.

9         Q.    Is there anything else that

10   her postvoid residual -- any other

11   information that you gained from that

12   with regard to your diagnosis of her?

13        A.    Yes.  To some degree, yes.

14        Q.    What else?

15        A.    She does have a history of

16   recurrent urinary tract infections; and

17   on occasion, recurrent urinary tract

18   infections can occur in patients who

19   don't empty their bladder completely.

20             The fact that her postvoid

21   residual was low on this visit reflects

22   to me that that pathophysiology, if you

23   will, is probably not relevant here.

24        Q.    Under her problem review, is

Konstantin Walmsley, M.D.

Page 51

1    this information that the plaintiff, Mrs.

2    Ward, told your medical assistant?

3            A.    We're speaking about

4    reviewed problems on page 1?

5            Q.    Yes.

6            A.    Those are populated kind of

7    retrospectively, if you will, once the

8    assessment is populated.  So the reviewed

9    problems are simply a reflection --

10   reflections of what's provided in the

11   assessment diagnoses, which are the last

12   two pages.

13           Q.    Okay.  Is that something

14   then that you would populate?

15           A.    That's correct.

16           Q.    And one of the things

17   reflected here is constipation; correct?

18           A.    Yes.

19           Q.    You agree with me that

20   constipation has been a complaint of Mrs.

21   Ward's for some time period.

22           A.    Yes.

23           Q.    Including before her surgery

24   with TVT in 2005; correct?

Konstantin Walmsley, M.D.

Page 52

1          A.     Yes.

2          Q.     And -- okay.  Do you --

3    well, you are not testifying that TVT has

4    anything to do with her constipation;

5    correct?

6          A.     No.   That's correct.

7          Q.     Do you agree with me that

8    constipation can cause pelvic pain?

9          A.     Depending upon its severity,

10   yes.

11         Q.     Do you agree with me that

12   the pelvic pain that can be caused by

13   constipation can be intermittent?

14         A.     Yes.

15         Q.     Do you agree that pelvic

16   pain that can be caused by constipation

17   can occur on and off over a number of

18   years?

19               MS. SANTRA:  Object to form.

20               THE WITNESS:  I think,

21         depending upon its severity, that

22         could happen.

23   BY MS. ROBINSON:

24         Q.     Chronic cystitis is listed

Konstantin Walmsley, M.D.

Page 53

1    as well.  Do you see that?

2         A.    Yes.

3         Q.    What is that intended to

4    represent here?

5         A.    That's intended to be

6    reflective of the fact that this

7    patient's had recurrent urinary tract

8    infections.

9         Q.    You do not relate that to

10   her TVT; is that correct?

11              MS. SANTRA:  Object to form.

12              THE WITNESS:  I -- actually,

13        I do.

14   BY MS. ROBINSON:

15        Q.    Okay.  Well, Doctor, I'm not

16   prepared to ask you questions about her

17   UTIs today.

18        A.    Okay.

19        Q.    And one of the reasons I'm

20   not going to do that is, nowhere in your

21   expert report do you say that her urinary

22   tract infection complaints are caused by

23   the TVT.

24              Do you agree with me on

Konstantin Walmsley, M.D.

Page 54

1    that?

2              A.    I do.

3              Q.    And I'm not going to ask you

4    those questions.   Okay?

5              A.    Okay.

6              Q.    Dyspareunia, do you see

7    that?

8              A.    Yes, I do.

9              Q.    And that's something that

10   you've added in there and we'll talk

11   about that more later.

12                   Pain in pelvis --

13             A.    Yes.

14             Q.    -- can you tell me what the

15   basis is for her -- this entry?   I mean,

16   what's it based upon?

17             A.    So when I examined her --

18   actually, I -- scratch that.

19                   Before I examined her and I

20   started interviewing about her pain, she

21   described starting to have some pelvic

22   pain in 2010.   Some of that pelvic pain

23   came as a result of intimacy.   Sometimes

24   the pain occurred when she was not

Konstantin Walmsley, M.D.

Page 55

1  sexually active.  Specifically, she

2  described having groin pain in both

3  groins, described as intermittent, dull,

4  sometimes worse after walking.

5            As you know, she actually

6  had her hysterectomy done in part because

7  of her pelvic pain.  That surgery was not

8  helpful in resolving her pelvic pain.

9            Those are the bases for my

10 providing that as a diagnosis.

11      Q.    Did you see anywhere in her

12 medical history where she had complaints

13 of pelvic pain other than in relation to

14 her hysterectomy?

15      A.    Yes.

16      Q.    Can you show me those

17 entries in your report?

18            MS. SANTRA:  Object to form.

19            THE WITNESS:  Let me take a

20      look.

21            (Pause.)

22            THE WITNESS:  Could you

23      reread that question to me, Ms.

24      Robinson?

Konstantin Walmsley, M.D.

Page 56

1              MS. ROBINSON:  I'll probably

2         rephrase it because I'm not sure

3         exactly how I asked it.

4              THE WITNESS:  Okay.

5    BY MS. ROBINSON:

6         Q.    But in your report, do you

7    identify any complaints that Mrs. Ward

8    made to any of her medical providers of

9    having pelvic pain other than the

10   instance prior to her hysterectomy where

11   she had reported a pelvic pain in her

12   lower left quadrant, I believe?

13        A.    Well, I mean, I think, to be

14   fair, she had an underlying history of

15   constipation, which you and I have agreed

16   could be a source of pelvic pain -- am I

17   -- is that -- am I answering your

18   question to your satisfaction?  I mean,

19   is that -- because to be fair, she did

20   have that as a problem before her sling

21   was ever done.

22              Did she ever say, "I'm

23   having pelvic pain from constipation"?

24   She did not.  But I guess I'm trying to

Konstantin Walmsley, M.D.

Page 57

1    answer your question by saying, you're

2    asking me if she had any reason to have

3    pelvic pain prior to her sling and

4    that's, for example, one instance that

5    might explain why she might have had it

6    beforehand.

7                    Have I seen her say, "I have

8    pelvic pain" or medical records

9    indicating that prior to her sling?  I

10   have not seen that.

11            Q.    Okay.  And my question is

12   actually more specific as to up to today.

13            A.    Okay.

14            Q.    So let's break this out a

15   little bit.

16                    One, you agree with me that

17   constipation could be a source of her

18   pelvic pain; correct?

19            A.    Possibly.

20            Q.    And you haven't been able to

21   rule that out as a -- to a reasonable

22   degree of medical certainty as a

23   potential source; correct?

24                    MS. SANTRA:  Object to form.

Konstantin Walmsley, M.D.

Page 58

1              THE WITNESS:  I mean, it

2          would be very low on my

3          differential, but I wouldn't

4          completely rule it out, no.

5    BY MS. ROBINSON:

6          Q.    Do we agree that she had

7    endometriosis?

8          A.    She did -- she was diagnosed

9    with endometritis.

10          Q.    And you're making a

11    distinction there between endometriosis

12    and endometritis?  Or am I just

13    pronouncing that wrong?

14          A.    It's just that when I think

15    of endometriosis, I think of a condition

16    where you can actually find depositions

17    of endometrial tissue in the pelvis; and

18    her diagnosis was, I believe, based on a

19    cervical biopsy, so I don't believe there

20    was any other tissues that were found to

21    contain endometritis.

22          Q.    Okay.

23              Do we agree, however, that

24    that condition that she had can cause

Konstantin Walmsley, M.D.

Page 59

1    pelvic pain?

2         A.    Yes.

3         Q.    And you cannot rule that out

4    to a reasonable degree of medical

5    certainty as a potential cause of some of

6    her intermittent complaints of pelvic

7    pain; correct?

8         A.    Up until her hysterectomy, I

9    cannot.

10        Q.    And you also understand that

11   she had ovarian cysts; correct?

12        A.    That's correct.

13        Q.    And you agree with me that

14   ovarian cysts can cause pelvic pain;

15   correct?

16        A.    Yes.

17        Q.    Are you able to rule out the

18   ovarian cysts as a potential cause of her

19   pelvic pain?

20        A.    Not entirely, no.

21        Q.    So then my next question is

22   whether you have seen documented in her

23   medical records at any time up until

24   today complaints of pelvic pain that

Konstantin Walmsley, M.D.

Page 60

```
1    could not be attributed to one of those

2    three conditions, that being her

3    constipation, her endometrial tissue, and

4    ovarian cysts.

5             MS. SANTRA:  Object to form.

6             THE WITNESS:  Are we

7        excluding my IME from your

8        question?

9             MS. ROBINSON:  Yes, because

10       I'm just asking about documents in

11       her medical records.

12            THE WITNESS:  I'm just going

13       to ask you to ask that question

14       one more time, if you would, for

15       me.

16            MS. ROBINSON:  Can I have

17       the court reporter read it back,

18       please?

19                 -  -  -

20            (The court reporter read the

21       pertinent part of the record.)

22                 -  -  -

23            MS. SANTRA:  And I object to

24       the form.
```

Konstantin Walmsley, M.D.

Page 61

1                THE WITNESS:  Yes.

2    BY MS. ROBINSON:

3          Q.    Can you show me where that

4    is --

5          A.    Well, one example of that

6    may be with Dr. Highland's office visit

7    which was in March of 2015 where she was

8    noted to have granulation tissue --

9          Q.    Okay.  Did -- were there

10   specific complaints of pelvic pain at

11   that time that you know of?

12         A.    Well, once again, I mean,

13   there were intermittent complaints.  I

14   don't recall in March of 2015 there being

15   pelvic pain and granulation tissue listed

16   in the same evaluation.

17         Q.    Okay.  Is that the only --

18   is that the -- is that office visit the

19   only other one that you have seen in her

20   medical records?

21              MS. SANTRA:  Object to form.

22              THE WITNESS:  Well, you

23         know, once again, I'm of the

24         understanding -- and this is

Konstantin Walmsley, M.D.

Page 62

1           obviously based on my discussions

2           with Mrs. Ward -- where that her

3           hysterectomy was done not only

4           because of vaginal bleeding, but

5           because of pelvic pain.

