# EXHIBIT G

Konstantin Walmsley, M.D.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

- - -

|  |  |  |
|---|---|---|
| IN RE: ETHICON, INC. | : | Master File |
| PELVIC REPAIR SYSTEM | : | No. |
| PRODUCTS LIABILITY | : | 2:12-MD-02327 |
| LITIGATION | : |  |
|  | : | MDL NO. 2327 |
| THIS DOCUMENT RELATES | : | JOSEPH R. GOODWIN |
| TO THE FOLLOWING CASES | : | U.S. DISTRICT JUDGE |
| IN WAVE 2 OF MDL 200: | : |  |
| JOANNE PHILLIPS | : | CASE NO. |
| v. | : | 2:12-cv-02489 |
| ETHICON, INC., et al. | : |  |
|  | : |  |

- - -

August 17, 2016

- - -

Expert deposition of
KONSTANTIN WALMSLEY, M.D., taken pursuant
to notice, was held at Courtyard Marriott
West Orange, 8 Rooney Circle, West
Orange, New Jersey, beginning at 12:42
p.m., on the above date, before Kimberly
A. Cahill, a Federally Approved
Registered Merit Reporter and Notary
Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Konstantin Walmsley, M.D.

Page 2

```
 1    APPEARANCES:
 2
 3    MOTLEY RICE LLC
      BY:  HAYLEIGH T. STEWART SANTRA, ESQUIRE
 4    28 Bridgeside Boulevard
      Mt. Pleasant, South Carolina  29464
 5    (843) 216-9373
      hstewart@motleyrice.com
 6    Representing the Plaintiffs
 7
      BUTLER SNOW LLP
 8    BY:  ASHLEY NADER STUBBS, ESQUIRE
      Suite 1400
 9    1020 Highland Colony Parkway
      Ridgeland, Mississippi  39157
10    (601) 948-5711
      ashley.stubbs@butlersnow.com
11    Representing the Defendants Johnson &
      Johnson and Ethicon
12
13
14
15
16                        -   -   -
17
18
19
20
21
22
23
24
```

Konstantin Walmsley, M.D.

Page 3

```
 1                    -   -   -
 2                  I N D E X
 3                    -   -   -
 4
 5   Testimony of:   KONSTANTIN WALMSLEY, M.D.
 6     By Ms. Stubbs                  6
       By Ms. Santra                 88
 7
 8                    -   -   -
 9              E X H I B I T S
10                    -   -   -
11
     NO.            DESCRIPTION          PAGE
12
13   Walmsley       Notice of            14
     (Phillips)-    Deposition of
14   1              Konstantin
                    Walmsley, M.D.
15
     Walmsley       Rule 26 Expert      16
16   (Phillips)-    Report of
     2              Konstantin
17                  Walmsley, MD
18   Walmsley       11/20/15 Curriculum 17
     (Phillips)-    Vitae of Konstantin
19   3              Walmsley
20   Walmsley       Document Entitled   17
     (Phillips)-    "Materials
21   4              Reviewed"
22   Walmsley       6/17/16 Encounter   21
     (Phillips)-    Summary for Joanne
23   5              Phillips
24   Walmsley       Invoice for         22
```

Konstantin Walmsley, M.D.

Page 4

| 1 | (Phillips)-6 | Phillips Case Review | |
| 2 | | | |
| | Walmsley | 6/16 AUGS and SUFU | 36 |
| 3 | (Phillips)-7 | Position Statement | |
| 4 | | | |
| | Walmsley | 1/10/05 Operative | 66 |
| 5 | (Phillips)-8 | Report for Joanne | |
| | | M. Phillips, | |
| 6 | | PHILLIPSJ_UTMC_MDR | |
| | | 00021 through | |
| 7 | | PHILLIPSJ_UTMC_MDR | |
| | | 00023 | |
| 8 | | | |
| | Walmsley | Twenty Pages of | 69 |
| 9 | (Phillips)-9 | Medical Records | |
| | | Beginning with | |
| 10 | | 12/13/05 Visit to | |
| | | Dr. Narula, | |
| 11 | | PHILLIPSJ_LAFHC_MDR | |
| | | 00056 | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Konstantin Walmsley, M.D.

Page 5

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line      Page Line      Page Line

 7

 8   Request for Production of Documents

 9   Page Line      Page Line      Page Line

10

11

     Stipulations

12

     Page Line      Page Line      Page Line

13

14

15   Question Marked

16   Page Line      Page Line      Page Line

17

18

19

20

21

22

23

24
```

Konstantin Walmsley, M.D.

Page 6

1                    -   -   -

2               KONSTANTIN WALMSLEY, M.D.,

3          after having been duly sworn, was

4          examined and testified as follows:

5                    -   -   -

6               EXAMINATION

7                    -   -   -

8    BY MS. STUBBS:

9          Q.    Dr. Walmsley, we've met

10   before, but again, for the record, my

11   name is Ashley Stubbs and I'm here on

12   behalf of Ethicon and Johnson & Johnson.

13              Do you understand that we're

14   taking your deposition today in the

15   Joanne Phillips matter?

16         A.    I do.

17         Q.    And you've been retained by

18   the Motley Rice firm to render opinions

19   about the injuries Ms. Phillips is

20   claiming as a result of the TVT implant;

21   is that correct?

22         A.    That's correct.

23         Q.    I just want to make sure I

24   have an accurate list of the other cases

Konstantin Walmsley, M.D.

Page 7

1    that you've been deposed in that involve

2    Ethicon products.

3              A.    Certainly.

4              Q.    So I was going to run

5    through those, and tell me if I miss any.

6              A.    Okay.   Certainly.

7              Q.    I have that you were deposed

8    in June of 2016 in the Martin case?

9              A.    Yes, ma'am.

10             Q.    And then also that month in

11   the Bailey case.

12             A.    Yes, that's correct.

13             Q.    And then same, June 2016, in

14   the Manor case?

15             A.    Yes.

16             Q.    And then in the Pridmore

17   case?

18             A.    Yes.

19             Q.    Then in the Lindberg case?

20             A.    That's correct.

21             Q.    It was a general deposition,

22   I believe?

23             A.    Yeah, that's correct.

24             Q.    And then the Sherry Fox

Konstantin Walmsley, M.D.

Page 8

1    matter?

2              A.      Yes.

3              Q.      And then the Ridgley,

4    R-I-D-G-L-E-Y?

5              A.      The Ridgley matter, yes.

6              Q.      Ridgley.

7                      Barbee or Barbee, were you

8    deposed --

9              A.      Barbee, yes, that was just

10   recently, yes.

11             Q.      And then I deposed you in

12   the McIntyre case; is that correct?

13             A.      Yes, ma'am.

14             Q.      And then you were also

15   deposed in the Vanbuskirk case?

16             A.      Yes.

17             Q.      Javins?  Javins?

18             A.      Correct.

19             Q.      Barr?

20             A.      Correct.

21             Q.      Garcia?

22             A.      Yes.

23             Q.      And then were you deposed

24   last week in the Ward and Baker cases?

Konstantin Walmsley, M.D.

Page 9

1          A.    Yes.

2          Q.    And then we're here today on

3    Phillips and I believe you have another

4    deposition taken in the Birt case; is

5    that correct?

6          A.    B-I-R-T, yes.

7          Q.    Any other cases that you've

8    been deposed in involving Ethicon

9    devices?

10         A.    Yes.

11         Q.    Okay.  What are those names?

12         A.    This is a case from 2010,

13   Gonzalez verse Ethicon.  That relates to

14   a dysfunctional Ethicon stapler that

15   resulted in complications.

16         Q.    So that wasn't a mesh

17   device; is that correct?

18         A.    No, ma'am, no.

19         Q.    Any other Ethicon cases that

20   we haven't discussed?

21         A.    No.

22         Q.    And then you've also served

23   as an expert witness for the plaintiffs

24   in other mesh cases involving devices not

Konstantin Walmsley, M.D.

Page 10

1    manufactured by Ethicon; is that correct?

2            A.     Yes.

3            Q.     And do those -- who are

4    those manufacturers?

5            A.     Those manufacturers include

6    Bard, Boston Scientific, AMS.   I believe

7    that's it.

8            Q.     And in all of the cases

9    where you testified or been retained to

10   render opinions about a synthetic mesh

11   device, were those cases where you were

12   retained by the plaintiff?

13           A.     In the pelvic mesh-related

14   arena, yes.

15           Q.     And in all of those cases,

16   was it your opinion that the device

17   implanted in the plaintiff caused their

18   injuries?

19           A.     To some degree, yes.

20           Q.     And in those cases where you

21   served as an expert in synthetic mesh

22   device cases, did you also opine in all

23   of those cases that the warnings were

24   inadequate?

Konstantin Walmsley, M.D.

