# EXHIBIT H

Page 1

CAUSE NO. 2013-DCL-3511-D

| | | |
|---|---|---|
| SANDRA GARCIA, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 103rd JUDICIAL DISTRICT |
| | ) | |
| RODOLFO J. WALSS, M.D., | ) | |
| RODOLFO J. WALSS, M.D., | ) | |
| P.A., JOHNSON & JOHNSON, | ) | |
| INC. and ETHICON, INC., | ) | |
| | ) | |
| Defendants. | ) | CAMERON COUNTY, TEXAS |

DEPOSITION OF

SUZANNE PARISIAN, M.D.

Phoenix, Arizona
February 12, 2015
9:04 a.m.

LEO T. MANKIEWICZ, CR, RMR, CRR
Arizona Certified Reporter
Certificate No. 50778

Page 2

1
2
3
4
5
6
7
8       BE IT REMEMBERED THAT THE DEPOSITION OF
9       SUZANNE PARISIAN, M.D.
10      was taken on behalf of Defendants, at the Hilton Phoenix
11      Suites, 10 East Thomas Road, Phoenix, Arizona,
12      commencing at 9:04 a.m., on Thursday, February 12, 2015,
13      before Leo T. Mankiewicz, Arizona Certified Reporter,
14      Certificate No. 50778, pursuant to Notice of Deposition.
15
16
17
18
19
20
21
22
23
24

Page 4

1               I N D E X
2                                    PAGE
3
Proceedings                                    8
4   Recess - 10:55 a.m. to 11:04 a.m.         92
    Luncheon Recess - 12:24 p.m. to 1:10 p.m.      166
5   Recess - 2:39 p.m. to 2:59 p.m.           252
    Recess - 3:29 p.m. to 3:43 p.m.           277
6
7               INDEX OF EXAMINATION
8                                    Page
9   WITNESS:  SUZANNE PARISIAN, M.D.
10  Witness Sworn .......................8
11  Examination by Mr. Hutchinson  .......................8
12  Examination by Mr. Lundquist  .......................281
13  Further Examination by Mr. Hutchinson  ..............302
14
15              E X H I B I T S
16  Ex. No.     Description              Page
17  1  A four-page photocopy of Defendants Johnson & ....13
       Johnson and Ethicon, Inc.'s Notice of
18     Intention to Take the Oral Deposition of Dr.
       Suzanne Parisian and Subpoena Duces Tecum.
19
20  2  A collective exhibit consisting of the file ......16
       of Dr. Suzanne Parisian in the present matter,
21     comprised of two three-inch binders, one
       entitled, "TVMS Docket, TVT Secur," and the
22     other bearing a case caption and "Documents -
       TVT Secur," containing various tabbed sections
       of documents, as well as an approximately
23     one-inch thick stack of various documents.
24                     (cont.)

Page 3

1
2   APPEARANCES:
3
    For the Plaintiff:
4
        Clark, Love & Hutson, G.P.
5       440 Louisiana Street, Suite 1600
        Houston, Texas  77002
6   BY:  WILLIAM W. LUNDQUIST, ESQ.
        Shepherd, Scott, Clawater & Houston, LLP
7       2777 Allen Parkway, 7th floor
        Houston, Texas  77019-2133
8   BY:  CYNTHIA L. FREEMAN, ESQ.
        (by telephone conference)
9
    For the Defendants:
10      Butler Snow LLP
        Renaissance at Colony Park, Suite 1400
11      Ridgeland, Mississippi  39158-6010
    BY:  CHAD R. HUTCHINSON, ESQ.
12
        Roerig, Oliveira & Fisher, LLP
13      10225 North 10th Street
        McAllen, Texas  78504
14  BY:  DAVID OLIVEIRA, ESQ.
15
16
17
18
19
20
21
22
23
24

Page 5

1           E X H I B I T S  (cont.)
2   Ex. No.     Description              Page
3   3  A 16-page photocopy of the Curriculum Vitae ......17
       of Suzanne Parisian, M.D.
4
5   4  A 20-page photocopy of Plaintiff's ...............25
       Designation of Expert Witnesses.
6   5  A 10-page photocopy of a document bearing the ....29
       present case caption and the heading, "Suzanne
7      Parisian, M.D., List of Documents Provided or
       Identified for Review in the above Referenced
8      Lawsuit," referred to as the "reliance list"
       in this deposition.
9
10  6  A 24-page photocopy of an IFU, or ..............125
       Instructions For Use document for the Gynecare
11     TVT Secur System, bearing Bates numbers
       ETH.MESH.02340568 through -0591.
12  7  A 16-page photocopy of a Patient Brochure for ...125
       Gynecare TVT, bearing Bates numbers
13     ETH.MESH08003295 through -3302.  (As presented
       at the deposition, this exhibit has blank
14     pages inserted every other page.)
15  8  An eight-page photocopy of a publication of .....181
       the U.S. Food and Drug Administration
16     entitled, "General Controls for Medical
       Devices."
17
18  9  A 41-page photocopy of a document issued by .....184
       the Food and Drug Administration, Center for
19     Devices and Radiological Health, and Center
       for Biologics Evaluation and Research,
20     entitled, "The 510(k) Program: Evaluating
       Substantial Equivalence in Premarket
21     Notifications [510(k)]," Guidance for Industry
       and Food and Drug Administration Staff,"
       issued July 28, 2014.
22
23                     (cont.)
24

Page 6

E X H I B I T S (cont.)

Ex. No.        Description        Page

10  A seven-page photocopy of a letter on the .......190
letterhead of Department of Health, Education
and Welfare, Public Health Service, Consumer
Protection and Environmental Health Service,
Food and Drug Administration, from B.H.
Minchew, M.D. to Ethicon, Inc. reflecting
approval of NDA 16-374 for a Prolene
Polypropylene Suture material, dated April 16,
1969, bearing Bates numbers ETH.MESH.09625731
through -737.

11  A 47-sheet, double-sided photocopy of a .........199
LexisNexis printout of a document entitled, "1
of 28 documents, Federal Register, 21 CFR Part
878, General and Plastic Surgery Devices,
General Provisions and Classification of 54
Devices, Docket No. 78N-2646, 47 FR 2810,"
dated January 19, 1982.

12  A 13-page photocopy of a letter on the ..........202
letterhead of Department of Health and Human
Services, Food and Drug Administration, from
Robert L. Sheridan, Director of Device
Evaluation to Mr. Walter S. Hennig of United
States Surgical Corporation, Re:
Reclassification of Nonabsorbable Polyprolyene
Surgical Suture, Docket Number 88P-0173, dated
July 5, 1990, bearing Bates numbers
ETH.MESH.09634664 through -4676.

13  A four-page photocopy of a letter on the .......215
letterhead of Department of Health & Human
Services, Food and Drug Administration, from
Benjamin R. Fisher, Ph.D. to Gregory R. Jones
of Ethicon, Inc., Re: K974098, declaring
substantial equivalence for the TVT system,
dated September 28, 2012, bearing Bates
numbers ETH.MESH.10040062 through -0065.

14  A 122-sheet, double-sided photocopy of a ........220
series of documents, labeled as a group,
"Traditional 510(k) Notification, Gynecare TVT
Secur System, bearing Bates numbers

Page 7

E X H I B I T S (cont.)

Ex. No.        Description        Page

15  A 20-page photocopy of a letter on the ..........227
letterhead of Department of Health & Human
Services, Food and Drug Administration, from
Carl A. Larson, Ph.D., of the Office of Device
Evaluation, Re: N16374/S34, Prolene
Polypropylene Suture, expressing approval of a
PMA supplement, dated October 7, 1988, with
attachments, bearing Bates numbers
ETH.MESH.09634299 through -4318.

16  A four-page photocopy of a document on the ......270
letterhead of AUGS and SUFU, entitled,
"Position Statement on Mesh Midurethral Slings
for Stress Urinary Incontinence," dated
January 3, 2014.

---o0o---

Page 8

1   Thursday, February 12, 2015

2                                    9:04 a.m.

3            P R O C E E D I N G S

4                ---o0o---

5        SUZANNE PARISIAN, M.D.,

6   CALLED AS A WITNESS, HAVING BEEN DULY

7        SWORN, TESTIFIED AS FOLLOWS:

8                ---o0o---

9   EXAMINATION BY MR. HUTCHINSON

10  BY MR. HUTCHINSON:

11       Q   Good morning, Dr. Parisian.  How are you

12  doing?

13       A   Fine.

14       Q   My name is Chad Hutchinson.  I represent

15  Johnson & Johnson and Ethicon in this case.  I'm here to

16  take your deposition, do you understand that?

17       A   Yes, sir.

18       Q   You've been deposed before, correct?

19       A   Yes, sir.

20       Q   You understand you're subject to the penalty

21  of perjury?

22       A   Yes, sir.

23       Q   If you don't understand one of my questions,

24  will you let me know?

Page 9

1        A   Yes, sir.

2        Q   Otherwise, I'm going to assume you understood

3   my question.  Is that fair?

4        A   Yes, sir.

5        Q   You've been offered as the plaintiff's expert

6   in the Garcia case, is that right?

7        A   Yes, sir.

8        Q   In what field?

9        A   For FDA regulatory issues.

10       Q   Is that your specialty?

11       A   Yes, sir.

12       Q   Any other specialties?

13       A   Well, I have other specialties, but that's

14  where I see my role, as an FDA regulatory expert.

15       Q   In this case?

16       A   Yes, sir.

17       Q   Okay, any other roles in this case?

18       A   No, sir.

19       Q   Have you ever been retained as an expert

20  witness in a mesh case before this one?

21       A   Yes.

22       Q   And which one?

23       A   I believe I was involved with the C.R. Bard

24  Marlex mesh.  I was involved with other surgi-  -- AMS

1   mesh, I've been involved with Boston Scientific's
2   transvaginal mesh.  Those are the ones I recall.  Oh,
3   no, Kugel, Kugel mesh.
4       Q    And you testified against the manufacturer in
5   all those cases?
6       A    Yes, sir.
7       Q    Are you still working in an expert capacity
8   for any of those manufacturers?
9       A    You mean for those cases?  Yes, sir.
10      Q    Approximately how many cases?
11      A    Right now, this is the only mesh case I have.
12      Q    Against Ethicon?
13      A    No, against anybody.  I don't have any
14  active -- I'm still involved, but I don't have any
15  active cases that I'm aware of.
16      Q    Okay.  Well, in how many cases have you been
17  providing expert testimony against manufacturers of mesh
18  products?
19      A    Well, those would be the issues.
20      Q    How many cases are we talking about?
21      A    I don't know, because they're MDLs.  I was the
22  expert for the AMS MDL.  I don't know how many cases
23  were in that before it settled, and then it was like,
24  I think I gave a deposition for one case that wasn't in

1   the MDL, or -- no, two, two.  So I don't know how big
2   the MDLs are.  I've just been hired for litigation.
3       Q    Okay, but you would be an expert for each and
4   every plaintiff in that -- in the MDLs, correct?
5       A    Yes, sir, if they needed me for the case, yes,
6   sir.  So I don't know how big those MDLs are; unlike
7   this case, which is here, I know it's a single
8   plaintiff.
9       Q    For -- let's talk about Ethicon in particular,
10  okay?
11      A    Yes, sir.
12      Q    How many mesh cases have you been involved in
13  against Ethicon?
14      A    Only this one.
15      Q    And if my math is correct, since 1997, you've
16  testified in court 81 times for a plaintiff, is that
17  right?
18      A    Yes, sir.  Those are the -- those aren't all
19  the cases I've had, but those are the ones that have
20  gone to court.
21      Q    And you've always testified for the plaintiff
22  in pharmaceutical and medical device cases?
23      A    In court, yes, but I have been an expert
24  witness for a medical device manufacturer.  I think it

1   was Clinical Innovations, so I was their expert.
2       Q    And how long ago was that?
3       A    That was several years ago.
4       Q    Over 20?
5       A    No, no, no, not over 20.  It was actually,
6   I think it was actually, like, six years ago.  It went
7   off my five-year list, but -- and then when I first
8   started out, if you want my full -- I was also the
9   expert for pedicle screws for industry.  So I've
10  testified for industry, I've testified for hospitals,
11  I've testified for industry versus industry.  So not
12  every case is a case like this case.
13      Q    You've never testified for a defendant in
14  court, have you?
15      A    Yes, I have, in court, yes, sir, but I believe
16  it was a hospital, Wash- -- hospital, Seattle Children's
17  Hospital.  There wouldn't be any reason I wouldn't, if
18  I accepted a case.
19      Q    Have you ever turned down a pharmaceutical
20  medical device case for a plaintiff?
21      A    Oh, yes.  I don't take every case given to me.
22      Q    I'm handing you what I've marked as Exhibit 1
23  to your deposition.  Do you have that in front of you?
24      A    Yes, sir.

1           (Whereupon, Exhibit 1 was marked for
2       identification.)
3   BY MR. HUTCHINSON:
4       Q    And if you'll look on the last page, we had
5   asked for some documents.  Do you see those?
6       A    Yes, sir.
7       Q    Did you bring those documents with you today?
8       A    I didn't bring my curriculum vitae, but
9   I thought you had received that.  I've tried to bring
10  everything else that I have, and then I think I helped
11  generate a list of documents I've relied on.
12      Q    Okay, and just so the record is clear, you've
13  brought everything that you have that is responsive to
14  the document request 1 through 9, correct?
15      A    Yes, sir.  I have brought what we call my
16  file.
17      Q    And you have your file in front of you, is
18  that correct?
19      A    Yes, sir.
20      Q    Why don't we do this.  And just for the
21  record, your file consists of two black binders, one of
22  which is called "TVT Secur" on the front, and the other
23  one is called, "Documents-TVT Secur," right?
24      A    Yes, sir.

Page 14

1      Q    And each document has a bunch of tabs, and a
2  lot of documents that you've reviewed for this case?
3      A    Yes, sir, and it's all my handwriting and my
4  tabs.
5      Q    And then we have a separate stack of loose
6  paper in front of you that you've brought responsive,
7  correct?
8      A    Yes, sir.
9      Q    And what does this stack represent?
10     A    Okay.  It would be the rest of my file, and it
11  represents my designation as an expert witness, what
12  we're going to talk about today, the amended report of
13  John Miklos, a list of documents that I've relied on,
14  the deposition notice, my billing records, all the
15  records that I've generated as well as the ones getting
16  ready for the deposition today that hasn't been billed;
17  some agreement for the protective order; the Has French
18  National Authority for Health report, November 2006;
19  some other articles that I've found, we'll put it that
20  way.  Those are articles I've found.
21      So the medical literature that I have here,
22  the searches are from my -- I've obtained those, and the
23  advertising from Johnson & Johnson for the Ethisorb
24  product; my communication that came with my binder; the

Page 15

1  510(k) for AMS products, which was one of the -- another
2  product, as well as the 510(k) -- I'll give -- K021263,
3  which was for the SPARC Sling System; the Codman
4  Ethisorb Dura Patch 510(k), K991413; the 510(k)
5  clearance for the Gynecare TVT Secur device, and that's
6  K052401.
7      I had done a search at one time of the suture
8  materials that are used for the mesh, the PDS absorbable
9  product, and I believe Vicryl.  So I brought those
10  510(k)'s that are stapled together.
11      And then, let's see, I brought the patents --
12  trademark for the Monitorr, M-O-N-I-T-O-R-R device; and
13  then last night, I brought -- I went and did a really
14  quick look at the Medical Device Reports for Gynecare
15  TVT, and I've brought those documents, kind of
16  summarized together.
17      Q    Okay, and that was for Gynecare TVT and not
18  TVT Secur, right?
19      A    No, it was the -- only way to get Secur is if
20  you use TVT Gynecare and then Secur.  So I did do it
21  looking at Secur, but it had to come up under TVT
22  Gynecare.
23      Q    Okay, and in this one stack of loose
24  documents, and the two black notebooks, they have some

Page 16

1  handwriting and highlights in them, correct?
2      A    Yes, sir.
3      Q    And all the handwriting and highlights were
4  done by you, correct?
5      A    Yes, sir.
6      Q    And nobody else.
7      A    Yes, sir.
8      Q    And why don't we go on and mark --
9      A    Except for the ones that are printed with a
10  highlighting.  If they're yellow, they're mine.
11      Q    And let's go ahead and mark as Exhibit -- as a
12  collective Exhibit 2 your two black notebooks and the
13  loose paper, as Exhibit 2, okay?
14      A    Um-hum.
15          MR. LUNDQUIST:  Well, obviously, when we --
16  I mean, we can receive copies.
17          MR. HUTCHINSON:  We'll have copies of them.
18          MR. LUNDQUIST:  Okay, all right.
19          (Whereupon, Exhibit 2 was marked for
20          identification.)
21  BY MR. HUTCHINSON:
22      Q    And does Exhibit 2 reflect every sheet of
23  paper that you used to formulate your opinion in this
24  case?

Page 17

1      A    No, no, because I mean, I've had a history of
2  mesh products before.  So you couldn't bring every
3  document that -- because I've dealt with mesh and the
4  same with the other vaginal mesh products, and I mean,
5  my knowledge of these types of products go back to
6  ProtoGen, which is a long time ago.  So it's not -- but
7  the ones that I have specifically used for Ethicon are
8  here.
9      Q    Okay.  Well, that was my question, thank you.
10  So Exhibit 2 would represent all of the materials that
11  you relied on in this particular case to reach opinions,
12  correct?
13      A    With the caveat that there's a background that
14  I have.  I can't bring that.  That's been acquired over
15  years.
16      Q    I understand.  All right, thank you.  Let's
17  look at your CV.  We'll mark it as Exhibit 3.
18  I recognize it's in here, but I've got a clean copy.
19      A    Thank you.
20          (Whereupon, Exhibit 3 was marked for
21          identification.)
22  BY MR. HUTCHINSON:
23      Q    This is the most current copy of your CV?
24      A    Yes.  I believe -- I think so.  I'm not sure.

Page 18

1    There's nothing really significantly different.  I just
2    might have had a different date on it, but I haven't
3    done anything different.
4        Q    All publications are included on your CV?
5        A    Yes, sir.
6        Q    You've never published anything in a
7    peer-reviewed journal, have you?
8        A    Well, no.  I have in terms of when I was in
9    developmental biology.
10       Q    Have you ever published anything on a cervical
11   mesh?
12       A    No.
13       Q    Proline?
14       A    No.
15       Q    TVT Secur?
16       A    No.
17       Q    Anything on SUI?
18       A    No, sir.
19       Q    You understand SUI means stress urinary
20   incontinence?
21       A    Yes, and I began looking at SUI issues when
22   I was at the FDA.
23       Q    You've never published on dyspareunia or
24   pelvic pain?

Page 19

1        A    No.
2        Q    Let's talk about presentations.  Are all the
3    presentations that you've given included within your CV?
4        A    Yes, sir.
5        Q    Have you ever presented on surgical mesh?
6        A    No, sir.
7        Q    Proline?
8        A    No, sir.
9        Q    TVT Secur?
10       A    No, sir.
11       Q    SUI?
12       A    No, sir.
13       Q    Dyspareunia or pelvic pain?
14       A    No, sir.
15       Q    Your research experience, is all that included
16   within your CV marked as Exhibit 3?
17       A    Yes, sir.  I haven't done any hands-on
18   testing.  I think that's what you're asking, about mesh.
19   No.
20       Q    No hands-on testing for any type of surgical
21   mesh?
22       A    That is correct.
23       Q    And no hands-on testing for any type of
24   product to treat stress urinary incontinence?

Page 20

1        A    I've actually consulted for firms for devices
2    for stress urinary incontinence that are radiofrequency
3    devices for treating that.
4        Q    We'll get to that in a minute, but let's stay
5    on hands-on testing.
6        A    I haven't done any hands-on testing, I just
7    consulted.
8        Q    For any type of SUI device?
9        A    Yes, sir.  No, I did.  I did do that.
10       Q    Oh, you did do that.
11       A    Yeah, I did do consulting for an SUI device,
12   but I didn't do hands-on testing.  I did regulatory
13   consulting.
14       Q    All right.  Just so the record's clear, you've
15   never done any hands-on testing for any type of stress
16   urinary device, correct?
17       A    Correct.
18       Q    Let's talk about your correspondence with
19   Ms. Garcia's counsel.  When were you first contacted in
20   this case?
21       A    I don't -- I think around sometime in the
22   summer, in July-ish.  I was looking at buying a house,
23   and he caught me, and I was in the middle of talking to
24   realtors and stuff.

Page 21

1        Q    He called you on your cell phone?
2        A    Yeah, and I didn't buy the house, so
3    I remembered that --
4        Q    That was in the summer of 2014?
5        A    Yes, sir.
6        Q    And what were you asked to do in this case?
7        A    I was asked if I would accept looking at the
8    case.  I mean, I was familiar with vaginal mesh from AMS
9    and I had had to look at issues with Ethicon before, so
10   he asked if I would look at an Ethicon issue.
11       Q    Okay, and what did you tell him you'd do?
12       A    I told him -- what did I tell him I'd do?
13   I told him I would look at it and I'd give him opinions
14   as to whether I would want to take the case.
15       Q    Have you ever spoken -- and who was that that
16   called you, Mr. Lundquist?
17       A    Mr. Lundquist.  He has my number.
18       Q    Had you ever spoken with Mr. Lundquist before
19   that first time?
20       A    Yes, I had worked with them on, I believe --
21   AMS?  Yes, AMS, for the MDL.
22       Q    Had you worked with Mr. Lundquist and his firm
23   for any other MDLs?
24       A    Paxil, I was involved with Paxil, and I'm not

Page 22

1    sure who all the people are in MDLs.  I know was with
2    Trasylol, I was involved.
3        Q   Trasylol?
4        A   Trasylol; and Paxil, and I'm not sure what
5    other ones I've been involved with.
6        Q   Okay.
7        A   Those are the ones I directly spoke to members
8    of his firm.
9        Q   That's at least four MDLs that you've been
10   working with Mr. Lundquist's firm on, correct?
11       MR. LUNDQUIST:  Objection, form.
12       THE WITNESS:  Well, I'm not working on an MDL,
13   I'm just working on this particular case.  So that would
14   be that they were part of an MDL group, as you know,
15   which could be hundreds of attorneys, for Paxil and --
16   so it was really -- was it four?  Yeah, but this isn't
17   an MDL, as far as I know.
18   BY MR. HUTCHINSON:
19       Q   Right.  When did you first start working with
20   Mr. Lundquist's firm?
21       A   Mr. Lundquist -- the firm?  The firm, the
22   first time I met -- that I remember meeting somebody
23   from that firm was for Paxil, which would have been
24   years ago.

Page 23

1        Q   How many years ago?
2        A   I'm not sure when that was.  I'm not sure --
3    I met them at the Kilker trial was the first time I met
4    someone from his firm, and I don't know when that was.
5    That was the only Paxil trial in Philadelphia.
6        Q   Would that have been more than 10 years ago?
7        A   I don't think it was that long ago.  It was
8    less than that.  It was probably, I don't know, eight
9    years ago, four years ago?
10       Q   Have you met with Mr. Lundquist before today's
11   deposition?
12       A   Yes, sir.
13       Q   How many times have you met?
14       A   For this deposition, I met with him once.
15   I met with him for three and a half hours, and that's
16   where we put together what my opinions would be for the
17   disclosure.
18       Q   Okay.
19       A   The only error he has is that I get $600 an
20   hour for court testimony and deposition.  He has it only
21   as 400.  That's an important one to me.
22       Q   So you've reviewed that expert disclosure
23   pretty thoroughly, correct?
24       A   Yes, sir.

Page 24

1        Q   Okay, and did you meet with Mr. -- when did
2    you have that meeting with Mr. Lundquist to review the
3    expert disclosure?
4        A   I believe it was in August.  It's on my
5    billing records.  I can look at my bills.
6        Q   And is that the only time you've met with
7    Mr. Lundquist?
8        A   Yes, sir.  Well, yesterday, I met with
9    Mr. Lundquist yesterday to discuss what I was going to
10   bring.
11       Q   And how long did you meet with Mr. Lundquist
12   yesterday?
13       A   We met for about four hours.
14       Q   So the meeting in August that was three and a
15   half hours, and your meeting yesterday that was four and
16   a half hours, would be the sum total of the two meetings
17   with Mr. Lundquist, correct?
18       A   Yes, sir.
19       Q   Has anybody met -- has anybody participated in
20   those meetings with you and Mr. Lundquist?
21       A   No.
22       Q   It's just been you and him on it only?
23       A   Yes, sir.
24       Q   Other than with Mr. Lundquist, have you

Page 25

1    discussed this case with anybody?
2        A   No, sir, nor would I think I would be
3    permitted to do that.  And by that I mean, by the
4    protective order.
5        MR. HUTCHINSON:  All right, so let's look at
6    what we'll mark as Exhibit number 4.
7        (Whereupon, Exhibit 4 was marked for
8        identification.)
9    BY MR. HUTCHINSON:
10       Q   So Mr. Lundquist made an error on the amount
11   per hour on Exhibit 4, and that should be $600 per hour
12   rather than 400, basically, is what you're saying?  Is
13   that correct?
14       A   For court and deposition testimony.  It's $400
15   an hour for work, that's correct, but it's for the other
16   would be what you're paying today, I guess, is $600 an
17   hour.
18       Q   Okay, well, let me make sure I understand.
19   It's $400 for your review of documents and records,
20   correct?
21       A   Yes, sir, when I stay in my office and just am
22   working on my case.
23       Q   And it's $600 per hour when you're giving
24   testimony at trial or in a deposition, correct?

1    A   Yes, sir.

2    Q   Do you still have a standing $6,000 per day

3  amount for trial?

4    A   For -- if I have to go to court, yes, sir.

5  It's for 10 hours.

6    Q   But it's $6,000 per day regardless of how much

7  time you spend?

8    A   Yes, sir, if I'm in trial.

9    Q   Do you charge any time for travel?

10    A   I usually travel -- I believe my husband --

11  I don't do the billing, but I believe we charge for the

12  time in the airplane.  If I was working on the plane,

13  then we would charge the $400, but if I'm just flying on

14  the plane, I believe we charge 150 an hour.

15    Q   What is the total amount of hours that you've

16  spent on this case?

17    A   Here, this is...  (Deponent hands document to

18  Mr. Hutchinson.)

19    Q   You've handed me two invoices, one invoice

20  Invoice number 2612 and Invoice 2639, and then a

21  handwritten piece of paper that's all within the

22  documents we've previously marked as an exhibit, is that

23  correct?

24    A   Yes, sir.

1    Q   And as best I can tell, you've spent nine and

2  a half hours working on this case.  Does that sound

3  about right?

4    A   Before, in getting ready for the prep, because

5  the prep is more than that, going through all the

6  documents.

7    Q   Well, I'm looking at the invoices.

8    A   Yeah, that's what I --

9    Q   So tell me, based on the documents that you've

10  brought with the deposition, how many total hours you've

11  spent on this case from the point you were called

12  initially to before you walked into this conference

13  room.

14    A   (Witness making handwritten calculations.)

15  Thirty-six hours, when you take getting ready for the

16  deposition.

17    Q   I'm sorry?

18    A   Thirty-six hours.

19    Q   Okay, and how many hours do you anticipate

20  spending after we leave today to get ready for trial?

21    A   I don't know.  I mean, I don't know if I'm

22  going to be asked to do anything else.  I haven't been

23  asked to do anything else.

24    Q   What percentage of your income is working --

1  strike that.  What percentage of your income has been

2  from working as an expert witness within the last five

3  years?

4    A   Um, about three years ago, I stopped doing

5  that much medical device.  Mainly I've been doing

6  consulting or manufacturing consulting.  So now it's

7  completely litigation support.  I'm trying to finish up

8  the cases that I have.  So it would be, a hundred

9  percent right now is involved in litigation support.

10    Q   And you've made over a million dollars over

11  the last five years doing litigation work, correct?

12    A   Yes, sir, and I've always been forthright with

13  all my bills.  So you have the total.  I'm sure, in the

14  records of all the depos, you just put them all

15  together.

16    Q   Do you advertise your services anymore?

17    A   No, sir.

18    Q   You used to advertise on hugesettlements.com,

19  didn't you?

20    A   No, I didn't.  Someone else put my website on

21  there and brought it up in a trial.  I forget which

22  trial it was, I think a hormone replacement therapy

23  case, they brought it up, and so then I quickly wrote to

24  them to remove it.  So no, I did not advertise on that

1  website.

2    Q   Has it been removed?

3    A   Last I've looked at it, it did, but it's

4  really buried in there.  It was, like, you had to know

5  where to look.  It's primarily an attorneys' website.

6  It has an awful name, but it's an attorneys' website and

7  so it was really cumbersome to find in the first place,

8  but it came up in a trial and I quickly removed it.

9    Q   Have you ever spoken with Dr. Miklos or

10  Dr. Trepeta?

11    A   No, sir.

12        (Whereupon, Exhibit 5 was marked for

13        identification.)

14  BY MR. HUTCHINSON:

15    Q   I've handed you what was marked as

16  Exhibit 5 -- this is off the record.

17        (Discussion off the record.)

18  BY MR. HUTCHINSON:

19    Q   Does this appear to be the reliance list for

20  you for this case?

21    A   Yes, sir.

22    Q   And is this up to date?

23    A   It should be, yes, sir.

24    Q   And did you prepare this document?

Page 30

1       A   I helped prepare the document.
2       Q   Who prepared the document?
3       A   Mr. Lundquist's firm prepared it, but we took
4   it from my documents and from things that I've written
5   for other things, and then I looked at the documents and
6   I tried to determine if it was complete.  So I was
7   assisted, but I didn't do the secretarial work.
8       Q   Is the time that you spent on this reliance
9   list reflected in the total amount of time you spent in
10  this case?
11      A   No, sir.
12      Q   Well, I'm sorry, we're going to need to get
13  back, because my impression was that you spent 36 hours
14  total working in this case.
15      A   Working on the case, yes, sir.
16      Q   Okay, but that doesn't include the time you
17  spent on this reliance list?
18      A   I didn't spend that much time on it.  If
19  I spend less than a half an hour, I don't bill.  So
20  there are times when I could do something very quickly
21  and I don't bill, so the time is not there; and then
22  they would e-mail me something and I'd look at it and
23  I'd say, no, we need to add this, or --
24      Q   Fair to say that you've spent less than -- or

Page 31

1   a half an hour or less on this reliance list?
2       A   Yes, sir.  I mean, it would be a poor use of
3   my time to be working on that list, but to assist is a
4   good use.
5       Q   What percentage of the materials on this
6   reliance list were supplied by plaintiffs' counsel?
7       A   Well, everything with Ethicon mesh has to come
8   from the plaintiff's counsel.  Some of these documents
9   are available, so I would have obtained them, like the
10  guidance documents, the FDA public notes, these are all
11  available information from the FDA.  So all the FDA
12  documents were documents that I've -- I obtained, at
13  various different times.  So those are all publicly
14  available.  So the good majority of it came from me,
15  basically.
16      Q   And I haven't had a chance to look at these
17  black notebooks yet, but are all of these ETH.MESH
18  documents in these two black notebooks?
19      A   The ones that I've relied on should be, yes,
20  sir.
21      Q   Okay.  Did you ever ask plaintiff's counsel to
22  get you more documents?
23      A   Not for this case, no, sir.
24      Q   Do you know how the documents that you

Page 32

1   received from plaintiff's counsel were selected by he or
2   his firm?
3       A   No.
4       Q   Okay.  Did you make any efforts to get any
5   other documents to rely on to support your opinions?
6       A   Well, yeah, the reliance list has a lot of
7   documents that I've got.
8       Q   Such as...?
9       A   The ones that aren't ETH.MESH in my documents
10  that I've obtained, primarily.
11      Q   Did you review any company documents that
12  expressed or provided any evidence contrary to your
13  opinions in this case?
14      A   No.
15      Q   Have you -- let's talk about your opinions for
16  a minute.
17      A   Yes, sir.
18      Q   Have you published any of the opinions that
19  you're offering today?
20      A   Published?  Anywhere -- you mean publicly?
21      Q   Yes, ma'am.
22      A   No.  No, sir.
23      Q   And I believe we already established that
24  you've not tested -- done any testing of mesh or any

Page 33

1   type of mesh product.
2       A   Correct, hands-on testing, that's correct.
3       Q   And how do you define hands-on testing?
4       A   Actually treating a patient or also looking at
5   a mesh in a laboratory, looking at histology, working up
6   mesh issues for Prolene.  So I haven't done anything
7   like that.  The FDA doesn't do that, and so that's not
8   the process I learned in the FDA.
9       Q   What about any benchtop testing?  Have you
10  ever done any benchtop testing?
11      A   Not on mesh.  I've done benchtop testing, but
12  not for mesh.
13      Q   Okay.  Did you do any type of tests whatsoever
14  in this case that would be reproducible?
15      A   I didn't do any testing.
16      Q   Have you ever spoken with any scientist,
17  engineer or medical doctor about your opinions?
18      A   No, sir.
19      Q   Have you ever spoken to anyone from the FDA
20  about your opinions?
21      A   No, sir.
22      Q   Have you ever called or written or contacted
23  FDA about any of your opinions?
24      A   No, sir.

Page 34

1      Q   Is it fair to say that all the opinions you
2   have in this case are for litigation and not for any
3   research or study?
4          MR. LUNDQUIST:  Objection, form.
5          THE WITNESS:  At this point in time, that's
6   correct.
7   BY MR. HUTCHINSON:
8      Q   Okay.  Are you intending to offer any
9   criticisms of FDA as part of your opinions at trial?
10     A   No, sir.
11     Q   Why not?
12     A   They're working within the framework in which
13  they can work.  So no, the issue isn't the FDA.  The
14  FDA -- from what I understand, the issue is Ethicon.
15         MR. HUTCHINSON:  Move to strike as
16  nonresponsive.
17     Q   Do you have any opinions -- scratch that.
18         Are you offering any opinions to a reasonable
19  degree of medical certainty about Ms. Garcia's medical
20  condition?
21     A   No, that would be cause- -- that's what
22  I would see as causation.  Obviously, I think that this
23  device plays into her, but in terms of her physical --
24  I haven't looked at her records to come up with a

Page 35

1   causation opinion.  I believe that would be to a
2   treating physician.
3      Q   It would be outside of your area of expertise?
4      A   Well, no, it wouldn't be outside my area of
5   expertise, but it's not what I see as my role.  I'm
6   trying to focus it as an FDA regulatory medical officer.
7      Q   Why do you think that would be within your
8   area of expertise, to offer a causation opinion?
9      A   Because I did it at the FDA in terms of health
10  risk assessment, in 21 C.F.R. Part 7.  So I did that,
11  and you would come up with issues and look for safety
12  issues, but that's not my role in this particular case.
13     Q   Let's talk about your opinions for a minute.
14     A   And can I clarify?
15     Q   Sure.
16     A   I'm assuming you're asking about standard of
17  care and her treatment and her outcome, and those to me
18  are clinical, and that's why I will defer that to
19  someone who's actually involved with her clinical care
20  and evaluation.
21     Q   Okay, but for the record, you have no opinions
22  to a reasonable degree of medical certainty about what
23  may have caused Ms. Garcia's alleged injuries, correct?
24         MR. LUNDQUIST:  Object to form.

Page 36

1          THE WITNESS:  Well, I wouldn't say that.
2   I would say that I'm not a causation person that would
3   be a physician talking about her specific case.
4   Obviously, if I'm sitting here discussing Ethicon and
5   TVT Secur, then from a health risk assessment, I believe
6   it's associated with her complications and her outcome.
7          So I don't know what you would call that in
8   terms of legal term, but it's not primary causation, but
9   is association.  It's related in some way to her medical
10  history in terms of her timing.
11  BY MR. HUTCHINSON:
12     Q   No primary causation opinions about
13  Ms. Garcia, correct?
14     A   I believe that's what we're talking about.
15  That would be for the physicians like Dr. Miklos and the
16  treating physicians to talk about, but obviously,
17  I think there's an association with her symptoms and the
18  types of symptoms that are seen for these devices.
19     Q   Understand.  Let me ask you again, so we can
20  have a clear record:  You have no primary causation
21  opinions about Ms. Garcia, correct?
22         MR. LUNDQUIST:  Object to form.
23         THE WITNESS:  Am I correct that primary
24  causation would be the medical physician treating the

Page 37

1   patient and standard of care?  That's not my area of
2   expertise in this particular litigation.
3   BY MR. LUNDQUIST:
4      Q   And you have no opinions -- primary causation
5   opinions about what may have caused Ms. Garcia's alleged
6   injuries, correct?
7          MR. LUNDQUIST:  Object to form.
8          THE WITNESS:  Well, that's -- in terms of a
9   health risk assessment, I believe that the vaginal mesh
10  is associated, and I don't know what you would call that
11  in terms of legal -- I believe it's associated.
12  BY MR. LUNDQUIST:
13     Q   Let's talk about the opinions you intend to
14  offer at trial, okay?
15     A   Okay.
16     Q   Tell me, in general, what opinions that you
17  plan on offering at trial?
18     A   Well, shall we go to my disclosure?
19     Q   You know, that might be a good idea.  Let me
20  get it.  You're looking at Exhibit 4, correct?
21     A   Yes, sir, and it would be specifically
22  page 10.
23     Q   Okay, I'm sorry, I'm on page 9.
24     A   Well, 9 is my history.  You want to go to 9?

