# Exhibit B

Confidential - Subject to Stipulation and Order of Confidentiality

Page 1

```
1                              -  -  -
2                                    :  SUPERIOR COURT OF
                                     :  NEW JERSEY
3    IN RE:                          :  LAW DIVISION -
     PELVIC MESH/GYNECARE            :  ATLANTIC COUNTY
4    LITIGATION                      :
                                     :  MASTER CASE 6341-10
5    (GENERAL, GROSS, WICKER)        :
                                     :  CASE NO.  291 CT
6
         CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
7                      CONFIDENTIALITY
8                              -  -  -
9                  Monday, November 5, 2012
10                             -  -  -
11             Transcript of the deposition of ANNE M.
12   WEBER, M.D., M.S., called for examination in the
13   above-captioned matter, said deposition taken
14   pursuant to Superior Court Rules of Practice and
15   Procedure by and before Kimberly A. Overwise, a
16   Certified Realtime Reporter, Registered Professional
17   Reporter, Certified Court Reporter, and Notary
18   Public, at Mazie, Slater, Katz & Freeman, 103
19   Eisenhower Parkway, 2nd Floor, Roseland, New Jersey,
20   on the above date, beginning at 9:41 a.m.
21                             -  -  -
22              GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com
24
25
```

Confidential - Subject to Stipulation and Order of Confidentiality

Page 2

1  APPEARANCES:
2
3    MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM M. SLATER, ESQ.
        CHERYLL A. CALDERON, ESQ.
4    103 Eisenhower Parkway, 2nd Floor
     Roseland, NJ  07068
5    973-228-9898
     aslater@mskf.net
6    ccalderon@mskf.net
     Counsel for Plaintiffs
7
8    BERNSTEIN LIEBHARD, LLP
     BY:  JEFFREY S. GRAND, ESQ.
9    10 E. 40th Street, 22nd Floor
     New York, NY  10016
10   212-779-1414
     grand@bernlieb.com
11   Counsel for Plaintiffs
12
     BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
13   BY:  CHRISTY D. JONES, ESQ.
     1020 Highland Colony Parkway, Suite 1400
14   Ridgeland, MS  39157
     601-948-5711
15   christy.jones@butlersnow.com
     Counsel for Johnson and Ethicon
16
17   BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
     BY:  NILS B. (BURT) SNELL, ESQ.
18   500 Office Center Drive, Suite 400
     Fort Washington, PA  19034
19   267-513-1884
     burt.snell@butlersnow.com
20   Counsel for Johnson and Ethicon
21
     SILLS CUMMIS & GROSS, P.C.
22   BY:  WILLIAM R. STUART, ESQ.
     One Riverfront Plaza
23   Newark, NJ  07102
     973-643-0700
24   wstuart@sillscummis.com
     Counsel for Caldera Medical, Inc., and Synovis
25

Page 4

1              I N D E X
2  WITNESS:                  Page
3  ANNE M. WEBER, M.D., M.S.
4    By Ms. Jones...........................8
5
6
7
8            E X H I B I T S
9            (Attached.)
10 No.      Description      Page
11 1218   Notice to Take Deposition of    45
          Dr. Anne M. Weber (General,
12        Gross, Wicker)
13 1219   Curriculum vitae          71
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  APPEARANCES VIA PHONE AND STREAM:
2
3    KLINE & SPECTER, P.C.
     BY:  ROGER CAMERON, ESQ.
4    1525 Locust Street, 19th Floor
     Philadelphia, PA  19102
5    215-772-1000
     roger.cameron@KlineSpecter.com
6    Counsel for Plaintiffs
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        DEPOSITION SUPPORT INDEX
2            - - -
3
4  Direction to Witness Not to Answer
5  Page  Line
6   65    4
7   66   21
8
9
   Request for Production of Documents
10
   Page  Line
11
   NONE
12
13 Stipulation
14 Page  Line
15 NONE
16
   Question Marked
17
18 Page  Line
19 NONE
20
21
22
23
24
25

Confidential - Subject to Stipulation and Order of Confidentiality

Page 6

1    CONFIDENTIAL DESIGNATION INDEX
         - - -
2
3    No Confidential Designations Submitted for
4    Volume I.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1    CONFIDENTIAL DESIGNATION INDEX
         - - -
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1         ...ANNE M. WEBER, M.D., M.S., after
2    having been duly sworn, was examined and
3    testified as follows:
4              - - -
5            EXAMINATION
6    BY MS. JONES:
7        Q    Doctor, would you state your name and
8    address for the record, please?
9        A    My name is Anne Margaret Weber.  My
10   address is 5626 Sharon Drive in Glen Arm -- two
11   words with a capital A -- Maryland 21058.
12       Q    And is that your home address?
13       A    Yes.
14       Q    Do you have a separate business address at
15   this point?
16       A    No.
17       Q    And are you currently employed, Doctor?
18       A    I'm employed in consulting.
19       Q    Do you have a separate consulting company?
20       A    No.  I'm not personally incorporated.
21       Q    When you say that you are engaged in
22   consulting, what kind of consulting are you engaged
23   in?
24       A    Consulting on this case.
25       Q    And that would be in litigation involving

Page 9

1    pelvic mesh; correct?
2        A    That's this case, yes.
3        Q    And can you tell me when you were first
4    retained in this case?
5        A    I began working in February of 2010.
6        Q    By whom were you first contacted?
7        A    I believe it was by Beth Baldinger of
8    Adam's firm.
9        Q    And approximately when was that?
10       A    I believe it was in the fall of 2009.
11       Q    And you said that you did not start
12   working on this case until the spring of 2010?
13       A    February, yes.
14       Q    What happened in that interim between
15   being contacted and actually starting working on
16   this case?
17       A    At some time later Adam contacted me and
18   we talked in more detail about exactly what the work
19   would involve and to make the specific arrangements
20   to go ahead.
21       Q    And what was your understanding about the
22   work involved?
23       A    To review documents from the company and
24   draw opinions about the product.
25       Q    And when you say "about the product," was

3 (Pages 6 to 9)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 10

1  there a specific product that you were asked to
2  evaluate?
3      A    The Prolift® product and procedure.
4      Q    And was it just the original Prolift® or
5  was it Prolift+M® as well?
6      A    Just the original Prolift®.
7      Q    And has that remained your charge
8  throughout until today?
9      A    Yes.
10     Q    Have you previously given a deposition?
11     A    Yes.
12     Q    On how many occasions?
13     A    Twice.
14     Q    Can you tell me in what context?  Was that
15 as a consultant, an expert witness?
16     A    One of the cases I served as an expert
17 witness for the defense and in the other case I was
18 one of the litigants.
19     Q    Let's talk about when you served as an
20 expert witness for the defense.  What type of case
21 was that?
22     A    Medical malpractice.
23     Q    Do you remember the style of the case or
24 the names of the parties involved?
25     A    The doctor was Dr. Neil Jackson.  I don't

Page 11

1  remember the plaintiff.
2      Q    Where was the case pending?
3      A    The doctor was from Providence.  The case
4  was in Newport, Rhode Island.
5      Q    Did you actually testify at trial or just
6  by deposition?
7      A    Yes, I testified at trial.
8      Q    What were the alleged injuries in that
9  case?
10     A    The woman had voiding dysfunction after
11 reconstructive surgery.
12     Q    What type of reconstructive surgery?
13     A    I don't remember.
14     Q    I take it it would have been some type of
15 pelvic floor repair surgery?
16     A    Yes.
17     Q    Did that case involve the use of mesh?
18     A    I don't remember.
19     Q    Who was the lawyer by whom you were
20 retained?
21     A    I don't remember.
22     Q    And did you give only one deposition at
23 that time?
24     A    Yes.
25     Q    Now, you said that you were also deposed

Page 12

1  in a case in which you were a litigant.  Can you
2  tell me about that, please?
3      A    Yes.  A patient I had seen once while I
4  was on faculty at the Cleveland Clinic brought a
5  claim against the clinic.
6      Q    And were you named as a party?
7      A    Yes.
8      Q    Presumably that was a medical malpractice
9  claim?
10     A    I believe so.
11     Q    Did that case go to trial?
12     A    It was dismissed.
13     Q    Do you remember the name of the plaintiff?
14     A    No.
15     Q    About when did you give that deposition?
16     A    I believe it was in around 2002.
17     Q    It was after you had left the Cleveland
18 Clinic then?
19     A    Yes.
20     Q    And what were the allegations in that
21 case?
22     A    This woman subsequently developed
23 infertility and believed that she should have been
24 offered egg retrieval as an option in her past, at
25 which time it wasn't even feasible.

Page 13

1      Q    When you say she subsequently developed
2  infertility, did she develop infertility as a result
3  of a procedure or was the claim simply that she had
4  not been given appropriate counseling and
5  alternatives when being treated for infertility?
6      A    I didn't treat her for infertility.  I
7  provided her with routine gynecologic care.  And she
8  subsequently developed infertility for unknown
9  reasons.  So her claim was that at the time I saw
10 her for normal gynecologic care, I should have
11 offered her options such as egg retrieval.
12     Q    And your testimony in that case, was that
13 case actually filed in Cleveland?
14     A    I don't remember.
15     Q    Your testimony in that case and the
16 testimony in the Rhode Island case are the only two
17 times that you have given depositions?
18     A    Correct.
19     Q    And you indicated that you are a
20 consultant obviously as an expert witness in this
21 litigation.  Have you been a consultant in other
22 litigation?
23     A    No.
24     Q    Other than your work here in this case, do
25 you have any other source of income?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 14

1    A    Yes.
2    Q    Tell me what that is.
3    A    I receive disability for my medical
4  condition.  And we have investments --
5          MR. SLATER:  She's not talking about
6  your personal income.
7  BY MS. JONES:
8    Q    I don't really want to go into your --
9    A    Okay.
10   Q    I don't want to go into your personal
11 investment history and income and so forth.  I
12 didn't mean to pry in the sense of that.  I'm just
13 trying to figure out other --
14         MR. SLATER:  Work that you do for
15 third parties.
16         THE WITNESS:  Yes.
17 BY MS. JONES:
18   Q    -- work that you do for anyone else.
19   A    Okay.  I provide editorial reviews for the
20 International Academy of Pelvic Surgery.
21   Q    And are you compensated for that?
22   A    Yes.
23   Q    Are you on a salary --
24   A    No.
25   Q    -- with them?

Page 15

1          And can you just tell me how you are
2  compensated?
3    A    It's $250 an hour.
4    Q    And approximately how much time do you
5  spend working with the International Academy of
6  Pelvic Surgery?
7    A    I would say eight hours a month.
8    Q    I gather it would vary from time to time
9  depending upon what you're doing?
10   A    Well, I typically provide a monthly series
11 of reviews of current medical literature.
12   Q    I'm sorry.  Would you say that again,
13 please?
14   A    I typically provide a review of the
15 current medical literature.
16   Q    And the current medical literature, is
17 that limited to certain topics?
18   A    To urogynecology.
19   Q    And within the realm of urogynecology, is
20 it limited to any more specialized area, stress
21 urinary incontinence or pelvic organ prolapse or any
22 other more specific area, or does it cover the whole
23 broad spectrum of urogynecology?
24   A    The broad spectrum of urogynecology.
25   Q    And when you say you provide the review

Page 16

1  article, are you required to conduct a search of the
2  medical literature or are you instead furnished with
3  literature and asked to prepare the review on
4  previously identified literature?
5    A    I search the literature myself and
6  identify what seems relevant to me to comment on.
7    Q    Let me see if I can go back.  I got a
8  little bit distracted here.  Let me say, Doctor,
9  you're standing.  And before you came in, Mr. Slater
10 advised that you intended to stand for portions of
11 the day.  And I take it that that is because of a
12 physical condition that's more comfortable for you?
13   A    Correct.
14   Q    Let me just say although we're on a
15 relatively tight schedule here, I want you to know
16 if at any time you need to take a break or go walk
17 around the block, if you'll just let me know, I'll
18 be glad to accommodate it and do whatever we can.
19 Okay?
20   A    Thank you.
21   Q    By the same token, if at any time you
22 don't understand my questions or you need me to
23 repeat something, if you'll stop me and ask me, I'll
24 see what I can do to accommodate that.
25   A    Yes.

Page 17

1    Q    You indicated earlier that you have
2  disability income.  Can you just tell me how long
3  you have been disabled?
4    A    I left my surgical practice in 2004.
5    Q    And I don't want to pry, but can you just
6  briefly describe for me was it your physical
7  condition that led to you leaving your surgical
8  practice?
9    A    Yes.
10   Q    Can you just give me an overview or just a
11 generalization of what that disability is?
12         MR. SLATER:  Let's go off the record
13 for a second.
14         (Discussion off the record.)
15 BY MS. JONES:
16   Q    What I've just asked, Doctor, is if you
17 can just tell me what about your physical condition
18 led to your disability from a surgical practice or
19 affected your surgical practice.
20   A    I have a pain condition that limits my
21 ability to perform the kind of surgery I was trained
22 to perform.
23   Q    Does it limit your ability specifically to
24 perform pelvic floor repair surgery?
25   A    That is the surgery I was specifically

5 (Pages 14 to 17)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 18

1  trained to perform.
2      Q   I understand that.  I guess what I'm
3  asking is would it affect your ability to do other
4  types of surgery?
5      A   I would presume so.
6      Q   You said that you left your surgical
7  practice in 2004; is that right?
8      A   Correct.
9      Q   Was there a period of time before 2004
10  where you gradually began to reduce the number of
11  surgeries that you performed as a result of this
12  condition?
13      A   No.
14      Q   Did this condition have a precipitous
15  onset?
16          THE WITNESS:  Adam?
17      MR. SLATER:  If you don't --
18          THE WITNESS:  I just don't
19  understand --
20      MR. SLATER:  Let's go off the record.
21  I object to the question.
22          (Discussion off the record.)
23          MR. SLATER:  I have a hard time with
24  that because obviously Dr. Weber doesn't want to
25  talk in detail about her physical medical condition.

Page 19

1  And, you know, she's trying to give you what she
2  can, but she's obviously uncomfortable talking about
3  this.
4          MS. JONES:  All I really want to know
5  is how it affected the surgical practice.
6      MR. SLATER:  So why don't we just go
7  with that question:  What was it about your
8  condition that impacted your ability to perform your
9  surgical practice?
10          Are you okay with that?  Because that
11  I think is a relevant question.
12          THE WITNESS:  It exacerbated my pain
13  condition.
14      MR. SLATER:  Can I help you for a
15  second?
16          Are you talking about the physical
17  requirements --
18          THE WITNESS:  Yes.
19      MR. SLATER:  -- on your body of
20  performing surgery in the operating room --
21          THE WITNESS:  Yes.  It's very
22  demanding.
23      MR. SLATER:  -- that would exacerbate
24  your condition?
25          THE WITNESS:  Yes.

Page 20

1  BY MS. JONES:
2      Q   If we're talking about the different types
3  of surgeries that you were performing in 2004, were
4  you performing, for example, abdominal
5  sacrocolpopexies?
6      A   Yes.
7      Q   And how long as a general matter would it
8  take you to perform that surgery?
9      A   It depends on the patient.
10      Q   I understand that, but give me an idea.
11  Would it be three or four hours?
12      A   I would say two to four hours.
13      Q   Were you also performing, for example,
14  sling surgeries to repair urinary incontinence?
15      A   Yes.
16      Q   And how long would those procedures take?
17      A   It would be very unusual for me to perform
18  a sling in an isolated -- as an isolated procedure.
19  This would be almost always in the context of a
20  concomitant prolapse operation.
21      Q   Other than the abdominal sacrocolpopexies,
22  what types of other prolapse surgeries were you
23  performing at that time?
24      A   For apical prolapse, uterosacral ligament
25  suspension.  For anterior and posterior prolapse,

Page 21

1  anterior and posterior colporrhaphy.
2      Q   How long did it take you to perform an
3  anterior colporrhaphy, for example?
4      A   Again, it's very uncommon to have an
5  isolated procedure like that.  Very few women come
6  in with one aspect of a pelvic floor disorder, at
7  least to my practice.
8      Q   Did all of the surgeries that you
9  performed, whether it's the abdominal sacrocolpopexy
10  or a TVT® sling procedure, equally affect your
11  condition?
12      A   My surgical practice consisted of a day of
13  surgery.  So when I was going to surgery, it was for
14  the day.
15      Q   How many days a week did you operate?
16      A   One.
17      Q   For what period of time would that have
18  been true?  This was when you were in Pittsburgh;
19  correct?
20      A   Correct.  I expected you were referring to
21  that, although that was also t rue for my clinical
22  practice in Cleveland unless I needed extra time.
23  Typically one day a week.
24      Q   So from the time you were in Cleveland
25  through the time you were in Pittsburgh, that was

Confidential - Subject to Stipulation and Order of Confidentiality

Page 22

1  your typical practice to have one day a week set
2  aside for surgery?
3      A   Correct.
4      Q   Let me go back and ask you about the case
5  where you testified.  I think you told me the
6  doctor's name was Neil Jackson?
7      A   Yes.
8      Q   When was that testimony?
9      A   I don't remember exactly.  I believe it
10  was somewhere in the range of seven to ten years
11  ago.
12      Q   So sometime between 2002 and 2005 roughly?
13      A   I think that's right.
14      Q   Were you living in Pittsburgh at the time?
15      A   Yes.
16      Q   Were you still on staff in Pittsburgh?
17      A   Yes.
18      Q   Incidentally, when you ceased your
19  surgical practice in 2004, did you remain on staff
20  at the institution?
21      A   Yes.
22      Q   And am I correct that you did so until
23  2006?
24      A   Yes.
25      Q   Can you tell me what you did from 2004 to

Page 23

1  2006 in that capacity?
2      A   Yes.  I remained the director of the
3  fellowship.  So I was responsible for working with
4  the fellows.  In the third year of the fellowship,
5  they had office practice.  So I continued my office
6  practice through 2004 and 2005 working with the
7  fellows in my office.  And I continued to work with
8  them to teach them and supervise them in performing
9  their research.  And I was also involved in
10  performing my own research and I was also working
11  for the NIH at that time.
12      Q   When you said that in the third year they
13  had an office practice, they would have basically
14  what amounted to a private practice and they would
15  see patients in the office?
16      A   With one of the faculty, yes.
17      Q   And did you continue to maintain an office
18  practice through this time period?
19      A   I did for 2004 and 2005.
20      Q   And what did your office practice consist
21  of?
22      A   All patients with a urogynecology problem.
23      Q   Was it limited at that point to
24  urogynecology?
25      A   Yes.

Page 24

1      Q   And when patients would come in to you in
2  the context of an office practice, would you
3  yourself actually examine the patients?
4      A   Yes.
5      Q   And then consult with the patients about
6  the appropriate treatment for whatever condition
7  they had?
8      A   Yes; with the fellows.
9      Q   That's kind of what my question is.  Did
10  you have a practice where you saw women individually
11  without a fellow being present?
12      A   No.
13      Q   And so if a fellow was present, would the
14  fellow under normal circumstances be the doctor
15  that's examining the patient or would you both
16  examine the patient?
17      A   We both examined the patient.
18      Q   And then in the event that the patient was
19  a surgical candidate, would that patient then be
20  referred elsewhere for surgery?
21      A   She would be referred to one of my
22  partners in the department with the fellow.
23      Q   With the fellow that would --
24      A   Follow her.
25      Q   -- that was there with you?

Page 25

1      A   Yes, exactly.
2      Q   Were you still engaged in surgery at the
3  time you testified in Rhode Island?
4      A   I don't remember.
5      Q   Did you have to prepare a report in that
6  case?
7      A   I don't specifically remember.
8      Q   Do you remember what your opinions were as
9  they related to voiding dysfunction?
10      A   I don't.
11      Q   And I think you told me that you did not
12  recollect whether or not mesh was in any way
13  involved in that lawsuit?
14      A   Correct, I did not remember.
15      Q   I take it that you don't remember
16  specifically rendering any opinions about the
17  propriety of use of mesh or not then?
18      A   No, I don't.
19      Q   And certainly there can be issues of
20  voiding dysfunction whether or not mesh is involved;
21  correct?
22      A   Yes.
23      Q   That wasn't a very good question.  Voiding
24  dysfunction can be associated with a number of
25  different pelvic floor surgeries; correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 26

1    A    Yes.
2    Q    That would be one of the standard risks
3  recognized by the medical community and known in the
4  context of doing virtually any type of pelvic
5  surgery; correct?
6              MR. SLATER:  Objection to the form.
7              You can answer.
8              THE WITNESS:  What do you mean by
9  "standard"?
10 BY MS. JONES:
11   Q    To be honest, I don't even remember how I
12 used the word "standard" so let me rephrase the
13 question.
14         Voiding dysfunction would be a recognized
15 complication of most pelvic surgeries; correct?
16             MR. SLATER:  Objection to the form.
17             You can answer.
18             THE WITNESS:  There are gradations of
19 voiding dysfunction that are very important to
20 differentiate between the different types of
21 surgery.
22 BY MS. JONES:
23   Q    Can you explain that to me?
24   A    By "gradations" I mean a spectrum ranging
25 from mild to severe.

Page 27

1    Q    And that spectrum ranging from mild to
2  severe may be associated with a variety of pelvic
3  surgeries; correct?
4    A    Yes.
5    Q    And that is true whether or not those
6  surgeries involve the use of mesh?
7    A    I don't agree with that.
8    Q    You don't agree that voiding dysfunction
9  is a complication of surgeries that do not use mesh?
10             MR. SLATER:  Objection to the form.
11             You can answer.
12             THE WITNESS:  That wasn't what I
13 understood you to ask me.
14 BY MS. JONES:
15   Q    Well, that's my question.
16   A    Could you repeat the question?
17   Q    Sure.  Is voiding dysfunction a recognized
18 complication of pelvic surgeries that do not use
19 mesh?
20             MR. SLATER:  Objection to the form.
21             You can answer.
22             THE WITNESS:  Yes.
23 BY MS. JONES:
24   Q    You said that you last performed surgery
25 in 2004; am I right?

Page 28

1    A    Yes.
2    Q    Was that early 2004 or late 2004?
3    A    I believe it was in the fall.
4    Q    When was the last time that you were
5  actually engaged in the practice of medicine?
6    A    At the end of 2005.
7    Q    And so in that interim between the fall of
8  2004 and the end of 2005, that would have been the
9  time period in which you were seeing patients in an
10 office setting with a fellow?
11   A    Correct.
12   Q    Do I understand correctly that you have
13 not actually examined a patient since the end of
14 2005?
15   A    Correct.
16   Q    Have you provided any type of consultation
17 to a patient since the end of 2005?
18   A    No.
19   Q    And that would include not written any
20 prescriptions or advising or consulting about
21 surgery or a medical condition?
22   A    Correct.
23   Q    I take it that you are not currently on
24 staff at any hospital?
25   A    Correct.

