# Exhibit C

Confidential - Subject to Stipulation and Order of Confidentiality

Page 213

1                          -  -  -

2                                    :  SUPERIOR COURT OF
                                     :  NEW JERSEY
3      IN RE:                        :  LAW DIVISION -
       PELVIC MESH/GYNECARE          :  ATLANTIC COUNTY
4      LITIGATION                    :
                                     :  MASTER CASE 6341-10
5      (GENERAL, GROSS, WICKER)      :
                                     :  CASE NO. 291 CT
6

          CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
7                        CONFIDENTIALITY
8                          -  -  -
9                 Tuesday, November 6, 2012
10                       VOLUME II
                           -  -  -

11

12           Transcript of the continued deposition of
13     ANNE M. WEBER, M.D., M.S., called for examination in
14     the above-captioned matter, said deposition taken
15     pursuant to Superior Court Rules of Practice and
16     Procedure by and before Kimberly A. Overwise, a
17     Certified Realtime Reporter, Registered Professional
18     Reporter, Certified Court Reporter, and Notary
19     Public, at Mazie, Slater, Katz & Freeman, 103
20     Eisenhower Parkway, 2nd Floor, Roseland, New Jersey,
21     on the above date, beginning at 9:45 a.m.
22                          -  -  -
23              GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
25

Confidential - Subject to Stipulation and Order of Confidentiality

Page 214

```
1   APPEARANCES:
2
3      MAZIE SLATER KATZ & FREEMAN, LLC
       BY:  ADAM M. SLATER, ESQ.
       103 Eisenhower Parkway, 2nd Floor
4      Roseland, NJ  07068
       973-228-9898
5      aslater@mskf.net
       Counsel for Plaintiffs
6
7      BERNSTEIN LIEBHARD LLP
       BY:  JEFFREY S. GRAND, ESQ.
8      10 E. 40th Street, 22nd Floor
       New York, NY  10016
9      212-779-1414
       grand@bernlieb.com
10     Counsel for Plaintiffs
11
       BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
12     BY:  CHRISTY D. JONES, ESQ.
       1020 Highland Colony Parkway, Suite 1400
13     Ridgeland, MS  39157
       601-948-5711
14     christy.jones@butlersnow.com
       Counsel for Johnson & Johnson and Ethicon
15
16     BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
       BY:  NILS B. (BURT) SNELL, ESQ.
17     500 Office Center Drive, Suite 400
       Fort Washington, PA  19034
18     267-513-1884
       burt.snell@butlersnow.com
19     Counsel for Johnson & Johnson and Ethicon
20
       SILLS CUMMIS & GROSS, P.C.
21     BY:  WILLIAM R. STUART, ESQ.
       One Riverfront Plaza
22     Newark, NJ  07102
       973-643-0700
23     wstuart@sillscummis.com
       Counsel for Caldera Medical, Inc., and Synovis
24
25
```

Page 215

```
1   APPEARANCES VIA PHONE AND STREAM:
2
3      KLINE & SPECTER, P.C.
       BY:  ROGER CAMERON, ESQ.
4      1525 Locust Street, 19th Floor
       Philadelphia, PA  19102
5      215-772-1000
       roger.cameron@KlineSpecter.com
6      Counsel for Plaintiffs
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 216

```
1               I N D E X
2   WITNESS:                    Page
3   ANNE M. WEBER, M.D., M.S.
4     By Ms. Jones....................220, 380
5     By Mr. Slater..................374, 381
6
7
8
9            E X H I B I T S
10            (Attached.)
11  No.      Description         Page
12  1220    List entitled "Materials     322
13          Reviewed"
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 217

```
1          DEPOSITION SUPPORT INDEX
2               - - -
3
4   Direction to Witness Not to Answer
5   Page  Line
6   NONE
7
8   Request for Production of Documents
9   Page  Line
10  285    8
11
12  Stipulation
13  Page  Line
14  NONE
15
16  Question Marked
17  Page  Line
18  NONE
19
20
21
22
23
24
25
```

Confidential - Subject to Stipulation and Order of Confidentiality

Page 218

1    CONFIDENTIAL DESIGNATION INDEX
             - - -
2    PAGE 222 LINE 18 THROUGH PAGE 223 LINE 3
3    PAGE 223 LINE 12 THROUGH PAGE 223 LINE 17
4    PAGE 226 LINE 20 THROUGH PAGE 227 LINE 10
4    PAGE 240 LINE 3  THROUGH PAGE 240 LINE 18
5    PAGE 250 LINE 24 THROUGH PAGE 251 LINE 7
6    PAGE 254 LINE 8  THROUGH PAGE 254 LINE 15
7    PAGE 260 LINE 7  THROUGH PAGE 260 LINE 13
8    PAGE 278 LINE 15 THROUGH PAGE 278 LINE 23
9    PAGE 338 LINE 9  THROUGH PAGE 339 LINE 8
10   PAGE 340 LINE 7  THROUGH PAGE 341 LINE 1
11   PAGE 341 LINE 17 THROUGH PAGE 342 LINE 12
12   PAGE 357 LINE 15 THROUGH PAGE 358 LINE 2
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 220

1    ...ANNE M. WEBER, M.D., M.S., after
2    having been duly sworn, was examined and
3    testified as follows:
4              - - -
5         EXAMINATION
6    BY MS. JONES:
7    Q    Doctor, as we mentioned yesterday and as
8    you know, you have submitted in this litigation
9    voluminous reports with your opinions that include
10   what I'll call a general report and then
11   case-specific reports for Ms. Gross and Ms. Wicker;
12   correct?
13   A    Correct.
14   Q    And you have since supplemented with some
15   additional reports after you have read or reviewed
16   additional materials; am I correct?
17   A    Correct.
18   Q    And we were furnished last Friday or over
19   the weekend with an updated list of materials that
20   you had reviewed.  And with the exception of
21   Dr. Lucente's deposition, which was taken on Friday,
22   I assume that that list is correct and complete to
23   the best of your knowledge?
24   A    Yes.
25   Q    Are all of your opinions that you intend

Page 219

1    CONFIDENTIAL DESIGNATION INDEX
             - - -
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 221

1    to offer at the trial set forth in the reports that
2    you have prepared?
3    A    Yes.
4    Q    Do you anticipate any additional work
5    specifically with respect to Ms. Gross or
6    Ms. Wicker?
7         MR. SLATER:  Objection.
8         You can answer.
9         THE WITNESS:  I think that depends on
10   what's produced between now and trial.
11   BY MS. JONES:
12   Q    Let me clarify.  I understand you may
13   review some additional depositions or documents, but
14   have you requested, for example, any materials on
15   either of those patients that you wish to review
16   that you've not yet had an opportunity to review?
17   A    No.
18   Q    Have you requested an opportunity to
19   examine either of those women?
20   A    No.
21   Q    Have you requested an opportunity to visit
22   with either of those women?
23   A    No.
24   Q    I take it that you are comfortable
25   arriving at your opinions with respect to those

3 (Pages 218 to 221)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 222

1  women based upon the contents of the medical records
2  and the depositions that you've reviewed?
3      A   And the reports.
4      Q   And what reports?
5      A   The reports from the people who have
6  examined them.
7      Q   Those who have examined them specifically
8  for purposes of this litigation?
9      A   Yes.
10     Q   Do you have any criticisms of the treating
11  surgeons or doctors who implanted the Prolift®s in
12  either Ms. Gross or Ms. Wicker?
13     A   No.
14     Q   Do you believe and is it your opinion that
15  each of those women was an appropriate candidate for
16  the use of Prolift®?
17     A   I do not agree.
18     Q   Well, let me see if I can separate these
19  out.  Is it your judgment that it is a breach of the
20  standard of care for a doctor to use Prolift® in any
21  woman?
22     A   I wouldn't call it a breach of the
23  standard of care.  I would call it a deception on
24  the part of Ethicon when they illegally marketed the
25  Prolift® and did not notify physicians and patients

Page 223

1  that was the case.  Physicians were assuming they
2  were using a properly FDA-cleared device and that
3  was untrue.
4          MS. JONES:  Move to strike as
5  nonresponsive.
6  BY MS. JONES:
7      Q   Doctor, in terms of whether or not the
8  device was legally marketed, are you aware of the
9  guidances that recognize that certain devices do not
10  require 510(k) clearance prior to marketing?
11     A   I am aware.
12     Q   Has the FDA ever begun, to your knowledge,
13  any type of enforcement proceedings against Ethicon
14  with respect to Prolift®?
15     A   The FDA informed Ethicon that it could not
16  market Prolift® until the clearance process was
17  completed, and Ethicon did that anyway.
18         MS. JONES:  Move to strike as
19  nonresponsive.
20  BY MS. JONES:
21     Q   My question, Doctor, was:  Has the FDA
22  ever initiated any enforcement proceedings against
23  Ethicon with respect to the marketing of Prolift®?
24     A   No.
25     Q   Has the FDA ever declared Prolift®

Page 224

1  misbranded in any way?
2          MR. SLATER:  To her knowledge?
3          THE WITNESS:  Not to my knowledge.
4  BY MS. JONES:
5      Q   The FDA did clear Gynemesh® PS, did it
6  not?
7      A   Yes, it did.
8      Q   That was in 2002?
9      A   Yes.
10     Q   The mesh in Prolift® is identical to that
11  mesh?
12     A   Yes.  Excuse me.  The mesh in Prolift® was
13  cut by a different method, it was not identical.
14     Q   I'm sorry.  It was not what?
15     A   It was not identical.
16     Q   It was in a different shape; correct?
17     A   It was cut by a different method.
18     Q   It was also in a different shape, was it
19  not?
20     A   Correct, it was in a different shape.
21     Q   And Gynemesh® PS was modified and cut by
22  surgeons in order to use it transvaginally, was it
23  not?
24     A   Correct.
25     Q   Mesh has been used and cut to be used in

Page 225

1  transvaginal surgeries since the 1990s, has it not?
2          MR. SLATER:  You're talking mesh in
3  general; right?
4          MS. JONES:  Uh-huh.
5          THE WITNESS:  Correct.
6  BY MS. JONES:
7      Q   And that mesh in general was cut and used
8  to be used transvaginally by surgeons without FDA
9  clearance for use in that manner; correct?
10     A   That's an entirely different situation.
11  Off-label use by physicians is allowable.  Illegal
12  marketing by a company is not.
13         MS. JONES:  Let's just move to strike
14  as nonresponsive.
15  BY MS. JONES:
16     Q   Can you answer my question, Doctor?
17         MS. JONES:  Do you want to read back
18  my question.
19         MR. SLATER:  She probably thinks she
20  did answer the question, as I do.
21         You understand when she moves to
22  strike, she's preserving her rights for the future.
23  It doesn't mean that your testimony is actually
24  going to be stricken because I'm obviously going to
25  oppose those motions.  I just want you to know

4 (Pages 222 to 225)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 226

1  procedurally what she's doing. She's just
2  preserving her rights. It's perfectly fine to move
3  to strike.
4        THE WITNESS: Okay. Could you repeat
5  the question, please?
6        (The court reporter read the record
7  as follows:
8        "QUESTION: And that mesh in general
9  was cut and used to be used transvaginally by
10  surgeons without FDA clearance for use in that
11  manner; correct?")
12       THE WITNESS: Correct. I'd like to
13  expand on that.
14       MR. SLATER: You can.
15       THE WITNESS: The off-label use by
16  physicians of a material or a drug is allowable.
17  Illegal marketing of a commercial product without
18  FDA clearance is not.
19  BY MS. JONES:
20    Q   Would you identify for me one place,
21  Doctor, just one place, where the FDA has ever
22  suggested that Ethicon illegally marketed Prolift®?
23    A   In the letters -- in the process -- in the
24  interaction between FDA and Ethicon, the letter
25  stated you may not market this device while this

Page 227

1  process of clearance is ongoing.
2    Q   Have you ever spoken with anyone at the
3  FDA about that?
4    A   No.
5    Q   Have you ever seen, Doctor, anywhere in
6  writing anyplace where the FDA said we consider that
7  Ethicon illegally marketed the device?
8    A   FDA determined, when they finally realized
9  Prolift® was on the market, that it required a
10  separate application for clearance.
11       MS. JONES: Move to strike as
12  nonresponsive.
13  BY MS. JONES:
14    Q   My question, Doctor, was: Have you ever
15  seen anyplace where the FDA said specifically we
16  consider that Prolift® was illegally marketed?
17       MR. SLATER: You mean where those
18  exact words were used?
19       MS. JONES: That's exactly what I'm
20  asking.
21       THE WITNESS: No.
22  BY MS. JONES:
23    Q   When surgeons began using mesh for
24  transvaginal surgery in the 1990s, they used tools
25  to place that mesh, did they not?

Page 228

1    A   Yes.
2    Q   You use tools when you do abdominal
3  surgery, do you not?
4    A   Yes.
5    Q   You use tools when you do any type of
6  Prolift® surgery, don't you?
7    A   Yes.
8    Q   In terms of --
9    A   I'd like to expand on that, if I may. You
10  use tools that the hospital buys and the surgeon may
11  request that are also used for other procedures.
12  The tools in the Prolift® procedure were developed
13  for use for the Prolift® procedure and only the
14  Prolift® procedure.
15    Q   Those tools were developed by surgeons,
16  weren't they?
17    A   No. They were developed by Ethicon.
18    Q   You don't think that they were developed
19  working with surgeons?
20    A   They were developed working with surgeons.
21    Q   And that surgeons use those tools?
22       MR. SLATER: Is that a question?
23       MS. JONES: That is a question.
24       THE WITNESS: They only use those
25  tools because Prolift® is made available as a kit.

Page 229

1  BY MS. JONES:
2    Q   Those tools were used by surgeons before
3  it was marketed as a kit, were they not?
4    A   No.
5    Q   Never?
6    A   No.
7    Q   That's your testimony?
8    A   Yes, it is.
9    Q   Have you ever used any of the Prolift®
10  tools?
11    A   No.
12    Q   Prior to being engaged in this litigation,
13  did you ever see any of those Prolift® tools?
14    A   No.
15    Q   If we go back to your testimony with
16  respect to Ms. Gross and Ms. Wicker, am I correct
17  that you testified that you have no criticisms of
18  the implanting surgeons?
19    A   The surgeons followed the standard
20  procedure of Prolift® implantation. My criticism is
21  of the Prolift® procedure and mesh implantation.
22    Q   My question, Doctor, was as follows: Do
23  you have any criticism whatsoever of the doctors who
24  chose to use Prolift® in Ms. Gross and Ms. Wicker?
25    A   No, I do not.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 230

1    Q   If we go back to the appropriate
2  treatments for prolapse, I think you identified
3  three different classes of treatment, if you will.
4  One is observational, just watching, if the patient
5  seems to be asymptomatic; correct?
6    A   Technically observation is not a form of
7  treatment.
8    Q   If a woman has prolapse but seems to be
9  asymptomatic, is it appropriate to observe and delay
10  any treatment?
11    A   Yes.
12    Q   Other therapies that are available would
13  be exercises, as we've discussed, correct --
14    A   Yes.
15    Q   -- pelvic floor exercises?  And the use of
16  pessaries; correct?
17    A   Correct.  And also behavioral and
18  lifestyle changes.
19    Q   In terms of pessaries, the pessaries are
20  not suitable for treatment for every woman's
21  prolapse, are they?
22    A   No, they are not.
23    Q   And, indeed, pessaries may be difficult
24  for some women to use; is that right?
25    A   That is correct.

Page 231

1    Q   Oftentimes it may be that a woman has to
2  visit her doctor three or four times a year in order
3  to have the pessary removed and cleaned and to
4  consult with a doctor; correct?
5    A   Correct.
6    Q   Pessaries generally have to be removed
7  before sexual intercourse; correct?
8    A   No.
9    Q   There are those who recommend removal
10  before sexual intercourse, do they not?
11    A   Are you speaking of physicians?
12    Q   Yes.
13    A   I can't speak to what all other physicians
14  would recommend.
15    Q   Have you seen it reported in the
16  literature that one of the issues with the pessary
17  use is that it should be generally removed for
18  sexual intercourse?
19    A   No.
20    Q   Have you seen it reported in the
21  literature that pessaries may be associated with
22  vaginal discharge?
23    A   Yes.
24    Q   Odor?
25    A   Yes.

Page 232

1    Q   Ulceration?
2    A   Yes.
3    Q   Bleeding?
4    A   Very uncommonly.
5    Q   And then if you're going to look at the
6  surgical treatments or therapies for prolapse, you
7  have vaginal approaches, abdominal approaches,
8  laparoscopic approaches, and robotic approaches;
9  correct?
10    A   Laparoscopic approaches are abdominal
11  approaches.  Robotic approaches are a subset of
12  laparoscopic approaches.
13    Q   Have you ever done laparoscopic surgery
14  for prolapse?
15    A   No.
16    Q   Have you ever done robotic surgery for
17  prolapse?
18    A   I am going to correct that last statement.
19  I have performed paravaginal repairs
20  laparoscopically.
21    Q   On how many occasions?
22    A   Perhaps 20 to 30.
23    Q   Have you ever performed robotic surgery?
24    A   No.
25    Q   If one is evaluating the surgical

Page 233

1  treatment for prolapse, one of the considerations is
2  the type and severity of the prolapse that the woman
3  has?
4    A   Yes.
5    Q   The surgeon's training and experience?
6    A   Yes.
7    Q   The patient's preference for the type of
8  surgery after consultation with the physician?
9    A   Yes.
10    Q   And obviously the desired outcome;
11  correct?
12    A   Yes.
13    Q   For example, one of the surgeries that can
14  be performed for prolapse is obliterative surgery
15  that closes the vagina; correct?
16    A   Correct.
17    Q   And that would obviously be appropriate
18  generally only for those who don't seek to have
19  intercourse in the future?
20    A   Correct.
21    Q   When surgeons perform the surgeries, they
22  often choose different techniques in performing the
23  same surgeries, do they not?
24        MR. SLATER:  Objection.
25        You can answer.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 234

1  THE WITNESS:  There are standard
2  techniques of performing surgeries that surgeons may
3  vary.
4  BY MS. JONES:
5  Q    And the surgeons vary based upon either
6  different approaches and what they feel comfortable
7  with or what they find to be satisfactory?
8  A    Correct.
9  Q    And as surgeons they may vary approaches
10  in the sense of being innovative in order to provide
11  better care to their patients?
12  A    That is a complicated answer because the
13  line between innovation and experimentation is not
14  black and white.
15  Q    Well, innovative approaches over time have
16  led to better healthcare in general, have they not?
17  A    No, I wouldn't agree with that in general.
18  Q    Would you agree that all surgeries have
19  risks?
20  A    Yes.
21  Q    That even in the absolute best of hands a
22  surgeon that there are complications that may not be
23  avoided?
24  A    Yes.
25  Q    If we talk about Ms. Gross, Ms. Gross had

Page 235

1  had prior surgeries before she had the surgery
2  involving Prolift®, had she not?
3  A    Correct.
4  Q    Had some recurrent prolapse?
5  A    She did not have recurrent prolapse.
6  Q    She'd had a hysterectomy before?
7  A    Correct.
8  Q    That's one of the issues that you consider
9  when you determine what surgery would be
10  appropriate?
11  A    I don't understand your question.
12  Q    Is it appropriate to consider what prior
13  surgeries a patient has had before you determine
14  what surgery to perform to correct the prolapse?
15  A    Of course, that's part of the patient's
16  history.  I don't know that that necessarily
17  modifies the surgical approach to her current
18  prolapse problem.
19  Q    Let me just ask you this:  What options
20  would you have considered as Ms. Gross' surgeon to
21  correct her problems in 2006?
22  A    Based on my understanding of her condition
23  at that time, with a Grade 3 to 4 rectocele and an
24  enterocele above that, I would have considered a
25  rectocele repair, a posterior colporrhaphy.  If I

Page 236

1  determined that she needed an apical prolapse
2  procedure, I would have considered an iliococcygeal
3  muscle repair, possibly a uterosacral ligament
4  suspension; and if I decided she needed it, which
5  would probably be an intraoperative decision, an
6  enterocele repair.
7  Q    How would you have counseled Ms. Gross in
8  advance of the surgery in terms of what her options
9  for treatment were?
10  A    As we discussed, I would go over
11  behavioral and lifestyle changes, pelvic muscle
12  exercises, pessary use, and surgery.
13  Q    And do you understand that all of those
14  were discussed with Ms. Gross?
15  A    My recollection from the records is that a
16  pessary was discussed.  I don't recall the
17  behavioral and lifestyle changes and exercises.
18  Q    Do you recall that Ms. Gross was not
19  interested in a pessary?
20  A    I recall that in the discussion with her
21  physician he was not enthusiastic it would be a good
22  solution for her.  And in her experience she also
23  preferred not to choose a pessary.
24  Q    What would you have discussed with
25  Ms. Gross about her surgical options?

