EXHIBIT D

Sarah Abbie Collins, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON
 2
 3    ------------------------   ) Master File No.
      IN RE:  ETHICON, INC.,     ) 2:12-MD-02327
 4    PELVIC REPAIR SYSTEM       )
      PRODUCTS LIABILITY         ) MDL 2327
 5    LITIGATION                 )
      ------------------------   ) JOSEPH R. GOODWIN
 6                               ) U.S. DISTRICT JUDGE
      THIS DOCUMENT RELATES TO   )
 7    ALL WAVE 4 AND SUBSEQUENT  )
      WAVE CASES AND             )
 8    PLAINTIFFS:                )
                                 )
 9    Sharon Bartley             )
      Case No. 2:12cv04270       )
10                               )
      Gladys Thruman             )
11    Case No. 2:12cv04930       )
                                 )
12    Sharon Kay Lunsford        )
      Case No. 2:12cv03308       )
13                               )
      Bertha Towns               )
14    Case No. 2:12cv03306       )
                                 )
15    Peggy Connolly             )
      Case No. 2:12cv04026       )
16                               )
      ------------------------   )
17
18            GENERAL EXPERT DEPOSITION OF
19              SARAH ABBIE COLLINS, M.D.
20               **TVT and TVT Exact**
21
22               March 6, 2017
23              Chicago, Illinois
24
```

Sarah Abbie Collins, M.D.

1      Q.     And what product was this that you

2  carried around?

3      A.     That was a TVT.

4      Q.     A TVT Retropubic?

5      A.     I mean, I wasn't carrying the trocars

6  with me.  It was just the mesh.  So, I don't know.

7      Q.     And you don't know whether or not that

8  sling was mechanical-cut or laser-cut?

9      A.     Correct.

10     Q.     And is that because you hadn't compared

11 the two by feeling them prior to that?

12     MR. RUMANEK:  Object to the form.

13 BY THE WITNESS:

14     A.     I had not, but also I can't tell the

15 difference.

16 BY MS. LIU:

17     Q.     Have you -- I mean, have you taken a

18 mechanical-cut sling and a laser-cut sling side by

19 side and compared them?

20     A.     No.

21     Q.     Do you know whether or not the other

22 slings that you've used besides the TVT Retropubic

23 and the TVT Exact were of a lighter mesh?

24     A.     I believe that the TVT is comparable to

Sarah Abbie Collins, M.D.

1    would be done for stress incontinence.

2    BY MS. LIU:

3        Q.    And, Doctor, did you review the IFUs

4    besides the 2015 one for this report?

5        A.    I reviewed one other version, but I

6    can't tell you specifically which one or whether it

7    was TVT or TVT Exact that I read that.

8        Q.    So, you read two IFUs in preparing your

9    report, is that correct?

10       A.    Yes.

11       Q.    And the two IFUs that you read, you

12   don't -- besides the 2015, you don't know which

13   other one that you read, is that correct?

14       A.    Correct, but I think it was an earlier

15   version.

16       Q.    Do you know how far back?

17       A.    No.

18       Q.    Now, do you know why the earlier

19   versions would not include all of the complications

20   that are listed in the 2015 IFU?

21       MR. RUMANEK:  Object to the form.

22   BY THE WITNESS:

23       A.    You know, other than sort of, you know,

24   trying to be more proactively defensive, no.

Sarah Abbie Collins, M.D.

1    BY MS. LIU:

2        Q.    And do you believe that all risks should

3    be in an IFU?

4        MR. RUMANEK:  Object to the form.

5    BY THE WITNESS:

6        A.    I think it's irrelevant whether all

7    risks are in the IFU.

8    BY MS. LIU:

9        Q.    So, you don't believe that all risks

10   should be in an IFU?

11       MR. RUMANEK:  Object to the form.

12   BY THE WITNESS:

13       A.    I think that's correct, yes.

14   BY MS. LIU:

15       Q.    Now, Doctor, have you ever designed a

16   medical device?

17       A.    I've never designed a medical device.

18       Q.    Have you ever drafted an IFU?

19       A.    I have not.

20       Q.    Do you understand the regulations that

