EXHIBIT E

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                        - - -
 2
 3    IN RE:                         :SUPERIOR COURT OF
      PELVIC MESH/GYNECARE           :NEW JERSEY
 4    LITIGATION                     :LAW DIVISION -
                                     :ATLANTIC COUNTY
 5                                   :
                                     :MASTER CASE 6341-10
 6                                   :
                                     :CASE NO. 291 CT
 7
           CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 8                        CONFIDENTIALITY
                              - - -
 9
                         September 12, 2012
10
                              - - -
11
12           Volume I of the transcript of the
13    Deposition of CHARLOTTE OWENS, M.D., called for
14    Videotaped Examination in the above-captioned
15    matter, said deposition taken pursuant to
16    Superior Court Rules of Practice and Procedure,
17    by and before JoRita B. Meyer, a Certified
18    Realtime Reporter, Registered Merit Reporter,
19    and Certified Court Reporter for the State of
20    Georgia, at the offices of Troutman Sanders,
21    600 Peachtree Street Northeast, Atlanta,
22    Georgia, commencing at 9:39 a.m.
23                        - - -
24              GOLKOW TECHNOLOGIES, INC.
            877.370.3377 ph|917.951.5672 fax
25                  deps@golkow.com
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
1    purpose of the IFU?
2        A.    The IFU is a document to provide some
3    general and some specific information to the
4    physician about the use of our product.
5        Q.    Did you understand that the IFU is
6    considered under FDA regulations to be the
7    primary label for the medical device, in this
8    case, the PROLIFT?
9        A.    Yes.
10       Q.    And you understood this would be the
11   primary source of information that surgeons
12   would look to to get information with regard to
13   the safety and efficacy and potential risks of
14   using the PROLIFT with patients, correct?
15       A.    When you say "primary," what do you
16   mean by "primary"?
17       Q.    Meaning this would be the first --
18   well, rephrase.
19             When I say "primary," I say that
20   if -- if there was anything that a surgeon
21   would look at, it would be this, this would be
22   the first thing that they would look to?
23       A.    I don't know if it's the first thing
24   that they would look to, because this would
25   have been part of our entire professional
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    education package; so this would be one of the
 2    things that they would look to, yes.
 3         Q.   Do you understand the significance
 4    under FDA regulations of the IFU being the
 5    primary label for the PROLIFT?
 6         A.   I understand the FDA regulations
 7    around the document.  I also understand the way
 8    that physicians are trained and operate.
 9              MR. SLATER:  Move to strike from "I
10         also" forward.
11    BY MR. SLATER:
12         Q.   What's your understanding as to the
13    significance of the IFU being the primary label
14    for the PROLIFT from FDA regulatory standpoint?
15         A.   That the agency sees this as the
16    document that they review as a part of the
17    packaging for our materials.  So it should
18    contain the relevant indications, description,
19    and -- and other pertinent information as
20    prescribed by the regulations.
21         Q.   That would also include all necessary
22    contraindications, warnings and precautions,
23    and adverse reactions, correct?
24         A.   It would include warnings,
25    precautions, contraindications, adverse
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    reactions, sterility, disposal, storage,
 2    et cetera.
 3         Q.   You have understood that all of the
 4    information in the IFU needed to be accurate,
 5    correct?
 6         A.   Yes.
 7         Q.   You understood that physicians were
 8    going to rely on the IFU in making decisions
 9    about whether or not to use the PROLIFT in
10    treating patients, correct?
11              MR. BROWN:  Objection.
12              THE WITNESS:  Physicians will not
13         rely solely on the IFU for making their
14         decisions.  Physicians will use the IFU
15         to help inform them, but they will also
16         use other information.
17    BY MR. SLATER:
18         Q.   You understood physicians would rely,
19    at least in part, on the PROLIFT IFU in making
20    decisions about whether they wanted to use that
21    product, that medical device, that system, in
22    their patients, correct?
23              MR. BROWN:  Objection.
24              THE WITNESS:  Physicians will use
25         this document and other documents to
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1          decide if they want to learn more about
 2          the system, and ultimately will use
 3          their training, education, and
 4          experience, plus this document, to
 5          decide if they want to use it.
 6    BY MR. SLATER:
 7          Q.   Did you understand that it was
 8    necessary to clearly and unambiguously
 9    communicate all necessary contraindications,
10    warnings and precautions, and adverse reactions
11    to physicians through the IFU?
12          A.   I understand the document should be
13    clear and unambiguous, yes.
14          Q.   Did you understand that it was
15    necessary for Gynecare, to the extent that a
16    risk was understood to exist with the PROLIFT,
17    to communicate it in the IFU as opposed to
18    assuming that surgeons would figure out that
19    risk on their own?
20          A.   I don't think you're giving surgeons
21    enough credit.  Surgeons don't have to figure
22    out the complications of an area that they
23    operate.  Surgeons are trained to know the
24    complications of the area in which they
25    operate.
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    BY MR. SLATER:
 2        Q.    Does it mean too much tension?
 3        A.    It's not that simple.
 4        Q.    How would a surgeon doing the
 5    procedure be able to objectively verify, based
 6    on an objective standard, that they had placed
 7    or not placed the mesh with excessive tension?
 8        A.    They would be able to look at the
 9    repair after surgery and see if it looks
10    relaxed or see if it looks like it's under
11    tension.
12        Q.    So that's how they would do it?
13        A.    That's generally how it was done.
14        Q.    Did you ever perform the PROLIFT
15    procedure?
16        A.    On the cadavers, yes.  In live
17    people, because I was not practicing during my
18    tenure at Ethicon, no.
19        Q.    Did you ever on your own, without any
20    other surgeon performing the procedure -- did
21    you ever place Gynemesh in a human's body?
22        A.    No.
23        Q.    Look at the adverse reactions,
24    please.  It was your understanding that you
25    needed to list each of the adverse reactions
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    that were known to you in Medical Affairs in
 2    this section, correct?
 3         A.    Yes.
 4         Q.    And you understood that if you failed
 5    to list adverse reactions that you were aware
 6    of, that that would render that warning
 7    deficient to some extent, correct?
 8         A.    Deficient?
 9              MR. BROWN:  Objection.
10              THE WITNESS:  I would say that we
11         listed the adverse reactions that we
12         knew were adequate and sufficient for
13         this document.
14    BY MR. SLATER:
15         Q.    Well, you just said a moment ago you
16    agreed with me that you understood you were
17    supposed to list each of the adverse reactions
18    that you in Medical Affairs knew existed at the
19    time of launch, correct?
20         A.    We listed the adverse events that we
21    knew to be directly related to the information
22    that we had at this time.
23         Q.    Okay.  Were there risks -- well,
24    rephrase.
25              You see where it says, at the end of
```