EXHIBIT E

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                       - - -
 2
 3   IN RE:                    :SUPERIOR COURT OF
     PELVIC MESH/GYNECARE      :NEW JERSEY
 4   LITIGATION                :LAW DIVISION -
                               :ATLANTIC COUNTY
 5                             :
                               :MASTER CASE 6341-10
 6                             :
                               :CASE NO. 291 CT
 7
        CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 8                      CONFIDENTIALITY
                            - - -
 9
                     September 12, 2012
10
                            - - -
11
12           Volume I of the transcript of the
13   Deposition of CHARLOTTE OWENS, M.D., called for
14   Videotaped Examination in the above-captioned
15   matter, said deposition taken pursuant to
16   Superior Court Rules of Practice and Procedure,
17   by and before JoRita B. Meyer, a Certified
18   Realtime Reporter, Registered Merit Reporter,
19   and Certified Court Reporter for the State of
20   Georgia, at the offices of Troutman Sanders,
21   600 Peachtree Street Northeast, Atlanta,
22   Georgia, commencing at 9:39 a.m.
23                          - - -
24            GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph|917.951.5672 fax
25              deps@golkow.com
```

```
 1    purpose of the IFU?
 2        A.    The IFU is a document to provide some
 3    general and some specific information to the
 4    physician about the use of our product.
 5        Q.    Did you understand that the IFU is
 6    considered under FDA regulations to be the
 7    primary label for the medical device, in this
 8    case, the PROLIFT?
 9        A.    Yes.
10        Q.    And you understood this would be the
11    primary source of information that surgeons
12    would look to to get information with regard to
13    the safety and efficacy and potential risks of
14    using the PROLIFT with patients, correct?
15        A.    When you say "primary," what do you
16    mean by "primary"?
17        Q.    Meaning this would be the first --
18    well, rephrase.
19              When I say "primary," I say that
20    if -- if there was anything that a surgeon
21    would look at, it would be this, this would be
22    the first thing that they would look to?
23        A.    I don't know if it's the first thing
24    that they would look to, because this would
25    have been part of our entire professional
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1   education package; so this would be one of the
 2   things that they would look to, yes.
 3        Q.   Do you understand the significance
 4   under FDA regulations of the IFU being the
 5   primary label for the PROLIFT?
 6        A.   I understand the FDA regulations
 7   around the document.  I also understand the way
 8   that physicians are trained and operate.
 9             MR. SLATER:  Move to strike from "I
10        also" forward.
11   BY MR. SLATER:
12        Q.   What's your understanding as to the
13   significance of the IFU being the primary label
14   for the PROLIFT from FDA regulatory standpoint?
15        A.   That the agency sees this as the
16   document that they review as a part of the
17   packaging for our materials.  So it should
18   contain the relevant indications, description,
19   and -- and other pertinent information as
20   prescribed by the regulations.
21        Q.   That would also include all necessary
22   contraindications, warnings and precautions,
23   and adverse reactions, correct?
24        A.   It would include warnings,
25   precautions, contraindications, adverse
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    reactions, sterility, disposal, storage,
2    et cetera.
3        Q.   You have understood that all of the
4    information in the IFU needed to be accurate,
5    correct?
6        A.   Yes.
7        Q.   You understood that physicians were
8    going to rely on the IFU in making decisions
9    about whether or not to use the PROLIFT in
10   treating patients, correct?
11            MR. BROWN:  Objection.
12            THE WITNESS:  Physicians will not
13       rely solely on the IFU for making their
14       decisions.  Physicians will use the IFU
15       to help inform them, but they will also
16       use other information.
17   BY MR. SLATER:
18       Q.   You understood physicians would rely,
19   at least in part, on the PROLIFT IFU in making
20   decisions about whether they wanted to use that
21   product, that medical device, that system, in
22   their patients, correct?
23            MR. BROWN:  Objection.
24            THE WITNESS:  Physicians will use
25       this document and other documents to

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1            decide if they want to learn more about
 2            the system, and ultimately will use
 3            their training, education, and
 4            experience, plus this document, to
 5            decide if they want to use it.
 6   BY MR. SLATER:
 7       Q.   Did you understand that it was
 8   necessary to clearly and unambiguously
 9   communicate all necessary contraindications,
10   warnings and precautions, and adverse reactions
11   to physicians through the IFU?
12       A.   I understand the document should be
13   clear and unambiguous, yes.
14       Q.   Did you understand that it was
15   necessary for Gynecare, to the extent that a
16   risk was understood to exist with the PROLIFT,
17   to communicate it in the IFU as opposed to
18   assuming that surgeons would figure out that
19   risk on their own?
20       A.   I don't think you're giving surgeons
21   enough credit.  Surgeons don't have to figure
22   out the complications of an area that they
23   operate.  Surgeons are trained to know the
24   complications of the area in which they
25   operate.
```

Confidential - Subject to Stipulation and Order of Confidentiality

1  BY MR. SLATER:
2      Q.   Does it mean too much tension?
3      A.   It's not that simple.
4      Q.   How would a surgeon doing the
5  procedure be able to objectively verify, based
6  on an objective standard, that they had placed
7  or not placed the mesh with excessive tension?
8      A.   They would be able to look at the
9  repair after surgery and see if it looks
10 relaxed or see if it looks like it's under
11 tension.
12     Q.   So that's how they would do it?
13     A.   That's generally how it was done.
14     Q.   Did you ever perform the PROLIFT
15 procedure?
16     A.   On the cadavers, yes.  In live
17 people, because I was not practicing during my
18 tenure at Ethicon, no.
19     Q.   Did you ever on your own, without any
20 other surgeon performing the procedure -- did
21 you ever place Gynemesh in a human's body?
22     A.   No.
23     Q.   Look at the adverse reactions,
24 please.  It was your understanding that you
25 needed to list each of the adverse reactions

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1   that were known to you in Medical Affairs in
 2   this section, correct?
 3       A.   Yes.
 4       Q.   And you understood that if you failed
 5   to list adverse reactions that you were aware
 6   of, that that would render that warning
 7   deficient to some extent, correct?
 8       A.   Deficient?
 9            MR. BROWN:  Objection.
10            THE WITNESS:  I would say that we
11       listed the adverse reactions that we
12       knew were adequate and sufficient for
13       this document.
14   BY MR. SLATER:
15       Q.   Well, you just said a moment ago you
16   agreed with me that you understood you were
17   supposed to list each of the adverse reactions
18   that you in Medical Affairs knew existed at the
19   time of launch, correct?
20       A.   We listed the adverse events that we
21   knew to be directly related to the information
22   that we had at this time.
23       Q.   Okay.  Were there risks -- well,
24   rephrase.
25            You see where it says, at the end of
```