# EXHIBIT F

Vladimir Iakovlev, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF VIRGINIA
AT CHARLESTON

****************************** Master File No.
IN RE:                          2:12-MD-02327
ETHICON, INC., PELVIC REPAIR   MDL 2327
SYSTEM PRODUCTS LIABILITY
LITIGATION                      JOSEPH R. GOODWIN
                                US District Judge
******************************
TONYA EDWARDS, ET AL,
              Plaintiffs,      Case No.
      v.                        2:12-CV-09972
ETHICON, INC., ET AL,
              Defendants.

******************************
JO HUSKEY AND ALLAN HUSKEY,
              Plaintiffs,      Case No.
      v.                        2:12-CV-05201
ETHICON, INC., ET AL,
              Defendants.
******************************


       DEPOSITION OF VLADIMIR IAKOVLEV, M.D.


           Tuesday, March 18th, 2014

                8:14 a.m.



      Held At:

            Hampton Inn Boston Logan Airport
            230 Lee Burbank Highway
            Revere, Massachusetts




   REPORTED BY:

   Maureen O'Connor Pollard, RMR, CLR, CSR

Vladimir Iakovlev, M.D.

Page 2

```
 1    APPEARANCES:
 2    FOR THE HUSKEY PLAINTIFFS:
 3         ROBERT J. McCONNELL, ESQ.
 4         MOTLEY RICE LLC
 5         321 South Main Street
 6         Providence, Rhode Island 02903
 7         401-457-7700
 8         bmcconnell@motleyrice.com
 9
10    FOR THE EDWARDS PLAINTIFFS:
11         JOHN FABRY, ESQ.
12         MUELLER LAW LLC
13         404 W. 7th Street
14         Austin, Texas 78701
15         512-478-1236
16         john.fabry@muellerlaw.com
17
18    FOR THE PLAINTIFFS:
19         MARGARET M. THOMPSON, M.D., J.D.
20         MOTLEY RICE LLC
21         28 Bridgeside Boulevard
22         Mt. Pleasant, South Carolina 29464
23         843-216-9000
24         mmthompson@motleyrice.com
25
```

Page 4

```
 1                    INDEX
 2    EXAMINATION                        PAGE
 3    VLADIMIR IAKOVLEV, M.D.
 4      BY MR. SNELL                       5
 5             EXHIBITS
 6    NO.      DESCRIPTION             PAGE
 7    1   Notice of deposition................ 10
 8    2   Rule 26 Expert Report of Dr.
 9          Vladimir Iakovlev................... 60
10    3   Document titled Facts of Data
11          Considered in Forming Opinions....... 60
12    4   Curriculum Vitae of Vladimir
13          Iakovlev............................ 60
14    5   Chain of custody regarding Mrs.
15          Edwards' mesh specimen, .............192
16    6   Slide of paraffin blocks from Mrs.
17          Edwards' explant.....................214
18    7   Slides of paraffin block of Ms.
19          Edwards' explant.....................214
20    8   Pathology report in Ms. Edwards'
21          case.................................285
22    9   Dr. Iakovlev's pathology report for
23          Mrs. Edwards' specimen...............307
24
25
```

Page 3

```
 1    APPEARANCES (Continued):
 2
 3    FOR THE DEFENDANTS:
 4         NILS B. SNELL, ESQ.
 5         BUTLER SNOW LLP
 6         500 Office Center Drive, Suite 400
 7         Fort Washington, Pennsylvania 19034
 8         267-513-1885
 9         burt.snell@butlersnow.com
10         -and-
11         M. ANDREW SNOWDEN, ESQ.
12         BUTLER SNOW LLP
13         150 3rd Avenue South, Suite 1600
14         Nashville, Tennessee 37201
15         615-651-6700
16         andy.snowden@butlersnow.com
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            P R O C E E D I N G S
 2
 3         VLADIMIR IAKOVLEV, M.D.,
 4    having been first duly sworn, was examined and
 5    testified as follows:
 6         DIRECT EXAMINATION
 7    BY MR. SNELL:
 8       Q.  State your full name for the record.
 9       A.  Vladimir Iakovlev.
10       Q.  And, Doctor, you understand you're
11    here today to take the deposition in the Huskey
12    and Edwards cases that are currently pending in
13    West Virginia --
14       A.  I do.
15       Q.  -- against Ethicon?
16       A.  I do.
17       Q.  All right.  Have you had a -- taken a
18    deposition before?
19       A.  Yes.
20       Q.  How many times?
21       A.  It was three times -- I mean two
22    depositions, but one was split into two
23    depositions.
24       Q.  Okay.  And were those relatively
25    recently?
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 6

1      A.  Yes.
2      Q.  All right.  So you understand the
3   rules of a deposition.  The only thing I'll
4   repeat or emphasize is if you don't understand a
5   question, let me know, I'll do my best to
6   rephrase it, repeat it, try to get to something
7   you can answer.  Okay?
8      A.  Okay.
9      Q.  What did you do today to prepare for
10  your deposition?
11     A.  I reviewed my report.
12        MR. SNELL:  Off the record.
13        (Off the record discussion.)
14  BY MR. SNELL:
15     Q.  Is that the sum total of your
16  preparation for your deposition, reviewing your
17  report?
18     A.  Yes.
19     Q.  How long did you review your report
20  for in preparation for your deposition?
21     A.  Last night, about two hours.
22     Q.  The Plaintiffs' lawyers who are here
23  today, had you ever met them before this
24  morning?
25     A.  Yes, I did.

Page 7

1      Q.  Did you meet with any Plaintiffs'
2   lawyers in preparation for your deposition?
3      A.  No.  I mean this -- I just met with
4   these lawyers.
5      Q.  How long?
6      A.  How long what?
7      Q.  How long was the meeting?
8      A.  Yesterday?
9      Q.  I thought there wasn't a meeting
10  yesterday.  I thought the only thing you --
11        MR. MCCONNELL:  I think he
12  misunderstood.
13     A.  I just misunderstood.
14        Can you repeat the question?
15  BY MR. SNELL:
16     Q.  Sure.
17        Did you meet with any of the
18  Plaintiffs' lawyers to prepare for your
19  deposition?
20     A.  Yesterday.  Yes, we did.
21     Q.  Yesterday or any day to prepare for
22  this deposition today.
23     A.  We met yesterday.
24     Q.  Okay.  How long did that meeting take
25  place?

Page 8

1      A.  About two hours.
2      Q.  Did it take place here at the Hampton
3   Inn?
4      A.  Yes.
5      Q.  What did you do during the meeting
6   with the Plaintiffs' attorneys, besides
7   obviously talk with them?
8      A.  We reviewed the report, and we talked
9   about the case.
10     Q.  Did you look at any other documents,
11  any other materials besides your report?
12     A.  No.  We mainly went through the list
13  of references in the report.
14     Q.  You have in front of you some
15  materials today.  Is that your report?
16     A.  It's a copy of my report.
17     Q.  Color copy of your report?
18     A.  Yes.
19     Q.  All right.  The two prior depositions
20  you gave, what matters were those in?
21     A.  Well, the first part is my summary of
22  my understanding of the processes which are
23  happening when mesh is placed in the body.
24        And the second --
25     Q.  I'm going to stop you.  I don't think

Page 9

1   we're communicating.
2        I believe you earlier testified you've
3   given two prior depositions?
4      A.  Yes.
5      Q.  My question was; what types of matters
6   or cases were those?
7      A.  Oh, previous depositions?
8      Q.  Yes.
9      A.  Mesh, transvaginal mesh litigations.
10     Q.  Against which manufacturer or doctors?
11     A.  Boston Scientific and AMS.
12     Q.  And when did you give that Boston
13  Scientific deposition?
14     A.  January.
15     Q.  Of this year?
16     A.  Yes.
17     Q.  And the AMS deposition?
18     A.  February, and the second session was
19  about two weeks ago.
20     Q.  February of 2014, March, 2014?
21     A.  Yes.
22     Q.  Have you given any other deposition
23  testimony?
24     A.  No.
25     Q.  For the Boston Scientific deposition,

3 (Pages 6 to 9)

Vladimir Iakovlev, M.D.

Page 10

1    do you know if that was also for West Virginia
2    cases, or was that New Jersey, or some other
3    state?
4         A.   There were three, I believe,
5    litigation processes.  One was West Virginia,
6    one was Massachusetts.
7         Q.   And for AMS, do you have an
8    understanding of where that litigation was that
9    you were testifying in; West Virginia,
10   Massachusetts, New Jersey?
11        A.   I'm not sure.  I'm not sure.  I don't
12   want to confuse things.
13        Q.   I don't want you to guess.  If you
14   know you know, if you don't you don't.
15             (Whereupon, Iakovlev Exhibit Number 1,
16             Notice of deposition, was marked for
17             identification.)
18   BY MR. SNELL:
19        Q.   Doctor, I'm going to hand you a notice
20   to take your deposition.  Give counsel a copy
21   (handing).  This has been marked as Exhibit 1.
22             Have you seen this document before?
23        A.   Yes.
24        Q.   Okay.  And can you tell me the
25   materials you brought in response to the notice

Page 11

1    to take your deposition?
2         A.   I didn't bring anything except for the
3    copy of my report.
4         Q.   Why not?
5         A.   Some questions were -- some items were
6    so broad, or I wouldn't be able to bring them
7    due to confidentiality issues or other issues.
8         Q.   Well, did you make any effort
9    whatsoever to sit down and bring -- strike that.
10             Did you make any effort whatsoever to
11   bring any materials in response to the notice?
12        A.   I can provide the samples which were
13   given to me within this litigation, remaining
14   samples.  I can provide that under my pictures.
15   But I cannot provide patient material or
16   patient -- the information containing
17   confidential patient information.
18             And some items were simply so broad,
19   that incorporates whole my career, so I cannot
20   do that.
21        Q.   Let's go through them one by one then.
22             You're looking at Schedule A, item
23   number 1, "All documents relating to fees,
24   billing, or time spent in connection with your
25   opinions in any pelvic mesh litigation."

Page 12

1         Do you have documents relating to
2    fees, billing, or time spent in this litigation?
3         A.   I haven't billed for this litigation
4    yet.  It's pretty early, and I'm probably slow
5    in billing.  And I'm not sure if I can provide
6    billing information for the other litigation.
7         Q.   Well, do you have billing information
8    for the Boston Scientific information?
9         A.   As I said, no, I have not done billing
10   for my -- for Boston Scientific work.
11        Q.   Have you done any billing information
12   for -- strike that.
13             Have you done any billing for AMS?
14        A.   Yes, I've done.
15        Q.   Did you bring that today?
16        A.   No, because I'm not sure if I can give
17   it to you.
18        Q.   Well, the attorneys here would be able
19   to let you know that.  Your job as the witness
20   is to bring materials, and if they have an
21   objection they can pose their objection.
22             MR. MCCONNELL:  Well, you know --
23             MR. SNELL:  I'll just put on the
24   record obviously --
25             MR. MCCONNELL:  You can put on the

Page 13

1    record what you want.
2             MR. SNELL:  -- it goes to bias.
3             MR. McCONNELL:  I don't think -- our
4    position is billing from other litigation
5    against other Defendants is not producible.  You
6    can ask him particularly -- you can ask him
7    approximately how much he may have billed.  But
8    the billing that he would send for other
9    litigation is -- this litigation you have a
10   right to, he hasn't done it.  Other litigation,
11   it's not producible.
12             MR. SNELL:  I mean our position is
13   obviously it goes to bias.  It is discoverable.
14   And it's been requested to be produced, it's not
15   here.  So we'll take it up with the Court.  And
16   if -- you know, we're going to be seeing each
17   other another day, so this is the least of my
18   concerns.
19             MR. FABRY:  Can we have an agreement
20   that if I object, or if Bob objects, that's good
21   for both parties?
22             MR. SNELL:  Yes.  I don't know who
23   represents who.
24             MR. FABRY:  Tonya Edwards, John Fabry.
25             MR. SNELL:  And you are representing

4 (Pages 10 to 13)

Vladimir Iakovlev, M.D.

Page 14

1  Huskey and Edwards?
2      MR. FABRY:  No, I'm representing Tonya
3  Edwards.
4      MR. McCONNELL:  I'm representing
5  Ms. Huskey, Bob McConnell.
6      MR. SNELL:  Of course, unless it's
7  obviously specific to one of the --
8      MR. FABRY:  Understood.
9      MR. SNELL:  All right.
10      MR. FABRY:  We'll also object to the
11  timing of this, of the notice.
12      MR. SNELL:  That's fine.  I don't
13  believe we got dates until very recently
14  anyways, right?
15  BY MR. SNELL:
16      Q.  How much time have you spent in this
17  litigation, the Ethicon litigation?
18      A.  Specifically to prepare the report?
19      Q.  No, in total in the Ethicon
20  litigation, how much time have you spent?
21      A.  Approximately it took me ten hours to
22  prepare the report, analyze samples.  Takes
23  about two hours per sample.  Maybe another three
24  hours to work on pictures.  And then on top of
25  that, you have to add all time I spent in

Page 15

1  researching implantable meshes in my career, so
2  I don't know how far we can extend all that.
3      Q.  How much do you charge for report
4  preparation?
5      A.  I charge $400 per hour.  $400 per
6  hour.
7      Q.  How much do you charge for giving a
8  deposition?
9      A.  $400 an hour.
10      Q.  How much do you charge for attending a
11  trial?
12      A.  $400 an hour.
13      Q.  And how many samples did you prepare
14  in this Ethicon litigation?
15      A.  It's in the report.  I believe it's
16  six.  So I had six TVT Ethicon slings,
17  identified as Ethicon slings.
18      Q.  And so those are what you're referring
19  to with regard to two hours per sample?
20      A.  Any.  Any mesh sample would take me,
21  for thorough examination, about two hours.
22      Q.  Okay.
23      A.  Including Ethicon or any other.
24      Q.  So for the Ethicon litigation, how
25  many samples have you studied at two hours per

Page 16

1  sample?
2      A.  The report combines my knowledge of
3  not just Ethicon meshes.  Ethicon meshes were
4  used to see if they follow the pattern and if
5  they're the same findings.  So specifically
6  those samples were just six.
7      But as I stated in the report, I
8  examined 130 samples since the beginning of my
9  interest in implantable meshes.
10      Q.  Have you prepared an invoice for the
11  Ethicon litigation?
12      A.  No.
13      Q.  Estimate the total time -- strike
14  that.
15      Can you estimate for me how much you
16  intend to charge for the Ethicon litigation if
17  you were to submit a bill for all your time up
18  until yesterday?
19      A.  So as I said, about ten hours for
20  statement, six patients by two hours, 12.  22
21  hours, 22, 25 hours.
22      Q.  Do you have a rate sheet, something
23  that is written that documents how much you
24  charge for your expert work?
25      A.  Yes, it's in there, it's 400.  I don't

Page 17

1  have a scale for different procedures.  $400
2  flat rate, 400 an hour flat rate.
3      I am not making a living as an expert.
4  I have no -- I had no knowledge about litigation
5  when I started working on meshes.  My main work
6  is diagnostic work at the hospital, and academic
7  work, research, teaching.
8      MR. SNELL:  Just note on the record
9  request to produce AMS; request to produce
10  Boston Scientific.
11  BY MR. SNELL:
12      Q.  This asked for an updated CV.  I know
13  there's a CV attached to your report, that was
14  produced with your report.  Is that current as
15  we sit here today?
16      A.  Yes, it is current.
17      Q.  No more publications or anything like
18  that?
19      A.  Nothing.
20      Q.  "All documents" -- Number 3, all
21  documents prepared by you or at your direction
22  in connection with your expected testimony, or
23  the development of your opinion or belief, and
24  assessment or determination of facts relating to
25  this and any other pelvic mesh cases.

5 (Pages 14 to 17)

Vladimir Iakovlev, M.D.

Page 18

1    A.  Everything I put for this case, for
2  this litigation, is in the report.  All pictures
3  and everything I prepared is in the report.  I
4  may produce something else for the trial if it
5  goes for trial, but I don't have it right now.
6    Q.  What may you produce for the trial?
7    A.  Maybe larger picture, or a model,
8  something like that, for demonstration purposes.
9    Q.  Your report has photographs of some of
10  the pathology specimens in Mrs. Edwards' case,
11  correct?
12    A.  Yes.  Yes.  Edwards had pictures.
13  Yes.
14    Q.  Specifically if we turn to the back,
15  towards the back, there's a series of
16  photographs that begin on Page 58 labeled TE1.
17    A.  Mm-hmm.
18    Q.  And they run to Page 71 ending at
19  Figure TE10b?
20    A.  Yes.
21    Q.  Are those all of the photographs that
22  you took of the pathology in Mrs. Edwards' case?
23    A.  Most likely.  I could have taken
24  several shots and just different exposure or
25  something, yeah.

Page 19

1    Q.  So you could have taken other
2  photographs, but these are the ones you decided
3  to include in your report?
4    A.  Yes.  Well, I can take endless number
5  of pictures.  These were taken to demonstrate my
6  findings, my conclusions, not to document the
7  case.  These are demonstrations.
8    Q.  Did you take any other photographs of
9  Mrs. Edwards' pathology specimens that were not
10  put into your report?
11    A.  As I said, I could have taken
12  different frames or exposures.  I have raw
13  files.  As a photographer you take several
14  shots, and then you pick the best one.
15    Q.  I understand that.
16      So did you bring those additional
17  photographs today?
18    A.  No.
19    Q.  Do you have them on your computer
20  somewhere in Toronto?
21    A.  They're saved, yes.
22    Q.  I'm sorry?
23    A.  They're saved on the hard drive, yes.
24    Q.  So why didn't you bring those?
25      MR. McCONNELL:  Objection.

Page 20

1    A.  They're just copy of the same image.
2  BY MR. SNELL:
3    Q.  But they would be at different power
4  levels?
5    A.  Yes.  Or focusing, maybe I didn't like
6  the focusing, so refocused.
7    Q.  They may be of a different part of the
8  specimen?
9    A.  Possible.  I don't remember now.
10    Q.  Okay.
11    A.  I could have taken the same feature,
12  like a muscle.  I see muscle here, I see muscle
13  there, but then again I cannot end up with 300
14  pictures in my report.
15    Q.  But you didn't bring them here today?
16    A.  No.
17      MR. SNELL:  So request to produce
18  those.
19  BY MR. SNELL:
20    Q.  And please preserve the metadata on
21  those.  Do you know what that is?  How about;
22  I'd like to request electronic copies of those,
23  if that's okay.
24    A.  Sure.  You mean raw files?
25    Q.  Native files.

Page 21

1    A.  Okay.  Sure.
2    Q.  Did you personally take the
3  photographs?
4    A.  Yes.
5    Q.  Okay.  Have you selected any
6  photographs for trial that you plan to blow up
7  or, you know, make larger?
8    A.  No.
9    Q.  You said a model.  What type of model
10  are you talking about that you may produce for
11  trial?
12    A.  Like a three-dimensional model just to
13  show how mesh looks under microscope, because
14  it's hard for people to understand
15  two-dimensional cuts of a three-dimensional
16  structure.
17    Q.  Have you prepared this 3D model?
18    A.  No.
19    Q.  Have you prepared it for any other
20  litigation?
21    A.  No.
22    Q.  What software would you use to prepare
23  the 3D model?
24    A.  I don't know yet.  But I mean I was
25  thinking about a simple, not a software model,

6 (Pages 18 to 21)

Vladimir Iakovlev, M.D.

Page 22

1    but simple actual model, physical, out of like
2    cables.
3        Q.  You mentioned cables.  What type of
4    cables?
5        A.  Any round structure with enough
6    stiffness to simulate the polypropylene filament
7    so it holds the shape.
8        Q.  Are you referencing like a metal
9    cable?
10       A.  No.  But I'm referencing cables with
11   plastic insulation, so it would be about the
12   same stiffness.  Or it can be hose, it doesn't
13   have to be a cable.
14       MR. McCONNELL:  Go off the record for
15   just a second.
16       (Off the record discussion.)
17   BY MR. SNELL:
18       Q.  So we have -- this is your final
19   report, and your only report?
20       A.  Yes.
21       Q.  Did you prepare any reports for the
22   other litigations, the AMS or Boston Scientific
23   litigations?
24       A.  Yes, I did.
25       Q.  Did you bring those here today?

Page 23

1        A.  No.  Because I don't know if I can
2    give it to you, because it's for different
3    litigation.
4        MR. SNELL:  Request to produce.
5    BY MR. SNELL:
6        Q.  Do you have any electronic files or
7    any electronic documents that you brought
8    responsive to this schedule that you're holding
9    now that you haven't given to me?
10       A.  No.
11       Q.  You don't have any thumb drives, any
12   DVDs or CDs that have any materials that are
13   responsive?
14       A.  No.
15       Q.  Number 5 is "Any reports or other
16   documentation concerning testing done by you in
17   connection with this or other pelvic mesh case."
18       A.  What I've done for this litigation is
19   in my report.  What I've done for other
20   litigation is in their corresponding reports.
21   And again, I'm not sure if I can give them to
22   you because they're for different litigation.
23   They contain names of the patients.  I'm always
24   concerned with confidentiality.
25       Q.  Did you talk to any of the attorneys

Page 24

1    about whether or not you could produce these
2    materials that you didn't bring but which you
3    have?
4        A.  Yes, we discussed this.
5        Q.  When?
6        A.  We discussed this yesterday.
7        Q.  Yesterday when you were here in
8    Boston?
9        A.  Yes.
10       Q.  Where did you come from to get to
11   Boston?
12       A.  Toronto.
13       Q.  You came in yesterday, then, from
14   Toronto?
15       A.  Yes.
16       Q.  The tests that you did in this
17   litigation, can you tell me what those were?
18       A.  What do you define, "test"?  Test is a
19   pathological examination, it's microscopic
20   images and microscopic descriptions, tests of
21   physical device, of a new device, it's also in
22   the -- described in the report.
23       Q.  So the tests done in this litigation
24   are you reviewed pathologic specimens and
25   analyzed them, correct?

Page 25

1        A.  Yes.
2        Q.  And then you also did some analyses on
3    a piece of mesh that had not been implanted,
4    correct?
5        A.  Yes.
6        Q.  And those are contained within your
7    report?
8        A.  Yes.
9        Q.  For example, you took, if I recall,
10   some SEMs of a piece of mesh that was not
11   implanted, correct?
12       A.  SEM, I don't --
13       Q.  Electron microscopy?
14       A.  Not scanning.
15       Q.  Not scanning.  Let me take that back.
16       You did some electron microscopy on a
17   piece of mesh that had not been implanted in a
18   human being, correct?
19       A.  No, I have not done that.
20       Q.  You haven't done that?
21       A.  I only did conventional histology on
22   the piece of mesh which had been exposed to
23   formalin and routine processing procedures, but
24   I have not done electron microscopy the same
25   way.

7 (Pages 22 to 25)

Vladimir Iakovlev, M.D.

Page 26

1    Q.  You did electron microscopy on mesh
2  that had been implanted in tissue?
3    A.  Yes.  Implanted and explanted,
4  transmission electron microscopy.
5    Q.  Did you do any other types of testing?
6    A.  Well, I've done transmission electron
7  microscopy.  I've done routine histology which
8  involves several stains, and polarization.  And
9  I examined new sample, Boston Scientific, and
10  actually other manufacturer devices.  Yeah,
11  that's it.
12    Q.  You didn't do, for example, FTIR
13  testing, correct?
14    A.  It's not within my expertise.  I don't
15  even know what it is.
16    Q.  Okay.  But it's not something you did?
17    A.  (Nodding in the negative).
18    Q.  Correct?
19    A.  I didn't.
20    Q.  You didn't do any chemical analyses on
21  any of the specimens, correct?
22    A.  You have to define what is chemical
23  analysis.  There is a specific test, if we put
24  chemical analysis, if I stain it with
25  histological stain is it chemical analysis, if I

Page 27

1  polarize it in microscope is it a chemical or
2  not?  I can tell you exactly what I've done and
3  what I haven't done.
4    Q.  Okay.  Let's just get to that.  And
5  tell me exactly what you did.
6    A.  So for transmission electron
7  microscopy the tissue is being imbedded in the
8  plastic and sectioned, and then it's being
9  examined under transmitted electron beam to see
10  ultra structures.  So essentially you examine it
11  by visual features, you identify structures
12  which are visible by the electron beam.  There
13  is no specific stain.  There's no specific
14  stain, it's heavy metal, and that's it.
15    For histology, the samples are fixed
16  in formalin, which came to me fixed in formalin,
17  except for one specimen which was in
18  St. Michael's, and it was St. Michael's patient,
19  and that specimen went directly to
20  glutaraldehyde for electron microscopy.  And --
21    Q.  I'm going to stop you right there.  I
22  just want to make sure I get this.
23    The specimen from the St. Michael's
24  patient, you said that specimen went directly to
25  what?

Page 28

1    A.  The specimen was divided.  There was
2  one part which was preserved in glutaraldehyde,
3  it's a type of fixative for electron microscopy;
4  and the other piece went to formalin, which is
5  fixative for histology.  Formalin is standard
6  fixative in all samples.  All of the samples
7  came to me in formalin already.  These are
8  routine diagnostic procedures, routine
9  diagnostic reagents.
10    Then after fixation, the samples are
11  being processed to be imbedded in formalin --
12  sorry, paraffin, and then paraffin blocks a
13  section to produce 4-micron thick sections on
14  glass slides, and then tissue can be stained.
15  Initial staining is hematoxylin and eosin, which
16  is agent E, and then immunohistochemical stains
17  can be used as well as histochemical stains,
18  specifically for meshes.  Immunohistochemical
19  stains for muscle can be used to identify
20  muscles, immunostain for S100 protein to help
21  identification of peripheral nerve branches.
22    I've also done staining for calcium,
23  trichrome stains, which I didn't do for Ethicon,
24  but I've done it for other meshes.
25    And then when the stains are completed

Page 29

1  they can be examined in the microscope.  And
2  again, there is a visual detection of present or
3  absent staining, or of it's specificity and then
4  interpretation.  This is a routine diagnostic
5  procedure.  That's how it's done.
6    Q.  When you say this process in the
7  review of the histologic slides is a routine
8  diagnostic procedure, when you say that you mean
9  that's a routine diagnostic procedure for a
10  pathologist like yourself?
11    A.  Yes, for an anatomical pathologist.
12  And for new mesh, because I've observed several
13  changes in the body and changes in the mesh, I
14  examine new mesh just to understand why there's
15  curving, why there's curling, and the pattern of
16  the weave, and its flexibility, because I
17  examine also tissues for their firmness, so I
18  need compare what's the firmness of the new mesh
19  without the scar before implantation.
20    Again, this is something I would do
21  for other implantable devices if I have a
22  question of how the changes happen.
23    Q.  You looked at the pattern weave in
24  some of the meshes, correct?
25    A.  Yes.

8 (Pages 26 to 29)

Vladimir Iakovlev, M.D.

Page 30

1    Q.  Do you have any formal training in
2    textiles?
3       A.  No.
4       Q.  Do you have any formal training in how
5    meshes are either woven or knitted together?
6       A.  No.
7       Q.  Have you ever been involved in the
8    weaving or knitting of a mesh?
9       A.  No.
10      Q.  Do you consider yourself a textile
11   expert?
12      A.  No.  I'm also not expert in pacemakers
13   or cardiac volumes, but when they come out of
14   the body they come to me.  The same thing with
15   knee implants and hip implants.  Everything
16   which is taken out of human body or taken off a
17   human body at time of death comes for a
18   pathology co-examination, so we have to
19   correlate the devices with the changes in the
20   body, and this part of our training as
21   pathologists.
22      Q.  One of the things you mentioned was
23   you examined the tissues for their firmness when
24   the mesh was in them, correct?
25      A.  Yes.

Page 31

1    Q.  Let's talk about Mrs. Edwards' case.
2    You don't know what the firmness of
3    her tissues were before she had the mesh put in,
4    correct?
5       A.  I know what's the firmness of tissue
6    in general human tissue when it's taken out, so
7    every time the sample -- well, I mean I see
8    where you're going, so I don't want you to
9    misrepresent my answer.
10      Q.  I want an accurate answer to my
11   question, not where you think I'm going to go.
12   Because I'm going to get to what you looked at
13   and how you handled it for Mrs. Edwards and all
14   of that.
15      All right.  You personally do not know
16   the firmness of her tissues before she had the
17   mesh put in, correct?
18      MR. McCONNELL:  Object to your leading
19   question.
20      MR. SNELL:  I'm allowed to lead, he's
21   adverse to me.
22   BY MR. SNELL:
23      Q.  Go ahead.
24      A.  I didn't, no.  I know what normal
25   tissue firmness is.  And if it was normal

Page 32

1    before, that was within the range of normal.
2    BY MR. SNELL:
3       Q.  What's the firmness of normal tissue?
4       A.  It's a tactile memory, I cannot
5    explain it.
6       Q.  How do you measure this firmness?
7       A.  There is no numerical measurement.  We
8    just touch and go by touch.
9       Q.  Is there any objective methodology by
10   which you can ascertain the firmness of tissue?
11      A.  No.  As I said, there is no numerical
12   volumes.  But it's how it's done, it's the
13   practice of pathologists.  For example, breast
14   cancers, we palpate, we find the edges, and then
15   there is measurement taken from firm edges, and
16   that's how millions of women are treated, either
17   treated by chemotherapy or not, just by patient.
18      Q.  What type of measurement is taken from
19   the edges?
20      A.  Length.  Linear measurements.
21      Q.  They're not using some type of
22   compression or calibration instrument to test
23   the firmness or hardness of the tissue, correct?
24      A.  No, there is not.
25      Q.  And there's nothing like that for the

Page 33

1    tissues that Mrs. Edwards had explanted with the
2    mesh, correct?
3       A.  No.  The only measurements in
4    pathology are taken weight and length and volume
5    in diagnostic -- routine diagnostic pathology.
6       Q.  The trichrome staining that you could
7    do, is it your testimony that you did not do
8    that for the Ethicon meshes?
9       A.  Yes, I did not do it specifically for
10   Ethicon meshes.
11      Q.  You didn't do any trichrome staining
12   on Mrs. Edwards' specimens, correct?
13      A.  No.
14      Q.  No, I'm not correct, or --
15      A.  No, I didn't do it for Mrs. Edwards.
16      Q.  Okay.  You mentioned a staining for
17   detection of calcium.  Was that the trichrome
18   you were talking about?
19      A.  No, it's a different stain.
20      Q.  What stain is that?
21      A.  von Kossa.
22      Q.  von Kossa?
23      A.  von Kossa, double S-A.
24      Q.  Did you do any von Kossa staining?
25      A.  von Kossa.  No, not for Ms. Edwards.

9 (Pages 30 to 33)

Vladimir Iakovlev, M.D.

Page 34

1    The stain is showing if there is calcium in the
2    tissue, so pretty much all fragile, brittle
3    tissues in human body contain calcium, that's
4    why they're brittle.  I saw that the bark is
5    cracking, so my question is is it because of
6    calcium inclusion, and that's why I did calcium
7    staining.  And it wasn't -- didn't contain any
8    calcium.
9        Q.  Did you do any calcium staining in
10   Mrs. Edwards' tissues?
11       A.  No.
12       Q.  Did you do any calcium staining on the
13   Ethicon -- other Ethicon TVT meshes?
14       A.  I'm not sure now.  I would have to
15   look.  Because I've done it in some samples,
16   some could have been TVT.
17       Q.  How would you go about checking to see
18   whether --
19       A.  I can check.  The slide is in my
20   office, the slides are in my office.
21       Q.  So you have some slides in your office
22   which contains pathology specimens that were
23   stained for calcium that you could check?
24       A.  Yes.
25       Q.  And as you sit here right now, you

Page 35

1    don't know whether those were for the TVT-O mesh
2    or some other manufacturer's mesh?
3        A.  No, I don't remember now.  These
4    meshes are very similar, they have exactly the
5    same patterns, there's no need of repeating
6    stain, because we see many specimens.
7        Q.  If the slides in your office, the
8    calcium staining slides, let's say if somehow
9    they were lost or damaged or destroyed, would
10   you have a way of knowing what they showed?
11       A.  I examined them.  I would remember
12   them.  And I took at least one picture to
13   document that it's not there.
14       Q.  Did you make any -- did you record or
15   write down anywhere what you saw on the calcium
16   staining?
17       A.  Calcium stain, no, but some
18   information is recorded.
19       Q.  What information is recorded with
20   regard to your review of explanted meshes?
21       A.  My histological findings, patient
22   demographics.  And it's confidential, so I
23   cannot release it, and privileged because it's
24   in preparation for publication.
25       Q.  What type of document is this that

Page 36

1    you're referring to, or is it a series of
2    documents that contain the histology findings,
3    the patient demographics, and other material?
4        A.  Each specimen which comes to
5    St. Michael's Hospital is processed as patient
6    sample, immediately becomes St. Michael's
7    patient.  So demographics is reported in the
8    system; patient date of birth, procedure date.
9    Then gross examination is recorded, or gross
10   pictures are being stored in the hard drives.
11   All stains are recorded in the laboratory
12   information system.  Then the report is being
13   generated, I sign out the report.  And then for
14   publication purpose, I summarize this in
15   spreadsheets.
16       Q.  Those would be like Microsoft Excel
17   spreadsheets?
18       A.  Yes.
19       Q.  Is that the program you used, or is it
20   some other program?
21       A.  It's Excel.
22       Q.  And you didn't bring any of those
23   materials, obviously?
24       A.  As I said, it, first of all, contains
25   patient confidential information.  Second, it's

Page 37

1    in preparation for publication, and it's my
2    personal research.
3        Q.  So it's in preparation.
4            You say it's your personal research,
5    but it's research that you're deriving opinions
6    from, correct?
7        A.  Yes.  But I meant personal, I am as a
8    principal investigator.  Personal not for home
9    use, but meant that I'm principal investigator
10   in the project.
11       Q.  And part of what goes into you
12   formulating your opinions is your experience
13   with these materials, correct?
14       A.  Yes.
15       Q.  Have you submitted any analyses for
16   publication?
17       A.  It's in preparation and at submission
18   stages, in pre-submission inquiries.
19       Q.  So your analyses have not been
20   submitted to a particular journal yet, is that
21   what you're telling me?
22       A.  Pre-submission inquiries, yes.  For
23   manuscripts specifically for transvaginal meshes
24   have not been submitted yet.
25       Q.  When you say "pre-submission

Vladimir Iakovlev, M.D.

Page 38

1    inquiries," I don't understand that, so explain
2    what that means?
3        A.  You write a short paragraph with a
4    letter to editor asking if the journal would be
5    interested in this type of publication.
6        Q.  Okay.
7        A.  Journals, they have very different
8    requirements, and it takes a month to prepare
9    the manuscript.  You submit it, it gets
10   rejected.  It just saves you time to send
11   pre-submission inquiry.
12       Q.  So you write essentially a paragraph
13   to say "here's what we did, are you interested
14   in moving to the next step?"
15       A.  Yes.
16       Q.  And can you tell me the journals that
17   you've done that for?
18       A.  I cannot tell you because it's
19   privileged.
20       Q.  Privileged under what?
21       A.  Maybe you will try to contact the
22   journal and stop my publication.
23       Q.  What I'm asking you; what's your
24   understanding of why it's privileged?  I'm not
25   interested in contacting the journal or trying

Page 39

1    to stop what you're doing, I'm just
2    understanding; why do you believe it's
3    privileged?
4        A.  Because people can contact the
5    journals.  People can and people have done it,
6    they've blocked publications.  There's a whole
7    process how to avoid that.
8            The manuscripts are anonymized,
9    reviewers don't see the names, reviewers don't
10   see the institutions.  You can even select
11   specific reviewers as not being used as
12   reviewers.  Because this issue came up lately
13   that if the manuscript's work is exposed before
14   it gets published, it can be either copied,
15   plagiarized, or stopped from publication.
16       Q.  How many journals have you -- so
17   you're not going to tell me the names of the
18   journals that you did the pre-submission --
19       A.  (Nodding in the negative.)
20       Q.  -- inquiries, correct?
21       A.  No.
22       Q.  How many journals were there that
23   you've done for pre-submission inquiries?
24       A.  Three.
25       Q.  Are those journals in the United

Page 40

1    States or international, Canada?  Where are they
2    at?
3        A.  They are all international.
4    Headquarters, I think at least for two, are in
5    UK.
6        Q.  The Excel spreadsheets that you
7    referenced, are those on your personal computer,
8    or some other computer system?
9        A.  They're backed up in the hard drives
10   of St. Michael's Hospital.  I do have them on my
11   research laptop.  I mean depending on the
12   version, because it's getting updated here and
13   there.  Yes, that's -- for pathology reports,
14   they are all in the hospital system.
15       Q.  And just so I'm clear, you have not
16   drafted a full manuscript for this research that
17   you're doing?
18       A.  For transvaginal meshes, no, it's not
19   completed yet.  And it will be more than one
20   manuscript.
21           MR. SNELL:  Note request to produce on
22   the calcium staining.
23   BY MR. SNELL:
24       Q.  I believe you also mentioned the
25   immunohisto staining S100?

Page 41

1        A.  Yes.
2        Q.  Okay.  And does that -- that stain is
3    to look for proteins?  Strike that.
4            What does S100 stain for?
5        A.  All immunohistochemical stains, the
6    staining specific protein in the -- sort of
7    simplified way of saying it -- the antibodies
8    being developed against the specific protein.
9    So that protein can be introduced into mouse,
10   mouse develops antibodies against the protein,
11   or a culture of cells develops antibodies
12   against the protein.  Then these antibodies are
13   being extracted.  And then if you apply these
14   antibodies against tissue, they bind to that
15   specific protein.  Then if you have -- initial
16   animal is mouse, and then you have antibodies
17   against mouse immunoglobulin, then you can bind
18   those antibodies over.
19           But the second set of antibodies are
20   conjugated with dye, brown dye, or through other
21   mechanism becomes brown, and this way you can
22   actually see where the initial target protein is
23   in the tissue.  It's a bit complex.  It's easier
24   to draw, but that's how it is.
25       Q.  If I had a sheet of paper, could you

11  (Pages 38 to 41)

Vladimir Iakovlev, M.D.

Page 42

1  draw what you're referencing?
2      A.  Yes.
3          So assume we have -- somebody was
4  smart enough to figure out that there is a
5  protein and he calls it S100, or he can call it
6  Bobby or whatever, I mean the researchers
7  sometimes comes up with funny names.  So this is
8  S100 protein, and we know this is S100 protein.
9          So this protein is introduced in
10 mouse.  So mouse, because it's a foreign protein
11 for the animal, develops antibody against S100
12 protein.  So the antibody (drawing), light chain
13 looks like letter J, just draw it like Y.  So
14 mouse immune system develops immunoglobulin
15 which binds against S100 protein.
16     Q.  Can I stop you?
17         The immunoglobulin that the mouse
18 develops, is that the antibody that -- is that
19 the antibody, or are they two different things?
20     A.  That's antibody.  Immunoglobulin is
21 antibody.  I mean, yes, antibody and
22 immunoglobulin, we can say that they are the
23 same thing.
24         So then if you kill the mouse, draw
25 serum, and then we have human tissue on the

Page 43

1  slide.
2          Now, then, if we take this antibody or
3  immunoglobulin and introduce it to a rabbit, so
4  this antibody goes into rabbit, and then this is
5  a mouse antibody, so let's make a thick dark so
6  we can (drawing) -- rabbit's immune system
7  develops antibodies against mouse antibodies,
8  and let's put it empty sort of clear like this
9  (drawing).
10         Then what we have, we have rabbit
11 anti-mouse immunoglobulin.  And then this
12 antibody can be also conjugated to specific
13 molecules which can be further amplified to
14 brown stain.
15         So now we have one vial of rabbit
16 anti-mouse antibodies, and we have mice, and
17 then we can introduce different proteins into
18 the mice, and then we can have one rabbit
19 antibody with the dye, and a whole set of
20 different antibodies from the mouse against
21 human proteins.  This gives you flexibility.
22         You apply first antibody, it binds
23 here because it's specific against human
24 protein.  But then you have universal detection
25 system, or dye, which will stick to the first

Page 44

1  primary antibody, and will show as a brown
2  color.  This one is colorless, this one will
3  have a color.
4          Technically you can attach dye here
5  and then just see the antibody.  But this will
6  be only very small signal, you may not be able
7  to see it.  This way you can have several
8  antibodies stuck to primary antibody, so your
9  signal gets larger and you can see it easier.
10     Q.  So the several antibodies stuck to the
11 primary antibody that's on the tissue slides of
12 the human that you're referring to?
13     A.  So this amplifies, instead of one
14 point you end up with several points.
15     Q.  And then the color that it stains for
16 S100 is brown that you referenced?
17     A.  For what I use is brown.  Sometimes if
18 you use different reagents it can be purple,
19 red.
20     Q.  Is there a certain brand or type of
21 S100 that you use?
22     A.  It's in the records for immuno -- as I
23 said, we are diagnostic lab, everything is
24 quality controlled and quality assurance, and
25 each new vial is being optimized and

Page 45

1  standardized.  It's in the records.  I can check
2  what they used.
3      Q.  Okay.  So just to be clear, the S100
4  stain that you used, somewhere it's recorded
5  what that S100 stain was and when it was used?
6      A.  Yes.  It's vial, the concentration,
7  dilution, manufacturer, positive controls,
8  negative controls.  Each day everything is
9  recorded.
10     Q.  Okay.  And is it the S100 protein that
11 the stain is specifically staining for?
12     A.  That antibody?
13     Q.  Yes.
14     A.  That antibody specific.  Because see,
15 sometimes what happens in the mouse, you have
16 multiple antibodies.  So the new step in this
17 technology, which I didn't try to draw, is that
18 you develop a tumor, neoplastic cells, which
19 pump out antibodies, and that becomes
20 monoclonal.  So you don't have a bunch of
21 antibodies including S100, you have just S100.
22 So this is again specifically S100.
23     Q.  Okay.  The S100 stain, you tell me all
24 the different tissues where that can potentially
25 stain positive for.  I know you mentioned

12 (Pages 42 to 45)

Vladimir Iakovlev, M.D.

Page 46

1    nerves.
2         A.  Schwann cells contain S100,
3    melanocytes, adipose tissue, fat, chondrocytes.
4         Q.  Monocytes, did you mention monocytes?
5         A.  No.  Chondrocytes.
6         Q.  Chondrocytes.
7         A.  Can be nonspecific in other cells at
8    low levels.  The art of pathology is not just to
9    be as a machine, you see staining or you don't.
10   You interpret it by other means.  I can see
11   nerves without S100 stain by any staining.  So
12   if morphology fits, pattern of staining fits,
13   then I use it as feature.  If I see that
14   something is not specific, if it's binding to
15   nonspecifically to different structures for
16   whatever reason, I either repeat the stain or I
17   don't -- I ignore the staining altogether.
18        Q.  Can S100 stain positive for monocytes?
19        A.  I would have to check on what exactly.
20   It potentially can.  It's not commonly used to
21   identify monocytes.  It's not a specific marker
22   for macrophages.  At least it's not regarded
23   like that in diagnostic field.
24        Q.  As you sit here today, do you know
25   whether S100 can stain monocytes?

Page 47

1         A.  I do not.  I don't remember.  As I
2    said, it's not specifically used for monocytes,
3    that's why I don't remember.
4         Q.  Can S100 stain positive in
5    histiocytes?
6         A.  Monocyte, histocyte, the same cell.
7    The answer is possibly can.  It's not used,
8    therefore I don't know.  I can check with the
9    list and rate of positivity for specific tissues
10   the companies supply.
11        Q.  Do you have a copy of that list and
12   rate of S100 staining back at your lab?
13        A.  That's either in manual for the
14   antibody of the supplier.  Or another way of
15   checking it, to check immuno queries, there are
16   websites and different publications.
17        Q.  Is that something you could easily do?
18        A.  For monocyte, yes, I can do that.  But
19   I don't understand the question.  Monocyte is a
20   cell.  Nerve is the largest structure.  So
21   morphologically they're so different that I
22   wouldn't even think about it.
23        Q.  Okay.
24        A.  There's no need to separate one from
25   the other because they're so different

Page 48

1    morphologically.
2         Q.  Do you know if S100 can stain from --
3    strike that.
4         Do you know if S100 can stain foreign
5    body joint cells?
6         A.  It's the same cell, histicytes.
7    We're talking about the same thing, just
8    different names.
9         Q.  They're a fusion of macrophages
10   together, that's why you're saying they're the
11   same cell?
12        A.  Yes.
13        Q.  But as you sit here today, you don't
14   know whether macrophages, whether they're in a
15   single cell or fused foreign body giant cell
16   status can stain for S100, correct?
17        A.  No, I don't know.  It didn't strike me
18   as strongly positive, otherwise I would have
19   seen it.  There are probably pictures here.
20   Like this one, see (indicating)?
21        Q.  We're going to get to those.
22        A.  This --
23        MR. FABRY:  Let him finish his answer,
24   please.
25        A.  There are macrophages.  From this

Page 49

1    power I don't see any staining, so in this
2    particular slide it did not stain.
3    BY MR. SNELL:
4         Q.  What slide are you talking about?
5         A.  64.  This is Page 64.
6         Q.  We will come back to that.
7         A.  For that specific situation, it did
8    not stain.  And it's just one picture, I just
9    flipped the page, it's not that I was looking
10   for.
11        Q.  Do you know, can S100 protein stain in
12   tumors?
13        A.  Yes.
14        Q.  Certain cells of lymph nodes?
15        A.  Yes.
16        Q.  Can S100 stain for epidural Langhorne
17   cells?  You're the doctor, not me.
18        A.  It can stain any cell which can
19   contain S100 family of proteins.  There might
20   be -- we might be talking about at least over
21   100 different cells, different situations.  As I
22   said, we interpret this how it looks basically.
23        Q.  So S100 is not a single protein, it is
24   a family of proteins, correct?
25        A.  Yes.

13  (Pages 46 to 49)

Vladimir Iakovlev, M.D.

Page 50

1      Q.   There can be over 100 different types
2   of cells that could potentially stain for S100?
3      A.   Possibly.  Don't quote me for 100.
4   Possibly, as I said, at least within ten, there
5   will be different scenarios.
6          And I have to repeat that the
7   interpretation is not based just brown or blue,
8   interpretation is based on morphological
9   features and correlation between positive
10  staining and morphological features.  So I
11  decide if it's specific or not.
12     Q.   So what you're testifying to is even
13  if something stains brown, you're the one who
14  decides whether or not it's a real finding?
15     A.   Yes.  Or if the finding which answer
16  the question.  It can be real, it can be real
17  S100 in the monocyte if you want, but it's not
18  specific.  I'm using it to highlight nerves.  If
19  it's highlighting something else, I just ignore
20  it because it's not my question.
21     Q.   Is there a specific stain that looks
22  for nerves, the neurovascular system?
23     A.   Just nerves, nothing else?  So one
24  single stain, neurofilament, neurofilament will
25  stain.  But neurofilament is a really thin

Page 51

1   structure, it's difficult to see.  I've tried
2   it, it's difficult to interpret.  I mean it's
3   easy to interpret when you see it, but it's
4   difficult to see on low power.
5      Q.   Did you do any neurofilament staining
6   on Mrs. Edwards?
7      A.   No.
8      Q.   Did you do any neurofilament staining
9   on any of the other TVT-O mesh specimens?
10     A.   I don't remember now.  I've tried it,
11  but which brand it was, type, I don't remember.
12         Human body, I don't think there is
13  such a thing as strictly specific staining,
14  because we all have the same genome in each
15  cell, and there might be situations when, for
16  whatever reason, specific environment or
17  specific stimuli, the cell starts producing a
18  protein.  They're all encoded in each cell.
19     Q.   As you sit here today, you don't
20  recall whether you performed any neurofilament
21  staining on any TVT explanted meshes, correct?
22     A.   I don't remember.  I could have, but I
23  don't remember.
24     Q.   You mentioned 4-micron thick cuts for
25  the histology preparation.  Are you talking

Page 52

1   about the thickness of the cuts of the tissue
2   with the microtome?
3      A.   Yes.  Electron microscopy is thinner.
4      Q.   For the TEM, the electron microscopy,
5   how thick are those cuts?
6      A.   I don't remember now.  I think it's
7   half an a micron or 1 micron.  It's really thin,
8   very thin.  It can be thicker.  If tissue starts
9   crumbling, then you get thicker, but it's much
10  thinner than histology.
11     Q.   I believe you testified for the
12  electron microscopy there's heavy metal
13  staining?
14     A.   I think osmium.
15     Q.   Can you spell that for us?
16     A.   Again, don't quote me, but I think
17  this is -- metal which is used for.  I can check
18  for you.  I mean it's accepted standardized
19  protocol for electron microscopy.
20     Q.   When you were talking about how the
21  histology samples are fixed, you mentioned
22  formalin, correct?
23     A.   Yes.
24     Q.   Formalin is a fixative for pathology?
25     A.   Yes.

Page 53

1      Q.   What exactly is formalin beyond it's a
2   fixative for pathology?
3      A.   It's a chemical which is caused by
4   proteins.  The proteins gets cross-linked.
5      Q.   Just S100 proteins, or all proteins?
6      A.   All proteins.  It prevents from
7   decomposition.  Proteins, cross-linked proteins
8   cannot be digested by bacteria or degrade
9   further.
10     Q.   Is formalin the same thing as
11  formaldehyde, or are they two different
12  chemicals?
13     A.   Formalin is solution of formaldehyde.
14  It's like vodka and -- well, spirit.
15     Q.   And for the formalin fixation in
16  pathology, is there a certain ratio that the
17  formaldehyde is supposed to be concentrated in?
18     A.   Yes.  It's premixed.  The laboratories
19  buy it premixed.  It's buffered.  It's not just
20  concentration, it's also acidity controlled.
21  And this is again quality assurance, quality
22  control systems in the labs.
23     Q.   Is formalin regularly used in the
24  pathology lab at your hospital?
25     A.   Yes, in all labs.  It's a standard

14  (Pages 50 to 53)

Vladimir Iakovlev, M.D.

Page 54

1    fixative throughout the world.
2        Q.  And the paraffin, how does that differ
3    from the formalin?
4        A.  Paraffin is paraffin, like a wax.
5        Q.  So it's not a preservative?  It
6    doesn't bind with proteins, or does it?
7        A.  No.  It just mechanically holds
8    tissue.  To cut tissue you need to hold it.  So
9    it's imbedded in paraffin, and then the knife
10   cuts through paraffin and cuts through the
11   tissue.  Because otherwise, the tissue would
12   fold under the knife.
13       Q.  When the tissue is in the formalin and
14   there's the cross-linking of the proteins, does
15   that cross-linking continue over time as the
16   tissue remains in the formalin?
17       A.  Yes, to a degree.  But the rate is
18   different.  And for specific proteins, it's a
19   little different.  It's variable.  But yes.
20       Q.  When you take the tissue out of the
21   formalin and you put it into paraffin, do you
22   know whether or not the proteins are still
23   cross-linked?  Assuming you don't take it out of
24   the --
25       A.  We assume that they are cross-linked,

Page 55

1    and the staining protocols and antibodies are
2    optimized for cross-linking.  So before the
3    staining is done, each staining requires
4    retrieval of the antibody.  So what happens, you
5    know that it's cross-linked, therefore you have
6    to unlink it.  So before staining is done,
7    there's unlinking process, or antigen retrieval.
8    You have to open the sites where the antibody
9    can see the tissue.  Then it's being opened by
10   different links.  So the antibody when it's
11   produced by manufacturer is optimized for
12   formalin fixed paraffin imbedded tissue.
13       Q.  So what you're saying is like for the
14   S100 antibody, it's optimized by the
15   manufacturer, that antibody, to be able to work
16   in the histologic specimen which has gone from
17   formalin to paraffin to cutting?
18       A.  Yes.
19       Q.  I believe you mentioned glutaraldehyde
20   for the electron microscopy.  What is that?
21       A.  It's a similar fixative but it's more
22   gentle, preserves the tails.  It's been found
23   experimentally that this is the best fixative
24   for fine details.
25       Q.  The glutaraldehyde is a fixative which

Page 56

1    is more gentle than formalin?
2        A.  Yes.  I mean, again, gentle is a
3    descriptive term.
4        Q.  Does glutaraldehyde contain
5    formaldehyde?
6        A.  Maybe traces.  I don't know exact
7    purity of it.  It's aldehyde.  It's, I guess
8    different tail, different length of the tail of
9    aldehyde group.
10       Q.  Do you know, is there a certain brand
11   or manufacturer you use glutaraldehyde from?
12       A.  I can check.  We have diagnostic lab.
13   I mean everything is coming from accredited
14   manufacturers.
15       Q.  How does the glutaraldehyde work?
16       A.  I believe it's the same principle.  It
17   crosslinks proteins, but in a different way.
18   But I'm not -- I don't know exact details,
19   what's the difference between formalin and
20   glutaraldehyde.
21       Q.  For formalin, do you know whether --
22   well, strike that.
23           For formalin, you do know that it
24   binds proteins?
25       A.  Crosslinks.

Page 57

1        Q.  For formalin, you know it crosslinks
2    proteins, correct?
3        A.  Yes.
4        Q.  Is that part of your basic pathology
5    training?
6        A.  Yes.
7        Q.  Have you had any discussions at all
8    with Mrs. Edwards' healthcare providers?
9        A.  No.
10       Q.  Have you ever talked to Mr. or
11   Mrs. Edwards?
12       A.  No.
13       Q.  Have you had any written
14   correspondence with any of Mrs. Edwards' medical
15   providers?
16       A.  No.
17       Q.  Have you spoken with anyone other than
18   Mrs. Edwards' lawyers about Mrs. Edwards' case?
19       A.  No.
20       Q.  Have you spoken with anyone other than
21   Mrs. Huskey's lawyers about Mrs. Huskey's case?
22       A.  No.
23       Q.  You didn't speak to any of
24   Mrs. Huskey's providers?
25       A.  No.

15  (Pages 54 to 57)

Vladimir Iakovlev, M.D.

Page 58

1    Q.  And you didn't have any written
2    conversations with them either; "them" being
3    Mrs. Huskey's providers?
4        A.  No.
5        Q.  The medical literature that you
6    reviewed, that's all contained within your list
7    of materials at the back of your report?
8        A.  Yes.  This was most relevant to the
9    report, because I reviewed way more during my
10   career.  I cannot include everything I've read.
11       Q.  The most important articles are
12   included in your materials list, though, to your
13   report?
14       A.  Yes.  Things like S100 protein.  I
15   mean this is a very long list of literature I
16   reviewed as part of my career.
17       Q.  As you sit here today, are there any
18   literature that come to mind that you've seen in
19   your career that are of particular importance to
20   you for your opinions?
21           MR. McCONNELL:  You mean other than
22   what's on the list?
23           MR. SNELL:  Absolutely, yes.
24       A.  Do you mean particularly important for
25   this report?

Page 59

1    BY MR. SNELL:
2        Q.  Particularly important to you in your
3    analysis of the Ethicon meshes.
4        A.  Depends on the question.  I mean if
5    specific question, then specific literature.  I
6    mean something -- one article which answers all
7    questions?  No, there is none.  There is one
8    article which gives you this piece of
9    information, the other one gives you this piece
10   of information.  I can't say one single most
11   important, no, I cannot.
12       Q.  As you sit here, are there any
13   articles that you intend to discuss at trial
14   that you haven't disclosed in your list of
15   materials?
16       A.  Unless you ask me specific question,
17   then I can -- if it becomes point of argument.
18       Q.  But as you sit here today --
19       A.  I don't plan, no.
20       Q.  All of the medical records and the
21   depositions that you reviewed in the Edwards'
22   case are listed in your materials list, correct?
23       A.  Yes.  Because, see, when I make
24   reference list I make it as for medical
25   literature for publication, so I -- reliance

Page 60

1    list, I believe, contains medical records.
2            (Whereupon, Iakovlev Exhibit Number 2,
3            Rule 26 Expert Report of Dr. Vladimir
4            Iakovlev, Number 3, Document titled
5            Facts of Data Considered in Forming
6            Opinions, and Number 4, Curriculum
7            Vitae of Vladimir Iakovlev, were
8            marked for identification.)
9    BY MR. SNELL:
10       Q.  Doctor, I'm handing you Exhibit
11   Number 2, 3, and 4 to your deposition (handing).
12           (Witness reviewing documents.)
13           MR. FABRY:  Would it be okay if we
14   take a real brief break before we dive into the
15   report?
16           MR. SNELL:  Sure.
17           MR. FABRY:  Thank you.
18           (Whereupon, a recess was taken from
19           9:33 a.m. to 9:42 a.m.)
20   BY MR. SNELL:
21       Q.  Just go back to one thing.  You
22   estimate that you spent 22 to 25 hours on the
23   Ethicon litigation up until yesterday, correct?
24       A.  Yes.
25       Q.  Now, you have Exhibits 2, 3 and 4 in

Page 61

1    front of you?
2        A.  Yes.
3        Q.  Exhibit 2 is your expert report,
4    correct?
5        A.  Yes.  Yes, it is.
6        Q.  And Exhibit 3 is the list of facts and
7    materials that you rely upon which include
8    medical literature, medical records,
9    depositions, documents, correct?
10       A.  Yes.  These were made available to me
11   by the attorneys.
12       Q.  Is that an accurate and complete list,
13   Exhibit Number 3, of the materials you reviewed?
14       A.  Well, see, this is -- the point is
15   that, as I said, it's whole career, so I've
16   reviewed more materials.  The list I provided in
17   the reference list is what I thought was most
18   relevant to this report.  I cannot state that
19   it's complete, because complete you have to go
20   back to articles I read in medical school.
21       Q.  Are there any articles specifically
22   concerning the TVT-O that you're going to rely
23   upon and talk about at trial, but which you
24   haven't included along with your expert report
25   and the list of materials that you provided to

Vladimir Iakovlev, M.D.

Page 62

1    us?
2         A.  No, I don't think so.
3         Q.  Okay.  Exhibit 4 is your curriculum
4    vitae, correct?
5         A.  Yes.
6         Q.  I believe you testified that that's
7    current?  Take a minute and look at it if you
8    want to.
9         A.  There might be a couple of workshops
10   happening later, but nothing in terms of major
11   publications.
12        Q.  Any workshops important to your
13   opinions in this case?
14        A.  No.
15        Q.  I want to go back to Exhibit 1, just
16   keeping going through the list of documents, if
17   that's okay, Doctor.
18        Schedule A, item number seven, do you
19   have any documents responsive to item number
20   seven?
21        A.  Which one?
22        Q.  Number seven.
23        A.  Number seven, the reference list?
24        Q.  No.  Number 7 to Exhibit Number 1.  So
25   let's just -- so we're looking at Exhibit

Page 63

1    Number 1, your notice of deposition, Schedule A.
2         A.  I understand.
3         Q.  And take a look at number seven.  Do
4    you have any documents responsive to that
5    request?
6         A.  I wasn't -- work in progress, it's
7    privileged, when I communicate with my
8    attorneys.
9         Q.  So then your communications with the
10   attorneys, you don't have any other documents
11   responsive to number seven?
12        A.  No.
13        Q.  Were there any literature, materials,
14   documents that were provided to you by the
15   attorneys, but you didn't look at it?
16        A.  There were some deposition records.
17   As a pathologist I only screen clinical and
18   relevant information for specific features
19   relevant to my opinion, so I was selective in
20   reviewing records.
21        Q.  When you say "records," you mean the
22   medical records?
23        A.  Medical records.  And I mostly rely on
24   clinical records rather than depositions.
25        Q.  Why do you mostly rely on the clinical

Page 64

1    records rather than depositions?
2         A.  Clinical records were more neutral,
3    they occurred before the litigation process.  I
4    believe they're less biased or they have chance
5    -- less chance of being biased.
6         Q.  Exhibit Number 3, take a look at it.
7    The facts or data considered, towards the back
8    there are some depositions beginning at item
9    number 193.
10        A.  Yes, I see that.
11        Q.  And the deposition transcripts listed
12   here run from 193 to 209.
13        A.  Yes, I see that.
14        Q.  You didn't review all of those
15   depositions?
16        A.  No.
17        Q.  Can you tell me the ones you reviewed?
18        A.  I don't think I reviewed any of the
19   depositions for this litigation.
20        Q.  Okay.  Do you know that there was an
21   Ethicon related trial in West Virginia recently
22   concerning the TVT?
23        A.  Yes, I'm aware of that.  Just recently
24   I was told.
25        Q.  Who told you?

Page 65

1         A.  An attorney.  My attorney.
2         Q.  Your personal attorney?
3         A.  No.
4         Q.  The gentlemen sitting here today?
5         A.  Yes.
6         Q.  Do you know the result of that trial?
7         A.  No.
8         Q.  Have you read any transcripts from
9    that trial?
10        A.  No.
11        Q.  Have you had any discussions with any
12   expert -- strike that.
13        Have you had any discussions with any
14   other Plaintiffs' expert in the Ethicon mesh
15   litigation?
16        A.  No.
17        Q.  Have you had any written
18   correspondence with any of the Plaintiffs'
19   experts in the Ethicon pelvic mesh litigation?
20        A.  Specifically for Ethicon, no.
21        Q.  Have you had any written
22   communications with them whatsoever?
23        A.  If they are experts for this trial and
24   I have collaborative projects, research
25   projects, yes, we had communication regarding

17 (Pages 62 to 65)

Vladimir Iakovlev, M.D.

Page 66

1    research projects.
2         Q.  What collaborative research projects
3    are you working on with any other Plaintiffs'
4    experts?
5         MR. McCONNELL:  Are you concerned
6    about confidentiality, Doctor?
7         THE WITNESS:  Yes.
8         MR. McCONNELL:  Well, are you able to
9    list the experts even?  Or is that confidential
10   as far as you're concerned?
11        THE WITNESS:  I'm not sure if I can
12   give away names and the specific projects,
13   because projects are my work in progress, and
14   names are names of other people.
15        MR. McCONNELL:  Okay.  Well, if you're
16   more comfortable not doing that, I think that's
17   your answer.
18        MR. SNELL:  Well, what's the basis of
19   your confidentiality?  We're going to have to
20   get the judge on the line for this one, because
21   this is -- any work he's doing with any other
22   Plaintiffs' experts is absolutely discoverable,
23   it goes to bias, it goes to all different types
24   of things.  So we'll figure out how to get the
25   judge on the line, because this is nonsense.

Page 67

1    BY MR. SNELL:
2         Q.  What's your basis for believing that
3    this is confidential, your work with other
4    Plaintiff experts?
5         A.  Because I will tell you names of other
6    people, that's my belief.  I don't know if those
7    people would object to me disclosing this
8    information.
9         Q.  Well, these names, are these experts
10   that have been disclosed by Plaintiffs in the
11   litigation?
12        A.  I have to see a list of experts in
13   this specific litigation, because I don't
14   remember now who are experts for this
15   litigation, who are not.
16        MR. FABRY:  Are we talking about --
17   I'm not trying to interrupt, just get some
18   clarification.
19        Do you have a hypothetical concern
20   that maybe people you're collaborating with
21   might also be experts, and you don't even know
22   if they're experts?
23        THE WITNESS:  No, the other way
24   around, because they're experts for different
25   trials --

Page 68

1         MR. FABRY:  Objection.
2         THE WITNESS:  -- for different
3    litigation process, and now I don't remember who
4    is expert for which, and if I tell now that I am
5    communicating with such person and he's not in
6    this, he's not disclosed as an expert, I just
7    don't remember it.
8    BY MR. SNELL:
9         Q.  All right.
10        MR. FABRY:  Is the collaboration that
11   you're doing, is that related to publication, or
12   something else?
13        THE WITNESS:  Publications.
14        MR. FABRY:  Okay.  So all of the
15   information that you gave before about concerns,
16   prepublication issues, confidentiality related
17   to that, is that the concern that we're talking
18   about?
19        THE WITNESS:  Yes.
20        MR. FABRY:  Okay.
21   BY MR. SNELL:
22        Q.  What research projects are we talking
23   about that you are collaborating with other
24   experts?
25        A.  Correlation between histological

Page 69

1    findings and clinical symptoms, and degradation
2    process of polypropylene.
3         Q.  What are the names of those experts,
4    Plaintiffs' experts?  I don't care whether
5    they're involved in Ethicon litigation or
6    another litigation.
7         MR. FABRY:  I'm just going to raise
8    the objection.  He's told us that he's concerned
9    about prepublication issues and confidentiality
10   related to that.
11        MR. SNELL:  I'm asking for their
12   identity.  I'm not asking right now for the
13   manuscript or whatever the publication is.  Do
14   you know, Counsel?
15        MR. FABRY:  No.
16        A.  If I'm given a list of experts which
17   are testifying for this specific trial, I can
18   select those which --
19   BY MR. SNELL:
20        Q.  Which ones do you know are Plaintiffs'
21   experts in the mesh litigation?
22        A.  In all mesh litigation --
23        Q.  Yes.
24        A.  -- or in specific?
25        Q.  In all mesh litigation.

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 70

1      A.   That's my concern, because I'm giving
2   you information I obtained for other litigation
3   processes, and I don't know if I can disclose
4   that.
5      Q.   The identity of a person is not
6   confidential.  I'm not asking you about
7   something you communicated with the lawyers
8   about.
9        I'm asking you for the identity of
10  Plaintiffs' experts, who you know are
11  Plaintiffs' experts, in a mesh litigation that
12  you're working on these collaborative research
13  projects with?
14     A.   In any mesh litigation, or
15  specifically TVT?
16     Q.   Any mesh litigation.  Then we can
17  drill down and figure out who they are, which
18  litigation they are in or whatever.
19       MR. McCONNELL:  Let me object for a
20  second.  I think your initial question was in
21  the Ethicon litigation, and I think what
22  Dr. Iakovlev is saying if you have a list of the
23  Plaintiff experts, you could show it to him and
24  he could -- this may be a moot question as it
25  relates to the Ethicon litigation.  And I think

Page 71

1   that might be the first step in this, unless I'm
2   wrong.
3      A.   Because if I now say that, okay, this
4   person is an expert for another litigation, then
5   I'm disclosing information that he's involved.
6   I mean I'm not sure if I can do that.
7        MR. FABRY:  If we have a non-disclosed
8   consulting expert in some litigation, and I'm
9   not involved in it and he's not involved in it,
10  I do think that's outside the scope of what
11  you're entitled to get into here.
12  BY MR. SNELL:
13     Q.   Which of these experts -- give me the
14  names of the experts who you know are disclosed
15  experts for the Plaintiffs in any mesh
16  litigation that you're working with on these
17  collaborative research projects.
18       MR. FABRY:  I'm going to object.
19  Asked and answered.
20       As he told you, if you give him a list
21  he'll look at it and tell you who he recognizes.
22     A.   I know that you're entitled to know
23  the names of experts for this specific
24  litigation.  I can select it from this list if I
25  know that these people actually give consent to

Page 72

1   be disclosed by participating in this
2   litigation, yeah, that's okay with me.  But if
3   it's another litigation, how can I?  I mean then
4   I'm telling you that this person is involved in
5   some other litigation, maybe he's not okay with
6   me telling you this.
7   BY MR. SNELL:
8      Q.   John Steege?
9      A.   Possible.  Again, just give me a list.
10     Q.   I'm giving you a list.
11       John Steege, a physician in North
12  Carolina?
13     A.   So if he's expert, yes, we have -- or
14  planning collaborative project.
15     Q.   Jerry Blaivas, a urologist in New York
16  City?
17     A.   Yes, we are planning collaborative
18  project, in stages, but there is nothing yet.
19     Q.   Bruce Rosenzweig, a physician in
20  Chicago, Illinois?
21     A.   Never heard his name.
22     Q.   Michael Margolis, a physician in
23  California?
24     A.   Never heard this name.
25     Q.   Ann Weber?

Page 73

1      A.   Never heard this name.
2      Q.   And what is your involvement with John
3   Steege?
4      A.   We're planning to do a collaboration
5   when I take my histological findings, and he --
6   and his team takes clinical findings, and we
7   check if these are correlating, if any
8   histological findings correlates with the
9   clinical presentation, and what's the degree of
10  correlation.
11     Q.   How long have you been working with
12  Dr. Steege?
13     A.   As I said, it's just in plans.  We
14  have not exchanged actual data yet.
15     Q.   And the project where you and
16  Dr. Steege are involved in, what does that
17  concern?
18       MR. FABRY:  Object to the form of the
19  question.
20     A.   Transvaginal devices, transvaginal
21  meshes.
22  BY MR. SNELL:
23     Q.   Have you had any written
24  communications with Dr. Steege?
25     A.   Yes, we had e-mails.

19 (Pages 70 to 73)

Vladimir Iakovlev, M.D.

Page 74

1      Q.  Have you produced those?  Did you
2   bring those here today?
3      A.  No.  But it's my privileged
4   information, it's research information.
5      Q.  Have you done any other -- are there
6   any writings that concern this project between
7   you and Dr. Steege besides the e-mails?
8      A.  No.  As I said, it's only plans, we
9   have not exchanged data yet.
10     Q.  Have you written up a protocol?
11     A.  No.  Again, it was in discussion.  We
12  haven't reached that stage yet.
13     Q.  Do you have a mission statement or
14  anything that describes the scope of the work
15  that you're looking at doing?
16     A.  No, not yet.
17     Q.  Who is funding this project between
18  you and Dr. Steege?
19     A.  There is no extra funding needed
20  because the histological work is done already,
21  as the diagnostic work.  And I don't know what's
22  involved at his end, but I don't require any
23  extra funding.
24     Q.  Who paid for the histology work?
25     A.  The samples which came from Steelgate

Page 75

1   and other sources of attorneys, the law firms
2   paid for the work.  Patients which are part of
3   St. Michael's system, they were absorbed by
4   St. Michael's system.  Samples which came from
5   other hospitals, they were paid partially by
6   insurance companies, partially by referring
7   physicians.
8      Q.  Your histology work for the samples
9   that came from Steelgate, the Plaintiffs'
10  lawyers paid for that?
11     A.  Law firms.
12     Q.  Which law firms?
13     A.  Motley Rice.  Some of it was paid by
14  Mueller Law.
15     Q.  Did you submit invoices to those law
16  firms?  Strike that.
17         Did you or your lab submit invoices to
18  those law firms?
19     A.  Yes, they did.  I don't know if all
20  Boston Scientific have been invoiced.  As I
21  said, I have not done my billing yet.  My lab
22  could have done some initial billing already at
23  least for Ms. Edwards because it was early,
24  billing had been completed.
25     Q.  Did you bring any of those bills here

Page 76

1   today?
2      A.  Not from the lab.  And as I said,
3   myself, I didn't do.
4      Q.  Do you know who is paying Dr. Steege
5   for his work in this collaborative research
6   project?
7         MS. THOMPSON:  Objection.
8         MR. FABRY:  Objection to form.
9         MR. McCONNELL:  Objection.
10     A.  I don't know if he needs any funding.
11  There's nothing to do, it's just put all data
12  together which is there already in the reports,
13  and do simple statistical tests.
14  BY MR. SNELL:
15     Q.  Have statistical tests been done on
16  these explanted mesh specimens that you've
17  looked at?
18     A.  Not yet.
19     Q.  You personally haven't done any
20  statistical analyses on any of the explanted
21  mesh specimens that you've been involved in?
22     A.  Yes, I did.  But that was before
23  Boston -- Ethicon, so it was -- first we started
24  with hernia meshes, then we compared hernias to
25  scar without the mesh, normal, so done

Page 77

1   statistics with that.  That was part of my
2   research.
3      Q.  You haven't done any statistical
4   analyses on any of the Ethicon meshes, correct?
5      A.  No, not yet.
6      Q.  You haven't done any statistical
7   analyses on any of the Ethicon TVT-O meshes,
8   correct?
9      A.  Not specific.  I measured some
10  parameters.  But specifically for correlation
11  with clinical symptoms, I mean the correlation
12  coefficients and so forth, no.  The research
13  project is planned to correlate large set of
14  data.
15     Q.  How large of a data set is this
16  research project plan to correlate?
17     A.  Right now I have over 70 transvaginal
18  meshes explanted, different manufacturers,
19  different designs.  Some of them are more
20  described; I mean there was more data for some,
21  and there is less data for others.
22     Q.  How do you know what statistical
23  analyses you're going to do on this large data
24  set?
25     A.  Well, I mean there are two things you

20  (Pages 74 to 77)

Vladimir Iakovlev, M.D.

Page 78

1    can do with retrospective data.  You can check
2    for correlation between two parameters, or you
3    can check if there is statistical difference
4    between two groups and then you can separate
5    patients by groups, by specific feature,
6    assuming if we -- talking about correlation, I
7    can measure thickness of degradation bark and
8    correlate it with in vivo exposure time, that
9    example of correlation coefficient.  Tests
10   between two linear parameters.
11        If we separate them into sort of
12   positive-negative groups, then specific
13   feature -- frequency of specific feature can be
14   measured if it's statistically significant,
15   assuming you separate it by, you see nerves
16   ingrown or not ingrown, so separate two samples
17   and then you measure nerve density, and then you
18   measure statistical significance between nerve
19   density between group where you see ingrown
20   nerves or you don't, because this is
21   positive-negative separation.
22       Q.  So you could calculate statistical
23   significance to see whether there's a true
24   statistical difference in nerve density and an
25   area where you see nerves around the mesh versus

Page 79

1    where you see -- versus an area away from the
2    mesh, is that what you're saying?
3        A.  What we've done, we took scar tissue
4    from inguinal canal without the mesh, when the
5    hernia was repaired, and then we measured nerve
6    density in the scar within the mesh from the
7    same hernia -- well, from the same type of
8    hernia surgery.  And then we took normal tissue
9    which was done -- which was taken before any
10   repairs, and then we compared.  So this is
11   example of checking for statistical
12   significance, and see if nerve density gross up,
13   down, then can make a conclusion that mesh
14   either inhibits or promotes nerve proliferation
15   or nerve ingrowth.
16        The protocols need to be designed to
17   answer specific questions.  When I collect all
18   data, then there will be several tests
19   performed, depending on questions.
20       Q.  So as you sit here today, you haven't
21   statistically analyzed the nerve density for the
22   Ethicon transvaginal mesh explants?
23       A.  No.  It's a work in progress.  I need
24   larger set.  And probably I will test if
25   specific brands somehow affect that, if there is

Page 80

1    statistical significance between brands.
2        Q.  In your report you list six TVT-O
3    specimens, correct?
4        A.  Yes.
5        Q.  And that's a small "n," correct?
6        A.  That's a small group, yes.
7        Q.  And the smaller the "n," the smaller
8    the number of samples one is working with, when
9    you do statistical analyses you have larger
10   confidence intervals?
11       A.  Well, the tests will show you, if
12   there is such a huge difference between the
13   groups, six samples will pull it off.  I just
14   use specific tests which are accurate and
15   sensitive.  I mean there are different tests,
16   parametric, non-parametric.  As I said, if it's
17   a big difference, even six samples will show it,
18   if you define that significance is up to
19   95 percent.
20       Q.  But as you -- just so we're clear, as
21   you sit here, you haven't done that?
22       A.  No.
23       Q.  And you haven't determined which
24   particular factors you may look at, correct?
25       A.  No, not specifically in a protocol.  I

Page 81

1    can at least view which will probably be in the
2    protocols, a few features.
3        Q.  What are those?
4        A.  Nerve ingrowth, nerve density,
5    vascular growth, vascular density, amount of
6    scar tissue, amount of inflammation, degree of
7    deformation, thickness of degradation bark,
8    muscle attachment, cause of perforation, nerve
9    atrophy.  That's what came to mind in a short
10   list.
11       Q.  Okay.  How did you come to know
12   Dr. Steege?
13       A.  Through the litigation process.
14       Q.  Who put you in touch with Dr. Steege?
15       A.  Dr. Margaret Thompson.  We started
16   discussing this for other litigation sometime in
17   the fall 2013.
18       Q.  Dr. Margaret Thompson works with one
19   of the Plaintiffs' law firms, correct?
20       A.  Yes.
21       Q.  So the Plaintiffs' law firms put you
22   in touch with Dr. Steege, correct?
23          MR. FABRY:  Objection.  Form,
24   misquotes the testimony.
25       A.  Yes, he was -- yes.

21 (Pages 78 to 81)

Vladimir Iakovlev, M.D.

Page 82

1    BY MR. SNELL:
2        Q.  You didn't know John Steege before the
3    Plaintiffs' law firms put you in touch with him,
4    correct?
5            MR. FABRY:  Objection.  Form.
6        A.  No.
7    BY MR. SNELL:
8        Q.  Had you ever met Dr. Steege before you
9    began in collaborative research project with
10   him?
11           MR. FABRY:  Objection.  Form.
12       A.  No.  I haven't met him actually.
13   BY MR. SNELL:
14       Q.  Did you know Dr. Steege at all before
15   you began this collaborative research project
16   with him?
17           MR. FABRY:  Objection.  Form.
18       A.  No.
19   BY MR. SNELL:
20       Q.  You didn't go to school with him,
21   correct?
22       A.  No.
23       Q.  Didn't do a residency with him,
24   correct?
25       A.  No.

Page 83

1        Q.  Didn't do a fellowship with
2    Dr. Steege, correct?
3        A.  No.
4        Q.  You've never done any prior research
5    with Dr. Steege before this collaborative
6    research project, correct?
7            MR. FABRY:  Objection.  Form.
8        A.  No.
9    BY MR. SNELL:
10       Q.  You understand Dr. Steege is a paid
11   expert for the Plaintiffs in this litigation,
12   correct?
13       A.  Yes, I do.
14       Q.  Have you personally met Dr. Steege?
15       A.  No.
16       Q.  Have you seen him via videoconference?
17       A.  No, we had only audio conference.
18       Q.  How many audio conferences have you
19   had with Dr. Steege?
20       A.  Sometimes it's hard to say who is in
21   the conference, who is participating.  I think
22   at least one or two times we had teleconference,
23   but it was not specifically for TVT litigation,
24   for Ethicon litigation.
25       Q.  When did you first get in touch with

Page 84

1    Dr. Steege?
2        A.  Sometime in fall 2013.
3        Q.  You know Dr. Steege is an expert in
4    the Edwards case for the Plaintiffs?
5        A.  You're telling me.  Yes, now I know.
6        Q.  Your materials list --
7        A.  Oh, yes, he is, because -- see, my
8    concern was that he could have been for
9    different litigation.
10           Yes, he is.
11       Q.  You know Dr. Steege is an expert in
12   the Huskey case for the Plaintiffs, correct?
13       A.  Yes.
14       Q.  And you know that because you saw his
15   expert report, correct?
16       A.  Yes.
17       Q.  When did you first get in touch with
18   Dr. Jerry Blaivas?
19       A.  Sometime -- that was actually this
20   year, early this year.
21       Q.  How did you come to get in touch with
22   Dr. Jerry Blaivas?
23       A.  During litigation process.
24       Q.  Who put you in touch with Dr. Jerry
25   Blaivas, Plaintiffs' expert?

Page 85

1        A.  Attorneys from Motley Rice.
2        Q.  Which specific attorney from Motley
3    Rice put you in touch with Dr. Jerry Blaivas?
4        A.  I think it was Dr. Thompson, but I'm
5    not sure now.  I have to think if it was
6    Dr. Thompson.
7        Q.  What communications have you had with
8    Dr. Jerry Blaivas, Plaintiffs' expert, in the
9    Edwards and Huskey cases?
10       A.  We never discussed Huskey and Edwards
11   case.
12       Q.  What communications have you had with
13   Dr. Jerry Blaivas?
14       A.  We had discussions regarding generally
15   transvaginal meshes, but we did not discuss this
16   patient specifically.
17       Q.  Before the attorneys from Motley Rice
18   put you in contact with Dr. Blaivas, did you
19   know him?
20       A.  No.
21       Q.  Do you have Dr. Blaivas' contact
22   information so that when you want to talk to him
23   you can get in touch with him?
24       A.  Yes, through e-mail.
25       Q.  And that information was provided by

22 (Pages 82 to 85)

Vladimir Iakovlev, M.D.

Page 86

1    the Plaintiffs' lawyers?
2         MR. FABRY: Objection. Form.
3         A. I now don't remember if he e-mailed me
4    first or somebody connected. But we have e-mail
5    conversation. I met him personally as well.
6    BY MR. SNELL:
7         Q. You've e-mailed Dr. Blaivas?
8         A. Yes.
9         Q. All right. Has he e-mailed you?
10        A. Yes.
11        Q. Have you written to him other than
12   e-mails, you know, in a letter, or sent anything
13   in writing to him?
14        A. No.
15        Q. When did you meet Dr. Blaivas?
16        A. Sometime early this year.
17        Q. And why did you meet with Dr. Blaivas?
18        A. Again, to discuss the possible
19   collaboration or planned collaboration, because
20   he has specific clientele, so he extracts the
21   samples, and he has a large experience.
22        Q. So you met with Dr. Blaivas to discuss
23   the transvaginal meshes?
24        A. Yes.
25        Q. Do you know Dr. Blaivas is being paid

Page 87

1    as an expert by the Plaintiffs?
2         A. Yes.
3         Q. Where did this meeting take place?
4         A. That was in Chicago.
5         Q. Where at in Chicago?
6         A. In my hotel room.
7         Q. Do you know the date when you were
8    staying at this hotel room?
9         A. No, I don't remember.
10        Q. Who else was there in the hotel room
11   besides you and Dr. Blaivas?
12        A. Nobody.
13        Q. Why were you in Chicago?
14        A. I had a deposition there.
15        Q. What deposition?
16        A. For the litigation, transvaginal
17   litigation.
18        Q. Which one?
19        A. AMS.
20        Q. But you didn't meet Dr. Blaivas --
21   strike that.
22             At what time did you meet Dr. Blaivas?
23        A. Oh, it was late at night.
24        Q. Late at night?
25        A. Yes. We were crossing. I was flying

Page 88

1    out early morning, and he just landed late
2    night, so hotel was right in the airport and we
3    agreed to meet.
4         Q. How long did that meeting take place
5    between Dr. Blaivas and yourself?
6         A. An hour, maybe just over an hour.
7         Q. What did Dr. Blaivas say to you during
8    that hour-long meeting?
9         A. We discussed transvaginal meshes, and
10   his findings, his experience. And I told him --
11   or explained what I see in the pictures.
12        Q. Why was Dr. Blaivas in Chicago?
13        A. I don't know. He could have been
14   meeting somebody from the same law firm. I
15   don't know.
16        Q. Dr. Rosenzweig is a Plaintiffs' expert
17   in this litigation, he's in Chicago. Are you
18   certain you've never met him or talked to him?
19        A. No.
20        Q. You're not certain, or you are
21   certain?
22        A. Repeat his name?
23        Q. Rosenzweig.
24        A. I have never seen him.
25        Q. Have you heard his name, though, other

Page 89

1    than -- strike that.
2             Have you heard his name prior to when
3    I raised his name with you?
4         A. No.
5         Q. Have you had any other meetings with
6    Dr. Blaivas?
7         A. No.
8         Q. This collaborative research project,
9    besides Drs. John Steege and Jerry Blaivas, are
10   there any other pathologists involved?
11        A. I'm the only pathologist in this.
12        Q. Are there any material scientists
13   involved in this collaborative research project?
14        A. These two physicians?
15        Q. Yes, in the project that you're
16   involved in.
17        A. I do have collaborative project with
18   material scientists.
19        Q. Who are they?
20        A. We're going back to the same question.
21   I don't know if they are experts. And if they
22   are not, then I'm disclosing their names that
23   they're involved in this, so I'm not sure if I
24   can give away this information.
25        Q. Dr. Kleiman?

23  (Pages 86 to 89)

Vladimir Iakovlev, M.D.

Page 90

```
1        A.  No.
2        Q.  Anybody from Germany?
3   Dr. Klosterhalfen?
4        A.  No.
5        Q.  Tomas Mühl, Tomas Mühl?
6        A.  No.
7        Q.  Dr. Jordi?
8        A.  No.
9        Q.  Dr. Dunn?
10       A.  Yes.  His name is -- you mean from
11  Vanderbilt?
12       Q.  Yes.
13       A.  Yes, yes, his name is -- he's doing
14  one of the testing.
15       Q.  What test is Dr. Dunn doing?
16       A.  It's spectral analysis of surface
17  polypropylene filaments.
18       Q.  Who else from Vanderbilt is involved
19  in this project besides Dr. Dunn?
20       A.  Coming back to the same situation.  If
21  you list the names and you tell me that you're
22  entitled to hear the name, I will say yes.
23       Q.  My position is I'm entitled to know
24  all these folks who are Plaintiffs' experts in
25  the mesh litigation.
```

Page 91

```
1        A.  If it's -- if he's involved in this
2   litigation, yes, I can tell.  But I need to see
3   the list.  The same thing, if you list the names
4   I'll tell you.
5        Q.  You know in your head who these
6   Plaintiffs' experts are, correct?
7            MR. McCONNELL:  Wait a minute.  We've
8   already gone through the routine.  If you're
9   going to list a name, he'll say yes or no.
10           MR. SNELL:  We are wasting time --
11           MR. McCONNELL:  No, we're not.
12           MR. SNELL:  -- me having to go through
13  and extract this stuff like I'm at a dentist
14  office.
15           MR. McCONNELL:  We're being very
16  precise, and he's protecting privileges of
17  potential confidential situations with other
18  subjects.  If you have a name, you can ask him,
19  he'll answer yes or no.  That's how it's been
20  working.
21           MR. SNELL:  He's testified that
22  Plaintiffs' experts -- or Plaintiffs' law firms
23  are paying him for this collaboration, or at
24  least part of it.  Are you telling me that
25  there's a privileged attached to that?
```

Page 92

```
1            MR. FABRY:  Well, actually let's be
2   real precise.  It's a planned possible project.
3   And in terms of what's relevant to this
4   particular case or cases, going through a list
5   of the experts in this case and whether those
6   folks are involved in the potential project,
7   that seems to be a fair and reasonable scope.
8            MR. SNELL:  Well, I'll keep going.
9   But we're going to get all the names eventually.
10  So I mean we can spend all day going through the
11  names.
12  BY MR. SNELL:
13       Q.  So Dunn from Vanderbilt, how did you
14  come to meet Dr. Dunn?
15       A.  Because he's doing an XPS analysis,
16  and when the question became if we converge the
17  XPS analysis, we and the doctors did.
18       Q.  Who put you in touch with Dr. Dunn?
19       A.  That's the name, I guess, we are stuck
20  with, because it's another researcher who is
21  doing collaboration with him.
22       Q.  The Plaintiffs' lawyers were the ones
23  who ultimately put you in touch with Dr. Dunn,
24  correct?
25       A.  No.  I contacted him through another
```

Page 93

```
1   researcher.
2        Q.  How did you contact Dr. Dunn?
3        A.  Through another researcher.
4            I have to clarify that the project
5   with Dr. Blaivas is not actually paid or will
6   not be paid by the attorneys, because the plan
7   was for future specimens, so specimens he'd
8   already done outside of the litigation process.
9   And we specifically discussed that this will not
10  be covered by either industry or lawyers.  And I
11  have some funds for this.
12           So we cannot apply blanket statement
13  that these projects are paid by law firms.
14       Q.  Do you know how much Dr. Blaivas has
15  been paid by Plaintiffs' law firms for the mesh
16  litigation?
17       A.  No.  But this exact project was
18  designed, or is in discussion to be designed to
19  be specifically free of any external funding.
20       Q.  Is there a protocol that you're
21  referencing?
22       A.  We have not made formal protocol.  But
23  in the discussion we were talking about
24  retrospective and prospective specimens from his
25  clientele, and specifically that cost will be
```

24 (Pages 90 to 93)

Vladimir Iakovlev, M.D.

Page 94

1    absorbed by either my research funds or his
2    research funds.
3        Q.   Your research funds, how do you gather
4    those?
5        A.   Those specifically, I have like a
6    nonspecific fund which was provided by my
7    university.  Then I can apply for grants.
8        Q.   Are you going to use meshes that
9    you've gathered in the mesh litigation in your
10   analyses?
11       A.   Yes, they are providing statistics.
12       Q.   Are you going to use meshes from the
13   mesh litigation in your analyses for which you
14   have been paid money by Plaintiffs' experts?
15           MR. McCONNELL:  Objection.
16       A.   Well, I mean I will combine them with
17   all available material.  And with available
18   material, as I said, some of it came within
19   litigation process, some of it came as
20   St. Michael's patients, some of it came as
21   patients of other hospitals outside of the
22   litigation process.
23   BY MR. SNELL:
24       Q.   Have you ever met Dr. Dunn?
25       A.   No.

Page 95

1        Q.   Have you e-mailed Dr. Dunn?
2        A.   He was in the chain of e-mail when we
3    were discussing the project.
4        Q.   Any conference calls with Dr. Dunn?
5        A.   I don't think so.
6        Q.   Did you ever have any conference calls
7    with Dr. Blaivas?
8        A.   I don't think so.
9        Q.   Guelcher?
10       A.   Yes, that's the --
11       Q.   That's the other Vanderbilt person,
12   right?
13       A.   Yes.
14       Q.   That you're involved in in this
15   collaborative project, correct?
16       A.   Yes.
17       Q.   You understand Guelcher is an expert
18   for the Plaintiffs?
19       A.   Now I do.  You told me.
20       Q.   Who put you in touch with Plaintiffs'
21   expert Guelcher?
22       A.   It was for other litigation process,
23   attorneys with Motley Rice.
24       Q.   Which attorney?
25       A.   I don't remember.

Page 96

1        Q.   When were you put in touch with
2    Dr. Guelcher?
3        A.   Say it again?
4        Q.   When were you first put in touch with
5    Dr. Guelcher?
6        A.   It was sometime in fall of 2013.
7        Q.   What's Dr. Gulcher's role in this
8    project involving transvaginal meshes?
9        A.   He analyzes data together with
10   Dr. Dunn and interprets it.
11       Q.   And the transvaginal meshes that
12   Dr. Guelcher is involved in analyzing data for,
13   some of those are meshes from litigation?
14       A.   Yes.
15       Q.   How many -- strike that.
16           Have you ever e-mailed Dr. Guelcher?
17       A.   Yes, we have communication through
18   e-mail.
19       Q.   Have you ever had conference calls
20   with Dr. Guelcher?
21       A.   Yes, we have.
22       Q.   How many conference calls?
23       A.   I don't remember.  As I said,
24   sometimes you don't know who is in the
25   conference call.  At least one.

Page 97

1        Q.   Have you ever met Dr. Guelcher in
2    person?
3        A.   Yes.
4        Q.   How many times have you met
5    Dr. Guelcher?
6        A.   I believe one time.
7        Q.   Where did you meet Dr. Guelcher?
8        A.   He came to my office in Toronto.
9        Q.   Why was he in Toronto?
10       A.   We were discussing findings.
11       Q.   So Dr. Guelcher flew up to your office
12   in Toronto to discuss transvaginal mesh
13   findings, correct?
14       A.   Yes.
15       Q.   Who paid for his plane ticket to get
16   to your office in Toronto?
17       A.   I don't know.
18       Q.   How long was Dr. Guelcher up in
19   Toronto when he came to see you?
20       A.   Several hours.
21       Q.   How long did you meet with
22   Dr. Guelcher when he came to see you in Toronto
23   about transvaginal mesh?
24       A.   Maybe two hours.
25       Q.   And you and Dr. Guelcher discussed

25 (Pages 94 to 97)

Vladimir Iakovlev, M.D.

Page 98

1    transvaginal mesh during that meeting in
2    Toronto?
3        A.  Yes.
4        Q.  And some of those meshes are from the
5    mesh litigation, correct?
6        A.  Yes, some of them.  Yes.  But not all
7    of them.
8        Q.  And have you been to Vanderbilt?
9        A.  No.
10       Q.  Are you planning to go see
11   Dr. Guelcher?
12       A.  Not at this time.
13       Q.  Do you have any trips planned to see
14   any other Plaintiffs' experts?
15       A.  Not at this time.
16       Q.  Do you have any plans to see any
17   Plaintiffs' experts while you're here in Boston?
18       A.  No.
19       Q.  Are you going to go to New York City
20   and see Dr. Blaivas?
21       A.  Not at this time.
22       Q.  Before Plaintiffs' lawyers put you in
23   touch with Dr. Guelcher, you didn't know him at
24   all, correct?
25       A.  No.

Page 99

1        Q.  No, I'm wrong; or yes, I'm correct?
2        A.  Yes, you're correct, I had not known
3    him.
4        Q.  And Dr. Guelcher is the one who put
5    you in touch with Dr. Dunn, correct?
6        A.  Yes.
7        Q.  And how did Dr. Guelcher put you in
8    touch with Dr. Dunn?
9        A.  We needed to discuss the protocol, how
10   we supply the specimens, and how they are
11   processed.
12       Q.  You just testified "we needed to
13   discuss the protocol, how we supply the
14   specimens, and how they are processed."  What do
15   you mean by that?
16       A.  Because specimens were in my lab, I
17   needed to separate them, separate filaments, and
18   ship them to Vanderbilt.
19       Q.  Have you sent anything to Vanderbilt
20   regarding the transvaginal mesh litigation?
21       A.  The samples.
22       Q.  The mesh samples?
23       A.  Yes.
24       Q.  When did you send the mesh samples?
25       A.  I believe it was early this year.

Page 100

1        Q.  In January of this year, 2014?
2        A.  I believe it was January, yes.  It
3    wasn't that long ago.  It was earliest December,
4    late February, sometime within that time frame.
5        Q.  Which mesh samples did you send to
6    Vanderbilt to the other Plaintiffs' experts?
7        A.  It was not Ethicon.
8        Q.  Which ones were they?
9        A.  It was a sling, but not Ethicon.
10       Q.  Which sling was it?
11       A.  I don't remember now.  I have to see
12   the recording which exactly.  I remember it was
13   a sling.
14       Q.  You have a record of the sling that
15   you did ship to the other Plaintiffs' experts in
16   Vanderbilt.  As you sit here today, you don't
17   recall the type of sling?
18       A.  Yes.
19       Q.  Was it a single sling you shipped to
20   the other Plaintiffs' experts in Vanderbilt?
21       A.  It was multiple filaments.
22       Q.  What do you mean by "multiple
23   filaments"?
24       A.  Filaments were --
25       (Phone interruption.)

Page 101

1    BY MR. SNELL:
2        Q.  Let me go back because we had an
3    interruption.
4            What do you mean by multiple filaments
5    which were shipped to the Plaintiffs' experts in
6    Vanderbilt by you?
7        A.  The filaments were separated from the
8    mesh, so I had to pick under microscope
9    filaments which were pulled out of the tissue
10   without tissue.  Because you need to do analysis
11   on the mesh which is free of tissue, have
12   exposed surface, so I could do it.
13       Q.  How did you pick the filaments out of
14   the mesh in the tissue?
15       A.  Use forceps and scalpel.
16       Q.  Did the other Plaintiffs' experts tell
17   you how to pick the filaments out of the
18   transvaginal mesh samples?
19       A.  No.
20       Q.  Is that something you devised on your
21   own?
22       A.  Yes.
23       Q.  When you testified you had to work on
24   this protocol regarding taking the filaments
25   out, what protocol are you talking about?

26 (Pages 98 to 101)

Vladimir Iakovlev, M.D.

Page 102

1      A.  The question is the chemical
2   composition of the surface.  So filaments were
3   either from a brand new mesh sling or specimens
4   which are from explanted mesh, and then
5   filaments can also be mechanically scratched to
6   remove the degradation layer.  So these are the
7   possibilities to create control samples and test
8   samples.
9      Q.  And that's part of what you discussed
10  with the Plaintiffs' experts from Vanderbilt,
11  Dr. Dunn and Guelcher?
12     A.  Yes, but the -- I designed the
13  protocol of excision and preparation.
14     Q.  Did you bring that protocol with you
15  today?
16     A.  No, because it's not for this
17  litigation.  I'm still concerned that I'm
18  disclosing this because it was for different --
19  not within the Ethicon.
20     Q.  And this is -- you didn't send any
21  filaments to Drs. Dunn and Guelcher from the
22  Ethicon TVT mesh?
23     A.  No.
24     Q.  Why not?
25     A.  Because I did not have a sample of

Page 103

1   Ethicon mesh excised and not exposed to
2   formalin.  I had a specific sample which
3   happened to be dry and tissue-free, this is rare
4   occurrence.  So if it's not exposed to formalin
5   you avoid artifacts of formalin, if it's pulled
6   out of tissue clean with the tissue you do not
7   clean the filaments, so you avoid artifacts of
8   tissue cleaning, therefore you measure exactly
9   what was in vivo.
10     Q.  So if there's been exposure to
11  formalin or -- if there's exposure to formalin,
12  there could be artifacts from that?
13     A.  There can be hypothesis that it can
14  create artifacts.
15     Q.  You just testified there can be
16  artifacts, correct?
17     A.  I did not say that there can be, but
18  possible.  I think I testified possible.
19     Q.  And there can be artifacts from it
20  when it's exposed to the body?
21     MR. FABRY:  Objection to form.
22  BY MR. SNELL:
23     Q.  Is that you testified to?
24     A.  No.  You test if the changes to
25  polypropylene mesh occur in vivo, and you try to

Page 104

1   avoid artifacts of fixation, or you try to avoid
2   measuring chemical composition of the body
3   parts.  That's why you need clean filament not
4   exposed to formalin.  This provides you the
5   cleanest protocol for the experiment.
6      Q.  And do you plan on doing this analysis
7   on the Ethicon TVT meshes?
8      A.  No.  I don't have a mesh which was
9   excised in this fashion from Ethicon.
10     Q.  The multiple filaments that you
11  separated, was that from one mesh or multiple
12  meshes?
13     A.  From one mesh.  One mesh.
14     Q.  Do you know the manufacturer of that
15  mesh as you sit here today?
16     A.  No.  I think I stated that I don't
17  remember.
18     Q.  Where did that mesh come from?
19     A.  You mean who supplied the specimen?
20     Q.  Yes.
21     A.  It was part of litigation process, a
22  litigation process, I don't remember which one,
23  though.
24     Q.  Was it sent by Steelgate to you?
25     A.  I don't remember that either.  Because

Page 105

1   I received specimens from at least two
2   depositories, and Mueller Law directly.  So
3   there was three sources, at least three sources.
4      Q.  So there are at least three sources
5   where you get meshes from -- strike that.
6         There are at least three sources where
7   you get transvaginal meshes which are involved
8   in the litigation; one being Steelgate, correct?
9      A.  Yes.
10     Q.  One being Mueller's law firm, correct?
11     A.  Yes.
12     Q.  And the third is what?
13     A.  Another depository, it's something
14  Bio, but I don't remember exact name.
15     Q.  Do you know where this -- is it a
16  company, Bio?
17     A.  It's a company.
18     Q.  Are they in Canada, or the United
19  States?
20     A.  United States.
21     Q.  Where are they at?
22     A.  I don't remember.
23     Q.  Biosynthesis?
24     A.  I don't remember.  It was smaller
25  number, maybe five, six samples.

27 (Pages 102 to 105)

Vladimir Iakovlev, M.D.

Page 106

1      Q.  How many samples have you gotten from
2  Steelgate?
3      A.  I can't tell you now.  It's at least
4  40, 50.
5      Q.  Do you have a list somewhere of the
6  samples you received from Steelgate?
7      A.  I have a list of samples I have, and
8  then there's information where they came from,
9  yes.
10     Q.  Do you have that -- did you bring that
11 list today?
12     A.  No.
13     Q.  The six TVT-O meshes, where did they
14 come from?
15     A.  I would have to check.
16     Q.  You don't have any documentation today
17 as to where they came from?
18     A.  No.
19     Q.  How many meshes did you get from --
20 strike that.
21         How many of these transvaginal meshes
22 involved in litigation did you get from Mueller?
23     A.  At least one.
24     Q.  Is that the best you can do?
25     A.  Ms. Edwards' came from there.

Page 107

1      Q.  Any others?
2      A.  From what I recall, I think others
3  came from Steelgate.  But again, I would have to
4  check with my records.
5      Q.  Your records would document whether
6  they came from Mueller, Steelgate, or this other
7  company, correct?
8      A.  Yes.  I have chain of custody forms.
9  Six samples we are talking about; five from law
10 firms, one was St. Michael's Hospital patient.
11 So one sample wasn't within litigation process,
12 I just received it, and it was identified as
13 Ethicon, and I could clearly see blue color of
14 the filaments.
15     Q.  The one from St. Michael's, what
16 patient is that?  Is that in this litigation?
17     A.  I analyzed it, so I find features for
18 Ethicon.
19         MR. FABRY:  You're saying it's not
20 litigation?
21 BY MR. SNELL:
22     Q.  That's what I'm asking, is it
23 litigation.  Is the St. Michael's -- strike
24 that.
25         Is the sample you received from

Page 108

1  St. Michael's for a patient who is involved in
2  mesh litigation?
3      A.  No.
4      Q.  How did you come to receive this
5  sample from St. Michael's then?
6      A.  It's part of my job.  I receive
7  specimens from patients.  Just one of the
8  patients happened to have identified Ethicon
9  mesh.  I mean there are others, I mean sometimes
10 I cannot identify which manufacturer, and it's
11 not recorded if it's inserted elsewhere.  But
12 for this specific, it was identified, and I
13 could verify it by blue color.
14     Q.  What are the five different law firms
15 that you receive the TVT-O meshes from?
16     A.  Repeat the question, please?
17     Q.  Sure.
18         I believe you testified you had gotten
19 TVT-O meshes from five different law firms.  Is
20 that wrong?
21     A.  No, not five different law firms.
22     Q.  So you got TVT-O meshes on five
23 different Plaintiffs in this litigation
24 involving Ethicon TVT meshes?
25     A.  I examined six excised or explanted

Page 109

1  meshes with confirmed Ethicon brand:  One of
2  this is Plaintiff for this litigation,
3  Ms. Edwards; four came from law firms, were sent
4  to me; and one was St. Michael's patient.
5      Q.  And the explant for Mrs. Edwards, that
6  came from the Plaintiffs' law firm?
7      A.  Yes.  It came from Mueller Law.
8      Q.  You have to speak up a little bit just
9  so she can hear you.
10     A.  Mueller Law.
11     Q.  Kulkarni, K-U-L-K-A-R-N-I, do you know
12 a Dr. Kulkarni?
13     A.  No, I never heard his name.
14     Q.  David Eberle?
15     A.  (Nodding in the negative).
16     Q.  Ron Luke.
17     A.  I didn't have any contacts with
18 anybody else.
19     Q.  Pandit?
20     A.  We listed everybody already.  I mean
21 all other researchers I collaborated were
22 outside the litigation process.
23     Q.  So other than Drs. Steege, Blaivas,
24 Dunn, and Guelcher, all the other researchers
25 are not experts for the Plaintiffs?

28 (Pages 106 to 109)

Vladimir Iakovlev, M.D.

Page 110

1    A.  No.  I stated I collaborated with
2    Dr. Bendavid.
3    Q.  You didn't state that.
4    A.  In this statement, that's how -- my
5    involvement in the meshes.  It's Page 1.
6    Q.  You're aware Dr. Bendavid is an expert
7    for the Plaintiffs?
8    A.  For this specific?  I'm not.  I don't
9    know.
10    Q.  You're aware Dr. Bendavid is an expert
11    for Plaintiffs in transvaginal mesh litigation?
12    A.  For Ethicon litigation, I don't know.
13    Q.  I'm not asking for Ethicon litigation.
14    If my question includes something
15    specific to for Ethicon litigation, then that's
16    what I mean.  If my question doesn't include
17    that, it's broader.  So...
18    A.  Then I --
19    Q.  You know, you just told me you know
20    Dr. -- strike that.
21    You know Dr. R. Bendavid is an expert
22    for the Plaintiffs in mesh litigation, correct?
23    MR. McCONNELL:  Objection.
24    A.  See, I know that he's not -- at least
25    I'm not aware that he's an expert for this

Page 111

1    specific litigation.  If I tell you that I know
2    that he is expert for other litigation, then I'm
3    disclosing information which may be confidential
4    to Dr. Bendavid, so we're back to the same
5    question.
6    BY MR. SNELL:
7    Q.  Dr. Bendavid is an expert in hernia
8    litigation for the Plaintiffs, correct?
9    A.  I don't know.  He could have been in
10    the past.  I don't know.
11    Q.  What is your understanding, who is
12    Dr. Bendavid an expert for?
13    A.  He's a surgeon.  He contacted me to do
14    research on hernia meshes for research purposes.
15    Q.  When did Dr. Bendavid contact you to
16    do this research on hernia meshes?
17    A.  2012.
18    Q.  What year?  You said --
19    A.  2012.
20    Q.  What month of 2012 did Dr. Bendavid
21    contact you to do research on hernia meshes?
22    A.  It was sometime in the second half.  I
23    don't remember exact month, but it was close to
24    the end, after summer.
25    Q.  You knew at that time that

Page 112

1    Dr. Bendavid was an expert for Plaintiffs in
2    litigation involving hernia meshes?
3    MR. FABRY:  Objection.  Form,
4    misquotes testimony.
5    A.  No.  I didn't know about any
6    litigation process until June of 2013.
7    BY MR. SNELL:
8    Q.  How did you come to learn about the
9    litigation in June of 2013, as you claim?
10    A.  I think it all started with
11    Ms. Edwards.
12    Q.  So from sometime in 2012 when you
13    contacted Dr. Bendavid up until June, 2013, you
14    didn't know anything about mesh litigation, is
15    that what you're testifying to?
16    MR. FABRY:  Objection.  Form,
17    misquotes the testimony.
18    A.  Yes.
19    BY MR. SNELL:
20    Q.  And how did you come to learn of the
21    mesh litigation in June of 2013?
22    A.  I received a specimen from
23    Ms. Edwards, and two other specimens, and then
24    -- I received them from Mueller Law, and then I
25    processed them as routine diagnostic samples as

Page 113

1    I would examine any other specimen.  And they
2    asked me what findings I have.  I stated what I
3    have, and it was in my report.  And then they
4    said "would you be able to be expert?"
5    Q.  Do you know how many cases
6    Dr. Bendavid has looked at for the Plaintiffs in
7    mesh litigation?
8    A.  I don't know.
9    Q.  Do you know how much he's been paid?
10    A.  I don't know.  I don't know if he is
11    an expert.
12    Q.  Is Dr. Bendavid involved in this
13    collaborative research project with Dr. Blaivas
14    and Steege and Dunn and Guelcher?
15    A.  No, because he is in hernia.  These
16    specialists are in transvaginal.  We may have
17    names on our research papers because some
18    features overlap just to have a broader
19    discussion.
20    Q.  What research papers are you
21    discussing or referencing?
22    A.  Future, what we can come up with.  But
23    he doesn't do anything specifically for these
24    projects, except for maybe writing discussion
25    parts for the papers.

29 (Pages 110 to 113)

Vladimir Iakovlev, M.D.

Page 114

1    Q. Have you seen the results of any of
2  the testing that Drs. Dunn or Guelcher have
3  performed on these filaments?
4    A. There was a very short communication,
5  it was just e-mail, not something formal.
6    Q. But do they tell you what their at
7  least preliminary analyses were showing
8  regarding the filaments you sent them?
9    A. Yes. I mean that was the e-mail, they
10  measured some traces of this. I didn't go into
11  these details.
12    Q. Were there any pictures, photographs,
13  or diagrams of the spectral analyses done by
14  Drs. Dunn and Guelcher in that e-mail?
15    A. No.
16    Q. When Dr. Ben -- is it your testimony
17  that Dr. Bendavid approached you to do work on
18  hernia meshes?
19    A. Yes.
20    Q. And is it your testimony under oath
21  that you didn't know that he was an expert for
22  Plaintiffs involved in hernia mesh?
23    A. Yes, I didn't know.
24    Q. So what did he say to you when he
25  approached you?

Page 115

1    A. All he said that there is -- there are
2  two techniques to repair hernias, which is
3  tension repair when you approximate tissue, and
4  then there is a mesh when you put a tension-free
5  repair. So he believes that surgeons who are
6  skillful enough, they can repair hernia without
7  mesh. And he sees more complications after
8  meshes rather than without the mesh. But he
9  didn't understand exactly why it's painful or
10  why other changes occur, and he proposed a
11  project to look at it under microscope more
12  carefully than usually is done.
13    Then he supplied samples from patients
14  outside of litigation, it wasn't litigation,
15  just routine prospectively collected patients
16  coming in to Shouldice Hospital. They were sent
17  as routine samples, they were processed as
18  routine samples.
19    Q. Now, I believe you earlier testified
20  that you learned of mesh litigation in June of
21  2013, correct?
22    A. Yes.
23    Q. And that's when you received a
24  specimen regarding Mrs. Edwards and some others
25  from Mueller Law, correct?

Page 116

1    A. Yes. When I received the specimens, I
2  think I received one for hernia before -- I
3  didn't know about the litigation. Then I
4  received Ms. Edwards' for transvaginal mesh,
5  still didn't know about the litigation. When I
6  disclosed my findings to requesting law firms, I
7  suspected there might be litigation, but
8  formally I didn't know.
9    Then I became aware that there is a
10  litigation when they asked me to be an expert.
11  So this was --
12    Q. Well, you got Mrs. Edwards specimen
13  from a law firm, correct?
14    A. Yes. I suspected it might be for
15  litigation, but it could have been just to
16  document what -- her planned litigation.
17  Because when you receive a specimen from a law
18  firm you suspect that there might be some
19  litigation. I didn't specifically ask.
20    Q. What; did the Mueller firm just send
21  you these specimens out of the blue?
22    A. I think the contacts were -- I don't
23  actually remember how this whole contact. I
24  don't remember. Possibly through contacts with
25  Dr. Bendavid, then somebody else's contacts.

Page 117

1    Q. You know Dr. Bendavid is involved with
2  Mueller Law Firm, do you know whether that --
3    A. See, if I know or I don't know, then I
4  disclose his confidential information. I don't
5  know if I can give you. I might be able to give
6  you, but then again, I'm concerned about --
7    Q. This involves your work in the Ethicon
8  litigation. How did you come to get involved in
9  the Ethicon litigation?
10    MR. FABRY: Objection. Argumentative.
11    He's already testified that nothing to
12  do with Dr. Bendavid has anything to do with his
13  work in the Ethicon litigation.
14    MR. SNELL: Actually he didn't say
15  that.
16  BY MR. SNELL:
17    Q. How did Mueller get your name? How
18  did Mueller Law Firm get your name?
19    A. I don't know. I don't actually know.
20  It's through Dr. Bendavid's contact, but who
21  specifically gave my name, I don't know. Maybe
22  he, maybe somebody else.
23    Q. Do you have the letter of when they
24  sent these specimens to you?
25    A. I have chain of custody with some -- I

30 (Pages 114 to 117)

Vladimir Iakovlev, M.D.

Page 118

1    mean I had contact with Mueller Law prior to
2    Ms. Edwards.  There was another specimen for a
3    hernia mesh.
4        Q.  When did you first have contact with
5    Mueller Law Firm?
6        A.  It was just before -- now I don't
7    remember if it was Mueller Law.  Ethicon came
8    from Mueller Law.  First sample came as --
9    Ms. Edwards' came from Mueller Law.  It was all
10   through some communication with Dr. Bendavid.
11       Q.  You were aware that Mueller's Law Firm
12   was sending you Mrs. Edwards' mesh before it
13   arrived in Toronto in your office, correct?
14       A.  Yes.
15       Q.  You were anticipating that the
16   Plaintiffs' lawyers were going to send you
17   Mrs. Edwards' mesh specimen, correct?
18       A.  Yes.
19       Q.  And how was it that you knew that the
20   mesh was going to be sent from the Mueller Law
21   Firm to you?
22       A.  I think it was e-mail.  I don't
23   remember.  Could have been phone call, could
24   have been e-mail.
25       Q.  Did you bring here today the

Page 119

1    documents, chain of custody, all of those
2    materials involving Mrs. Edwards' mesh?
3        A.  No.  But I believe you have chain of
4    custody, because I think I sent it.
5        Q.  Do you have any e-mails about
6    Mrs. Edwards' mesh showing what information was
7    packaged with the mesh?
8        A.  I didn't bring it because it was
9    exchange of information with lawyers, and again,
10   I don't know if it's privileged, if I can
11   disclose that.
12       Q.  Was there a letter, cover letter that
13   came with the specimen?  Strike that.
14           Was there a cover letter that came
15   with Mrs. Edwards' specimen?
16       A.  It was at least chain of custody.
17   Then I don't remember what was in the shipment.
18       Q.  Do you have a file on Mrs. Edwards
19   that would have any correspondence from the
20   Plaintiffs' law firms transmitting you
21   materials?
22       A.  Yes, I have my report, possible -- I
23   usually staple them together -- possible
24   previous pathology reports, chain of custody, my
25   report, it's all attached together.

Page 120

1        Q.  Did you bring your Edwards file here
2    today?
3        A.  But you have everything from --
4        Q.  No, no, no.  That's not how it works
5    here.
6            Did you bring your Edwards file here
7    to your deposition today?
8        A.  No.
9            MR. McCONNELL:  For the record, I'm
10   going to object to "that's not how it works."
11   How it works is you ask questions, he answers
12   them.
13           MR. SNELL:  How it works is we asked
14   for materials to be brought to the deposition,
15   including the Edwards case file, he hasn't
16   brought it.  I will tell you my experts bring
17   their case files to their depositions.
18           If you're objecting to him having to
19   produce the Edwards case file --
20           MR. McCONNELL:  I object to extraneous
21   comments from you telling us how it work.  We
22   don't need to hear from you how it works.
23   BY MR. SNELL:
24       Q.  Why didn't you bring the Edwards case
25   file?

Page 121

1            MR. FABRY:  Just want to reiterate the
2    objection to --
3        A.  Because you have everything that was
4    in the --
5            MR. FABRY:  Reiterating the objection
6    that the deposition notice with the lengthy list
7    of requested items was served allegedly Friday
8    and apparently filed Saturday.
9    BY MR. SNELL:
10       Q.  Well, Doctor, we just finalized your
11   deposition plans late last week, didn't we?
12       A.  I don't know when you finalized.  What
13   do you mean?
14       Q.  We just finalized the plans to have
15   your deposition here in Boston late last week,
16   correct?
17       A.  Apparently.
18       Q.  You know I was ready to come to
19   Toronto tomorrow to depose you?
20           MR. FABRY:  Objection.  Argumentative.
21   BY MR. SNELL:
22       Q.  Do you know that?
23       A.  Repeat the question.
24       Q.  Do you know that I was ready to come
25   to Toronto tomorrow to depose you --

31 (Pages 118 to 121)

Vladimir Iakovlev, M.D.

Page 122

1          MR. FABRY: Objection.
2      Q. -- at your place?
3          MR. FABRY: Relevance and
4  argumentative.
5      A. I don't know. I was told that the
6  deposition is taking place here in Boston
7  Monday.
8  BY MR. SNELL:
9      Q. Why are you here in Boston, besides
10 for the deposition?
11     A. No, just for the deposition.
12     Q. Okay. So you weren't here on prior
13 business or meetings?
14     A. No.
15     Q. And all of your materials are in
16 Toronto?
17     A. Yes.
18     Q. Did you bring the Huskey file here
19 today?
20     A. I didn't have anything of Huskey. I
21 had only clinical records.
22     Q. But you didn't bring those today,
23 correct?
24     A. No. I mean these are listed here.
25     Q. Did you look at any explants from

Page 123

1  Mrs. Huskey?
2      A. No.
3          MR. SNELL: Make a note; request to
4  produce all e-mails, communications between the
5  other Plaintiffs' experts and the doctor, the
6  protocol he referenced, his entire Huskey and
7  Edwards files as received.
8  BY MR. SNELL:
9      Q. I'm not sure if I asked you this, but
10 when you met with Dr. Blaivas in Chicago, do you
11 know why he was in Chicago?
12     A. I believe he was meeting someone from
13 Motley Rice. But I'm not sure.
14     Q. That's --
15     A. Maybe he had other business and
16 meeting somebody.
17     Q. But he told you he was planning on
18 meeting someone from Motley Rice?
19     A. Either him or somebody else, somebody
20 from Motley Rice, that they are meeting him. If
21 it was specifically trip to meet someone, I
22 don't know, someone in Motley Rice, I don't
23 know.
24     Q. Did Dr. Blaivas tell you about any
25 analyses or testing he had done on any Ethicon

Page 124

1  meshes when you met with him in Chicago?
2      A. No.
3      Q. Did Dr. Blaivas tell you about any
4  analyses or testing he had done with any meshes
5  involved in the transvaginal mesh litigation
6  during this meeting in Chicago?
7      A. He described his findings, not just
8  transvaginal meshes, his other approaches with
9  native tissue repair, and overall his
10 impression.
11         MR. SNELL: Note to request funding
12 sources and documentation regarding the project
13 between Plaintiffs' experts.
14 BY MR. SNELL:
15     Q. Is your lab bill to Plaintiffs'
16 lawyers separate from your billings?
17     A. Yes. They bill their technical fees.
18     Q. What are their technical fees?
19     A. Accession cases, clerical time, and
20 then processing time for technologists, reagent
21 use. There are specific fees for each
22 procedure.
23     Q. Do you have a protocol for how the
24 mesh specimens are processed that are involved
25 in litigation?

Page 125

1      A. Not specifically for litigation.
2  It's -- as I said, I process them as routine
3  diagnostic samples, as I would any other.
4      Q. Do you know how much your lab has
5  billed Plaintiffs' experts?
6      A. No.
7      Q. You could get that information if you
8  needed to?
9      A. Yes.
10         MR. SNELL: Note to request that.
11 BY MR. SNELL:
12     Q. When you send bills for your work as a
13 Plaintiffs' expert, who do you send them to?
14     A. To my attorney.
15     Q. Which attorney would that be?
16     A. Motley Rice.
17     Q. Who is the attorney at Motley Rice who
18 you have had the most contact with?
19     A. Dr. Margaret Thompson.
20         MR. SNELL: Note to request all
21 invoices.
22 BY MR. SNELL:
23     Q. Number 11 asks for photographs or
24 other images including photos of the Plaintiffs
25 or products taken by you or for you which relate

32 (Pages 122 to 125)

Vladimir Iakovlev, M.D.

Page 126

1   to your opinions in this case.
2        Now, you have some photographs or
3   photomicrographs in your expert report, correct?
4        A.  Yes.
5        Q.  And you may have taken others that are
6   back at your office?
7        A.  Yes.
8        Q.  But you don't have those here today,
9   correct?
10       A.  No.
11       MR. SNELL:  So request those.
12  BY MR. SNELL:
13       Q.  And those relate to your opinions in
14  this case, correct?
15       A.  Yes.
16       MR. McCONNELL:  Objection.
17  BY MR. SNELL:
18       Q.  Any graphics, number 12 is any
19  graphics or charts prepared by you for use at
20  trial.
21       A.  Repeat the question, please?
22       Q.  Yes.
23       Item number 12 asks for any graphics
24  or charts prepared by you for use at trial.  Do
25  you have any such documents?

Page 127

1        A.  Oh, no, I don't have anything.
2        Q.  13 asks for any Ethicon products in
3   your possession.
4        Do you have any Ethicon products?
5        A.  Those I tested, yes, but they are
6   opened now.
7        Q.  Did you bring those Ethicon products
8   that you opened and tested?
9        A.  No.
10       Q.  Do you still have those Ethicon
11  products that you opened and tested?
12       A.  Yes.
13       MR. SNELL:  So request to preserve,
14  request to produce.
15  BY MR. SNELL:
16       Q.  Please retain those products.
17       A.  I do, yes.  I retain everything.
18       Q.  And that was a TVT-O sling that you
19  tested?
20       A.  TVT and TVT-O use the same mesh.  Yes,
21  it was TVT-O.
22       Q.  Are you looking at Page 33 of your
23  report, Doctor?
24       A.  Yes.
25       Q.  Okay.  That's the TVT-O mesh that you

Page 128

1   analyzed?
2        A.  Yes.
3        Q.  And the same mesh that's in the
4   original TVT is in the TVT-O, correct?
5        A.  Yes.
6        Q.  Number 14, Exhibit Number 1, do you
7   have any documents that are responsive to item
8   number 14?
9        A.  No.  I mean this is a very long list.
10       Q.  Let's skip to 15, because 15 is more
11  specific.  I think we can handle 15.
12       15 is all specimens, paraffin blocks,
13  slides, or other mediums, and all documents
14  relating to the approximately 130 explanted mesh
15  specimens referenced in your report in this
16  case.
17       So did you bring those materials to
18  the deposition?
19       A.  No, because some of -- well, all of
20  these patients are St. Michael's patient cases,
21  because once they enter St. Michael's system it
22  becomes St. Michael's case.  So they belong to
23  St. Michael's, and there is a confidentiality
24  behind each specimen.
25       What I can produce, I can produce the

Page 129

1   samples where a patient consented for this
2   litigation, were those four remaining which I
3   received from law firm and other samples, not
4   St. Michael's, and not for this litigation
5   belong to other litigation processes.  So I
6   think we are limited to only those which are
7   within this litigation because patient consented
8   to be exposed and the samples.
9        Q.  Well, you're relying on 130 explanted
10  mesh specimens for your opinions in this case,
11  correct?
12       A.  Yes.
13       Q.  And is it your position that I'm
14  not -- my client is not entitled to look at that
15  same material that you've looked at in the
16  formulation of your opinions?
17       A.  Not in the form of confidential
18  information or material which either belongs to
19  other litigations or belongs to St. Michael's
20  Hospital.
21       Q.  How many of the 130 explanted mesh
22  specimens are involving litigation?
23       A.  At least 70.
24       Q.  And you're saying that when those 70
25  that involve litigation are sent to you, you put

33 (Pages 126 to 129)

Vladimir Iakovlev, M.D.

Page 130

1    them into the St. Michael's system?
2        A.  Yes.
3        Q.  These aren't referrals from treating
4    doctors to you, correct?
5        A.  No.
6        Q.  These are Plaintiffs' lawyers who send
7    you specimens, or have specimens arranged to be
8    sent to you, in which you then put into the
9    St. Michael's system, correct?
10       A.  Yes.
11       Q.  And none of these Plaintiffs' treating
12   doctors sent any of these litigation specimens
13   to you for the purpose of rendering any analyses
14   on their behalf, correct?
15           MR. FABRY:  Objection.  Form,
16   speculation.
17       A.  You mean directly from patients --
18   from treating physician to me?
19   BY MR. SNELL:
20       Q.  Yes.
21       A.  Some, I believe, came directly -- I
22   think they were requested by law firms, but they
23   came directly from the treating physicians.
24       Q.  All right.  The law firms, Plaintiffs'
25   law firms made the requests in all of these

Page 131

1    litigation explants, and they were then sent to
2    you, correct?
3        A.  Yes.
4        Q.  And those are the ones that you put
5    into the St. Michael's system?
6        A.  Yes.  All samples which come to
7    St. Michael's to me for analysis are being
8    entered into St. Michael's system.  I cannot
9    order a stain, or cannot do anything, unless
10   it's entered in the St. Michael's system.
11       Q.  Including the 70 at least that are
12   involved in litigation?
13       A.  Yes.  So each sample comes with
14   patient identifier, with date of birth, type of
15   procedure, type of mesh, because they come
16   directly from -- they're not altered by storage
17   facilities, so they come exactly like I would
18   receive it from a physician.
19       Q.  Look at item number 16.
20       A.  Yes.
21       Q.  Do you have any materials responsive
22   to item number 16?
23       A.  It's a long list again.  But again,
24   the same problem, it's paraffin blocks, they
25   belong to patients, and the patients are either

Page 132

1    for the litigations, or they're St. Michael's
2    Hospital, or other hospitals.  As I said, I mean
3    since I've been interested, I've been collecting
4    information about them, but patients didn't
5    consent to participate in litigation process.
6        Q.  Well, how many of the 70 patients is
7    it your understanding that -- strike that.
8            It's your understanding that all of
9    the patients who are involved in the mesh
10   litigation consented to the release of their
11   information regarding their explants?
12       A.  Yes.  That's my understanding.
13       Q.  Look at item number 17.  "Any protocol
14   you use, have used, or have developed regarding
15   the handling, processing, staining, analysis, or
16   testing of the approximately 130 explanted mesh
17   specimens referenced in your report."
18       A.  It's a standard -- it's standard
19   protocols for my lab.
20       Q.  Are those in writing?
21       A.  We have standard operating procedures.
22       Q.  Standard operating procedures that
23   were applied to the 130 explanted mesh
24   specimens?
25       A.  Yes, they apply to any specimen in the

Page 133

1    lab.
2        Q.  You don't have those standard
3    operating procedures today, correct?
4        A.  No.  Large binders.
5        Q.  Number 18 asks for "Any protocol
6    relating to physical materials, or chemical
7    analyses, testing, or study in which you
8    participated in any capacity regarding the
9    approximately 130 explanted mesh specimens
10   referenced in your report."
11           First of all, is there such a
12   protocol?  And if so -- first of all, is there
13   such a protocol?
14       A.  The only testing I do is just analyze
15   physically by this simple stretching, that's
16   what I do, and it's in the report.
17       Q.  The standardized stretching you
18   mentioned is on Page 33 of your expert report?
19       A.  Yes.  Not standard, I didn't say
20   standard.  I said simple stretch test.  I mean
21   there is no standard.
22       Q.  There's no standard that you applied
23   for this simple stretch test you performed and
24   which is depicted at Page 33 of your expert
25   report?

34 (Pages 130 to 133)

Vladimir Iakovlev, M.D.

Page 134

1    A.  No.  I recorded what I did, but
2  there's no standard protocol.
3    Q.  What about of the other 129 explanted
4  mesh specimens, is there any protocol relating
5  to any physical, material, or chemical analyses
6  or testing that you participated in?
7    A.  Those are diagnostic samples.  They
8  were processed as diagnostic routine.
9       But we are talking about different
10  things.  Those 130 are explanted patient
11  samples.  Here is new mesh device.
12    Q.  So for the 130 explanted mesh
13  specimens, were you involved in any physical,
14  material, or chemical analyses or testing?
15    A.  Each specimen is being gross, so there
16  is gross description, there's consistency, if
17  you call it physical.  And then it's being
18  stained, so to a degree it's a chemical
19  analysis, because you have to visualize.  And
20  then it's pathological examination of each
21  sample.
22    Q.  So the 130 explanted mesh specimens --
23    A.  I did histological examination, and to
24  whatever degree you can say it's chemical
25  testing or physical testing.

Page 135

1    Q.  You did gross observations, correct?
2    A.  Yes.
3    Q.  You did staining, correct?
4    A.  Yes.
5    Q.  You did pathological analysis of the
6  slides that were made, correct?
7    A.  Yes.
8    Q.  You did some electron microscopy,
9  correct?
10    A.  Only to a limited number of samples.
11    Q.  Any other testing, though, that you
12  did?
13    A.  No.
14    Q.  Do you know how many samples you did
15  electron microscopy on in total out of the 130
16  explanted mesh specimens?
17    A.  I think I submitted for electron
18  analysis up to ten samples, but not all of them
19  were usable.  So it's less than ten, more than
20  five, somewhere in that range.
21    Q.  Who did you submit them to?  Strike
22  that.
23       Who did you submit the mesh specimens
24  to for the electron microscopy?
25    A.  It's in our lab at St. Michael's.

Page 136

1  It's part of pathology laboratory, electron
2  microscopy.
3    Q.  Is there a particular person or head
4  of that part of St. Michael's lab for the
5  electron microscopy?
6    A.  I'm not sure if there is a specific
7  position as a head of electron microscopy.  We
8  have our department head.
9    Q.  Well, explain to me, how did you make
10  the submission of the mesh specimens to be
11  analyzed by electron microscopy?
12    A.  Oh, I just take a piece, put it in
13  glutaraldehyde, and give it to technician in
14  electron microscopy.  It's a part of the same
15  lab; here is the unit for chemistry, here's
16  histochemistry, it's part of -- we use the lab
17  for routine diagnostic work.  It's not something
18  specifically we do for commercial service, no.
19    Q.  Who is the technician you gave these
20  samples to?
21    A.  You need her name?
22    Q.  Yes.
23    A.  Sandy Cohen, I believe, C-O-H-E-N.
24    Q.  Does Sandy Cohen look at these images
25  under the electron microscope?

Page 137

1    A.  No.  She processes the tissue as the
2  technicians do, and she cuts sections, she gives
3  me blue sections which are thicker.  I select a
4  block, request for her to cut thin sections from
5  a specific block.  Then she prepares a grid.
6  Then she calls me when the grid is ready, and
7  she operates the electron microscope.  I point
8  where she needs to go and where she needs to
9  take pictures, and then I interpret these
10  pictures.
11    Q.  You said you submitted up to ten mesh
12  specimens for the electron microscopy, but not
13  all of them turned out usable?
14    A.  Yes.
15    Q.  What do you mean by that, "not all of
16  them turned out usable"?
17    A.  Sometimes you don't get the filament
18  in the section because it's a very small piece,
19  it's pretty much one-by-one millimeter piece.
20  Sometimes you get a filament, sometimes you
21  don't.  My interest is in filaments.  If there's
22  no filament, I don't examine.  Then some samples
23  for some reasons didn't cut well, they were
24  crushing, and tissue was burning by the electron
25  beam, so I cannot examine them.

Vladimir Iakovlev, M.D.

Page 138

1    Q.  The electron beam can burn tissue?
2    A.  Yes.  Plastic, imbedded plastic,
3  mainly imbedded plastic.  Plastic deforms, and
4  you cannot take a picture.
5    Q.  You said --
6    A.  The techniques how you avoid that, you
7  start warming it up from edges.
8    Q.  The plastic can burn under the
9  electron microscope?
10    A.  It melts, softens.
11    Q.  When you said Sandy prepares the grid,
12  what do you mean by that?
13    A.  See, the electron microscope is
14  different than regular microscope.  So electron
15  beam, and for electron beam you need very small
16  sections, it's practically one-by-one millimeter
17  section.  So this tissue which is about one
18  micrometer, thicker, I don't remember exactly,
19  you cannot put it on anything, it has to be
20  hanging in the air.  So there is a specific
21  copper grill, sort of round grill with bars like
22  this supporting the tissue.  So the tissue is
23  being placed freely on this grid, and then you
24  look through holes, you look through the tissue
25  within the holes.

Page 139

1    Q.  So the electrons pass through the
2  copper into the tissue, and that's what you see,
3  or is it down?
4    A.  They don't pass through the copper.
5  They pass through the tissue in the holes of the
6  grid.
7    Q.  Okay.
8    A.  So it looks like this (indicating).
9  If you magnify it, so the tissue is here, and
10  you can see square holes, and this is copper,
11  then you just examine tissue in the hole.
12    Q.  Okay.  You have records back at your
13  lab showing which specimens were not ultimately
14  usable?
15    A.  Yes, it can be retrieved.  But these
16  samples were from different litigation process,
17  and some of them were from St. Michael's
18  patients.  So...
19    Q.  How many of them are TVT-O meshes?
20    A.  One, and it was St. Michael's patient.
21  One was usable, and you have pictures in the
22  report of it.
23    Q.  That wasn't Mrs. Edwards, correct?
24    A.  This wasn't Mrs. Edwards.
25    Q.  Number 20, "All documents or

Page 140

1  communications relating to any publications,
2  proposed publications, or draft submissions for
3  publication authored by you relating to pelvic
4  mesh, pelvic organ prolapse, or stress urinary
5  incontinence."
6    Do you have any such documents?
7    A.  No.  If I had them published I would
8  have disclosed them.  But since they're not
9  published, I have concerns, and I think it's
10  privileged.
11    Q.  What's your reason for -- strike that.
12    So you do have documents or
13  communications relating to these publications,
14  but you haven't brought them here today,
15  correct?
16    A.  Well, the drafts, we work on drafts.
17    Q.  But you didn't bring the drafts here
18  today, correct?
19    A.  No.
20    Q.  And these are drafts that involve
21  other Plaintiffs' experts like Dr. Steege,
22  Blaivas, Guelcher, or Dunn?
23    A.  Not all.  I have publications and
24  drafts outside of this group.  One involves
25  Dr. Guelcher, but not all.

Page 141

1    Q.  Do you have any other publications
2  involving these topics?
3    MR. FABRY:  Objection to form.
4  BY MR. SNELL:
5    Q.  Strike that.
6    Do you have any other drafts of
7  publications involving the topics identified in
8  number 20?
9    A.  Again, nothing accepted and published.
10  And the drafts, I have only drafts.
11    Q.  And you didn't bring those because you
12  believe they're somehow confidential or
13  privileged?
14    A.  Privileged, yes.
15    Q.  Did you talk to any of the -- are
16  these drafts that have been submitted to a
17  journal?
18    A.  Well, we discussed pre-submission
19  inquiries.
20    Q.  So this is the same thing we discussed
21  earlier?
22    A.  Yes.
23    Q.  The pre-submission inquiries?
24    A.  Yes.
25    Q.  Have you had discussions with any of

36 (Pages 138 to 141)

Vladimir Iakovlev, M.D.

Page 142

1    the journal editors about whether or not you can
2    release these in this litigation?
3        A.  No.
4        Q.  Number 22, "Any letters, brochures,
5    promotions, or other documents which you
6    advertise or discuss your work or availability
7    as an expert or consultant."
8        A.  No, because I'm not an expert in terms
9    of I don't make living by working as an expert.
10       Q.  Do you advertise your services as an
11   expert?
12       A.  No.
13       Q.  23, "Copies of the syllabus and texts
14   used in any teaching setting by you."
15       A.  That's very broad.  If I go back to my
16   medical school, I started teaching my younger
17   students, that dates back to late '80s.  Do you
18   want me to bring all of that?
19       Q.  Are you currently teaching any
20   students in any medical school?
21       A.  Yes.  I'm an academic physician.
22       Q.  What's your -- are you an associate
23   professor?
24       A.  Assistant.  Hopefully I will become
25   associate soon.

Page 143

1        Q.  What classes do you currently teach?
2        A.  We have undergraduate medical
3    students, we teach pathology course.  We have
4    postgraduate residents, so we teach them.  I
5    also give lectures to physiotherapists, there's
6    a course for physiotherapists.  And I teach
7    pathologists at the conference, I conduct
8    workshops.
9        Q.  The pathology; do you teach pathology
10   to undergraduate students?
11       A.  Yes.
12       Q.  What course is that?
13       A.  Pathology.
14       Q.  Just basic pathology, Pathology 101?
15       A.  It's pathology sort of in relation
16   with clinical symptoms.  It's mostly
17   problem-based learning, like scenario, somebody
18   comes with cough, and then we solve into what
19   pathology is behind it, and what the
20   implications, what we may see under the
21   microscope, and then what correlates with
22   clinical symptoms.
23       Q.  Sort of like case analyses in
24   pathology?
25       A.  Yes, it's part of it.  I used to give

Page 144

1    lectures more, sort of broad lectures to medical
2    students in Winnipeg, now here I'm more involved
3    in this case-based learning.
4        Q.  Is there a formal textbook in this
5    case-based learning?
6        A.  There are recommended textbooks for
7    students.
8        Q.  Do you know what those are?
9        A.  One of them is a bible, Robbins,
10   usually called Robbins.  There's another one by
11   Anderson, first author.  And usually Facultative
12   Medicine compiles a list of recommended
13   literature, if they use that specific book or
14   another one.
15       Q.  Robbins text in pathology is the basic
16   text you were referring to?
17       A.  Yes, it's very basic.  There are two
18   versions of it; one is for medical students, one
19   is for residents.  There's not just only one, I
20   mean there are so many books in pathology.
21       Q.  Do you teach the postgraduate
22   residents?
23       A.  Yes.
24       Q.  What course do you teach them?
25       A.  Anatomical pathology.

Page 145

1        Q.  Are there any recommended texts that
2    you suggest to them, the postgraduate residents,
3    for the anatomic pathology?
4        A.  They need to use textbooks, broad
5    anatomical pathology textbooks.  They need to
6    use books written for specific subspecialties.
7    They need to do literature search.  We evaluate
8    them for ability to absorb all of that, and
9    independently find sources of reliable
10   information, and then we teach them how to judge
11   if the information is reliable.
12       Q.  Do you recommend, is Robbins Pathology
13   recommended to the postgraduate residents?
14       A.  Only in the first year.
15       Q.  Any other texts by name that you
16   recall as you sit here today?
17       A.  Yeah.  I mean Sternberg is one good
18   book which compiles pretty much all of
19   anatomical pathology, or most of it.
20          There are some other books.  Rosai is
21   a bible.
22       Q.  How do you spell that?
23       A.  Rosai?
24       Q.  Yes.
25       A.  R-O-S-A-I.

Vladimir Iakovlev, M.D.

Page 146

1    And then there's a long list of
2 smaller subspecialties.  Like if we go to
3 gynecological track, it will be Blaustein.  If
4 we go to urogynecological track, it will be
5 Amine.  It's a long list.  Depends on how narrow
6 you want to go.  If you want to go for specific
7 disease, then it might be just one single book.
8    There's no list of recommended
9 literature for postgraduate students or
10 pathologists overall.  We need to decide what is
11 reliable.  We do use some guidelines when it
12 goes to specific questions of billing, eligible
13 to bill, or standard of practice in a specific
14 geographic area.
15    Q.  Is Robboy one of the gynecologic
16 pathology tests, R-O-B-B-O-Y?
17    A.  Can you spell it again.
18    Q.  R-O-B-B-O-Y.
19    A.  No.  At least not that I'm aware of.
20    Q.  You said you teach pathology at a
21 conference.  What conference would that be?
22    A.  It was one in Canadian Association of
23 Pathology annual meeting.  Another one,
24 Pathology Update organized by University of
25 Charlton.

Page 147

1    Q.  Have you ever given any testimony or
2 statements to the US Food & Drug Administration?
3    A.  No.
4    Q.  Have you ever given any statements or
5 testimony to any U.S. Government investigation?
6    A.  No.
7    Q.  Sorry, U.S. Government department?
8    A.  No.
9    Q.  Have you given any statements or given
10 testimony to the Canadian equivalent of the US
11 FDA?
12    A.  No.
13    Q.  Have you given any public statements
14 concerning transvaginal mesh?
15    A.  No.
16    Q.  Have you given any press interviews or
17 interviews with reporters regarding mesh?
18    A.  No.
19    Q.  Look at number 26 to Exhibit 1,
20 "Communications between you and counsel for the
21 Plaintiffs to the extent such communications (1)
22 relate to your compensation."
23    So we've already discussed that?
24    A.  Do not have billing yet.
25    Q.  "Identify facts or data that you were

Page 148

1 provided and that you considered in forming your
2 opinions."
3    Is that -- we've discussed that, too?
4 That's materials on your materials list?
5    A.  Yes.
6    Q.  Did they -- did the Plaintiffs'
7 lawyers give you any other specific information
8 about the Edwards or Huskey cases?
9    A.  Just clinical records.  I requested
10 clinical records, and I was given clinical
11 records.
12    Q.  "Assumptions that Plaintiffs' counsel
13 provided you and that you relied on."
14    Were any assumptions provided that you
15 relied upon?
16    A.  No.
17    Q.  We can set that aside.
18    MR. SNELL:  Why don't we take a break.
19    (Whereupon, a recess was taken from
20    11:44 a.m. to 11:58 a.m.)
21 BY MR. SNELL:
22    Q.  We're back on the record.
23    Can you tell me the total hours you've
24 spent as an expert in any of the -- strike that.
25    Can you tell me the total number of

Page 149

1 hours you've spent serving as an expert in the
2 mesh litigation?
3    A.  You mean the number of hours I spent
4 to prepare?
5    Q.  No.  I mean the total hours you've
6 spent as a Plaintiffs' expert in mesh
7 litigation.
8    A.  That question, which is hard to
9 answer.  I can tell you how much time I spent
10 for specific report or for number of samples I
11 examined.  I can estimate.
12    So if I said about 70 samples, and it
13 takes about one to two hours on average, maybe
14 one and a half hours, so 70 times 1.5, so it's
15 105, then I prepare the reports, so it can go up
16 to 130 hours, somewhere in that ball park.
17    Q.  Would that include reviewing
18 literature and case-specific materials as well,
19 or is that additional?
20    A.  Case-specific material, clinical
21 records, yes.  Literature I cannot separate.  I
22 read literature for meshes, for my research.
23    Q.  The literature you identified in your
24 deposition, Exhibit Number 3 --
25    A.  I have it in here.

Vladimir Iakovlev, M.D.

Page 150

1      Q.  -- that's literature you read in
2  connection with your work as a Plaintiffs'
3  expert, correct?
4      A.  More of what this is here in Exhibit
5  Number 1, reference list.  This was more
6  available, this is, yes.
7      Q.  So the literature listed at the back
8  of Exhibit Number 1 is literature you read in
9  connection with your role as a Plaintiffs'
10  expert, correct?
11      A.  No.  I read this literature either in
12  connection with litigation or as my interest in
13  mesh research.  But those documents influence my
14  opinions.
15      Q.  Were they important to your opinions?
16      MR. FABRY:  Objection.  Form.
17      A.  To a degree.  Maybe I didn't use some
18  articles, but they provided small amount of
19  information which can make a conclusion when you
20  have several articles stating the same thing.
21  So there's no specific article I'm relying on,
22  but more a set of articles.
23  BY MR. SNELL:
24      Q.  You did your medical school in Russia?
25      A.  Yes.

Page 151

1      Q.  Were you accepted to a US residency
2  program?
3      A.  I had offers.  Well, no, I wasn't
4  accepted.  I had interviews.
5      Q.  Where did you interview in the United
6  States for a residency program?
7      A.  I had one interview here at Boston.  I
8  had one interview in Omaha.  There was a
9  sequence of matches, Canadian match and US
10  match, and if you get matched in one then you
11  automatically be deleted from the other one.  So
12  you do interviews all together, but then the
13  system works out the way.  So you cannot be
14  accepted to two programs at the same time.
15      Q.  When you interviewed in Boston, when
16  was that?
17      A.  I believe it was 2000.
18      Q.  Was that for a particular school's
19  program?
20      A.  Yeah, it was a psychiatry program.
21      Q.  Which school?
22      A.  I think it was Harvard.
23      Q.  You weren't accepted to that program?
24      A.  No.  As I said, you can only be
25  accepted to only one program.

Page 152

1      Q.  What school did you -- what school did
2  you interview for when you went to Omaha?
3      A.  It must be University of Nebraska.
4  I'm -- now it's my guess pretty much, I don't
5  know exact name.
6      Q.  Do you know the type of program that
7  you were interviewing for in Omaha?
8      A.  It was family practice.
9      Q.  Was this also in 2000?
10      A.  Yeah, it's all the same.
11      Q.  Have you ever practiced medicine in
12  the United States?
13      A.  No.
14      Q.  Are you a gynecologic pathologist?
15      A.  I am a pathologist, anatomical
16  pathologist.  So there is no specific
17  certification for gynecological pathologist.
18  You can limit your practice to gynecological
19  pathology, but there is no board certification
20  for gynecological pathology.
21      Q.  Did you do a fellowship in gynecologic
22  pathology?
23      A.  No.  Again, gynecological pathology is
24  not limited to those who do just fellowships.
25      Q.  You're an assistant professor of

Page 153

1  pathology, you've testified?
2      A.  Yes.
3      Q.  How does one become an assistant
4  professor of pathology at your institution?
5      A.  The department of laboratory medicine
6  and pathobiology evaluates your CV, your
7  research profile, and initially you're given
8  rank of lecturer.
9          And then after, I think, that you
10  accumulated enough or contributed enough to the
11  research to the science world, then you apply
12  for promotion.  They evaluate your teaching
13  performance, they evaluate your research
14  performance, and the impact of your academic
15  work, and then they either give you or not.
16      Q.  So assistant professor of pathology,
17  that's obviously above lecturer?
18      A.  Yes.
19      Q.  Is that the next step in the promotion
20  process at your facility?
21      A.  Yes.
22      Q.  What's the highest level at your
23  facility?
24      A.  Full professor.
25      Q.  Is there such thing as tenure at your

39 (Pages 150 to 153)

Vladimir Iakovlev, M.D.

Page 154

1    facility in Canada?
2        A.  There is little bit of difference in
3    terminology, but essentially everything follows
4    the same steps.
5        Lecturer or some equivalent of a
6    lecturer; assistant professor, there is no
7    equivalent, it's always assistant professor;
8    then associate professor; then a full professor.
9    Some universities, smaller universities, slower
10   sort of profile universities eliminated this
11   preliminary altogether, so they just give
12   assistant professor right away, or they rename
13   this.
14       Now, in the United States there are
15   different gradations when physicians become
16   either fully academic or partial academic, so
17   his contribution to academic world is either
18   partial -- tenure is pretty much appointment at
19   academic institution.
20       In Canada, it's usually either you are
21   appointed or you are not.  So you are in the
22   teaching hospital or you are not, you are in the
23   community.
24       Q.  Okay.
25       A.  It's much sharper distinction.

Page 155

1        Q.  The 130 explanted mesh specimens that
2    you have looked at, you note that 60 percent,
3    approximately 60 percent are transvaginal,
4    correct?
5        A.  Yes.
6        Q.  And are those the transvaginal mesh
7    specimens that you've seen in sum total?
8        A.  Yes.  I mean at the time when I was
9    writing this report, these numbers were as
10   stated.
11       Q.  So I believe you testified it was
12   approximately 70?
13       A.  Yes.
14       Q.  And how many of the 70 are stress
15   urinary incontinence meshes versus prolapse
16   transvaginal meshes?
17       A.  I cannot tell you exact number.
18   Probably a half.  But this can go up to -- from
19   30 percent to -- I don't believe it would exceed
20   60 percent.  So I didn't -- I don't remember
21   statistics.  It's a sizeable.  It's somewhere
22   between 30 percent to 60 percent, somewhere in
23   there.
24       Q.  30 to 60 percent is the urinary
25   incontinence?

Page 156

1        A.  Urinary incontinence.  It's a sizable
2    proportion.  Again, I don't know exact number.
3        Q.  That's fine.
4        So your best estimate is out of the 70
5    transvaginal meshes, explanted meshes you've
6    reviewed, somewhere between 30 and 60 percent
7    were slings?
8        A.  Yes.
9        Q.  Okay.  So if we do the math, that's
10   between 21 and 42 of those transvaginal
11   explanted meshes are slings?
12       A.  Yes.  Could be higher new.
13       Q.  And of those 21 to 42 mesh slings, how
14   many are from litigation?
15       A.  The transvaginal meshes, larger
16   proportion came as the litigation process,
17   smaller proportion came from St. Michael's
18   patients.  I had to search a few years back to
19   collect those.
20       Q.  So, approximately, would you estimate
21   90 percent of the transvaginal explanted mesh
22   slings that you've looked at are litigation?
23       A.  Maybe not as high.  Maybe 80 percent.
24   But somewhere in that ball park.
25       Q.  So approximately 80 percent of the

Page 157

1    transvaginal mesh slings that are explanted that
2    you've looked at are from litigation?
3        A.  Yes.  They were provided by law firms.
4        Q.  And when these explanted mesh slings
5    were provided by the law firms, do you know what
6    method of selection they used to come to those
7    mesh slings?
8        A.  When I was requesting them I was
9    requesting them to supply all samples.
10   Sometimes they would come, they didn't contain
11   the mesh, or it was individual curettage, so
12   then I was going through them.  But my request
13   was to supply everything available, just all
14   available clinical information, and then I will
15   decide what is suitable, what is not.
16       Q.  Do you have any way of knowing whether
17   they provided you with all of the explanted
18   meshes?
19       A.  No.
20       Q.  Do you know how many cases they
21   collected explanted meshes on in total?
22       A.  No.
23       Q.  Do you understand there's thousands of
24   cases involving the mesh litigation?
25       A.  Yes, I do understand that.  I don't

Vladimir Iakovlev, M.D.

Page 158

1    know what proportion of them contains pathology
2    samples, what proportion of those are available
3    to me or to other labs, but I do understand that
4    there are more than what I've seen.
5        Q.  And of those 80 percent of mesh slings
6    that you've looked at that were provided by the
7    law firms, I know you testified that five were
8    TVT-O?
9        A.  Provided -- yes, five.
10       Q.  And how many of the others -- strike
11   that.
12           What were the other types of meshes
13   that you looked at that were provided by the law
14   firms for the slings?
15       A.  Slings?
16       Q.  Yes.
17       A.  They were, as I stated, Boston
18   Scientific, AMS, and occasional either all
19   manufacturer or unidentified.
20       Q.  For the TVT-O meshes that you received
21   from the law firms, do you know how long those
22   meshes were in the body?
23       A.  I was requesting information, that was
24   -- one of my questions was to provide me with
25   information of in vivo exposure.  Sometimes this

Page 159

1    information was available with clinical records,
2    and sometimes it wasn't, depending on the extent
3    of clinical records.
4        Q.  Do you know how the explanted meshes
5    were handled following being taken out of the
6    body?
7        A.  Not specifically.  I know the
8    procedures, surgical procedures of how this is
9    done in our hospital, in the hospitals I worked
10   at, but I cannot tell you specifically for each
11   specimen.
12           My understanding is this is done in
13   accredited licensed medical institutions, it's
14   done more or less uniform fashion.
15           We are talking about surgical
16   handling?
17       Q.  Yes.
18       A.  Yes, that's my answer.
19       Q.  What about how they were processed and
20   handled in the pathology departments?
21       A.  That's variable, because those
22   specimens I received, they come in formalin.
23   Again, when they come in formalin, then I assume
24   they've been dealt with as accredited
25   laboratories, so the protocols should be

Page 160

1    approximately the same.
2            However, for some patients, like for
3    Ms. Huskey, there are no pathology, no
4    examination.
5        Q.  For the TVT mesh specimens, do you
6    have information about how long those specimens
7    were maintained in formalin before they came to
8    you?
9        A.  Yes.  I have dates of excision, and
10   then I have dates I performed section.
11       Q.  That's back at Toronto on your
12   computers?
13       A.  Yes.  If we trace back clinical
14   records of excision, then my record of pathology
15   report.
16       Q.  On Page 2 of your report at the very
17   bottom, you see it says you also had 29
18   explanted slings from other brands for analysis?
19       A.  See, I did have a number.
20       Q.  So you got 29 other explanted slings
21   and six explanted TVT slings?
22       A.  Yes, at the time of this report.
23       Q.  Do you know how popular Ethicon's TVT
24   mesh is compared to the other explanted sling
25   types you looked at?

Page 161

1        A.  What do you define "popular"?
2        Q.  How commonly it's used.
3        A.  No, I don't know.  I mean most
4    prevalent, as far as I understand, it's a large
5    company, so the market share is large.
6        Q.  Of the 29 others, do any stand out in
7    your head as, you know, you having a larger
8    volume of that particular mesh type; Monarc, you
9    know, by name?
10       A.  No.  It was approximately similar
11   ratios, AMS, Boston Scientific.  And you can see
12   that there were 35, five of them were TVT-O,
13   then anywhere between five to ten were other
14   manufacturers.
15       Q.  Do you know what methodology the
16   Plaintiffs' lawyers employed when they decided
17   which Boston Scientific and AMS meshes to send
18   you?
19       A.  No.  As I said, I requested all
20   available.
21       Q.  The bottom of Page 2, you say "This
22   randomizes the findings which are common to
23   Ethicon and non-Ethicon brands."
24           You didn't do a formal randomization
25   of these meshes, correct?

41 (Pages 158 to 161)

Vladimir Iakovlev, M.D.

Page 162

1    A.  No.
2    Q.  No, I'm not correct?
3    A.  I did not do formal randomization.  If
4  we talk about randomization as for clinical drug
5  trials, no.  This term implies that the samples
6  came from different sources, from different
7  manufacturers, and they were excised in
8  different parts of United States, age, spread,
9  and everything becomes more sporadic.
10    Q.  When tissue is taken out of the body
11  during surgical excision, isn't it correct that
12  it can lose weight?
13    A.  If it dries?  Yes, it can.  If water
14  dries up, yes, it will become lighter.
15    Q.  Is that important in -- strike that.
16        Does the weight of the tissue, the
17  specimen, change depending upon how long is the
18  time period between excision and when it's put
19  in formalin?
20    A.  Ask that question again?
21    Q.  Yes.
22        Does change in the weight of the
23  explant depend upon how long of a time period
24  elapsed between when the explant was excised to
25  when it was put in formalin?

Page 163

1    A.  I don't know.  We don't measure weight
2  at the excision and before we place in formalin.
3  I cannot tell you.
4    Q.  So in the charts or documents that you
5  have regarding the litigation mesh slings, you
6  don't have any calculations showing weight of
7  the specimens?
8    A.  No.  I never measured weight of the
9  specimens.  We measure weight for specific type
10  of specimens to describe a volume of the organ
11  when linear dimensions are difficult.  For that
12  specific purpose, there were no questions which
13  can be answered by weight.
14    Q.  You never measured the molecular
15  weight of any of the Ethicon TVT meshes,
16  correct?
17    A.  No.
18    Q.  Did you measure the molecular weight
19  of any of the Ethicon TVT meshes?
20    A.  I did not measure molecular weight.
21        MR. FABRY:  You should appreciate how
22  to ask good questions.
23        MR. SNELL:  I'm going to teach him how
24  to answer.  I understand.  It's just the way we
25  communicate, different ways, no big deal.

Page 164

1  BY MR. SNELL:
2    Q.  The published literature that is
3  attached to the back of Exhibit Number 2, your
4  report, that's literature that the Plaintiffs'
5  lawyers provided to you?
6    A.  No.  I mean there might be few items
7  which were suggested, but no, they didn't
8  provide that to me.
9    Q.  How do you maintain that literature
10  that's identified in the back of the Exhibit
11  Number 2, your expert report?
12    A.  I store some on my hard drive.  But
13  you cannot store everything, so sometimes I have
14  to go back and pull it off-line.  It's published
15  on-line, and I have access to all this.
16    Q.  You don't have it printed out in a
17  binder anywhere?
18    A.  Some of it is printed, some of it is
19  not.
20    Q.  You never got binders of literature
21  from the Plaintiffs' lawyers?
22    A.  Not for this litigation.  Some
23  articles were printed and they showed me this,
24  but not everything.
25    Q.  You've used some literature in the

Page 165

1  different litigations you've been involved in,
2  correct?
3    A.  Yes.
4    Q.  I take it you did your reports in the
5  AMS and Boston Scientific litigation before the
6  Ethicon litigation, correct?
7    A.  Yes.
8    Q.  Because you were deposed before the
9  Ethicon litigation, correct?
10    A.  Yes.
11    Q.  And your literature list in those
12  reports have similar articles to the ones you're
13  citing here?
14    A.  Yes.
15    Q.  On Page 3 you talk about how you
16  analyze the published literature.  And I'm at
17  the middle under number 1, "Findings in View of
18  Complications," can you tell me your search
19  method for that analysis?
20    A.  For published literature I usually go
21  for -- to PubMed website search and enter
22  keywords, see what is being available, and use
23  different combination of keywords, different
24  keywords.
25    Q.  Do you know what keywords you used?

42 (Pages 162 to 165)

Vladimir Iakovlev, M.D.

Page 166

1      A.  Mesh, vaginal mesh, vaginal slings,
2   sling mesh, degradation.  I mean I cannot
3   remember how many times I search, every time I
4   search it was a different.  I would exhaust one
5   type of a search and then come up with something
6   else.
7      Q.  You talk here about complications or
8   symptoms that can appear de novo or worsen?
9      A.  Yes.
10     Q.  Did you do any searches about
11  complications and symptoms that actually get
12  better after mesh placement?
13     A.  When I was searching for published
14  literature, they were providing all list of
15  complications, and also providing list of
16  parameters they measured to evaluate mesh
17  performance.  So they included positive results
18  and their assessment.
19        But since I'm getting excised mesh, by
20  definition somebody excised it for
21  complications, therefore my job is to compare
22  complications with excised specimen, therefore I
23  was limited to that spectrum.
24     Q.  You say you've gotten excised mesh for
25  complications.  Are you saying that's true for

Page 167

1   all of the transvaginal mesh slings?
2      A.  True for all excised?
3      Q.  Yes.
4      A.  If they are excised, they excised them
5   because of complications.
6      Q.  How do you know that?
7      A.  Why would you excise it without -- if
8   there is no complications?
9      Q.  You haven't heard of people,
10  Plaintiffs going to doctors asking for excisions
11  in cases where they're not having symptoms?
12     A.  No.  I cannot imagine such a scenario.
13     Q.  Have you heard of Plaintiffs who go to
14  surgeons asking for mesh to be removed so that
15  they can potentially obtain money?
16     A.  No, I have not heard that.
17     Q.  You don't know anything about that?
18     A.  No.  My understanding is patients come
19  with symptoms, clinician evaluates the patients,
20  works up a differential diagnosis, tries
21  non-invasive treatments, and then when the last
22  resort is -- when the differential diagnosis is
23  all narrowed to the mesh, and last resort is
24  excision, they perform excision.
25     Q.  Do you know anything about whether or

Page 168

1   not there's referral sources for Plaintiffs in
2   the transvaginal mesh litigation to go see
3   certain doctors who will explant their mesh?
4      A.  No, I don't know.  But as I said, to
5   me, clinical part, as far as I understand, the
6   patient can come with symptoms or request them
7   to do something, but then it's up to physician
8   to treat them, and they decide what treatments
9   are best suitable for the patient.
10     Q.  Do you know whether or not -- strike
11  that.
12        In your analysis of the transvaginal
13  sling from litigation, do you analyze the time
14  period between when the mesh was put in and when
15  the mesh was taken out to see how commonly, if
16  at all, that Plaintiff reported pain?
17     A.  No.  But that's interesting question,
18  because it can be correlated if there is enough
19  data, so that's where the collaborative projects
20  are to correlate pain and specifics of the pain
21  with specific findings.
22     Q.  You say on Page 4 of your report, I'm
23  under Section 1.1.1.1, "High Nerve Density" --
24     A.  Yes.
25     Q.  -- "Descriptions of painful scars are

Page 169

1   well-known in the literature."
2        Do you see that?
3      A.  Yes.
4      Q.  What do you mean by that?
5      A.  There are published cases when the
6   scar is painful.
7      Q.  Is that something you knew when you
8   were working as a surgeon before a pathologist,
9   or is that something you have recently learned
10  as an expert in this litigation?
11     A.  Well, I learned as a pathology
12  resident, maybe I had known it before when I was
13  in my medical school, but specifically I
14  remember reading about it as a pathology
15  resident.  Because there are specific painful
16  lesions, and you go through differential
17  diagnosis when somebody says painful nodule.  So
18  this can be a part of your -- it's a part of
19  your differential diagnosis, just a scar,
20  painful scar, not a neoplastic lesion.
21     Q.  So painful scar is something you
22  learned about at the latest by the time of your
23  pathology residency?
24     A.  I remember reading about it and paying
25  close attention.  I could have learned it

43 (Pages 166 to 169)

Vladimir Iakovlev, M.D.

Page 170

1    earlier.
2        Q.  How are scars formed?
3        A.  Do you want me to start from injury
4    until --
5        Q.  Sure.
6        A.  So first there is injury to tissues.
7    So if tissue is either mechanically damaged or
8    chemically or -- so there's physical factors
9    damaging tissue or chemical factors, or there's
10   inflammation, or there is ischemic damage.  So
11   if the tissue is destroyed in the area, then
12   this becomes either a hematoma or a sort of
13   cavity or an area with necrotic tissue.  Then
14   the periphery of the -- this cavity or necrosis
15   still has blood supply, so there are nutrients
16   and oxygen coming in, then the cells can come to
17   the area, inflammatory cells first, first would
18   be neutrophils, some macrophages, then the blood
19   vessels can ingrow, and then they can deliver
20   mesenchymal cells.  And then with the blood
21   vessels fibroblasts come, start laying collagen.
22   So it becomes a granulation tissue rich in small
23   capillaries with loose fibrous tissue and
24   inflammatory cells within.  Time progresses,
25   there's more collagen laid down, inflammatory

Page 171

1    cells remove debris or whatever.  And if it
2    cannot remove, then they localize it, and other
3    parts become more fibrotic, and so the scars
4    mature so there's less cells, less vessels, more
5    collagens, so it becomes harder, and gains
6    physical strength.  That's --
7        Q.  And that scar formation process that
8    you just outlined in basic form, does that occur
9    regardless of whether there's a mesh involved?
10       A.  Yes.  It's a nonspecific process.
11       Q.  Is it a process you learned about
12   during your pathology residency?
13       A.  No.  I learned it when I was a medical
14   student.
15       Q.  You mentioned some inflammatory cells,
16   and I think you said neutrophils?
17       A.  Initially neutrophils, yes.
18       Q.  They come in early?
19       A.  They're the first cells which come.
20       Q.  They're there, what, within a couple
21   hours of the injury?
22       A.  A couple, or four hours.
23       Q.  How big are neutrophils?
24       A.  Repeat the question?  How big?
25       Q.  Yes.  How large are neutrophils?

Page 172

1        A.  Approximately 25 microns.
2        Q.  Macrophages?
3        A.  Oh, that's a large spread.  They will
4    be larger to begin with, and then they can go
5    all the way over 100 microns.
6        Q.  On average are they about 20,
7    25 microns?
8        A.  I would say larger than that.
9        Q.  What would you say then?
10       A.  Maybe 50 microns.
11       Q.  50?
12       A.  50, 5-0.  I don't remember exact
13   number.  They are significantly larger than
14   other inflammatory cells.
15       Q.  The small capillaries that come in
16   there as part of the process to provide
17   nutrients to the scar --
18       A.  Yes.
19       Q.  -- how large are those, the diameter?
20       A.  So the smallest capillary will be as
21   small as one red blood cell.
22       Q.  So about seven microns, or nine?
23       A.  Pretty much close to that.  So all
24   vessels finally taper down to this, unless it's
25   a shunt between arteries and veins.

Page 173

1        Q.  And the fibroblasts that come in, what
2    size are they?
3        A.  Lengthwise or widthwise?
4        Q.  Tell me both.
5        A.  Length-wise it can be again pretty
6    large, as macrophages over 100 microns.
7    Widthwise, it might be 20 microns, somewhere in
8    that range.  Again I don't know exact number,
9    don't remember exact numbers, but these are
10   approximations.
11       Q.  The inflammatory cells, they can
12   actually change shape?
13       A.  Yes.
14       Q.  I think you have a photograph in here.
15   We'll get to it later.
16           And that's one of the ways that they
17   can deal with something like bacteria, to try to
18   get at a bacteria and contain it by changing
19   shape so that it can get to a location where
20   bacteria is?
21       A.  Yes.
22       Q.  They also can set out part of
23   themselves called a pseudopodia?
24       A.  Pseudopodia.
25       Q.  And that's -- can you describe what a

44 (Pages 170 to 173)

Vladimir Iakovlev, M.D.

Page 174

1    pseudopodia is from a macrophage?
2        A.  It's a finger-like projection of a
3    cytoplasm.  So the cell, from round, it becomes
4    like this.
5        Q.  You say right below that on Page 4
6    "The presence of the mesh does not significantly
7    affect nerve density in the scar tissue"?
8        A.  Yes.  That was our project with
9    Dr. Bendavid, that was our conclusion.
10       Q.  Have you published on that project
11   with Dr. Bendavid?
12       A.  Manuscript is in preparation.  Paper
13   has not been accepted yet.
14       Q.  Have there been any presentations of
15   that data with you, Dr. Bendavid, at any
16   conferences or meetings?
17       A.  Not yet.
18       Q.  Have they been discussed at your
19   hospital in the department of pathology or any
20   other groups?
21       A.  Well, I discussed it with Dr. Bendavid
22   at my hospital.
23       Q.  What stage is the manuscript in?
24       A.  It's almost done.
25       Q.  You obviously have a copy of that on

Page 175

1    your computer?
2        A.  Yes.
3        Q.  And the mesh you were looking at
4    there, was that in the hernia mesh or abdominal
5    wall?
6        A.  Hernia meshes, yes.
7        Q.  And when you say "The presence of the
8    mesh does not significantly affect nerve density
9    in the scar tissue," did someone do statistical
10   significance calculations to come to that
11   conclusion?
12       A.  Yes.
13       Q.  Did you do that, or do you have a
14   statistician involved?
15       A.  Well, first initially I do a sort of
16   quirk and dirty test, and then when we need
17   final to details, a statistician does it.
18       Q.  Do you know what type of test the
19   statistician does to determine statistical
20   significance concerning nerve density in the
21   scar tissue?
22       A.  She did non-parametric analysis.
23       Q.  Do you know the specific test name?
24       A.  It was a p-value.  I don't remember
25   exactly now, but there are several parametric

Page 176

1    and non-parametric tests.
2        Q.  Do you know if any corrections were
3    made to the data based on multiple comparisons?
4        A.  We are going into sort of different
5    areas of statistics.  This is -- this was a
6    simple test, ten virgin tissue, ten scar without
7    mesh, and ten mesh specimens.  So essentially
8    you have to measure, or calculate p-value of the
9    difference between these two groups.
10       Q.  All right.  There are multiple
11   comparisons in what you just identified?
12       A.  We -- I think multiple comparisons
13   might be a specific statistical term.  I don't
14   want to mix this.  This was a simple two group
15   analysis, and then difference between three
16   groups.
17       Q.  Have you calculated the statistical
18   significance, if any, affecting nerve density in
19   scar tissue concerning mesh slings?
20       A.  No.
21       Q.  The statistician that you consulted,
22   is that statistician in the -- strike that.
23           Is the statistician who you referenced
24   going to be named in the manuscript?
25       A.  Yes.

Page 177

1        Q.  And is that statistician somebody at
2    your hospital?
3        A.  She's U of T staff.
4        Q.  University of Toronto?
5        A.  Yes.
6        Q.  Page 4, Section 1.1.1.2, "Ingrowth,"
7    you say "The association of nerve entrapment
8    with pain is well established in medicine and
9    became common knowledge."
10           Do you see that?
11       A.  Yes.
12       Q.  And then you say "Since the dawn of
13   surgery, surgical techniques have been developed
14   to avoid nerve damage and entrapment."
15           Do you see that?
16       A.  Yes.
17       Q.  When did the association of nerve
18   entrapment with pain become common knowledge, in
19   your opinion?
20       A.  It's hard to trace now, but you have
21   to think that's the effect of it.  So once
22   people realize that toothache is when the nerve
23   is compressed in the root canal, that's where it
24   can be traced.
25       Q.  When did you acquire the knowledge

45 (Pages 174 to 177)

Vladimir Iakovlev, M.D.

Page 178

1    that nerve entrapment can lead to pain?
2        A.  In medical school.
3        Q.  Is that something you were taught
4    during basic pathology course in medical school,
5    or another course?
6        A.  Surgery mostly.  Yeah, mostly surgery.
7    Some neurology.
8        Q.  Page 4, a little bit further down, you
9    say "A knitted polypropylene mesh introduces
10   thousands of compartments (pores into the
11   body)."
12       Do you see that?
13       A.  Yes.
14       Q.  You're not talking about a TVT mesh
15   sling there, correct?
16       A.  Repeat the question?
17       Q.  You're not talking about a TVT mesh
18   sling, correct?
19       A.  You're not -- let's phrase it, "A mesh
20   of knitted design introduces multiple
21   compartments, including TVT Ethicon mesh."
22       Q.  But you wrote "introduces thousands of
23   compartments."  And you know the TVT sling is
24   only one centimeter wide, correct?
25       A.  Yes.

Page 179

1        Q.  You know how many pores there are per
2    centimeter?
3        A.  I can calculate it.  But it's a long
4    one.
5        Q.  Do you know how much tape, on average,
6    is left in a woman after she has a TVT-O sling
7    put in, the length of tape?
8        A.  The length of tape, I can go back and
9    check the records.  I don't remember exactly.
10   It's probably up to 10 centimeters or so,
11   roughly, my estimate.
12       Q.  The excess --
13       A.  More, probably more than 10
14   centimeters.
15       Q.  For TVT-O?
16       A.  Yes.
17       Q.  What's your estimate for the length of
18   tape?
19       A.  If you take a length, maybe up to
20   15 centimeters.
21       Q.  You understand that the excess tape is
22   cut?
23       A.  Yes.
24       Q.  And then the incisions are closed?
25       A.  Yes.

Page 180

1        Q.  Okay.  And it's your contention that
2    there's thousands of pores in that --
3        A.  Yes.
4        Q.  -- 15-centimeter piece of mesh tape?
5        A.  Yes.  Now we have to define what's
6    support.
7        The mesh is needed in the complex
8    weave pattern.  So the pores are not just those
9    which are commonly described in one dimension,
10   they're also spaces in third dimension.  These
11   are also pores.  People try to avoid that, but
12   it's still there.  When you look in the
13   microscope you see all this.
14       So if you now go to manufacturer
15   descriptions of the porosity of the mesh, this
16   will be underestimation of the number of
17   compartments.
18       So this -- if we go to Page 34, the
19   convention is that the pores are only on this.
20   But that's underestimation, because the space is
21   also in third dimension, and these are also
22   compartments.
23       Q.  What brand is that mesh on the left
24   that you're pointing to?
25       A.  Either Ethicon or another brand.

Page 181

1    They're all done the same way.
2        Q.  Those two aren't done the same way.
3    If you look at them, they certainly don't look
4    the same?
5        A.  One is blue, one is transparent, but
6    the knitting pattern is the same.
7        Q.  How do you know that?
8        A.  I can see it.
9        Q.  What type of mesh is this on the left?
10       A.  It's a transvaginal sling.
11       Q.  I'm saying who is the manufacturer?
12   What's the type of sling?
13       A.  I don't remember now.
14       Q.  Do you have information back at your
15   office that identifies, for example, Figure 17a
16   in the left, that's a photograph of this type of
17   sling?
18       A.  Yes, it's most likely AMS sling.  So
19   when the mesh is knitted, the parameters which
20   were described as porous are these holes, but
21   this is not all the compartments.  This is also
22   a pore, it's a different dimension, nobody
23   looked at it.  But when I look in the
24   microscope, this compartment is also inhabited
25   by living tissue with vessels and nerves, and

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 182

1    they're completely ignored during manufacturing
2    description. So if you measure so many pores in
3    one centimeter width, you also have to count
4    these pores.
5        Q. And it's your testimony that there's
6    tissue that gets into those pores in Figure 17b,
7    the lower right?
8        A. Yes.
9        Q. What's the distance in microns of that
10   space where you see tissue?
11       A. This space?
12       Q. Yes.
13       A. It's over a millimeter.
14       Q. And for the picture that's at the
15   bottom of Figure 17b on the right, what's the
16   size of those mesh pores?
17       A. Those small ones, over a millimeter.
18   Larger than a millimeter.
19       Q. The mesh pores in TVT mesh are larger
20   than a millimeter?
21       A. What do we define as a pore? Space
22   limited by filaments? They will go all the way
23   from nothing when the filaments touch each other
24   to the largest dimension. So it's a range. It
25   will start from 1 micron or whatever, no space

Page 183

1    in-between at all, to -- I don't remember exact
2    measurement, but it will be over a millimeter.
3        Q. Did you measure the pore size of the
4    TVT-O mesh?
5        A. At one point, yes, I measured this
6    linear dimension. The maximum dimension.
7    There's no such thing as pore size. There's
8    maximum dimension of a pore. Because these
9    pores, when they're looked in three-dimensional
10   space, start from zero, and then they extend to
11   maximum dimension. Maximum dimension can be
12   measured.
13       Q. And what was the measurement you
14   obtained for the maximum dimension of the pore
15   of the TVT-O mesh?
16       A. I don't remember now. Over a
17   millimeter. From -- usually it's over two
18   millimeters, largest dimension, or approaches to
19   two millimeters, largest dimension.
20       Q. Did you compare any explanted mesh
21   slings that were taken out for reasons other
22   than those that you assume were because of
23   complications?
24       A. Recurrence. Hernias can recur, so I
25   examined those meshes which were taken out for

Page 184

1    recurrence. Patient didn't come for --
2    complaining of symptoms as complication of the
3    mesh placement, but they came because hernia
4    recurred. So the mesh was excised for
5    recurrence.
6        Q. I think -- I don't think that we --
7    you didn't hear my question, I guess.
8            Did you look at any mesh slings,
9    transvaginal mesh slings, which were -- strike
10   that. I'll just ask it again.
11           Did you compare any explanted mesh
12   slings that were taken out for reasons other
13   than those that you assume were due to
14   complications?
15       A. I think I answered that.
16       Q. I'm not talking about hernia, I'm
17   talking about mesh slings.
18       A. Even before that.
19       Q. Okay. Let me understand then.
20       A. You asked me if I examined specimens
21   which were excised not for complications, and my
22   answer was that I -- my understanding is that
23   all meshes are excised to treat complications.
24       Q. So for the mesh slings that you looked
25   at, all of those you looked at were to people

Page 185

1    who had complications, to your understanding?
2        A. Yes.
3        Q. You didn't have a separate group of
4    mesh slings that you analyzed that were not
5    taken out for patients with complications and
6    you compared those two data sets, correct?
7        A. No. Because I don't believe such a
8    group exists.
9        Q. Let's go to Page 12 of your report.
10           What I'd like to do is just go through
11   the photographs, photo micrographs you have, and
12   ask you questions about them.
13           All right. We're looking at Figure 1a
14   on Page 12 of your report.
15           Do you see that?
16       A. Yes.
17       Q. And this is from Mrs. Edwards' TVT-O
18   sling, correct?
19       A. Yes.
20       Q. You did S100 protein staining,
21   correct?
22       A. Yes.
23       Q. What's the power of the views we're
24   looking at for these photographs in Figure 1a?
25       A. See, I was preparing this for just

Vladimir Iakovlev, M.D.

Page 186

1    general public, so it include each objective.
2    Then when I prepare the pictures, I crop them,
3    therefore the initial magnification factor is
4    thrown away just by cropping factors.  So
5    technically you cannot firmly state what
6    magnification factor the picture is.  I can give
7    you approximately dimensions for reference.
8        Q.  Sure.
9        A.  The filaments are approximately .2
10   millimeter.
11       Q.  Did you measure the filament diameter?
12       A.  Yes.  Approximately .2-millimeter
13   plus/minus.
14       Q.  Plus/minus what?
15       A.  Error of measurement.  Or maybe they
16   varied, maybe they're not all the same.
17       Q.  That's my question.  Did you go
18   through, and did you measure all the filaments
19   in Mrs. Edwards' TVT-O mesh that you looked at?
20       A.  No.  Didn't answer any questions,
21   approximately I measured range.
22       Q.  I guess what I'm getting at is when
23   you say you measured it, do you mean you
24   eyeballed it and measured it, or you measured it
25   with some type of tool?

Page 187

1        A.  Micrometer, tool, in the eyepiece.  So
2    you use scale in the eyepiece, and then you use
3    magnification factor objective, and then you
4    measure.
5        Q.  So Figure 1a, the microscope that you
6    looked at -- strike that.
7            The microscope you used to look at
8    Mrs. Edwards' specimens, what were the different
9    power options you had on that microscope?
10       A.  One -- objectives, not --
11       Q.  Objectives, yes.
12       A.  Objective magnification factors --
13   magnifications were times 1, 2.5, 4, 10, 25, 40,
14   100.
15       Q.  And can you estimate which one you
16   were using for Figure 1a?
17       A.  Close to 10.  Maybe 25.  It all
18   depends on cropping factor, because if the
19   picture was large and I just cropped.  Sometimes
20   you have to choose because not all objectives
21   are flat, sometimes it's darker corner, so it's
22   better to take a picture with lower
23   magnification and then crop it, and for some
24   magnification you go just to specific objective.
25       Q.  But you have all these photographs at

Page 188

1    your office?
2        A.  Yes.
3            MR. SNELL:  I think I asked, but just
4    note a request to produce.
5    BY MR. SNELL:
6        Q.  Under Figure 1a you talk about "The
7    nerve branches enter between the mesh filaments
8    and grow into the spaces of mesh structure-nerve
9    ingrowth since the spaces were created by the
10   mesh placement during surgery."
11           Do you see that?
12       A.  Yes.
13       Q.  When you write "The spaces were
14   created by the mesh placement during surgery,"
15   do you understand that the space where the mesh
16   is placed is actually a space that's there
17   before the surgery?
18       A.  No.  There are no space before.  There
19   is solid tissue, then there is an incision, and
20   then mesh is placed.  Therefore that space,
21   newly created during the incision, is filled by
22   the mesh, and then tissue has to ingrow in that
23   space that's introduced by the mesh.
24       Q.  Can you explain to me how it is --
25   strike that.

Page 189

1            Can you explain to me your
2    understanding of how a TVT-O mesh is put into
3    the body?
4        A.  There is an incision, and then a
5    trocar is being pulled through the tissue.
6        Q.  Where is the incision?
7        A.  Incision is -- I think one is in skin,
8    and the one is in the vaginal wall.
9        Q.  Is it a through-and-through incision
10   through the vaginal wall, or is it only partway
11   through?
12       A.  The mucosa is incised through, so it's
13   not just epithelial, the mucosa transect.
14       Q.  So the full thickness of the vaginal
15   wall is transacted during the TVT placement?
16       A.  Not vaginal wall, mucosa.
17       Q.  Does the mesh get placed -- so to your
18   understanding, if you think of the vagina, the
19   surgeon, to your understanding, does not dissect
20   all the way through the vaginal wall to put the
21   mesh up behind it and below the mid urethra, is
22   that your understanding?
23       A.  It's placed somewhere in that space
24   between urethra and the mucosa.  Again, there is
25   no hard anatomical structure to limit you either

48 (Pages 186 to 189)

Vladimir Iakovlev, M.D.

Page 190

1    way.  Mucosa is an anatomical structure you can
2    see.  Urethral wall anatomical structure you can
3    see and feel when it's dissected.
4        So when the mucosa is opened, what you
5    see, you actually see parts of vaginal wall, how
6    deep you are in the vaginal wall is
7    questionable.  What is part of vaginal wall.
8    Mucosa itself, some mucosal tissue, smooth
9    muscle, everything, all tissue up to the urethra
10   is vaginal wall.  So mesh is placed within parts
11   of the vaginal wall.
12       Q.  To your understanding, mesh is placed
13   within parts of the vaginal wall?
14       A.  Repeat it?
15       Q.  To your understanding, the TVT-O mesh
16   is placed within parts of the vaginal wall?
17       A.  Yes.
18       Q.  Have you ever performed a TVT?
19       A.  No.
20       Q.  Even in a cadaver lab setting?
21       A.  No.
22       Q.  Have you ever performed any type of
23   urinary incontinence surgery?
24       A.  No.
25           MS. THOMPSON:  Lunch is here.

Page 191

1            MR. SNELL:  I'm hungry.  Are you
2    hungry?
3            THE WITNESS:  Yes.
4            MR. SNELL:  Let's eat then.
5            (Whereupon, a luncheon recess was
6            taken at 1:01 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1            AFTERNOON SESSION
2            1:37 O'CLOCK P.M.
3
4            (Whereupon, Iakovlev Exhibit Number 5,
5            Chain of custody regarding Mrs.
6            Edwards' mesh specimen, was marked for
7            identification.)
8    BY MR. SNELL:
9        Q.  Doctor, I've handed you Exhibit
10   Number 5, which is the chain of custody that we
11   received regarding Mrs. Edwards' mesh specimen.
12       A.  Yes.
13       Q.  Do you recognize that document to
14   indeed be the chain of custody for Mrs. Edwards'
15   mesh specimen?
16       A.  It wasn't the chain of custody which I
17   signed, because it's not signed by me.  The one
18   on Page 3, that's signed by me.  And Page 4 is
19   also signed by me.
20       Q.  So when did you get Mrs. Edwards' mesh
21   specimen?
22       A.  June 3, 2013.
23       Q.  June 3rd, 2013?
24       A.  Yes.
25       Q.  And you're referencing the third page?

Page 193

1        A.  Yes.
2        Q.  On the first page you see "P.
3    Tomkins," and a date of August 24, 2012 for
4    Mrs. Edwards three H&E slides being released to
5    the Mueller Law Firm?
6        A.  Yes.
7        Q.  Do you know what transpired between
8    August 24th, 2012 and June 3rd, 2013 with regard
9    to Mrs. Edwards' slides?
10       A.  I don't know.  But if those are
11   slides, I received specimen in formalin.  Are
12   they the same specimens?
13       Q.  Do you know?
14       A.  I don't know.
15       Q.  On the third page, you were pointing
16   to where you signed for the materials.  Item
17   number two indicates three H&E slides?
18       A.  Yes.
19       Q.  Does that correspond to the three H&E
20   slides that are referenced on Page 1?
21       A.  I don't know.  I would have to look at
22   the slide identifiers.  Most likely they are,
23   but I don't know for sure.
24       Q.  So on June 3rd, 2013, you received one
25   jar containing surgical mesh material with

49 (Pages 190 to 193)

Vladimir Iakovlev, M.D.

Page 194

1    attached soft tissue in formalin?
2         A.   Yes.
3         Q.   And you received three H&E slides?
4         A.   Yes.
5         Q.   Did the material come directly to you,
6    or to someone else in your lab?
7         A.   Came directly to me.
8         Q.   And how long had Mrs. Edwards' explant
9    material been in formalin after her surgical
10   explant?
11        A.   I can trace it back to see what was
12   the time of excision.  I mean there's a clinical
13   record of excision.  It was January, 2012.  So a
14   year and a half.
15        Q.   So Mrs. Edwards' mesh material sat in
16   formalin for about a year and a half before you
17   came in possession of it?
18        A.   Yes.  Jar in formalin.  The H&E slides
19   were generated earlier.
20        Q.   Do you know who generated those H&E
21   slides?
22        A.   I would have to see the slides, where
23   they came from, because institutional identifier
24   sometimes are on the slides.
25        Q.   When you received the mesh material

Page 195

1    from Mrs. Edwards in the jar in formalin,
2    June 3rd, 2013, what did you do with that
3    explant?
4         A.   Took it out, took a gross photograph,
5    I think I did -- I think gross photographs of
6    all specimens, and then measured it, and then
7    examined it grossly for what it contains,
8    stiffness, any other physical parameters, then
9    sectioned it and put for processing.
10             And we discussed the processing that
11   was done by diagnostic laboratory, accredited
12   diagnostic laboratory by using standard
13   operating procedures.
14        Q.   When you say you sectioned the mesh --
15   strike that.
16             You took the mesh out of the formalin,
17   correct?
18        A.   Yes.
19        Q.   And you took photographs of it?
20        A.   Gross photographs.
21        Q.   And then you measured it, correct?
22        A.   Yes.
23        Q.   How did you measure it?
24        A.   With a ruler.
25        Q.   As we discussed earlier, though, you

Page 196

1    didn't weigh it, correct?
2         A.   No.
3         Q.   You mentioned you analyzed it for its
4    stiffness?
5         A.   Yeah.
6         Q.   How did you analyze it for stiffness?
7         A.   Just by palpation.
8         Q.   By using your fingers?
9         A.   Yes.
10        Q.   You didn't use any type of tool to aid
11   you in the stiffness testing?
12        A.   No.  It's not routinely done.  As we
13   discussed, numerical parameters are weight,
14   linear dimensions, and volume.  That's recorded
15   in pathology.
16        Q.   And then you said you sectioned the
17   mesh?
18        A.   Yes.
19        Q.   Did you section it before it was
20   ultimately put in formalin?
21        A.   No.
22        Q.   I'm sorry.
23             Did your section the mesh before it
24   was put in paraffin?
25        A.   Yes.  I would have to see how it was

Page 197

1    sectioned in the path report, pathology reports.
2    When they do it, the record all these
3    procedures.
4         Q.   Which pathology report are you
5    referencing; yours?
6         A.   Mine.
7         Q.   Did you bring your pathology report
8    here today?
9         A.   I thought it was provided to you.
10        Q.   I don't have a pathology report from
11   you.
12        A.   I didn't bring it today.
13        Q.   Just so I understand, after you do
14   your stiffness and physical analysis, what
15   happens from that point until when you section
16   it?
17        A.   Nothing.  I take it out, palpate it,
18   examine for whatever is inside, into the mesh,
19   if there is any nodule, tumor, mass,
20   hemorrhagic, describe the characteristics sort
21   of.  And then I decide what is the best way to
22   section to examine for specific questions.
23             So for mesh, my initial thoughts were
24   imbedding it perpendicular on the edge might be
25   the best way of doing it.  Now I think flat

50 (Pages 194 to 197)

Vladimir Iakovlev, M.D.

Page 198

1    gives you large area for its clinical features.
2    So it's a judgment call for pathologists.
3             And then the entire specimen is just
4    put in the cassette, or it's being sectioned and
5    then pieces are put in the cassette, and then
6    the cassette goes into the machine for
7    processing.
8        Q.  How is the specimen processed?
9        A.  Specimen processing is when specimen
10   is gradually dehydrated and then saturated by
11   softened blocks, or paraffin.
12       Q.  Were you the one who does the gradual
13   dehydration of Mrs. Edwards' mesh?
14       A.  No.  It's done by a machine in the
15   lab.  There is a processing machine.
16       Q.  What machine is that?
17       A.  You mean model?
18       Q.  If you know.
19       A.  I don't know.  I mean it's a standard
20   machine.  We have several machines.
21       Q.  Do you know what the steps are in the
22   dehydration process that you subjected
23   Mrs. Edwards' explant to?
24       A.  What usually is done -- not usually.
25   What is done by standard operating procedure, it

Page 199

1    goes through several solutions of formalin, so
2    first formalin circulates in the machine, then
3    this formalin is being replaced by solution of
4    an alcohol, gradually becomes 100 percent
5    alcohol.  The alcohol is a soluble substance,
6    but is not exactly water.  So at that stage the
7    specimen tissue becomes dehydrated, but still
8    immersed in fluid.  And then alcohol is being
9    replaced by xylene again in several solutions,
10   because xylene is a solvent for paraffin.  Then
11   when tissue is fully saturated by xylene,
12   paraffin can saturate it together with xylene.
13            And then the cassettes are being taken
14   out, and then tissue is put in the cassettes for
15   paraffin blocks.  Not in the cassettes, in the
16   bowls, the paraffin blocks.  It's a routine
17   protocol that's been in use for over 100 years.
18       Q.  Do you have a written protocol for how
19   Mrs. Edwards' mesh was processed and dehydrated?
20       A.  There is a standard operating
21   procedure.  It was done by standard operating
22   procedure.  Not just Mrs. Edwards specimen, any
23   specimen is processed by these procedures.
24       Q.  All of the litigation transvaginal
25   mesh specimens that you analyzed went through

Page 200

1    this same standard operating procedure to
2    gradually dehydrate the explant before putting
3    it into paraffin?
4        A.  Yes.  Not just explanted meshes.  I
5    also did the same procedure for new mesh.
6        Q.  Okay.  Now, the alcohol solution is
7    ultimately increased up to 100 percent?
8        A.  Yes.
9        Q.  Okay.  And during the dehydration
10   process, you testified that the alcohol is then
11   replaced by xylene?
12       A.  Yes.
13       Q.  What is xylene?
14       A.  It's a solvent.
15       Q.  I'm not a chemist, I'm sorry.
16       A.  It's a solvent.  I mean it's like any
17   solvent, chemical -- organic chemical solvent.
18       Q.  Does the solvent dry out the tissue?
19       A.  It's already dry.  Dehydration.  If
20   you mean drying as in dehydration, it's already
21   dehydrated.  It is fluid, it's liquid, but it's
22   not water.
23       Q.  What was the concentrations of the
24   xylene that were used in the process to prepare
25   Mrs. Edwards' mesh explant?

Page 201

1        A.  Xylene is a pure substance.  It's not
2    dissolved in any other substance.  It may have
3    traces of something, some other solvents, but...
4        Q.  You said that the explant was
5    submitted to -- or strike that.
6             You said the explant was subjected to
7    several circulations of formalin?
8        A.  Yes.  Or solutions, or containers.
9    And the machine takes fluid from the container
10   and circulates within to wash all the specimens,
11   and then the fluid is being collected back, and
12   then the container is used to replace previous
13   solution and so forth.  It cycles.
14       Q.  How many cycles are involved with the
15   circulation of formalin?
16       A.  I think at least three.  It's standard
17   operating procedures.
18       Q.  Do you know how long this at least
19   three cycles took for the circulation of the
20   formalin of Mrs. Edwards' explant?
21       A.  This process can be interrupted.  It
22   can be anywhere from 72 hours to two hours.  If
23   the specimens are loaded Friday, they remain in
24   formalin up until evening/afternoon of Sunday,
25   and then the cycles starts in.

51 (Pages 198 to 201)

Vladimir Iakovlev, M.D.

Page 202

1    Q.  The exposure to the alcohol -- strike
2  that.
3        The explant is exposed to different
4  concentrations of alcohol as you testified to,
5  correct?
6    A.  Yes.
7    Q.  Are those done in different cycles as
8  well?
9    A.  The alcohol steps follow formalin, so
10  there are several solutions.  First it will be
11  lower concentration of alcohol, I think
12  75 percent, then next solution becomes 85 or 80,
13  and then 90, 95, and then 100 percent.  So it's
14  increasing concentration.  I don't remember
15  exactly how many, but it will be increasing
16  concentration up to 100 percent pure alcohol.
17    Q.  Do you know for how long the -- strike
18  that.
19        Do you know for how long Mrs. Edwards'
20  mesh explant was exposed to the different
21  alcohol concentrations?
22    A.  No.  I would have to check with the
23  procedures.
24    Q.  And then the alcohol was replaced by
25  xylene, which is a solvent, as you testified to,

Page 203

1  correct?
2    A.  Yes.
3    Q.  And how is the mesh explant exposed to
4  xylene?
5    A.  The same way.  I mean contained within
6  cassettes, and fluid circulates through baskets
7  filled with these cassettes from different
8  specimens.  The machine is loaded by anywhere
9  between 20 to 100 of cassettes from different
10  patients, and everything is being processed in
11  the same time.
12    Q.  And how long was Mrs. Edwards' explant
13  exposed to the xylene?
14    A.  I would have to check for standard
15  procedures.  It's a standard procedure.  There
16  was nothing modified for Ms. Edwards.
17    Q.  Do you have an understanding about
18  whether it was for minutes, hours, days?
19    A.  Hours.  More hours than days or
20  minutes.
21    Q.  And the xylene is a pure substance, so
22  Mrs. Edwards' explant wasn't submitted to
23  different solutions of xylene, it was just
24  submitted to different cycles of xylene?
25    A.  See, when the alcohol is being

Page 204

1  replaced by xylene, there is traces of alcohol,
2  so then alcohol is being washed by several
3  cycles of xylene.  So one fluid -- one container
4  is used with xylene, but once it goes through
5  specimens, it absorbs some alcohol and then
6  there's a mixture, a little bit of alcohol, more
7  xylene.  So then all is drained, and then the
8  whole machine is filled with xylene again, so
9  there is much less traces of alcohol and there
10  are more xylene.  And then this is drained
11  again, and then a new solution is used.  So that
12  last step, usually third step is practically all
13  just xylene without traces of alcohol.
14    Q.  So the xylene helps remove the
15  alcohol?
16    A.  Yes.  It removes alcohol.
17    Q.  Okay.
18    A.  Replaces it.
19    Q.  And as the cassette, Mrs. Edwards'
20  cassette tissue specimen is exposed to more and
21  more xylene, the alcohol goes away, and at the
22  end you're left with pretty much pure xylene?
23    A.  Yes.
24    Q.  Is a single machine used for this
25  process we've described of going through the

Page 205

1  circulation of the formalin to alcohol
2  solutions, the xylene exposure, for
3  Mrs. Edwards' mesh?
4    A.  It's all done in one machine.  I mean
5  the cycle is all done in one machine.
6    Q.  And that's a machine inside your lab?
7    A.  Yes.
8    Q.  Are there certain temperature controls
9  within that machine during this process we've
10  been discussing for Mrs. Edwards' mesh?
11    A.  Yes, it's strictly controlled.
12    Q.  Do you know what the temperature
13  control is?
14    A.  For different stages it's different,
15  and you would have to go through the procedure.
16  It's programmed into the machine.
17    Q.  It would be laid out in the standard
18  operating protocol you described?
19    A.  Yes.  Or a manual for the machine.
20  And I believe it would be the same anywhere in
21  the diagnostic labs.
22    Q.  I believe you testified then the
23  explant is exposed to paraffin?
24    A.  Yes.
25    Q.  Is xylene still on the explant when

Vladimir Iakovlev, M.D.

Page 206

1    it's exposed to paraffin?
2        A.   There might be some traces, because
3    xylene is a solvent for paraffin, so xylene can
4    dissolve paraffin.   When it's fully saturated
5    with xylene, then you can saturate it with
6    paraffin, because paraffin is being dissolved by
7    xylene.   So you replace it with paraffin.
8        Q.   Was Mrs. Edwards' explant fully
9    saturated with xylene at the end of the xylene
10   cycles?
11       A.   Yes.
12       Q.   What was the temperature of the
13   paraffin that was put onto Mrs. Edwards' mesh
14   explant?
15       A.   It goes up to melting point of
16   paraffin.   I think it might be up to 90 degrees
17   centigrade.
18       Q.   So the paraffin that was put onto
19   Mrs. Edwards' mesh was at a temperature of up to
20   90 degrees centigrade?
21       A.   Yes.
22       Q.   And --
23       A.   Depends on the paraffin.   Some
24   paraffins need lower melting temperature, they
25   are have mixed, pre-mixed, so it's a little

Page 207

1    different, it's a little different.   But roughly
2    90 degrees, around that.
3        Q.   And how long does the explant stay in
4    the paraffin until -- strike that.
5            The melted paraffin ultimately sets
6    into a block, correct?
7        A.   Yes.
8        Q.   How long does it take for
9    Mrs. Edwards' explant to go from being exposed
10   to the hot, melted paraffin to a block?
11       A.   I don't know.   Sometimes it's
12   variable, so I would have to check with
13   procedures.   It's not that long.   Minutes, I
14   would say.   But again, I would have to check
15   with standard operating procedures.
16           Mostly depends how they imbed them,
17   because they are sitting in this liquified
18   paraffin, and technology is imbedded.   So if
19   it's the first cassette, it will take many
20   minutes.   But if it's a cassette on bottom, it
21   may take more than an hour.
22       Q.   Are they submitted -- strike that.
23           Are the cassettes exposed to some type
24   of cooling mechanism to set the paraffin?
25       A.   Yes.

Page 208

1        Q.   And that exposure to the cooling can
2    differ, depending upon the level at which it's
3    in this machine?
4        A.   No.   The time when the technologist --
5    just because they are sitting in paraffin when
6    the technologist is working.   So that period is
7    variable for cassettes.
8        Q.   What is the makeup of the paraffin
9    that you use for Mrs. Edwards' mesh?
10       A.   I don't know exact concentration,
11   proportions of paraffins, because some paraffins
12   have slightly different physical
13   characteristics.   It's somewhere in the
14   operating procedures.   It's a diagnostic grade
15   of paraffin.
16       Q.   Okay.   Do you know where your hospital
17   would have gotten the paraffin from that was
18   used in Mrs. Edwards' explanted mesh?
19       A.   I can check with the record.   I mean
20   every time they buy they have record.
21       Q.   Would it show the one that
22   Mrs. Edwards was exposed to?
23       A.   We can see what was -- and where it
24   was bought at that time, if there is a record.
25   I mean there should be a record.

Page 209

1        Q.   The testing that you did for
2    degradation of Mrs. Edwards' mesh, was that done
3    after the mesh was put in paraffin?
4        A.   Testing of degradation wasn't just
5    done on Ms. Edwards', because testing of
6    degradation and the process with controls
7    analysis comparison with -- of different
8    specimens.   So the specimens which are analyzed
9    by microscope, they are all going through the
10   same processing steps as we discussed.   So
11   Ms. Edwards' specimen went through all these
12   steps, as well as other specimens, as well as
13   controls of new mesh.
14       Q.   Let's focus on Mrs. Edwards
15   specifically, though.
16           The degradation analysis you did
17   regarding Mrs. Edwards' mesh was an analysis
18   done with microscope, correct?
19       A.   I detected.   It wasn't analysis.
20   Analysis of degradation process was not done on
21   one patient.   So to make conclusion of the
22   degradation it needed examination of several
23   specimens looking for specific features, and
24   compare this with control samples, which are --
25   which were new meshes subjected to the same

53 (Pages 206 to 209)

Vladimir Iakovlev, M.D.

Page 210

1    formalin fixation and processing steps.
2        Q.  You said you didn't do degradation
3    testing, you did --
4        A.  Detection.
5        Q.  -- detection.
6        Okay.  So the degradation detection
7    you did specific to Mrs. Edwards' mesh was done
8    when you looked through the microscope at her
9    specimens?
10       A.  Yes.
11       Q.  And that detection, looking through
12   the microscope, was done obviously after the
13   specimen had been first exposed to formalin and
14   then put in paraffin, in the paraffin set,
15   correct?
16       A.  Yes.  But the way you presenting it is
17   misrepresenting the analysis.  Because if they
18   go to analysis of degradation, you cannot base
19   it on one patient.  Once you do analysis, you
20   identify features which are reflecting
21   degradation, then you can detect it in other
22   specimens.  That's what was done for
23   Ms. Edwards.  Once I performed analysis of
24   degradation process, then I could detect it in
25   Ms. Edwards.

Page 211

1        Q.  You described the way in which
2    Mrs. Edwards' mesh was processed from the time
3    you got it until the time it was put into the
4    paraffin blocks and set.  Did you consult with
5    anyone about that process and how it should take
6    place?
7        A.  This is standard process of
8    microscopic examination.
9        Q.  So the answer is no, you didn't
10   consult with anyone, correct?
11       A.  No.
12       Q.  Did you consult with any polymer
13   chemist?
14       A.  No.
15       Q.  Did you consult with any material
16   scientist?
17       A.  No.
18       Q.  Did you talk with any of the other
19   Plaintiffs' experts?
20       A.  Regarding process?
21       Q.  Yes.
22       A.  This is the only process which enables
23   you to see things under microscope.
24       Q.  So the answer is you didn't talk to
25   any of the Plaintiffs' experts, correct --

Page 212

1        A.  No.
2        Q.  -- about the processing?
3        A.  No.
4        Q.  Did you imbed the entire specimens
5    received on Mrs. Edwards into the paraffin?
6        A.  I think so.  I would need to go and
7    check.  Sometimes I preserve, and then most of
8    the samples for this litigation were divided in
9    half once we had protocol that samples need to
10   be divided in half, and one half need to be
11   preserved.  So I would need to check if for
12   Ms. Edwards we already had that protocol, or we
13   didn't have that protocol.
14       Q.  Is this a written protocol, it sounds
15   like, you had?
16       A.  It was -- well, it was written for at
17   least one trial, for one litigation.
18       Q.  You don't happen to have a copy of
19   that protocol here today?
20       A.  It was for different litigation.
21       MR. SNELL:  I note request to produce.
22   BY MR. SNELL:
23       Q.  For the different solvents/chemicals
24   that Mrs. Edwards' mesh was exposed to, did you
25   consult with anybody else about what particular

Page 213

1    chemicals and concentrations should be used
2    during that process?
3        A.  No.  It's standard process, so I used
4    standard process.  The most important question
5    is if controls were exposed to the same steps,
6    which they were.
7        Q.  For Mrs. Edwards' mesh, why didn't you
8    leave half of it in formalin for us to look at?
9        A.  Because we didn't have that product.
10   I was not told that specimens for litigation
11   process may need another half for Defendants'
12   experts.  Once the protocol was formally set,
13   then I was processing all specimens in the same
14   fashion.  And later specimens, they were all
15   divided.
16       Q.  When did you process Mrs. Edwards'
17   specimens?
18       A.  In June, 2013.
19       Q.  For the paraffin blocks that you made
20   for Mrs. Edwards' specimens, did you cut through
21   all of the blocks when you did your analyses?
22       A.  No, the blocks were not exhausted,
23   there's still tissue, must be still tissue in
24   the blocks.
25       Q.  Did you take samples from each of the

54 (Pages 210 to 213)

Vladimir Iakovlev, M.D.

Page 214

1    blocks?
2        A.  If block is produced there is a slide,
3    so each block is being sectioned.  I had slides
4    for each block.  It could have been only one
5    block or it could have been more than one, but
6    if there's a block there's a slide.
7            (Whereupon, Iakovlev Exhibit Number 6,
8            Slide of paraffin blocks from Mrs.
9            Edwards' explant, was marked for
10           identification.)
11   BY MR. SNELL:
12       Q.  Handing you Exhibit Number 6
13   (handing).
14       A.  Yes.
15       Q.  Do you recognize these to be the
16   paraffin blocks from Mrs. Edwards' explant that
17   you prepared?
18       A.  There is no identifier.  I can see
19   it's Ethicon mesh because it's blue.
20           (Whereupon, Iakovlev Exhibit Number 7,
21           Slides of paraffin block of Ms.
22           Edwards' explant, was marked for
23           identification.)
24       A.  There are two blocks.  If they're the
25   same.

Page 215

1    BY MR. SNELL:
2        Q.  Take a look at Exhibit Number 7.
3        A.  That's a slide, but the block is
4    not -- I mean the outlines of the tissue are the
5    same, so I assume that this is, yes.
6        Q.  So Exhibit Number 7 has the blocks on
7    the front page to the left, and then a slide to
8    the right of that, correct?
9        A.  Yes.
10       Q.  And you see it says "Edwards, Tonya"
11   up above, correct?
12       A.  Yes.
13       Q.  Where was this slide made?
14       A.  That's St. Michael's Hospital label.
15       Q.  Your hospital?
16       A.  Yes.
17       Q.  A slide you made?
18       A.  My lab made.
19       Q.  What's the blue line?
20       A.  Control.  Immunohistochemical control.
21       Q.  So you made the blue line there?
22       A.  No.  The technologist.
23       Q.  So the specimen above is the control?
24       A.  Yes.
25       Q.  Below is the specimen from the block

Page 216

1    which mirrors the tissue appearance in the
2    block?
3        A.  Yes.
4        Q.  Okay.  Turn to the second page.
5    Similar to the first page; do you recognize this
6    to be another block?
7        A.  Yes.
8        Q.  With a slide that has tissue which
9    mirrors the shape of the block?
10       A.  Yes.
11       Q.  And although the label is cut off
12   above, does that also appear to be a
13   St. Michael's slide, have the same lot number,
14   40193?
15       A.  Looks like it, yes.
16       Q.  So having seen Exhibit 7, you made two
17   blocks of paraffin tissue with Mrs. Edwards'
18   explant in it?
19       A.  By this exhibit, it looks like that,
20   yes.  But I would have to check with my
21   pathology report.  It's most likely only two
22   blocks.
23       Q.  Go back to the chain of custody
24   exhibit, the very last page.
25       A.  Emory Med Labs material, and the next

Page 217

1    line is St. Michael's Hospital, 1a and -- yes,
2    they were only two blocks.
3        Q.  Okay.  So for Mrs. Edwards' mesh
4    specimen, you processed -- you ended up
5    processing it into two paraffin blocks labeled
6    1a and 1b?
7        A.  Yes.  That's correct.
8        Q.  And you took sections from both blocks
9    1a and 1b of Mrs. Edwards' mesh explant,
10   correct?
11       A.  Yes.
12       Q.  And if you look at Exhibit Number 6
13   and 7 --
14       A.  Yes.
15       Q.  -- does it appear that you
16   sectioned -- strike that.
17           Looking at Exhibit 6 and 7, does it
18   appear that you sectioned the mesh specimen
19   perpendicular in the formalin?
20       A.  It's on edge, or most of the specimen
21   is on edge.  I mean it's hard to define where
22   edge is of a round structure.
23       Q.  Mrs. Edwards' mesh explant that you
24   received, did it have protein on it?
25       A.  Human tissue is mostly protein.

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 218

1      Q.  So Mrs. Edwards' mesh explant had
2    obviously human tissue on it, correct?
3      A.  Yes.
4      Q.  And this human tissue contains
5    protein, correct?
6      A.  Yes.
7      Q.  It was exposed to the formalin with
8    the tissue on it, correct?
9      A.  "It" meaning mesh, yes.
10     Q.  The explant, yes.
11     A.  Yes.
12     Q.  Is formaldehyde a substance which
13   naturally occurs in the body?
14     A.  Maybe in very small amounts.
15     Q.  Which --
16     A.  Very small amounts.
17     Q.  Which organ would produce formaldehyde
18   in the human body?
19     A.  Might be -- I would have to check, but
20   it might be a product of when the liver is
21   metabolizing some substances and toxins.  But if
22   it is, it will be very small amount.  I know the
23   body's producing some aldehydes.  If any of
24   those aldehydes are containing the same tail as
25   formaldehyde, I don't know for sure.  But human

Page 219

1    body can produce aldehydes.  Actually that's
2    what people experience during hangover, because
3    alcohol is being converted to aldehydes.
4      Q.  Water was removed from Mrs. Edwards'
5    specimens during this processing?
6      A.  Yes.
7      Q.  How much water?
8      A.  All of it, or most of it.
9      Q.  Is it collected and weighed during the
10   processes that you had employed?
11     A.  Water?
12     Q.  Yes.
13     A.  No.
14     Q.  The water weight.
15     A.  No.
16     Q.  Is water known as a universal solvent?
17     A.  Yes.  It's a substance which dissolve
18   most -- the most of the chemicals.  I mean no
19   other solvent can dissolve as many chemicals
20   within.
21     Q.  Do you know if water is a known
22   plasticizer, or is that an area outside of your
23   field?
24     A.  It's an area outside of my field.
25     Q.  Okay.  Did you use tweezers or forceps

Page 220

1    or any tools to manipulate the mesh during the
2    processing steps?
3      A.  During imbedding it's usually handled
4    by forceps.  I -- depending on -- sometimes I
5    just section it and handle it with my fingers.
6    Depends.
7      Q.  Would you wear gloves?
8      A.  Yes, always.  New, new gloves out of
9    the package.
10     Q.  Do proteins have oxygen in them?
11     A.  Yes.  I mean there is oxygen.
12         You mean oxygen as oxygen gas, or
13   oxygen as oxygen atoms.
14     Q.  Oxygen atoms, correct.
15     A.  Yes.
16     Q.  For Mrs. Edwards' explant, you didn't
17   do any energy dispersion spectometry testing?
18     A.  That's outside of my field.
19     Q.  You did not do any scanning electron
20   microscopy in Mrs. Edwards' case, correct?
21     A.  No.  I did not do scanning electron
22   microscopy.
23     Q.  The electron microscopy that you did
24   look at -- strike that.
25         The electron microscopy that you did

Page 221

1    do for Mrs. Edwards' explant was done after her
2    samples had been dried out and set in paraffin,
3    correct?
4      A.  I don't think I've done electron
5    microscopy for Ms. Edwards.
6      Q.  Okay.
7      A.  I've done it on other Ethicon
8    explants.
9      Q.  So you have not done any type of
10   electron microscopy on Mrs. Edwards' explant?
11     A.  No.
12     Q.  You know that when formaldehyde bonds
13   with protein polymers a new polymer is formed?
14     A.  Please repeat the question?
15     Q.  Sure.
16         Do you know that when formaldehyde
17   bonds with protein polymers a new polymer is
18   formed?
19     A.  Protein polymer; I'm not sure what you
20   mean.
21     Q.  Okay.  Is that a field outside of your
22   expertise?
23     A.  I'm not sure if such thing exists, a
24   protein polymer.  Maybe since any sort of
25   setting, if you accept -- polymer is something

56 (Pages 218 to 221)

Vladimir Iakovlev, M.D.

Page 222

1  with relatively homogeneous simple molecule
2  which is being linked into continuous chains.
3  Proteins are completely different structures.
4  So I don't think this is a correct term.
5      Q.   When a chemical like formaldehyde --
6  is it your field of expertise where you know
7  whether when formaldehyde is exposed to
8  proteins, whether they can bond?
9      A.   That's the role of formalin.
10  Formaldehyde crosslinks proteins.
11      Q.   Okay.
12      A.   Protein becomes sort of tied up in
13  specific sites.
14      Q.   The chemicals we talked about in the
15  processing of Mrs. Edwards' specimen, the
16  paraffin -- strike that.
17          The chemicals and solutions we
18  discussed which Mrs. Edwards' mesh specimen were
19  subjected to, including the circulating
20  formalin, the alcohol, the xylene, and the
21  paraffin, is that the total of chemicals and
22  solutions that her mesh was submitted to?
23      A.   Then there's staining, so there's
24  chemicals during staining.
25      Q.   Before we get to staining, were there

Page 223

1  any others?
2      A.   That's it.  That's it.
3      Q.   Okay.  Have you ever been involved in
4  doing any chemical analyses of meshes?
5      A.   Well, we have to define what is
6  chemical analysis.  When I stain it, is it
7  chemical analysis, and look at it under a
8  microscope?
9      Q.   No.
10      A.   You mean specific like XPS analysis?
11  No.
12      Q.   Have you ever done FTIR testing on
13  meshes?
14      A.   No.
15      Q.   Is that something you were ever
16  trained on?
17      A.   No.
18      Q.   Okay.  You understand that there are
19  chemical tests that experts in other disciplines
20  use to analyze chemicals like FTIR testing?
21      A.   Yes, I heard -- I saw some
22  publications that were done and can be used.
23      Q.   But that's not something that you
24  regularly do in your course of work?
25      A.   No.

Page 224

1      Q.   That's not something you consider
2  yourself an expert on?
3      A.   No.
4      Q.   Have you ever -- just so I'm clear,
5  you've never prepared a mesh for chemical
6  processing and testing?
7      A.   For those specific tests, no.  I
8  prepared one sample, as we discussed earlier, as
9  a part of XPS analysis.  I prepared the sample
10  for XPS analysis.
11      Q.   XPS?
12      A.   XPS.
13      Q.   What is that?
14      A.   That's a spectroanalysis of x-ray, I
15  think, radiation, or based on x-ray principles.
16      Q.   How was it that you came to prepare
17  that sample?
18      A.   I happened to receive the sample,
19  which was in dry jar and devoid of tissue and
20  not exposed to formalin, the jar wasn't labeled
21  as formalin, so it was a good opportunity to
22  test it.  No formalin exposure, clean filaments
23  without tissue.
24      Q.   That's not something you did for TVT-O
25  mesh?

Page 225

1      A.   It was not TVT-O mesh.
2      Q.   What type of mesh was that?
3      A.   It was a sling of other manufacturer,
4  but I don't remember which manufacturer.
5      Q.   Did it have tissue on it?
6      A.   Partially yes, partially no.  The end
7  filaments were clean.
8      Q.   Did you consult any literature or text
9  when you did the preparation of that sling
10  sample?
11      A.   No.  The preparation was pretty
12  simple, cut off the ends and separate them in
13  two groups, scratch the surface on one group,
14  and leave the other group not altered.
15      Q.   Let's go back to Page 18 in your
16  report.  I'm sorry, go back even further.
17      A.   Yes.
18      Q.   So we were looking at Figure 1a,
19  "Nerve Ingrowth."
20      A.   Which page?
21      Q.   Page 12.
22      A.   Page 12.
23      Q.   So if we're looking at Page 12, you
24  see there are two holes where the mesh pores
25  were?

57 (Pages 222 to 225)

Vladimir Iakovlev, M.D.

Page 226

1      A.   There are five holes.
2      Q.   I'm talking about --
3      A.   "Hole" as hole left by the mesh
4   filaments in the tissue, or hole between mesh
5   filaments?
6      Q.   I'm talking about -- first to orient
7   ourself, let's back up and see if we can reach
8   an agreement.
9           Tissue is cut with a microtome,
10   right --
11      A.   Yes.
12      Q.   -- four or seven microns thick usually
13   when you're looking at doing this type of
14   microscopic analysis, right?
15      A.   Yes.
16      Q.   In your lab you cut it about 4
17   microns, correct?
18      A.   Yes.
19      Q.   And what happens is when you cut
20   through the tissue, the mesh will actually fall
21   out sometimes?
22      A.   Cross-sections of the filaments fall
23   out, yes.
24      Q.   Sometimes there can be some filament
25   left in that hole?

Page 227

1      A.   Yes.
2      Q.   But sometimes, many times it falls
3   out, correct?
4      A.   Yes.
5      Q.   All right.  So just to orient
6   ourselves, we're looking at the two holes that
7   are almost stacked vertically in the middle of
8   the page.
9      A.   Yes.
10      Q.   Okay.  Those are two different mesh
11   fibers that were present?
12      A.   Let's call them filaments.
13      Q.   Okay.  We'll use whatever word you're
14   comfortable with.
15      A.   Because they are called monofilament
16   meshes, so I think filament is more appropriate.
17      Q.   So the polypropylene TVT-O meshes is a
18   monofilament mesh?
19      A.   Yes.
20      Q.   Now, these two filaments that we're
21   looking at which appear to be close together and
22   oriented vertically in Figure 1a, those were
23   parts where the TVT-O mesh were before
24   sectioning, correct?
25      A.   Yes.  I mean these are holes left in

Page 228

1   the tissue.  I don't know if there is no
2   filaments left in there.  How do you know?
3      Q.   Well, it's your report, so you tell
4   me.
5           Are there filaments left in there?
6      A.   Because some of them are transparent
7   so you cannot see, you have to polarize just to
8   see if polypropylene is still there.  Most of
9   them fall out.
10      Q.   Do you know if polypropylene is still
11   there for Figure 1a?
12      A.   I would have to go back to the slide,
13   put it on the stage, use polarizer, and see if
14   it's there.  Without polarizer it's very
15   difficult, unless it's blue.  If it's blue, then
16   you can see the color.  But Ethicon meshes are
17   done by two filaments, one blue, one clear, so
18   clear ones wouldn't be visible.
19      Q.   Now, those two filaments of mesh, what
20   is that in-between them?
21      A.   In-between them?
22      Q.   Yes.
23      A.   They're almost touching.
24      Q.   Right.  But they're not quite
25   touching, correct?

Page 229

1      A.   No.
2      Q.   What is that in-between them?
3      A.   I would have to go high power and look
4   in the microscope.  There can be inflammatory
5   cell, a little bit of collagen, some in specific
6   fluids, serum.  It depends.  I mean I would have
7   to investigate, have a look, maybe stain.
8      Q.   There's tissue in-between those two
9   filaments, correct?
10      A.   Tissue components, yes.
11      Q.   And what's that distance between those
12   two filaments?
13      A.   I would have to measure it.  It looks
14   like there's at least one inflammatory cell, and
15   a little bit more of that, so my guess would be
16   at least 20 microns.
17      Q.   So your best estimate, using cells as
18   a scale --
19      A.   Yes.
20      Q.   -- the distance between those two mesh
21   filaments is 20, 30 microns?
22      A.   Yes.  At that level of sectioning,
23   specifically happened about approximately 20
24   microns.
25      Q.   And there are elements of tissue in

58 (Pages 226 to 229)

Vladimir Iakovlev, M.D.

Page 230

1    that 20, 30-micron space?
2        A.  Maybe less, because sometimes it's
3    getting jammed and so forth.
4        Q.  Okay.  There's areas -- there's
5    elements of tissue in that 20 to 30-micron
6    space?
7        A.  Yes.
8        Q.  If you look at the left side picture,
9    now I'm going to -- I want you to orient to this
10   filament which is the top one that we were
11   looking at --
12       A.  Yes.
13       Q.  -- here.  The space next to it -- if I
14   had your photos it would be easier.  What I've
15   drawn here, what is in this space which is to
16   the right of the middle pore?
17       A.  So it's kind of clear?
18       Q.  Yes.
19       A.  It's hard to say.  I would have to go
20   back to the slide.  It could be just a collagen,
21   a singular collagen.  Because collagen doesn't
22   stain well with hematoxylin counterstain,
23   immunostain, so anything clear on this image
24   with this sort of quality of printing is either
25   collagen or just empty space.

Page 231

1        Q.  Okay.  Look at Figure 1b.  Can you
2    tell me; what's the magnification?
3        A.  This was probably done at 40.  At
4    least 25 objective.  Probably 25.
5        Q.  If we're looking at the left slide,
6    these brown --
7        A.  It's a nerve branch.
8        Q.  It's your opinion those are nerve
9    branches?
10       A.  Yes.
11       Q.  Directly below them, do you see there
12   are two shapes that have distinct morphologic
13   appearances?
14       A.  Brown?
15       Q.  Below, no, in the darker blue.
16       A.  The dark blue, that's smaller
17   arterial.
18       Q.  Those are blood vessels?
19       A.  Blood vessels, yes, larger blood
20   vessels in terms of capillaries.  It's larger
21   than capillary.
22       Q.  Look at the bottom left corner of the
23   picture.  You see there's two -- these two brown
24   or reddish dots?
25       A.  Yes.

Page 232

1        Q.  What are those?
2        A.  Those are called twigs, nerve twigs.
3    It's very, very small branches of nerves getting
4    into practically one nerve fiber.
5        Q.  There are nerves that naturally occur
6    in the vaginal tissue, correct?
7        A.  Yes.  I mean all tissue has nerves.
8        Q.  To the left of the mesh filament which
9    is in the bottom right corner --
10       A.  Yes.
11       Q.  -- you see there are clear areas,
12   areas of white?
13       A.  Yes.
14       Q.  What is that?  Are those spaces in
15   connective tissue?
16       A.  Yes.  This is just a separation during
17   the processing.  I would have to look in the
18   microscope.  But sometimes tissue gets little
19   bit of retraction space when it's being
20   processed, it retracts, so there's artificial
21   empty space.
22       Q.  Is that what pathologists talk about
23   when they reference artifacts from the
24   processing?
25       A.  Yes.  Retraction, tissue retraction is

Page 233

1    an artifact.
2        Q.  Do nerves come in different shapes?
3        A.  Of course, they're all different.  Not
4    different as round and square, they're more
5    rounded.  But does that answer your question?
6        Q.  Yeah.  That's fine.
7            They obviously come in different
8    sizes, too, depending upon where on the branch
9    that you're looking at on the nerve?
10       A.  Yes.
11       Q.  And they can have a different
12   appearance, depending upon how you section
13   across the nerve?
14       A.  Yes.
15       Q.  So it's important to know the
16   orientation of the nerve in the slide that
17   you're looking at when it's cut, right?
18       A.  Yes.  I mean the orientation will be
19   -- of this cross-section will be different
20   depending on the -- or shape of cross-section
21   will be different depending on orientation.
22       Q.  Look at Figure 1c.
23       A.  Yes.
24       Q.  Now, this is a TVT-O mesh that's not
25   from Mrs. Edwards, right?

59 (Pages 230 to 233)

Vladimir Iakovlev, M.D.

Page 234

1    A.  Yes.  That's what it states, yes.
2    Q.  Who was it?
3    A.  I don't know.  Another patient who had
4    TVT-O explanted, TVT-O mesh explanted.
5    Q.  Would you have back at your office
6    that patient's medical history, full medical
7    history?
8    A.  I have to see what was this patient
9    and what was -- what medical records I had
10   available for that specific patient.
11   Q.  Do you know the orientation of the
12   tissue that was processed for the pictures in
13   Figure 1c?
14   A.  Orientation of the tissue, or
15   orientation of the mesh?
16   Q.  Orientation of the tissue.
17   A.  I don't think I can -- well, how do
18   you define "orientation of the tissue"?  The
19   mesh here, at least that part, was oriented the
20   way that filaments were perpendicular to the
21   sectioning plane, because I can see that it's
22   almost rounded.  Tissue orientation doesn't have
23   landmarks, so you cannot define tissue
24   orientation.  Tissue itself has a landmark, so
25   the longer access, shorter access.

Page 235

1    Q.  So what you're saying is because the
2    mesh filaments appear to be pretty circular --
3    A.  Yes.
4    Q.  -- the mesh was oriented perpendicular
5    to the way the cut was made?
6    A.  These specific filaments, they were
7    oriented perpendicular.  And as you can see in
8    the blocks, the mesh is oriented perpendicular.
9    Q.  Okay.  How were those nerves -- the
10   brown staining, it's your opinion those are
11   nerves?
12   A.  Yes.
13   Q.  Okay.  And how were they oriented?
14   A.  These nerves (indicating)?
15   Q.  Yes.
16   A.  These are perpendicular to the
17   filaments.
18   Q.  I think we're -- how was the nerve
19   oriented in the tissue block at the time this
20   cut was made?
21   A.  The nerves are at an acute angle to
22   the tissue, to the sectioning plane, something
23   like -- this is sectioning plane, this is a
24   nerve (indicating).
25   Q.  Okay.  Just so she -- we'll have to

Page 236

1    describe this so we have --
2    A.  It's an acute angle.  The nerve
3    orientation along the long axis is at an acute
4    angle to the sectioning plane.
5    Q.  And so for the record, you had your
6    top hand essentially parallel with the table,
7    correct?
8    A.  Yes.
9    Q.  And the nerve is not under it directly
10   parallel, but tilted up such that it would
11   transverse the plane?
12   A.  Yes.
13   Q.  And it's at a significant angle,
14   correct?
15   A.  It's an acute angle.
16   Q.  Acute.  I couldn't remember your word.
17   A.  It's not 90 degrees.  It's less than
18   90 degrees.
19   Q.  So would you estimate 10 to
20   15 degrees?
21   A.  Yeah, that's a reasonable estimate.
22   One is -- has smaller -- the one on the right
23   has smaller angle, and the one on the left has
24   larger angle.
25   Q.  Do you know what the power was on

Page 237

1    Figure 1c?
2    A.  At least 25.  The nerves are sizable.
3    These nerves are almost as thick as the
4    filament, so they're good nerves with good
5    perineurium.
6    Q.  What does that mean?
7    A.  Nerves, when they get larger, they
8    form specific sort of sheath of connective
9    tissue, which is called perineurium.  So you can
10   go to nerves with perineurium, and then they
11   slowly lose perineurium, they become thinner and
12   thinner, and then taper down to small fibers
13   which are called nerve twigs.
14   Q.  There's no mesh filaments on the
15   outside of these nerves on Figure 1c, correct?
16   A.  I have to -- can you repeat the
17   question?
18   Q.  Sure.
19   There's no mesh filaments outside
20   adjacent to these nerves in Figure 1c, correct?
21   A.  You mean on this side (indicating)?
22   Q.  On the opposite side of where --
23   there's mesh filaments in-between the two
24   nerves, correct?
25   A.  Yes.

60  (Pages 234 to 237)

Vladimir Iakovlev, M.D.

Page 238

1      Q.  But on the outside of those nerves,
2   there's no mesh filters?
3      A.  I don't know.  It's not in the
4   picture.  Because see, this is .2-millimeter,
5   this is .2-millimeter, so this distance is less
6   than a millimeter.  So if we check with the
7   largest span of the largest pores, the next set
8   of these filaments will be probably somewhere
9   here (indicating).  So I would have to go and
10  check what was in the slide.
11     Q.  Okay.  Figure 2a, is this
12  Mrs. Edwards' mesh?
13     A.  2a, it doesn't state that it's
14  Ms. Edwards'.
15     Q.  If you took pictures of Mrs. Edwards
16  and put them in your report, you would have
17  labeled them "Mrs. Edwards"?
18     A.  Yes.
19     Q.  You say here "Nerve entrapment and
20  deformation in an explanted TVT-O sling S100
21  stain, mesh filaments filled yellow in the lower
22  image copy."
23        In this case the mesh was curving
24  together with ingrown nerves, correct?
25     A.  Yes.

Page 239

1      Q.  For the -- I take it your opinion is
2   that the brown in the middle is a nerve?
3      A.  Yes.
4      Q.  Okay.  And then there's -- is that
5   tissue that's above and below it before you get
6   to the mesh filaments?
7      A.  Yes.  Everything is tissue here.
8      Q.  What type of tissue is that which is
9   above and below the nerve?
10     A.  Scar collagen.
11     Q.  What are the blue dots?
12     A.  Formatory cells, fibrocytes.
13     Q.  And fibrocytes, what do they do?
14     A.  Fibrocytes is a retired fibroblast.
15  Fibroblasts generate collagen, and then they
16  become inactive, and they become fibrocytes.
17     Q.  And between the mesh filaments in the
18  bottom corner --
19     A.  You have to lift it up.
20     Q.  I'm sorry.
21        The mesh filaments in the bottom
22  corner, there's also tissue in-between them?
23     A.  Yes.
24     Q.  What's the distance between those two
25  mesh pores?

Page 240

1      A.  I can only guess.  100 microns.
2      Q.  How does the tissue get into that
3   area?
4      A.  Grows in.
5      Q.  Is that from the fibroblasts?
6      A.  Fibroblasts included, to generate that
7   tissue, blood vessel need to be close by, then
8   fibroblasts need to come in, lay down collagen,
9   and the whole process.
10     Q.  Turn to Figure 2b.
11     A.  Yes.
12     Q.  Do you know what power this was taken
13  at?
14     A.  This is a low power.  Most likely 2.5.
15     Q.  And this isn't Mrs. Edwards' mesh
16  sling, correct?
17     A.  No. Oh, actually that's here, the low
18  power of one of the images.  That answers your
19  question.
20        So this mesh was migrating, so it
21  stretched the nerve.  See the 2b lower?
22     Q.  Yes.
23     A.  This one, this part (indicating).
24     Q.  Let me just put my glasses on.  Go
25  ahead.

Page 241

1      A.  See this part (indicating)?
2      Q.  For the record, you're indicating the
3   upper right corner and you're now referencing
4   back to Figure 1c, correct?
5      A.  Yes.
6         So this is a high power, this area, so
7   see this is very abnormal shape of a nerve.  So
8   what happens -- and see, this mesh is also
9   folded, so it's a fold of the mesh, and then
10  mesh migrates in the tissue, and then stretch
11  the nerve here.  So this is not ingrowth, but it
12  is deformation of the nerve by a migrating mesh
13  also deformed, because you can see it's curled
14  up like this (indicating).
15     Q.  How is it curled?
16     A.  Well, you see this one layer of mesh
17  and then this is the end of it.  So it's like
18  that (indicating).
19     Q.  How do you know that's not just the
20  plane in which the mesh was sectioned, such that
21  you're getting junctions of the mesh, or the
22  knitted --
23     A.  Well, it's either curled like this or
24  curled like that, because there is a second row,
25  at least one knot or intersection which is

61 (Pages 238 to 241)

Vladimir Iakovlev, M.D.

Page 242

1   second. If it was one layer of a mesh, you
2   would have just this structure continue. If
3   there is anything beyond that, it either curled
4   like this, it then provided this filament, or
5   like that or like this. So there is a
6   deformation of the mesh (indicating).
7       Q. But this isn't Mrs. Edwards' mesh,
8   though, right?
9       A. No, no. It's a TVT-O sling, but it's
10  not Ms. Edwards'.
11      Q. And the brown areas on Figure 2b, it's
12  your opinion that those are nerves?
13      A. Yes.
14      Q. Now, down at the bottom of the picture
15  there's a whole bunch of nerves, correct?
16      A. Yes.
17      Q. That's your opinion, correct?
18      A. Yes. It's a very densely integrated
19  tissue, yes.
20      Q. There's no mesh adjacent to that,
21  correct?
22      A. At the end?
23      Q. Correct.
24      A. No, it's on here.
25      Q. Right.

Page 243

1          There's mesh up above it, correct?
2       A. Yes.
3       Q. But down there, there's nerves, and
4   there's no mesh around it?
5       A. In nerves are seen -- so this is mesh
6   which is curled either this way or that way, so
7   these nerves are trapped in the pocket of
8   deformation. These little guys in there are
9   within the mesh core. So this nerve is, as you
10  can see, between this, so the nerve apparently
11  had to make it all the way here, but then,
12  because it's a very unnatural way for a nerve to
13  connect to a target tissue, it's clear that the
14  mesh was migrating, deforming, and deforming in
15  an ingrown branch by the shape of all of this.
16      Q. How do you know that nerve wasn't
17  there before the mesh?
18      A. It's within the space of the mesh.
19  This tissue, this tissue didn't exist before the
20  mesh was placed. We started discussing before
21  lunch break the trocar damages tissue, creates a
22  cavity, and then mesh fills that cavity with its
23  own compartments, because mesh is
24  three-dimensional structure, and the blood fills
25  all these cavities of the mesh, and then tissue

Page 244

1   ingrows into the mesh.
2       Q. Why are there nerves down in the
3   bottom corner -- strike that.
4          Why are there nerves in the bottom of
5   Figure 2b? In this area here I've circled.
6       A. Why there?
7       Q. Yes.
8       A. Because they just happened to be
9   there. They had --
10      Q. Do you know whether those nerves were
11  there before?
12      A. Before the mesh placement?
13      Q. Yes.
14      A. Those exactly nerves below?
15      Q. Yes.
16      A. They could have been. Because they
17  are beyond the area which was created by the
18  mesh placement.
19         See, everything from here, from here
20  to there wasn't there before surgery. Or at
21  least anything, if we apply strict rules,
22  anything in-between here wasn't there before
23  surgery.
24         Now, if the mesh curled up during
25  surgery, this pocket was intra-operatively. If

Page 245

1   the mesh migrated and curled up after surgery,
2   then this tissue could have been entrapped
3   during deformation. So it's hard to determine
4   if it was an intra-operative deformation or
5   later. But this corner, because it deforms
6   nerve, it migrated later. So I can say that by
7   this shape of the nerve, this migration happened
8   to be post-operatively. The nerves cannot grow
9   in almost like a 360 degrees circle. This is
10  really curled position (indicating).
11      Q. Are you saying that nerve in the top
12  right corner is the same nerve that's growing
13  around?
14      A. It could be. I don't know.
15      Q. So you're assuming that's the same
16  nerve?
17      A. It could be.
18      Q. You don't know?
19      A. I don't know for sure.
20      Q. Do you see some of the nerves in the
21  bottom here?
22      A. Both are deformed. Both segments --
23  if it's the same nerve, it's one nerve deformed.
24  If it's two nerves, both, we will end up with
25  two deformed nerves.

62 (Pages 242 to 245)

Vladimir Iakovlev, M.D.

Page 246

1  Q.  The nerve down in the bottom away from
2  the mesh, did you count the density of those
3  nerves for that area and compare it to the nerve
4  density in the area within the mesh?
5  A.  No, not for these specific samples.
6  Why it's not done?  Because then some -- how
7  does mesh -- or how can mesh influence nerve
8  ingrowth or nerve regeneration by chemicals.  So
9  if there are any chemical substances either
10  produced by mesh or by interaction of the mesh
11  with the body, your body produces some growth
12  factors when the mesh is placed, these chemicals
13  can spread over larger area, so it's not
14  scientific to limit your analysis here.  You can
15  do this test, but arguably influence of the mesh
16  can stretch further up.  So technically you
17  should measure everything which is in the tissue
18  which is changed.  This tissue is changed.
19  There's collagen here.
20  Q.  So now you're testifying that that
21  changed because of the mesh?
22  A.  Collagen, the position in such a
23  density?
24  Q.  The tissue at the bottom of this
25  picture.

Page 247

1  A.  At least part of it, yes, if this is
2  scar tissue.
3  Q.  Is it scar tissue?
4  A.  From this power it's hard to say, but
5  I mean it's light enough to be a scar tissue and
6  it's not adipose tissue.  I would have to go
7  back and look at the slide to tell you exactly
8  if it's a scar or not.
9  But generally, scar tissue not just
10  fills the mesh, also extends beyond mesh, beyond
11  the mesh structures.  There are four, if you
12  assess the scar, the scar affects area larger
13  than the mesh itself.
14  Q.  Move to Figure 2c.  What power was
15  this taken at?
16  A.  This was with 40X.
17  Q.  And your opinion is this shows central
18  degeneration?
19  A.  It's demyelination.  It's not
20  myelinated anymore.  The central part of the
21  nerve is not myelinated.
22  Q.  Is that a vessel directly above the
23  nerve?
24  A.  Yes, a small one.
25  Q.  And what are the blue dots around the

Page 248

1  nerve?
2  A.  You have to point which blue dots.
3  Q.  There's all different blue dots.
4  A.  Mostly are inflammatory cells or
5  fibrocytes, or nuclei of inflammatory cells.
6  Q.  This isn't a neuroma, correct?
7  A.  No.  Neuroma is the post-traumatic
8  deformation of nerve which appears as a
9  combination of deformed nerve and scar.
10  Q.  Go to Figure 3a.  Can you tell me
11  what's the power of this photo?
12  A.  Probably 25.  Maybe lower.  Maybe 10.
13  Q.  And that's tissue which is in-between
14  the mucosa and the mesh filaments?
15  A.  Yes.
16  Q.  Are nerves, is the mucosa made of --
17  strike that.
18  Are there nerves in mucosa?
19  A.  Nerve endings, but no nerves.  There
20  is no nerves in the epithelium.
21  Q.  You say "At this location, an external
22  pressure (intercourse) can compress the nerves
23  against the hardened mesh"?
24  A.  Yes.
25  Q.  Why did you say "can compress"?

Page 249

1  A.  I guess it depends on the specific
2  intercourse movements, if there is direct
3  compression.  Anything in the vagina can be
4  influenced or affected by intercourse, but
5  specific position can avoid pressure at specific
6  sites and can, I guess, have higher pressure
7  than other sites.
8  Q.  Do you know if Mrs. Edwards complained
9  of pain with sex in the five years following her
10  mesh implantation?
11  A.  I have to go back to the summary.  If
12  there was dyspareunia, then she did.
13  Q.  While you're looking, just so you
14  understand my question, it's a precise one --
15  A.  If she complained --
16  Q.  -- did Mrs. Edwards complain to her
17  doctors in the medical records in the five years
18  following her surgery when the TVT-O was
19  implanted?
20  MR. FABRY:  Objection to the form.
21  The record speaks for itself.
22  A.  I have to look, I don't remember where
23  she complained.  I remember one of the
24  complaints with dyspareunia, or pain, but when
25  was it.

63 (Pages 246 to 249)

Vladimir Iakovlev, M.D.

Page 250

1      You have to understand that I have
2   multiple litigations with multiple patients, and
3   I have my own 5,000 cases a year.
4        (Witness reviewing document.)
5      A.  So the recorded complications which
6   were recorded in 2011 included dyspareunia.  So
7   sometime between 2005 and 2011 she experienced
8   dyspareunia.  That's what was recorded.
9   BY MR. SNELL:
10     Q.  And it's your belief that was recorded
11  in the records?
12     A.  I just copied whatever was in the
13  records.
14     Q.  Okay.  Turn to Figure 4a, jump over.
15     A.  Yes.
16     Q.  As well as 4b.
17       These are not Mrs. Edwards, correct?
18     A.  No.
19     Q.  Are these TVT-O mesh?
20     A.  No.
21     Q.  And I think one of the things you
22  pointed out here was there was a giant cell
23  which you could see on this pathology slide?
24     A.  Yes.
25     Q.  And giant cells can form during part

Page 251

1   of the foreign body reaction?
2      A.  Yes.
3      Q.  Can giant cells form in the body even
4   if a foreign body is not present?
5      A.  Yes.
6      Q.  When?
7      A.  There's a differential diagnosis for
8   granulomatous inflammation.  So giant cells, if
9   we talk about macrophages in giant cells,
10  because there are giant cells for other tissues,
11  they are a hallmark of granulomatous
12  inflammation.  Or granulomatous inflammation is
13  collection of epithelioid histiocytes, and this
14  can include giant cells.
15       So giant cells, macrophages, giant
16  cells can be seen in granulomatous inflammation.
17  Granulomatous inflammation can be seen as a
18  reaction to foreign bodies, specific
19  microorganisms, just necrotic debris of body,
20  and some other obscure causes we don't know yet.
21     Q.  So if a surgery is done, let's say a
22  mesh isn't put in, but a surgery is done and
23  there's some necrotic tissue that results from
24  that, can foreign body giant cells form to come
25  in and try to clear out that debris?

Page 252

1      A.  There can be.
2      Q.  This myeloperoxidase stain --
3      A.  Yes.
4      Q.  -- the slide has colors of brown and
5   blue.  Which is the positive?
6      A.  Immunohistochemistry is positive when
7   it's brown, because it gives the color.  Blue is
8   counterstain so you can see negative tissue.
9   And blue is usually hematoxylin or some
10  combination of hematoxylin and some other blue
11  stain.
12     Q.  Figure 5, that's not Mrs. Edwards,
13  correct?
14     A.  No.
15     Q.  Do you know what power these were
16  taken at in Figure 5?
17     A.  Probably times 10.
18     Q.  Sorry?
19     A.  Times 10.
20       Here you can see that this still
21  remain filament, that's blue.  And this one is
22  crinkled, just an edge pulled off.
23     Q.  You note -- you write here, there's
24  arrow legend that says "congested vessels."
25       How do you know the status of that

Page 253

1   vessel, and whether it was congested before mesh
2   placement?
3      A.  Before placement?
4      Q.  Yes.
5      A.  Before placement that vessel didn't
6   exist, because this vessel grew into the mesh
7   structure.  This is within the mesh.
8      Q.  Were there slides that you looked at
9   pre and post-surgery that were able to discern
10  what vessels were present and which ones were
11  not?
12     A.  But this is common sense.  I mean
13  there is a space between filaments, and the
14  space between filaments was introduced by
15  placing mesh in the body.  So, therefore,
16  anything from here to there in this
17  three-dimensional -- actually from here to
18  there, because this is a film, anything from
19  here to there is an ingrown tissue which has
20  inhabited the mesh structure.  You can get some
21  sort of compression into this mesh structure,
22  but you cannot fully fill all spaces.
23     Q.  Turn to Figure 6, Page 22.
24     A.  Yes.
25     Q.  Now, this is Mrs. Edwards' mesh?

64 (Pages 250 to 253)

Vladimir Iakovlev, M.D.

Page 254

1    A.  Yes.
2    Q.  Why did you take -- look at the top
3    picture.  Why did you take this photograph?
4    A.  Because it's thrombosed, it's
5    thrombosed capillary.
6    Q.  There's not a legend or an arrow.
7    Where is the thrombosed capillary in the top
8    picture?
9    A.  The whole capillary.  You can see
10   in -- within the middle there's material which
11   is degenerated.  It means that there was a fiber
12   and then it degenerated.  This is not normal
13   appearance of blood vessel.  This substance is
14   not normally seen in capillaries.  This means
15   that the circulation stopped (indicating).
16   Q.  You're pointing to the center part of
17   the vessel and the bottom picture?
18   A.  This material and this material, this
19   is not normal.  And then this material, this is
20   not normal (indicating).  Normally you see
21   erythrocytes and leukocytes in the capillaries.
22   This is not normal content of blood vessel.
23   Q.  Was that important in your Edwards
24   analysis?
25   A.  Yes.  It means that circulation

Page 255

1    stopped in that capillary -- in these two
2    capillaries at least.
3    Q.  Is the photograph on the bottom a
4    higher magnification of part of the top?
5    A.  No.  These are two different.
6    Q.  Turn to Figure 7.
7    Now, this isn't Mrs. Edwards, correct?
8    A.  No.
9    Q.  It is or --
10   A.  It is not.
11   Q.  What's the power of this Figure 7?
12   A.  Times 10, or 25.  It's hard to say.
13   Depends on how much it is cropped.
14   Q.  Now, in the middle there's fat
15   deposition here, and they look like little
16   circles.
17   A.  Yes.
18   Q.  Or oblong holes.
19   A.  Most of them are full circles, but
20   some of them are in the generation process.
21   They are pink.  So normal fat is very
22   homogeneous, round circles throughout.  Once you
23   have this collapse of adipose sites, they become
24   pinker, because fat is gone out of them.  So
25   this is not healthy appearing fat.

Page 256

1    And see this, these are lipocytes, and
2    they're much smaller.  And these areas here and
3    there, there is fibrous tissue in-between them.
4    This is a lipocyte, this is a lipocyte, here is
5    fibrous tissue in-between.  So these are full
6    grown, and these are sort of sick lipocytes,
7    they don't have enough fat (indicating).
8    Q.  Figures 8 and 9, those aren't
9    Mrs. Edwards, correct?
10   A.  No.
11   Q.  No, they're not Mrs. Edwards?
12   A.  They are not Mrs. Edwards.
13   Q.  Is it your contention -- I'm looking
14   at Figure 9, is it your opinion that when the
15   surgeon excised this tissue that they excised
16   part of the urethra?
17   A.  So some response can originate from
18   vaginal wall urethral bladder.  Vaginal wall has
19   this wispy sort of appearance of the muscle.
20   Urethra has more energized bundles and detrusor
21   bundle muscle, they have bundles of muscle
22   because they have to do a lot of work.
23   So if you look at the specimen, this
24   is interesting, see this side has this wispy
25   muscle (indicating).

Page 257

1    Q.  You're pointing to the left side?
2    A.  To the left side.
3    And this side has bundles
4    (indicating).
5    Q.  You're pointing to the right side?
6    A.  To the right side.
7    So see the curve?  So this was peeled
8    off the urethra.  So some of this muscle is
9    probably stripped from the vaginal wall, some
10   was from the urethra.  So during dissection it
11   appears that some of the urethral muscle was
12   removed.
13   Q.  Figure 10a, obviously this is not
14   Mrs. Edwards, correct?
15   A.  No.
16   Q.  Do you know what brand this is in 10a?
17   A.  Probably Boston Scientific.  It's a
18   thicker mesh.  They use thicker mesh for
19   prolapse devices.
20   Q.  In Mrs. Edwards' specimens you didn't
21   see bladder wall, correct?
22   A.  No.  It's transvaginal placement.  But
23   I guess they can migrate.  Sorry.  I did not see
24   bladder wall in Ms. Edwards' specimen.
25   Q.  Did you see urethra wall in

65 (Pages 254 to 257)

Vladimir Iakovlev, M.D.

Page 258

1    Mrs. Edwards' specimen?
2        A.  I have to go and check with the
3    pictures.
4            I think you asked about this.  I
5    probably missed that statement.  I think I
6    recognize this picture.
7        Q.  Which one are you looking at, Doctor,
8    just so we know?
9        A.  TE4a.
10       Q.  You're on Page 61 of your expert
11   report?
12       A.  Yes.
13       Q.  Okay.  Go ahead.
14       A.  So this is labeled Mrs. Edwards
15   specimen.  And I think in the first part of the
16   expert report this picture was not labeled as
17   her specimen.  It appears that I missed the
18   labelling.
19           So on Page 24 --
20       Q.  Okay.
21       A.  -- the lower images are for
22   Ms. Edwards, at least lower images.
23       Q.  How do you know which one is correct?
24   How do you know whether or not it came from
25   Mrs. Edwards?

Page 259

1        A.  Because this was specifically selected
2    and saved in a folder specifically for
3    Ms. Edwards.  I was taking pictures at one time,
4    loading the same memory card, so there's no way
5    of mixing them up.
6        Q.  And you have that memory card, or you
7    have those folders in your computer?
8        A.  I save them, yes.
9            So we were talking about bladder wall.
10   No, I did not see bladder wall.
11       Q.  You didn't see urethral wall either in
12   Mrs. Edwards' case?
13       A.  TE4b, Page 62, the bundles on the
14   right, they're too thick to be just vaginal
15   wall.  Also the curving.  So the curvature
16   around the urethra, this is wispy muscle in the
17   vaginal wall, these are bundles.  You can
18   appreciate the difference, thicker bundles
19   towards urethral side, thinner wisps on the
20   vaginal wall (indicating).
21       Q.  So it's your -- just so I understand,
22   it's your contention that TE4b is actually from
23   Mrs. Edwards?
24       A.  Yes.  All images labeled "TE" are from
25   Mrs. Edwards.

Page 260

1        Q.  So TE -- let's look at Figure TE5, the
2    thrombosed capillaries.  That's the same as
3    Figure 6 which we looked at earlier on Page 22?
4        A.  Yes.
5        Q.  And that's Mrs. Edwards' mesh?
6        A.  Yes.
7        Q.  So in Figure 9, is that mislabeled?
8        A.  Figure 9, just 9?
9        Q.  Yes.
10       A.  Yeah, I didn't provide this
11   information that it was Ms. Edwards.  Because I
12   was providing this picture later on, I thought
13   that --
14       Q.  Turn to Page 28, Figure 12.
15       A.  Yes.
16       Q.  Okay.  This is Mrs. Edwards' specimen?
17       A.  Yes.
18       Q.  We talked about the process of how the
19   mesh came to get to this point, correct?
20       A.  Yes.
21       Q.  Is this a photo you took?
22       A.  Yes.
23       Q.  Okay.  And what's the liquid that's in
24   the background below the specimen on Figure 12?
25       A.  Just formalin draining from the

Page 261

1    specimen.
2        Q.  So this would have been after you took
3    it out of formalin, but before it went through
4    the process to get into paraffin that we talked
5    about?
6        A.  Yes.
7        Q.  And that was the entirety of the
8    specimen that was in the formalin?
9        A.  Yes.
10       Q.  Figure 13a, can you tell me the power
11   on that?
12       A.  Very low.  Either times 1 or times
13   2.5.
14       Q.  Can you tell me the angle in which the
15   microtome cut that tissue specimen?
16       A.  You mean mesh?
17       Q.  Well, I mean the tissue specimen.
18       A.  Tissue orientation, tissue -- if it
19   doesn't have landmark specific, it doesn't
20   have -- because tissue around the mesh is sort
21   of about the same dimension.  But the mesh can
22   vary if it is flat.  If it's round it's
23   difficult to rend, because any way you turn it's
24   -- some parts will be angled, some parts will be
25   perpendicular.

**66 (Pages 258 to 261)**

Vladimir Iakovlev, M.D.

Page 262

1      Q.  Do you know how this mesh was oriented
2  in this photograph?
3      A.  It was oriented, you can see in the
4  block, perpendicular, because you see
5  cross-sections.  So this part of the mesh is
6  perpendicular.  This part has a complex
7  orientation because some filaments are
8  perpendicular, some filaments are clearly
9  parallel.  Like this filament is almost
10  parallel.  So either mesh curled like this, or
11  it curled like this.  But in any case it's not a
12  flat structure anymore (indicating).
13      Q.  It's how you put it into the paraffin
14  block, correct?
15      A.  I can only orient what is there.  So
16  if it's deformed, then choose to see if it's
17  mostly on edge.  In this case, this tail, or
18  this further part is on edge perpendicular.  But
19  this one, any way you turn, there's no edge.
20      Q.  And that's because that's the way that
21  specimen was put into the paraffin?
22      A.  No.  Because it deformed in the body.
23      Q.  How did it deform in the body when
24  you're looking at Figure 28?  Strike that.
25          How does Figure 12 match up to Figure

Page 263

1  13?
2      A.  One of the pieces is here.  So one of
3  the pieces there is this, or that, or this one
4  is here.  So if you can see that this end seems
5  to be flat, but we don't know what's going on
6  there.  So mesh goes like this and then curls at
7  the end, creating this structure (indicating).
8      Q.  Is it your opinion that Mrs. Edwards'
9  mesh was curled?
10      A.  Yes.  It's here in the picture.  This
11  is deformed mesh.  It's not flat.  This is the
12  same mesh.  One part is sectioned like this, but
13  then suddenly there are more structures in
14  there.  If it was one mesh, one flat plane, it
15  would just continue, and you wouldn't see that
16  part of the image at all.  This would be all
17  filled like this.  So this end, is it curled
18  like this, or curled like that?  But this end is
19  deformed.  Because there is no other way to
20  produce this orientation other than to deform a
21  mesh (indicating).
22      Q.  So it's your opinion that that type of
23  orientation can't occur during the mesh sitting
24  in the formalin for a year plus of time, and it
25  can't occur based upon the way that you had the

Page 264

1  samples processed?
2          MR. FABRY:  Objection to form.
3      A.  If it is fused by scar tissue, the
4  deformation was fused in vivo.
5  BY MR. SNELL:
6      Q.  You're saying "if."  Was it?
7      A.  It is.
8      Q.  Okay.  So --
9      A.  It's in the pictures.  All spaces are
10  filled by scar tissue.  The shape is fused by
11  scar tissue, scar tissue is mature, it occurred
12  months before explantation.
13      Q.  So it's your opinion, then, that the
14  way that you had Mrs. Edwards' mesh fixed in
15  paraffin had no influence on that photograph,
16  correct?
17          MR. FABRY:  Objection to form.
18      A.  On the shape of the mesh?
19  BY MR. SNELL:
20      Q.  Yes.
21      A.  It did not cause the deformation,
22  because the deformation is fused by scar.
23  Processing doesn't cause scar to appear in the
24  spaces.
25      Q.  Turn to Page 14, and tell me what the

Page 265

1  power of this photo is.  Figure 14.
2      A.  Figure 14.
3      Q.  I'm sorry.
4      A.  Page 14.
5      Q.  Let me just ask a plain question.
6          On Page 31, we're looking at Figure
7  14, can you tell me the power of those two
8  photographs?
9      A.  This is very low, either 1 or 2.5.  I
10  think 1.
11      Q.  This isn't Mrs. Edwards' mesh,
12  correct?
13      A.  No.
14      Q.  No, it's not Mrs. Edwards'?
15      A.  It's not.  I mean if you ask if it is
16  or isn't, it's easier for me to -- not easy.
17  Okay.  It's not Ms. Edwards.
18      Q.  Okay.  Mrs. Edwards didn't have an
19  infection, correct?
20          MR. FABRY:  Objection.  Form.
21      A.  I don't know that.  I did not see
22  acute inflammation in the monitor firmly stated
23  that there was bacterial infection, but
24  subclinical amount of infection could be there.
25  BY MR. SNELL:

67 (Pages 262 to 265)

Vladimir Iakovlev, M.D.

Page 266

1      Q.  You did not see pathologic evidence of
2   an infection?
3      A.  I did not see morphologic evidence of
4   bacterial infection sufficient to be detected by
5   histological means.  Gold standard for infection
6   is cultures.
7      Q.  Cultures done turned up positive in
8   Mrs. Edwards' case that you saw?
9      A.  I don't know.
10     Q.  Did you ask for them?
11     A.  No.
12     Q.  So you don't know whether -- based on
13  everything you reviewed, you have not seen
14  evidence of infection in Mrs. Edwards' case,
15  correct?
16     A.  No.  But it doesn't mean that it
17  wasn't there.  As I said, I'm a pathologist,
18  pathologists detecting -- can detect only
19  specific infections.  But gold standard for
20  infection is microbiology, and this has to be
21  done at the time of surgery.
22     Q.  Okay.  And in Mrs. Edwards' case, did
23  you see an abscess in the pathology?
24     A.  No, I don't believe there was an
25  abscess.

Page 267

1      Q.  Figure 15, Page 32.
2      A.  Actually, yes, I didn't see abscess,
3   but I think she had mesh exposure at the time of
4   surgery.  So I can state that because it was
5   exposed, there was infection in there.  It just
6   didn't produce enough acute inflammation.
7   Because if there is exposure of anything of the
8   external surface, it is infected.
9      Q.  How is it infected?
10     A.  Anything on the surface is infected.
11  It can be infected inside, but on the surface,
12  definitely infected.
13     Q.  So what you're testifying to is that
14  there are bacteria on the surface following an
15  exposure?
16     A.  There is bacteria always on the
17  surface.  Any external surfaces of our body or
18  communicating with external surface have
19  bacteria.  Bacteria can also be present inside,
20  but on the surface they're always present.
21     Q.  But from everything you've looked at,
22  there was no active infection that showed up in
23  any cultures, correct?
24     A.  I didn't do cultures.  What I can see
25  if there is enough bacterial infection to cause

Page 268

1   acute inflammation, that I did not see.  But you
2   need large amount of bacteria in the area to
3   produce acute inflammation.
4      Q.  You didn't see large amounts of acute
5   inflammation in Mrs. Edwards' case?
6      A.  No.
7      Q.  Turn to Page 32, Figure 15.
8      A.  Yes.
9      Q.  This is not an Ethicon mesh, correct?
10     A.  No.
11     Q.  I'm sorry, we just -- is it an Ethicon
12  mesh, Figure 15?
13     A.  It is not Ethicon mesh.
14     Q.  All right.
15         MR. FABRY:  Can we take a short break?
16         MR. SNELL:  Absolutely.
17         (Whereupon, a recess was taken from
18         3:25 p.m. to 3:33 p.m.)
19  BY MR. SNELL:
20     Q.  Doctor, let's go to Figure 16a, the
21  new TVT-O mesh.
22         This is the mesh that you stretched,
23  correct?
24     A.  Yes.
25     Q.  Where is the mesh sheath?

Page 269

1      A.  It's removed.
2      Q.  Did you remove the mesh sheath before
3   or after you stretched it?
4      A.  Before.
5      Q.  And you stretched it for five minutes
6   statically?
7      A.  Yes.
8      Q.  What does that mean; you put a
9   continuous stretch on it for five minutes?
10     A.  Yeah.  The clamps were fixed in
11  specific lengths.
12     Q.  What type of clamps did you use for
13  this test?
14     A.  Hemostatic clamps.
15     Q.  So you oriented the hemostatic clamps
16  on the ends of the mesh and pulled it?
17     A.  Yes.
18     Q.  Did you measure the Newtons or force
19  in which you pulled it?
20     A.  No.
21     Q.  Were there any ANSI approved test
22  methods that you used?
23     A.  No.  This is not an industry grade
24  test.  This is a test I would do just on a live
25  device and what it can do in the body.  That's

68 (Pages 266 to 269)

Vladimir Iakovlev, M.D.

Page 270

1   my observational sort of testing as I would
2   normally do with other implantable devices if I
3   have questions.
4        Q.   Have you ever looked at the TVT-O
5   instructions for use?
6        A.   Yes.
7        Q.   Do they describe doing any type of
8   pulling, like you did your test here with the
9   sheath hole?
10       A.   No.  But the pulling is not simulated
11  to insertion procedure.  The pulling is
12  simulated to the processes which happened in the
13  body.
14       Q.   Looking at the bottom left photograph.
15       A.   Yes.
16       Q.   Did you stand that mesh up on end?
17       A.   I wouldn't lay flat.  I would have to
18  flatten it for the lower right.  But after the
19  stretch, it curls up.  This is free shape it
20  assumed after the stretching.  After the
21  pressure was released, it curled up, and then it
22  couldn't lay flat.
23       Q.   What I'm asking is for the bottom left
24  corner photograph, did you turn the mesh up on
25  its end, on its edge?

Page 271

1        A.   It did it itself.
2        Q.   Okay.  And you can see through the
3   mesh?
4        A.   Yes.
5        Q.   What's the white background?
6        A.   Paper.  A sheet of paper.
7        Q.   Okay.  And that's a millimeter ruler
8   you have next to the mesh in the bottom right
9   corner?
10       A.   Yes.  It shows you that the mesh was 5
11  centimeters, these marks, and stretched to six
12  centimeters, 120 percent of original length.
13  And then the force was released, it curled up.
14  And then I had to flatten it, and measured the
15  length between the marks, and it wasn't original
16  5 centimeters, it wasn't six centimeters, it
17  returned somewhat close to original length, but
18  it didn't really return to original length.
19       Q.   The bottom right corner which shows
20  the mesh next to the ruler, you can still see
21  through those pores?
22       A.   Yes.
23       Q.   Those pores are still intact?
24       A.   What is definition of intact pore?
25       Q.   The geometry of the pores is

Page 272

1   essentially similar to the way it was before?
2        MR. FABRY:  Objection.  Form.
3        A.   Similar, that's a questionable.  I
4   mean the length has changed, therefore they're
5   flattened.
6   BY MR. SNELL:
7        Q.   Are the pores larger, smaller, or how
8   do they compare -- strike that.
9             How do the pores in the bottom right
10  picture compare to the pores in the top right
11  picture?
12       A.   They are deformed.
13       Q.   How?
14       A.   Stretched.
15       Q.   What's the distance difference between
16  the top right and the top left photographs in
17  the mesh pores?
18       A.   10 percent.  So 5 millimeters out of 5
19  centimeters is 10 percent.  So the length of the
20  pores in the whole mesh is 10 percent larger
21  than before the test.
22       Q.   So after you submitted the mesh to
23  this test, the length of the pores was 10
24  percent longer?
25       A.   Yes.  Along the stretched pores.

Page 273

1        Q.   And the width, was it about the same,
2   or did you even measure that?
3        A.   I don't know.  I didn't measure that.
4   It was smaller, but I didn't measure exactly by
5   how much.
6        Q.   Was this a mesh that was exposed to
7   paraffin or any chemicals?
8        A.   No, not this one.  I exposed it to
9   formalin later, not before the test.
10       Q.   And is this a test that you came up
11  with that's depicted in Figure 16a?
12       A.   Yes.  I had new meshes and I saw the
13  curling of the meshes, of explanted meshes.  And
14  when I had new meshes, tried to simulate what
15  happens, and what happens sling is being placed
16  to support the urethra.  So the whole idea is it
17  applies some pressure on the urethra.  So its
18  counterforce would be stretching.  So this
19  stretching is a simulation of what happens
20  in vivo.
21       Q.   In your test you applied positive
22  forces on the ends of the mesh and pulled it
23  laterally?
24       A.   Yes.
25       Q.   With constant force?

69 (Pages 270 to 273)

Vladimir Iakovlev, M.D.

Page 274

1    A.  Yes.
2    Q.  Do you know that TVT is implanted
3    without fixation?
4    A.  There is no stitching.  It's implanted
5    without stretching.  But then it grows in, so
6    the tissue incorporation fixes the ends.
7    Q.  The growth -- the tissue grows into
8    the mesh?
9    A.  Yes.
10    Q.  But TVT mesh is not sutured, correct?
11    A.  No.  As far as I understand, no.
12    Q.  As far as you understand, the TVT mesh
13    is not sutured?
14    A.  Yes.  As far as I understand, the TVT
15    mesh is not sutured.
16    Q.  Okay.  Figure 18a, is that a picture
17    from Mrs. Edwards?
18    A.  No, it's not.
19    Q.  Is that an Ethicon mesh?
20    A.  No.
21    Q.  Figure 18 and Figure 19, are those
22    photographs of an Ethicon mesh?
23    A.  No.
24    Q.  And are those photographs -- are
25    Figures 18 and 19 photographs of Mrs. Edwards'

Page 275

1    mesh?
2    A.  No.  This was interesting observation,
3    because both belong to the same brand.
4    Q.  Do you know what brand it was?
5    A.  I believe AMS.  And they were exposed
6    to different length in vivo, therefore I could
7    compare degradation bark.
8    Q.  Have you seen any published scientific
9    literature that describes a degradation bark?
10    A.  In polypropylene?
11    Q.  Yes.
12    A.  No.  That's the problem, it's been
13    around for 50 years and nobody detected it.  At
14    least nobody detected it in cross-sections in
15    microscopy.
16    Q.  The use of the word "bark," that is
17    not a pathologic term, correct?
18    A.  It's a descriptive term.  That's how
19    it looks.  In pathology there are many words
20    from food.  Nutmeg lever is a pathological term.
21    Q.  In Figures 18, 18b, this area by the
22    bark, as you call it, is there increased
23    inflammation at that area?
24    A.  No.  The bark is in each specimen,
25    each explanted mesh.  I have not seen a single

Page 276

1    specimen without a bark.  Maybe if it's removed
2    very early it's not detectable.  But all
3    specimens came to me with at least a one year
4    exposure, so inflammation, no inflammation, it's
5    still there.
6    Q.  Figures 20, 21, 22, 23, are those
7    TVT-O meshes?
8    A.  20.
9    21, no.  21, no, it's not TVT.  I did
10    section TVT meshes, just a quality, but I did
11    experiment with this.  If I section further in
12    the block I can produce better quality slides of
13    formalin-exposed TVT-O mesh.
14    Q.  Figure 22 says "New mesh of the same
15    brand."  Is that referring back to the meshes in
16    Figure 20?
17    A.  Yes.  So this was perfect set.  Brand
18    new mesh, no new exposure to formalin.  By now I
19    have the same mesh with one month exposure to
20    formalin as a control, then a patient with one
21    year of in vivo exposure, and then patient with
22    nine years of in vivo exposure, no bark, very
23    thin bark, much thicker mesh.
24    Q.  Did you measure the thickness of the
25    bark to determine whether there was a

Page 277

1    statistically significant difference in that
2    thickness as compared amongst those years?
3    A.  This bark was 1 to 2 microns, this
4    bark was 4 to 5 microns.
5    Q.  Did you calculate whether that was
6    statistically significant?  Strike that.  Let me
7    just -- that was a bad question.
8    Did you perform a calculation to
9    determine whether that difference in thickness
10    of the bark that you claim is in those
11    photographs was a statistically significant
12    difference based on the samples?
13    MR. FABRY:  Objection.  Form.
14    A.  Within these two, no.  It's a project
15    to perform.  But at this stage, it was uniformly
16    2 microns.  I have never seen taken any
17    measurement from this patient more than 2
18    microns.  I can do statistical tests.  But if
19    you have all numbers, smaller or larger,
20    statistical tests will be significant, because I
21    know that there's a researcher.
22    BY MR. SNELL:
23    Q.  When you only have a limited number of
24    samples, statistical significance isn't
25    guaranteed, even though there may be a numerical

Vladimir Iakovlev, M.D.

Page 278

1  difference.  You know that as a scientist,
2  correct?
3      A.  But you can measure.
4      Q.  No, you have no answer my question
5  first.
6          You know as a scientist that when you
7  have a low number of samples that you are
8  analyzing and looking at to see whether there is
9  a statistically significant difference, just
10 because there is a numerical difference does not
11 necessarily mean there is a statistically
12 significant difference; do you agree or disagree
13 with that?
14         MR. FABRY:  Can I just interpose an
15 objection to the misuse of the term "statistical
16 significance" as to this hypothetical.
17         And you can go ahead and answer.
18 BY MR. SNELL:
19     Q.  Do you agree or disagree?
20     A.  Data points, not samples.  The same
21 sample can be measured at different parts to
22 create data points.  Multiple data points can be
23 put into statistical tests.
24         So if I measure barkness in different
25 filaments from the same sample, this will create

Page 279

1  a large data set.  Then it will reach
2  statistical significance.
3      Q.  You haven't done that, though?
4      A.  I've done that.  I measured filaments,
5  different filaments.
6      Q.  Where are your calculations showing
7  that this is statistically significant
8  different?
9      A.  I didn't test, because all of these
10 measurements were within 2-micron tests.
11 There's no point of doing statistical tests, the
12 p-value will be indefinitely small.  Because
13 data sets I measured were completely separate,
14 there were no overlap.  There's no point of
15 doing statistical tests.
16         Everything is between 1 and 2,
17 everything here is between 4 and 5, no overlap.
18 You do statistical tests to see if the overlap
19 completely overlaps both data sets, or there is
20 a small overlap, therefore you calculate the
21 width of the overlap.  If it's 5 percent or
22 less, it becomes that the difference is
23 95 percent -- is present to 95 percent
24 certainty.
25         If there's no overlap -- I can do this

Page 280

1  test, it's not that hard to do -- but I know as
2  a researcher that it will be indefinitely -- the
3  p-value will be indefinitely small.
4      Q.  So what is the mean width then of the
5  bark for the longer exposed meshes?
6      A.  4 microns.
7      Q.  All right.  And what is the confidence
8  interval, 95 percent confidence interval?
9      A.  Didn't do that.
10         You mean for that specific mesh that I
11 was measuring?
12     Q.  Yes.
13     A.  I didn't calculate confidence
14 interval.  But it wasn't reaching 2 microns of
15 the other.
16     Q.  Turn, if you would, to -- let me just
17 make a request on the record.  Request for
18 production of your pathology report in the
19 Edwards case.
20         How many pages is it?
21     A.  Two pages, one page.
22         MR. FABRY:  I'm pretty sure it's two.
23 As certain as I can be, at some point it must
24 have been produced to you.  But --
25         MR. SNELL:  It's not attached to his

Page 281

1  report, and it's never been produced to me, so I
2  don't have it.  If I had it, I would mark it,
3  because I'd like to mark it and ask you about
4  it.
5          MR. FABRY:  I didn't bring it.
6          Can we go off the record for a second?
7  BY MR. SNELL:
8      Q.  Did you make a report in Mrs. Huskey's
9  case?
10     A.  Are we --
11     Q.  We're on the record.
12         MR. FABRY:  Okay.  Do you want to deal
13 with getting the pathology report that you were
14 just asking about?  Or do you want to forget
15 about that and move on to something else?
16         MR. SNELL:  I'm not forgetting about
17 it.
18 BY MR. SNELL:
19     Q.  I just want to know, before I
20 transition to something else, I want to know did
21 you generate a pathology report for the Huskey
22 case?
23     A.  No, I didn't have a specimen.
24         MR. SNELL:  Okay.  All right.  If you
25 have the report, I'd like it.

71 (Pages 278 to 281)

Vladimir Iakovlev, M.D.

Page 282

1      MR. FABRY:  We're working on getting
2  it for you right now.  I agree, it didn't seem
3  to come with the copy of the expert report that
4  I received.  But I have seen it, and it was my
5  sincere belief that at some point --
6      MS. THOMPSON:  It should have been
7  attached.  It was an oversight, I believe.
8      MR. FABRY:  Okay.
9      MR. SNOWDEN:  So it wasn't produced
10 then?
11     MR. FABRY:  I'm not saying that.
12     MR. SNOWDEN:  If it was an oversight
13 and not attached it, wasn't produced.
14     MR. FABRY:  It's oversight.
15     MR. SNOWDEN:  I'm trying to
16 understand.
17     MR. FABRY:  What she's saying is as
18 far as we can tell it was not attached to this
19 report.
20     MR. SNOWDEN:  That you brought with
21 you today?
22     MR. FABRY:  That was produced as the
23 Rule 26 report.
24     MR. SNOWDEN:  Okay.
25     MR. FABRY:  What I'm saying is it has

Page 283

1  been my belief that it was separately and
2  otherwise produced to you in the litigation.
3  But as I'm sitting here right now, I can't
4  answer the question, you know, where it went.
5  We're always a little bit relying on what other
6  folks are telling us.
7      MR. SNOWDEN:  I'm making sure we're
8  all on the same page.
9      MR. FABRY:  None of that was supposed
10 to be on the record.
11 BY MR. SNELL:
12     Q.  Let's go to Figure 28.  You said
13 there's a cell wedged in a crack in a
14 non-Ethicon transobturator sling?
15     A.  Yes.
16     Q.  What type of cell is that?
17     A.  Most likely macrophage.
18     Q.  And how did the macrophage get into
19 this non-Ethicon transobturator sling space?
20     A.  You told me yourself the inflammatory
21 cells squeeze into small spaces to deliver their
22 function.
23     Q.  I can't testify.
24     Is that what your opinion is, the
25 inflammatory cells like macrophages can squeeze

Page 284

1  into areas that are as small as 500 nanometers
2  wide?
3      A.  At least they can stick to
4  pseudopodia.
5      Q.  Well, this cell you have a picture of
6  here which you say wedged into the crack, what's
7  the width of that crack?
8      A.  About 600 nanometers.  Or in the
9  width, the widest part is about 600 nanometers.
10     Q.  Okay.  And 1,000 nanometers equals 1
11 micron, correct?
12     A.  Yes.
13     Q.  Is that correct?
14     A.  Yes.
15     Q.  For Mrs. Edwards, did you look at all
16 of her medical records between the time of her
17 TVT-O implantation up until the time of when she
18 presented for explantation to see what were her
19 symptoms and complaints during that six and a
20 half year period?
21     A.  No.  As I mentioned, as a pathologist
22 I extract only the information which is relevant
23 to the specimen I examine, so I'm very
24 selective.  Specifically I check what was time
25 of insertion, and records describing change of

Page 285

1  symptoms that appear after insertion, or
2  symptoms which led to excision, and then records
3  of the excision and after excision.  I'm reliant
4  on clinical work-up of the differential
5  diagnosis.
6      (Whereupon, Iakovlev Exhibit Number 8,
7      Pathology report in Ms. Edwards' case,
8      was marked for identification.)
9  BY MR. SNELL:
10     Q.  Exhibit 8 I've just handed you is a
11 pathology report in Mrs. Edwards' case.
12     A.  Yes.
13     Q.  You've seen this document before, or
14 have you not?
15     A.  Probably I did.  Was it the same date?
16 Probably I did, because if it's the same
17 specimen, it usually comes with the specimen.
18     Q.  You see at the top it says "Soft
19 tissue with chronic inflammation and focal
20 foreign body giant cell reaction"?
21     A.  Yes.
22     Q.  Do you know whether or not you
23 actually reviewed this report prior to today?
24     A.  If my pathology report indicates that
25 there is accompanying pathology report, then I

72 (Pages 282 to 285)

Vladimir Iakovlev, M.D.

Page 286

1    did, because I always record if there's
2    pathology report accompanies the specimen.
3         Q.  The pathology report does not state
4    that there was any mesh exposure, correct?
5         A.  It actually doesn't state any
6    diagnosis at all.  Artificial mesh gross
7    examination only.  It's a statement that
8    specimen was received and that's it.  The mesh
9    itself wasn't examined.
10        Q.  It says "A representative section of
11   the soft tissue is submitted in Cassette A-1."
12        A.  Soft tissue, not the mesh.
13        Q.  "Soft tissue with chronic inflammation
14   and focal foreign body giant cell reaction"?
15        A.  They examined soft tissue, which is
16   outside of the mesh.
17        Q.  So they looked at soft tissue that was
18   outside the area of the mesh?
19        A.  Outside of the mesh.  Yes, they looked
20   at soft tissue outside the mesh.
21        Q.  And they found chronic inflammation
22   and foreign body giant cell reaction?
23        A.  Yes.
24        Q.  And that can -- and that finding can
25   occur any time you do surgery in soft tissue?

Page 287

1         A.  Yes, it can happen immediately, a few
2    weeks after surgery.
3         Q.  Why didn't you look at the specimen
4    for Mrs. Huskey?
5         A.  I wasn't given any.
6         Q.  I'm sorry?
7         A.  I didn't receive any specimens for
8    her.
9         Q.  As a pathologist, one of the key
10   things you do is look at pathology specimens to
11   draw conclusions, correct?
12        A.  To generate a pathology report, yes, I
13   need to look at the specimen.
14        Q.  To generate a pathology opinion, in
15   your normal course of work you look at the
16   pathology slides?
17            MR. MCCONNELL:  Objection.
18        A.  Not always.  Sometimes I'm asked
19   questions from clinicians, and we discuss what I
20   may see, what by biopsy methodology they can
21   use, either it's a fine needle biopsy or it's a
22   larger excisional biopsy, and I guide them.  Or
23   they ask if we take a biopsy, how I can help
24   them in the specific differential diagnosis.
25            So not always my job is limited to

Page 288

1    examination and generation of the report.
2    BY MR. SNELL:
3         Q.  Setting aside things like when you're
4    doing -- someone is going to do a biopsy, if
5    you're going to try to assess the degree of
6    inflammation in the tissues, you need to look at
7    the pathology slides as a pathologist, correct?
8         A.  To predict what degree I may see, I
9    don't have to look at the slides.  To assess
10   what degree is there, I have to look at slides.
11        Q.  You can make predictions, but when you
12   actually look at the slides, it may be within or
13   outside of your predictions, correct?
14        A.  Yes.  Because the prediction will be
15   based on my experience and knowledge.
16        Q.  At your hospital, do you issue
17   pathology reports without having reviewed the
18   pathology specimen?
19        A.  No.  I do not issue pathology reports
20   without reviewing specimens.
21        Q.  Before you sign your name to a
22   pathology report, you will have viewed the
23   pathology specimen at your hospital?
24        A.  Pathology report is generated after
25   reviewing specimens.

Page 289

1         Q.  You say under "Mrs. Huskey," take a
2    look, the second paragraph under
3    "clinico-pathologic correlation," I'm on
4    Page 72 --
5         A.  Yes.
6         Q.  -- you say "In these samples available
7    to me."
8             Do you see that?
9         A.  Yes.
10        Q.  What samples are you talking about
11   there?
12        A.  Samples of other explanted meshes.
13        Q.  Not Mrs. Huskey's samples given to
14   you?
15        A.  No.
16        Q.  Am I correct that you are not talking
17   about samples from Mrs. Huskey?
18        A.  No, I'm not talking about
19   Mrs. Huskey's samples.  These samples, pertinent
20   to either TVT-O meshes or other brands explanted
21   from other patients.
22        Q.  Did you ask for the pathology explant
23   in Mrs. Huskey's case?
24        A.  Yes.
25        Q.  When did you ask for that?

73 (Pages 286 to 289)

Vladimir Iakovlev, M.D.

Page 290

1      A. When I was given -- when I was asked
2 to be an expert witness in this case, I said "I
3 need all pathology available for all patients."
4      Q. And when was that for the Huskey case?
5      A. I don't remember now. It was sometime
6 early this year. Because when I received
7 Ms. Edwards', it's been sitting in my office for
8 long time.
9      MR. SNELL: Let's go off the record
10 for a minute.
11      (Off the record discussion.)
12 BY MR. SNELL:
13      Q. Doctor, I believe you earlier
14 testified -- strike that.
15      Did you have a control TVT-O mesh?
16      MR. FABRY: Objection to form.
17      A. You mean control new?
18 BY MR. SNELL:
19      Q. Yes.
20      A. As a control?
21      Q. Yes.
22      A. Yes, I did.
23      Q. Did you do any testing on that control
24 TVT-O mesh?
25      A. I did stretch tests. I put it in

Page 291

1 formalin, I think I still had parts of it in
2 formalin mand then put it in paraffin.
3      Q. Are there any pictures or results of
4 any testing you did on that control mesh?
5      A. As I told you, that for that specific
6 block it was difficult, filaments were floating
7 out, so I ended up with just non-TVT-O. I can
8 section it again, but at the time of the report
9 the sections floated.
10      Q. So you didn't compare Mrs. Edwards'
11 TVT-O mesh to a TVT-O control mesh, correct?
12      MR. FABRY: Objection. Form.
13      A. For degradation?
14 BY MR. SNELL:
15      Q. For anything.
16      A. No. The only thing I was testing new
17 was degradation.
18      Q. So we're clear, did you compare
19 Mrs. Edwards' TVT-O mesh to a TVT-O control mesh
20 for the purposes of your degradation analyses?
21      A. Not at the time of the report. The
22 experiment is still ongoing.
23      Q. Have you made -- well, have you done
24 it as we sit here today, compared Mrs. Edwards'
25 TVT-O mesh to a control TVT-O mesh for the

Page 292

1 purposes of investigating your opinions
2 regarding degradation?
3      A. As I said, I started the test at the
4 time of this report, couldn't complete it. It's
5 still in formalin, some parts. So no completed
6 comparison.
7      Q. And the mesh that you looked at as a
8 control which you exposed to the formalin and
9 then the paraffin was a mesh by another
10 manufacturer?
11      A. Yes. It was AMS.
12      Q. Okay. Was it a pelvic organ prolapse
13 mesh, or a sling mesh?
14      A. It was a sling; exactly look like
15 TVT-O, just without blue filaments.
16      Q. Now, that AMS sling mesh never had
17 tissue on it, am I correct?
18      A. No.
19      Q. No, I'm not correct?
20      A. It never had any tissue on it.
21      Q. Okay. Did that AMS sling mesh --
22 strike that.
23      Was that AMS sling mesh exposed to
24 proteins in the human body?
25      A. It was not exposed to proteins.

Page 293

1 That's the whole purpose of the control, not to
2 get it exposed. Exposed to everything else but
3 the body.
4      Q. Okay. And how long was that control
5 AMS mesh sling exposed to formalin?
6      A. The latest test came after one month
7 exposure to formalin.
8      Q. So, for example, Mrs. Edwards' mesh
9 was in formalin for over a year?
10      A. Yes. But I had other patients which
11 had their mesh only for 72 hours in formalin,
12 especially at St. Michael's, or other samples
13 which are coming in paraffin blocks, they're
14 processed in 48 to 72 hours.
15      Q. Did you have a control mesh sample
16 which had been exposed to formalin for the same
17 length of time that Mrs. Edwards' mesh was
18 exposed to formalin?
19      A. Actually had it longer, because her
20 initial H&E sections were exposed to formalin
21 within reasonable lab time, which is 48 to 72
22 hours. The specimen I processed, it had over a
23 year exposure to formalin. But the slides which
24 were cut initially, original, they were exposed
25 to formalin only four days. The lab procedures

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 294

1    say usually within three days.
2         Q.  For the processing you did, your
3    control was exposed to formalin for a month at
4    the most?
5         A.  Yes.
6         Q.  What's the minimum that your control
7    was exposed to formalin for?
8         A.  48 hours, 48 to 72 hours.  I just put
9    it in the same bucket with regular specimens.
10        Q.  On the H&E slides from Emory which you
11   looked at, the three slides, that's the sum
12   total of slides you've looked at from Emory for
13   Mrs. Edwards?
14        A.  Yes.
15        Q.  Okay.  And did you see this bark,
16   degradation bark, in those three H&E slides from
17   Emory?
18        A.  I've seen bark in all explanted
19   meshes, in all slides.  I don't remember
20   anything, so it must be there.  I mean I would
21   have to -- the only time when I don't see the
22   bark when there are no filaments.  If those
23   slides contain the bark -- the filaments, I saw
24   the bark.
25        Q.  As you sit here today, do you know

Page 295

1    whether you saw bark in those three H&E slides
2    from Emory?
3         A.  I don't remember.
4         Q.  Did you take photographs of what you
5    saw in those three slides from Emory?
6         A.  I can't -- have some pictures of those
7    slides.  I'm not sure if they're in the report
8    or they're in different ones.  The quality is
9    visually worse than from the previous slides.
10        Q.  Did you --
11        A.  I did not note a difference between my
12   sections and those, Emory.  If there was a
13   difference I would have noticed, and remembered
14   that.
15        Q.  Did you make any notes as you reviewed
16   the slides?
17        A.  Yes.  They all were put in drafts, and
18   then the -- the first pathology report, and then
19   I continued reviewing them, and they were put in
20   the expert report.
21        MR. SNELL:  Let's go off the record.
22        (Off the record discussion.)
23   BY MR. SNELL:
24        Q.  In Mrs. Edwards' case, what tests, if
25   any, did you do to determine whether there was

Page 296

1    degradation?
2         A.  I observed the staining of the bark
3    and polarized it.
4         Q.  Is it generally accepted in the
5    medical community to use immunohistochemical
6    staining to ascertain the amount that the stain
7    soaks up in material?
8         A.  Yes, it's called measuring protein
9    expression.  By the intensity of staining you
10   measure amount of expression of a protein.
11        Q.  And is there any medical literature
12   that reports on the degree or amount of stain
13   which is soaked up by polypropylene that you've
14   located?
15        A.  No.  It doesn't soak anything.
16        Q.  I'm sorry?
17        A.  It does not soak any fluids.  It's
18   hydrophobic.
19        Q.  Was there any inflammation from the
20   degradation that you saw in Mrs. Edwards' case?
21        A.  Repeat the question, please?
22   Inflammation?
23        Q.  Was there inflammation from the
24   degradation you claim occurred in Mrs. Edwards'
25   case?

Page 297

1         A.  Well, I see degradation and I see
2    inflammation at the same time.  Specifically
3    determine what is triggering that inflammation
4    or if there are multiple triggers is impossible,
5    because there can be multiple triggers.  I see
6    degradation and I see inflammation all occurring
7    at the same time.
8         Q.  Did you see a higher concentration of
9    inflammatory cells near the area of this bark,
10   as you call it in, Mrs. Edwards' case?
11        A.  Yes.  All inflammatory cells
12   surround -- concentrated around the filaments.
13   The bark is at the surface of the filaments.
14        Q.  Show me an example in your expert
15   report where there's a higher concentration of
16   inflammatory cells at the bark, and where there
17   are no inflammatory cells away from the mesh.
18        A.  This (indicating).  This is the bark,
19   here's inflammation cells, these are no
20   inflammation cells.
21        MR. FABRY:  What image are you looking
22   at, Doctor?
23        THE WITNESS:  This is Page 37, Figure
24   19b.
25   BY MR. SNELL:

75 (Pages 294 to 297)

Vladimir Iakovlev, M.D.

Page 298

1      Q.  Page 37, Figure 19b is not
2  Mrs. Edwards, correct?
3      A.  No.  If you want me to go specifically
4  to Mrs. Edwards, figure -- Page 70, Figure
5  TE10a, see these cells?  These are all
6  inflammatory cells, and this is scar.  So no
7  inflammatory cells here.  All inflammatory cells
8  are right against the inflammatory cells.  This
9  is the bark.
10      Same thing here, Figure 68, Figure
11  TE9a, bark, inflammatory cells.  Tissue is
12  collagen (indicating).
13      Q.  Hold on.
14      In Figure TE9a, there are inflammatory
15  cells away from what you've labeled as
16  degradation bark, correct?
17      A.  So this is inflammatory cells.
18      Q.  And there are inflammatory cells to
19  the left of that as well, correct?
20      A.  Well, there might be another filament
21  here.  I didn't look.
22      Q.  I don't want might.
23      These dark dots to the left of the
24  degradation bark, to the left of where you've
25  labeled tissue, are inflammatory cells, correct?

Page 299

1      A.  Yes, they are, in this specific
2  photograph.
3      Q.  All right.
4      A.  Now if we go back to this stain.
5      Q.  You're on TE7b?
6      A.  66.  Figure TE7b, this upper part, two
7  crossing filaments, inflammatory cells are here,
8  there's not much inflammatory cells away.  The
9  bark is here, bark is there (indicating).
10      Q.  The blue dots are the inflammatory
11  cells?
12      A.  Yes.
13      Q.  And there are inflammatory cells
14  throughout all of the tissue in-between the mesh
15  filaments in the top and the bottom, correct?
16      A.  Scattered, yet not concentrated.
17      Q.  So in the left corner, can you see
18  concentrations of inflammatory cells?
19      A.  Oh, this is just tissue artifact, just
20  folded.
21      Q.  Just tissue artifact?
22      A.  Yes.  That specific -- yes, there
23  could be, but in that specific picture it's an
24  artifact.
25      Q.  Did you quantify it in any

Page 300

1  calculations to look at the inflammatory cells
2  in a certain power field to see whether there
3  was a statistically significant difference in
4  the areas next to the mesh or away from the
5  mesh?
6      A.  No.  This is observation, it doesn't
7  need specific calculations.  If I do
8  calculations I have to -- this is done for
9  purpose of 95 percent accuracy or certainty.
10  For just descriptive, I don't need to do this
11  testing, otherwise I would be doing my reports
12  forever for one patient.
13      MR. SNELL:  Let's go off the record.
14      (Off the record discussion.)
15  BY MR. SNELL:
16      Q.  The inflammatory cells that you saw in
17  the tissues of Mrs. Edwards' explants, what are
18  the different processes or causes of those
19  inflammatory cells being present?
20      A.  Inflammation can happen to foreign
21  body.  If a foreign body is inert, the amount of
22  inflammation is minimal to no inflammation at
23  all.  So the foreign body should release some
24  chemicals to be recognized as a foreign.  That's
25  where I think we can think about degradation,

Page 301

1  release of molecules off the surface.
2      Then there can be bacteria which also
3  trigger inflammatory responses.
4      Q.  Why does the bark take up the stain?
5      A.  Why barks takes the stain?  It's
6  porosity.  The porous, cracks, they just trap
7  histological stains specifically.  You can do it
8  green, blue, black, any dye will stay there.
9  I've done it green, I've done it red, I've done
10  it any color.
11      Q.  For the degradation analyses, why
12  didn't you do any scanning electron microscopy
13  on Mrs. Edwards?
14      A.  I don't think it contributes.  It
15  doesn't answer any questions.
16      Q.  Can you say that -- are you saying
17  that there is -- if one were to look at
18  Mrs. Edwards' explants under scanning electron
19  microscope, there would not be any findings of
20  significance?
21      A.  It will be finding of a cracking.  I
22  can look in microscope just with a reflected
23  light.  I can -- I have actually done pictures
24  of cracks from the surface in regular
25  microscope, they look exactly like scanning

Vladimir Iakovlev, M.D.

Page 302

1    electron microscopy.
2         Q.  You didn't do that for Mrs. Edwards?
3         A.  No, because it doesn't contribute.  It
4    shows cracks, but then you're stuck with if the
5    cracks is inspissated in body protein or
6    polypropylene, I cannot analyze what the
7    material is on the surface, in the
8    cross-sections I can't analyze it.
9         Q.  The crack can be from the body's
10   proteins, that's one source?
11        A.  Yes.
12        Q.  And another source for your opinion is
13   that the cracks can be from degraded
14   polypropylene?
15        A.  Yes.  So if you see cracked material
16   in the surface, it can be either polypropylene
17   crack or protein.
18        Q.  Did you attempt to isolate this bark
19   that you opine is in the slides and chemically
20   analyze it?
21        A.  No.
22        Q.  Are any of the Plaintiffs' experts
23   currently doing that analysis?
24        A.  They're comparing scratched anodes,
25   scratched filaments.  But to me, I can polarize

Page 303

1    it.  If I see that the bark is synthetic,
2    polarized acts as a polypropylene optically, it
3    is a polypropylene.  So this is the type of
4    chemical analysis I do under microscope.  I
5    analyze optical properties of the material.
6         Q.  Actually optical properties, when
7    you're looking at polarized light, is not a
8    chemical analysis?
9         A.  No.  But it reflects chemical
10   composition.
11        Q.  And you know that polarized light will
12   reflect all things besides polypropylene,
13   correct?
14        A.  Say it again?
15        Q.  If you look at slides of tissue under
16   polarized light, a polypropylene mesh is not the
17   only thing that will light up and be shown in
18   the polarization, correct?
19        A.  Foreign bodies, most foreign bodies
20   able to polarize light will polarize.
21        Q.  Have you looked at the medical
22   literature to see whether collagen reflects
23   under polarized light?
24        A.  Collagen polarizes light to much less
25   a degree.  You can see it in the pictures.  This

Page 304

1    is collagen, that's how it looks under polarized
2    light.
3         MR. FABRY:  For the record, Doctor,
4    which image are we looking at?
5         THE WITNESS:  70, Page 70, picture
6    TE10a.
7         MR. FABRY:  That would be an image
8    specifically from --
9         MR. SNELL:  Hold on.  This is my exam.
10   If you want to ask those questions, you can feel
11   free.
12   BY MR. SNELL:
13        Q.  What other tissue cells light up
14   during polarized light?
15        A.  Cells will not polarize.  There are
16   some proteins which can polarize light, some.
17   This would be collagen, amyloid, other proteins.
18   The degree of polarization is much lower.
19        Why are we discussing this?  There are
20   granules, blue granules which your company
21   inserted and it's right in the bark.  This is
22   useless discussion.
23        Q.  Where do you see the blue granules?
24        A.  Here, Page 71, blue granules are in
25   the bark.  This is polypropylene.

Page 305

1         Q.  So --
2         A.  Figure TE10b.
3         MR. SNELL:  Are you testifying over
4    there, Margaret?
5         MS. THOMPSON:  To Andy.
6         A.  This is Figure TE10b.  See the blue
7    granules?  This is bark.  So the inner layers of
8    the bark are staining lightly, because the
9    pores, the cracks are small, they do not absorb
10   as much dye.  But also degradation process is
11   not as advanced to destroy this granule.
12        Once you go towards the surface, the
13   cracks open, the pores are larger, they absorb
14   more dye, therefore staining is darker, and the
15   blue granules lose their color.
16        This is logical.  I mean how much
17   better you can get?
18   BY MR. SNELL:
19        Q.  By what process does these blue --
20   what do you call them -- granules lose their
21   color?
22        A.  Degradation.  They degrade.
23        Q.  How?
24        A.  The same way as -- well, specific
25   chemical process?

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 306

1      Q.  Yes.  Are you talking oxidation?  What
2  are you talking about?
3      A.  This has to be studied.  I'm not a
4  material scientist.  I don't think anybody knows
5  exactly.  There is hypothesis of oxidation and
6  reactive species, but I mean I'm not a materials
7  scientist.
8      Q.  There's people who analyzed whether
9  there is alleged oxidation, and they found that
10  there is no oxidation.  You're aware of that
11  leak research, correct?
12      A.  I don't know.  This is polypropylene,
13  it's completely different, behaving differently
14  than non-degraded polypropylene.  And it doesn't
15  form by formalin alone, it forms in vivo.
16      Q.  Slide TE10b, what power or
17  magnification was that at?
18      A.  This is 100 oil immersion.  These are
19  all pictures of degradation of 100 objective oil
20  immersion.
21      Q.  That was under a light microscope, or
22  an electron microscope?
23      A.  Light.
24      MR. SNELL:  Go off.
25      (Off the record discussion.)

Page 307

1      (Whereupon, Iakovlev Exhibit Number 9,
2  Dr. Iakovlev's pathology report for
3  Mrs. Edwards' specimen, was marked for
4  identification.)
5  BY MR. SNELL:
6      Q.  Doctor, I'm going to attach Exhibit
7  Number 9 to your deposition.
8      A.  Yes.
9      Q.  This is your expert report in
10  Mrs. Edwards' case?
11      A.  No.  This is pathology report.
12      Q.  Strike that.
13      Identify for the record what Exhibit
14  Number 9 is.
15      A.  It's a pathology report for
16  Mrs. Edwards' specimen.
17      Q.  Did you prepare that report?
18      A.  Yes.
19      MR. SNELL:  Just note for the record
20  we received this about 20 minutes ago.
21  BY MR. SNELL:
22      Q.  Let me take a look at that, Doctor,
23  because I don't have a separate copy.
24      A.  (Handing).
25      Q.  You didn't bring a copy of Exhibit

Page 308

1  Number 9, your pathology report, to the
2  deposition today, did you?
3      A.  No.  I believe it was served to you
4  before.
5      MR. SNELL:  I'll make an application
6  to come back.
7      That's all the questions I have for
8  now.
9      Let me just make one thing.
10  BY MR. SNELL:
11      Q.  Doctor, I want you to preserve all of
12  the materials that we discussed that you have at
13  your lab and that's part of your file, all the
14  photos, all the samples, all the exemplars, the
15  controls.
16      You understand that?
17      A.  Yes.
18      Q.  Okay.
19      A.  Pertinent to TVT-O litigation?
20      Q.  Pertinent to all, because my request
21  goes beyond TVT-O.
22      A.  I cannot preserve if I'm requested to
23  supply specimens for the litigation.  If I
24  receive the same request from another company, I
25  have to supply it to them.

Page 309

1      Q.  That's fine.
2      But -- so your expert reports and your
3  pathology reports you've issued on other
4  litigation meshes, you still have those
5  pathology reports?
6      A.  Pathology reports have confidential
7  names of the patients.  I can provide pictures.
8      MR. FABRY:  Right now we're not having
9  a discussion about what will be produced.  That
10  will be a separate discussion.
11  BY MR. SNELL:
12      Q.  I'm just asking you to preserve --
13      A.  I will preserve everything I can.
14      MR. SNELL:  Thank you.
15      MR. FABRY:  No questions.  We'll
16  reserve our questions for trial.
17      Thank you.
18      (Whereupon, the deposition was
19  concluded at 4:28 p.m.)
20
21
22
23
24
25

78 (Pages 306 to 309)

Vladimir Iakovlev, M.D.

| | Page 310 |
|---|---|
| | |

Page 310

```
 1    COMMONWEALTH OF MASSACHUSETTS )
 2    SUFFOLK, SS.              )
 3         I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
 4    and Notary Public in and for the Commonwealth of
 5    Massachusetts, do certify that on the 18th day
 6    of March, 2014, at 8:14 o'clock, the person
 7    above-named was duly sworn to testify to the
 8    truth of their knowledge, and examined, and such
 9    examination reduced to typewriting under my
10    direction, and is a true record of the testimony
11    given by the witness.  I further certify that I
12    am neither attorney, related or employed by any
13    of the parties to this action, and that I am not
14    a relative or employee of any attorney employed
15    by the parties hereto, or financially interested
16    in the action.
17         In witness whereof, I have hereunto
18    set my hand this 30th day of March, 2014.
19
20    _____
21         MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22         Realtime Systems Administrator
23         CSR #149108
24
25
```

Page 312

```
 1         ------
          E R R A T A
 2         ------
 3    PAGE  LINE  CHANGE
 4    ____ ____ _____
 5         REASON: _____
 6    ____ ____ _____
 7         REASON: _____
 8    ____ ____ _____
 9         REASON: _____
10    ____ ____ _____
11         REASON: _____
12    ____ ____ _____
13         REASON: _____
14    ____ ____ _____
15         REASON: _____
16    ____ ____ _____
17         REASON: _____
18    ____ ____ _____
19         REASON: _____
20    ____ ____ _____
21         REASON: _____
22    ____ ____ _____
23         REASON: _____
24    ____ ____ _____
25
```

Page 311

```
 1         INSTRUCTIONS TO WITNESS
 2
 3         Please read your deposition over
 4    carefully and make any necessary corrections.
 5    You should state the reason in the appropriate
 6    space on the errata sheet for any corrections
 7    that are made.
 8         After doing so, please sign the
 9    errata sheet and date it.  It will be attached
10    to your deposition.
11         It is imperative that you return
12    the original errata sheet to the deposing
13    attorney within thirty (30) days of receipt of
14    the deposition transcript by you.  If you fail
15    to do so, the deposition transcript may be
16    deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

Page 313

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2
 3         I, _____, do
      Hereby certify that I have read the foregoing
 4    pages, and that the same is a correct
      transcription of the answers given by me to the
 5    questions therein propounded, except for the
      corrections or changes in form or substance, if
 6    any, noted in the attached Errata Sheet.
 7
 8    _____
      VLADIMIR IAKOVLEV, M.D.      DATE
 9
10
11
12
13
14
15    Subscribed and sworn
      To before me this
16    _____ day of _____, 20____.
17    My commission expires: _____
18
19    _____
      Notary Public
20
21
22
23
24
25
```

79 (Pages 310 to 313)

Vladimir Iakovlev, M.D.

Page 314

1              LAWYER'S NOTES
2        PAGE LINE
3        ____ ____ _____
4        ____ ____ _____
5        ____ ____ _____
6        ____ ____ _____
7        ____ ____ _____
8        ____ ____ _____
9        ____ ____ _____
10       ____ ____ _____
11       ____ ____ _____
12       ____ ____ _____
13       ____ ____ _____
14       ____ ____ _____
15       ____ ____ _____
16       ____ ____ _____
17       ____ ____ _____
18       ____ ____ _____
19       ____ ____ _____
20       ____ ____ _____
21       ____ ____ _____
22       ____ ____ _____
23       ____ ____ _____
24       ____ ____ _____
25

Golkow Technologies, Inc. - 1.877.370.DEPS