# EXHIBIT I

Vladimir Iakovlev, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

OF THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE: ETHICON, INC., PELVIC )  Master File No.
REPAIR SYSTEM PRODUCTS       )  2:12-MD-02327
LIABILITY LITIGATION         )  MDL 2327
                             )
THIS DOCUMENT RELATES TO THE )  JOSEPH R. GOODWIN
FOLLOWING CASES IN WAVE 1 OF )  U.S. DISTRICT JUDGE
MDL 200:                     )
                             )
-----------------------------
                             )
BARBARA VIGNOS-WARE          )  Civil Action No.
                             )
                Plaintiff,)  2:12-cv-00761
                             )
vs.                          )
                             )
ETHICON, INC., ET AL.        )
                             )
                Defendant. )

-----------------------------


---  This is the Deposition of VLADIMIR

IAKOVLEV, MD, taken at the Hilton Hotel,  145

Richmond Street West, Toronto, Ontario, on the 4th

day of March, 2016.

                ------------


            REPORTED BY:  HELEN MARTINEAU

             CERTIFIED SHORTHAND REPORTER

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

| Page 2 | Page 4 |
|---|---|

**Page 2**

```
1  --------------------------
   Donna Loustaunau        )
   v. Ethicon, Inc., et al.  )
2  Civil Action No. 2:12-cv-00666 )
3                          )
   Patricia Ruiz           )
4  v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-01021 )
5                          )
   Betty Funderburke       )
6  v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-00957 )
7                          )
   Elizabeth Blynn Wolfe   )
8  v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-01286 )
9                          )
   Donna Massey, et al.    )
10 v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-0880  )
11                         )
   Patti Ann Phelps, et al.  )
12 v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-01171 )
13 Dina Sanders Bennett    )
   v. Ethicon, Inc., et al.  )
14 Civil Action No. 2:12-cv-00497 )
15 Charlene Logan Taylor   )
   v. Ethicon, Inc., et al.  )
16 Civil Action No. 2:12-cv-00376 )
17 Cynthia Nix             )
   v. Ethicon, Inc., et al.  )
18 Civil Action No. 2:12-cv-01278 )
19 Barbara Kaiser          )
   v. Ethicon, Inc., et al.  )
20 Civil Action No. 2:12-cv-00887 )
21 Carol Jean Dimock       )
   v. Ethicon, Inc., et al.  )
22 Civil Action No. 2:12-cv-00401 )
   Ana Ruebel              )
23 v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-00663 )
24 --------------------------
```

**Page 3**

```
1  Jackie Frye             )
   v. Ethicon, Inc., et al.  )
2  Civil Action No. 2:12-cv-1004 )
3  Joan Adams              )
   v. Ethicon, Inc., et al.  )
4  Civil Action No. 2:12-cv-01203 )
5  Sharon Boggs, et al.    )
   v. Ethicon, Inc., et al.  )
6  Civil Action No. 2:12-cv-00368 )
7  Dina Destefano-Raston, et al.  )
   v. Ethicon, Inc., et al.  )
8  Civil Action No. 2:12-cv-01299 )
9  Teresa Georgilakis, et al.  )
   v. Ethicon, Inc., et al.  )
10 Civil Action No. 2:12-cv-00829 )
11 Donna Hankins, et al.   )
   v. Ethicon, Inc., et al.  )
12 Civil Action No. 2:12-cv-01011 )
13 Nancy Hooper, et al.    )
   v. Ethicon, Inc., et al.  )
14 Civil Action No. 2:12-cv-00493 )
15 Krystal Teasley         )
   v. Ethicon, Inc., et al.  )
16 Civil Action No. 2:12-cv-00500 )
17 Margaret Stubblefield   )
   v. Ethicon, Inc., et al.  )
18 Civil Action No. 2:12-cv-00842 )
19 Cindy Smith             )
   v. Ethicon, Inc., et al.  )
20 Civil Action No. 2:12-cv-01149 )
21 Lois Hoy, et al.        )
   v. Ethicon, Inc., et al.  )
22 Civil Action No. 2:12-cv-00876 )
   Constance Daino, et al.  )
23 v. Ethicon, Inc., et al.  )
   Civil Action No. 2:12-cv-01145 )
24 --------------------------
```

**Page 4**

```
1  Janet Smith, et al.     )
   v. Ethicon, Inc., et al.  )
2  Civil Action No. 2:12-cv-00861 )
3  Harriet Beach           )
   v. Ethicon, Inc., et al.  )
4  Civil Action No. 2:12-cv-00476 )
5  Maria C. Stone, et al.  )
   v. Ethicon, Inc., et al.  )
6  Civil Action No. 2:12-cv-00652 )
7  Diane Kropf, et al.     )
   v. Ethicon, Inc., et al.  )
8  Civil Action No. 2:12-cv-01202 )
9  Virginia White, et al.  )
   v. Ethicon, Inc., et al.  )
10 Civil Action No.2:12-cv-00958 )
11 Dee McBrayer, et al.    )
   v. Ethicon, Inc., et al.  )
12 Civil Action No. 2:12-cv-00779 )
13 Julie Wroble, et al.    )
   v. Ethicon, Inc., et al.  )
14 Civil Action No. 2:12-cv-00883 )
15 Sherry Fox, et al.      )
   v. Ethicon, Inc., et al.  )
16 Civil Action No. 2:12-cv-00878 )
17 Joyce Justus            )
   v. Ethicon, Inc., et al.  )
18 Civil Action No. 2:12-cv-00956 )
19 Kathleen Wolfe          )
   v. Ethicon, Inc., et al.  )
20 Civil Action No. 2:12-cv-00337 )
21 --------------------------
22
23
24
```

**Page 5**

```
1  A P P E A R A N C E S:
2  FOR THE PLAINTIFF AND THE WITNESS:
3  AYLSTOCK, WITKIN, KREIS, OVERHOLTZ, PLLC
4  DANIEL THORNBURGH, ESQ.
5  17 East Main Street, Suite 200
6  Pensacola, Florida 32502
7  Tel. 850.202.1010
8  Email:  dthornburgh@awkolaw.com
9
10 FOR THE DEFENDANT:
11 THOMAS COMBS & SPANN, PLLC
12 PHILIP J. COMBS, ESQ.
13 300 Summer Street, Suite 1380
14 Charleston, WV 25301
15 Tel.  304.414.1805
16 Email:  pcombs@tcspllc.com
17
18 FOR THE DEFENDANT:
19 BUTLER SNOW LLP
20 M. ANDREW SNOWDEN, ESQ.
21 150 3rd Avenue South, Suite 1600
22 Nashville, TN 37201
23 Tel.  615.651.6760
24 Email:  andy.snowden@butlersnow.com
```

2 (Pages 2 to 5)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 6

1        INDEX OF EXHIBITS
2  NO./ DESCRIPTION         PAGE
3
4  3  Flash drive containing files reviewed   8
       by Dr. Iakovlev in compiling his
5     clinico-pathological report re.
       Barbara Vignos-Ware.
6
7  1  Dr. Vladimir Iakovlev's      11
       clinico-pathological correlation
8     report re. Barbara Vignos-Ware.
9
10  2  Pathology report re. Barbara    67
       Vignos-Ware.
11
12  4  Surgical documentation report from   76
       Aultman Hospital for the explant and
13     implant procedure done on May 25th,
       2010, on Barbara Vignos-Ware.  Bates
14     labeled VIGNOS-WAREB_AULTH_MDR00111.
15
16
17
18
19
20
21
22
23
24

Page 7

1       INDEX OF WITNESSES
2  WITNESS.             PAGE
3  VLADIMIR IAKOVLEV, MD, affirmed
4  Cross-Examination by Mr. Combs....................
5  Re-Direct Examination by Mr. Thornburgh.........
6  Further Cross-Examination by Mr. Combs..........
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1       --- Upon commencing at 5:27 p.m.
2
3     (WHEREUPON, the witness was duly affirmed.)
4
5   VLADIMIR IAKOVLEV, MD., called as a witness herein,
6  having been first duly affirmed, was examined and
7      testified as follows:
8      CROSS-EXAMINATION BY MR. COMBS:
9     Q.  Dr. Iakovlev, right before the
10  deposition Mr. Thornburg gave me a flash drive and
11  would that flash drive have your reliance
12  materials for this case?
13      ---EXHIBIT NO. 3:  Flash drive
14        containing files reviewed by Dr.
15        Iakovlev in compiling his
16        clinico-pathological report re. Barbara
17        Vignos-Ware.
18      THE DEPONENT:  It would -- it contains
19  medical records I received and reviewed and chain
20  of custody form or forms, depending on if it was
21  one or several specimens.
22      BY MR. COMBS:
23     Q.  Would the medical records on that
24  flash drive be all the medical records that you

Page 9

1  would have reviewed in relation is to
2  Ms. Vignos-Ware's case?
3     A.  That's correct.
4     Q.  And the chain of custody form
5  reflects that you got the sample on November 29,
6  2015, would all of the work that you've done on
7  this case be between November 29th, 2015 and
8  February 1, 2016, when the report was produced?
9     A.  That's correct.
10     Q.  And there was no synoptic report
11  contained on the flash drive or produced in with
12  the report.  Does that indicate that you did not
13  do a synoptic report in this case?
14     A.  Because they were not done for all
15  cases.  I just didn't copy them when I had them.
16  So my understanding was since they were not
17  essential for me to form opinions they are part of
18  my records in St. Michael's Hospital.  I just did
19  not include any of them on the flash drives.
20     Q.  Did you perform a synoptic report in
21  this case?
22     A.  I don't know.  Again, it wasn't
23  essential.  It wasn't my goal to complete them.
24  Sometimes I complete them like month after expert

3 (Pages 6 to 9)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 10

1  report is served because they're not part of my
2  expert reports and opinions.  They're copy of it.
3      Q.  As we sit here today you don't know
4  whether you did a synoptic report in this case, is
5  that correct?
6      A.  That's correct.
7      Q.  I want to ask you about your billing
8  in this case.  Would it be a fair statement that
9  you have not kept an itemized bill regarding the
10  work in this case?
11      A.  That's correct.
12      Q.  And is it a fair statement that
13  there is no record of how long you've worked on
14  this case or the specific times or dates that
15  you've worked on this case.
16      MR. THORNBURGH:  Objection.
17      THE DEPONENT:  As with all other
18  specimens I've been doing for two years, this is
19  exactly -- it's impossible sometimes to trace
20  exactly how much time because sometimes I spend
21  ten minutes here, ten minutes there, for one case,
22  for another case.  So fragmented.
23      BY MR. COMBS:
24      Q.  In a prior case you told me that in

Page 11

1  your best estimate of the total time that you had
2  spent regarding your report in that case was 15 to
3  20 hours.  Would a similar amount be true in the
4  Vignos-Ware case?
5      A.  Yeah.  It will be true for most of
6  the cases.  Sometimes it might be less when
7  there's no mesh, specimen is small, records are
8  scant.  But most of the reports will fall within
9  15 to 20 hours.
10      Q.  Is it your best estimate that the
11  amount of time that you worked on the Vignos-Ware
12  report would be 15 to 20 hours?
13      A.  Somewhere in that ballpark.
14      Q.  Dr. Iakovlev, I'm going to hand you
15  what's been marked as an Exhibit 1, which is a
16  copy of your report in this case.
17      ---EXHIBIT NO. 1:  Dr. Vladimir
18          Iakovlev's clinico-pathological
19          correlation report re. Barbara
20          Vignos-Ware.
21      BY MR. COMBS:
22      Q.  And I want to ask you about what
23  your testimony is going to be at the trial of this
24  case regarding the photographs.

Page 12

1      A.  Yes.
2      Q.  So what is it you're going to tell
3  the jury in this case about the photograph that is
4  at B1a?
5      A.  There is multifilament mesh, in
6  keeping with Gynecare pelvic organ prolapse
7  devices.  It's folded, multilayer-ed, it's
8  incorporated by scar tissue in this folded shape
9  and configuration.  And there was some parts of
10  fat deeper down.  And the top right corner is --
11  appears to be getting close to erosion site.
12      Q.  And is it true that you received one
13  tissue sample in this case and that would be the
14  one that you received on November 29th, 2015 that
15  was identified as 10-96-104?
16      A.  Yes.  I received histological slides
17  of one specimen.
18      Q.  How many slides did you receive?
19      A.  Four.
20      Q.  And how many slides have you created
21  from that specimen.
22      A.  You mean stained further?
23      Q.  Yes, sir
24      A.  Standard is I stained one S100, one

Page 13

1  smooth muscle actin.  This would be my standard
2  approach.
3      Q.  Now, earlier you said that the
4  tissue that is in B1a is from a prolapse repair
5  device, is that correct?
6      A.  Yes, pelvic organ prolapse.
7      Q.  Do you have any slides that depict
8  the tissue from Ms. Vignos-Ware's TVT?  And I've
9  said that incorrectly.  Any tissue from
10  Vignos-Ware's TVT-O.
11      A.  So both were excised during the
12  excision of November 24th, 2010.  The sampling was
13  done for only part of the specimen.  What I saw in
14  the sections was more consistent, as I said, with
15  pelvic organ prolapse mesh, which in this case is
16  Prosima.  I cannot rule out completely that there
17  were no pieces of TVT-O in the excision specimen or
18  maybe some pieces within the tissue on the slide,
19  but most of it was in keeping with Prosima device.
20      Q.  Are there any photographs contained
21  in B1a through B13b that you believe are the TVT-O
22  device?
23      A.  No.  As I said, I cannot say with
24  certainly that any of the mesh fibers were from

4 (Pages 10 to 13)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 14

1  TVT-O.
2       Q.  Do you plan on testifying at the
3  trial of this case that any of these photographs
4  represent the fiber from TVT-O?
5       A.  No.  As I said, I cannot determine
6  to a certainty.  I will not testify that.
7       Q.  In B1a you make a reference to the
8  mesh in folded configuration.
9       A.  That's correct.
10      Q.  Can you testify whether that mesh
11  was folded at the time it was implanted?
12      A.  No, I cannot.
13      Q.  What is your basis for your
14  testimony that it is incorporated in a folded
15  configuration in Ms. Vignos-Ware's case?
16      A.  Because it is incorporated in folded
17  configuration.
18      Q.  You will not be able to say when
19  that folding occurred, is that correct?
20      MR. THORNBURGH:  Objection.
21      THE DEPONENT:  Sometime within the
22  timeframe after it was placed in the body and at
23  least a few months before it was excised.
24

Page 15

1       BY MR. COMBS:
2       Q.  And that could have included at the
3  time of implantation?
4       A.  That's correct.
5       Q.  And would your answer to that
6  question be the same on B1a, B1b and B1-2 for your
7  answer to the folded mesh?
8       A.  Yes.  And that answer would be for
9  all of the folded pelvic organ prolapse devices
10  for all these cases.
11      Q.  Dr. Iakovlev, what is it that you
12  plan to tell the jury about the photograph that's
13  B1b?
14      A.  BW1b.
15      Q.  Yes.
16      A.  This is an outline of a most likely
17  configuration of the mesh folds.
18      Q.  Anything else that you plan to tell
19  the jury about that photograph?
20      A.  No.  It's just my tracing of the
21  pelvic mesh within the tissue.
22      Q.  And that was going to be my next
23  question.  The solid yellow line that is included
24  in that photograph, that would be a line that you

Page 16

1  placed on to this photograph of Ms. Vignos-Ware's
2  mesh using your computer?
3       A.  That's correct.  And this would be
4  true for all other images with similar solid
5  yellow line.
6       Q.  What is it you plan to tell the jury
7  about the photograph that is labeled B1-2?
8       A.  This is an enlargement of a previous
9  piece of tissue.  It's enlargement of the upper
10  right corner.  And this part of the folded mesh
11  you can see is exposed.  There is granulation
12  tissue and inflammation on the site of erosion.
13      Q.  Anything else you plan to tell the
14  jury about the photograph that's labeled B1-2?
15      MR. THORNBURGH:  Objection.
16      THE DEPONENT:  No.
17      BY MR. COMBS:
18      Q.  Dr. Iakovlev, what is it you plan to
19  tell the jury in this case about the photograph
20  that's labeled BW3?  Let's go back.
21      MR. COMBS:  Dan, was your objection --
22  did I say the name of the slide wrong again?
23      MR. THORNBURGH:  No.  The objection was
24  to the extent that you're trying to limit him to

Page 17

1  -- I mean -- you don't want a speaking objection,
2  but to the extent that you're trying to say he's
3  only allowed to say what he tells you right now I
4  think may be overrestrictive as he's done a whole
5  report that identifies his opinions.  And some of
6  these figures are the same, they're just blown up.
7  And then he gives you a -- with that blown-up
8  figure what is your opinion on that?  It's the
9  same opinion to the same slide.
10      BY MR. COMBS:
11      Q.  What I'm here to do is whatever it
12  is you're going to tell the jury about these
13  photographs I just want to know now.
14      MR. THORNBURGH:  That's not contained
15  within his report?
16      MR. COMBS:  No, that's contained within
17  the report --
18      MR. THORNBURGH:  Well, it's in the
19  report.
20      BY MR. COMBS:
21      Q.  So, Dr. Iakovlev, let's go to BW3.
22  What is it you're going to tell the jury about
23  that photo?
24      A.  This is the erosion site.  With --

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 18

1     MR. THORNBURGH:  Objection.
2     THE DEPONENT:  -- acute inflammation and
3  some -- well, here we can see some bacteria.
4     BY MR. COMBS:
5     Q.  Anything else?
6     MR. THORNBURGH:  Objection.
7     THE DEPONENT:  That's about it.
8     BY MR. COMBS:
9     Q.  And I didn't hear.  Your voice
10  trailed off.
11     A.  That's about it, but if I'm asked
12  question I can answer more than I just told you
13  because might be able to give a lecture about one
14  picture.
15     Q.  Is there anything else that as we
16  sit here today you plan on telling the jury about
17  BW3?
18     A.  No.  My intention for this picture
19  to demonstrate the erosion site with some acute
20  inflammation.
21     Q.  Let me ask you a question about how
22  you identify bacterial colonies on this photograph.
23  Are the arrows that you have pointing to, acute
24  inflammation?

Page 19

1     A.  No, they're pointing to the whole
2  area.  The whole area is acute inflammation and
3  there are some clusters of small coccoid
4  structures which are in keeping with bacteria.
5     Q.  And what is the diagnostic criteria
6  that you used to determine whether there is a
7  bacterial colony?
8     A.  Just my interpretation.
9     Q.  Are there any stains that you could
10  have used for Ms. Vignos-Ware's samples to
11  determine whether -- the presence of bacterial
12  colony?
13     A.  The stains -- they can stain them in
14  different -- depending on gram positive, gram
15  negative.  Again many structures can be staining
16  with these stains.  They are not specific for
17  bacteria.  They identify the difference between
18  them.
19     However, just to see them that they are
20  there I just need H&E.  You don't need more than
21  that to see them.
22     Q.  Were any cultures taken of the
23  bacterial colonies that you identify on BW3?
24     A.  I don't know.

Page 20

1     Q.  Did any physician ever make a
2  diagnosis that Ms. Vignos-Ware suffered from an
3  infection?
4     A.  In the mesh?
5     Q.  Yes, sir.
6     A.  Well, I think we discussed this
7  before.  If you have chronic wound it's a given
8  there's infection on there.  So if somebody
9  describes chronic wound or erosion that implies
10  infection.  If it was worded like this I don't
11  remember because it's so obvious that I wouldn't
12  pay attention or wouldn't include it.
13     Q.  Did any physician ever make a
14  determination that Ms. Vignos-Ware suffered from a
15  bacterial infection at the site of her mesh
16  implant?
17     A.  I don't remember, and I gave you
18  reasons why I was not searching specifically for
19  that information.
20     Q.  Did the treating pathologist from
21  the Cleveland Clinic who inspected this same
22  tissue sample make a diagnosis that
23  Ms. Vignos-Ware suffered from an infection?
24     MR. THORNBURGH:  Objection.

Page 21

1     THE DEPONENT:  Let me see what was in
2  there.  It says acute and chronic inflammation.
3  That's what we say when we see acute inflammation,
4  implying that there is a bacterial infection.
5     BY MR. COMBS:
6     Q.  So is it your testimony that if
7  Dr. Chen had diagnosed an infection in
8  Ms. Vignos-Ware's tissue that the way he would
9  have referred to that infection would be by saying
10  acute and chronic inflammation and not using the
11  word "infection"?
12     A.  That's correct.  That's what we
13  call.  I go for frozen section they give me a
14  sample.  And orthopedic surgeon asks -- we don't
15  even talk about infection.  Our communication is
16  are there neutrophils or no neutrophils?  And
17  everybody understands what it means, neutrophils.
18  Neutrophils means infection.  Once they go beyond
19  specific level then that's acute inflammation.
20     Q.  And you would agree with me that
21  Dr. Chen does not use the word "infection" at any
22  point in this pathology report does he?
23     MR. THORNBURGH:  Objection.
24     THE DEPONENT:  Not in this report.  Yes,

6 (Pages 18 to 21)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 22

1    you're correct.
2          BY MR. COMBS:
3          Q.  Dr. Iakovlev, I want to ask you now
4    about BW4.
5          A.  Yes.
6          Q.  What is it that you plan to tell the
7    jury about this picture at trial?
8          A.  This is a difference again, as we
9    saw before there is a difference of density in the
10   scar tissue.  Left side is denser.  Inside the
11   mesh it's not as dense and you can see these
12   vacuoles of fluid within.  It's a common finding.
13   Once you have this multilayering folding of the
14   mesh the fluid bonds is not easy, it's
15   disrupted so the fluid accumulates there.
16         Q.  And is there any tissue in BW4 that
17   you diagnose as being loose, connective tissue?
18         A.  What do you mean loose connective?
19         MR. THORNBURGH:  Objection.
20         BY MR. COMBS:
21         Q.  Is there any tissue -- well, you're
22   familiar with the phrase "loose connective
23   tissue"?
24         MR. THORNBURGH:  Objection.

Page 23

1          THE DEPONENT:  I don't use that.  Loose,
2    connective fibroid connective tissue, dense scar,
3    this can be misinterpreted and -- so if we're
4    talking about normal loose connective tissue,
5    nonscar, nonedematous I don't.  What I see here is
6    scar tissue with some fluid in it.  So that will
7    be more precise definition.
8          BY MR. COMBS:
9          Q.  So no tissue in this slide that you
10   would describe as "loose connective tissue"?
11         MR. THORNBURGH:  Objection.
12         THE DEPONENT:  You have to explain what
13   you mean by loose connective tissue because it can
14   mean many things depending on who is using it.
15         BY MR. COMBS:
16         Q.  So how do you use it?
17         MR. THORNBURGH:  Objection.
18         THE DEPONENT:  In my -- I would use it
19   only for normal, nonscarred, nondamaged, loose
20   connective tissue with some fat tissue which is
21   not as dense.
22         So if we talk about connective tissue
23   tendons are connective tissue but they are very
24   dense.  And then if we go to fat in a way it's

Page 24

1    also connective tissue, but it's mostly fat.  And
2    then you go into the areas which are some fibrous
3    tissue but it's not as dense, but it's still
4    normal.  However, if we go to scar we can have
5    denser areas and then we can have not as dense or
6    loose, but I wouldn't use that term because
7    essentially it's a different type of tissue.  It's
8    not normal.  It's a tissue generated as a healing
9    process.  And if we use the same term for normal
10   tissue and the tissue which is reactive tissue
11   this would be confusing.  That's why I ask you
12   what exactly you mean by that term.
13         BY MR. COMBS:
14         Q.  Is there any tissue in BW4 that you
15   would identify as fat?
16         A.  As fat?  No.
17         Q.  Anything else you plan on telling
18   the jury about BW4?
19         MR. THORNBURGH:  Objection.
20         THE DEPONENT:  No.
21         BY MR. COMBS:
22         Q.  Let's turn to BW5.  What do you plan
23   to tell the jury about BW5 in this case?
24         A.  In this case, in this picture I can

Page 25

1    show the difference between scar tissue and the
2    fat.  So the fat would be indicated on there, the
3    right image.
4          Q.  And let me ask you some questions
5    about that.  So, for example, on the right, the
6    one that you've identified with the labels, how
7    far is the fat from the mesh in that picture?
8          MR. THORNBURGH:  Objection.
9          BY MR. COMBS:
10         Q.  So let's go to the upper, right-hand
11   corner where you indicate the word "fat."
12         A.  Oh, you mean this fiber?
13         Q.  Yes.
14         A.  It's very close.  It's few --
15         Q.  Approximately how many microns?
16         A.  Few microns, 20 microns.  Like a
17   really thin fibrous capsule around that mesh fiber
18   and then it's fat.
19         Q.  What else do you plan on telling
20   the jury about BW5?
21         A.  Well, I can compare that most of the
22   mesh is encased in scar tissue and that's how
23   nonscar tissue looks as fat here, and then I can
24   tell them about scar encapsulation and bridging

7 (Pages 22 to 25)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 26

1  fibrosis and the difference between fat and scar.
2      Q.  In BW5 where is the point where you
3  say that there's bridging fibrosis?
4      A.  I'm saying it now.
5      Q.  No, no, what point of the slide?
6      A.  Oh.
7      Q.  What location on BW5 are you going
8  to point to, to say is bridging fibrosis?
9      A.  This is the cluster of mesh fibers.
10 This is not a cluster. If we go through this pore,
11 the whole pore is filled with scar tissue.  So
12 this is the perfect example of bridging fibrosis.
13 And you can see that fat tissue is trying to make
14 its way there but it's not filling it.
15     Q.  And your testimony at this trial
16 will be, just so the record's clear, when you
17 talked about the clusters, one of the clusters is
18 the yellow object at the bottom, and then the
19 other cluster is the group of yellow at the top of
20 the right-hand picture of BW5, is that correct?
21     A.  Yes, and I marked it on exhibit
22 copy.
23     Q.  And it will be your testimony that
24 those two clusters, as you describe them, are not

Page 27

1  separated by fat?
2      A.  Yes, that's my testimony.  And this
3  is example where fat is right next to it.  But if
4  we go to other images the entire folded structure
5  doesn't have fat.  So the entire structure is all
6  one field of bridging fibrosis throughout, solid
7  fibrosis.
8      Q.  Alright.  And so just to make sure
9  that the record's clear on BW5, it will be your
10 testimony at trial that fat does not separate the
11 two clusters of mesh, as you've described it?
12     A.  My testimony will be a demonstration
13 of what bridging fibrosis means and what is the
14 difference between scar and fat.
15     Q.  So my question is are the two
16 clusters of mesh separated by fat?
17     A.  Why are you fixated on these two
18 clusters? It's just a demonstration.  We can flip
19 two pages and compare.  There's no fat anywhere
20 close in this fragment.  This was the only portion
21 I could see fat in the deeper parts here.
22     Q.  And Dr. Iakovlev, my question is,
23 yes or no, are the two clusters of mesh in BW5
24 separated by fat?

Page 28

1      MR. THORNBURGH:  Objection.
2      THE DEPONENT:  I don't see it.  I mean.
3  It's clearly here.  This is an outline, the
4  fibrous tissue, this is an outline of fat.  So
5  this is fat and this is bridging fibrosis.  So
6  from this point, this fiber to that fiber solid
7  scar.  This is bridging fibrosis.  This is my
8  testimony.
9      BY MR. COMBS:
10     Q.  Dr. Iakovlev, anything else you plan
11 on telling the jury in this case about BW5?
12     A.  No.
13     Q.  Let's turn to BW6.  What do you plan
14 to telling the jury at this trial about BW6?
15     A.  I will demonstrate for them the
16 reaction and why it is happening and how it is
17 contributing to all of the changes around the
18 mesh.
19     Q.  Is there any tissue in BW6 that you
20 would describe as loose, connective tissue?
21     A.  At the very edges there might be.
22 This would be a transition into normal tissue, as
23 I said, because I would use loose connective
24 tissue more for normal tissue, normal fibrous

Page 29

1  tissue or fiber connective tissue.  So at the very
2  edges there would be transitions so this would
3  classify, but the term is sort of loose.  I mean,
4  there's no specific terminology when it can be
5  used.  I mean, I think we shouldn't fixate on that
6  word.  And we should not use it without specific
7  determination of what it means.  As long as we all
8  agree what it means then we can use it otherwise
9  it can mean many things.
10     Q.  Dr. Iakovlev, the record is not
11 going to reflect what you're pointing to.  I'm
12 going to give you a green highlighter.  Can you
13 circle what it is you're referring to?
14     A.  To what?
15     Q.  I asked you if there was loose,
16 connective tissue and you talked about it being --
17 and were pointing to the upper, right-hand portion
18 of the picture but the record's not going to
19 reflect that.
20     A.  So for loose, connective tissue will
21 we agree that loose, connective tissue is only
22 normal tissue which has not been damaged
23 previously and it's loose just by anatomical
24 location?

8  (Pages 26 to 29)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 30

1      Q.  What do you -- here's my question,
2   BW6, is there loose, connective tissue?
3          MR. THORNBURGH:  Objection.
4          MR. COMBS:
5          Q.  If so --
6          A.  You brought that term.  And before I
7   start using it, because I didn't use it in the
8   report, you need to -- we need to agree what it
9   means.
10         Q.  Do you think that there is no loose,
11  connective tissue in BW6?
12         MR. THORNBURGH:  Objection.  He's
13  explained why using that term is inaccurate,
14  unless you both agree on the definition of what it
15  means.  I don't know how many times you're going
16  to ask him that.
17         BY MR. COMBS:
18         Q.  That's the question on the table.
19  Is there any loose, connective tissue in BW6.  If
20  the answer is no, it's no.
21         A.  Well, I can't answer the question if
22  I don't know what I'm answering.  I have to know
23  yes or no -- anyway, I think I've answered the
24  question.  We need to have definition and then we

Page 31

1   can use the term.
2          MR. THORNBURGH:  I'm not trying to tell
3   you but maybe if we put an "X" at the location
4   that you guys are talking about and then maybe say
5   how do you define what that "X" is?
6          BY MR. COMBS:
7          Q.  That's the next question.  Dr.
8   Iakovlev, take the green highlighter and circle
9   the area that you're talking about.
10         A.  So these edges, the very edge is the
11  interface with normal tissue where the mesh scar
12  plate ends.  So it can end at different type of
13  tissue.  From what I see more likely than not it
14  is transitioning into normal, nondense fibrous
15  tissue, nonadipose, nondense fibrous tissue.  There
16  might be fat right next to it.  It just didn't
17  make it into specimen because it was excised.
18  It's a very thin sort of layer there so I don't
19  know if it's just an edge of the specimen.  And to
20  tell you the truth this would be the -- well, not
21  really good picture to ask me that question.
22         Q.  You've drawn a green line on BW6.
23  And over to the left of the green line there are
24  two white spaces.  On the top they are white and

Page 32

1   on the bottom yellow.  Do those depict mesh?
2          A.  No, this is just a hole.  This is
3   edge of specimen.
4          Q.  And I apologize, I'm talking about
5   to the left of the green line.
6          A.  This?
7          Q.  Yes, sir.
8          A.  Yes.
9          Q.  The two things on the top that are
10  in white those are mesh, correct?
11         A.  Yes, this is all mesh.
12         Q.  Here's what I want to know, how many
13  microns is it from the two white pieces of mesh to
14  the green line that you've drawn?
15         MR. THORNBURGH:  Objection.
16         BY MR. COMBS:
17         Q.  Approximately.
18         MR. THORNBURGH:  Objection.
19         THE DEPONENT:  150 microns.
20         BY MR. COMBS:
21         Q.  And just so the record's clear, from
22  the two white pieces of mesh to the green line is
23  approximately 150-microns?
24         A.  That's correct.

Page 33

1          Q.  Dr. Iakovlev, is there anything else
2   that you're going to tell the jury about BW6?
3          MR. THORNBURGH:  Objection.
4          THE DEPONENT:  No.
5          BY MR. COMBS:
6          Q.  Dr. Iakovlev, I'm going to ask you
7   some questions now about the photographs that are
8   labeled BW7, 8, 9 and 10.  Are those photographs
9   in which you have identified nerve twigs or
10  branches?
11         A.  Nerve branches, twigs and fibers.
12         Q.  And what is it that you're going to
13  tell the jury about BW7?
14         A.  Same as before and as for other
15  specimens.  Demonstrates that the tissue is
16  innervated, it's alive, it can feel pain.  By
17  location, the nerves are in abnormal environment
18  in scar tissue within the mesh.  Some of them are
19  normal nerves, nothing wrong with them except for
20  location and position.
21         Q.  I'm going to ask you the same
22  question about BW8, 9 and 10.
23         A.  Yeah, the same answer.  I don't see
24  specifically distorted nerves, but I don't know

Golkow Technologies, Inc. - 1.877.370.DEPS

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 34

1  what's beyond them.  I see distorted nerves
2  frequently so there is a probability that
3  somewhere in that specimen there is a distorted
4  nerve.  I don't see neuromas but again I cannot
5  rule it out because I see frequently nerves
6  distorted to a degree as traumatic neuromas are --
7  that's it.
8          Q.  You do not plan at the trial in this
9  case to point to any neuroma that's contained
10  within BW7, 8, 9 or 10 and claim that it is
11  distorted, do you?
12         A.  I just told you.  I'm not.
13         Q.  And you do not plan at the trial of
14  this case to point to any nerves that are at BW7,
15  8, 9 or 10 and claim that there is a traumatic
16  neuroma, do you?
17         A.  I told you I'm not planning.
18         Q.  Dr. Iakovlev, did you consult with a
19  neuropathologist in regard to Ms. Vignos-Ware's
20  case?
21         MR. THORNBURGH:  Objection.
22         THE DEPONENT:  As with case before, I
23  don't think any neuropathologist look at mesh
24  specimen ever.  This would be useless to ask them.

Page 35

1  Again, nerves are normal; location is abnormal.
2  And I'm fully qualified to identify nerves in the
3  tissue.
4          BY MR. COMBS:
5          Q.  Yes or no answer, did you consult
6  with a neuropathologist regarding
7  Ms. Vignos-Ware's samples?
8          A.  There was no need and it wouldn't
9  contribute.
10         Q.  So the answer is no?
11         A.  The answer is no and I'm giving you
12  the reasons why.
13         Q.  For any portion of Ms. Vignos-Ware's
14  sample did you count the nerve density?
15         MR. THORNBURGH:  Objection.
16         THE DEPONENT:  As I said, if I did it
17  would be in my synoptic data notes and there was
18  no need for that to produce the expert report.  I
19  don't base my opinion on the density.  I don't
20  know.  I cannot say either to you yes or no.
21         BY MR. COMBS:
22         Q.  At the trial of this case you will
23  not be testifying that you calculated the nerve
24  density for any portion of Ms. Vignos-Ware's

Page 36

1  sample?
2          A.  I will not.
3          Q.  You did not stain any portion of
4  Ms. Vignos-Ware's sample with PGP9.5 or
5  neurofilament stain did you?
6          A.  I didn't.
7          Q.  Let's look at BW7.  How do you
8  describe that?  Is that a -- the nerve that is
9  depicted in that?
10         A.  Smaller nerve branch with some twigs
11  and some fibers in the background.
12         Q.  And do you know what nerve that
13  branch or twigs communicates to?
14         A.  I don't.
15         Q.  Do you know whether those are
16  sensory nerves?
17         MR. THORNBURGH:  Objection.
18         THE DEPONENT:  I think we've been
19  through that today.  More likely than not there
20  are sensory nerves -- I mean sensory fibers in
21  there.
22         BY MR. COMBS:
23         Q.  Can you point to any fiber or branch
24  in that photograph and tell us that it is a

Page 37

1  sensory fiber.
2          A.  Fibers?  That would be difficult
3  because fibers are -- they carry one function,
4  sensory or motor.  And by staining you cannot
5  differentiate.  Again, I'm not differentiating
6  them -- I'm not differentiating them because it's
7  not my purpose to differentiate based on stain,
8  it's by size.  Larger the nerve the likelihood
9  that it's mixed is higher.
10         Q.  And because you did not do the
11  PGP9.5 or the neurofilament stain you cannot point
12  to us any receptors in BW7, 8, 9 or 10 can you?
13         MR. THORNBURGH:  Objection.
14  Mischaracterizes.
15         THE DEPONENT:  I wasn't going to.  I
16  mean, that was not my purpose.
17         BY MR. COMBS:
18         Q.  And I just want to make sure that
19  you answered the question.  You can't point to any
20  nerve receptors in BW7, 8, 9 or 10 can you?
21         MR. THORNBURGH:  Objection.
22         THE DEPONENT:  I will not be showing
23  nerve receptors to a jury, you're correct.
24

10 (Pages 34 to 37)

Golkow Technologies, Inc. - 1.877.370.DEPS

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 38

1      BY MR. COMBS:
2      Q.  Thank you.  Dr. Iakovlev, is there
3  anything else that you plan on telling the jury
4  about BW7, 8, 9 or 10 that I failed to ask?
5      MR. THORNBURGH:  Objection.
6      THE DEPONENT:  No, not really.
7      BY MR. COMBS:
8      Q.  Dr. Iakovlev, I want to ask you
9  about the photographs that are labeled BW11a
10 through BW13b.
11     A.  Yes.
12     Q.  Collectively what do those depict,
13 and then I'll ask you about each one.
14     A.  They are following through the steps
15 how to detect degradation of polypropylene.
16     Q.  And in regard to Ms. Vignos-Ware's
17 case what will your testimony be regarding
18 degradation?
19     A.  It's the same story like 30 years
20 ago, polypropylene degrades in the body.
21     Q.  Will it be your testimony at this
22 trial that Ms. Vignos-Ware's mesh degraded?
23     A.  Yes.
24     Q.  And will it be your testimony at

Page 39

1  this trial that you were able to appreciate that
2  degradation through the light microscope?
3      A.  Yes, just give me one second.  Yes,
4  my testimony will be that polypropylene of the
5  implanted device degraded while in the body.
6      Q.  And I want to ask you a question
7  about BW11a.  You have two arrows that point to
8  what you term the "degradation layer", is that
9  correct?  On the right-hand picture?
10     A.  That's correct.
11     Q.  And how thick is that degradation
12 layer in that picture?
13     A.  This one is one of the thinnest.
14 This is the stage where I start detecting it.  So
15 this would be around 1 micron, maybe 1.5.  From
16 what I understand, now it's been only a number of
17 months between the implantation and explantation.
18 So considering that short period this bark
19 accumulated relatively fast.  It's thin but
20 considering that it's been in the body only -- so
21 it's on November 24th and it was implanted in May.
22 So it's really fast it's growing.  I mean, if it
23 was a TVT I wouldn't expect it to be visible by
24 that time.  Prosima degrades faster.

Page 40

1      Q.  Now, you told us earlier that your
2  testimony at the trial in this case will be that
3  the layer of degradation is between 1 and 1.5
4  microns, is that correct?
5      A.  Approximately.
6      Q.  And you just said that it's your
7  opinion that Prosima degrades faster than TVT, is
8  that correct?
9      A.  We're going into general opinions,
10 but generally thinner fibers of pelvic organ
11 prolapse devices appear to degrade faster.  I
12 don't know if it's size or composition of
13 polypropylene.  That's just my subjective -- not
14 subjective but my impression at this point.  I
15 don't have data, I don't analyze by this time.
16 But generally the lighter weight meshes degrade
17 faster than heavier weight TVT, TVT-O.
18     Q.  Dr. Iakovlev, what is it that you
19 plan to tell the jury about the photograph at
20 BW11a?
21     A.  Same thing.  The polypropylene
22 degrades.  In this case it's very thin so the
23 contribution to stiffening is not as great, I mean
24 it just began to grow at that time.  But the

Page 41

1  release of chemicals which are produced during the
2  degradation is there.  I would expect it to be
3  higher at the earlier stages.  And that's exactly
4  what was seen in Ethicon-conducted studies,
5  polypropylene degrades.  And exactly the same
6  methods, polarized light, blue granules.
7      Q.  What is it you plan on telling the
8  jury about the photograph at BW11b?
9      A.  The way it looks in polarized light
10 -- see because it's so thin I would rather show
11 BW12b where it became separated.  So now you can
12 see clearly that there is a layer of altered
13 polypropylene which peeled off.
14     Q.  Okay.  Well, let me keep going so
15 that I know.  Are you going to say anything about
16 BW11b?  And if so what?
17     A.  I probably wouldn't show it.
18     Q.  Okay.  Let's go to BW12a then.  What
19 is it that you plan to tell the jury about BW12a?
20     A.  This picture is kind of pale.  When
21 it's blown up it will be easier to show the
22 degradation layer.  Why it's so pale?
23     Anyway, there was a layer of
24 polypropylene -- of degraded polypropylene peeling

11 (Pages 38 to 41)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 42

1  off and it's more visible in BW12b so I would show
2  it together, two pictures together.
3       Q.  And is there anything else that you
4  plan on telling the jury about BW12a or BW12b?
5       A.  No.
6       Q.  And the layer that you're talking
7  about is, for example, the layer that's between
8  the two arrows on the right-hand picture on both
9  of those?
10      A.  Say it again.
11      Q.  The layer that you're referring to,
12  that's between the two arrows?
13      A.  Yeah, it's more visible, better
14  shown in BW12b.
15      Q.  And is that layer also 1 micron to
16  one and a half microns thick?
17      A.  Yeah, approximately.
18      Q.  Anything else you're going tell the
19  jury about 12a or 12b?
20      A.  No.
21      Q.  What is it you plan on telling the
22  jury about 13a and 13b?
23      A.  This is a blow up.  You can see the
24  degradation layer peeled off slightly and there

Page 43

1  are blue granules in it.  And the interesting
2  thing is that this degraded layer is low, it
3  doesn't have core any more.  So somebody cannot
4  claim that those blue granules came -- are coming
5  into the image not because they are in the
6  degraded layer but because overlapping core.
7  Clearly there is no core.  The core floated away.
8       Q.  And I didn't hear what you said.
9  You said the core floated away?
10      A.  Yes.
11      Q.  And how is it that the core floated
12  away?
13      A.  During processing.
14      Q.  Is that during the microtoming of
15  the slide?
16      A.  After that.
17      Q.  So the slide was cut and at what
18  point did the core float away?
19      A.  So when the slide is cut the core
20  doesn't stick well to the glass slide.  The only
21  force which is holding it, that central portion of
22  the core, is stickiness to the bark layer because
23  the bark is held by the tissue.  And once it
24  starts peeling off, either core or bark layer, it

Page 44

1  starts curling up because it's not sticking to the
2  glass slide so it's folding and curling.  And then
3  when the slide is going from solution to solution
4  this core slowly just get detached and float in
5  the fluid of processing fluid, whatever it is,
6  alcohol or xylene.  Some of them stay, some of
7  them float away.
8       Q.  And it's your testimony that that's
9  because it's not attached to the tissue as the
10  bark layer is?
11      A.  That's correct.  It is attached to
12  the bark layer and the bark layer is rough so it's
13  holding better to the tissue.
14      Q.  Anything else that you plan on
15  telling the jury about BW13a or BW13b?
16      A.  No.
17      Q.  Dr. Iakovlev.  You made a statement
18  earlier about release of chemicals during the
19  degradation process, have you made any calculation
20  about the amount of chemicals that you claim were
21  released in Ms. Vignos-Ware's tissue?
22      A.  No.
23      Q.  Dr. Iakovlev, have the samples that
24  you've taken photographs of in 11 through to 13b

Page 45

1  were they ever submitted for analytical chemistry?
2       MR. THORNBURGH:  Objection.
3       THE DEPONENT:  No.
4       BY MR. COMBS:
5       Q.  Any testing?
6       MR. THORNBURGH:  Objection.
7       THE DEPONENT:  Well, my testing is
8  histology examination so I did my testing.  I did
9  not do additional testing.
10      BY MR. COMBS:
11      Q.  And when you say "histology testing"
12  are you referring to looking at it under the light
13  microscope and the staining process?
14      A.  And using polarizing filters.
15      Q.  Anything else?
16      A.  No.
17      Q.  No other testing?
18      A.  No other testing.  Same way as
19  Ethicon scientists did in 1983.  They didn't use
20  anything else, just straining, phloxine.  They
21  used phloxine and not H&E and polarizing filters.
22      Q.  Dr. Iakovlev, you have not read any
23  of the depositions in this case, have you?
24      A.  That's correct.

12  (Pages 42 to 45)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 46

1    Q. You do not know what Dr. Walters'
2 testimony was on whether the mesh degraded do you?
3    A. No.
4    Q. At the trial of this case you will
5 not be testifying that there were any visible
6 particles from the mesh that are in
7 Ms. Vignos-Ware's sample, will you?
8    MR. THORNBURGH: Objection.
9    THE DEPONENT: You mean loose in the
10 tissue.
11    BY MR. COMBS:
12    Q. Yes, sir?
13    A. Not visible. I did not see visible
14 particles.
15    Q. And the -- because there was no
16 analytical testing of this mesh sample there would
17 be no testing of molecular weight or tensile
18 strength, is that correct?
19    A. That's correct.
20    Q. Alright. Let's take a break for
21 about five minutes.
22    --- Break taken at 6:22 p.m.
23    --- Upon resuming at 6:30 p.m.
24

Page 47

1    BY MR. COMBS:
2    Q. Dr. Iakovlev, there was an explant
3 of Ms. Vignos-Ware's TVT mesh on May 20th, 2010.
4 You do not have any sample from that did you?
5    A. I don't think there was a specimen
6 because there was no pathology report from that
7 specimen.
8    Q. You did not review any pathology
9 related to that procedure, did you?
10    A. No.
11    Q. Do you have any opinion about why
12 Ms. Vignos-Ware suffered an erosion less than two
13 months after the implantation of her TVT-O?
14    MR. THORNBURGH: Objection.
15    THE DEPONENT: Because mesh can erode.
16    BY MR. COMBS:
17    Q. Do you have any opinion on what
18 caused that erosion?
19    A. Mesh. The presence of the mesh.
20    Q. Is that it? That's the opinion?
21    A. Well, I mean if there's no
22 indication that there's another lesion, like
23 tumor, I mean what else can it be?
24    Q. Do you think -- is it your opinion

Page 48

1 that when this erosion happened in less than two
2 months post-implant that that's a wound healing
3 issue?
4    MR. THORNBURGH: Objection.
5    THE DEPONENT: Actually wound healing --
6 we're coming back to the same issue. So wound
7 healing -- the first intention healing is within
8 days, three to four days. I mean you have cuts on
9 your skin, does it take two months for you to
10 heal? If it takes two months you have a problem.
11 But normally normal people a skin incision would
12 heal within days, within a week.
13    BY MR. COMBS:
14    Q. Do you know whether
15 Ms. Vignos-Ware's surgical incision site ever
16 healed?
17    MR. THORNBURGH: Objection.
18    BY MR. COMBS:
19    Q. Do you know whether it healed during
20 the period from March 26th, 2010, to May 20th,
21 2010?
22    A. I don't know. I cannot tell you.
23 But there is no indication that it didn't.
24    Q. Do you know whether Ms. Vignos-Ware

Page 49

1 suffered a prolapse during the period between
2 March 26th, 2010, and May 20th, 2010?
3    MR. THORNBURGH: Objection.
4    THE DEPONENT: I thought that she had
5 prolapse before surgery, cystocele.
6    BY MR. COMBS:
7    Q. Let me ask a follow-up question. Do
8 you know whether her prolapse worsened during the
9 period of March 26, 2010, to May 20th, 2010?
10    MR. THORNBURGH: Objection.
11    THE DEPONENT: I don't know if it
12 worsened or changed. You're getting, again,
13 beyond my expertise or my role in this case. I'm
14 correlating clinical picture with pathology. And
15 I didn't provide opinions regarding prolapse.
16    BY MR. COMBS:
17    Q. As of May 20th, 2010,
18 Ms. Vignos-Ware's prolapse was severe enough that
19 she required a surgical repair, didn't she?
20    THE DEPONENT: I'm not sure exactly what
21 you're asking. If it got that bad between that
22 timeframe -- within that timeframe, or just
23 reached that point from any point of time?

13 (Pages 46 to 49)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

---

Page 50

1    BY MR. COMBS:
2        Q. Do you know?
3        A. I don't understand the question.
4    Well, first of all, it's beyond my role in this
5    case as a pathology expert. Second, I didn't look
6    for it, so I wouldn't be able to answer the
7    question.
8        Q. Anything else?
9        A. No.
10       Q. Will you testify at the trial of
11   this case that Ms. Vignos-Ware is at risk from any
12   mesh that remains in her body?
13       A. Is at risk for what?
14       Q. Anything. I'm asking if you will
15   testify to that.
16       A. Well, I mean at risk for specific
17   symptoms? For mesh related complications?
18       Q. Yes, sir. Will you be testifying at
19   this trial that Ms. Vignos-Ware is at risk from --
20   for any mesh-related complications as a result of
21   mesh that remains in her body?
22       A. Yes, she is. The mesh remains in
23   the body so all pathological changes related to
24   the mesh are still going on.

---

Page 51

1        Q. What mesh remains in her body?
2        A. So she had excision of a part of TVT
3    in May of 2010. So the exposed part was excised,
4    the lateral part still stayed.
5        Then in November 2010 more sling was
6    excised, again on accessible parts. Obviously the
7    obturator lateral ends were not excised, so those
8    stay within the body.
9        The aim during the surgery in terms of
10   Prosima mesh was to excise as much as possible.
11   And there might still be some portions left.
12       So technically, we are talking about
13   lateral parts of transobturator mesh and some
14   peripheral portions of the Prosima mesh are still
15   remaining in the body.
16       Q. Will it be your testimony at this
17   trial that some of the Prosima mesh remains in
18   Ms. Vignos-Ware's body?
19       MR. THORNBURGH: Asked and answered.
20       THE DEPONENT: More likely than not,
21   there is still some remaining.
22       BY MR. COMBS:
23       Q. Have you reviewed Dr. Walters'
24   testimony regarding whether he did or did not

---

Page 52

1    remove all of the Prosima mesh?
2        A. I did not read the testimony. And
3    it doesn't really matter what he testified because
4    it's difficult to actually assure completeness of
5    excision. You're cutting through the tissue.
6        Q. You were not involved in the
7    explantation of Ms. Vignos-Ware's Prosima mesh,
8    were you?
9        A. No. You make it sound like if I was
10   present it would be possible to determine if
11   everything is removed or not. I don't think
12   anybody will determine if it was not, even n
13   explanting surgeon. You can try, you can aim, but
14   you never are one hundred percent sure.
15       Q. If Dr. Walters testified that he
16   removed all of the Prosima mesh during the
17   explantation surgery on November 23rd, 2010, do
18   you dispute that?
19       MR. THORNBURGH: Objection.
20       THE DEPONENT: I wouldn't dispute his
21   testimony. That's his impression. He is entitled
22   to his opinion and impression. If it truly
23   reflects what is in -- what is happening that's a
24   different question.

---

Page 53

1        BY MR. COMBS:
2        Q. You don't know, do you?
3        A. I don't. I'm just telling you that
4    the way things are, it's impossible to assure 100
5    percent completeness of excision.
6        Q. During the November 23rd, 2010,
7    procedure did Dr. Walters perform a uterosacral
8    ligament suspension?
9        A. Yes, it was done.
10       Q. And do you know how that is
11   performed? And I'm not asking you for all the
12   details but do you know the basic procedure?
13       MR. THORNBURGH: Objection.
14       THE DEPONENT: Basic procedure is that
15   the uterus or vaginal vault is being suspended
16   internally.
17       BY MR. COMBS:
18       Q. In your report at page 7 you state
19   that, "The records indicated that Ms. Vignos-Ware
20   reported dyspareunia. Her husband also reported
21   pain on intercourse and feeling exposed mesh." Is
22   that correct?
23       A. That's correct.
24       Q. Do you know whether

---

14 (Pages 50 to 53)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 54

1  Ms. Vignos-Ware's husband reported dyspareunia
2  that was related to the suture repair that was
3  performed on November 23rd, 2010?
4          MR. THORNBURGH:  Objection.
5          THE DEPONENT:  You mean suture repair or
6  uterosacral wall suspension?
7          BY MR. COMBS:
8          Q.  Yes, sir.
9          A.  That's internal.  These would be
10  details more suitable for a urogynecologist to
11  answer.  Now, I don't understand exactly the
12  timing of this question.  So you're asking if the
13  symptoms persisted after the excision?
14         Q.  I'm asking if Ms. Vignos-Ware's
15  husband reported suffering pain during intercourse
16  as a result of the sutures placed in the
17  uterosacral ligament suspension?
18         MR. THORNBURGH:  Objection.
19         THE DEPONENT:  I don't see that on the
20  excision.  So let me see when it says that.  So
21  the penile pain is indicated on the visit of
22  October of 2010.  Then the mesh is excised.  Oh,
23  okay, now I see.  And then there is a suture which
24  was -- or what was believed to be suture, could be

Page 55

1  still part of mesh, which scratched her husband
2  again in 2011.
3          BY MR. COMBS:
4          Q.  And you're referring to the
5  September 12, 2011, entry that you have in your
6  chronology?
7          A.  That's correct.  And then Prolene
8  suture was removed.
9          Q.  And have you reviewed Dr. Walters'
10  deposition testimony as to whether the suture that
11  was used in the uterosacral ligament suspension
12  was causing Mr. Vignos-Ware's husband to suffer
13  the dyspareunia?
14         A.  After the mesh removed or before the
15  excision of November of 2010?
16         Q.  After.
17         A.  After yes.
18         Q.  Yes.
19         A.  After the excision his impression
20  was that it was suture scratching.
21         Q.  Yeah.
22         A.  Before the excision it was the mesh
23  which was scratching.
24         Q.  And have you -- my question was,

Page 56

1  have you reviewed his testimony?
2          A.  No, I didn't review his testimony.
3          Q.  You do not know what he says about
4  that visit do you?
5          MR. THORNBURGH:  Objection.
6          THE DEPONENT:  No.  As I said, I review
7  only clinical records and I summarize.  And it
8  clearly states that there was penile pain before
9  mesh excision, which is attributable to mesh.  And
10  after that there was a scratching from suture.
11  Suture was removed.  And after that I don't see
12  scratching, or didn't see it in the records and it
13  was gone.  And no significant dyspareunia was
14  reported in 2013.
15         BY MR. COMBS:
16         Q.  In your report at page 8 you state,
17  and I'm talking about the first full paragraph.
18  So you talk about, and I'll just read it very
19  quickly:
20             "Mesh erosion also caused scratching
21          of the penile shaft for Ms. [Vignos]
22          Ware's husband which caused pain and
23          discomfort during intercourse.  This
24          symptom has been termed as 'hispareunia'

Page 57

1          in the literature.  This phenomenon is
2          unique for mesh surgeries and was
3          described after the introduction of the
4          mesh for transvaginal placement."
5          Now, do you believe that that statement
6  is correct?
7          A.  Yes, I do.  Hispareunia was a term
8  that came into the publications after mesh
9  introduction.  The same phenomenon could have been
10  happening with sutures, but the term "hispareunia"
11  I saw it in the literature only after introduction
12  of the mesh.
13         Q.  And in the last sentence of that
14  paragraph you state, "The phenomenon is unique
15  for mesh surgeries."  And is that true?
16         MR. THORNBURGH:  Objection.
17         THE DEPONENT:  Scratching penis against
18  the mesh?  Yes.  Without the mesh you cannot
19  scratch against the mesh.
20         BY MR. COMBS:
21         Q.  Can you have hispareunia from a
22  suture?
23         A.  You can.
24         Q.  And in fact Ms. Vignos-Ware's

15 (Pages 54 to 57)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 58

1  husband had dyspareunia from a suture didn't he?
2       MR. THORNBURGH: Objection.
3       THE DEPONENT: So my statement is that
4  hispareunia term was introduced after the
5  introduction of the meshes, although it could have
6  been recorded, the same symptom, with the sutures
7  and it produces similar symptoms, the terminology
8  came about after the introduction of the mesh.
9       BY MR. COMBS:
10      Q. And --
11      A. The mechanism is similar but the
12 frequency is clearly different. So the frequency
13 went to the level when the term was invented.
14      Q. And in Ms. Vignos-Ware's case her
15 husband did in fact suffer from what you term
16 hispareunia as a result of the suture placed
17 during the suspension, didn't he?
18      MR. THORNBURGH: Objection.
19      THE DEPONENT: Well, see, if we think
20 about hispareunia as a term used for mesh-related
21 complications then we cannot use it against
22 suture-related complications. At the same time,
23 there is no strict definition of what hispareunia
24 is because it's a more descriptive term in the

Page 59

1  literature.
2       I have not seen a specific description
3  of what exactly it is and how it is defined.
4  Everybody can define it separately. If you ask me
5  about mechanism of penile scratching it would be
6  different. If you can use hispareunia, it really
7  depends on how we define hispareunia. If
8  hispareunia is only scratching related to the mesh
9  then we cannot use it for the suture.
10      BY MR. COMBS:
11      Q. Did Ms. Vignos-Ware's husband suffer
12 from pain during sex as a result of the suture
13 that was placed in her vagina during the
14 uterosacral ligament suspension?
15      MR. THORNBURGH: Objection. Phil, he's
16 answered the question four times now. You want
17 him to answer it a fifth time?
18      MR. COMBS: Yeah.
19      MR. THORNBURGH: Last time and then I'm
20 going to instruct him not to answer the same
21 question over again.
22      THE DEPONENT: He did and we still don't
23 know if it was part of mesh or suture. The
24 surgeon's impression that it was a suture,

Page 60

1  however, we don't know for sure.
2       BY MR. COMBS:
3       Q. And do you have any facts at all to
4  base it on the opinion that it might have been
5  mesh? What medical facts do you base that on?
6       A. Just experience because mesh
7  exposures are recurrent. They just come back and
8  back and back and back.
9       Q. And you've not reviewed Dr. Walter's
10 testimony on that have you?
11      A. I don't think anybody with naked eye
12 can, with certainty say that it's a Prolene suture
13 versus the fiber from the mesh, because they're so
14 similar, unless it's a very long stretch, which
15 never is.
16      Q. And you do not know whether
17 Dr. Walters testified that it was in fact a
18 suture; and that her husband in fact felt a
19 suture; and that he did in fact remove the suture;
20 and that did in fact solve the problem. You
21 don't know that, do you, because you've never read
22 his deposition.
23      MR. THORNBURGH: Objection. Asked and
24 answered. Phil, that's the fifth time. I said

Page 61

1  one more time. He answered the question. I'm
2  going to instruct him not to answer the question
3  again. You've already asked the same question.
4       BY MR. COMBS:
5       Q. You don't know what the deposition
6  testimony was on that point do you?
7       MR. COMBS: Dan, you can't have it both
8  ways. Your guy can't speculate about stuff, not
9  read the deposition transcript and then come in
10 and speculate about something internal. Can't do
11 it.
12      MR. THORNBURGH: He's answered the --
13      MR. COMBS: If you're going to speculate
14 about stuff at trial you don't know anything about,
15 you have to answer the questions about it.
16      MR. THORNBURGH: Hold on. You've asked
17 the same question six time now, six times. If you
18 want to ask him what his basis is for believing it
19 could be something other than the suture that's
20 fine, that's a little bit of a different question.
21 But you've asked the same question six times. So
22 I've instructed him not to answer.
23      MR. COMBS: That's because there is no
24 basis.

16 (Pages 58 to 61)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 62

1     MR. THORNBURGH: Why don't you ask him?
2  Why don't you ask him that? Ask him what the
3  basis is.
4     BY MR. COMBS:
5     Q. What's the basis, Dr. Iakovlev?
6     A. Basis for what?
7     Q. The basis for your opinion that it's
8  possible that it was mesh causing
9  Ms. Vignos-Ware's husband dyspareunia after the
10  mesh had been removed. What's the basis?
11     A. The basis is that Prolene sutures
12  are very similar to fibers of the mesh. It's the
13  same Prolene when it's cut really short and
14  tied, it will exactly have the same appearance.
15  It's a blue solid fiber, that's it. I don't think
16  even if you can -- unless there is a very sharp
17  difference in thickness of the fiber -- of the
18  suture, you can determine if it's coming from the
19  mesh or the suture. If the diameter of the fiber
20  is similar, it's impossible. You cannot determine
21  it even under the microscope. This is my opinion.
22  That his impression might be one thing but in fact
23  what is going on in there might be different.
24     Q. Have you ever treated

Page 63

1  Ms. Vignos-Ware?
2     A. No.
3     Q. Have you ever examined
4  Ms. Vignos-Ware?
5     A. I examined her specimen not her
6  physically.
7     Q. You were not present when
8  Dr. Walters performed an excision of the suture
9  from Ms. Vignos-Ware in 2011 were you.
10     A. If I was present?
11     Q. You weren't present were you?
12     A. No.
13     Q. And did you believe you were in a
14  better position to opine on that issue than
15  Dr. Walters?
16     MR. THORNBURGH: Objection.
17     THE DEPONENT: What I'm saying that
18  decision if it was a suture or fiber of the mesh
19  at this point is a speculation. Either it's in
20  transcript of a testimony or elsewhere, because
21  they're so similar. I see them all the time.
22  Sometimes the suture is used to remove the mesh.
23  So my opinion as a pathologist who examined both
24  sutures and mesh fibers under microscope is that

Page 64

1  if the suture gets to the thickness of mesh fibers
2  it's impossible to determine. Whatever anyone
3  says, it's impossible -- and this is my opinion as
4  a pathologist who examines these things under a
5  microscope.
6     BY MR. COMBS:
7     Q. And so my question is who do you
8  think is in a better position to make that
9  determination, you or the surgeon that actually
10  operated on her?
11     A. To make determination if it's
12  possible to determine what is suture and what is
13  mesh?
14     Q. Yes.
15     A. Me, because I'm examining under the
16  microscope, unless he indicated that it was
17  drastically thicker.
18     Q. And in regard to the procedure that
19  was performed on September 12th, 2011, you never
20  examined anything from that under the microscope,
21  did you?
22     A. The removal of the suture?
23     Q. Yes, sir.
24     A. No.

Page 65

1     Q. You haven't examined anything from
2  that procedure have you?
3     A. The only thing I'm saying it's
4  impossible to say one way or another, that's my
5  opinion.
6     Q. And you're providing that testimony
7  based upon a patient that you never saw regarding
8  a sample that you never examined, aren't you?
9     MR. THORNBURGH: Objection.
10     THE DEPONENT: No. I'm providing that
11  opinion based on examination of other sutures and
12  other meshes. That's my basis because I see that
13  under microscope over and over again.
14     BY MR. COMBS:
15     Q. This sample you did not examine did
16  you?
17     MR. THORNBURGH: Objection.
18     THE DEPONENT: No, but I'm not saying
19  that it wasn't suture. I'm just saying that it
20  could be suture or could be not. And either way
21  since we don't have the specimen we cannot answer
22  the question with certainty now because there is
23  no specimen.
24

17 (Pages 62 to 65)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 66

1    BY MR. COMBS:
2        Q.  Do you plan on offering any
3    testimony at trial that what Dr. Walters removed
4    from Ms. Vignos-Ware's vagina in September of 2011
5    do you plan on providing any testimony that that
6    was in fact mesh?
7        A.  No.
8        Q.  Dr. Iakovlev, you have a section in
9    your report that you talk about dyspareunia, it's
10   on page 7 and page 8.
11       A.  Yes.
12       Q.  Have you made any investigation of
13   Ms. Vignos-Ware's medical history to determine
14   whether she had other factors that could
15   contribute to dyspareunia?
16       A.  We're going back in the same loop.
17   I'm not a clinical treating physician.  My role
18   here is to correlate what was in the records and
19   what was in the specimen.  Clinical investigations
20   led to mesh excisions.  I ended up with a specimen
21   and I correlated with clinical records.  I don't
22   do clinical differential diagnosis based on the
23   records.  You're asking me something I don't do.
24       Q.  Have you been provided Dr. Walters'

Page 67

1    testimony regarding his interpretation of the
2    pathology report that's been marked as Exhibit 2?
3        ---EXHIBIT NO. 2:  Pathology report re.
4        Barbara Vignos-Ware.
5        THE DEPONENT:  Well, you know I didn't
6    have any depositions or any testimony.
7        BY MR. COMBS:
8        Q.  Dr. Iakovlev, I want to ask you a
9    question about a statement at the bottom of page 6
10   of your report.
11       A.  Yes.
12       Q.  You state, "It is further my opinion
13   that any residual parts of the mesh which were not
14   removed during the excision surgeries continue to
15   pose a risk for mucosal erosion."  I want to ask
16   you about the arms of the TVT-O device.  You told
17   us earlier that they were not removed, is that
18   correct?
19       A.  That's correct.
20       Q.  Are the arms of the TVT-O device
21   that,were not removed placed in a point where
22   there's,vaginal mucosa?
23       A.  Well, the intent was to remove as
24   much as possible but, again, I don't know how

Page 68

1    close they are.  So any residual parts means I
2    don't know.  If there are any residual parts they
3    are at risk to be exposed.  Could it be parts of
4    TVT-O?  Can they migrate to become that close?
5    Could it be parts of Prosima?  If there's any mesh
6    any reasonable distance to the mucosa sooner or
7    later, they can become exposed.
8        Q.  Do you have any evidence that the
9    arms of Ms. Vignos-Ware's TVT-O mesh are at her
10   vaginal mucosa?
11       A.  I don't know, that's why I said any
12   residual parts.  But I don't know if there are any
13   or not, but if there's anything left and if it's
14   close it can become exposed.
15       Q.  Are you going to offer any testimony
16   at this trial that Ms. Vignos-Ware's mesh did in
17   fact migrate?
18       A.  Parts of the mesh migrated, that's
19   why it became exposed.
20       Q.  Did Ms. Vignos-Ware go to the
21   emergency room approximately ten days after her
22   mesh had been placed?
23       MR. THORNBURGH:  Objection.
24       THE DEPONENT:  Yes, there was

Page 69

1    post-operative bleeding.
2        BY MR. COMBS:
3        Q.  And do you know what was the cause
4    of that post-operative bleeding?
5        MR. THORNBURGH:  Objection.
6        THE DEPONENT:  It's not clear because
7    the description was that the post-operative
8    incision line healed well.  Apparently they did
9    not see mesh exposure at the time.  It's a
10   clinical question.
11       BY MR. COMBS:
12       Q.  You do not know the answer?
13       A.  I don't have an opinion.
14       Q.  You don't have Ms. Vignos-Ware's
15   deposition so you wouldn't know what she says
16   about why she had to go to the emergency room on
17   May 30th, 2010?
18       MR. THORNBURGH:  Objection.
19       THE DEPONENT:  No, I wouldn't.
20       BY MR. COMBS:
21       Q.  In your report you refer to the mesh
22   being bunched up in the middle and twisted, is
23   that correct?
24       A.  In my report or clinical

18 (Pages 66 to 69)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 70

1  description? I mean in my description or clinical
2  description?
3      Q. It says it in your description. You
4  say, "Intraoperatively the mesh was exposed in two
5  places. No suture or mesh found in the bladder.
6  Mesh was bunched up in the middle and twisted."
7      A. I just copied it from the record.
8      Q. Do you know why the mesh was bunched
9  up in the middle and twisted?
10     A. Because it can. Because it's
11  defectively designed.
12     Q. Do you know why Ms. Vignos-Ware's
13  mesh was bunched up?
14     A. Because it can. Because it's
15  designed the way it allows to do that.
16     Q. Do you have any information at all
17  regarding Ms. Vignos-Ware's activities within the
18  month following her Prosima?
19     A. It doesn't matter. If it was a
20  well-designed device it wouldn't bunch up with any
21  activities. Are you implying that the device
22  should limit somebody's activities?
23     Q. Do you believe that there are no
24  limitations placed on somebody's activities

Page 71

1  following the implantation of a Prosima device?
2      MR. THORNBURGH: Objection.
3      THE DEPONENT: Immediately after
4  surgery? There are some protocols.
5      BY MR. COMBS:
6      Q. Do you know what those protocols
7  are?
8      A. No.
9      MR. THORNBURGH: Objection.
10     BY MR. COMBS:
11     Q. You do not know whether
12  Ms. Vignos-Ware's mesh was bunched up during the
13  implantation procedure, do you?
14     MR. THORNBURGH: Objection.
15     THE DEPONENT: I don't. Again, it
16  bunched up because it can either during
17  implantation or later on. Since it's designed in
18  a way that it can bunch up, it can bunch up. Let's
19  take about five minutes break.
20     ---  Break taken at 7:04 p.m.
21     ---  Upon resuming at 7:08 p.m.
22     BY MR. COMBS:
23     Q. Dr. Iakovlev, I want to make sure I
24  remember to ask you these questions. So in

Page 72

1  relation to Ms. Vignos-Ware's treatment you were
2  not present for any part of any procedure
3  performed on her, were you?
4      A. That's correct.
5      Q. You have not spoken to any of her
6  treating physicians, have you?
7      A. That's correct.
8      Q. You never saw her mesh in vivo?
9      A. That's correct.
10     Q. You played no role in preparing the
11  specimen for pathological review at the Cleveland
12  Clinic?
13     A. That's correct.
14     Q. And do you know what the protocols
15  were at the Cleveland Clinic for preparing her
16  specimen for pathology?
17     A. The appearance of the slides did not
18  indicate that there was any deviation from
19  standard protocols. It was properly processed,
20  properly fixed.
21     Q. And the tissue would have been
22  dehydrated?
23     A. It would be fixed, dehydrated,
24  rehydrated, put in xylene and paraffin, covered --

Page 73

1  stained, coverslipped.
2      Q. And is the fixative that would have
3  been used formalin?
4      A. Yes.
5      Q. I wanted to ask you regarding the
6  mechanisms that you had previously testified about
7  that can cause erosion. Would you have an opinion
8  at this trial which specific mechanism caused
9  Ms. Vignos-Ware's erosion?
10     A. Well, I testify different factors
11  contribute -- playing role within the mechanism.
12  So the specific mechanism is combination of
13  factors. So do you only deal with the factors?
14     Q. My question is will you be
15  identifying any one of those specific factors and
16  saying, this is what caused her mesh to erode.
17     A. But that's what I'm saying, there is
18  no one specific factor because the mechanism is so
19  complex, multiple factors are playing role.
20     Q. Will the factors that you describe
21  to the jury regarding the mechanisms of erosion be
22  the same that you've testified about in prior
23  cases?
24     A. Yes.

19 (Pages 70 to 73)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 74

1      Q.   And will you single out any one of
2   those factors as the cause of Ms. Vignos-Ware's
3   mesh --
4      A.   No, I will not single out one
5   factor.  They are all there.  They are around the
6   mesh.  Mesh is a foreign body, it cannot be
7   remodeled or resorbed.
8      Q.   That's all the questions I have at
9   this point.
10  ---  Break taken at 7:11 p.m.
11  ---  Upon resuming at 7:16 p.m.
12      DIRECT EXAMINATION BY MR. THORNBURGH:
13      Q.   Doctor, I want to make sure that the
14  record's clear.  You had said that regarding the
15  suture do you recall that that was removed from
16  the apex of Mrs. Ware?  Well, let me back up a
17  little bit.  The suture that was removed was a
18  Prolene suture, or at least identified as a
19  Prolene suture by Dr. Walters, correct?
20      A.   That's correct.
21      Q.   And the Prosima is made out of
22  Prolene?
23      A.   That's correct.
24      Q.   And Mrs. Ware experienced erosions

Page 75

1   from the Prosima in a number of places, including
2   in the apex.
3      A.   That's correct.
4      Q.   Which is where the suture was
5   removed from, that Dr. Walters called a Prolene
6   suture?
7      A.   That's correct.
8      Q.   And is it fair to say that Mrs. Ware
9   was experiencing dyspareunia prior to the
10  uterosacral vaginal wall suspension?
11      A.   That's correct.  Dyspareunia and
12  hispareunia.
13      Q.   And that was already occurring
14  before the uterosacral vaginal wall suspension
15  even occurred, right?
16      A.   That's correct.
17      Q.   And do you recall that the reason
18  the uterosacral vaginal wall suspension occurred
19  was as a result of the need to remove some of the
20  Prosima that was eroding through a number of
21  areas, including the apex?
22      MR. COMBS:  Object to form.
23      THE DEPONENT:  That's correct.
24

Page 76

1      BY MR. THORNBURGH:
2      Q.   Do I understand correctly that the
3   scratching that Mr. Ware was experiencing was at
4   the same location where Mrs. Ware was experiencing
5   dyspareunia and erosions that occurred prior to
6   the uterosacral vaginal wall suspension?
7      MR. COMBS:  Object to form.
8      THE DEPONENT:  Yeah, somewhere in that
9   area.
10      BY MR. THORNBURGH:
11      Q.   And defense counsel asked you about
12  some bleeding that occurred post-operatively after
13  Mrs. Ware was implanted with the Prosima device.
14  Do you recall that line of questioning?
15      A.   Yes, I do.
16      Q.   I want to show you something.  I'm
17  going to mark as Exhibit number 4, which is the
18  explant and implant procedure done on May 25th,
19  2010, Bates numbered AULTHMBR00111.
20      ---EXHIBIT NO. 4:  Surgical
21           documentation report from Aultman
22           Hospital for the explant and implant
23           procedure done on May 25th, 2010, on
24           Barbara Vignos-Ware.  Bates labeled

Page 77

1      VIGNOS-WAREB_AULTH_MDR00111.
2      BY MR. THORNBURGH:
3      Q.   I've got a couple of sections
4   highlighted on Exhibit number 4.  First off, what
5   was the preoperative diagnosis that Mrs. Ware
6   received?
7      A.   Dyspareunia post-TVT insertion.
8      Q.   So was it your understanding that
9   she developed dyspareunia after the TVT-O
10  insertion?
11      A.   Yes, that's what it states.
12      Q.   And then if you look at the
13  operative findings and procedures did Dr. -- did
14  the doctor -- the treating physician identify any
15  erosions?  An erosion of the TVT-O device?
16      A.   "Repeat pelvic examination reveals
17  that the transvaginal tape sling was exposed on
18  the patient's right and there was minimal exposure
19  on the left."
20      Q.   So there are multiple places of mesh
21  exposure of the TVT-O device?
22      A.   That's correct.
23      Q.   On the left and the right?
24      A.   On the left and on the right.

20 (Pages 74 to 77)

Vladimir Iakovlev, M.D.

Page 78

1    Q.  And is the -- the TVT-O device is
2  made from Prolene, correct?
3    A.  That's correct.
4    Q.  And the Prosima is also made with
5  Prolene?
6    A.  That's correct.
7    Q.  Just a thinner fiber?
8    A.  Yes.
9    Q.  Slightly thinner?
10    A.  Just over 100 microns.
11    Q.  And will the tissue reaction to the
12  Prolene polypropylene material of the TVT-O device
13  and the Prosima be similar?
14    A.  Yes, they would be similar.
15    Q.  And the erosion of the TVT-O device
16  began more than two months after the implantation
17  of the TVT-O, is that correct?
18    A.  Could you repeat that?
19    Q.  Yeah.  The erosion of the TVT-O
20  device occurred more -- approximately two or more
21  months before -- I'm sorry, after the implantation
22  of the TVT-O, correct?
23    A.  Yes.
24    MR. COMBS:  Object to form.

Page 79

1    BY MR. THORNBURGH:
2    Q.  In fact the TVT-O was implanted on
3  March 26th of 2010, right?  Approximately?
4    A.  Yes, march 26th and then --
5    Q.  And then the explant of the device
6  was at the same time that the Prosima was
7  implanted, right?
8    A.  Yes.
9    Q.  And that was how long after the
10  implant?
11    A.  Well, two months after the
12  implantation of TVT-O Prosima was implanted.
13    Q.  And then when the Prosima was
14  implanted if you look at Exhibit number 4, Exhibit
15  number 4 indicates that the doctor used -- used
16  the Vicryl sutures to fix the Prosima, does that
17  look -- is that accurate?
18    A.  That's correct, yes.
19    Q.  And I also want to show you on the
20  next page, page -- the second page of Exhibit 4,
21  Bates number ending in 112, do you see where it's
22  highlighted on the second line at the top
23  beginning with, "I then..."?
24    A.  "I then inserted vaginal retention

Page 80

1  device and inflated the balloon with 30mL of
2  air."
3    Q.  So you understand that the Prosima
4  device comes with an inflatable balloon?
5    A.  Yes.  To a degree, yes.
6    Q.  And did you understand -- do you
7  have an understanding that rather than using gauze
8  to pack the vagina after the implant that Ethicon
9  represented that this balloon would allow to
10  provide hemostasis of bleeding?
11    MR. COMBS:  Object to form.
12    THE DEPONENT:  Yes.  It would also keep
13  the mesh flat.
14    BY MR. THORNBURGH:
15    Q.  And also to keep the mesh flat.  And
16  does this operative report suggest that
17  Dr. Hamilton was attempting to follow the
18  recommendations and training of Ethicon?
19    A.  That's what it appears from the
20  description.  And Vicryl is a resorbable suture.
21    Q.  And in your review of Mrs. Ware's
22  medical records, and in your review of the
23  pathology, and your pathological findings, did the
24  balloon that was used in the Prosima keep the mesh

Page 81

1  flat?
2    MR. COMBS:  Object to form.
3    THE DEPONENT:  Well it certainly folded,
4  so if the balloon kept the mesh flat then it
5  folded after the balloon was removed.  It
6  certainly wasn't flat when it was removed.
7    BY MR. THORNBURGH:
8    Q.  And if you look at the operative
9  report, does the operative report indicate in any
10  way, you can take your time to review it, does it
11  indicate in any way that Dr. Hamilton implanted
12  the Prosima all bunched up?
13    MR. COMBS:  Object to form.
14    THE DEPONENT:  See the stitching of the
15  edges indicates that it was secured during the
16  surgery.  The way it is described here -- so he
17  inserts Prosima anteriorly and secures it with
18  Vicryl suture, and then tucks the wings into
19  correct anatomical location and then secures them
20  with Vicryl again.  So he's stretching it, putting
21  it in a flat configuration.  And then closes
22  incision and puts the balloon.  So if we analyze
23  all of this more likely than not the bunching up
24  occurred after the Vicryl sutures were resorbed,

21 (Pages 78 to 81)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 82

1   which takes several weeks.
2       BY MR. THORNBURGH:
3       Q.  So does your review of the operative
4   report indicate to you that the mesh was put in in
5   a matter that should have kept it flat but that at
6   some point after the Vicryl sutures absorbed the
7   mesh began to ball up and bunch?
8       A.  Yes, that's correct.  I mean this is
9   the explanation to reasonable degree of medical
10  certainty basing on all these facts, that it was
11  stretched, it was secured and the balloon was
12  placed.  So the only way it could became loose
13  again and gather together is that the sutures were
14  not holding it any more, and Vicryl is a
15  resorbable suture.
16      Q.  And does your review of the
17  operative report and your review of the pathology
18  slides indicate to you that at some point after
19  the balloon was used to -- as part of the Prosima
20  device that the mesh became bunched up?
21      A.  After the balloon was removed and
22  after the Vicryl sutures resorbed.
23      Q.  And is it your understanding that
24  Mrs. Ware had a number of mesh erosions?

Page 83

1       A.  Yes.
2       Q.  Those erosions began in the TVT
3   device, is that your understanding?
4       A.  That's correct.  It started with TVT
5   with first device, and then second device is
6   inserted and then second device became exposed.
7       Q.  So her tissue responded the same way
8   to the TVT-O device as it did to the Prosima
9   device, is that fair?
10      A.  Yes, both devices became exposed.
11      Q.  And does Mrs. Ware still have the
12  obturator -- still have mesh at least in her
13  obturator?
14      A.  Yeah, at least in both obturator
15  spaces.  Yes.
16      Q.  And does that put her at risk of
17  suffering future harm as a result of the tissue
18  response that she has already experienced with
19  both the TVT-O device and the Prosima device?
20      A.  Yes.  Mesh is there, all the
21  pathological changes, the scarring, the nerve
22  involvement is there, and especially in the
23  obturator space where the nerves are more abundant
24  and they are larger in there.

Page 84

1       Q.  And your review of the pathology
2   material, did that correlate with your review of
3   the medical records which showed that the mesh was
4   bunching?
5       A.  Sorry?
6       Q.  Yeah.  Your review of the pathology,
7   and we don't need to look at it again, but you had
8   identified some microphotographs that demonstrated
9   folding of the mesh?
10      A.  Yes.
11      Q.  Did that correlate with your review
12  of the medical records where bunching of the mesh
13  was identified?
14      A.  Oh perfectly.  That was exactly what
15  was described in the intraoperative report.
16  That's what I saw in microscopy.
17      Q.  Is that also evidence of migration?
18      A.  Yes, actually it is.  It was flat,
19  secured and sometime after Vicryl sutures resorbed,
20  it all bunched up.  So large portions of the
21  device migrated through the tissue to form these
22  complex folds.
23      Q.  Did your pathological analysis
24  correlate with mesh contraction?

Page 85

1       A.  Yes.  So what I saw, I saw scarring.
2   And we know that scar contracts.  And all these
3   layers became compacted during scar contraction.
4       Q.  Can scar contraction cause the mesh
5   to bunch?
6       A.  Yes, it can.  It will exacerbate the
7   migration.  So migration forms these folds, scar
8   contraction exacerbates it further.
9       Q.  And we won't look at all your
10  microphotographs again, but did your
11  microphotographs, in fact every one of them using
12  H&E staining, demonstrate dense scarring in and
13  between the pores?
14      A.  That's correct.
15      Q.  And did your microphotographs
16  demonstrate bridging fibrosis?
17      A.  That's correct.
18      Q.  Do all of your microphotographs
19  using H&E staining demonstrate encapsulation of
20  the mesh in scar plating?
21      A.  That's correct.
22      Q.  Do those findings correlate with
23  migration?
24      A.  Yes.

22 (Pages 82 to 85)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 86

1    Q.  Do those findings correlate with
2  contraction?
3    A.  Yes.
4    Q.  Do those findings correlate with
5  erosion?
6    A.  Yes.
7    Q.  Do those findings correlate with
8  pain?
9    A.  Yes.
10   Q.  Do those findings correlate with
11 dyspareunia?
12   A.  Yes.
13   Q.  Does riding a motorcycle or a bike
14 cause scarring?
15   A.  No.
16   Q.  Does riding a motorcycle or bike
17 cause contraction?
18   A.  No.  Scar contraction, no.
19   Q.  Does riding a motorcycle or bike
20 cause bridging fibrosis?
21   A.  No.
22   Q.  Does riding a motorcycle or bike
23 cause erosion?
24   A.  No.

Page 87

1    Q.  Does riding a --
2    A.  Unless you have accident and fall
3  and something --
4    Q.  Does riding a motorcycle or bike
5  cause bridging fibrosis?
6    A.  No.
7    Q.  Scar plating?
8    A.  No.  And it does not cause nerve
9  ingrowth for sure.
10   Q.  No further questions.
11   FURTHER CROSS-EXAMINATION BY MR. COMBS:
12   Q.  Dr. Iakovlev, does Ms. Vignos-Ware
13 suffer any pain currently?
14   MR. THORNBURGH:  Objection.
15   THE DEPONENT:  I don't know.  The
16 records stop sometime in 2013.
17   BY MR. COMBS:
18   Q.  And in 2013, the finding that you
19 recorded in your report was no significant
20 dyspareunia at the time, wasn't it?
21   A.  That's correct.
22   Q.  And you do not have any information
23 that Ms. Vignos-Ware suffered pain any time
24 between 2013 and the present, do you?

Page 88

1    MR. THORNBURGH:  Objection.
2    THE DEPONENT:  No, it wasn't my purpose.
3    BY MR. COMBS:
4    Q.  And have you been provided with a
5  copy of Dr. Rosenzweig's IME in this case?
6    A.  IME?
7    Q.  Yes, sir.
8    A.  What is IME?
9    Q.  His independent medical examination.
10   A.  You mean expert report or something?
11   Q.  Yes, sir.
12   A.  No.  I don't have any expert
13 reports.  I don't have any depositions.  All what
14 I have you have on flash drive.
15   Q.  Now, when Mr. Thornburgh was asking
16 you questions, was it your testimony that the
17 Prosima mesh caused Ms. Vignos-Ware's prolapse?
18   A.  No.
19   Q.  Alright.
20   A.  I never said that.
21   Q.  In fact she had prolapse prior to
22 any implantation of the mesh, didn't she?
23   MR. THORNBURGH:  Objection.
24   THE DEPONENT:  Well, the mesh was placed

Page 89

1  to treat the prolapse.
2    BY MR. COMBS:
3    Q.  Exactly.
4    A.  Yes.
5    Q.  You testified that Ms. Vignos-Ware's
6  dyspareunia was at the same location in 2010 and
7  2011 didn't you?
8    MR. THORNBURGH:  Objection.
9  Mischaracterizes.
10   THE DEPONENT:  Not sure.  I mean
11 dyspareunia or exposure of the mesh?
12   BY MR. COMBS:
13   Q.  Dyspareunia.
14   A.  I did not testify where exactly
15 dyspareunia was.  You can feel it in entire
16 pelvis.  When it hurts one point it can radiate.
17   Q.  So you didn't testify in response to
18 Mr. Thornburgh's questioning that her dyspareunia
19 was at the apex of her vagina?
20   A.  I thought we were talking about
21 exposure site.
22   Q.  And so if you testified that her
23 dyspareunia was at the apex of her vagina would
24 that be a mistake?

23  (Pages 86 to 89)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 90

1     A.  No.  If it's exposed there, there
2  will be feeling of dyspareunia there, but we were
3  focusing on exposure.
4     Q.  Where was Ms. Vignos-Ware's
5  dyspareunia in 2010?
6     MR. THORNBURGH:  And just so the record
7  is clear, so you understand, I think he was
8  answering questions about the hispareunia and
9  location of the mesh exposure --
10    MR. COMBS:  Perhaps I misheard him but I
11 don't think I did.
12    MR. THORNBURGH:  -- and the suture area.
13    THE DEPONENT:  So now I'm all mixed up.
14 Erosion, hispareunia, dyspareunia.  So which time?
15 What month of 2010?
16    BY MR. COMBS:
17    Q.  Are you going to have any testimony
18 at the trial of this case as to the location of
19 Ms. Vignos-Ware's dyspareunia at any time?
20    MR. THORNBURGH:  Objection.
21    THE DEPONENT:  Specific point?
22    BY MR. COMBS:
23    Q.  Yes, sir.
24    A.  No.  Dyspareunia is described in the

Page 91

1  clinical records.  If there is any further
2  definition there -- again, it's not my job to do
3  the clinical part.
4     MR. THORNBURGH:  You have one minute
5  left on your rebuttal time, just so you know.
6     MR. COMBS:  No, I don't.  I don't have
7  one minute left on my rebuttal time.  You can't
8  take time questioning him and say that's my time.
9     MR. THORNBURGH:  You used up all your
10 time.
11    MR. COMBS:  I didn't use up all my time,
12 Dan, that's just not true.
13    MR. THORNBURGH:  You used a lot of it.
14    MR. COMBS:  I didn't use up my time.
15    MR. THORNBURGH:  You get three hours.
16    MR. COMBS:  That's just not true.  First
17 of all we haven't been here for three hours.  And
18 it's not three hours it's two hours.
19    MR. THORNBURGH:  That's what I meant to
20 say.  Are you going to go for much longer?
21    MR. COMBS:  No, I'm not going to go for
22 much longer but it's an untrue statement that I
23 have only one minute.  Let's go off the record.
24    --- Off the record at 7:42 p.m.

Page 92

1     --- Back on the record at 7:43 p.m.
2  BY MR. COMBS:
3     Q.  Dr. Iakovlev, are you going to
4  testify in this trial regarding the location of
5  Ms. Vignos-Ware's dyspareunia at any time?
6     MR. THORNBURGH:  Asked and answered.
7     MR. COMBS:  Asked but interrupted.
8  BY MR. COMBS:
9     Q.  Are you going to testify about that
10 at this trial?
11    A.  The location was in the vagina.  So
12 dyspareunia is felt in the vagina and pelvis.
13    Q.  Are you going to do anything more
14 specific than that at this trial?
15    A.  No.
16    Q.  Now, is it your testimony that the
17 --
18    A.  Dyspareunia or hispareunia?
19    Q.  Let's start with dyspareunia?
20    A.  Dyspareunia, yes.  Vaginal and
21 pelvic.
22    Q.  So are you going to give any
23 testimony, any more specific than that, that it
24 was in the vagina or pelvis?

Page 93

1     A.  No.
2     Q.  Now let's talk about the
3  hispareunia.  Where was the hispareunia that
4  Ms. Vignos-Ware's husband felt in 2010?
5     A.  Hisareunia where the exposed part
6  is.
7     Q.  And was there an exposure of the
8  TVT-O mesh?
9     A.  There was exposure of TVT-O.
10    Q.  Was there an exposure of the Prosima
11 mesh?
12    A.  There was exposure of Prosima mesh.
13    Q.  Where was the hispareunia?
14    A.  Can anyone tell when it scratches --
15    Q.  That's my question.  You're the one
16 that's testifying and offering an opinion about
17 it.
18    A.  I am not offering an opinion.  I
19 just copied what is -- we're mixing what is my
20 opinion and what is in the record.  The record
21 says "penile scratching", "penile pain".  That's
22 not my opinion.
23    Q.  And are you going to offer any
24 testimony at the trial of this case where the

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 94

1  location of the mesh was that was causing that
2  penile scratching in 2010?
3      A.  I will not offer specific location
4  because I didn't examine the patient, didn't take
5  a history.  It's clinical part.  What I can say
6  about hispareunia and dyspareunia is what is in
7  the records.
8      Q.  Now, the location of the TVT-O and
9  the Prosima are different aren't they?
10     A.  Yes.
11     Q.  And the location of the TVT-O and
12 uterosacral vaginal vault suspension are different
13 aren't they?
14     A.  To a degree.  There would be overlap
15 with --
16     Q.  You believe there is overlap between
17 the placement of the TVT-O and the uterosacral
18 vaginal vault suspension?
19     MR. THORNBURGH:  Objection.
20     THE DEPONENT:  I'm talking about Prosima
21 and uterosacral suspension.
22     BY MR. COMBS:
23     Q.  That wasn't my question.  Maybe I
24 asked the wrong question.  My question is, do you

Page 95

1  believe there's any overlap between the placement
2  of the TVT-O and uterosacral vaginal vault
3  suspension?
4      A.  No, they're quite far from each
5  other.
6      Q.  Now, are you going to offer any
7  testimony at the trial of this case that
8  Ms. Vignos-Ware's Prosima was properly placed?
9      A.  Well, we just read the record.  I
10 don't see any indication that it wasn't properly
11 placed and it's quite -- it's not my opinion.  I
12 can read again what was there.  It was stretched.
13 It was put flat and sutures were secured on the
14 edges and then there was a balloon placed.
15     Q.  Are you a urogynecologist?
16     A.  No, I'm not.
17     Q.  Do you have any urogynecological
18 training?
19     A.  No.
20     Q.  Are you going to offer testimony at
21 the trial of this case that the placement was
22 proper?
23     A.  No, but I can see that the edges
24 were secured.

Page 96

1      Q.  Now, in response to Mr. Thornburgh's
2  questions, you testified that Vicryl sutures are
3  absorbable, is that correct?
4      A.  That's correct.
5      Q.  And you said that they absorb within
6  several weeks, is that correct?
7      A.  That's correct.
8      Q.  What do you think the time period is
9  for Vicryl absorption?
10     A.  It's variable between the patients.
11     Q.  How long do you think it is?
12     A.  I said weeks.
13     Q.  How many weeks.
14     A.  The answer was weeks.  If I say
15 "weeks" it means weeks, if I say "three weeks" it
16 will be three weeks, but I didn't say three weeks.
17     Q.  How many weeks?
18     A.  I'm getting really tired.  It's been
19 a very long day and we are running in circles now.
20 Weeks, I don't know how many.  It's variable
21 between patients.  You cannot narrow the number.
22 If you're trying to pull the number out of me I
23 cannot give you a number.
24     Q.  You don't know do you?

Page 97

1      A.  No, I know weeks.  This is how we
2  say.  Hours, weeks, years.  This is common to use
3  in pathology, in medicine, to use this term
4  describing timeframe.  Days, weeks, month.  This
5  is regular standard way of expressing the time.
6      Q.  Let me ask it this way.  Is it more
7  or less than a month?
8      A.  Weeks can be less than a month, can
9  be more than that month.
10     Q.  Here's my question, is the
11 absorption of Vicryl sutures does that occur in
12 more or less than a month?
13     MR. THORNBURGH:  Objection.
14     THE DEPONENT:  It's variable.  I said
15 weeks.  My answer it weeks.
16     BY MR. COMBS:
17     Q.  Do you know whether it occurs in
18 more or less than a month?
19     MR. THORNBURGH:  Objection.  Asked and
20 answered.  He said variable.  Depends on the
21 patient.  He said a number of different things and
22 he answered your questions.
23     BY MR. COMBS:
24     Q.  I know he said a lot of different

25 (Pages 94 to 97)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

Page 98

1  things.
2      A.  Sorry, if you're going to at the end
3  of the day repeat the question until I give you
4  just a number, just stop this; that's not fair.
5      Q.  That's not actually what I'm trying
6  to do, Dr. Iakovlev.  What I'm trying to do is
7  figure out -- you testified that it took place in
8  a matter of weeks.  I just want to know if you
9  know what the absorption period is for Vicryl
10 sutures?
11     A.  I said weeks, that's my answer.
12     Q.  Is the obturator space inside the
13 vagina?
14     A.  No.
15     Q.  Is there any place in your report
16 that you make reference to scar contraction?
17     A.  Yes, and you know that it is there.
18     Q.  Where?  You know your report better
19 than I do.  Maybe you do.
20     A.  Here we go.  Page 7, third
21 paragraph, third line from the top:
22         "...physiologically scar tissue
23         undergoes contraction.  In cases of
24         implanted meshes the scar tissue within

Page 99

1          and around the mesh contracts together
2          with the embedded within mesh device.
3          This leads to tightening in cases of
4          both slings and POP meshes, and further
5          wrinkling/gathering of the POP mesh
6          devices."
7      Q.  Dr. Iakovlev, you talk --
8  Mr. Thornburgh asked you a number of questions
9  whether motorcycle riding could cause, for
10 example, bridging fibrosis, et cetera.  Now here's
11 my question, can physical activities of a patient
12 cause a mesh to be displaced?
13     MR. THORNBURGH:  Objection.
14     THE DEPONENT:  Now we're talking what's
15 the mechanism of mesh displacement and migration.
16 Can physical activities contribute to that
17 process?  Possible.  But I think the main question
18 is, if it can.  So if physical activities
19 contribute to mesh displacement, then the mesh
20 design would limit physical activities.
21     BY MR. COMBS:
22     Q.  Are you going to offer any opinion
23 at the trial of this case as to whether physical
24 activities of a patient can or cannot cause mesh

Page 100

1  to become displaced from its implantations.
2      A.  I didn't bring it up.  I'm not going
3  to talk about physical activities.
4      Q.  Okay.  No more questions from me.
5      ---  Whereupon the examination was
6  completed at 7:52 p.m.

Page 101

1              REPORTER'S CERTIFICATE
2
3          I, HELEN MARTINEAU, CSR, Certified
4  Shorthand Reporter, certify;
5          That the foregoing proceedings were
6  taken before me at the time and place therein set
7  forth at which time the witness was put under oath
8  by me;
9          That the testimony of the witness and
10 all objections made at the time of the examination
11 were recorded stenographically by me and were
12 thereafter transcribed;
13         That the foregoing is a true and
14 accurate transcript of my shorthand notes so
15 taken.
16
17
18         _____
19         PER:  HELEN MARTINEAU
20         CERTIFIED SHORTHAND REPORTER.
21
22
23
24

26 (Pages 98 to 101)

cd35b5f9-af98-4695-b521-3725ffab88fb

Vladimir Iakovlev, M.D.

| | |
|---|---|
| Page 102 | Page 104 |

**Page 102**

```
1        - - - - - -
         E R R A T A
2        - - - - - -
3    PAGE  LINE  CHANGE
4    ____ ____ _____
5      REASON: _____
6    ____ ____ _____
7      REASON: _____
8    ____ ____ _____
9      REASON: _____
10   ____ ____ _____
11     REASON: _____
12   ____ ____ _____
13     REASON: _____
14   ____ ____ _____
15     REASON: _____
16   ____ ____ _____
17     REASON: _____
18   ____ ____ _____
19     REASON: _____
20   ____ ____ _____
21     REASON: _____
22   ____ ____ _____
23     REASON: _____
24   ____ ____ _____
```

**Page 104**

```
1        LAWYER'S NOTES
2    PAGE  LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
```

**Page 103**

```
1        ACKNOWLEDGMENT OF DEPONENT
2          I,_____, do
3    hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7
     _____
8    VLADIMIR IAKOVLEV, MD      DATE
9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

cd35b5f9-af98-4695-b521-3725ffab88fb