# EXHIBIT W

Vladimir Iakovlev, M.D.

Page 1

IN RE: PELVIC MESH LITIGATION      PHILADELPHIA COUNTY

----------------------------X      COURT OF COMMON PLEAS

Sharon Carlino and          :      TRIAL DIVISION - CIVIL

Charles Carlino,            :

            Plaintiffs,  :      JUNE TERM 2013

V.                          :

Ethicon, Inc., et al.,      :      No. 3470

           Defendants.  :

----------------------------X




Toronto, Ontario, Canada

Thursday, November 5, 2015



Deposition of VLADIMIR IAKOVLEV,

M.D., a witness herein, called for examination

by counsel for the Defense, in the above-mentioned

matter, the witness having been duly sworn, taken

at the Shangri-La Hotel, 188 University Avenue,

Toronto, Ontario, Canada commencing at 9:20 a.m.

on November 5, 2015, and the proceedings taken

by JUDITH M. CAPUTO, RPR, CSR, CRR.

Vladimir Iakovlev, M.D.

| Page 2 |
|---|

1       A P P E A R A N C E S :

2

3       On Behalf of the Plaintiff:

4       CHRISTOPHER J. ZIMMERMAN, Esquire

5       Anderson Law Offices, LLC

6       1360 West 9th Street, Suite 215

7       Cleveland, Ohio 44113

8       216.456.8870

9       christopher@andersonlawoffices.net

10

11      MICHAEL A. TRUNK, Esquire

12      Kline & Specter, P.C.

13      1525 Locust Street

14      Philadelphia, Pennsylvania 19102

15      215.772.1374

16      michael.trunk@klinespecter.com

17

18      On Behalf of the Defendants:

19      PHILIP J. COMBS, Esquire

20      Thomas, Combs & Spann, PLLC

21      300 Summers Street, Suite 1380

22      Charleston, West Virginia 25301

23      304.414.1805

24      pcombs@tcspllc.com

| Page 3 |
|---|

1       A P P E A R A N C E S :

2

3       On Behalf of the Defendants (cont'd):

4

5       M. ANDREW SNOWDEN, Esquire

6       Butler Snow, LLP

7       The Pinnacle at Symphony Place

8       150 3rd Avenue South, Suite 1600

9       Nashville, Tennessee 37201

10      615.651.6700

11      andy.snowden@butlersnow.com

12

13

14

15

16

17

18

19

20

21

22

23

24

| Page 4 |
|---|

1       I N D E X

2

3       WITNESS:   VLADIMIR IAKOVLEV

4                          PAGE

5       DIRECT EXAMINATION BY MR. COMBS.................6

6

7

8

9

10

11              INDEX OF EXHIBITS

12

13      NUMBER/DESCRIPTION               PAGE NO.

14      NO. 1:  First Amended Notice of Intention to      6

15      take the Oral Deposition of Vladimir Iakovlev.      6

16      NO. 2:  Flash Drive Containing Reliance Documents.

17      NO. 3:  Expert Report of Dr. Vladimir Iakovlev.      44

18      NO. 4:  Illustration of a Female Urogenital      53

19      Organs Post-Hysterectomy.

20      NO. 5:  Medical Record dated April 26, 2011 by      58

21      Ellen Conner, M.D., Bates No. CARLINOS_MOG_MDR00556.

22      NO. 6:  Operative report for Sharon Carlino dated      74

23      August 18, 2005 by Andrew Blechman, M.D.,

24      Bates No. CARLINOS_JSUMC_MDR0052 - MDR0054.

| Page 5 |
|---|

1              INDEX OF EXHIBITS

2                (CONTINUED)

3       NUMBER/DESCRIPTION               PAGE NO.

4       NO. 7:  Operative report for Sharon Carlino      77

5       dated November 26, 2007, by Dr. Blechman, M.D.,

6       Bates No. CARLINOS_JSUMC_MDR00125 - MDR00126.

7       NO. 8:  Pathology Report dated March 3, 2006, by      93

8       Dr. Govil, Bates No. CARLINOS_JESUMC_PAT00766 -

9       PAT00767.

10      NO. 9:  Chain of Custody Form dated      97

11      October 8, 2015.

12      NO. 10:  Operative Report dated December 17,      132

13      2010, by Ellen Conner, M.D., Bates No.

14      CARLINOS_JSUMC_MDR00151 - MDR00152.

15      NO. 11:  Diagram of the Female Genitalia.      194

16

17

18

19

20

21

22

23

24

2 (Pages 2 to 5)

Vladimir Iakovlev, M.D.

Page 6

1    -- Upon commencing at 9:20 a.m.
2
3            EXHIBIT NO. 1:  Amended Notice of
4        Deposition of Vladimir Iakovlev, M.D.
5        EXHIBIT NO. 2:  Flash Drive Containing
6        Reliance Documents.
7
8            VLADIMIR IAKOVLEV,
9    having been duly affirmed, testified on his oath as
10   follows:
11           DIRECT EXAMINATION BY MR. COMBS:
12       Q.  Dr. Iakovlev, my name is Thomas
13   Combs.  I am here to take your deposition today in
14   the Carlino case.  It's my understanding you
15   brought your reliance materials?
16       A.  Yes, I brought case-specific
17   reliance materials.
18       Q.  Okay.  And that's on the thumb
19   drive that we've marked as Exhibit 2?
20       A.  Yes.
21       Q.  All right.  And who retained you
22   in this case?
23       A.  My first contact was with Anderson Law.
24       Q.  And when did that occur?

Page 7

1        A.  Sometime earlier this year.
2        Q.  Sometime in 2015?
3        A.  Yes.
4        Q.  Will there be anything on the
5    thumb drive that will tell us when that occurred?
6        A.  There will be chain of custody; it
7    will show when I received the specimen.
8        Q.  And right before the deposition
9    started, Mr. Zimmerman told me that you haven't
10   billed anything in the Carlino case; is that right?
11       A.  No.
12       Q.  So would you be able to estimate
13   for us how much time you spent on the Carlino case?
14       A.  Roughly, one expert report takes
15   about 20 hours, average.
16       Q.  So something in the neighborhood
17   of 20 hours?
18       A.  Yes.
19       Q.  I understand it could be more, it
20   could be less, but in that ballpark?
21       A.  Yup.
22       Q.  Your role in this case is solely
23   as an expert witness; is that correct?
24       A.  Yes.

Page 8

1        Q.  Okay.  I mean, for example, you
2    have played no role in providing treatment to
3    Ms. Carlino?
4        A.  No.
5        Q.  And do you know who her current
6    treating physicians are?
7        A.  Current, or who was in the
8    records?  I mean, the only information I had about
9    her treatment care was what was in the records.
10       Q.  Okay.  And when you say "in the
11   records", what records?
12       A.  They are provided in the folder.
13   There is specific folder, medical records I
14   received, I reviewed.
15       Q.  Okay.  And on the reliance list,
16   the only medical records are Item 601 which says,
17   "Jersey Shore University Medical Center"?
18       A.  It's an umbrella term.  But if you
19   want to know exactly what medical records are
20   reviewed, you would go to that folder and see.  I
21   review all records I receive in terms of that.
22       Q.  So if there are other records on a
23   thumb drive, those would be records that are not on
24   the reliance list?

Page 9

1        A.  Well, again, see, if you have
2    records at one institution, they can go from one
3    time point to another.  So I might have received
4    only one portion.  Or I received extra records
5    which are going under the umbrella.
6            So as I said, I mean, this would be a
7    general description.  But if you want to know
8    exactly what medical records I could review, and I
9    reviewed, I would need to go to the folder.
10       Q.  Okay.  As we sit here right now,
11   do you remember what you reviewed?
12       A.  No.  It's not a memory test, I can
13   check.
14       Q.  No, it's not a memory test.  But
15   you know, I mean, all I have was your report and it
16   has "Item 601, Jersey Shore University Medical
17   Center Records".  And so I'm asking you about what
18   the records are that you reviewed.
19           So whatever records you had in this
20   case were on the thumb drive?
21       A.  Yes.
22       Q.  Is the report that you provided us
23   dated August 28th, 2015, is that your complete
24   opinion in this case?

3 (Pages 6 to 9)

Vladimir Iakovlev, M.D.

Page 10

1        A.  Yes.  At that date, I completed
2    the report.  So I didn't receive anything
3    additional to supplement or extend.
4        Q.  Thank you.  Maybe I didn't ask the
5    question very well.  But that's what I wanted to
6    make sure.  That, basically, this is the final
7    report in this case; there is no supplemental
8    report?
9        A.  Yes.  At this stage, yes.
10       Q.  And so are all of the opinions
11   that you plan to offer at the Carlino trial,
12   contained within this report?
13       A.  Unless I receive new material.
14       Q.  And at this time, you're not aware
15   of any new material that you would be receiving?
16       A.  Not yet.
17       Q.  Dr. Iakovlev, I want to put
18   something on the record, because I didn't
19   understand it.
20       I thought that this thumb drive that
21   you gave us was just your reliance materials for
22   the Carlino case; and that's not correct, is it?
23       A.  No.  That's for the whole date.
24       Q.  Okay, thank you.  Let me just put

Page 11

1    it on the record, so it's clear.
2        MR. COMBS:  The thumb drive that
3    Dr. Iakovlev provided to us that we've marked as
4    Carlino Exhibit 2, we're also going to mark as
5    Ramirez Exhibit 2, and I didn't understand that
6    until it was pulled up.
7        BY MR. COMBS:
8        Q.  Okay.  And, obviously, I'll be
9    asking you about the Ramirez materials in a
10   different deposition that is going to occur.
11       So the record is clear, everything that
12   you had that you're relying on in both the Carlino
13   and the Ramirez case, that you brought to the
14   case-specific deposition is contained in this thumb
15   drive?
16       A.  That is correct.
17       Q.  Okay, thank you.
18       Dr. Iakovlev, attached to the report
19   that you provided on August 28, 2015, was a copy of
20   your CV.  And I see that on the thumb drive there
21   is a different CV dated November 3rd, 2015.
22       Would you be able to summarize for me
23   what the changes are to the CV?
24       A.  Mostly publications.

Page 12

1    Publications, presentations.
2        Q.  Any change in your employment status?
3        A.  No.
4        Q.  You're at St. Michael's, right?
5        A.  Yes.
6        Q.  And what is your position?
7        A.  Director of cytopathology and
8    pathologist.
9        Q.  All right.  And you're also at --
10   are you an assistant professor at the University of
11   Toronto?
12       A.  Yes, I am.
13       Q.  And when did you become an
14   assistant professor?
15       A.  About five years ago.  Five or
16   less, I don't remember now.
17       Q.  All right.  The CV says 2008 to
18   present; is that roughly correct?
19       A.  Probably.
20       Q.  Okay.  Dr. Iakovlev, I'm looking
21   at the directory from the thumb drive that you
22   brought, and it's got three groups of materials.
23   It's got your chain of custody form; it's got a
24   group of medical records; and then it has a CV on

Page 13

1    it.
2        A.  No.  The thumb drive contains two
3    folders, case-specific information for Carlino, for
4    Ramirez.  And then separately there is CV, because
5    CV is common for both.
6        And when you open separate folders,
7    there will be case-specific information what I have
8    for that specific case.
9        Q.  And again, I just didn't ask that
10   very well.
11       We've got the folders out, and so we've
12   got -- we've got the chain of custody form, we've
13   got the grouping of medical records, and then we've
14   got the CV.
15       And is that the total of the case-specific
16   informations for Carlino?
17       A.  It is a weird way of --
18       Q.  It looks different on a PC.
19       A.  -- it's not Explorer.
20       So how it's grouped, there are two
21   folders, and CV is separate.
22       Q.  Sure.  But let's go back to the
23   Carlino folder.
24       A.  When we go back to each case

4 (Pages 10 to 13)

Vladimir Iakovlev, M.D.

Page 14

1    specific, there will be a folder for medical
2    records.  And there will be separate files for
3    chain of custody forms and billing, if I have
4    billing.
5         Q.  Okay.  Thank you.
6         That's what I was trying to establish.
7    In the case-specific materials in the Carlino case
8    include the chain of custody form and the medical
9    records?
10        A.  That's correct.
11        Q.  Not anything else?
12        A.  That's correct.
13        Q.  Are there any notes that you made
14   regarding work that you did on the Carlino case
15   that are not contained in the report or the thumb
16   drive that you brought today?
17        A.  I don't make any hand notes.
18        Q.  So during the examination that you
19   did of this specimen or the slides, there would be
20   no notes reflecting that?
21        A.  There is a pathology report.
22   Sorry, I didn't include it.  I can provide it to
23   you later on, or it might be already in the
24   folders.

Page 15

1         Q.  Okay.  So in addition to the two
2    things on the thumb drive, the third group of
3    materials that you would have for case-specific for
4    Carlino, would be a pathology report that you
5    prepared?
6         A.  That's correct.
7         Q.  Okay.  Anything else?
8         A.  No.
9         MR. COMBS:  Do you have the
10   St. Michael's pathology report?
11        MR. ZIMMERMAN:  No.
12        BY MR. COMBS:
13        Q.  Oh, okay.
14        A.  This is more of hand notes,
15   whatever you call it, but it's not hand note.
16        Q.  Is that what you're referring to?
17        A.  Yes.
18        Q.  All right.  We do have it.  So
19   it's an exhibit to your report.
20        I was not understanding exactly what
21   were you referring to, but thank you.  So we do
22   have that.
23        Anything else?  Any other Carlino
24   case-specific materials?

Page 16

1         A.  No.
2         Q.  Do you have any photographs that
3    are not contained in the report?
4         A.  No.
5         Q.  Are there slides that you prepared
6    that you did not photograph for the report?
7         A.  I take photographs from specific
8    areas, most representative.  But I think in this
9    case I sent all slides to you.  There's a chain of
10   custody form which describes what I send back.
11        Q.  So would there be slides that are
12   not photographed and contained within your report?
13        A.  How do you mean?  Photographs in
14   the report are already there.  So some additional
15   slides which I kept at St. Michael's Hospital and
16   didn't send to you?  I don't understand the
17   question.
18        Q.  All right.  In your report you
19   have photographs that are identified SC-1 through
20   SC-18?
21        A.  Yes.
22        Q.  Now my question is:  Do you have
23   photographs of all of the slides contained within
24   SC-1 through SC-18?

Page 17

1         A.  No, these are all the photographs
2    I have.  I prepared these photographs.
3         Q.  Okay.  So some of the slides that
4    you reviewed for Ms. Carlino's specimen, are not
5    photographed and --
6         A.  Could, could have not.  I don't
7    remember now.
8         Probably I took at least one image from
9    each slide.  But again, I don't remember now.
10        Q.  As we sit here today, you don't
11   remember whether you have a photograph from each of
12   the Carlino slides?
13        A.  No, I don't remember.  I take only
14   photographs to demonstrate features.
15        Q.  And what does that mean?  What
16   does it mean that you take photographs only to
17   demonstrate features?
18        A.  It means that I use photographs to
19   demonstrate pathological findings.  It's not a
20   documentation, it's illustration.
21        Q.  What does that mean?
22        A.  Illustrate pathological findings.
23   When I do assessment, I assess slides in the
24   microscope with my eyes.  And then when I prepare

Vladimir Iakovlev, M.D.

Page 18

1    the report, then I take photographs just
2    specifically for that report.
3         Normal pathology, we don't take
4    photographs.  We just provide assessment using
5    microscope.
6         Q.  And when you say "normal
7    pathology", do you mean, for example, the pathology
8    that you would do at St. Michael's?
9         A.  Yes.  So when I was preparing the
10   surgical pathology report, which you have, I wasn't
11   taking any photographs.  I was just looking at the
12   specimen, in the microscope, and generating report
13   normally, as I would normally do for any sample.
14        But because I was asked to also prepare
15   an expert report, so I needed to provide a larger
16   sort of document with illustrations.  That's why I
17   took photographs.
18        Q.  So when you're doing your work at
19   St. Michael's, you would have a pathology report
20   that would be one, or maybe one or two pages long,
21   and that would contain your findings for that case;
22   is that correct?
23        A.  That's correct.
24        Q.  And when you're doing the expert

Page 19

1    report, you would have things in addition to the
2    materials that you would have when you're preparing
3    a pathological report at St. Michael's?
4         A.  It's not additional material; it
5    would be additional description.  Description is
6    much longer with illustrations.
7         Q.  When you were talking about the
8    photographs that you have in your report, what's
9    the criteria that you use to decide to make a
10   photograph of a particular slide?
11        A.  When I make assessment, I see a
12   specific pathological feature, and then I find an
13   area which is most representative of that feature,
14   and I take a photograph to demonstrate it for a
15   non-pathologist.
16        Q.  And you say that there's a
17   photograph taken that is most representative of
18   that feature; what does that mean?
19        A.  Not just most representative,
20   sometimes it's easy to explain using it.
21        So it may not be most representative
22   for a pathologist, but it would be most useful for
23   a non-pathologist.  So there are different
24   criteria.  But I use it more, as I said, as an

Page 20

1    illustration to explain, to show the feature to a
2    non-pathologist.  Because this expert report is
3    aimed at non-pathologists.
4         Q.  So for example, SC- 1 and SC-2,
5    you call out that you're describing the scar
6    bridging, fibrous scar bridging.
7         Would those two photographs be the best
8    example that you found in the Carlino pathology of
9    scar bridging?
10        A.  Not necessarily best example.
11   There might be different areas.  I mean, the whole
12   thing might be good example.
13        Sometime you just take first available
14   area; it depends on the feature.  And some features
15   are focal, some features are diffused.
16        Q.  I couldn't hear you.
17        A.  Some features are focal; some
18   features are diffused.
19        Something like bridges, bridging
20   fibrosis is diffused.  I can take picture of any
21   part of the mesh and can demonstrate it.
22        But for something like nerve ingrowth
23   or neural ganglia, or something else, it would be
24   focal.  So I would have to search for it, it

Page 21

1    depends on the feature.
2         Q.  And so, for example, the two
3    photographs that you selected for fibrous scar
4    bridging, those would be -- did you pick those two
5    slides to depict that feature?
6         A.  Yes.
7         Q.  All right.  And for SC-4 and 5,
8    where you're discussing foreign body reaction, you
9    picked those two slides to discuss foreign body
10   reaction?
11        A.  With foreign body, I mean, if you
12   flip to the initial -- one more page.  The very
13   first photograph.
14        You see it was foreign body, pretty
15   much I can take picture of any of those fibers and
16   there will be foreign bodies.  I don't have to
17   choose.
18        Sometimes I do have to, because of the
19   artifacts, some sections don't come out flat.  So I
20   have to pick, for technical reasons, rather than
21   for pathological reasons.  So it's a combination of
22   factors.  Because picture need to be sort of
23   visually understandable for a non-pathologist, as I
24   said, if there are too many artifacts or something

Vladimir Iakovlev, M.D.

Page 22

1    else.
2         Q.  In the photographs you have in
3    your report where you go through scar bridging,
4    foreign body reaction, are those photographs the
5    best examples that you had of that phenomena?
6         MR. ZIMMERMAN:  Objection, asked and
7    answered.
8         THE WITNESS:  Not necessarily best
9    examples.  As I said, I mean, sometimes they are
10   just showing well enough for a non-pathologist.  I
11   am more concerned explaining things rather than
12   finding the best example.
13        BY MR. COMBS:
14        Q.  Is there any criteria that you can
15   point to about why you selected these slides to
16   photograph?
17        A.  Just to show us what feature I
18   observed.  As I said, with bridging fibrosis, I can
19   take pictures of any part of the mesh.
20        If we go back to the pathology report
21   it will give you percentage of pores which are
22   bridged.  In this case, it is 100 percent.
23        So any part of the mesh would show
24   bridging fibers.  So there was no selection; I

Page 23

1    probably just took the first available few.
2         Q.  So these would just be the first
3    two available slides that you looked at?
4         A.  Yeah.
5         Q.  For the slide three, where you say
6    "the curled portion", why did you pick that slide?
7         A.  That's a specific feature, it was
8    a focal.  You get some areas which are flat, some
9    areas which are twisted or deformed somehow.
10        So then I would have to look for it.
11   And if it's there, then I take picture of it.  It's
12   a focal feature.
13        Q.  If there were any other areas of
14   curled portion of the mesh, would you have taken a
15   picture of that as well?
16        A.  No.  We cannot squeeze 50
17   photographs in one report.  I would just take the
18   most representative, or the most illustrative for a
19   non-pathologist.
20        Q.  Okay.  And what's the criteria
21   that you use in deciding what's the most
22   illustrative?  Is it just what you like the best?
23        A.  Pretty much.  I look at it, and
24   think:  Would the non-pathologist understand it?

Page 24

1    That's how I pick them.
2         Q.  And --
3         A.  Images are just illustrations, as
4    I said.  I mean, I'm not taking them as
5    documentation or evidence.
6         Q.  I couldn't hear you.
7         A.  I'm not taking images as
8    documentation or evidence.  I'm taking them to
9    illustrate the features.
10        Q.  For your notice of deposition, we
11   have Schedule A.  And the Schedule A has 30 categories
12   of documents.
13        Is everything that you had in your
14   possession that is responsive to the Schedule A
15   contained on the thumb drive?
16        A.  Case-specific.
17        Q.  Yes.
18        A.  There wasn't anything of my
19   general opinions.
20        Q.  Okay.  So anything you had that is
21   case-specific for Ms. Carlino is included on the
22   thumb drive that we've marked as Carlino Exhibit 2?
23        A.  Either it was provided to you
24   before, or is included on the thumb drive.  Like

Page 25

1    report was provided to you, so I didn't copy it on
2    the thumb drive.
3         Q.  Okay.  So we've got the report,
4    we've got the materials on the thumb drive; we've
5    got the pathology that got left off the thumb
6    drive; anything else?
7         A.  No.
8         Q.  Okay.  So, if there is any -- if
9    we went through -- Dr. Iakovlev, all I'm trying to
10   do is not go through 30 of these categories.
11        So if you had anything responsive to
12   any of the 30 categories, it's either -- it's the
13   report, or it's the materials on the thumb drive
14   Exhibit 2 for a case-specific report.
15        A.  Yes, for the case-specific
16   reports, everything I had is either in the
17   documents you were provided before, as pathology
18   report and expert report, or on the thumb drive;
19   there is nothing else.
20        Q.  Okay.  Thank you.
21        A.  Or you received the slides.
22   That's another category of items.
23        Q.  Okay.  Dr. Iakovlev, we last took
24   your deposition on September 11, 2015.  My partner

7 (Pages 22 to 25)

Vladimir Iakovlev, M.D.

Page 26

1    David Thomas took it in the Mullins case.
2            Have you published any literature since
3    September 11, 2015?
4            A.  There were two abstracts published
5    in Canadian Journal of Surgery; they are in my CV.
6            Q.  So the journal, the abstracts were
7    published in, was Canadian Journal of Surgery?
8            A.  Yes.
9            Q.  They're listed on your CV?
10           A.  Yes, they are.
11           Q.  Can you just very briefly tell us
12   what those publications involved.
13           A.  One was similar to the degradation
14   paper.  I had to submit an abstract to present it
15   at the meetings, so it was just an outline of the
16   degradation paper.
17           And the second one was describing
18   migration of the mesh for hernia applications.  The
19   meeting was all for general surgeons and it was --
20   both were presented at the Canadian Hernia Society
21   section of the meeting.
22           Q.  Has that occurred yet?
23           A.  Yes.
24           Q.  When did that occur?

Page 27

1            A.  In September.
2            I also presented at the Bard de Vols
3    (ph) Annual Conference in Berlin, they invited me
4    to give a talk.  But that presentation didn't have
5    an abstract, it was an invited lecture.
6            Q.  Is that at Bardebolton (ph)?
7            A.  Bard de Vols.
8            Q.  Have you conducted any new
9    scientific testing since September 11, 2015?
10           A.  You mean research testing?
11           Q.  Yes.
12           A.  I mean, I have ongoing projects.
13           Q.  Okay.  Anything new since your
14   deposition was taken in September 11, 2015?
15           A.  No, nothing is finalized.
16           Q.  Okay.
17           A.  In terms of no new conclusions or
18   no new results.
19           Q.  Okay.  Thank you.  I just want to
20   make sure that I can rely on any testing that
21   you're going to testify about in the Carlino case.
22   I just want to make sure that we have had the
23   opportunity to depose you on that.
24           So no new conclusions or results from

Page 28

1    any testing since your deposition in September of
2    2015?
3            A.  That's correct.
4            Q.  When I looked through your
5    reliance list, the only deposition that I saw was
6    Dr. Barbolt's deposition from Ethicon.  Am I
7    correct that you have no depositions that are
8    related to case-specific issues in the Carlino
9    case?
10           A.  That is correct.  I almost never
11   review deposition records, rarely, when I have
12   really specific question.
13           Q.  And for the Carlino case, there
14   were no depositions that you reviewed?
15           A.  That's correct.
16           Q.  I realize that they're on the
17   flash drive, but since we don't have a hardcopy of
18   the flash drive, I just want to make sure that I
19   understand.  Would all of the records that you
20   reviewed in the Carlino case be on that flash
21   drive?
22           A.  You mean medical records?
23           Q.  Yes, sir.  Case-specific medical
24   records?

Page 29

1            A.  That is correct.
2            Q.  So whatever you reviewed, it's the
3    folder that says "medical records" on the Carlino
4    matter?
5            A.  That is correct.
6            Q.  Since your deposition in September
7    of 2015, have you changed your methodology in any
8    way regarding the collecting of samples or staining
9    of slides?
10           A.  No.  It's standard diagnostic
11   protocol of an accredited lab and I don't change
12   it.
13           (Reporter sought clarification).
14           A.  It's a standard protocol for
15   diagnostic, accredited diagnostic lab.
16           Q.  When you say "accredited lab", is
17   that a CLIA certified lab?
18           A.  We have several certifications
19   because, I mean, there is an overlap between the
20   U.S. and Canadian systems.
21           And primarily, we need to respond to a
22   Canadian certification.  I think it is, but I'm not
23   sure, I don't remember now.
24           One day I think I brought it for the

8 (Pages 26 to 29)

Vladimir Iakovlev, M.D.

Page 30

1    deposition, all of the certifications and
2    clearance, but now I don't remember.
3            We are for sure certified by the
4    Ontario QNPLS.
5            Q.  Sorry, the Ontario --
6            A.  QNPLS and ISO, that's for sure.
7    Because we just have it like a week ago.  But the
8    rest of the accreditations, I don't remember.
9            Q.  Was the lab previously certified
10   by ISO?
11           A.  Of course.
12           Q.  Dr. Iakovlev, have you had any
13   communications with other expert witnesses in the
14   Carlino case?
15           A.  No.
16           Q.  About Carlino?
17           A.  No.
18           Q.  So no conversations with any of
19   the plaintiffs' other expert witnesses?
20           A.  No.
21           Q.  Any material from those witnesses
22   that you're relying on?
23           A.  No, just medical records.  If you
24   think about material, that can be classified as

Page 31

1    material.
2            Q.  Okay.  And what I'm talking about
3    are expert reports, expert opinions, or expert
4    depositions from the plaintiffs' experts in
5    Carlino.
6            Have you relied for any aspect of your
7    testimony, on any other expert witnesses?
8            A.  No, I didn't receive anything, I
9    didn't ask for anything.
10           Q.  Have you reviewed any materials
11   from the defense expert witnesses in Carlino?
12           A.  No.
13           Q.  Dr. Iakovlev, I wanted to ask you
14   some questions about your process for the
15   clinicopathological correlation that you have set
16   forth at page 86 of your report.
17           And in it you've got three criteria.
18   The first:
19               "Clinical records were screened
20               for events and symptoms with
21               temporal relationships to meet
22               placement alteration or excision."
23           [as read]
24           And then you have two more bullet

Page 32

1    points, I won't read them.  But I wanted to ask you
2    about those three.  Where did those criteria come
3    from?
4            A.  That's how I approach them.  I
5    just put it in bullet format.  That's usually what
6    we do as pathologists, because when you receive a
7    specimen, we try to understand what's going on, and
8    interpret the findings in view of the clinical
9    information.
10           Sometimes it's straightforward, there
11   is not much to explore; and sometimes it's
12   complicated, so you have to go further back 15,
13   20 years to figure out what was happening at that
14   time.  But that's a general approach for
15   pathologists when they work-up their cases.
16           Q.  Can you refer me to any published
17   source that sets forth this criteria?
18           A.  No.  This was formulated
19   specifically for non-pathologists, just to explain
20   how pathologists function.  I mean, it's not a
21   formal sort of protocol for pathologists.
22           Q.  All right.  And I misunderstood
23   what you were explaining to me.
24           This criteria that you set forth on

Page 33

1    page 86 of the Carlino report, that's a criteria
2    that you used, that you've used -- strike that.
3            The criteria that you set forth on
4    page 86 of the Carlino report, that's the criteria
5    you've used when making your clinicopathological
6    correlation for expert reports?
7            A.  Yes and no.  As I said, the
8    criteria, or the way pathologists function is
9    independent for medical-legal work.  We review
10   histories, we try to understand what's going on and
11   we interpret our findings in view of the history,
12   and views, and knowledge.
13           But to make it more understandable for
14   non-pathologists who would be reading the expert
15   report, I put it in the bullet format.
16           Q.  Okay.  And is there any published
17   source that you can refer me to, that would say,
18   these are the criteria for clinicopathological
19   correlation?
20           A.  How would it be a published source
21   because it's done just specifically to explain to
22   non-pathologists who would be reading expert
23   report.
24           It's not, it's not -- this bullet

9 (Pages 30 to 33)

Vladimir Iakovlev, M.D.

Page 34

1  format points is not formulated for pathologists.
2  It's formulated to explain the readers of this
3  expert report how pathologists would be
4  functioning.
5       Q.  Is the answer to the question, no,
6  there's no published source that would set forth
7  these criteria?
8       A.  No, I don't think there would be.
9       Well, I mean, I don't know much about
10  publications for medical-legal work for
11  pathologists.  It is unique field.
12       Q.  You're not aware of any published
13  source that would support the criteria that you set
14  forth on page 86 of your report?
15       A.  No, because I did it.  I provided
16  that bullet format.
17       Q.  And this will be a different
18  criteria than you would use when reviewing a case
19  at St. Michael's, wouldn't it?
20       A.  No, it's not a different criteria.
21  You're mixing apples and oranges.
22       I did it specifically for non-pathologists
23  to understand how pathologists function.  How
24  pathologists function is a different -- not

Page 35

1  different, but I mean, it's the same process, but
2  this comes with understanding of the medicine and
3  pathology, so during our training.  So I think
4  we're mixing things which are not -- we're trying
5  to separate things which are inseparable.
6       Q.  When you review a pathological
7  specimen for your work at St. Michael's, do you
8  review all of the clinical records of the patient?
9       A.  No.  As I said, sometimes it's
10  straightforward.  There is one question, one
11  specific question from a clinician on specific
12  site.  I need to know what site, I need to know
13  what's the clinical question.
14       Some procedures have predetermined
15  pathological questions, so it's not being repeated.
16  Like, if I do Pap smears, like I do 2 or 3 thousand
17  Pap smears a year, they don't ask the same question
18  2,000 times, so it's predetermined.
19       But for some more complex cases, there
20  will be a paragraph written on the requisition by
21  the clinician.  And if I don't have enough
22  information, I go to clinical records.
23       For some specimens, I always go to
24  medical records.  And for some specimens I have to

Page 36

1  call up the clinician and ask.  It all depends on
2  the scenario and the complexity.
3       And the main purpose of this is for me
4  to obtain enough clinical information to interpret
5  correctly pathological findings.
6       So that's why I'm telling you that when
7  I put it in bullet format, that was specifically
8  done for non-pathologists.  Because for
9  pathologists, the entire process of training
10  through medical school and pathology prepares us to
11  extract needed information in a specific case.
12       We use our judgment based on our
13  training, knowledge and experience.  There is no --
14  there wouldn't be a bullet format, there are books
15  and training, years of training, to come to this
16  understanding.
17       So I just summarized it, again, based
18  on my knowledge, experience and training, for
19  non-pathologists.
20       Q.  In the first criterion you
21  reference:
22       "Clinical records screen for
23       events and symptoms with temporal
24       relationship to mesh placement,

Page 37

1       alterations or excision".
2       What is mesh alteration?
3       A.  Cutting or transecting.  Something
4  which is not -- cannot be classified as an
5  excision.
6       Q.  So you would view clipping of mesh
7  as different from excising mesh?
8       A.  See, again, clipping, what's
9  clipping?  Sometimes they say "clip"; they just
10  make a small cut, or transect.
11       Or sometimes they do clipping, they
12  clip small fibers and then they don't submit it to
13  pathology.  Again, this is a very vague, ambiguous
14  terminology that clinicians use.
15       But if there's no specimen, probably
16  the correct term would be "transection" or
17  "alteration" in this case.
18       Q.  You say in here "temporal
19  relationship"; What is the temporal relationship
20  that you're referring to?
21       A.  So if the symptoms occur, and they
22  changed with timing, which allows or brings mesh
23  into the differential diagnosis.  Because if
24  symptoms occurred before the mesh was placed, that

10 (Pages 34 to 37)

Vladimir Iakovlev, M.D.

Page 38

1    would be impossible.
2         Or if a symptom occurred at the
3    specific time after the mesh was placed, or
4    altered, that gives you greater degree of certainty
5    that the mesh is doing something.
6         Q.  So the temporal relationship that
7    you're referring to, did that have a defined
8    component?  Is there a specific amount of time?
9         A.  No.  It depends on the feature.
10   It depends on my judgment.  If I know mechanism, a
11   pathophysiological mechanism which would connect it
12   within that specific timeframe, again, knowing
13   pathobiology, pathophysiology.
14        Q.  Is there any written source that
15   you could point us to regarding what that temporal
16   relationship would be?
17        A.  I think we're going back.  This is
18   a summary, just to put in a bullet format.  This is
19   essentially summary which pathologists gain
20   through, like, 12 years of university training.
21        Q.  Okay.  My question is, is there
22   any written source you could refer me to that could
23   explain what you're using as the temporal
24   relationship in Criteria 1 --

Page 39

1         A.  It's my judgment.  If I see,
2    assuming -- if we're talking about scar
3    contraction, I cannot time it to immediate
4    postoperative period.
5         If there is tension in the mesh within
6    first week after surgery, I cannot attribute it to
7    scar contraction; that's a temporal relationship.
8    Because scar contraction starts later, that's an
9    example.
10        Q.  So no written source that you can
11   provide us?
12        A.  No, this is not correct.  Written
13   sources are understanding of pathophysiology and
14   pathology.  So temporal relationship is determined
15   by pathologist, or by clinician.
16        Q.  Okay.  I just --
17        A.  I just don't understand why would
18   you expect for each feature to be published as a
19   temporal relationship, assuming if someone is
20   performing the surgery?
21        We know that scarring occurs at
22   specific time point, or there could be
23   postoperative infection at specific time points.
24   These are all temporal relationships based on the

Page 40

1    understanding of pathobiology.
2         Q.  Here is my question.  If there is
3    any written source that you're relying on for
4    Criteria 1 in the Carlino report, just tell me what
5    it is.
6         A.  For each specific feature, there
7    would be a written source.  Like I said, I gave you
8    an example for scar contraction.  There are papers
9    which show when the scar contraction occurs and so
10   forth.
11        So you would have to go out for each
12   specific feature and then find the source,
13   published source for temporal relationship.
14        Q.  Okay.  So for scar contraction,
15   what would that temporal period be?
16        A.  There are several papers.
17        First of all, there will be papers on
18   healing, wound healing, skin wound healing.  Those
19   papers are quite old, so you probably be better
20   going to basic pathology books like Robins.
21        And then specifically for mesh scar
22   contraction, there are several papers which
23   measured it and timed it.
24        Q.  What are those papers?

Page 41

1         A.  I don't remember the authors right
2    now.  They're in my reliance list somewhere.
3         Q.  If you reviewed the reliance list,
4    would you be able to tell me what papers you're --
5         A.  That would be hard.  It's a long
6    list, I would probably pick it out, but it may take
7    long time.
8         Q.  So for mesh contraction, can you
9    tell me what papers you rely on to set your
10   temporal relationship?
11        A.  I would have to go to my review
12   papers and see what I reference in my review papers
13   and then it will be easier this way.
14        Because, I mean, I cannot remember
15   possibly all authors.  There are, like, 400 or 500
16   papers I have read since I started my research in
17   this.
18        Q.  What is the --
19        A.  -- there are some key papers which
20   I remember, but --
21        Q.  What are the key papers?
22        A.  Mostly from Kosterhaliften and
23   Klinge and my own.
24        Q.  I couldn't hear you.

11 (Pages 38 to 41)

Vladimir Iakovlev, M.D.

Page 42

1     A.  Kosterhaliften and Klinge and my
2  own, because these are focused on pathological
3  changes.
4     Q.  What are the temporal periods
5  regarding mesh contraction that you rely on?
6     A.  So when early granulation tissue
7  fills the spaces, it cannot contract yet.  The
8  first myofibroblasts appear sometime around week
9  five.
10     So starting from week five, depending
11  on tissue healing, there will be several stages for
12  scar contraction.  Myofibroblasts can contract,
13  reduction of extra cellular fluid will contract the
14  tissue.  And a remodeling of scar tissue,
15  reconfiguration also contracts.  So there will be a
16  more rapid contraction within three months
17  postoperative.  Again, it's variable between
18  people.  And then there will be slower phase later
19  on.
20     Q.  Okay.  Let me make sure that I
21  understand that.  Around week five is the beginning
22  of scar contraction.  You then have rapid
23  contraction at three months; and then after that
24  you have additional contraction?  Is that your --

Page 43

1     A.  Mostly.  Mostly it will occur in
2  most people around three months.  But it is very
3  variable.  And then depending on repetition,
4  because if the injury repeats, the cycle sets
5  again.
6     So the scar, new scar will be put down
7  and then contraction will continue on.  So it will
8  be slower.
9     So in most people, in most scenarios,
10  the largest part of the contraction will occur
11  around three months.  Again, it's very variable.
12     Q.  And what's the source that you
13  rely on that most people will have scar contraction
14  in three months?
15     A.  In mesh?  There was a paper, They
16  actually measured it.  They showed perfectly when
17  it peaks at three months.
18     Q.  Okay.  And what is that paper?
19     A.  Again, I'd have to search it,
20  You'd have to give me the time.
21     No, we'd have to search for the paper
22  itself.  I'd have to see the paper itself, not just
23  a heading.
24     Q.  Okay.  Well, let's go ahead and

Page 44

1  mark this as Exhibit 3.
2     EXHIBIT NO. 3:  Expert Report of
3     Dr. Vladimir Iakovlev.
4     THE WITNESS:  So on the record, if you
5  want me, I can do it after the deposition.  I would
6  have to open the papers, because they're in
7  specific folders, they're in my office.  Then I
8  will find the paper where it showed the peak.
9     BY MR. COMBS:
10     Q.  Okay.  So after the deposition,
11  would you just tell Mr. Zimmerman what paper you
12  were relying on for the three-month peak?
13     A.  Yes, I will.
14     Q.  Okay, thank you.
15     And do you remember, is that a pelvic
16  mesh paper or a hernia mesh paper?
17     A.  I don't remember now exactly what
18  it was.
19     It doesn't matter.  The mechanisms
20  behind it are not related to anatomical site; they
21  are related to general healing mechanisms in the
22  body.
23     Q.  And does the paper that you're
24  thinking about refer to contraction of mesh

Page 45

1  implanted for stress urinary incontinence?
2     A.  I think we are going into general
3  opinions now, not case-specific.
4     Q.  Okay.  What's the answer?
5     A.  As I said, mesh contraction is not
6  specific for anatomical site; it is driven --
7     Q.  I just couldn't hear you -- you
8  started talking quickly, I'm sorry.
9     A.  Mesh contraction is not specific
10  for an anatomical site.  It's driven by general
11  mechanisms of wound and tissue healing in the body.
12     So if you want to separate it, it will
13  be an artificial separation.  But I think we are
14  moving into general opinions.  We are moving away
15  from case-specific questions.
16     Q.  Okay.  And so is the paper that
17  you're relying on, for the temporal relationship
18  for pelvic mesh that you're talking about in
19  Criteria 1 in your clinicopathological correlation,
20  is that a paper that relates to stress urinary
21  incontinence mesh?
22     A.  So, again, I think we're
23  dissecting it in the wrong angle.  Each specific
24  feature, you will have timing based on pathobiology

12 (Pages 42 to 45)

Vladimir Iakovlev, M.D.

Page 46

1  and pathophysiology.
2        So we would have to go to each specific
3  feature and then you would have to ask me for, for
4  paper, published paper, for that specific feature.
5  And then we would have to go through the same
6  exercise again, and again, for each specific
7  feature.  But I think we are moving into general
8  opinions.
9        Q.  Well, I just want to know for this
10  Criteria 1 here:
11            "Clinical records were screened
12            for events and symptoms with
13            temporal relationship to mesh
14            placement, alteration or excision."
15  And I've asked you about contraction.
16        A.  Yes.
17        Q.  And so for mesh contraction --
18        A.  As an example, we discussed mesh
19  contraction, and I think we can stop there.
20  Because, I mean, then we would have to go through
21  each pathological feature and find the paper which
22  was publishing the timing of that pathological
23  feature.
24        Q.  We might do that.  But here's my

Page 47

1  only question that is on the table right now is:
2  Is the paper that you're relying on that mesh
3  contraction occurs at three months --
4        A.  It's not one paper.  I said that
5  paper was showing it in meshes.  But there are
6  several papers, and several papers showing scar
7  contraction outside of mesh.
8        So I was relying on my understanding of
9  the process based on several papers.  It's not just
10  one single paper.
11        Q.  Okay, thank you.
12        And do any of those papers involve mesh
13  placed for stress urinary incontinence?
14        A.  Again, I think we're crossing sort
15  of into general opinions, but I can answer.
16        Specifically for transvaginal meshes,
17  there is more information on contraction based on
18  clinical studies rather than pathological studies.
19        So I was relying on clinical
20  descriptions of mesh contraction, when urinary
21  obstruction occurred at a specific time point.
22        Q.  Here is my question.
23        A.  So the question --
24        Q.  Do any of those studies you're

Page 48

1  relying on deal with stress urinary incontinence
2  mesh?
3        A.  Yes.  As I said, this would be
4  clinical, not pathological, but clinical.  Clinical
5  papers describing as urinary obstruction -- as a
6  complication of mesh contraction.  And those papers
7  are quite numerous.
8        Q.  All right.  In terms of pathological
9  findings, are there any path -- strike that.
10        Are there any papers that are
11  discussing the pathology of stress urinary
12  incontinence meshes that you would rely on to say
13  that mesh contraction occurs at three months?
14        A.  I would have to review papers now,
15  how much of contraction they were describing.  I
16  don't just use one paper, I read many papers and
17  then I make summary in my head to understand the
18  process.  So I'm not plucking one paper.
19        Q.  Okay.  And I'm only asking you
20  about stress urinary incontinence.  And as we sit
21  here today, can you refer me to any paper that
22  discusses pathological findings showing the
23  temporal point at which you say contraction
24  occurred regarding the stress urinary incontinence

Page 49

1  mesh?
2        A.  So since this is quite artificial
3  separation for me, I would have to review papers
4  again, and if we agree, I can do it after the
5  deposition.
6        But this would be an artificial
7  separation.  Because I do not separate meshes
8  specifically for stress urinary incontinence.  And
9  some papers they have information which is
10  applicable to many devices, to different devices.
11        Q.  Do you want to just provide that
12  to Mr. Zimmerman?
13        A.  I can do it.
14        Q.  Okay.  The second criteria that
15  you've got for symptoms or procedures were
16  anatomically related to the urogenital area and the
17  mesh.
18        Let me ask you about that.  So again,
19  any written source for that?
20        A.  Which one?  Say it again.
21        Q.  Criteria 2:
22            "Symptoms or procedures were
23            anatomically related to the
24            urogenital area and the mesh."

13 (Pages 46 to 49)

Vladimir Iakovlev, M.D.

Page 50

1      A.  This is established principle of
2  pathology, as I mentioned to you, that I need to
3  know the site of the specimen; I have to know.  I
4  have to report where it's coming from.  Each
5  pathology report contains site of procedure.
6      Q.  What do you define as the
7  "urogenital area"?
8      A.  Urogenital area?
9      Q.  Yes.
10      A.  Urogenital organs.
11      Q.  And what organs does that include
12  in your definition?
13      A.  Not my definition.
14      Q.  Okay.  Well what is it?
15      A.  Anatomically.  Vagina, cervix,
16  uterus, adnexa, bladder, ureter, kidneys.  In
17  female individuals.
18      Q.  I may not have gotten this list
19  exactly but vagina, cervix, uterus, adnexa,
20  kidneys?
21      A.  Yes.
22      Q.  Did I miss any?
23      A.  That's the general description.
24      Q.  And Carlino obviously involves an

Page 51

1  implantation of TVT.  Is it your opinion that any
2  symptoms or procedures that occur in any of those
3  urogenital organs would have bearing on the TVT?
4      A.  It may have bearing on TVT; it may
5  have bearing on her symptoms.  It depends, it
6  depends on the scenario.  Again, I think we are
7  trying to kind of dissect it, which is difficult to
8  separate.
9      Q.  When the TVT is placed, does it
10  come in contact with the cervix?
11      A.  Not if it's placed properly.
12      Q.  For example, in Ms. Carlino's
13  case, the TVT would not have come in contact with
14  her cervix?
15      A.  No, it shouldn't.
16      Q.  Same question for uterus.
17      A.  Again, if it's placed properly,
18  and doesn't migrate that far, I mean it's...
19      Q.  In Ms. Carlino's case, no reason
20  to think that the TVT would in any way touch or
21  communicate with the cervix?
22      A.  She had hysterectomy at the time
23  of placement, so she had no uterus, no cervix after
24  the mesh was placed.

Page 52

1      Q.  And the mesh would not be placed
2  in the area where her cervix or uterus had been,
3  would it?
4      A.  Not normally.
5      Q.  Okay.  I just want to make sure,
6  because you qualified that.  I mean, you don't have
7  any reason to think that it was placed in the
8  Carlino case, or it would communicate with where
9  the cervix or uterus used to be?
10      A.  No, no.
11      Q.  I'm not trying to be difficult, I
12  don't think anybody at this table thinks that it
13  was.  I just want to make sure the record is clear
14  on that.
15          Same question regarding adnexa.
16          And in Ms. Carlino's case, the mesh,
17  the retropubic mesh would not be placed in a
18  position that would touch or communicate with that,
19  would it?
20      A.  No, it shouldn't.  I mean, if it's
21  properly placed, it shouldn't be in contact or
22  shouldn't be in the area.
23      Q.  Same for the kidneys?
24      A.  Of course not.

Page 53

1      Q.  After a hysterectomy is performed,
2  is the -- strike that.
3          What's a vaginal cuff?
4      A.  It's the top portion of the vagina.
5      Q.  And after the hysterectomy is
6  performed, would the cuff be at the top of the
7  woman's vagina?
8      A.  There would be a vault, so cuff,
9  again, it's a vague term.  For us, the pathologists,
10  the vaginal cuff is something which is removed with
11  the uterus, part of the vagina; it can be used in
12  some other work.
13          But after the uterus is removed, there
14  is a vaginal vault which is a blind vaginal pouch.
15          EXHIBIT NO. 4:  Illustration of a
16          Female Urogenital Organs
17          Post-hysterectomy.
18          BY MR. COMBS:
19      Q.  Dr. Iakovlev, I just want to use
20  this to make sure we're on the same page of the
21  areas we're talking about.
22          The Exhibit 4, is that a depiction of a
23  woman who is post-hysterectomy?
24      A.  That's correct.  But I wouldn't

14 (Pages 50 to 53)

Vladimir Iakovlev, M.D.

Page 54

1    call it "cuff", I would call it more of a vaginal
2    vault.  So what we use more commonly is vaginal
3    vault.
4            Vaginal cuff is part which is removed,
5    rather than the one which stays.  Again, that is
6    terminology we use as pathologists, use most
7    commonly.
8        Q.  Okay.  And whatever we refer to it
9    as, I just want to make sure that we're all on the
10   same page and the record is clear.
11           What you're calling a vaginal vault,
12   would be the area that is identified as "vaginal
13   cuff" on this diagram?
14       A.  Yes.
15       Q.  And a TVT that was properly
16   placed, would not be in the vicinity of the vaginal
17   vault or cuff; would it?
18       A.  No, it shouldn't be there.  Again,
19   provided the cuff or the vault is described
20   properly and provided TVTs staying in the position
21   where it's supposed to be, not migrating.
22       Q.  Again, same question for obturator
23   internus muscle.  A TVT that's properly placed,
24   would not pass through the obturator internus,

Page 55

1    would it?
2        A.  Unless it was placed like this.  I
3    mean, if it was intended to use as transobturator
4    tape --
5        Q.  Bad question.  Let me do it
6    better.
7            Retropubic TVT.  A retropubic TVT would
8    not be placed in the obturator internus muscle,
9    would it?
10       A.  Yes, unless it migrates there.
11       Q.  Okay.
12       A.  Because it can migrate.
13       Q.  Okay.  It's not placed in the
14   obturator internus, is it, if it's a retropubic?
15       A.  Not intentionally.  I'm not a
16   surgeon, but from what I understand, the
17   techniques, I mean, it's placed retropubically
18   rather than laterally.
19       Q.  And a properly placed retropubic
20   TVT is not placed in the puborectalis muscle
21   either, is it?
22       A.  I would have to defer you, if it
23   can be done during the procedure.  I would have to
24   defer it to clinical colleagues, to surgeons.

Page 56

1        Q.  Okay.  On the issue of whether a
2    retropubic TVT properly placed would pass through
3    the puborectalis muscle, you would defer it to a
4    urogynecologist or some other medical specialist on
5    that?
6        A.  Yes.  Sometimes I do have striated
7    muscle in the resected retropubic meshes.  But part
8    of the muscle, I'm not sure.
9        Q.  Okay.  So on the obturator
10   internus muscle, that would not be in the path of
11   the properly placed TVT; and on the puborectalis
12   muscle you would just defer?
13       A.  Yes.  But as I said, I do receive
14   some excised retropubic meshes, slings with some
15   striated muscle.  So in some circumstances, they do
16   cross striated muscle.  Normal, not normal
17   circumstance, but they do.  I have to break now.
18       Q.  Of course, that's fine.  Can I ask
19   one more question before you do?
20       A.  Yes.
21       Q.  I just want to follow up just on
22   the striated muscle issue.  The fact that you may
23   have seen striated muscle in a sample from a
24   retropubic TVT, that does not necessarily mean that

Page 57

1    it was muscle from the obturator internus or
2    puborectalis?
3        A.  Could have been any of those,
4    could have been migrating to the area.  So it would
5    be hard for me to explain it just using microscope.
6    I can only state that there is striated muscle, but
7    in each specific case we would have to go to the
8    records and intraoperative report to see where
9    exactly it was explanted from.
10           And then maybe go to implantation
11   records to see if it was implanted or had a chance
12   to be implanted in there, or migrated into the
13   area.  But each specific case would be specific.
14       Q.  Okay.  And on just the Carlino
15   case, you --
16       A.  If I can check with the pathology
17   report, I only check for presence of striated
18   muscle, and in this case, I did not see striated
19   muscle.
20       Q.  Okay.  All right.  We'll take your
21   break now, thank you.
22           MR. COMBS:  Off the record.
23           -- RECESS AT 10:24 --
24           -- UPON RESUMING AT 10:42 --

15 (Pages 54 to 57)

Vladimir Iakovlev, M.D.

Page 58

BY MR. COMBS:
Q.   Dr. Iakovlev, I'm going to ask you
now about the third criteria that you set forth on
page 86 for the clinicopathological correlation.
And would a record that showed that
after the revision in December 2010, Ms. Carlino
had complete resolution of her pelvic pain and
dyspareunia; would that be a record that would fall
within the third criteria that you set forth?
A.   Not sure.  As I said, it describes
mainly a decision to excise the mesh.  I guess you
can put it in that way.
Q.   Did you review any records in
Ms. Carlino's case that had a finding that after
the December 2010 revision, that Ms. Carlino had
complete resolution of her pelvic pain and
dyspareunia?
A.   I have to see what I wrote.  I
think my record stopped at around 2010, so I don't
have records after that.  At least it wasn't in the
summary.
Q.   Okay.  And we'll mark this as
Exhibit 5.
EXHIBIT NO. 5:  Medical Record dated

Page 59

April 26, 2011 by Ellen Conner, M.D.,
Bates No. CARLINOS_MOG_MDR00556.
BY MR. COMBS:
Q.   And you're familiar that the
surgeon who performed the revision for Ms. Carlino
in December 2010 was a Dr. Conner?
A.   As I said, I don't remember the
names of physicians.
Q.   All right.  Well, I don't think
it's controversial.  Dr. Conner performed a
revision in 2010; this is a record from her office.
And in the second paragraph she says:
"On December 17, 2010, I
performed partial removal and
revision of vaginal sling
ureterolysis, and cystoscopy.
This resulted in complete resolution
of her pelvic pain and dyspareunia
but worsening in her stress
incontinence." [As read]
That is a record that you did not have
at the time that you made your clinicopathological
correlation, isn't it?
A.   I don't know.  I could have had

Page 60

it, we need to check with the folder.  The date is
2011; there is a possibility I didn't have it.
Q.   As we sit here today, do you
remember having it?
A.   I don't remember.  I cannot
remember all 80 patients; it's physically
impossible.  If it's not there, then I didn't have
it.
Q.   Well, we took a look at the
records that are on the flash drive that you gave
us, so if it's not on that, that would mean that
you didn't have it for your clinicopathological
correlation?
A.   Say it again.
Q.   If it's not on the flash drive,
that means that you did not have that for your
clinicopathological correlation?
A.   That's correct.
Q.   Dr. Iakovlev, are you familiar
with the article, "Histopathology of Excised
Mid-urethral Sling Mesh" published by Hill in 2014
in the International Urogynecology Journal?
A.   Yes, I read it.
Q.   And when did you first become

Page 61

aware of that paper?
A.   Relatively recently.
Q.   Was that during the deposition in
September when David Thomas from my office deposed
you in the Mullins case?
A.   No, it wasn't during deposition.
I don't remember exactly what's the circumstances,
but I became aware of it.
Q.   That's not on your reliance list
in the Carlino case?
A.   No.  As I said, I just came across
it relatively recently.
Q.   And you're not relying on that
paper for your opinion in Carlino, are you?
A.   Retrospectively, I wouldn't rely
on it because they didn't do analysis the way I do.
They didn't score foreign body response.
They scored only chronic, and then they
used terminology which was unconventional about
fibrosis.  I mean, it seems like authors didn't
know what was published before in meshes.
Their rate of inflammation was very
different from previous papers.  So there are some
quite questionable aspects in that paper.

Vladimir Iakovlev, M.D.

Page 62

1    Q.  And so again, my question was:
2   You're not relying on that paper for any part of
3   your opinion in Carlino, are you?
4        A.  No, I wouldn't.  I mean, when I
5   was preparing the expert report, I was not aware of
6   it.  And now in retrospect, I wouldn't rely on it.
7        I mean, I would consider what people
8   are doing, what people are trying to do, but it
9   wasn't done appropriately enough to be a reliable
10  source.
11       Q.  And the authors of the Hill paper
12  are from the Cleveland Clinic; aren't they?
13       A.  I don't know.
14       Q.  You don't know?
15       A.  No.
16       Q.  It's published in the
17  International Urogynecology Journal; isn't it?
18       A.  Possibly, I don't remember.
19       Q.  I'll represent to you it's
20  published in the International Urogynecology
21  Journal; is that a reputable journal?
22       A.  It's not a high impact journal,
23  but it's a journal.
24       Q.  Do you rely on other articles from

Page 63

1   that journal on your reliance list?
2        A.  I read some articles from the same
3   journal; they publish quite a number of articles.
4        Q.  The pathologists in the Hill paper
5   were blinded, weren't they?
6        A.  Yeah, the pathologist was blinded --
7        Q.  What does that mean?
8        A.  -- to the cause of explantation of
9   symptoms.
10       Blinded means that you don't know
11  specific piece of information.  Whoever is
12  assessing a feature, is not aware of its specific
13  feature, so he's blinded.
14       Q.  What is the purpose of blinded?
15       A.  To reduce bias or reduce
16  possibility of a bias.
17       Q.  And the review that you've
18  conducted in the Carlino case, by definition that's
19  not blinded, is it?
20       A.  I think we are mixing apples and
21  oranges.  Are we talking about research or are we
22  talking about diagnostic assessment?
23       Q.  Either.  The review that you did
24  in Carlino is not blinded, is it?

Page 64

1        A.  How would you like to go to
2   hospital with your own problem and ask everybody to
3   be blinded of your current history?  You're mixing
4   things unmixable.
5        The diagnostic process cannot be
6   blinded by definition.  It's based on full
7   understanding of the history and knowledge of
8   previous investigations.
9        Blinded is only approach used for
10  research purposes.  So let's not mix it; let's make
11  it clear.  You are trying to mix something which is
12  not mixable.
13       Q.  And the review by the pathologist
14  in Hill was blinded, wasn't it?
15       A.  That's what they say in their
16  methods.
17       Q.  Do you have any reason to think it
18  wasn't?
19       A.  No.
20       Q.  And the review that you do for the
21  Carlino case, it's not blinded?
22       A.  I think I answered that question.
23  Twisting things, and you're trying to mix things
24  which are completely unmixable.

Page 65

1        Either we're talking about research or
2   we talking about diagnostic process.  Choose.
3        Q.  Okay.  Again, my question.  The
4   review that you did in the Carlino case, it's not
5   blinded, is it?
6        A.  It's wrong question.  It's incorrect.
7        Q.  Okay.  Do you refuse to answer the
8   question?
9        A.  I'm not refusing it.  I mean, this
10  question is completely incorrect.  This misrepresents
11  the whole medicine.
12       Q.  Okay.  So what were the parameters
13  that the pathologist in the Hill case was blinded
14  to?
15       A.  Now let's pick.  Are we talking
16  about research or diagnostic process?
17       Q.  No, I get to ask the questions
18  here.  So that's my question.
19       My question is:  What were the factors
20  that the pathologist in the Hill case was blinded?
21       A.  In the Hill case was not --
22       Q.  Strike that -- not the Hill case,
23  the Hill paper?
24       A.  In the Hill paper, it was not a

17 (Pages 62 to 65)

Vladimir Iakovlev, M.D.

Page 66

1  diagnostic process; it was a research project. If
2  we want to talk about research project, we can.
3  Again, it's going into general opinions, but we can
4  talk about it. I can talk about it.
5       But let's not mix diagnostic process
6  because it's completely separate process. It has
7  to be completely open, not blinded. You cannot use
8  blinded, because it would be a malpractice to do a
9  blinded assessment of a diagnostic specimen.
10      Q.  For any of the clinicopathological
11  correlations that you do, are they ever blinded?
12      A.  No. That's why I do
13  clinicopathological correlation, because I'm trying
14  to become aware of all information available.
15      Q.  And so at the time that you do --
16  strike that.
17      At the time that you did the Carlino
18  evaluation slides, you were aware of her -- the
19  medical conditions that she presented with at the
20  time of her revision?
21      A.  Yes. I intentionally requested
22  materials, clinical records, to become aware of as
23  much clinical information as possible. Because
24  that's the way diagnostic process is done.

Page 67

1       Q.  And in the Hill paper, they were
2  reviewing explanted meshes and did not know the
3  symptoms that were presented at the time of the
4  explantation; isn't that correct?
5       A.  Now we are switching from the
6  area. We are talking about diagnostic process, now
7  you're going back and forth to research. I think
8  it will be very confusing in the record.
9       Q.  Dr. Iakovlev, Mr. Zimmerman is
10 here to worry about the record. Here is my
11 question.
12      My question is: In the Hill paper, the
13 pathologist was blinded to the reason for the
14 explantation, weren't they?
15      A.  Yes. As a research, you want to
16 be blinded. But that would be completely separate
17 process, and the pathologist was not assessing
18 samples for diagnostic purpose.
19      But they had a specific research
20 question; that's why they were blinded.
21      Q.  And you said that you had a
22 criticism of the way that the pathologist in the
23 Hill case scored the foreign body reaction; is that
24 correct?

Page 68

1       A.  Yes. They didn't, actually. They
2  didn't score it.
3       Q.  And you said that you had a
4  criticism of -- I'm paraphrasing -- but the
5  terminology they used to describe fibrosis?
6       A.  That's correct. Because fibrosis
7  had been described in hernia meshes decades ago, in
8  term of bridging, fibrosis was used in that. But
9  in the Hill paper, they used some obscure
10 definition of fibrosis. And it wasn't really clear
11 what they were using as a criterion for fibrosis at
12 all.
13      Q.  And that the rate of inflammation
14 was different. That was also a criticism that you
15 had of the Hill paper, is that correct?
16      A.  That's correct. I think the
17 difference was up to 30 percent, so with the
18 previously published Smith --
19      (Reporter sought clarification).
20      A.  Smith et al. paper.
21      Q.  And did you have any other
22 criticisms of the methodology of the Hill paper?
23      A.  There are things like they didn't
24 separate clinical symptoms into smaller categories.

Page 69

1  There are a few smaller things, I just don't
2  remember now.
3       But when I went through it, it's
4  obvious they didn't spend as much time in the field
5  as I did. So I learned a little bit more, because
6  I was just exposed to much larger volume and I've
7  been in the field for much longer time.
8       Q.  How many meshes did the
9  pathologist review in the Hill paper?
10      A.  I don't remember now. But it was
11 smaller than my collection.
12      Q.  Do you know the pathologist from
13 the Cleveland Clinic that did that review?
14      A.  No.
15      Q.  How do you know how many meshes
16 that pathologist had reviewed?
17      A.  Well, it was written in the paper,
18 the methods.
19      Q.  Strike that.
20      Do you know whether the pathologist
21 from the Hill case or the Hill paper had ever
22 reviewed any meshes other than the meshes that are
23 the subject of the Hill paper?
24      A.  Well, the terminology they used

18 (Pages 66 to 69)

Vladimir Iakovlev, M.D.

Page 70

1   was clear, that they are not aware of many
2   publications which were published for hernia
3   meshes; they just didn't use it. And I don't think
4   they used it as a reference material as well.
5       Q.  And so my question again is: Do
6   you know whether the pathologist from the Hill
7   paper had reviewed any other meshes, other than the
8   ones that are the subject of the Hill paper?
9       A.  I don't, I don't know. It wasn't
10  clear to me that they review, their general --
11  their general understanding of the mesh body
12  interactions wasn't quite there.
13      Q.  I just want to make sure that my
14  question has been answered. You don't know how
15  many meshes the pathologist in the Hill paper has
16  reviewed; do you?
17      A.  It's written in the methods what
18  was written. What they reviewed beyond that paper,
19  that would be a different question, but --
20      Q.  And you don't know the answer to
21  that question?
22      A.  I don't know.
23      Q.  For the papers that you have
24  published regarding mesh complications, has the

Page 71

1   pathology been blinded in any of those papers?
2       A.  I think we're drifting into
3   general questions again.
4       Q.  Has the pathology been blinded in
5   any of those papers?
6       A.  Which papers?
7       Q.  Any paper that you have written
8   regarding mesh complications.
9       MR. ZIMMERMAN: Did you say "written"?
10      BY MR. COMBS:
11      Q.  Yes. That you're an author on.
12      A.  Depends on the feature. I mean,
13  sometimes when I analyze it, then I know the
14  answers after that, because I write the paper.
15      When I assess specific feature, it's
16  not in front of me, so I'm blind for a specific
17  feature. It depends, depends on paper, depends on
18  the question.
19      Q.  Here is my question. For any of
20  the papers that you've written regarding mesh
21  complications, was the pathology blinded?
22      A.  For some features, yes.
23      Q.  Was it blinded for all features?
24      A.  What do you mean, for all

Page 72

1   features?
2       Q.  Is there any paper that you've
3   written regarding mesh complications, in which you
4   describe in the methodology of the paper that you
5   were blinded?
6       A.  Yes.
7       Q.  What were they?
8       A.  Well, even in the degradation
9   paper, the latest paper, when I was measuring the
10  sequence of degradation bark, I had no idea what
11  the reason for the explantation was. Then I could
12  extract it when I was putting the paper together.
13  It was available to me, but when I was measuring
14  it, I wasn't -- it wasn't in front of me, I wasn't
15  aware. Basically, I was blinded for that specific
16  step.
17      But when you read the whole paper, as
18  an author I had to provide all the information. So
19  at certain stage, I pulled this information up.
20      Q.  Do you agree that in the Hill
21  paper --
22      A.  For some papers, for some features
23  in some papers, I used second pathologist. Again,
24  we're drifting into general questions, I think we

Page 73

1   need to stop now.
2       MR. TRUNK: I am going to second that.
3   There is an agreement in place that this is not to
4   deal with general areas. There's an agreement that
5   was discussed before Judge New, and an agreement
6   was reached between the parties not to go into
7   general -- I've let it go on for a long time now,
8   but there's nothing specific to Carlino with
9   respect to these questions.
10      BY MR. COMBS:
11      Q.  Doctor, let me ask you some
12  questions about the medical records that you've
13  reviewed for the Carlino case.
14      Did Ms. Carlino suffer from pelvic pain
15  prior to the implantation of the TVT device?
16      A.  She had back pain.
17      Q.  So your answer is that Ms. Carlino
18  had back pain prior to the implantation of the TVT
19  device?
20      A.  Yes, that's correct. I put it in
21  the summary.
22      Q.  Did Ms. Carlino have pelvic pain
23  prior to the implantation of the TVT device?
24      A.  As far as I can see from my

19 (Pages 70 to 73)

Vladimir Iakovlev, M.D.

Page 74

1  summary, that information wasn't there.  I didn't
2  see it.
3           Q.  If Ms. Carlino suffered from
4  pelvic pain prior to the implantation of the TVT
5  device, is that something that you would put in
6  your summary of clinical records?
7           A.  Most likely.
8           Q.  All right.
9           MR. COMBS:  Let's mark this as
10 Exhibit 6.
11          EXHIBIT NO. 6:  Operative report for
12          Sharon Carlino dated August 18, 2005 by
13          Andrew Blechman, M.D., Bates No.
14          CARLINOS_JSUMC_MDR0052 - MDR0054.
15 BY MR. COMBS:
16          Q.  Dr. Iakovlev, I've handed you
17 what's been marked as Exhibit 6.  And is that the
18 operative report for Ms. Carlino's implantation
19 surgery?
20          A.  Yup, looks like it.
21          Q.  And you can take a second to
22 review that if you'd like.
23          A.  (Witness reviews document).
24          Q.  Was one of the preoperative

Page 75

1  diagnoses for Ms. Carlino pelvic pain?
2           A.  Yes, that is there.
3           Q.  And was that also one of the
4  postoperative diagnoses for Ms. Carlino?
5           A.  Postoperative diagnosis is same,
6  so I guess it's the same.
7           Q.  And that would be pelvic pain that
8  Ms. Carlino had prior to the implantation of the
9  TVT device?
10          A.  Yes, that's correct.
11          Q.  And that record is not something
12 that you included in your clinicopathological
13 correlation?
14          A.  I did review it, obviously,
15 because as we talking about pelvic pain, there are
16 other reasons for pelvic pain, like menorrhagia,
17 fibroids, and surgery was done at the same time.
18          So when I was reviewing, I thought that
19 it's not significant to put in the summary.
20 Summary is more of a guide for me.
21          Q.  And that finding that Ms. Carlino
22 had pelvic pain prior to the implantation of the
23 TVT device, is not included in your summary, is it?
24          A.  No, I didn't put it in my report.

Page 76

1  I had probably reasons to believe that it was not
2  related to the mesh.
3           Q.  If Ms. Carlino had a mesh
4  revision, would that be something that would be
5  included in your clinicopathological correlation?
6           A.  Sometimes I saw many that I do not
7  include each of them.  I try to include major
8  events in the summary.
9           Q.  How many mesh revisions has
10 Ms. Carlino had?
11          A.  As I said, I mean, I try to
12 include any major events in the summary.  So if
13 there was some minor clippings or how they say
14 office excisions, it could have not included them.
15          Q.  Do you know how many revisions to
16 pelvic mesh that Ms. Carlino has had?
17          A.  As I said, right now I don't
18 remember all records; she had at least one.  So I
19 could receive the specimen.  There could be other
20 smaller excisions, or excisions after that date.
21 Either I'm not aware, or I don't remember now.
22          Q.  If there was a mesh revision that
23 you thought was relevant to Ms. Carlino's
24 clinicopathological correlation complication, you

Page 77

1  would have included it in your summary?
2           A.  If I thought that something --
3  well, if the material is available to me and I
4  think it is important for me for
5  clinicopathological correlation, I would've
6  included it in the summary.
7           Q.  And it is not a secret, Ms.
8  Carlino had an explantation on November 26, 2007.
9  You did not include that in your correlation, did
10 you?
11          A.  Either I didn't have that record,
12 or it was not significant for my correlation.  So I
13 don't see it in the summary.
14          EXHIBIT NO. 7:  Operative report for
15          Sharon Carlino dated November 26, 2007,
16          by Dr. Blechman, M.D., Bates No.
17          CARLINOS_JSUMC_MDR00125 - MDR00126.
18 BY MR. COMBS:
19          Q.  Dr. Iakovlev, I've handed you
20 what's been marked Exhibit 7, which is an operative
21 report from November 26, 2007 for Ms. Carlino.
22          At the bottom it's got the Bates number
23 from Jersey Shore Medical Center.  This would be
24 one of the records that you would have had to

20  (Pages 74 to 77)

Vladimir Iakovlev, M.D.

Page 78

1  review Ms. Carlino; isn't it?
2         A.   Well, I could, I could have not; I
3  don't know.  I don't remember now exactly each page
4  I had.  If it's not in the record, it wasn't there.
5  If it's there, then I reviewed it.
6         Q.   Again, I haven't gone through
7  every page of the record, but I assume it's there
8  because you do have records in your flash drive
9  from Jersey Shore Medical Center.  So I assume it
10  was there; if it's not, it's not.
11         This would be a procedure that you did
12  not rely on as part of your clinicopathological
13  correlation?
14         A.   Well, rely, not rely, summary is
15  just a summary.  Something like in bullet format
16  which describes a general idea.  I mean, if I
17  review the records, sometimes I include it,
18  sometimes I don't.
19         Q.   It's fine if you need --
20         MR. COMBS:  Let's go off the record for
21  a second.
22         -- RECESS AT 11:15 --
23         -- UPON RESUMING AT 11:20 --
24

Page 79

1         BY MR. COMBS:
2         Q.   Dr. Iakovlev, before the short
3  break, you had taken a second to look at the
4  November 26, 2007 document that's marked as
5  Exhibit 7.
6         That's not set forth anywhere in your
7  report, is it?  No mention of that document?
8         A.   It wasn't included.  If I saw it,
9  if it was included in my records I could review,
10  then probably didn't make that much of a
11  difference, so I didn't include it.
12         But as I said, the summary is not a
13  comprehensive review of the records.  Sometimes I
14  include things; sometimes I don't.  Depends on
15  situation.
16         Q.   You may think there is more motive
17  here than there is.  There was no pathology with
18  this.
19         And I just want to make sure that
20  you're not relying on this as part of your opinion.
21  If you are, I'm going to ask you questions about
22  it.  If you're not relying on it, I don't want to
23  ask anything more about it.
24         A.   See, I would have to think.  I

Page 80

1  mean, when I go through records they all go through
2  my head.  If I don't include them, it doesn't mean
3  that I don't rely on them.
4         I pretty much extract all the
5  information I can.  But sometimes it's not enough
6  for me to put in the summary.  Sometimes I get so
7  much records, I mean, it's impossible to make an
8  attempt to describe everything.
9         Seems to be a small excision, or a
10  small piece.  I'm not even sure if it generated any
11  specimen, as I said.
12         Q.   There was no pathology?
13         A.   It's pretty common.  When they get
14  eroded, they erode multiple times.  It's recurrent
15  erosion.
16         Q.   Okay.  And Exhibit 7, there is no
17  reference to it in your report?
18         A.   I didn't include it.
19         Q.   And as we sit here today, you're
20  not relying on this for part of your opinion in the
21  case.
22         MR. ZIMMERMAN:  Misstates his prior
23  testimony.  Objection.
24         THE WITNESS:  If I saw it, it was in my

Page 81

1  head, I am relying on it.  I just made a note that
2  it's recurrent erosion, wasn't big enough to be
3  included.
4         So I do rely on it.  Whatever I read,
5  whatever I learn about the case, I do rely.  It
6  leaves trace in my head.
7         BY MR. COMBS:
8         Q.   Okay.  Do you know what
9  Ms. Carlino's clinical course was after this
10  revision?
11         A.   After 2007?
12         Q.   Yes, sir.
13         A.   (Witness reviews document).
14         "She presented in 2010, feeling
15         something sharp in the vagina.
16         There was a palpable mesh and she
17         was referred to a surgeon for
18         recurrent erosion."
19  So, as I said, I mean, the erosion
20  recurred.
21         Q.   Now, do you have any information
22  regarding what Ms. Carlino's condition was between
23  November 2007 and 2010?
24         A.   I don't remember all records now.

21 (Pages 78 to 81)

Vladimir Iakovlev, M.D.

Page 82

1    I mean, what I have right now is just a
2  summary so -- and to me, as I said, as a
3  pathologist, I'm not making a comprehensive summary
4  of the records.  I'm extracting information to
5  interpret the pathology.  I was aware of what going
6  on, going through the records, if that's the
7  question.
8    Q.   During the period of 2007 to 2010,
9  do you know whether Ms. Carlino was continent?
10    A.   I don't remember all the details
11  in between.  As I said, right now, I just have the
12  summary.
13    Q.   During the period of 2007, 2008,
14  2009, do you know whether Ms. Carlino had any
15  pelvic pain?
16    A.   (Witness reviews document).
17    So what I extracted from the records
18  was discomfort, sensation of something sharp --
19    Q.   So my question was:  For the
20  period of 2007, 2008, 2009, do you know whether
21  Ms. Carlino had pelvic pain or dyspareunia?
22    A.   I didn't.  I mean, it wasn't my
23  purpose; I'm not a clinician.  I was extracting
24  information which is relevant in my specimen

Page 83

1  understanding.
2    I mean, you would probably need to -- I
3  would defer all of this then to clinical colleagues
4  who analyze the history and details, clinical.
5    Q.   Okay.  When you say a clinical
6  person, are you talking about a urogynecologist or
7  someone who's treating Ms. Carlino for that
8  condition?
9    A.   Either treating or is a
10  specialist, clinical specialist, yes, that's
11  correct.
12    Q.   All right.  And so on issues like
13  that, you would defer on?
14    A.   Not defer entirely.  I just say
15  that the clinical specialists would be more
16  interested in smaller details of clinical
17  presentation and development.
18    To me, clinical history is more of a
19  background to understand my pathology.  It is a
20  little bit different view in that I need major
21  facts in the history.
22    Q.   I'm sorry, major?
23    A.   Yes, major facts, major
24  developments rather than small details in the

Page 84

1  development.
2    Q.   Okay.  Ms. Carlino's implant was
3  in 2005, wasn't it?
4    A.   Yes.  August 18, 2005.
5    Q.   Now, do you know whether
6  Ms. Carlino was continent between 2005 and 2010?
7    A.   Wasn't my purpose.  I mean, when I
8  was going through records, I could see if she
9  wasn't or she was.  Sometimes I include it but most
10  of the time I don't include it.
11    Q.   Okay.
12    A.   Because I'm not assessing the
13  sling for its effectiveness.  I'm assessing the
14  complications which developed after its placement.
15    Q.   And as we sit here today, you're
16  not aware of whether Ms. Carlino was incontinent
17  between 2005 and 2010, are you?
18    A.   That wasn't my purpose.  I wasn't
19  focusing on that.
20    Q.   And you have on your chronology
21  that in December, Ms. Carlino had an explant; is
22  that correct?
23    A.   Yes.
24    Q.   And I think this is self-evident,

Page 85

1  but let me make sure the record is clear on it.
2    You would have played no role in any
3  way in regard to the treatment or pathology
4  regarding that explant as a treating physician?
5    That's a terrible question.  Let me
6  start over.
7    You weren't a treating physician for
8  Ms. Carlino, were you?
9    A.   No, I was not a treating
10  physician.
11    Q.   And you are not a treating
12  pathologist for Ms. Carlino, are you?
13    A.   The pathologist -- I wasn't the
14  primary pathologist, that's correct.
15    Q.   I mean, Dr. Govil, the Jersey
16  Shore University Medical Center, would have been
17  the pathologist that would have done the read
18  contemporaneous to the explant?
19    A.   Yes.  There was a pathologist,
20  yes.  I would have to see the pathology report to
21  see the names and exact details.
22    Q.   I'll represent to you it was
23  Dr. Govil.
24    And your review of the pathology for

22  (Pages 82 to 85)

Vladimir Iakovlev, M.D.

Page 86

1  Ms. Carlino would have been in June 2015, four and
2  a half years after the explant?
3        A.  Yeah, that's correct.  I was a
4  consultant in this case.  I wasn't the primary
5  pathologist.
6        Q.  And so you would have played no
7  role in preparing the specimen from that explant
8  for pathological review?
9        A.  Could you rephrase the question?
10        Q.  Yeah.  I understand your
11  criticism.  Let me try to do better.
12        There was a pathology review that took
13  place in December of 2010, and I'll represent to
14  you it was done by Dr. Govil.
15        You wouldn't have played no role in
16  preparing the specimen or the slide for that review
17  in 2010?
18        A.  If you're asking if I prepared the
19  slides for that review, no.  The first time I was
20  involved in this case and had the material was
21  2015.
22        Q.  And do you know how the tissue was
23  handled prior to your receiving it in June 2015?
24        A.  I created the diagnostic lab --

Page 87

1  oh, sorry.
2        -- INTERRUPTION IN THE RECORD --
3        -- RECESS AT 11:20 --
4        -- UPON RESUMING AT 11:30 --
5  BY MR. COMBS:
6        Q.  Dr. Iakovlev, before we took that
7  break, I was asking you about the preparation of
8  the specimen from the 2010 surgery.
9        You didn't play any role in handling
10  that until 2015; did you?
11        A.  That's correct.
12        Q.  And how was that tissue processed?
13        A.  It is the standard way of
14  processing tissues, also, diagnostic laboratory.
15        Q.  Okay.  How is it processed?
16        A.  Tissue is fixed in formalin, and
17  then it's grossed, and then it's placed in the
18  cassette, and then it goes through a processing
19  machine, and then it becomes embedded in paraffin
20  blocks, sectioned, stained, cover slipped.
21        (Reporter sought clarification).
22        A.  Cover slipped.
23        Q.  You and I are both quiet.  I'm
24  sure it's difficult for her.

Page 88

1  Was the tissue dehydrated?
2        A.  Yes, it was.
3        Q.  Cleaning agent -- sorry.  Clearing
4  agent added to it?
5        A.  What do you mean "clearing agent"?
6        Q.  Was xylene added to it?
7        A.  Yes.
8        Q.  And was fixative added to it?
9        A.  Yes, of course.
10        Q.  And what was the fixative that was
11  added to it?
12        A.  Formalin, it begins with formalin.
13        Q.  And who added the formalin?
14        A.  Some staff person.
15        Q.  And you wouldn't know any person
16  who had any role in preparing that specimen, would
17  you?
18        A.  No.
19        Q.  Was it embedded in paraffin?
20        A.  Of course.
21        Q.  And why?
22        A.  Pardon?
23        Q.  Why?
24        A.  Why?  You need to embed it into

Page 89

1  some form of median to section in the microtome.
2  It has to be supported by something in order to be,
3  to be cut.
4        Q.  And is that so that the tissue
5  will be stiffer so the microtoming process can
6  occur?
7        A.  Not stiffer.  Tissue would be held
8  by paraffin.
9        Q.  As a result of the dehydration and
10  fixation of this specimen, would it be hardened?
11        A.  To a degree, yes.
12        Q.  And would it be smaller?
13        A.  To a degree, yes.
14        Q.  You would have shrinkage of the
15  specimen?
16        A.  Well, depends on what -- it only
17  shrinks when you have water in it.  So something
18  which is solid, without water content, will not
19  shrink because shrinking comes from dehydration.
20        So when I dehydrate, I extract water
21  and the tissue shrinks.  There is a degree of
22  shrinking due to formalin, but it's much minor,
23  smaller.
24        Q.  What would be the degree of

23 (Pages 86 to 89)

Vladimir Iakovlev, M.D.

Page 90

1    shrinking that would occur to Ms. Carlino's tissue
2    after the specimen was processed?
3         A.   Depends on what part of the
4    specimen we're talking about.  Mesh fibers wouldn't
5    shrink at all.  Dense fibrous tissue wouldn't
6    shrink much.
7              It would be more of a loose areas, more
8    edematous areas would be shrinking more.  It all
9    depends how much water is in the material.
10   Polypropylene doesn't have much water except for
11   degraded part.
12        Q.   Okay.  Obviously, I'm a lay
13   person.  So is it fair to summarize that tissue
14   would shrink more based upon the amount of water it
15   had in it prior to the processing?
16        A.   No, the amount it had in the body.
17        Q.   In vivo?
18        A.   In vivo.  So something has a lot
19   of water, like edematous tissue is placed in
20   alcohol, the water would be extracted and replaced
21   by alcohol.  Some of it will be extracted; some of
22   it will be replaced.
23             So some of the spaces will contract,
24   some of the spaces will just remain open, empty,

Page 91

1    because the water is being drawn out.  Also depends
2    on the rigidity of adjacent structures, like
3    collagen fibers, or arteries, or mesh fibers.
4         Q.   The polypropylene would not shrink
5    any as a result of the dehydration process, would it?
6         A.   No.  Polypropylene itself wouldn't
7    shrink, that would be, I mean, if there is no water
8    in there, there wouldn't be any mechanism to shrink
9    it.
10        Q.   And the collagen would shrink
11   some, but not as much as the edematous tissue?
12        A.   Collagen molecule itself, wouldn't
13   shrink.  But the spaces between collagen fibers
14   would shrink.  And it depends how much space in it,
15   then there would be more or less shrinking.
16        Q.   And the edematous tissue would
17   then shrink more?
18        A.   Edematous tissue what?  Sorry?
19        Q.   Would shrink more than the
20   collagen?
21        A.   Yes.  Again, to a degree.  Depends
22   on adjacent structures, because if there is a large
23   structure which is holding the shape, or if it will
24   just provide an empty space.

Page 92

1         Q.   And specimens -- strike that.
2              There is a procedure by which you can
3    take a specimen and pin it to the board to make it
4    retain its integrity and shape, isn't there?
5         A.   Yes, but we're talking about
6    something else.  It's pinned before it's being
7    fixed.  So if we're talking about dehydration or we
8    talking about formalin fixation?
9              Because pinning is done for specimens
10   like stomach, for hollow organs which normally have
11   rounded configuration.  So you would have to have
12   some force to keep it flat.  So that's the main
13   purpose of pinning.
14        Q.   That would not have been done to
15   this specimen?
16        A.   Mesh is not a hollow organ; it's
17   not a stomach.
18        Q.   So it wouldn't have been done to
19   this specimen, would it?
20        A.   There wouldn't be a purpose for
21   that.
22        Q.   So it wasn't done, was it?
23        A.   No.
24        Q.   Now, the treating pathologist was

Page 93

1    Dr. Govil, and what did Dr. Govil find regarding
2    this tissue?
3         A.   Can I see his report?
4         Q.   Sure.  We'll mark this as Exhibit 8.
5              EXHIBIT NO. 8:  Pathology Report dated
6              March 3, 2006, by Dr. Govil, Bates No.
7              CARLINOS_JESUMC_PAT00766 - PAT00767.
8              THE WITNESS:  So signed, Sushama Govil,
9              final pathology diagnosis page says:
10                  "Fragments of fibroconnective
11             tissue with mild chronic
12             inflammation and foreign body giant
13             cell reaction to foreign material
14             comma, vaginal mesh."  [As read]
15             BY MR. COMBS:
16        Q.   And is that the same finding that
17   you made?
18        A.   Yes, it is the same.  This is a
19   summary of findings.
20        Q.   And so the finding that you made
21   in your pathology report would be consistent with
22   "Mild chronic inflammation and foreign body giant
23   cell reaction to foreign material, vaginal mesh"?
24        A.   That's what I describe.

24 (Pages 90 to 93)

Vladimir Iakovlev, M.D.

Page 94

1        Q.   And Dr. Govil made no finding to
2   dyspareunia, did he or she?
3        A.   That's what his findings are.  He
4   is given clinical history, mesh erosion,
5   dyspareunia, a revision of sling cystoscopy.
6   So he's asked question:  "What is wrong
7   with the tissue which is causing these symptoms?"
8        And his answer is:  "Fiber connective
9   tissue with mild chronic inflammation, foreign body
10  giant cell reaction to foreign material."
11       That's an abnormality he sees in the
12  tissue which was received for treatment of erosion
13  dyspareunia.
14       Q.   And the clinical history that he
15  received, that's something that he would have been
16  informed by Dr. Conner?
17       A.   Clinical history in the surgical
18  pathology reports copies what is on the
19  requisition.  So usually it's entered by excision
20  clerk or secretary.  It's a copy of what was
21  provided with the specimen.
22       He could have more information, through
23  personal communication, or just review of the
24  records, I don't know.

Page 95

1        But I can say for sure that this was
2   provided on the requisition with the specimen.
3        Q.   And Dr. Govil makes no finding
4   regarding urinary symptoms?
5        A.   He's not given it.  I don't know
6   if he knew about it, I mean...
7        Q.   Okay.  So my question is Dr. Govil
8   makes no finding in the final pathological
9   diagnosis about urinary symptoms; does he?
10       A.   Not directly.
11       Q.   And Dr. Govil makes no finding
12  regarding degradation in the pathology report,
13  does he?
14       A.   No.
15       Q.   Dr. Govil's diagnosis that he
16  found mild chronic inflammation; you told us that
17  that's consistent with what you found?
18       A.   Yes, if we go through my
19  pathological findings.
20       So I describe mostly foreign body type,
21  because it was more pronounced rather than
22  non-specific chronic inflammation.
23       Fiber connective tissue, that's what I
24  describe as scar.  And my focus was mainly on

Page 96

1   foreign body type, because in my assessment, is
2   more pronounced than chronic, non-specific.
3        Q.   Okay.  And so Dr. Govil's finding
4   that the inflammation is mild, that would be
5   consistent with your finding in regard to
6   Ms. Carlino's pathology as well?
7        A.   Yes.  It wasn't as pronounced as
8   foreign body type reaction.
9        Q.   What did you do with this specimen
10  after you got it?  And let me just, again, you know
11  I'm not trying to be secretive here.
12       I think there might be a mistake under
13  the pathological findings.  And I just want to ask
14  you about it to make sure I understand.
15       Under the "Pathological Findings" you
16  said:
17            "I received one H&E stain
18       slides and ten unstained slides
19       labeled JS10-13237, Meridian
20       Health."
21       That's not actually correct, right?  I
22  mean, didn't you -- you cut the ten slides?
23       A.   I'd have to see chain of custody
24  from what I receive and what I should.

Page 97

1        Q.   Okay.  So let me ask you, maybe
2   I'm mistaken on that.  Did you receive 11 slides
3   from Jersey Shore?
4        A.   I'd have to see chain of custody
5   from what I received.  It could probably was from
6   Steelgate.
7        MR. COMBS:  Let's go off the record for
8   a second.
9        EXHIBIT NO. 9:  Chain of Custody Form
10       dated October 8, 2015.
11  BY MR. COMBS:
12       Q.   Dr. Iakovlev, we went off the
13  record for a second and discussed this.  And I'm
14  now handing you what's been marked as Exhibit 9.
15  Is that the chain of custody form from you to the
16  defense lawyers in regard to Ms. Carlino's specimen
17  and slides?
18       THE WITNESS:  Yeah, that's correct.
19  BY MR. COMBS:
20       Q.   Okay.  And does it reflect that
21  what you got is that you got one slide from
22  Meridian Health, which was stained with H&E.  And
23  then you've got ten slides which St. Michael's cut
24  regarding Ms. Carlino's tissue?

25 (Pages 94 to 97)

Vladimir Iakovlev, M.D.

Page 98

1      A.  Yes.  I received the block and
2  then I asked them to cut ten stain slides.  I think
3  there was agreement with the defense counsel to cut
4  ten stain slides.
5      So when I was analyzing, I had one H&E
6  and ten stains.  So the wording wasn't reflecting
7  the whole story.
8      Q.  I understand.  Just so the record
9  is clear, or the reality of what happened is, you
10  got one stain slide and you got the block, and then
11  ten slides were cut from the block?
12      A.  Yes.
13      Q.  And those ten slides that were cut
14  from the block, would have been cut sometime in
15  2015 at St. Michael's?
16      A.  Yes.
17      Q.  And I would like to be able to
18  forego a lot of questions about the process of
19  cutting the slides.
20      So let me just give you kind of a long
21  statement, and then you can either agree or
22  disagree and we can just go from there, but I want
23  to cut out some of this.
24      When you were deposed in September of

Page 99

1  2015, you talked about the process of cutting the
2  slides at St. Michael's.  And in a prior deposition
3  you had provided us with the protocol from
4  St. Michael's.
5      And so all I want to do is just
6  establish these would have been cut same way, same
7  protocol?
8      A.  That's correct.
9      Q.  So the slides that would have been
10  cut at St. Michael's for Ms. Carlino's mesh, would
11  have been cut the same way that the other slides
12  had been cut that you have been deposed about?
13      A.  That is correct.
14      Q.  And they would be cut pursuant to
15  the protocol that you previously provided us of the
16  St. Michael's slide cutting process?
17      A.  Yes.  Standard operating
18  procedures.
19      Q.  Okay, thank you.
20      Now, after the specimen was provided to
21  you, did you take any efforts to clean the formalin
22  protein shell off the explant?
23      A.  I'm sorry.  There is no such thing
24  as protein formalin shell.

Page 100

1      Q.  So would the answer be "no"?
2      A.  It doesn't exist.
3      Q.  So you took no steps to clean
4  that?
5      A.  Of course not.
6      Q.  All right.  And did you receive
7  any analytical chemistry regarding Ms. Carlino's
8  mesh?
9      A.  What do you mean?
10      Q.  For example, in other cases in
11  which you've been involved, the specimen has been
12  sent to an analytical chemist.  Say, for example,
13  Dr. Jordi, or somebody like that, an analytical
14  chemistry has been done regarding the specimen.
15  Did that occur in this case?
16      A.  I don't think I ever had results
17  of those analysis, and I never relied on them.
18      Q.  So to the best of your knowledge
19  in this case, no analytical chemistry was performed
20  in regard to Ms. Carlino's mesh?
21      A.  I don't know, and I wouldn't ask.
22      Q.  You don't know whether the
23  molecular weight of the mesh in Ms. Carlino's
24  sample decreased, do you?

Page 101

1      A.  I think you're asking questions of
2  tests I couldn't perform, and I don't do it.
3      Q.  Okay.  Just so the record is
4  clear, you don't know if the molecular weight of
5  the proline in Ms. Carlino's specimen had
6  decreased, do you?
7      A.  No, I don't test for that.
8      Q.  And you don't know whether the
9  tensile strength of the mesh in Ms. Carlino's
10  specimen had decreased, do you?
11      A.  No, I didn't measure.
12      Q.  I want to ask you kind of another
13  windup question and maybe we can dispense with some
14  of the questions on that.
15      I want to ask you whether any scanning
16  electron microscope or transmission electron
17  microscope was used in this case, or whether
18  everything was just taken with your standard
19  microscope.
20      So that's what I wanted to ask you.
21  Were all of the photographs that you took in this
22  case, based upon your use of the light microscope?
23      A.  That's correct.
24      Q.  No SEM or TEM used in this case?

26 (Pages 98 to 101)

Vladimir Iakovlev, M.D.

Page 102

1      A.   No.  These are all research
2   techniques.  They have only very narrow
3   applications for diagnostic pathology.
4      Q.   All of the slides related to
5   Ms. Carlino's explant -- strike that.
6      You wouldn't have prepared any of the
7   slides related to Ms. Carlino's explant, would you?
8      A.   What do you mean?
9      Q.   That would have been done by
10  someone else?
11     A.   Of course.
12     Q.   That would be done by a
13  technician?
14     A.   That's correct.
15     Q.   Who is that technician?
16     A.   We have like 20 technicians in the
17  lab, and some procedures are done by one
18  technician, some procedures done by a different
19  technician.
20     Q.   So you would not know that person?
21     A.   I know all of them, but I don't
22  know who exactly did on that specific day.
23     Q.   Fair enough.  You don't know which
24  specific technician prepared the slides for

Page 103

1   Ms. Carlino?
2      A.   Probably there are several.
3   Different steps are done by different technicians.
4      Q.   There were several different
5   stains used with Ms. Carlino's slides; who picked
6   those stains?
7      A.   I did.
8      Q.   Dr. Iakovlev, I want to go through
9   the slides now.  And I'm going to follow pretty
10  much the same procedure for all of them.  What I
11  want to do at this point is find out what you're
12  going to say at trial about these slides.
13     So what I'd like to do is, is to go
14  through them one after another, and I'm going to
15  ask you repetitive questions, but the goal of all
16  these questions is just to find out what it is you
17  plan to tell the jury in the Carlino case using
18  this slide.  That's what I'm here to do.
19     So, let's just start with, just to
20  establish on the record, in Carlino you've got
21  figures SC-1 through 18; is that correct?
22     A.   That's correct.
23     Q.   Page 91 to 108 of your report?
24     A.   That's correct.

Page 104

1      Q.   Are all these pictures, on pages
2   91 through 108 of the slides that St. Michael's
3   processed?
4      A.   I had one H&E slide already
5   stained.  I could have taken some pictures of the
6   H&E slide I had already.
7      All the other stains, they would be
8   done at St. Michael's.  For H&E could be either
9   slide, it depends.  Some areas could been
10  photographed on one slide than the other.
11     Q.   Okay.  So for the photographs that
12  are labeled as being H&E stained, those could be
13  either from the original slide that you received
14  from Jersey Shore, or from the slides prepared by
15  St. Michael's?
16     A.   That's correct.  There wasn't much
17  difference.
18     Q.   All right.  So let's go to SC-1.
19  What is it that you're going to tell the jury about
20  SC-1 in this case?
21     A.   Bridging fibrosis scarring, halo,
22  chronic foreign body type inflammation around the
23  fibers.
24     Q.   What else?

Page 105

1      A.   That's about it.
2      Q.   Now, how big was the explant in
3   Ms. Carlino's case?
4      A.   Oh, largest dimension was 2.4
5   centimeter.
6      Q.   And what part of that explant does
7   this -- strike that -- does this photograph
8   represent?
9      A.   One of the flat parts, not curled.
10     Q.   And do you have a picture of the
11  gross specimen?
12     A.   I do.  I almost always -- well, I
13  always take pictures.  I didn't include it here,
14  but I do take photographs of all gross specimens.
15     It depends.  If it's demonstrative of
16  something, I include it in the report.  I guess I
17  didn't include it in this case, but I do.  It's
18  probably one photograph I didn't include on this
19  thumb drive; I do have it.
20     Q.   Okay.  Just obviously you don't
21  have it with you here today.  Would you just be
22  able to provide that to Mr. Zimmerman and he can
23  forward it to us?
24     A.   Yes.  But I have a description, if

27 (Pages 102 to 105)

Vladimir Iakovlev, M.D.

Page 106

1    we open my --
2         MR. ZIMMERMAN:  Your St. Michael's?
3         THE WITNESS:  No, I don't -- no, I
4    wouldn't have a gross description, because I didn't
5    have a gross specimen, that's right.  That's why I
6    didn't have it, sorry.
7         So answer is, I did not have a gross
8    specimen, therefore, I didn't take a gross
9    photograph.
10        BY MR. COMBS:
11        Q.  Okay.  Now, what portion of the
12   explant is this photograph taken of?
13        A.  As I said, one of the flat portions.
14        Q.  I mean, can you tell us?  I mean,
15   can you diagram it for us?
16        A.  What do you mean?
17        Q.  Well, how big is this, the
18   photograph on SC-1, how big is that in vivo?
19        A.  Oh, I can estimate, around
20   9 millimeters.  Anywhere between 7 to
21   10 millimeters; somewhere in that ballpark.
22        Q.  Okay.  So somewhere between 7 to
23   10?
24        A.  Maybe 6 to 10.

Page 107

1         Q.  Okay.  And would you be able to
2    tell us what part of the explant this picture is
3    from?
4         A.  What do you mean?  Lateral,
5    medial?
6         Q.  Would you be able to draw?  Could
7    you draw for us --
8         A.  It wasn't oriented.  As I said, I
9    had a flat portion, and one portion which was
10   twisted.
11        Where exactly was it in the body and
12   exact orientation, would be impossible to restore.
13        In some specimens, some features point
14   where one end is and where the other one -- in that
15   specific specimen, there are no anatomical
16   landmarks.
17        Q.  So in regard to the slide you
18   photographed in SC-1, you would be unable to tell
19   us where that was in vivo?
20        A.  You mean medial, lateral?
21        Q.  Yes.
22        A.  No.
23        Q.  And would be unable to tell us
24   what part of the explant that came from?

Page 108

1         A.  What do you mean, what part of
2    explant?
3         Q.  Well, if I gave you a sheet of
4    paper and I asked you to diagram, here's the
5    explant, show me where this comes from, you would
6    not be able to show that?
7         A.  Depends on orientation.  Because
8    as I said, this is a flat portion, and there is a
9    twisted sort of deformed portion.
10        So if picture is taken well enough, I
11   can see where the flat portion and where the
12   twisted portion is.  So then I would provide you
13   the most likely location.
14        Q.  Okay.  But you don't have that for
15   this case, do you?
16        A.  I didn't have a gross specimen.
17        Q.  So you would be unable to tell us
18   where this was in the specimen?
19        A.  If you give me a picture, I can
20   try to restore its position.
21        Q.  But you don't have the picture,
22   right?
23        A.  No.
24        Q.  Okay.  Dr. Iakovlev, I wanted to

Page 109

1    ask you a question about the photography in SC-1.
2    Was there any enhancement of the colors in that?
3         A.  No, I don't think so.  I have to
4    play sometimes with some images which are taken at
5    really high magnification or with polarized light,
6    because it's too dark.  But this one, no.
7         If it's just straight, normal
8    magnification I just don't do anything.
9         Q.  All right.  And the reason I'm
10   asking you that, is that the colors -- I should
11   make sure the record is clear.
12        I mean, the picture on the top and the
13   picture on the bottom in SC-1, that's the same
14   piece of mesh, right?
15        A.  Yes.  But see, this one is
16   altered.  So when I save it, the program saves the
17   whole thing.  So maybe it changes color space, I
18   don't know.
19        Q.  So, for example, on the bottom
20   picture of SC-1, you have "inflammation" drawn in.
21   You have "normal tissue" drawn in.
22        And those are things that you've
23   superimposed on top of the picture?
24        A.  Yes.

28 (Pages 106 to 109)

Vladimir Iakovlev, M.D.

Page 110

1     Q.  And what I'm specifically asking
2  you about is, see the colors are different on the
3  top and bottom picture.
4     A.  As I said, the original here is
5  just extract from the scanned image.  This one is
6  saved later on.  So the first image is created by
7  different software; second image is created by
8  Photoshop.  It might change color space, or in this
9  specific case, it probably did.
10     Q.  Okay.  And I'm not insinuating
11  anything here, you did not intentionally change the
12  color on this slide?
13     A.  As I said, I don't remember.
14  Sometimes I have to correct some colors, because it
15  turns out green, or pink, or -- it all depends on
16  the picture.  But I don't believe there isn't -- I
17  would change anything here, because original
18  picture was all right.
19     Q.  Okay.  When I'm looking at the
20  slides, how do I know when it's one that you've
21  changed the color on?
22     A.  If any changes are done -- well, I
23  mean, it depends on the scenario.  If white balance
24  is not correct to begin with, I have to alter the

Page 111

1  non-labeled copy as well.
2     If it doesn't come out white,
3  background is not white, if it's pink or green, as
4  I said, I have to correct white balance first, then
5  save the original image, then do my labeling and
6  then save it as a copy of the mesh.
7     So the alterations of the image can --
8  well, not alterations, adjustments of the image may
9  happen either at this stage, or only at the
10  labeling stage.  It depends on the scenario, on the
11  image.
12     Q.  So again, because you were using
13  your hands to point, it would be hard for the
14  record to reflect this.
15     Okay.  So the color adjustment could
16  occur on the top image, which would be the original
17  photograph of the image?
18     A.  So for the original image, I have
19  to do white balance.  I have to do white balance, I
20  have to make the best way possible to make it look
21  like it looks in the microscope.
22     So this image can be adjusted.  So then
23  when I'm satisfied with the image, with the
24  original image, that the white balance is correct,

Page 112

1  that the corners are not darker, or middle portion
2  is not light.  So when it's flat, when it's
3  acceptable, then I superimpose labeling.
4     And then it's saved in a different
5  software.
6     So the first software is different when
7  you extract the image, and it's second software
8  when I put -- I use Photoshop, is different.
9     Q.  And so the first picture, what
10  software are you using to take it?  The one that's
11  on top?
12     A.  Pardon?
13     Q.  On the top picture --
14     A.  Yes?
15     Q.  -- what software do you use for
16  that picture?
17     A.  What software?
18     Q.  Software?
19     A.  Oh, software.  Sorry, okay.  See,
20  when images are scanned, I think they are scanned
21  with, again it depends, if it's scanned image, they
22  scan by a Puret system.
23     If it's image taken by photograph, it
24  comes with Canon software, I use Canon camera.

Page 113

1  Then when I adjust images, when I adjust images
2  initially, I adjust some of them in Canon software.
3     The Puret does have some adjustment
4  features embedded usually.  And then when I put
5  labels and cropping and other things, then I use
6  Photoshop.
7     Q.  And here is my question.  For the
8  18 pictures that are in the Carlino report, or SC-1
9  through SC-18, is there any way I can know whether
10  that image has been adjusted?
11     A.  They had to be adjusted, at least
12  for white balance.  I mean, there's no way you can
13  just take a picture and -- sometimes they just --
14  whatever settings in the camera are, it comes out
15  it with perfect white balance, and sometimes I have
16  to -- it depends, I don't remember.
17     Q.  Okay.  So as we sit here today,
18  you're not able to tell me for the Carlino
19  photographs whether you adjusted the image?
20     A.  Yes, I mean there will be more
21  adjustments in the label, there will be labels.
22  But sometimes I have to adjust the top image, the
23  image without the labels.  All depends how the
24  image is obtained, the settings.

29 (Pages 110 to 113)

Vladimir Iakovlev, M.D.

Page 114

1      Q.  And when you adjust the white
2  balance, what does that do to the image?  I'm not a
3  photographer, so I don't --
4      A.  As I said, my goal is to make it
5  as close as possible to what I see in the
6  microscope.  Because when the camera takes -- or
7  any software takes a picture, if the white balance
8  is off, or if it decides to set white balance in
9  the wrong area, it's out of color.
10     But you can judge.  See, even now, this
11  is kind of bluish-greenish, the background.  It's
12  not gray-gray, so there is more blue and green
13  color in the background.  Because technically it
14  should be white.
15     But also it depends on the bulb, if
16  it's taken by the camera it depends on color of the
17  light of the bulb.  So there are filters in the
18  microscope.  Sometimes filters push; sometimes it's
19  not.  But when you push the filter, the intensity
20  of the light drops, the filters are sometimes
21  neutral, sometimes blue.  So most of the
22  microscopes have blue filters to compensate for the
23  light.
24     So there are multiple things which can

Page 115

1  change the color of light.  When the camera takes
2  it, I take -- when I take picture, I mean -- then I
3  open it in the computer, so then I can see if the
4  background is white or not.  So then I use it as a
5  white.
6      Q.  Okay.  So to make sure I
7  understand the process, you take the picture, then
8  you put it on the computer.  Then when you see it
9  on the computer, you decide whether you need to
10  adjust it further?
11     A.  Yeah.  If I see something wrong,
12  then I adjust it.
13     Q.  Then in addition to the original
14  adjustment to the top picture, then there is also a
15  second adjustment that you -- you're not making,
16  that just the software is making on the bottom
17  photograph here?
18     A.  Could be me.  Because see, now I
19  see that there were black and red.  See, I put some
20  in black and some in red.  So I could have made it
21  all black initially, and then I saw that it's
22  confusing, and then I tried to change color of this
23  and somewhere in the way, red color became more
24  intense; I don't remember now.

Page 116

1      Q.  Okay.  And so for example, the
2  fact that the picture on the bottom of SC-1 is a
3  different red than the picture on the top of the
4  SC-1, that could be something that you would have
5  adjusted while you were preparing that picture?
6      A.  Something happens during labeling,
7  that's what I can tell you.
8      Q.  And again, I think I asked this.
9  I just want to make sure I understand this.
10     On the SC-1 through 18, is there any
11  way that I can look at the description of the
12  picture and know whether it has been adjusted or
13  enhanced?
14     A.  They had to be adjusted, most of
15  them, at least the white balance, as I said.
16  That's the basics of processing images.  You have
17  to make sure that they at least white balance is
18  correct.
19     The cropping, turning them, I mean they
20  all come in different angles, I mean, when they are
21  microscopic slides.  So there is a degree of
22  adjustment on all images, and it's unavoidable.
23     Q.  All right.  And the color
24  enhancement that is evident on the bottom slide of

Page 117

1  SC-1, is there any way to know whether that's
2  occurred in any of the other photographs?
3      A.  I don't know, but I can say that
4  least adjustments are done, or least changes are
5  done to the top images.
6      Q.  Okay.  So the top images may be
7  adjusted some, but the bottom images will be
8  adjusted more?
9      A.  Yes, that's the general principle.
10     Q.  On SC-1 you have labeled
11  "inflammation" and then you have labeled "normal
12  tissue"?
13     A.  Yes, a very thin ring of normal
14  tissue.
15     Q.  And how far is the normal tissue
16  on SC-1 from the mesh?
17     A.  I don't think I understand the
18  question.
19     Q.  Well, how far is it?  What's the
20  distance between the mesh and the normal tissue on
21  SC-1?  An estimate.
22     A.  Which part of the mesh?  The most
23  out sort of -- fractions of a millimeter in some
24  places.  And in some places, I would say more

30 (Pages 114 to 117)

Vladimir Iakovlev, M.D.

Page 118

1    than -- close to a millimeter.  It depends.
2         I mean, sometimes I can see the scar
3    plate extends up to three millimeters beyond the
4    mesh.
5         Q.  Okay.  That doesn't occur on SC-1,
6    does it?  It doesn't extend?
7         A.  No.  In some places it's thin; some
8    places it's thicker.  Some places the normal tissue
9    inside is inside the pore.  That's why I do the
10   percentage.
11        Q.  And so what is the -- pick a spot.
12   Here, the middle mesh particle, right there.  If
13   you wouldn't mind just circling that one.
14        A.  Which one?
15        Q.  The middle one.
16        A.  This one?
17        Q.  Yeah.  How far is the normal
18   tissue from that piece of mesh, approximately?
19        A.  .1-millimeter.
20        Q.  So would that be 100 microns?
21        A.  About a hundred microns.
22        Q.  Okay, thank you.
23        Let's turn to SC-2.  Same question.
24   What are you going to say about it at trial?

Page 119

1         A.  Again, this is fibrous bridging,
2    smooth muscle, which is outside of fibrous scar
3    plate.  It just demonstrates where scar plate stops
4    and where normal tissue begins.
5         Q.  If I ask you to orient this
6    photograph to the patient, would you be able to do
7    that?  Would you be able to tell us where in the
8    patient this slide comes from?
9         A.  No.
10        Q.  If I were to ask you where in this
11   specimen this slide comes from, would you be able
12   to do that?
13        A.  No.  Again, I can try to match the
14   pattern most likely to the -- difficult to do.
15        Yeah.  I mean, it's difficult to do.
16        Q.  All right.  So for this slide in
17   SC-2, you would not be able to tell us what part of
18   the specimen it came from?
19        A.  No.
20        Q.  How did the pathological finding
21   which you are making regarding this slide, how did
22   that impact Ms. Carlino?
23        A.  It shows fibrous encapsulation, so
24   it's different from mesh by scar, encasement of the

Page 120

1    mesh fibers.
2         Q.  Any other way in which that would
3    impact Ms. Carlino?
4         A.  Another thing here, because scar
5    plate encases the entire structure, so whatever is
6    outside of the mesh, like mucosa.  So the blood
7    supply would have to go either around the mesh or
8    through this fibrous bridging.  So There's no other
9    way, it's either through it or around it.
10        That's another implication for scar
11   plate, because it's an obstacle for blood supply.
12        Q.  Any other way in which this would
13   impact Ms. Carlino?
14        A.  No.  Stiffness and obstruction of
15   normal blood supply.
16        Q.  And --
17        A.  Contraction as well.  So this
18   would be more of a demonstration that there's scar
19   continuously thin, so when it contracts, it
20   contracts the entire sling.  That's another --
21        Q.  And what was the degree of
22   contraction in SC-2?
23        A.  I don't know.
24        Q.  Now kind of the same question I

Page 121

1    asked you about SC-1, if you can just circle the
2    middle pore.
3         A.  So you want me to circle a pore or
4    fibers?
5         Q.  Well, I said that poorly.  And I
6    was asking about fibers, and thank you for that
7    correction.
8         The middle fiber.
9         A.  (Witness complies).
10        Q.  So let's just take a second and
11   talk about that so the record is clear.
12        The fiber is not actually present?
13        A.  Some of it probably is there, you
14   just cannot see it because it's clear.
15        Q.  Okay.  And can you tell whether
16   it's there or not?
17        A.  Only if it's a blue fiber.  When
18   it's clear, I would need a polarizer to see if it's
19   there.
20        Q.  In this particular one, you didn't
21   look at this photograph to see if it was polarized
22   or not?
23        A.  I don't understand your question.
24        I mean, if I could look at it if it was

31 (Pages 118 to 121)

Vladimir Iakovlev, M.D.

Page 122

1  polarized light?  It didn't...
2      Q.  Well, I'm -- I think you think I'm
3  asking you more than I am.  I know that you have
4  slides in here that you looked at under polarized
5  light.  SC-2, you didn't look at under polarized
6  light; at least not in this photograph?
7      A.  No.  But it's not polarized light
8  to take pictures.  That's straightforward light
9  microscopy.
10      Q.  That's all I'm trying to establish
11  here.  And as you look at that picture, can you
12  tell whether the fiber did or didn't remain in the
13  slide?
14      A.  It wasn't my purpose.
15      Q.  And again, I'm not -- again, I
16  think maybe I'm just not doing a very good job with
17  the question.  Let me try it again.
18      Sometimes the fiber gets removed from
19  the slide because of the cutting process; doesn't
20  it?
21      A.  That's correct.
22      Q.  Okay.  And that's just as the
23  microtome slices it, sometimes it will drag the
24  fiber out of the --

Page 123

1      A.  Most of it is not dragged by
2  microtome.  I think microtome does good job, it
3  cuts with -- it gets detached during processing.
4  Because non-degraded polypropylene is solid
5  material, and it doesn't have any porosity to stick
6  to the slide.  Therefore, its adherence is very
7  loose.
8      The only thing which is holding it, is
9  the degradation layer, which is porous and it's
10  stuck to the tissue.  So if that bond is not strong
11  enough, it just curls up and it floats away.
12      Q.  Okay.  And so, for example, the
13  top of the diagram in SC-2 the mesh fiber might be
14  there, it might not be there?
15      A.  May or may not, yes.
16      Q.  If it's not there, I mean, you can
17  tell from looking, that mesh fiber used to be
18  there?
19      A.  Yes, I certainly know it was
20  there.
21      Q.  Sure.  And again, I'm just trying
22  to make the record clear on this.
23      And so either it's not visible on the
24  slide, or it's been removed in the cutting process?

Page 124

1      A.  It's either not visible or it
2  became detached during processing.
3      Q.  Okay.  So then same question
4  regarding the fiber there.  How close is the normal
5  tissue to that fiber?
6      A.  Within 100 microns, I mean, the
7  closest.  If we're talking about average, for
8  median, or minimum --
9      (Reporter sought clarification).
10      A.  Average, median or minimum, or
11  maximum.  And that specific fiber in the middle,
12  it's less than 100 microns.
13      Q.  All right.
14      A.  But some areas I can see from
15  here, probably going up to 3, 4 hundred microns, or
16  even a millimeter.
17      Q.  And is this photograph on the
18  bottom of SC-2, is the color adjusted on that
19  photograph?
20      A.  As I said, I mean, all of the
21  images would have to be adjusted to a degree.  How
22  much of an adjustment was it, there are many
23  factors.
24      I try to make them more uniform, so

Page 125

1  they have the same intensity of color, same
2  contrast, so they look more or less the same.
3      Q.  And this stain that you used for
4  SC-2, that's an actin stain to show the smooth
5  muscle?
6      A.  Yes.
7      Q.  And I think this is self-evident,
8  but I just don't remember if I asked you about this
9  on the SC-1.
10      The bottom slide where the yellow is
11  drawn in, that's something you've drawn in on the
12  computer to show where the mesh fiber was?
13      A.  Yes.
14      Q.  Okay.  Earlier, when you were
15  discussing SC-2, you talked about blood supply, and
16  there had been no blood supply to the tissue
17  surrounding the mesh.  Is that tissue innervated?
18      A.  Which tissue?  Which is outside?
19      Q.  The tissue that is shown on SC-2;
20  is that tissue innervated?
21      A.  Yeah, I did the S100 stain, so --
22  and I think a neurofilament stain.
23      Q.  Dr. Iakovlev, let's talk a little
24  about SC-3.  What are you going to tell the jury

Vladimir Iakovlev, M.D.

Page 126

1    about that slide?
2         A.   This part clearly showed two parts
3    of the mesh, which were sectioned in one section.
4         So if it was a flat permutation, it's
5    either flat sectioning along the surface, and then
6    we would get the pattern of the mesh crossing
7    squares.
8         But in this case, there are two planes
9    on the mesh.  So the mesh curled and twisted to
10   produce this type of orientation in one section.
11        Q.   Can you tell us from what part of
12   the body the specimen that's depicted on SC-3 came
13   from?
14        A.   What do you mean "part of the
15   body"?
16        Q.   Can you orient it in the body?
17        A.   It's suburethral, somewhere of
18   urethral.
19        Q.   Could you orient it?  If I gave
20   you a diagram, could you show us where it was?
21        A.   Not specifically.  I can show the
22   area where it was, but to get perfect orientation
23   would be impossible to restore.
24        Q.   And can you tell us where in the

Page 127

1    specimen this came from?
2         A.   What do you mean?
3         Q.   Like, for example, could you draw
4    a diagram of the specimen and show us what part of
5    this specimen is depicted in SC-3?
6         A.   Well, I didn't have a diagram.  I
7    received just a slide.  So if I had a diagram, I
8    could try to find the twisted spot.
9         Q.   But you don't have a photograph or
10   diagram in this case?
11        A.   No.
12        Q.   So because of that, you can't
13   orient this and show us what part of the specimen
14   it's from?
15        A.   That is correct.
16        Q.   Now, could you explain to me again
17   your testimony regarding the different planes; and
18   I apologize, I don't understand it.  So, how is it
19   that you say the different planes show that there's
20   curling?
21        A.   So if we have a flat object; mesh
22   is flat when it's manufactured.  So there are two
23   ways of sectioning it.  Either it's parallel, and
24   then you get the pattern on the mesh with squares.

Page 128

1         Or, either perpendicular or angled, but
2    in any case, it is a cross-section through the
3    plane.
4         So you will have -- if it is flat, you
5    will have just one plane of the mesh.  Like we saw
6    in picture number one.  So, flat, one section.
7         Now, to produce two layers of mesh in
8    the same section, you have to have second layer.
9    And I assume it was just one device.
10        There is no indication that there were
11   two meshes inserted.  So it's the same mesh which
12   folded or curled, and the other portion was also
13   curved this way.
14        So one is straight, one is curved.  So
15   the orientation is somewhat similar to this.
16   That's the only way, geometrically, to produce that
17   figure in one section.
18        Q.   Now, you cannot say whether that
19   occurred during implantation or occurred
20   postimplantation, can you?
21        A.   No.  It occurred somewhere in the
22   body.  Scar tissue immobilized that shape, which is
23   growing around it, and it became fixed.  When it
24   occurred?  I know that it occurred before

Page 129

1    explantation, that's as far as I can say.
2         Q.   Okay.  But you can't tell us
3    whether it occurred at the time of placement or
4    whether it occurred postplacement?
5         A.   No.  My understanding is, I mean,
6    they tried to make it flat and they checked it
7    intraoperatively so...
8         Q.   What is your opinion regarding why
9    you know that this happened in vivo and did not
10   happen post-explantation?
11        A.   All spaces are filled with scar
12   tissue.  Scar tissue can grow when only when it is
13   in vivo.
14        This whole area, here in between -- do
15   you want me to mark it?  This is all filled by scar
16   tissue (indicates).  And it's the only the body
17   which can produce scar tissue.
18        Q.   Okay.  And I guess my question is
19   more, how do you know that the curling of the mesh
20   occurred in vivo, as opposed to curling of the
21   specimen post explantation?
22        A.   I just told you.  There is scar
23   tissue in that shape between the mesh fibers.  The
24   only way to produce scar tissue is to have that

33 (Pages 126 to 129)

Vladimir Iakovlev, M.D.

Page 130

1  shape in the body while scar tissue forms around
2  it.
3       Q.  And scar tissue does not deform
4  post-explantation?
5       A.  What do you mean deform?  It's not
6  deformation.  It's the location between the fibers.
7       Q.  And that -- and it's your --
8       A.  It cannot be grown between the
9  fibers outside of the body.
10      Q.  And it's your opinion that that
11  shape cannot change post-explantation?
12      A.  Shape of mesh, or shape of scar
13  tissue?
14      Q.  Shape of scar tissue?
15      A.  We're not talking about shape.
16  We're talking about the location of scar tissue.
17  Location of scar tissue is between mesh fibers.
18  Shape can change, but the location cannot change.
19      Q.  Okay.  And it's your testimony
20  that that location cannot change post-explantation?
21      A.  That's impossible.  That's a
22  process in vivo.
23      Q.  And you agree with me that vaginal
24  tissue does shrink post-explantation?

Page 131

1       A.  Yes.
2       Q.  You agree that vaginal tissue has
3  a different elasticity?
4       A.  What do you mean?
5       Q.  Is vaginal tissue elastic?
6       A.  Normal?
7       Q.  Yes.
8       A.  Yes.
9       Q.  And when a piece of tissue is
10 excised from the vagina, does it contract?
11      A.  Depends what tissue.  If it is
12 softer tissue, it can contract.  If there is
13 muscle, it can contract.  If it's scar tissue,
14 firm, just pure collagen, it wouldn't contract
15 much.
16      Q.  Dr. Iakovlev, did any of
17 Ms. Carlino's treating physicians reach the
18 conclusion that her mesh curled?
19      A.  Might be something described in
20 the operative report.  Sometimes they describe it,
21 sometimes they don't.  I mean, it depends.  All
22 depends on detail -- how much detail they put in
23 their operative report.
24      Sometimes I get quite curled meshes in

Page 132

1  the report, let's see.  This is implantation.  I
2  have to see the explant record.
3       EXHIBIT NO. 10:  Operative Report dated
4       December 17, 2010, by Ellen Conner, M.D.,
5       Bates No. CARLINOS_JSUMC_MDR00151 -
6       MDR00152.
7  BY MR. COMBS:
8       Q.  And, Doctor, I've handed you
9  Dr. Conner's operative report from the December 17,
10 2010 explantation.  And Dr. Conner did not make the
11 finding that Ms. Carlino's mesh had curled in vivo,
12 did she?
13      A.  Doesn't say either way what's flat
14 or curled, doesn't describe mesh much.  Describes
15 maybe what was done, rather than the state of the
16 mesh.
17      Q.  There's no finding in Dr. Conner's
18 report that the mesh is curled, is there?
19      A.  There's no description of the
20 mesh.
21      Q.  And you haven't reviewed
22 Dr. Conner's deposition, have you?
23      A.  No.
24      Q.  On the photographs on SC-3, again,

Page 133

1  the color is changed between the top and the bottom
2  slides.  Is that part of the process that you told
3  us about earlier with the Photoshop program?
4       A.  I'm not sure if there is any
5  change in color; it looks the same to me.
6       Q.  Okay.  So is it your belief that
7  the color is the same on these slides?
8       A.  Yeah, I mean, see, depending on
9  printer, also.  I can see this is more yellow, this
10 is greenish, all these colors are different.  And
11 it also depends on Word, when it gets embedded in
12 Word.  Word does something to images, I have no
13 idea.
14      Q.  All right.  So the use of the
15 program Word can also be something that can affect
16 the --
17      A.  See, the thing is that I'm not
18 relying on any color, it's illustrations.  I don't
19 know why we're so hooked on the colors.
20      Q.  Okay.  Dr. Iakovlev, the food is
21 here.  Do we want to take a break?
22      -- RECESS AT 12:35 --
23      -- UPON RESUMING AT 1:14 --
24

34 (Pages 130 to 133)

Vladimir Iakovlev, M.D.

Page 134

1    BY MR. COMBS:
2       Q.  Okay.  Dr. Iakovlev, are you ready
3    to go?
4       A.  Yes.
5       Q.  Thank you.  So when we took the
6    break, I had asked you about SC-3 and now I'm going
7    to ask you about SC-4 and SC-5.
8          It's my understanding from the
9    narrative in your report, you were using those
10   slides to demonstrate foreign body reaction to the
11   jury?
12      A.  That's correct.
13      Q.  So what is it you're going to use
14   these two slides to tell the jury?
15      A.  That there is foreign body
16   reactions surrounding the mesh fibers.  And then
17   there is scar plate on the outside of the foreign
18   body reaction.
19      Q.  And is this foreign body reaction
20   mild, moderate, intense?
21      A.  For that specific, I would say
22   it's pretty intense, and that's pretty much as high
23   as it goes.  And I'm judging it, because I've seen
24   300 specimens.

Page 135

1       Q.  And what is your criteria that you
2    use to scale the foreign body response?
3       A.  I use -- well, the number of
4    foreign body type cells or micro fibers.  I mean,
5    either it's one layer in occasional fibers, or they
6    become multilayered, and there are several cells.
7    When this halo or foreign body reaction is several
8    cells thick.  And it then becomes confluent, like
9    that multilayering is pretty much encircling most
10   of the fibers.  As you can see here, that this area
11   is confluent, and this area is confluent
12   (indicating).
13      Q.  Dr. Iakovlev, I'm sorry to
14   interrupt you.
15         -- OFF THE RECORD DISCUSSION --
16         BY MR. COMBS:
17      Q.  Okay.  Dr. Iakovlev, can you mark
18   in green what you're talking to us about, about the
19   confluent layer?
20      A.  So I outline the macrophages -- I
21   can outline them here.  As you can see, these are
22   larger areas; in comparison with this one, it would
23   be smaller areas here.  So there would be more
24   confluency in the SC-4 rather than SC-5.

Page 136

1          So what I use as a criterion, as I
2    said, number of cells, multilayering, confluency,
3    and the extent when this confluency stretches along
4    the mesh.
5          So if a segment of the mesh within the
6    4X objective has this confluent foreign body type
7    reaction, it would be a grade four.
8          If there are some gaps, some fibers do
9    not fully classify, qualify for confluent, then it
10   would be grade three.
11         And then if I have only occasional
12   patches of this confluent or multilayered -- not
13   confluent, multilayer, it would be grade two.
14         Very occasional macrophages, grade one.
15   And no macrophages at all would be grade zero.
16   That's pretty much it.
17      Q.  So is it a continuum from zero to
18   four?
19      A.  Yes.
20      Q.  Four is the highest, zero the lowest?
21      A.  Yes.
22      Q.  And how did you grade this?
23      A.  This would be grade four.
24         But again, see, I would have to have a

Page 137

1    microscopic field of 4X subjective; this is much
2    smaller.
3          So if we would assume that this extends
4    further up to here (indicating), and it has the
5    same appearance, this would be grade four.
6       Q.  All right.  And so the record is
7    clear, what you're showing us with your hands is
8    that the top picture on SC-4, that if there was
9    confluent en circulation on additional pieces of
10   mesh -- okay.  So we've turned now back to SC-1?
11      A.  So SC-1, you can see that there is
12   confluency, at least from this moment, somewhere in
13   here.  So this would be grade four (indicating).
14      Q.  And you marked that with a green
15   magic marker?
16      A.  Yes.  Assuming if we check this
17   area, this gap (indicating) - I'll mark it with
18   parallel lines - there is not as much foreign body
19   reaction.
20         But I've marked foreign body reaction
21   by the worst area.  So the grading is selected by
22   the worst, by the most inflamed area.  Because this
23   would be more important.
24      Q.  Is there any written criteria that

35 (Pages 134 to 137)

Vladimir Iakovlev, M.D.

Page 138

1  you're referring to in this grading of foreign body
2  reaction?
3          A.  I think it was in one abstract
4  somewhere -- maybe not, I don't know.  I'm using it
5  for future analysis.  I don't think paper, full
6  paper -- no.  Full paper was not written or
7  published using this type of analysis.
8          Q.  Is this your own analysis or is
9  this to reference someone else?
10         A.  No, the grading was designed by me.
11         Q.  Okay.
12         A.  After I've seen 200 specimens and
13  so forth, then I could analyze what's happening,
14  and I had a full spectrum of what is the lowest and
15  what is the highest.
16         I picked the worst ones, and this would
17  be grade four.  I picked the intermediate ones, and
18  then I tried to decide what would be more reliable
19  reproducible criteria, and then I came up with this
20  system.
21         Q.  Okay.  As of today, the system is
22  not published anywhere?
23         A.  No.
24         Q.  And if you could -- I don't want

Page 139

1  to retread this testimony at all, but if you can
2  quickly tell us, to make sure that I understand.
3         Zero is no microphages?
4         A.  Yeah, but I'm not sure while we're
5  talking about this.  This is not directly relevant
6  to my opinions.  My opinions are based on if there
7  is or there is not foreign body reaction.
8         So when I do the grading, this is for
9  future analysis.  I mean, I can tell you that this
10  is intense, but the precise sort of grading and
11  criteria and everything else, I mean, this doesn't
12  affect my opinions.
13         Q.  Okay.  For Ms. Carlino, that's
14  grade four?
15         A.  I would grade it as grade four.
16  You can check this in my pathology report if it was
17  a grade four.
18         Q.  I think it's on the very back of
19  that?
20         A.  Yes, it was grade four.
21         Q.  Okay.  And could you just briefly
22  again tell us the definition of grade four.  I just
23  want to make sure it's clear on the record.
24         A.  To me, grade four, as I said, was

Page 140

1  the highest possible foreign body response.  So
2  when I reached the point when I had enough
3  specimens to feel that I had a whole spectrum of
4  foreign body reaction, I take the worst ones and
5  analyzed what is common between them.
6         I realized that there is confluency,
7  and then I picked the times four objective as a
8  criterion to see the confluency of foreign body
9  reaction.  Because if I switched to ten, then I
10  would find some gaps all the time.
11         Q.  Okay.  So let's look at the bottom
12  picture.  And in it you have culled out on SC-4,
13  normal tissue.
14         So we don't get our colors confused,
15  how far is the normal tissue from the mesh fiber in
16  SC-4?
17         A.  Minimum, medium, maximum?
18         Q.  Like, for example, there
19  (indicating).  How far is that?
20         A.  This was the minimum.
21         Q.  How far is that?
22         A.  This is the smallest.  This would
23  probably be 40 microns.
24         Q.  Could you circle that?

Page 141

1          A.  (Witness complies).
2          Q.  And you circled that in red.  And
3  that would be approximately 40 microns?
4          A.  Yes.
5          Q.  And for example here, where you
6  have "scar"?
7          A.  Here, it would be much thicker,
8  200 microns, somewhere in that range, 300.
9          Q.  Could you just, for the one that's
10  40 microns, just put an "A".  And for the one
11  that's 300, just put "B".  Just so the record is
12  clear.
13         A.  (Witness complies).
14         Q.  Thank you.
15         Is the area that you've marked with
16  "B", is that larger or smaller than the diameter of
17  the mesh fiber that's depicted on SC-4?
18         A.  It's about the same diameter, so
19  we can use it.  I mean, the diameter should be
20  about 150.  So I guess that would be 150.  Yes, I
21  could use that as a measurement.
22         Q.  Okay.  So after comparing the area
23  circled in B with the mesh fiber, your estimate
24  would be, it would be approximately 150 --

36 (Pages 138 to 141)

Vladimir Iakovlev, M.D.

Page 142

1          A.  Probably closer to 200, because
2   tissue retracts somewhat.  So this space is a
3   little bit larger.  So you can even see, this is
4   the fiber here.  So this is 150, roughly, for TVT.
5          So you can see that there is a
6   direction about 20 percent, 25 percent; so it would
7   be 170-something.
8          Yes, this would be closer to 200, just
9   over 200 microns.
10          Q.  And when you say "closer to 200",
11   you're referring to the one you circled at B?
12          A.  Yes.
13          Q.  Thank you.
14   Dr. Iakovlev, I want to ask you now
15   about slides SC-6 through 11.  Are those ones that
16   collectively you are using to discuss the nerves in
17   Ms. Carlino's specimen?
18          A.  Yes.  This is the images of the
19   innervation in the specimen.
20          Q.  Now, in Ms. Carlino's case, you
21   did not rely on the opinion of a neuropathologist,
22   did you?
23          A.  No.
24          Q.  Did you count the nerve density

Page 143

1   for Ms. Carlino?
2          A.  We can check.  Yes, I did.
3          Q.  And what was your finding on the
4   nerve density?
5          A.  Entire issue .982.  Within mesh
6   pores, and in this case mostly pores, .4.  And
7   outside of the mesh, 1.29.
8          Q.  I couldn't hear the last thing you
9   said?
10          A.  1.29.
11          Q.  So is it your opinion that
12   Ms. Carlino's nerve density is abnormal?
13          A.  There's no such thing as normal or
14   abnormal.  I mean, nerve density, as I said, I
15   mean, I'm collecting as future analysis.  It has
16   nothing to do with my opinions.
17          My opinions are based on the presence
18   or absence of the nerves.  I don't think we need to
19   discuss density at all.
20          Q.  All right.  Your calculation of
21   Ms. Carlino's nerve density does not play a role in
22   your opinion in this case?
23          A.  No.
24          Q.  Did you make any finding in your

Page 144

1   report that any of Ms. Carlino's nerves are
2   abnormal?
3          A.  It's hard to say.  It was little
4   bit dried and cauterized.  So the tissue wasn't
5   really in a perfectly crisp state.  So it would be
6   very difficult to assess morphology of the nerves
7   due to artifacts; drying and cautery.
8          Q.  At the trial of this case, you do
9   not plan to tell the jury that any of Ms. Carlino's
10   nerves were at fault; do you?
11          A.  No.  I have no reason to believe
12   that they were abnormal.
13          Q.  Okay.  And no finding, that, for
14   example, Ms. Carlino had any traumatic neuromas
15   depicted in any of the slides?
16          A.  No, I didn't detect that.
17          Q.  No findings that Ms. Carlino had
18   an entrapped nerve?
19          A.  Well, they are entrapped.  They
20   are in the scar tissue.  So by location within the
21   scar, they're entrapped in the scar.
22          Q.  Did you make any finding that
23   Ms. Carlino had nerves that you believed were
24   entrapped within pores of mesh?

Page 145

1          A.  Yes.  In fact, there were two
2   branches which I assessed are present within the
3   nerve pores.
4          Q.  Which slides are those?
5          A.  I took them, and which slides --
6          Q.  I didn't ask that.
7          A.  I don't remember, because these
8   slides, some of them are so high magnification I
9   don't know if it was in the pore or outside.
10          Q.  Okay.  So what would your
11   testimony to the jury be on that point of whether
12   any nerves were entrapped within Ms. Carlino's
13   mesh?
14          A.  All of this shows -- most of the
15   shown nerve fibers are within the scar tissue.
16   They are entrapped in scar tissue.
17          If it's outside or inside, it doesn't
18   really matter.  Because one section can be inside
19   the pore and then outside of the pore; it makes no
20   difference.
21          It's in the scar tissue surrounded by
22   the mesh, the whole mesh scar plate is one solid
23   structure.
24          Q.  Just to make sure that I

37 (Pages 142 to 145)

Vladimir Iakovlev, M.D.

Page 146

1  understand.  Your testimony will be that's it's
2  within the scar tissue, but you cannot say whether
3  it is or is not within the mesh pore?
4       A.  Two of them were assessed as
5  within mesh pore.
6       I mean, if you just think about this
7  one -- just look at SC-7.  So the mesh extends
8  somewhere from here to there.  So partially, this
9  nerve branch is within the space within the mesh.
10      This is kind of on the line, so this
11 would be more difficult.  But in this image, I
12 don't know what's on this side, if I counted these
13 specific nerve branches inside, I don't know.
14 Again, it makes little difference.
15      It only makes a difference when there's
16 a traumatic neuroma right inside.  Scar tissue is
17 innervated, that's the main thing.
18      Q.  And you made no finding in this
19 case that Ms. Carlino had mesh filaments within the
20 nerve ganglia, did you?
21      A.  I don't think I had ganglia.  No.
22 There are no ganglia.
23      Q.  And do you agree that a
24 pathologist cannot look at a nerve on a

Page 147

1  histopathological slide and know whether it is
2  causing pain?
3       A.  Say it again.  Cannot look at
4  what?
5       Q.  Do you agree that a pathologist
6  cannot look at a nerve on a histopathological
7  slide, and know whether it is causing pain?
8       A.  Well, pain is a transient
9  sensation.  So this would be -- so there is
10 something abnormal; pathologists can describe what
11 is abnormal, if this can cause pain.  And then when
12 you correlate it with clinical symptoms, and then
13 you correlate it with pathology, this becomes a
14 conclusion.
15      Q.  Based on the slide itself, you
16 cannot make that finding?
17      A.  Well, I can say what's abnormal in
18 the slide.
19      Q.  Okay.
20      A.  Scarring is abnormal, presence of
21 foreign body is abnormal, innervation within the
22 scar is abnormal, because there are branches that
23 are trapped in the scar.
24      Now, this was removed for pain, for

Page 148

1  dyspareunia.  And the only abnormality I see, scar
2  tissue with foreign body, and it is innervated.
3  Putting these pieces together, this is the lesion
4  and this caused the pain.
5       Q.  Now, do you know that from looking
6  at the slide?  If somebody presented you with a
7  slide and you had no clinical history, would you be
8  able to look at it and say whether that person was
9  or was not in pain?
10      A.  When I look at the slide, I see
11 scar tissue and nerve branches within scar tissue.
12      I would say, this tissue is at risk for
13 pain; without any history.  Because it's abnormal
14 tissue, it's scar, and nerves are present in
15 abnormal environment.  So without any history, I
16 would say that this tissue is at risk for pain
17 already.
18      If I have a history of pain, I say
19 "well, here I go, that's the cause of pain".
20      Q.  Okay.  Without a history, you
21 cannot look at it and tell whether the person is or
22 is not in pain, can you?
23      A.  Without the history, if I look at
24 this slide, I would say, there is reasonable degree

Page 149

1  of probability that this was painful.  That's what
2  I would say.
3       Q.  Is there any clinical literature
4  that you can point me to that makes that
5  correlation for pelvic pain?
6       A.  For pelvic pain?
7       Q.  Yes.
8       A.  There was at least one case report
9  when the pain was there, the sling was excised and
10 there was traumatic neuroma, or the nerve was
11 deformed.
12      (Reporter sought clarification.)
13      The nerve was deformed.  One for sure,
14 that was certainly for transvaginal.  That one I
15 remember for sure.
16      Yeah, at least one paper for
17 transvaginal sling.  And the pain was caused by
18 neuroma, or nerve deformation caused by the mesh.
19      Q.  And there is no nerve deformation
20 or neuroma in Ms. Carlino's case, is there?
21      A.  There are nerves in there, in the
22 spaces.
23      Q.  Okay.  But you detected no
24 neuromas in Ms. Carlino's case, did you?

38 (Pages 146 to 149)

Vladimir Iakovlev, M.D.

Page 150

1    A.  No.  I detected just nerves.
2    Q.  Dr. Iakovlev, I want to ask you
3  one follow up question on that.
4    The case report that you mentioned, do
5  you remember who published that?
6    A.  No, I don't remember.  I said
7  that.
8    Q.  Do you know at what point it was
9  published?
10    A.  Quite a number of years ago, at
11  least four or five years ago.  I think four years.
12    Q.  Any other literature that you're
13  relying on for that opinion other than that one
14  case report?
15    A.  Kosterhaliften mentioned that in
16  his collection of hernia specimens, at least
17  60 percent of those hernias which were removed for
18  pain, contained nerve abnormalities, nerve
19  involvement.  That was for hernia.
20    And then we published paper just
21  recently -- or had some abstracts in the paper
22  where we published, when we compared hernia
23  specimens removed for recurrence and compared nerve
24  density with those which were removed for pain, and

Page 151

1  nerve density was much higher.  Of course we had
2  some neuromas, but not all of them had neuromas,
3  just higher in their density.
4    (Reporter sought clarification).
5    A.  Some of them just had pain and
6  high nerve density.
7    Q.  Dr. Iakovlev, what are the various
8  types of nerve receptors?
9    A.  Well, either we're talking about
10  pain receptors, and then we're talking about other
11  receptors, like temperature, touch, vibration.
12    Q.  What are the pain receptors?
13    A.  Pain receptors are usually just
14  bare endings of the nerves.
15    Q.  And what are they called?
16    A.  Nociceptors.
17    Q.  And what is the prevalence of
18  nociceptors in the interior vaginal wall?
19    A.  What do you mean "prevalence"?
20    Q.  What is the prevalence?
21    A.  What's the density?
22    Q.  Okay.  What is the density?
23    A.  I don't know.  It's there.  I
24  mean, that's why we can sense -- I think we're

Page 152

1  drifting again into general questions.
2    Q.  What magnification does it take to
3  detect a nociceptor?
4    A.  You need a stain to detect.
5    But we are drifting into general
6  questions again.  We won't have time to do the
7  second case.
8    Q.  What stain do you need?
9    A.  You can try PGP 9.5, I believe.
10    Q.  And what magnification do you
11  need?
12    A.  Might be quite high, up to 100.
13    Q.  And none of Ms. Carlino's slides
14  are stained with PGP 9.5, are they?
15    A.  No.  I don't need it.  Why do you
16  need that?
17    Q.  Okay.  My question is:  Were any
18  of them stained with PGP 9.5?  And the answer is
19  "no", correct?
20    A.  That is correct.
21    Q.  Now is the innervation of scar
22  tissue a normal or abnormal finding?
23    A.  That's a general question.
24    Q.  In Ms. Carlino's case, is it a

Page 153

1  normal or abnormal finding that you have found that
2  Ms. Carlino's mesh is innervated -- strike that --
3  that the scar is innervated in Ms. Carlino; is that
4  normal or abnormal?
5    A.  It's abnormal.  Scar tissue is
6  abnormal anywhere.  So any other changes within the
7  scar tissue are abnormal, because the environment
8  is abnormal to begin with.
9    Q.  Is it a normal or abnormal finding --
10  ignoring that the scar tissue is abnormal -- is it
11  normal or abnormal that her scar tissue is
12  innervated?
13    A.  I think you're mixing terms.
14    Is it normal to die from heart attack?
15  Yes, it is, because people do die.  Can we use
16  "normal" in that terminology?  No.
17    I think we need to separate normal, as
18  normal tissue without any changes.  Or tissue
19  changes which are expected as a response to
20  something.  So let's separate.
21    Normal, normal tissue, no changes.  If
22  there's any change, then we will use the term "as
23  expected".
24    Q.  Okay.  Is the innervation of the

Vladimir Iakovlev, M.D.

Page 154

1  scar tissue with Ms. Carlino, is that expected?
2        A.  It is expected.  It could have
3  been expected even before the meshes were put on
4  the market.
5        Q.  And that would be true of any scar
6  tissue, wouldn't it?
7        A.  Yes.  Some of them get innervated;
8  some of them don't.  Some of them get more dense
9  innervation, some of them are less dense.
10       Q.  All right.  So let's talk about
11 SC-6.  You stained that with S100?
12       A.  Yes.
13       Q.  Why did you stain it with S100?
14       A.  Wait a second.  Some of them were
15 stained with neurofilament.
16       Q.  SC-6, it says "S100".  I'm not
17 trying to trick you.
18       A.  Yes, it was S100.
19       Q.  Was the point of that to show the
20 nerve tissue?
21       A.  Yes.  It's the most robust stain.
22 The PGP 9.5 doesn't work well, either.  I tried
23 different stains, and my conclusion was that S100
24 is the best, most robust stain for the purpose I am

Page 155

1  doing.  So that was my conclusion.
2        Q.  Now, let's talk about SC-6.  What
3  is it that you're going to tell the jury about
4  SC-6?
5        A.  There are nerves in the tissue
6  surrounding the mesh.
7        Q.  And as it says in the little
8  legend, that's where the black arrows are pointing?
9        A.  Yes.  It helps to identify the
10 nerve branches.
11       Q.  Okay.  Where was this piece of
12 tissue in Ms. Carlino's body?
13       A.  Somewhere around the mesh.
14       Q.  Would you be able to orient it for us?
15       A.  No.
16       Q.  Where is the slide taken from
17 the specimen?
18       A.  What do you, "where is the slide"?
19       Q.  Yeah, if we had a diagram, would
20 you be able to draw where this specimen is from?
21       A.  If I have a slide, and I can find
22 it in the microscope then I could draw it for you.
23       Q.  In this case you have no diagram
24 or picture, right?

Page 156

1        A.  No.  You have the slide, I sent it
2  to you.
3        Q.  I understand.  But you don't have
4  a diagram of the specimen?
5        A.  No, I don't understand why --
6        Q.  You don't have a photograph of the
7  specimen?
8        A.  No.  Why do we need it?
9        Q.  So my question is, can you tell us
10 what part of the specimen this slide comes from,
11 SC-6?
12       A.  No.
13       Q.  Where is the mesh located in SC-6?
14       A.  Probably just below, somewhere here.
15       Q.  Would you agree with me that SC-6
16 does not depict any mesh fibers?
17       A.  That's correct.
18       Q.  Doesn't depict any mesh pores
19 either, does it?
20       A.  Not sure about the pores.  Pores
21 are space which is filled with scar tissue, it
22 cannot represent part of the pore.
23       Depending on mesh fiber location, if
24 they are located diagonally, like in corners, then

Page 157

1  part of this image would be in the pore.  Again, I
2  don't know.
3        Q.  And would you agree with me that
4  what is depicted on SC-6 are nerve twigs?
5        A.  See, it's a sliding scale, what
6  you call a twig, what you call a branch, what you
7  call a neurofiber or nerve.
8        Usually, usually to call it the nerve,
9  you need perineurium.  Anything smaller than that,
10 it doesn't have defined perineurium, then it
11 becomes a nerve twig.
12       Anything which contains only one single
13 nerve fiber would become a nerve fiber.
14       Q.  All right.  Do you describe what
15 you have pointed out in SC-6 as a nerve twig?
16       A.  This larger one could be
17 classified as a nerve.  The other one could be -- I
18 mean, it's hard to say.  The tissue was a little
19 bit compromised, and it didn't work well.  So it
20 was a little bit changed, altered.
21       The smallest one would probably be
22 nerve twig.  The larger ones could be nerve twigs,
23 could be nerve, like nerves.  I mean, again, there
24 is no difference.  It's all just thickness of them,

Vladimir Iakovlev, M.D.

Page 158

1    how many nerve fibers are within that bundle.
2        Q.  Dr. Iakovlev, do you see on here
3    there are some white bands that are running
4    parallel to the slide?
5        A.  Yes.
6        Q.  So, for example --
7        A.  Uhm-hmm.
8        Q.  That (indicating).
9        A.  Yes.
10       Q.  What are those?
11       A.  This is retraction, when tissue
12   retracts during processing.  So then there is space
13   in between them.
14       Q.  And what about that?  Why don't
15   you circle that; what is that?
16       A.  So this looks like a small vessel,
17   and this as well (indicating), from this power,
18   what I see.  But then just below that, it's
19   retraction.
20       Q.  Okay.  So what you've circled on
21   SC-6 would be things that looked to you like blood
22   vessels?
23       A.  Yes.  Most likely blood vessels,
24   not lymphatics.

Page 159

1        Q.  And those would be within what you
2    have described as a scar plate?
3        A.  Yes.
4        Q.  The nerve fibers that you've
5    identified on SC-6, are those coming from a
6    peripheral nerve?
7        A.  What do you mean?  They're all
8    peripheral nerves.  You mean autonomous or --
9        Are you asking about peripheral nerve
10   system versus autonomous?
11       Q.  Yes.
12       A.  That's difficult question.
13   Because some of the parts of the autonomous nerve
14   system are myelinated, so they will be stained by
15   some kind of stain.
16       In any case, autonomous or
17   nonautonomous, they are combination of motor and
18   sensory, both.
19       Q.  You don't know whether that is a
20   peripheral or autonomic nerve, do you?
21       A.  As I said, some of them could be
22   either.
23       Q.  But you can't --
24       A.  No, I cannot separate them, no,

Page 160

1    that's true.  But autonomous nervous system also
2    conduct pain, otherwise, you wouldn't feel pain in
3    the internal organs.  So it doesn't matter what
4    type of neuro system they coming from, they can
5    deliver pain sensation; that's the main reason.
6        Q.  What nerve are these fibers
7    branching from?
8        A.  That would be impossible to trace.
9    I mean, they are just small branches.
10       Q.  And you do not know what nerve
11   they --
12       A.  They don't have names.  They are
13   so small, they don't have any names.
14       Q.  And do you know what nerve they
15   ultimately branch from?
16       A.  No.
17       Q.  For any of the nerves that are set
18   forth on SC-6 through SC-11, you cannot tell us
19   whether that is a sensory nerve, can you?
20       A.  I can tell you one thing.  It
21   doesn't matter what nervous system they coming
22   from, what nerves they coming from.  Some of them
23   will be delivering sensation; it's unavoidable.
24       Q.  So here is my question:  For the

Page 161

1    nerves that are depicted from SC-6 to SC-11, you
2    cannot tell us whether any of those are sensory
3    nerves, can you?
4        A.  There is no such thing as --
5    well, there may be some purely sensory nerves, yes.
6    Most of the peripheral nerves will be mixed in
7    autonomous nervous system, it all depends.
8        (Reporter sought clarification).
9        A.  Some of the peripheral nerves are
10   sensory; most of the peripheral nerves will be
11   mixed.  Some of the autonomous nerves will be
12   sensory and motor, it all depends pre-ganglionic or
13   post-ganglionic.
14       But the main piece of information we
15   need to know, that at least some of them will
16   contain some of the sensory fibers.
17       Q.  For any of the nerves that are
18   depicted on SC-6 through SC-11, you cannot tell us
19   whether that is a sensory nerve, can you?
20       A.  I just answered you.  The main
21   piece of information that some of them will contain
22   at least some sensory fibers within the nerves.
23       You separating nerves, we have to think
24   about fibers, not nerves.  Nerve is a combination

41 (Pages 158 to 161)

Vladimir Iakovlev, M.D.

Page 162

1    of fibers, signals are going through the fibers,
2    each fiber can deliver a different signal.
3        Q.  Okay.  I'm pointing at this nerve,
4    far left on SC-6.  You can't tell whether that's a
5    sensory nerve, can you?
6        A.  Let's talk about fibers not --
7        Q.  Dr. Iakovlev, please answer my
8    question.
9        A.  Peripheral nerves are almost all
10   mixed motor and sensory.  You're trying to separate
11   something which doesn't exist -- it does exist, but
12   it's very small proportion, just purely sensory.
13       I can tell you if it is peripheral
14   nerve, it's not autonomous, 100 percent it will
15   have some sensory fibers.  If it's autonomous, then
16   it depends on the nerve.  Some of them will have
17   sensory fibers, some of them will not.
18       Q.  And the nerve I just pointed to,
19   far left on SC-6, you cannot tell us whether that
20   is or is not a sensory nerve?
21       A.  So based on the classification --
22       Q.  Can you answer my question first?
23   Then you can say whatever you want.
24       A.  Statistically --

Page 163

1        MR. ZIMMERMAN:  He has to clarify your
2    question.
3        BY MR. COMBS:
4        Q.  The first question is:  Can you
5    tell us whether that is or isn't a sensory nerve?
6        A.  I can tell you with a reasonable
7    degree of medically certainty, statistically, there
8    will be sensory fibers in that nerve.
9        Q.  So you haven't answered my
10   question.  Can you tell me whether that nerve, far
11   left, SC-6, is a sensory nerve?
12       A.  If we talk about peripheral nerve
13   system, there will be very small proportion purely
14   sensory nerves.  You're trying to pick less than 5
15   percent out of all peripheral systems and ask me
16   that question.  I think it's not valid question.
17       If we talk about from what we know and
18   statistically how many nerves, and how the
19   separation of motor and sensory fibers within the
20   nervous systems is, that statistically there is
21   higher probability that at least some of these
22   fibers in that nerve will be sensory is higher than
23   there is no sensory fibers at all.
24       Q.  Okay.  Now, I had asked you to

Page 164

1    directly answer this --
2        MR. COMBS:  He can explain all he wants
3    after this.
4        MR. ZIMMERMAN:  You get to ask the
5    question you want, but he has to give the answer
6    that he has to give.
7        BY MR. COMBS:
8        Q.  Okay.  And so are you refusing to
9    give me a "yes" or "no" answer to that question?
10       A.  Yeah, I cannot answer "yes" or
11   "no".  It's impossible.
12       The way you question, and the way you
13   ask the question, it's impossible to answer "yes"
14   or "no".
15       Q.  So you're unable to say, yes, yes,
16   that's a sensory nerve?
17       A.  If I say "yes" or "no" answering
18   your question, it will not be a true answer.  It
19   will not reflect --
20       Q.  It cuts both ways.  You can't say
21   it is, you can't say it isn't?
22       A.  I can say there is more
23   probability that there are sensory fibers in there
24   than no, much more.

Page 165

1        Q.  And is the magnification that is
2    used for SC-6, sufficient to detect a nerve
3    receptor?
4        A.  I'm not looking for nerve
5    receptors.  All nerves end up --
6        Q.  Dr. Iakovlev, again, just answer
7    my question.
8        MR. ZIMMERMAN:  He's trying to answer
9    the question.  Let him finish the answer.
10       BY MR. COMBS:
11       Q.  I apologize for interrupting you.
12       Do you want me to repose the question?
13       A.  I mean, why are you asking about
14   receptors if I was not looking for them?
15       Q.  Okay.  Well, I get to ask the
16   questions here.  I get to ask the questions I want
17   to ask you.
18       And here is my question:  Is the power
19   that you used for SC-6, which is ten times, is that
20   sufficient to detect nerve receptors?
21       A.  If it was a different stain, with
22   a good eye, it would be bordering on sufficient,
23   just bordering it.  It wouldn't be obvious, but you
24   can see some structures in that magnification.

Vladimir Iakovlev, M.D.

Page 166

1    You would need to actually study the
2 nerve receptors with a different stain. You would
3 need to go higher in most cases.
4        Q.   And that's a stain that you didn't
5 use on these slides, you didn't use the PGP 9.5?
6        A.   It wasn't my purpose.
7        And it's not a great stain either, so...
8        Q.   Okay. Now do we need to go
9 through SC-6 through 11 one by one, or can you tell
10 me collectively what you're going to be telling the
11 jury about these slides?
12       A.   As I said, I've repeated several
13 times. The main features are: There are nerve
14 branches; the tissue is innervated; and they're
15 located in abnormal environment. They are located
16 in scar tissue, and some of them are hidden within
17 the mesh pores. That's abnormal.
18       Q.   And that would be what you're
19 going to tell the jury about for all of the slides,
20 SC-6 through 11?
21       A.   Yes.
22       Q.   If there's something different
23 about a particular one, we'll stop and talk about
24 it.

Page 167

1        A.   Yes. And that most of the nerve
2 fibers we see in these nerves are sensors, are
3 more. There are more sensory nerve fibers than
4 motor, so they will be delivering sensations.
5        Q.   Let me ask you a question about
6 SC-7.
7        A.   Yes.
8        Q.   Okay. Top picture of SC-7, do you
9 agree that that nerve is -- do you agree it's very
10 faint?
11       A.   As I said, I mean, tissue was
12 somewhat compromised. Little bit dry, little bit
13 cauterized; so you must stain well in some areas.
14 Some areas were better, some areas were worse.
15       Q.   Just to make sure I understand.
16 When you say "cauterized" that means it was cut --
17 strike that.
18       Cauterizing means that the mesh was
19 explanted using heat as a source, and basically the
20 tissue burned off?
21       A.   Yes. Burned on the surface and
22 then gradually deeper. It was more or less cooked,
23 yeah.
24       Q.   Okay. And so that changed the

Page 168

1 integrity of the tissue that you had to look at?
2        A.   In some parts, yes.
3        Q.   And you also said that the tissue
4 was dry. What does that mean?
5        A.   Because during excision when the
6 cauterizer is used, some tissue dries up because of
7 the heat. I mean, some tissues just burns, and
8 some tissue dries in some areas.
9        Q.   And as a result of those two
10 factors, the nerves stained more faintly?
11       A.   Some of them, yes.
12       Q.   Did you do any enhancement on this
13 slide? I'm talking now about SC-7?
14       A.   I just circled the nerve, that's
15 all I did. You can barely see it, but I could see
16 better in the microscope.
17       Q.   Dr. Iakovlev, a follow-up question
18 about SC-8.
19       A.   Uhm-hmm.
20       Q.   On SC-8 you've identified a nerve
21 and that's what you pointed to with the arrow
22 circled in brown or black?
23       A.   Yes.
24       Q.   How far is that nerve away from

Page 169

1 the mesh?
2        A.   I don't know. What do you mean
3 "how far"? How far from closest mesh fiber?
4        Q.   Yes, sir.
5        A.   Something like half a millimeter.
6        Q.   So would it be your --
7        A.   It's an estimate. I'm not quite
8 sure. Maybe less, maybe 300 microns, because this
9 seem to be deformed.
10       So if I want to use the mesh fiber as a
11 scale, it would be difficult because this space is
12 deformed. So this may not be 150. So it might
13 be -- this is difficult. Might be anywhere between
14 2 to 4 hundred, just because of this distortion.
15       Q.   I understand it's an estimate, but
16 the estimate of the distance between the circled
17 part and the mesh would be somewhere between 200
18 and 400?
19       A.   Not the mesh, the closest fiber in
20 the picture. I mean, I don't know what's beyond,
21 maybe there's nerve fiber in this, that would
22 probably be close.
23       Q.   Something between the fiber at the
24 bottom of that picture and the mesh, something like

43 (Pages 166 to 169)

Vladimir Iakovlev, M.D.

Page 170

1    200 to 400 microns?
2         A.  Probably, yes.  That's the best
3    estimate right now.
4         Q.  Now, is there any difference of
5    the character of this tissue I'm pointing at here
6    and this tissue up here (indicating)?
7         And we can draw on that to make clear
8    for the record what we're talking about.  But here
9    the basic question is:  Is this type of tissue the
10   same as that tissue (indicating)?
11        A.  It's the same fibrous tissue, it's
12   scar to me.
13        Q.  Okay.  So your opinion would be
14   all of the blue tissue that is depicted in SC-8 is
15   scar tissue?
16        Looks like, from this picture, yeah.
17        Q.  Dr. Iakovlev, kind of same
18   question about SC-9.  How far are the nerves from
19   that mesh found?
20        A.  This twig is 20 microns, or maybe
21   JUST touching it already.  Because of the
22   deformation, it might be sitting right next to the
23   fiber.
24        Q.  And then the one below it?

Page 171

1         A.  One below it is a little further,
2    roughly 200 microns.
3         Q.  Now on the slide SC-9, is there
4    any artifact distortion at the top left-hand corner
5    of that picture --
6         A.  Yes.
7         Q.  -- the northwest?
8         A.  Yes, there is.  That is why I
9    cannot tell you exact distance.
10        Q.  Just so I understand, what is
11   artifact distortion?
12        A.  Some tissue became slightly
13   displaced during cutting or processing.
14        Q.  So what's depicted on this SC-9,
15   that would not be the way that this would have
16   looked at, if you looked in vivo, because of the
17   cutting process?
18        A.  Yes.  And to a degree there is
19   some artifact, yes, that is true.  That's why I
20   couldn't tell you exact distance.
21        Q.  Same question on the next one on
22   SC10; how far is that nerve from the mesh?
23        A.  60 microns, I don't understand the
24   difference.  It makes no difference, the distance.

Page 172

1         Q.  Okay.  And again, same question
2    that I asked you earlier:  Is the character of the
3    tissue the same in this section and in that
4    section?
5         A.  It looks the same to me.  It's a
6    little bit more frayed, because of the age, kind of
7    more fluffier because it's not supported; but same
8    tissue.
9         Q.  All right.  And it's your opinion
10   that that is all scar tissue depicted?  All the
11   blue on the bottom that is on SC-10 is scar?
12        A.  Well I mean -- it's coming out
13   from normal tissue.  All nerve fibers are branches,
14   they start in normal tissue.  Then you can see the
15   direction -- I'm drawing it for you -- you see the
16   direction goes all in the scar tissue (indicating).
17        So one end is pointing towards normal
18   tissue, the other end is pointing towards scar
19   tissue.  All of the nerves originate in normal
20   tissue, they end up in scar tissue.
21        So depends on where we cut them,
22   sometimes they're closer to normal; sometimes
23   they're deeper inside in scar tissue.  It's all
24   relevant.

Page 173

1         We measuring -- you're asking 60 or 70
2    microns, I can cut three or four sections and it
3    will be instantly 100 or 200.
4         This is so artificial what you're
5    trying to do, separate into measurements.  And it's
6    so artificial, it has no perspective for three
7    dimensionality of the specimen.
8         Q.  And that would be true of all the
9    slides, wouldn't it?
10        A.  Yes, it would be true for all the
11   slides.  So measurements in two-dimensional planes
12   or three-dimensional objects are meaningless.
13        Q.  And the line that you've drawn on
14   SC-10, that's your demarcation line between scar
15   tissue and normal tissue?
16        A.  No.  This is --
17        Q.  I apologize, I just didn't hear
18   you.
19        A.  This is direction of the nerve
20   position.
21        Q.  Okay.
22        A.  Assuming that the mesh is going
23   this way, the mesh can go like this.  So this end
24   may be going, pointing (indicating) -- I mean, we

44 (Pages 170 to 173)

Vladimir Iakovlev, M.D.

Page 174

1    are trying to make -- trying to fit the square peg
2    in a round hole.
3            Q.  When you sectioned the block, did
4    you try to trace any of these nerves throughout the
5    entire specimen?
6            A.  No, why?  You want to do it?  I
7    didn't want to do it.  There is no meaning of that.
8            I can see some of them end up in the
9    scar tissue, some of them end up more normal.  I
10   know that all of them come from normal tissue, and
11   that's innervating or crossing the scar.
12           Q.  So you would not have done that
13   for any nerves found within any of the slides from
14   SC-6 through SC-11?
15           A.  No.  I mean, it would have no
16   difference to me, to my opinions.
17           Some of them I see, as I said, deep
18   inside scar tissue.  Some of them a little bit
19   outside, some of them are all normal tissue.
20           When I get larger specimens, I can see
21   a lot of nerves in normal tissue.  And sometimes I
22   get perfect sectioning when I can see that it dives
23   from normal tissue into the scar.
24           Q.  I want to ask you now about SC-11.

Page 175

1            What is it you're going to tell the
2    jury about that slide?
3            A.  This is a myeloperoxidase stain.
4    And it shows that the microphages, which are
5    foreign body type reactions, they spill
6    myeloperoxidase.  It's one of their peroxidative
7    substances, and the mesh fibers are surrounded by
8    oxidated perineurium.
9            Q.  Now, same question I've asked you
10   a couple of times before.  You cannot tell us where
11   in Ms. Carlino's body this slide came from, can
12   you?
13           A.  Definitely came from the sling.  I
14   mean, this is part of the sling.
15           Q.  Okay.  And if we were to have a
16   diagram, and you were to have to point out where
17   this was in orientation to her body, you would not
18   be able to do that, would you?
19           A.  Well, it was in the area where the
20   sling was placed, so it's suburethral, somewhere in
21   that area.  But, optimally, no, I could not.  I can
22   generally tell you the location but not --
23           Q.  And same question that I've asked
24   before, you can't tell us where in the specimen the

Page 176

1    slide came from, can you?
2            A.  No.  I mean, I can tell you where
3    on the slide.  If I have the slide, I will find the
4    area.
5            Q.  Now it's my understanding in your
6    testimony you're using the stain to show the
7    presence of myeloperoxidase, right?
8            A.  Yes, it's one of the substances
9    that can be stained.  There are many other
10   oxidative substances around, but we don't have
11   stains for those.
12           Q.  Is there any literature that you
13   can point me to, that shows the use of
14   myeloperoxidase stain to stain for extracellular
15   myeloperoxidase?
16           Is that question clear?  If not, I'll
17   try to do better.
18           A.  I don't understand your question.
19           Myeloperoxidase is stain, so it detects
20   its presence.  Intracellular or extracellular, you
21   make your own assessment using your eyes.
22           Q.  It's a nuclear stain, isn't it?
23           A.  No.  Myeloperoxidase is enzyme,
24   which is produced inside the body and it spills

Page 177

1    out.  So that's completely wrong.
2            Q.  Can you point me to any literature
3    that describes the use of myeloperoxidase stain to
4    look for myeloperoxidase outside of the cell
5    nucleus?
6            A.  I don't understand your question.
7    Is any literature pointing the difference, if you
8    see staining inside the nucleus or outside the
9    plasma, or outside the center plasma in the
10   extracellular space; is that what you're asking?
11           Q.  Yes.
12           A.  I can't think, why would you do
13   that?
14           Q.  The question is:  Is there any
15   literature you can point me to?
16           A.  It wouldn't be scientific question
17   to do that.
18           Q.  Is there any --
19           A.  No.  There is, no, because there
20   is no scientific question to answer.
21           Q.  Now, can you point to any
22   literature that describes using myeloperoxidase
23   stain in the manner that you're using it in SC-11
24   to show myeloperoxidase spread throughout the

45 (Pages 174 to 177)

Vladimir Iakovlev, M.D.

Page 178

1  tissue?
2       A. My publication.
3       Q. Anything else? Has anybody else --
4       A. No.
5       Q. Are there any other publications
6  you can refer us to that would describe it?
7       A. I don't think so. Not that I
8  remember.
9       Q. Is there any tissue necrosis?
10      A. Pardon?
11      Q. Any tissue necrosis depicted in
12  SC-11?
13      A. I don't think so. I mean,
14  necrosis is -- large area of necrosis, no, I don't
15  see it.
16      Q. What concentration of
17  myeloperoxidase would it take to cause degradation
18  of polypropylene?
19      A. Question is wrong.
20      First, it's not just myeloperoxidase
21  which is causing it.
22      Second, nobody measured it. I don't
23  think you can do it.
24      Q. You had not measured it?

Page 179

1       A. No, I didn't.
2       Q. And you're not aware of anybody
3  else measuring it?
4       A. Why? My purpose was to detect
5  degradation.
6       Q. So my question is, you're not
7  aware of anyone else measuring it, are you?
8       A. No. And I wouldn't.
9       Q. Dr. Iakovlev, is it collectively --
10  I want to ask you a question about SC-12 through
11  18.
12      Are those slides that you prepared to
13  discuss what you believe is degradation of the mesh
14  in Ms. Carlino?
15      A. That's correct.
16      Q. And what is it that you're going
17  to tell the jury about this slide?
18      A. This shows that polypropylene
19  degrades while in the body and then becomes
20  brittle, cracks.
21      Q. Anything else that you're going to
22  tell the jury about those slides?
23      A. That's the main thing. I mean, it
24  degrades, changes physical characteristics over

Page 180

1  time, becomes brittle.
2       Q. And are you going to tell the jury
3  that this has a clinical impact on Ms. Carlino?
4       A. If it's brittle, if it changes
5  physical characteristics, it becomes stiff, firmer.
6  It's clearly brittle material.
7       Q. I'm sorry, I couldn't hear you.
8       A. It's clearly brittle material, it
9  cracks.
10      Q. Okay. What does your contention
11  that this is brittle material, what is the clinical
12  impact that you're going to tell the jury it had on
13  Ms. Carlino, if any?
14      A. Mainly, increase in stiffness.
15      Might be some significance to track
16  bacteria, but in this case, I don't see evidence of
17  bacterial infection. So mainly, it's increase in
18  stiffness.
19      Q. And I just want to make sure I
20  know everything that you're going to tell the jury
21  about the degradation that you say that you
22  identified in slides SC-12 through 18. For the
23  clinical impact it would be that it would increase
24  stiffness, nothing else?

Page 181

1       A. Well, there is also the process
2  which occurs. I mean, when it degrades, I mean,
3  there will be some chemicals released. We don't
4  know exactly which chemical released.
5       So they are -- the tissue around it
6  exposed to these chemicals. Again, that specific
7  part is not studied as in details. We just know
8  that it occurs or can predict.
9       Q. And in regard to Ms. Carlino's
10  case, you have not detected any tissue necrosis,
11  have you?
12      A. See, sometimes I can see some
13  amorphous material around the mesh fibers. And I
14  can see in that. I don't think it's specifically
15  tissue necrosis, but it's some substance which is
16  not alive. So there is some turnover around the
17  mesh fibers.
18      And Klinge it showed that there is
19  constant turnover around the fibers. So something
20  is driving sort of constant replacement of the
21  tissue. It's been shown in the studies.
22      What is driving it? Is it just
23  inflammation or inflammation and some substances
24  which are released? I mean, it may be different

46 (Pages 178 to 181)

Vladimir Iakovlev, M.D.

Page 182

1    from the meshes.
2          We just know that polypropylene
3    degrades, and there is some turnover.  So some
4    tissue becomes replaced, so it goes necrotic and
5    becomes replaced, just around the fibers.
6          So these are the pieces of information
7    what we know from published literature.
8          Q.  Can you show me on any of the
9    slides, any place where you're going to point to
10   and say, "that is evidence of tissue necrosis in
11   Ms. Carlino's case"?
12         A.  No, I wouldn't be able to.  It's
13   more a replacement rather than necrosis.
14   Kosterhaliften and Klinge show that there is
15   replacement tissue around the fibers.
16         Q.  Okay.  There's nothing on the
17   slides that you're going to point to and say, "that
18   shows necrotic tissue"?
19         A.  No.
20         Q.  What is the clinical impact that
21   you contend occurs because of the mesh being
22   increased on stiffness?
23         A.  Damages tissue.
24         Q.  I can't hear you.

Page 183

1          A.  Damages tissue.
2          Q.  And what damage to the tissue is
3    caused by the increased stiffness?
4          A.  Well, if it's firmer than tissue,
5    then it can damage tissue, because it's harder than
6    tissue, stiffer and harder.
7          Also, if there is any sort of internal
8    deformation forces slowly over years, it start to
9    curl.  So this would be the implications.
10         Q.  And for Ms. Carlino's case, have
11   you quantified in any way that increase in
12   stiffness?
13         A.  No, I couldn't.  I just see that
14   it's brittle, it's not as elastic or as flexible as
15   non-degraded polypropylene.
16         Q.  How is it that you quantify
17   stiffness?
18         A.  I don't.  I just see that one
19   material is more brittle than the other.
20         Q.  And the way that you would
21   quantify that would be through testing tensile
22   strength, isn't it?
23         A.  If you want to quantify it, yes,
24   but I'm not doing quantification.  I'm just doing

Page 184

1    qualitative analysis, more brittle or less brittle.
2          Q.  I understand.  And you have not
3    tested Ms. Carlino's mesh in any way to see if
4    there was a increase in tensile strength?
5          A.  Tensile strength, no.  Tensile
6    strength and stiffness are a little bit different.
7          Q.  You haven't done any quantitative
8    testing of Ms. Carlino's mesh to show an increase
9    in stiffness?
10         A.  As I said, I answered.  I did not
11   quantify it, I only qualified it.  And qualified it
12   the way that the degrading material is more
13   brittle, or brittle, and I don't see the
14   brittleness in non-degraded part.
15         So the degraded layer changed physical
16   characteristics, it became brittle.
17         Q.  And it's your opinion that as a
18   result of polypropylene degradation, the external
19   layer of Ms. Carlino's mesh would be more stiff?
20         A.  Yes, brittle.  Brittle and stuff
21   are similar terms.
22         Q.  Did you measure -- and obviously
23   we've taken your deposition before on this, and I
24   know that you've referred to it as "bark", the

Page 185

1    external layer.
2          Did you measure the thickness of the
3    bark for Ms. Carlino's mesh?
4          A.  4.5 microns median.  Most frequent
5    measurement was 4.5 microns.
6          Q.  Okay.  And that would be -- you're
7    going to test my math here.
8          That would be 1/200th of a millimeter?
9          A.  You lost me there.  I'm not good
10   at math.
11         Q.  All right.  In any event, your
12   calculation is that the median thickness of the
13   bark for Ms. Carlino was 4.5 microns?
14         A.  Yes.
15         Q.  Dr. Iakovlev, I want to ask you
16   some questions now about the clinicopathological
17   correlations that you made in this case.
18         And it's my understanding you have that
19   set forth on pages 87 through 90?
20         A.  Yes.
21         Q.  I want to make sure that I
22   understand the boundaries of your
23   clinicopathological correlation.
24         You've told us before that you would

47 (Pages 182 to 185)

Vladimir Iakovlev, M.D.

Page 186

1    never have examined Ms. Carlino, correct?
2        A.  That's correct.
3        Q.  This will be a little of a run-on
4    question.  But you never talked to her, never
5    talked to her treating physicians, never read the
6    depositions, and never had a doctor-patient
7    relationship with her; is that correct?
8        A.  That's correct.
9        Q.  And same questions regarding her
10   husband; you never have examined him?
11       A.  No.
12       Q.  You never talked to him?
13       A.  No.
14       Q.  Never reviewed any depositions
15   related to him?
16       A.  No.
17       Q.  Now, in your clinicopathological
18   correlation, you make -- strike that -- you have
19   opinions regarding Ms. Carlino's dyspareunia; is
20   that correct?
21       A.  That's correct.
22       Q.  Now, you're not a urologist, are
23   you?
24       A.  No.

Page 187

1        Q.  Not a urogynecologist?
2        A.  No.
3        Q.  You don't implant mesh?
4        A.  No.
5        Q.  Don't explant mesh?
6        A.  No.
7        Q.  You don't counsel or treat
8    patients with dyspareunia?
9        A.  No.
10       Q.  Don't counsel or treat patients
11   with urinary symptoms?
12       A.  No.
13       Q.  Don't prescribe medication for
14   pain, pelvic pain or dyspareunia?
15       A.  That is correct.
16       Q.  Now, in your clinicopathological
17   correlation at the bottom of page 88, you have:
18   "Removal of the mesh does not eliminate the
19   pathological factors described above."
20       What does that mean?
21       A.  Well, there is no way back.
22   That's pretty much the basis of it.  Because once
23   you place a mesh, then the damage of the mesh
24   placement cannot be eliminated.

Page 188

1        First, there is damage from the mesh
2    and then there is damage from the excision surgery,
3    and then that empty sort of space after excision
4    needs to heal so it gets replaced by scar tissue.
5        Essentially, it will never be the same.
6    That is the essence of it.
7        Q.  And that opinion that you have, is
8    inconsistent with Dr. Conner's opinion, isn't it?
9        A.  Possible, I mean, everybody is
10   entitled to an opinion.
11       Q.  Okay.  And we looked earlier at
12   Dr. Conner's note, which we marked as Exhibit 5,
13   where Dr. Conner stated that this was -- that the
14   removal of the mesh resulted in complete resolution
15   of her pelvic pain and dyspareunia, but worsening
16   in her stress incontinence.  That would be
17   inconsistent with your opinion, wouldn't it?
18       A.  Well, that's resolution of
19   symptoms for that period of time.  It doesn't say
20   that there is resolution of pathological changes.
21   We're talking about different things.
22       I'm talking about pathology.  Each
23   tissue changes.  He's talking about specific
24   timeframe within what he didn't elicit the

Page 189

1    symptoms.  I mean, we don't know what was after
2    that, and if the symptoms were subclinical or were
3    not reported.  I don't know.
4        Q.  And so what you're talking about
5    are pathological changes, not symptomatic changes.
6        A.  Pathological changes, which place
7    tissue at risk for symptomatic manifestations.
8        Q.  Okay.  And would you defer to a
9    urogynecologist on whether those pathological
10   changes were or were not causing pelvic pain and
11   dyspareunia for Ms. Carlino?
12       A.  Yes and no.
13       As long as the patient has good report
14   with the clinician.  They may or may not report it.
15   They may or may not feel it's significant enough, I
16   mean, so there are many other factors why patients
17   report and don't report.
18       There's also the time factor, if it
19   doesn't happen now, it may happen two years later.
20       Q.  And you would agree that
21   Dr. Conner's opinion was that mesh removal and
22   revision of the sling had resulted in complete
23   resolution of pelvic pain and dyspareunia as of
24   April 26, 2011?

48 (Pages 186 to 189)

Vladimir Iakovlev, M.D.

Page 190

1    A.   At that time his opinion was like
2  you stated.
3    Q.   Dr. Iakovlev, in your paper that
4  you published with Dr. Blaivis, you made an
5  estimate of dyspareunia pain from transvaginal
6  slings, didn't you?
7    A.   So to remind you that we're going
8  into general again.  The paper -- I'll still
9  answer.
10    The paper was estimating what could be
11  minimum number for specific complications.  Then it
12  was giving a range, and then it was discussing why
13  these numbers may or may not be reliable.
14    So there are many numbers there, and
15  some of them need to be taken with a specific angle
16  because of the factors that I had described.
17    Q.   And I don't remember the exact
18  word, but it was something like 3 percent, wasn't
19  it, for dyspareunia pain?
20    A.   If it was minimum, minimum
21  possible, out of what was published, could be.  I
22  mean, the minimum numbers are always low.  The true
23  number can be several fold higher.
24    So the range, I think was much higher,

Page 191

1  there was a large spread.  And then we were
2  discussing why these numbers can be artificially
3  low, unreliable and so forth.
4    So don't pluck just one number and say,
5  that is the truth, no.  That paper was a discussion
6  it was showing what was published, equality of
7  publications and so forth.
8    So I think in one table it was minimum
9  estimated, so it cannot drop lower than that, but
10  it can be ten times higher.
11    Q.   And that was something like 3
12  percent, right?
13    A.   Not lower than that, this is the
14  bottom.  This is the smallest number possible.  But
15  the true number maybe 35 to 40 percent.
16    Q.   All right.  The number that is in
17  your paper in that table is something like 3
18  percent, isn't it?
19    A.   The minimum possible number.
20    Q.   That's fine.  The qualification,
21  I'm sorry, I'll do it again.
22    The minimum number that's in that
23  table, it's 3 percent; isn't it?
24    A.   Reported.  The minimum reported

Page 192

1  number is 3.5 percent.  The true number, we
2  estimate are many fold higher.
3    Q.   Now Ms. Carlino, what other risk
4  factors did she have for dyspareunia?
5    A.   So the most common and easily
6  treatable factor is vaginal atrophy, I mean
7  depending on age.
8    Q.   I'll represent to you that
9  Ms. Carlino was postmenopausal, and in fact
10  correlated with vaginal atrophy?
11    A.   Yes, it would be.  So the usual
12  course of action, which I see in the histories, is
13  to try to treat the atrophy most commonly with
14  local estrogen cream.
15    Q.   Do you know whether Ms. Carlino
16  was or was not treated with local estrogen cream?
17    A.   I don't remember now.  It's so
18  easily done.  Even, there was obvious mesh
19  involvement, at least that part can be treated.
20    Q.   Again, my question is:  Do you
21  know whether Ms. Carlino was treated with vaginal
22  estrogen?
23    A.   I do not.
24    Q.   Okay.  Now is vaginal hysterectomy

Page 193

1  also a risk factor for dyspareunia?
2    A.   Not if it's done correctly.  Not
3  if there's no complications.  Not that I'm aware
4  of.
5    Again, I think we're going into general
6  and then not my field.  I mean, it's little bit
7  beyond my expertise.
8    Q.   If this is beyond your field of
9  expertise, just tell me that.
10    Is the calculation of the relative risk
11  factors of dyspareunia beyond your expertise?
12    A.   What is most important when I go
13  through the history that at one point of time all
14  investigations culminate in mesh excision, and I
15  receive the specimen.
16    Mesh is excised for symptoms.  When
17  examined, the disease is in mesh in the specimen.
18  That is the main, sort of fundamental factors which
19  are influencing my opinions.
20    Q.   Okay.  Let's talk about other risk
21  factors that Ms. Carlino had.
22    Vaginal atrophy, "yes" or "no"?
23    A.   Possible.  I mean, they all have.
24  But again, she ended up with excised mesh.

49 (Pages 190 to 193)

Vladimir Iakovlev, M.D.

Page 194

1    Q.  Hysterectomy; is that a risk
2  factor?
3        A.  I don't know.  It's beyond my
4  expertise.
5        Q.  Do you know whether there are
6  published rates for the dyspareunia rate associated
7  with vaginal hysterectomy?
8        A.  I don't know.  It's beyond my
9  expertise.
10       Q.  Do you know whether Ms. Carlino
11 had pelvic floor muscle dysfunction?
12       A.  Again, it's beyond my expertise.
13       I leave that into clinical workup.
14 When I step in, when the decision is made to excise
15 the mesh and there is a pathology specimen; that's
16 where my involvement becomes important.  Because I
17 can answer what is wrong with that specimen.
18       MR. COMBS:  Let's mark that as
19 Exhibit 11.
20       EXHIBIT NO. 11:  Diagram of the Female
21       Genitalia.
22       BY MR. COMBS:
23       Q.  Dr. Iakovlev, would you be able to
24 take a magic marker and show us where on this

Page 195

1  diagram Ms. Carlino's dyspareunia was?
2        Do you know at what point in her vagina
3  Ms. Carlino reports pain?
4        A.  You're asking the wrong person.
5  I'm not a clinical specialist.  I didn't examine
6  her, I would not be able to answer it.
7        Q.  That's fine.  So you would not be
8  able to put on this diagram where Ms. Carlino has
9  made reports of pain?
10       A.  Where she felt pain?
11       Q.  Yes, sir.
12       A.  No, I would not.  I didn't examine her.
13       Q.  Let me ask you a couple of
14 questions about your clinicopathological
15 correlation regarding urinary symptoms.
16       A.  Uhm-hmm.
17       Q.  Do you know whether Ms. Carlino
18 was continent after the sling was placed?
19       A.  Okay.  So she had stress
20 incontinence before the mesh was placed.  And then
21 after the mesh placement in 2010, there is stress
22 incontinence, and frequent UTIs, and symptoms of
23 urgency and dysuria.
24       So clinical record described little

Page 196

1  more, in addition to stress incontinence, they
2  described urgency and UTIs.  So she was not fully
3  continent in 2010.
4        Q.  So let me ask you a more specific
5  question.  Was she continent between the time when
6  she had the mesh implantation in 2005 and the first
7  revision in 2007?
8        A.  It's possible that she was.  I
9  mean, I don't remember now.
10       Q.  As we sit here today, you don't
11 know whether she was continent in that period?
12       A.  I don't remember.  And for what
13 period she was continent, and if she was continent
14 at all for any period.  There could have been some
15 improvement, I don't remember.
16       Q.  As a pathologist, you do not
17 diagnose SUI, do you?
18       A.  No.
19       Q.  You do not diagnose urge
20 incontinency, do you?
21       A.  No.
22       Q.  Dr. Iakovlev, as a pathologist,
23 you would be able to detect whether Ms. Carlino had
24 cancerous cells; wouldn't you?

Page 197

1        A.  If it's present in this specimen,
2  yes.
3        Q.  And you did not make any finding
4  that Ms. Carlino had cells that were cancerous, did
5  you?
6        A.  In the specimen I examined?
7        Q.  Yes, sir.
8        A.  That's correct.  I didn't find any
9  neoplasia.
10       Q.  And you did not find any loose
11 particles in Ms. Carlino's specimen, did you?
12       A.  What do you mean "loose particles"?
13       Q.  You did not find any loose
14 particles of mesh that had come detached from the
15 mesh in her specimen, did you?
16       A.  Sometimes I see some particles,
17 sometimes not.  It's usually not a large volume.  I
18 don't remember that.  Again, I don't make special
19 note of it.
20       Q.  Okay.  In Ms. Carlino's case, you
21 don't have documented anywhere that you saw those
22 particles, do you?
23       A.  As I said, I don't pay specific
24 attention.  Sometimes I see more than I would

50 (Pages 194 to 197)

Vladimir Iakovlev, M.D.

Page 198

1    visually expect and take picture.  But it's not
2    that common.
3            Q.   In this case you would not be
4    providing any opinion that Ms. Carlino had particle
5    loss from loose particles from the mesh; will you?
6            A.   At least not in the volume that it
7    would draw my attention.
8            Again, I'm using light microscopy.
9    What I can see by light microscopy that's as far as
10   I can go.
11           Q.   And you didn't make any finding of
12   that in this case?
13           A.   No, nothing that beyond what I
14   could see normal in the specimens or usually in the
15   specimens.
16           Q.   All right.  And again, there are
17   not any slides that you're going to point to at
18   this trial and say, hey, there's a loose particle?
19           A.   No.
20           Q.   Was Ms. Carlino's mesh laser cut
21   or mechanically cut?
22           A.   I don't know.  Doesn't make
23   difference to me.
24           Q.   For your purposes that's not

Page 199

1    important, is it?
2            A.   No.
3            Q.   The pathological findings from
4    mechanically cut mesh and laser cut mesh would be
5    the same, wouldn't it?
6            A.   They are somewhat different,
7    because heat-treated central portions of some
8    slings don't curl as much; and sometimes I can see
9    the ends, which are melted.
10           Q.   Do you know whether the central
11   portion of the Ethicon mesh has been treated?
12   Look, again --
13           A.   Some companies switch it halfway.
14           Q.   -- I'm not trying to trip you up
15   or anything.  Boston Scientific has a central
16   portion that's heat-treated.
17           A.   Some edges are cut by laser cut,
18   so they're melted.  But the mesh itself is still
19   flexible, it's not heat-treated.
20           And then some companies went further.
21   The edges were melted and the central portion was
22   somewhat ironed.
23           TVT mesh, Ethicon, I don't think the
24   central portion is heat-treated, but the edges may

Page 200

1    have different type of cutting at certain time
2    period.
3            Q.   And you do not plan on providing
4    testimony at this trial that there are any
5    pathological findings that you would attribute to
6    the way in which Ms. Carlino's mesh was cut?
7            A.   No.  I can say that the twisted
8    part was not heat-treated, because heat-treated
9    usually doesn't twist that much.
10           Q.   All right.  Any other pathological
11   findings that you're going to talk to this jury
12   about that would relate to the way in which
13   Ms. Carlino's mesh was cut?
14           MR. ZIMMERMAN:  Objection.  Overbroad.
15           He'll testify to what questions counsel
16   asks in the trial, which are consistent with and in
17   the scope of his expert report.
18           THE WITNESS:  We talked about many
19   things.  I may not remember everything it could
20   generate.  It feels like we covered most of it,
21   maybe some details were missed.
22           MR. COMBS:  Dr. Iakovlev, that's either
23   all my questions or really, really close.  Let's
24   take a break for two minutes.

Page 201

1            -- RECESS AT 2:36 --
2            -- UPON RESUMING AT 2:47 --
3    BY MR. COMBS:
4            Q.   Dr. Iakovlev, just a couple of
5    more questions for you.  First is, you told us the
6    median bark measurement was 4.5 microns.  How many
7    measurements did you take in this case?
8            A.   I take at least four measurements.
9    Sometimes I can make only four; it depends on the
10   specimen.  Sometimes it goes up to six, it depends.
11           Q.   Okay.  So somewhere between 4 and
12   6 measurements in this case?
13           A.   Usually.
14           Q.   Did you keep a record of which
15   fibers you were measuring?
16           A.   No.
17           Q.   All right.  In other depositions
18   I've seen you discuss the issue of nanocavities for
19   trapping stain.
20           And I just want to ask you:  Did you
21   detect any nanocavities in the Carlino mesh?
22           A.   I think we covered this in the
23   earlier deposition.  I detect them by seeing purple
24   color, that's the detection mechanism.

51 (Pages 198 to 201)

Vladimir Iakovlev, M.D.

Page 202

1          Q.  Can you point to any nanocavities
2     in the pictures of the slides in your --
3          A.  It's purple.  That's why it
4     stains, because it's trapped in the cavities.
5          Q.  None of your pictures are acute
6     enough resolution to show the nanocavities.
7          A.  Not for this one.  We did
8     transmission electron microscopy.  I did it once,
9     and I don't think I will do it again.
10         Q.  And then finally, I think I asked
11    you this, but I just want to make sure that I
12    didn't forget.
13         You have not looked at the defense
14    expert reports in this case, have you?
15         A.  No.
16         MR. COMBS:  All right.
17         Thank you, Dr. Iakovlev.  That's all
18    the questions I have for you at this time.
19
20    -- Whereupon the deposition adjourned at 2:49 p.m.
21
22
23
24

Page 203

1              REPORTER'S CERTIFICATE
2
3
4          I, JUDITH M. CAPUTO, RPR, CSR, CRR,
5     Registered Professional Reporter, certify;
6          That the foregoing proceedings were
7     taken before me at the time and place therein set
8     forth, at which time the witness was put under oath
9     by me;
10         That the testimony of the witness and
11    all objections made at the time of the examination
12    were recorded stenographically by me and were
13    thereafter transcribed;
14         That the foregoing is a true and
15    correct transcript of my shorthand notes so taken.
16
17
18
19         Dated this 18th day of November, 2015.
20
21
22         _____
23         PER:  JUDITH CAPUTO, RPR, CSR, CRR
24

Page 204

1              CERTIFICATE OF REPORTER
2     CANADA                )
3     PROVINCE OF ONTARIO   )
4
5     I, Judith M. Caputo, the officer before whom the
6     foregoing deposition was taken, do hereby certify
7     that the witness whose testimony appears in the
8     foregoing deposition was duly sworn by me; that the
9     testimony of said witness was taken by me in
10    shorthand, using Computer Aided Realtime, to the
11    best of my ability and thereafter reduced to
12    written format under my direction; that I am
13    neither counsel for, related to, nor employed by
14    any of the parties to the action in which the
15    deposition was taken, and further that I am not
16    related or any employee of any attorney or counsel
17    employed by the parties thereto, nor financially or
18    otherwise interested in the outcome of the action.
19
20    _____
21    Judith M. Caputo, RPR, CSR, CRR
22
23    Commissioner for taking
24    Oaths in the Province of Ontario

Page 205

1              INSTRUCTIONS TO WITNESS
2
3          Read your deposition over carefully.
4     It is your right to read your deposition and make
5     changes in form or substance.  You should assign a
6     reason in the appropriate column on the erratum
7     sheet for any change made.
8          After making any changes in form or
9     substance, and which have been noted on the
10    following erratum sheet, along with the reason for
11    any change, sign your name on the erratum sheet and
12    date it.
13         Then sign your deposition at the end of
14    Your testimony in the space provided.  You are
15    signing it subject to the changes you have made in
16    the erratum sheet, which will be attached to the
17    deposition before filing.  You must sign it in
18    front of a witness.  The witness need not be a
19    notary public.  Any competent adult may witness
20    your signature.
21         Return the original erratum sheet
22    promptly.  Court rules require filing within 30
23    days after you receive the deposition.
24

52 (Pages 202 to 205)

Vladimir Iakovlev, M.D.

Page 206

```
 1          * * ERRATA SHEET * *

 2

 3     NAME OF CASE:  SHARON CARLINO, ET AL. V. ETHICON, ET AL.

 4     DATE OF DEPOSITION:  NOVEMBER 5, 2015

 5     NAME OF WITNESS:  VLADIMIR IAKOVLEV, M.D.

 6

 7

 8     PAGE  LINE    CORRECTION REASON

 9     ___|___|_____|_____

10     ___|___|_____|_____

11     ___|___|_____|_____

12     ___|___|_____|_____

13     ___|___|_____|_____

14     ___|___|_____|_____

15     ___|___|_____|_____

16     ___|___|_____|_____

17     ___|___|_____|_____

18     ___|___|_____|_____

19     ___|___|_____|_____

20     ___|___|_____|_____

21

22           _____

23           VLADIMIR IAKOVLEV, M.D.

24
```

Page 207

```
 1     PROVINCE OF ONTARIO   )

 2     TORONTO REGION      )

 3

 4

 5          I, the undersigned, declare under

 6     penalty of perjury that I have read the foregoing

 7     transcript, and I have made any corrections,

 8     additions or deletions that I was desirous of

 9     making;

10          That the foregoing is a true and

11     correct transcript of my testimony contained

12     therein.

13

14          _____

15               VLADIMIR IAKOVLEV, M.D.

16

17     Subscribed and sworn to before me this ____

18     Day of _____, 2015 at

19     _____, _____.

20        (City)          (Province)

21

22     _____

23     (Notary Public)

24     My Commission Expires: _____
```

53 (Pages 206 to 207)