# EXHIBIT X

Vladimir Iakovlev, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

OF THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE: ETHICON, INC., PELVIC )

REPAIR SYSTEM PRODUCTS        )   Master File No.

LIABILITY LITIGATION          )   2:12-MD-02327

-----------------------------)   MDL 2327

THIS DOCUMENT RELATES TO THE )   JOSEPH R. GOODWIN

FOLLOWING CASES IN WAVE 1 OF )   U.S. DISTRICT JUDGE

MDL 200:                      )

DEE MCBRAYER, ET AL.,         )   Civil Action No.

                  Plaintiffs )   2:12-cv-00779

vs.                           )

ETHICON, INC., ET AL.         )

                  Defendants.)

-----------------------------

This is the Deposition of VLADIMIR IAKOVLEV, M.D.,

taken at the Hilton Hotel, 145 Richmond Street

West, Toronto, Ontario, Canada, on Sunday, the

13th day of March, 2016.

------------


REPORTED BY:  JUDITH M. CAPUTO, RPR, CSR, CRR

Vladimir Iakovlev, M.D.

## Page 2

```
 1    Donna Loustaunau        )
      v. Ethicon, Inc., et al.    )
 2    Civil Action No. 2:12-cv-00666 )
                              )
 3    Patricia Ruiz           )
      v. Ethicon, Inc., et al.    )
 4    Civil Action No. 2:12-cv-01021 )
                              )
 5    Betty Funderburke       )
      v. Ethicon, Inc., et al.    )
 6    Civil Action No. 2:12-cv-00957 )
                              )
 7    Elizabeth Blynn Wolfe   )
      v. Ethicon, Inc., et al.    )
 8    Civil Action No. 2:12-cv-01286 )
                              )
 9    Barbara Vignos-Ware, et al.  )
      v. Ethicon, Inc., et al.    )
10    Civil Action No. 2:12-cv-00761 )
                              )
11    Donna Massey, et al.    )
      v. Ethicon, Inc., et al.    )
12    Civil Action No. 2:12-cv-0880 )
                              )
13    Patti Ann Phelps, et al.  )
      v. Ethicon, Inc., et al.    )
14    Civil Action No. 2:12-cv-01171 )
                              )
15    Dina Sanders Bennett    )
      v. Ethicon, Inc., et al.    )
16    Civil Action No. 2:12-cv-00497 )
                              )
17    Charlene Logan Taylor   )
      v. Ethicon, Inc., et al.    )
18    Civil Action No. 2:12-cv-00376 )
                              )
19    Cynthia Nix             )
      v. Ethicon, Inc., et al.    )
20    Civil Action No. 2:12-cv-01278 )
                              )
21    Barbara Kaiser          )
      v. Ethicon, Inc., et al.    )
22    Civil Action No. 2:12-cv-00887 )
                              )
23    Carol Jean Dimock       )
      v. Ethicon, Inc., et al.    )
24    Civil Action No. 2:12-cv-00401 )
```

## Page 4

```
 1    Constance Daino, et al.   )
      v. Ethicon, Inc., et al.    )
 2    Civil Action No. 2:12-cv-01145 )
                              )
 3    Janet Smith, et al.     )
      v. Ethicon, Inc., et al.    )
 4    Civil Action No. 2:12-cv-00861 )
                              )
 5    Harriet Beach           )
      v. Ethicon, Inc., et al.    )
 6    Civil Action No. 2:12-cv-00476 )
                              )
 7    Maria C. Stone, et al.  )
      v. Ethicon, Inc., et al.    )
 8    Civil Action No. 2:12-cv-00652 )
                              )
 9    Diane Kropf, et al.     )
      v. Ethicon, Inc., et al.    )
10    Civil Action No. 2:12-cv-01202 )
                              )
11    Virginia White, et al.  )
      v. Ethicon, Inc., et al.    )
12    Civil Action No.2:12-cv-00958 )
                              )
13    Dee McBrayer, et al.    )
      v. Ethicon, Inc., et al.    )
14    Civil Action No. 2:12-cv-00779 )
                              )
15    Julie Wroble, et al.    )
      v. Ethicon, Inc., et al.    )
16    Civil Action No. 2:12-cv-00883 )
                              )
17    Sherry Fox, et al.      )
      v. Ethicon, Inc., et al.    )
18    Civil Action No. 2:12-cv-00878 )
                              )
19    Joyce Justus            )
      v. Ethicon, Inc., et al.    )
20    Civil Action No. 2:12-cv-00956 )
                              )
21    Kathleen Wolfe          )
      v. Ethicon, Inc., et al.    )
22    Civil Action No. 2:12-cv-00337 )
      ------------------------------
23
24
```

## Page 3

```
 1    Ana Ruebel              )
      v. Ethicon, Inc., et al.    )
 2    Civil Action No. 2:12-cv-00663 )
                              )
 3    Jackie Frye             )
      v. Ethicon, Inc., et al.    )
 4    Civil Action No. 2:12-cv-1004 )
                              )
 5    Joan Adams              )
      v. Ethicon, Inc., et al.    )
 6    Civil Action No. 2:12-cv-01203 )
                              )
 7    Sharon Boggs, et al.    )
      v. Ethicon, Inc., et al.    )
 8    Civil Action No. 2:12-cv-00368 )
                              )
 9    Dina Destefano-Raston, et al. )
      v. Ethicon, Inc., et al.    )
10    Civil Action No. 2:12-cv-01299 )
                              )
11    Teresa Georgilakis, et al.  )
      v. Ethicon, Inc., et al.    )
12    Civil Action No. 2:12-cv-00829 )
                              )
13    Donna Hankins, et al.   )
      v. Ethicon, Inc., et al.    )
14    Civil Action No. 2:12-cv-01011 )
                              )
15    Nancy Hooper, et al.    )
      v. Ethicon, Inc., et al.    )
16    Civil Action No. 2:12-cv-00493 )
                              )
17    Krystal Teasley         )
      v. Ethicon, Inc., et al.    )
18    Civil Action No. 2:12-cv-00500 )
                              )
19    Margaret Stubblefield   )
      v. Ethicon, Inc., et al.    )
20    Civil Action No. 2:12-cv-00842 )
                              )
21    Cindy Smith             )
      v. Ethicon, Inc., et al.    )
22    Civil Action No. 2:12-cv-01149 )
                              )
23    Lois Hoy, et al.        )
      v. Ethicon, Inc., et al.    )
24    Civil Action No. 2:12-cv-00876 )
```

## Page 5

```
 1       A P P E A R A N C E S:

 2

 3       FOR THE PLAINTIFFS AND THE WITNESS:

 4       ANDERSON LAW OFFICE, LLC

 5       BY:  CHRISTOPHER J. ZIMMERMAN, ESQ.

 6       1360 West 9th Street, Suite 215

 7       Cleveland, OH 44113

 8       Tel. 216.589.0256

 9       Email:  Ben@andersonlawoffices.net

10

11       FOR THE DEFENDANTS:

12       BUTLER SNOW, LLP

13       BY:  M. ANDREW SNOWDEN, ESQ.

14       150 3rd Avenue South, Suite 1600

15       Nashville, TN 37201

16       Tel. 615.651.6700

17       Email:  andy.snowden@butlersnow.com

18

19       Also present:

20       Amanda Robinson, Esquire

21

22

23

24
```

2  (Pages 2 to 5)

Vladimir Iakovlev, M.D.

Page 6

1           I N D E X

2

3  WITNESS:   VLADIMIR IAKOVLEV, M.D.

4                 PAGE

5  EXAMINATION BY MR. SNOWDEN.................8

6

7

8

9

10

11

12

13           INDEX OF EXHIBITS

14

15  NUMBER/DESCRIPTION              PAGE NO.

16  NO. 1:  Clinico-Pathological Report of      8

17  Dr. Vladimir Iakovlev Re: Dee McBrayer dated

18  January 2, 2016.

19  NO. 2:  Flash Drive containing files        8

20  reviewed by Dr. Iakovlev in compiling the

21  Clinico-Pathological Report Re: Dee McBrayer.

22  NO. 3:  Carolinas Laboratory Network Surgical   40

23  Pathology report with date of service of

24  April 3, 2009.

Page 7

1           INDEX OF EXHIBITS

2              (CONTINUED)

3  NUMBER/DESCRIPTION              PAGE NO.

4  NO. 4:  Women's Institute Office Note, dated   56

5  March 31, 2008.

6  NO. 5:  Women's Institute Office Note, dated   59

7  December 22, 2008.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 8

1           -- Upon commencing at 8:45 a.m.

2

3           EXHIBIT NO. 1:  Clinico-Pathological

4           Report of Dr. Vladimir Iakovlev Re: Dee

5           McBrayer dated January 2, 2016.

6           EXHIBIT NO. 2:  Flash Drive containing

7           files reviewed by Dr. Iakovlev in

8           compiling the Clinico-Pathological

9           report Re: Dee McBrayer.

10

11           VLADIMIR IAKOVLEV, M.D.,

12  called as a witness herein, having been first duly

13  affirmed, testified on his oath as follows:

14           DIRECT EXAMINATION BY MR. SNOWDEN:

15      Q.  Good morning, Dr. Iakovlev.

16      A.  Good morning.

17      Q.  We are here today to discuss

18  Ms. Dee McBrayer; is that your understanding?

19      A.  Yes.

20      Q.  I've marked Exhibit 1, your expert

21  report.  If you take a look at that and let me know

22  if that's your complete case-specific expert report

23  in this case?

24      A.  (Witness reviews document).  Yes,

Page 9

1  it is.

2      Q.  Okay.  And I've marked as

3  Exhibit 2 the flash drive that you provided to me,

4  and it looks like the flash drive has a chain of

5  custody form for a pathology specimen you received

6  as well as medical records; does that sound right?

7      A.  As for all the cases.

8      Q.  The materials on this flash drive,

9  these are all the case-specific medical records and

10  materials you reviewed in this matter?

11      A.  Yes.

12      Q.  Will you be offering any opinions

13  in this case regarding Ms. McBrayer's urinary

14  symptoms.

15      A.  (Witness reviews document).  No.

16      Q.  Will you be offering an opinion in

17  this case regarding loose particles in the tissue?

18      A.  (Witness reviews document).  No.

19      Q.  And let's get this out of the way

20  at the beginning.  For your degradation bark

21  opinions found on pages 17 through 21, are the

22  opinions you'll give regarding degradation bark the

23  same opinions you've given in prior general

24  depositions?

Vladimir Iakovlev, M.D.

Page 10

1    A.  Yes.
2    Q.  And in terms of the figures found
3  on pages 17 through 21, your testimony in
4  Ms. McBrayer's case will be consistent with your
5  prior -- strike that.
6    Will you be offering any testimony at
7  trial on any aspect of the design of the product?
8    A.  No, except for the effect on the
9  tissue which I see.  But I will not be offering
10  alternative design opinions.
11    Q.  Will you be offering an opinion in
12  this case that the mesh caused an erosion in
13  Ms. McBrayer?
14    A.  (Witness reviews document).
15    All right.  So if we go through the
16  records, entry April 2009, it describes mesh
17  erosion and during the excision there is mesh
18  erosion.
19    I had only H&E slides and it was -- the
20  slides were prepared at the original institution.
21  The site of erosion wasn't sampled in those
22  sections, but I will offer opinion based on the
23  description, records, and the knowledge and
24  experience of pathology of erosion sites of other

Page 11

1  specimens.
2    Q.  Okay.  So you're going to --
3    A.  Or what is described in the
4  general opinions.
5    Q.  Okay.  For Ms. McBrayer's case,
6  you don't have a section in your report where you
7  describe your opinion regarding erosion in this
8  case; is that correct?
9    A.  That's correct, because the
10  erosion site wasn't sampled in the sections because
11  I didn't have the tissue.  I had only H&E slides.
12    Q.  Okay.  And so in this case you
13  don't know what the erosion site looked like?
14    A.  Not based on this specimen.  But
15  the findings are repetitive, and they are
16  described in the general report.  Clinically it
17  was clearly described as erosion.
18    Q.  And in this case are you going to
19  be offering an opinion on whether the mesh caused
20  the erosion?
21    A.  Yes.
22    Q.  Okay.  And that's not found in
23  your report either, is it?
24    A.  I just found in my report the

Page 12

1  description of erosion, clinical description of
2  erosion.  So it's mentioned in the
3  clinicopathological correlation.
4    Q.  And where is that in your
5  clinicopathological correlation?
6    A.  Okay.  We start from the
7  beginning.
8    Q.  I'll just tell you, I can see it
9  on page 7 of the carry-over paragraph, the last
10  portion of that, it says:
11    "At that time there was also a
12    mesh erosion detected.  The erosion
13    expanded and examinations revealed
14    tenderness over the lateral margins
15    of the vagina and a firm scar
16    associated with the mesh."
17    A.  That's correct.  That's this
18  portion.  Let me just read further down.
19    (Witness reviews document).
20    Q.  Yes, let me know if there's
21  anything else in your clinicopathological
22  correlation about erosion?
23    A.  (Witness reviews document).  It
24  doesn't state where the erosion.  However, some

Page 13

1  parts of it reflect changes attributable to
2  erosion, such as inflammation, which is added on
3  the foreign body type inflammation around the
4  erosion site.
5    Q.  In this case, are you going to
6  offer an opinion regarding whether Ms. McBrayer
7  suffered an infection due to mesh?
8    A.  Again, since I had only slides, I
9  cannot show it in this specimen.  But I will -- I
10  can offer this opinion on the general report.
11    Q.  Okay.  So if I understand you
12  correctly, you will offer a general opinion
13  regarding infection, but in terms of whether
14  infection occurred in Ms. McBrayer, you will not be
15  offering an opinion?
16    A.  No.  I will offer an opinion based
17  on clinical records describing erosion and my
18  descriptions of the changes associated with erosion
19  described in the general report.
20    I will not show pictures,
21  microphotographs showing localized infection in
22  the specimen of Ms. McBrayer.
23    Q.  Okay.  And in Ms. McBrayer's case,
24  do any of her clinicians note an infection of the

4 (Pages 10 to 13)

Vladimir Iakovlev, M.D.

Page 14

1   mesh?
2       A.  Stating that it's erosion implies
3   that there is infection.  I don't remember if it
4   was specifically mentioned as infection, but
5   erosion is always associated with localized
6   infection.
7       Q.  Okay.  And my question was really
8   not whether they imply anything, but whether with
9   their words they mention an infection?
10      A.  I don't remember now if word
11  "infection" was mentioned.  Because it's
12  unavoidable, it always comes with erosion.
13      Q.  In this case you said you received
14  three H&E slides; is that right?
15      A.  That is correct.
16      Q.  Did you receive any other specimen
17  for Ms. McBrayer?
18      A.  No.
19      Q.  And so the three slides you have
20  are from the April 3rd, 2009 surgery at Carolinas
21  HealthCare System; is that right?
22      A.  Yes, it's April 2009.
23      Q.  Your case-specific opinion here is
24  based on your review of those three slides under

Page 15

1   the light and polarized microscope, your review of
2   Ms. McBrayer's records.  Anything else?
3       A.  My knowledge, training and
4   experience, materials referenced in the general
5   report, and the general report.
6       Q.  Do you recall in this case whether
7   you prepared a synoptic report?
8       A.  Again, if you received it, I did.
9       Q.  And you provided all of those that
10  you've completed to counsel?
11      A.  Yes.
12      Q.  Are you going to offer any
13  opinions in this case regarding the placement of
14  the mesh?
15      A.  In terms of the location or the
16  correctness of the technique?
17      Q.  The correctness of the technique
18  and where in Ms. McBrayer's case it was actually
19  placed.
20      A.  (Witness reviews document).
21      So she had posterior Prolift device
22  implanted in July 2007.  So it was in the posterior
23  vaginal wall.  That's the location of the device.
24  I cannot comment on the correctness of the

Page 16

1   technique.  I'm not urogynecologist.
2       Q.  Will you offer an opinion in this
3   case regarding mesh migration?
4       A.  As for all meshes, meshes migrate
5   or fibers within the mesh migrate.  I cannot offer
6   opinion regarding the degree of mesh migration.
7   But they all move.
8       MR. ZIMMERMAN:  Excuse me, can we take
9   a moment break.
10      -- OFF THE RECORD DISCUSSION --
11      -- Amanda Robinson joined the
12  conference.
13      BY MR. SNOWDEN:
14      Q.  Dr. Iakovlev, in your review of
15  the three slides you received from Carolinas
16  Medical Center, do you have any reason to believe
17  those were processed in any manner other than
18  standard tissue processing techniques?
19      A.  Well, the histology was
20  acceptable.  The quality of slides was acceptable.
21  I did not see any indication that the protocols or
22  the standard way of processing was not followed.
23      Q.  I'm going to ask you some
24  questions about your figure DM4 on page 13 of your

Page 17

1   report.
2       A.  Yes.
3       Q.  Did you consult a neuropathologist
4   in this case?
5       A.  As for all the cases, I did not
6   consult neither -- felt the need to consult a
7   neuropathologist on any of the cases.  And the
8   reason was given several times during these
9   depositions.  Neuropathologists examine brain
10  lesions, spinal lesions, some thick peripheral
11  nerves, neuropathies, but they do not examine
12  vaginal tissue, soft tissue and they do not examine
13  explanted vaginal meshes.  That is the expertise of
14  general surgical pathologists.
15      Q.  In Ms. McBrayer's case did you
16  count the nerve density?
17      A.  If there was a synoptic report, I
18  did, but it is not required to produce expert
19  report.  I don't use that number to formulate my
20  opinions.
21      Q.  So then the nerve density is not
22  significant to your opinion in this case?
23      A.  Not in any case.
24      Q.  In DM4, what are you showing?

5 (Pages 14 to 17)

Vladimir Iakovlev, M.D.

Page 18

1          A.   In DM4 there is nerve fiber --
2    sorry, there is a mesh fiber or space for mesh
3    fiber in the lower part.  And then on top of that
4    there is part of the scar plate and there is nerve
5    branch in the upper left.
6          So this nerve branch has an abnormal
7    location.  It's morphologically normal but it has
8    an abnormal location, it is in the scar plate and
9    positioned in the scar plate makes it entrapped in
10   the scar plate.
11         Q.   How large is it for the nerve
12   branch?
13         A.   Maybe 50 microns.
14         Q.   Did you identify any receptors in
15   Ms. McBrayer's specimen?
16         A.   I did not identify or did not
17   attempt to identify receptors in any of the
18   specimens.
19         Q.   Are you able to identify axons
20   with H&E stain?
21         A.   You can see them at very high
22   magnification in H&E stain.  They are very thin
23   structures.
24         Q.   And did you undertake that

Page 19

1    analysis to look for axons using very high power?
2          A.   I didn't need to.  Nerve branches
3    are nerve branch, it contains Schwann cells, it
4    contains axons.
5          Q.   In DM4, the two arrows you have
6    there pointing to the smaller nerve branches, what
7    is it morphologically that tells you that's a
8    nerve?
9          A.   Because it looks like a nerve.
10         Q.   That's what I'm trying to figure
11   out as a nonpathologist.  What is it that tells you
12   a nerve looks like a nerve?
13         A.   Okay.  So nerve is a fibrillary
14   structure because the axons and Schwann cells, they
15   run in parallel, tubular sort of orientation.  And
16   it becomes somewhat separated from the outside
17   stroma because Schwann cells, they have different
18   type of cytoplasm than the outside collagen.
19         And if it's a larger nerve branch or a
20   nerve, it has a perineurium, so there's a
21   separation from the outside.  If it gets smaller,
22   like a nerve twig, it doesn't have perineurium
23   anymore, it's more like a fascicle of a nerve
24   branched out and then it goes on its own.

Page 20

1          So if we look at this image, we can see
2    that there are parallel structures.  They are a
3    little bit wiggly, sort of curving.  And then there
4    is a separation, so they can outline.
5          Q.   And you're drawing in pen that
6    separation?
7          A.   Yes.  So everything is inside, is
8    the longitudinal or partially longitudinal section
9    of a nerve twig, nerve branch, and everything
10   outside is tissue.
11         And another portion is here.  It's much
12   easier to see in the microscope because resolution
13   in the microscope is better.  The picture doesn't
14   reflect fully what it -- how it looks in the
15   microscope.
16         That's about all the features.  And it
17   looks like a nerve.  We discussed it.  I mean,
18   after several years of training and looking through
19   thousands and thousands of slides, pathologists get
20   trained to recognize all these structures.
21         Q.   And one of those structures I
22   think you just identified, or at least one of the
23   features, I think you said that they have parallel
24   structures and then in this case, did you say -- I

Page 21

1    don't know if you said squiggly or wiggly, the
2    curved?
3          A.   Somewhat curved, wavy.
4          Q.   Wavy, that's a better word for it.
5          Is that wavy appearance one of the
6    factors in identifying the nerve?
7          A.   It depends on the orientation, on
8    the cut.  Sometimes you get a cut completely
9    transverse and then instead of wavy you have
10   tubular structures.
11         Q.   Okay.
12         A.   But when you get more
13   longitudinal, you get more wavy.  Sometimes it's
14   completely straight, so you have parallel rows, not
15   rows but parallel orientation of the Schwann cell
16   nuclei.  These nuclei are Schwann cell nuclei.
17         Q.   So those wavy parts are the
18   Schwann cell nuclei?
19         A.   Yes, mainly.  There might be some
20   other nuclei, like from small capillaries, but not
21   in this image, at least I don't think any of those
22   are in this image.
23         Q.   Do you attribute any symptoms to
24   the figure in DM4?

6  (Pages 18 to 21)

Vladimir Iakovlev, M.D.

Page 22

1      A.  Well, I mean, as we discussed
2  earlier, we cannot pinpoint one specific picture or
3  one specific morphological feature to a specific
4  symptom.  So we have to consider all changes
5  together as a complex and then apply them to the
6  complications or correlate them to the
7  complications.  This is a part of the pathological
8  changes associated with the mesh, and this would
9  be related to pain symptoms.
10      But it's not just that specific
11  picture caused -- or changes in this specific
12  picture caused pain symptoms.  It's an overall
13  device with similar changes caused the
14  complication.
15      Q.  If we turn to figure DM5.
16      A.  Yes.
17      Q.  It looks like there's some mesh in
18  the top portion of the picture; is that right?
19      A.  Yes.
20      Q.  Was there mesh passed -- we get to
21  the bottom of the picture, we don't see any mesh.
22  Do you know if there's mesh beyond where we're
23  looking in the photo, in the field?
24      A.  I don't know.  Probably not.  But

Page 23

1  I would need slides to answer this question.  Or
2  low power magnification.
3      Q.  Okay.  And it looks like here you
4  have large nerve deformed in the mesh scar plate,
5  H&E, magnification equivalent to ten X objective;
6  do you see that?
7      A.  Yes, I do.
8      Q.  Is there a perineurium on this
9  nerve?
10      A.  So in this image, this is sort of
11  equivocal finding.  If I had a block, I would do
12  S100 stain to confirm.  This structure, as I said,
13  is somewhat equivocal.  I suspect it can be large
14  deformed nerve, but I couldn't confirm it with S100
15  stain.
16      Q.  All right.
17      A.  If I had the block, I would
18  confirm it.  So my assessment was that likely it is
19  than not, but I cannot be 100 percent sure, for
20  this specific structure.
21      Q.  And if we look for those wavy
22  Schwann cell nuclei in this deformed nerve, do you
23  see any of those?
24      A.  Well, when it's deformed, the

Page 24

1  structure is deformed.  So the features are not the
2  same anymore.  So that's why there is a difficulty
3  in recognizing, so I would rely more on Schwann
4  cell stain like S100 protein.
5      Q.  What was it about this structure
6  that led to your opinion that it could be a
7  deformed large nerve?
8      A.  It stems out and there is a
9  specific orientation of the nuclei within -- I've
10  seen larger deformed nerve in H&E within the mesh
11  and they look similar.  But in all of those cases,
12  I could do S100 protein to confirm it.  In this
13  case I couldn't because I had no H&E and I didn't
14  want to destain and do any alteration of -- if it
15  was a hospital case, I would probably use one slide
16  to destain and do a stain over, but because it's a
17  medical-legal case, I didn't alter it.
18      So I can probably defer final decision
19  of this structure to -- if I receive a block or I
20  receive unstained slide I can do S100 stain and I
21  can complete assessment of this structure.
22      Q.  Would you expect a nerve, if this
23  were a nerve of this size, would you expect it to
24  have an endoneurium?

Page 25

1      A.  Yes.  I mean, it would have
2  perineurium and endoneurium if it is normal nerve.
3  If it becomes really distorted, it can lose all of
4  the structures.  And I've seen it happen, I've seen
5  nerves up to two millimeters and they lose all the
6  endoneurium and perineurium when they're deep
7  inside in the mesh.  I've seen it happening.  As I
8  said, it has similar appearance with multiple
9  capillaries distorting.  Because it becomes
10  partially scar tissue at that point.
11      Again, we're going into new field of
12  mesh pathology, all changes within the mesh, and
13  these type of structures are easier to investigate
14  when you have full access to the material like
15  paraffin block.
16      Q.  How did you rule out that this
17  wasn't just fibrous tissue?
18      A.  I couldn't.  I need S100 stain.
19      Q.  So sitting here today are you able
20  to say to a reasonable degree of medical certainty
21  that this structure is a deformed large nerve?
22      A.  I would have to say that this
23  is dependent on further investigation, if I have
24  access to material.  I cannot complete my

7 (Pages 22 to 25)

Vladimir Iakovlev, M.D.

Page 26

1  assessment based on what I have.
2       Q.   So sitting here today, you're not
3  able to say to a reasonable degree of medical
4  certainty that that is a deformed large nerve; you
5  need to do more?
6       A.   Yes.
7       Q.   Okay.  On DM6, what does this
8  figure show?
9       A.   Well, everything we discussed --
10 well, part of that, what we discussed in figure
11 DM4, we have similar mesh fibers, which are in a
12 scar plate.  The mesh fibers, they have foreign
13 body type inflammatory reaction surrounding the
14 mesh fibers, and scar plate with bridging fibrosis
15 on the outside.  And then in the lower right,
16 there is an obliterated artery and the lumen is
17 completely obliterated.  In this case the artery
18 became damaged within the scar plate.
19      Q.   Are you able to tell from
20 morphology alone when that damage occurred?
21      A.   It happened sometime before the
22 excision.  Definitely happened after implantation,
23 so sometime between implantation and excision.
24      The artery is directly in the scar

Page 27

1  plate, so the cause of this is associated with the
2  mesh and the scar plating.
3       Q.   Its position in the scar plate, is
4  that your basis for the opinion that it occurred
5  after placement of the mesh?
6       A.   I don't see any other condition
7  which would explain the obliteration.  I mean, this
8  is the most likely or to a reasonable degree of
9  medical certainty explanation for the damage of the
10 artery.  It's directly against the mesh.  I mean,
11 there's no other lesion around it.  I don't see any
12 other cause, which would cause the damage.
13      Q.   Did you consider age and
14 menopausal status in coming to that opinion?
15      A.   I considered those factors, as we
16 described.  I mean age-related changes, especially
17 for postmenopausal women, would be accelerated
18 atherosclerosis or calcifications in the media,
19 which is somewhat different from atherosclerotic
20 calcifications.  I don't see any calcifications
21 here.
22      Q.   What was the mechanism of the
23 injury that led to the obliterated vessel?
24      A.   It's hard to say.  It's in the

Page 28

1  scar plate, it's somewhere in the distribution of
2  this artery, there was blockage.  Scar plate
3  together with the mesh is quite significant
4  obstacle for blood vessels to grow.  So at one
5  point blood flow stopped through this branch.
6       Q.   Do you know what this -- what the
7  end target of this vessel was?
8       A.   Somewhere in the vagina.
9       Q.   Okay.  And did you see any
10 evidence of downstream consequences of this
11 obliterated vessel?
12      A.   I don't think we have tissue which
13 is supplied by this artery in this specimen,
14 because this will be supplying tissue somewhere
15 beyond this specimen, it's a relatively large
16 vessel.
17      Some branches may be supplying some
18 blood within this specimen, but the distribution
19 will be larger than just what tissue would have in
20 this specimen.
21      Q.   And what would you expect to see
22 as the downstream consequences of an obliterated
23 vessel?
24      A.   Mostly scarring.  Because if there

Page 29

1  is no blood supply, there will be more scarring.
2  Delayed healing.
3       Q.   Would you expect to see necrosis?
4       A.   Well, delayed healing is in a way
5  necrosis, breakdown -- mucosal erosion can be one
6  of the consequences.  If there is not enough blood
7  supply to the area to support mucosa, it becomes
8  fragile.  I mean, it's -- any extra damage will be
9  more damaging or cannot -- the mucosa will not be
10 able to withstand just normal damage.
11      Q.   Do you have an opinion as to how
12 the pathology depicted in DM6 impacted Ms.
13 McBrayer?
14      A.   I will give you the same answer as
15 before.  We cannot take one picture, one
16 morphological finding and single it out to a single
17 complication.  It is a complex, so it was playing
18 together with all the changes including scar
19 plating, nerve entrapment, inflammation, migration.
20      Q.   Let's turn to DM7.  What
21 significance, if any, do you attribute to this
22 picture?
23      A.   There is a piece of mucosa, so we
24 know that there was an excision of the mucosa.  And

8 (Pages 26 to 29)

Vladimir Iakovlev, M.D.

Page 30

1    there was description of erosion, surgically.
2         This is consistent; however, this
3    section did not capture the erosion site.  But we
4    know that it happened, through the records.
5         Q.  Is there anything abnormal in DM7?
6         A.  There is some chronic
7    inflammation, not very dense but there is some
8    chronic inflammation.  We may be close to erosion
9    site, but not very close.
10        Q.  Where is that chronic inflammation
11   in the picture?
12        A.  The lower part.  Not the pink part
13   but the nuclei.
14        Q.  The purple nuclei at the bottom?
15        A.  Yes.
16        Q.  There is a portion on the
17   left-hand side near the bottom that appears to be
18   different color, a little darker red.  Is there any
19   significance to that?
20        A.  It's intraoperative damage,
21   hemorrhage.
22        Q.  Is there anything else abnormal
23   about this picture in DM7?
24        A.  No.

Page 31

1         Q.  Do you attribute any symptoms to
2    the image depicted in DM7?
3         A.  No.  This is more or less normal
4    part of submucosa.
5         Q.  And specifically for your
6    degradation layer photos that go from DM8 A to DM10
7    B, do you attribute any symptoms to the presence of
8    the degradation layer?
9         A.  As before, we cannot single out
10   one feature, one picture, and attribute it to a
11   specific complication.  However, if we think about
12   it, the entire interaction or complex of
13   interactions between the tissue and the mesh is
14   actually through this degraded layer.  All the
15   chemical interactions, foreign body type reaction,
16   stimulus for scarring, all happening through this
17   degraded layer.  So, all features which were
18   observed in a sensation with mesh are influenced by
19   this interaction.  This includes brittleness,
20   increase in stiffness, includes the degradation
21   product.  I mean, all this is playing a role.
22        Q.  Did you measure the degradation
23   bark thickness in this case?
24        A.  If you don't have synoptic report,

Page 32

1    no.  We'll have a look.  (Witness reviews
2    document).
3         I think you're going to ask me to
4    estimate the thickness.
5         Q.  No, I'm just going to ask whether
6    you measured it in this case?
7         A.  No.  This would be hard because
8    the pictures are all longitudinal.  I would prefer
9    to estimate it in the cross-section.
10        Q.  Were you able to identify any blue
11   granules in the bark in this case?
12        A.  The printer makes this blue
13   blotchy.  It's not a good printer but...
14        (Witness reviews document).  While I'm
15   looking for all the descriptions, the presence of
16   the blue granules is not required to detect
17   degradation layer; I just need H&E stain and
18   polarizing filters.
19        However, let me have a look in my
20   report.
21        Q.  Sure.
22        A.  No, I did not see the blue
23   granules readily.  Sometimes it -- there are just
24   fragments of bark in there and you have to go

Page 33

1    through all bark fragments and it's really
2    difficult.
3         Q.  Okay.
4         A.  They might still be there, I just
5    couldn't find them.
6         Q.  All right.  And it looks like
7    you're on page 9 of your report here, which is good
8    because that's where I want to go next.
9         Under the section "Polypropylene
10   degradation," in the second paragraph you have,
11   "Cracking, indicated brittleness and internal
12   contraction forces."  Do you see that?
13        A.  I do.
14        Q.  Did you do any mechanical testing
15   on the specimen in this case?
16        A.  As for all other specimens, I did
17   not do any destructive testing; I only did
18   histology and analyzed polymer using histological
19   methods, which is a good way of doing it because it
20   gives you an opportunity to do histology and
21   analyze the polymer at the same time by
22   nondestructive methods.
23        Q.  A couple of sentences down you
24   have:

9 (Pages 30 to 33)

Vladimir Iakovlev, M.D.

Page 34

1      "Extensive cracking can also
2   provide cavities to harbor
3   bacteria, as is well-known in
4   microporous meshes."
5   Do you see that?
6      A.  I do.
7      Q.  Did you identify any bacteria in
8   the bark cracks in Ms. McBrayer's case?
9      A.  I don't aim to find them.  It
10  would be really difficult to identify one single or
11  a few bacteria.
12     As for all other specimens, I do not
13  aim to find single bacteria.  If it's a colony, I
14  can see it, I describe it.  Usually colonies are in
15  the severely infected erosion sites, you can see
16  them, but when it's one or two bacteria it's really
17  hard to say whether it is or is not.
18     Q.  So is it fair to say in this case
19  you did not find any?
20     A.  I did not look for any.
21     Q.  Okay.  And in this case you didn't
22  find any bacteria colonies either?
23     A.  No.
24     Q.  And then the next sentence you

Page 35

1   have:
2      "Additionally, degradation of a
3   substance indicates its breakdown
4   into smaller molecules, and in cases
5   of implanted materials, the products
6   of degradation are released into the
7   tissue adding to the complex
8   pathological interactions between
9   the mesh and the human body."
10  Do you see that?
11     A.  I do.
12     Q.  Do you know in Ms. McBrayer's case
13  whether any degradation products were released into
14  the tissue?
15     A.  Well, we have to accept the fact
16  that degradation is breakdown of a material into
17  smaller particles.  Like, any material -- any
18  degrading material will release new molecules.
19  It's like fire and smoke, you have fast exudation
20  which is fire and then you produce soot and smoke,
21  new molecules.
22     I did not do specific testing because
23  this would be destructive testing and this is very
24  difficult to do.  But based on studies in vivo,

Page 36

1   degradation products were measured in vitro --
2   sorry, in vitro environment, there is an array
3   of degradation products released during degradation
4   of polypropylene, ketones, acids and the larger
5   molecules.
6      Q.  So in this case you didn't test
7   for or find any of those degradation products
8   released into the tissue for Ms. McBrayer?
9      A.  No, as I said, these are
10  molecules, this is molecular level.
11     Q.  We jumped in on the pictures.  I
12  want to go back and just make sure we do the first
13  three.
14     On DM1 -- I'll wait until you get
15  there.
16     A.  All right.
17     Q.  DM1 on page 10, what do you see in
18  this picture?
19     A.  So again I will give you a
20  summary, but this will not limit my testimony at
21  trial.  I can expand the summary as outlined in the
22  general report.  And also I reserve the right to
23  answer any questions I am asked; I don't know what
24  I am going to be asked.

Page 37

1      In this image we see mesh fibers
2   incorporated by scar tissue and whole spaces
3   between mesh fibers within the mesh are filled by
4   scar tissue.  So this process is called bridging
5   fibrosis.  And when bridging fibrosis becomes
6   confluent and merges with the scar encapsulating
7   the mesh from outside, it forms a solid structure
8   of scar plate.  And the scar plate is reinforced by
9   the mesh within it.  At the same time the mesh is
10  reinforced by the scar tissue, because the fibers
11  have limited movement within the scar tissue.
12     And the structure becomes stiffer than
13  either scar tissue alone without mesh, or mesh
14  without the scar tissue.  Also, the scar tissue, as
15  anywhere else in the body, will contract during
16  maturation.  And this contraction is due to
17  reduction of the extracellular fluid, contraction
18  of myofibroblasts and crosslinking of collagen.
19  This is a defense -- or adaptation mechanisms in an
20  attempt to reduce the area of damage in the body.
21  So scar tissue contracts, pulls the fibers together
22  and the entire device becomes contracted.
23     So in this magnification, which is a
24  lower power magnification, we can also see a halo

10  (Pages 34 to 37)

Vladimir Iakovlev, M.D.

Page 38

1    or foreign body type reaction around the mesh
2    fibers, which is in variable response of the tissue
3    against the mesh fibers. And this inflammation is
4    aimed to destroy or degrade the foreign body. At
5    the same time it damages the tissue and contributes
6    to scar expansion.
7            And in this case it will be chronic
8    process of tissue damage, scarring tissue damage
9    and scarring, because the foreign body cannot
10   become completely reabsorbed because polypropylene
11   does not get reabsorbed. So this would be a
12   summary.
13           Q. Well, let me ask this question and
14   this is broadly across the entire specimen that you
15   reviewed.
16           Did you find any acute inflammation in
17   Ms. McBrayer's specimen?
18           A. I think we mentioned that, that
19   was the reason why I did not include erosion in a
20   separate section, because I did not have a section
21   of erosion -- I did not have a site of erosion in
22   the material which was submitted by the original
23   laboratory.
24           Q. Okay. So you didn't find any

Page 39

1    acute inflammation?
2            A. No.
3            Q. Are you going to offer an opinion
4    in this case that the mesh deformed in the body?
5            A. (Witness reviews document).
6            So my specimen or the slides which were
7    prepared at the original laboratory contained only
8    smaller portions of mesh. I could not assess what
9    deformation was demonstrated in this material.
10   However, as we saw with multiple Prolift devices,
11   all of them deformed and they came out as folded,
12   and this is described in my general opinions.
13           And if we go through the records, there
14   is repeated description of scarred area and banding
15   in there, and this had consistent association with
16   folding and multilayering on excision. And we saw
17   it multiple times during these depositions.
18           So I can offer my opinion based on the
19   clinical descriptions of scarring and banding, and
20   my general opinions provided in the general report.
21           Q. Okay. Did any clinician in this,
22   who treated Ms. McBrayer, say that the mesh was
23   folded or deformed?
24           A. Well, see, the descriptions

Page 40

1    usually I see in the clinic is banding and scarring
2    because if it's flat, it's not palpable. Every
3    time there is description of palpable banding or
4    scarring, when the specimen comes out it's always
5    folded. Because the three dimensionality, that
6    gives it its palpable nature because it becomes
7    stiffer and irregular and thicker. That's why it
8    can become palpated.
9            Q. At least for Ms. McBrayer's
10   specimen you were able to review, you didn't have
11   enough of a specimen to say her specimen folded?
12           A. I did not have enough material to
13   demonstrate it.
14           Q. Okay. And so your opinion is
15   based on your reading of the records and your
16   general opinion?
17           A. That is correct.
18           MR. SNOWDEN: Let's mark Exhibit 3.
19           EXHIBIT NO. 3: Carolinas Laboratory
20           Network Surgical Pathology report with
21           date of service of April 3, 2009.
22           BY MR. SNOWDEN:
23           Q. Dr. Iakovlev, I've handed you the
24   Carolinas Laboratory Network Surgical Pathology

Page 41

1    Report with the date of service of April 3, 2009.
2    Do you see that?
3            A. I do.
4            Q. Okay. And does that correspond
5    with the specimen or the slides you received in
6    this case?
7            A. Let me check. McBrayer, Dee,
8    14621. Yes, this is the pathology report
9    describing the specimen and the slides I received.
10           Q. Okay. And under the section
11   "Final Pathologic Diagnosis," it reads:
12               "Vagina: Foreign body
13           granulomatous inflammatory reaction
14           to surgical mesh and associated..."
15           Can you help me with that last word?
16           A. Cicatrix. Scar, that's another
17   word for scar tissue.
18           Q. So that's another word for scar?
19           A. Yes, it's scar tissue in reaction
20   to injury.
21           Q. Okay. And then the gross
22   description down at the bottom -- well, let's
23   just say before that there's
24   "Clinical Information/ Surgical Procedure," pain,

11 (Pages 38 to 41)

Vladimir Iakovlev, M.D.

Page 42

1  and it says, "Vaginal excision of vaginal mesh
2  4/2/2009." Do you see that?
3      A.  I do.
4      Q.  And then under the gross
5  description:
6          "Received in formalin and
7      labeled 'vaginal mesh' consist of a
8      0.9 by 0.8 by 03 cm aggregate of
9      pink to gray soft tissue fragments
10     and possible mesh material.
11     Specimen is submitted in entirety."
12     Do you see that?
13     A.  I do.
14     Q.  Does this pathologist mention the
15 specimen was curled or deformed or folded?
16     A.  No.
17     Q.  Does this pathologist mention
18 acute inflammation?
19     A.  No.
20     Q.  Does this pathologist mention
21 infection?
22     A.  No.
23     Q.  Does this pathologist say that the
24 mesh is degraded?

Page 43

1      A.  There is no description either
2  way.
3      Q.  Okay.
4      A.  If it is or it is not.
5      Q.  So you would agree with me that
6  the word "degradation" is not found in this
7  pathology report?
8      A.  There is no assessment for
9  degradation.
10     Q.  And so the word "degradation" is
11 not found in the report?
12     A.  If there is no assessment, there
13 is no word.
14     Q.  And you would agree that the final
15 pathologic diagnosis does not mention dyspareunia?
16     A.  I think we talk about it several
17 times that pathologists do not diagnose clinically
18 detectible symptoms. We explain the symptoms,
19 identifying morphological, pathological abnormality
20 in the tissue.
21         So clinical diagnosis is part of
22 clinical work-up. When we step in is when the
23 decision is made to excise tissue, ask a
24 pathologist what is abnormal in that tissue, what

Page 44

1  is causing the symptoms.
2          So as we discussed earlier, the process
3  of clinicopathological correlation is taking place
4  with each specimen. The clinicians provide
5  information why the excision is done, or biopsy,
6  and then pathologist responds to this, describing
7  what is abnormal.
8          And here in this case, we have exactly
9  the same process. And clinical information is:
10 Vaginal pain: Excision of vaginal mesh. Specimen
11 received: Vaginal biopsy, vaginal pain.
12         So this is what the clinician is
13 asking, or what information is provided to the
14 pathologist, "vaginal pain."
15         And then the pathologist examines the
16 specimen and describes what is the abnormality to
17 respond to this clinical information.
18         And what we see here, foreign body
19 granulomatous inflammation reaction to surgical
20 mesh and associated scar. So the pathologist tells
21 the clinician that the abnormality in the tissue
22 which is related to the clinical information is
23 presence of the foreign body and tissue reaction to
24 it as foreign body inflammatory reaction and

Page 45

1  scarring. Scar encapsulation, bridging fibrosis,
2  all of this within this umbrella term.
3      Q.  Doctor, I'm not sure what question
4  you're answering, but my question was, does this
5  pathology report and the final pathologic diagnosis
6  mention dyspareunia?
7      A.  And I explain to you that it would
8  never say dyspareunia because it's a clinical
9  diagnosis.
10     Q.  And in fact it's not --
11     A.  It's not diagnosis, it's
12 clinically elicited symptom.
13     Q.  In fact, we can agree that the
14 final pathologic diagnosis does not mention
15 dyspareunia?
16     A.  I wouldn't expect it to be there.
17     Q.  And in fact, the pathologist from
18 Carolinas Laboratory Network does not mention scar
19 plating in the diagnosis; is that correct?
20     A.  Well it clearly says "scar."
21     Q.  Does it say "scar plate"?
22     A.  No, but --
23     Q.  Does it say "bridging fibrosis"?
24     A.  No it doesn't.

12 (Pages 42 to 45)

Vladimir Iakovlev, M.D.

Page 46

1    Q.  Does the word "correlation" appear
2  anywhere in this pathology report?
3    A.  No.
4    Q.  Dr. Iakovlev, from my
5  understanding, reading your report, you have a
6  section on pain and a section on dyspareunia.  Is
7  that right?
8    A.  Yes.
9    Q.  Okay.  I have a question under
10  your "Pain" opinion.  On page 7 you have at the
11  last sentence that carries over on to 8:
12        "Scar tissue matures within a
13        year after injury and then can
14        remodel or expand, depending on
15        chronicity of the tissue damage."
16      What do you mean by "expand" there?
17    A.  Well, if you have chronic tissue
18  damage it will provide stimulus for fibrosis.
19  That's how organs get scarred.  Like liver
20  sclerosis, if there's chronic damage, chronic
21  hepatitis C or alcoholism, year after year there
22  will be more scar, more scar, more damage and then
23  it will expand.  Same thing with lung fibrosis or
24  with foreign bodies.

Page 47

1      If there is continuous stimulus and
2  tissue damage, the damaged tissue will be replaced
3  by scar, so there will be expansion of the scar or
4  thickening of the scar plate.
5    Q.  And on page 8, the third
6  paragraph, you have:
7        "The large body and arms of a
8        Prolift device have a large area and
9        a long course in the body, damaging
10        multiple neurovascular structures,
11        crossing striated muscles, providing
12        nonphysiological attachments between
13        the tissues and introducing a cause
14        for chronic inflammation."
15      Do you see that?
16    A.  I do.
17    Q.  Did you see any striated muscle in
18  your specimen in this case?
19    A.  No, I couldn't demonstrate it in
20  this.  But my opinion is based on multiple excision
21  specimens of Prolift devices.
22    Q.  And in Ms. McBrayer's case did you
23  find evidence of damage to multiple neurovascular
24  structures?

Page 48

1    A.  Some, but the specimen was
2  limited.
3    Q.  And actually, we just read from
4  the pathology report that it was -- the specimen
5  was less than a centimeter by a centimeter by a
6  centimeter; is that correct?
7    A.  That is correct.
8    Q.  So is it your understanding that
9  you did not receive the large body of the Prolift
10  device or the long arms of the Prolift device in
11  this case?
12    A.  Well, I received part of the body.
13    Q.  Okay.  In this case what was it
14  about the Prolift that caused Ms. McBrayer's pain?
15    A.  (Witness reviews document).
16      So she is being implanted with Prolift
17  device in July 2007.  Then there are entries in
18  October and December, and by December the symptoms
19  are described as discomfort in the lower back
20  associated with changes in bowel movement, also
21  some discomfort with ambulation.  She reported the
22  pain is global pelvic floor type discomfort and
23  does get worse after significant bowel movements
24  and/or other stimulation.

Page 49

1      And we go on into 2008, description of
2  continued pelvic floor rectal and vaginal
3  discomfort, worse with ambulation and long periods
4  of sitting and standing.  Bilateral pain in the
5  buttock area.  So at that time, no constriction
6  bands are palpable.
7      And continuing on, then in August there
8  is a description that sometimes she would
9  experience pain after intercourse.
10      And then in December 2008, which is
11  roughly one year and a half, just less than a year
12  and a half after the implantation, digital
13  examination revealed mild tenderness at the
14  proximal vagina with a palpable scarring secondary
15  to graft.  So in that moment, there is a palpable
16  scarring.  And tenderness on the palpation.
17      And then in February 2009 there is mesh
18  erosion.  And now the examination or findings of
19  the examination are progressively getting worse.
20        "Digital examination reveals
21        tenderness at the 7 and 5 o'clock
22        positions of the vaginal apex with
23        underlying palpable scarring
24        secondary to the graft.  These are

Golkow Technologies, Inc. - 1.877.370.DEPS

Vladimir Iakovlev, M.D.

Page 50

1    most notable for uncomfortable areas
2    on examination."
3        So at this moment there is unequivocal
4    association of the pain with the graft scarring,
5    palpable scarring.
6        Q.  I'm sorry, which record were you
7    just reading from?
8        A.  February 26, 2009.
9        Q.  Did you say it was getting
10   progressively worse?
11       A.  Yeah, when I was going through the
12   records, there's some vague descriptions and then
13   examination slowly visit after visit it becomes
14   more focused on the graft.
15       Q.  Was it significant to your opinion
16   that the complaints were getting progressively
17   worse?
18       A.  This is just a description.  I'm
19   describing what is in the records.  To my opinion
20   is to determine if the clinical differential
21   diagnosis was completed and if clinicians after
22   performing their clinical differential diagnosis
23   narrowed down the clinical differential diagnosis
24   to the mesh.  And I'm just showing how it was done

Page 51

1    in the records.  It's not my opinion.  I'm just
2    describing what is in the records.
3        And then April 2009, digital
4    examination reveals tenderness over the lateral
5    margins of the vagina and the firm scar consistent
6    with synthetic polypropylene mesh.
7        And then finally in April 2009, there
8    is excision of a part of the mesh, of Prolift mesh.
9    And the indications are, history of previous
10   vaginal reconstruction surgery with placement of
11   vaginal mesh, who now presents with mesh erosion
12   and vaginal pain.
13       The patient now presents for excision
14   of exposed mesh and release of scar tissue palpable
15   on examination.  And intraoperatively there was an
16   erosion and scarred area, which was released, and a
17   description that mesh was incorporated with
18   collagen ingrowth.  And the remainder of the mesh
19   was not removed.
20       So just going through the records, I
21   saw that clinicians perform clinical differential
22   diagnosis, narrowed down causes of pain and
23   dyspareunia to the mesh and made a decision to
24   excise the specimen.

Page 52

1        When I received the specimen, or when
2    the original pathologist received the specimen, the
3    only findings, or the only pathology there was
4    presence of the mesh as a foreign body and reaction
5    of the body to the mesh.
6        There's no other pathology, no natural
7    disease like neoplasia, or another foreign body in
8    there.  So the tissue which was associated with the
9    symptoms clinically showed pathology of the mesh
10   only.  So this is a first step in the morphological
11   differential diagnosis, we rule out any other
12   causes.
13       And then if we go further into the mesh
14   specific pathology, as we saw in the pictures,
15   there is bridging fibrosis, scar encapsulation,
16   chronic foreign body type inflammatory response,
17   innervation of the scar plate.
18       We know that scar plates contracts so
19   there was tensioning and there was -- it was
20   described as scarring and banding in the area which
21   was released.
22       And as I mentioned earlier, all of
23   these complex changes work together to produce the
24   symptoms.  And we can further explain how these

Page 53

1    symptoms came about.
2        Q.  All right.  Do you, for purposes
3    of your opinion regarding pain and dyspareunia in
4    this case, do you differentiate between pain from
5    scarring and pain from mesh erosion in Ms.
6    McBrayer's case?
7        A.  You cannot differentiate between
8    the two because they all occur at the same time.
9    Both can cause or contribute to the symptoms.  The
10   scarring on its own can produce the symptoms and we
11   saw it in many other cases, because scar contracts,
12   scar distorts tissue, there is entrapment of nerves
13   in the scar and all other mechanisms we discussed
14   earlier.
15       And at the same time, if you have
16   superimposed erosion on all these changes, you have
17   extra inflammation in the area and you have
18   additional load of inflammation, additional
19   granulation tissue, additional sensitization of the
20   tissues for pain, due to inflammation.  So, the
21   symptoms will get worse.  In addition, that will be
22   a risk factor for dyspareunia and dyspareunia when
23   the mesh becomes exposed.
24       Q.  And in Ms. McBrayer's specimen,

14  (Pages 50 to 53)

Vladimir Iakovlev, M.D.

Page 54

1    did you see any granulation tissue or increased
2    inflammation from the erosion?
3            A.  No, I did not have site of
4    erosion.
5            Q.  Was it important -- I heard you
6    mention, I think you used the phrase "progressively
7    worse" in describing the course of Ms. McBrayer's
8    pain symptomatology.
9            Was it important for your opinion that
10   it was progressively worse over time?
11           A.  No, I was not basing my opinions
12   on the progressive nature.  However, it correlates
13   with the pathophysiology of the changes related to
14   the mesh.  Because, as we discussed earlier, scar
15   contraction is a continuous process.  Most of it
16   occurs within first month after implantation.
17   However, with chronic damage and continuous scar
18   remodeling, it will continuously become more dense
19   and there will be more expansion of the scar
20   tissue, more contraction.  So slowly there will be
21   more tension and more distortion introduced in the
22   area.
23           Q.  Would it matter to your opinion if
24   while the morphological features that you just

Page 55

1    described of more contraction and all that was
2    occurring, that Ms. McBrayer's pain was actually
3    not changing at all?
4            A.  It can have different patterns,
5    but the progressive nature can be explained
6    morphologically.  But it will not change my
7    opinions if it's progressive or if it's
8    intermittent.  There are multiple ways how it can
9    present.  And the presentation would be more
10   expertise of urogynecologist.  I can explain how
11   progressive nature can be caused by the
12   morphological changes.
13           Q.  Okay.  If you have a patient, and
14   let's just say Ms. McBrayer, who has preexisting
15   history of dyspareunia, vaginal and rectal pain
16   that predated her surgery, and the morphological
17   changes in the Prolift device were occurring as you
18   say they were, but that pain didn't change, does
19   your morphological description explain that pain?
20           A.  I'm not sure of exactly what
21   you're asking.  But I can tell you if clinical
22   differential diagnosis is worked up, somebody is
23   already -- or one of the clinicians already made
24   this distinction that specific symptoms of pain and

Page 56

1    dyspareunia are associated with the pain.  Then I
2    examine the specimen and I explain what is the
3    cause for that pain.
4            EXHIBIT NO. 4:  Women's Institute
5            Office Note, dated March 31, 2008.
6            BY MR. SNOWDEN:
7            Q.  Dr. Iakovlev, earlier you
8    mentioned you read from a portion of the
9    March 31st, 2008, record, which I'm going to hand
10   to you now as Exhibit 4.  And in your summary in
11   your report you have description of:
12           "Continued pelvic floor, rectal
13           and vaginal discomfort, worse with
14           ambulation and long periods of
15           sitting and standing, bilateral pain
16           in the buttock area.  Digital
17           examination revealed tenderness, on
18           the levator ani.  Also, rectal exam
19           revealed significant elevation in
20           the rectal and levator ani tone with
21           bilateral trigger points from the
22           puborectalis to the vaginal apex.
23           No masses or abnormalities noted,
24           and no constriction bands from the

Page 57

1            graft were palpable."
2            Do you see that?
3            A.  I do.
4            Q.  If you take a look at the record
5    that I've just handed you in Exhibit 4 from
6    March 31, 2008, which is where you pulled your
7    summary from to put in your report, correct?
8            A.  So this is March --
9            Q.  31st, 2008.
10           A.  31st, 2008, all right, and it's
11   seven months after implantation.
12           Q.  The chief complaint there is
13   pelvic floor tension myalgia; do you see that?
14           A.  Yes.
15           Q.  And then "HPI," that's history of
16   present illness, correct?
17           A.  Yes.
18           Q.  And then the third line down,
19   halfway through the line, it says:
20           "It is bilateral in the buttock
21           area."
22           Do you see that?
23           A.  I do.
24           Q.  And then you've put in your

Vladimir Iakovlev, M.D.

Page 58

```
 1    summary on your page 3, you have that section, the
 2    buttock area.
 3        Then the next sentence which you don't
 4    include in your summary:
 5            "This pain has been long-
 6        standing and predated her surgery,
 7        which was performed in July and
 8        included a grafted posterior
 9        repair and enterocele repair."
10        Is there a reason why you did not
11    include that?
12        A.  I could not include everything.  I
13    just include specific data points related to the
14    specimen I receive.
15        Q.  Before today, did you know the
16    record said that?
17        A.  Pardon?
18        Q.  Before today, did you know that
19    portion of the record mentioned that her pain long
20    predated her surgery?
21        A.  I read the record so it's there.
22    As I said, I cannot include everything.  I try to
23    include only information which is directly
24    pertinent to the specimen I received.
```

Page 59

```
 1        Q.  Did you consider that her pain has
 2    been longstanding and predated her surgery when
 3    coming to your clinicopathological correlation?
 4        A.  I did, but the pre and post-
 5    clinical differential diagnosis is not specifically
 6    my role in this case.  I'm basing my opinion on
 7    clinical differential diagnosis work-up done by the
 8    clinicians, so when I see somebody already make the
 9    decision, compare it to pre and post, then the
10    decision is to excise the specimen.
11        Q.  Did they excise the entire mesh?
12        A.  No, they didn't.
13        Q.  Did they excise the eroded
14    portion; is that correct?
15        A.  Yes.
16        Q.  I'm going to hand you now what's
17    been marked as McBrayer 5?
18        EXHIBIT NO. 5: Women's Institute
19    Office Note, dated December 22, 2008.
20        BY MR. SNOWDEN:
21        Q.  If you look down at the bottom it
22    has admit date 12-22-2008; do you see that?
23        A.  I do.
24        Q.  And I think you also mentioned
```

Page 60

```
 1    this record when you were responding to one of my
 2    earlier questions but, in any event, you have an
 3    entry for December 22, 2008, on your report, on
 4    page 4?
 5        A.  Yes.
 6        Q.  Do you see that?
 7        A.  I do.
 8        Q.  Okay.  And in your summary on
 9    page 4, you have:
10            "The record indicated that Ms.
11        McBrayer reported having some pelvic
12        floor pain and mild dyspareunia,
13        using pain medication a couple
14        times a month.  Digital examination
15        revealed mild tenderness at the
16        proximal vagina with a palpable
17        scarring secondary to graft."
18        Do you see that?
19        A.  I do.
20        Q.  If you turn to Exhibit 5, would
21    you agree this is the record from which you're
22    basing your description on page 4?
23        A.  It looks like it, yes.
24        Q.  Okay.  And under the history of --
```

Page 61

```
 1    let's start with, the reason for office visit says
 2    "Vaginal pain," correct?
 3        A.  Yes.
 4        Q.  Under the "History of present
 5    illness," the third line down, it starts:
 6            "She reports she is doing well,
 7        having some mild dyspareunia,
 8        reports her symptoms overall are
 9        slightly improved, although she
10        continues to have some pelvic floor
11        pain and discomfort that preceded
12        her prior surgery and activity
13        related."
14        Do you see that?
15        A.  I do.
16        Q.  And you didn't include that in
17    your summary?
18        A.  As I said, I cannot include the
19    whole thing.  I just try to make a summary on the
20    go, as I described.
21        Q.  When determining whether the
22    morphological changes that you describe were the
23    cause of pain in Ms. McBrayer's case, did you
24    consider that her pain preceded her prior surgery?
```

16 (Pages 58 to 61)

Vladimir Iakovlev, M.D.

Page 62

```
 1          A.  I thought we agreed I do not do
 2  clinical differential diagnosis pre and post.  It's
 3  already done by somebody else.  I simply state the
 4  facts in the chronology, what she's experiencing.
 5          The comparison pre and post is not my
 6  role here.  It's the role of urogynecologist.
 7          Q.  Do you consider in any way whether
 8  her symptoms changed?
 9          A.  I see it in the records, but I
10  leave it to urogynecologist to compare.  Change,
11  not change.  Because pain and dyspareunia can be
12  caused by multiple factors, and urogynecologist can
13  determine if the causes are different pre and
14  postimplantation.  People have pain from
15  different -- for different reasons.
16          I cannot examine the patient.  I cannot
17  take history, so -- if I see that the mesh is
18  excised specifically for pain and dyspareunia, then
19  I examine the specimen and I explain the symptoms.
20          Q.  Okay.  Let's go to your summary on
21  page 4, February 26, 2009, Carolinas Medical
22  Center.  You mentioned that your review of the
23  record showed her symptoms were progressively
24  worse.  Do you recall that testimony?
```

Page 63

```
 1          A.  Well, summary description, what I
 2  see in the records.
 3          Q.  And we've just gone through two
 4  records that mention her pain has -- the last one
 5  we said, overall slightly improved and it's pelvic
 6  floor pain and discomfort that preceded her prior
 7  surgery.
 8          And now less than a year later, we're
 9  going to the February 26, 2009 record, where it
10  states:
11              "Pain has been stable not
12              worsening over the last year."
13          Do you see that in your report on
14  page 4?
15          A.  Which entry is it?
16          Q.  February 26, 2009.
17          A.  Yes.
18          Q.  Okay.  How do your morphological
19  findings explain that the pain was not worsening?
20          A.  It's not related to the --
21  morphological findings is not explaining the
22  pattern of changes during the course of her, well,
23  disease or complications.  As I said, I am
24  correlating it with the specimen I receive, with
```

Page 64

```
 1  the decision to excise the specimen at the time of
 2  excision.  I'm not doing clinical differential
 3  diagnosis.  And I'm not saying -- if we look at
 4  this entry --
 5          (Reporter sought clarification.)
 6          A.  Let me correct it.
 7          So when we look at the entry,
 8  December 22nd, 2008, so I'm saying Ms. McBrayer
 9  reported having some pelvic floor pain and mild
10  dyspareunia, and I'm not giving any description of
11  what is the cause for it.  I'm leaving it open to
12  the clinicians.
13          I'm not saying that it's due to
14  preexistent causes and I'm not saying that it's due
15  to mesh, because there is no decision at that time.
16  So I just leave it completely neutral, without
17  explanation of the causes, because that was my
18  impression during the review of the records, that
19  the clinical differential diagnosis is not
20  completed yet.
21          So this is completely neutral statement
22  of what she's experiencing during that visit
23  without giving any explanation of what is the
24  cause.
```

Page 65

```
 1          And the same for other entries.  When
 2  there is no completed differential diagnosis, I
 3  don't mention the cause, and when the differential
 4  diagnosis is completed and the decision is made to
 5  excise the mesh, then I provide it in the summary.
 6  Because this becomes directly relevant to my
 7  specimen.
 8          Q.  Dr. Iakovlev, when the physicians
 9  made the decision to remove a portion of the mesh
10  on April 3, 2009, is it your testimony that their
11  differential diagnosis was that the entire mesh was
12  causing her pain?
13          A.  You have to ask them if their
14  opinion was -- well, you have to ask first treating
15  physician and urogynecologist expert what would be
16  their opinion regarding if it's a part of the mesh
17  or entire mesh, and I'm just giving you a
18  morphological correlation.
19          Q.  Doctor, aren't you also basing
20  your opinion on the assessment that those doctors
21  made on April 3rd, 2009?  I think you just told me
22  that.
23          A.  Well, their conclusions.
24          Q.  And their conclusion was to remove
```

Vladimir Iakovlev, M.D.

Page 66

1    the eroded portion of the mesh and to leave the
2    remainder in, correct?
3          A.   That's correct.
4          Q.   By February 26, 2009, where the
5    exposure is first noted in your summary, that would
6    have been well over a year after the implantation
7    procedure that occurred on July 30, 2007?
8          A.   All right.  Let me see again.  So
9    she gets implantation one more time, so she's being
10   implanted in August 2007.  And then --
11         Q.   Then we go to February 26, 2009;
12   you'd agree that's more than a year?
13         A.   Yes, more than a year.
14         Q.   Okay.  And you've testified many,
15   many, many times that the scarring and contraction
16   that occurs in mesh is well established by a year,
17   correct?
18         A.   Most.  Well, I mean, yes.  I mean,
19   there will be -- the initial scar will be
20   established by -- within first year.  However, the
21   continuous damage of the tissue will cause more
22   scarring.  So this will be added on and on and on.
23   So if there is no clinical implication during the
24   first year, later developments and polypropylene

Page 67

1    degradation may tip the scale and cause the
2    symptoms.
3          Q.   So looking at the pathology
4    specimen you received in Ms. McBrayer's case, are
5    you able to tell us whether these changes occurred
6    before a year, after a year, two years later, when
7    did these changes occur in the tissue?
8          A.   They are continuous.  Some of it
9    is what was occurring during first weeks or month,
10   and some of it will be addition to those changes in
11   later month.
12         MR. SNOWDEN:  Can we take a quick
13   break?
14         -- RECESS AT 10:31 --
15         -- UPON RESUMING AT 10:42 --
16         BY MR. SNOWDEN:
17         Q.   Dr. Iakovlev, we've been talking
18   about some of the records from Ms. McBrayer's case.
19   And I just want to understand the clinico part of
20   your clinicopathological correlation.
21         For the clinico portion of your
22   clinicopathological correlation, what do you rely
23   upon?
24         A.   All right.  So let's have a look

Page 68

1    at the clinical summary.
2          So when I screen the records, I extract
3    all information which is relevant, including
4    preexisting conditions, including preexisting
5    symptoms, background medical and history.  So you
6    can see here background medical history:
7    Hypertension, gastroesophageal reflux disease;
8    surgical history:  breast reduction.
9          And then I screen for urogynecological
10   history, and I include all facts or at least
11   summary of them, some landmarks or milestones.
12         Now, if we go through the entries, for
13   example, there are several entries predating the
14   mesh implantation, actually quite a number of
15   entries predate, and there is history of pelvic
16   pressure, pain, protrusion, which are symptoms of
17   prolapse.  Stress-type incontinence.  So all of
18   these preexisting conditions are listed here.  I'm
19   not ignoring them.
20         There is another entry in May 2007,
21   progressive pelvic pressure, protrusion, some deep
22   pelvic dyspareunia, which she had for many, many
23   years.  Again, I'm not ignoring it.
24         And then we move on and then I can see

Page 69

1    that she's been worked up for the surgery.  Again,
2    I'm including it.  And then there is a description
3    of the surgery itself.  And this is one of the key
4    facts for me as a pathologist, because I need to
5    know the origin of the specimen.  So in this case,
6    I need to know what was implanted and where it was
7    implanted.
8          And then I can see the symptoms and I
9    just list these symptoms and I see that the
10   clinicians are working the differential diagnosis.
11   I mean, there is some uncertainty and I just
12   neutrally list whatever symptoms she had.  And when
13   there are firm conclusions of these symptoms, I
14   include them in the clinical summary.
15         And then finally when there is final
16   steps of the clinical differential diagnosis, when
17   the clinician could compare pre and post and
18   examine patient and do investigations, their
19   decision becomes to excise the mesh.  Again, this
20   would be another key fact for me, key entry.
21         The clinical differential diagnosis
22   work-up culminated in mesh excision, including all
23   those preexisting condition, concurrent condition
24   and anything else she might be experiencing, along

18 (Pages 66 to 69)

Vladimir Iakovlev, M.D.

Page 70

1    with the reasons for mesh excision.
2         And when the mesh gets excised, then
3    I'm answering the questions or the reasons why it
4    became excised.  I'm answering it using my
5    morphological differential diagnosis.  I'm not
6    performing the clinical differential diagnosis.
7         Q.  In this case are you going to
8    offer the opinion that Ms. McBrayer's pain was
9    caused by the mesh?
10        A.  So, the pain which was attributed
11   to the mesh clinically, and which triggered mesh
12   excision, was caused by the mesh.  She may have
13   different types of pain, headaches, some
14   fibromyalgia.  I'm not attributing all possible
15   pains in this patient.  I'm attributing specific
16   symptoms which were attributed to the mesh
17   clinically, and then I correlated or provide an
18   answer how this was caused and by what pathological
19   changes.  And in this case, as with other cases,
20   the pathology was the mesh itself, and the tissue
21   reaction to it.  It wasn't a natural disease, like
22   a tumor.
23        Q.  Which pain was attributed to the
24   mesh?

Page 71

1         A.  Oh, you mean --
2         Q.  Which pain in this case?  You have
3    said you're not considering headaches, you're not
4    considering other things.  So which pain are you
5    attributing to the mesh?
6         A.  Let's see how it's described
7    clinically.  (Witness reviews document).  So in
8    this case it's called vaginal pain.  Yeah, this is
9    logical, that's where the mesh was placed.
10        Q.  Okay.  And that differential that
11   you're referring to was on April 3rd, 2009?
12        A.  Not differential, this was the
13   conclusion of the differential diagnosis.
14        Q.  Okay.  And, Doctor, how do you
15   differentiate between that vaginal pain that you're
16   referring to and her longstanding history of
17   dyspareunia, vaginal and rectal pain that predated
18   her surgery, which has not improved significantly
19   which the clinicians found on the same -- wrote on
20   the same day that they explanted the mesh?
21        A.  I do not differentiate clinical
22   symptoms because pain, dyspareunia can be
23   multifactorial.  I leave this part to the
24   urogynecologists.  I am answering their question or

Page 72

1    their indication for the mesh excision.
2         Their decision was to excise the mesh.
3    So I'm answering that question, what was wrong with
4    the area which became excised.
5         Q.  In this case are you able to
6    provide an opinion on any potential changes in the
7    quality, intensity, location of the pain that you
8    would attribute to the mesh?
9         A.  No.  This would be beyond my
10   scope.  That's area of urogynecologists.  They can
11   examine the patient, they can take precise history,
12   compare the records, assess the quality of the
13   records and assess the quality of assessments,
14   because providers can be wrong.  So that's all area
15   of expertise of the urogynecologists.
16        Q.  Doctor, in this case are you
17   offering any opinions regarding any complications
18   involving the bowel or constipation?
19        A.  (Witness reviews document).
20        I don't see exact work-up, clinical
21   work-up in the records I examined regarding that
22   issue.  However, knowing that it's posterior
23   Prolift device and it's still there, she's at risk
24   of mesh migrating and affecting the -- and we've

Page 73

1    seen several cases how it happens up to obstruction
2    of the fecal outflow.  So she's at risk if she's
3    experiencing or she will experience; I cannot
4    attest to that.
5         Q.  So she may be at risk, but do you
6    have any opinion in this case that the mesh is
7    causing those complications at this time?
8         A.  No, I don't know.  Because I am
9    not a urogynecologist, I cannot examine the patient
10   or take the history.
11        But based on my knowledge and
12   experience, and the opinions described in the
13   general report, and appearance of on examining the
14   specimens, and you've seen it during these
15   depositions, that posterior Prolift device can
16   cause or any posterior mesh can cause complications
17   in the rectum.
18        Q.  Do you have any opinions in this
19   case -- are you going to offer an opinion in this
20   case that the mesh caused any symptoms in the
21   pelvic floor musculature?
22        A.  This is a question for
23   urogynecologists.  And I can tell you that changes
24   which are within the mesh are trigger for pain, and

19  (Pages 70 to 73)

Vladimir Iakovlev, M.D.

| Page 74 | Page 76 |
|---|---|

**Page 74**

1    this can spread further into and trigger a muscle
2    contraction. But more detailed mechanisms would be
3    an area of urogynecologists.
4        Q. And in this case you wouldn't be
5    able to tell us how far the mesh specimen you
6    reviewed was from any muscle?
7        A. It doesn't have to be in contact.
8    If you have a trigger for pain, many adjacent
9    muscles will start contracting as a reaction to
10    pain. It's known in many parts of the body. There
11    is a one-point trigger pain, but then the pain
12    spreads, or feeling of the pain spreads over larger
13    area, and then muscles start contracting, going
14    through this cycle, pain and contraction, more
15    contraction. Then there is pain in the muscle, and
16    then it triggers more contraction; like pain after
17    kidney stone. You have a trigger here, muscle
18    contracts around the kidney stone, and the pain is
19    actually caused not by the stone itself but the
20    contraction of the muscle around it.
21        Q. And, Doctor, on page 7 of your
22    report, just above your pain section you have:
23        "Overall Ms. McBrayer had some
24        preexistent pelvic pain symptoms

**Page 76**

1        MR. ZIMMERMAN: I don't have any
2    questions on Ms. McBrayer.
3        Mandy, you don't have any questions,
4    do you?
5        MS. ROBINSON: Not at this time.
6        MR. ZIMMERMAN: Thank you very much.
7
8    -- Whereupon the deposition concluded at 10:57 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| Page 75 | Page 77 |
|---|---|

**Page 75**

1        with which she lived for 17 years
2        not requiring surgical treatment.
3        After the Prolift mesh was placed,
4        the clinical course changed. There
5        was a progressive development of new
6        symptoms and the clinical
7        investigations lead to mesh excision
8        less than two years after mesh
9        placement."
10    Do you see that?
11        A. That is correct.
12        Q. I think we've been over this, but
13    I just want to confirm. Are you going to offer
14    opinions as to which new symptoms occurred?
15        A. This will be area of
16    urogynecologist and treating physicians. Some new
17    symptoms, well, pain and dyspareunia, but we agreed
18    that pain and dyspareunia is a group of symptoms,
19    is multifactorial. But those pain and dyspareunia
20    which were attributed to the pain -- to the mesh,
21    they triggered the excision.
22        MR. ZIMMERMAN: It's time.
23        MR. SNOWDEN: Thanks, Doctor.
24        THE WITNESS: Thank you.

**Page 77**

1        REPORTER'S CERTIFICATE
2
3
4        I, JUDITH M. CAPUTO, RPR, CSR, CRR,
5    Registered Professional Reporter, certify;
6        That the foregoing proceedings were
7    taken before me at the time and place therein set
8    forth, at which time the witness was put under oath
9    by me;
10        That the testimony of the witness and
11    all objections made at the time of the examination
12    were recorded stenographically by me and were
13    thereafter transcribed at my direction;
14        That the foregoing is a true and
15    correct transcript of my shorthand notes so taken.
16
17
18
19        Dated this 16th day of March, 2016.
20
21
22        _____
23
       PER: JUDITH CAPUTO, RPR, CSR, CRR
24

20 (Pages 74 to 77)

Vladimir Iakovlev, M.D.

Page 78

1          CERTIFICATE OF REPORTER
2  CANADA        )
3  PROVINCE OF ONTARIO   )
4
5  I, Judith M. Caputo, the officer before whom the
6  foregoing deposition was taken, do hereby certify
7  that the witness whose testimony appears in the
8  foregoing deposition was duly sworn by me; that the
9  testimony of said witness was taken by me in
10 shorthand, using Computer Aided Realtime, to the
11 best of my ability and thereafter reduced to
12 written format under my direction; that I am
13 neither counsel for, related to, nor employed by
14 any of the parties to the action in which the
15 deposition was taken, and further that I am not
16 related or any employee of any attorney or counsel
17 employed by the parties thereto, nor financially or
18 otherwise interested in the outcome of the action.
19
20 _____
21 Judith M. Caputo, RPR, CSR, CRR
22
23 Commissioner for taking
24 Oaths in the Province of Ontario

Page 80

1        - - - - - -
2        E R R A T A
3        - - - - - -
4  PAGE LINE CHANGE
5  _____
6  ___ ___ REASON: _____
7  _____
8  ___ ___ REASON: _____
9  _____
10 ___ ___ REASON: _____
11 _____
12 ___ ___ REASON: _____
13 _____
14 ___ ___ REASON: _____
15 _____
16 ___ ___ REASON: _____
17 _____
18 ___ ___ REASON: _____
19 _____
20 ___ ___ REASON: _____
21 _____
22 ___ ___ REASON: _____
23 _____
24 ___ ___ REASON: _____

Page 79

1       INSTRUCTIONS TO WITNESS
2
3        Read your deposition over carefully.
4  It is your right to read your deposition and make
5  changes in form or substance.  You should assign a
6  reason in the appropriate column on the errata
7  sheet for any change made.
8        After making any changes in form or
9  substance, and which have been noted on the
10 following errata sheet, along with the reason for
11 any change, sign your name on the erratum sheet and
12 date it.
13       Then sign your deposition at the end of
14 Your testimony in the space provided.  You are
15 signing it subject to the changes you have made in
16 the erratum sheet, which will be attached to the
17 deposition before filing.  You must sign it in
18 front of a witness.  The witness need not be a
19 notary public.  Any competent adult may witness
20 your signature.
21       Return the original erratum sheet
22 promptly.  Court rules require filing within 30
23 days after you receive the deposition.
24

Page 81

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4      I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10 changes in form or substance, if any,
11 noted in the attached Errata Sheet.
12
13
14 _____
15 VLADIMIR IAKOVLEV, M.D.     DATE
16
17
18 Subscribed and sworn
   to before me this
19 _____ day of _____, 20____.
20 My commission expires:_____
21
   _____
22 Notary Public
23
24

21 (Pages 78 to 81)