# EXHIBIT Y

Vladimir Iakovlev, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

OF THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


| | |
|---|---|
| IN RE: ETHICON, INC., PELVIC ) | Master File No. |
| REPAIR SYSTEM PRODUCTS ) | 2:12-MD-02327 |
| LIABILITY LITIGATION ) | MDL 2327 |
| ) | |
| THIS DOCUMENT RELATES TO THE ) | JOSEPH R. GOODWIN |
| FOLLOWING CASES IN WAVE 1 OF ) | U.S. DISTRICT JUDGE |
| MDL 200: ) | |

----------------------------
                            )
BETTY FUNDERBURKE            )  Civil Action No.
                            )
              Plaintiff,)  2:12-cv-00957
                            )
vs.                         )
                            )
ETHICON, INC., ET AL.       )
                            )
              Defendant. )
                            )
----------------------------


---  This is the Deposition of VLADIMIR

IAKOVLEV, MD, taken at the Hilton Hotel, 145

Richmond Street West, Toronto, Ontario, on the 4th

day of March, 2016.

------------


REPORTED BY:  HELEN MARTINEAU

CERTIFIED SHORTHAND REPORTER

Vladimir Iakovlev, M.D.

## Page 2

```
 1    ------------------------------
      Donna Loustaunau       )
 2    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00666 )
 3                           )
      Patricia Ruiz          )
 4    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01021 )
 5                           )
      Elizabeth Blynn Wolfe  )
 6    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01286 )
 7                           )
      Barbara Vignos-Ware, et al.  )
 8    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00761 )
 9                           )
      Donna Massey, et al.   )
10    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-0880 )
11                           )
      Patti Ann Phelps, et al.   )
12    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01171 )
13                           )
      Dina Sanders Bennett   )
14    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00497 )
15                           )
      Charlene Logan Taylor  )
16    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00376 )
17                           )
      Cynthia Nix            )
18    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01278 )
19                           )
      Barbara Kaiser         )
20    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00887 )
21                           )
      Carol Jean Dimock      )
22    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00401 )
23    Ana Ruebel             )
      v. Ethicon, Inc., et al.   )
24    Civil Action No. 2:12-cv-00663 )
```

## Page 4

```
 1    ------------------------------
      Janet Smith, et al.    )
 2    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00861 )
 3                           )
      Harriet Beach          )
 4    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00476 )
 5                           )
      Maria C. Stone, et al.  )
 6    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00652 )
 7                           )
      Diane Kropf, et al.    )
 8    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01202 )
 9                           )
      Virginia White, et al.  )
10    v. Ethicon, Inc., et al.   )
      Civil Action No.2:12-cv-00958 )
11                           )
      Dee McBrayer, et al.   )
12    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00779 )
13                           )
      Julie Wroble, et al.   )
14    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00883 )
15                           )
      Sherry Fox, et al.     )
16    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00878 )
17                           )
      Joyce Justus           )
18    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00956 )
19                           )
      Kathleen Wolfe         )
20    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00337 )
21    ------------------------------
22
23
24
```

## Page 3

```
 1    ------------------------------
      Jackie Frye            )
 2    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-1004 )
 3                           )
      Joan Adams             )
 4    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01203 )
 5                           )
      Sharon Boggs, et al.   )
 6    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00368 )
 7                           )
      Dina Destefano-Raston, et al.  )
 8    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01299 )
 9                           )
      Teresa Georgilakis, et al.  )
10    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00829 )
11                           )
      Donna Hankins, et al.  )
12    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01011 )
13                           )
      Nancy Hooper, et al.   )
14    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00493 )
15                           )
      Krystal Teasley        )
16    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00500 )
17                           )
      Margaret Stubblefield  )
18    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00842 )
19                           )
      Cindy Smith            )
20    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-01149 )
21                           )
      Lois Hoy, et al.       )
22    v. Ethicon, Inc., et al.   )
      Civil Action No. 2:12-cv-00876 )
23    Constance Daino, et al.  )
      v. Ethicon, Inc., et al.   )
24    Civil Action No. 2:12-cv-01145 )
```

## Page 5

```
 1    A P P E A R A N C E S:
 2
 3    FOR THE PLAINTIFF AND THE WITNESS:
 4    AYLSTOCK, WITKIN, KREIS, OVERHOLTZ, PLLC
 5    DANIEL J. THORNBURGH, ESQ.
 6    17 East Main Street, Suite 200
 7    Pensacola, Florida 32502
 8    Tel. 850.202.1010
 9    Email:  dthornburgh@awkolaw.com
10
11
12    FOR THE DEFENDANT:
13    THOMAS COMBS & SPANN, PLLC
14    PHILIP J. COMBS, ESQ.
15    300 Summer Street, Suite 1380
16    Charleston, WV 25301
17    Tel.  304.414.1805
18    Email:  pcombs@tcspllc.com
19
20
21
22
23
24
```

2 (Pages 2 to 5)

Vladimir Iakovlev, M.D.

Page 6

```
 1     A P P E A R A N C E S: continued
 2
 3     FOR THE DEFENDANT:
 4     BUTLER SNOW LLP
 5     M. ANDREW SNOWDEN, ESQ.
 6     The Pinnacle at Symphony place
 7     150 3rd Avenue South, Suite 1600
 8     Nashville, TN 37201
 9     Tel.  615.651.6760
10     Email:  andy.snowden@butlersnow.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
 1              INDEX OF EXHIBITS
 2     NO./ DESCRIPTION              PAGE
 3
 4     3   Flash drive containing files reviewed      9
           by Dr. Iakovlev in compiling his
 5         clinico-pathological report re. Betty
           Funderburke.
 6
 7     1   Clinico-pathological report of Dr.       12
           Vladimir Iakovlev re. Betty
 8         Funderburke.
 9
10     2   Pathology report for Betty Funderburke    12
           from the Duke Raleigh Hospital, Bates
11         labeled FUNDERBURKEB_DURH_MDR00038.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1              INDEX OF WITNESSES
 2     WITNESS.                      PAGE
 3     VLADIMIR IAKOVLEV, MD, affirmed
 4     CROSS-EXAMINATION BY MR. COMBS...................9
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 9

```
 1        --- Upon commencing at 3:14 p.m.
 2        (WHEREUPON, the witness was duly affirmed.)
 3            VLADIMIR IAKOVLEV, MD,
 4          called as a witness herein,
 5          having been first duly affirmed,
 6        was examined and testified as follows:
 7            CROSS-EXAMINATION BY MR. COMBS:
 8          Q.  Dr. Iakovlev, I want to ask you some
 9     questions about your -- let's go off the record.
10        --- Off the record at 3:14 p.m.
11        --- Back on the record at 3:14 p.m.
12        BY MR. COMBS:
13          Q.  Dr. Iakovlev, we took a break for a
14     second and Mr. Thornburgh handed me your flash
15     drive for this case and we've marked that as
16     Funderburke Exhibit 3.
17        ---EXHIBIT NO. 3:  Flash drive
18          containing files reviewed by Dr.
19          Iakovlev in compiling his
20          clinico-pathological report re. Betty
21          Funderburke.
22        BY MR. COMBS:
23          Q.  Is that the flash drive that you
24     provided to counsel with your materials that your
```

3 (Pages 6 to 9)

Vladimir Iakovlev, M.D.

Page 10

1    relied on in this case?
2         A. Yes.
3         Q. I have not opened it up yet, but
4    would it have the medical records and chain of
5    custody form on it?
6         A. Yes.
7         Q. Would there be anything else on it?
8         A. No, there might be several chain of
9    custody forms as there were several specimens.
10        Q. And if there was just one specimen
11   in this case it would just be one chain of
12   custody?
13        A. That's correct.
14        Q. And I took your deposition in an
15   earlier case and I asked you if you could provide
16   us with the bill for that case and you were not
17   able to. Is Funderburke basically the same?
18        A. I have not produced any bills for
19   any of the 35 plus patients.
20        Q. Alright. And if you'll bear with me
21   and let me ask a long question maybe we can just
22   short circuit some of this. Would it be a fair
23   statement that in the Funderburke case that you
24   have not kept track of the specific amount of

Page 11

1    hours you worked on that case, nor the days or
2    actual times that you worked on for that case but
3    plan, at some point in the future, to issue a bill
4    based upon your estimate of how much time you
5    worked on the case?
6         MR. THORNBURGH: Objection.
7         THE DEPONENT: That's correct.
8         BY MR. COMBS:
9         Q. And would all the work in that case
10   have taken place from whatever the first chain of
11   custody form shows you received the specimen until
12   the date the report was issued on February 1st?
13        A. That's correct. I just want to add
14   that this estimation of time is my routine way of
15   producing bills, or doing bills. I've been doing
16   it for two years now for all other litigations and
17   other patients, including Ethicon litigation.
18        Q. And can you give me a ballpark for
19   the amount of time that you would have spent on
20   the Funderburke case? In the earlier deposition
21   you told me 15 to 20 hours. Would this be in that
22   ballpark too?
23        A. Yes.
24        Q. Okay.

Page 12

1         A. They all would be in that park.
2    Again it will depend on the amount of the records
3    and number of images, these are variables. To
4    produce a report I need approximately the same
5    amount of time, usually about 2 hours, but the
6    images and the records are different.
7         Q. And so the actual writing of the
8    report takes about two hours and the creation of
9    the slides is what takes the additional time?
10        A. And review of medical records to
11   produce a summary.
12        Q. Dr. Iakovlev, I've marked as Exhibit
13   1 a copy of the case specific report.
14        ---EXHIBIT NO. 1: Clinico-pathological
15        report of Dr. Vladimir Iakovlev re.
16        Betty Funderburke.
17        BY MR. COMBS:
18        Q. And Exhibit 2 is the pathology
19   report.
20        ---EXHIBIT NO. 2: Pathology report for
21        Betty Funderburke from the Duke Raleigh
22        Hospital, Bates labeled
23        FUNDERBURKEB_DURH_MDR00038.
24        MR. THORNBURGH: Do you have Exhibit 2

Page 13

1    for me.
2         MR. COMBS: I think I just gave it to
3    you.
4         MR. THORNBURGH: Here it is. Thank you.
5         BY MR. COMBS:
6         Q. Dr. Iakovlev, we've done this in
7    some other cases. Basically I want to go through
8    the slides and I want you to tell me what your
9    trial testimony is going to be regarding the
10   photographs in the report. So let's start with
11   BF1a.
12        A. So how are we going to do it? I
13   just describe or you will ask me questions?
14        Q. I think it would go faster if you
15   just describe but I'll be glad to ask you some
16   questions. I'll start.
17        Can you tell me from what point in
18   Ms. Funderburke's body this sample came from?
19        MR. THORNBURGH: Objection.
20        THE DEPONENT: One point of time or
21   anatomical location?
22        BY MR. COMBS:
23        Q. Anatomical collection.
24        A. Well anatomical location is not

4 (Pages 10 to 13)

Vladimir Iakovlev, M.D.

Page 14

1  exactly point. This is a large structure so it's
2  pretty bulky.
3      Q. So where did this come from?
4      A. Anterior vaginal wall.
5      Q. And is this a sample from the
6  Prolift or the TVT?
7      A. Oh, that's Prolift.
8      Q. Now, when you received the sample in
9  this case you just received one sample didn't you?
10     MR. THORNBURGH: Objection.
11     BY MR. COMBS:
12     Q. I'm looking at page four of your
13 report.
14     A. I received H&E stains and stained
15 slides of one specimen, that's correct.
16     Q. And you told us earlier that the
17 specimen was a sample from the Prolift, is that
18 correct?
19     A. Yes.
20     Q. You did not receive any samples from
21 the TVT in this case did you?
22     A. From the pathological assessment I
23 would say that it was unlikely part of TVT. I
24 mean, this is based on pathological features so my

Page 15

1  impression was that all of the excised tissue, at
2  least what I received, because -- let me see if it
3  was totally submitted or not.
4      Q. I may have to ask you to repeat part
5  of that answer because your voice trailed off.
6      A. I have to see what was submitted.
7  See, what was submitted is only a part of this
8  specimen. The part which was on the slide was
9  consistent with Prolift device. So then no parts
10 which I would definitely say TVT. However I don't
11 know what was in the remaining nonsampled
12 specimen.
13     Q. Understand. And you might be
14 answering more than I thought I was asking in that
15 question.
16     The photographs that you have depicted
17 in your report would all be from the Prolift
18 explant?
19     A. More likely than not.
20     Q. Okay. And as we sit here today
21 there are not any of the photographs that you can
22 point to that you would say come from the TVT?
23     A. Not with certainty.
24     Q. Now, in the legend for the slide

Page 16

1  BF1a you talk about the fact that the mesh was
2  folded?
3      A. Yes.
4      Q. And you're not able to tell us
5  whether that mesh was folded at the time of
6  implantation are you?
7      MR. THORNBURGH: Objection.
8      THE DEPONENT: No. It folded sometime
9  in the body. Exactly when it happened from the
10 moment of when it was put in the body would be
11 difficult to say.
12     BY MR. COMBS:
13     Q. And you don't plan on telling the
14 jury the specific time at which this folding
15 happened in this case do you?
16     MR. THORNBURGH: Objection.
17     THE DEPONENT: I can say that it
18 happened sometime from the point it was put in the
19 body to a number of months before it was
20 explanted, because all these changes are at least
21 months old so it couldn't happen right before the
22 explantation.
23     BY MR. COMBS:
24     Q. It's possible that this folding

Page 17

1  occurred at the time it was implanted by the
2  surgeon isn't it?
3      MR. THORNBURGH: Objection
4      THE DEPONENT: It's possible. It's
5  possible that it was partially folded right away
6  and then folding continued later on. I mean,
7  there are many other scenarios and timing.
8      BY MR. COMBS:
9      Q. Alright. Let's see if we can
10 short circuit some of this. Same question about
11 the time that the folding occurred for BF1b, BF1c,
12 BF2a, BF2b, BF2c, BF3. For all of those would
13 your answer be the same that the folding could
14 have happened at the time of implantation?
15     MR. THORNBURGH: Objection.
16     THE DEPONENT: Could have happened, but
17 I believe it was -- the technique is to attempt to
18 put it as flat as possible.
19     BY MR. COMBS:
20     Q. Dr. Iakovlev, on several of these
21 slides, for example, BF1b and BF2b, there is a
22 yellow line drawn. What do you plan to tell the
23 jury that yellow line represents?
24     A. It represents the most likely plane

5 (Pages 14 to 17)

Vladimir Iakovlev, M.D.

Page 18

1  of the mesh.
2      Q.  Is that yellow line something that
3  you added to this photograph?
4      A.  Yes.
5      Q.  And so that would be something with
6  your computer program that you drew onto this
7  picture?
8      A.  Yes.
9      Q.  And I just want to make sure it's
10  clear that it's not something that you would see
11  if you put the slide under the microscope?
12      A.  Well, I mean, all slides have been
13  like this for many cases.  I mean, there is an
14  unaltered copy and then there are copies with some
15  markings and some of them have this yellow line
16  depicting the most likely plane of the mesh,
17  tracing of the mesh within the tissue.
18      Q.  And just for example, the solid
19  yellow lines on BF1b and BF2b those would be the
20  lines that you placed on with the computer program
21  while you were preparing the report?
22      A.  That's correct.
23      Q.  I want to ask you a question now
24  about BF2c.  What is it you plan to tell the jury

Page 19

1  about that slide at this trial?
2      A.  It's folded mesh; it's incorporated
3  by scar tissue; the most superficial layers are
4  denser, the scar is much denser; in deeper
5  portions of the mesh they have more fluid content,
6  edema, so it's not as dense deeper down; and then
7  the superficial portions are right under the
8  mucosa, and then there's part of the mucosa.
9      So it just shows that the mesh is folded
10  in the body.  The scar tissue grows into the
11  folds; it's incorporated like this in the body; it
12  forms this multilayer, bulky irregular structure,
13  together with the scar; and there is definite
14  fluid misbalance within some parts of these folds.
15  I mean, there's more fluid in some parts and less
16  fluid in other parts.
17      Q.  So if we're taking the photograph
18  from top to bottom, the top, left-hand corner of
19  the photograph that's what you're going to tell
20  the jury was the mesh that was near the mucosa?
21      A.  Yes.
22      Q.  And then from kind of the middle
23  third of that that's going to be what you term as
24  the denser scar?

Page 20

1      A.  Yes.
2      Q.  And then the bottom third,
3  right-hand corner of it that will be what you tell
4  the jury is deeper and reflects more edema?
5      A.  Yeah.  More edematous scar.  Scar
6  which contains more fluid.
7      Q.  And what's the criteria that you
8  used to make the determination in
9  Ms. Funderburke's case of the edema and the bottom
10  third, right-hand portion?
11      A.  Just density of the tissue, the
12  spaces -- when there's fluid the components get
13  separated further apart because fluid takes space
14  in between.
15      Q.  So are there any other factors other
16  than the density of the tissue that you're relying
17  on to draw that conclusion?
18      A.  At that power you do not see, but if
19  you go on higher power you can see that the
20  capillaries are dilated.  So the vessels they are
21  more stagnant, they contain more fluid, they are
22  larger, the outflow is slow from them.  So it just
23  goes together.  You have more fluid in the
24  vessels, it doesn't flow out the same rate as

Page 21

1  other places.  And then the fluid slowly seeps
2  into the tissue and stays in the tissue.
3      Q.  So let me ask you now, what is it
4  you're going to tell the jury about photograph
5  BF3?
6      A.  Just comparison between dense scar
7  and more edematous, more fluid-rich scar tissue
8  with some dilated vessels.
9      Q.  And are the dilated vessels that
10  you're referring to the ones that you have on the
11  right-hand side that you're drawn little arrows
12  to?
13      A.  Some of them I've marked with the
14  arrows.
15      Q.  And in Ms. Funderburke's case will
16  you be telling the jury of the cause of those
17  dilated vessels?
18      A.  Well, because it's a compartment,
19  it's within the mesh fold so it's abnormal
20  compartmentalization of the tissue.  And clearly
21  this is the only cause which interferes with the
22  fluid's in and out flow.
23      Q.  Is there anything else that you're
24  going to tell the jury about BF3?

6 (Pages 18 to 21)

Vladimir Iakovlev, M.D.

Page 22

1          A.  Fluid misbalance can cause higher
2    pressure within these compartments, and high
3    pressure is associated with feeling of either
4    itchiness which feels -- on the skin when it's
5    edematous itchiness, or can go all the way to pain
6    like in toothache.  The pressure goes up so high
7    in the compartment of the tooth and we feel pain.
8          Q.  Are you going to be -- is there
9    anything else about this slide, BF3, that you're
10   going to tell the jury in this case?
11         A.  No, that's it.
12         Q.  What do you plan on telling the jury
13   about the slide BF4?
14         A.  This is the proximity of mesh to the
15   mucosa.  So if we -- so the reason for mesh
16   exposure -- or one of the reasons for mesh
17   excision at the time was mesh exposure.  So this
18   picture shows proximity of mesh to the mucosa.
19   That image didn't capture exactly the erosion site
20   but it's getting closer.
21         Q.  Anything else that you plan on
22   telling the jury about slide BF4?
23         MR. THORNBURGH:  Objection.
24         THE DEPONENT:  No.

Page 23

1          BY MR. COMBS:
2          Q.  The photograph now that you've
3    labeled BF5.
4          A.  Yes.
5          Q.  What do you plan to tell the jury
6    about that?
7          A.  Here is the erosion.  You can see
8    that mesh fibers are getting through the mucosa
9    and there's inflammation.  So clearly mucosa is
10   disrupted.  There is infection.  There is
11   inflammation.
12         Q.  And what portion of
13   Ms. Funderburke's vagina did this specimen come
14   from?
15         A.  Anterior wall.
16         Q.  Can you be any more specific than
17   that?
18         A.  No.
19         Q.  Can you tell us where on the
20   anterior wall the erosion was?
21         MR. THORNBURGH:  Objection.
22         THE DEPONENT:  Somewhere in the anterior
23   wall.
24

Page 24

1          BY MR. COMBS:
2          Q.  Can you be any more specific?
3          A.  I cannot.
4          Q.  You made a comment about infection?
5          A.  Yes.
6          Q.  What was that comment?
7          A.  Because there is inflammation around
8    and there is exposure through the mucosa.  So any
9    open wound is invariably associated with infection
10   and infection will trigger acute inflammation.
11         Q.  Were any cultures taken of the site?
12         A.  I'm a pathologist -- an anatomical
13   pathologist so I determine if there is infection
14   by observing acute inflammation.  It has to go to
15   the level to trigger acute inflammation.  That's
16   my tool to determine infection.
17         Q.  So you determine infection based
18   upon whether there is inflammation?
19         MR. THORNBURGH:  Objection.
20         THE DEPONENT:  Acute inflammation.
21         BY MR. COMBS:
22         Q.  Were any cultures taken of the site?
23         A.  I don't know.
24         Q.  Was a diagnosis made by any

Page 25

1    physician that Ms. Funderburke suffered from a
2    vaginal infection?
3          A.  The diagnosis was made vaginal
4    erosion, which comes together with infection.
5          Q.  You cannot point me to any medical
6    record for any of Ms. Funderburke's treating
7    physicians diagnosed or as having a vaginal
8    infection can you?
9          MR. THORNBURGH:  Objection.
10         THE DEPONENT:  I think we're looking for
11   something artificial.  It's not separated.
12   Erosion is always associated with infection.
13         BY MR. COMBS:
14         Q.  So I ask again, can you point me to
15   any medical record where any treating physician
16   diagnosed Ms. Funderburke as having an infection?
17         A.  The way you word it no, because
18   you're using legal lawyer's language and
19   physicians use their own.  Mesh erosion is --
20   everybody understands it's a given that there is
21   infection there.
22         Q.  And as we sit here today you cannot
23   point us to any medical record or testimony from
24   any physician that diagnosed Ms. Funderburke as

7 (Pages 22 to 25)

Vladimir Iakovlev, M.D.

Page 26

1    having an infection can you?
2         MR. THORNBURGH: Objection.
3         THE DEPONENT: I was not looking for
4    that because it is so obvious. I mean, one comes
5    after another invariably so I wasn't even looking.
6    Maybe it's there but I wouldn't pay attention
7    because I mean this is obvious.
8         BY MR. COMBS:
9         Q. Okay. You can't point us to
10   anything can you?
11        MR. THORNBURGH: Objection. Asked and
12   answered. How many times are we going to do this?
13        THE DEPONENT: I cannot point because I
14   wasn't paying attention to that specific. I
15   wasn't expecting that question because that
16   question is -- how I should say? I couldn't
17   expect it possible.
18        BY MR. COMBS:
19        Q. Okay.
20        A. As a physician.
21        Q. Did you review the depositions of
22   the treating physicians for Ms. Funderburke?
23        A. No.
24        Q. Were those provided to you?

Page 27

1         A. The depositions?
2         Q. Yes, sir.
3         A. I didn't ask for deposition.
4         Q. What is the diagnostic criteria that
5    you use to diagnose a vaginal infection?
6         A. The diagnostic criteria to use
7    infection in general is to observe acute
8    inflammation. Assuming -- we use that in many
9    other tissues. We get called for frozen section
10   to determine the amount of neutrophils in some
11   tissue to determine if there is infection.
12   Because if some instance -- cultures take time.
13   If you want to have an answer if there is
14   infection or not you can do it by microscope,
15   observing acute inflammation. That's what we do
16   for knee implants and for other tissues and this
17   is done within minutes. So I use the same
18   criteria as I use for any other specimen. If
19   there is acute inflammation, if there is
20   infection.
21        Q. Was there any frank pus at the site
22   of the erosion?
23        MR. THORNBURGH: Objection.
24        THE DEPONENT: That you would have to

Page 28

1    ask clinical -- treating physician if there was
2    frank pus or little bit of oozing. I mean, I
3    don't know. Frank pus is a lot of acute
4    inflammation. This is a gross diagnosis of
5    infection, frank pus. Under microscope I see
6    parts of frank pus, neutrophils.
7         BY MR. COMBS:
8         Q. And you cannot point us to any pus
9    in this photograph, can you?
10        MR. THORNBURGH: Objection.
11        THE DEPONENT: Well, I mean if I go to
12   some areas this would qualify to fibrinopurulent
13   exudant.
14        BY MR. COMBS:
15        Q. And did the treating pathologist who
16   reviewed this specimen diagnose Ms. Funderburke as
17   suffering from an infection?
18        MR. THORNBURGH: Objection.
19        THE DEPONENT: There is no comment on
20   acute inflammation here.
21        BY MR. COMBS:
22        Q. And no finding by Dr. Draffin that
23   Ms. Funderburke was suffering from an infection
24   was there?

Page 29

1         A. Well it doesn't say either way if it
2    wasn't or there was.
3         Q. And if she was suffering from an
4    infection he would make that finding and comment
5    on it wouldn't he?
6         MR. THORNBURGH: Objection.
7         THE DEPONENT: Not necessarily. Because
8    he's concerned with malignancy, the describing and
9    then -- see, "negative for malignancy".
10        BY MR. COMBS:
11        Q. Is it your testimony that
12   Dr. Draffin was concerned about malignancy in
13   Ms. Funderburke's explant that occurred on
14   September 2010?
15        A. My testimony is all pathologists
16   first are concerned with malignancies in any
17   specimens. First we try to make sure that it's
18   not malignant. If it's benign then most cases it
19   doesn't even matter what you sign it out.
20        Pathology report is provided to
21   clinicians to manage the patient immediately. So
22   pathology report conveys information immediately.
23        Q. If Dr. Draffin had diagnosed an
24   infection, that would have been indicated on the

8 (Pages 26 to 29)

Vladimir Iakovlev, M.D.

Page 30

1  pathology report, wouldn't it?
2       MR. THORNBURGH: Objection.
3       THE DEPONENT: Not necessarily. He
4  could just disregard some findings. I mean, you
5  cannot put everything on this page. I don't know
6  if he saw this or didn't. There's no comment. He
7  doesn't say that there is no acute inflammation.
8  If he said that then I would say, yes, he looked
9  for it and he didn't see it. But this way I don't
10 even know if he was looking for it or not.
11      BY MR. COMBS:
12      Q. No finding of acute inflammation is
13 there?
14      MR. THORNBURGH: Objection.
15      THE DEPONENT: There was no way to
16 determine if he was looking for it.
17      BY MR. COMBS:
18      Q. Is there any finding in Exhibit 2
19 that Ms. Funderburke suffered from acute
20 inflammation?
21      A. No positive finding.
22      Q. Is there any finding in Exhibit 2
23 that Ms. Funderburke suffered from infection?
24      A. No positive finding, but also no

Page 31

1  negative finding.
2       Q. Is there anything else about the
3  slide BF5 that you plan on telling the jury?
4       MR. THORNBURGH: Objection.
5       THE DEPONENT: No, nothing.
6       BY MR. COMBS:
7       Q. Okay. Anything else about the
8  photograph in BF6 that you plan on telling the
9  jury?
10      MR. THORNBURGH: Objection.
11      THE DEPONENT: Self-explanatory foreign
12 body inflammation, that's it.
13      BY MR. COMBS:
14      Q. Anything else that you plan on
15 telling the jury?
16      MR. THORNBURGH: Objection.
17      THE DEPONENT: There's some scarring
18 around it. That's it.
19      BY MR. COMBS:
20      Q. Anything else?
21      A. No.
22      Q. The yellow that's drawn on the
23 right-hand side that's something that you would
24 have added in your computer program?

Page 32

1       A. Yes.
2       Q. And on the left-hand side the white
3  spaces, what do those represent?
4       A. Mesh fibers. Some of them are still
5  there, some of them are not.
6       Q. On the left-hand side the white
7  circles, are the mesh fibers still within those
8  white circles?
9       A. In some, in some are not.
10      Q. And which ones are the mesh fibers
11 in?
12      A. It's hard to say. I would need
13 polarizing lenses. Maybe all of them are still
14 there. It's -- folded or not it's hard to say.
15      Q. Can you tell us as we sit here which
16 ones of the white circles on the left-hand side
17 contain mesh?
18      MR. THORNBURGH: Objection.
19      THE DEPONENT: I just told you I need
20 polarizing lenses. This is the only way to say if
21 there are fibers or not, when they're clear. When
22 they're blue it's visible, but if it's not blue,
23 if it's a clear fiber then it's invisible. I mean
24 it's transparent in regular light.

Page 33

1       BY MR. COMBS:
2       Q. Do you know whether the mesh fibers
3  would have been removed from the slide, that this
4  is a photograph of, during the microtoming process?
5       A. It could have. I mean, some of them
6  float away, some of them stay.
7       Q. Dr. Iakovlev, I want to ask you
8  about the photographs of the slides that are at
9  BF7 through 9.
10      A. Okay.
11      Q. And what is it that you're going to
12 tell the jury about BF7?
13      A. Nerves, nerve branches can grow into
14 the mesh, into the scar tissue.
15      Q. Anything else?
16      A. They become trapped within the scar
17 tissue within the mesh. You can see small fibers.
18 Clearly the tissue is innervated, can feel pain.
19 That's it.
20      Q. What are you going to tell the jury
21 about the photograph that's labeled BF8?
22      A. Now findings are similar to previous
23 but there was chronic inflammation and the nerve
24 branch and small nerve fibers around it are all

Vladimir Iakovlev, M.D.

Page 34

1    within the area of inflammation, so it's just --
2    shows that inflamed tissue is innervated too.
3            Q. Anything else?
4            A. No.
5            Q. Same question about the photograph
6    that's labeled BF9. What are you going to tell
7    the jury about that?
8            A. Here is addition to previous
9    findings that there is large dilated vessel and
10   edematous trauma. So it just shows there is
11   innervation within the edematous part of the scar
12   tissue.
13           Q. Anything else?
14           A. No.
15           Q. I want to ask you for the
16   photographs that are labeled BF7, BF8 and BF9 did
17   you consult with a pathologist regarding
18   Ms. Funderburke's case?
19           A. No. Why would I? I'm a certified
20   licensed pathologist. I don't need
21   neuropathologist to assess this.
22           Q. So the answer is, no, you didn't
23   consult with a neuropathologist regarding
24   Ms. Funderburke's case?

Page 35

1            MR. THORNBURGH: Objection.
2            THE DEPONENT: Neuropathologists examine
3    brain, they examine large peripheral nerves for
4    peripheral nerve diseases, they examine muscle
5    biopsies. They don't examine meshes. I mean,
6    this is completely out of their scope. They don't
7    know about meshes anything. Why would I ask them?
8            BY MR. COMBS:
9            Q. Did you ask one regarding
10   Ms. Funderburke's case?
11           MR. THORNBURGH: Objection. Asked and
12   answered.
13           THE DEPONENT: How would -- why would I
14   ask if they don't know what to look for?
15           BY MR. COMBS:
16           Q. Dr. Iakovlev, just yes or no?
17           MR. THORNBURGH: He's already answered
18   that question.
19           BY MR. COMBS:
20           Q. Did you consult with a
21   neuropathologist regarding Ms. Funderburke's case?
22           A. I wouldn't even think about it.
23           Q. So is the answer no?
24           A. The answer is no.

Page 36

1            MR. THORNBURGH: Which is the same
2    answer he gave 20 lines ago.
3            MR. COMBS: Well then why did we spend
4    all that time fighting about it?
5            MR. THORNBURGH: Because you kept on
6    asking him.
7            MR. COMBS: Because it wasn't a clean
8    answer.
9            MR. THORNBURGH: His answer was no.
10           BY MR. COMBS:
11           Q. Now, Dr. Iakovlev, did you do a
12   count of nerve density regarding Ms. Funderburke's
13   case?
14           A. If I had that synoptic data compiled
15   I did. If I didn't -- if I don't have it then I
16   didn't have time to do it.
17           Q. So we weren't provided a synoptic
18   report in regard to Ms. Funderburke's case, does
19   that mean that one was not prepared?
20           A. Most likely. When was it served?
21           Q. I assume February 1st.
22           A. Some of them were completed, some of
23   them are not. It's irrelevant. I'm not doing
24   nerve count to form my opinions. It's done for

Page 37

1    completely, for different purpose. Has nothing to
2    do with the opinions -- well, it has something to
3    do but I mean the exact nerve density doesn't help
4    me either way in formulating my opinion. It's
5    done for a different purpose.
6            Q. As we sit here today you're not
7    aware of a synoptic report being prepared
8    regarding Ms. Funderburke?
9            A. I don't know. I don't remember now.
10           Q. If we weren't provided one does it
11   mean one wasn't done?
12           A. Most likely.
13           Q. Did you make any findings in
14   Ms. Funderburke's case that any of the nerves were
15   abnormal?
16           A. Abnormal in which way? Abnormal
17   like disease or abnormal distorted?
18           Q. Let's start with disease. Did you
19   make any findings that any of the nerves in
20   Ms. Funderburke's case were diseased?
21           A. Well, from S100 it seems -- and from
22   H&E I did not see any evidence of disease. There
23   was no morphological evidence of disease. They
24   looked more or less healthy nerves. They were in

10  (Pages 34 to 37)

Vladimir Iakovlev, M.D.

Page 38

1  abnormal location.  They were in scar within the
2  mesh, that's what is abnormal.  Some of them are
3  very close to mesh fibers so some were probably
4  distorted by the mesh to a degree.  Again, that
5  would be the only abnormality.
6       Q.  And did you make any finding that
7  nerves were distorted in Ms. Funderburke's case?
8       A.  Well, I can see that this nerve is
9  very close to the mesh fiber.
10       Q.  And, Dr. Iakovlev, just so that the
11  record's clear, what page are you on and which
12  photograph?
13       A.  Page 18, BF7.
14       Q.  And which nerve are you referring
15  to?
16       A.  The one which is on the lower right.
17  It's very close to the mesh fiber.
18       Q.  Will you be testifying in this case
19  that that nerve is distorted?
20       MR. THORNBURGH:  Objection.
21       THE DEPONENT:  Not significantly.
22       BY MR. COMBS:
23       Q.  Are there any other nerves in
24  Ms. Funderburke's sample that you consider to be

Page 39

1  distorted?
2       A.  No.
3       MR. THORNBURGH:  Objection.  When you
4  say nerves are you including branches and fibers
5  and -- I mean, because there's a difference
6  pathologically.
7       BY MR. COMBS:
8       Q.  Alright.
9       A.  If we're talking about little
10  fibers, I mean, we can see that some fiber here is
11  distorted but it's just a very thin fiber.  If
12  we're talking larger nerves and nerve branches
13  which collect many fibers I don't see that degree
14  of distortion in the slides, but I cannot rule it
15  out because -- when it's so close.  I don't know
16  what's going on millimeter from here.  If we cut
17  deeper, deeper maybe that nerve is completely
18  split by the fiber.  I see it all the time,
19  therefore the probability cannot be excluded
20  because I've seen it so many times in so many
21  specimens; the nerves get distorted by the fibers.
22  But if you ask me if I have it in the pictures in
23  my report the answer would be no.
24       Q.  Will you be testifying in this case

Page 40

1  that Ms. Funderburke had any neuromas?
2       MR. THORNBURGH:  Objection.
3       THE DEPONENT:  No.  My testimony would
4  be that I did not see neuromas in the slides I
5  examined, but however I cannot rule out that
6  possibility.
7       BY MR. COMBS:
8       Q.  No traumatic neuromas that you can
9  point us to in any of these photographs, is that
10  correct?
11       A.  That's correct.  In the photographs
12  there are no traumatic neuromas.
13       Q.  And no reference in the report to
14  any findings of traumatic neuromas during your
15  examination of the specimen?
16       A.  I did not describe one.
17       Q.  Dr. Iakovlev, I want to ask you
18  about the nerve branches that you described in
19  BF7, 8 and 9.
20       A.  Yes.
21       Q.  What nerve do those branches
22  correspond to?
23       MR. THORNBURGH:  Objection.
24       THE DEPONENT:  I don't know.  A

Page 41

1  myelinated nerve.
2       BY MR. COMBS:
3       Q.  Do you know what nerve they stem to?
4       A.  No.
5       Q.  Do you know what nerve they
6  communicate with?
7       MR. THORNBURGH:  Objection.
8       THE DEPONENT:  No.
9       BY MR. COMBS:
10       Q.  Do you know whether these nerves are
11  sensory nerves?
12       MR. THORNBURGH:  Objection.
13       THE DEPONENT:  I think we've been
14  through this earlier.  Most of the nerves in our
15  body are mixed, sensory and motor.  They contain
16  different fibers.  If we talk about fibers then
17  the fibers can be either sensory or motor.  When
18  they come together in larger trunks they're all
19  mixed.  So once we have a larger nerve, by
20  definition, it's mixed or over 90 percent of them
21  are mixed.
22       BY MR. COMBS:
23       Q.  The nerves you reference to in BF7,
24  8 and 9, those are not larger nerves, are they?

11 (Pages 38 to 41)

Vladimir Iakovlev, M.D.

Page 42

1          MR. THORNBURGH: Objection.
2          BY MR. COMBS:
3          Q. I mean what you're describing is a
4   larger nerve.
5          A. Let's get it clear.  One fiber is
6   like this.  It's just one fiber so it delivers one
7   function, either motor or sensory.  Once you get
8   two the likelihood one of them will be the other
9   way around is higher, pretty much 50 percent.
10  When you get a bunch the likelihood that at least
11  one is sensory and/or one is motor is over 90
12  percent.  So the larger the nerves get the more
13  chances that they are mixed.  It doesn't matter if
14  they're somatic or autonomic.  So that's -- larger
15  nerves as they get larger there's more mixed
16  function in them.
17         Q. Can you tell me whether any of the
18  nerves that are depicted on BF7 are sensory
19  nerves?
20         A. Let's put that term "sensory nerve"
21  away, because sensory fibers, that would be more
22  correct terminology, because fiber has only one
23  function, either sensory or motor.  When it's a
24  nerve rarely they have only one function and

Page 43

1   usually it's sensory only.  But most of -- over 90
2   percent of nerves would have mixed function, motor
3   and sensory.  So if we say sensory nerve or motor
4   nerve you implying or you're limiting my answers
5   only to that -- less than 10 percent nerves.
6          Q. So again my question is, can you
7   tell me whether any of the nerves that you have
8   labeled in BF7 are sensory nerves?
9          MR. THORNBURGH: Objection.
10         THE DEPONENT: So we going back.  Are we
11  talking about 90 percent, over 90 percent of the
12  nerves in the human body or 10 percent of the
13  human body.  If you're separating them into motor
14  and sensory then we're talking only a very small
15  subset and limiting ourselves into pretty much
16  nerve fibers.  If you want to talk about nerves in
17  general, over 90 percent, they are all mixed so we
18  cannot use the term "sensory" or "motor".
19         I mean, again, once you get into smaller
20  locations, into smaller, thin fibers getting close
21  to skin most of them will be sensory, depends on
22  location.  Some of them will be only motor.
23  Again, once it is larger it's mixed, once it's
24  smaller the function may be narrower.

Page 44

1          BY MR. COMBS:
2          Q. I'll ask you can you point to any
3   nerve branch on this photograph and tell me that
4   that is a sensory fiber?
5          MR. THORNBURGH: Objection.
6          THE DEPONENT: Nerve or fiber?
7          BY MR. COMBS:
8          Q. We'll start with fiber.  Can you
9   tell me that anything on this photograph is a
10  sensory fiber?
11         MR. THORNBURGH: Objection.
12         THE DEPONENT: It will be 50/50 split I
13  guess if you go -- or depends on location.  There
14  will be probability that one fiber is motor and
15  one is sensory.  Once we get into nerves I can
16  tell you more likely than not that these are mixed
17  rather than what you're trying to say sensory only
18  or motor only.  So this is mixed.  There's some
19  motor function in it and some sensory.  How much
20  of it?  What is the mix?  I don't know.
21         BY MR. COMBS:
22         Q. Are there any receptors depicted on
23  BF7?
24         MR. THORNBURGH: Objection.

Page 45

1          THE DEPONENT: Somewhere there but
2   visible at high magnification, yes.  You cannot
3   see them at that level of magnification.
4          BY MR. COMBS:
5          Q. Are there any nerve receptors that
6   are appreciable on BF7, BF8 or BF9?
7          MR. THORNBURGH: Objection.
8          THE DEPONENT: It's a low magnification.
9   You cannot see them at that magnification.  Did I
10  imply that I can see them on that magnification?
11         BY MR. COMBS:
12         Q. What magnification would it have
13  required for Ms. Funderburke's slide to have
14  appreciated the receptors?
15         A. Pretty high.  At least 40 or 60X and
16  it would need a different stain.  I'm not sure why
17  we're talking about receptors.  Receptors -- as a
18  given, where there are nerves there are receptors
19  because most nerves end with receptors.  That's
20  their targets.
21         Q. The strain that you performed was
22  the S100, correct?
23         A. That's correct.
24         Q. You didn't perform any other type of

12  (Pages 42 to 45)

Vladimir Iakovlev, M.D.

Page 46

1  staining in Ms. Funderburke's slides that would be
2  specific to nerve receptors did you?
3            MR. THORNBURGH:  Objection.
4            THE DEPONENT:  It wasn't my intention.
5  There is no purpose of it.  You have nerves, you
6  have receptors.
7            BY MR. COMBS:
8        Q.  And for Ms. Funderburke's slides
9  what stain would you have used if you were looking
10  for receptors?
11            MR. THORNBURGH:  Objection.
12            THE DEPONENT:  It wasn't my intention
13  and I was not going to do that because there is no
14  purpose for that.
15            BY MR. COMBS:
16        Q.  So my question is, if you had wanted
17  to look for nerve receptors in Ms. Funderburke's
18  sample, what stain would you use?
19        A.  I did not.  I did not want to and I
20  will not do it.  I don't see the purpose as a
21  physician.  Why are you forcing me to do something
22  else?  Are you teaching me how to do pathology?
23        Q.  My question is if you had wanted to
24  see nerve receptors what stain would you have

Page 47

1  used?
2        A.  If I want to use -- repeat the
3  question.
4        Q.  If you had wanted to see nerve
5  receptors in Ms. Funderburke's slides what stain
6  would you have used?
7            MR. THORNBURGH:  Objection.
8            THE DEPONENT:  You can use PGP9.5, this
9  is a stain, it's kind of a dirty old stain.  It
10  has been used in older studies.  S100 can lead you
11  to very end of the nerve fiber if it's myelinated.
12  Neurofilament can give you a little bit better
13  staining than PGP9.5 so it can show the endings of
14  the bare fibers.  You can do older stains like
15  silver stain.
16            BY MR. COMBS:
17        Q.  Ms. Funderburke's sample you did not
18  do the PGP9.5 or the neurofilament stain did you?
19            MR. THORNBURGH:  Objection.
20            THE DEPONENT:  Didn't intend to and
21  there was no purpose to do that.
22            BY MR. COMBS:
23        Q.  You didn't do it?
24        A.  Why are you trying to make it sound

Page 48

1  as if I could have and I should have but I didn't?
2        Q.  That's your reading.  My question is
3  just did you do it?
4        A.  No, I didn't.
5        Q.  Okay.
6        A.  Because I didn't need to.
7        Q.  Okay.
8        A.  Not because I wanted to hide
9  something.
10        Q.  Dr. Iakovlev, I want to ask you now
11  about the slides BF -- basically BF10 through
12  BF13b?
13        A.  Okay.
14        Q.  Are those all slides that you're
15  going to use to tell the jury that you believe
16  that was degradation in this case?
17        A.  It's not I believe, I know it is,
18  and your scientists also know that.
19        Q.  So let's start with BF10.  What is
20  it you're going to tell the jury about BF10?
21        A.  There is degradation bark observed
22  in 2015, or '16, the same way that it was observed
23  in 1983 by Ethicon scientists.
24        Q.  Anything else?

Page 49

1        A.  No.  It's the same 30 years after.
2        Q.  BF11a what is it you're going to
3  tell the jury about that?
4        A.  Same thing.  There are blue fibers
5  -- blue granules seen in the detached fragments of
6  the bark exactly the same way as it was observed
7  30 years ago.
8        Q.  Anything else?
9        A.  These pictures they just show the
10  birefringence of these fragments is independent
11  from the core because they're separated, and the
12  blue granules in the detached fragments are
13  independent from the core.  They are truly in the
14  bark, the same way as it was described in Ethicon
15  studies in 1980's.
16            And BF10 -- 11b, sorry, shows higher
17  magnification and clearly you can see that the
18  detached bark contains these blue granules.  They
19  were inserted specifically to identify
20  polypropylene in the body.  And it works grossly
21  for surgeons to remove the mesh or see it in the
22  bladder, as well microscopically.  You see blue
23  granules it means polypropylene.
24        Q.  Anything else you're going to tell

13 (Pages 46 to 49)

Vladimir Iakovlev, M.D.

Page 50

1  the jury about that slide?
2       A.  No.
3       Q.  What are you going to tell the jury
4  about BF12?
5       A.  Oh these colors are off, the
6  printing is.  The same thing, it's degraded, there
7  is bark, there are blue granules in it but it's
8  not a good picture.
9       Q.  Anything else?
10      A.  No.
11      Q.  BF13a and 13b, what are you going to
12  tell the jury about those?
13      A.  Just repetition of other.  Separated
14  fragments of the bark with blue granules.
15      Q.  Anything else?
16      A.  No.  It degraded, it cracked,
17  there's -- it's brittle cracking.
18      Q.  Anything else?
19      A.  No.  And then BF13b it's in
20  polarized light, the same fragment.  Now I can see
21  the behavior of polypropylene in polarized light.
22      Q.  Anything else?
23      A.  No.
24      Q.  Dr. Iakovlev, did you make a

Page 51

1  measurement of the thickness of what you term as
2  the degradation layer on BF10?
3       A.  No.
4       Q.  For any of the paragraphs from BF10
5  through BF13b did you make a measurement of what
6  you term as the degradation layer?
7       A.  As I mentioned to you earlier, I
8  don't need to measure it to determine that it's
9  degraded.  So I take measurements later on when I
10  compile the synoptic notes.
11      Q.  And since you didn't do a synoptic
12  report in this case you didn't measure the layer?
13      A.  No.
14      Q.  Can you estimate for me how many
15  microns thick it would be?
16      MR. THORNBURGH:  Objection.
17      THE DEPONENT:  It would be more of a
18  visual memory because I've seen so many of them.
19  Roughly 3 microns, 3.5.
20      BY MR. COMBS:
21      Q.  And what would be the clinical
22  impact to Ms. Funderburke from this 3.5 micron
23  thick layer that you claim is --
24      MR. THORNBURGH:  Objection.

Page 52

1       THE DEPONENT:  It's not just 3.5 thick,
2  it covers the entire mesh.  So the entire mesh --
3  the whole interaction between the mesh and the
4  body is through the degraded layer.  So pretty
5  much the body doesn't see anything but the
6  degraded polypropylene.  Whatever is deeper under
7  the bark doesn't matter because it's not getting
8  exposed to the tissue.  And the surface area is
9  much larger.
10      Now, in terms of clinical implications,
11  we know that it's brittle and I observed its
12  brittle behavior in microscopy, so it's not
13  flexible as nondegraded part.  It contributes to
14  stiffening of the mesh.  And the cracking also can
15  harbor bacteria, which had been a problem in
16  multifilament mesh, which is published in multiple
17  papers.
18      And since it's degrading, as I said,
19  where there's fire there's smoke.  So if it's
20  degrading it's producing fragments.  I mean,
21  degradation is decay or fragmentation of polymer
22  so there are some molecules released.  I don't
23  know the components of this and what exactly the
24  molecules.  There's whole array of chemical

Page 53

1  molecules or chemical substances produced during
2  degradation of polypropylene outside of the body
3  because it's easy to measure.  Some combination of
4  those is produced in the body as well.
5       Q.  You never saw Ms. Funderburke's mesh
6  in vivo did you?
7       A.  No.
8       Q.  And you would not have been present
9  in the operating room at the time this sample was
10  explanted would you?
11      A.  No.
12      Q.  And have you spoken to any of
13  Ms. Funderburke's treating physicians about this?
14      A.  No.
15      Q.  Have you read the deposition
16  testimony from any of Ms. Funderburke's treating
17  physicians about whether they believe the mesh
18  degraded?
19      MR. THORNBURGH:  Objection.
20      THE DEPONENT:  No.
21      BY MR. COMBS:
22      Q.  You played no role in preparing this
23  specimen did you?
24      MR. THORNBURGH:  Objection.

14 (Pages 50 to 53)

Vladimir Iakovlev, M.D.

Page 54

1     THE DEPONENT:  You mean before the
2 slides were cut?
3     BY MR. COMBS:
4     Q.  Yes, sir.
5     A.  No.
6     Q.  Do you know what the protocol was
7 for the specimen preparation at Duke Hospital?
8     A.  Well, judging by the quality of the
9 histology it was within acceptable range.  I did
10 not see any evidence of mishandling.  There is
11 crisp histology.  There is no reason to believe
12 that it was outside of the standards.
13     Q.  And following the explant of this
14 mesh it would have been dehydrated wouldn't it?
15     A.  It would be dehydrated, it would be
16 put in xylene and then in paraffin and then cut
17 and then rehydrated, stained and cover slipped.
18     Q.  And treated with formalin?
19     A.  Formalin was before.  Dehydrated
20 after.
21     Q.  Anything else?
22     A.  Labeled, shipped through FedEx to
23 me.
24     Q.  Do you know whether Dr. Visco used

Page 55

1 cauterization to remove this tissue sample?
2     A.  Sometimes you can see it at the
3 edges.  Usually it's within half a millimeter or
4 so the edges are burned.  This edge has some -- it
5 may be dry it may be cautering.  I don't
6 know.  Sometimes I see actually the cautering
7 melts bark and the core at the same time, just
8 giving extra evidence that the bark is present
9 while the excision surgery takes place.
10     In this case I cannot tell you if
11 there's cautery artifact or definitive artifact at
12 the edges.  But in any case it's only the edges.
13 I mean, the central part -- I mean, it's really
14 hard to burn tissue to that degree, to burn that
15 piece of tissue.  It's really sizeable chunk of
16 actual folded mesh here.
17     Q.  Just a second ago you talked about
18 the mesh being brittle.  In Ms. Funderburke's case
19 how did you make the determination that this mesh
20 was brittle?
21     A.  By appearance, indicating change in
22 physical properties.  Because how do you determine
23 that the glass is brittle?  When you break it, it
24 breaks into pieces.  How do you determine that

Page 56

1 plastic bag is not brittle?  Because it doesn't
2 break into pieces.
3     Q.  Sorry, I interrupted you.
4     A.  You can see that the glass is
5 brittle when it's broken, not even touching it.
6 The same way here, I see that it cracks, then
7 it's not flexible.
8     Q.  And prior to you seeing the mesh in
9 this case it was microtomed wasn't it?
10     A.  Yes, both the core and the bark.
11 The core didn't crack but the bark was cracked.
12     MR. COMBS:  Let's take a break.
13     ---  Break taken at 4:11 p.m.
14     ---  Upon resuming at 4:21 p.m.
15     BY MR. COMBS:
16     Q.  Dr. Iakovlev, I had a question about
17 the records that are all in the thumb drive versus
18 the records that are listed in the expert report.
19 And based on -- again, this is just a quick
20 determination because I just received the thumb
21 drive at the beginning of the deposition, but it
22 looked like not all of the records that are in the
23 report are also contained on the thumb drive.
24 Which would control?

Page 57

1     A.  So I explained it to Mr. Snowden for
2 the previous case.  The way the files are named
3 and they are assembled is very confusing.  So to
4 me sometimes I don't know how to name or what to
5 list in this.  I do my best to list all providing
6 institutions and all providing physicians, but
7 sometimes I just don't know how to classify it or
8 I cannot figure out what exactly it's coming from.
9 So the best way to determine if I had the record
10 and I reviewed it is to go to the thumb drive and
11 see if it's there.  Somewhere it might be buried
12 somewhere in the complex.  So that's why it might
13 be apparent discrepancy but it's not, it's just
14 the way the records are assembled.
15     Q.  That's fine.  That tells me
16 everything I need to know.  If it was a record you
17 reviewed it's on the flash drive?
18     A.  It may not be reflected and fall
19 into one of the categories for several reasons,
20 and most of them are not controlled by me.
21     Q.  That's fine.  You've answered the
22 question I had.
23     Now I want to ask you a couple of
24 questions about the sample that you had for

Vladimir Iakovlev, M.D.

Page 58

1    Ms. Funderburke's mesh.  No analytical testing was
2    performed on that sample was it?
3         A.  No.
4         MR. THORNBURGH:  Objection.
5    BY MR. COMBS:
6         Q.  You didn't ask anyone else to
7    perform any analytical testing did you?
8         A.  No.
9         Q.  No other types of testing performed
10   on the mesh, was there?
11        MR. THORNBURGH:  Objection.
12        THE DEPONENT:  Except for microscopy?
13   BY MR. COMBS:
14        Q.  Yes, sir.
15        A.  No.
16        Q.  That would be the basis for your
17   conclusions regarding, for example, degradation in
18   this case would be based on your observation of
19   the mesh through the light microscopy?
20        MR. THORNBURGH:  Objection.
21        THE DEPONENT:  Yes.  As I think your
22   scientists did 30 years ago.
23   BY MR. COMBS:
24        Q.  No scanning?  For example, no SEM.

Page 59

1         A.  No.
2         Q.  Now, Ms. Funderburke had a revision
3    on March 31st, 2009, you did not review any sample
4    from that revision did you?
5         A.  Which day is it?
6         Q.  March 31st, 2009.
7         A.  I did not see any pathology so I
8    don't know if there was any mesh submitted for
9    pathology, and I did not have a specimen either.
10        Q.  And same question regarding a
11   revision procedure done on January 14, 2010, you
12   didn't have any pathology from that either did
13   you?
14        A.  Yeah, from what I could determine in
15   the records I did not see pathology report and I
16   did not have specimen either.
17        Q.  In this case you are not going to
18   testify that you observed any obliterated arteries
19   in Ms. Funderburke's sample are you?
20        MR. THORNBURGH:  Objection.  To the
21   extent, Phil, we've asked for you to return your
22   expert's slides so he'll have an opportunity
23   to look at that information and he's reserved the
24   right in his report to supplement based on new

Page 60

1    information, including information contained in
2    the slides that your expert will return or
3    provide.
4         THE DEPONENT:  And this will be
5    pertinent to all findings.  This is limited to
6    what I had and I had only half.  Your experts have
7    the whole specimen.
8         BY MR. COMBS:
9         Q.  In the slides and photographs that
10   you reviewed in this case you did not see any
11   obliterated arteries from Ms. Funderburke did you?
12        A.  No.
13        Q.  There were no slides or photographs
14   that you're going to rely on to say that there
15   were particles that had separated from the mesh in
16   this case?
17        MR. THORNBURGH:  Objection.
18        THE DEPONENT:  Not to the size of being
19   visible and not in this case.
20        BY MR. COMBS:
21        Q.  Dr. Iakovlev, I want to ask you
22   about the clinico-pathological correlation and on
23   my copy of the report it's page 5.
24        A.  Yes.

Page 61

1         Q.  We'll go to the erosion section and
2    let's talk about the first two sentences.  And I
3    don't want to retread this but for the purpose of
4    this case I want to make sure the record's clear.
5         So the first two sentences of that
6    section you say, "Mesh erosion is a complication
7    unique from mesh surgeries.  It cannot occur with
8    nonmesh procedures."  Isn't that at some point
9    just a truism?  I mean, you can't have a mesh
10   erosion if no mesh was placed could you?
11        A.  This is obvious.  I don't know how
12   to answer.
13        Q.  Now, we discussed in a different
14   deposition in an earlier case that you can have
15   erosion from other foreign bodies that are
16   implanted in the human body can't you?
17        MR. THORNBURGH:  Phil, that's a general
18   question now.  I've asked you on another case.
19   We're not here about the other case, we're here
20   about the case specifics of this case.
21        BY MR. COMBS:
22        Q.  Okay.  Let's talk about
23   Ms. Funderburke.  If Ms. Funderburke had been
24   implanted with pessary can you tell us whether

16 (Pages 58 to 61)

Vladimir Iakovlev, M.D.

Page 62

1  that would or would not erode?
2         A.  Pessaries are not implanted.
3         Q.  Placed.
4         A.  If we talk about if there was
5  another foreign body implanted it could have
6  eroded.  That would be my answer.  Pessaries are
7  not implanted, at least not a normal use or
8  intended use.
9         Q.  And obviously I'm not a doctor.  If
10  I use the wrong term I'm sorry.  In fact I think
11  you corrected me about it once before already.  So
12  the question just is, if a pessary had been placed
13  in Ms. Funderburke's vagina that could erode,
14  couldn't it?
15         MR. THORNBURGH:  Objection.
16         THE DEPONENT:  Let's leave pessary alone
17  because it's a really bad example.  If there was
18  another foreign body under the mucosa it could
19  have eroded.  That would be my answer.
20         BY MR. COMBS:
21         Q.  I want to ask you about the
22  clinico-pathological correlation that you did for
23  Ms. Funderburke.  You've never treated
24  Ms. Funderburke have you?

Page 63

1         A.  That's correct.
2         Q.  Never examined her?
3         A.  That's correct.
4         MR. THORNBURGH:  Objection.  Do you mean
5  beyond the pathology?
6         THE DEPONENT:  I examined her specimen
7  but I have not examined her as a person.
8         BY MR. COMBS:
9         Q.  You've never talked to her?
10         A.  That's correct.
11         Q.  You've never talked to her treating
12  physicians?
13         A.  That's correct.
14         Q.  I think I asked you this but in case
15  I forgot, you have not reviewed their depositions
16  in this case?
17         A.  That's correct.
18         Q.  You do not have a doctor-patient
19  relationship with Ms. Funderburke?
20         MR. THORNBURGH:  Objection.
21         THE DEPONENT:  Well, to a degree.  I
22  examined her specimen so this is my relationship
23  with her, examination of her specimen.
24

Page 64

1         BY MR. COMBS:
2         Q.  And that was part of the forensic
3  process?
4         A.  Medical-legal process.  Forensics is
5  somewhat different.
6         Q.  You've never talked to any of
7  Ms. Funderburke's family members have you?
8         A.  That's correct.
9         Q.  Earlier I asked you some questions
10  about whether infection was listed in Exhibit 2,
11  the pathology report.
12         A.  Yes.
13         Q.  There's no mention made of pain in
14  Dr. Draffin's pathology report is there?
15         MR. THORNBURGH:  Objection.
16         THE DEPONENT:  Pain is a clinical
17  symptom.  It's elicited by taking history by
18  clinical physicians.  Pain is not part of
19  pathological diagnosis, it has never been.
20         BY MR. COMBS:
21         Q.  And there is no mention of
22  contribution to urinary symptoms in Dr. Draffin's
23  pathology report is there?
24         MR. THORNBURGH:  Objection.

Page 65

1         THE DEPONENT:  Again, this would be more
2  of a clinico-pathological correlation.
3  Correlation between pathology and clinical
4  picture.  Pathology reports just describe
5  pathological findings.  It doesn't do -- it
6  doesn't extend to correlation between clinical
7  symptoms and pathology.
8         BY MR. COMBS:
9         Q.  And no finding by Dr. Draffin that
10  there had been any degradation of
11  Ms. Funderburke's implant?
12         A.  There is -- no either way.  He didn't
13  examine -- he did not examine polypropylene mesh
14  for degradation.
15         Q.  Did he review it under a light
16  microscope?
17         A.  Yes, he did.
18         Q.  That's what you did in this case as
19  well, wasn't it?  Review it under a light
20  microscope?
21         A.  That's correct.
22         Q.  Dr. Draffin makes no finding that
23  there was degradation of this implant does he?
24         A.  He did not examine for it.  Either

17 (Pages 62 to 65)

Vladimir Iakovlev, M.D.

Page 66

1    way he is not describing degradation if it's there
2    or it's not.
3         Q. And you've never talked to
4    Dr. Draffin have you?
5         A. No.
6         Q. Do you have any basis for your
7    testimony that Dr. Draffin did not examine for
8    degradation?
9         A. Well, one part of this is there is
10   no mentioning of degradation either way.  If it's
11   there or it's not.  There's no description that he
12   was examining.
13        Regular pathologists don't even know
14   that polypropylene can degrade.  I wouldn't expect
15   them to know.  So there are multiple reasons to
16   believe that he didn't examine.  I mean there are
17   more reasons to believe he did not than he did.
18        Q. Do you know anything at all about
19   Dr. Draffin's background or qualifications?
20        A. No, I don't.
21        Q. Have you ever had any professional
22   interaction with him of any kind?
23        A. No.
24        Q. Dr. Iakovlev, I want to ask you a

Page 67

1    question about your statement on page 6.  That,
2    "The clinical records indicate an appearance of
3    urge incontinence and frequent UTI after
4    implantation of the Gynecare mesh devices." Do
5    you see that?
6         A. Yes, I do.
7         Q. What records are you relying on that
8    Ms. Funderburke had frequent UTIs after
9    implantation of the mesh device?
10        A. So July 2nd, 2010, Duke Medicine,
11   Dr. Visco:
12        "She does however endorse frequent
13        urinary tract infections since her mesh
14        placement and has been on Macrobid
15        suppression for this essentially since
16        her surgery."
17        Q. Is there any other records or
18   references in the medical file that you are
19   relying on for the basis of that statement?
20        A. Don't remember now.  This is clearly
21   stated in this record.
22        Q. Did Ms. Funderburke have UTIs prior
23   to mesh implant?
24        A. I believe she had some.

Page 68

1         Q. And how many UTIs did
2    Ms. Funderburke have after she had the implant?
3         A. Oh, now we're going into really
4    clinical questions. It's beyond my scope.  As I
5    said, I just read what was written in the clinical
6    notes.  You're asking something which I wouldn't
7    specifically get details.
8         Q. Are you going to offer an opinion at
9    the trial of this case that Ms. Funderburke
10   suffered increased urinary tract infections as a
11   result of the placement of the mesh device, or are
12   you going to leave that to somebody else?
13        A. Well, see, the description of UTIs
14   is in the clinical records so it's not my opinion
15   either way.  I can see it's written there.  So my
16   job as a pathologist is to take this information
17   and correlate with the pathology.  So if you're
18   asking me if she had or she had not it's not my
19   opinion.  I'm just copying whatever was in the
20   record.
21        Q. Are you going to testify at trial
22   that Ms. Funderburke had any urinary tract
23   infection as a result of having the mesh implant?
24        MR. THORNBURGH:  Objection.

Page 69

1         THE DEPONENT:  So as my
2    clinico-pathological correlation states that:
3         "Clinical records indicated change
4         of pattern of urinary tract infections,
5         frequent, to the degree that she
6         required antibiotics continuously after
7         the surgery."
8         So this is clinical records.  And then I
9    can show how this contributed through the mesh
10   using my pathological assessment.  Does that
11   answer your question?
12        BY MR. COMBS:
13        Q. No.
14        MR. THORNBURGH:  I think it actually
15   absolutely answers your question.  Are you going
16   to offer these opinions?  And he told you exactly
17   the opinions that he's going to offer and the
18   basis for those opinions.
19        BY MR. COMBS:
20        Q. Do you know the frequency of urinary
21   tract infections that Ms. Funderburke had prior to
22   the mesh implant?
23        MR. THORNBURGH:  Objection.
24        THE DEPONENT:  I don't.  I mean I see

18 (Pages 66 to 69)

Vladimir Iakovlev, M.D.

Page 70

1    what is written there that she has continuous
2    antidiuretic suppression since her surgery.  That's
3    what I extract.  Exact frequency, I mean, I think
4    we are going beyond my scope.  I'm not a clinician
5    who is doing differential diagnosis through the
6    records comparing pre- and post-.  My role is not
7    that.
8            My role is just to see what is in the
9    records, already summarized, the decision to
10   excise the mesh.  And then I examine the mesh and
11   I explain what pathological changes were in the
12   clinical picture.  How they were causing the
13   clinical picture.
14           I'm not doing the clinical differential
15   diagnosis so why are you asking me something I
16   wouldn't look for?  I wouldn't look for specific
17   differences before and after.  If it's there, if
18   it's stated I see it, but trying to extract it
19   myself it wouldn't be my role.
20           BY MR. COMBS:
21           Q.  Has Ms. Funderburke had any urinary
22   tract infections since the explant by Dr. Visco?
23           MR. THORNBURGH:  Which explant?  I'm
24   sorry?  Oh, by Dr. Visco.

Page 71

1            THE DEPONENT:  I don't know.  She could
2    have some urinary tract infection.  Let me see
3    what was provided in the records.
4            MR. THORNBURGH:  Are you talking about
5    the July 2nd?
6            THE DEPONENT:  She had several excisions
7    and we are talking about --
8            BY MR. COMBS:
9            Q.  I'm talking about the September
10   23rd, 2010 explant.  So my question is has
11   Ms. Funderburke had urinary tract infections since
12   that explant?
13           A.  I don't know.  It wouldn't be my
14   purpose again.  So it's damaged already.  There is
15   TVT still there.  It's not in my summary.  I don't
16   know if it was in the records.  Again, there are
17   several reasons I wouldn't necessarily focus on
18   that.
19           Q.  Do you know whether Ms. Funderburke
20   has suffered from incontinence after the explant
21   by Dr. Visco in September of 2010?
22           MR. THORNBURGH:  Objection.  Which?  Any
23   type?
24           THE DEPONENT:  I don't know.  Again I

Page 72

1    wouldn't focus specifically on that issue.
2            BY MR. COMBS:
3            Q.  In your clinico-pathological
4    correlation for Ms. Funderburke in relation to
5    urinary symptoms, what you set forth at pages 6
6    and 7, is it important to you whether
7    Ms. Funderburke has had incontinence or UTIs
8    following the explant of the mesh?
9            A.  Explant?
10           MR. THORNBURGH:  Objection.
11           BY MR. COMBS:
12           Q.  Yes.
13           A.  Explant is not that important
14   because you already have the damage.  There is
15   more of a -- more value in the changes after the
16   implant.  Explantation only part of it.  Part of
17   the mesh is still there.  There is scarring, there
18   is damage already.  So I wouldn't expect it to be
19   drastically different, it can in some cases.
20   Again, I'm not a treating physician but to me I'm
21   more focused on the change of pattern after
22   implantation for the reasons I just described.
23           Q.  So what urinary symptoms are you
24   going to tell the jury that Ms. Funderburke

Page 73

1    suffered after placement of the Gynecare device?
2            MR. THORNBURGH:  Objection.
3            THE DEPONENT:  Well it's stated in my
4    report.  "Clinical records indicate an appearance
5    of urge incontinence and frequent UTIs after
6    implantation of Gynecare mesh devices."  That's
7    what I saw in the records.
8            BY MR. COMBS:
9            Q.  And in order to make that
10   determination that she suffered frequent UTIs
11   after implantation, did you think it was necessary
12   to know whether she had suffered frequent UTIs
13   prior to implantation?
14           MR. THORNBURGH:  Objection.
15           THE DEPONENT:  I did not make a
16   determination.  I copied what was in the clinical
17   records.  Again, going into this again I'm not a
18   urogynecologist or a urologist to make clinical
19   determinations.  I saw it in the record exactly as
20   I read like 15 minutes ago.
21           BY MR. COMBS:
22           Q.  You won't be testifying at the trial
23   of this case that the mesh implant caused
24   Ms. Funderburke to have frequent UTIs, will you?

19 (Pages 70 to 73)

Vladimir Iakovlev, M.D.

Page 74

1          MR. THORNBURGH:  Objection.
2          THE DEPONENT:  Again, I can read it from
3     the record.  It's stated there.  I saw it.  I
4     copied it and then I correlate it with the
5     pathology.  That's the extent I can testify.
6          BY MR. COMBS:
7          Q.  Alright.  And you have made no
8     comparison of the frequency prior to the implant,
9     while the implant was in place or after the
10    implant had been explanted, have you?
11         MR. THORNBURGH:  Objection.  Asked and
12    answered.
13         THE DEPONENT:  I answered this question
14    several times.
15         BY MR. COMBS:
16         Q.  And is the answer no?
17         A.  No, the answer is as I answered.
18         Q.  If the answer is as you answered
19    then tell me how many UTIs did Ms. Funderburke
20    have prior to the implant?
21         A.  Your previous question was what I'm
22    going to testify regarding urinary symptoms.  Now
23    you're asking how many again.
24         Q.  Okay.  First sentence under your

Page 75

1     urinary symptoms you say, "Clinical records
2     indicate an appearance of urge incontinent and
3     frequent UTIs after implantation."  If your
4     testimony is going to be that she developed
5     frequent UTIs after implantation I want to know
6     what your knowledge is regarding UTIs prior to
7     implantation.
8          A.  Should I read that sentence again?
9          MR. THORNBURGH:  One last time.
10         THE DEPONENT:  One last time, yes.
11         MR. THORNBURGH:  No more after this.
12         BY MR. COMBS:
13         Q.  I understand the sentence.  I'm
14    asking before that.  I'm asking before the
15    implant.  That's what I'm asking.
16         MR. THORNBURGH:  Objection.  He's
17    already told you what he's going to do.  What he
18    does is he correlates what's said in the records
19    to the pathology.
20         MR. COMBS:  Dan, c'mon.  Let's not have
21    a speaking objection.
22         MR. THORNBURGH:  This is not my -- it's
23    not a speaking objection when he's already
24    testified to that five times.

Page 76

1          MR. COMBS:  That's a speaking objection.
2          BY MR. COMBS:
3          Q.  Dr. Iakovlev, you know, I think it's
4     an easy question.  Do you know?  Do you know
5     whether Ms. Funderburke had frequent UTIs
6     pre-implant?
7          A.  What do you mean frequent?  How
8     many?  She might have had 20, 30, since her birth.
9     People have UTIs.  This is all questions which
10    are so vague and ambiguous and that's not what I
11    do.  I do go through the records and if I see
12    something clearly stated I take it as face value
13    what's in the records.
14         Q.  Well, the question you're
15    complaining about being vague because it uses the
16    term "frequent" I'm using the term you used.
17    Under "urinary" symptoms" that's what you say.  So
18    here's my question, did she have frequent UTIs
19    pre-implant?  Whatever criteria you're using to
20    say that she had them after implant.
21         MR. THORNBURGH:  Objection.
22         THE DEPONENT:  So whatever you call
23    frequent, not frequent, I clearly saw indication
24    that the pattern of UTI changed.  If she had them

Page 77

1     before whatever frequency the clinicians put in
2     the record that frequent UTIs requiring
3     antibiotic suppression since her surgery.  That's
4     how I see it.  That's how it is in the records.
5     We can pull the record itself not just my summary.
6          How many of them?  I don't know.  We can
7     ask a clinician who put that sentence in.
8          BY MR. COMBS:
9          Q.  Okay.  Let's take a break for a
10    couple of minutes.
11         ---  Break taken at 4:49 p.m.
12         ---  Upon resuming at 4:56 p.m.
13         BY MR. COMBS:
14         Q.  Dr. Iakovlev, will you testify at
15    the trial of this case that there were changes in
16    Ms. Funderburke's tissue as a result of the mesh
17    implant?
18         A.  Yes.
19         Q.  And have you seen any other
20    pathology samples of Ms. Funderburke's tissue
21    other than the one taken on September 23rd, 2010?
22         A.  No.
23         Q.  Haven't seen any before that have
24    you?

Vladimir Iakovlev, M.D.

Page 78

1    A. No.
2    Q. Haven't seen any after that have
3  you?
4    A. No.
5    Q. There's a section in your report
6  regarding pain at page 6. What's your testimony
7  going to be at the trial of this case regarding
8  the location of Ms. Funderburke's pain?
9    A. Again, my testimony will not be
10  making clinical assessments. I mean, I can only
11  copy what is in the records.
12    Q. You don't know what the location of
13  Ms. Funderburke's pain was, do you?
14    A. Well, I can go back into record and
15  see where it was described. I myself did not
16  elicit that history where the pain is. I did not
17  examine.
18    Q. So any testimony that you had on
19  that would just be based on what you read in the
20  medical records?
21    A. That's correct.
22    Q. Do you know whether Ms. Funderburke
23  suffered from dyspareunia or not?
24    A. It wasn't a separate section. So

Page 79

1  from what I see dyspareunia wasn't the main
2  complication which was evident in the records. If
3  she had sex or sexual relationships I don't know.
4  She certainly was at risk for dyspareunia if she
5  had it or not, that would be a clinical question.
6    Q. And I started to interrupt you.
7  Were you finish with your answer?
8    A. Yes.
9    Q. You do not know whether
10  Mr. Funderburke was sexually active?
11    A. I don't.
12    Q. Ms. Funderburke suffered an erosion
13  less than three months after her implant didn't
14  she?
15    A. Sometime short of three months. She
16  had an excision in three months.
17    Q. Was that as a result of a wound
18  healing issue?
19    MR. THORNBURGH: Objection.
20    THE DEPONENT: A wound healing issue
21  would be if somebody observes the wound and sees
22  it doesn't heal, doesn't heal, doesn't heal and
23  stays open. So there would be a continuous
24  observation of this. If there's a gap in it then

Page 80

1  you don't know, if it healed and then became
2  eroded. So -- but in any case if there is wound
3  healing issue the object which prevented it from
4  healing, would be mesh.
5    BY MR. COMBS:
6    Q. You do not know whether
7  Ms. Funderburke suffered from a wound healing
8  issue in relation to her December 31st, 2008
9  implant do you?
10    MR. THORNBURGH: Objection.
11    THE DEPONENT: Well definitely, once it
12  became exposed the wound cannot heal. The foreign
13  body prevents it from healing.
14    BY MR. COMBS:
15    Q. Do you know when her exposure first
16  manifested?
17    A. Well, the record, as you said
18  sometime within the first three months after
19  implantation.
20    Q. And Ms. Funderburke is a diabetic
21  isn't she?
22    A. Yes, she is.
23    Q. As a result of Ms. Funderburke being
24  a diabetic is she likely to have poorer wound

Page 81

1  healing?
2    MR. THORNBURGH: Objection.
3    THE DEPONENT: Well, see there are many
4  diabetic patients without the mesh and they don't
5  develop mesh erosion or poor healing around the
6  mesh. And at the same time, many diabetics heal
7  over this. There would be some changes. It
8  depends on the patient. I don't personally know
9  or I'm not aware that diabetes is a
10  contraindication for mesh surgery. Diabetes could
11  have contributed to delayed wound healing. But
12  again, if there was no mesh there wouldn't be a
13  wound to begin with.
14    BY MR. COMBS:
15    Q. All surgeries are accompanied by
16  wounds, aren't they?
17    A. Yes, but not all contain foreign
18  bodies.
19    Q. You do not know how
20  Ms. Funderburke's mesh was placed, do you?
21    MR. THORNBURGH: Objection.
22    THE DEPONENT: What do you mean how?
23    BY MR. COMBS:
24    Q. Well, whether it was placed properly

21 (Pages 78 to 81)

Vladimir Iakovlev, M.D.

| Page 82 | Page 84 |
|---|---|
| 1  or not during the surgery. | 1       - - - - - - |
| 2       A. No, I don't know specific details. |     E R R A T A |
| 3  This would be a clinical question. | 2       - - - - - - |
| 4       Q. Dr. Iakovlev, I don't have any other | 3  PAGE LINE CHANGE |
| 5  questions related to Ms. Funderburke. | 4  ____ ____ _____ |
| 6       MR. THORNBURGH:  I may, just give me one | 5     REASON:  _____ |
| 7  second.  No questions.  Thank you. | 6  ____ ____ _____ |
| 8       --- Whereupon the examination was | 7     REASON:  _____ |
| 9  completed at 5:04 p.m. | 8  ____ ____ _____ |
| 10 | 9     REASON:  _____ |
| 11 | 10 ____ ____ _____ |
| 12 | 11    REASON:  _____ |
| 13 | 12 ____ ____ _____ |
| 14 | 13    REASON:  _____ |
| 15 | 14 ____ ____ _____ |
| 16 | 15    REASON:  _____ |
| 17 | 16 ____ ____ _____ |
| 18 | 17    REASON:  _____ |
| 19 | 18 ____ ____ _____ |
| 20 | 19    REASON:  _____ |
| 21 | 20 ____ ____ _____ |
| 22 | 21    REASON:  _____ |
| 23 | 22 ____ ____ _____ |
| 24 | 23    REASON:  _____ |
|  | 24 ____ ____ _____ |

| Page 83 | Page 85 |
|---|---|
| 1 | 1       ACKNOWLEDGMENT OF DEPONENT |
| 2       REPORTER'S CERTIFICATE | 2 |
| 3 | 3  I, _____, do |
| 4       I, HELEN MARTINEAU, CSR, Certified | hereby certify that I have read the |
| 5  Shorthand Reporter, certify; | foregoing pages, and that the same |
| 6       That the foregoing proceedings were | 4  is a correct transcription of the answers |
| 7  taken before me at the time and place therein set | given by me to the questions therein |
| 8  forth at which time the witness was put under oath | 5  propounded, except for the corrections or |
| 9  by me; | changes in form or substance, if any, |
| 10      That the testimony of the witness and | 6  noted in the attached Errata Sheet. |
| 11 all objections made at the time of the examination | 7 |
| 12 were recorded stenographically by me and were | _____ |
| 13 thereafter transcribed; | 8  VLADIMIR IAKOVLEV, MD       DATE |
| 14      That the foregoing is a true and | 9 |
| 15 accurate transcript of my shorthand notes so | 10 |
| 16 taken. | 11 |
| 17 | 12 |
| 18 | 13 |
| 19      _____ | 14 |
| 20 PER:  HELEN MARTINEAU | Subscribed and sworn |
| 21 CERTIFIED SHORTHAND REPORTER. | to before me this |
| 22 | 15 _____ day of _____, 20____. |
| 23 | 16 |
| 24 | My commission expires:_____ |
|  | 17 |
|  | 18 _____ |
|  | 19 Notary Public |
|  | 20 |
|  | 21 |
|  | 22 |
|  | 23 |
|  | 24 |

22  (Pages 82 to 85)

Vladimir Iakovlev, M.D.

Page 86

| 1 | | LAWYER'S NOTES |
|---|---|---|
| 2 | PAGE | LINE |
| 3 | ____ | ____ | _____ |
| 4 | ____ | ____ | _____ |
| 5 | ____ | ____ | _____ |
| 6 | ____ | ____ | _____ |
| 7 | ____ | ____ | _____ |
| 8 | ____ | ____ | _____ |
| 9 | ____ | ____ | _____ |
| 10 | ____ | ____ | _____ |
| 11 | ____ | ____ | _____ |
| 12 | ____ | ____ | _____ |
| 13 | ____ | ____ | _____ |
| 14 | ____ | ____ | _____ |
| 15 | ____ | ____ | _____ |
| 16 | ____ | ____ | _____ |
| 17 | ____ | ____ | _____ |
| 18 | ____ | ____ | _____ |
| 19 | ____ | ____ | _____ |
| 20 | ____ | ____ | _____ |
| 21 | ____ | ____ | _____ |
| 22 | ____ | ____ | _____ |
| 23 | ____ | ____ | _____ |
| 24 | ____ | ____ | _____ |

23 (Page 86)