# EXHIBIT D

Samantha Joy Pulliam, M.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: ETHICON, INC., PELVIC    )    Master File No.
REPAIR SYSTEM PRODUCTS          )    2:12-MD-02327
LIABILITY LITIGATION            )    MDL 2327

THIS DOCUMENT RELATES TO ALL
WAVE 4 AND SUBSEQUENT WAVE CASES
AND PLAINTIFFS:

Candy Breeden                        JOSEPH R. GOODWIN
Case No. 2:12cv04658                 U.S. DISTRICT JUDGE

Stephanie Browley
Case No. 2:12cv04515

Wendy Happel
Case No. 2:12cv03889

Ella Howard
Case No. 2:12cv03976

Charlotte Humphreys
Case No. 2:12cv04810

Cathy Kimsey
Case No. 2:12cv04814

Melanie Turner
Case No. 2:12cv03847


DEPOSITION OF SAMANTHA JOY PULLIAM, M.D.

GENERAL TVT and TVT-O

Friday, March 31, 2017

Chapel Hill, North Carolina

10:40 a.m.

Reported by:  Karen K. Kidwell, RMR, CRR, CLR

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Samantha Joy Pulliam, M.D.

## Page 2

1  DEPOSITION of SAMANTHA JOY PULLIAM, M.D.,
2  General TVT and TVT-O, a witness in the
3  above-entitled action, taken on behalf of Plaintiffs,
4  pursuant to the Federal Rules of Civil Procedures
5  before KAREN K. KIDWELL, RMR, CRR, a Certified
6  Shorthand Reporter, at Courtyard Chapel Hill, 100
7  Marriott Way, Chapel Hill, North Carolina, the 31st
8  day of March, 2017, at 10:40 a.m.
9
10
11  A P P E A R A N C E S
12  ON BEHALF OF PLAINTIFFS:
13  WILSON LAW, P.A.
      Kimberly Wilson White, Esq.
14  Marc C. Downing, Esq.
      111 Haynes Street
15  Suite 103
      Raleigh, NC 27604
16  919.890.0181
      kim@wilsonlawpa.com
17  marc@wilsonlawpa.com
18
19  ON BEHALF OF DEFENDANTS ETHICON and
      JOHNSON & JOHNSON:
20
      TROUTMAN SANDERS LLP
21  Eric Rumanek, Esq.
      600 Peachtree Street, N.E.
22  Suite 5200
      Atlanta, GA  30308
23  404.885.2606
      eric.rumanek@troutmansanders.com
24
25

## Page 3

1  I N D E X
2  WITNESS/EXAMINATION                       Page
3  SAMANTHA JOY PULLIAM, M.D.
4  By Ms. White                    5
5  By Mr. Rumanek                  255
6
7  E X H I B I T S
8  Number    Description              Page
9  Pulliam 1  Notice to Take Deposition of ......23
            Samantha Pulliam, M.D.
10
   Pulliam 2  Thumb drive with documents .......25
11
   Pulliam 3  Curriculum Vitae of Samantha ......30
12            J. Pulliam, M.D.
13  Pulliam 4  Expert Report of Samantha J. ......102
            Pulliam, M.D.
14
   Pulliam 5  Samantha Pulliam, General ........106
15            Reliance List in Addition to
            Materials Referenced in
16            Report, MDL Wave 4
17  Pulliam 6  Samantha Pulliam, Supplemental ...111
            General Reliance List in
18            Addition to Materials
            Referenced in Report, MDL Wave 4
19
   Pulliam 7  Gynecare TVT IFU, Highly .........152
20            Confidential, Subject to
            Stipulation and Order of
21            Confidentiality, Bates
            ETH.MESH.03427878-883
22
23
24
25

## Page 4

1  E X H I B I T S (Cont'd)
2  Number    Description              Page
3  Pulliam 8  November 4, 2011, Rachel .........206
            Zimmerman article, Surgery
4            Under Scrutiny: What Went
            Wrong With Vaginal Mesh,
5            Confidential, Subject to
            Stipulation and Order of
6            Confidentiality, Bates
            JJM.MESH.00187664-669
7  Pulliam 9  E-mail chain, top e-mail .........252
            10/2/2006, Marie Egan to
8            Melissa Doyle, Confidential,
            Subject to Stipulation and
9            Order of Confidentiality,
            Bates ETH.MESH.11529892-893
10
11
12
13  INSTRUCTIONS
14                                     Page
15  Instruction not to answer          105
16
17
18
19
20
21
22
23
24
25

## Page 5

1  FRIDAY, MARCH 31, 2017, CHAPEL HILL, NORTH CAROLINA
2  P R O C E E D I N G S
3  -oOo-
4  SAMANTHA JOY PULLIAM, M.D.
5  being first duly sworn, testified as follows:
6  EXAMINATION
7  BY MS. WHITE:
8  Q.  Dr. Pulliam, my name is Kimberly Wilson
9  White, and I'm here to take your deposition in
10  regards to you being designated as a general
11  urogynecology expert in Wave 4, right?
12  MR. RUMANEK:  Correct.
13  BY MS. WHITE:
14  Q.  Wave 4 litigation.  So you know why you're
15  here today?
16  A.  I do.
17  Q.  Okay.  Very good.  Have you ever given
18  your deposition before?
19  A.  I have not.
20  Q.  Okay.  Can you please state your name for
21  the record?
22  A.  Samantha Joy Pulliam.
23  Q.  All right.  Do you sometimes go by Mandy?
24  A.  I do.
25  Q.  What do your friends call you?

2  (Pages 2 to 5)

Samantha Joy Pulliam, M.D.

Page 6

1    A.  My friends call me Mandy.
2    Q.  Okay.  And where do you live?
3    A.  I current live in Chapel Hill.
4    Q.  And how long have you lived in
5    Chapel Hill?
6    A.  Since January of 2016.
7    Q.  Okay.  And you've never been deposed
8    before?
9    A.  I have not.
10   Q.  Okay.  So do you understand that the court
11   reporter just placed you under oath?
12   A.  Yes.
13   Q.  So your testimony here today is
14   virtually -- is the same as giving testimony under
15   oath in a court of law.  You understand that?
16   A.  I do.
17   Q.  So since you have not been deposed before,
18   I'm going to go through some deposition rules that
19   your counsel might have already gone over with you.
20   I'm going to be asking you questions today in regards
21   to your opinions about TVT and TVT-O.  Can we agree
22   that when I ask you a question about TVT, we're
23   referring to the Ethicon TVT retropubic device?
24   A.  Yes.
25   Q.  Okay.  And then TVT-O is the TVT obturator

Page 7

1    device.  Can we agree to that?
2    A.  Yes.
3    Q.  Okay.  I'm going to be asking you
4    questions.  If you don't understand my question, ask
5    me to rephrase it.  I'll be glad to do that.  If at
6    any point during the deposition you need to take a
7    break, I don't have a problem with that.  The only
8    thing I ask is that you answer the question that has
9    been posed and you do not take breaks during my
10   question.
11   A.  Okay.
12   Q.  Let's get through the question.  You can
13   take a break.  So just to be clear, you have never
14   given a deposition in a workers' compensation case?
15   A.  No.
16   Q.  Medical malpractice case?
17   A.  No.
18   Q.  And you've never been deposed in
19   connection with a pelvic mesh case?
20   A.  I have not.
21   Q.  Okay.  Have you ever testified in court?
22   A.  I have not.
23   Q.  You are probably the first doctor I've
24   ever deposed in 22 years that has never been under
25   oath before.  Probably a good thing.

Page 8

1    Are you currently employed?
2    A.  I am.
3    Q.  How are you employed?
4    A.  I work as a physician at the University of
5    North Carolina at Chapel Hill.
6    Q.  Okay.  And you are soft-spoken.  So I'm
7    going to ask you to keep your voice up today, mainly
8    for the court reporter.  The court reporter here to
9    my right is taking down everything that you say.
10   This will be the official record of your testimony.
11   So it's very important that she can hear your
12   testimony.
13   A.  Okay.
14   Q.  So what -- what's your title with the
15   university?
16   A.  I'm the division director of
17   urogynecology.  There's a longer title that involves
18   urogynecology and female pelvic reconstructive
19   surgery.  And that's within the Department of
20   Obstetrics and Gynecology at the University of North
21   Carolina.
22   Q.  Okay.  Did you just give me that longer
23   title?
24   A.  I did.
25   Q.  And did you take over for Catherine

Page 9

1    Matthews?
2    A.  Yes, I did.
3    Q.  And did you know Dr. Matthews before she
4    left?
5    A.  I knew her, not well.  I mean, I expect
6    I've introduced -- been introduced to her at national
7    meetings and maybe had a drink in a large group
8    before.
9    Q.  Okay.  Did Catherine reach out to you
10   about applying for this position at UNC?
11   A.  No.
12   Q.  Okay.  Have you ever talked to Catherine
13   about any testimony she's ever given under oath in
14   regards to the mesh litigation?
15   A.  Not that I recall.
16   Q.  Okay.  Are you aware that she, in fact,
17   also serves as a general urogyn expert in the mesh
18   litigation?
19   A.  I was not aware of that.
20   Q.  And did you receive and review any portion
21   of her deposition testimony in regards to mesh
22   litigation?
23   A.  Not that I recall.
24   Q.  So do you currently see patients?
25   A.  Yes, I do.

3 (Pages 6 to 9)

Samantha Joy Pulliam, M.D.

Page 10

1    Q.  Okay.  Tell me a little bit about that.
2  On what days do you see patients?
3    A.  So I see patients a different day every
4  week, probably on average three to four days a week.
5    Q.  Okay.  What do you do on the other days?
6    A.  Well, sometimes I operate.  I suppose that
7  counts as seeing patients.  And during the other
8  days, I do work in terms of the administrative
9  portion of my responsibility with regard to the
10  division so making the schedule and working on the
11  budget and things like that.  I do teaching of
12  residents and fellows within the university within
13  the fellowship that's part of my division which is
14  female pelvic medicine and reconstructive surgery so
15  there's a fellowship there.  We have three fellows
16  and I teach them.
17    I do some work with the American Urogyn
18  Society where I'm the quality chair which means I
19  oversee the development of a registry and work that
20  goes into designing quality measures to ensure that
21  urogynecologic procedures and practices are performed
22  to specific standards that are required by, for
23  example, the Center for Medicare and Medicaid
24  Services.  I go to a lot of meetings.
25    Q.  Okay.  So let's break this down a little

Page 11

1  bit.  You said that you see patients three to four
2  days a week?
3    A.  That's right.
4    Q.  And then how many days a week do you
5  teach?
6    A.  Well, on some of those days that I'm
7  doing -- working in the office or in the operating
8  room, I'm also teaching.  And then depending upon the
9  week, there is a didactic conference on Wednesday
10  mornings I'm responsible for running along with our
11  fellowship director.  And then, in addition to that,
12  I do lectures and teaching of the residents on
13  occasion.
14    Q.  So do you teach in the classroom?
15    A.  I give lectures sometimes or I'm usually
16  more likely to do sort of an ad hoc teaching but
17  not -- not a lot of classroom teaching, no.
18    Q.  So when you say you're teaching, it's
19  mainly with residents and fellows that are with you
20  as you're diagnosing and seeing patients?
21    A.  That's correct.  Mainly.
22    Q.  So how many days a week do you operate?
23    A.  One to two.
24    Q.  Do you currently surgically treat patients
25  who have been diagnosed with stress urinary

Page 12

1  incontinence?
2    A.  Yes, I do.
3    Q.  So do you have your own set of patients
4  that you see?  For example, you'll see a patient who
5  comes in, she is symptomatic for stress urinary
6  incontinence.  You would diagnose her and then
7  perhaps do surgery on her?
8    A.  Yes, I do.  I have my own set of patients,
9  and then I also oversee fellows who have their own
10  sets of patients, and I ensure that they are learning
11  and that they're taking good care of patients while
12  they're seeing them.
13    Q.  Okay.  And then do you also treat patients
14  who have been referred to you from other physicians?
15    A.  I do, although I'm not sure I would
16  differentiate between my own set of patients and
17  patients who are referred to me by other physicians.
18  That's really one in the same sort of idea.
19    I think there are a number of ways that a
20  patient could come to me.  They could be sent by
21  another physician.  They could find me themselves or
22  they might be sent by the emergency room or some
23  other referring source that's not specific to, you
24  know, another private physician relationship.
25    Q.  Okay.  Do you do research?

Page 13

1    A.  Yes, I think so.  I mean, I think I'm not
2  a basic science researcher typically, although I have
3  been involved in basic science over the course of my
4  career.  That's not currently my effort.  I do
5  research in quality of care primarily at this point.
6  But I'm also part of a larger group of
7  urogynecologists, and we do clinical trials and some
8  device trials as part of the larger group.  So my
9  name would be on protocols for pretty much the span
10  of things.
11    Q.  Okay.  Tell me about this larger group of
12  physicians.
13    MR. RUMANEK:  Just -- just as another kind
14  of deposition tip, since she's taking everything
15  down, make sure she finishes her question all
16  the way before you start answering.  That's so
17  that you're not talking over each other.
18    THE WITNESS:  I understand.
19  BY MS. WHITE:
20    Q.  And that wasn't a real good question.  So
21  what is this group of other physicians --
22    A.  Right.
23    Q.  -- that you've referred to that you all do
24  clinical trials?
25    A.  Right.  So the division that I oversee is

4 (Pages 10 to 13)

Samantha Joy Pulliam, M.D.

Page 14

1  a division of urogynecology and female pelvic
2  reconstructive surgery, and there are six physicians
3  and a nurse practitioner in the division, and so we
4  collaborate on research within that context. I
5  think -- I'm new to this group, but literature review
6  would show that most of the published papers from
7  this group involve the work of multiple physicians in
8  the group.
9      Q. Okay. Do you currently have clinical
10  trials going on right now?
11      A. I -- we do currently have clinical trials
12  going on right now, none that I personally am the
13  lead physician or investigator on.
14      Q. Do any involve polypropylene transvaginal
15  mesh products?
16      A. No, they do not. There is a research
17  project that's involved Pelvetex, but we are the
18  native tissue arm of that. So I guess in its
19  extension, it's a multicentered trial. There may be
20  other things besides native tissue that are used, but
21  for our group, we have used -- we have not used -- we
22  have only used the native tissue.
23      Q. Okay. So other than your position at UNC,
24  your current position, do you receive income from any
25  other source?

Page 15

1      A. Nothing comes to mind as a major source of
2  income. I think I have received a little bit of
3  income over the past probably seven years for some
4  legal review that's never resulted either in
5  deposition or sort of anything that's gone to court
6  to the tune of maybe 3 or $4,000 over the course of
7  the last ten years. But I don't remember much about
8  it. I couldn't even tell you who -- who it was.
9      Q. Okay. Have you ever been -- so let's talk
10  about that a little bit.
11      A. Okay.
12      Q. So you've been paid 3 to $4,000 to review
13  a case. Would that be a medical malpractice case?
14      A. Yes, that's it.
15      Q. Okay. Have you currently been paid by
16  J & J for any of your work involving this litigation,
17  the mesh litigation, whether it's wave 1, 2, 3, or 4,
18  have you been paid by J & J for being an expert in
19  the mesh litigation?
20      A. No, I have not.
21      Q. Okay. Are you keeping track of your time?
22      A. I am.
23      Q. Okay. Why have you not submitted an
24  invoice?
25      A. Well, my plan was to submit an invoice

Page 16

1  after this deposition, but it has -- it was
2  rescheduled a couple of times, and so it's just been
3  I was going to do it all together at the end of this
4  sort of phase of this work. And this has stretched
5  out so it just hasn't happened yet.
6      Q. Okay. I need to ask you some questions
7  about the work that you've done since I don't have
8  the invoices.
9      A. Okay.
10      Q. Okay. So to date, how much time have you
11  spent working as a general urogyn expert for the mesh
12  litigation?
13      MR. RUMANEK: Let me just make sure the
14  question is clear. Are you talking about just
15  her general, because she also worked on some
16  case specific, and I just want to make sure you
17  all are talking about the same.
18  BY MS. WHITE:
19      Q. Okay. Let's break that down. Okay?
20      A. Okay.
21      Q. Because we would have gone there anyways.
22  So in terms of your general urogyn expert work, how
23  many hours have you spent as of today's date
24  excluding the 15 minutes we have been in the
25  deposition?

Page 17

1      A. Okay. Well, I think to write the report
2  that I submitted, probably -- I mean, I haven't
3  totaled these, to be honest with you, but I think
4  probably over 40 hours, maybe 43 hours or so on the
5  generation of the report. And then probably over the
6  last several weeks, I've spent maybe 10 hours or so
7  reviewing the things that I wrote and working in
8  preparation for this.
9      Q. What do you mean "for this"?
10      A. For this deposition.
11      Q. Okay. But prior to writing the report,
12  did you do any research to get yourself in a position
13  to write the report or does that 43 hours include all
14  of that?
15      A. I would say that 43 hours includes all of
16  that.
17      Q. Okay. So your testimony here today is
18  that you've spent about 53 hours of time as a general
19  urogyn expert for wave 4?
20      A. I think that's about how much time I've
21  spent working on this case.
22      Q. But you have not submitted your invoice to
23  J & J as of date because you're waiting until this
24  deposition is over?
25      A. That's it.

5  (Pages 14 to 17)

Samantha Joy Pulliam, M.D.

Page 18

1    MR. RUMANEK: And I'll just note on the
2  record that we can provide the invoice when we
3  get it, and I think that will -- we can agree
4  that will reflect the accurate time --
5    THE WITNESS: Absolutely.
6    MR. RUMANEK: -- to the best of her
7  ability.
8  BY MS. WHITE:
9    Q. Okay. So now let's talk about case
10 specific. In how many cases have you been designated
11 a case specific urogyn expert for J & J?
12   A. So I'm not sure -- so designated and
13 actually happened are probably two different kinds of
14 questions. I -- I was given maybe three or four
15 cases to review. And I reviewed a couple of those.
16 But somewhere in the process of that, those were not
17 things that went forward. So I -- I'm not sure
18 designated meaning they were assigned to me. I'm
19 sure that that's true. But I think in terms of
20 actually going forward with being that expert, I
21 haven't really spent a lot of time on that.
22   Q. Okay. I don't care whether or not the
23 cases went forward.
24   A. Okay.
25   Q. I'm trying to ascertain how much time you

Page 19

1  have worked as an expert in which you're going to
2  bill J & J.
3    A. I see. Probably about 15 hours, maybe a
4  little bit less than that. I have spent less time --
5  actually, I mean, I've given -- written this down in
6  my system, provided it for my secretary who keeps
7  track of things, but I haven't looked at that because
8  it was such an abrupt end to the process.
9    Q. Okay. So if I understand your testimony
10 correctly, there is about 15 hours in case specific
11 work that you've done that you have not billed J & J
12 for yet?
13   A. That's right. And it's a very rough
14 estimate.
15   Q. Okay. Well, do you think it could be less
16 or more?
17   A. I don't know.
18   MR. RUMANEK: Object to the form.
19 BY MS. WHITE:
20   Q. And when do you plan to submit those
21 invoices because those cases are over.
22   A. Right. So, they are. And I -- at least I
23 assume so. I think my impression was that they were
24 on hold. So I guess -- but I -- this had all
25 transpired in a way that I seemed at this point,

Page 20

1  because this is the first time I've done this
2  perhaps, to happen in a block. So my plan had been
3  to submit the whole of it together at the end of
4  these depositions where initially planned to be
5  closer together than now they apparently are.
6    Q. Did anyone tell you not to submit your
7  invoices prior to this deposition?
8    MR. RUMANEK: Object to the form. I
9  don't even -- that would necessarily involve I
10 guess discussion with counsel. Don't tell her
11 anything that you discussed with counsel to the
12 extent that anybody else may have told you that.
13   THE WITNESS: I haven't discussed it with
14 anyone else.
15 BY MS. WHITE:
16   Q. Okay. So, again, if I understand your
17 testimony correctly, the work you've done on the case
18 specific cases, which isn't connected to this depo
19 today, you haven't invoiced J & J, but after this
20 depo is over, you're going to invoice them for that
21 work as well?
22   A. That's correct. I think, you know, some
23 of this has to do with my new understanding of how
24 this works. I know that at this point, now, there's
25 sort of the general deposition, and then there are

Page 21

1  depositions regarding each individual patient. But I
2  think when I went into this, that was a process that
3  I was still learning about. So moving forward, I may
4  do it differently. But that's what I've done this
5  time.
6    Q. So are -- I want to get back to income
7  from other sources.
8    A. Sure.
9    Q. Okay. I don't know if we covered that
10 other than you're an expert for J & J, and you're
11 going to get paid. You work for UNC?
12   A. That's correct.
13   Q. Do you receive income from any other
14 service -- places?
15   A. You mean, am I employed? I have stocks
16 and investments and all those sorts of things that
17 are on my tax returns.
18   Q. No, no, income. Are you receiving income
19 in any other capacity being on a board, serving as an
20 expert for another pharmaceutical company? Are you
21 receiving income?
22   A. I'm not on a board. I have not received
23 income that I can recall from any other
24 pharmaceutical company or any other entity.
25   Q. So your income -- income comes from UNC?

6 (Pages 18 to 21)

Samantha Joy Pulliam, M.D.

Page 22

1   A. Uh-huh.
2   Q. And then your time working as an expert
3   for J & J?
4   A. That's right.
5   Q. Okay. Do you need to change that?
6   A. No. I don't need to change that except to
7   say that the setup -- the arrangement for legal work
8   with the University of North Carolina actually will
9   pay the University of North Carolina for my services.
10   In other words, the funds received don't come
11   directly to me without going through them first.
12      And a large portion of the work that I do
13   here will have monies that are intentionally directed
14   towards resident education and other work within the
15   university. So whenever I submit my bill, the income
16   that is created from that is not going to come only
17   to me. And it will be managed by university.
18   Q. Do you receive a portion of that income?
19   A. No.
20   Q. Okay. And I'm familiar -- I work with
21   other experts at UNC. So I know what you're talking
22   about. But -- but your department benefits from that
23   income?
24   A. That's correct.
25      MR. RUMANEK: Object to the form.

Page 23

1   BY MS. WHITE:
2   Q. And, in fact, that money could be used for
3   research that you personally wanted to do or clinical
4   trials or -- I mean, you'll have -- that money will
5   come to your division.
6   A. Right. Some of the funding will come to
7   my division, and some to the greater department and
8   the university. And there are, you know, specific
9   things that I can do with it such as research and
10   education. There are other things I cannot do with
11   it.
12   Q. And who makes the decision for your
13   department where that money goes?
14   A. The chair of the department.
15   Q. And who's your chair?
16   A. Daniel Clarke-Pearson. I must say I think
17   he probably refines the decision. I suspect that
18   it's a larger decision that is on the part of the
19   medical school, but I'm not privy to those decisions.
20   Q. Okay. So I'm handing you what we have
21   marked as Exhibit 1.
22      (Pulliam 1 was marked for identification.)
23   BY MS. WHITE:
24   Q. Okay. So I'm handing you what we have
25   marked as Exhibit 1, which is the notice of your

Page 24

1   deposition. Then -- so, Dr. Pulliam, because I know
2   you are new to this, I'm going to be handing to you
3   exhibits that have exhibit stickers on them. At the
4   end of the day, we have to all work together to make
5   sure that those exhibits get back to the court
6   reporter if it has a sticker on it.
7      MR. RUMANEK: So I'll just say to the best
8   that you can, and we can all track them down
9   again, if we need to. Once we're done with one,
10   why don't we just try to create a stack in that
11   corner of the table that is closer to the court
12   reporter because there are other documents.
13      THE WITNESS: Okay, that's fine. I'll try
14   to do that.
15   BY MS. WHITE:
16   Q. Have you seen Exhibit 1 prior to today?
17   A. Yes, I have.
18   Q. And what did you bring with you in
19   response to your notice of deposition?
20   A. I think I brought here the things that you
21   see before you. These are collection of the articles
22   that I've used.
23      MR. RUMANEK: And I'll just note on the
24   record, also, that we brought a copy of the
25   report, a copy of her CV, and I've already given

Page 25

1   opposing counsel prior to the deposition so she
2   could have a chance to look at it a thumb drive.
3   We also have a reliance list which I think you
4   already have as well.
5      MS. WHITE: Okay. And can we agree, Eric,
6   that you will submit her invoices when you
7   receive them?
8      MR. RUMANEK: Yes.
9      (Pulliam 2 was marked for identification.)
10   BY MS. WHITE:
11   Q. All right. And Exhibit 2 for the record
12   is the thumb drive that you brought with you today?
13   A. Uh-huh.
14   Q. Okay? All right. How -- and you can put
15   Exhibit 1 to the side.
16      MR. RUMANEK: Kim, let me just --
17      MS. WHITE: Yes, sir.
18      MR. RUMANEK: -- I just want to put it on
19   the record because then tracking it down later
20   may be difficult. There's a password protection
21   on the thumb drive that is Pulliam --
22   PULLIAM2017.
23      MS. WHITE: I'm going to go ahead and
24   write that for the court reporter. Pulliam2017?
25      MR. RUMANEK: There's no spaces.

Samantha Joy Pulliam, M.D.

Page 26

1    MS. WHITE: Okay. That's written at the
2 bottom of the exhibit, Madame Court reporter.
3 And, sadly, it's in the -- on the date line.
4 All right. So you've got that then.
5 BY MS. WHITE:
6    Q. So what did you do to prepare for today's
7 deposition?
8    MR. RUMANEK: And let me just -- I don't
9 believe that she's asking you to discuss what
10 you and I have discussed. I think she's asking
11 more just general questions. Don't at any point
12 during the deposition get into what you and I
13 may have discussed.
14 BY MS. WHITE:
15    Q. So let's do it this way. Let's break it
16 down. Did you meet with the lawyer sitting to your
17 right in preparation for the deposition?
18    A. I did.
19    Q. Okay. And without discussing anything
20 that you and he talked about during that meeting or
21 meetings, tell me, first of all, how many times did
22 you meet with him?
23    A. We met in -- at the University of North
24 Carolina once a few weeks ago. I don't remember the
25 date.

Page 27

1    Q. You don't remember the date?
2    A. And then this morning briefly -- I do not.
3 And then this morning briefly. I think that's all of
4 our face-to-face meetings.
5    Q. So you met here at UNC. How long did that
6 meeting last?
7    A. Probably about two and a half or three
8 hours. Maybe three and a half.
9    Q. So you think three and a half hours?
10    MR. RUMANEK: Object to the form.
11    THE WITNESS: Somewhere between two and a
12 half and three and a half.
13 BY MS. WHITE:
14    Q. And there's something else that's going to
15 happen today. He's going to object sometimes,
16 hopefully not a lot. You need to answer the question
17 unless he instructs you not to answer the question.
18 But --
19    A. I understand.
20    Q. -- he'll be objecting for the record.
21    A. I understand.
22    Q. All right. So you met this morning. How
23 long did you meet this morning?
24    A. Probably about an hour and 15 minutes.
25    Q. Okay. And then did you have any telephone

Page 28

1 conferences with either Eric or other lawyers or
2 J & J representatives to get ready for today's
3 deposition?
4    A. So there were no meetings with J & J
5 representatives. And I have met with attorneys on
6 the phone I want to say two or three times in the
7 process of this, specifically within -- probably
8 twice.
9    Q. Okay. So tell me, two or three times,
10 let's take the first phone conference you had.
11    A. Okay.
12    Q. Do you remember when that occurred?
13    A. No.
14    Q. Okay. Was it -- was it within the last
15 month?
16    A. Yes, it was within the last month.
17    Q. Was it during the month of March? Today
18 is 31 so . . .
19    A. Most likely. I -- I am not very good with
20 dates. And I was away on vacation last week so now
21 I'm completely disrupted with regard to dates.
22    Q. All right. How long did that conversation
23 last?
24    A. Probably about an hour and a half.
25    Q. Okay. So tell me about telephone

Page 29

1 conference number two. When did that happen?
2    A. Wednesday night.
3    Q. Okay.
4    A. Okay.
5    Q. And how long did that conversation last?
6    A. Again, about an hour and a half.
7    Q. Okay. Tell me about conversation number
8 three. When did that occur?
9    A. So that was probably more remote and maybe
10 was about 45 minutes.
11    Q. When did it occur?
12    A. I'm guessing in the end of February, but I
13 couldn't be sure about the dates.
14    Q. Okay. But all this will be reflected on
15 the invoices that you send to J & J?
16    A. Yes.
17    Q. Okay. All right. I want to talk to you a
18 little bit about your background before we get into
19 your report. Where did you go to high school?
20    A. I went to the Stony Brook School which is
21 a small boarding school in Stony Brook, New York on
22 Long Island.
23    Q. Where did you grow up?
24    A. Beckley, West Virginia.
25    Q. So did I.

8 (Pages 26 to 29)

Samantha Joy Pulliam, M.D.

Page 30

1    A.  Did you really?  No kidding.
2    Q.  Yes, ma'am.  Where did you go to high
3  school?  Oh, you said Stony Brook?
4    A.  Did you go to Woodrow Wilson High School?
5  I guess I'm not supposed to ask you questions.
6    Q.  I went to --
7    MR. RUMANEK:  She'll make an exception if
8  you're talking about Beckley, West Virginia, I
9  think.
10    MS. WHITE:  I will.  Also, the only doctor
11  I've ever deposed from Beckley, West Virginia.
12  No, I went to the country school.  I went to
13  Liberty.  I could have went to Woodrow, but my
14  parents would have had to have driven me to the
15  bus stop.
16    THE WITNESS:  I understand.
17    MS. WHITE:  Hence I went to Liberty.
18    THE WITNESS:  I understand.
19  BY MS. WHITE:
20    Q.  Okay.  So you went to Stony Brook.  Okay.
21  And after Stony Brook, you attended Duke?
22    A.  I did.
23    (Pulliam 3 was marked for identification.)
24  BY MS. WHITE:
25    Q.  Okay.  I'm handing you what we have marked

Page 31

1  as Exhibit 3.  It is the CV that made its way to me
2  through your lawyer.
3    A.  Okay.  Thank you.
4    Q.  You can take a look at that and why don't
5  you tell me if that is the most up-to-date CV you
6  have?
7    A.  I believe so.
8    Q.  Okay.  All right.  Let's talk about that.
9  So after Duke, if I'm tracking it all correctly, you
10  graduated in 1990?
11    A.  That's right.
12    Q.  Is that right?
13    A.  Uh-huh.
14    Q.  So what -- what did you do between 1990
15  and 1994 because it looks like to me there's a gap
16  before you started med school.
17    A.  There is, there is.
18    Q.  So what was going on during those years?
19    A.  So I did quite a few things during that
20  time.  I worked for a religious organization, Campus
21  Crusade for Christ, and I worked counseling students
22  at Syracuse University, and I worked --
23    Q.  Excuse me.  Where?
24    A.  Counseling students at Syracuse University
25  in New York.  I worked in the summertime, for at

Page 32

1  least two summers, working in the inner city, soup
2  kitchens and homeless shelters and so forth.  Then I
3  left Campus Crusade probably about a year and a half
4  after I began that work and spent a brief time at
5  Columbia University Teacher's College, thought I was
6  going to pursue a degree in counseling psychology.
7    But during that time, I realized I really
8  wanted to go to medical school.  So I took a job then
9  in an effort to become more involved in medicine at
10  Sloan Kettering Cancer Center.
11    Q.  Where?
12    A.  Memorial Sloan Kettering Cancer Center in
13  New York City, Manhattan, where I served as a
14  research coordinator for clinical trials in the
15  Department of Gastroenterology.  And then I got into
16  medical school and moved to Winston-Salem in the
17  summer of 1994.
18    Q.  Okay.  Let me break some of that down.
19  Okay, you -- after you graduated Duke, is the first
20  thing you did was take a job for Campus Crusade for
21  Christ?
22    A.  That's correct.
23    Q.  All right.  So how long did you work for
24  Campus Crusade for Christ?
25    A.  I think about a year and a half.

Page 33

1    Q.  Is it during that job where you were
2  working in the inner city?
3    A.  That's correct.
4    Q.  Okay.
5    A.  So that I worked with college students.
6  So they were generally in college during the academic
7  year, and then in the summertime, they weren't there
8  and neither was I.  So then I would work with those
9  college students in a different setting which was in
10  the inner city.
11    Q.  Okay.  So then I have it mid-1992, you
12  left Campus Crusade for Christ?
13    A.  I think that's the right year, yes.
14    Q.  Okay.  And then where did you go after
15  that?
16    A.  I moved to New York City.
17    Q.  You moved to New York City.  And what did
18  you do in New York City?
19    A.  I spent a semester in graduate school.
20    Q.  All right.  And that was at Columbia
21  University Teacher's College?
22    A.  That's correct.
23    Q.  Okay.  How long were you in grad school?
24    A.  I was there for one semester.
25    Q.  Okay.  So why did you leave Columbia after

9  (Pages 30 to 33)

Samantha Joy Pulliam, M.D.

Page 34

1    one semester?
2        A.  Well, I had intended a degree in
3    counseling psychology.  But the semester really made
4    me realize that I needed a deeper understanding of
5    medicine and biology and human biology.  And so as a
6    biology major at Duke, I had toyed with the idea of
7    medical school, and I realized that that's what I
8    needed to do.  And so in order to move there, towards
9    that goal as expeditiously as possible, I stopped the
10   graduate program, worked in research, took the MCAT
11   and pursued medical school.
12       Q.  So prior to being enrolled at Columbia
13   University, you had not taken the MCAT?
14       A.  That's correct.
15       Q.  Okay.  So after Columbia University, after
16   you left there, what did you do?
17       A.  I worked at Sloan Kettering Cancer Center.
18       Q.  Okay.  All right.  And how long were you
19   there?
20       A.  Probably about another year and a half.
21       Q.  During this time, were you trying to get
22   in med school?
23       A.  So I was completing the application
24   process to get into medical school.  I took the MCAT,
25   and once that was accomplished, I applied to medical

Page 35

1    school.
2        Q.  Okay.  Is Wake Forest the only med school
3    you applied to?
4        A.  No.
5        Q.  Okay.  Where else did you apply?
6        A.  I applied to Columbia University and West
7    Virginia University.
8        Q.  And then Wake Forest University?
9        A.  And Wake Forest University.
10       Q.  Did you get in Columbia?
11       A.  No, I did not.
12       Q.  Did you get in WVU?
13       A.  No, I did not.
14       Q.  You got in Wake Forest?
15       A.  I did.
16       Q.  Well, my brother went to WVU about the
17   same time you did so we got a lot of --
18       A.  A lot of connections.
19       Q.  A lot of connections.  Okay.  So then what
20   year did you graduate medical school?
21       A.  1998.
22       Q.  Okay.  What kind of grades did you make in
23   med school?
24       A.  I believe I was in the upper third of my
25   class.  I participated in an alternative program.  It

Page 36

1    was called the parallel curriculum.  I don't think
2    Wake Forest still has it, but it was a small group,
3    didactic learning experience as opposed to a lecture
4    hall which is a traditional medical school format,
5    and so the class rank based on that was a little bit
6    diluted and different because there weren't
7    examinations and ranks so I don't know exactly where
8    I was in the class rank.
9        Q.  Okay.  So after graduating medical school,
10   did you enter into medical residency program?
11       A.  I did.
12       Q.  Okay.  And that would be you were an
13   intern in anatomic pathology at Mass General?
14       A.  Correct.
15       Q.  Was this the only residency program you
16   tried to get into?
17       A.  No, it wasn't.
18       Q.  Okay.  Tell me about the others you
19   applied to.
20       A.  I applied actually to pediatrics residency
21   programs, and there's a long list, the names I don't
22   recall.  It's been a long time.  I really wanted to
23   be in Boston or in the Northeast.  I think probably I
24   would have been happy with New York or Washington,
25   D.C. or Philadelphia so I concentrated my efforts

Page 37

1    there.
2        Q.  So let me stop you there.  Why did you
3    really want to be in Boston?
4        A.  Well, I had gone to high school on Long
5    Island.  I guess Boston's probably not right.  I
6    really wanted to be in New England or the Northeast.
7    I went to high school on Long Island and I liked the
8    New England area and Boston has a great reputation
9    for training programs.
10       Q.  Okay.  So you tried to get into a peds
11   residency program?
12       A.  That's right.
13       Q.  And was anatomic pathology your plan B?
14       A.  It was.
15       Q.  All right.  So you go into the residency
16   program.  And help me here.  When you say you're an
17   intern, that was the first year of an official
18   recognized residency program?
19       A.  That's absolutely correct.
20       Q.  Okay.  All right.  So it looks like to me
21   you stayed there one year?
22       A.  I did.
23       Q.  Okay.  Why did you leave that residency
24   program?
25       A.  Well, residency training is a very

10  (Pages 34 to 37)

Samantha Joy Pulliam, M.D.

Page 38

1    different experience than medical school. You focus
2    in on, you know, one specific discipline. And
3    pathology is sort of an interesting experience
4    because you receive specimens to examine from many
5    different disciplines and you're exposed to lots of
6    things.
7          Massachusetts General Hospital where I did
8    my pathology residency or internship had a vast
9    surgical source for pathology specimens and a really
10   excellent educational program and I was exposed to a
11   lot of things there. I also learned what it was like
12   to do pathology, and during the course of that year,
13   I realized that I probably wasn't well cut out for
14   pathology, and, in fact, I might prefer something
15   that had a little more active role such as a surgical
16   specialty and, also, that perhaps I talked too much
17   to be a very good pathologist which is really a
18   solitary experience.
19         So I -- I chose to pursue obstetrics and
20   gynecology which was not pediatrics, but it was
21   certainly part of my experience at Mass General to
22   learn about OB/GYN, as part of my pathological --
23   pathological -- pathology exposure.
24        Q. All right. So during this anatomic
25   pathology internship, did you apply to peds

Page 39

1    residency? Did you continue to try or is your
2    testimony that you decided you wanted to go into
3    OB/GYN, so hence you started down the OB/GYN road?
4         A. So I was conflicted. You know, I had gone
5    down the pediatrics road in the past, and I think
6    changing directions is always a challenge. And I --
7    I initially started in pediatrics, again, but
8    realized at some point that OB/GYN would be a better
9    option for me.
10        Q. So you did apply to peds?
11        A. That's correct.
12        Q. Okay. So then was OB/GYN kind of the plan
13   B if you didn't get into the peds residency programs
14   again?
15        A. You know, I suppose in hindsight, the
16   answer to that is yes. But I think, also, you know,
17   medicine is a process, and figuring out where you fit
18   in medicine is sort of a process of self-discovery.
19   And I think, you know, I would say that things
20   evolve, you know. I mean, you realize where you
21   belong over time. And certainly on this side of it,
22   I would never turn back.
23        Q. Okay. Why don't you tell the jury what is
24   anatomic pathology?
25        A. So patients go to surgery. And there

Page 40

1    is -- there are specimens that are taken. I mean, a
2    prime example might be a cancer specimen that's
3    removed and then determination about future treatment
4    about the diagnosis is made based upon the
5    microscopic examination of specimens. Also included
6    in anatomic pathology are things like autopsy and
7    understanding perhaps of what caused the death.
8         Q. How does -- how does anatomic pathology
9    differ from clinical pathology?
10        A. Clinical pathology in general deals more
11   with the laboratory and with, you know, blood samples
12   and kind of liquids as opposed to solids I guess is a
13   simple way to explain it.
14        Q. Okay. As you sit here today, you do not
15   consider yourself a pathologist, correct?
16          MR. RUMANEK: Object to the form.
17          THE WITNESS: I've had pathology training
18      and additional specific pathology training as it
19      pertains to obstetrics and gynecology.
20   BY MS. WHITE:
21        Q. Okay. Simple question. Are you a
22   pathologist?
23        A. I'm not a board-certified pathologist.
24        Q. Okay. And here at UNC, do you practice in
25   the area of pathology?

Page 41

1          MR. RUMANEK: Object to the form.
2          THE WITNESS: I think that I interact with
3      pathology almost every day, and certainly, I
4      evaluate the pathology specimens of my patients
5      when I perform hysterectomies, cystectomies, and
6      other gynecologic procedures.
7    BY MS. WHITE:
8         Q. Okay. I just -- do you practice -- are
9    you a practicing pathologist?
10        A. Is my -- no, I'm employed through the
11   OB/GYN department at the University of North
12   Carolina.
13        Q. Have you ever held yourself out as a
14   pathologist at any institution where you've worked?
15          MR. RUMANEK: Object to form.
16          THE WITNESS: I have not held myself out
17      as a pathologist at any institution where I've
18      worked since I was a fellow in pathology.
19   BY MS. WHITE:
20        Q. Okay. And then you talked about other
21   training you've had in pathology after the one year
22   in anatomic pathology at Mass General. Please tell
23   the jury about that.
24        A. So training in pathology, the assessment
25   and understanding of pathologic specimens in

11 (Pages 38 to 41)

Samantha Joy Pulliam, M.D.

Page 42

1  obstetrics and gynecology is part of the training
2  program there, part of the residency training.
3      Q.  Have you ever written and published in a
4  peer-reviewed journal anything pertaining to -- to
5  pathology or pathology research that you've done?
6      A.  No, I don't believe I have.
7      Q.  All right.  So did you apply to Mass
8  General's OB/GYN residency program?
9      A.  No, I did not.  Not as an initial
10 application.
11     Q.  Okay.  So where all did you apply because
12 you -- basically, you're leaving what would have been
13 a three-year residency program in pathology?
14     A.  That's right.
15     Q.  Okay.  And you did complete the one year?
16     A.  That's right.
17     Q.  Okay.  What were your grades like?
18     A.  There are no grades in a residency
19 program.  I was urged to stay, so it's not -- you
20 know -- I did well in the program.  My evaluations
21 were good.
22     Q.  Okay.  Where all did you apply to OB/GYN
23 residency?
24     A.  So I didn't apply to OB/GYN residency
25 programs.  I took an available position at what's now

Page 43

1  the university -- I think the University of Toledo
2  Medical College of Ohio.  And I moved there to spend
3  my first year as an intern in obstetrics and
4  gynecology there.
5      Q.  Why did you choose Medical College of
6  Ohio?
7      A.  Among the available programs, it was the
8  best program that I could be in.  Lou Weinstein, who
9  is chair of the department there, is known as a
10 former chair I think of the American College of
11 Obstetrics and Gynecology and a prominent person in
12 OB/GYN.  And so I thought it would be a good training
13 program.
14     Q.  Do you consider it a leading academic
15 medical institution?
16     MR. RUMANEK:  Object to form.
17     THE WITNESS:  I would say that it is a
18 leading academic medical institution.  It's not
19 Harvard University, but it's -- it provides a
20 ACGME accredited obstetrics and gynecology
21 training.
22 BY MS. WHITE:
23     Q.  Okay.  So why did you leave there after
24 one year?
25     A.  So as I mentioned, that was an available

Page 44

1  training program.  And sometimes in medical training,
2  you go where you must.  And when an opportunity arose
3  to be back in a place that I wanted to be, I for
4  personal reasons chose to pursue work at Boston
5  Medical Center where there was an available spot for
6  a person in second year of residency.
7      Q.  Okay.  So what do you mean by "for
8  personal reasons"?
9      A.  Well, there's certainly more to life than
10 work.  There are relationships and other aspects of
11 life that are compelling to almost everyone, and that
12 was true for me.
13     Q.  Okay.  So did you -- did you have a
14 significant other or family in Boston?
15     A.  I had significant attachments in Boston.
16     Q.  Okay.  So you leave Medical College of
17 Ohio, it's your testimony, because you had personal
18 relationships in Boston, and you wanted to get to
19 Boston?
20     A.  That's right.
21     Q.  Okay.  All right.  So you were at Boston
22 Medical Center from July 2000 to June of 2001.  And
23 then it looks like to me there's a break.
24     A.  There was no break.
25     Q.  Okay.  Then your CV is incorrect.

Page 45

1      A.  That's possibly true.
2      Q.  Okay.
3      A.  That's possibly true.  What I did there
4  was I completed a year of residency at Boston Medical
5  Center.
6      Q.  Okay.
7      A.  Part of that year involved three months
8  spent at Massachusetts General Hospital delivering
9  babies.
10     Q.  Okay.
11     A.  And during that time, I was recruited to
12 be part of the third year OB/GYN class at
13 Massachusetts General Hospital, Brigham and Women's
14 Hospital.  They had a vacancy, and I applied and was
15 accepted to be part of that program.
16     Q.  Okay.  So what I want you to do, Doctor,
17 is take a look at your CV.
18     A.  Yes.
19     Q.  And correct the mistake.  Because it says
20 here June 2000 through June 2001, you were a resident
21 OB/GYN Boston Medical Center.
22     A.  Yes.
23     Q.  And then we jump to July of 2002 --
24     A.  You're correct.  That 2 should be a 1.
25     Q.  Okay.

12  (Pages 42 to 45)

Samantha Joy Pulliam, M.D.

Page 46

1    A.  I was there for two years.
2    Q.  All right.  Makes sense.  So let's back up
3  for a second.
4    A.  Okay.
5    Q.  From -- in -- during your time at Medical
6  College of Ohio, did you surgically treat stress
7  urinary incontinence?
8    A.  I would say as an intern, it's possible
9  that I participated in cases that included stress
10  urinary incontinence, but that's not the major role
11  of an intern in any training program.
12    Q.  Okay.  Did you implant polypropylene mesh
13  devices during that time?
14    A.  I don't -- I don't recall.
15    MR. RUMANEK:  Wait, wait.  Make sure she
16  finishes her question.
17    THE WITNESS:  I'm sorry.
18  BY MS. WHITE:
19    Q.  Did you implant -- did you surgically
20  implant polypropylene mesh devices for the treatment
21  of stress urinary incontinence while you were at
22  Medical College of Ohio?
23    A.  I don't recall.  I'm considering my time
24  spent with the urogynecologist there, and I know I
25  did spend time with him, but I don't recall if he was

Page 47

1  performing those procedures at the time and that his
2  choice to perform them would be the only reason I
3  would have participated in a surgery.
4    Q.  Okay.  So you don't recall any experience
5  or exposure to polypropylene mesh devices during that
6  time at Medical College of Ohio?
7    MR. RUMANEK:  Object to form.
8  BY MS. WHITE:
9    Q.  You can answer.
10    A.  I don't recall.
11    Q.  Okay.  So then your opinions in this case
12  would not be based upon experience with polypropylene
13  mesh going back to 1999?
14    MR. RUMANEK:  Object to the form.
15    THE WITNESS:  I think that my experience
16  with polypropylene mesh may be not only based on
17  surgical experience.  Certainly, there is
18  literature that we have access to at that point,
19  in addition to teaching in didactics that I
20  would be exposed to in a residency program.
21  BY MS. WHITE:
22    Q.  Okay.  I don't understand your answer.
23    A.  So in a training program, there is
24  exposure on a number of levels.  There are senior
25  residents who perform with supervision procedures,

Page 48

1  and there are very junior residents who may observe
2  or interact with attending physicians about a number
3  of different things.  But they're rarely performing
4  things independently or actually doing almost
5  anything except perhaps a cesarean section which is a
6  different kind of focus for the intern.
7    So I don't necessarily recall actually
8  placing mesh myself, but I'm not sure that I would do
9  anything myself as an intern.  I know that that's not
10  the case.
11    Q.  All right.  So during your one year at
12  Boston Medical Center, did you become familiar with
13  or implant polypropylene mesh devices in women for
14  the treatment of stress urinary incontinence?
15    A.  So at Boston Medical Center, I know that
16  we were -- we meaning the larger Department of
17  Obstetrics and Gynecology -- using mesh implants.  I
18  participated in surgeries that were -- along with
19  urogynecologists there.  Whether I specifically
20  placed the mesh implants or assisted or were part of
21  that experience, yeah, I think so.
22    Q.  Okay.  Well, your expert report --
23    A.  Right.
24    Q.  -- which you submitted to the court in
25  this case --

Page 49

1    A.  Right.
2    Q.  -- says that you began placing mesh ten
3  years ago.
4    A.  That's right.
5    Q.  Okay.  So can I rely upon what you put in
6  your report or are you changing your testimony?
7    MR. RUMANEK:  Object to the form.
8    THE WITNESS:  So I think that ten years
9  ago was 2006, 2007.  And there are different
10  levels of placing mesh.  I would say that most
11  of the things that I did as a resident in
12  training were part of a learning process.  Sure,
13  I was involved, but I can't say that I would be
14  the primary person responsible for placing mesh.
15  BY MS. WHITE:
16    Q.  Okay.  So you're changing your testimony?
17    MR. RUMANEK:  No, she's not changing it.
18  Hold on just a sec.  She's not changing her
19  testimony.
20    MS. WHITE:  Okay.  I'm going to ask her
21  questions and give her plenty of opportunity to
22  explain.
23    MR. RUMANEK:  And that was commentary.
24  That wasn't a question.
25

13  (Pages 46 to 49)

Samantha Joy Pulliam, M.D.

Page 50

BY MS. WHITE:

Q. So to be clear, did you -- did you place polypropylene mesh -- surgically place polypropylene mesh for the treatment of stress urinary incontinence between June -- July 2000 and June 2001?

A. I participated in surgeries where polypropylene mesh was placed.

Q. Okay. And what types of surgeries did you participate in where polypropylene mesh was implanted? And, again, we're talking July 2000 through June of 2001.

A. So I would need to look at a case list from that point in time to tell you specific types of procedures that I participated in. Typical procedures that probably I participated in as a resident at that time would include suburethral slings and sacrocolpopexies.

Q. Do you remember what manufacturers' products you were using July 2000, June 2001 for these surgeries?

A. I couldn't be sure.

Q. And you say you would need a case list to know for sure. What do you mean by that?

A. So a case list would be a record of the patients that were involved in the care that I

Page 51

provided at the time.

Q. All right. So let's do it this way. How many surgeries were you involved in where mesh was implanted for the treatment of stress urinary incontinence from July of 2000 through June of 2001?

A. Anything that I would say would be a guess.

Q. Okay. Well, you're the expert. And you've just testified that you were involved in these surgeries --

A. Right.

Q. -- and all of this is a basis for your opinion.

A. Right.

Q. So I'm asking you how many were you involved in from July of 2000 through June of 2001?

MR. RUMANEK: To the best -- to best of your knowledge.

THE WITNESS: Right. So what you're asking me is to tell you when I was a second year resident in training how many procedures that I did involved mesh. Is that right?

BY MS. WHITE:

Q. Yes, ma'am.

A. Okay. I'm going to guess more than 20 and

Page 52

less than 40.

Q. Okay. And were you the lead surgeon implanting the suburethral slings?

A. As a second year resident in training, no, I was not.

Q. How much are you being paid for serving as an expert for J & J?

A. So the fees that I'm paid are determined by the University of North Carolina. And I believe they're about $600 an hour.

Q. Okay. So other than the suburethral slings, what was the other procedure that involved mesh?

A. Sacrocolpopexy.

Q. Okay. And what type of mesh product was used for that procedure?

A. Likely at that point, a polypropylene mesh or a Mersilene mesh, which is polyester.

Q. And how many of those procedures did you participate in from July of 2000 through June of 2001?

A. Probably -- probably five or less.

Q. Who was the head of that residency program?

A. The residency director was Callie

Page 53

Varaklis.

Q. Can you spell that last name?

A. I believe so. V-a-r-a-k-l-i-s.

Q. Okay. So now let's go to Massachusetts General Hospital. Oh, wait, first. Let me talk to you a little bit about your experience with the polypropylene sling procedures. How many complications were involved in the more than 20 less than 40 surgeries you were involved in?

MR. RUMANEK: Object to the form.

THE WITNESS: So how many complications were involved within that year?

BY MS. WHITE:

Q. Yes, ma'am.

A. I'll tell you a couple of things. One is that that one year in isolation was quite a long time ago so I'm not sure I could say reliably how many individual complications there were between 2000 and 2001.

Q. Yes, ma'am.

A. Yeah, I'm not sure I could say. I -- it would be very unreliable for me to do that, and I probably need to go back and look through the medical records of that list of cases to understand what the complication number was.

14  (Pages 50 to 53)

Samantha Joy Pulliam, M.D.

Page 54

1      Q. But you're not going to be able to have
2  access to that case list.
3      A. That's right.
4      Q. Right? You're not going to be able to
5  access the case list to know if you did more than 20
6  or less than 40, right?
7      A. That's correct.
8      Q. Okay. So let's go to July of 2001, June
9  of 2003. While I guess this would have been your
10  second year of a residency in OB/GYN?
11      A. So there would be an intern year and then
12  the year at Boston Medical Center, which would be the
13  second year. So this would be the third year of my
14  OB/GYN training. And, yeah, I guess the second year
15  of residency.
16      Q. So were you involved in the surgical
17  placement of polypropylene meshes for the treatment
18  of stress urinary incontinence during this time so --
19      A. Yes.
20      Q. -- July of 2001 -- June of 2003?
21      A. Yes.
22      Q. And did you perform those surgeries on
23  your own?
24      A. No.
25      Q. Okay. And who was your residency director

Page 55

1  at Mass General?
2      A. There were two different residency
3  directors at Mass General. And I'm not going to be
4  able to pull either name. It will come to me during
5  the course of this time.
6      Q. You say it will come to you?
7      A. I'm sure it will, but it's not on the tip
8  of my tongue right now.
9      MR. RUMANEK: Whenever it pops into your
10  head, it will be in the middle of an answer of
11  some other question, I'm sure.
12      THE WITNESS: It may be in the middle of
13  an answer to some --
14      MR. RUMANEK: You can say -- you can
15  answer it.
16  BY MS. WHITE:
17      Q. That will be fine. How many surgeries
18  were you involved in during this two-year period
19  involving mesh if you know?
20      A. I don't know exactly. What I can tell you
21  is that the American College of Graduate Medical
22  Education carries a minimum number of surgeries that
23  you're required to participate in to complete a
24  residency, and those are published every year.
25      And I graduated from residency program.

Page 56

1  And so I know that with confidence I met those
2  numbers. I don't know what those specific numbers
3  were then and I don't know what they are now. So
4  I -- was it more than 20 and less than 40? Possibly.
5      Q. But it didn't require you to use mesh in
6  the surgical procedures?
7      A. No, it did not. It did not. But I did
8  participate in surgeries that used mesh. I don't --
9  I can't, again, give you a number.
10      Q. Okay. Have you -- going back to your
11  pathology, have you ever worked as a pathologist at
12  any medical facility other than the one year that you
13  did your internship at Mass General?
14      MR. RUMANEK: Object to form.
15      THE WITNESS: So I believe you asked me
16  previously, and I've not been employed since I
17  was an instructor -- not an instructor -- what
18  is it, clinical something in pathology at
19  Massachusetts General Hospital.
20  BY MS. WHITE:
21      Q. Okay. And during your anatomic pathology
22  internship year, did you gain any sort of knowledge
23  or study polypropylene mesh explanted from a woman
24  who had been surgically implanted with that material?
25      A. Not to my recollection, no.

Page 57

1      Q. Okay. So you complete the OB/GYN
2  residency program at Mass General?
3      A. That's right.
4      Q. Now, could you have sat for board
5  certification after you completed your residency
6  program?
7      A. Board certification in?
8      Q. In OB/GYN?
9      A. So board certification for OB/GYN comes in
10  two steps. There's a written examination that you
11  are permitted to sit for at the conclusion of the
12  residency program. And I did sit for that within a
13  couple of weeks of the completion of the residency
14  program and passed that exam.
15      And then following that, there is the
16  requirement of the collection of what's called a case
17  list which basically is a record of your own
18  experience within certain categories to sort of
19  establish examples of your own practice. And then
20  there's an oral board examination that occurs
21  generally some years later after the completion of
22  the residency program.
23      So that's how I did it. I sat for the
24  available part of the written examination, and then I
25  took an oral examination some years later.

Samantha Joy Pulliam, M.D.

Page 58

```
1        Q.  Okay.  I think I understand that.  But you
2   could have taken the oral exam years earlier, right,
3   than what you did?
4        A.  So -- let me just look at what year I took
5   that.  There's a -- and it changes all the time
6   how -- what the length of time is between the time
7   you complete and the time you are allowed to complete
8   your case list, the time you take the written
9   examination and the time you're allowed to submit
10   your case list.
11        And it may have been -- and then also the
12   American College of Obstetrics and Gynecology for a
13   while did not allow individuals who participated in
14   fellowships to take the board examination while they
15   were in a fellowship.  And then there are individual
16   fellowships that won't allow you to take the board
17   examination.  So I would say that I took the board
18   examination as soon as I was able to do so.
19        Q.  Okay.  And are you board-certified in -- a
20   board-certified OB/GYN?
21        A.  I am.
22        Q.  Okay.  All right.  So after Mass General,
23   then you I guess applied for or compete for a
24   fellowship in female pelvic medicine and
25   reconstructive surgery at Mount Auburn?
```

Page 59

```
1        A.  That's correct.
2        Q.  And am I correct that that was something
3   you had to compete for?
4        A.  Right.  So there -- compete is a -- I
5   guess it's competition.  I mean, the Mount Auburn
6   Hospital actually was not sure if they were going to
7   offer a fellowship at the time.  And so once they
8   determined I think they were going to do that, I did
9   interview there, and they invited me to be there.
10        So I guess in a way that you would compete
11   for another job there's competition there.  I don't
12   know who my competition was.
13        Q.  Okay.  Did you apply for other fellowships
14   in addition to the one at Mount Auburn?
15        A.  I did, I did.
16        Q.  And did you get into other fellowships?
17        MR. RUMANEK:  Object to form.
18        THE WITNESS:  So --
19   BY MS. WHITE:
20        Q.  Fellowship programs?
21        A.  Right.  So the match system isn't such
22   that you get into -- it's not where you get -- you
23   don't get multiple job offers necessarily.
24        Q.  Okay.  So I guess what I'm asking you was
25   Mount Auburn Hospital, this fellowship program in
```

Page 60

```
1   female pelvic medicine and reconstructive surgery,
2   was this your first choice?
3        A.  No, it wasn't my first choice.
4        Q.  Okay.  What was your first choice?
5        A.  I think I wanted to go to Oregon.
6        Q.  Okay.  And why did you go want to go to
7   Oregon?
8        A.  Adventure.
9        Q.  Okay.  So what stopped you from going to
10   Oregon?
11        A.  I wasn't offered the position.
12        Q.  Okay.  And what position would that have
13   been?
14        A.  It would have been a similar fellowship at
15   Oregon Health Sciences University.
16        Q.  Okay.  Do you remember any of the
17   manufacturers of the polypropylene mesh devices that
18   you surgically implanted to women during your time at
19   Mass General?  I understand you weren't the lead
20   surgeon, but the cases you were involved in?
21        A.  Not off the top of my head, no.  I
22   think -- no, not off the top of my head.
23        Q.  Okay.  Do you mean that it might come to
24   you or --
25        A.  No.
```

Page 61

```
1        Q.  Or you just don't know?
2        A.  I don't mean that it might come to me.  I
3   think more I mean that I wasn't necessarily familiar
4   with the brands of anything at that point.  I mean,
5   in a residency program, you know, those are things
6   that are brought to you, not that you select.  And
7   their selection process is really dependent upon the
8   attending physician who does that selection.
9        Q.  Okay.  So during your residency program at
10   Mass General, July 2001 through June of 2003, what
11   were the surgical options for stress urinary
12   incontinence, back 2001-2003.
13        A.  So do you mean the ones that were to my
14   knowledge available at Massachusetts General
15   Hospital?
16        Q.  Yes, ma'am.
17        A.  Okay.  So I would say that the ones I
18   participated in were suburethral slings and
19   urethropexies, Burch urethropexy.  Were you only --
20   I'm sorry -- specifically asking about urinary
21   incontinence or --
22        Q.  Yes.
23        A.  Yeah, I think -- and possibly a collagen
24   injection into the urethra.  There may have been
25   other options that I wasn't exposed to that are
```

16  (Pages 58 to 61)

Samantha Joy Pulliam, M.D.

## Page 62

1  available. It's hard for me to comment on the
2  expertise of physicians practicing there over and
3  above the things that I participated in, but that
4  doesn't mean they weren't there.
5  　　Q.　Just so the record's clear, though, during
6  your time at Mass General, is that where you first
7  received training in the diagnosis and treatment of
8  stress urinary incontinence or did that start back at
9  the Medical College of Ohio?
10  　　A.　Right. I think that probably started back
11  at the Medical College of Ohio. Every year of
12  residency has sort of a different focus. Doesn't
13  mean that you're not exposed to the other things, but
14  the first year of residency, you might pick up some
15  things about urinary incontinence, but it might more
16  uniquely pertain to patients who are pregnant.
17  　　Q.　Okay. All right. So you're first
18  introduced to diagnosis and treatment of stress
19  urinary incontinence during your -- at Medical
20  College of Ohio?
21  　　A.　And actually, I mean, the truth is that
22  within the context of my residency training, that
23  would be my first exposure. But I think, you know,
24  medical school certainly provides exposure to that as
25  well.

## Page 63

1  　　Q.　Okay. All right. But during that first
2  year of the internship, that first year at Medical
3  College of Ohio, is that -- was that the first time
4  that you -- you were active in the diagnosis and
5  treatment of a patient who had stress urinary
6  incontinence?
7  　　A.　I -- possibly. I mean, I think as a
8  medical student, I participated in both urology and
9  OB/GYN courses. So as a medical student, to the
10  extent that medical students are, I would have been
11  involved in the exposure to evaluation and treatment
12  of those patients.
13  　　Q.　All right. Your fellowship began in July
14  of 2003. Who -- who was the director of this
15  fellowship program?
16  　　A.　Peter Rosenblatt.
17  　　MR. RUMANEK: Kim, we have been going
18  about an hour. Whenever it's a good time for a
19  break.
20  　　MS. WHITE: We can take a break now.
21  　　(A recess transpired from 11:48 a.m.
22  　　until 11:55 a.m.)
23  BY MS. WHITE:
24  　　Q.　All right. So let's talk about your
25  fellowship. I think you just testified that it's

## Page 64

1  Peter Rosenblatt who was the fellowship director?
2  　　A.　That's correct.
3  　　Q.　Okay. And tell me a little bit about the
4  difference between a fellowship and a residency
5  program.
6  　　A.　So I think the difference between the
7  programs really has to do with what the focus is.
8  Obstetrics and gynecology is a discipline, and there
9  is a certain sort of criteria for training that is
10  determined by the American College of Graduate
11  Medical Education and also by the American Board of
12  Obstetrics and Gynecology. And so training programs
13  are designed to fulfill those requirements with
14  regard to the topics included in obstetrics and
15  gynecology. Female pelvic medicine and
16  reconstructive surgery is a smaller area within the
17  field of obstetrics and gynecology.
18  　　And so fellowship training there is
19  designed to meet those standards or specific
20  educational objectives and to allow someone to
21  fulfill all the requirements for board certification
22  for those things. The focus is narrower generally in
23  a fellowship and there's some effort to do a little
24  bit of a deeper dive into some, in this case,
25  specific surgical techniques and maybe some more --

## Page 65

1  more specific and definitive knowledge on specific
2  areas.
3  　　A general obstetric --
4  obstetrician/gynecologist might know some things
5  about urinary incontinence, for example. A female
6  pelvic medicine and reconstructive surgeon would be
7  expected to know more, again have more experience in
8  surgery based on their fellowship training.
9  　　Q.　Okay. During your fellowship at Mount
10  Auburn with Dr. Rosenblatt, I guess he was your boss,
11  right?
12  　　A.　He was a fellowship director, correct.
13  　　Q.　Yeah. Did you diagnose and treat stress
14  urinary incontinence?
15  　　A.　With his oversight, yes.
16  　　Q.　Okay. Yeah. So let's talk about that.
17  Did you have your own patients during this fellowship
18  program?
19  　　A.　So not at the beginning, but as things
20  developed, yes. There are different criteria for
21  oversight that are part of a training program.
22  　　For example, for someone who has limited
23  experience there might be direct oversight. The
24  patient that I see I see, and the attending physician
25  is there watching every word I say, correcting every

Golkow Technologies, Inc - 877.370.3377

Samantha Joy Pulliam, M.D.

Page 66

1    word I say, so forth. As you grow in your
2    experience, that responsibility changes from being,
3    you know, direct oversight to indirect oversight and
4    then to consultation as you sort of mature through
5    the training process.
6        Q.  Okay.  Well, let's break it down by year.
7    Year July 2003 to July 2004, did you see -- did you
8    have your own patients that you diagnosed and treated
9    for stress urinary incontinence?
10       A.  I don't believe I did.
11       Q.  Okay.  So July 2004 to July 2005, did you
12   have your own patients that you diagnosed and treated
13   for stress urinary incontinence?
14       A.  So I think the answer there is possibly,
15   but let me just offer a caveat here that when you say
16   "my own," I think there are sort of degrees of that.
17   One would be in a sense of billing, right, did I sign
18   the billing form so that I personally was sort of
19   reimbursed and held accountable for that or did Peter
20   Rosenblatt or one of the other doctors there do that.
21   And those specific things, which would be one of the
22   criteria in training that I would think of as my own,
23   those things are evolving as well.
24       For example, now, in a fellowship training
25   program, at no time during the three years of

Page 67

1    fellowship is a fellow ever independently billing.
2    At the time that I was a fellow then, the rules were
3    a little bit different.  But the oversight was not
4    dependent upon those billing rules.
5        So, you know, as I made my way through my
6    second year, I think there were more situations in
7    which I behaved not with direct oversight but with
8    indirect oversight.  And a fellowship is really
9    defined by the oversight.  So the second year has
10   less oversight than the first year.
11       Q.  Okay.  That makes sense.  And then the
12   third year and what I'm really talking about is where
13   you are the physician that's along with the patient
14   making the decisions and directing the care.  Okay?
15       So by year three, did you have your own
16   patients where you're directing the care?
17       A.  So I saw patients separate from Peter
18   Rosenblatt.  But I never operated independently to my
19   recollection on patients who had urinary incontinence
20   or pelvic organ prolapse.  And so all of the patients
21   would still cycle through the oversight of Peter
22   Rosenblatt or one of the other urogynecologists
23   there.
24       Q.  Did you have a good relationship with
25   Dr. Rosenblatt?

Page 68

1        A.  I would say yes.
2        Q.  Okay.  And are you still in touch with him
3    today?
4        A.  Sure.
5        Q.  Okay.  Are you all friends?
6        A.  We're colleagues.  I mean, yes, I think
7    we're friends.
8        Q.  Okay.  And I think you talk in your
9    report, he's -- he's someone that you -- is it fair
10   to say he's someone you look up to?
11       A.  I regard him highly, yes.
12       Q.  Okay.  And has he been a mentor of yours
13   in the area of female reconstructive surgery?
14       A.  Absolutely.  I mean, I think that's what
15   it means to have a relationship as a trainer and a
16   trainee.  It certainly is true that the longer you go
17   after you've been away from your training, the more
18   you develop your own independent style.  But there
19   are probably still things I would talk with him about
20   if they came up.
21       Q.  And, well, do you view him as someone who
22   has certainly helped you -- helped you advance your
23   career?
24       MR. RUMANEK:  Object to the form.
25       THE WITNESS:  So yes and no.  I mean, I

Page 69

1    think he has certainly supported me and, when
2    called upon, given me advice and opportunity.
3    On the other hand, I mean, quite frankly, I've
4    worked hard to advance my own career.  And --
5    you know, I think that's -- that's the way --
6    the way it works.
7    BY MS. WHITE:
8        Q.  Well, has he ever served as like a
9    reference for you in a professional capacity?
10       A.  I think actually as part of the fellowship
11   director, he has to.
12       Q.  Is that a yes?
13       A.  Yes.  That's a yes.
14       Q.  And during this fellowship, and correct me
15   if I'm wrong, is -- is this the first time that you
16   utilized the Ethicon TVT product?  And we agreed that
17   TVT means TVT Retropubic.
18       A.  To be honest, as we said before, I wasn't
19   100 percent aware of the brands of the products that
20   were used at Massachusetts General Hospital or at
21   Brigham and Women's Hospital where I also operated,
22   and so I couldn't say absolutely.  I know that we did
23   use Ethicon products then.  But I don't -- I can't
24   say for sure that I didn't use them previously.
25       Q.  Well, did you have contact or

18  (Pages 66 to 69)

Samantha Joy Pulliam, M.D.

Page 70

1  communications with Ethicon sales reps during your
2  fellowship program?
3      A.  So within the context of my fellowship
4  program, there was certainly contact on the part of
5  the practice.  Peter Rosenblatt, other physicians,
6  attendings in the practice with Ethicon.  And I was
7  associated with them, whether I was assisting in
8  surgery, conversing with the reps in those contexts,
9  possibly I did.
10     Q.  Let's do it this way.
11     A.  Okay.
12     Q.  Because you're serving as an expert --
13     A.  Right.
14     Q.  -- testifying about the safety and
15  efficacy of TVT and TVT-O on behalf of Ethicon; is
16  that right?
17     A.  That's correct.
18     Q.  Okay.  So when is the first time that you
19  recall using -- knowing that you were using a TVT-O
20  product for the surgical treatment of stress urinary
21  incontinence?
22     A.  So I'm not sure I could put an actual date
23  on it, but that was definitely within my fellowship.
24  In other words, I couldn't say it was this date at
25  this time.  I -- there's just no way I can do that.

Page 71

1  It's been too long and it's not something that I
2  would keep track of in my head.
3      Q.  So you're testifying that you don't know
4  when you first used the TVT product?
5          MR. RUMANEK:  Object to the form.
6      Mischaracterizes her testimony.
7  BY MS. WHITE:
8      Q.  Please clear it up for me.
9      A.  I am testifying that during the course of
10  my fellowship, I did use Ethicon products.  I am not
11  sure that I can give you a specific date.
12     Q.  I'm not asking for a specific date.
13         MR. RUMANEK:  But she's answered
14     generally.
15  BY MS. WHITE:
16     Q.  Okay.  Did you use the TVT product for the
17  surgical treatment of stress urinary incontinence
18  during your fellowship program?
19     A.  Yes.
20     Q.  Did you use the TVT-O product during your
21  fellowship?
22     A.  Yes.
23     Q.  Okay.  And how did you become familiar or
24  introduced to the TVT medical device?
25     A.  Familiar in the sense of what?

Page 72

1      Q.  Well, how did you learn about it?  Like
2  was it something that Mount Auburn stocked and you
3  were forced to use it?  How do you recall becoming
4  familiar with the product for the first time?
5      A.  So there are probably a number of ways
6  that I became familiar with the product.  One would
7  be that at the time, this is when slings, Ethicon and
8  others, were becoming more commonly used.  And so
9  there was a buzz, right?  Whether that's with my
10  fellow trainees or with attendings, both within my
11  fellowship or outside, would talk about them.  They
12  were -- there was information present in didactic
13  sessions.
14     We did use the products and we had
15  representatives provide teaching and those sorts of
16  educational opportunities during that time.  There
17  were presentations at national conferences and
18  probably advertising booths at national conferences,
19  although I don't recall any of those specifically.  I
20  don't generally spend a lot of time in those places.
21  But those are all opportunities for me to become
22  aware of Ethicon and Ethicon products.
23     I think Ethicon is a leader in these types
24  of products.  So certainly they were one of the most
25  common that we were exposed to during that time --

Page 73

1  that I was exposed to during that time.
2      Q.  Do you know whether or not Dr. Rosenblatt
3  was a paid consultant for Ethicon during the years
4  you were in the fellowship program, July 2003 to June
5  of 2006?
6      A.  I've never been privy to Dr. Rosenblatt's
7  financial arrangements.
8      Q.  Is that a yes or a no?
9      A.  No, I don't know.  I don't know.
10     Q.  Would -- is that something you would have
11  wanted to known back July 2003-2006 whether or not
12  your fellowship director had a business relationship
13  with Ethicon?
14         MR. RUMANEK:  Object to form.
15         THE WITNESS:  What I would say that I did
16     know about Peter Rosenblatt was that he is a
17     businessman in addition to an excellent
18     physician and an excellent teacher, and I knew
19     that he had financial arrangements, as I assume
20     that most people who did teaching for companies
21     that did these mesh products have financial
22     arrangements.
23     I couldn't tell you the nature of the
24  financial arrangement, with whom he had them or how
25  much money he made.  But I assumed that there were

Samantha Joy Pulliam, M.D.

Page 74

1   some of those there, but that's an assumption on my
2   part, not based on any specific information that
3   Dr. Rosenblatt gave me. And so would it have made a
4   difference that he had a specific arrangement with
5   Ethicon? No.
6          Q. Do you think having a paid relationship
7   with a pharmaceutical company or a medical device
8   company makes a physician biased for or against a
9   product?
10         MR. RUMANEK: Object to the form.
11         THE WITNESS: So I think to a great
12   degree, it's important for physicians to
13   interact with pharmaceutical companies and that
14   that doesn't necessarily make someone a biased
15   person. I think that the question of bias is
16   really a hard one to figure out specifically and
17   there are many different things that go into it.
18   Bias may be present because someone really
19   thinks a good -- a procedure is good.
20         And then there's bias -- you know, whether
21   that's because there's been financial incentive,
22   that's another question. That's certainly
23   another kind of bias, but there are many kinds
24   of bias.
25

Page 75

1   BY MS. WHITE:
2          Q. Do you think that -- or let me ask you
3   this: Did Dr. Rosenblatt's endorsement of TVT and
4   TVT-O during your fellowship impact your decision to
5   utilize TVT and/or TVT-O as a form of treatment for
6   stress urinary incontinence?
7          MR. RUMANEK: Object to form.
8          THE WITNESS: So within the context of my
9   fellowship, Ethicon was certainly not the only
10   set of products that I was exposed to. In fact,
11   I probably couldn't name all of the types of
12   products that I was exposed to during my
13   fellowship even with regard to retropubic
14   slings. So I would have to say no, that's not
15   probably where or why I decided to use Ethicon
16   products.
17   BY MS. WHITE:
18         Q. Okay. So your testimony is that
19   Dr. Rosenblatt had nothing to do with your decision
20   to utilize TVT or TVT-O?
21         A. That was not my testimony.
22         MR. RUMANEK: Hold on. Just let me object
23   to the form. Mischaracterizes her testimony.
24   BY MS. WHITE:
25         Q. So your testimony is that Dr. Rosenblatt

Page 76

1   had nothing to do with your decision to use TVT or
2   TVT-O during July of 2003 through June of 2006 for
3   the treatment of stress urinary incontinence?
4          MR. RUMANEK: Object to the form.
5   She's -- her testimony is what her testimony is.
6   If you want to ask her a question. Her
7   testimony speaks for itself.
8   BY MS. WHITE:
9          Q. So let me ask you that again because I'm
10   not sure I got your answer. I'm really not, Doctor.
11   And I apologize.
12         Did Dr. Rosenblatt --
13         MR. RUMANEK: Hold on. Why don't you --
14   the question -- reread the answer.
15         MS. WHITE: I'm going to ask a new
16   question.
17         MR. RUMANEK: Okay.
18         MS. WHITE: This is my deposition. I'm
19   certainly allowed to do that.
20   BY MS. WHITE:
21         Q. So did Dr. Rosenblatt have anything to do
22   with your decision to utilize TVT or TVT-O for the
23   surgical treatment of stress urinary incontinence
24   between July of 2003 and June of 2006?
25         MR. RUMANEK: Object to the form.

Page 77

1          THE WITNESS: Dr. Rosenblatt exposed me to
2   a broad variety of brands and options for the
3   treatment of stress urinary incontinence. And
4   as my teacher, certainly influenced both my
5   expertise and my selection of products in that
6   way.
7   BY MS. WHITE:
8          Q. Do you know whether or not Dr. Rosenblatt
9   has ever received education grants from Ethicon?
10         A. I don't know.
11         Q. Do you know whether or not Dr. Rosenblatt
12   has ever received research funding from Ethicon?
13         A. I don't know.
14         Q. If you were aware that during your years
15   that you were in the fellowship program that he was
16   receiving hundreds of thousands of dollars from
17   Ethicon, would that have influenced your perspective
18   of TVT, TVT-O or other Ethicon products for the use
19   of stress urinary incontinence?
20         MR. RUMANEK: Object to the form.
21         THE WITNESS: My opinion of Dr. Rosenblatt
22   is a broad-based opinion based on my
23   interpersonal relationship with him. So no, I
24   don't -- I don't think that information would
25   have added or detracted anything from what I

20  (Pages 74 to 77)

Samantha Joy Pulliam, M.D.

Page 78

1      already know of Dr. Rosenblatt.
2    BY MS. WHITE:
3      Q.  I didn't ask you about Dr. Rosenblatt.  I
4    said, if you would have been aware during your
5    fellowship years that he was receiving hundreds of
6    thousands of dollars as a paid consultant for
7    Ethicon, would that have influenced whether or not
8    you used TVT and TVT-O for the treatment of stress
9    urinary incontinence in your patients?
10      MR. RUMANEK:  Object to the form.  Asked
11    and answered.
12      THE WITNESS:  My decision to use TVT and
13    TVT-O in my patients was based on my
14    understanding of the literature and my
15    experience with the product as I had in
16    residency, so, no, it wouldn't have.
17    BY MS. WHITE:
18      Q.  So according to your expert report, during
19    your fellowship, you yourself attended training that
20    was put on by GyneCare and Ethicon?
21      A.  Yes.
22      Q.  So that's correct, you -- while you were a
23    fellow, you attended GyneCare Ethicon training?
24      A.  That's correct.
25      Q.  Okay.  And did you attend that training to

Page 80

1    possible that I attended a cadaver lab as --
2    regarding a Prolift or one of the other mesh
3    implantation devices.
4      Q.  And you were a big Prolift user, right?
5      MR. RUMANEK:  Object to the form.
6      THE WITNESS:  I'm not sure what "big"
7    means, but no, I wouldn't say that I was a big
8    Prolift user.
9    BY MS. WHITE:
10      Q.  When was the last time that you surgically
11    implanted a Prolift device in a patient?
12      A.  Wow.  So -- I probably did a few of them
13    after I began my position at Massachusetts General
14    Hospital which would have been in 2006, I believe, so
15    probably over the course of a year or two at Mass
16    General, I may have done five to ten of them.
17      Q.  Okay.
18      A.  Maybe -- probably more on the order of
19    five.
20      Q.  All right.  Let's go back to TVT.  Please
21    tell the jury when you were first trained to
22    surgically implant TVT in a patient for stress
23    urinary incontinence.  When did you first get trained
24    to do that?
25      A.  So I think that training is something that

Page 79

1    learn how to surgically implant TVT?
2      A.  No, I didn't.
3      Q.  Okay.  So during your fellowship years,
4    when you attended these GyneCare Ethicon professional
5    education activities, what were you learning how to
6    do?  What product was that for?
7      A.  So to my recollection, there were a number
8    of reasons that I might have attended an Ethicon
9    training course.  Part of that was that I was a
10    fellow of Peter Rosenblatt and he was involved in
11    those trainings and so I accompanied him or went
12    along with him.
13      Some of those things were opportunities to
14    further the technique that I was already learning in
15    the course of my training, whether that was a
16    retropubic sling or a transobturator sling, which is
17    I think the thing I most often remember.
18      I was able to do that on cadavers which is
19    a completely different experience than performing it
20    on a patient.  And so while I did not learn or
21    perfect my technique, I think understanding anatomy
22    is a lot wiser to do on a cadaver specimen than it is
23    on a sleeping patient.  So those were opportunities
24    to -- for further education.  They weren't what
25    helped me learn to do the procedures.  It's also

Page 81

1    happens as a gradual process.  So first trained is
2    probably -- that makes it sound as though or I would
3    assume that something where you have this experience
4    and then you go do it, and that's never the case in
5    surgical training.  Surgical training is a long
6    process, happening over the course of years.
7      And so I would say that I was first
8    trained to do such a procedure during my fellowship,
9    beginning from the first time Ethicon products were
10    used probably during the first year of my fellowship
11    and until the conclusion of my fellowship.  So over
12    three years I was first trained to do this procedure.
13      Q.  Okay.  When's the first time, Doctor, you
14    recall, using the TVT device.
15      A.  I don't think I have a first recollection.
16      Q.  Okay.  Fair enough.  And so you're going
17    to stick to that.  You don't recall when you first
18    remember using the TVT device?
19      MR. RUMANEK:  Object to the form.  Asked
20    and answered.
21      THE WITNESS:  I don't think I could
22    identify a time when I wasn't.  You know, it's
23    like asking me when I first did a cesarean
24    section.  I've done them through my training.  I
25    don't remember the first time, but I do know

21 (Pages 78 to 81)

Samantha Joy Pulliam, M.D.

Page 82

1    that over the course of several years, I learned
2    to do it.
3    BY MS. WHITE:
4        Q.  Okay.  Who trained you to surgically
5    implant the TVT device in a woman for the treatment
6    of stress urinary incontinence?
7        MR. RUMANEK:  Object to the form.
8        THE WITNESS:  So I've had many educators,
9    trainers, teachers over the years.  Peter
10   Rosenblatt was certainly a great part of that.
11   Tony DiScuillo, who was another physician at my
12   fellowship, was certainly a part of that.  May
13   Wakamatsu, with whom I trained at Massachusetts
14   General Hospital, was a part of that.  Joan
15   Bengtson, who was at Brigham and Women's
16   Hospital, was certainly a part of that.
17   BY MS. WHITE:
18       Q.  Is it fair to say, and I think this is
19   what you've testified to, you first received training
20   on the TVT during those fellowship years?
21       MR. RUMANEK:  Object to the form.
22       THE WITNESS:  Yes, that's fair to say.
23   BY MS. WHITE:
24       Q.  Okay.  How about TVT-O?  Okay?  When were
25   you first trained to use the TVT-O device?

Page 83

1        A.  During my fellowship.
2        Q.  Okay.  Did you receive any training on the
3    surgical implantation of the TVT device from Ethicon
4    directly?
5        A.  Not to my recollection.  I believe that --
6    and I guess it really depends on what you mean by
7    "directly."  I spent most of my time as a surgical
8    trainee in the operating room -- all my time as a
9    surgical trainee in the operating room with other
10   attending physicians who were primarily responsible
11   for my training.
12       You know, Peter Rosenblatt worked with
13   Ethicon.  And so as he -- as much as he taught me to
14   do that, you know, I've had some training with Ethicon
15   in the process.  But I would never say that I was
16   directly trained to do the TVT by Ethicon.
17       Q.  Okay.
18       A.  TVT-O, I mean.
19       Q.  TVT or TVT-O?
20       A.  TVT-O is what you asked me about, I think.
21       Q.  No, I asked you about TVT, but let's talk
22   about TVT-O.
23       MR. RUMANEK:  I think she said both.
24       THE WITNESS:  Right.  I said both.
25

Page 84

1    BY MS. WHITE:
2        Q.  Okay.  So it's your testimony that you did
3    not receive direct training from Ethicon for the
4    surgical implantation of TVT or TVT-O?
5        MR. RUMANEK:  Object to the form.  Asked
6        and answered.
7    BY MS. WHITE:
8        Q.  I just -- I'm trying to pin down your
9    testimony.  It's usually not this hard, but I'm
10   sorry.  Just did you receive direct training from
11   Ethicon?
12       MR. RUMANEK:  So she's already -- she
13       answered that question.  You can answer it
14       again.
15       THE WITNESS:  One of the reasons that this
16   may be difficult is that I have come to use both
17   TVT and TVT-O through the course of my residency
18   and then fellowship training.  So part of that
19   is not any different from learning any other
20   surgical procedure that does or does not involve
21   a medical device.  So these are very gradual
22   processes over a long period of time.
23       And it's not, as I think back over my
24   experience in learning to do these procedures,
25   the question of whether I was trained to do this

Page 85

1    by Ethicon is almost a moot point.  I was
2    trained over many years to do the procedure by a
3    broad variety of providers and trainers.  And
4    it's a very difficult for me to say, Ethicon
5    trained me to do that because that just wouldn't
6    be accurate.
7    BY MS. WHITE:
8        Q.  After you left your fellowship and went on
9    to work at Mass General?
10       A.  That's right.
11       Q.  Okay.  Did you begin to regularly use TVT
12   and TVT-O to surgically treat stress urinary
13   incontinence in your patients?
14       A.  Yes, I have regularly used TVT and TVT-O.
15       Q.  Okay.  So in the course of all these years
16   of training through Rosenblatt, your fellowship, the
17   other folks you mentioned who are also mentioned in
18   your expert report, did you as part of your training
19   rely upon the instructions for use, the IFU?
20       A.  In what manner?
21       Q.  Is that something that also was a basis or
22   a knowledge base for you in terms of using TVT or
23   TVT-O in a patient?  Is that something you relied
24   upon and turned to?
25       A.  Not particularly, no.

22  (Pages 82 to 85)

Samantha Joy Pulliam, M.D.

Page 86

1    Q. Okay. What do you think is the purpose of
2  the IFU?
3    A. So I believe that the IFU has some
4  purposes. One is to fulfill government requirements
5  for the production of such with the creation of a
6  medical device. And then I think in the case of this
7  particular type of IFU, it's targeted at physicians
8  who are experienced in the treatment of stress
9  urinary incontinence as a discussion and a
10  presentation of the generals of the procedure.
11    Q. Do you think it's important that the IFU
12  is accurate in the information that's contained
13  therein?
14    MR. RUMANEK: Object to the form.
15    THE WITNESS: I think that it is important
16  that the IFU offers accurate information.
17  BY MS. WHITE:
18    Q. Okay. Let me ask you this: Are you
19  familiar with a doctor by the name of Vince Lucente?
20    A. I know a Vince Lucente, yes.
21    Q. Are you friends with him?
22    A. Absolutely not. I've met him on maybe one
23  occasion.
24    Q. Okay. Have you ever attended any of his
25  training sessions for any Ethicon product?

Page 87

1    A. I'm not sure whether it was his training
2  session. It's possible that he was present at a
3  training session that I attended.
4    Q. But as you sit here today, do you have a
5  recollection of any specific training session on any
6  specific product that you attended with Vince
7  Lucente?
8    A. No, I couldn't say specifically. I
9  believe he may have been present at one of the
10  Prolift -- or at the Prolift session I think I went
11  to. But I am -- I couldn't tell you where it was or
12  when it was or any more specifics about that.
13    Q. So you do think that you went to a
14  company-sponsored training program for Prolift?
15    A. I believe so.
16    Q. Okay. So let's go back a little bit.
17  During your fellowship years, what were the surgical
18  treatments for stress urinary incontinence involved
19  in your practice?
20    A. Involved in my training?
21    Q. Involved in your training. But you're a
22  licensed medical doctor during your fellowship years,
23  right?
24    A. That's correct.
25    Q. So 2003 to 2006, you know, what were the

Page 88

1  surgical procedures that you offered patients for
2  stress urinary incontinence?
3    A. So from 2003 to 2006, the surgical
4  procedures that I offered patients were almost
5  exclusively guided by the advice and input of the
6  physicians that are overseeing my training. So
7  within that context, there were TVT and TVT-O were
8  the equivalent in some other brand so retropubic and
9  transobturator slings.
10    There were laparoscopic urethropexies,
11  primarily the Burch procedure. There were
12  pubovaginal slings, typically composed of rectus
13  fascia. And there were abdominal or open Burch
14  procedures.
15    Q. Okay.
16    A. And also periurethral bulking procedures
17  so Coaptite. Occasionally a collagen injection. And
18  I think that's all.
19    Q. Okay. So what were some of the other
20  sling products that you used during your fellowship,
21  2003 to 2006, for -- other than Ethicon products?
22    A. Hmm. Probably a Bard procedure. I'm not
23  going to remember names. I'm just not good with
24  them, and they never were important to me.
25    Q. What about the ProteGen sling? Did you

Page 89

1  ever use that?
2    A. Maybe. The name is familiar to me, but I
3  don't know if that's because I heard it in the
4  literature or in the conversation or because we
5  actually did one.
6    Q. Are you aware of any complications with
7  the use of the ProteGen sling?
8    MR. RUMANEK: Object to the form.
9    THE WITNESS: Not off the top of my head.
10  BY MS. WHITE:
11    Q. Were you aware that it was one of the
12  first polypropylene mid-urethral slings pulled off
13  the market?
14    MR. RUMANEK: Object to the form.
15    THE WITNESS: No.
16  BY MS. WHITE:
17    Q. So other than your reliance upon your
18  fellowship directors, how did you make the decision
19  after you left the fellowship program to start using
20  TVT for the treatment of stress urinary incontinence?
21    A. So I think it's multifactorial decision.
22  One of the things that is true is that in the greater
23  body of literature, even at that time, TVT was one of
24  the primarily researched slings. And that body of
25  research has almost certainly grown since that time.

23 (Pages 86 to 89)

Samantha Joy Pulliam, M.D.

Page 90

1 But I felt that it would be prudent to choose a sling
2 about which there is a significant body of literature
3 supporting its use.
4 　　　In addition to that, at institutions like
5 Mass General, the negotiation and understanding of
6 what's used is part of deciding with your colleagues
7 and partners who also use that even across hospitals
8 which brands will be used and what we kept on the
9 shelf. So I was actually happy to note that those
10 were the ones that were there.
11 　　Q. You were happy to note that?
12 　　A. I was.
13 　　Q. And why is that?
14 　　A. Because, again, my exposure to the
15 literature and my experience and training led me to
16 understand that I felt comfortable performing
17 retropubic slings using those -- and transobturator
18 slings using those techniques, and so I was happy to
19 continue to use those things that I thought were best
20 used in my hands.
21 　　Q. Well, back in 2006, after you're done
22 training, you're now at Mass General, what literature
23 specifically were you relying upon that gave you that
24 level of comfort, that made you happy that this was
25 stocked on the shelves?

Page 91

1 　　MR. RUMANEK: Object to form.
2 　　THE WITNESS: So I think it would be hard
3 　　for me to point to one specific study. I think
4 　　there, even at that time, were multiple case
5 　　series dating back many years to follow along
6 　　patients with retropubic slings, and I think the
7 　　mass -- the total mass of the literature at that
8 　　point would probably be part of that.
9 　　　I mean, we could do a Medline search that
10 　　ended at 2006 and I can tell you to some degree
11 　　which ones I looked at if you would like, but I
12 　　think it would be unfortunate for me to choose
13 　　only one because there are many.
14 BY MS. WHITE:
15 　　Q. Well, I've only got a few hours with you
16 here today, and you're getting paid $600 an hour as
17 an expert for Ethicon as a general urogyn expert for
18 TVT and TVT-O. So can you recall what literature
19 specifically, if there's one that stands out to you
20 back in 2006, that gave you the comfort level to use
21 TVT in your patient population?
22 　　MR. RUMANEK: I'm going to object to the
23 　　form of the question. Asked and answered and to
24 　　the commentary and argument with the witness.
25

Page 92

1 BY MS. WHITE:
2 　　Q. You can answer, Doctor.
3 　　A. Okay. I think it would be very difficult
4 for me to choose one.
5 　　Q. Okay.
6 　　A. One of the things about the TVT is that
7 there's so much literature here. It's really -- I
8 think I would be mistaken to choose any one.
9 　　Q. Okay. What about TVT-O? What if any
10 specific article, clinical trial, literature, level 1
11 evidence, did you rely upon to -- that gave you that
12 comfort level to start using TVT-O in your patient
13 population?
14 　　MR. RUMANEK: Are you asking just about
15 　　level 1 or the other things?
16 BY MS. WHITE:
17 　　Q. Just, yeah, any piece of literature. I
18 assumed it would be level 1, but maybe it's not.
19 What -- what other than your training with Rosenblatt
20 did you rely upon, okay, to start using TVT-O in your
21 patient population?
22 　　MR. RUMANEK: Object to the form.
23 　　THE WITNESS: So I think there a lot of
24 　　things that lead you to start using something.
25 　　And I'll also observe that one of the challenges

Page 93

1 with new technology is trying to figure out
2 where and how to utilize it in your practice or
3 if. And so I would say that TVT-O did and does
4 occupy a specific group of patients for my
5 practice. So part of that decision process was
6 reviewing again the accumulating literature at
7 that time and speaking with experts, be that the
8 people who trained me or other people that I met
9 at conferences, and looking at various abstracts
10 and other things that were presented. That was
11 pretty early on in the use of TVT-O, in terms of
12 its introduction and presence in the United
13 States and so forth.
14 　　And so I have to say that I think that my
15 use of it was probably very limited at the
16 beginning and has grown within a certain niche
17 over time, but I can't point to a specific
18 article.
19 BY MS. WHITE:
20 　　Q. During your fellowship, do you recall
21 representatives from Ethicon being in the OR when
22 either you or Dr. Rosenblatt surgically implanted TVT
23 or TVT-O in patients?
24 　　A. So first of all, I would say that it's
25 probably true that as a trainee, I was never in the

24　(Pages 90 to 93)

Samantha Joy Pulliam, M.D.

## Page 94

1    OR without either Dr. Rosenblatt or another one of
2    the attending physicians overseeing my training.
3          And secondly, I think that it's certainly
4    possible that there was an Ethicon representative
5    present in the OR at certain points. But I don't
6    recall any specific individuals and I couldn't
7    actually say that the representative was actually
8    from Ethicon. It's even -- it's definitely possible
9    that there was someone there.
10        Q.  You just don't recall?
11        A.  I really don't. I mean, it's not
12   really -- they don't play a major factor in the
13   production of the surgical procedure. And they're
14   certainly not part of the doing of the procedure.
15        Q.  Why are they there?
16        MR. RUMANEK: Object to the form.
17        THE WITNESS: Why are they there? You
18   know, I think that, in part, as the person
19   providing either new technology or some form of
20   device, I think they want to ensure that
21   procedures are done without question. If
22   there's any question about the device, about the
23   packaging, about the thing that they're
24   providing, I think they feel responsible to see
25   it through.

## Page 95

1    BY MS. WHITE:
2        Q.  Do you get patient permission before you
3    permit a pharmaceutical rep to be in the OR?
4        MR. RUMANEK: Object to form.
5    BY MS. WHITE:
6        Q.  During the patient procedure?
7        A.  I would.
8        Q.  Since leaving your fellowship program,
9    have you implanted women with any Ethicon device
10   where an Ethicon representative was in the OR with
11   you?
12       A.  I think the answer to that is probably no.
13   But I wouldn't -- I couldn't say 100 percent, no.
14       Q.  So I want to talk to you a little bit
15   about your J & J relationship. After you got trained
16   on the TVT and TVT-O, and I know your testimony is
17   that was primarily during your fellowship and
18   Dr. Rosenblatt, did you serve as a preceptor or
19   proctor for J & J?
20       A.  I don't think so.
21       Q.  Okay. Have you ever been paid as a
22   preceptor or proctor for J & J?
23       A.  I don't think so. But I would have to say
24   that it's possible that I was paid during my
25   fellowship for some of the things that I may have

## Page 96

1    done. I don't think -- I mean, certainly since I
2    finished, I have no recollection of doing that.
3        Q.  What are some of the things you may have
4    done during your fellowship that you would have been
5    paid by J & J or Ethicon for?
6        A.  An example of that might have been, and
7    I'm not sure -- I'm thinking of this, and I'm not
8    sure it was specifically J & J, which is why I'm not
9    able to say this absolutely which company this was
10   for. But, for example, in a cadaver lab, when others
11   are being trained in what to do, sometimes there are
12   retractions and those sorts of things, so as a
13   fellow, I would be there and perhaps be compensated
14   to be there to retract or to hold or those sorts of
15   things during the process and maybe to help with
16   sometimes the passage of needles and those sorts of
17   things for new trainees.
18       Q.  All right. Other than possibly during
19   your fellowship and serving as an expert, general
20   expert in the mesh litigation and the case specific
21   expert role you're playing, have you previously
22   worked for Ethicon or J & J as a paid consultant?
23       A.  No.
24       Q.  Have you received education grants from
25   J & J or Ethicon?

## Page 97

1        A.  Not at Mass General, no, and not here as
2    far as I know, no.
3        Q.  Okay. At Mount Auburn?
4        A.  To my knowledge, there was not an
5    education grant that was specifically from Ethicon.
6    But I will say that as a fellow, the recipient of
7    that would have been the fellowship, not me. Unless
8    there was travel associated, which might have been
9    for one of these kinds of conferences.
10       Q.  Okay. How about any sort of research
11   funding agreement, have you ever entered into one
12   with J & J or Ethicon?
13       A.  No, I haven't.
14       Q.  Do you know whether Ethicon restricted the
15   sale of its TVT or TVT-O device solely to physicians
16   who had undergone an Ethicon training course?
17       MR. RUMANEK: Object to the form.
18       THE WITNESS: No, I don't know.
19   BY MS. WHITE:
20       Q.  In your opinion, should only physicians
21   who have undergone Ethicon training be permitted to
22   surgically implant the TVT?
23       A.  No, I don't think Ethicon training has
24   anything to do with being adequately trained to
25   surgically implant the TVT.

25 (Pages 94 to 97)

Samantha Joy Pulliam, M.D.

Page 98

1    Q.   Then why do you think Ethicon has these
2 training sessions?  What's their purpose?
3         MR. RUMANEK:  Object to the form, to the
4 extent you're asking her to testify about
5 Ethicon's purposes.
6         THE WITNESS:  Right.  So I don't know what
7 Ethicon's intent is.  But I can say that I think
8 there are a number of different types of people
9 who come to providing these kinds of surgical
10 procedures.  There are people like myself who
11 came through a training program where there were
12 experienced physicians, surgeons, who were, like
13 based on their own experience, able to
14 thoroughly and adequately train me and others
15 like me to do these procedures.
16        There are others for whom this procedure
17 became something that even though they did
18 perhaps other procedures for urinary
19 incontinence, this was new to them since
20 entering practice, and so they would require
21 some additional training besides their residency
22 training because this wasn't available then.  So
23 there are lots of different reasons and
24 different ways you might come to doing one of
25 these procedures, and I think based on your

Page 99

1    background and the timing of it, you might need
2 some additional training.
3 BY MS. WHITE:
4    Q.   Have you ever sat on a J & J or Ethicon
5 advisory board?
6    A.   I don't think so, no.
7    Q.   And other than your work as an expert in
8 terms of the mesh litigation, have you ever had a
9 professional contract for work that you entered into
10 with J & J or Ethicon over the course of your career?
11       MR. RUMANEK:  Object to the form.
12       THE WITNESS:  I'm not even sure what that
13 means.  I mean, was I -- was I a proctor as a
14 fellow and signed something that said I would be
15 a proctor?  Possibly.
16 BY MS. WHITE:
17   Q.   Did you get paid for being a proctor?
18   A.   I don't know.  I mean, I'm not sure.  I'm
19 giving an example of something that I would have
20 signed.  And I -- that's not how I would have
21 characterized myself, but I think that's certainly
22 something that I might have done as part of the
23 signature process of participating in those things.
24   Q.   Have you ever worked for a consultant or
25 an expert for any other pharmaceutical company other

Page 100

1    than J & J or Ethicon?
2    A.   No.
3    Q.   And we're going to talk a little bit more
4 in detail about this, but tell me about your patent
5 on vaginal suspension procedure.  Does -- first of
6 all, does that involve polypropylene mesh?
7    A.   So the patent itself does not specifically
8 involve polypropylene mesh, although polypropylene
9 mesh is certainly one of a variety of things that
10 could be used in the patent.  Patent is really about
11 a methodology for providing a suspension of the
12 vagina using the sacrum as a suspension point, and
13 doing that procedure through the vagina as opposed to
14 laparoscopically or abdominally in what's known as a
15 sacrocolpopexy which is usually done through an
16 abdominal approach.
17   Q.   So are you in talks with any
18 pharmaceutical company or medical device company
19 about this patent?
20   A.   No.  I mean, not any -- not any talks that
21 would have to do with adopting the product or using
22 the product, no.
23   Q.   Have you spoken with J & J or Ethicon
24 about this patent?
25   A.   So the patent has only been present in its

Page 101

1    completed form for about a year.  And no, I haven't
2 spoken with them about the patent.  And I know that I
3 didn't speak with them before then about it because
4 there was never a nondisclosure agreement or any of
5 those things signed between them.
6    Q.   Okay.  So as you sit here today, do you
7 recall any complications that arose with the TVT-O
8 during your fellowship program where you were
9 training under Dr. Rosenblatt?
10       MR. RUMANEK:  Object to the form.
11       THE WITNESS:  I do not.
12 BY MS. WHITE:
13   Q.   Okay.  When you have a complication with a
14 medical device, do you automatically report that to
15 the FDA?
16       MR. RUMANEK:  Object to the form.
17       THE WITNESS:  Do I automatically?
18 BY MS. WHITE:
19   Q.   Yeah.
20   A.   No, I do not automatically.  And I think
21 the other question there is really about what is a
22 complication from a medical device specifically.  I
23 mean, there are lots of surgical complications from
24 almost any procedure that are possibly but also maybe
25 not associated with the device itself.

26 (Pages 98 to 101)

Samantha Joy Pulliam, M.D.

Page 102

1    Q. Okay. Let's --
2    (Pulliam 4 was marked for identification.)
3    BY MS. WHITE:
4    Q. I'm going to hand you what we have marked
5    as Exhibit 4.
6         MS. WHITE: I brought a copy for you, but
7    I'm sure you've got it, her expert report?
8         MR. RUMANEK: I've got it. That's fine.
9    Thank you, though. I do appreciate.
10    BY MS. WHITE:
11    Q. And, Dr. Pulliam, is that your expert
12    report?
13    A. Yes, it's my expert report.
14        MR. RUMANEK: Make sure it's signed. I'm
15    sure it is, but --
16    BY MS. WHITE:
17    Q. When did Ethicon first approach you about
18    being a general urogyn expert in the transvaginal
19    mesh litigation?
20    A. In November or December. I think it was
21    December 2016.
22    Q. And who approached you?
23    A. Mr. Rumanek.
24    Q. Who?
25

Page 103

1         MR. RUMANEK: I did.
2    BY MS. WHITE:
3    Q. Okay. Can you say his name for the
4    record?
5    A. Eric Rumanek.
6    Q. Were you aware that some of your
7    colleagues, such as Dr. Rosenblatt, had agreed to
8    serve as an expert for Ethicon prior to you agreeing
9    to do so?
10    A. I wasn't aware that Dr. Rosenblatt had
11    agreed to be an expert witness for Ethicon, no.
12    Q. What about Catherine Matthews?
13    A. No, I was not.
14    Q. Do you know Kim Kenton?
15    A. I know who Kim Kenton is. And I was not
16    aware that she was an expert witness when I agreed to
17    do this.
18    Q. Did you discuss your decision to serve as
19    an expert with any of your colleagues prior to
20    agreeing to do so?
21    A. No, I did not.
22    Q. Did you discuss it with your superiors at
23    UNC?
24    A. I discussed it with Dr. Clarke-Pearson,
25    the chair of my department.

Page 104

1    Q. And what did he have to say about it?
2         MR. RUMANEK: Object to the form.
3         THE WITNESS: We discussed it primarily as
4    it concerned my other responsibilities at the
5    institution, and he was supportive.
6    BY MS. WHITE:
7    Q. So do you recognize Exhibit 4?
8    A. I do.
9    Q. Did you write that report by yourself?
10        MR. RUMANEK: Object to the form.
11        THE WITNESS: I wrote this report by
12    myself and submitted it in to counsel.
13    BY MS. WHITE:
14    Q. Say that again?
15    A. I wrote it by myself and submitted it to
16    counsel --
17    Q. So it's your test-- --
18    A. -- to discuss.
19    Q. Okay. So it's your testimony that you
20    wrote every word of the report by yourself?
21        MR. RUMANEK: Object to the form. And
22    I'll instruct the witness not to answer about
23    any drafts that may have been created or
24    discussed with counsel.
25

Page 105

1    BY MS. WHITE:
2    Q. I'm not asking about drafts. Did you
3    write every word of the report by yourself?
4         MR. RUMANEK: Object to the form.
5         THE WITNESS: So every word in this report
6    is my own.
7    BY MS. WHITE:
8    Q. Okay. Did you have any input from counsel
9    from Ethicon?
10        (Instruction not to answer.)
11        MR. RUMANEK: Object to the form. I'm
12    going to instruct the witness not to answer the
13    question.
14        MS. WHITE: That's a perfectly
15    appropriate.
16        MR. RUMANEK: I'm going to instruct the
17    witness not to answer the question.
18        MS. WHITE: So to be clear, for the
19    record, you're not permitting her to answer
20    whether or not there was input from counsel from
21    Ethicon?
22        MR. RUMANEK: Correct.
23    BY MS. WHITE:
24    Q. Did you have any input from Ethicon
25    company officials?

27 (Pages 102 to 105)

Samantha Joy Pulliam, M.D.

Page 106

1    A. No, I did not.
2    Q. Without telling me what was said, how much
3  time have you spent speaking with Ethicon lawyers
4  about the report?
5    A. An hour or two.
6    Q. An hour or two?
7    A. Uh-huh. I think also that the report and
8  preparation for the deposition -- I mean, I'm
9  assuming that you're talking about the creation of
10  the report. Is that right?
11    Q. Yes, ma'am.
12    A. Okay.
13    Q. In the general reliance list -- let's go
14  ahead and mark that.
15        MR. RUMANEK: I've got a copy of it as
16  well.
17    (Pulliam 5 was marked for identification.)
18  BY MS. WHITE:
19    Q. Dr. Pulliam, I'm going to hand you
20  Exhibit 5. Did you put together the general reliance
21  list?
22    A. Counsel put together the general reliance
23  list.
24    Q. And that was provided to you by counsel?
25    A. The general reliance list was created by

Page 107

1  counsel based on the content of my expert report and
2  also the information that they provided me before I
3  began to write the expert report.
4    Q. Okay. You're telling me that this general
5  reliance list was put together by counsel based upon
6  your report?
7        MR. RUMANEK: Object to the form.
8  Mischaracterizes what she just said.
9        THE WITNESS: I'm telling you that this
10  general reliance list was created based upon the
11  literature quoted in this report and other
12  documentation that was provided to me.
13  BY MS. WHITE:
14    Q. Okay. So how much of the general reliance
15  list did you provide counsel?
16        MR. RUMANEK: Objection.
17  BY MS. WHITE:
18    Q. Did you have any input at all with general
19  reliance list?
20        MR. RUMANEK: Object to form.
21        THE WITNESS: I did. I did.
22  BY MS. WHITE:
23    Q. Okay. So it's your testimony that you
24  provided them some of the materials that went into
25  what we have marked as Exhibit 5?

Page 108

1    A. Correct.
2    Q. Okay. And what did you provide them with?
3    A. So when I created this report, what I did
4  was I used PubMed to write the report and then
5  reviewed and provided citations from the literature
6  that I used at PubMed and then I turned to some of
7  the literature that was provided to me and reviewed
8  it as well. And then all of that was provided for
9  the generation of this report.
10    Q. Have you reviewed every single document
11  that is contained in Exhibit 5?
12    A. So I have reviewed to varying degrees of
13  detail most of the documents here.
14    Q. Okay. And you know this is -- I don't
15  know how many pages. They didn't number it. But
16  including -- let's go to the last page, for example,
17  of Exhibit 5.
18    A. Uh-huh.
19    Q. I may be referring to the wrong thing.
20  Let's see. Expert reports?
21    A. Yeah.
22    Q. You've reviewed all those expert reports?
23        MR. RUMANEK: Object to the form.
24        THE WITNESS: I have probably reviewed
25  many of these, but not -- not in equal detail.

Page 109

1  BY MS. WHITE:
2    Q. Okay. What are some you've reviewed in
3  more detail? Just point them out to me. Expert
4  reports. Last page of Exhibit 5.
5    A. So it's a little hard for me to
6  specifically identify these based on the way that
7  they're listed here. I have looked through some by
8  Dr. Blaivas, for example, and those would probably be
9  the ones that I am more familiar with. But I would
10  say that, in general, those weren't the kinds of
11  things that I relied on primarily to formulate my
12  opinions for this report.
13    Q. What did you primarily rely upon to
14  formulate the opinions for your report?
15    A. So there is a large body of literature, so
16  large I think that not only is it useful to look at
17  some of the many studies that exist but also to look
18  through some and to focus more really more on those
19  portions of literature that summarize some of the
20  stronger studies here. So, for example, Cochrane
21  reviews.
22    Q. So what did you rely upon most? Your
23  clinical experience, education, background, and
24  training, or a literature review as the basis for
25  your opinions?

28  (Pages 106 to 109)

Samantha Joy Pulliam, M.D.

Page 110

1    MR. RUMANEK: Object to the form.
2    THE WITNESS: I think it's really
3  impossible to say most. Over the course of a
4  career, there is familiarity with the literature
5  that is bred right into the development of
6  surgical technique, interaction with colleagues,
7  attending and -- attendance at meetings which,
8  in fact, are really sometimes the first time you
9  encounter the literature. So I think it would
10  be difficult to say one or the other.
11  BY MS. WHITE:
12    Q. Okay. I'm going to ask you to try,
13  though. I only have one opportunity to depose you.
14  So I'm trying to figure out the basis for your
15  opinions in this case. Is it more on your clinical
16  experience or is it more on your review of the
17  literature?
18    MR. RUMANEK: Object to the form. Asked
19  and answered. You don't have to answer it
20  differently other than the way you answered it.
21    MS. WHITE: Speaking objections are not
22  permitted and you know that. You can answer.
23    THE WITNESS: I think that all of the
24  things that you've mentioned have contributed to
25  my opinions today.

Page 111

1  BY MS. WHITE:
2    Q. Okay. I'm going to ask you one more time.
3  So what did you rely on most? Is it your clinical
4  experience or review of the literature in formulating
5  your expert opinions in this matter?
6    MR. RUMANEK: Object to the form. Object
7  to the form. Asked and answered.
8    THE WITNESS: It's impossible for me to
9  differentiate those.
10  BY MS. WHITE:
11    Q. Okay. So then are you saying it's equal
12  reliance on a literature review as opposed to your
13  clinical experience? I'm just trying to figure it
14  out, Doctor.
15    MR. RUMANEK: Object to form. Asked and
16  answered.
17    THE WITNESS: I'm saying it's impossible
18  for me to differentiate those. They're
19  intertwined.
20    (Pulliam 6 was marked for identification.)
21  BY MS. WHITE:
22    Q. So I'm going to hand you Exhibit 6. And
23  do you recognize that document?
24    A. Yes.
25    Q. And what is that?

Page 112

1    A. This is additional information reliance
2  list.
3    Q. And I'll represent to you I only got that
4  two days ago. So the supplemental general reliance
5  list, is that information counsel provided to you or
6  you provided to counsel?
7    MR. RUMANEK: Object to the form.
8    THE WITNESS: I don't actually -- I mean,
9  I'm not sure that I can go through each one of
10  these and look up which ones are which to see
11  which is which. I mean, I can tell you that
12  these -- for example, these that are the
13  communications from Ethicon are -- and
14  professional education things are clearly things
15  that counsel provided me. I expect that there
16  are some quotes, some papers here that are
17  things that I provided them.
18  BY MS. WHITE:
19    Q. Have you read or reviewed each and every
20  document in supplemental general reliance list which
21  has been marked as Exhibit 6?
22    MR. RUMANEK: Object to the form.
23    THE WITNESS: I am familiar with much of
24  this literature and have read in detail some of
25  it.

Page 113

1  BY MS. WHITE:
2    Q. Okay. That's not my question.
3    MR. RUMANEK: You may not have understood
4  her question.
5    THE WITNESS: No, I guess I didn't. Go
6  ahead.
7  BY MS. WHITE:
8    Q. Have you reviewed each and every document
9  on Exhibit 6, contained in Exhibit 6?
10    MR. RUMANEK: I just want to make sure.
11  When she says "document," she doesn't just mean
12  the literature. She means every entry on
13  Exhibit 6. Does that clarify?
14    THE WITNESS: I understand. I guess I'm
15  thinking only of the papers and studies. I have
16  looked at some of these e-mails and other things
17  and familiarized myself with the content, but
18  they're not usually the kinds of things that I
19  would use in the creation of my expert report
20  because they're not the important things in
21  terms of what the science is behind the studies.
22  BY MS. WHITE:
23    Q. Yeah. And I'm trying to figure out the
24  basis of your expert report. We have talked about
25  that some. You said you can't differentiate, right,

29 (Pages 110 to 113)

Samantha Joy Pulliam, M.D.

Page 114

1   between clinical experience and literature review?
2       A.  Uh-huh.
3       Q.  Okay.  Is there anything else that you're
4   relying on to form the basis of your opinions in this
5   litigation?
6           MR. RUMANEK:  Object to the form.
7           THE WITNESS:  So you mean in addition to
8   clinical experience and the literature review?
9   BY MS. WHITE:
10      Q.  Yes, Doctor.
11      A.  Absolutely.  I think there's my training.
12  I think there's my exposure at professional meetings
13  and my interaction with other professionals.
14      Q.  Okay.  So I want to talk to you now about
15  your clinical experience.  So your first job outside
16  training was as the associate director of
17  urogynecology and pelvic reconstructive surgery at
18  Mass General, right?
19      A.  That's right.
20      Q.  Okay.  So from August 2006 through 12 of
21  2012, let's see here.
22      A.  Go back to my --
23      Q.  Yeah, I've got to go back to it, too.
24  Let's do it this way.  From August of 2006 to 12 of
25  2015, did you implant TVT for the treatment of stress

Page 116

1   number 700?
2       A.  That's it.  I can also and have in the
3   past, although I didn't re-perform it because I don't
4   have access to those records at Mass General any
5   longer, I can run a billing record to see how many I
6   performed in that way.  That's probably the most
7   reliable way to figure out how many of those I
8   performed.
9       Q.  Okay.  I'm asking you how you came up with
10  that number for the expert report that's been
11  submitted in this federal court case.
12      A.  That's math.
13      Q.  Okay.  So just so I'm clear, you came up
14  with the number 700 based upon the average number of
15  mid-urethral slings you perform in a month?
16      A.  That's right.
17      Q.  Okay.  So on average, how many do you
18  implant in a month?
19      A.  Do you have a calculator?
20      Q.  I don't.
21      A.  Okay.  So it's been 12 months times 10
22  years.  5.8 is the average number.
23      Q.  Have you kept a database of all your
24  clients for the past ten years?
25      A.  I have not.

Page 115

1   urinary incontinence?
2       A.  I did.
3       Q.  Okay.  And from August 2006 to 12-2015,
4   did you implant TVT-O for the treatment of stress
5   urinary incontinence?
6       A.  I did.
7       Q.  Okay.  Doctor, did we mark your expert
8   report?
9       A.  Yes.
10      Q.  What number is that?
11          MR. RUMANEK:  That's 4.
12  BY MS. WHITE:
13      Q.  4.  Okay.  So -- and you may want to keep
14  this in front of you.  In your expert report, you say
15  that you have performed 700 mid-urethral slings over
16  the past ten years, right?
17      A.  That's right, roughly.
18      Q.  And how do you know that you have
19  performed more than 700 mid-urethral slings over the
20  past ten years?
21      A.  So I can look at two things.  The most
22  reliable thing I think is to understand how many I do
23  in an average month and then realize the number of
24  months I've been practicing.  Right?
25      Q.  Okay.  So that's how you came up with the

Page 117

1       Q.  Have you in any way -- oh, go ahead.
2       A.  I was going to say, I think keeping that
3   and keeping that outside the confines of the hospital
4   in my office would have not been true to patient
5   confidentiality.
6       Q.  Have you in any other way for the past ten
7   years tracked your patients?
8           MR. RUMANEK:  Object to the form.
9           THE WITNESS:  I'm not sure what you mean
10  by tracking.
11  BY MS. WHITE:
12      Q.  Well, again, I'm trying to figure out how
13  you came up to 700.  And I think it's based upon your
14  thoughts on how many slings you place monthly, right?
15      A.  That's right.
16      Q.  On average?  And that's how you came up
17  with that number?
18      A.  Uh-huh.
19      Q.  So is there any other basis for the 700
20  mid-urethral slings other than what you just
21  testified to?
22      A.  No, there's not.
23      Q.  All right.  So based on that 700 number
24  that you put in your expert report for this federal
25  court case --

Samantha Joy Pulliam, M.D.

Page 118

1    A.  Yes.
2    Q.  -- how many polypropylene mid-urethral
3  slings did you implant from August of 2006 through
4  December of 2015?
5    A.  So I think what you're asking me is how
6  many have I done since that time and to make that
7  subtraction?  Is that what you're asking me?
8    Q.  Yeah, the question is simple.  Out of that
9  700 mid-urethral slings over the past 10 years, how
10 many were polypropylene?
11    MR. RUMANEK:  Object to the form and the
12  characterization of the question.  I don't think
13  it's simple.
14    THE WITNESS:  So in addition to
15  polypropylene mesh slings, there would have been
16  slings constructed of rectus fascia.  That would
17  have been a small percentage of the slings that
18  I've done over that time frame so probably 20 of
19  them over the last 10 years I've done that were
20  not mesh slings.
21  BY MS. WHITE:
22    Q.  Okay.
23    A.  So that would leave 680 that would be mesh
24  slings.
25    Q.  How many of those 680 mesh slings were

Page 119

1  Ethicon products?
2    A.  The vast majority.
3    Q.  Well, what other products did you use
4  other than Ethicon?
5    A.  There may have been some Bard products
6  there.  And I can't remember the name of the other
7  brand with the nondisposable trocars that we used for
8  a brief time.
9    Q.  Did you use AMS products?
10    A.  I don't think so.
11    Q.  Boston Scientific?
12    A.  I don't think so.
13    Q.  Coloplast?
14    A.  Possibly.
15    Q.  You just don't know?
16    A.  No, I know that the majority of the slings
17  that I've used over this time have been Ethicon
18  slings and that the others were not things we decided
19  to go with as a group.
20    Q.  So out of those 680 mesh polypropylene
21  mesh slings, vast majority being Ethicon, can you
22  please identify for the record which specific Ethicon
23  products you have used?
24    A.  Uh-huh.  So TVT -- TVT-R I guess is the
25  designation -- I've used the retropubic sling --

Page 120

1    Q.  Yes, ma'am.
2    A.  -- with the portion of the trocar that's
3  got the reusable handle.  And TVT-O, TVT Abbrevo.
4  And then since I've been here at the University of
5  North Carolina, TVT Exact has replaced the TVT
6  device.
7    Q.  Okay.  Out of the 680 polypropylene mesh
8  mid-urethral slings, a vast majority being Ethicon, I
9  need you to tell me how many are TVT-R.
10    A.  So the TVT-R, probably -- I mean, since
11  I've been here, I've done -- they didn't have the
12  TVT-R here, and I've gone with the Exact.  So if --
13  let's just say for easy math, I did five a month
14  since I've been here, and I do probably
15  three-quarters of my slings as TVT Retropubic or TVT,
16  yeah, retropubic.  So let's say three quarters of 680
17  minus 60.  That's 450 roughly.
18    MR. RUMANEK:  Let the record reflect that
19  counsel assisted with a calculator.
20  BY MS. WHITE:
21    Q.  All right.  How many of the 680 involve
22  TVT-O?
23    A.  Can I see your calculator?
24    Q.  Why don't you just keep it, Doctor?  I'll
25  be happy to even give you my cell phone if you want,

Page 121

1  a calculator.
2    A.  680 minus what was the number I just gave
3  you?  450.  So roughly 230.
4    MR. RUMANEK:  And you said Exact --
5    THE WITNESS:  I'm sorry.  That was TVT-O.
6  Oh, right?
7  BY MS. WHITE:
8    Q.  No, TVT-O.
9    A.  TVT-O.  Okay, I apologize.  So I probably
10  started using Abbrevo maybe three or four years ago.
11  So let's say I did 150 TVT-Os and the remainder are
12  Abbrevos so another 180.
13    Q.  You've lost me.  Let me rephrase the
14  question.
15    A.  Sure.
16    Q.  I'm not trying to drag this out, God
17  knows, but I need to know how many of the 680
18  transvaginal polypropylene mesh mid-urethral slings
19  were TVT-O.
20    A.  Probably about 120 of them.  That's an
21  estimate.
22    Q.  Okay.  How many of the 680 polypropylene
23  mid-urethral slings that you have implanted has been
24  TVT Abbrevo?
25    A.  I guess that leaves 110 as the total

31  (Pages 118 to 121)

Samantha Joy Pulliam, M.D.

Page 122

1  number if we're doing the math.  Is that right?
2      Q.  You need to tell us.
3      A.  Right.
4          MR. RUMANEK:  And she's -- she's doing her
5  best to do the math.
6          THE WITNESS:  I'm doing my best to do
7  math.  This is not something that is included in
8  my report, and it's all something that I'm
9  deriving off the top of my head because this is
10  not, again, something I based my general report
11  upon in terms of the specific numbers.
12  BY MS. WHITE:
13      Q.  Okay.  Well, you did tell us in this
14  report you've done 700 mid-urethral slings?
15      A.  That's correct.
16      Q.  So I'm trying to figure out your basis for
17  being an expert --
18      A.  Right.
19      Q.  -- on behalf of Ethicon in support of
20  their products.
21      A.  Sure.
22      Q.  Okay.  So how many are TVT Abbrevo?
23      A.  So I believe I said 120.  Is that correct?
24          MR. RUMANEK:  So you said 450, was that
25  TVT --

Page 123

1  BY MS. WHITE:
2      Q.  Stop.
3      A.  Can we go back?  I think we have had this
4  very confusing conversation here, and I would like to
5  review the numbers.
6          MR. RUMANEK:  I'm not trying to interject.
7  Let's go off the record.
8          (Off record discussion.)
9  BY MS. WHITE:
10      Q.  We're going to go back on the record.  I'm
11  going to ask you questions.  If you can't answer my
12  questions, say "I don't know."  Okay?
13      A.  Okay.
14      Q.  All right.  So Doctor, you previously
15  testified that out of the 680 polypropylene
16  mid-urethral slings that you have placed, 450 is
17  TVT-R.
18      A.  Okay.
19      Q.  You then testified that 120 has been
20  TVT-O.  My question to you is, how many of the 680
21  have involved TVT Abbrevo?
22      A.  Okay.  And somewhere in there, I think I
23  answered a question about Exact as well.
24      Q.  Okay.  My question on the table is how
25  many have been TVT Abbrevo?

Page 124

1      A.  And so that I can make my estimate
2  complete, I'd like to look back, if it's possible, to
3  hear what my answer was about the TVT Exact.
4      Q.  Sure.
5          (Whereupon the Court Reporter read the
6          requested testimony.)
7  BY MS. WHITE:
8      Q.  Doctor, you testified clearly that it's
9  450 TVT-R.
10      A.  That's right.
11      Q.  And 120 TVT-O.
12      A.  Okay.
13      Q.  If you need to stop and figure it out for
14  Abbrevo, please do.  But I need to know how many
15  involve TVT Abbrevo.
16          MR. RUMANEK:  Object to the form and the
17  characterization.
18          THE WITNESS:  Okay.  So we have got TVT-R
19  and we have got TVT-O which I've said 450 and
20  120.
21  BY MS. WHITE:
22      Q.  Yes, ma'am.
23      A.  Okay.  And then I think the -- there are
24  60 or so that were TVT Exact.
25      Q.  Okay.

Page 125

1      A.  Okay?  And that would leave 50 that are
2  Abbrevo.  So that's, to recap, 450 for TVT-R; 120 for
3  TVT-O; 60 for TVT Exact; and 50 for TVT Abbrevo.
4      Q.  When was the last time you implanted a
5  TVT?
6      A.  The last time I implanted a TVT was in
7  December -- a TVT Retropubic, not the Exact; is that
8  correct?
9      Q.  Yes, ma'am, yes, ma'am.
10      A.  That would be December of 2015.
11      Q.  What Ethicon product do you currently use
12  for the treatment of stress urinary incontinence --
13          MR. RUMANEK:  Object to the form.
14  BY MS. WHITE:
15      Q.  -- in terms of the mid-urethral sling?
16          MR. RUMANEK:  Object to the form.
17          THE WITNESS:  Retropubic sling?
18  BY MS. WHITE:
19      Q.  Yes.
20      A.  Okay.  For my retropubic sling, I
21  currently use TVT Exact.
22      Q.  Why do you no longer use TVT?
23      A.  Because the TVT Exact was the brand of
24  sling that was available here.  I regard it as
25  substantially similar to the TVT that I used in my

Samantha Joy Pulliam, M.D.

Page 126

1  previous place of employment and so moved forward
2  with that.
3      Q.  When was the last time you implanted
4  TVT-O?
5      A.  TVT-O?
6      Q.  Yes, ma'am.
7      A.  It's probably been about three years,
8  possibly four.
9      Q.  Why have you predominantly utilized
10 Ethicon mid-urethral slings during your professional
11 career for the treatment of stress urinary
12 incontinence?
13     A.  So I think we talked about this maybe
14 before.  But I think there is a great deal of
15 research, a great deal of evidence that would support
16 the use of them.  They are -- it's a product that's
17 been present for a long time.  And it's a product
18 that I feel comfortable using.  And so from my
19 clinical experience, I've had good results so I
20 continue to use it.
21     Q.  How many of the 680 polypropylene
22 mid-urethral slings that you have placed involved
23 mechanically cut TVT?  Let's do it this way.  Bad
24 question.  I'm going to withdraw that.  Okay?
25         How many of the 450 TVT-R, retropubic,

Page 127

1  have involved mechanically cut TVT?
2      MR. RUMANEK:  Object to the form.
3      THE WITNESS:  I don't know.
4  BY MS. WHITE:
5      Q.  How many of the 450 TVT-R -- and, again,
6  when I say TVT-R or TVT, we're -- they're
7  synonymous -- have involved laser cut mesh?
8      MR. RUMANEK:  Object to the form.
9      THE WITNESS:  I would say that if I didn't
10     know the answer to the first question, the
11     answer to the second is those remaining.  I
12     don't know.
13 BY MS. WHITE:
14     Q.  Okay.  That's fine just to say that.  Have
15 you over the past ten years documented whether or not
16 you were implanting a TVT laser cut or a TVT
17 mechanical cut?
18     A.  So the documentation of the specific
19 device is always a matter of medical record.  So yes.
20 I mean, it would be documented with every device in
21 as much as the device reflects whether it's laser cut
22 or mechanically cut.
23     Q.  Do you know how many TVT laser cut TVTs
24 you have implanted versus TVT mechanical cut?
25     MR. RUMANEK:  Object to form.  Asked and

Page 128

1  answered.
2      THE WITNESS:  I don't know.
3  BY MS. WHITE:
4      Q.  If the TVT mechanically cut device was
5  taken off the market, it wouldn't affect your ability
6  to offer surgical options to women for the treatment
7  of stress urinary incontinence; is that true?
8      MR. RUMANEK:  Object to form.
9      THE WITNESS:  If the TVT mechanically cut
10     device was taken off the market --
11 BY MS. WHITE:
12     Q.  Could you still surgically treat women for
13 stress urinary incontinence?
14     A.  Yes.
15     Q.  Do you know, Doctor, whether or not you're
16 implanting mechanical cut versus laser cut?
17     MR. RUMANEK:  Object to form.
18     THE WITNESS:  So the TVT Exacts are laser
19     cut.
20 BY MS. WHITE:
21     Q.  Okay.  So back in the day when you were
22 doing TVT, did you know whether or not you were
23 implanting mechanical cut versus laser cut?
24     A.  I know there was a transition between
25 mechanical cut and laser cut.  I couldn't tell you

Page 129

1  the exact date of that, but no.  And it wasn't
2  important to me as a transition in terms of the
3  appropriate care of patients or in my outcomes.
4      MR. RUMANEK:  We have been going a while
5      so whenever we get to a stopping point, we can
6      take a little break.
7  BY MS. WHITE:
8      Q.  Of the 680 patients you've implanted with
9  polypropylene mid-urethral slings, how many have come
10 back to you with complications?
11     A.  Oh.  Again, it would be an estimate.  But
12 I think probably five to seven.
13     Q.  You mean five to seven patients?
14     A.  That's correct.  Part of the reason that
15 it's difficult to estimate is that I think when
16 you're asking me about my own that I implant, I think
17 that's probably the number that's most important
18 there in that question.
19     Q.  That's exactly what I'm asking you about.
20     A.  Okay.
21     MS. WHITE:  All right.  We'll take a
22     break.
23         (A recess transpired from 1:18 p.m.
24         until 1:25 p.m.)
25

33  (Pages 126 to 129)

Samantha Joy Pulliam, M.D.

Page 130

1 BY MS. WHITE:
2     Q. So I want to pick up where we left off. I
3 had asked you of the 7 -- actually of the 680
4 patients where you surgically implanted a
5 polypropylene mid-urethral sling how many have come
6 back to you with complications. And you said that
7 five to seven patients.
8     A. Right.
9     Q. So I need you to break that down for me.
10 Of those five to seven patients, how many have been
11 implanted with TVT?
12     A. Probably five.
13     Q. Okay. And of those five, how many have
14 been implanted with TVT mechanical cut?
15         MR. RUMANEK: Object to the form.
16         THE WITNESS: As I don't know the number,
17     when the mechanical cut change happened, I'm not
18     able really to say how many so I don't know.
19 BY MS. WHITE:
20     Q. Okay. And do you know how many of those
21 five had TVT laser cut?
22         MR. RUMANEK: Object to the form.
23         THE WITNESS: As I don't know about the
24     mechanical cut, I also don't know about the
25     laser cut.

Page 131

1 BY MS. WHITE:
2     Q. Okay. And how many of those patients who
3 came back to you had TVT-O?
4     A. Three. That's five plus three.
5     Q. That means eight patients?
6     A. Five plus two. Sorry. Two. I'm
7 estimating and so two.
8     Q. Okay. And, Doctor, of those 680 patients
9 you surgically implanted polypropylene mid-urethral
10 sling, you don't know how many experienced
11 complications but went to another doctor; is that
12 fair to say?
13         MR. RUMANEK: Object to the form.
14         THE WITNESS: I think that that's fair to
15     say for anyone who does any surgical procedure
16     of any kind.
17 BY MS. WHITE:
18     Q. Okay. So if I understand you correctly,
19 you currently treat stress urinary incontinence
20 surgically with it's TVT Exact; is that right?
21     A. TVT Exact, yes, that's right.
22     Q. Okay. And what other sort of
23 polypropylene sling?
24     A. TVT Abbrevo.
25     Q. Okay. And how else do you treat stress

Page 132

1 urinary incontinence surgically if you don't use a
2 polypropylene sling, either TVT Exact or TVT Abbrevo?
3     A. The other two things I might consider
4 using under specific circumstances would be a
5 laparoscopic Burch procedure. I could use an open
6 Burch, meaning an abdominal incision, if there was an
7 abdominal incision happening for a different reason.
8     Q. Okay.
9     A. I use periurethral Coaptite injections.
10 Periurethral Coaptite injections. And pubovaginal
11 slings using rectus fascia typically.
12     Q. So -- so what -- let me ask you this:
13 Surgically speaking, what procedure do you most use
14 to treat stress urinary incontinence these days?
15     A. I most use?
16     Q. Uh-huh.
17     A. TVT Exact.
18     Q. And give me a percentage in real time
19 here -- so hopefully this will be a little bit easier
20 for you -- here at UNC, what percentage of the time
21 when you're surgically treating stress urinary
22 incontinence would you use TVT Exact?
23     A. I would expect between 95 and 98 percent
24 of the time. Oh, I'm sorry. TVT Exact?
25     Q. Yeah.

Page 133

1     A. Probably 90 percent of the time.
2     Q. Okay. And break down the other 10 percent
3 for me.
4     A. The other 10 percent would be 5 to
5 7 percent TVT Abbrevo, and the other small
6 percentage, Burch or pubovaginal sling.
7     Q. So how many times have you surgically
8 removed or explanted TVT from a patient under general
9 anesthesia?
10     A. So are you referring to my own patients,
11 my own patients in whom I placed mesh slings?
12     Q. I'm referring to I guess any patient. I
13 mean, if you've got them in the OR and you're
14 operating on them, they're your patient, but maybe
15 someone who's even been referred to you; how many
16 times have you surgically removed or explanted
17 polypropylene -- well, strike that.
18         How many times have you surgically removed
19 TVT from a patient under general anesthesia?
20         MR. RUMANEK: Just so the question is
21     clear, do you mean TVT Retropubic?
22         MS. WHITE: Yes.
23         MR. RUMANEK: The original?
24 BY MS. WHITE:
25     Q. Me and the Doctor have an agreement, TVT

34 (Pages 130 to 133)

Samantha Joy Pulliam, M.D.

Page 134

1    equals TVT-R, okay?
2         A.  So because I know that my own patients
3    have received TVT, I can use that number, and to say
4    that of the five patients that have come back with
5    problems, probably four of them I have removed that
6    mesh.  None of those times to my recollection have
7    they been under general anesthetic.  They're all
8    under IV sedation with local anesthetic.
9         Q.  Okay.  So you've never removed --
10        MR. RUMANEK:  Hold on.
11        THE WITNESS:  I'm not done yet.
12   BY MS. WHITE:
13        Q.  Go on, please.
14        A.  I work at a tertiary care center so I'm
15   often referred patients who have had mesh, as you
16   observed; they -- my patients might go to someone
17   else and other people's patients might go to someone
18   else, somewhere else as well.  And as I work in a
19   tertiary care center, I often see patients who come
20   in with -- often.  I am referred patients, I don't
21   often see them, but when I do, they are patients
22   referred to me from outside sources.  And they have
23   had a retropubic sling.  It's not always possible for
24   me to say that they were TVT.  But, in general, I
25   would say that I can tell more recently if they're a

Page 135

1    TVT because they're blue.
2         And I have probably worked on, over the
3    course of 10 years, probably 10 or 20 patients who
4    I've removed mesh from from a sling.  I'm not sure I
5    can say they're TVT.  In fact, I can't.  But I would
6    say that about half of them have been under IV
7    sedation so maybe -- maybe 10 over the course of 10
8    years that have gone under general anesthesia.  So 10
9    patients over the course of 10 years under general
10   anesthesia, but I'm not sure that they're TVT because
11   it's not always provable.
12        Q.  Okay.  All right.  But you think -- of
13   your own patients?
14        A.  Of my own patients.
15        Q.  Make sure I get your testimony right.
16        A.  Of my own patients.
17        MR. RUMANEK:  Let her ask the question.
18   BY MS. WHITE:
19        Q.  Of the you said four you've removed mesh
20   from, not under general anesthesia, IV sedation?
21        A.  That's right.
22        Q.  Okay.  Of your four patients that you've
23   removed TVT from, did you remove TVT mechanical cut
24   or laser cut?
25        A.  I don't know.

Page 136

1         Q.  Okay.  Of the approximately ten under
2    general anesthesia, and your testimony is you don't
3    know if it was TVT or not?
4         A.  Right.
5         Q.  So I guess you don't know whether it was
6    TVT laser cut or mechanical cut?
7         A.  I don't know if it was TVT at all, let
8    alone mechanical cut or laser cut.
9         Q.  Okay.  So TVT-O now.
10        A.  Okay.
11        Q.  How many TVT-Os have you removed under
12   general anesthesia?
13        A.  So of my own patients, which we have
14   agreed is two, both of them were under IV sedation.
15        Q.  Okay.
16        A.  So zero of my own patients.  And, again,
17   same applies here.  I don't know if these were TVT
18   products from which I have removed under general
19   anesthesia, but I -- I can think of one patient that
20   was removed TVT-O under general anesthesia or -- or
21   not TVT-O.  Transobturator sling.  I don't know that
22   it was a TVT-O.
23        Q.  So you don't know if you've ever removed a
24   TVT-O under general anesthesia?
25        A.  It's just not necessary.

Page 137

1         Q.  Okay.  That's not my question.  I'm just
2    asking you, have you removed TVT-O under general
3    anesthesia, and you don't know?
4         MR. RUMANEK:  Object to the form of the
5    question.
6         THE WITNESS:  What I said was of my own
7    patients, I did not, because it was not
8    necessary, remove TVT-O under general
9    anesthesia.  Of patients referred to me, there
10   was one that I removed under general anesthesia,
11   but I'm not certain that it was a TVT-O.
12   BY MS. WHITE:
13        Q.  Okay.  Understand.  How do you know that
14   you have removed TVT four times under general
15   anesthesia?  How do you know that?
16        MR. RUMANEK:  Object to the form.
17   Mischaracterizes testimony.
18        THE WITNESS:  So I am estimating.  And I
19   know that the need for general anesthesia when
20   you remove TVT is uncommon.
21   BY MS. WHITE:
22        Q.  And why is that?
23        A.  Because the mesh erosions that are typical
24   for TVT are underneath the urethra, and this is a
25   common, easily accessible place for mesh erosions.  I

35  (Pages 134 to 137)

Samantha Joy Pulliam, M.D.

Page 138

1  don't mean that the mesh erosion is common.  I mean
2  that if you're going to find it, it's typically near
3  the urethra in the vaginal mucosa.
4       And so, like many other vaginal procedures
5  including the slings themselves, general anesthesia
6  is just not needed.  In addition, general anesthesia
7  may or may not have anything to do with the
8  requirements of the surgeon.  There are times when
9  general anesthesia is more safe for the patient.  And
10  so my knowledge here is an estimate based on my
11  understanding of the number of patients I've
12  experienced and the type of anesthesia.
13       In all honesty, to me, I prefer not to
14  have patients under general anesthesia.  And so if
15  that's possible, that's what I like to do.
16       Q.  Okay.  How many times in your career have
17  you cut or trimmed a mesh erosion or extrusion?
18       MR. RUMANEK:  Object to the form.
19       THE WITNESS:  So I think --
20  BY MS. WHITE:
21       Q.  And let me qualify that.  Of a TVT
22  product.
23       A.  Right.  So I think one thing to say is
24  that the first thing you said, and perhaps I could
25  have clarified then.  When you say "remove" and you

Page 139

1  then say "cut an extrusion," I'm not sure I think
2  about those as separate items.
3       Q.  Okay.  That's fine.
4       A.  So I think if you're going to ask me about
5  numbers, it's certainly likely that there's going to
6  be an overlap in those numbers because I don't
7  differentiate those in my mind.  And there's not a
8  different code for qualifying those sorts of things.
9       Q.  So then is it your testimony you have done
10  it four times?
11       A.  No.
12       MR. RUMANEK:  Object to the form.
13  BY MS. WHITE:
14       Q.  So then give me the number of patients
15  where you have implanted TVT that you've then had to
16  go back and either trim or excise the mesh in some
17  way and that patient was not under general
18  anesthesia.  That's all I'm trying to get to.
19       A.  Okay.  And that's a separate thing from
20  your previous question which was remove.
21       Q.  That's right.
22       A.  Okay.  So I think if we're going to call
23  trim, I suspect that's probably another four or five
24  patients.
25       Q.  Another four or five?

Page 140

1       A.  Uh-huh.  And of that four or five,
2  probably three or four of them are -- three of them
3  let's say are TVT, and two of them are TVT-O or
4  Abbrevo.
5       Q.  Okay.  And I don't want to know about
6  Abbrevo.
7       A.  Right.
8       Q.  I need to know about TVT and TVT-O.
9       A.  Okay.  I couldn't differentiate between O
10  and Abbrevo, even if you asked me to.
11       Q.  So then you don't know how many is TVT-O?
12       A.  I know that the combination of TVT-O and
13  Abbrevo is probably a two.
14       Q.  Okay.  So let's go back because I want the
15  record to be clear and us to understand your
16  testimony.  When I asked you how many times you have
17  surgically removed a TVT from a patient under general
18  anesthesia, you told me four.  What did -- what
19  was your --
20       MR. RUMANEK:  Object.  Sorry.  Object to
21       the form.  Mischaracterizes her testimony.
22  BY MS. WHITE:
23       Q.  Did I misstate something, Doctor?  I do
24  want to get this right.  Because what I'm trying to
25  get to is what is your understanding of remove.  I

Page 141

1  want to make sure you and I were talking about the
2  same thing.
3       A.  Let me tell you what my understanding of
4  remove is.
5       Q.  Please.
6       A.  Okay.  So there are a lot of different
7  categories of remove, and I think as as we have been
8  discussing, I've probably thought about the broad
9  categories of removal.  Sometimes there is a piece of
10  mesh that's probably less than a centimeter in size
11  that is visible and needs to be removed.  Sometimes
12  there is something that can be seen that's more
13  extensive than that that needs to be removed.  I
14  mean, there's sort of a broad spectrum of those sorts
15  of things.  So that's that.
16       The other would be pieces that are visible
17  that could be excised in the office.  And I say this,
18  and I feel like I want to say that I'm describing
19  this large universe of possibilities, but that
20  doesn't imply that there are lots of them.  It just
21  implies that there's lots of options for what you --
22  we might be discussing for removal.  Right?  So you
23  could remove the whole sling from the entire U shape
24  or hammock shape from a TVT or a TVT-O or you could
25  remove a few fibers underneath the urethra.

36  (Pages 138 to 141)

Samantha Joy Pulliam, M.D.

Page 142

1        General principle I think is that you
2   would like to remove what's necessary, certainly no
3   less than that and probably no more than that because
4   you want to minimize any other untoward effects of
5   surgery, operative time, et cetera.
6        Q.   Okay.  Thank you.  So I've got to go back
7   and ask you some questions to clarify your testimony.
8   Let's do it this way.  Given I now understand your
9   understanding of remove, how many times have you
10  surgically removed the whole TVT from --
11       A.   The entire TVT?
12       Q.   Yes, ma'am.
13       A.   In a situation in which I knew it was a
14  TVT?
15       Q.   Yes.
16       A.   Never.
17       Q.   Okay.  How many times have you removed the
18  whole TVT-O from a patient?
19       A.   Again, when I didn't -- when I was certain
20  it was a TVT product?
21       Q.   Yes.
22       A.   Never.
23       Q.   Okay.  So now let's go back and talk about
24  excising or removing or cutting fibers or strings of
25  mesh.  How many times have you surgically removed

Page 143

1   under light sedation, no sedation, general
2   anesthesia, I don't care, how many times have you
3   removed TVT from a patient?
4        A.   And just to clarify.  We have talked about
5   one extreme which was removing everything.
6        Q.   Yes, ma'am.
7        A.   And now we're talking about what I presume
8   is the other extreme which is removing just a few
9   fibers; is that right?
10       Q.   Yes, ma'am.
11       A.   Okay.  So probably there, in which I knew
12  it was a TVT Retropubic?
13       Q.   Yes, ma'am.
14       A.   Probably five times.
15       Q.   Okay.  And out of those five times, how
16  many times was it mechanical cut TVT?
17       A.   I don't recall.
18       Q.   And how many times was it laser cut TVT?
19       A.   I don't recall.
20       Q.   Okay.  And TVT-O?
21       A.   Uh-huh.
22       Q.   How many times did you just remove a few
23  fibers?
24       A.   Two, three times.
25       Q.   Okay.  I think you had previously

Page 144

1   testified --
2        A.   That was before we made the definitions
3   that we have just created, right.
4        Q.   Okay.  So your testimony is that two to
5   three times you've removed some part of, not the
6   whole TVT-O?
7        A.   So we talked about fibers.
8        Q.   Right.
9        A.   There is a vast difference between
10  removing everything and removing fibers.
11       Q.   I understand.
12       A.   Okay.  So I'm talking about fibers.
13  That's what we agreed upon as the -- as the second
14  category.
15       Q.   Oh, I'm with you.  I'm with you.  So
16  you're saying your testimony is two to three times,
17  right?
18       A.   That's right, in circumstances where I
19  knew it was a TVT-O.
20       Q.   When was the last time you did a revision,
21  meaning just a few fibers, to a TVT-O?
22       A.   Probably about two years ago.  It's --
23  it's not something that I have a date on that I can
24  pull out of my head.
25       Q.   Okay.  And I think we have covered this,

Page 145

1   but I want the record to be clear, have you in your
2   clinical practice ever followed the outcomes of your
3   patients who have had mechanically cut TVT versus
4   laser cut TVT?
5           MR. RUMANEK:  Object to the form.
6           THE WITNESS:  So you're asking me if I
7       keep a list someplace --
8   BY MS. WHITE:
9        Q.   Yeah.
10       A.   -- of these patients?
11       Q.   Yes, ma'am.
12       A.   And followed them by contacting them on an
13  ongoing basis?
14       Q.   No, just keep track of them clinically.
15  Have you ever either in research, clinical trials,
16  your practice, ever followed the outcomes of your
17  patients who have had mechanical cut TVT versus laser
18  cut TVT?
19           MR. RUMANEK:  Object to form.
20           THE WITNESS:  So have I done a research on
21  my own patients comparing the two?  No, I have
22  not.
23  BY MS. WHITE:
24       Q.   Have you ever or do you now specifically
25  request mechanical cut or laser cut TVT?

37 (Pages 142 to 145)

Samantha Joy Pulliam, M.D.

Page 146

1        MR. RUMANEK: Object to form.
2        THE WITNESS: I do not although I use
3    TVT Exact which I know to be laser cut.
4    BY MS. WHITE:
5        Q. Okay. Back when you were using TVT prior
6    to coming to UNC, did you specifically request
7    mechanical cut or laser cut TVT?
8        A. No, I did not because I don't and haven't
9    experienced any clinical difference between the two.
10        Q. How do you know?
11        A. Because I know that there's been a
12    changeover. And know that we have used TVT Exact and
13    also Abbrevo, both of which are laser cut, and I see
14    results of my patients in follow-up in the clinic.
15    There's also return of patients who come back if
16    they've had failure. And I just don't see it.
17        Q. Okay. So, this is very important. Are
18    you saying that TVT Abbrevo, TVT Exact, and
19    TVT Retropubic laser cut and TVT mechanical cut are
20    all equivalent products?
21        A. I'm saying that the clinical results I see
22    from those products are equivalent in terms of the
23    outcome regarding the stress urinary incontinence.
24        Q. Well, if it turned out that all five of
25    your patients who you did some type of revision on

Page 147

1    regarding the TVT that you previously testified to,
2    if that all happened to have been laser cut or
3    mechanical cut, would that change your opinion?
4        MR. RUMANEK: Object to form.
5        THE WITNESS: I think it's a supposition
6    to say that that could possibly be the case.
7    BY MS. WHITE:
8        Q. But you don't know, do you, Doctor?
9        MR. RUMANEK: Let her finish her answer.
10        THE WITNESS: I think that the -- the
11    truth is that mechanically cut and laser cut
12    are -- have also not been shown to have higher
13    rates of erosion or urinary retention or pain or
14    any of the other reasons that I would think
15    about needing to remove a sling so I think it's
16    unreasonable to assume that there would be one
17    or the other.
18    BY MS. WHITE:
19        Q. What is the basis for that opinion?
20        A. The medical literature.
21        Q. Okay. So you're relying upon the medical
22    literature for that opinion?
23        A. I am.
24        Q. Because you haven't tracked it in your
25    career. We have established that, right, this

Page 148

1    morning?
2        MR. RUMANEK: Object to the form.
3    Mischaracterizes her previous testimony.
4        THE WITNESS: Even if I did track it in my
5    own career, we have established that I do -- I
6    have done 680 of all such slings during my
7    career, and there are literature which supports
8    from views of thousands and thousands of women.
9    It would be useful for me really to refer to the
10    reviews, to the Cochrane database and other ways
11    of evaluating large cohorts. In general, that's
12    the sort of data that I rely on to make the
13    kinds of decisions about my practice.
14    BY MS. WHITE:
15        Q. Okay. Have you ever been provided with
16    documents from Ethicon that show that the
17    mechanically cut TVT can fray?
18        MR. RUMANEK: Object to the form.
19        THE WITNESS: So I've seen pictures of
20    mesh provided in this bit of information here,
21    this information that shows mesh that's been
22    pulled on and frayed.
23    BY MS. WHITE:
24        Q. I don't think that's what I asked you. I
25    mean, maybe the answer is I don't know. Let me

Page 149

1    rephrase the question.
2        Have you been provided with documents from
3    Ethicon, meaning Ethicon documents, that show that
4    the mechanically cut TVT can fray?
5        A. So I think by fraying, you mean that there
6    are small particles of mesh that are released if you
7    pull on a sling? And I've seen that it happens. And
8    I've seen that from Ethicon.
9        Q. Do you have an opinion as to what causes
10    that?
11        A. Well, I think undue and unnecessary stress
12    on the sling. I mean, I -- will cause fraying. And
13    that's I think true about laser cut mesh as well as
14    mechanically cut mesh.
15        Q. Have you been provided documents from
16    Ethicon that show the safety profile of mechanical
17    cut versus laser cut TVT?
18        A. In what way the safety profile?
19        Q. That there's a difference?
20        A. That there's a difference in safety?
21        Q. Yes.
22        MR. RUMANEK: Object to the form.
23        THE WITNESS: What kind of safety?
24    BY MS. WHITE:
25        Q. You don't get to ask me questions. I'm

38  (Pages 146 to 149)

Samantha Joy Pulliam, M.D.

Page 150

1    asking you, have you --
2          MR. RUMANEK: Hold on just a second. She
3    can ask. If she needs you to clarify the
4    question, she can ask you.
5    BY MS. WHITE:
6          Q. Let me rephrase it. Have you been
7    provided documents from Ethicon that show a
8    difference in the safety profile of mechanical cut
9    versus laser cut TVT?
10         MR. RUMANEK: And I just want to stop for
11   just a second because I don't want what she said
12   to confuse you in any way. If you don't
13   understand something that she asks, you
14   absolutely can ask her questions to clarify it
15   so please disregard what she said. Go ahead.
16         THE WITNESS: So I have seen documents
17   about the safety profile of mesh. And I have
18   seen documents about the safety profile with
19   regard to things like cytotoxicity, with regard
20   to complications from the surgical procedures.
21         I don't know that I've seen a direct
22   comparison of laser cut mesh to mechanically cut
23   mesh in any major research study that would be
24   meaningful to me, although I know that they've
25   probably been evaluated on a mechanical basis.

Page 151

1          I think probably those kinds of things were the
2    sorts of things that I reviewed briefly and then
3    passed over in favor of some of the larger
4    reviews of the literature.
5    BY MS. WHITE:
6          Q. Have you seen documents that show that
7    mechanically cut TVT can rope?
8          MR. RUMANEK: Object to the form.
9          THE WITNESS: So, again, I'm going to
10   assume that roping means that when it's pulled
11   on very hard, it becomes thinner and pulls
12   together? And if that's the case, I have seen
13   documents that show that it can rope.
14   BY MS. WHITE:
15         Q. What -- in your opinion, what causes TVT
16   to rope?
17         MR. RUMANEK: Object to the form.
18         THE WITNESS: In my opinion, what causes
19   TVT to rope?
20   BY MS. WHITE:
21         Q. Yes, ma'am.
22         A. Are you talking about laser cut or
23   mechanical cut mesh?
24         Q. I'm not -- I'm talking mechanical cut.
25         A. Okay. I think unnecessary, undue stress

Page 152

1    on the thing, yanking on it from one end to the other
2    can cause roping.
3          Q. So is it your opinion that TVT mechanical
4    cut only ropes or curls when there's undue pulling
5    and stretching, meaning undue tension?
6          MR. RUMANEK: Object to the form.
7          THE WITNESS: I think that's right. I
8    think left without undue tension, it's likely to
9    lay flat which is how it presents in the box and
10   how it's to be placed.
11   BY MS. WHITE:
12         Q. So would that be doctor error in
13   implantation?
14         MR. RUMANEK: Object to the form.
15         THE WITNESS: I think it's hard for me to
16   say globally about every individual case in
17   doctor error. But I think that the instructions
18   for use for all of the TVTs would basically
19   suggest that it's to be placed flat and tension
20   free.
21   BY MS. WHITE:
22         Q. With no tension?
23         A. Yeah, with no tension.
24   (Pulliam 7 was marked for identification.)
25

Page 153

1    BY MS. WHITE:
2          Q. All right. I'm going to hand you -- I'm
3    handing you what is Exhibit 7, an IFU?
4          A. Great.
5          Q. And are you familiar with Exhibit 7?
6          A. This looks like the English part of the
7    TVT instructions for use. Yes, I'm familiar. Is
8    that right?
9          MR. RUMANEK: I was just looking at the
10   year.
11         MS. WHITE: Let's go off the record for a
12   minute.
13         (A recess transpired from 1:54 p.m. until
14   1:58 p.m.)
15   BY MS. WHITE:
16         Q. All right. Back on the record. Sorry
17   about that. I am sorry Exhibit 7 is so small. I
18   feel your pain. I really do.
19         So you just testified that TVT is intended
20   and supposed to be placed in a tension-free manner.
21   Is that right, Doctor?
22         A. That's right.
23         Q. Okay. So if you take a look at page 5 of
24   the -- of Exhibit 7. And it's the top bullet. Well,
25   it's second to the top bullet point. And I'm going

Samantha Joy Pulliam, M.D.

Page 154

1    to read it to you.
2         A.   Okay.
3         Q.   Just because I know you're probably having
4    difficulty.  It says, "Ensure that the tape is
5    placed" -- wait, wait.  Sorry.  Back up.  Go to page
6    4.  Go to page 4.  I'm sorry.
7              Page 4.  And it's under Warnings and
8    Precautions.  And it's the third bullet point.  And
9    I'm going to try to read this.
10             And first of all, Doctor, have you seen
11   the IFU before today?
12        A.   I have.
13        Q.   Okay.  And have you used the IFU in the
14   course of your practice, you know, since your
15   fellowship through today's date?
16             MR. RUMANEK:  Object to the form.
17             THE WITNESS:  So I don't routinely refer
18   to the IFU.
19   BY MS. WHITE:
20        Q.   Have you -- did you ever refer to it prior
21   to doing a TVT surgical implant on a patient?
22        A.   If you mean do I read the instructions
23   before I do the procedure?  I do not.
24        Q.   No, that's not what I asked.  Have you
25   ever -- at some point in your career, did you take

Page 155

1    the time to read Ethicon's IFU?
2              MR. RUMANEK:  Object to the form.
3              THE WITNESS:  Yes.  I've read at least
4         portions of it in my career.
5    BY MS. WHITE:
6         Q.   Okay.  And so if you go to page 4, and
7    it's the third bullet point, it says -- I can't read
8    that.  Under Warnings and Precautions, "Users should
9    be familiar with surgical technique for bladder neck
10   suspensions and/or should be adequately trained in
11   implanting the GyneCare TVT system before employing
12   the GyneCare TVT device.  It is important that the
13   tape be located without tension under the
14   mid-urethra."
15             Do you see that?
16        A.   I do.
17        Q.   Is that a true statement based upon your
18   clinical experience?
19        A.   So it is true that users should be
20   familiar with the surgical techniques for surgery and
21   adequately trained.  And it is true that the tape
22   should be located without tension under the
23   mid-urethra.
24        Q.   Okay.  So now, go to page 5.  This has
25   been a laborsome exercise.  Sorry about that.

Page 156

1              If you go to page 5, and it is the second
2    bullet at the top of page 5.  It says, "Ensure that
3    the tape is placed with minimal tension under the
4    mid-urethra."
5              Do you see that?
6         A.   I do.
7         Q.   Okay.  So I guess my question to you is,
8    is it no tension or minimal tension?
9         A.   So in the instructions for use, I think
10   the key thing here is that these are instructions for
11   surgery to surgeons.  In general, in surgery, in
12   placing or controlling something, there is what I'll
13   call the gentle approach and then there's the firmer
14   grasp.  And in the gentle approach, I can give an
15   example of holding something that may bleed.  It's
16   impossible to not hold it perhaps in a surgical
17   scenario, but if it's grasped, it needs to be held
18   under minimal tension which is the same thing as no
19   tension because it will bleed.
20             So I think that in reading this as a
21   surgeon, I perfectly understand what this is
22   instructing me to do.  And I don't -- I don't see any
23   conflict between the two.
24        Q.   So what does the scientific literature
25   tell physicians in terms of whether it should be no

Page 157

1    tension or minimal tension?
2              MR. RUMANEK:  Object to the form.
3              THE WITNESS:  Scientific literature is
4         probably not the place that most people learn to
5         do these, just as the IFU is not the place where
6         surgeons learn to do these.  Surgeons have a
7         background in surgical handling of tissues, in
8         the placement of other slings in likelihood
9         besides suburethral slings and in the treatment
10        of all things that have to do with the vagina
11        before they do this.  So they have vast
12        experience in doing vaginal surgery.
13             I don't know that I think the literature,
14        which refers to the appropriate placement of
15        slings, is going to instruct someone in how to
16        do it, at least not in a randomized controlled
17        trial, looking at tensioning as much as it's the
18        surgical training that you have that would lead
19        you to understand how to do this.
20   BY MS. WHITE:
21        Q.   So is it your testimony that no tension on
22   page 4 is the same as minimal tension on page 5?
23        A.   It's my testimony that these are surgical
24   instructions for surgeons who routinely handle
25   tissue.

40 (Pages 154 to 157)

Golkow Technologies, Inc - 877.370.3377

Samantha Joy Pulliam, M.D.

## Page 158

1    Q.  Okay.  So based upon your expert opinion,
2  is it acceptable for a physician to place the TVT
3  with minimal tension?
4    A.  It is acceptable for a surgeon to place a
5  TVT in the way that they've been trained to place a
6  TVT such that it does not provide urinary retention
7  and does provide treatment for stress urinary
8  incontinence.  And I think the literature would
9  suggest that generally we're very successful in doing
10  that with TVT.  The success rates are good.  The
11  retention rates are low.
12    Q.  Then what's the problem with placing the
13  TVT with tension?
14    MR. RUMANEK:  Object to the form.
15    THE WITNESS:  So the problem with placing
16  the TVT with tension, and I think we're talking
17  about degrees here, right?  I mean, I think when
18  I talk with my patients, I essentially tell them
19  that I am an experienced surgeon.  And in every
20  kind of surgical procedure you have, you want
21  someone who knows what they're doing.  And I
22  know how to place this sling.
23    The problem with unnecessary tension is
24  that it causes or may cause, doesn't always
25  cause, but it my cause voiding dysfunction,

## Page 159

1  urinary retention.
2  BY MS. WHITE:
3    Q.  Okay.  And that's very painful for a woman
4  when she has urinary retention, right?
5    MR. RUMANEK:  Object to the form.
6    THE WITNESS:  Urinary retention sometimes
7  is physically painful.  It's not always
8  physically painful.
9  BY MS. WHITE:
10    Q.  You don't want that for your patients,
11  right, Doctor?
12    A.  I do not want that for my patients.
13    Q.  Have you seen internal documents from
14  Ethicon reflecting that the mechanically cut TVT can
15  release particles in a woman's body?
16    MR. RUMANEK:  Object to the form.
17    THE WITNESS:  I have seen some documents
18  to that effect, yes.
19  BY MS. WHITE:
20    Q.  Do you -- what causes that?
21    MR. RUMANEK:  Object to the form.
22  BY MS. WHITE:
23    Q.  In your expert opinion?
24    A.  So I think that there are probably a
25  variety of things that cause it.  I think that the

## Page 160

1  technique of mechanical cutting and then perhaps
2  undue tension on it can cause fraying which releases
3  particles.  I think that an interesting thing to note
4  about these particles is that they're made of the
5  very same thing as the mesh.  And all of that is made
6  of polypropylene.  A suture of polypropylene is
7  essentially the same thing as these particles and so
8  the presence of polypropylene has not been shown
9  historically for a long time to be a problem.
10    Q.  What's the basis for your opinion for
11  that?
12    A.  My own experience, the fact that
13  polypropylene sutures have been present in surgery
14  for decades.
15    Q.  So are you equating the TVT and/or TVT-O
16  in the vagina with a polypropylene suture placed
17  either in the abdomen or the vagina?  Are you saying
18  that's essentially the same thing?
19    MR. RUMANEK:  Object to the form.
20  Mischaracterizes her testimony.
21    THE WITNESS:  I think that I haven't even
22  referred to the abdomen.  But I think that there
23  are vaginally placed polypropylene sutures.
24  They even occupy the same space.  In history,
25  there have been Kelly plications.  Those have

## Page 161

1  been done since the 1950s at least that are made
2  from the same material as a polypropylene mesh.
3  They're made from exactly the same material.
4  BY MS. WHITE:
5    Q.  Okay.  So, again, you're equating a TVT
6  and/or TVT-O polypropylene mid-urethral sling with a
7  polypropylene suture?
8    MR. RUMANEK:  Object to the form.
9  Mischaracterizes her testimony.
10    THE WITNESS:  No, I'm not.
11  BY MS. WHITE:
12    Q.  Okay.  I just want to make sure I
13  understand your testimony.  We're talking about
14  mechanically cut TVT releasing particles into the
15  body.  And your --
16    MR. RUMANEK:  Let her ask the question.
17  BY MS. WHITE:
18    Q.  And your opinion is there's not a problem
19  with this.  Did I understand that part correctly?
20    A.  So I think into the body suggests to me
21  that -- I'm not sure where that is.  What I would say
22  is that polypropylene material in the vagina is small
23  fragments of this mesh -- this fray that is
24  equivalent to the presence of a suture.  It's the
25  same type of material in the same place that a suture

Samantha Joy Pulliam, M.D.

Page 162

1  might be placed.
2      Q. Okay. Have you seen Ethicon documents
3  that show that the Prolene, which is what the TVT is
4  made of, Prolene mesh, that the Prolene that's used
5  in the mechanically cut TVT can degrade?
6          MR. RUMANEK: Object to the form.
7          THE WITNESS: I've seen lots of literature
8  discussing whether or not polypropylene can --
9          MR. RUMANEK: Hold on. I think she asked
10  you about --
11  BY MS. WHITE:
12      Q. That's not what I asked you.
13      A. I'm sorry.
14      Q. Have you seen Ethicon documents that show
15  that the Prolene that's used in a mechanically cut
16  TVT can degrade?
17          MR. RUMANEK: Object to the form.
18          THE WITNESS: I may have reviewed some of
19  those here, but, again, for my opinions, I
20  haven't reviewed those as a way to formulate an
21  opinion about this.
22  BY MS. WHITE:
23      Q. Okay. And, again, your opinions have been
24  formulated based upon your review of the literature
25  and your clinical experience, right?

Page 163

1          MR. RUMANEK: Object to the form. And the
2  other things that have been discussed and
3  mentioned in her report.
4          THE WITNESS: And my discussions at
5  national conferences with other professionals,
6  yes.
7  BY MS. WHITE:
8      Q. Okay. So based upon your clinical
9  experience, what is the leading cause of TVT revision
10  surgery?
11          MR. RUMANEK: Object to the form.
12  BY MS. WHITE:
13      Q. Again, based upon your clinical
14  experience.
15      A. Right. So in my clinical experience, TVT
16  revision, and I suppose we should pause here to
17  talking about revision. And maybe, actually, we
18  should work to define that. So I'll say revision
19  would mean perhaps tightening or loosening of the
20  sling or releasing the sling for some issue that's
21  not due to mesh erosion or some other issue that has
22  to do with exposure of mesh? Is that a definition
23  that you would like or is there something else that
24  you --
25      Q. It's not, and it's not the question. So

Page 164

1  let me -- that's my fault, not yours. All right?
2          So what -- what is, based upon your
3  clinical experience, the leading cause of you having
4  to go in, the times that we have already discussed
5  this morning, and -- and excise or take out in whole
6  a TVT product?
7          MR. RUMANEK: Object to the form.
8          THE WITNESS: So the leading cause -- of
9  the surgeries that we've discussed, the leading
10  cause is the mesh exposure in the vagina.
11  BY MS. WHITE:
12      Q. Mesh erosion?
13          MR. RUMANEK: Object to the form.
14          THE WITNESS: Sometimes people say that
15  erosion implies presence in a different organ
16  such as the bladder and bowel which is
17  exceedingly rare. And mesh exposure in the
18  vagina also rare is really what I think is the
19  leading cause of going back to the operating
20  room.
21  BY MS. WHITE:
22      Q. All right. So let's talk about that in --
23  for a minute.
24          Of the -- I think it was the number of
25  patients that we've previously discussed where you've

Page 165

1  either taken the TVT out in whole or in parts, how
2  many of those patients had mesh erosion?
3          MR. RUMANEK: Object to the form.
4          THE WITNESS: So the majority of them have
5  mesh exposure in the vagina. And I will reserve
6  those comments to those patients that had
7  surgery under IV sedation as we discussed
8  previously. These were -- those were almost
9  exclusively exposure in the vagina.
10  BY MS. WHITE:
11      Q. Okay. And I think we testified, please
12  correct me if I'm wrong, four.
13      A. Okay.
14      Q. Okay? So when you say the great majority,
15  what do you mean by that? What number?
16      A. Three.
17      Q. Okay.
18      A. But I'm not -- I guess I'm also talking
19  about the other categories of TVT. For all
20  categories of TVT, whether we're talking about the
21  retropubic procedures, the obturator procedures, as I
22  think about those in total, all of those are about
23  mesh exposure, not about any other problem so --
24      Q. I asked you just about the TVT.
25      A. Yes, you're right. You're right. So

Samantha Joy Pulliam, M.D.

Page 166

1    still, we'll say four.
2        Q.  Is it three or four?
3            MR. RUMANEK:  Object to the form.
4            THE WITNESS:  Right.  So if we said four
5    in general, we will say three of those were for
6    mesh exposure.
7    BY MS. WHITE:
8        Q.  Okay.
9        A.  Okay.
10       Q.  What was the other one because of?
11       A.  Sometimes there's not exposure, but
12   there's irritation at the site.  The tissues thin.
13   So that's sometimes another reason to remove if we
14   can't address that in any other way.
15       Q.  Okay.  And you testified earlier you have
16   never removed a TVT-O in whole that you know of?
17       A.  That's right.
18       Q.  All right.  Okay.  And I think you've done
19   two or three --
20       A.  Right.  All of these numbers that I've
21   given you are estimates and so I'm -- you're holding
22   me to these firm numbers when I'm adding another
23   estimate, and I think the total number we're going to
24   have to decide is perhaps give or take a few because
25   the first ones were estimates.

Page 167

1        Q.  Well, you're an expert in this case.
2        A.  I am.
3        Q.  And I'm entitled to discover your clinical
4    experience.
5        A.  That's fine.
6        Q.  And you've already testified your clinical
7    experience is the basis, at least in part --
8        A.  That's right.
9        Q.  -- of your opinion?
10       A.  Right.
11       Q.  So in fairness to me, you know, you've
12   testified.  I've let you explain your answers as much
13   as you want to.  So you testified earlier that you've
14   never removed a TVT-O in whole?
15       A.  That's correct.
16       Q.  And that you've done a revision, meaning
17   clipped the fibers, two or three times, right?
18       A.  So I don't think we used the word
19   "revision" previously, but, yes, I've removed fibers
20   two or three times, yes, that's right.
21       Q.  Okay.  And was that because there was
22   exposure into the vagina?
23       A.  That's correct.
24       Q.  Okay.  So what -- what are in your opinion
25   the pros of the TVT, meaning the TVT-R, for a

Page 168

1    patient?  Why did you like that product?
2            MR. RUMANEK:  Object to the form.
3            THE WITNESS:  So I think that there are
4    pros to retropubic slings which includes the
5    TVT-R.  And they are to some degree in contrast
6    to other options for patients who have stress
7    urinary incontinence.
8            But, in general, the TVT-R is -- can be
9    done under local anesthetic with IV sedation.
10   It's a brief procedure, just focusing on the
11   operative -- perioperative advantages.  It's a
12   safe procedure.  It's an effective procedure.
13   It's a procedure with limited complications, and
14   it's a procedure that is not generally difficult
15   to recover from.
16   BY MS. WHITE:
17       Q.  Okay.  What are the cons of a TVT
18   procedure?
19           MR. RUMANEK:  Object to the form.
20           THE WITNESS:  So I think that, in general,
21   it is always preferable not to have surgery.
22   And that's certainly true of TVT as well as any
23   other surgical procedure for urinary
24   incontinence.  I think that it is -- if you're
25   talking about things that are unique to TVT, I

Page 169

1    suspect that the complication rates related to
2    mesh are the only specific, unique thing that I
3    can think of that is not common to all other
4    procedures for urinary incontinence so I guess I
5    would have to name that one.  But, in general,
6    that's the con, and that's a very low risk.  So
7    it's not much of a con.
8    BY MS. WHITE:
9        Q.  So what about TVT-O?  What are the pros of
10   the TVT-O?
11           MR. RUMANEK:  Object to the form.
12           THE WITNESS:  I would say they're similar.
13   BY MS. WHITE:
14       Q.  What are the cons?
15           MR. RUMANEK:  Object to the form.
16           THE WITNESS:  I would say that they're
17   similar.
18   BY MS. WHITE:
19       Q.  Similar to the TVT?
20       A.  That's correct.
21       Q.  Okay.  Have you ever looked at pathology
22   from an explanted TVT sling?
23       A.  I have seen photographs and micrographs of
24   those.
25       Q.  Okay.  So we'll get to that.

43  (Pages 166 to 169)

Samantha Joy Pulliam, M.D.

Page 170

1    A.  Okay.
2    Q.  But have you ever -- not photographs.
3  Have you ever seen the actual pathology on a slide
4  from an explanted TVT sling?
5        MR. RUMANEK:  Object to the form.
6        THE WITNESS:  So pretty rarely are slings
7    or anything ever looked at with my eyes to the
8    microscope.
9  BY MS. WHITE:
10    Q.  Yes, that's what I'm --
11    A.  I think putting my eyes to the microscope
12  or putting anyone's eyes to the microscope is not a
13  common way to look at pathology per se.  I think most
14  things are actually projected on screen.  But, no,
15  I've never looked through a microscope to explanted
16  mesh.
17        MR. RUMANEK:  Make sure to keep your voice
18    up.
19        THE WITNESS:  I'm sorry.  I might need
20    a --
21  BY MS. WHITE:
22    Q.  In those times where --
23        MR. RUMANEK:  Hold on.  You need to take
24    like a five-minute break?
25        THE WITNESS:  I need to get up and get a

Page 171

1    glass of water.
2        MS. WHITE:  Oh, sure.  Let's take a break.
3    I'm sorry.
4        (A recess transpired from 2:19 p.m. until
5        2:22 p.m.)
6  BY MS. WHITE:
7    Q.  In those times where you've removed mesh
8  from women, specifically TVT, did you request any
9  particular analysis of the explanted mesh?
10    A.  No, I did not.  I routinely send it for
11  macroscopic evaluation, just to basically affirm that
12  I've identified and removed mesh.
13    Q.  Do you know what a macrophage is?
14    A.  Yes.
15    Q.  What is a macrophage?
16    A.  It's a cell of inflammation and healing.
17  It's part of the immune system.
18    Q.  And do you know how to identify a
19  macrophage on a pathology slide?
20    A.  I do.
21    Q.  And did you learn that during your
22  pathology internship?
23    A.  Uh-huh.
24        MR. RUMANEK:  You got to say yes.
25        THE WITNESS:  Oh, I'm sorry.  Yes, I did.

Page 172

1  BY MS. WHITE:
2    Q.  So when was the last time you looked at a
3  histopathology slide involving explanted Prolene
4  mesh?
5        MR. RUMANEK:  Object to the form.
6        THE WITNESS:  You mean when was the last
7    time I looked at an explanted pathology slide
8    under the microscope?
9  BY MS. WHITE:
10    Q.  Yes, ma'am.
11    A.  I think, as I mentioned previously, I
12  don't believe I've ever actually looked at that under
13  a microscope, physically.
14    Q.  How many histopathology slides involving
15  an explant mechanical cut TVT sling have you looked
16  at?
17        MR. RUMANEK:  Object to the form.
18        THE WITNESS:  As I said previously, I have
19    not looked at them under the microscope.
20  BY MS. WHITE:
21    Q.  How many histopathology slides involving
22  an explanted laser cut TVT sling have you looked at?
23        MR. RUMANEK:  Object to the form.
24        THE WITNESS:  I have not looked at them
25    through the microscope.

Page 173

1  BY MS. WHITE:
2    Q.  How many histopathology slides involving
3  an explanted TVT-O sling have you looked at?
4        MR. RUMANEK:  Object to the form.
5        THE WITNESS:  I have not looked at them
6    under the microscope.
7  BY MS. WHITE:
8    Q.  Have you ever made a histopathologic slide
9  related to a polypropylene mesh after removal from a
10  woman's body?
11        MR. RUMANEK:  Object to the form.
12        THE WITNESS:  The making of a
13    histopathologic slide is not something that's
14    done by a pathologist or a gynecologist.  It's
15    an automated function that involves wax and a
16    special machine, and it's usually done as a
17    process in a pathology lab.  So no, I have not.
18  BY MS. WHITE:
19    Q.  Do you know how to make a slide from a
20  mesh explant?
21    A.  I know how to make a pathology slide.
22    Q.  Can you explain to process to me?
23    A.  Sure.
24    Q.  Go ahead.
25    A.  All right.  There are variations in the

44  (Pages 170 to 173)

Samantha Joy Pulliam, M.D.

Page 174

1    process depending upon the materials. But an H&E
2    pathology slide involves first fixing the specimen in
3    formalin and then processing it through a machine
4    that embeds the processing tissue into a piece that's
5    large enough to fit onto -- small enough to fit onto
6    a pathology slide. And placing that in paraffin.
7    And then slicing it onto a microtome so it's placed
8    onto your slide. And then putting a cap on top of it
9    to protect it.
10       Q. Okay. That's it?
11       A. For an H&E slide, that's correct. There
12   are different bits of processing, and I understand
13   there's actually a lot of discussion in this area for
14   creating a slide depending upon how you want to clean
15   the mesh, and those are not processes that I have
16   experience with.
17       Q. Do you believe in the value of
18   histopathology in relation to mesh?
19          MR. RUMANEK: Object to the form of the
20   question.
21   BY MS. WHITE:
22       Q. Meaning what value is it to you as a
23   physician treating women with polypropylene mesh
24   products? Can it tell you anything about what went
25   wrong?

Page 176

1    that degradation is certainly something that
2    the -- is a discussion in the medical literature
3    in terms of what happens to polypropylene, and
4    I've read a great deal of literature on both
5    sides of that, but I don't have any indication
6    that whatever degradation may or may not happen
7    has any clinical impact.
8    BY MS. WHITE:
9        Q. Okay. Do you believe that a patient can
10   have a foreign body reaction to polypropylene mesh?
11       A. So foreign body reactions, there are lots
12   of different meanings to that. I think, you know,
13   within medicine, there are lots of different kinds of
14   implants. I mean, ranging from hip replacements to
15   breast implants to mesh. And every time you place
16   something, even a suture that stays, there is a
17   reaction by the body because there's material there
18   that's foreign. I'm not sure that implies pathology
19   as much as it does the normal way in which the body
20   responds.
21       Q. Give me your definition of foreign body
22   reaction.
23       A. I think it's an inflammatory initial
24   process that pertains to the body identification and
25   processing of material that's identified by the body

Page 175

1          MR. RUMANEK: Object to the form of the
2    question.
3          THE WITNESS: So there are a variety of
4    reasons to look at something from pathology.
5    And there are a variety of ways to look at
6    something under many different types of
7    microscopes with many different types of stains
8    and evaluations and cleaning. Within that, in
9    my experience, I haven't performed those for
10   mesh erosions nor have I seen an indication to
11   do so.
12   BY MS. WHITE:
13       Q. Can it assist you in determining whether
14   the TVT or TVT-O degraded inside a patient's body?
15          MR. RUMANEK: Object to the form.
16          THE WITNESS: I'm sorry? I didn't
17   understand the first part of your question.
18   BY MS. WHITE:
19       Q. So can histopathology assist you in
20   determining whether a TVT or a TVT-O degraded inside
21   your patient's body?
22          MR. RUMANEK: Object to the form.
23          THE WITNESS: I'm not sure that there's
24   any clear correlation between clinical findings
25   and any even intimation of degradation. I think

Page 177

1    as not the body.
2        Q. Okay. Well, can a patient receiving a TVT
3    have an inflammatory reaction?
4        A. I think inflammation is a normal response
5    to any kind of surgery with or without an implant.
6        Q. Okay.
7        A. In other words -- I'll just add this in --
8    if I make an incision and it heals, inflammation is
9    part of how the body heals.
10       Q. Okay. Have you ever authored or published
11   any peer-reviewed articles on degradation of
12   polypropylene mesh?
13       A. I have not.
14       Q. Have you ever spoke on that issue at any
15   conference?
16       A. I have not.
17       Q. Have you ever at any conference lectured,
18   spoke about, presented posters on the use of
19   histopathology of mesh in making clinical
20   determinations for your patients?
21          MR. RUMANEK: Object to the form.
22          THE WITNESS: I don't think I have, no.
23   BY MS. WHITE:
24       Q. And are you holding yourself out to be an
25   expert in pathology?

45  (Pages 174 to 177)

Samantha Joy Pulliam, M.D.

## Page 178

1      MR. RUMANEK: Object to the form.
2      THE WITNESS: I'm an expert in pathology
3  as it pertains to the clinical care of my
4  patients.
5  BY MS. WHITE:
6      Q.  What does that mean?
7      A.  What that means is that I understand how
8  pathologic findings as reported to me or as found
9  under a microscope or in gross description impact the
10  care of my patients. I'm able to make clinical
11  decisions accordingly.
12      Q.  How have you used pathology in making
13  decisions about the clinical care of your mesh
14  patients?
15      A.  So most of my experience with mesh
16  patients has been removing mesh from this exposure
17  that we've discussed. Sometimes there is atrophy
18  meaning thinning of the vaginal tissue that results
19  as a process after menopause. And that is something
20  that is certainly something that I can find on
21  pathology that would prompt me to provide vaginal
22  estrogen to stimulate tissue growth there. That's
23  appropriate. Having said that, I think that
24  microscopic pathology is rarely useful in the
25  treatment of mesh patients.

## Page 179

1      Q.  Keep your voice up. I can barely hear
2  you.
3      A.  The air conditioner just came on, didn't
4  it? Okay.
5      Q.  So after you remove mesh from your
6  patients, and I know it's only happened five to seven
7  times.
8      A.  Five to seven times in the patients that I
9  know had TVT removed?
10      Q.  That's right.
11      A.  That's right.
12      Q.  TVT or TVT-O?
13      A.  For that I know had TVT removed, that's
14  right.
15      Q.  Do you check to see if there has been a
16  foreign body reaction in that patient to the mesh?
17      MR. RUMANEK: Object to the form.
18      THE WITNESS: No, I don't.
19  BY MS. WHITE:
20      Q.  Do you believe you can see the foreign
21  body response on a histological slide?
22      MR. RUMANEK: Object to the form.
23      THE WITNESS: So I think it doesn't matter
24  whether there's a foreign body response. As we
25  have discussed, I think that foreign body

## Page 180

1  response is, in general, a typical body response
2  to the presence of something that's not supposed
3  to be there. So I'm not sure it implies
4  pathology. And I'm not sure it has any special
5  significance when removing mesh.
6  BY MS. WHITE:
7      Q.  Okay. So in your clinical experience,
8  what types of complications have your patients
9  experienced with TVT? Let's start with just TVT
10  based upon your experience with the product since
11  your fellowship, what types of complications have
12  your patients experienced?
13      A.  My patients have experienced, as we've
14  discussed, mesh exposure in the vagina. They have
15  experienced urinary retention. And I would say
16  "they," I don't mean every single one of them. I
17  mean a select few. They've experienced retropubic
18  hematoma.
19      And I guess I want to emphasize again that
20  I do mostly TVT, but none of these complications are
21  necessarily unique to TVT. I could say the same if
22  you asked me about my patients who had surgical
23  treatment for urinary incontinence.
24      Q.  But, Doctor, I'm asking you about TVT?
25      A.  Right.

## Page 181

1      Q.  So, please, my question was --
2      A.  Do you want me to talk about things that
3  are unique to TVT or do you want me to talk about all
4  sorts of procedures that occur after treatment for
5  urinary incontinence?
6      Q.  No, I just want you to answer my question.
7  In your clinical experience, what types of
8  complications have your patients experienced with
9  TVT?
10      A.  Okay. So I think that answers my
11  question -- your question.
12      Q.  Mesh exposure in the vagina, urinary
13  retention, and retropubic hematoma?
14      A.  And the one further might be voiding
15  dysfunction, urinary urgency and frequency.
16      Q.  In your clinical experience, what types of
17  complications have your patients experienced with
18  TVT-O?
19      A.  I think all of those things I just
20  mentioned. So urinary retention, voiding
21  dysfunction. I've not had a retropubic hematoma with
22  the TVT-O. And transient thigh pain.
23      Q.  Transient thigh pain?
24      A.  Yes.
25      Q.  Have you ever had any of your patients

46 (Pages 178 to 181)

Samantha Joy Pulliam, M.D.

## Page 182

1    experience ongoing or chronic thigh pain?
2         A.   So if by chronic, you mean longer than a
3    typical six- or twelve-week post-operative period,
4    no, I have not.
5         Q.   Have you ever had a patient have a thigh
6    abscess?
7         A.   No.
8         Q.   Okay.   Would you agree with me that TVT
9    has been associated with the following complications;
10   and this is either based on your clinical experience
11   or your review of all the literature you brought here
12   with you today.   Okay?   So I'm going to go down the
13   list.
14        A.   Okay.
15        Q.   Mesh erosion into the urethra?
16        A.   Yes.
17        Q.   Mesh erosion into the vagina?
18        A.   Exposure, as we talked about, yes.
19        Q.   Pain a year or more after surgery meaning
20   chronic pain with TVT?
21             MR. RUMANEK:  Object to the form.  Object
22   to the form.
23             THE WITNESS:  I think that's true and
24   similar to other procedures for urinary
25   incontinence.  The other two you mentioned are

## Page 183

1         unique to TVT.  Or TV- -- or to mesh slings.
2    BY MS. WHITE:
3         Q.   Do you agree with me that there's a
4    difference between post-operative pain and chronic
5    pain?
6         A.   In general, yes, I do.
7         Q.   Okay.  How do you distinguish between the
8    two?
9         A.   So every patient is different.  And by
10   that, I mean, I think that it's unreasonable to
11   expect that the rate of resolution of pain after
12   surgery occurs at the same rate for every single
13   patient.  But, in general, I would say that chronic
14   pain could probably be expected to be diagnosed after
15   about six months postoperatively.  I think that's not
16   a firm number.  There are certainly patients who come
17   into surgery with either a predisposition towards
18   pain or existing pain that can be exacerbated, and
19   those things are harder to address.
20        Q.   In your opinion, can chronic pain from TVT
21   develop more than six months after implantation?
22             MR. RUMANEK:  Object to the form.
23             THE WITNESS:  No, not if it wasn't present
24        before six months.
25

## Page 184

1    BY MS. WHITE:
2         Q.   And is that opinion based upon anything
3    you have found in the medical literature?
4         A.   I think that opinion is based upon
5    basically the challenge of attributing.  In other
6    words, after six months, especially if there's been
7    no pain, causality there I think is really
8    challenging to establish.
9         Q.   So that's the basis for your opinion?
10        A.   That's right.
11        Q.   You're not citing something in the medical
12   literature?
13        A.   What I'm saying is that I don't think I
14   can find a solid study that would say that research
15   has shown that -- that there is or is not chronic
16   pain that occurs after any surgical procedure after
17   six months.  It's just not possible to directly
18   attribute those things in a way that is consistent.
19        Q.   Okay.  So would you agree with me that TVT
20   has been associated with painful sex?
21             MR. RUMANEK:  Object to the form.
22             THE WITNESS:  Like other surgical
23        procedures for urinary incontinence, TVT has
24        been associated with painful sex.
25

## Page 185

1    BY MS. WHITE:
2         Q.   Yeah, and I'm not asking about other
3    procedures.
4         A.   I understand.
5         Q.   Just TVT.  Urinary retention?
6         A.   Yes, as I said.
7         Q.   Death?
8         A.   I think there have been case reports of
9    death following surgical procedures with TVT.
10        Q.   Do you know of or have -- do you know of
11   either in the literature or have you experienced
12   death after a Burch procedure?
13             MR. RUMANEK:  Object to the form.
14             THE WITNESS:  I'm not familiar with case
15        reports that would identify death after Burch
16        procedure and I have not experienced death after
17        a Burch procedure.
18   BY MS. WHITE:
19        Q.   And what about in a pubovaginal sling?
20             MR. RUMANEK:  Objection.
21             THE WITNESS:  I'm aware of case reports.
22        I have not reviewed them myself and -- not
23        personally at all.
24   BY MS. WHITE:
25        Q.   I couldn't hear you.  You are aware or not

47 (Pages 182 to 185)

Samantha Joy Pulliam, M.D.

Page 186

```
1    aware?
2        A.  I said I am aware of reports.  I have
3    spoken with individuals who would verify that.
4        Q.  And who are those individuals?  Death
5    after pubovaginal sling?
6        A.  Eman Elkadry.
7        Q.  And how do you spell that person's last
8    name?
9        A.  E-L-K-A-D-R-Y.  And I'm not saying that
10   she personally had a death associated with a sling.
11       Q.  Would you agree with me that hemorrhage or
12   hematoma has been associated with TVT sling?
13       A.  Like other retropubic procedures, yes.
14       Q.  And what about UTIs?  Would you agree with
15   me that the TVT has been associated with UTIs?
16       MR. RUMANEK:  Object to the form.
17       THE WITNESS:  Like other surgical
18   procedures for urinary incontinence, yes, it
19   has.
20   BY MS. WHITE:
21       Q.  And what about overactive bladder?
22       MR. RUMANEK:  Object to the form.
23       THE WITNESS:  Like other procedures
24   associated with -- for treatment of stress
25   urinary incontinence, yes, it has.
```

Page 187

```
1    BY MS. WHITE:
2        Q.  And what about bleeding issues?
3        MR. RUMANEK:  Object to the form.
4        THE WITNESS:  I'm not sure what bleeding
5    issues mean.  That's not really a term I know
6    about.
7    BY MS. WHITE:
8        Q.  Okay.  Bleeding issues would mean that a
9    woman bleeds after implantation with the TVT.
10       MR. RUMANEK:  Object to the form.
11       THE WITNESS:  So I'm going to have to
12   explore that a little bit.  If you mean
13   immediate post-operative period surgical
14   bleeding, then like other surgical procedures,
15   there is a possibility of immediate
16   post-operative surgical bleeding.
17   BY MS. WHITE:
18       Q.  Are you aware of in the literature or
19   based on your clinical experience a woman bleeding
20   more than six weeks after implantation of the TVT?
21       MR. RUMANEK:  Object to the form.
22       THE WITNESS:  So when -- when a surgeon
23   hears the word "bleeding," what that evokes in
24   my mind is volumes of blood coming out of the
25   vagina, in an uncontrollable way that's life
```

Page 188

```
1    threatening greater than how many weeks, six
2    weeks did you say again?  And I would say the
3    answer to that is no.  Is there formulation of
4    granulation tissue which is sometimes a part of
5    difficulty healing that causes blood to be
6    present on a napkin afterwards, there is that
7    finding in all kinds of post-operative
8    procedures with stitches in the vagina including
9    TVT.
10   BY MS. WHITE:
11       Q.  What about reoccurrence of stress urinary
12   incontinence after implantation with the TVT?
13       MR. RUMANEK:  Object to the form.
14       THE WITNESS:  TVT has about 80 to
15   90 percent success rate.  And the failure rate
16   over time, that's very limited based on
17   long-term longitudinal studies, so yes, there's
18   some associated with recurrence.
19   BY MS. WHITE:
20       Q.  What is the basis for your opinion that
21   the TVT has 80 to 90 percent success rate?
22       A.  Cochrane review that summarizes the vast
23   majority of randomized control trials that were
24   acceptable -- inclusion criteria for Cochrane review.
25       Q.  So Cochrane review.  Which specific one
```

Page 189

```
1    and what year?
2        A.  I believe it's -- let me look here.  Let
3    me look at my reference in my expert report.  Sorry.
4    I'm having a little -- the expert report is right
5    here, isn't it?  That's probably the best place to
6    look.
7        MR. RUMANEK:  Page 16 is the --
8        THE WITNESS:  Thank you.
9        MR. RUMANEK:  There's the efficacy
10   section.
11       MS. WHITE:  I object to you telling her --
12   please don't.
13       MR. RUMANEK:  I'm sorry.
14       THE WITNESS:  There it is.  It's number
15   47. Ford. 2015.
16       MS. WHITE:  Ford 2015.
17       THE WITNESS:  Let me emphasize that's one
18   of several systematic reviews and so I think the
19   range of success is probably somewhat variable
20   in there, but that's one of the -- one of the
21   reviews that's a reliable good summary of a lot
22   of level 1 evidence.
23   BY MS. WHITE:
24       Q.  What's another good level 1 evidence that
25   you rely upon for your opinions that form the basis
```

48 (Pages 186 to 189)

Samantha Joy Pulliam, M.D.

Page 190

1  of your report?  Can you name one or two?
2      MR. RUMANEK:  Object to the form.
3      THE WITNESS:  I can review the listing and
4  let you know.
5  BY MS. WHITE:
6      Q.  Just off the top of your head, I mean,
7  what do you rely upon, Doctor, in forming your
8  opinion?
9      A.  I rely on Cochrane reviews, and I rely on
10  other summaries and reviews of level 1 evidence.  But
11  I have to say that I'm not very good with names so
12  that's why I had to look up Ford.  I mean, that's the
13  very common one.  That's an SGS systematic review
14  that's fairly recent, and the names are just not
15  things I access off the top of my head.
16      Q.  Okay.  Vaginal discharge, is that
17  associated with the TVT device?
18      MR. RUMANEK:  Object to the form.
19      THE WITNESS:  I would say the answer there
20  is rarely and not consistently at all, and
21  that's based on my clinical experience because
22  I'm not really aware of systematic reviews that
23  describe vaginal discharge as a separate item.
24  BY MS. WHITE:
25      Q.  What about permanent nerve damage?  Has

Page 191

1  that been a complication associated with the TVT?
2      MR. RUMANEK:  Object to the form.
3      THE WITNESS:  Like other procedures for
4  stress urinary incontinence, permanent nerve
5  damage is a rare, but known complication of
6  those procedures.
7  BY MS. WHITE:
8      Q.  Is that a yes?
9      A.  That's a yes.
10      Q.  Acute or chronic pain in the groin, has
11  that been an associated complication of the TVT-O?
12      MR. RUMANEK:  Object to the form.
13      THE WITNESS:  Yes.
14  BY MS. WHITE:
15      Q.  Acute or chronic pain in the leg, is that
16  an associated complication with the TVT-O?
17      MR. RUMANEK:  Object to the form.
18      THE WITNESS:  I think the groin and the
19  leg are the same thing.
20  BY MS. WHITE:
21      Q.  Is that a yes?
22      MR. RUMANEK:  You can ask her to clarify.
23      THE WITNESS:  Can you clarify?  The toe,
24  the foot, the thigh?  There's lots of parts of
25  the leg.

Page 192

1  BY MS. WHITE:
2      Q.  I take the groin to mean the vaginal area
3  and the leg to be more of the upper thigh.
4      A.  So I would say the medial thigh as it's
5  associated with the groin, yes.  And that's a nerve
6  distribution question.
7      Q.  Is thigh abscess an associated
8  complication with the TVT-O?
9      MR. RUMANEK:  Object to the form.
10      THE WITNESS:  I believe thigh abscess is a
11  described complication of some TVT-Os, yes.
12  BY MS. WHITE:
13      Q.  Well, have you seen it in the literature?
14      A.  Yes.
15      Q.  Have you seen it in level 1?
16      A.  I have.
17      MR. RUMANEK:  Object to the form.
18  BY MS. WHITE:
19      Q.  And for the jury, explain, what is level 1
20  evidence in the medical community?
21      A.  So level 1 evidence is a randomized
22  controlled trial.  What that means is that there is a
23  review -- there's a research study in which patients
24  are randomized.  And by that, I mean they're not
25  selected based on any particular patient criteria.

Page 193

1  In other words, they become part of the study due to
2  a set of criteria.  And once they become -- once they
3  meet those requirements, they're randomly placed in
4  either one arm is what it's called or the other arm
5  of the study.
6      And, usually, those arms do different
7  things.  There are two kinds of those things.  One of
8  which is that in a randomized controlled trial you
9  can be -- having one thing done to you or the other.
10  And another would be a randomized controlled trial in
11  which you have one thing done to you or a placebo
12  thing so that you're not having really anything to do
13  with you on the other side.  Those are more common in
14  drug trials.
15      Q.  In your opinion, what randomized
16  controlled trial do you rely upon the most when
17  counseling patients on whether or not to have or not
18  have a TVT product implanted for stress urinary
19  incontinence?
20      MR. RUMANEK:  Object to the form.
21      THE WITNESS:  So I would say that with
22  regard to slings in general and particularly
23  TVTs, there is a preponderance of evidence such
24  that individual randomized control trials aren't
25  even things that I rely upon anymore.  I think

49 (Pages 190 to 193)

Golkow Technologies, Inc - 877.370.3377

Samantha Joy Pulliam, M.D.

## Page 194

1  most of the data that I choose to look at is
2  sort of an even higher summary of those trials
3  such that a systematic review which compiles
4  information from many randomized control trials
5  is my better choice for evidence because it
6  involves more patients.
7  BY MS. WHITE:
8      Q.  Okay.  I want to talk to you a little bit
9  about the Burch procedure.  And, Doctor, help me with
10  something.  Is a Burch colosuspension [sic] and a
11  Burch urethropexy the same thing?
12      A.  So the Burch colposuspension?
13      Q.  Yes, colposuspension.
14      A.  Yes.  There are lots of interchangeable
15  terms, and, mostly, we just say "Burch."
16      Q.  Okay.  Because I saw in your report, it
17  looks like to me it's used interchangeably --
18      A.  That's right.
19      Q.  -- and I wanted to clarify that.  Okay.
20  How many of these procedures have you performed in
21  your career?
22      A.  So we will draw the line at my career when
23  I began practicing independently after my training?
24      Q.  Sure, that's fine.  So we're talking
25  2006-present.

## Page 195

1      A.  That's right.  I would say 20.
2      Q.  When was the last time you performed one
3  abdominally?
4      A.  Abdominally?
5      Q.  Yeah.
6      A.  2009 or 2010.  I don't do a lot of
7  abdominal surgery and so the bulk of my work there is
8  laparoscopic.
9      Q.  When was the last time you performed one
10  laparoscopically?
11      A.  Three months ago.
12      Q.  So it was here at UNC?
13      A.  That's correct.
14      Q.  And why did that particular patient have a
15  laparoscopic Burch colposuspension rather than a mesh
16  implant?
17      A.  It was her preference after counseling.
18      Q.  How many of your patients after counseling
19  choose either a Burch or a pubovaginal sling rather
20  than a mesh implant for treatment of stress urinary
21  incontinence?
22      MR. RUMANEK:  Object to the form.
23      THE WITNESS:  So I think if we look at the
24  patients who go to surgery because a lot of
25  patients after counseling choose nonsurgical

## Page 196

1  options for initial treatment of stress urinary
2  incontinence.  I think probably less than
3  5 percent.
4  BY MS. WHITE:
5      Q.  Right.  Because you've only did 20 in your
6  career?
7      A.  Right.
8      Q.  Right?
9      A.  That's right.
10      Q.  What are the complications you have
11  experienced in your clinical practice with a Burch
12  procedure?
13      A.  So there is urinary retention and voiding
14  dysfunction.  There is erosion of sutures through
15  either the vaginal wall or the abdomen.  The ones
16  I've seen actually are just in the vaginal wall.
17      MR. RUMANEK:  Hold on for a minute.  I'm
18  not sure she was finished.
19      THE WITNESS:  I'm not finished.  I'm not
20  finished.
21      There's hematoma which occurs behind the
22  pubic bone.
23  BY MS. WHITE:
24      Q.  And, again, I'm asking you in your
25  clinical experience.

## Page 197

1      A.  That's right.
2      Q.  The 20 that you've performed?
3      A.  That's right.
4      Q.  Okay.
5      A.  And there's failure of the surgery to work
6  in the long term.
7      Q.  So you've performed 20.  What percentage
8  of the Burch procedure have you had complications?
9      A.  About 5 percent.
10      Q.  5 percent.
11      A.  Not all of those are unique to one
12  patient.  So it's not that -- it's not that one
13  person had one complication and another person had
14  another complication.  Some of those occur in the
15  same patient.
16      Q.  Okay.  And -- and how do you know you've
17  performed 20 Burch procedures over the course of your
18  career?
19      MR. RUMANEK:  Object to the form.
20      THE WITNESS:  I think, in general, because
21  they're so uncommon that it's pretty much easy
22  for me to recall.
23  BY MS. WHITE:
24      Q.  Okay.  So in this estimated 5 percent
25  complication, was any of that your fault, surgeon

Golkow Technologies, Inc - 877.370.3377

Samantha Joy Pulliam, M.D.

Page 198

1    error?
2          MR. RUMANEK: Object to the form.
3          THE WITNESS: I think it's hard to know.
4    I'm not sure that all complications are a result
5    of surgeon error. I think that many
6    complications are a combination of unfortunate
7    events. Some of them have to do with patient
8    predisposition. Some of them have to do in my
9    understanding with aberrant anatomy. That's
10   been my experience in a particular patient who
11   experienced a lot of problems.
12   BY MS. WHITE:
13         Q. Tell me about this one patient that you
14   had because you clearly remember her.
15         A. I do.
16         Q. So you had one patient who had multiple
17   problems?
18         A. Uh-huh.
19         Q. So what all multiple problems did this one
20   patient have?
21         A. So to my recollection, she had a hematoma,
22   retropubic hematoma. That comes from large vessels
23   that are behind the pubic bone that bleed. Sometimes
24   those vessels can become very large. I mean, they're
25   like varicosities behind the pubic bone.

Page 199

1          And urinary retention, although not
2    prolonged. So for a week or so, I think. It's been
3    a little while since I thought about this patient.
4    And urgency and frequency.
5          Q. So if you've done 20 procedures and you've
6    had 5 percent with your patients having problems,
7    essentially, you've had one patient have a problem
8    with a Burch procedure?
9          A. That's right. She had a terrible time.
10         Q. All right. I gotcha. The patient -- go
11   ahead.
12         A. That's okay. I think that's right.
13         Q. The patient where you performed a
14   laparoscopic procedure three months ago, how is she
15   doing?
16         A. She's doing just fine. She needed a
17   catheter for about ten days afterwards which is not
18   uncommon in my experience with patients. It takes
19   them a little bit longer in my experience to not
20   require catheterization. Most patients who have a
21   sling, for example, are able to go home on the same
22   day or the day after without any form of
23   catheterization, but the Burch patients typically
24   take a little bit longer in my experience.
25         Q. Okay. So I just want to make sure I

Page 200

1    understand. The issues that you've seen with a Burch
2    in your own clinical experience, that's been urinary
3    retention?
4          A. Uh-huh.
5          Q. Erosion of sutures? That's what you said?
6          A. Yeah.
7          Q. So this patient had erosion of sutures?
8          A. She had a suture that was visible in the
9    vagina. The sutures are taken in the vagina as part
10   of the surgery.
11         Q. She had a hematoma?
12         A. She did.
13         Q. And voiding dysfunction which I think was
14   the urinary retention?
15         A. Urgency and frequency.
16         Q. Urgency -- okay. Have you ever had a
17   Burch procedure patient have painful sex after the
18   Burch procedure?
19         MR. RUMANEK: Object to the form.
20         THE WITNESS: Not that I know of.
21   BY MS. WHITE:
22         Q. Erosion other than I guess you -- erosion
23   of the suture into this one lady's --
24         A. Those are Gore-Tex sutures which are
25   permanent sutures that we use, placed in the

Page 201

1    retropubic space which is essentially the same space
2    as a sling would span.
3          Q. Okay. What kind of sutures do you use
4    these days? Is it polypropylene or Gore-Tex?
5          MR. RUMANEK: Object to the form.
6          THE WITNESS: For what?
7    BY MS. WHITE:
8          Q. When -- for like a Burch procedure?
9          A. Gore-Tex sutures.
10         Q. Gore-Tex?
11         A. Uh-huh.
12         Q. Why don't you use polypropylene suture?
13         A. So a little bit of suture choice depends
14   upon the approach. When you do a laparoscopic Burch
15   procedure, so my experience and training and the
16   availability of a long enough suture to tie a
17   laparoscopic knot which requires using a device to
18   place it through the laparoscopic needle driver and
19   down into the retropubic space makes Gore-Tex a
20   preferred suture for that type of procedure.
21         Q. Okay. And I think based upon your
22   testimony, you've never had one of your Burch
23   patients die, right?
24         A. I have not.
25         Q. Okay. How many pubovaginal slings,

51 (Pages 198 to 201)

Samantha Joy Pulliam, M.D.

Page 202

1    meaning the autologous fascial sling, have you
2    performed in your career since 2006?
3        A.  Probably 12.
4        Q.  When was the last time you performed one?
5        A.  About a year and a half ago.
6        Q.  Was it here at UNC?
7        A.  No.
8        Q.  Mass General?
9        A.  Yes.
10       Q.  Okay.  And why did this patient have a
11   pubovaginal sling rather than a mesh implant?
12       A.  So I'm not sure I recall that specific
13   patient, indications for.  I mean, I think there are
14   a variety of indications that I would use for a
15   pubovaginal sling.  Some of them are, again, patient
16   preference if that's what they choose.
17           On some occasions, there is some need to
18   place the urethra under a little more tension than a
19   tension-free sling would allow.  For example, a --
20   this may have actually been the last one I did.  I
21   had a patient who had had pelvic radiation for a
22   rectal cancer so that damages the tissue around the
23   urethra to the extent that the urethra becomes what's
24   known as a lead pipe urethra.  In other words, it's
25   stuck open.

Page 203

1           And so in those kinds of circumstances,
2    you want to put some tension on the urethra in order
3    to close it a little bit.  So in that circumstance,
4    since these mesh slings need no tension, a rectus
5    fascia sling is a better choice.
6        Q.  Okay.
7        A.  But, also, those slings are essentially
8    equivalent, with the exception of symptomatic
9    results.  And so it's not a wrong choice for a
10   patient at any point to have that choice of a sling.
11   It's just not common.
12       Q.  Have you -- in the 12 autologous fascia
13   sling procedures you've performed, have you ever had
14   a patient have suture erosion?
15       A.  No, although I know it's possible.
16       Q.  Have you ever had one of those patients
17   have voiding dysfunction?
18       A.  So when you place a sling under tension
19   and at the bladder neck, you would anticipate that
20   there's possibly some voiding dysfunction.  So while
21   I couldn't give you an actual number, yes, I've had
22   patients who have had voiding dysfunction.
23       Q.  How many out of the 12?
24       A.  Six.
25       Q.  50 percent?

Page 204

1        A.  So, again, this is a select patient
2    population, and I've described to you an example of
3    patients that I would provide the sling for.  So they
4    are sort of a unique group.  And it wouldn't surprise
5    me nor would it be unexpected to have that kind of
6    dysfunction.
7        Q.  Is it -- is part of it your inexperience
8    doing this procedure that caused 50 percent of your
9    patient population to have voiding dysfunction?
10          MR. RUMANEK:  Object to the form.
11   Mischaracterizes her testimony.
12          THE WITNESS:  I would say it's actually
13   because of the unique patient population in
14   which I perform the slings.
15   BY MS. WHITE:
16       Q.  So is this voiding dysfunction that you're
17   talking about, is this something that's transient on
18   or are you saying 50 percent of your patient
19   population after this procedure went on to have
20   voiding dysfunction?  Meaning something that stayed
21   with them forever?
22       A.  So many patients for whom a pubovaginal
23   sling is placed under some tension, which is
24   intentional, have voiding dysfunction, and some of
25   them have that resolve over time.  It's a longer

Page 205

1    period of time than sometimes the immediate
2    post-operative period.  But in addition, sometimes
3    there's an expectation that physical therapy will be
4    used to adjust the function of the sling.
5           But, you know, I think, this is in some
6    ways, again, entirely different patient population,
7    entirely different set of expectations.  It's pretty
8    uncommon even in that number that I gave you for me
9    to do this for someone who has typical stress
10   incontinence.
11       Q.  Okay.  Who in your opinion is the ideal
12   candidate for a TVT?
13       A.  A woman who has leaking with coughing and
14   sneezing, who has no evidence of urinary retention
15   prior to surgery.  And that's an isolated sling,
16   right?  So who has in my practice exhausted or at
17   least declined nonsurgical options for treatment.
18       Q.  You've actually been interviewed about
19   what you think the ideal candidate is for TVT.
20       A.  Okay.
21       Q.  Do you recall that?
22       A.  I think you'll have to give me more
23   specifics about that.  I talk about this often.
24       Q.  So we'll talk about it more.  Would -- do
25   you think that or have you stated in the past that

52 (Pages 202 to 205)

Samantha Joy Pulliam, M.D.

Page 206

1 another candidate would be someone who is not
2 sexually active?
3     A. For a retropubic sling?
4     Q. Yeah, for TVT?
5     A. I couldn't say with some certainty. I
6 mean, you're going to show me this document in a
7 moment, but I would expect that I didn't say that
8 about a retropubic sling.
9     Q. Okay. Any -- anything else? And I could
10 be mistaken. We'll talk about it.
11         MS. WHITE: Let's go ahead and mark that.
12     (Pulliam 8 was marked for identification.)
13 BY MS. WHITE:
14     Q. I'm handing you what we have marked as
15 Exhibit 8. Here, Eric.
16         Have you seen Exhibit 8 before?
17     A. I have.
18     Q. Okay. Do you remember giving this
19 interview?
20     A. I know Rachel Zimmerman, yes, and I
21 remember giving this interview.
22     Q. And how do you know her?
23     A. She contacted me. She works for National
24 Public Radio in Boston.
25     Q. Okay. So how many times have you declined

Page 207

1 to use vaginal mesh as a treatment option?
2         MR. RUMANEK: Object to the form.
3         THE WITNESS: Vaginal mesh meaning mesh to
4     use for?
5 BY MS. WHITE:
6     Q. Polypropylene mesh.
7     A. Okay. And in what context? In mesh for a
8 sacrocolpopexy placed abdominally? Mesh for vaginal
9 repair of prolapse or mesh for a sling?
10     Q. Stress urinary incontinence for a sling.
11     A. Having clarified that, I still don't know
12 that I can give you an actual percentage time number
13 of patients that I have declined to use mesh for a
14 suburethral sling.
15     Q. Do you think that transvaginal surgery
16 with mesh was considered a more straightforward
17 procedure for doctors not trained in abdominal
18 surgery?
19         MR. RUMANEK: Object to the form.
20         THE WITNESS: I think that's actually my
21     quote from this article.
22 BY MS. WHITE:
23     Q. It is. On page 3. Do you stand by that?
24     A. So this article is really about using mesh
25 for the repair of pelvic organ prolapse, not for

Page 208

1 stress urinary incontinence.
2     Q. Okay.
3     A. And I do think that it was probably
4 developed, the vaginal mesh procedures, as an
5 alternative to abdominal procedures. There are lots
6 of reasons for that. But I think, in general, that
7 is something that I would stand by with regard to
8 surgeries for pelvic organ prolapse.
9     Q. Okay. So let's go back. We were talking
10 about ideal candidate for the TVT.
11     A. Yes.
12     Q. Okay? Who is the ideal candidate for
13 TVT-O?
14     A. So in my practice, two things. One is
15 that we know there's another Cochrane review that
16 also involves Ford, I believe, but I don't think it's
17 primarily by her, that's evaluated TVT-O and TVT, the
18 use -- for use with intrinsic sphincter deficiency
19 which is a more severe kind of urinary incontinence.
20 And TVT-O in that context is a less effective. So
21 they're not an ideal candidate.
22         But patients who have garden variety,
23 meaning not intrinsic sphincter deficiency, would be
24 reasonable candidates for a TVT-O.
25     Q. Okay. Have you ever treated a woman with

Page 209

1 an autologous fascial sling who presented more than
2 one year after her surgery with new onset of pain
3 with sex or vaginal pain related to the sling
4 procedure?
5         MR. RUMANEK: Object to the form.
6         THE WITNESS: So if you're reading from
7     the article, I'd really like to see that.
8 BY MS. WHITE:
9     Q. I'm not reading from the article. I'm
10 done with the article. I'm sorry.
11     A. Are you finished with the article?
12     Q. Yes.
13     A. Okay. Can you say that again?
14     Q. Yeah. Have you ever treated a woman with
15 an autologous fascial sling who presented more than
16 one year after her surgery with new onset of pain
17 with sex or vaginal pain that was related to the
18 sling procedure?
19         MR. RUMANEK: Object to the form.
20         THE WITNESS: I don't know. I think -- as
21     we have discussed, I think attribution is always
22     challenging after six months after a procedure.
23     Having said that, understanding what the sling
24     is, I am not sure that I would be able to say
25     for certain whether that's the case or not. I

53 (Pages 206 to 209)

Samantha Joy Pulliam, M.D.

## Page 210

1    don't generally keep in my memory the specifics
2    on all the patients that I treat.
3    BY MS. WHITE:
4         Q.  But you understand for the purposes of
5    serving as an expert in this litigation, it's very
6    important for us to understand your clinical
7    experience. Correct?
8         A.  I do.
9         Q.  Okay. And to the best of your
10   recollection, has that ever happened? Have you ever
11   treated a woman with an autologous fascial sling who
12   presented more than one year after her surgery with
13   new onset of pain with sex or vaginal pain?
14        MR. RUMANEK:  Object to the form.
15        THE WITNESS:  I don't recall.
16   BY MS. WHITE:
17        Q.  Okay. So, Doctor, you understand that the
18   TVT is made of polypropylene mesh, right?
19        A.  Correct.
20        Q.  Okay. So my question to you is, are there
21   different types of polypropylene mesh?
22        MR. RUMANEK:  Object to the form.
23        THE WITNESS:  So do you mean, are there
24   different ways that polypropylene can be used to
25   create mesh? Yes.

## Page 211

1    BY MS. WHITE:
2         Q.  Okay. Yeah, just are there different
3    types of it? I mean, not all polypropylene mesh
4    devices are the exact same material?
5         A.  So they're all made of polypropylene.
6         MR. RUMANEK:  Object to the form.
7         THE WITNESS:  I'm sorry.
8         MR. RUMANEK:  Go ahead.
9         THE WITNESS:  They're all made of
10   polypropylene. But they may be woven or knitted
11   at greater or smaller interstices, and so I
12   think there are different types of mesh in that
13   context, but they're all made of the same thing,
14   polypropylene.
15   BY MS. WHITE:
16        Q.  Do you know what type of polypropylene the
17   Ethicon device is made with?
18        A.  So --
19        MR. RUMANEK:  Object to the form.
20        THE WITNESS:  Polypropylene mesh used in
21   the Ethicon devices are knitted macroporous
22   meshes.
23   BY MS. WHITE:
24        Q.  Do you know what type of antioxidants or
25   if antioxidants are in the TVT mesh device?

## Page 212

1         MR. RUMANEK:  Object to the form.
2         THE WITNESS:  The specific types, no, I
3    don't know.
4    BY MS. WHITE:
5         Q.  Do you know what type of polypropylene the
6    TVT-O mesh device is made from?
7         MR. RUMANEK:  Object to the form.
8         THE WITNESS:  It's also a macroporous
9    knitted mesh.
10   BY MS. WHITE:
11        Q.  Excuse me?
12        A.  It's a macroporous knitted polypropylene
13   mesh.
14        Q.  And what does "macroporous" mean?
15        A.  Macroporous means that the interstices,
16   the spaces between the knit, are larger in general
17   than 75 microns. This is an important number because
18   it implies that the cells in the body that can move
19   in to promote healing, angiogenesis and prevent
20   infection are able to make it into the space. That's
21   why macroporous is a very important part of meshes
22   that are used.
23        Q.  Do you know whether the Ethicon TVT is
24   made with the same polypropylene that the Boston
25   Scientific Solyx or Obtryx is made of?

## Page 213

1         MR. RUMANEK:  Object to the form.
2         THE WITNESS:  I didn't evaluate either of
3    those for purposes of this deposition.
4    BY MS. WHITE:
5         Q.  Do you know whether or not the Boston
6    Scientific products and the Ethicon products are made
7    with the same grade of polypropylene?
8         MR. RUMANEK:  Object to the form.
9         THE WITNESS:  I didn't evaluate the Boston
10   Scientific meshes for the purposes of this
11   deposition.
12   BY MS. WHITE:
13        Q.  Are you -- I'm sorry. Go ahead.
14        A.  I didn't evaluate those for the purposes
15   of this deposition.
16        Q.  Well, I'm just asking you -- not for
17   purposes of this deposition -- do you know whether or
18   not the Ethicon products and the Boston Scientific
19   products are made with the same grade of
20   polypropylene? Do you know the answer to that
21   question?
22        MR. RUMANEK:  Object to the form.
23        THE WITNESS:  I don't.
24   BY MS. WHITE:
25        Q.  Okay. Are you a biomaterials expert?

54  (Pages 210 to 213)

Samantha Joy Pulliam, M.D.

Page 214

1      MR. RUMANEK: Object to the form.
2      THE WITNESS: I think I'm a biomaterials
3   expert to the extent that it's required of me
4   for the purposes of informing my urogynecologic
5   patient care. In other words --
6   BY MS. WHITE:
7      Q. What does that mean?
8      A. What that means is that I need to
9   understand enough about biomaterials to make good
10  choices for patient care.
11     Q. Okay. Do you know the type of pellets --
12  polypropylene pellets that make up the Ethicon TVT
13  device?
14     MR. RUMANEK: Object to the form.
15     THE WITNESS: There are pellets that are
16  used to make the Ethicon TVT, but those pellets
17  aren't available to me in my patient care.
18  BY MS. WHITE:
19     Q. Have you ever examined the pellets that
20  make up the Ethicon TVT device?
21     MR. RUMANEK: Object to the form.
22     THE WITNESS: No.
23  BY MS. WHITE:
24     Q. Have you ever looked at them under a
25  microscope?

Page 215

1      A. The pellets?
2      Q. Yeah.
3      A. No.
4      Q. And, again, I think I asked you about the
5   antioxidants. What antioxidants are added to the
6   polypropylene that make up the TVT device?
7      MR. RUMANEK: Object to the form.
8      THE WITNESS: I don't know.
9   BY MS. WHITE:
10     Q. What antioxidants are added to the TVT-O
11  polypropylene --
12     A. I don't know.
13     Q. -- device? Are you an expert in polymer
14  science?
15     MR. RUMANEK: Object to the form.
16     THE WITNESS: Again, I'm only an expert in
17  polymer science as it pertains to the care of my
18  patients.
19  BY MS. WHITE:
20     Q. What does that mean?
21     A. That means that when I review the medical
22  literature, one of the things I want to know is, are
23  the devices that I'm using safe and effective. And
24  do they cause any problems that can be attributable
25  to the type of tissues or items that we're using.

Page 216

1   And in my review of the literature, I don't see
2   anything that I'm concerned about with regard to
3   either TVT or TVT-O.
4      Q. Have you ever personally conducted any
5   bench or laboratory research on polypropylene?
6      A. No, I have not.
7      Q. Have you ever done studies on mesh, not
8   using mesh, but the properties of the mesh?
9      MR. RUMANEK: Object to the form.
10     THE WITNESS: No, I have not.
11  BY MS. WHITE:
12     Q. How many different grades are there of
13  polypropylene?
14     MR. RUMANEK: Object to the form.
15     THE WITNESS: I don't know.
16  BY MS. WHITE:
17     Q. Can you name even one antioxidant that
18  goes into the TVT device?
19     MR. RUMANEK: Object to the form. Asked
20  and answered.
21     THE WITNESS: No, I can't.
22  BY MS. WHITE:
23     Q. What about the TVT-O?
24     MR. RUMANEK: Object to form. Asked and
25  answered.

Page 217

1      THE WITNESS: No, I cannot.
2   BY MS. WHITE:
3      Q. Have you ever tested different mesh
4   material for the treatment of stress urinary
5   incontinence?
6      MR. RUMANEK: Object to the form.
7      THE WITNESS: So I'm not sure what you
8   mean by "test." I have used different mesh
9   materials in my fellowship, had experience with
10  mesh that's been put forth by a variety of
11  different companies made in the form of
12  retropubic slings mostly for the treatment of
13  stress urinary incontinence. And I have
14  experienced those with my patients.
15  BY MS. WHITE:
16     Q. You mean you've implanted different types
17  of mesh products in different patients?
18     A. So I think -- question would be what you
19  mean by "testing." Have I done test tube like
20  experiments with different meshes? No. Have I
21  experienced them clinically? Yes, I have.
22     Q. Okay. Do you think that the peer-reviewed
23  literature that you brought here with you today
24  establishes that different retropubic polypropylene
25  mid-urethral slings made by different manufacturers

55 (Pages 214 to 217)

Samantha Joy Pulliam, M.D.

Page 218

1  perform differently?
2          MR. RUMANEK: Object to the form.
3          THE WITNESS: Well, I'm not sure that it's
4   exhaustive. In other words, I -- there is not a
5   large body of literature that compares one type
6   of sling to another. I think the one that comes
7   to mind is the use of the Sparc sling which is a
8   top down sling, in contrast to the use of a
9   retropubic sling by TVT. And the data in that
10  case is in favor, at least equivalent, with
11  regard to the Sparc sling and the TVT sling. So
12  I think they have -- in some reviews, the TVT is
13  superior. In some, they're equivalent.
14  BY MS. WHITE:
15      Q.  Are there differences in the biomechanical
16  properties of the TVT mechanical cut and the TVT
17  laser cut?
18          MR. RUMANEK: Object to the form.
19          THE WITNESS: There are.
20  BY MS. WHITE:
21      Q.  Okay. Can you tell me what they are?
22      A.  So some of them have to do with what
23  happens when they're placed under a great deal of
24  tension in terms of the stretch and the amount of
25  tensile strength it takes to extend them. But under

Page 219

1   physiologic circumstances, there's really not a lot
2   of significant difference. And both of those things
3   are not things that have been borne out in any of the
4   clinical research about either of them. In other
5   words, even if there is difference in the tensile
6   strength or -- actually, it's not the tensile
7   strength. In the requirement for extending the mesh,
8   it's certainly not something that's been clinically
9   significant.
10      Q.  And what's the basis for that opinion?
11      A.  The basis for that opinion are some of the
12  studies that I've seen. But, also, the large amount
13  of literature that's existed before and after the use
14  of the different meshes.
15      Q.  And you're talking about TVT mechanical
16  cut versus laser cut?
17      A.  Uh-huh.
18          MR. RUMANEK: You've got to answer out
19  loud.
20          THE WITNESS: Yes. Sorry.
21          MR. RUMANEK: We've got about 40 minutes
22  left on the clock at least. Do you need a
23  break?
24          THE WITNESS: Let me go for a little
25  while.

Page 220

1   BY MS. WHITE:
2       Q.  So I forget what exhibit is your report.
3   But I want to ask you --
4           MR. RUMANEK: 4.
5   BY MS. WHITE:
6       Q.  Exhibit 4.
7       A.  Okay.
8       Q.  Okay. So on page 2 of your report, second
9   paragraph from the bottom.
10      A.  Yes.
11      Q.  You talk about your clinical research.
12      A.  That's right.
13      Q.  And you've done clinical research on the
14  cost effectiveness of sling versus pelvic floor
15  physical therapy for treatment of stress urinary
16  incontinence?
17      A.  Right.
18      Q.  Can you tell me about that research?
19      A.  So that is as yet unpublished. I've been
20  working with a fellow, who is not yet presept,
21  although it was an abstract at the American Urogyn
22  Society. The design of that was a decision analysis,
23  and, essentially, we looked at what the options were
24  in terms of treatment in terms of costs overall over
25  the long term for a population.

Page 221

1           The way a decision analysis works is that
2   you try to imagine every conceivable sort of branch
3   point of things that do or don't go wrong of things
4   that do or not cost money, of how long it takes, of
5   decisions, changes, all of those things, and then you
6   try to understand under what circumstances is there
7   advantage of one branch over the other.
8       Q.  Has your research concluded that a sling
9   is more cost effective than pelvic floor physical
10  therapy?
11          MR. RUMANEK: Object to the form.
12          THE WITNESS: I think it depends upon how
13  you tweak the metrics.
14  BY MS. WHITE:
15      Q.  Okay. Can you expand upon that?
16      A.  Sure. We'll give an exaggerated example
17  which is probably not true because I don't have those
18  numbers in front of me right here. But let's say,
19  for example, that a sling procedure for some reason
20  is very inexpensive, but physical therapy costs a lot
21  of money. If we're looking only at a cost/benefit
22  analysis, then it would be advantageous to choose the
23  sling. If physical therapy is very inexpensive and
24  slings are very cheap or physical therapy is very
25  inexpensive and slings are very expensive, then it

56 (Pages 218 to 221)

Samantha Joy Pulliam, M.D.

Page 222

1  would make certain sense to choose physical therapy
2  because a certain number of patients who undergo
3  physical therapy would not require surgery. And, in
4  fact, that's how a practice -- large number of my
5  patients, I urge and counsel to undergo nonsurgical
6  care first before they choose a surgery.
7      Q. And how much do you charge for the
8  placement of a TVT -- well, TVT Exact now, what does
9  that cost a patient?
10      MR. RUMANEK: Object to the form.
11      THE WITNESS: So the cost to the patient
12  depends upon the patient's insurance coverage
13  and the agreed upon reimbursement according to
14  that. I personally am regulated by the charges
15  that are required of me by the University of
16  North Carolina and the negotiations they have
17  made with each individual insurance company. So
18  I'm not even sure I could tell you what that
19  number is.
20  BY MS. WHITE:
21      Q. So you don't even know?
22      A. No.
23      Q. What it costs a patient to -- to have a
24  TVT Exact device?
25      A. What I try to do in my practice is care

Page 223

1  that is -- advising patients solely on the clinical
2  needs of the patient. The University of North
3  Carolina and I, as I have taken on that
4  responsibility, have responsibility for the care of
5  the people of North Carolina. And I understand that
6  to be irrespective of their ability to pay. And so
7  we work with patients with insurance and without
8  insurance to ensure coverage.
9      There's a plan, it's called Charity Care,
10  that the University of North Carolina provides that
11  covers the surgeries for patients who are unable to
12  pay. And I don't receive anything as part of that
13  agreement personally.
14      Q. When do you expect your research on the
15  cost effectiveness of sling versus pelvic floor
16  therapy to get published?
17      A. I don't know. I worked on that when I was
18  at Massachusetts General Hospital with a fellow who's
19  there. And I would like it very much if she would
20  finish that. And if not, after about six months or a
21  year, I'll begin to work on it myself.
22      Q. Okay. And if I understand your testimony
23  here today, either the Burch procedure or pubovaginal
24  sling or mid-urethral slings, they're all within the
25  standard of care for the treatment of stress urinary

Page 224

1  incontinence?
2      A. They are.
3      Q. Okay. Do you prefer mesh over the Burch
4  procedure?
5      MR. RUMANEK: Object to the form.
6      THE WITNESS: I prefer the procedure that
7  I think is a combination of sort of the best
8  option for the patient in question. And I find
9  that more often than not, that involves a TVT
10  sling.
11  BY MS. WHITE:
12      Q. Okay. And why is that?
13      A. So, in general, in particular with
14  laparoscopic Burch, which has its advantages with
15  small incisions. The other procedures to me and in
16  my hands have longer operative times. They have the
17  greater potential for complications and in some cases
18  longer recovery.
19      For example, there's an incision for a
20  pubovaginal slings that's got the potential for pain
21  there that's very different I think from vaginal
22  incisions. I think that, in general, slings are as
23  effective for less time for recovery, for less risk
24  than the other procedures.
25      Q. In your opinion, is the Burch procedure as

Page 225

1  efficacious as the TVT procedure?
2      MR. RUMANEK: Objection. Object to the
3  form.
4      THE WITNESS: I think the literature would
5  suggest that that's true. I think that there
6  are additional things to consider with regard to
7  a Burch that aren't problems of a TVT. For
8  example, patients who have Burch procedures are
9  more likely to have anterior vaginal wall
10  prolapse than patients would have TVTs. And so
11  with that increased risk, that's another surgery
12  that's possible for a patient with a Burch
13  that's not necessarily more likely with someone
14  who has a TVT.
15  BY MS. WHITE:
16      Q. Do you counsel your patients that mesh
17  erosion is a possible complication of mesh
18  implantation?
19      A. Absolutely.
20      Q. And then do you also counsel them if
21  there's mesh erosion, they may have to have an
22  additional procedure?
23      A. I do.
24      Q. Okay.
25      A. I also tell them that the mesh erosion

57  (Pages 222 to 225)

Samantha Joy Pulliam, M.D.

Page 226

1    rate is very low and in many systematic reviews is
2    between 2 and 3 percent. So 97 percent of patients
3    or so who have slings placed don't require -- don't
4    have that complication and thus will not require that
5    surgery.
6         Q.   What do you tell them about the Burch
7    procedure?
8         A.   I tell them that there is a longer
9    operative time, that they have a risk of needing an
10   additional prolapse repair surgery and that, in many
11   cases, depending upon the type of surgery that I do,
12   it requires a different approach that takes an
13   enormously much -- an increased amount of surgical
14   time.
15        Q.   Did you use Prolift for pelvic organ
16   prolapse?
17        MR. RUMANEK: Object to the form.
18        THE WITNESS: I think we spoke earlier
19   about this. And the answer is I have used it.
20   But it -- not commonly.
21   BY MS. WHITE:
22        Q.   When was the last time you used it?
23        MR. RUMANEK: Object to the form. Asked
24   and answered.
25        THE WITNESS: I don't -- 2008 or '9,

Page 227

1    somewhere in there. I don't know specifically.
2    BY MS. WHITE:
3         Q.   So let's go back to your report.
4         A.   Before you do, is it possible we can take
5    a little break?
6         Q.   Sure.
7              (A recess transpired from 3:29 p.m. until
8              3:32 p.m.)
9    BY MS. WHITE:
10        Q.   All right. So, Doctor, is it your opinion
11   that the safety of the TVT mesh is not affected by
12   whether it's mechanically cut or laser cut?
13        MR. RUMANEK: Object to the form.
14        THE WITNESS: Yes, that's my opinion.
15   BY MS. WHITE:
16        Q.   And the sole basis for your opinion is
17   your review of the literature because you didn't keep
18   track of it in your patient population?
19        MR. RUMANEK: Object to the form.
20        Mischaracterizes her testimony.
21   BY MS. WHITE:
22        Q.   I don't think I did, but you can answer
23   certainly.
24        A.   So I think that because I haven't kept
25   track of it doesn't mean that I haven't had clinical

Page 228

1    experience with my patients and their outcomes. And
2    so I would say that it's also based on my clinical
3    experience with my patients.
4         Q.   Okay. Doctor, once again, how many
5    patients that you've implanted TVT with has had laser
6    cut mesh material?
7         MR. RUMANEK: Object to the form. Asked
8    and answered.
9         THE WITNESS: So I've said before, that
10   since I've been here at the University of North
11   Carolina, I've used TVT Exact and Abbrevo which
12   I know to be laser cut. So what I would say is
13   I can't give you an estimate of those before
14   then. But I know that at least those have had
15   laser cut mesh. And I know that I have been
16   doing TVT long enough to have some experience
17   with mechanically cut mesh.
18   BY MS. WHITE:
19        Q.   And to be clear, I am not here to question
20   you about TVT Exact or Abbrevo.
21        A.   Okay.
22        Q.   Okay. How many of your patients have
23   laser cut mesh wherein you placed TVT?
24        MR. RUMANEK: Object to the form. Asked
25   and answered.

Page 229

1         THE WITNESS: I don't know.
2    BY MS. WHITE:
3         Q.   Okay. And, Doctor, do you have an opinion
4    on whether or not the TVT is cytotoxic?
5         A.   It's not cytotoxic.
6         Q.   And what's your basis for that opinion?
7         MR. RUMANEK: Object to the form.
8         THE WITNESS: Well, there are the reviews
9    that I cited in my expert report and, actually,
10   in addition to that and in this literature are
11   several abstracts looking at -- oh, no, I'm
12   sorry. Those aren't those abstracts -- but
13   cytotoxicity means that cells die. There's
14   necrosis and tissue death around it. And that's
15   just not what we see in 97 percentil of
16   patients, give or take a few percentage points
17   depending on which study you look at. Patients
18   heal and they heal rapidly. So I think there
19   was the idea of cell death as a result of the
20   presence of the sling is really not borne out
21   clinically.
22   BY MS. WHITE:
23        Q.   In your opinion, can the TVT device erode?
24        A.   So I think we have talked about mesh
25   exposure in the vagina in the past. And I know that

58  (Pages 226 to 229)

Samantha Joy Pulliam, M.D.

Page 230

1  that can happen.  And we have established that that
2  can happen.
3           In rare occasions, it can erode, and
4  that's the term that's used, a mesh erosion, into
5  other surrounding organs.  Usually, the three that
6  are commonly named would be the urethra, the bladder,
7  and the bowel.
8       Q.  Okay.
9       A.  Those are very rare.
10      Q.  So let's turn to -- just a second.  Page
11  25 of your report and the Instructions for Use
12  section?
13      A.  Yes.
14      Q.  So beginning with this -- the section
15  Instructions for Use there in bold to the bottom of
16  the page, did you -- did you draft all this?
17      A.  I did.
18      Q.  Okay.  And did you draft the part where
19  you talk about 21 CFR 801.109?
20      A.  It's in quotations, which would imply that
21  it's a quote.
22      Q.  Where did you get that quote from?
23      A.  I looked it up on the FDA device labeling
24  guidance website.
25      Q.  Do you know what CFR stands for?

Page 231

1       A.  No, I don't.  But I do know what it refers
2  to which are different descriptions of instructions
3  for use.  In other words, there are instructions for
4  use that are prepared for devices that don't require
5  experts, and there are instructions for use that do
6  require experts.  And in this instance, the TVT
7  device is specifically directed at -- in terms of the
8  people who are to be using it are people who have
9  specifically listed experience in care for patients
10  with urinary incontinence and surgical experience for
11  the treatment of urinary incontinence.
12      Q.  And tell me again where you got this, the
13  FDA website?
14      A.  Yes.  In the guidance for labeling.
15      Q.  Okay.  And do you have experience with
16  regulatory affairs or product warnings?
17          MR. RUMANEK:  Object to the form.
18          THE WITNESS:  So I'm exposed to product
19  warnings when they become available as a
20  physician.  There are new black box warnings and
21  so forth from the FDA and other product warnings
22  that have become available, I've become familiar
23  with.
24  BY MS. WHITE:
25      Q.  Have you ever served as a regulatory or

Page 232

1  warnings expert in a case?
2          MR. RUMANEK:  Object to the form.
3          THE WITNESS:  No, I have not.
4  BY MS. WHITE:
5       Q.  Okay.  In forming your opinions in this
6  case, did you review the TVT and TVT-O instructions
7  for use?
8       A.  I did.
9       Q.  Because you do a whole section in your
10  report, right?
11      A.  Right.
12      Q.  Called the Instruction for Use.  And do
13  you think the instructions for use as prepared by
14  Ethicon for the TVT and TVT-O is adequate?
15      A.  As there are targeted at individuals like
16  me who are surgeons trained in the care of patients
17  with urinary incontinence and for patient -- or
18  surgeons with experience treating urinary
19  incontinence, yes, I do think they're adequate.
20      Q.  Okay.  So what's your opinion about the
21  purpose of the IFU?
22          MR. RUMANEK:  Object to the form.  Asked
23  and answered.
24          THE WITNESS:  I think they're a reference
25  for surgeons who are performing these things.

Page 233

1  BY MS. WHITE:
2       Q.  And I think you testified earlier that you
3  agree that they should be -- they should contain
4  accurate information, correct?
5       A.  I think they should contain accurate
6  information.  But I don't think that surgeons learn
7  to operate from these things.
8       Q.  It's to inform the surgeon about the
9  product, right?
10      A.  Yes.
11      Q.  And the information that's contained
12  therein about the product should be accurate, right?
13      A.  That's correct, but it's not necessarily
14  comprehensive, either.  I think that that's really
15  the point of this quote here in that adequate
16  directions of use cannot be prepared because they are
17  based on the assumption that the person using the
18  device has an extensive background and experience
19  that they bring to the OR with them.
20      Q.  Okay.  So let's turn to page 27 of your
21  report.
22      A.  Uh-huh.
23      Q.  And under Ethicon Training, there's a
24  paragraph about credentialing?
25      A.  Yes.

59  (Pages 230 to 233)

Samantha Joy Pulliam, M.D.

Page 234

1    Q. What -- tell me in your opinion what type
2  of doctor should be permitted to implant a TVT or
3  TVT-O device.
4        MR. RUMANEK: Object to the form.
5        THE WITNESS: Permitted by whom?
6  BY MS. WHITE:
7    Q. I guess a hospital.
8    A. So I think that's a little bit of a
9  difficult question to answer in part because I think
10 what you're -- the answer is probably something like
11 surgeons who meet the criteria for the hospital
12 credentialing body.
13   Q. So here at UNC?
14   A. Right.
15   Q. Okay. Before you implant a TVT Exact,
16 what kind of credentials do you have to have?
17   A. So I've been credentialed at the
18 University of North Carolina as a gynecologist, which
19 is part of my board certification and also part of
20 the experience that I presented in the required
21 information that the university had for me when I
22 came here. And I've been credentialed as a
23 urogynecologist.
24       And in neither case, actually, at the
25 University of North Carolina does that specifically

Page 235

1  say anything about a TVT. I have privileges to treat
2  stress urinary incontinence and other gynecologic
3  procedures similarly, but they base their
4  credentialing not on any specific item related to TVT
5  at all.
6    Q. Okay. And, in fact, Doctor, you don't
7  have to be -- have the certification female pelvic
8  medicine and reconstructive surgery to be able to
9  surgically implant a patient with a TVT Exact here at
10 UNC?
11   A. No, you don't.
12   Q. Okay. So if you go to the last page of
13 your report, and I'm sorry I'm bouncing around. But
14 the last page?
15   A. The very last page.
16   Q. The very last page.
17   A. There's just not much on it.
18   Q. "The benefits of TVT/TVT-O far outweigh
19 the risks, and thus TVT/TVT-O have become the gold
20 standard for the surgical treatment of female stress
21 urinary incontinence."
22       Do you see that?
23   A. Yes.
24   Q. When did the TVT and TVT-O become the gold
25 standard for the surgical treatment of female stress

Page 236

1  urinary incontinence?
2        MR. RUMANEK: Object to the form.
3        THE WITNESS: So I'm not sure that for
4  anything that's considered a gold standard there
5  is a day of decision. I think that those
6  references become true as there is consensus
7  among professionals who provide the service. I
8  think that as more people do it and more data is
9  acquired about it, I think they move into a
10 position as a gold standard when their safety
11 and efficacy is proven, when it is adopted by
12 experts in the field, and when it's successfully
13 and positively compared to other previous and
14 common type of procedures that might be done for
15 the type of diagnosis.
16 BY MS. WHITE:
17   Q. Okay. I'm going to just one more time, do
18 you have an opinion as to when the TVT and TVT-O
19 became the gold standard, what year?
20       MR. RUMANEK: Object to the form.
21       THE WITNESS: I don't think that's a fair
22 characterization of how something becomes a gold
23 standard.
24 BY MS. WHITE:
25   Q. Let me ask you this: Is the Burch

Page 237

1  urethropexy still a gold standard for the surgical
2  treatment of stress urinary incontinence?
3    A. It's still an acceptable treatment. I
4  think the reference to the gold standard probably,
5  although there's not a medical definition of gold
6  standard that I can think of, is based on the
7  acceptability of providers and its prominence as the
8  safest and most effective given the other things, the
9  operative time, and all the other things being equal,
10 and the most commonly used, and I think it's become
11 as such the standard against which other things are
12 compared.
13   Q. Okay. What is your basis for the opinion
14 that you wrote in your report, page 30, that the
15 TVT/TVT-O have become the gold standard for the
16 surgical treatment of female stress urinary
17 incontinence?
18   A. I think it's been stated in the literature
19 many times. I think that's how it was taught to me
20 during my surgical education, and I think that's my
21 experience.
22   Q. And is it your opinion that the TVT and
23 TVT-O devices and that procedure for stress urinary
24 incontinence is safer and more effective than the
25 Burch urethropexy?

Samantha Joy Pulliam, M.D.

Page 238

1    MR. RUMANEK: Object to the form.
2    THE WITNESS: It's my opinion that TVT and
3    TVT-O are as safe and as effective as either one
4    of those and in many circumstances are more
5    effective.
6    BY MS. WHITE:
7    Q. What are those many circumstances more
8    effective?
9    A. I suppose I shouldn't say many
10    circumstances. What I mean is that in many
11    systematic reviews, they're more effective. And in
12    some cases, that's objective success like a PAD test
13    or some other physician evaluation, and in some
14    cases, that's a systematic assessment or an
15    assessment that's based on patient experience. But I
16    think if you hold the whole thing in balance, based
17    on those reviews, TVT is a product that is equivalent
18    and likely superior than most measurements.
19    Q. Given you have only done 20 Burch
20    procedures, how are you qualified to offer that
21    opinion, Doctor?
22    A. I offer my opinion based on the medical
23    literature, on the preponderance of information
24    comparing Burch and TVT in numbers of patients that I
25    would never achieve in my career no matter how many

Page 239

1    patients I operated on. So the preponderance of
2    information is really based on systematic reviews,
3    not just the number of patients that I've operated
4    on.
5    Q. And, Doctor, you testified you've done
6    about 12 pubovaginal sling implantations, right?
7    A. That's right.
8    Q. Okay. And I'm going to ask you the same
9    question. Is it your opinion that the TVT and TVT-O
10    is more safe and more effective than the pubovaginal
11    sling procedure?
12    A. I think it is as effective. And I think
13    that it is in some cases safer, and based on the
14    evidence, again, that there are unique complications
15    to TVT, TVT-O, and pubovaginal slings that make them
16    comparable. But when you look at all other things
17    being equal, operative time, approach, potential
18    complications, those sorts of things, that this is
19    the gold standard.
20    Q. And, again, please tell this jury, given
21    you've only done 12 over the course of your entire
22    career, how are you qualified to offer that opinion?
23    A. I base my opinion about that certainly not
24    only on the number of these I've done, but also on
25    the medical literature which, again, evaluates many

Page 240

1    more patients than I would ever be able to operate on
2    in the course of my lifetime. I base it on
3    professional opinions of others in addition to
4    myself. So I feel confident that that's enough for
5    me to be able to say that this is my expert opinion.
6    Q. And you'll agree with me that patients who
7    undergo the Burch procedure or the pubovaginal sling
8    procedure, they don't have the risk of mesh erosion
9    into organs, right?
10    MR. RUMANEK: Object to the form.
11    THE WITNESS: That's correct.
12    BY MS. WHITE:
13    Q. Okay. And they don't run the risk of
14    thigh abscesses, correct?
15    MR. RUMANEK: Object to the form.
16    THE WITNESS: I would not say that they
17    have no risk of thigh abscess, but they have
18    lesser risk of thigh abscess which is also
19    extremely rare in TVT-O.
20    BY MS. WHITE:
21    Q. And as far as you know, you don't know of
22    anyone who has ever died of a Burch procedure,
23    correct?
24    MR. RUMANEK: Object to the form.
25    THE WITNESS: I personally do not know of

Page 241

1    anyone who has died of a Burch procedure.
2    BY MS. WHITE:
3    Q. And you know a doctor who knows someone
4    who had a pubovaginal sling patient die, is that your
5    testimony?
6    MR. RUMANEK: Object to the form.
7    THE WITNESS: That is my testimony.
8    BY MS. WHITE:
9    Q. Would you agree with me that one of the
10    most important things in medicine for patients is
11    that there is neutrality in their physicians, meaning
12    their physician isn't there pushing a product for
13    a profit?
14    MR. RUMANEK: Object to the form.
15    THE WITNESS: I think the most important
16    thing to patients for their physician is that
17    their physician is an advocate for the very best
18    care for the patient.
19    BY MS. WHITE:
20    Q. Do you agree that it's important that
21    there is neutrality in clinical studies and that the
22    evidence that's presented in peer-reviewed literature
23    be neutral?
24    MR. RUMANEK: Object to the form.
25    THE WITNESS: I think that "neutral" is a

61 (Pages 238 to 241)

Samantha Joy Pulliam, M.D.

## Page 242

1   very difficult word to use with regard to
2   peer-reviewed literature because a properly
3   conducted clinical trial is designed to show
4   differences and so, by definition, isn't
5   neutral. It's going to show a superior product
6   one over the other.
7   BY MS. WHITE:
8       Q.  Okay. Let's talk more about neutral and
9   what I'm talking about.
10      A.  Okay.
11      Q.  Is it important for authors of
12  peer-reviewed articles to disclose any financial
13  relationships with manufacturers?
14          MR. RUMANEK: Object to the form.
15          THE WITNESS: It is important for authors
16      to disclose financial relationships and other
17      relationships such as board membership or other
18      obligations.
19  BY MS. WHITE:
20      Q.  I mean, is that important for you as a
21  physician when you're reading a peer-reviewed article
22  to understand whether or not the authors have a
23  relationship with a pharmaceutical company or a
24  medical device company?
25          MR. RUMANEK: Object to the form.

## Page 243

1           THE WITNESS: It's important for me to
2       know where funding comes from regardless of its
3       source. And relationships regardless of their
4       relationship.
5   BY MS. WHITE:
6       Q.  And whenever funding comes into play,
7   would you agree there is at least a potential for
8   bias?
9           MR. RUMANEK: Object to the form.
10          THE WITNESS: I think there is potential
11      for bias for anyone who does research and
12      because the goal of a research is publication.
13      And so unless you want to indict the entire
14      medical literature, I think understanding that
15      bias is implicit in research of any kind is
16      probably important.
17          Having said that, I think that in this
18      massive evidence that's present for TVT and
19      TVT-O, the value is really with the volume that
20      there are all kinds of people who have
21      contributed to the medical literature. And it's
22      been generally consistent.
23  BY MS. WHITE:
24      Q.  Would you agree with me that when
25  designing a study, it's important that the study

## Page 244

1   authors or investigators do not have a financial
2   stake or interest in the outcome of that study?
3           MR. RUMANEK: Object to the form.
4           THE WITNESS: I think investigators always
5       have an interest in the outcome of the study.
6   BY MS. WHITE:
7       Q.  Always?
8       A.  They always do. I mean, it may not be a
9   financial interest, but they have an interest.
10      Q.  Okay. I'm asking you about a financial
11  stake. I asked you a very clear question. Do you
12  want me to repeat it?
13      A.  Please.
14      Q.  Would you agree with me that when
15  designing a study, it is important that the study
16  authors or investigators do not have a financial
17  stake or financial interest in the outcome of that
18  study?
19          MS. WHITE: Object to the form.
20          THE WITNESS: Ideally, there would not be
21      a need for any sort of a financial obligation
22      for a study, as a result of study. But funding
23      of studies is a necessary item so I realize that
24      it's probably a necessary part of research,
25      although sometimes people have financial

## Page 245

1       obligations or financial influence.
2   BY MS. WHITE:
3       Q.  There are many studies out there where the
4   designers and investigators do not have a financial
5   stake, do you agree?
6       A.  Yes.
7       Q.  Suppose that you are an investigator for a
8   study regarding a medical device that is funded by a
9   medical device or pharmaceutical company. Should you
10  be paid more if the results of the study come out one
11  way than if the results come out another way?
12          MR. RUMANEK: Object to the form.
13      Improper hypothetical.
14          THE WITNESS: No.
15          MS. WHITE: Let's go off the record.
16          (A recess transpired from 3:55 p.m.
17          until 3:58 p.m.)
18  BY MS. WHITE:
19      Q.  Okay. Back on the record.
20      A.  Okay.
21      Q.  Dr. Pulliam. So getting back on the IFU.
22      A.  IFU, okay.
23      Q.  And you really don't need to look at it,
24  but I want to talk a little bit about it. Is it your
25  opinion that an adequate directions for use or

62 (Pages 242 to 245)

Samantha Joy Pulliam, M.D.

Page 246

1  instructions for use for the TVT and TVT-O cannot be
2  prepared?
3          MR. RUMANEK: Object to the form.
4          THE WITNESS: Well, I think what my
5  opinion is, is that, first of all, adequate
6  depends upon who your target audience is. I
7  mean, for example, to explain to me with
8  surgical experience something would require a
9  very different language and terminology and
10  probably a very different degree of explanation
11  than to explain to someone who has little
12  surgical experience or no surgical experience.
13  And I don't think that the target audience is
14  someone with no surgical experience so I think
15  that given that and given the expertise of the
16  people in the audience, it's really difficult to
17  know what adequate means.
18  BY MS. WHITE:
19          Q. Okay. And, again, what about the
20  physician who doesn't have your level of experience?
21          A. Right.
22          Q. What is Ethicon doing to prevent those
23  doctors from implanting the TVT or TVT-O?
24          MR. RUMANEK: Object to the form.
25          THE WITNESS: So two things. One is --

Page 247

1  I'm not sure. I think it would be something
2  that is necessarily the sole, if at all,
3  responsibility of Ethicon. In other words,
4  there are many things that I need to do before
5  I'm allowed to do any surgery, let alone implant
6  anything. I need to be certified by the board
7  specialty in which I've trained which implies
8  that I have done training in medical school. I
9  need to be credentialed by the hospital in which
10  I work so that they are comfortable in my
11  performance. And I need to continue to undergo
12  that kind of review that occurs on a regular
13  basis by morbidity and mortality evaluations and
14  other evaluations of complications or problems.
15          And so I think -- Ethicon's responsibility
16  is not necessarily part of what I would expect
17  of them. I think those are things also that you
18  would expect out of a professional to decide
19  what's needed to provide training that's going
20  to really allow them to take care of patients.
21  BY MS. WHITE:
22          Q. So let's talk a little bit about the
23  Ethicon training. You testified early this morning
24  that you did not attend Ethicon training other than
25  through Dr. Rosenblatt for implantation of the TVT or

Page 248

1  TVT-O; is that correct?
2          A. That's right, not to my recollection.
3          Q. Okay. So do you have an opinion or what
4  are your opinions regarding the Ethicon training that
5  you discuss in your report?
6          A. Where are my --
7          Q. So let's go to that. Do you see it,
8  Doctor?
9          A. I do.
10          Q. What page are you on?
11          A. I'm on page 27.
12          Q. So who drafted this portion of your report
13  on Ethicon training?
14          A. I'm sorry?
15          Q. Who drafted this portion of your report on
16  Ethicon training?
17          A. I did.
18          Q. Okay. And what is your basis for the
19  substance of this report about Ethicon training?
20          A. I'm not sure I understand the question.
21          Q. I mean, how do you know anything about
22  Ethicon training for the TVT and TVT-O?
23          A. So I recall that what I said was that my
24  own training included my fellowship training and the
25  experience I had with the physicians that were part

Page 249

1  of the fellowship. But I think also we discussed the
2  fact that I was present at the trainings, some of
3  them, that may or may not have been Ethicon, but I
4  certainly attended trainings for slings like this.
5  Right?
6          Q. Okay. But we're talking Ethicon training.
7          A. Right.
8          Q. So I want you to tell me what types of
9  Ethicon training was provided for TVT and TVT-O.
10          A. What types were?
11          Q. Yeah.
12          A. So cadaver labs, for example.
13          Q. And did you ever attend one for TVT or
14  TVT-O?
15          A. I don't know that I can say whether I
16  happen attended one for TVT or TVT-O. I have
17  attended cadaver labs for slings in the past
18  including things like this. And I have looked at the
19  information provided to me about those -- those
20  teachings. And I have reviewed monographs and other
21  things that have been provided by Ethicon.
22          Q. Okay. So your opinions regarding the
23  adequacy of Ethicon training on for the TVT and TVT-O
24  is based upon your review of the documents which have
25  been provided to you by Ethicon?

63 (Pages 246 to 249)

Samantha Joy Pulliam, M.D.

Page 250

1    MR. RUMANEK: Object to the
2    form.
3    THE WITNESS: So, actually, I don't think
4    I've ever really spoken about the adequacy of it
5    for anything. I think I -- I've said here,
6    actually, that physician training is intended to
7    supplement, and training and knowledge is not a
8    primary source of expertise.
9    BY MS. WHITE:
10   Q. Do you have an opinion as to whether or
11   not providing -- training provided by Ethicon was
12   adequate for the TVT and TVT-O?
13   MR. RUMANEK: Object to the form.
14   Mischaracterizes.
15   THE WITNESS: So what I would say is that
16   based on the fact that the MAUDE database, which
17   is a broader reporting, also in that
18   Ford/Cochrane review of complications on a
19   national basis, that the complication rate from
20   placing these things, slings, is very low. And
21   I think that might be one actual clinical factor
22   that attests to the adequacy of training of
23   physicians who perform slings.
24   BY MS. WHITE:
25   Q. Is it your opinion that the TVT and TVT-O
     are safe because they come with a tracking lot number

Page 251

1    and because MDR and MAUDE permit the tracking of
2    complications?
3    MR. RUMANEK: Object to the form.
4    THE WITNESS: I don't think they are safe
5    because of that. I think that's a very useful
6    thing in terms of understanding complications.
7    But I don't think that makes them safe.
8    BY MS. WHITE:
9    Q. What is the basis for your opinion that
10   TVT and TVT-O are safe?
11   MR. RUMANEK: Object to the form.
12   THE WITNESS: I think there are lots of
13   bases. I think I have my clinical experience.
14   I think I have the literature. And I think I
15   have the discussions that I've had with
16   professionals other than myself.
17   BY MS. WHITE:
18   Q. Okay. Have you ever implanted a patient
19   with an outdated Prolift kit that was dropped off to
20   you by a Ethicon sales rep by the name of Melissa
21   Doyle?
22   MR. RUMANEK: Object to the form.
23   THE WITNESS: So I know who Melissa Doyle
24   is. And I don't recall that, but it's certainly
25   possible.

Page 252

1    BY MS. WHITE:
2    Q. Okay. And what would be the danger of
3    implanting a patient with an out-of-date Prolift kit?
4    MR. RUMANEK: Object to the form. It
5    assumes facts.
6    THE WITNESS: Given my recollection of
7    patient outcomes, I don't think there was any
8    danger.
9    MS. WHITE: Make this an exhibit.
10   (Pulliam 9 was marked for identification.)
11   Q. Who is Melissa Doyle?
12   A. Melissa Doyle is an Ethicon rep or was. I
13   don't know if she still is or not.
14   Q. So I'm handing you what we have marked as
15   Exhibit 9. This is an e-mail it looks like from
16   Marie Egan.
17   A. Yes.
18   Q. Who is that?
19   A. She was in charge of materials and
20   purchasing at Massachusetts General Hospital.
21   Q. Okay.
22   MR. RUMANEK: Let me just note we're over
23   five hours now. I'm going to let you finish
24   this line, but be as brief as you can.
25

Page 253

1    MS. WHITE: I'm almost finished.
2    BY MS. WHITE:
3    Q. And this e-mail is from Marie to Melissa.
4    And she says, "Obviously your opportunity is to
5    capture the business." Marie is talking to Melissa,
6    the sales rep. "Even more desirable with Mandy
7    Pulliam on board."
8    A. Yes.
9    Q. Do you recall dealing with Melissa in
10   regards to TVT-O and TVT-Secur?
11   A. Not specifically, no.
12   Q. What does she mean by the fact that you're
13   on board?
14   MR. RUMANEK: Object to the form.
15   THE WITNESS: So it would be hard for me
16   to know exactly what she meant. Although I
17   could make a supposition that when I joined May
18   Wakamatsu at Massachusetts General Hospital,
19   that meant that instead of there being one,
20   there were two physicians and so the opportunity
21   for two physicians to use a product instead of
22   one meant an increased potential for business.
23   BY MS. WHITE:
24   Q. Were you aware that Ethicon frequently
25   referred to you as a VIP customer?

64 (Pages 250 to 253)

Samantha Joy Pulliam, M.D.

Page 254

1    MR. RUMANEK: Object to the form.
2    THE WITNESS: No, I wasn't aware.
3  BY MS. WHITE:
4    Q. Were you aware that Ethicon frequently
5  referred to you as a high volume implanter of their
6  products?
7    MR. RUMANEK: Object to the form.
8    THE WITNESS: No, I haven't seen that
9  information.
10 BY MS. WHITE:
11   Q. Would it surprise you?
12   MR. RUMANEK: Object to the form.
13   THE WITNESS: So because of my association
14 with Peter Rosenblatt and also the fact that I
15 do pretty much exclusively pelvic reconstructive
16 surgery that treats urinary incontinence and
17 pelvic organ prolapse, it would make sense that
18 I was a high volume user of products that are
19 used for pelvic reconstructive surgery and
20 urinary incontinence.
21 BY MS. WHITE:
22   Q. And Melissa did her best over the years to
23 make sure you got invited to VIP activities at
24 various AUG functions and stuff like that, right,
25 throughout the years?

Page 255

1    MR. RUMANEK: Object. Object to the form.
2    THE WITNESS: I don't know if Melissa did
3  her best. I don't know anything about that.
4  BY MS. WHITE:
5    Q. I think that's all we have. Thank you,
6  Doctor.
7    A. Thank you.
8        EXAMINATION
9  BY MR. RUMANEK:
10   Q. All right. I just have a few questions I
11 want to follow up on. Dr. Pulliam, do you recall
12 throughout the course of the deposition you were
13 asked to give estimates for the number of TVTs you
14 implanted, the number of TVT-Os you implanted, the
15 number of TVT Abbrevos and the TVT Exacts. Do you
16 recall those questions?
17   A. I do.
18   Q. And were the numbers that you provided in
19 the deposition absolutely hard and fast numbers or
20 were you giving estimates?
21   A. They were absolutely not hard and fast
22 numbers. They would be estimates, complete
23 estimates.
24   Q. Okay. And is the same true with respect
25 to the questions that you were asked about the

Page 256

1  complications that you had seen in your practice?
2    A. Absolutely.
3    Q. And did you attempt to the best of your
4  ability as you sit here today to answer those
5  questions as truthfully as you could?
6    A. I attempted to answer them to the best of
7  my ability.
8    Q. Okay. You recall counsel asking you
9  questions whether or not you had reviewed certain
10 Ethicon internal documents?
11   A. Yes.
12   Q. Okay. Do you recall in the course of
13 preparing your report reviewing Ethicon internal
14 documents that discussed or mentioned at least the
15 potential for roping of mesh?
16   A. Yes.
17   Q. Do you recall reviewing Ethicon internal
18 documents that mention the potential for fraying of
19 mesh?
20   A. Yes.
21   Q. Do you recall reviewing internal Ethicon
22 documents that mention potential for particle loss?
23   A. Yes.
24   Q. Do you recall reviewing Ethicon internal
25 documents that mention the potential for

Page 257

1  cytotoxicity?
2    A. Yes.
3    Q. Do you recall reviewing Ethicon internal
4  documents that mention the potential and possibility
5  of degradation?
6    A. Yes.
7    Q. Did you consider those documents that you
8  reviewed in forming the opinions that are set forth
9  in your expert report and that you've testified about
10 today?
11   A. I considered those in addition to the
12 literature that is available to me within the
13 scientific community.
14   Q. And considering the materials that you
15 reviewed, do you hold your opinions set forth in your
16 report and that you've testified today to a
17 reasonable degree of medical certainty?
18   A. I do.
19   Q. And counsel didn't show you any documents
20 to confirm whether or not you recall reviewing any
21 particular documents about roping, fraying, particle
22 loss, cytotoxicity or degradation, did she?
23   A. No, she didn't.
24   Q. And counsel asked you a number of
25 questions about different, what I'll refer to as

65  (Pages 254 to 257)

Samantha Joy Pulliam, M.D.

Page 258

1  design issues, but potential for fraying, particle
2  loss, cytotoxicity, roping, perhaps curling.  Do you
3  recall those questions about the nature of the mesh
4  and the design of the mesh?
5      A.  I do recall them.
6      Q.  And have you addressed many of the topics
7  that she asked you about today in your expert report?
8      A.  I have.
9      Q.  Okay.  And are the basis for your opinions
10 set forth in your expert report?
11     A.  They are.
12     Q.  Okay.  Dr. Pulliam, if I told you that CFR
13 stands for Code of Federal Regulations, would that
14 impact your opinions in any way?
15     A.  No, it would not.
16     Q.  And Dr. Pulliam, the opinions that you've
17 given in response to counsel's questions today, have
18 those been opinions that you hold to a reasonable
19 degree of medical certainty?
20     A.  They are.
21     Q.  And are those based on your training,
22 experience, knowledge, discussions with -- let me
23 ask -- strike that.
24         What are your opinions based on that
25 you've testified about today?

Page 259

1      A.  They're based on my review of the medical
2  literature, my clinical experience, my training, on
3  my attendance at national and local meetings, and on
4  my discussions with peers.
5      Q.  Okay.  Thank you.  That's all the
6  questions.  For now.
7          MS. WHITE:  I don't think I have anything.
8          (Off record discussion.)
9          COURT REPORTER:  Do you want a rough
10 draft?
11         MS. WHITE:  Yes.
12         (The deposition was concluded
13             at 4:15 p.m.)
14         (Signature reserved.)
15
16
17
18
19
20
21
22
23
24
25

Page 260

1  STATE OF NORTH CAROLINA
2  COUNTY OF MECKLENBURG
3
4      I, Karen K. Kidwell, RMR, CRR, CLR, in and
5  for the State of North Carolina, do hereby certify that
6  there came before me on Friday, March 31, 2017,
7  SAMANTHA JOY PULLIAM, M.D., who was by me duly sworn to
8  testify to the truth and nothing but the truth of her
9  knowledge concerning the matters in controversy in this
10 cause; that the witness was thereupon examined under
11 oath, the examination reduced to typewriting under my
12 direction, and the deposition is a true record of the
13 testimony given by the witness.
14     I further certify that I am neither attorney
15 or counsel for, nor related to or employed by, any
16 attorney or counsel employed by the parties hereto or
17 financially interested in the action.
18     This the 4th day of April, 2017.
19
20
21         _____
           Karen K. Kidwell, RMR, CRR, CLR
22         Notary Public #19971050142
23
24
25

Page 261

1  ACKNOWLEDGMENT OF DEPONENT
2
3      I, SAMANTHA JOY PULLIAM, M.D., do hereby
4  certify that I have read the foregoing pages and that
5  the same is a correct transcription of the answers
6  given by me to the questions therein propounded,
7  except for the corrections or changes in form or
8  substance, if any, noted in the attached Errata
9  Sheets.
10
11
12     _____
           SAMANTHA JOY PULLIAM, M.D.  Date
13
14
15
16     Subscribed and sworn to before me this ____ day
17 of_____, 2017.
18
19
20     _____
           Notary Public
21 My Commission Expires:
22
23
24
25

66  (Pages 258 to 261)