# EXHIBIT F

Prof. Dr. Med. Uwe Klinge

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
---------------------------------§
IN RE:  ETHICON, INC., PELVIC   § Master File No.
REPAIR SYSTEM PRODUCTS LIABILITY § 2:12-MD-02327
LITIGATION                       §
                                 § MDL 2327
                                 §
                                 §
                                 §
THIS DOCUMENT RELATES TO         §
CASE CONSOLIDATION:              §
                                 §
Terreski Mullins, et al., vs.    § JOSEPH R. GOODWIN
Ethicon, Inc., et al.            § U.S. DISTRICT JUDGE
                                 §
Case No. 2:12-CV-02952           §
---------------------------------§
```

- - -

OCTOBER 5, 2015

- - -

Deposition of PROF. DR. MED. UWE KLINGE, held
at The Quellenhoff Hotel, Monheimsallee 52, 52062 Aachen,
Germany, commencing at 10:07 a.m., on the above date,
before Trina B. Wellslager, Registered Professional
Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Prof. Dr. Med. Uwe Klinge

Page 2

1  APPEARANCES:
2
3  ANDERSON LAW OFFICE, LLC
   BY:  BENJAMIN H. ANDERSON, ESQUIRE
   1360 West 9th Street
4  Cleveland, Ohio  44413
   (216) 589-0256
5  ben@andersonlawoffices.net
   Representing Plaintiffs
6
7
   THOMAS, COMBS & SPANN, PLLC
8  BY:  DAVID B. THOMAS, ESQUIRE
   300 Summers Street
9  Suite 1380 (25301)
   Post Office Box 3824
10 Charleston, West Virginia  25338
   (304) 414-1800
11 dthomas@tcspllc.com
   Representing Defendants
12
13
14 ALSO PRESENT:
15
   Raquel LaPointe, Paralegal, Anderson Law Office
16
17
18
19
20
21
22
23
24
25

Page 4

1
      I N D E X (Continued)
2
3  Exhibit 9  Research Article:  High Structural
      Stability of Textile Implants
      Prevents Pore Collapse and Preserves
4     Effective Porosity at Stain      36
5  Exhibit 10  PowerPoint Presentation Slides
      Provided by Dr. Uwe Klinge      41
6
   Exhibit 11  PowerPoint Presentation Slides
7     Provided by Dr. Uwe Klinge      52
8  Exhibit 12  Review Article:  Management of Mesh
      Complications after SUI and POP
9     Repair, Review and Analysis of the
      Current Literature      54
10
   Exhibit 13  Open Retromuscular Mesh Repair of
11    Complex Incisional Hernia:
      Predictors of Wound Events and
12    Recurrence Article      57
13 Exhibit 14  International Journal of Surgery,
      Large Pore Size and Controlled Mesh
14    Elongation are Relevant Predictors
      for Mesh Integration Quality and Low
15    Shrinkage - Systematic Analysis of
      Key Parameters of Meshes in a Novel
16    Minipig Hernia Model Article      70
17 Exhibit 15  Comparing Different Types of
      Suburethral Slings Using Perineal
18    Ultrasound, University of Aachen      110
19 Exhibit 16  Research Article:  Visualization of
      Polypropylene and Polyvinylidene
20    Fluoride Slings in Perineal
      Ultrasound and Correlation with
21    Clinical Outcome      111
22
23
24
25

Page 3

1
             - - -
          I N D E X
2            - - -
3  Testimony of:  PROF. DR. MED. UWE KLINGE
4     DIRECT EXAMINATION BY MR. THOMAS.............  7
      CROSS EXAMINATION BY MR. ANDERSON...........  126
5     REDIRECT EXAMINATION BY MR. THOMAS...........  147
      RECROSS EXAMINATION BY MR. ANDERSON..........  149
6
7
8  CERTIFICATE......................................  151
   LAWYERS' NOTES...................................  152
9
10       E X H I B I T S
         (Attached to Transcript)
11    (Exhibit No. 6 was retained by Mr. Thomas)
   PROF. DR. MED. UWE KLINGE              PAGE
12 EXHIBITS
13 Exhibit 1  Expert Report of Dr. Uwe Klinge Filed
      in the Mullins' Case      8
14
   Exhibit 2  Dr. Uwe Klinge's Copy of his Expert
15    Report File in the Mullins' Case      16
16 Exhibit 3  Curriculum Vitae of Dr. Uwe Klinge      16
17 Exhibit 4  Modified Classification of Surgical
      Meshes for Hernia Repair Based on the
18    Analyses of 1,000 Explanted Meshes
      Article, DX30766.1-DX30766.6      21
19
   Exhibit 5  Notice of Deposition of Dr. Uwe
20    Klinge for October 5, 2015      29
21 Exhibit 6  Jump Drive Provided from Mr. Anderson
      to Mr. Thomas      30
22
   Exhibit 7  Dr. Uwe Klinge's Copy of his
23    Curriculum Vitae      34
24 Exhibit 8  Expert Report of Professor Thomas
      Muehl      35
25

Page 5

1      PROF. DR. MED. UWE KLINGE, called as a witness
2  by the Defendants, having been first duly sworn,
3  testified as follows:
4      THE WITNESS:  I swear.
5      MR. ANDERSON:  Okay.  I have a stipulation
6  here.  We understand the court reporter is not
7  authorized to administer oaths in this venue.
8  Nevertheless, we request that she administer the
9  oath and we stipulate that we waive any objection to
10 the validity of the deposition based on the oaths.
11 Thanks.
12     So stipulated.
13     MR. THOMAS:  Agreed.
14     MR. ANDERSON:  Okay.  That sounds good.  Now
15 I'll just put just a quick thing on the record that
16 we have agreed, and Dave you can correct me if I'm
17 wrong about any of this, but we have agreed that
18 this deposition will be strictly limited to matters
19 that have occurred in 2014 and 2015 to date.
20     We objected to this deposition because
21 Dr. Klinge has been deposed by Mr. Thomas and other
22 defense counsel in the Ethicon case for 14 hours in
23 the gross litigation, some of that related to pelvic
24 organ prolapse, much of it was related to general
25 topics that he has had opinions on, and those

Prof. Dr. Med. Uwe Klinge

Page 6

1  opinions have stayed the same throughout this
2  litigation in most respects.
3        And then he was deposed another 14 hours in
4  November, 2012, on TVT matters, also general
5  matters, also fact witness matters.  He's been
6  cross-examined for trial purposes on three
7  occasions.
8     So because there's -- his reports have remained
9  essentially the same throughout these years, and
10  he's been deposed many times, and he's been asked to
11  sit for his deposition and trial, we have asked that
12  this deposition be strictly limited to his writings,
13  his teaching, conferences and things like that that
14  would relate to his CV just for the last two years,
15  and any literature that has become available in the
16  last two years, or since December of 2013.  And any
17  questions that could have been asked or were asked
18  at prior depositions, and we are going to object and
19  instruct -- I'll just instruct the witness not to
20  answer.  So that's our short thing we need to put on
21  the record.
22        MR. THOMAS:  Thanks, Ben.
23        MR. ANDERSON:  Thank you, Dave.
24        MR. THOMAS:  I agree with it in spirit and
25  substance.  The last deposition, as you're aware,

Page 7

1  where we discussed the TVT device was November,
2  2013.  It's my goal not to cover ground that we did
3  cover or could have covered back at that time.
4  There will be times that I have to refer back to
5  prior testimony as context or as predicate.  I'm
6  sure that won't be a problem.  I hope that won't be
7  a problem.
8        But it's not my goal to do more than is
9  required to understand the contents of his report in
10  the Mullins' case, as well as any changes in
11  Dr. Klinge's personal circumstances, his work or
12  literature generally since that time.
13        MR. ANDERSON:  We will see how we go, and if we
14  start referring to a bunch of old testimony, I'm
15  going to object and tell him not to answer.  And if
16  we start going into a report that is basically the
17  exact same report that you've had for the last four
18  years I'll object and tell him not to answer, but
19  let's see how we get.
20        MR. THOMAS:  I bet you we do just fine.
21        DIRECT EXAMINATION
22  BY MR. THOMAS:
23     Q.  Good morning, Dr. Klinge.
24     A.  Good morning.
25     Q.  How are you this morning?

Page 8

1     A.  Quite well.
2     Q.  Good.
3        (Klinge Exhibit No. 1 was marked for
4  identification.)
5     Q.  Let me show you what I've marked as Deposition
6  Exhibit No. 1.  Deposition Exhibit No. 1 is the report
7  that has been filed in the Mullins' case bearing your
8  name.  Fair?
9        MR. ANDERSON:  I think his question is, does it
10  bear your name?
11        THE WITNESS:  Yeah, uh-hum.
12        MR. ANDERSON:  Okay.
13     Q.  And is Exhibit No. 1 the complete report of the
14  opinions you intend to offer in this case?
15        MR. ANDERSON:  Well, objection.  It is the
16  report that he intends to offer in this case.
17     A.  I cannot -- shall I control whether all pages
18  are in this attachment or is it complete?
19     Q.  I'll represent to you it's what was produced to
20  me.
21     A.  And you said that it's complete?
22     Q.  Right.
23     A.  Okay.  I will trust it.
24     Q.  But are those the complete opinions you're
25  prepared to offer in this case?

Page 9

1     A.  If this is the one you get from Mr. Anderson,
2  and if it is complete, then I agree.
3     Q.  I'll represent to you I've made every effort to
4  give you exactly what Mr. Anderson gave me.  If I
5  didn't, it's my mistake or somebody under me's mistake,
6  or perhaps even Mr. Anderson's mistake, but I think it
7  is complete.
8     A.  I don't expect anything else.
9     Q.  It's been represented, Dr. Klinge, that the
10  opinions that you offer today are the same opinions that
11  you offered in the Lewis case, insofar as it relates to
12  generally the TVT device; is that fair?
13        MR. ANDERSON:  Objection.  Go ahead.
14     A.  I don't say or I don't understand what do you
15  mean by same.  There are some same principles, there are
16  some same ideas, there are some same findings, similar
17  findings.
18     Q.  Let me ask it this way.  I'm sorry.
19     A.  But of course there are some differences in
20  wording or...
21        MR. ANDERSON:  Depending on the questions you
22  ask he's saying there may be differences in wording,
23  but in general I think he's asking you, in general
24  are your opinions the same.  Is that fair?
25        THE WITNESS:  Yeah, but it is -- it is

3 (Pages 6 to 9)

Prof. Dr. Med. Uwe Klinge

Page 10

1     necessary to define what is in general, what are you
2     relying on?
3        Q.  Let me tell you what I'm trying to avoid,
4     Dr. Klinge.  I'm trying to avoid going through your
5     opinions line-by-line in this report, Exhibit 1, which
6     are some 39 pages, to ask you if these are opinions that
7     are new and different from your prior opinions or if
8     they're the same.
9           Can you tell me today, having prepared Exhibit
10    No. 1 for the Mullins' case, whether you have any
11    opinions that you haven't expressed before?
12          MR. ANDERSON:  Objection.  Just one second.  As
13    I told counsel in my writings to you when we
14    prepared this report, we tried to prepare the report
15    in a manner that would be consistent with old
16    reports.  In fact, we used the old reports and we
17    had to make some updates, of course.
18          But I will represent to you, as an officer of
19    the court, that his opinions are in general the same
20    opinions he's given you for the last four years with
21    regard to the material science of surgical meshes,
22    specifically as it relates to Ethicon.  I don't know
23    what more we can do than that, than to tell you that
24    his opinions are essentially the same as they were
25    before.

Page 11

1     BY MR. THOMAS:
2        Q.  Okay.  Dr. Klinge, having prepared Exhibit
3     No. 1, do you recall adding any new opinions that you
4     had not expressed before?
5        A.  We can go through all these points.  If you
6     have the impression that it is a different -- that there
7     are differences in regard to the previous ones, then
8     feel free, we can discuss them; whether you have some
9     questions we can discuss it.  If you agree to all this,
10    it is up to you to define which of these points you have
11    the impression that it's different than the previous
12    one.
13       Q.  Well, with all due respect, Doctor, you are the
14    one who is giving testimony about your opinions in this
15    case, and all I'm trying to understand is, in your own
16    mind, have you developed any new opinions for this case
17    that you have not expressed before relative to the TVT
18    mesh?
19          MR. ANDERSON:  And I'm just going to object,
20    say that he's tried to answer your question, and
21    I've tried to answer your question, and I thought we
22    made it pretty clear that his opinions in general
23    are the same.
24          MR. THOMAS:  I just --
25          MR. ANDERSON:  No, let me finish, because I

Page 12

1     don't think we need to be arguing on this.  You're
2     wasting time.  He's given you his opinions.  The
3     report is what it is, and it's essentially the same
4     report you've gotten for four years, and what we're
5     here to do is to talk about the things he's done in
6     the last two years.
7           So are his opinions in general the same?  Yes.
8     And you can -- and you can look at that by looking
9     at the summary of opinions.
10          MR. THOMAS:  But, Ben, you're not under oath
11    and you're not going to testify.
12          MR. ANDERSON:  I don't care.  I'm an officer of
13    the court and you I have agreed to certain things.
14          MR. THOMAS:  Please.
15          MR. ANDERSON:  And one of the things that you
16    did -- you can get upset if you want, I don't care.
17    But one of the things we did when I agreed to do
18    this deposition was you said, well, does he have any
19    new opinions?  And I said, no, you can see from his
20    report it's the same report.  In fact, it's even
21    smaller than the TVT than this one because he didn't
22    have an analysis of explants.  I told you that weeks
23    and weeks ago.
24          And you're trying to get him to say, are your
25    opinions exactly the same?  That depends on what

Page 13

1     your questions are and that's what he's trying to
2     say.  In general his opinions are the same.
3     However, if you have specific questions, he's happy
4     to answer them.  I don't know what more we can do
5     for you than that, Dave.
6           MR. THOMAS:  Ben, I'm not upset.  I am trying
7     to understand what his opinions are, and I've asked
8     him, and you've just used much more of the
9     transcript than I have so far.  Let's just move on
10    and do the best we can here.
11    BY MR. THOMAS:
12       Q.  Doctor, if you'd turn to the last page of
13    Exhibit No. 1, the very back.  Do you see expert
14    reports?  Did you review the expert report of
15    Dr. Iakovlev?
16       A.  Yes.
17       Q.  And did you review the expert report of Howard
18    Jordi?
19       A.  Yes.
20       Q.  Now, did you review the expert report of
21    Dr. Jordi in the Mullins' case, which is the case that's
22    here, or was it an expert report from another case, do
23    you know?
24       A.  I'm not sure.
25       Q.  Okay.

4 (Pages 10 to 13)

Prof. Dr. Med. Uwe Klinge

Page 14

1      MR. ANDERSON: It's Mullins.
2      MR. THOMAS: Thank you.
3      Q. Did you review the expert report of Dr. Jordi
4   in the Mullins' case prior to the finalization of your
5   report in this case?
6      A. I don't remember.
7      Q. Is the expert report of Dr. Iakovlev that you
8   reviewed in the Mullins' case?
9      A. Yes.
10      Q. Do you know whether you reviewed the expert
11   report of Dr. Iakovlev prior to the finalization of your
12   report, Exhibit No. 1?
13      A. I don't remember.
14      Q. There are a number of other expert reports that
15   follow here: Ducheyne, Elliott, Thames, Barbolt,
16   Greenberg, Klosterhalfen and Sexton. To my knowledge
17   those reports at the time you prepared your report were
18   not available at the time that you prepared your report
19   in this case.
20      MR. ANDERSON: Okay. Let me just -- you said
21   some of these things may be my mistake, so I need to
22   step in.
23      Ducheyne is something that, as you know, he has
24   prepared expert reports for the last four years in
25   numerous cases. Ducheyne was an old one that should

Page 15

1   have been removed from the reliance list because
2   that was from I have no idea how many years ago.
3      Shelby Thames would have been one from a long
4   time ago.
5      Barbolt he reviewed. Greenberg is old. Bern
6   Klosterhalfen, he reviewed it, but that would have
7   been in relation to the TVT -- it's the same one he
8   gave in the Lewis case. Sexton is old.
9      THE WITNESS: Old.
10      MR. ANDERSON: So I apologize.
11      MR. THOMAS: That's okay. I'm just trying to
12   understand what's -- what's in play and what's not.
13      MR. ANDERSON: Yeah.
14   BY MR. THOMAS:
15      Q. Have you reviewed other expert reports of
16   Dr. Iakovlev, other than the Mullins' case?
17      A. I don't think so.
18      Q. Okay. Have you reviewed other expert reports
19   of Dr. Jordi, other than in the Mullins' case?
20      A. I don't think so.
21      Q. Doctor, you have in front of you a document
22   that bears some handwriting on yours. Is that your copy
23   of your expert report?
24      A. That is correct.
25      Q. May I look at it, please? I'm going to mark

Page 16

1   this as Deposition Exhibit No. 2.
2      MR. ANDERSON: Uh-hum.
3      Q. And we'll come back to that in a moment. Thank
4   you.
5      (Klinge Exhibit No. 2 was marked for
6   identification.)
7      (Klinge Exhibit No. 3 was marked for
8   identification.)
9      Q. I'm going to hand you what's been marked as
10   Deposition Exhibit No. 3, and represent to you that
11   Deposition Exhibit No. 3 is a copy of your current CV
12   that was supplied to me by counsel last week. Do you
13   have that?
14      A. Yes.
15      Q. Is -- the best of your knowledge, is this a
16   current copy of your CV?
17      A. Yes.
18      Q. If you go to the page, participation and
19   moderator at other meetings.
20      A. Yeah.
21      Q. What are you trying to show here? What does it
22   mean to be a participator and moderator at other
23   meetings?
24      A. My task mainly in these meetings was giving key
25   lectures, keynotes, making the moderate -- moderation of

Page 17

1   the entire session or demonstrating operations.
2      Q. Okay. When you say "demonstrating operations,"
3   are you actually doing procedures that other people
4   observe?
5      A. Yes.
6      Q. I thought that you quit doing surgery in 2006.
7      A. Yeah.
8      Q. So a number of these meetings occur after 2006,
9   do you see?
10      A. Yes. The operation demonstration is -- is
11   related to the Second Hernia Telesurgery Meeting in
12   November, 2000, on behalf of Ethicon, where I was asked
13   to demonstrate operations.
14      Q. I understand. But then you have a number of
15   meetings, beginning on four, going down through 19.
16      A. Yeah.
17      Q. Where you attend various organizations --
18   various meetings in Aachen.
19      A. Yes.
20      Q. And are you demonstrating surgeries in those
21   procedures, in those meetings?
22      A. Only until 2006.
23      Q. Okay. And after that time what's your role
24   with those meetings?
25      A. Giving lectures, moderation, discussing the

5 (Pages 14 to 17)

Prof. Dr. Med. Uwe Klinge

Page 18

1    operation that has been transmitted to the audience
2    there, yeah.
3        Q.   And from 21 through 25, these are the master
4    classes that you've given, sponsored by the FEG?
5        A.   From 2000 -- organized by -- which one?
6        MR. ANDERSON:   Twenty-one.
7        A.   The Masterclass in Baden-Baden, they were
8    sponsored by the FEG.
9        Q.   And you're scheduled to do one in 2016 as well,
10   correct?
11       A.   2016 is next year?
12       Q.   You're scheduled to do that with the FEG?
13       A.   I'm not sure.  I don't know.  2015, this year,
14   yes.
15       Q.   Has that not happened yet?
16       A.   No.  It's in the beginning of November, 5th,
17   6th.
18       Q.   Okay.  That's the one I've seen.  Thank you.
19   I'm sorry.
20       A.   November of this year.
21       Q.   Okay, great.  On the page immediately prior to
22   that page on your CV, Entry No. 176, you gave a
23   presentation in Brazil by Skype on October 3l, 2014.
24       A.   Yes.
25       Q.   On How Far From the Ideal Mesh.

Page 19

1            Did you have written materials for that
2    presentation?
3        MR. ANDERSON:   Objection to form.
4        A.   Apart from the PowerPoint presentation that has
5    been transferred to Brazil for this, I don't have any.
6        Q.   Do you still have a copy of the PowerPoint
7    presentation that you used for the presentation in
8    Brazil?
9        A.   I'm sure I can find it.
10       Q.   Okay.  182, there is an entry for ideal meshes
11   of PVDF as the safer alternative to polypropylene.
12       A.   Yes.
13       Q.   Given on June the 12th, 2015, in Paris, France.
14   Tell me about that presentation, please.
15       A.   It was an invitation -- there is a hernia club
16   in France who makes this conference once a year, since
17   several years, and I was invited to give a lecture on
18   PVDF as a possible alternative at this conference.
19       Q.   Does the hernia club have a name?
20       A.   Club Hernie, Charite.
21       MR. ANDERSON:   There you go.  Imagine that.
22       Q.   Is it sponsored by any professional
23   organization?
24       A.   It is sponsored by all manufacturers, from
25   Ethicon, as well as Dahlhausen, as well as Covidien, as

Page 20

1    well as BARD.  So there has been 10, 15, industrial
2    stands that --
3        Q.   Is the FEG a sponsor of this organization as
4    well?
5        A.   No.
6        Q.   Did you have a PowerPoint presentation for
7    that?
8        A.   I did have, surely, and I'm sure that I can
9    find it.
10       Q.   Okay.  And 183 you gave another presentation in
11   Belgium on September the 17th, last month.
12       A.   Yep.
13       Q.   On PVDF?
14       A.   Yeah.
15       Q.   And tell me about that presentation, please.
16       A.   I was asked to -- to give a lecture about PVDF
17   because they -- obviously they felt that they have a leg
18   of information to this, and this was a -- an
19   organization, it was headed by Dr. Belleford and
20   Professor Meterly (phonetic), and it was sponsored by
21   the Belgium distributors of DynaMesh.
22       Q.   Okay.
23       A.   And there has been totally five, six
24   presentations.
25       Q.   At different times over what period?

Page 21

1        A.   No, no, no, in this evening.
2        Q.   Okay.  And did you have a PowerPoint
3    presentation that you gave at that time?
4        A.   Surely I -- I had, and presented it.
5        Q.   184, just October the 16th --
6        A.   It's coming next week.
7        Q.   Okay.  You haven't given it yet.
8        A.   Not yet.
9        Q.   Okay.  Mesh classification.  What's that about?
10       A.   Mesh classification.  Yeah, I was asked by the
11   -- by the surgeon who organized this regular meeting
12   once a year to give a lecture on mesh classification, as
13   this is an important issue, and she felt that she needs
14   some more information about this.  And as we prepared a
15   mesh classification some years ago, I think I was asked
16   to give there a lecture about this topic.
17           (Klinge Exhibit No. 4 was marked for
18   identification.)
19       Q.   Doctor, I'm going to hand you what's been
20   marked as Deposition Exhibit No. 4, and this is a
21   document we've talked about before.  It's a document
22   that you authored with Dr. Klosterhalfen titled,
23   Modified Classification of Surgical Meshes For Hernia
24   Repair Based on the Analyses of a Thousand Explanted
25   Meshes.  Is this the mesh classification to which you

6 (Pages 18 to 21)

Prof. Dr. Med. Uwe Klinge

Page 22

1  just referred?
2      MR. ANDERSON:  Is this paper part of what he
3  was asking you about at that conference?
4      A.  It is part of, of course.  It is a more general
5  lecture because you have several classifications for
6  meshes.  It is possible to create some more
7  classifications about the meshes, and it has to be or
8  you have to put it into the context what to say with
9  your classification.
10      And, of course, one option is this
11  classification, what we published in Hernia, because
12  this is the one who predicts the risk of a material in
13  regard to scarring and inflammation.  So, therefore,
14  it's just one part, it's an important classification,
15  but it is -- the lecture is not restricted to just this.
16  It's a more broader overview of what is possible and
17  what is the value of the different classifications.
18      Q.  What other --
19      A.  If you're interested, then you can join.
20      Q.  Okay.  Have you prepared your PowerPoint
21  presentation for that meeting yet?
22      A.  Widely.
23      Q.  Widely?
24      A.  Not finally, the final proof is not there, but
25  of course I have prepared it to a good extent.

Page 23

1      Q.  Since our last deposition when we discussed
2  TVT, have you given other presentations on the mesh
3  classification system that you have in Exhibit 4?
4      A.  I don't recall that this was the specific
5  topic, mesh classification.
6      Q.  Okay.
7      A.  It should have been there in the titles of the
8  presentations there.
9      Q.  Okay.  And just to go back, if you go back on
10  the prior page of your CV, on page or No. 156, it talks
11  about the classifications of meshes for risk assessment.
12  I guess I understood that's where you first presented
13  this new classification.  Is that fair?
14      A.  Yeah.
15      Q.  And as I looked through the list I didn't see
16  any other presentations on mesh classification unless --
17      A.  162.
18      Q.  Okay.  That's in German.
19      A.  That's in German.  But, however, it's
20  classification of mesh, of meshes.
21      Q.  Thank you.  I wouldn't have known that unless
22  you told me.  Any others?
23      A.  Sure.  I don't see any.
24      Q.  What is the status of the classification that
25  you and Dr. Klosterhalfen proposed for surgical meshes

Page 24

1  for hernia repair that's in Exhibit 4?
2      MR. ANDERSON:  Objection to form.  Go ahead.
3      A.  What -- I don't understand what you're thinking
4  of when you say, "What is the status"?
5      Q.  All right.  When we talked last time you said
6  that you put this together and presented it to a number
7  of manufacturers with the hope of getting some sort of
8  consensus about a mesh classification system.  I'm very
9  broad-brush stating that.  That's what I recall of your
10  testimony.  Is that fair?
11      MR. ANDERSON:  Objection; misstates prior
12  testimony.
13      A.  If I remember correctly we had some meetings
14  with manufacturers in Munich to discuss these issues to
15  make a standardized or a better characterization of
16  textile meshes.  But there hasn't been any ongoing
17  activities in this direction.
18      Q.  Okay.  So is it fair to understand that since
19  you had those initial meetings that when you discussed
20  your proposed classification in Exhibit 4, there had
21  been no movement by you or by the industry to adopt this
22  classification?
23      MR. ANDERSON:  Objection; form.
24      A.  First of all, there hasn't been no movement by
25  the industry so far I know.

Page 25

1      Q.  Okay.
2      A.  I believe that they adopt this classification
3  because they used it increasingly as argument, and I
4  didn't see any objection to this classification by the
5  industry that they don't agree to it.  So, therefore, I
6  think they adopt it.
7      Q.  Have you ever seen anything in writing that
8  suggests to you that any company has adopted the
9  modified classification of surgical meshes for hernia
10  repair that's contained in Exhibit 4?
11      A.  If you mean if I know that any company uses the
12  classification or the measurement of the pore sizes for
13  their products, and I don't know.  At least they didn't
14  publish it.
15      Q.  Okay.  And for the presentation that you're to
16  give in two weeks, or ten days, what other mesh
17  classification systems will be part of your
18  presentation?
19      A.  If I remember correctly, what I will tell in
20  ten days, is usually a classification is intended to
21  classify meshes for similar properties.  This can be a
22  classification according to the price, can be a
23  classification according to the color.  It can be a
24  classification for the size, it can be a classification
25  for the indication, it can be a classification for the

7 (Pages 22 to 25)

Prof. Dr. Med. Uwe Klinge

Page 26

1    risk of infection. That is somewhat, somehow how Amid
2    intended to provide his classification. It can be a
3    classification to predict the risk of scarring and
4    inflammation. That is a classification we are focusing
5    in.
6        So there are a lot of possible classifications
7    of meshes, and therefore you have to put it into the
8    context, what are you or what for -- what are you
9    looking for when using a classification, and therefore
10   you have to define the end point. That is -- so there
11   is no general classification of all meshes. That is the
12   message of this.
13       Q. Is your presentation that you're going to give
14   ten days focusing on mesh for hernia repair?
15       A. It is textiles in surgery.
16       Q. So --
17       A. It is not limited, but it is not focused on any
18   other part.
19       Q. Will your presentation that you give in ten
20   days advocate a particular mesh classification system?
21       A. Advocate in the -- in the meaning that I --
22   there are hardly any -- any alternatives. So if you
23   want to look at the risk for infection for several
24   devices, it is possible to take the classification of
25   Amid. I don't know any others who's able to or who's

Page 27

1    focusing on the risk for infection.
2        If you want to predict the risk for scarring
3    and inflammation, you have to stick to our
4    classification based on -- on the pore sizes. There is
5    no alternative, so therefore I -- I will point out that
6    there are several options.
7        Q. Okay. And when you say our classifications,
8    you're referring to that that's in Exhibit 4?
9        A. This article in Hernia.
10       Q. Okay.
11       MR. THOMAS: Just for the record, Counsel, I
12   noticed when I was going through this that I'm short
13   one page to this exhibit.
14       MR. ANDERSON: Okay. I'll add to it later.
15       MR. THOMAS: Okay.
16       Q. Dr. Klinge, since you and Dr. Klosterhalfen
17   prepared Exhibit 4, have any of the statements that
18   you've expressed in this study changed?
19       MR. ANDERSON: In this entire study that you're
20   looking at?
21       MR. THOMAS: That's right.
22       MR. ANDERSON: Oh.
23       A. We had the impression that it should be -- that
24   this classification is mainly, but it is -- it is
25   focused on textiles in a tension-free area, flat meshes

Page 28

1    in a tension-free area. This is expressed in the
2    document as I remember already, but maybe it should have
3    been underlined more -- more clearly.
4        Q. Okay. Any other changes or additions to the
5    Exhibit 4 in your current state of your proposed
6    modified classification of surgical meshes for hernia
7    repair?
8        A. Nothing that I have the impression that we
9    really need to correct it or to change it. We already
10   addressed all the limitations, we addressed that the --
11   that it is a proposal and we addressed the scientific
12   basis for this. So I don't see a need to -- to make a
13   substantial correction to this.
14       Q. Okay. If you'll go to Page 258 of Exhibit 4,
15   please. I'm sorry, the next page. It's the last page
16   of the exhibit. I have it as 258. I'm sorry. The last
17   page -- on the right side, about three-quarters of the
18   way down, there is a statement, "However, it is still
19   open for further studies whether 500 micrometers is a
20   reliable limit for histology and a thousand micrometers
21   for the calculation of the effective porosity or whether
22   this should be modified." Is this still a correct
23   statement today?
24       MR. ANDERSON: Objection. Go ahead.
25       A. In the meaning that it is still open for

Page 29

1    further studies, we are still waiting on some other
2    studies providing data that are in conflict with these
3    limits. Yeah, it's still open and we are still waiting.
4        Q. Okay.
5        A. We didn't receive any data that are rejecting
6    our hypothesis.
7        Q. Later on in that paragraph it states, "It may
8    be speculated whether the assumption of a best pore size
9    of 1,000 micrometers for preserving an effective
10   porosity has to be adjusted for; for example, meshes of
11   polyvinylidenfluoride PVDF with its smaller foreign body
12   granuloma do not show bridging of scar throughout the
13   pores even at small pore sizes of less than 650
14   micrometers, whereas polypropylene monofilaments usually
15   do." Is that still a true statement?
16       A. Yes.
17       (Klinge Exhibit No. 5 was marked for
18   identification.)
19       Q. Dr. Klinge, I'm going to hand you a copy of
20   your Notice of Deposition which I've marked as
21   Deposition Exhibit No. 5. The Notice of Deposition asks
22   you to bring certain things to the deposition. And I'm
23   sure you know this. If you don't, that's okay.
24       Mr. Anderson and I exchanged communications
25   about what you will and will not bring to the

8 (Pages 26 to 29)

Prof. Dr. Med. Uwe Klinge

Page 30

1  deposition, and I don't want to go through each one of
2  them, I just want to know what it is that you're
3  prepared to give me so we can go through that.
4       MR. ANDERSON:  Okay.  So what we -- without
5  going through all of it, I think we've addressed
6  each and every one of the 19 plus three subparts, so
7  22 categories of documents that were asked for.
8  Many of these were taken care of by providing them
9  through the report and the CV.
10      He -- I indicated to you that he has not billed
11  me yet for the -- for No. 1.  When he does, I'm
12  happy to provide that information to you.  I did
13  bring you a thumb drive which would be all of the
14  literature would be for the last two years
15  since his last deposition.
16      And many of your categories were objectionable,
17  as you know, and I sent you what he was able to
18  quickly grab in terms of PowerPoints for the last
19  two years.  You've identified a couple more here
20  today.  I'm happy to have him provide those to me so
21  that I can give those to you.
22      Otherwise, they're either objectionable,
23  already provided previous to this Notice of
24  Deposition, or provided to you since then.
25      (Klinge Exhibit No. 6 was marked for

Page 31

1  identification.)
2       Q.  Okay.  I'm going to mark the thumb drive as
3  Deposition Exhibit No. 6.  And, for the record, I'm
4  going to take this with me and provide a copy to
5  counsel.  Is that all right with you?
6       MR. ANDERSON:  Sure.  No, that's fine.
7       Q.  And just to be clear that there are no billing
8  records on Exhibit No. 6?
9       MR. ANDERSON:  There's no billing records
10  because I haven't gotten a bill from him.
11      Q.  Do you have any time records to show the amount
12  of time that you've spent preparing your report in this
13  case and the work that you've done in this case?
14      A.  Not in a written form.
15      Q.  Do you have them on a computer?
16      A.  No.
17      Q.  How do you maintain your time?
18      A.  I'm sure I'm -- some time I will find the time
19  to think about it and to estimate the time I spent for
20  this and trial.
21      Q.  Do you have any estimate at all of the time
22  that you've spent preparing your report?
23      A.  It's maybe around 30, 30 hours.
24      Q.  All right.
25      MR. ANDERSON:  He said preparing your report.

Page 32

1  You mean for all the work that he's done on Mullins
2  or just working on the report?
3       MR. THOMAS:  Specifically on the report.
4       MR. ANDERSON:  Oh, just the report.  He's
5  asking just on the report.
6       A.  Fifteen hours.
7       Q.  Fifty?
8       A.  Fifteen.
9       Q.  Fifteen.
10      And a minute ago you said you spent 30 hours
11  working on this matter.  What did you do with the other
12  15 hours?
13      A.  The preparation of -- of this deposition.
14      Q.  So is it fair to understand that your best
15  estimate of the amount of time that you've spent on the
16  Mullins' case, recognizing that you spent a lot of time
17  on prior cases, the total amount until we sat down here
18  today is 30 hours?
19      MR. ANDERSON:  Objection to the form of that
20  question.  Answer how much time you've spent on this
21  case.
22      A.  This is the time I would say I spent
23  specifically for this specific case.
24      Q.  Okay.
25      MR. ANDERSON:  Okay.

Page 33

1       A.  It is not the time that I was --
2       MR. ANDERSON:  You've answered the question.
3       Q.  I understand.
4       And, Doctor, did you meet with Mr. Anderson in
5  preparation for your deposition?
6       A.  Pardon?
7       Q.  Did you meet with Mr. Anderson in preparation
8  for your deposition?
9       A.  Yes.
10      Q.  And how many days?
11      A.  Two-and-a-half maybe.
12      Q.  And how much time did you spend over the
13  two-and-a-half days meeting with Mr. Anderson to prepare
14  for your deposition?
15      MR. ANDERSON:  That's what he gave you.
16      A.  Over all, 15 hours, about.
17      Q.  You have other papers in front of you other
18  than your written report we've marked as Exhibit 3.
19  What else do you have with you?
20      A.  That is my CV.
21      Q.  Okay.  May I see the CV that you brought,
22  please?  Do you mind if I look over your shoulder?
23      A.  I didn't --
24      Q.  Do you mind if I come over here and look over
25  your shoulder?

Prof. Dr. Med. Uwe Klinge

Page 34

1      A.  I can come to your side as well.
2      Q.  That's fine.
3          (Klinge Exhibit No. 7 was marked for
4    identification.)
5      Q.  Doctor, we've marked as Deposition Exhibit
6    No. 7 your copy of your CV, and I noticed you have some
7    writing on it.  Down at the bottom of the first page it
8    says, about 20 with PROLENE as control.  What does that
9    mean?
10     A.  In the list of publications that we made in all
11   these years, several of these publications are dealing
12   with the animal experiments where we tested different
13   materials, and about 20 of these published articles use
14   PROLENE as a control.
15     Q.  And what does it mean to use PROLENE as a
16   control?
17     A.  When in 1994 we started our work with Ethicon
18   to make a safer mesh, a lighter weight mesh, a better
19   mesh, then we planned a series of experiments.  And we
20   need a control group which reflects the tissue response
21   to -- to meshes as Marlex.  And Marlex was the most
22   common heavyweight mesh at that time, and a similar mesh
23   was provided by Ethicon, and this was the PROLENE.
24         So in all -- in a lot of these experiments we
25   agreed, together with the people from Ethicon where we

Page 35

1    made the plan for these analysis, that PROLENE served as
2    a control group as the mesh with the highest risk for
3    inflammation and scarring, and we received this PROLENE
4    mesh from the people of Ethicon.  The results of these
5    animal experiments have widely been published, and over
6    all we -- and this is the figure.
7      Q.  Okay.
8      A.  Twenty articles with PROLENE as a control
9    group.
10     Q.  And in different places you've made circles on
11   different studies.  Is that your effort to identify
12   those studies where you used PROLENE as a control?
13     A.  It should be these articles, yes.
14     Q.  Okay.
15     A.  I'm not sure in detail, but...
16         (Klinge Exhibit No. 8 was marked for
17   identification.)
18     Q.  Dr. Klinge, I'm going to hand you what's been
19   marked as Deposition Exhibit No. 8, and represent to you
20   that that's the expert report of Dr. Muehl.  And, Ben, I
21   apologize.  I thought I had an extra copy for you.
22         MR. ANDERSON:  That's all right.
23     Q.  You've seen Deposition Exhibit No. 8 before?
24     A.  Yes.
25     Q.  Is it fair to understand that you're relying on

Page 36

1    the findings by Dr. Muehl in Exhibit 8 for your
2    opinions in this case?
3          MR. ANDERSON:  Objection to the form.  Go
4    ahead.
5      A.  Some of the opinions are related to -- to these
6    findings.
7      Q.  Okay.  Is there anything about the opinions
8    expressed by Dr. Muehl in his report in Exhibit 8 that
9    you believe to be inaccurate?
10     A.  No.
11         (Klinge Exhibit No. 9 was marked for
12   identification.)
13     Q.  Okay.  Let me show you now what I've marked as
14   Deposition Exhibit No. 9.  It's a 2014 research article
15   titled, High Structural Stability of Textile Implants
16   Prevents Pore Collapse and Preserves Effective Porosity
17   at Strain.  Again, Ben, I'm sorry.  I for some reason
18   don't have an extra copy of that.
19         MR. ANDERSON:  That's all right.
20     Q.  Do you recognize Exhibit No. 9?
21     A.  Yes, I do.
22     Q.  Is Exhibit No. 9 intended to represent the
23   methodology for measurement of pore size that Dr. Muehl
24   followed in preparing his report, Exhibit 8?
25     A.  That's true.

Page 37

1      Q.  Okay.  Do you know of any differences in the
2    methodology expressed in Exhibit No. 9, the article, and
3    the report of Dr. Muehl, Exhibit No. 8?
4      A.  I'm not aware of any.
5      Q.  If you go down to the lower left hand of the
6    first page of Exhibit No. 9, it states, "It is this
7    excessive scar with consecutive contraction and thereby
8    shrinkage of the mesh area that is related to the most
9    -- related with the most serious complications, such as
10   severe vaginal pain, dyspareunia, vaginal shortening,
11   urethral obstruction, and SUI recurrence."
12         Since your last deposition have you undertaken
13   to understand the rate of complications -- the rate at
14   which these complications occur that you've identified
15   in Exhibit 9?
16         MR. ANDERSON:  Objection to form.  Go ahead.
17     A.  We didn't do any -- any -- we didn't do any
18   study to identify the absolute rate of it.
19     Q.  Okay.  Other than your work in this report,
20   which is Exhibit 9, since your last deposition, have you
21   undertaken to determine the rate at which complications
22   such as severe vaginal pain, dyspareunia, vaginal
23   shortening, urethral obstruction and SUI recurrence
24   happen?
25         MR. ANDERSON:  Objection.  Asked and answered.

10  (Pages 34 to 37)

Prof. Dr. Med. Uwe Klinge

Page 38

1    Didn't you just ask him that question?
2    Q.  He answered it with respect to the study.  I'm
3    trying to find out generally whether he's made any
4    investigation into the rates of complications that he's
5    identified in Exhibit 9.
6         MR. ANDERSON:  Okay.  That's still asked and
7    answered.  Go ahead.
8    A.  Only in the -- in the -- not specifically we
9    made a study to identify the rate of these complications
10   in clinical settings.
11   Q.  Okay.  So is it fair to understand that you
12   can't give me any rates of complications that occur for
13   stress urinary incontinence involving severe vaginal
14   pain, dyspareunia, vaginal shortening, urethral
15   obstruction and SUI recurrence?
16   A.  To make this clear it has to be state or -- it
17   has to be stated very clearly that the absolute number
18   of complications after use of a textile implant in
19   surgery, that it is not known and it is not possible to
20   know this.  Because it depends on the follow-up time, it
21   depends on the cohort size that you are investigating.
22   So there is no way in general to give you this number
23   you are asking for.
24   Q.  Okay.  Then you say that surgical intervention
25   is often required to alleviate the symptoms.  What does

Page 39

1    "often" mean?  How often?
2    A.  For me the meaning is more than rare.
3    Q.  And what does "rare" mean to you?
4    A.  Less than often.
5    Q.  Do you have any better description than that?
6    A.  Rare is whether you believe that it is a real
7    exception.  If it's rare then you have the feeling that
8    you have to tell someone because you have a special
9    case.
10   Q.  Is rare less than five percent?
11   A.  Five percent of what?  So it is not necessary
12   to --
13   Q.  Five percent --
14        MR. ANDERSON:  Let him finish.
15   A.  It is not possible to stick this to a certain
16   figure without putting it into the context.
17   Q.  Five percent of total implants.
18        MR. ANDERSON:  Objection to form.
19   A.  Five percent of total implants.  If you -- if
20   you apply a million implants, five percent means 50,000.
21   50,000.  50,000 is not rare.
22   Q.  Is 10,000 -- I'm sorry.
23   A.  It is a population of chance and the entire
24   population of chance in 50,000.
25   Q.  You have a good memory.

Page 40

1    A.  You wouldn't agree to say that this is rare.
2    Q.  Is 20,000 out of a million rare?
3    A.  If it's my wife, no.  It doesn't make any sense
4    to struggle for one percent or two percent.
5    Q.  Okay.  Do you have --
6    A.  It is too much.
7    Q.  Okay.  Is one in a million too much?
8    A.  If it's unnecessary we should agree that it's
9    too much.
10   Q.  Okay.  What is your definition of
11   "unnecessary"?
12   A.  Unnecessary is that you have no alternative, no
13   better alternative.  And if you have -- if you know that
14   there are risks and you have alternatives there, then it
15   is an unnecessary risk, yeah.
16   Q.  Okay.  In Exhibit No. 9, you and your coauthors
17   measure the effective porosity and the textile porosity
18   of the DynaMesh product at 600 microns, correct?
19   A.  Yes.
20   Q.  Did you attempt to measure the DynaMesh product
21   at a thousand microns?
22        MR. ANDERSON:  Objection.  Don't answer the
23   question.  You had an opportunity to ask him about
24   all these questions.  I don't care.  You just
25   established on the record, and I'm glad you did,

Page 41

1    that this exact data was exactly what came out of
2    the expert report of Muehl, which is exactly what
3    came out of the expert report of Muehl back in 2013,
4    and you had the ability, and your partner, Phil
5    Combs, sat right in this chair where Raquel is and
6    asked seven hours of questions of him, and then you
7    asked seven hours of questions to him about this
8    exact data.
9         MR. THOMAS:  I'm not going to argue with you.
10        MR. ANDERSON:  So he will not answer the
11   question.
12        MR. THOMAS:  Okay.
13   BY MR. THOMAS:
14   Q.  Is the work that's done in Exhibit 9 exactly
15   the same work that's contained in Exhibit 8?
16   A.  So far I can see is the exhibit is more extense
17   than the publication.
18   Q.  Okay.  Is it the same work though that makes up
19   both exhibits?
20   A.  Yes.
21        (Klinge Exhibit No. 10 was marked for
22   identification.)
23   Q.  Okay.  Dr. Klinge, I'm going to hand you now
24   what's been marked as Deposition Exhibit No. 10.
25   A.  Thank you.

11 (Pages 38 to 41)

Prof. Dr. Med. Uwe Klinge

Page 42

1    Q.  Deposition Exhibit No. 10 is a document that
2  counsel provided to me last week.  Do you recognize this
3  as a PowerPoint presentation you prepared?
4    A.  Yes, I will.
5    Q.  Can you tell when you gave this presentation?
6    A.  I have to look in my documents where which of
7  these presentations it was.  It was a presentation I
8  gave in Berlin on invitation of -- from Dr. Ismael, who
9  is a gynecologist from the Charite in Berlin, and he
10  made a conference at his department, and I was invited
11  to give a lecture with this topic, how to define an
12  optimum mesh.
13    Q.  Which entry did you refer to?
14    A.  This is 173.
15    MR. ANDERSON:  Ismael is I-s-m-a-e-l, and
16  Charite is C-h-a-r-i-t-e.
17    Q.  And, for the record, your CV shows that you
18  made this presentation on May the 8th; is that correct?
19    A.  May 8th, yeah.
20    Q.  Of 2015?
21    A.  No, 2014.  Sorry.  It's a mistake.  2014.
22    Q.  And, I'm sorry.  I was looking when you
23  answered.  Who asked you to make this presentation?
24    A.  Dr. Ismael.  He was a gynecologist at the
25  Virchow Hospital.  It's one part of the Charite of the

Page 43

1  University in Berlin.
2    Q.  And who sponsored the conference?
3    A.  It was sponsored by Dahlhausen.
4    Q.  And what is Dahlhausen?
5    A.  Dahlhausen is a distributor of DynaMesh product
6  in Germany.
7    Q.  And were you paid to make this presentation?
8    A.  Yes.
9    Q.  And how much were you paid to make this
10  presentation?
11    A.  Seven hundred euros.
12    Q.  And who was your audience?
13    A.  The audience would have been about 40 to 50
14  gynecologists.
15    Q.  Okay.  And those gynecologists practice in
16  Berlin?
17    A.  I don't know.
18    Q.  Were there other speakers?
19    A.  There has been other speakers, yes.
20    Q.  At the time that you made your presentation on
21  May the 8th, 2014, were other speakers also present?
22    A.  There has been other speakers during this
23  evening conference, yeah.
24    MR. ANDERSON:  Sometimes if he says has been it
25  translates as "were" for him.

Page 44

1    MR. THOMAS:  I understand.
2    MR. ANDERSON:  You asked the question twice.
3    THE WITNESS:  They are not sitting there any
4  longer.  So, sorry, yeah.
5    MR. ANDERSON:  There were is another way of
6  saying it.  There instead of has been.
7    THE WITNESS:  Has been they are sitting still.
8  Were is correct there.  Thank you.
9    Q.  Who else presented at that evening meeting?
10    A.  I really do not remember.  It was -- I have
11  been there only a small time between the flights,
12  because I have to leave at the same time Berlin.  So I
13  rushed in and rushed out, gave my presentation, answered
14  some questions, and the rest of the conference were done
15  by themselves.
16    Q.  Okay.  The title that I read, it says material,
17  then it's German.  What does the German statement say?
18    A.  How to define the best mesh for my purpose.
19  That is the problem every surgeon has.
20    Q.  And when you say every surgeon has that
21  problem, what do you mean by that?
22    A.  Every surgeon who uses implants have to be --
23  have to select very consciously to find the safest, the
24  best material for his specific purpose, and therefore it
25  is necessary to ask for -- to look for some -- to look

Page 45

1  for important information to be able to define the best
2  mesh.
3    Q.  Under that there is the statement, possible
4  conflict of interest:  Development of meshes in
5  collaboration with Ethicon, Hamburg and FEG --
6    A.  Textilltechnik.
7    Q.  -- Aachen expert testimony.
8    Is that the disclosure of people you've worked
9  for in the past?
10    A.  Yes.
11    (Klinge Exhibit No. 10 was marked for
12  identification.)
13    Q.  Okay.  And what was the goal of your
14  presentation that you -- that's Exhibit 10?
15    MR. ANDERSON:  Objection to form.  Asked and
16  answered.  Go ahead.
17    A.  The goal, you ask me -- please, can you repeat
18  the question?
19    Q.  What message were you trying to convey to your
20  audience?
21    A.  Sir, we can go throughout the first --
22  throughout the slides, the images.  There are
23  alternatives.  Basic message is there are alternatives
24  and the material has an impact on the outcome, and there
25  are several issues that have to be addressed when

Prof. Dr. Med. Uwe Klinge

Page 46

1    discussing about the material, that is the polymer, that
2    is the structure, that is the tissue response to the
3    biomaterial, that is the function that is intended to be
4    compensated by the implant, and therefore that is the
5    effective porosity, and therefore a medical device, a
6    textile medical device is a high-tech device which bears
7    a lot of risks, and therefore these are the tools to
8    define the -- the safest product. And, finally, it has
9    to be related to the quality of surgery, of course, and
10    to the quality of the patient.
11        Q.  Why did you choose the Ethicon Prolift device
12    to compare to the DynaMesh device?
13        A.  Just because I had the images of these two
14    alternatives.
15        Q.  Okay.  Did you believe that the Gynecare
16    Prolift device was an alternative for the treatment of
17    pelvic organ prolapse in May, 2014?
18        MR. ANDERSON:  Objection to form.  Go ahead.
19        A.  I remember that we made a lot of -- that we --
20    there are a lot of differences between these products,
21    between these textile structures.
22        Q.  Do you know whether the Ethicon Prolift device
23    was available for sale in May, 2014?
24        A.  No.
25        Q.  No, it wasn't or, no, you don't know?

Page 47

1        A.  I don't know.
2        Q.  Okay.  Let's go to the next page.  There are
3    two slides here referring to inflammation correlates
4    with fibrosis.  Tell me what you're trying to describe
5    to your audience here, please.
6        A.  The upper right image, inflammation correlates
7    with fibrosis.  It was the analysis of a thousand
8    explanted hernia devices and showed that you have a
9    close correlation between inflammation and connective
10    tissue, inflammation of the YX and connective tissue
11    scarring on the XX, and you see the more inflammation,
12    the more connective tissue.
13        The -- we have three different markings for the
14    -- for different devices.  The red ones are many plaque
15    three-dimensional structures where we know that we have
16    almost no big distance between the fibers, and they
17    all -- the histological reaction for all of these
18    plaques, almost all of these plaques, showed that you
19    have a high risk for inflammation and a high risk for
20    scarring.
21        You have the blue markings.  These are what we
22    would call lightweight large pore meshes, and
23    significantly less inflammation, significantly less
24    connective tissue.  And in the middle of the greens are
25    the small pore -- small pore heavyweight meshes, so the

Page 48

1    class two meshes.
2        You see there are some which performs quite
3    good in some patients, but the risk is significantly
4    higher in comparison to the blue.  It's better than the
5    red.  You over all see that there is some variation,
6    it's not a strict line, but you have an individual
7    response of various patients to the materials.  It can
8    be influenced by infection, for example.
9        So even if you have a very, very good material,
10    in case of infections you will see a lot of inflammation
11    and maybe more scarring.  So you see that the risk for
12    large-pore constructions is the lowest, for the plaques
13    it's the highest, and in between you have a higher risk
14    than compared to the blue.
15        This is -- in this image you just see the
16    correlation between inflammation and connective tissue,
17    and in the next one I added the next information whether
18    there is bridging fibrosis, whether the pores are
19    completely filled by scar tissue.
20        And there you can see on the third X that the
21    blues, or that the reds, the plaques they are completely
22    bridged.  There is no pore without any scarring in
23    filling out the entire pore.  The blues have the lowest
24    risks, the greens in between.
25        Q.  And, Doctor, have you ever made any attempt to

Page 49

1    determine the extent to which the increased inflammation
2    that you show in these two slides equates with increased
3    reports of pain in patients?
4        A.  That was one of the starting points when we
5    made our studies in the '90s that we -- that we observed
6    that a lot of people have chronic pain, and then when we
7    look to the explants 90 percent of these explants are
8    heavyweight, small pores, so from the class PROLENE at
9    Marlex.
10        And after the introduction of Vypro as a
11    large-pore mesh, and Ultrapro, we rarely got explants
12    because of pain after implantation of these materials.
13        So, yes, we know that the -- that 90 percent of
14    patients with chronic pain could be related to the use
15    of heavyweight small-pore meshes.
16        Q.  Have you ever studied the extent to which there
17    is increased inflammation and fibrosis associated with
18    meshes that are not -- that are removed for reasons
19    other than pain?
20        MR. ANDERSON:  Objection to form.
21        A.  Yes.
22        Q.  And have you compared the two to determine the
23    extent to which the increased inflammatory response and
24    fibrosis correlates with pain?
25        A.  The pain issue was mainly limited or related to

13  (Pages 46 to 49)

Prof. Dr. Med. Uwe Klinge

Page 50

1    the use of small-pore meshes. So you have an increased
2    risk for pain and you have an increased inflammation and
3    connective tissue in this group of -- of explants.
4        Q. I understand that's your opinion. Have you
5    published a study on that? That's what I want to know.
6        A. Yes, we did.
7        Q. And that's the 2002 study, did I get that
8    right?
9        A. The last time it was the publication 623
10   explants for Klosterhalfen and me.
11       Q. Let's go to the slide that says textile
12   characteristics, please. You list six different
13   characteristics for the textiles. That's the type of
14   material that's used in mesh. Is that correct?
15       A. At least six. There is the last indicating
16   that there are some more or are you on the left or --
17       Q. I'm on the left, exactly where you are.
18       A. On the left, yeah. So I started to make a list
19   of textile properties, but then indicating that there
20   are lots of more.
21       Q. And when you say pore size has to be considered
22   as most relevant for biocompatibility, what do you mean
23   by that?
24       A. The distance between the filaments or the pore
25   size of one millimeter in all direction has a high power

Page 51

1    to predict the tissue response in relation to
2    inflammation and fibrosis.
3        Q. Okay. If you'd go to the next page, please.
4    Under outcome, what are you trying to show in these last
5    series of slides, beginning with outcome?
6        A. The point to be discussed here is what is the
7    impact of the material on the outcome. And this depends
8    on the conditions. You're able with an awful surgery to
9    create all complications without the need of an implant,
10   and even with the best implant you can create a lot of
11   complications.
12          This makes it so difficult to identify in
13   clinical studies the impact of the material on the
14   outcome. So you have this mix-up of surgery and there
15   are of course patients where the indications may be not
16   the best and the good material.
17          But in the conferences there are a lot of
18   experts, and to all my colleagues doing an excellent
19   surgery, treating excellent patients, they experience
20   sometimes some complications. And looking for the
21   reasons for these complications, in these patients with
22   excellent surgery, excellent biology of the patient, the
23   impact of the material for the outcome can be
24   considerably high. It can go up to 70 percent, 80
25   percent.

Page 52

1        So the impact of the material on the outcome,
2    particularly in patients who know how to treat and in
3    good patients is very, very high, and in these patients
4    it is even more important to think about the material.
5    That is the point here.
6        Q. Doctor, when you made this presentation to
7    these doctors in 2014, did you discuss with them the
8    risk of mesh implantation on the nerves in the pelvic
9    floor? I don't see any slides on that.
10       A. No. It is a limited time and usually you'll
11   see it was for 20 minutes. And if you are counting the
12   imagines I usually have to talk as in the film, 21
13   images per second or per minute, and I've been off, I
14   suppose.
15          (Klinge Exhibit No. 11 was marked for
16   identification.)
17       Q. Let me show you what has been marked as
18   Exhibit 11, and it's another PowerPoint presentation
19   that was provided to me by counsel. It's very similar
20   to the one that you just provided me. Can you tell me
21   where you gave that presentation?
22       A. If I'm correct, this is a presentation a week
23   before I was invited by the Endoscopic Urogynecologist
24   Society that met at Norwich in U.K.
25       Q. Okay.

Page 53

1        A. And I was asked to, during the conference, to
2    give a presentation by the head of the conference.
3        Q. And did you go there at the request of
4    Dahlhausen?
5        A. I went there on request of this, of this head
6    of the conference, but Dahlhausen or the FEG supported
7    this travel.
8        Q. Did they pay you to attend 700 euros?
9        A. No.
10       Q. Did they pay your expenses to attend?
11       A. Expenses, yeah.
12       Q. Did you receive any other compensation for the
13   presentation of the -- the presentation that's Exhibit
14   No. 11?
15       A. No.
16       Q. While the slides are a little different the
17   message appears to me to be the same. Is it a similar
18   message for Exhibit No. 11 as it was for Exhibit 10?
19       A. You will always find that the facts are quite
20   similar in all these presentations during all the past
21   20 years. However, it's an evolving of ideas and the
22   meshes -- the speaking words, the words for the
23   conferences, they changed.
24       Q. Okay.
25          MR. THOMAS: Let's go off the record, please.

14 (Pages 50 to 53)

Prof. Dr. Med. Uwe Klinge

Page 54

1    I need to take a break.
2         MR. ANDERSON: Okay. We shall take a break.
3         (Recess from 11:33 until 11:41 a.m.)
4    BY MR. THOMAS:
5         Q. Doctor, what does it mean to be an academic
6    editor?
7         A. Pardon?
8         Q. What does it mean to be an academic editor of a
9    paper?
10        A. Elder?
11        Q. Academic editor.
12        MR. ANDERSON: Editor.
13        A. Editor. I don't know the official definition
14   of this.
15        (Klinge Exhibit No. 12 was marked for
16   identification.)
17        Q. Okay. Let me hand you what's been marked as
18   Deposition Exhibit No. 12. Deposition Exhibit No. 12 is
19   a review article June 27th, 2014, accepted October 3l,
20   2014, by Barski and Deng, where you're shown as the
21   academic editor.
22        A. Yes. So my task is I was asked to take care of
23   this article, and the first is you have to decide
24   whether it fits in the scope of the journal, or the
25   specific issue, or to just reject it as out of the

Page 55

1    scope.
2         If it is within the scope of this issue, then
3    you have to send it to some reviewers, and then you have
4    to wait until the reviewers ask or send back their
5    statements. Then you pass over these statements to the
6    authors and you are waiting until they send a revised
7    manuscript. Then you send this revised manuscript to
8    the reviewers, whether they accepted it or not. And
9    then you are finished.
10        Q. Okay.
11        A. Then you have to say the reviewers agree, then
12   you send it as last message to the authors. It is
13   accepted.
14        Q. Did you review Exhibit No. 12 before it was
15   published?
16        A. Yeah. Surely I read it, yeah.
17        Q. Did you comment on Exhibit No. 12 before it was
18   published?
19        A. I didn't -- I didn't was a reviewer for this
20   manuscript, I just organized the review process for
21   this.
22        Q. Okay. But did you offer any comments at all to
23   the authors about this Exhibit 12?
24        A. For this, no.
25        Q. Okay. In your practice when you review papers

Page 56

1    as an academic editor, if you find things in there with
2    which you disagree, do you advise the authors of your
3    disagreements?
4         MR. ANDERSON: Objection to form. Go ahead.
5         A. I rarely act as an academic editor. This was
6    an exception to do so. Usually I'm busy just as a
7    reviewer and I give my comments and statements and
8    recommendations to an editor.
9         Q. Why did you act as academic editor for Exhibit
10   No. 12?
11        A. I was asked and invited by Dr. Otto. He was
12   the invited editor of this issue of this journal, and he
13   asked several colleagues to help him in this editing
14   process for this issue.
15        Q. And Dr. Otto is the colleague that you
16   published with that we've talked about before?
17        A. No.
18        Q. Different Dr. Otto.
19        A. Yes.
20        Q. Okay. Who was the Dr. Otto that asked you to
21   participate in Exhibit No. 12?
22        MR. ANDERSON: What was his name? Which Otto
23   was this?
24        THE WITNESS: The last one.
25        MR. ANDERSON: Yes.

Page 57

1         A. This one is a urologist, I think Thomas, Thomas
2    Otto from Neuss, close to Dusseldorf. He's their head
3    of the department for urology.
4         Q. Okay. And do you know Dr. Barski, the first
5    named author?
6         A. I know that it is a resident at this
7    department --
8         Q. Okay.
9         A. -- there.
10        Q. Have you discussed with either Dr. Barski or
11   Dr. Deng the contents of Exhibit 12?
12        A. No.
13        Q. Do you have any reason to believe that this
14   review article, Exhibit 12, is not a good statement of
15   the medicine of the management of mesh complications
16   after SUI and POP repair, review and analysis of the
17   current literature?
18        MR. ANDERSON: Object to the form of the
19   question.
20        A. I don't have an opinion to this, except we read
21   it together.
22        (Klinge Exhibit No. 13 was marked for
23   identification.)
24        Q. Doctor, I've handed you maybe two copies, what
25   I've marked as Deposition Exhibit No. 13. Deposition

15 (Pages 54 to 57)

Prof. Dr. Med. Uwe Klinge

Page 58

1  Exhibit No. 13 is a study published by William S. Cobb,
2  and others, in the Journal of American College of
3  Surgery in 2015. Are you familiar with this study?
4      A. I'm not sure.
5      Q. Do you know Dr. Cobb?
6      A. I know his name.
7      Q. Okay. Have you ever collaborated with Dr. Cobb
8  on any projects?
9      A. No.
10     Q. Are you aware that Dr. Cobb, at about the same
11 time that you and Dr. Klosterhalfen wrote your article
12 in 2005, that Dr. Cobb and Dr. Heniford wrote a similar
13 paper, The Argument For Lightweight Polypropylene Mesh
14 in Hernia Repair. Do you remember that?
15     A. We have been surprised about this, yeah.
16     Q. Okay. You said you don't know if you've seen
17 Exhibit No. 13. Can you take a minute and look through
18 it and see if that refreshes your recollection about
19 whether you've seen it before? I want to give you
20 enough time before I ask you questions about it. If
21 you've seen it before, it's fine. If you haven't -- as
22 you're looking through it, does it ring a bell?
23     A. Maybe I've reviewed or I read just the
24 abstract. But I didn't -- didn't have a look in detail
25 to all the points here.

Page 59

1      Q. Okay. If you look at the study design it's a
2  retrospective review performed to include elective
3  retromuscular mesh repairs of complex incisional hernias
4  from August 2006 to 2013. Demographics, operative
5  details and post-operative events, including wound
6  events, surgical site infections and recurrences were
7  reported. And over a seven-year period they looked at
8  255 retromuscular mesh repairs of midline incisional
9  defects, and they analyzed various results, recurrences
10 and surgical site infections from that group; is that
11 correct?
12     A. As you read, as it's written in the abstract.
13     Q. This study finds that when evaluating
14 polypropylene meshes recurrence was more likely with
15 lightweight mesh, 22.9 percent, versus midweight mesh,
16 10.6 percent. Do you see that?
17     A. I see this.
18     Q. Are you aware of other studies finding an
19 increased rate of recurrence with lightweight mesh
20 compared to midweight mesh in hernia repair?
21     MR. ANDERSON: Objection to form. Go ahead.
22     A. Regardless that there is no clear definition
23 what is lightweight and midweight and heavyweight, I am
24 aware of studies showing differences in the outcome in
25 regard to recurrences between meshes.

Page 60

1      The summarized conclusion is difficult, and the
2  main concern when taking these studies is that it is a
3  complete mix-up of sources for recurrences. They are
4  underpowered usually. It is very, very difficult to
5  relate this outcome to the material, very, very
6  difficult.
7      Q. Do you agree with the statement generally that
8  when you evaluate polypropylene meshes that hernia
9  recurrence is more likely with lightweight mesh than
10 midweight mesh? Do you agree with that statement?
11     MR. ANDERSON: Again, objection.
12     A. As a general statement that all polypropylene
13 lightweight meshes have a higher risk for recurrences
14 than midweight, I cannot agree to this.
15     Q. Why not?
16     A. As I told you, there is no clear definition
17 which mesh is used, which technique is used. It is a
18 mix-up of various confounders that interact with a --
19 with the development of a recurrence. The outcome has
20 to be followed for a long period, probably longer than
21 seven years.
22     So all of these limitations of a clinical
23 study, 255 patients, the statistical power is too low to
24 -- to give any certain -- to allow any certain statement
25 on the outcome there. So you can describe the result as

Page 61

1  it is, but any linkage between two things, it is -- I
2  wouldn't agree to this.
3      Q. Okay. Turn to Page 610, please, of Exhibit 13.
4  And on the left side, right in the middle, it says,
5  "With respect to mesh type recurrence rates were 16.2
6  percent with synthetic mesh, 17.1 percent for
7  bioabsorbable mesh, and 25 percent for biologic mesh.
8  Of the recurrences seen in the permanent mesh group,
9  two-thirds occurred in the lightweight mesh patients.
10 When evaluating polypropylene meshes alone, a
11 significant difference in incidence of recurrence was
12 seen when comparing lightweight mesh, (22.9 percent) and
13 mid-weight mesh (6.10 percent) (p equals 0.045). The
14 mechanism of recurrence was central mesh fracture or
15 failure in nearly half of the recurrences."
16     As you read that, have you found or seen any
17 other studies making similar findings about central mesh
18 fracture or failure in lightweight meshes used to treat
19 hernia patients?
20     A. The central mesh rupture firstly has been
21 mentioned at one of the Suvretta conferences that has
22 been sponsored by Ethicon in about 2000, in around 2000,
23 by Chiapas. He was the first mentioning central mesh
24 rupture. These has been Aachen results because we
25 realized that if you have a -- if you use Vypro as a

16 (Pages 58 to 61)

Prof. Dr. Med. Uwe Klinge

Page 62

1    prototype of a material reduced mesh, in the condition
2    that you cannot close the fascia on top of it, that we
3    realize that in some patients you have a central mesh
4    rupture, and this was presented at this conference
5    there.
6            Meanwhile, there has been publications about
7    Ultrapro and there has been publications of central mesh
8    rupture in heavyweight meshes as well.  So there are
9    several studies already discussing mentioning the
10   problem of central mesh rupture.
11       Q.  Okay.  Have you been involved in any studies
12   discussing central mesh failure or rupture?
13       A.  I was approached by a Belgian surgeon and by
14   Chiapas to collect data about central mesh rupture, but
15   it was not -- there is no protocol of a study, and it
16   was not finished yet.
17       Q.  Is it still in process?
18       A.  We are still thinking about it.
19       Q.  And what did you do to gather data about
20   central mesh failures or ruptures?
21       A.  First of all, we presented the problem to the
22   audience and we presented the problem to the people from
23   Ethicon, and I know that the Belgium surgeons presented
24   the problem to Ethicon as well, in particularly as the
25   Ultrapro mesh of Ethicon has a specific problem to allow

Page 63

1    a central mesh rupture.
2            This was -- has been discussed by me and by
3    others with the -- with people from Ethicon, and at one
4    of the last conferences I was told by someone from
5    Ethicon that at the end of this year they will release a
6    modification of the current Ultrapro textile structure.
7    I was asked to keep this information confident, but I
8    hope in your hands it is still confident.
9        Q.  When you say you presented this information to
10   the audience, what audience did you speak to?
11       A.  In particularly I remember a meeting of the
12   German Hernia Society in Baden-Baden where this was a
13   hot topic in the presentations and discussions there
14   raised by various people there.
15       Q.  And when you say it was a "hot issue," what is
16   the hot issue?  Is it central mesh failure in
17   lightweight meshes?
18       A.  In the specific lightweight mesh of Ultrapro,
19   because the textile bending allows very easily a
20   splitting when you are putting load to it in between the
21   fibers.
22           In 90, perpendicular to this direction, it is
23   very difficult to make a rupture of the mesh, but to
24   open the textile bindings of this structure it's very
25   easy.  And you have similar differences for PROLENE and

Page 64

1    even more for Marlex.  In one direction it is very, very
2    strong, and in the other it has a very low resistance
3    for subsequent tearing force.
4        Q.  Have you analyzed other manufacturers'
5    lightweight meshes to see the extent to which those
6    lightweight meshes are involved in central mesh
7    failures?
8            MR. ANDERSON:  Objection.  Go ahead.
9        A.  We didn't make a systematic analysis of other
10   meshes.
11       Q.  Is that because the surgeons to whom you spoke
12   used Ultrapro -- or strike that.
13           Why didn't you look at other meshes to -- well,
14   strike that again.
15           Why did you not look at other lightweight
16   meshes used in hernia repair to determine the extent to
17   which they were involved in central mesh failures?
18           MR. ANDERSON:  Objection to form.  Go ahead.
19       A.  We have clearly showed that you have to look to
20   central mesh rupture, you have clearly showed that you
21   have to create a textile analysis in two directions to
22   identify the weakness of a textile construction.  We
23   have presented this to the public, how to analyze the
24   problem, how to analyze and how to solve it, and we
25   didn't -- I didn't focus my work on this topic, just

Page 65

1    because of time.
2        Q.  Okay.  Have others written on the issue of
3    central mesh failure involving lightweight mesh for
4    hernia repair for products other than Ethicon products?
5        A.  Sometimes it is not clear which products are
6    used.  Usually it is a -- these are retrospective
7    analysis of central mesh ruptures.  It's only a handful
8    of these studies.  Sometimes it is said that it is
9    Ultrapro and -- but sometimes it is not known which
10   material.
11       Q.  Do you know the extent to which lightweight
12   large-pore meshes from other manufacturers are involved
13   in central mesh failure in hernia repair?
14           MR. ANDERSON:  Objection to form.
15       A.  I have no data about it.
16       Q.  If you go to the last page, Page 612 of the
17   study, it states that, at the top of the page, "The
18   failure of these meshes is aggravated by bridged repairs
19   and in morbidly obese patients.  In our experience,
20   20 of the 43 recurrences were due to central failures of
21   lightweight mesh.  Our current practice has changed and
22   now we use a macroporous, midweight mesh construct with
23   a density of polypropylene of 45 grams per meter
24   squared."
25           Do you know of other physician groups who have

17 (Pages 62 to 65)

Prof. Dr. Med. Uwe Klinge

Page 66

1    stopped using lightweight mesh because of the risk of
2    central mesh failure?
3        MR. ANDERSON:  Objection to form.  Go ahead.
4        A.  I remember that there are surgeons stopping to
5    use in Germany Ultrapro for the use of incisional
6    hernias where you cannot close the fascia because of
7    these reports of this problem, and they went over or
8    they preferred to use other materials.
9        Q.  Okay.  And what other materials do you
10   understand they prefer to use?
11       A.  There are -- I don't know exactly specifically
12   for the specific surgeons, but there are several other
13   alternatives on the market that doesn't have this
14   problem, specific problem, of the Ultrapro.
15       Q.  In 2013, do you have any idea of the market
16   share that Ultrapro had for hernia repair in Germany?
17       A.  I estimate that it is, depending on the type of
18   hernia, for the groin it is maybe different to
19   incisional hernia.  But it is said to have around
20   70 percent.
21       Q.  And what other types of meshes make up the
22   30 percent in 2013?
23       A.  In Germany there is a -- a big competitor is
24   Covidien.
25       Q.  Does Covidien make a lightweight, large-pore

Page 67

1    mesh that is a competitor to Ultrapro?
2        A.  All the manufacturers are coming up with
3    lightweight meshes, some sort of lightweight meshes they
4    offer.  But Covidien is one of the biggest, made by
5    Medtronic, bought by Medtronic, and another major
6    manufacturer is Braun.
7        Q.  Brown?
8        MR. ANDERSON:  Braun.
9        Q.  B-r-a-u-n?
10       A.  Yeah, Braun.
11       Q.  Are you aware of reports of central mesh
12   failure with the Covidien lightweight large-pore mesh in
13   hernia repair?
14       A.  No.
15       Q.  Are you aware of central mesh failure for
16   lightweight mesh manufactured by Braun?
17       A.  No.
18       Q.  For hernia repair?
19       A.  No.
20       Q.  Dr. Cobb states in that last paragraph that our
21   current practice has changed and we now use a
22   macroporous midweight mesh construct with a density of
23   polypropylene of 45 grams per meter squared.
24       Do you find any flaw in the medical judgment of
25   Dr. Cobb and his group to use a macroporous midweight

Page 68

1    mesh construct with a density of polypropylene of 45
2    grams per meter squared.
3        A.  The major or the critical point is not the
4    weight.  The critical point is the textile construction,
5    whether you managed to make the linkage between the
6    filament strong enough to withstand a subsequent tearing
7    force.  And this can be realized with more weight, but
8    it can be realized with less weight.  So to -- for the
9    prevention of a central mesh rupture, the quality of the
10   textile construction is decisive.
11       Q.  Do you have any criticism of Dr. Cobb's group
12   using a polypropylene mesh for the repair of hernias?
13       A.  I have no opinion to this.
14       Q.  No opinion at all?
15       A.  No, it is too complex.  So for what hernia, in
16   which construction, which polymer, which polypropylene.
17   So you have to discuss it, what are the alternatives for
18   them of what to do.  So it's -- I'm not able to give a
19   short answer to this.
20       Q.  Okay.  You've not performed surgery yourself
21   since 2006, correct?
22       A.  That is correct.
23       Q.  Do you give advice to surgeons today about the
24   proper mesh used to treat incisional hernias?
25       A.  I don't think that I ever advised a colleague

Page 69

1    to use a specific product or a specific textile.  I
2    usually present our research data of the past 20 years.
3    I present our experiences which we made for these
4    meshes, and then I presented the facts, and I usually
5    left it up to the surgeon to draw his conclusions of it.
6        Q.  Did you ever tell any of your surgical
7    colleagues not to use a specific kind of mesh for hernia
8    repair?
9        A.  Surely I -- I indicated a higher risk for a
10   mesh.
11       Q.  And the higher risk you're talking about is
12   what you've talked about in your presentations?
13       MR. ANDERSON:  Objection.  As to which
14   presentation?
15       Q.  The presentations over the last 20 years to
16   which you've just referred.
17       A.  Of course you will find, you have a lot of my
18   presentations already in your documents, you will find
19   there some slides showing the problem of central mesh
20   rupture, of, yeah.  You will find it and I presented it
21   to the audience.
22       Q.  Okay.  And you agree that hernia repairs for a
23   hernia recurrence increase the likelihood of a surgical
24   site infection?
25       A.  The redo generally is considered as risk factor

18  (Pages 66 to 69)

Prof. Dr. Med. Uwe Klinge

Page 70

1   for SSE, SSI.
2       (Klinge Exhibit No. 14 was marked for
3   identification.)
4       Q.  Let me show you now what I've marked as
5   deposition Exhibit No. 14.
6       A.  Yes.
7       Q.  Exhibit No. 14 is a study published in the
8   International Journal of Surgery, first author, Weyhe,
9   W-e-y-h-e, second author the same William Cobb we've
10  talked about before.  Are you familiar with this study?
11      A.  Yes.
12      Q.  And, for the record, this study is published in
13  July of 2015.  Did you find this study on your own or
14  was it provided to you?
15      A.  I'm sorry?
16      Q.  Did you find this study on your own or was it
17  provided to you?
18      A.  No, I received it by -- from Dirk Weyhe.  He
19  discussed this issue with me during the last year
20  several times.
21      Q.  Were you aware that the authors were doing this
22  study prior to the publication?
23      A.  Pardon?
24      Q.  Were you aware that the authors were doing this
25  study prior to the time it was published?

Page 71

1       A.  Usually they do the experiments before
2   publishing.
3       Q.  But did they talk to you about it?
4       A.  They presented it in some of the conferences
5   already and they tried very hard to find a journal that
6   accepted this study there, and finally they have been
7   happy there because maybe it is so sophisticated in the
8   experimental setting that they have some difficulties to
9   pass reviewers.
10      Q.  Tell me what you know about the difficulties
11  they had in getting this study published.
12      A.  I don't know any details.
13      Q.  Okay.  And why do you suggest they had
14  difficulties in getting this study published?
15      A.  I don't have any opinion to this.
16      Q.  Okay.  If you go to Page 47, which is the
17  second page of Exhibit No. 14, down towards the bottom
18  of the introduction, it says, "The pore size of
19  commercially available meshes in hernia surgery ranges
20  from 0.4 millimeters to greater than 3.6 millimeters,
21  while the majority of the first mesh generation reach a
22  pore size of about .8 millimeters.  According to the
23  International EndoHernia Society, IEHS, pore sizes of
24  1.0 to 1.5 millimeters are recommended."
25      Do you agree with that statement, that's what

Page 72

1   the International EndoHernia Society recommends?
2       A.  The International EndoHernia Society made a
3   statement about the material and the meshes, and they
4   indeed recommend large pore meshes, but with a lot of
5   comments on the limitations to define or to make these
6   statements.
7       Q.  But is it true that the International
8   EndoHernia Society recommends pore sizes of 1.0 to 1.5
9   millimeters?
10      A.  As I told you, if you're going to this text
11  where they publish it, I think in the surgical -- in
12  Surgical Endoscopy, you have the entire text, several
13  pages there, and somewhere there is a recommendation for
14  this use of these large-pore meshes, yes.
15      Q.  In the range of 1.0 to 1.5 millimeters, true?
16      A.  Yeah; but with a lot of further comments to
17  this.
18      Q.  Okay.  "To our knowledge the correlation
19  between elasticity, stability porosity of mesh
20  constructions and shrinkage is not proven systematically
21  up to now."
22      Do you agree with that statement?
23      A.  At this time point, no.
24      Q.  And tell me why you don't agree with that.
25      A.  Because we presented already or we published

Page 73

1   already the consequence of mechanical loads to the
2   structure of the pores.
3       Q.  And that's the Muehl testing that we've talked
4   about so much in the past?
5       A.  Muehl testing and the -- the publication from
6   last year, I think.
7       Q.  Okay.  Any other publications about which
8   you're aware that cause you to disagree with that
9   statement?
10      A.  Muwalli (phonetic).
11      Q.  And is that the Muwalli (phonetic) paper that
12  uses uniaxial testing?
13      A.  I have to -- I have to see the paper.  The
14  group published so many things, but I remember that they
15  -- the investigated mechanical loads too as well.  There
16  are some from Vinadian (phonetic), from an Australian
17  group, that looked to the changes in meshes after
18  applying loads to it.
19      Q.  What about the issue of stability porosity of
20  mesh constructions and shrinkage is not proven
21  systematically up to now?
22      A.  I would agree to this.
23      Q.  Okay.
24      A.  Sufficiently.
25      Q.  So what they set out to do in this study was to

19 (Pages 70 to 73)

Prof. Dr. Med. Uwe Klinge

Page 74

1  define the optimal range of pore size, based on the
2  post-operative assessment of tissue integration and
3  shrinkage behavior in a hernia minipigs model. Do you
4  have any quarrel with the choice of the minipig as a
5  model?
6      MR. ANDERSON: Objection. Go ahead.
7      A. The minipig offers some -- some good options.
8  The placement of the mesh in the abdominal wall offers
9  some -- some options. Everything has a lot of
10  limitations as well, so therefore you have to -- to see
11  it in which context. What do you want to see, what do
12  you want to measure?
13      Q. Since you reviewed this study before, you're
14  aware that the meshes that are analyzed here are
15  specifically provided by Covidien and they were devised
16  for this study. Did you know that?
17      A. No.
18      Q. Let me direct your attention to the --
19      A. I know some of the authors are working for
20  Covidien, so therefore it is linked to Covidien. So,
21  yeah, I know.
22      Q. If you go back to Page 52, under the conflict
23  of interest. It's the last page of the study.
24      A. Last?
25      Q. Excuse me. The next to the last page. Next to

Page 75

1  the last page, I'm sorry, under conflict of interest.
2  It says Covidien produced the customized meshes used in
3  this study.
4      A. I think so, yeah.
5      Q. Okay. And if you go back to Page 48, it shows
6  the measurements of the pores for each of the meshes
7  that were studied there. Do you see that?
8      A. No, not yet.
9      Q. Page 48?
10      MR. ANDERSON: This one with the green on it.
11      A. Yeah.
12      MR. ANDERSON: What section, Dave?
13      MR. THOMAS: I'm on Table 1.
14      MR. ANDERSON: Okay, thanks.
15      Q. Do you see how the authors in Exhibit No. 14
16  measured pore size?
17      A. Yes.
18      Q. What is warp and weft?
19      A. So far I remember is the warp fibers are those
20  coming from the machine. So in a textile hosiery and
21  every -- most of the mesh construction of textile
22  hosiery, the fibers are coming from the ground, from the
23  machine, and these are the warp fibers, and there are no
24  weft fibers, different to the clothing. There you have
25  some weft fibers crossing all the other lines and

Page 76

1  combining these filaments.
2      In this -- in these textile constructions the
3  linkage is done just by turning one filament around the
4  other. So there that creates some sort of binding
5  there, but you don't have this weft. But, to make it
6  easier for a reader to understand it, it is helpful to
7  discuss on the one hand this is the warp direction.
8      MR. ANDERSON: Going up and down.
9      A. Up and down. And perpendicular to this, this
10  is the weft direction. The critical point is, if you
11  are tearing a mesh perpendicular to the warp direction,
12  you have to cut every filament. That is almost
13  impossible to do it by hand. If you put a load to it in
14  direction to the warp direction you can split it just by
15  opening these bindings. There is no filament as a weft
16  running across. And this opening of the bindings is in
17  some textiles very easy to manage as in Ultrapro. You
18  only need very small forces to split the mesh when
19  putting a load in this direction, in line with the warp.
20  If you make it -- if you place it perpendicular to this,
21  it is very strong.
22      Q. Okay. Do you see here -- you're referring to
23  the tensile strength of the Ultrapro when you're making
24  that description; is that right?
25      MR. ANDERSON: Objection.

Page 77

1      A. I don't get --
2      Q. You were talking about how if the mesh fails
3  then it's very easy for the mesh failure to expand. Was
4  that the point of your testimony?
5      A. The splitting of some textile constructions can
6  be done very easy, but only in one direction, to open
7  these loops, to open these bindings.
8      Q. Okay. And --
9      A. And, therefore, it is important to know that
10  there are two different directions, though it is not
11  correct to talk from a weft.
12      Q. Did as a part of your work with Dr. Muehl you
13  measure the strength of the meshes in two different
14  directions for the TVT device?
15      A. For the TVT as a sling, this was measured so
16  far I remember just as a sling.
17      Q. Okay.
18      A. But if you rely to the measurements of the
19  Prolift, or Prolift M, where you have a flat-mesh area,
20  there we did it in two directions.
21      Q. You see in Table 1 the authors in this study
22  measure the tensile strength at breaking point for each
23  of these customized meshes in the warp direction and the
24  weft direction. Do you see that?
25      A. Yeah.

20 (Pages 74 to 77)

Prof. Dr. Med. Uwe Klinge

Page 78

1    Q. And they're different, aren't they?
2    A. They are different.
3    Q. And is this the same difference in breaking
4  strength that you discussed a moment ago when we were
5  talking about Ultrapro, the difference in breaking
6  strength depending on which direction the load is
7  applied?
8    A. It is this difference between warp and weft
9  direction that the materials have different strength in
10  regard. And you'll see here in this, the last part one,
11  there you have tremendous differences. So the
12  differences may vary in the middle.
13    Q. Do you know the extent to which the differences
14  in Ultrapro -- strike that.
15    Do you know how the differences in Ultrapro's
16  breaking strength compare to the five meshes that are
17  contained in Table 1?
18    A. I know that we have published the data for
19  Ultrapro, but I don't recall it in the moment.
20    Q. And the data that you have published on
21  Ultrapro was what?
22    A. In many of our publications we started in the
23  section material and methods with a table that gives the
24  textile, the data of the textile analyzers there. And
25  there, in many of the publications, there has been a

Page 79

1  separate description of the tensile strength in the two
2  directions. We didn't talk of warp and weft direction,
3  but horizontal and vertically direction.
4    Q. Do you recall, as you sit here today, any of
5  those studies that I could go find that information?
6    MR. ANDERSON: Objection. Don't answer the
7  question. You're only allowed to ask the doctor
8  between 2013 to the present. You've had plenty of
9  time to ask him about all the studies that are in
10  his things over the last 30 hours plus of
11  questioning him. He's not going to answer it.
12    MR. THOMAS: Okay. We'll see.
13    MR. ANDERSON: Okay.
14  BY MR. THOMAS:
15    Q. Since 2013, when your deposition was last
16  taken, have you published any studies on Ultrapro where
17  you identify the tensile strength of Ultrapro in the
18  vertical and horizontal directions, or warp and weft?
19    A. No, except -- except the study from Muehl is
20  Prolift M where Ultrapro was used. So in this article
21  you will find some data related to this issue.
22    MR. ANDERSON: Thus my objection.
23    MR. THOMAS: I'm sorry. I have to stop again.
24    MR. ANDERSON: Okay.
25    (Recess from time 12:33 until 12:39 p.m.)

Page 80

1  BY MR. THOMAS:
2    Q. Page 51, under discussion. Authors state, "It
3  is hypothesized that the use of light meshes may reduce
4  undesirable clinical side effects. A series of
5  meta-analysis gathered data from randomized controlled
6  trials that compared lightweight and heavyweight meshes
7  in inguinal and abdominal hernia repair. No significant
8  differences" --
9    MR. ANDERSON: Where are you reading? I'm on
10    the wrong page, I guess.
11    MR. THOMAS: Page 51.
12    MR. ANDERSON: 51, okay. Sorry. I thought you
13    said 15. Go ahead.
14    Q. Let me start over again. Down under
15  discussion. "It is hypothesized that the use of light
16  meshes may reduce undesirable clinical side effects. A
17  series of meta-analysis gathered data from randomized
18  controlled trials that compared lightweight and
19  heavyweight meshes in inguinal and abdominal hernia
20  repair. No significant differences were found or only
21  slight advantages were detected after using lightweight
22  meshes and most advantages occurred only during the
23  early post-operative period."
24    Do you agree with that statement?
25    MR. ANDERSON: Objection to form.

Page 81

1    A. In the -- in the meaning that you consider the
2  limitations of these randomized control trials and
3  meta-analyses to -- to describe these differences, to
4  find these differences, to prove these differences in
5  general, this is a description of what currently is
6  found in some of these studies. However, you have to
7  make very, very clear that comparison of materials with
8  these clinical studies is hardly possible in general,
9  and therefore the absence of a difference can never be
10  taken as confirmation that there is no effect. That
11  would be unscientifically.
12    Q. The next paragraph, top of the page, says,
13  "While it is quite clear that a macroporous mesh
14  improves biocompatibility in terms of mesh integration,
15  the optimal pore size remains unknown."
16    Do you agree with that?
17    A. Optimum pore size, it is his opinion, but to
18  make it -- give a comment on this it has to be clear
19  what is meant by or what is the meaning of pore size,
20  how is it measured, in which regard. And what is clear
21  is the larger the pore, the safer, the less risk. This
22  is quite clear. Optimum for what purpose? The search
23  for an optimum for just one figure, it is -- it doesn't
24  make sense.
25    Q. Do you agree that as the pore size gets larger

21 (Pages 78 to 81)

Prof. Dr. Med. Uwe Klinge

Page 82

1    that you increase the risk of higher rates of shrinkage?
2        A.  No.
3        Q.  So the results of his studies where they
4    conclude that large pore size and lack of stability in
5    lightweight meshes leads to shrinkage you disagree with?
6        MR. ANDERSON:  Objection.  Misstating.  Go
7    ahead.  Objection.
8        A.  He has certain findings and these are -- I have
9    to accept as a fact.  What is missing in this article,
10   from my point of view, or what is not presented in this
11   article, is if you are discussing shrinkage, this means
12   that you have a deformation of the mesh.  This can be
13   done either by mechanical forces or it can be done by
14   contraction of the scar.  And the mechanical forces in
15   indeed the large-pore meshes usually are more pliable,
16   more flexible, and therefore they provide usually less
17   resistance to mechanical deformation.
18        On the other hand, the large-pore meshes in use
19   is significantly less scar and therefore you will have
20   less scarry shrinkage in large-pore materials in
21   comparison to others.  There may be experimental
22   settings where this is compensated or there may be
23   experimental settings where one dominates over the
24   other, but it has to be considered both.
25        Q.  Are you aware of any studies using the

Page 83

1    methodology you just described to compare shrinkage in
2    large-pore mesh and small-pore mesh?
3        A.  Studies that -- that are looking for the
4    stability of the textile structure with its
5    consequences, I do not remember that there are -- that
6    there are these studies.  The reason, of course, is that
7    in -- in hernia surgery we have tension-free conditions
8    and therefore this issue is not so relevant.
9        Q.  Is Exhibit No. 14 helpful to mesh designers in
10   understanding the forces and issues associated with
11   different types of mesh for hernia repair?
12        A.  Of course.
13        Q.  And in what regards is it helpful?
14        A.  This study acknowledged that you need or that
15   the importance of a structure or what I proposed to Dirk
16   Weyhe to name to call it structural stability.  But this
17   is maybe not the best word for it.
18        But the resistance of a textile, or the
19   influence of elongation, stretchability, pore collapse
20   to the deformation of these meshes.  This is a a -- this
21   is a study showing that this is important to consider
22   this.
23        Q.  Okay.  So is it fair to understand that in
24   addition to pore size that we've talked about a lot over
25   the years, that the structural stability of the material

Page 84

1    used to construct the mesh is of importance to
2    maintaining those pore sizes in vivo?
3        A.  Again, please.
4        (The question was read by the Reporter.)
5        A.  The structural stability, one aspect of a
6    structural stable textile is that you have a higher
7    resistance against pore collapse and a load.  But
8    structural stability may mean more.  It has to be
9    defined.  It is just how the textile responds to a
10   mechanical load.  This is the -- the critical point.
11   And this hasn't been a critical point for hernia meshes,
12   but it is a critical point for pelvic floor meshes.  And
13   this is the basic concept that has to be evaluated when
14   using hernia meshes in a condition where you have some
15   -- some load to it.
16        Q.  So are you saying the structural stability of
17   the mesh is not a critical point for hernia meshes?
18        A.  The structural -- it has not been in the
19   studying in the -- in the scientific world over years.
20   It was or it was regarded as tension free.  So the --
21   the change of a textile, if you place it in a flat mesh
22   area, the change of the textile in response to -- to
23   some mechanical loads was not in the focus of the
24   scientific world.
25        Q.  Is it appropriate for it to be in the focus in

Page 85

1    the hernia area?
2        A.  Is it appropriate?
3        Q.  Yes.
4        MR. ANDERSON:  Should have been.
5        A.  It depends on the hernia, on the type of
6    hernia, and the location.  There are -- there are
7    indications in the abdominal wall as well where you have
8    to consider forces, and for these indications you have
9    to consider this, yes.
10        Q.  And why is the structural stability a critical
11   point for pelvic floor meshes?
12        A.  Because the implants so far I know that are
13   used in the pelvic floor they replace -- they are
14   thought to replace some ligaments.  They are placed in
15   an area where you have movement, you have changes in the
16   position of the organs there.  So you have more
17   mobility, more mechanical forces to be considered in
18   this, in the pelvic floor.  It cannot be considered as
19   tension free.
20        Q.  Since your deposition in 2013, have you
21   undertaken to understand the forces present in the
22   pelvic floor?
23        A.  We didn't make specific studies to define the
24   forces in the pelvic floor.
25        Q.  Does Exhibit No. 14 suggest to you the need for

Prof. Dr. Med. Uwe Klinge

Page 86

1    additional studies in this area?
2        A.  Does it suggest that?
3        Q.  Are there any questions that are raised by
4    Exhibit No. 14 that you think can be answered by any new
5    studies on the issue of shrinkage on the large pore lack
6    of stability in lightweight meshes?
7        A.  It is the experience of any researcher that
8    when you finish the study you have a lot of more
9    questions to be solved there.
10       Q.  And exactly right.  That's my question here.
11   What questions are posed by Exhibit No. 14 that you
12   think bear additional study?
13       MR. ANDERSON:  Objection.  Go ahead.
14       A.  You have to look in -- you have to look
15   in other models.  You have to characterize more better
16   the pores or the distance between the fibers.  You have
17   to consider the anisotropy, what happens there.  You
18   have to consider the forces, you have to consider a lot
19   of these things.  So we can create several new studies
20   for scientific purpose.
21       Q.  Is this the first study about which you're
22   aware, Exhibit No. 14, that makes the finding that large
23   pore size and lack of stability in lightweight meshes
24   leads to shrinkage?
25       MR. ANDERSON:  Objection to the

Page 87

1    characterization of this and objection to anything
2    prior to 2013.  You can answer for anything that
3    you're aware of since 2013.  Do you understand my
4    objection?
5        THE WITNESS:  Yeah.
6        Q.  Okay.
7        A.  I don't recall any others.
8        Q.  Okay.  Since 2013, have you analyzed the extent
9    to which mesh in either hernia repair or pelvic floor
10   repair interact with nerves?
11       MR. ANDERSON:  Objection to the form of the
12   question.
13       A.  Analyzed -- if you're thinking of a specific
14   study looking to nerves, no.
15       Q.  Okay.  Have you spoken, since your deposition
16   in 2013, on the risks to nerves presented by
17   implantation of hernia mesh or pelvic floor mesh?
18       A.  Have you spoken -- you mean on conferences?
19       Q.  Conferences, presentations of any kind.
20       A.  I don't recall that this was a specific topic.
21       Q.  Okay.  Do you recall any PowerPoint
22   presentations, any slides since your last deposition, in
23   2013, where the issue of mesh and its impact on nerves
24   is discussed?
25       MR. ANDERSON:  Objection to form.

Page 88

1        A.  The relevance of scar, of the scarring as a
2    consequence of meshes and its consequences for chronic
3    pain is a message of the past 20 years, but I do not
4    recall that it is a specific issue that I had to cover
5    in the past 20 years.
6        Q.  Have you ever met Dr. Iakovlev?
7        A.  I have seen him, but I -- that's not I think a
8    meeting.  I just saw him.
9        Q.  Did you speak with him?
10       A.  No.
11       Q.  Have you spoken with Dr. Iakovlev about his
12   report?
13       A.  No.
14       Q.  For what purpose did you review his report?
15       MR. ANDERSON:  Objection to the form.
16       A.  In fact, I was interested to see whether he
17   could or whether he confirms all the things that we have
18   seen or analyzed in the past 20 years or whether he
19   found something different.
20       Q.  And what did you decide upon your review of his
21   report?
22       A.  What did what?
23       Q.  What did you decide upon your review of his
24   report?
25       MR. ANDERSON:  When you said I wanted to look

Page 89

1    at it to see if it confirmed or whether it was
2    different, he's asking what did you find when you
3    reviewed it.
4        A.  What did you find?  Yeah, more or less it is --
5    it is a confirmation of our experiences of the past 20
6    years.
7        Q.  What is it about Dr. Iakovlev's report confirms
8    your findings of the last 20 years?
9        A.  To make it briefly, the presence of
10   inflammation, the presence of scarring, the presence of
11   nerves that are entrapped in -- in the scars.
12       Q.  Is that all?
13       A.  That's not all, but these are major points.
14       Q.  Do you have -- did you review the opinion of
15   Dr. Iakovlev with respect to his suggestions that
16   polypropylene degrades in vivo?
17       A.  Yes.
18       Q.  And have you attempted to replicate the
19   experiments that he conducted where he claims to have
20   created a bark on the slides?
21       MR. ANDERSON:  Objection as to misrepresenting
22   what he said in his report, but go ahead.
23       A.  I personally did not make my own studies to --
24   to see these barks or degradation, so...
25       Q.  As of today, what is your recommendation for an

Prof. Dr. Med. Uwe Klinge

Page 90

1    alternative design for mesh used for the treatment of
2    stress urinary incontinence?
3         MR. ANDERSON:  Objection.  We already went
4    through this in 2013, 2012.
5    Q.  Let me ask you this question:  Has your opinion
6    changed from the time that we spoke in 2013 about your
7    recommendation for an alternative product for the
8    treatment of stress urinary incontinence?
9         MR. ANDERSON:  Okay.  You can answer that.
10   A.  I think it is -- it is outlined in the report
11   where the problems are, where the high risks of the
12   PROLENE is, and where the options for a safer
13   alternative design is.  And we can go through all these
14   aspects in detail to -- to see where are the
15   alternatives.
16   Q.  Doctor, I'd like to do that but Mr. Anderson's
17   not going to let me.
18        MR. ANDERSON:  Okay, go ahead.  Go ahead.  It
19   seems like you're close to the end.  Go ahead.
20   Q.  Let's turn to your report then, on Page 36.
21   Are you on Page 36?  Under safer alternative designs,
22   one such safer alternative design would be a mesh
23   product with less material, larger distance between the
24   mesh fibers, and then you reference Ethicon's Ultrapro.
25        In prior depositions you've told me that

Page 91

1    Ultrapro was not an appropriate device for the treatment
2    of stress urinary incontinence.  Are you suggesting now
3    that it is an appropriate device for the treatment of
4    stress urinary incontinence?
5         MR. ANDERSON:  Objection to the form of the
6    question.  Go ahead.
7    A.  The Ultrapro in its present form, or with these
8    huge pores with these material reduction, has of course
9    advantages in comparison to the PROLENE material in
10   regard to the tissue response.  There has been a Turkish
11   study clearly showing that it can be used as an
12   alternative.  However, I know --
13   Q.  Alternative for what?  I'm sorry.
14   A.  For the PROLENE mesh.
15   Q.  For stress urinary incontinence?
16   A.  Yes, it was done, a Turkish study for treatment
17   of stress urinary incontinence.
18   Q.  Has that been in the last two years?
19        MR. ANDERSON:  Well, let him finish his answer.
20   You keep interrupting him and he was trying to
21   answer the question.
22        MR. THOMAS:  I apologize, Ben.  I'm not trying
23   to interrupt him at all.
24        MR. ANDERSON:  You're not trying to, but you
25   are.  So go ahead.

Page 92

1    A.  However, I know that Ultrapro has some
2    disadvantages in regard to the structural stability, and
3    therefore I wouldn't like to have this in my body.
4    Q.  Okay.  Is the Turkish study to which you just
5    referred in the last two years?
6    A.  I do not remember the date of the publication,
7    whether it's before or within the past two years.
8    Q.  Is it in your reliance materials?
9         MR. ANDERSON:  It is.
10   Q.  Thank you.  Do you remember the first author on
11   the study?
12   A.  It was O., Ozark?
13        MR. ANDERSON:  Let's look at the study.  Let's
14   not be guessing.  Do you have the study?
15        MR. THOMAS:  I don't.
16   Q.  Let me see if I can go ahead on this.
17        Is your -- is it your opinion in your area of
18   expertise that Ethicon's Ultrapro mesh is an appropriate
19   safer alternative design for the treatment of stress
20   urinary incontinence?
21   A.  As I outlined, there are certain risks by the
22   -- by the PROLENE that is the small pores, that is the
23   huge amount of material and, of course, reduction of
24   material making larger pores will reduce these risks.
25        Whether in the specific function of a sling the

Page 93

1    Ultrapro really over the time will work really better or
2    whether it will create some new problems because of the
3    structural deficits, I'm not able to predict now.  I
4    have concerns for both.
5    Q.  And your concerns for the Ultrapro are what?
6    A.  The concerns of the Ultrapro, one of the major
7    concerns on the Ultrapro is that at really small forces
8    the pores collapse.  That means that the filaments are
9    coming very close together, that you have an increased
10   tendency for roping, or what the Weyhe group said,
11   shrinkage, this deformation of a small textile in the
12   construction of the Ultrapro, and that is -- that is the
13   major concern.  And that will lead to scar formation,
14   that will increase the risk for chronic pain.
15   Q.  And how do you answer those questions, whether
16   the Ultrapro is sufficient for treatment of stress
17   urinary incontinence?
18   A.  Sufficient in regard to what are -- what is the
19   textile structure that overcomes most of the risks, then
20   Ultrapro is not the best candidate for this.  But it is
21   better than PROLENE.
22   Q.  Do you know whether it is effective in the
23   treatment of stress urinary incontinence, this PROLENE?
24   A.  Effectiveness in the -- in the meaning whether
25   it can work, as it was shown that it can work, as if you

Prof. Dr. Med. Uwe Klinge

Page 94

1     want to know whether it is as safe, then we have to
2     admit that it is very difficult to -- to -- or we have
3     to discuss the problem of safety assessment in detail.
4          Q.  What kind of testing would be required to
5     compare the use of the Ultrapro to the PROLENE mesh
6     for the treatment of stress urinary incontinence?
7          A.  Which testing?
8          Q.  Yes.  What kind of testing would you do?
9          A.  The testing I would do is as we did it with
10    Ethicon starting in 1994.  We have to make preclinical
11    tests, we have to make an independent textile analysis,
12    we have to look to tissue reactions looking at animal
13    explants, at human explants, and we have to look to the
14    results in registries, and in particularly to the
15    failures, whether the failures can be avoided.  And then
16    we should get a good idea about the risks that are
17    linked to the device.
18         Q.  The other safer alternative design that you
19    identify in your report is the PVDF material?
20         A.  Yes.
21         Q.  As you sit here today, are you aware of any
22    PVDF sutures available for -- strike that.  Are you
23    aware of available -- Doctor, as you sit here today, are
24    you aware of any PVDF meshes that are sold for the

Page 95

1     treatment of stress urinary incontinence in the United
2     States?
3          A.  I don't know.
4          Q.  Okay.  And with respect to the safer
5     alternative design that you propose using PVDF, do you
6     have a design in mind?
7          A.  The design again has to consider the amount of
8     the material; it has to consider the distance between
9     the fibers; it has to consider the stability when
10    applied to load; it has to consider the particle loss
11    when trimming or cutting the material; it has to
12    consider the local cell reaction to the polymer surface,
13    and all of this together has to be considered and to
14    realize a safe design.
15         Q.  Does the DynaMesh PVDF mesh for the treatment
16    of stress urinary incontinence meet your criteria for a
17    safe and effective mesh for the treatment of stress
18    urinary incontinence?
19         A.  It meets several of these aspects, yes.
20         Q.  What does it not meet?
21         A.  I don't know whether it does not meet, but I
22    don't have any data about, for example, particle loss.
23         Q.  Okay.  What other --
24         A.  I didn't study it.
25         Q.  What other than particle loss are data points

Page 96

1     that you don't have about the PVDF mesh that you'd need
2     to have before it would be a safer alternative design?
3          MR. ANDERSON:  Object to the form.  Object to
4     the way you asked that question.  Go ahead.  It
5     misstates his testimony.  Go ahead.
6          A.  The advantages of this design is that it has a
7     polymer that uses less inflammation, less scar.  It has
8     a textile construction that is -- that shows higher
9     resistance to pore collapse, so it is more structural
10    stable.  It has borders that are not cut, but they are
11    sealed by the textile manufacturing.  So that is --
12    these at least three, four advantages of this
13    design.
14         Q.  I understand your advantages.  What you told me
15    before, I believe, was that there were certain data
16    points on issues that you've identified in your report
17    for which you have not collected data.  One was particle
18    loss.  Is there anything else that you would need to
19    know before you would recommend the DynaMesh mesh to be
20    marketed in the United States as a safer alternative
21    design to TVT?
22         MR. ANDERSON:  Object to the form of that
23    question.  Misstates his testimony.  Go ahead.
24         A.  Please, I have to -- can you read -- reread the
25    sentence?

Page 97

1          Q.  Let me go back a few.
2          MR. ANDERSON:  I'm going to object because you
3     keep saying --
4          MR. THOMAS:  I understand what you're objecting
5     to, Ben.  I hear you.  I'm trying to clean it up for
6     you, all right?
7          Q.  Okay.  I asked you the question, does the
8     DynaMesh PVDF mesh for the treatment of stress urinary
9     incontinence meet your criteria for a safe and effective
10    mesh for the treatment of stress urinary incontinence.
11    Your answer was, it meets several of those aspects.
12    Then I asked you, what does it not meet?  I do not know
13    whether it does not meet but I don't have any data
14    about, for example, particle loss.  What I'm interested
15    in is what other criteria do you not have data for.
16         A.  But then you asked another question.
17         MR. ANDERSON:  But he's asking this one.  Are
18    there any other categories that you don't have data
19    for?  You said you don't have particle loss.  Are
20    there any other categories that you don't have data
21    for is what he's asking.
22         A.  I don't know data about the subsequent tearing
23    force in the two directions.  I don't know the
24    stretching, stretching profile of this device at various
25    loads.  So it is not -- I didn't make a specific study

25 (Pages 94 to 97)

Prof. Dr. Med. Uwe Klinge

Page 98

1    to evaluate the use of the DynaMesh sling.
2         The point I was focused on was to demonstrate
3    that the PROLENE sling, that there are alternatives
4    possible, so that the properties of the PROLENE sling
5    that not -- that is not necessary that the PROLENE sling
6    is constructed.
7         There are alternatives, and one of these
8    alternatives is realized with PVDF. There are others
9    that took over some of the problems and found solutions
10   that are less risky than realized in the PROLENE.
11        So if it is -- if these aspects are safer than
12   PROLENE, if these are alternatives, yeah, these are
13   alternatives and they will reduce -- these principles
14   will reduce the risk that is realized by PROLENE.
15        Q. Let me go to Page 38 and Page 39 of your
16   report. Are you there? Bottom of Page 38. "Based on
17   these characteristics my studies comparing PVDF to
18   polypropylene, Ethicon's internal documents and other
19   scientific literature, as well as my background,
20   training and experience over 30 years, it is my opinion,
21   to a reasonable degree of medical and scientific
22   certainty, that PVDF, in the appropriate design, is a
23   safer alternative mesh material for treatment of stress
24   urinary incontinence than Ethicon's TVT mesh."
25        What I want to know is, do you have the details

Page 99

1    of the appropriate design that's in that sentence that
2    you can give me today?
3         A. I just can give you the principles for the
4    appropriate design.
5         Q. Okay.
6         A. And these principles are no overengineering,
7    material reduction, with the use of PVDF you have some
8    more options, some more benefits, some less risks,
9    larger pores. These are the principles. And the
10   elasticity has to be adopted to -- to the needs for the
11   demands of the tissues there.
12        Q. Okay. Are you finished?
13        A. Uh-hum.
14        Q. Is it fair for me to understand though you've
15   not taken those principles and transferred those into a
16   specific design of mesh using PVDF for the treatment of
17   stress urinary incontinence in women?
18        MR. ANDERSON: Objection to the form. Go
19   ahead.
20        A. It is -- it is correct that I was not
21   responsible for the textile structure or for the design
22   characteristics of the DynaMesh sling.
23        Q. Do you know of any risks that are present using
24   a device for the treatment of stress urinary
25   incontinence with PVDF?

Page 100

1         MR. ANDERSON: Objection. This is something
2    that could have been covered at the
3    last deposition. You're duplicating territory
4    again.
5         A. As we discussed at the occasion of my
6    presentations, complications can be done for several
7    reasons, can develop for several reasons, and therefore
8    of course can develop after use of a PVDF implant as
9    well.
10        Q. In your last deposition you told me that we're
11   not able to make specific conclusions that PVDF mesh by
12   DynaMesh is better than the PROLENE polypropylene mesh.
13   Is that still your testimony today?
14        A. Can you show me the specific --
15        Q. Page 32 of your deposition in 2013.
16        MR. ANDERSON: Okay. He's got it.
17        A. In regard or this statement has to be related
18   to the -- to the -- if you are thinking of clinical
19   studies showing the difference of one material over the
20   other, we are not able to create clinical studies
21   showing this. I'm -- in the moment we are not able to.
22   So I hope the registries will show. If you include all
23   our work, preclinical work and the analysis of the
24   explants, it is clear, it is undoubted, if you look to
25   the Ethicon documents, it is without any discussion that

Page 101

1    PVDF is superior as a material. That's it.
2         Q. Doctor, what's your current relationship with
3    FEG?
4         A. It didn't change. We -- I've been working with
5    the engineers from the FEG since our days with Ethicon
6    in 1994, and I'm consulting them in -- in research
7    questions. We had some funded research projects where
8    the FEG is a partner for it. I'm, as you know, on some
9    patents from the early 2000s.
10        Q. Have you had any new patents since your
11   deposition in 2013?
12        A. No.
13        Q. I noticed that your mesh with iron in it has
14   now come to market.
15        A. Yeah.
16        Q. Do you have any compensation arrangement with
17   FEG where you're compensated for your work on that mesh
18   project?
19        A. No.
20        Q. When we last had your deposition, you had no
21   written agreement with FEG. Do you have a written
22   agreement with FEG today?
23        A. No, no formal contract.
24        Q. At your last deposition you told me that you
25   were paid approximately 25 to $30,000 a year from the

26 (Pages 98 to 101)

Prof. Dr. Med. Uwe Klinge

Page 102

1    FEG. How much money did you receive from FEG for the
2    year 2013?
3        A.  Thirty-five.
4        Q.  Is that dollars or euros?
5        A.  Euros.
6        Q.  35,000 euros?
7        A.  Yeah.
8        Q.  And how much money did you receive from FEG for
9    2014?
10       A.  Similar.
11       Q.  About 35,000 euros?
12       A.  Yes.
13       Q.  It's October of 2015.  Have you received any
14   money from FEG on a year-to-date basis?
15       A.  Yes.
16       Q.  How much did you get?
17       A.  Because they are paying in the middle of the
18   year.
19       Q.  Okay.  How much money did you receive from --
20       A.  Similar.
21       Q.  35,000 euros?
22       A.  Yes.
23       Q.  Is that one payment?
24       A.  It's one payment -- most of it is in the middle
25   of the year, and every three months there it's 3,000

Page 103

1    euros.
2        Q.  Okay.  So how much money did you receive in the
3    middle of 2015 from FEG in one payment?
4        A.  29,000.
5        Q.  Okay.  And then you received three other
6    payments during the course of the year?
7        A.  Two, April and July.
8        Q.  Okay.  And those were 3,000 euros apiece?
9        A.  Yes.
10       Q.  And this is in addition to FEG paying you to go
11   to conferences to speak about their products?
12       MR. ANDERSON:  Objection to the form of that.
13       A.  The -- the compensation for the presentations
14   are from Dahlhausen, it's not from the FEG, and what
15   maybe is not included is some -- some travel expenses,
16   directly travel expenses.
17       Q.  And Dahlhausen is the distributor for FEG; is
18   that correct?
19       A.  Yeah.
20       Q.  Do you have any written agreement with
21   Dahlhausen?
22       A.  No.  Just for the one presentation and then
23   this, yeah.
24       Q.  The last time we were together we talked about
25   a video presentation that you helped -- you and the FEG

Page 104

1    worked together on.  Have you prepared any other video
2    presentations for the FEG since your last deposition?
3        A.  Not that I recall.
4        Q.  Have you provided any assistance on the product
5    literature for FEG for the products that they sell?
6        A.  Not that I recall.
7        Q.  What do you do with FEG in order to earn this
8    money that you've been paid every year?
9        MR. ANDERSON:  Objection.
10       A.  So we are currently developing these visible
11   meshes, we are currently working on elastic meshes, and
12   we are currently preparing other projects where I
13   provided the scientific background for the engineers to
14   -- to design their textile testing to create the
15   modifications that later on are tested or are used in
16   the project plans.  So you need someone who is an expert
17   in this field to -- to develop your products, and these
18   are engineers and I'm a surgeon.  They are thinking that
19   it is a good job that I make.
20       Q.  I'm sure you earn your money.
21       Since your deposition in 2013, have you been
22   involved in any studies with the FEG comparing PVDF mesh
23   to polypropylene meshes?
24       A.  I don't think so.
25       Q.  Okay.  You gave me two PowerPoint presentations

Page 105

1    where Dahlhausen caused you to go to different places to
2    talk about mesh properties that we talked about.  Since
3    2013, your last deposition, how many times have you done
4    that for that Dahlhausen?
5        A.  For Dahlhausen it was Berlin I was asked to;
6    Ghent was FEG, Neukirch was FEG.  So Dahlhausen, maybe
7    one, maybe one other.
8        Q.  Okay.  How many for FEG -- let me strike that
9    and let me ask a better question.
10       Since your last deposition in 2013, how many
11   times have you made presentations sponsored by FEG about
12   your materials, issues that you've discussed here today?
13       A.  Sponsored by FEG?  Two, three times.
14       Q.  Okay.  And you continued to appear on the
15   master hernia program for FEG.
16       A.  On the masterclass I -- I will go there this
17   year, yeah.
18       Q.  Okay.  And that's in addition to these other
19   presentations we discussed?
20       A.  Yes.
21       Q.  Any other presentations where you've spoken
22   about the benefits of PVDF, other than those from
23   Dahlhausen, from FEG or the master hernia program, since
24   your last deposition?
25       A.  Any other presentations?

27 (Pages 102 to 105)

Prof. Dr. Med. Uwe Klinge

Page 106

1    Q.  Yes.
2    A.  I was invited to -- to go to the Swedish
3  Conference of Surgeons and to talk about the ideal mesh.
4  I was invited to the World Hernia Meeting in Milano to
5  talk about the visible mesh there. I was invited to
6  some other conferences to talk about the ideal meshes,
7  as you can see in my CV, where the presentations are
8  named.
9    Q.  And for the last conferences you just
10  identified, who -- who paid your way to those
11  conferences?
12    MR. ANDERSON:  Which ones, the ideal meshes?
13    MR. THOMAS:  The ones he just identified.
14    MR. ANDERSON:  Well, he said, as you can see
15  from my CV, the presentations are named. Are you
16  talking about just the ideal mesh ones?
17    MR. THOMAS:  He talked about a Swedish
18  conference, he talked about Milan.
19  BY MR. THOMAS:
20    Q.  Who paid you?
21    A.  It was all invited -- I have been an invited
22  speaker, and the organizer of the conference, they took
23  over the costs.
24    Q.  Okay.
25    A.  They got their money from all the manufacturers

Page 107

1  and asked them all. But I -- I do not have any specific
2  relationship to any of them.
3    Q.  Okay. Are you working on any new mesh products
4  in the pelvic floor for FEG?
5    A.  Currently not.
6    Q.  FEG still use polypropylene in some of its
7  products?
8    A.  I believe so.
9    Q.  Have you ever told them to stop using
10  polypropylene in their products?
11    MR. ANDERSON:  Objection. You already asked
12  these questions at his last deposition. He's not
13  going to keep answering them.
14    Q.  Since your last deposition in 2013, have you
15  told FEG not to use polypropylene in its products?
16    A.  I'm presenting the risks of polypropylene since
17  1889.
18    MR. ANDERSON:  Really, 1889? You're an old
19  guy.
20    A.  1989. Since then I permanently presented to
21  the audience the disadvantages of polypropylene and the
22  advantages of PVDF, and of course they know.
23    Q.  Okay.
24    A.  It is their decision and I'm not involved in
25  their decision.

Page 108

1    Q.  A simple answer to my question, please.
2    Since your last deposition in 2013, have you
3  told FEG not to use polypropylene
4    A.  No.
5    Q.  -- in its products?
6    Since 2013, have you worked with
7  Dr. Klosterhalfen at FEG?
8    A.  The linkage, from FEG, no.
9    Q.  Okay. Have you continued to work with
10  Dr. Klosterhalfen since 2013?
11    A.  Yes.
12    Q.  And tell me about your work with
13  Dr. Klosterhalfen since 2013.
14    A.  We had discussions about this -- some -- how to
15  realize a fluorescence microscopy -- microscopically --
16  fluorescence microscopical analysis for -- for a new
17  project, and I asked him for advice.
18    Q.  What does that mean?
19    MR. ANDERSON:  Fluorescence microscopy?
20    MR. THOMAS:  I don't know what fluorescence
21  microscopy is.
22    MR. ANDERSON:  Then ask it. Why don't you
23  explain it.
24    A.  We are still working on the characterization of
25  the inflammatory infiltrate around polymer fiber, and

Page 109

1  therefore we need new procedures, new techniques, new
2  markers to -- to proceed there. And I'm trying to get a
3  project, and the funding for this, and I am very happy
4  that I can ask him, as an experienced pathologist, to
5  give me some -- some helpful information to this.
6    Q.  Are you working on any studies currently with
7  Dr. Klosterhalfen?
8    A.  He is -- he is working or he's still analyzing
9  the explants he collected at his institute, and from
10  time to time he asked me to have a look at the data and
11  to provide the statistical analysis there.
12    Q.  At your last deposition we talked about the
13  collection of hernia meshes that you're gathering at
14  your facility. I believe you told me at that time that
15  you were not collecting any explants from the pelvic
16  floor. Have you begun to collect any explants from the
17  pelvic floor?
18    A.  No.
19    Q.  Doctor, since your deposition in 2013, have you
20  identified any studies which describe clinical risks
21  from fraying or particle loss from TVT mesh?
22    A.  I do not recall that I really found clinical
23  studies dealing with this problem, but I increasingly
24  get aware that clinical studies have too many
25  limitations to address this problem.

28 (Pages 106 to 109)

Prof. Dr. Med. Uwe Klinge

Page 110

1     (Klinge Exhibit No. 15 was marked for
2  identification.)
3     Q.  Doctor, I'm going to hand you what's been
4  marked as Deposition Exhibit No. 15, and ask if you
5  recognize this document.  It's titled, Comparing
6  Different Types of Suburethral Slings Using Perineal
7  Ultrasound.
8     A.  Yes.
9     Q.  And you are on this -- is this an abstract?
10    A.  Yes.
11    Q.  Where was this abstract published?
12    A.  I don't know.
13    Q.  And who were these other people that are on
14  this?
15    A.  I assume it has been a presentation at a
16  conference.
17    Q.  Who are the other people on this -- on this
18  paper, Exhibit 15?
19    A.  Dr. Najjari is a gynecologist in the University
20  Hospital.
21    Q.  Here in Aachen?
22    A.  Here in Aachen.
23       And Maass has been the head of the department
24  for gynecology in -- at the University Hospital in
25  Aachen, but he left this year.  And Kirschner-Hermanns

Page 111

1  has been a urologist at the University Hospital in
2  Aachen.  She's now head of a department at the
3  University Hospital in Bonn.
4     Q.  And what role did you have in this
5  presentation?
6     A.  I provided more or less the statistical
7  analysis and gave some background information about
8  textiles, meshes.
9     Q.  And FEG funded this research?  Do you see on
10  the second page under disclosures?
11    A.  Yeah, obviously.  I don't know any details
12  about it.
13    Q.  Okay.  And where was this presented?
14    A.  So far I remember they -- they presented it at
15  the IUGA in Spain some time ago.  It should be possible
16  to find it by the Internet by Google research.
17       MR. ANDERSON:  Did you say I-U-G-A?  It just
18  didn't come out on the record.  I wanted to make
19  sure it came out.
20    A.  Yes.
21    (Klinge Exhibit No. 16 was marked for
22  identification.)
23    Q.  Let me show you now what we've marked as
24  Deposition Exhibit No. 16.  Deposition Exhibit No. 16 is
25  a research article by most of the same authors dated

Page 112

1  July of 2014, that appears to publish in BioMedical
2  Research International further findings on the same
3  research.  Have you seen this paper before?
4     A.  I've seen this, yeah.  And I get lost.
5        MR. ANDERSON:  Okay.  Just answer his
6  questions.
7     Q.  Why do you get lost?
8     A.  If you look to the authors.
9     Q.  That's my point.  What happened to you?
10    A.  I don't know.  I don't know.
11    Q.  Okay.  Do you have any understanding of why
12  this was published without you?
13    A.  No, no opinion to this.
14    Q.  Okay.  And the bottom line is the authors in
15  Exhibit 16 used the data that you all gathered from
16  Exhibit No. 15, and concluded that the differences noted
17  in Exhibit No. 15 had no impact on the resulting state
18  of continence for the people who were examined.  Is that
19  fair?
20       MR. ANDERSON:  Objection to the form.
21    A.  First of all, they gathered.  I didn't gather
22  any of these results, so that the data they collected.
23    Q.  Okay.
24    A.  And the conclusion there, it has no impact that
25  is reasonable, because it is a very small sample size

Page 113

1  and it will be impossible to -- find any significant
2  relationship to the functional outcome.  It shows that
3  to some extent material matters, and this can be
4  objectified by ultrasound.
5     Q.  But the material did not matter in the clinical
6  outcome as found by --
7     A.  No.
8     Q.  -- Exhibit 15.
9     A.  No.  That will be completely wrong to assume
10  this.  They could not find a positive relationship to
11  the outcome.  When you don't find any significant
12  relationship, this means that the study protocol has
13  some limits, that the cohort size has some limitations,
14  that the follow-up time has some limitations.  But it is
15  not allowed to assume the opposite that it was proven in
16  this study that there is no linkage to the clinical
17  outcome.  That would be completely wrong.
18    Q.  Okay.
19    A.  And this makes the limitations of these
20  clinical trials to address this question.
21    Q.  Was Exhibit 16 published without your
22  knowledge?
23    A.  I was not involved in -- in the publication of
24  this manuscript.
25    Q.  Did you know the result of the manuscript

29  (Pages 110 to 113)

Prof. Dr. Med. Uwe Klinge

Page 114

1  before it was published?
2      A.  I did know the results of their comparison as
3  it was presented in the abstract.
4      Q.  Okay.  The conclusions that are expressed in
5  Exhibit No. 16 were presented at the IUGA meeting?
6      A.  As I told you, the data, the data I know.  What
7  they measured, they know.  Their conclusion here I don't
8  know and I wouldn't agree to it, or you have to agree
9  that you didn't find it, but I was not involved in this.
10         MR. THOMAS:  Another quick break, please.
11         MR. ANDERSON:  Okay.
12          (Recess from 12:52 until 12:57 p.m.)
13  BY MR. THOMAS:
14      Q.  Doctor, thank you for allowing me to stand over
15  you.
16          Looking at Exhibit 2, which is your report, it
17  has some handwriting on it.  Necessary or unnecessary
18  risk.  What does that mean?
19      A.  That is one -- one of the major questions that
20  this report is dealing with.  Necessary or unnecessary
21  risk of PROLENE, whether there is some information that
22  it is a necessary risk.
23      Q.  Okay.  And do you have an opinion in that
24  regard?
25      A.  Yes.

Page 115

1      Q.  What is that opinion?
2      A.  The risks that we or that are identified by the
3  PROLENE are unnecessary.
4      Q.  Okay.  And unnecessary because you think they
5  can be removed by some alternative design?
6         MR. ANDERSON:  Objection, asked and answered,
7  not only at this deposition, but also at other
8  depositions.
9         MR. THOMAS:  Since 2013.
10         MR. ANDERSON:  However, go ahead.  Answer about
11  safe alternatives of the design.
12      A.  I'm sure that they can be resolved by
13  alternatives, and that was the context of this report in
14  detail.
15      Q.  Okay.  And that's the discussion we just had
16  about the alternatives.
17      A.  The amount of discussions, yeah.
18      Q.  Follow-up study protocol, sample size, no
19  complication, no difference.  What does that mean?
20      A.  In many clinical trials you will not see any
21  significant difference in the complication rates.  And
22  this is very often misused as confirmation of safety.
23  If you don't see a -- if you don't get a concern by a
24  clinical study it was misused as saying it is safe.
25          In fact, it usually reflects the insufficient

Page 116

1  design of the study, a too small sample size,
2  insufficient study protocol with various levels that are
3  not good enough to detect the difference and a very
4  short follow-up.  So there are a lot of trials using 50
5  patients, 100 patients, looking for a short period of
6  time for some vague readouts or outcome parameters.
7  They will not see anything, no problems, and then they
8  are presented to the audience as safe and no problem.
9          And I know that many manufacturers are really
10  happy to present these data, but it has to be very
11  clear.  These studies are not, or shouldn't be used,
12  it's dangerous to use them as a sign for safety.
13      Q.  I'm sorry.  What does this say?
14      A.  Elephants and horses.
15      Q.  Ah.
16      A.  So I would have been very happy if you'd give
17  me a -- now I'm really happy that you allow me to talk
18  about it.
19          We have in 1994 one of our first things was the
20  independent textile analysis of meshes.  And, as you
21  know, the PROLENE is considerably overengineered, so it
22  is possible to use it for elephants or horses, as you
23  see on some of my presentations that I took an image of
24  my horse at that time.
25          So PROLENE would be maybe an alternative if you

Page 117

1  want to treat elephants and horses.  And then I would
2  have been very happy if you asked me whether it is
3  possible to treat pelvic floor with PROLENE meshes in
4  elephants and horses, and I would answer -- I would have
5  answered you, not, not even in elephants and horses.
6  The strength may be sufficient, but all the other
7  disadvantages, small pores, frizzling, roping, all this
8  is still a problem of the PROLENE and therefore the risk
9  even for elephants and horses would be unacceptable and
10  unnecessary.
11      Q.  Risk benefit ratio important.  What does that
12  mean?
13      A.  Yeah, it's always the critical thing when you
14  discuss with a patient whether to use a material,
15  whether to use a procedure, to define the risk benefit
16  ratio.  And the risk benefit ratio of the material, that
17  is my -- my point.
18      Q.  Okay.  And in terms of the risks of the
19  procedure though, independent of the material, that's
20  out of your area of expertise, correct?
21      A.  I will let others to -- to discuss this.
22      Q.  Possible options to prove safety.  Is that the
23  CT scan, or what is that?
24      A.  No, that is just to -- then you have to discuss
25  the limitations of clinical trials.

Prof. Dr. Med. Uwe Klinge

Page 118

1    Q.  Clinical trials, I'm sorry.
2    A.  Clinical safety.  You have no chance to do it.
3    To prove superiority, that means that you want to create
4    studies comparing two different materials.
5    Q.  I see.
6    A.  And that is even more impossible, even more
7    impossible than just to prove the safety.  So therefore
8    comparing clinical trials are not --
9        MR. ANDERSON:  Are not what?
10   A.  -- effective.
11       MR. ANDERSON:  There you go.
12   Q.  Chronic foreign body reaction, no doubt
13   experience.  What does that mean?
14   A.  Animals, human tissues, literature, Ethicon's
15   documents, chronic foreign body.  We shouldn't discuss
16   about whether there is a foreign body reaction or not.
17   There is.
18   Q.  Well, even if we wanted to, Mr. Anderson's not
19   going to let me, because we've talked about that a lot.
20   A.  Yes; but you agree.
21   Q.  Agree with what?
22   A.  That it exists.
23   Q.  Let's go to the next question, please.
24       MR. ANDERSON:  Here we go.  Let's stay to it.
25   Q.  What's this next entry on your report?

Page 119

1    A.  The weight is important.  So the more material
2    the more foreign body reaction and its effects.
3    Material reduction improves tissue integration, its
4    effect.  More material is better.  So if you don't
5    believe in this, the contrast would be that more
6    material is better.
7    Q.  I see.
8    A.  It is ridiculous.  No one will say it and
9    therefore we can all accept this.
10   Q.  Well, didn't Cobb say this in his report when
11   he's saying because of the problems he experienced with
12   the lightweight mesh with large pores that he moved to a
13   heavier weight mesh in order to have more structural
14   stability to his pores?  Doesn't he say that?
15       MR. ANDERSON:  Objection.
16   A.  You can reduce the amount of material to a
17   point where the function is no longer guaranteed, yes.
18   Q.  What's this entry down here mean?  I can't read
19   your writing.
20   A.  One important point that has to be discussed is
21   the hernia surgery and the PROLENE is a mesh intended to
22   be incorporated as a flat mesh in a tension-free area.
23       So these are -- it's a hernia mesh.  And when
24   you -- when used to replace a ligament you have to
25   consider mechanical strain and then you have pore

Page 120

1    collapse and then you have small pores.
2        And there are good Ethicon documents and they
3    acknowledged the problem and talked about stress
4    healing.  So all this is in this report, as you see.
5    It's just that I don't forget to mention some of the
6    principles.
7    Q.  Thank you.
8        In comparison to laser cut, what does that say?
9    A.  Cut to other borders?
10   Q.  Okay.  Ten percent lost, 20 percent variation,
11   increase in surface.  Is that what that means?
12   A.  Yes.  There are documents clearly showing that
13   10 percent of the weight is lost by these particles, can
14   go up to 10 percent in the mechanical cut devices.  It's
15   incredibly a high number.
16   Q.  Go ahead.
17   A.  And the second thing that would worry me or
18   that worries me is that because of the cutting of small
19   strides, of big huge flat mesh, you have a variation in
20   bits of up to 20 percent, so that the -- it is a --
21   Q.  A variation in what?
22   A.  In width of the sling.  So the sling can be 10
23   millimeters or 12 millimeters.  It is not possible to
24   make it more acute, according to the Ethicon documents,
25   and it is clear because you are just -- it depends

Page 121

1    whether you cut in the -- directly in the line of the
2    warp of that filament or a little bit right or left.
3    Q.  Okay.
4    A.  And therefore you have this huge variation,
5    20 percent variation of width, 10 percent material loss
6    that is with a mechanical cut.  And this is a risk,
7    yeah, of course.
8    Q.  Okay.  Do you know of any studies or any papers
9    that suggest how much of that 10 percent goes into
10   people as opposed to being in the box or on the floor?
11   A.  No, no.
12   Q.  Okay.  Evidence of possible levels to define
13   what?
14   A.  Whether a material is safe or not.
15   Q.  Okay.
16   A.  We don't have the option for clinical trials.
17   We are waiting on registries.  We have to build them up.
18   We have the preclinical results giving a lot of
19   warnings, yeah.  So there are some risks for the PROLENE
20   solutions for all issues.  We can present them, that
21   there are solutions for all, and therefore it's
22   unnecessary and it is -- the Ethicon people in their
23   documents, they are in full agreement with our -- with
24   this statement, at least some of them.
25   Q.  What does that say?

31 (Pages 118 to 121)

Prof. Dr. Med. Uwe Klinge

Page 122

1    A.  This is -- this is a history of our
2  collaboration with Ethicon and that we received 60 boxes
3  with various materials, they are called CV, with a
4  specific number.  You certainly have all the material of
5  it.  We received more than -- more than 20 modifications
6  from them.
7    Q.  Modifications meaning different kinds of mesh?
8    A.  Surface coatings, various pore size.  We
9  received even PVDF meshes from Ethicon at that time.
10  So, yeah.
11    Q.  On Page 9 you say textile forces.  What is
12  this?
13    A.  Scar forces.  That is what we already
14  discussed, that you have to separate shrinkage forces in
15  these two forces.
16    Q.  And what's the purpose of this note at the
17  bottom of Page 9?  PROLENE hernia mesh.
18    A.  Weight.  It is the topic, weight, and our aim
19  of our collaboration was to reduce it, and in fact
20  Ultrapro is 30 percent less in comparison to PROLENE,
21  and it has a completely different tissue reaction and
22  everyone who feels it in his hands is clear.
23    Q.  DynaMesh, Restorelle and Aries.  Those are
24  three other products that fit in here; is that right?
25    A.  These are hernia meshes, these are pelvic floor

Page 123

1  -- devices from the pelvic floor.
2    Q.  And what numbers --
3    MR. ANDERSON:  Wait a minute.  He's not
4  through.
5    A.  This is the -- the weight of this.  This is an
6  example that you can reduce the weight.  This is an
7  example that you can improve the border.  DynaMesh we
8  have discussed extensively.
9    Q.  Since 2013 are you aware of any mesh used in
10  the treatment of stress urinary incontinence that has a
11  pore larger than that used in the Ethicon TVT device?
12    A.  DynaMesh?  At least DynaMesh sling has bigger
13  pores when put to strain.  So it has to be specified how
14  to measure it and in which situation.
15    Q.  That's the DynaMesh that's mentioned in
16  Dr. Muehl's report?
17    A.  Yes.
18    Q.  Now, at rest, without measuring under strain,
19  which pore size is larger, the DynaMesh or the TVT?
20    A.  There is no -- as we extensively have
21  discussed, there is no specific dimension or figure that
22  can reflect the porosity.
23    Q.  Okay.
24    A.  In the report there is a textile porosity,
25  there is an area of effective porosity, and there is a

Page 124

1  reduction after putting load to it.
2    Q.  Do you have an opinion, if someone was to ask
3  you which had a bigger pore size, without applying load
4  to it, what would you say, DynaMesh or TVT?
5    A.  We have to look to the --
6    Q.  Do you know without looking?
7    A.  That means the effective pores -- the
8  percentage of effective pores without any -- any strain
9  to it.  I think it is maybe similar, almost close to 60
10  percent or so.
11    Q.  Okay.  Page 29.  Nerve end scar.  Is that what
12  that says?
13    A.  Yeah.
14    Q.  Morphological substrate?
15    A.  Morphologically substrate.  When we have to
16  tackle the problem with some of the patients with heavy
17  weights, small-pore meshes such as PROLENE or Marlex,
18  they experience chronic pain.  We have to look into the
19  explants.  We have been very happy to identify that a
20  possible reason, a morphological substrate for this
21  clinical situation, is the entrapment of nerves, the
22  deformation of the nerve endings in the neighborhood of
23  the polymers.  So the risk for pain likely is caused by
24  this.  And if you don't see any nerves the patient
25  likely doesn't have pain.

Page 125

1    Q.  Okay.  Do you have any training in
2  neuropathology?
3    A.  No.
4    Q.  Do you consider yourself an expert in the
5  nerves in the pelvic floor?
6    A.  I would consider me as an expert of nerves with
7  textiles, in the neighborhood of textiles, wherever they
8  are.
9    Q.  Okay.  And it doesn't matter the textile,
10  whatever the textile there's a risk of the nerve being
11  impacted by the textile, correct?
12    A.  It depends from -- from the intensity of the
13  scar and from the surface, from the amount of the
14  material.  If you have huge pores of five, four,
15  millimeters, you hardly will see some nerves getting
16  entrapped into the scar, and it is quite rare that these
17  patients experience pain.
18    Q.  In order, in your judgment, for these nerves
19  that you've just identified to mediate pain to the
20  patient, do they have to be trapped in the scar?
21    MR. ANDERSON:  Object to the form.
22    A.  I just would point out that when you see nerves
23  entrapped in scar it is very likely the risk is very
24  high for these patients that they experience pain.  If
25  you don't see nerves that are entrapped in scar, the

Prof. Dr. Med. Uwe Klinge

Page 126

 1   risk is much, much lower.
 2       Q.  Are you able to distinguish between nerves that
 3   transmit pain and nerves that don't transmit pain?
 4       A.  No.
 5       MR. THOMAS:  That's all the questions I have,
 6   Doctor.  Thank you.
 7       MR. ANDERSON:  Let's take a short break and let
 8   me go through my notes real quick.
 9       (Recess from 2:17 p.m. until 2:30 p.m.)
10            CROSS-EXAMINATION
11   BY MR. ANDERSON:
12       Q.  Dr. Klinge, I'm showing you what was marked as
13   Exhibit 4 to your deposition that Mr. Thomas went over
14   with you, this modified classification of surgical
15   meshes.  Do you remember some questions about this
16   document?
17       A.  Yes.
18       Q.  Okay.  One of the sections he asked you about
19   was this one on Page 256.
20       MR. THOMAS:  I don't mean to interrupt, but is
21   that my highlighting?
22       MR. ANDERSON:  It's my highlighting.
23       MR. THOMAS:  Okay.  Is this the original
24   exhibit?
25       MR. ANDERSON:  It's not the original, it's

Page 127

 1   mine, the one you handed me.
 2       MR. THOMAS:  I apologize.
 3       MR. ANDERSON:  That's okay, okay.
 4       Q.  Mr. Thomas asked you this question:  However,
 5   it is still open for further studies whether 500 microns
 6   is a reliable limit for histology and 1,000 microns for
 7   the calculation of the effective porosity or whether
 8   this should be modified.  Did I read that correctly?
 9       A.  Yes.
10       Q.  Can you please explain what you meant there and
11   what this means by whether this 500 or the 1,000 should
12   be modified?  Please explain that.
13       A.  The reason that we put this sentence into the
14   text was that there was a discussion about or there were
15   some facts indicating that you need maybe two
16   millimeters or three millimeters as a minimum distance
17   between the fibers to prevent this bridging.  So it may
18   be that these limits are too small, in particularly if
19   you have some load on it.  So -- yeah.
20       Q.  Were there any facts that would indicate to you
21   that if it was going to be modified that it would go
22   less than 1,000 microns between fibers?
23       A.  No, I don't know any.
24       Q.  Okay.  Mr. Thomas also asked you about
25   Exhibit 4, and he asked you whether or not any society

Page 128

 1   in an official writing has adopted this.  Do you
 2   remember that question that he asked you?
 3       A.  Yes.
 4       Q.  Do you need a society to adopt this
 5   classification for the science behind it to be valid?
 6       A.  No.  These are facts.  It doesn't depend from
 7   the meaning or the opinion of a society.
 8       Q.  You had mentioned that there were some
 9   different classifications for different things.  For
10   instance, you mentioned the Amid classification for your
11   infection and your classification for higher risk for
12   scarring or bridging fibrosis.  Do you remember those
13   questions?
14       A.  Yeah.
15       Q.  Okay.  Have you seen any manufacturers in the
16   last 10 years marketing their meshes by saying, our
17   pores are large 75-micron pores that will prevent scar
18   bridging between the fibers?  Have you seen any
19   manufacturer marketing their mesh devices saying that?
20       A.  No.
21       Q.  Have you seen any manufacturers at their
22   conferences that they sponsor, including Ethicon, having
23   speakers get up and talk about how 75 microns will
24   prevent scarring and bridging and complications in
25   patients?

Page 129

 1       MR. THOMAS:  Object to the form of the
 2   question.  Go ahead.
 3       Q.  Have you seen any of those?
 4       A.  No.  No one is relying on 75 microns for this
 5   purpose.
 6       Q.  Have you seen anything in the literature since
 7   Ethicon and your group created the lightweight large-
 8   pore meshes in 1998 indicating anyone disputing that
 9   greater than 1,000 microns between the fibers of an
10   implanted surgical polypropylene mesh will prevent scar
11   plating and bridging?
12       A.  I'm not aware of any.
13       Q.  You were asked a lot of questions about whether
14   or not at some of the conferences that you speak whether
15   or not FEG was one of the sponsors at those conferences.
16   Do you remember those questions?
17       A.  Yes.
18       Q.  And were asked some questions as to whether
19   or not you had your expenses reimbursed or you got paid
20   some per diem for speaking at those conferences by FEG.
21   Do you remember those questions?
22       A.  Yes.
23       Q.  Does Ethicon sponsor conferences all around the
24   world for surgical meshes?
25       A.  Definitely, yes.

Prof. Dr. Med. Uwe Klinge

Page 130

1    Q.  Does Ethicon pay its speakers and/or reimburse
2    them for their expenses when they speak at those
3    conferences?
4    A.  Yes.
5    Q.  When you spoke at the request of Ethicon
6    numerous times, according to your CV, and they were a
7    sponsor, were they sometimes sponsors at the conference?
8    A.  Yes.
9    Q.  Are they sometimes sponsors at the conferences
10   at which you currently speak?
11   A.  Yes.
12   Q.  Did Ethicon reimburse you when you traveled and
13   you spoke if they asked you to go speak there?
14   A.  In former times they did it directly.  Today
15   they did it just by sponsoring the whole conference.
16   Q.  Okay.  You were asked some questions about
17   Exhibit 12.  That was the review article by Barski and
18   Deng, do you remember this, where you were the academic
19   editor?
20   A.  Yes.
21   Q.  Is the management of mesh complication, Doctor,
22   SUI and POP repair, within your field of biomaterial
23   science or hernia surgery?
24   A.  No, it's out of my focus.
25   Q.  Does anything in Exhibit 12 form the basis of

Page 131

1    your opinions in this case?
2    A.  No.
3    Q.  You were shown Exhibit 13, which is the new
4    Cobb article.  Do you remember being asked questions
5    about this document?
6    A.  Yes.
7    Q.  Okay.  This article under the background
8    section indicates that they are going to present a
9    consecutive series of elective retrorectus mesh repairs
10   of an abdominal wall in an attempt to determine
11   predictors of wound events and recurrence, and it
12   mentions in this that it's going to deal with central
13   mesh ruptures of complex incisional hernias.  Is that
14   what this article is about?
15   A.  Yes.
16   Q.  How does adapting different mesh design for
17   central mesh ruptures of complex incisional hernias
18   relate to pelvic floor meshes?
19   A.  It's a completely different thing.  The central
20   mesh rupture within the abdominal wall is a consequence
21   of the very high biomechanical forces in the abdominal
22   wall that will not occur in the pelvic floor, and
23   therefore the problem that is described in this setting
24   with these large hernias cannot be applied to other
25   fields in surgery.

Page 132

1    Q.  What's the definition of the word "power" with
2    regard to a study?  What does that mean?
3    A.  Statistical power usually means that if you
4    don't see a difference that maybe there is still a
5    difference and therefore you can, for these so-called
6    beta error, you can call the sample size.
7    Q.  What was the sample size here?
8    A.  You have to calculate it in detail.  But
9    usually if you have an effect in 10 percent of the
10   cases, you need more than 1,500 patients per group to
11   have a sufficient statistically power of 80 percent to
12   be sure that if you don't have a concern, if you don't
13   have a problem, that there really is -- that there
14   likely is no problem.  So you need a huge cohort.
15   Q.  Would 255 patients meet your definition of a
16   huge cohort in this example?
17   A.  Definitely not, and they mixed up several
18   procedures, they mixed up several materials, so they
19   formed several subgroups there.  And, for example, if
20   you -- if you just use five subgroups it is not 250
21   patients per group, but it's only 50 patients per group.
22   Q.  Okay.
23   A.  And this is in relation to the 1,500 you need.
24   So it is not justified to -- to make the conclusions as
25   the beta.

Page 133

1    Q.  Okay.  Mr. Thomas asked you a number of
2    questions about whether or not Cobb and his four
3    colleagues here, in changing their current practice, as
4    he pointed out on Page 612, whether or not they had
5    proven in this article that lightweight meshes have a
6    larger risk of complications than other meshes,
7    midweight meshes.  Do you remember those questions?
8    A.  Yes.
9    MR. THOMAS:  Object to the form of the
10   question.
11   Q.  Okay.  When they compared meshes about what
12   they had been using to what they're using now, do you
13   see anywhere in this article where they were using old
14   construction six-mill PROLENE to treat their hernia
15   patients?
16   A.  No, they do not, and therefore they are in
17   total agreement with Heniford who would refuse the use
18   of heavyweight meshes and they preferred the midweight
19   meshes.
20   Q.  And when it says a midweight mesh on Page 612,
21   what do they list for the weight of the midweight mesh?
22   A.  Forty-five grams per square meter.  But there
23   is no -- no final definition what is midweight, it is
24   just a description.
25   Q.  Okay.  But for our discussion let's just talk

Prof. Dr. Med. Uwe Klinge

Page 134

1    about the weight of in grams per meter squared.  The
2    midweight mesh that they characterize here was 45 grams
3    per meter squared you said?
4        A.  And that is less than half of the -- of the
5    PROLENE mesh in this specific situation where you need a
6    very strong repair.
7        Q.  So did they say in this article, we don't want
8    to use lightweight meshes, we'd rather use heavyweight,
9    105 gram per meter squared PROLENE?  Do you see that
10   anywhere in this article?
11       A.  No, definitely not.
12       Q.  What percentage of hernia surgeons in Germany,
13   let's take for an example, still use old construction
14   PROLENE or PROLENE of any construction for hernia
15   repair?
16       A.  PROLENE in every construction.
17       Q.  Whatever construction PROLENE is available on
18   the market today, how many --
19       A.  PROLENE, PROLENE, not polypropylene.
20       Q.  Correct, yeah.
21       A.  The use of PROLENE is rare, probably less than
22   10 percent, for an incisional hernia.
23       Q.  Does a discussion of central mesh rupture for
24   complex incisional hernias relate to whether the TVT
25   PROLENE causes increased risk in women?

Page 135

1        A.  No, it's a completely different setting.
2        Q.  Okay.  Let's go to Exhibit 14.  You were asked
3    some questions on this Dirk Weyhe and William Cobb
4    article.  Do you remember some questions about this?
5        A.  Yes.
6        Q.  Okay.  And this was the minipig hernia model.
7    Do you remember that?
8        A.  Yes.
9        Q.  Is that a flat mesh or a mesh that gets put
10   under tension like the TVT sling?
11          MR. THOMAS:  Object to the form of the
12   question.
13       Q.  Does a TVT sling get put under tension when
14   it's either placed by the physician or in vivo?
15       A.  Yes.
16       Q.  Okay.  Were the meshes that were put into these
17   minipigs in a hernia model, did they have forces placed
18   on them like the TVT?
19       A.  They were considered not to have forces.
20       Q.  In fact, if you look at the abstract, under
21   methods, were the meshes in this article, were they even
22   meshes that are on the market?
23       A.  None of it.
24       Q.  Are those called experimental meshes that you
25   use for research?

Page 136

1        A.  Yes.
2        Q.  On the second page of this article that
3    Mr. Thomas showed you, if you look under the
4    introduction, it says, "Nowadays it is well known that
5    pore size is a key influencing factor of
6    biocompatibility in terms of mesh integration, scar
7    plate formation and chronic inflammation."
8           If by pore size we mean the distance between
9    the fibers, do you agree with that statement?
10       A.  Yes.
11       Q.  Then it goes on to say, "A typical phenomenon
12   of scar formation may cause the retraction of the mesh
13   and it is proven in preclinical studies that small
14   pores, less than one millimeter, induce a connective
15   tissue scar plate which is described as the bridging
16   effect by Klinge and colleagues."  Do you agree with
17   that statement?
18       A.  Yeah, totally.
19       Q.  And are you or any of your colleagues authors
20   on this article that counsel pointed out to you?
21       A.  No, unfortunately not.
22       Q.  He also asked you a question about this
23   sentence:  "To our knowledge the correlation between
24   elasticity, stability porosity of mesh constructions and
25   shrinkage is not proven systematically up to now."  Did

Page 137

1    I read that sentence correctly?
2        A.  Yes.
3        Q.  What do you understand that to mean, this
4    systematically?
5        A.  If you just asked whether it's proven, yes, it's
6    proven.  If it is investigated systematically so that we
7    really have a good understanding about the relationship
8    between elasticity, stretching, pore size and shrinkage,
9    no, there is lacking sufficient studies that really
10   deals with this problem systematically.
11       Q.  Despite the fact that there may not be
12   systematic clinical studies or safety studies in the
13   literature, do you have an opinion as to whether or not
14   elasticity, stability of porosity of mesh constructions
15   and shrinkage will cause complications in patients?
16          MR. THOMAS:  Object to the form of the
17   question.
18       Q.  Do you have an opinion?
19       A.  Yes.
20       Q.  And what is that opinion?
21       A.  These are one of the basic reasons for these
22   complications.
23       Q.  And in this paper on Page 51, do these authors
24   cite the work by you and Muehl in looking at effective
25   porosity?  First let's look at Reference 28.

Prof. Dr. Med. Uwe Klinge

Page 138

1    A.  Twenty-eight.
2    Q.  Or do they cite the work by you and
3  Klosterhalfen?
4    A.  They cite our proposal for classification.
5    Q.  And that was the one that we looked at earlier?
6  Does that have effective porosity and Muehl's work in
7  the classifications?
8    A.  Yes.
9    Q.  Also reading from this article, Cobb and his
10  fellow authors say, "In our series 89 to 100 percent of
11  the large-pore meshes were well integrated at the edges,
12  while 50 to almost 70 percent, 67 percent of the
13  small-pore meshes were not."  Did I read that correctly?
14    A.  Yes.
15    Q.  Do you have an opinion as to whether or not, if
16  you have large-pore meshes that are well in -- strike
17  that.
18      What does this demonstrate to you?
19    A.  Though it's not clearly defined what they
20  assume to be well-integrated, but it indicates that the
21  large-pore meshes have a better tissue integration than
22  the others.
23    Q.  Let's go to their summary.  Let me read the
24  summary along with you.  "A pore size greater than 1.8
25  millimeters," that's 1,800 microns, correct?

Page 139

1    A.  Yeah.
2    Q.  "Seems to have a better integration and higher
3  biomechanical capacity.  The mesh shrinkage is dependent
4  on the implant's structural stability."
5      Do you agree with those two sentences?
6    A.  Yeah.
7    Q.  Are those opinions that you've outlined here
8  today and in your report?
9    A.  Yes.  This is the publication from Bayon.
10    Q.  Correct, Exhibit 14.
11    A.  Uh-hum.
12    Q.  Thank you.
13      Are you aware of any -- you were asked by
14  counsel some questions about comparison of lightweight
15  -- strike that.
16      You were asked some questions by Mr. Thomas
17  about studies comparing shrinkage of smaller-pore meshes
18  with larger-pore meshes.  Do you remember those
19  questions?
20    A.  Yes.
21    Q.  Are you aware of studies that compared
22  larger-pore meshes and smaller-pore meshes to look at
23  shrinkage?
24    A.  I'm aware of studies looking at shrinkage by
25  ultrasound, yeah.

Page 140

1    Q.  Did you -- have you looked at explant studies
2  in preclinical models to look at shrinkage of
3  larger-pore meshes versus smaller-pore meshes?
4    A.  Yes.
5      MR. THOMAS:  Object to the form of the
6  question.
7    Q.  I'm sorry.  You can answer.
8    A.  Yes.
9    Q.  Okay.  Going back how long?  Strike that.
10      When you worked with Ethicon, did you publish
11  -- strike that.
12      In 1998, did you make any publications
13  regarding shrinkage in smaller pore versus larger-pore
14  meshes?
15    A.  Yes.  Shrinkage became an issue at one of the
16  Suvretta conferences when Amid published for the first
17  time what he's calling meshoma, and we tried to -- to
18  study it in an animal experiment, and we published it,
19  and we compared a heavyweight PROLENE mesh with
20  lightweight, large-pore meshes in a dog study and
21  published it and studied it extensively with the guys
22  from Ethicon who came to Aachen at that time.  So it was
23  '98, I believe.
24    Q.  In your studies with Professor Klosterhalfen
25  and other colleagues that Mr. Thomas has asked you about

Page 141

1  regarding 1,000 explanted meshes, the 600-plus explanted
2  meshes and any other of your work, have you noticed a
3  correlation between smaller-pore meshes and shrinkage?
4      MR. THOMAS:  Object to the form of the
5  question.
6    A.  Yes.
7    Q.  Okay.  And what is that correlation?
8      MR. THOMAS:  Same objection.
9    A.  The shrinkage is more extensive the more scar
10  you have.
11    Q.  With -- with -- strike that.  Let me go back.
12      For your explant studies that you've done with
13  Professor Klosterhalfen and others, the ones that have
14  been presented to you here today by Mr. Thomas, have
15  there been a correlation between the distance between
16  the polypropylene fibers of those explants at less than
17  1,000 microns and shrinkage?
18      MR. THOMAS:  Object to the form of the
19  question.
20    A.  If you have a lot of shrinkage or better say
21  scar contraction there, you usually -- or you have a
22  smaller distance between the fibers, that is something
23  you see at the explants, but this is something you can
24  feel during any revision operation when you're feeling,
25  when you're getting this material and the tissue in your

Prof. Dr. Med. Uwe Klinge

Page 142

1    hands.
2        Q.   In all of the materials that you've reviewed
3    from the internal Ethicon documents, all of the
4    depositions of Ethicon employees, and any literature
5    published by Ethicon or its key opinion leaders, did you
6    ever see that Ethicon tested the structural stability of
7    the PROLENE used in TVT to see what the resistance of
8    pore collapse under load would be?
9        MR. THOMAS:  Object to the form of the
10   question.
11       Q.   As it would be used as a sling.
12       MR. THOMAS:  Same objection.
13       Q.   Have you seen any studies where they actually
14   study that?
15       A.   There are documents where they -- they put the
16   slings to -- to forces.
17       Q.   Did you ever see where they determined what the
18   structural stability would be necessary for the slings
19   and how to adapt the mesh in the TVT to respond to those
20   forces?
21       MR. THOMAS:  Object to the form of the
22   question.
23       A.   I didn't see any study where they are dealing
24   with the problem to overcome it, but just to demonstrate
25   the problems there are several images showing that there

Page 143

1    is a problem.
2        Q.   Do you have an opinion -- well, strike that.
3    Let me go back.
4        You had some questions by Mr. Thomas about
5    safer alternative designs of slings versus the TVT
6    PROLENE.  Do you have an opinion as to whether or not
7    the DynaMesh sling made of PVF would be safer in women
8    than the TVT sling with PROLENE in it?
9        A.   Yes.
10       MR. THOMAS:  Object to the form of the
11   question.
12       Q.   What is that opinion?
13       A.   That the DynaMesh design is safer, because it
14   considers the principles and avoids the high risk
15   problems of the PROLENE mesh.
16       Q.   You were asked some questions about whether or
17   not you had done this video presentation for FEG, you
18   and Professor Klosterhalfen.  Do you remember those
19   questions?
20       A.   Yes.
21       Q.   Did Ethicon ever ask you to be video'd
22   regarding the lightweight large-pore meshes?
23       A.   Yes.
24       Q.   Did they do that?
25       A.   Yes, they asked for a video session where I was

Page 144

1    asked to demonstrate the entire story of the development
2    of the first lightweight, large-pore hernia mesh, the
3    Vypro.  So I was asked to -- to tell how they -- how we
4    worked together over the years.  And this was a video
5    that was shown at -- at the conferences where the
6    industry where Ethicon has a stand.  There it was
7    running on a monitor all day or all time around, so
8    permanently you could see that the story --
9        Q.   You mean on a constant feed?
10       A.   On a constant feed.
11       Q.   Okay.
12       A.   It was shown.  And, yeah.
13       Q.   So Mr. Thomas asked you some questions about
14   the pore size, and I know you've had some discussions
15   about what do you mean by pore size.  But let's just go
16   back to his questions.
17       He asked you whether or not the pore size of
18   DynaMesh and the TVT slings, he asked you about pore
19   size out of the box, not in use, he said out of the box.
20       Do you have an opinion as to whether or not the
21   pore size of any mesh, as it comes out of the box, is
22   important to a patient?
23       MR. THOMAS:  Object to the form of the
24   question.
25       A.   It is -- it will create or it is not important

Page 145

1    for the patient because it has to be seen in relation to
2    the functional needs for this mesh.  And if you just
3    would -- would think that the text or that the distance
4    between the fibers when putting out of the box is
5    sufficient, then it would put the patient to a serious
6    risk, particularly if you place the device in a position
7    where you applied some force to it.
8        Q.   Let me see if I can make this more simple.
9    Does the -- does the distance of the -- distance between
10   the fibers for mesh out of the box have any relationship
11   to patient safety once it's in the body?
12       MR. THOMAS:  Object to the form of the
13   question.
14       A.   No.  The most important thing is what happens
15   in the tissue, the distance of the fibers in the tissue.
16       Q.   Okay.  Mr. Thomas pulled out your deposition
17   from November 14, 2013, and he showed you one question
18   and answer from Page 32 and 33.  Do you remember that?
19       A.   Yes.
20       Q.   And do you recall this series of questioning?
21   I want to take you back to Page 26.  Question:  What
22   studies in the last year have you published or will be
23   published?  And then your answer:  Let me start from the
24   last because it's more easy to recollect.  Did I read
25   that correctly?

Prof. Dr. Med. Uwe Klinge

Page 146

1    A.   Yes.
2    Q.   And then do you go on, on Page 26, 27, 28, 29,
3  30, 31 and 32 talking about those studies that you were
4  doing with Professor Klosterhalfen?
5    A.   Yes.
6    Q.   And then the question on Page 32:  Does this
7  study analyze the extent to which one design of a mesh
8  may be better than another?  And you said:  No, it is
9  not possible because of the variation by intent, the
10  variation is too big.
11       Was that answer and that question in your mind
12  related to these one, two, three, four, five, six pages
13  of this one study?
14    A.   Yes, in the text, this study.
15    Q.   And then when he says, are you able to conclude
16  from the research that you've done whether PVDF or
17  polypropylene are better meshes for the issues that you
18  were studying, was that question in your mind related to
19  the six pages before it about those studies?
20       MR. THOMAS:  Object to the form of the
21  question.
22    A.   Definitely, yeah.
23    Q.   Okay.  So when you said, as I told you, we are
24  not able to make specific conclusions that one is better
25  than the other, what did that relate to?

Page 147

1       MR. THOMAS:  Object to the form of the
2  question.
3    A.   That was related to this specific study where
4  we looked to the cell reaction in the neighborhood to
5  polypropylene and PVDF.
6    Q.   Thank you.
7       MR. ANDERSON:  No further questions, Counsel.
8            REDIRECT EXAMINATION
9  BY MR. THOMAS:
10    Q.   Let's go to Page 464 of your deposition on
11  November 15th, 2013.
12       MR. ANDERSON:  Four what?
13       MR. THOMAS:  464.
14       MR. ANDERSON:  464.
15    Q.   Line 8.  Other than that study you just
16  described, which is an exhibit that we've talked about
17  today, it's in the gerry abstract, "Are you aware of any
18  clinical studies that compare the use of PVDF to the use
19  of polypropylene in any application to determine which
20  is better?"  Answer:  "No, I don't recall any clinical
21  study."  Is that correct?
22    A.   That is correct.
23    Q.   And is that answer true still today?
24    A.   Yeah.
25    Q.   It is true today?

Page 148

1    A.   There are sufficient number of clinical studies
2  showing that it is -- that PVF is used and can be used,
3  but comparative clinical studies, there is not one in
4  the world which is sufficient.
5    Q.   Okay.
6    A.   So there is --
7    Q.   This doesn't ask --
8       MR. ANDERSON:  Hold on.  Let him finish.  You
9  can duck your head if you want, but when a man's
10  talking you can't --
11       MR. THOMAS:  I'm doing the best I can.  Don't
12  comment on my mannerisms, please.
13       MR. ANDERSON:  But you look disgusted with me.
14       MR. THOMAS:  I'm not disgusted with you, I'm
15  trying to get through the day.  Just let him go
16  ahead.
17       MR. ANDERSON:  You can answer your question.
18    A.   So there is no option for us to do a
19  comparative clinical study with sufficient statistically
20  power.
21    Q.   Are you finished?
22    A.   Yes.
23    Q.   Thank you.
24       The question that was asked back then, and what
25  I've tried to ask today was, are there any clinical

Page 149

1  studies that compare the use of PVDF to the use of
2  polypropylene in any application to determine which is
3  better?  No, I don't recall any clinical study.  Not
4  about power, not about sufficiency, not what studies in
5  your judgment are not adequate to answer the question.
6  Are there any that you've reviewed comparing the use of
7  PVDF to the use of polypropylene in any application to
8  determine which is better?
9       MR. ANDERSON:  Objection to the form of that
10  question.  Go ahead.
11    A.   No, I don't recall any.
12    Q.   Thank you.
13    A.   And it is not possible.
14       MR. THOMAS:  Okay.  Thank you.  That's all.
15       MR. ANDERSON:  That's all your questions?
16       MR. THOMAS:  Yeah.
17            RECROSS-EXAMINATION
18  BY MR. ANDERSON:
19    Q.   Doctor, is it possible to do a clinical study
20  comparing any mesh design in order to determine the
21  safety, not just PVDF and polypropylene, any clinical
22  study by any manufacturer or any scientist?
23       MR. THOMAS:  Object to the form of the
24  question.
25    A.   I cannot imagine how this can be realized

38  (Pages 146 to 149)

Prof. Dr. Med. Uwe Klinge

Page 150

1  sufficiently.
2      Q.  And those were the reasons you've explained
3  here today as to why you can't do a clinical study for
4  safety comparing meshes?
5      A.  Yes, safety, yes.
6          MR. ANDERSON:  That's all we've got.
7          MR. THOMAS:  Thank you, Doctor.  Nice to see
8  you again.
9          (Signature having been waived, the deposition
10  of DR. UWE KLINGE was concluded at 3:04 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1              LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25  _____  _____  _____

Page 151

1          C E R T I F I C A T E
2
3      I, TRINA B. WELLSLAGER, Registered Professional
4  Reporter and Notary Public, do hereby certify that,
5  pursuant to notice, the deposition of DR. UWE KLING was
6  duly taken on 10/5/15 at 10:07 a.m. before me.
7      The said DR. UWE KLINGE was duly sworn by me
8  according to law to tell the truth, the whole truth and
9  nothing but the truth and thereupon did testify as set
10  forth in the above transcript of testimony.  The
11  testimony was taken down stenographically by me.  I do
12  further certify that the above deposition is full,
13  complete, and a true record of all the testimony given
14  by the said witness.
15
16      _____
17      TRINA B. WELLSLAGER, RPR
18
19      (The foregoing certification of this transcript
20  does not apply to any reproduction of the same by any
21  means, unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS