# EXHIBIT H

Prof. Dr. Med. Uwe Klinge

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


--------------------------------§
IN RE:  ETHICON, INC.,           § MASTER FILE
PELVIC REPAIR SYSTEM PRODUCTS    § NO. 2:12-MD-02327
LIABILITY LITIGATION             §
_____    §
                                 § MDL NO. 2327
THIS DOCUMENT RELATES TO:        §
DIANNE M. BELLEW,                § JOSEPH R. GOODWIN
                                 § US DISTRICT JUDGE
Case No. 2:13-cv-22473           §
                                 §
--------------------------------

- - -

November 10, 2014

- - -

        Videotaped deposition of PROF. DR. MED. UWE

    KLINGE, held at Quellenhof Hotel, Monheimsallee

    52, 52062, Aachen, Germany, commencing at

    9:04 a.m., on the above date, before Tami Cline,

    Registered Merit Reporter, Certified Realtime

    Reporter.




- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Prof. Dr. Med. Uwe Klinge

## Page 2

1  APPEARANCES:
2    ANDERSON LAW OFFICES, LLC
     BY:  BENJAMIN HOUSTON ANDERSON, ESQUIRE
3    1360 West 9th Street
     Suite 215
4    Cleveland, Ohio 44113
     216-592-8384
5    Ben@andersonlawoffices.net
     Representing the Plaintiffs
6
     THOMAS COMBS & SPANN, PLLC
7    BY:  DAVID B. THOMAS, ESQUIRE
     300 Summers Street
8    Suite 1380
     Charleston, West Virginia 25301
9    Dthomas@tcspllc.com
10   BUTLER SNOW, LLP
     BY:  CHAD R. HUTCHINSON, ESQUIRE
11   1020 Highland Colony
     Renaissance at Colony Park, Suite 1400
12   Ridgeland, Mississippi 39157
     601-948-5711
13   Chad.hutchinson@butlersnow.com
     Representing Johnson & Johnson and Ethicon
14
15   ALSO PRESENT:
16   Gregory Fields, Videographer
     Julie Filarski, Anderson Law Offices, LLC
     Michael Kauffmann, Precision Trial Solutions
17
18
19
20
21
22
23
24

## Page 3

1         - - -
2        I N D E X
3         - - -
4  Testimony of:  PROF. DR. MED. UWE KLINGE
5    DIRECT EXAMINATION BY MR. ANDERSON............. 10
6    CROSS-EXAMINATION BY MR. THOMAS................ 82
7    REDIRECT EXAMINATION BY MR. ANDERSON........... 192
8
9        E X H I B I T S
10        (ATTACHED)
   EXHIBIT NO.                    PAGE
11
12  Klinge Trial    Article entitled "New Objective    121
    Deposition 1    Measurement to Characterize the
13                  Porosity of Textile Implants,"
                    Bates stamped DX31026.1 through
14                  DX31026.8
15  Klinge Trial    Article entitled "Synthetic and    126
    Deposition 2    biodegradable prostheses in
16                  pelvic floor surgery," Bates
                    stamped DX3036.1 through
17                  DX3036.11
18  Klinge Trial    Article entitled "The biology      130
    Deposition 3    behind fascial defects and the
19                  use of implants in pelvic organ
                    prolapse repair," Bates stamped
20                  DX30360.1 through DX30360.10
21  Klinge Trial    Ethicon Final Report, PSE          141
    Deposition 4    Accession No. 00-0035, An
22                  Exploratory 91-day Tissue
                    Reaction Study of
23                  Polypropylene-based Surgical
                    mesh in Rates (PSE ACC.  NO.
24                  00-0035)

## Page 4

1         E X H I B I T S
2         (CONTINUED)
         (ATTACHED)
3    EXHIBIT NO.                    PAGE
4  Klinge Trial    Article entitled "Long-term    165
   Deposition 5    outcome and quality of life
5                  after open incisional hernia
                   repair - light versus
6                  heavyweight meshes"
7  Klinge Trial    Article entitled "Bias-Variation   169
   Deposition 6    Dilemma Challenges Clinical
8                  Trials: Inherent Limitations of
                   Randomized Controlled Trials and
9                  Meta-Analyses Comparing Hernia
                   Therapies"
10
11  Klinge Trial    Article entitled "Prospective,    173
    Deposition 7    Long-Term Comparison of Quality
12                  of Life in Laparoscopic Versus
                    Open Ventral Hernia Repair"
13  Plaintiff's P0036   PowerPoint presentation       41
                    entitled "Stand & Deliver -
14                  Pelvic Floor Repair"
    Plaintiff's PLT0067  Article entitled            26
15                  "Complications from
                    vaginally placed mesh in
16                  pelvic reconstructive
                    surgery"
17  Plaintiff's PLT0260  Article entitled "Impact of  49
                    Polymer Pore Size on the
18                  Interface Scar Formation in
                    a Rat Model"
19  Plaintiff's PLT0271  Article entitled "The        51
                    lightweight and large porous
20                  concept for hernia repair"
    Plaintiff's PLT0697  Article entitled "Elongation 60
21                  of textile pelvic floor
                    implants under load is
22                  related to complete loss of
                    effective porosity, thereby
23                  favoring incorporation in
                    scar plates"
24

## Page 5

1        E X H I B I T S
2        (CONTINUED)
        (ATTACHED)
3    EXHIBIT NO.                    PAGE
4  Plaintiff's PLT0770   Article entitled "New    194
                   Polymer for Intra-Abdominal
5                  Meshes - PVDF Copolymer"
   Plaintiff's P0777   Ethicon document, Form for   63
6                  Test Method
                   Applicability/Suitability,
7                  Bates stamped
                   ETH.MESH.01992234 through
8                  ETH.MESH.01992237
9
   Plaintiff's P0829   E-mail chain and article     66
10                 entitled "New Objective
                   Measurement to Characterize
11                 the Porosity of Textile
                   Implants," Bates stamped
12                 ETH.MESH.02184130 through
                   ETH.MESH.02184138
13
   Plaintiff's P1087   PowerPoint presentation      68
14                 entitled "Thunder: Technical
                   Review, Somerville 28th
15                 February 2008"
   Plaintiff's 1156   PowerPoint presentation       43
16                 entitled "T-Pro (Thunder) -
                   Pipeline Leadership Team
17                 (PLT) - State Gate Discovery
                   Initiation, August 25, 2008
18
   Plaintiff's P1437   October 7, 2010, e-mail and  67
19                 article entitled "New
                   Objective Measurement to
20                 Characterize the Porosity of
                   Textile Implants," Bates
21                 stamped ETH.MESH.04945136
                   through ETH.MESH.04945144
22
23
24

2 (Pages 2 to 5)

Prof. Dr. Med. Uwe Klinge

## Page 6

E X H I B I T S
(CONTINUED)
(ATTACHED)

| EXHIBIT NO. | | PAGE |
|---|---|---|
| Plaintiff's P1679 | PowerPoint presentation entitled "Factors related to mesh shrinkage - What do we know? A review of literature and internal studies" | 54 |
| Plaintiff's P2995 | PowerPoint presentation entitled "Mesh Properties - How important are they?" | 72 |
| Plaintiff's P3184 | Letter to Quentin from Christoph Walther, Bates stamped HMESH_ETH_00379723 | 199 |
| Plaintiff's P3355 | English Translation of Plaintiff's Exhibit 3354, Patent for PVDF mesh | 196 |
| Plaintiff's P3356 | Page 20 of 1386 from Howard Jordi's expert report containing photographs | 30 |
| Plaintiff's Demonstrative P3357 | Document Bates stamped ETH-01755 | 64 |
| Plaintiff's Demonstrative P3358 | PowerPoint slide titled "Foreign Body Reaction: More Foreign Body = More Inflammation," Bates stamped P1005 ETH.MESH.02341454 | 17 |
| Plaintiff's Demonstrative P3359 | PowerPoint slide entitled "Patient Injury Due to Mesh Inflammation and Contraction" | 32 |
| Plaintiff's Demonstrative P3360 | PowerPoint slide, a blowup referencing PLT0697, "Elongation of textile pelvic floor implants under load is related to complete loss of effective porosity, thereby favoring incorporation in scar plates" | 62 |

## Page 7

E X H I B I T S
(CONTINUED)
(ATTACHED)

| EXHIBIT NO. | | PAGE |
|---|---|---|
| Plaintiff's Demonstrative P3361 | PowerPoint slide entitled "Pores Collapse Under Tension," referencing P2995, ETH.MESH.05237872, PLT 0697, P1452 - ETH.MESH.000007 | 74 |
| Plaintiff's Demonstrative P3362 | PowerPoint slide entitled "Prolift Unsafe/Defective Mesh Design" | 79 |
| Defendant's DX30064 | Article entitled "Classification of biomaterials and their related complications in abdominal wall hernia surgery" | 133 |

(RETAINED BY MR. ANDERSON)

| | | |
|---|---|---|
| Plaintiff's P3363 | Prolene suture | 20 |
| Plaintiff's P3364 | 240 meters of polypropylene | 21 |
| Plaintiff's P3365 | Basketball net | 57 |

## Page 8

---

DEPOSITION SUPPORT INDEX

---

| | PAGE |
|---|---|
| REPORTER'S CERTIFICATE | 220 |
| INSTRUCTIONS TO WITNESS | 221 |
| WITNESS ERRATA | 222 |
| WITNESS ACKNOWLEDGEMENT | 223 |
| LAWYER'S NOTES | 224 |

## Page 9

1    ---
2        THE VIDEOGRAPHER:  We are now on the record.
3    My name is Gregory Fields.  I'm the videographer
4    for Golkow Technologies.  Today's date is
5    11/10/2014, and the time is 9:04 a.m.  This video
6    deposition is being held in Aachen, Germany, in
7    the matter of In Re: Pelvic mesh, for the
8    Superior Court of New Jersey, Atlantic County.
9    The deponent is Uwe Klinge.  Counsel will be
10    noted on the stenographic record.  The court
11    reporter is Tami Cline and will now swear in the
12    witness.
13        MR. THOMAS:  The court reporter noted that
14    the taped deposition was being taken in the
15    Superior Court of New Jersey.  I thought this was
16    an MDL deposition.
17        THE VIDEOGRAPHER:  I'm sorry.  I had that as
18    a --
19        MR. ANDERSON:  MDL deposition.
20        THE VIDEOGRAPHER:  This is the MDL?
21        MR. ANDERSON:  Yeah.
22        THE VIDEOGRAPHER:  I apologize.
23        MR. THOMAS:  And only the MDL.  It's not
24    cross-noticed in New Jersey.

3 (Pages 6 to 9)

Prof. Dr. Med. Uwe Klinge

Page 10

1    MR. ANDERSON: It's MDL.
2    THE VIDEOGRAPHER: Okay. Okay.
3    THE COURT REPORTER: Would you raise your
4  right hand, please.
5    Do you swear or affirm the testimony you give
6  in this cause will be the truth, the whole truth
7  and nothing but the truth?
8    THE WITNESS: I swear.
9    THE COURT REPORTER: You can put your hand
10  down.
11    PROF. DR. MED. UWE KLINGE, called as a
12  witness by the Plaintiff, having been first duly
13  sworn, testified as follows:
14        DIRECT EXAMINATION
15  BY MR. ANDERSON:
16    Q.  Good morning, Dr. Klinge.
17    A.  Good morning.
18    Q.  Dr. Klinge, please tell the jury what your
19  profession is.
20    A.  I'm an abdominal surgeon and a biomaterial
21  researcher.
22    Q.  Where do you work, Dr. Klinge?
23    A.  I'm working at the University of Aachen.
24    Q.  And is that Aachen, Germany?

Page 11

1    A.  It's Aachen, Germany.
2    Q.  And is that where we are today?
3    A.  Exactly.
4    Q.  Please tell the jury a little bit about
5  Aachen University Hospital.
6    A.  It's a large teaching and research hospital,
7  and it is -- it has an extended research center
8  dealing with medical devices, the development of
9  medical devices.
10    Q.  And would those medical devices include
11  surgical meshes like the Prolift mesh?
12    A.  Yes.
13    Q.  And before we go through the issues in this
14  case, would you please just tell the jury briefly
15  about your education and training as a surgeon?
16    A.  I started my medical training 1977 at this
17  university, and when I finished it, then I started to
18  work in the surgical department at this university
19  for almost now -- almost 30 years. Yeah.
20    Q.  And did you do a surgical residency?
21    A.  Yes.
22    Q.  What years did you do a surgical residency?
23    A.  It started in 1985, and I worked specified as
24  abdominal surgeon -- as a general surgeon in 1993,

Page 12

1  and some years later on I got specified as an
2  abdominal surgeon.
3    Q.  Tell the jury a little bit about your
4  practice of abdominal surgery.
5    A.  While working at this surgical department, I
6  performed some thousands of operations, mainly done
7  for diseases of the abdominal cavity of the intestine
8  of the abdominal wall, but it covers almost all parts
9  of the body.
10    Q.  Have you used synthetic surgical mesh in your
11  surgical practice?
12    A.  Yes, I did.
13    Q.  Did you use hernia meshes in your surgical
14  practice that were manufactured by Ethicon?
15    A.  Yes, I did.
16    Q.  Doctor, what caused you to study the
17  biomaterial science of surgical meshes?
18    A.  When we started to use surgical meshes in the
19  beginning of the '90s, we got aware that we have to
20  face several complications that are related with
21  these mesh materials, mainly at the occasion of some
22  revision operations where we saw what happens to
23  these meshes after getting incorporated; and we
24  wanted to learn more about these meshes to avoid

Page 13

1  these complications.
2    Q.  And when did you first begin that work?
3    A.  We started to think about it in the beginning
4  of the '90s, and the research project really started
5  in 1994.
6    Q.  And as part of your work in looking at the
7  biomaterial science of surgical meshes and trying to
8  relate those to complications, did you work as a
9  consultant for Ethicon?
10    A.  Yes, indeed. When we decided to study meshes
11  and wanted to know what is the impact of the meshes
12  to the damage in the tissue, it was necessary to
13  collaborate with the manufacturer, because for these
14  research, you need a lot of modifications. You need
15  a lot of different designs to find out what is the
16  impact of a specific design to the tissue response.
17  And we have been very happy to find Ethicon as a
18  partner in this research who, during the following
19  ten years, supplied us with a lot of these meshes and
20  a lot of modifications so that we can do all these
21  studies.
22    Q.  And was this collaboration between Aachen
23  University Hospital, where you are here in Aachen,
24  and Ethicon?

Prof. Dr. Med. Uwe Klinge

Page 14

1    A.   Yes.
2    Q.   Okay.  Dr. Klinge, all of your opinions today
3  will need to be to a reasonable degree of medical and
4  scientific certainty.  Do you understand that?
5    A.   Yes.
6    Q.   Have you published articles in the
7  peer-reviewed medical literature that relate to the
8  safety of surgical meshes either for the abdomen or
9  the pelvic floor?
10   A.   Yes, I did.
11   Q.   How many times?
12   A.   With the specific topic of surgical meshes,
13  it's more than 100.
14   Q.   Have you written books and book chapters that
15  relate to the safety of surgical meshes for both the
16  abdomen and the pelvic floor?
17   A.   Yes, I did.
18   Q.   And on how many times?
19   A.   About 50.
20   Q.   Have you been asked to speak at conferences
21  around the world on the topic of surgical mesh
22  complications and safer mesh design for the abdomen
23  and the pelvic floor?
24   A.   Yes, I have been, and I'm still.

Page 15

1    Q.   Have you been asked by Ethicon to speak as an
2  invited lecturer at conferences sponsored by Ethicon?
3    A.   Yes.
4    Q.   On how many occasions?
5    A.   Several dozens.
6    Q.   Have you been invited by Ethicon to speak
7  directly to urogynecologists and urologists regarding
8  surgical meshes for the pelvic floor?
9    A.   Yes, I was.
10   Q.   Doctor, what is Prolene mesh?
11   A.   Prolene mesh is the brand name of a mesh, a
12  plastic net made of polypropylene fibers.
13   Q.   And is there a particular manufacturer that
14  uses the brand name Prolene?
15   A.   It's a brand name from Ethicon.
16   Q.   Are you familiar with the term "Prolene Soft
17  Mesh"?
18   A.   Yes.
19   Q.   And what is Prolene Soft Mesh?
20   A.   It is, again, a brand name from a mesh from
21  Ethicon made of polypropylene fibers.
22   Q.   And you're familiar with the word -- the mesh
23  Gynemesh PS?
24   A.   Yes.  It is -- it is the same textile

Page 16

1  structure as for Prolene Soft.
2    Q.   So Prolene, Prolene Soft and Gynemesh PS, is
3  it your testimony they are all brand names for
4  polypropylene mesh made by Ethicon?
5    A.   Yes.
6    Q.   Okay.  What is the mesh material that's in
7  the Prolift device?
8    A.   It is polypropylene.
9    Q.   And what is the brand name from Ethicon for
10  this polypropylene in the Prolift device?
11   A.   It's Gynemesh PS.
12   Q.   Okay.  Have you reviewed and do you rely upon
13  Ethicon internal documents and depositions of Ethicon
14  witnesses that you reviewed over the course of this
15  case in arriving at your opinions that you are going
16  to offer here today?
17   A.   Yes.
18   Q.   With regard to the Prolift, are you familiar
19  with the weight and surface area, the weave pattern
20  and the pore size --
21   A.   Yes.
22   Q.   -- of Prolift mesh?
23   A.   I'm sorry.
24   Q.   All right.

Page 17

1    A.   Yes, I am.
2    Q.   Generally speaking, how is the Prolift
3  supposed to function?
4    A.   It is supposed to function as a flat layer
5  reinforcing the tissue and the pelvic floor.
6    Q.   Dr. Klinge, I would like to talk to the jury
7  now about the way the tissue in our bodies reacts to
8  a foreign substance like polypropylene.  Now, with
9  your help and at your request, did we prepare some
10  slides for the jury today?
11   A.   Yes.
12   Q.   And would you feel that those would be
13  helpful to you as we are talking about some of your
14  opinions with the jury?
15   A.   Yes.
16        MR. THOMAS:  Let's go off the record a
17  second, please.
18        THE VIDEOGRAPHER:  We are off the record.
19  The time is 9:13 a.m.
20  (A recess was taken from 9:13 a.m. until 9:14 a.m.)
21        THE VIDEOGRAPHER:  We are back on the record.
22  The time is 9:14 a.m.
23        - - -
24        (Plaintiff's Demonstrative Exhibit No. P3358,

5 (Pages 14 to 17)

Prof. Dr. Med. Uwe Klinge

Page 18

1   PowerPoint slide titled "Foreign Body Reaction: More
2   Foreign Body = More Inflammation," Bates stamped
3   P1005 ETH.MESH.02341454, marked for identification.)
4                       ---
5   BY MR. ANDERSON:
6       Q.   Doctor, I'm showing you the first slide,
7   which is a demonstrative exhibit, which we have gone
8   ahead and labeled as Plaintiff's Exhibit P3358.  Is
9   this slide entitled, "Foreign Body Reaction," a slide
10  that you helped prepare for the jury today?
11      A.   Yes.
12      Q.   What does foreign body reaction refer to?
13      A.   Foreign body reaction mainly consists of an
14  inflammatory reaction and a scar reaction.  And if
15  you -- assume you get a splinter or foreign body into
16  your tissues.  The body tries to get rid of it, and
17  if they -- if the body is not able to get rid of this
18  foreign body, it's sent a lot of white blood cells to
19  this to build a wall to protect the surrounding
20  tissue from this foreign body.  And this
21  inflammatory -- these inflammatory cells are then
22  surrounded by dense scar tissue.
23      Q.   And when we see on this slide "more foreign
24  body equals more inflammation" -- you have put that

Page 19

1   there.  Why have you put that there for the jury?
2       A.   Sorry?
3       Q.   "More foreign body equals more inflammation,"
4   why have we put that there?  Why is that significant
5   to your opinions, Doctor?
6       A.   Yeah.  It was one of our -- or it was
7   confirmed by all of our studies that, of course, the
8   more foreign body you have, the more inflammation you
9   have.  The more surface you have, the more
10  inflammation you have.  So if you have two splinters,
11  you will have more inflammation than if it is only
12  one.
13      Q.   Doctor, I believe by this time in the trial
14  that the jury would have already seen a Prolift
15  anterior mesh.  I -- we have one there on the slide.
16  Did I ask you to calculate the amount of
17  polypropylene fiber that is woven into a Prolift
18  anterior mesh?
19      A.   Yes, I did.
20      Q.   And please tell the jury how much
21  polypropylene suture material is in a Prolift
22  anterior mesh.
23      A.   So it is -- it is about 240 meters of
24  polypropylene fiber that is used in the Prolift

Page 20

1   anterior implant.
2       Q.   Doctor, did I ask you to bring with you to
3   your testimony today a Prolene suture?
4       A.   Yes.
5           MR. ANDERSON:  And, Counsel, for purposes of
6   the record, it's a demonstrative exhibit, which
7   we have premarked as Plaintiff's Exhibit P3363.
8                       ---
9           (Plaintiff's Exhibit No. P3363, Prolene
10  suture, was marked for identification.)
11                      ---
12  BY MR. ANDERSON:
13      Q.   Doctor, is this the Prolene suture you
14  brought here to the deposition today?
15      A.   Yes.  Exactly.
16      Q.   Can you please first show the Prolene suture
17  to the jury?  If you would just lay it on that piece
18  of paper so the -- our kind videographer here can
19  pick up on that.
20      A.   (Complying.)
21      Q.   Thank you.
22           Now, Doctor, you have placed sutures like
23  this in patients?
24      A.   Yes.  This is a typical suture we are using

Page 21

1   in the OR, but usually we made some knots about it
2   and we removed the rest of the fibers.  So, actually,
3   we left 1 to 2 centimeters of this suture in the body
4   when we made a stitch with this material.
5       Q.   So given that you trim this after you do the
6   stitch, show the jury, if you would, how much
7   polypropylene stitch is left.
8       A.   So, of course, it depends from thickness of
9   the tissue, but usually it's not more than this.
10      Q.   What is that?
11      A.   What remains in the tissue after --
12      Q.   About 2 inches?
13      A.   An inch is 2.5 centimeters, so it is -- it is
14  less than one inch.
15      Q.   Okay.  By way of example, Doctor, did I ask
16  you to measure -- you said there was 240 meters of
17  polypropylene material in an anterior mesh?
18      A.   Yes.
19                      ---
20          (Plaintiff's Exhibit No. P3364, 240 meters of
21  polypropylene, marked for identification.)
22                      ---
23  BY MR. ANDERSON:
24      Q.   I will mark this as Plaintiff's

Prof. Dr. Med. Uwe Klinge

Page 22

1    Exhibit P3364. Did I ask you to measure out 240
2    meters of polypropylene?
3        A. Yes. I --
4        Q. Could you, please -- and did you measure that
5    yourself?
6        A. Yeah. I did it myself, and I actually walked
7    20 times in my room or at my house --
8        Q. Okay.
9        A. -- to get this -- the length of this suture
10   material.
11       Q. If you would just lay that on the piece of
12   material next to it.
13       A. Yeah.
14       Q. Now, Doctor, we're not as familiar in the
15   United States with the metric system. How many yards
16   of material does 240 meters relate to?
17       A. It is equal to 260 yards.
18       Q. And you know in the US we play football, and
19   a football field is 100 yards long. So is this more
20   than two and a half football fields of material
21   that's woven into a Prolene anterior mesh?
22       A. Exactly. Or if you don't play football, it
23   is three times the height of the Statue of Liberty in
24   New York.

Page 23

1        Q. Okay. All right. Thank you.
2        Doctor, do you have an opinion to a
3    reasonable degree of medical and scientific certainty
4    as to whether there will be a different amount of
5    foreign body reaction and inflammation in a patient's
6    tissues to less than one inch of suture material of
7    polypropylene versus more than two and a half
8    football fields of polypropylene material? Do you
9    have an opinion?
10       A. Yes.
11       Q. And what is that opinion?
12       A. If you place this huge amount of material in
13   a comparatively small area, you will have a
14   significantly higher intensity and amount of
15   inflammation and scar tissue as a reaction to this
16   huge amount of material.
17       Q. Okay. Doctor, we can put those to the side
18   for the moment.
19       I would like to now -- sorry. I would now
20   like to talk to you about the relationship between
21   this foreign body reaction to polypropylene mesh and
22   a concept known as mesh contraction or mesh
23   shrinkage. Are you familiar with those terms, mesh
24   shrinkage or mesh contraction?

Page 24

1        A. Yes.
2        Q. Just briefly tell the jury in your own words
3    what mesh contraction or mesh shrinkage is.
4        A. When we are talking about mesh shrinkage, we
5    usually are thinking of the contraction of the scar
6    tissue around the mesh.
7        Q. And is scar tissue -- is there another -- is
8    fibrosis also another word for scar tissue?
9        A. Yes. Fibrosis is -- the fibrosis around the
10   mesh is usually the scar tissue.
11       Q. So if this piece of paper is the mesh as it's
12   in the body, can you explain to the jury what we're
13   talking about in terms of mesh shrinkage or
14   contraction if that's the implant and the black here
15   is -- the table is the tissue?
16       A. When the mesh is usually incorporated into
17   the scar tissue, and we know that scar contracts. It
18   lose a lot of water, and, therefore, when the scar is
19   contracting, it is pushing together the implant like
20   this. It can be up to 90 percent that the mesh
21   material is reduced by this contraction of the scar.
22       Q. Have you published in the peer-reviewed
23   literature on the subject of mesh shrinkage and
24   contraction and the resulting clinical consequence to

Page 25

1    patients?
2        A. Yes, I did.
3        Q. How many publications over what period of
4    time relate to mesh shrinkage and mesh contraction
5    that you have authored?
6        MR. THOMAS: Objection, without more
7    specificity into what area of the body.
8    BY MR. ANDERSON:
9        Q. Doctor, have you published in the
10   peer-reviewed literature on the subject of mesh
11   shrinkage and contraction of polypropylene meshes,
12   like the Prolift mesh, resulting in clinical
13   consequences to patients?
14       A. Yes.
15       MR. THOMAS: Same objection.
16   BY MR. ANDERSON:
17       Q. How many times have you done that, Doctor?
18       A. It's more than 50.
19       Q. Doctor, in terms of inflammatory response and
20   this foreign body reaction that we have been talking
21   to, will that -- will there be any difference between
22   a surgical mesh implanted, for instance, in the
23   abdominal wall and these principles versus a surgical
24   mesh implanted in the pelvic floor?

7 (Pages 22 to 25)

Prof. Dr. Med. Uwe Klinge

Page 26

1    MR. THOMAS:  Objection; foundation.
2    THE WITNESS:  The wound contraction is not
3    restricted to the abdominal wall.  It happens in
4    the entire body.  The foreign body responds.  The
5    scarring around a foreign body happens in every
6    part of the body, and in this regard the response
7    of the tissue to the -- to a mesh, it's quite
8    similar whether it is in the pelvic floor or
9    whether it's in the abdominal cavity.
10   BY MR. ANDERSON:
11   Q.  Doctor, I now want to explain to the jury
12   what the consequences to the patient are of severe
13   inflammation and contraction of polypropylene mesh
14   like Prolift.  Okay?
15   A.  Yes.
16                    ---
17   (Plaintiff's Exhibit No. PLT0067, Article
18   entitled "Complications from vaginally placed mesh in
19   pelvic reconstructive surgery", was marked for
20   identification.)
21                    ---
22   BY MR. ANDERSON:
23   Q.  I'm handing you what has been marked as
24   Plaintiff's Exhibit 0067.  It is PLT0067.

Page 27

1    MR. THOMAS:  This has a sticky on it.  Is
2    that yours?
3    MR. ANDERSON:  What I have done for you,
4    Counsel, is on every one of these documents,
5    since they're multipaged, to make it easier for
6    you to reference them, I flagged the pages for
7    you.
8    MR. THOMAS:  Thank you.
9    MR. ANDERSON:  You're welcome.
10   BY MR. ANDERSON:
11   Q.  Do you recognize this article as something
12   you reviewed in arriving at your opinions in this
13   case?
14   A.  Yes.
15   Q.  And it says -- is this article from the
16   International Urogynecological Journal in 2009
17   significant to your opinions in this case?
18   A.  Yes, it is.
19   Q.  If you will please turn with me to page 529.
20   MR. ANDERSON:  And if you'll highlight --
21   Michael, if you'll highlight the bottom right
22   image.
23   BY MR. ANDERSON:
24   Q.  Doctor --

Page 28

1    MR. THOMAS:  Just note my objection to this
2    before you show the jury what the picture is
3    until we have an adequate foundation for the jury
4    to see the picture.
5    BY MR. ANDERSON:
6    Q.  And you reviewed this article in coming to
7    your opinions in this case?
8    A.  Yes.
9    Q.  And does this article involve the Prolift
10   mesh?
11   A.  Yes.
12   Q.  And if we're looking at this image contained
13   within the article, what are we looking at here,
14   Doctor?
15   A.  It is showing the explanted mesh material
16   that is in -- taken off in several parts, and you see
17   that it is incorporated into a lot of scar tissue,
18   that it is deformed, that it's not laying very flat
19   in this area.
20   MR. THOMAS:  Just show --
21   THE WITNESS:  It's hard to identify the
22   textile structure in this compound of scar.
23   MR. THOMAS:  I just want to show my
24   continuing objection for lack of foundation.

Page 29

1    MR. ANDERSON:  Noted.
2    BY MR. ANDERSON:
3    Q.  As a hernia surgeon, did you remove
4    contracted polypropylene meshes from patients?
5    A.  Yeah.  We did a lot.  And the appearance of
6    these meshes are completely similar to this.  We
7    have -- in these contracted meshes, we have this huge
8    amount of scar tissue.  The advantage in the
9    abdominal wall is that we are able to explant them in
10   total and, whereas in this area, it usually is taken
11   off in parts.
12   Q.  And you say, "in this area."  You removed
13   mesh from the pelvic floor?
14   A.  Yes.
15   Q.  Did you have an opportunity to review
16   Dr. Howard Jordi's expert report in this case?
17   A.  Yes.
18   Q.  Did you see photos in his report of mesh that
19   had been taken out of Ms. Bellew?
20   A.  Yes.
21   Q.  And did you rely on those photos in his
22   report in arriving at your opinions here today?
23   A.  Yes.
24   MR. THOMAS:  Objection.  To my knowledge,

8 (Pages 26 to 29)

Prof. Dr. Med. Uwe Klinge

Page 30

1    the -- any specific causation testimony of
2    Ms. Bellew is not contained in his report.  Am I
3    incorrect?
4         MR. ANDERSON:  We're not going to talk about
5    causation.
6         MR. THOMAS:  Okay.  Show my objection to any
7    plaintiff-specific testimony by Dr. Klinge.
8         MR. ANDERSON:  I'll show your objection.
9                         - - -
10        (Plaintiff's Exhibit No. P3356, Page 20 of
11   1386 from Howard Jordi's expert report containing
12   photographs, was marked for identification.)
13                        - - -
14   BY MR. ANDERSON:
15        Q.  I'm handing you what's been premarked as
16   Plaintiff's Exhibit 3356.  Is that one of the
17   photographs that you saw from Dr. Jordi's report of
18   explanted mesh from Ms. Bellew?
19        A.  Yes, it is.
20        Q.  Was this image significant to your opinions
21   in this case?
22        A.  Yes.
23        Q.  Can you please explain the significance of
24   that image in relation to what we just -- what the

Page 31

1    jury just saw?
2         A.  This image --
3         MR. THOMAS:  Excuse me.  Let me place my
4    objection.  I object to this because it is not a
5    disclosed opinion in the report that Ben here --
6    that's at issue in this deposition and also
7    because this witness is designated on general
8    causation issues and not on plaintiff-specific
9    issues.
10   BY MR. ANDERSON:
11        Q.  Does the appearance of Ms. Bellew's
12   contracted mesh in -- does the appearance of the mesh
13   in -- from Dr. Jordi's report -- what do you see from
14   that -- from that image, sir?
15        A.  On this photograph you see the folding of a
16   mesh that is incorporated into very big amount of
17   scar tissue, and it is a confirmation that this
18   phenomenon is not limited to the abdominal wall, but
19   it happens in every part of the body.
20        Q.  Now, Doctor, you have seen the Prolift
21   anterior mesh as it comes out of the box.  Have you
22   seen that?
23        A.  Yes.
24        Q.  How does the Prolift mesh out of the box

Page 32

1    compare to contracted mesh removed due to
2    complications like we've seen in these -- in these
3    recent photographs from the Blandon article as well
4    as this from Ms. Bellew?
5         A.  The mesh, when it's taken out of the box,
6    usually is very soft, pliable, flexible, whereas a
7    mesh that is integrated into this scar tissue usually
8    is rigid, stiff, not flexible, not stretchable any
9    longer; and, therefore, it is going to be in sharp
10   contrast to the properties of the surrounding tissue.
11        Q.  Doctor, did you prepare a slide for the jury
12   regarding mesh inflammation and contraction and their
13   relation to consequences for the patient?
14        A.  Yes.
15                        - - -
16        (Plaintiff's Demonstrative Exhibit No. P3359,
17   PowerPoint slide entitled "Patient Injury Due to Mesh
18   Inflammation and Contraction", was marked for
19   identification.)
20                        - - -
21   BY MR. ANDERSON:
22        Q.  I'm showing you what we have marked as
23   Plaintiff's Exhibit P3359.  Is that the slide?
24        A.  Yes.

Page 33

1         Q.  Okay.
2         MR. ANDERSON:  If you could just bring in the
3    first bullet points.
4         MR. THOMAS:  Just show my objection to this
5    demonstrative and testimony about this because
6    the patient has not been designated for the
7    quantitative risks of complications in the pelvic
8    floor.
9    BY MR. ANDERSON:
10        Q.  Doctor, if we look here to these first two
11   bullet points, can you tell us why you created these
12   for the jury?
13        A.  One of our important findings in these years
14   of research together with Ethicon was that this mesh
15   inflammation, this inflammatory region around the
16   foreign body, it's a permanent one.  It is -- it
17   doesn't stop after three weeks or four weeks, but it
18   stays there as a chronic wound until the end of the
19   life of the patient; and this chronic wound leads to
20   a permanent tissue irritation.
21        In some patients there's always some sort of
22   scarring that is protecting the surrounding tissues
23   from the foreign body, but in some patients this
24   scarring is very, very severe; and it leads that

9 (Pages 30 to 33)

Prof. Dr. Med. Uwe Klinge

Page 34

1   almost all the entire area where the mesh was been
2   placed is blocked by this scarring.
3           MR. THOMAS:  Just show my objection to any
4      testimony to Bullets 2, 3 and 4 because it calls
5      for testimony about risks in the pelvic floor
6      which is beyond this witness's expertise.
7   BY MR. ANDERSON:
8      Q.  Doctor, over the course of your 20 years of
9   research, how many explants from the abdominal wall
10  have you looked at and analyzed?
11     A.  We have meanwhile several thousand of
12  explanted meshes here that we have had a look to and
13  we try to analyze.
14     Q.  As part of this body of work over the last 20
15  years, how many explanted meshes from the pelvic
16  floor have you analyzed?
17     A.  It's up to 500.
18     Q.  Okay.  So with regard to these thousands of
19  hernia mesh explants from humans that you have
20  analyzed and hundreds of pelvic floor explants that
21  you've analyzed over the course of these 20 years,
22  have you recognized similarities between the
23  contraction of the explanted abdominal wall meshes
24  and the explanted pelvic floor meshes?

Page 35

1           MR. THOMAS:  Show my objection to this to the
2      extent it's based upon his review of the
3      Klosterhalfen explants of the pelvic floor which
4      this court has already ruled is inappropriate for
5      him on which to rely for his opinions.
6           MR. ANDERSON:  Counsel, how about just saying
7      "objection"?
8           MR. THOMAS:  Because I didn't think it would
9      be clear from the record.
10  BY MR. ANDERSON:
11     Q.  Have you personally reviewed pelvic floor
12  explants?
13     A.  Yes.
14     Q.  How many personal -- how many personal
15  reviews of pelvic floor explants have you done,
16  Dr. Klinge?
17          MR. THOMAS:  Same objection.
18          THE WITNESS:  It's about 50.
19  BY MR. ANDERSON:
20     Q.  Okay.  So of these 50 meshes that have been
21  taken out of women's bodies that you've analyzed and
22  the hundreds, if not thousands, that you've looked at
23  of hernia mesh explants, have you noticed
24  similarities in terms of the tissue response to the

Page 36

1   polypropylene meshes that have been explanted?
2      A.  We always found similar tissue response, and
3   we didn't find any significant difference in the
4   tissue reaction.
5      Q.  And with regard to the first two bullet
6   points on the slide that we were talking about a few
7   minutes ago, mesh inflammation is permanent and in
8   some patients mesh scarring is severe.  Have you
9   arrived at those opinions based upon your 20 years of
10  work, all of your peer-reviewed publications, the
11  conferences you've spoken at around the world, the
12  conferences to urogynecologists and urologists at
13  the request of Ethicon, your review of thousands of
14  hernia mesh explants and your review of hundreds of
15  pelvic floor explants and over 50 that you have
16  reviewed yourself?
17          MR. THOMAS:  Objection.
18          THE WITNESS:  Yes, exactly.
19          MR. THOMAS:  Object to the form of question.
20          THE WITNESS:  It is.
21          MR. ANDERSON:  Whatever.
22  BY MR. ANDERSON:
23     Q.  Go ahead.
24     A.  The permanence of the mesh inflammation, it's

Page 37

1   a fact and that in some of these cases you have an
2   extended scarring.  It is a fact.  It is not related
3   to some specific location in the body.
4           MR. ANDERSON:  Okay.  Let's show the next two
5      bullet points.
6   BY MR. ANDERSON:
7      Q.  Doctor, based upon your review of all of the
8   Ethicon materials and the Ethicon depositions, your
9   review of the scientific literature in this case,
10  your 20 years of experience as a biomaterials
11  researcher, your experience as a hernia surgeon who's
12  treated -- not only implanted but treated
13  complications related to hernia, your review of
14  thousands of hernia mesh explants, your analysis
15  personally of 50 pelvic floor explants, and all of
16  the work that you've done to arrive at your opinions
17  in this case, can you state to a reasonable degree of
18  medical and scientific certainty as to whether or not
19  these two bullet points are accurate?
20          MR. THOMAS:  Object to the form.  Object;
21      goes beyond his expertise and beyond his
22      designation in the report.
23          THE WITNESS:  Yes.  It is -- it is a fact
24      that if you have a chronic wound with a lot of

Prof. Dr. Med. Uwe Klinge

Page 38

1   scar tissue, that, of course, you have a higher
2   risk for chronic pain, because of a higher risk
3   for getting nerves that are entrapped into the
4   scar tissue; and in the area of the pelvic floor
5   you have a higher risk of dyspareunia, erosions
6   and organ dysfunction. And, therefore, the
7   extent of inflammation and scarring is a very big
8   concern for the patient's safety. And if you
9   have a lot of inflammation, a lot of scar, this
10  carries a lot of risks for the patients.
11  BY MR. ANDERSON:
12     Q. Is there any way for a surgeon who is
13  implanting a Prolift mesh or a hernia mesh to know
14  the extent of scarring and contraction that will
15  occur over the patient's life in and around the mesh
16  or a way to control it?
17     A. Not in regard to the specific response of a
18  patient, but for the general statement that the more
19  material, the more inflammation, then, of course, you
20  can estimate it.
21     Q. Based upon your years of consulting with
22  Ethicon and all of your work over the last 20 years,
23  and your work with Ethicon, do you have personal
24  knowledge as to whether Ethicon was aware of these

Page 39

1   issues with contraction and inflammation of their
2   polypropylene meshes that you have discussed?
3       MR. THOMAS: Objection to what Ethicon knew.
4   BY MR. ANDERSON:
5      Q. Again, based upon your personal knowledge as
6   a consultant with Ethicon, did you have discussions
7   with them about the contraction of their
8   polypropylene meshes?
9      A. Yes, I definitely know that we have discussed
10  this during our working group meetings with people
11  from Ethicon, exactly this problem of shrinkage, and
12  we have been trying to figure out what are the main
13  reasons. So, yeah, it was a finding from Ethicon as
14  well as from us --
15     Q. And did you --
16     A. -- working hand in hand.
17     Q. I'm so sorry.
18       And in this working hand in hand with Ethicon
19  in coming to these questions regarding mesh shrinkage
20  and its relationship to patient complications, did
21  you publish, while you were a consultant with
22  Ethicon, in the peer-reviewed literature on these
23  issues?
24     A. Yes.

Page 40

1      Q. Are these documents significant to your
2   opinions -- strike that.
3        Have you seen in the internal documents and
4   depositions of Ethicon witnesses discussions
5   regarding patient complications related to mesh
6   contraction?
7      A. Yes.
8      Q. Are these documents significant to your
9   opinions in this case?
10     A. Yes.
11     Q. Have you studied and published in the
12  peer-reviewed literature on the amount of shrinkage
13  or contraction that will occur in the human body to
14  polypropylene surgical meshes?
15     A. Yes.
16     Q. What have your studies shown regarding the
17  amount of shrinkage that occurs with polypropylene
18  meshes in the human body?
19     A. Roughly you have to estimate a shrinkage, a
20  contraction of about 30 to 50 percent, but it depends
21  on the design of the mesh. So it can be much more;
22  it can be a little bit less.
23     Q. How does the amount of foreign body material
24  in the mesh relate to the amount of mesh shrinkage or

Page 41

1   contraction that will occur in the tissue?
2      A. The more material, the more inflammation, the
3   more scar, the more contraction, the more shrinkage.
4      Q. Dr. Klinge, in the internal documents that
5   you have reviewed from Ethicon, have you seen
6   anywhere where they mention or address these concerns
7   over the amount of material with their Prolift mesh?
8      A. Yes, I did.
9            ---
10       (Plaintiff's Exhibit No. P0036, PowerPoint
11  presentation entitled "Stand & Deliver - Pelvic Floor
12  Repair", was marked for identification.)
13           ---
14  BY MR. ANDERSON:
15     Q. I'm showing you what has been marked as
16  Plaintiff's Exhibit P0036.
17       Is this document something that you have
18  reviewed during your work in this litigation?
19     A. Yes, I did.
20     Q. Is it significant to your opinions in this
21  case?
22     A. Yes.
23       MR. THOMAS: What is the date of this
24  document?

11 (Pages 38 to 41)

Prof. Dr. Med. Uwe Klinge

Page 42

1      MR. ANDERSON:  It's in your production, and
2  so any Ethicon production, according to the
3  metadata, I believe it's 2008, but we can
4  certainly check that on a break.
5      MR. THOMAS:  Thank you.  Just note my
6  objection to the use of any company documents
7  after the date of Mrs. Bellew's surgery.
8      MR. ANDERSON:  Oh, this is certainly before
9  Ms. Bellew's surgery.
10      MR. THOMAS:  I just wanted to make sure.
11  Thank you, Ben.
12  BY MR. ANDERSON:
13      Q.  Is this document significant to your opinions
14  in this case?
15      A.  Yes.
16      Q.  Just explain briefly what this document is,
17  Dr. Klinge.
18      A.  It's a PowerPoint presentation from Ethicon.
19      Q.  Okay.  If you go to page 7 of the document in
20  this Ethicon PowerPoint, you have seen this slide?
21      A.  Yes.
22      Q.  Okay.  Is this important to your opinions?
23      A.  Yes, it is important.
24      Q.  Can you explain why, please?

Page 43

1      MR. ANDERSON:  Blow up the -- yes.
2      THE WITNESS:  The topic of this slide is
3  "Improved Tissue Response," and so to get an
4  improved tissue response, the people that make
5  this presentation, they cited my work with
6  Klosterhalfen --
7      MR. ANDERSON:  If you could blow that up.
8      THE WITNESS:  -- where we wrote down the
9  entire concept of the lightweight and large pore
10  concept, and they figured out that for an
11  improved tissue response, you need a large porous
12  construction to reduce the tissue response.  So
13  they are in line completely with what we have
14  found during these years, and they accepted it,
15  obviously.
16  BY MR. ANDERSON:
17      Q.  And is this in line -- how does this relate
18  to your opinions regarding the amount of foreign body
19  reaction and the amount of inflammation?
20      A.  It's exactly in accordance.  So, yeah.
21      ---
22      (Plaintiff's Exhibit No. 1156, PowerPoint
23  presentation entitled "T-Pro (Thunder) - Pipeline
24  Leadership Team (PLT) - State Gate Discovery

Page 44

1  Initiation, August 25, 2008, was marked for
2  identification.)
3      ---
4  BY MR. ANDERSON:
5      Q.  Okay.  I'm showing you what has been marked
6  as Plaintiff's Exhibit 1156.
7      Are you familiar with this document,
8  Dr. Klinge?
9      A.  Yes, I am.
10      Q.  Is this something that you reviewed during
11  your work in this litigation?
12      A.  Yes, I did.
13      Q.  And is it significant to your opinions here
14  today?
15      A.  Yes, it is.
16      Q.  If we turn to page 12 of the document, is
17  this slide significant to your opinions?
18      A.  Yes.
19      MR. ANDERSON:  Can you blow up the right-hand
20  side of that?
21  BY MR. ANDERSON:
22      Q.  Doctor, is this part of the PowerPoint slide
23  significant?  And, if so, why?
24      A.  In this PowerPoint presentation from 2008

Page 45

1  from Ethicon, it is clearly stated that we need less
2  foreign body material.  We need materials that
3  correlate to the physiological characteristics.  So
4  it expresses that these people want to have less
5  material to make it safer.
6      Q.  Based upon your review of all of the
7  materials in this litigation and all the depositions
8  as well as your years of consulting with Ethicon, did
9  you determine whether or not they ever manufactured a
10  pelvic organ prolapse mesh with mesh that was
11  actually designed for the pelvic floor?
12      A.  No, I didn't -- didn't find any -- any
13  information to this.
14      Q.  The Gynemesh PS mesh and Prolift, was that
15  designed by Ethicon as a hernia mesh or a pelvic
16  floor mesh?
17      A.  To my knowledge, it was designed as a
18  material-reduced hernia mesh.
19      Q.  Okay.  Dr. Klinge, I want to shift gears here
20  a little and talk to you about another mesh design
21  characteristic, and that is the pores.  What are mesh
22  pores?
23      A.  A mesh is more or less a net, and the pore is
24  the area in between the filaments.

Prof. Dr. Med. Uwe Klinge

Page 46

1      Q.  Is the size of the pores or these open spaces
2   in the mesh material something that you have studied
3   over the last 20 years, published on in the
4   peer-reviewed literature, consulted with Ethicon
5   about and presented at conferences around the world
6   over the last 20 years?
7      A.  We did it extensively.
8      Q.  Is it also these open spaces or these pores a
9   design principle that you have used to work with
10   manufacturers to design safer meshes?
11      A.  Yes.
12      Q.  Can you tell us what the significance of
13   these pores or open spaces are with regard to the
14   tissue response for patients?
15      A.  The size of a pore means a critical parameter
16   to predict what happens when the tissue is -- or when
17   the mesh is incorporated into the tissue.  If you
18   have very small pores, then the -- or the space in
19   between the fibers is completely filled by scar
20   tissue; and that makes the mesh stiff and rigid,
21   whereas if you have very large pores, large distances
22   between the fibers, the body is able to fill the
23   pores with fat tissue, and then the mesh remains
24   flexible, stretchable.  So the small pores means a

Page 47

1   considerable risk for the patient, whereas the larger
2   the pore, the less of the risk.
3      Q.  Is another way to say the larger the pore,
4   the greater the distance between the fibers of the
5   mesh?
6      A.  Yes.
7      Q.  Okay.  Have you conducted research over the
8   last 20 years, published peer-reviewed studies, and
9   worked as an Ethicon consultant on sufficient pore
10   size or how large these openings need to be in
11   surgical meshes to prevent these patient consequences
12   you are talking about?
13      A.  Yes, we did.
14      Q.  And has that research included analyzing the
15   pore size of meshes that are surgically removed from
16   animal models, abdominal wall, as well as the pelvic
17   floor?
18      A.  Yes.
19      Q.  And from your background, training, research,
20   your peer-reviewed publications, all your work for
21   the past 20 years.  Your consulting work with
22   Ethicon, all the materials that you have reviewed in
23   this case, do you have an opinion to a reasonable
24   degree of medical and scientific certainty as to what

Page 48

1   the critical pore size or open space must be for a
2   surgical mesh implant for both hernia repair and
3   pelvic floor repair in order to be safe in the
4   tissues?
5      A.  Yes.
6      Q.  And what is that opinion?
7      A.  The larger the pores, the safer it is to --
8   the larger the pores, the lower the risk for this
9   bridging; and for polypropylene, the critical figure
10   is about 1 millimeter.
11      Q.  And, again, we're on the metric system, but I
12   know the jury is going to see documents that some of
13   them are in millimeters and some are in microns.  What
14   does 1 millimeter equal in terms of microns?
15      A.  It equals 1,000 microns.
16      Q.  So 1 millimeter equals 1,000 microns?
17      A.  Yes.
18      Q.  So would -- I'm not real good at math, so
19   would 3 millimeters equal 3,000 microns?
20      A.  Exactly.
21      Q.  Okay.  I got that one right.
22      I know that you said you have over 1,000
23   publications in the peer-reviewed literature on the
24   safe design of surgical meshes.  We obviously can't

Page 49

1   go through all of those today, but I did want to show
2   the jury just a couple of your peer-reviewed
3   publications contained in your research on the
4   relationship between inflammation and contraction and
5   adequate mesh pore size for polypropylene meshes.
6   Okay?
7      A.  Yes.
8         ---
9      (Plaintiff's Exhibit No. PLT0260, Article
10   entitled "Impact of Polymer Pore Size on the
11   Interface Scar Formation in a Rat Model", was marked
12   for identification.)
13         ---
14   BY MR. ANDERSON:
15      Q.  I'm showing you what we have marked as
16   Plaintiff's Exhibit PLT0260.
17      MR. ANDERSON:  Counsel.
18      If you'll highlight the top.
19   BY MR. ANDERSON:
20      Q.  Is this one of your peer-reviewed
21   publications on polymer pore size?
22      A.  Yes, it is.
23      MR. ANDERSON:  And if we could turn to
24   page 213 and enlarge the left side of the

13 (Pages 46 to 49)

Prof. Dr. Med. Uwe Klinge

Page 50

1    document down there where it says "loose
2    network."
3    BY MR. ANDERSON:
4        Q.   Doctor, drawing your attention to this part
5    of your peer-reviewed publication from 2002, what
6    does that statement tell us in terms of this
7    relationship between these -- the distance between
8    the fibers and patient complications?
9        A.   In this publication from 2002, we described
10   that we found that if you have larger pores of more
11   than 1, 2 milimeters, then the scar tissue is
12   limited to the fibers and that the pores, the holes
13   in between the fibers, are filled by fat tissue.  So
14   these are the good pores, whereas if you have smaller
15   pores, less than 1 millimeter, you usually have scar
16   tissue linking these fibers strongly to each other
17   and making the entire implant stiff and rigid.
18       Q.   And just to be clear, Doctor, does that mean
19   that every pore from an explanted mesh that is less
20   than 1,000 microns, that every one of them is going
21   to be filled with scar?
22       A.   No.  But the risk is very, very high that
23   these pores are filled by scar tissue; and,
24   therefore, you have to say, the larger the pore, the

Page 51

1    lesser the risk.
2        Q.   So the higher the -- the further the distance
3    of the fibers above 1,000 microns, the less risk of
4    this bridging of the scar tissue?
5        A.   Yeah, less risk and make it more safer, then,
6    for the patient.
7        Q.   Okay.  And if we could just turn to the last
8    page.
9            Who funded this study that you did regarding
10   impact of polymer pore science?
11       A.   These findings were part and as a result of
12   our collaboration in these ten years where we worked
13   together with the people from Ethicon.
14           ---
15       (Plaintiff's Exhibit No. PLT0271, Article
16   entitled "The lightweight and large porous concept
17   for hernia repair", was marked for identification.)
18           ---
19   BY MR. ANDERSON:
20       Q.   I'm now handing you what has been marked as
21   Plaintiff's PLT0271.
22           Do you recognize this as another one of your
23   peer-reviewed publications?
24       A.   Yes.

Page 52

1        Q.   And in this 2005 article, does it discuss
2    your research on inflammation and scarring and its
3    relationship to adequate pore size?
4        A.   Yes.
5            MR. ANDERSON:  If we go to the second page of
6        the article and we blow up this left side, if you
7        could draw up some language there and do the
8        photograph underneath it as well.  Thank you,
9        Michael.
10   BY MR. ANDERSON:
11       Q.   Explain to the jury if this has any
12   significance to you in this relationship of pore size
13   of a mesh and patient complications.
14       A.   So this manuscript basically is a summary of
15   these ten-year works.
16       Q.   Ten-year work with Ethicon you mean?
17       A.   With Ethicon where we wanted to develop safer
18   meshes together with them.  And you see an example of
19   small pore meshes on the left side with the number
20   "A" there.  These are very small pores, and these are
21   all filled up by scar tissue, making this rigid mesh
22   scar compound.
23       Q.   Well, it's not filled with scar tissue in
24   this picture.

Page 53

1        A.   No.  These -- these are images from the
2    textile that you're taking out of the box; but if you
3    are placing these meshes into the tissues, then you
4    will find as a result this integration into thick
5    scar tissue, making this small pore net a high risk
6    device for -- with a high risk for getting
7    complications.
8            On the right side you see what is possible,
9    and that is the development that we, together with
10   Ethicon, realized, that we enlarged -- we make the
11   pores much larger, up to 3 to 5 milimeters.  And if
12   you place this textile construction into the tissues
13   and then look afterwards what happens, you will find
14   a very flexible, thin mesh tissue compound which is
15   integrated into fat tissue.  And, therefore, it is a
16   good example that by reduction of the material to 30
17   percent of this of the left side by making the pores
18   larger, that you can improve significantly the
19   reaction of their surrounding tissue.
20       Q.   So when you were talking about wanting to
21   have this good tissue, this fat tissue in the pores
22   or the open spaces, in the figure to the right in B,
23   would that be the area where it's the open diamond
24   space?

14  (Pages 50 to 53)

Prof. Dr. Med. Uwe Klinge

Page 54

1    A.  Yes.
2    Q.  That's the area you want the fat tissue to
3  grow?
4    A.  There we want to have this fat tissue,
5  because this fat tissue keeps it flexible,
6  stretchable, elastic.
7          - - -
8      (Plaintiff's Exhibit No. P1679, PowerPoint
9  presentation entitled "Factors related to mesh
10  shrinkage - What do we know? A review of literature
11  and internal studies", was marked for
12  identification.)
13          - - -
14  BY MR. ANDERSON:
15    Q.  Okay.  I'm going to show you a document,
16  Plaintiff's Exhibit P1679.
17      Have you seen this document before, Doctor?
18    A.  Yes, I've seen it.
19    Q.  And is it something that you saw in this
20  litigation and it is significant to your opinions in
21  this case?
22    A.  Yes, it is.
23    Q.  Okay.  And what is this document, if you
24  would?

Page 55

1    A.  It's an Ethicon document showing or dealing
2  with the factors related to mesh shrinkage.
3    Q.  If we could just turn over, please, to
4  page 12 of this PowerPoint.  And what is the date on
5  the bottom left there?
6      MR. ANDERSON:  If you could blow that up.
7  BY MR. ANDERSON:
8    Q.  What is the date of this PowerPoint, Doctor?
9    A.  It is done in 2007.
10      MR. ANDERSON:  Okay.  Take down the blowup.
11  BY MR. ANDERSON:
12    Q.  And what do we find from this particular
13  slide?
14      MR. ANDERSON:  And if you would highlight the
15  bullet point 2 from this Ethicon PowerPoint.
16      THE WITNESS:  The people who made this, they
17  acknowledge that the pore size has to be more
18  than 1 millimeter to avoid this fibrotic bridging
19  or this dangerous scarring of the holes.
20  BY MR. ANDERSON:
21    Q.  Okay.  So fibrotic bridging, fibrosis relates
22  to what?
23    A.  Scar.
24    Q.  And bridging relates to what?

Page 56

1    A.  Bridging means that the scar is filling out
2  completely the pores, the room in between the fibers,
3  which means a risk.
4    Q.  A risk -- what type of risk, Doctor?
5    A.  A risk for contraction of the scar and the
6  mesh and pain and erosion and dysfunction.
7    Q.  As the pore sizes of a mesh in use are
8  greater than 1 millimeter or 1,000 microns, in your
9  opinion will that reduce the risk of contraction?
10    A.  Yes.
11    Q.  And with pore sizes in use that are less than
12  1,000 microns, or 1 millimeter, in your opinion will
13  that increase the risk of mesh shrinkage or
14  contraction?
15    A.  Definitely, yes.
16      MR. THOMAS:  Just show my objection to
17  leading questions.
18  BY MR. ANDERSON:
19    Q.  Go ahead.
20    A.  So definitely.  A pore size below
21  1 millimeter will increase the risk for scar bridging
22  and will increase the risk for complications.
23    Q.  Dr. Klinge, I now want to talk about another
24  concept with you, and that's about how and when it is

Page 57

1  important to measure the pores of meshes like
2  Prolift.  I know that you asked me to bring a
3  basketball net here today to help provide at least a
4  simple explanation to begin with of the importance of
5  the pore measurements; is that correct?
6    A.  Yes.
7      MR. ANDERSON:  Okay.  Just for demonstrative
8  purposes and for the record, we have marked the
9  basketball net as Plaintiff's Exhibit P3365.
10          - - -
11      (Plaintiff's Exhibit No. P3365, Basketball
12  net, was marked for identification.)
13          - - -
14      MR. ANDERSON:  Are you ready?  Okay.  Thank
15  you.
16  BY MR. ANDERSON:
17    Q.  So, Doctor, explain what you're trying to
18  show the jury here with regard to pore size and pore
19  measurement.
20    A.  So we know that the pore size is critical for
21  the tissue reaction.  We want to have large pores.
22  When you are taking out a net of the box, then the
23  pores may be sufficient; but if you have it in use,
24  if you implanted it and if the surgeon puts some even

Prof. Dr. Med. Uwe Klinge

Page 58

1    slight forces to it, you see that you have this
2    collapse of pores, that even very small pores can get
3    very, very small.  And, therefore, by applying these
4    forces to a net, it can make a large pore net to a
5    small pore net and, thereby, increases the risks
6    considerably.
7        Q.  So in your opinion, in terms of patient
8    safety, when is it important to look at the greatest
9    distance between the fibers?  Before it goes in the
10   body or after?
11           MR. THOMAS:  Objection.
12       Q.  Or after it's used?
13           MR. THOMAS:  Objection; foundation, expertise
14   designation.
15   BY MR. ANDERSON:
16       Q.  Go ahead, Doctor.
17       A.  You have to take into account that any force
18   can lead to a pore collapse, and if you want to use a
19   mesh in an area where these forces may occur, then,
20   of course, you have to analyze the pore size in use.
21       Q.  Doctor, did you do testing on the Prolift
22   mesh to determine what would happen to the Prolift
23   pores when stretch forces are applied, for instance,
24   when the Prolift is going to be implanted in a woman?

Page 59

1    Did you do testing?
2        A.  We did it.
3        Q.  Please explain just generally the testing
4    that you were involved in regarding looking at the
5    pores after forces are applied to them.
6        A.  In 2005 I met with a colleague of mine from
7    the technical university, Prof. Dr. Thomas Mühl, and
8    we wanted to develop a machine that makes it possible
9    to really measure pore sizes and to really give a
10   measurement what happens to the pores when applying
11   some forces to it.  We want to have a measurement
12   that is reproducible, that is objective, and that is
13   reliable.  And this has not been done before and,
14   therefore, we developed this machine and finally
15   could finish our work in 2007.
16       Q.  Was that work published in the peer-reviewed
17   literature?
18       A.  Yes.  We publish everything and didn't want
19   to restrict it because we -- we want to make it
20   public so that everyone can use this way to optimize
21   his research and development.
22       Q.  And when was that information published in
23   the peer-reviewed literature?
24       A.  We published this, the technique, the

Page 60

1    machine, the details of it in 2007, and later on some
2    of the results in 2013.
3        Q.  And do those peer-reviewed publications cover
4    all of the protocols and the test methods and the
5    setup and analysis of the testing?
6        A.  Yes.  In every detail.
7        Q.  And did one of those publications actually
8    involve testing of the Prolift device on this machine
9    in order to investigate the pores after stretch is
10   applied?
11       A.  Yes, it is.
12       Q.  And were you involved in the development of
13   the testing and the protocols and parameters for the
14   pore testing for that 2013 article looking at the
15   Prolift mesh?
16       A.  Yes, I was involved in all of this, and I was
17   the medical doctor who was responsible for the
18   interpretation and analysis of this data.
19       Q.  Did the testing that was published by you in
20   2013 include testing on the Prolift arms?
21       A.  Yes, it did.
22           ---
23       (Plaintiff's Exhibit No. PLT0697, Article
24   entitled "Elongation of textile pelvic floor implants

Page 61

1    under load is related to complete loss of effective
2    porosity, thereby favoring incorporation in scar
3    plates", was marked for identification.)
4           ---
5    BY MR. ANDERSON:
6        Q.  I'm showing you what has been marked as
7    Plaintiff's Exhibit PLT0697.  Doctor, is this that
8    2013 publication regarding your testing of the
9    Prolift device?
10       A.  Yes, it is.
11           MR. ANDERSON:  If you would hit that.  Yeah.
12   BY MR. ANDERSON:
13       Q.  And if you could please go with me to page 5.
14   And we have blown up the left-hand side and have some
15   images as well as the figure box below that.
16           What are we seeing here, Doctor, in terms of
17   the testing in this scientific research that you did?
18       A.  In the upper part you are just seeing an
19   image of the Gynemesh PS or the Prolift mesh without
20   applying any tension to it.  You see the black lines.
21   These are the fibers, and the room in between these
22   are the pores.
23       Q.  And, Doctor, how much force was applied to
24   the Prolift arms that we're seeing in this testing

16 (Pages 58 to 61)

Prof. Dr. Med. Uwe Klinge

Page 62

1  that was published in 2013?
2      A.  So, yeah, I forgot to explain.  The lower
3  image shows the same structure when applying some
4  force to it.  So you see the same change as you see
5  with the basketball net.  When you apply some forces
6  to it, you find -- you see a collapse of the pores.
7  The pores -- the force that we applied in this
8  experiment was 4.9 newton.  That is around one pound.
9      Q.  How did you determine what forces you were
10  going to place on the Prolift arms during this
11  testing that's published in 2013?
12      A.  We had been looking to the many Ethicon
13  internal documents, and we wanted to keep below their
14  limits what they assume to be reasonable limits, and
15  we found two references, at least two references.
16      Q.  And when you're saying references, are you
17  talking about references in the Ethicon documents to
18  the foreseeable amounts of forces that would be
19  placed on the arms during the implantation of the
20  Prolift?
21      A.  Yes.
22          ---
23      (Plaintiff's Demonstrative Exhibit No. P3360,
24  PowerPoint slide, a blowup referencing PLT0697,

Page 63

1  "Elongation of textile pelvic floor implants under
2  load is related to complete loss of effective
3  porosity, thereby favoring incorporation in scar
4  plates", was marked for identification.)
5          ---
6  BY MR. ANDERSON:
7      Q.  Okay.  And we created a slide, I think, to
8  help the jury with that demonstrative, Plaintiff's
9  Exhibit 3360.
10      MR. ANDERSON:  If you could just put in those
11  two references.
12  BY MR. ANDERSON:
13      Q.  And, Doctor, are these the two references
14  from the Ethicon documents regarding two different
15  estimated forces that may be placed on the arms?
16      A.  Yes.  In these two documents you find either
17  5 pounds in the one document or even 12 pounds in the
18  other, and so we wanted to be below this range, not
19  to show that there is a collapse with extremely high
20  forces, but we want to know what happens to pores
21  when applying just 1 pound.
22          ---
23      (Plaintiff's Exhibit No. P0777, Ethicon
24  document, Form for Test Method

Page 64

1  Applicability/Suitability, Bates stamped
2  ETH.MESH.01992234 through ETH.MESH.01992237, was
3  marked for identification.)
4          ---
5  BY MR. ANDERSON:
6      Q.  I'm showing you, Doctor, what the plaintiffs
7  have marked and is noted on the slide as Plaintiff's
8  0777, is this the document where they estimated
9  approximately 5 pounds of force?
10      A.  Yes, it is.
11      Q.  And does 2.3 newtons per centimeter estimate
12  to about 5 pounds of force?
13      A.  Yes.
14          ---
15      (Plaintiff's Demonstrative Exhibit No. P3357,
16  Document Bates stamped ETH-01755, was marked for
17  identification.)
18          ---
19  BY MR. ANDERSON:
20      Q.  Okay.  And then showing you what has been
21  marked as Plaintiff's Exhibit P3357, is this the
22  document that you referenced in terms of Ethicon
23  stating that you could estimate 12 pounds of force by
24  the surgeon being placed on the Prolift arms during a

Page 65

1  Prolift procedure?
2      A.  Exactly.
3      Q.  Okay.  Thank you.
4          Doctor, what is the significance of your
5  findings with regard to the mesh that we see that has
6  had 1.1 pounds of force applied to it in terms of the
7  tissue response in the patient?
8      A.  It clearly demonstrates and confirms that you
9  have a change of the pore size when applying some
10  force to it and that even very low forces can lead to
11  very, very small pore mesh -- meshes; and, therefore,
12  the application of slight forces changing the
13  appearance of a mesh like this will increase risks.
14      Q.  Okay.  Well, put it simply, what does that
15  mesh on the bottom mean to the patient?
16      MR. THOMAS:  Objection; foundation,
17  expertise.
18  BY MR. ANDERSON:
19      Q.  Yeah.  I think we've laid your foundation for
20  expertise.  Go ahead, Doctor.
21      A.  The mesh will mean increased risk for scar
22  bridging, shrinkage, contraction, pain, erosion.
23      Q.  Okay.  In your review of the internal Ethicon
24  documents in this case, did you determine whether

17 (Pages 62 to 65)

Prof. Dr. Med. Uwe Klinge

Page 66

1    Ethicon's scientists had considered your and
2    Dr. Mühl's pore testing publications and the effects
3    of mesh pore size under strain?
4        A.  Yes, I did.
5                     ---
6            (Plaintiff's Exhibit No. P0829, E-mail chain
7    and article entitled "New Objective Measurement to
8    Characterize the Porosity of Textile Implants," Bates
9    stamped ETH.MESH.02184130 through ETH.MESH.02184138,
10   was marked for identification.)
11                    ---
12   BY MR. ANDERSON:
13       Q.  Let's pull up the two documents so the jury
14   can see what we're talking about.
15           I'm handing you what has been premarked as
16   Plaintiff's Exhibit P0829.  Have you seen this
17   document before, Dr. Klinge?
18       A.  Yes, I've seen.
19       Q.  Is this something you considered and reviewed
20   in arriving at your opinions in this case?
21       A.  Yes.
22       MR. ANDERSON:  If we could blow up the top
23       part of this and also show the attachment that
24       goes with this article -- with this internal

Page 67

1        Ethicon e-mail.  Yes.
2    BY MR. ANDERSON:
3        Q.  Explain what the significance is to you of
4    this e-mail in 2008 as well as the attachment.
5        MR. THOMAS:  Objection; calls for Ethicon's
6        state of mind.
7        THE WITNESS:  They are circulating our
8        manuscript that we published in 2005 as a
9        sophisticated method to measure porosity, so they
10       have been aware of it.
11                    ---
12           (Plaintiff's Exhibit No. P1437, October 7,
13   2010, e-mail and article entitled "New Objective
14   Measurement to Characterize the Porosity of Textile
15   Implants," Bates stamped ETH.MESH.04945136 through
16   ETH.MESH.04945144, was marked for identification.)
17                    ---
18   BY MR. ANDERSON:
19       Q.  Okay.  Let me show you another document which
20   is Plaintiff's Exhibit 1437, which is another e-mail,
21   an Ethicon e-mail, this one dated 2010, from a
22   Dr. Joerg Holste to a Dr. Juergen Trzewik.  Do you
23   know Dr. Joerg Holste?
24       A.  Yes, I know.  He is a leading scientist in

Page 68

1    Hamburg, Ethicon.
2        Q.  Did you work with him in the last 20 years?
3        A.  He was a member of the working group that has
4    been working together with us.
5        Q.  And if we see the attachment to this e-mail,
6    two years later what do you find here, Doctor?
7        MR. THOMAS:  Objection; postdates
8        Ms. Bellew's surgery, and there is nothing here
9        to comment on other than the fact it's just a
10       transmittal letter.
11   BY MR. ANDERSON:
12       Q.  Go ahead, Doctor.
13       A.  In 2010 they again circulated it to the
14   members of their research groups.
15                    ---
16           (Plaintiff's Exhibit No. P1087, PowerPoint
17   presentation entitled "Thunder: Technical Review,
18   Somerville 28th February 2008", was marked for
19   identification.)
20                    ---
21   BY MR. ANDERSON:
22       Q.  I'm showing you what has been marked as
23   Plaintiff's Exhibit P1087.
24           Have you seen this document before,

Page 69

1    Dr. Klinge?
2        A.  Yes, I've seen it.
3        Q.  And is it significant to your opinions in
4    this case today?
5        A.  Yes, it is.
6        Q.  And what generally is this document?
7        A.  It's a technical review from Ethicon.
8        Q.  And what year is this dated?
9        A.  It's made from 2008.
10       Q.  If you would turn, please, over to page 21 of
11   Plaintiff's Exhibit 1087.  Is this slide of the
12   PowerPoint something you've seen before?
13       A.  Yes, I've seen it.
14       Q.  And is this significant to your opinions with
15   regard to a pore collapse and pore deformation and
16   its relation to patient injury?
17       A.  Yeah.
18       Q.  Okay.  What do you see here, Doctor, that you
19   would like to point out to the jury?
20       MR. ANDERSON:  Highlight 4.
21       A.  So in this definition of the requirements to
22   improve, as it is said in the subtitle, "Improving
23   lives by advancing the standard of care in tissue
24   repair," they identify it as an important point to

18 (Pages 66 to 69)

Prof. Dr. Med. Uwe Klinge

Page 70

1    improve this -- these results, shrinkage and
2    stiffening; and they defined a pore size of more than
3    3 millimeter as being essential, and for the first
4    time they mentioned a pore size of 1 millimeter under
5    stretch. So they acknowledged that you have to look
6    to the pore size and use additionally to the pore
7    size in the box or without any forces.
8         MR. THOMAS: Objection; move to strike. Goes
9    beyond what the document says.
10   BY MR. ANDERSON:
11   Q.  I want to go back to a document previously
12   used, which was Plaintiff's Exhibit 1156. We looked
13   at this with the jury a little earlier today, and --
14        MR. THOMAS: Can you give me just a second,
15   please?
16        MR. ANDERSON: Sure.
17        MR. THOMAS: Thank you. I have it now.
18   BY MR. ANDERSON:
19   Q.  Okay. If you go to page 13 of this 2008
20   Ethicon PowerPoint, have you seen this slide before,
21   Doctor?
22   A.  Yes, I've seen it.
23   Q.  And is that significant to your opinions in
24   this case?

Page 71

1    A.  Yes.
2         MR. ANDERSON: Okay. Highlight the left-hand
3    side of this picture.
4    BY MR. ANDERSON:
5    Q.  What are we seeing here, Doctor?
6    A.  So in this image you see the same phenomenon
7    as we have seen in -- with the basketball net, that
8    when applying some forces, the pores collapse and you
9    will create a small pore mesh.
10   Q.  We see the word "effective porosity" there.
11   What's that refer to?
12   A.  Effective porosity, that's exactly the term
13   that we were able to define with the testing that we
14   do a lot of, Professor Mühl. So they adopted this
15   terminology in --
16   Q.  Just explain that real simply for the jury,
17   what effective pores would be.
18   A.  So effective pores means that is the area of
19   the good pores roughly. So the good pores are those
20   with fat. If you start with half of the pores are
21   filled by fat in the upper line, then it's going to
22   zero in the lower if you applied some force to it.
23   So you only have small pores, noneffective, poor
24   pores, risky pores in the lower part when you apply

Page 72

1    the force to it.
2    Q.  Thank you, Doctor.
3                   - - -
4         (Plaintiff's Exhibit No. P2995, PowerPoint
5    presentation entitled "Mesh Properties - How
6    important are they?" was marked for identification.)
7                   - - -
8    BY MR. ANDERSON:
9    Q.  Going -- I want to show you now Plaintiff's
10   Exhibit P2995. Is this a document that you have
11   reviewed and relied upon in this litigation?
12   A.  Yes, I did.
13   Q.  And what is this, Doctor?
14   A.  This is a PowerPoint presentation from
15   Ethicon.
16   Q.  And if we would go to slide 25 of this
17   presentation by Ethicon.
18   A.  Yes.
19   Q.  Is that significant to your opinions that
20   you're offering here regarding pore size and pore
21   deformation after stretch is applied?
22   A.  Yes, it is.
23   Q.  Okay. Please explain for the jury.
24   A.  Because this figure wants to express in the

Page 73

1    title already that large pores become very small
2    under stress, and it was in contrast to the previous
3    one, which was a drawing. It shows that was an
4    Ethicon experiment showing or trying to demonstrate
5    what happens to the textile structure to the pores
6    when applying a force to it.
7    Q.  As part of your review of the materials in
8    this case, did you see the Ethicon video of a Prolift
9    anterior actually being implanted in a woman?
10   A.  Yes, I did.
11   Q.  And is that video significant to your
12   opinions in this case?
13   A.  Yes, it is.
14   Q.  Okay. I don't want to have to show the jury
15   the entire video because they may have already seen
16   it, but did you ask me to create some screenshots
17   from that video?
18   A.  Yes.
19   Q.  Okay. And did we create a slide showing
20   these videos --
21   A.  Yes.
22   Q.  -- these screenshots for the jury?
23   A.  Sorry.
24   Q.  Sorry. Yes?

19 (Pages 70 to 73)

Prof. Dr. Med. Uwe Klinge

Page 74

1      A.  Yes.
2                    ---
3          (Plaintiff's Demonstrative Exhibit No. P3361,
4      PowerPoint slide entitled "Pores Collapse Under
5      Tension," referencing P2995, ETH.MESH.05237872, PLT
6      0697, P1452 - ETH.MESH.000007, was marked for
7      identification.)
8                    ---
9      BY MR. ANDERSON:
10         Q.  Okay.  I'll put up this next slide which
11     we'll use for demonstrative as P3361.  Just one
12     second.  Go ahead.
13         MR. THOMAS:  Before you show that to the
14     jury, are you representing that this is
15     Ms. Bellew's surgery?
16         MR. ANDERSON:  If I did, I would have said
17     that.
18         MR. THOMAS:  That's why I show my objection
19     to this not being representative of Ms. Bellew's
20     surgery.
21         MR. ANDERSON:  It's okay.  It's your
22     document.
23     BY MR. ANDERSON:
24         Q.  So showing you Plaintiff's Exhibit P3361,

Page 75

1      over to the right is that a screen shot from a DVD
2      produced by Ethicon of Ethicon surgeons implanting a
3      Prolift anterior into a woman?
4          A.  Yes.
5          Q.  Okay.  So you asked me to put these three
6      images together.  Why did you ask me to do that?  Why
7      do you think that's important for the jury to see,
8      Doctor?
9          A.  Because it makes very clear that we have to
10     deal with a realistic problem.  On the left you see
11     the image from the Ethicon study where they just
12     described it.
13         In the middle you see an image of our testing
14     where we tried to measure it to quantify the
15     consequences to different forces.
16         And on the right you see exactly the same
17     deformation, the same roping of the arms during the
18     OR.  So the collapse of pores is a real phenomenon.
19         Q.  So whether we can take the Ethicon document
20     that says 5 pounds of force is placed by the surgeon
21     on the arms during implant or 12 pounds of force
22     during implant, this image to the right, is this the
23     resulting characterization of the mesh arm after
24     either 5 or 12 pounds of force are placed on it?

Page 76

1          A.  Obviously the forces in the OR when in use
2      are too high for this specific design of this mesh,
3      leading to this roping, even in this teaching video.
4          MR. THOMAS:  Objection; move to strike,
5          beyond the area of expertise and not a disclosed
6          opinion.
7          MR. ANDERSON:  It certainly was disclosed
8          opinions, and the videos are in his reliance
9          materials.  And he talked about initial force, 12
10         pounds of force.  He talks about 5 pounds of
11         force.  He says that when you use the applied
12         loads that Ethicon used that you get to see pore
13         deformation.  He said that you see it from
14         Ethicon's documents, his documents and the DVD.
15     BY MR. ANDERSON:
16         Q.  Okay.  So if we can just zoom in on this
17     Ethicon DVD on the right-hand side produced by
18     Ethicon in this litigation, is that significant to
19     your opinions?  Is that what you were discussing with
20     the jury of how the mesh is curled and roped and
21     deformed?
22         A.  Yes.
23         MR. THOMAS:  Same objection.
24         THE WITNESS:  Exactly.  So this is not longer

Page 77

1      any large pore mesh design.  This rope will be
2      integrated into dense scar tissue and nothing --
3      nothing else, and it will become stiff and rigid.
4      BY MR. ANDERSON:
5          Q.  Is that appearance of the arm right there, is
6      that what it looks like when it comes out of the
7      Ethicon box?
8          A.  No, definitely not.
9          MR. ANDERSON:  Okay.  You can take that down.
10         Oh, actually, bring that back up.
11     BY MR. ANDERSON:
12         Q.  Do you have an opinion to a reasonable degree
13     of medical and scientific certainty as to whether the
14     mesh arms that the jury is seeing in the right-hand
15     picture would result in unnecessary risk to the
16     tissues?
17         MR. THOMAS:  Objection; beyond his area of
18         expertise.
19         THE WITNESS:  The appearance of such a mesh
20         in this roping form means a considerable risk,
21         and because it is -- there is no need for this,
22         it is an unnecessary risk.
23     BY MR. ANDERSON:
24         Q.  And would that unnecessary risk involving the

Prof. Dr. Med. Uwe Klinge

Page 78

1    tissue response, would that risk be the same with
2    mesh of this appearance whether it was in the
3    abdominal tissue, the pelvic tissue or the tissue
4    under your armpit?
5         MR. THOMAS: Same objection.
6         THE WITNESS: A mesh curled like this,
7    getting these small pores like this one will
8    result everywhere in the body in a scar mesh
9    compound that is stiff and rigid and not flexible
10   any longer.
11        MR. ANDERSON: You can take that down.
12   BY MR. ANDERSON:
13        Q.  After your review of all the materials in
14   this case regarding Ethicon's meshes for treating
15   pelvic organ prolapse, all of your work that you've
16   done in the scientific literature, conferences you've
17   spoken at around the world, the conferences you've
18   spoken as an invited lecture by Ethicon, and your
19   work as a hernia surgeon both implanting and
20   explanting polypropylene meshes, your work in
21   reviewing thousands of hernia mesh explants from
22   humans, your review of looking at explants from
23   pelvic floor -- from the pelvic floor in women, do
24   you have an opinion to a reasonable degree of medical

Page 79

1    and scientific certainty as to whether the Prolift
2    was a safe design or an unsafe defective design?
3         MR. THOMAS: Objection.
4         A.  I have --
5         MR. THOMAS: Excuse me.  Just let me base my
6    objection to the foundation that he's laid.  Go
7    ahead.
8    BY MR. ANDERSON:
9         Q.  Do you?
10        A.  I have.
11        Q.  Okay.  And what is that opinion, Dr. Klinge?
12        A.  The Prolift carries unnecessary risk and,
13   therefore, it's unsafe.
14        Q.  Doctor, did we prepare a slide for the jury
15   regarding your opinions of what you consider to be
16   the critical design defects in the Prolift?
17        A.  Yes.
18            ---
19        (Plaintiff's Demonstrative Exhibit No. P3362,
20   PowerPoint slide entitled "Prolift Unsafe/Defective
21   Mesh Design", was marked for identification.)
22            ---
23        MR. ANDERSON: Okay.  If we could show that.
24   That is Plaintiff's Demonstrative 3362.

Page 80

1    BY MR. ANDERSON:
2         Q.  Is this the PowerPoint that you wanted me to
3    prepare, Doctor?
4         A.  Yes.
5         Q.  Okay.  You have a point there, "Less
6    Material = Safer," under the heading "Prolift
7    Unsafe/Defective Mesh Design."  What do you mean by
8    this first bullet point?
9         A.  It became clear from all our work that less
10   material would reduce the risk of inflammation and
11   scarring, so less material will make it safer and
12   there is no need for this amount of material as it is
13   used for the Prolift.
14        Q.  Okay.  Let's go to your next point.
15        A.  From all our work, it is evident and clear
16   and undoubted that large pore -- larger pores will
17   make it safer.  They will help that the pores are
18   filled by fat tissue, keeping it flexible.  So,
19   therefore, larger pores would make it safer, and
20   there is no need for the small pores of the Prolift.
21        Q.  And your third point?
22        A.  The pores have to resist a collapse when
23   applied, some forces that we have seen that these
24   forces have been applied.  And, therefore, a mesh

Page 81

1    design that avoids this collapse under forces would
2    be much safer, and there is no need that you bring in
3    a mesh that shows this roping.  There is no need,
4    and, therefore, all these three points are
5    unnecessary risks.
6         Q.  After all of your review of the thousands of
7    pages of depositions, the internal Ethicon documents,
8    all the things that we've been just covered
9    throughout your testimony today as well as your work
10   with Ethicon as a consultant for ten years and over
11   20 years of work in the field, do you have an opinion
12   to a reasonable degree of medical and scientific
13   certainty as to whether the Prolift was safely
14   designed to be permanently implanted in a woman's
15   pelvis?
16        A.  Yes.
17            MR. THOMAS: Objection; foundation,
18   expertise.
19   BY MR. ANDERSON:
20        Q.  Now answer the question.
21        A.  Yes.
22        Q.  And what is that opinion, Doctor?
23            MR. THOMAS: Same objection.
24   BY MR. ANDERSON:

21 (Pages 78 to 81)

Prof. Dr. Med. Uwe Klinge

Page 82

1    Q.  Now go.
2    A.  Because it carries unnecessary risk.  It is
3 designed unsafe and defective.
4        MR. ANDERSON:  Thank you.  No further
5    questions at this time.
6        THE VIDEOGRAPHER:  We are off the record.
7    The time is 10:22 a.m.
8 (A recess was taken from 10:22 a.m. until 10:33 a.m.)
9        THE VIDEOGRAPHER:  This marks beginning of
10   Video Number 2.  We are back on the record.  The
11   time is 10:33 a.m.
12            CROSS-EXAMINATION
13 BY MR. THOMAS:
14   Q.  Good morning, Dr. Klinge.
15   A.  Good morning.
16   Q.  You're an expert that's been retained by
17 Mr. Anderson in this case; is that correct?  Expert
18 witness?
19   A.  Yes.
20   Q.  And you're paid for the time that you spend
21 working on this matter?
22   A.  Yes.
23   Q.  And you're paid at the rate of $500 an hour;
24 is that right?

Page 83

1    A.  Yes.
2    Q.  How much money have you been paid to work on
3 this case?
4        MR. ANDERSON:  Objection.  You mean Bellew?
5        MR. THOMAS:  Yes.
6        MR. ANDERSON:  The Bellew case.
7        THE WITNESS:  It's about $20,000, included
8    the tax.  In Germany you have to reduce it almost
9    by half.
10 BY MR. THOMAS:
11   Q.  Okay.  And in preparation for your deposition
12 today, you met with Mr. Anderson?
13   A.  Yes.
14   Q.  And how many days did you meet with
15 Mr. Anderson?
16   A.  Three days.
17   Q.  Okay.  And how many hours did you spend with
18 Mr. Anderson in preparation for your deposition?
19   A.  Six hours a day.
20   Q.  So about 18 hours?
21   A.  Maybe.
22   Q.  So about $9,000; correct?
23   A.  Yeah.
24   Q.  All right.  Now, from the mid-1990s to 2006,

Page 84

1 you were a practicing surgeon with a focus on
2 abdominal hernia repairs; correct?
3    A.  No.  Ah.
4    Q.  What?
5    A.  Yeah.  So I just understand.  I was an
6 abdominal surgeon with the focus on hernia surgery.
7 That is okay, yeah.
8    Q.  Okay.  Fine.  Thank you.
9        And I'm not trying to trick you.  If you
10 don't understand my question, let me know, and I'll
11 try to rephrase it.  I know that English is not your
12 first language, and I'll do the first I can.
13   A.  And I am not sure every time.
14   Q.  And I speak West Virginian.  I don't speak
15 German.
16       Doctor, you've not performed surgery since
17 2006, have you?
18   A.  Not in humans.
19   Q.  Okay.  And prior to 2006, you treated
20 hernias?
21   A.  Yes.
22   Q.  And a hernia is essentially an organ pushing
23 through the abdominal wall; correct?
24   A.  Not always.

Page 85

1    Q.  Why can you not describe a hernia as an organ
2 pushing through the abdominal wall?
3    A.  Because there are hernias, for example, close
4 to the esophagus, through the diaphragm, where you
5 have a hernia, but it is not a defect in the
6 abdominal wall.
7    Q.  Okay.  Well, you could repair hernias with
8 sutures; is that correct?
9    A.  You can try to repair it by sutures, yes.
10   Q.  And sutures are sometimes called stitches?
11   A.  Yes.
12   Q.  And sutures and stitches are the Prolene that
13 you showed to the jury on direct examination;
14 correct?
15   A.  There are many kind of different sutures,
16 different suture materials, and one of the suture
17 material is Prolene.
18   Q.  And when you repair a hernia with sutures,
19 you basically put the tissue back in place and then
20 support it with the stitches; correct?
21   A.  The stitches are supported to keep the
22 approximation of the tissues together, yeah.
23   Q.  Okay.  And you can also treat hernias with
24 surgical mesh; correct?

22 (Pages 82 to 85)

Prof. Dr. Med. Uwe Klinge

Page 86

1     A.  Yes.
2     Q.  And you can repair hernias with polypropylene
3   mesh; correct?
4     A.  Yes.
5     Q.  There are about 20 million surgical mesh
6   implantations every year; true?
7     A.  That is said by Saunders in his reference.
8   Whether it's true, I didn't count it.
9     Q.  And abdominal hernia repair is the most
10  frequently performed operation and surgery; correct?
11    A.  That is correct.
12    Q.  And the use of mesh to repair hernias is an
13  important option for patients; true?
14    A.  Yes.
15    Q.  Polypropylene is the most widely used mesh
16  for hernia repair; true?
17    A.  That should be true.
18    Q.  And mesh implants made of polypropylene have
19  been used in the human body since 1963; true?
20    A.  That is true.
21    Q.  And Ethicon began selling Prolene mesh for
22  hernia repair in 1974?
23    A.  Yeah.
24    Q.  And the Prolene mesh that's used to repair

Page 87

1   hernias is the same material that is used to make
2   Prolene soft in the Prolift; correct?
3     A.  Please, can you --
4     Q.  Prolene mesh used in hernia repair is made of
5   the same polypropylene material that is used to make
6   Prolene soft for use in the Prolift?
7     A.  I think so, yeah.
8     Q.  Now, you started implanting polypropylene
9   mesh for hernia repair in the early 1990s; true?
10    A.  Yes.
11    Q.  And you performed about 200 hernia repairs
12  using mesh; correct?
13    A.  Yes.
14    Q.  Now, a minute ago you showed the jury
15  Plaintiff's Exhibit 3364, which is the amount of
16  polypropylene that, if taken apart, the Prolift would
17  have in it; correct?
18    A.  Yes.
19    Q.  Well, just so it's clear, you never implant
20  polypropylene in that form into a body, do you?
21    A.  No.
22    Q.  The polypropylene is woven or knitted into a
23  mesh so it can be implanted; correct?
24    A.  Yes.

Page 88

1     Q.  And we don't have a Prolift here, but the
2   Prolift itself does not look like Exhibit 3364;
3   correct?
4     A.  Yes.
5     Q.  Now, the hernia meshes that you used to
6   repair hernias are often bigger than the meshes used
7   in the pelvic floor to repair a pelvic organ
8   prolapse; correct?
9     A.  The meshes can be bigger, but the area for
10  implantation is completely different.
11    Q.  So are you telling the jury that implanting a
12  mesh in the abdominal area is different from
13  implanting a mesh in the pelvic floor?
14       MR. ANDERSON:  Objection.
15       THE WITNESS:  Yes.
16       MR. ANDERSON:  Go ahead.
17  BY MR. THOMAS:
18    Q.  Stay with me, though, for a minute.  But the
19  amount of mesh that you implant in the abdominal area
20  to repair hernias is often much more than the amount
21  of mesh that's used in this anterior Prolift that you
22  have described in P3364; correct?
23    A.  It was correct before we developed together
24  with Ethicon these large pore meshes, which have a

Page 89

1   reduced amount of material.  We could reduce the
2   amount of polypropylene to 30 percent of these
3   heavyweight small pore meshes, and, therefore, it is
4   difficult.  It depends from -- from the specific size
5   of the mesh.  Then you can do this calculation and
6   look whether it exactly fits or whether it's a little
7   bit more.
8     Q.  Meshes that you used before 2006 to implant
9   into humans for the repair of hernias had more
10  polypropylene in them than the polypropylene that you
11  showed the jury in 3364; correct?
12    A.  2006 you said?
13    Q.  Before 2006.  You implanted meshes --
14    A.  We --
15    Q.  -- some meshes that had more polypropylene
16  than is present in 3364.
17    A.  After our development of Vypro of these large
18  pore meshes with Ethicon, we only use these
19  material-reduced methods; and, therefore, the use of
20  this huge amount of material was very, very rare.
21    Q.  You know today that mesh is used in the
22  repair of hernias by a doctor every single day, in
23  Germany, in the United States, everywhere around the
24  world that has more mesh than is present in 3364,

23 (Pages 86 to 89)

Prof. Dr. Med. Uwe Klinge

Page 90

1    don't you?
2        A.  I know that in Germany 90 percent -- more
3    than 90 percent of the meshes used for hernia repair
4    are large pore meshes.
5        Q.  And what meshes are those specifically?
6        A.  These are Ultrapro.  Ultrapro is the leading
7    from Ethicon.
8        Q.  Okay.  Are you saying Ultrapro is appropriate
9    for the pelvic floor?
10       A.  No.
11       Q.  So just so your testimony is clear, it's not
12   your opinion that Ultrapro is an appropriate mesh to
13   treat pelvic organ prolapse in the pelvic floor;
14   true?
15       A.  If you stick to the third point we presented
16   there, that it has to prevent a pore collapse -- and
17   Ultrapro obviously does not prevent a pore collapse
18   when applied to forces; therefore, it is not the best
19   idea to use Ultrapro in this -- for this indication,
20   yes.
21       Q.  It's true that you do not have the opinion
22   that Ultrapro is a reasonable alternative design for
23   the use of mesh in the treatment of pelvic organ
24   prolapse; true?

Page 91

1        MR. ANDERSON:  Objection to form.
2        THE WITNESS:  As it carries unnecessary risk,
3    I am sure that it is not a safe alternative.
4    BY MR. THOMAS:
5        Q.  Okay.  Now, when you started implanting mesh
6    for hernia repair, you didn't understand all of the
7    biomechanical demands of the abdomen; true?
8        A.  It is a permanent learning that I have when I
9    started surgery.  I don't know, but I permanently
10   learned about it.  And we learned a lot about these
11   meshes, and, of course, when we started to make this
12   research, we didn't know everything.
13       Q.  Are you able to answer my question yes or no?
14   Let me ask it again.
15       When you started implanting mesh for hernia
16   repair, you didn't understand all of the
17   biomechanical demands of the abdomen; true?
18       A.  What do you think of "all"?
19       Q.  Doctor, let me hand you your deposition that
20   you gave.
21       I'm sorry.  It's the wrong one.
22       No.  I was right.
23       MR. ANDERSON:  Thank you, Counsel.
24   BY MR. THOMAS:

Page 92

1        Q.  Turn to page 89 of the deposition, please.
2        MR. ANDERSON:  I think you gave me two
3    copies, Counsel.  Yeah.  You gave me --
4        MR. THOMAS:  I think there's two days.
5        MR. ANDERSON:  Oh, you're going to need both.
6        THE WITNESS:  98?
7    BY MR. THOMAS:
8        Q.  Page 89, line 16.  You there?
9        "QUESTION:  And, Doctor, in the early '90s
10   the physicians didn't understand all of the
11   biomechanical demands of the abdomen; is that
12   correct?
13       "ANSWER:  There was limited knowledge about
14   the biomechanics of the abdomen."
15       Did I read that correctly?
16       MR. ANDERSON:  Excuse me.  I will object.
17   That is not the same question you asked.  You
18   asked, "Do you know everything," and here you
19   changed the question from this to what it was in
20   the deposition.  So if we were at sidebar, I
21   would have pointed that out to the judge.
22       MR. ANDERSON:  And I understand your objection.
23   BY MR. THOMAS:
24       Q.  Did I read that correctly?

Page 93

1        A.  Yeah.
2        Q.  Okay.
3        MR. ANDERSON:  It's an inappropriate use of
4    the deposition, so that's my objection.
5        MR. THOMAS:  And you stated it clearly.
6    BY MR. THOMAS:
7        Q.  And, Doctor, it's clear that in the '90s
8    physicians didn't understand all of the biomechanical
9    demands of the abdomen; true?
10       A.  There was limited knowledge about the
11   biomechanics of the abdomen.  Still open questions.
12       Q.  Okay.  And when you were performing hernia
13   surgery, it was important for you that the patient
14   understand whether the benefits of that hernia
15   surgery outweighed the risks of that hernia surgery;
16   correct?
17       A.  That is correct.
18       Q.  And it's your job as a doctor to explain the
19   risks of hernia surgery to the patient so the patient
20   can make that informed decision; correct?
21       A.  Yes.
22       Q.  And it's true, Doctor, that any surgery has
23   risks?
24       A.  Which type of risks do you think?

24 (Pages 90 to 93)

Prof. Dr. Med. Uwe Klinge

Page 94

1    Q.  Well, is it true that every hernia surgery
2  has risks?
3    A.  Has some risks.
4    Q.  And it's your job to tell a patient about
5  those risks so that they can make a decision about
6  whether to have the surgery; correct?
7    A.  I have to tell him not that there are
8  possible ways to get some complication, but I have to
9  give him the information that he gets a good estimate
10  how big the risk is, whether there is an alternative
11  with a less risk and what is the benefit.
12    Q.  And --
13    A.  So is it a necessary risk or is it an
14  unnecessary risk?  And all this together I have to
15  discuss with the patient.  It is not so simple to say
16  there are some risks.
17    Q.  And you tell the patient that there is a
18  lifelong risk of infection from that mesh implant,
19  wouldn't you?
20    A.  From the moment we know there is a -- that we
21  learn that there was this permanent inflammation that
22  you have a lifelong risk for infection.  You have an
23  implant.  They received an implant.  It's not a
24  tissue repair.  They received a plastic implant for

Page 95

1  the rest of their lives.
2    Q.  And anytime you have a plastic implant,
3  there's a risk, a lifelong risk of an infection;
4  true?
5    A.  Yes.
6    Q.  And that would be for a hip or for a knee
7  just as well as a mesh; correct?
8    A.  But the numbers are different, and it is
9  different to treat it.
10    Q.  Answer to my -- Doctor, it's fair to say that
11  there's a lifelong risk of infection from mesh, just
12  like there's a lifelong risk of infection from a hip
13  implant or a knee implant?  Yes or no.
14    MR. ANDERSON:  Objection; beyond the scope of
15  cross -- beyond the scope of direct.
16    THE WITNESS:  If you are thinking of the
17  principal possibility of a lifelong risk to get
18  an infection, yes.
19  BY MR. THOMAS:
20    Q.  Thank you.
21    And when you're talking to a patient about
22  the risks of hernia repair, you talk to a patient
23  about the risk of a late onset of chronic pain;
24  correct?

Page 96

1    A.  This topic surely is mentioned with the
2  patient, that chronic pain may be a serious
3  complication after operation, yes.
4    Q.  And when you say late onset, that means that
5  this pain does not manifest itself until after the
6  surgery sometime; correct?
7    A.  Yes.
8    Q.  And you also tell patients that hernia mesh
9  is difficult to remove; true?
10    A.  Yes.
11    Q.  And you talk to a patient about a risk of
12  hernia recurrence?
13    A.  Yes.
14    Q.  And a hernia recurrence means that the mesh
15  repair did not work and the hernia repair comes back;
16  correct -- excuse me, the hernia comes back; is that
17  correct?
18    A.  There are different definitions of
19  recurrence, and where the hernia comes back, whether
20  it's really a problem that the mesh doesn't work,
21  whether it's a new hernia that is for the patient a
22  recurrence.  So it is not so simple, but we are
23  discussing the manifestation of another hernia
24  despite using a mesh.

Page 97

1    Q.  And a patient needs to know that there's a
2  risk that the surgery won't work; correct?
3    A.  Yes.
4    Q.  And you talk to a patient who is looking at a
5  potential hernia repair with mesh about the risk of
6  mesh shrinkage; correct?
7    A.  Yes.
8    Q.  And any mesh will have a shrinkage or
9  contracture rate of at least 20 percent; correct?
10    A.  At least 20 percent?  The difference is the
11  extent of this one.
12    Q.  Any -- any mesh -- it's true that any mesh
13  will have a shrinkage or contracture rate of at least
14  20 percent; correct?
15    A.  There may be some conditions where it's a
16  little bit lower, but, yeah, sure, more or less it
17  is.  You have to assume a contraction of 20 percent.
18    Q.  And when you were treating patients for
19  hernia repairs, you explained all of these risks to
20  the patient so the patient would understand?
21    A.  But in a completely different way.
22    Q.  Is that true?
23    A.  I explained these risks to the patients.
24    Q.  So when you used polypropylene mesh for

25 (Pages 94 to 97)

Prof. Dr. Med. Uwe Klinge

Page 98

1  hernia repair, you believed that the benefits of that
2  mesh outweighed any risks to your patient; true?
3      A.  In some specific patients in some specific
4  conditions where we are discussing the alternatives,
5  we are discussing the risks of the patient's
6  conditions, the risk of the procedure, the risk of
7  the biomaterials, all this together will end up in
8  the risk-benefit ratio.  And when you have all this
9  information, how often something occurs, then you can
10 discuss it with the patient and you can make your
11 decision, yes.
12     Q.  Well, when you recommended mesh to a patient
13 for the repair of their hernia, you believed that the
14 mesh that you were going to use, the benefits of that
15 mesh outweighed the risk to the patients; true?
16     A.  In those patients where I am using meshes, I
17 have been using meshes, the decision of me and the
18 patient was that in this case the use of a specific
19 mesh in a specific way outweighs the risks.
20     Q.  Okay.  Now, over the last 20 years, there are
21 millions of people on earth walking around with mesh
22 in their body, and a large percentage of those meshes
23 are either polypropylene or they contain
24 polypropylene; true?

Page 99

1      A.  Sure.
2      Q.  Yeah.  Now, you've never treated the
3  plaintiff in this case; correct?
4      A.  That is correct.
5      Q.  And you've never examined the plaintiff in
6  this case; correct?
7      A.  That is correct.
8      Q.  And you have never rendered any medical
9  diagnosis specific to the plaintiff in this case;
10 correct?
11     A.  That is correct.
12     Q.  And you have never examined the actual mesh
13 explanted from the plaintiff in this case; correct?
14 Other than the photograph you looked at?
15     A.  I think so, yeah.
16     Q.  Now, I want to look at that photograph that
17 Mr. Anderson showed you.  Do you have it in front of
18 you?  Exhibit P3356.
19         Do you have that, Dr. Klinge?
20     A.  Yes.
21     Q.  Now --
22     A.  I see.
23     Q.  In the top left-hand corner -- you understand
24 this to be a mesh explant from Mrs. Bellew?

Page 100

1      A.  Yes.
2      Q.  And the top left-hand corner, is that the
3  area of mesh that you were describing in your direct
4  examination?
5      A.  Yes.
6      Q.  And that mesh has -- is covered with tissue;
7  correct?
8      A.  Yes.
9      Q.  And that mesh has been stored in
10 formaldehyde; correct?
11     A.  Yes.
12     Q.  And you have not measured that mesh to
13 determine the extent to which any pores in that mesh
14 have collapsed, have you?
15     A.  Not specifically this mesh.
16     Q.  Thank you.
17         As a matter of fact, you have not performed
18 any analysis on the mesh specific to Ms. Bellew;
19 correct?
20     A.  Specifically, yeah.
21     Q.  Now, you have not ever performed surgery for
22 the repair of pelvic organ prolapse; correct?
23     A.  That is correct.
24     Q.  And we talked about the Prolift before.

Page 101

1  You've never used a Prolift in any surgery; correct?
2      A.  That is correct.
3      Q.  And do you know the tools that are used to
4  place Prolift?
5      A.  I've seen it on the video.
6      Q.  There's a trocar?
7      A.  Yes.
8      Q.  And there's a cannula; correct?
9      A.  Yes.
10     Q.  You've never placed a mesh with trocars, have
11 you?
12     A.  No.
13     Q.  You've never placed a mesh with cannulas,
14 have you?
15     A.  No.
16     Q.  You've never placed a mesh using the same
17 tools as Prolift; correct?
18     A.  That is correct.
19     Q.  Now, you were shown Exhibit 3361.  Could you
20 get that in front of you, please.
21         MR. THOMAS:  Could you pull that up, please,
22     3361, so the jury can see it?
23 BY MR. THOMAS:
24     Q.  And this is the slide that you talked about

26 (Pages 98 to 101)

Prof. Dr. Med. Uwe Klinge

Page 102

1    on direct examination, and this is a surgical
2    procedure involving the Prolift; correct?
3        A.  Yes.
4        Q.  And it uses cannulas; correct?
5        A.  Yes.
6        Q.  And it uses trocars; correct?
7        A.  Yes.
8        Q.  And you've never used either one of those;
9    correct?
10       A.  Yes.
11       Q.  And you understand that the mesh is to be
12   placed tension-free inside the body; correct?
13       A.  What do you mean by is said or --
14       Q.  Do you know that -- do you know that a
15   surgeon is to place the Prolift in the body
16   tension-free?  Do you know that?
17       A.  There are some ideas that it should be done
18   tension-free, but obviously it is not possible to
19   place it tension-free; therefore, there is no
20   measurement that it is done tension-free.  There
21   is -- it's not a fact.
22       Q.  But you have not done one; correct?
23       A.  Yes.
24       Q.  It's correct that you have not done one?

Page 103

1        A.  It is correct that I never did it.
2        Q.  Okay.  You've never tried to place mesh
3    tension-free inside a woman; correct?
4        A.  I -- the abdominal wall surgery, the use of
5    meshes, is supposed to be in a tension-free area.  We
6    know that's -- and I did it in woman.
7        Q.  Okay.  But not in a pelvic floor?
8        A.  Not in the pelvic floor.
9        Q.  Okay.  And when the Prolift is placed, it
10   goes through cannulas; correct?
11       A.  Yes.
12       Q.  And that allows for the smooth passage of the
13   mesh through the cannulas; correct?
14       A.  It is supposed that you need some forces,
15   according to the internal documents from Ethicon.  It
16   is supposed that you need some forces to do so.
17       Q.  And you don't know what this mesh looks like
18   inside of the person on whom this surgery is being
19   performed, do you?
20       A.  In the video you have it -- a view from
21   inside, and it appears -- though the quality is not
22   very good for these slides, but it appears as if
23   these -- this mesh in the video is looking curled
24   even inside; and from all the explants that we were

Page 104

1    able to investigate, we saw this deformation, this
2    roping in all of these explants, wherever they were
3    taken.  It's not a phenomenon that is outside the
4    body.  It's inside the body.
5        Q.  You've not seen it yourself, have you,
6    Doctor?
7        A.  In this case, not.
8        Q.  Okay.
9        A.  Only in the video I've seen it.
10       Q.  And the only video that you've seen of a
11   Prolift repair is the one that you just discussed;
12   correct?
13       A.  That is a video made by Ethicon --
14       Q.  Okay.
15       A.  -- as a teaching video.
16       Q.  And you don't have any basis to give an
17   opinion as to what the mesh looks like in the body,
18   do you?
19           MR. ANDERSON:  Objection.
20           THE WITNESS:  If you --
21   BY MR. THOMAS:
22       Q.  Is that yes or no?  You can tell me yes or no
23   and then tell me what it is.
24       A.  Please then.

Page 105

1        Q.  Do you have any basis to understand what the
2    mesh looks like in the body after it's implanted?
3        A.  I have a basis, yes.
4        Q.  And what is that?
5        A.  This basis is our explants, our -- the
6    visualization of many operations that have been shown
7    on the conference where you see it that is the
8    appearance of the arms for Prolift total, Prolift
9    posterior.  When you're looking to all of these
10   teaching videos, you always will see that the mesh is
11   not longer laying there in a flat way, but they
12   showed this roping.  You can find it almost every --
13   in every video and every transmission of an
14   operation.
15       Q.  On the outside?
16       A.  No.  Before -- sometimes you are able to see
17   the arms before closing all wounds, or sometimes you
18   may make some laparoscopy looking from inside.
19       Q.  Now, you're not an expert in pelvic floor
20   surgery with regards to the surgical procedure used
21   to treat pelvic organ prolapse; true?
22       A.  In regard to surgical procedure, it's true.
23       Q.  And you're not a specialist for finding the
24   best indication for a mesh in the pelvic floor; true?

27 (Pages 102 to 105)

Prof. Dr. Med. Uwe Klinge

Page 106

1    A.  That is true.
2    Q.  And you've never consulted with Ethicon on
3  issues of pelvic organ prolapse; true?
4    A.  That is true.
5    Q.  Now, you're not an obstetrician; true?
6    A.  Please, what?
7    Q.  You're not an obstetrician?
8    A.  What is an obste --
9    Q.  Baby doctor.
10    A.  No, I'm not a baby doctor.
11    Q.  You're not an obstetrician?
12    A.  Okay.  Yeah.  Yeah.
13    Q.  You're not a gynecologist?
14    A.  I'm not.
15    Q.  You're not a urologist?
16    A.  I'm not.
17    Q.  And you're not a urogynecologist; correct?
18    A.  I'm not.
19    Q.  And you've never completed a fellowship or
20  residency in those fields; correct?
21    A.  That is correct.
22    Q.  And you have never studied the pelvic
23  forces -- pelvic floor forces in a human; correct?
24    A.  We tried.  We tried in some research projects

Page 107

1  to define the -- or to learn about the anatomy and
2  the forces.
3    Q.  But you -- did you ever complete the study of
4  pelvic forces in the human?
5    A.  We completed some of the studies, and I guess
6  some of this already has been published in a
7  peer-reviewed literature, but of course we are not
8  finished with all our studies in this field.
9    Q.  Let me show you another transcript of
10  testimony, please, and direct your attention to page
11  3497.
12    A.  47?
13    Q.  3497, line 15.
14    A.  3497.
15    MR. ANDERSON:  And I'll just place an
16  objection on the record.  This is outside the
17  scope of direct.  Didn't talk about pelvic
18  forces.
19    What's your page?
20    MR. THOMAS:  3497.
21  BY MR. THOMAS:
22    Q.  Do you have it, Doctor?
23    A.  Yes.
24    Q.  Line 15.

Page 108

1    "QUESTION:  You've not studied the pelvic
2  floor forces in a human; correct?
3    "ANSWER:  That is correct."
4    Did I read that correctly?
5    A.  Yes.
6    Q.  Thank you.
7    Now, you agree that mesh is an important
8  option for patients in pelvic floor repair; correct?
9    A.  In some patients, yes.
10    Q.  And you agree that polypropylene is an
11  appropriate use in pelvic floor if you have the right
12  construction of that polypropylene; correct?
13    A.  If it's a right construction for this
14  specific purpose, yeah, it can be.
15    Q.  Okay.  And 91 percent of all gynecological
16  nonabsorbable meshes are polypropylene; correct?
17    A.  It should be, correct.  We never -- I never
18  analyzed or counted it.
19    Q.  Now, over the years you talked about your
20  work from Ethicon.  Ethicon paid you for your work,
21  didn't they?
22    A.  In the years from 2000 to 2005, yes.  In the
23  years before, no.
24    Q.  And you received royalties from Ethicon for

Page 109

1  sales of Vypro; correct?
2    A.  In these -- this is the payment you're
3  talking of.  This is in the years from 2000 until
4  2005.  I got something like royalties for the selling
5  of Vypro and Ultrapro.
6    Q.  And so every time Ethicon sold a Vypro and an
7  Ultrapro, you earned money; correct?
8    A.  Yes.
9    Q.  You earned about 20,000€ a year from
10  royalties from Ethicon from 2000 to 2005; is that
11  correct?
12    A.  That is correct.
13    Q.  Now, you received no royalties for the sales
14  of Prolene mesh; correct?  Prolene Soft Mesh.
15    A.  Yes.
16    Q.  I want to go back to another exhibit that you
17  talked about on direct, and it's Plaintiff's Exhibit
18  0697.  Do you have that?
19    A.  Not yet.
20    Q.  0697 is your 2013 study.
21    Do you have that now?
22    A.  Yes.
23    Q.  And Plaintiff's Exhibit 0697 was published in
24  2013?

28  (Pages 106 to 109)

Prof. Dr. Med. Uwe Klinge

Page 110

1    A.  Yes.
2    Q.  Now, in this study in 2013, you compare
3   Prolift and Prolift+M with DynaMesh; correct?
4    A.  That is correct.
5    Q.  And you and Mr. Mühl tested this -- these
6   meshes on the same machine that you conducted your
7   test back in 2007; correct?
8    A.  Yes.
9    Q.  And the machine that you developed in 2007
10  was fabricated in part by a company known as FEG;
11  correct?
12   A.  Please, can you -- can you please repeat it.
13      MR. THOMAS:  Can you read that back, please.
14      THE COURT REPORTER:  "And the machine that
15  you developed in 2007 was fabricated in part by a
16  company known as FEG; correct?"
17      THE WITNESS:  I don't think they fabricated
18  any part of this machine.
19  BY MR. THOMAS:
20   Q.  And what do you base that on?
21   A.  Because the FEG makes meshes and doesn't make
22  any computer hardware, photograph, image maker, so
23  nothing -- no component of this machine can be done
24  by the FEG.

Page 111

1    Q.  Okay.
2    A.  So I think they -- Professor Mühl bought it
3   from -- or has made it from their own engineers from
4   the university.
5    Q.  Okay.  Have you read the depositions of
6   Professor Mühl?
7    A.  I guess I have, yeah.
8    Q.  Okay.  Did you recall any testimony he gave
9   in that regard?
10   A.  No.
11   Q.  All right.  When you did your testing back in
12  2005 to 2007 and you developed this machine, did you
13  do it in conjunction with the FEG?
14   A.  Yes.  It was a -- it was a funded project by
15  the ministry together with the FEG and Professor
16  Mühl, yeah.
17   Q.  And the FEG manufactures meshes?
18   A.  Yes.
19   Q.  And the FEG makes PVDF meshes; correct?
20   A.  Yes.
21   Q.  And PVDF meshes are the meshes that you
22  compare -- used to compare the other meshes in the
23  study; correct?
24   A.  We made a comparison between this specific

Page 112

1   Gynemesh PS from polypropylene to a DynaMesh made of
2   PVDF in this specific -- two specific meshes.
3    Q.  And just so the jury understands, DynaMesh is
4   manufactured by FEG; correct?
5    A.  Yes.
6    Q.  And you, at the time of this study, were a
7   paid consultant for FEG; correct?
8    A.  Yes.
9    Q.  Now, in the first paragraph of this study --
10  excuse me, in the abstract in this study, you note on
11  the right side --
12      MR. THOMAS:  Can you bring that up, please?
13  It's 0697.
14      MR. KAUFFMANN:  Which page?
15      MR. THOMAS:  Front page.  Excuse me.  Let's
16  go to page -- the third page of that article.
17  Under Prolift+M system Gynemesh and Ultrapro,
18  first sentence.
19  BY MR. THOMAS:
20   Q.  "Without any strain, the effective porosity
21  was 57.5 percent, and the majority of pores had a
22  diameter of larger than 100 microns" -- "1,000
23  microns."
24      Correct?

Page 113

1    A.  Prolift+M, yeah.  Yeah.  You read it
2   correctly.
3    Q.  Okay.  And back on the first page in the
4   abstract on the right side, you identify the fact
5   that Prolift in tension-free can be considered a
6   large pore Class I mesh; correct?
7    A.  Yes.  It's one of bigger -- it has one of the
8   biggest pores of all mesh available.
9    Q.  And down at the bottom you say that both
10  meshes -- this is on the right side of the first
11  page.
12      "Both meshes can be classified as large pore
13  Class I mesh with an effective porosity that is
14  sufficient to prevent bridging of scar tissue
15  throughout the entire pore."
16      Correct?
17   A.  I didn't -- didn't -- couldn't follow where
18  you have been reading.
19   Q.  I'm down --
20      MR. ANDERSON:  You changed.  He was down in
21  the abstract.  You're moving down.
22  BY MR. THOMAS:
23   Q.  Down on the right side, about two-thirds of
24  the way on the right.  "The Gynemesh PS is identical

29 (Pages 110 to 113)

Prof. Dr. Med. Uwe Klinge

Page 114

1  to the Prolene Soft Mesh for hernia repair, and the
2  textile structure of the Prolift+M system is copied
3  from the Ultrapro hernia mesh."
4      A.  Is identical, yes.
5      Q.  "Both meshes can be classified as large pore
6  Class I mesh with an effective porosity that is
7  sufficient to prevent bridging of scar tissue
8  throughout the entire pore."
9      That's true?
10     A.  You read -- no, that's not true, but you read
11 it correctly.  It's not true if you applied some
12 forces to it.
13     Q.  Okay.  Well, this --
14     A.  This is just restricted to the situation
15 where you don't apply any forces.
16     Q.  Okay.  And it's only if you apply forces to
17 it that, as far as you're concerned, it loses the
18 adequate pore size to prevent against this bridging;
19 correct?
20     A.  Then, yes, it's correct that this mesh then
21 change to a small pore, dangerous high risk device.
22     Q.  All right.  Now, the testing that you have in
23 Exhibit 0697, you were retained as a plaintiff's
24 expert at this time; correct?

Page 115

1      A.  I did not understand this.
2      Q.  You were a plaintiff's -- you were an expert
3  for Mr. Anderson at the time you did the work on this
4  paper; correct?
5      A.  Yes.
6      Q.  And you were paid for your time in connection
7  with this work; correct?
8      A.  Yes.
9      Q.  And you didn't disclose that in the study
10 that you were an expert for plaintiffs in litigation
11 against Ethicon at the time that you did this study;
12 correct?
13     A.  Yes.
14     Q.  And it's also correct that you didn't
15 disclose in this study that you were a consultant for
16 the FEG; correct?
17     A.  Yes.
18     Q.  And it's also correct that you show in this
19 article that the -- or purport to show that the
20 DynaMesh retains a better effective porosity than the
21 Ethicon mesh under strain; correct?
22     A.  We showed that there is an option to do it
23 without collapse of the pores, and this is done by
24 the DynaMesh.  That was shown in the article.

Page 116

1      Q.  Where is your basketball net?
2      A.  We don't have ball.
3      Q.  Don't need a ball.
4      A.  Okay.
5      MR. ANDERSON:  Would you like to use my net,
6  Dave?
7      MR. THOMAS:  I would, please.
8  BY MR. THOMAS:
9      Q.  I don't remember what number we attached to
10 this net, but I want to ask you some questions about
11 the net.
12     You used the net to describe to the jury
13 forces that are present in the pelvic floor; correct?
14     A.  No.  I want to demonstrate what happens to a
15 pore if you applied some forces.
16     Q.  Okay.
17     A.  And you see the pore collapse.  That is a
18 fact.
19     Q.  Now, when you tested the mesh like you did in
20 Exhibit 0697, you attached one end of the mesh to one
21 point and then pulled it in one direction; correct?
22     A.  Yes.
23     Q.  And if you could show that to the jury.  Hold
24 one end and pull.

Page 117

1      A.  (Complying.)
2      Q.  And that's how -- that's how you tested it in
3  your study; correct?
4      A.  Yeah.  Similar to the way Ethicon did it.
5      MR. THOMAS:  Move to strike after "yes."
6  BY MR. THOMAS:
7      Q.  And you applied weights of 100 grams to 1,000
8  grams to the other end of the mesh in order to get
9  your results; correct?
10     A.  If you're talking of this study, yes.
11     Q.  Now, in the body, mesh undergoes forces from
12 multiple directions, doesn't it?
13     A.  It depends whether it functions as a
14 replacement of ligaments or whether it is a function
15 as a flat area, but, of course, you always have
16 forces from all sides wherever you are in the world.
17 But if you are thinking of ligaments, the relevant
18 forces are -- should be -- or should -- it should be
19 possible to estimate them if you're thinking of
20 uniaxial, from one direction.
21     Q.  And when you place the mesh in the body --
22 spread out the net --
23     A.  (Complying.)
24     Q.  -- tissue goes into the pores; correct?

30 (Pages 114 to 117)

Prof. Dr. Med. Uwe Klinge

Page 118

1      A.  Yes.
2      Q.  And it's applied tension-free so that the
3  tissue in the pores is what actually holds the mesh
4  into place; correct?
5      MR. ANDERSON:  Objection.
6      Go ahead.
7      THE WITNESS:  Yes.
8  BY MR. THOMAS:
9      Q.  And you've not done any testing of mesh with
10  tissue in it, have you?  Excuse me.  Strike that.
11      You have not done any effective porosity
12  testing of mesh with tissue in it, have you?
13      A.  We didn't do -- it is impossible to do it
14  with this machine, to have a testing of the effective
15  porosity, a measurement of the effective porosity
16  with tissue inside.
17      Q.  Okay.  And you know that it's possible to
18  design a test that tests the forces on the mesh from
19  multiple directions, don't you?
20      A.  I know that there are experimental settings
21  doing this, but it is a -- it is impossible to model
22  the situation in a pelvis in -- with any of these
23  settings completely.  It's -- every time --
24  everything is just an arbitrary trial that you can

Page 119

1  try to model it, but it's not -- never perfect.
2      Q.  But you agree it's possible to construct a
3  test that measured forces applied in different
4  directions of the mesh; correct?
5      A.  You can make a setting where you apply some
6  forces from two directions, but it never reflects a
7  situation of a mesh that is incorporated into tissue.
8  Never.
9      Q.  So when --
10      A.  There's no way.
11      Q.  When you -- you can design a -- strike that.
12      When mesh is implanted in the human body, the
13  stresses that are applied to that mesh are both
14  lengthwise, top to bottom, diagonally; correct?
15      A.  It depends from the location and of the
16  function and of the size of the mesh whether the
17  model has to include these differences or whether
18  it's possible to just think of one direction, and all
19  mechanical testing setups are insufficient or
20  computer simulations until now are insufficient to
21  model this.
22      Q.  Well, it's true that there are a variety of
23  forces that are applied to a mesh in placement in the
24  pelvic floor; correct?

Page 120

1      A.  Yes.
2      Q.  And it's not only the one directional force
3  that you used in your test model; correct?
4      A.  The one direction force is the best
5  approximation for the ligaments, for the arms.
6      Q.  But my --
7      A.  Not for the others.  I agree.  Not for the
8  flat mesh area.  Then it is not the best way.
9      Q.  And it's possible to design a test that
10  allows for mesh being pulled in multiple directions
11  and also to account for weight on the top of the
12  mesh?
13      A.  As I said, no.  Not sufficiently.  You can
14  design such a test where you put forces from various
15  directions, but the interpretation of these results
16  is very difficult; and overall as a setup to reflect
17  the situation in the body, it is insufficient.
18      Q.  As a matter of fact, the test that you did in
19  both 2007 and 2013 is insufficient to determine the
20  extent to which this test can be applied to the
21  development of better meshes; correct?
22      A.  No.
23      Q.  Let me show you -- go back to your study,
24  Plaintiff's 0697.

Page 121

1      In 2013, the last sentence of the abstract,
2  it says, "The clinical studies have to prove whether
3  devices with high porosity as well as high structural
4  stability can improve the patient's outcome."
5      Did I read that correctly?
6      A.  Yes.
7      Q.  And in 2007 --
8      MR. THOMAS:  Can I have a sticker, please.
9      I'm going to mark this as Klinge Trial
10  Deposition Exhibit Number 1.
11      - - -
12      (Klinge Trial Deposition Exhibit No. 1,
13  Article entitled "New Objective Measurement to
14  Characterize the Porosity of Textile Implants," Bates
15  stamped DX31026.1 through DX31026.8, was marked for
16  identification.)
17      - - -
18  BY MR. THOMAS:
19      Q.  Let me show you what I have marked as Klinge
20  Trial Deposition Exhibit Number 1.
21      MR. ANDERSON:  Thank you.
22      Q.  Klinge Trial Deposition Exhibit Number 1 is
23  the first study that you and Professor Mühl conducted
24  back in 2007; correct?

31 (Pages 118 to 121)

Prof. Dr. Med. Uwe Klinge

Page 122

1    A.  Yes.
2    Q.  And in this study, you and Professor Mühl did
3  uniaxial testing on DynaMesh and other meshes
4  manufactured in Europe; correct?
5    A.  Yes.
6    Q.  And you found in 2007 that the DynaMesh
7  retained its effective porosity and the other meshes
8  did not; correct?
9    A.  No.
10    Q.  Not true?
11    A.  No, that's not true.
12    Q.  Did DynaMesh retain its effective porosity?
13    A.  Yes, but Sofradim light as well.
14    Q.  Okay.  And at the end of the study in 2007,
15  you say that, in the abstract, "Further in vivo
16  studies have to investigate whether the preservation
17  of a high effective porosity under stress may help to
18  improve biocompatibility of textile implants."
19        Is that correct?
20    A.  Yes.
21    Q.  And "in vivo studies" means studies in
22  animals?
23    A.  Amongst all, but more or less the most
24  important way to learn what happens to the meshes is

Page 123

1  the analyses of explanted materials from humans.
2    Q.  Okay.  The study says further in vivo
3  studies.  That means studies of mesh in animals;
4  correct?  Isn't that what that means?
5    A.  I guess at that time we thought that -- this
6  was a setting in a lab without any tissue, without
7  any biology, and we said this testing from the lab
8  has to be transferred to the biology, and this --
9  therefore, we said we need this in vivo studies, and
10  there's no specification to animal or reduction to
11  animals.
12    Q.  There have been no in vivo studies to
13  investigate whether the preservation of a high
14  effective porosity under stress may help to improve
15  biocompatibility of textile implants, has there?
16    A.  Not before, because this was the presentation
17  of this -- this conception.
18    Q.  And in 2013 in Exhibit 0697, you repeat, the
19  clinical studies have to prove whether devices with
20  high porosity as well as high structural stability
21  could improve the patient's outcome.  There's still
22  no clinical studies that prove wherefore devices with
23  high porosity as well as high structural stability
24  can improve the patient's outcome, are there?

Page 124

1    A.  The problem that they are not there are
2  because the old meshes, the small pore meshes, as
3  Prolift, they all belong to the category of these
4  small pore thing.
5    Q.  Okay.
6    A.  How we don't have sufficient explants from
7  large pore materials with a high structural stability
8  in the moment, but we are still collecting these
9  materials.
10    Q.  Can you answer my question yes or no?  Let me
11  ask it again.
12        In 2013, Doctor, you state in this study,
13  "Clinical studies have to prove whether devices with
14  high porosity, as well as high structural stability,
15  can improve the patients' outcome."
16        There's still no clinical studies that prove
17  whether devices with high porosity as well as high
18  structural stability can improve the patients'
19  outcome; true?
20    A.  There are no comparative clinical studies at
21  all.
22    Q.  Thank you.
23        Now, Doctor, in this study in both 2007 and
24  in 2013, you identified 1,000 microns or 1 millimeter

Page 125

1  as the standard of effective porosity in
2  polypropylene; correct?
3    A.  Yes, that is what we used.
4    Q.  But you used 600 microns for PVDF; correct?
5    A.  Yes.
6    Q.  Now, it's true in the context of effective
7  porosity, if a pore is reduced even 10 microns, to
8  990 microns, it does not get counted in a porosity
9  calculation; correct?
10    A.  That is correct.
11    Q.  And so it's only pores with 1,000 microns in
12  all directions that are included in the effective
13  porosity calculation; correct?
14    A.  That depends on the polymer.  If you have
15  another polymer where you know that it behaves a
16  little bit better, then it is very easy to change the
17  machine.  It is objective, reproducible, reliable.
18  So if you, as a manufacturer, have a polymer where
19  you know that it is -- critical diameter would be
20  only 900 microns, yeah, then you can make these
21  measurements with your critical diameter.
22    Q.  Okay.  And the machine --
23    A.  Our data, we, up to now -- we just had the
24  data of 1,000 for polypropylene and 600 for PVDF,

32 (Pages 122 to 125)

Prof. Dr. Med. Uwe Klinge

Page 126

1    but -- yeah.
2         Q.   But you didn't -- those are the only two
3    measurements you took, at 1,000 for polypropylene and
4    600 for PVDF; correct?
5         A.   Measurements, there have been a lot, but
6    these are the two, yeah.  If you applied this
7    measurement to this machine for polypropylene, you
8    can put in only one range.
9         Q.   Okay.
10        A.   One limit.
11        Q.   You know, other scientists disagree with your
12   1,000 figure for polypropylene, don't they?
13        A.   I'm not aware of anyone who said that the
14   pore size and the bridging does not happen, no.
15        Q.   Okay.
16        A.   And I don't know any measurements showing
17   that it is different.
18             MR. ANDERSON:  Keep this separate.
19                         - - -
20             (Klinge Trial Exhibit No. 2, Article entitled
21   "Synthetic and biodegradable prostheses in pelvic
22   floor surgery," Bates stamped DX3036.1 through
23   DX3036.11, was marked for identification.)
24                         - - -

Page 127

1    BY MR. THOMAS:
2         Q.   Let me show you what's been marked as Klinge
3    Trial Exhibit Number 2.  It's an article by Deprest
4    and others.
5         A.   Yes.
6         Q.   Are you familiar with this article?
7         A.   I think a long time ago I read it.
8         Q.   And this is an article in 2005?
9         A.   Yes.
10        Q.   About the same time that you came out with
11   your article about 1,000 millimeters; correct?
12        A.   Obviously.
13        Q.   And do you know Dr. Deprest?
14        A.   Yes, very well.
15        Q.   And he's writing about synthetic and
16   biodegradable prostheses in pelvic floor surgery;
17   correct?
18        A.   Obviously, yeah.
19        Q.   If you turn to page 4 of Klinge Trial
20   Deposition Exhibit 2, there's a description of Type I
21   meshes.  Do you see that?
22        A.   Yes.
23        Q.   And it includes in Type I meshes, described
24   them as totally microporous; correct?

Page 128

1         A.   He used another classification.
2         Q.   Okay.  That's my point.  He describes the
3    synthetic implant materials for Prolene and Marlex as
4    totally microporous; correct?
5         A.   That is correct.
6         Q.   And he disagrees with your classification?
7         A.   No.  No.  There is no -- not any data showing
8    that the bridging doesn't occur.  There is not any
9    data that 1 millimeter is not a critical limit.  The
10   only thing that happens is he used the classification
11   of Amid, who was produced when we start -- before we
12   started our joint collaboration with Ethicon, and at
13   that time there hasn't been any large pore mesh.  So
14   Amid was not able to consider these large pore meshes
15   in his classification.  So when using this old
16   classification, of course, you will have a mix of
17   these terms.
18        Q.   Okay.
19        A.   But it doesn't -- is relevant in any way to
20   the fact that small pores have an increased risk,
21   makes it unsafe and are filled by scar tissue.
22        Q.   Go to the bottom.
23        A.   So no.
24        Q.   I'm sorry.  Go to the bottom of page 4.

Page 129

1         A.   Yeah.
2         Q.   And Dr. Deprest says that, "Pore sizes
3    greater than 75 microns allow for rapid ingrowth of
4    fibroblasts and vascular elements necessary to anchor
5    the implant within the native tissue."
6              That's what he says, isn't it?
7         A.   Yes.
8         Q.   Okay.  Is that correct?
9         A.   The fact is --
10        Q.   Is it correct?
11             MR. ANDERSON:  Is what correct?
12   BY MR. THOMAS:
13        Q.   Is that statement correct?  Do you agree with
14   that?
15        A.   The statement is only correct if you assume
16   that you need a pore size of 75 microns to allow scar
17   to get integrated.  Our point is that we want to
18   separate the integration of fat and scar, and,
19   therefore, you need a completely different size of
20   the holes.  If you are agreed that you want to have
21   scar in your implant, then, of course, yeah, this is
22   correct.
23        Q.   So you --
24        A.   But it's a completely mix-up of the -- and

33 (Pages 126 to 129)

Prof. Dr. Med. Uwe Klinge

Page 130

1    there is no fact to it.  It is a citation of Amid's
2    classification and nothing more.
3        Q.  Okay.  You could have changed the settings on
4    your effective porosity testing to measure for 75
5    microns; correct?
6        A.  Everyone can do it.  Yeah.
7        Q.  But you didn't do that?
8        A.  No.
9        Q.  Let me show you now what's been marked as --
10   and, by the way, he was joined in that study by eight
11   other people on the study; correct?  On the first
12   page you can count the people who were involved in
13   the study.
14       A.  Yeah.
15               - - -
16       (Klinge Trial Deposition Exhibit No. 3,
17   Article entitled "The biology behind fascial defects
18   and the use of implants in pelvic organ prolapse
19   repair," Bates stamped DX30360.1 through DX30360.10,
20   was marked for identification.)
21               - - -
22   BY MR. THOMAS:
23       Q.  Let me show you now what I have had marked as
24   Klinge Trial Exhibit Number 3.  And this is a --

Page 131

1    another paper a year later by Dr. Deprest; correct?
2        A.  Yes.
3        Q.  It's in 2006.  This is a year after your
4    paper; correct?
5        A.  Yes.
6        Q.  And if you'll go to page 3 of this trial
7    Exhibit 3, once again, he cites to the Amid
8    classification; correct?  Down on the right, lower
9    right-hand corner?
10       A.  Yes.
11       Q.  And you see the classification of implants
12   where it talks about macroporous -- that's with an
13   a -- that's greater than 75 microns.  Do you see
14   that?
15       A.  Yeah.
16       Q.  And it says in the lower right-hand side
17   that, "Pore sizes greater than 75 microns allow for
18   rapid ingrowth of fiberglass and vascular elements
19   necessary to anchor the implant within the native
20   tissue.  Peak ingrowth is reached at pore size around
21   400 to 500 microns."
22           Did I read that correctly?
23       A.  Yeah.
24       Q.  You didn't --

Page 132

1        A.  The next sentence.
2        Q.  Yes.  Larger --
3        A.  "Larger pores limit the fibrosis process to
4    perifilament region and the pores get filled with
5    fat."
6        Q.  Right.  But you didn't do any testing on your
7    effective porosity machine at 400 to 500 microns, did
8    you?
9        A.  We didn't make a calculation exactly with
10   this one, no.
11       Q.  Okay.  And do you agree with Dr. Deprest that
12   in the use of implants in pelvic organ prolapse
13   repair that peak ingrowth is reached at pore size
14   around 4- to 500 microns?  Do you agree with that?
15       A.  If you are -- this is while you are coming
16   from tissue engineering, and it is not the value that
17   helps us to define whether you have fat and scar
18   tissue.  Therefore, it is no argument against the
19   relevance of effective porosity for the clinical
20   outcome.
21       Q.  Okay.  But you didn't measure at 4- or 500
22   microns, which is the peak level identified by
23   Dr. Deprest, did you?
24       A.  In what -- in what sense should --

Page 133

1        Q.  Yeah.  You didn't conduct those tests on --
2        A.  If --
3        Q.  -- either DynaMesh or on polypropylene in the
4    tests you did with Professor Mühl; correct?
5        A.  If we place a mesh into this machine and
6    defined the critical size of, let's say, 200 microns,
7    yeah, there will never be an effective pore -- pore
8    that will be filled by fat tissue.
9        Q.  My --
10       A.  We know this, yeah.
11       Q.  My point is, Doctor, you didn't test at the
12   areas identified by Dr. Deprest as being the peak
13   ingrowth for tissue as cited in the exhibit I just
14   gave you.  You've not done that, have you?  True?
15       A.  But in the --
16       Q.  Is it true?
17       A.  We never modified this testing with these
18   data, yes, that is true.
19       Q.  Okay.
20       A.  But it doesn't make any sense.
21               - - -
22       (Defendant's Exhibit No. DX30064, Article
23   entitled "Classification of biomaterials and their
24   related complications in abdominal wall hernia

34 (Pages 130 to 133)

Prof. Dr. Med. Uwe Klinge

Page 134

1    surgery," Bates stamped DX30064.1 through DX30064.7,
2    was marked for identification.)
3              - - -
4    BY MR. THOMAS:
5        Q.  All right.  And you know that there are some
6    people -- let me show you what's been marked as
7    Defendant's Exhibit 30064, and 30064 is the Amid
8    paper from 1997.  You recognize that?
9        MR. ANDERSON: I'm sorry, Counsel.  Is this
10   going to be a defense exhibit?  Because the other
11   ones you used a defense exhibit for Klinge.  Do
12   you want it to be a Klinge exhibit?  Because
13   you --
14       MR. THOMAS:  I know that.  And just for your
15   benefit and my admission, I didn't realize when I
16   marked them that they had numbers on them.  All
17   I'm trying to do is not create new numbers if I
18   can.
19       MR. ANDERSON:  Okay.
20       MR. THOMAS:  And we'll change -- we'll change
21   the numbers at a later time if I have to.
22       MR. ANDERSON:  So that it correlates with
23   your exhibit numbers.  Okay.  That's fine.
24       MR. THOMAS:  I'm just trying to identify them

Page 135

1    as best I can.
2        MR. ANDERSON:  Yeah.
3    BY MR. THOMAS:
4        Q.  Now, Doctor, I've shown you Defendant's
5    Exhibit 30064, and this is the Amid paper that we
6    have been talking about, isn't it?
7        A.  Yes.
8        Q.  And this is what has been known as the Amid
9    classifications since 1997; correct?
10       A.  Yes.
11       Q.  And you know that there's some people that
12   still follow the Amid classification; correct?
13       A.  I personally will follow it when -- when
14   looking at the risk for infection and material
15   infection, I -- it's still proper to follow this
16   classification.  If you want to separate the bridging
17   fibrosis, the scarring of the pores, it is not
18   appropriate.
19       Q.  But that's you.  You know that there are some
20   scientists who still follow the Amid class at this
21   indication?
22       A.  Depends on the purpose why.
23       Q.  Okay.  Thank you.
24       A.  What do you want to have with the -- yeah.

Page 136

1        Q.  It's fair to understand, Doctor, that the two
2    studies that you did with Professor Mühl that we've
3    had marked one as Plaintiff's 0697 and the other as
4    Klinge Trial Exhibit Number 1, are not, standing
5    alone, able to replicate what happens in the human
6    body; correct?
7        A.  They are able to replicate some aspects.
8        Q.  Okay.  But the whole point of these studies
9    is to give people a starting point so that you can
10   use this information to develop a better model to
11   understand what happens in the human body; correct?
12       A.  It helps to predict the risk for rigid
13   fibrosis without any forces and what happens to your
14   textile, to your device when you applied some forces.
15   Therefore, it gives a measure so that you can
16   optimize the design of the meshes, yeah.
17       Q.  Uniaxial forces only; correct?
18       A.  Uniaxial forces, yeah.  And you can modify
19   the forces.  You can modify the diameter depending on
20   the polymer you are using.  So a very standardized
21   technique, open for everyone.
22       Q.  And so when you go back to Plaintiff's 0697
23   and you go to page 5 --
24       MR. ANDERSON:  Hold on.  Let's get 06 --

Page 137

1    that's not it.
2        MR. THOMAS:  It's the 2013 study.
3        MR. ANDERSON:  Yeah.  But I moved stuff.
4    Here.
5        THE WITNESS:  Five.
6    BY MR. THOMAS:
7        Q.  Are you there?  The porosity of the
8    Gynemesh PS and the Gynemesh -- and the DynaMesh, I'm
9    sorry, are measured, on the very top of that article.
10   Do you see that?
11       A.  Where are you?
12       Q.  Is that textile porosity where it says
13   porosity at percentage?
14       A.  I guess it's the textile porosity.
15       Q.  Okay.  Do you know what it is?
16       A.  The textile porosity is the area that is not
17   covered by the ligaments.
18       Q.  Okay.
19       A.  So maybe this is the easiest definition of
20   this one.
21       Q.  Do you know under Gynemesh where it's 62.9,
22   do you know what that represents?
23       A.  Where are you?
24       Q.  Under porosity at the top in the figure, in

Prof. Dr. Med. Uwe Klinge

Page 138

1    Figure 3 on the far left.  Doctor -- Doctor, if you
2    look at page 5 --
3        A.  Yeah.
4        Q.  -- of Exhibit 0697, I'm looking at
5    Gynemesh PS with no force, zero newtons per
6    centimeter, under arm 1, and there's a figure 62.9.
7        A.  Yeah.
8        Q.  What does that mean?
9        A.  That means when you made an image, that 67 --
10   62.9 percent of this area is not covered by
11   filaments.
12       Q.  Okay.  And that's arm 1; correct?
13       A.  That's arm 1.
14       Q.  And then arm 3 is 60.1; correct?
15       A.  Yeah.
16       Q.  And if you compare that with DynaMesh arm 1,
17   that is equal to or greater than the value for
18   DynaMesh; correct?
19       A.  Yes.
20       Q.  Okay.  Now, you agree that biocompatibility
21   of long-term implantable devices can be defined as
22   the ability of the device to perform its intended
23   function with the desired degree of incorporation in
24   the host without eliciting any undesirable, local or

Page 139

1    systematic effects in the host?
2        A.  Yes.
3        Q.  And you know of no studies -- strike that.
4            You agree that Prolene Soft Mesh has a better
5    biocompatibility than the Prolene mesh used in hernia
6    repair?
7        A.  It depends on the specific design and -- of
8    the different -- it depends from the location and --
9        Q.  Do you have an opinion --
10       A.  -- to place it.
11       Q.  Do you have an opinion about whether Prolene
12   Soft Mesh has a better biocompatibility than Prolene?
13       A.  I cannot answer it.  I have an opinion, but
14   it cannot be answered just by yes or no.
15       Q.  Okay.
16           MR. ANDERSON:  I have the same objection.
17   Outside the scope of direct.
18   BY MR. THOMAS:
19       Q.  And you know of no studies in a randomized
20   controlled trial which compare the biocompatibility
21   of Prolene Soft Mesh with another mesh; correct?
22       A.  There is no way to make a clinical trial
23   where this question with sufficient statistical
24   power.

Page 140

1        Q.  Okay.
2        A.  There's no way.
3        Q.  So the answer is there are no studies?
4        A.  There are no studies proving the safety or
5    the superiority of any of these devices.
6        Q.  Now, Doctor, when we talked about in vivo
7    studies, we're talking about studies conducted in
8    animals; correct?
9        A.  It's one part, yeah.
10       Q.  And you used rats in studies to help
11   determine types of inflammatory reactions which occur
12   with implanted meshes, haven't you?
13       A.  In this collaboration that we started
14   together with Ethicon, we used rats, rabbits and
15   other animals.  So depending on the specific
16   question, we need different models.
17       Q.  And the reason why you did that was so that
18   you could place mesh in animals and study the tissue
19   response to that mesh; correct?
20       A.  Yes.
21       Q.  And you also used rats in studies to
22   determine the extent to which mesh integrates into
23   the tissues of the rat?
24       A.  As I told you, we use rats, rabbits, but we

Page 141

1    confirmed all these results by looking at the human
2    explants.
3        Q.  And the reason why you wanted to -- strike
4    that.
5            You used rats in studies to determine the
6    extent to which the mesh implanted into the rat
7    integrates into the tissues; correct?
8        A.  I didn't get the entire question.
9        Q.  Let me ask it again.
10           In your experience, you use rats in studies
11   to determine the extent to which the mesh implanted
12   in the rats integrates into the tissues of the rats;
13   correct?
14       A.  Yes.
15       Q.  Okay.  And you know that Ethicon has
16   conducted tissue reaction and tissue integration
17   studies where Ethicon implanted mesh in animals,
18   don't you?
19       A.  Yes, I know.
20       Q.  And you have reviewed some of those studies;
21   correct?
22       A.  Yes.
23           ---
24           (Klinge Trial Exhibit No. 4, Ethicon Final

36 (Pages 138 to 141)

Prof. Dr. Med. Uwe Klinge

Page 142

1    Report, PSE Accession No. 00-0035, An Exploratory
2    91-day Tissue Reaction Study of Polypropylene-based
3    Surgical Mesh in Rates (PSE ACC.  NO. 00-0035), was
4    marked for identification.)
5            - - -
6    BY MR. THOMAS:
7        Q.  I'm going to show you what I have marked as
8    Klinge Trial Exhibit Number 4.
9        Dr. Klinge, Klinge Trial Exhibit Number 4 is
10   a document titled -- document dated July 11, 2001.
11   It's a final report, and it's titled, "An Exploratory
12   91-Day Tissue Reaction Study of Polypropylene-Based
13   Surgical Mesh in Rats."
14           You've seen that before, haven't you?
15       A.  I think I saw it, yeah.
16       Q.  And you reviewed that in connection with your
17   work in this litigation, didn't you?
18       A.  Yes.
19       Q.  And you did not see this study before this
20   litigation; correct?
21       A.  That is correct.
22       Q.  And Ethicon conducted this study in the
23   period 2000 to 2001; correct?
24       A.  It should be correct.

Page 143

1        Q.  And let's go to page 2 of 27 of this study.
2        A.  Two of 27.
3        Q.  See under "Summary"?  Right there under
4    "Summary."
5            The first line, "A subcutaneous implantation
6    study was conducted to assess the tissue reaction
7    profile and qualitative integration of several
8    different constructions of polypropylene surgical
9    meshes."
10           Tell the jury what a subcutaneous
11   implantation study is.
12       A.  A subcutaneous implantation study, then you
13   usually place small pieces of a mesh in the
14   subcutaneous area beneath -- underneath the skin on
15   top of the muscles, so it's laying in fat.  It can be
16   done very easily.  And, yeah, and then you are able,
17   then, after some time that you can explant the
18   material and look to the tissue reaction to this.
19       Q.  Okay.  And you can look to both the tissue
20   reaction, which is the -- how the body reacts to the
21   mesh; correct?
22       A.  Yes.
23       Q.  And the qualitative integration of the mesh.
24   That means the extent to which the tissue integrates

Page 144

1    into the mesh; correct?
2        A.  You have to define it very carefully what --
3    what type of tissue, what are -- which cells you are
4    looking at, what happens in the pores, which is your
5    area of interest.  So research is not so simple just
6    to say we are making it and looking to this, no.
7        Q.  Okay.
8        A.  It is --
9        Q.  You understood that this study placed mesh
10   under the skin of rats --
11       A.  Yeah.
12       Q.  -- in order to look at the tissue reaction to
13   that mesh as well as to analyze the extent to which
14   the tissue integrated into the mesh.  You understand
15   that was a goal of this study?
16       A.  Yeah.  We did it several time ourselves
17   but --
18       Q.  Same type --
19       A.  -- we know the limitations of this very, very
20   well.
21       Q.  I understand.  But you've done this same type
22   of study yourself with different animals and
23   different meshes?
24       A.  And for some other purposes with this

Page 145

1    specific hypothesis, yeah.
2        Q.  Okay.  And if you turn the page, please, it
3    talks about materials.  Do you see that?
4        A.  There we are.
5        Q.  We're on page 3 of 27 --
6        A.  Yeah.
7        Q.  -- of Klinge Trial Exhibit Number 4.
8        A.  Uh-huh.  Bard, Surgipro, Prolene and Prolene
9    Soft, Vypro.
10       Q.  And there are listed there seven different
11   meshes that are tested; correct?
12       A.  Yes.
13       Q.  And the Bard mesh that's tested there is a
14   competitor's mesh, isn't it?  Bard mesh is not made
15   by Ethicon?
16       A.  No, no, no.
17       Q.  Excuse me.  Bard mesh is not made by Ethicon;
18   correct?
19       A.  That is correct.
20       Q.  Thank you.
21           And that's what you referred to as a small
22   pore heavyweight mesh; correct?
23       A.  Yes.
24       Q.  Surgipro mesh, likewise, is a mesh

37 (Pages 142 to 145)

Prof. Dr. Med. Uwe Klinge

Page 146

1 manufactured by a competitor; correct?
2     A. Yes.
3     Q. Now, Prolene mesh is a -- is the hernia mesh
4 used by Ethicon that has a pore size smaller than the
5 Prolift mesh; correct?
6     A. How -- what is your definition of the pore
7 size and how it is measured? What is the pore size
8 of the Prolift mesh? So it is insufficient. We know
9 it meanwhile to give just one figure.
10     Q. Without tension it is clear that the pore
11 size of the Prolene mesh used in hernia repair is
12 smaller than the --
13     A. The area of affected pores maybe.
14     Q. Let me ask the question again, and let me
15 finish it before you give an answer.
16     A. Sorry.
17     Q. Doctor, it's true that the area of the pore
18 for the Prolene mesh used in hernia repair is smaller
19 than the pore size without tension of the pore size
20 of the Prolene polypropylene mesh used in Prolift?
21     MR. ANDERSON: Objection.
22     THE WITNESS: Again, it would be necessary to
23 make a testing of the effective porosity for the
24 Prolene mesh. I didn't do it, so I know -- I

Page 147

1     don't know it.
2 BY MR. THOMAS:
3     Q. I'm not talking about effective porosity.
4 I'm not -- I'm talking about porosity at rest without
5 tension.
6     A. The textile porosity --
7     Q. Yes.
8     A. -- you mean.
9     Q. Well, if you want to call it textile
10 porosity, that's fine.
11     A. But this is essential, because we are
12 sticking to the effective porosity. We wanted to
13 know what happens to the tissue. The textile
14 porosity is not relevant, so --
15     Q. Okay. To you.
16     A. There are no figures about this.
17     Q. Okay. The company used, in its study,
18 Prolene mesh, which is the same mesh used in hernia
19 repair. You agree with that?
20     A. There has been a Prolene mesh used in hernia
21 repair, though there are some modifications. It is
22 not clear which modification exactly was used here,
23 but, yeah.
24     Q. Okay. And the company also tested Prolene

Page 148

1 Soft Mesh; correct?
2     A. Yes.
3     Q. And the company tested Vypro mesh. You see
4 that?
5     A. Yes.
6     Q. And it tested three different kinds of Vypro
7 mesh. Do you see that?
8     A. Yes.
9     Q. And Vypro mesh is the mesh that you helped
10 Ethicon develop; correct?
11     A. Yes.
12     Q. And Vypro mesh is the mesh that you
13 characterize as being lightweight large pore;
14 correct?
15     A. Yes.
16     Q. And the company in Klinge Trial Exhibit
17 Number 4 compared the tissue reaction and tissue
18 integration of all seven of these meshes; correct?
19     A. Yeah.
20     Q. And they implanted these meshes in rats for
21 7 days, 28 days, 63 days, and 91 days; correct?
22     A. Yeah, that is correct.
23     Q. And after each of these time frames, some of
24 the rats were killed, sacrificed, and then the mesh

Page 149

1 removed so it could be analyzed; correct?
2     A. Yeah.
3     Q. And when you removed the mesh from the animal
4 to be analyzed, how do you prepare samples? What's
5 the proper way to prepare samples?
6     A. Usually the tissue sample is fixed in
7 formaldehyde, and then later on it is -- it is put
8 into a paraffin so that you can make some sections of
9 it, and then later on it's stained.
10     Q. And so the formaldehyde is added to the
11 samples upon withdrawal not only as a preservative
12 but to fix the tissue in place; correct?
13     A. To stop the degradation of the tissues. If
14 you don't use formaldehyde and you're storing some
15 tissue at home, you will see a catastrophe. It will
16 be destroyed within some few days.
17     Q. And after the mesh is then cut into slides
18 from the paraffin, a study pathologist looked at
19 these slides; correct?
20     A. Someone is looking sometime, yeah.
21     Q. Well, you know that a pathologist in this
22 case looked at the slides. Do you know that?
23     A. In this case, yeah. But it's not necessary
24 that it has to be a pathologist.

38 (Pages 146 to 149)

Prof. Dr. Med. Uwe Klinge

Page 150

1      Q.  But a pathologist is what?  What's a
2  person -- what's a pathologist do?
3      A.  A pathologist is someone who has the training
4  to investigate tissues that are extracted by some
5  surgical means or from some tissues, and there he was
6  trained to identify the changes in these tissues.
7      Q.  Now, you didn't work at the institute of
8  pathology at your hospital, did you?
9      A.  No.
10     Q.  And you don't -- you didn't do a residence in
11 pathology, did you?
12     A.  No.
13     Q.  And you had no fellowship in pathology, did
14 you?
15     A.  No.
16     Q.  As a matter of fact, you're not permitted to
17 sign pathology reports at your hospital; correct?
18     A.  That is correct.
19     Q.  Now --
20     A.  But in research, the examination never is
21 done by the pathologist but by the researcher
22 themselves.
23         MR. THOMAS:  Object.  Move to strike
24     everything after "that's correct."

Page 151

1  BY MR. THOMAS:
2      Q.  Let's go to page 2.  And page 2, the third
3  line down under "Summary," the summary finds, "The
4  inflammatory reaction among the different
5  constructions was relatively similar, ranging from
6  minimal to mild in intensity and, thus, were all
7  considered to be biocompatible."
8         Did I read that correctly?
9      A.  Yes.
10     Q.  If you go to page 9, first line of the second
11 paragraph on page 9, page 9 of 27 up at the top.
12 "Study found that all of the meshes had sufficient
13 porosity to allow for integration with surrounding
14 connective tissue."
15         Did I read that correctly?
16     A.  Yes.
17     Q.  And, Doctor, when people conduct studies,
18 they make these slides that you referred to with the
19 tissue samples; correct?  So that they can be looked
20 at under a microscope, that's what you do; correct?
21     A.  Again?
22     Q.  When studies, like Klinge Trial Exhibit
23 Number 4, conducted the tissue that's removed from
24 the slices, the paraffin, it's made into slides to

Page 152

1  put under a microscope; correct?
2      A.  Yeah.
3      Q.  And it's the microscopic observation by the
4  person looking at it that causes him to reach the
5  conclusions that they express in the report; correct?
6      A.  No, not always.  You have to look to the
7  microscopical appearance of the explants as well.  So
8  the microscopical mainly is an explanation of what
9  happens, but for the patient it's more important what
10 happens clinically.
11     Q.  You've never looked at the slides that this
12 study generated in Klinge Trial Exhibit Number 4,
13 have you?
14     A.  I never got the slides from this study from
15 study from Barbolt.  I've seen it.
16     Q.  And you know they're still available, don't
17 you?
18     A.  What?
19     Q.  You know they're still available, don't you?
20     A.  They are still available?
21     Q.  Yes.  You haven't looked at it?
22     A.  I didn't get it, yes.
23         THE WITNESS:  Is it possible to get?
24 BY MR. THOMAS:

Page 153

1      Q.  Let's go to Plaintiff's Exhibit 271.  That's
2  your 2005 paper.
3         MR. ANDERSON:  That's not it.
4  BY MR. THOMAS:
5      Q.  And this is a paper that you prepared with
6  Dr. Klosterhalfen and Dr. Junge?
7      A.  That is correct.
8      Q.  And would you call this a review article?
9      A.  Yes.
10     Q.  And you're kind of reviewing the state of
11 medicine and science on the concept of lightweight
12 and large pore mesh for hernia repair in this paper;
13 correct?
14     A.  Please can you repeat the question, the
15 details?
16         MR. THOMAS:  Can you read that back, please.
17         THE COURT REPORTER:  "And you're kind of
18     reviewing the state of medicine and science on
19     the concept of lightweight and large pore mesh
20     for hernia repair in this paper; correct?"
21         THE WITNESS:  And "you're kind"?
22         MR. THOMAS:  I'm sorry.
23         THE WITNESS:  I don't understand the first
24     words.

Golkow Technologies, Inc. - 1.877.370.DEPS

Prof. Dr. Med. Uwe Klinge

Page 154

1        MR. THOMAS:  That's my fault.  I apologize.
2   BY MR. THOMAS:
3        Q.  The purpose of this article,
4   Plaintiff's 2071, is to review the state of science
5   and medicine on the mesh concept known as lightweight
6   and large porous for hernia repair?
7        A.  Yes, that is --
8        Q.  Thank you.
9        A.  -- true.
10       Q.  And in here you talk not only about old
11  meshes but also new meshes; correct?
12       A.  The new generation mesh, yeah.
13       Q.  And in the abstract, which is on the first
14  page of 2071, you state that:  "All experimental
15  evidence and first clinical data indicate the
16  superiority of the lightweight large porous mesh
17  concept with regard to a reduced number of long-term
18  complications and particularly increased comfort and
19  quality of life after hernia repair."
20       Correct?
21       A.  That is correct.
22       Q.  And what you're referring to there are your
23  initial results; correct?
24       A.  What is your definition of "initial"?

Page 155

1        Q.  Well, there's certainly --
2        A.  It is what we know to this time point.
3        Q.  There are no long-term studies available to
4   determine the extent to which lightweight large pore
5   mesh behaves better than small pore heavyweight mesh,
6   as you've described them in this study, at the time
7   that you published this study?
8        A.  At this time, no, not to my knowledge.
9        Q.  Okay.  Let's go to page 112, please.
10       I don't think that's the right page, Doctor.
11  112.
12       MR. ANDERSON:  112?
13       MR. THOMAS:  Under --
14       MR. ANDERSON:  You're reading off of your
15  exhibit number, but you said go to Plaintiff's
16  Exhibit, so ours doesn't have your -- do you have
17  your trial exhibit number?
18       MR. THOMAS:  I'm looking at this number right
19  here, 112.  Is that different than yours?
20       MR. ANDERSON:  Yeah.  Maybe yours is
21  different.  Let's see.  Did you -- did you give
22  me your exhibit?
23       MR. THOMAS:  You already -- it's already in
24  the record, so I didn't.

Page 156

1        MR. ANDERSON:  Yeah.  But your version is
2   different from this version because you've got
3   yours stamped at the bottom.
4        THE WITNESS:  Do you have the pages?
5        MR. ANDERSON:  And we don't have the stamped.
6        THE WITNESS:  We don't have the same pages.
7        MR. THOMAS:  I'll do it from your document.
8   Let me see if I can find the page.  I wonder why
9   it's different.
10  BY MR. THOMAS:
11       Q.  Let's go to page 10 of Exhibit 0271, please.
12       Do you have page 10?
13       A.  Yes.
14       Q.  On page 10 you and your coauthors begin
15  talking about the new generation of lightweight large
16  porous meshes, Vypro and Vypro II; correct?
17       A.  Yes.
18       Q.  And is the purpose of this discussion to talk
19  about the promise of Vypro and Vypro II in hernia
20  repair; correct?
21       A.  The purpose of what?
22       Q.  The promise.
23       A.  Promise?
24       Q.  The future potential benefits of Vypro -- let

Page 157

1   me ask the question again.
2        On page 10 of Exhibit 0271, there is a
3   paragraph titled "The New Generation:  Lightweight
4   Large Porous Meshes."  Correct?
5        A.  Yes.
6        Q.  And in that paragraph, series of paragraphs,
7   you discuss Vypro and Vypro II?
8        A.  Yes.
9        Q.  And those -- Vypro I is the mesh that you
10  helped develop with Ethicon for hernia repair;
11  correct?
12       A.  Yes.
13       Q.  And Vypro II was a subsequent development of
14  Vypro again in hernia repair; correct?
15       A.  Yes.
16       Q.  And the bottom of that paragraph or that
17  section says that, "First clinical trials confirm the
18  expected superiority of the lightweight large porous
19  mesh concept concerning quality of life after hernia
20  repairs."
21       What does "quality of life after hernia
22  repair" mean?
23       A.  It depends from the -- from the trial that
24  you are doing.  Quality of life -- to measure quality

Prof. Dr. Med. Uwe Klinge

Page 158

1    of life, there are different tools depending on the
2    investigator. It can be looking to foreign body
3    sensation. It can be looking to pain. It can be
4    looking to serious complications. So a lot of these
5    things. And there are some attempts to quantify
6    them. There are some questionnaires, as SF-36, which
7    gives a lot of data. So you try to quantify quality
8    of life to know what happens to the patient.
9        Q.   Okay. And is the quality of life an
10   appropriate end point for a study to determine
11   whether a mesh implanted in the body is functioning
12   appropriately?
13       A.   It's usually a secondary end point. It's --
14       Q.   Secondary to recurrence?
15       A.   Yes.
16       Q.   Okay.
17       A.   Usually.
18       Q.   All right. But it's an important end point
19   to understand how a patient's quality of life has
20   been affected by the hernia repair; correct?
21       A.   It's one way to measure this.
22       Q.   And at this time there are no long-term
23   studies on Vypro and Vypro II to determine the
24   quality of life for these patients after hernia

Page 159

1    repair; true?
2        A.   So far I remember the long term is there one,
3    two years maybe. I don't know exactly the Brinkman
4    study when it came up, when it was published there.
5    It was about three years, so it depends from what you
6    are thinking of long term.
7        Q.   And under polypropylene, next paragraph down,
8    you say, "Most manufacturers have added to their
9    range of polypropylene heavyweight mesh small porous
10   mesh modifications, lightweight large porous
11   adaptation."
12           Correct? Did I read that correctly?
13       A.   Yeah. Yes.
14       Q.   And if you go to the last sentence in that
15   section it says, "However, clinical trials have yet
16   to confirm the promising preclinical results."
17           Now, what does that mean?
18       A.   That means that at that time we hoped that it
19   is possible to make the clinical trial and to
20   demonstrate that one material is superior to another
21   just by operating 150 patients in this direction
22   or -- and 150 patients with another mesh, and we did
23   some prospective clinical trials with Ethicon
24   together to get this information; but we learned that

Page 160

1    it is not possible at all to do this confirmation at
2    clinical studies.
3        Q.   At the time that you published Exhibit 2075,
4    there were no clinical trials available to confirm
5    the promising preclinical results of the lightweight
6    large porous polypropylene mesh that most
7    manufacturers have added; correct?
8        A.   So it is correct --
9        Q.   Thank you.
10       A.   -- in regard to comparing studies.
11       Q.   Okay.
12       A.   It is not correct in regards to the analysis
13   of explants.
14       MR. THOMAS:   All right. Move to strike
15   everything after "it's correct."
16   BY MR. THOMAS:
17       Q.   You also discuss on page 11 of Exhibit 0271
18   Ultrapro; correct?
19       A.   Yes.
20       Q.   And Ultrapro is the mesh that you understand
21   to be the predominant mesh used in hernia repair in
22   Germany; is that correct?
23       A.   So far I know, yes.
24       Q.   And at the end of your discussion of

Page 161

1    Ultrapro, you say, "Overall the Monocryl
2    polypropylene composite Ultrapro is currently the
3    member of the lightweight large porous mesh family
4    with the lowest foreign body reaction and optimized
5    handling. The first clinical studies produced
6    encouraging results to move forward with this mesh
7    concept."
8            Correct?
9        A.   Yes.
10       Q.   And I believe you've already told me that you
11   do not think that Ultrapro -- strike that.
12           Ultrapro is the same mesh as Prolift+M;
13   correct?
14       A.   Prolift+M used the Ultrapro.
15       Q.   Okay. And you do not believe that Ultrapro,
16   known as Prolift+M, is appropriate for use in the
17   pelvic floor; correct?
18       A.   This work is focused on the tension-free
19   situation in the abdominal wall without applying any
20   forces to it. At that time we didn't think that
21   someone is using this mesh for a situation where you
22   applied some forces; and, therefore, Ultrapro is
23   still the mesh I think with the largest pores and,
24   therefore, with a pretty nice tissue integration if

41 (Pages 158 to 161)

Prof. Dr. Med. Uwe Klinge

Page 162

1   applied without any force and tension and if it's
2   laying flat.
3       Q.  Is it your opinion that Ultrapro should not
4   be used for abdominal hernia repair?
5       A.  For abdominal hernia repair there is, of
6   course, an indication to use it.
7       Q.  Okay.  And so is it your opinion that
8   Ultrapro is appropriate for abdominal hernia repair,
9   but the same mesh in Ultrapro, which is in Prolift+M,
10  is not appropriate in the pelvic floor?
11      A.  It doesn't matter in what tissue you are
12  using it.  It is -- you should use it in a
13  tension-free way so that it's laying as an area, as a
14  flat mesh there.  If you apply some tension -- and we
15  made ourselves experiments using the Ultrapro close
16  to the diaphragma where we applied some tension to it
17  and got disappointing results with the Ultrapro.  So
18  it depends on the specific indication function of
19  these devices.
20      Q.  And surgical technique?
21      A.  If you are free -- if you are free, of
22  course, with the surgical technique you can do every
23  complication that is imaginable, but there are some
24  procedures that need some forces, and in these cases

Page 163

1   this mesh is not a good alternative.  It's not a safe
2   alternative.
3       Q.  And when you speak about "this mesh," you're
4   talking about Ultrapro?
5       A.  Ultrapro.
6       Q.  Okay.
7       A.  Yeah, you talk.
8       Q.  Is there any mesh that you've identified
9   that's appropriate for use in the pelvic floor for
10  the repair of pelvic organ prolapse?
11      A.  I cannot give a general statement to this.  I
12  know that there are textile constructions and design
13  for meshes that are more resistant to the collapse,
14  but it depends on the indication of the specific
15  situation.  There is never one device for all
16  diseases in the pelvic floor.  No, it's not done.  It
17  has to be very carefully designed for the specific
18  purpose.
19      Q.  And you've not designed a specific mesh for
20  the treatment of pelvic organ prolapse; true?
21      A.  No.  I'm only asked sometimes whether this
22  fits our -- whether the device of the FEG, where I am
23  a consultant, fits to these principles of less
24  material, large pores and stability of the structure.

Page 164

1       Q.  You answered my question no, so I need to
2   answer it again -- ask it again.
3           It's true that you have never designed a mesh
4   for the treatment of pelvic organ prolapse; true?
5       A.  I was involved in the design process in
6   regards to the question whether the textile design
7   fulfills these requirements, but, of course, I'm not
8   entirely manufacturing or designing meshes for the
9   pelvic floor.
10      Q.  And can you identify for me any mesh
11  available in the United States today that is -- where
12  the benefits outweigh the risk for the treatment of
13  pelvic organ prolapse?
14      A.  You cannot answer this question because it's
15  a general statement.  It doesn't make any sense.
16      Q.  Okay.  Since the work that you've done --
17  strike that.
18          Since your 2005 article that you've just
19  described, there have been long-term studies
20  comparing lightweight large pore mesh against small
21  pore heavyweight mesh, haven't there?
22      A.  There has been published several studies,
23  yeah.
24                      - - -

Page 165

1       (Klinge Trial Deposition Exhibit No. 5,
2   Article entitled "Long-term outcome and quality of
3   life after open incisional hernia repair - light
4   versus heavyweight meshes", was marked for
5   identification.)
6                      - - -
7   BY MR. THOMAS:
8       Q.  Let me show you what's been marked as Klinge
9   Trial Exhibit Number 5.  It's a research article
10  titled "Long-Term Outcome and Quality of Life After
11  Open Incisional Hernia Repair, Light Versus
12  Heavyweight Meshes."  First author is Ladurner.  Have
13  you seen this study?
14      A.  I guess I have seen it, yeah.
15      Q.  And this is a long-term study of up to 72
16  months after incisional hernia repair with
17  lightweight meshes compared to heavyweight meshes;
18  correct?
19      A.  Yeah.
20      Q.  And the heavyweight mesh is a Prolene mesh.
21  The lightweight mesh is your Vypro mesh; correct?
22      A.  Yes.
23      Q.  And the two groups were equal in body mass
24  index, age, gender and hernia size; correct?

42 (Pages 162 to 165)

Prof. Dr. Med. Uwe Klinge

Page 166

1        Is that correct?
2        A.  Age and gender you said?
3        Q.  If you look in the abstract, see in the
4    abstract?
5        A.  Yeah.
6        Q.  It says right in the middle under "Methods,"
7    "The two groups were equal in BMI," which is body
8    mass index, "age, gender and hernia size."  Correct?
9        A.  Yeah.  I'm looking to the data there, so
10   hernia size almost -- it's -- yeah.
11       Q.  Okay.  And it finds in the conclusions, "In
12   this study the health-related quality of life based
13   upon FS36 survey after open incisional hernia repair
14   with light or heavyweight meshes is not related to
15   the mesh type in the long-term follow-up."
16       Did I read that correctly?
17       A.  You read this correctly.
18       Q.  And what that means is that the kind of mesh
19   that was used in the hernia repair did not affect the
20   long-term quality of life in the patients in this
21   study; true?
22       A.  No.  Because it is ridiculous to take this
23   study with 12 patients in one group and 12 patients
24   in the other and to make a read out with the FS36.

Page 167

1    It is so tremendously underpowered that this
2    statement, of course, is not confirmed by these data.
3    It's ridiculous to discuss this.
4        Q.  Well, it's certainly what this study reports;
5    correct?
6        A.  You read it correctly.
7        Q.  Okay.  And it's published in the
8    peer-reviewed literature?
9        A.  Yes.  Maybe -- yeah.  BMC should be peer
10   reviewed, yes.
11       Q.  Okay.  But you disagree with the findings in
12   Exhibit Number 5; correct?
13       A.  No.  The findings they describe, but the
14   conclusion, it is underpowered.  You cannot state
15   this.  So the findings, when they measured it, yeah,
16   it can be correct.  But to take 12 patients in one
17   group and 12 in the other and come up with this
18   conclusion, it is dangerous to do so.
19       Q.  And the reason why is because you want to
20   have more subjects in the study or perhaps even a
21   registry to allow you to have more data upon which to
22   make certain findings; correct?
23       A.  The reason is coming from the statistics,
24   that you need a certain amount of data to come with

Page 168

1    this conclusion; and it is not justified.  And the
2    statistical power is just one measure.  Yeah, you
3    have to consider this.  It's not because I want to
4    have it.
5        Q.  Let's --
6        A.  And, therefore, it is so difficult to make a
7    clinical trial comparing two different devices in
8    similar patients.
9        Q.  Let's --
10       A.  And, therefore, we need as an alternative
11   registry.  Yes, I'm sure.
12       Q.  Registries is the better way to go?
13       A.  It offers the option to accumulate data from
14   a long -- of very many patients over a long period,
15   and, of course, the data of the registries over the
16   time will help us to understand it.
17       MR. THOMAS:  Let's take a break and change
18   the tape.
19       THE VIDEOGRAPHER:  We are off the record.
20   The time is 12:21 p.m.
21   (A recess was taken from 12:21 p.m. until 12:33 p.m.)
22       THE VIDEOGRAPHER:  This marks beginning of
23   Video Number 3.  We are back on the record.  The
24   time is 12:33 p.m.

Page 169

1    BY MR. THOMAS:
2        Q.  Doctor, before we were -- broke, we were
3    talking about the limitations in randomized
4    controlled trials, about them not being sufficiently
5    powered; correct?
6        A.  Yes.
7                       - - -
8        (Klinge Trial Exhibit No. 6, Article entitled
9    "Bias-Variation Dilemma Challenges Clinical Trials:
10   Inherent Limitations of Randomized Controlled Trials
11   and Meta-Analyses Comparing Hernia Therapies", was
12   marked for identification.)
13                      - - -
14   BY MR. THOMAS:
15       Q.  Let me hand you what I have marked as Klinge
16   Trial Exhibit Number 6.  Klinge Trial Exhibit
17   Number 6 is a paper you have just published on this
18   topic, isn't it?
19       A.  Yes.
20       Q.  And on the first page, I guess it's a 2014
21   paper, titled "Bias-Variation Dilemma Challenges
22   Clinical Trials: Inherent Limitations of Randomized
23   Controlled Trials and Meta-Analyses Comparing Hernia
24   Therapies."  And in this paper you criticize

43 (Pages 166 to 169)

Prof. Dr. Med. Uwe Klinge

Page 170

1   randomized controlled trials and meta-analyses;
2   correct?
3       A.  I showed the limitation of these --
4       Q.  Yes.
5       A.  -- or some questions.
6       Q.  And the ultimate conclusion of this paper,
7   Klinge Trial Exhibit Number 6, is that registries
8   provide better information than do randomized
9   controlled trials or meta-analyses; correct?
10      A.  Not correct.  If you believe that better is
11  sufficient than -- that is not the purpose to have
12  better data, but we need other data, and registries
13  are able to provide additional data that will help us
14  to define what is the outcome of the patients, yes,
15  additionally.
16      Q.  Go to page 787 of Trial Exhibit Number 6.
17      You see that?  You see in the middle of the
18  second paragraph it begins, "Observational studies
19  nowadays can best be done with the help of
20  registries, would provide a structure and a set of
21  variables that are known to reflect all major
22  influences on the patients' outcome.  In this regard,
23  it uses the same variables as the RSCT but did not
24  restrict its data acquisition to a small group of

Page 171

1   study patients."
2       Did I read that correctly?
3       A.  Yes.
4       Q.  And the purpose of that is to talk about more
5   robust data set from a greater number of people?
6       MR. ANDERSON:  Objection.  RSCTs are outside
7   the scope of direct.
8       But go ahead, Dr. Klinge.
9       THE WITNESS:  So I'm not sure whether it's
10  possible to reduce robust database, whether this
11  covers all the questions that we address in this
12  article.
13  BY MR. THOMAS:
14      Q.  Do you conclude from this article that using
15  data from a long-term registry with a large number of
16  patients with more data is better than doing the
17  randomized controlled trials that have been used in
18  the past?
19      A.  I would never say that it is better in a
20  general term.  It will help us to define the outcome
21  of the patients, better than in -- with all the
22  limitations of randomized controlled trials, and this
23  is expressed on several pages there.
24      Q.  Okay.

Page 172

1       A.  So registries should be done additionally to
2   randomized controlled trials depending on the
3   question, depending on the setting.
4       Q.  And registries, just for the benefit of the
5   jury, are sets of data that are accumulated as people
6   go through hernia surgeries, and data is completed at
7   the time of the surgery; correct?
8       A.  The data are not complete yet.  Registries
9   have the advantage that you can include various kinds
10  of patients, not only restricted to some standard
11  patients, and you can include a follow-up of various
12  times, very long period.  There is -- in clinical
13  studies, you usually finish after one day or one year
14  or two years.  So the registry offers a lot more
15  options to made a post-market surveillance quality
16  control of devices; and, therefore, I think it is
17  very interesting from manufacturer if they are
18  interested in making their follow-up of their
19  patients.
20      Q.  Okay.  Let me show you what's been marked as
21  Klinge Trial Exhibit Number 6.
22      THE COURT REPORTER:  It should be 7.
23      MR. THOMAS:  Seven.  I'm sorry.  Let me mark
24  on it 7.  Let me have that back, Doctor, please.

Page 173

1           - - -
2       (Klinge Trial Exhibit No. 7, Article entitled
3   "Prospective, Long-Term Comparison of Quality of Life
4   in Laparoscopic Versus Open Ventral Hernia Repair",
5   was marked for identification.)
6           - - -
7   BY MR. THOMAS:
8       Q.  Doctor, let me show you what I have marked
9   now as Klinge Trial Exhibit Number 7.
10      Klinge Trial Exhibit Number 7 is a 2012
11  study, first author Colavita, titled "Prospective,
12  Long-Term Comparison of Quality of Life in
13  Laparoscopic Versus Open Ventral Hernia Repair."
14      Have you seen this before?
15      A.  I have seen it, but it's some time ago.
16      Q.  Okay.  And if you look down at the methods,
17  patients in this study were drawn from the
18  international hernia registry; correct?
19      A.  Yes.
20      Q.  And it's 30 centers in the United States,
21  Canada and Europe and Australia; correct?
22      A.  Yes.
23      Q.  And in this study the authors looked at a
24  total of 710 hernia repairs; correct?

44 (Pages 170 to 173)

Prof. Dr. Med. Uwe Klinge

Page 174

1    A.  Yes.
2    Q.  And looked at the long-term comparison of
3  quality of life for these 710 hernia repairs;
4  correct?
5    A.  Yes.
6    Q.  And they used what's known as the Carolinas
7  Comfort Scale.  Are you familiar with that?
8    A.  Yes, I know it.
9    Q.  And that's -- is that similar to the SF-36
10  questionnaire that we talked about in the previous
11  study?
12    A.  It is another tool.
13    Q.  Okay.  Do you recognize the Carolinas Comfort
14  Scale as a way to determine the quality of life in a
15  population of patients?
16    A.  It is a way to measure it, yeah.
17    Q.  Okay.  At the time this study was published
18  in 2012, if you look at the first page under the
19  abstract and conclusion, to your knowledge was this
20  the largest prospective quality of life study
21  comparing laparoscopic ventral hernia repair with
22  open ventral hernia repair, or do you know?
23    A.  I think that's -- that is true.
24    Q.  Okay.  And so what these authors did was go

Page 175

1  to the registry and get the data that you have just
2  described in your previous answers in order to make
3  their analysis of a bigger population with more data
4  for their findings; true?
5    A.  They are going to a registry, but the
6  registry is not only registry because it has name.
7  You have to go into the details, look at what
8  variables are recorded.  That was outlined in the
9  previous paper for me.
10    Q.  If you go to page 719 of Klinge Trial Exhibit
11  Number 7, first paragraph on the left, midway down,
12  the authors conclude from this study, "There was no
13  difference in mesh sensation symptoms between
14  heavyweight or lightweight polypropylene mesh.  As
15  mentioned earlier, both were used with similar
16  frequency and laparoscopic and open repairs."
17        Did I read that correctly?
18    A.  Yes.
19    Q.  So across this population of 710 hernia
20  repairs, comparing lightweight mesh as opposed to
21  heavyweight mesh, they found no difference as to mesh
22  sensation; correct?  Is that correct?
23    A.  They described that they found -- yeah.
24    Q.  Okay.  And if you go to page 721 of the same

Page 176

1  study, first full paragraph on the left, it says, "In
2  multivariant analysis, mesh weight had no effect on
3  pain, activity limitation, mesh sensation, or overall
4  symptoms in the present study."
5        Did I read that correctly?
6    A.  You read this correctly.
7    Q.  And it follows down to the end of that
8  paragraph and it says, "In a recent small comparative
9  study of open ventral hernia repair with light and
10  heavyweight mesh, no difference was seen in quality
11  of life using SF-36 with long-term follow-up."
12        And that's the study that we looked at a
13  minute ago, the Ladurner study; correct?
14    A.  Twenty-seven, if this is here, the reference,
15  27?  Yeah, you're right.
16    Q.  The results of this study, Klinge Exhibit 7,
17  confirms these findings -- this long-term study from
18  the registry, Klinge Exhibit Number 7, confirms the
19  randomized controlled trials, the Ladurner study,
20  that we talked about before.  That's what this study
21  finds; correct?
22    A.  It confirms that the insufficiency of this
23  study to detect any differences.  It is not possible
24  to prove something by doing these studies, and,

Page 177

1  therefore, there is a tremendous flaw in the
2  interpretation of these data.  You are not allowed to
3  say that this study proves that result is similar.
4  It is -- it is not justified to do so.
5    Q.  Okay.  Let's --
6    A.  Even if it's done and even if it's published,
7  no.
8    Q.  So you disagree with the findings in Klinge
9  Exhibit Number -- Trial Exhibit Number 7?
10    A.  The interpretation, yeah.  It's completely
11  not justified.
12    Q.  Now, Dr. Klinge, you have contended for years
13  that traditional use of hernia repair was
14  overengineered -- excuse me.  Start over again.
15  Strike that.
16        Doctor, you have contended for years that
17  traditional meshes used for hernia repair are
18  overengineered and is stronger than is necessary for
19  the treatment of hernia repair; correct?
20    A.  We found this, yeah.
21    Q.  And you have argued that a lighter weight
22  larger pore mesh is better to accomplish the same
23  treatment of hernia repair; correct?
24    A.  Is better to?

45 (Pages 174 to 177)

Prof. Dr. Med. Uwe Klinge

Page 178

1    Q.   Yes.
2    A.   I didn't get every word of your question.
3    Q.   Let me ask it again.
4    A.   Yes.
5    Q.   You have contended that a manufacturer can
6    design a lighter weight larger pore mesh to
7    accomplish the same repair of a hernia as you can
8    with a traditional heavyweight mesh; correct?
9    A.   No.
10   Q.   What did I miss?  You can't get the same
11   repair with a lighter weight larger pore mesh?
12   A.   If you're believing that you can exactly the
13   same type of repairs with a heavyweight mesh and a
14   large pore lightweight meshes, no, that's not true.
15   There are indications for the different meshes.
16   Q.   Still appropriate --
17   A.   What we said is that you can improve the
18   tissue integration by reduction of the material,
19   making the pores larger, and that -- therefore, we
20   developed together with Ethicon these large pore
21   meshes, and this was confirmed in many animal trials,
22   human explants.
23   Q.   Let's go back to P1087, please.
24        MR. ANDERSON:  Did you say 1087?

Page 179

1        MR. THOMAS:  Yes.  It's the PowerPoint.
2        MR. ANDERSON:  I know.  We just have a stack
3    of documents, so I have to find it.
4        MR. THOMAS:  Strike that.  I'm not going to
5    do that one anyway.
6        MR. ANDERSON:  Okay.
7        MR. THOMAS:  Let's go to P0260, which is a
8    2002 study with Dr. Klinge and Dr. Klosterhalfen.
9        MR. ANDERSON:  Okay.
10   BY MR. THOMAS:
11   Q.   Doctor, on direct examination you discussed
12   Plaintiff's Exhibit 0260 in connection with your
13   earlier work on talking about the impact of polymer
14   pore size on the interface scar formation in a rat
15   model; correct?
16   A.   That is correct.
17   Q.   And you used this article to talk about your
18   findings about what happens with the smaller pore
19   heavyweight mesh, correct, as compared to the
20   heavyweight large pore mesh?
21   A.   Yes.
22   Q.   And in this study, the lightweight large pore
23   mesh that you use as a comparator is your Vypro mesh?
24   A.   Yes.

Page 180

1    Q.   And that's the mesh that you helped develop
2    with Ethicon?
3    A.   Yes, with a pore size of 3 to 5 millimeter.
4    Q.   And you compared Vypro against the
5    heavyweight monofilament Marlex; correct?
6    A.   In this article we took Marlex --
7    Q.   Correct.
8    A.   -- as an example of a small pore mesh.
9    Q.   And the Marlex pore size is not the same as
10   the Prolene Soft pore size, is it?
11   A.   There are differences.
12   Q.   Yes.  The Marlex mesh is typically reported
13   as a 0.6 millimeter mesh, isn't it?
14   A.   Roughly it is assumed that it has smaller
15   pores.
16   Q.   And the Prolene Soft Mesh is typically
17   described as a mesh with about 2.5 millimeters;
18   correct?
19   A.   I don't want to say that it is possible to
20   reflect the pore size just by one figure.  You know
21   all the limitations of all these techniques, yeah.
22   Q.   They are certainly different, aren't they?
23   The Marlex and the Prolene Soft Mesh are very
24   different in their characteristics?

Page 181

1    A.   Yes.  The soft Prolene mesh is more open than
2    the Marlex.
3    Q.   Okay.  Doctor, you cannot point to a mesh
4    today for use in the pelvic floor that has no risks
5    of infection, can you?
6    A.   There is no study -- if you -- no risks means
7    no complication at all?  No, there is no way.
8        MR. ANDERSON:  I'll just say objection;
9    outside the scope of direct.
10   BY MR. THOMAS:
11   Q.   And, Doctor, you do not know of any mesh
12   construction that leads to a lower -- strike that.
13        Doctor, you do not know of any mesh
14   construction for use in the pelvic floor that leads
15   to a lower erosion rate than Prolift; correct?
16   A.   I know that there -- that there are ways
17   to reduce the risk.  There are no clinical
18   comparative studies, to my knowledge.
19   Q.   Doctor, you know of -- you do not know of any
20   mesh construction today for use in the pelvic floor
21   that leads to a lower erosion rate than Prolift;
22   correct?
23        MR. ANDERSON:  Objection; asked and answered.
24        THE WITNESS:  A mesh construction which

46 (Pages 178 to 181)

Prof. Dr. Med. Uwe Klinge

Page 182

```
 1      follows our criteria reducing the material,
 2      making it larger, it will reduce the erosion
 3      rate, but there is no comparative study
 4      available.
 5      BY MR. THOMAS:
 6          Q.  Let me ask the question again, Doctor.
 7          Are you aware of any mesh construction for
 8      use in the pelvic floor that leads -- strike that.
 9          Are you aware of any mesh constructions
10      available for use today in the pelvic floor that
11      leads to lower erosion rates than Prolift?
12          MR. ANDERSON:  Objection; asked and answered
13      for the third time.
14          THE WITNESS:  As I don't know any comparative
15      study directly comparing different mesh
16      structures, I only can say that there are mesh
17      structures with lower risk than the Prolift.
18      BY MR. THOMAS:
19          Q.  But you are --
20          A.  For erosion.
21          Q.  But you are aware of no studies that prove
22      that point; correct?
23          A.  No clinical studies proving this.
24          Q.  Is that true?
```

Page 183

```
 1          A.  That is true.
 2          Q.  Okay.  And you are aware of no mesh
 3      construction that causes less chronic pain in the
 4      pelvic floor than Prolift; true?
 5          A.  No clinical study comparing different mesh
 6      materials and showing differences are available up to
 7      now.
 8          Q.  And you're aware of no mesh design for use in
 9      the pelvic floor that provides lower contracture
10      rates than the Prolift; true?
11          A.  No, that's not true.  I'm well-aware of mesh
12      criteria for a safer mesh design as we outlined it,
13      less material, larger pores and no pore collapse.
14      This will make a safer mesh design.
15          Q.  Are you aware of any mesh design available
16      for use today in the pelvic floor that provides lower
17      contraction rates than the Prolift?
18          A.  There are mesh constructions which are closer
19      to these criteria for mesh design -- for safe mesh
20      design.
21          Q.  Are you aware of any comparative studies
22      which show that there is a mesh available for use in
23      the pelvic floor today that provides lower
24      contracture rates than the Prolift?
```

Page 184

```
 1          A.  No comparative studies are available, to my
 2      knowledge.
 3          Q.  Okay.  Can you name one mesh on the market
 4      today that you think that the benefits outweigh the
 5      risks for use in treatment of pelvic organ prolapse?
 6          A.  No.  And to answer this question, it is
 7      impossible in this general statement.  It depends on
 8      the patient.  It depends on the indication.  Then you
 9      have to specify which implant under which conditions.
10      So it is not possible to answer this question.
11          MR. THOMAS:  Let's take a break for a second.
12          THE VIDEOGRAPHER:  We are off the record.
13      The time is 12:55 p.m.
14      (A recess was taken from 12:55 p.m. until 1:00 p.m.)
15          THE VIDEOGRAPHER:  We are back on the record.
16      The time is 1:00 p.m.
17      BY MR. THOMAS:
18          Q.  Doctor, can you tell the jury one product on
19      the market for the treatment of pelvic organ prolapse
20      that you think is better than the Prolift?
21          A.  In regard to the effective porosity, for
22      example, and the strain, I know that DynaMesh has a
23      device that is superior to the Prolift.
24          Q.  And the DynaMesh is not -- is that the only
```

Page 185

```
 1      one that you think is better for use in the pelvic
 2      floor --
 3          A.  I know --
 4          Q.  -- than the Prolift?
 5          A.  I know there is a huge variety.  I'm not sure
 6      which is -- what is on the market, actually, but I
 7      know that there are various designs of meshes; but we
 8      didn't make a systematic testing of all devices that
 9      are on the market or have been on the market.
10          Q.  And the DynaMesh is not available for sale in
11      the United States; correct?
12          A.  I think so, but I'm not informed about the --
13          Q.  You think that it is available?
14          MR. ANDERSON:  Let him finish his answer, if
15      you wouldn't find.
16          Go ahead.
17          THE WITNESS:  I think it is not available,
18      but I'm not knowing all the details which product
19      is in which country on the market.
20      BY MR. THOMAS:
21          Q.  Let me --
22          A.  I'm not involved in this business.
23          Q.  Let me ask the question this way so it's
24      clear.  We had some interruptions.
```

47 (Pages 182 to 185)

Prof. Dr. Med. Uwe Klinge

Page 186

1    You don't know whether DynaMesh, manufactured
2  by FEG, is available for sale in the United States,
3  do you?
4    A.  I don't know.
5    Q.  Okay.  And you said that DynaMesh is better
6  than Prolift from the perspective of effective
7  porosity?
8    A.  As we measure it, as we can show with our
9  measurements it has a higher effective porosity, it
10  has a higher stability when put to strain.
11    Q.  But you agree that there are no clinical
12  long-term studies that prove the superiority of the
13  DynaMesh over the Prolift for the treatment of pelvic
14  organ prolapse?
15    A.  There are at all no comparative studies
16  showing the superiority of any of these, and, again,
17  it is not possible to do so.  I don't see a good way
18  to do so.
19    Q.  And you're aware of no studies that
20  demonstrate that PVDF mesh, which is DynaMesh, is
21  superior to the polypropylene mesh used in Prolift;
22  correct?
23    A.  We know from many histological studies that
24  the tissue reaction to PVDF is better than the tissue

Page 187

1  reaction to the polypropylene, less inflammation,
2  less scarring when you are using the PVDF.
3    Q.  And the PVDF -- strike that.
4    You're aware of no studies in humans that
5  demonstrate that PVDF mesh is superior to
6  polypropylene mesh used in Prolift for pelvic floor
7  repair; correct?
8    A.  Our studies in human explants always
9  confirmed the superiority of PVDF as a polymer to be
10  integrated in tissue.
11    Q.  And is this in hernia explants?
12    A.  This is in hernia explants.
13    Q.  And these -- this is the hernia explants that
14  you've reviewed with Dr. Klosterhalfen in his
15  collection?
16    A.  Yes.
17    Q.  And have you looked at any PVDF mesh explants
18  from the pelvic floor?
19    A.  Up to now I never saw one.
20    Q.  Okay.
21    A.  Which is a good sign.
22    Q.  And just so the record is clear, you don't
23  maintain your own collection of mesh removed from the
24  pelvic floor; correct?

Page 188

1    A.  I don't have an own -- at the moment I don't
2  have an own collection of pelvic floor meshes.
3    Q.  You collect hernia meshes; correct?
4    A.  We had collected, but meanwhile the -- all
5  the tissue samples are stored in a biotissue bank
6  from the university from the institute for pathology
7  centrally where they are stored under GCP conditions.
8    Q.  Okay.  But you've never asked your department
9  that deals with the pelvic floor to preserve and
10  collect meshes that have been removed in explants;
11  correct?
12    A.  No.  It's no longer an issue that I -- that
13  I'm asked to collect these.  They are sent all to
14  this bio bank; and when you want to make a research,
15  then you can ask for getting these samples.
16    Q.  Now, to your knowledge, there's only one mesh
17  manufacturer in the world that makes mesh made of
18  PVDF for the treatment of pelvic organ prolapse;
19  correct?
20    A.  In the moment, I think this is true.
21    Q.  And that's FEG?
22    A.  This is true.
23    Q.  And that's the German mesh manufacturer
24  headquartered here in Aachen?

Page 189

1    A.  Yes.
2    Q.  And you helped PVDF -- excuse me.  Strike
3  that.
4    You helped FEG develop its PVDF mesh, didn't
5  you?
6    A.  Yes.
7    Q.  And you're named on the patent for PVDF mesh?
8    A.  Yes.
9    Q.  You've done research for FEG since 1994;
10  correct?
11    A.  That is correct.
12    Q.  And Dr. Oberlinski is one of FEG's owners;
13  correct?
14    A.  That is correct.
15    Q.  And he used to work with you at the
16  university; correct?
17    A.  This again?
18    Q.  He used to work -- Dr. Oberlinski used to
19  work at the university, didn't he?
20    A.  When we started our collaboration, he worked
21  for the institute for textile engineering at the
22  university, but then later on he changed to the
23  company.
24    Q.  It was Dr. Oberlinski who first told you that

48 (Pages 186 to 189)

Prof. Dr. Med. Uwe Klinge

Page 190

1    there are several textile options available to change
2    mesh?
3        A.  Yes.
4        Q.  Now, you've been a paid consultant by FEG
5    since 1998 or 1999.  Is that true?
6        A.  No.  I guess it was later on.  It was after
7    the contract finished with the -- with Ethicon.
8        Q.  And to this day you're compensated annually
9    by FEG; correct?
10       A.  Correct.
11       Q.  And they pay you about 30,000€ a year?
12       A.  Yeah.
13       Q.  They determine how much they'll pay you each
14   year depending on how well the company does that
15   year; correct?
16       A.  Yes.
17       Q.  And you've spoken at conferences sponsored
18   solely by FEG; correct?
19       A.  Yes.
20       Q.  And you do that routinely?  You regularly
21   attend conferences around the world on behalf of FEG;
22   correct?
23       A.  I routinely attend conferences, and I am
24   invited all over the world.  Most of these, far most

Page 191

1    of these invitations are not linked to the FEG.  So
2    it is an exception if I do it on the -- on the
3    invitation of the FEG.  This is a rare exception.
4        Q.  And your picture is on the FEG website, isn't
5    it?
6        A.  Maybe.  To be fair, I never have looked to
7    this website.  I didn't saw any need to do so.
8        Q.  And you're going to teach next week in
9    Baden-Baden at a class sponsored by FEG, aren't you?
10       A.  Yeah.
11       Q.  The International Masterclass for
12   Laparoscopic Hernia Repair; correct?
13       A.  Yes.
14       Q.  And that's a seminar sponsored by the FEG?
15       A.  Yeah.  It was an invitation by Professor
16   Berger, who was the former head of the German
17   Society, and we did it for the fourth time or the
18   fifth time.
19       Q.  And the agenda for the hernia session is on
20   the FEG website, isn't it?
21       A.  As I told you, I'm not a visitor of this
22   website.
23           MR. THOMAS:  That's all the questions I have.
24   Thank you, Doctor.

Page 192

1            MR. ANDERSON:  Okay.  Take a short break.
2            THE VIDEOGRAPHER:  We are off the record.
3    The time is 1:10 p.m.
4    (A recess was taken from 1:09 p.m. until 1:31 p.m.)
5            THE VIDEOGRAPHER:  We are back on the record.
6    The time is 1:31.
7            REDIRECT EXAMINATION
8    BY MR. ANDERSON:
9        Q.  Dr. Klinge, do you remember when counsel was
10   asking you some questions about the PVDF mesh and
11   PVDF fibers?
12       A.  There has been several questions, but I
13   remember.
14       Q.  Okay.  If we could go to Plaintiff's Exhibit
15   697 right here.  It's the Otto article.  If we could
16   go over a few pages to the mesh.
17           MR. ANDERSON:  No.  Blow up the top part.
18   Actually, no, no.  Next page.
19           MR. KAUFFMANN:  Next page?
20           MR. ANDERSON:  Okay.  Yeah.  Blow up the
21   whole top part.
22   BY MR. ANDERSON:
23       Q.  Doctor, the mesh on the far right side, the
24   DynaMesh, is that the mesh that you were talking with

Page 193

1    counsel about that's made by FEG?
2        A.  Yes.  This is a PVDF mesh made by FEG.
3        Q.  And does FED -- FEG make meshes made out of
4    this PVDF material for pelvic organ prolapse?
5        A.  Yes.
6        Q.  And just explain quickly for the jury what
7    PVDF is as a polymer, as a material.
8        A.  PVDF is a plastic material like -- as
9    polypropylene is, but it has -- it consists of two
10   fewer atoms.  So it has some other molecules inside,
11   and it has more stability than the polypropylene.
12       Q.  How long have you known about PVDF as an
13   alternative polymer to polypropylene for surgical
14   meshes?
15       A.  We, actually, started to think about it in
16   1997.  When we finished the Vypro, we knew that it
17   was possible to made a mesh with large pores.  But
18   Vypro consists of five filaments, and to reduce
19   further on the risk for bacterial infection, we
20   wanted to construct it as a monofilament.  And,
21   therefore, we have been looking for the best material
22   for the construction of a monofilament large pore
23   meshes.  And there it came up that PVDF may be the
24   best.

49 (Pages 190 to 193)

Prof. Dr. Med. Uwe Klinge

Page 194

1        And we approached Ethicon to join this
2   activity further on.  We asked for some grants to do
3   this research, and, fortunately, we got the
4   permission to do this project by our university and
5   we got some further grants to work on PVDF meshes;
6   but, unfortunately, Ethicon denied to develop meshes
7   made of PVDF, though they provided us with one PVDF
8   mesh that is made by Ethicon.
9        Q.  So did Ethicon have an opportunity to work
10  with you and FEG to develop PVDF meshes during this
11  time period?
12       A.  Obviously they had a mesh, but they didn't
13  want to go into this project to develop PVDF meshes,
14  but they were asked, but they denied.  They didn't
15  want to do so.
16       Q.  Have you studied the differences in the
17  tissue reaction in patients' tissue of polypropylene
18  versus a PVDF?
19       A.  Yeah.  We did a several --
20       Q.  Okay.
21       MR. ANDERSON:  Pull up Plaintiff's Exhibit
22  770, which may help us with this discussion.
23       - - -
24       (Plaintiff's Exhibit No. PLT0770, Article

Page 195

1   entitled "New Polymer for Intra-Abdominal Meshes -
2   PVDF Copolymer", was marked for identification.)
3       - - -
4   BY MR. ANDERSON:
5       Q.  I'm showing you what's been marked as
6   Plaintiff's Exhibit 0770.  Is this some of the
7   research that you were just describing where you were
8   looking at tissue response to PVDF?
9       A.  Yes.
10      Q.  Okay.  Tell the jury what your conclusions
11  were after looking at this PVDF study.
12      A.  In this study, this study clearly confirms
13  that the tissue reaction to the PVDF is better than
14  for the polypropylene.
15      Q.  Who provided you with the PVDF meshes for
16  testing in this study?
17      A.  It was a PVDF mesh made by Ethicon.
18      MR. ANDERSON:  Let's go to the end of the
19  document under the conclusion section.  Go back.
20  There.  "This study was supported..."
21      No.  Down below.  Next paragraph.
22  BY MR. ANDERSON:
23      Q.  Is this what you're discussing, that this
24  PVDF study was, in fact, supported and funded by

Page 196

1   Ethicon?
2       A.  Yes.
3       Q.  Okay.
4       MR. ANDERSON:  Let's go to Exhibit 3354.  Oh,
5   it's the wrong one.  I need the translation.
6       - - -
7       (Plaintiff's Exhibit No. P3355, English
8   Translation of Plaintiff's Exhibit 3354, Patent for
9   PVDF mesh, was marked for identification.)
10      - - -
11  BY MR. ANDERSON:
12      Q.  I'm showing you what has been marked as
13  Plaintiff's Exhibit 3355.  What is this, Doctor?
14      A.  This is a patent from Ethicon.
15      Q.  Okay.  And what's it a patent for?
16      A.  It's a patent for a PVDF mesh.
17      Q.  Is this something that you've reviewed and
18  relied upon in forming any of your opinions here?
19      A.  Yes.
20      Q.  If you'll turn over to page 12.
21      MR. THOMAS:  Show my objection to this
22  witness offering any testimony about this
23  document.  It's well beyond the scope of his
24  expertise.  The document speaks for itself.

Page 197

1       There's nothing special he can bring to the
2   issues raised by this patent.
3       MR. ANDERSON:  Yeah.  And I didn't ask him
4   anything about PVDF on direct.  You chose to.
5   You opened the door.  We're going to drive
6   through it.
7   BY MR. ANDERSON:
8       Q.  Okay.  So if you will look at page 12 under
9   claims.
10      A.  Yes.
11      Q.  What does it say with regard to the pore
12  sizes for PVDF mesh?
13      A.  Basic structure should have a pore size with
14  a range of 1.5 to 8.0 millimeter, so to be extremely
15  large, covering 90 percent of the total area of the
16  pores.
17      Q.  Okay.  Let's go to Plaintiff's Exhibit 1087,
18  which you've already seen.  Plaintiff's Exhibit 1087.
19  He can have it.  I gave him a copy.  Plaintiff's
20  Exhibit 1087.
21      You're okay.  You don't need to go there.
22  It's going to come up on the screen.
23      Is this a document we reviewed earlier during
24  your direct examination?

50  (Pages 194 to 197)

Prof. Dr. Med. Uwe Klinge

Page 198

1     A.  Yes.
2     Q.  Okay.  From 2008?
3     A.  From 2008.  Ethicon document.
4     Q.  Okay.
5         MR. ANDERSON:  If you'd go to the slide.
6         MR. KAUFFMANN:  Got it.
7         MR. ANDERSON:  Yes.  Blow up that bottom
8     left.
9  BY MR. ANDERSON:
10    Q.  In this Ethicon presentation, what is this?
11    A.  This is a PVDF copolymer mesh.
12    Q.  And do you know -- and based upon your review
13 of the patent and your review of these documents, did
14 Ethicon have a brand name for this PVDF mesh?
15    A.  No.  I don't think that they marketed it.
16    Q.  No.  Not marketed it but --
17    A.  Yeah.
18    Q.  -- did they have a brand name for it?
19    A.  Brand name was Pronova.  Pronova was the name
20 of this.
21    Q.  Do you have any information as to whether or
22 not Ethicon ever chose to sell their Pronova mesh
23 made out of PVDF?
24    A.  So far I know, they never brought it to the

Page 199

1  market.
2     Q.  And from your reading of the PowerPoint, what
3  was the discussion and the reason for this PowerPoint
4  being given at Ethicon?
5         MR. THOMAS:  Objection; state of mind,
6     knowledge of Ethicon.
7  BY MR. ANDERSON:
8     Q.  What was discussed in this Thunder PowerPoint
9  by Ethicon?
10        MR. THOMAS:  Same objection.
11        THE WITNESS:  The entire project was to
12    evaluate whether the use of PVDF would make a
13    safer approach -- would make a safer device for
14    the use in the pelvic floor.
15             ---
16        (Plaintiff's Exhibit No. P3184, Letter to
17    Quentin from Christoph Walther, Bates stamped
18    HMESH_ETH_00379723, was marked for identification.)
19             ---
20 BY MR. ANDERSON:
21    Q.  Let's look at Plaintiff's Exhibit 3184.  This
22 is a document that you have seen before, Dr. Klinge.
23        MR. ANDERSON:  If you'll highlight the
24    section that says "In extremely, this patient,"

Page 200

1  right there.
2         MR. THOMAS:  That's not what it says.  I
3     object to showing this document to the jury,
4     admission of this document and any testimony
5     about this document.  The document speaks by
6     itself, and this witness is not qualified, with
7     no foundation to give any comment about the
8     document.
9  BY MR. ANDERSON:
10    Q.  Dr. Klinge, did you, in fact, have this
11 document in your own files when you worked with
12 Ethicon?
13    A.  Yes.
14    Q.  And did you produce that to Ethicon when they
15 requested all of your files?
16    A.  Yes.
17    Q.  So this is a document that you received while
18 you were consulting with them?
19    A.  Yes.
20    Q.  Great.  And underneath there it says
21 Christoph Walther.  Is that one of the Ethicon
22 employees that you would have worked with?
23    A.  Yes.
24    Q.  And in the middle there where it says,

Page 201

1  "Pronova monofilaments are an extremely good
2  candidate as implant material, very high flexibility
3  and low bending stiffness" --
4     A.  Yes.
5     Q.  -- "and without loss of tensile strength in
6  contrast to polypropylene and long-term stability --
7  long-term stability in human body."
8         Do you agree with those statements by
9  Ethicon?
10    A.  Yes.
11    Q.  Do you have an opinion as to whether or not
12 polypropylene mesh is -- creates greater inflammatory
13 reaction in tissues than PVDF mesh?
14    A.  Polypropylene in general produces more
15 inflammation, more scarring than PVDF.
16    Q.  You were asked by Mr. Thomas on
17 cross-examination whether polypropylene has been used
18 in the human body for hernia mesh since 1962.  Do you
19 remember that question?
20    A.  Yes.
21    Q.  And has polypropylene been used in the human
22 pelvis of women for pelvic organ prolapse since 1962?
23    A.  No.  I don't think ten years.
24    Q.  He also pulled out the -- that 240 meters of

Prof. Dr. Med. Uwe Klinge

Page 202

1    suture material and asked you whether or not that
2    much material goes into some of the meshes in the
3    hernia -- for hernia repair.  Do you remember that
4    part of your questioning?
5        A.  Yes.
6        Q.  Is there a difference between that amount of
7    material in the abdominal wall than that amount of
8    material in a woman's vaginal space?
9        A.  Definitely.  The use of a mesh in the
10   abdominal wall, we don't have to consider some
11   forces.  It's laying there flat, usually beneath the
12   muscles.  You don't have any tension to any arms or
13   something like this.  There are less nerves.  There
14   are no organs with direct contact to the mesh that
15   can be damaged by this.  So it is more easy -- if you
16   have some complications, some infection, it is
17   quite -- much more easy to remove it and to repair
18   the damage after a mesh complication.
19       Q.  Easier to remove the hernia than the pelvic
20   organ prolapse, is that what you're saying?
21       A.  It is easier to remove the mesh.
22       MR. THOMAS:  Let me move to strike his
23   testimony about mesh in the pelvic floor as being
24   beyond the area of his expertise.

Page 203

1        MR. ANDERSON:  You sure asked him a lot of
2    questions about it, but okay.  Let's move on.
3    BY MR. ANDERSON:
4        Q.  You were asked some questions about
5    consenting your patients when you were a hernia
6    surgeon.  Do you remember that?
7        A.  Yes.
8        Q.  And you were asked questions about what risks
9    you would pass along to your patients; correct?
10       A.  Yes.
11       Q.  Can you pass along a risk if you're not told
12   about it by the manufacturer?
13       A.  No.
14       Q.  If you were a surgeon who's implanting a new
15   surgical device, do you expect the manufacturer to
16   pass along information they have about serious
17   adverse events that could affect that risk-benefit
18   discussion with your patients?
19       A.  Definitely.
20       MR. THOMAS:  Objection; foundation, beyond
21   the scope.
22       MR. ANDERSON:  It's direct response to the
23   cross-exam.
24   BY MR. ANDERSON:

Page 204

1        Q.  Go right ahead, Doctor.
2        A.  When using -- when I would use a new device,
3    I'm dependent on the information that is provided by
4    the manufacturer for the long-term risks or for the
5    risks that are connected to this device.  There is no
6    other way to get this information.
7        Q.  If you're a surgeon that's putting in what
8    you characterize as a relatively new device, if the
9    manufacturer knew that there was a serious long-term
10   risk of chronic debilitating pain, would you expect
11   them to pass that information along to you?
12       A.  Yes, I would.
13       MR. THOMAS:  Objection to foundation.
14       THE WITNESS:  And in parallel, he has to stop
15   selling it.
16   BY MR. ANDERSON:
17       Q.  And if a manufacturer was aware of serious
18   adverse events of life-altering untreatable erosions,
19   would you expect them to pass that along to you as a
20   surgeon?
21       MR. THOMAS:  Objection.
22       A.  Yes.
23       MR. THOMAS:  Argumentative.
24   BY MR. ANDERSON:

Page 205

1        Q.  Okay.  Wait until he does his objection --
2        A.  Sorry.
3        Q.  -- and then you can answer because it's
4    messing up the record, and it's harder for her to
5    type.
6        A.  Sorry.
7        MR. THOMAS:  Do you want to ask the question
8    again?
9        MR. ANDERSON:  I think I liked it.
10       THE COURT REPORTER:  You might need to --
11       MR. ANDERSON:  Because he interrupted me?
12       MR. THOMAS:  I didn't want mean to.
13       MR. ANDERSON:  Well, you already did.
14       MR. THOMAS:  I'm sorry.  Doing the best I
15   can, man.
16   BY MR. ANDERSON:
17       Q.  If a manufacturer is aware of serious
18   lifelong risk of recurrent erosions that can't be
19   treated, would you, as a surgeon, want to know that?
20       A.  Yes.
21       Q.  If a manufacturer is aware that their product
22   can create a serious adverse long-term risk of
23   dyspareunia or painful sexual relations, would you
24   expect them to pass that along to you?

52 (Pages 202 to 205)

Prof. Dr. Med. Uwe Klinge

Page 206

1      A.  Yes.
2      Q.  If a manufacturer was aware that in certain
3   patients, like young patients or sexually active
4   patients, that in those patients they shouldn't have
5   that device implanted, would you expect them to pass
6   that along to you?
7      A.  Yes.
8      MR. THOMAS:  Just show my objection to the
9   whole line is being beyond his whole line of
10   expertise as a hernia surgeon.
11      MR. ANDERSON:  And that's fine because, just
12   for the judge's purposes when we go to argue
13   this, Mr. Thomas asked numerous questions about
14   passing on the risk-benefit information and that
15   the manufacturer didn't need to tell him these
16   things because he already knew it; and so let's
17   go through some of the things on redirect of what
18   he would like to know from the manufacturer, and
19   so that's what I'm attempting to do now.  So
20   we'll note your objection and my response.
21   BY MR. ANDERSON:
22      Q.  If the manufacturer is aware that their
23   device should not be used with certain patients,
24   certain indications, would you expect them to pass

Page 207

1   that information along to you?
2      A.  Yes.
3      MR. THOMAS:  Objection; vague.
4      THE WITNESS:  Yes, of course.
5   BY MR. ANDERSON:
6      Q.  For instance, if a manufacturer knew that a
7   particular type of hernia or a particular type of
8   prolapse, it would be inappropriate to treat with
9   that device, would you expect them to pass that along
10   to you?
11      MR. THOMAS:  Objection; compound.
12      THE WITNESS:  Yes.
13   BY MR. ANDERSON:
14      Q.  Mr. Thomas said something on cross about the
15   Prolift being implanted tension-free.  You've seen
16   the DVD; correct?
17      A.  Yes.
18      Q.  You've seen the internal documents by
19   Ethicon?
20      A.  Yes.
21      Q.  Is there any way that a Prolift can actually
22   be implanted tension-free in a woman?
23      MR. THOMAS:  Objection; not an expert in the
24   surgical procedure.

Page 208

1      THE WITNESS:  There is no way to place it
2   completely tension-free, and I believe there is
3   no one who will really think of it as an option.
4   BY MR. ANDERSON:
5      Q.  When you saw those arms being pulled through
6   the woman's groin from her vaginal incision, was
7   there tension being placed on those arms?
8      A.  Definitely.  Uniaxial tension, as it was done
9   in our measurements and as it was done -- as it was done
10   in the drawings from Ethicon and in the study done by
11   Ethicon.
12      Q.  And Mr. Thomas mentioned that when you did
13   your uniaxial testing with Professor Mühl that you
14   held one end and you pulled on the other end;
15   correct?
16      A.  Yes.
17      Q.  Is that exactly what the surgeon was doing in
18   that DVD video with the arms?
19      A.  Yes.
20      Q.  You were asked some questions about your
21   testing with Professor Mühl by Mr. Thomas about
22   whether or not this -- the porosity setup and
23   investigation you had done accounted for pelvic floor
24   forces.  Do you remember that?

Page 209

1      A.  Yes.
2      Q.  As you looked at the pores in the DVD and the
3   tension placed on the mesh arms by the surgeon, are
4   those pores deformed before any forces from the
5   pelvis are being placed on the mesh?
6      MR. THOMAS:  Objection.  Again, not familiar
7   with the surgical procedure and what's going on
8   inside.
9      THE WITNESS:  In these arms there is no
10   interference with some other forces from the
11   pelvic floor, and there is no interference with
12   some ingrowing tissue which will occur later on.
13   BY MR. ANDERSON:
14      Q.  So were the pores irreversibly deformed on a
15   Prolift arm even before the woman's vaginal incision
16   is closed?
17      A.  Yes.
18      MR. THOMAS:  Objection.  That's beyond the
19   scope of this witness's ability to testify, any
20   expertise, any disclosed opinions or testing.
21   BY MR. ANDERSON:
22      Q.  And your answer was?
23      A.  Yes.
24      Q.  Thank you.

53 (Pages 206 to 209)

Prof. Dr. Med. Uwe Klinge

Page 210

1    He also -- Mr. -- the counsel also pointed
2  out from these articles -- he pointed out to two
3  sections on the 2007 article and the 2013 article,
4  these sections that says clinical studies have to
5  prove whether or not effective porosity and meshes
6  with high effective porosity will actually result in
7  improved patient complications.  Do you remember
8  that?
9    A.  Yes.
10    Q.  And he asked you, "You haven't done any
11  clinical studies to look at this, have you?"  Do you
12  recall that question?
13    A.  Yes.
14    Q.  Are you a mesh manufacturer, Doctor?
15    A.  No.
16    Q.  After Ethicon circulated these two e-mails in
17  2008 and again in 2010, circulating your and Mühl's
18  testing, did you see anywhere in the Ethicon
19  documents where they did any clinical studies to look
20  at pore deformation?
21    A.  No, I didn't find any hint for this.
22    Q.  Do you see anywhere in the documents, all the
23  thousands of documents you reviewed, all the
24  depositions of all the Ethicon witnesses you

Page 211

1  reviewed, or any scientific literature where Ethicon
2  ever looked at what the impact on patients would be
3  after forces were placed on the arms?  Do you see
4  that anywhere?
5    A.  No.
6    Q.  You were asked why your machine was set for
7  1,000 microns for polypropylene in terms of a
8  critical limit of the distance between the fibers,
9  and you were asked why PVDF was set at 600 microns.
10  Do you remember that?
11    A.  Yes.
12    Q.  Why?
13    A.  The basis for these two figures, 600 and
14  1,000 microns, have been our investigations of the
15  tissues, because we have seen that around the fiber
16  made of PVDF, the inflammatory reaction is -- is
17  attenuated and there is less scar and that the pores
18  are filled with fat even when the size of the hole of
19  the pore is only 600 microns.  And, therefore,
20  because this -- this measurement by Professor Mühl
21  was intended to predict the risk for these scar
22  contraction and scar integration in the pores;
23  therefore, we adopted this to 600 microns for PVDF
24  and 1 millimeter for polypropylene.  It fits to our

Page 212

1  experimental results.  And if you have another
2  polymer, yeah, you have to put it to this polymer
3  after having the -- making this investigation.
4    Q.  Thank you.  Let me go to another question
5  he -- series of questions you were asked.
6    He put two articles in front of you by Jan
7  Deprest, and counsel said, "Are you aware of other
8  scientists out there who may disagree with your 1
9  millimeter?"  Do you remember that part of the
10  questioning?
11    A.  Yes.
12    Q.  Those two articles by Jan Deprest, is Jan
13  Deprest an Ethicon consultant?
14    A.  So far I know, yes.
15    Q.  And if Jan Deprest said that 75 microns is
16  efficient for good, healthy tissue ingrowth and it
17  will resist scar plates, is that consistent or
18  inconsistent with Ethicon's own documents?
19    MR. THOMAS:  Object to the form of the
20  question.  Object to foundation.
21    THE WITNESS:  It will be inconsistent.  If
22  you really believe that it is possible to -- or
23  the ingrowths of healthy tissue is possible for
24  these low pore size, then it would be

Page 213

1  inconsistent.  The Ethicon people clearly stated
2  it on several pages in several documents that we
3  have to consider a pore size of 3 millimeters or
4  at least 1 millimeter and far beyond.
5  BY MR. ANDERSON:
6    Q.  And was the product that was developed by you
7  and Ethicon, the Vypro mesh, did it have pore sizes
8  less than 75 microns?
9    A.  No.
10    Q.  Did it have pore sizes larger than 1,000
11  microns?
12    A.  So the pores -- the area of the large pores
13  is considerably higher, and the diameter of these
14  pores is between 3 and 5 millimeter.
15    Q.  Have you seen anywhere in the Ethicon
16  documents out of all of the ones you've reviewed or
17  out of the ten years of consulting with them or all
18  of the depositions that you saw anywhere where
19  Ethicon said, "At 75 microns we can prevent fibrotic
20  bridging"?
21    A.  Nowhere.
22    Q.  You were asked another series of questions
23  about whether there were any RCTs that you could
24  point to randomized controlled trials of Prolift in

54 (Pages 210 to 213)

Prof. Dr. Med. Uwe Klinge

Page 214

1    order to prove the safety of its device.  Do you
2    remember that?
3        A.  Yes.
4        Q.   You were asked whether you had conducted any
5    studies or knew of any studies, randomized controlled
6    trials, to prove the safety of Prolift.  Do you
7    remember that?
8        A.  Yes.
9        Q.   Do you see anywhere where Ethicon conducted
10   their own safety studies in order to look as to
11   whether or not this amount of material was actually
12   necessary to support a woman's pelvic organs?
13       A.  No.
14       Q.   Did you see anywhere where Ethicon did any
15   clinical trials to determine whether or not the pore
16   sizes of Gynemesh PS were necessary to be that size
17   in order to support pelvic organ prolapse?
18       A.  No.
19       Q.   Did you see anywhere where Ethicon justified
20   or clinically studied that it was necessary for them
21   to have pores that would collapse and look like the
22   deformed pores on the DVD in order to be safely
23   implanted in a woman?
24       MR. THOMAS:  Objection; argumentative.

Page 215

1    BY MR. ANDERSON:
2        Q.   Did you see that?
3        A.  No.
4        Q.   You were asked a whole lot of questions about
5    this 91-day rat study, so let's talk about a rat
6    study if we could.  That was an internal Ethicon
7    study; correct?
8        A.  Yes.
9        Q.   Done by Ethicon scientists?
10       A.  Yes.
11       Q.   Was it peer-reviewed in the peer-reviewed
12   publications?
13       A.  No.
14       Q.   The size of the piece of mesh, can you just
15   show the jury what the size of the piece of mesh
16   would be that went into the back of these little
17   rats?
18       A.  It's usually the size of the fingertip or the
19   nail.
20       Q.   Okay.  So we have a piece of mesh the size of
21   our fingernail going into the back of a rat for 91
22   days.  That's what this study was; correct?
23       A.  Yes.
24       Q.   Is that going into healthy tissue?

Page 216

1        A.  It's healthy tissue in healthy rats.
2        Q.   Is it being used with trocars and cannulas to
3    pull it in there?
4        A.  No trocars.
5        Q.   Is it going in through a transvaginal
6    incision of the rat?
7        A.  No, nothing like this.
8        Q.   Is it being permanently implanted in the
9    rat's tissue?
10       A.  It's only implanted for 90 days.
11       Q.   Were any forces placed on the mesh during the
12   implanting or being forced -- any forces on the mesh
13   after implantation?
14       A.  No.  When placing in the subcutaneous area,
15   you don't have any forces.
16       Q.   Is the subcutaneous skin in the back of a rat
17   the same as the delicate pelvic tissues of a woman?
18       A.  No.  It is -- the tissue reaction of pure fat
19   is attenuated.
20       Q.   When Prolift or any other pelvic organ
21   prolapse mesh is put into a woman's tissue, is that
22   because it's healthy or unhealthy?
23       MR. THOMAS:  Objection.
24       THE WITNESS:  Unhealthy.

Page 217

1    BY MR. ANDERSON:
2        Q.   And is it being permanently implanted or
3    implanted for 91 days?
4        A.  It's permanently for years hopefully.
5        Q.   And are these rats having sexual relations
6    while they have the mesh in their back?
7        MR. ANDERSON:  I would like to withdraw that
8    question.
9        THE WITNESS:  I think so.
10   BY MR. ANDERSON:
11       Q.   Let me ask you this, Doctor.
12       Would it be safe to take a three-month study
13   of a piece of mesh that's the size of your fingernail
14   that was in the back of a rat where no trocars were
15   used in healthy tissue, not going through a
16   transvaginal incision, with no forces placed on the
17   mesh, in order to say this study will tell you that
18   Prolift can be safely implanted in a woman's vagina
19   for the rest of her life?
20       A.  It would be very dangerous to take this study
21   as a proof for safety.  This is not justified.  And
22   if you'll remember to the results, there wasn't no --
23   there wasn't a significant difference among the
24   meshes.  Meanwhile, you have hundreds of studies

55 (Pages 214 to 217)

Prof. Dr. Med. Uwe Klinge

Page 218

1    showing that the material has an impact on the tissue
2    ingrowth.  So if you make your own study and seeing
3    no difference in these small group of animals, then
4    you should think of exchanging the people who are
5    responsible for this study.  It is -- yeah.
6        Q.  So counsel asked you on cross-examination --
7    he said, "You have not designed a device that was
8    designed for the -- for pelvic organ prolapse."  Do
9    you remember that question?
10        A.  I remember it.
11        Q.  Has Ethicon ever designed a mesh that was
12    specifically designed for the pelvic floor?
13        A.  No.
14        Q.  You were asked three different questions that
15    I want to go to, Doctor.  You were asked at the
16    beginning of your cross-exam, "91 percent of all
17    surgical meshes on the market today are made of
18    polypropylene."  Do you remember that question?
19        A.  Yes.
20        Q.  And do you remember the question of, "Can you
21    think of any product on the market today that is
22    safer than Prolift for pelvic organ prolapse?"  Do
23    you remember those questions?
24        A.  Yes.

Page 219

1        Q.  Is Prolift or Prolift+M still on the market
2    today?
3            MR. THOMAS:  Objection.
4            THE WITNESS:  So far I know, it is not longer
5    on the market.
6            MR. ANDERSON:  I don't have any other
7    questions.
8            MR. THOMAS:  We need to consult.
9            THE VIDEOGRAPHER:  We are off the record.
10    The time is 2:01 p.m.
11    (A recess was taken from 2:01 p.m. until 2:02 p.m.)
12            MR. THOMAS:  That's all the questions I have.
13            (Whereupon, the deposition concluded at
14    2:02 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 220

1        C E R T I F I C A T E
2
3        I, Tami Cline, Registered Merit Reporter,
4    Certified Realtime Reporter, and Florida Professional
5    Reporter, do hereby certify that, pursuant to notice,
6    the deposition of PROF. DR. MED. UWE KLINGE was duly
7    taken on November 10, 2014, at 9:04 a.m. before me.
8        The said PROF. DR. MED. UWE KLINGE was duly
9    sworn by me according to law to tell the truth, the
10    whole truth and nothing but the truth and thereupon
11    did testify as set forth in the above transcript of
12    testimony.  The testimony was taken down
13    stenographically by me.  I do further certify that
14    the above deposition is full, complete, and a true
15    record of all the testimony given by the said
16    witness.
17
18
19        _____
        Tami Cline, RMR, CRR, FPR
20
21        (The foregoing certification of this
22    transcript does not apply to any reproduction of the
23    same by any means, unless under the direct control
24    and/or supervision of the certifying reporter.)

Page 221

1        INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully
5    and make any necessary corrections.  You should state
6    the reason in the appropriate space on the errata
7    sheet for any corrections that are made.
8
9        After doing so, please sign the errata sheet
10    and date it.  It will be attached to your deposition.
11
12        It is imperative that you return the original
13    errata sheet to the deposing attorney within thirty
14    (30) days of receipt of the deposition transcript by
15    you.  If you fail to do so, the deposition transcript
16    may be deemed to be accurate and may be used in
17    court.
18
19
20
21
22
23
24

56 (Pages 218 to 221)

Prof. Dr. Med. Uwe Klinge

| Page 222 |
|---|

```
 1            - - - - - -
 2          E R R A T A
 3            - - - - - -
 4    PAGE  LINE  CHANGE
 5    ___  ___  _____
 6      REASON: _____
 7    ___  ___  _____
 8      REASON: _____
 9    ___  ___  _____
10      REASON: _____
11    ___  ___  _____
12      REASON: _____
13    ___  ___  _____
14      REASON: _____
15    ___  ___  _____
16      REASON: _____
17    ___  ___  _____
18      REASON: _____
19    ___  ___  _____
20      REASON: _____
21    ___  ___  _____
22      REASON: _____
23    ___  ___  _____
24      REASON: _____
```

| Page 224 |
|---|

```
 1            LAWYER'S NOTES
 2    PAGE  LINE
 3    ____  ____  _____
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```

| Page 223 |
|---|

```
 1         ACKNOWLEDGMENT OF DEPONENT
 2
 3         I, _____, do hereby
 4    acknowledge that I have read the foregoing pages, 1
 5    to 224, and that the same is a correct transcription
 6    of the answers given by me to the questions therein
 7    propounded, except for the corrections or changes in
 8    form or substance, if any, noted in the attached
 9    Errata Sheet.
10
11
12    _____     _____
13    PROF. DR. MED. UWE KLINGE          DATE
14
15
16
17
18    Subscribed and sworn to before me this
19    ____ day of _____, 20___.
20    My Commission expires: _____
21
22    _____
      Notary Public
23
24
```