IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| IN RE ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 MDL 2327 |
| THIS DOCUMENT RELATES TO: WAVE 4 CASES | JOSEPH R. GOODWIN U.S. DISTRICT JUDGE |

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
TO LIMIT TESTIMONY OF PROF. DR. MED. UWE KLINGE

Defendants Ethicon, Inc., Ethicon, LLC, and Johnson & Johnson (collectively, "Ethicon") submit this memorandum in support of their motion to limit the testimony of Prof. Dr. med. Uwe Klinge. The cases to which this motion applies are identified in Ex. A to the motion.

BACKGROUND

Dr. Klinge is a former hernia surgeon who, when he practiced in his native Germany, used mesh implants in the surgical repair of abdominal wall hernias. Dr. Klinge has been identified as an expert witness in Wave 4. He offers general opinions about the design of and alternatives to the various meshes manufactured by Ethicon for the treatment of stress urinary incontinence and pelvic organ prolapse.

Dr. Klinge prepared two Rule 26 expert reports for the Wave 4 cases in which he has been identified as an expert, both of which are identical to the reports he submitted for Wave 1.

The first report, dated November 16, 2015, concerns the Prolene mesh used in mid-urethral slings manufactured by Ethicon for the treatment of stress urinary incontinence,

including the TVT, TVT-O, TVT Secur, TVT Abbrevo, and TVT Exact devices. *See* Ex. B, Rule 26 Expert Report of Prof. Dr. Med. Uwe Klinge (Nov. 16, 2015) ("Klinge SUI Report").

Dr. Klinge's second Rule 26 expert report, dated November 17, 2015, relates to the Prolene Soft mesh found in Gynemesh PS, Prolift, and Prosima, each of which Ethicon manufactured for the treatment of pelvic organ prolapse. *See* Ex. C, Rule 26 Expert Report of Prof. Dr. Med. Uwe Klinge (Nov. 17, 2015) ("Klinge Prolapse Report").

The Prolene and Prolene Soft meshes are both made of polypropylene treated with antioxidants and share the same chemical structure. But they differ in design. Prolene Soft has larger pores, weighs less, and has lower burst strength than Prolene. Although Dr. Klinge's opinions regarding Prolene and Prolene Soft overlap to an extent, the bases underlying his opinions are different, and he has been deposed separately regarding his opinions as to each mesh. Accordingly, this memorandum addresses Dr. Klinge's two expert reports separately, with Section I below relating to Dr. Klinge's SUI Report and Section II relating to his Prolapse Report. Challenges that apply to both reports follow Section II.

## LEGAL STANDARD

Ethicon incorporates by reference the standard of review for *Daubert* motions as articulated by the Court in *Edwards v. Ethicon, Inc.*, No. 2:12-cv-09972, 2014 WL 3361923, at *1–3 (S.D. W. Va. July 8, 2014).

## ARGUMENT

I.      **The Court Should Exclude Dr. Klinge's Opinions Regarding Alternative Designs to the Prolene Mesh Used in Ethicon's SUI Products.**

In his SUI Report, Dr. Klinge identifies two alternative designs that, he claims, "would be safer in a woman's pelvic tissues as a treatment for incontinence than some of the design characteristics of the Prolene mesh in TVT." *See* Ex. B, Klinge SUI Report at 36. Those

2

alternative designs are (1) a device made out of "a mesh product with less material and larger distance between the mesh fibers," such as Ethicon's Ultrapro mesh, which is used in hernia repairs; and (2) a device made of polyvinylidene fluoride ("PVDF") mesh rather than polypropylene. *Id.*

As discussed below, the Court should preclude Dr. Klinge from testifying about alternative designs in this litigation because his opinions are unsupported by testing or scientific literature demonstrating that his proposed alternative designs are actually safer than—and at least as effective as—Ethicon mesh products.

> **A. Expert opinions regarding alternative designs must be supported by testing or scientific literature demonstrating that the proposed alternative is actually safer.**

As the Fourth Circuit recently explained in *Nease v. Ford Motor Co.*, an expert's alternative-design opinion must be excluded under *Daubert* if the expert failed to establish that the alternative design is actually safer using reliable testing or scientific literature. 848 F.3d 219 (4th Cir. 2017). The plaintiff in *Nease* crashed a truck he was driving because he was unable to stop, allegedly due to the "mechanical binding" of the truck's speed-control cable. *Id.* at 221-23. The plaintiff's expert proposed three alternative designs to the speed-control cable which purportedly would have prevented the accident. *Id.* at 234. The court noted that the expert based his opinions on the fact that the manufacturer had used "all of these alternative design features [in other vehicles] for many years by the time the [truck] was produced." *Id.*

The Fourth Circuit held the expert's alternative design opinions were unreliable because they were unsupported by testing or scientific literature. *Id.* The court had previously explained that while *Daubert* is a "flexible test" and no single factor is dispositive, "[o]ne especially important factor for guiding a court in its reliability determination is whether a given theory has

been tested." *Id.* at 231.[1] As the court observed, in the absence of supportive testing or scientific literature, an expert's theory may be plausible and "'may even be right[,] . . . [but] it is no more than a hypothesis, and thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case.'" *Id.* (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010)).

Applying these principles, the court found that the expert "performed no tests or studies to determine whether, in fact, these older, long-standing designs were involved in fewer binding incidents." *Id.* at 234. The expert similarly "offered no data from any other studies or accident records to prove that the older designs were less likely to bind than the one incorporated" in the truck. *Id.* Rather, the court explained, the expert "simply proclaimed without any support that the alternative designs he identified were safer than the design of the speed control cable assembly in the [truck]." *Id.*

For these reasons, the court concluded that the "testimony should have been excluded as it was 'unsupported by any evidence such as test data or relevant literature in the field.'" *Id.* (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 249 (4th Cir. 1999)). Importantly, the court explained that the "fact that the [proposed] alternatives have generally been in use for decades is wholly insufficient to prove that such designs were safer" in the context of the accident at issue, or "that reasonably prudent manufacturers would have adopted them." *Id.*

In applying the teachings of *Nease* to Dr. Klinge's opinions, it is clear that the Court should preclude Dr. Klinge from testifying about potential alternative designs for the same reasons.

---

[1] Applying the *Daubert* factors, the court held that the expert's opinion that the speed-control cable was defective should have been excluded because (i) he "conducted no testing whatsoever to arrive at his opinion"; (ii) he failed to publish or otherwise subject his theory to peer review; (iii) his poor "methodology" rendered it impossible to determine a potential rate of error; and (iv) a company document identifying potential failure modes did not constitute "general acceptance" of the expert's theory. *Id.* at 232-33.

### B.  Dr. Klinge's opinion regarding an Ultrapro alternative is speculative.

Dr. Klinge has no reliable basis to testify that a larger pore mesh like Ultrapro would have been safer and efficacious for use in the treatment of stress urinary incontinence. *See* Ex. B, Klinge SUI Report at 36-39. Dr. Klinge has not conducted any testing on Ultrapro or similar meshes that actually demonstrates that such meshes are safer than the Prolene used in Ethicon mesh products. Nor did he identify even a single clinical study to prove the safety and efficacy of a mid-urethral sling using Ultrapro or a mesh similar to it.[2] Indeed, in the section of his Report devoted to safer alternative design, Dr. Klinge simply proclaims—without any support whatsoever—that "a mesh product with less material and larger distance between the mesh fibers" would be safer than Prolene. Ex. B, Klinge SUI Report at 36.

Dr. Klinge acknowledged in deposition that, based on this lack of evidence, he is "not able to predict" whether "in the specific function of a sling the Ultrapro really over the time will work really better or whether it will create some new problems." *See* Ex. F, Klinge 10/5/15 Dep. 92:17–93:4. Indeed, he admitted in that same deposition that answering this question would require "preclinical tests," an "independent textile analysis," and an examination of "tissue reactions looking at animal explants [and] human explants," all of which "should" provide only "a good idea" about whether Ultrapro in a mid-urethral sling is feasible. *Id.* at 94:10–18.

---

[2] Although Dr. Klinge identified at deposition an article by Okulu as support for his opinion that Ultrapro is a safer alternative design, Ethicon notes that the authors of that study used a completely different surgical technique—described as a "double-forced sling." Ex. D, Okulu et al., *Use of three types of synthetic mesh material in sling surgery: A prospective randomized clinical trial evaluating effectiveness and complications*, 47 SCANDINAVIAN J. UROLOGY 217 (2013). Importantly, a different device requiring a different surgery cannot be a safer alternative design. *See Mullins v. Ethicon, Inc.*, 2:12-cv-02952, at 3-5 (S.D. W. Va. Feb. 23, 2017) (explaining that alternative surgeries and procedures are not alternative designs because they "do not inform the jury on *how* the [device's] design could have feasibly been made safer to eliminate the risks that caused the plaintiff's injuries."). Indeed, Okulu acknowledged that "[t]his surgical method also needs evaluation, especially in comparison with the traditional TVT sling procedure." *Id.* at 223. Moreover, Dr. Klinge admitted at deposition that this article does not support the proposition that Ethicon's SUI treatment devices would be safer if they used Ultrapro instead of Prolene mesh. *See* Ex. E, Klinge 11/4/15 Dep. Tr. 285:5–20 (acknowledging that Ultrapro cannot be used "as a ligament, as the Prolene is intended to [be] used").

Thus, like the expert in *Nease*, Dr. Klinge "simply proclaimed without any support that the alternative designs he identified were safer" than Prolene. *See Nease*, 848 F.3d at 234. Because Dr. Klinge failed to support his alternative design opinion with the testing and peer-reviewed studies required under Federal Rule of Evidence 702 and *Daubert*, the Court should preclude him from offering this opinion at trial. *See Nease*, 848 F.3d at 234; *Oglesby*, 190 F.3d at 249 (requiring test data or relevant literature showing testing by others); *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658, 681–82 (S.D. W. Va. 2014) (flawed testing failed to meet peer-reviewed standards).

Further condemning Dr. Klinge's opinion regarding meshes like Ultrapro as alternative designs is the fact that Dr. Klinge himself doubts whether such a mesh would actually work for the treatment of stress urinary incontinence. Indeed, he has previously testified in this MDL that Ultrapro is not an appropriate alternative design for the treatment of stress urinary incontinence because it "is not sufficient to withstand—or to preserve the big pores—under these conditions of biomechanics as it is required for the use as a sling." *See* Ex. G, Klinge 11/15/13 Dep. 529:12–23.

Even today Dr. Klinge has "concerns" that the pores of Ultrapro collapse "at really small forces," and he candidly admitted that he "wouldn't like to have [Ultrapro] in [his] body." *See* Ex. F, Klinge 10/5/15 Dep. 92:1–3, 93:5–14. Dr. Klinge should not be permitted to testify that a larger pore mesh, such as Ultrapro, was a feasible alternative design when he has admitted such a design could very well impair the utility of a mid-urethral sling. *See Conklin v. Novartis Pharms. Corp.*, No. 9:11CV-178, 2012 WL 4127295, at **8-10 (E.D. Tex. Sept. 18, 2012) (excluding expert's opinion that reduced dosage of medication at issue would have reduced risk but maintained efficacy on grounds that expert "offer[ed] no evidence as to the efficacy of a reduced

[medication] regimen, and he does not explain from where he draws his naked conclusion regarding efficacy.").

### C.  Dr. Klinge's opinion regarding a PVDF alternative is speculative.

Dr. Klinge's opinion that Ethicon should have employed PVDF mesh when designing its various mid-urethral sling products should be excluded for the same reason. Dr. Klinge is able to identify only one stress urinary incontinence device in the whole world that uses PVDF— Dynamesh—which is manufactured by the same German company (FEG) for which Dr. Klinge is a consultant. *See* Ex. F, Klinge 10/5/15 Dep. 101:2–103:16. But Dr. Klinge's opinion that PVDF mesh is a feasible alternative design is not supported by clinical testing or scientific literature demonstrating that it is, in fact, safer than and as effective as the Prolene used in Ethicon mesh products in treating stress urinary incontinence.

Although Dr. Klinge conducted bench-top testing to compare the pore size of PVDF to Prolene under certain conditions, he admitted that he does not know whether PVDF mesh is subject to particle loss, nor does he know the "stretching profile" of the device under load. *Id.* at 97:15–24. Thus, Dr. Klinge has no testing or scientific literature from which he could determine whether PVDF mesh is subject to some of the very same criticisms he levies against the Prolene mesh in Ethicon's stress urinary incontinence devices. Nor does Dr. Klinge have any testing or scientific literature that would permit him to opine that PVDF would be equally effective for the treatment of stress urinary incontinence. For these reasons, Dr. Klinge does not have a reliable basis to testify that PVDF mesh is actually a safer alternative design. *See Nease*, 848 F.3d at 234.

The mere existence of PVDF mesh is "wholly insufficient to prove that [it was] safer" in the context of treating stress urinary incontinence, or that a "reasonably prudent manufacturer[]

7

would have adopted" it for use in mid-urethral slings. *See id*. The Court should exclude Dr. Klinge's opinions regarding alternative designs.

II.   **The Court Should Limit Certain of Dr. Klinge's Opinions Regarding Prolene Soft Mesh Used in Ethicon's Prolapse Products.**

A. **The Court should exclude any testimony from Dr. Klinge regarding alternative designs to Prolene Soft.**

On page 16 of his Prolapse Report, Dr. Klinge states, "The PVDF product, Dynamesh, is a safer design than Gynemesh PS [i.e., Prolene Soft mesh] for all of the reasons stated above as further established in Muehl's testing." *See* Ex. C, Klinge Prolapse Report at 16. This statement is the first reference to PVDF in the report, and Dr. Klinge cites no literature or other reliable, objective data to support it. In fact, the only other references to PVDF—or any other alternative design, for that matter—in Dr. Klinge's entire report are summaries of company documents that, in Dr. Klinge's view, show Ethicon considered PVDF as an alternative to polypropylene, among other possible changes to the design of Prolene Soft mesh. *See* Ex. C, Klinge Prolapse Report at 25–26.

Notably, Dr. Klinge's Prolapse Report is virtually identical to the report he submitted in *Bellew*, where this Court excluded Dr. Klinge's opinions on alternative design. The Court found that, in the section of his *Bellew* report addressing alternative design, "Dr. Klinge fails to cite *any* peer-reviewed studies." Mem. Op. & Order (*Daubert* Motions) at 16, *Bellew v. Ethicon, Inc.*, No. 2:13-cv-22473 (S.D. W. Va. Nov. 20, 2014) [ECF #265] ("*Bellew* Order"). This Court also emphasized that "Dr. Klinge's report provides no indication that his alternative design opinions are based on anything other than his and Dr. Mühl's effective porosity testing and internal Ethicon documents," which the Court deemed "not sufficiently reliable scientific bases under

*Daubert*." *Id.* Because Dr. Klinge has submitted the same report here, the Court should again exclude his alternative design opinions.

Plaintiffs here may well argue that a different result is compelled by Dr. Klinge's *de bene esse* deposition in *Bellew*—which occurred after *Daubert* briefing in *Bellew* but before the Court issued its opinion excluding Dr. Klinge's alternative design opinions. Any such argument would be misplaced. Dr. Klinge testified in *Bellew* that he is not aware of any peer-reviewed studies showing PVDF—or any other proposed alternative to Prolene Soft—is safer and more effective at treating pelvic organ prolapse. *See* Ex. H, Klinge 11/10/14 Dep. 182:14–184:2 (testifying he is not aware of any clinical studies showing alternative mesh design that has lower rate of erosion, that causes less chronic pain, or that has lower contracture rate than Prolene Soft mesh).

In fact, when Dr. Klinge was asked in that deposition whether he could even identify "any mesh . . . that's appropriate for use in the pelvic floor for the repair of pelvic organ prolapse," Dr. Klinge responded, "I cannot give a general statement to this. I know that there are textile constructions and design for meshes that are more resistant to the [pore] collapse, but it depends on the indication of the specific situation." *Id.* at 163:8–15.

Dr. Klinge later confirmed that he could not name one mesh with usage benefits that exceed the risks of use in the treatment of pelvic organ prolapse. *Id.* at 184:3–6. And he specifically denied that a larger-pore mesh like Ultrapro is a safer alternative to Prolene Soft. *Id.* at 90:11–20 ("Ultrapro obviously does not prevent a pore collapse when applied to forces; therefore, it is not the best idea to use Ultrapro in this—for this indication, yes.").

Furthermore, although Dr. Klinge claims that Dr. Muehl's effective porosity testing proved that PVDF mesh is a safer design than Prolene Soft, nothing in Dr. Klinge's report actually establishes this assertion. *See* Ex. C, Klinge Prolapse Report at 16. As noted above, there

is no mention of PVDF in Dr. Klinge's report until this statement, and the only other discussion of PVDF in his report addresses internal company documents, not Dr. Muehl's testing. Moreover, the bench-top testing Dr. Klinge conducted with Dr. Muehl simply does not establish that PVDF mesh is actually safer than and as effective as Prolene Soft in the treatment of pelvic organ prolapse. *See supra* § I.C (Dr. Klinge does not know whether PVDF mesh is subject to the same critiques he makes regarding Prolene Soft).

In short, nowhere in his Rule 26 expert report or in his *de bene esse* deposition does Dr. Klinge cite any peer-reviewed literature that demonstrates that PVDF or a mesh with larger pores would actually be safer alternatives to Prolene Soft, much less equally effective alternatives. Instead, he relies only on his "effective porosity testing and internal Ethicon documents, which are not sufficiently reliable scientific bases under *Daubert*." *Bellew* Order at 16. As a result, he should not be permitted to testify regarding alternative design in cases involving Ethicon's prolapse products. *See Nease*, 848 F.3d at 234.

### B. The Court should exclude Dr. Klinge's opinions regarding fraying and particle loss in Prolene Soft.

The Court should also exclude Dr. Klinge's opinion that Prolene Soft is defective because it is subject to fraying and particle loss. *See* Ex. C, Klinge Prolapse Report at 19–23. In support of that opinion, Dr. Klinge cites a number of Ethicon documents relating to TVT, a mid-urethral sling used in the treatment of stress urinary incontinence, not pelvic organ prolapse. For example, Dr. Klinge cites a 2003 memorandum to the TVT file indicating that "fraying is inherent in the design and construction of the product," clinical reports from 2004 describing "crumbling" of TVT, and elongation studies comparing the effect of various methods of cutting TVT mesh. *Id.* at 19–20. Dr. Klinge also relies on a 2003 study by Pariente describing "particle shedding" in TVT. *Id.* at 20.

The Ethicon documents and the Pariente study cited by Dr. Klinge provide no support whatsoever for his opinion that Prolene Soft mesh frays and loses particles. *Id.* 19-20. Ethicon uses Prolene mesh in the TVT device described in these documents, not the Prolene Soft mesh found in Prolift and Ethicon's other pelvic organ prolapse products. As mentioned, Prolene and Prolene Soft have different designs, including different pore sizes and different weights (Prolene Soft has larger pores and weighs less). Thus, even if internal company documents were somehow a reliable basis to show mesh fraying and particle loss in Prolene, these internal documents cannot reliably support Dr. Klinge's opinion that Prolene Soft mesh frays and loses particles, insofar as the documents relate to an entirely different product.

Stripped of the TVT documents, the only "data" Dr. Klinge cites in support of his opinion that Prolene Soft mesh frays and loses particles is his observation of "curled and roped mesh . . . in the Prolift implantation videos" he was provided. *See* Ex. C, Klinge Prolapse Report at 23. In his *de bene esse* deposition for *Bellew*, Dr. Klinge referenced this same video, again identifying it as proof of roped and curled mesh. *See* Ex. H, Klinge 11/10/14 Dep. 73:7–75:18. Nowhere in his report or in his deposition, however, does Dr. Klinge explain how mesh roping or curling allegedly seen in this video is related to his claim that Prolene Soft mesh frays and loses particles. Without a reliable basis to support his opinion that fraying and particle loss occur, Dr. Klinge should not be permitted to testify about this supposed defect.

Dr. Klinge is also unable to explain the clinical significance, if any, of fraying and particle loss. In his report, Dr. Klinge opines that, "more probably than not, particulates scattered throughout the pelvic tissue will create an inflammatory response of some magnitude; will increase the overall foreign body reaction and inflammatory response; will increase the amount of the fibrotic reaction; and will run the risk of migrating into other parts of the body." *See* Ex. C,

11

Klinge Prolapse Report at 23. Dr. Klinge cites no peer-reviewed literature for this opinion, and he has previously testified that he does not know of "any clinical study testing the relationship between particle loss and the clinical outcome." *See* Ex. G, Klinge 11/15/13 Dep. Tr. 411:12–24. For all of these reasons, the Court should preclude Dr. Klinge from offering opinions at trial regarding mesh fraying and particle loss.

III.   **Dr. Klinge's Narrative Summary of Ethicon Documents and Depositions and His Opinions Concerning Ethicon's Knowledge, State of Mind, and Corporate Conduct Should Be Excluded.**

Both of Dr. Klinge's expert reports are replete with opinions regarding Ethicon's alleged knowledge of a variety of topics and narrative summaries of Ethicon's documents. *See*, *e.g.*, Ex. B, Klinge SUI Report at 9 ("Ethicon employees have testified that Ethicon knew before the launch of its pelvic meshes . . . that in some women, there would be a severe FBR . . . ."); *id.* at 14 ("Numerous Ethicon internal documents demonstrate Ethicon was acutely aware of the heavyweight, small pore problem."); Ex. C, Klinge Prolapse Report at 29 ("According to their documents, Ethicon also acknowledged why these design requirements were so important in terms of patient safety."); *id.* (". . . Ethicon knew that poor design leads to poor outcome."). This Court ruled in *Lewis* that Dr. Klinge's opinions regarding Ethicon's documents and corporate knowledge "are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *Lewis v. Ethicon, Inc.*, No. 2:12-cv-4301, 2014 WL 186872, at *5 (S.D. W. Va. Jan. 15, 2014).

In the *Bellew* case, Dr. Klinge included in his report the same improper opinions regarding Ethicon's knowledge and state of mind. In response to Ethicon's *Daubert* motion, the plaintiff insisted she did not intend to elicit such testimony from Dr. Klinge, and the Court denied as moot Ethicon's motion on this point. *Bellew* Order at 14-15.

12

Yet, during Dr. Klinge's *de bene esse* deposition for *Bellew*, the plaintiff's counsel elicited the very testimony Ethicon had moved to exclude. *See*, *e.g.*, Ex. H, Klinge 11/10/14 Dep. 65:23–66:4 ("Q. Okay. In your review of the internal Ethicon documents in this case, did you determine whether Ethicon's scientists had considered your and Dr. Mühl's pore testing publications and the effects of mesh pore size under strain? A. Yes I did."); *id.* at 67:7–10 ("They are circulating our manuscript that we published in 2005 as a sophisticated method to measure porosity, so they have been aware of it."). Counsel for the plaintiffs elicited the same type of testimony in Dr. Klinge's *de bene esse* deposition for the *Mullins* consolidated case. *See*, *e.g.*, Ex. E, Klinge 11/4/15 Dep. 24:1–18 (testifying that "internal Ethicon document" "clearly expressed that . . . the Ethicon scientists still recognized the importance of, first, large pore sizes and, second, minimal amount of foreign body material as recommendations for a mesh construction.").

As this Court has already recognized, Dr. Klinge's opinions about Ethicon's knowledge and corporate conduct should be excluded. These opinions would not be helpful to the jury, *see Lewis*, 2014 WL 186872, at *6, and they "would actually invade the province of the jury rather than assist it in resolving material issues of fact," as Dr. Klinge's opinions are predicated on nothing more than his own reading of Ethicon's documents. *See Hines v. Wyeth*, No. 2:04-0690, 2011 WL 2680842, at *7 (S.D. W. Va. July 8, 2011).

## CONCLUSION

For the reasons set forth above, certain of Dr. Klinge's opinions fail to pass muster under *Daubert*, and the Court should limit his testimony at trial.

Respectfully submitted,


*/s/ David B. Thomas*

David B. Thomas (W.Va. Bar #3731)
Thomas Combs & Spann PLLC
300 Summers Street
Suite 1380 (25301)
P.O. Box 3824
Charleston, WV 25338
(304) 414-1800
dthomas@tcspllc.com

*/s/ Christy D. Jones*

Christy D. Jones
Butler Snow LLP
1020 Highland Colony Parkway
Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS 39158-6010
(601) 985-4523
christy.jones@butlersnow.com

COUNSEL FOR DEFENDANTS ETHICON, INC.,
ETHICON, LLC, AND JOHNSON & JOHNSON

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

| | |
|---|---|
| **IN RE ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **Master File No. 2:12-MD-02327**<br>**MDL 2327** |
| **THIS DOCUMENT RELATES TO:**<br>**WAVE 4 CASES** | **JOSEPH R. GOODWIN**<br>**U.S. DISTRICT JUDGE** |

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to CM/ECF participants registered to receive service in this MDL.

*/s/ David B. Thomas*
David B. Thomas (W. Va. Bar No. 3731)
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
P.O. Box 3824
Charleston, WV 25338-3824
(304) 414-1800