Exhibit E

Nicole B. Fleischmann, M.D.

```
1                IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF WEST VIRGINIA
2                      CHARLESTON DIVISION
3    -----------------------------
     IN RE:  ETHICON, INC.      :MASTER FILE NO:
4    PELVIC REPAIR SYSTEM          :2:12-MD-02327
     PRODUCTS LIABILITY LITIGATION :MDL NO. 2327
5                                  :
                                   :JOSEPH R. GOODWIN
6                                  :U.S. DISTRICT JUDGE
     THIS DOCUMENT RELATES TO ALL  :
7    WAVE 4 - TVT & General re      :
     Prolift                       :
8                                  :
     ----------------------------- :
9
10                         — — —
11                    MARCH 15, 2017

                           — — —
12
13            Oral sworn deposition of NICOLE B.
14       FLEISCHMANN, M.D., held at RIKER DANZIG SCHERER
15       HYLAND & PERRETTI, LLP, Headquarters Plaza, One
16       Speedwell Avenue, Morristown, New Jersey,
17       before Margaret M. Reihl, RPR, CCR, CRR, CLR
18       and Notary Public, on the above date,
19       commencing at 10:32 a.m., there being present:
20
21
              GOLKOW TECHNOLOGIES, INC.
22         877.370.3377  ph/917.591.5672 fax
                 deps@golkow.com
23
24
```

Nicole B. Fleischmann, M.D.

```
 1    A P P E A R A N C E S:

 2

 3    MAZIE SLATER KATZ & FREEMAN
      By: ADAM M. SLATER, ESQUIRE

 4    103 Eisenhower Parkway, 2nd Floor
      Roseland, New Jersey  07068

 5    aslater@mskf.net
      (973) 228-9898

 6    Representing the Plaintiffs

 7

 8    RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
      BY:  MAHA M. KABBASH, ESQUIRE

 9    Headquarters Plaza
      One Speedwell Avenue

10    Morristown, New Jersey  07962-1981
      (973) 538-0800

11    mkabbash@riker.com
      Representing the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Nicole B. Fleischmann, M.D.

```
1                    I N D E X
2   WITNESS:                                    Page
    NICOLE B. FLEISCHMANN, M.D.
3
            By Mr. Slater                      4, 241
4           By Ms. Kabbash               228, 244
5                    — — —
6                  E X H I B I T S
7
    NICOLE FLEISCHMANN DEPOSITION EXHIBITS      MARKED
8
    No. 1    Defendants' Objections and Responses
9            to Plaintiffs' Notice to Take
             Deposition of Nicole Fleischmann      4
10
    No. 2    Expert report of Nicole B.
11           Fleischmann, M.D.                      4
12  No. 3    Curriculum Vitae                       4
13  No. 4    Nicole Fleischmann General Reliance
             List in Addition to Materials
14           Referenced in Report                  4
15  No. 5    Nicole Fleischmann Supplemental General
             Reliance List in Addition to Materials
16           Referenced in Report                  4
17  No. 6    Thumb drive                           5
18  No. 7    Prolift notes (six pages)            11
19  No. 8    Letter to "Dear Scott" dated 11/6/09
             from Dr. Fleischmann                 64
20
21                   — — —
22
23
24
```

Nicole B. Fleischmann, M.D.

```
1                (Documents marked for identification as

2           Nicole Fleischmann Deposition Exhibit Nos. 1

3           through 5, inclusive.)

4                ... NICOLE FLEISCHMANN, M.D., having

5           been duly sworn as a witness, was examined and

6           testified as follows ...

7    BY MR. SLATER:

8           Q.   Good morning, Dr. Fleischmann.  You know

9    me, I'm Adam Slater, I'm going to take your deposition

10   now.

11               Do I need to give you any instructions?

12          A.   If you like to.

13          Q.   Sure.  You need to just tell the truth,

14   you know that, right?

15          A.   Yes.

16          Q.   If I ask you a question that doesn't

17   make sense to you for any reason, please let me know,

18   and I'll reask the question, okay?

19          A.   Okay.

20          Q.   The good thing with no video is I can go

21   as fast as I want.  In front of you is a series of

22   documents, do you see this right here?  We marked them

23   NF-1 through 5.  I just want to go through these

24   exhibits real quick.
```

Nicole B. Fleischmann, M.D.

```
 1          A.     Sure.

 2          Q.     NF-1 is the deposition notice response

 3    from defense counsel.

 4                 Have you seen that?

 5          A.     Yes, I have.

 6          Q.     In response to this deposition notice,

 7    did you produce any documents?

 8          A.     I did not.

 9                 MR. SLATER:  Now, we have a flash drive

10          here, which I guess we'll mark as 6.

11                 (Document marked for identification as

12          Nicole Fleischmann Deposition Exhibit No. 6.)

13                 MS. KABBASH:  I can represent to you on

14          the record that that flash drive that you've

15          marked as Exhibit 6 contains the materials that

16          are set forth on Dr. Fleischmann's supplemental

17          general reliance list.

18    BY MR. SLATER:

19          Q.     Dr. Fleischmann, have you produced your

20    invoices for your work in this case?

21          A.     No, I haven't.

22          Q.     How much have you -- rephrase.

23                 I saw in your report and you have your

24    billing rates, so those rates apply, right?
```

Nicole B. Fleischmann, M.D.

1        A.      Yes.

2        Q.      Okay.  How much time have you spent in

3   connection with the reports on the Prolift®, Prolift+M®

4   and Gynemesh® PS that we're here to depose you on?

5        A.      About 100 hours.

6        Q.      And, again, I just don't have it in

7   front of me, what's your billing rate for that time?

8        A.      500 per hour.

9        Q.      Does that include that time, the time

10  preparing for this deposition?

11       A.      No, that does not.

12       Q.      How much time did you spend preparing?

13       A.      I haven't added it up yet, but I would

14  say it's approximately about 50 hours.

15       Q.      What are you billing for the time during

16  the deposition itself for today?

17       A.      I bill $7,500 for the day.

18       Q.      So you're billing $7,500 for this

19  deposition?

20       A.      Yes.

21              MR. SLATER:  Off the record.

22              (Discussion off the record.)

23              MR. SLATER:  I'm not going to ask about

24      the cumulative billing by Dr. Fleischmann

Nicole B. Fleischmann, M.D.

```
 1              because my practice and my understanding from
 2              my interactions with defense counsel today and
 3              other cases has been that we ask about --
 4              obviously, in this case I've asked what time
 5              was spent on the reports I'm going to depose
 6              Dr. Fleischmann on, but my understanding has
 7              always been that both sides respect the fact
 8              that we're not going to ask experts what
 9              they've billed over all across the litigation,
10              understanding if I asked it you would object
11              anyway, right?
12                      MS. KABBASH:  For purposes of this
13              deposition, yes, that's correct.
14                      MR. SLATER:  And, frankly, as liaison
15              counsel for New Jersey, having a lot of
16              involvement in this, that's always been my
17              understanding, and I've enforced that and it's
18              been enforced against me.  So to the extent
19              this record will have any use in the future for
20              people, that, to my understanding, is the rule,
21              and it benefits both sides.
22                      Okay, moving forward.
23   BY MR. SLATER:
24              Q.    Exhibit 2 is a copy of the expert report
```

Nicole B. Fleischmann, M.D.

```
1    I was given.  Is that the report --

2            A.      Yes, it is.

3            Q.      -- on Prolift®, Prolift+M® and Gynemesh®

4    PS?

5            A.      Yes, it is.

6            Q.      Does this contain the opinions that you

7    are offering on these products?

8            A.      Yes.

9            Q.      Throughout the report you went into

10   quite a bit of detail describing facts, facts from

11   literature, facts from documents, facts from your own

12   background.  Did you set forth those facts that were

13   most important to you in forming your opinions when you

14   wrote this report?

15           A.      Yes.

16           Q.      In the course of the report, you cited

17   specifically some articles, obviously less articles

18   than are listed on your reliance list.  Are those the

19   articles that you felt were most important to you in

20   forming your opinions?

21           A.      They were among the articles that were

22   most important to me, yes.

23           Q.      Is there some other article that you

24   didn't mention in your report that you would say to me
```

Nicole B. Fleischmann, M.D.

1  this article is very important also to my opinions

2  beyond those you actually discussed in the report?

3       A.    I think the main articles that I rely on

4  are in this report.

5       Q.    There's no others that you would point

6  to right now?

7       A.    Well, I mean, there are some articles

8  that I reviewed in the course of my deposition prep

9  that have come to my attention, but I don't think that

10  my opinions have changed very much from this.

11       Q.    This is my question:  Are there any

12  articles you could point to right now, other than those

13  listed in the report where you say, you know, if I

14  could redo my report right now, I would make sure I

15  also cited this article also because it's very

16  important to my opinions as well?

17            Is there anything that you could point

18  to?

19       A.    It depends on how the deposition goes

20  because there may be things that you ask me that I

21  would rely on other articles for.

22       Q.    Not my question.

23            My question is, as you sit here right

24  now before I've asked you anything substantive, having

Nicole B. Fleischmann, M.D.

```
 1   formed your opinions and getting to write your own

 2   report in this litigation, are there any articles that

 3   you would say I didn't specifically cite to that

 4   article or discuss it in my report, but it's one that,

 5   as I sit here now, I can tell you is very important to

 6   my opinions, and if I were to rewrite my report right

 7   now, I would add that article in because it's that

 8   important?  Is there anything like that?

 9        A.     Put it this way, there are articles that

10   I did not add to my report that I find are important

11   articles.

12        Q.     Okay.  Which ones?

13        A.     I actually gave you a copy of my notes,

14   and in my notes there are some articles that are not in

15   my report, that are on my notes list.

16             MS. KABBASH:  We haven't given him a

17        copy of your notes yet.  She has reference

18        notes.

19             THE WITNESS:  I have reference notes.

20        You're welcome to have a copy of it.

21             MR. SLATER:  Can I see that, so I may

22        refer to it.

23             MS. KABBASH:  We made copies of it, if

24        you would like it.  So I'd be happy to give it
```

Nicole B. Fleischmann, M.D.

1          to you.

2                    THE WITNESS:  I think that would be

3          comprehensive for you.

4                    MR. SLATER:  Do you have an extra, or

5          you just have the one -- you have it anyway, so

6          I can mark this?

7                    THE WITNESS:  I have a copy and then we

8          gave you a copy.

9                    (Document marked for identification as

10          Nicole Fleischmann Deposition Exhibit No. 7.)

11                    MR. SLATER:  I marked as Exhibit 7 --

12                    MS. KABBASH:  Do you want a copy?

13                    MR. SLATER:  Sure.

14    BY MR. SLATER:

15          Q.    I marked as Exhibit 7 a document that

16    says Prolift® notes.

17                    What is that?

18          A.    These are the notes that I created

19    throughout the hours where I prepared for my

20    deposition, and a lot of these articles are already in

21    my report.  They're medical literature.

22          Q.    So to the extent medical literature

23    appears within the report or on this Prolift® notes

24    document, those are the articles that to you are most

Nicole B. Fleischmann, M.D.

1    important in forming your opinions?

2            A.      Exactly.

3            Q.      With regard to internal documents from

4    Ethicon, you mentioned several in your report or

5    documents that were -- let me rephrase it.

6                    You mentioned some documents that were

7    created by Ethicon in your report and you discussed

8    them specifically.  Were those the Ethicon documents

9    that were most important to you in forming your

10   opinions?

11           A.      Can you give me an example, please.

12           Q.      You talked about professional education

13   PowerPoint, for example.

14           A.      Okay, yes.

15           Q.      You talked about the IFUs, you talked

16   about patient brochures, you talked about the surgical

17   technique, you talked about the monograph.

18           A.      Yes.

19           Q.      Okay.  There were various -- we're going

20   to get to it, but there's various documents listed on

21   your reliance materials which are internal documents

22   from Ethicon.  If they're not described in your report,

23   were they still of significance to you?

24           A.      They are probably documents that I

Nicole B. Fleischmann, M.D.

```
 1   reviewed, but I did not find significant enough to put

 2   in my report.

 3           Q.     Let's go to Exhibit 3.  I think that

 4   that is your CV.  Is that an up-to-date, current CV?

 5           A.     Yes.

 6           Q.     Let's go to the next document, which is

 7   4, that's your original reliance list of materials

 8   relied upon, correct?

 9           A.     Yes.

10           Q.     Exhibit 5 is titled "Supplemental

11   General Reliance List."

12                  Is this the reliance list that we should

13   rely on as being comprehensive of what you've reviewed

14   and relied on in this case?

15           A.     Yes.

16           Q.     If you look at your Supplemental General

17   Reliance List, after the medical literature you get to

18   a section that's titled "Production Materials," and

19   those appear to me to be documents that are Ethicon

20   documents that were produced, and they have Bates

21   numbers attached to most of them, correct?

22           A.     Yes.

23           Q.     Did you read all these documents?

24           A.     I believe I have at least perused these
```

Nicole B. Fleischmann, M.D.

1    documents, but not in depth.

2          Q.    Would peruse mean that you might have

3    shuffled through a pile and seen the cover and gone to

4    the next one?

5                MS. KABBASH:  Objection to form.

6                THE WITNESS:  Possibly.  I think that

7          some of these I recognize on here as documents

8          that I have read, and others I don't recognize

9          as well.

10   BY MR. SLATER:

11         Q.    There's a lot of documents on here with

12   reference to the TVT products.  Is that because this

13   list is comprehensive of materials you've reviewed in

14   connection with TVT reports as well as Prolift®,

15   Prolift+M® and Gynemesh® PS?

16         A.    Yes.

17         Q.    Are you specifically relying on any of

18   the TVT documents listed on here for your opinions on

19   the Prolift®, Prolift+M® or Gynemesh® PS?

20         A.    I think when I -- I think the answer to

21   that is yes.

22         Q.    In what sense?

23         A.    That TVT is a procedure that has been

24   around for 20 years and that the mesh is very similar

Nicole B. Fleischmann, M.D.

1    to Prolift®, and I certainly consider that when I think

2    about my opinions on Prolift®.

3           Q.      Go, if you could, to the third page of

4    your production materials.

5           A.      The third page of the production

6    materials.

7           Q.      Yeah.  Don't go back.  The heading is

8    "Production Materials."

9           A.      Okay, yes.

10          Q.      And go to the third page of it, little

11   more than halfway down, and it's a document dated

12   May 3, 2006.  It says, e-mail string, top one from

13   David Robinson to Carolyn Brennan regarding Suzette

14   e-mail discussing problems with Prolift®.

15                  Do you see that?

16          A.      Yes.

17          Q.      Do you know what that document is?

18          A.      Not offhand.

19          Q.      The next document says 2/2/26, notes

20   from meeting with Dr. V. Lucente and Dr. M. Murphy to

21   discuss Prolift® RCT.

22                  Do you know what that document is?

23          A.      No, not offhand.

24          Q.      Dr. Lucente is Dr. Vincent Lucente,

Nicole B. Fleischmann, M.D.

1    correct?

2            A.      Yes.

3            Q.      Is he the doctor who trained you on the

4    Prolift®?

5            A.      Yes.

6            Q.      Do you respect Dr. Lucente?

7            A.      I don't know him personally.  I mean, I

8    don't know as a person, I have no opinion.

9            Q.      Okay.  When you were trained by

10   Dr. Lucente, did you believe what he told you?

11           A.      Yes.

12           Q.      Did Dr. Lucente describe the results

13   that you could expect with the Prolift® as he trained

14   you, based on data, studies, that sort of thing?

15           A.      No, not that I recall.

16           Q.      Are you familiar with the fact that

17   Dr. Lucente has published literature regarding the

18   Prolift®?

19           A.      Yes.

20           Q.      Is that literature part of what you rely

21   on for your opinions?

22           A.      Sure.

23           Q.      Is it your assumption that when

24   Dr. Lucente and his group have published data regarding

Nicole B. Fleischmann, M.D.

```
 1    the Prolift® that the data has been accurately

 2    presented?

 3          A.     Yes.

 4          Q.     If Dr. Lucente's data actually was not

 5    accurately presented -- well, let me ask you this

 6    question:  Has anyone ever suggested to you before

 7    right now that Dr. Lucente has not accurately

 8    represented the outcomes of his Prolift® surgeries?

 9          A.     No.

10          Q.     Has anyone ever told you that that's

11    been challenged at any time?

12          A.     I'm sure it has been.

13          Q.     Well, I'm asking you if anyone has ever

14    told you that it's been challenged?

15          A.     No, but I'm not shocked to hear that.

16                 MR. SLATER:  Move to strike from "but"

17          forward.

18    BY MR. SLATER:

19          Q.     Has anyone ever told you that anyone

20    within Ethicon was of the view that Dr. Lucente and his

21    group published data that was not accurate?

22                 MS. KABBASH:  Objection to form.

23                 You can answer.

24                 THE WITNESS:  It may be in these
```

Nicole B. Fleischmann, M.D.

```
 1              e-mails, but I had not personally been told

 2              that.

 3    BY MR. SLATER:

 4              Q.     And if it's in these e-mails, you did

 5    not read the e-mails that are listed here that said

 6    that?

 7              A.     Not that I recall.

 8              Q.     So, as you sit here right now, you're

 9    not aware of anybody within Ethicon expressing the view

10    that Dr. Lucente and his group have published data

11    that's not accurate with regard to his Prolift®

12    outcomes?

13              A.     Right.

14              Q.     Has anybody ever told you that

15    Dr. Lucente's data, which was evaluated through an IIS

16    grant from Ethicon, was reviewed by an outside expert,

17    meaning not Lucente and not Ethicon?

18                     Did you know that that was done?

19              A.     No.

20              Q.     Would you accept that Dr. Lucente is

21    knowledgeable regarding the Prolift® and the risks and

22    complications that can arise from a Prolift®?

23              A.     I accept that he is, yes.

24              Q.     Do you know what Ethicon internally
```

Nicole B. Fleischmann, M.D.

```
 1    believes are the known complications and risks with

 2    regard to the Prolift®?

 3            A.      I don't believe that Ethicon has any

 4    other understanding of what the known risks are than

 5    the risks that are in -- that are known to all of us.

 6            Q.      And those would be the risks that are

 7    listed in the IFU, for example?

 8            A.      Among the IFU and in the clinical

 9    literature.

10            Q.      Okay.  In terms of -- I want to just get

11    vocabulary together.

12                    When I talk about the Prolift® -- let me

13    ask you this:  With regard to the Prolift® and

14    Prolift+M®, is there any difference, from your

15    perspective, in terms of the risk-benefit profile?

16            A.      No.

17            Q.      Meaning the same benefits are sought to

18    be achieved and the same risks would exist with both

19    products?

20            A.      Yes.

21            Q.      Does the same hold true for Gynemesh®

22    PS?

23            A.      Yes.

24            Q.      One source of information that you
```

Nicole B. Fleischmann, M.D.

1    obtained when you were first trained on the Prolift®

2    was information from Ethicon regarding their

3    understanding of the benefits and risks, correct?

4          A.     It was one source, yes.

5          Q.     To the extent Ethicon provided

6    information, you as an expert, I'm asking you now, were

7    they obligated to provide the truth about what they

8    knew?

9          A.     One would hope that they were providing

10   the truth, yes.

11         Q.     Well, as an expert witness, if Ethicon

12   did not provide truthful information about the risks

13   that they knew existed with the Prolift®, you would

14   criticize that, correct?

15         A.     I would if it was the only information

16   that I had at that time.

17         Q.     All right.  So you're saying if you --

18   rephrase.

19               So you're saying that there's

20   circumstances in which it would be okay for Ethicon to

21   not disclose risks that they know?

22               MS. KABBASH:  Objection to form.

23               THE WITNESS:  If there were clinical

24         risks that were known, I would expect that the

Nicole B. Fleischmann, M.D.

1              company would have told me about them.

2    BY MR. SLATER:

3          Q.    If there were clinical risks known to

4    Ethicon regarding the Prolift®, the Prolift+M® or

5    Gynemesh® PS, they should have disclosed those,

6    correct?

7          A.    If they knew them, yes.

8          Q.    Do you know what risks were known to

9    Ethicon as of the date the Prolift® first went on the

10   market?  Have you ever seen anything indicating a list

11   of risks they knew existed?

12         A.    I've read some internal documents on

13   that, yes.

14         Q.    What internal documents are you

15   referring to?

16         A.    I've looked over some depositions, Owens

17   deposition.

18              MS. KABBASH:  That may not be on the

19         list Adam.  That was recently provided to

20         Dr. Fleischmann, the Charlotte Owens

21         deposition.  Very recently she was sent the

22         Charlotte Owens deposition on Prolift®.

23   BY MR. SLATER:

24         Q.    Anything else?

Nicole B. Fleischmann, M.D.

```
1            A.      Just reviewing the literature that
2    Ethicon knew based on the TVM data that was available
3    at that time.
4            Q.      Have you ever seen an analysis of the
5    TVM data that was prepared by somebody other than an
6    Ethicon employee or one of the investigators?
7            A.      An analysis of the TVM data besides one
8    of the investigators?
9            Q.      Or by Ethicon itself.
10           A.      No, I'm not sure.
11           Q.      Are you aware of whether there's been
12   anybody who's had access to the TVM raw data and done
13   their own analysis of the outcomes?
14           A.      No.
15           Q.      Are you aware of something called the
16   study of Gynemesh® PS, clinical study of that; do you
17   know that there was a study conducted?
18           A.      No, but I'm happy to look at it.
19           Q.      You haven't seen it before today, right?
20           A.      I'm not sure.
21           Q.      You're not aware of it?
22           A.      Not offhand.
23           Q.      In the materials list there is a list of
24   company witness depositions, still in Exhibit 5, the
```

Nicole B. Fleischmann, M.D.

```
 1    supplemental reliance list, there's a company witness

 2    depositions list.

 3                 Do you see that?

 4         A.      Yes.  Am I on the right page?

 5         Q.      No, you're not.

 6         A.      Oh, I'm sorry.

 7         Q.      The list of company witness depositions,

 8    is that complete if you were to add Charlotte Owens?

 9         A.      Yes.

10         Q.      Do you know what dates transcripts of

11    Charlotte Owens you saw?

12         A.      I believe they're from 2012.

13         Q.      Was it a one day, two days?

14         A.      It was a two-day deposition, 2012.  I'm

15    not entirely sure.

16         Q.      You saw both days?

17         A.      Yes.

18         Q.      Was that important to you?

19         A.      It enlightened me about some of the

20    things that were going on with the company at that

21    time, but it was not important to my opinions about

22    Prolift®.

23         Q.      With regard to the depositions that are

24    listed on this page, the materials list, company
```

Nicole B. Fleischmann, M.D.

1   witness depositions, Piet Hinoul, two days of

2   depositions, was that of significance to you?

3          A.    I can't say that I went into that one

4   in-depth.

5          Q.    You can remember reading it?

6          A.    I did read it at one point, but not

7   recently.

8          Q.    Is there anything in that you can tell

9   me now was of any significance to you?

10         A.    Not offhand.

11         Q.    Charles Nager, was that of any

12  significance?

13         A.    Same.

14         Q.    Marty Weisberg, there's four different

15  days listed, any significance to that?

16         A.    Same, I don't recall specifically what's

17  in those depositions.

18         Q.    Since it's not listed here, you were

19  never given Axel Arnaud's depositions, were you?

20         A.    I don't think so, no.

21         Q.    Did you want to be provided whatever

22  depositions may have been taken that would provide

23  information as to what Ethicon knew about the risks and

24  benefits of the Prolift®?

Nicole B. Fleischmann, M.D.

```
 1          A.     Again, these were not of primary

 2   importance to me when I was forming my opinions about

 3   Prolift®.

 4          Q.     I don't want to put words in your mouth,

 5   although I do, let me ask you this:  With regard to

 6   your opinions on the risks and benefits of the

 7   Prolift®, did you consider at all what Ethicon knew as

 8   to the risks and benefits, or did you form your opinion

 9   based on what you've read in the literature and your

10   own experience?

11          A.     At the time or now?

12          Q.     As you sit here right now, we'll wind

13   backwards, but as you sit here right now, what is your

14   opinion based upon?

15          A.     My opinion is mostly based upon the

16   clinical literature and my own experience.

17          Q.     When you first were training on the

18   Prolift® and first starting to use it in terms of your

19   understanding of the risks and benefits, was that based

20   in part on what Ethicon informed you about the risks

21   and benefits?

22          A.     It was not.

23          Q.     Well, you were trained by Ethicon,

24   right?  It's a simple question; you were trained by
```

Nicole B. Fleischmann, M.D.

```
1    Ethicon, right?

2            A.      On Prolift®, yes.

3            Q.      Okay.  You saw the IFU, right?

4            A.      At some point, yes.

5            Q.      You read the IFU, right?

6            A.      I believe so, yes.

7            Q.      You believed it to be a true statement,

8    right?

9            A.      Yes.

10           Q.      Okay.  To the extent Ethicon identified

11   adverse reactions or risks or any other information,

12   that was part of what your understanding was, correct?

13           A.      Yes.

14           Q.      You assumed that Ethicon, which is a

15   large pharmaceutical company employing professionals

16   and consulting with doctors, including the TVM group,

17   in that they would have used that, those sources of

18   information to give you the best information they had

19   about what are the risks and benefits, correct?

20           A.      Yes, but there was a lot of other

21   information that I had at that time that was probably

22   more important to me than what I was reading in the IFU

23   or what a rep was telling me.

24                   MR. SLATER:  Move to strike from "but"
```

Nicole B. Fleischmann, M.D.

```
 1         forward.

 2    BY MR. SLATER:

 3         Q.      If Ethicon disclosed to you a

 4    significant risk, a risk that could cause very serious

 5    harm to a patient associated with the Prolift®, you

 6    would have incorporated that into your understanding,

 7    correct?

 8         A.      Yes.

 9         Q.      When you consented patients, you would

10    tell the patients your understanding of the risks and

11    benefits, correct?

12         A.      Yes.

13         Q.      And that's because the patient has to

14    decide whether to have this procedure and this device

15    put in their body; it's their decision, right?

16         A.      Correct.

17         Q.      And you as a physician would want to

18    make sure that you gave them the risk-benefit profile

19    so they would understand here's the benefits you could

20    get, but these are the risks, including the most severe

21    things that can happen just so you, the patient, can

22    decide what's best for you, right?

23         A.      Correct.

24         Q.      So the extent, again, that Ethicon would
```

Nicole B. Fleischmann, M.D.

1  tell you about severe risks, you would tell that to

2  your patients so the patient could consider that,

3  correct?

4        A.    Yes, luckily that was not the only

5  information I was relying upon at the time.

6              MR. SLATER:  Move to strike after "yes".

7  BY MR. SLATER:

8        Q.    Do you know what sources of information

9  Ethicon had and has had regarding the complications

10  caused by the Prolift®, the Prolift+M® and Gynemesh®

11  PS?  Do you know how Ethicon gets that information?

12       A.    I know that they look at the MAUDE

13  database, and there are reports to them directly.

14       Q.    Anything else?

15       A.    The clinical literature.

16       Q.    Anything else?

17       A.    Anecdotes.

18       Q.    What's an anecdote?

19       A.    A physician e-mail.

20       Q.    Any other sources?

21       A.    They rely on the medical community to

22  tell them about their complications.

23       Q.    And that's the medical community around

24  the world, correct?

Nicole B. Fleischmann, M.D.

1          A.     Yes.

2          Q.     To the extent Ethicon knows about severe

3    complications that can have a permanent impact on a

4    woman from all those various sources, they should

5    consider that with regard to whether the design is

6    safe, correct?  They should take it into account,

7    right?

8          A.     Yes.

9          Q.     And they should make sure they warn

10   physicians who are considering using the product and

11   who are going to have to consent patients, they should

12   give that information to the doctors so they can give

13   that information to patients so the patient can make an

14   informed decision on whether or not to consent,

15   correct?

16              MS. KABBASH:  Objection to form.

17              THE WITNESS:  I just -- I have trouble

18          with the way you're phrasing these questions

19          because physicians don't only rely on what they

20          hear from the company to make a decision about

21          what the risks and benefits of a procedure are.

22              MR. SLATER:  Move to strike.

23   BY MR. SLATER:

24          Q.     My question is what Ethicon is supposed

Nicole B. Fleischmann, M.D.

1    to do.  I'm not talking about -- but let me ask the

2    question again differently.  Maybe I'll do a better

3    job, it's unlikely, but I'll try.

4                    To the extent Ethicon knows about severe

5    complications that can occur with the Prolift®, the

6    Prolift+M®, the Gynemesh PS®, they needed to make sure

7    that they gave that information to physicians so

8    physicians could incorporate that into their knowledge

9    base and make sure that they could tell patients not

10   only the benefits that could be achieved but also here

11   are the risks, including the most severe things that

12   can happen, so the patient could make an informed

13   decision, correct?

14                    MS. KABBASH:  Objection to form.

15                    THE WITNESS:  Yes, and you asked me that

16         question already, and I said yes.

17                    MR. SLATER:  Thank you.  Move to strike

18         after "yes".

19   BY MR. SLATER:

20         Q.    You don't have to laugh at me.  I'm

21   doing the best I can.

22         A.    Me too.

23         Q.    If you go further in your materials

24   list, it goes to other materials and you have publicly

Nicole B. Fleischmann, M.D.

1   available materials, including a bunch of practice

2   bulletins and other information issued by professional

3   organizations, right?

4           A.      Okay.

5           Q.      That's part of what you considered?

6           A.      Yes.

7           Q.      Have you ever taken any of the committee

8   opinions or practice bulletins or physician statements,

9   these various statements from these organizations like

10  AUGS, SUFU and all of these organizations and actually

11  read them and then consulted the references that were

12  cited to go see if the references were accurately cited

13  for what they were cited for?

14          Have you ever done that type of

15  cross-checking?

16          A.      Yes, I have.

17          Q.      With which ones, any ones in particular?

18          A.      With many of them.

19          Q.      Have you ever noticed any

20  inconsistencies between the proposition something was

21  cited for and what the source document actually said?

22          A.      No, I didn't.

23          Q.      So if you're on the witness stand in

24  front of a jury and we show you one that shows a

Nicole B. Fleischmann, M.D.

1    discrepancy, that would be just something you didn't

2    notice when you did the review?

3              A.    Well, you'd have to give me a specific.

4              Q.    If you go further you get to expert

5    reports, there's three expert reports listed?

6              A.    Where are we?  Oh, here, I got it.

7              Q.    Are those of any significance to you in

8    forming your opinions in connection with the Prolift®,

9    Prolift+M® or Gynemesh® PS, Blaivas, Kohli and

10   Rosenzweig?

11             A.    Not really.

12             Q.    Okay.  Turning to the next page, there's

13   a series of depositions in the MDL wave cases.

14                   Were those of significance to you?

15             A.    Not particularly.

16             Q.    Did you read any of them?

17             A.    Are we talking about the MDL wave cases

18   in general?

19             Q.    The depositions listed.

20             A.    With regards to Prolift® because there's

21   a lot of depositions here.

22             Q.    Let's start with all of them.  Did you

23   read any of these depositions?

24             A.    Yes, I did.

Nicole B. Fleischmann, M.D.

```
1         Q.      Which ones did you actually read?

2         A.      I read ones that were pertinent to

3    Prolift®, a couple of them.

4         Q.      Which ones?

5         A.      Alan Garely's.  I read Dan Elliott's.

6    We're talking specifically about Prolift®?

7         Q.      We're talking about this whole list

8    right here.  I want to know what you read on this list,

9    not limited to Prolift®.

10        A.      Well, I've read these depositions but

11   not recently.  The most recent ones that I have read

12   have been the ones with regard to Prolift®.

13        Q.      There's no deposition regarding Prolift®

14   for Dan Elliott listed here, is there?

15        A.      Yes, there is.

16        Q.      Am I overlooking it?

17        A.      Oh, I'm looking under expert reports.  I

18   apologize.

19        Q.      Let's start over.  In the list of

20   depositions on this page under the heading "MDL Wave

21   Cases" --

22        A.      Yes.

23        Q.      -- did you read any of these

24   depositions?
```

Nicole B. Fleischmann, M.D.

```
1           A.      I have, but the only one I've read

2    recently is Alan Garely's on Prolift®.

3           Q.      You know Dr. Garely, right?

4           A.      Not personally.

5           Q.      You know who he is?

6           A.      I know who he is, but I don't know him

7    personally.

8           Q.      Did you read any of the other

9    depositions on this list of depositions?

10          A.      Yes, but not recently.

11          Q.      Anything in those that are of any

12   significance to you, as you sit here right now?

13          A.      Not offhand.

14          Q.      There's a list of expert reports further

15   down on this page.  Did you read those expert reports

16   or any of them?

17          A.      Yes, I've read the ones recently that

18   have had to do with Prolift®.

19          Q.      Which ones?

20          A.      Alan Garely's and the Elliott Prolift®.

21          Q.      Did you ever see Dr. Elliott's

22   deposition or any deposition of him regarding the

23   Prolift®?

24          A.      I believe I have.  Yes, I believe I
```

Nicole B. Fleischmann, M.D.

1    have, although I don't see it on the reliance list.

2            Q.     Is there anything of any significance to

3    that now that you can tell me?

4            A.     Not really.

5            Q.     Going to the last page, there's more

6    expert reports.

7                   Did you read any of those on the last

8    page of this list?

9            A.     At some point, but not recently.

10           Q.     Anything of any significance on this

11   page, this last page of expert reports?

12           A.     Not particularly.

13           Q.     Let's look at your Prolift® notes,

14   Exhibit 7.

15                  "Early TVM studies," that's one of your

16   headings, right?

17           A.     Yes.

18           Q.     Those are important articles for you in

19   forming your opinions, right?

20           A.     They were articles I wanted to be aware

21   of when I was preparing for my deposition.

22           Q.     These are articles written by the

23   doctors who actually invented and developed the

24   Prolift®, correct?

Nicole B. Fleischmann, M.D.

```
1          A.      Yes.

2          Q.      Would you consider this literature to be

3   important?

4          A.      Sure.

5          Q.      You write here "Berrocal" and you write

6   "concept."  What does that mean, "concept"?

7          A.      I'm just referring to the paper that he

8   wrote which discussed the concept of Prolift®.

9          Q.      Is that what your takeaway was from that

10  article, that it talks about the concept?

11         A.      Yes.

12         Q.      Was there anything else about that

13  article that was significant to you?

14         A.      I don't recall.

15         Q.      I didn't see any discussion of anything

16  in the article that went beyond really that, but I want

17  to know because this is my time to depose you, is there

18  anything else about the Berrocal article which was

19  published in 2004, right?

20         A.      Yes.

21         Q.      Anything else about that that's

22  significant to you?

23         A.      Not offhand, but if you show me the

24  article, we can discuss any particular specifics in
```

Nicole B. Fleischmann, M.D.

```
 1    there.
 2            Q.     You don't remember what it says?
 3            A.     I remembered that it talked about the
 4    concept of Prolift®.
 5            Q.     Do you remember anything else about the
 6    article?
 7            A.     Not particularly.
 8            Q.     You prepared for about 50 hours for this
 9    deposition?
10            A.     Yes.
11            Q.     Did you review that article as part of
12    your preparation?
13            A.     Yes, I did.
14            Q.     And still the only takeaway you have is
15    that it talked about the concept?
16            A.     Yes, and the details of the concept of
17    Prolift®.
18            Q.     Did they talk about any troubling
19    complications or risks with the procedure?
20            A.     Not in that article.
21            Q.     Are you sure about that?
22            A.     No, not sure, but I don't recall that it
23    did talk about that.
24            Q.     Nothing that you cited in your report,
```

Nicole B. Fleischmann, M.D.

```
 1    right?

 2          A.      Right.

 3          Q.      To the extent they talked about

 4    complications of concern, that would be something that

 5    you would have wanted to note in your analysis, right?

 6          A.      Yes, but there were other articles that

 7    discussed that.

 8                  MR. SLATER:  Move to strike from "but"

 9          forward.

10    BY MR. SLATER:

11          Q.      Do you recall, and maybe this will

12    refresh your recollection, they talked about their

13    concern over retraction of mesh in the human body?

14          A.      In the TVM article, yes.

15          Q.      In the Berrocal article?

16          A.      Well, if you'd show it to me, I'm happy

17    to look at it.

18          Q.      I don't have it.

19          A.      Yeah, I don't have it either.

20          Q.      I have it here.

21          A.      Good.

22          Q.      It is good.  You don't know, do you?

23          A.      I don't have a photocopy.

24          Q.      I pointed to my head, by the way.
```

Nicole B. Fleischmann, M.D.

```
 1              A.      I don't have a photographed copy of it

 2      in my brain like you do.

 3              Q.      You don't even remember that it

 4      discussed retraction, do you?

 5              A.      It may have.  I will defer to you on

 6      that.

 7              Q.      You don't remember, as you sit here now,

 8      whether that article discussed retraction or not,

 9      right?

10              A.      No, but I will take that it did, if you

11      say it did.

12              Q.      I'm not trying to -- my question is

13      this:  You don't recall whether that article even

14      discussed retraction, do you?

15              A.      No, I don't recall.

16              Q.      Do you know whether the French TVM group

17      were concerned about retraction/contraction of the mesh

18      throughout the time the Prolift® was being developed

19      and marketed?  Do you know whether they were concerned?

20              A.      Yes, I believe they were.

21              Q.      These were doctors who probably had as

22      much, if not more experience with the Prolift® than any

23      doctors in the world, right?

24              A.      At that point, yes.
```

Nicole B. Fleischmann, M.D.

1        Q.      Well, you're not saying you had more

2   experience at any time in your life with the Prolift®

3   than they did, are you?

4        A.      I wasn't referring to myself.  I was

5   just saying at that time they were the ones that had

6   the most experience.

7        Q.      Is there some doctor you could point to

8   who at any point had more experience with the Prolift®

9   than the French TVM group?

10        A.      Currently, I believe there are a lot of

11   doctors that used Prolift® for a very long time, maybe

12   not as long as they did, but a very long time.

13        Q.      And who are those that you would think

14   had more experience with the Prolift® than TVM group?

15              MS. KABBASH:  Objection to form.

16              THE WITNESS:  I can't give you names,

17         but I can tell you that there are people who

18         have been doing Prolift® for a long time, since

19         it was first invented.

20              MR. SLATER:  Move to strike.

21   BY MR. SLATER:

22        Q.      I'm asking for names.  Can you name

23   anybody, any doctor in the world that had more

24   experience with the Prolift® than the French TVM group?

Nicole B. Fleischmann, M.D.

```
 1            A.     I mean, I can tell you Lucente had a

 2   very longstanding experience with TVM, and he was not

 3   in the French group.  Miller.

 4            Q.     Miller.  Miller had a lot of experience

 5   with the Prolift®?

 6            A.     Dan Miller, wasn't he on there?  Yes.

 7            Q.     Dennis Miller.

 8            A.     Dennis Miller, I'm sorry.

 9            Q.     That's okay.

10                   Anybody else?

11            A.     No, but I'm sure I could come up with

12   people who were doing Prolift® for a long time.

13            Q.     Well, my question was this, not who do

14   you know of that did a lot of Prolift® surgeries, my

15   question is this:  Is there any doctor in the world you

16   can point to that had more experience with the Prolift®

17   than the French TVM group?

18            A.     Not more.

19            Q.     Is there any doctor in the world you

20   could point to who had as much experience with the

21   Prolift® as the French TVM group?

22            A.     I just gave you two names.

23            Q.     Lucente and Dennis Miller, those are the

24   two?
```

Nicole B. Fleischmann, M.D.

1        A.      Yes.

2        Q.      You've never seen Lucente's internal

3   data, right?

4        A.      No.

5        Q.      His actual raw internal data,

6   spreadsheets from his patients, nothing like that?

7        A.      No, no, I have not, no.

8        Q.      Do you know whether the French TVM group

9   thought that the Prolift® should be used in only a

10  limited spectrum of patients?  Obviously, patients with

11  prolapse, but do you know whether they thought that it

12  should be limited in who it's used in at any point in

13  time?

14       A.      I know they thought it was ideal in

15  patients who had higher grades of prolapse.

16       Q.      A higher grade of prolapse would be a

17  clear stage 3 or a 4?

18       A.      Yes.

19       Q.      When did you learn -- well, rephrase.

20               From the time -- rephrase.

21               At the time you first started using the

22  Prolift®, what was your patient selection criteria?

23       A.      The same.

24       Q.      Got a clear stage 3 or a 4?

Nicole B. Fleischmann, M.D.

1          A.     Well, I was always taught in my training

2     that stage 1 and 2 prolapse really didn't need surgery.

3          Q.     Do you know whether there were any

4     other -- rephrase.

5                 Do you know of any other limitations

6     that the TVM group thought should be placed on the use

7     of Prolift®?

8          A.     No.  Oh, with the exception of pregnant

9     patients.

10         Q.     So you thought the only limitations on

11    the use of Prolift® should be high grade prolapse,

12    stage 3 and 4 and pregnant women?

13         A.     I don't think that they said that there

14    was a limitation on stage 3 and 4 prolapse.  I just

15    think they said it was ideal for that case.

16         Q.     Would you agree with me that a physician

17    could follow the proper procedure for implanting a

18    Prolift® and erosion can occur?

19         A.     Yes.

20         Q.     And I use the word erosion to include

21    erosion, exposure, extrusion when I ask that question.

22                Is the answer the same?

23         A.     Erosion, extrusion.

24         Q.     Yeah.  The question is this:  Do you

Nicole B. Fleischmann, M.D.

1    agree that a doctor can follow the correct procedure,

2    implant the Prolift® properly and an exposure or an

3    erosion or an extrusion can still occur?

4          A.    Do you mean an erosion into an organ?

5          Q.    Either way.

6          A.    No.  An extrusion, yes.

7          Q.    You think that an erosion into an organ

8    can only happen if the doctor doesn't put in the

9    Prolift® correctly?

10         A.    If the dissection is not correct,

11   exactly.

12         Q.    What about the dissection would lead the

13   Prolift® to erode into the bladder?

14         A.    Probably an unrecognized bladder injury

15   at the time of surgery or just being way too close to

16   the urethral area of the bladder.

17         Q.    Do you agree or disagree that the

18   Prolift® can through the inflammatory reaction and its

19   reaction with the adjoining tissue erode into the

20   bladder, even if it's placed in the right place in the

21   right way?

22               You disagree with that?

23         A.    I do disagree with that.

24         Q.    Do you know what Ethicon thinks about

Nicole B. Fleischmann, M.D.

```
 1   that?

 2          A.     No.

 3          Q.     If they think that can happen, do you

 4   disagree with Ethicon?

 5          A.     Yes.

 6                 MS. KABBASH:  Objection to form.

 7                 THE WITNESS:  I do.

 8   BY MR. SLATER:

 9          Q.     Do you know whether the TVM group, any

10   of their members ever published that there should be

11   caution taken in determining who should actually get a

12   Prolift® put in their body?

13                 MS. KABBASH:  Objection to form.

14   BY MR. SLATER:

15          Q.     They actually used that word in that

16   published article.

17                 Did you ever see that?

18          A.     No, I don't recall that, that wording.

19          Q.     Did you ever see an article that had

20   words to the effect -- rephrase.

21                 Did you ever see an article which Cosson

22   was one of the authors where part of the takeaway was

23   that the use of Gynemesh® Prolene soft mesh as part of

24   this procedure turned out to have too many risks and
```

Nicole B. Fleischmann, M.D.

```
 1    that they may have to find a completely different

 2    material because of the problems they were seeing.

 3                   Did you ever see that article?

 4                   MS. KABBASH:  Objection to form, lack of

 5           foundation.

 6                   THE WITNESS:  No, I have not seen an

 7           article on that, a peer-reviewed article on

 8           that.

 9    BY MR. SLATER:

10           Q.    You never saw that, okay.

11                   What are you using currently to treat --

12    rephrase.

13                   If a patient comes in now to your

14    practice, I'm not talking about this second, but in

15    this time frame, here in 2017, with a cystocele, for

16    example, one option is to do a suture repair, a

17    colporrhaphy, correct?

18           A.    Yes.

19           Q.    That's something you do in your

20    practice, right?

21           A.    Occasionally.

22           Q.    What are the other procedures that you

23    do besides colporrhaphy to treat a cystocele?

24           A.    I'll do a colporrhaphy, I'll augment it
```

Nicole B. Fleischmann, M.D.

```
 1   with a graft, usually a biologic graft, if I'm going to

 2   do that, although that's not very common.  I will do a

 3   sacrocolpopexy.

 4           Q.      You do a sacrocolpopexy to treat a

 5   cystocele?

 6           A.      If there's uterine prolapse.

 7           Q.      Let's says there's not.  Let's just say

 8   it's a cystocele, AS, you can cross off the list,

 9   right?

10           A.      No.

11           Q.      You do abdominal sacrocolpopexy just to

12   treat cystoceles?

13           A.      Yes.

14           Q.      Really, okay, what else?

15           A.      In an older patient I'll do a

16   colpocleisis.

17           Q.      Are you currently using any

18   polypropylene synthetic mesh through the vagina to

19   treat cystoceles?

20           A.      No.

21           Q.      Are you currently using any

22   polypropylene mesh through the vagina to treat

23   rectoceles?

24           A.      No.
```

Nicole B. Fleischmann, M.D.

1        Q.      Are you currently using any

2    polypropylene mesh through the vagina to treat any type

3    of prolapse?

4        A.      Not in a while.

5        Q.      When is the last time you used mesh,

6    polypropylene mesh through the vagina to treat any type

7    of prolapse?

8        A.      About 2013.

9        Q.      Is that due to your risk-benefit

10   analysis?

11       A.      No.  That's due to the fact that a

12   product that I was very happy with was pulled from the

13   market, and there was not really another one that I

14   found to be equal.

15       Q.      The product that was pulled off the

16   market was the Prolift® and the Prolift+M®?

17       A.      Yes.

18       Q.      Why don't you use Gynemesh® PS cut by

19   you to fit the defect through the vagina?

20       A.      I used to do that.

21       Q.      I'm asking why you don't do it now?

22       A.      Because when I was doing the Sonin(ph.)

23   approach with Gynemesh® PS, I was getting more pelvic

24   pain than I liked, so I stopped doing that when

Nicole B. Fleischmann, M.D.

```
 1    Prolift® came out.

 2          Q.      Do you use Gynemesh® PS in your

 3    practice?

 4          A.      No, not really.

 5          Q.      You do abdominal sacrocolpopexy,

 6    correct?

 7          A.      Yes.

 8          Q.      What mesh do you use?

 9          A.      A Y mesh, I was using the Bard for a

10    while, and now I'm using Coloplast Restorelle mesh.

11          Q.      When you say "Y mesh," you're talking

12    about the shape of the mesh or a specific brand?

13          A.      No, there's many brands of Y mesh.  It's

14    just a specific company.

15          Q.      So since -- well, rephrase.

16                  You said you stopped putting mesh in

17    through the vagina around 2013.  The Prolift® and

18    Prolift+M® were pulled off the market in 2012.

19                  Was that the last time you put mesh in

20    through the vagina to treat prolapse?

21                  MS. KABBASH:  Objection to form.

22                  THE WITNESS:  No.

23    BY MR. SLATER:

24          Q.      After the Prolift® and Prolift+M® were
```

Nicole B. Fleischmann, M.D.

1  withdrawn from the market, what, if any, mesh did you

2  place through the vagina to treat prolapse from the

3  time that they were withdrawn from the market to that

4  time in 2013 when you ceased?

5          A.     I briefly trialed the Coloplast product,

6  which was the only at that point trocar product,

7  trocar-based product that resembled Prolift® to me, but

8  I was not happy with it, so I stopped doing it.  And

9  now that's no longer available.

10         Q.     It's a good thing.

11                MR. SLATER:  Off the record.

12                (Discussion off the record.)

13  BY MR. SLATER:

14         Q.     Do you accept that there are some women

15  who as a result of the Prolift® have suffered what can

16  fairly be described as catastrophic permanent

17  complications?

18                Do you agree with that?

19         A.     As a result of the Prolift®?

20         Q.     Yes.

21         A.     As a result of the product?

22         Q.     As a result of the Prolift® being put in

23  their body and being in their body, yes.

24         A.     It's not as a result of the Prolift®.

Nicole B. Fleischmann, M.D.

1    It's a result of how the Prolift® was placed.

2           Q.     You're saying that you think that can

3    only happen when the doctor doesn't do the procedure

4    correctly?

5           A.     A catastrophic?

6           Q.     Yeah.

7           A.     Absolutely.

8           Q.     Are you aware that there are some

9    physicians, including those that you would consider to

10   be the most highly skilled physicians in the world with

11   the Prolift® to have had that type of outcome?

12                 MS. KABBASH:  Objection to form and lack

13          of foundation.

14                 THE WITNESS:  If that's the case, it's

15          extremely rare.

16   BY MR. SLATER:

17          Q.     You don't know though, do you?

18                 MS. KABBASH:  Objection.

19                 THE WITNESS:  Yes, I do.

20   BY MR. SLATER:

21          Q.     You know that that has happened, or you

22   know that --

23          A.     I know that it would be extremely rare

24   for a catastrophic event to happen with someone who is

Nicole B. Fleischmann, M.D.

1    very well trained at putting in a Prolift®.

2            Q.     You just said it would be.  Do you know

3    that that has actually occurred though?  I'm not

4    talking hypothetically here.  Do you know that that's

5    actually occurred?

6            A.     There may be an occurrence, but I'm not

7    saying that that is a common thing.

8            Q.     You're saying there may be -- are you

9    acknowledging that it has happened, or are you saying

10   you're not sure if it's happened, but you'll accept

11   that it probably has?  Which one is it?

12                  MS. KABBASH:  Objection.

13                  THE WITNESS:  I'm saying that I'll

14           accept that it probably has.

15   BY MR. SLATER:

16           Q.     Do you know what Ethicon's view is as to

17   whether or not the Prolift® can be put in properly and

18   a woman can still suffer a catastrophic, permanent

19   complication from the Prolift® itself?

20           A.     I know that Ethicon asked that its

21   surgeons to be well trained in putting -- in pelvic

22   surgery, in all pelvic surgery before embarking on

23   using a Prolift®.

24           Q.     Let's talk about your experience with

Nicole B. Fleischmann, M.D.

1    the Prolift®.  You were trained by Ethicon, correct, by

2    Dr. Lucente at an Ethicon event, correct?

3         A.     I really don't consider that my training

4    on Prolift®.

5         Q.     Let me ask it differently.  You attended

6    an Ethicon professional education training session that

7    was run by Dr. Lucente, correct?

8         A.     I did.

9         Q.     You learned things during that seminar,

10   correct?

11        A.     Yes.

12        Q.     Okay.  You took that into account in

13   moving forward with patients, correct?  That was part

14   of what you took into account?

15        A.     Yes.

16        Q.     I believe there came a point in time

17   when you modified your procedure for implanting a

18   Prolift®; is that correct?

19        A.     Yes.

20        Q.     When did that occur?

21        A.     Pretty early on in my using it.

22        Q.     Can you tell me when?

23        A.     When, I didn't hear you say, when or

24   why?

Nicole B. Fleischmann, M.D.

1        Q.      Can you tell me when?

2        A.      When I started modifying Prolift® was

3    probably almost immediately when I adapted it.

4        Q.      Would that be within 2007 then?

5        A.      Yes.  Trying to get my time frame.

6        Q.      Can you tell me specifically the

7    modification you made to your procedure?

8        A.      I was trying to recreate what I had

9    learned when I was putting in the Gynemesh® PS before I

10   started using Prolift®, which was to access the

11   sacrospinous ligament from an anterior approach,

12   meaning that we would go through an incision on the

13   anterior vaginal wall to get to the sacrospinous

14   ligament.  That's how I learned to place the Gynemesh®

15   PS because it gave me a deep repair of the apex of the

16   vagina, and you have to remember that I was operating

17   on people with advanced prolapse, and it is my opinion

18   that anybody who has a large cystocele has apical

19   prolapse, not just my opinion, but many people's

20   opinion.

21              So I was trying to recreate that in a

22   way that the anterior only did not allow me to do.

23       Q.      That's what you were doing initially?

24       A.      Yes.

Nicole B. Fleischmann, M.D.

1        Q.     What was the change to your procedure,

2   or did I misunderstand?  I thought there was a point in

3   time when you modified your Prolift® procedure?

4        A.     I did.

5        Q.     What was the modification?

6        A.     So exactly that, I would take the

7   Prolift® but I would cut the back straps of the

8   posterior part repair -- I would almost have to draw it

9   for you because it's hard to explain.

10        Q.     You don't need to draw it.  I'm pretty

11   familiar.

12        A.     So I would cut the back straps off the

13   Prolift®, the P side and I would sew it with Prolene to

14   the A side, so that I would have a shape that had six

15   legs coming from it, and the deep legs I would put

16   through the sacrospinous ligament from an anterior

17   approach.

18        Q.     Who taught you to do that?

19        A.     It was a modification that closely

20   resembled what I had been doing in my fellowship.  So

21   in my fellowship, we would take capios and we would put

22   the Gynemesh® into the sacral spinous ligament from the

23   same approach.

24        Q.     It was Vince Lucente who suggested this

Nicole B. Fleischmann, M.D.

1    modification to you, correct?

2          A.     He may have suggested it, but it was

3    something that I had been thinking about, how I could

4    do that same kind of repair that I had been doing in my

5    fellowship with the Prolift®.

6          Q.     If you wrote in a document, for a while

7    I considered going back to my previous repair until I

8    was clued into the modified total repair by Lucente in

9    an informal meeting, would that be an accurate

10   statement that it was Dr. Lucente?

11         A.     It might have been that.  It could have

12   been.

13         Q.     So just to get this clean, Dr. Lucente

14   suggested this modification to the procedure, correct?

15         A.     Yes, I guess he did.

16         Q.     Okay.  And did you feel that that

17   modification improved your outcomes?

18         A.     It improved my outcomes, yes, but not as

19   much as I wanted.

20         Q.     My understanding is that when the

21   Prolift+M® came out, you began to use the Prolift+M®,

22   correct?

23         A.     Yes.

24         Q.     And my understanding is that, from your

Nicole B. Fleischmann, M.D.

1  perspective, your outcomes improved when you started

2  using the Prolift+M®, correct?

3          A.      No.  It wasn't because of the M.  It was

4  because I had at that point, and even before I started

5  using the M, I had gone back to doing a total -- to

6  total repair, and that's when my outcomes started to

7  really improve.

8          Q.      If you wrote in a document that with the

9  advent of M, the outcomes are getting better and

10  better, you would stand by that statement if you wrote

11  that, wouldn't you?

12                 MS. KABBASH:  Objection to form.

13                 THE WITNESS:  It depends on when I wrote

14      the document.

15  BY MR. SLATER:

16          Q.      November of 2009?

17          A.      Right.  So I had done Prolift® after

18  that for another three years, and my feeling is my

19  outcomes had gotten better because of the way that I

20  was doing the Prolift® after I modified the approach --

21  after I went back to the total approach is when my

22  outcomes started getting really better.

23          Q.      The modification to your procedure, is

24  that something that Ethicon placed into the IFU as an

Nicole B. Fleischmann, M.D.

```
 1    alternative way to place the Prolift®?

 2            A.      No.

 3            Q.      So your outcomes would not be

 4    representative of other physicians not using the same

 5    procedure potentially, correct?  You had your own

 6    modified procedure, right?

 7                    MS. KABBASH:  Objection.

 8                    THE WITNESS:  I did, but I just want to

 9            clarify that I went back to the procedure that

10            was done -- that was recommended in the IFU not

11            long after I wrote that letter.  It just

12            wouldn't be reflected in that letter, because

13            even when I modified the approach, I was still

14            not getting some apical prolapse.

15                    MR. SLATER:  Move to strike from "but"

16            forward.

17    BY MR. SLATER:

18            Q.      So my understanding is initially you

19    followed the IFU?

20            A.      So initially I really didn't follow the

21    IFU, initially.  Very early on, I modified the Prolift®

22    to recreate what I had done in my fellowship.

23            Q.      Okay.

24            A.      It wasn't until after that letter was
```

Nicole B. Fleischmann, M.D.

1    written that I actually went back to the IFU approach.

2         Q.    Let me walk through this.  Initially

3    when you first started doing the Prolift® when you were

4    first trained, you were following this -- a modified

5    procedure similar to what you had been doing with

6    Gynemesh® PS where you did an anterior incision to

7    attach the mesh to the sacrospinous ligament.

8              You described that earlier in the

9    deposition, correct?

10        A.    Yes.  Can I -- I don't mean to interrupt

11   you.  I just want to really clarify this.  When I first

12   started Prolift®, my first Prolifts® were A only, just

13   as the IFU, A only, okay.  So there was no deep

14   support.  So someone would come in with a cystocele and

15   I would just do anterior kit, and I was getting

16   recurrences at the top of the vagina.

17             So when I thought about it, I said to

18   myself this is not exactly what I was doing in my

19   fellowship because I was getting something into the

20   ligament during my fellowship.  So that is why I

21   modified the technique probably after speaking to him

22   and seeing how can I get that deeper repair that I'm

23   looking for.

24             So maybe a few months or a few --

Nicole B. Fleischmann, M.D.

1    whatever it was after I started doing Prolift®, I

2    modified the technique, and that's about the time that

3    you see that letter being written.

4           Q.    Well, let me understand, your

5    professional education with the Prolift® took place in

6    2007, correct?

7           A.    I don't remember if it was 2006 or 2007.

8           Q.    Your report says 2007, and I think the

9    documentation in the report was 2007.  You actually

10   discuss it when you were trained.  It says it right

11   here -- oh, I see what it says, a Prolift®

12   preceptorship and proctorship in 2006 and 2007

13   respectively, okay.

14          So you started using the Prolift® 2006,

15   2007?

16          A.    Around there.

17          Q.    Okay.  Initially, were you following the

18   IFU and then you saw some apical prolapse recurrences?

19          A.    Yes.

20          Q.    So then you modified your procedure?

21          A.    Yes.

22          Q.    To get more support from the

23   sacrospinous ligament?

24          A.    Yes.

Nicole B. Fleischmann, M.D.

1          Q.      Okay.  And then at some point you had

2   this conversation with Dr. Lucente where he suggested

3   this modification?

4          A.      Yes.

5          Q.      When did that occur?

6          A.      It probably occurred a few months after

7   I had started doing the Prolift®, at a meeting, or I

8   had seen him somewhere and I came up to him and I said,

9   listen, I'm getting a lot of apical recurrences with

10  the anterior repair, and I said, but I don't want to

11  put mesh on the back wall of the vagina, so how do I do

12  this so that I can still fix my cystoceles and get a

13  deeper repair, and then he said, well, you could try

14  modifying it.

15         Q.      And for how long did you use that what

16  I'm going to call the Lucente modification?

17         A.      I think that would be bad to do that.

18                 MS. KABBASH:  Objection to form.

19  BY MR. SLATER:

20         Q.      I'm going to call it that for the rest

21  of my life, so let's go.

22         A.      Of course.  Probably a couple of years.

23         Q.      Did there come a point when you stopped

24  following this modification?

Nicole B. Fleischmann, M.D.

1        A.      Yes.

2        Q.      At that point did you go back to doing

3   the IFU procedure?

4        A.      And the difference was then I was

5   starting to do totals, so I started to do the anterior

6   and posterior.

7        Q.      If you had just a cystocele with a

8   patient, you wouldn't put a total Prolift® in for just

9   a cystocele, would you?

10       A.      You have to remember the philosophy.

11       Q.      It's a simple question.  No, I don't

12  want to know the philosophy.

13       A.      Yes, I would.  Yes, I would.

14       Q.      So you would put in a total Prolift® in

15  somebody who has no rectal prolapse?

16       A.      Who has no rectocele?

17       Q.      Right.

18       A.      Yes, because, because, recurrences

19  happen in the posterior wall, the posterior apical

20  wall.

21       Q.      Right.

22       A.      So what I was doing was I was supporting

23  the posterior apical wall behind the uterus with the

24  posterior passes, and then my results became much

Nicole B. Fleischmann, M.D.

1    better.

2         Q.    Your results in terms of whether you got

3    recurrences?

4         A.    Yes.

5         Q.    Okay.  But you put all that mesh in just

6    to prevent a recurrence in a compartment that didn't

7    have any prolapse when you operated on the patient,

8    correct?

9         A.    Exactly.  It's similar to what we do

10   with our Y meshes and colpopexies.  We do support the

11   back of the uterus and the back wall of the vagina,

12   even if the patient doesn't have a significant

13   rectocele.  That's why Y meshes are not used in

14   colpopexies.  It's the same principle.

15             MR. SLATER:  Move to strike from

16        "exactly."

17   BY MR. SLATER:

18        Q.    The reason that you can get a recurrence

19   in the unoperated compartment that didn't have prolapse

20   initially is because there's a displacement of force

21   once you put the Prolift®, for example, in the anterior

22   portion of the vagina, that is going to displace forces

23   on to the posterior part, so the reason you'd put in

24   mesh in the back, even though there's no prolapse, is

Nicole B. Fleischmann, M.D.

1   because when the force is displaced, now it's going to

2   put more force on the posterior part of the vagina,

3   correct?

4              MS. KABBASH:  Objection to form.

5              THE WITNESS:  The forces that happen in

6         the pelvis will go to the weakest area of the

7         vagina, which is now the unmeshed area.

8   BY MR. SLATER:

9         Q.    Are you aware that there are many

10  physicians that never felt that there was adequate data

11  to support the benefit of putting mesh in the posterior

12  compartment?

13        A.    Yes, but I'm also aware of physicians

14  that have found that there are good benefits to mesh in

15  the posterior compartment.

16             MR. SLATER:  Move to strike from "but"

17        forward.

18             Let's mark this NF -- I don't have an

19        extra copy of it though.

20             MS. KABBASH:  I have it.

21             MR. SLATER:  This?

22             MS. KABBASH:  Yeah.

23             (Document marked for identification as

24        Nicole Fleischmann Deposition Exhibit No. 8.)

Nicole B. Fleischmann, M.D.

```
 1    BY MR. SLATER:
 2          Q.    So we've marked as Exhibit 8 this letter
 3    you wrote to Scott Jones, November 6, 2009, right?
 4          A.    Yes.
 5          Q.    And you described yourself in the first
 6    paragraph as "one of your most loyal Prolift® users,"
 7    right?
 8          A.    Yes.
 9          Q.    You go through some history -- rephrase.
10                The second paragraph you talk about how
11    by the time you finished your fellowship, you had a
12    strong relationship with the company, that's Ethicon,
13    right?
14          A.    Yes.
15          Q.    And you naturally gravitated to using
16    these products, which you listed above, the TVT and the
17    TVT-O.  And then you say, hence the importance of
18    targeting young fellows.
19                That's what you said, right?
20          A.    I did.
21          Q.    Meaning if you can get the young fellows
22    to become loyal to your products, then they will
23    probably use your products going forward, right?
24                MS. KABBASH:  I just want to state a
```

Nicole B. Fleischmann, M.D.

```
 1           standing objection to questioning on this

 2           particular subject matter because you asked her

 3           about the same exact language at the Corbett

 4           TVT deposition.

 5                   MR. SLATER:  I didn't depose her on the

 6           Prolift® that day.

 7                   MS. KABBASH:  I know, and I'm not going

 8           to object to questioning related to the

 9           Prolift®, but you happened to address that same

10           exact language at the prior deposition, so I'm

11           just going to ask you to move on to other

12           things that are more relevant to Prolift®.  I

13           know there's a lot of things in this letter

14           related to Prolift®.

15                   MR. SLATER:  I'll struggle to do so.

16   BY MR. SLATER:

17           Q.     Can you answer that one question?

18           A.     I guess I'll answer it the way I

19   answered it when we discussed this back then, which was

20   that this was coming off the heels of a marketing

21   meeting, and so I had that marketing frame of mind when

22   I was talking to them in this letter.

23           Q.     When we go down to the fifth paragraph,

24   you talk about your training.  In there you say 2005.
```

Nicole B. Fleischmann, M.D.

1    In your report you said you were trained in 2006, 2007.

2              Can you tell me more specifically?  We

3    probably have it somewhere.

4         A.    Yeah, I think I would have to sort of

5    ask someone to pull that, if you have that, because I

6    can't remember exactly what year it was, but it was

7    around that time.

8         Q.    And you say that your training with

9    Dr. Lucente that day changed your practice forever

10   because he taught you about a full thickness

11   dissection, right?

12        A.    Yes.

13        Q.    And you say that you got your erosion

14   rate to go down after that, correct?

15        A.    Yes.

16        Q.    In the last paragraph on the first page

17   you say, I began to do Prolift® anterior for stage 3

18   cystocele and Prolift® total for complete procidentia,

19   correct?

20        A.    Exactly.

21        Q.    Would you also -- rephrase.

22              When you say you did Prolift® anterior

23   for stage 3, that would also include stage 3 or 4,

24   correct?

Nicole B. Fleischmann, M.D.

1         A.     Yes, but stage 4 was more likely to be a

2    complete procidentia, so then I would probably do a

3    total.

4         Q.     Okay.  Let's go to the second page.  At

5    the top you talked about the fact that you started to

6    have apical recurrences, correct?

7         A.     Yes.

8         Q.     This is what we've been talking about a

9    little bit earlier today.

10               And then you in the next paragraph talk

11   about having an informal meeting with Dr. Lucente, and

12   he clued you into the modified total repair, correct?

13        A.     Yes.

14        Q.     And that's where you would take the arms

15   from the posterior Prolift®, cut them off and then sew

16   them on to the anterior Prolift® and use that to get

17   additional support for a cystocele and to get

18   additional apical support to prevent an apical

19   recurrence, correct?

20        A.     Yes.

21        Q.     Where would the arms go, these arms that

22   you sewed on to the anterior Prolift®, where would they

23   go to?

24        A.     They would go onto the bottom of the

Nicole B. Fleischmann, M.D.

1   mesh, not close -- close to where the side arms are but

2   just downward.

3           Q.      And where would they extend back to,

4   where would they go in the body?  Rephrase.

5                   So you would sew them on to the body

6   where you just described.  Where would you put the mesh

7   after you attached it, where in the body would it be

8   left?

9           A.      The same place as if you were doing a

10  total, through the sacrospinous ligament.

11          Q.      Okay.

12          A.      So I was making the same passes as I

13  would if we were doing a total.

14          Q.      If you did that would you note that in

15  your operative report that you had done so?

16          A.      Yes.

17          Q.      So you would actually say, even for a

18  cystocele repair, we took the posterior, we cut off the

19  arms, we attached them.  So if I read one of your

20  operative reports, I would know you did that modified

21  total, correct?

22          A.      Yes, it would say that it was configured

23  in the shape of a six legged insect.  That's exactly

24  how I would dictate it.

Nicole B. Fleischmann, M.D.

```
 1                    MS. KABBASH:  Really?

 2                    THE WITNESS:  Yes.

 3    BY MR. SLATER:

 4          Q.     Did you tell your patients that the mesh

 5    was going to be configured like a six legged insect in

 6    their body?

 7          A.     No.  That was not something I felt the

 8    patient needed to understand.

 9          Q.     Looking at the second paragraph on the

10    second page of this letter you wrote, at the end of the

11    paragraph, you say with the advent of M, that's

12    referring to the Prolift+M®, right?

13          A.     Yes.

14          Q.     The outcomes are getting better and

15    better.  That's what you stated, right?

16          A.     Yes, that's what I stated.

17          Q.     You were trying to tell the truth to

18    Scott Jones about your experience with Ethicon's

19    products at the time, right?

20          A.     Yes.

21          Q.     In the third paragraph here on the

22    second page of this letter, you talked about being

23    approached by other manufacturers to try their

24    products, right?
```

Nicole B. Fleischmann, M.D.

```
 1          A.      Yes.

 2          Q.      And you talk about the AMS Elevate,

 3   right?

 4          A.      Yes.

 5          Q.      And you talk about an issue with it that

 6   you felt made it less optimal than the Prolift®, right?

 7          A.      Right.

 8          Q.      And then you say also "the mesh is not

 9   my beloved M," right?

10          A.      Yes.

11          Q.      Again, you were trying to tell Scott

12   Jones truthfully how you felt about the Prolift+M®

13   mesh, correct?

14          A.      Yes.

15          Q.      Let's look at the last paragraph.

16                  In the second sentence you say, "the

17   product needs some advancement: it's only perfect when

18   the surgeon modifies it and you will eventually lose

19   avid users who don't adopt this technique to 'deeper'

20   products."

21                  That's what you wrote, right?

22          A.      That's what I wrote.

23          Q.      To your knowledge, did Ethicon ever

24   promulgate this modified technique that you're talking
```

Nicole B. Fleischmann, M.D.

```
1    about?

2              A.      No, they did not.

3              Q.      You say, "Remember not many pelvic

4    surgeons like putting mesh over the rectum when the

5    main problem is cystocele," correct?

6              A.      That's what I said, yes.

7              Q.      And that's a true statement, that

8    doctors -- the majority of pelvic surgeons are hesitant

9    to use mesh in the posterior compartment, even if there

10   is a rectocele, correct?

11             A.      Yes.

12             MS. KABBASH:  Objection to form.

13             THE WITNESS:  I was too at the time.

14   BY MR. SLATER:

15             Q.      And even up until the time when the

16   Prolift® and Prolift+M® no longer were available, the

17   majority of surgeons, even those who were very familiar

18   with the Prolift® or the Prolift+M®, were very hesitant

19   to put that mesh in the posterior compartment, correct?

20             A.      Well, I'm not sure about what the

21   majority of surgeons are, but I felt that way at the

22   time.  I don't feel that way now.

23             Q.      You said, "Not many pelvic surgeons like

24   putting mesh over the rectum when the main problem is
```

Nicole B. Fleischmann, M.D.

1    cystocele.  It just doesn't make sense."

2                    That's what you said, right?

3            A.      That's what I felt at the time, yes, but

4    I definitely changed that thinking later on.

5                    MR. SLATER:  Move to strike from "but"

6            forward.

7                    Can we just go off.  Take a break for

8            five minutes.

9                    MS. KABBASH:  Sure.

10                   (Brief recess taken at 11:44 a.m.)

11                   (Deposition resumes at 11:56 a.m.)

12   BY MR. SLATER:

13           Q.      In your report and on your Prolift®

14   notes, you cite to an article from Dietz from 2011

15   regarding ultrasounds.

16           A.      Okay.

17           Q.      And you rely on that article to say that

18   contraction doesn't occur basically, right?

19                   MS. KABBASH:  Objection to form.

20                   THE WITNESS:  Well, that's one of the

21           things that I rely on to say contraction

22           doesn't occur.

23   BY MR. SLATER:

24           Q.      The Dietz study from 2011 that was with

Nicole B. Fleischmann, M.D.

```
1   the Perigee?

2           A.      Yes.

3           Q.      Not with the Prolift®, right?

4           A.      It is Perigee.

5           Q.      It's not with the Prolift®, Prolift+M®

6   or Gynemesh® PS, right?

7           A.      No, but it's with another polypropylene

8   mesh.

9                   MR. SLATER:  Move to strike from "but"

10          forward.

11  BY MR. SLATER:

12          Q.      All polypropylene meshes are not the

13  same, right?

14          A.      No, there's different types of

15  polypropylene meshes.

16          Q.      They have varying configurations,

17  varying methods of implant, right?

18          A.      Yes.

19          Q.      The fiber diameters can vary, right?

20          A.      Yes.

21          Q.      The pore sizes can vary, right?

22          A.      Yes.

23          Q.      The elasticity can vary, right?

24          A.      Yes.
```

Nicole B. Fleischmann, M.D.

1          Q.      You cited in your list of materials that

2    you reviewed Velemir.  It's actually on your list of

3    articles.

4                  MS. KABBASH:  You mean her reliance

5          list?

6                  MR. SLATER:  Your reliance list, yeah.

7                  THE WITNESS:  Not in my notes.

8    BY MR. SLATER:

9          Q.      Not in your notes.  Velemir, Amblard,

10   "Transvaginal mesh repair of anterior and posterior

11   vaginal wall prolapse: a clinical and ultrasonographic

12   study" published in Ultrasound Obstetrics and

13   Gynecology in 2010.

14                 That's on your list, right?

15         A.      Yes.

16         Q.      Did you read that article?

17         A.      At some point I'm sure I did.

18         Q.      Do you know what it says?

19         A.      It probably talks about retraction.

20         Q.      You don't remember anything that article

21   actually says, do you?

22         A.      I sort of remember, but not exactly.  I

23   remember that they did find some retraction.

24         Q.      Some retraction; is that your

Nicole B. Fleischmann, M.D.

```
 1    recollection?

 2            A.     Yes.

 3            Q.     Do you remember what percentage of

 4    patients in that study, which was actually done with

 5    Prolifts®, had retraction that was qualified as

 6    moderate or severe?

 7            A.     I don't remember the number.

 8            Q.     Do you have any sense of what the

 9    percentage was?

10            A.     I want to say about 30%.

11            Q.     Okay.   It was actually closer to about

12    89%.  Does that refresh your memory, or you just don't

13    know?

14                   MS. KABBASH:   I'm just going to request

15            that if you question the witness on the

16            specifics of an article that you present her

17            with a copy of the article.

18                   MR. SLATER:   I don't have it.  I have it

19            here, pointing to my ear.

20                   MS. KABBASH:   That's fine, but I'm just

21            going to make that ongoing request going

22            forward.

23                   MR. SLATER:   I got you.

24    BY MR. SLATER:
```

Nicole B. Fleischmann, M.D.

```
1           Q.      You don't know, though, do you?

2           A.      Well, if you say that there was an 89%

3    retraction, I would just want to see the article again

4    to look at what they were doing.

5           Q.      Let's talk about Velemir for a couple

6    minutes.  Do you know who placed those Prolifts®?

7           A.      Probably someone in the original TVM

8    group.

9           Q.      You didn't mention that article anywhere

10   in your report at all, did you?

11          A.      In my actual report?

12          Q.      In your actual report where you told us

13   all the important facts and all your opinions, that

14   article doesn't get mentioned once, does it?

15          A.      I don't think so, no.

16          Q.      Do you know if somebody from Ethicon

17   medical affairs assisted with that article as well?  Do

18   you know whether that was part of the process?

19          A.      No, I don't know that.

20          Q.      You don't know that Pete Hinoul was

21   acknowledged for his help with that?  You don't know

22   that, do you?

23                  MS. KABBASH:  Same objection.

24                  THE WITNESS:  If you say so, I'll take
```

Nicole B. Fleischmann, M.D.

```
1              it.  I don't have the article in front of me.

2    BY MR. SLATER:

3              Q.     In forming your opinions, you did not

4    factor in the Velemir article, did you?

5                    MS. KABBASH:  Objection to form.

6                    THE WITNESS:  It's on my reference list,

7              so I did read it, but there must be a reason

8              why I didn't put it in there in my report.

9    BY MR. SLATER:

10             Q.     Tell me the reason right now.

11                   MS. KABBASH:  Same objection.

12                   THE WITNESS:  If you show me the

13             article, I'd be happy to look at it and tell

14             you why.  I can't recall enough about the

15             article to tell you why it wasn't in there.

16   BY MR. SLATER:

17             Q.     You obviously made a decision that you

18   weren't going to reference the article in your report,

19   right?

20                   MS. KABBASH:  Objection.

21                   MR. SLATER:  I'm sorry.  What's the

22             objection?

23                   MS. KABBASH:  Lack of foundation.

24   BY MR. SLATER:
```

Nicole B. Fleischmann, M.D.

```
 1          Q.      Rephrase.

 2                  You're telling us that you read the

 3     Velemir article?

 4          A.      It's on my reference list.

 5          Q.      Just because it's on the reference

 6     list -- rephrase.

 7                  Just because it's on the reference list

 8     does not mean you read it, correct?

 9          A.      It means I perused it at some point.

10     I'm sure I did.

11          Q.      There was nothing about it that you

12     thought was important enough, obviously, because you

13     didn't mention it in your report, if you did actually

14     read it, right?

15          A.      I can't recall the exact findings of the

16     article, what the details of the article was, so I

17     probably made a decision, but I can't recall what it

18     was.  If you showed me the article, I would be happy to

19     look at it and tell you why I didn't find that I wanted

20     to put it in my report.

21          Q.      So in your report you rely on the Dietz

22     article, that's the one you actually cite to for

23     ultrasound findings with a different product, the

24     Perigee.
```

Nicole B. Fleischmann, M.D.

```
 1                    That's what you actually utilize in your

 2    report, right?

 3           A.      Yes, I put that one in my report.

 4           Q.      And you didn't actually cite to or you

 5    didn't discuss in any way the Velemir article, which

 6    was done by doctors in the TVM group who actually

 7    placed the mesh and had findings regarding Prolift®

 8    retraction that was found on ultrasound?  You didn't

 9    mention that anywhere in your report, right?

10                    MS. KABBASH:  Objection.

11    BY MR. SLATER:

12           Q.      It's a correct statement, correct?  It's

13    not mentioned anywhere in your report, right?

14           A.      It's not mentioned in my report, but I

15    will tell you what the TVM group found about retraction

16    was that it was not symptomatic in most cases.

17                    MR. SLATER:  Move to strike from "but"

18           forward.

19    BY MR. SLATER:

20           Q.      That's actually what you think, isn't

21    it, based on the materials you actually reviewed that

22    the TVM group doesn't think that retraction is

23    symptomatic?

24           A.      In most cases.
```

Nicole B. Fleischmann, M.D.

1        Q.      Did you see any presentation by

2   Professor Jacquetin in which he talked about Prolift®

3   patients where they were placed at his hospital with a

4   19.6% rate of symptomatic retraction on vaginal

5   examination?  Did you ever see that?

6        A.      His patients had -- he said that his

7   patients had a 19.6% symptomatic retraction rate?

8        Q.      Have you ever seen that presentation?

9        A.      No.

10       Q.      It's not mentioned anywhere in your

11  report or reliance list, so you have never seen that,

12  right?

13       A.      No.

14       Q.      And it wasn't something you factored

15  into your opinions, correct, couldn't have factored in

16  if you have never seen it, right?

17       A.      No.  But it wouldn't negate all the

18  other articles.

19       Q.      No, no, Doctor, I have limited time --

20       A.      -- that I have seen that have not shown

21  that kind of retraction rate.

22              MS. KABBASH:  Adam, I'm going to ask you

23          to let her complete her response, please.

24              MR. SLATER:  Move to strike.  Move to

Nicole B. Fleischmann, M.D.

```
 1              strike after the "no."
 2    BY MR. SLATER:
 3         Q.     You didn't factor that in because you've
 4    never seen it, right?
 5              MS. KABBASH:  Objection to form.
 6              THE WITNESS:  I will factor it in, but
 7         it will not be the only thing that I consider
 8         about retraction.
 9              MR. SLATER:  Move to strike.
10    BY MR. SLATER:
11         Q.     Up until just now when I told you about
12    it, you didn't know that that presentation existed,
13    right?
14         A.     If it was not on my reliance list, then
15    I did not review that presentation.
16         Q.     Since you didn't know it existed until a
17    few minutes ago, you certainly did not take it into
18    account in forming your opinions that are set forth in
19    your report, correct?
20         A.     No, I did not.
21         Q.     Are you aware of whether there's any
22    cases that are currently in discovery or going into
23    discovery in which you were involved in the treatment
24    of the patients?
```

Nicole B. Fleischmann, M.D.

```
 1                   MS. KABBASH:  You mean in New Jersey?

 2                   MR. SLATER:  Anywhere.

 3                   THE WITNESS:  Any product, any case?

 4    BY MR. SLATER:

 5         Q.    Any case against Ethicon.

 6         A.    Yes.

 7         Q.    And what are you aware of?

 8         A.    I get a notice from Ethicon with the

 9    names of patients who have filed some kind of claim.

10         Q.    Do you do anything with that

11    information?

12         A.    So if the patient is an active patient

13    of mine, then I have to notify them that I'm an expert

14    witness for Ethicon, and I have to send them a letter

15    regarding that.

16         Q.    Are you aware of whether any of your

17    cases have not just been filed but the case is actually

18    going into or is in active discovery where you were

19    involved in the treatment of the patient?

20         A.    I'm trying to understand the difference.

21         Q.    There is a difference between the case

22    just being filed and then where the case actually

23    starts to go through discovery, where the treating

24    doctors have their depositions taken, the plaintiffs
```

Nicole B. Fleischmann, M.D.

1    get deposed, and the case may actually go on to trial.

2           A.    Yes.

3           Q.    Are you aware of any of your cases being

4    in that active discovery phase now?

5           A.    Yes.

6           Q.    What cases?

7           A.    I know there is a case in the MDL that

8    is coming up that I was an implanter on.

9           Q.    Any other cases you're aware of?

10          A.    No.

11          Q.    When you say it's coming up, what do you

12   mean by that?

13          A.    It's coming up in the next crop of MDL

14   cases.

15          Q.    How do you know that?

16          A.    Because the company has made me aware.

17          Q.    How do they make you aware?

18          A.    They tell me, usually in writing.

19          Q.    Do you have that letter you got about

20   that case?

21          A.    I have letters, but I don't have that

22   letter with me.

23          Q.    Your report on Page 3 talks about pelvic

24   organ prolapse.  You can look at it, if you want.

Nicole B. Fleischmann, M.D.

```
 1            A.      Okay.  I have my own copy.

 2            Q.      That's fine, either one.

 3                    Page 3 and it says, pelvic organ

 4      prolapse, when defined by symptoms, has a prevalence of

 5      3 to 6% and up to 50% when based upon vaginal

 6      examination, right?

 7            A.      Yes.

 8            Q.      When you refer to the 50%, that's an

 9      anatomic finding?

10            A.      Yes.

11            Q.      It may be that it is no symptoms; the

12      patient is not even aware of it in some cases, right?

13            A.      Or they have other symptoms that are

14      not -- not specifically bulge symptoms, but they are

15      symptoms that we know are related to the prolapse like

16      urinary retention or recurrent urinary tract

17      infections.

18            Q.      You state very clearly that prolapse,

19      when defined by symptoms, has a prevalence of 3 to 6%,

20      right?

21            A.      Yes, pelvic organ prolapse symptoms,

22      right, bulge symptoms.

23            Q.      You don't say the word bulge, right?

24      The word bulge isn't there, right?
```

Nicole B. Fleischmann, M.D.

1          A.      No, it's not there.

2          Q.      Of those 3 to 6% of women that have

3     symptoms of prolapse, a very small percentage will

4     actually ever be surgical candidates, correct?

5          A.      About 11%.

6          Q.      And the 11% you're relying on what,

7     Olson?

8          A.      Yes.

9          Q.      Nobody can come up with a more recent

10    article, huh?

11              MS. KABBASH:  Objection.  That wasn't a

12          question.  You don't have to answer.

13    BY MR. SLATER:

14         Q.      Look at Page 7.  You talk about

15    basically an algorithm for how a patient gets worked up

16    in order to determine how a patient should be treated,

17    right?  That's kind of what you're talking about there?

18         A.      Yeah.

19         Q.      And one of the things you say after

20    going through in that first full paragraph, you ask

21    about what her personal life is like, especially with

22    regard to sexual activity, as all this information can

23    be helpful with diagnosing and formulating a treatment

24    plan, right?

Nicole B. Fleischmann, M.D.

```
 1          A.      Exactly.

 2          Q.      And basically for each woman you have to

 3   take into account who are you, what's your lifestyle,

 4   how old are you, what do you do, as you say here, are

 5   you sexually active, do you want to be sexually active,

 6   do you plan to be sexually active.  All those types of

 7   things you have to put into the evaluation so that that

 8   woman can be counseled based on her situation, right?

 9          A.      Correct.

10          Q.      And the reason you said especially with

11   regard to sexual activity is because certain treatments

12   pose more risk than others to sexual function, right?

13          A.      That's not the only reason.

14          Q.      It's one of the reasons, right?

15          A.      Well, it goes into our informed consent

16   process, and then it also for me is a decision about

17   whether if a woman is older and not sexually active

18   whether I may want to do a vaginal closure procedure.

19          Q.      If a woman is sexually active or wants

20   to be sexually active, you want to take that into

21   account because there are varied risks depending on the

22   treatment that's provided, correct?

23          A.      Yes.

24          Q.      One of the risks with the Prolift® is
```

Nicole B. Fleischmann, M.D.

1    that the mesh itself can lead to dyspareunia, correct?

2            A.    I don't know.  I think the mesh can lead

3    to erosions.

4            Q.    Do you agree, not agree or not have an

5    opinion that contraction of Prolift® mesh around the

6    vagina and hardening of the mesh commensurate with that

7    can lead to dyspareunia?

8            A.    I think when meshes are placed too

9    tightly, they can lead to dyspareunia.

10           Q.    Do you think the only time a Prolift®

11   leads to dyspareunia is when someone places them too

12   tightly?

13           A.    When there's too much tension on the

14   mesh, yes, I do believe that.

15           Q.    Can you define for me too much tension

16   objectively?  What's the objective test for too much

17   tension?

18                 MS. KABBASH:  Objection to form.

19                 THE WITNESS:  Are you talking about

20         intraoperatively too much tension?

21   BY MR. SLATER:

22           Q.    I'm talking about placing a Prolift®

23   with too much tension, what's the objective test for

24   that?

Nicole B. Fleischmann, M.D.

1          A.      Well, in the operating room we're

2     looking to make sure that the mesh is not too tight

3     under the vaginal wall, so we do certain maneuvers or

4     we did when I was doing Prolift® to make sure that the

5     mesh was covering side wall to side wall but wasn't in

6     a band across, because if you put too much tension on

7     the arms, you could feel that.  So after we closed the

8     vagina, we would do a maneuver to push up on the mesh

9     and we'd watch the mesh retract inward to the trocars,

10    and then we knew that the tension was not too much.

11         Q.     Do you agree that the mesh can be placed

12    without too much tension, meaning the arms aren't

13    pulled taut when the closure occurs, so it's left

14    without what you would consider to be excessive

15    tension, but then due to bridging fibrosis, scar

16    plating and contraction, the meshes can band?

17         A.      I think when the mesh is placed flatly

18    under the bladder and not under too much tension,

19    that's an extremely rare event that I would not see in

20    any degree of frequency.

21         Q.     Do you agree or disagree that there are

22    very highly skilled, very experienced doctors who did

23    the Prolift® and Prolift+M® who -- let me rephrase it.

24              Do you agree or disagree that there were

Nicole B. Fleischmann, M.D.

1    very highly skilled physicians who placed Prolifts®

2    exactly the right way and ended up with tension banding

3    of the arms despite that?

4           A.    I believe there are very highly skilled

5    doctors that may not have placed Prolift® the right way

6    and got that as an outcome.

7           Q.    Okay.  Did that happen to you?

8           A.    Yes.

9           Q.    Did you breach the standard of care when

10   you did that?

11          A.    I think that it's in our complication

12   informed consent that it's a possibility because we are

13   allowed not to be perfect in medicine, but so we give

14   ourselves a little leeway for that to happen, but I

15   still believe that when you do a perfectly placed

16   Prolift®, that that kind of thing is not going to

17   happen.

18          Q.    It's certainly foreseeable that a doctor

19   is not going to place a Prolift® in a, quote, perfectly

20   placed way, right?

21          A.    I mean, any procedure is like that.

22   It's not just Prolift®.  We are fallible as surgeons,

23   that's why we have risk assessments and complication

24   rates, even the best of us.

Nicole B. Fleischmann, M.D.

```
1          Q.    Did Ethicon -- well, rephrase.

2                And you agree that where a Prolift® is,

3   quote, unquote, not perfectly placed, you can end up

4   with scarring of the mesh that leads to contraction

5   that leads to dyspareunia, correct?

6          A.    I believe that when it's not placed

7   well, that that can happen, yes.

8          Q.    Has Ethicon ever objectively stated what

9   the right level of tension is, where they've actually

10  given an objective test that a doctor can say, okay,

11  this is not excessively tensioned, I'm following this

12  standard?

13               MS. KABBASH:  Objection to form.

14               THE WITNESS:  I was trained how to do

15          Prolift®.  I was trained on that tensioning

16          technique, and that was the extent of what

17          Ethicon had taught me.

18  BY MR. SLATER:

19          Q.    Okay.  Did Ethicon teach you when you

20  were trained what would happen to the mesh when pulled

21  on in terms of what would happen to the pores; did

22  Ethicon tell you that?

23          A.    No, but I could imagine that if you pull

24  tightly on a mesh the pore size will decrease.
```

Nicole B. Fleischmann, M.D.

```
 1          Q.      You can imagine that now right?

 2                  MS. KABBASH:  Objection.

 3                  THE WITNESS:  I could imagine that the

 4          whole time.

 5   BY MR. SLATER:

 6          Q.      You could, but here's the question:  Did

 7   you?  Did you actually cognitively say to yourself,

 8   when I pull on the mesh, the pore sizes are going to

 9   change, or is that something you'd become aware of just

10   in recent years?

11          A.      I can't tell you when I first thought of

12   that or learned that.

13          Q.      Ethicon never told you that, right?

14          A.      I don't specifically recall Ethicon

15   telling me that, no.

16          Q.      Ethicon never warned you about the risks

17   of scar plating and bridging fibrosis leading to

18   clinically symptomatic contraction, did they?

19          A.      The whole concept of contraction and

20   scar plating and bridging fibrosis, whatever you want

21   to call it, you know, was something that I had been

22   made aware of very early on in this -- when using this

23   technique.  I mean, those kinds of terms had come up

24   very early on, at meetings, but it was always the
```

Nicole B. Fleischmann, M.D.

1    understanding that it had to do with how the mesh was

2    placed, whether it was folded or bunched because we

3    weren't taking care to place it flatly or we were

4    putting too much tension under it.

5           Q.    So your understanding was that if you

6    put it in properly and the mesh wasn't folded or

7    bunched, those things wouldn't happen?

8           A.    Not symptomatically, no.

9           Q.    On Page 9 at the bottom you're talking

10   about -- you just talked about Baden-Walker, and you

11   just talked about POP-Q, right?

12          A.    Right.

13          Q.    You say the very bottom of Page 9,

14   "regardless of which measurement system is used, the

15   physician needs to quantify the degree of prolapse and

16   the compartments affected in order to form a treatment

17   plan for the patient," and that's because depending on

18   the nature of the prolapse, you may or may not feel

19   that a Prolift® or Gynemesh® PS or Prolift+M® would be

20   indicated, right?

21          A.    Or if surgery is indicated at all.

22          Q.    So the reason that you have this

23   language at the bottom of Page 9 is because you need to

24   evaluate the degree of prolapse and the compartments

Nicole B. Fleischmann, M.D.

1    affected to determine, A, is surgery indicated and, B,

2    what type of surgery of the various options, right?

3              A.    Right.

4              Q.    Were you ever made aware of any

5    increased risks for a patient if both a Prolift® and a

6    TVT-O were placed in the same patient?

7              A.    Made aware?

8              Q.    Yeah.

9              A.    No.

10             Q.    Ethicon never notified you of any such

11   increased risk, did they?

12                  MS. KABBASH:  Objection to form.

13                  THE WITNESS:  No.  We were just told

14           that if -- when doing -- I mean, from the

15           surgeon's monograph and from my training that

16           if you did a mesh repair, you should use a

17           separate incision for the sling.

18   BY MR. SLATER:

19             Q.    One of the documents that you reference

20   in your report is the physician's monograph, right?

21             A.    Yes.

22             Q.    When did you get that?

23             A.    Probably when we were training.

24             Q.    Well, I want to know if you remember

Nicole B. Fleischmann, M.D.

1    when you got it?

2           A.     Probably my training course on Prolift®.

3           Q.     Well, you're saying probably --

4           A.     Yeah.

5           Q.     -- it sounds like you don't remember?

6           A.     I don't recall the exact date, but I

7    would imagine that's about when it was.

8           Q.     How did you get the monograph?

9           A.     When we trained, they gave us a packet

10   of documents, and that was one of the documents.

11          Q.     You think it might have been one of the

12   documents?

13          A.     I think so, yeah.

14          Q.     You don't recall specifically?

15          A.     I think.  I can't give you exact, but I

16   think, to the best of my knowledge.

17          Q.     Did you think that the monograph was a

18   document that was telling you important information

19   about the risks and benefits of the Prolift®?

20          A.     I felt it had tips in there on how to

21   use the mesh beyond what was in the IFU and what we had

22   learned.

23          Q.     Are you aware of whether any statements

24   in the monograph are factually inaccurate?

Nicole B. Fleischmann, M.D.

1          A.     Not offhand.

2          Q.     Did you ever review the monograph to try

3    to identify those statements that might be factually

4    inaccurate?

5          A.     I can't recall any factual inaccuracies

6    in the monograph.  There may be if we've learned more

7    since the monograph was written that it is factually --

8    but I can't tell you at the time that it was factually

9    inaccurate.

10         Q.     Would you agree with me that in terms of

11   your own knowledge of the potential risks and

12   complications with the Prolift®, that your knowledge of

13   those risks and complications increased as time went on

14   from the time you first started doing it up until the

15   time when you stopped using it?

16         A.     I don't think there were any new

17   complications that I learned as I started doing

18   Prolift®.  My complication rate went down as I began

19   doing Prolift® more often, but there was nothing new

20   that had happened or a complication rate that I had

21   experienced that I had not been at least aware of when

22   I started doing Prolift®.

23         Q.     As you went forward in time, were there

24   publications or discussions or information that you

Nicole B. Fleischmann, M.D.

1   learned of about the severity of complications and the

2   impacts on some women from Prolifts® that was beyond

3   what you had known initially?

4          A.     From other physicians or from my own

5   practice?

6          Q.     From any source.

7          A.     Not really.  I mean, I know that there

8   have been, you know, significant complications, but,

9   again, in my own practice I wasn't seeing that, and,

10  you know, these are anecdotes.

11         Q.     So you relied on what you read in

12  specific published literature, specific documents from

13  Ethicon and your own personal experience?

14         A.     Usually.

15         Q.     You made a reference -- go to Page 15,

16  if you could, and at the very bottom you talk about

17  "the primary drawback of the anterior colporrhaphy is a

18  relatively high risk of recurrent prolapse," right?

19         A.     Right.

20         Q.     And you talk about a reported recurrence

21  rate of over 30%, and you cite to Dr. Weber and some

22  other doctors' article, right?

23         A.     Yes.

24         Q.     Do you know what the findings are as to

Nicole B. Fleischmann, M.D.

1   what percentage of patients with a recurrence from

2   colporrhaphy actually require surgery to treat that

3   recurrence?

4          A.     There's different reports on that.

5          Q.     There are reports into the single

6   digits, correct?

7          A.     There are some reports that are a little

8   bit higher than that.

9                 MR. SLATER:  Move to strike.

10  BY MR. SLATER:

11         Q.     Well, let me ask you this:  Maybe you

12  haven't seen all the studies.  Are you familiar with

13  studies that actually find that the re-operation rate

14  for recurrence of prolapse after, for example, a

15  anterior colporrhaphy is under 10%?

16         A.     There are some studies that show that,

17  yes, but it's about that number.

18         Q.     I saw in your list of studies Diwadkar.

19  It's actually on your little Prolift® notes document.

20                Are you familiar with that article?

21         A.     Yes, I am.

22         Q.     You didn't discuss it at all in your

23  report, did you?

24         A.     No, but I'm familiar with the article.

Nicole B. Fleischmann, M.D.

1          Q.      And on your Prolift® notes, it's listed

2    on the last page, but there's no notes next to it in

3    terms of the significance.

4          A.      Right.

5          Q.      As you sit here right now, what does the

6    Diwadkar article discuss?

7          A.      It's the re-operation complication rate

8    between native tissue and Prolift®.

9          Q.      And it points out that the nature of the

10   complications and the re-operations is higher for the

11   mesh, right?

12         A.      The re-operation --

13                 MS. KABBASH:  Objection.

14                 THE WITNESS:  -- rate is higher for

15         prolapse, but for recurrence it's higher for

16         native tissue.

17   BY MR. SLATER:

18         Q.      Do you know what Ethicon's view is as to

19   the significance of the Diwadkar article?

20         A.      I don't know what Ethicon's view is, no.

21         Q.      You talk about the Lowman article, which

22   studied Prolift® dyspareunia, right?

23         A.      Yes.

24         Q.      Is that an important article to you?

Nicole B. Fleischmann, M.D.

```
 1          A.      Sure.

 2          Q.      17% de novo dyspareunia, right, with the

 3   Prolift®, right?

 4          A.      Yes, but it was high in everybody.

 5                  MR. SLATER:  Move to strike from "but"

 6          forward.

 7   BY MR. SLATER:

 8          Q.      Do you know Dr. Lowman?

 9          A.      Not personally.

10          Q.      Do you know Dr. Hale who also authored

11   that article?

12          A.      Not personally.

13          Q.      Do you know that Dr. Hale was a paid

14   consultant to Ethicon at the time the article was

15   published?

16                  MS. KABBASH:  Objection.

17   BY MR. SLATER:

18          Q.      The Lowman article?

19          A.      If you say so.

20          Q.      Do you know that Dr. Lowman has worked

21   as a expert for Ethicon, paid expert?  Are you aware of

22   that?

23          A.      I'm a paid expert for Ethicon.  It

24   doesn't change my opinions about the procedure that
```

Nicole B. Fleischmann, M.D.

1   we're talking about.

2                   MR. SLATER:  Move to strike.

3   BY MR. SLATER:

4          Q.      Are you aware that Dr. Lowman is a paid

5   expert for Ethicon?

6          A.      You're telling me that now, yes.

7          Q.      You didn't know that before, right?

8          A.      No.

9          Q.      Go to Page 27, I guess.  I don't need to

10  refer to the report, actually.  Let me have a little

11  discussion with you about something.

12                  You talk about the Amid classification

13  for pore size in your report, right?

14         A.      Yes.

15         Q.      And that's from an article he published

16  in 1997, right?

17         A.      Yes.

18         Q.      And he published that based on an

19  evaluation of pore sizes in hernia meshes, right?

20         A.      Yes.

21         Q.      And that was at a time when lightweight,

22  large pore meshes were not yet available on the market,

23  right?

24                  MS. KABBASH:  Objection.

Nicole B. Fleischmann, M.D.

```
1                    THE WITNESS:  Right.

2     BY MR. SLATER:

3          Q.      And he was talking about 75 microns as

4     an adequate pore size to allow the body's defenses to

5     try to eradicate bacteria from the pores, correct?

6          A.      Right.

7          Q.      The Amid classification is not

8     addressing whether or not one has a risk or an

9     increased risk for bridging fibrosis or scar plating,

10    correct?  It doesn't address those issues, right?

11         A.      No, because these were not -- he doesn't

12    specifically use those terms, right.

13         Q.      When we talk about the pore size in the

14    context of scar plate and bridging fibrosis, the size

15    that is discussed in the literature is a one centimeter

16    pore size, correct?

17                   MS. KABBASH:  You said centimeter.

18                   MR. SLATER:  I meant milliliter.

19                   THE WITNESS:  In the Amid classification

20         of type 1?

21    BY MR. SLATER:

22         Q.      No, no, the question made no sense

23    because I said centimeters anyway.

24                   Well, let me ask you this:  Are you
```

Nicole B. Fleischmann, M.D.

1    familiar with the literature of Klinge, Klosterhalfen

2    and Cobb?

3            A.     I've reviewed some of that literature,

4    yes.

5            Q.     Do you know what they say as to what

6    a -- what the criteria is for a heavyweight, small pore

7    mesh?

8            A.     No, not offhand.

9            Q.     Do you know what criteria they use for a

10   midweight mesh?

11           A.     I don't know the actual parameters, no.

12           Q.     And you don't know the parameters for

13   what they use to qualify a lightweight, large pore

14   mesh, do you?

15           A.     I don't know.  I can't regurgitate those

16   parameters for you, no.

17           Q.     In terms of your expertise, you wouldn't

18   hold yourself out as an expert with regard to the

19   actual materials with regard to specific pore sizes,

20   would you?

21           A.     I am not a materials expert, but I'm

22   very familiar with the use of these meshes in the human

23   body and how they're placed.

24           Q.     Are you familiar with literature

Nicole B. Fleischmann, M.D.

1  discussing the significance of a 1 millimeter pore

2  size?

3          A.      No, not offhand.  I mean, probably some

4  of the Moalli literature talks about that.

5          Q.      Did you rely on Moalli literature in

6  forming your opinions?  I saw one article mentioned.

7          A.      Yeah, I'm trying to remember.  I think

8  so, yes.

9          Q.      The articles that she's written on the

10  subject of what happens to mesh under tension and in

11  use, I didn't see those mentioned actually in your

12  reliance list or your report?  They're not there, are

13  they?

14              MS. KABBASH:  Objection.

15              THE WITNESS:  They're not because those

16          are sort of benchwork articles, and I prefer

17          the articles about the human body use.

18              MR. SLATER:  Move to strike from

19          "because" forward.

20  BY MR. SLATER:

21          Q.      Are you aware that those who design mesh

22  and actually evaluate whether mesh is going to be safe

23  and efficacious or not actually rely on studies like

24  Dr. Moalli's studies that we just talked about?

Nicole B. Fleischmann, M.D.

1          A.      They have to because that's what we have

2    until it's implanted in the human body, but after it's

3    implanted in the human body, those kinds of articles

4    are more important.

5          Q.      Well, have you studied the literature

6    regarding what the mesh characteristics are when it's

7    explanted after someone has complications?  Have you

8    read that literature?

9          A.      I read some of that literature, but that

10   is -- that I don't give credence to as I do as much as

11   the Level 1 evidence that shows how mesh behaves in the

12   human body over time.

13              MR. SLATER:  Move to strike from "but"

14        forward.

15   BY MR. SLATER:

16         Q.      Have you read articles or studies or any

17   peer-reviewed information about what happens to -- what

18   the condition of mesh is when it's been explanted from

19   patients due to complications?  Have you read that

20   literature?

21         A.      I have, but I find it very faulty.

22              MR. SLATER:  Move to strike from "but"

23        forward.

24   BY MR. SLATER:

Nicole B. Fleischmann, M.D.

```
 1           Q.    The literature I just mentioned to you,
 2    you did not take that into account in forming your
 3    opinions, correct?
 4                 MS. KABBASH:  Objection to form.
 5                 THE WITNESS:  I consider it, but I just
 6           don't consider it in a high level because
 7           there's so many variables that come with mesh
 8           explants, like how the explant is done, how
 9           much tension the surgeon is applying.  It can
10           deform the mesh just by taking it out.
11    BY MR. SLATER:
12           Q.    Are you aware that one of the things
13    that doctors look at when they explant mesh after
14    complications, the doctors actually write these studies
15    about what it looks like, that they look to see if the
16    mesh has bridged the pores and formed scar plating and
17    whether the mesh appears to be contracted?  Do you know
18    that they look at those things, or are you not aware?
19           A.    They probably do, but I don't think that
20    that's so important because we don't know about the
21    patients who have these meshes inside them and whether
22    those same -- who are asymptomatic who have those same
23    phenomenon, but it's not a clinical problem for them.
24           Q.    You just said they probably do.  You
```

Nicole B. Fleischmann, M.D.

1    don't know whether or not.  You're just saying I guess

2    it might happen, but you can't point to it?

3                    MS. KABBASH:  Objection to form.

4                    THE WITNESS:  I have read some of those

5            articles.  I'm just saying why I don't find

6            them to be very reliable.

7    BY MR. SLATER:

8        Q.    You didn't factor them into your

9    analysis because you reject them as having any

10   reliability?

11                   MS. KABBASH:  Objection.

12   BY MR. SLATER:

13       Q.    Am I understanding your approach?

14                   MS. KABBASH:  Objection,

15           mischaracterization.

16                   THE WITNESS:  I say that they are not as

17           reliable as what I look to in the Level 1

18           evidence, where we see that large groups of

19           women have these implants and are doing very

20           well with them.

21   BY MR. SLATER:

22       Q.    There's Level 1 evidence where some of

23   the patients have serious complications within those

24   groups, right?

Nicole B. Fleischmann, M.D.

1           A.      But it's rare and it's really not any

2   different than the Level 1 evidence we have with other

3   types of surgeries for pelvic organ prolapse.

4                   MR. SLATER:  Move to strike from "but"

5           forward.

6   BY MR. SLATER:

7           Q.      There's Level 1 evidence where some of

8   the patients with Prolifts® are documented to have

9   serious complications, right?

10          A.      Yes.

11          Q.      You've read, for example, the Prolift®

12  literature, you cited some of it in there, some studies

13  done with Prolifts®, right?

14          A.      Mm-hmm.

15          Q.      And you've seen complication rates

16  documented of 16, 17, even higher percentages of

17  erosion rates, right?

18          A.      I have.

19          Q.      Those are -- that has to be of concern

20  to anybody looking at the safety profile of the

21  product, erosion rates in excess of 15%, right?

22                  MS. KABBASH:  Objection.

23                  THE WITNESS:  It depends.  It depends on

24          where in the surgeon's time frame and how long

Nicole B. Fleischmann, M.D.

```
1              they've been doing the procedure, and a lot of

2              people who have 15% erosion rates in the

3              beginning are not having those towards the end

4              of their -- later in their careers, and it also

5              depends on the type of erosion, how symptomatic

6              it is.

7    BY MR. SLATER:

8         Q.    An overall erosion rate of 17% in a

9    peer-reviewed study, in and of itself is something that

10   you have to be concerned about and want to look at.

11              Would you agree with that?

12        A.    I would want to look at it, but I'd want

13   to know more specifics about what those erosions were

14   and the level of severity.

15        Q.    Well, you saw studies that had those

16   percentages of erosion.  What did you do to try to

17   understand the significance of those findings?  Let's

18   talk about Withagen, 17% erosion rate, right?

19        A.    Yes.

20        Q.    What did you do to study the

21   significance of the 17% erosion rate?  What's your

22   analysis?

23        A.    I think you can't always analyze from a

24   study what the significance of the erosion is.
```

Nicole B. Fleischmann, M.D.

1        Q.      Well, 17% in and of itself is of

2   concern, correct?

3        A.      Right, but not all of those patients are

4   going back to the OR to have their exposures corrected.

5              MR. SLATER:  Move to strike from "but"

6          forward.

7              THE WITNESS:  In fact, only 30% of

8          patients who actually had exposures go back to

9          the operating room to have them corrected.  So

10         that, by definition, shows that there's a large

11         amount of asymptomatic patients who have either

12         small or asymptomatic exposures.

13             MR. SLATER:  I struck from the word

14         "but" forward for all of that.

15  BY MR. SLATER:

16       Q.      There are studies where more than 50% of

17  the patients with erosions have to have re-operations,

18  correct?

19       A.      There is, there is one or so, but not in

20  the large meta-analyses.

21       Q.      In the Withagen study with the 17%

22  erosion rate, she was a Prolift® consultant --

23  rephrase.

24              Withagen was an Ethicon consultant; she

Nicole B. Fleischmann, M.D.

```
 1    was being paid by Ethicon, right?

 2         A.     I suppose.

 3         Q.     She had a 17% erosion rate, right?

 4    That's what she documented in a peer-reviewed study,

 5    right?

 6         A.     Yes.

 7         Q.     You would assume she was skillful,

 8    right?

 9         A.     I don't know her.

10         Q.     Did you do any evaluation of her erosion

11    rate and the erosions described in that study to

12    determine whether it was a concern to you or not?  Did

13    you actually evaluate that study?

14         A.      No, not specifically that study because

15    I looked at other studies.  That was not just the only

16    study about exposures.

17                 MR. SLATER:  Move to strike from

18         "because" forward.

19                 THE WITNESS:  The national exposure rate

20         is about 10% in the large meta-analyses.

21    BY MR. SLATER:

22         Q.     That's for all meshes for prolapse,

23    right?

24         A.     For all meshes.
```

Nicole B. Fleischmann, M.D.

```
1            Q.     Do you know what the actual -- withdraw
2     that.
3                   What percentage of patients suffering
4     persistent chronic vaginal and pelvic pain after a
5     Prolift®, what percentage would be of concern to you?
6     How high does the percentage have to go before you say
7     this is something we have to be concerned about?
8                   MS. KABBASH:  Objection to form.
9                   THE WITNESS:  You're talking about de
10           novo pelvic pain?
11    BY MR. SLATER:
12           Q.     Yes.
13           A.     Well, we don't want to see any de novo
14    pelvic pain in any of our patients, so even one patient
15    is not something that we are happy with.
16           Q.     I'm talking about persistent,
17    symptomatic vaginal, pelvic pain that's permanent and
18    is symptomatic for the patient for the rest of her
19    life, what percentage of women would need to suffer
20    that before you would say the risks outweigh the
21    benefits for this product?
22           A.     But that's not been my experience with
23    Prolift® when reviewing the literature that it causes
24    symptomatic vaginal or pelvic pain more than any other
```

Nicole B. Fleischmann, M.D.

1    procedure for pelvic organ prolapse.

2          Q.    This is my question:  Sitting here as an

3    expert, is there any frequency of persistent, permanent

4    vaginal and pelvic pain resulting from a Prolift®

5    surgery where you would say that's too much, we

6    shouldn't use this procedure?

7                MS. KABBASH:  Objection.

8    BY MR. SLATER:

9          Q.    What's the percentage you'd have to get

10   to before you'd say that's enough?

11               MS. KABBASH:  Calls for speculation.

12               MR. SLATER:  She's an expert in the

13         case.

14   BY MR. SLATER:

15         Q.    What's your opinion?

16         A.    My opinion is that pelvic pain and

17   vaginal pain can happen after any procedure that we do,

18   and we must warn patients beforehand that that's a

19   possibility, but we have to weigh, like you said, the

20   risks and benefits of doing surgery versus not doing

21   surgery, and for women who are very bothered and

22   debilitated by their pelvic organ prolapse, they are

23   sometimes or more often than not willing to take the

24   risk of pelvic pain.

Nicole B. Fleischmann, M.D.

```
 1                    MR. SLATER:  Move to strike.
 2   BY MR. SLATER:
 3        Q.    I'm just asking you what percentage
 4   would be too high to say that the benefits outweigh the
 5   risks?
 6                    MS. KABBASH:  Objection.
 7   BY MR. SLATER:
 8        Q.    I just want to know what percentage.
 9   1%?  If 1% of the women were getting permanent,
10   persistent, chronic pelvic and vaginal pain that was
11   going to be symptomatic for the rest of their life, is
12   that acceptable to you?
13        A.    It was something I'd have to warn the
14   patient about and let the patient and I make the
15   decision together about whether it was worth that risk.
16        Q.    Okay.  At 2%, if you knew 2% of the
17   patients were getting that, would you say that's too
18   much, I'm not going to use this anymore?
19                    MS. KABBASH:  Objection, asked and
20            answered.
21                    THE WITNESS:  It's an individual
22            decision between the patient and the doctor
23            where the doctor informs the patient about the
24            risks of surgery, and the surgeon and the
```

Nicole B. Fleischmann, M.D.

```
 1              patient decide whether the risks are worth the

 2              benefits of outcome.

 3    BY MR. SLATER:

 4         Q.     If 10% of the patients with Prolifts®

 5    were getting that outcome, would you still say the

 6    Prolift® is still something that's reasonable to

 7    recommend?

 8              MS. KABBASH:  Asked and answered.

 9              THE WITNESS:  Twenty, 30, 40, 50%, if

10         that was a common outcome, which it's not, I

11         would definitely have to let a patient know

12         that that was a debilitating possibility.

13    BY MR. SLATER:

14         Q.     So at 50%, if one out of two women were

15    having that outcome, you would still say it's

16    reasonable to use this?

17              MS. KABBASH:  Objection,

18         mischaracterization, asked and answered.

19              THE WITNESS:  With any procedure, if the

20         risks were so high, I probably wouldn't be

21         doing it.  I like my patients.

22    BY MR. SLATER:

23         Q.     We'll see.  You refer to abdominal

24    sacrocolpo -- rephrase.
```

Nicole B. Fleischmann, M.D.

1              You refer to a laparoscopic

2    sacrocolpopexy as a minimally invasive technique with a

3    steep learning curve on Page 30?

4          A.    Okay.

5          Q.    Is that accurate?

6          A.    Let me see where we are.

7          Q.    Bottom, five lines up.

8          A.    Yes.

9          Q.    On Page 31 at the bottom, you indicate

10   at the bottom, "There have been numerous studies on

11   this type of graft in the treatment of apical prolapse

12   such as ASC."

13              Now, first of all, when you talk about

14   this type of graft, you're just talking about Amid Type

15   1 mesh, right?

16         A.    Yes.

17         Q.    You say "the safety of this approach,"

18   meaning abdominal sacrocolpopexy, right?

19         A.    Yes.

20         Q.    "Has been well established in numerous

21   studies reported over the last several decades," and

22   that's accurate, right?

23         A.    Yes.

24         Q.    Did you use any other mesh kits besides

Nicole B. Fleischmann, M.D.

1    the Prolift® and Prolift+M®.  You mentioned Coloplast,

2    you tried one of theirs, I think?

3            A.    A few times, yes.

4            Q.    Any others?

5            A.    No.

6            Q.    Let's look at Page 33.  You mentioned in

7    the middle paragraph at the bottom, you cite a couple

8    of studies.  You say Berrocal 2004 and Cosson ICS

9    abstract 2005, right?

10           A.    Yeah.

11           Q.    Are you familiar with that abstract or

12   those abstracts, actually?

13           A.    Yeah, there's a bunch of them.

14           Q.    Are you familiar with them?

15           A.    I'm familiar with them, but I can't

16   regurgitate them.

17           Q.    Did you see the exposure rates of I

18   believe it was about 6.7%?

19           A.    Okay.  You'd have to pull the study for

20   me to see for sure.

21           Q.    I don't have it.  I'm Rain Man with this

22   stuff.  I have no life.  It's what I do.

23           A.    6.7%, yes, you're right.  You're good.

24           Q.    Yeah, it's too bad.  Too bad for me.

Nicole B. Fleischmann, M.D.

1              Did you see in the Cosson ICS abstract

2    that they described a 6.7% rate of exposure as high?

3         A.    In the abstract, I don't recall whether

4    they qualified that as high, but that sounds about

5    right.

6         Q.    Just above what I just talked to you

7    about, you talk about the decision by the TVM group to

8    choose Gynecare Gynemesh® PS.

9              Do you know how that decision was made?

10        A.    You mean the inner workings of how they

11   picked their mesh?

12        Q.    Right.

13        A.    I don't know.  Probably it had something

14   to do with the history with TVT.

15             MR. SLATER:  Move to strike from

16        "probably" forward.

17   BY MR. SLATER:

18        Q.    You understand that Gynemesh® PS is

19   different from the mesh in the TVT products, right?

20        A.    Of course.

21        Q.    You call Gynemesh® PS a low weight mesh.

22             Do you see that?

23        A.    Yes.

24        Q.    Are you aware of the fact that material

Nicole B. Fleischmann, M.D.

1    scientists, including, for example, Cobb, who is a paid

2    consultant to Ethicon would term Gynemesh® PS as a

3    midweight mesh?

4            A.      Okay, but it's lower weight than the

5    original Prolene mesh was.

6            Q.      When you're talking about the Prolene

7    mesh, you're talking about the mesh in the TVT?

8            A.      Yes.

9            Q.      That's a small pore, heavyweight mesh,

10   right?

11           A.      No.

12                   MS. KABBASH:   Objection.

13                   THE WITNESS:   That's not a small pore.

14           When you're comparing the PS to the original

15           TVT mesh, it's lower weight.

16   BY MR. SLATER:

17           Q.      Are you aware that, for example, Cobb

18   and Klinge, those people who actually study these

19   things, consider Prolene, the Prolene mesh and the TVT

20   to be a heavyweight, small pore mesh?  Do you know that

21   they characterize it that way?

22           A.      Maybe they do, but that is not how I

23   think it should be characterized.

24           Q.      And that decision by you, is that based

Nicole B. Fleischmann, M.D.

1    on a peer-reviewed study by someone who is an expert on

2    the materials?

3            A.      I had read a lot of the biomaterials,

4    and it's considered to be not a heavyweight mesh, TVT.

5            Q.      Really, okay.

6                    You refer to the surgical procedure

7    being refined over a five-year period through more than

8    600 surgical interventions by the nine French surgeons,

9    and that was ultimately documented in the Caquant study

10   right, 684 patients?

11           A.      Yes.

12           Q.      Complication rates over 30%, do you

13   remember that?

14                   MS. KABBASH:   Objection.

15   BY MR. SLATER:

16           Q.      Do you remember that?

17           A.      That number includes a lot of things,

18   stress incontinence, it includes mesh exposure.  It

19   includes many, many other things.

20           Q.      They documented in the Caquant study the

21   complications through three months, right, early

22   complications?

23           A.      Yes.

24           Q.      And they came up with a percentage, I

Nicole B. Fleischmann, M.D.

1    don't have it in front of me, but I believe it was in

2    excess of 30%, right?

3              That was the number they came up with

4    right?

5         A.    I don't have it in front of me, but I

6    know it included a lot of things, including recurrent

7    stress incontinence.

8         Q.    They termed that complication rate as

9    being a high rate of early complications, right?

10             MS. KABBASH:  Objection.  I'm just going

11        to continue my objection to asking the witness

12        about specifics about particular studies

13        without the report date -- excuse me -- without

14        the study being --

15             MR. SLATER:  She can say she doesn't

16        know without looking at the study.

17             MS. KABBASH:  That's fine.  I'm just

18        going to continue my objection.  Go ahead.

19   BY MR. SLATER:

20        Q.    Is the answer you need to look to see if

21   I'm right?

22        A.    It is.  I'm just recalling that one

23   thing that we just discussed.

24        Q.    Do you recall that they described the

Nicole B. Fleischmann, M.D.

1    early complication rate in excess of 30% at three

2    months as being high?

3            A.      Again, I don't recall the exact

4    complication rate.  I just remember what went into that

5    complication pool.

6            Q.      Well, the rate of over 30% complications

7    at three months, that is a high rate of complications,

8    right?

9                    MS. KABBASH:  Objection.

10                   THE WITNESS:  But it depends on what

11           you're calling complications.  I mean, there's

12           serious complications, there's minor

13           complications.  There's someone coming back

14           with a post-operative urinary tract infection.

15           I mean, these are all things that we see with

16           any procedure to correct prolapse.

17                   MR. SLATER:  Move to strike.

18   BY MR. SLATER:

19           Q.      Do you agree with the TVM group that

20   authored the article about their own patients that the

21   rate of over 30% complications after only three months

22   was a high rate.

23                   Do you agree that's a high rate?

24           A.      I agree that 30% of significant

Nicole B. Fleischmann, M.D.

1    complications after any procedure is a high rate.

2         Q.    Do you agree that there were

3    complications at over 30% at three months was a high

4    rate of complications?

5         A.    Again, it depends on what goes into that

6    complication rate.

7         Q.    Do you have a over 30% complication rate

8    with your patients at three months?

9         A.    It depends on what you're talking about

10   as complications.

11        Q.    Any complications.

12        A.    A urinary tract infection, persistent

13   pain for a few months.  I mean, it depends on what goes

14   into that complication rate.  It can happen.

15        Q.    However you qualify your complications,

16   do you have over 30% complication rates at three

17   months?

18        A.    Certainly not serious complications.

19        Q.    Well, any complications.  Do you have

20   over 30% of your patients with complications?

21        A.    I don't consider them complications.  I

22   consider them to be peri-operative healing.

23             MS. KABBASH:  Dr. Fleischmann, I'm going

24             to remind you to wait until Mr. Slater gets to

Nicole B. Fleischmann, M.D.

1          the end of his question, okay.

2                  THE WITNESS:  Thank you.

3      BY MR. SLATER:

4          Q.     On Page 34 you're going through the

5      history of the TVM group developing the Prolift®, and

6      in the first full paragraph you say, "The procedure

7      could be performed on women with all stages of prolapse

8      but was best suited for those with more advanced stages

9      of prolapse," right?

10         A.     I'm trying to find where --

11         Q.     First full paragraph, first sentence.

12         A.     Yes.

13         Q.     Was that your understanding of what the

14     TVM group thought was the best indication, women with

15     advanced stages of prolapse?

16         A.     Yes, and I just, in general, think

17     that's the best indication for surgery.

18         Q.     You cite the Prolift® Surgeon's Resource

19     Monograph, Page 3, right?

20         A.     I do.

21         Q.     And do you believe that the monograph

22     provides reliable information about which patients

23     would be the best patients for the procedure?

24         A.     Yes, at the time that it was written.

Nicole B. Fleischmann, M.D.

1        Q.      Did your view change at some point after

2   you read it?

3        A.      No, not specifically.

4        Q.      Do you believe now that it's still

5   accurate, or you think it's not accurate?

6        A.      No, I believe it's accurate.

7        Q.      It says in part, that in patients with

8   previous failure, that would be somebody that had a

9   prior Prolift® -- rephrase.

10               It says, in patients with previous

11  failure, that would be someone who had prolapse treated

12  previously, so this is now their second or more repair,

13  correct?

14       A.      That's what that would indicate.

15       Q.      Patients with risk factors for failure,

16  that would be somebody who may have a medical condition

17  or some kind of a tissue issue where you wouldn't

18  expect them to heal very well, that kind of thing?

19       A.      Sure.

20       Q.      And/or the most severe degree of

21  prolapse.  The most severe degree of prolapse, what

22  does that mean?

23       A.      It means at least a stage 3 or stage 4.

24       Q.      And when you say a stage 3, you're

Nicole B. Fleischmann, M.D.

1    talking about a clear stage 3, not some borderline 2 or

2    3, you're talking about a clear 3 or a 4, right?

3            A.      I'm talking about a 3 or a 4.  It

4    doesn't mean that it couldn't be done in other

5    patients.  It just means that that's the best

6    indication, that you could get away with maybe doing a

7    native tissue repair in someone who has lesser degrees

8    of prolapse.  That's what that states.

9            Q.      Because they say actually those are the

10   clearest indications?

11           A.      Yes.

12           Q.      Use the word clearest indications.

13                   You agree with that?

14           A.      I think so, yeah.

15           Q.      Did Ethicon and the IFU ever state that

16   the clearest indications were for women with the most

17   severe degrees of prolapse who had previous failures of

18   prior surgery and had risk factors for failure?

19                   Did Ethicon ever warn doctors as to that

20   patient criteria?

21           A.      No, that's not in the IFU.

22           Q.      It's not in the patient brochure either,

23   is it?

24                   MS. KABBASH:  Objection to form.

Nicole B. Fleischmann, M.D.

```
1                THE WITNESS:  Patient brochure, no.

2    BY MR. SLATER:

3         Q.    Did you read the patient brochures in

4    your practice?

5         A.    I had them in my office, yeah.

6         Q.    So you would have read them, right?

7         A.    Yeah.

8         Q.    You would have been familiar with what

9    they said?

10        A.    Yeah.

11        Q.    Okay.  Did you assume that they told the

12   truth about risks and benefits?

13        A.    To the best that they could, yes.

14        Q.    Did you give the patient brochures to

15   your patients?

16        A.    I did in the beginning.  After a while I

17   stopped.

18        Q.    You would just rely on your discussion?

19        A.    Yes, and I had a written -- my own

20   writing that I had given to the patients based on my

21   own understanding of how the procedure went and the

22   most current literature.

23        Q.    If you go to Page 35, the very bottom,

24   the last four lines it says, "Tension on the anterior
```

Nicole B. Fleischmann, M.D.

1   and posterior meshes is adjusted before removing the

2   cannulas."

3                 That's an important part of the

4   procedure, right?

5          A.     Yes.

6          Q.     "This is performed with closed vaginal

7   wall and manual compression of the deepest portion of

8   the implant to keep the device from overtightening."

9          A.     Yes.

10         Q.     That's very important, from your

11  perspective?

12         A.     Yes.

13         Q.     You didn't want to overtighten, correct?

14         A.     Right.

15         Q.     Now, it's not saying no tension, and

16  it's not saying not to tighten at all.  It's just

17  saying you want to get an appropriate level of tension

18  and tightness, correct?

19         A.     The description is exactly as described.

20         Q.     But, I mean, the answer to -- rephrase.

21                I'm correct that nowhere have doctors

22  been told there should be no tension whatsoever and no

23  tightness.  It's just don't have too much tension or

24  too much tightness.  That's the instruction, right?

Nicole B. Fleischmann, M.D.

```
 1              A.      The idea is for the implant to lay flat

 2    over the tissues, but not to be under tension.

 3              Q.      Well, there has to be some tension to

 4    keep it in place, right?

 5              A.      Yeah.  I mean, we do pull up on the --

 6    we do pull up on the straps initially, but then once

 7    they're pulled up, we want to reduce that tension to a

 8    very acceptable level.

 9              Q.      Whatever that acceptable level is,

10    there's some level of tension left on the Prolift® when

11    it's left in the body at the end of the surgery, right?

12              A.      It has to be laying flat in the pelvis,

13    yes.  I mean, it has to support.

14              Q.      There has to be some tension?

15              A.      There has to be support, yes, or else

16    there will be a failure.

17              Q.      Meaning right away there would be a

18    failure?

19              A.      It'd be a failure right then.

20              MR. SLATER:  Let's just go off the

21         record for a second.

22              (Discussion off the record.)

23              (Brief recess taken at 12:57 p.m.)

24              (Deposition resumes at 1:35 p.m.)
```

Nicole B. Fleischmann, M.D.

1    BY MR. SLATER:

2           Q.      Doctor, you talk about the patients you

3    treated with Prolift® and Prolift+M®, and you say you

4    did about 500?

5           A.      Roughly.

6           Q.      Okay.  Obviously, initially it would

7    have only been the Prolift® because there was no

8    Prolift+M® yet, right?

9           A.      Correct.

10          Q.      How many Prolift®s would you say you did

11   before you started to do the Prolift+M®?

12          A.      I would just have to calculate it by the

13   years, so I would probably break it down that if I was

14   doing Prolift® and M total for five years, that the

15   last two years was M, so that would be 200 out of the

16   500.

17          Q.      When you say the last two years would be

18   M, you were using just the Prolift+M® the last two

19   years?

20          A.      Yes.

21          Q.      So there came a point when you stopped

22   using the Prolift® and were exclusively using the

23   Prolift+M®, correct?

24          A.      My hospital would only let me stock one

Nicole B. Fleischmann, M.D.

1    product, so we were stocking the M.

2           Q.    You chose the Prolift+M® as opposed to

3    the Prolift®, correct?

4           A.    I started doing the M by choice.

5           Q.    In terms of the complications that you

6    say you saw with your patients, you don't know your

7    overall complication rates or profile because your

8    patients didn't all return to you?  You don't know what

9    their outcomes were in all cases, right?

10          A.    Well, all of my patients returned to me

11   postoperatively.

12          Q.    In the long term you don't know what all

13   the outcomes are for your patients, correct?

14          A.    I don't know every patient, but I know a

15   lot of them.

16                MR. SLATER:  Move to strike from "but"

17          forward.

18   BY MR. SLATER:

19          Q.    Turn to Page 39 of your report, you talk

20   about an article where the first author is Menefee,

21   M-e-n-e-f-e-e?

22          A.    Yes.

23          Q.    Is that Prolift®?

24          A.    It's polypropylene mesh.

Nicole B. Fleischmann, M.D.

1          Q.      Do you know what products were used?

2          A.      Not offhand.  I'd have to look at the

3    article.

4          Q.      Not the Prolift®, right?

5          A.      I'm not entirely sure.

6          Q.      You found that this study showed that

7    there was no difference found in the composite failure

8    measures, including anatomic and quality of life

9    outcomes among the three groups, colporrhaphy, porcine

10   and mesh; that's what it says, right?

11         A.      There was a lower anatomic fail rate

12   within the mesh group.  Repeat the question for me.

13         Q.      You say, "no difference was found in

14   composite failure measures including anatomic and

15   quality of life outcomes among the 3 groups."

16         A.      In composite measures, but the anatomic

17   failure rate was higher in the other groups.

18         Q.      Do you accept that anatomic failure rate

19   is less important than the quality of life and the

20   symptoms the patient reports?

21         A.      I think anatomic rates are very

22   important.

23         Q.      You don't operate based solely on an

24   anatomic recurrence.  You operate for a recurrence if

Nicole B. Fleischmann, M.D.

1    there's a symptomatic component that causes quality of

2    life deterioration, correct?

3              A.    That's usually what leads you to a

4    re-operation is symptomatic complaints.

5              Q.    So there may be anatomic recurrences if

6    you, for example, define a recurrence as stage 2, where

7    the patient doesn't feel bothered and doesn't need any

8    further treatment, right?

9              A.    Exactly, subjective is important.

10             Q.    You cite at the top of Page 40, about

11   halfway through, to Haluska.  You say Halsaka, but it's

12   Haluska, right?  That's just a misspelling?

13             A.    It's a typo.

14             Q.    What was the erosion rate reported in

15   Haluska; do you remember?

16             A.    I can't remember offhand, no.

17             Q.    17% or more, does that sound right?

18             A.    I don't recall.

19             MS. KABBASH:  Objection.

20             THE WITNESS:  Yeah, no, I don't.

21   BY MR. SLATER:

22             Q.    Why would you cite to just the --

23   rephrase.

24             Why would you only talk about the

Nicole B. Fleischmann, M.D.

1    recurrence rates in that study and not talk about the

2    erosion rate when it's in double digits, at the very

3    least?

4              MS. KABBASH:  Objection to form.

5              THE WITNESS:  Well, in this particular

6         paragraph, I'm talking about recurrence in

7         general, and I think recurrence rates are

8         important.

9    BY MR. SLATER:

10         Q.    These are anatomic recurrence rates,

11   right?

12         A.    Yes, in separate parts of this report I

13   talk about erosion, just not in this particular

14   paragraph.

15         Q.    I don't remember seeing the Haluska

16   erosion rates cited anywhere.  Did you cite to it?

17         A.    No, but I talk about erosion rates in

18   general.

19              MR. SLATER:  Move to strike from "but"

20         forward.

21   BY MR. SLATER:

22         Q.    On Page 40 you talk about the Altman

23   2011 RCT, right?

24         A.    Yes.

Nicole B. Fleischmann, M.D.

```
 1          Q.      Is that study important to you in

 2    forming your opinions?

 3          A.      Yes.

 4          Q.      Did you ever look at the red lines of

 5    the Altman manuscript that were done by medical affairs

 6    directors at Ethicon before it was submitted to the New

 7    England Journal of Medicine?

 8          A.      No.

 9          Q.      Are you aware that medical directors at

10    Ethicon red lined the manuscript before it was

11    submitted?

12          A.      No.

13               MS. KABBASH:   Objection to form.

14    BY MR. SLATER:

15          Q.      Are you aware that editors of New

16    England Journal of Medicine were deposed with regard to

17    that article?

18          A.      I'm not aware of that, no.

19          Q.      I assume you haven't seen any of the

20    exhibits from the depositions of the New England

21    Journal of Medicine editors, right?

22          A.      I have not.

23          Q.      The Altman conclusion was that when you

24    looked at quality of life in terms of the reported
```

Nicole B. Fleischmann, M.D.

1    subjective criteria, weren't the outcomes essentially

2    there was no statistically significant difference

3    between the Prolift® and the native tissue?

4            A.      No, there was a statistical significance

5    in the bulge symptoms.

6            Q.      Are you sure about that?

7            A.      I'm pretty sure.

8            Q.      That's what you say in the report,

9    right?

10           A.      I'm pretty sure, yeah.

11           Q.      Did you review the appendices to the

12   Altman study?

13           A.      The references or the appendices?

14           Q.      The appendices in the New England

15   Journal of Medicine.

16           A.      I looked at them, I'm sure.

17           Q.      I asked if you read them.

18           A.      I'm sure.

19           Q.      Do you remember anything about that

20   data?

21           A.      No.

22           Q.      On Page 40 into 41 you talk about the

23   study by Sokol, et al., and you say, "the recurrence

24   rate in the posterior mesh group was 21.9% vs 18.2% in

Nicole B. Fleischmann, M.D.

1    the non-mesh group with no statistical significance,"

2    right?

3              A.     Yes.

4              Q.     So that's essentially finding whether

5    you use mesh or native tissue for posterior repair, at

6    least that study, right?

7              A.     Right.

8              Q.     Then you talk about Withagen, the RCT,

9    and one of the things you talk about is that if mesh

10   was used to repair a posterior prolapse, there was a

11   significantly higher rate of de novo prolapse elsewhere

12   in an untreated compartment, as opposed to if native

13   tissue was used for the prolapse repair, right?

14             A.     Right.

15             Q.     And that ties in with what we talked

16   about earlier that when you use this mesh to support a

17   prolapse, that there's a displacement of forces to the

18   untreated compartment?

19             A.     Right.

20             Q.     That puts more strain on it, correct?

21             A.     Correct.

22             Q.     To your knowledge, did Ethicon ever warn

23   of that in any of their documents?

24             A.     No.

Nicole B. Fleischmann, M.D.

```
1          Q.     And that would hold true for anterior

2   and posterior mesh, right?

3          A.     No, they did not.

4          Q.     Looking on Page 41 you discuss the

5   Cochrane review, and this was not limited to Prolift®.

6   This is talking about overall --

7          A.     Yes.

8          Q.     -- treatments, correct?

9          A.     Correct.

10         Q.     One of the things they found in your

11   third bullet point, "more women in the mesh group

12   required repeat surgery for the combined outcome of

13   prolapse, stress incontinence, or mesh exposure,"

14   right?

15         A.     Yes.

16         Q.     And that is consistent with

17   Dudcar(ph.)as well having higher re-operation rates for

18   mesh, right?

19                MS. KABBASH:  Objection.

20                THE WITNESS:  Exposure.

21   BY MR. SLATER:

22         Q.     You said exposure?

23         A.     Right, higher rates of operation in the

24   mesh group because of exposure.
```

Nicole B. Fleischmann, M.D.

1          Q.     It's a complication that gets surgically

2     treated, right?

3          A.     It can, if it can't be taken care of in

4     the office.

5          Q.     Well, I want to talk to you about that.

6                 When people talk about taking care of an

7     exposure in the office, whether it's in the office or

8     the hospital, you are still doing a surgical procedure

9     to remove mesh, right?

10         A.     Not really.

11         Q.     Well, you're having the woman be placed

12    on the table, you're using surgical instruments to cut

13    mesh out of her vagina, and then you are closing the

14    incision, right?  It's an operative procedure, just

15    taking place in the office versus in the hospital,

16    right?

17         A.     It's on the level of a Pap smear with

18    how invasive it is.

19         Q.     Really?

20         A.     Really.

21         Q.     Do you know there are some women that

22    find it to be an incredibly uncomfortable experience to

23    be in a doctor's office under some local anesthesia

24    having mesh cut out of her vagina?

Nicole B. Fleischmann, M.D.

1          A.      If it was that type of procedure, I

2     probably would do it in the operating room.  I wouldn't

3     do anything that was too uncomfortable for a woman to

4     handle in the office.

5          Q.      Well, I didn't say too uncomfortable to

6     handle because women have it done, but have you ever

7     taken the time to talk to the patients and ask them how

8     they enjoyed the experience of having mesh cut out of

9     their vagina in the office?

10         A.      Yes.  In fact, I find that many of the

11    patients if I've had to do that don't even remember

12    that experience because I've had conversations with

13    some of my patients and I've said, do you remember when

14    we had to remove that, and they said no.

15         Q.      All right.  And there's some that

16    probably do remember the experience, right?

17         A.      More often than not, no.

18         Q.      More often than not the patients forget

19    that you cut mesh out of their vagina in the office;

20    that's the majority of your patients?

21         A.      Hasn't happened that many times, but I

22    can tell you that I have spoken to women who have been

23    through this with me, and I haven't found that to be an

24    unpleasant experience for them.

Nicole B. Fleischmann, M.D.

1          Q.      And that's your personal experience,

2    right?

3          A.      After talking to my patients, yes.

4          Q.      Let's talk across the board with doctors

5    around the United States.  Do you know how women

6    generally feel about the experience of having mesh cut

7    out of their vagina in the doctor's office?

8          A.      I can't tell you that, but I can tell

9    you they probably would remember having to go back to

10   the operating room to repair a recurrence more likely

11   than to have a little piece of mesh cut out of them,

12   which is on the level of a suture being removed from

13   them in the office.

14              MR. SLATER:  Move to strike from "but"

15         forward.

16   BY MR. SLATER:

17         Q.      There is a risk that an erosion can

18   occur, it can be treated, more erosion can happen, it

19   can be treated, and it can keep happening; that's a

20   risk, right, recurrent erosions, right?

21         A.      It's a small risk.

22         Q.      Well, is there some study you can point

23   to that quantifies the number of what the percentage of

24   that risk is?

Nicole B. Fleischmann, M.D.

1          A.     I can't point to a study.  I can just

2     tell you that a mesh erosion, when you take it out, if

3     you take it out properly will not come back.

4                 MR. SLATER:  Move to strike after "I

5          can't point to a study."

6     BY MR. SLATER:

7          Q.     There's no study that actually

8     quantifies recurrent erosions that you can point to,

9     correct?

10         A.     Yes, but there's no study to the

11    opposite that shows that mesh erosions recur.

12         Q.     Have you read the Blandon article from

13    the Mayo Clinic doctors?

14         A.     No.  You would have to show it to me,

15    and I can tell you if I have.

16         Q.     Let's see if it's on your list.  I think

17    it is.  Yeah, here it is Blandon, et al.,

18    "Complications from vaginally placed mesh in pelvic

19    reconstructive surgery."

20         A.     Okay.

21         Q.     International Urogynecology Journal,

22    2009.

23                Do you remember that article?

24         A.     No, not offhand.

Nicole B. Fleischmann, M.D.

1      Q.      As you sit here now, is there anything

2  about that article you relied on in considering and

3  forming your opinions?

4      A.      I can't remember the article offhand.

5      Q.      See if I can refresh your memory.  Do

6  you remember anything about -- rephrase.

7              To refresh your memory, do you remember

8  seeing in the article a picture of Prolift® mesh that

9  had been removed from the woman, do you remember seeing

10  the actual color of the mesh on gauze?

11             Do you remember that picture?

12     A.      I just don't remember the article, so

13  I'm not going to remember the picture that you're

14  talking about.

15     Q.      On Page 42 you talk about an SGS

16  systematic review in 2016, right?

17     A.      Yes.

18     Q.      Do you remember a systematic review from

19  SGS from earlier in time?  Have you ever seen that

20  systematic review?

21     A.      I think there was one from about 2007 or

22  '08.

23     Q.      Miles Murphy authorized it; do you

24  remember that?

```
 1        A.      Yes, yes.

 2        Q.      Did you cite to that one?

 3        A.      I'm not sure.  I don't think I did

 4   because this is more updated.

 5        Q.      You said based on that study, Number 4,

 6   "Mesh erosion occurred in up to 36% of patients."

 7                When you refer to that you're saying

 8   that was the high number you saw in one of the studies

 9   that they considered in their review?

10        A.      That was the high number of overall

11   outcomes.

12        Q.      If anybody were to suggest that the

13   decision of whether or not a woman is going to have a

14   medical device, in this case the Prolift®, placed into

15   her body that that decision is up to the doctor and

16   that the patient doesn't play a role in making that

17   decision, you would disagree with that, right?

18        A.      Of course.  Well, that's the informed

19   consent process.

20        Q.      And if there were a court that were to

21   say as long as the doctor says I would still have done

22   the Prolift® on this patient, even if you told me

23   additional risks, for example, let's say, I showed a

24   doctor some risks and you say it wouldn't matter to me,
```

Nicole B. Fleischmann, M.D.

 1   I still would have done it, if there were a court that

 2   said that's enough, it doesn't matter what the patient

 3   would say because as long as the doctor says that he or

 4   she would still recommend it, that's the end of the

 5   inquiry, that would be divorced from what actually

 6   happens in actual medical practice, correct?

 7              MS. KABBASH:  Objection, calls for legal

 8         conclusion and beyond the scope of expert

 9         opinions.

10   BY MR. SLATER:

11         Q.    You can answer.

12         A.    I don't really understand the question.

13         Q.    I know it's hard to understand, I agree,

14   because it makes no sense, but I'll ask it again, which

15   it doesn't.

16              I'm going to give you a scenario where a

17   doctor who is an implanter is shown some risks about

18   the Prolift®, they say I wasn't aware of those risks?

19         A.    Shown from whom?

20         Q.    By me in the deposition.  I show them

21   documents.

22         A.    By a lawyer?

23         Q.    Yeah, in a deposition.  I show documents

24   to the implanting doctor and they say, I was not aware

Nicole B. Fleischmann, M.D.

1    of those risks, but I still -- even if you told me

2    those back then, I still would have recommended the

3    Prolift® to the patient, I think it would have made

4    sense for them, and I would have still said I recommend

5    this to you as a treatment and would have still told

6    the patient, look, you have other options, but I'm

7    recommending this to you.

8              If a court were to say, that's it, we

9    don't care what the patient says she would have done if

10   told these additional risks as long as the doctor says

11   they would recommend it, that's the end of the inquiry

12   as to whether or not those additional warnings would

13   have mattered or not, essentially taking the patient

14   out of the decision-making, that would not comport with

15   actual medical reality in terms of how the consent

16   process works, correct?

17             MS. KABBASH:  Objection.  I'm sorry, I

18        have not been making long objections.  I really

19        don't think this is fair.  You are --

20             MR. SLATER:  Don't make a speaking

21        objection.

22             MS. KABBASH:  Calls for legal

23        conclusion, calls for legal analysis.

24             MR. SLATER:  No, it doesn't.

Nicole B. Fleischmann, M.D.

```
 1              MS. KABBASH:  You are asking her to
 2         comment on the learned intermediary doctor,
 3         that's not fair, beyond the scope of the
 4         opinions.
 5  BY MR. SLATER:
 6         Q.    You can answer.
 7         A.    I just want to ask a question.
 8         Q.    Sure.
 9         A.    You are asking me to make a legal
10  decision?
11         Q.    No.  I'm asking how medicine works.  I
12  was saying if you compare that to how medicine works,
13  that would be because the patient has an absolute right
14  to be told whatever risks are known and then make her
15  own decision for what she wants done to her, right?
16              MS. KABBASH:  Same objection.
17              THE WITNESS:  I am only going to speak
18         to the fact the informed consent process is
19         what it is.  It's well explained.  I don't need
20         to explain it.
21  BY MR. SLATER:
22         Q.    The patient has the right to be told the
23  risks that are known because she can make her own
24  decision of what she can do, right?
```

Nicole B. Fleischmann, M.D.

```
1              A.     Yes.

2                     (Brief recess taken at 1:56 p.m.)

3                     (Deposition resumes at 2:41 p.m.)

4    BY MR. SLATER:

5              Q.     Let's look at Page 44 and 45.  You talk

6    about mesh exposure, and when you do that, you're

7    talking about exposure into the vagina, correct?

8              A.     Yes.

9              Q.     The first thing you say is that the

10   causes or the risk factors, rather, have not been

11   completely elucidated.

12                    You're talking about in the literature?

13             A.     Yes.

14             Q.     There is some literature that talks

15   about what may be causing it, but there hasn't really

16   been a study that's determined what causes exposure; am

17   I correct?

18             A.     I think there's no definitive study.  I

19   think there's theories.

20             Q.     Let's take smoking, for example.

21   Smoking is associated, in general, with wound healing,

22   right?

23             A.     Exactly.

24             Q.     But someone may be a smoker and their
```

Nicole B. Fleischmann, M.D.

```
1    wounds could heal fine, and someone could not smoke at

2    all and they could have a wound healing issue, right?

3         A.    Right.

4         Q.    There's also literature that says I

5    think the time period is about three weeks, if somebody

6    who is even a heavy smoker stops for three weeks

7    leading up to the surgery, that should alleviate the

8    risk.

9               Are you familiar with that?

10        A.    No, but --

11        Q.    You haven't seen that?

12        A.    No, I haven't.

13        Q.    You say that the most commonly seen, and

14   this is the third line on Page 45, "The most commonly

15   seen presentation of mesh exposure includes mesh

16   visible at a previous suture line, without any evidence

17   of inflammation/granulation and well incorporated into

18   the adjacent intact vaginal epithelium."

19              First of all, when you say it's the most

20   commonly seen, do you mean by you?

21        A.    That's the most commonly seen by me.

22        Q.    You're not talking about any specific

23   source of literature for that proposition, right?

24        A.    Let me just look at where you are.  Just
```

Nicole B. Fleischmann, M.D.

1    show me where you are, which paragraph.

2          Q.     The very top of the page, the third

3    line.

4          A.     Okay.  Well, I do cite literature for

5    this.  I mean, I do cite an article.

6          Q.     Is that the sole source for that

7    proposition, or were you actually talking about your

8    own personal experience?

9          A.     Well, I agree with that.  That's why I

10   wrote it, from my own personal experience, but I do

11   cite that article.  That it's a suture line is most

12   common.

13         Q.     What's the basis to say that the most

14   common -- the most commonly seen presentation, not just

15   in your practice, but across the United States, is mesh

16   visible at the previous suture line.  What would be the

17   support to say that's what is most commonly seen across

18   the board in this country?

19         A.     If it's in the midline of the vagina,

20   where this incision was, as opposed to another area of

21   the vagina where no incision is made.

22         Q.     No, I understand what it means.

23         A.     Right.

24         Q.     Here's my question:  What, if any,

Nicole B. Fleischmann, M.D.

1   support do you have to say that that is the most

2   commonly seen presentation of mesh exposure, meaning

3   mesh visible at a previous suture line?  What's the

4   source of that to tell me that's the most common

5   presentation across the country?  I mean, you told me

6   what you see, that's your practice, that's not

7   necessarily everybody.

8           A.      Right.

9           Q.      So what's your source to say that's the

10  most common across the board?

11          A.      I don't have a source besides the one

12  that I cited.

13          Q.      You say, "less common presentations

14  include exposure along a vaginal sulcus."

15                  And, just for the record, what does that

16  mean?

17          A.      It's the crease where the vagina meets

18  the skin or the mucosa over the bone, over the pubic

19  bone.

20          Q.      "Along unincised vaginal mucosa or

21  visible fibers through intact, thin epithelium."

22                  Those are three what you call less

23  common presentations?

24          A.      Yes.

Nicole B. Fleischmann, M.D.

1         Q.      Is that based on your own experience?

2         A.      Yes and, also, I think this is from this

3    record that I cite.

4         Q.      The Wu article?

5         A.      Yes.

6         Q.      Exposure into the vagina can occur not

7    at the suture line, correct?

8         A.      It can.

9         Q.      That can be associated with clear signs

10   of inflammation, correct?

11        A.      I don't really know how to answer that.

12        Q.      Have you ever treated an exposure into

13   the vagina not at the suture line with a Prolift®?

14        A.      Yes.

15        Q.      Okay.  The tissue in those cases can be

16   inflamed, correct?

17        A.      I mean, not necessarily.  I guess -- I

18   don't know how to answer inflammation.  I mean,

19   inflammation to me means red and irritated and

20   purulent, and we don't really see that with exposures.

21        Q.      You define inflammation to include

22   purulent, which is a sign of an infection?

23        A.      It can, but I don't see that with these

24   exposures.

Nicole B. Fleischmann, M.D.

1          Q.      When you said inflammation you associate

2   with being purulent, that's --

3          A.      I just said it could mean that.  I don't

4   mean that it is definitely associated with that.

5          Q.      I mean the term inflammation, you can

6   have inflammation in response to an infective process,

7   but you can also just have inflammation completely

8   unassociated with any infection whatsoever, right?

9          A.      Yes.

10         Q.      Are you aware of whether or not scar

11  plating, bridging fibrosis of the mesh itself can lead

12  to an increased risk and cause erosion?

13         A.      I don't really have an opinion about

14  scar plating or bridging fibrosis in terms of erosion.

15         Q.      You say, I'm continuing in the same

16  paragraph on Page 45, the middle of the page, "Here

17  perforation of the sulcus by the implantation needles

18  (or trocar), 'button-holing' of the epithelium during

19  dissection or progressive epithelial thinning due to

20  urogenital atrophy are likely the primary causes."

21                 What are you citing for that statement?

22  What are relying on to say that?

23         A.      I am relying on my own experience and

24  several articles that I have read that have

Nicole B. Fleischmann, M.D.

1    corroborated that.

2         Q.    Mesh exposure, as you're describing, can

3    occur without any of those things occurring, right?

4    Meaning, you can have mesh exposure where there's no

5    perforation of the sulcus by the implantation needles,

6    where there's no button-holing of the epithelium during

7    dissection and where there's no progressive epithelial

8    thinning due to urogenital atrophy, right?

9         A.    You could.

10        Q.    You would have to look in an individual

11   case at what occurred to that person if you wanted to

12   try to form an opinion as to the cause in that

13   patient's case, right?

14        A.    You would.

15        Q.    You can do a full thickness dissection,

16   and you can still get an exposure into the vagina,

17   right?

18        A.    Very unlikely.

19        Q.    Are you telling me that from a

20   theoretical perspective, or are you saying there's been

21   some study that has shown that it's not going to

22   happen?  I mean, I want to understand.

23        A.    I think that when you look at the

24   studies of people who have been doing procedures like

Nicole B. Fleischmann, M.D.

1    Prolift® over time, as we get better and better at

2    doing the full thickness dissection, we watch our

3    erosion rates go down, and that's because we've learned

4    to do proper full thickness dissections.

5           Q.    You were taught to do the full thickness

6    dissection that you said brought your exposure rate way

7    down by Dr. Lucente, right?

8           A.    Yes, he clued me into it.

9           Q.    Did he seem to know how to do a full

10   thickness dissection?

11          A.    Yes.

12          Q.    He taught you how to do it, right?

13          A.    He showed me, and then I also learned

14   about it reading about Prolift® in the monograph.

15          Q.    When he showed you, did his technique

16   seem to be correct?

17          A.    I really can't remember.  I just

18   remember discussing it with him.

19          Q.    Vincent Lucente taught you the full

20   thickness dissection, right?

21          A.    Yes, he explained to me how it was done,

22   and I learned it from that.

23          Q.    What would you expect the erosion rate

24   into the vagina or the exposure rate, if you want to

Nicole B. Fleischmann, M.D.

1    call it that, should be for somebody who's doing a

2    proper full thickness dissection with a Prolift®?

3           A.     Under 3%.

4           Q.     Do you know what Dr. Lucente's erosion

5    rate into the vagina is?

6           A.     I know from the initial study it was

7    higher.

8           Q.     Do you know what it was for his own

9    patients in his clinical practice?  Let me ask the

10   question --

11          A.     He'd probably say it was 0%.

12          Q.     Let me -- well, he probably would.

13                 Would you believe that if he said he had

14   zero erosions?

15          A.     No, I would not, I would not.

16          Q.     What would you expect -- well, you know

17   what, there was a question I asked.  Let me ask it

18   again, can you just tell me what I said.  I want to

19   make sure I don't miss something here.  It was like

20   three questions ago.

21                 (The court reporter read back the record

22          as follows:

23                 "Question:  Do you know what it was for

24          his own patients in his clinical practice?")

Nicole B. Fleischmann, M.D.

1    BY MR. SLATER:

2           Q.     Do you know what Dr. Lucente's exposure

3    rate or erosion rate, whatever you want to call it,

4    into the vagina was with his own patients in his own

5    clinical practice?

6           A.     During what years?

7           Q.     During any years.

8           A.     During the last few years he was using

9    Prolift®?

10          Q.     During any of the years he was using

11   Prolift®.

12          A.     But it changes, it changes as we get

13   better.

14          Q.     Doctor, I don't want to argue with you

15   about whether it changes.  I didn't ask you if it

16   changes.  I want to start broad.

17                 Do you know what Dr. Lucente's exposure

18   rate was at any time for his own patients in his own

19   practice?

20          A.     I only know about his initial article.

21          Q.     His initial article being what, which

22   article?

23          A.     It was high, it was about 12%, 13%.

24          Q.     What's his initial article?  Which one

Nicole B. Fleischmann, M.D.

```
1    are you talking about?

2            A.     The Lucente Miller article was a 14%

3    exposure rate.

4            Q.     Are you talking about the TVM study?

5            A.     The TVM study.

6            Q.     That wasn't the Prolift®, was it?

7            A.     No, it's not.

8            Q.     So let's talk about the Prolift® now.

9    Do you know what --

10           A.     No, I don't know the number offhand.

11           Q.     Do you know during any time period what

12   Dr. Lucente's erosion was for Prolift®, his own

13   practice?

14           A.     No, I do not know.

15           Q.     But you testified if someone is doing it

16   the right way with a full thickness dissection, it

17   should be under 3%, right?

18           A.     It should be.

19           Q.     And you haven't seen the analysis that

20   was done of his internal data through the ISS grant by

21   Ethicon, right?

22           A.     No, I have not seen that analysis.

23           Q.     Just coming back, and I don't know what

24   you said to this, so if I'm repeating the question, I
```

Nicole B. Fleischmann, M.D.

1    get a demerit, you do agree that someone can do a

2    proper full thickness dissection and they can still

3    have an erosion through the vaginal tissue into the

4    vagina, right?

5         A.    Yes, because it's for a different

6    reason.  Like, there could be a suture disruption or a

7    hematoma behind the vagina that creates a suture

8    disruption, and you could still get an exposure that

9    way.

10        Q.    You can also have a chronic inflammatory

11   reaction that causes damage to the tissue and leads to

12   the mesh eroding through the tissue, right?

13        A.    I don't know.  I haven't really seen

14   that in my practice.

15        Q.    Okay.  I understand you haven't seen it

16   in your practice.

17              Do you have an opinion one way or the

18   other as to whether that happens?

19        A.    I think it's conjecture about whether it

20   happens.  I don't know clinically whether it happens.

21   I don't know how we could tell that that was happening.

22        Q.    I just want to know if you have an

23   opinion whether that's something that happens to some

24   patients?

Nicole B. Fleischmann, M.D.

```
 1           A.      I think there are more other likely

 2   reasons why someone might have an exposure than that.

 3                   MR. SLATER:  Move to strike.

 4   BY MR. SLATER:

 5           Q.      My question is whether you have an

 6   opinion one way or the other whether that occurs,

 7   erosion through the vagina where someone did a proper

 8   full thickness dissection?

 9           A.      When there is a suture disruption or a

10   hematoma, yes.

11           Q.      Okay.  How about when there's no suture

12   disruption or hematoma?

13           A.      No suture disruption, no hematoma, no

14   faulty pass?

15           Q.      Right.

16           A.      Very unlikely.

17           Q.      Well, what are you basing that on?

18           A.      I'm just basing that on 500 Prolifts®

19   that I've done and basing it on the literature that

20   I've read.

21           Q.      Do you have an opinion one way or the

22   other as to whether or not there can be scarring of the

23   mesh that then leads to erosion through the tissue,

24   even if there was a proper full thickness dissection?
```

Nicole B. Fleischmann, M.D.

1    Can that happen?

2            A.     I don't think that we could say it was

3    from that.  I don't know how someone would say what

4    caused the exposure.

5            Q.     I just want to know if you -- so you're

6    saying it doesn't happen or it can, or you don't know?

7            A.     I don't think it could be known that --

8    I'm sorry, I'm jumping on it.

9                   MS. KABBASH:  Just want to remind you to

10           wait until he's completely finished before you

11           start your answer.

12                  THE WITNESS:  I think that if there's a

13           mesh exposure and it's not at the area of the

14           suture line, it's somewhere else, that it could

15           or in more cases than not, it would have to be

16           because of a faulty dissection, not a full

17           thickness dissection.

18                  MR. SLATER:  Move to strike.

19   BY MR. SLATER:

20           Q.     Here's my question:  Can there be a mesh

21   erosion as a result of the mesh being scarred and scar

22   plated coming through the tissue, even if there was a

23   full thickness dissection properly done?  Do you have

24   an opinion of whether or not that can happen or no

Nicole B. Fleischmann, M.D.

```
 1   opinion?

 2           A.      I don't have an opinion about that.

 3           Q.      Okay.  Have you read -- I know you've

 4   done a lot of expert work now in this litigation.

 5   You've been an expert I assume in a bunch of cases

 6   where people were -- in individual cases, right?

 7           A.      I've done some.  I don't know what a

 8   bunch is, a lot is.

 9           Q.      Well, have you done more than ten

10   Prolift® cases where you've looked at people's records

11   and seen what happened to them?

12           A.      No.

13           Q.      Let's talk about your report, Page 46,

14   your heading "Contraction."

15                   First of all, I want to understand, do

16   you agree that contraction occurs with the Prolift®,

17   the Prolift+M® and Gynemesh® PS?

18           A.      I think that it's been described.  I

19   don't really always understand what it means when we

20   say "contraction."

21           Q.      So you don't have an opinion as to

22   whether or not it occurs.  You say it's described, but

23   you're not telling us you have an opinion one way or

24   the other of whether it occurs?
```

Nicole B. Fleischmann, M.D.

```
 1              MS. KABBASH:  Objection.

 2              THE WITNESS:  I'm just telling you I

 3        don't really understand the full definition of

 4        contraction in a symptomatic way.

 5   BY MR. SLATER:

 6        Q.    Have you read medical literature that's

 7   talked about contraction for symptomatic patients?

 8        A.    Yes.

 9        Q.    Having read that, though, you still

10   don't understand what they're talking about?

11        A.    I understand what they're talking about,

12   but I don't know how they diagnose it.  I think

13   everybody has a different definition of a mesh

14   contraction.

15        Q.    Do you know how the doctors in the TVM

16   group diagnosed contraction?

17        A.    No, and I've been trying to figure that

18   out because when they say that they had a such and such

19   rate of mesh contraction, they really don't explain

20   what that means.

21        Q.    You read all their articles?

22        A.    I read it, but it's hard for -- I'm

23   still not getting a good definition of how they said

24   this person has a retraction versus that person has a
```

Nicole B. Fleischmann, M.D.

1    retraction.

2           Q.     Have you read literature about doctors

3    palpating through the tissue mesh that was hard and

4    rigid and caused pain when it was being touched?  Are

5    you aware that that happens with some patients?

6           A.     I'm aware of feeling mesh through

7    tissues, but I can't always say that it causes pain

8    when it's being touched.

9           Q.     I didn't say "always," I never said the

10   word "always."

11                 Are you aware of what I just described

12   to you, reports of doctors palpating in the vagina,

13   feeling hardened, thickened mesh behind the vaginal

14   tissue?

15          A.     Yes.

16          Q.     And that when they press on it or

17   palpate it, it causes pain for the patient?

18          A.     Yes, I've heard of that, but I am also

19   aware of mesh that feels contracted behind the vaginal

20   wall that doesn't cause any symptoms in the patient

21   that you can palpate and the patient doesn't feel any

22   symptoms.

23          Q.     So you would agree that contraction in

24   some cases can be clinically symptomatic?

Nicole B. Fleischmann, M.D.

1        A.      I guess if you feel and you palpate an

2    area that's hard and it hurts the patient, then it is

3    symptomatic, and I more likely than not feel that it's

4    under too much tension.

5                MR. SLATER:  Move to strike the "and I

6           more likely than not" part at the end.

7    BY MR. SLATER:

8        Q.      One of the risks with the Prolift®

9    procedure is that excessive tension would be left on

10   some or all of the mesh leading to complications;

11   that's one of the risks, right?

12       A.      Yes, it is.

13       Q.      And in the scenario where excessive

14   tension is left on the mesh, that can cause the pores

15   to be condensed down and lead to scar plating; that's

16   recognized, right?

17       A.      I guess theoretically, yes.

18       Q.      When there's tension on the mesh,

19   particularly the arms of the Prolift®, that can lead to

20   tension banding of the arms, correct?

21       A.      I'm not really sure.  I mean, I think if

22   you put any part of the mesh under too much tension,

23   whether it's the arms or the body, that you could feel

24   an area of the mesh under the vaginal wall.  The thing

Nicole B. Fleischmann, M.D.

```
 1    is it's not always clinically felt by the patient,

 2    which is why it's hard to know the clinical

 3    significance of it.

 4              MR. SLATER:  Move to strike "the thing

 5         is" part at the end.

 6    BY MR. SLATER:

 7         Q.    On Page 46 where you're talking about

 8    contraction and you point out the 2011 FDA warning, the

 9    FDA thinks contraction occurs, right, because they

10    mention it as a risk, right?

11         A.    Yes, it's a risk, the FDA knows about

12    it.

13         Q.    Do you have an understanding of the

14    understood quantification of contraction with Prolift®

15    mesh?

16              MS. KABBASH:  Objection.

17              THE WITNESS:  I don't have an

18         understanding of the clinically significant

19         contraction with Prolift® mesh.

20    BY MR. SLATER:

21         Q.    Okay.  Do you know what level of

22    contraction Ethicon expected to occur with the Prolift®

23    inside the body?

24         A.    Probably about 30 to 40%.
```

Nicole B. Fleischmann, M.D.

```
1              Q.     Did you ever see where it said 30 to

2      50%?

3              A.     I mean, this just goes back to the

4      hernia data.

5              Q.     Well, I'm going back to the

6      understanding of the Prolift®.

7                     Did you ever see any internal documents

8      that talked about an expected contraction rate of 30 to

9      50% of the mesh?

10             A.     I've seen it that high, yes.

11             Q.     You in this on Page 46, talking about

12     contraction, cited to Amid, an article from 1972

13     regarding "A simple stapling technique for the

14     prosthetic repair of massive incisional hernias,"

15     right?

16             A.     Yes.

17             Q.     And he was talking about -- and that's

18     what you cited for 20 to 30%, that's where that

19     statistic came from, right?

20             A.     Yes.

21             Q.     Then you cited another article about

22     hernia, "Inguinal hernia advances or controversies?"

23     Right?

24             A.     Yes.
```

Nicole B. Fleischmann, M.D.

1          Q.      You then go down a little further and

2     you say "Dietz et al. found no evidence of mesh

3     contracture in 40 patients who underwent anterior TVM

4     repair using translabial 4-dimensional ultrasound,"

5     right?

6          A.      Right.

7          Q.      And that's the article we talked about

8     earlier that's not about the Prolift®, it was about the

9     Perigee, correct?

10         A.      We discussed that.

11         Q.      On Page 47 you have a chart of

12    dyspareunia rates based on a series of articles.

13                Were those the most important articles

14    to you in addressing the dyspareunia rates?

15         A.      They were many of them, yeah.

16         Q.      Were there any others that you would add

17    to the chart right now, if you could?

18         A.      Let's see.  I don't have the Dietz on

19    there.  Unless -- oh, I have it there.  It's just not

20    on this specific chart, but it's also -- it's in the

21    report.

22         Q.      I'm talking about the chart, any other

23    important studies.  You say Dietz, that's Dietz and

24    Maher.

Nicole B. Fleischmann, M.D.

```
1            A.      Yeah, Dietz is the meta, so it's just
2     discussing these studies anyway.
3            Q.      Is that the Dietz that you cite to on
4     Page 48, Dietz and Maher?
5            A.      Yes.
6            Q.      Where you say they "also found no
7     difference in sexual function between anterior repairs
8     with and without mesh"?
9            A.      That's the one.
10           Q.      When you refer to sexual function, what
11    are you referring to?
12           A.      I'm referring to the studies that did
13    questionnaires.  I mean, they're all in the randomized
14    controlled studies.
15           Q.      Okay.  But when it refers to sexual
16    function, what does that mean?
17           A.      It's pain, it's dyspareunia, pain.
18           Q.      In your chart you didn't list the Altman
19    RCT, which you said was very important to you, did you?
20           A.      No, I didn't.
21           Q.      Do you know what the dyspareunia rates
22    were there, de novo dyspareunia?
23           A.      Did they discuss dyspareunia in Altman?
24           Q.      They did, 7% for the Prolift®, 2% for
```

Nicole B. Fleischmann, M.D.

1    the suture repairs.

2          A.    Oh, there you go.  But I don't think

3    they were statistically significant differences.

4          Q.    The rate with the Prolift® was three

5    times as much; that would be clinically significant,

6    right?

7          A.    But not statistically significant.

8                MR. SLATER:  Move to strike.

9    BY MR. SLATER:

10         Q.    7% for the Prolift®, which is more than

11   3% -- rephrase.

12               The Prolift® dyspareunia rate in Altman

13   was 7%, which is more than three times the 2% for the

14   suture repair.  Is that clinically significant?

15         A.    But you're looking at a very small

16   percentage of patients.  You're looking at 400

17   patients, so it's significant for that study

18   clinically, but not statistically.

19               MR. SLATER:  Move to strike.

20   BY MR. SLATER:

21         Q.    Is that answer, yes, it's clinically

22   significant?

23               MS. KABBASH:  Objection.

24               THE WITNESS:  But it's not statistically

Nicole B. Fleischmann, M.D.

```
 1            significant.

 2                    MR. SLATER:  Move to strike.

 3                    THE WITNESS:  Yes, it's clinically

 4            significant and not statistically significant

 5            in such a small group of patients.

 6                    MR. SLATER:  Move to strike the "not

 7            statistically significant in such a small group

 8            of patients" at the end.

 9   BY MR. SLATER:

10            Q.    Do you know what language was removed

11   from the Altman manuscript before it was submitted to

12   the New England Journal of Medicine at the request of

13   medical affairs at Ethicon?

14                    MS. KABBASH:  Objection.

15   BY MR. SLATER:

16            Q.    Do you know what language they took out

17   regarding dyspareunia?

18            A.    I don't.

19            Q.    When one looks at the concept of de novo

20   dyspareunia, it's not enough to just say somebody had

21   discomfort with sexual relations after surgery to fully

22   understand what happened with that patient; would you

23   agree with that?

24                    MS. KABBASH:  Objection to form.
```

Nicole B. Fleischmann, M.D.

```
 1                 THE WITNESS:  I don't really understand

 2          the question.

 3  BY MR. SLATER:

 4          Q.     Good.  I'm doing my job.

 5                 With regard to de novo dyspareunia, one

 6  thing you look at is the very basic thing after the

 7  surgery, did the woman have discomfort with sexual

 8  relations; that's kind of the general question, right?

 9          A.     After surgery, yes, that's the question.

10          Q.     Now, after surgery you would expect

11  every woman to have dyspareunia for some period of time

12  because she had an operation through her vagina, so you

13  would expect sexual relations to be uncomfortable,

14  regardless of what type of surgery is done, right?

15          A.     For a period of time.

16          Q.     And then over time, for most women,

17  their surgical area heals, they get better, and they

18  don't have dyspareunia or discomfort with sexual

19  relations going forward due to the surgery, right?

20          A.     Yes, over time.

21          Q.     And, for example, with a suture repair,

22  over time you expect the incision to heal, you expect

23  whatever scarring there is to soften and become no

24  longer painful, right?
```

Nicole B. Fleischmann, M.D.

```
1          A.     Right, unless they develop scar tissue

2   or they have a foreshortened vagina due to cutting out

3   the vaginal wall from, say, a vaginal hysterectomy or

4   too much of an anterior colporrhaphy cutting out the

5   vaginal wall, sometimes they can get just a narrowing

6   or tightening of their vagina that way.

7               MR. SLATER:  Move to strike "unless."

8   BY MR. SLATER:

9          Q.     If a woman has, due to a suture repair,

10  some tightening of the vagina, that can be released,

11  you can release the sutures, right?

12         A.     No, not always, not when the vaginal

13  wall has been resected.  Sometimes they don't have

14  enough vagina left to have sex.  We see that.

15         Q.     So that one instance is there's so much

16  tissue taken out that the woman just has very little

17  vagina left, and it's just going to be uncomfortable

18  because her vagina is so small?

19         A.     And short.

20         Q.     And short that it's just not going to be

21  compatible with normal relations?

22         A.     Exactly.

23         Q.     Okay.  Where a woman has a normal size

24  vagina, not shortened, and she's had a suture repair,
```

Nicole B. Fleischmann, M.D.

1    you expect the incisions to heal over time and for the

2    woman to not have dyspareunia long term, correct?

3            A.      Well, yeah, one would hope, but it still

4    happens.

5            Q.      For most women, that's the course they

6    get better, right?  They heal and they don't have

7    dyspareunia long term?

8            A.      But that's not what the studies show.

9            Q.      If they don't have a shortened vagina?

10           A.      That's not what the studies show.  When

11   we look at studies on any vaginal surgery, there's a

12   risk of postoperative de novo dyspareunia on any

13   procedure, whether it's a suture repair or not.

14           Q.      I get that, but now I'm trying to talk

15   about why it's happening and trying to figure out those

16   women that might have it as a persistent condition, why

17   that would be?

18           A.      It could be muscular, they could

19   develop -- you know, after pelvic surgery some people

20   develop pelvic floor myalgia, just from being operated

21   on in that area.

22           Q.      What percentage of women with nonmesh

23   surgery develop pelvic floor myalgia due to a suture

24   repair of prolapse?  Is there any study that's actually

Nicole B. Fleischmann, M.D.

```
 1    analyzed that?

 2         A.      There may be, I don't know it though.

 3         Q.      Okay.  Prolift® surgery and the

 4    placement of the Prolift®, that can trigger a myalgia

 5    situation, correct?

 6         A.      I think that any surgery that goes

 7    through the retropubic space or the vagina or the deep

 8    muscles of the vagina, whether it's a sacrospinous

 9    ligament fixation or it's a deep paravaginal repair can

10    cause a pelvic floor myalgia, it's not just Prolift®.

11              MR. SLATER:  Move to strike.

12    BY MR. SLATER:

13         Q.      With a Prolift® one of the things that

14    happens is you operate through the obturator area,

15    correct?

16         A.      You are dissecting into that area

17    exactly.

18         Q.      And pulling mesh arms through it, right?

19         A.      You're placing them through it.

20         Q.      And then the mesh is left there after

21    the surgery is over, right?

22         A.      There are straps that are left there,

23    yes.

24         Q.      And before the surgery, that would not
```

Nicole B. Fleischmann, M.D.

1    have been an area that had any issues, most likely,

2    because the obturator is not part of what you would be

3    operating on with nonarm, nonmesh surgery, right?

4           A.     Well, if you were doing certain

5    surgeries, like deep paravaginal repairs, anterior

6    repairs, you would get into that same space.

7           Q.     You would get on the edge of it; you

8    wouldn't be putting something all the way through it?

9           A.     You wouldn't put anything through the

10   muscles of the thigh.

11          Q.     What I'm driving at is when you do a

12   Prolift® surgery, there's mesh left in areas where

13   there's been tracks made by the trocars in areas that

14   can lead to pelvic floor myalgia due to that trauma,

15   correct?

16          A.     I suppose it's possible, but I don't

17   think that it's any greater than any other procedure

18   that we do on the pelvic floor, so I don't see that

19   that is a definite correlation.

20          Q.     Well, it would be greater than with a

21   colporrhaphy, where you don't operate in that part of

22   the body, right?  Because by definition if you're not

23   going there, you're not going to cause a problem there

24   with an alternative procedure, right?

Nicole B. Fleischmann, M.D.

1           A.      Well, I feel like with a colporrhaphy

2    you're going through the deep muscles of the pelvis, if

3    you're doing it properly and you're really plicating

4    that tissue from side wall to side wall, as you should

5    be, you can absolutely get a pelvic floor myalgia.

6           Q.      Do you have patients that you trigger

7    pelvic floor myalgia in when you do suture repairs?

8           A.      Posterior repairs, sometimes.

9           Q.      Not anterior?

10          A.      Not as much with anterior repairs but

11   with posterior repairs we do.

12          Q.      How often?

13          A.      It's happened.  I mean, not often, but

14   it happens.

15          Q.      Well, how many times?

16          A.      I can't give you a number on that.  It's

17   just something that I see in my practice.

18          Q.      How often?

19          MS. KABBASH:  Asked and answered.

20          THE WITNESS:  I really can't give you a

21          number.

22   BY MR. SLATER:

23          Q.      How many times have you seen it with an

24   anterior repair?

Nicole B. Fleischmann, M.D.

```
 1            A.      I don't do a lot of anterior repairs, so
 2   I can't tell you that, but I can tell you that with my
 3   posterior repairs, I will see a fair amount of pelvic
 4   floor myalgias afterwards.
 5                   MR. SLATER:  Move to strike from "but"
 6            forward.
 7   BY MR. SLATER:
 8            Q.      If you see pelvic floor myalgia after a
 9   suture repair, generally that resolves with time,
10   right?
11            A.      Unfortunately, not always.
12            Q.      I didn't say always, did I?  I said
13   generally it resolves with time, right?
14            A.      We hope so.  We have to work with them.
15   We have to teach them how to dilate sometimes.  We have
16   to give them estrogen.  We have to give them things
17   that help them sometimes.  It's not always a
18   cut-and-dry situation where it will get better with
19   time.
20            Q.      When the mesh from the Prolift® is left
21   inside the body, do you understand that it has a
22   chronic inflammatory reaction that continues when the
23   mesh is left in the body; do you understand that?
24            A.      I understand there's a graft host
```

Nicole B. Fleischmann, M.D.

1   reaction, which is chronic.

2       Q.    And that plus potentially tension with

3   the mesh, potentially contraction, potentially erosion,

4   those things can cause or exacerbate myalgia, correct?

5       A.    I suppose if there's tension,

6   absolutely.

7       Q.    It is difficult, and in many patients

8   likely impossible, to safely or effectively remove the

9   arms of the Prolift® if you need to due to

10  complications, right?

11      A.    It can be done.  I've done it.  It's

12  generally unnecessary.

13            MR. SLATER:  Move to strike.

14  BY MR. SLATER:

15      Q.    In some patients the benefit of trying

16  to remove the arms of the Prolift® to treat

17  complications would be outweighed by the risk, correct?

18      A.    Right.

19      Q.    And I'm talking about patients who are

20  symptomatic.

21      A.    Right.

22      Q.    Where the arm is causing pain but the

23  doctor says, look, I don't think that it's worth trying

24  this because I can cause a lot more damage, I think you

Nicole B. Fleischmann, M.D.

1   have to live with the pain, I think the surgery is too

2   risky; that is a potential scenario, right?

3                    MS. KABBASH:  Objection.

4                    THE WITNESS:  Where the arm is causing

5          pain?

6   BY MR. SLATER:

7          Q.     Yes.

8          A.     I haven't really seen the arm cause

9   pain.

10         Q.     You, as an expert in this case, have not

11  seen any indications that the arms of the Prolift®

12  cause pain for patients?

13         A.     Not typically.  It's usually that

14  there's --

15         Q.     Didn't ask typically.

16                You, as an expert for Ethicon on the

17  Prolift®, are you testifying to a reasonable degree of

18  medical certainty that you're not aware of the arms of

19  the Prolift® causing pain for patients, yes or no?

20         A.     Not the arms in and of itself.

21         Q.     Okay.  Are you aware what Ethicon thinks

22  on that question of whether the arms of the Prolift®

23  can cause pain for a patient?

24         A.     I'm not aware of what Ethicon thinks.

Nicole B. Fleischmann, M.D.

```
1              Q.     Did you ever think it might be a

2    reasonable thing for you to want to educate yourself on

3    what Ethicon knew about the Prolift®, Gynemesh® PS and

4    the Prolift+M® to understand, based on all the

5    different sources of information coming into them, what

6    did they have available to them to see if maybe they

7    knew about things that you weren't aware of or maybe a

8    severity or a frequency of complications you just

9    didn't fully appreciate?  Did you consider that?

10              MS. KABBASH:  Objection to form.

11              THE WITNESS:  I did try to educate

12        myself on those things.

13    BY MR. SLATER:

14              Q.     I'm talking about through Ethicon's

15    knowledge, to learn Ethicon's knowledge.

16              A.     I'm saying that I did try, I just maybe

17    didn't succeed in every area, but I did read expert

18    depositions, and I did try to go through some of those

19    documents.

20              Q.     But I think, as you sit here now, you've

21    confirmed for me you don't really have an understanding

22    of what Ethicon's understanding is as to the risk

23    profile for the Prolift®, other than what they've put

24    in their documents?
```

```
 1                 MS. KABBASH:  Objection.

 2   BY MR. SLATER:

 3         Q.    That are like the IFU, the patient

 4   brochure, the monograph, those types of documents,

 5   other than that you don't know what they internally

 6   understood, correct?

 7                 MS. KABBASH:  Objection.

 8                 THE WITNESS:  I have somewhat of an

 9         understanding of what they understood prior to

10         going to launch with the product.

11   BY MR. SLATER:

12         Q.    Is it your understanding that

13   Ethicon's -- rephrase.

14               As you sit here now, do you believe,

15   based on what you've seen, that Ethicon's understanding

16   of the risks of the Prolift® when they went to launch,

17   that they put those into the IFU so that doctors would

18   be warned of what they knew?

19         A.    I think that they put enough of what was

20   known at the time of the complication risk profile into

21   the IFU so doctors could understand.

22         Q.    I don't know if you're answering my

23   question directly, so I want to try to make it very

24   clear.  I'm not asking about whether it was, you
```

Nicole B. Fleischmann, M.D.

 1   know -- whether doctors could figure it out and all

 2   that stuff.

 3              My question is very direct.  Did Ethicon

 4   set forth the risks that it understood to exist with

 5   the Prolift® when they went to the market in 2005, did

 6   they set forth those risks in the IFU?  Their internal

 7   knowledge, was it set forth in IFU as to the risks?

 8              MS. KABBASH:  Objection.

 9              THE WITNESS:  I think that they were,

10        yes.

11   BY MR. SLATER:

12        Q.    Did the IFU for the Prolift® warn that

13   retraction of the Prolift® mesh could create a risk of

14   discomfort with sexual relations with sexually active

15   women, was that warned of in the IFU?

16        A.    It warned of contraction.  It didn't

17   specifically talk of sexual relations in the original

18   IFU.

19        Q.    Did Ethicon indicate in the initial IFU

20   or any of the IFUs that the risk of contraction of the

21   mesh and pain with sexual intercourse could be

22   increased with hysterectomy?

23        A.    That is not in the IFU.  It is in the

24   surgeon's monograph, though.

Nicole B. Fleischmann, M.D.

```
 1              MR. SLATER:  Move to strike "it is"

 2         forward.

 3    BY MR. SLATER:

 4         Q.    Do you know what the circulation of the

 5    monograph was?  Do you know who it was given to?

 6         A.    It was given to surgeons who were

 7    training on Prolift®.

 8         Q.    Do you know during what time period and

 9    to how many doctors it was given?

10         A.    I don't know those numbers.  I know they

11    distributed it as widely as they could.

12         Q.    You just made a statement, I know they

13    distributed it as widely as they could.

14              Who told you that?

15         A.    It's just a -- I just remember seeing

16    the monograph.  I remember seeing it when I was

17    training.

18         Q.    So you saw it?

19         A.    I saw it.

20         Q.    You don't know who else did, right?

21         A.    Well, people that were training saw it,

22    people who were going through Prolift® training all saw

23    it.

24         Q.    Well, you don't know what people saw at
```

Nicole B. Fleischmann, M.D.

1    training seminars that you weren't at, do you?

2         A.    No, but I'm assuming that they stuck to

3    the same protocol as they did with me.

4              MR. SLATER:  Move to strike from "but"

5         forward.

6    BY MR. SLATER:

7         Q.    Do you know how many Prolift® monographs

8    were printed?

9         A.    No, I don't have that information.

10        Q.    You don't know how many doctors were

11   given the monograph, do you?

12        A.    I don't know.

13        Q.    When you first were trained on the

14   Prolift, you were already using Gynemesh® PS regularly

15   in your practice, right?

16        A.    Yes.

17        Q.    Go to Page 49, please.  There is a

18   sentence under "Pelvic pain," the second sentence says,

19   "In most cases, postoperative pain resolves

20   spontaneously and can be managed conservatively,"

21   correct?

22        A.    Yes.

23        Q.    And that's true for suture repairs,

24   correct?

Nicole B. Fleischmann, M.D.

1         A.      Mm-hmm, yes.

2         Q.      Are you saying that that is true for the

3    Prolift®?

4         A.      That is true for the Prolift®.

5         Q.      Are you saying that's true for Gynemesh®

6    PS?

7         A.      That's true for Gynemesh® PS, but that

8    doesn't always happen.  I mean, we do have prolonged

9    pain with some of those patients.

10        Q.      Are you saying that is true for the

11   Prolift+M®?

12        A.      Any procedure for pelvic organ prolapse

13   can cause prolonged pain.

14        Q.      Do you know when it was -- rephrase.

15                Are you aware of whether the TVM group

16   was asking Ethicon to put a safer mesh in the Prolift®

17   from the time even before the Prolift® went on the

18   market?

19        A.      I've heard some reports that people were

20   considering other meshes.

21        Q.      My question is are you aware that the

22   TVM group was asking Ethicon to use a safer mesh than

23   the mesh that was in the Prolift® even before it went

24   on the market?

Nicole B. Fleischmann, M.D.

```
 1              MS. KABBASH:  Objection.

 2              THE WITNESS:  I've been made aware of

 3          that from some of the reviews that I've done.

 4   BY MR. SLATER:

 5          Q.     Reviews of what?

 6          A.     Depositions.

 7          Q.     So you've seen it related by other

 8   witnesses in a deposition?

 9          A.     Yes.

10          Q.     Ultimately, Ethicon determined to use

11   Ultrapro mesh in the Prolift®, and they marketed that

12   as the Prolift+M®, correct?

13          A.     Yes.

14          Q.     Am I correct that the reason they did

15   that is because the expectation was that with the

16   Monocryl, which would absorb, that you would be left

17   with a lighter weight, larger pore mesh within the

18   human body?

19          A.     That was the thinking behind it.

20          Q.     Do you have an opinion as to whether or

21   not that panned out in actual clinical reality?

22          A.     I think when we look at the studies, it

23   probably didn't.  I can tell from you my own practice

24   that by the time I was using M, my exposure rates were
```

Nicole B. Fleischmann, M.D.

1   very low, but I really did attribute that to my level

2   of experience at that point.

3              I also felt that appreciation of the

4   implant behind the vaginal wall was much less with the

5   M than it was with the Prolift® PS, but in terms of

6   patients' happiness or outcomes, I didn't see much of a

7   difference.

8        Q.    When you say appreciation behind the

9   vaginal wall, you mean being able to palpate on the

10  vaginal tissue and feel that the mesh was behind it?

11       A.    Exactly.

12       Q.    Did Ethicon perform any studies before

13  launching the Prolift+M® to support the claims they

14  were making to doctors as to the better outcomes they

15  could expect?

16       A.    I think those were studies were in

17  progress, and they were -- I mean, I think that's where

18  they were at that point.

19       Q.    Would you agree Ethicon should have

20  conducted at least a midterm, I won't even go for long

21  term, at least a midterm, year to two years I'll define

22  it as for purposes of this question, study of the

23  Prolift+M® before making claims to doctors and patients

24  that it could have or it would have improved outcomes

Nicole B. Fleischmann, M.D.

1   for patients?

2           A.    I mean, listen, it's always good to have

3   more data before you launch something, but I think that

4   they had enough data that they felt comfortable

5   launching it, and, ultimately, there were theoretical

6   improvements with M, although, again, outcomes were not

7   different, like you said.

8                 MR. SLATER:  Move to strike from "but"

9           forward.

10  BY MR. SLATER:

11          Q.    The Prolift+M® clinical study that

12  Ethicon did, tell me if I'm wrong, I think it had an

13  erosion rate of 14.8%; does that sound right?

14                MS. KABBASH:  Objection.

15                THE WITNESS:  Let me look at my notes,

16          if I even have it in there.

17                The Milani study was the original one,

18  that was 10% exposure rate.  10%, same as the other.

19  BY MR. SLATER:

20          Q.    Was there a Prolift+M® study --

21  rephrase.

22                The clinical study that was used to

23  launch the Prolift+M®, do you know what the exposure

24  rate was in that study?  Are you saying that was 10%?

Nicole B. Fleischmann, M.D.

1            A.        I thought that was the Milani study, but

2    I could be wrong.   I thought that was the original

3    Ethicon-sponsored study.

4            Q.        I'm looking at your notes, because you

5    brought me there, gives me something to read.

6            A.        Okay.

7            Q.        Under Prolift+M® you list long-term

8    studies.

9                      One year is not long term, is it?

10           A.        No, it's not as long as we would like.

11           Q.        Three years would not be a long-term

12   study for a permanent implant, would it?

13           A.        Well, no, not compared to other studies

14   that we have on permanent implants, it's not.

15           Q.        So there's no long-term studies of the

16   Prolift+M®, right?

17           A.        No, we never got there.

18           Q.        You list Lensen, L-e-n-s-e-n, 2013, you

19   wrote, less exposure with M but likely due to author

20   experience two and a half to three and a half pore

21   size.

22                     That's what you wrote, right?

23           A.        Mm-hmm.

24           Q.        Were those the conclusions by the

Nicole B. Fleischmann, M.D.

1    doctors that did that study, or is that your

2    conclusion?

3         A.    That's my conclusion.  I think that the

4    main conclusion was that there was less exposure rate

5    with M, but they also attributed that to their

6    technique.

7         Q.    You wrote two and a half to three and a

8    half pore size.  That's millimeters, right?

9         A.    Yes, not centimeters.  The whole thing

10   would fall through.

11             MR. SLATER:  I have a mutual motion to

12        strike after the word yes on that.  I was

13        sitting here thinking to myself we all know

14        that, and I realized this deposition may be

15        used by people that are never going to meet any

16        of us, may meet you, but won't me and Maha, so

17        I just thought I'd say that for the record.

18        Some people don't get humor out of the

19        transcript.  We could have gotten it if Maha

20        wanted the video here, but she doesn't like

21        humor to come across.

22             MS. KABBASH:  I'm a very boring person.

23             MR. SLATER:  I would not agree with

24        that.

Nicole B. Fleischmann, M.D.

1    BY MR. SLATER:

2          Q.    Okay.  So the reference to two and a

3    half to three and a half millimeter pore size, that was

4    your sense of one of the reasons why there was less

5    exposure.

6                Am I reading that correctly?

7          A.    You know something, I think I was just

8    trying to remind myself what the pore size was for the

9    M once the Monocryl dissolved.

10         Q.    Okay.  So you weren't -- even though it

11   says due to author experience two and a half to three

12   and a half pore size?

13         A.    I think that was just a note I was

14   making for myself because these are my notes.

15         Q.    Do you know what happened with the

16   recurrence rates of the Prolift+M® as compared to the

17   Prolift®?

18         A.    Like I said, they have been about the

19   same.

20         Q.    As far as an alternative to the

21   Prolift®, the Prolift+M®, from your perspective, was a

22   reasonable alternative once Ultrapro was placed into

23   that system, right?

24         A.    It was.

Nicole B. Fleischmann, M.D.

1          Q.      I want to talk about dyspareunia a

2    little bit with the Prolift®.

3                  If a woman has discomfort or pain with

4    sexual relations as a result of the mesh from the

5    Prolift® becoming scar plated, hard, contracted, behind

6    or next to the vagina such that if you palpate on it,

7    it hurts, it's reasonable to then make an effort, if

8    deemed safe enough, to try to remove that mesh, right?

9          A.      If that's what she wants.  She won't

10   always want that.

11         Q.      Well, one choice would be I'll live with

12   the pain or try to have physical therapy and see if

13   they can soften the scarring?

14         A.      Right, exactly.

15         Q.      Which is enormously painful when

16   somebody has physical therapy through the vagina

17   palpating on a painful scar band; that can be very

18   painful, right?

19         A.      I suppose.

20         Q.      Let's say a woman wants to have the mesh

21   removed and the doctor thinks that's a reasonable

22   alternative and actually offers it as an option, the

23   mesh may be removed or at least whatever the doctor can

24   get to, and the woman may still have that pain, right?

Nicole B. Fleischmann, M.D.

1          A.     It's possible, especially if there is a

2   pelvic floor myalgia causing the pain from the

3   beginning and they need to do physical therapy after

4   that.

5          Q.     It can be that the scar plating and

6   contraction of the mesh can cause pain at that

7   location, and it also can trigger spasm within the

8   pelvic floor as a result of that pain, right?

9          A.     It could, yes.

10          Q.     And that could lead to myalgia, correct?

11          A.     Yes.

12          Q.     And even if you remove the mesh, the

13   myalgia can remain, correct?

14          A.     Well, it usually gets better after you

15   take out an area that's tense.  Like, if you can point

16   to a patient having a thickened area and if you palpate

17   it and it hurts them, by removing it, you will

18   significantly reduce the discomfort.  Whether there is

19   some remaining myalgia left, physical therapy --

20          Q.     When you say usually -- I'm paraphrasing

21   what you said they usually get better, are you relying

22   on any study for that, or is that just your experience?

23               MS. KABBASH:  Objection.

24               THE WITNESS:  That's my experience, but

Nicole B. Fleischmann, M.D.

1           there's also studies.

2     BY MR. SLATER:

3           Q.      Which study?

4           A.      I can't think of offhand which study,

5     but I can tell you there are other studies which have

6     shown that removing pelvic mesh, not in everybody, but

7     in many patients will relieve the symptoms.

8           Q.      In some patients you can remove the

9     Prolift® mesh in one area and the woman can feel better

10    for a period of time and pain can come back; that

11    happens to some women, right?

12          A.      I guess, but this is all very

13    theoretical for me.  This is not something that I can

14    say that I'm seeing a great deal of in practice.  I

15    suppose if it happened, you know, yes, it could, people

16    could have complicated cases of pain after a procedure

17    like Prolift® or really, I mean, frankly any procedure

18    for pelvic floor prolapse.

19               MR. SLATER:  Move to strike from "or"

20          forward.

21    BY MR. SLATER:

22          Q.      One of the risks of the Prolift® is that

23    the mesh will contract around the vagina and cause

24    vaginal shortening, correct?

Nicole B. Fleischmann, M.D.

```
1          A.      I suppose that it could, yes.

2          Q.      Did Ethicon warn of that risk?

3          A.      It warns of contraction.

4          Q.      Did Ethicon warn that contraction of the

5   mesh can lead to vaginal shortening?

6          A.      Well, I think that that just kind of --

7   that follows.  I mean, when we think about what

8   contraction is, we're thinking of a shortening of the

9   vagina.

10         Q.      When you think about -- rephrase.

11                 Ethicon marketed the Prolift® and said

12  there would be some contraction with the scarring that

13  would go in through the pores, this beautiful lattice,

14  the scar net, that was supposed to be a good thing,

15  right?

16                 MS. KABBASH:  Objection.

17                 THE WITNESS:  I call that integration.

18         You're talking contraction or over-shortening

19         of the mesh.

20  BY MR. SLATER:

21         Q.      I'm actually talking about terminology.

22                 Ethicon told people there would be

23  in-growth of scar tissue, and it would help to create a

24  scar net and good support, and there would be some
```

Nicole B. Fleischmann, M.D.

1    contraction and that would be a good thing, right?

2          A.    But they also warn, for instance, in the

3    IFU that there's a risk of contraction.  I think

4    they're talking about something different than what

5    you're just describing.

6          Q.    All right.

7                MR. SLATER:  Move to strike.

8    BY MR. SLATER:

9          Q.    Limit it to my question.

10         A.    Okay.

11         Q.    I'm correct that was part of what

12   Ethicon was telling doctors, right; that contraction

13   and the scarring growing through the lattice of the

14   mesh was a good thing, it was to create support, right,

15   a strong, durable support, right?

16         A.    I'm just troubled because in the adverse

17   sections they talk about cracks, so, obviously, they

18   wouldn't list it in the adverse reactions if it was a

19   good thing.

20         Q.    Really, they wouldn't give conflicting

21   messages?

22               MS. KABBASH:  Objection.

23   BY MR. SLATER:

24         Q.    Really, because it wouldn't be -- it

Nicole B. Fleischmann, M.D.

1    wouldn't be a good thing for Ethicon to give

2    conflicting information about something that could

3    happen with the Prolift®, on one hand saying it would

4    be a good thing, on the other hand saying it's a

5    potential risk, because that could be confusing to a

6    doctor?

7                    MS. KABBASH:  Objection, form.

8                    THE WITNESS:  I think we get a lot of

9             information from Ethicon.  We understand what

10            integration and graft host relations are.  We

11            understand there is tissue integration into the

12            graft.  We don't want there to be an

13            over-buildup of fibroblast causing mesh to

14            contract, but that is a risk of the procedure

15            which they warn about.

16    BY MR. SLATER:

17            Q.    Ethicon said in the IFU scarring that

18    leads to implant contraction, right; that's actual

19    phrase, right?

20            A.    Yes, yes, yes.

21            Q.    They didn't talk through how with the

22    Prolift®, this, quote, unquote, revolutionary device,

23    they described it as how they would specifically impact

24    the patient due to the Prolift® being in the body, they

Nicole B. Fleischmann, M.D.

1    didn't actually go through that explanation, did they?

2              MS. KABBASH:  Objection to form.

3              THE WITNESS:  They didn't, because I

4         still think it's questionable about how

5         symptomatic that process is for women.

6    BY MR. SLATER:

7         Q.    If Ethicon thought it could be

8    symptomatic for women and believed that before they

9    even put the Prolift® on the market, they should have

10   warned about that, correct?

11             MS. KABBASH:  Objection.

12   BY MR. SLATER:

13        Q.    If that's what their information showed?

14        A.    But they did warn of contraction.

15        Q.    I'm talking about the consequences of

16   it.  If they knew those consequences could be

17   symptomatic and could be difficult for the woman, for

18   example, chronic dyspareunia that wouldn't go away,

19   vaginal shortening, tension banding, those types of

20   things, they should have talked about it if they knew

21   those were risks.  They should have let doctors know

22   that so they could share that with patients.

23             MS. KABBASH:  Objection.

24             THE WITNESS:  I'm saying that I feel

Nicole B. Fleischmann, M.D.

```
1              they did discuss those risks with us by saying

2              don't make the mesh too tight, this can cause

3              contraction.  All these things we were aware of

4              when we started using these products.  It's not

5              like I wasn't aware of them.

6                   MR. SLATER:  Move to strike.

7    BY MR. SLATER:

8         Q.    Is the answer to my question, yes, that

9    they should have warned about that if they knew it?

10                  MS. KABBASH:  Objection.

11                  THE WITNESS:  Yes, and I'm glad they

12            did.

13                  MR. SLATER:  Move to strike from "and".

14   BY MR. SLATER:

15        Q.    Look at Page 52.  Put your glasses back

16   on.

17        A.    I know, I thought we were done.

18        Q.    I'm going to make 30 minutes feel like

19   30 years.

20                  Halfway down Page 52 you actually talk

21   about the study of the Prolift+M®, right?

22        A.    Yes.

23        Q.    And at 3 years follow up, anatomical

24   success, meaning just measuring the location of the
```

Nicole B. Fleischmann, M.D.

```
1    organs, was about 75, 76%, right?

2           A.      Yes.

3           Q.      And mesh exposure rate was 14.8%, right?

4           A.      Yeah, it's interesting, I have different

5    numbers here, but that's correct in this report.  Oh,

6    this is the three-year, I apologize.

7           Q.      One year was 10%?

8           A.      Right, right.

9           Q.      So just to be clear, at one year from

10   the Prolift+M® study, the exposure rate was 10%, and at

11   three years it was up to 14.8%, right?

12          A.      Yes.

13          Q.      Do you know if when they calculated

14   14.8%, they included exposures that occurred and were

15   counted in the earlier years and that may have been

16   treated.  Do you know if they included all -- on a

17   cumulative basis all exposures -- let me ask the

18   question clean.

19                  When they counted the 14.8%, did they

20   count those on a cumulative basis, meaning every

21   exposure that occurred during those three years?

22          A.      I don't believe those were new

23   exposures, 14.8%, I believe those included the 10%.

24          Q.      It should have included all the
```

Nicole B. Fleischmann, M.D.

1    exposures that occurred over the three years?

2            A.     Yes.

3            Q.     That's the proper way to count, right?

4            A.     Right.

5            Q.     On Page 55 you start listing Medical

6    Society statements, and on Page 57, if you go through

7    that, you say, "I strongly agree with these

8    statements."

9                   So you strongly agree with those things

10   you cited in those three pages?

11           A.     Yes.

12           Q.     Let's look at Page 55 and 56.  We have

13   the ACOG, AUGS joint recommendations, right?

14           A.     Right.

15           Q.     And the second bullet point at the top

16   of Page 56 says, "Pelvic organ prolapse vaginal mesh

17   repair should be reserved for high risk individuals,"

18   that's one of the statements, right?

19           A.     Right.

20           Q.     And that would mean somebody that's

21   likely already failed a primary repair, has risk

22   factors for failing future repairs, correct?

23           A.     I also think it's somebody with a high

24   grade prolapse.

Nicole B. Fleischmann, M.D.

1          Q.     I was going to get to that.

2          A.     Okay.

3          Q.     Somebody with a clear stage 3 or stage

4    4, correct?

5          A.     Correct.

6          Q.     And that's, from your perspective, the

7    proper criteria for the use of the Prolift® and

8    Prolift+M®, correct?

9          A.     Yes.

10         Q.     Also for Gynemesh® PS?

11         A.     Yes.

12         Q.     The fourth bullet point, "Compared with

13   existing mesh products and devices, new products should

14   not be assumed to have equal or improved safety and

15   efficacy unless clinical long-term data are available,"

16   and you agree with that, right?

17         A.     Yes.

18         Q.     And that would apply to the Prolift®

19   when it first went on to the market, right?

20         A.     Well, we didn't have long-term data on

21   Prolift® then.

22         Q.     So that principle which you applied to

23   was not adhered to with the Prolift®, right?

24                MS. KABBASH:  Objection.

Nicole B. Fleischmann, M.D.

```
 1            THE WITNESS:  Well, the ACOG statement
 2        was written after Prolift® already had some
 3        long-term data on it, so they're just saying
 4        that newer products need to be better
 5        evaluated.
 6  BY MR. SLATER:
 7        Q.    This principle, as far as you're
 8  concerned, would apply to the Prolift® when it first
 9  went on the market in 2005.  They just didn't have
10  long-term studies at that time, right?
11        A.    No, we had TVM study then.
12              MS. KABBASH:  Objection.
13  BY MR. SLATER:
14        Q.    That wasn't the Prolift®, right?
15        A.    No, but I mean with the exception of the
16  placement of the product, it was the same.
17        Q.    Do you know that -- do you know what the
18  endpoints were for the TVM study, the endpoints on the
19  proposal for the study?  Did you ever read the proposal
20  for the TVM study?
21        A.    You mean what they were looking at, what
22  they were -- safety, efficacy?
23        Q.    What they were studying, do you know
24  what the primary endpoint was for the TVM study?
```

Nicole B. Fleischmann, M.D.

1          A.     No.  What do you mean "the primary

2    endpoint"?

3          Q.     Do you know what a proposal is for a

4    clinical study?

5          A.     Yes.

6          Q.     Did you ever read it?

7          A.     I read the TVM study.  I don't know if I

8    read the proposal for it.

9          Q.     Do you know what the endpoints were for

10   the TVM study?

11         A.     I'm not sure what you mean.  We're

12   looking at safety and efficacy of the product.

13         Q.     But do you know specifically what the

14   endpoints were in terms of what they were measuring,

15   what they were looking to prove?

16         A.     They were looking to prove recurrence

17   rates.

18         Q.     Do you know what the endpoint was with

19   the confidence intervals applied that they deemed

20   success or failure of a study?

21         A.     I've been told.

22         Q.     What have you been told?

23         A.     They were looking for a 20% or under

24   recurrence rate.

Nicole B. Fleischmann, M.D.

1      Q.      Are you aware that the French TVM study

2  failed that endpoint?

3      A.      I'm aware that it was unclear whether it

4  failed that endpoint.  There was good data to say that

5  the recurrence rates were less, but at the highest

6  point the recurrence rate was over that 20% mark.

7      Q.      Do you know who Scott Ciarocca is?

8      A.      He was the R&D guy at the time.

9      Q.      Bingo.  Do you know what he said in

10  sworn testimony about whether the endpoints -- the

11  primary endpoint of the 20% recurrence rate was met or

12  not?

13      A.      I haven't read his testimony.

14      Q.      Have you ever looked at the internal

15  documents regarding whether the endpoint was met?

16      A.      I've been made aware of this issue.

17      Q.      The reason I'm asking is because you

18  said there was some sort of lack of clarity or

19  something or it was unclear so I'm trying to figure out

20  why you would say that when I questioned Mr. Ciarocca

21  multiple times and he has admitted to me in sworn

22  testimony it didn't meet the primary endpoint?

23          MS. KABBASH:  I'm going to object.

24  BY MR. SLATER:

Nicole B. Fleischmann, M.D.

1          Q.      So I'm curious you haven't seen that

2    testimony.

3                  MS. KABBASH:  I'm going to object.  The

4          testimony is not before the witness.

5                  Go ahead, you can answer.

6                  MR. SLATER:  That's my point.

7                  MS. KABBASH:  That's my point.

8                  THE WITNESS:  I can't speak to his

9          testimony.  I can just tell you that after

10         reviewing some information about that, that I

11         felt that when Ethicon made the decision to go

12         forward, they felt that it was close enough and

13         that there was enough benefit from the product

14         to go forward with it.

15   BY MR. SLATER:

16         Q.      Is there some document you can point to

17   where someone actually said even though we failed this

18   endpoint, we're still going to go forward because we

19   got close enough?

20         A.      No, I can't point to that document.

21         Q.      I'm going to tell you I've spent years

22   on this, I've never seen such a document.

23                 Have you seen some witness who said

24   that?

Nicole B. Fleischmann, M.D.

```
1              A.      Well, I did read Dr. Owens' testimony.

2              Q.      And you think she said that?

3              A.      I think she felt there was enough

4    benefit from the TVM study to go forward, yes.

5              Q.      So you think it was her decision that

6    even though they failed the primary endpoint that they

7    should go forward anyway?

8                      MS. KABBASH:   Objection,

9              mischaracterizes.

10                     THE WITNESS:   I think when they looked

11             at the confidence intervals they found it was

12             an outlier that kept them from going forward,

13             and they decided to look at the main data from

14             that study.

15   BY MR. SLATER:

16             Q.      An outlier you mean an outlier patient?

17             A.      That there was -- yes, that there was --

18   there was an outlier result.

19             Q.      Okay.  What are you relying on for that?

20   I've never seen that.  I'm curious.  Can you point me

21   to somewhere on your reliance list what document that

22   was?

23             A.      I'm talking Owens' testimony.

24             Q.      She said there was an outlier patient
```

Nicole B. Fleischmann, M.D.

1    and that was the reason why they decided to go forward,

2    even though they failed the primary endpoint?

3         A.    Not an outlier patient but had to do

4    with the confidence intervals of the study, that they

5    weren't tight enough.  I'm telling you what I remember

6    from reading from the testimony, but from wherever it

7    was, the decision was made there was enough benefit

8    from the product to go forward.

9         Q.    We fell into the rabbit hole talking

10   about long-term studies.  You will agree with me the

11   TVM study was not the Prolift®, right?

12        A.    Right.

13        Q.    And you agree with me it failed the

14   primary endpoint if you look at the data?  If you look

15   at the actual data, it failed the primary endpoint,

16   correct?

17             MS. KABBASH:  Objection to form.

18             THE WITNESS:  I remember it was slightly

19        off.

20   BY MR. SLATER:

21        Q.    It failed the primary endpoint.  The

22   recurrence rate was over 20% when they applied the

23   statistical model, correct?

24        A.    I believe it was off, yes.

Nicole B. Fleischmann, M.D.

1          Q.     And it then climbed in the following

2    years; you know that, right?  The recurrence rates went

3    up and the erosion rates went up as well; you know

4    that, right?

5               MS. KABBASH:  Objection.

6    BY MR. SLATER:

7          Q.     When they continued to follow the

8    patients, do you know that?

9          A.     The five-year data?

10         Q.     I'm not talking five years.  I'm saying

11   let's go from one year to two years to three years to

12   four years to five years, whatever, the rates continue

13   to go up.

14         A.     You have to show me the study.

15         Q.     Do you know?

16         A.     No, I don't know offhand.

17         Q.     The last bullet point halfway down Page

18   56 says, "Patients should provide their informed

19   consent after reviewing the risks and benefits of the

20   procedure as well as discussing alternative repairs."

21              That you absolutely agree with, right?

22         A.     Yes.

23         Q.     And that comes back to what we discussed

24   earlier, the decision of whether or not to have the

Nicole B. Fleischmann, M.D.

1    operation is the patient's, correct?

2           A.     Right, with the doctor explaining to

3    them what the risks are.

4           Q.     The doctor explains the risks, the

5    benefits, the alternatives, the doctor will likely

6    provide recommendations, but, ultimately, the patient,

7    in her own judgment, based on her own assessment of

8    that information, decides what to do with her own body,

9    correct?

10          A.     Yes, but more likely than not the

11   patient will ask the doctor what they think should be

12   done, and the doctor will have to make a

13   recommendation.

14                 MR. SLATER:  Move to strike from "but"

15          forward.

16   BY MR. SLATER:

17          Q.     A doctor should never be coercive,

18   right, in making a recommendation, right?  Meaning if

19   the patient is asking for recommendations, the doctor

20   can give them but shouldn't actually be coercive?

21          A.     Well, if you mean coercive, the doctor

22   should push the patient to do what is best for the

23   patient, then, yes, the doctor should be coercive.

24          Q.     In making a recommendation?

Nicole B. Fleischmann, M.D.

1        A.      Well, the doctor knows better than the

2    patient about these procedures and their outcomes.  So

3    if a doctor thinks that a specific procedure is very

4    good for a patient, then the patient will often defer

5    to the doctor on what that -- what that procedure is.

6        Q.      If the doctor consenting a patient for

7    Gynemesh® PS, for the Prolift® or Prolift+M® was not

8    given the information that Ethicon knew about the

9    risks, such that some severe risks were not disclosed

10   to the doctor, then the doctor -- and the doctor didn't

11   give that to the patient, the patient was not put in

12   the position to give fully informed consent, right?

13              MS. KABBASH:  Objection.

14              THE WITNESS:  If that was the case, but

15         I'm not saying that was the case.

16              MR. SLATER:  Move to strike from "but"

17         forward. I just want you to know I don't like

18         saying move to strike.

19              MS. KABBASH:  I know you used to

20         complain at the very beginning of the

21         litigation it was not New Jersey practice, then

22         you got very good at it.

23              MR. SLATER:  No, it is New Jersey

24         practice, that is my view, you have to do it.

Nicole B. Fleischmann, M.D.

```
 1    BY MR. SLATER:

 2         Q.    You agree that roping and curling of the

 3    arms of Prolift® occurs, right?

 4         A.    I don't know.

 5         Q.    No opinion on that?

 6         A.    Of the arms?

 7         Q.    Yes.

 8         A.    I have no way of knowing that.

 9         Q.    Have you watched the surgical videos

10    that Ethicon created and used as part of their

11    professional education?

12         A.    Way back when I did.

13         Q.    Did you ever see evidence of roping or

14    curling in any of those videos?

15         A.    Roping or curling of the arms, the arms

16    sit inside the patient.  Unless we're cutting the

17    patients open, we can't see roping and curling of arms.

18         Q.    Do you know what the medical affairs

19    director at Ethicon thinks about whether or not -- I'll

20    ask you, David Robinson, do you know what he thinks

21    about whether the arms are roped or curled inside the

22    body?

23         A.    No, I don't know what Dave Robinson

24    thinks.
```

Nicole B. Fleischmann, M.D.

1          Q.      He was a very experienced Prolift® user,

2    he was part of the TVM study, right?

3          A.      I suppose he was.

4          Q.      Do you know what Charlotte Owens'

5    background was?  You read her deposition before she

6    became medical director.  Did you see what her

7    background was?

8          A.      Gynecologist.

9          Q.      Pretty much a general gynecologist,

10   right?

11         A.      Yes.

12         Q.      Were you surprised that somebody like

13   that with only four years of general gynecology

14   experience was put in the position of worldwide

15   director for Ethicon to make decisions should we warn

16   about the Prolift®?

17              MS. KABBASH:  Objection, beyond the

18         scope.

19              MR. SLATER:  It's not beyond the scope.

20         She is giving opinions about Ethicon's

21         negligence claims in these cases.

22   BY MR. SLATER:

23         Q.      What do you think about that?

24         A.      I was not in a position at that point to

Nicole B. Fleischmann, M.D.

1    judge whether somebody was or was not appropriate for

2    that job.

3            Q.    As you sit here right now, you read her

4    deposition recently, wasn't in time to get on your

5    reliance list, but you read it.  Somebody with that

6    level of experience, you would agree, you would hope

7    that Ethicon would have had somebody far more

8    experienced in that position when they're going to

9    market with something like the Prolift® and they need

10   to have somebody overseeing clinical studies, design

11   control, all these different things that were going on,

12   right?

13           MS. KABBASH:  Objection, beyond the

14       scope.

15           THE WITNESS:  I'm sure she was more than

16       qualified to make those decisions.

17   BY MR. SLATER:

18           Q.    Really?

19           A.    I'm sure.

20           Q.    Why?

21           A.    Because they hired her.

22           Q.    So de facto because Ethicon hired her,

23   she must have been qualified for the job?

24           A.    I'm sure there were many others looked

Nicole B. Fleischmann, M.D.

1  at and she was picked, and I was not privy to that

2  information, so I really can't answer that.

3          Q.     All the things I'm sure of, you actually

4  don't know those things?

5          A.     How could I?

6          Q.     I want to -- I can make it clearer for

7  the record.

8                 You don't have any idea how they decided

9  to hire her, right?

10          A.     Of course not.

11          Q.     But they did hire her four years out of

12  her residency in general gynecology, admitted she

13  didn't even have a deep understanding of the use of

14  mesh at all, right?

15                 MS. KABBASH:  Objection.

16  BY MR. SLATER:

17          Q.     Correct?

18                 MS. KABBASH:  Beyond the scope.

19  BY MR. SLATER:

20          Q.     It's what she admitted, right?

21          A.     I don't think that she was a pelvic

22  floor surgeon at that time, but she did claim that she

23  had used mesh products and that she was introduced to

24  those products in her residency.

Nicole B. Fleischmann, M.D.

```
 1          Q.     She actually also testified when mesh

 2   was used, she would watch someone else use it and she

 3   wouldn't use it in the operations, right?

 4          A.     She did work with somebody else when she

 5   had to do a mesh procedure.

 6          Q.     You would agree with me that Ethicon

 7   needed to have a fully qualified pelvic floor surgeon

 8   with extensive knowledge of mesh in that position to be

 9   a responsible medical device manufacturer going to

10   market with something like the Prolift®, wouldn't you?

11                 MS. KABBASH:  Objection, beyond the

12          scope.  Dr. Fleischmann is not opining on

13          Ethicon personnel procedures and policies.

14          Beyond the scope.

15   BY MR. SLATER:

16          Q.     You can answer.  We disagree?

17          A.     Look, I think that if they felt she was

18   a qualified person and she surrounded herself with

19   people that she had felt could help her make those

20   decisions, then I think it's just like Donald Trump.

21          Q.     I'm not even going to move to strike

22   that one.

23                 MS. KABBASH:  I might move to strike

24          that one.
```

Nicole B. Fleischmann, M.D.

1    BY MR. SLATER:

2          Q.    Was it your understanding that Charlotte

3    Owens surrounded herself with people and they worked

4    well as a team together; was that your understanding?

5          A.    I understand there is a team involved

6    for everything that happens.

7          Q.    Do you know about the disputes and

8    issues she had with her co-workers?

9          A.    I do not.

10         Q.    Every time you throw one of these I

11   assume things, you realize you open the door to all

12   this other mishegoss that comes out.

13               On Page 58, the first full paragraph you

14   say, "Nor does the medical literature provide evidence

15   that the use of Gynemesh® PS results in excessive

16   contraction of tissues causing complications to the

17   patient in the absence of overtensioning or failure to

18   ensure that the mesh is lying flat."

19               That's what you wrote, right?

20         A.    Yes.

21         Q.    And you were referring specifically to

22   the medical literature regarding Gynemesh® PS, right?

23   That's what you say here right, the literature?

24         A.    Yeah, I'm just trying to look at where

Nicole B. Fleischmann, M.D.

1    you are.  Okay.

2           Q.    You are referring to the medical

3    literature regarding Gynemesh® PS, right?

4           A.    Yes.

5           Q.    And then you cite Dietz, which is an

6    article about the Perigee, which is a different

7    product, right?

8           A.    Yes.

9           Q.    You don't cite Velemir, which is

10   actually a study of the Prolift® with regard to

11   contraction of Prolift®?

12          A.    I did not cite that one.

13          Q.    You say towards the bottom of this

14   paragraph, "If mesh contraction exists, it is unlikely

15   to be a progressive phenomenon and is probably limited

16   to the period of physiological wound healing."

17                You cite Dietz again for that, right?

18                MS. KABBASH:  Just to be clear, that's a

19        quote from Dietz.  That's not her language.

20   BY MR. SLATER:

21          Q.    I understand you are citing Dietz for

22   that, right?

23          A.    Yes.

24          Q.    Do you know if Dietz was being paid by

Nicole B. Fleischmann, M.D.

1    AMS when he published that article?

2              A.     He may have been.

3              Q.     Little bit of an issue, huh?  You're

4    sitting talking about how great something is and you're

5    being paid by the company?

6                     MS. KABBASH:  Objection, harassing.

7                     THE WITNESS:  Only if you think the

8              person changed their data because of being paid

9              by.

10   BY MR. SLATER:

11             Q.     Did you ever see any of Dietz's other

12   studies where he found there is contraction of mesh on

13   ultrasound?  Did you ever see those?

14             A.     No.

15             Q.     You should look and see.

16                    MS. KABBASH:  Do you have them for her

17             because I've been asking for that all day?  Do

18             you have that?

19                    MR. SLATER:  I don't have anything.

20             I've got what you got, I have Post-it notes.

21                    MS. KABBASH:  My standing objection

22             continues.

23                    MR. SLATER:  Who is giving documents?

24             That doesn't work for me.  I am a solo guy on a

Nicole B. Fleischmann, M.D.

1        horse.

2                MS. KABBASH:  James will be very happy

3        to hear.

4                MR. SLATER:  He will be very happy to

5        know he wasn't helping me with this, believe

6        me.

7   BY MR. SLATER:

8        Q.    Do you actually -- when you say that --

9   rephrase.

10               You cited Dietz.  Were you saying that

11  this description of what he says with regard to the

12  Perigee, which is a different mesh and different

13  product, were you trying to say this would apply to the

14  Gynemesh® PS?

15       A.    I'm talking about mesh in general, yeah.

16       Q.    So when we go back through it, you

17  actually can't say that those quotes throughout your

18  report from Dietz actually specifically apply to the

19  Prolift® or Gynemesh® PS, right?

20               MS. KABBASH:  Objection.

21               THE WITNESS:  I think there is a paucity

22        of literature, good literature on mesh

23        contraction in general, so we have what we

24        have.

Nicole B. Fleischmann, M.D.

```
1   BY MR. SLATER:

2         Q.    What is the periodic -- rephrase.

3               What is the period of physiologic wound

4   healing?

5         A.    Well, it has to do with, you know, the

6   four stages of wound healing and mesh incorporation.

7         Q.    What is the period of physiological

8   wound healing; how long is that?  Trying to get an

9   idea, you cited this.

10        A.    I have to go back to the graft, probably

11  about three to four months.

12        Q.    So it's your assumption that contraction

13  stops happening after three to four months, or you're

14  just saying that's what Dietz said?

15        A.    That's what Dietz said.

16        Q.    Do you have an opinion one way or the

17  other on that?

18        A.    I think that the healing happens, and

19  that's when we see the mesh incorporation and what it's

20  going to be, about three or four months.

21        Q.    Do you know whether -- rephrase.

22              Do you have an opinion as to whether

23  contraction of the mesh, Gynemesh® PS, the Prolift®,

24  Prolift+M®, whether that continues after three or four
```

Nicole B. Fleischmann, M.D.

1    months, do you have an opinion on that?

2          A.    I think it may, but I don't know that

3    it's symptomatic.

4          Q.    It may be, it may not be; you don't

5    know?

6                MS. KABBASH:  Objection.

7                THE WITNESS:  I think more likely than

8        not, it's not symptomatic.

9    BY MR. SLATER:

10         Q.    Why do you say that?

11         A.    Because we have large meta-analysis of

12   data that do not talk about mesh contraction or do not

13   talk about what you so call the effects of mesh

14   contraction are.

15         Q.    Do you know in those studies whether

16   they were looking for mesh contraction?

17         A.    No, but they're looking at other things

18   like dyspareunia and recurrence and all the things you

19   feel would be a clinical result from mesh contraction,

20   and I don't think they exist in high levels.

21               MR. SLATER:  Move to strike after "no."

22   BY MR. SLATER:

23         Q.    One of the clinical manifestations of

24   mesh contraction would include vaginal or pelvic pain,

Nicole B. Fleischmann, M.D.

```
 1    right?
 2           A.      If you believe that.  I don't know that
 3    that's the case.  I think that mesh contraction can
 4    exist without any pelvic pain or dyspareunia, and I
 5    think there are studies that show that.
 6           Q.      Do you have an opinion, yes or no, that
 7    mesh contraction can cause pelvic pain and vaginal
 8    pain?
 9           A.      I think it can when mesh is
10    overtightened.
11           Q.      Okay.  Do you have an opinion as to
12    whether contraction of mesh -- I'm talking about
13    Gynemesh® PS, the Prolift® and the Prolift+M® here, I
14    don't want to talk about the rest of the world, so my
15    question is do you have an opinion as to whether
16    contraction of Gynemesh® PS, Prolift® or Prolift+M® can
17    cause dyspareunia?
18           A.      I think it can, yeah, in certain cases.
19           Q.      Do you agree that contraction of
20    Prolift®, Gynemesh® PS or Prolift+M® can cause
21    recurrence?
22           A.      It could.
23           Q.      At the bottom of Page 59 you make a
24    statement.  You talk about your vast review of the
```

Nicole B. Fleischmann, M.D.

```
 1   medical literature.

 2                   Did you do a vast review of the medical

 3   literature?

 4         A.      I really tried to.

 5         Q.      We have pointed out some articles that

 6   you didn't have in your reliance list during the course

 7   of this deposition.

 8         A.      Yes.

 9         Q.      And we pointed out other articles that

10   you don't cite or discuss in your report, correct?

11         A.      There are articles that I have not

12   reviewed, but that doesn't mean I haven't done a vast

13   review of the medical literature.

14                   MR. SLATER:  Move to strike from "but"

15         forward.

16   BY MR. SLATER:

17         Q.      Alternatives to the use of the Prolift®

18   would include Gynemesh® PS, right?  You can just cut

19   the mesh and use it as you deem fit in the patient,

20   right?

21         A.      Yes.

22         Q.      An alternative to the Prolift® could

23   include native tissue repair, right?

24         A.      Yes.
```

Nicole B. Fleischmann, M.D.

1          Q.      An alternative to the Prolift® could

2     include other -- rephrase.

3                  One of the alternatives to the Prolift®

4     would have been other mesh kits that didn't have arms;

5     that was another option, right?

6          A.      Right.

7          Q.      One of the alternatives to the Prolift®

8     was to use Ultrapro in the Prolift® which ultimately

9     was marketed as Prolift+M®, correct?

10         A.      Right, if that was available at the

11    time.

12                 MR. SLATER:  Move to strike after

13         "right."

14    BY MR. SLATER:

15         Q.      One of the alternatives to the use of

16    Gynemesh® PS would be suture repair, correct?

17         A.      It's an alternative, yes.

18         Q.      One of the alternatives to Gynemesh® PS

19    would be to take Ultrapro mesh and cut it, flat sheets

20    of Ultrapro, right?

21         A.      Yeah, but I don't think that Ultrapro

22    was approved in the vagina as a flat sheet of mesh

23    ever.

24         Q.      You could do it off-label?

Nicole B. Fleischmann, M.D.

1          A.      You could.

2          Q.      Initially, Gynemesh® PS was used -- let

3    me ask the question differently.

4                  Initially, before Gynemesh® PS was

5    marketed, doctors would cut Prolene Soft mesh and use

6    it to treat vaginal prolapse, correct, off-label?

7          A.      I suppose they did, but I didn't do

8    that.

9                  MR. SLATER:  Move to strike from "but"

10         forward.

11   BY MR. SLATER:

12         Q.      Have you ever written warnings for a

13   medical device?

14         A.      No.

15         Q.      Have you ever, other than your work as

16   an expert here, studied any sources of standards for

17   warnings for medical device?

18         A.      I have looked at some of the standards.

19         Q.      As part of your work as an expert?

20         A.      As part of my work as an expert.

21         Q.      You cited the blue book memo from the

22   FDA and Ethicon standard operating procedure?

23         A.      Yes, I've looked at those.

24         Q.      That standard operating procedure is

Nicole B. Fleischmann, M.D.

1  your understanding that's the standard that Ethicon now

2  applies?

3          A.      Yes.

4          Q.      Is it your understanding that's

5  consistent with their prior standards?

6          A.      Yes.

7          Q.      What's your basis for that

8  understanding?

9          A.      I only looked at the standard operating

10  agreement, and I can't tell you about whether it's

11  changed or not over the years.

12               MR. SLATER:  I'm going to stop and save

13          my last four minutes for follow-up on Maha's

14          blistering direct, cross, whatever you want to

15          call it.

16  BY MS. KABBASH:

17          Q.      Dr. Fleischmann, I'm going to ask you

18  some follow-up questions on the questions that you were

19  asked earlier today.

20               You were asked about whether your

21  opinions are contained in your report.

22               Are your opinions also contained in the

23  testimony that you've provided at your deposition

24  today?

Nicole B. Fleischmann, M.D.

```
 1                    MR. SLATER:  Objection.

 2                    THE WITNESS:  Yes.

 3    BY MS. KABBASH:

 4           Q.     You were asked some questions earlier

 5    today about a modified procedure to the Prolift®

 6    anterior that you employed.

 7                    Do you recall that?

 8           A.     Yes.

 9           Q.     Okay.  And you testified that at some

10    point in time after you started using Prolift®, you

11    would take the straps of a Prolift® posterior and

12    attach them to the anterior portion.

13                    Do you recall that?

14           A.     Yes.

15           Q.     At some point in time did you start

16    employing the Prolift® total device in a manner

17    consistent with the IFU?

18                    MR. SLATER:  Objection.

19                    THE WITNESS:  Yes, I did do that.

20    BY MS. KABBASH:

21           Q.     And why did you do that?

22           A.     Because I was getting some apical

23    recurrences in uterine prolapse in the modified

24    technique I was using, so I then began to do the total
```

Nicole B. Fleischmann, M.D.

1    technique and had much better outcomes.

2           Q.    And was the total technique that you

3    employed consistent with the IFU as those instructions

4    were set forth by Ethicon?

5           A.    Yes.

6                 MR. SLATER:  Objection.

7    BY MS. KABBASH:

8           Q.    Ultimately, did you find that the

9    Prolift® total method -- strike that.

10                Ultimately, did you find that your use

11   of the Prolift® total improved your patients'

12   experiences with their prolapse repair?

13                MR. SLATER:  Objection.

14                THE WITNESS:  I had less recurrences of

15          the apicals, so, yes, I would say they did.

16   BY MS. KABBASH:

17          Q.    And in your use of the Prolift® total,

18   did you implant mesh into the posterior vaginal wall of

19   the vagina?

20          A.    I did.

21          Q.    If you can pull out the Exhibit 8, which

22   was your letter to Scott Jones, do you have that there

23   among the exhibits?

24          A.    Yes, I have it.

Nicole B. Fleischmann, M.D.

1          Q.     Mr. Slater asked you about some language

2     at the end of this letter where you indicated -- and

3     this letter is dated November 2009; is that correct?

4          A.     Yes.

5          Q.     And you went on to use Prolift® for --

6     and Prolift+M®, I should say, for three years after

7     when this letter was written; is that right?

8          A.     Correct.

9          Q.     And the last two lines of this letter

10    say, "Remember not many pelvic surgeons like putting

11    mesh over the rectum when the main problem is

12    cystocele.  It just doesn't make sense."

13               Do you see you wrote that at that time?

14         A.     Yes.

15         Q.     Did you later come to find that it did

16    make sense to, in appropriate patients, implant mesh on

17    the posterior vaginal wall?

18               MR. SLATER:  Objection.

19               THE WITNESS:  Yes, I found that it was

20          more beneficial in cases even when there was

21          cystocele and mild uterine prolapse to support

22          the uterus with a posterior side.

23    BY MS. KABBASH:

24         Q.     And why was that?  Why did you find that

Nicole B. Fleischmann, M.D.

1    that was useful?

2           A.    Because I just wasn't getting -- I

3    was -- one of the main differences between doing the

4    Prolift® and what I was doing before when I was cutting

5    my own PS, I was doing hysterectomies on everybody.

6    With Prolift® I was really trying to do uterine sparing

7    surgery, which I thought benefited women.

8                Now by leaving the uterus it needed

9    better support than just the anterior portion would

10   give us, so by supporting the back wall of the uterus,

11   I was getting better uterine support, and you have to

12   remember, I'm operating on patients who all have very

13   severe prolapse, either stage 3 or stage 4.  So almost

14   everybody has a little element of uterine prolapse if

15   they have a uterus.

16          Q.    And after -- I think I just asked you,

17   after you wrote this letter, you continued to use

18   Prolift+M®; is that right?

19          A.    I did.

20          Q.    Did you use the Prolift+M® until that

21   product was discontinued?

22          A.    I did up until the day.

23          Q.    Okay.  Did you see a difference in your

24   patient outcomes between the -- your use of the regular

Nicole B. Fleischmann, M.D.

1    Prolift® device and the Prolift+M® in your patients?

2           A.    I didn't have a difference in my --

3    well, with the exception that I was then doing the

4    total Prolift®, I would say that my outcomes were

5    better, but I didn't attribute that to the mesh, I

6    attributed it to the fact I was putting mesh on the

7    back side, which I could have done with Prolift® too, I

8    just never really got there with that device.  So I did

9    see better outcomes from that point.

10          The only outcome that I felt was a

11   little bit better is that there was less palpation or I

12   would call it a mesh appreciation behind the vaginal

13   wall with M, but in terms of patient's happiness, with

14   the exception I had better outcomes with recurrences,

15   no, it was the same.

16          Q.    Did you see any difference in patient

17   outcomes with respect to complications, complication

18   rates between the Prolift+M® mesh and the Prolift®

19   mesh?

20          A.    No, but my exposure rate was lower, but

21   I also attributed it to the fact by the time 2011, 2012

22   came around, I was getting very good at that repair.

23   So I really was shocked when someone came in with an

24   exposure, unlike in previous years, where I sort of

Nicole B. Fleischmann, M.D.

1  expected a certain amount of my patients to have an

2  exposure.  At that point exposures were always a little

3  bit shocking.

4          Q.      You were asked questions earlier today

5  by Mr. Slater about whether you had seen a

6  PowerPoint -- or strike that -- whether you had seen a

7  presentation of data from TVM surgeons where a 19.6%

8  symptomatic contraction rate was reported.

9                  Do you recall being asked about that?

10         A.      Yes.

11         Q.      In your report, in your preparation of

12  your report, have you relied on large meta-analyses

13  that have studied the use of transvaginal mesh to treat

14  prolapse?

15                 MR. SLATER:  Objection.

16                 THE WITNESS:  I have.  I looked at many

17          of those meta-analyses.

18  BY MS. KABBASH:

19         Q.      Have you also reviewed and relied on

20  several randomized, controlled trials that specifically

21  analyzed Prolift®?

22         A.      Yes.

23         Q.      And in those studies did you see any

24  evidence or anything similar to a 19.6% rate of

Nicole B. Fleischmann, M.D.

1    symptomatic contraction?

2           A.     No, because that would imply to me like

3    that level of dyspareunia or something like that,

4    symptomatic contraction, and I did not see that.

5           Q.     You were asked earlier today if you were

6    a materials expert.

7                  Do you recall that?

8           A.     Yes.

9           Q.     If you could turn to your opinions at

10   the end of your report, Page 65 specifically, do you

11   have that in front of you?

12          A.     Yes.

13          Q.     If you look at Opinion Number 3, I'll

14   read that into the record, it says, "The Gynemesh® PS

15   used in Prolift® and the Ultrapro mesh used in

16   Prolift+M® are appropriate, effective and safe

17   materials for use in this indication.  Polypropylene

18   mesh and sutures have been used as implant for decades.

19   Based on my review of the peer-reviewed medical

20   literature and my surgical experience implanting these

21   devices and treating patients who have had them

22   implanted, the pore sizes of these meshes are

23   appropriate."

24                 Do you see that?

Nicole B. Fleischmann, M.D.

```
 1              A.      Yes.

 2              Q.      With respect to the first sentence that

 3     these meshes are appropriate, effective and safe

 4     materials for use in this indication, do you continue

 5     to hold that opinion?

 6                      MR. SLATER:  Objection.

 7                      THE WITNESS:  I hold the opinion that I

 8              am a materials expert when it comes to these

 9              particular materials, because I've used them

10              for so long and in so many patients, but I

11              wouldn't say that I am a broad spectrum

12              materials expert, or that is my career.

13     BY MS. KABBASH:

14              Q.      And your opinion that you just stated,

15     is that also based on your review of the medical

16     literature that is set forth in this report and on your

17     reliance list?

18                      MR. SLATER:  Objection.

19                      THE WITNESS:  Exactly.

20     BY MS. KABBASH:

21              Q.      You were asked lots of questions today

22     about the specific findings of various clinical

23     studies.

24                      Do you recall that?
```

Nicole B. Fleischmann, M.D.

```
 1          A.      Yes.

 2          Q.      Have any copies of any clinical studies

 3    been put before you today?

 4          A.      No, they haven't.

 5          Q.      Would it have been helpful to you to

 6    have those articles in front of you so that you could

 7    actually confirm the findings of those studies as they

 8    were represented to you?

 9                  MR. SLATER:  Objection.

10                  THE WITNESS:  Yes, it would have been

11          helpful.

12    BY MS. KABBASH:

13          Q.      You were asked questions earlier today

14    about whether you had participated in the drafting of

15    warnings for medical devices.

16                  Do you recall that?

17          A.      Yes.

18          Q.      On Page 66 of your report, I'll read

19    into the record the first part of Opinion Number 8, it

20    says, "The Instructions for Use, professional education

21    materials, and patient brochures accurately reflect the

22    risks of these products as they are reported in the

23    medical literature and are consistent with my training

24    and extensive surgical experience."
```

Nicole B. Fleischmann, M.D.

1              Do you see that?

2        A.    Yes.

3        Q.    Does that continue to be your opinion?

4        A.    My opinion is for the purpose of these

5   products that I do have -- I am an expert in the area

6   of being able to define whether these risks -- the

7   risks associated with the device were accurately

8   reflected.

9        Q.    And is that -- are those opinions based

10  on your review of the medical literature?

11       A.    Yes, they are.

12             MR. SLATER:  Objection.

13  BY MS. KABBASH:

14       Q.    As a matter of fact, if you look on Page

15  61 to 62 of your report, there are five numbered

16  paragraphs there.

17             Do you see that?

18       A.    Yes.

19       Q.    In those five numbered paragraphs, do

20  you set forth precisely what the basis of your opinions

21  are with respect to the warnings for Prolift®,

22  Prolift+M® and Gynemesh® PS?

23             MR. SLATER:  Objection.

24             THE WITNESS:  Yes, I do.

Nicole B. Fleischmann, M.D.

```
 1   BY MS. KABBASH:

 2        Q.     And has there been any discussion today

 3   at this deposition which changes that body of

 4   information as you've set it forth on those two pages

 5   of your report?

 6                    MR. SLATER:  Objection.

 7                    THE WITNESS:  No, there's been nothing

 8        that's been discussed that would change that.

 9   BY MS. KABBASH:

10        Q.     You were asked earlier today about

11   whether it's possible that women who have had a

12   Prolift® or Prolift+M® mesh would have to go to the

13   operating room for revision of mesh exposure more than

14   once.

15                    Do you recall that?

16        A.     Yes.

17        Q.     In your review of the meta-analyses that

18   have looked at the transvaginal use of mesh to treat

19   prolapse and the RCT specifically regarding Prolift®,

20   have those items of literature reflected a large

21   proportion of women who have had to go back for more

22   than one revision surgery to treat a mesh exposure?

23                    MR. SLATER:  Objection.

24                    THE WITNESS:  No, they don't.
```

Nicole B. Fleischmann, M.D.

1   BY MS. KABBASH:

2          Q.      And on Page 66 of your report, Opinion

3   Number 7 is "Contraction is described in the literature

4   but cannot be differentiated from the concept of

5   over-tensioning which is clearly warned about in the

6   product IFUs and the Prolift® Surgeon's Resource

7   Monograph which specifically state that the mesh should

8   lay in loosely."

9                  Do you see that?

10         A.      Yes.

11         Q.      Does that remain your opinion to this

12  day?

13                 MR. SLATER:  Objection.

14                 THE WITNESS:  Yes.

15  BY MS. KABBASH:

16         Q.      Do you hold that opinion to a reasonable

17  degree of medical certainty?

18         A.      Yes, I do.

19         Q.      Have any of the discussions that we have

20  had today altered your opinion on that point?

21         A.      No.

22                 MS. KABBASH:  That's it.

23                 MR. SLATER:  I have five follow-up

24         questions.

Nicole B. Fleischmann, M.D.

```
 1   BY MR. SLATER:

 2         Q.     First of all, you were asked about

 3   whether it would have been helpful to have various

 4   articles or studies in front of you.  You could have

 5   brought them and had them here to review.

 6               You didn't bring them, correct?

 7               MS. KABBASH:  Objection.

 8               THE WITNESS:  I don't have the articles

 9         with me, no.

10   BY MR. SLATER:

11         Q.     You could have brought them, right?

12               MS. KABBASH:  Objection.

13               THE WITNESS:  I could have.

14   BY MR. SLATER:

15         Q.     The meta-analyses on mesh, they're not

16   all Prolift®, correct?  It's about all different types

17   of mesh products and mesh devices, right?

18         A.     Transvaginal mesh in general.

19         Q.     The RCTs on Prolift® you just referred

20   to with defense counsel, are any of those RCTs where

21   they specifically had an endpoint to evaluate for

22   retraction of the mesh or painful retraction of the

23   mesh, where that was actually an endpoint they were

24   studying?
```

Nicole B. Fleischmann, M.D.

```
 1                    MS. KABBASH:  Objection.
 2                    THE WITNESS:  Dyspareunia only, not
 3           retraction or contraction, as you call it.
 4                    MR. SLATER:  Move to strike.
 5   BY MR. SLATER:
 6           Q.    That answer is no, correct?
 7                    MS. KABBASH:  Objection.
 8                    THE WITNESS:  Not retraction or
 9           contraction specifically.
10   BY MR. SLATER:
11           Q.    The studies that you said don't show a
12   large number of women with multiple erosions and
13   multiple surgeries, you were just asked about that,
14   most of those studies are not long-term studies, right?
15           A.    The longest term we have is five years
16   to seven years.
17           Q.    You were asked about whether anything
18   today changed your opinions in any way.
19                    Is there anything I can tell you that
20   would actually get you to say, you know what, now that
21   you've shown me this, I will say that the benefits are
22   outweighed by the risks of the Prolift®?  Is there
23   anything I could show you, something from an internal
24   document or any information I could show you that you
```

Nicole B. Fleischmann, M.D.

1  would say, okay, it's an unreasonable risk-benefit

2  profile?

3        A.    From an internal document?

4        Q.    From any source.

5        MS. KABBASH:  Objection, calls for

6      speculation.

7        MR. SLATER:  I'm giving you example,

8      internal documents, internal information,

9      anything.

10       THE WITNESS:  Not from an --

11       MS. KABBASH:  Objection.

12       THE WITNESS:  -- internal document

13     because I have all the information I need right

14     now, especially doing the product, you know.

15 BY MR. SLATER:

16       Q.    Is there anything I could show you or

17 tell you that would cause you to sit back and say, you

18 know what, based on that, the risk-benefit profile is

19 not reasonable for the Prolift®?

20       MS. KABBASH:  Objection, calls for

21     speculation.

22 BY MR. SLATER:

23       Q.    Is there anything I could show you that

24 would convince you of that?

Nicole B. Fleischmann, M.D.

```
 1              A.     I can't think of anything you would show

 2    me that would convince me of that.

 3              MR. SLATER:  No other questions.

 4    BY MS. KABBASH:

 5              Q.    Dr. Fleischmann, with respect to the

 6    Prolift® RCTs that you have reviewed and the

 7    meta-analyses, Mr. Slater asked you if they had as an

 8    endpoint contraction.

 9              Based on your review of those articles

10    and how those studies were set up and the complications

11    that they tracked, do you have any reason to believe

12    that a finding of a clinical symptom of contraction

13    would have been excluded from the study?

14              MR. SLATER:  Objection, multiple

15         grounds.

16              THE WITNESS:  Not excluded, I just don't

17         know it had a clinical manifestation for them

18         to be able to include it in a complication part

19         of the study.

20    BY MS. KABBASH:

21              Q.    And you didn't note any findings in the

22    study that would have demonstrated those clinical

23    manifestations, correct?

24              MR. SLATER:  Objection.
```

Nicole B. Fleischmann, M.D.

```
1                THE WITNESS:  Exactly.

2                MS. KABBASH:  That's it.

3                (Witness excused.)

4                (Deposition concluded at 4:14 p.m.)

5                        - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Nicole B. Fleischmann, M.D.

1           C E R T I F I C A T I O N

2                    I, MARGARET M. REIHL, a Registered

3           Professional Reporter, Certified Realtime

4           Reporter, Certified Shorthand Reporter,

5           Certified LiveNote Reporter and Notary Public,

6           do hereby certify that the foregoing is a true

7           and accurate transcript of the testimony as

8           taken stenographically by and before me at the

9           time, place, and on the date hereinbefore set

10          forth.

11                   I DO FURTHER CERTIFY that I am

12          neither a relative nor employee nor attorney

13          nor counsel of any of the parties to this

14          action, and that I am neither a relative nor

15          employee of such attorney or counsel, and that

16          I am not financially interested in the action.

17

18

19          --------------------------------

            Margaret M. Reihl, RPR, CRR, CLR

20          CSR #XI01497  Notary Public

21

22

23

24

Nicole B. Fleischmann, M.D.

```
 1                     -  -  -  -  -  -

 2                   E  R  R  A  T  A

 3                     -  -  -  -  -  -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6    REASON:  _____

 7    _____  _____  _____

 8    REASON:  _____

 9    _____  _____  _____

10    REASON:  _____

11    _____  _____  _____

12    REASON:  _____

13    _____  _____  _____

14    REASON:  _____

15    _____  _____  _____

16    REASON:  _____

17    _____  _____  _____

18    REASON:  _____

19    _____  _____  _____

20    REASON:  _____

21    _____  _____  _____

22    REASON:  _____

23    _____  _____  _____

24    REASON:  _____
```

Nicole B. Fleischmann, M.D.

1                 ACKNOWLEDGMENT OF DEPONENT

2

3                 I, NICOLE B. FLEISCHMANN, M.D., do

4         hereby certify that I have read the foregoing

5         pages, and that the same is a correct

6         transcription of the answers given by me to the

7         questions therein propounded, except for the

8         corrections or changes in form or substance, if

9         any, noted in the attached Errata Sheet.

10

11

12

    _____
13   NICOLE B. FLEISCHMANN, M.D.      DATE

14

    Subscribed and sworn to before me this

15

    _____ day of _____, 2017.

16

    My commission expires:_____

17

18   _____

    Notary Public

19

20

21

22

23

24