# EXHIBIT J

Scott A. Guelcher, Ph.D.

Page 1

FOR THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

_____

IN RE:  ETHICON, INC.,
PELVIC REPAIR SYSTEMS
PRODUCTS LIABILITY LITIGATION
Master File No. 2:12-MD-02327
MDL NO. 2327

_____

THIS DOCUMENT RELATES TO:

TONYA AND GARY EDWARDS
vs.
ETHICON, INC., ET AL.,          JOSEPH R. GOODWIN
(Case No. 2:12-cv-09972)        U.S. DISTRICT
                                JUDGE

and

JO HUSKEY AND ALLEN HUSKEY
vs.
ETHICON, INC., ET AL.,
(Case No. 2:12-cv-05201)

_____


DEPOSITION OF SCOTT A. GUELCHER, PH.D.

Nashville, Tennessee

March 25, 2014




Reported by Marilyn Morgan, LCR #235, CCR #0174


Golkow Technologies, Inc.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Scott A. Guelcher, Ph.D.

Page 2

1    APPEARANCES:
2    ON BEHALF OF PLAINTIFFs
3        Tim E. Jackson, Esq.
4        Michael H. Bowman, Esq.
5        WEXLER WALLACE, LLP
6        55 West Monroe Street, Suite 3300
7        Chicago, Illinois  60603
8        (312) 346-2222
9        tej@wexlerwallace.com
10       mhb@wexlerwallace.com
11   and
12       Christina Lewis, Esq.  (by telephone)
13       MUELLER LAW
14       404 West 7th Street
15       Austin, Texas  78701
16       (512) 478-1236
17   ON BEHALF OF DEFENDANT:
18       David B. Thomas, Esq.
19       THOMAS, COMBS & SPANN, PLLC
20       300 Summers Street, Suite 1380
21       Charleston, West Virginia  25338
22       (304) 414-1807
23       dthomas@tcspllc.com
24

Page 3

1        The deposition of SCOTT A. GUELCHER,
2    PH.D., taken on behalf of the Defendant and
3    taken pursuant to notice on March 25, 2014,
4    beginning at approximately 9:19 a.m., at 150
5    3rd Avenue, South, Nashville, Tennessee,
6    pursuant to stipulations of counsel.
7        S T I P U L A T I O N S
8        It is agreed that the court reporter,
9    being a notary public for the State of
10   Tennessee, may swear the deponent, take the
11   deposition on the Stenograph shorthand machine
12   and afterwards reduce the same to typewriting
13   when it may be used for all purposes provided
14   by the Federal Rules of Civil Procedure
15   governing depositions.
16
17
18
19
20
21
22
23
24

Page 4

1        I N D E X
2    WITNESS                          PAGE
3    SCOTT A. GUELCHER, PH.D.
     Examination by Mr. Thomas . . . . . . . .  5
4
        E X H I B I T S
5
     Number      Description       Page
6
     Exh.1    Report                  6
7
     Exh.2    Notebook                8
8
     Exh.3    Notebook                8
9
     Exh.4    Notice of Deposition        9
10
     Exh.5    Rebuttal Report            60
11
     Exh.6    Anderson Study             71
12
     Exh.7    1976 Study                 73
13
     Exh.8    Fayolle Study              93
14
     Exh.9    Clave Article             102
15
     Exh.10   Letter                    165
16
17
18
19
20
21
22
23
24

Page 5

1        SCOTT A. GUELCHER, PH.D.,
2    after having been first duly sworn, was
3    examined and testified as follows:
4            DIRECT EXAMINATION
5    BY MR. THOMAS:
6        Q.   Good morning, Dr. Guelcher.  It's
7    Guelcher; is that correct?
8        A.   That's right.
9        Q.   I introduced myself to you before the
10   deposition.  My name is David Thomas.  I
11   represent Ethicon.  I'm going to ask you a
12   number of questions today about your expert
13   reports in the Ethicon matters; fair enough?
14       A.   Yes.
15       Q.   I see that you have before you two
16   notebooks.  What's in the notebooks?
17       A.   So one of these notebooks is the
18   report with -- the first report that was filed
19   with the reliance documents from that.  And the
20   second notebook is another notebook of support
21   documents.
22       Q.   We'll both be doing that today so
23   take your time and don't worry about it.
24       The second notebook that you referred

2 (Pages 2 to 5)

Scott A. Guelcher, Ph.D.

Page 6

1    to is additional support documents?
2        A.   Yes, that's right.
3        Q.   Do the additional support documents
4    in the second notebook relate to the first
5    report?
6        A.   Yes.
7        Q.   Do the two notebooks that you have in
8    front of you represent the total of the
9    reliance materials for the reports that you've
10   provided in this matter?
11       A.   Yes.
12       (Exhibit 1 was marked.)
13       Q.   (By Mr. Thomas) Let me show you what
14   I've marked as deposition Exhibit No. 1.
15   Deposition Exhibit No. 1 is what was provided
16   to us as the Rule 26 expert report for you in
17   this matter.
18           When you referred to your first
19   notebook as having the report and reliance
20   materials, is Exhibit No. 1 the report to which
21   you're referring?
22       A.   Yes.
23       Q.   On -- at the end -- I'm sorry.
24   Exhibit B to Exhibit No. 1 is a list of

Page 7

1    reliance materials attached to your report?
2        A.   Yes.
3        Q.   Do you have that?
4        A.   Yes.
5        Q.   Is everything that is in the two
6    notebooks that you've just identified for the
7    record contained within the reliance materials,
8    to your knowledge?
9        A.   Yes, I believe so.
10       Q.   Are there documents in this reliance
11   list that are not contained in the two
12   notebooks that you brought with you today?
13       A.   I don't think so.
14       Q.   Okay.  Was it your intention when you
15   brought the two notebooks that you've
16   identified earlier today that you brought with
17   you all the documents upon which you relied for
18   the formulation of your opinions in the case?
19       A.   Yes.
20       Q.   Just for the record, the first
21   notebook that you identified it has a title on
22   it that says In Re: Boston Scientific
23   Corporation, Product Liability Litigation,
24   Expert Report of Scott Guelcher, Ph.D.

Page 8

1        A.   Yes.
2            MR. THOMAS:  We'll mark that as
3    Exhibit No. 2.
4            (Exhibit 2 was marked.)
5        Q.   (By Mr. Thomas)  This was the first
6    notebook to which you referred for your expert
7    report and your reliance materials; fair?
8        A.   Yes.
9            (Exhibit 3 was marked.)
10       Q.   (By Mr. Thomas)  Deposition Exhibit
11   No. 3 is a second notebook of documents that
12   you brought with you that are your reliance
13   materials for your expert report in the Ethicon
14   case?
15       A.   Yes.
16       Q.   It's your testimony that the
17   documents in Exhibits 2 and 3 are the total of
18   the reliance materials for your expert report
19   which we've marked as Exhibit 1?
20       A.   Yes.
21       Q.   All right.  Did you bring with you
22   any other materials for your deposition today?
23       A.   No.
24       Q.   Did you bring any billing records

Page 9

1    with you today?
2        A.   No.  Dr. Dunn has those.  That's
3    subcontracted through Dr. Dunn.
4        Q.   Did you prepare billing records that
5    you gave to Dr. Dunn?
6        A.   I have sent him some billing records,
7    yeah.  But I don't have those with me.
8    Dr. Dunn has them.
9        Q.   Is there a reason why you didn't
10   bring those with you here today?
11       A.   I haven't been bringing them to
12   depositions.  So everything is billed through
13   him.  So I don't have them with me.
14           MR. THOMAS:  Is there a reason why he
15   hasn't produced those today?
16           MR. JACKSON:  It was my understanding
17   he didn't have them, that they were all in
18   the custody of Dr. Dunn.
19           (Exhibit 4 was marked.)
20       Q.   (By Mr. Thomas)  Let me show you
21   what's been marked as deposition Exhibit No. 4.
22   Deposition Exhibit No. 4 is a notice of your
23   deposition for today as well as a document
24   rider that requests that you bring certain

3 (Pages 6 to 9)

Scott A. Guelcher, Ph.D.

Page 10

1    documents with you to the deposition. Did you
2    review that in advance of your deposition?
3        A.   Briefly.
4        Q.   What did you do when you reviewed it?
5    For what purpose did you review it?
6        A.   To pull the documents together.
7        Q.   And I believe you've told me the only
8    documents that you've brought with you to the
9    deposition today are the ones that we've marked
10   in the notebooks of Exhibits Nos. 2 and 3?
11       A.   That's right.
12       Q.   Were there other documents that are
13   responsive to Schedule A on Exhibit No. 4 that
14   you didn't bring with you?
15           MR. JACKSON: I'm just going to note
16       that we have pending objections to several
17       of these scheduling requests.
18           MR. THOMAS: That's fine.
19       A.   Let me look at this for a minute.
20           So I have provided an opinion on
21   other pelvic mesh cases, but I did not bring
22   that information with me because of the
23   consulting with the attorneys. I think
24   everything else is here, just looking at this.

Page 11

1        Q.   (By Mr. Thomas) Let's look at
2    Paragraph 1 of Exhibit 1, Schedule A, all
3    documents related to fees, billing, and/or time
4    spent in connection with your opinions.
5            How do you keep your time in this
6    case?
7        A.   I send activity reports to Dr. Dunn,
8    and then he -- I must have misunderstood this.
9    It's all billed through Dr. Dunn's company. So
10   I send everything to him in the form of weekly
11   activity reports and monthly invoices.
12       Q.   Tell me the form that the weekly
13   activity reports take.
14       A.   It's a table that lists the hours
15   that I worked per day, the specific time of the
16   day that I worked on it, and then a brief
17   description of the activity.
18       Q.   And is this a report that you submit
19   to Dr. Dunn on a weekly basis?
20       A.   Usually. The reports are all -- it's
21   a weekly summary.
22       Q.   Is this a computer-generated report
23   or a hand-generated report?
24       A.   It's a -- I do it in Microsoft Word.

Page 12

1        Q.   Do you have notes of the time that
2    you spent that you transfer over to Microsoft
3    Word?
4        A.   I keep it on my calendar.
5        Q.   And is your calendar a hard copy
6    calendar?
7        A.   It's electronic on my phone.
8        Q.   And the time that you have on your
9    electronic calendar on your phone is
10   transferred over to your Microsoft Word report
11   that you send to Dr. Dunn on a weekly basis?
12       A.   That's right. Yes.
13       Q.   And the report that you provide to
14   Dr. Dunn identifies the day that you worked?
15       A.   It identifies the day, the time of
16   day, and the number of hours and the activity.
17       Q.   Is that a form that you prepared or a
18   form that Dr. Dunn provided to you?
19       A.   It's a form that I had from other
20   cases, other consulting, I should say.
21       Q.   Other consulting with Dr. Dunn or
22   consulting you've done individually?
23       A.   Consulting I've done individually
24   with other companies.

Page 13

1        Q.   Are the weekly activity reports that
2    you submitted to Dr. Dunn on your computer
3    presently?
4        A.   I think so. I don't think I deleted
5    those off my computer.
6        Q.   Is that something you could have sent
7    to us today so we could --
8        A.   I can. Like I said, in the past,
9    I've not -- Dr. Dunn just had those, and I just
10   missed it.
11       Q.   Okay.
12       A.   I can send them to you.
13       Q.   Yeah. I would like to be able to ask
14   questions about those today. So to the extent
15   we can get those sent over here and printed out
16   and used in the deposition --
17       A.   I can do that.
18           MR. JACKSON: Do you have somebody
19       who can log into your computer and get
20       these? It might be easier just to have
21       Dr. Dunn produce everything today. I can
22       probably have them do that.
23           MR. THOMAS: That would be great.
24           THE WITNESS: I would be more

4 (Pages 10 to 13)

Scott A. Guelcher, Ph.D.

Page 14

1    comfortable for him doing that because he
2    does the actual billing. That's why I was
3    confused. But I think if he can send the
4    reports, it would be better because I don't
5    know that I've -- I mean, I send them to
6    him and I --
7          MR. JACKSON: It may be that he was
8    deposed prior to you previously, so it
9    didn't matter.
10         THE WITNESS: That would be the most
11   accurate version of what's available.
12         MR. THOMAS: Let's go off the record
13   a second.
14         (Discussion off the record)
15         (Ms. Lewis joined the deposition by
16   teleconference.)
17         MS. LEWIS: This is Christina Lewis.
18   I'm with the Mueller Law Office, and we
19   represent Mr. and Mrs. Edwards in this
20   case.
21         And I would like an agreement from
22   defense counsel that all objections by
23   counsel for Huskey are the same as us. If
24   we can have that agreement, I'll put my

Page 15

1    phone on mute so that I don't disrupt the
2    deposition too much.
3          MR. THOMAS: That's fine with me.
4          MS. LEWIS: Thank you so much, and I
5    apologize for the confusion.
6          MR. THOMAS: Not a problem.
7     Q.   (By Mr. Thomas) Have you requested
8    that Dr. Dunn supply those activities records?
9     A.   Yes. He's not in his office, but
10   he's going to call me when he gets there. If
11   he'll e-mail them to me, I can get them printed
12   out.
13    Q.   Very good.
14         Dr. Guelcher, you testified a moment
15   ago that you have consulted with attorneys on
16   matters involving other mesh products; is that
17   fair?
18    A.   Yes.
19    Q.   How many?
20    A.   Three other products.
21    Q.   And what are the manufacturers of
22   those products?
23    A.   American Medical Systems and Boston
24   Scientific.

Page 16

1     Q.   Okay. And then you've consulted with
2    attorneys with respect to Ethicon products?
3     A.   Yes.
4     Q.   For a total of three?
5     A.   Ethicon would be the fourth product.
6    There are two AMS products.
7     Q.   Okay. And have you given deposition
8    testimony in the AMS cases?
9     A.   One of the AMS cases and the Boston
10   Scientific case.
11    Q.   So have you given a total of two
12   depositions?
13    A.   Yes.
14    Q.   What is the product at issue in the
15   AMS case where you've given a deposition?
16    A.   I believe it was the SUI.
17    Q.   And what is the product at issue in
18   the Boston Scientific case where you've given a
19   deposition?
20    A.   There were several products. I can't
21   remember the names right now. Pinnacle maybe.
22   There were five of them, but I can't remember
23   all the names.
24    Q.   For what application were those

Page 17

1    products used? For the same application?
2     A.   Same application.
3     Q.   For stress urinary incontinence?
4     A.   Yes, I believe so.
5     Q.   When were you first contacted about
6    providing expert opinion with respect to
7    Ethicon?
8     A.   With respect to Ethicon would have
9    been -- I don't remember the exact date. Maybe
10   a month ago.
11    Q.   How were you contacted?
12    A.   By the attorneys at Wexler.
13    Q.   Prior -- is it your practice when you
14   get contacted to make notations in your
15   activity log about contacts with counsel?
16    A.   I'm not sure what you mean.
17    Q.   Would we be able to go back and look
18   at your activity reports that you have already
19   identified that Dr. Dunn is going to give to us
20   to find out when you were first contacted about
21   this litigation?
22    A.   In this case, I believe that would
23   be -- that information would be in the activity
24   report.

5 (Pages 14 to 17)

Scott A. Guelcher, Ph.D.

Page 18

1    Q.  Okay.
2    A.  I believe.
3    Q.  Were you contacted directly about
4  providing expert opinions with respect to
5  Ethicon, or did they go through Dr. Dunn?
6    A.  It came through Dr. Dunn.
7    Q.  And were you on a conference call
8  with Dr. Dunn and counsel for plaintiffs in the
9  case?  Is that how you first got brought into
10  the case?
11    A.  No.  Dr. Dunn called me in the
12  evening and we discussed it.
13    Q.  And what did Dr. Dunn tell you?
14    A.  That the attorneys at Wexler Wallace
15  wanted us to write an expert report for the
16  Ethicon case.
17    Q.  And did you and Dr. Dunn discuss the
18  details of the scope of the expert report that
19  you were preparing for the Ethicon case?
20    A.  Yes.
21    Q.  And tell me what you discussed during
22  that call about the scope of the report.
23    A.  Well, the scope of the report would
24  primarily be teaching with respect to the

Page 19

1  oxidation of polypropylene.  We didn't have any
2  samples.  So it was all -- the report was
3  essentially based on literature and documents
4  from Ethicon about the oxidation of
5  polypropylene.
6    Q.  Did you divide responsibilities for
7  the report during the call?
8    A.  Dr. Dunn and I wrote separate
9  reports.  My report focused more on oxidation
10  of polypropylene, particularly the response in
11  the body.
12      Dr. Dunn's area of expertise is in
13  product design, polymer science.  So he
14  addressed issues more related to safety
15  analysis, those types of questions.
16    Q.  Prior to the conversation that you
17  had with Dr. Dunn about a month ago concerning
18  this potential expert report, had you studied
19  Ethicon mesh products at all?
20    A.  No, I wouldn't say studied.  I was
21  familiar that the products existed because of
22  the other litigation, but I had not studied
23  Ethicon products in particular.
24    Q.  So is it fair to understand that when

Page 20

1  Dr. Dunn contacted you about preparing this
2  expert report for use in this litigation, that
3  you then began to -- your understanding of the
4  Ethicon mesh products used to treat stress
5  urinary incontinence?
6    A.  A detailed understanding -- I had
7  been studying the effects of in vivo
8  polypropylene oxidation for some time, maybe
9  six months prior to that.  But the details of
10  the Ethicon mesh started at the time I talked
11  to Dr. Dunn.
12    Q.  And the work that you did on the --
13  the six months work that you just discussed
14  that you did was with respect to the meshes of
15  other manufacturers?
16    A.  With respect to the meshes of other
17  manufacturers and also the oxidative
18  degradation of polypropylene in general.
19    Q.  Was the work that you did with
20  respect to the Ethicon SUI mesh products
21  different from the work that you did analyzing
22  the AMS products or the Boston Scientific
23  products?
24    A.  It was different in the sense that we

Page 21

1  didn't have samples, either materials as made
2  or materials that had been explanted from the
3  body.  We didn't have those samples.
4      So we focused in the reports more on
5  the literature, internal documents, more on the
6  oxidative degradation of polypropylene.
7    Q.  Have you ever analyzed an Ethicon
8  mesh used for the treatment of stress urinary
9  incontinence?
10    A.  I have not.  I don't have the sample.
11    Q.  Have you ever analyzed an explant of
12  mesh manufactured by Ethicon for the treatment
13  of stress urinary incontinence?
14    A.  No, not to my knowledge.
15    Q.  Have you ever requested to analyze a
16  mesh manufactured by Ethicon for the treatment
17  of stress urinary incontinence?
18    A.  Not to my knowledge.  But a lot of
19  the product testing was done by Dr. Dunn.
20    Q.  Have you ever requested to a mesh
21  explant manufacturer for Ethicon, for the
22  treatment of stress urinary incontinence, for
23  the purposes of your own analysis?
24    A.  I have not done that directly.

6 (Pages 18 to 21)

Scott A. Guelcher, Ph.D.

Page 22

1    Dr. Dunn had some materials from manufacturers
2    and I don't remember exactly what.  But
3    personally I have not requested samples.
4         Q.   Did you have conversations with
5    Dr. Dunn about the availability of mesh samples
6    for testing?
7         A.   I think in this case, to the extent
8    that we didn't have them.
9         Q.   My question was, did you have
10   conversations with Dr. Dunn about the
11   availability of mesh samples for testing?
12        A.   I mean, we discussed it.  But the
13   problem was we didn't have the samples.  So
14   they weren't available.
15        Q.   Did you request samples to conduct
16   testing?
17        A.   I did not.  I don't know what he did.
18   But I know that the time was short between when
19   we had to get the report submitted and when the
20   request came.  So there was also a time
21   constraint.  There wasn't time to do it.
22        Q.   Now, did the work that you did in the
23   AMS and Boston Scientific litigation follow the
24   same pattern in terms of what you did for those

Page 23

1    cases?
2         A.   Well, in the AMS and Boston
3    Scientific studies, we had exemplars and we had
4    in some cases explanted materials.  There may
5    have been materials from Ethicon.  I just don't
6    remember because it wasn't part of that
7    specific case.  And Dr. Dunn did that testing,
8    and he would know.
9         Q.   Okay.  In the AMS litigation, what
10   kind of testing did you conduct on AMS exemplar
11   mesh?
12        A.   So can I talk with -- this or other
13   cases, I don't know how much detail I can
14   disclose on this.  These are other cases that
15   are by protective court order, so I don't know
16   what I can say or not say in terms of the
17   details.
18        Q.   I'm asking now only what kind of
19   testing that you performed, not what the
20   results of those tests were.
21        A.   Right.  But I don't know that --
22   because it's a protective order, I don't know
23   that I could even disclose the tests that we
24   did because it was somebody else's material on

Page 24

1    a different case.  So I guess I'm concerned
2    about disclosing something I'm not allowed to
3    disclose.
4         Q.   Would you like to consult with
5    counsel?
6         A.   I would, if that would be okay.
7         Q.   Just for the record, just for your
8    benefit, I'm going to want to know all the
9    kinds of tests that were conducted on the AMS
10   and Boston Scientific meshes and the purposes
11   of those tests.
12            If he's not going to be permitted to
13   answer that, then we'll figure out the next
14   path to take.
15            MR. JACKSON:  The question is
16   how far the protective orders go in the
17   state courts that are involved.  So Boston
18   Scientific state court litigation was in
19   Delaware and Massachusetts.  And the AMS
20   litigation was at the MDL level.
21            MR. THOMAS:  Just so you know, I'm
22   not going to argue with you about it.
23   Either you're going to let him answer or
24   you're not.  I am going to go to court and

Page 25

1    seek to get the answers because I think
2    it's very important to what's going on
3    here.
4            So either he's going to answer or
5    he's not.  I'm not going to argue with you
6    about it.
7            MR. JACKSON:  I think the questions
8    he's asked, you need to answer them at this
9    point.
10        A.   Okay.  So could you repeat it?  I
11   have lost track.
12        Q.   (By Mr. Thomas)  What kinds of tests
13   did you conduct on the exemplar meshes for AMS?
14        A.   So for AMS, we did gel permeations
15   chromatography, GPC.  I should say Dr. Dunn did
16   all the testing.  I'm telling you what I
17   remember.  So in some of this would be my
18   report so it's not an all inclusive list, but
19   it's what I remember.
20        Q.   Very good.
21        A.   We did GPC.  I know he took a number
22   of photographs under the microscope.
23        Q.   Light microscopy or SCN?
24        A.   Light microscopy.  I think there was

7 (Pages 22 to 25)

Scott A. Guelcher, Ph.D.

Page 26

1    -- well, I don't know about the SCN.  I can't
2    remember.
3            We also did x-ray photoelectron
4    spectroscopy or XPS.  That's a surface method
5    where we can detect products of oxidative
6    degradation on the surface.
7            We also did FTIR.  Again, Dr. Dunn
8    did all of these studies I know for the AMS, I
9    believe for the Boston Scientific as well.
10   Ethicon, I can't remember.  It's not in my
11   report so I don't -- and Dr. Dunn did it.  So I
12   don't remember what we did there.
13       Q.   The purpose of the GPC testing is to
14   do what?
15       A.   Measure the molecular weight.
16       Q.   What does molecular weight tell you
17   in the context of oxidation?
18       A.   Well, if the oxidation is
19   sufficiently severe.  So oxidation comes from
20   the surface inward.  If the oxidative
21   degradation is severe enough, say during
22   processing or after implantation, you could see
23   a reduction in molecular weight which can
24   correlate with reduction in ductility and

Page 27

1    embrittlement.  So that was the GPC
2    measurement.
3        Q.   For what purposes did you take the
4    photographs by light microscopy?
5            MR. JACKSON:  Object to the form.
6        A.   Just a visual representation of the
7    mesh.
8        Q.   (By Mr. Thomas)  For what purpose was
9    the XPS testing conducted?
10       A.   The purpose of the XPS was to look
11   for carbonyl and hydroxyle groups on the
12   surface which are products of oxidative
13   degradation.
14       Q.   What is FTIR?
15       A.   Fourier transform infrared
16   spectroscopy.
17       Q.   And I believe you testified that
18   Dr. Dunn conducted FTIR testing on both AMS and
19   Boston Scientific meshes?
20       A.   I believe that he did, but I'm more
21   confident in the XPS data because that's what I
22   specifically used in my reports.  Dr. Dunn can
23   speak to all the testing that was done.  Those
24   were all done by him.

Page 28

1        Q.   In addition to the tests conducted on
2    the exemplar meshes, were the same tests
3    conducted on explanted meshes?
4        A.   Only for one of the AMS cases.  We
5    had some explanted mesh and we did XPS on that
6    mesh.
7        Q.   For what purpose did you conduct XPS
8    testing on the AMS explanted mesh?
9        A.   To identify the presence of carbonyl
10   and hydroxyle groups similar to the exemplars.
11       Q.   When you tested the explanted mesh
12   from AMS, was it necessary to prepare that mesh
13   explant for testing?
14       A.   The preparation of the explant was
15   done by Dr. Iakovlev, who is at the University
16   of Toronto.
17       Q.   Did you or Dr. Dunn have any
18   involvement in consulting with Dr. Iakovlev
19   about the preparation of the explant for XPS
20   testing?
21       A.   We did.
22       Q.   And tell me about your conversations
23   with Dr. Iakovlev about the appropriate way to
24   prepare this sample for analysis.

Page 29

1        A.   Well, we had it shipped to us wet.
2    Dr. Iakovlev --
3        Q.   Let me stop you there.  When you say
4    shipped wet, what do you mean by that?
5        A.   It was in buffer, I believe, saline
6    buffer.  I can't remember the details.
7        Q.   Was the mesh when you received wet in
8    Formalin?
9        A.   No, I don't think so.
10       Q.   Was there a reason why you did not
11   want it in Formalin?
12       A.   Well, some of Dr. Iakovlev's samples
13   were processed in Formalin for histology.  Now
14   formalin is compatible with polypropylene.  It's
15   known that you can look it up.  Dr. Iakovlev
16   has run controls on pristine meshes, but we
17   felt for this purpose to have it in saline
18   would introduce less questions regarding the
19   analysis.
20       Q.   Why did you use saline instead of
21   Formalin?
22       A.   Saline is typical physiological.
23   It's a buffer that's used often to mimic body
24   fluids.

8 (Pages 26 to 29)

Scott A. Guelcher, Ph.D.

Page 30

1    Q.   What concerns did you have about any
2    impact Formalin may have on the sample that you
3    were going to test?
4        A.   We didn't have any concerns because
5    polypropylene and Formalin are compatible.
6        Q.   At the time that you analyzed the
7    mesh explant from AMS that you had shipped in
8    saline, did you analyze the extent to which
9    Formalin would interact with proteins on the
10   surface of the mesh explant?
11       A.   No.  Dr. Iakovlev desiccated the
12   explants manually, from what I remember.  He
13   removed extra tissue that he could find and
14   then shipped them to us dry for the XPS
15   testing.
16       Q.   I'm sorry.  I misunderstood your
17   answer.  I thought you told me a minute ago
18   that you received the mesh explant wet.
19       A.   Dr. Iakovlev did.  He received the
20   mesh explant from the hospital.  He prepared
21   the sample for XPS then shipped it to us
22   dry after he had removed the tissue from the
23   sample.
24       Q.   I see.  Did -- how did Dr. Iakovlev

Page 31

1    clean the sample?
2        A.   I can't remember the details.  It was
3    a different case, so I didn't review this.  So
4    how much detail again should I --
5            MR. JACKSON:  If you can, answer the
6        question.
7        A.   In this case, I really can't remember
8    exactly how he -- he did it.  I know that he
9    had some mesh samples that he had scraped and
10   some that he had manually dissected just to
11   remove the tissue.  But it was all done in
12   things like saline or dry.
13           To my knowledge, I can't remember any
14   processing of Formalin.  But I'm going on my
15   memory, and it was a different case.
16       Q.   All right.  Was there any effort to
17   test explanted meshes from the Boston
18   Scientific litigation?
19       A.   I'm not sure what you mean by "any
20   effort."  We didn't have the explant, so we
21   couldn't do it.
22       Q.   Did you request explants from Boston
23   Scientific to conduct tests?
24       A.   I believe we did.  But then again,

Page 32

1    Dr. Dunn has been handling those types of
2    requests.
3        Q.   Going back to the AMS explant you and
4    Dr. Dunn analyzed, you said you conducted XPS
5    testing.  Any other testing you conducted on
6    that AMS explant?
7        A.   No.  I mean, the amount of sample is
8    very small.  Dr. Dunn may have done -- he may
9    have done FTIR.  I can't remember.  But I think
10   the samples are very small.  That's one
11   advantage of XPS, is that we can probe a very
12   small surface.
13           So to my knowledge, what I can
14   remember is we only did XPS on those.
15       Q.   What was the goal of conducting the
16   testing on the AMS explanted mesh?
17       A.   It was to look for presence of
18   hydroxyle and carbonyl groups on the surface
19   that are associated with polypropylene
20   degradation.
21       Q.   And what do the hydroxyle and
22   carbonyl groups tell you if you find them on
23   these explanted meshes?
24           MR. JACKSON:  Object to the form.

Page 33

1        A.   Well, you can do a similar approach
2    using FTIR that's in the literature where it
3    tells you that -- polypropylene is a
4    hydrocarbon.  So there shouldn't be any
5    carbonyl and hydroxyle groups.  So if you see
6    these species, it's an indication of oxidation
7    of the surface.
8            This has been done by FTIR, also, in
9    the past.  But XPS, we believe, is more
10   sensitive.
11       Q.   More sensitive than what?
12       A.   FTIR.
13       Q.   In what respect is XPS more sensitive
14   than FTIR?
15       A.   XPS gives atomic percents, so percent
16   carbon, percent oxygen, percent nitrogen.  And
17   it also provides details about the state of the
18   bonding.  So it can tell you whether there's
19   bound oxygen on the surface.
20       Q.   Why wasn't GPC testing conducted on
21   the AMS mesh explant?
22       A.   There wasn't enough material, and GPC
23   takes quite a bit more material.
24       Q.   In the hierarchy of tests, it

9 (Pages 30 to 33)

Scott A. Guelcher, Ph.D.

Page 34

1    provides you helpful information to understand
2    the extent to which degradation may have
3    occurred, where does GPC fit?
4         MR. JACKSON:  Object to the form.
5         A.   Well, I believe the GPC would be
6    below XPS in priority because GPC is a bulk
7    measurement.  XPS is a surface measurement.
8    Oxidative degradation proceeds from the surface
9    inward.  So XPS is going to provide more
10   detailed information.
11        Q.   (By Mr. Thomas)  How does GPC compare
12   to FTIR?
13        A.   FTIR is also a method primarily for
14   looking at the oxidized species on the surface.
15   GPC is measuring the bulk molecular weight of
16   the polymer.
17        Q.   Which is more sensitive, FTIR or GPC?
18        A.   I don't know if I could answer that.
19   They measure different things.  GPC measures
20   molecular weight and FTIR is measuring chemical
21   composition.
22        Q.   Is it fair to understand that a
23   molecular weight analysis is going to be more
24   accurate than an FTIR analysis to understand

Page 35

1    the extent to which polypropylene is degraded?
2         A.   I wouldn't agree with that -- the
3    only way you could support that statement is if
4    you could measure GPC of that actual degraded
5    layer.  But, again, that's going to be
6    difficult.
7         GPC is essentially a volume average
8    over the entire fiber.  So it doesn't really
9    tell you what's going on on the surface because
10   it's averaged over the entire volume.
11        Q.   Have you ever testified that
12   molecular weight analysis is more sensitive to
13   look at degradation than FTIR?
14        A.   They measure different things.  So
15   GPC measures molecular weight.  FTIR measures
16   the surface composition.  And FTIR is, I don't
17   think is, as sensitive as XPS, but they just
18   measure different things.
19        I think GPC is an important
20   measure -- if you see degradation by GPC, that
21   means it's even -- it's fairly degraded, if
22   you're seeing loss in molecular weight.
23        But I wouldn't use the word
24   sensitive.  I would say XPS can tell you what's

Page 36

1    happening at earlier time points before you
2    have a lot of molecular weight loss, and then
3    GPC would actually measure that loss in
4    molecular weight.  So it's measuring something
5    different.
6         Q.   Do you agree with this statement:  A
7    molecular weight analysis is really going to be
8    more accurate, I think, than to try to look for
9    degradation than with the FTIR for these
10   explanted meshes?
11        A.   It depends on the context of the
12   statement.  I mean -- like I said, GPC is going
13   to tell you whether there's a loss of molecular
14   weight in the material.  FTIR -- the problem
15   with FTIR is it could be looking at -- you
16   can't interpret it as directly as XPS in terms
17   of the source of the carbonyl or the hydroxyle
18   groups.  And it has to be fairly far along in
19   the degradation before you can see it.
20        Q.   What has to be fairly far along in
21   the degradation before you can see it?  I
22   didn't understand your answer.  I'm sorry.
23        A.   Well, I'm saying that FTIR, I think
24   is -- XPS, you can see what's happening, I

Page 37

1    believe, at earlier time points than you could
2    with FTIR because the peaks aren't always as
3    resolved as well.  XPS is, I think more precise.
4         Q.   So is it your position that XPS is
5    the best test method to understand the extent
6    to which oxidation occurs on the surface of
7    explanted meshes?
8         A.   I would say that XPS can -- I think
9    the advantage of XPS is it can predict what's
10   happening at very early time points before
11   there's molecular weight loss.
12        Molecular weight loss happens later
13   in the process.  Those carbonyl and hydroxyle
14   groups will form on the surface earlier.  So
15   GPC is very effective for measuring molecular
16   weight loss.  I think what I'm saying here is
17   that XPS can predict those events at very early
18   time points before there's molecular weight
19   loss.  That's what I'm saying.
20        Q.   What kind of equipment is necessary
21   to conduct XPS testing?
22        A.   Well, there's a specific instrument
23   in XPS that's a high vacuum device.  So you
24   have to -- it's a fairly expensive instrument.

10  (Pages 34 to 37)

Scott A. Guelcher, Ph.D.

Page 38

1    Q.   And how is that test conducted?
2         MR. JACKSON:  Object to the form.
3         A.   Dr. Bridget Rogers at Vanderbilt did
4    the XPS testing.  That's her area of expertise.
5    The actual details of how the test is
6    performed, she would be -- she's the one that
7    did the testing for this.  I basically talked
8    with her about interpretation of the data.
9         Q.   (By Mr. Thomas)  Okay.  How is XPS
10   testing different from EDX testing?
11        A.   Well, EDX, in my understanding, is
12   more like SCM where you would look for specific
13   atoms in the background.  But my understanding
14   is that XPS is more sensitive than EDX.  That's
15   why we do XPS.
16        Q.   Did you conduct any EDX testing on
17   any of the meshes you analyzed?
18        A.   Not to my knowledge, but Dr. Dunn
19   would be able to speak to that.
20        Q.   The reason why you and Dr. Dunn
21   conducted the tests that you did on the AMS and
22   Boston Scientific meshes was to understand the
23   extent to which these meshes may undergo
24   oxidative degradation?

Page 39

1         A.   Yes.  We were looking for evidence of
2    oxidative degradation.  The advantage of XPS is
3    that you can see what's happening at early time
4    points, and it doesn't require a lot of
5    sampling.  And you can probe the surface with
6    it.  That's really the advantages of it.
7         Q.   Okay.  Dr. Guelcher, go back to a
8    month ago or so when you were first contacted
9    by Dr. Dunn about your work in this case, and
10   you had this conversation with Dr. Dunn you
11   just told me about, and you decided what work
12   you were going to do and you didn't have any
13   exemplars and you didn't have any explanted
14   meshes.  What did you do to acquaint yourself
15   with the Ethicon product?
16        MR. JACKSON:  Object to the form.
17        A.   We reviewed papers on it, internal
18   documents, published papers describing the
19   product.
20        Q.   (By Mr. Thomas)  Are all the
21   documents that you reviewed to familiarize
22   yourself with the product in Exhibits 2 and 3?
23        A.   Yes.
24        Q.   Did you conduct your own literature

Page 40

1    search?
2         A.   So I've conducted my own literature
3    search on -- I have done my own searches for
4    oxidative degradation of polypropylene.
5         For the internal documents, we were
6    provided with documents by the attorneys.  We
7    didn't have access to those through literature.
8         Q.   Is it fair to understand, though,
9    specifically for the Ethicon mesh, that you
10   didn't conduct an internal -- strike that.
11        Is it fair to understand with respect
12   to the Ethicon mesh that you didn't conduct a
13   new literature search about the oxidative
14   effects on polypropylene?
15        A.   Not for specific Ethicon products.  I
16   was focusing more on the mechanisms of
17   oxidative polypropylene in general.
18        Q.   As a part of your work and your
19   opinions in this case, did you ever focus on
20   the mechanisms of oxidation of polypropylene
21   for Ethicon products specifically?
22        A.   Could you repeat that?
23        Q.   Doctor, you testified -- strike that.
24   Doctor, in the course of your work in this

Page 41

1    case, did you ever analyze the extent to which
2    Ethicon mesh specifically degrades?
3         A.   There was some internal documents
4    that there were references in one of these is
5    addressed in the rebuttal report.  We just
6    received a document.
7         There was a 1987 study.  There was a
8    human study and a study in dogs that were done
9    by Ethicon that discussed oxidative degradation
10   of polypropylene.  These were with Prolene
11   sutures, I believe, and not the mesh.  It was
12   the sutures.
13        Q.   Other than the internal documents
14   that you described, did you conduct any
15   investigation to determine the mechanism of any
16   oxidative degradation that Prolene mesh
17   undergoes?
18        A.   Not specific to Prolene.  I think in
19   some of the literature studies, Prolene or TVT
20   Ethicon meshes were reviewed.  But it's
21   polypropylene, so we were focusing really on
22   the oxidation of the polypropylene molecule.
23        Q.   What did you do in formation of your
24   opinions in this case to understand the history

Scott A. Guelcher, Ph.D.

Page 42

1    of Prolene?
2        A.   I reviewed the documents that are in
3    the reference materials.
4        Q.   Do you know how long Prolene has been
5    in the market?
6        A.   I believe since the 1960s.
7        Q.   Do you know the application for
8    Prolene since the 1960s?
9        A.   I know it's used in sutures and
10   hernia mesh and in the pelvic floor meshes.
11       Q.   Do you know how Prolene happened to
12   be introduced as a medical device in the 1960s?
13       A.   I don't remember the history of that.
14       Q.   Are you familiar with a term known as
15   a new drug application, NDA?
16       A.   That's a regulatory term, I presume.
17       Q.   What's your understanding of what a
18   new drug application is?
19       A.   I don't know that I'm familiar with
20   the new drug application.  My work is more in
21   devices where we're dealing with PMAs and
22   510Ks.  And a new drug application I'm not as
23   familiar with.
24       Q.   What's your general understanding of

Page 43

1    what that is, to the extent that you have one?
2        A.   I would presume that when a company
3    develops a new drug, they submit a new drug
4    application.  But that specific term, I don't
5    know the details of it.
6        Q.   In learning about the polypropylene
7    used in Prolene, did you review any of the
8    testing conducted by Ethicon since the 1960s in
9    connection with the safety and efficacy of the
10   polypropylene used in Prolene?
11       A.   Primarily, the dog study and human
12   study were the primary documents that I
13   reviewed.
14       Q.   And the dog study would be the
15   seven-year dog study?
16       A.   The seven-year dog study published in
17   1992.
18       Q.   What was the human study you referred
19   to?
20       A.   I wouldn't call it a human study.  It
21   was sutures explanted from vascular grafts in
22   human patients.  That one was done in 1987.
23       Q.   That must be in your rebuttal report?
24       A.   It is.

Page 44

1        Q.   I'll get it here in a minute.  No
2    problem.
3            Were those the only two studies
4    you've looked at to understand specifically the
5    testing done by Ethicon on the safety and
6    efficacy of the polypropylene used in Prolene
7    since its introduction in the '60s?
8        A.   There was a 17-year study done by
9    Nielson published about maybe 2011, I think,
10   2013.
11       Q.   You've opened your book.
12       A.   That's this one.
13       Q.   You obviously have that in your
14   notebook there?
15       A.   Yes.
16       Q.   I didn't see that referenced in your
17   report.  For what purpose did you look at the
18   17-year Nielson study?
19       A.   Well, it was a long-term study on the
20   TVT device, not the TVT-O but the TVT device.
21       Q.   Do you understand that the mesh used
22   in the Nielson study for the 17-year data
23   that's contained in that study is the same mesh
24   that's used in TVT-O?

Page 45

1        A.   Yes.
2        Q.   Are you able in your area of
3    expertise to use the results from the Nielson
4    study that you have in front of you?  Can you
5    transfer those to TVT-O?
6            MR. JACKSON:  Object to the form.
7        A.   There are differences in my
8    understanding between TVT and TVT-O in the
9    approach and the instruments.
10           The mesh is the same, is also
11   polypropylene.  But whether or not you can
12   translate this to TVT-O, I don't know.  I'm not
13   a surgeon.  But I know it's also polypropylene
14   mesh.
15       Q.   Of what significance to you is the
16   Nielson study that you have in front of you,
17   the 17-year data?
18       A.   Well, it's not that many patients and
19   they -- a fraction of them, they followed --
20   maybe 60 percent they followed out to 17 years.
21   One of them had a complication, an erosion.
22   But I think it's just another piece of data.
23           I mean, Dr. Nielson is -- I think it
24   says in the back here that he's a consultant

12 (Pages 42 to 45)

Scott A. Guelcher, Ph.D.

Page 46

1    for Ethicon.  So, you know, he has interest in
2    success of the material.  It's one study done
3    by a clinician who is pretty connected to the
4    material.
5        Q.   Do the findings in the Nielson study,
6    the 17-year data support your opinions in this
7    case?
8        MR. JACKSON:  Object to the form.
9        A.   There was an erosion in one of the
10   meshes that would be consistent with my opinion
11   that polypropylene undergoes surface oxidation
12   which leads to embrittlement, can lead to
13   erosion and other types of complications.
14       Q.   There's nothing in that study to
15   suggest that there's degradation involved in
16   the one erosion that's there, is there?
17       A.   I don't think they looked at that.
18       Q.   Is that the only point in the Nielson
19   study upon which you rely to support your
20   opinions, the fact that an erosion occurred?
21       A.   There wasn't a lot of -- I mean, the
22   examinations that these women received, some of
23   them they talked to over the phone.  It was a
24   quality-of-life survey in older women.  So to

Page 47

1    me, it's a bit difficult to interpret.  Were
2    there other types of complications?  It's hard
3    to say.
4        The data just aren't that -- they say
5    in here that a lot of the patients didn't want
6    these invasive evaluations.  So it's very
7    qualitative.  It's difficult for me to take
8    much away from it.  It's just another piece of
9    information.
10       Q.   All I'm trying to understand is
11   you've obviously pointed this out to me as
12   something in your file that's of significance
13   to you, and I need to know the significance of
14   it to your opinions in the case.
15       A.   So, I mean, I thought I answered it.
16   There was one patient had an erosion.  And it's
17   difficult for me to rely heavily on this
18   document just because of the types of data that
19   was collected.  It wasn't specific to the types
20   of questions that we're asking.  I would say it
21   was more inconclusive, if that's what you're
22   asking.
23       Q.   Okay.  So have we identified now the
24   studies that you looked at specific to Ethicon

Page 48

1    mesh or suture in connection with your opinions
2    in the case?
3        A.   I believe so.  Well, yeah, for
4    specific -- yes, I believe so, for specific
5    Ethicon products that I can remember.
6        Q.   Right.  Dr. Guelcher, have you ever
7    used the term "gold standard"?
8        A.   I think a lot of people use this
9    term.  It can apply to a lot of -- it depends
10   on the context of what you mean.
11       Q.   How do you use the term "gold
12   standard" in your work?
13       A.   I don't think I use it very much.  It
14   can be used in the context of almost like a
15   clinical control.  So in my work in bone
16   grafting, a lot of people refer to autograft
17   bone as the gold standard.  It's the most
18   successful approach for healing bone.
19       That doesn't necessarily mean it's
20   preferred or the best way to do it.  It's just
21   what's known to be the most effective.  So
22   autograft bone has its deficiencies.  People
23   still refer to it as the gold standard because
24   it's the best known approach basically.

Page 49

1        Q.   And in the bone graft context,
2    there's no perfect bone graft procedure; fair?
3        A.   Well, the problem with autograft is
4    that you have to get it from somewhere.  That
5    introduces a lot of limitations.  And so
6    there's a number of different approaches that
7    can be used.
8        Q.   At least that is -- the autograft
9    bone procedure is known as the gold standard
10   in your area of expertise because it's the
11   best that you-all have available at this
12   time; is that fair?
13       A.   That's the way a lot of -- I think
14   that's -- I mean, understanding within the
15   field is that autograft is the gold standard
16   in terms of healing.
17       Q.   Have you made any investigation to
18   determine the extent to which the use of
19   polypropylene in tissue repair has been
20   considered the gold standard since the '60s?
21       A.   Well, I don't know that I would agree
22   with that statement.  I think some of Ethicon's
23   own documents and e-mails say that they're
24   moving toward these PVDF meshes because the

13 (Pages 46 to 49)

Scott A. Guelcher, Ph.D.

Page 50

1    inflammatory response is less severe.
2       Q.   My question is very simple:  Have you
3    made any investigation to determine the extent
4    to which polypropylene has been considered the
5    gold standard in tissue repair since the 1960s?
6       A.   Well, I think I just said other
7    people may consider it the gold standard.  I
8    looked into these documents, and I don't
9    consider it the gold standard.  It's an
10   unstable material in my opinion.
11          It may have been the best one
12   available in 1960, but I think recent evidence
13   points to the contrary that there are
14   alternative materials available.
15          I think even Ethicon's own e-mails
16   there are statements that we need to move to a
17   different material because of problems with
18   polypropylene.
19      Q.   And what material -- do you have an
20   opinion that there's a better material than
21   polypropylene in the treatment of stress
22   urinary incontinence?
23      A.   That opinion really wasn't the
24   subject of my report.  I can say that in the

Page 51

1    documents that I reviewed, there were Ethicon
2    employees and I believe even consultants
3    pointing out that PVDF, for example -- there
4    are some papers that have pointed out that PVDF
5    would be a better choice, but I didn't look at
6    that specifically in my report.
7       Q.   Do you know what PVDF is?
8       A.   Polyvinylidene fluoride.
9       Q.   Have you ever studied the use of
10   polyvinylidene fluoride in the context of
11   tissue repair?
12      A.   No.  Like I said, that's outside the
13   context of my report.  I'm just noting that
14   even Ethicon employees are doubting this notion
15   that polypropylene is the only thing available.
16      Q.   Do you know of any PVDF mesh
17   available for sale in the United States?
18      A.   No.  It would require another
19   regulatory filing.
20      Q.   Now, at what point, to your
21   knowledge, was PVDF available as an
22   alternative?
23      A.   I believe -- let me look at the
24   document.

Page 52

1       Q.   Are you referring to Ethicon
2    documents now?
3       A.   Yes.
4       Q.   Are you looking at the seven-year dog
5    study?
6       A.   I am.  So they were looking at
7    alternatives.  One of the alternatives was
8    Ethylon, Novafil, Prolene, and they point out
9    that -- let me look at this for a minute.
10          So in this dog study, some of the
11   dogs were implanted with PTVF sutures in 1987,
12   and I believe the -- so this report is
13   basically saying PVF and Novafil did not show
14   the surface cracks and surface oxidation that
15   Prolene was showing.  So this would be 1992, I
16   think this was published.  Yeah.
17      Q.   Is it your understanding that the
18   Ethicon dog study was published?
19      A.   I mean published internally.  It
20   looks like it's an internal report to me.
21   That's what I meant by published.  Submitted, I
22   should say.
23      Q.   Doctor.  Is there any significance to
24   your opinions in this case, whether you are

Page 53

1    looking at Prolene that's sutured or Prolene in
2    mesh, in terms of the oxidative degradation
3    issues?
4       A.   Well, there's a number of comments in
5    the internal Ethicon documents about moving
6    from heavy-weight to light-weight mesh, the
7    notion being just having less polypropylene has
8    been associated with a reduced inflammatory
9    response.
10          Mesh is different than sutures.  It's
11   implanted in a different anatomic site where
12   there could be differences in load-bearing.
13   There could be differences in the cellular
14   infiltrate.  There's many types of differences.
15          So I don't know that -- you can learn
16   some things from the suture studies, but it's
17   not necessarily representative of how much
18   degradation you would see in a mesh.  I would
19   think you would see more in a mesh.
20      Q.   Why?
21      A.   Because there's more polypropylene
22   there.  It's -- especially in the pelvic floor,
23   it's bearing a load, so it's under a different
24   types of stresses and strains.  So the

14  (Pages 50 to 53)

Scott A. Guelcher, Ph.D.

Page 54

1    consequences of those, oxidative degradation
2    could be different in a mesh than you would see
3    in a suture.
4        Q.   Are your opinions in this case
5    specific to meshes?
6        A.   Well, I think my opinions relate to
7    oxidative degradation of polypropylene and then
8    how that can affect the mesh.  That's my --
9        Q.   I understand that.  But are your
10   opinions in this case specific to meshes and
11   not sutures?
12       A.   Yes.  I'm not here to testify about
13   polypropylene sutures.  I was looking at the
14   suture studies because it was the data that was
15   available to evaluate the body's response to
16   polypropylene.
17       Q.   And are your opinions in this case
18   specific to the polypropylene mesh used for the
19   treatment of stress urinary incontinence?
20           MR. JACKSON:  I'm going to object to
21   form.
22       A.   So, again, my opinions are generally
23   to oxidative degradation of polypropylene and
24   how that can affect its performance in the SUI

Page 55

1    application.
2        Q.   (By Mr. Thomas)  You've not looked at
3    the extent to which oxidative degradation of
4    polypropylene can impact the performance of
5    Prolene in other applications?
6        A.   Like hernia or something?
7        Q.   Correct.
8        A.   That's not what I'm saying in the
9    report or testifying to.  It's the meshes and
10   the SUI.
11           MR. JACKSON:  We've been going for
12   about a hour.  Do you think it's time for a
13   break?
14           MR. THOMAS:  That's fine.
15           (A break was taken from 10:26 a.m.
16   until 10:39 a.m.)
17       Q.   (By Mr. Thomas)  Doctor, I want to
18   move to your report which we've marked as
19   Exhibit No. 1.
20       A.   Okay.
21       Q.   Go to page 4 of your report, please.
22   The second paragraph on page 4, you talk
23   about -- you make the statement, Although
24   polypropylene can never be considered inert.

Page 56

1    Is there any material that can be used for
2    medical implants that can be considered inert?
3        A.   Some are less active than others.  I
4    don't know if it's anything that's completely
5    inert.
6        Q.   You continue and say, It's often
7    stabilized against the threat of oxidation by
8    adding antioxidants to the molten polymer.
9    These antioxidants are supposed to act as
10   scavengers that will react with any oxidative
11   species.
12           Do you know how, if at all, Ethicon
13   stabilized Prolene against the threat of
14   oxidation by adding antioxidants?
15       A.   So there's some information in the
16   internal documents I know they made some
17   changes to stabilizer levels.  The stabilizer
18   levels that I saw were reported as ranges.
19           In the 1987 human explants, it was
20   noted that the antioxidant was depleted in the
21   surface oxidized layer on the polypropylene.
22           My understanding was the oxidants
23   were added to protect against oxidation during
24   thermal processing.  But to dose an antioxidant

Page 57

1    over the lifetime of the device in vivo would
2    be -- I don't know if that can be done.  That's
3    what I'm saying in this paragraph.
4        Q.   What did Ethicon do to stabilize its
5    polypropylene against oxidation?
6        A.   In the human study -- not the human
7    study.  The human explanted materials, they
8    were using --
9        Q.   I need you to identify what you're
10   reading now.
11       A.   Oh, this is the report issued on
12   human explants from human vascular graft,
13   Prolene sutures removed from human vascular
14   graft.
15           MR. JACKSON:  Is there a Bates number
16   at the bottom of that?
17           THE WITNESS:  Ethicon mesh 12831391.
18       Q.   (By Mr. Thomas)  It's dated September
19   30, 1987?
20       A.   Yes.
21       Q.   And it's an Ethicon document?
22       A.   Yes.
23       Q.   It says, IR microscopy of explanted
24   Prolene received from professor R. Guidoin?

15 (Pages 54 to 57)

Scott A. Guelcher, Ph.D.

Page 58

1    A.   Yes.
2    Q.   When did you first see those
3  documents?
4    A.   Yesterday, I believe.
5    Q.   And how did you obtain those
6  documents?
7    A.   Dr. Dunn asked for this document, I
8  believe.  I got it from him.  I believe he
9  asked the attorneys for it.
10    Q.   And what does --
11    A.   You asked about the antioxidants.
12    Q.   Correct.
13    A.   I believe that this report -- I need
14  to find it.  Dilauryl thiodipropionate, DLTDP,
15  is what I believe -- I believe they were using
16  this as antioxidant in the suture at this time.
17  It appears reduced in the two-year sample
18  spectra and further reduced in the eight-year
19  sample spectra.  And in the material they
20  scraped off the surface, they did not find any
21  of it.  That's what the report says.
22    Q.   Okay.  Just for the record, that's
23  marked as document No. 18?
24    A.   Yes.

Page 59

1    Q.   In Exhibit No. 3; is that right?
2    A.   Yes, that's right.
3    Q.   And you received that document
4  yesterday.  Any other documents that you
5  received yesterday that you rely on for your
6  opinions in the case?
7    A.   Well, they're in this notebook.
8    Q.   This is the new binder?
9    A.   Yes.  So this was one that I brought
10  with me.  These are some --
11    Q.   I see.
12    A.   Most of this I got from Dr. Dunn.  He
13  had requested a number of these documents, and
14  he got them from attorneys and we reviewed them
15  yesterday.
16    Q.   I see.  So the documents in Exhibit
17  No. 3 go with the rebuttal report that you were
18  served yesterday?
19    A.   They do, yeah.
20    MR. THOMAS:  For the record, I'm
21  going to mark as Exhibit No. 5 -- Exhibit
22  No. 5 is an expert rebuttal report from
23  Scott Guelcher, Ph.D., that I received for
24  the first time this morning.  And the

Page 60

1  documents -- I guess there are 20 documents
2  in a notebook which we've marked earlier as
3  Exhibit No. 3.
4    (Exhibit 5 was marked.)
5    Q.   (By Mr. Thomas) Those 20 documents
6  are the documents upon which you rely for the
7  substance of your rebuttal report, Exhibit 5?
8    MR. JACKSON:  Object to the form.
9    A.   Well, the rebuttal report also
10  includes the documents submitted.  The rebuttal
11  report also includes documents in the first
12  report.
13    Q.   Okay.  But the new documents for the
14  rebuttal report are contained in the notebook,
15  Exhibit 3, that you brought here with you this
16  morning?
17    MR. JACKSON:  Object to the form.
18    A.   I believe that they are.
19    Q.   (By Mr. Thomas) Other than document
20  No. 18 in Exhibit No. 3, do you have any other
21  documents to support your opinion that the
22  antioxidants in the Prolene mesh were not
23  sufficient to stabilize against the threat of
24  oxidation?

Page 61

1    A.   This is the only document that has
2  the in vivo analysis of that.
3    Q.   Okay.  Going back to my original
4  question, what did you do to understand how
5  Ethicon used antioxidants to stabilize Prolene
6  against the threat of oxidation?
7    A.   So Dr. Dunn was looking at this more
8  in his report.  I discussed this topic with
9  Dr. Dunn.  He showed me some documents
10  providing ranges of the antioxidant that were
11  provided.
12    There were some changes made to the
13  antioxidant levels as well.  I'm not sure that
14  we were able to identify what those were.  But
15  I do believe there were some documents stating
16  that the antioxidant levels were changed, but
17  Dr. Dunn was looking at that.  I discussed it
18  with him.
19    Q.   Do you have an opinion that you're
20  prepared to offer to a reasonable degree of
21  scientific certainty that the antioxidant
22  package used by Ethicon for Prolene is
23  inadequate to protect against oxidation in
24  vivo?

16 (Pages 58 to 61)

Scott A. Guelcher, Ph.D.

Page 62

1      A.   My opinion is that the antioxidant
2   used cannot protect against oxidation in vivo.
3   I believe that because of the teachings of Jim
4   Anderson that this chronic inflammatory
5   response foreign body reaction is ongoing and
6   will continue to oxidize material and deplete
7   the antioxidant.
8          That observation is basically
9   supported by these studies on the sutures from
10  the human explants and, you know, consistent, I
11  think, with the field that you simply can't
12  protect a device over its lifetime.  It's going
13  to be implanted in a patient over the patient's
14  lifetime with an antioxidant.  Eventually, it
15  will be depleted.
16     Q.   Can you tell me today what the
17  antioxidant package that Ethicon used to
18  protect the Prolene polypropylene from
19  oxidation was?
20     A.   I don't know what it is today.  In
21  this report in 1987, it was DLTDP.
22     Q.   Is that all it was?
23     A.   That's what it says in this report.
24     Q.   Have you tried to determine the

Page 63

1   specific antioxidant package Ethicon used to
2   stabilize Prolene against the threat of
3   oxidation?
4      A.   Dr. Dunn and I looked at this.  Like
5   I said, our conclusion was that the documents
6   provided a range of antioxidant.  It didn't
7   provide a specific dose.
8      Q.   Can you tell me today as you sit here
9   in this chair the antioxidant package Ethicon
10  used to stabilize Prolene against the threat of
11  oxidation?
12     A.   I don't remember what it was.
13     Q.   Is it your opinion, Doctor, that
14  there is no antioxidant package available that
15  can effectively stabilize polypropylene against
16  the threat of oxidation?
17     A.   I don't believe it's possible to
18  stabilize an implant against oxidation over its
19  entire lifetime.  I don't know that there's
20  much data on what the dosing should be.  If
21  it's dosed too high, that could cause problems.
22  There's papers that have noted that.
23         The problem is it's an inherently
24  unstable material, and stabilizing it is going

Page 64

1   to be very difficult.  No matter what
2   antioxidant is added, it's going to be
3   gradually depleted over time.
4      Q.   What's the basis for your opinion
5   that whatever antioxidant is available is going
6   to be depleted over time?
7      A.   Well, the paper by Jim Anderson and
8   other papers that have shown that this foreign
9   body reaction is continuous and ongoing and
10  it's going to continue as long as the material
11  is there.  Eventually, that antioxidant is
12  going to be depleted.
13         I suppose you could put it in at very
14  high doses, but then you're going to have
15  toxicity concerns.  To my knowledge, nobody has
16  studied that, what's the amount of antioxidants
17  to add to protect it over its lifetime.
18     Q.   Is it your opinion that the
19  antioxidant package Ethicon used is inadequate
20  or that it can't be done?
21     A.   Well, my opinion is that the
22  antioxidant used in 1987 is inadequate.  That
23  opinion is supported by Ethicon's own data.
24         I don't know what -- I don't remember

Page 65

1   what the antioxidant is that's being used
2   today, but my opinion would be that that would
3   also be inadequate.  Over time, it's just going
4   to be depleted and you can't guarantee that
5   it's going to stay there.
6      Q.   Okay.  And the same would be true for
7   any polypropylene used as a medical device;
8   fair?
9          MR. JACKSON:  Objection to form.
10     A.   I don't believe polypropylene can be
11  stabilized effectively over its lifetime when
12  implanted in a human or animal.
13     Q.   (By Mr. Thomas)  What's the risk when
14  you're unable to stabilize the polypropylene
15  used as a medical implant over the life of the
16  implant?
17         MR. JACKSON:  Object to the form.
18     A.   Well, the risk is exactly what's
19  pointed to in this Ethicon study.  At two
20  years, I don't believe they saw --
21     Q.   This is Tab 18 again, the Guidoin
22  study?
23     A.   Yes.  I need to review this again for
24  just a minute.  There are a lot of documents.

17 (Pages 62 to 65)

Scott A. Guelcher, Ph.D.

Page 66

1    So I can say that as you go from two
2  to eight years, the amount of DLTP -- DLTDP was
3  reduced, and in that surface oxidized layer it
4  was gone.
5    So I think this study supports the
6  idea that stabilizing polypropylene against in
7  vivo degradation permanently for the lifetime
8  of the patient is going to be very difficult.
9  Eventually, the material will oxidize and
10  become embrittled.
11    And those are the consequences, I
12  believe, to not being stable.
13    Q.  Okay.  Are you aware of any study
14  published in peer-reviewed literature which
15  suggests that Ethicon Prolene loses its
16  antioxidant package such that it oxidizes and
17  becomes embrittled, as you've described it?
18    A.  I'm not aware of a published study
19  that's shown that.  But, then again, Ethicon's
20  internal study reported that.
21    Q.  What have you done to understand the
22  circumstances of the study that's in Tab 18 of
23  Exhibit 3?
24    A.  I've read the study, and then there

Page 67

1  were some minutes that were issued to schedule
2  a meeting to -- I think at the meeting, they
3  talked about the implications of the study
4  where they were going to measure -- there was
5  concern about how deep are these surface
6  cracks.  And I think Dr. Dunn was trying to
7  find additional information, SCM.  We couldn't
8  find that information.  So this was all we
9  could get on this particular study.
10    But there was a follow-up meeting.
11  We have some minutes from that, but we don't
12  have much additional -- they measured some
13  crack depths.  But I believe it was the SCM
14  images that we didn't have.  We have FTIR data
15  here for no SCM.
16    Q.  Okay.  Is it your opinion that the
17  DLTDP is the only antioxidant in Prolene?
18    MR. JACKSON:  Objection to form.
19    A.  Well, then I've already answered
20  that.  In 1987, this report refers to the DLTDP
21  stabilizer antioxidant.  I can't remember what's
22  used today.  I know there was a range of doses
23  in the material.  That range is pretty broad.
24  But I don't remember what the current

Page 68

1  antioxidant is.
2    Q.  (By Mr. Thomas)  Do you know whether
3  there's more than one in 1987?
4    A.  In 1987, I don't know.  This report
5  just refers to DLTDP.  That's -- it doesn't say
6  whether there's another one.  It just talks
7  about DLTDP.
8    Q.  Have you made any effort to
9  understand how Ethicon arrived at the
10  antioxidants that it uses to stabilize Prolene
11  against the threat of oxidation?
12    MR. JACKSON:  Object to the form.
13    A.  Again, there were a limited number of
14  references that we talked about.  I believe
15  reviewing some of those documents with
16  Dr. Dunn, there was a change made in the
17  antioxidant levels, and we were trying to find
18  additional documents to explain that change,
19  why it was made.  And I don't believe that was
20  successful.
21    Q.  (By Mr. Thomas)  Is Tab 18 in this
22  document the extent of Exhibit 3, the extent of
23  your knowledge of what you believe to be
24  depletion of the antioxidants in Prolene?

Page 69

1    A.  This is the only study that I'm aware
2  of that we found that addressed the antioxidant
3  question directly.
4    Q.  In your review of documents in
5  connection with this case, are you aware of any
6  other documents that you've reviewed which
7  address the depletion of antioxidants in
8  Prolene suture or Prolene mesh?
9    A.  This is the only one that we could
10  find that directly addressed the antioxidant
11  question, how much antioxidant is left.
12    Q.  So if I'm going to ask you the
13  question on what documents you rely to support
14  your opinion that the antioxidants in Prolene
15  suture are depleted over time, you would point
16  to Tab 18 in Exhibit 3?
17    A.  Well, there's indirect information in
18  the dog study because the dog study observed
19  surface cracking that would also be a
20  consequence of oxidative degradation and
21  embrittlement.  But they didn't -- I don't
22  believe in this study they actually looked at
23  the amount of antioxidant remaining.
24    Q.  Anything else?

18  (Pages 66 to 69)

Scott A. Guelcher, Ph.D.

Page 70

1      A.   Those are the two studies that I'm
2 aware of that looked specifically at this
3 question.
4      Q.   Let's go back to your report on page
5 4 again.  In the middle of the second
6 paragraph, it says, Nor is this stabilization
7 permanent.  The purpose of using antioxidants
8 is to react with any oxidated species that
9 threaten the molecular structure of the
10 polypropylene chain.  You cite to footnote 4,
11 but there's no footnote 4.
12     A.   I'm not sure what happened there.  It
13 must be an oversight.
14     Q.   Do you recall the paper upon which
15 you relied for that statement?
16     A.   I don't recall the paper for that
17 one.  But I think the point of this statement
18 is really in my experience, antioxidants are
19 added to protect for a certain shelf life.  So
20 you would add an antioxidant to protect a
21 polymer for a three-year shelf life.
22          These types of studies can be done in
23 the known.  That type of dosing can be done.
24 What I'm saying is that trying to determine the

Page 71

1 dosing to protect against in vivo degradation
2 is another question.
3      Q.   Let me ask you this question:  Is it
4 your belief that the antioxidants that are
5 added to Ethicon prolene polypropylene are
6 merely for shelf life consideration?
7      A.   There was a statement that I read in
8 one of the documents.  I can't remember which
9 one it was.  But there was an Ethicon document
10 that made the statement that the stabilizer was
11 added to protect against mechanical and thermal
12 processing.
13     Q.   Is it your opinion that the
14 antioxidants added to Prolene polypropylene are
15 only to extend the shelf life of that product?
16     A.   The only evidence I have for the
17 purpose of adding antioxidants was to stabilize
18 it against manufacturing shelf life in the box
19 before it's implanted.  I didn't see any
20 evidence in the documents that I reviewed where
21 antioxidants were added dosed for the purposes
22 of in vivo stability.
23          (Exhibit 6 was marked.)
24     Q.   (By Mr. Thomas)  A minute ago, you

Page 72

1 discussed the Anderson article.  Let me hand
2 you what I've marked as deposition Exhibit
3 No. 6 and ask you if Exhibit No. 6 is the
4 Anderson study to which you've cited in your
5 paper.
6      A.   Yes.
7      Q.   And I believe I heard you say that
8 you cite Anderson for the proposition that over
9 the life of the material, that antioxidants
10 will be depleted.  Did I hear that correctly?
11          MR. JACKSON:  Object to the form.
12     A.   I think what I said was this foreign
13 body reaction will continue as long as the
14 material was present.
15     Q.   (By Mr. Thomas)  Okay.  Does the
16 Anderson article speak to the issue of the
17 extent to which antioxidants added to
18 polypropylene will be depleted over time?
19     A.   Not directly.  I was using Anderson
20 to support the notion that the foreign body
21 response is ongoing.
22     Q.   Are there any of the studies that
23 you've cited in your report, Exhibit No. 1,
24 that support the proposition that antioxidants

Page 73

1 added to polypropylene deplete over time and
2 create a risk of degradation?
3      A.   As I said before, the only study that
4 looked at specific questions of antioxidant
5 loss would be the human explants from 1987.
6      Q.   That's Tab 18 in Exhibit No. 3?
7      A.   Yes.
8          (Exhibit 7 was marked.)
9      Q.   (By Mr. Thomas)  Let me show you
10 what's been marked as deposition Exhibit No. 7.
11 Deposition Exhibit No. 7 is a study, 1976,
12 titled Subcutaneous Implants of Polypropylene
13 Filaments, lead author Liebert.  You cite this
14 in your paper, don't you?
15     A.   Yes.
16     Q.   This is a 1976 study that compares
17 polypropylene implanted in animals with
18 antioxidants and without antioxidants; correct?
19     A.   Yes.
20     Q.   The Liebert study finds that the
21 polypropylene treated with antioxidants does
22 not degrade?
23     A.   In this particular study in this
24 implantation site for this period of time, they

19 (Pages 70 to 73)

Scott A. Guelcher, Ph.D.

Page 74

1    were able to protect it from degradation.  Let
2    me look -- I need to look at this for a minute.
3         So they went out to an implantation
4    time of 160 days.  I think that's five or six
5    months.
6         So I'm not saying that you can't
7    protect it for a period of time. I mean, even
8    the human explants showed some antioxidant
9    after eight years.  I'm saying it's reduced.
10   So this is five months.  But if you go out
11   years, these devices are made to be implanted
12   in humans for their lifetime.
13        If you go out for very long periods
14   of time, I don't think you can guarantee that
15   these antioxidants -- they didn't even measure
16   the anti -- I don't think they did.  I would
17   have to look at it again.
18        So I'm not saying that you can't
19   protect it for some period of time.  I'm just
20   saying that I doubt whether you can protect it
21   over the lifetime of the device on every
22   patient, that you can protect it from
23   oxidation.  This is only five months.
24        At eight years in these sutures

Page 75

1    explanted from humans, they saw loss of
2    antioxidant.
3         Q.   When you talk about the sutures at
4    eight years, again, you're talking about Tab 18
5    in Exhibit 3 of your rebuttal report?
6         A.   Yes.
7         Q.   So you would suggest that Tab 18 of
8    Exhibit 3, the suture study, is inconsistent
9    with the findings in Exhibit 7 in Liebert?
10        A.   No.  I think they're consistent.
11   Liebert only went out five months.  What this
12   study is saying -- let me read the findings
13   again.
14        Q.   Just for your benefit, I don't have
15   that study.
16        A.   I understand.
17        Q.   I'll get that, but I don't have that.
18        A.   I understand that.  But what this
19   study is saying is -- I need to find it.
20        So the DLTDP appears reduced at two
21   years.  Two years is longer than five months.
22   And at eight years, it's further reduced.  And
23   then in the oxidized material that they scraped
24   off, they didn't find it.

Page 76

1         So I see this study as being
2    consistent with Liebert.  I think Liebert was
3    asking a different question.  I think Liebert
4    was saying, Well, for five months, I can add
5    enough antioxidant to stabilize the
6    polypropylene.  So I want to compare stabilized
7    polypropylene -- it's like a control -- versus
8    unstabilized polypropylene.
9         So Liebert was going after a
10   different question, but he just didn't go out
11   as far as this study did.  So I don't really
12   see any consistencies between these two
13   studies.
14        Q.   Are you aware of any studies in the
15   peer-reviewed literature that support your
16   position that stabilizers used to protect
17   against oxidation in polypropylene deplete over
18   time and create a risk of the oxidative
19   degradation of polypropylene?
20        A.   There's no studies that have
21   specifically shown that.  But I think from what
22   we know about the foreign body response, that
23   the oxidative attack is continuous and ongoing.
24        What we know from the human explants,

Page 77

1    initially that antioxidant is going to be
2    depleted.  That's what I think we know.
3         Q.   We know from your earlier testimony
4    that polypropylene has been used in tissue
5    repair for 50 years now; correct?
6         A.   Yes.
7         Q.   Wouldn't you expect that to be an
8    issue of significance in the medical and
9    scientific literature if polypropylene used for
10   the last 15 years loses antioxidants and poses
11   a risk to the patients?
12        A.   I don't know if -- the papers I'm
13   actually familiar with that I reviewed are not
14   specifically looking at the question of
15   antioxidant depletion, but they do show signs
16   of oxidation.
17        So if there's signs of oxidation,
18   this study confirms it.  And you would
19   anticipate that if it's oxidizing, the
20   antioxidant is not protecting it.
21        Q.   That's something that could be
22   tested, though, couldn't it?
23        A.   Well, they tested it here.
24        Q.   You're talking about the Ethicon --

20  (Pages 74 to 77)

Scott A. Guelcher, Ph.D.

Page 78

1    A.   In the human explants, yeah.
2    Q.   I'm talking about in the peer-
3  reviewed literature to the extent that was a
4  phenomenon going on, that was something that
5  could be presented in a controlled scientific
6  test that could be subject to peer-review and
7  published in the literature?
8    A.   They should be able to do that.
9  That's just not what those studies did.  They
10  were looking more at signs of surface oxidation
11  like Liebert did.  They were looking at the
12  phenomenon of surface oxidation.
13    Q.   The Anderson paper that we just
14  discussed, the Anderson paper you've cited for
15  the proposition of the continuous foreign body
16  reaction to the life of the explant; is that
17  fair?
18    A.   Yes.
19    Q.   Any other purpose?
20    A.   General background on the nature of
21  the inflammatory response that was in the
22  report.
23    Q.   Dr. Guelcher, your education is what?
24    A.   So I have a bachelor's degree and

Page 79

1  master's degree and Ph.D. in chemical
2  engineering.
3    Q.   And you've not studied polypropylene
4  before your work in this case; correct?
5    A.   No.  But I've studied oxidative
6  degradation of other polymers.
7    Q.   And polyurethane is an issue of your
8  interest?
9    A.   Yes.
10    Q.   Does polyurethane degrade in vivo?
11    A.   Polyurethane is a broad term.  So
12  part of my research, we design lysine-derived
13  polyurethane grafts that we published a couple
14  of papers reporting that they undergo oxidative
15  degradation.  But those polymers are the tissue
16  grafts, so they're designed to degrade
17  oxidatively.
18      The other side would be biostable
19  polyurethane implants.  They are designed to be
20  be biostable.  Jim Anderson did a lot of work
21  over the years investigating the oxidative
22  degradation of polyether urethanes.  So other
23  materials such as polycarbonate urethanes have
24  have been studied that are more exidatively

Page 80

1  stable.  But the polyethers are known to undergo
2  oxidative degradation.
3    Q.   Is there any material of which you're
4  aware that you could use for a medical device
5  implant that is not subject to oxidative
6  degradation?
7    A.   Every material is going to -- the
8  foreign body response is going to happen when
9  you implant a foreign material.  So the
10  difference is materials -- materials respond
11  differently to that foreign body reaction.  And
12  I think Ethicon's data points to polymers like
13  PVDF as being more resistant to oxidative
14  degradation.  So some are more resistant than
15  others.
16    Q.   Are you saying that PVDF does not
17  degrade by oxidation in vivo?
18    A.   What I'm saying is, in the dog study,
19  the PVDF sutures didn't show evidence of
20  surface cracking.  Now, whether there's
21  oxidative degradation, you would have to use
22  more sensitive techniques like XPS to actually
23  characterize a surface.
24      At seven years in this dog study,

Page 81

1  they were not seeing the same amount of
2  cracking that they saw in the polypropylene.
3    Q.   Do you have an opinion, Dr. Guelcher,
4  that there's any polymer that can be implanted
5  in the human body that is not subject to
6  oxidative degradation?
7    A.   That's not really within the scope of
8  my report.  I mean, my report is focusing on
9  oxidative degradation of polypropylene.  I'm
10  just noting observations that there are
11  polymers that appear to undergo less oxidative
12  degradation.
13    Q.   Whether it's in the scope of your
14  report or not, do you have an opinion in that
15  regard?
16    A.   I have an opinion that some materials
17  are going to degrade more slowly in response to
18  that foreign body reaction than others.  But I
19  don't know that it's been shown conclusively
20  that they do or don't.  The data aren't there.
21    Q.   So is it fair to understand that you
22  do not have an opinion as to whether there's
23  any polymer that's available for implantation
24  as a medical device that does not undergo

21 (Pages 78 to 81)

Scott A. Guelcher, Ph.D.

Page 82

1    oxidative degradation?
2        A.   I mean, I wouldn't say does not.  I
3    would just say it's much more stable than
4    polypropylene.  There are polymers that are
5    more oxidatively stable than polypropylene.
6        Q.   What are those?
7        A.   Well, the PVDF and --
8        Q.   What else?  We've talked about PVDF.
9    Anything else?
10       A.   What else did I look at?  I said
11   polycarbonate urethanes are more stable
12   against oxidative degradation than polyethers.
13   Those would be a few.
14           Again, I'm not -- I'm focusing in my
15   report my opinions on that polypropylene
16   degrades oxidatively in a significant rate.
17       Q.   Going back to your report, page 4,
18   note 4, do you know what site is appropriate
19   there that is left out in footnote 4?
20       A.   I don't.  I don't have that with me.
21       Q.   The next paragraph says, The
22   oxidation of the polymer on the tertiary
23   hydrogen bond is the rate controlling step in
24   this process, and it will result in the

Page 83

1    polypropylene's molecular chain being broken
2    and the reaction repeating until no more
3    polypropylene can be broken down.  What does
4    that mean?
5        A.   I think that statement is referring
6    to this autocatalytic effect.  Once you start
7    to form these reactive species on the surface,
8    it just continues to react.  There's no reason
9    for it to stop.  It will continue to react and
10   in later stages of degradation, there could be
11   molecular weight loss and embrittlement.
12       Q.   At what stage would there be
13   molecular weight loss?
14       A.   That's addressed by this concept of
15   the induction time.  So the paper by Fayolle
16   and Liebert, these papers together are
17   suggesting -- there's a -- Fayolle put out the
18   notion that embrittlement can happen -- this is
19   in figure 1.
20           So the induction time that's measured
21   by, in this case, the FTIR measurements, the
22   induction time is where there's this sharp
23   change in the slope of the curve.  So the
24   concentration of hydroxyle and carbonyl groups

Page 84

1    is relatively -- it's a very small slope.
2            And then at some point when that
3    induction time is reached, it becomes
4    autocatalytic, and the concentration of those
5    groups increases.
6            What Fayolle is saying is that
7    critical molecular weight for embrittlement in
8    the materials he looked at, he was reporting a
9    molecular weight of 200,000 grams per mole.
10   And he noted that that embrittlement on the
11   basis of mechanical testing, that embrittlement
12   is happening prior to the induction time
13   measured by spectroscopy.
14       Q.   I'm going to need you to help me
15   understand these charts.
16       A.   Okay.
17       Q.   We're on page 5 now of Exhibit No. 1.
18       A.   Right.
19       Q.   And these are charts that you
20   borrowed from Dr. Fayolle's paper?
21       A.   They were published in the Fayolle
22   study from 2000.
23       Q.   At the top of (a), it says
24   spectrophotometric induction time.  What does

Page 85

1    that mean?
2        A.   The spectrophotometric induction time
3    is the time at which there's that change in the
4    slope of concentration of hydroxyle groups and
5    carbonyl groups.  So that line is almost flat,
6    so there's very small change.
7            And then at some point, it becomes
8    autocatalytic.  The concentration of these
9    groups on the surface is high enough that now
10   the rate at which the oxidation reaction is
11   happening is much faster.  That's the induction
12   time.
13       Q.   Just for my benefit, the
14   spectrophotometric induction time is
15   represented in figure A as the triangles and
16   squares at the bottom?
17       A.   Yes.
18       Q.   And so at the point at about, oh, 250
19   to 260 is where there's a change in the
20   hydroxyle groups and carbonyl groups which
21   reflects a chemical change in the
22   polypropylene?
23       A.   That's right.
24       Q.   So the embrittlement induction time

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 86

1    means what?
2        A.   This is a nice part of the work that
3    Fayolle did. He was measuring ultimate
4    elongation here by this. So embrittlement
5    induction time, that's where the axis on the
6    left with the curves with the hash lines, as you
7    can see, the elongation is relatively constant.
8    Then when you reach this embrittlement
9    induction time, the material becomes highly
10   brittle and less elongation.
11       Q.   What does elongation mean?
12       A.   That's the amount that you can
13   stretch it. Out here, it's 800 percent. You
14   can stretch it to eight times its initial
15   length. When it becomes brittle, that number
16   drops below -- then even small amounts of
17   strain cause the material to fail.
18       Q.   Now, is it fair to understand --
19   again, me trying to understand this chart --
20   that at the beginning of the study, the range
21   of the elongation is around 750 to 900?
22       A.   Right.
23       Q.   And then over time, it decreases and
24   then drops off rather dramatically at about 125

Page 87

1    to 175 hours. Am I reading that correctly?
2        A.   Yes.
3        Q.   So after that period of time, you
4    have a reduction in elongation and increase in
5    embrittlement. And then about 75 hours later,
6    you have an increase in the hydroxyle and the
7    carbonyl groups. Is that fair?
8        A.   That's right.
9        Q.   Each one of these changes that are
10   shown in Exhibit A amount to a change in the
11   chemical structure of the polypropylene;
12   correct?
13       A.   Well, the hydroxyle and carbonyl
14   groups, that's the introduction of bound
15   oxygen. The embrittlement is a mechanical
16   property. That's not a -- the structure of the
17   polymer is changing. It's becoming brittle.
18       Q.   But the chemical structure of the
19   polymer does not change in figure A until you
20   get to the formation of the hydroxyle groups
21   and the carbonyl groups?
22       A.   The chemical structure is breaking,
23   and Fayolle explains the details. And there's
24   some explanations for what could be happening

Page 88

1    there.
2        These concepts of tie chains and
3    amorphous chains that connect crystalline
4    regions are breaking and that can lead to
5    embrittlement. So what Fayolle is saying is
6    that changes in the polymer that lead to
7    embrittlement happen before large
8    concentrations of hydroxyle and carbonyl
9    groups, which has been the traditional way.
10   Even XPS would measure formation of hydroxyle
11   and carbonyl groups on the surface.
12       What Fayolle is saying is that
13   embrittlement happens you can really -- before
14   that becomes appreciable. It becomes this
15   autocatalytic increase.
16       Q.   Now, figure B uses axes of molecular
17   weight, time, and concentration moles per
18   kilogram; correct?
19       A.   Yes.
20       Q.   Is B appropriate to overlay on A?
21       A.   So my comments, my notations, on
22   Panel B were designed to kind of interpret A
23   especially in light of Liebert.
24       So Fayolle reports a critical

Page 89

1    molecular weight for embrittlement in the
2    polymers he was looking at 200,000 grams per
3    mole. The polypropylene samples he was using
4    became embrittled when the molecular weight
5    dropped to 200,000 grams per mole. That's what
6    that critical molecular weight -- that's what
7    Fayolle was saying.
8        Q.   It starts at about 225,000?
9        A.   That's when the material becomes
10   sufficiently brittle that it's -- the material
11   is basically brittle.
12       Q.   This shows the change in molecular
13   weight over time?
14       A.   Yes.
15       Q.   And at about 210 hours is when you
16   reach a reduction in molecular weight from
17   about 260 to about 200,000?
18       A.   That's how Fayolle defined it, as
19   embrittlement at that 200,000 molecular weight.
20       Q.   The molecular weight then continues
21   to become reduced until at about 260 hours the
22   molecular weight of the polypropylene or
23   whatever substance you're measuring at that
24   point is down around 75,000; correct?

Scott A. Guelcher, Ph.D.

Page 90

1    A.   That's right.
2    Q.   Now, the hydroxyle group and the
3  carbonyl groups are the same graphs that are on
4  figure A; correct?
5    A.   Yes.
6    Q.   So at the bottom where you have time
7  and days and subcutaneous implantation, what
8  does that mean?
9    A.   So I added the line -- the red line
10 at the bottom is a way to interpret the data
11 from Liebert.  So what Liebert was teaching was
12 that -- he reported an induction time of 108
13 days by his own -- he did very similar measures
14 on explanted materials of hydroxyl and carbonyl
15 groups.
16      And he reported in vivo induction
17 time of 108 days.  And then he notes if you
18 consider molecular oxygen as the source and
19 physiological temperatures, there should be an
20 induction time of 20 years, and yet we're
21 measuring 108 days.  Clearly, there has to be
22 some sort of reactive oxygen within the body.
23      Based on the work of Anderson and
24 others, we know now that that's associated with

Page 91

1  the foreign body response.  That's where the
2  208 days come from.  That's the induction time
3  measured by Liebert for unstabilized
4  polypropylene explanted from the sutures in the
5  films -- explanted from the hamsters.
6      So the 90 days is an approximation of
7  this concept of Fayolle that it basically
8  becomes embrittled before this induction time,
9  and he's basically saying -- you can deduce
10 from this as around 90 or a hundred days it's
11 becoming embrittled, unstabilized polypropylene
12 in vivo.  That's what this is saying.
13    Q.   And figure A is all Fayolle; correct?
14    A.   Both of those plots, the plots
15 themselves came from Fayolle.  Everything in
16 black came from Fayolle.
17    Q.   All I have is black and white.
18    A.   All right.  So I used a different
19 font.  You can probably tell a difference in
20 the fonts that I used.
21    Q.   The time (days) subcutaneous
22 implantation, where does that come from?
23    A.   That is the time scale that Liebert
24 measured.  So what this plot is trying to do is

Page 92

1  pull together the auto-oxidation that's
2  observed in air at elevated temperatures with
3  what happens in the body.  It's just a
4  different source of oxygen, reactive oxygen in
5  the body.
6    Q.   So in the Fayolle part of figure B on
7  page 5 where it shows at 210 hours there's the
8  critical molecular weight for embrittlement,
9  you drop down and get at about 90 days.  How do
10 those two -- 210 hours, which is less than ten
11 days, and 90 days -- how can you draw those
12 together?
13    A.   Well, that's what I was saying.  So
14 the hours axis is that's the auto-oxidation
15 that just happens with molecular oxygen as an
16 oxygen source at elevated temperatures.
17      What Liebert is saying is this
18 process happens over this time of about 100
19 days in vivo because there's a different source
20 of reactive oxygen.  It's the reactive oxygen
21 species secreted by the inflammatory cells.
22 That's why -- that's the difference in the time
23 scale.
24    Q.   Okay.  And so the time scale for

Page 93

1  Liebert, where you say that the embrittlement
2  will occur at about 90 days, is based upon
3  Liebert's study of polypropylene without
4  antioxidants?
5    A.   Right.
6    Q.   And the Fayolle study is based upon
7  testing of polypropylene with the antioxidants
8  removed; correct?
9    A.   Let me look at the Fayolle study
10 again to make sure.
11    Q.   Do you recall that without looking?
12    A.   Let me look at it for a minute.
13    Q.   I have it for you here if that's
14 easier.
15    A.   I've got it.
16      MR. THOMAS:  Let me mark it anyway as
17 a deposition exhibit.  It's deposition
18 Exhibit 8, a copy of the Fayolle study.
19      (Exhibit 8 was marked.)
20    Q.   (By Mr. Thomas)  Exhibit 8 is a study
21 titled Oxidation Induced Embrittlement in
22 Polypropylene, a tensile testing study June
23 2000 by B. Fayolle, F-a-y-o-l-l-e.
24    A.   So he says in the experimental

24 (Pages 90 to 93)

Scott A. Guelcher, Ph.D.

Page 94

1    section, The additives, I'm presuming the
2    stabilizers, antioxidants were extracted in a
3    soxhlet extractor in chloroform hexane ethanol.
4    I would interpret that statement as saying
5    that there was also unstabilized polypropylene.
6        Q.   Have you seen any testing of
7    stabilized polypropylene to support the
8    positions that you take on page 5 of Exhibit
9    No. 1?
10       A.   No.  These data were the data that I
11   had for unstabilized polypropylene.
12       Q.   Let's take a quick break please.
13           (A break was taken from 11:31 a.m. to
14   11:41 a.m.)
15       Q.   (By Mr. Thomas)  Let's go back to
16   page 5 of Exhibit No. 1.  Is it fair to
17   understand, based upon your analysis of Liebert
18   and Fayolle as depicted in these two graphs on
19   page 5, that there is no embrittlement without
20   a loss of molecular weight?
21       A.   I don't know that I would say it that
22   way.  I would say that loss in molecular weight
23   leads to embrittlement.
24       Q.   Okay.  The tests that we've just

Page 95

1    discussed -- strike that.  The papers that
2    we've just discussed by Fayolle and Liebert
3    where you used test data from polypropylene
4    without antioxidants, these same tests could be
5    used for testing polypropylene with
6    antioxidants, couldn't they?
7        A.   These tests?
8        Q.   Yes.
9        A.   Yes.  You have to go out to longer
10   time points, but they could be used.
11       Q.   Right.  And to your knowledge, none
12   of that testing has been done?
13       A.   Not using this specific approach.  I
14   mean, there are papers where people have looked
15   at explants and noted evidence of surface
16   oxidation, but not this type of time course.  A
17   mechanistic study that would have to be done
18   in vitro.
19       Q.   The studies that you're referring to
20   are the Clave and Costello articles that you
21   referred to elsewhere in your report?
22       A.   Yes.
23       Q.   But in terms of the types of studies
24   conducted by Liebert and by Fayolle that are

Page 96

1    discussed on page 5 of your report, to your
2    knowledge, this type of analysis has not been
3    done for polypropylene with antioxidant
4    packages?
5            MR. JACKSON:  Objection to form.
6        A.   I don't know that this particular
7    test has been done for polypropylene with the
8    antioxidant.
9        Q.   Okay.  Now, the Fayolle paper,
10   Exhibit No. 8, also deals with thermal
11   oxidation of polypropylene films.  Do you see
12   that?
13       A.   Yes.
14       Q.   Does the fact that they're testing
15   polypropylene films as opposed to polypropylene
16   sutures or mesh have any impact on your
17   opinions?
18       A.   Let me look at this for just a
19   minute.
20           I'm just looking to see if he -- they
21   don't report film thicknesses.
22       Q.   Look at the very beginning in the
23   abstract.  They talk about a hundred microns.
24   Is that the thickness of the film?

Page 97

1        A.   Okay.  Yeah.  I see a hundred
2    microns.  For some reason it's not in the
3    experimental.
4            So my -- why I believe they used
5    hundred micron films is because these films are
6    very thin.  So because they're so thin, these
7    changes in the surface are going to result in
8    molecular weight degradation because the
9    sutures are much thicker.  So -- they're on the
10   millimeter scale.
11           Basically, because they're using
12   these thin films, that allows them to measure
13   these changes in molecular weight more
14   accurately, because molecular weight is a
15   volume average property.  So if you use a very
16   thin film, then surface degradation is going to
17   contribute more to molecular weight loss of the
18   bulk polymer.
19       Q.   How big are sutures, did you say?
20       A.   Three or five -- let me just look.
21   It was in one of these studies.  Let me find
22   it.  I thought it was.  I can't seem to find
23   it.
24       Q.   It's not really important to my

Scott A. Guelcher, Ph.D.

Page 98

1    question.
2        A.   Okay.
3        Q.   Is there a difference between the use
4    of a film and the use of a suture for purposes
5    of this analysis done by Fayolle?
6        A.   You would see the same changes on the
7    surface of a suture that you would see on the
8    surface of a film.  But you might not see the
9    same changes in molecular weight because with
10   the film, the surface is a larger -- well,
11   okay.
12       Q.   The oxidation that Fayolle studies is
13   thermal oxidation, isn't it?
14       A.   It's thermal oxidation.  That was the
15   point of figure 1 in my report of page 5 was to
16   connect the time scales.  What Liebert was
17   saying is thermal oxidation under physiological
18   conditions, molecular oxygen, 37 c. would take
19   20 years, but he observes 108 days.  That
20   points to a much more reactive source of oxygen
21   in the body.
22            So they're similar processes.  It's
23   just the difference in the source of the
24   oxygen.  Fayolle was looking at sort of

Page 99

1    thermally-induced where you heat it up, and
2    molecular oxygen is actually the source of
3    oxygen that causes reaction.
4        Q.   Thermal oxidation, is at 90 degrees
5    c.?
6        A.   I don't know what temperature he
7    used.
8        Q.   First page of the abstract.
9        A.   90 c.
10       Q.   And normal body temperature is 37 c.?
11       A.   Yeah.  But I was saying that Liebert
12   noted that thermal oxidation in the body is
13   much slower, but there's another source of
14   reactive oxygen.  That's the reactive oxygen
15   secreted by the inflammatory cells in the body.
16            The purpose of that figure was to
17   show that -- Liebert has a similar plot of
18   hydroxyl and carbonyl groups from the explants.
19   It's the same reaction.  It's just a different
20   source of reactive oxygen.
21       Q.   So the conclusions that you reached
22   with respect to opinion No. 1 in your report
23   are based upon your review of the literature
24   that you've discussed and not on any testing

Page 100

1    that you conducted yourself; true?
2        A.   Yes.  These are literature data.  As
3    I said earlier, we didn't even have materials
4    to test for this sort of work.
5        Q.   Paragraph 2 on page 6 titled
6    Polypropylene Degradation In Vivo, the second
7    full paragraph says, Macrophages and FBGCs
8    attached to biomaterials are known to lead to
9    degradation and device failure.
10            There's no cite there.  Do you know
11   what cite is appropriate there?
12       A.   Which paragraph is this again?
13       Q.   Right in the middle of the page,
14   adhesion of macrophages.  The last sentence
15   reads, Macrophages and FBGCs attached to
16   biomaterials are known to lead to degradation
17   and device failure?
18       A.   I believe Anderson discusses this
19   point.  In my own research, we've shown that
20   macrophages attached to the scaffolds lead to
21   active degradation.  We published that in 2011.
22       Q.   With what material?
23       A.   With the polyurethane.
24       Q.   Have you found any kind of literature

Page 101

1    which supports the proposition that macrophages
2    and FBGCs attached to polypropylene are known
3    to lead to degradation and device failure?
4        A.   Well, some of the clinical studies
5    report the presence of an inflammatory
6    infiltrate in these cells, and some of these
7    materials extruded or became affected.
8        Q.   My question is simpler than that.  My
9    question is whether you're aware of any peer-
10   reviewed literature which finds that
11   macrophages and FBGCs attached to polypropylene
12   are known to lead to degradation and device
13   failure?
14       A.   For polypropylene, it's not been
15   studied specifically.  But, again, in those
16   images, it shows -- the ones that are more
17   where you see these inflammatory cells, it's
18   associated with oxidative degradation.
19       Q.   Just so we're clear, though, you've
20   not found any peer-reviewed literature that
21   finds that macrophages and FBGCs attached to
22   polypropylene lead to device failure?
23       A.   I mean, that's a very narrowly worded
24   statement.  I don't want to be boxed in by

26 (Pages 98 to 101)

Scott A. Guelcher, Ph.D.

Page 102

1   that.
2       Q.   Is it true?
3       A.   I'm going to stick by my answer.
4   There are inflammatory cells present, and he's
5   explaining samples that failed.
6       Q.   Is there any report in the peer-
7   reviewed literature that any polypropylene mesh
8   or suture failed due to macrophages and FBGCs
9   attaching to polypropylene?
10      A.   Let me look at Clave again.
11          (Exhibit 9 was marked.)
12      Q.   (By Mr. Thomas)  For the record,
13  you're referring to Exhibit No. 9, which is the
14  Clave article.  So Clave reports two types of
15  responses, a Type 1 and a Type 2 reaction
16  characteristic of an infection.  A majority
17  of altered polymorphonuclear neutrophils
18  were found; suggested an infectious process.
19  This is on page 263 under the histological
20  analysis.
21          He also reports a Type 2 reaction is
22  chronic inflammation rich in giant cells and
23  mononuclear cells.  And then he also sees
24  these -- evidence of what could be oxidative

Page 103

1   degradation.  He sees evidence of cracking.
2           These are basically supporting his
3   conclusions that these polypropylene implants
4   are altered in vivo.
5       Q.   *  But there's nothing in Clave's
6   article, Exhibit No. 9, that discusses device
7   failure, is there?
8       A.   Let me read what he wrote again.
9   Well, I mean, these are a hundred implants,
10  explanted from patients due to complications.
11  So I would say that the device failed if they
12  had to take it out because of complications.
13      Q.   When you're talking about
14  degradation, you're talking about the
15  polypropylene being degraded to the point where
16  it breaks or fails; correct?
17      A.   No.  I think that's discussed in my
18  report, is where you have surface oxidation
19  that can lead to molecular weight loss,
20  embrittlement, cracking, is a whole chain of
21  events that happens.
22          What I'm saying is that Clave took a
23  hundred explants from patients that had
24  complications that had problems with the mesh.

Page 104

1   And many of those explants, he saw inflammatory
2   reactions associated with infection or a
3   chronic inflammatory response.
4           He saw cracking on the surface which
5   is consistent with oxidative degradation as
6   even pointed out in Ethicon's studies, the dog
7   study and the human explants.
8           He sees evidence by FTIR of carbonyl
9   groups that are associated with oxidative
10  degradation.  Now he comments that he can't say
11  whether it's oxidative degradation or whether
12  it's something else, but it's consistent with
13  the notion of oxidative degradation.
14          So when you take Clave plus Ethicon's
15  own data that oxidation can lead to surface
16  cracking and embrittlement, I think Clave is
17  teaching that meshes that were explanted
18  because of complications because they failed
19  showed this inflammatory response and surface
20  oxidation.  That's the way that I would answer
21  your question.
22      Q.   Is Clave the only support that you
23  have that macrophages and FBGCs attached to
24  biomaterials are known to lead to degradation

Page 105

1   and device failure?
2       A.   Let me look at Costello as well.
3       Q.   Is Costello the only other one that
4   you would look to?  That's not an Ethicon mesh,
5   by the way, is it?
6       A.   No.  But it does have a polypropylene
7   component, I believe.
8       Q.   Does it have a polypropylene
9   component with the Ethicon added effect?
10      A.   I don't know.  Let me just see what
11  he says.  Yeah, these were the Bard
12  composites.  But he discusses oxidation.  He
13  has some SCM images showing surface effects,
14  effects of surface oxidation.
15      Q.   You're in the Costello study now?
16      A.   Yes.
17      Q.   Is polypropylene ever appropriate to
18  use in a medical device?
19          MR. JACKSON:  Objection to form.
20      A.   I'm not really here to speak to that.
21  I was looking at suitability for polypropylene
22  in these pelvic floor-type applications.
23      Q.   (By Mr. Thomas)  For the pelvic
24  floor, is polypropylene ever appropriate to use

27 (Pages 102 to 105)

Scott A. Guelcher, Ph.D.

Page 106

1   in a medical device?
2       A.   Not saying whether it's appropriate
3   to use or not. I'm saying that it can undergo
4   surface oxidation due to the foreign body
5   reaction that can lead to changes in the
6   polypropylene, and those changes are not fully
7   understood.
8           They're observed by Ethicon in their
9   own studies. They were never really followed
10  up on or understood. And so the long-term
11  behavior of the device is unpredictable. I'm
12  not saying that it can never be used. I'm
13  saying because of these changes due to foreign
14  body reaction, its performance can be
15  unpredictable.
16      Q.   You say it's unpredictable. Does
17  that mean you do not have an opinion as to what
18  will happen to the device over the life of its
19  implantation?
20      A.   I believe that over the life of its
21  implantation, the polymer will change in
22  response to the foreign body reaction. Well,
23  specific changes would be loss of molecular
24  weight, embrittlement. In some patients, that

Page 107

1   can lead to extrusion, pain. It's consistent
2   with those adverse events in patients.
3           And I believe that the instability of
4   the polymer can contribute to those adverse
5   events.
6       Q.   Okay. What is it that allows you to
7   offer the opinion that the surface oxidation of
8   polypropylene that you've described leads to
9   extrusions?
10      A.   Well, I think Ethicon even noted in
11  some of their documents the importance of
12  matching the properties of the mesh to the
13  properties of the host tissue. This is known,
14  it's true just -- it's important to match the
15  properties of the implant to that of the
16  tissue.
17          So if you have an implant that now is
18  becoming very brittle, it's no longer
19  comparable to the tissue that it's surrounded
20  by.
21      Q.   Is this something you're just
22  deducing and piecing together or something
23  that's based upon any kind of medicine or
24  science?

Page 108

1       A.   Well, I think that these papers are
2   showing there is surface oxidation that we know
3   leads to embrittlement. Then these devices that
4   are extruded are infected as a complication.
5           So I think that these papers are
6   showing the connection between the two.
7       Q.   Are there any papers in the medical
8   or scientific literature that suggest that
9   surface oxidation of polypropylene mesh can
10  lead to extrusion?
11      A.   I think Clave is suggesting this, as
12  I was explaining. He sees these hundred meshes
13  where there were problems. He sees evidence of
14  surface oxidation. He sees inflammatory cells
15  and the infiltrate infection.
16      Q.   Is that the sole basis for your
17  opinion that surface oxidation of polypropylene
18  mesh can lead to extrusions, the Clave article?
19      A.   Clave would probably be the one.
20      Q.   Anything about your own work that
21  you've done in your training, education, and
22  experience outside of Clave that leads you to
23  conclude that surface oxidation of
24  polypropylene mesh can lead to extrusion?

Page 109

1       A.   Not that I'm aware of.
2       Q.   What is the basis for your opinion
3   that surface oxidation on polypropylene mesh
4   leads to pain?
5       A.   I think if you have a brittle piece
6   of plastic embedded in soft tissue, it's going
7   to be painful.
8       Q.   Is this based upon what you know or
9   based upon any scientific literature to support
10  your position?
11      A.   I would have to look for some papers
12  on this. But, I mean, I think it's obvious if
13  you have brittle plastic in your body, it's
14  going to hurt.
15      Q.   It's based on that obviousness as
16  opposed to your review of any scientific
17  literature; is that fair?
18      A.   I can't think of a paper right now
19  that explicitly says that.
20      Q.   Just so we understand, you don't know
21  whether the mesh in Ms. Edwards was brittle, do
22  you, to use the term as you've used it?
23          MS. LEWIS: Objection: Form.
24      A.   We didn't have an opportunity to

28 (Pages 106 to 109)

Scott A. Guelcher, Ph.D.

Page 110

1    measure that.
2       Q.  (By Mr. Thomas)  The same is true
3    with the mesh of Ms. Edwards, you don't have
4    any idea whether the mesh in Ms. Edwards was
5    brittle, using the term as you've used it?
6       MS. LEWIS:  Objection:  Form.
7       MR. JACKSON:  I'm going to object
8    too.  You brought two names in there.
9       MR. THOMAS:  Let me start over again.
10   I want to get a clean question.
11      Q.  (By Mr. Thomas)  It's fair to
12   understand, Dr. Guelcher, that you don't know
13   whether the mesh in Ms. Huskey was brittle
14   using the term as you've used it here today.
15      MR. JACKSON:  Object to the form.
16      A.  Without the explant materials, we
17   couldn't do that assessment.
18      Q.  It's fair to understand that you
19   don't know as you sit here today whether the
20   mesh in Ms. Edwards was brittle using that term
21   as you've used it here today?
22      MS. LEWIS:  Objection:  Form.
23      A.  Without the explants, we can't do the
24   measurement.

Page 111

1       Q.  (By Mr. Thomas)  On page 6 of your
2    report, you again identify examples of
3    polyurethanes which have degraded over time.
4    Did you try to identify any polypropylene
5    products that had degraded over time that led
6    to device failures?
7       A.  Well, I mean, again, I think Clave
8    addresses this point of connecting surface
9    degradation with failure of a mesh.
10      Q.  Okay.  Other than Clave, did you find
11   any other evidence of device failure using
12   polypropylene?
13      MR. JACKSON:  Object to the form.
14      A.  That's the one I can think of right
15   now.
16      Q.  (By Mr. Thomas)  Okay.  What is
17   toughness?
18      MR. JACKSON:  Object to the form.
19      A.  Well, toughness is typically
20   associated with the area under the stress/
21   strain curve.
22      Q.  What does it mean?
23      A.  It's a measure of how much energy a
24   material can absorb before it fails.  So a

Page 112

1    brittle material would not be very tough
2    because if you take it out to small strains, it
3    fails.
4       Q.  Okay.  Do you know whether Ethicon
5    Prolene after implantation is more or less
6    tough after seven years?
7       MR. JACKSON:  Object to the form.
8       A.  Well, I think that question is rather
9    complicated.  Let me find the data.
10      Q.  (By Mr. Thomas)  Are you looking in
11   the seven-year dog study now?
12      A.  Yes.  I'm trying to find the data.  I
13   don't know.  I'm not finding the data here.
14      Q.  Do you have a recollection of looking
15   at the toughness data in the Ethicon studies?
16      A.  From what I remember, there was the
17   elongation was either the same after a year or
18   even got a little worse after two years.  And
19   all of a sudden in seven years, it becomes much
20   more ductile.
21      So I had questions about the
22   methodology used to do those measurements.  All
23   the materials that were tested showed that same
24   trend.  All four of them, the Ethilon, Novafil,

Page 113

1    Prolene, they all showed that same trend.
2       So this report in the expert report
3    focused on seven-year data.  But if this were
4    really going on, why aren't you seeing it in
5    the one- or two-year data.  It just seems
6    strange to me.
7       Q.  Have you seen other studies conducted
8    on Ethicon prolene polypropylene analyzing
9    the extent to which the implanted polypropylene
10   is more tough than the pristine polypropylene.
11      A.  The only data I've seen on Ethicon
12   polypropylene is the dog study where they did
13   mechanical testing on the sutures.
14      Q.  And increased toughness and increased
15   embrittlement are polar opposites of each
16   other; is that fair?
17      A.  Yeah.
18      Q.  And if something became more tough,
19   by definition, it becomes less brittle?
20      A.  But that's if you believe those
21   seven-year data.  They seem flawed to me.  The
22   methodology in the report is not -- there's not
23   a lot of details, and something seems wrong.
24      I don't understand why you can see

29 (Pages 110 to 113)

Scott A. Guelcher, Ph.D.

Page 114

1    this elongation, this increase in ductility in
2    seven years and one and two years you're not
3    seeing it.
4        Q.   You've not conducted your own tests
5    to determine whether these polypropylene
6    sutures become more tough after implantation,
7    have you?
8        A.   No.
9        Q.   On page 6 of Exhibit No. 1 in your
10   report, you're talking about failure mechanisms
11   that you've observed in connection with
12   polyether urethanes and polyester urethanes.
13   Do you see that?
14       A.   Yes.
15       Q.   Is this work that you've been
16   involved in?
17       A.   So the environmental stress cracking
18   of biostable polyether urethanes is primarily
19   the work of Dr. Anderson.
20       Q.   Have you done any work in that
21   regard?
22       A.   We've done -- in the papers I've
23   published, we've shown that these materials
24   degrade in vitro -- they degrade in vivo due to

Page 115

1    oxidative degradation, and they degrade in
2    vitro using a macrophage pocket simulating
3    fluid developed by Dr. Anderson.  We see a
4    connection between those rates of degradation
5    in vitro and in vivo that led us to conclude
6    they're degrading by oxidation.
7        Q.   Is the mechanism of oxidation that
8    you've observed in the polyurethanes the same
9    as the mechanism that you've suggested occurs
10   with polypropylene?
11       MR. JACKSON:  Object to the form.
12       A.   The difference between the two
13   polymers would be where the oxidative attack
14   takes place in the chain.  So in the
15   polypropylene, it's the hydrogen on the
16   tertiary carbon that's being -- that
17   hydrogen-carbon bond is being attacked.
18       Q.   (By Mr. Thomas) So the polyether
19   urethanes would undergo environmental stress
20   cracking, and then you would have subsequent
21   loss of molecular weight?
22       A.   The idea is similar to what we saw in
23   the SCM images of the cracked polypropylene.
24   Once the surface starts to crack, that

Page 116

1    generates new surface that oxidated species can
2    use and cells can migrate into and continue
3    this process of oxidative degradation.  That's
4    what that's referring to.
5        Q.   When you look at, under scan
6    electronic microscopy, environmental stress
7    cracking of these polyurethanes, what do you
8    see?
9        A.   You see cracks in the material.  I
10   don't know what you mean.
11       Q.   Does it flake off?  Does it break?
12   Does it propagate throughout the center of the
13   fiber?
14       MR. JACKSON:  Objection to form.
15       A.   It can.  They're not typically
16   fibers.  These are more bulk material.
17       Yeah, pacemaker lead insulation.  So
18   it's a different form of the material.  It's
19   not necessarily a fiber.
20       Q.   (By Mr. Thomas)  When you have
21   oxidative degradation in the surface of the
22   polyurethane in what you mentioned on page 6
23   of your report, does the material flake off?
24       A.   It can. I don't know that it always

Page 117

1    does. That can be an outcome. Particulates.
2        Q.   Does it crack down through the entire
3    body of the implant?
4        MR. JACKSON:  Object to the form.
5        A.   I don't know if it goes through the
6    entire body.  The surface cracks, and then the
7    cracks can grow.
8        Q.   (By Mr. Thomas) Does the material
9    flake off and cleave off so that you have a
10   smooth surface underneath?
11       A.   I don't know.  I mean -- what I'm
12   saying here is that it cracks, and then the
13   cracks generate new surface that can lead to
14   more oxidation.  If pieces become embrittled,
15   it can slough off like they saw in the dog study
16   or the human explants where you end up with the
17   layer of degraded material.
18       Q.   What is crack propagation?
19       A.   If the crack grows.
20       Q.   It's like when you put a crack in a
21   windshield and you press on it, it spreads
22   across the windshield?  That's crack
23   propagation?
24       MR. JACKSON:  Object to the form.

30 (Pages 114 to 117)

Scott A. Guelcher, Ph.D.

Page 118

1      A.   I think that's a little different.  I
2  think crack propagation would be the crack into
3  the surface can deepen.  It can widen.  Again,
4  once it cracks, there's two things that can
5  happen.  It becomes mechanically compromised,
6  and then it generates new surface for oxidative
7  attacks.  So the crack can grow and propagate
8  through the material.
9      Q.   (By Mr. Thomas)  In what direction
10  does the crack propagate?  Does it matter?
11      A.   You know, I would think it would be
12  inclined to propagate in the direction of the
13  stress.  But it just depends on the loading, on
14  the type of material.
15      Q.   Something that could be tested, of
16  course?
17      A.   I think Ethicon looked at this too.
18      Q.   I'm talking about you now, whether
19  you could test --
20      A.   I haven't done these studies.  These
21  are published studies.  The materials that I
22  work with are designed to be resorbable, so
23  they don't typically crack.  They're resorbed
24  and replaced with new tissues.

Page 119

1      I haven't actually done experiments
2  of measuring crack propagation.
3      Q.   So you don't know how crack
4  propagation would manifest itself in
5  polypropylene which had undergone surface
6  oxidation?
7      MR. JACKSON:  Object to the form.
8      Q.   (By Mr. Thomas)  Is that fair?
9      A.   Let me look at this document for a
10  minute.
11      Q.   What are you looking at now?
12      A.   This would be a memo on crack depth
13  in explanted prolene polypropylene sutures.
14      Q.   This is another document that you've
15  brought here today, Tab 19 in Exhibit No. 3
16  dated June 15, 1982?
17      A.   Yes.  So in this study, they were
18  measuring the depth of the crack.  They
19  concluded that the sutures had crack depths
20  varying from .5 to 2 microns.  The diameter of
21  the suture in this case was 25 microns.
22      Crack depth does not vary
23  systematically with implantation time.  It
24  varies significantly from point to point along

Page 120

1  the fiber length.  So they report measurements
2  of crack depth.  But there's no pictures.  They
3  just report the numbers.
4      These were materials that were
5  implanted anywhere from two to seven and a half
6  years.
7      Q.   Is that the only information that you
8  have to look to to determine the extent to
9  which cracks will propagate in polypropylene?
10      A.   Let me look at the other one, the
11  human explants.
12      Q.   That's Tab 18 in Exhibit 3?
13      A.   Yeah.  So, again, they don't provide
14  a lot of details.  This is one of the documents
15  Dr. Dunn was trying to get.  We don't have SEM
16  images.  They have microscopy observations by
17  -- I think this is Mr. Schiller who did SEM.
18      At two years, he notes no cracking.
19  At eight years, he notes severe cracking.
20  Without the pictures, we don't know what that
21  means.  But he basically says that at eight
22  years, they're severely cracked.
23      So these are the two documents that
24  I'm aware of where Ethicon was looking at

Page 121

1  cracking of polypropylene sutures.
2      Q.   My question, Doctor, are those two
3  documents, 18 and 19 in Exhibit No. 3, the sole
4  source of your understanding of what happens to
5  polypropylene when there's cracking?
6      A.   Well, I think Clave also addressed
7  this, that cracking was associated with these
8  failed meshes that were either infected or
9  extruded or had other complications.
10      Q.   Right.  But we've covered now the
11  source of your knowledge of what happens to
12  polypropylene when it cracks.  That's Clave,
13  and that's documents 18 and 19 in Deposition
14  Exhibit 3?
15      A.   Those are the studies that I'm aware
16  of.
17      Q.   On page 7 of your report in the
18  middle of the page, there's a paragraph that
19  begins, While the addition of stabilizers to
20  polypropylene.  You reference a figure 2(a).
21      A.   That should be figure 1(a).  I think
22  that's an error.  I don't know that I have a
23  figure 2 in this report.
24      Q.   So figure 1(a) goes back to page 5?

31 (Pages 118 to 121)

Scott A. Guelcher, Ph.D.

Page 122

1    A.   That's right.
2    Q.   All right.  The last sentence of that
3  paragraph begins, At this embrittlement stage,
4  the elongation of the polymer decreases
5  substantially.  Does that mean the fiber itself
6  shrinks?
7    A.   No.  The elongation is the Y axis on
8  this plot.  So the percent elongation is the
9  longest distance you can stretch it before it
10  breaks.  So it starts off around 800 percent
11  elongation.  You could stretch it out to eight
12  times its initial length.
13       So then when it becomes embrittled
14  even at very small strains, the material fails
15  because it's become embrittled.
16    Q.   Which leads to adverse events after
17  implantation such as extrusion and chronic pain
18  caused by sclerosis.  What is sclerosis?
19    A.   Sclerosis would be hardening of the
20  implant in the tissue.
21    Q.   This is the same phenomenon we talked
22  about a few minutes ago?
23    A.   Yes.
24    Q.   Dr. Guelcher, if there's no reduction

Page 123

1  in molecular weight, would you agree that
2  there's no degradation of the polypropylene?
3       MR. JACKSON:  Object to the form.
4    A.   Again, I think this is a more complex
5  question.  When you measure the molecular
6  weight, you're measuring the molecular weight
7  of the entire material.  So if the degradation
8  is occurring at the surface, you may not see
9  it.
10       It's difficult to probe.  So I guess
11  the way I want to answer that is if I go back
12  to the -- if I go back to the Ethicon human
13  implant results where they noted --
14    Q.   That's Tab 18?
15    A.   I believe it's Tab 18.  If I go back
16  to that one, they mentioned the cracked
17  surfaces were easily wiped off and deposited on
18  a KBR window for IR.  The surface scrapings had
19  the handling consistency of a waxy snow.
20       Then they noted that the surface
21  scrapings were melted at 147 and 156 degrees on
22  a hot stage, and this is the melting range
23  previously observed for oxidatively degraded
24  polypropylene.

Page 124

1       So what I would say is if you took
2  the entire suture and measured -- it depends on
3  what you're probing and measuring.  If you're
4  measuring the molecular weight of the entire
5  suture, because the surface layer doesn't
6  represent the entire volume, you may not see a
7  difference.
8       But by actually probing that surface
9  layer like they did in this experiment, you
10  would see that it has a lower molecular weight.
11  But if you measure the bulk molecular weight,
12  you may not see it.
13       That's what I was saying is you would
14  use -- molecular weight measurements are very
15  effective and useful.  It's just you have to
16  make sure you're sampling the degraded region
17  of the polymer correctly.
18    Q.   If you go back to page 5 of your
19  report --
20    A.   Right.
21    Q.   -- you have more than a 20 percent
22  reduction in molecular weight before you have
23  embrittlement, don't you?
24    A.   Yes.  That was a film, you know, so

Page 125

1  it's a different -- it's different than -- I
2  mean, these experiments were specifically
3  designed to test this idea.  So I don't know
4  that you would necessarily see the same thing
5  in a suture.
6    Q.   Okay.  You've not tested it in a
7  suture?
8    A.   No.  I guess what I'm saying is
9  molecular weight -- to clear up what I was
10  saying earlier, molecular weight is very
11  important.  It's just sampling that degraded
12  layer by molecular weight analysis can be very
13  difficult to do.  That's why we like methods
14  like XPS because you can use smaller amounts.
15       MR. THOMAS:  Let's go off the record
16  for a second.
17       (A break was taken from 12:27 to 1:43
18  p.m.)
19    Q.   (By Mr. Thomas) Dr. Guelcher, has
20  Dr. Dunn submitted any invoices for your time
21  in this case yet?
22    A.   I don't know if he's submitted
23  invoices to the attorneys.  I've submitted
24  invoices to him, but I don't know that he's

32 (Pages 122 to 125)

Scott A. Guelcher, Ph.D.

Page 126

1    submitted them to the attorneys.
2        Q.   How many invoices have you submitted?
3        A.   I believe one.
4        Q.   Okay.
5        A.   I can't remember.
6        Q.   If you look at Exhibit No. 1, which
7    is your expert report in this case, how much
8    time did you have in this case prior to the
9    time that you completed Exhibit No. 1?
10           MR. JACKSON:  Object to the form.
11       A.   I don't remember.
12       Q.   (By Mr. Thomas)  The time that you
13   have in this case prior to the time that you
14   completed Exhibit No. 1 would be reflected in
15   your billing records?
16       A.   I believe it would.
17       Q.   Okay.  From the time that you
18   completed Exhibit No. 1, what additional work
19   have you done in this matter since that time?
20       A.   I reviewed the documents.  I wrote
21   the rebuttal report.  I met with the attorneys
22   and Dr. Dunn to discuss the documents.
23       Q.   Now, the documents that you've
24   reviewed after Exhibit No. 1, what documents

Page 127

1    were those?
2        A.   Well, the ones in Exhibit No. 3, I
3    guess.  Yeah, this one.
4        Q.   The documents that are in Exhibit
5    No. 2 are the documents that go with your first
6    report; correct?
7        A.   Yes.  I reviewed those again too.
8        Q.   Did you review those before you did
9    your report?
10       A.   Yeah.  I mean, I wrote the report
11   from those documents.  I can't remember how
12   much I reviewed every one, but they were all
13   part of the --
14       Q.   Again, the goal of the deposition
15   Exhibit No. 2 is to capture all the documents
16   upon which you relied for the opinions you
17   express in your original report; correct?
18           MR. JACKSON:  Object to the form.
19       A.   Yes.
20       Q.   (By Mr. Thomas)  After you completed
21   your original report, reviewed the documents
22   that were in Exhibit No. 2, you said you
23   reviewed additional documents.  We've talked
24   earlier today about the documents in Exhibit

Page 128

1    No. 3.  When did you review the documents in
2    Exhibit No. 3?
3        A.   Last week.
4        Q.   Okay.  And the documents in Exhibit
5    No. 3 is your best effort at identifying all
6    the documents upon which you rely for your
7    rebuttal report which is Exhibit No. 5 that I
8    got this morning; correct?
9        A.   Right.
10       Q.   All right.  Now, other than reviewing
11   the documents for Exhibit No. 2 and the
12   documents for Exhibit No. 3, what other work
13   have you done in this case?
14       A.   Well, I wrote the reports.
15       Q.   Right.
16       A.   I reviewed the documents.  I --
17       Q.   When you say you reviewed the
18   documents, is your review limited to the
19   documents in Exhibits 2 and 3?
20       A.   There were other documents I went
21   through as well.  They're all listed -- all the
22   reliance documents that are listed in the
23   report.  I mean, they're all --
24       Q.   That's where I want to ask you about

Page 129

1    it.  If you go to page 11 of Exhibit No. 1, it
2    says in the second sentence, In addition to my
3    knowledge, skill, training, and experience as
4    an engineer, the following depositions of
5    Ethicon employees and the exhibits thereto were
6    supplied to me.  And then there's a list of
7    people.
8            Did you read all those depositions?
9        A.   No.  I didn't read all of them.
10       Q.   Do you know of any of them that you
11   read?
12       A.   I reviewed parts of Dr. Burkley's.  I
13   think that's the main one I reviewed.
14       Q.   Any others in the first paragraph
15   there that you recall reviewing?
16       A.   Not that I can remember.
17       Q.   The reason why you reviewed
18   Dr. Burkley was to understand the work he did
19   on the seven-year dog study?
20       A.   Primarily, yeah.
21       Q.   Any other reason that you can recall?
22       A.   He was the scientist at Ethicon that
23   had done most of the work on in vivo
24   performance of the polypropylene, the dog

Scott A. Guelcher, Ph.D.

Page 130

1  study.
2      Q.  The next paragraph says, I've also
3  considered the following material identified in
4  Exhibit B.
5          Again, there are documents in
6  Exhibit B that aren't in your two notebooks;
7  correct?
8      A.  Yeah, I think so.
9      Q.  And is it fair to understand that to
10  the extent you identified documents that were
11  important to your opinions, you put those in
12  your notebooks, Exhibits 2 and 3?
13      A.  Right.
14      Q.  In addition, the following Rule 26
15  reports were supplied to me, and a list of
16  people.  These reports were provided after we
17  had reached my opinions in this case.
18          Did you review any of those Rule 26
19  reports?
20      A.  No, not much, I don't think.
21      Q.  There's nothing in those Rule 26
22  reports that have any bearing on the opinions
23  that you're giving today as far as you know?
24      A.  No.

Page 131

1          MR. JACKSON:  Objection to form.
2      Q.  (By Mr. Thomas)  Down in heading
3  No. 5, it talks about exhibits which I plan to
4  use as a summary of or in support of opinions?
5      A.  Right.
6      Q.  What photographs do you plan to use?
7      A.  Yeah.  I don't have any photographs.
8  I don't have FTIR studies, and I don't have
9  exemplar TVT.  Dr. Dunn may have.  I don't have
10  those.  I didn't rely on those for this report.
11          It was the Ethicon documents and the
12  papers that we've been talking about, but not
13  the first two.
14      Q.  Other than the graphics in your
15  report, are there any other exhibits extracted
16  from the materials that you reviewed or
17  excerpts from learned treatises and literature
18  that you know that you'll use as an exhibit at
19  trial in this case?
20      A.  I don't know.  I mean, I haven't
21  thought about preparing for trial.  So I don't
22  know what -- I mean, I could use information in
23  those papers to prepare slides.  It's hard to
24  say, not having done that.

Page 132

1      Q.  Do you know when trial is scheduled
2  in this case?
3      A.  I don't.
4      Q.  Compensation is listed at $275 an
5  hour for review and study, $350 per hour for
6  deposition and trial testimony time.
7          How much time have you billed
8  Dr. Dunn for, as of today?
9      A.  I don't remember how many it's been.
10      Q.  Have you been paid yet?
11      A.  I can't remember when I submitted the
12  reports.  I may have been paid something for
13  writing a report, but I can't remember when
14  those invoices were submitted.
15      Q.  Are you paid yourself $275 an hour,
16  or is that time that's billed to Dr. Dunn's
17  company and you're paid something different?
18      A.  So Dr. Dunn bills all the effort at
19  275 or 350 through his company, and he pays me
20  200 as a subcontractor through his company.  So
21  I'm not an employee, but I'm a subcontractor of
22  his company.
23      Q.  Okay.  So you receive $200 an hour
24  whether it's review and study or whether it's

Page 133

1  deposition and trial time?
2      A.  It's $200 for review and study and
3  275 for deposition and trial testimony.
4      Q.  When you and Dr. Dunn discussed
5  working on the Ethicon mesh cases, and you
6  decided between the two of you the scope of the
7  work that you would do, what was the scope of
8  the work that Dr. Dunn would do?
9          MR. JACKSON:  I'm going to object as
10  asked and answered.
11      A.  I can't speak for Dr. Dunn, but
12  certainly he has expertise in polymer science.
13  So I think he's speaking to the auto-oxidation
14  of polypropylene.
15          He has expertise in product design.
16  So he was looking at failure modes and effects
17  analysis.  He was looking more at those
18  questions.
19      Q.  (By Mr. Thomas)  Did you share your
20  report with Dr. Dunn before you finalized it?
21      A.  I don't remember.  I know I sent him
22  a copy of the final one.  We've discussed it,
23  but I don't know if I sent a draft or something
24  to him.

34 (Pages 130 to 133)

Scott A. Guelcher, Ph.D.

Page 134

1    Q.   Did you discuss your work on your
2   initial report with Dr. Dunn as you were doing
3   the work?
4        A.   I believe so.  I don't quite remember
5   what we talked about prior to writing the
6   report.
7        Q.   When you wanted materials to review
8   in connection with the work that you were doing
9   in this project, did you speak with Dr. Dunn or
10  to counsel?
11       A.   I spoke with Dr. Dunn.  Dr. Dunn,
12  through his company, handles all those types of
13  transfers with counsel.
14       Q.   Are you currently engaged in any
15  projects with Dr. Dunn and any other expert in
16  this litigation that is a research project on
17  meshes used in the pelvic floor?
18       A.   So are you talking expert witness in
19  litigation, or are you talking about research
20  projects?
21       Q.   Research projects.
22       A.   We are.
23       Q.   And how many projects?
24       A.   With Dr. Dunn, there's one.

Page 135

1        Q.   And are there projects with other
2   experts?
3        A.   There is.  There's a project with
4   Dr. Iakovlev.
5        Q.   What is the project with Dr. Dunn?
6        A.   The project with Dr. Dunn is looking
7   at the characterization of explanted mesh and
8   also the in vitro degradation of mesh for
9   polypropylene.
10       Q.   In vitro degradation?
11       A.   Right.
12       Q.   And what kind of explanted mesh are
13  you characterizing?
14       A.   Well, it's from one of the AMS cases.
15  It's polypropylene mesh.  I don't remember the
16  exact name of it, but it's a name that's broad.
17       Q.   What's the nature of the work that
18  you're doing?
19       A.   We're characterizing the surface of
20  the material by XPS.
21       Q.   How many explanted meshes do you
22  have?
23       A.   There are several.  I don't remember
24  the exact number.

Page 136

1        Q.   Are they all AMS meshes?
2        A.   I believe they are.
3        Q.   And where did you obtain the meshes?
4        A.   From Dr. Iakovlev.
5        Q.   Do you know where he obtained them?
6        A.   I'm not exactly sure.  I mean, they
7   came from the hospital, I believe, that treated
8   the patient.  But I don't know exactly which
9   hospital.  I don't remember.
10       Q.   Are you and Dr. Dunn in possession of
11  the explants now?
12       A.   I don't know.  Dr. Bridget Rogers at
13  Vanderbilt ran the XPS maybe a month ago.  I
14  don't know who has them now, if we still have
15  them or if he sent them back.
16       Q.   Who handled the meshes when they were
17  here at Vanderbilt?
18       A.   I believe Dr. Rogers.
19       Q.   Do you know how the explants were
20  received, in what form?
21       A.   They were received as dried fibers.
22       Q.   Do you know who was responsible for
23  the preparation of the explanted mesh samples?
24       A.   Dr. Iakovlev.

Page 137

1        Q.   Did you have any -- do you and
2   Dr. Dunn have any involvement in how those
3   samples will be prepared for XPS testing?
4        A.   Yes.  We discussed that with
5   Dr. Iakovlev.
6        Q.   What kind of parameters did you
7   discuss with Dr. Iakovlev about preparation of
8   these samples?
9        A.   We talked about this earlier.  I
10  believe they were shipped in saline and then
11  desiccated by Dr. Iakovlev.  And then one group,
12  he sent desiccated; another group, he scraped
13  off the degraded material on the surface.
14       Q.   What is the question that you and
15  Dr. Dunn are trying to answer by characterizing
16  these explanted meshes?
17       A.   We're looking for evidence of bound
18  oxygen on the surface that would be indicative
19  of oxidation of the polypropylene mesh.
20       Q.   Is XPS the only test that you're
21  conducting on these explanted meshes?
22       A.   That's all we've done so far.  We're
23  considering others.  But so far, we've done
24  XPS.

Scott A. Guelcher, Ph.D.

Page 138

1     Q.   And what will the XPS hopefully show?
2   What will this test tell you about the
3   explanted meshes?
4            MR. JACKSON:  Object to form.
5     A.   Well, it would tell you whether
6   there's oxygen bound with carbon on the
7   surface.
8     Q.   (By Mr. Thomas)  Is it able to
9   quantify or just detect presence?
10    A.   Quantify.
11    Q.   And in what amounts or quantification
12  would the oxygen bound to carbon be significant
13  in the analysis of oxidation of explanted mesh?
14    A.   Any oxygen would be significant.  As
15  Fayolle teaches, it doesn't take much on the
16  surface to catalyze the oxidation of the
17  material.
18        Oxygen shouldn't be there.  It's a
19  hydrocarbon.  So any bound oxygen in the
20  material would have to be a result of
21  oxidation.  So anything that we found would be
22  significant.
23    Q.   What efforts were made to clean the
24  mesh prior to the XPS testing to remove any

Page 139

1   other materials that didn't belong there?
2     A.   Well, we discussed that too.  So
3   Dr. Iakovlev mainly desiccated the residual
4   tissue.  And then one group he sent that had
5   just been desiccated, and the other group he
6   scraped to make sure that all the tissue was
7   gone.
8     Q.   I believe you also said that you were
9   looking at in vitro degradation as part of this
10  project?
11    A.   Yes.
12    Q.   Tell me how that fits into your work.
13    A.   I've published two papers on
14  biomaterials in the last several years where
15  we -- Dr. Anderson reported a number of years
16  ago of fluid that's used to simulate the
17  macrophage pocket.  So you can immerse the
18  biomaterial in this fluid, and it's similar to
19  essentially bathing the material in the
20  macrophage.  So we're considering doing those
21  experiments as well.
22        I've published a couple of papers on
23  that with polyurethane where we're able to show
24  that it degrades in vitro.

Page 140

1     Q.   Is that the full scope of the work
2   that you and Dr. Dunn are doing?
3     A.   As of right now.
4     Q.   Do you have plans to do additional
5   work?
6     A.   I don't know.  We're still discussing
7   it.
8     Q.   Who was involved in this project
9   other than you and Dr. Dunn?
10    A.   Dr. Iakovlev.
11    Q.   Who is funding this project?
12    A.   We're discussing that right now.
13    Q.   Is anybody funding it now?
14    A.   The explant work was paid for by the
15  litigation.
16    Q.   Does that mean you've received
17  payment from counsel for the plaintiffs in the
18  AMS litigation?
19    A.   Dr. Rogers did for the XPS
20  experiments.
21    Q.   Any other source of payments?  Have
22  you received any compensation for your work on
23  this project?
24    A.   Yes.  I mean, it's billed, but I

Page 141

1   didn't actually do the XPS experiments.  I've
2   discussed them with Dr. Rogers and Dr. Dunn,
3   and I included it in other reports.  So I've
4   been paid for that part of it.
5     Q.   Okay.  And is the research project
6   that you're doing with Dr. Iakovlev different
7   than the one you're doing with Dr. Dunn?
8     A.   Dr. Iakovlev's project relates to a
9   number of polypropylene explant materials.
10  They come from a variety of sources like hernia
11  mesh, pelvic floor mesh, where he sees the
12  surface degradation, primarily focusing on
13  histology and microscopic assessment.  So it's
14  more qualitative pathology-focused.
15    Q.   Who is working with you and
16  Dr. Iakovlev on that project?
17    A.   Dr. Dunn is involved as well, not as
18  much.
19    Q.   And how many explants are involved in
20  this project?
21    A.   I'm not sure.  It's more than ten, I
22  think.  I don't remember the number.
23    Q.   Do you know whether any Ethicon
24  explants are involved?

36 (Pages 138 to 141)

Scott A. Guelcher, Ph.D.

Page 142

1    A.   I don't.
2    Q.   What is Dr. Dunn doing on this
3  project?
4         MR. JACKSON:  Object to the form.
5    A.   Mostly consulting.
6    Q.   (By Mr. Thomas)  What are you doing
7  on this project?
8    A.   I had some discussions with
9  Dr. Iakovlev about staining for things like
10  myeloperoxidase to show evidence of active
11  macrophages at the site, similar to what I've
12  done with the other materials I've worked with.
13    Q.   What would the staining of the meshes
14  to show active macrophages at the site show
15  you?
16    A.   It would show that there's secretion
17  of myeloperoxidase, which is an enzyme that is
18  involved in these reactive oxygen species.  So
19  it would show the presence of that enzyme and
20  provide evidence that macrophages are at the
21  material surface secreting these reactive
22  oxygen species that can promote oxidation of
23  the polymer.
24    Q.   What's the status of the work that

Page 143

1  you're doing with Dr. Iakovlev on these
2  polypropylene explant materials?
3    A.   He submitted a presubmission inquiry
4  to Nature Biotech.
5    Q.   I'm sorry, I don't know what that
6  means.
7    A.   Nature Biotechnology is a scientific
8  journal.  Dr. Iakovlev submitted a
9  presubmission inquiry regarding its suitability
10  for publication in that journal.  As far as I
11  know, he's waiting to hear from the editor.
12    Q.   Has any work been conducted on this
13  project while this request is pending?
14    A.   Not in the past week or two.  We've
15  been waiting to hear back.
16    Q.   Prior to that time, had you done any
17  initial work on analyzing these polypropylene
18  explant materials?
19    A.   No.  I assisted Dr. Iakovlev with
20  writing, editing the draft.
21    Q.   The draft request?
22    A.   The manuscript, yeah, the
23  presubmission inquiry.
24    Q.   Is there a manuscript in draft?

Page 144

1    A.   It's a presubmission inquiry, so it's
2  basically an abstract of figures.
3    Q.   So there has been work conducted and
4  data collected so far?
5    A.   Yes.
6    Q.   That's what I want to know.  What
7  kind of work have you done and data you've
8  collected for this project?
9    A.   Well, so Dr. Iakovlev did the data
10  collection.  There's histological staining,
11  staining of histological sections.  There's
12  microscopy showing the presence of a degraded
13  layer on the surface.
14    Q.   Is that light microscopy or SCM?
15    A.   Both, polarized light microscopy,
16  SCM.  There's another type of imaging technique
17  he used as well.  It's all imaging in
18  histology.
19    Q.   What is the question that this paper
20  seeks to answer?
21         MR. JACKSON:  Object to the form,
22  asked and answered.
23    A.   Well, the paper is directed toward
24  providing evidence that polypropylene degrades

Page 145

1  in vivo by an oxidative mechanism.
2    Q.   (By Mr. Thomas)  And who has funded
3  the project with Dr. Iakovlev?
4    A.   I don't know.  I think some of the
5  samples have been evaluated in the course of
6  the litigation.  So certainly his time would be
7  paid for by the attorneys, plaintiffs'
8  attorneys.  But I don't know the details of
9  that.
10    Q.   How much time have you spent on this
11  project with Dr. Iakovlev?
12    A.   Maybe ten hours or so.  It's hard to
13  say.
14    Q.   Have you been paid for your time in
15  that project?
16    A.   For parts of it.  So I visited
17  Dr. Iakovlev in Toronto as part of the pending
18  litigation.  I was paid for that.  But for
19  writing the paper, I can't remember if I
20  charged for that or not.
21    Q.   What responsibility did you have for
22  the writing of the paper?
23    A.   Well, Dr. Iakovlev wrote the draft.
24  I edited it.  It talks more specifically about

37 (Pages 142 to 145)

Scott A. Guelcher, Ph.D.

Page 146

1   surface degradation. Dr. Iakovlev is a
2   pathologist, so my contribution is more on the
3   material science, chemistry, the things
4   described in my report.
5       Q.   The work that you and Dr. Dunn are
6   doing with the AMS polypropylene explants where
7   you're analyzing the surface of the material by
8   XPS, are there plans to publish that research?
9       A.   We would like to publish it, but
10  we're not as far along as Dr. Iakovlev is.
11      Q.   What laboratory is doing the imaging
12  that Dr. Iakovlev is doing for the
13  polypropylene explant materials?
14      A.   I don't know where he's doing it. I
15  presume he's doing it at his university in
16  Toronto.
17      Q.   Is any of the work on the explanted
18  meshes in the polypropylene explant study by
19  Dr. Iakovlev being done at Vanderbilt?
20      A.   No.
21      Q.   And the XPS work and the work with
22  Dr. Dunn has been done by Dr. Rogers at
23  Vanderbilt?
24      A.   Yes, that's right.

Page 147

1       Q.   Are you involved in any research or
2   projects to identify a better material for use
3   as a medical device in the pelvic floor?
4       A.   No.
5       Q.   Have you done any work in this
6   litigation about a suitable alternative device
7   for the treatment of stress urinary
8   incontinence that is equally safe and effective
9   as the Ethicon TVT device?
10      MR. JACKSON:  Objection to form.
11      A.   Again, I was -- my report, my intent
12  was to review the in vivo performance of
13  polypropylene and not look at alternative
14  devices.
15      MR. THOMAS:  Am I going to get the
16  time sheets today?
17      MR. JACKSON:  I'm actually waiting on
18  a response to my e-mail.  But the last I
19  heard is that these were included in our
20  objections to the request for production
21  attached to the deposition.
22      MR. THOMAS:  Really?
23      MR. JACKSON:  That's the last
24  response I got, but I am actually waiting

Page 148

1   on another one.  But that's what I've got
2   at this point.
3       Q.   (By Mr. Thomas)  Let's go back to
4   your original report, page 8, the paragraph
5   that begins, Finally with respect to the idea,
6   the next sentence reads, These stresses cannot
7   only act as catalysts for oxidative
8   degradation, they can alter the properties of
9   the mesh itself.
10      What properties of the mesh are
11  changed by the stresses that you discuss in
12  that paragraph?
13      A.   I'm just going to read it again.
14      Q.   Sure.
15      A.   I think what I'm saying here is that
16  the antioxidants basically guard against --
17  antioxidants are designed to protect against
18  oxidation.  So mechanical stresses on the
19  material can sort of exacerbate these effects.
20      Mechanical loading of the mesh pelvic
21  floor environment is different, say, than the
22  suture.  That can cause changes in the
23  degradation and response of the material.
24  That's what I'm really trying to say there.

Page 149

1       Q.   Help me out a little bit.  I don't
2   really understand that.  They can alter the
3   properties of the mesh.  What properties of the
4   mesh can be altered?
5       A.   Strength.  It's elongation.  These
6   changes in the polypropylene are happening over
7   time.  They can change as mechanical properties
8   which is toughness, embrittleness, these things
9   we've been talking about.
10      Q.   Does it include tensile strength?
11      A.   Yeah.  Tensile strength would be
12  another mechanical property that could change
13  over time due to oxidative changes.
14      Q.   Okay.  So you have tensile strength,
15  you have elongation, you have toughness.  What
16  other physical properties of the mesh can be
17  altered by oxidative degradation?
18      A.   I think basically it's the
19  embrittlement -- it's going to become more
20  brittle, less tough.  The strength could
21  change.  Those are the -- that's what I think
22  of when I think of embrittlement.
23      Q.   Are those the results of the
24  oxidative degradation that you discuss in this

38 (Pages 146 to 149)

Scott A. Guelcher, Ph.D.

Page 150

1  paper?
2     A.  Yes.
3     Q.  It's those changes in the physical
4  properties that you just identified that
5  compromise the ability of the mesh to perform
6  its function in the body; is that fair?
7     A.  Yes.  I believe that those changes
8  in -- the changes in the composition of the
9  polymer due to the oxidation combined with
10  mechanical forces in the environment of the
11  pelvic floor can cause the mesh to change over
12  time.
13     Q.  And it's those changes in strength,
14  elongation, toughness, embrittlement that you
15  conclude compromise the ability of the mesh to
16  perform its function in the pelvic floor?
17     A.  I think that's part of it.
18     Q.  What else is there?
19     A.  I think as I've been saying in the
20  report, it's really the embrittlement of the
21  mesh is what's causing it to change over time
22  and lead to extrusion and these types of
23  problems.
24     Q.  Anything else?

Page 151

1     A.  I think that's . . .
2     Q.  Let's go to page 10 of your report,
3  please.  When you're considering the use of a
4  biomaterial for implantation in a human body,
5  do you consult that material safety data sheet?
6     A.  That's one piece of information.  The
7  materials that I'm making, we don't -- they're
8  experimental.  So we don't have material safety
9  data sheets.
10     But for an established material like
11  polypropylene, that's one factor I would look
12  at, is what the MSDS is saying about the
13  material.
14     Q.  Is it normally part of your business
15  when you start working with a material that's
16  going to be implanted in the human body, is it
17  your practice to go to the material safety data
18  sheet to see what it says about that material?
19     MR. JACKSON:  Object to the form.
20     A.  That's typically what we do whether
21  it's in the human body or not.  If we're using
22  it in the laboratory if there's a possibility
23  of someone being exposed to it, we keep a file
24  of the MSDSs for all the materials we're using

Page 152

1  in the lab.
2     Q.  The reason why you keep MSDS sheets
3  for materials in the lab is in the event
4  somebody in the lab is exposed to that material
5  while handling it; correct?
6     MR. JACKSON:  Objection to form.
7     Q.  (By Mr. Thomas)  Is that true?
8     A.  Yeah.  That's why we have them.
9     Q.  The reason why you have the material
10  safety data sheets is not to determine what the
11  clinical impact of implanting those materials
12  may be in the human body?
13     A.  I think it's something that should be
14  considered.  I mean, if it says on the MSDS
15  it's incompatible with strong oxidizers and you
16  know that part of the cellular response is
17  materials that secrete strong oxidizers, that's
18  something that should be considered.
19     Q.  In your judgment, what does a strong
20  oxidizer mean?  What's relevant in terms of
21  strong for purposes of degradation to
22  polypropylene mesh?
23     A.  Well, molecular oxygen will oxidize
24  polypropylene at elevated temperatures.

Page 153

1  Stronger oxidizers such as hypochloric acid and
2  peroxides listed here are stronger oxidizing
3  agents than chlorine.
4     These are all stronger oxidizing
5  agents than molecular oxygen.  That's what I'm
6  referring to when I say reactive oxygen
7  species.
8     Q.  What strength chlorine is required to
9  degrade polypropylene that has antioxidants
10  added to it?
11     MR. JACKSON:  Objection to form.
12     A.  I mean, that's the problem with
13  designing these implants for permanent
14  implantation.  It's very difficult to predict
15  what dose of antioxidant is going to be
16  required to protect every patient from this
17  oxidation.
18     Q.  (By Mr. Thomas)  Do you have an
19  opinion about how much chlorine would be
20  required to degrade Prolene polypropylene
21  that's been treated with an antioxidant
22  package?
23     MR. JACKSON:  Objection to form.
24     A.  I think you can't just parse out.

39 (Pages 150 to 153)

Golkow Technologies, Inc. - 1.877.370.DEPS

Scott A. Guelcher, Ph.D.

Page 154

1   These are reactive oxygen species.  There's a
2   number of different molecules that are secreted
3   by inflammatory cells that have been shown in
4   Ethicon studies and in published papers to
5   cause surface degradation of polypropylene.
6          So we know that what the cells
7   secrete is enough to oxidize the propylene.
8   It's been observed in several studies.
9      Q.   My question is a little different.
10  Do you have an opinion as to the amount of any
11  of these materials, strong oxidizers such as
12  chlorine, peroxides, etc., that are necessary
13  and sufficient to cause the oxidation of
14  Prolene polypropylene?
15         MR. JACKSON:  Objection to form.
16     A.   My answer would be that macrophages
17  secrete sufficient amounts of these molecules.
18  I mean, we know this because it's been
19  observed.
20         I don't know that anybody has
21  measured or I don't know how you would measure
22  the exact concentration.  It's really
23  irrelevant.  It's not being done outside the
24  body.  It's being -- you know, Dr. Anderson has

Page 155

1   published this solution that's been shown to
2   simulate the composition of that macrophage
3   pocket.
4          But, again, it's a very complex
5   reaction.  There's a number of species
6   involved.
7      Q.   One of the things you would like to
8   know is the amount of oxidizers that may
9   compromise polypropylene so that you can modify
10  your additive package to resist that oxidation;
11  fair?
12         MR. JACKSON:  Object to the form.
13     A.   Dr. Anderson has come the closest to
14  describing it as a mixture of cobalt and
15  peroxide that simulates -- I've published a few
16  papers on this.
17     Q.   (By Mr. Thomas)  You have or he has?
18     A.   Well, I have.  I don't know if my
19  paper is in here or not.  It may not be.
20  Dr. Anderson is the first to publish it.  It's
21  not in here.  Let's see if it's in the other
22  one.
23         MR. JACKSON:  Are you looking for
24     your publications?

Page 156

1          THE WITNESS:  Yeah.  It's in my
2   paper.
3          MR. JACKSON:  It's referenced as
4   footnote 9.
5          THE WITNESS:  Yeah.  It says
6   "document not available."
7      A.   I'm just checking Anderson's review
8   to see if he tells what it is in here as well.
9          Well, I don't remember the exact
10  composition of the solution.  But he's
11  published a number of papers, and we've used it
12  as well.  It's a fluid that can be used to
13  simulate the macrophage pocket in vitro.
14     Q.   (By Mr. Thomas)  That's in the
15  context of the polypropylene?
16     A.   No.  Other people have cited this as
17  well.  It's an in vitro model for oxidative
18  degradation.
19     Q.   You've talked about Dr. Anderson many
20  times.  The one study that we've marked -- is
21  it cited in your paper?
22     A.   It's No. 8.
23     Q.   Is it Exhibit 8?
24     A.   I don't know what the exhibit is.

Page 157

1   It's No. 6.
2      Q.   Have you worked with Dr. Anderson
3   before?
4      A.   I've not worked with him.  I know him
5   professionally.
6      Q.   Okay.  So when you cite to
7   Dr. Anderson, it's based on your knowledge of
8   his studies and conversations that you've had
9   with him personally as opposed to work that
10  you've done with him on studies?
11     A.   It's mostly through citations.  He's
12  very well known in this area of foreign body
13  response.  That's his area of expertise.  He's
14  very well known in that field.
15     Q.   Now, we talked about Exhibit No. 6
16  earlier, and I understood that the reason why
17  you cited that paper was for discussion of the
18  foreign body response to implanted materials;
19  correct?
20     A.   Yes.
21     Q.   What specifically is it about the
22  Anderson paper that's important to your
23  opinions?
24     A.   There's a number of papers by other

Scott A. Guelcher, Ph.D.

Page 158

1    researchers as well.  This is, I think, a
2    particularly well written concise review
3    summarizing his 30 years of work in this area.
4    So it's -- I would say that he's a key thought
5    leader in the field, and this is a very nicely
6    written paper and it's useful for citing.
7         Q.   Let's go to 2.4 of Exhibit 6 which is
8    the Anderson paper.
9         A.   Okay.
10        Q.   And the heading is Consequences of
11   Foreign Body Giant Cell Formation.
12        A.   Right.
13        Q.   Right in the middle of that
14   paragraph, it says, For example, additional
15   polymers such as polypropylene used in
16   artificial joints or polypropylene used as a
17   suture material may undergo surface oxidation
18   by the ROIs.
19        A.   Yes.
20        Q.   Medical devices and prostheses
21   composed of addition polymers usually contain
22   small amounts of antioxidants to inhibit this
23   oxidative processes.  Do you see that?
24        A.   Yes.

Page 159

1         Q.   Has Dr. Anderson, to your knowledge,
2    ever written that adding small amounts of
3    antioxidants to inhibit this oxidative process
4    is not sufficient to protect against the
5    degradation of polypropylene?
6         A.   I don't think he's saying here that
7    it works or doesn't work.  I just think he's
8    saying that this is what people do.
9         Q.   My question is, are you aware of him
10   writing anywhere that the use of antioxidants
11   doesn't work?
12        A.   Again, he's not saying it works here
13   either.  He's not saying it works or doesn't
14   work.
15        Q.   If you go to the next page under
16   figure 3, it says again that these studies
17   clearly identify the importance of the use of
18   antioxidants in these polymers to inhibit the
19   oxidation process that occurs with the foreign
20   body reaction.
21        A.   It says that in the text?  Where does
22   it say --
23        Q.   It's under "device failure."
24        A.   Yeah.  Which paragraph?

Page 160

1         Q.   It's the paragraph that begins "these
2    studies."
3         A.   Oh.
4         Q.   The paragraph ends with, The chemical
5    and molecular composition of the primary
6    structure of the polyurethane polymer is known
7    to modulate or inhibit the process of
8    environmental stress cracking and degradation.
9    And that's by adding these antioxidants;
10   correct?
11        A.   No.  That's not what he's saying at
12   all.  I think you're misreading this paragraph.
13             So he says, These studies identify
14   the importance of the use of antioxidants to
15   inhibit the oxidation process.  Okay.  So he's
16   saying that people use it.
17             Then he says, The persistence of the
18   foreign body reaction and the fact that it is
19   present at the interface between the tissue and
20   the device for the lifetime suggests that the
21   oxidation process is continuous albeit at low
22   levels.  In general, chemical degradation and
23   physical damage in pacemaker leads most
24   probably have a synergistic effect on the

Page 161

1    failure of the insulation.
2             What he's saying in the last
3    paragraph is -- this is what I was talking
4    about earlier.  When he says the chemical and
5    molecular composition of the primary structure,
6    "primary structure" refers to the backbone of
7    the polymer.
8             So a polyether urethane is known to
9    be very sensitive to oxidative degradation and
10   its consequent environmental stress cracking.
11   Polycarbonates or polysiloxane urethanes are
12   less sensitive.
13             So he's saying that the structure of
14   the urethane backbone, whether it's a polyether
15   or polycarbonate in the polyurethane backbone
16   is a contributing factor to this.  He's not
17   talking about antioxidants there.
18        Q.   Is it fair to understand that you
19   consider Dr. Anderson to be one of the leading
20   authorities in understanding the extent to
21   which a foreign body reaction to biomaterials
22   may impact oxidation?
23        A.   I wouldn't say it that way.  I would
24   say that Dr. Anderson spent a very long career

41 (Pages 158 to 161)

Scott A. Guelcher, Ph.D.

Page 162

1  studying the response to the body through the
2  foreign body reaction to implanted
3  biomaterials. That's what this paper is
4  talking about.
5      Q.  Have you ever had discussions with
6  Dr. Anderson about whether antioxidants added
7  to polypropylene can sufficiently inhibit
8  oxidation of the polypropylene to allow the
9  medical device to perform its intended
10 function?
11     A.  I've not discussed that with
12 Dr. Anderson, but he's not saying that in this
13 statement. He's saying you can add
14 antioxidants to try to help it, but the problem
15 is that reaction is never going to stop. So
16 how do you know how much to add?
17     Ethicon's own data showed that when
18 they add antioxidants, it's depleted after
19 seven or eight years. So it didn't totally
20 work.
21     Q.  That's in that one study we talked
22 about?
23     A.  Yeah. And I haven't seen any other
24 studies -- in one of the memos, they said that

Page 163

1  they were looking at this. What reference is
2  that?
3      Q.  It was 18, 19, and 20.
4      A.  I think it was No. 20. They said --
5  there's a memo, a follow-up to -- I think this
6  was a -- well, the meeting minutes from the
7  Prolene explants.
8      And, basically, it's summarizing
9  those human explants that I was talking about
10 earlier. And then there's a point on here at
11 the top of page 2, it says, Mr. Burkley is
12 planning to look at the remaining dry explants
13 by IOR. He will also try to see the
14 relationship between the amount of stabilizers
15 added to the polymer and degradation and
16 cracking.
17     You know, we never -- we couldn't
18 find anything further on that. In a number of
19 these presentations that I have also from
20 Ethicon -- I can pull some of these up. This
21 would be --
22     Q.  That's your rebuttal report. I'm not
23 there yet.
24     A.  I know. But you're asking me

Page 164

1  about -- what I'm saying is, I'm not seeing any
2  evidence here even in this presentation --
3  they're talking about oxidation, and there's
4  really nothing here that suggests that these
5  studies, looking at a dose response, how much
6  do you have to dose the polypropylene to
7  protect it from oxidation?
8      There's no evidence that this was
9  looked at after this document in 1987. We
10 couldn't find anything.
11     Q.  Did you ask anybody?
12     A.  We did. Well, Dr. Dunn, like I said,
13 we talked about it. He talked with the
14 attorneys requesting, but I don't think these
15 documents could be found.
16     Q.  Okay.
17     A.  That's what I know. So the only
18 thing that I know about it is what's in these
19 memos and these presentations where basically
20 they're recognizing that there's oxidative
21 degradation.
22     But there's really no discussion of,
23 Hey, let's do a dose response study. There's
24 e-mails that say should we look at this. And,

Page 165

1  again, there's no evidence that I've seen that
2  it's being looked at.
3      I guess I'm just saying it's unknown
4  and, to my knowledge, it's not been looked at.
5      Q.  Did you ask to see all of the
6  degradation work that Ethicon has in its files
7  related to polypropylene?
8      A.  I believe that Dr. Dunn did. I even
9  think Dr. Burkley was asked -- and I don't know
10 if I have that deposition in front of me.
11     But I believe that in Dr. Burkley's
12 deposition, he really was talking about the dog
13 study. To our knowledge, there weren't other
14 studies.
15     (Exhibit 10 was marked.)
16     Q.  (By Mr. Thomas) Let me show you
17 what's been marked as deposition Exhibit
18 No. 10. Deposition Exhibit 10 is a letter from
19 me to counsel in this case enclosing a list of
20 studies about which Ethicon testified at what's
21 known as a Rule 30(b)(6) deposition on various
22 studies that were conducted by Ethicon over the
23 years.
24     And if you look at page 3 of Exhibit

42 (Pages 162 to 165)

Scott A. Guelcher, Ph.D.

Page 166

1    No. 10, there is a topic known as
2    "degradation."
3        A.   Uh-huh.
4        Q.   And I take it that other than the dog
5    study, you've not seen any of these degradation
6    studies where Ethicon has looked at to the
7    extent to which these -- the Ethicon
8    polypropylene degrades in vivo?
9            MR. JACKSON: Objection to form.
10       A.   I haven't seen these studies.
11       Q.   (By Mr. Thomas) Okay.
12       A.   This is just a list of --
13       Q.   They're available.
14           MR. THOMAS: Let's go off the record,
15   please.
16           (A break was taken from 2:41 p.m.
17   until 3:09.)
18           MR. THOMAS: While at recess, I've
19   had a number of conversations with counsel
20   for the plaintiff about the unavailability
21   of the time records that are the subject of
22   the deposition as well as the late service
23   of the rebuttal report and the anticipated
24   production of a rebuttal report for Dr. Dunn

Page 167

1    whose deposition is scheduled for tomorrow.
2        Counsel and I have agreed that we
3    will stop the deposition of Dr. Guelcher
4    today to resume at a later date; at which
5    point, I will be able to inquire about the
6    billing records which will be produced as
7    well as the scope of the rebuttal report.
8        In addition, counsel has agreed to
9    talk to me tomorrow about a date for
10   Dr. Dunn; at which time, we will find a
11   date hopefully to resume Dr. Guelcher and
12   to complete Dr. Dunn in a day, the goal
13   being that we only have one day for
14   Dr. Dunn for both his initial report and
15   whatever rebuttal report he prepares so
16   that we get this done as efficiently as we
17   can. I think that's the scope of the
18   agreement.
19           MR. JACKSON: You have represented it
20   as I understand it.
21           MR. THOMAS: That's all. Thank you,
22   Dr. Guelcher.
23           FURTHER THIS DEPONENT SAITH NOT.
24           (Deposition adjourned at 3:10 p.m.)

Page 168

1            CERTIFICATE OF COURT REPORTER
2        I, Marilyn Morgan, Licensed Court
3    Reporter and Notary Public for the State of
4    Tennessee, do certify that the above deposition
5    was reported by me and that the foregoing
6    transcript is a true and accurate record to the
7    best of my knowledge, skills, and ability.
8        I further certify that I am not an
9    employee of counsel or any of the parties, nor
10   a relative or employee of any attorney or
11   counsel connected with the action, nor
12   financially interested in the action.
13       I further certify that I am duly
14   licensed by the Tennessee Board of Court
15   Reporting as a Licensed Court Reporter as
16   evidenced by the LCR number and expiration date
17   following my name below.
18       Subscribed and sworn to before me when
19   taken, this 25th day of March, 2014.
20
21           _____
22           MARILYN MORGAN, LCR #235
             Expiration Date: 6/30/14
             Notary Public, State of Tennessee
23           Commission expires: 6/18/17
24

Page 169

1            INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections. You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it. It will be
10   attached to your deposition.
11       It is imperative that you
12   return the original errata sheet to the
13   deposing attorney within thirty (30) days
14   of receipt of the deposition transcript
15   by you. If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

43 (Pages 166 to 169)

Scott A. Guelcher, Ph.D.

Page 170

```
 1          ------
            E R R A T A
 2          ------
 3     PAGE  LINE  CHANGE
 4     ____ ____ _____
 5     REASON: _____
 6     ____ ____ _____
 7     REASON: _____
 8     ____ ____ _____
 9     REASON: _____
10     ____ ____ _____
11     REASON: _____
12     ____ ____ _____
13     REASON: _____
14     ____ ____ _____
15     REASON: _____
16     ____ ____ _____
17     REASON: _____
18     ____ ____ _____
19     REASON: _____
20     ____ ____ _____
21     REASON: _____
22     ____ ____ _____
23     REASON: _____
24     ____ ____ _____
```

Page 171

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
            I,_____, do
 3     hereby certify that I have read the
       foregoing pages, and that the same
 4     is a correct transcription of the answers
       given by me to the questions therein
 5     propounded, except for the corrections or
       changes in form or substance, if any,
 6     noted in the attached Errata Sheet.
 7
       _____
 8     SCOTT A. GUELCHER, PH.D.      DATE
 9
10
11
12
13
14
       Subscribed and sworn
15     to before me this
       _____ day of _____, 20____.
16
       My commission expires:_____
17
18     _____
       Notary Public
19
20
21
22
23
24
```

44 (Pages 170 to 171)