# EXHIBIT H

Paul J. Michaels, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

```
                                )
IN RE: ETHICON, INC., PELVIC    )    Master File No.
REPAIR SYSTEM PRODUCTS          )
PRODUCTS LIABILITY LITIGATION   )     2:12-MD-02327
                                )
THIS DOCUMENT RELATES TO THE    )       MDL 2327
FOLLOWING CASES IN WAVE 2       )
OF MDL 200:                     )
                                )   JOSEPH R. GOODWIN
Tamara Carter, et al. v.        )
Ethicon, Inc., et al.           ) U.S. DISTRICT JUDGE
Civil Action No. 2:12-cv-01661  )
                                )
Sandra Childress, et al. v.     )
Ethicon, Inc., et al.           )
Civil Action No. 2:12-cv-01564  )
                                ) PAUL J. MICHAELS, M.D.
Marion Chrysler v.              )
Ethicon, Inc., et al.           ) JUNE 18, 2016
Civil Action No. 2:12-cv-02060  )
                                )
Melissa Sanders, et al. v.      )
Ethicon, Inc., et al.           )
Civil Action No. 2:12-cv-01562  )
                                )
Ana Sierra, et al. v.           )
Ethicon, Inc., et al.           )
Civil Action No. 2:12-cv-01819  )
                                )
Toni Hernandez v.               )
Ethicon, Inc., et al.           )
Civil Action No. 2:12-cv-02073  )
                                )
```

Reported by:

Rebecca J. Callow, CSR, RPR, CRR

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

| Page 2 |
|---|
| 1 |
| 2       DEPOSITION OF PAUL J. MICHAELS, M.D. |
| 3      THIS DOCUMENT RELATES TO CARTER |
| 4          Austin, Texas |
| 5        Saturday, June 18th, 2016 |
| 6           11:52 a.m. |
| 7 |
| 8 |
| 9   Deposition of PAUL J. MICHAELS, M.D., pursuant to |
| 10   Notice held at the offices of Hissey Kientz, |
| 11   9442 N. Capital of Texas Highway Building 1, |
| 12   First Floor Conference Room, Austin, Texas, before |
| 13   Rebecca J. Callow, Registered Merit Reporter, |
| 14   Certified Realtime Reporter, Registered |
| 15   Professional Reporter, and Notary Public in and |
| 16   for the State of Texas. |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 3 |
|---|
| 1   A P P E A R A N C E S : |
| 2 |
| 3   FOR PLAINTIFFS: |
| 4      Aylstock, Witkin, Kreis & Overholtz, PLLC |
| 5      17 East Main Street |
| 6      Suite 200 |
| 7      Pensacola, Florida 32502 |
| 8      (850) 202-1010 |
| 9      BY:     Bryan F. Aylstock, Esquire |
| 10         baylstock@awkolaw.com |
| 11 |
| 12   FOR PLAINTIFFS: |
| 13      Danny L. Curtis, P.C. |
| 14      9229 Ward Parkway |
| 15      Suite 370 |
| 16      Kansas City, Missouri 64114 |
| 17      (816) 523-4667 |
| 18      BY:     Danny L. Curtis, Esquire |
| 19         dcurtis@dannylcurtispc.com |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 4 |
|---|
| 1   A P P E A R A N C E S : |
| 2 |
| 3   FOR JOHNSON & JOHNSON AND ETHICON, INC.: |
| 4      Thomas Combs & Spann PLLC |
| 5      300 Summers Street |
| 6      Suite 1380 |
| 7      Charleston, West Virginia 25301 |
| 8      (304) 414-1807 |
| 9      BY:     David B. Thomas, Esquire |
| 10         dthomas@tcspllc.com |
| 11 |
| 12   FOR JOHNSON & JOHNSON AND ETHICON, INC.: |
| 13      Butler Snow, LLP |
| 14      150 3rd Avenue South |
| 15      Suite 1600 |
| 16      Nashville Tennessee 37201 |
| 17      (615) 651-6700 |
| 18      BY:     M. Andrew Snowden, Esquire |
| 19         andy.snowden@butlersnow.com |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 5 |
|---|
| 1            INDEX |
| 2             PAGE |
| 3   PAUL J. MICHAELS, M.D. |
| 4   Examination by Mr. Snowden .......................6 |
| 5   Changes and corrections  ........................97 |
| 6   Signature Page  ..................................98 |
| 7   Court Reporter's Certificate ....................99 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12          EXHIBITS |
| 13   NO.      DESCRIPTION      PAGE |
| 14   Exhibit 1    Expert Report of Paul J.      6 |
| 15         Michaels, M.D. (Re: Tamara |
| 16         Carter) |
| 17   Exhibit 2    09/28/2012 Pathology Report for    73 |
| 18         Tamara Carter |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

2 (Pages 2 to 5)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 6

1      PAUL J. MICHAELS, M.D.,
2   Called as a witness herein, having been first
3   duly sworn by a Notary Public, was examined and
4   testified as follows:
5           EXAMINATION
6   BY MR. SNOWDEN:
7   Q.  Good morning, Dr. Michaels.
8   A.  Good morning.
9   Q.  I'm Andy Snowden.  I represent Ethicon in
10  the case that we're talking about today.
11       Is it your understanding that we're
12  going to talk about the Tamara Carter case?
13  A.  Yes.
14       (Exhibit 1 marked.)
15  BY MR. SNOWDEN:
16  Q.  I'm going to hand you what's been marked as
17  Exhibit 1.  Would you please take a look at that and
18  let me know if that contains your entire specific
19  report regarding Tamara Carter.
20       (Document review.)
21  A.  Yes.
22  BY MR. SNOWDEN:
23  Q.  And does the case-specific report in
24  Exhibit 1 contain all of your case-specific opinions

Page 7

1   for Tamara Carter?
2   A.  Yes.  The caveat to that is since this, I
3   have reviewed her deposition, but it didn't really
4   change any of my opinions in the case.
5   Q.  Do you have any additions or corrections to
6   make to your report before we get started?
7   A.  Well, I guess, the only thing I would say
8   is after seeing her deposition, you know, it seems
9   like her -- the number of pregnancies and deliveries
10  changed from one place to another.
11       So I guess the only thing I would say
12  is that she's had multiple pregnancies that resulted
13  in multiple deliveries rather than saying four and
14  two and one.  Just because it seems like that was
15  kind of all over the place.
16  Q.  Okay.  Does that have any effect on your,
17  any of your opinions in this case?
18  A.  No.
19  Q.  When were you first asked to work on the
20  Tamara Carter case?
21  A.  I don't have my -- oh, you know what?
22       It would have been, I would say,
23  likely in March of this year.
24  Q.  Okay.  What were you asked to do?

Page 8

1   A.  I was asked to review her slide from her
2   mesh excision and review her medical records and
3   basically write an expert report regarding my
4   opinions with respect to both of those.
5   Q.  How much time have you spent working on
6   Ms. Carter's case to date?
7   A.  I don't have that in hard copy with me.  I
8   would say over 20 hours, but not over 30.
9   Q.  How much of that time was spent looking at
10  the pathology slide versus reviewing the other
11  materials?
12  A.  I don't know exact numbers.  Maybe
13  reviewing the slide, photographing it, everything,
14  maybe when I add up all the time together, because I
15  would look at it and then maybe come back to it
16  again to photograph it another time and look at it a
17  little more.  Maybe over an hour, an hour-ish.
18  Q.  And then the rest of that approximately 20
19  hours was spent reviewing medical records.  Is that
20  right?
21  A.  Medical records and maybe reviewing
22  literature regarding an issue I found in the case,
23  writing the report.  That took a significant amount
24  of time.  Discussions about the case.  That would be

Page 9

1   mainly it.
2   Q.  Okay.  Did you do anything to prepare for
3   your case-specific deposition?
4   A.  I reviewed her deposition.
5        I reviewed my report again.
6        I reviewed some of the medical records
7   again.  Just very briefly went through the medical
8   records, not to the extent I did the first time.
9        I reviewed the defense pathology
10  expert report, and that was mainly it.
11  Q.  Are you relying on any of the articles
12  written by Dr. Iakovlev or any of his expert reports
13  or depositions for any of your opinions in this
14  case?
15  A.  Yes.
16  Q.  Okay.  Which ones?
17  A.  I would have to go through this list.
18       (Document review.)
19  A.  I don't have all of the authors listed out.
20  There's some that he's listed as an author but it's
21  not the first few.  But basically, his article about
22  degradation of the mesh.
23  BY MR. SNOWDEN:
24  Q.  Do you recall what year that was published?

3 (Pages 6 to 9)

Golkow Technologies, Inc. - 1.877.370.DEPS

Paul J. Michaels, M.D.

Page 10

1    A.  I don't.
2    Q.  Was that -- I'll strike that.
3         And I think you have an article -- a
4  literature reference, number 6.  It's Bendavid,
5  "A mechanism of mesh-related post-herniorrhaphy
6  neuralgia."
7         I believe that's a -- is it your
8  understanding that's a Dr. Iakovlev article as well?
9    A.  Yes, but there --
10        Sorry.  I understood your question to
11  say with regards to my opinions in this case, and
12  that article dealt with neuroproliferation.
13    Q.  Okay.
14    A.  And there wasn't any of that in this -- the
15  small amount of mesh that was in the slide.
16    Q.  Okay.  Are you relying on any deposition
17  testimony for your opinions in Ms. Tamara Carter's
18  case?  Let me ask a better question.  Sorry.
19        Are you relying on any of
20  Dr. Iakovlev's deposition testimony for any of your
21  case-specific opinions here?
22    A.  No.
23    Q.  Are you relying on any of his expert
24  reports in other litigation for your case-specific

Page 11

1  opinions in this case?
2    A.  No.
3    Q.  When did you first review Dr. Iakovlev's
4  degradation article?
5    A.  A while ago.  I don't -- I couldn't tell
6  you.  Relatively early on in this -- in my
7  involvement with these cases.
8    Q.  So that would have been prior to issuing
9  this report in this case.  Is that right?
10    A.  Yes.
11    Q.  Is that where the term "bark," in your
12  opinion, comes from?
13    A.  From where?
14    Q.  Does it come from Dr. Iakovlev's article
15  that you mentioned?
16    A.  I've seen it referenced in a few different
17  places.  I don't know if that's the only place, that
18  that's the origin of it.
19    Q.  Okay.  Do you recall any of those other
20  places where "bark" is referenced?
21    A.  I don't remember what Ethicon scientists
22  called it.  I know they addressed it as well in the
23  '80s or something when I reviewed those -- their own
24  documentation regarding their studies.

Page 12

1         But I found that that's not uncommon
2  in pathology where people refer to the same thing by
3  different names, and I assume that that's -- they
4  were all talking about -- not assume, but they were
5  all talking about the same thing, based on their
6  diagrams and pictures.
7    Q.  Are you relying on any other medical
8  literature in this case that describes a -- and I'm
9  using "bark" in quotes -- layer under the light
10  microscope?
11    A.  I don't remember if -- if it's been used in
12  other places.
13    Q.  In this case, did you receive a gross
14  specimen?
15    A.  No.
16    Q.  And was your review -- and strike that.
17         How many specimens did you receive in
18  this case?
19    A.  I just received one slide.
20    Q.  Okay.  And was that from the
21  September 27th, 2012, excision surgery?
22    A.  Yes.
23    Q.  Let's go to -- well, how did you make sure
24  that it was from that surgery when you first

Page 13

1  reviewed the slide?
2    A.  The date on the slide, I think it was 2012,
3  and it correlated with the sheet that I received
4  from the lab.
5    Q.  Other than review under the light
6  microscope and the use of polarized light
7  microscopy, did you do any other testing of any
8  specimen for Ms. Carter?
9    A.  No.
10    Q.  If you could, turn to page 9 of your
11  report.  You have, it looks like, an HNE picture at
12  the bottom.  Do you see that in your figures?
13    A.  Yes.
14    Q.  Can you describe what we're seeing in that
15  figure?  And is this -- strike that.
16         Is this Figure 1?  Because it's a
17  little confusing because the headings are cut off
18  from the page.
19    A.  Oh, yes.  And it's Figure 1.
20    Q.  So Figure 1 on page 9, please tell us
21  what's depicted.
22    A.  So that is, I would say, a medium
23  magnification view of a fragment of the mesh where
24  you can see the refractile polypropylene surrounded

4 (Pages 10 to 13)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 14

1  by dense fibrous tissue with chronic inflammation.
2      Q.  What kind of chronic inflammation is
3  present?
4      A.  I don't know what you mean by what type
5  of -- chronic inflammation:  That's what it is.
6      Q.  Okay.  What type of cells do you consider
7  in that -- being the chronic inflammation present
8  here?
9      A.  I would say mostly lymphocytes, although
10  there are likely some macrophages as well.
11      Q.  Are there any other foreign-body giant
12  cells present?
13      A.  This magnification, I can't really tell.
14      Q.  Do you recall finding foreign-body giant
15  cells in Ms. Carter's specimen?
16      A.  Yes.
17      Q.  Do you know how many you found?
18      A.  I didn't count them.
19      Q.  In Figure 1, could you ...
20          (Pause in proceedings.)
21  BY MR. SNOWDEN:
22      Q.  Could you, using that red pen, mark the
23  areas of chronic inflammation on Figure 1?
24      A.  By an arrow or circling, or how should I do

Page 15

1  it?
2      Q.  Why don't you circle the areas of chronic
3  inflammation.
4          MR. AYLSTOCK:  And, Doctor, you'll
5  want to put something under that because that marker
6  will bleed through.
7  BY MR. SNOWDEN:
8      Q.  Here.  Why don't we use the red pen.
9          (Witness complies.)
10          (Pause in proceedings.)
11      A.  I would say I circled the main areas that I
12  can see at this magnification.
13  BY MR. SNOWDEN:
14      Q.  Okay.  Did you find any -- well, is there
15  any acute inflammation in Figure 1?
16          (Document review.)
17      A.  I don't think I saw any acute inflammation
18  in this specimen at all.
19          So at this magnification it would be
20  hard to ascertain the difference between them, so I
21  would say likely not.
22  BY MR. SNOWDEN:
23      Q.  Okay.  In your practice, do you typically
24  grade the degree of inflammation in a specimen?

Page 16

1      A.  Could you repeat that?
2      Q.  Yeah.
3          In your practice, do you grade the
4  degree of inflammation when it's present?
5      A.  In some types of specimens, yes.
6      Q.  Did you do that in this specimen?
7      A.  No.  This isn't one of the types that I
8  grade inflammation in.
9      Q.  Which types do you grade inflammation in?
10      A.  Liver biopsies for hepatitis, you --
11  there's a grading scale for inflammation.
12          Heart biopsies for acute allograft
13  rejection we grade inflammation.
14          Same with kidney allograft rejection
15  we grade inflammation.
16          You grade some inflammation in some
17  types of non-neoplastic diseases of the colon, like
18  when you're evaluating for inflammatory bowel
19  disease like ulcerative colitis and Crohn's disease.
20          Same with celiac disease.  In the
21  small intestine, we grade the types of inflammation
22  and the degree.
23          I would say those would be the main
24  specimens where, in the pathology report, it would

Page 17

1  be important to issue some sort of statement
2  regarding the degree or severity of the
3  inflammation.
4      Q.  Is it important, then, when you're looking
5  at a mesh removal to know the degree of
6  inflammation?
7      A.  Not as far as a grading system because
8  there's really not one that exists, to my knowledge,
9  that's used.
10      Q.  Is there any way you differentiate between
11  what -- for instance, what you see in Ms. Carter's
12  case and other cases when it comes to degrees of
13  inflammation?
14      A.  Just by looking at pictures, if I were to
15  compare pictures, I would say one has a more
16  significant degree of inflammation than the other.
17          This is certainly -- I would not
18  consider this minimal or slight, because that would
19  just indicate just -- from a general pathologist's
20  standpoint, that kind of terminology would indicate
21  a very few scattered lymphocytes or macrophages or
22  plasma cells that are not being clustered.
23          These are large groups of lymphocytes
24  that are, you know, adjacent to the mesh within the

5 (Pages 14 to 17)

Golkow Technologies, Inc. - 1.877.370.DEPS

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 18

1  fibrous tissue, so I wouldn't come up with a term to
2  grade them.  I would just take a picture of it and
3  comment that there was chronic inflammation there.
4      Q.  For all of your figures -- and you have six
5  of them -- are you able to point to any nerve
6  receptors?
7      A.  Nerve receptors?
8      Q.  Yes.
9      A.  No.
10     Q.  Do you have any nerves pictured in your
11  photos?
12     A.  There are probably nerves on Figure 3, but
13  it's a really low magnification view, and they are
14  not within the fibrosis of the mesh, so I didn't
15  comment on them.
16     Q.  Let's go to Figure 3.
17     A.  Okay.
18     Q.  You said there are probably some -- and
19  just tell me if I'm wrong here.
20         There are probably some nerves, but
21  they're not in the fibrosis of the mesh in Figure 3.
22         Where does the fibrosis of the mesh
23  stop in Figure 3?
24     A.  Do you want me to draw it?

Page 19

1      Q.  Yes.  If you want to draw a line.
2      A.  I would say the scar plate is pretty --
3  this is actually a really good case, because you can
4  clearly see this rounded encapsulating fibrosis
5  which is described in the literature with regards to
6  these.  So ...
7      Q.  So you've drawn an oval around the area of
8  fibrosis.
9      A.  Yeah.  I may -- there may be a little bit
10  that extends up to here, but the actual sclerotic --
11  where you can see the clefting of the fibrosis is
12  pretty clear around here and extends a little up
13  there.
14     Q.  How do you differentiate between clefting
15  of fibrosis versus the presence of loose connective
16  tissue?
17     A.  Pathology residency.
18         Clefting is a microscopic finding that
19  you look at and you say there are clefts between the
20  tissue.  It's not really -- you don't see that in
21  normal, loose -- loose fibrosis tissue.
22     Q.  Are there any books we can look at that
23  would show us that?
24     A.  Probably any general pathology book.  Not

Page 20

1  that I brought with me.
2      Q.  Any that you can recall?
3      A.  Probably Robbins Patho -- or Robbins &
4  Cotran, Enzinger and Weiss, Goldblum's book.  Any
5  soft tissue book, I'm sure, describes the presence
6  of clefts within fibrosis tissue, both in a
7  non-neoplastic and neoplastic setting.
8      Q.  Would something like that be found in
9  gynecologic pathology texts?
10     A.  Yeah.  I would think so.
11     Q.  Are there -- are there authoritative
12  gynecologic pathology texts?
13     A.  There are several gynecologic pathology
14  texts?
15     Q.  Okay.  Are there any that you have used in
16  the past or continue to use?
17     A.  There are several.
18     Q.  Any in particular?
19     A.  Dr. Young's book.
20         Christopher Crum's book.  Those are
21  the two main ones.
22         Some people use Robboy.  I don't tend
23  to use that one very much.  Olivi and Nucci have a
24  book.  That's a good book.

Page 21

1      Q.  So far you've only named people at Harvard.
2  Anyone else?
3      A.  Well, if you know anything about books, you
4  know that they have chapters written by people that
5  aren't at Harvard.
6      Q.  Okay.  Blaustein's "Pathology of the
7  Female" --
8      A.  I don't -- I've never liked that book.
9      Q.  Okay.  Why not?
10     A.  I don't like the way it's written.  It has
11  a lot of not useless information, but it just
12  seems -- it's not very helpful from a pathologist's
13  standpoint.  Most people that I've worked with don't
14  use that very much.
15         I mean, it's obviously a big textbook,
16  but I personally -- you're asking about what I use.
17  I don't use that.
18         So WHO for, you know, ovary and cervix
19  and uterus.  That's the international book.  So
20  those would be the main ones.
21     Q.  Okay.
22     A.  The Fascicles.  The AFIP Fascicles.
23     Q.  Are those books that you've mentioned
24  typically written by leaders in the field -- sorry.

6  (Pages 18 to 21)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 22

1 Let me start over.
2        Are the chapters in those books
3 typically written by leaders in the field?
4    A.  No.  I wouldn't say so.  Not typically.
5        I mean, they're written by people
6 that -- the editors who are the leaders in the field
7 will say, "Hey, do you want to write a chapter on
8 such-and-such?"
9        "Okay.  I'll write a chapter on
10 such-and-such."
11        And then it will be reviewed and
12 edited by the leaders in the field, but not taking
13 anything away from the people that have written
14 chapters whatsoever.
15        But I wouldn't say that because
16 someone has a chapter in a book it anoints them as a
17 leader in the field.
18    Q.  If you take a look at Figure 2 -- actually,
19 before we move to Figure 2, where in the body did
20 Figure 1 come from?
21    A.  I think it came from the posterior vaginal
22 wall, to my recollection.  That's what it was
23 reported to have come from.
24    Q.  All right.  Do you know where in the

Page 23

1 posterior vaginal wall?
2    A.  I couldn't point to a location.
3    Q.  What significance to your opinion in this
4 case is the inflammation seen in Figure 1?
5    A.  I guess I don't -- can you repeat that?
6    Q.  I'll ask a better question.
7        Do you place any significance to your
8 finding of chronic inflammation?
9    A.  Well, I evaluate all of the findings
10 together.  So it's not just that there is chronic
11 inflammation, it's the degree of chronic
12 inflammation, the location of the chronic
13 inflammation, exquisitely surrounding the mesh.  Its
14 location within the dense fibrosis that's
15 surrounding the mesh.
16        So it's more than just, for me, seeing
17 that there's chronic inflammation, it's knowing
18 where it is in the biopsy and what it's intimately
19 associated with, which in this case is the mesh,
20 which shows that there is significant inflammatory
21 reaction to the mesh in this patient.
22    Q.  Okay.  Earlier you told me you don't
23 typically label the degree of inflammation and you
24 just told me the degree of inflammation is important

Page 24

1 to your opinion.
2    A.  No.  I don't grade the degree.  So I don't
3 say -- you were asking initially about grading, and
4 I said that I don't grade the degree of
5 inflammation.
6        But noticing the quantity without
7 placing a grade on it is something that you do when
8 you compare from one to another.
9    Q.  Okay.  The quantity of inflammation in
10 Ms. Tamara Carter's case, how does that compare to
11 other cases?
12    A.  I would have to see the picture of it to
13 show you how it compares.
14    Q.  Okay.  Is this -- is this a slight
15 reaction, a moderate reaction, a marked reaction, or
16 you just wouldn't place a grade on it?
17        MR. CURTIS:  Object to the form of the
18 question.
19    A.  I would say it's somewhat moderate based on
20 this picture.
21 BY MR. SNOWDEN:
22    Q.  Okay.  And that's -- based on Figure 1
23 that's moderate inflammation.
24    A.  Well, I mean, again, like I said, I'm

Page 25

1 not -- I'm not grading it.
2        So I'm saying it's -- you know, it's a
3 good amount of -- it's not slight, it's not all over
4 the tissue.  And you're not going to force me to
5 grade it when I'm telling you that I don't grade
6 them, so ...
7    Q.  Okay.  So what significance does the degree
8 of inflammation have on your opinion in this case?
9        MR. CURTIS:  I know it was not
10 intentional, but you've cut him off a couple of
11 times.  Would you please wait until the doctor
12 finishes his answer.
13        MR. SNOWDEN:  Sure.
14        THE WITNESS:  Can you repeat that?
15        THE REPORTER:  Yes.
16        (The record was read as requested:
17        "So what significance does the degree
18        of inflammation have on your opinion
19        in this case?")
20        MR. CURTIS:  What was his answer?
21        Do you need to hear part of the answer
22 that you gave?
23        THE WITNESS:  No.  That's fine.
24    A.  I would say it supports my opinions.

7 (Pages 22 to 25)

Golkow Technologies, Inc. - 1.877.370.DEPS

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 26

BY MR. SNOWDEN:
1    BY MR. SNOWDEN:
2      Q.   How does it support your opinions?
3      A.   Because it's showing that there is an
4    inflammatory response to the mesh.
5      Q.   Okay.  Does it matter for your opinions --
6    strike that.
7           Does the degree of the inflammation
8    matter for your opinions?
9      A.   Well, if there was just one lymphocyte or
10   two lymphocytes, I wouldn't comment on that.  So the
11   fact that I'm commenting on inflammation means that
12   I'm considering it pathologic in this case, which I
13   do.
14     Q.   And at what point do you consider it
15   pathologic?
16     A.   There's no way for me to really count the
17   number of lymphocytes as we sit here and tell you
18   how many wouldn't be.
19           I can tell you from this tissue
20   removed from this client, Ms. Carter, that this is
21   significant, and that's what I would say and that's
22   what I did say in here.
23     Q.   But in this case you're not using a grading
24   system.  Right?

Page 27

1      A.   Right.
2           We don't -- I don't use -- none of us
3    use grading systems for --
4      Q.   And --
5      A.   Don't.  Stop cutting me off.
6      Q.   I -- actually, I haven't said anything.
7      A.   Yeah.  You were starting to talk.
8           So, as I said, we don't use grading
9    systems.  I'm not doing a study.  So in studies they
10   may say grade 0, 1, 2, 3.  We don't do that when
11   evaluating these types of specimens, we would just
12   comment on whether there's inflammation present.
13   And in this case I took pictures of it to
14   demonstrate that morphologically.
15     Q.   So do we just have to take your word for
16   what level it becomes significant?
17           MR. CURTIS:  Object to the form of the
18   question.
19     A.   I took pictures.  So no.  You don't have to
20   take my word for it, because I took pictures.
21           So, by definition, it's not just my
22   word, it's an image demonstrating what I've
23   described.
24   ///

Page 28

1    BY MR. SNOWDEN:
2      Q.   Okay.  Is it your testimony that it's not
3    common in the field of pathology to rate or put a
4    degree on inflammation?
5      A.   Okay.  So we can go over this again, but
6    there are certain locations in the body and certain
7    diseases where you do grade inflammation routinely.
8           Now, when you're looking at a vaginal
9    mesh erosion that is taken out with fibrous tissue,
10   then we don't typically grade them with a numerical
11   score.
12           In this case, what I do is I described
13   that there was chronic inflammation.  And I took
14   pictures to demonstrate the chronic inflammation so
15   that at trial when I'm describing this, I can show
16   the number of inflammatory cells and how they're
17   surrounding the mesh and present within this scar
18   fibrosis tissue.
19     Q.   So how many inflammatory cells did you
20   count?
21     A.   I didn't count them.  I wouldn't have.
22   That's not a standard.
23     Q.   That's part of your answer, though.  We'll
24   move on.

Page 29

1           MR. CURTIS:  Just a minute.  Just a
2    minute.
3           MR. THOMAS:  Let's get an even keel
4    here.
5           MR. CURTIS:  Refrain from making
6    remarks that are not a question.  It's just not
7    appropriate for you to editorialize about the
8    answers that you don't like, and we're not going to
9    do that.
10          MR. SNOWDEN:  And I'd ask that that go
11   both ways.
12          MR. CURTIS:  But it starts with you.
13   Because you're not going to antagonize this witness.
14          MR. SNOWDEN:  You're wasting my time.
15          MR. CURTIS:  Just change your
16   attitude.  You came in here with some burr up your
17   ass.  I don't know what it is, but settle down and
18   ask your questions --
19          MR. THOMAS:  Let's go off the record.
20          MR. SNOWDEN:  Let's go off the record.
21          (Discussion off the record.)
22   BY MR. SNOWDEN:
23     Q.   All right.  Dr. Michaels, if you could turn
24   to Figure 2 of your report.

8 (Pages 26 to 29)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 30

1    Could you please tell us what we see
2  here in this photo?
3    A.  So in this photo there are mesh spaces
4  towards the left of the photo with a little bit of
5  mesh that's still in there on the bottom left.
6    And there's -- excuse me -- chronic
7  inflammation with lymphocytes and macrophages, and
8  there's some multinucleated foreign-body giant
9  cells, there's some dilated blood vessels, and there
10  are areas of fibrosis at the upper right and lower
11  right periphery of the figure.
12    Q.  Okay.  The figure legend says,
13  "Granulomatous tissue reaction associated with
14  adjacent mesh filaments."
15    Do you see that?
16    A.  Yes.
17    Q.  What makes this granulomatous?
18    A.  The fact that there are foreign body-type
19  giant cells and histiocytes.
20    Q.  What significance, if any, does the
21  presence of granulomatous tissue have on your
22  opinion in this case?
23    A.  Well, it's showing that there's a reaction
24  to the foreign material present within the specimen.

Page 31

1    Q.  Do you grade the degree of granulomatous
2  inflammation?
3    A.  No.
4    Q.  Anything else of significance in Figure 2?
5    A.  I think I just described basically the
6  whole figure, so in that -- I guess, in this
7  particular objective, that would be what I would
8  describe from it.
9    Q.  Turn to -- well, before we do that, did you
10  measure the thickness of the granulomatous
11  inflammation in this case?
12    A.  No.  I didn't quantify or measure the
13  thickness of the granulomatous inflammation.
14    Q.  Does that have any impact on your opinions
15  in this case, the thickness of the granulomatous
16  inflammation?
17    A.  No.
18    Q.  Does it just matter that it's there?
19    A.  That it's there and that it's quite
20  visible, and the location of it.
21    Q.  Okay.  Let's go to Figure 3.  What do we
22  see in this photomicrograph?
23    A.  So towards the bottom of the tissue piece
24  there is a portion of mesh that's surrounded by

Page 32

1  fibrosis and has fibrosis between the filaments, and
2  there's associated inflammation around those
3  individual filaments.
4    And then the upper part of the figure
5  shows more -- shows the adjacent stroma within the
6  specimen that has -- you can see the obvious --
7  well, you can see blood vessels in the upper part
8  with some of the more edematous -- I should say not
9  edematous, but loosely -- loose stroma.
10    Q.  Did you -- I think earlier we talked
11  about -- you drew a circle on the figure and you
12  said this was the encapsulated scar.  Did you
13  measure the thickness of the encapsulated scar in
14  this case?
15    A.  No.  I didn't measure the thickness of the
16  encapsulating scar in this case.
17    Q.  Does that have any impact on your opinions?
18    A.  No.  It doesn't have an impact on my
19  opinions.
20    Q.  Why not?
21    A.  Because it matters that it's there, not the
22  size of it.
23    Q.  Did you measure the distance from the mesh
24  to -- well, let me start over.

Page 33

1    Outside of the circled area on Figure 3
2  that you've put on the exhibit, is the tissue --
3  would you call it normal?
4    A.  It appears unremarkable --
5    Q.  Okay.
6    A.  -- from this magnification.
7    Q.  All right.  Did you measure the distance
8  from the mesh fibers to unremarkable tissue in this
9  case?
10    A.  No.
11    Q.  Does it matter to your opinions?
12    A.  No.
13    Q.  Why not?
14    A.  Because what is in the mesh is abnormal.
15  So it's not like they need to excise -- it's not
16  like a tumor, that it's malignant and you have to
17  measure how close the tumor is to the resected
18  margin.
19    There's no need to measure anything.
20  Just because there's normal tissue adjacent to the
21  mesh means nothing from this -- the distance.
22    Q.  Figure 4 in your report:  Is this a higher
23  magnification of the bottom portion from Figure 3?
24    A.  Yes.

9 (Pages 30 to 33)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 34

1    Q.   What are we looking at in Figure 4?
2    A.   We are looking at the fibrosis between the
3  two areas of mesh filaments, and we're also seeing
4  the clefting of the fibrosis tissue, which you just
5  see when you have sclerotic scar tissue basically,
6  or fibrous tissue.
7         And then you can also see that each of
8  those mesh filaments is surrounded by a chronic
9  inflammatory response.  And then we know from the
10  prior one -- one of the prior figures that there is
11  evidence of a granulomatous response with the
12  foreign-type giant cells.
13    Q.   Did you -- well ...
14         And then Figure 5:  Is that an even
15  higher magnification of the middle portion of
16  Figure 4?
17    A.   Yes.
18    Q.   Do you have an opinion in this case
19  regarding whether Ms. Carter's mesh contracted in
20  her body?
21    A.   Yes.  I would say that based on these
22  findings it appears that it -- it would have.
23    Q.   And which findings specifically are you
24  referring to?

Page 35

1    A.   The encapsulating fibrosis would probably
2  be -- I would say the most suggestive finding to
3  correlate histologically at least, because that's
4  what you typically see in any aspect of the body
5  when you have scar tissue.  When it's surrounding a
6  structure, that's when you have that kind of
7  shrinkage or contracture.
8         So I would say that that would be the
9  histological correlate to a contracture.
10    Q.   And what -- what's the basis for your
11  opinion that the presence of fibrosis is a
12  histological correlate for contracture?
13    A.   My entire, I guess, experience as a
14  pathologist, that that's -- and my reading.  That's
15  what you see with contractures is, you see dense
16  fibrosis.  You see a fibrous scar.
17         Whether it's a contracture in
18  someone's hand or vaginal region or something in the
19  abdomen, that's -- the histologic correlate is
20  usually dense hyalinized cellular fibrosis.
21    Q.   Is that found in any medical literature
22  anywhere?
23    A.   Yeah.  Everywhere.
24    Q.   Are you relying on any medical literature

Page 36

1  for that opinion?
2    A.   My kind of career of reading medical
3  literature.  It's not like it's only been described
4  in one location.  I'd say "Oh, yeah.  So-and-so
5  mentioned it in 1995."
6         It's just kind of a general -- it's a
7  general.  It's general knowledge.  Pathology
8  knowledge.
9    Q.   Did you measure the pore space in
10  Ms. Carter's specimen?
11    A.   No.
12    Q.   Do you know whether you saw a pore in the
13  tissue specimen?
14    A.   Well, I didn't examine the gross tissue
15  specimen.
16    Q.   Are we looking at a pore in Figure 4?
17    A.   That's the space between it.  Correct.
18    Q.   And so --
19    A.   This is -- this would be deformed,
20  technically.  I mean, it's a different area.
21         This whole area is sort of deformed
22  because it shouldn't just have -- you have clusters
23  of filaments here, so it's kind of indicative of the
24  fact that it's sort of deformed.

Page 37

1    Q.   Okay.  Take me through next -- I don't
2  understand why --
3         Why do the clusters of fibers mean it's
4  deformed?
5    A.   Well, you can see that this is -- it's not
6  uniform.  So you have like four -- on the right you
7  have four filaments spaces, where on the left you
8  have six and they're at different spacing.
9         So normally, when you would have the
10  mesh prior to implantation, everything would be
11  uniformly spaced.  But in here, you can see, based
12  on its incorporation into the tissue, that it's not.
13  So I'm using that to say that it's, by definition,
14  not the same form, so it's deformed.
15    Q.   Have you sectioned the pristine mesh and
16  looked at it under a microscope?
17    A.   Like unremarkable mesh?
18    Q.   No.  Pristine mesh out of the box.
19    A.   No.
20    Q.   Have you ever seen a TVT out of the box?
21    A.   Under the microscope?
22    Q.   Under the microscope or just in person.
23  Have you had one in your hands?
24    A.   Yes.

Golkow Technologies, Inc. - 1.877.370.DEPS

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 38

1    Q.   When was that?
2    A.   In medical school or probably towards the
3  end of medical school.
4    Q.   Have you ever had a Prolift in your hands?
5    A.   I don't recall if I've ever had a non-used
6  Prolift in my hands.
7    Q.   Okay.  If I asked you to -- and I'm not
8  asking at this point, but would you be able to draw
9  the structure of a Prolift?
10       MR. CURTIS:  Object to the form of the
11  question.
12       MR. AYLSTOCK:  And I would also say
13  this is -- I don't know, this is general
14  questioning.
15       MR. CURTIS:  Yeah.
16       MR. AYLSTOCK:  We're really far afield
17  of Ms. Carter and you're -- and his case-specific
18  opinions in this case.  So we provided ample
19  opportunity for general questioning, that deposition
20  is closed.
21       MR. SNOWDEN:  And I'll have to
22  respectfully disagree with you.  Dr. Michaels just
23  testified that as part of this case he can tell it's
24  deformed based on the structure, and I'm trying to

Page 39

1  figure out what the basis for that opinion is.
2    BY MR. SNOWDEN:
3    Q.   So, Doctor, if I asked you to -- and I'm
4  not right this second -- would you be able to draw
5  the filament structure of a Prolift?
6       MR. CURTIS:  We object to the form of
7  the question.  And I can tell you that we're not
8  going to engage in any drawing of the --
9       MR. SNOWDEN:  I haven't asked him to.
10      MR. AYLSTOCK:  And are you talking
11  about the outline of the mesh or --
12      THE WITNESS:  Yeah.  I don't
13  understand.
14      MR. AYLSTOCK:  The whole thing is
15  confusing.
16   BY MR. SNOWDEN:
17   Q.   If I asked you to draw a pore with the
18  outlining mesh filaments, could you do it?
19      MR. CURTIS:  I continue to object to
20  the form of the question.
21      And I think Mr. Aylstock is right:
22  That that's far afield from his testimony that this
23  particular Figure 4 depicts deformed mesh in this
24  particular patient.

Page 40

1   BY MR. SNOWDEN:
2    Q.   You can answer.
3    A.   Yeah.  It's like a crisscross.
4       So, I mean, I'm not a good drawer, but
5  I've seen it; I've held it in my hands, as I've
6  already testified, but -- and I've seen the
7  difference between anterior and posterior in the
8  Total Prolift, so I -- I could -- you know, I know
9  what that looks like as well, so ...
10   Q.   And this is my last question on this.
11       How many filaments surround a Prolift
12  pore?
13   A.   I'm not --
14       MR. CURTIS:  I object to the form of
15  the question.
16       Go ahead.
17   A.   I would have to look at a picture of it.
18   BY MR. SNOWDEN:
19   Q.   Did you do that before coming to your
20  opinion that Figure 4 shows deformation of the mesh?
21   A.   Could you repeat that?
22   Q.   Yeah.
23       Did you look at a picture of a Prolift
24  before coming to the opinion in Figure 4 that the

Page 41

1  mesh was deformed?
2    A.   Yes.  I've seen the pictures before I came
3  to that conclusion.
4    Q.   Is there any blood vessels in Figure 4?
5    A.   Yes.
6    Q.   So would you agree this tissue is
7  vascularized?
8    A.   I would say the tissue in Figure 4 is
9  vascularized.
10   Q.   Is there any edema present in Figure 4?
11   A.   It's hard to tell at this magnification for
12  certain.
13   Q.   Figure 4 captures every single mesh
14  filament from Ms. Carter's body that you have
15  reviewed.  Correct?
16   A.   I believe so.
17   Q.   Okay.  And so if we count them, it's a
18  total of 10.  Is that right?
19   A.   Yes.
20   Q.   Do you know whether this is a
21  representative specimen?
22       MR. CURTIS:  Objection.
23  Representative of what?
24   ///

11 (Pages 38 to 41)

Golkow Technologies, Inc. - 1.877.370.DEPS

Paul J. Michaels, M.D.

Page 42

BY MR. SNOWDEN:

1    Q.  Of the whole -- of Ms. Carter's specimen.
2    Let me ask it again.
4         Do you know whether this is a
5    representative specimen of the whole of Ms. Carter's
6    excised mesh?
7    A.  I would -- well, it's my opinion, just
8    based on how your body reacts to foreign material,
9    that this would be representative of what's not
10   sampled that's in her body.
11   Q.  So the inflammation we see here in the
12   fibrosis, we see here you expect that to be
13   equivalent or similar throughout the rest of the
14   specimen.
15   A.  I would say that it would be similar,
16   although changes obviously occur if it's -- because
17   in this area, we don't actually have it eroding
18   through the mucosa.
19        So when it's eroding through the
20   mucosa, I would imagine there would be more acute
21   inflammation or hemorrhage or edema, depending on if
22   it's located near -- you know, if there's mesh near
23   the -- some of her mesh has migrated.  It's near the
24   urethra, it may be involving smooth muscle or it

Page 43

1    could be involving skeletal muscle, which could
2    cause, again, a slightly different response.
3         But, generally, I would say that it
4    would be similar, the basis of the inflammatory
5    response.
6    Q.  You brought up a good point.
7         You didn't see the erosion site in this
8    case, did you?
9    A.  Correct.  This was the only slide I have.
10   Q.  So you didn't see any mucosa.
11   A.  I don't remember if there was mucosa on
12   this.  It wasn't -- let me look.  I thought that
13   there was, it just wasn't at the mesh.
14        Yeah.  There's squamous mucosa.
15   Q.  And did you -- did you see mesh near the
16   squamous mucosa in this?
17   A.  Well, I mean, it depends on how you define
18   "near."
19   Q.  How do you define it?
20   A.  Well, it's within a few millimeters of the
21   mucosa.  That's certainly closer than if it was
22   5 centimeters away.  You would say that that was
23   relatively near compared to something farther.
24        So -- but it wasn't -- in this

Page 44

1    particular section, it wasn't in continuity with the
2    epithelium.
3    Q.  Do you recall there being five portions of
4    tissue on the slide you reviewed in this case?
5    A.  Yes.
6    Q.  Is there any reason you didn't take
7    photographs of the other four?
8    A.  They didn't have mesh, and the report was
9    on the reaction to the mesh.
10   Q.  Is the -- did you remark at all about the
11   tissue in the other four pieces in your report?
12   A.  Yes.
13   Q.  Where is that?
14   A.  It's under the microscopic findings.
15   Q.  All right.  So what's your opinion
16   regarding what you saw in those other four pieces?
17   A.  Well, as I say, I say, "The histologic
18   section show numerous fragments of tissue, some of
19   which are lined by reactive and acanthotic squamous
20   mucosa with underlying stromal edema, and others
21   that show fibromuscular and fibroneural tissue."
22        And then I go on to say, "In one
23   fragment ..." and I describe the mesh.
24   Q.  Okay.  Was there anything significant about

Page 45

1    those other four pieces?
2    A.  I didn't think that there was anything
3    other than what I described that showed significant
4    pathologic change other than the stromal edema
5    that's underneath the mucosa.
6    Q.  Figure 4:  Do we see any nerves in this
7    clear micrograph?
8    A.  It's hard to tell if there are any nerves
9    at this magnification.
10        If they are, they would be small, and
11   I didn't think that they were within that fibrosis
12   of the -- between the mesh.
13   Q.  Is it fair to say you didn't find any
14   nerves that you would consider were entrapped in the
15   scar tissue?
16   A.  Yes.  I agree with that.
17   Q.  Okay.  Is it fair to say you didn't find
18   any deformed nerves in this case?
19   A.  Yes.  And I didn't have an S100, which
20   limited my ability to find any.  But based on HNE
21   alone, I did not see any deformed nerves in this
22   case.
23   Q.  So fair to say, then, there are no
24   traumatic neuromas in this specimen that you

12 (Pages 42 to 45)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 46

1 reviewed?
2    A.  I didn't notice any traumatic neuromas in
3 the specimen.
4    Q.  Would that have jumped out at you?  A
5 traumatic neuroma.
6    A.  It depends.  It should.
7    Q.  What do we see in Figure 5?
8    A.  Well, again, we see prominent hypocellular
9 and hyalinized fibrosis that's extending between
10 these mesh filaments that I have with arrows.  And
11 at the arrows you can also see a chronic
12 inflammatory and foreign body response.
13    Q.  We also see blood vessels in Figure 5.  Is
14 that right?
15    A.  There are tiny compressed blood vessels.
16    Q.  So you'd agree this tissue is vascularized.
17    A.  Well, there are vessels in it, but they are
18 compressed and I don't see red blood cells within
19 them.  It's certainly not necrotic.  It's not -- it
20 doesn't look like there's no vascular supply getting
21 to it.
22    Q.  Are those red blood cells in the
23 granulomatous tissue described in Figure 2, and are
24 actually pictured in Figure 5?  That's the left

Page 47

1 portion of the picture.
2    A.  Yeah.  At the edge.
3    Q.  What are the tiny -- other than the chronic
4 inflammation, what are the tiny purple dots in
5 Figure 5?
6    A.  They're a variety of cells.
7    Q.  Did you look at these to determine what
8 type of cells these were?
9    A.  Well, they're fibroblasts, and they're
10 endothelial cells, and they're perimyocytes
11 associated with the vessels.  There are probably
12 some mast cells that you often see in stromal
13 tissue.
14    Q.  Anything else?
15    A.  Nothing striking that jumped out at me.
16    Q.  We've gone through five of your figures and
17 you've described your findings in them.  Can you
18 tell us what impact this is having on Ms. Carter?
19        MR. CURTIS:  Object to the form of the
20 question.
21        (Document review.)
22    A.  So I would say that based on the features
23 that I identified histologically that they would be
24 a morphologic explanation for her symptoms

Page 48

1 dyspareunia, pain to palpation.  And then
2 extrapolating based on, as we talked about, knowing
3 that these findings would be representative of other
4 areas of her mesh that were not removed.
5        Urethral fistula formation, recurrent
6 urinary tract infections, and a recurrent stress
7 urinary incontinence.  Knowing that this was in an
8 area away from her bladder, but knowing that the
9 same mesh substance was in other areas, I would say
10 you could extrapolate from that, which we do as
11 pathologists all the time when we only see a small
12 bit of tissue but have to make an evaluation based
13 on a larger specimen.
14    BY MR. SNOWDEN:
15    Q.  In answering my question, I notice you
16 reviewed a portion of your report.
17        Were you looking for the clinical
18 symptoms that Ms. Carter experienced?  Was that part
19 of what you had reviewed?
20    A.  No.  I was reviewing what I reported and
21 the actual time of when this mesh was taken out, and
22 what I had summarized.
23        Because there's a lot of information
24 in these cases, and before I give you a thoughtful

Page 49

1 answer that I want to be accurate and precise, I
2 wanted to review to make sure that what I'm saying
3 are her symptoms or her -- what impact this tissue
4 had is accurate.
5    Q.  Had you looked solely at the tissue without
6 any clinical history in this case, could you have
7 told us those clinical symptoms?
8        MR. CURTIS:  Object to the form of the
9 question.
10    A.  I didn't do that.  That's not what I was
11 asked to do.
12    BY MR. SNOWDEN:
13    Q.  Okay.
14    A.  So I can't really postulate what I could
15 have done without that scenario.  I wasn't in that
16 scenario.
17    Q.  But are you able to look at any of these
18 figures in your report and tell me what impact this
19 tissue reaction is having, was having, on
20 Ms. Carter's pain?
21        MR. CURTIS:  Object to the form of the
22 question.
23    A.  Well, I don't operate in a vacuum, so I
24 can't just look at one picture and tell you

13 (Pages 46 to 49)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 50

1 everything about the patient.
2        I, and other pathologists and other
3 physicians, have to take everything into account and
4 put them together and rule out other etiologies of
5 pain. And there are tons of etiologies of pain you
6 can identify microscopically, and I didn't find any
7 of them in this material.
8        So I can't just look at one picture in
9 a case like this and dictate what kind of symptoms
10 or signs she was showing.
11 BY MR. SNOWDEN:
12    Q. How about all the pictures? Could you look
13 at all the pictures and say that?
14        MR. CURTIS: Object to the form of the
15 question.
16 BY MR. SNOWDEN:
17    Q. Let me reask the question.
18        If you look at all the pictures
19 together, would you be able to do that?
20        MR. CURTIS: Object to the form of the
21 question.
22    A. Again, I told you regarding any of these
23 I'm not operating in a vacuum. I wasn't just asked
24 to look at the histology and write a report about

Page 51

1 what my findings were.
2        I was asked to look at the histology
3 in conjunction with the medical records and issue a
4 report basically saying what I felt if I felt like
5 these correlated, which I do.
6        And part of that was evaluating the
7 tissue and making sure there weren't other findings.
8 And there are several that can be found in any given
9 case that could have basically said that these other
10 finding, in addition to the mesh, this other finding
11 actually could have equally have produced pain, and
12 I didn't see any evidence of that in this case.
13 BY MR. SNOWDEN:
14    Q. How did the reaction to the mesh -- how
15 does it correlate with the clinical symptoms in this
16 case?
17    A. Well, the inflammation and the scarring
18 would lead to basically deformation and an
19 inflammatory reaction associated with the actual
20 filaments that are present. And the contracture,
21 based on the fibrosis, would lead to an anatomic,
22 basically, malfunction, if you will, of the general
23 area and could lead to pain. Obviously, the
24 extrusion, because when it's contracting and there's

Page 52

1 inflammation, it's going to move within the tissue,
2 and, depending on the location, can lead to urinary
3 dysfunction.
4    Q. Did this mesh that we're looking at in
5 these five figures lead to urinary dysfunction?
6    A. Well, this particular mesh was -- again, it
7 was taken from posteriorly, so it wasn't in that
8 area.
9        So as we've already -- as I've already
10 mentioned, I think you can take -- well, it's my
11 opinion that you can take these inflammatory
12 processes that are occurring in a mesh that is
13 uniform throughout its actual product.
14        It's not as if when you have a mesh
15 product they coat part of it in one polymer and
16 another part in something else and then they add
17 other coating to another part. It's uniform.
18        So the tissue reaction you see in a
19 small amount would correlate and you can extrapolate
20 to other parts of the tissue, assuming that it's in
21 other parts of the body, which it is.
22        It's not just in this posterior
23 vaginal wall, it's in other -- this is just -- this
24 isn't representative of how much tissue -- how much

Page 53

1 mesh she has in her body.
2    Q. Did you review a specimen taken from
3 Ms. Carter's anterior vaginal wall?
4    A. No. I think we've already gone over that.
5        This is the one specimen that I have
6 where there are five fragments of the tissue that
7 are on the slide, and it was taken, reportedly, from
8 the posterior vaginal wall.
9    Q. Which device are we looking at in these
10 figures?
11    A. The Prolift.
12    Q. What aspect of the Prolift device led to
13 the changes -- the tissue changes we're looking at
14 in these figures?
15        MR. CURTIS: Object to the form of the
16 question.
17    A. I don't know what you mean.
18 BY MR. SNOWDEN:
19    Q. What about the Prolift led to these tissue
20 changes, if you know?
21    A. I don't know what you're talking about. I
22 don't understand that question.
23    Q. How did the Prolift cause these tissue
24 changes which you're correlating with Ms. Carter's

14 (Pages 50 to 53)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 54

1  symptomatology in this case?
2      A.  Because it's a synthetic foreign body.
3          I don't know what you're getting at.
4  I don't understand.
5      Q.  I'm asking -- I'm just asking for your
6  opinion on what aspect of the Prolift device led to
7  the tissue changes you're correlating with
8  Ms. Carter's symptomatology?
9          MR. CURTIS:  Object to the form of the
10  question.
11      A.  The polypropylene mesh and its
12  characteristics.
13      BY MR. SNOWDEN:
14      Q.  Okay.  Which characteristics led to the
15  tissue changes we see here?
16      A.  I guess I don't understand the question.
17      Q.  Do you have an opinion as to the specific
18  elements of the Prolift device that led to the
19  tissue changes we see in Ms. Carter's case?
20          MR. CURTIS:  Object to the form of the
21  question.
22          THE WITNESS:  Can you repeat the last
23  question?
24          THE REPORTER:  Yes.

Page 55

1          (The record was read as requested:
2          "Do you have an opinion as to the
3          specific elements of the Prolift
4          device that led to the tissue changes
5          we see in Ms. Carter's case?")
6      A.  So, I guess, getting back -- I'm assuming
7  this is a general question with regards to Prolift
8  in general.
9          So, as we covered earlier, the heavy
10  weight, the pore size, its location I would say in
11  that anatomic region.  All those together would
12  correlate with the findings that we're seeing.
13      BY MR. SNOWDEN:
14      Q.  Did you quantify the degree of contraction
15  in Ms. Carter's case?
16      A.  No.  We don't quantify fibrosis in
17  non-research settings in this location in the body.
18      Q.  And I just want to make sure we're talking
19  about the same thing.
20          I'm asking about the contraction of the
21  mesh that I believe you've said you're opining
22  occurred in this case.  Did you quantify the degree
23  of that contraction?  Not the degree of the fibrosis.
24      A.  Well, the contraction is secondary to the

Page 56

1  fibrosis.  So when I'm talking pathologically about
2  the contraction, I'm talking about what's causing it
3  which is the fibrosis; and no, I didn't quantify any
4  element of the contraction or fibrosis.
5      Q.  Is there anything you could have done to
6  measure or quantify the contraction in this case?
7      A.  Not that I would have done that I'm aware
8  of.
9      Q.  Do you have an opinion in this case that
10  Ms. Carter's mesh migrated?
11      A.  Yes.
12      Q.  Okay.  And what's that opinion?
13      A.  That it did.
14      Q.  Okay.  Where did it migrate from?
15      A.  I can't give you exact anatomic locations.
16  But the fact that it was eroded through the mucosa,
17  by definition, is a migration.
18          So I don't -- I can't tell you that it
19  took a 135-degree turn and went anterior,
20  posterior -- anterolateral.
21          But it migrated from its normal
22  location to coming out of the body.  That's, by
23  definition, migration.
24      Q.  In your opinion -- strike that.

Page 57

1          Figure 5 you have in the legend
2  "Prominent hypocellular and hyalinized fibrosis."
3          Do you see that?
4      A.  Yes.
5      Q.  What do you mean when you say "hyalinized"?
6      A.  It means it's -- just for a layman's term,
7  it's very pink and hypocellular.  It's kind of --
8  when it's hyalinized, it has a glassy appearance.
9          Microscopically, it tends to be
10  associated with these clefts, which you can see,
11  which are these almost white tiger stripes that
12  traverse horizontally.
13          That's hyalinization.
14      Q.  Is the presence of hyalinized fibrosis
15  significant to your opinion?
16      A.  It's just evidence of dense fibrosis which
17  you see in the setting of scars.
18      Q.  Are you offering an opinion in this case
19  that Ms. Carter's mesh degraded in vivo?
20      A.  Yes.
21      Q.  And what's the basis for that opinion?
22      A.  My microscopic evaluation using
23  polarization microscopy.
24      Q.  Where did you get the idea to do that?

15 (Pages 54 to 57)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 58

1    A.  From the literature and from Ethicon's own
2  scientists who did the same thing.
3    Q.  Which literature?
4    A.  Well, I don't know the exact names of the
5  studies.  I know just a couple days ago I was
6  rereviewing this and was, again, seeing the reports
7  from Ethicon scientists that showed the same
8  degradation.
9         And so when I first got involved, I
10  was sort of pointed to that material because
11  obviously, as a layperson in the medical community,
12  I didn't have access to Ethicon's internal
13  documents.
14         So those were provided to me, and then
15  I did my own literature search and had other
16  article -- peer-reviewed articles that I could
17  review, like Dr. Iakovlev's article, and saw the
18  findings, read about the findings.  Read about the
19  scanning electron microscopy, its correlation.
20         The prior medical literature,
21  postulating about biofilm and that it's a protein
22  polymer and not really a foreign synthetic material.
23  And so after reading all of that and seeing them
24  talking about polarization light microscopy, that's

Page 59

1  why I polarized these cases.
2    Q.  What about the specimen in this case
3  supports your opinion that the mesh degraded in
4  vivo?
5    A.  The outer polypropylene bark, or layer --
6  whichever you prefer to use -- is detached from the
7  core, and it's also detached from the surrounding
8  tissue and it's broken into numerous pieces.
9    Q.  And is that what you have shown in
10  Figure 6?
11    A.  Yes.
12    Q.  How did you -- well, let me start over.
13         Did you rule out artifacts of microtomy
14  when determining that Figure 6 was degraded
15  polypropylene?
16    A.  Yes.  It's my opinion from reviewing the
17  literature that these findings are not from any sort
18  of microtome or processing.
19    Q.  And why is that?
20    A.  From what I've read, that even without
21  those -- in the pictures that I've seen, even
22  without those processing features that you would
23  still see the same findings without formalin
24  fixation or cutting or anything.  You still see

Page 60

1  cracking of that outer layer.
2    Q.  And I think what you're referring to now
3  are cracks with SEM photos.  Is that right?
4    A.  Um-hmm.
5    Q.  Okay.  And I want to focus specifically on
6  what we're -- the specimen you reviewed -- well, let
7  me start over.
8         Did you do any scanning electron
9  microscopy on this specimen?
10    A.  No.
11    Q.  Did you do any transmission electron
12  microscopy in this specimen?
13    A.  No.
14    Q.  Did you do any analytical chemistry tests
15  on this specimen?
16    A.  No.
17    Q.  Okay.  Your review of this specimen was
18  limited to light and polarized light microscopy.
19  Would you agree?
20    A.  To the specimen, yes.
21    Q.  And so the specimen we're talking about
22  right now --
23         MR. SNOWDEN:  I don't want to get into
24  general opinions so that I draw a bunch of

Page 61

1  objections from you guys.
2         MR. CURTIS:  Just ask your question.
3         MR. AYLSTOCK:  Did I look like I was
4  going to object?  I'm sitting here minding my own
5  business.
6    BY MR. SNOWDEN:
7    Q.  From your review of the polarized light
8  microscopy and light microscopy in this case, what
9  is it that led you -- how did you rule out that this
10  bark was not just an artifact of processing or
11  microtomy?
12         MR. CURTIS:  Object to the form of the
13  question.
14    A.  Because it doesn't have that appearance.
15         After years of looking at processing
16  artifacts, it doesn't have that appearance.  You
17  don't see multiple little -- you wouldn't see this
18  kind of architecture based on a microtome blade.  It
19  just makes -- it doesn't make any pathologic sense
20  to me.
21    BY MR. SNOWDEN:
22    Q.  Did you see any -- well, hold on one
23  second.  Sorry.
24         (Pause in proceedings.)

16  (Pages 58 to 61)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 62

1  BY MR. SNOWDEN:
2  Q.  Other than Dr. Iakovlev's article and the
3  Ethicon study that you referenced earlier, do you
4  recall any other articles you're using for the basis
5  of your degradation opinion?
6        And I'm specifically asking about with
7  the use of light microscopy.
8  A.  I can't recall.
9  Q.  Do you recall in the article by Iakovlev,
10  and others, that he -- one of the ways he asserts
11  you can differentiate between non-degraded
12  polypropylene and degraded polypropylene is the
13  uptake of histologic stain?
14        MR. CURTIS:  I don't know why this is
15  not general.  I mean, you're not asking him about
16  his bases for the judgment he made in this case,
17  you're talking about these --
18        MR. SNOWDEN:  I absolutely am.
19        MR. CURTIS:  You're talking about
20  these articles and all this other stuff that was
21  specifically covered.  This same topic, this same
22  author, this morning in the general.
23  BY MR. SNOWDEN:
24  Q.  You can answer the question.

Page 63

1        MR. CURTIS:  I object to the question.
2  A.  Can you repeat the question?
3        MR. SNOWDEN:  Can you repeat the
4  question, please.
5        (The record was read as requested:
6        "Do you recall in the article by
7        Iakovlev and others that he -- one of
8        the ways he asserts you can
9        differentiate between non-degraded
10        polypropylene and degraded
11        polypropylene is the uptake of
12        histologic stain?")
13  A.  I would have to see the article.
14  BY MR. SNOWDEN:
15  Q.  You don't recall that?
16  A.  I recall there being a mention about the
17  stain, but I don't remember that it was specifically
18  in regards to whether it's degraded or non-degraded.
19  And before I answer any question about the article,
20  I'd like to see the article.
21  Q.  How do you determine, when you're looking
22  under the microscope and coming to your opinions in
23  a mesh case, that the fragments you see depicted in
24  Figure 6 are degraded polypropylene rather than

Page 64

1  non-degraded polypropylene?
2        MR. CURTIS:  I object to the form of
3  the question.
4  A.  Because it's morphologically similar to
5  what's been described with respect to degraded
6  polypropylene.  And that's -- as a pathologist,
7  that's the basis of my entire career is, you use
8  literature and your own training and images of what
9  is described as X, and then you see it yourself and
10  you say, Based on my opinion and based on my
11  knowledge of what is out there in the literature,
12  what has been published, this is analogous to what
13  is being described, and you come to your own
14  conclusions.
15        So when I reviewed this particular
16  case and looked at what we're seeing on Figure 6, my
17  opinion is that that is degraded -- that's evidence
18  of degraded polypropylene bark and not a processing
19  or sectioning artifact.
20  BY MR. SNOWDEN:
21  Q.  And what morphologic features are you using
22  to come to that conclusion?
23  A.  Well, as I said earlier, the fact that it's
24  separated from the core.

Page 65

1        It's in multiple fragments.
2        It's also separated from the
3  surrounding tissue.
4        You can't see that blue dye, because
5  this is a polarized picture, so you can't see the
6  actual blue dye.
7        But just based on those features,
8  that's -- and correlating with the literature,
9  that's how I came to that conclusion.
10  Q.  Anything else?  Any other morphologic
11  similarities?
12  A.  I think I described the main ones.
13        MR. CURTIS:  Let's take a break, if
14  this a convenient spot.
15        MR. SNOWDEN:  I'd like to get through
16  this line of questioning first, please.
17        THE WITNESS:  I actually need to use
18  the restroom.
19        MR. SNOWDEN:  Okay.
20        MR. THOMAS:  Let's take a break.
21        MR. SNOWDEN:  Over my objection.
22        (Recess from 1:20 p.m. to 1:26 p.m.)
23  BY MR. SNOWDEN:
24  Q.  Dr. Michaels, what, if any, clinical

17 (Pages 62 to 65)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 66

1  significance do you attribute to the degradation of
2  Ms. Carter's specimen?
3      A.  Well, the degradation of the polypropylene
4  leads to increased inflammation which would then
5  lead to increased fibrosis, which would correlate
6  with her symptoms that I described in my report --
7  and signs in my report.
8      Q.  That any -- and all symptoms attributed to
9  the degradation layer?
10     A.  Well, that's one aspect of the foreign body
11 response.  It increases the response and the
12 inflammation which would then increase the fibrosis,
13 so that's one element of it.
14     Q.  Did you do a measurement of the degradation
15 layer in this case?
16     A.  No.
17     Q.  Did you do any type of nerve density
18 analysis in the specimen?
19     A.  Well, I described earlier how there weren't
20 any nerves that were entrapped.
21          So -- and I would only take into
22 account what nerves were in the area of the mesh.
23 So I didn't do any -- and even regardless, I would
24 feel that that's something that would be more likely

Page 67

1  in the setting of a research study and similar to
2  grading of inflammation in fibrosis that we've
3  talked about.  So I personally don't do that.
4      Q.  Did you consult with a neuropathologist in
5  this case?
6      A.  No.
7      Q.  Did you consult with any other pathologists
8  regarding Ms. Carter's specimen?
9          MR. CURTIS:  That was all covered this
10 morning, his consultation with neuropathologists and
11 other pathologists and even other experts.
12         MR. SNOWDEN:  Regarding Ms. Carter or
13 not?
14         MR. CURTIS:  Regarding all six cases.
15     A.  No, I did not.
16 BY MR. SNOWDEN:
17     Q.  Have you spoken with any of the other --
18 well, strike that.
19         Have you spoken with anyone else other
20 than counsel for the plaintiffs regarding
21 Ms. Carter's case?
22     A.  I don't believe so.
23     Q.  Have you ever examined Ms. Carter?
24     A.  No.

Page 68

1      Q.  Other than --
2      A.  I was going to say, not physically, just
3  her tissue.
4      Q.  Other than the one tissue slide you
5  reviewed in this case, have you ever examined
6  Ms. Carter?
7      A.  No.
8      Q.  Have you ever spoken with Ms. Carter?
9      A.  No.
10     Q.  Have you -- were you present during any of
11 the surgical procedures Ms. Carter had?
12     A.  No.
13     Q.  Did you have an opportunity to view the
14 mesh in vivo?
15     A.  No.
16     Q.  Did you have an opportunity -- strike that.
17         Have you read -- well, which
18 depositions, if any, have you read regarding
19 Ms. Carter's case?
20     A.  Well, that's hard to answer, because within
21 her case I have general opinions in this report that
22 I had reviewed multiple depositions from Ethicon
23 scientists and -- and then I've also, since this
24 report, reviewed her -- her deposition testimony.

Page 69

1          But I don't recall reviewing any,
2  like, treating physician testimony in this case or
3  any other expert testimony in this case.
4      Q.  And that's really what I'm after.
5          I'm after the case-specific materials
6  relating to Ms. Carter and not depositions of
7  Ethicon's employees or anything sort of in the
8  general portion of your report.
9          If you turn actually to Exhibit --
10 well, it's toward the end of your report.  You have a
11 list, "Case-Specific Materials Reviewed."  It's
12 Exhibit C -- let me make a better record of that.
13         Exhibit D to your report.  Is this your
14 reliance list?
15     A.  Yes.  I provided the portion that's with my
16 font, Garamond or ...
17     Q.  And so beginning on page 5, was that
18 provided by counsel for the plaintiff?
19     A.  Yes.
20     Q.  Do you recall reviewing the deposition of
21 Dr. Weiss?
22     A.  No.
23     Q.  Did you review the deposition of
24 David Carter?

18 (Pages 66 to 69)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 70

1    A.  I don't recall.  I don't think so.
2    Q.  Did you ask for all of the medical records
3  in this case?
4    A.  Yes.
5    Q.  Do you know if you've received all of them?
6    A.  I mean, I didn't receive her, like,
7  pediatric records.
8         I have no way of knowing if I received
9  all of someone's medical records.  I have no way of
10  knowing that.
11    Q.  Was there anything you requested
12  specifically to Ms. Carter that you were not
13  provided?
14    A.  I don't recall requesting anything that I
15  wasn't provided in Ms. Carter's case.
16    Q.  Are there any other depositions relating to
17  Ms. Carter's care that you've reviewed that are not
18  on this list?
19    A.  Not that I recall.
20    Q.  What effect, if any, on your opinion that
21  you stated earlier that the mesh deformed would the
22  fact that the explanting physician found no roping,
23  curling, or deformation of the mesh?
24         MR. CURTIS:  Object to the form of the

Page 71

1  question.
2    A.  I would have to see that -- where that was
3  described and see what words were used.  I can't --
4  I mean, I would like to see where that's described.
5  BY MR. SNOWDEN:
6    Q.  Is that something that could be important
7  for your opinion if the clinician who saw the mesh
8  in vivo said it was not deformed?
9         MR. CURTIS:  Object to the form of the
10  question.
11    A.  Well, it's somewhat subjective.  I've
12  certainly had many surgeons remove things and say,
13  "This tumor was 4 centimeters big."
14         And then I get it and cut it and it's
15  2.5 centimeters.
16         So in that situation, who's right?  I
17  am.
18         I'm the one that cut it; I'm the one
19  that measured it.  If someone's saying -- the
20  surgeon is saying, Well, this is -- well, okay,
21  that's --
22         Okay, that's fine.  It was
23  2.5 centimeters.  I felt like it was 4.
24         Okay.  But I measured it and it was

Page 72

1  2.5.
2         So if someone's saying, Yeah, it
3  didn't look deformed, you'd have to ask more
4  specific questions.
5         Well, was it exactly the way it was
6  when it was put in, or do you mean it wasn't
7  completely twisted around?
8         Is that what you define "deformed?"
9         So it's based on a particular
10  clinician or any physician's definition of what term
11  they're using.  But I would want to see what was
12  exactly described about it.
13         Because that would be -- I would
14  think, just based on the limited amount of tissue I
15  saw, I would be surprised that it looked normal.
16  BY MR. SNOWDEN:
17    Q.  Sitting here today, you don't know one way
18  or the other how the explanting physician testified.
19    A.  I don't know the specific words because I
20  already told you that I didn't review his
21  deposition, so no.
22         And I don't remember there being a
23  mention in the operative report that specifically
24  said that it looked normal or that it wasn't

Page 73

1  deformed.  So I don't recall that.
2    Q.  Did the operative report mention that the
3  mesh was deformed?
4    A.  I don't recall.  I've looked at a lot of
5  operative reports.  I'd have to rereview it.
6         (Exhibit 2 marked.)
7  BY MR. SNOWDEN:
8    Q.  I'm handing you what's been marked
9  Exhibit 2.
10         Dr. Michaels, have you reviewed this
11  record previously?
12    A.  Yes.
13    Q.  And what is this record?
14    A.  It is the pathology report from the mesh.
15    Q.  And is this the pathology report from the
16  hospital where the mesh was removed and then you
17  subsequently received a portion of that?
18    A.  Yes.
19    Q.  Okay.  Does this hospital -- well, strike
20  that.
21         Let's take a look down at the gross
22  description.  It says, "Received in formalin labeled
23  'Carter, Tamara L, DOB 9/7/1959,' and 'mesh' are four
24  irregular, ragged fragments of white and blue

19 (Pages 70 to 73)

Paul J. Michaels, M.D.

Page 74

1  synthetic mesh material, with embedded tan-pink
2  prominently congested soft tissue, that vary from
3  0.7-1.5 cm in greatest dimension, and are 2.3 by 2.0
4  by 0.8 cm in aggregate."
5        Do you see that?
6  A.  Yes.
7  Q.  It also says "representative sections of
8  soft tissue are submitted as A1."
9        Do you see that?
10  A.  Yes.
11  Q.  So the specimen that you reviewed in this
12  case was a portion of the whole specimen that was
13  sent to pathology.  Is that right?
14  A.  Yes.
15  Q.  And if we look at the diagnosis that's a
16  couple of lines above the gross, do you see anywhere
17  where the pathologist notes deformation of the mesh?
18  A.  Well, deformation wouldn't be something
19  that would be listed in the diagnosis.  You wouldn't
20  put that in the diagnosis.
21        If anything, it would be in the gross
22  description, which -- in which they're described as
23  irregular and ragged fragments of white and blue
24  synthetic mesh.

Page 75

1        So actually, in fact, he is describing
2  that these are irregular and ragged, which I would
3  say -- a synonym of which could be "deformed,"
4  depending on how you -- depending on how you use the
5  term "irregular and ragged."
6        That's certainly not normal,
7  flattened, you know, mesh.  It's clearly describing
8  something that is deformed.
9  Q.  And you saw representative sections of
10  those four pieces on the -- on your slide.  Right?
11  A.  Of the pieces of tissue?
12  Q.  Um-hmm.
13  A.  Yes.
14  Q.  And those pieces of tissue weren't just
15  perfect circles or squares, they were sort of ragged
16  fragments of tissue.
17  A.  That's one dimension.
18        You know, this is different than the
19  gross evaluation.
20  Q.  All right.  Do you see the word
21  "deformation" on this?
22  A.  I don't specifically see the word
23  "deformation" on this.
24  Q.  Okay.  Do you see anything in the diagnosis

Page 76

1  about deformation?
2  A.  I don't see anything in the bolded
3  diagnosis that says anything about deformation.
4  Q.  Anything in the bolded diagnosis or gross
5  description about roping or curling?
6  A.  Well, again in the gross description -- you
7  know, you're trying to ask if they use -- if there
8  is a very specific finding when they're using
9  nonspecific terms.
10        So "irregular and ragged" could be
11  describing something that is roped or curled.  Just
12  because they're not using the words "roped or
13  curled," doesn't mean that they weren't.
14        And they are, again, not saying that
15  these are regular, they're not saying that they're
16  smooth.  They're saying that these are irregular and
17  ragged, so I think that actually supports the fact
18  that this is not normal mesh.
19  Q.  Do you see any mention on this pathology
20  report of mesh degradation?
21  A.  I do not see that they evaluated for mesh
22  degradation in this report.
23  Q.  Did they use a light microscope?
24  A.  They did use a light microscope, but

Page 77

1  there's no mention of polarization microscopy.
2  Q.  Do you need a polarized lens to assess
3  degradation in this case?
4  A.  You don't need a polarized lens to assess
5  degradation, but they also did not do a microscopic
6  description.  So there's no -- we have no idea of
7  exactly what they saw, it was just incorporated into
8  the final diagnosis.
9  Q.  Okay.  Do you know Dr. Jonathan Strauss?
10  A.  I know of him.
11  Q.  Do you know where he went to medical
12  school?
13  A.  No.
14  Q.  Do you know what his research interests
15  are?
16  A.  No.
17  Q.  Do you know if he's avid in the field of
18  degradation of polypropylene?
19  A.  No.
20  Q.  Do you know his day-to-day methods of
21  evaluating mesh specimen?
22  A.  No.
23  Q.  Is there anything about -- strike that.
24        Does this pathology report correlate

20 (Pages 74 to 77)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 78

1  these findings to any of Ms. Carter's symptoms?
2      A.  I don't understand what that question
3  means.
4      Q.  Looking at this pathology report, does this
5  pathologist, Dr. Strauss, correlate his findings to
6  Ms. Carter's symptoms?
7      A.  I don't see any comment in this pathology
8  report attempting to correlate these findings with
9  Ms. Carter's symptoms.
10      Q.  And -- because you normally wouldn't see
11  that in a pathology report from a hospital
12  specifically.  Is that fair?
13      A.  Well, it depends.  It depends on what kind
14  of specimen you're dealing with, and if you're asked
15  to do that.
16          And in some specimens, we are asked to
17  do that.  We are asked to correlate the findings or
18  to mention if the findings do not correlate.
19          And so in this particular example, he
20  didn't say anything.  So there's no mention that he
21  was asked to or that he would feel comfortable to,
22  or if he knew the literature with regards to mesh
23  and complications, so no.  It's just a simple
24  pathology report.

Page 79

1      Q.  For all you know, he could have spent the
2  last two months doing 161 to 201 hours reviewing
3  literature.  Right?
4          MR. CURTIS:  Object to the form of the
5  question.  This is argumentative.
6      A.  It's pretty petty and nasty, frankly.
7          And I don't know anything about
8  Dr. Strauss and what he did prior to issuing this
9  pathology report on Ms. Carter in 2012.
10  BY MR. SNOWDEN:
11      Q.  All right.  Looking at the diagnosis.
12          Is the diagnosis found here consistent
13  with your diagnosis?
14      A.  I would say so.
15      Q.  Anything different in this diagnosis from
16  yours?
17      A.  Well, obviously, I've expanded on mine.
18  But I would say superficially, they're -- we found
19  similar things with regards to what he reported.
20      Q.  If we go to the clinical information at the
21  top, it mentions pre-op and post-op.
22          Do you see that?
23      A.  Um-hmm.
24      Q.  And there is no indication on the pre-op or

Page 80

1  post-op of pain, is there?
2      A.  I don't see anything about the word "pain"
3  in that.
4      Q.  And there's no mention of dyspareunia in
5  the pre-op or post-op.
6      A.  Not in the pre-op or post-op of the
7  clinical information on the pathology report, that's
8  correct.
9      Q.  What's your understanding of why the mesh
10  specimen you reviewed was removed from Ms. Carter?
11      A.  Well, it looks like Dr. Weiss had noted a
12  firm foreign body suburethrally, and then underwent
13  an exploration for that suburethral mesh with a
14  repair of a urethral injury, and then removed a
15  perirectal foreign body.  It was based on the
16  erosion.
17      Q.  Okay.  Any indication to you that the mesh
18  was removed due to pain?
19      A.  My recollection from her deposition was
20  that she was experiencing pain at this location.
21      Q.  And from the medical records -- before I
22  ask that question.
23          What location are you talking about?
24      A.  The posterior vaginal wall and also, I

Page 81

1  think, suburethrally.  Even though we don't have
2  that specimen.
3      Q.  Where did the specimen go that was removed
4  suburethrally, if any?
5      A.  I don't know what was done with it, or if
6  it was -- what was done.
7      Q.  You reviewed the record from
8  September 27th, 2012?
9      A.  I don't know what record you're talking
10  about.
11          The pathology record?
12      Q.  I'm sorry.  The operative note from that
13  date.
14      A.  Yeah.  I'd have to look at it again.  I
15  don't recall as I'm sitting here what it said.
16      Q.  Before coming to your opinion, are you
17  offering any opinions in this case regarding
18  Ms. Carter's anterior vaginal wall?
19      A.  Well, as we've already discussed, I am
20  extrapolating the findings that I am seeing in her
21  posterior vaginal wall from the specimen that I
22  received.  And extrapolating those findings and
23  correlating them with her symptomatology that would
24  have been affected by pathology of the anterior

21 (Pages 78 to 81)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 82

1 vaginal wall, given that the mesh has similar
2 biologic properties and there's still mesh that's
3 within her body.
4    Q.  So just so I understand.
5         Any opinion you have on the anterior
6 vaginal wall is not -- it's based on an extrapolation
7 from the specimen you reviewed from the posterior
8 vaginal wall.  Do I have that right?
9    A.  Right.  Which is consistent with what we do
10 on a day-to-day basis as pathologists where we have
11 a small amount of tissue that's felt to be
12 representative of a larger process.  And we have
13 opinions and form opinions and make extrapolations
14 based on that material.  That's correct.
15    Q.  Did the treating pathologist in this case
16 extrapolate about the anterior vaginal wall in
17 rendering this pathologic diagnosis --
18         MR. CURTIS:  Object --
19         Go ahead.
20 BY MR. SNOWDEN:
21    Q.  -- about the explanted posterior mesh?
22         MR. CURTIS:  Object to the form of the
23 question.
24    A.  Can you repeat that?

Page 83

1         MR. SNOWDEN:  Can you please repeat
2 that?
3         (The record was read as requested:
4         "Did the treating pathologist in this
5         case extrapolate about the anterior
6         vaginal wall in rendering this
7         pathologic diagnosis?")
8    A.  I don't see that he made any clinical
9 comments on this pathology report in general.
10         MR. CURTIS:  How much more time do you
11 show?
12         MR. SNOWDEN:  16 minutes.
13         THE REPORTER:  Would you like me to
14 check?
15         MR. SNOWDEN:  Sure.
16         MR. CURTIS:  Yes.
17         THE REPORTER:  I have 1 hour and 43
18 minutes on the record.
19 BY MR. SNOWDEN:
20    Q.  Doctor, will you be offering any opinions
21 at trial regarding any symptoms experienced by
22 Ms. Carter after the mesh was removed on
23 September 27th, 2012?
24    A.  Well, there was only a small portion of the

Page 84

1 mesh removed on September 27th, so her symptoms --
2 let me review this.
3         (Document review.)
4    A.  From my recollection, she had persistent
5 symptoms even after the small amount of mesh was
6 removed.
7         So I would say based on my findings
8 from that particular day, knowing that there is
9 still a significant amount of mesh material in that
10 anatomic location, I would say that I would feel
11 comfortable correlating her symptoms based on my
12 examination of the mesh from this case.
13 BY MR. SNOWDEN:
14    Q.  And that opinion about symptoms that
15 postdated the September 27th, 2012, surgery that's
16 not based on any new mesh specimen you reviewed?
17    A.  No.  I would just say that it would be --
18 depending on what I was asked, if she developed some
19 sort of new complication or a different quality of a
20 symptom, then that would obviously -- you know, I
21 wouldn't be able to be as confident about
22 correlating that with her current specimen that I
23 could with the current one with the symptoms she was
24 having prior to the surgery on September 27th, 2012.

Page 85

1    Q.  When you were evaluating the post
2 September 2012 symptoms, did you -- did you consider
3 deposition testimony of Dr. -- and I'm going to
4 butcher this name -- Tenggardjaja?
5         MR. SNOWDEN:  I'll give you the
6 spelling afterwards.
7         THE REPORTER:  Thank you.
8    A.  Well, given that I've already said that I
9 didn't review any other deposition transcripts, I
10 would say, no.
11 BY MR. SNOWDEN:
12    Q.  Okay.  On page 2 of your report under
13 number 7, you have a statement that begins
14 "Ms. Carter's reported signs and symptoms of
15 exquisite pain to palpation, dyspareunia ..." and
16 then it goes on.
17         Do you see that?
18    A.  Yes.
19    Q.  Does it matter to any of your opinions that
20 Dr. Tenggardjaja testified that he felt Ms. Carter's
21 pain was exaggerated?
22         MR. CURTIS:  Object to the form of the
23 question.
24    A.  No.

22 (Pages 82 to 85)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 86

1    BY MR. SNOWDEN:
2      Q.  Why not?
3      A.  Because pain is subjective.  And, you know,
4  if someone under oath, or regardless, is saying that
5  they have significant pain and there's a reason for
6  that pain, which pathologically my opinion is that
7  there would be a reason for that pain, whether
8  another physician deems it to be exaggerating or not
9  doesn't completely disqualify it.
10      Q.  Earlier in the deposition you mentioned
11  that there were -- I think you said tons of etiology
12  of pain.  Do you recall that?
13      A.  Was that in this deposition?
14      Q.  I believe so.
15          Anyway, are there multiple etiologies
16  of pain?
17      A.  Biologically, yes; and pathologically.
18      Q.  And you would agree psychiatrically?
19      A.  Potentially.
20      Q.  Did you -- did you review -- well, let me
21  start over.
22          Did you do a clinical differential
23  diagnosis in this case?
24      A.  No.  I did a pathologic differential

Page 87

1  diagnosis.
2      Q.  Okay.  And what's the difference?
3      A.  Well, a clinical differential diagnosis
4  would be something that you would do clinically with
5  a patient that presents with particular signs and
6  symptoms.
7          Pathologically what I do is correlate
8  the clinical differential diagnosis with what I'm
9  seeing pathologically.
10          So I am -- I didn't examine the
11  patient, I didn't take her history, I didn't think
12  Oh, okay, well, her pain can be from this, from
13  this, from this, or from this.
14          What I did is, I examined the
15  pathologic specimen where a physician is taking out
16  an area that is clearly grossly abnormal that was
17  eroding through the vaginal wall -- you know,
18  clearly migrated based on its location in the
19  tissue, taking that out, submitting that to me, and
20  my goal is to look at that and say, Okay, so what
21  are the causes for, you know, her mesh erosion or
22  pain, et cetera.
23          So mesh erosion can be because it
24  actually didn't migrate, but that the surface of the

Page 88

1  mucosa ulcerated, and ulcerated down to the point of
2  the mesh.
3          So it may have nothing to do with the
4  mesh, and that's an important feature.
5          The patient may have had a viral
6  infection -- herpes, CMV, any other number of
7  viruses -- that ulcerated the mucosal surface, which
8  then extended down into the soft tissue and then
9  that's how the mesh was eroded.
10          So I look at that and say, Okay.
11  Well, I'm looking at the mucosa, and just like
12  Dr. Strauss did, recognize that the squamous mucosa
13  doesn't have any significant histopathologic change,
14  so that is not the etiology for the pain in this
15  example.
16          The other thing in my differential
17  diagnosis would be, are there any sort of neoplastic
18  proliferations that would have grown and moved the
19  mesh, which clearly happens.
20          That happens in the uterus with women
21  that have IUDs and they have a tumor and the tumor
22  grows and the IUD comes out.  It's not because the
23  IUD came out on its own, it's because the tumor was
24  growing.

Page 89

1          So I look at the tissue, looking for
2  any sort of tumors or neoplasms, or anything that
3  could have grown clonally.  There was nothing like
4  that.
5          Look for infections other than,
6  viruses like fungal infections.  If she had been a
7  diabetic, she may have been predisposed to fungal
8  infections, which can be completely separate from
9  the mesh, and that could have caused the problems
10  that she was experiencing in that area and not from
11  the mesh.
12          You can have vasculitis where the
13  vessels become inflamed on their own and that's
14  something that's more often in women than men.
15          So that would not be inconsistent
16  with, you know, a 53-year-old woman to find
17  vasculitis in the tissue which can cause exquisite
18  pain.
19          So that's the difference between a
20  clinical and a pathologic differential diagnosis, is
21  that clinicians can't do that because they're not
22  looking under the microscope.  They say, Here, I'm
23  taking this out; this is abnormal; it eroded through
24  the mucosa, and my job is to rule out -- basically

23 (Pages 86 to 89)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 90

1  to evaluate why that happened.
2          And so that's what I did in this case
3  and what I would do in any case, whether I
4  specifically say it or not, in a general pathology
5  report that I would do in a hospital.  That is what
6  is the process of reviewing all of these specimens
7  in pathology.
8      Q.  Is a pathologic differential diagnosis more
9  robust than a clinical differential diagnosis?
10      A.  I wouldn't say one is more robust than the
11  other.
12      Q.  Okay.
13      A.  I would say they both have their
14  complexities to them.
15          There are certainly a lot of diseases
16  that I can diagnose under the microscope and there
17  are certainly a lot of etiologies that a particular
18  symptom can have.  So I wouldn't say that one is
19  necessarily more robust than the other, they're just
20  different.
21      Q.  Do you -- do you take into consideration
22  the same things that a clinician would in a clinical
23  differential diagnosis?
24      A.  Well, only in the sense that I'm taking

Page 91

1  into account that this is a symptom and I'm coming
2  up with a list of possible etiologies that I could
3  identify histologically.
4          But other than that, I would say that
5  they're different in the sense that we're evaluating
6  different parameters.
7      Q.  What role does the clinician's
8  determination on reason for removal play in your
9  pathologic differential diagnosis?
10      A.  Well, it plays a role, because they are --
11  we're at their mercy for them taking out the
12  diseased part of the tissue, or the tissue that they
13  are concerned about.
14          So we have to rely on clinical
15  differential diagnosis to then perform a good
16  pathologic differential diagnosis.  Because if she's
17  complaining of area -- in the vaginal area -- or
18  sorry.
19          If she's complaining of pain or
20  symptomatology in the vaginal area and then they do
21  a skin biopsy from the posterior, you know, leg,
22  well, that's not going to really help me.
23          So we have to rely on one another to
24  come to basically a consistent finding.

Page 92

1      Q.  What pain specifically are you correlating
2  to the specimen in this case?
3      A.  Well, she reported pelvic pain and
4  dyspareunia.  Both.  So I would say both of those
5  would be consistent with my findings.
6      Q.  Did you consider her prior Repliform sling
7  with the use of bone anchors in that?
8      A.  Yes.
9      Q.  Did you rule it out?
10      A.  Yes.
11      Q.  How?
12      A.  Because I -- from my recollection in this
13  case from the operative report following that, they
14  had mentioned that everything was -- it was all
15  taken out.
16          And from my recollection from her
17  deposition transcript, the quality of pain and the
18  type of pain that she's describing is very different
19  than any pelvic pain she had had before around the
20  time that she initially had had that surgery.
21      Q.  How did it change?
22      A.  It was different type of pain.
23          I remember reading her deposition
24  transcript and reading her notes and coming to the

Page 93

1  conclusion that it was described differently.
2          But I would have to, you know, go
3  through her deposition transcript to use the exact
4  words that she had used.  I don't remember if she
5  had said a stabbing pain or something like that, but
6  it was described differently.
7      Q.  Did you consider her opioid dependency in
8  coming to your conclusions in this case?
9      A.  Absolutely.
10          MR. CURTIS:  Object to the form of the
11  question.
12          BY MR. SNOWDEN:
13      Q.  Did you rule those out -- rule that out?
14          MR. CURTIS:  Object to the form of the
15  question.
16      A.  Well, opioid -- whether she was dependent
17  or casual use or abuse, whatever, would not in and
18  of itself cause a scarring and inflammatory reaction
19  around mesh, which is what I saw.
20          So had she complained of pain in a
21  vaginal area and the clinicians were pointing to it
22  and said, "Is this painful?"
23          And she said "Yes, that's exquisitely
24  painful."

24  (Pages 90 to 93)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 94

1     And then they took out that area and
2  there was no mesh, no inflammation, then I would
3  say, Hey, I don't have an explanation for it.
4     But in this case, that's not -- and I
5  would say maybe it has to do with her reported use
6  of drugs.
7     But in this case, that's not the case.
8  In this case, there was mesh that was clearly
9  described as being irregular and ragged.
10     Microscopically, I'm seeing scar
11  tissue and what I'm showing on my microscopic slides
12  is pores that have been filled with sclerotic
13  hyalinized scar tissue, a prominent inflammatory
14  reaction, and includes foreign-body-type giant
15  cells, evidence of polypropylene degradation.
16     So these are all things that if
17  someone was just having pain from opioid use you
18  wouldn't see all that, you would have a biopsy and
19  there would be nothing.
20  BY MR. SNOWDEN:
21     Q.   Okay.  Is that what happened during the
22  September 27th, 2012, surgery when the physician
23  looking for mesh in the anterior vaginal didn't find
24  any, broke scrub, talked to the patient's husband,

Page 95

1  and he for the first time told the doctor that that
2  mesh had already been removed?
3     MR. CURTIS:  Object to the form of the
4  question.
5     A.   I would have to review that operative
6  report.  I don't remember that.
7  BY MR. SNOWDEN:
8     Q.   You don't recall that?
9     MR. CURTIS:  Object to the form of the
10  question.
11     A.   I don't remember those details.
12     I remember the pre-op -- I remember
13  the pre-op diagnosis, and I remember, you know, the
14  description of the surgery, but I don't know if it
15  had been removed prior -- I don't know who had
16  removed it.  I don't know if they submitted it for
17  pathology.  She obviously had a lot of different
18  clinicians that she went to, so I would have to see.
19     But that's not what I'm doing in this
20  case.  I'm describing what is clearly abnormal
21  tissue.
22  BY MR. SNOWDEN:
23     Q.   Was the pre-op diagnosis in this case pain?
24     A.   No.  There was no mention of pain.  It just

Page 96

1  mentioned mesh erosion, which -- again, there's
2  evidence that there's no other cause of this in this
3  tissue that I examined, and female stress
4  incontinence.
5     Q.   Thanks, Dr. Michaels.
6  MR. SNOWDEN:  No further questions.
7     MR. CURTIS:  Okay.
8     (Proceedings concluded at 2:07 p.m.)

Page 97

1     - - - - - -
     E R R A T A
2     - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6     REASON:  _____
7  ____  ____  _____
8     REASON:  _____
9  ____  ____  _____
10     REASON:  _____
11  ____  ____  _____
12     REASON:  _____
13  ____  ____  _____
14     REASON:  _____
15  ____  ____  _____
16     REASON:  _____
17  ____  ____  _____
18     REASON:  _____
19  ____  ____  _____
20     REASON:  _____
21  ____  ____  _____
22     REASON:  _____
23  ____  ____  _____
24     REASON:  _____

25  (Pages 94 to 97)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 98

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5    hereby certify that I have read the
6    foregoing pages, and that the same is
7    a correct transcription of the answers
8    given by me to the questions therein
9    propounded, except for the corrections or
10   changes in form or substance, if any,
11   noted in the attached Errata Sheet.
12
13
14   _____
15   PAUL J. MICHAELS, M.D.        DATE
16
17
18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20_____.
20   My commission expires:_____
21
     _____
22   Notary Public
23
24

Page 99

1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
3               CHARLESTON DIVISION
4    _____
                                 )
5    IN RE: ETHICON, INC., PELVIC  )   Master File No.
     REPAIR SYSTEM PRODUCTS        )
6    PRODUCTS LIABILITY LITIGATION )   2:12-MD-02327
                                   )
7    THIS DOCUMENT RELATES TO THE  )    MDL 2327
     FOLLOWING CASES IN WAVE 2     )
8    OF MDL 200:                   )
                                   ) JOSEPH R. GOODWIN
9    Tamara Carter, et al. v.      )
     Ethicon, Inc., et al.         ) U.S. DISTRICT JUDGE
10   Civil Action No. 2:12-cv-01661 )
                                   )
11   Sandra Childress, et al. v.   )
     Ethicon, Inc., et al.         )
12   Civil Action No. 2:12-cv-01564 )
                                   )
13   Marion Chrysler v.            )
     Ethicon, Inc., et al.         )
14   Civil Action No. 2:12-cv-02060 )
                                   )
15   Melissa Sanders, et al. v.    )
     Ethicon, Inc., et al.         )
16   Civil Action No. 2:12-cv-01562 )
                                   )
17   Ana Sierra, et al. v.         )
     Ethicon, Inc., et al.         )
18   Civil Action No. 2:12-cv-01819 )
                                   )
19   Toni Hernandez v.             )
     Ethicon, Inc., et al.         )
20   Civil Action No. 2:12-cv-02073 )
                                   )
21   _____)
22        REPORTER'S CERTIFICATE
23   ORAL DEPOSITION OF PAUL J. MICHAELS, M.D.
24            June 18, 2016

Page 100

1
2        I, Rebecca J. Callow, Registered Merit
3    Reporter and Notary Public in and for the State of
4    Texas, hereby certify to the following:
5        That the witness, PAUL J. MICHAELS, M.D.,
6    was duly sworn by the officer and that the
7    transcript of the oral deposition is a true record
8    of the testimony given by the witness;
9        That the original deposition was delivered
10   to _____.
11       That a copy of this certificate was served
12   on all parties and/or the witness shown herein on
13   _____.
14       That pursuant to information given to the
15   deposition officer at the time said testimony was
16   taken, the following the amount of time used by
17   each party at the time of the deposition:
18       M. Andrew Snowden (1h59m)
            Attorney for Johnson & Johnson and
19          Ethicon, Inc.
20       Danny L. Curtis (0h0m)
            Attorney for Plaintiffs
21
22
23
24

Page 101

1
2        I further certify that pursuant to FRCP Rule
3    30(f)(1) that the signature of the deponent:
4        [  ] was requested by the deponent or a
5    party before the completion of the deposition and is
6    to be returned within 30 days from date of receipt
7    of the transcript.  If returned, the attached
8    Changes and Signature Page contains any changes and
9    the reasons therefor;
10       [  ] was not requested by the deponent or
11   a party before the completion of the deposition.
12
13       I further certify that I am neither
14   counsel for, related to, nor employed by any of the
15   parties or attorneys to the action in which this
16   proceeding was taken.  Further, I am not a relative
17   or employee of any attorney of record in this cause,
18   nor am I financially or otherwise interested in the
19   outcome of the action.
20
21
22
23
24

26  (Pages 98 to 101)

519601dd-302d-461a-b6e7-ec2579d40e40

Paul J. Michaels, M.D.

Page 102

```
 1
 2
 3
 4        SUBSCRIBED AND SWORN TO under my hand and
 5   seal of office on this the _____ day of
 6   _____, _____.
 7
 8
 9   _____
10       Rebecca J. Callow, RMR, CRR, RPR
11       Notary Public, Travis County, Texas
12       My Commission No. 12955701-3
13       Expires:  09/12/2017
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

519601dd-302d-461a-b6e7-ec2579d40e40