# EXHIBIT D

Ted M. Roth, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE:  ETHICON, INC.        ) Master File No.
PELVIC REPAIR SYSTEM         ) 2:12-MD-02327
PRODUCTS LIABILITY           )
LITIGATION                   )
_____  ) JOSEPH R. GOODWIN
                             ) U.S. DISTRICT
THIS DOCUMENT RELATES TO     ) JUDGE
ALL WAVE 4 PLAINTIFFS        )

DEPOSITION OF TED M. ROTH, M.D.

(PROLIFT+M)

DEPOSITION OF:  TED M. ROTH, M.D., taken

before Lynne M. Morrison, Notary Public in and

for the State of Maine, pursuant to notice

dated March 13, 2017, at Embassy Suites Hotel,

1050 Westbrook Street, Portland, Maine, on

March 17, 2017, commencing at 10:02 a.m.

Ted M. Roth, M.D.

Page 2

1        A P P E A R A N C E S
2
         For the Plaintiffs:
3
         Andrew N. Faes, Esq.
4        Wagstaff & Cartmell, LLP
         4740 Grand Avenue, Suite 300
5        Kansas City, MO 64112
         (816) 701-1100
6        afaes@wcllp.com
7
         For the Defendant:
8
         Diana Katz Gerstel, Esq.
9        Riker Danzig Scherer Hyland Perretti, LLP
         Headquarters Plaza
10       One Speedwell Avenue
         Morristown, NJ 07962-1981
11       (973) 451-8468
         dgerstel@riker.com
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                INDEX
2    WITNESS: TED M. ROTH, M.D.
3      Direct Examination by Mr. Faes:     4, 92
4      Cross-Examination by Ms. Katz Gerstel:  83, 98
5
6              E X H I B I T S
7    Exhibit No.   Description              Page
8      1    Notice to Take Deposition of
            Ted Roth, M.D.                    5
9
      2    Defense Expert General Report of
10          Ted Roth, M.D.                    7
11     3    Curriculum vitae              16
12     4    "CONFIDENTIAL - SUBJECT TO STIPULATION
            AND ORDER OF CONFIDENTIALITY"
13          ETH.MESH.01595614-01595619
            Gynecare Prolift +M IFU        54
14
       5    "CONFIDENTIAL - SUBJECT TO STIPULATION
15          AND ORDER OF CONFIDENTIALITY
            ETH.MESH.19580129-ETH.MESH.19580130
16     E-mails dated May 28, 2014 and October
            30, 2013                        73
17
18   *(Exhibits 1 through 5 included in original and
     copies.)
19
20
21
22
23
24

Page 4

1            TRANSCRIPT OF TESTIMONY
2                 * * * * *
3    TED M. ROTH, M.D., having been duly sworn by the
4       Notary Public, was deposed and testified as
5       follows:
6                 * * * * *
7              DIRECT EXAMINATION
8    BY MR. FAES:
9    Q.  Good morning, Dr. Roth.
10   A.  Good morning.
11   Q.  My name is Andy Faes, and we met yesterday
12      where we talked for about five hours regarding
13      your opinion, general opinions on the TVT and
14      TVT-O devices.  Do you remember that?
15   A.  Yes.
16   Q.  And today we're here to talk about your
17      general opinions regarding the Prolift+M
18      device.  Is that your understanding?
19   A.  Yes.
20   Q.  As before, as with yesterday, if I ask a
21      question that you don't understand for any
22      reason, please let me know and I'll try to
23      rephrase the question.  If you answer the
24      question, I will assume that you understood

Page 5

1    the question as asked.  Fair enough?
2    A.  Yes.
3    Q.  Doctor, I've handed you four premarked
4       exhibits.  The first exhibit is Exhibit No. 1,
5       which is the Notice of Deposition.  It's the
6       same notice as yesterday.
7          Have you brought anything with you today
8       in response to that notice that you didn't
9       already produce yesterday?
10   A.  No.
11   Q.  Oh, and I just wanted to ask you actually one
12      more question.  Back up.
13         Is it your understanding that you're here
14      today -- you're only being offered as an
15      expert this time regarding the Prolift+M
16      device?
17   A.  That's my understanding.
18         MR. FAES:  And I just want to make it
19      clear for the record that we've been told that
20      at this time he's only being offered as a
21      general expert on the Prolift+M device even
22      though his expert report contains information
23      on the Prolift and Gynemesh PS device as well.
24      So if he's declared as a general expert on

Ted M. Roth, M.D.

Page 6

1 either the Prolift or Gynemesh PS at a later
2 date, we would reserve our rights to take an
3 additional deposition on those two products at
4 that time. Is that your understanding as
5 well?
6     MS. KATZ GERSTEL: Yes, that's our
7 understanding.
8 BY MR. FAES:
9 Q. So what have you brought with you today to
10 this deposition?
11 A. I brought a copy of my report on Prolift and
12 Prolift+M, which you have, and I brought some
13 selected articles from my reliance list
14 similar to actually the one I brought
15 yesterday but left in my bag.
16 Q. And yesterday we marked a supplemental
17 reliance list during your TVT and TVT-O
18 deposition. I believe it was Exhibit 3A. Is
19 that your reliance list for your opinions in
20 the Prolift+M case as well?
21 A. I can't remember what specifically was on the
22 supplemental reliance list, but I think the
23 reliance list is pretty much everything from
24 TVT, TVT-O, Prolift, Prolift+M, Gynemesh PS.

Page 7

1 Q. Is there any literature that you've brought
2 with you today that isn't listed on the
3 exhibit that we marked yesterday as Exhibit 3A
4 which was your supplemental reliance list?
5 A. This is all part of the reliance list, nothing
6 different than what was on the reliance list.
7 Q. And does the reliance list we marked yesterday
8 as Exhibit 3A contain a listing of all the
9 materials that you've reviewed and relied upon
10 in forming your opinions regarding the
11 Prolift+M product?
12 A. Yes.
13 Q. You brought a report with you today regarding
14 the Prolift+M, and I've also marked a copy of
15 that as Exhibit No. 2. Do you have that in
16 front of you?
17 A. Yes.
18 Q. Is that the same report as what you've brought
19 with you today on your own?
20 A. It appears to be the same report, yes.
21 Q. And this report is dated January 31, 2017. Is
22 that when you completed and signed it?
23 A. Yes.
24 Q. Does this report marked as Exhibit No. 2

Page 8

1 contain all of the opinions that you've
2 reached regarding the Prolift+M in this case?
3 A. Yes.
4 Q. Now, this particular report is titled Prolift,
5 Prolift+M and Gynemesh PS; is that correct?
6 A. It is.
7 Q. So you've combined three different products
8 into a single report; is that correct?
9 A. Yes.
10 Q. Do you have an understanding that the
11 Prolift+M device has a completely different
12 mesh than what is in the Prolift, and it's
13 different than the Gynemesh PS?
14 A. Yes.
15 Q. So even though it contains a completely
16 different mesh, you still felt it was
17 appropriate to combine all your opinions
18 regarding these three products into a single
19 report?
20 A. Yes.
21 Q. Now, I was going through your report, and I
22 don't see that you mention the Prolift+M
23 specifically until about page 28 of your
24 report. Do you know if that's accurate or

Page 9

1 not?
2 A. That's where I sort of focus on the Prolift+M
3 in particular.
4 Q. And I guess I don't want to belabor that
5 point. I guess you do use Prolift+M in one
6 other spot on page 13, but I guess what I'm
7 getting at in my question to you is in pages 1
8 through 27 when you're repeatedly referring to
9 the Prolift, are you using the Prolift
10 interchangeably with Prolift+M on pages 1
11 through 27 of your report, or are you
12 specifically referring to the older Prolift
13 device which contains the Gynemesh PS mesh,
14 not the Ultrapro mesh?
15 A. Ultimately, it depends upon which paragraph
16 you're referring to. For instance, page 11,
17 paragraph marked C, so, for instance, that
18 study is the original Prolift. Complications
19 listed on page 12, again, I think I used the
20 language transvaginal mesh, mesh kits, so that
21 would include both Prolift+M and the original
22 Prolift. Page 13, mesh exposure is a risk of
23 transvaginal mesh, Prolift, Prolift+M,
24 Gynemesh PS. Page 10, Altman's Randomized

3 (Pages 6 to 9)

Ted M. Roth, M.D.

Page 10

1    Control Trial was the original Prolift.
2         You know, um, I mean, I certainly could
3    have submitted three separate reports.  I
4    mean, I could have repeated a lot of
5    information in the first part of the report
6    for the original Prolift covering the
7    Prolift+M.  I didn't really see a need to
8    separate out the products in a report.
9    Q.  I mean, I guess what I'm getting at, is there
10   any spot in this report where you refer to the
11   Prolift when you are actually referring to the
12   Prolift and the Prolift+M as well, and how
13   would I as a reader who is trying to
14   understand your opinions that you're going to
15   offer in this case know the difference, if
16   that is, indeed, the case?
17   A.  Well, most of my opinions for the Prolift+M, I
18   guess, start on page 28, although some of what
19   I write about in terms of degradation of
20   polypropylene toxicity, because the Prolift+M
21   is also polypropylene, applies to Prolift+M.
22        The issues with Recall Bias that I
23   discuss on page 20 apply to not only Prolift+M
24   and Prolift but almost all surgical

Page 11

1    procedures.  Biocompatibility of Polypropylene
2    mesh, page 21, would apply to the
3    polypropylene that is both in Prolift and
4    Gynemesh PS and Prolift+M.  Discussion of
5    infection, page 16, regarding Type I
6    macroporous meshes would apply to both
7    Prolift, Gynemesh and Prolift+M.
8         So I didn't mean to make it confusing in
9    terms of addressing the individual products.
10   I just tried to because brevity is the soul of
11   wit combine a report for all three products.
12   Q.  And how many -- well, strike that.
13        When were you first approached to be an
14   expert specifically regarding the Prolift+M
15   product?
16   A.  It was the same time that I was approached to
17   be an expert for TVT, and we chatted about
18   that yesterday.  My recollection is I was
19   contacted by Doug DiPaola 2014, 2015ish.
20   Q.  And how many hours would you say you've spent
21   working on your Prolift+M report, and that
22   includes both review of materials and writing
23   the actual report as well as any deposition
24   prep time?

Page 12

1    A.  I mean, you have the bill or the accountable
2    hours there.  Can I review that?
3    Q.  Sure.  And just for the record, you're
4    referring to the exhibit that we marked at
5    yesterday's deposition as Exhibit 1A.
6    A.  So specifically for the Prolift+M reports,
7    although the original report I think that I
8    wrote was actually Prolift and Gynemesh and
9    then I was asked to essentially add Prolift+M
10   to that report, I probably spent, let's see,
11   at least 12.25 hours on the Prolift+M portion
12   of the report.  But there was also revisions
13   made to the Prolift, Gynemesh PS part of the
14   report.  15 or 20 hours for the Prolift+M part
15   of the report.
16   Q.  Okay.  Now, in your report, you discuss both
17   Gynemesh PS and Prolift.  Do you have an
18   understanding that the mesh in the -- that the
19   Gynemesh PS is the same mesh as what is in the
20   Prolift mesh?
21   A.  Yes.
22   Q.  And what is your understanding with regard to
23   the Prolift+M mesh?  Do you know if that mesh
24   is used for any other application?

Page 13

1    A.  My understanding is that the other name for
2    the Prolift+M, I don't know if it's still
3    marketed as such, is the Ultrapro mesh, and I
4    think that has applications in hernia repair.
5    Q.  So you would agree that the Prolift+M mesh is
6    still available as the Ultrapro mesh for sale
7    to physicians for use in the United States,
8    correct?
9    A.  Um, I'm not too sure.  I don't do abdominal
10   hernia repairs, and I haven't investigated
11   whether Ultrapro is still marketed or
12   available.
13   Q.  Okay.  In your expert report marked as Exhibit
14   No. 2, you go through various facts and
15   literature and discuss various facts and
16   literature.  Did you discuss the facts and
17   literature in your expert report that you felt
18   were the most important to you in drawing your
19   conclusions and making your opinions regarding
20   the Prolift+M device?
21   A.  Yes.
22   Q.  And there are also, as I said, articles cited
23   throughout your report, correct?
24   A.  There is articles cited for Prolift+M, and

4  (Pages 10 to 13)

Ted M. Roth, M.D.

Page 14

1   there is articles cited for Prolift and
2   polypropylene, yes.
3   Q. In terms of your decision-making in writing
4   your report, why did you cite the articles
5   that you did in your report with regard to
6   Prolift+M?
7   A. Do you want me to go through each article and
8   their merits?
9   Q. Well, I was more asking a general question of
10  why you chose the articles that you did to
11  discuss in your report.
12  A. I tried to carefully review the literature.
13  These were, in my opinion, the salient
14  articles on Prolift+M. That's why I chose
15  these articles.
16  Q. Would you agree that they're the articles --
17  strike that.
18       You'd agree that the articles that you
19  cited -- specifically cited in your report is
20  not a comprehensive listing of all the
21  available medical literature specifically
22  regarding the Prolift+M, correct?
23  A. I don't know that I can tell you how many
24  actual articles are out there for Prolift+M.

Page 15

1   Q. Yeah, I understand, Doctor. My question is
2   you would agree that you didn't -- I think
3   that's a fairly non-controversial question.
4   You didn't choose to cite every single article
5   that is available regarding Prolift+M in the
6   body of your report, correct?
7   A. Yeah, correct.
8   Q. So you said that you chose what you felt were
9   the most salient ones, right?
10  A. That's correct.
11  Q. So my question is what about the articles you
12  chose led you to believe that they were the
13  most salient articles, in your words?
14  A. So I guess I can ask again, do you want me to
15  go through each one of the articles that I
16  reviewed and describe why I think each one has
17  merit and is salient because it's kind of a
18  broad question?
19       Each of the articles that I used are
20  certainly different. You have Khandwala's
21  article. That's a prospective cohort, single
22  center. You have Milani. That's a cohort
23  study but multiple centers also with one year
24  follow-up as well Khandwala's study.

Page 16

1        Then there was also a reference made to
2   an article on the hernia literature about
3   heavyweight, mid-weight, lightweight
4   polypropylene meshes. Then there was
5   Quemener, which has a slightly different study
6   design but also had a follow-up with 20 months
7   with a fairly significant number of patients.
8   Another retrospective cohort study by Lensen
9   looking at both patients with Prolift and
10  Prolift+M combined.
11       I felt like these were the key articles.
12  I also like the article by Body which looked
13  at sexual function after patients with Prolift
14  and Prolift+M. And, ultimately, you know,
15  because there is not really a lot of
16  randomized control trials of Prolift+M, I did
17  cite one of the meta-analyses or actually
18  multiple meta-analyses, which, again, is the
19  best evidence -- much better evidence for than
20  cohort studies or RCTs.
21       I don't know if that answers your
22  question.
23  Q. I think so, Doctor. I've re-marked a copy of
24  your C.V. from yesterday as Exhibit No. 3.

Page 17

1   A. Sure.
2   Q. If you need to refer back to that, you can.
3   But within your C.V. there is a list of
4   publications. Do any of the publications in
5   your C.V. specifically address the Prolift+M
6   device?
7   A. No, not specifically, no.
8   Q. Do any of the publications on your C.V. that
9   you've participated in address the
10  transvaginal mesh technique for the treatment
11  of prolapse?
12  A. The only publication -- well, I did a book
13  chapter on vaginal stricture after pelvic
14  organ prolapse surgery, and some of that
15  chapter covers mesh revision surgery and those
16  challenges.
17  Q. Are there any other publications that you've
18  done that specifically address the TVM
19  technique for the treatment of prolapse?
20  A. No.
21  Q. Would you agree that the Prolift+M is an
22  alternative surgical procedure for the
23  treatment of prolapse as compared to other
24  techniques that are available to physicians?

5 (Pages 14 to 17)

Ted M. Roth, M.D.

Page 18

1     MS. KATZ GERSTEL: Object to form.
2  A. I mean, it's available in the armamentarium,
3     or it was available in a surgeon's
4     armamentarium for prolapse, so it's an
5     alternate to traditional methods.
6  BY MR. FAES:
7  Q. Now, you've used both the Prolift and the
8     Prolift+M in your practice, correct?
9  A. That's correct.
10 Q. And you've implanted approximately 160
11    Prolifts and 80 Prolift+Ms; is that correct?
12 A. That's about right.
13 Q. How many -- strike that.
14    When was the first time that you
15    implanted a Prolift device, the original
16    Prolift?
17 A. 2005, 2006, maybe.
18 Q. And when was the first time that you implanted
19    the Prolift+M device?
20 A. It was probably sometime in 2008, late 2008, I
21    think.
22 Q. So you believe that you first implanted the
23    Prolift+M device in late 2008?
24 A. I think so.

Page 19

1  Q. Were you specifically trained on the Prolift+M
2     device, or did you just rely on your previous
3     training on the Prolift device before you
4     implanted that the first time?
5  A. There was not really significant -- I wouldn't
6     really consider it significant changes to the
7     device. Means of introduction, trocars,
8     essentially it was the same technique. So as
9     far as I know, there wasn't additional or
10    supplemental training offer.
11 Q. Prior to using the Prolift+M for the first
12    time, did anyone instruct you or inform you
13    that the handling of the mesh could be
14    different?
15    MS. KATZ GERSTEL: Object to form.
16 A. Handling of the mesh? I'm not sure what you
17    mean.
18 BY MR. FAES:
19 Q. Let me back up. First of all, you've held
20    both the Prolift mesh and the Prolift+M mesh
21    in your hands prior to and during surgery,
22    right?
23 A. Yes.
24 Q. Does the mesh feel different in your hands

Page 20

1     prior to and during surgery between the
2     Prolift and the Prolift+M mesh?
3     MS. KATZ GERSTEL: Object to form.
4  A. Yes.
5  BY MR. FAES:
6  Q. Do you have to -- do you feel like you have to
7     handle the mesh any differently during
8     implantation of the device?
9  A. I think what you mean is how you tension the
10    mesh or how you place the mesh, is that
11    different during the procedure because of how
12    the meshes feel in your hand?
13 Q. Yes.
14 A. Yes.
15 Q. How is it different?
16 A. So the Prolift+M at least, you know, in your
17    hand is a little stiffer than the original
18    Prolift, and I would attribute that to the
19    weight of the mesh because of the combination
20    of the polypropylene and the Monocryl, the
21    dissolvable material.
22 Q. Did any -- strike that.
23    Do you feel like you have to handle the
24    Prolift+M mesh differently when you place it

Page 21

1     in order for the mesh to be placed
2     successfully compared to the Prolift
3     procedure?
4     MS. KATZ GERSTEL: Object to form.
5  A. No, I don't think that the technique was all
6     that different. It was you still have to
7     place the mesh in a, as they say, a tension-
8     free fashion, lay the mesh in flat, you know,
9     secure the mesh, or at least my inclination
10    was to secure the mesh at the bladder neck and
11    also secure the mesh at the cervix, really not
12    all that significant.
13 BY MR. FAES:
14 Q. When you first started using the Prolift+M
15    mesh in 2008, did you have an understanding at
16    that time that you were one of the first
17    physicians in the United States to start using
18    that device?
19 A. I think I was one of the first physicians to
20    use the original Prolift, too. Yeah, I think
21    that the Prolift+M was cleared by the FDA
22    sometime in maybe May of 2008. But, like I
23    said, to the best of my recollection, I
24    probably used it in late 2008 or 2009.

6 (Pages 18 to 21)

Ted M. Roth, M.D.

Page 22

1    Q. Did you have an understanding when you were
2        using the Prolift+M in 2008 and 2009 that
3        Ethicon and Johnson & Johnson hadn't made the
4        Prolift+M available to all surgeons; they kind
5        of just made it available to a limited number
6        of surgeons?  Did you have that understanding
7        or not?
8    A. I don't know that that was made clear to me.
9    Q. Do you know whether or not that's true today?
10   A. I haven't investigated who got their hands on
11       Prolift+M sooner than other folks.
12   Q. So in forming your opinions in this case, you
13       don't know when Ethicon and Johnson & Johnson
14       did what they called a full launch of the
15       Prolift+M device, meaning they made it
16       generally available to all physicians as
17       opposed to just selected physicians?
18   A. I don't know.
19   Q. And you were a preceptor for Prolift+M,
20       correct?
21   A. I was a preceptor or proctor for both Prolift
22       and Prolift+M.
23   Q. Can you recall -- strike that.
24          When was the first time that you did a

Page 23

1        proctoring or preceptoring event specifically
2        for the Prolift+M device, not the Prolift
3        device?
4    A. I have no recollection.
5    Q. Did there come a time when Ethicon and Johnson
6        & Johnson informed you as a proctor or
7        preceptor that if you were going to proctor or
8        preceptor the Prolift device that you needed
9        to be able and willing to proctor or preceptor
10       the Prolift+M device as well?
11   A. I'm sorry, could you repeat that?
12   Q. Yeah, maybe I can make it a little bit
13       simpler.
14          Did anyone at Ethicon and Johnson &
15       Johnson ever tell you at some point that if
16       you were going to be a -- continue to be a
17       proctor or preceptor for the original Prolift
18       device that you needed to be willing and able
19       to proctor or be a preceptor for the Prolift+M
20       device as well?
21          MS. KATZ GERSTEL:  Object to form.
22   A. I don't have any recollection of that.
23   BY MR. FAES:
24   Q. If that was indeed the case that you were told

Page 24

1        that, do you feel that would be an appropriate
2        action by Ethicon and Johnson & Johnson?
3          MS. KATZ GERSTEL:  Object to form.
4    A. I don't know what you mean by appropriate.
5        You know, I didn't have qualms about training
6        people on Prolift+M or training them on the
7        original Prolift.
8    Q. So you don't think it would be inappropriate
9        for a medical device company to say if you're
10       going to continue to be a teacher for device A
11       such as the Prolift, you also need to be
12       willing and able to be a teacher on device B,
13       the Prolift+M, whether or not you're
14       comfortable implanting that device or not?
15          MS. KATZ GERSTEL:  Object to form.
16   BY MR. FAES:
17   Q. Do you think that's appropriate or not?
18   A. I don't know that I'm in a position to judge
19       what's appropriate for a device company since
20       I didn't work for or at that level in a device
21       company.
22   Q. Well, what about as a physician, as a
23       physician you were told that in order to
24       continue teaching for a particular device that

Page 25

1        you also needed to be able to teach on a
2        similar but different device regardless of
3        whether or not you were comfortable implanting
4        that device yourself regardless of whether or
5        not that was your device of choice?
6          MS. KATZ GERSTEL:  Object to form.
7    A. This is kind of hypothetical.  I was
8        comfortable with the original Prolift and
9        comfortable with Prolift+M.  I don't think
10       that I was ever asked to or put in a situation
11       where, you know, I had to be able to train
12       people on both or not at all.
13   BY MR. FAES:
14   Q. Yeah.  And it is hypothetical, and
15       hypothetical questions are allowed.  So
16       hypothetically, if you were not comfortable
17       with the second device that the company told
18       you -- a company told you that you needed to
19       be willing to teach even though you weren't
20       comfortable implanting that device yourself or
21       recommending it, do you think that would be
22       appropriate?
23          MS. KATZ GERSTEL:  Object to form.
24   A. I don't know because I was comfortable with

7 (Pages 22 to 25)

Ted M. Roth, M.D.

Page 26

1    both devices.  I don't know that I have an
2    opinion about that.
3  BY MR. FAES:
4  Q.  So you don't have an opinion as a physician
5    one way or the other of whether it would be
6    appropriate or inappropriate for a device
7    company to tell you that you had to be willing
8    to teach on a similar but different device to
9    a device that you were comfortable implanting
10    regardless of whether or not you were
11    comfortable with the second device?
12        MS. KATZ GERSTEL:  Objection.  Asked and
13    answered.
14  A.  Again, I was comfortable with both devices.  I
15    don't know how to answer your question.
16  BY MR. FAES:
17  Q.  Okay.
18  A.  Sorry.
19  Q.  So when you began to start -- let me back up.
20        When was the last time that you implanted
21    a Prolift, the traditional Prolift device?
22  A.  I don't recall.  I have a better recollection
23    of when I probably implanted the last
24    Prolift+M.  I can give you that information.

Page 27

1  Q.  So that's going to be my next question, but
2    before I move on to that, is the answer to my
3    question of when you last implanted a
4    traditional Prolift device is that you don't
5    know?
6  A.  I don't know.
7  Q.  And when was the last time that you implanted
8    a Prolift+M device?
9  A.  It was spring or summer of 2011.
10  Q.  And you would agree that you haven't had --
11    one of the reasons that you haven't implanted
12    a mesh kit for the treatment of pelvic organ
13    prolapse since approximately July of 2011 is
14    because you haven't had a patient who has
15    wanted one since then, correct?
16        MS. KATZ GERSTEL:  Object to form.
17  A.  I think there are a few reasons why I haven't
18    done a transvaginal mesh kit since that time.
19    One reason is the Prolift products were
20    removed from the marketplace and no longer
21    available.  Number two, in counseling patients
22    about other mesh products available, a lot of
23    them were peppered by TV advertising about
24    litigation, you know, for mesh.

Page 28

1        So to answer your question, no, I have
2    not had a patient wanting a mesh kit since
3    2011.
4  BY MR. FAES:
5  Q.  And specifically since July of 2011, correct?
6  A.  Thereabouts.
7  Q.  When you began to use the Prolift+M device in
8    the latter half of 2008, did you continue to
9    use the original Prolift device, or did you
10    completely switch over to the Prolift+M
11    device?
12  A.  I don't have a great recollection of sort of
13    what we did.  I think there were probably a
14    number of Prolifts, the original Prolifts that
15    were stocked at the hospital, and I think that
16    we continued to use a combination of Prolift+M
17    and the original Prolift.  And then once I
18    started seeing patients back post-operatively
19    with the Prolift+M, I think that we stopped
20    ordering the original Prolift and continued
21    with the Prolift+M.
22  Q.  So you would agree that at a certain point the
23    Prolift+M device became your kit of choice for
24    the treatment of pelvic organ prolapse over

Page 29

1    the original Prolift kit; is that accurate?
2  A.  Yes.
3  Q.  And why is that?
4  A.  Um, well, I guess I like the idea of the
5    hybrid material.  I like the idea of the
6    increase in the pore size.  The way I sort of
7    thought about the Prolift+M was that once the
8    absorbable Monocryl material went away, you
9    were left with an lacier framework, if you
10    will, of the polypropylene.
11        The idea that using, you know, less mesh
12    and having similar outcomes appealed to me
13    most like -- not unlike other things in
14    medicine where, you know, you try to use the
15    least amount of something to achieve, you
16    know, your goal; for instance, the lowest dose
17    of a statin drug to control your cholesterol,
18    et cetera.  So that was part of the appeal.
19  Q.  So you testified that one of the reasons why
20    you ultimately switched to the Prolift+M kit
21    as your prolapse kit of choice was that you
22    liked the idea of an increase in pore size; is
23    that accurate?
24  A.  Yes.

8 (Pages 26 to 29)

Ted M. Roth, M.D.

Page 30

1    Q. So you would agree that all things being
2       equal, a lighter weight, larger pore mesh may
3       be more beneficial to a patient than a
4       heavier, smaller pore mesh, correct?
5          MS. KATZ GERSTEL:  Objection,
6       mischaracterization.
7    A. I think in sort of my reading and my takeaway
8       from the literature, you know, I don't think
9       it's so much about it has to do with the
10      weight of the mesh.  I think it has to do with
11      the pore size, and it doesn't always -- you
12      know, it's not always an association lighter
13      weight equals larger pores.  And so for me, it
14      has to do more with the pore size than the
15      actual weight or density of the mesh material.
16   BY MR. FAES:
17   Q. Well, you've agreed that you've already
18      offered the opinion that the Gynemesh PS,
19      which is the same as the Prolift mesh, is
20      already a Type I macroporous mesh, correct?
21   A. Correct.
22   Q. And you also believe that the TVT mesh is a
23      Type I macroporous mesh, correct?
24   A. Mm-hmm.

Page 31

1    Q. So if both of those meshes are already Type I
2       macroporous mesh, why did you like the idea of
3       an increase in pore size with the Ultrapro
4       mesh?  Did you believe that that provided your
5       patients with some additional clinical benefit
6       or not?
7          MS. KATZ GERSTEL:  Object to form.
8    A. You know, again, in my understanding of the
9       literature and healing processes with mesh, at
10      least in, like I said, my understanding, the
11      appealing thing about larger pore size is how
12      the body may react to the larger pores in
13      terms of healing and fibrosis and that you
14      might have a more favorable means of healing
15      with the larger pore size than with smaller
16      pore sizes or with the mesh fibers being
17      closer together.
18   BY MR. FAES:
19   Q. And when did you first use Gynemesh PS in your
20      medical practice for the treatment of pelvic
21      organ prolapse?
22   A. Probably, I mean, I used Gynemesh PS for both
23      vaginal or transvaginal applications as well
24      as sacrocolpopexies.  Probably 2005.

Page 32

1    Q. Have you ever used the PROLENE Soft mesh in
2       your medical practice?
3    A. I don't know that I can make a huge big
4       difference between PROLENE Soft and the
5       Gynemesh PS.  I'm more familiar with the
6       labeling of the Gynemesh PS than PROLENE Soft.
7    Q. Do you know whether there is any difference at
8       all between the Gynemesh PS and the PROLENE
9       Soft mesh?
10   A. I'm not aware.
11   Q. Assuming that the Gynemesh PS and the PROLENE
12      Soft mesh are, in fact, exactly the same mesh,
13      do you think it's appropriate for Ethicon and
14      Johnson & Johnson to charge a substantially
15      higher price for the Gynemesh PS mesh than
16      they do for the PROLENE Soft mesh?
17         MS. KATZ GERSTEL:  Objection.
18   A. You know, I'm not in R & D or marketing.  I
19      don't know -- I couldn't tell you what their
20      charges were on these materials when we were
21      using them.
22   Q. Now, you stated that you've used both the
23      Gynemesh PS in your medical practice both for
24      abdominal sacrocolpopexies and for

Page 33

1       transvaginal mesh applications; is that
2       correct?
3    A. Yes.
4    Q. And just for the record, for the rest of the
5       day I will refer to abdominal sacrocolpopexy
6       as ASC because I don't like saying that word.
7          Do you still use the Gynemesh PS mesh for
8       transvaginal use today?
9    A. I do not.
10   Q. When did you stop using it for transvaginal
11      use?
12         MS. KATZ GERSTEL:  Just place an
13      objection.  This is a +M deposition.
14         MR. FAES:  Objection is noted.
15   A. Probably have not used any sort of
16      polypropylene mesh transvaginally placed since
17      2011.
18   BY MR. FAES:
19   Q. And why is that?
20   A. For the reasons that we discussed earlier,
21      apart from the fact that I don't even know if
22      Gynemesh is still available, number one.  And
23      two is the mesh litigation.
24         Earlier, you asked what my reasons were

9  (Pages 30 to 33)

Ted M. Roth, M.D.

Page 34

```
1   for not using Prolift+M or Prolift, and we
2   discussed the mesh litigation and the
3   availability of Prolift.  So in regards to
4   Gynemesh, I don't know if it's still available
5   or being marketed, but the patients, again,
6   are very peppered by the advertisements that
7   they're seeing on TV regarding mesh and mesh
8   litigation.
9   Q.  I guess my reaction, Doctor, which isn't
10  reflected on the record, was I was under the
11  impression that you were still using Gynemesh
12  PS in ASC repairs; is that not accurate?
13  A.  I think you asked about transvaginal
14  application, but for ASCs we're using a
15  different product which is still
16  polypropylene.  And part of the theme of
17  yesterday's deposition was cost savings.
18  We're using a product from a different
19  company, Caldera.
20  Q.  And what is that product that you're using?
21  A.  It's a Y-mesh, and it's called IntePro,
22  I-N-T-E-P-R-O.
23  Q.  Actually, I'm not sure if that's right because
24  I'm 99 percent sure that IntePro is made by
```

Page 35

```
1   ASTORA Women's Health.
2   A.  What is the name of their mesh?
3   Q.  Well, I mean, just so the record is clear, you
4   might not have the name correct, but you're
5   fairly confident that the Y-mesh that you're
6   using is the Caldera Y-mesh; is that accurate?
7   A.  It's actually the Caldera mesh, just the name
8   escapes me.
9   Q.  And when did you stop using Gynemesh PS for
10  ASC repairs?
11  A.  I don't have a specific recollection.  I've
12  used a lot of different meshes for ASC
13  repairs, and a lot of what it sort of boiled
14  down to was cost.
15  Q.  Do you feel that Gynemesh PS is the best mesh
16  available for ASC repairs or not?
17  A.  I'm not aware of a specific study with ASCs
18  that sort of touts what is the best brand of
19  mesh.  The majority of us doing ASCs are using
20  some form of polypropylene.  I think that most
21  people would agree that polypropylene is the
22  mesh of choice for ASCs.  What brand I think
23  has to do with perhaps how you're doing it and
24  what your own experience with that material is
```

Page 36

```
1   and handling characteristics and ease of
2   suture placement, things like that.
3   Q.  Well, you'd agree that if you did believe that
4   the Gynemesh PS mesh was the best mesh
5   available for ASC repairs and that it would
6   compromise patient outcomes and safety not to
7   have that mesh available, you would go to your
8   hospital and insist that that be made
9   available for use in your patients; is that
10  accurate?
11      MS. KATZ GERSTEL:  Object to form.
12  A.  Yeah, I try to be a good patient advocate; and
13  so regardless of cost, if I felt like one mesh
14  was better than all the other meshes in
15  regards to safety and rate of exposure and
16  success, then I would go to bat for that mesh.
17  And more importantly, I would go to bat for my
18  patients.
19  BY MR. FAES:
20  Q.  And you haven't done that with regards to the
21  Gynemesh PS mesh, correct?
22  A.  I have not.
23  Q.  Have you ever used the Gynemesh -- strike
24  that.
```

Page 37

```
1       Have you ever used the Prolift+M mesh for
2   an ASC repair?  And when I say Prolift+M mesh,
3   I am also referring to the Ultrapro mesh.
4   A.  I have not.
5   Q.  So even though at one time you felt the
6   Ultrapro mesh was your -- strike that.
7       So even though at one time the Prolift+M
8   mesh, which is also the Ultrapro, was your
9   mesh or kit of choice for the treatment of
10  pelvic organ prolapse, you've never used it in
11  an ASC repair; is that accurate?
12  A.  Yeah, I would say that the hybrid mesh, the
13  Ultrapro mesh, was my mesh of choice for a
14  transvaginal application, but an abdominal
15  sacrocolpopexy is a very different operation
16  than a transvaginal mesh.
17  Q.  So even though an ASC is a very different
18  operation than a transvaginal mesh, you have
19  used the Gynemesh PS mesh in both of those
20  applications, but you haven't used the
21  Ultrapro mesh in both of those applications;
22  is that accurate?
23  A.  That's accurate.
24  Q.  Do you believe that the Ultrapro mesh, which
```

Ted M. Roth, M.D.

Page 38

1    is also the Prolift+M mesh, is an appropriate
2    choice for repair of ASC?
3    A. That I don't know because I don't know that
4    there is specific data to support the use of
5    the so-called hybrid mesh for sacrocolpopexy.
6    Q. If a physician were to use the Ultrapro mesh
7    in an ASC repair, and again the Ultrapro mesh
8    is the same as the Prolift+M mesh, do you
9    believe that that would be within the standard
10   of care for an ASC repair or not?
11        MS. KATZ GERSTEL: Object to form.
12   A. I mean, I've never used a hybrid mesh for an
13   ASC; and, again, that's a vastly different
14   operation than the transvaginal mesh kits.
15   Standard of care, you know, there would have
16   to be some data to support the use of Ultrapro
17   in the abdominal space specifically for ASCs
18   for me to say whether it could become standard
19   of care.
20   BY MR. FAES:
21   Q. Have you ever looked or studied that question
22   of whether there is data regarding the
23   Ultrapro mesh for ASC?
24   A. I am not aware of specific data for Ultrapro

Page 39

1    for ASCs.
2    Q. My question is have you actually looked for
3    and studied that question?
4    A. Well, I think I answered that. I'm not aware
5    of any studies with ASC that use Ultrapro.
6    So, yes, I've looked.
7    Q. You've looked and you couldn't find any?
8    A. Couldn't find any.
9    Q. Other than the Prolift and Prolift+M kits,
10   what other kits have you used for the
11   treatment of pelvic organ prolapse?
12   A. I mean, I've done cadaver labs or participated
13   in cadaver labs for a Boston Sci product and
14   AMS, but the only other mesh kit that I put
15   into a human is the Coloplast Exair.
16   Q. And how many Exairs did you put into live
17   patients?
18   A. I think I probably did two.
19   Q. And why did you stop using the Coloplast Exair
20   products after using it in only two patients?
21   A. Well, it's not that I sort of was gearing up
22   to use it or stop using it. The rep from
23   Coloplast had a mesh kit which was
24   polypropylene with a similar but slightly

Page 40

1    different method of introduction and trocar
2    retrieval or mesh arm retrieval and wanted me
3    to trial it. So we tried it on a couple of
4    patients. It handled nicely, but I continued
5    to use Prolift+M at that time.
6    Q. Are you familiar with the Prosima device at
7    all manufactured by Ethicon and Johnson &
8    Johnson?
9    A. I am.
10   Q. Did anyone from Ethicon and Johnson & Johnson
11   ever introduce that product to you or try to
12   get you to use it?
13   A. Yes.
14   Q. And why did you choose not to try that device?
15   A. I think that by the time that J & J introduced
16   Prosima, I think that Prolift+M was already up
17   and running. And I felt like the applications
18   for Prosima were somewhat limited, and I think
19   that Prosima was more geared towards surgeons
20   who were not comfortable with trocar
21   placement, and that was sort of the appeal of
22   Prosima. It was a trocarless mesh device.
23   Q. So you would agree that one of the potential
24   appeals of the Prosima device was that it was

Page 41

1    trocarless, and it didn't require any trocar
2    passes, correct?
3        MS. KATZ GERSTEL: Object to form.
4    A. I think that would appeal to some folks. I
5    think I was certainly comfortable with trocar
6    passage, and I didn't feel a need to adopt
7    Prosima.
8    BY MR. FAES:
9    Q. Would you agree that one of the potential
10   benefits of the Prosima device was that it did
11   not require the use of mesh arms like the
12   Prolift+M device?
13        MS. KATZ GERSTEL: Object to form.
14   A. I don't know that that was a benefit or a
15   detriment to that product. To be honest with
16   you, I really had very little interest in -- I
17   didn't proctor or teach that product. I never
18   put a single Prosima in a patient.
19        But in terms of thinking about why mesh
20   kits fail and all of that, on the one hand, I
21   think that not having deep arms and having a
22   trocarless application is maybe both a benefit
23   as well as a detriment to the device. But,
24   again, I don't know the literature well enough

11 (Pages 38 to 41)

Ted M. Roth, M.D.

Page 42

1    on Prosima to tell you.
2  BY MR. FAES:
3  Q. Would you agree or disagree that the use of
4    mesh arms in a device like the Prolift+M can
5    introduce unique risks to a patient as opposed
6    to a mesh device for pelvic organ prolapse
7    like the Prosima which does not include mesh
8    arms?
9       MS. KATZ GERSTEL: Object to form.
10  A. Yeah, there would be risks unique to the
11    passage of those trocars to then retrieve the
12    mesh arms. So, yes, there are unique risks
13    associated with retrieval of the mesh arms.
14  BY MR. FAES:
15  Q. Would you agree that when designing a mesh kit
16    like the Prolift+M it would be beneficial to
17    the patient and to patient safety to design
18    the procedure to have as few trocar passes as
19    possible?
20  A. I don't know that I can say that trocar passes
21    are what is responsible for, you know, issues
22    with Prolift. Prolift is a pretty minimally
23    invasive procedure; and I think that although,
24    as we said yesterday I haven't designed a

Page 43

1    biomedical device or a mesh kit, I think I'm
2    comfortable with the number of trocar passes,
3    and I agree with the design of the device.
4  Q. So you wouldn't agree that a device that has
5    minimal or less or zero trocar passes is a
6    potential safety benefit to a patient?
7  A. I think ultimately the question would be, for
8    me, I would have to look at that trocarless
9    device and vet whatever mechanism is being
10    used to potentially keep the mesh in place
11    and/or look at its efficacy and failure rate.
12  Q. Are you familiar with the AMS Elevate device?
13  A. Vaguely.
14  Q. Are you aware that the AMS Elevate device only
15    requires one trocar passage as opposed to the
16    Prolift+M device that requires up to six
17    trocar passes?
18  A. It's been a while since I've looked at, you
19    know, alternate devices, so I can't tell you
20    that -- I've never used an AMS mesh kit in a
21    human.
22  Q. So you would agree based on your previous
23    responses that you've never specifically
24    studied the question of whether a device such

Page 44

1    as the Prolift+M, which requires multiple
2    trocar passes, introduces additional risks to
3    the patient because of those trocar passes as
4    opposed to a device that requires less trocar
5    passes like the AMS Elevate or a device that
6    requires zero trocar passes like the Prosima?
7       MS. KATZ GERSTEL: Object to form.
8  A. Again, I don't think I can talk about the AMS
9    product because I'm not familiar with their
10    literature. I can't tell you how safe that
11    product was. I don't know what adverse events
12    were associated in the Prosima device. To me,
13    it's sort of hypothetical that less trocar
14    passage would equal more safety. I think I
15    would need to look at a series, papers, and I
16    haven't looked at the Prosima literature or
17    the AMS literature.
18  BY MR. FAES:
19  Q. So you would agree then that you've never
20    specifically studied the question or whether
21    or not less trocar passes in a mesh kit such
22    as the Prolift+M would equal more safety,
23    correct?
24  A. I mean, I don't think there's been a head-to-

Page 45

1    head trial of a multi-trocar transvaginal mesh
2    like Prolift versus a single trocar passage
3    material like the AMS kit. I can tell you
4    that the Prolift+M, despite having multiple
5    trocar passages, I would feel to be safe.
6  Q. Would you agree that I wouldn't expect you to
7    be able to offer an opinion to a reasonable
8    degree of medical certainty of whether or not
9    if the Prolift+M kit had been designed with
10    less trocar passes than it currently has
11    whether or not that would be safer, more safe
12    or less safe for a patient; is that accurate?
13       MS. KATZ GERSTEL: Objection,
14    hypothetical.
15  A. I mean, it's a hypothetical question. You
16    know, the French mesh group designed the
17    device with, you know, two trocar passages on
18    either side for the anterior and one on either
19    side for the posterior. I don't know if less
20    trocar passages would equal greater safety.
21    And the other question would be for me is
22    how you define safety. What adverse event are
23    we looking to decrease with less trocar
24    passage? That would be my question.

12 (Pages 42 to 45)

Ted M. Roth, M.D.

Page 46

1    MS. KATZ GERSTEL:  Can we take a bathroom
2  break?
3    MR. FAES:  Sure.  I actually need one,
4  too, but I wasn't going to be the one to cry
5  uncle.
6    (A break was taken.)
7  BY MR. FAES:
8  Q. Doctor, we're back on the record after a short
9  break.  Are you ready to proceed?
10 A. Sure.
11 Q. We may have talked about this some yesterday,
12   but how many Prolift or Prolift+M meshes have
13   you either excised or revised in the course of
14   your career?
15 A. Today you asked Prolift and Prolift+M.
16   Yesterday I think we discussed only slings.
17 Q. So my question is, just so it's clear for the
18   record, how many Prolift or Prolift+M meshes
19   have you excised or revised during the course
20   of your career?
21 A. I mean, I've probably done 60 mesh excisions
22   or revisions; and of those, maybe two-thirds
23   were Prolift.  So maybe 40 out of the 60.
24 Q. When you say 40, do you mean 40 Prolift or

Page 47

1    Prolift+M, or do you mean 40 just Prolift?
2  A. I don't have a specific breakdown of how many
3    of the 40 were Prolift and how many were +M.
4  Q. But in your mind, the 40 includes Prolift and
5    Prolift+M, right?
6  A. I would group them together, yes.
7  Q. When you say 40 out of the 60, what is the 60
8    referring to?  Is that the number of excisions
9    or revisions of pelvic organ prolapse mesh
10   kits that you've revised in the course of your
11   career, or is that something else?
12 A. The 60 would include mesh from
13   sacrocolpopexies and mesh from other
14   manufacturer's kits.
15 Q. So in about 240 cases you've put in a Prolift
16   or Prolift+M, and in about 40 cases you've
17   removed or excised a Prolift or Prolift+M
18   mesh, correct?
19 A. I mean, the majority of those patients who had
20   a mesh revision or excision were not patients
21   that I implanted.  But your numbers are
22   correct.
23 Q. Do you intend to offer any opinions in this
24   case regarding specifically any complication

Page 48

1    rates or efficacy rates regarding the
2  Prolift+M in your own patients?
3  A. Yes.
4  Q. And what is that opinion?
5  A. I don't know that we specifically put my
6    numbers in the Prolift+M section of my report;
7    but I would say that my rate of exposure, I
8    mean, it's kind of broad, and it's hard for me
9    to sort of single out Prolift+M from the
10   original Prolift.  But I would say that my
11   rate of exposure was probably anywhere from
12   eight to 15 percent, at least.
13     And when I've seen patients back for a
14   Prolift+M, and I continue to see some of these
15   patients, I have not seen anyone come back in
16   symptomatic from a recurrent prolapse.  But,
17   then again, you know, maybe we haven't
18   followed them out long enough, as time will
19   tell.
20 Q. So you believe that your rate of exposure with
21   the Prolift+M specifically is somewhere
22   between eight and 15 percent; is that
23   accurate?
24 A. Yes.

Page 49

1  Q. And how many patients is that based on?
2  A. Again, it's hard for me to tease out the
3    Prolift+M from the original Prolift kits.  And
4    I would also say that my exposure rate
5    decreased in the time that I started with the
6    original Prolift to when I ended with
7    Prolift+M.
8      So, you know, like I said, it's hard for
9    me to sort of pull out just what my rate of
10   exposure was for the Prolift+M patients.  It
11   all -- and I don't think that I saw much of a
12   difference in rate of exposure between the
13   original Prolift and the Prolift+M, but I
14   think that over time my exposure rates
15   decreased.  I think that's more to changes in
16   technique and other factors.
17 Q. So the eight to 15 percent exposure rate, you
18   can't be any more specific than that?  You
19   just have that range; is that accurate?
20 A. Yeah, eight to 15 percent.  I know it's kind
21   of a broad range.
22 Q. Would you agree that your opinions regarding
23   your own personal experience with your
24   patients regarding the Prolift+M is not based

13 (Pages 46 to 49)

Ted M. Roth, M.D.

Page 50

1    upon any formal analysis where you determined
2    the exact number of patients, the number of
3    patients that were lost to follow-up or any
4    standardized evaluation protocol, correct?
5         MS. KATZ GERSTEL: Object to form.
6    A. Yeah, I haven't done a retrospective cohort
7    analysis of my Prolift patients where I
8    formally looked at it, but I feel like my mesh
9    exposure rate is anywhere from eight to 15
10   percent.
11   BY MR. FAES:
12   Q. In your expert report starting on page 17, you
13   discuss mesh shrinkage, and you state that all
14   experienced surgeons should know scar tissue
15   can contract and, therefore, such contraction
16   is expected. However, contraction of Gynemesh
17   PS and macroporous polypropylene mesh itself
18   has not been demonstrated. Do you see that?
19   A. Yes.
20   Q. Is that an opinion you intend to offer
21   regarding the Prolift+M or Ultrapro mesh?
22   A. Yes.
23   Q. So you believe that contraction of the
24   Ultrapro or Prolift+M mesh has not been

Page 51

1    demonstrated?
2    A. As far as I know, in regards to my own
3    patients and my review of the literature, I
4    haven't seen a well-designed description of
5    mesh shrinkage or contraction for the
6    Prolift+M.
7    Q. So do you agree or disagree that mesh
8    contraction or shrinkage is a risk of
9    transvaginal POP repair with mesh that has
10   been reported in the published scientific
11   literature?
12        MS. KATZ GERSTEL: Object to form.
13   A. I guess, you know, in my read of some of the
14   literature describing mesh shrinkage slash
15   contracture, I've had an issue sort of
16   figuring out how they define or qualify or
17   stage what they mean by mesh shrinkage and
18   contracture. I think that part of, you know,
19   physiological healing of a wound is that you
20   have some mesh -- you have some wound
21   contracture, but I haven't seen a convincing
22   paper to say that there is such a thing. In
23   fact, I think that we have a decent paper by
24   Dietz at least in patients that he followed

Page 52

1    with the AMS kit that he didn't find mesh
2    contracture or shrinkage. In fact, I think he
3    found an increase in total vaginal length,
4    which would be the opposite of what you would
5    get with mesh shrinkage or contracture.
6    BY MR. FAES:
7    Q. So I'm not sure that I got an answer to my
8    question that I understood. Are you saying
9    that you agree with that statement, you
10   disagree with it, or you can't answer it yes
11   or no?
12   A. Like I said, I think it's hard to say that
13   there is mesh shrinkage when I don't know that
14   we've defined or been able to sort of gauge or
15   qualify what that means, you know. I've read
16   -- I probably have the article here. I'm not
17   as organized as you guys with your binders.
18        So there is an article, and I can't
19   remember if we discussed in the report
20   although I sort of alluded to it, even Ben
21   Feiner and Chris Maher's article, Vaginal Mesh
22   Contraction, I don't think that they really
23   were able to define or quantify mesh shrinkage
24   or contracture in that article.

Page 53

1         So I don't know that I believe that mesh
2    contracture or shrinkage happens.
3    Q. Okay. So if the FDA concluded that mesh
4    contracture does happen and has been reported
5    in the scientific sign literature, you would
6    disagree with the FDA?
7    A. I think I would need to look at whatever
8    papers the FDA has reviewed that have reported
9    mesh contracture and sort of see how those
10   authors defined mesh contracture or shrinkage.
11   Clinically, I haven't found that in the case
12   of TVTs, for instance, which is, you know,
13   mesh, that there is any sort of mesh
14   shrinkage. I think if there were mesh
15   shrinkage or contracture that over time if
16   this is a process that occurs over time that
17   we would see patients coming in with urinary
18   retention, more issues with urgency and LUTS
19   symptoms. I haven't found that patients have
20   had loss of vaginal length over time.
21        In the patients with Prolift that I've
22   seen, I haven't seen that they have developed
23   more urgency or overactive bladder over time
24   related to mesh shrinking or contracting, so I

14 (Pages 50 to 53)

Ted M. Roth, M.D.

Page 54

1    haven't seen it in my practice.
2    Q.  So just to be clear, you do not believe that
3        mesh contracture occurs with the Prolift+M?
4    A.  Correct.
5    Q.  Can I have you look at the Prolift+M IFU that
6        is marked as an exhibit in front of you, and
7        specifically I want to have you look at the
8        adverse reaction section on page number two.
9        And if you look under adverse reactions, the
10       first bullet point one of the adverse
11       reactions listed is contracture.  Do you see
12       that?
13   A.  I'm sorry, under adverse reactions?
14   Q.  Yes, it's in the last line of the first bullet
15       point, fistula formation, contracture,
16       scarring, mesh exposure, erosion or extrusion?
17   A.  Mm-hmm.
18   Q.  So since you believe that mesh contracture
19       does not occur, do you believe that Ethicon
20       and Johnson & Johnson has provided inaccurate
21       information in their Prolift+M IFU?
22       MS. KATZ GERSTEL:  Objection,
23       mischaracterization.
24   A.  I guess, you know, the language that I would

Page 55

1    sort of for me at least that that sentence
2    starts off with potential adverse reactions,
3    so that's how I would sort of qualify
4    contracture is that it's a potential adverse
5    reaction.  I don't know that I can say more
6    about it than that.  But, you know, J & J has
7    it in their IFU that it's a potential
8    reaction.
9    BY MR. FAES:
10   Q.  Have you ever seen anything from any
11       memorandums or findings from Ethicon's own
12       medical director stating that they believe
13       polypropylene mesh contracts 30 to 50 percent
14       as a rule of thumb?
15       MS. KATZ GERSTEL:  Objection.
16   A.  I haven't seen those communications.
17   BY MR. FAES:
18   Q.  If that is something Ethicon believed
19       regarding their polypropylene meshes for the
20       treatment of pelvic organ prolapse as early as
21       2002, would that affect any of the opinions
22       that you're offering in this case regarding
23       the Prolift+M?
24       MS. KATZ GERSTEL:  Objection.

Page 56

1    A.  I guess what I would have to know is whether,
2        as you say, if there is a 30 to 50 percent
3        contraction, does that -- how is that realized
4        and does that mean -- how does that affect
5        clinical outcomes.  Just to say that there is,
6        you know, 30 to 50 percent contraction of the
7        mesh, I guess I would need to know is, number
8        one, how did they document that.  Number two,
9        is it clinically relevant and what does that
10       lead to.
11   BY MR. FAES:
12   Q.  Let me ask you this, Doctor.  Do you believe
13       that a potential adverse reaction of the
14       Prolift mesh is that excessive contraction or
15       shrinkage of the tissue surrounding the mesh,
16       vaginal scarring, tightening and/or shortening
17       may occur?
18       MS. KATZ GERSTEL:  Andy, are you asking
19       about Prolift or Prolift+M?  You said Prolift.
20       I just wanted to clarify.
21   BY MR. FAES:
22   Q.  First, do you believe it's an adverse event of
23       -- if you can answer is it an adverse event of
24       both products, or do you believe it's only an

Page 57

1    adverse event of one or the other?
2    A.  Which particular adverse reactions were you
3        referring to?  I'm sorry.
4    Q.  So I'll restate the question.  Do you believe
5        that a potential adverse reaction of the
6        Prolift or Prolift+M mesh is that excessive
7        contraction or shrinkage of the tissue
8        surrounding the mesh, vaginal scarring,
9        tightening and/or shortening may occur?
10   A.  I mean, I think those can occur in any
11       reconstructive pelvic floor surgery regardless
12       of whether mesh is used or not.
13   Q.  Do you think that is a reasonable warning to
14       place in the adverse reaction section of the
15       Prolift+M IFU?
16       MS. KATZ GERSTEL:  Object to form.
17   A.  I mean, I think it's a reasonable warning, but
18       I think that those adverse events I think are
19       well known to surgeons operating in this
20       arena, in this space.
21   BY MR. FAES:
22   Q.  At what time, at any time during when the
23       Prolift+M was marketed and sold or now?
24   A.  Well, I think the majority of the adverse

15 (Pages 54 to 57)

Ted M. Roth, M.D.

Page 58

1    events that you listed can occur with any sort
2    of prolapse repair.  And so in that regard, I
3    think they're well known to surgeons operating
4    in that arena, and they were certainly known
5    at the time that Prolift was available and had
6    been known prior to, you know, the
7    introduction of mesh kits.
8    Q.  Have you ever engaged in any kind of study or
9    formal analysis of what percentage of surgeons
10   actually know or knew about that particular
11   adverse reaction during the time that the
12   Prolift+M was marketed and sold?
13       MS. KATZ GERSTEL:  Object to form.
14   A.  When you say this particular adverse reaction,
15   you are referring to --
16   BY MR. FAES:
17   Q.  Excessive contraction or shrinkage of the
18   tissue surrounding the mesh, vaginal scarring,
19   tightening or shortening that may occur?
20   A.  I have not done a poll of other urology,
21   urogyn, GYN surgeons about what they knew or
22   read in the IFU.
23   Q.  So you can't state as you sit here today to a
24   reasonable degree of medical certainty the

Page 59

1    percentage of pelvic floor surgeons who are
2    aware or not aware of that particular risk; is
3    that correct?
4        MS. KATZ GERSTEL:  Object to form.
5    A.  Again, my opinion is that these risks were
6    commonly known for non-mesh procedures as well
7    as mesh procedures.  So, I mean, these are the
8    risks of native tissue repairs apart from the
9    use of the word mesh.
10   Q.  My question was a little different than that.
11   My question was can you state to a reasonable
12   degree of medical certainty the percentage of
13   pelvic floor physicians in the United States
14   who knew or didn't know about that particular
15   risk during the time the Prolift+M mesh was
16   sold?
17       MS. KATZ GERSTEL:  Object to form.
18   A.  I can't say what other people what their
19   knowledge base was or what their experiences
20   were.  These risks, these adverse reactions
21   were commonly known.
22   BY MR. FAES:
23   Q.  Do you believe it's -- I take it that you
24   believe it's unnecessary then to put in the

Page 60

1    adverse reactions section of the Prolift or
2    Prolift+M IFU that excessive contraction or
3    shrinkage of the tissue surrounding the mesh,
4    vaginal scarring, tightening and/or shortening
5    may occur?
6    A.  I mean, as we talked about yesterday, I've
7    never written an IFU, and I don't know the
8    specifics of sort of what the FDA might
9    require J&J to put in the IFU, although my
10   recollection is that the FDA was involved with
11   the construction of the IFU for Prolift+M.
12   But, you know, sort of my impression of what
13   needs to be in an IFU is I don't think that
14   you need to put in what are commonly known
15   risks and adverse reactions in the IFU.  I
16   think that it's nice that it's there.  I don't
17   know that it adds much to, you know, to either
18   encouraging or deterring physicians from using
19   the product.  It certainly may help with
20   informed consent for physicians who perhaps
21   are unaware of this, but I offer the opinion
22   that most pelvic surgeons would be aware of
23   these adverse reactions.  Common knowledge.
24   Q.  But my question is specifically since you

Page 61

1    think that most physicians are aware and it's
2    common knowledge, do you believe it's
3    unnecessary to include that warning in the IFU
4    for the Prolift or the Prolift+M mesh?
5        MS. KATZ GERSTEL:  Objection.  Asked and
6    answered?
7    A.  Again, I don't know that I have an opinion
8    about it either way.  I mean, we've already
9    concluded and I've admitted that I've not
10   written or contributed to IFUs.
11   BY MR. FAES:
12   Q.  Okay.  I think you've answered my question
13   then, Doctor.  Thank you.
14   A.  Okay.
15   Q.  Do you believe that neuromuscular problems
16   including acute and/or chronic pain in the
17   groin, thigh, leg, pelvic and/or abdominal
18   area is a potential adverse reaction of the
19   Prolift and Prolift+M mesh?
20   A.  I think that the majority of the adverse
21   reactions that you listed are also potential
22   adverse reactions of any prolapse procedure.
23   Q.  So, again, do you have any opinion of whether
24   or not it is necessary or unnecessary to

16  (Pages 58 to 61)

Ted M. Roth, M.D.

Page 62

1    include that particular adverse reaction in
2    the IFU for the Prolift+M?
3    A. Again, I think I'm of the feeling that those
4    were commonly known adverse reactions for any
5    prolapse repair, so these would be common.
6    This would be common knowledge amongst
7    surgeons doing these procedures.
8    Q. So with regard to that particular adverse
9    reaction or set of adverse reactions, however
10   you want to clarify it, would you agree that
11   you haven't done any kind of formal analysis
12   as to what percentage of pelvic floor
13   physicians in the United States were aware
14   that that was a potential adverse reaction of
15   the Prolift+M during the time it was marketed?
16       MS. KATZ GERSTEL:  Object to form.
17   A. I haven't done a formal analysis, no.
18   BY MR. FAES:
19   Q. And I need to re-ask the question because I'm
20   not sure I got an answer.
21       My question was specifically -- two
22   questions ago my question was do you believe
23   it is necessary or unnecessary to include a
24   warning in the adverse reaction section of the

Page 63

1    Prolift+M IFU that neuromuscular problems
2    including acute and/or chronic pain in the
3    groin, thigh, leg, pelvic and/or abdominal
4    area may occur?
5    A. I'm of the opinion that since these are
6    adverse reactions that are commonly known to
7    surgeons operating in this arena and can occur
8    with non-mesh kits that it's not new
9    territory.  So, again, I've not written an
10   IFU, but my understanding is that if adverse
11   reactions or risks are common knowledge that
12   the FDA doesn't require a manufacturer to add
13   those things to the IFU.  The fact that J&J
14   puts those things into the IFU I think is
15   helpful, and I think -- but I don't know that
16   it adds a whole lot to the IFU.
17   Q. But my question was specifically can you
18   answer yes or no do you believe it's necessary
19   or unnecessary to -- strike that.
20       Can you answer yes or no do you believe
21   it's necessary to include those risks in the
22   IFU for the Prolift+M or not?
23   A. I think if they're commonly known risks
24   associated with any prolapse repair that it's

Page 64

1    not necessary for them to be listed in the
2    IFU.
3    Q. So if Ethicon and Johnson & Johnson did
4    actually put that risk in one of their IFUs
5    for either the Prolift or Prolift+M mesh, you
6    believe that Ethicon and Johnson & Johnson
7    would be putting unnecessary information in
8    their IFUs; is that correct?
9        MS. KATZ GERSTEL:  Object to form.
10   A. I think that the information provided here is,
11   as I said, commonly known to surgeons who are
12   operating in this arena.  When you say
13   unnecessary to put it in, I don't see the harm
14   in putting it in.  I would probably say that
15   the information if it were commonly known to
16   surgeons operating in this arena was put in
17   then it might be not so much unnecessary but
18   perhaps it would be redundant.
19   BY MR. FAES:
20   Q. But you would agree that putting that
21   particular risk in the Prolift+M IFU might
22   actually be helpful to some physicians in
23   discussing the risk of their device with the
24   patient and doing informed consent?

Page 65

1        MS. KATZ GERSTEL:  Objection.
2    A. Absolutely.
3    BY MR. FAES:
4    Q. And same question with regard to the risk of
5    excessive contraction or shrinkage of the
6    tissue surrounding the mesh.  Would you agree
7    with that as well?
8        MS. KATZ GERSTEL:  Objection.
9    A. In regards to helping counseling patients,
10   absolutely.
11   BY MR. FAES:
12   Q. Would it be helpful in reminding doctors that
13   that is a potential risk of the Prolift+M
14   procedure?
15       MS. KATZ GERSTEL:  Objection.
16   A. I mean, when I was a proctor, I would try to
17   review a lot of this at the cadaver stations
18   and also review these sorts of things when
19   people would come to my hospital and watch
20   surgery.  I think more education is better
21   than less education.
22   BY MR. FAES:
23   Q. So you would agree then that it might be
24   helpful in reminding the doctor that that

17 (Pages 62 to 65)

Ted M. Roth, M.D.

Page 66

1    excessive contraction is a potential risk of
2    the Prolift+M IFU by including it in the
3    adverse reactions section of the IFU, correct?
4          MS. KATZ GERSTEL:  Objection.
5    A.  It can't hurt, so yes.
6    BY MR. FAES:
7    Q.  Would you agree with me that serious
8    complications associated with surgical mesh
9    for transvaginal repair of pelvic organ
10   prolapse are not rare?
11         MS. KATZ GERSTEL:  Objection.
12   A.  I guess I would need to know how you define a
13   serious adverse event.
14   BY MR. FAES:
15   Q.  Well, you know the FDA has actually issued a
16   statement stating that serious complications
17   associated with surgical mesh for transvaginal
18   repair of pelvic organ prolapse are not rare,
19   correct?
20   A.  I did read that statement, and one questions
21   how they define serious adverse events.
22   Q.  So can you answer yes or no whether or not you
23   agree or disagree with the FDA statement
24   regarding whether or not serious complications

Page 67

1    with transvaginal mesh for POP are rare?
2    A.  Again, I guess my issue is how the FDA defined
3    serious adverse events.  There was a nice
4    poster presentation from a recent AUGS
5    meeting.  And, again, what they did was they
6    did a systematic review of the literature.
7    Again, that's different than the MAUDE
8    database, but they did a systematic review of
9    the literature between 2005 and 2016, and they
10   looked at the rate of serious adverse events
11   in the literature.  And how they defined
12   serious adverse events was hemorrhage,
13   contraction, mesh infection requiring surgery,
14   injury to visceral structures and fistula.
15   And then they also looked at the rate of
16   serious adverse events of mesh versus
17   traditional repair in ASC.
18        So based on the review of the literature
19   as opposed to the problematic reporting up to
20   the MAUDE database, I would say that serious
21   adverse events are rare.
22   Q.  So you then would disagree with the statement
23   that serious complications associated with
24   surgical mesh for transvaginal repair of

Page 68

1    pelvic organ prolapse are rare -- are not
2    rare?  Sorry.
3    A.  I would.  You can have serious adverse events
4    with any procedure for prolapse and/or
5    incontinence.  And, again, the issue I have
6    with the FDA warning from 2008 and then the
7    subsequent follow-up in 2011 is that there is
8    no denominator.  And it's also very unclear as
9    to what they define as serious adverse events.
10        My understanding is that the majority of
11   the so-called serious adverse events were
12   related to mesh exposure.  And I wouldn't
13   consider exposure of mesh to be a serious
14   adverse event.  It's not life threatening.  It
15   typically doesn't require rehospitalization.
16   Typically doesn't require re-operation.
17   Exposure of the mesh is oftentimes
18   asymptomatic.  Mesh exposure typically doesn't
19   lead to persistent or significant disability,
20   and the interventions to correct a mesh
21   exposure aren't meant to correct disability,
22   aren't going to save or decrease the rate of
23   rehospitalization and/or prevent a life-
24   threatening condition.

Page 69

1    Q.  Would you agree or disagree that mesh erosion
2    can require multiple surgeries to repair and
3    can be debilitating in someone?
4          MS. KATZ GERSTEL:  Object to form.
5    A.  When you say debilitating, are you referring
6    to the surgery to remove the mesh, or are you
7    referring to the mesh exposure itself as
8    debilitating?
9    BY MR. FAES:
10   Q.  I'm referring to the consequences on the
11   patient's quality of life and ability to
12   engage in everyday activities.
13   A.  You know, when I counsel patients about these
14   operations, all prolapse repairs, we talk
15   about quality of life.  And these women have
16   pretty significant impaired quality of life
17   from prolapse and from urinary incontinence,
18   and we talk about the potential improvement
19   for quality of life with these operations; but
20   we also talk about how complications from
21   these surgeries that are meant to improve
22   quality of life can lead to worsening of
23   quality of life.
24        In my experience, yes, sometimes removing

18 (Pages 66 to 69)

Ted M. Roth, M.D.

Page 70

1    mesh can require multiple surgeries. I have
2    not seen patients where I've removed mesh left
3    with significant disability after removing
4    mesh, and I have not seen people have
5    inability to perform their activities of daily
6    living because of a mesh complication.
7    Q. So getting back to my question again, you
8    would agree that mesh erosion from pelvic
9    organ prolapse can require multiple surgeries
10   to repair and can be debilitating in some
11   women. Would you agree or disagree with that?
12   A. That's possible.
13   Q. So in cases where the pelvic organ prolapse
14   mesh does require multiple surgeries and ends
15   up being debilitating to women, do you
16   consider that to be a serious adverse event or
17   not, or does it have to be life threatening to
18   you in order to be a serious adverse event?
19        MS. KATZ GERSTEL: Objection.
20   A. Well, at least for Dr. Lowman who did this
21   poster at AUGS, she didn't consider however
22   you define life disabling as a serious adverse
23   event. So I guess, you know, I would have to
24   sort of take it on a case-by-case basis to

Page 71

1    sort of, you know, learn more about what that
2    individual patient was experiencing.
3        My own experience has been that people do
4    quite well with these procedures, and they
5    don't suffer disability or disabling
6    complications like what you're asking about.
7    BY MR. FAES:
8    Q. But getting back to my question, do you
9    believe that a mesh erosion that requires
10   multiple surgeries to repair and is
11   debilitating to a woman, can that potentially
12   be a serious adverse event according to your
13   definition, or do you require the event to be
14   life threatening in order for it to be
15   considered a serious adverse event?
16        MS. KATZ GERSTEL: Object to form.
17   A. I mean, the reason why we do these operations
18   is to help people, not hurt them. If someone
19   ends up with, you know, a complication, I take
20   it pretty seriously. But most of us, I think,
21   would define a serious adverse event as a
22   life-threatening condition.
23   BY MR. FAES:
24   Q. So are you saying that in a case where

Page 72

1    multiple mesh revisions cause debilitating
2    injury to a woman and affect her way of life
3    that you still don't consider that a serious
4    adverse event? Yes or no.
5        MS. KATZ GERSTEL: Object to form.
6    A. I guess that would be an adverse event related
7    to the mesh revision surgery as opposed to the
8    mesh being placed. It's hard to answer that
9    question.
10   BY MR. FAES:
11   Q. What if the mesh erosion from the POP kit
12   requires multiple surgeries to repair, is
13   debilitating to the woman, and that becomes --
14   and because of the debilitating injury the
15   woman becomes suicidal and it's then life
16   threatening. Does that then qualify in your
17   mind as a serious adverse event?
18        MS. KATZ GERSTEL: Object to form.
19   A. I guess I would really need to learn more
20   about how you define debilitating and, you
21   know, what that means. In my experience, I
22   have not seen patients disabled from either a
23   mesh kit or from surgery to revise a mesh kit
24   or from, you know, the exposures that for the

Page 73

1    most part can be treated nonsurgically and can
2    be treated medically.
3    BY MR. FAES:
4    Q. So it's your testimony that you've never seen
5    a woman that has been debilitated from
6    complications from a pelvic organ prolapse
7    mesh?
8        MS. KATZ GERSTEL: Object to form.
9    A. I guess I'm still wondering how we're defining
10   debilitating, number one. And I've removed
11   mesh from women who have had pain with
12   intercourse, exposures. I removed sling mesh
13   from the urethra in women who have had
14   urethral injuries. I don't know how we're
15   defining debilitating.
16   BY MR. FAES:
17   Q. Doctor, I'm going to hand you what's been
18   marked as Exhibit No. 5 to your deposition.
19   And this is an e-mail dated May 28, 2014, and
20   if I can have you turn actually to the last
21   page which is the beginning of the e-mail
22   string. And you see at the top it states that
23   the product is Gynemesh, and that's the mesh
24   that is used in the Prolift device, correct?

19 (Pages 70 to 73)

Ted M. Roth, M.D.

Page 74

1    A.  Correct.
2    Q.  And you look under details and it states, It
3         was reported that the patient underwent a
4         surgical procedure on 4/27/05 and TVT and
5         Gynemesh were implanted.  It was reported that
6         she experienced pain, erosion of her internal
7         bodily tissue and other injuries following the
8         procedure.  It was reported that the patient
9         has undergone multiple surgeries and
10        revisionary procedures.  No additional
11        information was provided.  Do you see that?
12   A.  I do.
13        MS. KATZ GERSTEL:  Object.  This e-mail
14        does not appear to pertain to a Prolift+M.
15        MR. FAES:  Your objection is noted.
16   BY MR. FAES:
17   Q.  And, again, just to clarify before I go to my
18        next question, your testimony was that you
19        haven't seen a woman debilitated from mesh
20        from pelvic organ prolapse in your experience,
21        correct?
22   A.  Again, I'm not too sure what we mean by
23        debilitated, but I really don't have a clear
24        recollection of anyone being significantly

Page 75

1         debilitated by mesh.
2    Q.  Okay.  If you turn to the first page, at the
3         top it states, It was reported that during
4         insertion the patient experienced pain,
5         erosion, extrusion, infection, urinary/bowel
6         problems, recurrence, bleeding, dyspareunia,
7         and vaginal scarring.  Then it goes on to
8         state, It was reported that patient underwent
9         mesh excision on 11/11/2005, 1/06/2006,
10        12/17/2007, 12/01/2008 by Ted M. Roth due to
11        exposure and dyspareunia.  Do you see that?
12   A.  I do.
13   Q.  Do you have a recollection upon reviewing this
14        document of any patient that you've treated
15        with pelvic organ prolapse mesh that fits this
16        particular profile?
17   A.  I mean, I have a pretty good memory for a lot
18        of things, but I honestly don't remember doing
19        multiple procedures on one particular person.
20   Q.  So do you have any recollection of any patient
21        that you've treated that had four different
22        revision surgeries of a pelvic organ prolapse
23        mesh product?
24   A.  I don't recall.  I don't remember this

Page 76

1         particular patient.
2    Q.  So do you believe that this report is
3         inaccurate?
4         MS. KATZ GERSTEL:  Objection.
5    A.  Well, I believe -- there's my name, and,
6         again, I don't have this person's medical
7         record in front of me to substantiate the
8         procedures that I did on her, and I also don't
9         have the medical record to substantiate what
10        her complaints were.  So I don't know what I
11        can say about those.
12   BY MR. FAES:
13   Q.  Do you believe that a patient who has
14        undergone multiple revisionary procedures
15        including four different mesh excisions across
16        a period of at least three years and is
17        experiencing pain, erosion, bleeding,
18        dyspareunia and vaginal scarring is
19        debilitated or not, or can you not answer from
20        this information?
21        MS. KATZ GERSTEL:  Object to form.
22   A.  I mean, I think I'd have to know how she was
23        before the surgery as well.
24        You know, there are a lot of people that

Page 77

1         have pain, urinary and bowel problems,
2         bleeding, dyspareunia, scarring before they
3         have surgery.  You know, it's hard for me to,
4         you know, answer your question without having
5         all of the information in front of me.  We
6         have three sentences.
7    BY MR. FAES:
8    Q.  So you would agree with me then that a report
9         of a woman who has underwent four different
10        mesh excisions over a period of three years,
11        has pain, erosion, extrusion, infection,
12        urinary/bowel problems, recurrence, bleeding,
13        dyspareunia and vaginal scarring, assuming
14        those are all related to the prolapse mesh,
15        you're still not able to determine whether or
16        not that patient can be considered to have had
17        a debilitating mesh injury?
18        MS. KATZ GERSTEL:  Objection.
19   A.  Not to be difficult, but I would still need to
20        know sort of what her baseline was like prior
21        to, you know, having whatever procedure she
22        had.  I would need to know whether she was
23        having pain before the procedure, whether she
24        was having infections or bowel problems, what

20  (Pages 74 to 77)

Ted M. Roth, M.D.

Page 78

1    degree prolapse she has because, again,
2    recurrence, assuming that is recurrence of
3    prolapse, you know, there is no single
4    operation that is 100 percent guaranteed to
5    not lead to recurrent prolapse.  I would also
6    need to know whether she was having
7    dyspareunia before her procedure or, you know,
8    what vaginal scarring means.
9        I don't know that I can answer your
10   question without looking at this woman's
11   medical record.
12   BY MR. FAES:
13   Q. So you would agree then that the fact that a
14      woman has had four different excisions of a
15      pelvic organ prolapse mesh over a period of
16      three years, it's not reasonable to conclude
17      that that particular patient has likely
18      experienced some pain as a result of those
19      multiple procedures and multiple revisions?
20         MS. KATZ GERSTEL:  Objection,
21      hypothetical.
22   A. It's hard to know what she has resulted in as
23      a result of those four procedures.  My
24      experience with removing mesh and sort of what

Page 79

1    has been put out in the literature is that
2    typically you can resolve a lot of the
3    purported problems of pain with removing the
4    mesh, and albeit it may require more than one
5    operation.  But, you know, more times than
6    not, people are left with a reduction in their
7    pain.
8    BY MR. FAES:
9    Q. Could you conclude from this report of a
10      person -- strike that.
11         Could you conclude that if a person has
12      had four separate mesh excisions of a pelvic
13      organ prolapse mesh over a period of four
14      years that that patient more likely than not
15      experienced pain from those multiple
16      extrusions or exposures prior to the mesh
17      revision surgeries?
18         MS. KATZ GERSTEL:  Objection.
19   A. I mean, there is no way to know, at least
20      looking at this, why she had the mesh
21      excisions four times.  Did she have a mesh
22      excision because she was in pain?  Did she
23      have a mesh excision because she was bothered
24      by vaginal discharge and bleeding?  Did she

Page 80

1    have a mesh excision because her partner felt
2    the mesh when they had coitus?  I don't know.
3    I would be happy to review the medical record.
4    BY MR. FAES:
5    Q. So all of those potential causes for those
6      excisions of the mesh, you wouldn't consider
7      any of those to be serious adverse events
8      because none of them are life threatening,
9      correct?
10         MS. KATZ GERSTEL:  Objection.
11   A. The exposure of mesh and the fact that there
12      is a failure rate of mesh and the potential
13      for revision or reoperation, these are the
14      risks of not only mesh surgery but native
15      tissue repairs as well as sacrocolpopexy,
16      which is mesh but not in this space.
17   BY MR. FAES:
18   Q. If a patient is unable to -- excuse me, I'm
19      going to start over.
20         If a patient is unable to comfortably
21      engage in sexual intercourse for the rest of
22      their life as the result of a Prolift+M or
23      other prolapse mesh, would you consider that
24      to be a serious adverse event?

Page 81

1        MS. KATZ GERSTEL:  Objection.
2    A. You know, I mean --
3    Q. Respectfully, I think, Doctor, this is a yes
4      or no question.  So I would ask, if you can,
5      to first answer the question yes, no, or I
6      don't know.  Then if you need to add an
7      explanation to the end of that, feel free to
8      do so, but I would like an answer to my
9      question first, please.
10         MS. KATZ GERSTEL:  I object to that and
11      say, Doctor, you should answer the question as
12      you need to in order to be truthful and
13      accurate.
14         MR. FAES:  Respectfully, Counsel, you
15      know that's not the rule.  If we need to call
16      Judge Eifert and discuss it, we can.  But you
17      know from Judge Eifert the rule is if you're
18      asked a yes or no question, you need to answer
19      the question yes or no or I don't know.  And
20      if you need to -- or you can't answer the
21      question yes or no, then if you need to offer
22      an explanation to the end of that to make your
23      answer complete, you can feel free to do so.
24         But Judge Eifert has ruled on this

21 (Pages 78 to 81)

Ted M. Roth, M.D.

Page 82

1    multiple, multiple times on what the rule in
2    these depositions is.  So if that is your
3    position, I think we should stop the
4    deposition right now and call Judge Eifert so
5    we can get a responsive answer to the
6    question.
7        MS. KATZ GERSTEL:  I'm going to allow the
8    doctor to answer the question as he needs to
9    to be truthful and accurate.  If he can answer
10   with a yes or no, fine.
11   A.  Would you be so kind as to repeat the question
12   at this point?
13       MR. FAES:  Can I have the court reporter
14   please read back the question.
15       (The pending question was read back
16       by the reporter.)
17   A.  I can't answer that with a yes or no.
18   BY MR. FAES:
19   Q.  Fair enough, Doctor.  Doctor, if a person
20   experiences chronic debilitating pain for the
21   rest of their life as the result of a
22   Prolift+M or other prolapse mesh, would you
23   consider that to be a serious adverse event or
24   not?  Yes or no.

Page 83

1        MS. KATZ GERSTEL:  Same objection.
2    A.  I can't answer that with a yes or no.
3        MR. FAES:  Doctor, I think I'm about out
4    of time.  So if I have any time left, I will
5    reserve the balance of that for redirect.
6    Thank you very much.
7            CROSS-EXAMINATION
8    BY MS. KATZ GERSTEL:
9    Q.  Doctor, you were asked a moment ago about
10   Exhibit No. 5 which is an e-mail string; is
11   that correct?
12   A.  Yeah.
13   Q.  And do you see the e-mail string where it
14   starts on the page ending in 0129?
15   A.  Yes.
16   Q.  It's dated Wednesday, October 30, 2013?
17   A.  Correct.
18   Q.  And some of the information in that e-mail is
19   redacted, but do you see in this e-mail where
20   it says initial reporter: attorney?
21   A.  Yes.
22   Q.  Is there any way to verify or validate these
23   claimed injuries which were reported by an
24   attorney just by reading this e-mail?

Page 84

1    A.  I think what I said to Mr. Faes was that I
2    can't validate much of anything without
3    looking at this woman's medical record.
4    Q.  Doctor, can pelvic organ prolapse impact a
5    woman's quality of life?
6    A.  Yes.
7    Q.  How?
8    A.  It may cause significant discomfort, pain,
9    back pain, have a decrease in their ability to
10   perform their activities of daily living,
11   dyspareunia, loss of intimacy, feelings of
12   shame and even guilt over that.  It can have
13   pretty significant impact on their quality of
14   life.
15   Q.  And do you see patients in your own practice
16   that experience those negative impacts on
17   their quality of life because they suffer
18   pelvic organ prolapse?
19   A.  Yes.
20   Q.  Do you have patients in whom you have
21   implanted Prolift+M that you have followed for
22   years after their surgery?
23   A.  Yes.
24   Q.  Do you actually tend to see your patients in

Page 85

1    whom you implanted a Prolift+M -- strike that.
2    Do the patients in whom you have implanted a
3    Prolift+M for the most part return to you for
4    follow-up care?
5        MR. FAES:  Object to form.
6    A.  Yeah.  I mean, that's my impression; but the
7    other side of the coin is if they didn't
8    return to me, I have a pretty good
9    relationship with the other surgeons in the
10   state who might care for those patients, and
11   we keep an open line of communication about
12   patients who don't necessarily return to the
13   implant or the original consulting physician.
14   BY MS. KATZ GERSTEL:
15   Q.  And for those reasons, do you, therefore --
16   strike that.
17       Doctor, for those reasons, are you
18   therefore able to make an assessment of how
19   your patients in whom you have implanted
20   Prolift+M do for years following their
21   surgeries?
22   A.  Yes.
23       MR. FAES:  Object to form.
24   BY MS. KATZ GERSTEL:

22 (Pages 82 to 85)

Ted M. Roth, M.D.

| Page 86 |
|---|

1  Q. Are the results that you've had with your
2     patients in whom you've implanted Prolift+M
3     consistent with the medical literature?
4  A. Yes, that's my feeling.
5  Q. For most of your patients in whom you've
6     implanted Prolift+M, has Prolift+M improved
7     their quality of life?
8        MR. FAES: Object to form.
9  A. Yes.
10 BY MS. KATZ GERSTEL:
11 Q. For most of your patients in whom you've
12    implanted Prolift+M, even years after their
13    surgery, are most of them still doing well?
14       MR. FAES: Object to form.
15 A. Yes.
16 Q. Does Prolift+M have advantages that non-mesh
17    pelvic floor repair surgeries don't have?
18 A. I mean, I feel that there's enough data in the
19    literature to support the use of mesh in the
20    anterior compartment. And I think that the
21    way I sort of think about patient selection is
22    it's not that there is, you know, what are the
23    indications for mesh, but who is the best
24    patient for mesh or who would mesh be best in;

| Page 87 |
|---|

1     and I think that there is certainly a role for
2     mesh in patients with recurrent prolapse or
3     advanced stages of prolapse, patients at risk
4     for recurrent prolapse, i.e., folks with
5     levator avulsion.
6         So, yeah, absolutely there is a role for
7     Prolift+M specifically in the anterior
8     compartment, and there may be a role for mesh
9     in the posterior compartment in patients who
10    have perhaps failed repairs at least based on
11    one study that I reviewed.
12 Q. Doctor, do you regularly read the peer-
13    reviewed medical literature on transvaginal
14    mesh prolapse repairs?
15 A. I do.
16 Q. Do you confer with your colleagues, your
17    surgical colleagues about transvaginal mesh
18    prolapse repairs?
19 A. I do.
20 Q. Do you attend medical society conferences --
21    strike that.
22       Do you attend medical society conference
23    events on transvaginal mesh prolapse repairs?
24 A. When you say events, you mean posters and

| Page 88 |
|---|

1     presentations at the medical society? Yes,
2     I do.
3  Q. Do you base your opinions on Prolift+M on the
4     scientific data in the peer-reviewed medical
5     literature and your conversations with your
6     surgical colleagues and the medical society
7     conferences that you attend?
8  A. I do.
9        MR. FAES: Object to form.
10 BY MR. KATZ GERSTEL:
11 Q. And also on your own practice?
12 A. I do, yes.
13 Q. Can serious adverse events result from any
14    pelvic floor repair surgery?
15       MR. FAES: Object to form.
16 A. As I've defined serious adverse events, yes.
17    And as what other adverse events were also
18    discussed, as we discussed, can occur with all
19    prolapse repairs.
20 Q. Including non-mesh repairs?
21 A. Correct.
22 Q. Are the majority of the complications you have
23    seen in Prolift+M patients treatable?
24 A. Yes.

| Page 89 |
|---|

1  Q. Are the complications that you've seen in your
2     own practice -- strike that.
3         Are the kinds of complications after
4     Prolift+M that you've seen in your own
5     practice the same complications that you have
6     seen reported in the literature over time?
7        MR. FAES: Object to form.
8  A. Yes.
9  BY MS. KATZ GERSTEL:
10 Q. Are the complications that can occur with
11    Prolift+M all complications that can occur
12    with abdominal sacrocolpopexy?
13       MR. FAES: Object to form.
14 A. Yes.
15 BY MS. KATZ GERSTEL:
16 Q. Are the complications that can occur with
17    Prolift+M all complications that can occur
18    with non-mesh pelvic floor repairs?
19 A. Yes.
20 Q. Is exposure or erosion a complication that can
21    happen even with sutures used in non-mesh
22    pelvic floor repairs?
23 A. Yes.
24       MR. FAES: Object to form.

23 (Pages 86 to 89)

Ted M. Roth, M.D.

Page 90

1  Q. Having implanted some 80 Prolift+M and then
2     followed your patients for years afterwards,
3     are you an expert in how a woman's body reacts
4     to the implantation of mesh with a Prolift+M?
5        MR. FAES:  Object to form.
6  A. Insomuch as I've been able to follow my
7     patients over years, yes.
8  BY MS. KATZ GERSTEL:
9  Q. Having implanted some 80 Prolift+Ms and then
10    followed your patients for years afterward,
11    are you an expert in how the design of
12    Prolift+M minimizes trauma to a woman's body
13    compared to other non-mesh prolapse repairs?
14       MR. FAES:  Object to form.
15 A. Yes.
16 BY MS. KATZ GERSTEL:
17 Q. How does the design of the Prolift+M minimize
18    trauma to a woman's body?
19 A. I mean, it's a minimally invasive means of
20    providing support to one or multiple
21    compartments of the vagina.  Abdominal
22    sacrocolpopexy, I would argue, is at times a
23    maximally invasive means of doing something
24    similar but can't address all of the

Page 91

1     compartment.
2        So I think in that regard, I think that
3     the Prolift or rather the construction of the
4     Prolift and the application of the Prolift is
5     minimally invasive and provides minimal tissue
6     trauma.
7  Q. Do the trocars allow for the Prolift+M to be a
8     minimally invasive surgery?
9  A. Yes.
10 Q. As an implanter of Prolift+M as well as a
11    surgeon who performs other non-mesh pelvic
12    floor repairs, regularly reads the
13    peer-reviewed medical literature on pelvic
14    floor repairs, attends medical society
15    conferences and confers with colleagues on
16    pelvic floor repairs, Dr. Roth, are you an
17    expert in the warnings surgeons need to have
18    prior to performing the Prolift+M?
19       MR. FAES:  Object to form.
20 A. Yes.
21 BY MS. KATZ GERSTEL:
22 Q. Are experienced pelvic floor surgeons commonly
23    aware of all of the risks of Prolift+M before
24    reading the IFU?

Page 92

1        MR. FAES:  Object to form.
2  A. That's my opinion, yes.
3  BY MS. KATZ GERSTEL:
4  Q. How is it that experienced pelvic floor
5     surgeons are knowledgeable of the risks of
6     Prolift+M before they read an IFU?
7        MR. FAES:  Object to form.
8  A. I think it's a combination of training, and
9     hopefully they also read the peer-reviewed
10    medical literature and that they're
11    experienced with other forms of prolapse
12    repair that have the same warnings and risk of
13    adverse events.
14 BY MS. KATZ GERSTEL:
15 Q. In your opinion, does the Prolift+M IFU
16    appropriately warn pelvic floor surgeons of
17    the risk of Prolift+M?
18       MR. FAES:  Object to form.
19 A. I feel that it does.
20       MS. KATZ GERSTEL:  I think that's all I
21    have.
22          REDIRECT EXAMINATION
23 BY MR. FAES:
24 Q. I just have a couple follow-up questions for

Page 93

1     you, Doctor.
2        Earlier, I think defense counsel was
3     asking you whether or not the complications
4     for a non-mesh prolapse surgery are all the
5     same for a mesh repair of pelvic organ
6     prolapse surgery, and you answered that all
7     the complications are the same.  Do you
8     remember that?
9  A. I do.
10 Q. So you don't believe that mesh erosion,
11    exposure, extrusion is a unique risk to pelvic
12    organ prolapse surgery with mesh?
13 A. Insomuch as, you know, the mesh is a permanent
14    synthetic material, and permanent synthetic
15    materials are used for native tissue repairs,
16    apical vault suspensions, that permanent
17    sutures, which are akin to mesh in that
18    they're nonabsorbable and are used in
19    uterosacral suspensions and sacrospinous
20    ligament fixations, those sutures -- and,
21    actually, again, the sutures that are
22    oftentimes used for the repairs of the
23    anterior or posterior compartment, all of
24    those sutures can erode, poke through the

24  (Pages 90 to 93)

Ted M. Roth, M.D.

Page 94

1    vaginal wall much like mesh can.
2    Q.  So you don't think that mesh erosion,
3        exposure, extrusion is a unique risk of pelvic
4        organ prolapse surgery with mesh; is that
5        accurate?
6    A.  Insomuch as patients can have exposures of,
7        like, or permanent suture material, which is
8        not unlike mesh, no, I don't feel it's a
9        unique adverse event.
10   Q.  Earlier, defense counsel was asking you some
11       questions about Exhibit No. 5 and pointed out
12       that that adverse event report was reported by
13       an attorney.
14   A.  Yes.
15   Q.  Do you know whether or not attorneys in all 50
16       states in the United States have an ethical
17       obligation to tell the truth and not
18       misrepresent the facts of a particular case?
19   A.  I didn't sit for the Bar exam.  I don't know
20       what your code of ethics has you do or not do.
21   Q.  Do you know how many formal complaints have
22       been filed with Ethicon and Johnson & Johnson
23       regarding their pelvic mesh implants?
24   A.  I don't know.

Page 95

1    Q.  Do you think that would be information that
2        would be useful in forming your opinions
3        regarding whether or not the Ethicon pelvic
4        mesh products are safe and effective?
5    A.  No.
6            MS. KATZ GERSTEL:  Objection.
7    BY MR. FAES:
8    Q.  Do you know how many formal complaints have
9        been filed against the company specifically
10       with regard to the Prolift+M mesh?
11   A.  No.
12   Q.  You don't think that would be helpful
13       information to have in forming your opinions
14       regarding the safety and efficacy of the
15       Prolift+M mesh?
16   A.  I think you have to evaluate every case
17       individually for the merit behind the case.  I
18       mean, I think that people are entitled to
19       complain or blame surgery on anything.  It's
20       one of the reasons why we spoke about recall
21       bias in the report.  I haven't had a chance to
22       review a lot of cases in my time as an expert,
23       but so far a lot of the cases that I've
24       reviewed the purported complications are not

Page 96

1    so much related to the mesh themselves but to
2    mismanagement by the patient's providers.
3    Q.  So you don't think that the percentage of
4        patients who have filed a formal complaint to
5        the company regarding the Prolift+M is a
6        potential indicator of patient satisfaction or
7        lack of patient satisfaction?
8            MS. KATZ GERSTEL:  Objection.
9    A.  I mean, I think we have good medical
10       literature to support patient satisfaction
11       with Prolift, at least specific on the
12       original Prolift.  I don't know that I would
13       be able to opine about patient satisfaction
14       just merely based on the number of complaints
15       to the company.
16   BY MR. FAES:
17   Q.  And earlier defense counsel was asking you
18       questions about patients that you have
19       implanted with Prolift+M and their follow-up
20       care.  Do you remember that?
21   A.  Yes.
22   Q.  Have you done any kind of formal analysis
23       asking patients if they have gone and seen
24       other doctors for problems or follow-up care

Page 97

1    with their Prolift+M devices?
2    A.  I've not done a formal analysis, no.
3    Q.  So if another -- if one of your patients
4        implanted with Prolift+M went to another
5        doctor, and that doctor didn't tell you about
6        it or was out of your area, you would have no
7        way of knowing whether or not that patient
8        went to another doctor for treatment of a
9        complication with the Prolift+M, right?
10   A.  Well, luckily, I have a good relationship with
11       the other three or four docs in the state that
12       do what I do, and we keep an open line of
13       communication.  We sort of have this unwritten
14       agreement to let each other know about each
15       other's patients that perhaps don't follow up.
16           It doesn't happen that often, and I can't
17       remember the last time someone called me up
18       about a patient that, you know, went to a
19       different provider.
20   Q.  But if a patient with a Prolift+M seeks
21       treatment outside of this network of three or
22       four docs and doesn't tell you about it for
23       problems with their Prolift+M, you would have
24       no way of knowing about that, correct?

25  (Pages 94 to 97)

Ted M. Roth, M.D.

Page 98

1  A. I would have no way of knowing about that.
2  Q. Doesn't it violate HIPAA rules for you doctors
3     to be discussing complications that you've
4     treated with each other's patients if you're
5     referencing those patients by name?
6        MS. KATZ GERSTEL: Objection.
7  A. What we do typically is we ask the patient for
8     their permission to contact the implanting
9     physician prior to corresponding.
10 BY MR. FAES:
11 Q. So if a patient of yours that was implanted
12    with a Prolift+M by you goes to another doctor
13    for treatment of -- for treatment of a
14    complication with the Prolift+M and doesn't
15    give that other doctor consent to talk to you
16    about it, you would also have no way of
17    knowing about that, correct?
18 A. That seems de facto, ipso facto, yeah.
19       MR. FAES: I don't have any further
20    questions for you at this time, Doctor. Thank
21    you for your time.
22       MS. KATZ GERSTEL: I just have one
23    follow-up.
24          RECROSS-EXAMINATION

Page 99

1  BY MS. KATZ GERSTEL:
2  Q. Doctor, could you please turn to page 13 of
3     your report?
4  A. 13.
5  Q. Do you cite a paper by Barber on page 13 of
6     your report?
7  A. I did.
8  Q. And did Barber -- well, strike that.
9        Are uterosacral suspension and
10    sacrospinous ligament fixation two non-mesh
11    pelvic floor repairs for prolapse?
12 A. They are.
13 Q. And did Barber report on exposure rate for
14    sutures after uterosacral ligament suspension
15    and sacrospinous ligament fixation?
16 A. He did.
17 Q. And what did he report about suture exposure
18    rates?
19       MR. FAES: Object to form.
20 A. So Matt Barber noted a 15.4 percent suture
21    exposure rate after uterosacral suspension,
22    and a 17.2 percent suture exposure rate after
23    sacrospinous fixation.
24       MS. KATZ GERSTEL: Thank you. That's all

Page 100

1      I have.
2         (The deponent will read and sign.)
3         (The deposition concluded at 12:35
4      p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 101

1      I, TED ROTH, M.D., do hereby certify that the
2   foregoing testimony taken on March 17, 2017, is
3   true and accurate to the best of my knowledge and
4   belief.
5
6
7
   DATE              TED ROTH, M.D.
8
9
10     At           in said County of      ,
11  this day of            , 2017 personally
12  appeared TED ROTH, M.D., and he made oath to the
13  truth of the foregoing answers by him subscribed.
14     Before me,                  , a
15  Notary Public
16
17
18  My Commission Expires:
19
20
21
22
23
24

Ted M. Roth, M.D.

Page 102

1           STATE OF MAINE
2       I, Lynne M. Morrison, a Notary Public in
3   and for the State of Maine, do hereby certify that
4   pursuant to notice there came before me on March
5   17, 2017, the following-named person to wit:  TED
6   ROTH, M.D., who was duly sworn to testify to the
7   truth and nothing but the truth; that he was
8   thereupon carefully examined upon his oath and his
9   examination reduced to writing under my
10  supervision; that this deposition is a true record
11  of the testimony given by the witness.
12      I further certify that I am neither
13  attorney nor counsel for, nor related to, nor
14  employed by any of the parties to the action in
15  which this deposition is taken, and further, that
16  I am not a relative or employee of any attorney or
17  counsel employed by the parties hereto, or
18  financially interested in this action.
19      IN WITNESS WHEREOF, I have hereunto set my
20  hand this 27th day of March, 2017.
21
22
            Lynne M. Morrison
23
    My Commission Expires:
24  April 4, 2019

Page 104

1           LAWYER'S NOTES
2   PAGE LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

Page 103

1   THE ORIGINAL DEPOSITION OF TED ROTH, M.D. SHOULD
    INCLUDE THE FOLLOWING CORRECTIONS:
2
    Page   Line   Change from this      To this
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
            TED ROTH, M.D.
24

27 (Pages 102 to 104)