# EXHIBIT E

Ted M. Roth, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE:  ETHICON, INC. | ) Master File No. |
| PELVIC REPAIR SYSTEM | ) 2:12-MD-02327 |
| PRODUCTS LIABILITY | ) MDL No. 2327 |
| LITIGATION | ) |
| _____ | ) JOSEPH R. GOODWIN |
| THIS DOCUMENT RELATES TO | ) U.S. DISTRICT JUDGE |
| ALL WAVE 4 PLAINTIFFS | ) |

DEPOSITION OF TED M. ROTH, M.D.

(TVT and TVT-O General)

Deposition of TED M. ROTH, M.D., taken

before Beth Gaige, RPR, Notary Public in and

for the State of Maine, pursuant to notice

dated March 13, 2017, at the Embassy Suites

Hotel by Hilton, 1050 Westbrook Street,

Portland, Maine, on March 16, 2017, commencing

at 9:59 a.m.

Ted M. Roth, M.D.

|  | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | For the Plaintiff: |
| 8 | |
| 9 | Andrew N. Faes, Esq. |
| 10 | WAGSTAFF & CARTMELL, LLP |
| 11 | 4740 Grand Avenue, Suite 300 |
| 12 | Kansas City, MO 64112 |
| 13 | 816.701.1100 |
| 14 | afaes@wcllp.com |
| 15 | |
| 16 | For the Defendant: |
| 17 | |
| 18 | Diana Katz Gerstel, Esq. |
| 19 | Riker Danzig |
| 20 | Headquarters Plaza |
| 21 | One Speedwell Avenue |
| 22 | Morristown, NJ 07962-1981 |
| 23 | 973.451.8468 |
| 24 | dgerstel@riker.com |

**Page 3**

INDEX

DEPONENT: TED M.ROTH, M.D.          PAGE:

Direct Examination by Mr. Faes          4
Cross Examination by Ms. Katz Gerstel     217

EXHIBITS:                    PAGE:

Exhibit-No. 1    Notice of Deposition      7
Exhibit-No. 1-A   Invoices              9

Exhibit-No. 2    Defense Expert General   15
                 Report
Exhibit-No. 3    General Reliance List    42
Exhibit-No. 3-A   Supplemental General    43
                 Reliance List
Exhibit-No. 4    Curriculum Vitae       47
Exhibit-No. 5    Dollars for Docs       95
Exhibit-No. 6    Report from CMS.gov     98
Exhibit-No. 7    ProPublica report      100
Exhibit-No. 8    Contract with Ethicon  106
Exhibit-No. 9    E-mail chain          116
Exhibit-No. 10   Contract with Ethicon  125

Exhibit-No. 11   Article published by
                 Dr. Roth             211

Exhibit-No. 12   Article published by
                 Dr. Roth             211

|  | Page 4 |
|---|---|
| 1 | TRANSCRIPT OF PROCEEDINGS |
| 2 | - - - - - - - - - - |
| 3 | TED M. ROTH, M.D., having been duly sworn by |
| 4 | the Notary Public, was examined and testified |
| 5 | as follows: |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. FAES: |
| 8 | Q.  Good morning, Dr. Roth. |
| 9 | A.  Morning. |
| 10 | Q.  My name is Andy Faes, and I represent various |
| 11 | plaintiffs in this litigation, and I'm here |
| 12 | today to take your deposition regarding your |
| 13 | opinions on the TVT and TVT-O. |
| 14 |     Do you understand that? |
| 15 | A.  Yes. |
| 16 | Q.  And you understand that you're under oath and |
| 17 | must tell the truth, right? |
| 18 | A.  Yes. |
| 19 | Q.  If I ask you a question any time today that |
| 20 | you don't understand, please feel free to let |
| 21 | me know, and I'll try to rephrase the |
| 22 | question.  Otherwise, if you answer the |
| 23 | question, I'll assume that you understood the |
| 24 | question as asked. |

|  | Page 5 |
|---|---|
| 1 |     Fair enough? |
| 2 | A.  Yeah. |
| 3 | Q.  You've been deposed before, right? |
| 4 | A.  I have. |
| 5 | Q.  How many times? |
| 6 | A.  Twice. |
| 7 | Q.  And one of those cases was a case involving an |
| 8 | Ethicon pelvic mesh product, right? |
| 9 | A.  As a -- yes.  I was an implanter. |
| 10 | Q.  And what was the other case? |
| 11 | A.  The other case was a med mal case. |
| 12 | Q.  And what was your role in that case? |
| 13 | A.  The defendant. |
| 14 | Q.  And what was -- what did that case |
| 15 | involve? |
| 16 | A.  The nature of the case was a claim of delayed |
| 17 | diagnosis. |
| 18 |     Do you need details of the facts? |
| 19 | Q.  What -- well, first of all, when approximately |
| 20 | did this occur? |
| 21 | A.  2007.  And it involved an elderly woman with |
| 22 | hematuria, and they claimed delayed diagnosis |
| 23 | in advanced bladder cancer. |
| 24 | Q.  And what was the resolution of that case? |

2 (Pages 2 to 5)

Ted M. Roth, M.D.

Page 6

1   A.  It was settled.
2   Q.  Did that case involve a pelvic mesh at
3   all?
4   A.  No.
5   Q.  Do you recall who the -- who any of the
6   lawyers were who were involved in that case?
7   A.  It was a local law firm from Maine.
8   Q.  And that kind of leads into my next
9   question.
10      Have you ever been a party to a lawsuit
11   before, other than that case?
12   A.  I was named in one, two -- two suits from my
13   time during residency at Duke, and I was
14   dropped from both of those without any sort
15   of, you know, payment or settlement.
16      And then I was a defendant in another
17   case in Mississippi, and that is kind of
18   ongoing, unfortunately.
19   Q.  Okay.  What is the -- what's the case in
20   Mississippi involve?
21   A.  The case in Mississippi was I was working at a
22   planned parenthood-like clinic, and the
23   patient claims that I improperly performed
24   termination of pregnancy.

Page 7

1      And that case is sort of ongoing, or
2   there's issues with the case that I -- I can't
3   discuss; let's just say that.
4   Q.  Okay.  When did the procedure that's the
5   subject of the lawsuit take place?
6   A.  March of 2004 or -- I think it was March of
7   2004.
8   Q.  Okay.  I'm going to hand you what's been
9   marked as Exhibit No. 1 to your deposition.
10      (Deposition Exhibit No. 1 was marked for
11   identification.)
12   BY MR. FAES:
13   Q.  And that's the notice of your deposition here
14   today.
15      Have you ever seen that document before?
16   A.  (Examining document) I have not.
17   Q.  So you haven't had an opportunity to review
18   any of the various document requests or -- and
19   requests for production of documents that are
20   attached to this notice?
21   A.  I -- I don't think I've seen a formal notice
22   of my deposition today, no.
23   Q.  Have you brought any materials or items with
24   you here today for this deposition?

Page 8

1   A.  I have my report, and I have selected medical
2   literature, and I think that Diana has my CV.
3      MS. KATZ GERSTEL:  And I'll just say for
4   the record that we filed a response to this
5   notice yesterday.
6      MR. FAES:  I know you did.
7   BY MR. FAES:
8   Q.  Have you brought any bills or invoices for
9   your work in this case?
10   A.  I have not, no.
11   Q.  Have you billed or invoiced any of your work
12   in this case yet?
13   A.  When you say in this case, you mean for the
14   production of the report or for various cases
15   that I have reviewed?
16   Q.  I'm specifically talking about your invoices
17   for the TVT and TVT-O general report that
18   we're here today to discuss.
19   A.  I have, yes.
20   Q.  And approximately how many hours have you
21   billed so far today?
22   A.  Geez --
23      MS. KATZ GERSTEL:  You know, can I just
24   say that I actually brought invoices.

Page 9

1      MR. FAES:  Okay.
2      MS. KATZ GERSTEL:  They're not
3   broken down by TVT, TVT-O, but I have
4   invoices.
5      MR. FAES:  Okay.  I'm going to mark
6   Exhibit 1-A to your deposition, and I am --
7   for the record this is the invoices that
8   counsel has brought with her to the deposition
9   today.
10      (Deposition Exhibit No. 1-A was marked
11   for identification.)
12   BY MR. FAES:
13   Q.  Doctor, do these represent the various
14   invoices that you've submitted for your work
15   as a litigation consultant with Ethicon and
16   Johnson & Johnson regarding the pelvic mesh?
17   A.  (Examining document) I mean, they're not the
18   exact bills I submitted, but I guess it's --
19   it's a distillation of those bills.  The
20   numbers look right.
21   Q.  So, for example, the very first page of
22   Exhibit No. 1-A, is that an invoice
23   actually prepared by you, or is that not an
24   invoice prepared by you?

3 (Pages 6 to 9)

Ted M. Roth, M.D.

Page 10

1    A. (Examining document) Well, it's -- it's not
2       the actual -- I didn't actually type this, so
3       it wasn't prepared by me.  But I have prepared
4       a bill that was e-mailed to Diana, and this
5       appears to be a distillation of that.
6    Q. So do you know who prepared the invoice or the
7       page 1 of Exhibit 1-A?
8    A. I -- I don't.
9    Q. It's not something that was prepared by you
10      though, right?
11   A. Not by me, but it's an accurate representation
12      of one of the bills that I submitted to Diana.
13         MR. FAES:  Okay.  Just for the record,
14      we requested that we be provided with
15      all of the actual bills he has submitted in
16      this case.
17   BY MR. FAES:
18   Q. Doctor, I've only had a brief second to go
19      through the invoices and payments marked as
20      Exhibit 1-A.
21         But does it appear accurate that so far
22      you've been paid -- or at least you billed
23      over $125,000 for your work as a litigation
24      consultant with Ethicon and Johnson & Johnson?

Page 11

1    A. That's -- I think that's fair.
2    Q. When were you first approached to be a
3       litigation consultant regarding the TVT and
4       the TVT-O products?
5    A. It was with -- had to be late 2014 or 2015.
6       It was a different attorney who worked for a
7       different firm who is no longer with, I guess,
8       Butler Snow.
9          MS. KATZ GERSTEL:  Doug DiPaola.
10         THE WITNESS:  Yeah.
11   A. I think I was contacted by him in late 2014 or
12      2015 and signed an agreement at that point.  I
13      had maybe one phone conversation with him and
14      one meeting with him, and there was a
15      time that went by and nothing was happening.
16      And then I was recontacted by Diana.
17   BY MR. FAES:
18   Q. So you were first approached about potentially
19      being a witness in late 2014 and 2015, and
20      signed an agreement at that time, correct?
21   A. Yes.
22   Q. When did you actually start work on the TVT
23      and TVT-O General Expert Report?
24   A. Let's see, I met with -- I had a phone

Page 12

1       conversation with Diana, met with her in
2       Boston in May of 2016.  I think that's about
3       right.  And then we had a three-hour
4       conversation, meeting in Boston; then she told
5       me what my deadlines were, which were pretty
6       quick.
7    Q. Prior to becoming involved in this litigation
8       as an expert witness for Ethicon and
9       Johnson & Johnson, have you ever been an
10      expert witness in any kind of case before?
11   A. Not for mesh cases, no.  I've done a little
12      bit of case reviews for one of the local law
13      firms here in Portland, but they weren't --
14      they weren't mesh litigation cases.  And the
15      cases didn't proceed to the point where I was
16      deposed.  I reviewed the cases, wrote a
17      report.
18   Q. And what kind of case reviews did you do for
19      the local firm in Portland?
20   A. They're both -- one was a med mal case.  The
21      other was a patient complaint to the medical
22      board about this particular surgeon, and the
23      attorney wanted me to review the case, look at
24      the merits of the case.

Page 13

1    Q. So essentially your job in those cases
2       was to review medical records and write a
3       report?
4    A. Yes.
5    Q. And what time frame did your -- did
6       this case review for the local law firms in
7       Portland take place?
8    A. I think one was probably in 2008.  One was in
9       2009.
10         I'm actually in the middle of one, a
11      third, currently, that I will probably be
12      deposed on at some point, and that is -- it's
13      sort of a quasi-mesh case.  It's more of --
14      the accusation against the implanter was
15      inadequate informed consent for the mesh.
16   Q. And what kind of a mesh was involved in that
17      case?
18   A. It was an AMS product.
19   Q. What kind of AMS product?
20   A. It was the Apogee.
21   Q. And when was that implant -- when was the
22      Apogee implanted in that case?
23   A. I think it might have been 2009, 2010.
24   Q. And that's ongoing, and you haven't

4 (Pages 10 to 13)

Ted M. Roth, M.D.

Page 14

1    issued a report in that case yet, right?
2    A.  What's interesting for that, I met with the
3        attorney a couple of times.  We -- I read
4        through all the records.  We had a
5        conversation.  He actually generated the
6        report.  I think in Maine they don't require
7        experts to necessarily generate a report, and
8        so that's -- that's ongoing, so I've yet to be
9        deposed in that matter.
10   Q.  So am I correct that you've done approximately
11       three case reviews for the same --
12   A.  For the same firm.
13   Q.  -- the same Portland firm?
14           What firm is that?
15   A.  Oh, it's -- you guys always have so many names
16       in your firms.  I -- I'm blanking out on the
17       name of the firm.  It's, you know, a gazillion
18       different last names of the firm.
19   Q.  And of those -- and those three case reviews,
20       was your role to write a report for the
21       plaintiff or the defendant in those
22       cases?
23   A.  The attorneys were all representing the
24       defendant.  I mean, again, one of the cases

Page 15

1    was not -- she wasn't being sued.  It was just
2    that that law firm handles complaints to the
3    medical board.  So she wasn't -- it wasn't a
4    suit.  But the other two -- actually, the
5    other two cases involved the same physician,
6    and I was working on -- on his defense.
7    Q.  So of all the cases where you've been an
8        expert witness in litigation, it's always been
9        for the defendant; is that accurate?
10   A.  Correct.
11   Q.  I'm going to hand you what's been marked as
12       Exhibit No. 2 to your deposition, if you need
13       it.  I understand you already have a copy
14       of it.
15           (Deposition Exhibit No. 2 was marked for
16       identification.)
17   BY MR. FAES:
18   Q.  Is this the TVT and TVT-O expert report that
19       you issued in this case?
20   A.  (Examining document) Yes.
21   Q.  And this report covers both the TVT and the
22       TVT-O, correct?
23   A.  Correct.
24   Q.  Is there any particular reason why you chose

Page 16

1    to issue one expert report for both the TVT
2    and TVT-O, as opposed to doing a separate
3    report for the TVT and a separate report for
4    the TVT-O?
5    A.  No particular reason.
6    Q.  Do you feel that the TVT and the TVT-O have
7        identical safety profiles?
8    A.  I think that they do have identical safety
9        profiles, but I think that some of the
10       complications from the TVT and TVT-O are a
11       little different based on the nature of the
12       passage of the -- the mesh material, but I
13       think that they're both very safe.
14   Q.  So you'd agree then that the TVT and TVT-O
15       have different complication rates with regard
16       to certain complications, right?
17   A.  They have -- yes, I would agree that they have
18       different complication rates in regards to
19       certain complications, yes.
20   Q.  And despite knowing that they had these
21       different complication rates with regard to
22       certain complications, you still felt it was
23       appropriate to combine all of your opinions
24       regarding both those products in a single

Page 17

1    report?
2           MS. KATZ GERSTEL:  Object to form.
3    A.  You know, again, I think they're sort of
4        variations of a sling technique.  I think it
5        was pretty reasonable to combine them into one
6        report.  A lot of the data, you know, compares
7        both the retropubic and the transobturator
8        techniques.  The mesh is essentially the same.
9        I didn't see a need to have separate reports.
10   BY MR. FAES:
11   Q.  Do you believe that the TVT and TVT-O have
12       identical efficacy profiles?
13           MS. KATZ GERSTEL:  Object to form.
14   A.  We have slightly longer term data for the
15       retropubic TVT than for the TVT-O.  Again,
16       depending upon what study you read, what
17       meta-analysis you read, I think that most of
18       us would say that the efficacy is relatively
19       equivalent.
20   BY MR. FAES:
21   Q.  So you believe that the efficacy profile of
22       the TVT versus the TVT-O is relatively
23       equivalent but not equivalent?
24           MS. KATZ GERSTEL:  Object to form.

5 (Pages 14 to 17)

Ted M. Roth, M.D.

Page 18

1   A. They're not exactly the same.
2   BY MR. FAES:
3   Q. Okay.  And despite having the opinion that the
4      efficacy profile between the TVT and the TVT-O
5      is not exactly the same, you still felt it was
6      appropriate to combine your opinions for both
7      those products in a single report; is that
8      accurate?
9           MS. KATZ GERSTEL:  Object to form.
10  A. I -- I really didn't feel the need to write
11     separate reports on the TVT and the TVT-O.
12  BY MR. FAES:
13  Q. Now, are you -- with regard to the TVT, are
14     you offering opinions as to the safety and
15     efficacy of both the mechanically-cut TVT and
16     the laser-cut TVT?
17  A. I can offer opinions on both.  I can tell you
18     that in my practice, I use the
19     mechanically-cut TVT.
20  Q. And you understand that the mechanically-cut
21     and the laser-cut TVT are two distinct
22     different products, correct?
23          MS. KATZ GERSTEL:  Object.
24  A. I know that the manufacturing basis for those

Page 19

1      products is -- is obviously different, and I
2      know that the -- there's labeling on the box
3      that is different that distinguishes laser-cut
4      from mechanically-cut.  I think there's an L
5      on the laser-cut box.
6           The -- the handling characteristics in my
7      hands are very similar between the two
8      products, but I -- I would agree with you that
9      they're two slightly different products.
10  BY MR. FAES:
11  Q. So knowing that the TVT and the -- strike
12     that.
13          Knowing that the mechanically-cut TVT and
14     the laser-cut TVT are two distinctly different
15     products with two distinct different order
16     codes and identifiers, do you feel that the
17     safety profile for the mechanically-cut TVT is
18     identical to the safety profile for the
19     laser-cut TVT?
20          MS. KATZ GERSTEL:  Object to form.
21  A. I'm not aware of any difference in efficacy or
22     any difference in the safety profile between
23     the laser-cut and the mechanically-cut TVT
24     products.  I can't recall a single -- I can't

Page 20

1      recall a single article comparing the two in
2      terms of efficacy or safety profile.
3           BY MR. FAES:
4   Q. So is it going to be in your opinion -- strike
5      that.
6           Do you intend to offer an opinion in this
7      case to a reasonable degree of medical
8      certainty that the safety profile between the
9      mechanically-cut TVT retropubic and the
10     laser-cut TVT retropubic are identical?
11  A. Yes.
12  Q. And what is the -- what is the basis for that
13     opinion?
14  A. Well, it's -- it's not based on the medical
15     literature, because I -- again, I can't
16     find -- I don't recall seeing a randomized
17     controlled trial looking at laser-cut versus
18     mechanically-cut mesh.  However, I've used
19     both products and followed patients, you know,
20     out, and I've seen no difference in efficacy
21     or adverse events with either product.
22  Q. So you'd agree that your opinion that the
23     efficacy rate for the TVT mechanically-cut --
24     strike that.

Page 21

1           You'd agree that your opinion that the
2      safety profile for the TVT mechanically-cut
3      and the laser -- TVT laser-cut is identical
4      can't be based on the medical literature
5      because there's been no randomized controlled
6      trial specifically comparing the safety
7      profile of the TVT retropubic mechanically-cut
8      versus the TVT retropubic laser-cut, correct?
9           MS. KATZ GERSTEL:  Object to form.
10  A. That's a very long question.
11  BY MR. FAES:
12  Q. It is.
13  A. I -- I can tell you that in my experience,
14     I've seen really no difference in the handling
15     characteristics or in efficacy or in adverse
16     events with the two different products.
17          Can I say that the efficacy is the same
18     in my hands?  Yes.
19          Globally, I can't make a comment on that.
20  Q. So your opinion that the safety profile of the
21     TVT retropubic laser-cut and the TVT
22     retropubic mechanically-cut are identical is
23     based on your personal experience, not your
24     review of the medical literature; is that

6  (Pages 18 to 21)

Ted M. Roth, M.D.

Page 22

1    accurate?
2        MS. KATZ GERSTEL:  Object to form.
3    A.  Well, my review of the medical literature --
4    in my review of the medical literature, I
5    don't see -- I haven't seen a comparison trial
6    between the two products.  So my opinion is
7    based on my personal experience.
8    BY MR. FAES:
9    Q.  So since your opinion in that regard is based
10   on your personal experience, you'd agree that
11   it's not based on any formal analysis
12   that you've done, correct?
13       MS. KATZ GERSTEL:  Object to form.
14   A.  How do you define formal analysis?
15   BY MR. FAES:
16   Q.  Well, I would define formal analysis as have
17   you specifically analyzed a number of
18   patients -- well, strike that.
19       What would you define as a formal
20   analysis?
21   A.  I guess I'm the one who is supposed to answer
22   the questions today.
23       I've -- I've gone back and done a
24   retrospective review of my patients who have

Page 23

1    had laser-cut versus mechanically-cut TVTs,
2    and I guess I'm sort of privileged in that I
3    live in Maine and it's a small state and
4    people tend not to, you know, leave the state
5    or -- and they tend to come back to doctors
6    who've implanted them.  So I've had an
7    opportunity to follow these patients out for
8    several years, and I've not seen any
9    difference in efficacy or any adverse events
10   with the two different products.
11   Q.  So your opinion that the safety profile
12   between the mechanically-cut and the laser-cut
13   TVT retropubic is based on your retrospective
14   review of your own patients?
15   A.  Of my own patients, yes.
16   Q.  And is any of your analysis regarding your
17   retrospective review of your patients
18   disclosed anywhere in your expert report?
19   A.  I don't think that I made a specific comment
20   about my own experience with laser-cut versus
21   mechanically-cut.
22       Again, I'm using mechanically-cut mesh at
23   this point mostly because I think of a cost
24   issue of my facility.

Page 24

1        But, no, I don't think that we made a
2    specific comment as to my personal experience
3    with laser-cut versus mechanically-cut, mostly
4    because I don't really distinguish between the
5    two in terms of handling characteristics,
6    efficacy or safety.
7    Q.  So this retrospective review that you did of
8    mechanically-cut TVT versus laser-cut TVT, how
9    many patients were involved?
10   A.  It was probably at least a hundred.
11   Q.  How many of those patients were -- well, let
12   me follow up on that, so strike that.
13       Is it almost -- I mean, what -- do you
14   know the exact number as you sit here today?
15   A.  I mean, I could -- I could certainly get back
16   to you on that, but I think it's a hundred
17   patients.  I probably looked at 50 and 50,
18   just pulled them, you know, from the medical
19   record and then referenced the implant log at
20   the hospital.
21   Q.  And so you've kind of anticipated my next
22   question.
23       How many of these patients were
24   laser-cut, and how many of them were

Page 25

1    mechanically-cut?
2    A.  I mean, it's just a personal retrospective
3    review.  It's not published.  But, you know, I
4    was curious as to know whether there was any
5    sort of differences between the two products.
6    So I just, you know, looked at my experience
7    with them and pulled 50 charts, you know,
8    randomly from each, the laser-cut and
9    mechanically-cut groups, and sort of looked
10   through their records, the electronic medical
11   record.  Really no differences between --
12   between the two groups.
13   Q.  And what was the average length of follow-up
14   between the two groups?
15   A.  The follow-up was anywhere from two to four
16   years, I think.
17   Q.  You think?  Have you done any kind of write-up
18   or written analysis?
19   A.  No.  It's not -- it's not published.  I didn't
20   write it up.  I just sort of, you know, sat at
21   the computer and pulled charts and pulled out
22   the implant logs and sort of looked at this.
23   Q.  Do you know what percentage of patients had
24   been lost to follow-up?

7 (Pages 22 to 25)

Ted M. Roth, M.D.

Page 26

1  A. No, I don't. I mean, it wasn't -- again, it
2     wasn't something I was trying to publish, so
3     it wasn't a very rigorous analysis.
4        MR. FAES: So I would just state to
5     counsel that if Dr. Roth is going to base his
6     opinion based on this chart review, we would
7     request to be provided with the basis for his
8     opinions.
9  BY MR. FAES:
10  Q. Doctor, I just want to follow up briefly on
11     something that you said regarding the TVT
12     retropubic device.
13        You said that you're mainly using the TVT
14     retropubic mechanically-cut mesh right now
15     because of a cost issue; did I hear that
16     correctly?
17  A. Yes.
18  Q. What cost issue are you referring to
19     specifically?
20  A. My understanding is that the TVT-Exact is a
21     bit more expensive, at least at our facility,
22     than the older TVT retropubic.
23  Q. So you know that the TVT-Exact is offered in
24     laser-cut mesh only; it's not offered --

Page 27

1  A. Correct.
2  Q. -- with a mechanically-cut mesh option,
3     correct?
4  A. Correct.
5  Q. What about the -- just the regular TVT
6     retropubic laser-cut; is there some reason why
7     you don't use that as opposed to the
8     mechanically-cut TVT retropubic?
9  A. I think we've, you know, we've had the
10     mechanically-cut. I don't know the specifics
11     of the contract pricing, but I've been told,
12     you know, to try to limit costs, and we've
13     continued to use the mechanically-cut TVT
14     retropubic.
15        And I've continued to use the TVT-O,
16     which is mostly mechanically-cut, as well, as
17     opposed to the Abbrevo.
18  Q. If the TVT-Exact device were the same price as
19     the TVT mechanically-cut retropubic device
20     that you use currently, would you switch to
21     the TVT-Exact device?
22  A. Not necessarily.
23  Q. So if you wouldn't switch to the TVT-Exact
24     device if it was the same price as the TVT-R

Page 28

1     mechanically-cut, why did you say that you
2     were primarily using the mechanically-cut mesh
3     TVT-R right now because of a cost issue?
4  A. I'm sorry. I missed the -- can you repeat
5     that?
6  Q. Sure. I guess I'm a little confused, Doctor.
7        You first said that you were using the
8     mechanically-cut mesh TVT-R because of a cost
9     issue, but then you said that you wouldn't
10     necessarily switch to the TVT-Exact, which is
11     a laser-cut, if it were the same price as the
12     TVT retropubic mechanically-cut. So why did
13     you say --
14  A. So you're asking -- you're asking why -- I'm
15     sorry to interrupt. You're asking why I favor
16     the retropubic TVT versus the TVT-Exact?
17  Q. No, I'm not. I'm asking why did you say --
18     why did you state earlier that you were
19     primarily using the mechanically-cut mesh TVT
20     retropubic because of a cost issue?
21        MS. KATZ GERSTEL: Object.
22  A. I still think that you're asking why I would
23     favor the regular retropubic TVT if it were
24     the same cost as the laser-cut Exact, and I

Page 29

1     would favor the regular TVT because I actually
2     favor the handles more so and the trocars more
3     than the TVT-Exact.
4  BY MR. FAES:
5  Q. So you'd agree then it's not necessarily the
6     mesh in the TVT retropubic mechanically-cut
7     that you favor over the TVT-Exact?
8  A. I would agree that -- well, for one there is
9     the cost issue, but the other is I'm pretty
10     comfortable with the original trocar passage
11     and the handles. So I favor that product over
12     the Exact.
13  Q. Do you believe that the safety profile for the
14     TVT-O mechanically-cut mesh is identical to
15     the safety profile for the TVT laser -- strike
16     that.
17        Do you believe that the safety profile
18     for the TVT-O mechanically-cut mesh is
19     identical to the safety profile for the TVT-O
20     laser-cut mesh?
21  A. Again, I don't think that I've seen scientific
22     literature to say that -- that there's a
23     difference or that there is not a difference.
24     I've always used the mechanically-cut TVT-O.

8 (Pages 26 to 29)

Ted M. Roth, M.D.

Page 30

1    I've used the Abbrevo a handful of times.  I
2    have not seen a difference between laser-cut
3    and mechanically-cut transobturator passage of
4    the mesh.
5    Q. But again, you'd agree that with regard to the
6    TVT-O, there's been no randomized controlled
7    study specifically looking at the safety
8    profile of the TVT-O mechanically-cut mesh to
9    the TVT-O laser-cut mesh, correct?
10   A. To the best of my recollection, I've not found
11   a randomized controlled trial to -- that
12   compares the two, no.
13   Q. So again, like the TVT, your opinion that
14   the safety profile of the TVT-O
15   mechanically-cut is identical to the TVT-O
16   laser-cut is based on your personal
17   experience?
18        MS. KATZ GERSTEL:  Objection.
19   A. Again, I don't know that I can say that they
20   are equivalent.  I have more experience with
21   the mechanically-cut TVT-O than with the
22   Abbrevo, even though I was -- you know, I had
23   used the Abbrevo, and was a proctor for the
24   Abbrevo.  I haven't seen any sort of clinical

Page 31

1    difference in the patients that I've, you
2    know, taken care of.
3    BY MR. FAES:
4    Q. Have you done a retrospective review of the
5    TVT-O like you have for the TVT product?
6    A. I haven't.
7    Q. Have you done any kind of formal analysis with
8    regard to the safety profile of the TVT-O
9    mechanically-cut versus laser-cut mesh in your
10   own patients like you have for the TVT
11   product?
12   A. No.  The -- the Abbrevo -- again, it's another
13   sort of cost issue.  The Abbrevo is
14   significantly more expensive than the regular
15   TVT-O, and I also prefer how the original
16   TVT-O handles versus the Abbrevo.
17        So I've -- I don't think I have enough
18   patients to really sort of come up with a
19   Gestalt as to safety and efficacy because I
20   just -- my preference is just to use the TVT-O
21   mechanically-cut.
22   Q. Well, you understand that when I'm asking
23   about the differences between the TVT-O
24   mechanically-cut and the TVT-O laser-cut, I'm

Page 32

1    specifically talking about the TVT-O, not
2    the -- I'm not including the Abbrevo.
3    A. I see.  Okay.
4    Q. You understand that?
5    A. Okay.  So, no, I mean, I -- I haven't, you
6    know, sort of gone back and looked at any of
7    that.  I've been very happy with the
8    mechanically-cut TVT-O product.
9    Q. Do you know how many -- excluding the Abbrevo,
10   do you know how many -- approximately how many
11   TVT-O laser-cut products you've used during
12   the course of your career as opposed to TVT-O
13   mechanically-cut?
14   A. I don't.
15        I think at one point the rep from the
16   company brought in the laser-cut TVT-Os to
17   try.  This is years ago.  He's no longer my
18   rep.  And my recollection is that it was --
19   they were more expensive than the
20   mechanically-cut TVT-O.  They handled
21   similarly, so I just stuck with the
22   mechanically-cut TVT-O.
23   Q. So do you recall what rep it was that first
24   brought in the TVT-O laser-cut mesh for you to

Page 33

1    evaluate?
2    A. That was probably Kendall Bremner.
3    Q. When did that occur?
4    A. I -- I really have no recollection.  He hasn't
5    been my rep for -- for many years.
6    Q. And your recollection was after evaluating,
7    that it -- the mesh of the TVT-O laser-cut
8    handled similarly but handled a little bit
9    differently than the TVT-O mechanically-cut;
10   is that accurate?
11        MS. KATZ GERSTEL:  Object to form.
12   A. I don't think it handled differently at all.
13   I think it was sort of the cost issue again.
14   They handled similarly, and it seemed like
15   outcomes were the same when I followed those
16   patients out.  So there wasn't really a reason
17   to switch or to change, especially when it was
18   a little more expensive.
19   BY MR. FAES:
20   Q. Well, you keep saying that they handled
21   similarly, correct?
22   A. Intraoperatively, yes.
23   Q. You'd agree that similarly is not the same as
24   identically, right?

9 (Pages 30 to 33)

Ted M. Roth, M.D.

Page 34

1    A. Then I would say that they handled
2       identically.
3    Q. So you're changing your testimony to state
4       that you believe the TVT-O laser-cut mesh and
5       the TVT mechanically-cut mesh handled
6       identically; is that accurate?
7          MS. KATZ GERSTEL: Objection.
8       Argumentative.
9    A. The -- in my hands -- and again, this has been
10      years since I've used the laser-cut TVT-O. I
11      don't know that I -- it's hard for me to sort
12      of distinguish between, you know, similarly
13      and identically. Identically is very strong,
14      you know, language. You know, things that are
15      identical are exactly identical, and I don't
16      know that, you know, every sling case that I
17      do is identical and every way that I put a
18      sling in is identical. I put a sling in
19      someone in a similar fashion to putting a
20      sling in someone else. The way I tension
21      slings is similar, but it's not always
22      identical. So it's hard for me to say that
23      they handle identically.
24   Q. Fair enough, Doctor.

Page 35

1          Now, on your report, again, it's combined
2       with TVT and TVT-O, and I think we've
3       established that you do intend to offer
4       opinions with regard to both the laser-cut and
5       the mechanically-cut configurations for both
6       of those products, correct?
7    A. Yes.
8    Q. Is there any reason why on the title of this
9       report you didn't state that your general
10      report was for TVT-O mechanically-cut, TVT-O
11      laser-cut, TVT-O mechanically-cut and TVT-O
12      laser-cut as opposed to just TVT and TVT-O?
13         MS. KATZ GERSTEL: Objection.
14   A. I didn't realize the title needed to be all
15      that detailed, I guess.
16   BY MR. FAES:
17   Q. But you'd agree that this expert report that
18      you are offering opinions on, that you are
19      offering opinions on four distinctly different
20      products with distinctly different order codes
21      all within the same report, correct?
22         MS. KATZ GERSTEL: Objection.
23      Mischaracterization.
24   A. I mean, I'm prepared to offer opinions about

Page 36

1       the TVT line of products, both laser-cut and
2       mechanically-cut.
3    BY MR. FAES:
4    Q. So you're prepared to offer opinions regarding
5       the entire TVT line of products now, including
6       the Abbrevo, the Secur and the TVT-Exact?
7          MS. KATZ GERSTEL: Objection.
8    A. Well, I wouldn't say the TVT-Secur, although I
9       have a sense of experience with that. We're
10      talking about the TVT and the TVT-O.
11         The fact that they're boxed differently,
12      the fact that there's an L on the laser-cut
13      box versus the mechanically-cut box, the fact
14      that, you know, J & J makes a distinction
15      between the products, clinically they have
16      similar efficacy and handling characteristics
17      and safety profiles. So I'm prepared to offer
18      opinions about TVT and TVT-O laser-cut and
19      mechanically-cut.
20   BY MR. FAES:
21   Q. But just to be clear for the record, you're --
22      you are offering opinions regarding four
23      distinctly different products with four
24      distinct order codes, correct?

Page 37

1          MS. KATZ GERSTEL: Objection.
2    A. Again, I'm -- I'm not subject or familiar with
3       the order codes or all of that. I know that
4       the laser-cut products have L on the box. We
5       are talking about laser-cut TVT versus
6       mechanically-cut TVT and TVT-O
7       mechanically-cut and TVT-O laser-cut, and I'm
8       prepared to offer opinions about those.
9    BY MR. FAES:
10   Q. Are you offering an opinion in this case
11      regarding the TVT clear mesh and also the TVT
12      blue mesh?
13   A. I mean, I don't really distinguish between the
14      original TVT, which was not blue, and
15      subsequent iterations of the TVT, which were
16      then made blue, so yes.
17   Q. So you feel that the safety profile of the TVT
18      clear mesh is identical to the safety profile
19      of the TVT blue mesh?
20   A. If you're referring to -- when you say clear
21      mesh, the TVT that was released before they
22      decided to dye it blue, then yes.
23   Q. Do you know whether Ethicon and Johnson &
24      Johnson issued a report -- well, strike that.

Ted M. Roth, M.D.

Page 38

1    Let me back up.
2        First of all, do you know when Ethicon
3    and Johnson & Johnson first started offering
4    the TVT retropubic in a blue mesh as opposed
5    to a clear mesh?
6    A. I don't recall.
7    Q. Do you know whether or not Ethicon and Johnson
8    & Johnson issued a report prior to releasing
9    the TVT mesh in blue stating that -- or
10   concluding that the change in the mesh from
11   clear to blue represented a potential change
12   that could affect the safety and efficacy of
13   the device?
14       MS. KATZ GERSTEL: Object to form.
15   A. I'm -- I'm not aware of that communication.
16   BY MR. FAES:
17   Q. If assuming that to be true, that Ethicon
18   and Johnson & Johnson concluded that a
19   change in the TVT mesh from clear to blue was
20   a change that could affect the safety and
21   efficacy of the device, would that change any
22   of your opinions in this case as to whether or
23   not the safety profile of the TVT and clear
24   mesh is identical to the TVT blue mesh?

Page 39

1        MS. KATZ GERSTEL: Object to form.
2    A. I guess I'd have to find some medical
3    literature to, you know, support a difference
4    in the clear mesh versus the blue mesh.
5    BY MR. FAES:
6    Q. But you'd agree, at least as to this point,
7    you haven't specifically looked at the
8    literature with regard to the question of
9    whether the safety profile of the TVT clear
10   mesh is different from the safety profile of
11   the TVT blue mesh, correct?
12       MS. KATZ GERSTEL: Object to form.
13   A. I'm not aware of scientific literature
14   differentiating between the clear mesh and the
15   blue mesh in terms of safety, efficacy,
16   adverse events.
17   BY MR. FAES:
18   Q. But my question is, have you, as an expert for
19   Ethicon and Johnson & Johnson, specifically
20   looked at that question?
21       MS. KATZ GERSTEL: Objection.
22   A. I've looked at the medical literature, and
23   I -- to the best of my knowledge, I've not
24   seen medical literature, scientific

Page 40

1    literature, you know, elaborating the
2    difference between the clear and the blue mesh
3    in terms of the safety, adverse events, or
4    efficacy.
5    BY MR. FAES:
6    Q. So if you haven't seen any medical literature
7    on that point, what are you basing your
8    opinion on that the safety and efficacy of the
9    TVT clear mesh and blue mesh is the same?
10       MS. KATZ GERSTEL: Objection.
11   A. My experience with the clear and the blue
12   mesh.
13   BY MR. FAES:
14   Q. So you believe that you have personal
15   experience with the TVT clear mesh?
16   A. I seem to remember that the -- there were TVT
17   with clear mesh early on, but again, it's --
18   it's been years probably since I've seen clear
19   TVT mesh. Maybe 2003, 2004 the mesh was
20   clear, but I -- it's been a long time.
21   Q. Have you ever seen a TVT-O clear mesh, or has
22   that mesh always been blue when you've used
23   it?
24   A. I think that mesh has always been blue.

Page 41

1    Q. Okay. The expert report that's in front of
2    you as -- in front of you marked as Exhibit
3    No. 2, how much time would you say you spent
4    actually writing that report as opposed to
5    reviewing materials?
6    A. Hard to say. I mean, I would be reviewing and
7    writing and then we were, you know, doing a
8    lot of editing, as well. Maybe 25 hours,
9    30 hours of writing and editing and -- as
10   opposed to just pure, you know, reading and
11   reviewing written materials for the report.
12   Q. And how many hours would you say that you
13   spent in reviewing materials for your report?
14   A. You know, I would say at least 50 hours.
15   There were scads of articles, you know, to --
16   to review.
17   Q. How much time did you spend preparing
18   for your deposition today?
19   A. Fifteen hours maybe.
20   Q. And that 15 hours would be at your preparation
21   rate of $600 an hour; is that accurate?
22   A. Yes.
23   Q. And have you billed for that time yet?
24   A. I have not.

11 (Pages 38 to 41)

Ted M. Roth, M.D.

Page 42

1   Q. Okay. So that time is not included in the
2       exhibit marked as 1-A that's in front of you,
3       correct?
4   A. No.
5   Q. Is the expert report marked as Exhibit No. 2
6       in front of you, does that contain a complete
7       and accurate reflection of all the opinions
8       that you intend to offer in this case?
9   A. In regards to TVT and TVT-O, yes.
10  Q. Doctor, I'm going to hand you what's been
11      marked as Exhibit No. 3 to your deposition.
12          (Deposition Exhibit No. 3 was marked for
13      identification.)
14      BY MR. FAES:
15  Q. And can you tell me what Exhibit No. 3 is?
16  A. This is the General Reliance List.
17      MR. FAES: And I'm just going to ask
18      counsel, because in the flurry of all the
19      supplemental reliance lists -- is this his
20      most updated one, or was there a supplemental
21      one that I haven't got?
22      MS. KATZ GERSTEL: Supplemental.
23      MR. FAES: There is a supplemental one
24      that I have got.

Page 43

1       Do you mind if I mark this?
2       MS. KATZ GERSTEL: No, go ahead. It's
3   your copy.
4       MR. FAES: Oh, it's for me.
5       Does he have one for him that I can mark?
6       MS. KATZ GERSTEL: Mm-hmm.
7       MR. FAES: Doctor, what's your first
8   reliance list marked at? I forget.
9       THE WITNESS: This is 3.
10      MR. FAES: Three? So I'll mark your
11  supplemental reliance list as Exhibit 3-A.
12          (Deposition Exhibit No. 3-A was marked
13      for identification.)
14      MR. FAES: Might as well just throw that
15  out.
16      BY MR. FAES:
17  Q. Doctor, is Exhibit 3-A a comprehensive list of
18      all of the materials you've reviewed and
19      relied upon in forming your opinions in this
20      case?
21  A. I mean, there are a few things on here that I
22      did not specifically review, but I really
23      didn't read a lot of some of the expert
24      reports on the back of the list. I was trying

Page 44

1       to focus on my own opinions. But the
2       bibliography here, the list of articles, is
3       consistent with what I've used to generate my
4       reports.
5   Q. What -- which of the expert reports on the
6       back page have you not reviewed?
7   A. I didn't -- I haven't reviewed Jerry Blaivas's
8       TVT-O report. I've reviewed some of
9       Rosenzweig's reports when I first started
10      generating my report. I did not review Bob
11      Shull's Prolift report. I don't think that I
12      reviewed Margolis's TVT-O report or Elliott's
13      reports.
14  Q. You don't think you've reviewed any of
15      Dr. Elliott's reports --
16  A. No.
17  Q. -- that deal with the TVT, TVT General --
18  A. No.
19  Q. -- or the TVT-O Gen?
20  A. No.
21  Q. Who prepared the document in front of you
22      marked as Exhibit 3-A, which is titled
23      Supplemental General Reliance List?
24  A. I mean, some of this is, you know, the medical

Page 45

1       literature from my reports, and so part of it
2       I've -- I've helped prepare as, you know,
3       references for my report, and I think that a
4       lot of this is also from -- from -- from the
5       attorney.
6   Q. Had you seen your supplemental reliance list
7       marked as Exhibit 3-A in front of you prior to
8       this morning?
9   A. Not this actual piece of paper, but I mean, I
10      have on my computer a ton of articles and, you
11      know, J & J documents. And so, I mean, I
12      think this is consistent with, you know,
13      everything, you know, all the databases that I
14      have on my computer; but I haven't seen this
15      physically in front of me.
16  Q. Have you seen it -- just to be clear for the
17      record, have you seen it -- this document
18      marked as Exhibit 3-A, your supplemental
19      reliance list in front of you, in any form,
20      whether physically or electronically, prior to
21      this morning?
22  A. I mean, like I said, I've seen all of the
23      names and all of the articles, you know,
24      sequentially on a -- in the computer file, but

12 (Pages 42 to 45)

Ted M. Roth, M.D.

Page 46

1 not collected in a list form.
2 Q. So you'd agree that you didn't give
3 final approval to the document marked as
4 Exhibit No. 3-A in front of you that you
5 confirmed that you'd reviewed all of the
6 materials on this list prior to it being
7 submitted; is that accurate?
8     MS. KATZ GERSTEL: Objection.
9 A. I did not give final approval, no.
10 BY MR. FAES:
11 Q. Doctor, what percentage of your practice is
12 spent treating women as opposed to men?
13 A. 99.9 percent. I have had to treat two men in
14 the last 12 years because I was one of only a
15 few people doing a procedure called InterStim
16 in the state, and, you know, the anatomy of
17 the back is similar in a man or a woman. So
18 I've had to treat a couple of men with
19 InterStim. But other than that, it's all
20 women.
21 Q. Doctor, I'm going to mark your CV as Exhibit
22 No. 4 and hand that to you.
23     (Deposition Exhibit No. 4 was marked for
24 identification.)

Page 47

1 BY MR. FAES:
2 Q. And this is your current CV, is that
3 correct, or at least as of August of 2016?
4 A. Yeah, August of 2016.
5 Q. Your CV has a number of publications and
6 presentations listed.
7     Are there any clinical studies that
8 you're working on currently that aren't listed
9 on your list of publications or presentations?
10 A. I mean, I submitted an abstract to the ICS
11 meeting that's going to be in the fall, but I
12 wouldn't call it a clinical study. It's more
13 a report, not a clinical study.
14 Q. So it's kind of like the ND Posters that you
15 presented at the ICS meetings in Beijing in
16 2012; is that accurate?
17 A. Well, I mean, it was their choice for them to
18 not be, you know, non-discussion poster
19 presentations. We'll see what ICS, you know,
20 does with my -- with my abstract. It will
21 probably be another poster at the meeting.
22 So --
23 Q. So it's --
24 A. There's oral posters and there's

Page 48

1 non-discussion posters. The non-discussion
2 posters are literally posters that hang in a
3 hall. They're still accepted, but you don't
4 get up in front of your colleagues and, you
5 know, do a formal presentation.
6 Q. So what is the -- what is the subject matter
7 of the presentation or poster that you've
8 submitted for the upcoming ICS meeting?
9 A. It's the use of InterStim sacral
10 neuromodulation in a woman with something
11 called paradoxical puborectalis syndrome.
12 It's defecatory dysfunction, chronic anal
13 rectal pain. And she had failed multiple
14 conservative therapies, and so we used
15 InterStim in her, and she had a pretty
16 dramatic response.
17 Q. So you'd agree that you're not currently
18 working on any clinical studies involving
19 pelvic mesh, correct?
20 A. That's correct.
21 Q. And this is a similar but different question.
22 You're not -- you'd agree that you aren't
23 currently doing any current research on any
24 polypropylene meshes; is that correct?

Page 49

1 A. No.
2 Q. Have you ever written any articles or
3 publications specifically on the Burch
4 procedure, either the open Burch or the
5 laparoscopic Burch procedure?
6 A. Not specifically on Burch procedures and --
7 but I did write a paper years ago about
8 voiding and outlet obstruction after
9 anti-incontinence surgery, and my recollection
10 is that maybe -- I'd have to go back and look,
11 but it might have been that some of those
12 patients did have Burches, but it's been
13 14 years.
14 Q. You're referring to the --
15 A. Delayed voiding and outlet obstruction after
16 anti-incontinence surgery.
17 Q. Okay. Have you ever written a -- written or
18 done research specifically on the autologous
19 fascial sling?
20 A. No research and no reports on that.
21 Q. Do you consider yourself an academic
22 physician?
23 A. I think that people who are in -- who are in
24 teaching institutions would probably say that

13 (Pages 46 to 49)

Ted M. Roth, M.D.

Page 50

1    they are academic.  I like to write some
2    papers and occasionally do some teaching.  So
3    in that regard I'm quasi-academic.
4    Q.  Yeah, that's actually about the answer I would
5        expect from you.  Usually I get a simple yes
6        or no, but you're kind of unique in that
7        you -- you're not -- you're not affiliated
8        with any university or learning institution,
9        right?
10   A.  I'm not, no.
11   Q.  But yet you still continue to regularly
12       publish articles fairly regularly over the
13       course of your career, right?
14   A.  Yeah.  It's fun.
15   Q.  Would you agree that you don't hold yourself
16       out as an expert in chemical engineering?
17   A.  I'm not an expert in chemical engineering, no.
18   Q.  Would you agree that you're not an expert in
19       pathology?
20   A.  Well, that's kind of a broad question.  I'm
21       not a pathologist, but I'm familiar with, you
22       know, the pathology as it pertains to, you
23       know, what I do, pathologic appearance of
24       bladder epithelium, pathologic appearance of

Page 51

1    the vulva, pathologic appearance of, you know,
2    ovaries.  So I'm not a pathologist, but I'm
3    familiar with the pathology of the disease
4    processes that I deal with.
5    Q.  You've explanted a number of different
6        pelvic meshes in the course of your career,
7        correct?
8    A.  I have.
9    Q.  Is it your normal practice to send any of
10       those explanted materials out for pathology?
11   A.  Every time.
12   Q.  Would you agree that you're not an expert in
13       polymer chemistry?
14   A.  I am definitely not an expert in polymer
15       chemistry.
16   Q.  Would you agree that you're not a biomedical
17       engineer?
18   A.  I'm not.
19   Q.  Would you agree that you've never done any
20       bench research on polypropylene mesh?
21   A.  I have not.
22   Q.  Would you agree that you've not done any lab
23       research on polypropylene mesh?
24   A.  I have not.

Page 52

1    Q.  Would you agree that you've never done any
2        kind of pathological or pathology analysis on
3        an explanted polypropylene mesh?
4    A.  I have not.
5    Q.  Would you agree that you're not a biomaterials
6        specialist?
7    A.  That's -- again, I sort of -- how do you
8        define a biomaterials specialist?  I'm -- I'm
9        comfortable with the -- the meshes and the
10       allografts and the autografts that I've used,
11       but I'm certainly not employed in industry as
12       someone who develops or manufactures
13       biomaterials.
14   Q.  Have you ever published any opinions --
15       published -- that polypropylene does not
16       degrade in the human body?
17   A.  I've published no opinions about polypropylene
18       whatsoever.
19   Q.  Have you ever -- well, I think you've already
20       answered the next question, but I'm going to
21       ask it anyway.
22           So you'd agree then that you've never
23       published opinions that polypropylene does not
24       create a foreign body reaction in the body?

Page 53

1    A.  Yeah.  I mean, I think I've answered that I
2        haven't published anything on polypropylene in
3        that regard.
4    Q.  When were you -- when did you first implant a
5        midurethral polypropylene sling?
6    A.  2003 or -- 2003 probably.
7    Q.  And what was the first midurethral
8        polypropylene sling that you implanted?
9    A.  It was a retropubic TVT.
10   Q.  And who trained you on how to put that in?
11   A.  I think it was -- I think it was Neeraj Kohli,
12       actually, back in 2003.
13   Q.  And was that during a training seminar that
14       was sponsored by Ethicon and Johnson &
15       Johnson?
16   A.  It was.
17   Q.  When were you -- when did you first put the
18       TVT-O device in for the first time?
19   A.  I mean, let's see, I -- actually I put in TOTs
20       I think in late -- in 2004 and TVT-O 2005,
21       2006.  Good grief, I can't remember.
22   Q.  And when you say TOTs in 2004, are you
23       referring to the Monarc device or some other
24       device?

14 (Pages 50 to 53)

Ted M. Roth, M.D.

Page 54

1    A.  The Monarc.
2    Q.  So you'd agree that the first transobturator
3        midurethral sling that you were trained to put
4        in was the Monarc device, not the TVT-O?
5    A.  It was before the TVT-O was, so yes.
6    Q.  And when you -- after you were trained to put
7        in the Ethicon TVT-O, did you switch
8        exclusively to the Ethicon TVT-O or did you
9        continue to use the Monarc device as well?
10   A.  So my experience with the Monarc device, the
11       outside-to-in TOT, to be honest, I didn't
12       really care for it very much, and so I used it
13       a handful of times, went back to doing
14       retropubic TVT.  And then I was approached by
15       J & J with their TVT-O, and I used that and
16       actually was quite enamored with it.
17   Q.  So other than the TVT retropubic -- the
18       Ethicon TVT retropubic, the Ethicon TVT-O
19       retropubic and the Monarc, you've also put in
20       TVT-Securs before, right?
21   A.  I've put in -- in terms of J & J products,
22       yeah, I've put in the TVT-Secur and the
23       Abbrevo.
24   Q.  Have you ever put in a TVT-Exact?

Page 55

1    A.  I have.
2    Q.  You're not -- you're currently still a
3        preceptor for the TVT and TVT-O, correct?
4    A.  I mean, I haven't signed or updated a contract
5        with J & J in a while.  As far as I know, I
6        am.
7           We currently don't have a rep, and I
8        think the last event that I did was 2014.  So
9        if they wanted me to teach someone to do
10       slings, I'd be happy to.
11   Q.  You've been a preceptor for the TVT Abbrevo,
12       correct?
13   A.  I think technically I probably was a preceptor
14       for the TVT Abbrevo, and I did train a
15       physician in the northern part of our state to
16       do Abbrevo.  But I don't think it was they
17       actively had me teaching people to do
18       Abbrevos.  It was more of TVTs and TVT-Os.
19   Q.  How many Abbrevos have you put in on patients?
20   A.  Maybe 20.
21   Q.  So even though you've only put in
22       approximately 20 TVT Abbrevos, Ethicon has you
23       going out and teaching other physicians how to
24       put that device in?

Page 56

1           MS. KATZ GERSTEL:  Objection.
2    BY MR. FAES:
3    Q.  Is that accurate?
4    A.  I mean, the technique for Abbrevo is very
5        similar to the TVT-O.  So I -- I guess they
6        felt comfortable with me training people to do
7        Abbrevos with my experience with TVT-O.
8    Q.  Is the TVT Abbrevo available at Central Maine
9        Medical Center where you work?
10   A.  It is.
11   Q.  But you said it's substantially more expensive
12       than the TVT retropubic device?
13   A.  Well, I don't know -- it's more -- it's
14       certainly more expensive than the TVT-O, and
15       my understanding is the TVT-O is more
16       expensive than the retropubic TVT.  So it's
17       more expensive than retropubic TVT.
18          One of the -- one of the OB-GYNs in the
19       other group, he likes the Abbrevo, so he uses
20       it, but infrequently.
21   Q.  Which physician is that?
22   A.  His name is Jonathan Commons.
23   Q.  Have you ever been a preceptor or trainer on
24       the TVT-Exact device?

Page 57

1    A.  I don't think that I've trained anyone on
2        TVT-Exact, no.
3    Q.  Have you -- you've been trained yourself on it
4        though, correct, or not?
5    A.  Yeah.
6    Q.  Specifically on the Exact?
7    A.  I mean, the Exact is not all that different
8        than just the retropubic TVT.  So I don't know
9        that I -- I did a formal cadaver lab, or
10       course.  I think I just used TVT-Exact because
11       I've been trained to do TVT retropubic.
12   Q.  So you didn't have any kind of separate
13       formalized training for the TVT before you put
14       the TVT-Exact in for the first time, correct?
15   A.  No.
16   Q.  What would you say your sling of choice is
17       right now for patients?
18          MS. KATZ GERSTEL:  Objection.
19   A.  Well, I mean, I go through an informed consent
20       process with the patients, and we discuss, you
21       know, retropubic approach and the obturator
22       approach.  I -- I favor TVT-Os, but some
23       people, you know, opt for the retropubic.
24       Some people like the idea of the obturator

15  (Pages 54 to 57)

Ted M. Roth, M.D.

Page 58

1    approach, but I think you have to, you know,
2    tailor the sling to the individual patient.
3        BY MR. FAES:
4    Q. So you'd agree that all things being equal,
5        you generally recommend to patients the TVT-O
6        approach as opposed to the TVT, correct?
7        MS. KATZ GERSTEL: Objection.
8    A. I think that sort of I'm in the habit of not
9        really recommending. I'm in the habit of sort
10       of presenting them with different options and
11       trying to do, you know, the best, you know,
12       means of educating them about these choices
13       and then not letting them make a sort of a bad
14       decision. But I don't say that's the one you
15       should have.
16           I say, you know, this is the retropubic.
17       These are, you know, the upsides and downsides
18       of that. This is the obturator approach, the
19       ups and downsides, and, you know, sort of
20       engage them in that -- in that discussion.
21       But I don't -- I don't necessarily actively
22       recommend -- I don't know that I've actively
23       recommended anything to anyone. I really like
24       them to be part of the decision-making.

Page 59

1    BY MR. FAES:
2    Q. What do you tell patients are the upsides and
3        downsides of the TVT retropubic approach?
4        MS. KATZ GERSTEL: Objection.
5    A. So we have longer-term data for the TVT
6        retropubic, and so I can give them some decent
7        counseling about what their long-term success
8        rate with that would be versus TVT-O where I
9        think our -- the longest-term data with TVT-O
10       is around seven years. Obviously, we have
11       significantly longer data for the retropubic.
12           And then we talk about adverse events and
13       complications, the passage of the trocar as
14       being retropubic, so that may put them at
15       greater risk of a bowel or bladder injury.
16           The -- depending upon again sort of, you
17       know, what you read in terms of literature,
18       patients may have a bit more voiding
19       dysfunction, urgency after a retropubic TVT
20       versus the TVT-O.
21           The TVT-O, they may have groin discomfort
22       after the procedure, usually self-limited, but
23       significantly less risk of bladder injury or
24       bowel or great vessel injury in the pelvis.

Page 60

1        Some people debate whether transobturator
2    slings are appropriate for patients with ISD
3    and whether retropubic slings should be done
4    versus obturator slings in the morbidly obese
5    or in the elderly. I'm more likely to put in
6    a retropubic sling in a 36-year-old and more
7    likely to put a transobturator sling in an
8    86-year-old.
9        So there is, I think, a lot of things
10   that sort of go into choice of sling and --
11   and route of the sling based on a lot of, you
12   know, patient factors.
13   BY MR. FAES:
14   Q. So I think you've answered this question a
15       little bit in talking about the TVT
16       retropubic, but let me follow up with the same
17       question.
18           What do you counsel patients -- strike
19       that.
20           What do you tell patients -- when you're
21       counseling them about slings, what do you tell
22       them are the upsides and downsides of the
23       TVT-O device?
24           MS. KATZ GERSTEL: Objection.

Page 61

1    A. So the risks of TVT-O, much like risks of the
2        TVT retropubic, bleeding, infection, need for
3        further surgery. With the TVT-O there is less
4        of a risk of injuring their bowel or their
5        bladder or their urethra with the -- with the
6        TVT-O than with the retropubic. Groin pain
7        pretty much occurs unilaterally in the TVT-O
8        slings and much more rarely in retropubic
9        TVTs, although sometimes they have suprapubic
10       pain.
11           There's some debate about discomfort with
12       intercourse, that that might be more common
13       with transobturator slings than with
14       retropubic slings. And then again, there is
15       just the long-term data where we have seven
16       years, but the seven-year data seems similar
17       to the seven-year data, long-term data for
18       retropubic TVT.
19       BY MR. FAES:
20   Q. Now, you mentioned in your answer regarding
21       the upsides and downsides of the TVT
22       retropubic device that you counsel patients
23       that there is more data regarding the
24       long-term success rate when you're talking

16  (Pages 58 to 61)

Ted M. Roth, M.D.

Page 62

1    about the TVT-R; is that correct?
2  A. That's correct.
3  Q. What do you tell patients the -- you believe
4    the long-term success rate of the TVT
5    retropubic is?
6        MS. KATZ GERSTEL:  Objection.
7  A. I usually say something along the lines of
8    80 percent cure rate at ten years for sort of
9    all-comers and 16 percent improved.
10      BY MR. FAES:
11 Q. Is one of the key pieces of data that you're
12   relying on for the long-term success rate of
13   the TVT retropubic device the Nelson 17-year
14   study?
15 A. Yeah.  I mean, it's a small -- a small
16   population, but they, you know, were able to
17   follow those patients out for 17 years.
18 Q. Is that something that you specifically
19   discuss with patients, that there is a 17-year
20   follow-up?
21 A. I think I don't really use the 17-year
22   follow-up.  I use ten years.
23 Q. And why is that?  Why do you use ten years
24   instead of the 17-year follow-up?

Page 63

1  A. I don't know.  I think -- I think ten seems to
2    stick better in their mind.
3  Q. I just want to follow up on this line of
4    questioning before I forget and move on to
5    something else.
6        So in addition to the TVT retropubic, the
7    TVT-O, the TVT-S, the TVT Abbrevo, the
8    TVT-Exact and the Monarc products, what other
9    slings have you used in the course of your
10   career for stress urinary incontinence?
11 A. I've actually used the Caldera product.  I
12   mean, I've done -- that's been -- I've put
13   that into human beings.  I've been to cadaver
14   labs for the Boston Sci and the Bard products.
15   And I also did a lab on the Coloplast
16   products, but the only other sling that I've
17   put into humans was the Caldera.
18 Q. Do you remember specifically what Caldera
19   product you put in?
20 A. I think they call it a Desara sling, and it
21   comes with different handles.  So the
22   appealing thing about that product is that
23   it's -- you know, the mesh material can then
24   be attached to different handles, so you can

Page 64

1    put it in, you know, in a retropubic or down
2    to the vagina or inside-out or outside-in
3    approach.  So, you know, that's kind of
4    appealing, but I found their -- their mesh to
5    be -- their handling characteristics were --
6    it's a lot more stiff than the J & J products.
7  Q. How many of those have you put in?
8  A. Two.
9  Q. When was that?
10 A. Probably in the last two years.  I put in two,
11   and I followed the patients, and they did
12   okay.  I just -- I didn't like how the
13   material handled intraoperatively, so I didn't
14   continue putting them in.
15 Q. Have you ever put in a Sparc sling?
16 A. No.
17 Q. Okay.  And just so the record's clear, you've
18   gone to cadaver labs for Boston Scientific,
19   Bard and Coloplast, but you've never actually
20   placed any of their slings in live human
21   patients; is that accurate?
22 A. I think that's correct, yeah.
23 Q. Is there any particular reason why after going
24   to a cadaver lab for Boston Scientific and

Page 65

1    learning how to put in one of their slings
2    that you chose not to use that sling in your
3    practice?
4  A. Well, I think the issue with their product was
5    that they don't have an inside-out obturator
6    sling, and I favor that over outside-in.  I'm
7    not, you know, all boned up on their
8    literature about efficacy and adverse events,
9    and I don't specifically remember how their
10   mesh handled, you know, with -- on the
11   cadaver, but they -- they don't have an
12   inside-out approach, so just, you know, I'm
13   continuing to do, you know, TVT-Os in that
14   regard.
15 Q. But you'd agree that nobody has an inside-out
16   technique, other than Ethicon and Johnson &
17   Johnson's TVT-O or Abbrevo, correct?
18 A. The Caldera product that I just mentioned.  So
19   sort of the appeal of that was that they have
20   different handles so you can attach their mesh
21   to a helical handle, which is similar to the
22   helical handle on an TVT-O and pass that from
23   inside to out.  You could also use a different
24   handle and do the passage outside-in or go

17 (Pages 62 to 65)

Ted M. Roth, M.D.

Page 66

1    retropubic, but their mesh handles
2    differently.
3    Q. So the same question with regard to -- first
4       of all, what Bard products were you trained
5       on, the Align, the Ajust, all of the above?
6    A. I think I played with the Ajust.
7    Q. Just to help you out, the Ajust is the mini
8       sling.
9          Does that refresh --
10   A. Yes.
11   Q. -- your recollection?
12   A. Yeah.  And, you know, it was on the market, I
13      think, for, like, six seconds.  It didn't last
14      very long.
15         And the Coloplast sling, I think that's
16      their adjustable sling.  It's the Aris maybe.
17   Q. And after evaluating the Bard Ajust sling, is
18      there any reason why you chose not to perform
19      that product anymore?
20   A. Well, I mean, I never performed it in a human.
21      I just went to the lab.
22   Q. Oh, yeah.  Sorry, bad question.  Let me back
23      up.
24         Is there any reason after evaluating the

Page 67

1    Ajust in a cadaver lab why you chose not to
2    use that product in your patients?
3    A. I guess I just didn't feel the need to change.
4    I didn't really see a benefit to using that
5    product over the J & J products.
6    Q. And what about the Coloplast Aris; the same
7    question with regard to that?
8    A. The same thing.  I didn't care much for the
9    means of introducing it into the -- into the
10   patient, into the cadaver.  And, again, I
11   really didn't feel the need to change from
12   what I'm currently using.
13   Q. How many TVT-Securs have you placed during the
14   course of your career?
15   A. It's been a long time since I've put a Secur
16   in someone.  I've probably put in maybe 50 or
17   60 Securs.  Probably the last time I put one
18   in someone was in late 2007, 2008.
19   Q. Why did you stop using the TVT-Secur device in
20   late 2007, 2008?
21   A. I think that my experience in following my
22   patients up with the TVT-Secur, it didn't have
23   the -- the durability and efficacy of the
24   traditional three-incision slings.  And I

Page 68

1    think that there was, you know, enough data
2    by, you know, 2008 to sort of, you know --
3    that it wasn't comparable to the traditional
4    slings in terms of outcomes.  So I think
5    that's why I stopped using it.
6    Q. How -- what percentage of your practice would
7    you say is devoted to treating mesh
8    complications?
9    A. When you say complications, are we including
10   people who have failed previous slings or are
11   you -- what complications do you -- do you
12   mean?
13   Q. Yes.  All mesh complications.  What percentage
14   of your practice would you say are -- is
15   devoted to treating patients with mesh
16   complications?
17   A. So I would say that, you know, maybe
18   40 percent of my practice is redo slings for
19   failures and -- and then complications related
20   to placement of the mesh or long-term, you
21   know, complications of mesh procedures.
22   Q. And how many slings would you say you put in
23   a year currently?
24   A. Between 100 and 120.

Page 69

1    Q. And how many sling excision or revision
2    procedures would you say you perform in an
3    average year?
4    A. At least 20, at least, if not more.
5    Q. And if I changed my question to ask about how
6    many mesh revision or excision procedures you
7    perform in an average year, what's that
8    number?
9    A. We're talking about slings?
10   Q. No.  Now I'm expanding the question to any
11   type of mesh, including pelvic or prolapse
12   mesh.
13   A. I think that that number has sort of decreased
14   in the last few years because of less -- less
15   products being on the market.  I mean, it's
16   March.  I haven't -- I haven't done any mesh
17   excisions or revisions for either
18   sacrocolpopexy mesh or mesh kits in the last,
19   you know, three-and-a-half months.  I mean, I
20   think at this point I probably do, you know,
21   less -- less than ten a year just because I
22   think there's less mesh being used perhaps.
23         MR. FAES:  Sorry.  Can you read back that
24   last -- the last two sentences of that last

18 (Pages 66 to 69)

Ted M. Roth, M.D.

Page 70

1   part? I kind of zoned out. I didn't hear
2   what he said.
3        (Previous question read back by The
4   Reporter.)
5   BY MR. FAES:
6   Q. So in terms of sling procedures, you're
7     putting in about 100 to 120 a year, and you're
8     excising or revising approximately 20 or more
9     a year; is that accurate?
10  A. The majority of the -- if you're asking if
11    they're -- if they're all my patients, if
12    they're all the same --
13  Q. I'm not asking if they're all your patients.
14    I'm just asking in terms of the ratio, you'd
15    agree that you're putting in about 100 to 120
16    midurethral polypropylene slings a year, and
17    you're excising or revising 20 or more a year;
18    is that -- that accurate?
19  A. Yeah. I mean, the -- the patients who are
20    getting revisions and excisions are -- those
21    are not patients that I put slings into. But,
22    yes, those are accurate numbers.
23  Q. So in terms of your practice in slings, about
24    80 percent of it's putting them in and about

Page 71

1     20 percent is taking them out, right?
2   A. And then usually putting another sling in
3     those 20 percent. Yeah, it's -- that's pretty
4     much, you know, correct.
5   Q. Has it been your experience that frequently
6     when a patient has a problem with a sling
7     that requires excision or removal, that
8     they frequently go to a doctor that's
9     different than the one that has originally
10    implanted it?
11         MS. KATZ GERSTEL: Object to form.
12  A. I think that what happens, at least in Maine,
13    is that a lot of the doctors who put in slings
14    are not comfortable removing slings, and --
15    but, I mean, I've seen patients who've had
16    some sling complications, and they go back and
17    they see their doctor who put the sling in,
18    and then that doctor sends them to me to deal
19    with the complication.
20         I know that a lot of folks, and it's
21    supported in the medical literature, not
22    everyone goes back to see their implanting,
23    you know, surgeon. So I mean, it's -- it's
24    hard to say.

Page 72

1   BY MR. FAES:
2   Q. So you'd agree that -- well, strike that.
3        So physicians that -- there are many
4     physicians that are comfortable putting them
5     in, and most of those physicians have been
6     trained by a mesh manufacturer on how to
7     put the slings in, which is part of the reason
8     why they're comfortable pitting them in,
9     correct?
10         MS. KATZ GERSTEL: Object to form.
11  A. I -- I mean, I don't -- I mean, I know most of
12    that people that put in slings in the State of
13    Maine. I -- I know who they are. I know
14    their names. I don't know -- I don't know who
15    trained them. They certainly could have been
16    trained during residency. Some of them may
17    have been trained at a course that's sponsored
18    by a mesh manufacturer. I don't know the
19    extent of their training.
20         I know certain physicians in the state
21    that I trained, and so, you know, I know who I
22    trained to put in slings, but I don't know
23    everyone's training background.
24  BY MR. FAES:

Page 73

1   Q. As part of your training sessions that you do
2     for Ethicon and Johnson & Johnson when you're
3     a preceptor, do you -- when you're training
4     physicians on how to put them in, do you also
5     train physicians on how to excise or remove
6     the sling if necessary during those sessions?
7   A. The problem with that is that you have limited
8     time, and one of the things that I certainly
9     would discuss with doctors who I was training
10    is, you know -- or at least something that I
11    was always taught in training was that if you
12    can't handle your own complication, then, you
13    know, you should consider maybe not doing that
14    procedure. But there really wasn't a chance
15    to, you know, go through, you know, how to
16    remove a sling. And I think, you know, spend
17    enough time on, you know, trying to get them
18    comfortable with the anatomy and placement and
19    sort of the pearls of doing it and tensioning
20    the slings and dealing with sort of
21    perioperative complications like what do you
22    do with a patient who can't pee after a sling
23    and how long do you wait before you go and
24    revise a sling. But we didn't really go

19 (Pages 70 to 73)

Ted M. Roth, M.D.

Page 74

1  through, you know, how do you remove the sling
2  in those training sessions.
3  Q. So I'm just going to reask it in a different
4  way, because I'm not sure I quite understood
5  the answer to my question --
6  A. Sorry.
7  Q. -- in that long answer.
8      You'd agree that during the training
9  sessions that you give as a proctor for
10  Ethicon and Johnson & Johnson, you don't spend
11  any time during the training sessions
12  instructing physicians specifically how to
13  remove or excise a mesh device, if it becomes
14  necessary, during the course of the patient's
15  treatment and care, correct?
16  A. That's fair, yes.
17      MS. KATZ GERSTEL:  Object to form.
18  BY MR. FAES:
19  Q. And what's -- we talked a little bit about
20  your -- how you counsel patients regarding the
21  differences between the TVT and the TVT-O.
22      What percentage of the slings that you
23  put in would you say are TVT as opposed to
24  TVT-O?

Page 75

1  A. I would say that probably 10 percent are
2  retropubic TVT, and the remainder are TVT-O.
3  Q. And of the slings that you're putting in right
4  now, 100 percent of both the TVTs and TVT-Os
5  are the mechanically-cut version of those
6  products, correct?
7  A. That's correct.
8  Q. Besides the TVT-O -- TVT mechanically-cut, the
9  TVT-O mechanically-cut, and the TVT Abbrevo
10  device, what other products -- what other
11  sling products are currently available to you
12  to use at Central Maine Medical Center?
13  A. I don't know.  I mean, I don't know what they
14  stock the shelves with.  I know they stock the
15  shelves with my products, because I'm probably
16  the one that does the most slings at the
17  hospital.  I mean, I think we could probably
18  get whatever sling we wanted, but I don't know
19  that they stock Boston Sci's products, for
20  instance, or Coloplast's products.
21  Q. Is Central Maine Medical Center the only
22  hospital where you currently have privileges?
23  A. Yes.
24  Q. And you're currently a licensed physician in

Page 76

1  the State of Maine, right?
2  A. Correct.
3  Q. Are you currently licensed in any other
4  states?
5  A. No.
6  Q. What other states have you been licensed in?
7  A. North Carolina and Mississippi.
8  Q. And when did your license in North Carolina
9  become inactive?
10  A. Probably when I left North Carolina.  Within a
11  year or two of 2001, I would imagine.
12  Q. The same question with regard to Mississippi.
13  A. I left Old Miss in the fall of 2004.  So I
14  just left -- let my license expire.  Probably
15  2004, 2005.
16  Q. Have you ever been subject to any disciplinary
17  action by any medical board in any state where
18  you've been licensed?
19  A. No.
20  Q. How did you end up in Maine -- Portland,
21  Maine?
22  A. Well, what I like to tell people is that there
23  was a job in the back of a medical journal.
24      And there was.  You know, I grew up in New

Page 77

1  Jersey, and my parents had a little place in
2  upstate New York, so we were near the lakes
3  and the mountains and all of that.  And when
4  my mentor at Old Miss had sort of said that
5  there was nothing left he could, you know,
6  teach me -- he was kind of being funny about
7  it -- I was looking for jobs.  And Portland
8  seemed like a nice -- or Maine sounded like a
9  nice place to come, and there was a job in the
10  back of one of the journals for Central Maine.
11      And I'd never heard of Lewiston, Maine,
12  before, and my first question was, how close
13  are you to Portland?  Because I'd heard of
14  Portland.  And it's pretty close, and I've
15  been here for, I guess, just over 12 years.
16  So far so good.
17  Q. When you performed the TVT -- Ethicon TVT
18  retropubic device, do you do it under local or
19  general anesthesia?
20  A. We typically do it under general with
21  something called an LMA, laryngeal mask
22  airway, most of the time.
23  Q. Have you ever done a TVT retropubic under
24  local anesthesia?

20 (Pages 74 to 77)

Ted M. Roth, M.D.

Page 78

1    A. I've done it with local and sedation.  My
2       experience is that I think you have to choose
3       your patients carefully to do sedation with
4       local.  I know that the original TVT was --
5       that was sort of one of the selling points,
6       that you could do it under -- under local.
7          For whatever reason a lot of my patients
8       are, how shall I say, high anxiety, and more
9       difficult to keep them still for a procedure
10      with sedation than local.  So I just pretty
11      much do them all under general.
12   Q. When you do a TVT retropubic under local
13      anesthesia, do you perform a cough test to
14      check the tension in the tape?
15   A. I go through the motions of a cough test.  The
16      problem with that is that not everyone leaks
17      when they're supine.  So I mean, I think it
18      gives you some estimation of tensioning, but I
19      don't know that I would hang my hat on cough
20      tests as a great marker for efficacy post-op.
21   Q. Do you have an understanding of whether or not
22      the TVT retropubic procedure, as it was
23      originally designed by the inventor, was
24      designed to be performed under local

Page 79

1       anesthesia with a cough test?
2    A. Yes.
3    Q. You do have that understanding?
4    A. Correct.
5    Q. Do you have an understanding that there's a --
6       some studies have shown a greater than 15
7       percent difference between -- in efficacy
8       rates between performing a TVT retropubic
9       under local anesthesia with a cough test as
10      opposed to general anesthesia?
11         MS. KATZ GERSTEL:  Object to form.
12   A. I can't think of that particular study right
13      now.
14         The other issue is that not everyone who
15      gets a sling is just getting a sling.  A lot
16      of my patients are getting a sling and a
17      prolapse repair at the same time.  So I think
18      that's also something else that necessitates
19      general anesthetic.
20   BY MR. FAES:
21   Q. Would you agree that an efficacy difference of
22      15 percent between doing the procedure under
23      local and doing it under general is
24      significant?

Page 80

1    A. I guess it depends upon what you define as
2       efficacy.  I mean, I'm -- I'm not familiar
3       with what paper you're referring to, but I
4       guess I'd have to sort of know when you say
5       efficacy, do you mean post operatively, you
6       know, they have a subjective -- is it a
7       subjective outcome that you're looking at or
8       is this a measurable urodynamic outcome that
9       you're looking at or pad counts, weighted
10      pads.
11         Fifteen percent, you know, I don't
12      know -- it's hard for me to say whether that's
13      significant or not.
14   Q. If Ethicon and Johnson & Johnson had data
15      showing that there was a 15 percent difference
16      in objective cure rate with the TVT when done
17      under local anesthesia with a cough test as
18      opposed to general anesthesia, is that
19      information as an implanting physician who
20      uses the TVT retropubic that you would want to
21      know?
22         MS. KATZ GERSTEL:  Object to form.
23   A. I think I'd want to know it.  If it's a
24      question of ultimately would it change my

Page 81

1       practice of doing the majority of my slings
2       under general anesthesia.  Hard to know.
3    BY MR. FAES:
4    Q. Assuming that it were true that there was a
5       15 percent difference in the objective cure
6       rates for doing it under local anesthesia with
7       a cough test as opposed to general, is that
8       something that you would feel obligated to
9       pass on to your patients when doing informed
10      consent so that they could make a choice
11      regarding whether they want local or general
12      anesthesia?
13         MS. KATZ GERSTEL:  Object to form.
14   A. I would pass it along to my patients.  But you
15      also -- you also have to sort of know your --
16      know your patients.  And I can -- I can tell
17      you that being here for 12 years, when I've
18      mentioned the idea of honestly doing a sling
19      under local with sedation, most of my patients
20      really baulk at that, and their -- their
21      comment is, I just want to be put out so --
22   BY MR. FAES:
23   Q. Do you know what the pore size is of the
24      Prolene mesh in the TVT and TVT-O devices?

21 (Pages 78 to 81)

Ted M. Roth, M.D.

Page 82

1   A. Greater than 75 microns.
2   Q. Do you know any more specifically than that
3       the size of the pores in the TVT or TVT
4       retropubic device?
5   A. Not off the top of my head.
6   Q. Do you know what the weight of the device
7       is -- of the mesh is in the TVT and TVT-O
8       devices?
9   A. I don't.
10  Q. Do you know why Ethicon and Johnson & Johnson
11      calls the mesh in the TVT and TVT-O devices
12      the old construction mesh?
13      MS. KATZ GERSTEL:  Objection.
14  A. The old construction mesh?  I've not heard
15      that term used to describe the TVT mesh.
16      BY MR. FAES:
17  Q. Do you have an understanding of what the mesh
18      that's used in the TVT and TVT-O was
19      originally developed for?
20  A. I mean, my understanding of sort of mesh
21      products being used in the vaginal space is
22      that it was based on the hernia literature and
23      outcomes from mesh used for hernia repair, and
24      that there were, you know, other forms of mesh

Page 83

1       products trialed in the vaginal space.  The
2       majority of them were -- had very untoward
3       outcomes, but I think that's why -- or that's
4       sort of the movement of mesh in the vaginal
5       space was based on hernia literature.
6   Q. Do you have an understanding of when the mesh
7       that was -- that is used in the TVT and TVT-O
8       was first used in the human body?
9   A. I mean, Prolene has been used in the human
10      body since probably the '50s.  I can't
11      remember exactly when Prolene was, you know,
12      weaved or knitted into a mesh and then put
13      into the human body.  I don't have an idea of
14      that.
15  Q. Do you have an understanding of whether or not
16      the mesh that's used in the TVT -- well,
17      strike that.
18      Do you know whether or not the mesh
19      that's used in TVT and TVT-O was specifically
20      designed for the treatment of stress urinary
21      incontinence?
22  A. I don't know that it was specifically designed
23      for the treatment of stress urinary
24      incontinence, but I know that other meshes and

Page 84

1       products were also trialed for stress urinary
2       incontinence, and all of the products that are
3       currently on the market, or were recently on
4       the market but then withdrawn from the market,
5       were all some form of polypropylene.
6   Q. Do you know whether or not the mesh that's
7       used in the TVT and TVT-O device is actually
8       the same mesh as the Prolene hernia mesh that
9       was introduced by Ethicon and Johnson &
10      Johnson in 1974?
11  A. I don't know.
12  Q. So just to be clear, you don't know one way or
13      the other, correct?
14  A. One way or the other what?
15  Q. Whether or not the mesh in the TVT and TVT-O
16      is or is not the same as the original 1974
17      hernia mesh introduced by Ethicon and Johnson
18      & Johnson?
19  A. I don't know if it's the same mesh, no.
20      MR. FAES:  We've been going about two
21      hours.  Would this be a good time for a break?
22      MS. KATZ GERSTEL:  It would be great.
23      Thank you.
24      (Brief recess taken.)

Page 85

1       BY MR. FAES:
2   Q. Doctor, we're back on the record after a short
3       break.
4       Are you ready to proceed?
5   A. Yes.
6   Q. Doctor, if I could have you look at your CV,
7       which I believe is marked as Exhibit No. 4.
8       If you look on -- I don't know what page
9       it is, but it's -- I think it's second to the
10      last page where it states Speaker's Bureau.
11      Tell me when you're ready.
12  A. (Examining document) Speaker's Bureau, yes.
13  Q. You're currently on the Speaker's Bureau for
14      Pfizer?
15  A. I am.
16  Q. And you're currently on the Speaker's Bureau
17      for GSK, correct?
18  A. Yes.
19  Q. You're currently on the Speaker's Bureau for
20      Allergan, correct?
21  A. Yes.
22  Q. And you're currently on the Speaker's Bureau
23      for Shionogi, S-h-i-o-n-o-g-i; is that
24      correct?

22 (Pages 82 to 85)

Ted M. Roth, M.D.

Page 86

1    A. Yes.
2    Q. And what products do you speak for for
3       Pfizer?
4    A. Well, I'll just say that it's actually been
5       years since I've given any presentations for
6       those companies because they've kind of moved
7       away from a lot of speaker programs. However,
8       when I was speaking for Pfizer, it was Toviaz
9       and Detrol.
10   Q. What about GSK; what products have you spoken
11      for on their behalf?
12   A. Vesicare and Myrbetriq.
13   Q. Allergan?
14   A. Sanctura.
15   Q. And...
16   A. Shionogi.
17   Q. Shionogi?
18   A. They have a product called Osphena,
19      O-s-p-h-e-n-a, Osphena.
20   Q. What's Osphena?
21   A. It is a type of drug called a SERM. It's a
22      Selective Estrogen Receptor Modulator. It's
23      used for dyspareunia and vaginal dryness, oral
24      tablet.

Page 87

1    Q. When you've been on the Speaker's Bureau for
2       these four companies in the past, you've been
3       compensated for your time by those companies
4       for speaking engagements that you were
5       involved in, correct?
6    A. Yes.
7    Q. And I found an older version of your CV from
8       2012, and on that version of your CV, you had
9       Ortho-McNeil also listed under Speaker's
10      Bureau at that time?
11   A. Yeah. So that would have been Elmiron,
12      E-l-m-i-r-o-n, Elmiron. That's a drug for
13      interstitial cystitis.
14   Q. And Ortho-McNeil is a Johnson & Johnson
15      company, correct?
16   A. I think that's correct, yeah.
17   Q. And when you -- and what years approximately
18      did -- were you a consultant for Ortho-McNeil
19      at the Johnson & Johnson company?
20   A. I don't know that I was a consultant. I mean,
21      I spoke for them. Let's see, it could
22      have been 2006 through 2009 or '10. I don't
23      remember.
24   Q. It's your testimony that you don't know

Page 88

1       whether or not you were a consultant for --
2    A. No.
3    Q. -- the Johnson & Johnson company,
4       Ortho-McNeil?
5    A. I said that I wasn't a consultant, that I
6       spoke for them. You asked what years I was
7       involved with them, and I struggle to remember
8       what years I was speaking for them.
9    Q. Did you have a consulting agreement with them
10      that you signed when you were speaking for
11      them?
12   A. I don't remember the wording on the contract.
13   Q. But whether it was a consulting agreement or a
14      contract, you did have a contract with the
15      Johnson & Johnson company, Ortho-McNeil when
16      you were speaking for them from approximately
17      2006 to 2009, correct?
18   A. Yes.
19   Q. And that contract involved, among other
20      things, the amount of your compensation for
21      any speaking engagements that you did on their
22      behalf, correct?
23   A. It would have, yes.
24   Q. And under surgical preceptor consultant on

Page 89

1       your CV, you list Ethicon Female Urology,
2       correct?
3    A. Yes.
4    Q. And Medtronic, correct?
5    A. Yes.
6    Q. And the Medtronic device, you're a preceptor
7       for their InterStim product, correct?
8    A. Correct.
9    Q. And you receive compensation from Ethicon and
10      Johnson & Johnson and Medtronic for
11      preceptoring events that you do on their
12      behalf, correct?
13   A. Correct.
14   Q. And do you have -- strike that.
15         And you've been a preceptor with Ethicon
16      and Johnson & Johnson since approximately
17      2006; is that accurate?
18   A. That's about -- I think that's about right,
19      yeah.
20   Q. Do you recall when your first contract was
21      that you signed with Ethicon and Johnson &
22      Johnson?
23   A. It may have been 2006. I know the rep from
24      2006. It was probably 2006.

23 (Pages 86 to 89)

Ted M. Roth, M.D.

Page 90

1  Q. Do you recall whether or not that -- whether
2     or not you had a contract in 2007 with Ethicon
3     and Johnson & Johnson that was for up to
4     $60,000?
5        MS. KATZ GERSTEL: Objection.
6  A. I'm -- are you asking whether I was
7     compensated $60,000 in that year?
8        I don't understand your question. I'm
9     sorry.
10  BY MR. FAES:
11  Q. No. I'm asking whether you had a contract
12     with Ethicon and Johnson & Johnson in 2007
13     that provided for a maximum of $60,000 in
14     compensation?
15        MS. KATZ GERSTEL: Objection.
16  A. I -- I don't remember the wording of the
17     contract. I'm sorry.
18  BY MR. FAES:
19  Q. Now, in addition to Pfizer, GSK, Allergan and
20     Shionogi, you've also received payments from
21     Astellas Pharmaceuticals?
22  A. GSK is Astellas or Astellas was GSK.
23  Q. And you've received payments in the past from
24     Covidien?

Page 91

1  A. Covidien. Not that I'm aware of.
2  Q. You don't recall receiving any payments within
3     the last three years from Covidien?
4  A. I mean, Covidien has become -- Medtronic has,
5     I think, purchased Covidien. I don't remember
6     getting paid by Covidien.
7  Q. You've received payments within the last three
8     years from Coloplast, correct?
9  A. Probably payments towards going to a lab but
10     not being a proctor or a speaker for them.
11  Q. But the answer to my question is, yes, you
12     have received some payments from Coloplast
13     within the last three years, correct?
14  A. Yes.
15  Q. And Coloplast is another mesh manufacturer
16     that makes, among other things, the RS device
17     that you went to a cadaver lab on, correct?
18  A. Yes.
19  Q. And you've received payments within the last
20     three years from Caldera, correct?
21  A. Not that I'm aware of.
22  Q. You've received payments within the last three
23     years from American Medical Systems?
24  A. The last three years?

Page 92

1  Q. Well, let me broaden that. The last four
2     years.
3  A. I remember going to Minneapolis for an AMS
4     event in May of 2011 perhaps, but that's --
5     that's all I can remember.
6  Q. And you would have received reimbursement for
7     travel expenses, which is a form of payment,
8     for -- from American Medical Systems for going
9     to that event, correct?
10  A. Yes.
11  Q. And American Medical Systems is a manufacturer
12     of pelvic mesh devices and slings, correct?
13  A. They were, yeah.
14  Q. And you received payments within the last five
15     years from Astora Women's Health?
16  A. Okay. So, right, AMS became Astora briefly.
17     It's probably that I had dinner with their rep
18     or something, and that may be what's showing
19     up on whatever you've got there.
20  Q. So you would agree that you have received
21     payments from Astora Women's Health within the
22     last five years?
23  A. I don't think that I received check from
24     Astora, but I think that I had a steak with

Page 93

1     the rep.
2  Q. So is the answer to my question, yes, that you
3     would have received a payment of some kind or
4     reimbursement from -- or an in-kind payment
5     from Astora Women's Health within the last
6     five years?
7  A. A dinner, yes.
8  Q. Would you agree that you've received payments
9     from Bayer Pharmaceuticals within the last
10     five years?
11  A. I -- I don't know who that would be or what
12     that would be for. So I don't have any
13     recollection of Bayer Pharmaceuticals.
14  Q. Would you agree that you've received payments
15     from AbbVie, A-b-b-v-i-e, within the last five
16     years?
17  A. Oh, AbbVie. I've attended --
18  Q. Possibly, just to help you out, in connection
19     with a product called Lupron?
20  A. Yeah, thank you. Yeah, I've attended some
21     dinner events that were responded by AbbVie.
22  Q. And you've received payments within the last
23     five years from Ferring Pharmaceuticals?
24  A. Do you have a product for them, too?

24  (Pages 90 to 93)

Ted M. Roth, M.D.

Page 94

1  Q. Well, just for now can you -- I don't. Can
2     you tell me if you recall receiving a payment
3     from them within the last four years?
4  A. I don't. I'm -- I'm sorry.
5  Q. Have you received payments within the last
6     five years from OmniGuide, Inc.?
7  A. I -- I don't know what that is. I'm sorry.
8  Q. Have you received payments within the last
9     five years from Noven Pharmaceuticals?
10 A. Not that I'm aware of.
11 Q. Have you received payments within the last
12    five years from Smith & Nephew, Incorporated?
13 A. Had dinner with the rep.
14 Q. So is the answer to my question, yes, you
15    received payments within the last five years
16    from Smith & Nephew, Inc.?
17 A. In a matter of speaking. They paid for my
18    dinner, so yes.
19 Q. And you've received payments within the last
20    five years from Bio-Rad Laboratories?
21 A. I -- not that I'm aware of.
22 Q. And you've received payments within the last
23    five years from Cooper Surgical, Incorporated?
24 A. No, not that I'm aware of. It sounds like

Page 95

1     I've made a lot of money, but I don't -- good
2     grief.
3  Q. I'm going to hand you what has been marked as
4     Exhibit No. 5 to your deposition.
5        (Deposition Exhibit No. 5 was marked for
6     identification.)
7  BY MR. FAES:
8  Q. And this is a document called Dollars for Docs
9     pulled off the ProPublica website.
10       Have you ever seen this document before?
11 A. (Examining document) I have not.
12 Q. This document indicates that you received 84
13    separate payments for a total of $16,450 from
14    15 different companies in 2015.
15       Do you see that?
16 A. On the front page, yes.
17 Q. Do you have any reason to dispute the accuracy
18    of this report?
19 A. Again, I'm not familiar with this, and I don't
20    know where they got the information from, so
21    with -- I don't -- I can't testify to how
22    accurate this is.
23 Q. Are you aware that you can go onto this
24    website and dispute any payments that you feel

Page 96

1     are inaccurately reported on this website?
2  A. You're pointing it out to me for the first
3     time. I've not heard of this website before.
4  Q. Can you turn to page 3 of 7 of this document?
5     And specifically I want you to look at the
6     second line from the bottom, October 29, 2015.
7        How much? 399 related to pelvic
8     implants. What for? Gift from Caldera
9     Medical, Inc.
10       Do you see that?
11 A. Yeah.
12 Q. Does that refresh your recollection as to
13    whether or not you've actually received any
14    payments from Caldera Medical in the last five
15    years?
16 A. I don't remember receiving a gift. I know it
17    hasn't -- it hasn't been that long, but I
18    don't remember what that was. It would have
19    been something to do with slings. It escapes
20    me. Sorry.
21 Q. So did you receive a payment or payment in
22    kind from Caldera Medical of $399 on
23    October 29th of 2015 or not?
24 A. I -- I don't remember. That seems like an odd

Page 97

1     number to me, 399.
2  Q. Do you have any reason, as you sit here today,
3     to dispute the accuracy of this report?
4  A. Only because I don't remember it, so that
5     would be my reason to dispute that, but I --
6     this isn't ringing a bell for me.
7        MS. KATZ GERSTEL: I just want to place
8     an objection to using this document. I don't
9     know what the source of the information is or
10    if it's been verified.
11 BY MR. FAES:
12 Q. Do you know whether or not there is actually a
13    government website called CMS.gov that tracks
14    the payments that doctors receive from medical
15    and device companies?
16 A. I know that there is a website related to the
17    so-called Sunshine Act. I've not visited that
18    website, but it -- maybe you have.
19 Q. Do you know that you can go to the CMS
20    websites and dispute any information that they
21    have with regard to a particular physician?
22 A. I've had no reason to visit their website, but
23    that's news to me.
24 Q. I'm going to hand you what's been marked as

Ted M. Roth, M.D.

Page 98

1    Exhibit 6 to your deposition, and this is
2    actually a partial report from the CMS.gov
3    website for you for the same year, 2015.
4        (Deposition Exhibit No. 6 was marked for
5    identification.)
6    BY MR. FAES:
7    Q.  Do you see that at the top of the page Ted M.
8    Roth, your name?
9    A.  Yes.
10   Q.  And if you turn to the second page of this,
11   this actually shows that you received two
12   payments from Caldera Medical, Inc., for a
13   total of $750.54 in 2015.
14       Do you see that?
15   A.  Up at the top of the second page, yes.
16   Q.  Does that refresh your recollection about
17   whether you received any payments from Caldera
18   Medical, Inc., in 2015?
19   A.  I'd have to go -- I mean, this is news to me.
20   I'd have to look at my taxes from that year
21   and see if that were the case. I don't
22   remember being paid by Caldera.
23   Q.  Well, you understand that this would also
24   include any kind of expense reimbursement

Page 99

1    or in-kind payment?
2    A.  I mean, I've eaten with the reps, so it's
3    conceivable that that's what, you know, this
4    dollar amount is reflecting.
5    Q.  So you'd agree that it's possible that you did
6    receive $750.54 from Caldera Medical in
7    2015, either in terms of payments or
8    reimbursement for expenses; you just can't
9    remember one way or another?
10       MS. KATZ GERSTEL:  Objection.
11   A.  I mean, I don't remember being handed a check
12   by Caldera, but I remember eating with the
13   rep. So I guess my answer is yes.
14   BY MR. FAES:
15   Q.  And you also see that there is on the same
16   page four payments from Smith & Nephew,
17   Incorporated, for $218.83?
18   A.  Yes.
19   Q.  Is that -- actually, I think you stated that
20   you did remember being paid by Smith & Nephew,
21   so I have no further questions on that.
22       If you go back to page 5 or Exhibit
23   No. 5, the first page? This indicates that
24   you received a total of 84 separate payments

Page 100

1    in 2005, correct?
2    A.  2005?
3    Q.  Or 2015.  I apologize.
4    A.  Yeah, it says 84 payments for 2015.
5    Q.  If that's accurate, that would indicate that
6    you received some kind of payment from a
7    medical or device company nearly one out of
8    every four days in 2015; is that accurate?
9        MS. KATZ GERSTEL:  Objection.
10   A.  I think that's -- that's correct math.  It's
11   surprising to me.
12   BY MR. FAES:
13   Q.  I'm going to hand you what's been marked as
14   Exhibit No. 7 to your deposition.
15       (Deposition Exhibit No. 7 was marked for
16   identification.)
17   BY MR. FAES:
18   Q.  And this is the ProPublica report for you for
19   the year of 2014.  I know it's a little
20   difficult to follow, but you see the second
21   line 2014 is in a different color, so this is
22   the 2014 report.
23       Do you see that?
24   A.  Yes.

Page 101

1    Q.  And this indicates that in 2014 you received
2    65 different payments from pharmaceutical and
3    medical device companies for a total $12,835,
4    correct?
5    A.  Yeah, that's what it says.
6    Q.  And if you turn to the second page, it states
7    that you received $8,619 for consulting in
8    three separate payments.
9        Do you see that?
10   A.  I do.
11   Q.  And if you go down to drug and devices in
12   2014, it states that the product name for that
13   $8,619 is other.
14       Do you see that?
15   A.  I do.
16   Q.  Do you have any idea what that would be
17   referring to in 2014?
18       If it helps, you can turn to Page 3 of 6,
19   and it indicates that that $3,938 actually
20   came from Ethicon US, LLC.
21       Do you see that?  And it was on May 9th
22   of 2014.
23   A.  Yes.
24   Q.  Does that refresh your recollection of what

26  (Pages 98 to 101)

Ted M. Roth, M.D.

| Page 102 | Page 104 |
|---|---|

**Page 102**

1   that payment would be for?
2   A. I may have -- it's very possible that that was
3   one of the Bangor proctorships that we did,
4   and then we had to go back and do it again.
5   My guess is that that relates to two
6   trips in a short amount of time that I had to
7   do to Bangor to get a doctor trained on TVT-O.
8   MS. KATZ GERSTEL: The same objection to
9   the Exhibit 7 that I made to Exhibit 5.
10  MR. FAES: What's the objection?
11  MS. KATZ GERSTEL: That I don't know this
12  information, if it's been verified.
13  MR. FAES: Well, that's why I'm asking
14  the doctor questions. I'm asking him to
15  verify it.
16  A. Yeah. My guess is that those payments relate
17  to, again, to two programs I did in Bangor in
18  a short amount of time.
19  BY MR. FAES:
20  Q. As you sit here today, do you have any reason
21  to dispute that you were paid $8,880.75 by
22  Ethicon in 2014?
23  A. I don't know how accurate the numbers are, but
24  I don't have a reason to dispute it at the

**Page 103**

1   same time.
2   Q. Well, those -- the actual amounts that you
3   were paid by Ethicon, LLC, in 2014 would be
4   reflected in any 1099s that you would have
5   received from Ethicon and Johnson & Johnson
6   for that year, correct?
7   A. Yeah. I think that's how it works.
8   Q. Can you turn to --
9   A. Do you have my 1099?
10  Q. -- Exhibit No. 1? Go back to Exhibit No. 1,
11  and I'm going to have you look at page No. 5
12  of that.
13  A. Page 5? Okay.
14  Q. Mm-hmm. And specifically on page number 5
15  No. 11, one of the requests that we made for
16  you to bring today was copies of Schedule C
17  and Form 1099 of your tax records for the
18  preceding five tax years, as well as any other
19  documentation that reflects consulting and/or
20  expert fees charged to defendants.
21  Do you see that?
22  A. I'm sorry, you said under 11?
23  Q. Mm-hmm.
24  A. I see letters I, J, K and L.

**Page 104**

1   Q. Page 5, paragraph 11.
2   A. You said Exhibit 1, correct?
3   Q. Yes.
4   A. Oh, okay. Well, as I answered earlier, this
5   is the first time I'm seeing this -- the
6   record or notice to take my deposition, and I
7   think Diana earlier said that she only filed
8   it yesterday, so...
9   Q. So you'd agree that you didn't bring any of
10  the documents requested that are responsive to
11  request No. 11 here with you today?
12  A. No.
13  MS. KATZ GERSTEL: I'm just going to
14  object and say that counsel's filed a response
15  to this notice.
16  BY MR. FAES:
17  Q. You'd agree that you haven't made any attempt
18  to comply with the federal rules and attempt
19  to see if you have any documents responsive to
20  request No. 11 in your possession, correct?
21  MS. KATZ GERSTEL: Objection.
22  A. I'm pretty sure I have the documents at home,
23  but again, this is the first I'm seeing this
24  notice to take my deposition. So, no, I did

**Page 105**

1   not bring those documents today.
2   MR. FAES: Okay. We would request that
3   those documents be provided to us within the
4   next 30 days.
5   MS. KATZ GERSTEL: And I'm just going to
6   say again that we filed a response to this
7   notice.
8   MR. FAES: So is it your position that
9   you don't have to produce the items in --
10  requested in request No. 11 to our notice?
11  MS. KATZ GERSTEL: I'm just going to
12  reiterate that we have filed a response to
13  this notice and to request No. 11.
14  MR. FAES: Go off the record for just a
15  second.
16  (Off-the-record colloquy.)
17  BY MR. FAES:
18  Q. Doctor, we are back on the record after a
19  short break.
20  Are you ready to proceed?
21  A. Sure. Yes.
22  Q. Doctor, earlier I think you agreed that you
23  first became a consultant or preceptor for
24  Ethicon and Johnson & Johnson in 2006?

27 (Pages 102 to 105)

Ted M. Roth, M.D.

Page 106

1  A. To the best of my recollection, yes.
2  Q. Do you know if you had a contract with Ethicon
3     and Johnson & Johnson for every year beginning
4     in 2006?
5  A. My recollection is that they would have me
6     sign a contract every year.
7  Q. Okay.  Well, I'll represent to you that we
8     have gone through the documents provided by
9     Ethicon and Johnson & Johnson.  We've only
10    been able to locate your contracts for the
11    year 2009 and 2011.
12        MR. FAES:  So I would make a request to
13    counsel that we be provided with all of the
14    other years of Dr. Roth's contracts.
15 BY MR. FAES:
16 Q. Doctor, I'm going to hand you what's been
17    marked as Exhibit No. 8 to your deposition.
18     (Deposition Exhibit No. 8 was marked for
19    identification.)
20 BY MR. FAES:
21 Q. And does this appear to be a contract with you
22    dated April 30th of 2009?
23 A. It does.
24 Q. You can turn -- I know you're a newbie at

Page 107

1     this, but these are called Bates numbers down
2     at the bottom, these ETH numbers.  If you
3     could turn to the page ending in 0278?
4  A. (Examining document) Yeah.
5  Q. And I realize the quality of the copy is
6     terrible here, but does that appear to have
7     been signed by you and by Ethicon?
8  A. I can definitely see where Ethicon signed
9     something.  I can't see anything that remotely
10    resembles my really awful signature there, but
11    it looks like a contract that was typical of
12    Johnson & Johnson that I would have signed.
13 Q. Do you have any reason to dispute whether or
14    not this was -- well, actually if you turn to
15    the page 0277.
16        And it appears that -- there again, the
17    quality is still bad, but it's a little bit
18    better.  It appears to have been signed by
19    someone at Central Maine Medical Center?
20 A. Right.
21 Q. Do you have reason to dispute that this is --
22    whether or not this was the contract that you
23    actually signed in April of 2009?
24 A. This looks like it.

Page 108

1  Q. And if that changes at any time during the
2     course of my questioning, let me know.
3        Do you recall that there was some
4     controversy between you and the institution
5     regarding the signing of this particular
6     contract?
7        MS. KATZ GERSTEL:  Object to form.
8  A. I don't -- I'm not too sure what you mean by
9     controversy.  I think that my institution
10    wanted to look into whatever liability they
11    might, you know, be involved with me
12    proctoring, but I don't know that there was
13    controversy.
14 BY MR. FAES:
15 Q. Do you recall whether someone at your
16    institution actually made a request to Ethicon
17    and Johnson & Johnson that changes be made to
18    this contract in order for you to be able to
19    sign it?
20 A. Knowing my institution, I certainly would not
21    be surprised by something like that, but I --
22    I don't remember the specifics.
23 Q. Do you recall if anybody at your institution
24    expressed concerns that a contract like this

Page 109

1     might be construed as you getting sort of --
2     and he used the word -- kickbacks from Ethicon
3     and Johnson & Johnson for using their
4     products?
5        MS. KATZ GERSTEL:  Object to form.
6  A. Not that I'm aware of.
7  BY MR. FAES:
8  Q. You're not aware of that?
9  A. I'm not aware of that communication or
10    whatever you may be referring to.
11 Q. You can turn to the page labeled Exhibit A,
12    and the ending Bates number on that is 0279.
13 A. Okay.
14 Q. And you can see that this particular contract
15    in 2009 under section four calls for you to be
16    paid $3,000 for each eight-hour day.
17        Do you see that?
18 A. Yes.
19 Q. Is that an accurate representation of the fees
20    that you agreed to be paid by Ethicon and
21    Johnson & Johnson for your services?
22 A. Yes.
23 Q. You can turn to the following page at the
24    bottom, Section B.  It states that this

28 (Pages 106 to 109)

Ted M. Roth, M.D.

Page 110

1    contract is for up to $33,000 a year.
2        Do you see that?
3        MS. KATZ GERSTEL:  Object to form.
4    A.  Payments for consulting should not exceed
5        $33,000 per year, yes.
6    BY MR. FAES:
7    Q.  So you'd agree that this contract that you
8        signed in 2009 provides for you to be paid up
9        to $33,000 from Ethicon and Johnson & Johnson
10       as a consultant, correct?
11       MS. KATZ GERSTEL:  Object to form.
12   A.  Up to that amount, yes.
13   BY MR. FAES:
14   Q.  If you could turn to the page ending in 0275?
15   A.  75.
16   Q.  And I specifically want to ask you about a
17       section in paragraph 12?
18   A.  (Examining document) Twelve.  Okay.
19   Q.  Starting on the seventh line down, starting
20       with the word it states -- with the word you
21       it states:  You shall not make any
22       representation relating to companies' products
23       or to companies' clinical outcomes unless such
24       representations have been reviewed and

Page 111

1    approved in advance by a company.
2        Do you see that?
3    A.  I do.
4    Q.  Is that a clause in this contract that you
5        agreed to when you signed the contract?
6    A.  As far as I remember, yes.
7    Q.  So you'd agree that according to the clause in
8        this contract, if you felt that the safety or
9        efficacy rates of the TVT or TVT-O products,
10       for example, were different from what the
11       company wanted you to communicate regarding
12       the safety and efficacy rates, you would be
13       prohibited from communicating those rates
14       during your preceptoring opportunities per
15       this contract, correct?
16       MS. KATZ GERSTEL:  Objection.
17   A.  As far as I could understand the language
18       here, I would be -- I would not be able to
19       make any representation or claims that had not
20       been reviewed probably by J & J legal, so
21       correct.
22   BY MR. FAES:
23   Q.  If you can turn to the page of this contract
24       ending in 0281.  Strike that.  It's actually

Page 112

1    0283 that I want you to look at.
2        And you see that there's an addendum to
3    this contract?
4    A.  (Examining document) Okay.
5    Q.  Do you recall whether this was an addendum
6        that someone from your institution at Central
7        Maine Medical Center requested be made to the
8        contract?
9    A.  I don't remember the specifics, but it
10       mentions Laird Covey, who was, I think at that
11       point -- he's retired now -- president of the
12       medical center, and this must have been
13       something that they felt like they needed to
14       put into my contract.
15   Q.  Well, just to help you out, Doctor, and move
16       things along, if you can turn to page ending
17       in 0277, and that's actually -- that will
18       actually show you the original section of
19       22-B.  It actually starts on the previous
20       page.
21       But I will represent to you that the
22       portion that has been changed is that the
23       sentence at the top of 0277, in conducting
24       other activities, you will not take a position

Page 113

1    or represent interests that conflict with
2    Ethicon's interest during the initial term or
3    any extended term of this agreement, is
4    actually the clause that your -- that was
5    struck in this addendum.
6        Do you have any recollection of that
7    being removed from your contract at the
8    request of your institution?
9    A.  I don't.
10   Q.  Do you believe that that is an appropriate
11       request of Ethicon and Johnson & Johnson to
12       ask of their consultants, that in conducting
13       other activities, you will not take a position
14       or represent interests that conflict with
15       Ethicon's interest during your initial term or
16       any extended term of this agreement?
17       MS. KATZ GERSTEL:  Objection.
18   A.  I mean, I think it would be reasonable for my
19       medical facility to ask the same thing of me,
20       to not take a contrary interest or an interest
21       contrary to -- to their benefit.  So it stands
22       to reason that Ethicon would take a similar
23       stance.
24   BY MR. FAES:

29  (Pages 110 to 113)

Ted M. Roth, M.D.

Page 114

1  Q. So do you think it was unreasonable for your
2     medical center, Central Maine Medical Center,
3     to ask for that provision to be removed from
4     your contract prior to you signing?
5        MS. KATZ GERSTEL: Objection.
6  A. I -- you know, I wasn't really privy to the
7     decision-making regarding this contract, and
8     I'm not too sure I can really, you know,
9     comment on that.
10 BY MR. FAES:
11 Q. So it's your testimony that you weren't privy
12    to the decision-making regarding this
13    contract?
14       You don't recall anything in writing
15    regarding -- taking place regarding this
16    contract?
17       MS. KATZ GERSTEL: Object to form.
18 A. This is 2009, eight years ago. I really don't
19    remember the specifics. I don't know what
20    prompted this addendum. I -- I honestly don't
21    remember.
22 BY MR. FAES:
23 Q. Do you recall whether or not anyone at your
24    facility at Central Maine Medical Center also

Page 115

1     expressed a concern with regard to this
2     contract that certain provisions of it might
3     be construed that you would be unable to
4     recommend a competitor's product, such as an
5     AMS Sparc or Monarc or Boston Scientific sling
6     according to the terms of this contract?
7        MS. KATZ GERSTEL: Objection.
8  A. You know, I don't know. I mean, the
9     fascinating thing is that the majority of
10    proctors that I know for J & J were also
11    proctors for competitors' products. I myself
12    just, you know, stuck with J & J.
13       Personally I would be -- I would find it
14    difficult to, you know, one week proctor
15    someone on a J & J sling and the next week
16    proctor them on an AMS sling and, you know,
17    make any sort of claims about, you know, which
18    one was better. But many of my colleagues
19    work for multiple device companies and had no
20    problem with that.
21 BY MR. FAES:
22 Q. Doctor, I'm going to hand you what's been
23    marked as Exhibit No. 9 to your deposition.
24       (Deposition Exhibit No. 9 was marked for

Page 116

1     identification.)
2  BY MR. FAES:
3  Q. And looking at the top page of this, this
4     appears to be an e-mail from you to a Steve
5     Gauthier and James Hagen, dated Saturday,
6     March 14th of 2009.
7        Do you see that?
8  A. (Examining document) Yes.
9  Q. And it appears that you would have been privy
10    to this entire e-mail string, correct?
11 A. Well, my -- yeah. My name's on it, and --
12    wow. Okay.
13 Q. And who is Steve Gauthier?
14 A. He's someone who recently was asked to resign
15    from CMMC. He was involved with contracts. I
16    don't know what his -- whether he was an
17    attorney or whether he was a high school -- I
18    have no idea what his background was, but he
19    was involved with contracts at one point.
20 Q. Who's James Hagen?
21 A. James Hagan was a former -- he ran the
22    specialty -- I think he was specialty
23    practices manager. I'm not too sure, you
24    know, what his title was at the medical

Page 117

1     center. He's retired.
2  Q. So he was an employee of Central Maine Medical
3     Center, correct?
4  A. He was.
5  Q. Who is Laird Covey?
6  A. Also retired. I think his title was president
7     of Central Maine Medical Center.
8  Q. And who is Lisa Ledoux?
9  A. Lisa Ledoux is no longer working at CMMC. She
10    was -- she was employed under James Hagen.
11    She was managing director of surgical
12    specialty practices.
13 Q. And if I could have you turn to the last page
14    of this document, and it actually goes kind of
15    in reverse chronological order. So I think
16    we're looking at actually the first e-mail in
17    the string because it goes backward.
18       And if you look there, there is an e-mail
19    from Steve Gauthier dated 3/5 of 2009 where it
20    goes to Lisa Ledoux. And he states: I have
21    reviewed this agreement and have some
22    concerns. I need to see whether we have any
23    special language in Ted Roth's contract that
24    would address his ability to retain comp aside

30 (Pages 114 to 117)

Ted M. Roth, M.D.

Page 118

1  from his traditional MD duties.  Do you have a
2  copy of his contract?
3       Do you see that?
4  A.  (Examining document) Yes.
5  Q.  And then above you see the reply, that his
6  contract, meaning your contract, says that he
7  can -- that he may earn outside compensation
8  as long as he receives written permission from
9  Jim.  What we would like to suggest is that
10  the contract be drafted between CMMC and
11  Ethicon and that the money comes directly to
12  us.  Once we receive it, we can issue a
13  teaching stipend to Dr. Roth that is cleaner
14  for everyone.
15       Do you see that?
16  A.  I see that.
17  Q.  Do you recall whether that was actually what
18  occurred under your contract that was signed
19  in April of 2009?
20       Did the payments go to your institution
21  and then they paid you, or did the payments go
22  directly to you?
23  A.  No, the payments went directly to me.
24  Q.  If you turn to the page ending in 6016, you

Page 119

1  can see an e-mail from James S. Hagen, who is
2  apparently the vice-president of Physician
3  Practices at Central Maine Healthcare.
4       Do you see that?
5  A.  Yeah.
6  Q.  Do you know James Hagen?
7  A.  I knew him.  He's retired now.
8  Q.  And is he -- is he a medical doctor?
9  A.  James Hagen was not a medical doctor.  He was
10  not a clinician, no.
11  Q.  What was James Hagan's role within Central
12  Maine Medical Center?
13  A.  Vice-president of physician practices.
14  Q.  And you can see that on this date James Hagen
15  writes:  The contract as written pretty much
16  looks like a kickback and has a host of things
17  wrong, including it is unclear as to the value
18  of services being paid for, specifically since
19  the majority of the compensation is coming
20  from duties being performed that are already
21  part of Dr. Roth's duties.
22       Do you see that?
23  A.  I do.
24  Q.  Does this refresh your recollection as to

Page 120

1  whether personnel at Central Maine Medical
2  Center felt that your consulting contract as
3  initially written could potentially look like
4  a kickback?
5  A.  In, you know, eight years almost to the date,
6  I don't remember the specific language of
7  this.  There's a lot of communication between
8  these administrators, and I haven't seen my
9  e-mail part of this thread yet, but...
10  Q.  So do you recall responding to this and trying
11  to defend this contract as not being an actual
12  kickback as someone at -- as James Hagen at
13  Central Medical Center felt?
14  A.  Well, I'm sure that it's here someplace,
15  because most people know me to be relatively
16  vocal about my opinions.  So I'm sure I
17  responded at some point.
18       MS. KATZ GERSTEL:  Could the doctor have
19  a moment to read over this?
20       MR. FAES:  Sure.  Would now be a good
21  time to take our lunch break, and we can come
22  back?
23       MS. KATZ GERSTEL:  Okay.
24       MR. FAES:  Okay.

Page 121

1       (Lunch recess taken.)
2  BY MR. FAES:
3  Q.  Doctor, we're back on the record after a lunch
4  break.
5       Are you ready to proceed?
6  A.  Yes.
7  Q.  Before we took a break we were talking about
8  an exhibit, which is an e-mail chain regarding
9  your employment contract with Ethicon and
10  Johnson & Johnson, correct?
11  A.  Correct.
12  Q.  What exhibit number is that?
13  A.  Nine.
14  Q.  So if you look at Exhibit No. 9, it appears
15  that you reply on the first page of this and
16  attempt to defend the contract stating that
17  you -- I will provide you with my J & J
18  employment contract ASAP.  You will
19  see that there are no kickbacks or sham,
20  slash, under-the-table consulting payments
21  occurring.  I only get paid for these teaching
22  obligations that were -- are outlined in the
23  formal employment contract.
24       Do you see that?

31 (Pages 118 to 121)

Ted M. Roth, M.D.

Page 122

1  A. Yes.
2  Q. And further on in that same sentence you state
3     that these products are FDA approved.
4        Do you see that?
5  A. Yes.
6  Q. What products are you referring to that you
7     believe are FDA approved?
8  A. The -- I mean, at this point in 2009, we were
9     doing slings for J & J, as well as Prolift.
10 Q. So you believe that the TVT and TVT-O are FDA
11    approved?
12 A. As far as I know, yes.
13 Q. Do you understand that there is a difference
14    between approval and clearance?
15 A. I think I used the terms interchangeably.
16 Q. So when you were a preceptor for Ethicon and
17    Johnson & Johnson during your preceptoring
18    sessions, were you telling other physicians
19    that the TVT and TVT-O devices were FDA
20    approved?
21       MS. KATZ GERSTEL:  Object to form.
22 A. I was probably using that language, yes.
23 BY MR. FAES:
24 Q. No one at Ethicon and Johnson & Johnson ever

Page 123

1     told you that that was incorrect or may be a
2     violation of the law to represent their
3     products as FDA approved rather than FDA
4     cleared?
5        MS. KATZ GERSTEL:  Objection.
6  A. Not that I'm aware of.  I guess I don't
7     understand the difference between FDA
8     clearance and FDA approval.
9  BY MR. FAES:
10 Q. Fair enough.  And further down on the -- I
11    think it's the second from the bottom
12    paragraph you state:  I've trained doctors who
13    would ordinarily refer their patients, slash,
14    their complications, to doctors in their own
15    networks, EMMC and MMC, but because of
16    relationships that I've built with them, when
17    they come to CMMC for teaching, they send
18    those patients to me.
19       Do you see that?
20 A. Mm-hmm.
21 Q. So one of the benefits of continuing to be a
22    preceptor and training other physicians on the
23    use of slings, such as the TVT and the TVT-O,
24    is that when they have complications with

Page 124

1     their patients, a lot of those physicians
2     would send their patients to you for treatment
3     of those complications; is that accurate?
4        MS. KATZ GERSTEL:  Objection.
5  A. I mean, they might send me their
6     complications, yes.
7  BY MR. FAES:
8  Q. And that's an important part of your practice.
9     In fact, that's -- 40 percent of your practice
10    is redoing slings for failures, correct?
11       MS. KATZ GERSTEL:  Objection.
12 A. Yes.
13 BY MR. FAES:
14 Q. So it just makes good business sense to
15    continue to train other physicians as a
16    proctor or preceptor for Ethicon and Johnson &
17    Johnson, correct?
18       MS. KATZ GERSTEL:  Objection.
19 A. I don't know whether it makes good business
20    sense to continue to train physicians.  I
21    wasn't actively seeking their complications or
22    their -- or their business.  I think, you
23    know, it's a small state, and we developed,
24    you know, a rapport and relationships.  And I

Page 125

1     think that's sort of, you know, what that --
2     what that comment in the e-mail was about.
3        I certainly was not looking to develop a
4     mesh complication business.
5  BY MR. FAES:
6  Q. So you weren't necessarily looking to have
7     those referrals, but you understood at that
8     time in 2009 that that was something that was
9     occurring because a lot of the physicians that
10    you were training were referring their
11    complications to you, correct?
12 A. Yeah.  I mean, I've been in the state since
13    2005, and I was getting complications referred
14    to me by physicians, you know, prior to 2009.
15    I was getting failed incontinence procedures
16    prior to 2009, whether those be Burch
17    procedures or slings.
18 Q. I'm going to hand you what's been marked as
19    Exhibit No. 10 to your deposition.
20       (Deposition Exhibit No. 10 was marked for
21    identification.)
22 BY MR. FAES:
23 Q. And this is another contract between --
24    another consulting contract between you and

32 (Pages 122 to 125)

Ted M. Roth, M.D.

Page 126

1    Ethicon and Johnson & Johnson, dated
2    February 1st of 2011; is that correct?
3    A. Yes.
4    Q. And if you turn to Exhibit B, page ending in
5       6960, is that your signature and date of
6       January 6, 2011, there?
7    A. Yes.
8    Q. And if you can turn to page -- the page before
9       that ending in 6959, under Section B you see
10      again that this contract has a maximum value
11      of $33,000 per year, correct?
12         MS. KATZ GERSTEL:  Objection.
13   A. Yes.
14      BY MR. FAES:
15   Q. So again, this contract provides for you to be
16      paid up to $33,000 a year by Ethicon and
17      Johnson & Johnson for your consulting work
18      with them, correct?
19         MS. KATZ GERSTEL:  Objection.
20   A. Yes.
21      BY MR. FAES:
22   Q. And, Doctor, would you consider yourself an
23      expert with regard to warnings for medical
24      devices?

Page 127

1    A. Would I be -- I'm sorry -- an expert on
2       warnings for medical devices in regards to how
3       I counsel my patients regarding medical
4       devices or an expert on what the FDA issued?
5       I don't -- I don't know what you mean.
6    Q. Do you consider yourself an expert with regard
7       to what warnings should be included in the IFU
8       or Instructions For Use for a medical device?
9    A. I think I'm -- I would be -- I've never
10      written an IFU, but I have written surgical
11      textbooks, which are IFU-like in their extent.
12      But I'm -- I guess I'm comfortable with the
13      warnings in the IFUs as they pertain to TVT
14      products.
15   Q. Do you have an understanding of what risk
16      information medical device companies are
17      required to put in their IFUs?
18   A. You mean by the FDA?
19   Q. Well, I just mean in general do you have an
20      understanding of what risk information medical
21      device companies are required to put in their
22      IFUs?
23   A. I think it would be what reasonable physicians
24      or implanters would need to know in order to

Page 128

1    not only counsel their patients but also to
2    decide whether they wanted to use that
3    product.
4    Q. Do you know what FDA standards govern what
5       risk information medical device companies are
6       required to put in their IFUs?
7    A. I don't.
8    Q. Do you know what industry standards govern
9       what risk information companies are required
10      to put in the IFUs?
11   A. I don't.
12   Q. Do you know what departments medical device --
13      of a medical device company are involved in
14      creating the warnings and precaution section
15      or the adverse reaction section of an IFU?
16   A. Not specifically, no.
17   Q. Do you -- have you ever read any testimony
18      from Ethicon employees regarding what
19      Ethicon's position is on what needs to be in
20      an IFU with regard to risk information?
21   A. Not that I recall.
22   Q. I think you already answered this earlier, but
23      it's correct that you have never drafted an
24      IFU for a medical device or assisted in

Page 129

1    drafting an IFU for a medical device, correct?
2    A. That's correct.
3    Q. And is that answer the same with regard to a
4       prescription drug?
5    A. I've not been involved with physician or
6       patient prescribing information for
7       prescription drugs, no.
8    Q. Would you agree that physicians should be made
9       aware of all the significant safety risks
10      associated with the product in the IFU or
11      instructions for use?
12         MS. KATZ GERSTEL:  Object to form.
13   A. Could you repeat the question?  I'm sorry.
14      BY MR. FAES:
15   Q. Sure.  Would you agree that physicians should
16      be made aware of all of the significant safety
17      risks associated with a medical device
18      in the IFU or instructions for use for that
19      product?
20   A. I think that physicians should avail
21      themselves of that information.  The question
22      I guess is when you say make aware of, I think
23      that's -- the onus is the physician's
24      responsibility.

33 (Pages 126 to 129)

Ted M. Roth, M.D.

| Page 130 | Page 132 |
|---|---|
| 1 Q. Yeah. My question is a little different than<br>2   that.<br>3 A. Sorry.<br>4 Q. My question is: Would you agree that the --<br>5   that a physician should be made aware of the<br>6   significant safety risks associated with a<br>7   medical device in the IFU or instructions for<br>8   use for that medical device?<br>9 A. Yes.<br>10 Q. Would you agree that the warnings and adverse<br>11   reaction section of the TVT IFU should include<br>12   all the significant risks and complications<br>13   related to the use of the TVT or TVT-O?<br>14     MS. KATZ GERSTEL: Object to form.<br>15 A. I don't know. When you say -- when you say<br>16   all, I think, you know, there are certain<br>17   risks and complications that are known to<br>18   physicians doing these surgeries. I don't<br>19   know that you need an exhaustive list of every<br>20   one of them for people who are -- are doing<br>21   this.<br>22   BY MR. FAES:<br>23 Q. So you would disagree with the statement that<br>24   the warnings and adverse reaction section of | 1   case specifically regarding the design of the<br>2   TVT or the TVT-O?<br>3 A. In regards to?<br>4 Q. Just the overall design.<br>5 A. No.<br>6 Q. You'd agree then -- well, strike that.<br>7     Do you know what the standard is that a<br>8   manufacturer must follow in designing a mesh<br>9   product like the TVT or TVT-O?<br>10 A. That sounds very broad to me. I'm not sure<br>11   what you mean by the standard.<br>12 Q. So are you aware of any standards or standards<br>13   that a manufacturer must follow in designing a<br>14   mesh product like the TVT or the TVT-O?<br>15     MS. KATZ GERSTEL: Objection.<br>16 A. In -- I'm sorry. In regards -- in regards to<br>17   animal testing, sterilization techniques,<br>18   manufacturing techniques? I don't know what<br>19   you mean by standard. I'm sorry.<br>20   BY MR. FAES:<br>21 Q. Okay. Do you know how a medical device<br>22   company goes about designing a device like the<br>23   TVT or TVT-O?<br>24     MS. KATZ GERSTEL: Object to form. |

| Page 131 | Page 133 |
|---|---|
| 1   the TVT IFU should include all the significant<br>2   risks and complications related to the use of<br>3   that device?<br>4 A. I guess I'm just -- I have a difficulty with<br>5   the use of the word all. That just sounds<br>6   like an exhaustive list, and I don't know that<br>7   it would make a difference. I mean, there<br>8   are, you know, common -- commonly-known risks<br>9   of midurethral slings that -- or any sort of<br>10   anti-incontinence procedure that I don't know<br>11   all need to be in the IFU.<br>12 Q. Okay. So you believe that the IFU for the TVT<br>13   and TVT-O does not necessarily need to include<br>14   all the significant risks associated with the<br>15   use of that device?<br>16 A. That's correct.<br>17 Q. Do you intend -- well, strike that.<br>18     Do you consider yourself an expert on the<br>19   design of medical devices?<br>20 A. Not in the sense where -- I've not designed a<br>21   medical device, but I'm familiar with sort of<br>22   the history of the sling. But I'm not a<br>23   biomedical engineer.<br>24 Q. Are you going to offer any opinions in this | 1 A. I mean, I know a little bit about the history<br>2   of the TVT and sort of the ideas behind it and<br>3   sort of how that came to -- to being. I don't<br>4   know the specifics of, you know, once that<br>5   idea was in J & J's hands, how they then<br>6   proceeded to do testing or set up<br>7   manufacturing or things along those lines.<br>8   BY MR. FAES:<br>9 Q. You'd agree then you don't know what kind of<br>10   experts are involved in designing a device<br>11   like the TVT or TVT-O?<br>12     MS. KATZ GERSTEL: Object to form.<br>13 A. You said experts?<br>14   BY MR. FAES:<br>15 Q. Yes.<br>16 A. You mean expertise or I'm not --<br>17 Q. Would you agree that you don't know what<br>18   kind of experts that Ethicon and<br>19   Johnson & Johnson or a company like Ethicon<br>20   and Johnson & Johnson would need to use or<br>21   employ in designing a device like the TVT or<br>22   TVT-O?<br>23     MS. KATZ GERSTEL: Object to form.<br>24 A. I mean, I could, you know, conjecture that |

34 (Pages 130 to 133)

Ted M. Roth, M.D.

Page 134

1    they would need physicians, statisticians,
2    animal lab support, people, you know, in the
3    manufacturing end. I think, you know, those
4    are the types of experts that they would need
5    for the design and manufacture of a product
6    like the TVT.
7    BY MR. FAES:
8    Q. So you prefaced your answer with, you could
9       conjecture.
10          Would you agree that you don't actually
11      know what experts are involved. You're merely
12      making a conjecture; is what accurate?
13   A. I don't know who J & J or Ethicon employed
14      to -- in the process of developing the TVT,
15      but my -- my guess would be it would be
16      multidisciplinary groups of people,
17      clinicians, surgeons, animal lab folks,
18      biomedical engineers, people in the
19      sterilization and manufacturing to have a
20      product like this.
21   Q. But again, you prefaced your answer with, you
22      would guess. So you're not stating that you
23      know. You're just making an educated guess or
24      conjecture, correct?

Page 135

1    A. Correct.
2    Q. Do you know what a design history file is?
3    A. I do not.
4    Q. Did you review the design history file for the
5       TVT or TVT-O?
6    A. No.
7    Q. Do you know what a design failure modes and
8       effects analysis is?
9    A. No.
10   Q. Do you know what an application of failure
11      modes and effects analysis is?
12   A. No.
13   Q. Since you don't know what a design failure
14      modes effects analysis is or an application
15      modes failure analysis is, you would agree
16      that you wouldn't offer any opinions regarding
17      either of those analyses with regard to the
18      TVT or TVT-O, correct?
19          MS. KATZ GERSTEL: Object to form.
20   A. Correct.
21   BY MR. FAES:
22   Q. Do you know whether or not the warnings in the
23      IFU or instructions for use for the TVT and
24      TVT-O are part of the design failure modes

Page 136

1    effects analysis?
2    A. Since I don't know what the design failure
3       effects and modes is, I don't know if the IFU
4       was part of that.
5    Q. Have you ever reviewed or are you familiar
6       with any of Ethicon's internal standard
7       operating procedures related to the design of
8       the medical -- of medical devices or
9       specifically the TVT and TVT-O?
10   A. No.
11   Q. Have you ever designed a medical device
12      yourself or helped design a medical device?
13   A. Nothing that went very far, no.
14   Q. So nothing that went very far.
15          What have you worked on?
16   A. I -- I had some ideas about a change in the
17      introduction mechanism for the InterStim, but
18      we didn't do anything with it, and I didn't --
19      I didn't really walk it up the flag pole, so
20      to speak.
21   Q. Do you know how long it takes to get a medical
22      device product to market?
23   A. I do not.
24   Q. Do you own any patents for the design of

Page 137

1    medical devices?
2    A. No.
3    Q. Are you familiar with industry standards that
4       govern medical device design?
5          MS. KATZ GERSTEL: Object to form.
6    A. No.
7    BY MR. FAES:
8    Q. In your expert -- your report, you state that
9       you've implanted about 1200 midurethral
10      slings.
11          Approximately how many midurethral slings
12      have you explanted or revised in your career?
13   A. Geez, anywhere from 100 to 200 maybe.
14   Q. So you believe that you've explanted or
15      revised somewhere between 100 and 200
16      midurethral slings for stress urinary
17      incontinence in the course of your career; is
18      that accurate?
19   A. Yeah.
20   Q. Could you be any more specific than that?
21          Do you know if it's more than 150 or less
22      than 150?
23   A. I -- it's not something I really keep track
24      of. I'm sorry.

35 (Pages 134 to 137)

Ted M. Roth, M.D.

Page 138

1    Q. Doctor, if I could have you look at your
2       expert report, which is marked as Exhibit
3       No. 2, and if I could have you look
4       specifically at page number 5 and the second
5       paragraph from the bottom where you state:
6       Midurethral sling operations have been the
7       most extensively researched surgical treatment
8       for SUI in women and have a good safety
9       profile.
10          Do you see that?
11   A. (Examining document) Yes.
12   Q. So I understand that you're making that
13      opinion regarding midurethral slings, that
14      they've been the most extensively researched
15      treatment for stress urinary incontinence in
16      women and have a good safety profile.
17          Are you making that same opinion
18      specifically about the TVT retropubic?
19   A. TVT retropubic would be amongst those sling
20      operations, and yes.
21   Q. Do you believe that the TVT retropubic sling
22      is the most extensively researched treatment
23      for SUI in the world?
24          Is that an opinion that you intend to

Page 139

1       offer in this case?
2    A. I mean, I haven't counted up how many papers
3       as it relates to TVT versus Sparc, but yes.
4    Q. So even though you haven't done an analysis of
5       how many TVT studies or patients there have
6       been related to Sparc, you're going to offer
7       an opinion that it's the most extensively
8       researched surgical treatment for SUI?
9          MS. KATZ GERSTEL: Object to form.
10   A. To the best my knowledge, the majority of the
11      literature out there on midurethral slings
12      relates to retropubic TVT, so yes.
13         BY MR. FAES:
14   Q. So in terms of -- when you say that it's the
15      most extensively researched, are you stating
16      that it's the most extensively researched in
17      regard to number of patients, quality of data,
18      length of data, or all of the above?
19   A. Number of studies, probably most patients,
20      follow-up, all the above.
21   Q. So have you done an analysis of the number of
22      patients that have been studied with regard to
23      the TVT retropubic as compared to a sling such
24      as the Sparc?

Page 140

1    A. I mean, I haven't counted up individual RCTs.
2       The best data that we can go on are the
3       systematic analyses and the meta-analyses, and
4       unfortunately most of those group all
5       midurethral slings in together regardless of
6       manufacturer.
7          So I can't -- I can't give you a number
8       of, you know, how many women have had
9       retropubic TVTs, you know, how many randomized
10      controlled trials -- specifically how many
11      randomized controlled trials there are off the
12      top of my head specifically for retropubic
13      TVT.
14         But the best scientific literature in
15      support of the midurethral slings are from --
16      not from randomized controlled trials but from
17      meta-analyses and the systematic analyses or
18      systematic analyses.  And those group
19      midurethral slings in together.
20   Q. And that's a good point, Doctor.  In your --
21      further on in your report, you discuss a
22      number of different meta-analyses and Cochrane
23      analyses, including the Novara, Schimpf, Dean,
24      Rehman and -- Rehman studies, correct?

Page 141

1    A. Yes.
2    Q. And those are all studies that include some
3       TVT slings, but they include a number of other
4       different slings as well; is that accurate?
5    A. That's correct.
6    Q. Now, in writing your report, you -- I mean,
7       obviously you've got a reliance list of
8       materials that you relied on.
9          But in writing your report, would you
10      agree that you discussed the studies that you
11      felt were most important and relevant to you in
12      forming your opinions in this case?
13   A. You mean by discussed, discussed them in my
14      report or discussed them with the attorney?
15   Q. No.  I'm not asking about anything you
16      discussed with your attorney.  I'm just asking
17      would you agree that your expert report marked
18      as Exhibit No. 2 discusses various articles
19      and facts, correct?
20   A. It does.
21   Q. You'd agree that the articles and facts that
22      you discuss in your expert report are those
23      articles and facts that you felt were most
24      important to you in forming your opinions and

Ted M. Roth, M.D.

| Page 142 | Page 144 |
|---|---|

Page 142

1  conclusions in this case, correct?
2  A. Yes.
3  Q. And you specifically reference four different
4     meta-analyses, the Novara, Schimpf, Dean and
5     Rehman studies, that -- and all four of those
6     are regarding midurethral slings in general,
7     not specifically the TVT, correct?
8  A. Well, on that page 7, yes, those are the
9     references for -- for that chart from Nager's
10    paper on midurethral slings.
11 Q. Yes. And, in fact, you've copied and pasted a
12    portion of Nager's 2016 paper into your expert
13    report on page 7, correct?
14 A. Yes.
15 Q. And Nager's 2016 paper specifically discusses
16    the four aforementioned meta-analyses that we
17    talked about, right?
18 A. Yeah. He used those meta-analyses to
19    construct that -- that chart.
20 Q. And would you agree that all four of those
21    meta-analyses include in their analysis
22    slings other than the TVT, correct?
23 A. That's my recollection, yes.
24 Q. How did you account for the fact that there

Page 143

1  were multiple other midurethral slings in
2  these studies in doing your analysis where you
3  concluded that the TVT and -- when you reached
4  your conclusions regarding the TVT and the
5  TVT-O?
6  A. I'm sorry. Could you repeat that?
7  Q. I'm not sure I can, so I'll restate it.
8  A. Okay.
9  Q. In your conclusions regarding the TVT-O,
10    you relied on Nager's 2016 paper, which
11    included four meta-analyses, correct?
12 A. You said my conclusions about the TVT-O, so
13    I -- I don't know that his -- his paper
14    included, or at least those meta-analyses
15    included, both retropubic, pubovaginal slings,
16    as far as I can remember, also transobturator
17    slings as well. But I don't know that I -- I
18    based my specific conclusion about TVT-Os
19    based on Nager's paper.
20 Q. So you didn't base any conclusions regarding
21    the safety and efficacy of the TVT-O on
22    Nager's 2016 paper that you've included in
23    your expert report here?
24    MS. KATZ GERSTEL: Objection.

Page 144

1  A. Well, not his -- not his paper. His paper was
2     sort of more of a -- a commentary review of
3     sort of the state of midurethral slings, and I
4     used this graph because it seemed like a nice
5     summary of the data for midurethral slings
6     versus other -- other methods of
7     anti-incontinence surgery.
8     BY MR. FAES:
9  Q. Right. Nager's 2016 paper is actually an
10    editorial, isn't it?
11 A. Right. It's commentary, yeah.
12 Q. In fact, the heading on the paper says
13    Viewpoint, right?
14 A. Correct.
15 Q. So if you intend -- going back to page 5 of
16    your report, you stated that you do intend to
17    offer an opinion that the TVT operation is the
18    most extensively researched surgical treatment
19    for SUI in women.
20    Do you intend to offer an opinion in this
21    case that the TVT-O is the most extensively
22    surgical -- most extensively researched
23    surgical treatment for SUI in women?
24    MS. KATZ GERSTEL: Object to form.

Page 145

1  A. I don't -- I'm not too sure what you're
2     asking, but I don't know if there's as much
3     data for the transobturator slings as there
4     are for the retropubic slings. So I'm not
5     sure what you're asking.
6     BY MR. FAES:
7  Q. Right. You'd agree that there can only be one
8     device that can be the most extensively
9     researched surgical treatment for SUI, right?
10    MS. KATZ GERSTEL: Objection.
11 A. Well, I mean, there can be one procedure that
12    is most extensively studied under the heading
13    of the midurethral slings; and then under that
14    heading, yes, there could probably be only one
15    device that could be the most extensively
16    studied out of that group of procedures.
17    BY MR. FAES:
18 Q. And you believe that that's the TVT and not
19    the TVT-O, right?
20 A. That's correct.
21 Q. So you'd agree that the TVT-O is not the most
22    extensively studied device for the treatment
23    of stress urinary incontinence, correct?
24    MS. KATZ GERSTEL: Objection.

Ted M. Roth, M.D.

Page 146

1    A.  I would agree.
2    BY MR. FAES:
3    Q.  And you make your opinion about the TVT device
4        being the most extensively studied sling for
5        the treatment of stress urinary incontinence
6        despite not having done a formal analysis
7        comparing the number of patients or the number
8        of studies as it relates to the Sparc sling,
9        correct?
10           MS. KATZ GERSTEL:  Objection.
11   BY MR. FAES:
12   Q.  Or compared to the Sparc sling.
13   A.  I mean, again sort of off the top of my head,
14       I can't tell you how many studies have been
15       done on TVT versus Sparc, but my recollection
16       is that there are more TVT studies than Sparc
17       studies.
18           I think going back to -- if we go to page
19       8 of my report, which helps with my memory,
20       TVT has been studied in more than 100
21       randomized controlled trials.  TVT-O has been
22       studied in more than 60 randomized controlled
23       trials; and I think, you know, again off the
24       top of my head, those -- that makes them, both

Page 147

1        TVT and TVT-O, the most extensively studied
2        retropubic and obturator slings.  But I can't
3        tell you off the top of my head how many RCTs
4        the AMS product had or off the top of my head
5        how many, you know, RCTs Sparc had.
6    Q.  Don't you need to know the number of Sparc
7        RCTs in order to opine that there are more TVT
8        slings -- TVT RCTs than Sparc RCTs?
9           MS. KATZ GERSTEL:  Objection.
10   A.  I don't think I need to know the actual
11       number.  Just -- I think I need to know that
12       there's just more of them.  I don't know if
13       that makes any sense.
14   BY MR. FAES:
15   Q.  Did you know the number at any point?
16   A.  I don't know the actual number of Sparc RCTs
17       or Monarc RCTs.
18   Q.  Have you done any kind of analysis of the
19       quality of the Monarc studies compared to the
20       quality of the TVT studies?
21           MS. KATZ GERSTEL:  Objection.
22   BY MR. FAES:
23   Q.  Or strike that.
24           Have you done an analysis of the quality

Page 148

1        of the TVT studies as compared to the quality
2        of the Sparc studies?
3           MS. KATZ GERSTEL:  Objection.
4    A.  I've not looked at Sparc studies head to head
5        with TVT studies, but -- and again, what I've
6        looked at are the systematic reviews and the
7        meta-analyses.  And other doctors have sort of
8        looked at the strengths and the weaknesses of
9        a lot of those studies and sort of, you know,
10       put together the meta-analyses, and -- but I
11       haven't put them head to head myself, no.
12   BY MR. FAES:
13   Q.  So you're just -- when you're making your
14       opinion that the quality of the TVT studies is
15       better than the quality of the Sparc studies,
16       you're not basing that on your own formal
17       analysis; you're basing that on the analysis
18       of other individuals; is that accurate?
19           MS. KATZ GERSTEL:  Objection.
20   A.  I'm basing that on people that are in
21       academics that are much more expert on
22       statistics and doing systematic reviews in
23       meta-analyses than I am, so yes.
24   BY MR. FAES:

Page 149

1    Q.  Have you done an analysis of the quality of
2        the TVT-O studies compared to the quality of
3        the Monarc studies that are out there?
4           MS. KATZ GERSTEL:  Object to form.
5    A.  Again, I'm relying my opinions on the -- not
6        necessarily individual RCTs but the
7        meta-analyses and the systematic reviews.
8           BY MR. FAES:
9    Q.  At the bottom of page 6 of your report, you
10       state that MUS, including the TVT and TVT-O,
11       are taught in residency and fellowship
12       programs throughout the United States and are
13       the gold standard procedure for SUI.  To state
14       otherwise would not reflect the reality of
15       surgical management of SUI today.
16           Do you see that?
17   A.  Yes.
18   Q.  Is that an opinion that you intend to offer in
19       this case?
20   A.  Yes.
21   Q.  Do you know whether the Burch procedure is
22       still offered in residency and fellowship
23       programs throughout the United States today?
24   A.  I mean, I haven't been in academic -- a

38 (Pages 146 to 149)

Ted M. Roth, M.D.

| Page 150 | Page 152 |
|---|---|
| 1  teaching institution in 12 years. My best | 1  use of midurethral slings versus data for |

Page 150

1  teaching institution in 12 years. My best
2  guess is that there may be people doing
3  Burches in select patients, probably not as a
4  primary procedure but as a -- perhaps a
5  procedure where someone has had a sling; they
6  had an untoward event with a sling; the sling
7  was removed; the patient had recurrent stress
8  incontinence; and the patient opted to proceed
9  with another surgery for their stress
10  incontinence; and they did a Burch instead of
11  doing another -- another sling, either
12  pubovaginal or mesh.
13  Q. So I'm not sure if that answers my question.
14      Do you know whether --
15  A. I don't, no. Sorry.
16  Q. So you've done no analysis of whether -- of
17  how many institutions still teach the Burch
18  procedure today?
19  A. I mean, I'm in contact with folks at Duke on
20  occasion. I don't think that -- I'm not aware
21  that they're doing Burches. I don't know
22  anyone doing Burches at Old Miss. I don't
23  think that they're very commonly performed at
24  this time.

Page 151

1  Q. Have you ever performed a Burch procedure?
2  A. Absolutely.
3  Q. When's the last time you performed a Burch
4  procedure?
5  A. 2001, 2002.
6  Q. Would you agree that the Burch procedure for
7  the treatment of stress urinary incontinence
8  is still within the standard of care today?
9  A. I would not criticize someone for doing a
10  Burch procedure if that's what they had to
11  offer the patient. So I think it's within the
12  standard of care.
13  Q. Do you know whether or not Burch procedures
14  for the treatment of stress urinary
15  incontinence are actually on the rise within
16  the last two years?
17  A. That I'm not aware of.
18  Q. Do you think that would be an important fact
19  to know when you're talking about the reality
20  of surgical management for stress urinary
21  incontinence today in your report?
22      MS. KATZ GERSTEL: Object to form.
23  A. I mean, I think, you know, what's maybe more
24  important is to know the data supporting the

Page 152

1  use of midurethral slings versus data for
2  Burches. I think it's more important to know
3  the inherent risks of slings versus Burches.
4  I think that, you know, maybe there are
5  certain doctors out there that are not
6  comfortable performing midurethral slings, and
7  they're doing Burches.
8      I think -- I don't know that there's a
9  rise of Burch procedures would impact my -- my
10  personal practice or my expert opinion on
11  midurethral slings.
12  BY MR. FAES:
13  Q. Do you know whether or not the number of
14  midurethral slings performed in the United
15  States has actually gone down over the past
16  couple years?
17  A. That I don't know. I can tell you that in my
18  practice, not that it's a reflection of the
19  US, I haven't seen a decrease in slings.
20  Q. Do you think that would be an important fact
21  to know in stating your opinion regarding the
22  reality of surgical management of stress
23  urinary incontinence today?
24      MS. KATZ GERSTEL: Object to form.

Page 153

1  A. In regards to -- what was the word before
2  management? You said --
3  BY MR. FAES:
4  Q. Do you think that -- I'll restate the entire
5  question.
6  A. Sorry.
7  Q. Do you think it would be important to know
8  whether or not the number of midurethral
9  slings in the United States was actually on
10  the decline in issuing your opinion regarding
11  the reality of surgical management of SUI
12  today?
13      MS. KATZ GERSTEL: Object to form.
14  A. Again, you know, I don't think that what
15  doctors do in terms of whether they favor one
16  surgery or another would affect the data that
17  we have for midurethral slings.
18      So, you know, I think there's probably
19  lots of factors that influence decision-making
20  between whether to offer a patient a
21  midurethral sling or a Burch procedure. One
22  of those factors is probably the ongoing
23  litigation; and, you know, that may be the
24  factor for why there has been a decrease in

39 (Pages 150 to 153)

Ted M. Roth, M.D.

Page 154

1    slings, as you say, or an increase in Burches.
2        You know, I think we have to practice
3    evidence-based medicine.  I think we -- you
4    know, patients come to see me for advice
5    about, you know, their medical care.  They
6    don't come to ask me about, you know, legal
7    matters, and I don't talk to them about
8    necessarily, you know, legal matters.
9        So I think there's -- there's probably
10   lots of factors that go into why doctors
11   choose one procedure, you know, over other.
12   Q.  Would you agree with me that the popularity or
13   prevalence of a particular procedure isn't
14   necessarily an indication of its safety or
15   effectiveness?
16       MS. KATZ GERSTEL:  Object to form.
17   A.  I would agree that the popularity of a
18   procedure, you know, certainly can be related
19   to its efficacy and/or its safety.  But the
20   popularity of a procedure may have nothing to
21   do with safety or efficacy.  It may have to do
22   with demand.
23   BY MR. FAES:
24   Q.  And you state that the TVT and TVT-O are the

Page 155

1    gold standard procedure for SUI.
2        Do you mean that the -- specifically the
3    TVT and the TVT-O are the gold standard, or do
4    you mean that midurethral slings are the gold
5    standard?
6    A.  We're -- I'm sorry.  Where did I -- where did
7    I say that?
8    Q.  The bottom of page 6 still.  MUS, including
9    TVT and TVT-O, are taught in residency and
10   fellowship programs throughout the United
11   States and are the gold standard procedure for
12   SUI.
13   A.  That's basically quoting Serati's article.
14   That is what he put forth in his article, but
15   I would agree with that.
16   Q.  So that's an opinion that you intend to offer
17   in this case to a reasonable degree of medical
18   certainty?
19   A.  Yes.
20   Q.  And again, my question was:  Are you offering
21   the opinion that specifically the TVT and
22   TVT-O are the gold standard procedure for SUI
23   or that midurethral slings are the gold
24   standard procedure for SUI?

Page 156

1        MS. KATZ GERSTEL:  Object to form.
2    A.  I think that the gold standard for
3    anti-incontinence surgery currently is -- are
4    midurethral slings, and of that classification
5    the most studied, and in my read and my
6    recollection, the best data supports TVT and
7    TVT-O.
8    BY MR. FAES:
9    Q.  So just to make -- I just want to be clear on
10   what your opinions are.
11       You'd agree that there can only be one
12   gold standard, right?
13       MS. KATZ GERSTEL:  Object to form.
14   A.  I mean, if we're going to say one gold
15   standard, you know, if I can put it in
16   perspective, there are probably at least 12
17   different ways to do a Burch procedure.  There
18   are probably even more ways to do pubovaginal
19   slings.  So, you know, to say that a Burch
20   procedure is the gold standard, there's, you
21   know, 12 different ways to do one.  But
22   only -- only one can be the gold standard.
23       There's probably 20 ways to do a
24   pubovaginal sling, but only one can be the

Page 157

1    standard.
2        Midurethral slings, I feel, are the --
3    the gold standard, and out of the -- that
4    family of midurethral slings, I think that TVT
5    and TVT-O are -- again have the most -- the
6    most data and the best outcomes.
7        If I had to choose one, the TVT versus
8    the TVT-O, the gold standard, I would say the
9    retropubic TVT, because it's been around
10   longer, and we have even more data for that
11   than the TVT-O.
12   BY MR. FAES:
13   Q.  So do you believe that the Bard Align sling is
14   the gold standard for stress urinary
15   incontinence?
16   A.  I can't tell you because I don't think it's
17   been out -- I don't think it's even on the
18   market anymore.  And --
19   Q.  I think you're thinking of the Ajust.
20   A.  The Ajust.
21   Q.  The Align is still on the market.
22   A.  You know, I don't think that there's enough
23   data to say that it is any better or any worse
24   than TVT.  It's a midurethral sling, so you

40  (Pages 154 to 157)

Ted M. Roth, M.D.

Page 158

1  know, theoretically it should work in a more
2  physiologic manner than a pubovaginal sling or
3  a Burch procedure.
4      Midurethral slings are the gold standard
5  for stress urinary incontinence treatment.
6  Q. Right. I guess what I'm getting at, Doctor,
7  is are you saying that all -- any midurethral
8  sling for the treatment of stress urinary
9  incontinence is the gold standard, or are you
10  just saying that specific ones are the gold
11  standard?
12      So, example, I asked you about Align, and
13  I'm not quite sure what your answer was, quite
14  honestly, so let me ask you a different
15  question.
16      Do you think that the Boston Scientific
17  Advantage sling is the gold standard for
18  stress urinary incontinence?
19      MS. KATZ GERSTEL: Object to form.
20  A. I think -- again, I don't know the data for
21  that particular sling. I don't think that
22  there's enough data to say that it is superior
23  to TVT or TVT-O. have been around longer
24      TVT and TVT-O have been around longer

Page 159

1  than the other slings. They have the most
2  data.
3      But in terms of your three general
4  choices for anti-incontinence surgery, we've
5  got Burches, pubovaginal slings and midurethral
6  slings. Midurethral slings are considered by
7  most folks out there to be the gold standard
8  operation for stress incontinence.
9  BY MR. FAES:
10  Q. So I'm going to ask it a little differently,
11  because I'm not quite sure I still got an
12  answer to my question.
13      Can you answer yes or no do you believe
14  that the -- for example, the Boston Scientific
15  Advantage sling is the gold standard treatment
16  for stress urinary incontinence?
17      Can you answer that yes or no, or can you
18  not answer?
19  A. I don't know enough about that product to say
20  how good it is or whether -- or how effective
21  it is or what their -- their particular
22  adverse event profile is.
23  Q. So you'd agree that not all midurethral slings
24  are the gold standard; you can't make that

Page 160

1  claim.
2      MS. KATZ GERSTEL: Object to form.
3  A. I think as a group they are the gold standard.
4  I think there are certain slings that have
5  been removed off the market that did not
6  perform as well as traditional slings. For
7  instance, the TVT-Secur or even the MiniArc
8  by AMS.
9      I think that single-incision slings are
10  midurethral slings, but I don't think they are
11  the gold standard. So, no, not all
12  midurethral slings are created equal and not
13  all are the gold standard.
14  BY MR. FAES:
15  Q. Right. So you'd agree that not all
16  midurethral slings are created equal and that
17  many midurethral slings have different safety
18  and efficacy profiles, correct?
19      MS. KATZ GERSTEL: Object to form.
20  A. Yes.
21  BY MR. FAES:
22  Q. Would you agree that it's difficult to
23  consider something the gold standard if it's
24  no longer being manufactured or sold anymore?

Page 161

1      MS. KATZ GERSTEL: Object to form.
2  A. I think whether industry decides to
3  manufacture something or not doesn't really
4  impact, you know, whatever outcomes data were
5  there when it was in place. So I don't know
6  that I can say that.
7  BY MR. FAES:
8  Q. So you don't have an opinion as to whether or
9  not a product can still be considered the gold
10  standard even if it's no longer being
11  manufactured or sold?
12      MS. KATZ GERSTEL: Object to form.
13  A. That's correct.
14  BY MR. FAES:
15  Q. So when you say that something is the gold
16  standard procedure for SUI, what exactly do
17  you mean?
18      Do you mean that it's the most prevalent;
19  that it's the highest quality? Or what
20  specifically do you mean?
21      MS. KATZ GERSTEL: Object to form.
22  A. So in terms of what I mean by the gold
23  standard, is -- or at least what Dr. Serati
24  meant in his article about the gold standard,

41 (Pages 158 to 161)

Ted M. Roth, M.D.

Page 162

1    is that TVT and TVT-O have become the standard
2    by which other slings are compared in terms of
3    outcomes, in terms of the safety profile, in
4    terms of adverse effects.
5    Q. So what do you mean when you say that MUS are
6    the gold standard treatment for SUI?
7    A. Well, MUS, midurethral slings, including TVT
8    and TVT-O, are thought to be the gold
9    standard. This is what Serati wrote in -- in
10   his paper. And again, what I said earlier was
11   that not all midurethral slings are, you know,
12   created equal. I don't disagree with what
13   Serati said, but I think what he's referring
14   to are traditional three-incision midurethral
15   slings, TVT, TVT-O amongst those, not
16   single-incision slings.
17   Q. So do you intend to offer an opinion in this
18   case that midurethral slings are the gold
19   standard procedure for SUI?
20   A. I am.
21   Q. And you make that opinion even though you
22   stated earlier, for example, that you don't
23   have enough information to determine whether
24   or not, for example, the Boston Scientific

Page 163

1    Advantage sling is the gold standard or not?
2         MS. KATZ GERSTEL: Object to form.
3    A. I mean, based on again what -- what we
4    consider to be the best data, which is from
5    the meta-analyses and the systematic analyses,
6    where they grouped, you know, different, you
7    know, manufacturers of -- of slings in
8    together, that's what I'm basing my opinion
9    on.
10   BY MR. FAES:
11   Q. Would you agree that a lot of opinions and
12   facts that you discuss in your report are
13   regarding midurethral slings as a group and
14   not necessarily the TVT-O by itself or the TVT
15   by itself?
16        MS. KATZ GERSTEL: Object to form.
17   A. I mean, you know, again, taken individually
18   randomized controlled trials are pretty good
19   evidence, but better evidence is afforded by
20   larger reviews, systematic reviews,
21   meta-analyses.
22   BY MR. FAES:
23   Q. So looking at page 16 of your report,
24   you've republished a portion of

Page 164

1    Dr. Nager's 2016 editorial on midurethral
2    slings here; is that correct?
3    A. (Examining document) What part of --
4    Q. I'm talking about the table.
5    A. Oh, I mean page -- you said 16. I'm sorry.
6    You mean 7?
7    Q. Seven.
8    A. Yes.
9    Q. There's actually no page number on this page;
10   I don't know why.
11   A. Page 7, right.
12   Q. And this table has a summary of different
13   results that favor midurethral slings
14   and complications that favor a retropubic
15   colpopexy -- laparoscopic colpopexy
16   or pubovaginal sling, correct?
17   A. Yes.
18   Q. And when we're talking about open retropubic
19   colpopexy, we're talking about a Burch, right,
20   open Burch?
21   A. Open Burch -- yes, colpopexy is an open Burch,
22   correct.
23   Q. Okay. So from here on out, I'll refer to that
24   as an open Burch, because I don't like that

Page 165

1    word.
2    A. Yeah, it's too many syllables.
3    Q. So is this just information that you found
4    helpful, or do you intend to offer an opinion
5    in this case to a reasonable degree of medical
6    certainty, for example, that the data favors
7    midurethral slings with regard to overall cure
8    rates?
9    A. In terms of sort of couching my opinions and
10   sort of putting things into perspective, I
11   think this is a nice summary of at least, you
12   know, information that Dr. Nager gleaned from
13   three or four, you know, meta-analyses and
14   systematic reviews.
15        So, yes, I'm prepared to offer an opinion
16   that midurethral slings are favored versus
17   Burch procedures in a number of ways
18   elaborated by this graph, this chart.
19   Q. So what about with regard to TVT, are you
20   going to offer an opinion in this case that
21   specifically the TVT retropubic has a better
22   all -- better overall cure rate than the open
23   Burch procedure?
24   A. Yes.

Ted M. Roth, M.D.

Page 166

1    Q. And what are you relying on to come to
2       that conclusion?
3    A. I have to comb through some of the studies
4       that I've looked at. Let's see, so the data
5       from Hilton Ward was more of a, you know,
6       randomized controlled trial, and basically
7       they came to the conclusion that TVT was not
8       inferior to the then gold standard, which was
9       the Burch. And then -- but the majority of
10      the systematic analysis and meta-analyses that
11      I've reviewed, you know, take into
12      consideration all midurethral slings.
13   Q. Well, first of all, the Ward Hilton study
14      found that it was not inferior --
15   A. Correct.
16   Q. So that doesn't really support that the
17      overall cure rates for midurethral slings are
18      better than open Burch, correct?
19   A. It doesn't say that it's better, but you also
20      have to look at follow-up and, you know,
21      specifically, you know, how do they define
22      cure rate? You know, was that based on, you
23      know, objective data, subjective data, pad
24      counts, so...

Page 167

1    Q. And --
2    A. I'm sorry. Go ahead.
3    Q. Were you done? I don't want to cut you off.
4    A. Go ahead.
5    Q. Well, most of the other data that you're
6       relying on that states that the -- for the
7       conclusion that the TVT, the overall cure
8       rates for the TVT is superior to the open
9       Burch are meta-analyses which include other
10      TVT sling products, right?
11   A. Yeah. I don't know specifically that there
12      was a meta-analysis or systematic analysis
13      that just limited midurethral slings to J & J
14      products.
15   Q. Right. So, for example, the Schimpf study,
16      which is reference number 17 in this table
17      which is cited multiple times, that
18      included the TVT and the TVT-O, but it also
19      included a number of other products, including
20      the I-Stop, Monarc, TVT-Secur, MiniArc and
21      something called the Safyre, S-a-f-y-r-e,
22      sling, correct?
23   A. Yes.
24   Q. So in forming your -- in relying on that

Page 168

1       material in forming your conclusion that
2       specifically the TVT and not the midurethral
3       sling has a better overall cure rate than the
4       open Burch, what methodology did you
5       use to eliminate all those other slings in
6       forming your conclusion regarding the TVT
7       sling as opposed to midurethral slings in
8       general?
9           MS. KATZ GERSTEL: Objection.
10   A. I don't think that you can take --
11      unfortunately you can't take a meta-analysis
12      and dissect out, you know, the individual
13      studies. I mean, you can look at the
14      individual studies and -- and look at the
15      sling versus the Burch, but I don't think you
16      can take the end product, which is the
17      meta-analysis, and then, you know,
18      retroactively tease out how well the Burch
19      did. You just have to look at those -- or
20      excuse me -- or how well the J & J TVT did.
21      You just have to look at those individual
22      studies.
23          You know, the majority of -- at least in
24      this section of my report, we used the

Page 169

1       information from the meta-analyses and the
2       systematic reviews because that information is
3       better than a randomized controlled trial with
4       limited numbers, so...
5    BY MR. FAES:
6    Q. Right. So you'd agree that if, for example,
7       in the Schimpf study you took out all of the
8       other manufacturers' slings and just compared
9       TVT retropubic to open Burch or all the
10      studies involving TVT retropubic to open
11      Burch, you might reach a different conclusion,
12      correct?
13          MS. KATZ GERSTEL: Object to form.
14   A. I mean, that's possible.
15   BY MR. FAES:
16   Q. And the same question with regard to TVT-O.
17      If you took out all the other slings out of
18      the Schimpf study and compared just the TVT-O
19      to the open Burch, you might reach a different
20      conclusion with regard to overall cure rates
21      and some of the other things that were
22      measured in that study, right?
23          MS. KATZ GERSTEL: Object to form.
24   A. Again, you're -- you're taking out significant

43 (Pages 166 to 169)

Ted M. Roth, M.D.

Page 170

1    numbers of patients from a systematic review,
2    slash, meta-analysis. So, you know, de facto,
3    it certainly could affect the end conclusions.
4    BY MR. FAES:
5    Q. So what methodology did you use to
6    determine that the conclusions in the Novara,
7    Schimpf, Dean and Rehman studies were
8    applicable to the TVT retropubic device?
9        MS. KATZ GERSTEL: Object to form.
10   A. Is the information in the -- in the Schimpf
11   and the Novara meta-analyses systematic
12   reviews are consistent with the individual
13   data that I've seen in the randomized
14   controlled trials for TVT and TVT-O. That's
15   my methodology, is that, you know, you have
16   limited numbers of patients in randomized
17   controlled trials. When you take, you know,
18   greater numbers and put them into the
19   systematic analysis and then subsequent
20   meta-analysis, the results are similar.
21       And then, you know, to take my own
22   personal experience with the products and
23   having done, like, 1200 of them, my experience
24   is consistent with what's in -- in the

Page 171

1    literature.
2    BY MR. FAES:
3    Q. Earlier, Doctor, we were talking about -- kind
4    of jumped ahead, and we were talking about
5    your statement on page 8 of your report that
6    TVT has been studied in more than a hundred
7    randomized controlled trials, and TVT has been
8    studied in more than 60 RCTs.
9        Do you remember that?
10   A. Yeah.
11   Q. Would you agree that none of the TVT
12   randomized controlled -- TVT hundred
13   randomized controlled studies had a primary
14   endpoint of safety?
15       MS. KATZ GERSTEL: Object to form.
16   A. I mean, most of these trials -- most trials
17   for incontinence procedures are not -- they're
18   not powered for -- to show differences in
19   safety. They're powered for differences in a
20   primary outcome like incontinence.
21   BY MR. FAES:
22   Q. Right. So you'd agree that of the hundred
23   randomized controlled trials for the TVT, zero
24   of those trials had a primary endpoint of

Page 172

1    safety?
2        MS. KATZ GERSTEL: Object to form.
3    A. I can't recall any of those trials
4    specifically randomizing patients for sling
5    that the primary outcome was, as you said,
6    safety, whatever that means.
7    BY MR. FAES:
8    Q. So the same is also true with regard to the
9    TVT-O, correct?
10   A. As far as I know, correct, yes.
11   Q. Do you intend to offer an opinion in this case
12   that the TVT and the TVT-O device are both
13   safe and effective?
14   A. Yes.
15   Q. And you're offering those opinions to a
16   reasonable degree of medical certainty,
17   correct?
18   A. Yes.
19   Q. If you go to page 9 of your report, at the end
20   of the first paragraph you write that over
21   80 percent of women are cured or have
22   significant improvement in their symptoms with
23   either retropubic or transobturator route MUS
24   for up to five years after surgery. And

Page 173

1    again, the Ford article is cited.
2        Do you see that?
3    A. Yes.
4    Q. And you'd agree that the Ford article is
5    actually the Cochrane analysis that includes
6    many other slings, other than the TVT and
7    TVT-O, correct?
8    A. Yes.
9    Q. So what do you believe the percentage of women
10   with SUI who are cured or have significant
11   improvement in their symptoms with the TVT is
12   at five years?
13       MS. KATZ GERSTEL: Object to form.
14   A. Well, I mean, besides, you know, what I, you
15   know, believe in the Cochrane review and what
16   I've seen in individual randomized controlled
17   trials with follow-up and all of this is
18   consistent with my own experience, which is
19   that I would say that 80 percent of women are
20   cured, and I would venture to say that
21   16 percent are improved, you know, between
22   that one- and five-year mark after surgery.
23   BY MR. FAES:
24   Q. The same question with regard to the TVT-O.

44 (Pages 170 to 173)

Ted M. Roth, M.D.

Page 174

1    What would you state is the percentage of
2    women with SUI who are cured or have
3    significant improvement in their symptoms with
4    either -- symptoms with TVT-O, sorry, five
5    years after surgery?
6  A. I would say it's -- it would be very similar.
7    80 percent cure rate, 16 percent improved.
8    Again, it all depends upon how you define
9    cure, whether that's subjective, objective,
10    how you define improvement.
11  Q. You'd agree that that five-year
12    cure/improvement rate is a very important
13    metric or yardstick, if you will, in your
14    opinion that the TVT and TVT-O device is
15    effective for treating stress urinary
16    incontinence, right?
17       MS. KATZ GERSTEL:  Object to form.
18  A. I think that regardless of what
19    anti-incontinence procedure you're looking at,
20    you need to have long-term data for it.  So,
21    you know, five years to me is certainly more
22    important than one year, not to -- not to, you
23    know, put down one year's worth of data, but
24    five year's worth of data is, to me, more

Page 175

1    significant and certainly more significant for
2    my patients.
3  BY MR. FAES:
4  Q. What do you think is the most significant
5    metric to you in issuing your opinion that the
6    TVT and TVT-O is effective for the treatment
7    of stress urinary incontinence?
8       MS. KATZ GERSTEL:  Object to form.
9  A. I guess you have to sort of look at it in a
10    couple of different ways.  I think you need to
11    look at it in terms of patient satisfaction.
12    I think that's an important metric, whether
13    the patient would, you know, recommend the
14    procedure to her friends or relatives, family
15    members.
16       And I think that in addition to just
17    the -- the pure data of cure rate or, you
18    know, pad counts and -- even or objective
19    absence of stress incontinence on exam or in a
20    urodynamic lab, I think you also have to look
21    at the low rate of reoperation to look at, you
22    know, success.  But there's a very low of
23    reoperation for recurrence of incontinence
24    after midurethral slings.

Page 176

1  BY MR. FAES:
2  Q. So if I understand your testimony correctly,
3    you think there are three important metrics in
4    your opinion that the TVT is effect -- TVT and
5    TVT-O is effective:  Patient satisfaction,
6    objective cure rates and reoperation rates; is
7    that correct?
8  A. Low rate of --
9       MS. KATZ GERSTEL:  Object to form.
10  A. Low rate of reoperation after having a
11    midurethral sling for incontinence.
12  BY MR. FAES:
13  Q. So what do you believe the patient
14    satisfaction rate is for the TVT sling?
15       MS. KATZ GERSTEL:  Object to form.
16  A. I don't know that I administer a formal visual
17    analog score for patient satisfaction, but I
18    think people are generally very pleased with
19    their outcomes.
20  BY MR. FAES:
21  Q. Is there anywhere in your expert report where
22    you disclose an objective number that you
23    believe is the patient satisfaction rate for
24    the TVT sling?

Page 177

1       MS. KATZ GERSTEL:  Object to form.
2  A. I know it's been studied in some of the
3    literature that I've reviewed.  I don't know
4    that I specifically put that in the report.
5       BY MR. FAES:
6  Q. So how low would the patient satisfaction
7    rate have to get with the TVT before you
8    would change your opinion that it's
9    effective for the treatment of stress urinary
10    incontinence?
11       MS. KATZ GERSTEL:  Object to form.
12  A. I guess it's a matter of how you measure
13    patient satisfaction, in what -- in what
14    realm, what arena, what scoring system.  I --
15    you know, to be honest with you, I haven't
16    thought about that because overwhelmingly I
17    see patients come back thrilled with, you
18    know, their results.  And sort of the common
19    thing that I hear is why did I wait so long to
20    have this done.
21       I really don't see a lot of unhappy folks
22    who -- who've had slings.
23       BY MR. FAES:
24  Q. So am I correct in that you can't state to any

45 (Pages 174 to 177)

Ted M. Roth, M.D.

Page 178

1    objective quantifiable standard for at what
2    point patient satisfaction would be too low
3    for you to still give the opinion that the TVT
4    is effective for the treatment of stress
5    urinary incontinence?
6         MS. KATZ GERSTEL:  Objection.
7    A.  Like I said, it's not something that I've had
8    to consider.  I think that if I, you know,
9    started doing these procedures and I was
10   seeing patients back who were unhappy,
11   dissatisfied, then, you know, certainly I
12   would -- I would reconsider why I was offering
13   that procedure to patients, but I can't -- I
14   don't have a number or a percentage off the
15   top of my head that I can give you.
16   BY MR. FAES:
17   Q.  What do you believe are the objective cure
18   rates for the TVT at five years?
19        MS. KATZ GERSTEL:  Object to form.
20   A.  I mean, what I tell folks is that probably,
21   you know, 80, 83 percent are cured at -- at,
22   you know, five to seven years.
23   BY MR. FAES:
24   Q.  What would the objective cure rate at five

Page 179

1    years have to drop to in order -- before you
2    would reconsider your position that the TVT is
3    effective for the treatment of stress urinary
4    incontinence?
5    A.  I don't know that I could -- I guess I would
6    also have to know, you know, what the
7    alternatives were for me to alter my practice
8    to offer them something else.
9         You know, objective cure rates, I mean,
10   that's very good; but oftentimes, you know, an
11   objective cure rate doesn't really correlate
12   with subjective cure rates and what the
13   patient perceives and patient related
14   outcomes.
15        So, you know, you can have someone who
16   objectively is still leaking urine in your
17   office, but when you ask them if they are
18   perceiving that they're leaking urine, a lot
19   of times they may not be, and they're quite
20   happy.
21        So there's more -- you can't -- I don't
22   know that I could sort of tease out, you know,
23   just an objective cure rate or just a
24   subjective cure rate or just reoperation rate.

Page 180

1    I think you have to look at the whole -- whole
2    picture, not just one element.
3    Q.  What do you believe are the reoperation rates
4    for the TVT?
5         MS. KATZ GERSTEL:  Object to form.
6    A.  It's -- in my hands, it's pretty uncommon that
7    I have to go and do a second anti-incontinence
8    procedure on -- on someone.  Of course, my
9    practice is also skewed where I do see
10   failures usually from other physicians putting
11   slings in, and depending upon what their
12   physical exam is like, what their anatomy is
13   like, I may have to either remove the sling
14   initially, let them heal, and then we consider
15   another surgery, or we just go back in and I
16   put a new sling in them.
17        So, I mean, again, in my hands it's a
18   pretty low rate of reoperation for recurrent
19   stress urinary incontinence.  I can't give you
20   a number.
21   BY MR. FAES:
22   Q.  Yeah.  I'm going to just reask the question,
23   because I may have phrased it inelegantly, and
24   I'll just start with the caveat that I'm not

Page 181

1    asking you necessarily about your personal
2    experience.
3         My question is:  What do you believe are
4    the overall reoperation rates for the TVT as
5    reported in the medical literature?
6         MS. KATZ GERSTEL:  Object to form.
7    A.  I don't -- I don't know that I can tell you
8    off the top of my head.  I don't know off the
9    top of my head.  I'd have to look through my
10   report and see whether we even discuss that in
11   the report.
12   BY MR. FAES:
13   Q.  Am I correct in that you can't state any
14   numerical quantitative standard to where the
15   reoperation rates for the TVT would reach a
16   level that would be unacceptable to you and
17   you would change your opinion that they --
18   that the TVT is effective for the treatment of
19   stress urinary incontinence?
20        MS. KATZ GERSTEL:  Object to form.
21   A.  Again, I can't really offer a number because
22   it -- it's pretty uncommon that I have to
23   reoperate on someone after they've had a
24   sling.

46 (Pages 178 to 181)

Ted M. Roth, M.D.

Page 182

1    BY MR. FAES:
2    Q.  What do you believe are the key metrics or
3        measurements for your opinion that the TVT and
4        TVT-O device is safe for the treatment of
5        stress urinary incontinence?
6            MS. KATZ GERSTEL:  Object to form.
7    A.  My major metric is what's sort of published in
8        the literature, which is a very low rate of
9        severe adverse events.  So a very low rate of
10       death, low rate of pulmonary embolus, sepsis,
11       bowel injury, great vessel injury.  Things
12       that are severe or life threatening.
13   BY MR. FAES:
14   Q.  So do you consider the rates of non-life
15       threatening but life-changing adverse events,
16       such as chronic pelvic pain that lasts the
17       lifetime of the patient or the inability to
18       ever engage in sexual intercourse again in
19       your analysis of whether or not the TVT and
20       TVT-O device is safe?
21           MS. KATZ GERSTEL:  Object to form.
22   A.  In my experience, I've -- I've not seen
23       patients have issues with chronic pelvic pain
24       or inability to have intercourse after a sling

Page 183

1        that I've put in them.
2            With that being said, I've seen patients
3        who had midurethral slings and were looking at
4        all different brands of midurethral slings and
5        different routes of passage come in with, as
6        you said, life-altering issues, pain, fistula,
7        malposition of the sling, et cetera, et
8        cetera.
9            You know, I think that the data that I
10       reviewed for the report shows that chronic
11       pelvic pain is pretty uncommon after
12       midurethral slings.  I think that dyspareunia
13       is pretty uncommon after midurethral slings.
14       In fact, there's some data that suggests that
15       sexual function improves after the placement
16       of a midurethral sling.
17           But in regards to safety, I think that,
18       you know, all procedures for incontinence,
19       they all have very similar complication
20       profiles; dyspareunia, chronic pelvic pain,
21       erosion or exposure of material either into a
22       viscus or into the vagina.  These can all
23       occur, not just with mesh procedures, but can
24       occur with traditional procedures.

Page 184

1    Q.  So in what percentage of patients with the
2        adverse event after a TVT or TVT-O of never
3        being able to comfortably engage in sexual
4        intercourse for the rest of her life need to
5        be seen before you would say to yourself this
6        product or procedure is unacceptable to me; I
7        don't believe it's safe?
8            MS. KATZ GERSTEL:  Objection.
9    A.  Yeah.  I mean, it's -- that to me is a very
10       hypothetical question, because I'm just not
11       seeing those types of patients, so I -- I've
12       not thought about that, you know.  I can't
13       give you a number.
14   BY MR. FAES:
15   Q.  So if after treatment with a TVT or TVT-O it
16       was found that 5 percent of patients were
17       unable to comfortably engage in sexual
18       intercourse for the rest of their life because
19       of the TVT or TVT-O, would that change your
20       opinion on whether or not it's safe and
21       effective?
22           MS. KATZ GERSTEL:  Objection.
23   A.  Well, I mean, safe and effective, I mean --
24       what you just stated I don't think has

Page 185

1        anything to do with the efficacy.
2    BY MR. FAES:
3    Q.  Fair enough.
4    A.  I think, you know, there's -- there's more to
5        it than, you know, what I offer the patient.
6        It's -- the patient is part of the equation
7        here.  I think, you know, part of the informed
8        consent process with a sling, in my mind,
9        should involve a discussion about both, you
10       know, the benefits, as well as the potential
11       adverse events that can occur, complications,
12       and what they may expect long term.
13           I think there are plenty of patients out
14       there who, if you spoke with them and you
15       said, if I do this procedure on you, you have
16       a 5 percent chance lifetime of not being able
17       to engage in comfortable intercourse again,
18       but on the flip side you have a 90 percent
19       cure rate, I think that, you know, there's
20       going to be a lot of patients out there who
21       are really bothered by urine incontinence who
22       are going to still have this procedure for
23       that 5 percent, five-women-out-of-one-hundred
24       risk.

47 (Pages 182 to 185)

Ted M. Roth, M.D.

Page 186

1    Q. So you'd agree then that a 5 percent risk of
2       never being able to engage in sexual
3       intercourse comfortably for the rest of their
4       life following a TVT or TVT-O isn't high
5       enough to you to conclude that the device is
6       not safe?
7          MS. KATZ GERSTEL:  Objection.
8    A. You know, it sounds like we're -- we're
9       gambling or we're playing poker with a number.
10      I don't -- I don't have a number in mind.  I
11      don't -- I don't think about, you know,
12      things, you know, with a specific, you know,
13      number in mind.
14         In terms of whether to offer it to a
15      patient or not, it's a procedure that I've
16      been doing for well over a decade and, you
17      know, I'm not -- I'm not seeing patients with
18      debilitating complications or long-term
19      sequela from the procedure.
20         You know, I don't -- I don't know what
21      that number would be, but, you know, whatever
22      number that would be it would be something I
23      would discuss with my patients as part of, you
24      know, the informed consent procedure and, you

Page 187

1       know, lay it on them.
2    Q. You stated that one of the key metrics to you
3       in issuing your opinion that the TVT and TVT-O
4       device is safe is a low rate of serious
5       adverse events, and in defining serious
6       adverse events, you're defining that as
7       life-threatening events; is that correct?
8    A. That's how I would define a serious adverse
9       event is something life threatening.
10   Q. So with that definition in mind, how high
11      would the risk of serious adverse events with
12      the TVT or TVT-O need to be in order for you
13      to change your opinion that the TVT and TVT-O
14      device is safe?
15   A. Again, you know, to put it in perspective,
16      we're dealing with a surgery that is for a
17      non-life-threatening condition.  It's for a
18      quality of life condition.  And again, as -- I
19      can't give you a number as to, you know, how
20      many serious adverse events I would need to
21      stop offering that to patients as a matter of
22      ethics.
23         But when I do informed consent with a
24      patient, I try to present them with as much of

Page 188

1       the risks and those rates of risk as I can,
2       you know, muster.  But I can't give you a
3       specific number as to, you know, 15 percent --
4       what number -- what percentage of serious
5       events, you know, I would stop offering this
6       procedure to patients.  I haven't thought
7       about it, because it's not happening.
8    Q. Can you tell me how much higher the rate of
9       serious adverse events, as you defined them,
10      with regard to the TVT and TVT-O would need to
11      be in comparison to a feasible alternative for
12      the same indication before you would change
13      your opinion that the TVT and TVT-O device is
14      safe?
15         MS. KATZ GERSTEL:  Objection.
16   A. I think what you're asking is for the same
17      indication but also balanced with similar
18      efficacy.
19         You know, we have pubovaginal slings.  We
20      have Burches.  We have urethral bulking.  We
21      have midurethral slings.  And we have physical
22      therapy.  And, you know, unfortunately they're
23      not equally effective, and they all have their
24      own unique set of risks and complications.

Page 189

1          You know, I -- I don't know what number
2       that would be to get me to stop using
3       midurethral slings because it's a very
4       hypothetical, you know, question.
5    BY MR. FAES:
6    Q. Is there any device or surgery for the
7       treatment of stress urinary incontinence that
8       you believe is not safe or effective?
9    A. I think that, you know, in a particular
10      surgeon's hands, you know, they can have very
11      good outcomes with Burches and with a very low
12      rate of adverse events, wound infections,
13      transfusions, things like that.  And the same
14      thing goes towards pubovaginal slings.
15      Midurethral slings the same thing.
16         Pelvic floor physical therapy doesn't
17      involve surgery, but it may not be as
18      effective as the other techniques, because
19      it's like any other exercise program, what you
20      put into it is, you know, sort of what you'll
21      get out of it.
22         But I think that there are people out
23      there that are very good at doing pubovaginal
24      slings.  The technique is similar but

48 (Pages 186 to 189)

Ted M. Roth, M.D.

Page 190

1    different than midurethral slings.  And both
2    of those are even more different than
3    retropubics.  And, you know, there's data to
4    say that, you know, top down is not as good as
5    bottom up for retropubics.
6          You know, I think in a particular
7    surgeon's hands, you can have pretty good
8    success with -- or pretty good safety with any
9    of those.
10   Q.  Would you agree with me that there isn't any
11   specific medical device for the treatment of
12   stress urinary incontinence that you can point
13   to that you believe is unsafe?
14        MS. KATZ GERSTEL:  Object to form.
15   A.  Well, I think that there were some products on
16   the market that were removed years ago, the
17   Protegen sling in particular, that was unsafe.
18   Other than that, you know, overall
19   anti-incontinence procedures are safe.
20   BY MR. FAES:
21   Q.  So what specifically about the
22   Protegen device led you to the conclusion that
23   it was unsafe for stress urinary incontinence?
24   A.  The Protegen device had a pretty high rate of

Page 191

1    both, as far as I can remember -- it's been
2    years now -- vaginal as well as urethral
3    erosion.
4    Q.  So you would agree with me that a device like
5    the TVT or TVT-O could have a high enough rate
6    of vaginal and urethral erosion to where you
7    would conclude that it was unsafe for the
8    treatment of stress urinary incontinence?
9          MS. KATZ GERSTEL:  Objection.
10   A.  Again, that's a hypothetical question, because
11   TVT and TVT-O don't have very high erosion
12   rates or exposure rates at all.
13         I mean, you know, one of the reasons why
14   I don't offer Burch procedures to most of my
15   patients is because there is significant
16   morbidity with a Burch.
17         So I guess I would agree with you that
18   there is some threshold for, you know, safety.
19   I don't know what that threshold, you know,
20   would be for TVT, TVT-O.  I never had the
21   opportunity, thankfully, to use the Protegen
22   sling, and I, off the top of my head, can't
23   remember what their -- what the rate of
24   exposure was or rate of injury was.

Page 192

1    BY MR. FAES:
2    Q.  So you just anticipated my next question.  You
3    don't know, as you sit here today, the -- what
4    the overall rate of exposure was for the
5    Protegen sling with regard to vaginal and
6    urethral erosions, correct?
7          MS. KATZ GERSTEL:  Object to form.
8    A.  Not off the top of my head.
9    BY MR. FAES:
10   Q.  If the rate of vaginal and urethral erosions
11   for a particular sling for the treatment of
12   stress urinary incontinence were found to be
13   19 percent, would you -- would that be high
14   enough for you to conclude that that device
15   was not safe for the treatment of stress
16   urinary incontinence?
17        MS. KATZ GERSTEL:  Objection.
18   A.  You know, that's hard to say.  Are we asking
19   19 percent urethral erosion or 19 percent just
20   vaginal exposure rate, combined?
21   BY MR. FAES:
22   Q.  Combined.
23   A.  You know, the other issue that I would need to
24   sort of look at because unfortunately a lot of

Page 193

1    what's in the literature about urethral
2    erosions is that it wasn't that the material
3    eroded or poked -- poked through the urethra
4    but that the -- the physician surgeon probably
5    missed a urethral injury at the time of the
6    implant.  So a lot of, quote, unquote,
7    erosions into the urethra were actually missed
8    injuries.
9          You know, I don't know the -- I don't
10   know that number.  I can't -- I can't give you
11   a number that would sway me from doing --
12   doing the procedure.  If -- you know, I
13   counsel my patients about those risks with --
14   with TVT and, you know, the rates of erosion
15   or rather vaginal exposure are exceedingly low
16   with TVT.
17         I can tell you that in my hands I don't
18   think that I've ever seen someone that I put a
19   TVT, a TVT-O into with a mesh exposure.
20   That's 1200 patients.  And that's consistent
21   with the literature.
22         But it's also about patient selection.  I
23   don't put slings into certain individuals,
24   smokers, poorly controlled diabetics.

49 (Pages 190 to 193)

Ted M. Roth, M.D.

Page 194

1    I'm getting a little wordy. I can't give
2  you a specific number as to when I would quit
3  doing slings on my patients.
4 Q. So you would agree with me that there's no
5  objective numerical standard that you can
6  point to with regard to the rate of vaginal
7  and urethral erosions with a sling device for
8  stress urinary incontinence to where you would
9  conclude that that device is no longer safe
10  for stress urinary incontinence?
11    MS. KATZ GERSTEL: Object to form.
12 A. Again, I guess the question is is how many --
13  you know, I would take a thousand vaginal mesh
14  exposures over a single urethral exposure as
15  complications. Because a lot of mesh
16  exposures are asymptomatic and can be treated,
17  you know, nonmedically -- or excuse me --
18  nonsurgically, medically.
19    So again, it's for me to give you a
20  number, an objective number as to when I
21  would, you know, stop doing slings because
22  this is all very hypothetical, in my mind,
23  because we're not seeing erosion rates of
24  19 percent with TVT, TVT-O.

Page 195

1    BY MR. FAES:
2 Q. We're not? You're not aware of any randomized
3  controlled study that showed a 19 percent
4  erosion rate with TVT?
5    MS. KATZ GERSTEL: Objection.
6 A. Not off the top of my head. That seems --
7  you're talking about a vaginal exposure or
8  talking about urethral erosion?
9    BY MR. FAES:
10 Q. Talking about vaginal exposures and tape
11  projections.
12 A. I'm not familiar with -- with that literature.
13 Q. If there were such a study, would that change
14  your opinions in this case regarding the
15  safety of the TVT sling?
16    MS. KATZ GERSTEL: Objection.
17 A. I would have to review the article and how it
18  was done, patient selection, you know, at what
19  point the surgeon was in their learning curve
20  with the device. I think there's a lot of --
21  of factors involved with, you know, publishing
22  a paper like that. I think you have to look
23  at that. I mean, I would certainly look at
24  that very carefully, but I wouldn't

Page 196

1  immediately be swayed away. I'd have to, you
2  know, digest that paper.
3    BY MR. FAES:
4 Q. But I'll take it from your response
5  that as you sit here today, you're not aware
6  that at one point in 2013 Ethicon and Johnson
7  & Johnson actually had data published on their
8  website regarding a randomized controlled
9  study comparing the TVT retropubic to the
10  Sparc device which showed a 19 percent erosion
11  rate with the TVT and a 6 percent erosion rate
12  with the Sparc; you're not aware of that,
13  correct?
14    MS. KATZ GERSTEL: Objection.
15 A. No, I'm not. I'm also not aware of that being
16  published in the literature.
17    MR. FAES: Can we go off the record for a
18  quick second?
19    (Brief recess taken.)
20    BY MR. FAES:
21 Q. Doctor, we're back on the record after a short
22  break.
23    Are you ready to proceed?
24 A. Sure.

Page 197

1 Q. Before the break we were talking a little bit
2  about safety rates and the Protogen sling.
3    I guess my question to you is this:
4  You've offered an opinion in this case
5  that the TVT and TVT-O device are safe,
6  and you've stated that the only stress urinary
7  device that you can point to that you feel is
8  not safe is the Protogen, right?
9    MS. KATZ GERSTEL: Object to form.
10 A. I guess it depends upon how you define, you
11  know, not safe. I mean, if -- medical errors
12  can occur. A bowel can be injured with, you
13  know, retropubic approaches because of, you
14  know, how the trocar is angled, previous
15  surgery. You could injure, you know, one of
16  the vessels in the pelvis. I guess it depends
17  on what you mean by not safe.
18    I mean, the Protogen kind of stands out
19  because I think specifically it was removed
20  for people claiming that it was not safe.
21  Again, it's been years and -- since I even
22  thought about the Protogen sling.
23    BY MR. FAES:
24 Q. So I guess my question to you is this: What

Ted M. Roth, M.D.

Page 198

1    objective standard are you applying for your
2    conclusion that the TVT and TVT-O is safe for
3    the treatment of stress urinary incontinence?
4         How would I know a device for stress
5    urinary incontinence that isn't safe if
6    I saw it?
7         MS. KATZ GERSTEL:  Object to form.
8    A.  You know, again, I guess it depends upon what
9    you feel is a significant number of serious
10   adverse events.  You know, my review of the
11   literature, my experience with TVT is that
12   there is a very low rate of serious adverse
13   events with that device.  I can't -- I can't
14   really offer you a number as to, you know,
15   what -- what number, what percentage of
16   procedures leading to a serious adverse event
17   equates to, you know, that device not being,
18   you know, safe.  You know, I don't know.
19        When I think about it, you know, when you
20   look at the MAUDE database, when you look at
21   the numbers of what they -- what they call
22   adverse events, some of them not very -- not
23   very serious, but adverse events, you know,
24   you know the numerator, but I don't know the

Page 199

1    denominator.
2         I can't -- I can't tell you what -- what
3    that magic number is where I would -- I would
4    stop offering a procedure for safety reasons.
5    BY MR. FAES:
6    Q.  Doctor, if you turn to page 24 of your report,
7    and on page 24, second paragraph down, you
8    state that TVT is amongst the least stiff
9    meshes available as an MUS, and you cite the
10   Moalli article.
11        Do you see that?
12   A.  Yeah.
13   Q.  Now, do you know whether or not the Moalli
14   article was specifically studying the
15   mechanically-cut mesh or the laser-cut mesh?
16   A.  I have to look back at it.  I can't remember
17   off top of my head.
18   Q.  You would agree that based on the timing of
19   the article, it's most likely the
20   mechanically-cut mesh, correct?
21   A.  Based on the article coming out in 2008, which
22   means that her work was done way prior to
23   that, it's most likely based on
24   mechanically-cut mesh.

Page 200

1    Q.  Do you remember that one of the conclusions of
2    that article was also that the TVT mesh could
3    easily deform under a minimal amount of
4    tension?
5         MS. KATZ GERSTEL:  Object to form.
6    A.  I think it could deform, but the amount of --
7    my recollection is this was a uniaxial testing
8    that she put the meshes through, but that
9    amount of tension was -- although you say
10   minimal, I think that the amount of tension to
11   cause it to deform was supraphysiologic; that
12   it was above and beyond, you know, what
13   someone could manifest with a cough or a
14   Valsalva or a squat.
15   BY MR. FAES:
16   Q.  So if someone concluded that the TVT
17   mechanically-cut mesh could deform under a
18   minimal amount of tension, would you disagree
19   with that conclusion?
20        MS. KATZ GERSTEL:  Objection.
21   A.  I guess the question is is whether that
22   deformation is clinically relevant and whether
23   it makes a clinical difference in efficacy and
24   outcomes.

Page 201

1    BY MR. FAES:
2    Q.  But my question is if someone gave the opinion
3    that the TVT mesh could actually deform under
4    a minimal amount of tension or a minimal
5    amount of force, would you agree or disagree
6    with that opinion?
7         MS. KATZ GERSTEL:  Objection.
8    A.  Would I change my opinion that it's the least
9    stiff mesh?
10   BY MR. FAES:
11   Q.  No, no, no.  That's not what I'm asking.
12   A.  I'm sorry.
13   Q.  My question is if someone offered the opinion
14   that the TVT mechanically-cut mesh can deform
15   under a minimal amount of tension or force,
16   would you agree or disagree with that
17   statement?
18        DEFENSE COUNSEL:  Objection.
19   A.  I guess I would -- I would really need to know
20   a minimal amount of force, what that means.  I
21   would need to know the process by which
22   they're putting the mesh through that force.
23   You know, is it an animal model?  Is it
24   bench-top model?

51 (Pages 198 to 201)

Ted M. Roth, M.D.

Page 202

1        I would need more information, I think.
2   BY MR. FAES:
3   Q. Have you ever engaged in the study of how much
4      force a TVT sling is subjected to during an
5      implantation?
6   A. How much -- you mean how much force I'm
7      putting on it through -- when I'm placing it
8      through the pelvis?
9   Q. Well, not you specifically, but in general
10     have you ever engaged in the study of how much
11     force a TVT sling is typically subjected to
12     during implantation?
13  A. I've not read anything in regards to how much
14     force is applied to the mesh during placement.
15  Q. So you would agree -- so you wouldn't offer
16     any opinions in this case regarding whether
17     the TVT mesh during implantation in the body
18     is subjected to five newtons of force or ten
19     newtons of force or 15; you have no number
20     that you know of that the TVT is subjected to
21     when it's implanted in the body or once it's
22     in the body, correct?
23        MS. KATZ GERSTEL:  Object to form.
24  A. I guess I'm a little bit confused if you're

Page 203

1      asking what the force on the sling is after
2      it's been placed versus how much forces it may
3      be seeing in the course of being placed.  And,
4      no, I can't -- I can't give you a specific
5      number as to what -- how many newtons a cough
6      is or a squat is.
7        But my recollection of the -- and I don't
8      know that we quoted it here -- Dr. Dietz in
9      Australia did a study of meshes looking at
10     uniaxial tension or deformation of mesh, and I
11     think the number he had was 10 to 15 newtons.
12     But again, that's -- it's supraphysiologic in
13     terms of, you know, what the mesh would see
14     with a cough, a sneeze, going to the gym.
15  BY MR. FAES:
16  Q. Do you intend to offer any opinions in this
17     case as to what percentage the TVT mesh can
18     become elongated when subjected to normal
19     forces during implantation of the mesh?
20        MS. KATZ GERSTEL:  Object to form.
21  A. Again, I don't know how that would affect
22     clinical outcomes.  So I don't -- I don't know
23     that I have an opinion about elongation of the
24     mesh during implantation.

Page 204

1   BY MR. FAES:
2   Q. So you don't intend to offer any opinions in
3      this case one way or the other as to how
4      elongation or deformation of the mesh could
5      affect clinical outcomes?
6        MS. KATZ GERSTEL:  Object to form.
7   A. I'm sure that, you know, it certainly makes
8      sense that if you put a sling on a significant
9      amount of stretch, that you have ruined or
10     changed the mechanical properties of the
11     sling.  It's not the same piece of material
12     that you've -- that you started with.  But
13     clinically whatever forces or amount of
14     elongation occurs in the placement of the
15     sling does not affect clinical outcomes and
16     that's what -- you know, what we have to look
17     at.
18  BY MR. FAES:
19  Q. Would you agree that the TVT mesh is not
20     designed to fray?
21        MS. KATZ GERSTEL:  Object to form.
22  A. I mean, earlier I said that, you know, did
23     not -- or I have not designed a biomedical
24     device.  I have not found that the TVT devices

Page 205

1      fray at all.
2   BY MR. FAES:
3   Q. Have you read any documents or any memorandums
4      in this case from Ethicon medical directors
5      where they conclude that fraying is actually
6      inherent in the construction of the TVT
7      mechanically-cut mesh?
8        MS. KATZ GERSTEL:  Objection.
9   A. I think that if fraying occurs, I haven't seen
10     that -- that affects clinical outcomes or
11     efficacy.
12  BY MR. FAES:
13  Q. Would you agree that if fraying does occur, it
14     would be considered an unwanted effect of the
15     TVT mesh?
16        MS. KATZ GERSTEL:  Objection.
17  A. Again, I don't know how clinically relevant
18     fraying or not fraying is, because I don't
19     see -- I don't see any sort of untoward effect
20     on clinical outcomes if fraying occurs.  I
21     don't -- I don't know that it does.
22  BY MR. FAES:
23  Q. So you're unaware and you've never seen
24     multiple reports from physicians to Ethicon

52 (Pages 202 to 205)

Ted M. Roth, M.D.

Page 206

1   and Johnson & Johnson where they report frayed
2   edges of the mesh protruding through the
3   vaginal epithelium of women that have been
4   treated with the TVT sling?
5       MS. KATZ GERSTEL: Objection.
6   A. So I've read reports of mesh exposure, which I
7   think is what you're describing.
8   BY MR. FAES:
9   Q. No. I am specifically describing frayed edges
10  of mesh sticking through the vaginal
11  epithelium reported by doctors to Ethicon and
12  Johnson & Johnson.
13      MS. KATZ GERSTEL: Objection.
14  A. I guess I'm -- through -- through the incision
15  that they placed the mesh through? Through a
16  separate area?
17  BY MR. FAES:
18  Q. Through a separate area, not through the
19  incision.
20  A. So that -- what you're saying is that that's a
21  mesh exposure; that someone had the mesh
22  implanted and then they re-presented to their
23  doctor with an edge of the mesh coming through
24  the vagina?

Page 207

1   Q. Right. An exposure which the physician who
2   trimmed the mesh specifically described as a
3   frayed edge; have you ever seen reports of
4   that to Ethicon and Johnson & Johnson?
5       MS. KATZ GERSTEL: Objection.
6   A. I mean, what happens to the mesh when it's
7   within the vagina, I think, is -- and, you
8   know, what it's subjected to potentially, you
9   know, toilet paper and intercourse and other
10  sorts of external stimulus can certainly
11  affect the appearance of mesh. I have not
12  read reports of frayed edges on exposures.
13  Exposed mesh is exposed mesh.
14  BY MR. FAES:
15  Q. So if you saw multiple reports from doctors
16  where they reported to Ethicon and Johnson &
17  Johnson seeing frayed edges of the mesh
18  protruding through the vaginal epithelium or
19  sharp, spiky edges, would that change your
20  opinion in this case as to whether or not
21  fraying mesh can cause adverse patient
22  consequences?
23      MS. KATZ GERSTEL: Objection.
24  A. I guess I don't know if -- if the mesh frays.

Page 208

1   And, you know, I will admit that, you know,
2   mesh can -- there's an exposure rate; it's
3   very low. And I haven't seen in my own
4   experience frayed mesh. I would need to know
5   more about what they're seeing and a bit more
6   about those patients before, you know, passing
7   judgment on -- on that.
8   BY MR. FAES:
9   Q. So you'd agree with me that there could be
10  information that you haven't seen in this case
11  that could change your opinions regarding the
12  safety and efficacy of the TVT or TVT-O?
13      MS. KATZ GERSTEL: Objection.
14  A. I mean, it's possible. I mean, I haven't -- I
15  haven't read every, you know, piece of paper
16  that's -- that's out there. Sure, it's
17  possible that there's something I haven't read
18  that would, you know, change my idea about
19  safety and efficacy. But after putting in
20  1200 slings, not seeing fraying; I'm not
21  seeing significant exposures; I'm not seeing
22  dyspareunia; I'm not seeing issues with, you
23  know, clinical outcomes in the long term.
24  BY MR. FAES:

Page 209

1   Q. Would you agree that the TVT mesh is not
2   designed to deform?
3       MS. KATZ GERSTEL: Objection.
4   A. I think that the TVT mesh is designed to be
5   flexible with a certain amount of stiffness.
6   I think that that's -- you know, besides the
7   fact that you're placing it at the midurethra,
8   I think that's the -- the level of stiffness
9   also impacts some of the success of the TVT,
10  not just the fact that it's at the midurethra,
11  which I think is supported in the literature.
12      If you look at some of the head-to-head
13  trials, Sparc versus TVT, they're relatively
14  similar meshes, but the TVT is a little less
15  stiff, and it also has a higher cure rate.
16  And so it's not just that placing the mesh in
17  the midurethra guarantees success. I think
18  there's something to the biomechanical
19  properties, as well.
20      But -- I didn't answer your question.
21  The mesh is not -- they didn't design mesh
22  with the idea for it to deform. They designed
23  the mesh for it to support the midurethra.
24  BY MR. FAES:

53 (Pages 206 to 209)

Ted M. Roth, M.D.

Page 210

1    Q. So you would agree that if the TVT mesh were
2       to become deformed or curled underneath the
3       urethra, that would be an unintended
4       consequence, correct?
5          MS. KATZ GERSTEL: Objection.
6    A. We try to place the slings underneath the
7       midurethral flat without tension. I've not
8       seen a sling that has curled or folded on
9       itself or frayed. What I've seen are slings
10      that are not positioned at the midurethra, and
11      that's -- that's really the majority of what
12      I've seen.
13   BY MR. FAES:
14   Q. But you would agree if that were to occur, it
15      would be an unintended effect, correct?
16         MS. KATZ GERSTEL: Objection.
17   A. Well, I think it would be unintended for
18      anyone to place a sling improperly, and I
19      think it would be unintended for the sling to
20      not sit, you know, flatly against the urethra.
21         MS. KATZ GERSTEL: Can I ask how we're
22      doing on time?
23         MR. FAES: We've got, like, seven minutes
24      or so.

Page 211

1    BY MR. FAES:
2    Q. I'm going to hand you two exhibits, Doctor,
3       because I'm running out of time.
4    A. Okay.
5    Q. Exhibit 11 and 12.
6          MR. FAES: I'm getting yours.
7          (Deposition Exhibit No. 11 was marked for
8       identification.)
9          MR. FAES: That's 11.
10         (Deposition Exhibit No. 12 was marked for
11      identification.)
12      BY MR. FAES:
13   Q. And Exhibit No. 11 is an article published by
14      you titled Management of Persistent Groin Pain
15      After Transobturator Slings.
16         Do you see that?
17   A. (Examining document) Yeah.
18   Q. And the first sentence of the abstract is
19      prolonged groin pain after transobturator tape
20      is uncommon.
21         Do you see that?
22   A. Yes.
23   Q. And then if you look at Exhibit No. 12, this
24      is another article by you in -- published in

Page 212

1       2010 titled: Pre-ramus passage of inside-out
2       transobturator sling. Is that correct?
3    A. (Examining document) Yes.
4    Q. And the first sentence of that abstract is,
5       groin pain after transobturator tape is not
6       uncommon; is that correct?
7    A. Correct. Mm-hmm.
8    Q. So just looking at Exhibit No. 7, if you turn
9       to the second page, second column, and you
10      state in that article: Conceivably the
11      proximity of the mesh to a branch of the
12      anterior obturator nerve may cause compression
13      and entrapment, parentheses, before entering
14      the thigh, the obturator nerve divides into an
15      interior and posterior branch. Then the
16      anterior branch travels superficial to the
17      internal obturator muscle but deep into the
18      pectineus and adductor longus muscle, and then
19      it travels superficial to the adductor brevis
20      muscle; and finally the motor branches arise
21      distal the obturator foramen and supply the
22      adductor brevis, adductor longus and gracilis
23      muscles. Interior branch entrapment may lead
24      to exercise-related pain or may consist of

Page 213

1       groin pain.
2          Do you see that?
3    A. Yeah.
4    Q. Now, this published -- this article was
5       published in 2007, correct?
6    A. Yes.
7    Q. And this is specifically treating a sling that
8       a patient had been treated with using the
9       obturator approach?
10   A. So this -- this article was basically a case
11      series of three women who had persistent groin
12      pain after -- specifically after an outside-in
13      transobturator sling, the Monarc.
14   Q. And at this time in 2007, the TVT-O had
15      actually been around for about three years and
16      the Monarc sling a little longer than that,
17      right?
18   A. Correct.
19   Q. And do you know that this article is actually
20      cited quite frequently by other items in the
21      literature for the proposition that the TVT-O
22      can actually cause groin pain due to its
23      proximity to the adductor muscles?
24         MS. KATZ GERSTEL: Objection.

54 (Pages 210 to 213)

Ted M. Roth, M.D.

Page 214

1    A. I'm kind of familiar with the article being
2       cited a lot.  I don't know -- you know, both
3       TOTs and TVT-Os go through the medial
4       compartment of the thigh so...
5       BY MR. FAES:
6    Q. Do you know whether or not -- well, strike
7       that.
8          First of all, would you agree that the
9       fact that this 2007 article is quite
10      frequently cited for that proposition
11      indicates that this was potentially new or
12      novel information to the medical community as
13      of 2007?
14         MS. KATZ GERSTEL:  Objection.
15   A. I -- I don't think so.  I mean, I think that I
16      just, you know, wrote about my experience in
17      dealing with these three patients, and in all
18      likelihood other people were having -- were
19      finding similar issues.  It was just I was
20      quicker to write about it than other folks.
21      BY MR. FAES:
22   Q. Would you agree that the evolution of one of
23      your conclusions in the article from 2007, from
24      prolonged groin pain with transobturator tape

Page 215

1       is uncommon to groin pain after a
2       transobturator tape is not uncommon, reflects
3       an evolution in the understanding of how
4       common groin pain following a transobturator
5       tape procedure was between 2007 and 2010?
6          MS. KATZ GERSTEL:  Objection.
7    A. I mean, the point of -- the point of my
8       language in the first paper where I say
9       prolonged groin pain after transobturator tape
10      is uncommon was to point out that it is
11      uncommon, number one; and number two is
12      because it's uncommon, here are three cases of
13      people who had this uncommon event.
14         My language in the other article, in the
15      abstract, which again is a distillation of the
16      article, I start off the abstract with groin
17      pain after transobturator tape is not
18      uncommon.  But I also didn't preface it by
19      saying prolonged groin pain.  I just said
20      that, you know, out there people experience
21      some groin pain after transobturator routes of
22      surgery.
23         But then I think that later on in both
24      articles I talk about how the groin pain is

Page 216

1       usually self-limited, and it's pretty uncommon
2       to see groin pain, you know, after, let's say,
3       three weeks.
4       BY MR. FAES:
5    Q. Have you seen documents in your review in
6       issuing your opinions in this case indicating
7       that Ethicon and Johnson & Johnson, as early as
8       2004, believed that persistent groin pain with
9       the TVT-O was actually common and were already
10      considering changes to the design of the
11      device to address that issue less than three
12      months after the device had been launched in
13      the United States?
14         MS. KATZ GERSTEL:  Objection.
15   A. I don't remember seeing those documents.
16         MR. FAES:  Off the record for a second.
17         (Off-the-record colloquy.)
18         MR. FAES:  Doctor, I have many more
19      questions for you, but I'm informed I am out
20      of time.  So thank you for your time.  I will
21      let defense counsel conduct any questioning
22      which she may have.
23         MS. KATZ GERSTEL:  Thank you.
24            CROSS-EXAMINATION

Page 217

1       BY MS. KATZ GERSTEL:
2    Q. Dr. Roth, would it be fair to say that you
3       have been implanting both the TVT retropubic
4       and the TVT-O for some 13 years?
5    A. Yes.
6    Q. And I believe you testified that you've
7       implanted a total of over a thousand TVTs and
8       TVT-Os combined?
9    A. Easily, yes.
10   Q. Have the vast majority of your patients been
11      happy with their results after having a TVT or
12      a TVT-O implanted?
13         MR. FAES:  Object to form.
14   A. The vast majority are very pleased with their
15      outcomes, and I can't remember a specific
16      patient who regretted her decision to have a
17      sling.
18      BY MS. KATZ GERSTEL:
19   Q. For the vast majority of patients in whom you
20      have implanted a TVT or a TVT-O, has their
21      surgery improved their quality of life?
22         MR. FAES:  Object to form.
23   A. Yes.
24      BY MS. KATZ GERSTEL:

55 (Pages 214 to 217)

Ted M. Roth, M.D.

Page 218

1    Q. Do most patients in whom you implant a TVT or
2       TVT-O have complications?
3           MR. FAES: Objection.
4    A. I guess it depends on how you define
5       complications, but for the most part, people
6       do quite well after slings that I implanted.
7       BY MS. KATZ GERSTEL:
8    Q. For patients who do have complications after
9       TVT or TVT-O, in your hands, is their
10      complication usually treatable?
11          MR. FAES: Object to form.
12   A. Yes.
13      BY MS. KATZ GERSTEL:
14   Q. And are their complications usually treatable
15      conservatively?
16          MR. FAES: Object to form.
17   A. Yes.
18      BY MS. KATZ GERSTEL:
19   Q. Do you regularly read the peer-reviewed
20      medical literature --
21          (Off-the-record colloquy.)
22      BY MS. KATZ GERSTEL:
23   Q. Do you regularly read the peer-reviewed
24      medical literature on midurethral slings

Page 219

1       including TVT and TVT-O?
2           MR. FAES: Object to form.
3    A. Yes.
4       BY MS. KATZ GERSTEL:
5    Q. Do you confer with your medical colleagues
6       about midurethral slings including TVT and
7       TVT-O?
8           MR. FAES: Object to form.
9    A. Yes.
10      BY MS. KATZ GERSTEL:
11   Q. Do you attend medical society conferences at
12      which TVT and TVT-O are discussed?
13   A. Yes.
14   Q. Are your opinions on TVT and TVT-O based on
15      your own outcomes with the devices, as well as
16      the peer-reviewed medical literature?
17          MR. FAES: Object to form.
18   A. Yes.
19      BY MS. KATZ GERSTEL:
20   Q. Do you recall that Mr. Faes asked you some
21      questions about laser-cut mesh versus
22      mechanically-cut mesh?
23   A. I remember those questions.
24   Q. Is it correct that TVT comes both as a

Page 220

1       mechanically-cut -- strike that.
2           Do you agree that TVT can have
3       mechanically-cut mesh or laser-cut mesh?
4    A. Yes. They -- I think the Exact only comes as
5       laser-cut, but the regular retropubic can come
6       as both laser- or mechanically-cut. And the
7       Abbrevo, I think, is laser-cut and the TVT-O can
8       come as laser-cut or mechanically-cut. But I
9       use just the mechanically-cut material.
10   Q. Dr. Roth, whether it's mechanically-cut or
11      laser-cut -- strike that.
12          Doctor, if the TVT has laser-cut mesh or
13      mechanically-cut mesh, regardless of whether
14      it has -- strike that. Start over.
15          Doctor, regardless of whether a TVT has
16      laser-cut mesh or mechanically-cut mesh, it's
17      still a TVT; is that correct?
18   A. Yes.
19   Q. And regardless of whether a TVT-O has a
20      laser-cut mesh or mechanically-cut mesh,
21      it's still a TVT-O; is that correct?
22   A. Yes.
23   Q. Is it true that -- strike that.
24          Are you aware of any peer-reviewed

Page 221

1       medical literature that has ever shown any
2       different outcomes for patients whether
3       they've had a mechanically-cut mesh or a
4       laser-cut mesh?
5           MR. FAES: Object to form.
6    A. I'm not aware of any publications in that
7       regard, no.
8       BY MS. KATZ GERSTEL:
9    Q. Are you aware of any evidence whatsoever from
10      any source that has ever shown different
11      outcomes for patients according to whether
12      they've had a mechanically-cut mesh or a
13      laser-cut mesh?
14          MR. FAES: Object to form.
15   A. No, I'm not aware of that.
16      BY MS. KATZ GERSTEL:
17   Q. And yourself having implanted more than a
18      thousand TVTs and TVT-Os, have you ever seen
19      any clinical differences in outcomes between
20      laser-cut mesh and mechanically-cut mesh?
21          MR. FAES: Object to form.
22   A. No.
23      BY MS. KATZ GERSTEL:
24   Q. Doctor, do you recall that Mr. Faes asked you

56 (Pages 218 to 221)

Ted M. Roth, M.D.

Page 222

1    some questions about blue mesh versus clear
2    mesh?
3    A. Yes.
4    Q. Are you aware of any evidence whatsoever from
5      any source indicating that patients have
6      different outcomes depending on whether
7      they've had a blue mesh or a clear mesh?
8        MR. FAES: Object to form.
9    A. No.
10       BY MS. KATZ GERSTEL:
11   Q. And have you ever seen in your own practice a
12     difference in outcomes for patients depending
13     on whether they've had a blue mesh or a clear
14     mesh?
15       MR. FAES: Object to form.
16   A. No.
17       BY MS. KATZ GERSTEL:
18   Q. Do you recall Mr. Faes asking you about the
19     pore size of the mesh used in TVT and TVT-O?
20   A. Yes.
21   Q. Are you aware of whether the mesh in TVT and
22     TVT-O are macroporous type 1 meshes?
23       MR. FAES: Object to form.
24   A. They're macroporous type 1 meshes.

Page 223

1        BY MS. KATZ GERSTEL:
2    Q. Why is it -- strike that.
3        Is it your understanding that type 1
4      macroporous meshes are the most -- well,
5      strike that.
6        Is it your understanding that type 1
7      macroporous polypropylene meshes are the best
8      tolerated meshes to use in the human body?
9        MR. FAES: Object to form.
10   A. In terms of their use in the vagina and also
11     for abdominal repairs that I do,
12     sacrocolpopexies, those are the safest meshes.
13       (Off-the-record colloquy.)
14   Q. And can you explain why it's important that --
15     strike that.
16       Doctor, do you recall Mr. Faes asking you
17     some questions about what you are an expert
18     in?
19   A. Yeah.
20   Q. Having implanted over a thousand TVTs and
21     TVT-Os and then followed your patients for
22     years afterwards, is it fair to say that
23     you're an expert in how a woman's body reacts
24     to the implantation of TVT or TVT-O?

Page 224

1        MR. FAES: Object to form.
2    A. I think that's fair.
3        BY MS. KATZ GERSTEL:
4    Q. As a surgeon who has implanted over a thousand
5      TVTs and TVT-Os combined, are you an expert in
6      how the design of the TVT and TVT-O avoids
7      unintended trauma?
8        MR. FAES: Object to form.
9    A. Yes.
10       BY MS. KATZ GERSTEL:
11   Q. As a surgeon who has implanted over a thousand
12     TVTs and TVT-Os combined, are you an expert in
13     how the design of the TVT and TVT-O minimizes
14     the potential for complications?
15       MR. FAES: Object to form.
16   A. Yes.
17       BY MS. KATZ GERSTEL:
18   Q. As a surgeon who was trained in non-mesh
19     anti-incontinence surgeries and has implanted
20     over a thousand TVT-Os and TVTs combined and
21     who regularly reads the peer-reviewed medical
22     literature on midurethral slings and confers
23     with colleagues on midurethral slings, are you
24     an expert in what risks pelvic surgeons are

Page 225

1      aware of before they do a midurethral sling
2      surgery?
3        MR. FAES: Object to form.
4    A. Yes.
5        BY MS. KATZ GERSTEL:
6    Q. And are you thereafter an expert in what
7      warnings pelvic surgeons would need to be
8      given prior to performing a TVT or TVT-O?
9        MR. FAES: Object to form.
10   A. Yes.
11       BY MS. KATZ GERSTEL:
12   Q. Is it your opinion that the design of the TVT
13     makes it a safe and effective device?
14       MR. FAES: Object to form.
15   A. Yes.
16       BY MS. KATZ GERSTEL:
17   Q. Is it your opinion that the design of the
18     TVT-O makes that a safe and effective device?
19       MR. FAES: Object to form.
20   A. Yes.
21       BY MS. KATZ GERSTEL:
22   Q. And can you explain how the design of the
23     TVT-O, promotes its safety and efficacy?
24   A. I mean, the idea behind the obturator sling

57 (Pages 222 to 225)

Ted M. Roth, M.D.

Page 226

1    was to change the complication profile of a
2    retropubic approach, specifically perforating
3    the bladder, bowel, and great vessels of the
4    pelvis.
5        The TOT, which came out prior to the
6    TVT-O was a novel approval whereby the trocars
7    were passed through the -- groin,
8    ischiorectal or superior aspect -- aspect of
9    the ischiorectal fossa, paravaginal space and
10   then into the vagina so that we're not getting
11   anywhere near the bladder, the bowel, or the
12   pelvis.
13       The innovation of the TVT-O, which in my
14   mind I favor over the TOT, is that you're
15   starting at the mid-vagina, which is important
16   for the efficacy of these procedures.  But the
17   sling is placed at midurethra or very close to
18   what's considered to be the midurethra.
19       And then passage of the device from
20   inside to out again in my mind is safer from
21   inside to out than outside to in because of
22   the anatomy and how the obturator
23   neurovascular bundle presents itself to the
24   sling.

Page 227

1        From outside to in, the neurovascular
2    bundle runs along the outside of the obturator
3    foramen.  So if you're going from outside to
4    in, in my mind and in some papers, you have a
5    greater risk of injuring that neurovascular
6    bundle because it's in front of the bone.
7        If you're coming from inside to out, that
8    neurovascular bundle is naturally protected
9    because it's running around the outer rim of
10   the bone.
11       So I think you have, you know, greater
12   protection and greater safety with the TVT-O
13   versus the TOT, although I think that most of
14   your meta-analyses, systematic reviews
15   probably find that there's really not a
16   significant difference in terms of safety of
17   inside-out versus outside-in.
18   Q.  And can you explain how the design of the TVT
19   promotes the safety and efficacy of that
20   device?
21   A.  So, you know, the original pubovaginal slings
22   that we were doing there was a means of you
23   had to affix the sling to either the rectus
24   fascia or the retropubic space with bone

Page 228

1    anchors.  If you weren't using a full length
2    piece of material, then you would do
3    essentially what was known as a sling on a
4    string, and you would attach suture tails to
5    the end of the sling, but you would still have
6    to go above, make an incision to fix the
7    material there.
8        The novel thing about the TVT is that
9    although you are still going retropubically,
10   you no longer have to affix the material to
11   the rectus fascia or to the -- pubic bones
12   with bone anchors.  You have essentially an
13   anchorless system, which requires less
14   dissection, less invasive.  And, you know, in
15   my mind people have significant -- there were
16   case reports of people developing
17   osteomyelitis with the bone anchors and other
18   sorts of infections, seromas, with the
19   pubovaginal sites.
20   Q.  Doctor, does the IFU for the TVT and TVT-O, do
21   those include every single possible
22   complication attendant to the implantation of
23   those devices?
24       MR. FAES:  Object to form.

Page 229

1    A.  You know, I don't think that the IFUs contain
2    every conceivable possible complication
3    from -- from those devices, but I think that
4    they contain the -- what's relevant to not
5    only the implanting surgeon but also to the
6    patients.
7    BY MS. KATZ GERSTEL:
8    Q.  Do the IFUs need to contain every single
9    possible complication for the TVT and TVT-O?
10       MR. FAES:  Object to form.
11   A.  I think that a lot of what's contained in the
12   IFUs -- the majority of what's contained in
13   the IFUs are well-known complications to
14   pelvic surgeons, urologists, urogynecologists,
15   people doing incontinence surgery.  So I don't
16   think that an exhaustive list of complications
17   is necessary, and I also don't think that it
18   would impact patient care or decision-making
19   for -- for that surgeon to do that procedure.
20   BY MS. KATZ GERSTEL:
21   Q.  Doctor, if you have dinner with a sales rep
22   from a medical device or pharmaceutical
23   company, do you receive cash?
24   A.  No.  I just -- I just get dinner.

58 (Pages 226 to 229)

Ted M. Roth, M.D.

Page 230

1    Q. Doctor, do you recall that Mr. Faes asked you
2       some questions about the work that you've done
3       with various medical devices and
4       pharmaceutical companies?
5    A. Yes.
6    Q. Has the work that you've done with medical
7       devices and pharmaceutical companies mostly
8       involved teaching or instructing other
9       surgeons and doctors?
10       MR. FAES: Object to form.
11   A. Yeah. I mean, the majority of what I was
12      contracted to do by J & J and what I still
13      continue to do for Medtronic is teaching
14      other -- other physicians how to do
15      procedures.
16       There was maybe one event where -- well,
17      there may be a few events where J & J brought
18      a lot of implanters and had us congregate for
19      us to discuss pearls, tips, tricks to get our
20      opinions and to sort of see how things were
21      going for their -- feedback.
22       But the majority of what I was contracted
23      to do was to -- was to teach both at my
24      facility, at a doctor's facility and also at

Page 231

1       cadaver labs.
2    BY MS. KATZ GERSTEL:
3    Q. Doctor, would you ever do work, including
4       speaking and teaching, for a medical device or
5       pharmaceutical company if you believed that
6       the safety and efficacy of the products you
7       were speaking or teaching about were not
8       supported by medical evidence?
9       MR. FAES: Object to form.
10   A. Yeah, no, I try to be pretty ethical. I
11      wouldn't -- if I felt like the TVT products
12      were unsafe or didn't have good outcomes, I --
13      number one, I wouldn't attend them; and,
14      number two, I certainly wouldn't teach other
15      people how to do it.
16       And the same thing for my relationships
17      with the drug companies; I wouldn't get up in
18      front of a group of people and tell them about
19      a drug if it was unsafe or not effective.
20   BY MS. KATZ GERSTEL:
21   Q. Doctor, you were asked about an Exhibit 8,
22      which is a contract that you had with Ethicon,
23      dated April 30th of 2009. On the page ending
24      in 0275 under number 12, you were asked about

Page 232

1       this clause, which states, you shall not make
2       any representation relating to companies'
3       products or to companies' clinical outcomes
4       unless such representations have been reviewed
5       and approved in advance by a company.
6    A. Mm-hmm.
7    Q. Do you recall being asked about that?
8    A. Yeah.
9    Q. Doctor, did you ever make any representations
10      to doctors you were teaching, according to
11      this contract with Ethicon, that you did not
12      believe were accurate or supported by the
13      medical evidence?
14       MR. FAES: Object to form.
15   A. I did not.
16   BY MS. KATZ GERSTEL:
17   Q. Doctor, you were also asked about Exhibit 9,
18      which is a chain of e-mails between you and
19      personnel at your hospital.
20       Do you recall those questions?
21   A. Yes.
22   Q. And on the first page of Exhibit 9, the page
23      ending in 6013, this is an e-mail that you
24      sent to Steve Gauthier, James Hagen, copying

Page 233

1       Laird Covey and Lisa Ledoux; is that correct?
2    A. Yes.
3    Q. And when you drafted this e-mail, on March 14,
4       2009, were you working as an expert for
5       Ethicon at this time?
6    A. I was working as a proctor and preceptor at
7       that point.
8    Q. And you were not working as an expert yet; is
9       that correct?
10   A. An expert in regards to mesh --
11   Q. Litigation expert.
12   A. No.
13   Q. Doctor, I want to read a couple of sentences
14      from this e-mail. Going down to about the
15      middle of the page did you write in this
16      e-mail: These products, meaning the Johnson &
17      Johnson products that you were going to be
18      preceptoring on, these products are FDA
19      approved, rigorously studied and are what I
20      would recommend to my family members.
21   A. I wrote that, yes.
22   Q. And then right below that did you write the
23      following: I'm approached weekly by other
24      device companies to use their products and

59 (Pages 230 to 233)

Ted M. Roth, M.D.

Page 234

1    become preceptors from them.  I favor J & J
2    since I've had about a decade of experience
3    with their products, and again, they are the
4    most rigorously studied products.
5    A.  Yes, I wrote that.
6    Q.  And then turning on to the third page which
7    ends in 6015.
8        Is this another e-mail that you wrote?
9    It actually starts on the bottom of 6014.
10   A.  Yes.  This is -- that's part of the e-mail on
11   6014, correct.
12   Q.  And so looking back at 6015, do you see where
13   it starts:  Patients are not being brought to
14   the OR?
15   A.  Okay.  Yeah, I see -- I see where you are now,
16   yeah.
17   Q.  Patients are not being brought to the OR to
18   use J & J products.  They are being brought to
19   the OR to have surgery to correct specific
20   problems.  I choose to use J & J products
21   since they have the most data to support them
22   out of all the possible medical device
23   companies that make products for incontinence
24   and prolapse.  These procedures are done

Page 235

1    according to strict guidelines and no
2    deviation -- I don't know what the next word
3    is -- and then it says standard of care.
4        Did I read that correctly?
5    MR. FAES:  Object to form.
6    A.  Yes.  As much as I typed it incorrectly, you
7    read it correctly.
8    BY MS. KATZ GERSTEL:
9    Q.  Doctor, do you practice evidence-based
10   medicine?
11   MR. FAES:  Object to form.
12   A.  Yes.
13   BY MS. KATZ GERSTEL:
14   Q.  What is evidence-based medicine?
15   A.  It's medicine and surgery based upon what's
16   been shown to be effective and safe in the
17   medical literature.
18   Q.  How is it helpful to your patients to practice
19   evidence-based medicine?
20   A.  I think by offering them what is
21   evidence-based medicine, they're getting the
22   best -- that might be too strong but the --
23   they're getting the procedure, the treatment,
24   the medicine that has been vetted and studied

Page 236

1    the most, as opposed to me offering them some
2    sort of treatment that hasn't been rigorously
3    studied, vetted, you know, something that is
4    based on anecdotal, you know, single case
5    report.  Evidence-based medicine is based on,
6    you know, specific trials, powered
7    investigations, adequate, you know, control
8    groups and rigorous assessment of outcomes.
9    Q.  Doctor, could you please turn to page 6 of
10   your report?
11   A.  Okay.
12   Q.  Do you see the sentence down at the bottom
13   that Mr. Faes asked you about, MUS, including
14   TVT and TVT-O, are taught in residency and
15   fellowship programs throughout the United
16   States and are the gold standard procedure for
17   SUI?
18   A.  Yes.
19   Q.  Do you recall Mr. Faes asking you some
20   questions about this statement?
21   A.  Yes.
22   Q.  Are TVT and TVT-O among the midurethral slings
23   that Serati was talking about?
24   A.  Yes.

Page 237

1    Q.  Could you turn to page 9, please.  And can --
2    do you see the sentence:  Over 80 percent of
3    women with SUI are cured or have significant
4    improvement in their symptoms with either
5    retropubic or transobturator route MUS for up
6    to five years after surgery?
7    A.  Yes.
8    Q.  And that's a statement that is from the Ford
9    2015 Cochrane paper; is that correct?
10   A.  Correct.
11   Q.  And are TVT and TVT-O included in the
12   midurethral slings that are being referenced
13   there?
14   A.  Yes.
15   Q.  Doctor, do you remember that Mr. Faes asked
16   you some questions about patient satisfaction?
17   A.  Yes.
18   Q.  Could you please turn to page 15 of your
19   report?
20   A.  Okay.
21   Q.  Do you include a discussion here under
22   Retropubic Versus Transobturator Midurethral
23   Slings about the Laurikainen 2014 paper?
24   A.  You're on page 15?

60 (Pages 234 to 237)

Ted M. Roth, M.D.

Page 238

1  Q. Yes.
2  A. Yes.
3  Q. And did the Laurikainen paper discuss patient
4     satisfaction?
5  A. Excuse me.  Yes, it did.  It addressed
6     subjective success, and it's a
7     patient-reported outcome.
8  Q. This sentence in the middle of the paragraph,
9     it starts 92.6 percent.
10        Do you see where I'm reading?
11  A. Yes.
12  Q. I'll just read that sentence.  92.6 percent of
13     women in the TVT group and 88.6 percent of the
14     women in the TVT-O group reported that they
15     would recommend the procedure to a friend.
16        Doctor, is that an indication of patient
17     satisfaction?
18        MR. FAES:  Object to form.
19  A. Yes.
20      BY MS. KATZ GERSTEL:
21  Q. Doctor, is a 19 percent exposure or tape
22     projection rate something that you have seen
23     in your own practice?
24        MR. FAES:  Object to form.

Page 239

1  A. No.
2      BY MS. KATZ GERSTEL:
3  Q. Is a 19 percent exposure or tape projection
4     rate a rate that has been reported in the
5     meta-analyses and systematic reviews of
6     randomized controlled trials on midurethral
7     slings, including TVTs and TVT-Os?
8        MR. FAES:  Object to form.
9  A. I don't think that any of the meta-analyses or
10     systematic analyses reported rates anywhere
11     close to 19 percent.
12      BY MS. KATZ GERSTEL:
13  Q. Could you please look at page 19 of your
14     report?
15        Under Mesh Exposure/Extrusion in your
16     report, did you discuss the Funk study from
17     2013?
18  A. (Examining document) I did.
19  Q. And can you tell us what that study found in
20     terms of risk of reoperation due to exposure
21     or erosion?
22  A. Sure.  So that was a population-based study.
23     I can't remember the database that they
24     accessed, but it's a pretty extensive number

Page 240

1  of patients, 188,454 women who underwent sling
2  revision, removal of mesh.  The -- ultimately
3  the nine-year risk of -- or the nine-year
4  cumulative risk of reoperation was 3.7 percent
5  with a risk of mesh erosion, slash, exposure
6  of 2.5 percent.
7     But with that being said, there were some
8  limitations to that in terms of not knowing
9  when they presented, not knowing what sling
10  was placed, et cetera, et cetera.  But that's
11  a very low rate of erosion for a very large
12  number of patients, which is consistent with
13  my personal experience.
14  Q. Does the Funk study show that there was a
15  nine-year cumulative risk of 3.7 percent
16  of the sling revision or removal due
17  to mesh erosion and retention?
18  A. That's correct.
19  Q. Doctor, in formulating your opinions, do you
20  base your opinions on the peer-reviewed
21  medical literature?
22     MR. FAES:  Object to form.
23  A. Yes.
24     BY MS. KATZ GERSTEL:

Page 241

1  Q. In formulating your opinions, do you base your
2  opinions on highest level of evidence
3  available?
4     MR. FAES:  Object to form.
5  A. I try to make my opinions based on the
6  meta-analyses and systematic reviews, which
7  are the highest levels of evidence available.
8     BY MS. KATZ GERSTEL:
9  Q. Does the highest level of evidence in the
10  medical literature consist of systematic
11  reviews and meta-analyses?
12  A. Yes.
13  Q. And is that why you cited the Nager commentary
14  on page 7 of your report which aggregates the
15  results of four systematic reviews and
16  meta-analyses?
17     MR. FAES:  Object to form.
18  A. Yeah.  That's why I -- I put that chart in,
19  because it's a very nice summation of
20  midurethral slings versus other incontinence
21  procedures and the results based on those four
22  meta-analyses.
23     MS. KATZ GERSTEL:  That's all I have.
24     THE WITNESS:  Sure.

61 (Pages 238 to 241)

Ted M. Roth, M.D.

| Page 242 | Page 244 |
|---|---|

**Page 242**

1    MR. FAES:  Until tomorrow.
2    MS. KATZ GERSTEL:  Yes.
3        (The deposition concluded at 4:45 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 244**

1            CERTIFICATE
2        I, Beth Gaige, a Registered
3    Professional Reporter and Notary Public in and
4    for the State of Maine, hereby certify that
     the within-named deponent was sworn to testify
5    the truth, the whole truth, and nothing but
6    the truth in the aforementioned cause of
7    action.
8        I further certify that this deposition
     was stenographically reported by me and later
9    reduced to print through computer-aided
10   transcription, and the foregoing is a full and
11   true record of the testimony given by the
12   deponent.
13       I further certify that I am a
     disinterested person in the event or outcome
14   of the above-named cause of action.
         IN WITNESS WHEREOF, I subscribe my hand
15   and affix my seal this 28th day of March 2017.
16
17
18   _____
19        Beth Gaige, RPR
20        Notary Public
21   My commission expires:
22
23
24

**Page 243**

1    DEPONENT SIGNATURE PAGE
2    CAPTION:  IN RE:  ETHICON, INC.
3    PELVIC REPAIR SYSTEM
4    PRODUCTS LIABILITY LITIGATION
5    DEPONENT:  TED M. ROTH, M.D.
6
7    I, TED M. ROTH, M.D., acknowledge that I have
8    read Pages 1 through 242 inclusive of the
9    transcript of my deposition taken on
10   March 16, 2017.  I further acknowledge that:
11       (check appropriate language)
12
13   _____ the same is a true, correct, and complete
14   transcription of the answers given by me to
15   the questions recorded therein.
16           OR
     _____ except for the changes noted on the attached
17   errata sheet, the same is a true, correct,
     and complete transcription of the answers
18   given by me to the questions recorded
     therein.
19   _____
20        TED M. ROTH, M.D.
21   Subscribed and sworn to before me
22   this_____ day of_____, 2017
23   _____
24   Notary Public

**Page 245**

1    THE ORIGINAL DEPOSITION OF TED M. ROTH, M.D.
2    SHOULD INCLUDE THE FOLLOWING CORRECTIONS:
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   _____
23
24        TED M. ROTH, M.D.

62 (Pages 242 to 245)