6                Other than what I've just

7           presented to you and the fact that

8           she's had some UTIs, some

9           left-sided pain, I'm going back to

10          2008 now, I'm not identifying any

11          specific pelvic pain issues in the

12          medical records that I've

13          received.

14   BY MS. ROBINSON:

15          Q.    With regard to the March

16   23rd, 2015 visit with the granulated

17   tissue --

18          A.    Right.

19          Q.    -- do you agree that that

20   was not related to her TVT?

21          A.    I don't have any evidence

22   that it was.

23          Q.    What do you believe the

24   granulated tissue was caused by?

Page 63

1              MS. SANTRA:  Object to form.

2              THE WITNESS:  Probably

3         healing from the hysterectomy.

4    BY MS. ROBINSON:

5         Q.    So, Doctor, the medication

6    list -- well, I'm sorry.  Let's go on.

7              You have mixed incontinence

8    listed in the review of problems;

9    correct?  And I'm back at Exhibit 5, your

10   examination here?

11        A.    Yes.

12        Q.    She had mixed incontinence

13   prior to her TVT; correct?

14        A.    It was really almost purely

15   stress incontinence as a matter of fact.

16        Q.    But there were documented

17   complaints in her medical records of

18   overactive bladder symptoms as well, is

19   that correct, by Dr. DeLeary?

20        A.    Well, when she saw Dr.

21   Highland -- she did have urodynamics done

22   a few years prior seeing Dr. DeLeary

23   where a diagnosis of mixed urinary

24   incontinence was offered, and she also

Konstantin Walmsley, M.D.

Page 64

```
 1    used Ditropan XL, which is a drug used to

 2    treat overactive bladder.

 3              That being said, when she

 4    saw Dr. DeLeary, you know, his impression

 5    was genuine stress urinary incontinence

 6    related to urethral hypermobility.

 7         Q.    And as you're sitting here

 8    right now, you don't recall seeing him

 9    make notations of some kind of overactive

10    bladder.

11         A.    What I recall is that he

12    prescribed Enablex, but soon thereafter

13    discontinued it when he operated on her,

14    which suggests to me that he wasn't

15    finding it or she wasn't finding it very

16    effective.

17         Q.    Now, TVT is indicated for

18    the treatment of stress urinary

19    incontinence; correct?

20         A.    Yes.

21         Q.    It is not indicated for the

22    treatment of overactive bladder; correct?

23         A.    Not directly, no.

24         Q.    Some patients, however, who
```

Konstantin Walmsley, M.D.

Page 65

1    do have overactive bladder along with

2    stress urinary incontinence may see

3    improvement of both by the use of TVT; is

4    that correct?

5             A.    That can happen sometimes,

6    yes.

7             Q.    And it very well could have

8    happened with Mrs. Ward; is that correct?

9                   MS. SANTRA:  Object to form.

10                  THE WITNESS:  It's possible.

11   BY MS. ROBINSON:

12            Q.    And you understand that for

13   an extensive time period, years, Mrs.

14   Ward did see significant improvement of

15   her urinary incontinence, is that

16   correct, with the TVT?

17            A.    She did have some

18   improvement with her SUI, no question.

19            Q.    And today, is it your

20   impression that her mixed urinary

21   incontinence is actually predominantly

22   overactive bladder?

23            A.    The impression I got from

24   her was that it was about 50/50.

Konstantin Walmsley, M.D.

Page 66

1          Q.      What caused her SUI in 2005

2    before her TVT placement?

3          A.      Well, anatomically, she had

4    a condition called urethral

5    hypermobility.

6          Q.      Did you do any testing

7    during your examination to confirm

8    whether she still has urethral

9    hypermobility?

10         A.      Yes, I did.

11         Q.      And what did you do?

12         A.      One of the -- one of the

13   things I do during a pelvic exam when I'm

14   examining the patient is have them bear

15   down or cough to see if that produces any

16   prolapse.

17         Q.      And what did you find when

18   you did that?

19         A.      She did not have any

20   evidence of prolapse.

21         Q.      So does that indicate she

22   had no evidence of urethral

23   hypermobility?

24         A.      That's correct.

Konstantin Walmsley, M.D.

Page 67

1          Q.     So is it your impression

2    that the TVT has worked to improve that

3    condition?

4                    MS. SANTRA:   Object to form.

5                    THE WITNESS:   It has

6              anatomically corrected the

7              hypermobility in my opinion.

8    BY MS. ROBINSON:

9          Q.     Where did you report those

10   findings?

11         A.     Well, since those are --

12   findings were not positive findings, I

13   didn't document the fact that she did not

14   have urethral hypermobility.  In fact,

15   when I populate findings on my electronic

16   health resource, in a lot of instances,

17   if, for example, someone doesn't have

18   urethral hypermobility, it won't

19   necessarily add it there.

20                  Some of them -- it'll

21   populate if there's no cystocele or

22   rectocele, for example.  It'll say no

23   cystocele, no rectocele.  So if you look

24   at my IME, it'll actually populate no

Konstantin Walmsley, M.D.

Page 68

1    cystocele, no rectocele. It doesn't,

2    however, populate no urethral

3    hypermobility. It only populates that in

4    a positive sense if it's there.

5         Q.    I didn't even really see in

6    your report where you had done a cough

7    stress test.

8         A.    Yes. Like, once again, I do

9    it on every woman who has incontinence as

10   a part of my practice, part of my

11   examination.

12              If the findings are

13   negative, it's not reflected in my

14   report. It's not reflected in my

15   physical exam because it's --

16         Q.    What other type of negative

17   findings might you have that would not be

18   reflected in this exam note that we have

19   as Exhibit No. 5?

20         A.    Well, for Mrs. Ward, there

21   were two negative findings that weren't

22   -- two positive findings that because

23   they were negative weren't noted.

24              One was that a lot of times

Konstantin Walmsley, M.D.

Page 69

1    when I'm doing a pelvic exam, if I

2    appreciate constipation, I'll document

3    that, so she had none of that, no

4    constipation.

5                And if the bladder is

6    palpable, oftentimes I will document the

7    bladder as being palpable.  Her bladder

8    was not palpable.

9                Q.    And what do you mean by the

10   bladder being palpable?

11               A.    That I could palpate it even

12   after emptying, suggesting that perhaps

13   one is not emptying their bladder well.

14               Q.    Okay.  So when you examined

15   the bladder, you confirmed essentially

16   the postvoid residual finding that she

17   had normally emptied her bladder?

18               A.    Right.

19               Q.    Is there anything else that

20   didn't show up in your exam report that

21   was a normal finding?

22               A.    None that I can think of

23   here today.

24               Q.    So do I understand correctly

Konstantin Walmsley, M.D.

Page 70

1    then that based on your exam, she has had

2    an anatomical correction of her urethral

3    hypermobility?

4              MS. SANTRA:  Susan, sorry.

5         Can we take a quick restroom break

6         or do you want him to answer --

7              MS. ROBINSON:  Yeah, let him

8         answer that question first.

9              THE WITNESS:  Could you

10        repeat the question, Susan?

11             MS. ROBINSON:  Let's take a

12        break and we'll have the court

13        reporter read it back then.

14             THE WITNESS:  Fair enough.

15        Thank you.

16             MS. SANTRA:  Thanks.  Sorry

17        about that.

18             (A recess was taken from

19        10:10 a.m. to 10:16 a.m.)

20             MS. ROBINSON:  And if I can

21        just get the court reporter to

22        read that question back and then

23        we're ready to go.

24                    -   -   -

Konstantin Walmsley, M.D.

1                    (Whereupon, the court

2              reporter read back from the record

3              as follows:

4                    "QUESTION:  So do I

5              understand correctly then that

6              based on your exam, she has had an

7              anatomical correction of her

8              urethral hypermobility?")

9                       -   -   -

10                   THE WITNESS:  Yes.

11   BY MS. ROBINSON:

12        Q.    Doctor, during -- did you

13   visually see any leakage during the cough

14   stress test?

15        A.    I did not, although she had

16   very little in her bladder to leak out,

17   to be fair.

18        Q.    But your objective findings

19   did not demonstrate any recurrence of her

20   stress urinary incontinence; is that

21   correct?

22                   MS. SANTRA:  Object to form.

23                   THE WITNESS:  Well,

24              unfortunately, they weren't really

Konstantin Walmsley, M.D.

Page 72

1          designed to demonstrate such, but

2          -- but, no, they did not.

3    BY MS. ROBINSON:

4          Q.    Well, let me ask the

5    question again, because it's a very

6    straightforward question:  Doctor, did

7    your objective findings on your

8    examination of the plaintiff, Mrs. Ward,

9    document a recurrence of her stress

10   urinary incontinence?

11              MS. SANTRA:  Object to form.

12              THE WITNESS:  No, they did

13         not.

14   BY MS. ROBINSON:

15         Q.    Doctor, what -- assume for a

16   minute that Dr. DeLeary did note that he

17   saw components of overactive bladder and

18   that Mrs. Ward during her deposition

19   testimony said she did have some urge

20   symptoms prior to her TVT placement in

21   2005.  Okay?

22         A.    Okay.

23         Q.    Just assume for me that

24   that's correct.

Konstantin Walmsley, M.D.

Page 73

1          A.      Okay.

2          Q.      Doctor, what would have

3   caused Mrs. Ward to have overactive

4   bladder symptoms prior to her TVT

5   placement?

6          A.      Well, there are a lot of

7   different causes for overactive bladder.

8   So some of it is idiopathic.  Sometimes

9   overactive bladder can be attributed to

10  lifestyle issues such as caffeine or

11  bladder irritant intake.  There are

12  instances where, for example,

13  constipation, if it's severe, can

14  exacerbate overactive bladder symptoms.

15         Q.      Anything else?

16         A.      Well, weight can sometimes

17  be an exacerbating factor of overactive

18  bladder.

19         Q.      Anything else?

20         A.      None that I can think of as

21  we sit here today.

22         Q.      Do you agree with me that

23  all of those factors exist in Mrs. Ward

24  today?

Konstantin Walmsley, M.D.

Page 74

1          A.      To some degree they do, yes.

2          Q.      Number one, her overactive

3    bladder symptoms could simply just be

4    idiopathic in nature; correct?

5                  MS. SANTRA:  Object to form.

6                  THE WITNESS:  Possibly.

7    BY MS. ROBINSON:

8          Q.      Two, her overactive bladder

9    symptoms could be caused by her

10   lifestyle; correct?

11                 MS. SANTRA:  Object to form.

12                 THE WITNESS:  Possibly.

13   BY MS. ROBINSON:

14         Q.      Did you see in her

15   deposition testimony that she drinks up

16   to three containers of tea a day?

17         A.      Yes.

18         Q.      Do you agree with me that

19   tea which contains caffeine can be a

20   bladder irritant?

21         A.      Yes.

22         Q.      And that that can cause

23   overactive bladder symptoms?

24         A.      Yes.

Konstantin Walmsley, M.D.

Page 75

1          Q.     Do you also see that she has

2     intake of six to eight glasses of water a

3     day as well?

4          A.     Yes.

5          Q.     And so you agree with me

6     that some of her lifestyle factors today

7     can impact her complaints of overactive

8     bladder; correct?

9          A.     Not necessarily water

10    intake, but some of the other stuff we

11    discussed, yes.

12         Q.     She still complains of

13    intermittent constipation as well;

14    correct?

15         A.     Which she described to me as

16    mild, but yes.

17         Q.     And if you look at your IME,

18    you've documented her current weight

19    today at, I believe it's, 232 pounds?

20         A.     Yes.

21         Q.     And, Doctor, assume for me

22    that one of her visits to Dr. Highland

23    documented that she weighed about 182

24    pounds before her TVT implant.  That

Konstantin Walmsley, M.D.

Page 76

1    shows about a 50-pound weight gain; is

2    that correct?

3         A.    Yes.

4         Q.    Do you agree with me that

5    her weight gain can affect her urinary

6    functioning?

7         A.    Yes.

8         Q.    Do you agree with me that

9    weight gain can cause her to have urge

10   symptoms?

11        A.    Yes.

12        Q.    Do you agree with me that

13   her weight gain could even cause stress

14   incontinence?

15        A.    Yes, to some degree, that's

16   true.

17        Q.    Do you agree with me that

18   her 50-pound weight gain could make her

19   urge incontinence symptoms worse?

20        A.    Possibly, yes.

21        Q.    Did you recommend to her

22   that she loses weight?

23             MS. SANTRA:   Object to form.

24             THE WITNESS:   Not being her

Konstantin Walmsley, M.D.

Page 77

```
 1          treating physician, we didn't
 2          discuss that.
 3   BY MS. ROBINSON:
 4          Q.    But it isn't surprising to
 5   you that somebody who might have had some
 6   slight overactive bladder symptoms in
 7   2005, if they gain over 50 pounds ten
 8   years later, continued to have caffeine
 9   intake, it isn't surprising to you that
10   their overactive bladder symptoms could
11   worsen.
12              MS. SANTRA:  Object to form.
13              THE WITNESS:  I mean, in the
14          absence of all the other medical
15          nuances to Mrs. Ward and that this
16          was just a patient who did nothing
17          else other than gain 48 pounds and
18          continue along with her current
19          bladder irritant intake, is that
20          the question?
21              MS. ROBINSON:  Yes.
22              THE WITNESS:  It's
23          plausible, but -- but for Mrs.
24          Ward, it's a little more
```

Konstantin Walmsley, M.D.

Page 78

1          complicated than that, because she

2          has obviously mixed urinary

3          incontinence.  It's not straight

4          urgency or overactive

5          bladder-related incontinence.

6    BY MS. ROBINSON:

7          Q.    You also saw that she has

8    been diagnosed within the last few years

9    of having diabetes; is that correct?

10          A.    Yes.

11          Q.    How does diabetes affect

12    voiding?

13          A.    Well, to a certain extent,

14    it depends on the duration of the

15    diabetes and one's hemoglobin A1C, which

16    serves as a fairly good indicator of

17    diabetic control.

18               So for patients who have

19    long-standing, poorly controlled

20    diabetes, sometimes what we see is

21    actually impaired bladder sensation where

22    the bladder doesn't feel itself to the

23    same degree it did in the nondiabetic

24    state.

Konstantin Walmsley, M.D.

Page 79

1        Q.     And if that's the case, then

2    what impact does it have on somebody's

3    urinary function, their frequency, their

4    overactive bladder symptoms?

5        A.     So, I mean, she's only

6    really had diabetes to my mind for the

7    last three years or so, so I'm not really

8    privy to her hemoglobin A1C levels.  To

9    my -- you know, to my discredit, I

10   suppose, I didn't ask her that specific

11   question.

12             But assuming her hemoglobin

13   A1Cs were in poor control, it could have

14   a -- you know, it could have a minor

15   impact over three years, but nonetheless

16   an impact.

17       Q.     And without -- you do not

18   have sufficient information right now to

19   rule the diabetes out as a potential

20   influence or a potential cause of her

21   overactive bladder symptoms; is that

22   correct?

23       A.     Well, I would put minimal

24   weight on diabetes, but I wouldn't rule

Konstantin Walmsley, M.D.

Page 80

1    it out entirely.

2         Q.    With regard to her

3    medications, did you review that list

4    with her?

5         A.    Yes.

6         Q.    Was she taking any pain

7    medications for complaints that she had

8    related to the TVT?

9              (Pause.)

10             MS. ROBINSON:  I'm sorry.

11        Are you there?

12             THE WITNESS:  I'm here.  I'm

13        just trying to process the

14        question, because the pain that

15        she was relating to me was pelvic

16        and vaginal pain, including groin

17        pain.

18             And inasmuch as I was aware

19        of the fact that she was taking

20        multiple pain medications,

21        hydrocodone, for example,

22        meloxicam, for example, my

23        understanding is that she was

24        taking them for pelvic pain, but

Konstantin Walmsley, M.D.

Page 81

1              she didn't make mention to me that

2              she was taking them for other

3              purposes.

4    BY MS. ROBINSON:

5         Q.    Well, if I told you she was

6    taking pain medications for her neck and

7    shoulder and back --

8         A.    Uh-hum.

9         Q.    -- would that be

10   inconsistent with your understanding of

11   what she -- what she presented to you?

12        A.    Well, not necessarily, but

13   -- only because I was aware of her having

14   those conditions at the time of my IME.

15            That being said, I would

16   imagine that those medications, whether

17   they're being used for her back or neck

18   pain, were probably having some impact on

19   her pelvic pain.

20        Q.    Are you testifying that the

21   pelvic pain that she experiences is so

22   severe that she has to take a pain

23   medication like hydrocodone to control

24   them?

Konstantin Walmsley, M.D.

Page 82

1            MS. SANTRA:  Object to form.

2            THE WITNESS:  Well, no, not

3        necessarily.

4    BY MS. ROBINSON:

5        Q.    You've never seen a medical

6    record, a single medical record, where a

7    doctor has prescribed her with pain

8    medication for any complaints that she

9    has related to the TVT; correct?

10           MS. SANTRA:  Object to form.

11           THE WITNESS:  These pain

12       medications were not prescribed by

13       urologists, gynecologists, or

14       TVT-related doctors.

15   BY MS. ROBINSON:

16       Q.    And, in fact, she has never

17   complained to a single doctor that she

18   has experienced pain during sexual

19   intercourse; is that correct?

20           MS. SANTRA:  Object to form.

21           MS. ROBINSON:  Other than

22       yourself.

23           THE WITNESS:  No.

24   BY MS. ROBINSON:

Konstantin Walmsley, M.D.

Page 83

1          Q.      Let me reask the question:

2     Is it correct that, according to your

3     review of your -- of her medical records,

4     that she has never complained to a single

5     one of her treating physicians that she

6     has experienced pain during sexual

7     intercourse?

8                    MS. SANTRA:   Object to form.

9                    THE WITNESS:   Could you

10          repeat the question?  I'm sorry,

11          Susan.

12    BY MS. ROBINSON:

13          Q.      Doctor, let me try to make

14    it simpler.

15          A.      Okay.

16          Q.      In your review of her

17    medical records, did you find anywhere

18    where she had made a single complaint to

19    any of her treating physicians that she

20    experienced pain during sexual

21    intercourse?

22          A.      No.

23          Q.      Doctor, if you'll turn to

24    page 4 -- well, first, let me -- let me

Konstantin Walmsley, M.D.

Page 84

1    -- before we do that, let's talk about

2    the review -- or her history of present

3    illness?

4                    Did you find any

5    inconsistencies in her recitation of her

6    history to you with what you later

7    reviewed in the medical records?

8            A.    I'm sorry.  I don't know if

9    I understood that question, Susan.

10           Q.    The history of present

11   illness, if I understand correctly, was

12   her providing you with that information

13   during your examination; correct?

14           A.    That's correct.

15           Q.    Did you later find any

16   inconsistencies with what she told you in

17   your review of her medical records?

18           A.    Not especially, no.

19           Q.    Up -- about five lines up,

20   you state:  She notes bilateral groin

21   pain, intermittent, dull, sometimes after

22   walking.

23           A.    Yes.

24           Q.    Did you see anywhere in her

Konstantin Walmsley, M.D.

Page 85

1    medical records that she had made that

2    complaint to any of her treating

3    physicians?

4              MS. SANTRA:   Object to form.

5              THE WITNESS:   Yes.

6    BY MS. ROBINSON:

7         Q.    Where did you see that?

8         A.    As an example, in 2012, she

9    saw Dr. Highland with complaints of

10   left-sided pain, pelvic pain, which is in

11   the same region as the groin.

12        Q.    Does that pain specify that

13   she's having that pain with walking?

14        A.    No.

15        Q.    Did I understand correctly

16   that that is pelvic pain that you related

17   to her ultimate surgery for the

18   hysterectomy?

19        A.    To some degree, yes.

20        Q.    Can you tell me how you did

21   the vaginal exam?

22        A.    Yes.  So my patients lie in

23   the prone position.  They -- typically

24   I'll examine their abdomen first; and

Konstantin Walmsley, M.D.

Page 86

1   then when they undergo a pelvic exam,

2   they will either go into a position

3   called the frog leg where they bend their

4   legs in kind of a diamond shape or, in

5   this instance, they'll be positioned in a

6   lithotomy position where their legs are

7   up in stirrups.

8          At that point, I'll examine

9   them with -- do what's called a bimanual

10  exam, using gloves, whereby I separate

11  the labia to examine their external

12  genitalia, ask them -- first off, assess

13  the rugation or whether or not there's

14  atrophy to the vulvovaginal tissues,

15  examine for discharge, adequate

16  lubrication and such, and then perform

17  what's called a bimanual exam where I'll

18  insert my fingers into the vaginal canal

19  and ask them to bear down or cough to

20  assess if there's any prolapse.

21         During the bimanual exam,

22  there's also an opportunity for me to

23  palpate certain areas or trigger points

24  to see if there's pain to palpation.

Konstantin Walmsley, M.D.

1        Q.    At the time you were doing

2   this examination, you know that she is

3   complaining of having dyspareunia;

4   correct?

5        A.    She had made that complaint

6   to me during her interview, yes.

7        Q.    When you performed the

8   examination, did you use one digit or

9   two?

10       A.    Typically, two.

11       Q.    Did she describe that she

12  experienced any pain when you began the

13  examination just on insertion of the two

14  digits?

15       A.    Prior to my insertion, she

16  had no pain.

17       Q.    At what point did she

18  experience some pain?

19       A.    Typically -- in her

20  instance, her pain was almost exclusively

21  in her anterior urethra, directly along

22  and under the sling, more so on the right

23  side than the left side.

24       Q.    I guess I'm trying to get an

Konstantin Walmsley, M.D.

Page 88

1    understanding at what point in your

2    examination she would have had any pain.

3          A.    Right.  And I guess what I

4    -- maybe my answer wasn't clear before.

5                So when I placed my fingers

6    inside of her to examine her for

7    prolapse, I also would, you know, palpate

8    the vaginal canal throughout, the floor

9    of the vaginal canal, what's called the

10   apex or the uppermost portion of the

11   vagina and then what's called the

12   anterior vaginal canal underneath the

13   bladder and the urethra.

14               In her particular instance,

15   in terms of point tenderness and point

16   palpation, she had tenderness underneath

17   the sling in the area of the mid-urethra

18   with more tenderness up on the sidewalls

19   of the vaginal space.  In Mrs. Ward's

20   instance, more in the right vaginal

21   sulcus than the left.

22         Q.    And how did she express that

23   tenderness to you?

24         A.    As I recall, that she would

Konstantin Walmsley, M.D.

Page 89

1    say, yeah, it's right there, it's --
2    that's where it hurts; and in terms of
3    the differentiator in terms of the
4    quantitative amount of discomfort, it was
5    -- it was more uncomfortable on the right
6    side than the left in the area of the
7    vaginal sulci.
8         Q.    Was it so uncomfortable that
9    she could not endure your examination?
10        A.    It was close to that point.
11   I mean, I didn't really mash the tissues
12   that aggressively, but I did it firmly
13   enough that she elicited -- that it
14   elicited pain.
15        Q.    Did you notice any scarring
16   at the apex?
17        A.    Nothing significant.
18        Q.    Does that mean you didn't
19   notice scarring?
20             MS. SANTRA:  Object to form.
21             THE WITNESS:  Well, once
22             again, I think we're getting into
23             a discussion about documenting a
24             significant negative and whether

Konstantin Walmsley, M.D.

Page 90

1          or not, I guess, number one,

2          whether my computer would do that

3          for me automatically and whether

4          or not I would add that

5          information.

6                What I can tell you is, if

7          there was apical scarring, it was

8          insignificant enough that I didn't

9          feel it necessary to put in the

10         report.

11               If I were to re-examine her

12         today and you were to ask that

13         question and I was to examine her

14         realtime, I would probably have

15         said I can, you know, feel the

16         vaginal cuff scar if I felt it

17         closely enough.  But was it a --

18         an excessive, thick, tender scar?

19         No.

20   BY MS. ROBINSON:

21         Q.    Other than your notation

22   that she had tenderness under the

23   urethra, did she have -- were there any

24   other abnormal findings during your

Konstantin Walmsley, M.D.

Page 91

1    examination?

2          A.    Yes.   There was -- besides

3    induration, there was also a -- a taut

4    feeling to the sling in those particular

5    areas, where it almost felt as if the

6    edge of the sling felt more sharper and

7    more pronounced.

8          Q.    But do I understand

9    correctly that there was no mesh

10   exposure; correct?

11         A.    That's correct.

12         Q.    You were unable to feel any

13   mesh underneath the scarring; correct?

14                MS. SANTRA:  Object to form.

15                THE WITNESS:  I could

16          palpate the sling underneath the

17          scar tissue, but I could not

18          appreciate, feel, or see any

19          extrusion.

20   BY MS. ROBINSON:

21         Q.    She's never had any mesh

22   exposure or extrusion; correct?

23         A.    Not to my knowledge, no.

24         Q.    In your medical practice, is

Konstantin Walmsley, M.D.

Page 92

1    it uncommon for you to be able to feel

2    palpable mesh after a sling has been

3    placed?

4                    MS. SANTRA:  Object to form.

5                    THE WITNESS:  Somewhat.

6    BY MS. ROBINSON:

7          Q.    But it is something that you

8    feel in cases; correct?

9          A.    Yeah.  If you're trying to

10   identify it and trying to feel it, in

11   most instances, you're able to.

12         Q.    And when -- in those

13   instances, not all of those instances

14   reproduce pain; correct?

15         A.    That's correct.

16         Q.    Is it also true that if you

17   have placed a fascial sling for stress

18   urinary incontinence, that you can feel

19   where that sling has been placed after

20   the surgery?

21         A.    That tends to be much more

22   challenging in my hands, but still

23   possible.

24         Q.    Every surgical procedure for

Konstantin Walmsley, M.D.

Page 93

1    stress urinary incontinence has a risk of

2    scarring; correct?

3              A.    Yes.

4              Q.    And that risk of scarring

5    can be prevented only by not doing the

6    surgery; correct?

7              A.    Yes.

8              Q.    Can delayed healing increase

9    the scarring during -- after a stress

10   urinary incontinence surgery?

11                  MS. SANTRA:  Object to form.

12                  THE WITNESS:  I don't know

13             if I understand your question.

14   BY MS. ROBINSON:

15             Q.    If there is a delay, if for

16   some reason the scar doesn't heal in the

17   ordinary process, can that create an

18   increase in the vaginal scarring?

19                  MS. SANTRA:  Object to form;

20             vague.

21                  THE WITNESS:  Yeah, I

22             suppose it depends on the cause of

23             the delayed healing, the

24             underlying issue related to that

Konstantin Walmsley, M.D.

Page 94

1          delayed healing, but that's a
2          plausible theory.
3   BY MS. ROBINSON:
4          Q.    Did you see in the medical
5   records that a week after her surgery,
6   the plaintiff had a coughing fit and felt
7   pain and experienced bleeding from her
8   vagina after her surgery?
9          A.    Uh-hum.
10         Q.    You did see that; correct?
11         A.    Yes, I did.
12         Q.    Can that be something that
13   would interfere with her normal healing
14   process?
15         A.    Well, you know, taking that
16   as a standalone question, I would say
17   yes, but I think her clinical history
18   would go against that in the instances of
19   that particular situation you're speaking
20   of.
21              MS. ROBINSON:  Okay.  Well,
22          move to strike everything after
23          "yes."
24              MS. SANTRA:  Object.

Konstantin Walmsley, M.D.

Page 95

1    BY MS. ROBINSON:

2          Q.    My follow-up question is,

3    does that indicate to you that there

4    might have been a little ripping or a

5    little tearing?

6                MS. SANTRA:  Object to form.

7                THE WITNESS:  No.

8    BY MS. ROBINSON:

9          Q.    Is it possible that

10   following that event, that that event

11   could have caused greater type of

12   scarring for her than what otherwise

13   might normally have occurred?

14         A.    I would say no to that.

15         Q.    And what do you base that

16   on?

17         A.    Well, I base that on the

18   lack of anything within the medical

19   records that would indicate that that

20   particular instance where she had this, I

21   guess, coughing spell and subsequent

22   bleeding spell -- there was nothing in

23   her post -- in evaluations following that

24   that indicated that she was having any

Konstantin Walmsley, M.D.

Page 96

1    sort of delayed healing or significant

2    scarring that would support that theory.

3                 In fact, despite that, she

4    actually had, as we discussed, an

5    initially good result to her sling.  So

6    it's just hard for me to imagine that

7    something happening on June 27th, 2005,

8    with a follow-up approximately nine days

9    later on July 6th where the vaginal

10   bleeding had stopped that same day and

11   she had no further problems or pain -- of

12   pain or discomfort, you know, voiding

13   well, denying any leakage, it's hard for

14   me to state that that would have been a

15   risk factor for either delayed healing or

16   excessive scarring or any other

17   complication.

18        Q.    Doctor, during your

19   examination, she had a normal urinalysis;

20   is that correct?

21        A.    Well, with the exception of

22   glycosuria, yes.  She had sugar in her

23   urine.

24        Q.    And that's consistent with

Konstantin Walmsley, M.D.

Page 97

1    her diabetes; correct?

2            A.      Yes.

3            Q.      Is that an abnormal level of

4    sugar?

5            A.      That is.

6            Q.      How high is that?

7            A.      Well, typically, for someone

8    to spill sugar in their urine, their

9    blood sugar has to be over 180.  So I

10   can't comment as to the specific blood

11   sugar level, but it's suggestive of the

12   fact that her sugar was not adequately

13   controlled at the time of her visit to

14   me.

15           Q.      Under your assessment and

16   plan, when you talk about pain in pelvis,

17   pelvic and perineal pain --

18           A.      Correct.

19           Q.      Do you see that?

20           A.      Yes.

21           Q.      -- did she experience pain

22   in the perineal area during your

23   examination?

24           A.      No.

Konstantin Walmsley, M.D.

Page 98

1          Q.      Where does that come from?

2          A.      That is an ICD-10 code that

3    unfortunately groups pelvic pain under

4    the nomenclature of pelvic and perineal

5    pain.

6          Q.      So she -- are you saying she

7    did not have any peroneal pain and that's

8    just an electronic entry?

9          A.      Yes, ma'am.

10         Q.      Doctor, I'm still a little

11   confused about the pelvic pain

12   complaints.  Are those complaints

13   distinct from the dyspareunia complaint?

14         A.      Yes, they are.

15         Q.      Was there anything on your

16   examination that had -- supported any --

17   you know, any of her symptoms of pelvic

18   pain other than the dyspareunia?

19         A.      Well, I mean, the pelvic

20   exam, to be fair, didn't demonstrate

21   dyspareunia.  It just provoked pain on

22   vaginal exam.  So certainly vaginal pain

23   was reproducible.  The vaginal pain that

24   was produced on exam was consistent with

Konstantin Walmsley, M.D.

Page 99

1    where she had had dyspareunia.

2            But regarding pelvic pain,

3    it really only was borne out during my

4    interview with the patient.  I wasn't

5    able to re-create, for example, groin

6    pain on examination.

7            MS. SANTRA:  Off the record.

8                    -  -  -

9            (A discussion off the record

10           occurred.)

11                   -  -  -

12   BY MS. ROBINSON:

13       Q.    Doctor, I think you were

14   describing during your examination you

15   were not able to reproduce any groin

16   pain; is that correct?

17       A.    That's correct.

18       Q.    And with regard to pelvic

19   pain itself, did I understand correctly

20   on what you were saying that while your

21   examination showed some tenderness, that

22   isn't necessarily indicative of somebody

23   in her daily activities experiencing

24   pelvic pain?

Konstantin Walmsley, M.D.

Page 100

1          A.     To some degree.  So, for

2    example, my physical exam demonstrated

3    some of the pelvic pain that Mrs. Ward

4    had, but not all that was described to

5    me, and I'm not convinced that the pain

6    she has at rest that's worsened by

7    walking is necessarily the vaginal pain

8    that I reproduced on exam.

9          Q.     Are you testifying to a

10   reasonable degree of medical certainty

11   that the pain that she describes upon

12   walking is caused by the TVT?

13         A.     I wouldn't attribute it

14   solely to the sling, no.

15         Q.     And what's the basis that

16   you attribute it partially to the sling?

17         A.     Well, the placement of the

18   sling is -- is in the area of her pain,

19   so I wouldn't rule it out because of

20   that.

21         Q.     Would you agree with me the

22   literature does not support incidences of

23   groin pain following TVT surgery?

24               MS. SANTRA:  Object to form.

Konstantin Walmsley, M.D.

Page 101

1            THE WITNESS:  Well, I don't

2        know if I would necessarily agree

3        with that, because I think it also

4        depends on the route of placement.

5        I mean, in other words, a TVT

6        Obturator sling has a higher risk

7        of groin pain than a retropubic

8        TVT sling, for example.

9    BY MS. ROBINSON:

10        Q.    And she has the retropubic;

11    correct?

12        A.    That's correct, yes.

13        Q.    With regard to her

14    dyspareunia, what does your examination

15    tell you -- or how does your examination

16    play in your assessment that her

17    dyspareunia is caused by the TVT?

18        A.    Well, it's a combination

19    both of her subjective complaints and

20    objectively what I discovered.  To be

21    fair, she had only had sex with her

22    husband about three or four times and, in

23    fact, hadn't been sexually active after

24    her hysterectomy, but she describes

Konstantin Walmsley, M.D.

Page 102

1    specifically that the pain being pain in

2    the vaginal canal and in the groin area.

3              Taking her groin pain out of

4    the equation relating to her dyspareunia,

5    when I examined her, the pain that I was

6    able to reproduce on exam corroborated

7    with the physical location of the pain

8    that she had during intimacy, and when I

9    say the pain in her vaginal canal is what

10   I'm speaking towards.

11         Q.    And how did it corroborate?

12   Did it corroborate in terms of location?

13   Did it corroborate in terms of intensity?

14         A.    Probably more location, you

15   know, than intensity; and, I mean, I

16   don't want to sound graphic here, but

17   it's difficult to reproduce, you know,

18   vaginal intercourse-related pain during a

19   bimanual exam obviously.

20         Q.    Okay.

21              So then how do you know that

22   the location is consistent with the pain

23   she would experience during sexual

24   intercourse?

Konstantin Walmsley, M.D.

Page 103

1    A.    So, I mean, to the point of

2  dyspareunia or vaginal pain, I guess

3  there are two elements.  One is that --

4  the quality of the pain and the other is

5  the location, I suppose.  And the quality

6  can have its own breakdown I guess as to

7  particular elements.

8         But when I was examining

9  Mrs. Ward, for example, and reproducing

10  tenderness on exam, she recounted to me

11  that the pain that she was having during

12  my vaginal exam was the same

13  location-wise as the pain she had during

14  intimacy, during intercourse.

15    Q.    So it's based on her telling

16  you that when you touched her in a

17  certain area, that was the area she was

18  having pain during sexual intercourse.

19    A.    It may have been the other

20  way around.  It may have been more me

21  examining her and eliciting tenderness

22  and saying, is this where you were having

23  pain when having sex, when having

24  intercourse, to which she recounted yes.

Konstantin Walmsley, M.D.

Page 104

1          Q.    Did you take any measures to

2    account for the fact that she's in

3    litigation?

4                 MS. SANTRA:  Object to form.

5                 THE WITNESS:  I did not.

6    BY MS. ROBINSON:

7          Q.    And you understand that pain

8    is pretty much subjective.  Right?

9                 MS. SANTRA:  Object to form.

10                THE WITNESS:  I mean, I

11           think pain has certainly different

12           layers of quality and

13           significance.

14   BY MS. ROBINSON:

15         Q.    Did you find anything during

16   the course of your examination that you

17   felt would prevent her from having sexual

18   intercourse?

19                MS. SANTRA:  Object to form.

20                THE WITNESS:  Well, I think

21           the term "prevent," it probably

22           has multiple layers, too.  Are you

23           speaking about kind of

24           mechanically?

Konstantin Walmsley, M.D.

Page 105

1              MS. ROBINSON:  Yes.

2              MS. SANTRA:  Object to form.

3              THE WITNESS:  I mean, with

4          the exception of the scar tissue

5          and the tenderness to it around

6          the area of her sling, no.

7    BY MS. ROBINSON:

8          Q.    Speaking specifically about

9    the scar tissue and the tenderness, are

10   you able to testify that that in and of

11   itself is significant enough to prevent

12   sexual intercourse?

13         A.    Well, this is one of these

14   areas where we have to kind of jump from

15   one particular arena to the other.

16              So I'm understanding through

17   an interview and exam with this patient

18   that it's painful, so kind of the

19   pre-answer premise to your question is

20   that intimacy is so painful for her that

21   she doesn't want to have it.

22              That being said, could an

23   average-sized -- not to be graphic, but

24   an average-sized penis be inserted into

Konstantin Walmsley, M.D.

Page 106

```
1    her vagina?  I would say the answer to
2    that would be yes.
3         Q.    You have treated -- well,
4    have you treated patients who come to you
5    and do not have sex because they have
6    pain during sexual intercourse?
7         A.    Yes.
8         Q.    And is it fair to say that
9    many of those patients have never had a
10   TVT sling placed?
11             MS. SANTRA:  Object to form.
12             THE WITNESS:  Some of them,
13        yes.
14   BY MS. ROBINSON:
15        Q.    Is it fair to say that, you
16   know -- well, I'm not talking about the
17   TVT sling.  I'm talking about any sling.
18        A.    Right.
19        Q.    Okay.
20             And in those instances, are
21   they there so that you can help them have
22   more comfortable sexual intercourse?
23        A.    Yes.
24        Q.    And what is it that you
```

Konstantin Walmsley, M.D.

Page 107

1   recommend that they do?

2          A.    Well, it depends on what's

3   causing the dyspareunia.

4          Q.    And there are many different

5   potential causes of dyspareunia; correct?

6          A.    There are -- there are

7   multiple causes.

8          Q.    And, for example, can you

9   tell me that on the one or two occasions

10  that Mrs. Ward had attempted sexual

11  intercourse with her husband, that her

12  pain was not caused by either her -- the

13  ovarian cyst she had or the endometrial

14  problems that she has?

15              MS. SANTRA:  Object to form.

16              THE WITNESS:  Well, I can

17              speak to you about my discussions

18              with her and what she recounted to

19              me.

20              MS. ROBINSON:  Well -- okay.

21              Go ahead and do that.

22              THE WITNESS:  So it was a

23              number -- it was a number -- she

24              had sex about three or four times.

Konstantin Walmsley, M.D.

Page 108

1           She described the pain as being in

2           both the vaginal canal and in the

3           groins; but when she described it

4           based on her husband's experience,

5           she felt like he was placing a

6           rough stick inside of her with

7           more pain on the right than the

8           left.

9    BY MS. ROBINSON:

10           Q.    Do you know whether that was

11   consistent with her deposition testimony

12   or not?

13           A.    I don't specifically recall

14   location language in her deposition.  I'd

15   have to re-look at it again to see.

16                MS. ROBINSON:  Okay.  We'll

17           move on.

18                Can I get an idea of how

19           much time I have on the record

20           left?

21                        -    -    -

22                (A discussion off the record

23           occurred.)

24                        -    -    -

Konstantin Walmsley, M.D.

Page 109

1              THE COURT REPORTER:  Eight

2         minutes left.

3              MS. ROBINSON:  So I will

4         stop here at 11:10.  Okay.  So,

5         Doctor, let me move on a little

6         bit.

7    BY MS. ROBINSON:

8         Q.    On page 2 of your report,

9    which is Exhibit 2, you list a number of

10   common complicaces with TVT; is that

11   correct?

12        A.    Yes.

13        Q.    Do we agree that you are not

14   relating pain into her legs or thighs to

15   the TVT; correct?

16        A.    Correct.

17        Q.    Do we agree that she does

18   not have chronic inflammation of her

19   tissue?

20        A.    I would disagree with that.

21        Q.    You didn't perform a biopsy.

22   Right?

23        A.    I did not.

24        Q.    She never had her mesh

Konstantin Walmsley, M.D.

Page 110

```
 1    explanted; correct?
 2           A.     That's correct.
 3           Q.     Did you visualize any
 4    discharge from her vagina during your
 5    examination?
 6           A.     I did not.
 7           Q.     Did you visualize -- did you
 8    use a speculum during your examination?
 9           A.     I did.
10           Q.     Did you visualize any
11    redness or inflamed areas around her
12    urethra?
13           A.     I did not.
14           Q.     Doctor, you didn't find any
15    scar bands; correct?
16           A.     I did not.
17           Q.     There was no vaginal
18    shortening or stenosis; correct?
19           A.     Not that I identified, no.
20           Q.     There was no erosion or
21    exposure or protrusion of her mesh; is
22    that correct?
23           A.     No, ma'am.
24           Q.     You did not find any nerve
```

Konstantin Walmsley, M.D.

Page 111

1    entrapment; correct?

2          A.    No.

3          Q.    There was no roping or

4    curling of her mesh; is that correct?

5          A.    No.

6          Q.    There was no fraying;

7    correct?

8          A.    That's correct.

9          Q.    There was no particle loss

10   that you found; correct?

11         A.    None that I could identify,

12   no.

13         Q.    There was no infection of

14   her wound or infection of the site of her

15   mesh; correct?

16         A.    No.

17         Q.    Do you know if her TVT was

18   mechanically cut or laser cut mesh?

19         A.    I do not know.

20         Q.    As a result of that, is it

21   fair for me to say, Doctor, you cannot

22   attribute any of her injuries to the fact

23   that her mesh was either one or the

24   other?

Konstantin Walmsley, M.D.

Page 112

1          MS. SANTRA:  Object to form.

2          THE WITNESS:  That's

3     correct.

4  BY MS. ROBINSON:

5          Q.    And there was no degradation

6  of her mesh.  Do we agree with that?

7          A.    None that I could identify.

8          Q.    Doctor, with regard to your

9  general opinions regarding the IFU,

10  you've never written an IFU; is that

11  correct?

12          A.    I have not.

13          Q.    You've never worked for a

14  device company and been asked to write

15  their IFU; correct?

16          A.    Only read them, not write

17  them.

18          Q.    You've only -- you've never

19  worked for FDA and been asked to review

20  IFUs; correct?

21          A.    I've not.

22          Q.    Do you know of any

23  regulation with regard to what is

24  required by a manufacturer when drafting

Konstantin Walmsley, M.D.

Page 113

1    and finalizing an IFU?

2              A.    No.

3              Q.    You are citing to an AMA

4    informed consent requirement and that's

5    8.08; is that correct?

6              A.    Yes.

7              Q.    And what does that relate to

8    generally?

9              A.    That's a policy regarding

10   informed consent.

11             Q.    Does that require doctors

12   and physicians to give informed consent

13   to their patients?

14             A.    Correct.

15             Q.    That's not a regulation that

16   is placed upon manufacturers; correct?

17             A.    Well, no, not directly.

18             Q.    And you agree with me that

19   the doctor is required to inform the

20   patient; correct?

21             A.    Correct.

22             Q.    You've read Dr. DeLeary's

23   transcript; correct?

24             A.    I did.

Konstantin Walmsley, M.D.

Page 114

1        Q.    And you know that he states

2    that he was aware that dyspareunia was a

3    potential risk at the time he implanted

4    the TVT; correct?

5                MS. SANTRA:  Object to form.

6                THE WITNESS:  Yes.

7    BY MS. ROBINSON:

8        Q.    He was aware that scarring

9    could be a part of that; is that correct?

10               MS. SANTRA:  Object to form.

11               THE WITNESS:  Yes.

12   BY MS. ROBINSON:

13       Q.    He was aware that voiding

14   dysfunction could occur; is that correct?

15               MS. SANTRA:  Object to form.

16               THE WITNESS:  Yes.

17   BY MS. ROBINSON:

18       Q.    He was aware that those

19   conditions could be mild, severe;

20   correct?

21               MS. SANTRA:  Object to form.

22               THE WITNESS:  Yes.

23   BY MS. ROBINSON:

24       Q.    That they could be short

Konstantin Walmsley, M.D.

1    term or long term; is that correct?

2                    MS. SANTRA:   Object to form.

3                    THE WITNESS:   Correct.

4    BY MS. ROBINSON:

5         Q.    Doctor, with regard to your

6    testimony about the mesh contracture, can

7    you testify to a reasonable degree of

8    medical certainty having not seen her

9    mesh that it -- that the mesh itself

10   actually contracted?

11        A.    Yes.

12        Q.    And what's that based on?

13        A.    Well, it's based primarily

14   on my physical exam findings, which

15   indicated some tautness and tightness to

16   the area where the sling was located.

17        Q.    And that makes you think

18   that the mesh itself contracted or simply

19   that there was wound contracture?

20        A.    Well, really, typically,

21   it's a combination of both.

22        Q.    Can you tell me what degree

23   it contracted?

24        A.    Well, that's very difficult

Konstantin Walmsley, M.D.

Page 116

1    to do in the absence of histological or

2    electron micrograph-type specimens.

3              Q.    When did you last implant a

4    polypropylene mesh?

5              A.    About three weeks ago.

6              Q.    If that patient develops

7    dyspareunia in the future, do you believe

8    it's caused by a defect in the mesh?

9                   MS. SANTRA:  Object to form.

10                   THE WITNESS:  Well, I think

11             that's a difficult question to

12             answer because I think to some

13             degree it depends on, number one,

14             which kind of mesh and, secondly,

15             it would depend to some degree on

16             why the patient is having the

17             dyspareunia; in other words, is it

18             something I would attribute to, in

19             this example, the sling or

20             something else.

21    BY MS. ROBINSON:

22             Q.    Well, let's back up for a

23    second then and let's say the type of

24    mesh that you currently use is a type 1

Konstantin Walmsley, M.D.

Page 117

1    lightweight macroporous mesh; correct?

2           A.    Yes.

3           Q.    And TVT is a type 1

4    lightweight macroporous mesh; correct?

5           A.    Yes.

6           Q.    Have you ever sat down to

7    compare those two types of meshes side to

8    side?

9           A.    Only holding them in my hand

10   type comparisons, not more sophisticated

11   comparisons.

12          Q.    You've never studied them.

13   Right?

14          A.    Not in depth like a

15   molecular or biomechanical type of person

16   might, no.

17          Q.    And --

18                MS. SANTRA:  I think time is

19          up, Susan.

20   BY MS. ROBINSON:

21          Q.    You're not testifying that

22   that mesh is an alternative to the TVT

23   mesh; is that correct?

24                MS. SANTRA:  I'm going to

Konstantin Walmsley, M.D.

Page 118

```
 1          instruct him not to answer the
 2          question because time is up.
 3               MS. ROBINSON:  All right.
 4          Go ahead.
 5               MS. SANTRA:  I actually need
 6          just a two-minute break, if that's
 7          all right, so we're going to go
 8          off the record for a minute.
 9               (A recess was taken from
10          11:11 a.m. until 11:15 a.m.)
11                    -   -   -
12                  EXAMINATION
13                    -   -   -
14     BY MS. SANTRA:
15          Q.   Dr. Walmsley, you performed
16     a differential diagnosis when coming to
17     your opinions about Ms. Ward; is that
18     correct?
19          A.   Yes, ma'am.
20          Q.   And when you were performing
21     your differential diagnosis, did you take
22     into account her other medical
23     conditions?
24          A.   Yes, I did.
```

Konstantin Walmsley, M.D.

Page 119

```
 1            Q.    And I'll just -- I have a
 2    list, but did you take into account her
 3    past -- or history of infertility, kidney
 4    stores, ███████, ███████████,
 5    migraines, lumbar back pain, abdominal
 6    pain, hiatal hernia, constipation, and
 7    weight gain of about 48 pounds when you
 8    were performing your differential
 9    diagnosis on Ms. Ward?
10            A.    Yes.
11                  MS. ROBINSON:  Object to
12            form.
13    BY MS. SANTRA:
14            Q.    And considering all her --
15    all of those other medical conditions,
16    did you still come to the conclusion that
17    the TVT was a cause for her pelvic pain
18    and dyspareunia?
19            A.    Yes.
20                  MS. ROBINSON:  Object to
21            form.
22    BY MS. SANTRA:
23            Q.    And did you still come to
24    the conclusion to a reasonable degree of
```

Konstantin Walmsley, M.D.

Page 120

1    medical certainty that her TVT was a

2    cause for her urinary dysfunction?

3         A.    Yes.

4         Q.    And when you were performing

5    your differential diagnosis for Ms. Ward,

6    did you take into account her surgical

7    history?

8         A.    I did.

9         Q.    And that included a

10   hysterectomy in 1991, kidney stones in

11   1996, cholecystectomy, a D & C in 2006 --

12             MS. ROBINSON:  Object to the

13             form.

14   BY MS. SANTRA:

15        Q.    -- and a -- I'm sorry.

16   Strike that.  Let me start over with

17   that.

18             Ms. Ward's surgical history

19   included kidney stones, a

20   cholecystectomy, a D & C, and a

21   laparoscopically assisted vaginal

22   hysterectomy with BSO; is that correct?

23        A.    Correct.

24        Q.    And did you take into

Konstantin Walmsley, M.D.

Page 121

```
 1    account her entire surgical history when
 2    you performed your differential
 3    diagnosis?
 4            A.    Yes.
 5                  MS. ROBINSON:  Object to
 6            form.
 7    BY MS. SANTRA:
 8            Q.    And did you still come to
 9    the conclusion that the TVT mesh was a
10    cause for her injuries today?
11            A.    Yes.
12                  MS. ROBINSON:  Object to
13            form.  I'm sorry.  I don't mean to
14            -- Hayleigh, I don't mean to get
15            you off track.  I'm just having a
16            hard time getting my objection in
17            before the doctor speaks.
18                  MS. SANTRA:  Sure.  That's
19            fine.
20    BY MS. SANTRA:
21            Q.    I want to go to your opinion
22    concerning the IFU.  I think that's your
23    general opinion number 1; correct?
24            A.    Yes.
```

Konstantin Walmsley, M.D.

Page 122

1        Q.    And what is your experience

2    with IFUs?

3        A.    I use IFUs in gaining

4    experience about medical devices and

5    procedures relating to those devices.  I

6    rely upon it to help me not only guide me

7    technically with the procedure, but allow

8    me to understand the indications,

9    contraindications, and potential

10   complications relating to the use of the

11   medical device.

12       Q.    And so does your opinion on

13   the TVT's IFU as of 2005 come from your

14   experience with IFUs as a practicing

15   urologist who relies on IFUs for medical

16   devices --

17             MS. ROBINSON:  Object to

18        form.

19   BY MS. SANTRA:

20       Q.    -- every day in your

21   practice or regularly in your practice?

22       A.    Yes.

23       Q.    And early on in the

24   deposition, counsel was asking you what

Konstantin Walmsley, M.D.

Page 123

1    you knew as far as complications from the

2    TVT in 2005.  Do you remember those

3    questions?

4          A.    Yes.

5          Q.    And can you explain your

6    opinion as to why you think the warnings

7    or the adverse reactions that were put in

8    the IFU in 2005 were inadequate to inform

9    doctors about the true risks of the TVT?

10         A.    Certainly.  I think the

11   first is in the types, quantitatively the

12   different types, of adverse reactions

13   that can be expected, number one.  And

14   then, number two, the nature,

15   significance, chronicity, and/or severity

16   of those adverse reactions as it relates

17   to the fact that some of them are

18   specifically mesh related.

19         Q.    And so in 2005, if someone

20   understood that there may have been a

21   possibility for pain with the TVT

22   implant, does their understanding as to

23   the nature and chronicity and character

24   of that pain matter?  Does that make

Konstantin Walmsley, M.D.

Page 124

1    sense?

2         A.    Yes.

3              MS. ROBINSON:  Object to

4         form.

5              THE WITNESS:  Yes, and to

6         that end, having pelvic pain after

7         any incontinence procedure, yes,

8         that's an expectation.  That being

9         said, when using synthetic mesh as

10        a means of performing that

11        antiincontinence procedure, the

12        pelvic pain that is inherently

13        related to the mesh is actually

14        quite different from the pelvic

15        pain one might expect from, let's

16        say, a nonmesh-related

17        antiincontinence surgery.

18             So I think that for an

19        antiincontinence surgery to read

20        about pelvic pain from a

21        mid-urethral sling, for example,

22        he or she may be drawing a

23        conclusion that, oh, well, this is

24        the typical kind of pain that I

Konstantin Walmsley, M.D.

Page 125

```
 1          would expect after, let's say, an
 2          autologous fascial sling procedure
 3          or a Burch procedure, where in
 4          fact it's different simply because
 5          the kind of pain that mesh can
 6          induce is different.
 7     BY MS. SANTRA:
 8          Q.    And we were talking about
 9     your examination of Ms. Ward in that you
10     said if you were treating her as a
11     treating physician, you may order a
12     urodynamic study if you were to see her
13     again; is that right?
14          A.    I would consider it, yes.
15          Q.    Could you treat Ms. Ward
16     without doing a urodynamic study if she
17     was your patient?
18          A.    Yeah, I probably would, in
19     fact, treat her in anticipation or before
20     a urodynamic study.
21          Q.    And so even without doing
22     that urodynamic study, you're confident
23     that you have enough information to
24     render your opinions about Ms. Ward to a
```

Konstantin Walmsley, M.D.

Page 126

1   reasonable degree of medical certainty?

2       A.      That's correct.

3       Q.      And you also had talked

4   about the fact that you performed a cough

5   stress test of Ms. Ward; is that correct?

6       A.      I did, albeit not typically,

7   because typically, a cough stress test is

8   done when the bladder's full.  In the

9   instance of Mrs. Ward, I was doing the

10  cough stress test primarily to see if

11  there was any urethral hypermobility.

12              Because her bladder only had

13  15 cc's in it, even if she really did

14  have genuine stress incontinence, it

15  might be harder to elicit incontinence

16  with a patient lying down on her back

17  with not much urine within her bladder.

18      Q.      So the fact that she did --

19  she had a negative cough stress test on a

20  day that she went to see you when she

21  didn't have a lot of urine in her

22  bladder, that does not mean that she has

23  no recurrent stress urinary incontinence;

24  is that correct?

Konstantin Walmsley, M.D.

Page 127

1          A.      That's correct.

2          Q.      When you were performing

3    your differential diagnosis of Ms. Ward's

4    overactive bladder, did you consider

5    other factors such as her caffeine

6    intake, her weight, her lifestyle, the

7    fact that it could be idiopathic, the

8    fact that she has a history of

9    constipation, and her diabetes?

10         A.      I did.

11         Q.      And did you still conclude

12   that the TVT is a cause of her overactive

13   bladder symptoms?

14              MS. ROBINSON:  Object to

15         form.

16              THE WITNESS:  Yes.

17   BY MS. SANTRA:

18         Q.      And how do you know that or

19   how did you rule the TVT in?

20         A.      Well, in large part, because

21   that the complaints of her voiding

22   dysfunction occurred in a temporal

23   fashion, consistent with TVT-related

24   issues.

Konstantin Walmsley, M.D.

1              For example, the TVT

2    undergoes a shrinkage and a contraction.

3    That in part is the mesh; that in part is

4    wound contraction.  And that over time,

5    the fact that she went from actually

6    having benefit from the TVT as far as

7    voiding dysfunction to then developing

8    significant voiding dysfunction certainly

9    is very supportive of the TVT as being a

10   causative factor.

11              I wouldn't, to the points

12   made earlier, rule out other issues.  For

13   example, the fact that she's gained

14   weight would certainly contribute to

15   that, less likely the constipation which

16   she had both before and after her

17   surgeries.  And the diabetes, I wouldn't

18   weight necessarily as heavily only

19   because it's only been ongoing for

20   several years.

21              So I wouldn't necessarily

22   rule out other causes entirely as

23   contributing to her voiding dysfunction,

24   but certainly from a time course

Konstantin Walmsley, M.D.

1    standpoint and clinically, based on the

2    kind of incontinence she has, which is

3    mixed incontinence, which is typically

4    the kind of voiding dysfunction one can

5    see as a complication of TVT, it's

6    certainly a cause.

7         Q.    And in your differential

8    diagnosis for Ms. Ward's pelvic pain, did

9    you consider her history of constipation,

10   endometritis, ovarian cysts, and her

11   other surgeries?

12        A.    Yes.

13        Q.    And you still came to the

14   conclusion that the TVT is a cause for

15   her pelvic pain?

16        A.    Correct.

17        Q.    And -- and specifically

18   about the endometritis, you said you

19   couldn't rule it out up until she had a

20   hysterectomy?

21        A.    Correct.

22        Q.    Can you explain that?

23        A.    So there's no evidence of

24   her having any aberrant endometrial

Konstantin Walmsley, M.D.

Page 130

```
 1    tissue outside of her cervix, uterus, and
 2    fallopian tubes, and ovaries for that
 3    matter.  As a result, and moreover, she
 4    had her -- after her hysterectomy, her
 5    pelvic pain was no better or no worse.
 6              So it leads me to conclude
 7    that, first off, there's no endometrial
 8    tissue remaining to cause any sort of
 9    endometritis-related pain, number one,
10    and, number two, the fact that her
11    surgery really had no impact on it
12    suggests to me that the surgery itself
13    was not -- the hysterectomy, that is -- a
14    causative factor as it relates to her
15    pelvic pain.
16              Q.   And your examination and
17    interview of Ms. Ward, did you conduct
18    those the same way you would conduct them
19    for any patient who's coming into your
20    office?
21              A.   Yes.
22              MS. ROBINSON:  Object to
23        form.
24    BY MS. SANTRA:
```

Konstantin Walmsley, M.D.

1          Q.     And so the fact that the

2     litigation is ongoing had no effect on

3     your -- your examination or interview or

4     the way you conducted those; is that

5     correct?

6          A.     That's correct.

7               MS. ROBINSON:   Object to

8          form.

9     BY MS. SANTRA:

10         Q.     Regarding your pelvic exam

11    of Ms. Ward, you reproduced Ms. Ward's

12    pain on pelvic exam with your two

13    fingers; is that correct?

14         A.     Correct.

15              MS. ROBINSON:   Object to

16         form.

17    BY MS. SANTRA:

18         Q.     Would the activity during

19    sex of the husband's penis be, for lack

20    of a better word, would that be more

21    vigorous or -- than your exam?

22         A.     Yes.

23              MS. ROBINSON:   Object to

24         form.

Konstantin Walmsley, M.D.

Page 132

1                    THE WITNESS:  I would think
2          so, yes.
3  BY MS. SANTRA:
4          Q.    And so from the fact that
5  upon your exam with your two fingers Ms.
6  Ward had pain in the -- in the vaginal
7  sulci, does that lead you to conclude
8  that she would also have that pain upon
9  intercourse?
10                   MS. ROBINSON:  Object to
11         form.
12                   THE WITNESS:  Yes.
13  BY MS. SANTRA:
14         Q.    And can you say that to a
15  reasonable degree of medical certainty?
16         A.    I can.
17         Q.    Going to your case-specific
18  opinions, you mention two things, scar
19  plate and contraction/shrinkage as it
20  relates to Ms. Ward.
21                   First, how do you know that
22  a scar plate formed with Ms. Ward's TVT?
23         A.    Based on my physical
24  examination and the fact that when I

Konstantin Walmsley, M.D.

1    examined her, she had indurating tissue

2    around and extending up to the vaginal

3    sulci where her sling was located.  That

4    was the scar plate that I discuss in my

5    report.

6         Q.    And then what evidence did

7    you find that there was contraction or

8    shrinkage of Ms. Ward's TVT?

9         A.    So that was based on the

10   appreciation of the sling in certain

11   areas feeling taut or tense to my

12   palpation.

13          Once again, that is a

14   shrinkage that I attribute both to the

15   mesh itself contracting, but also to

16   there being some degree of wound

17   contraction as well.

18        Q.    And this -- the scar plate

19   and shrinkage and contraction of the TVT

20   is what is contributing to Ms. Ward's

21   pelvic pain and dyspareunia; is that

22   right?

23        A.    Correct.

24          MS. ROBINSON:  Object to

Konstantin Walmsley, M.D.

Page 134

1          form.

2    BY MS. SANTRA:

3          Q.    And does the scar plate

4    formation and the contraction or

5    shrinkage of the TVT also contributing to

6    Ms. Ward's urinary issues?

7          A.    Yes.

8                MS. ROBINSON:   Object to

9          form.

10   BY MS. SANTRA:

11         Q.    Counsel asked you earlier

12   about whether there was chronic

13   inflammation.   Do you remember that

14   question?

15         A.    I do.

16         Q.    How do you know that Ms.

17   Ward has chronic inflammation of her

18   tissue?

19         A.    Well, I think, to be fair,

20   the best way to demonstrate that would be

21   to literally remove the mesh and examine

22   it pathologically, during which time, if

23   there were chronic inflammation, you'd

24   see that identified.   You'd see a foreign

Konstantin Walmsley, M.D.

Page 135

1    body response to the mesh-based material.

2                    So my conclusion that

3    there's chronic inflammation is based on

4    my physical exam and the fact that there

5    is a scar plate that is present that

6    continues to be tender on examination,

7    which to me is consistent with a chronic

8    inflammatory process.

9            Q.    And are you basing that on

10   your clinical experience in treating

11   women like Ms. Ward and your knowledge of

12   the medical literature?

13           A.    Yes.

14                 MS. ROBINSON:  Object to

15       form.

16   BY MS. SANTRA:

17           Q.    Counsel asked you whether

18   the TVT was a cause for or contributing

19   to Ms. Ward's UTIs.  Do you remember

20   that?

21           A.    I do.

22           Q.    And I think you said you

23   think it is a cause for her UTIs.  Can

24   you explain that?

Konstantin Walmsley, M.D.

Page 136

1          MS. ROBINSON:  Wait.  I'm
2     going to object to this.  I'm
3     going to object to this being
4     outside the scope of his opinions
5     he's rendered in his report --
6          MS. SANTRA:  Well, if he --
7          MS. ROBINSON:  -- on Mrs.
8     Ward.
9          I mean, nowhere in the four
10    corners of his report does he
11    relate UTIs to her TVT as being a
12    potential injury she sustained as
13    a result of the TVT.  And I'm
14    going to object.  It's outside the
15    scope and we are limiting him to
16    the four corners of his report.
17         MS. SANTRA:  On the last
18    page of his report, he
19    specifically reserves the right to
20    supplement and amend his opinions,
21    and the point of this deposition
22    is to -- is to clarify and explore
23    his opinions as to Ms. Ward.
24         If you don't want to

Konstantin Walmsley, M.D.

Page 137

1          question him on it, that's fine,

2          but I would like for him to state

3          his opinion as to her UTIs on the

4          record.

5                  MS. ROBINSON:  I absolutely

6          and totally disagree with that.

7          If he wants to supplement his

8          opinions, he can do it with a

9          supplemental report, which we will

10         then take to the court and state

11         it's out of bounds.

12                 There is no new information

13         that he has that calls for any

14         supplementation of his opinions.

15         He had all of the information

16         necessary to render a full report

17         at the time he filed the report

18         and I object to you trying to

19         expand the scope of his opinions

20         during this deposition during your

21         direct examination.

22                 MS. SANTRA:  He's gotten new

23         medical records and new

24         depositions have been taken since

Konstantin Walmsley, M.D.

Page 138

1     the reporting of his report on

2     July 8th so --

3          MS. ROBINSON:  If you look

4     at his report as it is written, he

5     has documented on the occasions

6     where he has reported UTIs.  He

7     has sufficient information.  He

8     could have rendered that opinion

9     before.

10         And I'm not -- I mean, I

11    absolutely object to you exploring

12    this area with him.  It is outside

13    the scope of his report and I

14    object to any attempt at this

15    deposition to expand his opinions.

16         MS. SANTRA:  Well, we may

17    issue a supplemental report, and I

18    guess we'll leave the deposition

19    open if you all want to depose him

20    on that.

21         MS. ROBINSON:  We'll just

22    have to take that up later, but I

23    was not prepared to depose him on

24    that because it's not part of his

Konstantin Walmsley, M.D.

Page 139

1           opinions.

2                    MS. SANTRA:  I'm going to

3           move on.

4      BY MS. SANTRA:

5           Q.    On your reliance list, you

6      have included the materials in and

7      reviewed for the TVT general causation

8      reports; is that right?

9           A.    Yes.

10           Q.    And you have also relied on

11      the TVT general causation report issued

12      in this case just in general as

13      background for your case-specific

14      opinions in this case; is that correct?

15           A.    Yes.

16           Q.    And isn't it true that

17      Ethicon puts in their 2015 instructions

18      for use for the TVT that the TVT can

19      cause acute and/or chronic pain in the

20      groin, thigh, leg, pelvic, and/or

21      abdominal area?

22                    MS. ROBINSON:  Object to

23           form.

24                    THE WITNESS:  That's

Konstantin Walmsley, M.D.

Page 140

1          correct.

2    BY MS. SANTRA:

3          Q.    And that the TVT can cause

4    pain with intercourse that may not

5    resolve?

6                MS. ROBINSON:  Object to

7          form.

8                THE WITNESS:   That's

9          correct.

10   BY MS. SANTRA:

11         Q.    And that the TVT can cause

12   acute and/or chronic pain?

13               MS. ROBINSON:  Object to

14         form.

15               THE WITNESS:  Yes.

16   BY MS. SANTRA:

17         Q.    And that the TVT can cause

18   voiding dysfunction.

19               MS. ROBINSON:  Object to

20         form.

21               THE WITNESS:  Yes.

22               MS. SANTRA:  I think that's

23         all I have for you.  Thank you,

24         Doctor.

Konstantin Walmsley, M.D.

Page 141

```
 1              THE WITNESS:   Thank you.
 2              MS. ROBINSON:   Thank you,
 3      Doctor.
 4              THE WITNESS:   Thank you.
 5              (Witness excused.)
 6              (Deposition concluded at
 7      approximately 11:42 a.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Konstantin Walmsley, M.D.

```
 1                    CERTIFICATE
 2
 3
 4
 5         I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
 6  deposition is a true record of the
    testimony given by the witness.
 7
           It was requested before
 8  completion of the deposition that the
    witness, KONSTANTIN WALMSLEY, M.D., have
 9  the opportunity to read and sign the
    deposition transcript.
10
11
12
13  _____
    KIMBERLY A. CAHILL, a
14  Federally Approved Registered
    Merit Reporter and Notary Public
15  Dated:  August 15, 2016
16
17         (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24
```

Konstantin Walmsley, M.D.

Page 143

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Konstantin Walmsley, M.D.

Page 144

1                    —   —   —   —   —   —

                    E R R A T A

2                    —   —   —   —   —   —

3    PAGE   LINE   CHANGE

4    ____   ____   _____

5    ____   ____   _____

6    ____   ____   _____

7    ____   ____   _____

8    ____   ____   _____

9    ____   ____   _____

10   ____   ____   _____

11   ____   ____   _____

12   ____   ____   _____

13   ____   ____   _____

14   ____   ____   _____

15   ____   ____   _____

16   ____   ____   _____

17   ____   ____   _____

18   ____   ____   _____

19   ____   ____   _____

20   ____   ____   _____

21   ____   ____   _____

22   ____   ____   _____

23   ____   ____   _____

24   ____   ____   _____

Konstantin Walmsley, M.D.

Page 145

 1

 2                ACKNOWLEDGMENT OF DEPONENT

 3

 4                I,_____, do

 5      hereby certify that I have read the

 6      foregoing pages, 1 - 146, and that the

 7      same is a correct transcription of the

 8      answers given by me to the questions

 9      therein propounded, except for the

10      corrections or changes in form or

11      substance, if any, noted in the attached

12      Errata Sheet.

13

14

15      _____

16      KONSTANTIN WALMSLEY, M.D.          DATE

17

18

19      Subscribed and sworn
        to before me this

20      _____ day of _____, 20____.

21      My commission expires:_____

22

        _____

23      Notary Public

24

Konstantin Walmsley, M.D.

Page 146

```
 1                    LAWYER'S NOTES
 2    PAGE   LINE
 3    ____   ____   _____
 4    ____   ____   _____
 5    ____   ____   _____
 6    ____   ____   _____
 7    ____   ____   _____
 8    ____   ____   _____
 9    ____   ____   _____
10    ____   ____   _____
11    ____   ____   _____
12    ____   ____   _____
13    ____   ____   _____
14    ____   ____   _____
15    ____   ____   _____
16    ____   ____   _____
17    ____   ____   _____
18    ____   ____   _____
19    ____   ____   _____
20    ____   ____   _____
21    ____   ____   _____
22    ____   ____   _____
23    ____   ____   _____
24    ____   ____   _____
```