```
 1        A.    No.
 2        Q.    Has there ever been a case
 3  where you said the warnings were
 4  adequate?
 5        A.    No.
 6        Q.    Okay.
 7        A.    There are certain instances
 8  earlier on when I was retained in these
 9  matters that I didn't comment on the IFU.
10  To my knowledge, I don't recall
11  commenting on the IFU, for example, in
12  the Martinez case, which was Martinez
13  versus AMS in March of 2014.
14              But certainly over time,
15  that has become an opinion of mine.
16        Q.    When you were retained and
17  asked to render your opinion in any
18  synthetic mesh case about the IFU, was it
19  always your opinion that that IFU was
20  inadequate to warn the physician of the
21  risk claimed in the case?
22        A.    In many instances, yes.
23        Q.    Was there ever a case where
24  you didn't -- where you were asked to
```

Konstantin Walmsley, M.D.

Page 12

1    render an opinion as to the warnings and

2    didn't render that opinion?

3         A.    I mean, the only instance in

4    which that happened were in cases where I

5    vetted those cases and felt, on behalf of

6    the attorneys who asked me to review the

7    case, that there weren't any issues

8    related to the mesh product.

9         Q.    In all the cases where you

10   were deposed in, if in any of those cases

11   you were asked to render an opinion about

12   the IFU, just in the cases you were

13   deposed in, was it your opinion that the

14   IFU was inadequate?

15        A.    That would be correct.

16        Q.    What did you do to prepare

17   for your deposition today, Dr. Walmsley?

18        A.    I had a brief discussion

19   with counsel prior to coming in the room.

20   I refreshed my memory as it relates to my

21   report and the medical records.

22             I also additionally reviewed

23   deposition of Dr. Kim and also a report

24   by a Dr. Shoemaker.

Konstantin Walmsley, M.D.

Page 13

1          MS. SANTRA:  Off the record.

2                  -  -  -

3          (A discussion off the record

4     occurred.)

5                  -  -  -

6          MS. STUBBS:  Back on.

7     BY MS. STUBBS:

8          Q.    Doctor, we were discussing

9     what you did in preparation for your

10    deposition and off the record, Ms.

11    Stewart told me that she was going to

12    send me a link of the documents you

13    reviewed, so we won't mark that as an

14    exhibit, but we'll just note for the

15    record that that's being supplied by

16    counsel.

17          But if you could, tell me

18    the documents you reviewed in order to

19    prepare your report and opinions in this

20    case.

21          A.    Certainly.  So my report

22    came along with a reliance list, which

23    contains about two and a half pages of

24    reference articles.  There's also

Konstantin Walmsley, M.D.

Page 14

1    mentions made in the reliance list as to

2    my reviewing of the current IFU, patient

3    brochures, applicable depositions, the

4    list of complaints, if you will, and I

5    believe some other -- some other -- some

6    other documents as well.

7                    MS. STUBBS:  Okay.

8                    Let me just go ahead and

9              mark a few documents as exhibits

10             and then we'll be able to look at

11             your reliance list together.

12                    THE WITNESS:  Certainly.

13                    -  -  -

14             (Deposition Exhibit No.

15             Walmsley (Phillips)-1, Notice of

16             Deposition of Konstantin Walmsley,

17             M.D., was marked for

18             identification.)

19                    -  -  -

20   BY MS. STUBBS:

21             Q.    So, first, I'm going to hand

22   you just the deposition notice.

23             A.    Yes.

24             Q.    And are you familiar with

Konstantin Walmsley, M.D.

Page 15

1    this notice?

2              A.    I am.

3              Q.    And this is what requested

4    you to appear today in the Phillips case;

5    correct?

6              A.    Yes, ma'am.

7              Q.    And as part of that, we

8    asked you to bring certain documents with

9    you; is that correct?

10             A.    Uh-hum.

11             Q.    And off the record, counsel

12   provided me with the invoice for this

13   case, for your charges to date, and

14   there's some other documents we requested

15   and I'm going to walk through those.

16                  But first I want to ask you,

17   have you reviewed any Ethicon company

18   documents to date?

19                  MS. SANTRA:   Object to form.

20                  MS. STUBBS:   For the

21         Phillips matter.

22                  THE WITNESS:   I mean, with

23         the exception of the TVT IFU and

24         having seen a brochure, I've not.

Konstantin Walmsley, M.D.

Page 16

1    BY MS. STUBBS:

2           Q.    You haven't reviewed any

3    internal company e-mails in this matter;

4    is that correct?

5                 MS. SANTRA:  Object to form.

6                 THE WITNESS:  I have not.

7                      -  -  -

8                 (Deposition Exhibit No.

9           Walmsley (Phillips)-2, Rule 26

10          Expert Report of Konstantin

11          Walmsley, MD, was marked for

12          identification.)

13                     -  -  -

14   BY MS. STUBBS:

15          Q.    I'm going to hand you what I

16   marked as Exhibit 2 -- it's a copy of

17   your report -- and just ask you, is that

18   a correct copy of your report in the

19   Joanne Phillips matter?

20          A.    Yes, it is.

21          Q.    And does this report contain

22   all of your opinions in the Phillips

23   case?

24          A.    Yes, it does.

Konstantin Walmsley, M.D.

Page 17

```
 1                    -   -   -
 2               (Deposition Exhibit No.
 3          Walmsley (Phillips)-3, 11/20/15
 4          Curriculum Vitae of Konstantin
 5          Walmsley, was marked for
 6          identification.)
 7                    -   -   -
 8    BY MS. STUBBS:
 9          Q.    Then I'm going to hand you
10    what I marked as Exhibit 3 and just ask
11    you to verify that this is an updated
12    copy of your C.V.
13          A.    Yes.
14                    -   -   -
15               (Deposition Exhibit No.
16          Walmsley (Phillips)-4, Document
17          Entitled "Materials Reviewed", was
18          marked for identification.)
19                    -   -   -
20    BY MS. STUBBS:
21          Q.    And then as Exhibit 4, is
22    this the reliance list that you referred
23    to earlier as far as the materials
24    reviewed in formulating your opinions in
```

Konstantin Walmsley, M.D.

Page 18

1    the Phillips case?

2         A.    That's correct.

3         Q.    And so then let's look at

4    Exhibit 4, the materials reviewed.  It

5    states that you looked at depositions of

6    medical providers.  Is that the

7    deposition of Dr. Kim?

8         A.    Yes.

9         Q.    Did you review any other

10   depositions of any other treaters in this

11   case?

12        A.    I did not.

13        Q.    Did you also review the

14   deposition testimony of the plaintiff?

15        A.    I did.

16        Q.    And then medical and billing

17   records, did you review all medical

18   records provided to you by counsel in

19   this case?

20        A.    I did.

21        Q.    Have you reviewed any

22   additional records since drafting your

23   report?

24        A.    The only other additional

Konstantin Walmsley, M.D.

Page 19

1    record that I reviewed in her behalf was

2    a expert report by a Dr. Shoemaker.

3                     Hayleigh, did you send me

4    additional records on her?  I don't quite

5    recollect seeing them.  I just -- that's

6    why I'm checking.

7                     MS. STUBBS:  Oh, please.

8             Thank you.

9                     THE WITNESS:  Yeah, yeah.

10   BY MS. STUBBS:

11         Q.    And when you refer to Dr.

12   Shoemaker, that's the expert on behalf of

13   Ethicon; is that correct?

14         A.    That's correct.

15         Q.    And did his report in any

16   way change any of your opinions in your

17   report that was served?

18         A.    No, ma'am.

19                     MS. STUBBS:  Hayleigh, while

20            you look for that, I'm just going

21            to keep going.

22                     MS. SANTRA:  Sure.  That's

23            fine.

24   BY MS. STUBBS:

Konstantin Walmsley, M.D.

Page 20

1          Q.     Next, you list instructions

2     for use.  Did you review the TVT IFU that

3     was in place in January of 2005 when Ms.

4     Phillips had her implant?

5          A.     I did.

6          Q.     And did you review any other

7     TVT IFUs?

8          A.     Specific to this case, no,

9     but I have a whole dossier of IFUs.

10         Q.     But as far as your opinions

11    in this case regarding the warnings, do

12    they pertain solely to the IFU in place

13    at the time of Ms. Phillips' implant?

14         A.     Yes.

15         Q.     And then you also list the

16    patient brochure.  Is that the patient

17    brochure that was in use in January of

18    2005?

19         A.     Correct.

20         Q.     Do you have any opinions

21    about the adequacy of the patient

22    brochure in this matter?

23         A.     I don't.

24         Q.     Then you also reviewed the

Konstantin Walmsley, M.D.

Page 21

1    plaintiff fact sheet; is that correct?

2         A.    Yes, I did.

3         Q.    And then you list numerous

4    articles that you reviewed.  Anything

5    else that's not contained in this

6    reliance list that you reviewed in this

7    matter?

8         A.    No.

9                    -  -  -

10                   (Deposition Exhibit No.

11              Walmsley (Phillips)-5, 6/17/16

12              Encounter Summary for Joanne

13              Phillips, was marked for

14              identification.)

15                   -  -  -

16   BY MS. STUBBS:

17        Q.    I'm going to show you next

18   what I've marked as Exhibit 5.  This is

19   what we have as your IME record for Ms.

20   Phillips.

21                   Did you take any notes

22   during the IME or is everything reflected

23   in this document that pertains to Ms.

24   Phillips' IME?

Konstantin Walmsley, M.D.

```
 1          A.    I did not take any notes.

 2    Really everything that I documented and

 3    recorded during my IME is present in the

 4    report.

 5          Q.    When you say report, are you

 6    referring to the IME or the expert

 7    report?

 8          A.    The IME.

 9          Q.    And we'll walk through that

10    in further detail later, but it is your

11    testimony today that any information

12    taken down by you would be contained --

13    during the IME would be contained in that

14    document; is that correct?

15          A.    Yes.

16                    -   -   -

17                (Deposition Exhibit No.

18          Walmsley (Phillips)-6, Invoice for

19          Phillips Case Review, was marked

20          for identification.)

21                    -   -   -

22    BY MS. STUBBS:

23          Q.    And then I'm going to show

24    you what I've marked as Exhibit 6.  This
```

Konstantin Walmsley, M.D.

Page 23

1    is the invoice that counsel provided us

2    with before the deposition began for your

3    fees in the Phillips case.

4                    Can you tell me for the

5    record how much you've been paid in this

6    case?

7            A.    $5,575.

8            Q.    And what do those charges

9    include?

10           A.    They include the review of

11   the medical records and depositions, as

12   well as the preparation of the report.

13           Q.    Do you recall when you were

14   first retained in this case?

15           A.    It would have been in the

16   latter part of May to early June.

17           Q.    Of this year?

18           A.    2016, yes.

19           Q.    And how long did it take you

20   to formulate your opinions in this case?

21           A.    Roughly eight to nine hours.

22           Q.    And your opinions were based

23   on the review of the documents we've

24   discussed?

Konstantin Walmsley, M.D.

Page 24

1          A.     In part, yes.

2          Q.     And then also of your

3     physical exam of the plaintiff?

4          A.     And my IME, yes.

5          Q.     Have you spoken with any of

6     Ms. Phillips' treating physicians?

7          A.     No.

8          Q.     And on how many occasions

9     have you met Ms. Phillips?

10          A.     Only once.

11          Q.     And was that during the IME?

12          A.     Yes.

13          Q.     What is your hourly rate?

14          A.     $500 an hour.

15          Q.     And does that include -- is

16     that a flat rate for any of your work or

17     is there a different rate for testimony,

18     for example?

19          A.     It's more or less the same.

20     For out-of-town court appearances where a

21     full day is taken, it's a

22     five-thousand-dollar rate unless the time

23     spent exceeds eight hours.

24          Q.     Did you personally draft

Konstantin Walmsley, M.D.

1    your report in this matter?

2           A.    I did.

3           Q.    Doctor, I believe that

4    defense expert Dr. Shoemaker at the time

5    of issuing the report hadn't conducted an

6    IME yet, but I know that that is in the

7    works -- Hayleigh, I'm not sure when

8    that's scheduled -- but is that something

9    that you would want to review and

10   consider whether or not you need to

11   supplement your opinions based on that if

12   an IME is done?

13          A.    Certainly, yes.

14          Q.    Before we get into your

15   opinions in this case and the IME, I'd

16   like to talk to you a little bit about

17   the condition that Ms. Phillips had with

18   regard to incontinence.

19                In your practice, what

20   percentage of your practice is dedicated

21   to treating women with incontinence?

22          A.    Probably 20 percent.  It's a

23   guess.

24          Q.    And would that include women

Konstantin Walmsley, M.D.

Page 26

1    with stress urinary incontinence as well

2    as urge incontinence?

3         A.    Yes.

4         Q.    And would you agree that the

5    device TVT is indicated to treat stress,

6    not urge, incontinence?

7         A.    That's correct.

8         Q.    And would you agree that Ms.

9    Phillips had mixed incontinence, meaning

10   a stress component and an urge component?

11        A.    You're talking about at the

12   time of her initial implant?

13        Q.    At the time of her implant,

14   yes.

15        A.    She had mixed urinary

16   incontinence.

17        Q.    Would you agree that stress

18   and urge incontinence greatly affect a

19   woman's quality of life?

20        A.    Yes.

21        Q.    And would you agree that a

22   surgery using a mesh device to treat SUI

23   is an elective procedure?

24        A.    Yes.

Konstantin Walmsley, M.D.

1        Q.     It's not a life-threatening
2    condition.
3        A.     Only quality of
4    life-threatening, as I often talk to
5    patients about.
6        Q.     How do you see in your
7    practice incontinence affect your
8    patients' lives?
9        A.     Well, it's well-known that
10   incontinence is a quality-of-life
11   condition and there have been numerous
12   studies looking at quality of life in
13   women with incontinence.
14              And there's no question that
15   it affects quality of life in multiple
16   ways, not only because of the condition
17   itself and the fact that having
18   incontinence can increase risk of skin
19   breakdown, urinary tract infections, but
20   it also has social and psychological
21   impacts, for example, maybe not being
22   involved or active in the same things you
23   might have been before, whether it be
24   exercise or certain social situations,

Konstantin Walmsley, M.D.

Page 28

1    wearing black, for example, to kind of

2    hide incontinence.

3              There have been studies that

4    have correlated depression with urinary

5    incontinence, so it's certainly impactful

6    on multiple levels.

7         Q.    Would you agree that it's

8    important to have both surgical and

9    nonsurgical treatment options available

10   to women for the treatment of

11   incontinence?

12        A.    Yes.

13        Q.    And would you agree that

14   there are risks associated with any

15   surgical treatment of stress urinary

16   incontinence, whether that is with or

17   without mesh?

18        A.    Yes.

19        Q.    Would you agree that the

20   risk of scar formation -- scar tissue

21   formation -- is a risk associated with

22   any surgery to treat SUI whether that's

23   with or without mesh?

24        A.    Not completely, but in part,

Konstantin Walmsley, M.D.

Page 29

 1   yes.

 2          Q.    What part do you disagree

 3   with?

 4          A.    Any surgery can create

 5   scarring; however, surgery involving the

 6   use of pelvic mesh creates a greater

 7   degree of scarring.

 8          Q.    I know one of your opinions

 9   -- and we'll get into it in further

10   detail -- is regarding alternative

11   treatment options as opposed to using a

12   mid-urethral sling like TVT; is that

13   correct?

14          A.    Correct.

15          Q.    And you propose using a

16   fascial sling; is that correct?

17          A.    An autologous fascial sling,

18   yes.

19          Q.    And that's where actual

20   human tissue is used to repair or to

21   treat stress urinary incontinence; is

22   that correct?

23          A.    That's an instance where

24   instead of creating the support to the

Konstantin Walmsley, M.D.

Page 30

1    urethra with a synthetic piece of

2    polypropylene mesh, one actually uses

3    what's called fascia, which is a

4    connective tissue layer that can mimic or

5    provide a similar support.

6          Q.    And would you agree that

7    that alternative procedure does not

8    involve the use of a medical device?

9              MS. SANTRA:   Object to form.

10             THE WITNESS:   Correct.

11         Other than suture material to

12         suture the sling in place, that

13         would be correct.

14   BY MS. STUBBS:

15         Q.    And that's because you're

16   using the actual tissue to provide

17   support; correct?

18         A.    Yes.

19         Q.    And would you agree that

20   there are risks associated with that

21   procedure?

22         A.    I would.

23         Q.    And would you agree that

24   that is a longer operating time?

Konstantin Walmsley, M.D.

Page 31

```
 1          A.     This is true.
 2          Q.     And does that risk -- does
 3   that surgery, using human tissue as
 4   opposed to a polypropylene-based mesh,
 5   does that surgery present the risk of
 6   scar formation?
 7          A.     Yeah.
 8          Q.     Can that surgery result in
 9   dyspareunia?
10                 MS. SANTRA:  Object to form.
11                 THE WITNESS:  To some
12          degree, yes.
13   BY MS. STUBBS:
14          Q.     Can that surgery result in
15   pelvic pain?
16          A.     Once again, to some degree,
17   yes.
18          Q.     Currently, you said 20
19   percent of your practice is dedicated to
20   treating women with incontinence; is that
21   correct?
22          A.     That's correct.
23          Q.     Of those patients that you
24   treat, how many of them would you say,
```

Konstantin Walmsley, M.D.

1    percentage-wise, do you ultimately

2    perform surgery on?

3          A.      Probably about 20 to 30

4    percent.

5          Q.     And when you don't perform a

6    procedure to treat the incontinence, are

7    you using medication?

8          A.      Typically, medications or

9    lifestyle/behavioral modifications, in

10   addition to physical therapy.

11         Q.      And in this particular case,

12   Ms. Phillips, before having the TVT

13   implant, she tried alternative forms of

14   therapy including Detrol LA; is that

15   correct?

16         A.      She did try medications for

17   her condition, yes.

18         Q.      And based on the records I

19   reviewed, it looked like the Detrol was

20   actually helping; is that correct?

21         A.      It was helping with her

22   urgency and urgency urinary incontinence,

23   yes.

24         Q.      But not the stress; is that

Konstantin Walmsley, M.D.

1    correct?

2          A.     That's correct.

3          Q.     And, ultimately, she elected

4    to go forward with the TVT procedure to

5    treat her stress incontinence; correct?

6          A.     Yes.

7          Q.     And the Detrol to your --

8    strike that.

9                 Based on your review of the

10   records, did the Detrol have any impact

11   on her stress incontinence?

12         A.     Not that I could conclude

13   from my evaluation of the records, no.

14         Q.     Do you disagree with Dr.

15   Kim's decision in any way to implant TVT

16   in Ms. Phillips in 2005?

17         A.     I do not.

18         Q.     Do you agree that she was an

19   appropriate candidate for that device

20   based on her presentation of symptoms in

21   January 2005?

22         A.     I do.

23         Q.     Going back to your opinion

24   regarding alternative forms of treatment

Konstantin Walmsley, M.D.

Page 34

1    and, instead of using a sling or a

2    polypropylene-based sling, using human

3    tissue to repair it, would you agree that

4    that surgery using human tissue also

5    presents the risk of recurrence of

6    urinary problems?

7            A.    Yes.

8            Q.    Does it present the risk of

9    infection?

10           A.    Yes.

11           Q.    Do you agree that

12   mid-urethral slings are a -- within the

13   standard of care currently for the

14   treatment of stress urinary incontinence?

15           A.    Yes.

16           Q.    Do you currently implant any

17   mid-urethral slings as a treatment option

18   for your patients suffering from stress

19   urinary incontinence?

20           A.    I do.

21           Q.    And is that -- what device

22   is that that you use?

23           A.    I'm using the Coloplast ARIS

24   device.

Konstantin Walmsley, M.D.

1          Q.     And is that a

2     polypropylene-based sling?

3          A.     It is.

4          Q.     And you would agree that TVT

5     is a polypropylene-based sling; correct?

6          A.     Yes.

7          Q.     Why do you choose to use the

8     sling you use as opposed to TVT?

9          A.     A lot of times when we

10    examine devices and kits, obviously

11    besides an analysis of related

12    literature, discussions with key opinion

13    leaders, to a large degree, the -- you

14    can get a lot of information from

15    palpating and examining mesh.

16              One of the issues that I

17    find appealing about the Coloplast sling

18    is, it tends to have less elasticity, so

19    as a result, the rate of contraction is

20    less, which essentially means when I

21    place the sling, I don't have to

22    necessarily be concerned as much about

23    the way that sling will change over time

24    as it relates to contraction.

Konstantin Walmsley, M.D.

Page 36

1          Q.     Okay.

2          A.     So I'm still placing the

3     sling in a tension-free fashion, but I'm

4     less concerned about how the contraction

5     of the sling will affect patients'

6     voiding function long term.

7          Q.     Did you see any evidence of

8     contraction of Ms. Phillips' sling when

9     you examined her?

10         A.     I did not.

11              MS. STUBBS:   Doctor, I know

12              we've walked through this position

13              statement in other cases, so I'm

14              not going to go through it in any

15              great detail, but I want to show

16              you what I've marked as Exhibit 7,

17              the AUGS and SUFU position

18              statement that was updated in

19              2016.

20                   -   -   -

21              (Deposition Exhibit No.

22              Walmsley (Phillips)-7, 6/16 AUGS

23              and SUFU Position Statement, was

24              marked for identification.)

Konstantin Walmsley, M.D.

1                    -   -   -

2   BY MS. STUBBS:

3          Q.    Are you familiar with this

4   position statement?

5          A.    I am.

6          Q.    Are you a member of AUGS or

7   SUFU?

8          A.    I'm not.

9          Q.    Would you agree that those

10  are reputable medical organizations?

11         A.    I'm not very in tune with

12  the specific nature of these

13  organizations.  That being said, I have

14  colleagues who are good doctors who are

15  members of the organizations, so I would

16  have to conjecture that they would be

17  reputable organizations.

18         Q.    And are you not a member of

19  these organizations because you're not a

20  urogynecologist?

21         A.    No.

22         Q.    Okay.

23         A.    The AUGS society is geared

24  towards urogynecologists, but the SUFU

Konstantin Walmsley, M.D.

Page 38

1    society is open to urogynecologists as

2    well as physicians such as myself who

3    have received fellowship training in

4    female urology.

5         Q.    And why are you not a member

6    of that organization?

7         A.    You know, I'm so busy

8    clinically that joining the organization

9    has never been something that has been

10   compelling or meaningful to me, not to

11   say that I wouldn't appreciate the

12   opportunity to be a member, but it's just

13   never, you know, appealed to me just

14   because I'm so busy clinically as it is.

15        Q.    If you would look with me,

16   this position statement that I've marked

17   as Exhibit 7 discusses the use of

18   mid-urethral slings for stress urinary

19   incontinence; correct?

20        A.    Yes.

21        Q.    Would you turn with me to

22   the second page and the point number 3?

23   In bold, it states:  "Polypropylene mesh

24   mid-urethral slings are a standard of

Konstantin Walmsley, M.D.

Page 39

1    care for the surgical treatment of SUI

2    and represent a great advance in the

3    treatment of this condition for our

4    patients."

5              Did I read that correctly?

6         A.    You did.

7         Q.    Do you disagree with that

8    statement?

9              MS. SANTRA:  Object to form.

10             THE WITNESS:  The only, you

11        know, adjective I would disagree

12        with is "great."  I think it's

13        obviously an advance in the

14        treatment of this condition.  It

15        has advantages, but it also has

16        disadvantages.

17             And, I mean, I think to be

18        fair, if we try to identify

19        reasons for this statement being

20        put forth, you know, in part, the

21        position statement has been put

22        forth because the use of slings,

23        there has been some controversy

24        created obviously with the current

Konstantin Walmsley, M.D.

Page 40

1         environment that we're in

2         regarding slings.

3              So inasmuch as I think it's

4         an advance, I would argue the

5         point that it's a great advance

6         simply because I think there are

7         pros and cons to using slings.

8              Certainly if you compare the

9         use of polypropylene slings for

10        stress urinary incontinence, it's

11        still used, perhaps not as

12        commonly as it was three or four

13        years ago, for example, but it's

14        still used, which I think is

15        reflective of the fact that

16        there's an advance.

17   BY MS. STUBBS:

18        Q.   Would you agree that in the

19   past three or four years, the litigation

20   environment surrounding the pelvic mesh

21   products, in particular the mid-urethral

22   slings, has had an effect on doctors

23   using those devices?

24              MS. SANTRA:  Object to form.

Konstantin Walmsley, M.D.

Page 41

```
 1                THE WITNESS:  Well, I would
 2           expand the answer pool to say it's
 3           both affected doctors and
 4           patients, but yes.
 5   BY MS. STUBBS:
 6           Q.    Do you agree that -- you
 7   said there are advantages and
 8   disadvantages to using a mid-urethral
 9   sling; correct?
10           A.    Yes.
11           Q.    Would you agree that there
12   are disadvantages as well as advantages
13   to using -- to any surgical treatment to
14   treat SUI?
15           A.    I think that's fair, yes.
16           Q.    In that same section,
17   section 3, if you go down a few lines,
18   the sentence starting "MUS is associated"
19   --
20           A.    Uh-hum.
21           Q.    -- it says, "MUS is
22   associated with less pain, shorter
23   hospitalization, faster return to usual
24   activities, and reduced costs as compared
```

Konstantin Walmsley, M.D.

Page 42

1    to historic options that have been used

2    to treat SUI over the past century."

3              Did I read that correctly?

4        A.    You did.

5        Q.    Do you disagree or agree

6    with that statement?

7        A.    I would agree with every

8    single comment made there, but I'm not as

9    privy to the reduced costs analysis.  And

10   the reason I'm not is because the slings

11   and the devices carry costs.  The fact

12   that patients are not in the hospital as

13   long would diminish costs.  Complication

14   rates probably would create costs.

15              So I'm not privy to the

16   analysis that points out reduced costs.

17       Q.    But other than that

18   statement -- that portion of the

19   statement, you agree with the statement

20   that I just read?

21       A.    This is true.

22       Q.    I'd like to go to your

23   report and let's discuss opinion number

24   1.  And this opinion is regarding the IFU

Konstantin Walmsley, M.D.

Page 43

1  in place at the time of Ms. Phillips'

2  implant; correct?

3      A.    Yes.

4      Q.    And it is your opinion that

5  the IFU in place in January of 2005 was

6  not sufficient to enable informed consent

7  of Ms. Phillips; is that correct?

8      A.    Yes.

9      Q.    What do you contend should

10  have been in the IFU that wasn't?

11      A.    Well, firstly --

12          MS. SANTRA:  Object to the

13      form.

14          THE WITNESS:  -- there's

15      terminology in the IFU that would

16      indicate a clinician to believe

17      that the response to pelvic mesh

18      is a temporary response.

19          And I quote from one of the

20      adverse reaction statements from

21      the IFU in 2005, quote:

22      Transitory local irritation at the

23      wound site and a transitory

24      foreign body response may occur.

Konstantin Walmsley, M.D.

Page 44

```
 1        This response could result in

 2        extrusion, erosion, fistula

 3        formation and inflammation,

 4        unquote.

 5             Quite frankly, I think

 6        that's a misleading statement

 7        because those words imply

 8        temporary and we know that the

 9        reaction to mesh, the foreign body

10        reaction, the inflammatory

11        response, is a chronic one.

12             And in addition, there are

13        additional adverse reactions

14        and/or risks within the use of

15        suburethral slings that aren't

16        mentioned in the IFU, for example,

17        pelvic pain and dyspareunia.

18             And what's important to know

19        is that inasmuch as

20        antiincontinence procedures for

21        SUI can create these potential

22        complications, the nature of them

23        is different.  For example,

24        dyspareunia can be much more
```

Konstantin Walmsley, M.D.

Page 45

1          difficult to manage in the

2          mesh-based mid-urethral sling

3          setting than, for example, in an

4          autologous fascial sling.

5               So besides, for example,

6          pelvic pain and dyspareunia, it's

7          not only the provision of those

8          potential adverse events; it's the

9          fact that there's no language or

10         context to those potential adverse

11         events that speaks to the

12         difficulty unique to those adverse

13         events in the mesh arena.

14    BY MS. STUBBS:

15         Q.    Let's start with your first

16    opinion regarding the transitory response

17    language.

18         A.    Okay.

19         Q.    Did you see any evidence

20    when you examined Ms. Phillips of a

21    chronic inflammatory response or foreign

22    body response?

23              MS. SANTRA:  Object to form.

24              THE WITNESS:  Well, I think

Konstantin Walmsley, M.D.

Page 46

1          that's a difficult question to

2          answer because, to be fair, those

3          specific descriptive terms that

4          we've just been using are really

5          histopathological types of terms.

6                 What you can appreciate and

7          what I did appreciate on Ms.

8          Phillips' exam is the presence of

9          a scar plate and tenderness

10          related to my exam.  Those are

11          reflective of an inflammatory

12          process.

13                 But to be fair, those

14          terminologies are probably more

15          aptly used in a histopathological

16          type of context.

17   BY MS. STUBBS:

18          Q.    Would you agree that in

19   order to render an opinion to a

20   reasonable degree of medical certainty

21   that Ms. Phillips had a chronic

22   inflammatory response, you would need

23   pathology?

24                 MS. SANTRA:  Object to form.

Konstantin Walmsley, M.D.

Page 47

```
 1              THE WITNESS:  Not
 2          necessarily, because certainly on
 3          clinical exam, if one appreciates
 4          indurated and/or scarred tissue,
 5          for example, around a mesh sling,
 6          especially in the presence of
 7          tenderness, in most often -- in
 8          most instances, within a
 9          reasonable degree of medical
10          certainty, that defines or
11          supports the presence of an
12          inflammatory response.
13  BY MS. STUBBS:
14          Q.    Would you agree that an
15  inflammatory response is a known risk of
16  implanting any device in the pelvic
17  space?
18              MS. SANTRA:  Object to form.
19              THE WITNESS:  Well,
20          certainly, for a synthetic mesh
21          product, that inflammatory
22          response will be a chronic one;
23          whereas, with nonsynthetic-based
24          or biological graft material, for
```

Page 48

1          example, the response is a

2          self-limited one.  There is an

3          inflammatory response.  There

4          obviously is some degree of

5          scarring, as there is with any

6          surgery, but the extent of that

7          response is significantly

8          different and short term.

9     BY MS. STUBBS:

10         Q.    You also mentioned pelvic

11    pain and dyspareunia being risks that

12    were not contained in the IFU at the time

13    of Ms. Phillips' implant; correct?

14         A.    Yes.

15         Q.    Ms. Phillips had her implant

16    in 2005; correct?

17         A.    Yes.

18         Q.    And based on your review of

19    the records, are you aware that she

20    didn't go back to her implanting

21    physician for nearly eight years after

22    having that implant?

23         A.    That's correct.

24         Q.    And she hasn't had a pelvic

Konstantin Walmsley, M.D.

Page 49

1    exam since 2005 other than your exam; is

2    that correct?

3            A.    Yes.

4            Q.    In fact, her doctor, Dr.

5    Kim, suggested that she have a pelvic

6    exam and she refused; is that correct?

7            A.    Yes.

8            Q.    And so to date, you're the

9    only doctor that has performed a pelvic

10   exam on Ms. Phillips since she had the

11   implant; correct?

12           A.    Yes.

13           Q.    And when I deposed Ms.

14   Phillips, she represented to me that she

15   had dyspareunia post-implant on one

16   occasion.  Did you see that in the

17   deposition?

18           A.    I did.

19           Q.    Have you seen anywhere in

20   the medical records where she complained

21   of dyspareunia post-implant on numerous

22   occasions?

23                 MS. SANTRA:  Object to form.

24                 THE WITNESS:  I did not see

Konstantin Walmsley, M.D.

Page 50

```
 1          much reference to dyspareunia at
 2          all, so I would have to answer
 3          that question no.
 4   BY MS. STUBBS:
 5          Q.    Did you see anywhere in the
 6   medical records post-implant where Ms.
 7   Phillips complained of pelvic pain?
 8               MS. SANTRA:  Object to form.
 9               THE WITNESS:  To some
10          degree, yes.
11   BY MS. STUBBS:
12          Q.    Is that when she went to her
13   primary care doctor?
14          A.    Well, I'm thinking about her
15   visit to Dr. Kim in 2012.  I mean,
16   obviously, she came to see him requesting
17   the TVT device be removed.  Although the
18   subject of pain wasn't answered or
19   explored, per se, she explained this
20   condition where she would be getting red
21   bumps, which to my mind is a presentation
22   of pain.  I concluded that when she was
23   saying that, she was speaking about
24   pelvic pain.  Now, I may not be correct
```

Konstantin Walmsley, M.D.

Page 51

1    in that, but that was my conclusion.

2         Q.    Were the words "pelvic pain"

3    referenced in that visit at all?

4         A.    Not to my recollection, no.

5         Q.    And you familiarized

6    yourself with Dr. Kim's testimony in this

7    case; correct?

8         A.    Yes.

9         Q.    And are you aware that Dr.

10   Kim testified that if the words "pelvic

11   pain" or "dyspareunia" had been added to

12   the IFU in 2005, it wouldn't have changed

13   his decision to recommend TVT to this

14   plaintiff?

15              MS. SANTRA:  Object to form.

16              THE WITNESS:  I recall that.

17   BY MS. STUBBS:

18        Q.    Would you agree that the

19   instructions for use or the IFU for a

20   product is only one source of risk

21   information available to a doctor?

22        A.    I think it can be one of

23   several sources, yes.

24        Q.    Would you agree that doctors

Konstantin Walmsley, M.D.

Page 52

1    rely on other sources of information when

2    gathering information about a product and

3    whether or not to use that product?

4          A.    Yes.

5          Q.    Do you personally, prior to

6    using a product, only rely on the IFU to

7    gain your risk information?

8          A.    I rely heavily on the IFU.

9          Q.    Do you rely on medical

10   literature?

11         A.    I do.

12         Q.    Do you rely on information

13   gathered through continuing medical

14   education seminars?

15         A.    I do.

16         Q.    Do you rely on information

17   discussed by your colleagues that use the

18   device?

19         A.    Depending upon the

20   colleague, yes.

21         Q.    Your second opinion, we've

22   talked briefly about, but that is the

23   alternative treatment that you are

24   proposing to Ms. Phillips.  As opposed to

Konstantin Walmsley, M.D.

Page 53

1    having a TVT, you propose a fascial

2    sling; is that correct?

3         A.    Yes.

4         Q.    And you agreed earlier that

5    that is not an alternative device;

6    correct?  That's using human tissue?

7              MS. SANTRA:  Object to form.

8              THE WITNESS:  Could you

9         repeat the question?  I'm sorry.

10             MS. STUBBS:  Sure.

11   BY MS. STUBBS:

12        Q.    You would agree that that

13   alternative that you proposed does not

14   involve an alternative medical device.

15        A.    No, it doesn't.

16        Q.    It's a procedure; is that

17   correct?

18        A.    Correct, yeah.

19        Q.    Have you seen anywhere in

20   Ms. Phillips' records where any treating

21   physician has recommended that she have

22   her TVT taken out?

23        A.    No.

24        Q.    And based on her deposition,

Konstantin Walmsley, M.D.

Page 54

1    are you aware that she does not currently

2    have any treating physicians for her GYN

3    symptoms that she's complaining of?

4            A.    Correct.

5            Q.    And would you agree that no

6    doctor, in the medical records or Dr. Kim

7    in his deposition testimony, has opined

8    that the TVT device is in fact causing

9    the symptoms she's complaining of in this

10   lawsuit?

11           A.    Correct.

12           Q.    So one of your opinions, I

13   believe it's your last opinion, is that

14   she has a guarded prognosis; is that

15   correct?

16           A.    Correct.

17           Q.    What is your basis for that

18   opinion?

19           A.    My basis for that opinion

20   stands on not only my review of the

21   medical records, depositions, but also on

22   my independent medical exam.

23           Q.    Is it your recommendation

24   that Ms. Phillips have the TVT explanted?

Konstantin Walmsley, M.D.

Page 55

1          A.     Possibly, yes.

2          Q.     And what is your basis for

3    that?

4          A.     Well, she currently has

5    pelvic pain.  She currently has

6    dyspareunia, although she's only

7    attempted intimacy once since her sling

8    was placed.

9                 There are other factors that

10   are contributing to her pelvic pain that

11   likely should be treated first in my

12   opinion --

13         Q.     What are those factors?

14         A.     Well, she has what I believe

15   is lichen sclerosus on the basis of some

16   inflammation on the posterior wall of her

17   vaginal space.  In addition, she does

18   have some mild vulvovaginal atrophy.  I

19   would recommend treating those

20   conditions, you know, in addition to

21   considering sling removal.

22                But if I can choose between

23   performing a procedure or trying

24   something medical or conservative, I'd

Konstantin Walmsley, M.D.

Page 56

1    probably opt on the medical/conservative

2    treatments first.

3         Q.    And the lichen sclerosus and

4    the vaginal atrophy, are you contending

5    that those were caused by the mesh at

6    all?

7         A.    I'm not.

8         Q.    You also have the opinion

9    that Ms. Phillips has scar plate

10   formation as a result of the TVT; is that

11   correct?

12        A.    Yes.

13        Q.    When you examined Ms.

14   Phillips, did you see any evidence of any

15   erosion or extrusion of the mesh?

16        A.    I did not.

17        Q.    Have you seen anywhere in

18   the medical records where any doctor has

19   seen any erosion or extrusion of the

20   mesh?

21        A.    No.

22        Q.    When you state that there

23   was scar plate formation, describe for me

24   what you were able to palpate or see.

Konstantin Walmsley, M.D.

Page 57

1          A.     So, visually, the tissue

2     around the sling appeared to be somewhat

3     thicker.  On palpation, I could palpate

4     the ridge of scar tissue around the

5     sling.  There was tenderness in the area

6     of the sling as I was examining this scar

7     tissue.  There was no specific areas of

8     point tenderness.

9               Sometimes, in prior

10    examinations or with prior patients, they

11    might have areas that are more tender,

12    for example, up at the vaginal sulci

13    which are the upper corners of the

14    vaginal space.  Ms. Phillips did not have

15    those findings.

16         Q.     Ms. Phillips had had a

17    hysterectomy prior to having the TVT; is

18    that correct?

19         A.     Yes.

20         Q.     Would you agree that having

21    that type of surgery can also result in

22    scar formation?

23               MS. SANTRA:  Object to form.

24               THE WITNESS:  Possibly, yes.

Konstantin Walmsley, M.D.

Page 58

1    BY MS. STUBBS:

2         Q.    Can it result in pelvic

3    pain?

4         A.    Sometimes it can, yes.

5         Q.    Can it result in

6    dyspareunia?

7         A.    Yes.

8         Q.    Ms. Phillips' TVT hasn't

9    been taken out in -- any portion of it;

10   correct?  It's still intact in her body;

11   correct?

12        A.    Yes.

13        Q.    And so there's no pathology

14   in this case; is that correct?

15        A.    There's not.

16        Q.    And would you agree that

17   pathology would be necessary in order to

18   render an opinion to a reasonable degree

19   of medical certainty that the mesh in her

20   body had degraded?

21        A.    For that particular finding,

22   yes.

23        Q.    So did you see any evidence

24   of degradation?

Konstantin Walmsley, M.D.

Page 59

1          A.    I did not.

2          Q.    Did you see any evidence of

3    roping, curling, or fraying of the mesh

4    in Ms. Phillips?

5          A.    I did not.

6          Q.    Did you see any evidence of

7    shrinkage or contracture?

8               MS. SANTRA:  Object to form.

9               THE WITNESS:  Of the mesh,

10          you mean.

11              MS. STUBBS:  Yes.  I'm

12          sorry.

13              THE WITNESS:  I did not.

14   BY MS. STUBBS:

15         Q.    Did you see any evidence of

16   particle loss of the mesh in her body?

17         A.    I did not.

18         Q.    Did you see any evidence of

19   inadequate tissue ingrowth?

20         A.    I did not.

21         Q.    Did you see any evidence of

22   nerve entrapment?

23              MS. SANTRA:  Object to form.

24              THE WITNESS:  I did not.

Konstantin Walmsley, M.D.

Page 60

1    BY MS. STUBBS:

2          Q.    I'd like to talk with you

3    now about Ms. Phillips' prior medical

4    history before having the TVT implanted

5    and then we'll talk about the actual

6    implant itself.

7                Would you agree that Ms.

8    Phillips suffered from back and hip pain

9    as a result of a motor vehicle accident

10   she had in the '90s and that pain

11   continued into the 2000's?

12         A.    Yes.

13         Q.    And after she had the

14   implant, she continued to see her primary

15   care doctor for pain related -- relating

16   back to that accident.

17         A.    That's correct.

18         Q.    Would you agree that she had

19   poorly controlled diabetes prior to

20   having the TVT implanted?

21         A.    I mean, to some degree.

22         Q.    And that worsened over time?

23         A.    I think it's hard to really

24   track whether her diabetes was well

Konstantin Walmsley, M.D.

Page 61

1    controlled or poorly controlled because I

2    don't -- didn't recall seeing in her

3    medical records blood tests such as

4    hemoglobin A1Cs that would otherwise

5    point towards poorly controlled diabetes,

6    although there was mention made of poor

7    diabetic control by her primary care

8    doctor, Dr. Narula.

9            Q.    Would you agree that Dr.

10   Narula's records reflect that Ms.

11   Phillips failed to comply on numerous

12   occasions with doctors' recommendations

13   regarding her care and treatment of her

14   diabetes?

15                MS. SANTRA:  Object to form.

16                THE WITNESS:  Comments to

17        that effect were made, yes.

18   BY MS. STUBBS:

19           Q.    Ms. Phillips was also a

20   smoker; is that correct?

21           A.    Yes.

22           Q.    Would you agree that smoking

23   can impact wound healing following

24   surgery?

Konstantin Walmsley, M.D.

Page 62

1        A.      Yes.

2        Q.      Would you agree that smoking

3   has an impact on stress urinary

4   incontinence as a result of the constant

5   coughing, for example?

6        A.      If one does have a constant

7   cough, that can certainly be a

8   predisposing factor for prolapse.

9   Whether or not it affects the surgical

10  management of stress urinary incontinence

11  is hard for me to opine on.

12              I mean, certainly after we

13  perform slings, we want patients to avoid

14  heavy lifting for a period of time, so if

15  you're heavily coughing during that

16  four-week interval, theoretically it

17  could create an opportunity for the sling

18  to move or the repair to be imperfect.

19              But usually after four

20  weeks, once a mesh sling is in place, it

21  doesn't really get affected by coughing,

22  sneezing, excess pressure, because it's

23  holding everything in place.

24       Q.      Would you agree that Ms.

Konstantin Walmsley, M.D.

Page 63

1    Phillips' smoking history continued to

2    cause her health issues pre and

3    post-implant?

4            A.    I mean, I certainly think

5    it's not a -- healthy to smoke, but it's

6    hard to quantify or for that matter

7    directly correlate her smoking with her

8    health between 2005 and 2016, for

9    example.

10           Q.    Was she diagnosed with COPD?

11           A.    I think she was.

12           Q.    And I believe she saw her

13   primary care doctor on numerous occasions

14   for bronchitis and other upper

15   respiratory issues; correct?

16           A.    Yes.

17           Q.    And would you agree that

18   smoking can contribute to those types of

19   health issues?

20           A.    Yes.

21           Q.    Did you see in the records

22   where her doctor, Dr. Narula, repeatedly

23   cautioned her to quit smoking?

24           A.    Yes.

Konstantin Walmsley, M.D.

Page 64

1          Q.    And she refused that advice;
2    is that correct?
3               MS. SANTRA:  Object to form.
4               THE WITNESS:  I'm not sure
5          if she refused the advice, but she
6          certainly didn't abide by it.
7               MS. STUBBS:  Okay.  That's
8          fair.
9               THE WITNESS:  Yeah.
10   BY MS. STUBBS:
11         Q.    It looks like Ms. Phillips
12   first presented to Dr. Kim in October of
13   2004; is that correct?
14         A.    Yes.
15         Q.    And when she presented, she
16   had mixed incontinence; correct?
17         A.    Primarily stress, but with
18   some urge incontinence, yes.
19         Q.    And that's when he
20   prescribed the Detrol; correct?
21         A.    Yes.
22         Q.    And we talked about earlier
23   how she improved for a period of time,
24   but then decided to go forward with the

Konstantin Walmsley, M.D.

1    implant for her stress incontinence;

2    correct?

3          A.    Yes.

4          Q.    Did you see in the records

5    where apparently there was a surgery

6    scheduled to do the TVT and then the

7    plaintiff wanted to move it up to January

8    as opposed to March?

9          A.    I do recall seeing that,

10   yes.

11         Q.    And, ultimately, that

12   surgery was performed on January 10th,

13   2005; correct?

14         A.    Yes.

15         Q.    Did you see any evidence of

16   any complications as a result of that

17   surgery?

18         A.    No, I did not.

19         Q.    And a cystoscopy was

20   performed at the time of the implant;

21   correct?

22         A.    Yes.

23         Q.    Did you see any evidence of

24   injury to the bladder or urethra as a

Konstantin Walmsley, M.D.

Page 66

```
 1    result of that implant?

 2           A.    I did not.

 3           Q.    And was she discharged the

 4    same day as the procedure?

 5           A.    She was.

 6           Q.    Would you agree that the TVT

 7    implant is a minimally invasive

 8    procedure?

 9           A.    Correct.

10                 MS. STUBBS:  I'd like to

11                 look at the operative report for

12                 her implant and I'll mark it as

13                 Exhibit 8.

14                      -  -  -

15                 (Deposition Exhibit No.

16                 Walmsley (Phillips)-8, 1/10/05

17                 Operative Report for Joanne M.

18                 Phillips, PHILLIPSJ_UTMC_MDR00021

19                 through PHILLIPSJ_UTMC_MDR00023,

20                 was marked for identification.)

21                      -  -  -

22    BY MS. STUBBS:

23           Q.    If you would go with me to

24    "Operative Indications," please, it
```

Konstantin Walmsley, M.D.

1    states:  "The patient is a 51 year old

2    lady with significant stress urinary

3    incontinence"; correct?

4          A.    Yes.

5          Q.    And would you agree that TVT

6    at the time it was implanted in Ms.

7    Phillips was an appropriate device for

8    treatment of significant stress urinary

9    incontinence?

10          A.    Yes.

11          Q.    And then next it states,

12    "The risks and benefits of transvaginal

13    tape sling including bleeding, infection,

14    retention, injury to adjacent organs,

15    erosion, and anesthesia related

16    complications were discussed, and she

17    agrees to proceed"; correct?

18          A.    Yes.

19          Q.    And after having the TVT

20    implanted, Ms. Phillips didn't attend her

21    follow-up appointment in February;

22    correct?

23          A.    That's correct.

24          Q.    And she was sent a letter by

Konstantin Walmsley, M.D.

Page 68

1    Dr. Kim letting her know that she had

2    missed her appointment, and she didn't go

3    back to him until 2012; is that correct?

4          A.    Yes.

5          Q.    However, she did go see her

6    primary care doctor in between the 2005

7    implant and 2012, when she returned to

8    Dr. Kim; correct?

9          A.    Yes.

10         Q.    Would you agree that the

11   visits that -- with her primary care

12   doctor between 2005 following the implant

13   and 2012 before she goes back to Dr. Kim

14   -- that the bulk of those visits related

15   to health issues regarding her poorly

16   controlled diabetes and her lower back

17   pain as a result of her motor vehicle

18   accident?

19              MS. SANTRA:  Object to form.

20         That's a large body of records.

21         If you want to show him a few --

22              MS. STUBBS:  Sure.

23              I'll mark as Exhibit 9 the

24         records immediately prior and then

Konstantin Walmsley, M.D.

Page 69

1         following the implant with her

2         primary care doctor.

3                   -  -  -

4              (Deposition Exhibit No.

5         Walmsley (Phillips)-9, Twenty

6         Pages of Medical Records Beginning

7         with 12/13/05 Visit to Dr. Narula,

8         PHILLIPSJ_LAFHC_MDR00056, was

9         marked for identification.)

10                  -  -  -

11  BY MS. STUBBS:

12         Q.    So the first record is dated

13  12/13/05.  Do you see that?

14         A.    I do.

15         Q.    And it says she has

16  occasional pain in her lower back, but no

17  frequency or dysuria; correct?

18         A.    Yes.

19         Q.    And she's having pain in her

20  lower abdomen where the scar was; is that

21  correct?

22         A.    From her recent sling, yes.

23         Q.    Would you turn to the next

24  record, please?

Konstantin Walmsley, M.D.

Page 70

1      A.    Yes.

2      Q.    On this record, she is

3  reporting pain in her lower back on

4  external rotation of both hips.

5            Do you see that?

6      A.    Yes.

7      Q.    And she -- those injuries

8  related to the motor vehicle accident she

9  had had back in the '90s; correct?

10     A.    I would assume so, yes.

11     Q.    She injured her hips in that

12  accident; correct?

13     A.    Yes.

14     Q.    Do you also see where it

15  says in the first paragraph, "is in total

16  denial in terms of her blood sugar and

17  blood pressure control"?

18     A.    I do see that.

19     Q.    Would you turn with me until

20  you get -- I'm sorry.  The Bates numbers

21  are cut off for some reason, but if you

22  keep going until we get to 7/16/08 --

23  it's a few more pages.  You'll see it at

24  the top.

Konstantin Walmsley, M.D.

Page 71

1          A.     I'm there.

2          Q.     Okay -- this record, it

3   says, "She is staying nervous and

4   stressed.  She has to watch the grand

5   kids.  Her blood pressure is under fair

6   control.  Her blood sugars are running

7   high.  Her back, legs, and feet hurt.

8   She says that it is from diabetes.  She

9   does not want to go on insulin.  No

10  abdominal pain, nausea, fever"; correct?

11         A.     Correct.

12         Q.     So up until this point, has

13  she complained to the -- the one doctor

14  she was seeing, Dr. Narula, of any

15  dyspareunia?  And take your time to look

16  at it.

17         A.     To date, Dr. Narula's

18  records have no specific language about

19  dyspareunia in them.

20         Q.     What about any reference to

21  pelvic pain?

22                (Pause.)

23                THE WITNESS:  I don't see

24         any references to pelvic pain thus

Konstantin Walmsley, M.D.

Page 72

1          far.

2    BY MS. STUBBS:

3          Q.    The next record is dated

4    9/4/08.  Do you see that?

5          A.    I do.

6          Q.    "Patient has cough,

7    wheezing, sinus drainage.  No abdominal

8    pain, nausea.  Her back continues to

9    hurt.  She has had it since her motor

10   vehicle accident when she was 23 years of

11   age.  Her hips became crooked at that

12   time.  No numbness, tingling, weakness.

13   Hurts to sit or stand on it for a long

14   period of time.  No abdominal pain."

15              So up until this point, Ms.

16   Phillips is complaining of pain related

17   to her motor vehicle accident injuries;

18   correct?

19         A.    Yes.

20         Q.    Have you seen any reference

21   up until this date, 9/4/08, of any

22   complaints relating to her TVT implant

23   other than the 12/05 one where she talks

24   about the scar area hurting?

Konstantin Walmsley, M.D.

Page 73

1          A.     I have not.

2          Q.     Would you turn several pages

3    until you get to 11/3/10?

4                 (Pause.)

5                 THE WITNESS:   Okay.

6    BY MS. STUBBS:

7          Q.     On this visit, she's again

8    complaining of lower back pain; correct?

9          A.     Yes.

10         Q.     And based on your review of

11   her records, she had lower back pain as a

12   result of her motor vehicle accident;

13   correct?

14         A.     In part, yes.

15         Q.     What else do you think

16   contributed to that lower back pain?

17         A.     I mean, it's such a broad

18   diagnostic category, low back pain; that

19   I'm sure a big part of her low back pain

20   relates to her motor vehicle accident and

21   even Dr. Narula's medical documentation

22   speaks to that.

23                You know, that being said,

24   she may also have additional causes of

Konstantin Walmsley, M.D.

Page 74

1    low back pain, whether it be arthritis or

2    things of that nature.

3         Q.    Do you in any way believe

4    her lower back pain was caused by the TVT

5    implant?

6         A.    I don't.

7         Q.    And she was diagnosed with

8    degenerative arthritis on this visit;

9    correct?

10        A.    Correct.

11        Q.    If you would go to the last

12   visit, it's the last page, 10/24/11, so

13   this is the year before she goes back to

14   Dr. Kim; correct?

15        A.    Yes.

16        Q.    And it says, "The patient

17   describes pain in both knees and lower

18   back.  Her nerves are shot.  She had a

19   car accident today.  No abdominal pain,

20   change in appetite, weight or fever";

21   correct?

22        A.    Yes.

23        Q.    So, again, the year before

24   she returns to Dr. Kim, she doesn't have

Konstantin Walmsley, M.D.

Page 75

1    any GYN complaints; correct?

2              MS. SANTRA:  Object to form.

3              THE WITNESS:  She doesn't

4         voice any, no.

5    BY MS. STUBBS:

6         Q.    And she doesn't have any

7    abdominal pain based on this record;

8    correct?

9         A.    She doesn't voice any, no.

10        Q.    When Ms. Phillips went back

11   to Dr. Kim, I believe it was -- September

12   of 2012; correct?

13        A.    I thought it was October of

14   2012.

15        Q.    10/10/12; is that right?

16        A.    Correct.

17        Q.    -- that was the first visit

18   she had had with him since the implant;

19   correct?

20        A.    Yes.

21        Q.    And she approached Dr. Kim

22   about wanting the TVT implant out; is

23   that correct?

24        A.    Yes.

Konstantin Walmsley, M.D.

1          Q.     Were you aware of whether or

2    not she had filed a lawsuit at that time?

3          A.     I was not.  I am not.

4          Q.     Have you seen anywhere in

5    the medical records prior to the visit on

6    10/10/12 where any doctor recommended

7    that she have the TVT implant out?

8          A.     No.

9          Q.     And have you seen anywhere

10   in the medical records prior to 10/10/12

11   where any doctor conducted a pelvic exam?

12         A.     No.

13         Q.     And have you seen anywhere

14   in the medical records prior to 10/10/12

15   where any doctor noted pelvic pain or

16   dyspareunia?

17         A.     Obviously with the exception

18   of that one visit in December 12th where

19   she had probably more retropubic, but

20   nonetheless pelvic pain, no, and no for

21   dyspareunia either.

22         Q.     And Dr. Kim noted that he

23   did not believe the TVT was causing her

24   problems at that time; is that correct?

Konstantin Walmsley, M.D.

Page 77

1          A.     He did make that comment.

2          Q.     And he suggests that she get

3     a second opinion; is that right?

4          A.     Correct.

5          Q.     And did she ever get that

6     second opinion?

7          A.     No.

8          Q.     And did she ever have a

9     pelvic exam after that visit?

10          A.     Not until I saw her.

11          Q.     Other than the IME.  Thank

12     you.

13               I'd like to talk now about

14     your IME.  Can you walk me through the

15     procedure?  So from the time the patient,

16     Ms. Phillips, comes into your office, up

17     until the end of the exam, what's the

18     procedure you underwent to perform your

19     IME?

20          A.     Certainly.  So typically

21     what would happen and what Ms. Phillips

22     did is, she presents herself to the

23     office.  There is some paperwork that's

24     filled out, questions about past medical

Konstantin Walmsley, M.D.

Page 78

1    history, questions about medications,

2    questions about current complaints.

3    There is a review of systems form that

4    the patient fills out.

5              Once those forms are filled

6    out, she comes back to an examination

7    room where one of my medical assistants

8    enters all of the data into the

9    electronic health record template for her

10   visit.

11             Once that's completed, then

12   I will come into the examination room,

13   introduce myself to the patient, and ask

14   them questions relating to their

15   particular complaint.

16             In the case of Mrs.

17   Phillips, if you go to page 2 of my IME,

18   you'll see that my history of physical

19   illness -- or history of present illness,

20   excuse me -- we call that the HPI, that

21   in essence is 16 lines long and it is a

22   memorialization of the patient's

23   complaints, which in some part are also

24   predicated on the questions I'm asking

Konstantin Walmsley, M.D.

Page 79

```
1    the patient.
2              Once I complete that
3    history-taking, during which time I
4    review her problems, her chief
5    complaints, medications, allergies, past
6    medical and past surgical history, social
7    and family history, and review of
8    systems, then I'll leave the room and in
9    this case have the patient change.
10   They'll cover -- they'll take their
11   clothes off from the waist down, cover
12   themselves with a drape.  I step out of
13   the room during this process and then
14   come back in the room with a female
15   chaperone to examine the patient.
16             My examination is a
17   comprehensive examination.  I exam their
18   heart, lungs, abdomen, back, skin.  When
19   I do the pelvic exam, in addition to
20   doing a pelvic exam, I occasionally will
21   scan the bladder.  If there's a question
22   of incomplete emptying, I'll do that --
23   in Ms. Phillips' case, I did -- and then
24   I'll perform a complete pelvic exam,
```

Konstantin Walmsley, M.D.

Page 80

1    after which time, I go to my office,

2    record the physical exam findings, and

3    then finish the office visit with the

4    patient coming to my office.

5              It's a little bit of a

6    nuance in the IME world because I'm not a

7    treating physician, so I'm not

8    necessarily going to engage the patient

9    in treatment, but I will discuss with the

10   patient my conclusions, and that's what I

11   did with Ms. Phillips.

12         Q.    You indicated you did do a

13   bladder scan; is that correct?

14         A.    I did.

15         Q.    Did you see any evidence of

16   incomplete emptying?

17         A.    Her postvoid residual was 32

18   milliliters, which is fairly low.

19         Q.    You mentioned some intake

20   forms --

21         A.    Yes.

22         Q.    -- is that something --

23   Hayleigh, do you all have those or --

24              MS. SANTRA:  I don't think

Konstantin Walmsley, M.D.

Page 81

1          we've gotten those.

2                    THE WITNESS:  Typically what

3          happens with the intake forms is,

4          once the data is entered, they're

5          shredded.

6                    MS. STUBBS:  Will you all

7          just check on that -- if you don't

8          have them, fine.  If you do, will

9          you give them to counsel?

10                    THE WITNESS:  Sure.

11                    MS. STUBBS:  Okay.

12    BY MS. STUBBS:

13          Q.    Let's turn to the second

14    page of your IME.  Let's start with

15    social history.  Under "Smoking Status,"

16    it says, "Unknown if ever smoked."

17                    Would you agree based on

18    your review now of her records that she

19    was a smoker?

20          A.    Yes.

21          Q.    And then "History of Present

22    Illness," I want to talk about where

23    she's -- is this based on what she's

24    telling you about her symptoms or your

Konstantin Walmsley, M.D.

Page 82

 1   nurse?

 2           A.     No, no.

 3           Q.     It's you?

 4           A.     It's me asking her questions

 5   and her responding to my questions.

 6           Q.     Do you see where it says,

 7   "developed pain shortly thereafter"?

 8           A.     Yes.

 9           Q.     And that's after her TVT

10   implant; correct?

11           A.     Correct.

12           Q.     And then it says, "had some

13   vaginal bleeding on and off for six

14   months"; is that correct?

15           A.     Yes.

16           Q.     Did you see anywhere in the

17   medical records where she reported pain

18   or vaginal bleeding after having the TVT

19   implanted?

20           A.     Well, firstly, when she saw

21   her primary care doctor in December of

22   2005, there was some pain in the area of

23   her incisions from her TVT.

24                  With regards to pelvic pain,

Konstantin Walmsley, M.D.

Page 83

1   I didn't see any record of that

2   thereafter, but obviously she has other

3   sources of pain that she did complain

4   about afterwards.

5          Q.    What about vaginal bleeding?

6          A.    I don't recall seeing that.

7          Q.    And it looks like after 18

8   months, she started developing MUI.  Is

9   that mixed urinary incontinence?

10         A.    Correct.

11         Q.    And that would be stress and

12  urge; correct?

13         A.    Yes.

14         Q.    So the urge incontinence

15  that had gotten better on Detrol came

16  back after having the TVT implant; is

17  that correct?

18         A.    Yes.

19               MS. SANTRA:  Object to form.

20  BY MS. STUBBS:

21         Q.    And would you agree that TVT

22  is not indicated to treat urge?

23         A.    It's not indicated to treat

24  urge.

Konstantin Walmsley, M.D.

1        Q.    And then it says, "After

2   about 1 year, she started developing

3   pelvic pain.  She also had dyspareunia,

4   as she was sexually active with her

5   husband for several years (till 2009)."

6               Based on my deposition of

7   plaintiff, would you agree that she

8   stated on the record that she only had

9   sex one time after the implant?

10              MS. SANTRA:  I have that

11          deposition if --

12              THE WITNESS:  I have it

13          right here, actually.

14              (Pause.)

15              THE WITNESS:  Yes, one time.

16  BY MS. STUBBS:

17        Q.    And she did note to you that

18  she had had some mild discomfort with

19  intercourse prior to having the TVT;

20  correct?  That's what's reflected.  It

21  says, "She had some mild discomfort with

22  intimacy before surgery but this was much

23  worse"; is that correct?

24        A.    Correct, yes.

Konstantin Walmsley, M.D.

Page 85

1          Q.    And then it says, "She

2     describes a rough, tearing sensation to

3     sex especially upon entering the vagina."

4          A.    Right.

5          Q.    Did you see anywhere in the

6     medical records where anything of that

7     nature was mentioned to any of her

8     treating physicians following the TVT

9     implant?

10         A.    I did not.

11         Q.    You also note a history of

12    two to three UTIs a month.  Did you see

13    anywhere in the medical records where

14    that was indicated?

15         A.    I did not.

16         Q.    Did you see any evidence of

17    a urinary tract infection upon your

18    examination?

19         A.    No.

20         Q.    And you saw no erosion or

21    extrusion; correct?

22         A.    I did not.

23         Q.    And when you were able to --

24    when you noted tenderness upon your exam,

Konstantin Walmsley, M.D.

Page 86

1    was that at the site of where the mesh

2    was located?

3          A.    Yes.

4          Q.    Did you see any evidence of

5    where Ms. Phillips went back to Dr. Kim

6    after the 10/10/12 visit?

7          A.    I don't believe so.

8          Q.    Did you see any evidence

9    where she saw any urogynecologist,

10   gynecologist, or urologist after

11   10/10/12, other than your IME?

12         A.    No.

13         Q.    And so you performed a

14   pelvic exam; correct?

15         A.    Yes.

16         Q.    And you took your -- did

17   your do a urinalysis as well?

18         A.    A urine analysis?

19         Q.    Yes.

20         A.    Yes.

21         Q.    And you did a bladder scan;

22   correct?

23         A.    Yes.

24         Q.    Any other testing or exams

Konstantin Walmsley, M.D.

Page 87

1    that you performed at that time on her

2    female anatomy?

3            A.    No, ma'am.

4            Q.    Did she report any bowel

5    problems to you during her IME?

6            A.    Yes.

7            Q.    What are those?

8            A.    She noted that she had some

9    constipation.

10            Q.    Is it your opinion that that

11    constipation is related to the mesh?

12            A.    No.

13            Q.    Do you have an opinion as to

14    what the cause of her constipation is?

15            A.    Not specifically, I don't.

16            Q.    Have we discussed all of

17    your opinions to date during this

18    deposition today?

19                    MS. SANTRA:  Object to form.

20                    THE WITNESS:  I believe so,

21            yes.

22                    MS. STUBBS:  I don't have

23            any further questions, Hayleigh.

24            Do you?

Konstantin Walmsley, M.D.

Page 88

1           MS. SANTRA:  Okay.  I'm

2      going to, but I -- is it okay if I

3      go to the bathroom real quick?

4           MS. STUBBS:  Of course.

5      We'll go off the record.

6           (A recess was taken from

7      2:02 p.m. to 2:06 p.m.)

8                -  -  -

9              EXAMINATION

10               -  -  -

11 BY MS. SANTRA:

12      Q.    Dr. Walmsley, you performed

13 a differential diagnosis when coming to

14 your opinions about Ms. Phillips;

15 correct?

16      A.    I did.

17      Q.    And your opinions that

18 you've expressed about Ms. Phillips are

19 based on your clinical experience, your

20 review of her medical records, your

21 independent examination of Ms. Phillips,

22 and your knowledge of the medical

23 literature; is that right?

24      A.    Correct.

Konstantin Walmsley, M.D.

Page 89

1          Q.     And when you were performing

2     your differential diagnosis for Ms.

3     Phillips, did you take into account all

4     of her other medical conditions,

5     including diabetes, smoking, the hip and

6     back pain from her motor vehicle accident

7     in the 1990s, her abdominal hysterectomy,

8     her appendectomy, tumor removals from her

9     neck, her COPD, hypertension, arthritis,

10    GERD, and hyperlipidemia?

11               MS. STUBBS:  Object to form.

12               THE WITNESS:  Yes.

13    BY MS. SANTRA:

14         Q.     And is it -- based on your

15    differential diagnosis, is it your

16    opinion that the TVT sling is a

17    substantial factor in the pain that you

18    palpated upon examination?

19         A.     Yes.

20               MS. STUBBS:  Object to form.

21    BY MS. SANTRA:

22         Q.     And how did you rule out Ms.

23    Phillips' hysterectomy as a cause for

24    that pain that you observed upon

Konstantin Walmsley, M.D.

Page 90

1    examination?

2         A.    Well, I mean, first off, her

3    hysterectomy was performed over 20 years

4    ago and, generally speaking, if one

5    encounters pelvic pain or dyspareunia

6    from a procedure such as a hysterectomy,

7    you would expect that that would be

8    present soon after the hysterectomy and

9    certainly a chronic condition that's

10   commented on in the medical records.  I

11   mean, she had no comment made as to that

12   being the case in the medical records

13   that I reviewed.

14              In addition, at least on

15   physical examination, when I examined Ms.

16   Phillips, she had no tenderness at the

17   apex of the vagina, which is typically

18   where one encounters pelvic pain after a

19   hysterectomy.

20        Q.    In your case-specific

21   opinions, you mention the scar plate

22   formation that you saw that was due to

23   the TVT sling; is that right?

24        A.    Yes.

Konstantin Walmsley, M.D.

Page 91

1          Q.     And is that scar plate

2    formation that you -- that was painful

3    for Ms. Phillips when you examined her,

4    is that evidence of her foreign body

5    reaction to the sling?

6          A.     That's correct.

7          Q.     And you talked about lichen

8    sclerosus and vaginal atrophy; is that

9    correct?

10         A.     I did, yes.

11         Q.     And Ms. Phillips has those

12   conditions as well?

13         A.     Yes, she has evidence of

14   both of those conditions.

15         Q.     Even given those conditions,

16   is the TVT -- excuse me.  Strike that.

17                Even given her lichen

18   sclerosus and vaginal atrophy, is the TVT

19   sling still a substantial factor in

20   producing the pain that you reproduced

21   upon examination?

22                MS. STUBBS:  Object to form.

23                THE WITNESS:  Yes.

24   BY MS. SANTRA:

1          Q.    I want to talk about your

2    reliance list for a minute.  In your

3    reliance list, you say that you

4    incorporated Dr. Blaivas' general TVT

5    causation report; is that correct?

6          A.    Not as specifically as you

7    just stated, but, yes, I did rely upon

8    Dr. Blaivas' report for general opinions.

9          Q.    And so before writing your

10   report for Ms. Phillips, you had reviewed

11   Dr. Blaivas' general causation report on

12   the TVT?

13         A.    Yes.

14         Q.    And to the extent Dr.

15   Blaivas relied on Ethicon internal

16   documents or other materials that he

17   cites in his report, you would

18   incorporate all of that into your -- part

19   of your -- or all of Dr. Blaivas'

20   conclusions from his review of those

21   documents into your knowledge base; is

22   that correct?

23               MS. STUBBS:  Object to form.

24               MS. SANTRA:  I don't know if

Konstantin Walmsley, M.D.

Page 93

1          I need to ask that again.

2                  THE WITNESS:  Well, I think

3          to answer your question, I didn't

4          specifically review Ethicon

5          internal documents myself relating

6          to this case.

7                  Obviously having read and

8          reviewed Dr. Blaivas' report,

9          which certainly does reflect his

10         review of those internal

11         documents, what I can tell you is,

12         having trained under Dr. Blaivas

13         and knowing his reputation as a

14         key opinion leader in the field of

15         urology and the management of

16         incontinence in both men and

17         women, I would trust and rely on

18         his opinion -- you know, on his

19         interpretation of those documents

20         and records.

21  BY MS. SANTRA:

22         Q.    And I believe you mentioned

23  the fact that the TVT IFU in 2005 did not

24  have dyspareunia or chronic pain as some

Konstantin Walmsley, M.D.

Page 94

1    of the adverse events; is that correct?

2           A.    Yes.

3           Q.    And the 2015 TVT IFU does

4    list dyspareunia and chronic pain as

5    potential adverse events; is that

6    correct?

7                 MS. STUBBS:  Object to the

8           form.

9                 THE WITNESS:  Amongst other

10          potential adverse events, yes.

11   BY MS. SANTRA:

12          Q.    So even according to

13   Ethicon, the TVT can cause chronic pain

14   and dyspareunia; correct?

15                MS. STUBBS:  Object to the

16          form.

17                THE WITNESS:  That's

18          correct.

19   BY MS. SANTRA:

20          Q.    You were asked some

21   questions about -- some questions

22   comparing an autologous sling to the TVT

23   mesh device.  Do you remember those

24   questions?

Konstantin Walmsley, M.D.

Page 95

1        A.    I do.

2        Q.    And I think you were asked

3    generally whether an autologous sling can

4    cause dyspareunia or pelvic pain.  Do you

5    remember that question?

6        A.    I do.

7        Q.    Is there a difference in the

8    characteristic and nature of any

9    dyspareunia or pelvic pain that's caused

10   by an autologous sling versus the nature

11   and characteristic of dyspareunia or

12   pelvic pain caused by a mesh device?

13              MS. STUBBS:  Object to the

14         form.

15              THE WITNESS:  Yes.

16   BY MS. SANTRA:

17        Q.    What are some of the

18   differences?

19        A.    So using an autologous

20   fascial sling as compared to synthetic

21   mesh creates a different host response.

22   When using mesh in the pelvic arena,

23   there is an inflammatory response that

24   tends to generate more scarring and

Konstantin Walmsley, M.D.

Page 96

1    fibrosis and more inflammation, which

2    tends to lead towards more significant

3    dyspareunia and pelvic pain, not only

4    with regards to intensity of the pain,

5    but chronicity of the pain.

6                    Autologous facial slings can

7    create or have these adverse events as

8    well.  It's part of the informed consent

9    process for autologous facial slings.

10   However, the nature of the pain and the

11   nature of the dyspareunia, both

12   quantitatively and qualitatively are

13   different because the inflammatory

14   response, that response which can create

15   fibrosis and scarring, is much less

16   intense and less significant than what is

17   seen with synthetic mesh.

18                    One of the reasons you need

19   to suture an autologous fascial sling in

20   place, for example, is because unlike

21   synthetic mesh, where the fibrosis and

22   scarring essentially sets that mesh in

23   place, fairly quickly, with autologous

24   facial slings, that type of vigorous

Konstantin Walmsley, M.D.

Page 97

1    inflammatory response is essentially

2    absent such that if you were to place an

3    autologous fascial sling and not stitch

4    it into location, it would have a very

5    high rate of migration and failure

6    because it wasn't -- it wouldn't position

7    itself under the urethra in such a way as

8    to create support effectively.

9            Q.    In regards to Exhibit 7,

10   which is the AUGS and SUFU statement that

11   we -- that defense counsel went over --

12           A.    Yes.

13           Q.    -- have you seen that

14   statement before?

15           A.    I have.

16           Q.    And does anything in that

17   statement change your opinions today

18   about Ms. Phillips?

19           A.    No.

20           Q.    And defense counsel asked

21   you questions to the effect of that the

22   IFU is just one source of information for

23   doctors; is that correct?

24           A.    I remember that question,

Konstantin Walmsley, M.D.

Page 98

1    yes.

2          Q.    And you said that you rely

3    heavily on IFUs for your practice?

4          A.    I do.

5          Q.    Can you explain that a

6    little bit?

7          A.    I can.

8                There's no question that

9    gaining experience and knowledge with

10   procedures, other than on a personal

11   level, can be augmented by research and

12   review; and inasmuch as some of that

13   review can be related to peer-reviewed

14   literature, can be related to published

15   guidelines, can be related to opinions

16   shared by key opinion leaders or

17   colleagues, to my mind, the framework of

18   knowledge, whether it's a package insert

19   for a medication, for example, or an IFU

20   for a medical device is -- the

21   foundation, I should say, really are

22   those types of products in my practice.

23                I believe that the IFU

24   serves as a guide for literature, for

Konstantin Walmsley, M.D.

Page 99

1    opinions put forth by national leaders in

2    fields such as incontinence; and to some

3    degree, if the IFU is incomplete, the

4    literature is incomplete, the opinions

5    put forth by key opinion leaders are

6    incomplete because these very -- these

7    very authors, these very surgeons -- the

8    literature that even in my reliance list

9    is to some degree premised on information

10   in package inserts and IFUs, for example.

11        Q.    And that would be kind of

12   especially true when a product is in the

13   first few years of a product being on the

14   market; is that right?

15              MS. STUBBS:  Object to the

16         form.

17              THE WITNESS:  To some

18         extent, I think that's when the

19         IFU is the most critically

20         important, because that's really

21         setting the foundation for how you

22         want to incorporate the use of a

23         medical device in your practice.

24   BY MS. SANTRA:

Konstantin Walmsley, M.D.

Page 100

1        Q.      Counsel asked you some

2    questions about whether in every report

3    you've written, you found that the TVT

4    was a cause for the plaintiff's injuries.

5              Do you remember that line of

6    questioning?

7        A.      I remember some questioning

8    regarding IFU commentary.

9        Q.      And for the TVT, that IFU

10   wasn't changed in any substantial way

11   until 2015; is that correct?

12              MS. STUBBS:  Object to the

13         form.

14              THE WITNESS:  Yes, it is.

15   BY MS. SANTRA:

16        Q.      So from 2000 to 2015, when

17   it was substantially changed, there was

18   basically the same information in the TVT

19   IFU; correct?

20              MS. STUBBS:  Objection to

21         form.

22              THE WITNESS:  Essentially,

23         yes.

24   BY MS. SANTRA:

Case 2:12-md-02327   Document 3585-7   Filed 04/11/17   Page 102 of 107 PageID #: 122351

Konstantin Walmsley, M.D.

1          Q.     Have you rendered all your

2     opinions to a reasonable degree of

3     medical certainty?

4             A.     I have, yes.

5                 MS. SANTRA:  I think that is

6          all I have for you.

7                 MS. STUBBS:  I don't have

8          any further questions.

9                 (Witness excused.)

10                (Deposition concluded at

11         approximately 2:23 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Konstantin Walmsley, M.D.

1

2                      CERTIFICATE

3

4

5          I HEREBY CERTIFY that the

   witness was duly sworn by me and that the

6   deposition is a true record of the

   testimony given by the witness.

7

           It was requested before

8   completion of the deposition that the

   witness, KONSTANTIN WALMSLEY, M.D., have

9   the opportunity to read and sign the

   deposition transcript.

10

11

12

13   _____

   KIMBERLY A. CAHILL, a

14   Federally Approved Registered

   Merit Reporter and Notary Public

15   Dated:  August 22, 2016

16

17          (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

Konstantin Walmsley, M.D.

Page 103

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10             You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14             It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Konstantin Walmsley, M.D.

Page 104

1                    –  –  –  –  –  –

                        E R R A T A

2                    –  –  –  –  –  –

3

4     PAGE   LINE    CHANGE

5     _____  _____   _____

6         REASON:    _____

7     _____  _____   _____

8         REASON:    _____

9     _____  _____   _____

10        REASON:    _____

11    _____  _____   _____

12        REASON:    _____

13    _____  _____   _____

14        REASON:    _____

15    _____  _____   _____

16        REASON:    _____

17    _____  _____   _____

18        REASON:    _____

19    _____  _____   _____

20        REASON:    _____

21    _____  _____   _____

22        REASON:    _____

23    _____  _____   _____

24        REASON:    _____

Konstantin Walmsley, M.D.

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4                    I, _____, do

5       hereby certify that I have read the

6       foregoing pages, 1 - 106, and that the

7       same is a correct transcription of the

8       answers given by me to the questions

9       therein propounded, except for the

10      corrections or changes in form or

11      substance, if any, noted in the attached

12      Errata Sheet.

13

14

15      _____

16      KONSTANTIN WALMSLEY, M.D.          DATE

17

18

19      Subscribed and sworn
        to before me this

20      _____ day of _____, 20____.

21      My commission expires:_____

22

        _____

23      Notary Public

24

Konstantin Walmsley, M.D.

Page 106

1                    LAWYER'S NOTES

2    PAGE   LINE

3    ____   ____    _____

4    ____   ____    _____

5    ____   ____    _____

6    ____   ____    _____

7    ____   ____    _____

8    ____   ____    _____

9    ____   ____    _____

10   ____   ____    _____

11   ____   ____    _____

12   ____   ____    _____

13   ____   ____    _____

14   ____   ____    _____

15   ____   ____    _____

16   ____   ____    _____

17   ____   ____    _____

18   ____   ____    _____

19   ____   ____    _____

20   ____   ____    _____

21   ____   ____    _____

22   ____   ____    _____

23   ____   ____    _____

24   ____   ____    _____