## Page 38

1    We can go to 9.
2        Q    Well, that's where it starts, isn't it?
3        A    Yes, sir, but it's really basically background
4    there.
5        Q    Okay, but everything about Parisian on pages 9
6    through the top of page 14, correct?
7        A    Yes, sir.
8        Q    And does this expert disclosure list all of
9    the opinions that you plan on offering at trial?
10       MR. LUNDQUIST:  Form.
11       THE WITNESS:  The disclosure plus the
12   discussion today in the deposition, because the
13   disclosure's limited as to what it can say, and so my
14   purpose, I believe, for the deposition is that you get
15   to explore what those opinions are that are being listed
16   here in the -- whatever this is called -- in the
17   disclosure.  Am I correct?
18   BY MR. HUTCHINSON:
19       Q    Let's look at -- tell me the best way to boil
20   down those four pages of opinions.  So how would you, as
21   a purported expert in this case, boil down your opinions
22   from pages 9 to 13?
23       MR. LUNDQUIST:  Form.
24       THE WITNESS:  Well, the opinions begin where

## Page 39

1    it says, on page 10, after "Since leaving the FDA...,"
2    the next paragraph, "Dr. Parisian will testify that her
3    opinions...," and so we can begin there, because the
4    beginning is my history.  You can ask me questions about
5    my history.  That's what before that paragraph.
6        Do you have questions before that, or...?
7    BY MR. HUTCHINSON:
8        Q    Let's look at -- let's look at page 9.
9        A    Okay.
10       Q    Well, before we do that --
11       A    Because this is your chance to explore my
12   history.
13       Q    Thank you, and before we do that, if -- would
14   it be fair that if I ask you questions about pages 9
15   through 14 of this expert designation, and when we get
16   to the end of page 14, will we have covered all of your
17   opinions in this case?
18       A    I believe those would be the opinions that I'm
19   planning to give in terms of the court.  That's why
20   I worked with Mr. Lundquist to try and make sure you had
21   those opinions, but there's going to be more information
22   and support provided in today's discussion.
23       Q    I understand, but this document would have all
24   the -- your general opinions, correct?

## Page 40

1        A    Yes, sir.
2        Q    All right.  Let's look at page 9.  It states
3    in the middle, "Dr. Parisian presided over 162 health
4    risk assessments."
5        A    Actually, it was more than that.  It was when
6    I was in the Office of Health Affairs, and then I did a
7    hundred more when I was in ODE, so it's 262.
8        Q    For what purpose was that?
9        A    Pardon.?
10       Q    For what purpose was that?
11       A    It was to look at health risk assessments,
12   like I was describing before, about what was the cause;
13   to make recommendations to the FDA in terms of actions
14   to take to protect the public.  Many of them were
15   voluntarily recalls, some of them are mandatory recalls.
16   So it would be the processes described in 21 C.F.R.
17   Part 7, health hazard, health risk assessments.
18       Q    And did you do any health risk assessments for
19   mesh?
20       A    You know, I don't know.  I don't recall.
21       Q    Do you recall doing any health risk
22   assessments for any SUI product?
23       A    I don't recall -- these are post-market
24   issues, these are products that are already being

## Page 41

1    marketed, and I don't recall specifically, but it was a
2    while ago.  I mean, the last time I was there it was in
3    '95, so out of 262, I don't remember.
4        Q    It states, on the bottom of page 9, you were
5    the FDA's liaison with the National Institutes of
6    Health, involving what?
7        A    For those issues, ENT, ears, nose and throat
8    surgery, kidney, pulmonary, women's health and
9    alternative medicine.  So I was -- had to be the person
10   that would go to meetings with the NIH to discuss those
11   issues.
12       Q    The NIH is a very respectable organization,
13   correct?
14       A    Yeah, National Institutes of Health, yes, sir.
15       Q    It's one of the leading authorities in the
16   field?
17       A    It is -- it is, in terms of this country, yes,
18   sir.  And in what field?  I mean, it is an outstanding
19   medical institution, that's all.  I mean, it's... I'm
20   not going to say anything bad about the NIH.
21       Q    When you were the liaison with the NIH, did
22   you work with them on anything about mesh?
23       A    Not specifically about mesh.
24       Q    Anything about SUI?

Page 42

1      A   I don't recall that I did.

2      Q   Anything about the pelvic floor?

3      A   I don't recall that I did, but I don't recall

4   that I didn't, because about that time there was

5   interest by the NIH on pelvic floor and there was a

6   document that was put out, and I don't recall, because

7   the issue was that I was handling devices for women in

8   terms of medical devices, and so I know that pelvic mesh

9   and pelvic surgery was an issue, and I don't recall what

10   happened with the NIH.

11      Q   Let's look on page 10.

12      A   Yes, sir.

13      Q   It states, in the middle,

14          "During her tenure at FDA, Dr. Parisian

15          reviewed hundreds of marketing applications

16          for safety and efficacy."

17          Correct?

18      A   Yes, sir.

19      Q   Those are the 510(k)'s that you reviewed?

20      A   It would be 510(k)'s and PMAs, and then also

21   the investigational device associated clinical trials.

22      Q   Did any of the 510(k)'s that you reviewed have

23   long-term clinical data?

24      A   Yes.  The company would commit to follow up,

Page 43

1   because they would make claim on the long-term follow-up

2   data.  So for industry to make comparative claims, they

3   would come in and say, well, we've done this study, so

4   yes.

5      Q   You've never reviewed a 510(k) for any type of

6   mesh product, have you?

7      A   I don't know, because it's used throughout

8   surgical stuff.  So I don't -- I don't remember because

9   I did surgical devices, so I don't -- I did do mesh.

10   I was involved with abdominal adhesions devices that was

11   Proceed, that was Ethicon's product.  So I was involved

12   with mesh issues.

13      Q   Okay.  Let's talk about mesh for the pelvic

14   floor.  You've never reviewed a 510(k) for mesh for

15   pelvic floor, correct?

16      A   Not that I'm aware of.

17      Q   Or SUI.

18      A   Yes, that's correct, because a lot of times,

19   they were using -- at the period of time I was there,

20   they were doing fascia.  So I was aware of urological

21   issues, but with primarily with fascia, and they were

22   also doing the sacrocolpoplexy sling and bone anchor, so

23   I don't believe mesh was being used.

24      Q   Did any of the 510(k) applications that you

Page 44

1   reviewed recommend -- strike that.

2          Did any of the 510(k) applications that you

3   reviewed have any labeling that says there was no

4   long-term clinical data?

5      A   Well, there would be nothing that would

6   prevent any 510(k) manufacturer from putting that on.

7   If a device was particularly dangerous -- and I'm trying

8   to think.  We had devices that were 510(k)'s because

9   510(k)'s would cover implanted devices.  We would have

10   some kind of statements like that, that if there was no

11   long-term data known, because it usually would be a risk

12   versus benefit, that that would be a device, like I can

13   think of devices for, like, handicapped children or

14   something that would be the unknown, that they would

15   have something like that.  So there's nothing that

16   prevents that statement, but it's usually a riskier

17   device.

18      Q   All right.  Let's go back to my question,

19   okay?

20      A   Okay.

21      Q   Did you review any 510(k)'s that had any

22   labeling, proposed labeling, that says there was no

23   long-term clinical data?

24          MR. LUNDQUIST:  Form.

Page 45

1          THE WITNESS:  Well, for 510(k), sure, because

2   you don't even have to be cleared -- you don't even have

3   to be making a device to get a 510(k) cleared.

4          So if it was a risky device, that information

5   would be included in terms of the risk versus benefit

6   for physicians.  I don't remember a specific device, but

7   would that be unusual?  No, I don't think it would be

8   unusual, particularly if there was no history for the

9   device.  But again, it would typically be a risky

10   device.

11   BY MR. HUTCHINSON:

12      Q   Down there on the bottom, it said, on page 10,

13   it says,

14          "Dr. Parisian will provide her opinions

15          on the FDA's clearance of TVT-S on

16          November 28, 2005, including concerns with

17          Ethicon's design validation process."

18          Do you see that?

19      A   Yes, sir.

20      Q   What concerns do you have about the design

21   validation process?

22      A   It's internal concerns by Ethicon.  There's --

23   and I have marked some tabs where they discuss it.  If

24   you look at this book, the first book, which we'll call

Page 46

1    this one Volume 1, this one that says "TVT Secur," there
2    is a series of documents in here talking about the
3    concerns with quality assurance and the validation
4    process, design protocols.  And so there's internal
5    e-mails.
6          It would begin with tab 8, 9, 10, 11, 12, 13,
7    14, 15, 16, 17, 18.  So the tabs that I -- in this
8    Volume 1 book describe internally that the company was
9    concerned, particularly their quality assurance people,
10   with the adequacy of the design validation protocol for
11   the TVT Secur device, and that it wouldn't live up to
12   the scrutiny of the FDA if they came in and inspected
13   because of the way it had been done.  There were several
14   series of amendments that were made to the design
15   validation.  So I'd direct you to those documents, in
16   terms of TVT Secur.
17         I think what's even more important in that
18   opinion, there, is that I see that, as an FDA regulatory
19   person, my role is to explain the history of how the
20   510(k) -- to go step back, to explain to a jury the
21   510(k) process and what it requires, what a
22   manufacturer's required.
23         So I believe that's usually what -- so you
24   skipped over that part, but I think that's what I would

Page 47

1    be giving to a jury is explaining the FDA process and
2    then putting the TVT Secur into that context, of
3    framework.
4    Q   The concerns -- but the concerns that are
5    referenced in this disclosure are concerns that you said
6    you read from company documents, correct?
7    A   Um, the internal concern has to come from the
8    company documents, because --
9    Q   Well --
10   A   -- because this would be privileged
11   information.  It wouldn't be out in the real world.
12   Q   Well, I want to know what -- I want to know
13   your opinions about Ethicon's design validation process.
14   A   Well, one that the quality assurance personnel
15   were concerned about, that the company was trying to
16   rush this product to market and they hadn't done
17   adequate testing.  They hadn't done design validation,
18   which is a key to a successful device, is that the
19   company, under 21 C.F.R. 820, must do adequate design
20   validation to make sure that the device performs as
21   needed for the patient and the physician.
22         And so it's a red flag, in a way, when the
23   quality assurance people are concerned about the quality
24   of the design validation that was done before a

Page 48

1    design -- before a device is released, and so those
2    would be things that, in terms of good manufacturing,
3    are of concern.
4          Like, they actually did one design validation
5    where they gave the questionnaires of studies to
6    doctors -- and that would be in tab 11, it would be
7    dated January 26 -- January 3rd, 2006 -- and the
8    doctors' response, when they saw the original study
9    questionnaire, was that they wanted them to revise the
10   IFU.
11         So even before they had released the product,
12   of the physicians who were looking at this, the product
13   and the performance of the product as part of Ethicon's
14   design validation, were raising questions about the
15   adequacy of the Instructions For Use for doctors.
16   Q   Dr. Parisian, do you know what the design
17   requirements are?
18   A   Sure.
19   Q   The requirements for design validation?
20   A   Sure.  In terms of the FDA?  In terms of 21
21   C.F.R. 820?  Sure, you have to ensure that your company
22   is making a product that will fulfill user needs, and
23   you have to address any potential risks in terms of the
24   performance of that product, because it's a prohibited

Page 49

1    act for you, Ethicon, to market a device that's not safe
2    and effective.
3    Q   On the bottom of page 10 it states,
4          "Ethicon relied upon two of their own
5          devices, the TVT and TVT-O, as substantial
6          equivalent predicate devices, despite obvious
7          differences between them."
8          Do you see that?
9    A   Yes, sir.
10   Q   What are the obvious differences between them?
11   A   Um, the obvious differences in them -- well,
12   the length of the mesh, the insertion --
13   Q   The length of mesh between TVT and TVT-O?
14   A   Yes, sir.  Okay, because -- and also, well,
15   TVT is a retro-pubic insertion, makes a U-shaped sling,
16   whereas TVT-O is an H-shaped sling, and so both of them
17   had a process where you would have two points of
18   fixation in terms of putting in your sling, yes.
19   Q   What other differences between --
20   A   Well, and so now the company was introducing
21   what they called a single-incision sling, SIS, that
22   had -- was much shorter.  It was only 8 centimeters
23   long.  So you changed the lengths of the sling.
24         You had a new insertion device, in terms of,

Page 50

1   that had never been used for the TVT or the TVT-O.
2       You had a new insertion row, in terms of also
3   having to tension this device, because neither TVT or
4   TVT-O required tensioning.  So that was a new issue.
5       So you had a new inserter, you had new
6   tensioning, you had a new release mechanism, you had --
7   the Ethisorb's fixation was different than had been done
8   with either one of those devices.
9       So the only thing that's similar is that there
10  was Prolene, but even the Prolene was different, in that
11  the Prolene for TVT and TVT-O was a mechanical-cut
12  Prolene, as opposed to the introduction of a laser-cut
13  Prolene for TVT-S, which changes the stretchability of
14  the Prolene.  So there were a lot of differences.
15      Q   Do you know how the stretchability of
16  mechanically-cut versus laser-cut mesh has changed the
17  physiological range?
18      A   The physiological range --
19      Q   The --
20      A   No, no, no --
21      Q   I'm asking --
22      A   Yes, I do know the answer to that --
23      Q   Okay, can you explain that, please?
24      A   -- but I want to explain, the word

Page 51

1   "physiological range" came from the company, and it was
2   introduced by the company --
3       Q   Dr. Parisian --
4       A   No, no, no, let me explain.
5       Q   I'll move to strike as nonresponsive.
6       A   No, it was -- yes, I do know the difference.
7       Q   All right, I'm not sure -- okay, then
8   explain --
9           MR. LUNDQUIST:  Let her finish her answer.
10  BY MR. HUTCHINSON:
11      Q   I'm not asking where the name "physiological
12  range" came from.
13      A   No, it's --
14      Q   What I'm asking is, do you know --
15      A   Yes, I do know the difference.
16      Q   Okay, what's the difference?
17      A   The difference is, the physiological range was
18  to cover the range of the change in stretchability.  The
19  mechanical-cut was -- had more stretch, was more elastic
20  than the laser-cut mesh, and so in order to be able to
21  reference the seven years of history with the TVT and
22  the TVT-O, the company created the term "physiological
23  range," even though they knew that the Prolene stretch
24  had changed.  They expanded the standard for what would

Page 52

1   be the acceptable stretch, to include the TVT Secur.
2       So it was a term introduced by the company to
3   just cover that we had totally changed the
4   stretchability, we had made it a much stiffer mesh, but
5   that term allowed the company internally, in their
6   documents, to then say, well, now we can recite -- we
7   can use the years of the TVT, but the mesh was totally
8   changed, because you had -- laser-cut edging changes the
9   edge, it melts it, so that you have a much rougher edge
10  than you did for TVT and....  So yes, I do know the
11  difference.
12      Q   Dr. Parisian, are all of the documents that
13  you relied on in support of any opinion about
14  mechanically-cut versus laser-cut within the documents
15  we've already marked as Exhibit 3, or -- 2, rather?
16      A   The one specific for what I'm talking about
17  the physiological range in Ethicon, yes, that's in
18  there --
19      Q   But --
20      A   -- in terms of -- but the issue is, I've dealt
21  with Prolene mesh before, and I know what a laser-cut
22  does versus mechanical-cut, but the documents that would
23  be specifically supporting my opinions about laser-cut
24  are in here.

Page 53

1       Q   Did you ever review any clinical expert report
2   regarding mechanically-cut and laser-cut mesh and the
3   responses to that?
4       A   No.
5       Q   Okay.  Let's look at the top of page 11.
6           MR. HUTCHINSON:  Off the record for a second.
7           (Discussion off the record.)
8   BY MR. HUTCHINSON:
9       Q   It states at the top of page 11 on Exhibit 4,
10  "Dr. Parisian will opine on potential flaws of the
11  design of the TVT-S."  Do you see that?
12      A   Yes, sir.
13      Q   What is -- what are the potential flaws of
14  design of the TVT Secur?
15      A   Okay.  The potential flaws would be the use of
16  the Ethisorb Dura Patch in terms of the attachment end,
17  because that's not -- that's -- and we can talk about
18  why I think that's -- but just to go through my list.
19          The other one would be the change in the mesh,
20  the stretchability, in terms of decreasing it.
21      Q   You're talking about laser-cut versus
22  mechanical-cut?
23      A   Yeah, that would be one aspect of it.  So we
24  have fixation, poor fixation with the Ethisorb.  We have

1   the change in the mesh in terms of the laser cut. We
2   have the tensioning, that the tensioning mechanism is --
3   has been a major issue in terms of the safety of this
4   device. So there weren't development of instructions on
5   appropriate tensioning.
6        Let's see, what else? The -- in terms of, the
7   complaints that were being received originally were the
8   inserter was sharp and could cut things, you know, cut
9   organs and cause damage, and then the release mechanism
10  was problematic in terms of the physician knowing
11  exactly where they were releasing. Not only is
12  tensioning hard, but releasing. The physicians and
13  their key opinion leaders said they have a difficult
14  time knowing where they're putting the mesh.
15       Q   Anything else?
16       A   Let's see. 8 centimeters. I think the
17  8 centimeters, when they go into the design of the next
18  generation mesh, I believe they're doing that around
19  2008, they're talking about going with a longer mesh
20  because they kind of arbitrarily chose the 8 centimeters
21  based on that it may be acceptable for most bodies, and
22  so --
23       Q   Anything else?
24       A   I'm thinking. Those are the designs. I think

1   that the reproducibility is an issue with the design,
2   poor design, in that even the key opinion leaders are
3   saying that they were having a hard time predicting what
4   the outcome would be.
5        So that's an issue with the design, that you
6   want to make sure that it can be used consistently by
7   the physicians if they do it right, and by your
8   instructions, that they will have a good outcome, and so
9   that's a flaw.
10       Let's see, what else was there? The sheep
11  study. I think the sheep study was a problem. When you
12  go through the sheep study, you realize that they don't
13  do a sheep study simulating use of the product in even
14  the sheep. They do flat pieces of mesh in terms of
15  adhesion, in terms of ability to attach the mesh to the
16  wall with the Ethisorb. They don't simulate a real use
17  situation and the forces of the pelvis.
18       Let's see, what else? So animal testing would
19  be an issue.
20       Another issue is that they didn't do a
21  comparison of testing of the TVT and the TVT-O to the
22  TVT-S, and so they're saying that they're substantial
23  equivalent, they get cleared to make a product that's a
24  substantial equivalent, and yet there are issues of

1   safety and effectiveness that are not addressed, and
2   they got clearance, but once the product gets cleared,
3   they are not addressing safety issues in terms of doing
4   a CAPA and creating preventive types of issues,
5   corrective and preventive issues.
6        Let's see, what else? And that's not
7   discussing the IFU, because internally there was a
8   discussion that they needed to create a better
9   instructions for the physicians in terms of a cookbook
10  as opposed to the IFU. The IFU doesn't have the same
11  issues that were known in terms of the CER that was
12  written by a Dr. Owens, in terms of a potential risk.
13  None of that information was being provided to the
14  physicians. But that's post-market, so we'll leave
15  that. But the CER was actually pre-market. So they
16  knew those risks and they did not plan to provide those
17  to the physician.
18       Q   Any other flaws of the design of the TVT-S?
19       A   Let me look at tab 8. (Witness reviewing
20  documents.) I talked about the Ethisorb, which is your
21  fleece, and we talked about the stretch in terms of the
22  mesh, we talked about that.
23       They also changed -- the pull-out force was
24  changed to 164 grams, which was the physiological limit.

1   They made that change for the TVT-S. Originally, the
2   pull-out force had been around 500 grams. So this is
3   coming from my tab 18, and it's going through the design
4   history of the TVT Secur.
5        Another issue is that they marketed both the
6   retropubic U and the obturator H as being able to be
7   done with the same device, and that -- that is like,
8   really? You really need to test that out, because
9   you're talking about physicians' ability to plant two
10  different devices, that you supposedly can do it with
11  this device, and I think that -- and that's how they
12  marketed it, and I think even in retrospect, they saw
13  that that was a bad thing to do.
14       And they say that the placement of this thing
15  is even more -- in this presentation, is even more
16  critical than when you place the TVT, because if you
17  don't plant -- if you don't place it next to the pelvic
18  bone, the pubic bone, you're going to hit the bowel. So
19  you have an issue of potential bowel perforation. You
20  also have an issue with bladder perforation. There was
21  more bladder perforation, so that also is a poor design.
22       And also, the other products had all been sold
23  as tension-free. So this was now adding tension to the
24  whole mix. I think I talked about tensioning, didn't I?

Page 58

1    Q   Have we discussed all the potential flaws that
2  you believe were in the design of the TVT-S?
3    A   That's what I'm trying to do.  I'm trying to
4  make sure.  So we knew -- I had mentioned the
5  8 centimeters, I mentioned the fixation, I mentioned the
6  correct -- that you need to have the correct placement,
7  and yet, in -- okay, so that's not design.  What else?
8        The versatility; we talked about the sheep
9  study.  Okay, those would be things that, before you put
10  a product on the market, should have been addressed.
11    Q   Dr. Parisian, have we talked about all your
12  opinions about the potential flaws of the design of the
13  TVT-S?
14    A   Well, the other big flaw is they didn't do a
15  clinical trial.  The pre-market release that they did
16  with Dr. Artibani and Dr. Nilsson came up with safety
17  issues, and the company was going to proceed ahead with
18  the clinical trials, and I think Dr. Weisberg, in his
19  CER, said that they were not going to do a clinical
20  trial based on it being like the TVT and the TVT-O,
21  where internally they're talking about it being
22  different.
23    Q   We'll add clinical trials to the list.
24  Anything else?

Page 59

1    A   What I'm doing in my answer is I'm generating
2  as pre-market.  These are pre-market flaws that you
3  should have been able to see in terms of your risk
4  assessment and your 21 C.F.R. 820, your design flaws.
5  We're not talking about post-market.  These are things
6  that should have been known to an expert in this product
7  before they put it on the market.
8    Q   Have we talked about all potential design
9  flaws in the TVT-S, in your opinion, pre-market?
10    A   Well, the other was they relied on engineer
11  Dan Smith, instead of the relying on their own internal
12  physicians, as potential risk.
13    Q   Okay, anything else?
14    A   As for pre-market, yes.
15    Q   Okay, thank you, and these opinions that you
16  formed about the potential design flaws of the TVT-S,
17  those are opinions are based on your review of Ethicon's
18  documents, correct?
19    A   Yes, sir.
20    Q   Anything else?
21    A   Well, I think the other thing that I didn't
22  mention was the learning curve, that it actually -- the
23  company was aware it was difficult for surgeons to put
24  these in to begin with, and that's a user error

Page 60

1  potential problem that you have to put into your design
2  documents and your design validation, and that really
3  wasn't adequately addressed, and when it was given to
4  physicians, they said change the instructions, and they
5  didn't.  They kept the same instructions.
6        So I think, that it was going to be very
7  difficult to put this product in was known before they
8  even launched it in the United States.
9    Q   Let's look at the -- all right.  Anything
10  else, Dr. Parisian?
11    A   Um --
12    Q   This is my one and only time to get all your
13  opinions, and I'm entitled to them, so --
14    A   I know, I'm trying --
15    Q   -- I need to ask you.  Anything else?
16    A   I'm trying to answer.  Well, they worked with
17  Prolene for years, so they should have known about the
18  potential for mesh degradation, that over time you could
19  have mesh degradation.  So that was something to also
20  address, because this whole thing is based on the -- and
21  I'm not the pathologist discussing this, but I'm the FDA
22  person -- that the integration of the -- the implant, to
23  hold it in place, is important.
24    Q   Anything else, Dr. Parisian?

Page 61

1    A   Okay, let me look, let me look.  Well,
2  I think --
3    Q   And let me ask you this.  What are you
4  reviewing now?
5    A   Here, you can see.  (Witness indicating.)
6    Q   You're reviewing your expert designation,
7  correct?
8    A   Yes, sir.
9    Q   Okay.
10    A   And I'm trying to kind of shorten it, so --
11    Q   Sure, if you can shorten it so we can move on,
12  I'd appreciate it.  Anything else?
13    A   The other issue I think that the company
14  needed to take into consideration was that they were
15  already marketing the TVT and the TVT-O, and so those
16  devices actually had a potential risk for erosion; so
17  the complications, dyspareunia, vaginal scarring.  So
18  there was a known risk associated with these types of
19  device.  They didn't just begin one day and make the TVT
20  Secur.  So those elements that were already known, if
21  you're going to make a less-invasive, safer device,
22  should have been addressed in their early testing and
23  design, and they didn't.
24    Q   Anything else?

Page 62

1   A   Yeah.  Before they even marketed this device,
2   they did have the pre-market information from the
3   physicians who had done it, and there was no plans to
4   have a certification training to make sure that the
5   doctors were aware of how to use this product.
6   Q   And that's a potential design flaw with the
7   design, correct?
8   A   From the very beginning, that there was
9   nothing put out that they were going to address it.  As,
10  like I said, they already had the history of the TVT,
11  the TVT-O, so --
12  Q   And any --
13  A   -- insertions is important.
14  Q   Move to strike as nonresponsive.  Anything
15  else, Dr. Parisian?
16  A   I think that will do it.
17  Q   Okay.  Look at page -- at the top of page 11.
18  A   Yes, sir.
19  Q   It says,
20      "Dr. Parisian will also discuss the
21      adequate and ethical disclosures required when
22      ghostwriting articles."
23      Do you see that?
24  A   Yes, sir.

Page 63

1   Q   What do you mean by that?
2   A   Well, that in terms of, you have to -- well,
3   I would specifically refer you to my book, in terms of
4   tab 6 and tab 7.  Do you want me to pull those out, in
5   terms of ghostwriting?
6      Ghostwriting refers to -- let me get that, 6
7   and 7.
8   Q   I'm not asking about what ghostwriting refers
9   to.  What I'm asking is:  What are your opinions about
10  adequate and ethical disclosures required when
11  ghostwriting?  So if you can stick to that question, I'd
12  appreciate it.
13  A   All right, but for your benefit, I'll
14  reference to you tab 6 and 7, when you have my book.
15      Ghostwriting ethical is disclosure.  The
16  company needs to inform the physician, or the patient,
17  the source of the information that they're -- that
18  they're providing.
19      They have to also disclose their involvement
20  in writing a report.  For example, the sheep study was
21  put out, published, and Dr. Artibani says they hadn't
22  been involved in it.  He was basically put on the
23  article as a name, and Dan Smith, who had actually done
24  the sheep study involved at this time, was only put on

Page 64

1   as a "thank you for helping."
2   Q   Okay, anything -- would you give me another
3   example?
4   A   Well, and also, those would be under the
5   regulations, in terms of writing adequate instructions
6   and adequate warning, adequate information about the
7   product.  Where is this information coming from?
8      And so that's required, in terms of
9   ghostwriting, that a company disclose that to a
10  physician, and particularly if they're going to using it
11  as their marketing information that they're going to
12  have their sales reps give out, and so that would be
13  under your 21 U.S.C. 352 and adequate instructions,
14  adequate warnings.
15      It would also feed into --
16  Q   Dr. Parisian, let's stick with answering the
17  question.
18      MR. LUNDQUIST:  She's answered your question
19  about the ghostwriting.
20      MR. HUTCHINSON:  I know.  I'm asking, for
21  example, she gave me the Artibani sheep study.
22  Q   What other examples?
23  A   All right, well, there's the performance
24  evaluations of a new TVT-like mesh system for the

Page 65

1   treatment of stress urinary incontinence.  It's in my
2   tab 7, and it basically says, we need to get two
3   surgeons as lead authors, otherwise there's a little
4   credibility leak for customers.
5      So Ethicon is writing an article to be
6   published about the use of the TVT mesh system for SUI,
7   and they're including the TVT Secur -- they're saying
8   how -- this is -- this example is for TVT, and they're
9   proposing --
10  Q   Okay.  It's not for TVT Secur, correct?
11  A   Well, that's correct, but the page says,
12  "would suggest something like performance evaluation of
13  this for TVT Secur."
14      So this is an example of the company writing
15  an article, they say they're going to find doctors'
16  names to put on the article, and they're talking about
17  that they would like a similar type of article for TVT
18  Secur.
19      So this is an example of ghostwriting, and
20  this is an example where there's not a disclaimer that
21  the company has written the article, and that the --
22  they're just going to find doctors to put the names on.
23  Q   Can you give me --
24  A   That's ghostwriting.

Page 66

1      Q   Excuse me.  Can you give me any other
2   examples?
3      A   Well, I gave you those two examples, talking
4   internally.
5      Q   Well, can you give me any other examples?
6      A   Well, those are the two I have.
7      Q   Other than those two.
8      A   There is, I believe...  (Witness reviewing
9   documents.)
10     Q   And Dr. Parisian, just for the record, when
11  I'm asking for examples, you're looking under tab 6
12  and 7, correct?
13     A   I was.  I'm looking right now at tab 4,
14  because of the -- plan for how they're going to
15  release the product.
16     Q   Can you give me any other examples, other than
17  the two that we've already discussed?
18     A   That's why I'm looking at this one document,
19  to see if they talk about those -- getting publications
20  out, but I don't -- I don't see that they do.  So those
21  were the two that I'll stick with.
22     Q   If you look on -- further on page 11 --
23     A   Um-hum.
24     Q   -- kind of in the middle, it states,

Page 67

1          "Dr. Parisian will also testify that
2          Ethicon failed to adequately study, design and
3          test the TVT-S prior to allowing the device to
4          be sold."
5          Do you see that?
6      A   Yes, sir.
7      Q   Have we already discussed all of your opinions
8   relating to the adequacy of studying, designing and
9   testing the TVT Secur?  I think so, but I just want to
10  make sure.
11     A   That's the pre-market, but then it goes on to
12  talk about the post-market.
13     Q   I understand, pre-market.  Have we already
14  discussed all of your opinions?
15     A   About the potential flaws of the design.
16     Q   Of the study, design and testing of the TVT
17  Secur, in pre-market.
18         MR. LUNDQUIST:  Objection.
19         THE WITNESS:  If I divide it into pre-market,
20  and then the next part of that paragraph --
21  BY MR. HUTCHINSON:
22     Q   I'm sorry, is that a yes?
23     A   Let me think about it.  Yes, I think that
24  would be the -- well, the tests would be the clinical

Page 68

1   trials that they -- there wasn't a plan to do clinical
2   trials before they launched, or to do a human trial, or
3   even to do a sheep study that simulated the use.
4          So that would be testing, as opposed to the
5   flaws.  The design flaws were the obvious issues that
6   they needed to -- but even their testing was inadequate.
7   So that's little bit more.
8      Q   Let talk about post-market.  What do you
9   believe -- what are your opinions as to what Ethicon
10  failed to do on post-market of the TVT Secur?
11     A   Well, in terms of post-market, they weren't
12  actually -- they didn't get any clinical data on the
13  post-market failure.  Most of these devices, when they
14  failed, they were failing in 12 weeks.
15         I went and did an MDR search, and that's not
16  in here, but it was part of this type of an opinion, and
17  Medical Device Reports are described under 21 C.F.R.
18  803, and they're mandatory for Ethicon when they receive
19  information about a failure of their device, return of
20  SUI, erosion.  Those would be failures.
21         If you look at the MDRs, the Medical Device
22  Reports, and you look at the reports that are being
23  discussed internally about the failures, they're not
24  consistent.

Page 69

1          I went and just, last night, quickly just put
2   in "TVT Secur" -- if I can find that document --
3      Q   Well, why don't you stick with me.  On
4   post-marketing opinions --
5      A   Well --
6      Q   -- the first one is no clinical data, correct?
7      A   Well, yeah, this is essential to post-market,
8   because this is --
9      Q   Okay.
10     A   -- mandatory.
11     Q   Are we on the second opinion?
12         MR. LUNDQUIST:  She's talking about her --
13  she's still articulating her point on post-market
14  issues, I think.
15         THE WITNESS:  Yes.
16  BY MR. HUTCHINSON:
17     Q   All right, we're back.
18     A   Post-market requires -- when I say
19  post-market, that would include complaint file handling,
20  and this would be all described under 21 C.F.R. 820.  It
21  would be complaint file handling as well as medical
22  device reporting.
23         So internally, the documents, I see
24  discussions of failures in Germany and Australia, and

Page 70

1    that information is not being filed with the FDA, and it
2    should be, because that information is not -- unless the
3    company is feeling that they don't need to file because
4    it's already in their labeling, okay, in their IFU.
5            And so if you look at -- which it's not -- if
6    you look at the trend -- okay, I did a really, really
7    fast look at the Medical Device Reports last night,
8    because this is a discussion about post-market, and
9    I felt that I needed to look at the MDRs to see if the
10   company was filing MDRs, because they're required to
11   when they find out that the product failed.
12           And when I looked at the years 2006 through
13   2007, which is a year block, for Gynecare TVT, there
14   were no reports in the FDA's database of anything, okay?
15   So -- and that's all the TVT products. There's nothing.
16           And then when I did a look at year -- on the
17   back of this page, you may want to have -- be aware
18   there's information on the back.
19   Q    This is handwritten notes by you, correct?
20   A    Yes, sir.
21   Q    And this is in what we've previously marked as
22   Exhibit 2, correct?
23   A    Right, but it's on the back, so somebody may
24   miss it.

Page 71

1    Q    We'll make sure we have it, and what is this?
2    A    This is -- so my computer wasn't working very
3    well last night, so that's why I didn't print it all
4    out, but I went and I looked at the years 2007 to 2008,
5    for all Gynecare TVT, all products, and there were three
6    MDRs filed with the FDA. Only one of them was for
7    Secur, and it was filed not by the company but by a user
8    facility, and I printed it out, and it was for a bent
9    device. It wasn't for a patient injury, it was a bent
10   device that the doctor had, and they had to send it
11   back. So there were three, a total of three MDRs.
12           Then I looked at the year 2008 and 2009.
13   There were nine MDRs for all of TVT. Two of those were
14   for Secur. So 2008, 2009.
15           Now, internally we're seeing discussions of
16   Germany and Australia, failures for people like Lucente,
17   and they're not being captured in the MDRs. They should
18   be, because the IFU and the labeling doesn't have the
19   severity and the frequency with which reports of
20   erosion, dyspareunia is occurring and failure. So that
21   information would be required to be reported to the FDA,
22   in terms of the regulations, 21 C.F.R. 803.
23           Year 2009 through 2010, there's eight reports,
24   and there is one Secur report in those eight, and it was

Page 72

1    from a user facility, not from the company.
2            The year 2010 through 2011, there were nine
3    reports, and I believe there was one report for Secur,
4    where there was an erosion, and the company said it was
5    because the doctor implanted it too tight for the Secur,
6    and that the woman had had severe pain, on antibiotics
7    for two years, numbness both legs, incontinence, and so
8    that was reported to the company supposedly in 2010 for
9    an implant of 2008.
10           When you look at 2011 to 2012, there's 18
11   reports, and the Secur report is actually voluntary,
12   it's by somebody else, for an event from 6/1/2007, where
13   a woman was complaining in one week post her surgery she
14   was incontinent.
15           Okay, and then you look at 2012 to 2013, and
16   there are 22 records, of which five of them are Secur.
17   So FDA is not getting a lot of MDR reports here from the
18   company up through 2013.
19           Then 2013 to 2014, after Ms. Garcia's
20   procedure, there is over 500 records. I didn't look at
21   all of them because it was late, but there were over 500
22   records.
23           So the FDA is not getting reports for anything
24   for TVT really until the year 2013, and there were 61 of

Page 73

1    those 500 I counted were Secur, which is a small
2    percentage, really, of over 500 reports. I could go
3    month by month and find out what the total would be, but
4    I think it makes its point, that FDA was really not
5    getting Medical Device Reports from the company until
6    2013, and yet their records show that they were aware of
7    issues before that, and they're not getting a lot of
8    reports for Secur.
9            I mean, in 2013, they have 61 reports out of
10   500. That's a small percentage that's Secur. The year
11   2014 to 2015, there's 500 records.
12           So if you're going to say that they're
13   required to report Medical Device Reports to the FDA to
14   notify the FDA or alert the FDA of a safety signal or an
15   issue with their product, there's no signal here for
16   Secur until -- or anything with TVT until 2014, 2013.
17           So they're not filing MDR reports as they're
18   required to do, and if a physician knew how to look up
19   MDR reports, say, any physician who decided, I'm going
20   to use this device versus another, the MDRs really are
21   fairly silent. There's not a lot of reports. So
22   I think that feeds into that opinion.
23   Q    All right. Dr. Parisian, have we discussed
24   all of your post-marketing --

Page 74

1      A   No, no, that's just getting started.
2      MR. HUTCHINSON:  All right.  Well, I'll tell
3   you what.  I'm going to -- and we'll -- I told everybody
4   that at the beginning of this deposition that I'm trying
5   to be respectful for the witness' time, but we're just
6   simply not going to finish today if we continue down
7   this path.
8      So I'm going to ask, Dr. Parisian, if you
9   would, just in an effort for me to be respectful for
10   your time and your -- Mr. Lundquist's time, if you could
11   stick with my question, so we can kind of move on.
12      MR. LUNDQUIST:  And hold on, Doctor.
13      I mean, with all due respect, Chad, you're
14   asking a pretty broad question, on the -- you're asking
15   her the basis for her opinion.  She's given it to you.
16      MR. HUTCHINSON:  Okay.
17      MR. LUNDQUIST:  I think she's being actually
18   fairly as succinct as she can, over a six-year period,
19   with some of these MDR reports.  And to be clear,
20   I mean, we will be finished today after six hours on the
21   record.  If you want more time, obviously, you have to
22   take that up with the judge.
23      MR. HUTCHINSON:  Okay.
24      MR. LUNDQUIST:  But if you want to ask her

Page 75

1   more specific questions, perhaps --
2   BY MR. HUTCHINSON:
3      Q   Doctor --
4      MR. LUNDQUIST:  You understand where I'm
5   coming from, as well.
6   BY MR. HUTCHINSON:
7      Q   Dr. Parisian, your opinions on post-marketing
8   surveillance relates no clinical data, the filing or not
9   filing of the MDR reports.  Any other opinions?
10      A   Yes.  In 2007, the German complaints they
11   received, January 2007, my tab 49, they received
12   complaints from Germany of 49 reports of failures, at
13   four to 12 weeks.
14      They also had complaints of Australia, the
15   Australian issue in 2007, that they were having problems
16   in Australia with the three key opinion leaders in
17   Australia having a 65 percent failure rate, a 30 percent
18   failure rate and a 45 percent failure rate.  Those were
19   post-market, because this is the performance of the
20   device in human beings outside the United States.
21      Q   Anything else?
22      A   So, yeah, Germany, let's see...  I would say
23   also the European experience that the company had in
24   2007, talking about that the -- and this would be under

Page 76

1   my tab 45, this is a presentation May 15th, 2007 at the
2   European Feedback Board Update, and the company's
3   talking about the failure rates in terms of the TVT
4   Secur.  They knew that the TVT-O had had a failure rate
5   from early experience of 89 percent, whereas the TVT
6   Secur was 74 percent.  They knew the Monarc was
7   supposedly 91 percent.
8      They talk about the things they knew about the
9   device and the problems with it.  The issue of tension
10   was discussed in that meeting.  They said that there's
11   large variations of the surgical procedures.  They said
12   results on incontinence are not consistent with
13   70 percent rather than 90 percent, results were
14   unpredictable.  So that would be another example, with
15   the European experiences.
16      They were saying that in 2007, that the key
17   experts and nonexperts are disappointed with the product
18   and are abandoning the procedure.  They said that there
19   was no advantage over the conventional TVT and to accept
20   these failures that they're seeing.  They're already
21   talking about coming up with another device, Dr. Leval's
22   mini TVT-O.  So that's 2007.
23      The Australian would be around....  So
24   internally, they were getting information that the

Page 77

1   product was having problems.
2      Q   Anything else, on post-marketing?
3      A   Okay, let's see.  Well, again, this would be a
4   document that was -- we're talking about what
5   happened -- what did they have before June 2010 on
6   Ms. Garcia's surgery.
7      Q   No, I'm asking you about any other opinions
8   about post-marketing.
9      A   No, but I tried to testify on that
10   particularly.  So there is a presentation, Incontinence
11   Platform, August 19th, by Harel Gadot, which would be
12   also in Europe, and he's talking about the International
13   UGA abstract, that there was de novo urgency reported in
14   the abstracts, and 4.2 percent voiding dysfunction.
15      So there was information from Europe
16   Dr. Lucente experienced at six weeks.  He had -- he was
17   having a high failure rate, and that's Dr. Lucente,
18   who's one of the key people for this product.  They know
19   that there's a huge -- that the learning curve is great.
20   So this is all post-- this is all post-market issue.
21      And this is where they say in the
22   presentation, "It is completely different than the TVT
23   and the TVT-O."  That's significant, because the 510(k)
24   cleared it to be marketed only because it was

Page 78

1  substantially equivalent. So internally, the company's
2  aware from the European data that it's not a substantial
3  equivalent. That would then make it by definition an
4  adulterated device. It wasn't the device cleared by the
5  FDA.
6      Q   Anything -- any other opinions regarding
7  post-marketing surveillance?
8      A   Okay. User error is a post-market issue, and
9  they have --
10     Q   Okay, tell me about your opinions about user
11 error, please.
12     A   Tab 41 begins with the Germany experience,
13 poor experience in tensioning, and then tab 42,
14 March 2007, there is discussion about the learning
15 curve, longer learning curve; mesh tensioning was
16 different than any of the other kits. Tab 42.
17         Tab 43, which is a March 2007 e-mail, early
18 results of TVT Secur, they're saying that the tension
19 isn't tight enough. So tension, 30 percent recurrence,
20 that I know about, in terms of that tab, early results
21 of TVT Secur. And the salespeople are -- in Europe are
22 asking about the rumor that there's 30 percent
23 incontinence.
24     Q   And -- sorry.

Page 79

1      A   So those are post-market.
2      Q   Any other opinions about post-market,
3  Dr. Parisian?
4      A   Well, I would definitely send you to tab 44,
5  which is a PowerPoint presentation called "TVT Secur"
6  before the Quality Board.
7      Q   Yeah, I'm not -- I'm not going to get to the
8  documents that you looked at. I just want to know what
9  your opinions were on what Ethicon did wrong in
10 post-marketing.
11     A   Okay, well, they weren't filing MDRs. They
12 weren't doing a corrective and preventive action to
13 correct the issues that are being described when they
14 know their product's not substantial equivalent. Can't
15 do that under 21 C.F.R. 820. So you can't market a
16 product that you have all these signals from post-market
17 that it's not performing like you're cleared.
18     Q   Anything else?
19     A   Well, in terms of post-marketing, in terms of
20 Australia, where they're having problems, the company
21 says, in this Quality Assurance -- Quality Board
22 presentation, that despite knowing that the product is
23 failing in Australia and there's an issue, that they're
24 going to keep the product in the market in order to

Page 80

1  train people.
2      Well, you don't do that. If there's a user
3  error or problem, you don't just allow them to continue
4  to use it to keep the product on the market.
5      Q   Anything else?
6      A   They didn't conduct a recall in the United
7  States. When they knew that the product was not
8  performing as it was cleared, and it was adulterated and
9  it wasn't safe and effective, they didn't stop sales,
10 they didn't contact physicians, like Dr. Miklos,
11 Dr. Walss, and let them know about the potential risks
12 with this product, particularly for the women who were
13 implanted already, and they continued to market a
14 product that was defective, basically, in terms of 21
15 C.F.R. 806. It should have actually been -- marketing
16 should have been stopped. There are plenty of other
17 products.
18     Q   Anything else?
19     A   That you continue to market an adulterated
20 device?
21     Q   Yes, ma'am. Anything else, any other opinions
22 related to post-marketing?
23     A   Well, in all that post-marketing, they also
24 knew the pre-marketing flaws, in terms of what I had

Page 81

1  originally said about their design, testing, sheep.
2      So that should have all been something that
3  should have raised a red flag, because they knew the
4  background of this product, and the other products. So
5  they should have incorporated a comparison of the
6  products already being sold into their post-market.
7      So you didn't have notification of physicians.
8  You didn't have notification of the FDA, because you
9  didn't have MDRs being filed. You didn't have FDA being
10 told the product isn't performing the way it was
11 supposed to. You had continuing marketing of a product
12 that was not -- that was not performing the way it was
13 supposed to. You didn't have updating of the IFU to
14 inform people of the risk of the frequency.
15     Q   Okay.
16     A   You didn't have updating of the IFU in terms
17 of CAPA, as to which patient should this be used for,
18 because they make a claim to the FDA that it's only
19 certain patients, and in Australia they're proposing,
20 well, maybe we'll tell the Australians it's obese women
21 or really healthy women. So they don't narrow down who
22 is this device for --
23     Q   Okay.
24     A   -- and is there any benefit of this device.

Page 82

1    And so I think notification, continued marketing, no
2    reporting, failure to correct the problem --
3        Q   Anything else?
4        A   That's quite a bit.  Let me think about that.
5        Q   All right.  Have we discussed all of your
6    opinions as they relate to the pre-marketing and
7    post-marketing of TVT Secur?
8        A   Let me look at this a minute.  Well, I think
9    my other opinion is that this product wasn't going to
10   work.  I mean, they didn't convey to physicians this
11   unpredictability, and I think Dr. Miklos will actually
12   testify about that more, but it was, like, Dr. Walss
13   and all other physicians using this product were doomed
14   because, for one, they say there's a learning curve;
15   some people say there's over a hundred patients; they
16   don't have good instructions in terms of tensioning.
17       There's no way that you could use this
18   product -- the KOL, the key guys, in 2006, were having a
19   hard time using it.  So if the key users can't use it
20   reliably, then who -- what other physicians are going to
21   use this product?
22       So it's failing of the company to tell the
23   doctors that this is a really risky product and there's
24   a high risk, and do you really want to use it?  And

Page 83

1    I think that my tabs for that would be tab 48, tab 47,
2    tab 49, tab 53, 54, and 58, and then also Dr. Miklos,
3    because he had been a preceptor, and he said how
4    difficult it is to place.
5        So it's like -- it's like getting a product
6    with -- from Home Depot with Chinese instructions, and
7    no one's ever going to put it together, and that's
8    basically what's happening, and so it's getting blamed
9    on user error, but there's a point where it's not user
10   error, it's design error that's also contributing to the
11   user error, and so that goes back to design flaws of the
12   pre-market.
13       Q   Have we discussed now all of your
14   pre-marketing and post-marketing opinions and the bases
15   for those opinions?
16       A   Well, the other one would include that
17   post-market, they're not informing the FDA.  So that's
18   actually kind of its own opinion.
19       Q   Have we now discussed all of your opinions, as
20   they relate to the TVT Secur?
21       MR. LUNDQUIST:  Post-market or pre-market?
22   Yeah, okay.
23       THE WITNESS:  We didn't touch on the user
24   brochure.  In my book, there's a patient brochure, and

Page 84

1    that needs to be included too, because the patient
2    brochure was -- the one I have is generated in 2008, and
3    it says, if -- the only number in there is 97 percent.
4    So for TVT family, it says that you're going to have
5    a -- it implies a 97 percent success rate.
6        So if a woman received such a brochure, it
7    doesn't have adequate information about risks or
8    warnings, in terms of the differences in the risk for a
9    TVT-O versus TVT, versus a TVT Secur.  That information
10   is not in there.  They just put them all together as a
11   TVT family, and I think that's misleading in terms of 21
12   C.F.R. 801.109, that's adequate prescription labeling,
13   and FDA uses that also to apply to a direct-to-consumer
14   information.
15   BY MR. HUTCHINSON:
16       Q   And that's --
17       A   So you have to be truthful and accurate there.
18       Q   I'm sorry.  Are you finished?
19       A   I think so.
20       Q   Okay.  Have we now discussed all of your
21   opinions as they relate to the pre-marketing and
22   post-marketing of TVT Secur and the bases for those
23   opinions?
24       A   Well, we haven't talked about bases.  You

Page 85

1    haven't wanted me to go through the bases, but these are
2    my opinions as to them.  We've talked about what my
3    opinions are, and then I've been trying to lead you to
4    the bases, but we haven't discussed those.
5        Q   Okay, well, I need to find out all the bases
6    for your opinions, too.
7        A   I know.  I've been trying to provide it to
8    you.
9        Q   Well, if you could -- if you could do that for
10   me, I'd appreciate it.
11       A   Well, that's why I'm trying to give you the
12   bases in terms of the tabs --
13       Q   Okay.
14       A   -- so you know which documents I'm looking at,
15   and we can go through those documents specifically, but
16   I was trying to shorten it, to give you the opinions.
17       Q   Okay.
18       A   That's what you asked.  That's what
19   I understood you to ask.
20       Q   Okay.  Have we now discussed all of your
21   opinions as they relate to the pre-marketing and
22   post-marketing of TVT Secur?
23       A   Well, I also read Dr. Walss' testimony and
24   I think my opinions are relevant in terms of his use of

Page 86

1    the choice of this product to implant in Ms. Garcia, to
2    bring this back to Ms. Garcia; and also Dr. Miklos.
3    I think they're consistent with what Dr. Miklos says in
4    terms of his understanding.
5        So the post-market are further supported in
6    Ms. Garcia's case by both of those physicians, in terms
7    of their experience with these products from a clinical
8    standpoint.
9        Q   Okay.  Have we now discussed all of your
10   opinions as they relate to the pre-marketing and
11   post-marketing of TVT Secur?
12       A   As topics.  We can go through specific
13   documents and I can show you the basis for each one of
14   those opinions.
15       Q   But as topics, we've covered them all,
16   correct?
17       A   I've been trying to summarize it all into --
18   let's see.  In terms of the post-market, I think the
19   Australian is important, and it's another opinion, in
20   that the FDA wasn't told about the potential risks for
21   Australia.  The company never conducted a recall in
22   Australia.  They had a Dear Doctor letter, so that they
23   were going to update training.  Physicians didn't want
24   retraining, and the company was thinking about

Page 87

1    introducing this product to block off the Miniarc.
2        And that information, FDA's required to have
3    that information, too, in terms of post-market safety
4    information about a product that's being marketed.  That
5    would be significant to FDA, that the Austr- -- human
6    data, no matter where the source, is significant to the
7    FDA in terms of safety, patient safety, because when
8    products are cleared, there's little human data.
9        And so the Germany experience and the
10   Australian experience should have been told to the FDA
11   in some fashion.
12       Q   Okay.
13       A   And it wasn't, and so that also would be
14   misbranding of your device in terms of 21 U.S.C. 352(t),
15   small T, that you have to provide reports to the FDA,
16   and that would be information that needs to be safety
17   information, even for a 510(k), that needed to be
18   communicated to the FDA, whether it was MDRs or it was
19   just direct notification of the FDA.
20       Q   Have we now discussed all of your opinions?
21       A   And also, more importantly, as Dr. Walss said,
22   that would have been important to him to have known
23   about, and also Dr. Miklos; so not only to communicate
24   it to the FDA, but to communicate it to the physicians.

Page 88

1        Q   Have we now discussed all of your opinions --
2        MR. LUNDQUIST:  Form.
3    BY MR. HUTCHINSON:
4        Q   -- as to the post-marketing and pre-marketing
5    of TVT Secur?
6        A   There's a lot of opinions there.
7        Q   I'm not asking you how many, I'm just asking
8    if we've discussed them all.
9        A   Let's see.  I'm trying to...  Well, in
10   post-market, I think there's also, I believe, in tab 44,
11   when they're talking about the challenges, lessons
12   learned, the company as part of their post-market --
13       Q   I want to talk about your opinions, not what
14   the document says.
15       A   No, the opinions --
16       Q   Tell me what your opinion is.
17       A   The opinion is that the company identified
18   that the rush to market without clinical data was a
19   significant factor in terms of the failure of this
20   product in terms of, to succeed.  So that would mean
21   that the company identified that as a post-market issue,
22   that they weren't going to do that in the future is what
23   they said, and that would come out of tab 44, and they
24   said that in 2007, years before Ms. Garcia was

Page 89

1    implanted.
2        In tab 50, the company was aware that it was
3    suboptimal performance.
4        Q   Do you have any other -- I'm sorry.
5        A   Yeah, and then the marketing, we haven't
6    talked about the marketing, because marketing actually
7    would fit under post-market issues too, in terms of the
8    information that the physicians were being told about
9    the success and performance of this product, that was
10   not acceptable too.  The claims that were being made for
11   this product as being less invasive, less risky, it's
12   implying it's a safer device and it's not, in terms
13   TVT-O and TVT.  So marketing is another issue.
14       So we have physician notification, FDA
15   notification, we have a learning curve, training,
16   tensioning, we have marketing claims, we have failure to
17   communicate risks even to patients, doctors, and failure
18   to file MDRs, failure to make effective CAPAs, in terms
19   of quality assurance, continuing to market an
20   adulterated device, prohibited act, 21 U.S.C. 331(a) and
21   (b).
22       Also, and we haven't talked specifically about
23   the IFUs.  We'll talk about that.
24       Q   We'll get to the IFUs in a minute, but is that

Page 90

1   a fair summary, what you just gave, of all your opinions
2   as related to the pre-marketing and post-marketing of
3   the TVT Secur?
4      A  Yeah, and then what they had learned --
5      Q  And I'm sorry, is that a yes?
6      A  I think so, and what they had learned in terms
7   of the next generation, which was, by 2008, they're
8   already talking about what they were going to do with
9   the next device.
10      So there is this post-market where they're
11   moving on to another device already before Ms. Garcia is
12   implanted, and then -- let's see.
13      Also the communication with the FDA in terms
14   of the 522, not doing the 522.  The communication is not
15   that this is -- we're taking this off the market because
16   it's a dangerous device.  The company told the FDA,
17   supposedly, based on the company's documents, that it
18   was a safe device and we were just making a marketing
19   decision, and it's not accurate.  That would fit into
20   the FDA reporting.
21      Q  Okay.
22      A  But they didn't get a 522, and then they
23   closed the registry, in terms of post-market
24   information.  They had opened a registry, they knew they

Page 91

1   needed clinical data, and they closed it prematurely,
2   without the data, and we don't have the follow-up to
3   what happened to that registry data.  So that's another
4   post-market issue.
5      Q  So have we now discussed all your opinions as
6   it relates to the pre-marketing and post-marketing of
7   the TVT Secur?
8      A  I think also, I would reference Dr. Miklos'
9   report --
10      Q  Well, instead of referencing reports, I want
11   to talk about your opinions.
12      A  Yeah.
13      Q  Okay.
14      A  But --
15      Q  So why don't you tell me:  Have we discussed
16   all of your opinions as they relate to the pre-marketing
17   and post-marketing of TVT Secur?
18      A  We have discussed my opinions other than the
19   IFU.  I said we haven't specifically discussed the IFU.
20      Q  All right, thanks.
21      Your lawyer -- I mean, I'm sorry --
22   Ms. Garcia's lawyer has asked to take a quick bathroom
23   break.  So why don't we go off the record for just a
24   second.

Page 92

1      THE WITNESS:  That would be fine.  I'd like
2   that.
3      (Deposition in recess from 10:55 a.m. to 11:04 a.m.)
4   BY MR. HUTCHINSON:
5      Q  Dr. Parisian, we're back on the record.  You
6   realize that?
7      A  Yes.
8      Q  Are you ready to go?
9      A  Yes, sir.
10      Q  Okay.  Now, you're a pathologist, is that
11   correct?
12      A  Yes, sir.
13      Q  Last time you treated a living patient was
14   when?
15      A  In the 1980s.  I was a company doc.
16      Q  You're not a member of the American Medical
17   Association?
18      A  No, no, I am.
19      Q  You are?
20      A  Yes.
21      Q  How long have you been a member of the
22   American Medical Association?
23      A  For years.
24      Q  More than 10 years?

Page 93

1      A  More than 10 years, yeah.
2      Q  Okay.  Have you ever been board-certified in
3   internal medicine?
4      A  No, sir, just pathology, anatomic and
5   clinical.
6      Q  Do you have any staff privileges at any
7   hospital?
8      A  No, sir.
9      Q  Are you credentialed at any hospital?
10      A  No, not right now.  I'm licensed, but not
11   credentialed.
12      Q  You're not a biostatistician?
13      A  That's not my training.  I've used biostats
14   for different issues, but I'm not -- that would not be
15   what I would put myself out as.
16      Q  Or an epidemiologist?
17      A  Only in that I've done epidemiology for the
18   FDA.  I have hands-on epidemiology, but I don't have a
19   degree in epidemiology.
20      Q  But you're not holding yourself out as an
21   expert in epidemiology, correct?
22      A  Not for this litigation.
23      Q  Or a toxicologist?
24      A  I've been trained -- I can run a toxicology

Page 94

1    lab as a pathologist, but I'm not discussing toxicology
2    for this litigation. I've had no toxicology in terms of
3    FDA.
4         Q   You're not -- I'm sorry.
5         A   Well, because I had to look at animal data.
6    They didn't -- as a pathologist, they used me also to do
7    a lot of toxicology work for devices.
8         Q   You're not a polymer scientist, biomaterial
9    engineer or behavioral scientist, correct?
10        A   Those aren't my specialties. I've been
11   involved in all those issues.
12        Q   You're not a surgeon?
13        A   That is correct.
14        Q   Not a gynecologist?
15        A   Well, I did a lot of gynecology in terms of
16   general practice. So I've done it as a family
17   practice-type situation, but I'm not a gynecologist.
18        Q   What about a urologist?
19        A   No, I'm not a board-certified urologist. I've
20   done some urology. I mean, I'm assuming you're talking
21   about someone that's your specialty every day. Yes,
22   I am not a practicing urologist.
23        Q   And you're not a urogynecologist, either, are
24   you?

Page 95

1         A   I'm not a practicing urogynecologist, but I'm
2    a pathologist. So in terms of the anatomy, I'm aware of
3    the anatomy and the issues about it.
4         Q   You're not an expert in SUI?
5         A   Only in the regulatory issues for SUI. I'm
6    not a person who would treat patients for SUI.
7         Q   Not in the medical sense, correct?
8         A   Yes, correct.
9         Q   And in fact, you're not an expert in any of
10   the medical specialties that may be at issue in this
11   case, correct?
12        MR. LUNDQUIST: Object, form.
13        THE WITNESS: I'm an FDA regulatory expert. A
14   pathologist does have some role. I'm not your
15   pathologist, there's a pathologist, but I have that
16   clinical training and background as an FDA medical
17   person.
18        So I don't know what you're -- I mean, I'm
19   not -- I'm an FDA medical officer. So I'm talking about
20   regulatory issues for a medical device in a particular
21   case, so --
22   BY MR. HUTCHINSON:
23        Q   Well, I'm asking you if you're an expert in
24   any of the medical specialties that are at issue in this

Page 96

1    case. Medical specialties, not FDA regulatory, medical
2    specialties.
3         MR. LUNDQUIST: Form.
4         THE WITNESS: The medical specialties would be
5    anatomic clinical pathology, but I'm not -- that is not
6    my sole role here.
7    BY MR. HUTCHINSON:
8         Q   And you're not an expert in determining
9    corporate motive or intent, are you?
10        A   I wouldn't even do that. The only thing
11   I would use is documents that state what the intent or
12   motive is, not a subjective intent or motive, that's
13   correct, but what the documents in evidence support, or
14   what their testimony is. That would be them saying what
15   their intent was.
16        Q   Do you know what the current gold standard for
17   the treatment of SUI is?
18        A   No, not -- I don't know right now what today
19   it is, because there's a lot of options, and also the
20   SUI can have -- the degree with which the woman has SUI
21   would determine the options, whether she goes through in
22   surgery or whether she goes to minimally invasive or
23   whether she doesn't get anything now and uses Kugel
24   exercises, just those with pads. So I don't know what

Page 97

1    the gold standard is.
2         Q   Are you familiar with the American
3    Urogynecological Society or the American Urology
4    Associates or Association, or the International
5    Urogynecological Association?
6         A   I'm familiar with the words and what they've
7    done and their involvement in some of the SUI issues.
8         Q   Are they well respected societies within the
9    field?
10        A   They are the societies for the field. Well
11   respected by who? I mean, there are people join them.
12   Some of those fields actually had begun some of the
13   concerns about SUI and mesh products.
14        Q   Would you consider them leaders in the field,
15   these societies?
16        A   They are societies for those fields, so
17   there's nobody -- so they would be the leaders for those
18   fields, because they're professional organizations.
19        Q   Would you consider them well respected?
20        A   Yeah, doc --
21        Q   Within the medical community?
22        A   Yeah, I have no reason to -- I mean, it's like
23   the AMA. Is the AMA well respected in the medical
24   community? It's a professional organization. People

Page 98

1    join it.
2        Q   And you relied, in reaching some of your
3    opinions, in part, on some of the literature from these
4    societies, correct?
5        A   Yeah, and some of their meetings and some of
6    their concerns, when they were concerned, I think around
7    at 2006, about the safety of surgical mesh.  They
8    actually were bringing it to the forefront.  FDA
9    actually was responding to the specialists who were
10   concerned about SUI and pelvic floor replacement, POP
11   procedures.
12       Q   Have you ever diagnosed, treated or managed
13   SUI?
14       A   Yeah, sure.  I mean, I've had women with SUI,
15   and you tell them what it is, and you talk to them about
16   what the options would be, and just -- that was back in
17   the 80's.
18       Q   And you did that when you were a pathologist?
19       A   No, when I was treating real people, living
20   patients, back in the 80's.  I was the company doctor at
21   Avtex, and I was the first -- you would have patients
22   come in and they would explain what their problems were,
23   and then I would have to send them to somebody else,
24   refer them.  So yeah, I would have to talk to them about

Page 99

1    SUI.
2        Q   Right, but you never managed a patient with
3    SUI or treated a patient with SUI, did you?
4        A   I would have referred them to somebody or told
5    them what their options were.  Oftentimes they chose not
6    to do anything.
7        Q   Have you ever participated in a cadaver study
8    or an animal study about mesh?
9        A   Not about mesh.  I've participated in a lot of
10   cadavers, but not about mesh.
11       Q   Anything about any foreign SUI product?
12       A   Pardon?
13       Q   Have you ever participated in a cadaver or
14   animal manual study for any type of product?
15       A   I didn't participate.  I've consulted for
16   manufacturers who was working with the product they
17   wanted to get cleared.
18       Q   Have you ever seen how a TVT Secur product is
19   implanted in the body?
20       A   Physically seen it, no.
21       Q   I take it you've ever implanted a TVT Secur
22   device in somebody's body.
23       A   You are right, I never have.
24       Q   And nor have you implanted any medical device

Page 100

1    in any person's body, correct?
2        A   Um, I don't know if I have.  I mean, I put
3    sutures in people.  I mean, I've done lacerations.
4    I don't know if I've never -- I've assisted when they've
5    implanted devices.  I've not been the primary implanter
6    of, like, a hip implant or something like that.
7        Q   And do you have any expertise in implanting
8    medical devices in any way?
9        A   I don't know, because you're talking about a
10   history going back to the 70's, and so I don't know.
11       Q   Okay.
12       A   Um, medical devices -- I mean, I wouldn't say
13   I'm a cardiologist, I didn't do pacemakers, so I didn't
14   do any specialized devices, but to say I've never
15   implanted a medical device, I don't know.
16       Q   Do you -- well, that's not my question.  My
17   question was, do you have any expertise in implanting
18   medical devices?
19       A   From the regulatory point of view --
20       Q   I'm not asking for the regulatory, if
21   you don't mind, I'm asking for a medical standpoint.  Do
22   you hold yourself out as having expertise in implanting
23   medical devices?
24       A   I've been around where medical devices -- I've

Page 101

1    been in the OR when medical devices are implanted and
2    I've also removed medical devices after they've been
3    implanted.  So I do have some hands-on expertise about
4    the biocompatibility and the effect in the body of
5    medical devices.  I don't have a specialty that had a
6    specific device that they're implanting for a procedure,
7    but the working parts of the body for implantation,
8    yeah, I'm familiar with that.
9        Q   Have you ever designed any clinical trials
10   regarding mesh?
11       A   Not for mesh.
12       Q   Any type of SUI product?
13       A   I did not design it.  I reviewed it.  So that
14   was the radiofrequency trials.
15       Q   You've never been involved in any clinical
16   research regarding mesh, have you?
17       A   No.
18       Q   Or SUI?
19       A   No.
20       Q   You've never designed pelvic mesh?
21       A   No.
22       Q   Or any type of SUI product?
23       A   Only consulted on someone who was working with
24   one.

Page 102

1    Q   And I think we talked about this earlier, but
2   you've never done any type of biomechanical testing for
3   pelvic mesh or any SUI product, correct?
4    A   Correct.  FDA wouldn't do that.
5    Q   In fact, you've never inspected a mesh
6   explant, have you?
7    A   Yeah, I've done that.  I mean, I've seen
8   explanted mesh.
9    Q   Have you ever inspected -- I'm not asking if
10  you've seen one, I'm asking if you've inspected one.
11   A   Well, I've -- surgical path, you remove
12  explanted mesh.  I don't know what you -- I meant looked
13  at it and examined measured it and the qualities of it.
14  I don't know what you mean by "inspect."
15   Q   Did you ever inspect -- well, did you ever
16  inspect a piece of mesh for any types of degradation?
17  Have you ever done that before?
18   A   Not in the laboratory setting specifically.
19  I would be looking at it grossly.
20   Q   You've never performed a DDSA, have you?
21   A   No.
22   Q   You've never performed an FMEA, have you?
23   A   Wait a second, wait.  Go back.  The DD -- what
24  did you say?

Page 103

1    Q   DDSA.
2    A   Yeah, what are you saying is a --
3    Q   Do you know what DDSA stands for?
4    A   I don't know what it --
5    Q   What about a Design Device Safety Analysis,
6   have you ever --
7    A   Oh, that, yes --
8    Q   -- performed a Design --
9    A   -- but I haven't used that term for it.
10       THE REPORTER:  Wait, one --
11       MR. HUTCHINSON:  Wait a minute, one person at
12  a time.
13       THE REPORTER:  Yeah, one person at a time.
14  BY MR. HUTCHINSON:
15   Q   Have you ever performed a design -- I'm sorry,
16  scratch that.  Have you ever performed a Device Design
17  Safety Analysis for a mesh product?
18   A   Not for a mesh product.
19   Q   Or any type of SUI product?
20   A   I've reviewed the ones that the companies
21  have.
22   Q   Have you ever performed a Failure Mode
23  Evaluation Analysis for any type of mesh product?
24   A   No, reviewed them.

Page 104

1    Q   Have you ever done an FMEA for any type of SUI
2   product?
3    A   I've only reviewed them, because they're the
4   company documents that I learned to review at the FDA.
5    Q   You're not an expert on how mesh performs in
6   the body, are you?
7    A   Yes, I am, in terms of what -- in terms it
8   being a FDA reviewer, medical officer, you have to look
9   at the effects of mesh, and one of the things would be
10  shrinkage, contraction, infection, the porosity in terms
11  of the migration of certain cells through the pores.  So
12  yes, I've looked at issues for that for mesh for the
13  FDA --
14   Q   You're not --
15   A   -- and degradation, and then your double-sided
16  meshes which would have a side that -- yes, so I've had
17  to do that for FDA.
18   Q   You're not an expert in the design process for
19  pelvic mesh, are you?
20   A   Not in the design process.  I had to review,
21  but not design.
22   Q   Or any type of product -- SUI product.
23   A   The design process -- I mean, I've had to look
24  at all the -- I had to look at clinical studies for the

Page 105

1   manufacturer.  I don't know about -- I mean, I've looked
2   at clinical studies for radiofrequency trying to show
3   them to be safe and effective, get clearance from the
4   FDA.  So I don't know what --
5    Q   But you're not an expert in the design process
6   of any SUI product.
7    A   The original design, that's correct.
8    Q   Okay.  You've never invented a medical
9   product, have you?
10   A   Well, I helped develop a medical product.
11  I don't have a patent, in terms of a product that was to
12  be implanted.
13   Q   Do you have any expertise in designing or
14  developing a medical product?
15   A   Sure.
16   Q   Other than from a regulatory standpoint?
17   A   Well, no, no, as a consultant and working with
18  a manufacturer to bring a new product to the market,
19  I have to -- you participate with people who were
20  creating the device, the how do you select materials,
21  what standards do you use, what kind of information
22  would you tell the FDA.  So yeah, I've done that.
23   Q   Well, let's talk about when you were at the
24  FDA.  You were there from '91 to '95, is that right?

Page 106

1    A   Yes, sir.
2    Q   What, 20 years ago?
3    A   Yes, sir.
4    Q   Did you have a computer when you worked with
5    FDA?
6    A   Yes, sir, we did.  I learned how to use
7    WordPerfect; the FDA taught me how.  It was a really
8    crappy computer.
9    Q   What kind of computer did you have?
10   A   It was -- I don't remember what kind it was,
11   but it was -- it was not good.  But yeah, they sent me
12   to computer classes to use it on, but you didn't have
13   access to the internet.  At that point in time, FDA
14   reviewers weren't allowed to use the internet.
15   Q   Did you or anyone that you worked with at the
16   FDA have a laptop?
17   A   Sure.  There were laptops, but you had to buy
18   your own laptop.
19   Q   Did you or anyone you worked with at the FDA
20   have a cell phone?
21   A   No, there weren't cell phones back then.
22   I don't think there were cell phones.  No, I don't
23   remember cell phones.
24   Q   You're not here as a representative of FDA,

Page 107

1    are you?
2    A   That's correct.  The cell phones -- actually,
3    there were cell phones at that time.  You weren't given
4    a cell phone by the FDA.  Is that what you're talking
5    about?
6    Q   No, I'm just asking -- I'm asking if you or
7    anyone of your colleagues at FDA carried around a cell;
8    phone.
9    A   Yeah, in those days cell phones existed,
10   because we had safety issues and health risk assessments
11   that I sat in, because that --
12   Q   I'm not asking if they existed.  Move to
13   strike as nonresponsive.
14       I'm asking if you or any of your colleagues at
15   FDA carried around a cell phone, yes or no.
16   A   I don't recall.
17   Q   Okay.
18   A   I don't recall.  But I knew that they existed.
19   Q   You worked in the Office of Health Affairs?
20   A   Originally, the first two years with the
21   Office of Health Affairs, yes, at CDRH.
22   Q   Do you know, would that be the OHA?
23   A   Yes, sir.
24   Q   Do you know if it's still an office within the

Page 108

1    FDA, as today?
2    A   No, it was disbanded by Dr. Kessler and
3    Dr. Burlington in 1993, and the few medical officers
4    that were in it were supposed to go to pre-market
5    issues, ODE.  So I got transferred from that to ODE,
6    Office of Device Evaluation.  So I know it doesn't
7    exist.
8    Q   When you were working with FDA, you never had
9    final authority to approve a device, did you?
10   A   I think you mean final sign-off in terms of
11   the letter?  That's correct.
12   Q   Correct.
13   A   That is a chain of command that -- that is
14   correct.  I didn't sign -- did I have the authority to
15   approve and deny?  Yes, but not the final signoff.
16   Q   And you never had responsibility for approving
17   a drug label, did you?
18   A   A drug label?
19   Q   Um-hum, or a medical device label, final
20   authority.
21   A   I did as a clinician.  If I didn't approve it,
22   it wasn't going to get approved, but I didn't sign the
23   letter.  I agree, I did not sign the final letter.
24   That's an administrative point of view.

Page 109

1    Q   Has FDA ever asked your opinion about labeling
2    since you left in 1995?
3    A   Yes, they have.  They had me go as an expert
4    on their panel about device labeling.
5    Q   And when was that?
6    A   1997.  They were trying to have an advisory
7    panel to discuss ways of improving medical device
8    labeling to make it more consistent, like drug labeling.
9    Q   And is 1997 the last time?
10   A   Yes, sir.
11   Q   When you worked with the FDA, did you work
12   with any type of mesh products?
13   A   I don't recall, because mesh products -- I had
14   a lot of surgical products I don't recall.  I mean --
15   Q   You don't recall being involved with any type
16   of SUI products at FDA?
17   A   I don't recall because I was also the medical
18   officer for the urological and I also supported the
19   OB-GYN, so I'm not sure, and occasionally I would
20   consult for plastic surgery.  So I don't know if that
21   would cover all the places where they would come.
22   Q   At FDA, you were never involved with any type
23   of pelvic floor repair products, were you?
24   A   I don't believe I was.

Page 110

1    Q   At FDA, you were never involved with Prolene.
2    A   That's not true.
3    Q   Okay.
4    A   I actually had to go look at the NDA for
5  Prolene for suture issues, because it was a transitional
6  device, so I have looked at the NDA through the
7  510(k)'s.  So I was involved --
8    Q   For what reason?
9    A   Oh, wait, I was involved with mesh being used
10  for vascular grafts.  So I did have to get involved with
11  mesh, because -- it was mesh and other things.
12    Q   But I'm talking about any type of mesh for SUI
13  products.  You've not been involved at FDA with any type
14  of mesh used for SUI products, is that correct?
15    A   That's correct, because they actually came on
16  the market after I left, pretty much.
17    Q   Why did you look at the NDA for Prolene?
18    A   There were issues on suture, and so you had to
19  go back to the NDA.  I don't recall why, but I remember
20  having to look at the Prolene NDA, which was over in
21  CDER and going through it, and since I've been involved
22  in litigation stuff, too, I've looked at suture and
23  Prolene, so....  But it began at the FDA.
24    Q   Okay.  At FDA, did you ever work with J&J or

Page 111

1  Ethicon?
2    A   Yes.
3    Q   Okay, on what?
4    A   They were -- they have a lot of medical
5  devices, and I also was involved with them after I left
6  FDA, but in terms of, one of the issues was I think a
7  product called Interceed that I was called in to as a
8  chief medical officer to sit in a meeting that the
9  company was selling a product with claims that weren't
10  accepted to the FDA.  So I had to work, trying to bring
11  Interceed under -- in compliance with the requirements
12  of the Act.
13    Q   Would -- could -- but when you were working at
14  FDA, you never worked with J&J or Ethicon regarding any
15  mesh product, correct?
16    A   Well, that's an abdominal adhesion product
17  that's similar, but it's not --
18    Q   I'm talking about a mesh product for SUI.
19    A   Well, that's different.  No, I wasn't involved
20  in -- Johnson & Johnson, and then I was involved with
21  Johnson & Johnson when I left FDA, I worked with them as
22  a consultant.
23    Q   When, with Johnson & Johnson?
24    A   Yes, sir.

Page 112

1    Q   When?
2    A   That would have been -- it's on my CV.  That
3  would have been -- I don't remember the years.  It was
4  early after I left FDA, Johnson & Johnson came and found
5  me, because I had been involved in an issue, a device,
6  kind of a device/drug issue, and so they asked me to
7  write a letter to the internal -- to an internal
8  medicine journal about my involvement as an FDA medical
9  officer looking at their product, and they also had me
10  write an article on the workup of preservatives in terms
11  of drugs and devices, and then I taught at their
12  national sales meeting one year.  I have a clock from
13  Johnson & Johnson saying thank you for my help.  So yes,
14  I did work for Johnson & Johnson.
15    Q   You didn't consult with Johnson & Johnson
16  about any mesh product, did you?
17    A   Not for surgical mesh product, that's correct.
18    Q   At FDA, you were never responsible for
19  post-marketing surveillance of a medical device?
20    A   Well, no, I was involved with post-market.
21  That was with the OHA.
22    Q   With a medical device.
23    A   All medical devices, in terms of looking at
24  the accuracy of warnings, instructions for use.  I was

Page 113

1  actually on a post-market surveillance, or -- the head
2  of post-market surveillance for anesthesia products.
3      So yeah, that was what I did in OHA was
4  post-market and all, and I would report to the Office of
5  Compliance.  I think that's where Tim Hulatowski was, in
6  Office of Compliance.  I was their medical support,
7  because at that time they didn't have MDs.
8    Q   When was the first time you'd ever heard of
9  TVT Secur?
10    A   TVT Secur, I really hadn't heard about TVT
11  Secur until I was asked to be involved with TVT Secur.
12  I had been involved with TVT and TVT-O in terms of all
13  the other products, and I was aware of the clearance of
14  it, I believe, in the '95 period, TVT, and so --
15    Q   You were contacted -- strike that.
16    A   In August, I believe.
17    Q   In August of 2014.
18    A   Correct, about TVT Secur.  I may have focused
19  on the others.
20    Q   Have you ever seen a TVT Secur device?
21    A   Now I have, in terms of the pictures.
22  I haven't physically held one.
23    Q   Do you understand the procedure for implanting
24  a TVT Secur device?

Page 114

1     A   I don't think anybody does, but --
2     Q   Let me ask you this:  Do you agree that you do
3   not have the requisite education, training and
4   experience to implant a TVT device, a TVT Secur device?
5     A   I would agree with that.  I would agree with
6   that for the entire -- I don't have -- to physically
7   implant it in a patient, I would not even attempt it.
8   And so I agree that I would not even attempt it, and
9   that's not my role, and that -- FDA people don't have
10   that training, either.
11     Q   Do you know the difference between
12   polypropylene and Prolene?
13     A   Well, polypropylene is the material that
14   Prolene mesh is made out of.  It's a polypropylene mesh
15   that can vary in terms of -- well, polypropylene, yeah,
16   that's the answer.
17         Prolene can be a suture, and resin -- it's a
18   resin.  Polypropylene is a resin that's used to make
19   whatever they need in terms of suture or mesh or what's
20   ever made up of; it's called Prolene, and the trade name
21   is Prolene, at Ethicon.
22     Q   My question to you, though, is:  Do you know
23   the difference between polypropylene and Prolene?
24     A   Yes, Prolene is --

Page 115

1     Q   What is the difference?
2     A   Prolene is the trade name.  Polypropylene is
3   the type of resin that's used to make whatever product
4   is going to be named Prolene.
5     Q   Do you know -- what do you know about the
6   manufacturing process Ethicon uses to make Prolene?
7     A   Well, it's usually a mesh extrusion,
8   polypropylene resin extrusion process, which you have of
9   the extruder make fibers, and then you use the fiber to
10   weave what you need to do in terms of your mesh.
11         So that's basically, and then once you've
12   made your fibers to your diameter and you've woven it
13   the way it's supposed to, then you have to clean it, you
14   have to sterilize it, and you put it in your kit.
15     Q   And you know that mesh is made of knitted
16   filaments of Prolene sutures, don't you?
17     A   Yes.
18     Q   We can agree to that.
19     A   Yeah.  It's thread, you can think of it as
20   thread, and every mesh has its own design in terms of
21   the way it's woven, in terms of the pores and -- yes,
22   and it's multi-filament, I believe, in terms of the
23   mesh.
24     Q   I know we've talked about your opinions about

Page 116

1   design defect, but do you have any manufacturing defect
2   opinions?
3     A   You know, manufacturing -- let me clarify what
4   I think you mean.  Manufacturing would, like a lot, did
5   I look at Ms. Garcia's lot and look and see if there was
6   an particular issue with her lot in terms of the quality
7   assurance?  No, I did not look at that.
8         So I don't have any specific manufacturing
9   defect issues about the line, but I've not been asked to
10   look at all the good manufacturing practices about
11   specific lots.
12     Q   Has any of your work at FDA or since then
13   involved polypropylene or Prolene, with the exception of
14   the hernia, the stuff that we talked about earlier?
15     A   Yeah, I mean, AMS uses polypropylene in terms
16   of their Sparc mesh.  So I've looked at the Sparc mesh
17   and the evolution of how that mesh comes out.  So yeah,
18   I've done that, and Kugel, like we said, and then I've
19   looked at Bard's.  I once did a case with C.R. Bard and
20   Marlex mesh.  So I've looked at polypropylene mesh.
21     Q   Have you ever performed any type of study on
22   the biocompatibility of polypropylene or Prolene?
23     A   I haven't done any studies.  I've looked at
24   toxicology data in terms of the inflammatory response

Page 117

1   that you get from different types of mesh, looking at --
2   and I've looked at more than just Prolene.  I've looked
3   at the soft meshes, light meshes, heavy meshes,
4   ultra-light, all those different variations in terms of
5   your weight and the type of biocompatibility responses
6   you get for, like, hernia.  I didn't do the hernia
7   issues, but the hernia meshes.  So I've looked at that,
8   in terms of animal toxicology.
9     Q   You've never participated in any clinical
10   trials regarding polypropylene, have you?
11     A   No.
12     Q   Or done any clinical research on
13   polypropylene?
14     A   No.
15     Q   Or you've never seen any degraded
16   polypropylene?
17     A   No, I've seen that in my world of going
18   through meshes, I've seen degraded, but I've not -- I've
19   not been -- made a study of degraded mesh.
20     Q   Right, but have you ever seen degraded
21   polypropylene under a microscope?
22     A   I've seen -- I've seen slides of it, I mean,
23   pictures.  I haven't put one under the -- I have four
24   microscopes, but I haven't put that under my microscope.

Page 118

1    Q   Have you ever done any type of independent
2  testing or analysis or any root cause analysis to
3  determine if Prolene is defective?
4    A   No.
5    Q   Let's talk about Ms. Garcia for a minute.  You
6  didn't review her medical records.
7    MR. LUNDQUIST:  Object to form.
8    THE WITNESS:  I did review Dr. Walss'
9  testimony, and I do have --
10    MR. HUTCHINSON:  Move to strike as
11  nonresponsive.
12    Q   I'm talking about medical records.
13    A   Right, and I have her progress reports and
14  medical records in one of my folders here, so that --
15    Q   Oh, I'm sorry.
16    A   So you would have that.
17    Q   Have you spoken to any of her doctors?
18    A   No.
19    Q   Do you have any idea what information
20  Dr. Walss relied on when he was consulting with
21  Ms. Garcia?
22    A   Based his testimony, yes.
23    Q   Outside of what's in his testimony?
24    A   No.

Page 119

1    Q   Do you know whether Dr. Garcia (sic) relied on
2  the IFU?
3    A   He read the IFU, so -- I have the IFU -- so
4  yes, he did read it.
5    Q   Do you have any idea of what training from
6  Ethicon Dr. Walss may have received about the TVT Secur?
7    A   All he says is that he went to a course.  We
8  don't know who presented it.  He said there were other
9  people, other devices being presented, and sales reps
10  were there.  We don't have a specific course.  He said
11  that he did have the sales rep come and watch him do
12  several cases and say that he had -- he was doing it the
13  way he was supposed to do it.
14    So that's in terms of his training.  Then he's
15  used the TVT and the TVT-O.  That's all I can see from
16  his depo in terms of the Secur.
17    Q   And I'm sorry, I think you said Dr. Walss was
18  using it the way he was supposed to?
19    A   That's what he was told by the representative
20  from Ethicon who watched him do a couple cases.
21    Q   Do you have any idea of what potential risks
22  of TVT Secur that Ms. Garcia's doctor was aware of?
23    A   He was aware of the surgical risks of the
24  procedure.  He was aware that there could be a rare risk

Page 120

1  for erosion and that it would be transitory.  He
2  testified to -- a lot about that, and -- but he did not
3  know that it was more than rare, and so -- we know that
4  that's, in terms of his informed consent, he didn't use
5  that in the informed consent because he did not think
6  that it was something that was actually going to occur,
7  and that it was transitory, it wasn't permanent.  And he
8  wasn't aware of having to remove it -- the frequency for
9  failure and the removal --
10    Q   Do you know -- I'm sorry.
11    A   -- and the risk for dyspareunia.  He wasn't
12  aware of that, too.  I'm trying to remember what else he
13  said he wasn't aware of.
14    Q   Do you know whether Ms. Garcia saw the patient
15  brochure?
16    A   She did not.  I don't believe she was
17  specifically asked at her deposition, but she did not
18  reference having seen one.
19    Q   Have you ever spoken with any doctor who has
20  implanted a TVT Secur device?
21    A   No, sir.
22    Q   Have you ever talked with any doctor about the
23  IFU for a TVT Secur device?
24    A   I haven't specifically spoken to him.  I have

Page 121

1  Dr. Miklos' report and I have Walss --
2    Q   Well, what about any mesh product?
3    A   Have I spoken to doctors who implanted mesh?
4    Q   Yes, about the IFUs for any mesh product.
5    A   No.  I've seen a lot of IFUs for mesh
6  products.  I've not spoken to doctors specifically about
7  them.
8    Q   Did you do any type of study or survey of
9  doctors to determine what risks associated with SUI
10  surgery they're aware of?
11    A   No.
12    Q   Do you have any study or survey of doctors to
13  determine what risks from the TVT Secur product that
14  they appreciate from the IFU?
15    A   We have Dr. Miklos, and Doctor --
16    Q   Other than the plaintiff's expert.
17    A   -- we have Dr. Walss, and he's relevant to
18  Ms. Garcia, and so he wasn't -- he goes on about the
19  things that he wasn't aware of, in terms of the IFU.
20    Q   But no study or survey of doctors, correct,
21  that you've done?
22    A   That I've done, no, I haven't done a study.
23    Q   You've never drafted a label or IFU for a mesh
24  device, have you?

Page 122

1         MR. LUNDQUIST:  Form.
2         THE WITNESS:  I don't recall, because the FDA
3    doesn't draft the labels, they look at the labels, but
4    I don't recall if any of the PMAs actually had a --
5    BY MR. HUTCHINSON:
6         Q    Or any types of SUI device.
7         A    For an SUI device, I did work with a
8    manufacturer that I did help draft the labels as a
9    consultant for that, and I evaluated their data.
10        Q    And what manufacturer was that?
11        A    I think it's INSURx, I-N-S-U-R-X, and it was
12   that they had gotten rejected by the FDA on their
13   clinical data and I was brought in to go over the
14   clinical data to kind of reorganize it, reevaluate and
15   then it got cleared.
16        Q    And that was with -- I'm sorry, INSURx?
17        A    I believe that's what the name was,
18   I-N-S-U-R-X.  I was brought in by another consulting
19   firm, Weisbrod, I think -- not Weisbrod, Weisberg.  It
20   was a consulting firm in Washington, D.C.  I don't
21   remember their name.  Anyway, they needed someone who
22   could go through the clinical data.
23        Q    You've never drafted patient brochure for a
24   mesh device, have you?

Page 123

1         A    For a mesh device, no, that is correct.
2         Q    Yes, ma'am, or for an SUI device?
3         A    Well, I worked on their device, but --
4         Q    I'm talking about a patient brochure.
5         A    Yeah, they had a patient brochure.
6         Q    Have you ever consulted with the FDA about an
7    SUI mesh device?
8         A    Consulted for -- specifically, no.  Well,
9    I did consult for this company that went into the FDA
10   and got cleared.  I didn't go to the meetings with the
11   FDA, that I recall.
12        Q    And what product was this INSURx trying to
13   bring to market?
14        A    It was a radiofrequency device that's used for
15   treating the woman's vagina, urethra, so that you would
16   decrease SUI.  It was just an alternative treatment,
17   sort of like they use Botox when you're thickening the
18   tissue.
19        Q    But it didn't have any mesh in it.
20        A    No mesh, no mesh.
21        Q    You've never sat on a FDA warnings or label
22   committee, have you?
23        A    I don't know what that would be.  I mean, have
24   I sat on committees where you talk about warnings or

Page 124

1    labels for the FDA?  It's not a committee.  Because,
2    see, drug does have that, the CDRH doesn't have that.
3    Yes, I've sat on safety issues in the sessions about
4    labels and warnings.
5         Q    Have you ever designed any label readability
6    studies?
7              Label readability studies, for the court
8    reporter.
9         A    Readability.  I actually consulted for the
10   division in CDRH that was doing that when they were
11   trying to develop home health products, and so I was the
12   medical input as to their readability.  I didn't design
13   the study.
14        Q    You've never talked with FDA about the
15   regulatory history about the TVT Secur, have you?
16        A    No.
17        Q    Do you intend to offer what the -- the actual
18   verbiage, do you intend to offer opinions about what the
19   actual verbiage of the IFU should say?
20        A    Yeah, I could do that.  And which IFU?  They
21   only had one IFU for the Secur, so yeah, I can talk
22   about the verbiage, what's missing.
23        Q    That's what I want to ask you about.  I'm
24   going to hand up what I'll mark....

Page 125

1              What's the next exhibit?
2              (Whereupon, Exhibits 6 and 7 were marked
3              for identification.)
4    BY MR. HUTCHINSON:
5         Q    Dr. Parisian, I'm handing you what I'm marking
6    as Exhibit 6 and Exhibit 7 to your deposition.
7         A    Okay.
8         Q    And Exhibit 6 is the IFU and Exhibit 7 is the
9    patient brochure.  Does that look right?
10        A    No, this is the later one.  This is 2011.  Her
11   surgery was 2012.  I looked at 2008.  Yes, I think it
12   is, okay.
13        Q    Let's look at Exhibit 6 now.
14        A    I'm also pulling up Dr. Miklos, because he
15   also talked about what he thought --
16        Q    Well, I don't want to talk about Dr. Miklos.
17   I want to talk about your opinion.  So let's look at
18   Exhibit 6.
19        A    Okay, but I can pull it up.
20        Q    Did you review Exhibit 6 in forming your
21   opinions?
22        A    Yes, sir.
23        Q    What criticisms do you have about the IFU that
24   was marked as Exhibit 6?

Page 126

1    A    Okay.  Is this the order that it really is in?
2    Yeah.  One of the criticisms is that the information
3    about risk and benefits and all should be up front.
4    They're showing the procedure, so like, if you're a
5    physician, you're going to be -- more likely it's going
6    to be the procedure, to look at the procedure, not look
7    at the IFU.
8    Q    Right.
9    A    So right away, that downplays the IFU
10   information, which --
11   Q    Okay, what else?
12   A    -- which increases the need for the company to
13   communicate through its sales reps or through Dear
14   Doctor letters, is typically the design of that, and
15   what you --
16   Q    So I'll tell you what, Dr. Parisian.  Help me
17   make a list, please.  I want to know what all criticisms
18   you have of the IFU marked as Exhibit 6.
19        Number one, I have information regarding risk
20   and benefits should be up front, correct?
21   A    Right, it's on page 10.
22   Q    And what's your second criticism?
23   A    Okay, let me tell you.  Again, the
24   positioning.  They have the description --

Page 127

1    Q    I'm sorry?
2    A    The positioning of it.
3    Q    The positioning of what?
4    A    Of the label.  They have it --
5    Q    Of what on the label?
6    A    I'm going to tell you.
7    Q    Okay.
8    A    They have, under Description, they have this
9    long description of the polypropylene mesh, its
10   filaments.  Doctors aren't going to read that.  It's got
11   to be up front.
12   Q    What page are you on?
13   A    I'm on page 10.  You're putting stuff that a
14   physician who's implanting this is not going to care
15   about.
16   Q    All right.  So let me ask you this, and make
17   sure we're clear:  That what you suggest is that the
18   wording on page 10 under Description should be up front,
19   correct?
20   A    No.
21   Q    All right, help me out.
22   A    I'm saying that the way this is written about
23   the -- in terms of physicians --
24   Q    No, I'm not asking about physicians, I'm

Page 128

1    asking about what your opinion is, about what the --
2    what your criticisms are about the IFU.
3    A    And I'm telling you.
4    Q    Okay.
5    A    The placement of it, the --
6    Q    The placement of the description --
7    A    No, no.
8    Q    -- on page 10?
9    A    No, no, no.  The placement of the important
10   information for the IFU is actually -- and we're up to
11   page 10, and you've got this long description that no
12   surgeon is going to sit there and want to read --
13   Q    Okay, so --
14   A    -- about polypropylene mesh and all this
15   stuff, and --
16   Q    So you believe that the information on page 10
17   should be moved to the beginning of the IFU; is that
18   what your testimony is?
19   A    No.
20        MR. LUNDQUIST:  Form.
21   BY MR. HUTCHINSON:
22   Q    Then where should it be moved?
23   A    That's what -- I'm looking at the label and
24   I'm going to tell you what's going to be moved.  In

Page 129

1    terms of -- you've already the lost the physician.  He's
2    not going to read any of this stuff.
3    Q    Move to strike as nonresponsive.  I'm asking
4    you, where should --
5    A    I'm going to tell you what needs to be moved,
6    okay?
7    Q    -- it be moved?
8    A    Hold on.  All this is surgical stuff.  When
9    you see the contraindications, warnings and precautions,
10   you should have that up front.  It's now on page 20, so
11   we're 10 pages back from where anything begins --
12   Q    Move strike as nonresponsive.  I'm asking you,
13   where --
14   A    I'm telling you.
15   Q    -- the information on page 10 should be moved
16   in the IFU?
17   A    It should be moved to after -- it should be
18   shortened, for one thing.  The description should be
19   just that little part up there, the first part, and then
20   you should have --
21   Q    I'm not asking how it should be shortened or
22   how it should be lengthened.  I'm asking where it should
23   be moved.
24   A    It should be front, the first page.

1      Q   Okay, so you're telling me that the
2   information on page 10 should be moved to page 1,
3   correct?
4      A   Yes.
5      Q   Okay.
6      A   And it should be -- because the device -- it's
7   describing what the device is, and then the next thing
8   that should come is the indication for use.
9      Q   All right, so the criticisms that I have is,
10   number one, the information regarding risk and benefits
11   should be up front instead of page 10; the second
12   criticism I have is the placement of important
13   information on page 10 should be moved to page 1.
14       What other criticisms, if any, do you have
15   about the IFU?
16      A   Well, the device description is so long, it's
17   not telling the doctor what he needs to know.  He needs
18   to know what's up in that first description.  He doesn't
19   need to know all this stuff about the sandwich-bonded
20   thermal -- doctors don't care about that.
21      Q   All right.  So, Doctor --
22      A   Okay, then you have the --
23      Q   -- Dr. Parisian, stay with me.  So you're
24   testifying that the information on page 10 under

1   Description is too long, correct?
2      A   Yes.
3      Q   And Dr. Parisian --
4      MR. LUNDQUIST:  Sorry, she was about to write
5   on the exhibit.  I was just making sure.
6   BY MR. HUTCHINSON:
7      Q   And you're testifying also that the
8   information about the sandwich sections -- I'm sorry --
9   the information about the sandwich that ends the section
10   of the mesh should not be included in that, correct?
11      A   Not there, the way --
12      Q   I'm sorry, is that correct?
13      A   Not -- yes.
14      Q   All right.
15      A   Because when you design a label, you want to
16   have the information up front, so that the most
17   important information is available to a physician.
18   Chances are that your marketing and your sales rep is
19   going to have to convey this information, but if you're
20   going to make an effective IFU, you put the most
21   important information up front.  I don't think there's a
22   physician around who would care about how this is
23   knitted and -- that doesn't make any sense to them.
24   They think it's a cleared device.  They have here the

1   description of what the device should have in it.  Then
2   you have the indications for use, which is the important
3   thing, what is it intended for.  Then you go into the
4   instructions for use --
5      Q   All right, well, Dr. Parisian, stick with me.
6   So we're talking about your criticisms, and I have three
7   so far.  I'm sorry, I have four.
8       I have information regarding risk and benefits
9   should be up front instead of page 10.  The second one
10   is, important information on page 10 should be moved to
11   page 1.  Third is, too long device description on
12   page 10; and the fourth criticism I have is that we
13   shouldn't discuss the sandwich -- the section of the end
14   of the mesh, on page 10.
15       Anything else?
16      A   Yeah.  All those --
17      Q   What else?
18      A   All those pictures, 1 through 10, should be
19   under the Instructions For Use.
20      Q   Okay, I'm sorry, you're saying the pictures on
21   pages, actually, 2 --
22      A   Right.
23      Q   -- through 8 should be somewhere else, is
24   that correct?

1      A   Yeah, they have no business being up front.
2   They should be under Instructions For Use, because
3   they're relevant to the different positions, the
4   U-position and the H-position.  Without a picture, it's
5   really bad instructions.
6      Q   You do understand that I've handed you what
7   was marked as Exhibit 6 to be the Instructions For Use
8   of TVT Secur.
9      A   I know, but they're not designed correctly.
10   Now I see why people talk about cookbooks.
11      Q   So the pictures are not designed right?
12      A   No, the pictures are in the wrong place.
13      Q   Pictures wrong place, okay.
14      A   They should be under the Instructions For Use,
15   where you're talking about the specific procedure, the
16   U-procedure, the hammock procedure.  You have to have
17   pictures in the right section.
18      Q   Do you have any other criticisms --
19      A   Yeah, yeah.
20      Q   -- of the IFU?
21      A   Okay, so we have -- we started out with the
22   Description and the Indication For Use.  Then we would
23   have, after that we would have, before you started into
24   the Instructions For Use, you would start with the

Page 134

1    contraindications, because a physician needs to know up
2    front what's the contraindications.  That should be up
3    in the first --
4        Q   I'm sorry, contraindications?
5        A   Yeah.
6        Q   Should be where?
7        A   Right up after the Indications For Use.
8        Q   Contraindications should be where, after...?
9        A   Indications For Use.
10       Q   On what page?
11       A   They should be probably be out on page 1 or 2.
12       Q   Contraindications should be on page 1, is that
13   correct?
14       A   Well, it should follow the Indications For
15   Use.
16       Q   I'm asking you, where should contraindications
17   be located?
18       A   Well, you can't know what page, because we've
19   moved the Description, we've shortened it.  So we've
20   taken --
21       Q   Contraindications should be up front?
22       A   Yeah --
23       Q   Okay.
24       A   -- after the Indications For Use, you should

Page 135

1    have the contraindications.
2        Q   And where is contraindications now?
3        A   It's on page 20.
4        Q   Okay.  So it should be up front rather than on
5    page 20, correct?
6        A   Yeah, in the contraindications.
7        Q   Do you have any other criticism?
8        A   Well, yeah, I do.  Just let me look at the
9    contraindications... (Deponent reading document.)
10           That contraindication comes from surgical mesh
11   Prolene.
12       Q   I'm not asking where that contraindication
13   came from.  I'm asking you about your criticisms.
14       A   Okay, I'll tell you what my
15   contraindications --
16       Q   I'm not talking about your contraindications.
17   I'm talking about your criticisms --
18       A   I'm going to tell you.
19       Q   -- of the IFU, in Exhibit 6.
20       A   Okay, the company says to the FDA that you can
21   only use this product in certain selected patients.  So
22   if there's a patient that should not be appropriate for
23   this product, say, weight, if the woman is too obese, it
24   could be in the contraindications, it could be in the

Page 136

1    warnings and precautions, but who this product shouldn't
2    be used for, anyone with an allergy to polypropylene,
3    there are patients with that, they should not also be in
4    here.
5        Q   So your opinion is that the contraindications
6    are poorly worded, correct?
7        A   Well, no, they're not complete.
8        Q   Not complete.
9        A   If the company knows of people that should not
10   be implanted, that would be where you would put this
11   information.  And they're implying to the FDA, and to --
12   in the discussion of Australia, that they know that
13   there are patients that this product is good for and
14   not.
15       Q   What should the contraindications have
16   included that they don't include already?
17       A   Well, the 8 centimeters mesh was chosen
18   because it would fit most patients.  So if it doesn't
19   fit most patients -- this isn't a two-size device, it's
20   a one-single-size device -- that would be in the
21   contraindications.
22       Q   Okay.
23       A   If a woman that's too obese, or -- what woman
24   is contraindicated, what --

Page 137

1        Q   What other criticisms do you have about the
2    IFU?
3        A   Well, we're still -- so the contraindication
4    if a person has an allergy to polypropylene, there are
5    people that do, then that would be contraindicated in
6    that patient --
7        Q   Okay.
8        A   -- and --
9        Q   So my question to you is, what other
10   criticisms of the IFU do you have?
11           MR. LUNDQUIST:  She hasn't finished answering
12   your question, I don't think, on contraindications.
13           Have you?
14           THE WITNESS:  Right.  So if the
15   contraindication --
16           MR. HUTCHINSON:  No, she testified that the
17   contraindications are incomplete.
18           THE WITNESS:  All right, and that they should
19   be addressed.
20           Okay, the Warnings and Precautions is now what
21   we're going through.  At this time --
22   BY MR. HUTCHINSON:
23       Q   My question is:  What are your criticisms
24   about the Warnings and Precautions?  Is it the placement

Page 138

1   or is it the verbiage, or language?
2       A   Well, all -- we're talking about, okay, the
3   placement.  This should be up front, on page 1 or 2, not
4   page 20.
5       Q   Okay.
6       A   Okay, let me look at the warnings.  Okay, they
7   have a statement under Warnings and Precautions,
8               "Users should be familiar with surgical
9           technique for urethral suspension and should
10          be adequately trained in the Gynecare TVT
11          Secur system before using."
12              I've criticized that they don't have a
13  certification, so how would a physician out there
14  adequately train to use it?  All they're saying is that
15  you have to know how to use -- do urethral surgery.
16  Dr. Walss did a lot of urethral surgery.
17      Q   Move to strike as nonresponsive.
18      A   Well --
19      Q   We're not talking about Dr. Walss.
20      A   No --
21      MR. LUNDQUIST:  She's answering your question.
22  BY MR. HUTCHINSON:
23      Q   So my question is:  What other criticisms do
24  you have about the IFU?

Page 139

1       A   It defines -- it should define what would be
2   someone who's adequately trained.  Would it be someone
3   who would go to a course?  Would it be -- you know, and
4   so their marketing should be consistent with that, that
5   those people who were adequately trained, by definition
6   here, then should use this product.  That would be a
7   warning.
8       Q   What else?  What other criticisms do you have?
9       A   The second, that it should be used with care
10  to minimize the chance of damage to large vessels,
11  nerves, bladder and bowels --
12      Q   I'm sorry, is this the language?
13      A   No, no, this is -- I'm just showing you where
14  I am.
15      Q   I know, but you're reading a document.
16      A   Right.
17      Q   My question is:  What criticism do you have
18  about the IFU?
19      A   Well --
20      Q   And I'm making a list.  So what is the next
21  one on our list?
22      A   We're moving to the next one, where they're
23  saying that it is important to pay attention to the
24  specific patient's anatomy while inserting the device.

Page 140

1       Q   Okay, so is that --
2       A   That's a --
3       Q   Is that a criticism you have about the
4   language under the warnings?
5       A   Yeah.
6       Q   Okay.
7       A   That's a real stupid statement.
8       Q   Anything else?
9       A   I mean, to a physician, that means nothing,
10  I mean.  And also, you don't say that the device, unlike
11  the other devices, is sharp.  So it does have a tendency
12  to cut.
13      Q   So other than a criticism of language in the
14  warnings, do you have any other criticisms of the IFU?
15      A   No, I'm still going, looking at -- we're
16  looking at Warnings and Precautions.
17      Q   Well, you've already criticized the language,
18  I get that, but other than the criticisms of the
19  language and the warnings, do you have any other
20  criticism of the IFU for TVT Secur?
21      A   I think they tell them, for the hammock
22  position, that bladder injury is unlikely, but --
23      Q   Where are you?
24      A   I'm moving down the warnings, under the

Page 141

1   "hammock" position.
2       Q   Okay, and that goes to the language, correct?
3       A   Well, no, no.  It's -- this is a warning,
4   okay?  And so for the hammock position, the hammock
5   position is the most commonly used position and also the
6   one that's getting reported with bladder perforation.
7       Q   What's your criticism about that, the
8   language?
9       A   Well, no, it doesn't give the post-market
10  information about the bladder perforation rate.
11      Q   Okay.
12      A   Because it's one thing to say that it's
13  unlikely to occur with this technique, but bladder
14  perforation is actually being reported, I think, in some
15  documents, at 19 percent.  So that information
16  underplays the potential risk to a physician on the
17  hammock position.
18      Q   All right.
19      A   And then the hammock position, as we saw also,
20  if the device isn't put near the pubic bone, you may
21  actually hit blood vessels, which was another thing that
22  was there.  So if you're going to talk about the risk of
23  the hammock position, you need to say those.
24      Q   Do you have any other criticisms --

Page 142

```
 1        A   Yes.
 2        Q   -- about the IFU?
 3        A   Now, they're saying, "Ensure that the tape is
 4   placed with -- "
 5        Q   I'm asking you, do you have any criticisms
 6   about the IFU?
 7        A   Yes.
 8        Q   Okay.
 9        A   I'm telling you what.
10        Q   What's the next criticism?
11        A   Based on the information they have, this is
12   not a good IFU.  They also --
13        Q   What's your criticism?
14        A   I'm going tell you, "Ensure the tape is placed
15   with -- "
16        Q   You're just reading from a document.
17        A   No, I'm --
18            MR. LUNDQUIST:  She's giving the basis for
19   her --
20            THE WITNESS:  I'm trying to tell you where I
21   am, why it's wrong.
22   BY MR. HUTCHINSON:
23        Q   I meant, what's your criticism?
24        A   You're telling a physician, under Warnings and
```

Page 143

```
 1   Precautions, that there should be no tension placed
 2   under the mid-urethra.
 3        Q   And you believe that's wrong.
 4        A   I believe that's wrong and inaccurate, in
 5   terms of their internal documents, when they say
 6   tensioning is very important in terms of this device,
 7   and so this is not an adequate warning.
 8            I mean, these are warnings.  Warnings are
 9   like, red light, yellow light, important information,
10   and this is not -- this is not telling them that
11   tensioning is very important to the success of this
12   procedure; and you see that through all their documents,
13   and that information's not there, and --
14        Q   What other criticisms do you have,
15   Dr. Parisian, of the IFU?
16        A   The other is that there is nothing here about
17   the learning curve.  All the documents internally are
18   discussing the long learning curve --
19        Q   And so let me ask you this:  Is your opinion
20   that there should be something in the IFU that says
21   there's a long learning curve?
22        A   Yeah.
23        Q   Okay.
24        A   Because they're talking --
```

Page 144

```
 1        Q   And -- hold on just a minute, stick with me.
 2   What other opinions do you have, or criticisms, rather,
 3   about the IFU?
 4        A   Okay, I'm talking -- these are warnings, and
 5   so the learning curve should actually go up where
 6   they're talking about, the physician should be aware of
 7   the surgical technique and adequate training.  Okay,
 8   then, you would put the learning curve in there.  These
 9   are warnings.  Warnings are supposed to be, before you
10   use this, Doctor, you need to know this.
11        Q   Stick with me.  So what other criticisms do
12   you have?
13        A   The next statement, "Acceptable surgical
14   practice should be followed," that's not a warning.
15   Doctors know that.
16        Q   And so that shouldn't be in there, correct?
17        A   "...should be followed -- "
18        Q   Is that correct?
19        A   Let me look at it.  As well -- I mean, yeah,
20   that's not a warning, because doctors would think of
21   that just in terms of surgical stuff.  What should be
22   there is the potential for these things to be
23   contaminated and difficult to remove.  That's a better
24   warning.  Here, this is just telling a doctor he needs
```

Page 145

```
 1   to know how to do surgery technique.  That's not a
 2   warning.
 3        Q   Which bullet point are you?
 4        A   I'm on the first one on page 21.
 5        Q   Okay.  All right, the acceptable surgical
 6   practice.  All right, any other criticisms?
 7        A   Well, the next one, do not perform this if you
 8   think the surgical site may be infected.  You're talking
 9   about the urethra and the woman's vagina, which is
10   contaminated --
11        Q   So you don't like the bullet point -- you
12   don't like the language in bullet number 2 on page 21,
13   correct?
14        A   Correct.
15        Q   All right, any other criticisms?
16        A   Okay, so they do mention removal --
17        Q   Doctor --
18        A   No, I'm continuing on that --
19        Q   Do you have any other criticisms of the IFU?
20        A   Yes, yes.
21        Q   Okay.  What are they?
22        A   Okay, where they're talking about the surgical
23   site, they're saying that it must only be with the
24   understanding that subsequent infection may require its
```

Page 146

1    removal. Actually, the tape has been removed for many
2    reasons. So this would be where you would highlight the
3    risk of infection, the potential removal, a need for
4    additional surgical procedures, and it could be
5    difficult to remove and you actually may never be able
6    to treat the infection.
7           So you have, the risk of infection could be a
8    permanent issue, you may not be able to remove the
9    surgical mesh, and it may be something that could cause
10   problems forever. So that doesn't convey that.
11          Q   All right. Do you have any other criticisms?
12   I'm making a list about what -- hold it just a minute,
13   Dr. Parisian. Listen to my question. I'm making a list
14   and I'm up to 15 now criticisms that you have for the
15   IFU. Does that sound about right so far?
16          A   Yeah, I'm going through the IFU with you --
17          Q   Okay.
18          A   -- we're all the way through, you --
19          Q   I know, but does that sound right so far?  You
20   have at least 15 criticisms of the IFU so far?
21          A   Yeah.
22          Q   Okay.
23          A   It's not -- it's got a good IFU.
24          Q   Okay, if you could continue.

Page 147

1          A   All right.
2          Q   What's your next criticism of the IFU?
3          A   I don't know why they put the pregnancy there.
4          Q   Is that a criticism?
5          A   You could actually put a pregnancy as a one
6    single line. Yeah, this is --
7          Q   All right. My question is, is that a
8    criticism?
9          A   Yeah.
10         Q   Okay, so we're up to 16?
11         A   Yeah.
12         Q   Okay.
13         A   But see, in terms of warnings, you're supposed
14   to put the most important things first. It's not likely
15   that this is going to be used on a pregnant woman,
16   but --
17         Q   What other criticisms do you have about the
18   IFU?
19         A   I'll go on. There's again, pregnancy, women.
20   You could have just put pregnancy off by itself as a
21   separate population, because it's not going to be what a
22   physician who's potentially going to be doing this is
23   thinking about. You could have had a special population
24   and had pregnancy under that, considerations for

Page 148

1    pregnancy. That would -- let's see...
2           Okay, the next is just a routine warning for
3    surgical procedures.
4          Q   Is that a criticism you have?
5          A   Yeah.
6          Q   Okay, so is that 17 criticisms?
7          A   This would just be --
8          Q   Doctor -- Dr. Parisian --
9          A   I don't know if would be or not, but you would
10   use --
11         Q   Okay. Dr. Parisian --
12         A   Yes.
13         Q   Are we up to 17 criticisms you have for the
14   IFU?
15         MR. LUNDQUIST:  Object to form.
16         THE WITNESS:  I don't know.  You're keeping
17   track.  I wouldn't argue with you, but --
18   BY MR. HUTCHINSON:
19         Q   Well, if I've counted to 17 criticisms you
20   have of the IFU, would you have any reason to dispute
21   that?
22         A   No, sir.
23         Q   Okay.
24         A   The other is that --

Page 149

1          Q   What's number 18?
2          A   Number 18 would be that the postoperative
3    should be under the Instructions For Use, not under the
4    Warnings and Precautions, because that would be
5    postoperative information that you would tell your
6    patient about, not to jog. So it doesn't need to be in
7    the Warning and Precautions, it needs to be under the
8    Instructions For Use and the postoperative course.
9          Q   Okay.
10         A   It's just in the wrong place.
11         Q   What's number 19?
12         A   Okay, and the same with, "Patient should be
13   instructed to contact surgeon," that should be under
14   postoperative care and instructions for use.
15         Q   All right, what's number 20?  What's
16   number 20, Dr. Parisian?
17         A   I'm looking.  The next talks about de novo
18   destrusor stability.
19         Q   And what's wrong with that?
20         A   There's no information as to how frequent, and
21   yet they're trending it in their own post-market
22   information.  So how frequently does that occur for this
23   device, in terms of a meaningful warning for a
24   physician?

38 (Pages 146 to 149)

Page 150

1    Q   What's number 21?
2    A   Twenty-one, we'll leave that --
3    Q   What's your 21st criticism of the IFU?
4    A   Well, in terms of the IFU, in terms of
5  Warnings and Precautions, the information that needs to
6  be in there that's not in there, because I've gone
7  through the information that is, should be the failure
8  rate. What is the likelihood of the failure rate, based
9  on tensioning, inadequate tensioning --
10    Q   Is that -- I'm sorry.
11    A   That's not in the warnings at all.
12    Q   Is that your 21st criticism?
13    A   Yes, sir.
14    Q   Okay. What would be the -- do you have any
15  other criticisms of the IFU?
16    A   I don't think the number really applies,
17  because we're talking about a redesign of a label that's
18  inadequate.
19    Q   What is your next criticism of the IFU,
20  Dr. Parisian?
21    A   Let me think about it. Let me think about it.
22  Okay, you need to include the failure rate that
23  they've --
24    Q   I'm sorry, the failure rate?

Page 151

1    A   Yes.
2    Q   Doctor, Dr. Parisian, you're talking real fast
3  on me. Including the failure rate, would that be the
4  22nd criticism you have of the IFU?
5    A   Yeah, there's no information in here about the
6  high failure rate that's being seen in the post-market
7  information.
8    Q   Do you have any other criticisms of the IFU?
9    A   Let me think. I'm thinking. Actually,
10  I think that I would have divided this label differently
11  in terms Warnings and Precautions, because medically --
12  drugs had combined warnings and precautions in 2006, but
13  not medical devices.
14        So there should be a hierarchy of warnings
15  versus precautions, because warnings would be your
16  higher risk information, like, do not use an
17  anticoagulation therapy, that first one, that's a
18  warning, whereas a precaution -- putting them together
19  doesn't give a doctor....
20        So the way they've categorized -- you can make
21  it 20 whatever-it-is -- the warnings and the precautions
22  should be separated, because warnings are of higher risk
23  to a physician implanting the device and it needs to be
24  highlighted. It wasn't combined in medical devices, it

Page 152

1  was combined in drugs.
2    Q   Dr. Parisian, your -- what is your -- your
3  24th criticism was to divide the label differently.
4  What is your 25th criticism, though --
5        MR. LUNDQUIST:  Form.
6  BY MR. HUTCHINSON:
7    Q   -- of the IFU?
8    A   Okay, but I wanted to make it clear for you,
9  I'm talking about -- we just went through Warnings and
10  Precautions. I'm not going to go back through the list.
11    Q   I understand that. I understand that. That's
12  why I'm keeping the list. So --
13    A   Some are higher for warnings, they're
14  appropriate warnings, and some are lower risks, things
15  that are something -- a precaution, and that would be
16  something that needs to be divided from Warnings and
17  Precautions.
18    Q   All right. What is your 25th criticism of the
19  IFU?
20    A   Let me go through. There's nothing about --
21  okay, Adverse Reactions, it should be -- Adverse
22  Reactions is what they're calling it; they want to call
23  it that, or complication. And let's look at that.
24    Q   All right. Dr. Parisian, before you -- I'm

Page 153

1  still making my list. So what's your 26th criticism of
2  the IFU?
3    A   Well, I'm looking at the Adverse Reaction
4  section.
5    Q   Can you list the 26th criticism? Otherwise,
6  we'll move on.
7    A   Yeah, sure I can.
8    Q   Okay.
9    A   I mean, looking at it right away, one of the
10  issues is the use of the word "transitory" or "local
11  irritation" -- "transitory local irritation." The
12  words --
13    Q   And that's a criticism?
14    A   Oh, it's a big criticism.
15    Q   Okay. What's your next criticism?
16    A   Well, no, why is it my criticism?
17    Q   No, I'm sorry --
18    A   It should be --
19    Q   Dr. Parisian, listen to my question. Stick
20  with me, okay? What's your next -- what's your 27th
21  criticism of the IFU?
22    A   Okay, but let's go back to 26.
23    Q   No, I'm taking this deposition, Doctor.
24        MR. LUNDQUIST:  Doctor, it's all right, if he

Page 154

1  doesn't --
2  BY MR. HUTCHINSON:
3      Q   I'm going to ask you a question.  What's your
4  27th criticism of the IFU?
5          MR. LUNDQUIST:  If he doesn't want the basis
6  for it, he's welcome to ask what the criticisms are.
7          THE WITNESS:  And that isn't what --
8          MR. LUNDQUIST:  That's fine.
9          MR. HUTCHINSON:  I'm totally entitled to know
10  what her criticisms are.
11          MR. LUNDQUIST:  You are.
12  BY MR. HUTCHINSON:
13      Q   What's your 27th criticism?
14      A   Well, my 27th is that instead of the word
15  "transitory," it should be "permanent."
16      Q   Okay, what's your -- do you have any other
17  criticisms of the IFU?
18      A   And it should be -- yes.
19      Q   Okay.  What's the next one?
20      A   The Adverse Reactions is totally inadequate.
21  There's nothing about need for revision surgery, and
22  there's nothing about the difficulty removing of the
23  mesh.  There's nothing about the potential risk for
24  infection, chronic pain, dyspareunia, change in your

Page 155

1  vagina in terms of scarring.  None of that information
2  is in here.  So the Adverse Reaction is totally
3  inadequate --
4      Q   Okay.
5      A   -- in terms of the information.
6      Q   Do you have any other criticisms of the IFU?
7      A   Let me --
8      Q   And your 28th criticism was the Adverse
9  Reactions language, correct?
10      A   It's still inadequate.
11      Q   I'm sorry, is that correct?
12      A   Yes, it's totally inadequate.
13      Q   Do you have any other criticism of the IFU?
14          MR. LUNDQUIST:  Just for clarification, are
15  you talking about just the inadequacy or what she thinks
16  should be in here, or are you asking about --
17          MR. HUTCHINSON:  I'm talking about her
18  criticisms.
19          MR. LUNDQUIST:  Fair.
20          THE WITNESS:  Oh, because I'm trying to tell
21  you what should be in there.
22  BY MR. HUTCHINSON:
23      Q   Have we discussed all of your criticisms of
24  the IFU?

Page 156

1      A   Yeah, it's -- and I can summarize.  It's --
2          MR. LUNDQUIST:  You don't need to summarize,
3  that's okay.  Thank you.  If you've gone through them,
4  Dr. Parisian, I think --
5          THE WITNESS:  So you're going to ask me what
6  needs to be in it?
7  BY MR. HUTCHINSON:
8      Q   No, I'm going to ask you to summarize for us
9  what your criticisms are for the IFU.
10      A   Okay.  The design of the document is not
11  correct.  The information for the physician that he
12  needs to know about choosing this device is not up
13  front.
14          There's too much discussion of the device.
15  You can put that later in the labeling, to describe the
16  device.
17          The Instructions For Use, the surgical
18  procedure needs to be later in there.  They need to tie
19  the precautions that go with the Instructions For Use
20  with pictures.  You need to have pictures, so that the
21  physician would know what the potential procedure is.
22  You can't have pictures not together.
23          Adverse Events is deficient.  It doesn't talk
24  about the permanent nature of the complications, in

Page 157

1  terms of risk versus benefit.
2          So the sum is that it's an inadequate label in
3  terms of risk versus benefit information for a physician
4  choosing to use this product versus another product.
5          It also doesn't talk about the post-marketing
6  history, the learning curve, and what a physician needs
7  to do to be able to use this device safely on a patient.
8          And what kind of information oftentimes the
9  label will have information for consulting for your
10  patients, counseling your patients, there's nothing in
11  here for a physician about information you give to a
12  patient.
13      Q   What should the label say?
14      A   Okay, the label should say that -- just what
15  I said, in terms of the summary.  It needs to put the
16  risk information, the warnings and precautions divided
17  separately up front, with the contraindications under
18  the device description with the intended use, the
19  indication for use.
20          It needs to convey if there are any patients
21  that are not appropriate; what kind of training a
22  physician has.  The difficulty with tensioning needs to
23  be in here, and in implanting.  It also needs to, as
24  post-market data is obtained, the high failure rate at

Page 158

1   12 weeks, in terms of this device:  Do you want to use
2   this product versus another product?
3          It also needs to have a list of the adverse
4   events, complications that can occur, that they can be
5   permanent, that it can be difficult to remove a mesh,
6   that infections cannot be treated, perhaps; that removal
7   of the mesh -- you cannot remove all of the mesh and you
8   may still have infection.
9          It also doesn't discuss anything about nerve
10  injury, that people will have chronic pain.  It
11  doesn't -- it implies that the issues of complications
12  are going to be temporary and transient.  Those are not
13  the right words, and the company internally was talking
14  that was the wrong term to use.
15         So, you know, it just doesn't convey the risk
16  versus benefit information in an adequate prescription
17  label for a 21 C.F.R. 801.109.
18     Q   Have we discussed all the language you believe
19  that should be in the IFU?
20         MR. LUNDQUIST:  Object to form.
21         THE WITNESS:  That's what I think.
22  BY MR. HUTCHINSON:
23     Q   Dr. Parisian?
24     A   I think that, in terms of, I am not a

Page 159

1   clinician, and so as an FDA reviewer looking at the
2   warnings and looking at what the medical literature has
3   covered, those are my opinions.
4          We also have to take Dr. Miklos, because he
5   actually can talk --
6      Q   I'm not talking about Dr. Miklos.
7          MR. LUNDQUIST:  She's answering your question.
8   She's answering your question.
9          MR. HUTCHINSON:  Move to strike as
10  nonresponsive.
11         MR. LUNDQUIST:  Doctor, you can continue your
12  answer.
13         THE WITNESS:  I'm going to refer to him in
14  order to talk about the training, because he was a
15  preceptor and he would know about the adequacy for the
16  IFU training, because I haven't focused on that.
17  BY MR. HUTCHINSON:
18     Q   Okay, and have we talked about all of your
19  opinions regarding language that should be in the IFU?
20     A   All the -- all the language?  Because -- did
21  we talk about the language?  I mean, we talked about it
22  in the beginning, the dyspareunia, product -- is that in
23  your...?
24         I'm asking you.  I'm asking you, have we

Page 160

1   talked about all the language that you believe should be
2   in the IFU?
3      A   The -- yeah, I think also it needs to have an
4   adverse reaction that failure has been found at 12
5   weeks, in terms of the medical literature --
6      Q   Okay, anything else?
7      A   -- and their own data.
8      Q   Anything else?
9      A   That their long-term performance hasn't been
10  determined by the company.
11     Q   Anything else?  Dr. Parisian, anything else?
12     A   I'm thinking, I'm thinking.  I think also, in
13  terms of the fixation, the fixation, there's no
14  information about the success of fixation with the
15  Ethisorb.
16     Q   I'm talking about the language.
17     A   Right, no, the right --
18     Q   So tell me, have we discussed everything?
19     A   There's this whole discussion of the freeze in
20  the design, but there's nothing about that this has
21  never been used for this indication before, in terms of
22  the Dura Patch that they're using.
23     Q   Anything else?
24     A   That information needs to be there to tell the

Page 161

1   physician that the fixation hasn't been determined, and
2   there's no long-term data about that.  So difficulty
3   removing, training.  What else?  I think that's about
4   it.
5      Q   Dr. Parisian, are you aware of any IFU on the
6   market that has everything that you have suggested in
7   it, and in the order in which you've suggested it?
8      A   Actually, a lot of the information was
9   suggested by the FDA in 2008 --
10     Q   Move to strike as nonresponsive.  I'm not
11  asking about the FDA.
12     A   Well, there's different components of it.
13     Q   My question -- my question to you is, are you
14  aware of any IFU on the market that has all the
15  information in it and in the order you think it should
16  be in it, yes or no?
17     A   I don't know.  I mean, I don't think so,
18  because this is specifically looking at the documents
19  for TVT Secur.  The documents for TVT-O and the
20  documents for TVT and other product would be different,
21  but in terms of the information, there's -- some other
22  of the labels may actually have some of that.
23     Q   Dr. Parisian, did Ethicon do anything correct
24  when they drafted this IFU for TVT Secur, anything that

Page 162

1    they did well?

2       A   Let me look.  In terms of this IFU, no.

3       Q   Okay, and Dr. Parisian, you'll know that the

4    FDA did review this IFU before it cleared TVT Secur,

5    correct?

6       A   It was included in the 510(k) package, but the

7    FDA reviewed it for the intended use.  They didn't

8    review it, they don't approve it.

9       Q   Well, my question to you is:  You do know that

10   the FDA looked at the IFU that we've talked about before

11   it cleared TVT Secur, correct?

12        MR. LUNDQUIST:  Objection.

13        THE WITNESS:  No, we know that it was in the

14   FDA's submission, the 510(k).  I will agree with that.

15   BY MR. HUTCHINSON:

16       Q   Okay.

17       A   We don't really have any comments.  We have

18   Dr. Herrera saying he doesn't know how you could put

19   this device in.  So FDA didn't approve that.  That's an

20   IFU.

21       Q   I'm not talking about approving, I'm talking

22   about clearing.

23       A   Well, you're --

24       Q   FDA -- just stick with me.  FDA cleared TVT

Page 163

1    Secur, correct?

2       A   They did, but not that label.

3       Q   And FDA had this label at their office when

4    they cleared TVT Secur, correct?

5       A   It was with the 510(k) --

6       Q   Is that correct?

7       A   Yes, it was with the 510(k) submission --

8       Q   And that clearing --

9       A   -- and Herrera's comment is that --

10       Q   And that clearing -- just a minute.  By

11   clearing the TVT Secur, FDA gave Ethicon the green light

12   to market this, correct?

13       A   Only to market it, but not with that IFU.

14       Q   Right, and --

15       A   FDA doesn't review the IFU.  That's up to

16   Ethicon, and the only thing the FDA reviewed in the

17   510(k) was the intended use, and the submission and the

18   representation that this device was exactly the same as

19   TVT and TVT-O, and some of that information is from TVT

20   and TVT-O.

21        And so the FDA only reviews labeling for the

22   intended use.  They didn't -- that's not cleared by the

23   FDA or approved by the FDA, and you can say it all you

24   want, but it's not.

Page 164

1       Q   Did FDA -- strike that.  Did Ethicon violate

2    any federal regulations with the IFU that was marked as

3    Exhibit 6?

4       A   Yes, 21 U.S.C. 352(a) --

5       Q   Any others?

6       A   Well, I'm explaining it.  I'm answering your

7    question.

8        MR. LUNDQUIST:  Let her finish.

9        THE WITNESS:  21 U.S.C. 352(a)(f)(1), (f)(2),

10   in terms of mis-branding; 21 C.F.R. 801.109, adequate

11   prescription label; 21 C.F.R. 1.21, failure to reveal

12   material facts.  Twenty-one -- those would be the main

13   ones in terms of the labeling, adequate instructions for

14   use.  Yes, sir.

15   BY MR. HUTCHINSON:

16       Q   And this --

17       A   So those are violated.  Those are not

18   consistent with the information that -- and I'm not

19   going to say violated.  Those are not in compliance.  If

20   I was an FDA regulatory expert, with the requirements

21   for an adequate label, based on information that the

22   company has, especially in 2010, because we're looking

23   at labels that began when it was first cleared, but once

24   it was marketed, and by 2010, that label is not an

Page 165

1    adequate label for Ms. Garcia.

2       Q   Let's look at Exhibit number 7.  That's the

3    patient brochure that you have in front of you, correct?

4        MR. LUNDQUIST:  You're going to launch into a

5    whole new -- as far as the brochure, so is now a good --

6        MR. HUTCHINSON:  Patient brochure?

7        MR. LUNDQUIST:  Yeah, I figure you probably

8    have a good deal of questions on that.  Can we kind of

9    take a --

10        MR. HUTCHINSON:  I really don't think I'm

11   going to do --

12        MR. LUNDQUIST:  Maybe a 30-minute lunch break,

13   unless you just want to --

14        MR. HUTCHINSON:  Why don't we -- so you want

15   to take a break now?

16        MR. LUNDQUIST:  I mean, we've been going for

17   about three and half hours.  So just 30 minutes, back

18   at, let's call it back 10 to one?

19   BY MR. HUTCHINSON:

20       Q   Well, let me ask you this:  Do you have a lot

21   of opinions about the patient brochure that we haven't

22   already talked about?

23       A   Yeah.

24        MR. HUTCHINSON:  Let me -- all right, why

Page 166

1 don't we take a -- plaintiff's counsel, you want to take
2 a --
3     MR. LUNDQUIST:  Thirty.
4     MR. HUTCHINSON:  -- 30-minute lunch, is that
5 right?
6     MR. LUNDQUIST:  Let's call it that.
7     MR. HUTCHINSON:  Okay.  All right, fair
8 enough.
9     (Luncheon recess taken from 12:24 p.m. to 1:10 p.m.)
10 BY MR. HUTCHINSON:
11   Q   We ready?
12   A   Yes.
13   Q   Okay.  We're back on the record after having
14 lunch and ready to go.  Dr. Parisian --
15   A   Yes.
16   Q   -- the label in this case is the IFU, correct?
17   A   Yes, well -- the label, yes, as opposed to
18 labeling.
19   Q   Correct, but we're talking -- when we talk
20 about the label, you and I are talking about the same
21 thing in this case?
22   A   In this case, yes.
23   Q   And I think, before we took a break, you gave
24 us 28 to 30 reasons or so about why you believe the IFU

Page 167

1 was defectively designed, correct?
2     MR. LUNDQUIST:  Object.
3     THE WITNESS:  And then I summarized, tried to
4 say why, because it's not the points as much as the way
5 it's laid out.
6 BY MR. HUTCHINSON:
7   Q   And the label is part of the product?
8   A   Yes.
9   Q   And you can't separate product from the label;
10 meaning the two of them go hand-to-hand, right?
11   A   Well, in what sense?  In terms of a regulatory
12 sense, you can.  If you're talking about a 510(k)
13 clearance, they're different.  Because the only thing
14 that's really reviewed is the indications for use in
15 terms of 510(k) clearance, and then you get a nice
16 clearance letter saying it's up to you, manufacturer, to
17 ensure your labeling, which would be your IFU, is
18 adequate.
19   Q   Well, certainly Ethicon couldn't sell the TVT
20 Secur device without an IFU, could they?
21   A   No, they have to indicate what the intended
22 use is.
23   Q   So if the label is defectively designed, it's
24 your opinion that the product's defectively designed,

Page 168

1 correct?
2   A   It's misbranded.  I mean, I've had a lot of
3 other opinions about defective design, but we're talking
4 about the IFU, and the label is misbranded, it's
5 inadequate, particularly by the time Ms. Garcia has her
6 surgery.
7   Q   Does that mean that the product was
8 defectively designed?
9   A   Just based on the labeling?  In terms of the
10 training for the physician, yeah, we discussed that in
11 terms of the design in the very beginning.
12   Q   Okay.  Did you determine -- did you do any
13 tests to determine if the product was defectively
14 designed?
15   A   Yeah, I think I have -- well, I haven't done
16 any physical tests.
17   Q   Okay.
18   A   I've looked at documents about it, and --
19   Q   Okay.
20   A   -- and reports.
21   Q   Are you relying on -- I know you've looked at
22 documents, but are you relying on any peer-reviewed
23 publications or scientific literature as the basis of
24 your opinion that the product is defectively designed?

Page 169

1   A   I would look at the Cochran report.  The
2 Cochran report went and came up looking at all
3 randomized controlled studies that had been done and
4 said, very nicely, that it was not an adequate product
5 to use and that it would have been withdrawn from the
6 market.
7   Q   Can your theory the TVT Secur product is
8 defectively designed, can that theory be tested?
9   A   From a regulatory point of view?  Sure.  In
10 terms of the methodology that I'd use is exactly the
11 same methodology I would have used at the FDA to make
12 that same determination:  Is this an adequate device?
13 Are the instructions adequate?
14     So that that methodology can be tested, and
15 then the post-marketing reports actually substantiates
16 that it wasn't adequately designed --
17   Q   Have you done --
18   A   -- in their own internal discussions.  So
19 based on the medical literature, their own company
20 reports, their own testimony, their own documents,
21 and -- it is inadequately designed.  It did not meet --
22 by "inadequately designed," I mean it's not meeting its
23 users' needs, in terms of what the design requirements
24 are, and that would be under 21 C.F.R. 820.

Page 170

1    Q   Has your theory been tested?
2    A   Has my theory...?  You mean my process or
3  methodology?
4    Q   No, I'm talking about your opinion that the
5  TVT Secur device is defectively designed.  Has that
6  theory been tested, yes or no?
7    A   I don't understand the question.
8    Q   Have you done any tests to determine if the
9  TVT Secur device is defectively designed?
10   A   No, I have not.
11   Q   Are you aware --
12   A   Can I clarify?  You mean physical tests?  Have
13  I taken it into a laboratory and done physical tests?
14  No.
15   Q   Well, have you done any types of tests to
16  determine if the product is defectively designed?
17   A   Other than looking at the internal documents
18  and company reports and the post-marketing, I mean, it's
19  the company documents that have actually been what's
20  defectively designed and as my basis for that opinion,
21  and the medical literature.
22   Q   Is that a no?
23   A   I don't think I'm understanding your question.
24   Q   Okay.  Have you done any test to determine if

Page 171

1  the TVT Secur device is defectively designed?
2        MR. LUNDQUIST:  Object.
3        THE WITNESS:  Where I put it in the laboratory
4  and tested it?  I haven't done any testing like that.
5  BY MR. HUTCHINSON:
6    Q   I'm talking about any tests.
7        MR. LUNDQUIST:  Object to form.
8        THE WITNESS:  I've done what a regulatory
9  expert would do in terms of looking at adequacy of
10  design and what I would have done at FDA.  I used the
11  same kind of documents.
12  BY MR. HUTCHINSON:
13   Q   But have you done any tests other than
14  physical tests?
15       MR. LUNDQUIST:  Object to form.
16       THE WITNESS:  I haven't done any physical
17  tests, but I've used the documents that a regulatory
18  expert would rely on to come up with that opinion.
19  I'm not -- I don't -- are you trying to say,
20  am I an engineer that would have done physical
21  laboratory testing?  No, I'm not, but the documents I've
22  used are the same documents that I would have used at
23  the FDA to say, is there an issue with this device;
24  health risk assessment, in terms of a health risk

Page 172

1  assessment.
2  BY MR. HUTCHINSON:
3    Q   Has a safer design been manufactured?
4    A   Well, in terms of Ms. Garcia --
5        MR. LUNDQUIST:  Form.
6        THE WITNESS:  -- we have the TVT-O.  Since Dr.
7  Walss has been familiar with that, he said that's what
8  he would have used if he had known about the potential
9  risks.
10  BY MR. HUTCHINSON:
11   Q   Well, my question to you is:  Do you believe
12  that a safer design, other than a safer design than
13  TVT -- strike that.
14       Do you believe that there is a safer design on
15  the market compared to TVT Secur?
16       MR. LUNDQUIST:  Form.
17       THE WITNESS:  Yes.
18  BY MR. HUTCHINSON:
19   Q   And what was that?  What was that safer
20  design?
21   A   Based on the company documents, the medical
22  literature, Dr. Miklos, it would be be the TVT and the
23  TVT-O.  Now, I'm not saying they're safe, but I'm saying
24  they're safer than the TVT Secur.

Page 173

1    Q   Are you relying on any controlled study to
2  support your opinion that the TVT Secur caused injury to
3  Ms. Garcia?
4    A   A controlled study?  Why would I rely on a
5  controlled study?  I'm relying on all the company
6  documents and the information about the potential risks.
7    Q   And that's all?
8    A   And also we have Dr. Miklos, Dr. Walss, you
9  know, those -- in terms of a health risk assessment, I'm
10  relying on the totality of all those documents.
11   Q   Right, but I'm asking you about a controlled
12  study.  Are you relying any controlled study, yes or no?
13   A   Not one specific controlled study, no, sir.
14   Q   What -- and I believe it's your testimony that
15  the TVT or TVT-O, in your opinion, would be the proposed
16  alternative safer design, is that right?
17   A   Based on what Dr. Walss said, I would go with
18  the TVT-O.
19   Q   Okay.
20   A   Or no treatment at all.
21   Q   And are you aware of any study comparing the
22  current IFU that we have talked about as Exhibit 6 to
23  the proposed IFU that you claim is safer?
24   A   The current study -- I know we have

Page 174

1  Dr. Miklos, it's not -- from his clinical practice as a
2  physician and knowledgeable at the --
3      Q  I'm not asking about Dr. Miklos, I'm asking
4  about studies.
5      A  Well, there hasn't been a study of my proposed
6  label tested because it's based on documents that I've
7  reviewed.  If the company wanted to do that, they could
8  do that, but I haven't seen that the company has done
9  such a study.
10     Q  The IFU that you propose has never been
11 cleared by the FDA, has it?
12     A  It wouldn't need to be.  The company could
13 have done it immediately.
14     Q  Is that a no?
15     A  That's correct, and by 2010, which is the time
16 period we're talking about, the company had not updated
17 their label.  So they would have the IFU that we
18 discussed, and I don't know that -- and FDA doesn't have
19 to clear a 510(k)'s label.  The manufacturer can update
20 it immediately.
21     Q  In fact, the IFU that you propose has never
22 been submitted to the FDA, has it?
23     A  That's correct.
24     Q  Okay, not even by you.

Page 175

1      A  Why would it be, by me?  That's correct.
2      Q  And it's fair to say that no mesh manufacturer
3  has ever included an IFU like the one you believe is
4  safe, with their product?
5      MR. LUNDQUIST:  Form.
6      THE WITNESS:  I've seen various mesh
7  manufacturers' labels.  They have components of the
8  information that I have, at various different times.
9  Their labels have been changing since the FDA's public
10 Health Announcement 2008.  So their labels are evolving.
11     So much of that information isn't included in
12 the labels.  I think there's a discussion in 2009, when
13 the company's comparing TVT's label using the word
14 "transitory" versus AMS label, where the transitory
15 doesn't occur.  So there are components of those
16 statements --
17 BY MR. HUTCHINSON:
18     Q  I'm not talking about components, I'm talking
19 about an IFU exactly like the one that you had proposed
20 to be safer.
21     MR. LUNDQUIST:  Object to form.
22     THE WITNESS:  "Exactly" is the word, yes,
23 but --
24     //            //

Page 176

1  BY MR. HUTCHINSON:
2      Q  Exactly.  Am I correct?
3      A  In terms of -- I --
4      MR. LUNDQUIST:  Form.
5      THE WITNESS:  That's correct, I mean, because
6  nobody would have written the entire label -- I didn't
7  write a label.  I told you what was deficient in your
8  label and what should be there.  So there isn't a label
9  that I've even created, other than to tell you what my
10 opinions are in terms of what's missing from the label.
11 BY MR. HUTCHINSON:
12     Q  Is -- so I guess it's fair to say that no one
13 in the world has ever marketed a product with an IFU --
14 with the IFU like the one you believe is safe, correct?
15     MR. LUNDQUIST:  Object to form.
16     THE WITNESS:  Well, the label --
17 BY MR. HUTCHINSON:
18     Q  I'm just asking for a yes or no.  Then you can
19 explain your answer.
20     MR. LUNDQUIST:  Form.
21     THE WITNESS:  Yes, because we're talking about
22 a TVT Secur label, not every label in every one in the
23 world, and the company could have used that label at any
24 time, and making a label that's very specific for their

Page 177

1  post-marketing information, which had never been
2  included in their initial label.  They had one label
3  that came out and was never updated with any post-market
4  safety information.
5  BY MR. HUTCHINSON:
6      Q  Is there a mesh manufacturer of a mini-sling
7  on the market that has an IFU that you believe is better
8  than Ethicon's?
9      A  There are labels for other manufacturers that
10 have been updated over time that are better than you
11 would compare to the 2011 label -- what date was that
12 label that you showed me?  Oh, that was the very first
13 label.
14     Yeah, the other manufacturers that I've seen
15 labels that are better than TVT's label, one would be
16 AMS, one would be Boston Scientific.  Their labels have
17 different components, they're not perfect labels, but
18 they're more robust than the Ethicon label.
19     Q  Let's talk about the IFU that you propose and
20 compare it to the current IFU for TVT Secur, okay?
21     A  Well, you asked me my opinions on the --
22 I didn't propose and draft a label.
23     Q  Okay, and in fact, that's something that
24 you're not doing in this case, correct?

Page 178

1    A   I wasn't asked to do that.  You asked me
2  specifically what are my opinions on the label, and
3  I gave you my opinions on the label.  I didn't draft a
4  better label, other than to tell you how I would
5  rearrange the information.  So there isn't a drafted
6  label by me other than the opinions.
7    Q   Okay, and so that's something you've not done
8  is, you've not drafted a better label than the one for
9  TVT Secur, correct?
10   A   I haven't physically drafted -- that's what
11 I wanted to be clear.  I haven't physically drafted a
12 label.  I've told you what's deficient in terms of
13 inadequate information.  There are consultants like me
14 that could draft a label, but I haven't done that.
15   Q   Since you haven't talked with Dr. Walss, then
16 you don't know if the IFU that you proposed would have
17 made any difference in how he selected the product, do
18 you?
19       MR. LUNDQUIST:  Object to form.
20       THE WITNESS:  Based on his deposition, I do.
21 BY MR. HUTCHINSON:
22   Q   Okay.
23   A   His deposition said it did.  He repeatedly
24 said if he had known that, he wouldn't have -- what was

Page 179

1  in the IFU, he wouldn't have used the product, he would
2  have used the TVT-O, which he knew how to use and had
3  used.  So he repeatedly said that.
4        Do you want examples or just, is that enough
5  for you?
6    Q   Since you haven't spoken with Dr. Walss, do
7  you have any idea if the IFU that you propose would have
8  made any difference in the way he performed a
9  risk/benefit analysis?
10   A   Based on his testimony, the information that
11 I was adding would have, according to him, have changed
12 his use of the product.  I haven't physically spoken to
13 him, but knowing what he said was important to him in
14 terms of the information and use of the product, yes,
15 I think it would have, but that would be up to him to
16 answer that.
17   Q   And do you know if the IFU that you proposed
18 would have made any difference in the way he discussed
19 the procedure with Ms. Garcia?
20   A   The way I did propose it, yes, because I was
21 adding post-market information, which he didn't have,
22 and it could have been sent to him in a Dear Doctor
23 letter, it could have been told him by the sales rep.
24 So there's other communications besides the IFU.

Page 180

1    Q   My question is:  Since you haven't spoken with
2  Dr. Walss, do you know if the IFU that you proposed
3  would have any made difference in the way discussed
4  the procedure with Ms. Garcia?
5        MR. LUNDQUIST:  Object to form.
6        THE WITNESS:  I only can rely on his
7  testimony, and he said it would have.
8  BY MR. HUTCHINSON:
9    Q   So it's your opinion that a TVT-O would be a
10 safer design?
11   A   It's relative.  It's safer than a TVT Secur.
12   Q   And TVT-O is a multi-sling -- multi-incision
13 sling, correct?
14   A   Right.
15   Q   And a TVT Secur is a one-incision sling.
16   A   Single-incision, yes.
17   Q   So it's your opinion that a two-incision sling
18 is better than a one-incision sling?
19   A   No, it's not my opinion.  My opinion is that
20 for a physician to know how to be able to use a device,
21 it makes it a better device.  Dr. Walss is familiar
22 with a TVT-O, and he was not familiar and was not able to
23 familiar with the tensioning issues because the company
24 didn't instruct him on it for the TVT-S.  So you're

Page 181

1  always better off having a doctor using a product that
2  he's aware how to use rather than one he's not.
3    Q   Dr. Parisian, you've never designed an
4  alternative design, like the one you believe is safer,
5  have you?
6    A   For what?
7    Q   For stress urinary incontinence.
8    A   An alternative design of what?
9    Q   An alternative design of the TVT Secur.
10   A   Oh, so you're saying for another device.
11   Q   Yes.
12   A   No, I've not designed a device, but Dr. Walss,
13 which is the important part, said he would have used the
14 TVT-O, which has, based on the company's documents, a
15 lower risk of recurrence of SUI and other problems.  It
16 has risks, but lower risks than TVT Secur.
17   Q   I want to hand you what we'll mark as
18 Exhibit 8 to your deposition.
19   A   Sure.
20       (Whereupon, Exhibit 8 was marked for
21       identification.)
22 BY MR. HUTCHINSON:
23   Q   I believe you've seen this document before,
24 correct?

Page 182

1      A   Yes, General Controls of Medical Devices.
2      Q   In fact, this is on the reliance list.
3      A   Yes, sir.
4      Q   And when you worked with FDA, you knew what
5  general controls for medical devices were, didn't you?
6      A   Sure.
7      Q   General Controls provide the FDA with means of
8  regulating devices to ensure safety and effectiveness,
9  correct?  I'm in the introduction part.
10     A   Where are you reading?
11     Q   The introduction part.
12     A   General Controls...
13     Q   General Controls provide the FDA with means of
14  regulating devices to ensure safety and effectiveness?
15     A   Right, Congress required that the FDA would
16  come out with General Manufacturing Practices, GMP.
17     Q   And you agree with that statement I just read,
18  correct?
19     A   That was the purpose of the --
20     Q   I understand.
21     A   Yes.
22     Q   I'm not asking about the purpose.  Just stick
23  me, and we'll get through this.
24     A   Yes.

Page 183

1      Q   You agree with that, and the next sentence
2  says, "General Controls and the amendments apply to all
3  medical devices."  You agree with that correct?
4      A   Yes, sir.
5      Q   And including Ethicon's?
6      A   All devices, all --
7      Q   Including the TVT Secur that Ms. Garcia
8  received, correct?
9      A   Yes.
10     Q   Those standards apply to Ethicon and the
11  product, correct?
12     A   All medical devices sold in the United States,
13  yes.
14     Q   I'm sorry, is that correct?
15     A   Yes.  I think I have two.  Did somebody else
16  need one?
17     Q   If you look -- if you turn with me to
18  page 2 --
19     A   Um-hum.
20     Q   -- under Key Points, it says,
21         "General Controls are the basic
22         authorities of the Medical Device Amendments
23         that provide FDA with the means of regulating
24         devices to ensure safety and effectiveness."

Page 184

1          You agree with that, right?
2      A   Yes.
3      Q   And the FDA's General Controls, they address
4  safety now, right?
5          MR. LUNDQUIST:  Object to form.
6          THE WITNESS:  Well, the purpose is to attempt
7  to address safety.  They -- FDA doesn't specify
8  General Controls per se for each manufacturer.
9  BY MR. HUTCHINSON:
10     Q   But these standards address safety, correct?
11     A   Right, under good manufacturing practices.
12     Q   And these controls, or standards, are
13  mandatory for Ethicon to follow, correct?
14     A   Yes.
15         (Whereupon, Exhibit 9 was marked for
16         identification.)
17  BY MR. HUTCHINSON:
18     Q   Okay, and if you look at what I'll hand you as
19  Exhibit 8 -- I'm sorry -- Exhibit 9 to your deposition,
20  Dr. Parisian?
21     A   Um-hum, yes, sir.  This the newest one.
22     Q   Guidance for Industry and Food and Drug
23  Administration Staff, correct?
24     A   Well, this is the newest one.  There's been a

Page 185

1  series of them before that.  This is the 2014 --
2      Q   But we'd want to look at the newest one,
3  wouldn't we?
4          MR. LUNDQUIST:  Form.
5          THE WITNESS:  Depends what your question is.
6  Because we're talking about back in -- I have no --
7  I have no reason to quibble about this.  I'm just saying,
8  this is the newest one.
9  BY MR. HUTCHINSON:
10     Q   Well, let's look at Exhibit 9.  You relied on
11  this for reaching your opinions, correct?
12     A   Yes, sir.
13     Q   And when you worked at FDA, you relied on
14  guidance documents like this to educate you on certain
15  topics?
16     A   Oh, I didn't rely on this, I already knew
17  this.  I had been trained, everything in here.  This is
18  basically for manufacturers to try to facilitate their
19  awareness of when they need to put in a 510(k).  So
20  there's -- there was no change in the regulations.
21     Q   Well, so here, if we look at this document, we
22  have FDA giving guidance to both industry and its staff
23  about the 510(k) process, right?
24     A   Yes, new staff, basically, but the regulations

Page 186

1   hadn't been changed.
2       Q   Do you disagree with anything the FDA was
3   telling the medical community and its own staff in this
4   document?
5       A   No, I'm not.  I'm just saying I knew about
6   this long before this guidance.
7           So do you have a question?
8       Q   Let's turn to page 3.
9       A   Okay.  Got it.
10      Q   It's the last sentence.  It says,
11  "Because...," the last sentence on page 3.  Do you see
12  that?
13      A   Yes, sir.
14      Q   Okay.  It says,
15          "Because devices are classified according
16      to the level of regulatory control necessary
17      to provide a reasonable assurance of safety
18      and effectiveness, classification of a new
19      device through the 510(k) process requires FDA
20      to determine the issues of safety and
21      effectiveness presented by the new device and
22      the regulatory controls necessary to address
23      those."
24          Did I read that correctly?

Page 187

1       A   Yes, sir.
2       Q   And did FDA get it wrong here, or is it
3   correct?
4       A   No, it's right.
5       Q   So basically you're saying, or -- basically,
6   what you would agree with, as we kind of sum it up, is
7   the 510(k) review provides reasonable assurance of
8   safety and effectiveness.
9           MR. LUNDQUIST:  Object to form.
10          THE WITNESS:  No, no, the term "reasonable" is
11  used with PMA.  It determines the issues of safety and
12  effectiveness, based on the predicate device.  The
13  predicate device, unlike a PMA, is used for clearance of
14  the -- supportive clearance of the 510(k) for the device
15  substantially equivalent.  So yeah, that's correct.
16  BY MR. HUTCHINSON:
17      Q   Okay.
18      A   And if you're found substantially equivalent
19  to a predicate device, that controls.
20      Q   I know that.  We'll get to that in a minute,
21  but if the device has been 510(k) cleared, the FDA has
22  found reasonable assurance of safety and effectiveness,
23  fair enough?
24          MR. LUNDQUIST:  Form.

Page 188

1           THE WITNESS:  No, you're adding -- where do
2   you see "reasonable"?
3   BY MR. HUTCHINSON:
4       Q   On page 3.
5       A   Page 3, okay.  Reasonably assured of safety --
6   to provide, okay, but that's not "reasonable," because
7   they use "reasonable" in the PMA regs, and --
8       Q   Just, if you could stay with me.  If a device
9   has been cleared in the 510(k) process, you'll agree
10  that FDA has found there's a reasonable assurance of
11  safety and effectiveness, correct?
12          MR. LUNDQUIST:  Object form.
13          THE WITNESS:  Yes, based on the predicate.
14  BY MR. HUTCHINSON:
15      Q   Thank you, and the 510(k), that relates to
16  clearance of the device, not approval.
17      A   That's right.
18      Q   And that's something that would be relevant in
19  this case if we wanted to have a full picture of the
20  regulatory background of TVT Secur.
21          MR. LUNDQUIST:  Object to form.
22          THE WITNESS:  Of course it's relevant.
23  BY MR. HUTCHINSON:
24      Q   Okay.  It would also explain the history, the

Page 189

1   regulatory history of the product, wouldn't it?
2       A   Yes.  Do you want to discuss that?
3       Q   We will in a minute.
4       A   Okay.  I want to understand the question,
5   here.
6       Q   If you'll turn -- well, let's switch gears for
7   a minute, and let's talk about -- well, while we're on
8   here, while we're talking about FDA 510(k) clearance,
9   the 510(k) also relates to the safety of the device,
10  correct?
11          MR. LUNDQUIST:  Form.
12          THE WITNESS:  Based on the predicate device,
13  but only to -- the device has not been marketed, so
14  based on the safety of the prior device.
15  BY MR. HUTCHINSON:
16      Q   If we have a -- strike that.  Let's talk about
17  Prolene sutures for a minute.  You're familiar with
18  Prolene suture, I believe you've already testified to,
19  correct?
20      A   Yes, sir.
21      Q   And I'll hand you what we'll mark as
22  Exhibit 10 to your deposition.
23          (Discussion off the record.)
24      //          //

1          (Whereupon, Exhibit 10 was marked for
2     identification.)
3          MR. HUTCHINSON:  Will?  Pay attention.  Make
4     sure that's on the record.
5          THE WITNESS:  All right.
6     BY MR. HUTCHINSON:
7     Q    Now, you've seen this document before, haven't
8     you?
9     A    Yes, sir.
10    Q    And you will agree that TVT Secur's mesh is
11    made of these knitted filaments that we talked earlier
12    about, of Prolene suture, right?
13    A    Well, it's the same polypropylene.
14    Q    It's the Prolene suture.  It's knitted
15    filaments together.
16    A    Right.
17    Q    And if you look at this document, this is --
18    it says NDA 16-374, is that right?
19    A    Yes, sir.
20    Q    And that's the number that was assigned to the
21    NDA for Prolene sutures.
22    A    Yes.
23    Q    And FDA approved the NDA for Prolene sutures
24    on April 16, 1969, correct?

1     A    Yes, sir.
2     Q    And it's been in use since.
3     A    Yes, sir.
4     Q    And these were approved by FDA as a drug.
5     A    Under the drug regulations, because the
6     medical device regulations hadn't been made yet.
7     Q    And that approval includes labeling, correct?
8     A    Yes, that would include the labeling.
9     Q    Right, so the FDA concluded that the Prolene
10    sutures were safe and effective for intended use.
11    A    As a suture, yes, sir.
12    Q    And FDA approval of NDA means there's a
13    finding by the FDA that that drug is safe and effective
14    for use in the human body, as labeled?
15         MR. LUNDQUIST:  Object to form.
16         THE WITNESS:  Yes, it was an NDA approved
17    product.
18    BY MR. HUTCHINSON:
19    Q    And if somebody wanted a complete history
20    about -- a complete picture about the regulatory
21    history, this would be the starting point, won't it?
22    A    This is where I started, yes, sir.
23    Q    Okay, and over the years, there has been --
24    there have been supplements to NDA 16-374, correct?

1     A    Right, until it was transitioned over to CDRH.
2     Q    And do you know how many supplements there
3     have been?
4     A    No.
5     Q    And one --
6     A    I don't recall how many supplements there have
7     been.
8     Q    Did you look?
9     A    At one time I did.
10    Q    You don't know now?
11    A    I don't know, sitting here today.
12    Q    And every time the FDA approves a supplement,
13    that's confirmation that Prolene suture is safe and
14    effective as labeled, correct?
15         MR. LUNDQUIST:  Object to form.
16         THE WITNESS:  For that specific indication.
17    They don't go back and re-look at everything.  It's only
18    on a specific indication.
19    BY MR. HUTCHINSON:
20    Q    Now, let's talk about before 1976.  FDA
21    regulated medical devices just like they did drugs.
22    A    No.
23    Q    Before 1976?
24    A    No.  Let me explain.

1     Q    Okay.
2     A    They had certain drugs -- certain devices that
3     the FDA was concerned about safety issues, and so the
4     FDA chose to apply the drug regulations to certain
5     devices that would be referred to as the "transitional"
6     devices.
7          So they were actually required to have an NDA
8     approval, and the requirements were comparable to what
9     was required at that time for approval, because those
10    have been evolving, too, in terms -- this was pre the
11    70's, when FDA would have required clinical trials.
12    Q    Right.
13    A    They didn't do that here, but --
14    Q    Right.  Well, but one of the medical devices
15    that FDA regulated just like drugs was the Prolene
16    sutures, correct?
17    A    Yes, sir.
18    Q    And --
19    A    Just as a suture, not as a mesh.
20    Q    And if we look at -- let me make sure
21    I understand something.
22    A    Sure.
23    Q    A pre-amendment device is one that was sold
24    before the Medical Device Act of 1976, correct?

Page 194

1      A   For a medical device, yes, sir.

2      Q   Okay.

3      A   So we call it pre-amendment, but not all

4  pre-amendment devices were regulated as drugs.  This was

5  a transitional pre-amendment device that actually the

6  NDA came over as a PMA approval when they got regulated,

7  devices.

8      Q   And you'll agree that pre-amendment devices,

9  with a few very specific exceptions, were grandfathered

10  as safe and effective, correct?

11      A   Yes.

12      Q   Okay.  In fact, that's what you wrote in your

13  book, "FDA Inside and Out."

14      A   That's right, but that's not specifically --

15  you need to look at the section on transitional devices,

16  because this was already NDA-approved.  So it is safe

17  and effective as a Prolene suture.  It was transitioned

18  to having a PMA approval when it moved over to CDRH.

19         So it's a little higher standard than what

20  you're reading there for the pre-amendment device,

21  because not all of them have any kind of clinical

22  trials.

23      Q   Right, but the Prolene sutures, that was a

24  pre-amendment device.

Page 195

1      A   It was a transitional device, technically, but

2  it was pre-amendment.

3      Q   And the Prolene mesh was a pre-amendment

4  device, correct?

5      A   The surgical mesh was a pre-amendment device,

6  but it came if from Usher, I think, before 1976.  So

7  mesh was pre-amendment.  Prolene was NDA-approved.  So

8  the material, the resin, was NDA-approved.

9      Q   Well, Prolene mesh was grandfathered in as

10  safe and effective.

11      A   Based on that it was a surgical mesh which was

12  pre-amendment.  So the mesh -- yes, we're not -- I mean,

13  it's a cleared device.  I'm not talking....

14      Q   Right.

15      A   But technically, surgical mesh was a

16  pre-amendment device.  Prolene was an approved material

17  as an NDA.

18      Q   And FDA has never done anything to change the

19  fact that Prolene mesh was grandfathered in as safe and

20  effective, have they?

21      A   No.

22      Q   Okay.

23      A   It's based on the history.  I don't think FDA

24  really could do anything.

Page 196

1      Q   After 1976 amendments, Prolene sutures became

2  a PMA Class III device, right?

3      A   Well, they're --

4      Q   I'm sorry, is that right?

5      A   Yes, they're a PMA-approved device, so

6  therefore, they're a Class III, but then they were

7  reclassified into 510(k) Class II.

8      Q   And Class III devices require FDA review and

9  approval.

10      A   Yes.

11      Q   Okay, and in fact, Prolene sutures remained a

12  Class III device until the FDA down-classified it in

13  1990.

14      A   Right.  In fact, Ethicon wanted to keep it a

15  Class III device.  It was the rest of the industry which

16  supported re-classification, and so FDA re-classified

17  it.

18      Q   And what does it mean when something is

19  down-classified?

20      A   It means that FDA -- in this particular case,

21  they said that they reviewed the medical literature and

22  they felt that there could be accurate, er -- adequate

23  controls to ensure safety and efficacy with using

24  general controls and special controls, rather than the

Page 197

1  controls -- also special controls, of the -- that have

2  to be developed in a PMA or NDA, so it could then, from

3  then on, be cleared as a 510(k).

4      Q   All right.  Let's talk about, going back to

5  Prolene mesh, though, that's a pre-1976 device?

6      A   No, mesh, mesh in general.  Surgical mesh was

7  used in the Vietnam War and it was pre -- pre-amendment.

8      Q   I'm talking about Prolene mesh, pre-1976

9  device, correct?  We just talked about that.

10      A   Prolene is, yes, but it's based on a product,

11  the Prolene that actually had been NDA-approved.

12      Q   And it's made of the knitted filaments, just

13  like the Prolene suture.

14      A   Well, no, it doesn't look like suture.  That's

15  where --

16      Q   Okay, I'm not asking what it looked like.  I'm

17  asking about what it's made of.

18      A   Yes, it's made of the same resin.

19      Q   Correct, and it's made of the exact material

20  previously approved by FDA as safe and effective,

21  correct?

22      A   The resin is, which is used for the suture.

23      Q   And because it was a pre-1976 device, it was

24  grandfathered in as safe and effective, as a Prolene

## Page 198

1    mesh.

2         MR. LUNDQUIST: Object.

3         THE WITNESS: All surgical meshes were. Even

4    Marlex mesh was grandfathered in. So yeah, it was, but

5    see, there's a difference in structure between a mesh

6    and a suture. The material was approved --

7    BY MR. HUTCHINSON:

8         Q   I understand.

9         A   -- and surgical mesh was what the

10   grandfathered device --

11        Q   But stick with me. The original Prolene mesh

12   was made of the exact material that FDA had already

13   approved as safe and effective, correct?

14        A   For a suture, yes, sir.

15        Q   Okay, fine, and then ultimately, FDA

16   classified surgical mesh, including Prolene mesh, as a

17   Class II device.

18        A   Yes.

19        Q   You know that.

20        A   Yes.

21        Q   Okay, and that occurred in the 1990s, based

22   upon your review?

23        A   It was late 1980s, early 1990s, somewhere in

24   there.

## Page 199

1         Q   Okay, and FDA reached that decision after

2    recommending, or -- after considering recommendations of

3    three panels of experts, correct?

4         A   You mean their classification panels. Yes,

5    their standard classification panel. The panel

6    recommended that surgical mesh should be cleared as a

7    Class II device, and FDA did accept that.

8         Q   And those panels held open meetings?

9         A   I believe so. They're public, the

10   information.

11        Q   Did you go to any of those?

12        A   No. I think it predated my time at the FDA.

13        Q   I'm going to hand you what we'll mark as

14   Exhibit 11 to your deposition. If you can put that 10

15   back there?

16        A   Yes, sir. I got more than 10. Are you going

17   to do the --

18        Q   Just set it aside. We'll...

19        A   Got it. Yeah, 1982.

20            (Whereupon, Exhibit 11 was marked for

21            identification.)

22   BY MR. HUTCHINSON:

23        Q   So you've seen this document before, correct?

24        A   Yes, sir, talking about mesh.

## Page 200

1         Q   And in fact, you relied on it in forming your

2    opinions.

3         A   At various times, yes, sir.

4         Q   And if we look at page 17 -- well, first of

5    all, this is a proposed rule classifying Prolene mesh as

6    a Class II device, correct?

7         A   Right, that's how that works. You have to

8    come out with a proposed rule, first.

9         Q   Okay, and look with me on page 17.

10        A   Yes, sir.

11        Q   It says,

12            "Summary for reasons for recommendation:

13            The Panels recommend that surgical meshes be

14            classified into class II (performance

15            standards) because the Panels believe that the

16            device has an established history of safe and

17            effective use."

18            Did I read that correctly?

19        A   Yes, sir.

20        Q   Okay. Do you agree with that?

21        A   Yes, knowing the history of what they were

22   reviewing, because they're talking about going -- the

23   original surgical mesh was actually for reinforcing soft

24   tissue, bone, and it was used in trauma patients in

## Page 201

1    Vietnam, and it wasn't always permanently placed. It

2    was transient. So yeah, I believe that there had been a

3    history of surgical mesh use in the past.

4         Q   Well, but let's be clear. You agree with the

5    expert panels that the FDA employed in that the device

6    has an established history of safe and effective use.

7    That's something you agree with, correct?

8         A   Based on the history --

9         Q   I'm sorry, is that a yes?

10        A   Yes. Knowing --

11        Q   I'm sorry, is that a yes?

12        A   Yes, knowing the documents they're reviewing,

13   yes. It's not anything to do with surgical, for

14   urological uses.

15        Q   And FDA then classified Prolene mesh as a

16   Class II device in the latter part of 1998 -- I'm sorry,

17   1988.

18        A   Correct, and then they have performance

19   standards, which FDA never issued. So there was an

20   expectation that FDA was going to issue performance

21   standards for different devices, and they didn't.

22        Q   And it's been in use ever since, right?

23        A   Yes.

24        Q   Okay. So I want to hand you what we'll mark

Page 202

1    as Exhibit 12 to your deposition, Dr. Parisian.
2    A    Okay.  Are we done with this?
3    Q    Yeah, you can put it in that stack.
4    A    Got it.  Yes.
5         (Whereupon, Exhibit 12 was marked for
6         identification.)
7    BY MR. HUTCHINSON:
8    Q    And you've seen this, or -- this is the July
9    of 1990 order down-classifying sutures, right?
10   A    Yes, sir.
11   Q    And this is a document that you relied on in
12   forming some of your opinions?
13   A    About the history of mesh, yes, sir.
14   Q    Correct.  And if you look at the first
15   paragraph, it says, "FDA concludes...," are you with me?
16   A    And this is in response to a petition by U.S.
17   Surgical.  U.S. Surgical wanted to -- Ethicon wasn't --
18   Q    Look at the first paragraph.
19   A    All right.
20   Q    It says, "FDA concludes...," you see that?
21   A    The first --
22   MR. OLIVEIRA:  Second sentence.
23   THE WITNESS:  Second sentence.  Yes, sir,
24   I see it.  Um-hum, suture.

Page 203

1    BY MR. HUTCHINSON:
2    Q    Actually, turn to the last page for me.
3    Robert Sheridan, he's on this letter on behalf of the
4    FDA.  You see that?
5    A    He signed it on behalf of Office of Device
6    Evaluation, so he --
7    Q    And you worked for FDA.
8    A    Yes, sir.
9    Q    Did you ever work with Robert?
10   A    Yes, sir.
11   Q    Did you know him?
12   A    You know, I never worked with him.  He was at
13   the center when I was there, and then he retired shortly
14   after I was there, so....
15   Q    Is he a competent individual?
16   A    I don't know.
17   Q    You don't know?
18   A    Well, I know his background is totally
19   different.  He's an administrative person, no clinical
20   background, but he was in management at the FDA.
21   Q    If we look at page 12, ETH.MESH09634675.  Do
22   you see that?
23   A    Okay.  Page 12?
24   Q    Correct.

Page 204

1    A    Where are you?  Based on -- what paragraph?
2    I'm on page 12.
3    Q    Okay.  The second from the bottom paragraph,
4    it says, "In this matter...," do you see that?
5    A    Um-hum.
6    Q    It says,
7         "...significant publicly available
8         information indicates that the existing
9         nonabsorbable polypropylene surgical sutures
10        are generally safe and effective."
11        Did I read that right?
12   A    Yes, sir.
13   Q    And do you agree with that statement?
14   A    Yes, sir.
15   Q    Okay, so let's just be clear that you agree,
16   as an FDA expert in this case, that the polypropylene
17   sutures were safe and effective, correct?
18   A    Yes, sir.
19   Q    And also, if you turn with me to page 7 of
20   this document, bottom paragraph, and the last sentence
21   there says,
22        "...and that the polymer's degradation
23        proceeds slowly and is generally not
24        considered clinically significant under most

Page 205

1    circumstances of use."
2         Did I read that correctly?
3    A    That's what it states, yes, sir.
4    Q    And you agree with that, don't you?
5    A    That that's what it states?
6    Q    No, you're agreeing with that statement,
7    correct?
8    A    Let me look at the whole statement.
9    MR. LUNDQUIST:  Object to form.
10   THE WITNESS:  This was actually based on the
11   time period, in terms of, there's been knowledge about
12   suture, different things that cause sutures to oxidize
13   and degrade since this time, but this is in 1990.  So it
14   reflects the information considered in 1990.
15   BY MR. HUTCHINSON:
16   Q    Well, my question is:  Do you agree with that
17   statement?
18   A    That it reflects 1990.
19   Q    Do you agree that the degradation is
20   clinically insignificant under most circumstances of
21   use?  You agree with that?
22   A    They're talking about suture.
23   Q    Right.
24   A    So in terms of --

Page 206

1      Q   I understand.  I understand.  I'm asking if
2   you agree with that.
3          MR. LUNDQUIST:  Object to form.
4          THE WITNESS:  For suture, yes.
5   BY MR. HUTCHINSON:
6      Q   And let's be clear.  The mesh is made up of
7   the exact type of material that suture is, correct?
8      A   That's not what they're talking about, though.
9      Q   I'm not --
10     A   They're talking only about suture.
11     Q   Stick with me.  Stick with me.
12     A   But you can't generalize from here.
13     Q   I understand.  Move to strike as
14  nonresponsive.  Stick with me.
15         You will agree that the suture is made up of
16  the exact -- I mean, the mesh is made up of the exact
17  material as what the suture is made of, correct?
18         MR. LUNDQUIST:  Form.
19         THE WITNESS:  Yes, they're both polypropylene,
20  but they're not the same.  This is suture, which is a
21  different area, surface area, than mesh.  And it's a
22  different indication, because people usually tend to use
23  multiple sutures in a surgical site.  So one suture may
24  not be quite as important.

Page 207

1   BY MR. HUTCHINSON:
2      Q   Let's look at page 12, bottom paragraph, last
3   sentence.  Are you with me?
4      A   Page 12, bottom paragraph.  We're flipping
5   through the -- okay, bottom paragraph, all right.
6      Q   It says,
7          "...determination of comparable safety
8          and effectiveness of future nonabsorbable
9          polypropylene surgical suture and marketed
10         sutures can be made in the context of a
11         pre-market notification under Section
12         510(k)...."
13         Did I read that right?
14     A   Well, it's -- yes, this is classified in a
15  510(k), for suture.
16     Q   And that means that the FDA uses a 510(k)
17  paradigm to determine comparable safety and
18  effectiveness.
19         MR. LUNDQUIST:  Form.
20         THE WITNESS:  For suture, yes, sir.
21  BY MR. HUTCHINSON:
22     Q   Okay, and it's fair to say that the mesh that
23  Ms. Garcia received was made up of small sutures that
24  FDA previously approved as safe and effective.

Page 208

1          MR. LUNDQUIST:  Form.
2          THE WITNESS:  No, her mesh is not sutures.
3   BY MR. HUTCHINSON:
4      Q   It's made of the exact same material that was
5   previously approved by FDA as safe and effective,
6   correct?
7          MR. LUNDQUIST:  Form.
8          THE WITNESS:  Polypropylene is approved and
9   cleared.  I've never said anything -- as a suture --
10  BY MR. HUTCHINSON:
11     Q   I understand.
12     A   -- but there's differences in risk between a
13  mesh and a suture, and --
14     Q   But my question -- stick with me.  My question
15  is:  The mesh that Ms. Garcia received is made of the
16  exact same material that FDA had already approved as
17  safe and effective, correct?
18         MR. LUNDQUIST:  Form.
19         THE WITNESS:  So?  I mean, that's --
20  BY MR. HUTCHINSON:
21     Q   I'm sorry, just a yes or no, and then go on
22  and explain your answer.
23         MR. LUNDQUIST:  Form.
24         THE WITNESS:  Yes, it's made of polypropylene,

Page 209

1   but that's really irrelevant, because this is talking
2   about suture, and this document is basically, so FDA is
3   justifying why they're not going to come out with
4   mandatory performance standards for sutures, because
5   they were saying that they thought it was low risk, the
6   suture material.  So that's what this document is
7   saying.
8          But yes, but just because things are made of
9   the same material doesn't mean the risks are potentially
10  the same in a human being.
11  BY MR. HUTCHINSON:
12     Q   Dr. Parisian, you're familiar with the Safe
13  Medical Device Act of 1990, correct?
14     A   Yes.
15     Q   And you'll agree that it added to the 510(k)
16  application process a new section called Summary of
17  Safety and Effectiveness?
18     A   Yes, sir.
19     Q   Okay, so the 510(k) process, at least in part,
20  deals with safety, correct?
21         MR. LUNDQUIST:  Object to form.
22         THE WITNESS:  Yes, but the safety based on the
23  predicates, not on the device itself, because it hasn't
24  been marketed.

1   BY MR. HUTCHINSON:
2       Q   Have you ever -- and by the way, let's talk
3   about your book for a minute.  You wrote a book called
4   "FDA Inside and Out," is that correct?
5       A   Yes, sir.
6       Q   That was published about Fast Horse Press?
7       A   Yes, which is my company.
8       Q   You're the only owner of that company, aren't
9   you?
10      A   It doesn't even exist as a company, but yes,
11  I was the only person -- my husband, I think, took the
12  money for the books, and so -- but it doesn't even exist
13  anymore.
14      Q   I'm sorry, explain that to me.  How can you be
15  the owner of a company that doesn't exist?
16      A   Well, it's not -- it's a doing business --
17      Q   Just explain to me, please.
18      A   From a legal point of view, it's a doing
19  business under the name, but it's under my company, my
20  corporation, Medical Device Assistance, which is now
21  MD Assist, Inc.  So it's now like a facet of that group.
22      Q   Is this still the only book that Fast Horse
23  Press has published?
24      A   Yes, and we don't even sell them anymore.  So

1   we don't sell them.  I mean...
2       Q   Who gets -- how many books did this -- did you
3   sell of this FDA Inside and Out?
4       A   Not that many.  I mean, I think we originally
5   had -- I don't know, probably less than a thousand, but
6   we're not selling them anymore.
7       Q   I'm sorry?
8       A   Other people sell them.  We've given books to
9   other people to let them sell.  So I don't know how many
10  have been sold.
11      Q   You don't sell this book anymore, fair enough?
12      A   I don't, that's correct.
13      Q   Okay, and why not?
14      A   Because I don't have time to fool with it.
15  Other people have been willing to sell it.  The price
16  we've allowed them to reduce it to whatever -- it was --
17  so I don't sell it.  It's not like it was a money
18  winner, it was never meant to.
19      Q   Does Fast Horse Press still publish this book?
20      A   No, it was a one-time publication.
21      Q   So this book is not in circulation anymore, is
22  that correct?
23      MR. LUNDQUIST:  Form.
24      THE WITNESS:  It is in circulation.  There are

1   medical libraries that have it, and people have it.
2   I don't know how many people have it.  So it's in
3   circulation.  You can get it on Amazon but, you know,
4   I don't know how many are out there.
5   BY MR. HUTCHINSON:
6       Q   If I were to call Fast Horse Press, who would
7   answer the telephone?
8       A   Nobody, because I believe Fast Horse Press
9   used to be in Front Royal, Virginia, so there is no Fast
10  Horse Press.
11      Q   Do you -- during your review of this case, did
12  you review the 510(k) for modified Prolene mesh?
13      A   I have reviewed --  you mean in terms of the
14  surgical mesh for modified Prolene mesh?  Yes, I've
15  reviewed certain, like, Dynamesh, yes, there's mod- --
16  yes.
17      Q   No, I'm talking about the 510(k), K962530, for
18  modified Prolene mesh.  Did you review that?
19      A   At one time I did, yes, sir.
20      Q   And that would be on your reliance list,
21  correct?
22      A   I don't know if it would be or not, because
23  I've reviewed it for other things that I've reviewed the
24  Prolene mesh.

1       Q   Do you know what device was used as a
2   predicate for modified Prolene mesh?
3       A   Probably Prolene mesh.
4       Q   And FDA -- based on your review, you know that
5   FDA cleared modified Prolene mesh on August 6, 1996,
6   correct?
7       A   Yes, sir.
8       Q   And if somebody wanted a complete picture
9   about the regulatory history, the 510(k) for modified
10  Prolene mesh would be relevant.
11      MR. LUNDQUIST:  Object to form.
12      THE WITNESS:  It could be, at some point when
13  you go -- I think even in my pile I have documents of
14  510(k)'s that I've pulled, so I wouldn't just look at
15  TVT.  I'd look at the components.
16  BY MR. HUTCHINSON:
17      Q   So the predicate was Prolene mesh.
18      A   Yes, sir.
19      Q   And it's that same Prolene mesh that was
20  grandfathered in as safe and effective.
21      A   Yes, sir.
22      Q   And FDA found that modified Prolene mesh was
23  substantially equivalent to Prolene mesh, correct?
24      A   Based on what the company told them.  The FDA

Page 214

```
 1    didn't look at it.  They just go on what the document is
 2    that the company sends in, and I don't believe that that
 3    was cleared as a -- for SUI.  It was cleared for filling
 4    in spaces that need to have some kind of strengthening,
 5    more surgical hernias and abdominal hernias.
 6        Q    That's your testimony for modified Prolene
 7    mesh, Dr. Parisian?
 8        A    I don't recall, but --
 9        Q    Wait a minute.  I'm just asking, yes or no --
10        A    I don't know.
11        Q    -- is that your testimony for modified Prolene
12    mesh?
13        A    I don't recall that 510(k), in terms of, if it
14    was specially for SUI.
15        Q    And Dr. Parisian --
16        A    And the reason I say that is because there are
17    slings that were made for sacrocolpopexy that actually
18    had Prolene, people were using surgical mesh.  So
19    I don't recall.
20        Q    And Dr. Parisian, you definitely reviewed the
21    510(k) for TVT, didn't you?
22        A    Yes, sir.
23        Q    And FDA cleared TVT on January 28, 1998?
24        A    Yes.
```

Page 215

```
 1        Q    And TVT, it's made of the same Prolene mesh
 2    that was grandfathered in as safe and effective, right?
 3        A    Yes.
 4        MR. LUNDQUIST:  Form.
 5    BY MR. HUTCHINSON:
 6        Q    And are you critical of the FDA at all for
 7    clearing TVT?
 8        A    No, not based on what the process is at the
 9    FDA.
10        Q    And you reviewed the updated letter from FDA
11    dated September 28, 2012, didn't you?
12        A    Which letter?
13        Q    It's a letter addressed to Mr. Greg Jones at
14    Ethicon from FDA regarding TVT.
15        A    You mean, to change the product code, or the
16    522?  I don't know if I know that letter.  Do I get to
17    see it?
18        Q    Sure.
19             (Whereupon, Exhibit 13 was marked for
20             identification.)
21    BY MR. HUTCHINSON:
22        Q    Dr. Parisian, I'll hand you what we'll mark as
23    Exhibit 13 to your deposition.
24        A    Oh, okay.  Okay, yes, this is where I got it
```

Page 216

```
 1    from.
 2        Q    And you've seen that letter before, haven't
 3    you?
 4        A    Yes.
 5        Q    Relied on it in support of your opinions?
 6        A    Yes, they corrected their original approval
 7    for TVT.  They did this FDA in 2012 with most of these
 8    SUI products.  They changed the product code.
 9        Q    I'm sorry, they didn't correct anything; they
10    just changed the product code, correct?
11        A    Correct, yes.
12        Q    Is that correct?
13        A    Yes, that's what I was saying.  They changed
14    the product code.
15        Q    And Benjamin Fisher signed this letter from
16    FDA.  Did you work with Ben?
17        A    No.
18        Q    You're not critical of FDA or Ben Fisher in
19    any way, are you?
20        A    No.  No, they're just putting it under a
21    different code, which is how everything is filed at the
22    FDA, in terms of product.  They gave it its own code.
23    They took it from FTL, which was surgical mesh, and now
24    put it over into a code that represents SUI products,
```

Page 217

```
 1    which is -- they gave it OTN, which is mesh surgical
 2    synthetic urogynecological for stress urinary
 3    incontinence female multi-incision.
 4        Q    And you reviewed the TVT-O for this case --
 5    the 510(k) for TVT-O, didn't you?
 6        A    Yes, sir.
 7        Q    And FDA cleared 510(k) for TVT-O on
 8    December 8, 2003.
 9        MR. LUNDQUIST:  Form.
10    BY MR. HUTCHINSON:
11        Q    Yes?
12        A    Was it 2003?  You have it in front of you.
13        Q    Is that correct?
14        A    Well, they cleared it.
15        Q    Huh?
16        A    They cleared it, TVT-O.
17        Q    And TVT-O is made of the same Prolene mesh
18    that was grandfathered in as safe and effective?
19        A    Yes.
20        Q    And the FDA found that TVT-O was substantially
21    equivalent to TVT, which had already been cleared,
22    correct?
23        A    Correct, that's what -- based on the 510(k),
24    yes, sir.
```

Page 218

1    Q   So that brings us to TVT Secur. FDA cleared
2    this, TVT Secur, on November 28, 2005.
3    A   Yes, sir.
4        MR. LUNDQUIST:  Form.
5    BY MR. HUTCHINSON:
6    Q   Predicate was TVT and TVT-O.
7    A   Yes, sir.
8    Q   Both of those had been cleared.
9        MR. LUNDQUIST:  Form.
10       THE WITNESS:  Yes, sir.
11   BY MR. HUTCHINSON:
12   Q   And TVT Secur is made of the same mesh that
13   was grandfathered in as safe and effective?
14   A   Yes.
15   Q   And it's made of the exact same material that
16   FDA approved as safe and effective, correct?
17       MR. LUNDQUIST:  Form.
18       THE WITNESS:  With the NDA back in the 60's,
19   yes.
20   BY MR. HUTCHINSON:
21   Q   Okay. So the product that Ms. Garcia received
22   was made of the same material FDA approved as safe and
23   effective, correct?
24       MR. LUNDQUIST:  Form.

Page 219

1        THE WITNESS:  Actually, not totally correct,
2    because one of the things is, yes, it's a polypropylene,
3    but then the laser -- the laser cut actually had changed
4    the mechanical properties of it, but it is the same --
5    BY MR. HUTCHINSON:
6    Q   I'm talking about the same material. We're
7    talking about the same material.
8    A   It's the same material, polypropylene.
9    Q   Thank you. Well, no, it's the same material
10   Prolene, correct?
11   A   Well, that's the trade name, yes, sir.
12   Q   Okay, and you'll agree with me on that,
13   correct?
14   A   Yes, sir.
15   Q   And the FDA found that TVT Secur was the
16   substantially equivalent to TVT and TVT-O, correct?
17   A   Based on the information that the company
18   provided, yes, sir, and they cited a third predicate,
19   which was the -- was it Gyne Image Sling? -- to address
20   the FDA's question for additional information. So there
21   were three predicates for TVT Secur, not two.
22   Q   And if we look at -- do you have -- I'll hand
23   you what we'll mark as Exhibit 14.
24   A   Thank you.

Page 220

1    Q   Dr. Parisian, I'm handing you what we'll mark
2    as Exhibit 14 to the deposition.
3    A   Yes, sir.
4        (Whereupon, Exhibit 14 was marked for
5        identification.)
6    BY MR. HUTCHINSON:
7    Q   This is the 510(k) for TVT Secur, correct?
8    A   Yes. Yes, sir.
9    Q   And you've definitely seen this document
10   before you walked in here today.
11   A   Yes, sir.
12   Q   Did FDA mess up by telling Ethicon they could
13   market this device?
14       MR. LUNDQUIST:  Form.
15       THE WITNESS:  Not based on the information
16   that was provided, that it was substantially equivalent
17   to TVT-O, TVT, and the third predicate they indicated
18   eventually.
19   BY MR. HUTCHINSON:
20   Q   And do you fault FDA at all for sending the
21   letter dated November 28, 2005 to Ethicon?
22   A   No, it's a cleared device, based on -- and
23   it's -- based on what they told the FDA, the FDA cleared
24   it. They regulatory would have had to have cleared it.

Page 221

1    Q   And if we look at -- are you with me on the
2    November 28, 2005 letter?
3    A   Okay, let me find that.
4        MR. LUNDQUIST:  It's the first --
5        THE WITNESS:  Yes, right there, first thing,
6    got it. All right. What do you want?
7    BY MR. HUTCHINSON:
8    Q   First paragraph that says,
9        "You may, therefore, market the device,
10       subject to the general control provisions of
11       the Act."
12   And those are the same general controls provisions we've
13   already talked about.
14   A   Yes, sir.
15   Q   And those are the general controls that
16   provide FDA with the means of regulating devices to
17   ensure safety and effectiveness, is that right?
18   A   Yes, to oversee, as the gatekeeper for devices
19   in the United States, yes.
20   Q   And the general controls refer to
21   adulteration?
22   A   Yes, sir.
23   Q   And misbranding?
24   A   Right. Can't misbrand, can't adulterate.

Page 222

1    Q   And they relate to good manufacturing
2    practices.
3    A   Right, that's the manufacturer does that, yes,
4    sir.
5    Q   And all of these general controls relate to
6    the safety of the device, is that right?
7    A   Trying to ensure the safety for the public of
8    the devices.
9    Q   Is that a yes?
10       MR. LUNDQUIST:  Form.
11       THE WITNESS:  No, they relate to, the product
12   can be introduced into marketing in the United States.
13   That's what this letter is for, and it goes on --
14   BY MR. HUTCHINSON:
15   Q   I'm talking about general controls.
16   A   Then you go to the third paragraph, and you
17   can't say --
18   Q   I'm not there yet.  Just stick with me, okay?
19   A   Well, general controls --
20   Q   All of these general controls -- wait, I don't
21   want to talk over the court reporter.  All these general
22   controls relate to the safety of the device, correct?
23   A   No, they relate to a device that's being
24   marketed in the United States.  A manufacturer has to

Page 223

1    comply with all those requirements in order for ensure
2    that the manufacturer markets a safe and effective
3    product that's not prohibited by the Act.
4    Q   And --
5    A   It says, "you."  It says, "you."  It keeps
6    saying "you" to the manufacturer, not the FDA.  So these
7    are the general controls, good manufacturing, that the
8    FDA has set up that manufacturers independently have to
9    address in terms of their procedures.
10   Q   And if we look at Exhibit 14 to your
11   deposition, this 510(k) for TVT Secur, this is the
12   information that Ethicon sent to FDA, is that right?
13   A   Yes, sir, and then also additional
14   information.  I think that's in this packet.
15   Q   And this is the information that FDA
16   considered before it cleared TVT Secur, correct?
17   A   Sure, yes.
18   Q   Okay.  If you look at -- do you remember who
19   signed the Truthful and Accuracy Statement?
20   A   I think it was a Patricia --
21   Q   Hojnoski?
22   A   I think it was.
23   Q   Do you have any criticism of Patricia
24   Hojnoski?

Page 224

1    A   Yes.  I don't think it is truthful and
2    accurate.
3    Q   Have you contacted FDA to alert them that
4    Patricia messed up?
5    A   Well, no.
6    Q   If you look at page ETH.MESH.07876630 -- are
7    you with me?
8    A   6630.
9    Q   Have you reviewed this document before?
10   A   Yes, sir.
11   Q   And did Ethicon misrepresent anything to FDA
12   here?
13   A   They didn't represent the change in stretch,
14   because that's significant in terms of a surgical mesh.
15   You have to usually characterize the elasticity
16   principles and burst strength.  They didn't describe
17   that here.  They said it's the same material, but the
18   ends will have this Ethisorb, the Dura Patch.
19       So they didn't tell the FDA this device is
20   going to be different in terms of the stretchiness and
21   that would come from the laser cut as opposed to the
22   mechanical, and that's an important issue in terms of
23   surgical mesh.
24   Q   Look with me to -- on ETH.MESH 715, if you

Page 225

1    have that in front of you.
2    A   I will in a minute.  All right.  Yes, okay.
3    Q   And this is a Clinical Review done by
4    Dr. Hector Herrera, correct?
5    A   Yes, I helped hire him.  So I know him and
6    I trained him.
7    Q   And he's a competent doctor, isn't he?
8    A   Um, yes, he is.
9    Q   If you trained him.
10   A   He is a competent -- he's a urologist by
11   training, one of the few that they have at the FDA.
12   Q   Do you have any criticism of Dr. Herrera?
13   A   No, I have a criticism that he wasn't listened
14   to, but...
15   Q   I'm sorry, he wasn't listened to?
16   A   As a medical officer, he gives his opinions
17   and it's up to the rest of the division who's reviewing.
18   He's not in the same division.
19   Q   Was Dr. Herrera diligent and smart?
20   A   Yes, I think he's right.  They needed to give
21   data.
22   Q   Was he an honest doctor?
23   A   Yes.
24   Q   And did you work with him at all at FDA?

Page 226

1    A   Yes, I -- I --
2    Q   After you hired him.
3    A   Yes, but he's a part-time, he's an older
4  urologist.  He was -- he had retired from urological
5  practice.
6    Q   And if you'd look at the next page, 716, last
7  paragraph, it says,
8        "With the company's response to prior
9        deficiencies, I do not have any urological
10        clinical issues to preclude approving the
11        submission."
12    Do you see that?
13    A   Um-hum.
14    Q   Did he get it wrong?
15    A   No, not based on the process, because they
16  came up with a subsequent 510(k) that showed that they
17  had actually already approved it, the Gyne Ideas
18  Minitape, which makes it so the FDA can't really ask for
19  clinical studies if they've already got a predicate.
20    Q   Are you aware of anything Ethicon hid from
21  Dr. Herrera or misrepresented to Dr. Herrera?
22    A   Well, yeah, they misrepresented the European
23  experience and the KOLs were not having a good time
24  putting this in, and that the IFUs were inadequate and

Page 227

1  that there were safety issues.
2        Now, this is to get cleared.  This device got
3  cleared.  The issue really for Ms. Garcia is
4  post-market.
5        But they did not -- and they did not tell
6  Dr. Herrera about the change in the mesh, the difficulty
7  with using the inserter, and they are basing their
8  argument on that they're substantially equivalent to TVT
9  and TVT-O.
10        And so he had to accept, based on what their
11  representations were from the expert, the company, that
12  they had satisfied his concerns.
13        (Whereupon, Exhibit 15 was marked for
14        identification.)
15  BY MR. HUTCHINSON:
16    Q   Let's look at what I'll hand you to be marked
17  as Exhibit 15 to your deposition, and you have reviewed
18  this document before today, haven't you, Dr. Parisian?
19    A   Let me look at it and make sure.
20    Q   Okay.  Yes?
21    A   Yes, this is for the PMA, when it was still a
22  PMA.
23    Q   And if you'll look with me on
24  ETH.MESH.09634315 -- and by the way, before we get to

Page 228

1  that document, this is a letter dated October 7, 1988
2  from FDA, is that right?
3    A   Right.
4    Q   And it's about the same NDA 16374 that we've
5  been talking about?
6    A   Correct --
7    Q   The Prolene suture.
8    A   -- and it's been transitioned with the
9  Supplement 34 -- you have so many supplements --
10  Supplement 34, and it's now being reviewed as a PMA by
11  CDRH.
12    Q   And the page that I referenced you to, that's
13  the package insert that Ethicon sent FDA, correct?
14    A   For Prolene, yes, sir.
15    Q   And it says, under Actions, "The suture...."
16  Are you with me?
17    A   Yes.
18    Q   It says,
19        "The suture is not absorbed nor is it
20        subject to degradation or weakening by the
21        action of tissue enzymes."
22    Is that correct?  That's what it says.
23    A   Yes, sir, that's what it says.
24    Q   And that's the exact language in the IFU for

Page 229

1  TVT Secur about degradation.
2    A   Correct, I said that it came from the suture.
3    Q   Right.
4    A   Came from Prolene suture.
5    Q   And that exact language was sent to FDA, back
6  in 1988 and before that?
7    A   Yes, it's a PMA supplement for a suture
8  material.
9    Q   I'm sorry, is that correct?
10    A   Yes, sir.
11    Q   And that exact language was reviewed by FDA,
12  correct?
13    A   Yes, based on the 1969 clearance, which
14  technology and biochem have changed a lot, but yes, that
15  is an approved language carried over from the original
16  NDA approval.
17    Q   Correct, and that exact language was approved
18  by FDA, correct?
19    A   As a drug.  It wasn't re-approved, it was --
20  what was the indication?  It was -- because FDA didn't
21  go back and re-look.  Let me look at the label.  They
22  wanted to have an updated labeling changes for the size
23  7-0 Prolene clear and pigmented sutures.  So it was only
24  basically to change the labeling for the clear and

Page 230

1   pigmented sutures.
2        Q   You're not critical of FDA in any way for
3   approving that language, are you?
4        A   No.  I don't have the prior label.  I have
5   this label.  So I don't know if that actually had
6   been -- if it had come from the NDA or if it actually
7   had been changed in this PMA.
8        Q   But that exact language is the same language
9   about degradation in the current TVT Secur IFU, correct?
10       A   Right, it's appropriate for a suture.
11       Q   If -- let's talk about your experience with
12  the FDA a little bit.  Back 20 years ago when you worked
13  at the FDA, did they start out to have safe products
14  cleared?
15            MR. LUNDQUIST:  Form.
16            THE WITNESS:  Yes.  They still do, as far as
17  I know.
18  BY MR. HUTCHINSON:
19       Q   And when you worked at FDA, you didn't want
20  to -- an unsafe product to be cleared, did you?
21       A   There are legal limitations, like there are
22  products that are unsafe, like Class III devices that
23  still haven't been classified by FDA, the safety and
24  efficacy is not known.  So you're bound by what the

Page 231

1   requirements are for certain products.  You didn't want
2   to hurt people, you wanted to have the public protected,
3   but you're also limited in terms of what you can
4   request.
5        Q   When you worked for FDA --
6        A   In that period, that got worse even in 1997,
7   when the Lewis Ferguson actually got passed.
8        Q   When you worked for FDA, Dr. Parisian, did you
9   work alongside competent professionals?
10       A   Yes.
11       Q   FDA could have refused to clear modified
12  Prolene mesh, correct?
13            MR. LUNDQUIST:  Form.
14            THE WITNESS:  They could have, but why would
15  they?
16  BY MR. HUTCHINSON:
17       Q   FDA could have refused to clear TVT or TVT-O
18  or TVT Secur, correct?
19            MR. LUNDQUIST:  Form.
20            THE WITNESS:  Yes, they could have.
21  BY MR. HUTCHINSON:
22       Q   And do you know how many transvaginal mesh
23  slings FDA has cleared, sitting here today?
24       A   Quite a few.

Page 232

1        Q   Give me your best estimate.
2        A   I don't know.  We're talking about many --
3   I wouldn't be surprised if it was in the hundreds --
4            MR. LUNDQUIST:  Form.
5            THE WITNESS:  -- in terms of all the different
6   510(k)'s and supplements and, yeah, changes.
7   BY MR. HUTCHINSON:
8        Q   FDA has never recommended any labeling changes
9   for TVT Secur, has it?
10       A   I haven't seen any.  I don't know if they have
11  or not.
12       Q   And FDA has never recommended any labeling
13  changes for any of the TVT family of products, have
14  they?
15       A   I don't know.  I mean, I would have to -- only
16  the FDA and Ethicon would know that.
17       Q   What you do know is that FDA has never
18  determined that TVT Secur labeling was false or
19  misleading, is that --
20       A   Why would they?  They never had to review it.
21       Q   My question is a yes or no.  Then you can
22  explain.
23       A   No, they have not.  That doesn't change my
24  opinions, because they had no reason to ever review it.

Page 233

1   It's up to Ethicon to have made an adequate label.
2        Q   FDA has never determined that the labeling of
3   any of the TVT family of products is false and
4   misleading.
5        A   That's correct.  They've done some other
6   action where they send out a safety -- a public health
7   notification, so it's actually taking it kind of one
8   step higher.  FDA is actively involved in the labeling
9   and information being given to physicians and patients.
10       Q   And because FDA is actively involved, they
11  have never determined that the TVT Secur device was
12  misbranded, have they?
13       A   I don't think they've ever reviewed it to look
14  at that.  That would be a --
15       Q   Well, I'm not talking about what they
16  reviewed.  I need a yes or no:  FDA has never determined
17  that TVT Secur device was misbranded.
18       A   That is correct, because they've never looked
19  at it, as far as I know.
20       Q   And in fact, FDA has never considered or
21  determined that any of the TVT family of products have
22  been misbranded, have they?
23       A   Not that I'm aware of.
24       Q   Misbranding, that's a specific finding by FDA.

Page 234

1    Yes?
2         A    No, it's --
3         Q    No?
4         MR. LUNDQUIST:  It's just -- it's a legal
5    THE WITNESS:  It's just -- it's a legal
6    finding by the FDA, but it's described in the Act for
7    the manufacturer, in terms of misbranding, adequate
8    instructions for use of warnings.  It puts it on the
9    manufacturer, not the FDA, to make sure that they're not
10   misbranded, and that even in the approval letters, the
11   clearance letter you showed me before, it said it's up
12   to the manufacturer to ensure that they don't misbrand,
13   adulterate.
14        So it's under -- and we're talking 21 U.S.C.
15   352.  So that's the manufacturer's job.  It's not up to
16   the FDA.  The FDA may fine somebody who's misbranded and
17   bring charges or make a warning letter saying that, but
18   it's really the manufacturer to ensure they don't
19   misbrand their product.
20        MR. HUTCHINSON:  Move to strike as
21   nonresponsive.
22        Q    FDA -- strike that.  Misbranding is a legal
23   finding by FDA, correct?
24        MR. LUNDQUIST:  Form.

Page 235

1         THE WITNESS:  Well, in two components.
2    It's --
3    BY MR. HUTCHINSON:
4         Q    Is that -- I'm sorry.  You can explain your
5    answer, but I need you to say yes, yes or no.
6         A    I'm going to say I can't say yes or no,
7    because one, I'm not an attorney and you're asking me a
8    legal decision.
9         Q    Well, I'm just using your words.
10        A    No, but in terms of a manufacturer, in terms
11   of the Act and as a consultant, I consult with
12   manufacturers as to whether they've misbranded in terms
13   of the requirements for adequate instructions and
14   warnings.
15        So there's two different components:  Are you
16   misbranding?  The FDA may make a legal decision or it
17   may not.  The manufacturer is the gate that should
18   determine misbranding.
19        Q    But if the FDA believes that a product is
20   misbranded, it can make the manufacturer change the
21   label, can't it?
22        A    No.
23        Q    No?
24        A    No.

Page 236

1         Q    It could make the manufacturer take the
2    product off the market, can't it?
3         A    Only under certain requirements.  It's the --
4         Q    I'm sorry, is that a yes?
5         A    Under certain requirements.
6         Q    Wait --
7         A    No, I can't answer yes or no --
8         Q    Okay.
9         A    -- because they're --
10        Q    Well, wait just a minute, let me talk.
11   I don't want to talk over the court reporter, okay?
12        If FDA believes that a product is misbranded,
13   it can tell the manufacturer, or make the manufacturer
14   take the product off the market, correct?  Yes or no,
15   then you can explain.
16        MR. LUNDQUIST:  Form.
17   BY MR. HUTCHINSON:
18        Q    That's something the FDA can do, yes?
19        A    They can technically do it, but rarely do it,
20   because it takes --
21        Q    Move to strike as nonresponsive.
22        A    Well --
23        Q    They can do it, can't they?
24        A    They can, but technically, they don't.  They

Page 237

1    would rather get voluntary compliance.  Like, they will
2    send a warning letter.  A warning letter will say you're
3    misbranding.  There's no legal action, but it's a
4    notification that the FDA considers you misbranding.
5    They're not going to take the product off the market
6    because of misbranding.  They're going to -- the
7    manufacturer is -- it's assumed that the manufacturer
8    won't want to not comply with the Act --
9         Q    Let's go back --
10        A    -- notification.  So they did voluntarily
11   comply --
12        Q    Let's get -- let's go back to FDA.  The FDA
13   never concluded that Ethicon had failed to provide
14   safety information to FDA, did it?
15        MR. LUNDQUIST:  Form.
16        THE WITNESS:  I don't know.  All we can go on
17   is what the FDA has put in writing.  We don't know what
18   the FDA concluded, but they did ask for a 522 study and
19   the company chose not to do it.
20   BY MR. HUTCHINSON:
21        Q    FDA never concluded that the TVT Secur's
22   labeling was inconsistent with the medicine or science.
23        A    No, that's not correct.  In terms of the
24   public health notification, they looked at the entire

Page 238

1    industry --
2        Q   Let's talk about the Secur, okay?
3        A   Well, they didn't focus on the Secur, they
4    talked about the SUI industry in terms of mesh --
5        Q   All right, so let's --
6        A   -- and they re-classified it.
7        Q   Stick with me, let's stick with my question.
8    On TVT Secur's labeling, FDA never concluded that that
9    labeling was inconsistent with medicine or science.
10       MR. LUNDQUIST:   Form.
11       THE WITNESS:   You know, I don't know what FDA
12   concluded other than they asked for a 522 post-market
13   safety study.
14   BY MR. HUTCHINSON:
15       Q   FDA never requested that TVT Secur be
16   withdrawn from the market.
17       A   That's true.
18       Q   And FDA never declared that TVT Secur was
19   illegally marketed.
20       A   That's true, it was cleared.  I've never said
21   it was illegally marketed.  I'm saying it wasn't
22   marketed -- the cleared device, in terms of the
23   clearance.
24       Q   When we talk about the 522 order, you've

Page 239

1    reviewed that, is that right?
2        A   Yes.
3        Q   That has nothing at all to do with a recall,
4    does it?
5        A   No, no, it's to get post-market safety
6    information, long-term data, to add to the label, update
7    the label, which is one of the things that I said needed
8    to be done.
9        Q   A 522 order has nothing to do with punishing a
10   company, does it?
11       A   No, and it's usually industry-wide, in terms
12   of, the 522 was issued to all the surgical mesh industry
13   for their products.
14       Q   And this 522 order, it was industry-wide,
15   wasn't it?
16       A   Yes, sir.
17       Q   And it was sent to all manufacturers of mini
18   slings?
19       A   Right.  To continue marketing, right.
20       Q   Not just Ethicon.
21       A   That's right.
22       Q   And about -- do you know how many companies
23   received -- different companies received a 522 order?
24       A   Quite a few, because every product had to have

Page 240

1    a 522 order.
2        Q   My question is:  Do you know how many
3    companies received a 522 order?
4        A   No.
5        Q   Would it surprise you if it was over 25?
6        A   I thought it was more than that.  So no, it
7    wouldn't surprise me if you just say 25.
8        Q   In fact, do you know that FDA issued over 100
9    522 orders?
10       A   See, that's what I was thinking more, yes,
11   sir.
12       Q   So Ethicon just wasn't just singled out on
13   this 522 order, were they?
14       A   No, no, the entire industry was, particularly
15   for the single-incision sling.
16       Q   You don't know why Ethicon stopped making TVT
17   Secur, do you?
18       MR. LUNDQUIST:   Object to form.
19       THE WITNESS:   I do based on the documents, in
20   terms of the failure of the product and the safety
21   issues.  They said they de-commercialized it, but
22   actually it was less safe -- it was less safe than
23   TVT-O.  There was no real advantage for a physician to
24   use TVT as compared no TVT-O, in terms of the potential

Page 241

1    risk.  The Australian physicians didn't even want to be
2    re-trained in it, and it was not -- it was not a big
3    seller.  Physicians had stopped using the product.
4        So it was a safety issue.  It should have been
5    recalled long before Ms. Garcia was actually implanted,
6    but they chose not to go ahead with the 522 study based
7    on saying the complexity of the study.
8    BY MR. HUTCHINSON:
9        Q   Dr. Parisian, let's talk about the MDRs for
10   just a minute and your prior testimony about MDRs.
11       You know the difference between an MDR and an
12   issue report, don't you?
13       A   Sure.  An MDR is filed by the company.
14       Q   And an issue report is not filed by the
15   company, is it?
16       A   No.
17       Q   And did you review any issue reports in this
18   case?
19       A   Not specifically called issue reports.  Are
20   you talking about CAPA reports, when the company is
21   looking at safety issues?
22       Q   Have you ever looked at Ethicon's policies and
23   procedures for monitoring medical devices?
24       A   At various different litigations I have, yes.

Page 242

1      Q   Okay, I'm talking about for this litigation.
2   That's not in your reliance material, is it?
3      A   No, that's in my training of having been
4   involved with Ethicon products in terms of marketing.
5   The only thing I saw was a 15 to 20 percent ceiling in
6   terms of complaints, and they tend to have an acceptable
7   minimum that can be filed every month in terms of
8   things -- it goes along with --
9      Q   How long ago has it been since you looked at
10  Ethicon's policies and procedures for monitoring medical
11  devices?  How many years?
12     A   I'd say, maybe two.
13     Q   You did that in the context of other
14  litigation?
15     A   Yes, sir.
16     Q   But you didn't do that in the context of this
17  case, is that right?
18         MR. LUNDQUIST:  Form.
19         THE WITNESS:  No, sir.
20  BY MR. HUTCHINSON:
21     Q   Am I correct?
22     A   Yes, sir.
23     Q   Are you intending to offer any opinions that
24  Ethicon received a product complaint and did not

Page 243

1   appropriately report it to FDA?
2          MR. LUNDQUIST:  Form.
3          THE WITNESS:  The only way I could do --
4   BY MR. HUTCHINSON:
5      Q   Hold on just a minute.  I'll let you explain
6   your answer, but start with yes or no, and then explain
7   for me, please, ma'am.
8      A   At this point in time, I would say no.
9      Q   Okay.
10     A   Because I haven't been given specific
11  complaint files, which you know is different than an
12  MDR.  So the only way to know if something wasn't filed
13  is you have to go through each complaint file and see if
14  it actually was filed as an MDR.  So that's why I'm not
15  planning to do that, because I haven't received all the
16  complaint files.
17     Q   So fair enough.  As we sit here today, you
18  have no opinion whatsoever that Ethicon received a
19  product complaint and didn't adequately report it to
20  FDA.
21         MR. LUNDQUIST:  Objection.
22         THE WITNESS:  Well, I do.  In terms of the
23  numbers of MDRs, we know that they're receiving
24  complaints.  A specific --

Page 244

1   BY MR. HUTCHINSON:
2      Q   Well, stick with my question.
3          MR. LUNDQUIST:  She is answering your
4   question.
5          THE WITNESS:  No, in terms of the volume of
6   complaints that are being received and discussed
7   internally, the MDRs that I pulled up are not consistent
8   with that same pattern.  So we know there were things
9   not being filed.
10         I haven't gotten to go through the complaint
11  files specifically and look at them in terms of failure
12  to file, but I haven't seen Mrs. Garcia's MDR.  There
13  should be an MDR filed for Ms. Garcia, and I hadn't seen
14  that at that point in time.  I don't -- I don't know if
15  anyone knows where it is, but there should be something.
16  So I can't talk about it without having -- knowing that
17  she actually had one filed.
18         MR. HUTCHINSON:  Move to strike as
19  nonresponsive.
20     Q   Dr. Parisian, are you offering any opinion
21  that Ethicon received a product complaint and didn't
22  adequately or appropriately report it to FDA?
23         MR. LUNDQUIST:  Form.
24         THE WITNESS:  I think I've explained that at

Page 245

1   this point in time I haven't received complaint files,
2   which I can do, but I haven't been asked to do that, and
3   in Ms. Garcia's point, I haven't specifically received
4   her MDR.
5   BY MR. HUTCHINSON:
6      Q   Are you testifying that Ethicon withheld
7   anything from FDA?
8      A   No -- well, in terms of, did they fully
9   communicate so that FDA could fulfill its role, I don't
10  believe they did, as I talked about, in the 510(k).
11  I don't think the risk information came through --
12     Q   I'm not talking about 510(k)'s.  Stick with me
13  for just a minute.  I'm talking about product
14  complaints, MDRs, okay?
15     A   Well, based on my review, my really
16  superficial review, there was not the type of MDRs that
17  you would expect to see from the company documents.
18     Q   My question is:  Are you testifying, or do you
19  have any opinions, that Ethicon withheld anything from
20  FDA regarding product complaints?  Yes or no.
21         MR. LUNDQUIST:  Object, form.
22         THE WITNESS:  I think I've answered it,
23  based -- it will have to be a very general, that in
24  terms of the documents I'm seeing, particularly in 2007,

Page 246

1     the MDRs are not there, in terms of, filed with the FDA.
2     BY MR. HUTCHINSON:
3        Q   So you think -- so you think FDA -- I'm sorry,
4     strike that.
5            You think, just because of the numbers of MDRs
6     that you're seeing in 2007 --
7        A   Of premature failure.
8        Q   -- that Ethicon is not adequately reporting
9     product complaints to FDA?  Is that your testimony?
10       A   Based on that --
11       Q   I'm sorry, is that your testimony?
12       A   Yes, sir.  Based on that information today, to
13    actually hone it in, I'd have to look at the complaint
14    files and compare them one-to-one as to what you're
15    reporting.
16       Q   And that's something you've not done so far,
17    is that correct?
18       A   That's right.
19       Q   Do you believe that Ethicon had a proper
20    safety surveillance department?
21       A   No, and that's based not on this case, but on
22    having seen the other cases that I've been involved in.
23    They tend not to report something that's included in the
24    label.  If the word "erosion" is in the label, it's not

Page 247

1     going to be reported by the procedure.  So I would need
2     to look at that in more depth, but at this point in
3     time, the information suggests that they're not
4     adequately surveilling, or -- updating physicians and
5     FDA on the risk that's being reported personally.
6        Q   Can you tell me name of a person who you think
7     did something wrong at Ethicon's post-market
8     surveillance group?
9        A   I don't think anybody did anything wrong.
10    I think that --
11       Q   Hold on just a minute.  I'm sorry, can you --
12       A   I don't have a person's name that --
13       Q   Okay.
14       A   -- did something wrong.  I think that --
15       Q   Can you tell me the name -- hold on just a
16    minute -- can you tell me the name of anybody at
17    Ethicon's post-marketing surveillance group that did
18    something well?
19       A   I don't know any of the names in that group,
20    and the issue is that they're following procedures, and
21    Ethicon has unique procedures in terms of filing of
22    MDRs.
23       Q   So you can't give me, sitting here today, you
24    can't give me a specific example of anything that

Page 248

1     Ethicon may have done to violate an MDR reporting
2     requirement, correct?
3            MR. LUNDQUIST:  Object to form.
4            THE WITNESS:  Only --
5     BY MR. HUTCHINSON:
6        Q   Hold on a minute.
7        A   Yeah, I cannot, in terms of the documents and
8     the reports of perforation, and --
9        Q   I'm not talking about the documents.  I'm
10    talking about a specific case example.  Can you give me
11    one specific case example of a violation?
12       A   Um-hum.
13           MR. LUNDQUIST:  Form.
14           THE WITNESS:  No, and as I said, I haven't
15    seen Ms. Garcia's MDR.  So there should be an MDR for
16    her.
17           MR. LUNDQUIST:  Are we at a good breaking
18    point?
19           MR. HUTCHINSON:  Give me just one --
20           MR. LUNDQUIST:  Okay, we've been going --
21    that's fine, whatever you need.
22           MR. HUTCHINSON:  Give me five minutes?
23           THE WITNESS:  Sure.
24           MR. LUNDQUIST:  Whatever you want.

Page 249

1            THE WITNESS:  Go for it.
2     BY MR. HUTCHINSON:
3        Q   Let's talk about your device work with
4     MD Assist.  That company's still in existence?
5        A   Yes, sir.
6        Q   You're the sole shareholder?
7        A   No, my husband is, too.
8        Q   You and husband own it, right?
9        A   Yes, he gets all the monies, I get all the
10    work.  We won't tell him.
11       Q   Has he had a chance to spend any of the money
12    you make testifying for plaintiffs?
13       A   Has he?
14       Q   Yes.
15       A   He has all the money.  I'm busy doing --
16    I don't get...
17       Q   When is the last --
18       A   He's an anesthesiologist and does all the
19    billing and handles all that stiff.
20       Q   When is the last time MD Assist did any
21    regulatory consulting work for a medical device company?
22       A   It would have been last year.  I had to cut
23    off even the manufacturers.  I just don't have time and
24    I'm trying to cut back.

Page 250

1    Q   And you don't have time because your full-time
2    job now is to do the litigation work, like we're here
3    today on, correct?
4         MR. LUNDQUIST:  Object.
5         THE WITNESS:  Well, no, I'm trying to retire,
6    and so I'm trying to not take new issues on.  I'm
7    getting old.
8         MR. OLIVEIRA:  I know how you feel.
9         THE WITNESS:  And I'll swear to that.
10   BY MR. HUTCHINSON:
11        Q   MD Assist has never done any consulting work
12   for a pelvic floor product, have they?
13        A   No, not for a pelvic floor.
14        Q   MD Assist has never had a surgical mesh
15   product approved by FDA.
16        A   They're not approved --
17        A   I'm sorry, cleared.  Cleared.
18        A   That's correct.
19        Q   All right.  MD Assist has never been involved
20   with the submission of a 510(k) for a device where it
21   was surgical mesh.
22        A   I believe that's correct.
23        Q   And MD Assist has never been involved in the
24   design of a medical device where part or all of it was

Page 251

1    surgical mesh.
2         A   That's correct.
3         Q   Never been involved in any clinical trial to
4    evaluate the safety and efficacy of surgical mesh?
5         MR. LUNDQUIST:  Object.
6         THE WITNESS:  That's correct.
7    BY MR. HUTCHINSON:
8         Q   Never been, or -- performed a DDSA for
9    surgical mesh.
10        A   As far as I can recall.  You mean at a
11   company?  That's correct.
12        Q   Never performed an FMEA for a device where
13   part of all of it was surgical mesh.
14        A   That's correct.
15        Q   And in fact, never worked on any medical
16   device that was designed specifically for a
17   urogynecological indication.
18        MR. LUNDQUIST:  Form.
19        THE WITNESS:  Not at the FDA.
20   BY MR. HUTCHINSON:
21        Q   Is that correct?
22        MR. LUNDQUIST:  Form.
23        THE WITNESS:  Other -- you said a surgical --
24   if you say a surgical, that's correct, because surgical

Page 252

1    you're -- because I did --
2    BY MR. HUTCHINSON:
3         Q   A surgical urogynecological device, correct?
4         A   That's correct.
5         MR. HUTCHINSON:  All right, so....
6         MR. LUNDQUIST:  Five minutes?
7         MR. HUTCHINSON:  Will's going to take a break,
8    so we'll take a quick five.
9         (Deposition in recess from 2:39 p.m. to 2:59 p.m.)
10        MR. HUTCHINSON:  Back on the record.
11        Q   Dr. Parisian, we're back from a break.  You'll
12   agree that lawyer advertising can stimulate reporting of
13   adverse events, correct?
14        A   It can be one of the things, yes, sir.
15        Q   With regard to the adverse events that you
16   accessed on the MAUDE database, can you identify how
17   many of those adverse reports were filed by attorneys
18   representing plaintiffs in mesh litigation?
19        A   There were filed by the companies and they
20   said they were notified by attorneys, so....
21        Q   And can you identify how many of those were?
22        A   No, sir.  But that doesn't mean events don't
23   happen.
24        Q   You'll agree FDA recognizes that submissions

Page 253

1    of an MDR does not mean that the product caused or
2    contributed to that injury, correct?
3         A   That is a statement that is, I think, in the
4    regulations.
5         Q   That's something you would agree to?
6         A   Yes.  Otherwise, nobody would file any MDRs.
7         Q   And you'll also agree, which is consistent
8    with your testimony before, that oftentimes an MDR is
9    incomplete.
10        A   There are incomplete MDRs filed with the FDA,
11   yes, sir.
12        Q   And you can't draw any conclusions from MDRs
13   about causation, can you?
14        MR. LUNDQUIST:  Object, form.
15        THE WITNESS:  It depends on what the MDR says.
16   I mean, you can't make a blanket statement, but you
17   can't come up with an incidence rate based on an MDR, on
18   the MDR database.
19   BY MR. HUTCHINSON:
20        Q   Okay, and you have no evidence that Ethicon
21   failed to report to FDA any adverse event report that it
22   received.
23        MR. LUNDQUIST:  Object to the form.
24        THE WITNESS:  Other than that there wasn't any

Page 254

1  filing, and I'm seeing all these documents where there's
2  erosion failures perforations, and there are no MDRs.
3  BY MR. HUTCHINSON:
4      Q    But no evidence.  You have no evidence to
5  suggest that, correct?
6          MR. LUNDQUIST:  Object to form.
7          THE WITNESS:  I think that is evidence, in
8  that the MDRs are only getting filed in 2013.  So the
9  database is not consistent with the information that the
10 company's considering, particularly in 2007, 2008.
11 There's nothing about the Australian cases or the German
12 cases in the MDR database.
13 BY MR. HUTCHINSON:
14     Q    And that's all the evidence that you have,
15 correct?
16     A    Well, that's significant evidence, because I'm
17 looking at the records internally, which is the
18 evidence --
19     Q    Hold on just a minute.  I'm not asking for
20 significant.  I'm asking, is that all the evidence you
21 have?
22     A    That's significant information, yes.  That's
23 why I would support that the trends in the MDR, not --
24 the trends, for the Secur particularly, is not

Page 255

1  consistent with the internal picture.
2      Q    And you can't give us one example of a patient
3  having a product complaint and that product complaint
4  not being reported to FDA, can you?
5          MR. LUNDQUIST:  Form.
6          THE WITNESS:  I'm going to rely --
7  BY MR. HUTCHINSON:
8      Q    I'm sorry?
9      A    Yes, I think I can.
10     Q    Tell me the name of that patient.
11     A    Well, I don't know name of the patient.
12     Q    Can you give us --
13     A    I know they --
14     Q    Hold on just a minute.  Stick with me.  Can
15 you give us one example of a patient who had a product
16 complaint and that product complaint did not get
17 reported to FDA?
18     A    The 49 patients in Germany that were not
19 reported to FDA in 2007, the Australian patients that
20 weren't submitted to the FDA, because the issues and the
21 frequency and the severity is not in the labeling in
22 2007.  So those should have been reported to the FDA.
23     Q    Let's go to your Exhibit 7, please, and that's
24 the patient brochure.

Page 256

1      A    Exhibit 7, okay, got it.
2      Q    You've reviewed this and relied on it in
3  forming your opinions, correct?
4      A    Actually, I reviewed the 2008 patient
5  brochure.  That's in one of my books, here.
6      Q    And --
7      A    But this is relevant to Ms. Garcia.  It's
8  2011.
9      Q    And this would be -- hold on just a minute,
10 Dr. Parisian.
11     A    Yes, sir.
12     Q    Dr. Parisian -- Dr. Parisian -- this patient
13 brochure that was marked as Exhibit 7 would have been
14 the one that Ms. Garcia would have received prior to her
15 surgery, correct?
16     A    Right, I said this would have been the
17 relevant one to her, because it's 2011, but I saw 2008.
18     Q    Do you have any criticisms about this patient
19 brochure?
20     A    Yes, the criticisms are similar to the IFU, in
21 terms of, when we were talking about for the physician,
22 the types of the warning information.
23         I do have one good statement about Ethicon in
24 that they did include a heading about risks, basically,

Page 257

1  what risks.  So that was good.  So you asked me before
2  for something good, and --
3      Q    Move to strike as nonresponsive.
4      A    No, no, I was trying to --
5      Q    Let's talk about your criticisms to the
6  patient brochure that we've marked as Exhibit 7.
7          Would you list any criticisms that you have
8  about the patient brochure marked as Exhibit 7?
9      A    Yes.  I would reference the same adverse event
10 information that's missing in the IFU, the same type of
11 information the document discusses on page 19.
12         And one of the things that I didn't mention
13 before that would be relevant and germane to a woman's
14 brochure, the pain on intercourse for her partner,
15 that that is a -- either in the physician's IFU or in
16 the patient's information, and I think it's also in
17 Dr. Miklos' description, so --
18     Q    So your testimony is that this patient
19 brochure should warn about dyspareunia to a woman's
20 partner?
21     A    No -- yes.  Oh, yes, in terms of -- not
22 dyspareunia, that's her pain, but a male inserting his
23 penis can actually feel -- there's been reports of that,
24 particularly from Ms. Garcia.  So the pain on

Page 258

1    intercourse for the partner, a woman needs to know about
2    that. That's a big issue if you've got a partner and
3    he's going to have pain every time he has sex with you.
4        Q   Let's talk about your criticisms. Have you
5    told me all of your criticisms about the patient
6    brochure marked as Exhibit 7?
7        A   Well, I tried to simplify it. It's fairly
8    similar to the types of problems I had with the IFU, in
9    terms, specifically for the adverse events, the
10   permanency, that this is not transitory, which is right
11   there, and I would also refer you to Dr. Miklos, because
12   he goes through, from a physician's point of view, the
13   types of information he thinks should be in the label in
14   terms of what a physician needs to know, and I would put
15   it in terms a patient could understand.
16       Q   Do you remember when we talked about the IFU,
17   you listed to me at least 28 specific criticisms you
18   have of the IFU? Do you remember that testimony?
19       A   Yeah, I went -- yes, I went through the label,
20   trying to give you both the opinion and then what kind
21   of information I would use to correct it.
22       Q   And how many specific criticisms do you have
23   about the patient brochure?
24           MR. HUTCHINSON:  Form.

Page 259

1            THE WITNESS:  Well, the patient brochure is
2    not a design issue. It actually has indications,
3    contraindications, precautions. So I would move that
4    forward in the beginning for a woman, but the design in
5    terms of the brochure is a little better than the
6    physician's IFU, but the adverse reaction information
7    should be the same, again, warning about the permanency
8    of the issues, just like I described for the physician
9    IFU.
10           But it has to be written in terms that a
11   woman, a non-physician, could understand, a lay person
12   could understand. It's -- it would be an example of
13   direct consumer labeling. So it needs to be in
14   information that a consumer could understand.
15   BY MR. HUTCHINSON:
16       Q   How many specific criticisms do you have about
17   the patient brochure?
18           MR. LUNDQUIST:  Form.
19   BY MR. HUTCHINSON:
20       Q   You listed 28 or more for the IFU. How many
21   for the patient brochure?
22           MR. LUNDQUIST:  Form.
23           THE WITNESS:  Okay, one of the things about
24   this brochure as opposed to the IFU is, this is called a

Page 260

1    "family," "TVT family" product. So it really isn't
2    specific for TVT Secur. The company is aware internally
3    that there's differences in risks for the TVT Secur
4    versus the other products --
5            MR. HUTCHINSON:  Move to strike as
6    nonresponsive.
7        Q   Doctor, stick with me and listen to my
8    question.
9        A   That's one.
10       Q   Okay, that's one. All right, I'm asking you
11   to quantify, and if you don't understand my question,
12   please let me know, but I'm asking you to quantify: How
13   many specific criticisms do you have about the patient
14   brochure?
15           MR. LUNDQUIST:  Object to form.
16           THE WITNESS:  I'm thinking. I would put --
17   just two, I would put the pregnancy information over by
18   itself --
19   BY MR. HUTCHINSON:
20       Q   I'm sorry, did you say two?
21       A   Two.
22       Q   And what are they?
23       A   The pregnancy information would be taken away
24   as a specific population all to itself, because it

Page 261

1    doesn't apply to most women who are getting SUI
2    procedures.
3        Q   What would the second -- I mean, the second --
4    strike that. What would the second --
5        A   Third. Third.
6        Q   Well --
7        A   First was that it should be separated out as
8    a --
9        Q   Wait a minute. I don't know if you and I are
10   communicating. I want to know how many specific
11   criticisms you have about the patient brochure, and
12   I thought you told me two.
13       A   No, no, I told you the second one.
14       Q   Okay, all right. So my question is, how many
15   specific -- I want you to quantify this, and if you
16   don't understand the question, let me know, but I'm
17   asking you to quantify, how many specific criticisms do
18   you have about the patient brochure?
19           MR. LUNDQUIST:  Object to form.
20           THE WITNESS:  I would say we were up to two.
21   So I would say, in a short answer, I can do it in -- as
22   four. So the third criticism would be --
23   BY MR. HUTCHINSON:
24       Q   Okay, hold on just a minute. I'll get to that

Page 262

1   in a minute, but I want to make sure I understand.  You
2   have four specific criticisms about the patient
3   brochure, correct?
4       A   Yes.
5       Q   All right, do you have any others?
6           MR. LUNDQUIST:  Form.
7           THE WITNESS:  No.
8   BY MR. HUTCHINSON:
9       Q   All right.  So tell me what your four
10  criticisms are about the patient brochure.
11      A   Okay.  We've already done one, we've already
12  done two.
13      Q   All right.  Number one was the pregnancy.
14      A   No, no --
15      Q   I'm sorry.  Number one was --
16      A   That Secur should be separated out, in terms
17  of the --
18      Q   Okay, Secur should be separated out.
19      A   Because its risk is unique compared to the
20  other product.
21      Q   Wait just a minute.  The court reporter is not
22  keeping up with us.  Number one is, the Secur should not
23  be separated out.
24      A   No, it should.

Page 263

1       Q   I'm sorry, it should be separated out.  The
2   second one was pregnancy, right?
3       A   In its own special population, taken out of
4   the --
5       Q   Okay, what's the third one?
6       A   The third are the inadequacies of the warnings
7   for the user, as I described for the IFU, but in terms
8   that a patient could understand.
9       Q   Okay, and what's your fourth one?
10      A   The fourth are the adverse events are
11  inadequate, just as I described in the IFU; and then
12  I would also reference Dr. Miklos' report on page 19,
13  where he talks about, from a physician's point of view,
14  what information needed to be in the labeling, and
15  I would put that all in terms of a label that a patient
16  could understand.
17      Q   And if Dr. Miklos has opinions about the IFU
18  and the patient brochure, your opinions about the IFU
19  and the patient brochure would be cumulative, wouldn't
20  they?
21          MR. LUNDQUIST:  Form.
22          THE WITNESS:  Pardon?  I don't understand
23  that.
24      //            //

Page 264

1   BY MR. HUTCHINSON:
2       Q   You don't understand?
3       A   I don't understand what that is, what your
4   question is on that.
5       Q   They would be duplicative.  You're giving
6   opinions about the same topics.
7       A   Oh, you mean --
8       Q   It would be cumulative.
9       A   Cumulative.
10          MR. LUNDQUIST:  Form.
11          THE WITNESS:  I would rely on Dr. Miklos, in
12  terms of the information that he as a physician thinks
13  should be in the labeling is consistent with the type of
14  information I described before, but the -- the adverse
15  events --
16  BY MR. HUTCHINSON:
17      Q   Just a minute, stick with me.  But that would
18  be cumulative, wouldn't it?
19          MR. LUNDQUIST:  Object to form.
20          THE WITNESS:  Cumulative, yes, but I don't
21  understand why you're asking that.
22  BY MR. HUTCHINSON:
23      Q   If -- when you reviewed the patient brochure,
24  did you notice anything that Ethicon did well --

Page 265

1       A   Yeah.
2       Q   -- in drafting the patient brochure?
3       A   I was trying to tell you what they did well,
4   but you didn't want to hear it.
5           I thought what was good was, from the 2008 to
6   the 2011, they actually did add a section, which I think
7   they might have wanted to put up front, about risk, and
8   I thought that was a good addition in terms of a label,
9   on page -- it's not totally complete, but on page 12.
10          And some of the information in the risk
11  information is not conveyed in the adverse event
12  reports.  It's not -- they should cover each other.  If
13  you're describing these particular risks, then some of
14  the adverse event reports or adverse events that I'm
15  saying is missing should reflect information that they
16  put in this risk section.  So the risk -- starting the
17  risk section was a good thing.
18      Q   Did you see anything else that Ethicon did
19  well in the patient brochure marked as Exhibit 7?
20      A   Well, they spelled Gynecare and TVT right, but
21  I think that --
22      Q   Anything else?
23      A   It's a better -- they're improving their label
24  since the 2008 label, but they still are not conveying

Page 266

1    the specific risks for the TVT Secur, which is different
2    than the other products. They're just putting them
3    together in the TVT family. Even internally that was
4    questioned when the company was saying, are we really
5    going to have a TVT family that includes TVT Secur?
6         So I think that that would be my number one,
7    but I think it was right to have questions for your
8    doctor, but they needed to improve the adverse events to
9    make sure that the woman knew that these were permanent
10   risks, such as chronic pain, dyspareunia, change in the
11   vagina, things like that. And I think I captured that
12   before when I talked about the IFU for the physician.
13        Q   You're not an expert on Prolene, are you?
14        A   What do you mean by "an expert on Prolene"?
15   I mean, you've seen I've gone through the regulatory
16   history of Prolene, so I don't know if.... There is a
17   regulatory expertise that I have on Prolene.
18        Q   Would that be the only expertise that you have
19   on Prolene?
20            MR. LUNDQUIST: Form.
21            THE WITNESS: I've used Prolene suture, so
22   I don't know, what do you mean, in terms of Prolene?
23   BY MR. HUTCHINSON:
24        Q   Do you hold yourself out as an expert on

Page 267

1    Prolene?
2         A   In terms of the regulatory issues that would
3    be considered, FDA regulatory, on Prolene.
4         Q   And that would be all, is that correct?
5         A   As a physician --
6         Q   I'm sorry. And that would be all, correct?
7             MR. LUNDQUIST: Form.
8             THE WITNESS: I believe that's the only role
9    I would have here in terms of Prolene.
10   BY MR. HUTCHINSON:
11        Q   Okay, and --
12        A   And as a pathologist and as having looked at
13   tissue slides, you know, animal studies, so -- but that
14   would be regulatory, too. That would be -- I guess you
15   would call that a toxicology point of view.
16        Q   The FDA advisory panel has never recommended
17   removing any mesh product from the market, correct?
18        A   The advisory panel? I believe that's correct.
19   They didn't even -- you're talking about advisory panel
20   where they talk about SUI and POP? Yes, they asked for
21   data.
22        Q   The National Institutes of Health has never
23   recommended removing any mesh product from the market,
24   has it?

Page 268

1         A   They wouldn't. They would recommend not using
2    it, but they wouldn't recommend removal.
3         Q   And they have never recommended not using TVT
4    Secur, have they?
5         A   I don't know what the NIH -- I haven't looked
6    at what the NIH has said about TVT Secur.
7         Q   The American College of OB-GYN has never
8    recommended removing any mesh product from the market,
9    has it? ACOG.
10        A   A specific mesh --
11        Q   We're referencing ACOG, A-C-O-G.
12        A   Not that I recall. They have guidelines, they
13   don't talk about removal of a device.
14        Q   The American Urogynecologic Society, or AUGS,
15   has never recommended removing any mesh product from the
16   market, has it?
17        A   I believe so. I don't see that that would be
18   their role, either.
19        Q   I'm correct?
20        A   Yes, sir. I said, I believe so.
21        Q   And you would agree that a ban on the use of
22   synthetic mesh products would prohibit many women from
23   accessing treatment options?
24        A   A ban, for many indications -- they use

Page 269

1    surgical mesh for a lot of --
2         Q   Stick with my question.
3         A   I didn't --
4         Q   You would agree that a ban on the use of
5    synthetic mesh products would prohibit many women from
6    accessing treatment options, correct?
7         A   That's a very generic statement. It's not
8    the --
9         Q   I'm asking you. Correct?
10        A   If FDA banned all surgical --
11        Q   Just a minute. Wait a minute. I don't want
12   to talk over the court reporter.
13        A   No.
14        Q   You would agree, correct, Dr. Parisian? Yes
15   or no.
16            MR. LUNDQUIST: Form.
17            THE WITNESS: Well, let me ask --
18   BY MR. HUTCHINSON:
19        Q   I'm the one asking questions today.
20        A   I know, I want to answer. I'm asking for a
21   clarification.
22            Are you saying -- what I think you're saying
23   is, if FDA were to ban surgical mesh, that would deny
24   women treatment options, generally? Yes.

Page 270

1    Q   Let me hand you what we'll mark as Exhibit 16
2    to your deposition.
3           (Whereupon, Exhibit 16 was marked for
4           identification.)
5       THE WITNESS:  So do the colors have any
6    indication, on the clips?  That's a black.
7       MR. LUNDQUIST:  What?
8       MR. HUTCHINSON:  I got a black clip.  That
9    means it's a very important document, one I suspect
10   you'll probably disagree with, but we'll try to -- we'll
11   try to go through it.
12      Q   I've handed you what's been marked as
13   Exhibit 16 to your deposition.  Do you see that?
14      A   Yes, sir.
15      Q   In fact, this is a document you relied on in
16   reaching your opinions, is that right?
17      A   I've seen this, yes.
18      Q   And AUGS, that's an association of surgeons
19   who treat SUI.
20      A   That would be that group, yes, sir.
21      Q   Has over 1700 members.
22      A   Yes.
23      Q   It includes urologists, gynecologists and
24   urogynecologists, correct?

Page 271

1    A   Right, and it includes the SFU -- SSFU.
2    Q   And that's another society, true?
3    A   Right, Society of Urodynamics, Female Pelvic
4    Medicine and Urogenital Reconstruction.
5    Q   And you're not a member of either one of
6    these, are you?
7    A   No, sir.
8    Q   And if we look on page 2, paragraph one, in
9    bold it says, "Polypropylene material is safe and
10   effective as a surgical implant."  Do you see that?
11   A   Yes, sir.
12   Q   Do you agree with that statement,
13   Dr. Parisian?
14   A   Yes, sir.
15   Q   Okay, and if we look at --
16   A   And look at, they talk about the different
17   specialties, and they're talking about the general
18   polypropylene, yes, sir.  We've talked -- that it's been
19   approved, FDA, polypropylene, surgical implant.  It can
20   be a suture, it can be anything.
21   Q   And if we look at -- if we look at paragraph
22   four -- I'm sorry, if we look at paragraph two, the
23   monofilament polypropylene mesh, MUS, that stands for
24   mid-urethral slings, correct?

Page 272

1    A   Yes, sir.
2    Q   And that's what Ms. Garcia has got, right?
3       MR. LUNDQUIST:  Object to form.
4       THE WITNESS:  Um --
5    BY MR. HUTCHINSON:
6    Q   Dr. Parisian --
7    A   Let me look at this, because they often make a
8    differentiation between the SISMUS and the MUS.  Let me
9    just see what they're talking about.
10   Q   All I'm asking you is: Is your opinion that
11   Ms. Garcia got a mid-urethral sling?
12   A   Yes, single-incision mid-urethral sling.
13   Q   And paragraph 2 says,
14         "The monofilament polypropylene mesh MUS
15       is the most extensively studied
16       anti-incontinence procedure in history."
17       Do you agree with that statement?
18   A   Where --
19   Q   Paragraph 2.
20   A   Paragraph 2.
21   A   The bold.
22   A   Oh, all the heading.  I thought you're talking
23   about the --
24   Q   Do you agree with that statement?

Page 273

1    A   Yes, that's what the group said at the
2    advisory panel.  The FDA disagreed, that they needed
3    more safety information, but this group of physicians
4    said that they were satisfied that it's been studied.
5    FDA didn't agree with that at the panel meeting or in
6    its subsequent documents.  That's why they're trying to
7    get data.  They didn't ask for a 522 for those products.
8    They expected the --
9    Q   Move to strike as nonresponsive.
10       Paragraph 4 says,
11         "The FDA has clearly stated that the
12       polypropylene mid-urethral sling is safe and
13       effective in the treatment of SUI."
14       Do you agree with that statement?
15       MR. LUNDQUIST:  Form.
16       THE WITNESS:  I think you need to look at what
17   is said in that paragraph.  That's what I would agree
18   with.
19   BY MR. HUTCHINSON:
20   Q   But I'm asking you, do you agree with that
21   statement?
22   A   No, I think you need to look at, the FDA
23   continues to evaluate it, its use for the treatment, and
24   will report later, and the FDA says that they have data

Page 274

1    up to one year, for multi-incision.  This isn't the TVT
2    Secur.
3          Q    Do you disagree that the FDA has stated that
4    polypropylene MUS is safe and effective in the treatment
5    of SUI?
6          MR. LUNDQUIST:  Form.
7    BY MR. HUTCHINSON:
8          Q    That's something you disagree with?
9          MR. LUNDQUIST:  Form.
10         THE WITNESS:  I agree with what's in the
11   paragraph.  I don't agree with that statement.  The
12   FDA's continuing to get data about it.  So the paragraph
13   is correct, but the statement is, I think, overreaching.
14   BY MR. HUTCHINSON:
15         Q    Um --
16         A    And if you look at above, in number 1, they
17   said that even for surgical mesh, there's no data past
18   17 years, in terms of safety.  So it's not totally
19   proven, and that's what's going on here.  FDA is asking
20   for data.
21         MR. HUTCHINSON:  Move to strike as
22   nonresponsive.
23         Q    Dr. Parisian, let's change gears for a minute.
24   Have you ever participated in a urogynecological

Page 275

1    clinical trial?
2          A    No, sir.  I haven't participated in one.
3          Q    Have you ever participated in any clinical
4    trial for any medical product?
5          A    You mean me being a subject?  No, I've been --
6          MR. LUNDQUIST:  No, I don't think that's what
7    he's saying.
8          She suggesting she's actually a participant
9    that, like -- just clarifying the question, here.
10   BY MR. HUTCHINSON:
11         Q    No?
12         A    No, I've not been in.  I did some clinical
13   trials back when I was in my hospital days as an ER
14   doctor, I remember having to go to IRBs and stuff.
15   I don't remember what they were, but they were
16   device-type drugs.
17         Q    My question to you is:  Have you ever
18   participated in any clinical trial as a participant for
19   a medical device?
20         A    Well, see, I've never been a subject or an
21   investigator in a clinical trial that I'm aware of.
22   I've reviewed them for the FDA and approved them,
23   monitored them, evaluated them, but not been the
24   principal investigator.  I think that's what you want to

Page 276

1    know.
2          Q    Have you ever participated as a subject in a
3    clinical trial for any type of gynecological product?
4          A    No.  No, I haven't.  As a subject, the
5    patient?
6          Q    Yeah.
7          A    No.
8          Q    Have you ever tested any type of gynecological
9    product in some type of trial?
10         A    No.
11         Q    You wrote a book at one point called, "Twin
12   Cubs of a White Wolf"?
13         A    Yes, sir.
14         Q    And what is that book about?
15         A    It's a romance novel that I never sold.
16   I used the name McLean Thomas and --
17         Q    Okay, why didn't you use your real name when
18   you published it?
19         A    Because I just felt like -- I registered my
20   name.  That's why everybody, all the defense firms know
21   the name.  So I haven't hidden the name, but I just
22   didn't use it at the time, and I wrote -- and it's never
23   been sold or distributed.  Somehow, defense firms have
24   found it, I guess, at the Library of Congress and some

Page 277

1    defense blogs have put it online, with -- which I think
2    is illegal, but I've never sold it.  And it has nothing
3    to do with the FDA.
4          Q    Have you ever -- what is the book about, then?
5          A    The book is about a mother that lies, that's
6    the white wolf, and two people that think that she's
7    their mother and she's not.
8          Q    Is it about an incestuous sexual relationship?
9          MR. LUNDQUIST:  Form.
10         THE WITNESS:  No, they're not incestuous.
11   That issue is that they're not related at all, and the
12   mother is allowing them to think they were.  So that's
13   where the mother's lying.  And I didn't sell it.  A lot
14   of judges would love it, but I haven't sold it.
15         MR. HUTCHINSON:  Let me take a quick break.
16         (Deposition in recess from 3:29 p.m. to 3:43 p.m.)
17   BY MR. HUTCHINSON:
18         Q    Dr. Parisian, we're back on the record, having
19   taken a break.  Do you intend to offer any other
20   opinions in this case other than the ones we've already
21   discussed?
22         MR. LUNDQUIST:  Object to form.
23         THE WITNESS:  No.  Could I clarify something
24   about my book?

Page 278

BY MR. HUTCHINSON:

1  Q   Sure.

2  A   That I said judges would like it, I don't mean

3  the judges would like it. I mean that they're curious

4  as to why a book about -- not about the FDA, that was

5  never sold, is always brought up. So I don't know if

6  they'd like it or not. I wanted to correct that answer.

7  Q   Okay, fine. Is that the only romance novel

8  you've ever written?

9  A   Well, it's the only one ever published. The

10  other one's up in my closet. I'm not going to do that

11  again.

12  Q   Do you recommend doing any -- I mean, I'm

13  sorry, strike that.

14      Do you plan on doing any work on -- in this

15  case in the future?

16  A   I haven't been asked to.

17  Q   Is there any additional work that you believe

18  that you should do, having now been deposed?

19  A   No.

20  Q   Have you ever been sued?

21  A   No.

22  Q   Have you ever filed bankruptcy?

23  A   No.

Page 279

1  Q   Has the Court ever determined that you cannot

2  give an expert opinion?

3  A   One court has, and that would be the Trasylol

4  decision in terms of Judge Middlebrooks, and then there

5  was a judge in Arizona here who had a pain pump case who

6  did not think a FDA expert was necessary, and then there

7  was a case for Aredia Zometa, where the judge -- I think

8  Hogan was the name of the case, or the judge, and he

9  determined that neither FDA expert could participate

10  because of the way that the filing was.

11  Q   Has a court ever excluded you as an expert?

12  Is that what you're talking about?

13  A   Yes, sir, those are the ones.

14      MR. LUNDQUIST: Form.

15  BY MR. HUTCHINSON:

16  Q   That would be how many cases?

17      MR. LUNDQUIST: Form.

18      THE WITNESS: That I know of is Trasylol --

19  yeah, four.

20  BY MR. HUTCHINSON:

21  Q   Four. Have you ever been held in contempt of

22  court?

23  A   No.

24  Q   Have you ever been charged or convicted of a

Page 280

1  crime?

2  A   No.

3  Q   Have you understood all of my questions?

4  A   I've tried to, and I've tried to ask for

5  clarification.

6  Q   Is there anything about the testimony you've

7  given that you'd like to change?

8  A   No.

9  Q   Your middle initial is D, as in David?

10  A   Yes, it's Dorgan.

11  Q   And your husband's name is James W., is that

12  correct?

13  A   Yes, sir.

14  Q   You used to live in West Virginia?

15  A   I used to live in the western part of

16  Virginia, in Fort Royal.

17      MR. HUTCHINSON: All right, thank you. No

18  further questions.

19      THE WITNESS: Yes, sir.

20      MS. FREEMAN: I don't have any questions.

21      MR. LUNDQUIST: I'm going to have a few,

22  Cynthia.

23  //                    //

24  //                    //

Page 281

1      EXAMINATION BY MR. LUNDQUIST

2  BY MR. LUNDQUIST:

3  Q   Good afternoon, Doctor.

4  A   Good afternoon.

5  Q   Certainly we've talked about a lot of your

6  opinions today, but as the designation set forth as

7  Exhibit --

8      MR. HUTCHINSON: Four.

9      MR. LUNDQUIST: Thank you.

10  Q   -- 4 reflects, you're intending to give

11  opinions consistent with, obviously, your testimony

12  today in Exhibit number 4, is that fair?

13  A   Pardon?

14  Q   You're intending to give opinions at trial

15  consistent with your testimony today and with respect to

16  Exhibit 4, which would be the designation of experts?

17  A   Yes.

18      MR. HUTCHINSON: Objection, leading.

19      THE WITNESS: Yes, sir.

20  BY MR. LUNDQUIST:

21  Q   All right. I want to talk about, since we

22  haven't really discussed, to some extent, the bases for

23  some of your opinions, Doctor.

24      As I understood your testimony, is it possible

Page 282

1    that there could be an instance where the -- where a
2    polypropylene sling may be appropriate for implantation
3    if the physician has adequate information to do a
4    risk/benefit analysis?
5         A    Yes.
6         Q    Based on your review of documents from Ethicon
7    and the deposition testimony you reviewed and all the
8    various things you reviewed in preparing for your
9    deposition today, do physicians who utilize the TVT
10   Secur have adequate information to conduct a
11   risk/benefit analysis?
12              MR. HUTCHINSON:  Object to form.
13              THE WITNESS:  Based on the information I've
14   reviewed?  No.
15   BY MR. LUNDQUIST:
16        Q    And you actually went through today and
17   discussed some of the data that you have access to that
18   the average urogynecologist or OB-GYN would not have,
19   fair?
20        A    That's correct.
21        Q    And certainly based on your review of
22   Dr. Walss' deposition, you can appreciate that there was
23   a lot of information that we've discussed today that he
24   did not have access to.

Page 283

1              MR. HUTCHINSON:  Leading.
2    BY MR. LUNDQUIST:
3         Q    Correct?
4         A    Yes.
5         Q    And you had to sign a confidentiality order to
6    be able to review these documents?
7         A    Yes, sir.
8         Q    You also reviewed deposition testimony from
9    Ethicon employees, correct?
10        A    Yes, sir.
11        Q    And is that deposition testimony something
12   that the average urogynecologist or OB-GYN who implants
13   Ethicon products is going to have at hand?
14        A    No.
15        Q    Is your opinion that a manufacturer could be
16   obligated to do pre-market clinical trials under
17   industry guidelines even if the FDA doesn't require a
18   510(k) process?
19        A    Yes, as part of design development under 21
20   C.F.R. 20.
21        Q    What is the basis for that opinion besides a
22   requirement under 21 C.F.R. Part 20?
23        A    Well, and also to ensure that they sell a safe
24   and effective product and make sure that it actually

Page 284

1    performs as intended, in terms of the risk versus
2    benefit.  So clinical trials are required for certain
3    devices before they get cleared.
4         Q    Part of that would be to establish a -- would
5    you agree that part of that would be to establish a
6    favorable risk/benefit ratio?
7         A    To help develop the IFU, yes, and to also give
8    the label information.  Some manufacturers do clinical
9    trials beforehand to get -- so they have it for
10   marketing; they can make claims in terms of benefits.
11        Q    And in terms of your methodology in that
12   opinion, do industry guidelines and standards inform
13   your methodology with respect to that opinion?
14        A    Yes.
15        Q    And that would include the GHTF standards that
16   you cited in your reliance list?
17        A    Yes, as well other -- other industry
18   standards, such as biocompatibility standards, testing
19   standards.  There's all kinds of ISO standards, and AAMI
20   standards.  So international, United States, industry
21   standards.
22        Q    That would include your work consulting with
23   industry?
24        A    Yes, and it began in my work with the FDA,

Page 285

1    I got involved in standards organizations, looking at
2    standards for the FDA, and then after I left FDA, I was
3    a reviewer of voluntary standards for various industry
4    groups.
5         Q    Can clinical trials of similar products be
6    instructive in evaluating the safety and efficacy
7    profile of a device?
8         A    Yes.
9         Q    And so would it be fair to say that while it
10   may be instructive, it would not be appropriate to
11   solely rely on that?
12              MR. HUTCHINSON:  Objection, leading.
13              THE WITNESS:  Yeah, if there's significant
14   differences, you have to take into consideration what
15   are the differences and how will they potentially change
16   the safety and effectiveness.
17   BY MR. LUNDQUIST:
18        Q    And what types of differences are you talking
19   about, particularly in the context of the TVT Secur?
20        A    Well, in terms of the change in the mesh that
21   we went through at 8 centimeter; that you're using
22   Ethisorb as a fixation component, or the Christmas tree
23   formation, which is new -- we haven't talked about
24   that -- to stabilize the mesh; that you're using a new

Page 286

1    inserter that is sharp as opposed to the other inserter;
2    that you're saying that this device can be used for
3    either a retropubic or a hammock configuration, which
4    was new, that one mesh would be sold for both. I went
5    into some of that.
6        Q   Okay. So in other words, when you are talking
7    in your designation -- you testified somewhat today, but
8    when you're trying to determine whether a product is
9    safe and effective, separate and apart from looking at
10   clinical data from similar products, you would also look
11   at, if they were done, pre-market clinical studies on a
12   particular product.
13       A   Right, right. You could also begin looking at
14   the literature, the medical literature, for other
15   products that are similar to what you're considering.
16   So it's not just your own products. You can look at
17   what other -- the history of other products.
18       Q   And this is the methodology that you employed
19   as a medical officer within the FDA as well, fair?
20           MR. HUTCHINSON: Objection, leading.
21           THE WITNESS: Well, yes, and this is the
22   methodology that manufacturers employ and the FDA
23   anticipates they will employ when you have them come
24   for -- industry come in for meetings. You ask them,

Page 287

1    "What did you look at?" if they have a meeting, and
2    they'll usually talk about animal data, studies that
3    they've done, other similar studies, industry standards.
4    FDA allows companies to cite certain industry standards.
5    So yeah, that's the typical process around designing a
6    medical device.
7    BY MR. LUNDQUIST:
8        Q   Okay, you told me just a minute ago that
9    industry standards and guidelines informed your
10   methodology and your opinion on whether or not
11   pre-market clinical trials are necessary for the TVT
12   Secur.
13       A   Well, it's not just that. That would
14   contribute, but also my experience as a physician, and
15   my knowledge and training as to what the potential risks
16   are to human beings. So those would also feed into it.
17       Q   After leaving the FDA -- well, let me ask you
18   this: While you were at the FDA, were you on these
19   types of industry standards committees?
20       A   Yes, I was assigned, particularly in the
21   Office of Health Affairs, to be involved in standards
22   committees.
23       Q   And then after leaving the FDA were you ever
24   on an industry standards committee?

Page 288

1        A   Yes, it continued on.
2        Q   So we talked about the various industry
3    standards separate and apart from the FDA regulations
4    and guidance documents that you've utilized, right?
5        A   Yes.
6        Q   Okay. Can clinical -- strike that. Can
7    industry standards and guidelines require pre-market
8    clinical trials, even though they don't specifically
9    call out polypropylene transvaginal mesh?
10       A   Yes, and also the medical literature, the
11   history of the product, devices, all of these things
12   have to be taken into consideration, particularly if
13   you're changing the device.
14       Q   Why?
15       A   Because you have to ensure that it's going to
16   work in terms of the patient, it's going to do what it's
17   supposed to do, and there are many new features with
18   this product that needed to be addressed.
19       Q   So in addition to the testimony you've given
20   as to why you believe Ethicon should have conducted
21   pre-market clinical trials, do you have.... Well,
22   strike that. What is HAS?
23       A   HAS is a French organization that did a review
24   of the types of studies that needed -- information that

Page 289

1    needed to be for pelvic procedures, and I think the name
2    is the French National Authority for Health, HAS.
3        Q   And that was listed in your reliance list, was
4    it not?
5        A   Yes.
6        Q   That's something you relied on in rendering
7    your opinions in this matter?
8        A   Yes. And you asked about standards also
9    supporting pre-clinical. It was also the company's
10   documents and their own internal discussion that they
11   needed clinical data before they had it launched.
12           MR. HUTCHINSON: Move to strike as
13   nonresponsive.
14   BY MR. LUNDQUIST:
15       Q   So we're clear, the HAS is not the FDA
16   equivalent in France; is that fair?
17           MR. HUTCHINSON: Objection, leading.
18           THE WITNESS: I don't believe it is. Now, let
19   me look. I'm not sure. It could be. I don't want to
20   say it isn't. I'm not sure what their FDA is called.
21   This is their national authority for health. So it may
22   be their FDA equivalent. I know they have a different
23   name, but that may somehow be connected to them.
24   //            //

Page 290

1  BY MR. LUNDQUIST:
2      Q   Just so we're clear -- I think you have
3  testified to this -- when you were formulating your
4  opinions on whether or not pre-market clinical trials
5  were necessary for the TVT-S, you relied on this HAS
6  study, did you not?
7          MR. HUTCHINSON:  Objection, leading.
8          THE WITNESS:  Yes.  There's a HAS study that
9  is similar to the NICE study, in that they're talking
10 about funding.  Their focus is on funding of effective
11 procedures.  So I believe that's where HAS comes in.
12 BY MR. LUNDQUIST:
13     Q   Okay, well, back up.  What is NICE?
14     A   NICE is a group in the United Kingdom that
15 looks at the efficacy of products that are offered for
16 treatment, and they get into whether they're going to
17 fund it in terms of socialized medicine.  So they're
18 actually technology-assessment types of organizations.
19     Q   Oh, there it is, and that's also listed on
20 your reliance list as having reviewed this document to
21 substantiate these opinions you've given today?
22     A   Right.
23     Q   The National -- the National Institute for
24 Health Care Excellence?

Page 291

1      A   Yes.  It's a technology assessment.
2      Q   The GHTF guidelines that you reviewed, are
3  those guidelines still utilized in industry today?
4      A   Yes, because products are now becoming more
5  global, and so the FDA and different regulatory agencies
6  are trying to harmonize requirements and the procedures
7  and processes that manufacturers do, to try to have some
8  overlap, so that there's a consistency with the types of
9  requirements for marketing product.
10     Q   Do you have personal knowledge as to whether
11 the industry -- strike that.  Do you have personal
12 knowledge as to whether industry had any input into the
13 formulation of those guidelines?
14     A   Industry typically does, but it's also through
15 the regulatory bodies that are on those different
16 panels.  So industry does, because they also sit on
17 those panels, but the regulatory bodies do, too.
18     Q   In your consulting work with industry, do you
19 utilize the GHTF -- did you utilize the GHTF guidelines?
20     A   Yes, yes, especially for post-market
21 surveillance for devices.
22     Q   And so we're clear, the GHTF guidelines are
23 not federal regulations, are they?
24         MR. HUTCHINSON:  Objection, leading.

Page 292

1          THE WITNESS:  Not unless FDA adopts them
2  specifically, and then they often oftentimes will issue
3  something that they have adopted.
4  BY MR. LUNDQUIST:
5      Q   And the same would be true for the ISO
6  standards that you talked about earlier; those are not
7  federal regulations?
8      A   Those are not federal regulations.  FDA will
9  allow certain ones to be used by manufacturers.  FDA
10 kind of picks and chooses which consensus documents
11 they're going to accept in the standards.
12     Q   You were asked some questions by counsel about
13 your opinions on the types of pre-market trials and
14 pre-market data that needed to be done by Ethicon prior
15 to marketing its products.  Do you recall that?
16     A   Yes.
17     Q   Your opinions on the types of trials and the
18 types of testing and the types of data that Ethicon
19 should have done prior to commercialization are not
20 based solely on what you want; is that fair?
21     A   Well, they're not subjective opinions.
22 They're based on the company's documents and also some
23 of the issues of safety and effectiveness.  The HAS
24 document actually talks about the type of information

Page 293

1  that should be obtained.  So they're from various
2  sources.
3      Q   So did you -- so essentially, did you rely on
4  industry guidelines to inform you what would be an
5  appropriate pre-market clinical trial?
6      A   That would be that, and also company documents
7  in terms of what they've done, and also my own training
8  and experience looking at similar types of issues for
9  the FDA, for clinical trials.
10     Q   Now, in order to -- in terms of the labeling
11 of the IFU in regard to the TVT Secur, in order to use
12 the device safely, do you need to know about the
13 severity of the complications?
14     A   The labeling -- yes, the labeling is supposed
15 to indicate the severity and the frequency, and it's not
16 jut the IFU, it's also the marketing.  The marketing has
17 to be consistent with the potential risks and benefits.
18 You can't overstate benefits and not give the risk
19 information.
20     Q   And so we're clear, nowhere in the IFU that
21 you looked at today does it talk about severity,
22 permanence or frequency of the adverse events, does it?
23     A   Right, and that's the information you
24 originally got cleared, but you get that information as

Page 294

1    the product is being used, and the label is a living
2    thing. It's supposed to be updated with your
3    post-market information for physicians. They call it
4    the Total Product Life Cycle, TPLC, that the
5    manufacturer updates their labels.
6        Q    And that type of information is information
7    the investigator would need to know to be able to
8    appropriately -- strike that.
9            Whose responsibility is it to ensure that the
10   information is -- adequate information is contained in
11   the instructions for use?
12           MR. HUTCHINSON: Objection, form.
13           THE WITNESS: The manufacturer.
14   BY MR. LUNDQUIST:
15       Q    You can answer.
16       A    The manufacturer, according to the Act and
17   implementing regulations.
18       Q    And who writes the IFU?
19       A    The manufacturer, and they could update it at
20   any time.
21       Q    And separate and apart from FDA regulations
22   that you talked about, if a complication is potentially
23   going to be permanent, and that is a foreseeable risk by
24   the manufacturer, should it be included, based on

Page 295

1    industry guidelines, in the instructions for use?
2        A    Yes. In terms of adequate warnings, yes.
3        Q    And the same would be true with respect to
4    severity?
5            MR. HUTCHINSON: Objection, leading.
6            THE WITNESS: Yes.
7    BY MR. LUNDQUIST:
8        Q    Frequency?
9            MR. HUTCHINSON: Leading.
10           THE WITNESS: Right. Well, an adequate label
11   is supposed to have that information.
12           MR. HUTCHINSON: Move to strike as
13   nonresponsive.
14   BY MR. LUNDQUIST:
15       Q    And with respect to your opinions on labeling,
16   have you ever referred to and used and relied on
17   industry guidelines, separate and apart from the FDA
18   regulations?
19       A    Yes. That's part of my training. I'm trained
20   in those.
21       Q    The same would be true for your opinions on
22   post-market surveillance?
23           MR. HUTCHINSON: Leading.
24           THE WITNESS: Yes.

Page 296

1    BY MR. LUNDQUIST:
2        Q    What is the basis of your opinions on
3    post-market surveillance that you've given today?
4        A    It's particularly having worked in OHA in the
5    post-market surveillance group -- I mean, the
6    post-marketing issues, and having dealt with MDRs and
7    follow-up and looking at adequacy of warnings and
8    labeling. So that was what I was involved in in the
9    first couple years, and then I continued on, since I was
10   first trained in.
11       Q    Does the length of.... One of the categories
12   you were designated on is the literature reflecting the
13   problems that surgeons were experiencing with the TVT
14   Secur.
15       A    That should be added to the list.
16           MR. HUTCHINSON: Objection, form.
17   BY MR. LUNDQUIST:
18       Q    And -- well, let's just ask. What is the
19   basis for your opinion that the literature reflected
20   that surgeons were experiencing problems with the TVT
21   Secur?
22       A    Well, the published literature was, and then
23   the KOLs, people discussing it with the -- it's based on
24   the company documents and information -- where are you?

Page 297

1        Q    It's on page 13, middle of 13.
2        A    Yes, it would be based on the company
3    documents and also the -- from the physicians, and then
4    you look at the Cochran report. The Cochran report
5    actually did a randomized controlled study and review
6    and set out the potential risks, and that wasn't in the
7    labels. So they actually looked at all the literature
8    for us and said that there were -- needed to be
9    warnings.
10       Q    Okay, and we're talking about the warnings,
11   the -- obviously, you believe the Instructions for Use
12   was inadequate related to the TVT Secur.
13           MR. HUTCHINSON: Objection, leading.
14           THE WITNESS: It was inadequate because it
15   wasn't being updated. It first got cleared, and then as
16   more information was coming, particularly in 2007, 2008,
17   that information wasn't being added. Even before it was
18   launched, it wasn't updated, in terms of the first
19   amendment for the design validation. The doctors said,
20   update the IFU. Internally, the company's doctors are
21   saying, update the IFU, the Instructions For Use, and
22   they weren't updating the information.
23           So internally, the company was saying it.
24   I think Dan Smith was the one primarily not wanting to

Page 298

1    update the information. There was discussion about
2    needing a "cookbook" to teach the doctors how to put the
3    devices in, and that wasn't being done in terms of the
4    labels, and it was never updated.
5            MR. HUTCHINSON: Move to strike as
6    nonresponsive.
7    BY MR. LUNDQUIST:
8        Q   And so the inadequacy of the warning --
9            MR. HUTCHINSON: I'm sorry, did you get my
10   objection?
11           THE REPORTER: Yes, I did.
12   BY MR. LUNDQUIST:
13       Q   The inadequacy of the warnings that you've
14   talked about today, that's not just based on the FDCA;
15   that's based on these other guidelines and standards
16   that we've talked about. Is that fair?
17           MR. HUTCHINSON: Object to form.
18           THE WITNESS: Well, it's based on other
19   guidelines and standards. It's also based on my
20   experience as a physician and training as a physician
21   being able to understand what's being reported, in that
22   a physician needs to know that information. And it's
23   further supported by Dr. Miklos.
24   //                    //

Page 299

1    BY MR. LUNDQUIST:
2        Q   So with respect to your opinions on labeling,
3    have you referred to and used and relied on industry
4    guidelines, separate and apart from FDA regulations?
5        A   Yes.
6        Q   Okay, and the same --
7        A   And adequate labels and discussion of adequate
8    labels, yes.
9        Q   Sure. Same would be true for your opinions on
10   post-market surveillance?
11           MR. HUTCHINSON: Objection to form.
12           THE WITNESS: Correct, and that would also
13   come under corrective and preventive action, when you're
14   having issues, but that's FDA, again.
15           MR. HUTCHINSON: Move to strike as
16   nonresponsive.
17   BY MR. LUNDQUIST:
18       Q   Talking about the literature, would the length
19   of a study play a role in whether or not you can
20   determine if a particular patient might have future
21   complications?
22       A   Yes, totally, and you have to take that into
23   consideration, is it six weeks versus twelve weeks, or
24   if it's a follow-up. So you have to be able to review

Page 300

1    the medical literature. That's where my training and
2    experience in looking at literature comes from.
3        Q   Would pre-market clinical trials, if designed
4    appropriately, give us information on frequency of
5    complications?
6        A   Yes.
7        Q   How do you know that?
8        A   Well, especially because the reports were
9    actually coming at 12 weeks in terms of failures. So
10   even a short-term trial, less than a year, would come up
11   with this information.
12       Q   And would a pre-market clinical trial, if
13   designed appropriately, also give you information on --
14   strike that.
15           But would a pre-market clinical trial, if
16   designed appropriately, give us information on the
17   severity of complications?
18       A   Yes.
19       Q   Obviously, that would be before the product
20   was placed on the market.
21       A   Correct.
22           MR. HUTCHINSON: Objection, form.
23           THE WITNESS: And then the company proposed to
24   have a registry to give that information, which they

Page 301

1    didn't follow through. That was -- the TVT world was
2    listening, but they didn't follow up with it.
3            MR. HUTCHINSON: Objection, nonresponsive.
4    BY MR. LUNDQUIST:
5        Q   Is it possible for an industry guideline to
6    take into account every single medical device and then
7    give you a list of exactly what type of -- or kind of
8    trial needs to be done?
9            MR. HUTCHINSON: Form.
10           THE WITNESS: No, no. The company is
11   responsible for their own design. Because there's so
12   many types of devices, so many types of issues, the
13   manufacturer is the expert. The manufacturer has to
14   take into consideration the potential risks. They look
15   at the literature, other similar trials, and they design
16   what they need to look at in terms of their product.
17           But no, I don't know of any government agency
18   or industry standard that is specific for all medical
19   device manufacturers, because of the variety of devices.
20           MR. LUNDQUIST: Doctor, I think that's all the
21   questions I have. I'll pass the witness.
22           MR. HUTCHINSON: Assuming, Cynthia, you don't
23   have any follow-up questions, is that correct? Cynthia
24   Freeman?

Page 302

1    MS. FREEMAN:  Yeah, that's right, I don't have
2    any.
3    MR. HUTCHINSON:  Okay, I've got just a couple.
4    FURTHER EXAMINATION BY MR. HUTCHINSON
5    BY MR. HUTCHINSON:
6    Q   Dr. Parisian, according to your reliance list,
7    you relied on the GHTF guidelines, correct?
8    A   Yes, sir.
9    Q   And these are standards that relate to safety?
10   A   Yes, sir.
11   Q   These are standards that apply to Ethicon's
12   products?
13   A   Worldwide products, yes, sir.
14   Q   Including TVT Secur?
15   A   All of them.
16   Q   And these standards are mandatory for Ethicon
17   to follow, correct?
18   A   No.  They're mandatory for them to consider
19   and then create their own procedures that would be
20   adherent to them wherever they want to market their
21   product.
22   Q   I asked you earlier about your participation
23   as a subject in a clinical trial.  Have you ever
24   designed a clinical trial for any type of gynecological

Page 303

1    product?
2    A   Not for a gynecological product.  I was
3    required at FDA to design -- oh, wait a second.  That's
4    basically right, in terms of that, because breast cancer
5    is not really gynecological.  You were talking about
6    pelvis.
7    Q   And you have never helped with a clinical
8    trial in any type of urology, correct?
9    A   That's correct, yes.
10   MR. HUTCHINSON:  I don't have any further
11   questions.  Thank you for your time.
12   THE WITNESS:  Can I clarify one other thing?
13   You asked me about bankruptcy and suits.  My husband has
14   filed bankruptcy, and there's been some suits against
15   him, lawsuits against him.
16   MR. LUNDQUIST:  I don't think he asked you
17   that.
18   THE WITNESS:  No, but I wanted to clarify for
19   him that I wasn't saying no, but they were my husband's,
20   so I don't know anything about those.
21   BY MR. HUTCHINSON:
22   Q   Well, when did your husband file bankruptcy?
23   MR. LUNDQUIST:  Form.
24   MR. HUTCHINSON:  What's the matter with the

Page 304

1    form, counsel?
2    MR. LUNDQUIST:  It's completely irrelevant.
3    THE WITNESS:  Well, no, he filed bankruptcy
4    years ago.  I don't know, I think like 10 -- 10, 11
5    years ago.  I didn't.  I don't know anything about it,
6    but I don't know -- I'm not -- the specifics of it.
7    BY MR. HUTCHINSON:
8    Q   How much money -- were you and your husband
9    married back in 2000?
10   A   Yes, sir.
11   Q   How much, back in 2000, how much money were
12   you making then, doing litigation services?
13   A   About -- I don't know, 400,000, 500,000.
14   MR. HUTCHINSON:  All right, no further
15   questions.  Thanks.
16   Before everybody goes -- and why don't we stay
17   on the record -- let the record reflect that we have 16
18   exhibits, and what we'll do is, plaintiff's counsel and
19   I will try to make sure we have all of them together,
20   and then we'll get back the record.
21   (Discussion off the record.)
22   MR. HUTCHINSON:  All right, so we're back on
23   the record.  Let the record reflect that we have 16
24   exhibits attached to this deposition, and that

Page 305

1    plaintiff's counsel, and I as counsel for Ethicon, have
2    both looked at the exhibits and believe that they are
3    complete.  Is that right?
4    MR. LUNDQUIST:  That's fair.
5    MR. HUTCHINSON:  All right, thanks.  That's
6    all we have.
7    THE REPORTER:  Okay.
8    MR. HUTCHINSON:  Wait, back on the record.
9    And let's also make a record that the two big
10   black binders that have tabs in one of them, 1 through
11   69, and 1 through 23 in another one, are going to be
12   given to the court reporter, let him have possession of
13   these for him to make sure that complete and color
14   copies are made, and that he will be responsible for
15   submitting them directly to the witness.  Okay?  Thank
16   you.
17   (Deposition concluded at 4:20 p.m.)
18   ---o0o---
19
20
21
22
23
24

```
 1          C E R T I F I C A T E
 2
 3          I, LEO T. MANKIEWICZ, CR, a Certified
 4  Reporter in the State of Arizona, do hereby certify that
 5  an oath was duly administered to the witness Suzanne
 6  Parisian, M.D., pursuant to A.R.S. §41-324(B) and that
 7  the foregoing pages constitute a full, true, and
 8  accurate transcript of the proceedings had in the
 9  foregoing matter, all done to the best of my skill and
10  ability.
11          The witness herein, Suzanne Parisian,
12  M.D., has requested signature.
13          SIGNED and dated this 20th day of
14  February, 2015.
15
16
17          _____
18          LEO T. MANKIEWICZ, CR, RMR, CRR
19              Certified Reporter
                Certificate No. 50778
20
21
22
23
24
```

```
 1          - - - - - -
            E R R A T A
 2          - - - - - -
 3  PAGE  LINE  CHANGE
 4  ____ ____ _____
 5      REASON: _____
 6  ____ ____ _____
 7      REASON: _____
 8  ____ ____ _____
 9      REASON: _____
10  ____ ____ _____
11      REASON: _____
12  ____ ____ _____
13      REASON: _____
14  ____ ____ _____
15      REASON: _____
16  ____ ____ _____
17      REASON: _____
18  ____ ____ _____
19      REASON: _____
20  ____ ____ _____
21      REASON: _____
22  ____ ____ _____
23      REASON: _____
24  ____ ____ _____
```

```
 1          INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition
 4  over carefully and make any necessary
 5  corrections.  You should state the reason
 6  in the appropriate space on the errata
 7  sheet for any corrections that are made.
 8          After doing so, please sign
 9  the errata sheet and date it.  It will be
10  attached to your deposition.
11          It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
```

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
    hereby certify that I have read the
    foregoing pages, and that the same
 4  is a correct transcription of the answers
    given by me to the questions therein
 5  propounded, except for the corrections or
    changes in form or substance, if any,
 6  noted in the attached Errata Sheet.
 7
    _____
 8  SUZANNE PARISIAN, M.D.        DATE
 9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20_____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
```

Page 310

```
 1              LAWYER'S NOTES
 2    PAGE LINE
 3    ____ ____ _____
 4    ____ ____ _____
 5    ____ ____ _____
 6    ____ ____ _____
 7    ____ ____ _____
 8    ____ ____ _____
 9    ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23    ____ ____ _____
24    ____ ____ _____
```