Page 29

1    Q    And have not been since 2005?
2    A    I remained at Magee-Womens Hospital at the
3  University of Pittsburgh until May 2006.
4    Q    So during that six-month period from the
5  end of 2005 until mid-2006, you would have remained
6  on staff there?
7    A    Correct.
8    Q    But that would have been the only place
9  that you had privileges at that point in time?
10   A    Correct.
11   Q    And since that point in time you have not
12 had privileges elsewhere?
13   A    Correct.
14   Q    And I take it that obviously at some time
15 you moved from Pittsburgh back to Maryland?
16   A    Correct.
17   Q    When was that?
18   A    That was in June of this year.
19   Q    June of 2012?
20   A    Yes.
21   Q    Did you remain in Pittsburgh in that
22 interim?
23   A    Yes.
24   Q    What prompted your move to Maryland this
25 year?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 30

1    A    My husband has a new job.
2    Q    Your husband's not a medical doctor, is
3 he?
4    A    No.
5    Q    You told us, Doctor, that you were first
6 contacted in the fall of 2009 about this litigation?
7    A    I believe that's correct.
8    Q    And that you thought you actually began
9 working on the case in February 2010?
10    A    Yes.
11    Q    When you say that you began working on the
12 case in February of 2010, what does that mean?  What
13 did you begin doing?
14    A    I began to review the Ethicon documents.
15    Q    And those were all documents that would
16 have been sent to you by plaintiffs' counsel?
17    A    Yes.
18    Q    Prior to beginning review of those
19 documents, had you ever reviewed the internal
20 documents of any device manufacturer?
21    A    No.
22    Q    Or any drug manufacturer?
23    A    No.
24    Q    I take it that you have not been a
25 consultant to any drug or device manufacturer; is

Page 31

1 that correct?
2    A    That is correct.
3    Q    And that you have not been engaged in the
4 determination as to whether or not a 510(k) is
5 necessary to be filed; is that correct?
6    A    Yes.
7    Q    That you've not before being engaged by
8 plaintiffs' counsel in this litigation ever prepared
9 a 510(k)?
10    A    That is correct.
11    Q    Before being engaged in this litigation,
12 had you ever reviewed a 510(k)?
13    A    No.
14    Q    Before being engaged in this litigation,
15 had you ever reviewed any of the different analyses
16 done, such as the failure mode evaluation analysis
17 or device design safety analysis, on any product?
18    A    No.
19    Q    Had you ever reviewed any adverse
20 experience reports to the manufacturer?
21    A    Yes.
22    Q    In what capacity?
23    A    When I was the program director of the
24 pelvic floor disorders network.
25    Q    I want to come back to this, but as I kind

Page 32

1 of appreciate your CV, as the program director
2 there, you kind of were the coordinator of certain
3 clinical trials done by the network?
4    A    Not the coordinator.  We had a data
5 coordinating center.  That was their job.  I was the
6 program director.
7    Q    Well, tell me what that means as program
8 director.  What did you do?
9    A    Well, I ran the network.  So I organized
10 and led the meetings that we held initially monthly
11 and then quarterly.  I worked with the investigators
12 in designing and -- obviously they were performing
13 the trials at their sites, but the data coming in,
14 the adverse events for different trials, we had
15 safety committees consisting of investigators and
16 members of the data coordinating center and myself.
17 Shall I go on?
18    Q    Well, I'm going to come back to that.  Let
19 me see if I can stick with the adverse experience
20 reports that we were talking about.  In that context
21 you would see adverse experience reports that
22 adverse events that took place in the context of the
23 clinical trials; correct?
24    A    Correct.
25    Q    And those reports that you received in the

Page 33

1 context of a clinical trial might or might not have
2 anything to do with a device; correct?
3    A    Correct.
4    Q    Can you tell me what trials were conducted
5 by the network that involved the use of a device?
6    A    We performed a placebo-controlled trial
7 using a drug product, which is Botox, and in that
8 context reviewing the adverse events that were
9 submitted to the FDA and to the manufacturer.
10    Q    Any other product that you reviewed the
11 adverse events for?
12    A    No.
13    Q    No devices that you reviewed the adverse
14 events for?
15    A    Correct.
16    Q    And I take it that you have never had a
17 position where you actually went in and examined the
18 documents or database of a device manufacturer's
19 adverse experience reports?
20    A    Correct.
21    Q    And I take it that prior to being engaged
22 in this litigation, there's never been a time at
23 which you were in a position where you had to
24 determine whether or not an adverse event was
25 reportable to the FDA under the device regulations?

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 34

1     A    That's correct.
2     Q    Prior to becoming involved in this
3  litigation, did you ever have an occasion to examine
4  the MAUDE database of the FDA?
5     A    Yes.
6     Q    In what context?
7     A    In the context of experiences that we had
8  related to another trial we were running, which was
9  abdominal sacrocolpopexy, in terms of mesh and
10  suture complications.
11     Q    And when was that?
12     A    Perhaps in 2005-2006.
13     Q    Let me just put it into context.  Were you
14  still at the Kerry Magee Hospital at the time?
15     A    Magee-Womens Hospital.
16     Q    I'm sorry.
17     A    As I told you, I left Magee-Womens
18  Hospital in May 2006, so chances are.
19     Q    Well, I mean, I was trying to help you see
20  if you could put dates around it a little bit.
21  That's --
22     A    It doesn't --
23     Q    It helps me sometimes to remember where I
24  was when something happened in order to put a date
25  around it.  That's the only reason I was asking.

Page 35

1     A    My work at NIH was continuous.  So, no,
2  I'm sorry, that doesn't help me.
3     Q    Okay.  Can you tell me about that trial
4  that involved abdominal sacrocolpopexy?  Did I
5  understand you to say it was -- no.  That was Botox.
6  Just tell me about that trial.
7     A    Yes.  This was a randomized trial
8  comparing women who were undergoing abdominal
9  sacrocolpopexy without preoperative stress
10  incontinence symptoms to determine if the addition
11  of a Burch colposuspension at the time of the
12  abdominal sacrocolpopexy could help prevent stress
13  incontinence.
14     Q    And what was the outcome of that study?
15  What were your conclusions?
16     A    The Burch was helpful not in 100 -- it did
17  not 100 percent prevent the development of stress
18  incontinence after abdominal sacrocolpopexy, but it
19  was helpful.
20     Q    And you indicated that in that context you
21  were required to review the FDA MAUDE database?
22     A    Yes.
23     Q    Tell me about that.
24     A    We were -- the patients at the
25  investigative sites were experiencing some mesh

Page 36

1  erosions that the investigators wondered whether
2  this was a particular combination of mesh with a
3  particular combination of sutures.  So we were
4  looking to the MAUDE database to see if we could
5  gather any information if anyone else's experience
6  had indicated that.
7     Q    Can you tell me what types of sutures were
8  being used?
9     A    I don't remember.
10     Q    Was there a particular type of mesh that
11  was being used?
12     A    I don't remember.
13     Q    Do you remember whether the protocol for
14  the trial required the use of a particular mesh in
15  the surgery?
16     A    No, it did not.
17     Q    So you might have had surgical meshes used
18  or manufactured by several different manufacturers?
19     A    That is possible.
20     Q    And presumably they could also be
21  different types of meshes, partially absorbable,
22  nonabsorbable?
23     A    No.  I believe the protocol required
24  nonabsorbable mesh.
25     Q    Was that the CARE study?

Page 37

1     A    Yes.
2     Q    Do you remember what the exposure rate
3  was?
4     A    Not off the top of my head.
5     Q    Did you ever publish the exposure rate?
6     A    It should be in the document, the article
7  reporting the primary outcomes of the trial.
8     Q    Do you know who the lead author would be
9  on that study where would you expect to see it?
10     A    Linda Brubaker.
11     Q    Tell me how you reviewed the MAUDE
12  database at that point in time.
13     A    I don't remember a lot of specifics.  I
14  believe we searched for mesh in the use of prolapse
15  surgery.
16     Q    You don't remember actually doing a search
17  relating to, for example, one particular
18  manufacturer reporting rates, you just looked at the
19  entire database and did that search?
20     A    Correct.
21     Q    Do you remember what your findings were?
22     A    I don't.
23     Q    Did you speak with anyone at the FDA about
24  this?
25     A    No.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 38

1    Q    Have you ever been employed by the FDA?
2    A    No.
3    Q    Have you ever been a consultant to the
4  FDA?
5    A    No, no.
6    Q    Have you ever served on any of the FDA
7  advisory committees?
8    A    No.
9    Q    Have you ever testified at any FDA
10  advisory committee?
11    A    No.
12    Q    Have you ever testified before any other
13  government institution, any type of hearing?
14    A    No.
15    Q    Before being retained in this litigation,
16  had you ever had any discussion with any of the
17  employees at Ethicon about pelvic mesh?
18    A    No.
19    Q    Had you ever had any discussions with any
20  of the employees at Ethicon about transvaginal tape?
21    A    No.
22    Q    Do you know Piet Hinoul?
23    A    No.
24    Q    Do you know David Robinson?
25    A    I may have met him at one point in the

Page 39

1  past. I don't remember clearly.
2    Q    Do you know Axel Arnaud?
3    A    No.
4    Q    Have you ever had any involvement with the
5  TVM group in France?
6    A    No.
7    Q    Do you know any of the members of the TVM
8  group?
9    A    No.
10    Q    Just so I'm clear, you don't know
11  Dr. Cosson or Dr. Jacquetin or Dr. Debodinance or
12  any of the people that were involved in the
13  development of Prolift®?
14    A    Correct.
15    Q    I take it if you don't know them, you've
16  never spoken with any of them about their studies of
17  the product?
18    A    Correct.
19    Q    Do you know Vincent Lucente?
20    A    Yes.
21    Q    How do you know Dr. Lucente?
22    A    By attending the same meetings.
23    Q    Those would be the urogynecology national
24  meetings, professional organizations?
25    A    Yes.

Page 40

1    Q    Do you know him and had any other dealings
2  with him in any other context?
3    A    No.
4    Q    Have you ever spoken with Dr. Lucente
5  about his use of pelvic mesh in pelvic floor
6  repairs?
7    A    No.
8    Q    Do you know Dr. Dennis Miller?
9    A    No.
10    Q    Do you know anyone who was involved in the
11  clinical studies for Gynemesh® PS?
12    A    Yes.
13    Q    Who would that be?
14    A    I don't remember all their names off the
15  top of my head. I know Doug Hale was involved, I
16  believe. I know him.
17    Q    And how do you know him?
18    A    Attending the same meetings.
19    Q    Do you know anyone who was involved in the
20  clinical studies on Prolift®?
21    A    To which studies are you referring?
22    Q    Any of them.
23         MR. SLATER:  Objection; overbroad.
24         You can answer.
25

Page 41

1  BY MS. JONES:
2    Q    I mean, really I'm just asking you to tell
3  me anybody that you know of that was involved in the
4  clinical studies -- not that you know of but that
5  you know who was involved in the clinical studies
6  involving Prolift®?
7         MR. SLATER:  You're just having her
8  go off the top of her head from her recollection
9  without having any of the studies in front of her
10  for the record.
11         You can do the best you can to
12  answer.
13         THE WITNESS:  The only other person I
14  can think of right now is Cheryl Iglesia.
15  BY MS. JONES:
16    Q    And how do you know Dr. Iglesia?
17    A    Attending the same meetings.
18    Q    Have you ever had any discussion with
19  Dr. Iglesia about studies involving -- or her study
20  involving Prolift®?
21    A    No.
22    Q    Have you had any discussion with Dr. Hale
23  with respect to the study involving Gynemesh® PS?
24    A    No.
25    Q    Do you know any of the physicians who have

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 42

1  been involved in the studies of either Prolift+M® or
2  Prosima®?
3      A   Again, off the top of my head, the only
4  one I know who was involved in Prosima® was Halina
5  Zyczynski.
6      Q   And have you spoken to Dr. Zyczynski about
7  that?
8      A   No.
9      Q   Was she at Pittsburgh when you were there?
10     A   Yes.
11     Q   Have you had any discussion with her about
12 the use of mesh in pelvic floor repairs in general?
13     A   We may have discussed that when we were on
14 the faculty together.  I don't remember
15 specifically.
16     Q   When you were on the faculty there, was
17 mesh used in pelvic floor repairs?
18     A   I don't believe so.  If you're -- can I
19 clarify?  Are you talking about stress incontinence
20 or prolapse?
21     Q   Well, let's separate it.  Was it used in
22 the context of stress incontinence?
23     A   Other surgeons, yes.
24     Q   You did not use it?
25     A   Correct.

Page 43

1      Q   But other surgeons used, for example, the
2  TVT® products?
3      A   I don't know specifically.
4      Q   Was mesh used in abdominal sacrocolpopexy?
5  You know what I'm saying.
6      A   Yes.
7      Q   I apologize.  I have for some reason a
8  very difficult time with that word.
9          Did you use mesh in the context of
10 abdominal sacrocolpopexy?
11     A   Yes.
12     Q   Did you have a preferred manufacturer for
13 that mesh product?
14     A   No.
15     Q   Do you know whose mesh you used?
16     A   I don't.
17     Q   Was all of the mesh used at the Kerry
18 Women's Hospital purchased by the hospital?
19     A   Magee-Womens Hospital; yes.
20     Q   And Magee-Womens Hospital would purchase
21 that mesh and all doctors would use the same mesh?
22     A   I don't know.
23     Q   You don't know whether or not doctors
24 requested, for example, the mesh of a particular
25 manufacturer for their use in surgery?

Page 44

1      A   I don't know.
2      Q   You did not?
3      A   I did not, no.
4          Is this a good time for a break?
5          MS. JONES:  Sure.
6          MR. SLATER:  Sure.  Take a break
7  whenever you need.
8          THE WITNESS:  Good.
9          (Short recess.)
10 BY MS. JONES:
11     Q   Doctor, have you ever discussed the use of
12 transvaginal mesh for use in pelvic floor surgery
13 with anyone at the FDA?
14     A   No.
15     Q   Have you ever submitted anything about
16 your opinions on the use of transvaginal mesh for
17 pelvic floor prolapse to anyone at the FDA?
18     A   No.
19     Q   Other than the reports that you have
20 submitted in this lawsuit, have you ever prepared
21 any other report or writing on the use of mesh in
22 pelvic surgery that's not identified in your CV?
23     A   No.
24         (Exhibit No. 1218 was marked for
25 identification.)

Page 45

1  BY MS. JONES:
2      Q   Let me show you what's been marked as
3  Exhibit 1218 to the deposition, which is the notice
4  for the deposition.  Have you seen this document,
5  Doctor?
6      A   No.
7      Q   It asks that you bring with you certain
8  documents and materials.  Have you brought any
9  documents with you to this deposition?
10         MR. SLATER:  One second.  Just for
11 your benefit, because I had an interaction with
12 other counsel for the defense -- we have teams of
13 people we deal with -- I had addressed these
14 deposition notices and the requests directly to
15 other counsel and had explained what we were going
16 to produce in connection with each of the
17 depositions, and I've been adhering to that, which
18 was the financial disclosures, the reports obviously
19 and the lists of materials reviewed, and had made it
20 clear we weren't going to be producing anything else
21 because we felt that primarily the documents are
22 Ethicon documents that both sides have
23 electronically stored anyway.  It would have been a
24 tremendous amount of wasted paper and duplication.
25 So I had explained that to counsel a while back when

Confidential - Subject to Stipulation and Order of Confidentiality

Page 46

1  the requests for production from each of the experts
2  had come out. So I didn't, frankly, even give the
3  notice to my expert because obviously it's beyond
4  her expertise to decide what to produce. So those
5  were decisions of counsel.
6         MS. JONES: I understand.
7  BY MS. JONES:
8      Q   What I want to do is to talk about this
9  notice a little bit, Doctor, and talk with you about
10 what we've asked for and what you have reviewed. I
11 received on Friday, I think, it may have been
12 Saturday, a supplemental list of materials that you
13 have reviewed that I think -- and I'm directing this
14 as much to counsel as to you -- I think represents
15 the universe of materials that you have reviewed as
16 of that date, and then I got a note that you've
17 since looked at Dr. Lucente's deposition.
18         MR. SLATER: Right. What we've done,
19 for the benefit of counsel, is -- obviously there's
20 a tremendous amount of documents referenced, many
21 notes and in the context of the reports that have
22 been served. Dr. Weber's also endeavored to make a
23 list of what she reviewed. So the entire universe
24 would be anything referenced in the reports,
25 anything listed in the materials reviewed list. And

Page 47

1  I've told my associates now since we're here I want
2  them to sweep and make sure they haven't missed
3  anything. And, if necessary, I'll give you today
4  again if there's anything else to be added so you'll
5  have everything. I think you have it all, but if
6  you don't, if there's a few stragglers, I'm going to
7  make sure you have them.
8  BY MS. JONES:
9      Q   Did you review anything, Doctor, other
10 than what was sent to you by plaintiffs' counsel?
11     A   Yes.
12     Q   Tell me what that was.
13     A   It's on the list. It would include things
14 that I found on the FDA home page, for example, the
15 summary statements for products.
16     Q   Can you just describe for me what
17 independent research you did other than review the
18 materials that plaintiffs' counsel sent to you?
19     A   Well, for example, if I came across a
20 reference to a product that I wasn't familiar with
21 or didn't already have documentation on, I would
22 look to the FDA database to obtain the summary
23 statement, which contains the indications and so on.
24     Q   When you say you would look at the FDA
25 database, you would look at the FDA website?

Page 48

1      A   Yes.
2      Q   For information about products?
3      A   Yes.
4      Q   Anything else that you looked at the FDA
5  website about?
6      A   I looked at the advisory panel meeting
7  that they held in September of last year -- last
8  year, yes.
9      Q   Other than looking at the FDA website for
10 that type of material, did you look at or did you do
11 any other independent research?
12     A   Another example would be looking on the
13 Ethicon website to see what they had available on
14 their products, what was listed as their current
15 instructions for use, current material directed at
16 patients, things like that.
17     Q   Okay. What else?
18     A   I would often look at the medical
19 literature when an area came up that I didn't feel I
20 had enough background on, find relevant articles,
21 and then they would be produced for me.
22     Q   So you would do, for example, a Medline
23 search for articles on a certain topic and then ask
24 plaintiffs' counsel to send you the actual articles?
25     A   Yes.

Page 49

1      Q   And can you tell me what those topics were
2  that you asked for articles on?
3      A   Those are listed in the materials
4  reviewed, the articles themselves.
5      Q   But what I'm asking you is you said that
6  there were areas that you did not feel as
7  knowledgeable about and did research on. I'm asking
8  you to tell me what those areas are.
9         MR. SLATER: Objection to the form.
10        You can answer.
11        THE WITNESS: Hernia repair,
12 complications and effectiveness of stress
13 incontinence products. That's what I can think of
14 off the top of my head.
15 BY MS. JONES:
16     Q   Have you spoken with any of the plaintiffs
17 in this litigation?
18     A   No.
19     Q   You have reviewed the medical records of
20 Ms. Gross and Ms. Wicker; correct?
21     A   Yes.
22     Q   Have you reviewed the medical records of
23 any other plaintiff?
24     A   Yes.
25     Q   How many?

13 (Pages 46 to 49)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 50

1      A   Approximately 10 to 15.
2      Q   Have you prepared reports on any of those
3  women other than Ms. Gross and Ms. Wicker?
4      A   Yes.
5      Q   Can you tell me the names of those women?
6      A   Donna Rogers and Patricia Firman,
7  F-I-R-M-A-N.
8      Q   Anyone else?
9      A   No.
10     Q   Had you spoken with the treating
11  physicians or surgeons of any of the plaintiffs in
12  this litigation?
13     A   No.
14     Q   And I assume you've not spoken with any of
15  their family members, husbands or significant others
16  or anything of that nature?
17     A   Correct.
18     Q   Other than Mr. Slater, what lawyers have
19  you met with in the context of this litigation?
20     A   No one else.
21     Q   In fairness, I know you said that you were
22  contacted and talked with somebody else in
23  Mr. Slater's office, but you've not talked with
24  anyone that's not associated with Mr. Slater's
25  office here; is that correct?

Page 51

1      A   Correct.
2      Q   Have you attended any meetings in which
3  other expert witnesses were present?
4      A   No.
5      Q   Have you participated in any phone calls
6  with other expert witnesses for the plaintiffs?
7      A   Yes.
8      Q   And was that on more than one occasion?
9      A   No.
10     Q   With whom did you speak?
11     A   With Dan Elliott.
12     Q   Have you spoken with any of the other
13  witnesses --
14     A   No.
15     Q   -- for the plaintiffs?
16     A   By e-mail.
17     Q   Let's see if I can separate these.  When
18  did your conversation with Dan Elliott occur?
19     A   On Saturday.
20     Q   Two days ago?
21     A   Correct.
22     Q   And can you tell me what the subject of
23  that conversation was?
24     A   The case.
25     Q   What about the case?

Page 52

1      A   We were specifically discussing the
2  urologic aspects from Dr. Elliott's standpoint and
3  the urogynecologic aspects from my standpoint.
4      Q   Was that related to a specific plaintiff
5  or just in general?
6      A   Both.
7      Q   Well, what I'd like you to do is tell me
8  everything you can remember about that conversation.
9      A   We were discussing the urinary retention
10  issue, and we discussed the contraindication that
11  now exists for patients with preexisting pain
12  conditions.
13     Q   Was anyone on the telephone besides you
14  and Dr. Elliott?
15     A   Mr. Slater.
16         MR. SLATER:  I was teaching them.
17  BY MS. JONES:
18     Q   How long did that phone call last?
19     A   I was on the phone call for approximately
20  half an hour.
21     Q   And when you said that you were discussing
22  contraindications of pain syndrome, tell me what you
23  remember about that discussion.
24     A   The knowledge that has been gained since
25  the Prolift® product and procedure was marketed that

Page 53

1  women who have a preexisting pain condition are
2  relatively or absolutely contraindicated from
3  undergoing a Prolift® procedure.
4      Q   And when you say that, it's based upon
5  what?
6      A   Upon their higher risk of exacerbation of
7  their existing pain condition or the development of
8  a new pain condition.
9      Q   And were you giving that information to
10  Dr. Elliott or vice versa?
11     A   We were discussing it.
12     Q   Well, can you tell me in what context you
13  were discussing it?  Were you talking about it in
14  the context of a specific plaintiff?
15     A   Yes.
16     Q   And who was that?
17     A   The plaintiffs Linda Gross and Pamela
18  Wicker.
19     Q   Did Dr. Elliott express any opinions to
20  you about that?
21     A   Yes.
22     Q   What were those?
23     A   I'd rather you ask him.
24         MR. SLATER:  She's allowed to ask
25  you.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 54

BY MS. JONES:
1   Q   I'm entitled to ask you.
2   A   You're entitled to ask me.  All right.
3   All right.  His opinions, as I recall, were that the
4   urinary retention that Linda Gross experienced was a
5   direct result of the Prolift® procedure.  And the
6   fact that Pamela Wicker had preexisting pain
7   conditions in her interstitial cystitis and her
8   migraine headaches is a contraindication to her
9   having undergone the Prolift® procedure, which is
10  known now.
11  Q   Did Dr. Elliott express an opinion to you
12  as to whether or not at the time that Ms. Wicker
13  received her Prolift® that information was known?
14  A   That information was foreseeable by
15  Ethicon.  They did not warn physicians and patients
16  of that likelihood.
17  Q   My question was a little bit different.
18  It was whether or not it was known.  Had it been
19  published in the medical literature?
20  A   It was not at the time that the plaintiffs
21  underwent their surgery.
22  Q   Now, you said that those were the opinions
23  that Dr. Elliott expressed to you.  What opinions
24  did you share with him, if any?

Page 55

1   A   I agreed with his opinions.
2   Q   My recollection is that you said, Doctor,
3   that you were discussing with him and you shared
4   with him information, facts, opinions, whatever,
5   from the urogynecological standpoint and he was, as
6   I recall what you said, expressing opinions to you
7   from the urological standpoint; am I right?
8   A   Yes.
9   Q   How did those differ in terms of -- what
10  information were you sharing with him from the
11  urogynecological standpoint?
12  A   The two different specialties have a lot
13  of overlap.  They also have their different
14  perspectives.  And I think by discussing our
15  perspectives and our opinions that, for example,
16  urinary retention in Linda Gross was caused by the
17  Prolift® product and procedure, that he professed
18  that opinion on the basis of his urologic training
19  and experience and I professed that opinion on the
20  basis of my urogynecologic training and experience.
21  Q   Did the two of you reach those opinions by
22  approaching the subject from different viewpoints?
23  A   From the perspective of our differing
24  specialties, yes.
25  Q   What I'd like for you to do then is to

Page 56

1   tell me what the difference is in terms of the way
2   you approached it from the way he approached it.
3   What facts, what knowledge, whatever that you had
4   from the urogynecological spectrum did you use to
5   educate him, if so, and vice versa?
6          MR. SLATER:  Objection.  The
7   foundation of the question assumes aspects -- it's
8   just not accurate foundation.
9          You can answer as best you can and
10  tell her what went on during the conversation.
11         THE WITNESS:  I can answer from my
12  perspective as a urogynecologist.  I cared for women
13  exclusively.  My training has been in the care of
14  women exclusively.  My experience may be broader in
15  the care of women with prolapse -- I don't know that
16  for a fact -- regarding Dr. Elliott's practice.  So
17  my experience, my training and experience, in caring
18  specifically for women with pelvic floor disorders
19  gives me the background to interpret the clinical
20  events and that's the basis for my opinions.
21  BY MS. JONES:
22  Q   Did Dr. Elliott share with you any
23  insights that you had not previously had?
24  A   No.  I'd like to expand on that a little.
25  I think he has a greater experience in caring for

Page 57

1   women and men perhaps with interstitial cystitis and
2   that that may give him greater insight into the
3   complications that Pamela Wicker has experienced and
4   also into the possible diagnosis that Dr. Benson
5   attributed to findings at the time of a cystoscopy
6   with Linda Gross after her Prolift® surgery.
7   Q   Other than Dr. Elliott, have you spoken
8   with any of the other expert witnesses identified by
9   the plaintiffs in this case?
10  A   No.
11  Q   When you reviewed Ethicon documents or the
12  literature in this case, did you take any notes?
13  A   Yes.
14  Q   And where are those notes?
15  A   On my computer and handwritten.
16  Q   But you did not bring those with you?
17  A   No.
18  Q   Did you separately mark in any way on the
19  documents?
20         Let me ask this first:  Did you receive
21  those documents electronically or in hard copy?
22  A   Both.
23         MR. SLATER:  I just want to place an
24  objection.  I'm generally not somebody who
25  overobjects during a deposition and I don't mind

15 (Pages 54 to 57)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 58

1  making a record, but to the extent that -- and I
2  think it was essentially exclusively -- what
3  Dr. Weber was doing was part of her interaction with
4  me and part of our work product, I'm not necessarily
5  going to agree to produce these things. I don't
6  mind you setting a record because I know you want to
7  find out what exists, but a lot of this may come
8  within the work product privilege.
9          MS. JONES: Okay. I don't think her
10  notes come within the work product privilege and how
11  she maintained them and did that.
12          MR. SLATER: To a large extent, it
13  also may come within drafts of different portions of
14  the report. It's extensive.
15          MS. JONES: Well, we'll take that up
16  and deal with it. I mean, I understand that we're
17  not entitled to drafts and all, but my
18  understanding, from what Dr. Weber suggested, was
19  that she simply had notes that she had taken from
20  review of the documents. I do think we're probably
21  entitled to those.
22          MR. SLATER: We'll address it.
23          MS. JONES: That's fine.
24          MR. SLATER: It becomes a two-way
25  street, you know --

Page 59

1          MS. JONES: We will address it.
2          MR. SLATER: -- that I'm generally
3  not that interested in driving down, but we can talk
4  about it.
5  BY MS. JONES:
6      Q    I forgot, Doctor, to ask you, you told me
7  that you had also communicated with other experts I
8  think by e-mail?
9      A    Yes. Generally, that would be a three-way
10  conversation with Mr. Slater by e-mail.
11      Q    And who else?
12      A    Oh, Sue Shott.
13      Q    And when did those conversations or
14  communications take place?
15      A    I don't recall exactly.
16      Q    Have you met Sue Shott?
17      A    No.
18      Q    Have you ever had any occasion to work
19  with or familiarity with her work before?
20      A    I know of some of her medical literature.
21  That would be the extent of my...
22      Q    And can you tell me when you had these
23  e-mail communications with her?
24      A    No, I don't recall.
25      Q    Was it recently?

Page 60

1      A    What do you mean by "recently"?
2      Q    Within the last month?
3      A    No.
4      Q    Was it before she produced a report?
5      A    She has also more than one report. To
6  which report are you referring?
7      Q    Either one.
8      A    The best I can do is over the last several
9  months, but not in the last month.
10      Q    Can you tell me what the subject matter of
11  those communications was?
12      A    We were discussing the Gynemesh® PS mesh
13  study and the TVM studies.
14      Q    Do you have copies of those e-mails?
15      A    Yes.
16      Q    You didn't bring those with you today
17  either, did you?
18      A    No.
19      Q    Counsel and I will address these issues
20  later on, but I'm going to ask that you maintain all
21  of your notes and all of your correspondence until
22  we resolve the issue as to whether or not we're
23  entitled to them. Okay?
24      A    Yes.
25      Q    Have you had correspondence with any of

Page 61

1  the other experts?
2      A    No.
3      Q    Do you personally know any of the other
4  expert witnesses?
5      A    I know Dr. Margolis.
6      Q    How do you know Dr. Margolis?
7      A    Attending the same meetings.
8      Q    But you've not discussed this litigation
9  with him?
10      A    No.
11      Q    Anybody else?
12      A    No.
13      Q    You obviously are being compensated for
14  your time in working with plaintiffs' counsel;
15  correct?
16      A    Correct.
17      Q    Can you tell me at what rate you're being
18  compensated?
19      A    It is $350 an hour.
20      Q    And is that for all purposes?
21      A    Yes.
22      Q    It's not more for testifying versus review
23  of documents, preparing reports or anything?
24      A    We haven't discussed that.
25      Q    As we sit here today, all of your time has

16 (Pages 58 to 61)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 62

1  been billed at $350 an hour?
2      A    Earlier in our working relationship it was
3  $250 an hour.
4      Q    Can you tell me approximately when you
5  changed the rate from 250 to 350?
6      A    Perhaps the spring of this year.
7      Q    2012?
8      A    I believe so.
9      Q    How much have you been compensated at this
10  point?
11     A    I don't know.
12     Q    You didn't bring your financial statements
13  with you?
14     A    I understood from Adam that that had been
15  disclosed.
16          MR. SLATER:  You have our
17  disclosures.  They didn't give that to you?
18          MS. JONES:  I have not seen them.
19          MR. SLATER:  I'll have somebody print
20  a copy.  We produced them for all our experts.  The
21  hours spent, the rates, when the rate went from 250
22  to 350, the whole thing was produced.
23          MS. JONES:  Okay.  I apologize.  If I
24  have --
25          MR. SLATER:  It's no big deal.

Page 63

1          MS. JONES:  It's either it never got
2  to me or I've overlooked it.
3          MR. SLATER:  And I told defense
4  counsel that I served it on, which was not you in
5  fairness, I don't expect anything else from the
6  defense.  I expect similar disclosures.
7  BY MS. JONES:
8      Q    Can you tell me, Doctor -- and maybe we
9  can get this sometime in the next day or two --
10          MR. SLATER:  I can get it for you by
11  the next break.
12          MS. JONES:  That's fine.
13  BY MS. JONES:
14     Q    Can you tell me approximately how much
15  time you've spent?
16     A    It varies.
17     Q    Let me ask you this:  You have produced a
18  voluminous report, general report, in this
19  litigation.  Can you tell me how long it took you to
20  prepare that?
21     A    I've been reviewing documents since
22  February of 2010.  I've been working on writing the
23  report since perhaps 2011.  It's been a -- not a
24  continuous process but a process of evolution.
25     Q    Was there a point in time that you

Page 64

1  specifically sat down and said I'm going to start
2  drafting my report?
3      A    I don't remember.
4      Q    Did you submit statements to counsel for
5  your time?
6      A    Yes.
7      Q    When you would submit those statements to
8  counsel for your time, would you itemize what you
9  had done?
10     A    I have done that recently.  I hadn't done
11  that for the entire course of...
12     Q    When you say you would itemize what you
13  had done, give me an example of how you would
14  itemize it.
15          MR. SLATER:  I'm going to preserve my
16  objection.  I'll let her answer the question, but
17  I'm not waiving any objections to work product.
18          You can answer.
19          THE WITNESS:  I would make a table.
20  The first column has the date, the second column has
21  the tasks, and the third column has documents
22  produced.  And what I mean by that is documents that
23  I myself have written that I'm submitting to
24  Mr. Slater.
25

Page 65

1  BY MS. JONES:
2      Q    Have you written documents for Mr. Slater
3  other than drafts of this report?
4          MR. SLATER:  Don't answer the
5  question.
6          She's not going to testify about
7  drafts.  Remember, we've served multiple
8  supplemental reports, so --
9          MS. JONES:  I thought I made it clear
10  that I wasn't asking about drafts.  I'm asking
11  whether or not there has been anything else prepared
12  that are not drafts.
13          MR. SLATER:  My position is whatever
14  my expert's been providing to me is work product.
15  Because she may not understand the difference and
16  may make a mistake in how she speaks about it, I'm
17  just not going to have her testifying about what she
18  provided me.  My position is what she was providing
19  to me were draft reports, formulations of draft
20  reports.  And that's my position.
21  BY MS. JONES:
22     Q    Have you sent any written documents to
23  anyone other than Mr. Slater?
24          MR. SLATER:  When you say
25  "Mr. Slater," you mean me or my associates

17 (Pages 62 to 65)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 66

1  obviously; right?
2           MS. JONES:  Yeah.
3           THE WITNESS:  No.
4  BY MS. JONES:
5      Q    Have you met any of the other plaintiffs'
6  lawyers involved in this litigation?
7      A    No.
8           MR. SLATER:  In fairness, the guy you
9  met today is a plaintiff lawyer.
10          THE WITNESS:  Oh.
11          MR. SLATER:  Jeff Grand is a
12  plaintiff lawyer.
13          THE WITNESS:  Oh, I beg your pardon.
14          MS. JONES:  Just for the record, so
15  that the record is clear, the notice of the
16  deposition is marked as Exhibit 1218.
17  BY MS. JONES:
18     Q    Have you provided any written documents to
19  counsel other than drafts of your report and
20  invoices?
21          MR. SLATER:  My position is the same.
22  That was the question you asked.  I'm taking the
23  same position.  You're not asking like did she send
24  me a medical article or something, you're talking
25  about things that she authored; correct?  I mean, I

Page 67

1  have no problem with you asking did she ever send me
2  an article or something she found, but in terms of
3  things that she wrote, my position is that's work
4  product, that's my interaction with my expert.  And
5  I would accord you the same position as well.
6  BY MS. JONES:
7      Q    Have you sent to Mr. Slater information
8  that you gleaned from any independent research?
9      A    For example, if I came across an article
10 in medical literature that I wasn't sure Adam had
11 seen yet, I would forward it to him.
12     Q    Have you sent anything other than medical
13 articles to him?
14     A    I can't think of anything else right now.
15     Q    Have you given any interviews about this
16 litigation?
17     A    No.
18          MR. SLATER:  About the litigation in
19 particular?
20          MS. JONES:  Uh-huh.
21 BY MS. JONES:
22     Q    When is the last time you gave an
23 interview about pelvic mesh?
24     A    I believe it was last fall.
25     Q    And to whom did you talk?

Page 68

1      A    Rachel Zimmerman.
2      Q    Other than Rachel Zimmerman, have you
3  given other interviews relating to the use of mesh
4  in pelvic surgeries?
5      A    No.
6      Q    Have you ever given any interview on TV or
7  film or anywhere where you've appeared personally?
8      A    No.
9      Q    Have you participated in any clinical
10 trials since you left Magee in 2006?
11     A    I continued to work with NIH until 2008.
12     Q    And you were the program manager there;
13 correct?
14     A    Yes.
15     Q    But in terms of actually performing the
16 surgery or prescribing the Botox, for example, that
17 was done by doctors in the network and not you; am I
18 right?
19     A    Yes.
20     Q    Have you written anything, Doctor, about
21 mesh that's not shown on your CV, other than
22 obviously the reports in this litigation?
23     A    Written for publication do you mean?
24     Q    Well, written for publication, yes.  Have
25 you written anything for publication that's not on

Page 69

1  your CV?
2      A    No.
3      Q    Have you written anything that has been
4  submitted to any third party that's not on your CV?
5      A    No.
6      Q    Let me give you an example.  You've never
7  written anything to any of the medical schools or
8  training programs with respect to your opinions on
9  mesh?
10     A    No.
11     Q    I think you've already said that you had
12 not submitted anything to the FDA, for example?
13     A    Correct.
14     Q    Am I correct, Doctor, that you never used
15 or implanted Prolift®?
16     A    That is correct.
17     Q    Am I correct that you never used or
18 implanted Gynemesh® PS?
19     A    That I can't say for sure since I am not
20 sure what mesh I used in abdominal sacrocolpopexy.
21     Q    Did you ever use any mesh that you
22 actually cut and modified into shape in the course
23 of your surgeries?
24     A    Are you referring to transvaginal
25 placement?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 70

1    Q    Well, let me just see if I can do this.
2  Did you ever perform any transvaginal placement of
3  mesh in any surgery?
4    A    Yes.
5    Q    What types of surgery did you perform
6  involving transvaginal placement of mesh?
7    A    TVT®.
8    Q    And when you used the TVT®, did you use
9  Ethicon's TVT®?
10   A    Yes.
11   Q    And can you tell me when you began using
12 Ethicon's TVT®?
13   A    When I was at the Cleveland Clinic.  That
14 was just beginning to be available.
15   Q    My recollection is that TVT® became
16 available in 1998.  Would you have been using it
17 about that time?
18   A    No, I don't think so.  I think it would --
19 my recollection it is closer to the time I left the
20 clinic.  And then when I joined Magee-Womens
21 Hospital, I did not use TVT®.
22   Q    Had you used anything before you used
23 TVT®?
24   A    In terms of a mesh product --
25   Q    Yes.

Page 71

1    A    -- for stress incontinence?  No.
2    Q    Do you have any recollection of using any
3  sling product other than a TVT® for urinary
4  incontinence?
5    A    No.
6    Q    At any time?
7    A    No.
8         (Exhibit No. 1219 was marked for
9  identification.)
10 BY MS. JONES:
11   Q    I'm going to show you, Doctor, what I've
12 marked as Exhibit 1219, which is a copy of your CV
13 that we were provided.  I'd like to ask you whether
14 or not this is current.
15   A    Yes, this is current.
16   Q    Do you have any publications that are in
17 process?
18   A    No.
19   Q    You don't have any that you've submitted,
20 for example, that you're waiting to hear on
21 acceptance?
22   A    Correct.
23   Q    What I want to do is talk with you about
24 your CV a little bit.  We covered some of this so
25 I'm going to jump around a little bit.  Just bear

Page 72

1  with me.
2         If we look at your professional
3  experience, you show on there 2008 till present the
4  International Academy of Pelvic Surgery.  And we've
5  already spoken about that.  As I recollect and
6  understand, your role is to summarize, if you will,
7  the current medical literature on urogynecology?
8    A    Let me clarify.  I select a topic when --
9  once I've looked at the medical literature and if an
10 article of interest has been recently published, I
11 may select that and then a handful of other articles
12 on that topic.  So it's theme-based.  And then I
13 critically review the articles I've selected and
14 provide a summary and a clinical take-home message
15 for the audience.
16   Q    Do you do that once a month?
17   A    Once a month.
18   Q    And when you say that you provide the
19 clinical information and take-home article, that
20 would be written and posted on the website?
21   A    Correct.
22   Q    And are those writings and opinions
23 attributed to you specifically?
24   A    Yes.
25   Q    So if we do a search, for example, of the

Page 73

1  website, we would be able to find all of the
2  comments that you had written over a period of time?
3    A    Yes.  And I would like to add that you
4  won't find anything for the past two or three months
5  because I have devoted my time to preparing for this
6  and the trial.  So I haven't done it continuously
7  except for the past two or three months.
8    Q    When you said you devoted yourself to
9  preparing for this and the trial, what have you
10 done?
11   A    I've continued to review documents.  I've
12 read deposition testimony.  I have continued to
13 produce the supplemental reports.  I've read the
14 reports of the defense and plaintiffs' experts.
15   Q    And I know that we're going to get
16 presumably the disclosure here, but can you tell me
17 on a just daily or weekly basis how much of your
18 time that's taken?
19   A    It varies.  Would you like to restrict
20 that to a time frame and perhaps I can answer you
21 more accurately?
22   Q    Well, you said that the last two or three
23 months you had devoted most of your time to working
24 on this case.  And I'm just trying to get a sense of
25 whether that's 40 hours a week and you're working,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 74

1  you know, a typical day or it's, you know, three
2  hours one week and 40 hours the next week.
3      A    I would say over the last couple of months
4  it's been more steady.  Let me think for a minute
5  and I'll do my best to give you a weekly estimate.
6          I would estimate a range of between 25 to
7  30 hours a week.
8      Q    Other than these review articles, themes
9  that you write for the International Academy of
10  Pelvic Surgery, have you written other materials for
11  that group?
12     A    No.
13     Q    You also show that you were a freelance
14  editor for The Medical Editor.  What is The Medical
15  Editor?
16     A    That is a service run by Carl Richmond, as
17  you can see, who accepts typically manuscripts from
18  scientists all other the world who pay for editing
19  services to improve the clarity, the grammar, the
20  spelling, make it consistent with the journal's
21  requirements.
22     Q    And as a freelance editor for that group,
23  I assume that the way it would work is periodically
24  they would send you a paper and you would edit it
25  and send it back?

Page 75

1      A    Correct.
2      Q    In the course of that, was it limited to
3  any particular field?
4      A    No.
5      Q    So this is not necessarily
6  urogynecology-related?
7      A    Correct.
8      Q    How many papers approximately have you
9  edited for The Medical Editor?
10     A    Hundreds.
11     Q    One hundred?
12     A    Hundreds.
13     Q    Hundreds.  I take it that you no longer do
14  that?
15     A    Correct.
16     Q    How were you compensated for that?  Were
17  you on a salary?  I assume as a freelance editor you
18  were compensated on the basis of each paper?
19     A    Hourly.
20     Q    So if it took you ten hours to edit, you
21  would be paid a certain amount by the hour?
22     A    Correct.
23     Q    And when you say that you had done
24  hundreds, was that essentially a full-time position?
25     A    Perhaps not full time.  Perhaps

Page 76

1  three-quarters time.
2      Q    Let me see if I can put it in this
3  perspective.  When you say "three-quarters time,"
4  does that mean that you might be spending as much as
5  30 hours a week doing that?
6      A    Correct.
7      Q    And during that same period of time, you
8  also have listed BioScience Writers.  Were you doing
9  the same thing for that group?
10     A    Similar.  A wider range of documents.
11  When I was working with The Medical Editor, that was
12  almost exclusively academic manuscripts.  The
13  documents with BioScience Writers was a wider range
14  of documents.
15     Q    When you're talking about academic
16  manuscripts, are you talking about the manuscripts
17  that are being written by academicians or are they
18  written for academicians?
19     A    Both.
20     Q    How do you define academic manuscripts?
21     A    A manuscript that's intended to be
22  published in a peer-reviewed publication.
23     Q    And I take it then that the BioScience
24  Writers might or might not be headed for peer-review
25  publication but perhaps would be for some popular or

Page 77

1  industry trade publication?
2      A    Not necessarily, not necessarily for
3  publication.  Grant applications, things like that.
4      Q    And, again, it would not be limited to
5  urogynecology?
6      A    Correct.
7      Q    In none of these positions after 2007 up
8  to date have you been engaged in doing any original
9  research; is that correct?
10     A    The last publication I have in terms of
11  original research was published last year, in 2011.
12  So that was something I was involved in leading up
13  to 2011.
14     Q    Well --
15     A    Can I correct something?  Because I
16  realize I've been speaking of my time at NIH as if
17  it went through 2008, but it really ended at the end
18  of 2007 before going into 2008.
19     Q    Okay.  What is the publication that you're
20  referring to in 2011?
21     A    It's on Page 6 of 25, the first one.
22     Q    This is the reanalysis of the randomized
23  trial?
24     A    Correct.
25     Q    That randomized trial was actually done

Confidential - Subject to Stipulation and Order of Confidentiality

Page 78

1  about 2000, wasn't it?
2      A   Approximately.
3      Q   I'm not sure exactly.  My recollection is
4  that you published the results of that in 2001; is
5  that right?
6      A   I think that's correct, yes.
7      Q   So the trial itself was actually conducted
8  in the late '90s, early 2000?
9      A   Correct.
10     Q   And this reanalysis was done after you
11  were retained as an expert in this litigation?
12     A   Correct.
13     Q   Have you published other materials since
14  you were engaged as an expert in this litigation?
15     A   In the nonpeer-reviewed literature, yes.
16     Q   Can you identify for me what those
17  publications are?
18     A   Page 13 of 25.  These are in reverse
19  chronological order so that would be, let's see, I
20  guess just the first two.
21     Q   Do you remember whether or not you had
22  already been contacted by plaintiffs' counsel when
23  you wrote commercial pressures and professional
24  ethics revisions to the ACOG practice bulletins?
25     A   I don't remember.

Page 79

1      Q   You certainly by the time that you had
2  written that had addressed and made comments with
3  respect to lawyer advertising with respect to pelvic
4  mesh surgeries, hadn't you?
5      A   I'm sorry?
6      Q   By this point in time you certainly were
7  aware and eventually wrote about lawyer advertising
8  related to the use of mesh in pelvic floor repairs,
9  didn't you?
10     A   I'm not familiar with what you're
11  referring to.  Can you show me that?
12     Q   We might get to it.  You don't remember
13  that?
14     A   I said I'm not familiar with what you're
15  referring to.
16     Q   You do remember seeing lawyer advertising
17  with respect to mesh being used in pelvic floor
18  repair surgeries, don't you?
19     A   Yes.
20     Q   And that you saw that early on after the
21  2008 public health notice?
22     A   I don't remember specifically.
23     Q   If we look at the next entry on your CV
24  where you said you were medical officer or the
25  program director for research for female pelvic

Page 80

1  floor disorders, how did that come about?  I mean,
2  how did you get involved with that program?
3      A   In the late 1990s the professional
4  organizations, the leaders of our professional
5  organizations, met with the leaders at NIH to
6  discuss the lack of high-quality research in female
7  pelvic floor disorders.  And with that encouragement
8  NIH created a position in the National Institute of
9  Child Health and Human Development to develop a
10  specific research program devoted to female pelvic
11  floor disorders.  And at one of our professional
12  meetings the director of the NICHD at that time,
13  Duane Alexander, came and spoke to the group and
14  announced that this position was available.  So I
15  applied and I was selected.
16     Q   Were you in the group that went initially
17  to discuss this program with the NIH?
18     A   No.
19     Q   Do you know who was?
20     A   The only person I can remember is Richard
21  Bump.
22     Q   As I recall, what you said was that the
23  leadership of the professional organization went.
24  Was that the leadership of ACOG or was it --
25     A   No, not ACOG.  I believe it was the

Page 81

1  American Urogynecologic Society and the Society of
2  Gynecologic Surgeons.
3      Q   And when you were selected to run that
4  program, what instructions were you given by the NIH
5  in terms of what they expected, what was going to be
6  done?
7      A   They wanted to develop several initiatives
8  to solicit investigator -- I'm sorry -- to solicit
9  applications from investigators in the field.
10  Because there hadn't been dedicated NIH funding for
11  female pelvic floor disorders in the past,
12  investigators would have a very high level of
13  competition to obtain NIH funding.  So part of my
14  job was to develop these initiatives to solicit
15  applications from the investigators in the field to
16  let them know that NIH is concerned about the lack
17  of high-quality research in this field and is
18  dedicating research funding to advance the science.
19  And those are called requests for applications.  And
20  they're posted with a deadline.  And then the
21  applications come in, are reviewed, and depending on
22  the limits of the funding, several are selected for
23  funding.
24          So we had an initiative focused on basic
25  science research in female pelvic floor disorders,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 82

1  epidemiological research, and then for clinical
2  research we established the clinical trials network,
3  the pelvic floor disorders network, which also went
4  out as a request for applications specifically for
5  the investigative sites and also for the data
6  coordinating center for investigators to submit
7  applications and be selected for participation.
8      Q    And the way I understand NIH works is you
9  post, for example, a request for application and
10  then an investigator, a doctor, would submit a
11  proposal in which he says I'd like to do a study,
12  basically submits the protocol or grant request, I'd
13  like to do a study involving these issues, these
14  number of patients, and this outcome, and the NIH
15  and then presumably you would look at that proposal
16  and protocol and say this looks like a good study
17  and I'm going to give him the money to conduct it?
18      A    It's a little --
19      Q    I know that's simplified.
20      A    Yes.
21      Q    But am I essentially correct?
22      A    The main difference is the review
23  committee is independent of the NIH staff.  There
24  are standing committees and then for the RFA
25  specifically we call an ad hoc committee to review

Page 83

1  the applications, they're scored, and then based on
2  the score is the typical way that funding decisions
3  are made.
4      Q    All right.  So you didn't yourself then
5  personally make those funding decisions?
6      A    Correct.
7      Q    You had an ad hoc committee that would
8  have reviewed all of them and decided which ones
9  would be the most appropriate for funding?
10      A    Yes.  As I said, they would score them and
11  then obviously we would rank them by score.  We have
12  input, depending on what we see as the greatest need
13  in the field, but generally the funding decisions go
14  very strongly by score.
15      Q    And then once a study is funded, you as
16  the program director would monitor that study and
17  receive reports, interim reports, in the context of
18  the study?
19      A    Correct.
20      Q    You note on your CV that you were involved
21  with the investigational new drug trial.  Is that
22  the Botox --
23      A    Correct.
24      Q    -- trial you referenced earlier?
25      A    Yes.

Page 84

1      Q    And when you noted that you were the
2  clinical monitor, that you would review adverse
3  reports, you obviously were not a blinded
4  investigator here, were you?
5      A    Perhaps I misunderstood the question.
6  With the clinical monitor, who is one person, and
7  the safety monitor, who is another person, from the
8  data coordinating center, we would review the
9  adverse events.  And those were blinded.  The data
10  were blinded to us as we reviewed the adverse
11  events.
12      Q    Okay.  And was that then a review of all
13  of those and all of the different clinical trials
14  that were being sponsored at the time?
15      A    Correct.
16      Q    When you were doing this and acting as the
17  medical officer program director, how much time did
18  you spend in that capacity?
19      A    That changed over the years.  When I began
20  in 1999, it was 25 percent.  And then it increased.
21  I believe when I left Cleveland to go to Pittsburgh,
22  it increased to 50 percent.  When I stopped my
23  surgery practice, it went to 75 percent.  And then
24  when I left Magee-Womens Hospital altogether, it
25  went to a hundred percent.

Page 85

1      Q    And you left the hospital in the end of
2  2005, so you had a two-year period that it was a
3  hundred percent of the time?
4      A    Close.  I believe I left Magee in May of
5  2006.
6      Q    I'm sorry.  I think you probably said that
7  and I --
8      A    Yeah, in the range of a year and a half.
9      Q    And when you said that it became a hundred
10  percent of your time, did you spend more and more
11  time there or was it just a hundred percent of the
12  time because you no longer had the obligations at
13  Magee?
14      A    The latter.
15      Q    So would it be fair to say that the amount
16  of time, not the percentage of time but the amount
17  of time that you spent as program director basically
18  remained the same over the entire period of time?
19      A    No, no.  It increased.
20      Q    Okay.  But it didn't increase -- this is
21  what I'm trying to say:  After you left Magee, it
22  remained the same?
23      A    No.  It went from 75 percent to
24  100 percent.
25      Q    I know.  I think that's where we

22 (Pages 82 to 85)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 86

1  miscommunicated a minute ago, because I thought you
2  told me it went to a hundred percent of your time
3  because you were no longer working at Magee but it
4  didn't mean extra time.  Do you see the difference
5  that I'm saying?
6      A   No.
7      Q   Okay.  It's one thing to say I'm spending
8  75 of my time on this and 25 percent of my time at
9  Magee, but if that 25 percent of the time at Magee
10  goes away and you're only working at NIH, then it
11  becomes a hundred percent of the time but it doesn't
12  necessarily mean more time.  And I thought that was
13  what you told me had happened.  And I may have
14  misunderstood.
15     A   I am not sure what you're asking.  I'm
16  sorry.
17     Q   All right.  Let me see if I can do it this
18  way:  When you were at Magee and you said you were
19  spending 75 percent of your time working as the
20  program director -- correct?
21     A   Yes.
22     Q   -- how much time was that?
23     A   You know, these time calculations are
24  artificial.
25     Q   I understand.  I'm just asking for you to

Page 87

1  give me an estimate.  You know, did you spend 30
2  hours a week on it?
3          MR. SLATER:  If you can reasonably
4  estimate it.  If you find it to be a guess, she
5  doesn't want you to just guess at something.
6          THE WITNESS:  It would be probably in
7  the range of 50 to 60 hours a week.
8  BY MS. JONES:
9      Q   A week?  That would have been what you
10  were spending in 2005?
11     A   No.  In 2006, after I -- no, no.  I'm
12  sorry.  You're correct.  You're correct.
13     Q   That's what were spending in 2005.  What
14  did you spend in 2006?
15     A   Probably 60 to 80.
16     Q   Bear with me.  I know I'm repeating
17  myself.  When you started this, you initially were
18  at the Cleveland Clinic; correct?
19     A   Correct.
20     Q   And at that point in time you were
21  spending about 25 percent of your time there?
22     A   Correct.
23     Q   Did you have a contract with the NIH?
24     A   They have a mechanism that's called IPA.
25  What's that stand for?  I don't remember what that

Page 88

1  stands for.  But it is an arrangement between the
2  NIH and my institution to account for a certain
3  percentage of my time that I'm not spending working
4  for the institution, the Cleveland Clinic at that
5  time.
6      Q   So the arrangement was really between the
7  NIH and the Cleveland Clinic for your time?
8      A   Correct.
9      Q   And did the same thing hold true with
10  respect to Magee when you moved to Magee?
11     A   Correct.
12     Q   And at that point in time it changed from
13  25 percent to 50 percent?
14     A   Correct.
15     Q   And at what point in time did it change to
16  75 percent?
17     A   When I discontinued my surgical practice.
18     Q   At the end of 2004?
19     A   Yes, I believe that was the fall of 2004.
20     Q   You said you left Magee-Womens
21  Hospital in June of 2006?
22     A   I believe it was May.
23     Q   And why did you leave the hospital at that
24  time?
25     A   I wanted to be able to devote all my time

Page 89

1  to the NIH work.  And I can expand on that a little
2  if you like.  I came to Magee with the specific idea
3  of developing a new fellowship program in female
4  pelvic medicine and reconstructive surgery, which is
5  a long name that's been given to our subspeciality
6  of urogynecology.  And I accomplished that and we
7  graduated several fellows and it was running along
8  very smoothly, so I felt that it was safe to carry
9  on with the faculty that were in place and I could
10  then devote myself to the NIH.
11     Q   When you went to Magee, at the time that
12  you went there, there was no fellowship program?
13     A   Correct.
14     Q   Did you actually have to go out and hire
15  or retain, bring in other faculty members for that
16  residency program?
17         MR. SLATER:  Fellowship program?
18         MS. JONES:  I mean fellowship
19  program.
20         THE WITNESS:  Not at that time.  As
21  we -- it's a three-year fellowship.  So we obtained
22  a fellow, the first fellow, in the first year, so
23  there was one fellow; a second fellow in the second
24  year, so there were two fellows; and a third fellow
25  in the third year, so there were three fellows.  So

Confidential - Subject to Stipulation and Order of Confidentiality

Page 90

1  we had the full complement of three fellows.
2        At that time when we had three
3  fellows, then staff were added to increase the
4  exposure of the fellows to clinical practice and
5  research, for example, things that were important in
6  their fellowship.
7     Q    Did you ever have more than one fellow per
8  year --
9     A    No.
10    Q    -- in the fellowship program?
11    A    Oh, I take that back.  No.  At one time we
12  did have two fellows in one year.  It occurred with
13  a graduating resident that everyone was --
14  graduating from the residency at Magee-Womens
15  Hospital that everyone was very impressed with so we
16  decided to keep her as well as the fellow who we had
17  already arranged to keep -- or, you know, take on.
18    Q    And even though you were the director of
19  that fellowship program, I assume other faculty
20  members and other surgeons were involved in the
21  training of those fellows as well?
22    A    Correct.
23    Q    In other words, you weren't the sole
24  person that was there responsible for ensuring that
25  they were trained?

Page 91

1     A    Correct.
2     Q    In the course of developing this program,
3  though, would you be responsible for developing the
4  curriculum, I guess, in terms of what they should be
5  taught?
6     A    Yes, in a specific sense.  In a general
7  sense the American Board of Obstetrics and
8  Gynecology, which is our certifying organization,
9  provided a general outline of the topics that the
10  fellows should be taught.  And then we filled in the
11  specifics of exactly how they were going to obtain
12  that knowledge.
13    Q    And did there come a point in time at
14  which ACOG actually certified that fellowship?
15    A    The American Board of Obstetrics and
16  Gynecology, two different -- yeah, ACOG is the
17  professional organization.
18    Q    I apologize.
19    A    Yes.
20    Q    And when was that?
21    A    Let me just glance at my CV and see when
22  we graduated the first fellow, because she came
23  under the certification.  It's a process, as I'm
24  sure you can understand.
25        Okay.  So our first fellow graduated in

Page 92

1  2004.  So then I would expect we received
2  certification in 2003.  That's Page 5 on the bottom.
3     Q    Okay.  In this fellowship program,
4  although you did not use transvaginal implanted mesh
5  in your surgeries, did other surgeons at Magee use
6  transvaginal mesh?
7     A    To the best of my recollection, at or
8  around the time I was leaving that was beginning to
9  happen.
10    Q    At or about the time you were leaving in
11  2006?
12    A    Correct.
13    Q    At the time that you were there, were
14  slings being used for urinary incontinence?
15    Q    To what type of sling are you referring?
16    Q    Well, were mesh slings being used?
17    A    No.
18    Q    Was any mesh used at Pittsburgh other than
19  for abdominal sacrocolpopexy?
20    A    Not to my recollection, except as I just
21  said, toward the time I was leaving.
22    Q    And toward the time that you were leaving,
23  what were the surgeons there beginning to use?
24    A    I don't remember.
25    Q    Were the residents trained on how to

Page 93

1  perform surgeries to correct urinary incontinence?
2     A    The fellows; yes.
3     Q    The fellows.  I'm sorry.
4        And what surgeries were they trained on?
5     A    Slings.
6     Q    What types of slings?
7     A    Rectus fascia slings, cadaveric fascia
8  slings, string slings.
9     Q    They were not trained on any mesh
10  products?
11    A    Not to my recollection.
12    Q    And can you tell me what training they
13  received with respect to the other types of pelvic
14  organ prolapse surgery?
15    A    Yes.  Abdominal sacrocolpopexy,
16  uterosacral ligament fixation and sacrospinous
17  ligament fixation for apical prolapse, anterior and
18  posterior colporrhaphy for anterior and posterior
19  vaginal prolapse, paravaginal repair for anterior
20  vaginal prolapse.
21    Q    And were there any procedures in place to
22  evaluate the competencies of the fellows in
23  performing each of those surgeries?
24    A    Yes.
25    Q    Tell me how you do that.

24 (Pages 90 to 93)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 94

1    A    When the fellows were on surgical
2  rotations, each faculty member on a monthly basis --
3  they rotated on a monthly basis.  So at the end of
4  each month's rotation the faculty would provide to
5  me, as the fellowship director, an evaluation of the
6  fellows' progress in learning how to perform the
7  surgeries.
8         As the fellows progressed through their
9  fellowship and we saw them evolve in their level of
10 skill and experience, we then arranged the surgeries
11 in such a way that the faculty member was the second
12 assistant, the fellow was the first assistant, and
13 the resident, the senior resident, was the primary
14 operating surgeon.  And in that way the fellows
15 would also learn how to teach.
16    Q    Your fellowship program was, you've
17 already said, certified under the American Board of
18 Obstetrics and Gynecology; correct?
19    A    Correct.
20    Q    Is it a fair statement that the fellows in
21 your program were doctors who had completed training
22 as OB-GYNs?
23    A    That wasn't a requirement.  They could
24 also have graduated from training in urology.
25 Typically they are residents who applied for a

Page 95

1  program, had graduated -- or were going to graduate
2  from residencies in obstetrics and gynecology.
3     Q    Did residents in OB-GYN at Pittsburgh do
4  pelvic floor repair surgeries?
5     A    Yes; under the supervision of the faculty.
6     Q    So as residents they were taught, for
7  example, to do abdominal sacrocolpopexy?
8     A    Yes, in -- it depends on the difficulty of
9  the case.  The attending physician would make a
10 decision as to whether that was a fellow case or a
11 resident case or both.
12    Q    But is that one of the surgeries that you
13 would have expected a resident to be trained on
14 during the course of a residency in obstetrics and
15 gynecology?
16    A    Again, it depends.  Some residents have
17 already decided on their future career path.  They
18 may decide to go into maternal-fetal medicine or
19 reproductive endocrinology and infertility.  And in
20 that situation it is not a good use of surgical
21 teaching to teach those residents how to perform
22 that surgery.  That's not going to be part of their
23 clinical practice when they graduate.
24    Q    Pelvic floor repair surgery is fairly
25 complex surgery, is it not?

Page 96

1     A    Yes.
2     Q    Regardless of the form, whether it's
3  colporrhaphy or sacrocolpopexy, it can be difficult
4  surgery --
5     A    It can be.
6     Q    -- for a doctor?
7         It is the type of surgery that generally
8  is best performed in the hands of a specialist; is
9  that fair?
10         MR. SLATER:  Objection.
11         You can answer.
12         THE WITNESS:  I wouldn't want to make
13 an across-the-board statement agreeing with that.  I
14 think in terms of a general philosophy I would agree
15 with that.  And certainly the American Board of
16 Obstetrics and Gynecology agreed with that since
17 they created the subspeciality of female pelvic
18 medicine and reconstructive surgery.
19 BY MS. JONES:
20    Q    And it is the specialists, whether they
21 come from a gynecological background or a urological
22 background, that generally perform that surgery?
23    A    I don't know if I can say that on a
24 nationwide basis.
25         And I would like to correct one thing now

Page 97

1  that you mentioned urology, because this fellowship
2  was actually jointly boarded, if you will, by the
3  American Board of Obstetrics and Gynecology and the
4  American Board of Urology.  What would typically
5  happen in a case like ours as a urogynecologist, the
6  American Board of Obstetrics and Gynecology would
7  certify my program and the American Board of Urology
8  would certify programs that were led by urologists.
9     Q    At the time that you were organizing this
10 fellowship in Pittsburgh, how many fellowship
11 programs were there in the United States?
12    A    I believe there were 17.
13    Q    And that's 17 programs for urogynecology
14 in general, whether it's the American Board of
15 Obstetrics and Gynecology and the American Board of
16 Urology?
17    A    I believe that's correct.
18    Q    So if there were 17 programs, for example,
19 you would generally be training someplace between 50
20 and 60 fellows a year in this surgery?
21    A    Collectively.  Of course, they only
22 graduate one at a time.
23    Q    Right.
24    A    Yes.  But at any given moment there may be
25 something like 50 in training at some level between

Confidential - Subject to Stipulation and Order of Confidentiality

Page 98

1  the first and the third year.
2      Q   It's a fairly small group of folks that
3  are trained on an annual basis?
4      A   It's growing.  It's new.  But, yes, it is
5  small.
6      Q   Do you know how many fellowship programs
7  there are today?
8      A   I don't.
9      Q   At the time that you were at Magee, from
10  2001 to 2004, you were spending about 50 percent of
11  your time as the program director for the female
12  pelvic floor disorders; correct?
13     A   Yes.
14     Q   And then 50 percent of your time would
15  have been spent as the program director for the
16  fellowship program?
17     A   In addition to my clinical practice and my
18  clinical research, yes.
19     Q   And that's what I want to get to.  Can you
20  tell me how your time was broken down during that
21  time period?
22     A   Well, I had one day in surgery.  I think I
23  had one and a half days in the office.  And that
24  would leave, say, a half a day roughly for my
25  responsibilities as the program director of the

Page 99

1  fellowship.
2      Q   When you say you had a day and a half in
3  the office, was that a day and a half of clinical
4  care in the office?
5      A   Yes.
6      Q   And can you tell me at that point was your
7  practice here restricted to urogynecology?
8      A   Yes.
9      Q   And were those patients that were referred
10  to the institution with pelvic floor disorders or
11  urinary incontinence or other issues?
12     A   They could be referred by other doctors.
13  They could refer themselves in, self-referrals.
14     Q   And we talked a little bit about your
15  surgical practice, but there you would have had one
16  day of surgery a week from 2001 to 2004?
17     A   Correct.
18     Q   And during that time do you have any idea,
19  Doctor, how many abdominal sacrocolpopexies you
20  performed?
21     A   That would be relatively uncommon.  Maybe,
22  if I'm guessing six per year, three years, 15 to 20.
23     Q   And how many colporrhaphies?
24     A   Well, again, unusual to come across a
25  patient who needed a single -- see, abdominal

Page 100

1  sacrocolpopexy tends to address those things.
2  Working vaginally doing a colporrhaphy, it would be
3  unlikely to address all of the patient's problems so
4  it would be a combination of procedures.
5      Q   Is abdominal sacrocolpopexy the only
6  abdominal surgery you performed?
7      A   Well, for prolapse, yes.
8      Q   Did you perform it for other conditions?
9      A   Retropubic colposuspension, Burch
10  colposuspension for incontinence.
11     Q   Anything else?
12     A   No.  Oh, excuse me.  Paravaginal repair
13  can also be performed usually in conjunction with a
14  Burch.
15     Q   And do you have any idea during that
16  period of time how many Burch procedures you
17  performed?
18     A   Well, at Magee I was more likely to
19  perform a sling.  That was the experience of the
20  faculty group.  I should add that at that time we
21  were participating in a clinical trial that was run
22  through the urinary incontinence treatment network,
23  which was also an NIH-funded network that I worked
24  with.  I didn't lead that one, but I worked with
25  them.  That was funded by the National Institute of

Page 101

1  Diabetes, Digestive Diseases, and Kidney, which is
2  where urologic research funding comes from.  And so
3  we, "we" meaning the faculty in the urology and
4  urogynecology divisions, were participating in a
5  clinical trial comparing Burch and sling procedures
6  for stress incontinence.
7      Q   And the slings that you were using were
8  the cadaveric, the --
9      A   Rectus fascia and what are called string
10  slings, if you're familiar with that terminology.
11     Q   And the string slings are what?
12     A   I'm basically using sutures anchored in
13  periurethral tissue.
14     Q   Going back to my question trying to get an
15  idea, I mean, granted that when you're talking about
16  the vaginal surgeries and the colporrhaphy, for
17  example, any of the other surgeries that you were
18  doing, whether it's the colporrhaphy, the
19  sacrospinal ligament fixation, all of those would
20  involve vaginal surgery; correct?
21     A   Correct.
22     Q   And all of those would have involved a
23  section of the vagina?
24     A   Correct.
25     Q   And I assume that you would say that as

26 (Pages 98 to 101)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 102

1 with colporrhaphy, any of the vaginal surgeries,
2 whether it be the sacrospinal ligament fixation or
3 others, would be more likely to be a combination
4 procedure than a stand-alone, separate procedure?
5     A   Yes.
6     Q   Recognizing that, can you give me an
7 approximation of, for example, the number of
8 colporrhaphies that you performed, whether or not
9 they were performed in conjunction with another
10 surgery?
11    A   I would estimate something in the
12 neighborhood of 200 to 300 cases.
13    Q   During the entire time that you were
14 there?
15    A   At Magee-Womens Hospital.
16    Q   At Magee.  And the same question with
17 respect to the sacrospinal ligament fixation.
18    A   Well, my preference was to perform the
19 uterosacral ligament fixation, unless there was a
20 special reason not to do that.  So the sacrospinous
21 ligament fixation would be less common for me to
22 perform.
23    Q   Divide the two, the uterine ligament
24 fixation versus the sacral, and tell me
25 approximately how many of each you would have done.

Page 103

1     A   I would say probably 80 percent for the
2 uterosacral ligament suspension and 20 percent for
3 the sacrospinal ligament fixation.
4     Q   And that 80 percent, what number would
5 that be roughly equivalent to?
6     A   Yeah, that's really difficult to answer.
7 I could give you a guess as to the total number of
8 surgeries.  But as to the breakdown as to whether
9 they needed an apical prolapse repair with an
10 anterior and posterior -- and/or posterior vaginal
11 repair...
12    Q   Give me an approximation of the total.
13    A   I think I did.  Did I say 200 to 300?
14    Q   Right.  But I understood that was just
15 colporrhaphy.  You're suggesting that that's the --
16    A   Oh, oh.  Yes, yes.
17    Q   That's the total?
18    A   I meant that to be the total.
19    Q   I'm sorry.  I wasn't following.  So that
20 would basically include over that roughly three-year
21 period at Magee you would have done 2 to 3 hundred
22 surgeries total?
23    A   For prolapse, correct.
24    Q   Okay.  And while you were there at Magee,
25 were there any special textbooks or teaching

Page 104

1 protocols that you used in the fellowship?
2     A   I mean, there are several textbooks that
3 we used.  Do you want me to try to list them?
4     Q   Well, can you tell me what some of the
5 textbooks were that were used with respect to the
6 prolapse surgery?
7     A   Well, for example, Mark Walters and Mickey
8 Karram have a textbook on Urogynecologic and
9 Reconstructive Surgery I believe is the title.
10    Q   And were there others similar to that that
11 were used or recommended in the course of the
12 fellowship?
13    A   There are some very classic gynecology
14 textbooks like TeLinde's, atlases like Clifford
15 Wheeless'.  I have a textbook in office
16 urogynecology.  That's all I can think of at the
17 moment.  I'm sure there are many more.
18    Q   I really was just trying to get a feel for
19 the ones that you recollect might have been used or
20 referred to in the course of that fellowship program
21 there.
22    A   Uh-huh.
23    Q   So that represents the universe that you
24 can remember at this moment; is that correct?
25    A   Correct.

Page 105

1          Can we have another break?
2          MR. SLATER:  Sure.
3          (Discussion off the record.)
4          (Luncheon recess taken from 12:41
5 p.m. to 1:52 p.m.)
6 BY MS. JONES:
7     Q   Doctor, let me follow up with a couple of
8 questions about some of your testimony this morning.
9 You testified that most of the time when you did
10 pelvic floor repair surgery that you used a
11 combination of different techniques.
12         MR. SLATER:  Objection.
13         You can answer.
14         THE WITNESS:  No, I don't recall
15 saying that.  I used a combination of different
16 procedures.
17 BY MS. JONES:
18    Q   Fair enough.  So that you would, for
19 example, use colporrhaphy together with utero
20 ligament suspension fixation, for example, or some
21 other procedure?
22    A   Uterosacral ligament suspension, yes, for
23 apical prolapse if that was the patient's problem.
24    Q   Why is it that you so often used a
25 combination of two procedures?

27 (Pages 102 to 105)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 106

1      A    It's the nature of the condition of
2  prolapse.
3      Q    Explain that to me.
4      A    As surgeons we artificially segment the
5  vagina into the apex, the anterior vagina, and the
6  posterior vagina.  In reality the vagina is a
7  continuous tube.  And when prolapse occurs, it's
8  more likely to occur in more than one of the
9  segments that we artificially designate than a
10 single segment.
11     Q    And because it occurs in more than one of
12 those segments, it's necessary to do for optimal
13 repair more than one procedure?
14     A    Correct.
15     Q    And in addition to those procedures, you
16 would often also do a procedure for urinary
17 incontinence at the same time, would you not?
18     A    For stress incontinence.
19     Q    Stress incontinence.
20     A    Again, if that was the woman's problem,
21 yes.
22     Q    Understood.  But stress incontinence often
23 happens in conjunction with prolapse, does it not?
24     A    Correct.
25     Q    And when you would do an abdominal

Page 107

1  sacrocolpopexy, would you also do or use a
2  combination of procedures?
3      A    As necessary, yes.
4      Q    So that, for example, even though you're
5  doing an abdominal sacrocolpopexy, you might at the
6  same time also be doing a vaginal surgery or
7  colporrhaphy or some other procedure?
8      A    Typically not a colporrhaphy.  That
9  wouldn't ordinarily be necessary to combine with an
10 abdominal sacrocolpopexy.
11     Q    What other procedures would you ordinarily
12 combine with an abdominal sacrocolpopexy?
13     A    A procedure for stress incontinence.
14     Q    Now, I know that you told me that you used
15 mesh when you were in Pittsburgh at the Magee-Womens
16 Hospital in surgeries for abdominal sacrocolpopexy.
17     A    Correct.
18     Q    And you said in fairness that you did not
19 remember what kind of mesh.
20     A    Correct.
21     Q    Can you describe for us the
22 characteristics of that mesh that you used?
23     A    No.
24     Q    So you don't, for example, know whether it
25 was a multifilament versus a monofilament?

Page 108

1      A    I would prefer not to guess.
2      Q    Fair to say you don't remember whether it
3  was macroporous as opposed to microporous?
4      A    Again, I would prefer not to guess.
5      Q    And I assume that you don't know whether
6  it was polypropylene versus Gore-Tex® versus
7  Mersilene® or some other type of mesh?
8      A    I would not have used Gore-Tex®.  I am
9  doubtful I would have used Mersilene®.
10     Q    I think you told us that it was not
11 partially absorbable?
12     A    Correct.  No, I didn't tell you that.
13 That was in the context of the CARE trial.
14     Q    Okay.
15     A    That was part of the study design.
16     Q    Do you know whether or not you have used a
17 partially absorbable mesh?
18     A    No, I did not.
19     Q    But you don't know whether or not it was
20 polypropylene?
21     A    I cannot say that with certainty.
22     Q    When you were performing a surgery using
23 this mesh, did the mesh come, as you can recall, in
24 a box, A separate piece of mesh?
25     A    A flat rectangular piece of mesh, yes.

Page 109

1      Q    And were there any instructions or
2  anything else in the box that you remember looking
3  at?
4      A    Are you referring to the instructions for
5  use?
6      Q    Instructions for use or anything else that
7  would have been within the box.
8      A    I don't recall.
9      Q    Did you modify or cut that mesh in any
10 way?
11     A    Yes.
12     Q    While you were in the operating suite?
13     A    At the scrub nurse's table, yes.
14     Q    In other words, would you cut it after you
15 had the patient, if you will, on the table in the
16 course of the surgery after you had seen whatever
17 the condition was?
18     A    Yes.
19     Q    You told us that you knew several people
20 or had met several people in the context of
21 professional meetings.  What professional meetings
22 prior to, you know, the end of 2006 did you normally
23 attend?
24     A    The American Urogynecologic Society
25 meeting, the Society of Gynecologic Surgeons

28 (Pages 106 to 109)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 110

1  meeting, and occasionally the meeting of the
2  American College of Obstetricians and Gynecologists.
3      Q    And do you continue to attend those
4  meetings?
5      A    No.
6      Q    When is the last time you attended a
7  meeting of any of those organizations?
8      A    I believe that would be in 2008.
9      Q    Did you, in fact, attend a meeting after
10 you left the position as program director at the
11 NIH?
12     A    No, I don't believe so.
13     Q    The reason I'm asking, according to your
14 CV, you were there until 2007.  So my question is
15 once you left that group, have you attended any
16 professional organizational meeting?
17     A    No, I don't believe so.
18     Q    And it would be a fair statement then that
19 you've not personally presented at any meetings
20 since that time?
21     A    Correct.
22     Q    Let me see if I can go back, a little
23 further back.  You were at the Cleveland Clinic from
24 1993 to 2000; correct?
25     A    Correct.  I had my fellowship in '92 to

Page 111

1  '93.
2      Q    That's what I want to go back to.  As I
3  appreciate your training, you went to college at the
4  University of Maryland and finished there in 1983?
5      A    Correct.
6      Q    With a degree in microbiology?
7      A    Correct.
8      Q    Have you ever done any work in the field
9  of microbiology since you finished?
10     A    No, not since I graduated from college.
11     Q    In other words, you've not been engaged in
12 any laboratory or bench testing in any capacity with
13 respect to the field of microbiology since you
14 finished college?
15     A    Correct.
16     Q    Did you go directly from undergraduate to
17 medical school?
18     A    Yes.
19     Q    And you finished medical school then in
20 1988?
21     A    Correct.
22     Q    And then you did a residency in OB-GYN?
23     A    Correct.
24     Q    And that was at Hartford?
25     A    Hartford Hospital, yes.

Page 112

1      Q    And can you tell me when you were doing
2  that residency from 1988 to 1992 -- it was a
3  four-year residency?
4      A    Yes.
5      Q    -- during that time I assume you had
6  various rotations?
7      A    Correct.
8      Q    In medical school itself, you would have
9  had courses with respect to the anatomy; correct?
10     A    Correct.
11     Q    Those would have included courses in
12 pelvic anatomy?
13     A    Correct.
14     Q    When you were doing your residency in
15 OB-GYN, did you have additional training and courses
16 in pelvic anatomy?
17     A    Not a course per se, but it was certainly
18 part of our curriculum.
19     Q    That's a major part of the body that
20 gynecologists deal with on a regular basis; correct?
21     A    Correct.
22     Q    And was it during the course of your
23 residency then that you were taught how to examine
24 patients for various conditions?
25     A    Yes.

Page 113

1      Q    And I assume that during that residency
2  you kind of covered a broad spectrum of
3  gynecology --
4      A    Yes.
5      Q    -- and obstetrics?
6          So you would have delivered babies?
7      A    During my residency, yes.
8      Q    You would have provided routine
9  gynecologic care to patients?
10     A    Yes.
11     Q    Counseled on contraception?
12     A    Yes.
13     Q    Counseled on or treated women for
14 menopausal issues?
15     A    Yes.
16     Q    And would you also have performed surgery
17 during that course of your residency?
18     A    Yes.
19     Q    In what areas?
20     A    In obstetrics, in gynecology, in
21 gynecologic oncology, and in the field of
22 reproductive endocrinology and infertility, in which
23 a lot of laparoscopic surgery is performed.
24     Q    So when you say in obstetrics, that would
25 be, for example, C-sections?

29 (Pages 110 to 113)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 114

1    A    Yes.
2    Q    Did you perform any surgeries for stress
3  incontinence?
4    A    Yes.
5    Q    At that point in time, this is 1988 to
6  '92, what procedures did you use to treat stress
7  incontinence?
8    A    Primarily the Burch colposuspension.
9    Q    And that was an open abdominal surgery?
10    A    Preperitoneal, retropubic.
11    Q    Any other procedures that were used to
12  treat stress incontinence?
13    A    Kelly plication.
14    Q    Anything else?
15    A    That's all I can remember.
16    Q    Did you counsel with patients at that
17  point in time about stress incontinence?
18    A    Yes.
19    Q    And offer them alternative treatments to
20  surgery?
21    A    Yes.
22    Q    What alternatives did you discuss with the
23  patients?
24    A    Behavioral and lifestyle changes, fluid
25  modification, avoidance of certain fluids or even

Page 115

1  foods if that appeared to aggravate their problem,
2  things like that, and pelvic muscle exercises and
3  pessary use.
4    Q    No question in your mind that stress
5  incontinence can have an adverse effect on a woman's
6  lifestyle?
7    A    I agree with that.
8    Q    And that it can affect her from a
9  psychosocial perspective, if you will?
10    A    It can.
11    Q    That it can, you know, expose her to
12  embarrassing circumstances that may lead some women
13  to avoid participation in certain activities?
14    A    It can.
15    Q    It can certainly also affect a woman's
16  sexual function?
17    A    It can.
18    Q    It is a condition that you as a
19  urogynecologist certainly believes warrants
20  treatment?
21    A    Treatment is based on the patient's
22  symptoms.
23    Q    Understood.  Treatment in the sense that
24  women need to have various alternatives available,
25  whether it's pelvic floor exercises or

Page 116

1  pharmacological agents or surgery, to treat that
2  condition?
3    A    I'm not sure I understand your question.
4  Could you rephrase that?
5    Q    Let me see if I can put it in this
6  perspective.  Stress incontinence can pose a
7  significant burden to a woman?
8    A    It can.
9    Q    You agree with that?
10    A    Correct.
11    Q    And the condition itself is serious enough
12  that it's a condition that warrants the development
13  of treatment for that condition?
14        MR. SLATER:  Objection to the form.
15        You can answer.
16        THE WITNESS:  Again, treatment is
17  based on the patient's symptoms.
18  BY MS. JONES:
19    Q    I understand.  I'm not trying to suggest
20  that every patient would receive the same treatment.
21  I'm simply saying that the condition itself is
22  serious enough and can pose, depending upon the
23  patient, a significant burden such that different
24  alternative treatments are and should be part of the
25  physician's armamentarium to treat that condition?

Page 117

1        MR. SLATER:  Objection to the form.
2        You can answer.
3        THE WITNESS:  Shall I explain what
4  I'm struggling with?
5  BY MS. JONES:
6    Q    That's fine.
7    A    Okay.
8    Q    Do that and we'll see if we can straighten
9  it out.
10    A    Okay.  If we understood the etiology of
11  stress incontinence, we could offer a specific
12  etiology-based treatment.  Right now our treatments
13  are empiric, which means we don't fully understand
14  the etiology so we're not able to treat the root
15  cause.  And in a perfect world we would understand
16  the etiology fully, we would have an etiologic-based
17  treatment, and we would be able to diagnose women
18  with the specific cause of her incontinence.
19  Incontinence is only a symptom, the end result of
20  whatever abnormality has preceded it that allows
21  that symptom to occur.
22        Does that help you or help --
23    Q    Let me see if we can approach it this way:
24  Incontinence is the result of a dysfunction in the
25  pelvic floor system; correct?

30 (Pages 114 to 117)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 118

1    A    Not necessarily, not exclusively.
2    Q    It can be?
3    A    It can be.
4    Q    We know that various conditions and events
5  have been associated with stress incontinence;
6  correct?
7    A    Correct.
8    Q    One of those is parity?  I'm sorry.  You
9  have to say --
10    A    Correct.  I didn't realize that was the
11  end of the question.
12    Q    Well, I meant to have a question mark
13  there.  One of those would be not only parity, but
14  it would include whether or not you'd had difficult
15  vaginal deliveries of children; correct?
16    A    It can.
17    Q    Well, for example, one of the thoughts is
18  that during the course of childbirth you can develop
19  whether it's vaginal tears or damage to the muscle
20  such that it may result in stress incontinence;
21  correct?
22    A    Well, that's exactly what we don't
23  understand fully.  Clearly there is an epidemiologic
24  relationship between childbirth and the development
25  of stress incontinence.  To be able to say that this

Page 119

1  specific injury in this specific woman led to the
2  development of stress incontinence, that we are
3  unable to say.
4    Q    There are also other conditions that have
5  been associated with stress incontinence; correct?
6    A    Correct.
7    Q    Obesity?
8    A    Correct.
9    Q    Certain medical conditions?
10    A    Correct.
11    Q    Such as diabetes, for example?
12    A    Correct.
13    Q    What are the other explanations that have
14  been associated from an epidemiological standpoint
15  with stress incontinence?
16        MR. SLATER:  By the way, I just want
17  to place an objection.  Obviously I'm not going to
18  tell her not to answer.  And I understand the
19  plaintiffs had an SUI in their past so it can be
20  deemed relevant, but at some point I assume we're
21  going to get to prolapse.  Maybe.
22        THE WITNESS:  Previous surgery for
23  incontinence, being female.
24  BY MS. JONES:
25    Q    How about age?

Page 120

1    A    Age does not have a direct relationship
2  with the development of incontinence.
3    Q    Anything else that you can think of that's
4  been theorized to have a direct development
5  relationship?
6    A    Theorized?
7    Q    That's fine.  Answer the theorized.
8    A    Menopause has been theorized, medication
9  use, specific medications.
10    Q    How about previous surgeries,
11  hysterectomies?
12    A    That's controversial.  I wouldn't say that
13  it's been established as an association.
14    Q    In your practice you said that you, as I
15  recall -- I'm not sure whether you said that you had
16  prescribed this or whether it was available, so let
17  me ask you.  Did you prescribe pessaries for use for
18  incontinence?
19    A    Yes.
20    Q    Did you prescribe pelvic floor exercises
21  for incontinence?
22    A    Yes.
23    Q    That would be primarily the Kegel
24  exercise?
25    A    Kegel is, yes, the eponym attached.

Page 121

1    Q    I'm sorry?
2    A    The eponym, the name of the doctor who
3  described this in the literature.
4    Q    Had you prescribed pharmacologic agents
5  for treatment of stress incontinence?
6    A    If I did, it would have been very rarely.
7    Q    Very, very?
8    A    Very rarely.
9    Q    And obviously you have performed the Burch
10  suspension?
11    A    Correct.
12    Q    Any other type of treatment that you
13  either prescribe or surgical procedure that you
14  perform for treatment of stress incontinence?
15    A    The Kelly plication and sling procedures
16  and injection of bulking agents, Durasphere®, for
17  example, Contigen®.  Those are the two names that I
18  can think of at the moment.
19    Q    When did you use Kelly's plication
20  techniques?
21    A    Typically in an elderly patient with mild
22  to minimal symptoms where I felt their risks
23  outweighed -- the risks of a different stress
24  incontinence operation outweighed the benefits for
25  the patient.

31 (Pages 118 to 121)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 122

1    Q    When I said "when," I was actually
2  thinking in terms of time period.
3    A    Oh.
4    Q    Were you using that in your residency?
5    A    Yes.
6    Q    So you would have used it '88 to '92.  Did
7  you continue to use that throughout the time you
8  were practicing?
9    A    Yes.
10    Q    When did you first begin to use the sling
11  procedures?
12    A    During my fellowship at the Cleveland
13  Clinic.
14    Q    That would have been 1992-93 then?
15    A    Correct.
16    Q    At that point in time what materials were
17  you using for slings?
18    A    Primarily rectus fascia.
19    Q    And were there issues with recurrence with
20  that surgery?
21    A    "Issues" meaning?
22    Q    Meaning that there were failures and that
23  the condition recurred?
24    A    Yes.
25    Q    And do you know what that rate of

Page 123

1  recurrence was?
2    A    No.
3    Q    I think you mentioned earlier today that
4  at some point you used cadaveric tissues?
5    A    I did not mention that.  That had been
6  used in -- at Magee-Womens Hospital.  I did not use
7  that material myself.
8    Q    Why did you choose not to use that
9  material?
10    A    I didn't believe it was effective.
11    Q    You didn't believe it was effective in the
12  sense of providing long-term stability?
13    A    Providing a long-term -- I don't like the
14  word "stability," but a long-term solution for the
15  patient's symptoms.
16    Q    Were there also safety issues associated
17  with cadaveric tissues?
18    A    I don't believe that was to the extent of
19  being clinically relevant.  I think those were
20  primarily theoretical.
21    Q    The cadaveric tissues were used at Magee;
22  is that correct?
23    A    Correct.
24    Q    Were they used at the Cleveland Clinic?
25    A    I didn't use them.  I don't recall if my

Page 124

1  partners used them.
2    Q    And am I correct that when you were in
3  your residency, just the residency, '88 to '92, you
4  were doing the Kelly's plication and the Burch
5  procedure?
6    A    And also the Marshall-Marchetti-Krantz,
7  another retropubic suspension.
8    Q    At the time that you were doing these
9  surgeries, were there any published randomized
10  controlled trials on any of these surgeries upon
11  which you relied in terms of making your
12  determination as to procedures to use?
13    A    Not that I recall.
14    Q    Let me see if I can turn to a little bit
15  different subject now and talk with you about
16  prolapse.  When did you first perform any surgery
17  for pelvic organ prolapse?
18    A    That would be in the first year of my
19  residency.
20    Q    In 1988?
21    A    Yes.
22    Q    And can you tell me what procedure it was
23  that you performed?
24    A    In general that I performed during my
25  residency?

Page 125

1    Q    Yeah.  In all fairness, what I want to
2  talk with you about is what you did for treatment of
3  prolapse during your residency versus what you did
4  during the fellowship.  I just want to have an
5  understanding of the differences.
6    A    All right.  So in my residency we were
7  trained to perform the sacrospinous ligament
8  fixation as the most common procedure used for
9  apical prolapse.  In my fellowship and during my
10  residency, anterior and posterior colporrhaphy.
11    Q    Can I stop you there and then come back to
12  the fellowship?  At the time that you were taught to
13  do the sacrospinal ligament fixation for apical
14  prolapse, it was a vaginal surgery; correct?
15    A    Correct.
16    Q    What were the risks associated with that
17  surgery that you would discuss with the patient?
18    A    There are the general risks of -- that
19  apply across the board pretty much to surgery in
20  general:  Bleeding; infection; if bleeding was
21  excessive, the possibility of a transfusion; the
22  risks associated with anesthesia; the possibility of
23  a blood clot.
24        Specific to this type of procedure:
25  Recurrence of prolapse, voiding dysfunction, pain

32 (Pages 122 to 125)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 126

1  with intercourse.  And by "voiding dysfunction" I
2  can expand on that if you like.
3      Q    That's fine.
4      A    Okay.  So temporary inability to empty the
5  bladder fully, urgency, frequency, urinary tract
6  infection.  So that's what I would consider -- not
7  urinary tract infection specifically, but in
8  speaking to the patient about urinary issues, that's
9  what I would talk with her about.
10      Q    Are there any other risks associated with
11  sacrospinous ligament fixation that you can remember
12  that you would talk with them about?
13      A    Organ damage in general.  We're working
14  very close to the bladder, the rectum, nerves.
15  Blood vessels goes in the category of bleeding.
16      Q    What about potential nerve damage?
17      A    Potential nerve damage, correct.
18      Q    And when you indicated that you'd discuss
19  the risks of painful intercourse, that's for I guess
20  two or three different reasons:  One, that that's a
21  risk any time you're doing vaginal surgery; correct?
22      A    Correct.
23      Q    Two, there's a possibility that you could
24  affect either the length of the vagina or the
25  introitus in the course of the surgery?

Page 127

1      A    I -- that's a possibility.
2      Q    And the third aspect with the sacrospinal
3  ligament fixation specifically is that surgery,
4  if you will, often pulled the vagina to one side or
5  the other so that it affected its anatomical
6  structure; correct?
7      A    That is correct in a temporary sense.
8  That's the result of surgery.  For example, if it
9  were placed in the patient's right sacrospinous
10  ligament, the axis of the apex would be deviated to
11  the right temporarily.  As healing occurred, the
12  axis was -- became restored to its normal direction.
13      Q    As I understand this, and I promise you I
14  have very basic understanding of it, the vaginal
15  wall was affixed by a suture to the sacrospinous
16  ligament?
17      A    Yes.
18      Q    And that meant that it was attached
19  generally on one side, the right or the left,
20  depending upon what the condition was you were
21  treating it for?
22      A    Actually it depended on whether the
23  surgeon was right- or left-handed typically.  But,
24  again, that was a temporary deviation that would
25  resolve itself in the course of healing.

Page 128

1      Q    Were there any other risks that you would
2  discuss with your patients when you were doing the
3  sacrospinous ligament fixation?
4      A    I can't think of any others on the top of
5  my head.
6      Q    Now, I stopped you because you were
7  getting ready to say that that's what you did in
8  your residency prior to 1992.  And then that somehow
9  changed or evolved when you began your fellowship or
10  did your fellowship?
11      A    Correct.
12      Q    How did that evolve?
13      A    In the group of surgeons they were
14  performing a range of surgeries:  Sacrospinous
15  ligament fixation, uterosacral ligament suspension,
16  iliococcygeus muscle suspension.  Those were the
17  three vaginal apical procedures.
18      Q    And I think you told us that you at least
19  came to prefer the uterine --
20      A    Uterosacral ligament suspension.
21      Q    And why was that?
22      A    I felt it provided good restoration of
23  the -- good correction of the vaginal prolapse and
24  it was relatively easy to teach to residents and
25  fellows.

Page 129

1      Q    Was it an easier surgery to perform than a
2  sacrospinal ligament fixation?
3      A    I don't know if I would qualify it as
4  easier.  It required less dissection in the very
5  deep pelvis in the region of the sacrospinous
6  ligaments, obviously.  If we're not doing a
7  sacrospinous ligament fixation or a Prolift®
8  procedure, we're not needing to dissect around the
9  sacrospinous ligaments.
10      Q    And how would your discussions with the
11  patients about the risk of the uterine sacrospinal
12  suspension differ from what you discussed with
13  patients with the sacrospinous fixation, ligament
14  fixation?
15      A    Uterosacral ligament suspension carries a
16  slightly higher risk of ureteral injury because of
17  where the stitches are placed.  During surgery a
18  cystoscopy is performed to check whether the ureters
19  are still patent after the stitches have been tied
20  down.  And if they're not, one or the other, then we
21  address that immediately and the patient doesn't
22  have any additional morbidity from that point.  But
23  I would alert the patients that that was a
24  possibility and we would not leave the operating
25  room until we were sure that that was not the case.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 130

1    Q    Other than that, the other risks remain
2  the same?
3    A    Similar.
4    Q    Well, you essentially have the same
5  potential complications associated with the surgery
6  in terms of the anesthesia complications, the
7  bleeding complications, perforation complications?
8  All of those things would have remained the same?
9    A    Yes.
10    Q    It was also a vaginal surgery so there
11  would also be the risk of painful intercourse?
12    A    Yes.
13    Q    During the time that you were practicing
14  medicine or surgery, throughout that period of time
15  did you continue to perform and treat the uterine
16  sacral ligament suspension procedure for treatment
17  of the apical prolapse?
18    A    Yes.  I would prefer to perform the
19  uterosacral ligament suspension unless I felt that
20  wasn't the best procedure for the patient.
21    Q    And did you continue under other occasions
22  to use the sacrospinal ligament fixation?
23    A    The sacrospinous ligament fixation, yes.
24    Q    I'm sorry.  You mentioned the issues with
25  possible urethral damage in the course of the

Page 131

1  surgery.
2    A    Excuse me.  Ureteral.
3    Q    Ureteral.  Was voiding dysfunction also a
4  potential complication of the uterine sacral
5  ligament fixation?
6    A    Uterosacral ligament fixation, yes.
7    Q    I'm going to get these terms right one of
8  these days.
9         MR. SLATER:  It's all right.  Your
10  opening's two months away.
11         MS. JONES:  I'm sorry?
12         MR. SLATER:  I said it's all right.
13  Your opening's two months away.  You have plenty of
14  time.
15         MS. JONES:  I won't be able to
16  pronounce them then.
17         MR. SLATER:  Two months from
18  Wednesday.
19  BY MS. JONES:
20    Q    Can you have ongoing voiding dysfunction
21  associated with sacrospinal ligament fixation?
22    A    That has not been my clinical experience.
23    Q    Have you seen that reported in the medical
24  literature?
25    A    No.

Page 132

1    Q    Have you seen it reported in the medical
2  literature associated with the uterosacral ligament
3  fixation?
4    A    Maybe I can back up and you can make sure
5  we're talking in the same way.  You described
6  voiding dysfunction that was -- can you say it
7  again?
8    Q    I said ongoing.
9    A    Ongoing.
10    Q    It continues after just the immediate
11  surgery.
12    A    Okay.  So for how long?
13    Q    For any length of time.
14         MR. SLATER:  Objection.
15         You can answer.
16         THE WITNESS:  In my experience the
17  voiding dysfunction that occurs after uterosacral
18  ligament suspension or sacrospinous ligament
19  fixation is in the range of days, occasionally
20  weeks.
21  BY MS. JONES:
22    Q    Have you seen reported in the literature
23  voiding dysfunction that lasts longer than that?
24    A    Longer than what?
25    Q    Well, you just said that you generally saw

Page 133

1  it last days and sometimes weeks.  I'm asking about
2  being reported that it's a longer lasting and
3  perhaps permanent condition.
4    A    I don't believe I've ever seen it recorded
5  as a permanent condition.
6    Q    Have you ever seen it being reported as
7  longer lasting requiring subsequent treatment?
8    A    Not after an apical suspension.  That
9  typically -- if that occurs, it's because an
10  anti-incontinence operation was performed at the
11  same time that requires treatment.
12    Q    While you were in your residency, do you
13  have any idea how many sacrospinal ligament
14  fixations you performed?
15    A    No.
16    Q    Was it common in your residency for you to
17  perform pelvic floor repair surgery?  In your
18  residency?
19    A    What do you mean by "common"?
20    Q    Well, how many pelvic floor repair
21  surgeries did you do during your residency?
22    A    I don't know.
23    Q    Other than the sacrospinal ligament
24  fixation, what other surgeries did you perform?
25    A    Specific --

Confidential - Subject to Stipulation and Order of Confidentiality

Page 134

1    Q    During your residency.
2    A    Specific to prolapse?
3    Q    Prolapse, yes.
4    A    Uterosacral ligament suspension. I don't
5  believe that included abdominal sacrocolpopexy. And
6  it would include anterior and posterior
7  colporrhaphy.
8    Q    Do I understand that you do not have a
9  recollection of doing the abdominal sacrocolpopexy
10  during your residency?
11    A    Correct.
12    Q    But you did do anterior and posterior
13  colporrhaphies?
14    A    Correct.
15    Q    Tell me what you understood the potential
16  complications and risks associated with
17  anterior/posterior colporrhaphies to be.
18    A    They would be very similar to the risks of
19  the uterosacral ligament suspension and the
20  sacrospinous ligament fixation.
21    Q    Any major differences that you can recall
22  in terms of what you would have discussed with your
23  patients?
24    A    No, I don't think so.
25    Q    Any other surgeries that you would have

Page 135

1  performed during your residency for prolapse?
2    A    For prolapse? No, I don't think so.
3    Q    Then let's go into your fellowship. You
4  did your fellowship at the Cleveland Clinic. And
5  this was a one-year fellowship; am I correct?
6    A    Correct.
7    Q    Other than just the length of it, how did
8  that fellowship differ from the fellowship at Magee
9  that you were involved with later on?
10    A    At Magee we were particularly interested
11  in training academicians. And in order to provide
12  them with the background to design and perform
13  high-quality research in their careers, they
14  obtained a Master's degree, a Master's of Science
15  degree in clinical research as part of their second
16  year of fellowship. I did not have that opportunity
17  in my fellowship so that was something I did a
18  little later.
19    Q    Anything else in terms of the actual
20  surgeries or patient care that you performed?
21    A    The setup of my fellowship was divided
22  amongst the three divisions in our department of
23  gynecology. So there was a four-month block in the
24  division of benign gynecology, which was primarily
25  vaginal surgeons doing reconstructive surgery; a

Page 136

1  four-month block with the gynecologic oncologists,
2  working with them in their care of patients with
3  gynecologic cancers; and a four-month block with the
4  division of reproductive endocrinology and
5  infertility, which, as I said before, is primarily
6  laparoscopic surgery.
7    Q    So of that year of fellowship that you
8  did, if I'm correct, you had a four-month block in
9  which you concentrated on pelvic floor
10  reconstructive surgery that would have included
11  whether it's prolapse or stress incontinence
12  surgeries?
13    A    Correct.
14    Q    And other than the fact that you began
15  using the uterosacral ligament procedure for apical
16  reconstruction, was there any other differences in
17  the surgeries that you performed --
18        MR. SLATER:  Objection to the form.
19        You can answer.
20  BY MS. JONES:
21    Q    -- as a fellow as opposed to a resident?
22    A    I believe what I said is that uterosacral
23  ligament suspension was performed during my
24  residency, not as commonly as the sacrospinous
25  ligament fixation. I didn't experience training in

Page 137

1  abdominal sacrocolpopexy until I reached my
2  fellowship.
3    Q    I apologize. When you got the training
4  for the abdominal sacrocolpopexy, at the time was
5  mesh used in that procedure?
6    A    Yes.
7    Q    And can you tell me what kind of mesh was
8  used in that procedure?
9    A    No.
10    Q    Do you know whether it was multifilament
11  or monofilament?
12    A    No.
13    Q    Do you know whether it was polyethylene as
14  opposed to Mersilene® or Gore-Tex® or something
15  else?
16    A    It wasn't Gore-Tex®, but I don't know what
17  it was.
18    Q    Did you use mesh in all of your abdominal
19  sacrocolpopexies?
20    A    Yes.
21    Q    And was that true throughout the time that
22  you were performing surgeries?
23    A    Yes.
24    Q    When you would counsel a patient about
25  abdominal sacrocolpopexy, how would you counsel them

Confidential - Subject to Stipulation and Order of Confidentiality

Page 138

1  about the risks of that surgery?
2      A   So all of the other risks that we've
3  already discussed and, in addition to that, the
4  risks specific to mesh, mesh erosion, mesh
5  infection, the possibility of repeat surgery, if a
6  mesh complication occurred in which the mesh needed
7  to be removed, and then the risks associated with
8  laparotomy, so bowel adhesions, small bowel
9  obstruction, the need for a reoperation if that
10  occurred, sometimes, not always, scarring, of
11  course, you know, an abdominal scar.  I think that's
12  everything I can think of at the moment.
13      Q   Was there anybody specifically who trained
14  you on abdominal sacrocolpopexy?
15      A   Mark Walters.
16      Q   Is that the Mark Walters who's associated
17  with the International Academy of Pelvic Surgery?
18      A   Yes.
19      Q   And was he your principal mentor during
20  your fellowship?
21      A   I don't know that I would describe him as
22  a mentor.  He joined the staff as I -- no.  Actually
23  he joined the staff in August of 1993 just after I
24  had finished my fellowship and joined the staff.
25  And since I hadn't -- oh, I guess I misspoke then

Page 139

1  because I've been describing the abdominal
2  sacrocolpopexy as if it occurred in my fellowship.
3  But, no, he joined the year -- the month after I
4  finished my fellowship.  So that would have actually
5  occurred in the following year.  So I misspoke about
6  that.  Because the surgeons who were already there
7  did not perform abdominal sacrocolpopexy.  I would
8  describe him as a colleague.
9      Q   Was it Dr. Walters that introduced the use
10  of abdominal sacrocolpopexy at the Cleveland Clinic
11  then?
12      A   Yes.
13      Q   Prior to doing your first abdominal
14  sacrocolpopexy, had you done any surgery using mesh?
15      A   The only possibility I can think of, and
16  I'm not certain of this, but it would be with the
17  oncologic surgeons if they had an abdominal
18  reconstruction from a hernia or some other
19  postoperative event; otherwise, the answer would be
20  no.
21      Q   You yourself don't have any recollection
22  of doing any hernia repair surgery, do you, or do
23  you?
24      A   Not by myself.  It would be oncologists.
25      Q   I understand.  My question is did you

Page 140

1  perform hernia repair surgery going through your
2  oncology training?
3      A   In the four-month block with the
4  oncologists, I do recall performing hernia repairs
5  with them, yes.
6      Q   And do you remember whether or not mesh
7  was used?
8      A   It's a possibility.  I cannot recall that
9  with certainty.
10      Q   You think your first abdominal
11  sacrocolpopexy would have been in 1993?
12      A   Correct.
13      Q   At that time did you know whether any mesh
14  had been cleared by the FDA for use in abdominal
15  sacrocolpopexy?
16      A   No.  To my knowledge, Gynemesh® PS mesh
17  was the first to be cleared by the FDA for an
18  indication in pelvic reconstructive surgery.  That
19  was in 2002.
20      Q   Do you know, Doctor, whether or not the
21  mesh that you used in 1993 had been cleared by the
22  FDA for any use?
23      A   I would assume so.
24      Q   Do you know what use it was cleared for?
25      A   Since I don't remember the specific mesh,

Page 141

1  I don't think you want me to guess.
2      Q   Do you know of any mesh cleared for use in
3  prolapse or stress incontinence surgery before 1996?
4      A   I am not specifically aware of the dates
5  revolving around the FDA clearance of stress
6  incontinence products.
7      Q   You're not aware of any mesh being cleared
8  for use in pelvic reconstructive surgery before
9  Gynemesh® PS?
10          MR. SLATER:  Objection.
11          THE WITNESS:  Correct, that is my
12  understanding.
13  BY MS. JONES:
14      Q   The use of mesh in abdominal
15  sacrocolpopexy was a use that was developed by
16  physicians; correct?
17      A   I would assume so.
18      Q   Historically there had been abdominal
19  sacrocolpopexy performed without using mesh, had
20  there not?
21      A   Correct.
22      Q   And there had been some problems with the
23  use of other tissues like the autologous tissues or
24  other graft tissues associated with it; correct?
25      A   Problems?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 142

1    Q    Problems with recurrence?
2    A    Yes.
3    Q    And one of the reasons that the doctors
4  resorted to the use of mesh was to provide a better
5  anatomical repair with less recurrences; is that
6  correct?
7    A    What do you mean by a "better anatomical
8  repair"?
9    Q    Well, you tell me why you used mesh in
10  abdominal sacrocolpopexy.
11    A    Because it was the best alternative at the
12  time.
13    Q    And why was it the best alternative at the
14  time?
15    A    Because typically the vagina isn't long
16  enough to reach the sacrum by itself, so you need a
17  bridging material.  And use of materials such as --
18  autologous materials required harvest of a large
19  amount of natural tissue from the patient, so that's
20  a downside.  And then other materials, Unigraft
21  materials, had issues with increased recurrence of
22  prolapse.
23    Q    There obviously was some morbidity
24  involved with patients from the stripping of the
25  fascia in preparing the autologous tissue; correct?

Page 143

1    A    Correct.
2    Q    Forgive me, Doctor, I think I asked this
3  question, but I can't remember.  In terms of
4  discussions of the complications with the patients,
5  and you're talking about the abdominal
6  sacrocolpopexy, the complications that you would
7  discuss were essentially the same as with the other
8  surgeries that we've already discussed plus the ones
9  involving mesh that you described; correct?
10    A    Correct; and the risks specific to the
11  abdominal approach.
12    Q    The risks specific to the abdominal
13  approach in addition to the scarring and so forth,
14  it's an open surgery that takes longer to heal, for
15  example, and generally it's a longer surgery than
16  some of the others, is it not?
17    A    No, I don't agree with that.
18    Q    You do agree that it generally takes
19  patients longer to recover from the abdominal
20  sacrocolpopexy than from a vaginal surgery?
21    A    Well, can you be more specific about what
22  you mean by recovery?  Do you mean return to work?
23  What do you mean?
24    Q    Well, if you were to counsel a patient on
25  abdominal sacrocolpopexy and you were going to tell

Page 144

1  them how long it was before they would return to
2  their normal lifestyle, whether it's work,
3  activities, whatever, how would you counsel them?
4         MR. SLATER:  Objection; vague.
5         You can answer.
6         THE WITNESS:  I would counsel her
7  that she should expect to be off work in the
8  neighborhood of six to eight weeks.
9  BY MS. JONES:
10    Q    And what would you tell her about how long
11  it would be before she could drive?
12    A    Drive?  That's variable.  I would
13  recommend to patients they not be taking pain
14  medication -- they should get to the point in their
15  recovery when they are no longer in need of taking
16  pain medication before they begin driving.
17    Q    And how long would it be that you would
18  tell someone that they need to avoid exercise,
19  for example?
20    A    Six to eight weeks and once I had checked
21  them twice usually in the office before releasing
22  them to that kind of activity.
23    Q    And how long should they avoid
24  intercourse?
25    A    Similar range, six to eight weeks and

Page 145

1  until I had seen them.
2    Q    If you were in contrast advising a patient
3  who was having a colporrhaphy, how long would you
4  tell her it would take her to recover?
5         MR. SLATER:  Objection.
6         You can answer.
7         THE WITNESS:  Six to eight weeks.
8  BY MS. JONES:
9    Q    And would you tell her on all of the other
10  issues exactly the same as you would say on the
11  abdominal sacrocolpopexy?
12    A    Correct.
13    Q    How long would you tell her she'd be in
14  the hospital?
15    A    Usually two days.
16    Q    How long was somebody in the hospital with
17  abdominal sacrocolpopexy?
18    A    Usually two days.
19    Q    At the time that you started using mesh in
20  the abdominal sacrocolpopexy, were there any
21  randomized clinical controlled trials regarding the
22  use of mesh in that surgery?
23    A    Compared to what?
24    Q    Compared to using it without.  Were there
25  any randomized controlled clinical trials of which

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 146

1  you were aware of involving abdominal sacrocolpopexy
2  when you started using mesh in 1993?
3      A    No.
4      Q    Am I correct, Doctor, if you know, that
5  mesh had actually been used in abdominal
6  sacrocolpopexy by surgeons since the 1970s?
7      A    No, I don't know when abdominal
8  sacrocolpopexy with mesh began to be used.
9          Is this a good time for a break?
10         MS. JONES:  Okay.
11         MR. SLATER:  Sure.
12         (Short recess.)
13  BY MS. JONES:
14     Q    Doctor, are you currently licensed to
15  practice medicine?
16     A    No.
17     Q    Do you know when you were last licensed?
18  Would it have been 2006?
19     A    No.  I believe I carried my license
20  through to the end of 2007.
21     Q    Have you attended any continuing medical
22  education courses since that point in time?
23     A    No.
24     Q    Are you Board-certified in any specialty?
25     A    No.  I was Board-certified in obstetrics

Page 147

1  and gynecology and I did not maintain that when I
2  discontinued my clinical practice.
3      Q    And were you ever Board-certified in any
4  subspecialty of urogynecology?
5      A    No.  At that time the Board had not yet
6  created subspecialty certification for individuals.
7  They were only certifying fellowship programs.
8      Q    When you were at the Cleveland Clinic
9  after you finished your fellowship, you stayed on,
10  can you describe for me what you did at the
11  Cleveland Clinic for that period from '93 to 2000?
12     A    Yes.  My clinical practice started as a
13  general gynecology practice.  When I realized I
14  needed a stronger background in clinical research
15  design and performance, I attended the program at
16  the University of Michigan and obtained a Master's
17  of Science degree in clinical research design and
18  statistical analysis.
19         And when I completed that, my chairman
20  created a new position of director of clinical
21  research in the department and appointed me as the
22  first in that position.  And in that role I advised
23  the other faculty members and fellows and residents
24  in designing and performing their own research.  I
25  performed my research in conjunction with my

Page 148

1  colleagues in our division and our fellows and
2  residents.  And then in 1999 I began working with
3  the NIH.
4      Q    Well, let me see if I can break this down
5  a little bit.  When you took the Master's of Science
6  degree, did you take a leave of absence to go and
7  get that degree?
8      A    No.
9      Q    Did you attain that by a correspondence
10  school?  How did you obtain that degree?
11     A    University of Michigan has a special
12  arrangement.  They call it on job/on campus for
13  people who travel in -- they have local people, too,
14  but who can travel in from other states where the
15  classes are held from Thursday to Sunday one day a
16  month -- excuse me -- once a month.  And in that way
17  the Master's is completed with its full credits in
18  just under two years.
19     Q    All right.  So from '97 then to '99 you
20  were spending four days a month working on your
21  Master's at -- was that at Ann Arbor?
22     A    Yes.
23     Q    And you said your practice was a general
24  gynecology practice?
25     A    Yes.

Page 149

1      Q    So that you were seeing women and were you
2  also doing obstetrics?
3      A    No.
4      Q    Were you seeing women then in an office
5  setting where you were counseling them on
6  contraceptive, menopause, doing your annual checkups
7  and so forth?
8      A    Correct.
9      Q    And was that the case, did you follow that
10  practice throughout your tenure at the Cleveland
11  Clinic?
12     A    No.
13     Q    When and how did that change?
14     A    Within a couple of years, with the support
15  of my chairman, he recognized my special interest in
16  pelvic floor disorders and we arranged that my
17  clinical practice would focus on that to the
18  exclusion of other general gynecology issues and
19  regular well women care.
20     Q    And who were the other members of the
21  staff at the Cleveland Clinic who focused on pelvic
22  floor issues?
23     A    Mark Walters; Lester Ballard,
24  B-A-L-L-A-R-D; Delbert Booher, B-O-O-H-E-R.
25     Q    And when you began, it would have been

38 (Pages 146 to 149)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 150

1  sometime then around 1995-96 that you began to move
2  into the urogynecology practice?
3      A   Urogynecology had always been a portion of
4  my practice.  It was at that time that it became
5  exclusive -- my practice was exclusive to
6  urogynecology.
7      Q   At that point in time then is it fair to
8  say while you were at the Cleveland Clinic that you
9  had done colporrhaphies?
10     A   Yes.
11     Q   Sacrospinal ligament fixation?
12     A   Sacrospinous ligament fixation, yes.
13     Q   The uterosacral ligament suspension?
14     A   Yes.
15     Q   The abdominal sacrocolpopexy?
16     A   Yes.
17     Q   Various sling or Burch procedures for
18  stress incontinence?
19     A   Yes.
20     Q   Anything else?
21     A   The Kelly plication and paravaginal
22  repair.
23     Q   While you were at the Cleveland Clinic, do
24  you have any idea how many prolapse surgeries you
25  performed?

Page 151

1      A   I would estimate in the range of 1,500 to
2  2,000.
3      Q   Between '93 and 2000?
4      A   Yes.
5      Q   And what type of procedure did you perform
6  the greatest number of?
7      A   For apical prolapse, it would be the
8  uterosacral ligament suspension.  For anterior and
9  posterior vaginal prolapse, it would be anterior and
10  posterior colporrhaphy.
11     Q   I didn't ask the question very well
12  obviously.  I'm trying to figure out in terms of
13  your patient population, did you treat patients more
14  for apical prolapse or for anterior and posterior
15  prolapse?
16     A   I really can't tell you that.
17     Q   Do I recollect correctly that you said
18  that you did surgery one day a week at the Cleveland
19  Clinic?
20     A   Typically, yes.
21     Q   On your CV you say that you were also
22  involved in the education of medical students in
23  core rotation obstetrics and gynecology while you
24  were there?
25     A   Yes.

Page 152

1      Q   What did that consist of?
2      A   A four- to six-week rotation where the
3  medical students -- actually obstetrics and
4  gynecology was four to six weeks.  So the gynecology
5  portion would be roughly half of that.  And they
6  would attend office with us, they would come to
7  surgery with us, see postoperative patients in the
8  hospital, attend lectures, and so on.
9      Q   Were you involved prior to obtaining your
10  Master's in research?
11     A   Yes.
12     Q   What percentage of your time was spent in
13  research?
14     A   I think at that time I had a half day that
15  was not otherwise in the office or in the OR, in the
16  operating room.
17     Q   And that half day would have been when you
18  did whatever research you were engaged in?
19     A   And what would otherwise be called spare
20  time.
21     Q   Did you have any administrative
22  responsibilities?
23     A   Not at that time.
24     Q   In 1999 when you took the position as
25  program director for the pelvic floor disorder

Page 153

1  program, at that point in time when you were at the
2  Cleveland Clinic you were spending 25 percent of
3  your time I think doing that is what you testified;
4  correct?
5      A   Yes.
6      Q   And that would have been further from '99
7  until 2001 when you left the Cleveland Clinic?
8      A   Yes.
9      Q   And why did you leave the Cleveland
10  Clinic?
11     A   There was an opportunity at the University
12  of Pittsburgh.  As I mentioned earlier, the chairman
13  very much wanted to develop a fellowship program and
14  the faculty who were there didn't really have the
15  skill set or the experience to make that happen.
16     Q   At any time while you were practicing
17  medicine, Doctor, did you have your privileges
18  suspended?
19     A   No.
20     Q   Did you ever have your license restricted
21  in any way?
22     A   No.
23     Q   Other than the one lawsuit that we talked
24  about earlier, have any other claims filed against
25  you?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 154

1    A    No.
2    Q    If I look at your CV, there's a reference
3    to 2001 a Presidential SGS Member Prize Award.
4         What was that?
5    A    Could you just remind me where you are?
6    Q    It's on Page 3.
7    A    Oh, yes.  So that was a research award for
8    a presentation.  I believe the 2000 one was the
9    anterior colporrhaphy trial.  And the one in 2001, I
10   can match it to my abstract if you want me to.  I
11   don't remember off the top of my head what that was
12   for.  Okay.  So the anterior colporrhaphy trial was
13   I was awarded -- myself and my co-authors were
14   awarded that first prize, Presidential SGS Member
15   Prize in 2001.  And then in 2000 myself and
16   Dr. Walters were awarded the 1st Prize Presidential
17   SGS Member Prize for our study about the
18   cost-effectiveness of urodynamic testing.
19   Q    While you're looking at that, first of
20   all, both of those prizes would have been joint
21   awards to whoever the authors were on those papers?
22   A    Yes.
23   Q    And then the next one is Best Poster
24   Presentation.  Tell me what that topic was in 1999.
25   A    Okay.

Page 155

1         MR. SLATER:  Best poster?  I remember
2    that.  First grade.  I always made the best poster.
3         THE WITNESS:  Science fair my sister
4    said.
5         Okay.  That was for our study on
6    sexual function in women before and after surgery
7    for pelvic organ prolapse and urinary incontinence.
8    BY MS. JONES:
9    Q    And then you have the ACOG/Ethicon
10   Research Award for Innovations in Gynecologic
11   Surgery in 1996?
12   A    Yes.  That was for the research proposal
13   that turned out to be the anterior colporrhaphy
14   trial.
15   Q    And was that awarded to you as well as the
16   folks that were the co-authors of the --
17   A    The institution, to the Cleveland Clinic.
18   Q    And then if you look down here, the Prize
19   Paper, American Urogynecologic Society, in 1996,
20   what was that?
21   A    I believe that was the "Sexual function
22   and vaginal anatomy in women treated with
23   sacrospinous ligament suspension and pelvic
24   reconstruction."
25   Q    If we look under "Professional Service,"

Page 156

1    you have that you were a member of the editorial
2    board of Obstetrics & Gynecology.  Obstetrics &
3    Gynecology is the publication of ACOG?
4    A    Yes.
5    Q    And that publication of ACOG would go to
6    all of the members of the American College of
7    Obstetrics and Gynecology?
8    A    Yes.
9    Q    That is a peer-reviewed journal?
10   A    Yes.
11   Q    Can you tell me how you as an editor on
12   that journal were involved in the peer review?
13   A    Yes.  As a member of the editorial board,
14   we have a greater role in the review of manuscripts.
15   A manuscript is typically sent out to two or three
16   reviewers.  One reviewer will be a member of the
17   editorial board and the other one or two reviewers
18   will be a member of the OB-GYN community.  And we
19   also participated in the editorial board meetings
20   where we discussed matters of editorial policy, et
21   cetera.
22   Q    Let me ask this question:  If somebody is
23   a researcher and they complete a study, they submit
24   a paper for publication, does that paper
25   automatically go out to peer reviewers?

Page 157

1    A    It does at the Journal of Obstetrics &
2    Gynecology, yes.
3    Q    So it automatically goes out to peer
4    reviewers and then those peer reviewers, are those
5    peer reviewers chosen as ideally people that are,
6    quote, expert in the field of the subject matter of
7    the paper?
8    A    I think it depends.  When there are two or
9    three reviewers, I think the editor would decide to
10   send the manuscript to one or two people who are
11   expert in the field and perhaps an additional
12   reviewer who's not necessarily an expert to make
13   sure that it's explained well enough to someone
14   who's not an expert.
15   Q    And the purpose of that peer review,
16   though, is more than just looking at it from the
17   standpoint of whether or not it reads well?
18   A    Yes.
19   Q    Its purpose is also to ensure as best they
20   can the validity of the scientific methods and
21   conclusions that are described in the paper?
22   A    I would describe it as a process of
23   evaluation of the scientific methods, data analysis,
24   presentation, conclusions drawn.
25   Q    And following that peer review, those peer

Confidential - Subject to Stipulation and Order of Confidentiality

Page 158

1  reviewers will send their comments back to the
2  editorial board or do they go directly to the author
3  of the paper?
4      A   No.  To the editor.  There's an editor and
5  then there are associate editors in the broad
6  specialty areas of obstetrics and gynecology.  So
7  the reviewers' comments will go back to the
8  appropriate associate editor.  And the main editor
9  could be involved, if necessary, deciding what the
10  disposition of the paper would be, whether it would
11  be rejected, rejected with possibility of rereview
12  if it were resubmitted, or acceptance.
13      Q   So once it goes out to the peer reviewers,
14  it's returned to the editor and at that point in
15  time the editor can either reject it or can send it
16  back to the authors to make corrections?
17      A   To receive the feedback from the reviewers
18  and make changes as the authors decide.
19      Q   And then it would be resubmitted to the
20  editorial board and is it sent back to the peer
21  reviewers?
22      A   Typically.
23      Q   And then it's sent back to the editorial
24  board that makes the final decision on acceptance or
25  publication?

Page 159

1      A   Yes, acceptance or rejection.
2      Q   And so before it is ultimately accepted
3  for publication, assuming there have been any
4  changes to be made, it's been sent out to the peer
5  reviewers at least twice?
6      A   Typically, yes.
7      Q   And that process applies to original
8  research that's submitted?
9      A   Yes.
10      Q   Does it apply to review articles that are
11  submitted?
12      A   Yes.
13      Q   Does it apply to letters to the editor?
14      A   No.
15      Q   Other than on Obstetrics & Gynecology,
16  have you served on the editorial board of any other
17  peer-reviewed journal?
18      A   Not on the editorial board, no.  I've been
19  a peer reviewer -- I think that's on the next
20  page -- yes, of several other journals.
21      Q   And when you say you were a peer reviewer,
22  they may just periodically call you and ask you to
23  look at some paper that's been submitted?
24      A   Correct.
25      Q   And are you compensated for that?

Page 160

1      A   No.
2      Q   On your CV it says that you were a peer
3  reviewer on all of these at present?
4      A   Correct.
5      Q   Can you tell me when the last time you
6  peer-reviewed an article for Obstetrics & Gynecology
7  was?
8      A   I would estimate perhaps a year ago.
9      Q   That would have been 2011?
10      A   Yes.
11      Q   Do you remember whether or not the article
12  that you peer-reviewed was published?
13      A   No, I don't.
14      Q   What about the American Journal of
15  Obstetrics and Gynecology; when's the last time you
16  peer-reviewed something there?
17      A   That might be a little longer, perhaps
18  2010.  I don't remember exactly.
19      Q   What about the American Journal of
20  Gastroenterology?
21      A   That would be less.  That would even be a
22  little farther away, maybe 2008.
23      Q   How about the British Journal of
24  Obstetrics and Gynaecology?
25      A   I don't remember exactly.  A couple of

Page 161

1  years I would guess.
2      Q   How about the Cleveland Clinic Journal of
3  Medicine?
4      A   Again, I would guess a couple of years.
5      Q   How about Diseases of the Colon & Rectum?
6      A   A couple of years.
7      Q   How about Evidence-based Obstetrics &
8  Gynecology?
9      A   Probably a couple of years.
10      Q   Gastroenterology?
11      A   Probably a couple of years.
12      Q   International Urogynecology Journal?
13      A   That might be more recent, perhaps a year
14  or two ago.  I'm not sure.
15      Q   How about the Journal of Pelvic Surgery?
16      A   Probably a couple of years ago.
17      Q   How about the Journal of Reproductive
18  Medicine?
19      A   Probably a couple of years ago.
20      Q   How about the Journal of Urology?
21      A   Probably a couple of years ago.
22      Q   How about the Journal of Women's Health?
23      A   Probably a couple of years ago.
24      Q   How about the Medical Science Monitor?
25      A   Probably a couple of years ago.

41 (Pages 158 to 161)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 162

1    Q    How about the Neurourology and
2    Urodynamics?
3    A    Probably a couple of years ago.
4    Q    Fair to say you have not peer-reviewed any
5    journal article in 2012?
6    A    Correct.
7    Q    If I remember your testimony, you're not
8    sure that you peer reviewed anything in 2011?
9    A    Correct.
10    Q    The last time you remember peer-reviewing
11    anything would have been 2010?
12    A    I'm not sure.
13    Q    Could it have been longer ago than that?
14    A    It could have been.
15    Q    Other than in the case of abdominal
16    sacrocolpopexy, have you ever taught a resident or
17    fellow about the use of mesh in pelvic floor repair
18    surgery?
19    A    Well, as I said, at or around the time I
20    was leaving the Cleveland Clinic, we were beginning
21    to use the TVT®.  So in that setting, yes.
22    Q    And I think you told us you did not use
23    the TVT® in Pittsburgh?
24    A    Correct; except -- no.  Excuse me.  Never
25    mind.

Page 163

1    Q    Have you used TVT® to correct stress
2    incontinence at any time after you left the
3    Cleveland Clinic?
4    A    No.
5    Q    On how many occasions did you use it at
6    the Cleveland Clinic?
7    A    I can give you a range of perhaps 10 to
8    20.
9    Q    And that would have been shortly before
10    you left?
11    A    Correct.
12    Q    And am I correct that you never used other
13    mesh slings other than the TVT®?
14    A    Correct.
15    Q    And did you use only the TVT® or did you
16    use the TVT® Obturator?
17    A    No, not the TVT® Obturator.
18    Q    And was there a reason that you did not
19    use the TVT® once you moved to Pittsburgh?
20    A    The experience at Pittsburgh, at the
21    University of Pittsburgh Magee-Womens Hospital, was
22    in using slings of rectus fascia.  And I agreed with
23    that practice and that's how I performed slings.
24    Q    So at the time that you joined the staff
25    at Magee, they were using the autologous tissue and

Page 164

1    had not used mesh at all; correct?
2    A    I don't know that.
3    Q    What I'm trying to ask, was there anything
4    about your experience with the TVT® that caused you
5    to abandon the use of the TVT® or was it that you
6    went to Magee and they were using the autologous
7    tissue and you just adopted that?
8    A    I think it's always preferable to perform
9    a surgery without mesh.
10    Q    Prior to that point in time, had you had
11    any adverse experiences with the TVT® surgery that
12    led you to abandon it?
13    A    Not with my patients, not in patients who
14    I personally operated on, but as a referral center
15    we are referred patients who have complicated
16    problems.  So I have removed TVT® slings for mesh
17    complications.
18    Q    Did you do that in the Cleveland Clinic?
19    A    Yes.
20    Q    Did you do that at Pittsburgh?
21    A    No.  The community was not using mesh to
22    the degree that was occurring in Cleveland, I
23    believe.  So I don't recall personally seeing
24    referrals for mesh complications.
25    Q    You told us that when you began using mesh

Page 165

1    for abdominal sacrocolpopexy, that you would discuss
2    with your patients the complications potentially
3    associated with mesh?
4    A    Yes.
5    Q    And that would be including mesh exposure
6    or erosion?
7    A    Yes.
8    Q    Mesh contraction?
9    A    Yes.
10    Q    I think you mentioned the possibility of
11    infection?
12    A    Infection, yes.
13    Q    Anything else that you would counsel your
14    patients on?
15    A    The possibility of a fistula development,
16    enterovaginal or rectovaginal.
17    Q    And was that true, I mean your counseling
18    of your patients about that group of potential
19    complications remained true from 1993 throughout
20    your practice?
21    A    Yes.
22    Q    While you were practicing, did you
23    maintain any database or registry of the patients on
24    whom you performed surgeries?
25    A    No, not unless they were involved in one

42 (Pages 162 to 165)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 166

1  of our specific research protocols.
2      Q    I know.  I was trying to separate that out
3  and ask whether or not you kept a personal list or
4  file of surgeries that you performed and so forth.
5      A    No.
6      Q    We have been talking about prolapse.
7  Would you consider prolapse to be a pelvic floor
8  disorder?
9      A    Yes.
10     Q    And would you consider prolapse to be a
11 pelvic floor disorder that can pose serious problems
12 for women?
13     A    It can.
14     Q    As we talked about with incontinence, it
15 can also affect a woman's lifestyle or confidence?
16     A    It can.
17     Q    Can be an embarrassing situation?
18     A    Are you comparing incontinence and
19 prolapse or just restricting --
20     Q    No, not at all.  I'm just asking in
21 general.  I was really referring back to what we had
22 talked about earlier only, not necessarily comparing
23 the two.
24     A    Okay.  Yes.  Then the answer is yes.
25     Q    The answer is, yes, that it can be

Page 167

1  embarrassing.  Can it affect either the ability or
2  desire for sexual relations?
3      A    What do you mean by "ability"?
4      Q    Well, can it affect sexual function?
5      A    It can affect sexual function.
6      Q    Can it affect sexual satisfaction?
7      A    It can.
8      Q    Can prolapse impair bowel movements
9  depending on the type of prolapse?
10     A    It can.
11     Q    Can it affect urinary incontinence?
12     A    Can you specify that?
13     Q    Well, can it affect either urinary
14 incontinence or urinary retention?
15     A    I don't know that it affects urinary
16 incontinence.  Urinary retention can be associated
17 with very advanced prolapse.
18     Q    In terms of the symptoms that a woman
19 often reports, she might report a feeling of pelvic
20 heaviness or a bulge from time to time?
21     A    Yes.
22     Q    Have there been or are there risk factors
23 associated with prolapse?
24     A    I don't think I understand your question.
25     Q    What factors have been identified as

Page 168

1  potential causes of prolapse?
2      A    Okay.  Again, we talked earlier about not
3  completely understanding the etiology of stress
4  incontinence.  The same thing applies to
5  understanding the etiology of prolapse.  My
6  understanding of the development of prolapse begins
7  with some element of pelvic muscle dysfunction that
8  leads to undue strain on the connective tissue
9  attachments to the vagina they were not by nature
10 designed to withstand, and so over time those
11 connective tissue attachments can stretch or
12 possibly break resulting in loss of support to the
13 vagina.  And since the other organs in the pelvis --
14 the bladder, the uterus, the rectum -- rely
15 primarily on the vagina for support, when the vagina
16 loses support, the pelvic organs prolapse.
17     Q    You said that it was your understanding
18 that it was a disorder of the muscles in the pelvic
19 floor?
20     A    A dysfunction of the pelvic muscles.
21     Q    And the dysfunction of the pelvic muscles
22 can be painful?
23     A    Not the type that leads to prolapse.  In
24 the way I'm speaking of dysfunction at this moment,
25 it's a weakness or a laxity, a loss of tone or

Page 169

1  strength, not a painful condition.
2      Q    Let me just ask the question and
3  understand that.  Has pelvic muscle dysfunction been
4  associated with pelvic pain?
5      A    "Dysfunction" is a very broad term.  I
6  prefer to speak specifically of what I believe is
7  affecting the pelvic muscles.  Are they hypertonic?
8  Is that a reason for pain?  To my understanding,
9  laxity associated with prolapse does not cause
10 pelvic muscle pain.
11     Q    Are other forms of pelvic muscle disorder,
12 whether it's dystonia or something else, associated
13 with pelvic pain?
14     A    Yes.  Hypertonicity, spasm, myalgia, a
15 number of terms that, yes, are associated with pain.
16     Q    And those disorders that are associated
17 with pelvic pain are disorders that are seen and
18 treated by gynecologists and urogynecologists?
19     A    Yes.
20     Q    Now, if we're looking at the factors
21 associated with prolapse, they may be genetic
22 factors, for example?
23     A    Possibly.
24     Q    So, for example, family histories have
25 been associated with prolapse?

43 (Pages 166 to 169)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 170

1    A   Yes.
2    Q   There's some thought that connective
3  tissue diseases or other diseases might be
4  associated with prolapse?
5    A   Might be.
6    Q   Obesity has been associated with prolapse?
7    A   Yes.
8    Q   Childbirth has been associated with
9  prolapse?
10   A   Yes.
11   Q   Have conditions that are stress or strain
12  on the musculature, for example, constipation, been
13  associated with prolapse?
14   A   To my understanding, that is more
15  theoretical than evidence-based.  I think it's
16  plausible, but I don't think it's well supported by
17  the literature.
18   Q   How about age being associated with
19  prolapse?
20   A   Age, yes.
21   Q   Menopause?
22   A   Menopause, again, theoretical but not well
23  supported.
24   Q   How about smoking?
25   A   Theoretical, not -- I don't believe I've

Page 171

1  seen literature supporting an association between
2  smoking.  Chronic coughing is often listed.  And,
3  again, that's something that's more anecdotal and
4  not, to my knowledge, well supported in the
5  literature.
6    Q   Chronic coughing has been associated much
7  like constipation has in the sense of it putting
8  stress or strain on the pelvic musculature?
9    A   Correct.
10   Q   Are there other identified factors that
11  have been associated with prolapse?
12   A   Lifting, heavy physical work, that falls
13  into the category of the constipation and the
14  chronic coughing.  Again, really anecdotal.
15   Q   How about exercise?
16   A   Yeah, that's a confounder.  Obviously a
17  very general term.  So there may be some exercises
18  that are actually beneficial in terms of protecting
19  or strengthening the pelvic floor and preventing or
20  ameliorating prolapse and then there may be
21  exercises that are -- have a relation with increased
22  intra-abdominal pressure and have that theoretical
23  association with prolapse.
24   Q   If a patient came to you with prolapse,
25  and just for our purposes right now let's say just a

Page 172

1  general prolapse, you can pick any kind you want, I
2  assume that you would agree with me, and I think
3  this is what you've said, that any consultation and
4  treatment has to be geared specifically to the
5  patient's condition?
6    A   To the patient's symptoms.
7    Q   Patient's symptoms.
8    A   Yes.
9    Q   And as a surgeon when you're advising a
10  patient or consulting with them on the alternatives
11  for treatment of those symptoms or conditions, it's
12  important to discuss the broad range of those
13  possible alternative treatments?
14   A   Yes.
15   Q   And in discussing those treatments with a
16  patient, depending upon her condition, among the
17  alternative treatments that would be considered
18  would be, one, doing nothing and just observing the
19  condition for a while to see how it developed;
20  correct?
21   A   Correct.
22   Q   Two, suggesting the use of certain pelvic
23  floor muscle exercises --
24   A   Correct.
25   Q   -- to strengthen the muscles; correct?

Page 173

1    A   Correct.
2    Q   Three might be the use of pessaries?
3    A   Correct.
4    Q   And four might be the use of different
5  surgeries; correct?
6    A   Correct.  I would also add behavioral and
7  lifestyle changes.
8    Q   And when you say "behavioral and lifestyle
9  changes," tell me what changes you would include
10  within that.
11   A   I would inquire as to her bowel habit and
12  ask her about things like straining; and if that's a
13  problem for her, to address that.  Almost regardless
14  of whatever other form of treatment she chooses, if
15  any, I would want her to stop doing that, straining.
16   Q   And so to accomplish that would you
17  prescribe, for example, a laxative or some other
18  pharmacologic agent or how would you change that?
19  Change her eating habits?
20   A   Well, pharmacology would be one way to go.
21  Eating habits.  You have to learn what the patient's
22  already doing obviously to be able to suggest what
23  will work for her, what she's going to be willing to
24  accept and so forth.
25   Q   And as a surgeon when you counsel a

Confidential - Subject to Stipulation and Order of Confidentiality

Page 174

1  patient about the different surgical alternatives,
2  one of the issues that would be important would be
3  for the surgeon to counsel with respect to
4  procedures with which he or she is comfortable and
5  familiar; correct?
6     A    Correct.
7     Q    And if he or she is not comfortable or
8  familiar with doing a particular surgery that the
9  patient needs, then it would be appropriate to refer
10  that patient elsewhere?
11     A    I agree with that.
12     Q    So that as a practical matter, it's
13  important in the course of discussing treatment of
14  prolapse with a patient that the surgeon and patient
15  together discuss all of the options for her
16  particular condition as well as determining whether
17  or not or what type of surgery that particular
18  surgeon can or should perform?
19          MR. SLATER:  Objection to the form.
20          You can answer.
21          THE WITNESS:  Yeah, that's a long
22  question.  I agree with the beginning part.  I think
23  I lost you at the end.
24  BY MS. JONES:
25     Q    You would agree with me that if a surgeon

Page 175

1  does not feel comfortable with performing a
2  particular surgical procedure, it would be
3  appropriate for that surgeon to refer the patient to
4  someone else for that procedure?
5          MR. SLATER:  Objection; asked and
6  answered.
7          You can answer again.
8          THE WITNESS:  Correct.
9  BY MS. JONES:
10     Q    Let me back up and go to a different topic
11  before I forget this.  You never used or implanted
12  Prolift®; correct?
13     A    Correct.
14     Q    You never underwent or participated in any
15  of the professional education programs on Prolift®;
16  correct?
17     A    Correct.
18     Q    You never did any cadaver training with
19  respect to the use of mesh products for pelvic floor
20  repair?
21     A    Correct.
22     Q    I take it you never talked with any of the
23  sales representatives about Ethicon's products or
24  Prolift®?
25     A    Correct.

Page 176

1     Q    Never reviewed prior to being engaged in
2  this litigation any of the marketing materials for
3  Prolift®?
4     A    Just what I would see in the journals, you
5  know, as I'm reading them.
6     Q    Never saw a surgery involving Prolift®?
7     A    I've seen the surgical videos.
8     Q    The surgical videos that you saw in the
9  context of this litigation?
10     A    Yes.
11     Q    Prior to being retained as an expert in
12  this litigation, you had never seen a surgical video
13  for the implantation of Prolift®?
14     A    Correct.
15     Q    I think it's self-explanatory, but you've
16  never observed a surgery where Prolift® has been
17  used other than on that video that you saw in the
18  context of litigation?
19     A    Correct.
20     Q    Have you participated, Doctor, in the
21  professional educational programs of any
22  manufacturer of pelvic mesh other than Ethicon?
23     A    I have not participated in the
24  professional education for Prolift®.
25     Q    I understand that.  My question was not

Page 177

1  very artful.  I apologize.  Have you participated in
2  any professional education program put on by any
3  manufacturer of mesh used in pelvic floor repair?
4     A    No.
5     Q    I had initially restricted my questions to
6  Prolift®, but let me ask this in a broader sense.
7  Have you seen or observed any surgery using
8  transvaginally implanted mesh for pelvic floor
9  repair?
10          MR. SLATER:  You're talking about
11  prolapse now; right?
12          MS. JONES:  Prolapse.  I'm sorry.
13          THE WITNESS:  Prolapse.  Okay.  The
14  answer is no.
15  BY MS. JONES:
16     Q    Regardless of the manufacturer?
17     A    Correct.
18          MR. SLATER:  That question was
19  vaginal surgery; right?
20          MS. JONES:  Transvaginal, yeah.
21  BY MS. JONES:
22     Q    Obviously you were never a Prolift®
23  preceptor; correct?
24     A    Correct.
25     Q    Have you ever visited with or spoken to a

Confidential - Subject to Stipulation and Order of Confidentiality

Page 178

1   Prolift® preceptor?
2       A   Do you mean ever or specific to Prolift®
3   precepting?
4       Q   Specific to Prolift®.
5       A   No.
6       Q   Do you know Prolift® preceptors?
7       A   I know Vince Lucente.
8       Q   Do you know anyone other than Vince
9   Lucente?
10      A   Probably but I don't -- I can't pull out
11  any other names off the top of my head.
12      Q   Were you ever a Prolift® proctor?
13      A   No.
14      Q   Ever speak to a Prolift® proctor about
15  Prolift®?
16      A   No.
17      Q   Before being engaged as an expert in this
18  litigation, had you ever read the Prolift®
19  information for use?
20      A   Instructions for use?  No.
21      Q   Instructions for use.  I'm sorry.
22      A   No.
23      Q   Had you ever read the IFU for Gynemesh®
24  PS?
25      A   No.

Page 179

1       Q   Had you ever read the IFU for any other
2   mesh used for pelvic floor reconstruction?
3       A   I may have when I was performing abdominal
4   sacrocolpopexy, and I can't remember the mesh we
5   used, but it's likely I would have read the
6   instructions for use for that product.
7       Q   You just can't remember?
8       A   (Witness shakes head.)
9       Q   Have you ever read the IFU prior to being
10  engaged in this litigation for any transvaginal mesh
11  kit used in pelvic floor repair?
12      A   Again, are we focusing on prolapse
13  specifically?
14      Q   Yes.  I'm sorry.
15      A   No.
16      Q   Am I correct, Doctor, that you have never
17  either been employed by or engaged as a consultant
18  for any either pharmaceutical or device
19  manufacturer?
20      A   I have not been.
21      Q   At no time have you ever been requested by
22  either a manufacturer or a regulatory agency to
23  consult on the contents of instructions for use?
24      A   No.
25      Q   Have you ever been requested to advise on

Page 180

1   a surgical technique manual?
2       A   For a manufacturer?
3       Q   Produced for a manufacturer.
4       A   No.
5       Q   Have you prior to being engaged in this
6   litigation ever seen a surgical technique manual
7   published by a manufacturer?
8       A   Specific to prolapse or incontinence?
9       Q   Let's talk about specific to prolapse
10  first.
11      A   No.
12      Q   Have you ever seen a surgical technique
13  manual specific to incontinence?
14      A   Yes.
15      Q   Tell me what surgical technique manual you
16  saw.
17      A   The TVT®.
18      Q   Have you seen any surgical technique
19  manual ever published by any manufacturer other than
20  Ethicon?
21      A   Before this involvement?
22      Q   Before this involvement.
23      A   No.
24      Q   Today as you sit here have you seen any
25  surgical technique manuals produced by AMS, for

Page 181

1   example?
2       A   Yes.
3       Q   From Boston Scientific?
4       A   No.
5       Q   By Bard?
6       A   No.
7       Q   Do you know whether or not Bard or Boston
8   Scientific had any surgical technique manuals?
9       A   I do not know.
10      Q   What surgical technique manual produced by
11  AMS did you review?
12      A   The Apogee® and the Perigee®.
13      Q   Do you know when AMS first produced that
14  surgical technique manual?
15      A   Roughly early 2000s, '2, '3.  I don't know
16  exactly.
17      Q   You've never used Apogee® in your
18  practice; correct?
19      A   Correct.
20      Q   When you were at Magee, was any AMS
21  product used there?
22      A   I don't believe so.
23      Q   While you were at Magee, do you know
24  whether any Bard product or Boston Scientific
25  product was used there?

46 (Pages 178 to 181)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 182

1    A    I don't know but I can't say for sure not.
2         MR. SLATER:  One second.
3         (Short recess.)
4  BY MS. JONES:
5    Q    Doctor, when you did your training on
6  abdominal sacrocolpopexy, you said that you were
7  trained by Dr. Walters?
8    A    Yes.
9    Q    Was that in surgery, hands-on training?
10   A    Yes.
11   Q    Did you do any work in a cadaver lab, for
12  example, to do that surgery, to learn to do the
13  surgery?
14   A    No.
15   Q    Were there any videos or DVDs available to
16  you to help you learn how to do that surgery?
17   A    No.
18   Q    Did you see any slides or PowerPoint
19  presentations about how to do that?
20   A    No.
21   Q    I guess that's almost 20 years ago.  Maybe
22  they didn't have those at that time.  Did you attend
23  any lectures on how to do that surgery and under
24  what circumstances?
25   A    I had exposure to abdominal

Page 183

1  sacrocolpopexy, the teaching of how to perform it,
2  in my residency and in my fellowship, but in actual
3  hands-on performing surgery under the supervision
4  and guidance of Dr. Walters, that occurred in 1993.
5    Q    When you said you had exposure during your
6  fellow --
7    A    Residency and fellowship.
8    Q    -- your fellowship and residency, was that
9  in the form of lectures?
10   A    Yes; and textbooks.
11   Q    Do you have any recollection of how many
12  cases you watched before you actually performed the
13  surgery?
14   A    No, I don't.
15   Q    Was it more than one?
16   A    Yes.
17   Q    Who credentialized you to allow you to do
18  an abdominal sacrocolpopexy at the Cleveland Clinic?
19   A    I don't recall if there was a specific
20  process for that.  It would have been my chairman if
21  that process -- I certainly remember that when I
22  joined the staff as to what procedures I would be
23  performing.  And I don't remember how we
24  specifically added on subsequent procedures, but it
25  would be my chairman.

Page 184

1    Q    And would the same thing be true for
2  sacrospinous ligament fixation, for example?
3    A    Well, that -- yes, that would have been,
4  you know, as part of my initial hiring out of
5  fellowship.
6    Q    But it would have been --
7    A    The chairman.  My chairman.
8    Q    The chair of your department or your
9  hospital would have been the one that credentialized
10  you that said that you're allowed to perform these
11  surgeries?
12   A    Well, we filled out the form together.
13  Here are the list of procedures.  You've done that?
14  Yes.  You're trained and experienced in that?  Yes.
15  So to my recollection, we did that together.
16   Q    You and the chairman?
17   A    Yes.
18   Q    But the chairman had to sign off on that,
19  if you will, before you were allowed to conduct
20  those surgeries in that hospital?
21   A    Correct.
22   Q    Was that true of all of the surgeries that
23  you performed?
24   A    Yes.
25   Q    And was that true also at Magee when you

Page 185

1  went to Pittsburgh?
2    A    I don't remember that specifically, but I
3  imagine a similar process took place.
4    Q    Generally it is the hospitals or the
5  chairs of those departments there that authorize or
6  give the permission to surgeons to perform certain
7  surgeries; correct?
8    A    Yes.
9    Q    Doctor, have you ever talked with a
10  patient who had mesh used for pelvic floor repair
11  and recommended that they file a lawsuit?
12   A    No.
13   Q    I think you told us about your knowledge
14  of potential mesh complications.  Have you ever
15  removed a Prolift®?
16   A    No.
17   Q    Or any portion of the mesh of a Prolift®?
18   A    No.
19   Q    Have you ever treated a woman who had a
20  Prolift®?
21   A    No.
22   Q    And I said treated.  Have you ever
23  examined a woman who had a Prolift®?
24   A    No.
25   Q    In the course of your teaching, did you

47 (Pages 182 to 185)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 186

1  train residents or fellows on the treatment of mesh
2  complications?
3       A    Specific to abdominal sacrocolpopexy and
4  slings, yes.
5       Q    And in terms of the abdominal
6  sacrocolpopexy, what types of treatment did you
7  recommend or suggest to fellows or residents was
8  appropriate in the case of exposures or erosions?
9       A    Depending on the size of the erosion,
10  beginning with topical treatment, estrogen; if there
11  appeared to be an active vaginitis going on, topical
12  antibiotics; if that wasn't successful, then attempt
13  at mesh resection transvaginally; and if that wasn't
14  successful, then mesh resection abdominally.
15       Q    Do you agree that mesh exposures do not
16  necessarily require any treatment?
17            MR. SLATER:  Objection.
18            You can answer.
19            THE WITNESS:  I must say, my
20  experience in treating patients with mesh erosion
21  has fortunately been limited.  I personally would
22  feel uncomfortable unless the patient was ready for
23  frequent follow-up to just watch and wait.
24  BY MS. JONES:
25       Q    You said that you would -- I don't think

Page 187

1  you said this, but I interpreted this -- suggest
2  topical creams.  That would be an estrogen cream?
3       A    Yes.
4       Q    And did you find that the estrogen cream
5  was often sufficient to accomplish the healing?
6       A    Again, my clinical experience in managing
7  mesh complications like erosion is limited.
8  Personally I'm not sure that estrogen has -- is
9  effective or whether it's passage of time.  No one's
10  studied the most effective way to manage mesh
11  complications.
12       Q    When you say that your experience managing
13  mesh erosions is limited, do you have any idea how
14  many mesh erosions you have treated?
15       A    I would say a handful at most.
16       Q    Five?
17       A    Probably less than five.
18       Q    Have you ever done any mesh resections?
19       A    Only for a TVT®.
20       Q    Never done a mesh resection for an
21  abdominal sacrocolpopexy?
22       A    No.
23       Q    Is there a reason, when you were talking
24  about doing mesh resections, that you would first
25  attempt a vaginal resection before an abdominal

Page 188

1  resection?
2       A    To spare the patient another abdominal
3  operation.
4       Q    An abdominal operation is just a far more
5  serious, complicated operation than the vaginal
6  approach?
7       A    It can be.
8       Q    As a practical matter, Doctor, if you've
9  not done a mesh resection, I assume you've done no
10  mesh removals?
11       A    Except for TVT®.
12       Q    Except for the TVT®?
13       A    Correct.
14       Q    And how many mesh removals have you done
15  with the TVT®?
16       A    That would have been at the Cleveland
17  Clinic.  So, again, I can't give you a number, but I
18  would say less than five.
19       Q    When we were addressing the mesh
20  resections, generally you would take the most
21  conservative approach first to the treatment of that
22  erosion?
23       A    I personally don't like the word
24  "conservative" because it means so many things to so
25  many people.

Page 189

1       Q    Would you choose the least invasive?
2       A    It depends.  I think if I saw a patient
3  with a very extensive erosion where I felt there was
4  a risk to her, then I don't know if I would feel
5  comfortable wasting -- not wasting time but spending
6  time on something that wouldn't have a great chance
7  of success.
8       Q    You told us, Doctor, that you were aware
9  of a risk of mesh contraction.  Did you ever have a
10  patient that you treated for mesh contraction?
11       A    No.
12       Q    You told us that you were aware of the
13  risk of infection associated with the use of mesh.
14  Did you ever have a patient that you treated for
15  infection associated with mesh?
16       A    No.
17       Q    As you sit here today, do you remember
18  treating any patient who had mesh used in an
19  abdominal sacrocolpopexy for any mesh-related
20  complication?
21       A    No.
22       Q    Other than the TVT® that we talked about,
23  do you remember treating any patient at all for any
24  mesh-related complication?
25       A    No.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 190

1    Q   Have you ever examined mesh removed from a
2 patient that had been used to repair prolapse?
3    A   No.
4    Q   Am I correct that you've never then looked
5 at mesh that's been removed under a microscope or
6 held it in any way?
7    A   I have reviewed the histology slides
8 prepared for this case.  I haven't handled it in my
9 hands.
10   Q   Prior to being engaged as an expert
11 witness in this case, had you ever looked at
12 pathology slides on mesh?
13   A   No.
14   Q   Prior to being engaged as an expert
15 witness in this case, had you ever held in your hand
16 to examine any mesh removed from a patient other
17 than the transvaginal tape?
18   A   No.
19   Q   Prior to becoming involved in this
20 litigation, had you ever reviewed any
21 photomicrographs of mesh removed from a patient?
22   A   No.
23   Q   Prior to being involved and engaged as an
24 expert in this case, had you ever seen any surgery
25 or observed any surgery to remove mesh from a

Page 191

1 patient?
2    A   No.
3    Q   Prior to being engaged as an expert
4 witness in this case, had you ever performed any
5 examination of the porosity of a mesh?
6    A   Now, Dr. Moalli at the University of
7 Pittsburgh is involved in studying mesh
8 characteristics.  I am certainly not -- at that time
9 I was not directly involved in her research.  I've
10 been in her lab and she's shown me what she's doing.
11 That would be the extent of my answer.
12   Q   You've never been engaged in any research
13 on the porosity of mesh; am I correct?
14   A   Correct.
15   Q   You've never actually measured the size of
16 the pores of mesh; am I correct?
17   A   Correct.
18   Q   You've never actually done any comparison
19 between the different shapes of the pores of mesh;
20 am I correct?
21   A   Correct.
22   Q   You've never done any studies comparing
23 multifilament with monofilament mesh; am I correct?
24   A   Correct.
25   Q   You certainly don't hold yourself out as a

Page 192

1 polymer chemist, do you?
2    A   No, I am not a polymer chemist.
3    Q   And I take it that you're not a
4 biomaterials expert?
5        MR. SLATER:  Objection to the form.
6        You can answer.
7        THE WITNESS:  What do you mean by an
8 expert?
9 BY MS. JONES:
10   Q   Well, do you have any special training in
11 the development of biomaterials?
12   A   Not in the development of biomaterials.
13 Based on my background and my study in this case, I
14 think I have a broad understanding of the input,
15 say, a medical director at Ethicon would give into
16 discussions and decisions surrounding biomaterials.
17   Q   That's not really what my question is,
18 Doctor.  Let me ask this:  You said based upon your
19 study in this case.  Am I correct then that prior to
20 becoming engaged as an expert witness in this
21 particular litigation, you had not studied the
22 characteristics of those meshes?
23   A   Correct.
24   Q   And that means you had never done any
25 laboratory studies on them?

Page 193

1    A   Correct.
2    Q   Never done any biomechanical studies on
3 them?
4    A   Correct.
5    Q   Never compared the biomechanical studies
6 done on the different types of meshes?
7    A   Correct.
8    Q   Never done any type of comparison upon the
9 characteristics of the different meshes, such as
10 tensile strength or burst point?
11   A   Correct.
12   Q   And you've never done any animal or
13 toxicology studies involving the use of mesh, have
14 you?
15   A   No.
16   Q   I understand that you are a medical
17 doctor, but beyond the standard medical training, do
18 you have any advanced training in pathology?
19   A   No.
20   Q   How about in radiology?
21   A   No.
22   Q   Psychiatry or psychology?
23   A   "Advanced training" meaning?
24   Q   Well, have you ever held yourself out as a
25 psychiatrist?

49 (Pages 190 to 193)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 194

1    A   No.
2    Q   Have you obtained any postgraduate
3  education in the field of psychiatry?
4    A   No.
5    Q   Have you ever been granted privileges on
6  staff at any hospital as a psychiatrist or for
7  psychiatry?
8    A   No.
9    Q   You're certainly not Board-certified in
10 psychiatry?
11   A   Correct.
12   Q   It would also be true that you don't hold
13 yourself out as an infectious disease specialist?
14       MR. SLATER:  Objection.
15       You can answer.
16       THE WITNESS:  I am experienced in
17 caring for the infectious diseases that occur in
18 gynecologic and urogynecologic practice.
19 BY MS. JONES:
20   Q   There is a subspeciality that's recognized
21 for infectious diseases, isn't there?
22   A   I don't know.
23   Q   You've certainly not been Boarded as an
24 infectious disease specialist?
25   A   No, I am not.

Page 195

1    Q   And don't have any advanced training in
2  the field of neurology?
3        MR. SLATER:  Did you say neurology?
4        MS. JONES:  Neuro, N-E, neurology.
5        THE WITNESS:  Certain tests are
6  performed as part of urodynamic testing, for
7  example, that evaluate the muscles and the nerves.
8  So I certainly have training and experience in that.
9  BY MS. JONES:
10   Q   I'm sorry.  You have training and
11 experience in?
12   A   The muscle and nerve testing that is a
13 part of urodynamic studies.
14   Q   And in the course of your work as a
15 surgeon and doing pelvic floor repairs, did you
16 become aware of the potential complication of injury
17 to the pudendal nerve?
18   A   Yes.
19   Q   And did you treat pudendal neuralgia?
20   A   No, I have not had that in my clinical
21 experience.
22   Q   Have you had patients who had pudendal
23 nerve damage?
24   A   Not in my clinical practice, no.
25   Q   Have you ever reviewed, Doctor, the

Page 196

1  federal regulations that pertain to devices?
2    A   I have reviewed some of them.
3    Q   When did you review those?
4    A   Do you mean a date or relative to this
5  case?
6    Q   Relative to this lawsuit.
7    A   Okay.  Yes, relative to this lawsuit.
8    Q   But you had never reviewed the FDA
9  regulations prior to becoming engaged as an expert
10 witness in this lawsuit?
11   A   No.
12   Q   I asked a very bad question.  I think
13 we've got a double negative there.
14       Had you ever reviewed the FDA regulations
15 pertaining to devices prior to becoming engaged as a
16 witness in this case?
17   A   No.
18   Q   Had you ever been involved in a clinical
19 trial designed to evaluate the safety and efficacy
20 of a medical device prior to becoming engaged in
21 this lawsuit?
22   A   Yes.
23   Q   What device was that?
24   A   Well, we hadn't decided.  This was in the
25 pelvic floor disorders network.  We were interested

Page 197

1  in studying mesh products.  And that was at a time
2  when the products were rapidly changing, products
3  being brought on the market, taken off the market,
4  changed, put back on the market.  And ultimately in
5  my tenure as the program director of the pelvic
6  floor disorders network, we were not confident that
7  we could choose a product and have relevant study
8  results by the time it takes to complete a clinical
9  trial.
10   Q   When was this being considered?
11   A   I would say between 2006 and 2007.
12   Q   Does the pelvic floor network still exist?
13   A   Yes.
14   Q   Does the program at NIH still exist?
15   A   Yes.
16   Q   Who is the current program director?
17   A   I don't know.
18   Q   When is the last time that you had any
19 contact with that network?
20   A   Well, the network itself, not the
21 individuals I assume is what you're meaning.  So the
22 following year, the 2008 year, that would -- so you
23 know, throughout that year just smoothing over the
24 transition a little bit.
25   Q   Why did you leave your position as program

50 (Pages 194 to 197)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 198

1 director?
2 A   I felt that I had accomplished what I
3 wanted to accomplish.  The clinical trials network
4 was functioning well.  I was confident that it would
5 continue without my leadership.  And my health at
6 that time benefited from me reducing the intensity
7 of my workload and the amount of travel I was
8 required to do.
9 Q   So am I correct, if we go back to where we
10 started, that you were never involved in a clinical
11 trial to evaluate the safety and efficacy of a
12 device?
13 A   Correct.
14 Q   Prior to being retained as an expert
15 witness in this lawsuit, had you ever reviewed the
16 patient brochure for Prolift®?
17 A   No.
18 Q   Had you reviewed the patient brochure for
19 any other product?
20 A   Specific to a medical device for prolapse?
21 Q   Right.
22 A   No.
23 Q   Had you ever reviewed the patient brochure
24 for TVT®?
25 A   I believe so.

Page 199

1 Q   Did you ever counsel with a patient about
2 the patient brochure for the TVT®?
3 A   I don't understand your question.
4 Q   Did you ever use the patient brochure for
5 the TVT® to counsel a patient?
6 A   No.
7 Q   You understand that patient brochures are
8 available through doctors to counsel patients?
9 A   Do I understand they're available?
10 Q   How do you understand that patients get
11 the patient brochures?
12 MR. SLATER:  Objection to the form.
13 You can answer.
14 THE WITNESS:  The hard copy, the
15 little pamphlet?  I would assume they usually pick
16 that up in the doctor's office.
17 BY MS. JONES:
18 Q   And they are designed to be used in
19 consultation with a physician, are they not?
20 MR. SLATER:  Objection.
21 You can answer.
22 THE WITNESS:  I don't believe it
23 says -- I take that back.  To my mind, they're a
24 marketing device.
25

Page 200

1 BY MS. JONES:
2 Q   Well, let me ask it this way:  Would you
3 ever perform a surgery on a patient who came to you
4 and said, Doctor, I've looked at the patient
5 brochure and I want to have a surgery involving this
6 device without first counseling with them?
7 A   No.
8 Q   Did you use patient brochures with the
9 TVT®?
10 A   I did not supply patients with the patient
11 brochure.
12 Q   And that's because you considered them to
13 be a marketing device?
14 A   No.  That's because if they were
15 available, it would be someone else's job to make
16 them available to the patient, like the --
17 Q   I don't understand.
18 A   Like the nurse manager of the clinical
19 area deciding what materials would be put out for
20 patients' use.
21 Q   That's something that was put out in your
22 facility and given to patients without the approval
23 of physicians?
24 A   I don't know specifically.  I wasn't
25 involved.

Page 201

1 Q   When you said that you considered the
2 patient brochures to be marketing devices, did you
3 ever use or make available a patient brochure to a
4 patient for any reason?
5 A   For a commercial product?
6 Q   Uh-huh.
7 A   I did not personally do that, no.
8 Q   Do you know whether in any institution
9 with which you were associated the patient brochures
10 for devices were distributed to patients?
11 A   I don't know.
12 Q   Did you ever have a conversation with a
13 patient about the contents of the patient brochure?
14 A   Not that I recall.
15 Q   Do you remember whether or not there were
16 patient brochures with Gynemesh® PS?
17 A   Do I know if they existed?
18 Q   Uh-huh, or whether you used them.
19 A   Prior to being involved --
20 Q   Prior to being involved as an expert
21 witness here.
22 A   I do not know.
23 Q   Am I correct that prior to being involved
24 as an expert witness in this litigation, you have no
25 recollection of ever reviewing a patient brochure on

Confidential - Subject to Stipulation and Order of Confidentiality

Page 202

1 any mesh product?
2    A   With the patient you mean or just
3 reviewing it for general reading?
4    Q   Just reviewing it.  Do you remember ever
5 reading a patient brochure prior to being engaged in
6 this litigation?
7    A   No, I don't recall.
8    Q   Do you ever remember walking into or
9 looking at the brochures at Magee, for example, to
10 see what patient brochures were out there for the
11 patients to look at?
12    A   No.
13    Q   Have you ever used any materials put out
14 by a manufacturer to assist you in counseling a
15 patient?
16    A   I don't recall.  Using products was not a
17 big part of my practice.
18    Q   Well, let me ask you a little bit
19 differently.  Sometimes there are brochures or
20 publications that may not deal specifically with the
21 product but that may deal with the condition, pelvic
22 organ prolapse, for example.  Do you ever remember
23 using any of those types of materials to counsel the
24 patients?
25    A   We had brochures that discussed conditions

Page 203

1 that were prepared by the American College of
2 Obstetricians and Gynecologists, and I would use
3 those brochures in speaking with patients.
4    Q   Other than the brochures put out by ACOG,
5 did you use any other materials in counseling the
6 patients?
7    A   Yes.  We had prepared materials of our
8 own.
9    Q   And did you, in fact, prepare materials of
10 your own with respect to prolapse?
11    A   I think that was a joint effort with my
12 colleagues in the division.
13    Q   Where, at Magee or at Cleveland Clinic?
14    A   In Cleveland.
15    Q   Can you tell me what the form of that was?
16 Was it just a typewritten description of prolapse or
17 did it cover the types of treatment and the
18 complications or was it more of a brochure?
19    A   I can't recall all the details.  What I
20 recall is things like postoperative instructions,
21 how to reach your doctor, things like that.
22    Q   You don't remember then something that was
23 like a description of what prolapse is, what the --
24    A   Well, those are --
25    Q   -- different treatments are?

Page 204

1    A   Those are the brochures that we used from
2 the American College.
3    Q   You didn't develop a separate brochure on
4 those conditions, for example, and those treatments
5 and the complications that might be associated with
6 it?
7    A   No.
8    Q   At any time, Doctor, while you were
9 practicing before you left the NIH, did you ever
10 take any sabbaticals?
11    A   I think when I first left the NIH, my
12 leave was described as a sabbatical with the
13 possibility I would return.  And then I didn't
14 return.  Does that answer your question?
15    Q   Well, maybe.  What did you do in that
16 sabbatical or did you do anything in that
17 sabbatical?
18    A   It was -- I didn't pursue another degree.
19 It was a general term for not work -- you know, not
20 being in that position any longer with the
21 possibility that I was returning.
22        THE WITNESS:  It is 5 o'clock.
23        MR. SLATER:  I think just go a couple
24 more minutes to finish this line of questioning and
25 that's okay.  That's customary.

Page 205

1        THE WITNESS:  Okay.
2 BY MS. JONES:
3    Q   I asked you about what surgeries you were
4 permitted to perform or credentialed to perform.
5 How did you go about determining which surgeries you
6 would seek credentialing in?
7    A   It depended on what surgeries I had been
8 experienced in during my training.
9    Q   Fair to say that you only sought
10 credentialing with respect to the procedures that
11 you felt comfortable with?
12    A   Yes.
13    Q   Do you know how many abdominal
14 sacrocolpopexy cases you performed before you felt
15 proficient to do that surgery on your own?
16    A   No, I don't remember.
17    Q   All of the surgeries that you performed
18 involved dissection of tissues, did they not?
19    A   Is that a general question, every
20 surgery --
21    Q   It's just a general question.
22    A   Related to prolapse or every surgery at
23 all?
24    Q   Related to prolapse.
25    A   Yes.

52 (Pages 202 to 205)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 206

1    Q    Did you use hydrodissection in your
2  practice?
3            MR. SLATER:  Let me just stop here.
4  It's 5 o'clock.  It's after 5:00.  We had planned to
5  stop at 5:00.  I wanted to let you go if you were
6  finishing a line of questioning, but it seems that
7  we're getting into something new now in terms of
8  surgical techniques so I think it's a good stopping
9  point.  I'm not going to tell her not to answer this
10  question but --
11            MS. JONES:  That's fine.
12  BY MS. JONES:
13    Q    If you'll answer this question and if
14  there's a follow-up or two, that would be fine, but
15  then we'll stop.
16    A    We didn't call it hydrodissection.  We
17  called it infiltration.  We were not entering the
18  vesicovaginal and the rectovaginal spaces with the
19  infiltrate.
20    Q    How did the infiltration differ from
21  hydrodissection?
22    A    Hydrodissection, to my understanding, is a
23  technique in which fluid is injected into the
24  vesicovaginal and/or rectovaginal spaces.  This is
25  unique to Prolift®.  This is not the way standard

Page 207

1  anterior and posterior colporrhaphy, for example,
2  are performed.  Does that answer your question?
3    Q    Well, I don't think so.  I was asking you
4  about the difference between hydrodissection and the
5  infiltration that --
6    A    Okay.  So hydrodissection, again, is in
7  the vesicovaginal space.  I'll just talk about that
8  just for simplicity.  It's the same for the
9  rectovaginal space, just the opposite, anterior to
10  posterior.  You understand.
11            Infiltration when performing an anterior
12  colporrhaphy is the injection of the infiltrate into
13  the layers of the vaginal wall.
14    Q    Have you ever performed what you describe
15  as hydrodissection?
16    A    No.
17            MS. JONES:  That's it.
18            MR. SLATER:  See you tomorrow at
19  9:30.
20            MS. JONES:  See you in the morning.
21            (Witness excused.)
22            (Whereupon the deposition recessed at
23  5:08 p.m.)
24                - - -
25            CERTIFICATE

Page 208

1
2          I, KIMBERLY A. OVERWISE, a Certified
   Court Reporter and Notary Public of the State of New
3  Jersey, do hereby certify that prior to the
   commencement of the examination, ANNE M. WEBER,
4  M.D., M.S.,  was duly sworn by me to testify to the
   truth, the whole truth and nothing but the truth.
5
          I DO FURTHER CERTIFY that the
6  foregoing is a verbatim transcript of the testimony
   as taken stenographically and before me at the
7  time, place and on the date hereinbefore set forth,
   to the best of my ability.
8
          I DO FURTHER CERTIFY that I am
9  neither a relative nor employee nor attorney nor
   counsel of any of the parties to this action, and
10  that I am neither a relative nor employee of such
   attorney or counsel, and that I am not financially
11  interested in this action.
12
13
          KIMBERLY A. OVERWISE
14        CCR: 30X100224600
          Dated:  November  19,  2012
15
16
17
18
19
20
21
22
23
24
25

Page 209

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over carefully
4  and make any necessary corrections.  You should
5  state the reason in the appropriate space on the
6  errata sheet for any corrections that are made.
7          After doing so, please sign the errata
8  sheet and date it.
9          You are signing same subject to the
10  changes you have noted on the errata sheet, which
11  will be attached to your deposition.
12          It is imperative that you return the
13  original errata sheet to the deposing attorney
14  within thirty (30) days of receipt of the deposition
15  transcript by you.  If you fail to do so, the
16  deposition transcript may be deemed to be accurate
17  and may be used in court.
18
19
20
21
22
23
24
25

Confidential - Subject to Stipulation and Order of Confidentiality

Page 210

1       E R R A T A  S H E E T
2       - - - - - -
3
4  PAGE   LINE     CHANGE
5  ____  ____   _____
6       REASON:   _____
7  ____  ____   _____
8       REASON:   _____
9  ____  ____   _____
10      REASON:   _____
11  ____  ____   _____
12      REASON:   _____
13  ____  ____   _____
14      REASON:   _____
15  ____  ____   _____
16      REASON:   _____
17  ____  ____   _____
18      REASON:   _____
19  ____  ____   _____
20      REASON:   _____
21  ____  ____   _____
22      REASON:   _____
23  ____  ____   _____
24      REASON:   _____
25

Page 212

1                    LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

Page 211

1
2           ACKNOWLEDGMENT OF DEPONENT
3
4           I, ANNE M. WEBER, M.D., M.S., do
5   hereby certify that I have read the foregoing pages,
6   1-210, and that the same is a correct transcription
7   of the answers given by me to the questions therein
8   propounded, except for the corrections or changes in
9   form or substance, if any, noted in the attached
10  Errata Sheet.
11
12
13  _____      _____
    ANNE M. WEBER, M.D., M.S.       DATE
14
15
16
17
    Subscribed and sworn
18  to before me this
    ____ day of _____, 2012.
19
    My commission expires:_____
20
21  _____
    Notary Public
22
23
24
25