Page 237

1  A    I would have discussed the procedures I
2  named before and that at least part of the decision
3  would be based on the intraoperative findings.
4  Q    And what would you have told her were the
5  complications associated with the surgery?
6  A    As we discussed yesterday, the general
7  risks of any surgery:  Bleeding, infection, risk of
8  anesthesia, complications that aren't directly
9  related to the surgical site but occur
10  postoperatively, like blood clots, pneumonia.
11  And then specific to the surgery, after
12  surgery pain with intercourse, voiding dysfunction.
13  I would mention the risk of ureteral injury since a
14  possibility would be uterosacral ligament
15  suspension, other organ injury that may need other
16  surgery to repair it.  That's all I can think of at
17  the moment.
18  Q    Would you discuss with her risk of damage
19  to the pudendal nerve?
20  A    Nerve damage.  I consider in the organ
21  tissue damage category nerve damage.  I would only
22  specifically mention that if I were considering a
23  sacrospinous ligament fixation.
24  Q    What would you have told her about the
25  possibility of recurrence?

7 (Pages 234 to 237)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 238

1    A    That these operations aren't perfect, we
2  can't obviously guarantee 100 percent success, and
3  that there's a possibility that her problem could
4  come back.
5    Q    And, in fact, about 30 percent of all
6  prolapse surgeries are for recurrence, aren't they?
7    A    I don't think that's a reliable number.
8    Q    That's certainly --
9    A    That's from one study.
10    Q    That number's certainly been reported, has
11  it not?
12    A    It's been reported to death.
13    Q    And there have been different studies
14  which have reported recurrence rates as high and in
15  excess of 50 percent; correct?
16    A    Recurrence, again, is a definition that's
17  undergone modification.  At a time in the past when
18  anatomic outcomes were the focus, patients were
19  labeled as having recurrent prolapse when it passed
20  a certain arbitrary point in the POP-Q system.  Many
21  of those women are asymptomatic, they don't need
22  subsequent surgery, they go on about their lives.
23    Q    My question was, Doctor:  Rates of
24  recurrence in excess of 50 percent have been
25  reported, have they not?

Page 239

1    A    Correct.
2    Q    Those have been reported out of the
3  Cleveland Clinic; correct?
4    A    Correct.
5    Q    Those were reported out of the Cleveland
6  Clinic when you were there; correct?
7    A    It was certainly a study I co-authored.  I
8  don't remember exactly when that was published, if I
9  had left the Cleveland Clinic by then.
10    Q    But the patients in the study, patients
11  were treated and the study was conducted while you
12  were at the Cleveland Clinic?
13    A    Correct.
14    Q    You are aware, are you not, that the FDA
15  premarket notification process prior to 2005 did not
16  require original clinical studies to support the
17  clearance of surgical mesh; correct?
18    A    Correct.
19    Q    In the course of looking at and reviewing
20  these records, have you looked at any clinical data
21  that was used to support the clearance of the AMS
22  products Apogee® or Perigee®?
23    A    Not specifically, no.
24    Q    Had you ever looked at any clinical data
25  or ever seen any clinical data on those two

Page 240

1  products?
2    A    Not specifically, no.
3    Q    Can you identify any transvaginal mesh
4  product that has more published clinical data than
5  Prolift®?
6    A    I think the relevant point is that there
7  was no data on Prolift® at launch.
8        MS. JONES:  Move to strike as
9  nonresponsive.
10  BY MS. JONES:
11    Q    My question, Doctor, was:  Can you
12  identify any transvaginal mesh product for whom
13  there is more published clinical data than on
14  Prolift®?
15    A    This is 2012.  It's an entirely different
16  situation.  And Ethicon pulled Prolift® off the
17  market in the face of all this data because it was
18  not safe and not effective.
19        MS. JONES:  Move to strike as
20  nonresponsive.
21  BY MS. JONES:
22    Q    My question for the third time, Doctor,
23  is:  Can you identify a single transvaginal mesh
24  product for which there is more published clinical
25  data than Prolift®?

Page 241

1    A    No.
2    Q    Can you identify other than Prolift® any
3  transvaginal mesh product for whom there is more
4  published data than Gynemesh® PS?
5    A    No.
6    Q    Have you reviewed, Doctor, any of the
7  preclinical bench or animal studies done on the
8  Prolene® PS or the Prolene® mesh?
9    A    The Gynemesh® PS mesh?
10    Q    Or the Gynemesh® PS mesh.
11    A    Yes.
12    Q    What studies have you reviewed?
13    A    The animal studies in a rat model looking
14  at mesh implantation in an abdominal location for
15  short-term histologic changes.
16    Q    I think I asked you this yesterday.  But
17  I'm not certain.  Have you yourself actually ever
18  performed any animal studies?
19    A    I have assisted the fellows in their work
20  with Dr. Moalli at the University of Pittsburgh in
21  her studies of -- in her animal studies.  And at the
22  Cleveland Clinic I supervised the fellows in the
23  performance of their research with animals.
24    Q    Have you ever actually implanted mesh in
25  an animal?

8 (Pages 238 to 241)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 242

1     A    No.
2     Q    Have you ever actually taken mesh out of
3   an animal and examined it pathologically?
4     A    I have not taken mesh out of an animal.  I
5   have examined it pathologically.
6     Q    The tissues from the animal?
7     A    Yes.
8     Q    Have you ever published on any of those
9   animal review studies?
10    A    They have been published.  I am not a
11  co-author.
12    Q    Doctor, have you ever performed any
13  studies to evaluate the foreign body response to any
14  mesh?
15    A    No.
16    Q    What is your understanding of the size of
17  a microphage?
18    A    I'm sorry?
19    Q    Do you know what the size of a microphage
20  is?
21         MR. SLATER:  A macrophage?
22         THE WITNESS:  Macrophage?  Macrophage
23  is what you're saying?
24  BY MS. JONES:
25    Q    Yes, yes.

Page 243

1     A    Macrophage is in the range of 10 to
2   20 microns.
3     Q    Do you know what the size of a leukocyte
4   is?
5     A    Macrophages are in the family of
6   leukocytes, so, yes, 10 to 20 microns.
7     Q    Have you ever seen any criticism by the
8   FDA of the pore size of the Gynemesh® PS or the
9   porosity of the Gynemesh PS?
10         MR. SLATER:  Can I have that question
11  read back?  I might have missed something there.
12         (The court reporter read the record
13  as follows:
14         "QUESTION:  Have you ever seen any
15  criticism by the FDA of the pore size of the
16  Gynemesh® PS or the porosity of the Gynemesh PS?")
17         MR. SLATER:  Objection; assumes the
18  issue was even ever looked at by the FDA.
19         You can answer.
20         THE WITNESS:  Not to my knowledge.
21  BY MS. JONES:
22    Q    Have you used polypropylene sutures in
23  your surgeries?
24    A    Yes.
25    Q    Since the time you were in your residency?

Page 244

1     A    Yes.
2     Q    Ever had any difficulties with use of
3   those sutures?
4     A    Difficulties like what?
5     Q    I'm asking you, Doctor.
6         MR. SLATER:  She's asking you to
7   define what you mean by "difficulties."  It's a
8   pretty ambiguous term, which I object to.
9   BY MS. JONES:
10    Q    You can't answer that question, Doctor?
11         MR. SLATER:  Can you refine what you
12  mean by "difficulties"?
13         MS. JONES:  I'm asking the doctor
14  whether she can answer the question.
15         MR. SLATER:  She already asked you to
16  define the term so I don't understand why you won't
17  do it.
18         MS. JONES:  Because I'm asking the
19  questions, counsel.
20         MR. SLATER:  Okay.  But she's already
21  asked you to refine what you mean.  So normally when
22  you're taking a deposition and the witness says I
23  don't know what you mean, you refine the question.
24         MS. JONES:  This is the first
25  deposition I've ever taken, Doctor -- I mean,

Page 245

1   counsel.
2         MR. SLATER:  If you're going to start
3   calling me Dr. Slater, okay, you're not going to be
4   the first one.  It's a big step up for me.  Wow.
5   BY MS. JONES:
6     Q    Have you ever filed an adverse experience
7   report with respect to polypropylene sutures?
8     A    No.
9     Q    Have you ever reported anywhere any
10  degradation with polypropylene sutures?
11    A    No.
12    Q    Have you ever seen any evidence of
13  degradation in your surgeries?
14    A    No.
15    Q    In terms of the mesh that you used in
16  abdominal sacrocolpopexy, have you ever seen
17  evidence of degradation there?
18    A    I wouldn't see evidence of degradation
19  because it's -- if it's going on, it's going on in
20  the patient's body.
21    Q    Have you ever seen any removed mesh,
22  Doctor, that shows any evidence of degradation?
23    A    Yes.
24    Q    When did you see that?
25    A    In my review of the medical literature.

9 (Pages 242 to 245)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 246

1    Q    My question, Doctor, was whether or not
2 you had actually seen mesh that showed any evidence
3 of degradation.
4    A    I believe I answered your question.
5    Q    You've held mesh that shows evidence of
6 degradation?
7    A    You didn't ask me if I held it.
8    Q    Let's see if we can get on the same
9 wavelength.
10        MR. SLATER:  Whatever you do, don't
11 get on the same wavelength.
12 BY MS. JONES:
13    Q    I'm asking you, Doctor, whether or not you
14 have held in your hands any polypropylene mesh of
15 which you decided or could discern any evidence of
16 degradation.
17    A    No.
18    Q    Have you ever had a patient who had a
19 failure of mesh that you attributed to degradation?
20    A    I can't say -- I can't say.  I can't say
21 no for sure.  Patients experience failure and it's
22 possible that it's due to suture breakage, which
23 would be due to suture degradation.
24    Q    All right.  Maybe we miscommunicated.  I
25 was asking you about the mesh itself this time.

Page 247

1        MR. SLATER:  What's the question?
2 She must have misunderstood.
3        MS. JONES:  I asked her whether or
4 not she had ever had a failure of mesh in a patient
5 that she attributed to degradation.
6        THE WITNESS:  No.
7 BY MS. JONES:
8    Q    Prior to becoming or being retained as an
9 expert in this litigation, is it fair to say that
10 you had not previously reviewed the literature on
11 polypropylene?
12    A    In my experience as the program director
13 for the pelvic floor disorders network, we were
14 considering the design of a trial using mesh.  At
15 that time I would have reviewed the literature to
16 understand what had been done with mesh products and
17 what other research was needed.
18    Q    What can you remember about your review of
19 the literature at that time specifically as it
20 relates to polypropylene mesh?
21    A    The literature was lacking.
22    Q    What can you remember about your review of
23 the literature at that time with respect to
24 polypropylene mesh?
25    A    There may have been case series and

Page 248

1 retrospective chart reviews.  I don't recall seeing
2 any prospective research.
3    Q    Do you recall reviewing any biomaterials
4 literature at that time with respect to the
5 characteristics of polypropylene?
6    A    I may have.  I can't say for sure.
7    Q    Do you remember reviewing any literature
8 with respect to the historical use of polypropylene
9 in the body?
10    A    I would expect so.
11    Q    Well, can you tell me as you sit here
12 today when polypropylene was first used in the body?
13    A    I believe it was in the '50s or '60s.
14    Q    Do you know when polypropylene mesh was
15 first used in the body?
16    A    I believe in that same time, '50s or '60s.
17    Q    As you sit here today, Doctor, can you
18 identify any alternative mesh product that you
19 believe is a better product for use to treat
20 prolapse than Gynemesh® PS?
21    A    I don't believe mesh of any type in the
22 polypropylene family is an appropriate choice for
23 transvaginal mesh implantation.
24    Q    Let me ask the question a little bit
25 differently.  Can you identify for me any type of

Page 249

1 mesh that you believe is appropriate for use
2 transvaginally?
3    A    Based on my background and my study, my
4 conclusion is that any mesh placed transvaginally
5 for prolapse exceeds -- the risks far exceed the
6 benefit.
7    Q    Am I correct then, Doctor, that you, as
8 you sit here today, cannot identify for us an
9 alternative mesh to Prolift® for use transvaginally
10 to repair prolapse?
11    A    You're suggesting an alternative is
12 necessary.  I don't agree with that.
13    Q    I'm just asking you, Doctor, whether or
14 not you can identify one.
15        MR. SLATER:  Well, let me just ask
16 what the question means.  She just told you she
17 doesn't think any of the meshes should be used.  So
18 when you say can you identify one, are you asking
19 her to just list them?
20        MS. JONES:  Could we not have
21 speaking objections?
22        MR. SLATER:  Well, I object to the
23 form.  It's incredibly ambiguous, the question.
24 Could you rephrase it?
25        MS. JONES:  How about let me conduct

10 (Pages 246 to 249)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 250

1  this and you just say objection, as I have done at
2  your depositions, and we'll be in good shape.
3       MR. SLATER:  Well, you went a little
4  past the word "objection," with all due respect, so
5  I think the question is extremely confusing and
6  ambiguous.
7  BY MS. JONES:
8       Q   I'm asking you, Doctor, this question:
9  You have told us that you do not consider any mesh
10 to be appropriately used for the transvaginal
11 treatment of prolapse; is that correct?
12      A   I believe I said polypropylene mesh or
13 mesh in the polypropylene family.
14      Q   All right.  That's what I thought you
15 said.  So can you tell me then of any mesh that can
16 be appropriately used transvaginally?
17      A   I don't believe such a product exists.
18      Q   So it's fair to say that while you're
19 saying polypropylene mesh should not be used, that
20 you're not suggesting that there is a better
21 alternative mesh than polypropylene?
22      A   I don't agree with your use of the word
23 "alternative."
24      Q   Well, I'm trying to understand your
25 opinions, Doctor.  So what I'm asking you is, is

Page 251

1  there a better mesh of which you are aware than the
2  polypropylene mesh?
3       A   A yes or no answer would not -- would be
4  misleading.  You're suggesting that there's a
5  comparison to be made.  I can use the words of one
6  of Ethicon's own employees:  The best of a bad lot,
7  talking about polypropylene.
8       MS. JONES:  Move to strike as
9  nonresponsive.
10 BY MS. JONES:
11      Q   My question, Doctor, doesn't relate to
12 polypropylene.  My question relates to whether or
13 not you have an opinion that there is a mesh that
14 has better characteristics for implantation in the
15 body than polypropylene.
16      A   I have answered that I don't believe a
17 mesh exists that's appropriate for transvaginal
18 implantation for Prolift® -- prolapse.  Excuse me.
19      Q   So it would be your opinion that no mesh
20 should be on the market for the transvaginal
21 treatment of prolapse?
22      A   I believe that the mesh -- let me start
23 again.  The greater part of my knowledge revolves
24 around Gynemesh® PS mesh used in Prolift®.  To my
25 understanding, every product on the market went

Page 252

1  through the 510(k) process, which in my opinion is
2  inadequate to demonstrate the safety of these
3  meshes.
4       MS. JONES:  Move to strike as
5  nonresponsive.
6  BY MS. JONES:
7       Q   My question, Doctor, was this:  Is it your
8  testimony and your opinion that no mesh should be on
9  the market for the transvaginal treatment of
10 prolapse?
11      A   My opinion is that if a mesh belongs on
12 the market for the transvaginal treatment of
13 prolapse, the safety needs to be established first.
14      MS. JONES:  Move to strike as
15 nonresponsive.
16 BY MS. JONES:
17      Q   As we sit here today, Doctor, is it your
18 opinion that no mesh used for transvaginal treatment
19 of prolapse should be on the market?
20      A   I believe I answered that question.  To my
21 understanding, all of the products currently on the
22 market have gone through 510(k) process, which in my
23 opinion is insufficient to establish their safety.
24 If they're not safe, they don't belong on the
25 market.

Page 253

1       Q   So your opinion is that no mesh currently
2  used for the transvaginal treatment of prolapse
3  should be on the market?
4       A   I believe I answered that question.
5       Q   I'm just asking you, Doctor, am I correct
6  that that is your opinion?
7       A   I don't believe that -- I believe I've
8  answered that question and I don't believe that
9  question can be answered with a simple yes or no.
10      Q   Well, tell me then, Doctor, identify for
11 me as you sit here today the mesh that you believe
12 should be on the market for the transvaginal
13 treatment of prolapse.
14      A   I already told you I don't believe that
15 mesh exists at this point in time.
16      Q   Do you know how many doctors in this
17 country have used polypropylene mesh for the
18 transvaginal treatment of prolapse?
19      A   No.
20      Q   You do know that a significant number of
21 surgeons in this country have used transvaginal mesh
22 for the treatment of prolapse; correct?
23      A   I know that a significant number of
24 surgeons have used mesh and have abandoned it
25 because they believe it's too unsafe to be used in

Confidential - Subject to Stipulation and Order of Confidentiality

Page 254

1  their patients.
2      Q   You know that not every woman who has had
3  transvaginal mesh used to correct prolapse has
4  experienced complications, don't you?
5      A   Not yet.  These women are at lifelong risk
6  for complications from the permanent implantation of
7  Prolift® mesh.
8      Q   Based upon the studies and the literature
9  that are out there, 75 to 80 percent of the women
10  who have transvaginal mesh used to correct prolapse
11  have had no major complications; correct?
12      A   Not yet.  There is no safe time -- one of
13  your experts in the medical literature -- there is
14  no safe time after mesh implantation for eliminating
15  the risk of complications.
16          MS. JONES:  Move to strike as
17  nonresponsive.
18  BY MS. JONES:
19      Q   As we sit here today, today, Doctor, 75 to
20  80 percent of the women who have had transvaginal
21  mesh correction of Prolift® have experienced no
22  significant, major complications; correct?
23          MR. SLATER:  Objection.
24          THE WITNESS:  Where do you get the --
25          MR. SLATER:  You can go ahead.

Page 255

1          THE WITNESS:  Where do you get the 75
2  to 80 percent?
3  BY MS. JONES:
4      Q   Well, let me just ask you first, do you
5  agree with that?  That's my question.
6      A   I would like to know the basis for your
7  question.  I would like to know the basis for which
8  you claim that 75 to 80 percent of women after
9  Prolift® implantation have not had significant,
10  major complications.
11      Q   You know, Doctor, I get to ask the
12  questions here.
13      A   And I get to have the questions clarified.
14      Q   Well, my question to you is do you agree
15  with that figure or not?
16      A   I am not going to agree with that
17  statement on the basis of a lack of clarification.
18      Q   Have you looked at the medical literature
19  with respect to the use of transvaginal mesh?
20      A   Short term.
21      Q   My question, Doctor, is have you looked at
22  the medical literature with respect to the use of
23  transvaginal mesh?
24      A   Yes.
25      Q   And that medical literature reports on

Page 256

1  complications noted in the studies, whether it's
2  case studies or randomized trials, does it not?
3      A   It may.  It may not be complete or
4  accurate.  For example, in the TVM studies that were
5  published, the five-year study that was published in
6  the medical literature is inaccurate and does not
7  accurately provide the extent of complications
8  experienced by women who had the TVM procedure.
9      Q   As I recall, Doctor, you have never
10  examined a woman that's had Prolift®; is that
11  correct?
12      A   That is correct.
13      Q   Have you ever spoken with a woman that's
14  had Prolift®?
15      A   It's not on her forehead.
16      Q   I'm sorry?
17      A   It's not on her forehead.  Not to my
18  knowledge.
19      Q   Have you ever done --
20          MR. SLATER:  Do you want to take a
21  break?
22          THE WITNESS:  Is this a good time for
23  a break?
24          MR. SLATER:  If you need a break,
25  it's a good time.

Page 257

1  BY MS. JONES:
2      Q   Let me ask this question first.  Have you
3  ever done any separate analysis, Doctor, of any
4  literature regarding Prolift® complications?
5          MR. SLATER:  What do you mean by a
6  "separate analysis"?  Beyond what she's done in this
7  case?
8          THE WITNESS:  What do you mean by
9  "separate analysis"?
10  BY MS. JONES:
11      Q   Have you ever sat down, Doctor, and done a
12  meta-analysis of studies involving Prolift®?
13      A   No.
14          MS. JONES:  Let's take a break.
15          (Short recess.)
16  BY MS. JONES:
17      Q   Doctor, in your reports that outline your
18  opinions in this case, have you set forth your
19  criticisms of the medical literature and the
20  individual studies?
21      A   Yes.
22      Q   To the best of your knowledge as you sit
23  here today, have you identified all of those
24  criticisms?
25      A   Yes.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 258

1    Q   If we turn to the instructions for use for
2  Prolift®, you have opinions about the adequacy of
3  the warnings that were included within them; am I
4  correct?
5    A   Yes.
6    Q   Can you tell me, Doctor, or just summarize
7  for me, if you would, your opinions of what should
8  have been in the IFU in terms of complications that
9  were not in there and when they should have been
10  included?
11    MR. SLATER:  Do you mind if she has
12  her report available or the IFU available?  Because
13  she has nothing in front of her right now.
14    MS. JONES:  I understand.  And I will
15  stipulate to you that whatever is in the report is
16  in the report.  I'm not trying to trick you.  I'm
17  just trying to move quickly through this.
18    MR. SLATER:  Because it's kind of
19  hard to remember everything sitting here.
20    THE WITNESS:  I would prefer to have
21  my report.
22    MS. JONES:  Then you're more than
23  welcome.
24    MR. SLATER:  Unless counsel might
25  want you to just throw out a couple and she's just

Page 259

1  going to ask you questions about the few that you
2  come up with now as long as we understand --
3    MS. JONES:  If you want to have your
4  report, you can have it.  I was, frankly, just
5  trying to move along quickly in the hopes we could
6  finish today.  I'm not trying to put anybody at a
7  disadvantage.
8    MR. SLATER:  I'm fine with doing
9  this.  I just don't want it to be construed later
10  that her testimony was some complete list.  That's
11  all.  As long as we have that understanding, it's
12  fine.  It's up to you.
13    MS. JONES:  I'm willing to say that
14  whatever's in the report is in the report.  I'm not
15  trying to trick you in any way, shape, or form.  But
16  I'm also willing to let you have the report and go
17  through it.
18    THE WITNESS:  Could you repeat the
19  question, please?
20    (The court reporter read the record
21  as follows:
22    "QUESTION:  Can you tell me, Doctor,
23  or just summarize for me, if you would, your
24  opinions of what should have been in the IFU in
25  terms of complications that were not in there and

Page 260

1  when they should have been included?")
2    THE WITNESS:  Well, I can answer the
3  last part of the question first.  Clearly they
4  should have been included from the moment Prolift®
5  was on the market.
6  BY MS. JONES:
7    Q   While you're looking for that, Doctor, is
8  it your testimony that you believe that every
9  potential complication associated with the use of
10  Prolift® was known at the time that it was first
11  marketed?
12    A   I understand that was the testimony of
13  Ethicon employees; yes.
14    Q   I was asking really for your opinion at
15  the time.
16    A   No.  My opinion at the time was that all
17  of the risks were not known and that evolved over
18  time.  In fact --
19    Q   How do you understand that those risks --
20    A   -- the treating physicians of the
21  plaintiffs testified that they learned over time
22  several of the contraindications and additional
23  risks that Ethicon failed to inform them of.
24    Q   What is your understanding of how that
25  evolved over time?

Page 261

1    A   My understanding is that patients with
2  preexisting chronic pain conditions are
3  contraindicated to undergo the Prolift® procedure
4  because they are at such higher risk of developing
5  either an exacerbation of their preexisting
6  condition or the development of a new pain condition
7  and that was not warned of at the time of Prolift®
8  launch.
9    Q   Let me ask you this, Doctor:  In terms of
10  women with a chronic pain condition, those women
11  would be at increased risk of pelvic pain regardless
12  of the type of surgery that was performed, would
13  they not?
14    A   That is not my clinical experience.
15    Q   In the course of your clinical experience,
16  did you perform prolapse surgery on patients with a
17  chronic pain syndrome?
18    A   Yes.
19    Q   Tell me what types of chronic pain
20  syndrome you would perform surgery on.
21    A   Fibromyalgia, arthritis, migraine
22  headaches.  That's all I can think of at the moment.
23    Q   Do you have any idea as you sit here today
24  how many women you performed prolapse surgery on who
25  had fibromyalgia?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 262

1     A    I do not know.
2     Q    How about how many women had migraine
3  headaches?
4     A    I do not know.
5     Q    Did you take any special precautions for
6  women who had chronic pain syndrome?
7     A    I counseled them that in the immediate
8  postoperative period they may experience more pain
9  and we will do everything we can to manage that
10  effectively for them.  Outside of the immediate four
11  to six weeks after surgery, that should have
12  resolved to baseline.
13     Q    Did you counsel all women whom you knew
14  had had chronic pain conditions about that?
15     A    That would have been my practice.
16     Q    Is that something that you think would be
17  a standard practice for surgeons performing prolapse
18  surgery?
19     A    I don't want to speak for all surgeons
20  performing prolapse surgery.
21     Q    Is that something that you trained your
22  residents to do?
23     A    Yes.
24     Q    Is that something that you trained your
25  fellows to do?

Page 263

1     A    Yes.
2     Q    Is that something that you did beginning
3  in the course of your residency?
4     A    I don't remember that specifically.
5     Q    When did you begin to counsel patients
6  about chronic pain syndromes?
7     A    That would have been in my residency when
8  they were surgical candidates.
9     Q    So from the time you were in your
10  residency, you would have counseled patients on
11  those chronic pain situations?
12     A    Correct.
13     Q    And that was something that you were
14  trained to do in your residency?
15     A    Correct.
16     Q    And what do you consider to be chronic
17  pain conditions or syndromes?
18     A    I don't understand your question.  Are you
19  asking again for a list of chronic pain conditions?
20     Q    I am.
21     A    All chronic pain conditions?
22     Q    What I'm asking for is a list, Doctor, of
23  the conditions that would prompt you to counsel
24  patients about that.
25     A    So you're asking for a list of all chronic

Page 264

1  pain conditions?
2     Q    I am, if that's what you would --
3     A    Okay.  To the best of my recollection at
4  the moment, I already mentioned fibromyalgia,
5  arthritis -- I can't remember the third thing I
6  said.
7     Q    You said migraines.
8     A    Migraines.  Thank you.  Interstitial
9  cystitis, endometriosis.  Many chronic pain
10  syndromes don't have a diagnosis.  They are
11  described as a chronic pain syndrome.  I'm trying to
12  give you a list of the conditions that actually have
13  a diagnosis.
14     Q    Well, can you give me some -- other than
15  what you've already given, are there other examples
16  of complaints that women had experienced that would
17  prompt you to have the conversation with them about
18  chronic pain and any increased risk?
19     A    Pelvic muscle spasm.  I can't think of any
20  other conditions at this time.
21     Q    If you became aware as a physician that a
22  patient had complained of significant pain following
23  earlier surgical procedures, would you have
24  counseled them on that?
25         MR. SLATER:  Objection; ambiguous.

Page 265

1         You can answer.
2         THE WITNESS:  Significant pain that
3  became chronic?
4  BY MS. JONES:
5     Q    That's what I'm trying to ask you.  I'm
6  trying to understand under what circumstances you
7  would counsel patients on chronic pain and any
8  increased risk.
9         MR. SLATER:  Objection; ambiguous.
10         You can answer.
11         THE WITNESS:  I don't know that I can
12  add to the list I've already given you.
13  BY MS. JONES:
14     Q    But you would counsel patients about that
15  regardless of the type of prolapse surgery that you
16  were going to perform?
17         MR. SLATER:  Objection.
18         You can answer.
19         THE WITNESS:  Yes, yes.
20  BY MS. JONES:
21     Q    I mean, it didn't make any difference
22  whether it was a vaginal sacrospinal ligament
23  fixation or an abdominal sacrocolpopexy?
24     A    Correct.
25     Q    Other than the chronic pain syndrome that

14 (Pages 262 to 265)

Confidential - Subject to Stipulation and Order of Confidentiality

1  you just mentioned, are there other complications
2  that you believe should have been included within
3  the IFU at the time of launch?
4      A   Infection potentiation was included as a
5  risk and that is an inadequate statement to --
6      Q   I'm sorry.  What --
7      A   Oh, Page 405.  And that is an inadequate
8  description of the nature and extent and severity of
9  the kinds of infectious complications that can occur
10  after the Prolift® procedure and permanent Prolift®
11  mesh implantation.
12      Q   Can you identify for me, Doctor, any
13  studies that show a statistical significant
14  increased risk of infection associated with
15  Prolift®?
16      A   There are two types of infections.  The
17  first type of infection is an acute infection, an
18  abscess, as an example.  And to my knowledge, that
19  type of infection has not been increased after
20  Prolift® procedures.
21          The second type of infection is a chronic
22  low-grade infection, and that is something that
23  occurs more commonly after Prolift® surgery than
24  after native tissue repair.
25      Q   And can you tell me what study you're

1  relying upon when you say that?
2      A   Because Ethicon failed to study the
3  etiology of mesh erosion, the etiology is not
4  completely understood.  Surgeons believe that a
5  chronic low-grade infection is responsible for mesh
6  erosion and recurrent mesh erosion.  And in that way
7  that is an example of a chronic low-grade infection
8  that can only occur after mesh implantation and
9  specifically Prolift®.
10      Q   Doctor, my question was really can you
11  identify specifically for me what you're relying
12  upon when you make those statements?
13      A   All of the articles that demonstrate at
14  least a 10 percent -- not at least -- an average of
15  10 percent and many studies showing much higher
16  rates of mesh erosion.
17      Q   Erosion, not infection, erosion?
18      A   Again, because the etiology is not
19  understood because Ethicon failed to study this,
20  mesh -- surgeons are still trying to figure out what
21  causes mesh erosion.  And it's plausible from a
22  biological standpoint that these are low-grade
23  subclinical infections and are causing mesh erosion
24  and recurrent mesh erosion.
25      Q   And that is a hypothesis at this point?

1      A   I don't think I would label it a
2  hypothesis.
3      Q   Then can you identify for me a study that
4  shows a statistically significant increased risk of
5  a low-grade infection?
6      A   Mesh erosion.
7      Q   I'm asking you for a study.  Can you just
8  identify for me what it is that you're relying upon
9  when you make those comments?
10          MR. SLATER:  With all due respect,
11  I'm not going to go through what she said -- and
12  you're tilting your head at me -- but, you know,
13  she's given you a very, very specific answer and
14  given you chapter and verse on a whole extent of
15  literature.
16          MS. JONES:  Counsel, I've asked four
17  times --
18          MR. SLATER:  And you've gotten a
19  direct answer.
20          MS. JONES:  I have asked four times
21  for the identification of a study and we don't have
22  a study that's been identified yet.  If there's not
23  one, there's not one.
24  BY MS. JONES:
25      Q   I'm just asking what it is specifically

1  that you rely upon.  What is it that you rely upon
2  for those statements?
3      A   The Altman study didn't even report the
4  number of patients who experienced mesh erosion.  It
5  reported the number of patients who required surgery
6  for mesh erosion.  Every single study of Prolift® in
7  the literature identifies that specific rate of mesh
8  erosion in that study.  That's the studies -- those
9  are the studies I am relying on.
10      Q   So you're relying on erosion as being
11  identical to infection?
12      A   To the best of my understanding in 2012,
13  because Ethicon failed to study this and understand
14  the etiology of mesh erosion before they put the
15  Prolift® or even the Gynemesh® PS mesh on the
16  market, etiology of mesh erosion is not completely
17  understood.  To my understanding, the most logical
18  explanation is a subclinical low-grade infection
19  because the mesh is contaminated on placement and
20  that contamination cannot be cleared.  It shows
21  itself as mesh erosion and recurrent mesh erosion.
22          MS. JONES:  Move to strike as
23  nonresponsive.
24  BY MS. JONES:
25      Q   Doctor, tell me, if you would, what you

Confidential - Subject to Stipulation and Order of Confidentiality

Page 270

1  rely upon in support of your opinion that a
2  subclinical infection causes mesh erosion.
3          MR. SLATER:  In addition to what she
4  just told you, counsel?
5          MS. JONES:  I'm just asking her to
6  tell me.
7          MR. SLATER:  Hang on.  It's asked and
8  answered.  So I'm asking you do you want her to
9  repeat what she said or in addition to what she
10  said?
11          MS. JONES:  I want her to tell me
12  what she relies upon specifically --
13          MR. SLATER:  She just told you.
14          MS. JONES:  -- for the opinion that a
15  subclinical infection causes erosion.
16          MR. SLATER:  And you were asking in
17  the literature.  Now it goes beyond the literature?
18  She can bring out anything else?
19          MS. JONES:  I've never gotten
20  anything out of the literature.
21          MR. SLATER:  Well, you have.  She
22  listed every single Prolift® study with erosion
23  rates.
24          MS. JONES:  Counsel, come on.  It's
25  inappropriate.

Page 271

1          MR. SLATER:  It's not inappropriate.
2  She said it three times.
3          MS. JONES:  It is inappropriate.  And
4  I don't want to go to the judge, but even the judge
5  is going to recognize these are speaking objections.
6  We've got an expert witness here who can answer the
7  questions.  This is inappropriate.
8          MR. SLATER:  Well, it's
9  inappropriate, too, for counsel to pretend that an
10  answer hasn't been given and to continue to ask the
11  same question because you don't like the answer.
12          MS. JONES:  No, I haven't gotten the
13  answer.  And we can look at it and we can ask Judge
14  Higbee to look at it.
15          MR. SLATER:  You have the right to do
16  that.  I feel very confident that what I'm doing is
17  appropriate right now.
18          MS. JONES:  Well, I don't think it's
19  appropriate, what Judge Higbee thinks is
20  appropriate.  So I'm going to ask the question one
21  more time.
22  BY MS. JONES:
23     Q   I'd like, Doctor, for an answer to the
24  question.  Specifically what is it upon which you
25  rely that says a subclinical infection causes

Page 272

1  erosion?
2     A   In addition --
3          MR. SLATER:  Same objection.
4          You can answer again.
5          THE WITNESS:  In addition to all the
6  evidence in the medical literature, I rely on the
7  experience and opinion of surgeons who are
8  experienced in caring for women who have mesh
9  erosion and recurrent mesh erosion and who have
10  studied this over their years of clinical practice
11  in order to somehow find a better way to treat these
12  women, because we don't --
13  BY MS. JONES:
14     Q   Can you name those surgeons for me?
15     A   Dr. Shlomo Raz.
16     Q   Anybody else?
17     A   I don't remember his name.  He is the
18  infectious disease expert from the University of
19  Connecticut.
20     Q   Okay.  The infectious disease expert in
21  this litigation?
22     A   Yes.
23     Q   Anybody else?
24     A   That's all I can think of off the top of
25  my head.

Page 273

1     Q   Do you believe, Doctor, and is it your
2  opinion that the erosions associated with
3  transvaginal mesh are different from the erosions
4  with other mesh?
5          MR. SLATER:  Objection to the form.
6          You can answer.
7          Highly ambiguous.
8          You can answer.
9          THE WITNESS:  Yes.
10  BY MS. JONES:
11     Q   How?
12     A   The mesh is implanted through what is
13  termed surgically a clean contaminated environment.
14  It's laden with bacteria from the moment it's in the
15  woman's body.
16     Q   That's with the transvaginal mesh?
17     A   Correct.
18     Q   What causes erosion in the mesh used in
19  abdominal sacrocolpopexy?
20     A   The characteristics of the mesh incite an
21  inflammatory reaction and foreign body reaction that
22  disturbs the surrounding tissue and results in the
23  formation of an erosion.
24     Q   And that's different from what happens
25  with a transvaginal mesh?

16 (Pages 270 to 273)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 274

1    A    Are you asking me to differentiate
2  abdominal sacrocolpopexy?
3    Q    I'm asking you how the erosions that occur
4  with meshes not used in transvaginal surgery are
5  caused and how those differ from what's used in
6  transvaginal surgery.
7          MR. SLATER:  Objection to the form.
8          You can answer.
9          THE WITNESS:  First of all, in
10 abdominal sacrocolpopexy the mesh is placed on the
11 outside of the vagina from an internal basis.  In
12 transvaginal mesh implantation, the vagina is
13 incised, dissected, creating whatever level of
14 tissue damage occurs with incisions and dissection.
15 And, as I said, the mesh is contaminated in
16 placement because of the natural vaginal
17 microenvironment that cannot be sterilized at the
18 time of surgery.  The surgical field cannot be
19 separated, draped in such a way as to isolate a
20 specific area that you're operating on in order to
21 prevent the introduction of bacteria with mesh
22 implantation.  That's one reason.
23 BY MS. JONES:
24    Q    I'm sorry, Doctor.  We're just not
25 communicating.  If you have mesh that's used in

Page 275

1  abdominal sacrocolpopexy, there have been reports of
2  erosion; correct?
3    A    Vaginal erosions, correct.
4    Q    And my question to you is whether or not
5  the cause of those erosions is different from the
6  cause of the erosions you see with transvaginal
7  mesh.
8    A    As I've already said, the etiology of
9  erosions is not fully understood.  Mesh -- bacterial
10 contamination of the mesh is logical in
11 understanding why mesh erosion occurs and why mesh
12 erosion occurs so much more frequently in
13 transvaginal Prolift® mesh implantation than in
14 abdominal mesh implantation.
15   Q    And so is the answer that as you sit here
16 today, you don't know whether or not there's a
17 different etiology for mesh erosion associated with
18 abdominal sacrocolpopexy versus the transvaginal
19 inserted mesh?
20   A    That is correct.  The etiology of mesh
21 erosion is not completely understood.
22   Q    We started this discussion when we were
23 talking about your criticisms of the IFU.  And I
24 guess my question, Doctor, is if we go through this,
25 are you going to take me through each one of these

Page 276

1  things that you've noted and say you have completely
2  set out your opinions here in your report?
3    A    My opinions are completely set out in my
4  report.
5          MR. SLATER:  Obviously, counsel,
6  there are supplemental reports, too.
7  BY MS. JONES:
8    Q    Doctor, have you ever talked with or
9  visited with a surgeon who has used Prolift® to
10 treat women?
11   A    You mean specific to the Prolift®?
12   Q    Yes, ma'am.
13   A    No.
14   Q    Have you ever spoken with a doctor who has
15 gone through the Prolift® professional education
16 program about that program?
17   A    No.
18   Q    Have you ever spoken with a doctor who has
19 gone through either a proctorship or a preceptorship
20 with respect to Prolift®?
21   A    No.
22   Q    Have you ever attended any professional
23 meetings where studies with respect to Prolift® were
24 specifically discussed?
25   A    Yes.

Page 277

1    Q    What were those?
2    A    I don't remember specifically.  It would
3  be in the years between 2005 and 2007, the end of
4  2007, when I was still attending professional
5  meetings.
6    Q    Do you remember who presented?
7    A    No.
8    Q    Do you remember what study was presented?
9    A    No.
10   Q    Do you remember anything about any
11 discussion at the time?
12   A    Discussion, very controversial.  Doctors
13 were very gravely concerned that the widespread use
14 of mesh was happening without evidence of safety
15 and, in fact, with strong evidence of grave harm to
16 patients without demonstrated benefit.
17   Q    Can you identify for me, Doctor, any
18 doctors who expressed that view?
19   A    Dr. Ingrid Nygaard; Dr. Peggy Norton;
20 Dr. Linda Brubaker; Dr. Mary Pat FitzGerald;
21 Dr. Matt Barber; Dr. Scott Smilen, S-M-I-L-E-N;
22 Dr. Robert Porges, P-O-R-G-E-S; Dr. Bob Shull,
23 S-H-U-L-L.  Do you want me to keep going?
24   Q    All of these doctors expressed a view at
25 this meeting that you attended?

17 (Pages 274 to 277)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 278

1    A    I'm reflecting on a number of meetings.
2    Q    How many meetings did you attend where
3  Prolift® was discussed?
4    A    I can estimate four to six.
5    Q    And can you tell me what meetings they
6  were?
7    A    I can tell you what meetings they were
8  likely to be.  The American Urogynecologic Society
9  and the Society of Gynecologic Surgeons.
10    Q    And you would have attended four to six of
11  those between 2005 and 2007?
12    A    They're held annually so that would be
13  six, yes.  They're separate meetings.  Three years,
14  two meetings a year, six meetings.
15    Q    I asked you to identify for me the people
16  that expressed concerns.  There were also people
17  expressing the other side of that, were there not?
18    A    Yes.  Those doctors were largely paid by
19  Ethicon.
20    Q    There were doctors who were not paid by
21  Ethicon that were involved in and used mesh, did
22  they not?
23    A    Yes.
24    Q    Do you remember any of the presentations
25  where doctors suggested that the use of transvaginal

Page 279

1  mesh was appropriately used for prolapse?
2    A    No, I do not remember specific
3  presentations.
4    Q    Do you remember the names of any doctors
5  who presented on that?
6    A    Not specifically.
7    Q    Do you remember whether or not you ever
8  saw any presentation involving any of the members of
9  the TVM group?
10    A    I don't remember specifically.
11    Q    Do you know how many academic institutions
12  were training surgeons on the use of transvaginal
13  mesh?
14    A    No.
15    Q    Do you know how many fellowship programs
16  trained fellows on the use of transvaginal mesh?
17    A    No.
18    Q    Do you know how many fellowship programs
19  continue to train fellows or surgeons on the use of
20  transvaginal mesh for treatment of prolapse?
21    A    Well, they can't train on Prolift® because
22  it's been pulled off the market and --
23        MS. JONES:  Move to strike as
24  nonresponsive.
25        THE WITNESS:  -- Gynemesh® PS mesh

Page 280

1  has been restricted to abdominal use.
2        MS. JONES:  Move to strike as
3  nonresponsive.
4  BY MS. JONES:
5    Q    Doctor, my question was:  Do you know how
6  many fellowship programs continue to train fellows
7  on the use of transvaginal mesh to treat prolapse?
8    A    No, I don't.
9        Excuse me.  I'd like to take two minutes
10  to go to the restroom.
11        MS. JONES:  Please.
12        (Short recess.)
13  BY MS. JONES:
14    Q    Doctor, I'm going to talk about Ms. Gross
15  for a second.  So until and unless I tell you
16  something else, that's who we're going to be talking
17  about.  Okay?
18    A    Okay.
19    Q    As I understand the opinions that have
20  been set forth in your report, you believe that she
21  experienced left pudendal neuralgia from Prolift®;
22  am I correct?
23    A    Correct.
24    Q    Partial urinary retention?
25    A    Correct.

Page 281

1    Q    Mesh erosion and exposure?
2    A    Correct.
3    Q    Fear, anxiety, and depression?
4    A    Correct.
5    Q    And that she is fully disabled?
6    A    Correct.
7    Q    Now, did I correctly summarize the
8  case-specific opinions that you have with respect to
9  Ms. Gross and her injuries?
10    A    Yes.
11    Q    I know that you testified yesterday that
12  you were initially contacted in this litigation in
13  the fall of 2009.  When were you first asked to
14  review the medical records of Ms. Gross?
15    A    I don't remember specifically.
16    Q    Can you give me an approximation of when
17  you first began to review Ms. Gross' medical
18  records?
19    A    No.
20    Q    Can you tell me how long you spent
21  reviewing Ms. Gross' medical records in preparation
22  of that report?
23    A    No, I can't estimate that.
24        MS. JONES:  Counsel, I think you told
25  me yesterday that you would get a copy of the

18 (Pages 278 to 281)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 282

1  financial disclosure.
2        MR. SLATER:  Oh, yeah.  It's sitting
3  around the corner.  Want me to look for it now?
4        MS. JONES:  Well, no, but let's get
5  it at the break.
6        MR. SLATER:  Absolutely.
7        MS. JONES:  Because I would like to
8  see it before and mark that.
9        MR. SLATER:  I have the packet with
10  all the experts so I'll give you the whole thing,
11  because apparently no one showed it to you.
12        MS. JONES:  I'm not suggesting --
13        MR. SLATER:  They're so busy passing
14  notes to you they're not giving you our disclosures.
15  BY MS. JONES:
16    Q   Is there any way, Doctor, that you can
17  separate out for us the time that you spent
18  reviewing and preparing your opinions with respect
19  to Ms. Gross?
20    A   No.
21    Q   Would the answer be the same with respect
22  to Ms. Wicker?
23    A   Yes.
24    Q   And I think it's implicit in what I just
25  asked you, but it is also correct then that you did

Page 283

1  not separately invoice Mr. Slater for the
2  preparation of your opinions with respect to
3  Ms. Gross?
4    A   Correct.
5    Q   Or Ms. Wicker?
6    A   Correct.
7    Q   To the best of your knowledge, have you
8  reviewed the complete medical records of Ms. Gross?
9    A   Complete as in her whole life?
10    Q   Well, have you reviewed the complete
11  medical records of every doctor whose records you
12  have reviewed?
13    A   Yes, all material provided to me I have
14  reviewed.
15    Q   But that's not really my question.  My
16  question is:  Did you receive excerpts from my
17  doctors' files?
18    A   No.  Well --
19    Q   Here's the question:  Sometimes doctors
20  only receive copies of the operative reports, for
21  example, and not the notes.  And that's all I'm
22  asking is whether or not you reviewed the complete
23  records of the doctors that you have identified in
24  the supplemental materials reviewed or whether you
25  only received certain portions of those files.

Page 284

1    A   If I understand your question correctly,
2  you're asking me to identify something that I don't
3  know I've seen.  So I don't know how to answer that.
4    Q   I'm asking the question because, frankly,
5  Doctor, what I looked at earlier in terms of the
6  materials reviewed didn't necessarily have all the
7  Bates numbers and all there so I can't tell exactly
8  what you've reviewed from each doctor's files.  But
9  I do know that you can sometimes review the files
10  and it's apparent that you don't have the complete
11  file from a given doctor.  And that's what I'm
12  asking you.
13    A   I -- it was not obvious to me that chunks
14  were missing.  I can't say for certainty otherwise.
15    Q   That's all I'm asking.  I'm just asking
16  whether or not, to the best of your knowledge, you
17  received the complete file from each of the doctors
18  whose records you reviewed.
19    A   Well, again, complete.  For example,
20  Dr. Likness cared for Mrs. Gross, I don't know, what
21  beginning -- beginning at what age, but he was her
22  lifetime family physician.  So have I reviewed every
23  page of her medical records related to Dr. Likness?
24  Probably not.
25    Q   Were you furnished with any summary of the

Page 285

1  medical records?
2    A   Yes.
3    Q   Were you furnished with a summary of the
4  medical records for both Ms. Wicker and Ms. Gross?
5    A   Yes.
6    Q   Do you know who prepared that summary?
7    A   I don't remember.
8        MS. JONES:  I know we're going to
9  have an argument about this, but I'm going to
10  request those summaries.
11        MR. SLATER:  You can send me a
12  letter.  I mean, my position is that they were
13  provided only to give an idea of what was being
14  provided, that Dr. Weber relied on the records, not
15  on the summary, so it's work product.
16        MS. JONES:  Well, I know that's your
17  position.  We'll take it up later.  But I'm going to
18  ask for those.  And I would ask you --
19        MR. SLATER:  Are you going to send me
20  all your summaries?  Are you going to send me all
21  the summaries that you did for your experts?
22        MS. JONES:  I don't send summaries to
23  my experts.
24        MR. SLATER:  Someone does.
25        MS. JONES:  Not that I know of.

19 (Pages 282 to 285)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 286

BY MS. JONES:
1
2    Q   Do you know whether or not you received
3 those summaries -- were they in electronic form or
4 hard copy?
5    A   Electronic.
6    Q   I'm going to ask you, just as I did
7 yesterday, if you would maintain those permanently
8 up until the time of trial and so forth so that when
9 the Court decides what's appropriate for us to get
10 or not we will have access to them.  Okay?
11    A   Yes.
12    Q   Do you know any of the treating physicians
13 for Ms. Gross?
14    A   No.
15    Q   Are you familiar with Dr. Antolak?
16    A   Antolak?
17    Q   Uh-huh.
18    A   I don't know how to say his name either.
19 I'm familiar with him now, of course.
20    Q   When you say you're familiar with him now,
21 in what sense are you familiar with him now?
22    A   In the course of being a treating
23 physician for Mrs. Gross.
24    Q   Have you reviewed his deposition?
25    A   Honestly, I need my list of materials

Page 287

1 reviewed to know for sure.
2    Q   I will represent to you I did not see it
3 listed on your materials reviewed so I'm --
4         MR. SLATER:  Wait.  You're looking at
5 the wrong list then.
6         MS. JONES:  Well, I may be.
7         MR. SLATER:  There's been updated
8 lists.  I'm just telling you.  He's definitely
9 listed.  I'll find out during lunch.
10         MS. JONES:  I mean, let's do this
11 during lunch:  Can we get what you believe is the
12 complete list --
13         MR. SLATER:  Absolutely.
14         MS. JONES:  -- of everything at
15 lunch?
16         MR. SLATER:  Yes.
17         MS. JONES:  Just check, because I
18 will represent to you that what I was looking at did
19 not have that deposition transcript listed.
20 BY MS. JONES:
21    Q   Did you receive the entire deposition
22 transcripts for the doctors and witnesses that you
23 reviewed?
24    A   Do you mean when I received deposition
25 transcripts, were they complete?

Page 288

1    Q   Yes.
2    A   Yes.
3    Q   Did you review summaries of the
4 depositions?
5    A   In some cases, yes.
6    Q   Were you furnished summaries of all of the
7 depositions?
8    A   No.
9    Q   Can you tell me what summaries you
10 reviewed of the depositions?
11    A   Dr. Benson.  That's the only one I can
12 remember.
13    Q   I asked you, Doctor, when you had reviewed
14 the information that relates to Ms. Gross.  You said
15 you couldn't remember.  Did you actually look at it
16 during this year, 2012?
17    A   Yes.
18    Q   Had you looked at any portion of those
19 records before?
20    A   Yes.
21    Q   Do you remember whether or not you looked
22 at them before the fall of 2011?
23    A   I don't remember.
24    Q   Did you receive summaries of any of the
25 depositions of the Ethicon witnesses?

Page 289

1    A   Yes.
2    Q   Tell me which witnesses you received
3 summaries on.
4    A   To the best of my recollection, Dr. Piet
5 Hinoul.  That's all I can remember.
6    Q   Did you receive complete deposition
7 transcripts on the Ethicon witnesses?
8    A   Yes.
9    Q   Did you receive all of the exhibits to
10 those depositions?
11    A   No.
12    Q   Have you requested any other Ethicon
13 documents for review that you've not yet seen?
14    A   No.
15    Q   Before you reviewed the deposition of
16 Dr. Antolak, were you familiar with his reputation
17 as a specialist on pudendal neuralgia?
18    A   No.  Well, let me just say in reviewing
19 the records of Mrs. Gross, she had seen Dr. Antolak.
20 So at that point I became aware of his specialty in
21 pudendal neuralgia.  So that would be at some time
22 before his deposition.
23    Q   Did you do any investigation or research
24 on Dr. Antolak?
25    A   I believe I searched his name on PubMed,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 290

1 the medical literature.
2     Q    And did you do any searches on any of
3 Ms. Gross' other doctors?
4     A    Yes; Dr. Hibner, again from the medical
5 literature.
6     Q    And did you pull and review any of the
7 medical articles written by either Dr. Hibner or
8 Dr. Antolak?
9     A    Yes.
10    Q    And are the articles that you pulled and
11 reviewed identified on the list of materials
12 reviewed?
13    A    Yes, if there were articles.
14    Q    Let me ask you this:  Do you recall
15 reading articles authored by either of those two
16 doctors?
17    A    I can't be sure.  If I read them, they're
18 on the list.
19    Q    Let me ask you, have you reviewed any
20 materials from the Social Security Administration on
21 Ms. Gross?
22    A    No.
23    Q    You identified three experts' reports that
24 you had reviewed before preparing your opinions, and
25 those were those of Dr. Serrato, Dr. Welch, and

Page 291

1 Dr. Provder; is that correct?
2     A    Mr. Provder, yes.
3     Q    And did you rely upon the report of
4 Dr. Serrato in formulating your opinions?
5     A    Yes.
6     Q    Did you review the ultrasounds that Dr.
7 Serrato performed?
8     A    No.
9     Q    Have you ever seen any ultrasounds on
10 Ms. Gross?
11    A    No.
12    Q    Have you seen any radiology at all with
13 respect to Ms. Gross?
14    A    No.
15    Q    Have you seen any pathology with respect
16 to Ms. Gross?
17    A    Yes.
18    Q    Tell me what you've seen.
19    A    I have seen histology slides,
20 photomicrographs of mesh and tissue.
21    Q    Have you seen the actual slides or just
22 the photomicrographs?
23    A    Just the photomicrographs.
24    Q    And do you know who prepared those
25 photomicrographs?

Page 292

1     A    I cannot say for sure.
2     Q    Are the photomicrographs specifically
3 identified on the list of materials reviewed
4 according to which institution they would have come
5 from?
6     A    No.
7     Q    Are they identified in any way?
8     A    I believe they're identified by her name,
9 Linda Gross, and by a number.
10    Q    And what do you think that number refers
11 to?
12    A    I don't know.
13    Q    You don't know whether they're exhibits to
14 the deposition or whether they're something from the
15 medical records?
16    A    They may have been used as exhibits.  They
17 are not labeled as exhibits.
18        MS. JONES:  Counsel, I'm going to ask
19 specifically that those photomicrographs be
20 produced.
21        MR. SLATER:  You have them already.
22        MS. JONES:  I just want to know which
23 ones they are so that we --
24        MR. SLATER:  You have them all.  She
25 was given everything I produced to you.  When

Page 293

1 Dr. Welch's report was produced, we gave you all of
2 the photomicrographs of every single slide he looked
3 at and those were provided to Dr. Weber.
4        MS. JONES:  That's all I'm trying to
5 figure out is what photomicrographs Dr. Weber has
6 actually seen because she can't identify them for
7 me.
8        MR. SLATER:  Dr. Welch had those
9 prepared in his offices at Harvard and then they
10 were provided to me and I bounced them to Dr. Weber.
11 And she had those plus the report to look at.  We
12 produced to you all the photomicrographs so you have
13 everything she saw.
14        MS. JONES:  That's fine.  I just want
15 to know what it is that she saw.  That's all I'm
16 asking.
17        MR. SLATER:  I've produced it to you
18 already.  I mean, I can't tell you which specific
19 slides.  You have them.  You can put them up on a
20 screen and say did you see this.  I don't know that
21 she'd be able to say I saw this slide, that slide.
22 She had them all.  Everything that I produced to you
23 was given to her electronically.  We sent it to her.
24 And we produced it to you on a disk.  You have all
25 of them.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 294

1   And the numbers, I don't have the
2   list of materials reviewed, but I assume the list of
3   numbers is the numbers from the institutions where
4   they identify the path slides.  I mean, they have
5   section numbers, whatever you call them.
6   BY MS. JONES:
7       Q   So that what we're clear on, Doctor, is
8   that the photomicrographs you have gotten are the
9   ones from Dr. Welch?
10          MR. SLATER:  Yes.
11          MS. JONES:  Not from any other
12  institution, not prepared by any other institution?
13  That was my question.
14          MR. SLATER:  To my knowledge, there
15  are no other photomicrographs.
16          MS. JONES:  That's the reason I'm
17  asking the question.
18          MR. SLATER:  Do you have any that I
19  don't know of?  Want to throw all our chips into the
20  middle of the table?  No, I'm not aware of any.  In
21  fact, I just e-mailed my partner to find out if the
22  defense experts prepared any photomicrographs on the
23  slides they looked at because I don't think we were
24  produced any.  So I actually just e-mailed Dave
25  Mazie to find out because I don't think we got any

Page 295

1   from the defense.  They may not have prepared any.
2   I'm assuming they did; otherwise, there's no way to
3   show them to the jury.
4           MS. JONES:  I think we're clear on
5   this now.  That's all I want to know is what it is
6   the doctor has seen.
7           MR. SLATER:  The photomicrographs --
8   what happened was recuts were provided to Dr. Welch.
9   He looked at them.  He had micrographs prepared.  I
10  don't know the process.  It's some sophisticated
11  camera on a microscope or something probably.  I can
12  barely work my own camera.  And then whatever he
13  prepared was sent to us electronically, provided on
14  disks, we copied the disks, we provided that all to
15  you.  And whatever we were provided by Dr. Welch, we
16  bounced it to Dr. Weber so she had what we had.
17  BY MS. JONES:
18      Q   And you have not seen anything other than
19  the photomicrographs --
20      A   Correct.
21      Q   -- with respect to the pathology?
22          And, Doctor, have you attempted, based
23  upon those photomicrographs, to look at it and come
24  to any diagnostic conclusions based upon review of
25  those photomicrographs?

Page 296

1       A   Can you help me understand what you mean
2   by a diagnostic conclusion?
3       Q   For what purpose did you look at the
4   photomicrographs?
5       A   To correlate them with the findings of
6   Dr. Welch.
7       Q   Of Dr. Welch?
8       A   Dr. Welch.
9           THE WITNESS:  Did I speak correctly?
10          MR. SLATER:  Yeah.
11  BY MS. JONES:
12      Q   Prior to receiving the report of Dr. Welch
13  and the photomicrographs, had you looked at any of
14  the pathology for Ms. Gross?
15      A   No.
16      Q   Had you expressed any opinion with respect
17  to the pathology for Mrs. Gross prior to seeing
18  Dr. Welch's report?
19      A   No.
20      Q   Is it a fair assumption that you rely upon
21  Dr. Welch for any of your opinions with respect to
22  the pathology?
23      A   Yes.
24      Q   So that you don't have independent
25  opinions on the pathology beyond what Dr. Welch

Page 297

1   reported?
2       A   Correct.
3       Q   And is the same true with respect to
4   Dr. Serrato?
5       A   With respect to the ultrasound findings
6   you mean?
7       Q   Yes.
8       A   Yes, correct.
9       Q   And is there anything in Mr. Provder's
10  report upon which you rely in forming your opinions?
11      A   Yes.
12      Q   What is that?
13      A   On his assessment of her level of
14  disability and inability to return to her
15  profession.
16      Q   And you understand that she is a nurse by
17  profession?
18      A   I understand that.
19      Q   Would you agree that pudendal neuralgia is
20  a pain syndrome?
21      A   Yes.
22      Q   Can you tell me what the symptoms of
23  pudendal neuralgia are?
24      A   There are several characteristic symptoms
25  that will vary from patient to patient.  Pain in the

22 (Pages 294 to 297)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 298

1   distribution of the pudendal nerve, pain that's
2   worsened with sitting, pain that may be relieved by
3   standing or lying down.  That's all.
4       Q    Are you familiar with a burning sensation
5   being associated with pudendal neuralgia?
6       A    Neuropathic pain is often described by the
7   patient as having a burning character.
8       Q    How about numbness?
9       A    Numbness is not strictly a symptom of
10  pain, a characteristic -- a description of the
11  patient's pain experience.
12      Q    Well, maybe I wasn't clear.  I was asking
13  really about symptoms of the pudendal neuralgia.
14      A    No, I don't think numbness would be a
15  characteristic typical of pudendal neuralgia.
16      Q    Are you familiar with feelings of a lump
17  or foreign body in the vagina or rectum associated
18  with pudendal neuralgia?
19      A    It can be.
20      Q    How about abnormal temperature sensations
21  like flushing?
22      A    As a response to the pain itself.  Maybe
23  you can clarify for me.  Are you talking about the
24  symptoms specific to pudendal neuralgia or the
25  symptoms the patient may experience as a result of

Page 299

1   the pain of the pudendal neuralgia?
2       Q    I'm really just talking about symptoms
3   that have been reported in association with pudendal
4   neuralgia.
5       A    Okay.  So, no, I would say apart from an
6   association or an event associated with the
7   patient's pain, an abnormal flushing feeling would
8   not be a typical symptom of pudendal neuralgia.
9       Q    How about constipation?
10      A    Again, not specific as a typical symptom
11  confined to pudendal neuralgia itself.
12      Q    How about pain or straining with bowel
13  movements?
14      A    Well, that is in the distribution of the
15  pudendal nerve so that would be consistent, not
16  straining per se but pain.
17      Q    How about straining or burning with
18  urination?
19      A    It's possible, again, with the
20  distribution of the pudendal nerve.
21      Q    How about a sense that the bladder is not
22  empty or never empty?
23      A    Again, possible based on the distribution.
24      Q    How about low back pain?
25      A    No, I don't think that would be typical.

Page 300

1       Q    How about painful intercourse?
2       A    Again, as a result of the distribution of
3   the pudendal nerve in the vaginal area, yes, pain.
4       Q    How about musculoskeletal pain in other
5   parts of the pelvis?
6       A    You mean other parts than the distribution
7   of the pudendal nerve?
8       Q    Right, right.
9       A    Okay.  So that answer would be no.
10      Q    Would be?
11      A    No.
12      Q    So that I understand that last answer, you
13  don't think that pudendal neuralgia is or can be
14  accompanied by musculoskeletal pain in other parts
15  of the pelvis?
16      A    Well, let me see if I can clarify that.
17  The pain of pudendal neuralgia can lead to pelvic
18  muscle spasm.  And pelvic muscle spasm can occur on
19  both sides of the pelvis, the side on which the
20  pudendal neuralgia exists and also on the other
21  side.
22      Q    Can you see pudendal neuralgia and pelvic
23  floor dysfunction together?
24      A    Well, what do you mean by "pelvic floor
25  dysfunction"?

Page 301

1       Q    Well, I said that because I was listening
2   to you talking about pelvic spasms.  If you had some
3   dysfunction of the pelvic floor musculature, could
4   you see that in conjunction with pudendal neuralgia?
5       A    Yes.
6       Q    And in the course of your practice,
7   Doctor, did you regularly treat pudendal neuralgia?
8       A    No.
9       Q    If somebody came in with what you
10  diagnosed as pudendal neuralgia, would you refer
11  them out?
12      A    I would evaluate the patient from a
13  urogynecologic perspective and offer the patient
14  what I felt was appropriate on that basis.  If I
15  felt that there were contributors or possibly the
16  entire etiology outside of my scope of
17  urogynecology, then I would either -- if I felt
18  there was a contribution, I would refer her and work
19  in conjunction with the referring -- with the doctor
20  to which I would refer her.  If I felt it was
21  entirely outside the scope of urogynecology, then I
22  would simply refer her.
23      Q    What is your understanding are the causes
24  of pudendal neuralgia?
25      A    Well, there are several:  Trauma; in some

23 (Pages 298 to 301)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 302

1  people situations where they are sitting
2  specifically, for example, on a bicycle or a
3  motorcycle, whether it's the pressure of them
4  sitting on that position or the vibration, say, of a
5  motorcycle engine, there is that association;
6  surgery, of course.
7      Q    We talked earlier already about different
8  forms of prolapse surgery that might be associated
9  with pudendal neuralgia, but has hysterectomy been
10 associated with pudendal neuralgia?
11     A    No, hysterectomy by itself, no.
12     Q    What about childbirth or difficult
13 deliveries?
14     A    Yes, that would be possible.
15     Q    Infections in the pelvic floor?
16     A    Infections in the pelvic floor?  You
17 mean --
18     Q    Or infections in the pelvis.
19     A    In the pelvis.  No, I have not heard that
20 as being a cause of pudendal neuralgia.
21     Q    And when a patient presented to you with
22 symptoms that you thought might indicate pudendal
23 neuralgia, how would you go about making that
24 diagnosis?
25     A    I would obtain her history, see if there

Page 303

1  were any identifiable factors that may have caused
2  or contributed to this situation.  I would ask her
3  for a very detailed explanation or description of
4  her pain:  The location; any factors that relieved
5  it or exacerbated it; the nature of the pain, any
6  describing words that she could give me; the
7  duration; a complete history related to the pain;
8  and then any other points of her history that could
9  potentially be relevant; and then an examination in
10 the pelvic area to map the distribution of her pain
11 to see if it was consistent with the distribution of
12 the pudendal nerve; and then an external examination
13 to see if that reproduced her pain or exacerbated
14 it; and then an internal examination to see if there
15 was any other information that I could gather as to
16 the location or the reproducibility of the pain with
17 examination.
18     Q    And what type of treatment would you
19 prescribe?
20     A    Again, this is where -- once I had a
21 better understanding of the possible cause where I
22 would be likely to involve a second physician.  A
23 pudendal -- a nerve block -- I could administer a
24 pudendal nerve block in the office.  And that has
25 both a diagnostic and a therapeutic effect if she

Page 304

1  experiences pain relief.  It's diagnostic in the
2  sense that if she experiences pain relief, that's a
3  very strong indication, what many doctors feel is
4  the strongest indication, that you are, in fact,
5  dealing with pudendal neuralgia; and then
6  therapeutic obviously in the sense that if her pain
7  is relieved, she feels better.
8      Q    And did you actually when you were
9  practicing perform pudendal nerve blocks?
10     A    Not in my -- during my residency; yes; not
11 since then.
12     Q    During your residency between '88 and '92?
13     A    Correct.
14     Q    Would that have been the last time that
15 you've treated pudendal neuralgia?
16     A    Yes.
17     Q    Other than the nerve block, is there any
18 other type of treatment that you would have
19 prescribed for pudendal neuralgia that you can
20 remember?
21     A    I would not.  At that point I would
22 involve another physician with expertise.
23     Q    In the case of Ms. Gross, is it your
24 opinion that the surgery that she had for prolapse
25 caused the pudendal neuralgia or is it the use of

Page 305

1  mesh that caused the pudendal neuralgia?
2      A    I think it is most likely that the
3  pudendal neuralgia was caused by the proximity of
4  the mesh itself.  I can't rule out the possibility
5  of a contributing factor that occurred during the
6  surgery.
7      Q    And can you tell me why you think it is
8  most likely to be the proximity of the mesh
9  itself?  The proximity of the mesh to the nerve?
10     A    Correct.
11     Q    And why do you reach that conclusion?
12     A    I am not sure I understand your question.
13 Why --
14     Q    Why is it that you believe that it's the
15 proximity of the mesh to the nerve that's caused the
16 neuralgia as opposed to the surgery itself?
17     A    I think if Mrs. Gross had had a direct
18 very traumatic injury, such as the trocar passage
19 through the pudendal nerve, that would have been
20 immediately evident when she was woken from
21 anesthesia.  I think it's possible that she had a
22 less severe injury due to trocar passage.  As I
23 said, I can't rule that out.
24     After surgery then it's the mesh
25 placement, the inflammatory and foreign body

24 (Pages 302 to 305)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 306

1  reaction that it causes, the fibrosis and scarring
2  in very close proximity to the nerve, if not on the
3  nerve, that led to her pudendal neuralgia.
4      Q    And did you review the medical records of
5  Ms. Gross to determine whether or not she had
6  experienced any signs or symptoms before the surgery
7  that might be indicative of pudendal neuralgia?
8      A    Yes.
9      Q    Did you find any?
10     A    No.
11     Q    So when you went back and looked at the
12  records, you did not find that she had experienced
13  any symptoms that had been associated with pudendal
14  neuralgia?
15         MR. SLATER:  You're talking about
16  prior to the surgery?
17         MS. JONES:  Prior to the surgery.
18         THE WITNESS:  I didn't find any
19  evidence that she had symptoms of pudendal neuralgia
20  before the Prolift® surgery.
21  BY MS. JONES:
22     Q    Did you find that Ms. Gross had a prior
23  history of stress urinary incontinence?
24     A    Yes.
25     Q    Of obstructed defecation?

Page 307

1      A    Those were her symptoms, yes.
2      Q    And had a rectocele?
3      A    Yes.
4      Q    Ms. Gross had also had several
5  pregnancies, had she not?
6      A    Three.
7      Q    There were some difficult deliveries?
8      A    What do you mean by "difficult"?
9      Q    Well, she had a fourth-degree vaginal
10  tear, didn't she?
11     A    Actually in reading the doctor's delivery
12  note, he cut the fourth-degree to make room for the
13  delivery of the fetus.
14     Q    Had she had any pelvic spasms of which
15  you're aware?
16     A    Pelvic muscle spasm?
17     Q    Uh-huh.
18     A    No, not to my knowledge.
19     Q    So do I understand your opinion, Doctor,
20  to be that Dr. Benson's use of trocars in the
21  Prolift® surgery did not likely cause the pudendal
22  nerve injury?
23     A    I can't rule it out.
24     Q    Do you have any opinion as to whether or
25  not Dr. Benson's surgical technique was incorrect in

Page 308

1  any way?
2      A    His surgical technique was not incorrect
3  based on his operative report.  The trocar passages
4  themselves introduce an unreasonable degree of risk
5  of nerve damage specifically along with other types
6  of damage in the Prolift® procedure.
7      Q    My understanding, though, from what you
8  testified earlier, and I'm just asking, is that if
9  Ms. Gross had experienced nerve damage as a result
10  of the use of the trocars, you would have expected
11  to have seen that immediately?
12     A    Direct severely traumatic as in driving
13  the trocar right through the nerve.  Also, the
14  pudendal nerve at various places, because everyone's
15  anatomy is different, branches into its three
16  terminal branches.  It's possible that one of the
17  smaller branches was directly injured.  As I said, I
18  cannot rule it out.
19     Q    I understand that you can't rule it out.
20  But am I correct that even though you say you can't
21  rule it out, your belief and position as you sit
22  here today is that the nerve damage was not as
23  likely due to the trocar as it was to the placement
24  of the mesh?
25     A    Correct.

Page 309

1         Is this a good time for a break?
2         (Discussion off the record.)
3         MS. JONES:  Can we go ahead until we
4  get lunch?
5         THE WITNESS:  Yes.
6  BY MS. JONES:
7      Q    Are you aware, Doctor, of any place in the
8  medical records where there's any mention or
9  discussion of pudendal nerve damage prior to August
10  of 2007?
11     A    Can I look at my report, please?
12     Q    Yes.
13         MR. SLATER:  Yeah, sure.  I have it
14  on the floor here.
15  BY MS. JONES:
16     Q    Doctor, I'll tell you where I think it is.
17  I picked that up on Page 6 of your report.  And my
18  note says the first mention of pudendal nerve damage
19  as a cause of the symptoms was recorded on
20  August 29th, 2007.
21     A    Okay.  And that's on Page 6?
22     Q    I have it marked on Page 6.  That's what I
23  took my notes from.
24         THE WITNESS:  Can I ask you a
25  question?  Should we step out or can I just ask you?

25 (Pages 306 to 309)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 310

1    MR. SLATER:  No.  Don't ask me
2 anything.  I mean, if there's something missing from
3 this notebook, then I have to just get someone to
4 bring it in.  The page number may just be a typo or
5 something on her outline.
6    MS. JONES:  It may be.  I promise
7 this is not a trick.  I have my notes.
8    THE WITNESS:  Yeah, I just -- I don't
9 see what you're saying.
10 BY MS. JONES:
11    Q    I don't see it on Page 6 either.  I've
12 obviously got a typo on it.
13    MR. SLATER:  Off the record.
14    (Discussion off the record.)
15 BY MS. JONES:
16    Q    All right.  Doctor, while we were off the
17 record, it is on Page 5 that you note in your report
18 that the first mention of pudendal nerve damage as a
19 cause of Ms. Gross' symptoms was on August 29, 2007;
20 correct?
21    A    Correct.
22    Q    And you mentioned that you had treated
23 pudendal neuralgia in your residency.  Was it in
24 medical school or in the residency that you were
25 taught the distribution of the pudendal nerve?

Page 311

1    A    Both.
2    Q    And were you taught to do the pudendal
3 nerve block in your residency or in medical school?
4    A    I certainly learned it in my residency.  I
5 don't remember if I learned it in medical school
6 also.
7    Q    You testified earlier that pudendal nerve
8 damage can be the result of the sacrospinal ligament
9 fixation?
10    A    Correct.
11    Q    And my question is, how is it caused by
12 that surgery?
13    A    Typically it's an entrapment where the
14 suture -- in a sacrospinous ligament fixation, the
15 surgeon is approaching the sacrospinous ligament
16 from its superior aspect.  And the pudendal nerve in
17 relation to the ischial spine and the sacrospinous
18 ligament is in very close proximity in such a way
19 that a suture can be passed into the substance of
20 the sacrospinous ligament and entrap the pudendal
21 nerve.
22    Q    Would you say that again, please?
23    A    Do you want me to rephrase it or --
24    Q    No, no, no.  I just -- I think my mind
25 went in and out for just a second.  I just don't

Page 312

1 think I caught the last of what you said about how
2 it could -- I know we talked about the approach, but
3 tell me how it entraps the nerve.
4    A    So the superior surface of the
5 sacrospinous ligament, the ischial spine, and the
6 pudendal nerve are all in very close proximity.  The
7 surgeon in passing a suture through the superior
8 aspect of the sacrospinous ligament may
9 inadvertently include the pudendal nerve in that
10 suture, entrapping it.  It's called pudendal nerve
11 entrapment.
12    Q    And it's that type of entrapment that's
13 generally the cause of pudendal nerve neuralgia in
14 the sacrospinal ligament fixation surgery?
15    A    Correct.
16    Q    The surgery that Ms. Gross had on the
17 pudendal nerve was in June of 2009; correct?
18    A    Yes.
19    Q    And it was performed by Dr. Hibner?
20    A    Yes.
21    Q    At the time that Dr. Hibner performed that
22 surgery, he did not find the presence of mesh, did
23 he?
24    A    There's conflicting information on that
25 point.  The operative note which he dictated

Page 313

1 immediately after performing the operation has a
2 description of mesh attached directly to the
3 pudendal nerve.  Under testimony Dr. Hibner
4 testified that he did not believe it was mesh; if it
5 were mesh, he would have sent it for pathology, and
6 he did not send it for pathology and he believed it
7 was scar tissue.
8    Now, in terms of causing Mrs. Gross'
9 pudendal neuralgia, whether it was mesh or not,
10 according to Dr. Hibner's conflicting information,
11 she had pudendal neuralgia on the basis of the mesh
12 implantation near or -- adjacent to or touching the
13 pudendal nerve in such a way that the inflammatory
14 body reaction, the scarring, the fibrosis from the
15 Prolift® mesh implantation was responsible for her
16 pudendal neuralgia.
17    Q    Have you seen any pathology that shows
18 that mesh is in any of the scar tissue around the
19 pudendal nerve?
20    A    As I understood from Dr. Hibner's
21 testimony, he did not send that specimen for
22 pathology.
23    Q    And you've not seen any pathology from any
24 other surgery or any other findings that mesh was
25 actually removed from the pudendal nerve?

26 (Pages 310 to 313)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 314

1      A   Again, to my understanding from
2  Dr. Hibner's testimony, that wasn't sent for
3  pathology.  You wouldn't take -- even if he had
4  taken mesh off the pudendal nerve, unless he excised
5  the pudendal nerve or a part of it, that would not
6  show up in the pathology specimen.
7      Q   You wouldn't send an encased mesh to
8  pathology?
9      A   According to my understanding of the
10  operative note, mesh or scar -- mesh, that's in the
11  operative note, Dr. Hibner's testimony, scar tissue
12  was found attached to the pudendal nerve.  The goal
13  of the operation, of course, is to leave the
14  pudendal nerve intact.  If you excise a portion of
15  the pudendal nerve and send it to pathology, the
16  patient is obviously going to suffer from that
17  excision.
18      Q   My question was really a little different,
19  Doctor.  If you as a surgeon excised tissue in which
20  mesh was encased, would you have sent that to
21  pathology?
22      A   Yes.
23      Q   And would you think that that would be the
24  standard of care for a surgeon to send that material
25  to pathology?

Page 315

1      A   I was taught to send all material to
2  pathology.  You take it out of the patient, you send
3  it to pathology.  I can't really speak to what every
4  other surgeon does.
5      Q   That's what you would have taught your
6  residents and fellows when you were involved in
7  academic medicine?
8      A   Correct.
9      Q   I take it that it's your position that
10  Ms. Gross would not have had pudendal nerve
11  neuralgia but for the use of Prolift®?
12      A   Correct.
13      Q   Have you seen any medical literature
14  specifically that relates to Prolift® and pudendal
15  nerve involvement?
16      A   No.
17      Q   Mrs. Gross had mesh removed and the
18  Prolift® removed in early 2007, did she not?
19          MR. SLATER:  Objection to the form.
20          You can answer.
21          THE WITNESS:  The date again, please?
22  BY MS. JONES:
23      Q   I confess to you, Doctor, I'm looking for
24  the exact date.  I don't have it in my notes.
25          In December, December 14 of 2006,

Page 316

1  Dr. Benson performed a surgery to excise the
2  Prolift® vaginal mesh; correct?
3      A   To my understanding, he was concentrating
4  on the anterior portion of the Prolift® mesh at that
5  surgery.
6      Q   And subsequently Ms. Gross had other
7  portions of the Prolift® removed; correct?
8      A   Yes.
9      Q   Did Ms. Gross suffer from interstitial
10  cystitis?
11      A   In my opinion, no.
12      Q   What's that opinion based upon?
13      A   That opinion is based upon the -- my
14  understanding of the course of interstitial cystitis
15  and how that did not match up with Linda Gross'
16  course.
17      Q   Tell me what you understand the typical
18  course of interstitial cystitis to be.
19      A   Well, first I'll explain interstitial
20  cystitis is a collection of symptoms.  In its severe
21  form that leads to cystoscopic findings, it is a
22  chronic disease or condition with symptoms of
23  urgency, frequency, and bladder pain that occur over
24  the course of months and years.
25          Mrs. Gross didn't have a diagnosis of

Page 317

1  interstitial cystitis before she had the Prolift®
2  placed.  I believe it was approximately two months
3  after the Prolift® procedure Dr. Benson performed a
4  cystoscopy and described findings that he attributed
5  to the possibility of interstitial cystitis.  On
6  subsequent cystoscopies those findings were not
7  repeated.
8          So on that basis she didn't have it
9  before, she had one cystoscopy two months after the
10  surgery at a time when she was experiencing urinary
11  tract infections, retention -- and urinary
12  retention, and the cystoscopic findings were never
13  seen again on subsequent cystoscopies.
14      Q   You told us yesterday that you had spoken
15  with one of the other plaintiffs' experts with
16  respect to interstitial cystitis; am I correct?
17      A   Yes.
18      Q   And who was that?
19      A   That was Dr. Elliott.
20      Q   And did you speak with Dr. Elliott
21  specifically about the diagnosis of interstitial
22  cystitis in Ms. Gross?
23      A   I can't remember.
24      Q   Does Dr. Elliott, if you know, have a more
25  extensive background in the treatment of

27 (Pages 314 to 317)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 318

1  interstitial cystitis in women than you do?
2      A   Yes, I would presume so.
3      Q   In your practice, Doctor, did you
4  regularly treat women with interstitial cystitis?
5      A   No.
6      Q   Do you know how many women you actually
7  treated with interstitial cystitis?
8      A   No.
9      Q   After you completed your residency, did
10  you treat anyone with interstitial cystitis?
11      A   I'm sure I saw patients with a history of
12  stable interstitial cystitis.  I did not treat
13  patients with bladder distillation or
14  hydrodistention or any other form of that kind of
15  treatment.
16      Q   And would you regularly refer people with
17  those conditions to urologists?
18      A   Yes.
19      Q   Are there sources of inflammation in the
20  pelvic floor other than mesh, for example?
21      A   In the pelvic floor?
22      Q   Uh-huh.
23      A   The pelvic musculature?  Source of
24  inflammation.  Certainly, muscles can be inflamed
25  for reasons other than mesh.

Page 319

1      Q   For example, could you have inflammation
2  associated with muscle spasms or tension?  And let
3  me say muscle spasms or tension in the pelvic floor
4  muscles, the musculature.
5      A   So are you asking whether inflammation is
6  the starting point and then it's associated with the
7  development of pelvic muscle spasm?
8      Q   No.  I'm asking whether or not muscle
9  spasms or tension in the pelvic floor muscles can be
10  a source of inflammation, can lead to inflammation.
11          MR. SLATER:  Are you talking about
12  generalized inflammation or any particular
13  inflammation?
14          MS. JONES:  Just inflammation.
15          MR. SLATER:  Objection.
16          You can answer.
17          THE WITNESS:  Not to my knowledge.
18  BY MS. JONES:
19      Q   During the course of your practice,
20  Doctor, did you treat patients with pelvic floor
21  muscle pain?
22      A   Yes.
23      Q   And what type of treatment did you
24  prescribe for those patients?
25      A   Well, in her history I would look for any

Page 320

1  causative or contributing factors that could be
2  addressed by behavioral or lifestyle changes, if
3  something was triggering the pain specifically.  If
4  there weren't any known triggers that I could
5  address, then it's empiric treatment for muscle
6  relaxation.  I would start with physical therapy.  I
7  would add pharmacologic therapy if needed.
8      Q   And would you follow the same process with
9  respect to myofascial pain?
10      A   Myofascial pain is -- myofascial pain is
11  used synonymously with pelvic muscle spasm.
12      Q   With muscle spasms?
13      A   Pelvic muscle spasm, hypertonicity,
14  levator myalgia.  There isn't one name for this
15  condition.
16      Q   I understand.  When you said synonymously,
17  it threw me off a little bit, because I thought you
18  said that muscle spasms were synonymous with
19  myofascial pain.  Maybe I misunderstood.
20      A   Well, myofascial pain is not specific.
21  That could be any muscles in the body.  So are you
22  talking about pelvic myofascial pain?
23      Q   I am.
24      A   Okay.  So then it's possible you could
25  have pelvic muscle spasm without pain.  But if you

Page 321

1  have pelvic muscle spasm and pain, that would be
2  used interchangeably with pelvic myofascial pain.
3      Q   Are there other sources of pelvic
4  myofascial pain other than muscle spasms?
5      A   Sure.  Anything that can happen to a
6  muscle.  You can strain it.  You can bruise it, I
7  suppose.  You could -- it could be traumatized in
8  some way.
9      Q   Can stress trigger myofascial pain?
10      A   Like emotional stress?
11      Q   Yeah.
12      A   As opposed to physical stress?
13      Q   Well, physical stress could obviously
14  trigger it; right?
15      A   Right.
16      Q   Could emotional stress?
17      A   Emotional stress.  It could certainly
18  exacerbate it.  It could trigger it if a woman for
19  some reason was adding an element of voluntary
20  contraction -- muscle tension, of course, anywhere
21  is a very common reaction to stress so I don't see
22  any reason why it couldn't affect the pelvis.
23      Q   Is it your opinion, Doctor, that Ms. Gross
24  benefited from pelvic physical therapy?
25      A   After her surgery to treat her pelvic

28 (Pages 318 to 321)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 322

1  muscle spasm?  Is that what you're referring to?
2      Q    No.  You know that she did receive some
3  physical therapy and pelvic floor tone and
4  relaxation physical therapy, do you not?
5      A    Yes.  So that would be after her surgery
6  to treat her pelvic muscle spasm; no?
7      Q    And it was recommended that she
8  participate in a pain management program, wasn't it?
9      A    That was offered to her as an option.
10         MR. SLATER:  Just so you know, lunch
11  is here.
12         MS. JONES:  Okay.
13  BY MS. JONES:
14      Q    Is it your judgment that she would benefit
15  from participation in a pain management program?
16      A    I don't know.
17         MS. JONES:  Let's stop and have
18  lunch.
19         (Luncheon recess taken from 1:13 p.m.
20  to 2:34 p.m.
21         (Exhibit No. 1220 was marked for
22  identification.)
23  BY MS. JONES:
24      Q    We have marked as Exhibit 1220 the list of
25  materials reviewed.  Doctor, have you reviewed this?

Page 323

1      A    Have I reviewed that document?
2      Q    Yes, ma'am.
3      A    Yes.
4      Q    And I understand that over the lunch hour
5  this was changed and the deposition of Dr. --
6         MR. SLATER:  Antolak.
7  BY MS. JONES:
8      Q    -- Antolak was added to this?
9      A    Correct.
10      Q    And also a video of some explantation was
11  added to this?
12      A    Yes.
13      Q    Is there anything else that you have
14  reviewed that's not on this document?
15      A    No.
16      Q    Did you actually review the deposition of
17  Dr. Antolak over the lunch hour?
18      A    I skimmed it, yes.  I skimmed it.
19      Q    Did you skim or review any other materials
20  over the lunch hour?
21      A    The most recent follow-up on Mrs. Gross
22  after having had her first Botox injection.
23      Q    Anything else?
24      A    No.
25      Q    According to the financial disclosure that

Page 324

1  your counsel has just provided, you have been paid a
2  total of $328,647 as of October 15, 2012; correct?
3      A    I have no reason to doubt the document.  I
4  do not know the number off the top of my head.
5         MR. SLATER:  I can represent to you
6  this was the accurate number as of the date of
7  disclosure.  There have been subsequent invoices;
8  it's just not updated.
9  BY MS. JONES:
10      Q    Have there been subsequent invoices since
11  October 15?
12      A    Yes.
13      Q    How frequently do you invoice plaintiffs'
14  counsel?
15      A    Once a month.
16      Q    What was the date of the last invoice?
17      A    November 1st.
18      Q    Do you know for what amount that was?
19      A    I don't.
20         MS. JONES:  Counsel, can you tell me?
21         MR. SLATER:  I can find out.  I don't
22  know off the top of my head, but I'll find out the
23  amount.
24  BY MS. JONES:
25      Q    This indicates that your hourly rate

Page 325

1  became $350 an hour in July of 2012; is that
2  correct?
3      A    Again, I don't have any reason to doubt
4  that.  I don't recollect that myself.
5      Q    You recollect and I think you testified
6  that you increased your hourly rate from 250 to 350
7  dollars an hour, didn't you?
8      A    Correct.
9      Q    So that we would have to go back and
10  actually get the underlying invoices to see when you
11  changed that hourly rate?
12      A    Well, I believe you just identified that
13  as occurring in July 2012.
14      Q    No.  That's what I asked you and you told
15  me you didn't know.
16      A    I do not remember exactly when that
17  happened.  If you want confirmation beyond what's in
18  front of you, yes, we could go back to the
19  individual invoices.
20         MR. SLATER:  And I'm representing to
21  you that is when it happened.
22  BY MS. JONES:
23      Q    Have you changed your hourly rate for
24  review of the medical literature as a medical
25  writer?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 326

1    A    No.
2    Q    So that remains $250 an hour?
3    A    Yes.
4    Q    What prompted you to change this rate to
5 $350 an hour?
6    A    I felt with my growing experience and
7 expertise over the past almost three years of
8 reviewing the documents and so on that that added
9 experience increased the value of my time.
10    Q    At any time, Doctor, have you totaled the
11 amount of the invoices to confirm that what you've
12 been paid is $328,000-plus?
13    A    No.
14    Q    Since October 15 approximately how much
15 time have you spent in this litigation?
16    A    Not including the time since I arrived in
17 New Jersey.
18    Q    Well, let's divide it up.  Before you
19 arrived in New Jersey.
20    A    I would say between 30 and 40 hours.
21    Q    Since October 15th?
22    A    I don't like to guess.
23    Q    My recollection is that you testified
24 yesterday that you had spent approximately 30 hours
25 a week the last several months preparing for this

Page 327

1 deposition and the reports and so forth.
2    A    Well, I'm still guessing, but a better
3 guess would probably be between 50 and 60 hours.
4    Q    And when did you arrive in New Jersey?
5 That's before you came to New Jersey?
6    A    Correct.
7    Q    When did you come to New Jersey?
8    A    Saturday about noontime.
9    Q    And since that time, since the time that
10 you arrived in New Jersey, how many hours have you
11 spent?
12    A    On Saturday Adam and I worked until about
13 6:30.  And then I went to the hotel and worked for
14 perhaps two hours.  On Sunday --
15    Q    So that would have been a total of how
16 many hours?  Eight hours?
17    A    Approximately.  On Sunday Adam and I
18 worked together for about eight hours and then in
19 the evening I worked for about three hours, so that
20 would be 11 hours.
21    Q    And then yesterday you had how much time?
22    A    Yesterday I worked in the morning for
23 about two hours.  And then we had the deposition.
24 And then I worked in the evening for about half an
25 hour.

Page 328

1    Q    So that would have been roughly ten and a
2 half hours?
3    A    Yes.
4    Q    And today did you work any before you came
5 here for the deposition?
6    A    Yes.  I worked this morning for about an
7 hour.
8    Q    And how do you charge for your travel?
9    A    We haven't discussed that yet.
10    Q    You expect your expenses to be reimbursed,
11 I assume?
12    A    Yes.
13    Q    And you expect to be compensated for your
14 time and travel?
15    A    Yes.
16    Q    Before we took a lunch break, we were
17 talking about whether or not Ms. Gross would benefit
18 from a pain management program.  Do you remember
19 that?
20    A    Yes.
21    Q    Have you seen or do you know of the
22 success of programs such as the Mayo Pain Clinic
23 program in treating pelvic pain?
24    A    I do not know.
25    Q    Do you believe that Ms. Gross would

Page 329

1 benefit from pain management?
2    A    Are you referring specifically to this
3 program now or pain management in general?
4    Q    In general.
5    A    I believe she may benefit.  She would
6 hopefully benefit.
7    Q    You would agree that one's perception of
8 pain can be influenced by one's psychological
9 well-being?
10    A    Yes.
11    Q    If you were treating Mrs. Gross today
12 based upon what you know, what treatment, if any,
13 would you prescribe for her?
14    A    As under what realm?  As a
15 urogynecologist?
16    Q    If Ms. Gross walked into your office today
17 with what you understand to be her current medical
18 condition, is there any treatment that you would
19 prescribe to her?
20    A    Well, of course, I would take her history,
21 which is already very familiar to me, but I would
22 make sure I understood that from her standpoint,
23 especially in terms of her current symptoms.  I
24 would perform an examination.  I would determine
25 what aspects of her condition I may able to address,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 330

1    what additional consultations would be beneficial in
2    her overall management.  And I would go from there.
3        Q    As you sit here today, do you have any
4    opinion as to what other consultations would be
5    beneficial to her in her overall management?
6        A    She has a pain management specialist.  She
7    has her family practitioner.  She sees
8    urogynecologists.  She's receiving psychological
9    counseling.  She sees a urologist.  She undergoes
10   physical therapy.  I can't think of any other
11   consultations that I could offer her at this time.
12       Q    Is there any medical treatment that you as
13   a urogynecologist would offer her today?
14       A    Well, to the extent possible, considering
15   her conditions are now more likely than not
16   permanent, I think she's receiving the -- unless
17   something new happens, her current management I
18   think is addressing all of her issues and offering
19   her what there is available, although limited,
20   because she's not in a state where cure is a
21   possibility for her, she's in a state of palliation.
22       Q    What is your prognosis or what is your
23   opinion as to her prognosis if you have one?
24       A    Specific to any one of her conditions or
25   all of them?

Page 331

1        Q    To any condition about which you've been
2    asked to opine.
3        A    I believe that her condition, while it may
4    wax and wane within a certain restricted range over
5    time, is otherwise permanent.
6        Q    And when you say her condition is
7    permanent, will you describe for me what condition
8    it is that you believe is permanent?
9        A    I believe her pain is permanent.  It's
10   possible she may experience some relief, not likely
11   resolution of the pelvic muscle spasm component of
12   her pain.  I believe her urinary retention is
13   permanent and she will require intermittent
14   self-catheterization for the rest of her life.  To
15   the extent that she has mesh remaining, she remains
16   at lifelong risk for mesh-related complications like
17   mesh erosion.
18       Q    Do you have any evidence that she, in
19   fact, has mesh remaining in her body?
20       A    To my knowledge, there are at least pieces
21   of the six mesh arms that were implanted in Linda.
22       Q    And have you done anything in any way to
23   quantify the amount of mesh, if any, that's left?
24       A    No, that's not possible.  Ultrasound can
25   visualize mesh -- can visualize mesh.

Page 332

1        Q    Is there anything other than the
2    ultrasounds upon which you rely for your opinion
3    that there are some residual pieces of mesh?
4        A    To my understanding of the operative
5    reports, specific areas, such as the placement of
6    the two superficial anterior arms through the
7    obturator space and the two deep anterior arms
8    through the obturator space and the two posterior
9    arms through the ischiorectal fossa, have not been
10   specifically sought with the idea of removing them.
11       In fact, Mrs. Gross has been informed that
12   it would be -- it would introduce additional
13   morbidity.  And her husband, Mr. Gross, had a very
14   insightful observation:  If it's too difficult to
15   remove the mesh that was implanted, how is -- or too
16   dangerous, how is it not too dangerous to implant it
17   in the first place?
18       MS. JONES:  Move to strike as
19   nonresponsive.
20   BY MS. JONES:
21       Q    Are you relying upon his deposition or
22   have you spoken with Mr. Gross?
23       A    I have not spoken with Mr. Gross.
24       Q    Have you reviewed the reports of the
25   defense experts with respect to Ms. Gross?

Page 333

1        A    Yes.
2        Q    Which reports have you reviewed?
3        A    Kavaler, Minkin.  I believe those are the
4    two that are specific to Mrs. Gross.
5        Q    Do you have any opinions or disagreements
6    with either of those reports?
7        A    Yes, I do.
8        Q    Can you tell me what they are?
9        A    Can I have the report, please?
10       Q    If you have it with you.
11       MR. SLATER:  Well, I can go have
12   somebody print copies.  You don't have them?
13       MS. JONES:  I'm asking for the
14   disagreements with the report.
15       MR. SLATER:  I understand.  She's
16   saying she needs to be able -- they're lengthy
17   reports.  What she's going to likely do now is go
18   page by page for probably an hour or two.  I'm not
19   being facetious.  I can go get them printed, but if
20   the question's going to be to list all her
21   disagreements --
22   BY MS. JONES:
23       Q    Have you, in fact, prepared a report
24   listing all your disagreements?
25       A    I have made comments.

31 (Pages 330 to 333)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 334

1    Q    Where did you make comments?
2    A    In a document.
3    Q    In what document?
4    A    I don't remember the title. It's not a
5 report as in those reports of mine.
6    Q    It's not a report that's been furnished to
7 us?
8    A    Correct.
9    Q    Let me ask you, Doctor, to summarize if
10 you can your disagreements with those of
11 Dr. Kavaler.
12    A    I really prefer to have the report in
13 front of me.
14    MR. SLATER: I'm going to go get
15 someone to print it.
16    THE WITNESS: Because my criticisms
17 are very specific and I'll do a much better job when
18 I have the report in front of me.
19 BY MS. JONES:
20    Q    So as we sit here today, you really don't
21 remember what those criticisms are?
22    MR. SLATER: That's unfair. I
23 object. You asked her to list her criticisms. And
24 any competent and reasonable witness and attorney
25 would want to have the document in front of them in

Page 335

1 order to answer the question when Kavaler's report
2 is nearly 50 pages long, Minkin wrote two lengthy
3 reports. So she has the right to have the document
4 in front of her if you're going to ask her any
5 questions about the document; right? So I'm going
6 to get them.
7    MS. JONES: I'm asking her questions
8 about her opinions, counsel.
9    MR. SLATER: You're asking what?
10    MS. JONES: I'm asking her questions
11 about her opinions. I asked her to summarize those
12 opinions. I think I'm entitled to an answer to
13 that.
14    MR. SLATER: You're going to get an
15 answer. You object to me putting the reports in
16 front of the witness?
17    MS. JONES: I don't have any
18 objection to it.
19    MR. SLATER: So I'll go get them.
20    MS. JONES: But I think that's the
21 reason we ask you to bring documents with you.
22    MR. SLATER: Hang on. Hang on. With
23 all due respect, you're taking a deposition, you're
24 asking questions of the witness about documents you
25 didn't bring. The customary thing that we do is if

Page 336

1 you're going to ask someone about a document, give
2 it to them and say, here, I'm going to ask you some
3 questions about the document.
4    So we'll take a break. I'm going to
5 go get those two reports. And, counsel, you have
6 the materials reviewed. You know that she saw all
7 the expert reports. It's all listed. I'll go get
8 those two reports because that's your particular
9 question. It's actually three reports. Take a
10 break while I get them.
11    (Short recess.)
12    MR. SLATER: So I have given her the
13 reports now.
14 BY MS. JONES:
15    Q    Okay. I have a question before you go
16 through the reports, Doctor. You said that you had
17 prepared a document critiquing these reports for
18 Mr. Slater?
19    A    Yes.
20    Q    Did you review that report in preparation
21 for this deposition?
22    MR. SLATER: Objection to the form.
23    You can answer.
24    THE WITNESS: Considering the defense
25 expert reports were only served on October 15th, it

Page 337

1 has been in the past couple of weeks. I don't know
2 that I reviewed it specifically in preparation for
3 my own deposition.
4 BY MS. JONES:
5    Q    Have you reviewed that document since you
6 arrived here on Saturday?
7    A    No.
8    Q    When did you actually prepare it?
9    A    I don't know. Sometime after
10 October 15th.
11    Q    Sometime in the last two to three weeks
12 anyway?
13    A    Correct.
14    Q    Now, what I would like you to do is to
15 summarize for me your criticisms or disagreements,
16 however you choose to characterize it, with
17 Dr. Kavaler.
18    A    A general summary of my opinions is that
19 she does not address all the issues of substance,
20 she makes misleading and inaccurate statements, and
21 her opinion -- I disagree with the opinion -- her
22 opinions as to the causation of Mrs. Gross'
23 injuries.
24    Q    Do you know Dr. Kavaler?
25    A    No.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 338

1    Q    Ever met her?
2    A    No.
3    Q    Know anything about her practice beyond
4  what you know in the report?
5    A    I think I Googled her once her report was
6  provided to me.
7    Q    Ever read any of her publications?
8    A    No.
9    Q    When you said that she did not address all
10  of the material aspects of the case, what areas do
11  you believe she failed to address?
12    A    She failed to address, among many other
13  things, Ethicon's failure to warn physicians and
14  patients of the material risks, many of which
15  affected Linda Gross directly, like the risk of
16  urinary retention.
17       In fact, Dr. Robinson right before he
18  joined Ethicon was so alarmed about the extent and
19  severity of urinary retention that he was seeing in
20  his patients and in other -- the patients of other
21  physicians with whom he was in contact when he first
22  arrived at Ethicon, he felt strongly that he wanted
23  to include a specific warning in the Prolift® IFU
24  about the risk of this prolonged and severe urinary
25  retention.

Page 339

1       This was discussed.  Opinions from
2  experienced Prolift® users were taken -- were
3  obtained urgently at a meeting.  They didn't know
4  what caused this.  Ethicon didn't study it.  They
5  drafted something to be put into the IFU and it
6  never made it into the IFU.  So physicians and
7  patients went unwarned of this severe risk after the
8  Prolift® procedure.
9       MS. JONES:  Move to strike as
10  nonresponsive.
11  BY MS. JONES:
12    Q    Doctor, other than the risk of urinary
13  retention that you believe that Dr. Kavaler failed
14  to address, are there other issues that you believe
15  she failed to address?
16       MR. SLATER:  Objection to the form of
17  the question.
18       You can answer.
19       THE WITNESS:  She failed to address
20  Ethicon's failure to warn of the risk of
21  complications after the Prolift® procedure that were
22  untreatable.
23  BY MS. JONES:
24    Q    Such as?
25    A    Such as chronic pelvic pain, mesh

Page 340

1  exposure -- mesh erosion and recurrent mesh erosion
2  that could not be resolved, vaginal anatomic
3  distortion and scarring that could not be addressed
4  in a way that a woman was able to engage in normal
5  sexual relations, to name a few.
6       Shall I keep going?
7    Q    Anything else that you believe that she
8  failed to address that she should have addressed in
9  this context.
10    A    She failed to address Ethicon's failure to
11  warn that patients on anticoagulation therapy are
12  contraindicated to undergo the Prolift® procedure.
13  This was another warning that Ethicon had placed in
14  its instructions for use, for example, for the TVT®,
15  which is only two trocar passes, and yet in the
16  Prolift® procedure with six trocar passes through
17  the deep pelvis a warning was not added.  It was
18  considered.  And Ethicon, for reasons that are
19  inexplicable to me, never made that change.
20       There was a warning that Axel Arnaud
21  wanted to include in the Prolift® IFU right before
22  Prolift® was getting ready to launch about pelvic
23  pain and pain with intercourse.  And this warning
24  was not added to the IFU because the IFUs had
25  already been printed and the change -- Ethicon

Page 341

1  didn't want to make the change and reprint the IFUs.
2       MS. JONES:  Move to strike as
3  nonresponsive.
4  BY MS. JONES:
5    Q    What other areas do you believe -- and I'm
6  just asking you to list them -- that Dr. Kavaler
7  failed to address?
8       MR. SLATER:  And just for the record,
9  you want her to just go off the top of her head and
10  list generally?  She has the report here.
11       MS. JONES:  She's got the report in
12  front of her.  I'm just asking her --
13       MR. SLATER:  You can keep listing off
14  the top of your head and then eventually you can sit
15  down and go through the report if you want to if
16  counsel wants the complete list.
17       THE WITNESS:  One more thing is that
18  Dr. Kavaler failed to address the failure of Ethicon
19  to properly study Prolift® before launch in a way
20  that would allow for appropriate patient selection,
21  and that includes patients with preexisting pain
22  conditions, when it was learned only later that
23  these patients would have an -- or were at higher
24  risk to have an exacerbation of their preexisting
25  pain condition or the development of a new pain

Confidential - Subject to Stipulation and Order of Confidentiality

Page 342

1 condition such that implantation of the Prolift® was
2 contraindicated in them, that they could develop
3 complications that were untreatable, that left them
4 with devastating, life-altering complications for
5 which there is no treatment.
6          Dr. Kavaler failed to address the
7 fact that Ethicon failed to study the complications
8 that were known and foreseeable that would occur
9 with the Prolift® procedure. And they failed to
10 include this in their internal design processes
11 which, if they had performed properly, the Prolift®
12 would have never reached the market.
13          MS. JONES: Move to strike as
14 nonresponsive.
15 BY MS. JONES:
16     Q    Do you know, Doctor, whether or not
17 Dr. Kavaler actually used the Prolift®?
18     A    I believe she stated so in her report.
19     Q    She actually had experience using Prolift®
20 with her patients, did she not?
21     A    Evidently. I just answered that. I'd
22 like to continue to address your previous question.
23     Q    Other things that you say she left out?
24     A    The other disagreements I have with her
25 opinions.

Page 343

1     Q    Let me separate these if I can, because I
2 thought that we were talking about first and I
3 thought my question was first what is it that you
4 believe that she left out and didn't address,
5 because that was where you started first.
6     A    Well, what you asked me first was what I
7 did I disagree with in her report. And on Page --
8 give me just a second.
9          Okay. So on Page 69 she is addressing
10 the -- she is addressing -- she's making a
11 counterpoint to my opinion in which she states:
12 Ethicon adequately warns about the risk of nerve
13 damage in its Prolift® IFU and patient brochure.
14          And in other places in her report she
15 opines that Ethicon's Prolift® IFU adequately warned
16 of the risks. So what I was doing was providing you
17 with my opinion in contrast to that that Ethicon did
18 not adequately warn of the risks in its Prolift®
19 IFU.
20          So now shall I continue with my
21 disagreements with her opinions?
22     Q    I would like to hear all of your
23 disagreements. Before we spend time doing that, let
24 me ask you this: Are there any disagreements with
25 her opinions that are not set forth in your report?

Page 344

1     A    Yes.
2     Q    What are they?
3     A    On Page 27, No. 3, Dr. Kavaler claims that
4 Mrs. Gross has recurrent prolapse. She did not have
5 recurrent prolapse. Her opinion is that Prolift®
6 was an appropriate choice to treat her bothersome
7 recurrent prolapse. And, again, she does not have
8 recurrent prolapse.
9          Prolift® is a safe and effective treatment
10 of pelvic organ prolapse. I do not agree with that.
11     Q    Let me make myself clear. Maybe my
12 question wasn't clear. The opinion that you have
13 about Prolift® is set forth in your report, is it
14 not?
15     A    Correct.
16     Q    My question is: Are there any opinions
17 that you have in response to Dr. Kavaler that are
18 not set forth in your report?
19     A    Yes.
20     Q    That's what I'm trying to identify is just
21 that discrete group of opinions that you have not
22 previously written about.
23     A    Okay.
24          MR. SLATER: Just objection to the
25 form.

Page 345

1          You can answer.
2          THE WITNESS: Page 27, No. 5: Linda
3 Gross chose to undergo so many surgeries after the
4 original implant that it is impossible to attribute
5 her present condition to Prolift®. Many of these
6 surgeries were against the advice of her
7 physician -- physicians.
8          This is absolutely unreasonable.
9 Mrs. Gross went through the process of multiple
10 surgeries at each time sitting down with her
11 surgeon, discussing her condition, and making a
12 joint decision to go ahead with surgery. She didn't
13 set out to have the number of surgeries she had.
14 She had the number of surgeries she had as a direct
15 result of the Prolift® procedure and the permanent
16 Prolift® mesh implantation. At each time she was
17 faced with the decision as to whether she would
18 undergo surgery again. This was in consultation
19 with her surgeon and under his or her recommendation
20 to go forward because that was a reasonable choice
21 at the time. To suggest --
22 BY MS. JONES:
23     Q    May I just ask -- let me just ask one
24 question.
25          MR. SLATER: Don't interrupt her. I

34 (Pages 342 to 345)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 346

1    mean, she's in the middle of her answer.
2              MS. JONES:  I just want to ask this
3    question.
4    BY MS. JONES:
5        Q    Is there documentation in the medical
6    records that surgeons advised her against having
7    further surgery?
8        A    Yes.  I would like to expand on that and
9    also complete the answer to the question.
10       Q    I'm perfectly happy for you to complete
11   your answer.
12       A    It is unreasonable and unethical to
13   suggest that Mrs. Gross underwent surgery at any
14   particular instance because no surgeon acting
15   ethically would perform a surgery that he or she did
16   not feel that the possible benefit of that surgery
17   outweighed the possible risks.  It would be
18   unethical to do otherwise.  To suggest that
19   Mrs. Gross underwent surgery against the advice of
20   her physicians ignores that obvious and very basic,
21   fundamental aspect of the practice of surgery.
22       Q    Are you finished?
23       A    That's the rest of my answer to that
24   question.  Shall I continue with the remaining
25   disagreements that I have with Dr. Kavaler that are

Page 347

1    not otherwise in my report?
2        Q    I thought that that was what you had just
3    told me you had completed.
4        A    That was No. 5.  I was just completing my
5    response to No. 5 on Page 27.
6        Q    Please tell me what else you disagree with
7    that's not otherwise in your report.
8              MR. SLATER:  Objection to the form.
9    You can answer.
10             THE WITNESS:  No. 6:  Linda Gross'
11   current condition is attributable to pelvic muscle
12   spasms.  Dr. Kavaler ignores the reality that Linda
13   Gross has pelvic muscle spasm in addition to other
14   conditions.  She acts like pelvic muscle spasm is
15   the exclusive cause of the constellation of Linda
16   Gross' symptoms and I do not agree with that.
17             Prolift® did not -- this is No. 7:
18   Prolift® did not cause pudendal neuralgia in Linda
19   Gross.  If Ms. Gross at some time -- excuse me -- at
20   some point developed a pudendal injury, it cannot be
21   attributed to Prolift®, particularly in light of her
22   preexisting history of pelvic floor defect and her
23   extensive history of post-implant surgeries.
24             The only surgery that Mrs. Gross
25   underwent that specifically addressed her

Page 348

1    pudendal -- the pudendal nerve was the surgery that
2    she had with Dr. Hibner, the neurolysis and the
3    combination of procedures that accompanied that.
4    It's ludicrous to suggest that pudendal neuralgia
5    was the result of that surgery when pudendal
6    neuralgia was the indication for that surgery.  At
7    no other time did Mrs. Gross undergo a surgery that
8    directly addressed the pudendal nerve or that would
9    place the pudendal nerve at risk for the kind of
10   outcome she had, the pudendal neuralgia, except for
11   the indexed Prolift® procedure and the result of the
12   Prolift® mesh implantation.
13             No. 8:  Linda Gross' incomplete
14   bladder emptying cannot be attributed to Prolift®.
15   I disagree with that opinion and the basis for that
16   is explained in my report.
17             No. 9:  Linda Gross' two mesh
18   extrusions are the result of post-implant surgeries,
19   not her July 2006 implant surgery.  I disagree with
20   this opinion.  And, again, it is ludicrous to
21   suggest that mesh erosion as a complication can
22   occur unless you have mesh implantation.  She had
23   Prolift® mesh implantation, and as a result of that
24   mesh implantation she subsequently developed the
25   complication of mesh erosion.

Page 349

1              No. 10, Page 28:  The known risks of
2    Prolift® are adequately warned about in the
3    product's IFU and patient brochure.  I utterly
4    disagree with this.  In -- I'm going to try to
5    confine my remarks to what is not already in my
6    report at your request.  Linda Gross read the
7    patient -- the Prolift® patient brochure and she
8    relied on it in making her decision to go ahead with
9    the Prolift®.  She believed the false and misleading
10   statements in the Prolift® patient brochure.
11             MS. JONES:  Move to strike as
12   nonresponsive.
13             MR. SLATER:  She's in the middle of
14   her answer.
15             MS. JONES:  I don't care.
16   BY MS. JONES:
17       Q    I mean, I've asked only for an
18   identification of what it is that you disagree with
19   in the report that's not otherwise set forth in your
20   report.  And if you disagree with the statement that
21   they failed to warn, that's all I need.
22             MR. SLATER:  You realize my concern
23   with the question is it's a very difficult thing to
24   say what's in the report, what's not in the report.
25   You know, we're being cautious because we're

Confidential - Subject to Stipulation and Order of Confidentiality

Page 350

1  concerned about someone later saying something fell
2  within the crack.
3  BY MS. JONES:
4      Q    Let's answer this question, Doctor:  Have
5  you set forth in your roughly 600 pages of report
6  your opinions with respect to the warnings and the
7  contents of the IFU?
8      A    Yes.
9      Q    Have you set forth in your report your
10  opinions with respect to the warnings and content of
11  the patient brochure?
12      A    Yes.  I would like to point out you asked
13  me specifically with regard to Linda Gross and with
14  regard to what's not already in my report.  I'm
15  telling you about the patient brochure and what
16  Linda relied on.  That's not in my report.
17      Q    Let me ask you this:  You're relying upon
18  Ms. Gross' deposition testimony?
19      A    Correct.
20      So am I allowed to go forward?
21          MR. SLATER:  Just hang on.  She'll
22  ask a new question.
23          THE WITNESS:  I thought I was still
24  answering the last question.  I thought I was still
25  answering the question where you asked me --

Page 351

1  BY MS. JONES:
2      Q    Is it your intent, Doctor, to walk through
3  every page and every paragraph that Dr. Kavaler
4  wrote in her report and say you disagree with it?
5          MR. SLATER:  Before you answer, I
6  have to place an objection.  Just one second.
7          Counsel, if you ask the question what
8  does she disagree with in Dr. Kavaler's report, I
9  assume you'd want her to go through and tell you
10  everything, so that's what you would expect her to
11  do.  It's a bit argumentative and pejorative to kind
12  of say it as if that's something that you wouldn't
13  expect her to do.
14  BY MS. JONES:
15      Q    Do you disagree with every paragraph in
16  Dr. Kavaler's report?
17      A    I can't make that claim until I, again, go
18  through every paragraph in Dr. Kavaler's report.  I
19  was trying to be responsive to your question and you
20  interrupted me.
21          MS. JONES:  Let me take 30 seconds.
22          (Short recess.)
23  BY MS. JONES:
24      Q    Doctor, in the interest of time and
25  because I would really like to finish this

Page 352

1  deposition today, I am going to withdraw my question
2  to ask you to go through and outline the various
3  disagreements with Dr. Kavaler.
4          Let me ask you this question:  Have you
5  reviewed the report of Dr. Minkin?
6      A    Yes.
7      Q    Have you reviewed the report of
8  Dr. Stevens?
9      A    Yes.
10      Q    In the document that you prepared with
11  your comments about these reports for Mr. Slater,
12  did you include in there comments about Dr. Minkin
13  and Dr. Stevens?
14      A    I don't recall making comments about
15  Dr. Stevens' report.
16      Q    In your report and opinions we talked
17  about, you have said that you believe that Ms. Gross
18  experienced fear, anxiety, and depression on a
19  permanent basis; is that correct?
20      A    Yes.
21      Q    Can you tell me what that is based upon?
22      A    What my opinion is based upon?
23      Q    Exactly.
24      A    Yes.
25      Q    What's the basis for that opinion?

Page 353

1      A    The basis for that opinion is my review of
2  her medical records and the depositions of her
3  treating physicians.
4      Q    Have you reviewed any medical records
5  relating to any psychological issues that she
6  experienced before having Prolift®?
7          MR. SLATER:  Objection to the form of
8  the question.
9          You can answer.
10          THE WITNESS:  Could you repeat the
11  question, please?
12  BY MS. JONES:
13      Q    Have you reviewed any records relating to
14  Mrs. Gross' psychological condition prior to the
15  Prolift® surgery?
16      A    Yes.
17      Q    What?
18      A    Well, for example, when she had her
19  surgery in 2001, the hysterectomy and Burch
20  procedure, she experienced headaches that were
21  spinal headaches, and she had a prolonged course
22  with that that was very distressing to her.
23      Q    Anything else?
24      A    Not that I can recall right now.
25      Q    Let me turn to Ms. Wicker for a second.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 354

1  Can you tell me, Doctor, if Ms. Wicker had presented
2  to you in 2008 when she saw Dr. Bercik, what
3  treatment, if any, you would have recommended for
4  her?
5      A    As we discussed before, I would counsel
6  her regarding behavioral and lifestyle changes,
7  pelvic muscle exercises, pessary use, or surgery.
8  Considering her duration of symptoms was relatively
9  short, I would want to get a better sense from her
10  as to the severity and the impact of her symptoms on
11  her life as we discussed the different treatment
12  options.
13          After that discussion, if she felt that
14  she would like to proceed with surgery, I would
15  discuss with her the options, with or without a
16  hysterectomy, of apical suspensions such as the
17  uterosacral ligament suspension and the anterior
18  colporrhaphy for her anterior vaginal prolapse.
19      Q    And do you feel that those surgical
20  procedures would have been appropriate for her
21  condition based upon your review of the medical
22  records?
23      A    Yes.
24      Q    Would you have recommended surgery to her
25  for her condition?

Page 355

1      A    Well, again, I would want to get a better
2  sense from her -- as I'm sure you can understand,
3  what gets recorded in the medical record is a
4  shorthand for what actually goes on in the
5  counseling session.  So what's not present in the
6  medical record -- is a high level of detail
7  regarding her symptomatic state, the duration of her
8  symptoms, their intensity, her degree of bother
9  related to her symptoms, her impact on her quality
10  of life, and so on.  So before I could say with
11  certainty that I would recommend surgery for her, I
12  would need that additional information.
13      Q    Do I understand then that based upon your
14  review of the medical records you can't say one way
15  or another whether or not the surgery was
16  appropriate for her?
17          MR. SLATER:  Objection.
18          You can answer.
19          THE WITNESS:  Dr. Bercik is an
20  experienced respected surgeon.  I am not going to
21  disagree with his decision after he counseled
22  Mrs. Wicker to recommend surgery to her.
23  BY MS. JONES:
24      Q    Do you know Dr. Bercik?
25      A    No.

Page 356

1      Q    What do you know about him?
2      A    I know he is the head of urogynecology at
3  Yale.  I can't remember anything else specific.
4      Q    You've already told us that you spoke with
5  Dr. Elliott about whether or not Ms. Wicker suffered
6  from interstitial cystitis I believe?
7      A    I certainly spoke with Dr. Elliott.  I
8  don't remember specifically exactly what we
9  discussed about Mrs. Wicker.
10      Q    Did Ms. Wicker suffer from interstitial
11  cystitis in your judgment?
12          MR. SLATER:  Objection to the form of
13  the question.
14          THE WITNESS:  That is in her medical
15  history so I would accept her historical report of
16  that, yes.
17  BY MS. JONES:
18      Q    Have you attempted to evaluate whether or
19  not there was any other source of pelvic pain for
20  Ms. Wicker other than what you attribute to Prolift®
21  or the Prolift® surgery?
22      A    Well, at this point Mrs. Wicker also has
23  an element of pelvic muscle spasm which is likely
24  related to her pain, which is due to the Prolift®
25  procedure.  Other than that, I don't know that she

Page 357

1  has any other diagnoses in her pelvis that would
2  account for her symptoms.
3      Q    Pelvic muscle spasms can certainly occur
4  in the absence of the presence of mesh, can't they?
5      A    Yes.
6      Q    Did you review Mrs. Wicker's medical
7  records for other physical conditions that could
8  account for or contribute to her source of pelvic
9  pain or her pelvic pain?
10      A    Yes, I reviewed her records.
11      Q    Did you identify in reviewing the records
12  any other physical conditions that would account for
13  or contribute to her pelvic pain?
14      A    No, I did not.
15      Q    Based upon your review of the medical
16  records, was there anything in the medical records
17  that should have served as a contraindication to the
18  surgery, the Prolift® surgery, in Ms. Wicker?
19      A    Now there is an understanding that
20  patients with preexisting pain conditions like
21  migraine headaches and interstitial cystitis are
22  contraindicated to undergoing the Prolift® procedure
23  because they have a higher risk of exacerbation of
24  their current condition or the development of a new
25  condition.  That information, although known and

37 (Pages 354 to 357)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 358

1  foreseeable by Ethicon, had not been distributed or
2  communicated by Ethicon to physicians and patients.
3      Q   Other than Ms. Wicker's interstitial
4  cystitis, what conditions did you see in the medical
5  records that suggested that Ms. Wicker suffered from
6  any type of chronic pain syndrome?
7      A   Migraine headaches.
8      Q   Anything else?
9      A   Arthritis.
10     Q   And where was the arthritis?
11     A   In her hips.
12     Q   Anything else?
13     A   No.
14     Q   Was there anything about what you learned
15 from the medical records or the depositions in the
16 case about Ms. Wicker's activities that would have
17 contributed to her chronic pain?
18     A   No.
19     Q   What is your prognosis as we sit here
20 today for Ms. Wicker?
21     A   She carries a lifelong risk of further
22 mesh erosions and requirement -- and the required
23 treatment.  She has recurrent prolapse that may or
24 may not be correctable, treatable.  She may not be
25 able to undergo surgery for that because of

Page 359

1  complications from the Prolift®.  She has pelvic
2  pain and vaginal pain that more than likely than not
3  is a permanent condition.  This affects her ability
4  to have normal sexual relations with her husband in
5  that she has an anatomic vaginal canal, but the
6  dysfunction of the vaginal tissues and the pelvic
7  muscles and the scarring and the fibrosis prevent
8  her from having a normal enjoyable sexual life with
9  her husband.
10     Q   Let me follow up with some questions on
11 that.  First, what surgery, if any, would you
12 recommend be considered for Ms. Wicker to correct
13 her prolapse?
14     A   That is a very difficult question to
15 answer that Dr. Raz is currently struggling with.
16 She has lost so much of her normal vaginal tissue
17 because of the scarring and the recurrent mesh
18 erosion and the recurrent -- repeated surgeries.
19 I've certainly never faced a situation like that in
20 my clinical experience, so her surgical options in
21 terms of treating her cystocele would have to be
22 very creative.
23         (Discussion off the record.)
24 BY MS. JONES:
25     Q   Am I correct, Doctor, that Dr. Raz

Page 360

1  reported that he had restored the length of the
2  vagina to I want to say 10 centimeters?  Does that
3  sound right?
4      A   Yes.
5      Q   And that Dr. Raz thought he had a good
6  result with that?
7      A   He had a good result in terms of, as I
8  said, the creation of an anatomic vaginal canal.  He
9  was unable to obviously turn back time and give her
10 normal vaginal tissue, vaginal tissue in the absence
11 of fibrosis and scarring and mesh fragments that
12 will continue to pose a risk of recurrent mesh
13 erosion and the need for further surgery and
14 functional aspects of her sexual function in terms
15 of pain, vaginal pain, pelvic pain, pelvic muscle
16 spasm that unfortunately he is also unable to
17 reverse.
18     Q   And upon what do you rely that she has
19 residual mesh?
20     A   The ultrasound identification of mesh and
21 the fact that she continues to present with
22 recurrent mesh erosion.
23     Q   And when was she last treated for mesh
24 erosion of which you're aware?
25     A   In October she had granulation tissue,

Page 361

1  which in the presence of mesh is often a precursor
2  to the exposure.  The last time --
3      Q   October of this year?
4      A   Yes.  And that was treated in the office.
5      Q   Was any mesh specifically noted at that
6  time?
7      A   She did not have an overt mesh erosion.
8      Q   Who saw the granulation tissue?
9      A   Dr. Raz.
10     Q   And how was she treated for the
11 granulation tissue at that time?
12     A   She was treated with a topical cautery
13 agent, silver nitrate.
14     Q   And do you know how she responded to that?
15     A   I do not.
16     Q   Do you know whether or not Ms. Wicker is
17 on any pain medication at this time?
18     A   I do not know that off the top of my head.
19     Q   Do you know or have an opinion as to
20 whether Ms. Wicker would benefit from a pain
21 management course?
22     A   I don't know.  She may; she may not.
23     Q   If she were your patient, would you
24 recommend that she receive treatment for pain
25 management?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 362

1    A    And by that -- what do you mean
2 specifically by "pain management"?  She is having
3 pain management.
4    Q    Based upon what you know of Ms. Wicker's
5 current condition, if she came to see you and you
6 examined her, what would you recommend for her, if
7 anything, in terms of pain management?
8    A    You mean different or in addition to what
9 she is currently receiving?
10    Q    Or the same as what she's currently
11 receiving.
12    A    Well, she's having physical therapy.  She
13 is treated with a muscle relaxant for her pelvic
14 muscle spasm.  She is using vaginal estrogen cream
15 to -- in an attempt to help the vaginal tissue.
16 She's waiting to see if her vaginal tissue -- she's
17 waiting to see if enough time can elapse without
18 another mesh erosion for the consideration of
19 treatment of her cystocele.  I don't think I have
20 anything to add to that.
21    Q    Other than the interstitial cystitis and
22 the migraine headaches, is there anything
23 significant in Ms. Wicker's preexisting medical
24 history that's important to you in terms of your
25 opinions?

Page 363

1    A    I consider arthritis as another chronic
2 pain condition that she has.
3    Q    Anything else?
4    A    No.
5    Q    Do you know what the cause or do you have
6 an opinion of what the cause of Ms. Wicker's
7 prolapse was?
8    A    Well, as I think we discussed previously,
9 the etiology of prolapse is not fully understood.
10 She has some of the epidemiologic risk factors that
11 have been identified, such as vaginal births.  Other
12 than those factors, I don't see anything in her
13 history that stands out in particular.
14    Q    Do you have an opinion as to what the
15 cause of Ms. Wicker's interstitial cystitis was?
16    A    Even less so is the etiology of
17 interstitial cystitis understood.  And as I
18 mentioned before, it's really just a constellation
19 of symptoms.  So, no, I do not have an understanding
20 of what the cause of Mrs. Wicker's interstitial
21 cystitis is.
22    Q    And I think you told us that rather than
23 treating a patient with interstitial cystitis, you
24 would have referred them to a urologist for
25 recommendations for treatment?

Page 364

1    A    Correct.
2    Q    Is this a good time for a break?
3         MS. JONES:  We can.  I'm trying to
4 finish.  But if you want to take a break, we will.
5         THE WITNESS:  Yes.
6         (Short recess.)
7 BY MS. JONES:
8    Q    Doctor, have you seen any of the pathology
9 on Ms. Wicker?
10    A    Yes.
11    Q    What did you see?
12    A    Photomicrographs of resected tissue and
13 mesh.  And I have seen photographs of resected
14 tissue and mesh.
15    Q    And from whom did those photomicrographs
16 come?
17    A    From Dr. Welch.
18    Q    And from whom did you obtain copies of the
19 photographs?
20    A    From Dr. Raz.
21    Q    You reviewed the records relating to Dr.
22 Raz' surgery on Ms. Wicker?
23    A    Correct.
24    Q    Had you ever seen anyone perform a surgery
25 using the materials that Dr. Raz used in the

Page 365

1 surgery?
2    A    In -- you're referring to any of his
3 surgeries?
4    Q    Well, you know that he -- these are my
5 words, not his words, but did a construct using
6 polypropylene?  Are you aware of that?
7    A    The Prolene® suture --
8    Q    Yes.
9    A    -- is that what you're referring to?  Yes.
10    Q    You know that Prolene® suture is
11 polypropylene?
12    A    Correct.
13    Q    Had you ever seen anyone use that before?
14    A    No.
15    Q    That's not something that you saw or used
16 or trained on when you were practicing?
17    A    Correct.
18    Q    Do you have an opinion as to what the
19 risks, if any, were or are with that procedure using
20 that material?
21    A    Above and beyond or different from the
22 risks that we've already talked about in terms of
23 surgery?
24    Q    Associated with the use of that Prolene®
25 suture as he did.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 366

1    A   It would be possible to have a suture
2  erosion or an uncovering of the suture by -- through
3  or under the vaginal epithelium.  That's the only
4  additional risk that I can think of, you know,
5  besides all the other things we've talked about.
6    Q   How would you have counseled your patient
7  on the use of that material in a way different from
8  the use of mesh?
9    A   If a suture erosion occurred, I would
10  counsel the patient that that is a simple problem to
11  solve in that the suture can be simply snipped out.
12  It doesn't involve a dissection.  It doesn't involve
13  the likelihood of recurrent mesh erosion.  And in
14  general it would be just a much simpler procedure
15  than resecting mesh.
16    Q   As I understand it, Dr. Raz' surgery
17  involved a series of interlocking sutures; is that
18  your understanding?
19    A   Yes.
20    Q   Have you ever seen any published article
21  on that procedure anywhere using interlocking
22  sutures?
23    A   Not that I can recall.  I haven't
24  specifically argued for it.
25    Q   You're not aware of any randomized

Page 367

1  controlled clinical trial using that procedure and
2  those materials?
3    A   No.
4    Q   If you had been counseling a patient,
5  would you have suggested to the patient that that
6  would be an experimental therapy?
7    A   Well, as we've already established, I have
8  not been trained in using this procedure.  It would
9  depend on what the collective experience had been
10  with that procedure.
11    Q   Well, I guess my question, Doctor, is
12  knowing what you know today about that procedure and
13  the absence of information about that procedure in
14  the medical literature, would you have counseled or
15  told your patients that it was an experimental
16  procedure?
17        MR. SLATER:  Objection to the form of
18  the question; foundation also.
19        You can answer.
20        THE WITNESS:  I'll create two
21  scenarios for you.  One scenario, let's pretend I'm
22  a fellow with Dr. Raz and I spend three years
23  training with him and I gain from his experience and
24  skill in teaching and his experience in the
25  performance of this particular procedure with his

Page 368

1  patients and his understanding of the risks and
2  benefits.  In that case I would not consider it
3  experimental.
4        In the other scenario, I learn about
5  this procedure in some way and I decide I'm going to
6  try it on my patient.  In that case it would be
7  experimental and I would counsel her in that way.
8  BY MR. JONES:
9    Q   Do you know whether or not Dr. Raz had
10  performed this same procedure previously?
11    A   I do not know.
12    Q   Have you seen any of the radiology in this
13  case?
14    A   In Dr. Raz' deposition, images of the
15  ultrasound and MRI were used as exhibits.
16    Q   But have you seen those?
17    A   Yes.  His deposition was videotaped so,
18  yes, I have seen those.
19    Q   I mean did you just see it on the screen
20  on the videotape or do you have digitalized versions
21  of those materials?
22    A   The former.
23    Q   So you actually watched the video and saw
24  those displayed on the screen?
25    A   Correct.

Page 369

1    Q   You've not looked at them otherwise where
2  you were actually holding them in your hand?
3    A   Correct.
4    Q   You state in your report that you believe
5  that Ms. Wicker has permanent impairment.  Can you
6  tell me what the basis of that opinion is?
7    A   Yes.  First I'd like to mention something
8  that I forgot which is relevant to your question,
9  and that is her urinary tract symptoms, which is
10  frequency, urgency, and bladder pain.  I believe
11  those symptoms are permanent subject to the
12  management that she's currently receiving.
13    Q   Let me ask you that.  Did she suffer those
14  symptoms before she had her Prolift® surgery?
15    A   To my understanding, her symptoms related
16  to her history of interstitial cystitis were stable,
17  so she did not have current symptoms related to her
18  history of interstitial cystitis before her Prolift®
19  surgery.
20    Q   Had she had the same symptoms in the
21  past --
22    A   I don't believe she --
23    Q   -- associated with interstitial cystitis?
24    A   Excuse me.  I don't believe she had
25  bladder pain.  I believe she had frequency/urgency

Confidential - Subject to Stipulation and Order of Confidentiality

Page 370

1  that led to her historical diagnosis of interstitial
2  cystitis.
3      Q   Now, I think you were answering the
4  question of permanent impairment.
5      A   Yes.  So her other conditions, her vaginal
6  pain and dyspareunia, I believe those are permanent
7  conditions.  Her pelvic muscle spasm contributing to
8  her pelvic pain is undergoing treatment with
9  physical therapy and muscle relaxants.  It's
10 possible she may experience some improvement in
11 those symptoms.  I am not hopeful that she will
12 experience true resolution.
13     Q   When you're talking about she may
14 experience some improvement in those symptoms, would
15 that be improvement in the symptoms of pelvic spasms
16 and dyspareunia?
17     A   Correct, and vaginal pain.
18     Q   And vaginal pain.
19     A   She has symptoms related to her cystocele.
20 And as I mentioned before, she's waiting -- she and
21 Dr. Raz are waiting to see if a sufficient amount of
22 time will elapse for him to be confident or
23 relatively confident that mesh erosion will not
24 recur and that he may be able to proceed with the
25 cystocele repair.  If he judges that he cannot, then

Page 371

1  her cystocele will be a permanent condition.  She
2  continues to be at risk for recurrent mesh erosion
3  and the risks associated with her treatment, which
4  would be surgical.
5      Q   I'm sorry.  You said the risk associated
6  with her treatment would be?
7      A   Surgical.
8      Q   Would be the risk associated with surgery,
9  is that what --
10     A   That's what I intended to mean.
11     Q   I'm sorry.  I just didn't understand.
12         You say in your report that Ms. Wicker is
13 disabled.  Can you tell me the basis of your opinion
14 that she is disabled?
15     A   She is disabled to the extent that she
16 can't enjoy a normal sexual life with her husband.
17 She is disabled to the extent that she is troubled
18 by chronic pain and all of the consequences that
19 attend that.  She is disabled to the extent related
20 to her urinary symptoms with frequency and urgency
21 and bladder pain that induce anxiety and worry that
22 she will have an incontinent episode in public, for
23 example, and face the humiliation of that if she
24 can't reach a restroom in time.  And those
25 conditions, her urinary symptoms, I believe are

Page 372

1  permanent.
2      Q   Can I just ask one question?  I asked you
3  first about permanent impairment and then I asked
4  you secondly about disability.
5      A   Yes.
6      Q   And I'm trying to discern whether or not
7  those are one and the same or they're two different
8  issues.  Let me just say if I'm reading this, I look
9  at disability as saying disability in the sense of
10 being unable to participate, for example, in gainful
11 employment or the normal activities to which she has
12 been engaged in.  Is that what you're --
13     A   Well --
14     Q   Is that how you would define it, first?
15         MR. SLATER:  Objection.
16         You can answer.
17         THE WITNESS:  I would take a broader
18 view of disability affecting every minute of every
19 hour of every day of her life.  And that includes,
20 as I said, being disabled in her ability to enjoy
21 normal sexual relations with her husband, being
22 disabled in terms of limitations on her activities
23 based on her frequency, urgency, and bladder pain
24 and the necessary proximity of a restroom and her
25 pelvic pain in general and, as I said, the

Page 373

1  consequences that attend chronic pain and the
2  disability that inflicts on her quality of life.
3  BY MS. JONES:
4      Q   If you were her doctor, based upon what
5  you understand her current condition to be, would
6  you restrict her activities in any way?
7      A   In my opinion, the harm has been done.
8  The harm was done when she had the Prolift®
9  procedure and the permanent Prolift® mesh
10 implantation.  I don't believe she can further harm
11 herself by engaging in the activities that provide
12 her with a semblance of the quality of life that she
13 had before.
14     Q   So the answer is that you would not
15 restrict her activities in any way today?
16     A   I would restrict her activities to her
17 tolerance of her symptoms.
18     Q   Can you switch back to Ms. Gross for a
19 second?
20     A   I can.
21     Q   Would you put any restrictions or
22 limitations on Ms. Gross and her activities if you
23 saw her today?
24     A   Again, the harm has been done with the
25 Prolift® procedure and the permanent Prolift® mesh

41 (Pages 370 to 373)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 374

1   implantation.  I don't believe she can further harm
2   herself with her activities.  And, again, if -- the
3   restrictions would be only to the -- her tolerance
4   of her symptoms such that she doesn't precipitate a
5   level of pain that's intolerable to her.
6           MS. JONES:  Did someone join us on
7   the phone?
8           MR. SLATER:  I think that was the
9   sound of someone hanging up actually.
10          MS. JONES:  I think it was, too.
11  That's what I was checking.
12          MR. CAMERON:  This is Roger.  I think
13  it was just a line check.
14          MS. JONES:  Dr. Weber, I thank you.
15  I think that's all I have right now.
16          MR. SLATER:  I have a couple brief
17  follow-up questions.  I'll only be three or four
18  hours.
19  BY MR. SLATER:
20      Q    A few moments ago in the context of Pam
21  Wicker you were asked about the symptoms of her
22  cystocele, her bladder prolapse that she currently
23  has.  Remember that?
24      A    Yes.
25      Q    And within the constellation of symptoms

Page 375

1   or the results of her cystocele, is one of those
2   results obstructed voiding?
3       A    Yes.
4       Q    And that was discussed by Dr. Raz as well
5   during his testimony; correct?
6       A    Yes.
7       Q    And what is the obstructed voiding and why
8   is that due to this recurrent prolapse that has
9   occurred since all these surgeries had to be done
10  after the Prolift®?
11      A    What happens with a cystocele, when the
12  bladder drops down, there's a kinking effect between
13  the urethra and the bladder so that it becomes very
14  difficult for the bladder to empty normally.  And,
15  in fact, Mrs. Wicker is in the very uncomfortable
16  position of having to stand in order to be able to
17  empty her bladder to try to overcome this obstructed
18  voiding.
19      Q    Do you believe as long as the cystocele is
20  not able to be repaired that that will continue?
21      A    Yes.
22      Q    You were asked a question a moment ago
23  about Linda Gross and whether her activities would
24  be restricted by you.  Remember that question?
25      A    Yes.

Page 376

1       Q    Do you have an understanding of the fact
2   that due to her condition, Linda Gross is unable to
3   conduct her normal daily activities and to work;
4   correct?
5       A    Yes.
6       Q    And that's a result of her condition?
7       A    Yes.
8       Q    It also affects her ability to engage in
9   her day-to-day activities that she would prefer to
10  engage in?
11      A    Yes.
12      Q    You were asked earlier about Dr. Minkin's
13  report about Linda Gross.  In her report Dr. Minkin
14  talked about the episode in 2001 where Linda Gross
15  suffered from spinal headaches and it took about a
16  year for those to resolve.  You saw that?
17      A    Yes.
18      Q    And you saw where Dr. Minkin actually
19  referred to those as migraines?  Did you see that?
20      A    Yes.
21      Q    In the context of what you've testified to
22  earlier with regard to chronic pain as a
23  contraindication and in the context of Dr. Benson's
24  overall testimony, how does that fit in if, in fact,
25  one were to consider that to be a chronic pain or

Page 377

1   migraine condition?  How would that impact on your
2   overall opinion?
3       A    Yes.  Well, as we discussed previously,
4   what has been learned by surgeons over time is that
5   patients with a preexisting pain condition are at
6   much higher risk for either the exacerbation of
7   their existing pain condition or the development of
8   a new pain condition after the Prolift® procedure
9   such that it is considered -- the Prolift® procedure
10  is considered now contraindicated in those patients.
11  So given the fact that Mrs. Gross has this history,
12  then that would have served as a contraindication
13  for her to undergo the Prolift® procedure at all.
14      Q    With regard to a comparison of risks
15  between certain native tissue repairs with sutures
16  and the Prolift®, you were asked about various
17  risks.  Remember that mostly yesterday and a little
18  today?
19      A    Yes.
20      Q    Is there a significant difference between
21  the severity, the duration, and the treatability of
22  pain with intercourse or discomfort with intercourse
23  that a woman might experience after a native tissue
24  repair as compared to the dyspareunia that a woman
25  could suffer following a Prolift®?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 378

1    A   Yes.  There --
2    Q   I don't need you to explain.  I just want
3 to establish that.
4    A   Okay.
5    Q   Counsel obviously can ask you about it,
6 but I just want to make sure it's clear.  I know
7 it's explained in your report.
8         Earlier in the deposition you testified
9 with regard to what you termed as Ethicon's
10 deception to surgeons at the time that Linda Gross
11 and Pam Wicker had the procedure.  Remember that
12 testimony?
13    A   Yes.
14    Q   And in the course of your reports, did you
15 detail your evaluation of the different things that
16 you would term Ethicon's deception of surgeons
17 beginning with the launch up through those
18 surgeries?
19    A   Yes.
20    Q   One thing that you talked about was the
21 failure of Ethicon to obtain 510(k) clearance.  Are
22 there other aspects to Ethicon's deception beyond
23 their failure to tell doctors that the product had
24 not been cleared by the FDA?
25    A   Yes.

Page 379

1    Q   You talked earlier in the deposition about
2 your reliance on certain physicians with regard to
3 the fact that the Prolift® mesh can harbor a chronic
4 low-grade infection which can cause recurrent
5 erosions and other harm to a woman.  Remember that
6 testimony?
7    A   Yes.
8    Q   And you said that two of the physicians
9 you relied on were Dr. Raz and you referred to the
10 doctor from Connecticut.  That would be
11 Dr. Kreutzer?
12    A   Yes.
13    Q   Did you also rely on the opinions and
14 experience of Dr. Margolis as well in that regard?
15    A   Yes.
16    Q   You were asked if you had spoken with any
17 Prolift® users about the Prolift® or the Prolift®
18 professional education.  Do you remember that?
19    A   Yes.
20    Q   You did, in fact, have the ability and you
21 did actually read the depositions of Dr. Benson,
22 Dr. Bercik, Dr. Raders, Dr. Hinoul, Dr. Robinson,
23 Dr. Kirkemo, Dr. Jafri from the Firman case, you had
24 the opportunity to read extensive deposition
25 testimony from multiple users of the Prolift® in

Page 380

1 that context; correct?
2    A   Yes.
3    Q   You were asked about the summary of
4 medical records that was provided to you by my
5 office and I think you said one or more deposition
6 summaries.  Ultimately, beyond just using those as a
7 short summary of what had been provided just to get
8 an idea of what was there, did you ultimately read
9 each of the records yourself and read each of the
10 depositions yourself and rely on your own reading of
11 the source materials to form your opinions?
12    A   Yes.
13         MR. SLATER:  I have no other
14 questions.
15 BY MS. JONES:
16    Q   Let me follow up just briefly, Doctor.
17 You were asked about dyspareunia following the use
18 of transvaginal mesh.  Have you actually treated a
19 woman who has had transvaginal mesh implanted for
20 prolapse for dyspareunia?
21    A   No.
22    Q   You were asked about the obstructed
23 voiding that you say Ms. Wicker is experiencing?
24    A   Yes.
25    Q   Is that something that could be treated

Page 381

1 with the use of a Burch procedure?
2         MR. SLATER:  You're asking
3 specifically in Pam Wicker as things stand now?
4         THE WITNESS:  The Burch
5 colposuspension is indicated for the treatment of
6 stress incontinence.  It is not indicated to resolve
7 obstructed voiding.
8 BY MS. JONES:
9    Q   Do you know whether or not the use of that
10 procedure could be used for obstructed voiding in
11 Ms. Wicker?
12    A   Well, of course, it could be.  I wouldn't
13 recommend it.
14    Q   Do you know whether or not the TVT®
15 procedure is available for use in obstructed
16 voiding?
17    A   No.
18         MS. JONES:  That's all I have.
19 BY MR. SLATER:
20    Q   Just to follow up on those last two
21 questions, when you said Burch could be used, were
22 you saying that you would recommend it or think it's
23 an appropriate treatment for Pam Wicker?
24    A   No.  I was just responding in the general
25 sense that anybody can do anything, but I would not

43 (Pages 378 to 381)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 382

1 recommend it.
2      Q    The problems that Dr. Raz testified with
3 regard to during his trial testimony, those would
4 apply to any effort to treat the cystocele at this
5 point; correct?
6      A    Yes.
7           MR. SLATER:  No other questions.
8           (Witness excused.)
9           (Whereupon the deposition adjourned
10 at 4:47 p.m.)
11                 - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 384

1           INSTRUCTIONS TO WITNESS
2
3           Please read your deposition over carefully
4 and make any necessary corrections.  You should
5 state the reason in the appropriate space on the
6 errata sheet for any corrections that are made.
7           After doing so, please sign the errata
8 sheet and date it.
9           You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12           It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the deposition
15 transcript by you.  If you fail to do so, the
16 deposition transcript may be deemed to be accurate
17 and may be used in court.
18
19
20
21
22
23
24
25

Page 383

1           CERTIFICATE
2
3      I, KIMBERLY A. OVERWISE, a Certified
Court Reporter and Notary Public of the State of New
4 Jersey, do hereby certify that prior to the
commencement of the examination, ANNE M. WEBER,
5 M.D., M.S.,  was duly sworn by me to testify to the
truth, the whole truth and nothing but the truth.
6
      I DO FURTHER CERTIFY that the
7 foregoing is a verbatim transcript of the testimony
as taken stenographically by and before me at the
8 time, place and on the date hereinbefore set forth,
to the best of my ability.
9
      I DO FURTHER CERTIFY that I am
10 neither a relative nor employee nor attorney nor
counsel of any of the parties to this action, and
11 that I am neither a relative nor employee of such
attorney or counsel, and that I am not financially
12 interested in this action.
13
14
      KIMBERLY A. OVERWISE
15      CCR: 30X100224600
      Dated:  November 19, 2012
16
17
18
19
20
21
22
23
24
25

Page 385

1           E R R A T A  S H E E T
2                 - - - - - -
3
4 PAGE   LINE      CHANGE
5 ____  ____   _____
6      REASON:  _____
7 ____  ____   _____
8      REASON:  _____
9 ____  ____   _____
10      REASON:  _____
11 ____  ____   _____
12      REASON:  _____
13 ____  ____   _____
14      REASON:  _____
15 ____  ____   _____
16      REASON:  _____
17 ____  ____   _____
18      REASON:  _____
19 ____  ____   _____
20      REASON:  _____
21 ____  ____   _____
22      REASON:  _____
23 ____  ____   _____
24      REASON:  _____
25

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 386

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4          I, ANNE M. WEBER, M.D., M.S., do
5    hereby certify that I have read the foregoing pages,
6    213-385, and that the same is a correct
7    transcription of the answers given by me to the
8    questions therein propounded, except for the
9    corrections or changes in form or substance, if any,
10   noted in the attached Errata Sheet.
11
12
     _____      _____
13
     ANNE M. WEBER, M.D., M.S.      DATE
14
15
16
17
     Subscribed and sworn
18   to before me this
     _____ day of _____, 2012.
19
     My commission expires:_____
20
21   _____
     Notary Public
22
23
24
25
```

Page 387

```
1
2        LAWYER'S NOTES
     PAGE  LINE
3    _____  _____  _____
4    _____  _____  _____
5    _____  _____  _____
6    _____  _____  _____
7    _____  _____  _____
8    _____  _____  _____
9    _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24   _____  _____  _____
25   _____  _____  _____
```