21   are involved in drafting an IFU?

22       MR. RUMANEK:  Object to the form.

23   BY THE WITNESS:

24       A.    I am very vaguely aware of them but...

Sarah Abbie Collins, M.D.

1    BY MS. LIU:

2        Q.    So, you don't know as far as the

3    regulations are concerned what needs to be in an

4    IFU, is that correct?

5        MR. RUMANEK:  Object to the form.

6    BY THE WITNESS:

7        A.     That's correct.  I approach an IFU as a

8    clinician and a surgeon.

9    BY MS. LIU:

10       Q.    But not as somebody who would understand

11   the regulatory restrictions or regulatory

12   requirements of an IFU, is that correct?

13       MR. RUMANEK:  Object to the form.

14   BY THE WITNESS:

15       A.     Probably, although I think the IFU is

16   written for me as a surgeon.  I think that I'm the

17   target audience and so insofar as the, you know --

18   I think it doesn't necessarily matter what, you

19   know, regulatory bodies would think should go in an

20   IFU.  If it doesn't help me, I don't know that it's

21   relevant.

22   BY MS. LIU:

23       Q.    So, if there are regulatory requirements

24   put down by the Government, you don't believe that

Sarah Abbie Collins, M.D.

1          Q.      So, you haven't been consulted by a

2    medical device company as to what should go in from

3    a clinician's perspective into an IFU, have you?

4          A.      No.

5          Q.      And as far as designing a medical

6    device, you testified that you have not, is that

7    correct?

8          A.      That's correct.

9          Q.      Have you ever participated in designing

10   a mesh product?

11         A.      No.

12         Q.      Have you ever been approached by a

13   company to help with designing a mesh product?

14         A.      No.

15         Q.      So, Doctor, you are not a biomaterials

16   engineer, are you?

17         MR. RUMANEK:  Object to the form.

18   BY THE WITNESS:

19         A.      I am not an engineer.

20   BY MS. LIU:

21         Q.      And you wouldn't consider yourself to be

22   a biomechanical engineer, is that correct?

23         MR. RUMANEK:  Object to the form.

24   BY THE WITNESS:

Sarah Abbie Collins, M.D.

1        A.    I think it's factual that I am not a

2   biomechanical engineer.

3   BY MS. LIU:

4        Q.    And you are not an expert in designing

5   mesh products, is that correct?

6        MR. RUMANEK:   Object to the form of the

7   question.

8   BY THE WITNESS:

9        A.    I would say as it relates to

10  urogynecology, I'm an expert in the mesh products

11  that are used for urogynecology.

12  BY MS. LIU:

13       Q.    But you're not an expert in actually

14  designing the weave of the mesh, is that correct?

15       MR. RUMANEK:   Object to the form.

16  BY THE WITNESS:

17       A.    That's correct.

18  BY MS. LIU:

19       Q.    Are you an expert when it comes to

20  developing the weight of the mesh?

21       MR. RUMANEK:   Object to the form.

22  BY THE WITNESS:

23       A.    I am not an expert in developing the

24  weight of the mesh.

Sarah Abbie Collins, M.D.

1    BY MS. LIU:

2        Q.    What about in determining the pore size,

3    are you an expert in determining the pore size of

4    the mesh?

5        MR. RUMANEK:  Object to the form.

6    BY THE WITNESS:

7        A.    No.

8    BY MS. LIU:

9        Q.    Do you know what the optimal pore size

10   should be in a sling?

11       MR. RUMANEK:  Object to the form.

12   BY THE WITNESS:

13       A.    Yes.

14   BY MS. LIU:

15       Q.    And how do you know that?

16       A.    Well, there have been multiple studies

17   comparing different materials used for midurethral

18   slings and over the years we've attained a lot of

19   good data from the hernia literature as well and we

20   know that tissue ingrowth is maximized when the

21   pores are over 75 microns and when the mesh is

22   monofilamentous and that is an Amid Type 1 mesh.

23       Q.    So, you're basing this on the Amid

24   study, is that correct?

Sarah Abbie Collins, M.D.

```
 1        Q.     Did they also send you internal

 2   documents?

 3        A.     You know, I never -- I've seen some

 4   internal documents, but I'm not aware of Butler

 5   Snow having sent them to me.  I've seen a couple of

 6   them but...

 7        Q.     How many internal documents would you

 8   say you've reviewed in generating your report?

 9        A.     Not in generating my report.  I have

10   seen them since I generated my report.

11        Q.     So, your report was -- the last time --

12   strike that.

13               Based on your invoice, the last time you

14   worked on your report was January 29, 2017, is that

15   correct?

16        A.     Um-hmm.

17        Q.     When would you have reviewed internal

18   documents?

19        A.     Definitely since then.

20        Q.     So, you reviewed internal documents

21   since the report?

22        A.     Um-hmm.

23        Q.     And did reviewing any of those internal

24   documents change any of your opinions?
```

Sarah Abbie Collins, M.D.

1      A.     No.

2      Q.     And approximately how many internal

3   documents would you have reviewed since generating

4   your report?

5      A.     Oh, maybe two or three.

6      Q.     Do you remember what documents they

7   were?

8      A.     Honestly, no, I don't even know from

9   whom or to whom they were -- they looked like memos

10  that would raise possible safety questions that

11  would then be answered based on studies that were

12  done and sort of dismissed as legitimate concerns.

13     Q.     So, these were -- were they like e-mail

14  memos or were they actual memos from a meeting?

15     A.     I don't know.

16     Q.     Now, Doctor, if you will look at your

17  reliance list.  If you will turn -- it's not really

18  numbered.  But there is a very long list.  It's

19  kind of maybe three-quarters of the way in.

20     A.     Like this stuff?

21     Q.     Yes.  Yes.  Do you see that there are

22  quite a few actually of -- it's labeled "Production

23  Materials."  It's right after your "Medical

24  Literature" section.

Sarah Abbie Collins, M.D.

1                Do you see that?  Up top on to the left

2    corner.

3        A.      Yes.

4        Q.      Okay.  Do you see that there are several

5    pages of internal documents that are listed on your

6    reliance list?

7        A.      Yes.

8        Q.      But you didn't actually rely on them, is

9    that correct?

10       A.      That's correct.

11       Q.      Did you rely on the two or the three

12   that you reviewed in generating your report?

13       A.      Well, like I said, I read them after I

14   generated the report.  So, no.

15       Q.      So, you didn't rely on any internal

16   documents in generating your report?

17       A.      No, I didn't think they were relevant to

18   what I was writing.

19       Q.      Were they provided to you prior to

20   generating your report?

21       A.      I mean, I -- I bet I had -- I bet they

22   were included in some of the materials that Butler

23   Snow sent me.  They're just not helpful to what

24   I -- what I was writing.

Sarah Abbie Collins, M.D.

```
1        Q.      So, you didn't review them prior to

2   writing your report?

3        A.      Correct.

4        Q.      Now, do you know how Butler Snow

5   determined the internal documents to send to you?

6        A.      No.

7        Q.      And you said you did not feel that they

8   were relevant.  If you hadn't reviewed them, how

9   come you didn't feel that they were relevant?

10       MR. RUMANEK:   Object to the form.

11  BY THE WITNESS:

12       A.      Well, you know, in -- I was charged with

13  creating a document that talked about my opinions

14  related to the safety and efficacy of the TVT

15  especially as it compares to its alternatives.

16              And I don't think that -- I mean, I

17  think that the really robust scientific literature

18  about these devices is almost overwhelming in

19  quantity.  I had my hands full with that and that I

20  do think is relevant to the safety and efficacy of

21  the device.

22              What different members of a corporation

23  are saying to each other about that device is not

24  helpful in my opinion about the safety and efficacy
```

Sarah Abbie Collins, M.D.

1   of the device.

2       Q.    So, if the biomaterial engineers who

3   designed the product tested the product or later on

4   developed or later on -- strike that -- or later on

5   gathered information that related to the safety of

6   its product, you wouldn't find that that would be

7   relevant to your analysis?

8       MR. RUMANEK:   Object to the form.

9   BY THE WITNESS:

10      A.    I think it might be relevant but not

11  necessary because I have so much other data that,

12  you know, comes from the peer-reviewed body of

13  literature.  I just can't imagine that that one

14  memo would change what I already know based on a

15  systematic review type level evidence.

16  BY MS. LIU:

17      Q.    So, you're basically saying that in

18  any -- even if you had the entire body of internal

19  documents, you wouldn't consider them in generating

20  your report, is that correct?

21      MR. RUMANEK:   Object to the form.

22  BY THE WITNESS:

23      A.    If I had -- I can't say that.  I mean, I

24  didn't read them all, you know.  If there's a

Sarah Abbie Collins, M.D.

1      Q.     Doctor, did you review any depositions

2  prior to generating your general expert report?

3      A.     I don't think so.  I may have reviewed

4  some of the case-specific depositions by then.

5      Q.     Okay.  So, you didn't review any

6  corporate witnesses' testimony prior to generating

7  your general report, is that correct?

8      A.     That's correct.

9      Q.     And, Doctor, if you will turn to, in the

10  supplemental report, there are some pages after the

11  "Production Materials" where up top it says

12  "Company Witness Depositions."

13      A.     And you said it's where?

14      Q.     It's right after the "Production

15  Materials."  So, there were the "Medical

16  Literature," the next section is "Production

17  Materials."  I'm sorry.  There are no page numbers

18  on here that I could refer you to.

19      A.     Yeah.  Okay.  "Production Materials."

20      Q.     Yeah, it's right after the "Production

21  Materials" section.  It's towards the back.  It's

22  three pages from the back.  Sorry.

23      A.     "Other Materials"?

24      Q.     Yes.  "Other Materials."  It says there

Sarah Abbie Collins, M.D.

1    is "Company Witness Depositions"?

2        MR. RUMANEK:  Which one?

3        MS. LIU:  Exhibit 6.

4        THE WITNESS:  She said the supplemental.

5    BY MS. LIU:

6        Q.    So, it would be "Company Witness

7    Depositions."  Do you see that on the third page?

8            Sorry.  You know, mine are printed on

9    double-sided.  So, on the sixth page.

10       MR. RUMANEK:  Keep them as together as you

11   can.  You don't want to get them out of order if

12   you are referring to specific pages.

13   BY THE WITNESS:

14       A.    "Company Witness Depositions."

15   BY MS. LIU:

16       Q.    Yes.  Do you see that, Doctor?

17       A.    Um-hmm.

18       Q.    So, you testified before that you didn't

19   put this together.  Did you review any of these

20   deposition testimony --

21       A.    No.

22       Q.    -- prior to generating your report?

23       A.    No.

24       Q.    Have you reviewed any of them since you

Sarah Abbie Collins, M.D.

1    generated your report?

2        A.    No.

3        Q.    So you're not relying on any company

4    witness depositions for your report, is that

5    correct?

6        A.    That's correct.

7        Q.    And, Doctor, if you will turn another

8    couple of pages to "Other Materials."

9        A.    Okay.

10       Q.    Did you put this list together?

11       A.    No.

12       Q.    This list just has "Other Materials."

13   If you'll take a quick second to look through them.

14            Have you relied on everything as part of

15   your "Other Materials"?

16       MR. RUMANEK:  Give her a second to look at it.

17   BY THE WITNESS:

18       A.    Have I relied on everything?

19   BY MS. LIU:

20       Q.    Yes.

21       A.    No, just specific things.

22       Q.    Okay.  So, some of the materials that

23   you see in the other materials you recognize, is

24   that correct?

Sarah Abbie Collins, M.D.

```
 1    BY THE WITNESS:

 2         A.    I don't know.

 3    BY MS. LIU:

 4         Q.    And if Ethicon had knowledge that the

 5    pore sizes -- that the pores did collapse under

 6    pelvic pressure, would that be information that you

 7    would have considered in generating your report?

 8         MR. RUMANEK:  Object to the form.

 9    BY THE WITNESS:

10         A.    Probably not.

11    BY MS. LIU:

12         Q.    So, basically what Ethicon thought or

13    stated, you would not have considered in generating

14    your report, is that correct?

15         MR. RUMANEK:  Object to the form, misstates

16    the --

17    BY THE WITNESS:

18         A.    I would have to --

19         MR. RUMANEK:  Let me get the objection out.

20              Object to the form, mischaracterizes the

21    evidence and her testimony.

22    BY THE WITNESS:

23         A.    I guess I would have to see a document

24    like that.  It sounds like you're stating that if
```

Sarah Abbie Collins, M.D.

1   Ethicon knew that their product was not as they

2   were representing.  But I actually just don't

3   believe that to be the case, but I'd be happy to

4   review whatever documentation you have.

5   BY MS. LIU:

6       Q.    But you haven't reviewed any documents

7   that state this, is that correct?

8       A.    I have not.

9       Q.    And you testified earlier that you've

10  only reviewed two to three internal documents,

11  correct?

12      MR. RUMANEK:  Object to the form of the

13  question.

14  BY THE WITNESS:

15      A.    That's correct.

16  BY MS. LIU:

17      Q.    Are you familiar with the term

18  "effective porosity"?

19      A.    Effective porosity?  No.

20      Q.    Let's assume that effective porosity

21  means the pore size after tension is placed on the

22  mesh.

23          Do you believe that there is a

24  difference between the effective porosity and the

Sarah Abbie Collins, M.D.

1       Q.     Do you believe a lighter weight mesh

2   would have a better safety profile?

3       MR. RUMANEK:  Object to the form.

4   BY THE WITNESS:

5       A.     I do not.

6   BY MS. LIU:

7       Q.     And even if Ethicon's own scientist

8   believe that a lighter weight mesh would have a

9   better safety profile, you would not consider that

10  information in your opinions?

11      MR. RUMANEK:  Object to the form.

12  BY THE WITNESS:

13      A.     I would not.

14  BY MS. LIU:

15      Q.     Have you done any -- have you reviewed

16  any of the testing done by Ethicon?

17      A.     No.

18      Q.     Do you have any opinions as to whether

19  or not the TVT mesh frays?

20      MR. RUMANEK:  Object to the form.

21  BY THE WITNESS:

22      A.     I do not believe that it frays when used

23  appropriately in a clinical setting.

24  BY MS. LIU:

Sarah Abbie Collins, M.D.

1          MR. RUMANEK:  Object to the form.

2     BY THE WITNESS:

3          A.     I don't believe there are any risks to

4     the antioxidants used.

5     BY MS. LIU:

6          Q.     And why -- how do you say that?

7          A.     Well, my understanding is that the --

8     there are antioxidants compounded with the mesh

9     material to prevent oxidation of the mesh in situ

10    in vivo and there haven't been any adverse events

11    that come from the antioxidant package per se and

12    so -- but since I can't name the specific

13    antioxidants, I can't tell you their profiles

14    specifically.

15         Q.     Now, in your report your opinion is that

16    the polypropylene mesh used to make the TVT or

17    TVT Exact is inert, is that correct?

18         MR. RUMANEK:  Where are you referring

19    specifically?

20    BY MS. LIU:

21         Q.     Just in your report you've -- you've

22    stated in your report, it's your opinion that the

23    polypropylene mesh is inert, is that correct?

24         A.     Well, the polypropylene mesh with the

Sarah Abbie Collins, M.D.

1    antioxidant compound as is produced with the TVT,

2    yes, I believe that it is inert.

3         Q.    And how did you form this opinion that

4    it was inert?

5         A.    Well, you know, mostly my clinical

6    experience tells me that it's inert and, you know,

7    there are -- there is some recent literature from I

8    think it was even December of 2016, the Thames

9    report shows definitely that it is inert.

10        Q.    Now, have you reviewed any internal

11   documents by Ethicon that found microscopic changes

12   to the surface of the mesh after it's been

13   implanted?

14        MR. RUMANEK:   Object to the form.

15   BY THE WITNESS:

16        A.    Not Ethicon documents that said that,

17   no.

18   BY MS. LIU:

19        Q.    And if you had seen Ethicon documents

20   where they've stated they've tested the mesh after

21   implantation and that there are changes to the

22   surface of the mesh, would that change your opinion

23   as to whether or not the polypropylene is inert?

24        MR. RUMANEK:   Object to the form,

Sarah Abbie Collins, M.D.

1   mischaracterizes the evidence.

2   BY THE WITNESS:

3       A.    It would not.

4   BY MS. LIU:

5       Q.    So, you would not consider any of the

6   tests that Ethicon did during the development and

7   along the lines of them selling the TVT, you

8   wouldn't consider any tests that they did as part

9   of your report?

10      MR. RUMANEK:   Object to the form.  Are you

11  asking her did she consider it?  She said numerous

12  times if you want to show her a document, she will

13  consider it.  Are you asking did she consider it?

14  BY MS. LIU:

15      Q.    No.  My question was if -- you had

16  stated that it wouldn't matter if you had seen

17  these documents, that you would not have considered

18  them in your report.

19          So, what I'm just trying to clarify is

20  that if you had seen tests with results from

21  Ethicon that showed that the polypropylene was not

22  inert, would you have considered that in generating

23  your report?

24      MR. RUMANEK:   Object to the form.

Sarah Abbie Collins, M.D.

1    BY THE WITNESS:

2         A.    I mean I think the Thames paper is

3    irrefutable, and I have that data.  So, I'm not

4    sure that there is anything that I could read from

5    an internal document from Ethicon that would change

6    my mind about that.

7    BY MS. LIU:

8         Q.    And you also in your report noted the

9    Material Safety Data Sheet, is that correct?

10        A.    Yes.

11        Q.    And you also noted that based on the

12   Material Safety Data Sheet, you did not feel as

13   though -- that that had any bearing on your use of

14   the TVT mesh, is that correct?

15        MR. RUMANEK:  Object to the form to the extent

16   it mischaracterizes what's in the report.

17   BY THE WITNESS:

18        A.    Yes.  Did you want to -- where are you

19   in the report?

20   BY MS. LIU

21        Q.    I'm not sure exactly where I am

22   because -- but --

23        A.    There is no page number for you?

24        Q.    I wasn't looking at it when I was asking

Sarah Abbie Collins, M.D.

1    you the question.  So, I'm not sure.

2           But in your -- you did reference the

3    MSDS, correct?

4        MR. RUMANEK:  If you need to find it, take the

5    time to find it.  It's not a memory test.

6    BY MS. LIU:

7        Q.    Let's move on.

8           Doctor, have you reviewed the MSDS for

9    the -- Ethicon's TVT mesh?

10       A.    Yes.

11       Q.    Okay.  And did you consider the MSDS

12   when you drafted your report?

13       MR. RUMANEK:  Object to the form.

14   BY THE WITNESS:

15       A.    Not really, no.

16   BY MS. LIU:

17       Q.    I just found it too.

18       A.    Yeah.

19       Q.    So, you did not consider the data that

20   was in the MSDS, is that correct?

21       MR. RUMANEK:  Object to the form.

22   BY THE WITNESS:

23       A.    That's correct.

24   BY MS. LIU:

Golkow Technologies, Inc.                          Page 211

Sarah Abbie Collins, M.D.

1    Q.    And, so, you didn't rely on the MSDS

2    when you formed your opinions, is that correct?

3         MR. RUMANEK:  Object to the form.

4    BY THE WITNESS:

5         A.    Correct.  I just want to clarify that I,

6    when thinking about the material of the TVT, is not

7    a raw polypropylene material.  It's actually there

8    is additives to it that make it not the same

9    material.

10   BY MS. LIU:

11        Q.    And, Doctor, you don't know what

12   those -- the added materials are, correct?

13        A.    I just know that they are --

14        MR. RUMANEK:  Object to the form.

15   BY MS. LIU:

16        Q.    And, so, you've never tested how these

17   antioxidants affect the mesh, correct?

18        MR. RUMANEK:  Object to the form.

19   BY THE WITNESS:

20        A.    Correct.  I don't see that that's

21   necessary.

22   BY MS. LIU:

23        Q.    And you've never seen any of the test

24   results that Ethicon may or may not have done with

Sarah Abbie Collins, M.D.

1   the antioxidants on the polypropylene mesh for the

2   TVT?

3        MR. RUMANEK:  Object to the form.

4   BY THE WITNESS:

5        A.   Do you mean their own internal studies?

6   BY MS. LIU:

7        Q.   Correct.

8        A.   No.

9        Q.   And, so, you didn't consider any of that

10   material in generating your report, correct?

11        MR. RUMANEK:  Object to the form.

12   BY THE WITNESS:

13        A.   Right.

14   BY MS. LIU:

15        Q.   Have you seen evidence in the literature

16   that shows that the TVT mesh shrinks or contracts?

17        MR. RUMANEK:  Object to the form.

18   BY THE WITNESS:

19        A.   I have seen reports about the complex of

20   the mesh and the human tissue into which it's

21   implanted shrinking together a small amount, yes.

22   BY MS. LIU:

23        Q.   Did you, when you were researching to

24   draft your report, did you run any PubMed searches

Sarah Abbie Collins, M.D.

1      A.    Correct.

2      MR. RUMANEK:   Object to the form.

3  BY MS. LIU:

4      Q.    Have you searched for articles about

5  chronic inflammatory response?

6      MR. RUMANEK:   Object to the form.

7  BY THE WITNESS:

8      A.    I have not.

9  BY MS. LIU:

10     Q.    Have you considered any articles that

11 speak to the chronic inflammation of tissues with

12 the TVT mesh?

13     MR. RUMANEK:   Object to the form.

14 BY THE WITNESS:

15     A.    No, not specifically.  I've looked at,

16 you know, study abstracts and papers that

17 clinically evaluate whether patients have systemic

18 inflammation and whether that could be a result of

19 the mesh.

20          But I haven't looked at the, you know,

21 microscopic tissue level.  I don't think that

22 that's clinically relevant.

23 BY MS. LIU:

24     Q.    So, you actually haven't looked at

Sarah Abbie Collins, M.D.

1    explanted mesh under a microscope, correct?

2        A.    I --

3        MR. RUMANEK:  Object to the form,

4    mischaracterizes her testimony.

5    BY MS. LIU:

6        Q.    Have you looked at mesh?

7        A.    Looked at mesh under a microscope?

8        Q.    Yes.

9        A.    No.

10       Q.    Have you looked at any mesh under a

11   microscope, new mesh, pre-implanted mesh or

12   explanted mesh?

13       A.    No.

14       Q.    You -- we talked a little bit about the

15   IFU earlier and as far as inflammatory response.

16   In the IFU it talks about a transient response, is

17   that correct?

18       A.    That's correct.

19       MR. RUMANEK:  Object to the form.

20   BY MS. LIU:

21       Q.    And is that what you believe to be the

22   case, that the inflammatory response is transient?

23       MR. RUMANEK:  Object to the form.

24   BY THE WITNESS: