# EXHIBIT D

Stanley Zaslau, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

-----

| | | |
|---|---|---|
| IN RE: ETHICON, INC., | ) | Master File |
| PELVIC REPAIR SYSTEM | ) | No. 2:12-MD-02327 |
| PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | MDL No. 2327 |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | JOSEPH R. GOODWIN |
| ALL WAVE 4 AND SUBSEQUENT | ) | U.S. DISTRICT JUDGE |
| WAVE CASES | ) | |
| | ) | _____ |
| _____ | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

-----

DEPOSITION OF STANLEY ZASLAU, M.D.

-----

Wednesday, March 8, 2017

-----

General- Prolift

General - Gynemesh PS

Stanley Zaslau, M.D.

| Page 2 |
|---|

1    DEPOSITION OF STANLEY ZASLAU, M.D.
2    a witness herein, called by the Plaintiffs for
3    examination, taken pursuant to the Federal Rules
4    of Civil Procedure, by and before Constance Lee, a
5    Registered Professional Reporter and a Notary
6    Public in and for the State of West Virginia, at
7    the law offices of Jackson Kelly, PLLC, 150 Clay
8    Street, Suite 500, Morgantown, West Virginia, on
9    Wednesday, March 8, 2017, at 2:01 p.m.
10                      -----
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| Page 3 |
|---|

1    COUNSEL PRESENT:
2
3    For the Plaintiffs:
4       Andrew N. Faes, Esq.
5       WAGSTAFF & CARTMELL, LLP
6       4740 Grand Avenue, Suite 300
7       Kansas City, MO 64112
8       afaes@wcllp.com
9
10   For the Defendants Ethicon, Inc., and Johnson &
11   Johnson:
12      Susan M. Robinson, Esq.
13      THOMAS COMBS & SPANN, PLLC
14      300 Summers Street, Suite 1380
15      P.O. Box 3824
16      Charleston, WV  25301
17      srobinson@tcspllc.com
18                      -----
19
20
21
22
23
24

| Page 4 |
|---|

1                      INDEX
2    EXAMINATION                      PAGE
3    BY MR. FAES                      6
4    BY MS. ROBINSON                  185
5    BY MR. FAES                      204
6
7    EXHIBITS                         PAGE
8    1 - Notice of Deposition              7
9    5 - Flash drive  (Retained by counsel)     7
10   2 - General Expert Report of Stanley       8
11       Zaslau, MD, MBA, FACS, Regarding
12       Gynemesh PS and Prolift
13   3 - Stanley Zaslau General Reliance List    10
14       in Addition to Materials Referenced
15       in Report:  MDL Wave 4
16   4 - Stanley Zaslau Supplemental General    10
17       Reliance List in Addition to Materials
18       Referenced in Report:  MDL Wave 4
19   6 - Curriculum vitae                 18
20   8 - Field Visit Letter - ESC Sales     61
21       Representative, Sept. 25-26, 2013
22       ETH.MESH.23989026 through -9033
23       CONFIDENTIAL - SUBJECT TO STIPULATION
24       AND ORDER OF CONFIDENTIALITY

| Page 5 |
|---|

1    9 - E-mail chain dated Sept. 19, 2003     65
2        ETH.MESH.25089710 through -9712
3        CONFIDENTIAL - SUBJECT TO STIPULATION
4        AND ORDER OF CONFIDENTIALITY
5    10 - E-mail with attached letter dated     68
6        January 30, 2012
7        ETH.MESH.05772307 through -2309
8        CONFIDENTIAL - SUBJECT TO STIPULATION
9        AND ORDER OF CONFIDENTIALITY
10   11 - E-mail chain dated Feb. 13, 2007     74
11       ETH.MESH.07031556 through -1559
12       CONFIDENTIAL - SUBJECT TO STIPULATION
13       AND ORDER OF CONFIDENTIALITY
14   7 - (not marked at deposition)
15
16                      -----
17
18
19
20
21
22
23
24

2 (Pages 2 to 5)

Stanley Zaslau, M.D.

Page 6

PROCEEDINGS
-----
1
2
3      STANLEY ZASLAU, M.D.
4  a witness herein, having been first duly sworn,
5  was examined and testified as follows:
6      -----
7      EXAMINATION
8  BY MR. FAES:
9    Q. Good afternoon, Dr. Zaslau.
10   A. Good afternoon, sir.
11   Q. My name is Andy Faes, and I represent various
12 Plaintiffs in this litigation, and I'm here now to
13 take your deposition regarding the Prolift and
14 Gynemesh PS products. Do you understand that?
15   A. I do.
16   Q. And you understand that you're under oath and
17 must tell the truth; correct?
18   A. I understand.
19   Q. And I know you've been through this several
20 times before but if I ask you a question that for
21 some reason you don't understand, please let me
22 know, and I'll try to rephrase the question. Okay?
23   A. Okay.
24   Q. I'm going to hand you what's been marked as

Page 7

1  Exhibit No. 1 to your deposition. Have you seen
2  this before?
3        (Dr. Zaslau Deposition Exhibit No. 1 was
4  marked for identification.)
5    A. Yes, I have.
6    Q. And this notice asks you to bring various
7  documents and things to your deposition today.
8    A. Yes.
9    Q. Have you brought anything with you in
10 response to the request in this notice?
11   A. I brought a variety of things, yes.
12   Q. What did you bring?
13   A. A copy of my CV, and that's it.
14   Q. Just your CV?
15      MS. ROBINSON: May I interrupt.
16      MR. FAES: You may.
17      MS. ROBINSON: I just provided you with
18 a flash drive that includes all of his reliance
19 materials which are the materials that were provided
20 to you in response to his notice of deposition.
21      MR. FAES: I'm going to mark that as
22 Exhibit No. 5, the flash drive, and I'll probably
23 come back to that in just a second.
24      (Dr. Zaslau Deposition Exhibit No. 5 was

Page 8

1  marked for identification.)
2    Q. First, Doctor, I see you have a binder in
3  front of you with various materials.
4    A. Yes.
5    Q. What's in that binder? I'll let you answer
6  the question: What's in the binder that you brought
7  with you today?
8    A. It has a variety of different studies,
9  exhibits from other depositions, materials I've
10 reviewed, articles.
11   Q. Okay. I'm going to hand you what's been
12 marked as Exhibit No. 2 to your deposition. Can you
13 tell me what that is.
14      (Dr. Zaslau Deposition Exhibit No. 2 was
15 marked for identification.)
16   A. That is my general expert report.
17   Q. And this report is the report that you signed
18 on January 11th of this year; is that accurate?
19   A. Yes.
20   Q. And does this report in front of you marked
21 as Exhibit No. 2 contain all of the opinions that
22 you've reached regarding the Prolift and Gynemesh PS
23 products?
24   A. To the date as of January 11th, the date that

Page 9

1  it was signed, yes.
2    Q. And in this report you go through various
3  facts and discuss various facts. Did you discuss
4  the facts that you felt were most relevant and
5  important to you in drawing your opinions in this
6  case?
7        MS. ROBINSON: Object to form.
8    A. I did, yes.
9    Q. There are also many various articles cited
10 throughout your expert report; correct?
11   A. Yes.
12   Q. In terms of your decision-making in writing
13 your report, why did you cite to those articles?
14   A. I thought they had scientific importance. I
15 believed the paper was sound and the conclusion and
16 the recommendations were sound.
17   Q. So it's accurate that you believe all of the
18 articles that you specifically discuss in the body
19 of your report are relevant and the conclusions of
20 those articles are sound; is that accurate?
21   A. I think the material is relevant, yes. And I
22 think the conclusions are sound.
23   Q. Okay. I'm going to hand you what's been
24 marked as Exhibit No. 3 and 4 to your deposition.

3 (Pages 6 to 9)

Stanley Zaslau, M.D.

Page 10

1    (Dr. Zaslau Deposition Exhibit Nos. 3
2  and 4 were marked for identification.)
3    MR. FAES:  That's 3.  That's 4.
4    Q.  And can you tell me what Exhibit No. 3 is.
5    A.  Exhibit 3 is a general reliance list in
6  addition to materials that I have in my report that
7  I've written on Gynemesh and Prolift.
8    Q.  Okay.  And what is Exhibit No. 4?
9    A.  Exhibit No. 4 are supplemental additional
10 materials in addition to what was referenced and
11 reported in my report.
12   Q.  Actually, can I ask you to hand me back
13 Exhibit No. 4 because that's my copy.  I'm going to
14 get you a different Exhibit No. 4.
15     MR. FAES:  For the record, it's the same
16 No. 4.  It's just a copy without my markings on it.
17     (Witness reviews document.)
18   Q.  Do you -- do you know what the difference is
19 between Exhibit No. 3 and Exhibit No. 4?
20   A.  Yeah.  There's certainly additional materials
21 in it.  The latter parts of No. 4 refer to videos,
22 to a deposition comment, to questions from the FDA,
23 a lot of expert reports, a variety of different
24 physicians over a period of time.

Page 11

1    Q.  So do you know specifically or -- strike
2  that.
3        Do you know in general what kinds of
4  materials were added to Exhibit No. 4, your
5  supplemental reliance list?  Did I understand you
6  correctly that you added some procedure videos to
7  that?
8    A.  Yeah, it looked like there were some
9  procedure videos and discussions that are in here as
10 well.  There's a large, large body of material here.
11   Q.  And when did you review the additional
12 materials that were added to your supplemental
13 reliance list marked as Exhibit No. 4?
14   A.  I've been reviewing materials in preparation
15 for this report and additional materials, very
16 significantly over the last three months, to as of
17 last evening.
18   Q.  Now, counsel has brought with her a flash
19 drive marked as Exhibit No. 5.
20   A.  Yes.
21   Q.  Is there anything contained on Exhibit No. 5
22 that is not listed in your supplemental reliance
23 list marked as Exhibit No. 4?
24   A.  No, there shouldn't be anything different.

Page 12

1    Q.  Is there anything in the binder that you
2  brought with you today that's in front of you that
3  is not on -- listed in the reliance list marked as
4  Exhibit No. 4?
5    A.  No.
6    Q.  Now, I noticed on your reliance list there is
7  a lot of literature regarding slings and TVT and
8  TVT-O.  In forming your opinions regarding the
9  Prolift and Gynemesh PS, did you rely on midurethral
10 slings and the TVT to form any of your opinions
11 regarding the safety and efficacy of the Prolift?
12   A.  Yes.
13   Q.  What specifically did you rely on?
14   A.  The design of the TVT is what helped create
15 the eventual Prolift; the trocars, the mechanism for
16 which they could be inserted, the concepts of the
17 anatomy and their relevant relationships leads to
18 the use of trocars in the pelvic floor, from the
19 original TVT when it came out in 1997 to its
20 modifications via the obturator route.
21   Q.  And the same question regarding the Gynemesh
22 PS product:  In forming your opinions regarding the
23 Gynemesh PS product, did you rely on midurethral
24 slings, specifically the TVT and TVT-O to form any

Page 13

1  of your opinions regarding the safety and efficacy
2  of the Gynemesh PS?
3    A.  Yes.  Again, certainly, it was those
4  formatives studies, that formative product, that
5  helped lead to the discovery of Gynemesh PS.
6    Q.  Are you relying on any data or findings in
7  any of the TVT or midurethral sling literature in
8  order to form your opinions regarding the Prolift?
9    A.  Yes.
10   Q.  And what are you relying on there?
11   A.  Well, we've known about the success of slings
12 since even before TVT was described.  Back in the
13 mid-1990s, and even before, with a variety of
14 different types of mesh that was used and the way
15 that mesh was delivered with not trocars at the time
16 but staining needles.
17       So the procedure has -- of how that
18 was done, the complications associated thereof, were
19 the same issues that are certainly relevant to the
20 TVT and later to the Gynemesh and Prolift.
21   Q.  Would you agree that the -- the overall
22 safety profile of TVT and TVT-O is different from
23 the overall safety profile of Prolift product?
24     MS. ROBINSON:  Object to form.

4 (Pages 10 to 13)

Stanley Zaslau, M.D.

Page 14

1    A.  I don't follow what you mean by "safety
2  profile."  What do you mean by that?
3    Q.  Would you agree -- well, what do you believe
4  a safety profile is?  I guess when I say "safety
5  profile" -- strike that.
6        What I mean "safety profile," I mean
7  the overall safety and efficacy of the product.
8  With that definition in mind, would you agree that
9  the overall safety profile of the TVT and TVT-O is
10 different from the Prolift product?
11       MS. ROBINSON:  Object to form.
12   A.  I'm not sure I'm understanding, but I'll try
13 and answer.
14   Q.  Okay.
15   A.  To me, when you say "safety profile," what
16 you're saying is that does the product do what it's
17 intended to do, are the risks that could be
18 associated with it predictable based on how it would
19 work.  And would the success be able to be predicted
20 on the basis of both of those things, in other
21 words, its mechanism and the complications that
22 would be associated with.  That's how I would see
23 that.
24   Q.  You'd agree that the, for example, the TVT

Page 15

1  product has much less mesh in it than the Prolift
2  product; correct?
3    A.  The TVT does have less mesh it in, yes.
4    Q.  And you'd agree that the fact that the
5  Prolift has much more mesh than the TVT and TVT-O
6  product can mean that it can potentially cause a
7  higher rate and incidence of complications than the
8  TVT because of the amount of mesh present?
9        MS. ROBINSON:  Object to form.
10   A.  That would be expected on terms of the volume
11 of mesh, yes.  You could estimate that.  For a TVT
12 it would be, it's a 2-by-12 centimeter mesh.  So of
13 that, roughly 6 centimeters would be under the
14 urethra and out laterally to the pelvic side wall.
15 In Prolift or in a prolene mesh PS, a typical defect
16 might be 6 centimeters by maybe 8 centimeters in
17 terms of the width of the cystocele, so that's 48
18 cubic centimeters in terms of volume.
19       So I would expect that, since there's
20 four times more mesh in the typical cystocele, that
21 the rate of complication can certainly be magnified
22 four or more times.
23   Q.  Okay.  When were you first contacted
24 regarding being an expert on the Prolift and

Page 16

1  Gynemesh PS products?
2    A.  I was asked originally to work in the TVT
3  cases about four years ago.  At that time there was
4  discussion of involvement in the Prolift cases.  But
5  it was only over the last six months that I was
6  asked to go forward and work and prepare formal
7  reporting as I have for today.
8    Q.  So if I understand your testimony correctly,
9  you believe you started work on the -- your Prolift
10 and Gynemesh PS report sometime in November of last
11 year or December?
12   A.  I started over the summer.  I mean, this
13 was -- was an ongoing discussion that there would be
14 a need to work on a Prolift report.  And this was
15 based on the timing of when counsel had asked me to
16 complete that and their discussion was to have it
17 completed for the January submission.
18   Q.  So I guess my question is when did you
19 essentially get the green light, so to speak, from
20 counsel from Ethicon and Johnson & Johnson to start
21 working on a general expert report for Prolift and
22 Gynemesh PS?
23   A.  Over the summer of last year, initially, but
24 the bulk of the work was really done over the last

Page 17

1  three to four months.
2    Q.  Have you billed for any of that time yet for
3  your Gynemesh PS and Prolift report beginning in the
4  summer of last year?
5    A.  Some of that has through monthly reports but
6  there are other projects I am working on in this
7  litigation.  So it was a piece of a larger effort.
8    Q.  Have you brought any of those invoices for
9  your Gynemesh PS and Prolift with you here today?
10   A.  I have not, no.
11   Q.  How many hours would you -- and we've asked
12 that those be produced.
13       How many hours would you estimate that
14 you've spent working on review of materials and
15 drafting your Gynemesh PS Prolift report?
16   A.  Approximately 45 hours.
17   Q.  And those 45 hours, were those at a rate of
18 $500 an hour?
19   A.  That's correct.
20   Q.  How many hours would you say you spent
21 actually drafting the report as opposed to reviewing
22 materials?
23   A.  I do both at the same time, so it's -- it's
24 hard to tell.  I may have on one computer an article

5 (Pages 14 to 17)

Stanley Zaslau, M.D.

Page 18

1    I'm looking at and writing on my laptop, so
2    sometimes they're both done at the same time.
3        Q. Is it fair to say that when you bill for your
4    time, you don't separate your writing activities
5    versus your review of material activities?
6        A. I do not.
7        Q. Okay. I'm going to hand you what's been
8    marked as Exhibit No. 6 to your deposition.
9            (Dr. Zaslau Deposition Exhibit No. 6 was
10   marked for identification.)
11       Q. If you can tell me what that is.
12       A. This is copy of my CV.
13       Q. Uh-huh. I'll represent to you that this is
14   the copy that was provided to us with your expert
15   report. Is this your current curriculum vitae?
16       A. Yes. I mean, certainly there may be some
17   additional publications that may have been added
18   since this had gone to you.
19       Q. When was this last updated?
20       A. I update it monthly, so I don't -- there's
21   usually a date on the bottom. I can't see the date
22   here. For whatever reason it was blocked out at
23   some point in time. This was probably, I'd say, the
24   January version, so you know, early January 2017,

Page 19

1    first week of January.
2        Q. And as you mentioned earlier, your curriculum
3    vitae includes a list of publications.
4        A. Yes.
5        Q. Do any of those publications listed in your
6    CV specifically address the Prolift product?
7        A. No.
8        Q. Do any of the publications in your CV
9    specifically address the Gynemesh PS product?
10       A. No.
11       Q. Do any of your publications in your CV
12   specifically address the TVM technique for the
13   treatment of prolapse?
14       A. Yes, there's an article that we published in
15   2016 on the carcinogenic potential of mesh. I'm not
16   sure if it made it into this version here. I could
17   look and see. We've had several other case reports
18   that were published regarding eroded -- eroded Burch
19   and MMK procedures, which may not have made it into
20   this version because they were just recently
21   accepted.
22       Q. Okay. What -- what -- what's the name of the
23   article where you discuss carcinogenic?
24       A. It's by Adel, A-D-E-L, 2016, and it's on the

Page 20

1    carcinogenic potential of mesh. I'm trying to see
2    if I can find you the exact -- exact copy of it,
3    which is somewhere in my reliance. It may be in one
4    of these books. I'm not sure which exact one it's
5    in, but let me see if I can find it. Yeah,
6    Carcinogenic Potential of Polypropylene Midurethral
7    Slings, What Do We Know So Far.
8        Q. Okay. And you mentioned earlier some case
9    reports?
10       A. Yes.
11       Q. Regarding the MMK and the Burch procedure?
12       A. Yes.
13       Q. I understand those have been submitted for
14   publication?
15       A. They were just accepted by the American
16   College of Obstetrics and Gynecology resident case
17   reviews. So these are case reports that were
18   accepted for publication for their website.
19       Q. So was it one case report regarding one MMK
20   and one regarding Burch?
21       A. That's correct, one of each.
22       Q. Those are treatments for stress urinary
23   incontinence, not for vaginal prolapse; correct?
24       A. That's correct. But they were written

Page 21

1    because these were patients involving erosions of
2    their materials.
3        Q. Why did you choose to write a case report
4    regarding erosion materials from MMK and the Burch
5    procedure?
6        A. These were patients that had these procedures
7    many years ago and had other symptoms that were not
8    addressed, and only upon cystoscopy were these
9    issues noted.
10       Q. Have you ever published in the area of mesh
11   complications?
12       A. Not directly, no.
13       Q. So you say not directly; have you published
14   indirectly in the area of mesh complication?
15       A. I meant -- I should have just said no.
16       Q. Okay. So what did you mean when you said not
17   directly? Were you perhaps referring just to your
18   expert reports in this litigation or is there
19   something else you were thinking of?
20       A. I don't know what I was thinking of.
21       Q. Okay. Now, you've used Prolift in your
22   medical practice from approximately 2004 to 2012; is
23   that correct?
24       A. Yes. Closer to 2010 or so. We didn't have

6  (Pages 18 to 21)

Stanley Zaslau, M.D.

Page 22

1   access to it after about 2010.
2      Q.  Okay.  I'm just going by your expert report,
3   which I believe says that you implanted
4   approximately 100 Prolifts between 2004 and 2012?
5      A.  Right.  Really all of them -- Prolift was
6   available nationally until about 2012, but at our
7   facility, my last case was probably about 2009.  Or
8   so.
9      Q.  Okay.  Actually, it says on page 3 of your
10  report it says from 2001 until 2012 you performed
11  over 100 Prolift procedures.  Do you see that?
12     A.  Yeah.  Well, I couldn't have performed them
13  in 2001 because Prolift didn't exist in 2001.
14     Q.  That's correct.  When do you believe that you
15  first performed a Prolift procedure?
16     A.  On page 3, I started -- in the second
17  paragraph, I learned to perform the Prolift
18  procedure in practice beginning in 2004.  So from
19  2001 to 2012 should really say, from 2004 on I
20  performed a hundred Prolift procedures.
21     Q.  So that's an error in your report on page 3
22  where it should say 2004 to 2012; is that accurate?
23     A.  Yes.
24         MS. ROBINSON:  Object to form.

Page 23

1      A.  Yes.
2      Q.  Where did you learn to -- where did you
3   first -- strike that.
4          Where were you first trained on the
5   Prolift device?
6      A.  I went to the Cleveland Clinic to a hands-on
7   session with Dr. Howard Goldman, it was a cadaver
8   lab and live cases.
9      Q.  Now, I don't -- correct me if I'm wrong, but
10  is there anywhere in your expert report where you
11  talk about the first time you used the Gynemesh PS
12  product, specifically the flat mesh product?
13     A.  I never used it as an independent entity.
14  It's not been available at our hospital to use as an
15  independent product.
16     Q.  And you've been at West Virginia University
17  since 2001?
18     A.  That's correct.
19     Q.  Do you know why it's never been offered at
20  your hospital --
21     A.  I don't know.
22     Q.  -- as an independent product?
23     A.  I don't know and I never asked.
24     Q.  And to this day you've never asked; is that

Page 24

1   accurate?
2      A.  Now, it's after the fact.  You know, once the
3   mesh kits had not been available, then, you know,
4   why would I go back and ask?  It also wasn't
5   something that was necessary for me to use as an
6   independent product.
7      Q.  So do you -- you perform -- I know I'm going
8   to say it wrong -- for the rest of day I'll refer to
9   it as ASC, do you perform abdominal sacrocolpopexy
10  with mesh products?
11     A.  I do now, yes.
12     Q.  What products do you use for ASC?
13     A.  We use the Bard Y-mesh and have been using
14  that for the last few years.
15     Q.  So the Bard Y-mesh is available at your
16  hospital, but the Gynemesh PS is not; is that
17  accurate?
18     A.  That's correct.  It was never available, and
19  I don't know why it wasn't or what the story was.
20  The first Gynecare product available was the TVT,
21  and the TVT-O certainly was available, and the
22  Prolift was available.  But Gynemesh as a separate
23  entity wasn't.
24     Q.  Do you know whether or not Ethicon and

Page 25

1   Johnson & Johnson makes a Y-mesh similar to the Bard
2   ALYTE?
3      A.  Yeah, I don't know if they do.
4      Q.  Have you ever asked or done any research on
5   that?
6      A.  No, because this is, again -- our abdominal
7   sacrocolpopexy experience is just over the last few
8   years.  So in terms of what's available to us, the
9   Boston product is available.
10         I want to make one comment.  I want to
11  make a comment to you about our hospitals and how
12  ordering works.  The products are ordered through
13  the system for not just our hospital but for others
14  in the system.  So they'll order things that maybe
15  other people might use, and so they'll make
16  decisions based on the system.  Say, well, you're
17  the only one using it for the system, you know,
18  maybe we should use something else.  They're using
19  something else in Parkersburg, could you use what
20  they use.  They're trying to make systems decisions
21  for a large number of hospitals.  So that affects
22  availability of what's available.
23     Q.  What other mesh kits have you used for the
24  treatment of pelvic organ prolapse?

7 (Pages 22 to 25)

Stanley Zaslau, M.D.

Page 26

1    A. Just Prolift.
2    Q. Do you -- did you feel at the time that you
3  used the Prolift from 2004 to 2012 that it was the
4  best mesh kit available for the treatment of pelvic
5  organ prolapse?
6    A. I liked it.  I liked it because it was easy
7  to use.  It's a very logical approach.  I liked that
8  the mesh was soft and easy to position where you
9  wanted to at the level of the defect.  I was happy
10  with it.  And I had good results.  It was very
11  intuitively easy to do based on all that we knew
12  already about trocars and placement in the body for
13  15 -- say, 2004 -- so for the -- my nine years
14  prior, there was a logical extension.
15    Q. My question was a little different, though.
16  My question was specifically, did you feel, when you
17  were using the Prolift that it was the best mesh kit
18  available for the treatment of pelvic organ
19  prolapse?
20    A. I didn't look for others.  I was happy once I
21  had started using it and didn't feel I needed to
22  look further.
23    Q. So if I understand you correctly, you don't
24  have an opinion one way or the other whether or not

Page 27

1  the Prolift was the best mesh kit available for the
2  treatment of pelvic organ prolapse when you were
3  using it?
4    A. I haven't tried any other ones, so I couldn't
5  tell you.  But I was happy with the product I was
6  using.  So I didn't feel the need to try other ones.
7    Q. So do you intend to offer an opinion in this
8  case that the Prolift mesh was -- is or was the best
9  mesh kit available for the treatment of pelvic organ
10  prolapse?
11    A. I think it's an excellent kit that serves --
12  served its stated purpose of what it was intended to
13  do and was successful in its use and, to this day, I
14  still see patients back who have done extremely well
15  with it.
16    Q. Right.  I think my answer (sic) is a pretty
17  simple yes-or-no question.  Do you intend to offer
18  an opinion in this case, one way or the other, that
19  the Prolift mesh kit is the best -- is or was the
20  best mesh kit available for the treatment of pelvic
21  organ prolapse?
22    A. I certainly couldn't say it's the best
23  because it's the only one I've used, so I wouldn't
24  have a fair comparison to another kit.

Page 28

1    Q. Do you have any opinions about whether or not
2  the Gynemesh PS mesh is the best mesh available for
3  the treatment of pelvic organ prolapse?
4    A. Again, I couldn't say it's the best mesh for
5  its intended purpose of what it's supposed to do.
6    Q. I think you've answered my question.  Go
7  ahead and finish.
8    A. I was going to say for its intended purpose,
9  it does quite well.
10    Q. So when was the last Prolift mesh that you
11  implanted in a patient?  When was that done?
12    A. I would say 2009 or 2010.  Our hospital at
13  that point had stopped ordering them.  This was
14  sometime after the FDA ruling in 2008.  But for no
15  reason other than -- well, we're not stocking this
16  because you're the only one using this.  I was the
17  only one using Prolift.  There's no one else using
18  other mesh kits in our hospital.  I'm not sure about
19  any other ones in the system, but you're the only
20  one using them.  We're stocking them just for you.
21    Q. So you believe that the last time you
22  implanted a Prolift mesh was in 2009 or 2010?
23    A. Yes.
24    Q. Not 2012, as stated in your expert report?

Page 29

1    A. No.
2    Q. On page 3?
3    A. I have not done anything after say 2010.
4    Q. So your report should read on page 3, from
5  2004 until 2009 or 2010, you performed over a
6  hundred Prolift procedures?
7    A. Yes.
8    Q. And the -- you still believe that that part
9  of the sentence is right, that you performed over a
10  hundred Prolift procedures?
11    A. Just over a hundred, yes.
12    Q. How did you determine that you performed over
13  a hundred Prolift procedures?
14    A. Well, we reviewed patients and how they're
15  doing.  Look at complications.  Look at the kind of
16  procedures we were doing and so that gave me that
17  number.
18    Q. So the last time that you implanted a Prolift
19  device was in 2009 or 2010; when was the last time
20  that you performed a Prolift procedure?
21    A. 2009 or 2010.
22    Q. It was the same time?
23    A. Yes.
24    Q. And why did you choose to stop doing the

Stanley Zaslau, M.D.

Page 30

1    Prolift procedure?
2        A. It wasn't available anymore in our facility.
3        Q. Okay. Just to clarify, Doctor, I'm asking
4    about the Prolift procedure, not the Prolift device?
5        A. Right. I only used the Prolift device. I
6    never used the Gynemesh. If the device wasn't
7    there, then I didn't do the procedure or I couldn't
8    do the procedure.
9        Q. So it's your testimony that you can't do a
10   Prolift procedure without having the Prolift device?
11           MS. ROBINSON: Object to form.
12       A. Well, when you're saying the Prolift
13   procedure, what you're saying to me is their
14   trademarked procedure with their trocars and their
15   mesh, and I'm saying that I can't since it's not
16   available.
17       Q. Well, do you know that prior to the Prolift
18   mesh kit being commercially available as a kit in
19   2004, that doctors were taking the Gynemesh PS mesh
20   and cutting it themselves and essentially putting it
21   in the same way or close to the same way as the
22   Gynemesh -- strike that -- as the Prolift kit?
23       A. That's certainly something that could be
24   done, that's certainly something I knew about, but

Page 31

1    chose not to.
2        Q. Why did you choose not to?
3        A. I liked the kit. It was very compact and
4    easy to use. The handles were very ergonomic. The
5    retrieval device was very logical and to come up and
6    create something on my own, I just didn't think was
7    good. Our hospital was trying to do the same thing
8    with their slings: They have a general sling kit
9    that you can fashion into whatever you wanted to do
10   and it didn't go over well amongst any of the
11   practitioners. So I decided I'm not going to
12   manufacture something. I'm just going to go back to
13   what is tried and true and it's what's worked and
14   know that it's an option I don't have that's
15   available to me.
16       Q. Is it fair to say that one of the reasons
17   that you chose not to continue to do the Prolift
18   procedure once the Prolift kit was no longer
19   available to you at your hospital is because you
20   felt like there were better treatment options
21   available to your patients?
22           MS. ROBINSON: Object to form.
23   Mischaracterizes his testimony.
24       A. No, I don't think the treatment options were

Page 32

1    better. I think that these were the options that I
2    was left with. If the Prolift were available, I
3    certainly would have wanted to keep using it because
4    it worked. It had done quite well. If you can't
5    have what -- what you'd like to have, you can also
6    do the things that work. I've done anterior repairs
7    for many years with cadaveric fascia with fascia
8    lata, with pericardium. Just traditional
9    applications.
10          I have enough other options for
11   prolapse that if I don't have a Prolift, I can work
12   around it. But certainly it would have been nice to
13   have. In those special cases where Prolift would
14   have really been a great thing to have.
15       Q. So you mentioned that you've used cadaveric
16   tissue for a prolapse repair; is that correct?
17       A. Yes.
18       Q. Have you ever used the cadaveric tissue in a
19   Prolift-type procedure?
20       A. Yes.
21       Q. And you still do that today?
22       A. Not as frequently. I don't think it works as
23   well. It depends on each patient. One of the
24   things about prolapse is that every patient is

Page 33

1    different. They have multiple surgeries, the size
2    of the prolapse, and all these factors need to be
3    considered. The ideal biologic is still yet to be
4    determined. I use Pelvicol a lot. Early on it was
5    very thick. I didn't like the way it healed. There
6    were ridges in it.
7           Fascia lata is good but not in every
8    patient. Sometimes they had pain and other
9    complaints. It's something that is really very
10   individualized as to how to approach prolapse.
11       Q. When was the last time you performed a
12   Prolift-type procedure using cadaveric tissue?
13          MS. ROBINSON: Object to form to the
14   characterization of the Prolift-type procedure.
15       A. When you -- you refer to that several times.
16   To, me when you say Prolift you're talking about
17   trocars; and the answer is I don't use trocars
18   anymore because they're not available and I'm not
19   going to use a staining needle as a trocar. I
20   won't. I will do sacrospinous ligament fixation
21   with fascia using free needles or a Capio device or
22   something. I don't use trocars anymore. I have not
23   used trocars since the Prolift kit has not been
24   available.

9 (Pages 30 to 33)

Stanley Zaslau, M.D.

Page 34

1    Q. Prior to 2004 when you started using the
2  Prolift device, what were you -- what were you doing
3  to treat pelvic organ prolapse?
4    A. The same things that I had mentioned to you
5  earlier. So anterior repair, anterior repair with
6  autologous fascia as needed. With cadaveric fascia,
7  with Pelvicol cadaveric dermis, Tutoplast
8  Pericardium. Whatever options were available to us
9  in our tissue bank.
10    Q. So in 2009 or 2010, when your hospital
11  stopped having the Prolift available, did you ever
12  go to the Prolift -- strike that.
13        Did you ever go to the hospital or the
14  board or whoever is in charge of purchasing those
15  things and say to them, hey, I really want to keep
16  using this Prolift? Can I still get it?
17    A. I asked them what had gone on, and then they
18  said, we're not stocking this anymore. You're the
19  only one in the system who uses it. I didn't want
20  to start putting up a fight over it as the only
21  person who is using it.
22        I could go back to what worked. It
23  worked fine before. This was nice, nice to have,
24  nice in the right patient. But that's a sign of

Page 35

1  where they were. And I didn't fight that battle.
2    Q. So you felt that even without the Prolift
3  product, there were plenty of other nonmesh
4  alternatives that were suitable options that were
5  available to you to treat your patients with pelvic
6  organ prolapse; is that accurate?
7        MS. ROBINSON: Object to form.
8    A. Well, there are options that are available.
9  Are they as good as Prolift is? Yes, I think
10  Prolift would be just as good. But I do think that
11  in particular cases, particular index cases that
12  Prolift would be better. For larger defects, for
13  multicompartment defects, it would be nice to have
14  that. It would be nice to have that option for
15  patients. But that option was taken away.
16    Q. But you'd agree that even without Prolift as
17  an option you had sufficient acceptable alternative
18  options to treat pelvic organ prolapse when your
19  hospital stopped stocking the Prolift?
20        MS. ROBINSON: Object to form.
21    A. As I said, yes, they were good options but
22  certainly it would be nice to have Prolift as well.
23  If I can't have it, I can't have it. But it's --
24  that's the way it was.

Page 36

1    Q. Okay.
2        MR. FAES: I'm going to object and move
3  to strike after the answer, yes, they were good
4  options.
5    Q. During the time that you were using the
6  Prolift from 2004 to 2009 or '10, did you continue
7  to do native tissue repairs with sutures as an
8  alternative to Prolift and vice versa or did you
9  only do Prolift?
10    A. No, I did -- all of the above, as you
11  mentioned. So native tissue repairs, application,
12  cadaveric grafting. You know, Prolift was for
13  special patients with special disease states.
14    Q. So what was your -- what was your patient
15  selection criteria for using the Prolift during the
16  time that you were using that device?
17    A. Patients with very large defects, large
18  anterior defects or large posterior defects.
19  Patients with very large multicompartment defects,
20  so anterior as well as a posterior defect. Patients
21  who had failed other procedures and maybe they were
22  done from above. Maybe someone had an abdominal
23  sacrocolpopexy and failed, so you don't want to go
24  back in the same compartment so you go in from

Page 37

1  below. Patients who -- I was worried about had a
2  risk of failure, of significant failure from
3  multiple components.
4    Q. Is it fair to say that you generally only
5  performed the Prolift in patients with stage 3 or 4
6  defects?
7        MS. ROBINSON: Object to form.
8    A. Four, it would depend on the age. Because in
9  four you have to wonder whether you should do a
10  colpocleisis and close off the vaginal vault. Some
11  of those patients, you don't want to fix their
12  prolapse, you would rather close the vault. Some
13  stage 2, most stage 3.
14    Q. Did you ever perform a Prolift in a patient
15  with stage 1 prolapse?
16    A. No.
17    Q. Do you feel it's appropriate to perform a
18  Prolift in a patient with stage 1 prolapse?
19    A. I think you have to make that decision when
20  you're in the OR. Sometimes what you gauge
21  clinically is not what you see in the OR. So you
22  think it's a stage 1, and you get to the OR and it's
23  actually worse, then yes. Sometimes you get to the
24  OR and you think it's a stage 2 and then once you

10 (Pages 34 to 37)

Stanley Zaslau, M.D.

Page 38

1  unroof it there's a big enterocele, and there's a
2  small cystocele, and so the answer would be no. You
3  don't have to open the Prolift kit until you're
4  ready to use it. So it's not something that's lost
5  moneys for the institution if you don't open it. So
6  you make the decision as you need to based on the
7  individual patient.
8    Q. When did you first perform the ASC procedure?
9    A. I've done the ASC, I do these with our
10  urogynecology colleague who doesn't like the
11  morbidity of an abdominal incision, has concerns
12  about the ureters and such, so I will help him with
13  mobilization and setup and do all those cases.
14    Q. I don't want to interrupt you, Doctor. My
15  time is limited. I just want to back you up a
16  little bit because my question is a little
17  different. My question was just, specifically, when
18  did you first perform the ASC?
19      MS. ROBINSON: I think he was answering
20  the question, and I think he's entitled to explain
21  his answers.
22    Q. Were you answering my question? I think it
23  would just be a year.
24      MR. FAES: It sounded like he was

Page 39

1  talking about one of his colleagues.
2    Q. Go ahead and finish your answer.
3    A. So in 2014, we began doing these regular with
4  my colleague who doesn't like the morbidity of
5  abdominal punctures and these challenging situations
6  involving the ureter. So starting at that point I
7  would be involved in all of those ASC cases. We do
8  approximately two a month.
9    Q. Is it your testimony that you didn't first do
10  an ASC until 2014?
11    A. Yes.
12    Q. I apologize. That's where the confusion was.
13  I just figured you did one much earlier than that.
14      So is the Bard Y-mesh the only mesh
15  you've ever used for an ASC procedure?
16    A. Yes.
17    Q. Do you feel that's the best mesh available
18  when mesh is needed for an ASC procedure?
19      MS. ROBINSON: Object to form.
20    A. I think it works well for us. We have not
21  had any erosions or extrusions that we know from it
22  but I haven't tried others. We haven't felt the
23  need to try others.
24    Q. In terms of alternative treatments for a

Page 40

1  patient, ASC would be one of the alternatives if
2  there was, in fact, prolapse in the part of pelvis
3  that's appropriate for treatment; correct?
4    A. Yes.
5    Q. Did anyone from Ethicon and Johnson &
6  Johnson, ever try to get you to use the Prolift+M
7  product?
8    A. No, it was never offered to us, nor did we
9  ever inquire about it.
10    Q. Do you have any kind of understanding of what
11  the Prolift+M product is made from or how it's
12  different from the Prolift product?
13    A. I do.
14    Q. What's your understanding of how it's
15  different than the Prolift product?
16    A. The M creates an opportunity for mesh to
17  potentially be absorbable. So it's -- it uses an
18  absorbable suture in it with the Monocryl. So you
19  have prolene interweaved with Monocryl.
20      So the thought is that, if you have a
21  part -- it creates a partially absorbable mesh. The
22  thought is maybe this will improve symptomatic --
23  symptoms for the patient and also improve their
24  anatomic location. It was a thought, but in looking

Page 41

1  at the literature, differences between the two are
2  very minimal in terms of prolapse support and, in
3  terms of complications, certainly are still similar
4  issues with erosions and extrusions and all of the
5  other potential issues from pelvic floor surgery.
6    Q. Are you familiar with the Prosima product?
7    A. I have heard of it but I've not used it.
8    Q. Do you know what the Prosima product is made
9  from?
10    A. I don't know off the top of my head, no.
11    Q. Do you recall if anyone from Ethicon and
12  Johnson & Johnson ever tried to sell you the Prosima
13  product or get that in your hospital?
14    A. I know that they did not, no. I would have
15  remembered that and certainly asked about it.
16    Q. Do you have an understanding that the Prosima
17  product doesn't have mesh arms like the Prolift
18  does?
19    A. Like I said, I haven't used it so I don't
20  remember the specifics of it. I'll take your word
21  for it that it doesn't have arms.
22    Q. So since you're not familiar with the
23  product, I'll take it that you don't intend to offer
24  an opinion in this case one way or the other,

11 (Pages 38 to 41)

Stanley Zaslau, M.D.

Page 42

1  whether the fact that the Prosima product does not
2  have mesh arms but the Prolift product does, whether
3  or not that's a benefit of the Prosima product?
4     A.  I certainly can -- I've not used it
5  personally, but I certainly can review literature
6  and make comments on success, anatomic success and
7  side effects, complications, erosion, extrusion,
8  dyspareunia, things like that.  I certainly can
9  interpret that literature.  But I can't say from a
10  user perspective any differences.
11    Q.  But you haven't done that, at least at that
12  time, in your expert report, any kind of analysis on
13  the Prosima product or whether a mesh product
14  without arms is superior or not superior to a
15  product with arms like the Prolift?
16    A.  No, as I said, I certainly can review about
17  literature and make expert comments about it, but I
18  can't say I've used them.
19    Q.  My question is have you done that at this
20  time?
21    A.  Have I done that at the time.  I may have
22  made reference in my report to an article or two
23  that have used that, but I would have to look
24  specifically at that.

Page 43

1     Q.  Do you have an opinion as you sit here today
2  whether or not a mesh product without arms has
3  safety and -- safety or efficacy benefits over a
4  product with arms like the Prolift?
5     A.  I think there are complications that can be
6  associated with all of them, arms or no arms.  There
7  can be challenges and issues with implantation and
8  anatomic success and postoperative pain and problems
9  associated with all of those.
10    Q.  But do you have any opinions of whether a
11  product with arms is more or less likely to cause
12  complications than a product without arms like the
13  Prosima?
14    A.  I can't say that at this time, no.
15    Q.  Are you familiar with the Elevate product?
16    A.  I've heard of it, I have not used it.
17    Q.  Are you familiar with the fact that, unlike
18  the Prosima, the Elevate product does not have
19  trocar passes?
20    A.  Yes.
21    Q.  But you know -- and you know it's a mesh
22  product?
23    A.  I do know it's a mesh product, yes.
24    Q.  Do you have any opinions whether there is a

Page 44

1  safety benefit to a product like the Elevate that
2  doesn't have trocar passes compared to a product
3  like the Prolift that has multiple trocar passes?
4     A.  Certainly, injuries can still happen:  Bowel,
5  bladder, nerves, other structures in the path of how
6  you are securing this mesh, even though it doesn't
7  have trocar passes.  There certainly still can be
8  significant complications with these as well.
9     Q.  I understand that.  But do you have an
10  opinion as to whether or not a product like the
11  Elevate that has zero trocar passes is more or less
12  likely to cause complications than a product like
13  the Prolift that does have trocar passes?
14        MS. ROBINSON:  Object to form.
15    A.  I mean, it's hard to say for any of these
16  things.  Even the mesh products that you spoke of.
17  I mean, complications are in the hands of user.  And
18  if you know how to use a Prolift, you will do it
19  well and you won't have any injuries.  If you don't
20  know how to use an Elevate or a Prosima, you will
21  have significant complications.  At the end of the
22  day, it comes down the end user of these products.
23  The answer is for any of these products you can have
24  very significant injuries.

Page 45

1     Q.  You would agree with me that if a product has
2  no trocar passes in its design, then a person can't
3  be injured from the trocar passes; correct?
4         MS. ROBINSON:  Object to form.  Asked
5  and answered.
6     A.  You can't be injured from the trocar passes,
7  but you can be injured for how you use the setup and
8  how you're securing this mesh and what you're
9  securing it to.
10    Q.  Would you agree that a product with no trocar
11  passes has potential safety benefits over a product
12  that has multiple trocar passes?
13    A.  Again, it comes down to the end user.  The
14  trocar passes in the Prolift are straightforward.
15  They can be done tactile and with the -- under
16  vision.  I have been able to do that with both, and
17  I've never had any significant injuries.
18    Q.  My question is, specifically, do you believe
19  that there's a potential safety benefit to a product
20  with zero trocar passes as opposed to a product with
21  multiple trocar passes?
22        MS. ROBINSON:  Object to form.  Asked
23  and answered.
24    A.  It certainly can.  Again, all of these are

12  (Pages 42 to 45)

Stanley Zaslau, M.D.

Page 46

1    issues related to the end user.  If the end user
2    knows how to use the product, then they all should
3    do well.
4       Q.  Would you agree that, in general, if you're
5    designing a product or procedure, you want to design
6    it with as few trocar passes as possible to
7    accomplish the intended result?
8       A.  I don't know if the issue is with the trocar
9    passes.  I think the issue is with the end user.
10          (The reporter read from the record as
11      requested.)
12          MS. ROBINSON:  And I'm just going to
13      note my objection.  He's not been offered as a
14      design engineer or anything like that to testify
15      about that, and he's answered, I believe, to the
16      best of his ability your questions.
17          MR. FAES:  Let me ask it a different
18      way.
19       Q.  Doctor, do you have any opinions to a
20    reasonable degree of medical certainty whether or
21    not a -- whether or not it would be better to design
22    a product with as few trocar passes as possible to
23    achieve the intended result?
24       A.  It may not necessarily be the trocar passes

Page 47

1    that are the problem in patients who have
2    complications from surgeries like this.  Again, it
3    may relate to many other issues including the user
4    and how they fashion the mesh and how they secure
5    it.  You know, the most common complications people
6    have, pain, dyspareunia, erosion, extrusion, those
7    all relate to procedural things that a surgeon is
8    doing.  The complication that you're talking about
9    that are trocar based are extremely rare.
10       Q.  Can you answer the question yes or no?  If
11    you can't answer the question yes or no, just tell
12    me and I'll move on.  Can you answer the question
13    yes or no:  Do you have an opinion in this case as
14    to whether or not it would be best when designing a
15    product like the Prolift to design it with as few
16    trocar passes as possible to achieve the intended
17    result?
18       A.  No, I do not believe that the number of
19    trocar passes relates to the success of product.  It
20    relates to the success of the end user's ability to
21    use the product.
22       Q.  Now, Doctor, you've been a litigation
23    consultant for Ethicon and Johnson & Johnson since
24    approximately 2004; is that accurate?

Page 48

1       A.  No, the last four years or so.
2       Q.  I'm sorry, I misspoke.  Doctor, you'd agree
3    that you've been a litigation consultant for Ethicon
4    and Johnson & Johnson since approximately 2014; is
5    that accurate?
6       A.  Maybe a little before that, but yes.
7       Q.  So perhaps in late 2013 is when you were
8    first approached by lawyers from Ethicon and Johnson
9    & Johnson to be a litigation consultant; right?
10       A.  Yes.
11       Q.  And was that first case that you were
12    approached the Edwards case?
13       A.  Yes.
14       Q.  And you've essentially been a litigation
15    consultant for Ethicon and Johnson & Johnson since
16    that time; is that accurate?
17       A.  Yes.
18       Q.  I'm going to hand you what's been marked as
19    Exhibit No. 4 to your deposition.  And I'll
20    represent to you that these are the invoices that
21    were produced to us from attorneys from Ethicon and
22    Johnson & Johnson regarding work you did as a
23    litigation consultant between November of 2015 and
24    April of 2016.  If you need to take a minute to

Page 49

1    review that, you can do so.
2          But my question is:  You'd agree that
3    in a space of less than six months, between November
4    of 2015 and April of 2016, you earned more than
5    $45,000 for approximately 115 hours of work as a
6    consultant for Ethicon and Johnson & Johnson?
7       A.  I haven't summed the numbers up, but if
8    that's what it comes out to, then that's what it is.
9       Q.  Would you agree that that's nearly half your
10    entire annual salary from the State of West Virginia in
11    2015?
12       A.  It very well may be.
13       Q.  In fact, your entire annual salary from the
14    State of West Virginia in 2015 was $110,524.32?
15       A.  That's correct.
16       Q.  And that's for -- that salary of $110,000,
17    give or take, is for working the entire year, 40
18    hours a week, minus vacations and holidays; right?
19       A.  No.
20       Q.  No?  Tell me where I'm wrong.
21       A.  Well, you have my state salary.  We're paid
22    by the university as well as by the state.
23       Q.  I understand.  And you've also earned
24    approximately $11,500 for another case, the Oxley

13 (Pages 46 to 49)

Stanley Zaslau, M.D.

Page 50

1    case?
2       A. If that's what's written there.
3       Q. It's not written there, I'm just asking.
4       A. I couldn't tell you those numbers off the top
5    of my head.  The rates and information certainly can
6    be made available to you.
7       Q. If you testified that you billed
8    approximately $11,500 to review materials and write
9    your report in the Oxley case, would you have any
10   reason to disagree with that?
11      A. I would not.
12      Q. Do you recall how much you billed in the --
13   in the Edwards case?
14      A. I don't know off the top of my head.
15      Q. Do you know approximately how much it was?
16      A. I don't.
17      Q. Now, you've also been a consultant for
18   Medtronic.  Is that accurate?
19      A. I used to be.
20      Q. You've done speaking engagements for them
21   within the last three years, which you were paid
22   for?
23      A. No.
24      Q. No?

Page 51

1       A. Not that I know of in the last three years.
2    It probably is longer than that.  Or maybe I've been
3    to a conference as such.  I think it's longer than
4    that.
5       Q. You don't recall -- well, perhaps in the last
6    four years.  Does your answer change then?
7       A. It might.
8       Q. Do you recall being paid $3,000 compensation
9    by Medtronic for a speaking engagement in October of
10   2013?
11      A. No, I don't remember the specifics of that.
12   I used to be a proctor for sacroneural modulation,
13   so it may have been a proctoring event where I had
14   gone to another institution, but I don't remember
15   the specifics of where that was.
16      Q. Do you have any reason to dispute whether or
17   not you've been paid by Medtronic for a speaking
18   event in the past?
19      A. Not at all, no.  I don't think it was a
20   speaking event.  I think it was a proctoring event.
21   Those speaking events have disappeared a long time
22   ago, have dissipated a long time ago.
23      Q. You've also received payments in the past
24   from Cook Incorporated; is that correct?

Page 52

1       A. Not to my knowledge, no.
2       Q. You don't ever recall receiving any payments
3    of any kind from 2013 to the present from Cook
4    Incorporated, which is a medical device company?
5       A. No, I don't remember.
6          MS. ROBINSON:  I'm sorry, what are you
7    saying, what's the name?
8          MR. FAES:  Cook Incorporated.
9       Q. Have you ever received payments in the last
10   four years from Olympus America?
11      A. Not that I remember, no.
12      Q. Have you ever received payments in the last
13   four years from Astellas Pharmaceuticals?
14      A. Astellas.
15      Q. Astellas, yes, thank you.
16      A. Not that I recall.  Speaking engagements are
17   things that really stopped a long time ago.  The way
18   reporting is, if I had gone to a dinner or a
19   conference and they paid for a meal for us, whatever
20   that may be, those are now reportable so there may
21   be events like that.  I don't remember any
22   significant sums of money from any of those
23   companies.
24      Q. Didn't you testify in 2014 during the Edwards

Page 53

1    case that most of those events had been stopped
2    because your university had a policy against that?
3       A. Well, they're stopped because the university
4    had a policy against that, but it also stopped
5    because the industry doesn't do those anymore.  The
6    reps don't come around.  There's no industry reps
7    that come to universities.  There's no such
8    educational forums anymore.  It's a combination of
9    both things.
10      Q. Do you recall when your university
11   implemented that policy?
12      A. Probably about the same time as our last
13   engagements.  Maybe 2013 or so.  I don't remember.
14      Q. Have you ever received payments from
15   Cumberland Pharmaceuticals --
16      A. Not to my knowledge.
17      Q. -- in the last four years?
18      A. Not to my knowledge.
19      Q. Have you ever received payments from Amgen
20   Incorporated, A-M-G-E-N?
21      A. Not to my knowledge, no.
22      Q. Have you ever received payments from Boston
23   Scientific in the last four years?
24      A. Not to my knowledge, no.

14 (Pages 50 to 53)

Stanley Zaslau, M.D.

Page 54

1    Q.  Have you ever received payments -- well, back
2  up.
3         You know that Boston Scientific is a
4  manufacturer of pelvic mesh products like Ethicon
5  and Johnson & Johnson?
6    A.  Yes, I do.
7    Q.  Have you ever received any payments in the
8  last four years from GlaxoSmithKline?
9    A.  Not that I know of.  I used to be a speaker
10  for them many years ago, but not that I remember in
11  the last four years.
12    Q.  What did you speak for them regarding?
13    A.  Their medications for erectile dysfunction
14  and overactive bladder.
15    Q.  What's their drug for overactive bladder?
16    A.  Overactive bladder was -- I'm trying to
17  remember.  Let's stick with erectile dysfunction.
18  It was Levitra, was the bigger of the two agents.
19    Q.  Have you received any payments the last four
20  years from Intuitive Surgical?
21    A.  I took a robotics course, and my expenses may
22  have been paid for that, but I have not received any
23  payments.
24    Q.  Assuming that reimbursement for expenses is a

Page 55

1  payment, you would agree that you've received
2  payments from Intuitive Surgical in the last four
3  years?
4         MS. ROBINSON:  Object to form.
5    A.  No.  My expenses were paid for by the
6  university if a bill was sent on my behalf, but I
7  never received a check from Intuitive for anything.
8    Q.  Have you received any payments within the
9  last four years from Lumenis, Inc.?
10    A.  Not to my knowledge, no.
11    Q.  Are you aware that the government actually
12  keeps track of payments to physicians and publishes
13  those on their website?
14    A.  I'm sure they do.
15    Q.  Have you ever checked that website for any of
16  the payments that may have been made from industry
17  to yourself?
18    A.  There was an update on the Sunshine Act that
19  happened a few years ago.  I went back and checked
20  that last time it was updated and didn't see
21  anything of note other than some emails, and I think
22  there was something from Medtronic.
23    Q.  So if the government website showed that in
24  2013 you received nine payments from Medtronic USA

Page 56

1  Inc. for a total amount of $4,948.12, do you believe
2  that that information is inaccurate?
3    A.  I believe that information is accurate.
4    Q.  So does that change your answer as to whether
5  or not you've received payments from Medtronic in
6  the last four years?
7    A.  That I -- I've received payments from them,
8  yes.  But nine payments that sum to $4,000 is not
9  any significant amount of money.
10    Q.  So $5,000 isn't a significant amount of money
11  to you?
12    A.  Over nine payments?
13    Q.  That's correct.
14    A.  No, it's not a significant amount of money.
15    Q.  If the government's website showed, in 2014,
16  that you received 25 payments for a total amount of
17  $12,503.88, would you have any reason to disagree
18  with that?
19    A.  I would not.
20    Q.  Is $12,000 -- $12,500 over 25 payments a
21  significant amount of money to you or not?
22    A.  No.  That's $12,000 divided by 25, so no,
23  it's not significant.
24    Q.  Besides Ethicon and Johnson & Johnson, what

Page 57

1  other pharmaceutical or drug companies have you done
2  consulting work with or for over the last ten years?
3    A.  Over the last ten years?  I've worked with
4  Pfizer.  I worked with Ortho-McNeil.  I'm not sure
5  of any other ones, it's been so long.
6    Q.  And Ortho-McNeil is actually a Johnson &
7  Johnson company just like Ethicon; is that accurate?
8    A.  They may be, but that's many, many years ago.
9    Q.  How many years ago was it when you last
10  consulted for Ortho-McNeil?
11    A.  Maybe 2005 or so.  It's been a long time.
12    Q.  Do you recall what kind of consulting work
13  you did for them in 2005?
14    A.  I was a speaker for the overactive bladder
15  medications.
16    Q.  Do you recall how many speaking events you
17  did for Ortho-McNeil or Johnson & Johnson company
18  for their overactive bladder medication?
19         MS. ROBINSON:  Object to form.
20    A.  Over when?  Over what time period?
21    Q.  Over your entire period of consulting with
22  them?
23    A.  I couldn't tell you how many.  It goes back
24  15 years.

15  (Pages 54 to 57)

Stanley Zaslau, M.D.

Page 58

1    Q.  Is it more than ten?
2    A.  It's more than ten.
3    Q.  More than 20?
4    A.  It might be.  I don't remember.  It's been a
5  long time.
6    Q.  Do you recall what you were paid for each of
7  those speaking engagements?
8    A.  Each was -- at that time maybe $500.
9    Q.  For how long of an engagement?
10    A.  It depends.  An hour or so, plus travel.
11    Q.  What kind of consulting work did you do for
12  Pfizer?
13    A.  I was a speaker for their overactive bladder
14  and erectile dysfunction medicines.
15    Q.  So was it a competing overactive bladder
16  medication to Ortho-McNeil's overactive bladder
17  medications?
18    A.  Yes.
19    Q.  Did you do consulting regarding both
20  overactive bladder medicines at the same time?
21    A.  Yes.
22    Q.  Did you see that as any kind of potential
23  conflict of interest?
24    A.  No.

Page 59

1    Q.  Do you know if Ortho-McNeil and Pfizer were
2  aware that you were consulting for both of their
3  overactive bladder medications at the same time?
4    A.  Yes, I'm sure they were.
5    Q.  Why are you sure they were?
6    A.  I'm the only female pelvic specialist in the
7  State of West Virginia.  I'm the only board
8  certified urologist who deals with voiding and
9  sexual dysfunction, which makes me the authority in
10  the state to teach at all levels; to physicians, to
11  nurses, nurse practitioners in a variety of
12  different forums.  So industry would sponsor my
13  ability to speak throughout the State of West
14  Virginia, to educate doctors at roundtable forums,
15  at Grand Rounds, CME events throughout the state,
16  beginning with my arrival in 2001.
17    MS. ROBINSON:  When you get a second,
18  can we take a bathroom break.
19    MR. FAES:  Right now is perfect.
20    (A brief recess was taken from 3:13 p.m.
21  to 3:15 p.m.)
22  BY MR. FAES:
23    Q.  Doctor, we're back on the record after a
24  short break.  Are you ready to proceed?

Page 60

1    A.  Yes.
2    Q.  Before we went off the record, we were
3  discussing various pharmaceutical and medical device
4  companies that you've done consulting work with over
5  the last ten years.  Other than Pfizer and
6  Ortho-McNeil, are there any other companies you can
7  think of?
8    A.  I cannot.
9    Q.  Are there any companies that you've --
10  pharmaceutical or medical device companies that
11  you've received grants from in the last ten years?
12    A.  No.
13    Q.  And I know you've been asked this before, but
14  I just need to ask it again to see if the answer's
15  changed.  Are you currently doing any litigation
16  consulting work for anyone other than Ethicon and
17  Johnson & Johnson?
18    A.  I am not.
19    Q.  Not doing any consulting work for Boston
20  Scientific?
21    A.  No.
22    Q.  Or American Medical Systems?
23    A.  No.
24    Q.  Or C.R. Bard?

Page 61

1    A.  Nobody else.
2    Q.  Okay.  Doctor, I'm going to hand you what's
3  been marked as Exhibit No. 8 to your deposition.
4    And this is a document that's been
5  produced to us by Ethicon and Johnson & Johnson.
6    (Dr. Zaslau Deposition Exhibit No. 8 was
7  marked for identification.)
8    Q.  And you can see on the first page it's a
9  field visit letter from ESC sales representative; do
10  you see that?
11    A.  Yes.
12    Q.  And it's dated September 25th to 26th, 2013.
13  Do you see that?
14    A.  Yes.
15    Q.  It says the sales rep name is Kristen Brikis.
16  Do you see that?
17    A.  I do.
18    Q.  Do you recognize that name?
19    A.  Not at all.
20    Q.  So you don't -- never talked to Kristen
21  Brikis, a sales representative from Ethicon and
22  Johnson & Johnson, to your knowledge?
23    A.  Never seen her.
24    Q.  If you can turn to -- it says page 3 of 8

16  (Pages 58 to 61)

Stanley Zaslau, M.D.

Page 62

1  down here (indicating).  And I want to ask you
2  specifically about the middle of the page where it
3  says -- starts with WVU, dash, and it states, "After
4  meeting with Dr. Zaslau, Board Certified Professor
5  and Chief of the Urology Residency Program, I wanted
6  to see if he was performing less TVT Sling
7  procedures since the mesh lawsuits.  Dr. Zaslau
8  confirmed he is a committed" Ethicon -- sorry --
9  "Gynecare/Ethicon TVT user.  He also mentioned that
10  the reason for the decline in TVT classic sling
11  (-30K) is due to Dr. Shapiro leaving WVU Hospital."
12          Do you see that?
13     A.  Yes.
14     Q.  And it also says, "Dr. Zaslau is interested
15  in working with Ethicon-he would also like any
16  education assistance with the residents."
17          Do you see that?
18     A.  For the residents, yes.
19     Q.  Does this document refresh your memory at all
20  about having a discussion with Ms. Brikis?
21     A.  No.
22     Q.  Regarding these issues?
23     A.  No.
24     Q.  Do you recall having any kind of conversation

Page 63

1  with a sales representative from Ethicon and Johnson
2  & Johnson around this time?
3     A.  We never saw them after say 2009 or 2010.  So
4  if someone had shown up, maybe they had shown up on
5  an individual day and said, Oh, I'm the rep.
6  Certainly, I don't know who this is person is.
7  Second of all, Dr. Shapiro never left WVU hospital
8  so I don't know where that comes from because he's
9  still here.  Maybe the person is confused with
10  someone else.
11     Q.  Do you recall expressing an interest to a
12  sales representative at Ethicon and Johnson &
13  Johnson in this time frame, in September of 2013,
14  that your -- that you're interested in working with
15  Ethicon?
16     A.  I'm sure if there was a rep who was there at
17  that time, who I don't remember who they were -- I'm
18  sure that I would say that we would like any
19  education assistance for the residents.  Meaning, is
20  there any academic programs that they have coming
21  up, any textbooks that are available for residents
22  in learning surgeries of the pelvic floor, any
23  grants that were available for them.  We look for
24  that for all industry then we can support our

Page 64

1  resident education.
2     Q.  And this was actually about the time that you
3  were approached by Ethicon and Johnson & Johnson to
4  work with them as a litigation consultant; is that
5  accurate?
6     A.  It may have been around that time.
7     Q.  Well, you stated that you first started
8  working on the Edwards case in approximately late
9  2013, and this is late 2013; correct?
10     A.  I thought I was asked in about 2012 or so to
11  begin doing things, and I was contacted by attorneys
12  from -- I'm trying to remember what --
13     Q.  Butler Snow, perhaps?
14     A.  From Butler Snow in about 2012 or so.  And
15  then there was a bit of ramp-up time before any kind
16  of involvement in anything.
17     Q.  So you believe that you were actually
18  contacted in approximately 2012 for the first time
19  regarding being a litigation consultant for Ethicon
20  and Johnson & Johnson?
21     A.  Somewhere around there.  But it took --
22  definitely there was some ramp-up time and effort.
23     Q.  Do you recall who your first contact was
24  with --

Page 65

1     A.  Yes.
2     Q.  -- attorneys for?
3     A.  Yes, Brian Jackson.
4     Q.  And when was the first time you submitted a
5  bill for consulting work for Ethicon and Johnson &
6  Johnson?
7     A.  I don't remember.  I would have to look back.
8  There were a lot of discussions for a period of time
9  and then there was a lot of downtime.  There was
10  more discussions and more downtime and then
11  assignments.
12     Q.  Do you believe that this record is
13  inaccurate, that you would have expressed interest
14  in working with Ethicon in September of 2013?
15     A.  No, I think this is very accurate.  I'm
16  always interested in working with all industries
17  that will benefit the education of our residents.
18  And to this day, any rep I would ever see would
19  always ask for educational assistance for residents.
20     Q.  I'm going to hand you what's been marked as
21  Exhibit No. 9 to your deposition.
22          (Dr. Zaslau Deposition Exhibit No. 9 was
23  marked for identification.)
24     Q.  And this is an e-mail produced from Ethicon

17 (Pages 62 to 65)

Stanley Zaslau, M.D.

Page 66

1  and Johnson & Johnson files dated September 19th of
2  2003.  Do you see that?
3    A.  Yes.
4    Q.  And you see that it says the subject is,
5  "Important AUGS Leads."  And you can see that your
6  name and address is the second name down on the
7  first page?
8    A.  I do.
9    Q.  And if you turn to the following page, it
10  indicates that, "These clinicians expressed strong
11  interest in evaluating the MoniTorr.  Please follow
12  up with them and let them know if you need
13  assistance."
14       Do you see that?
15    A.  I do.
16    Q.  Do you recall going to an AUGS convention in
17  2003 and expressing interest in the MoniTorr product
18  to representatives from Ethicon and Johnson &
19  Johnson?
20    A.  I probably did.  But I've had interest in
21  that product since it was released even before going
22  to that meeting.
23    Q.  Would you agree that one of the purposes of
24  the AUGS conventions is for manufacturers like

Page 67

1  Ethicon and Johnson & Johnson to showcase their new
2  products?
3       MS. ROBINSON:  Object to form.
4    A.  They certainly could be, yeah.
5    Q.  And did you ultimately end up evaluating the
6  MoniTorr product?
7       MS. ROBINSON:  Object to form.
8    A.  Did I evaluate it?  It's something we
9  considered purchasing but never did.
10    Q.  Why did you not -- why did you end up not
11  purchasing the MoniTorr after evaluating it?
12    A.  You're asking me something that's not
13  relevant to any of this discussion, but I'll take
14  the time to explain it to you.
15       So the MoniTorr is a urodynamic system
16  used to evaluate voiding dysfunction in patients.
17  It was a very simple office-based procedure that
18  would allow patients to have bladder systematic
19  studies and voiding studies over a short period of
20  time in an office visit without having to go to a
21  hospital.  And I thought this would be an
22  interesting device for our office and for
23  convenience of patients and ease of performing the
24  procedure.  And after researching it, it didn't

Page 68

1  catch my eye to meet the needs that I wanted from
2  it.  So I didn't go any further.
3    Q.  I'll hand you what's been marked as
4  Exhibit No. 10 to your deposition.
5       (Dr. Zaslau Deposition Exhibit No. 10
6  was marked for identification.)
7    Q.  And this is an e-mail string dated January
8  30th, 2012.  Do you see that?  It's on the very
9  first page.
10    A.  Yes.
11    Q.  You've already flipped to the second page,
12  and I've taken the liberty of highlighting your
13  e-mail address.  At least I believe that's your
14  e-mail address.  That is your e-mail address,
15  SZaslau@hsc.wvu.edu?
16    A.  That's correct.
17    Q.  This is an e-mail that you would have
18  received in January of 2012; is that accurate?
19       MS. ROBINSON:  I just object to form.
20  You know, if he can take a minute to look at this
21  document.
22       MR. FAES:  Sure.
23       MS. ROBINSON:  I can't even count how
24  many e-mail addresses.

Page 69

1       MR. FAES:  Like I said, I highlighted
2  his e-mail for him so he doesn't have to go through
3  it all.
4    Q.  The question pending is:  This is an e-mail
5  that you would have received on January 30th of
6  2012; is that accurate?
7    A.  Well, it's an e-mail I could have received.
8  Some of our e-mails are quarantined and put in a
9  clutter or a junk folder.  So it may have been
10  something that I would have to search for.  But
11  certainly, in looking at it, it's not something that
12  I'm struck by to attend or to be a part of.
13    Q.  So your answer is you don't know one way or
14  the other if you actually received this e-mail on
15  January 30th of 2012 or not?
16    A.  No, I don't know.  I don't have independent
17  recollection of it.  Nor, as I read it, would I jump
18  to attend it.
19    Q.  Okay.  Well, if you turn to the following
20  page, it states that in past years, in the second
21  paragraph, that they've conducted an annual summit
22  meeting around the February/March time frame where
23  they discussed topics related to the treatment of
24  these critical conditions, meaning above stress

18 (Pages 66 to 69)

Stanley Zaslau, M.D.

Page 70

1    urinary incontinence and pelvic organ prolapse.  In
2    2012, we will not continue to facilitate these types
3    of important discussions in a variety of formats but
4    will not be holding a one-time formal summit
5    meeting.  Do you see that?
6         MS. ROBINSON:  Are you asking him if he
7    sees it?
8         MR. FAES:  First, I'm asking him if he
9    sees that.
10        A.  I see what you said.  You said "we will not."
11   It says we will continue to facilitate these types
12   of important discussions but will not be holding a
13   one-time formal meeting.
14        Q.  Okay.  Thank you.  Do you remember being
15   informed by Ethicon and Johnson & Johnson in January
16   of 2012 that they would not be having a formal
17   meeting regarding SUI and POP as they had in years
18   past?
19        A.  No, nor do I have any recollection of this
20   message at all.
21        Q.  But we can see on the second page that,
22   apparently, Ethicon and Johnson & Johnson did have
23   your WVU e-mail address?
24        A.  Yes, it appears that they did.

Page 71

1         Q.  Do you regularly get e-mails from Ethicon and
2    Johnson & Johnson?
3         A.  Not now.  In the past maybe.  But not
4    commonly.
5         Q.  How often did you get e-mails like this in
6    the past?
7              MS. ROBINSON:  Object to form.  It
8    mischaracterizes his testimony.  He doesn't know if
9    he got this or not.
10        A.  Not often, if at all.
11        Q.  Do you still have any e-mails from Ethicon
12   and Johnson & Johnson in your possession?
13        A.  No.
14             MS. ROBINSON:  Object to form.
15        Q.  And you've looked for them?
16        A.  No.
17        Q.  If I can have you look back at Exhibit No. 1
18   which is the notice of your deposition.
19             MR. FAES:  I think I gave him my copy
20   again.  I did.
21        Q.  I'm going to have you look at, specifically,
22   Paragraph 11 on Exhibit No. 1.  And one of the items
23   that we've requested is all correspondence,
24   memoranda, e-mails or other documents reflecting

Page 72

1    communications including written, electronic and/or
2    oral with any employees or defendants related to any
3    female pelvic mesh product sold by Ethicon Inc. for
4    the treatment of stress urinary incontinence or
5    pelvic organ prolapse.  Do you see that?
6         A.  I do.
7         Q.  Did you make any attempt to comply with the
8    federal rules and see if you had any documents
9    responsive to Paragraph No. 12 in your possession?
10        A.  No, because an e-mail like this, I would
11   delete it at the time that I got it because it's not
12   pertinent to me.  And if there were anything that
13   was pertinent, I would save it, but I never had any
14   e-mails that had any pertinence whatsoever over the
15   years.
16        Q.  To be clear, you haven't actually gone and
17   looked for any documents responsive to item 12 in
18   our request?
19        A.  I don't have any.  I don't have any.
20        Q.  Have you looked?
21        A.  I look as I get e-mail.  If it's there -- if
22   I received an e-mail like this today -- let's
23   pretend this is today.  I would look at an e-mail
24   like this, and I would delete it, so I don't have

Page 73

1    any.
2              And to further that, e-mail in my junk
3    cabinet as I go through it, it gets deleted.  E-mail
4    in my clutter file, if something like this were in
5    there, it would also get deleted, so I wouldn't have
6    any.
7         Q.  So since you've been a litigation consultant
8    for Ethicon and Johnson & Johnson, you regularly
9    delete e-mails received from them?
10        A.  E-mails like this inviting me to a forum,
11   yes, but otherwise, no, I don't get any e-mails from
12   Ethicon.
13        Q.  Approximately how many e-mails like that
14   would you say that you receive on an average month?
15             MS. ROBINSON:  I'm going to object to
16   form and also want to note for the record, my guess
17   is that we've filed an objection to his notice of
18   deposition.
19             MR. FAES:  So noted.
20             MS. ROBINSON:  I just want that noted.
21             MR. FAES:  Okay.  Can you read back the
22   pending question.
23             (The reporter read from the record as
24   requested.)

19  (Pages 70 to 73)

Stanley Zaslau, M.D.

Page 74

1    A.  Again, we're referring to this particular
2   e-mail, this mass e-mail sent to a variety of people
3   from Ethicon; right?
4    Q.  Yes.
5    A.  The answer is, maybe once or twice a year,
6   and no, I don't take them seriously.
7    Q.  What about other e-mails that aren't, as you
8   characterize, mass e-mails; how many other Ethicon
9   e-mails that aren't mass e-mails would you say that
10   you receive on an average month, excluding, of
11   course, any e-mails from counsel?
12    A.  None.
13    Q.  I'm going to hand you what's been marked as
14   Exhibit No. 11 to your deposition.
15        (Dr. Zaslau Deposition Exhibit No. 11
16   was marked for identification.)
17    Q.  Take a minute to go ahead and review that.
18        (Witness reviews document.)
19    Q.  And I specifically want to ask you, starting
20   on the second page where it states, "Here are the
21   Team Keystone submissions for the TVT World
22   registry.  These submissions have been well thought
23   out.  I believe Halina Zycznski has already been
24   approached by David Robinson.  We should include the

Page 75

1   other two at Magee for sure, Moalli & Sagan.  Please
2   let us know if you need any additional docs or
3   information."
4        You see that at the top of the second
5   page?
6    A.  I do.
7    Q.  Then if you go down, it says, "Ron Rink," and
8   then there's a number of physician names, and on the
9   second page you're No. 5.
10    A.  Okay.
11    Q.  Dr. Stanley Zaslau.  Do you see that?
12    A.  Yes, I do.
13    Q.  Do you recall ever being approached by
14   Ethicon and Johnson & Johnson to participate in the
15   TVT world register?
16    A.  No.
17    Q.  Did you participate -- did you ever
18   participate in any way in the TVT world register?
19    A.  No.
20    Q.  Do you know who Ron Rink is?
21    A.  I do know who Ron Rink is.  Ron Rink was our
22   last known TVT rep -- our last known Ethicon rep to
23   step foot in WVU, that was about 2008, 2009, I
24   think, is when he -- he was not part -- either not

Page 76

1   part of the company or the reps weren't servicing
2   us.  He's the last known name that I know as an
3   industry representative.
4    Q.  Did you ever have any personal meetings or
5   contacts with Ron Rink?
6    A.  He would come for cases occasionally.  But
7   really he was just there to make sure supplies were
8   available.
9    Q.  When you say he came for cases, what do you
10   mean by that?  That he actually sat in on surgeries?
11    A.  He would observe the cases that we're doing.
12   If we had a few Prolifts or TVT obturator or
13   whatever cases that were going on, he would come and
14   be a part and observe.
15    Q.  Did he ever provide you with any information
16   or materials, such as patient brochures or doctor
17   brochures talking about the products?
18    A.  I've seen patient brochures over the years.
19   We've had patient brochures over the years, and it's
20   easier to sit with a patient and describe things
21   than to give them a brochure, so we kind of stopped
22   that over time.
23    Q.  What patient brochures have you used from
24   Ethicon and Johnson & Johnson in the past?

Page 77

1    A.  It's been many years.  I -- I couldn't tell
2   you the specific ones that we've had.  The initial
3   Prolift patient brochure, I'm sure we had.  Then we
4   didn't have any more so it was easier to just talk
5   with patients than sit and read them a brochure.
6    Q.  Did Ron Rink ever e-mail you materials or
7   e-mail you information or e-mail you about cases?
8    A.  No.
9    Q.  You don't recall ever receiving any kind of
10   e-mails of any kind from Ron Rink over the six years
11   of his employment with Ethicon and Johnson &
12   Johnson?
13    A.  I don't remember, no.
14    Q.  Is it possible that he did e-mail you and you
15   just don't remember one way or the other?
16    A.  It's possible he did and I read it and
17   deleted it.  But again, nothing of -- things that
18   would come from Ron Rink would be things he would
19   have sent to the office.  Brochures or things he may
20   hand me about a product.  Okay, here's a brochure,
21   if he's in the OR.  But nothing by e-mail that I
22   recall.
23    Q.  Do you know that we've been told by Ethicon
24   and Johnson & Johnson that all of Ron Rink's e-mails

Stanley Zaslau, M.D.

Page 78

1    and materials and items he had when he left Ethicon
2    and Johnson & Johnson have been lost by the company?
3        MS. ROBINSON:  Object to form.
4    A.  Yeah, like I said, I haven't seen Ron Rink
5    since 2008 or 2009, so I couldn't comment.
6    Q.  Do you know when the Gynemesh PS product was
7    first available for sale in the United States?
8    A.  It was in the early 2000s sometime.
9    Q.  So you believe that the first time that the
10   Gynemesh PS product was available for sale was in
11   the early 2000s?
12   A.  Sometime around there.  I mean, certainly it
13   was before Prolift.  So Prolift is, what, 2004.  So
14   that's got to be, what, the year before, somewhere
15   around there.
16   Q.  And I noticed -- correct me if I'm wrong --
17   you haven't noted the date that the Gynemesh PS
18   product was first made available for sale in the
19   United States anywhere in your expert report; have
20   you?
21   A.  No.
22   Q.  Did you not feel that that was an important
23   fact to know in offering your opinions in this case
24   regarding the Gynemesh PS?

Page 79

1    A.  No.
2    Q.  Do you know when the -- actually, let me
3    clarify that.  Is your answer, no, you don't think
4    it's an important fact to know in order to issue
5    your opinions, or yes, you think it is an important
6    fact to know?
7        MS. ROBINSON:  Object to form.
8    A.  To know the date when it was first put out?
9    Q.  Yes, when it was first available for sale in
10   the United States.
11   A.  I said it was in the early 2000s.  I think
12   that's specific enough.
13   Q.  But you don't know any more specifically than
14   that, and you don't think it's important to know?
15   A.  No, it's in the early 2000s.
16   Q.  Is it your opinion in this case that the
17   Gynemesh PS product has been safe and effective for
18   the entire time that it's been on the market in the
19   United States?
20   A.  It's been safe and effective, yes.  It has
21   its known complications of what you would expect for
22   any other mesh, but better than its predecessors
23   from the mid-1990s.
24   Q.  So you have the opinion that its been safe

Page 80

1    and effective for the entire time that it's been on
2    the market in the United States, but you don't know
3    specifically what that time period is?
4    A.  I said the time period is the early 2000s.
5    You want me to pin it down to an exact year?
6    Q.  Do you know the exact year?
7    A.  Yeah, the exact year is 2002.
8    Q.  Okay.
9    A.  But that's the early 2000s.
10   Q.  Do you know what the Prolene Soft product is?
11   A.  It was a variation of prolene mesh with
12   different weight and some different characteristics
13   to it.
14   Q.  Do you know what the differences are between
15   Prolene Soft mesh and the Gynemesh PS?
16   A.  I'd have to look specifically at the details
17   between the two, in terms of the dynamics.
18   Q.  Do you know when the Prolift product was
19   first made available for sale in the United States?
20   A.  About 2004.  2005.
21   Q.  Do you know when the Prolift product was
22   first legally available for sale in the United
23   States?
24       MS. ROBINSON:  Object to form.

Page 81

1    A.  What do you mean by "legally available"?
2    Q.  Well, do you know when it was cleared for use
3    in the United States?
4        MS. ROBINSON:  Object to form.
5    A.  You mean cleared by the FDA?
6    Q.  Yes.
7    A.  2008.
8    Q.  So you know that it was being sold by Ethicon
9    and Johnson & Johnson in the United States before it
10   actually had FDA clearance; is that accurate?
11       MS. ROBINSON:  Object to form.
12   A.  What was?
13   Q.  The Prolift.
14   A.  Well, the Prolift is the mesh, so the mesh
15   was approved in 2002.  The trocars were engineered
16   products that are not relevant to prolene mesh,
17   because they're not -- they're not housed within the
18   body.  They're just the vehicles to place the mesh.
19       So the mesh is the only product that
20   stays in the body at the end of the day.  So 2004,
21   that mesh was appropriate to be implanted in
22   patients.  It's just the vehicle for it that got
23   approved three years later.
24   Q.  But you know that the Prolift device as an

21 (Pages 78 to 81)

Stanley Zaslau, M.D.

Page 82

1   entire kit was being sold by Ethicon and Johnson &
2   Johnson in 2004, 2005, 2006 and 2007, and did not
3   have FDA clearance at that time?
4        MS. ROBINSON: Object to form.
5    A. You mean -- again, the mesh was. It's the
6   simple --
7    Q. I'm not asking about the mesh. I'm asking
8   about the Prolift kit.
9    A. Yes, I do know that.
10   Q. When you were using -- let me back up. Would
11  you, as a physician, knowingly use a medical device
12  that you knew had not been cleared by the FDA?
13   A. The device in my hands is mesh. The mesh
14  was cleared by the FDA. The matter in which --
15   Q. That's not my question, respectfully, Doctor.
16   A. All right. I'm respectfully answering your
17  question.
18   Q. I'm not asking about the Prolift
19  specifically. I'm asking about medical devices in
20  general. My question --
21   A. What is your question?
22   Q. My question is, would you --
23        MS. ROBINSON: So let me just -- you two
24  are interrupting each other, so if you can please

Page 83

1   let him finish his question and then you answer and
2   then -- so I can keep track.
3    Q. My question is -- to you, Doctor, is, if you
4   knew that a medical device had not been cleared by
5   the FDA, would you use that device?
6    A. It depends on the device. This is a very
7   different situation. This is not like a penile
8   implant that I would put in. I certainly wouldn't
9   implant a device such as that in someone that's not
10  FDA cleared.
11        This mesh is FDA cleared. The manner
12  in which is it is placed, i.e., the trocars, was not
13  FDA cleared until 2008. The mechanism for which it
14  is placed is very simplistic, and it should not
15  require any significant efforts to do, and it was
16  extremely useful, comfortable, ergonomic and
17  logical, based on what we've known with the
18  old-fashioned TVT, which was a very difficult device
19  to place; this was effortless to do without problem.
20   Q. Do you know how many times the FDA told
21  Ethicon and Johnson & Johnson in writing between
22  2007 and May of 2008 that they may not market the
23  Prolift device until it has clearance?
24        MS. ROBINSON: Object to form.

Page 84

1    A. Do I know how many e-mails have been sent?
2    Q. I'm not talking about e-mails. I'm asking
3   how many times -- do you know how many times the FDA
4   told Ethicon and Johnson & Johnson in writing that
5   you may not market the Prolift device until you have
6   clearance?
7        MS. ROBINSON: Object to form.
8    A. I don't know how many times, no.
9    Q. During the period of 2007 and 2008, when
10  Ethicon was being told by the FDA that they may not
11  market the device until they have clearance, is that
12  information that you would have wanted to know when
13  you were implanting the device at that time?
14        MS. ROBINSON: Object to form.
15   A. Say it again.
16   Q. If you -- well, first of all, let's back up.
17  You were implanting the Prolift device in late 2007
18  and early 2008; correct?
19   A. Yes.
20   Q. Would you have wanted to know during that
21  time period that the FDA had gone to Ethicon and
22  Johnson & Johnson and told them multiple times in
23  writing that they should have submitted a 510(k) on
24  the Prolift, they didn't have clearance and that

Page 85

1   they shouldn't continue to sell the device until
2   they had clearance?
3        MS. ROBINSON: Object to form.
4    A. I would be more interested to know why they
5   would actually say such a thing for such a
6   simplistic device. Why on earth it would need to be
7   approved is really beyond me. It's a very simple
8   ergonomic, easy to place trocar, easier than any of
9   their other products, including their retropubic
10  TVT, which, as you know, is associated with numerous
11  injuries. I don't even understand why it needed to
12  be FDA approved. It's a device passer.
13   Q. That wouldn't give you any pause at all to
14  find out that you were putting a device in the
15  patient that did not have FDA clearance?
16   A. Again, I'm not putting the device in patient.
17  I'm putting the mesh in the patient. The passers
18  and the trocars are discarded. It's the mechanism
19  of delivery. It has nothing to do with the device.
20   Q. So you were using a kit that had mesh devices
21  and trocars to put in your patient, even though the
22  trocars are not staying permanently in the patient,
23  those were part of a kit that were not FDA approved;
24  that wouldn't give you any pause -- you might not

22  (Pages 82 to 85)

Stanley Zaslau, M.D.

Page 86

1    say to yourself, geez, maybe I shouldn't use this
2    until they have FDA clearance?
3        MS. ROBINSON: Object to form. Asked
4    and answered.
5        A. I was using an FDA-approved mesh with a
6    logical and simplistic delivery system.
7        Q. So you would have no problem using a kit with
8    tools that were not FDA cleared?
9        A. None whatsoever.
10       MS. ROBINSON: Just note my objection to
11   the form and that line of questioning.
12       Q. Do you know what the indications for use are
13   for the Gynemesh PS product?
14       A. I know what an IFU is, yes.
15       Q. No, no, no. My question is: Do you know
16   what the indications -- current indications for use
17   are for the Gynemesh PS product?
18       A. You would have to show them to me so I can
19   read them. I haven't looked at them in a while.
20       Q. Do you know whether or not -- as you sit here
21   today, whether or not the Gynemesh PS mesh is
22   indicated for transvaginal placement?
23       A. I'd have to look at it -- I'd have to look at
24   it and see its most recent iteration.

Page 87

1        Q. So you don't know as you sit here today
2    whether it's only indicated for abdominal placement
3    or whether it's only indicated for transvaginal
4    placement?
5        A. If you want to ask me questions about the
6    Gynemesh IFU, just show it to me, and I can look at
7    it.
8        Q. But as you sit here without -- without
9    looking at the IFU, you don't know the answer to
10   that question; is that accurate?
11       A. Gynemesh should be safe and effective for use
12   in the pelvic floor.
13       Q. That's not my question. My question is: Do
14   you know as you sit here today, or is it anywhere in
15   your expert report, what the current indications for
16   use are for the Gynemesh PS?
17       A. I don't believe it's in my expert report, no.
18       Q. Do you believe that's an important fact that
19   you need to know to offer an opinion that the
20   Gynemesh PS is safe and effective?
21       MS. ROBINSON: Object to form.
22       A. I told you before that it's safe and
23   effective. It was approved in 2002, and it
24   certainly could be used in the pelvic floor. Then

Page 88

1    you're asking me about the IFU, but you won't show
2    it to me.
3        Q. I'm not asking you about necessarily the IFU
4    specifically. I'm just asking you about the --
5        A. You said that before.
6        Q. -- indications for use are.
7        A. You said before the Gynemesh IFU. That's
8    what you said.
9        Q. So irregardless of the Gynemesh IFU, do you
10   know what the current indications for use are for
11   the Gynemesh PS?
12       A. The Gynemesh can be used for the pelvic
13   floor, for pelvic floor reconstruction, and it
14   should be used on a case-by-case basis determined by
15   the surgeon and in discussion with the patient that
16   that's the best thing for them, that's the best
17   option for them.
18       Q. Do you know whether or not it is indicated
19   for transvaginal use?
20       A. I haven't seen -- again, I haven't seen the
21   latest IFU and its indications.
22       Q. So when you're issuing an opinion in this
23   case, are you -- is it your opinion that the
24   Gynemesh PS is safe and effective for use for

Page 89

1    placement transvaginally or abdominally or both?
2        A. I've not used it transabdominally. I've used
3    the Boston mesh, and it's been fine for that. I
4    suppose it could be used as well. It's macropore
5    and monofilament, so it certainly would suffice for
6    that. It certainly, based on its characteristics,
7    should be safe for the pelvic floor, as well, even
8    as of today. Again, after a careful discussion
9    with -- with the patient and the then physician.
10       Q. Have you ever used a surgical mesh for an
11   indication that it -- strike that.
12           Have you ever used a surgical mesh for
13   an application that it's not indicated for?
14       A. No.
15       Q. You'd agree that if a person used a surgical
16   mesh for an application it's not indicated for, that
17   would be considered an off-label use of the product?
18       A. If that's how it's labeled, then, yes, it
19   would be off-label.
20       Q. And as a physician, have you ever used a
21   medical device off-label?
22       A. No.
23       Q. An off-label use?
24       A. No. Strike that.

23 (Pages 86 to 89)

Stanley Zaslau, M.D.

Page 90

1      Yeah, I have done neuromodulation
2   procedures that were meant to be unilateral.  I've
3   done them bilateral for attempted greater efficacy.
4      Q.  Have you ever used -- have you ever
5   prescribed a drug for an off-label use?
6      A.  Yes.
7      Q.  Would you agree that, generally, before you
8   attempt to use a drug for an off-label use, you
9   would want to attempt to use other -- other drugs,
10  if they're available, to see if those worked first
11  before you go to an off-label drug?
12     A.  Depends what the indication is.  Depends what
13  the setting is.  I'll give you an example.  You have
14  a female with sexual dysfunction, Viagra is not FDA
15  approved for females, but females have sexual
16  dysfunction and have shown improvement with that
17  medication, even though it's indicated for males.
18     So intuitively, and based on the
19  problem, one could suggest that it may be
20  efficacious and you would use that based on your
21  skills and training.
22     Q.  Are you aware that the Gynemesh PS is
23  sometimes used for physicians -- by physicians for
24  the treatment of stress urinary incontinence?

Page 91

1      A.  It can be, yeah.
2      Q.  Are you offering an opinion in this case that
3   the Gynemesh PS, if used as a treatment for stress
4   urinary incontinence, is safe and effective?
5      A.  We're using it in the setting of having to
6   create a way of passing it under the urethra, so not
7   using it in its traditional obturator fashion as
8   part of a TVT-O or a TVT.
9      So if it meant fashioning the Gynemesh
10  into that form, then that's at the surgeon's
11  discretion of how they want to do that.  But as it
12  is on the basis of a kit, the kit, then certainly it
13  would be safe.
14     Q.  So the answer to my question is, yes, your
15  opinion is that Gynemesh PS used for the treatment
16  of stress urinary incontinence in a sling would be
17  safe and effective?
18     A.  It would.
19     Q.  Have you done any kind of formal analysis to
20  reach that conclusion with regard to the stress
21  urinary incontinence?
22     A.  Yeah, for suburethral slings.  All macropore
23  monofilament meshes, at least the ones that are
24  available now, should be safe and effective.

Page 92

1      Q.  Do you believe that implanting a Prolift
2   device today would be within the standard of care?
3      A.  It would.  It would certainly depend on,
4   again, the patient, the physician, the degree of
5   prolapse, the compartment involved.  It certainly
6   could be -- could be very efficacious today in the
7   right patient.
8      Q.  Do you believe that implanting the Gynemesh
9   PS transvaginally today is within the standard of
10  care?
11     A.  As a stand-alone piece of mesh with trocars
12  and such created by a physician or anchoring, as
13  such, it could be.
14     Q.  But you don't know as you sit here today
15  whether or not the -- implanting the Gynemesh PS
16  transvaginally is indicated or not?
17     A.  I mean, I don't do it.  I would like to do it
18  based on a kit.  But the physician certainly could.
19  If they wanted additional anterior support.
20     Q.  In fact, you've never done it; right?
21     A.  I have not.
22     Q.  Do you agree with the FDA's viewpoint that
23  there's a need for more rigorous studies regarding
24  the safety and efficacy of mesh kits?

Page 93

1      A.  Certainly study is always warranted for any
2   device and to look at the long-term follow-up.
3      Q.  Do you believe that there are adequate
4   studies to support the safety and efficacy of a
5   Prolift device?
6      A.  There's lots of studies done over the years
7   with long-term data, yes.
8      Q.  So you believe that there's an adequate
9   amount of long-term data with regard to the Prolift
10  device to support its safety and efficacy?
11     A.  Well, it depends where we're going to define
12  "long-term."  We have seven-year data for Prolift.
13  We have five-year data for Prolift that's been
14  published.  It would be nice have to 10-year data,
15  15-year data.  Certainly that could come with time,
16  nice to have.  But we have long-term data that
17  showed that when it was out, while it was out it was
18  effective at reducing prolapse and symptoms.
19     Q.  So my question is -- is pretty simple:  Do
20  you believe that there's adequate long-term safety
21  data on the Prolift to support its use?
22     A.  Yes.
23     Q.  And if the FDA's viewpoint was that there
24  isn't enough, you would disagree with that

24 (Pages 90 to 93)

Stanley Zaslau, M.D.

Page 94

1    viewpoint?
2       A.  I think the FDA has acknowledged very clearly
3    that there needs to be more data, and they recognize
4    that the data that they've looked at, that there
5    needs to be more of.  It would be nice if there were
6    randomized control trials but there're not.  Many of
7    these are treatment groups only followed for a long
8    period of time.  They've also acknowledged that this
9    is hard to do; it's hard to get long-term data.
10      Q.  Have you ever seen the -- strike that.
11          Have you ever seen the 522 order that
12   was issued by the FDA with regard to the Prolift
13   device?
14      A.  I'm sure I have, but if you want to question
15   me on it, I would like you to show it to me.
16      Q.  Do you know what Ethicon did in response to
17   the 522 order on the Prolift device?
18      A.  Again, if you would like to question me about
19   it, can you show me the documents.
20      Q.  I'm just asking as you sit here today, do you
21   know what Ethicon did in response to the 522 order
22   on the Prolift device?
23      A.  Well, the 522 order was about what time
24   period?

Page 95

1       Q.  2012.
2       A.  2012, right.  Okay.  Do you remember what
3    time period it was in 2012?  It was about February,
4    March.  That's about five or six-page document of
5    really very interesting questions.  Break down your
6    data further, by compartment, anterior, posterior;
7    breakdown on your follow-up of mesh complications.
8    Really very pretty straightforward material.  But
9    also asked at the same time for more significant
10   data, over really what would have taken a very long
11   time to do.  They wanted follow-up over years of
12   activity.
13          The response was four months later,
14   about the summer of 2012, that they sent a letter to
15   J&J and said, we would like to stop marketing this
16   product right now.  So a four-month time period from
17   March until the summer.  Get all this data, get all
18   this information.  And then the next response from
19   the FDA was, no, shut it off.
20      Q.  So you believe that the Prolift device was
21   removed from the market at the FDA's request?
22      A.  No.  I think it was Johnson & Johnson looking
23   and saying, look at all this data that we have to
24   wire.  I mean, it's really kind of crazy, the level

Page 96

1    of what they wanted.  I'm sorry, it was April.
2    Okay?  So you know, you didn't specify.
3           How many pages is this large document?
4    Six, seven pages.  You know, we want safety and
5    effectiveness at 6, 12, 18, 24, and 36 months, and
6    the data that you're showing me only has 12 months.
7    I mean, there's no way that they can give data out
8    for what was wanted at the very little amount of
9    times that was given.
10          Your study plan lacks study milestones
11   and timeline elements.  Looking at this and saying,
12   okay, this April of 2012.  Then they turn around
13   July 9th of 2012, said, well, we're suspending your
14   study.  There's no way, even if they wanted to, that
15   they could adequately satisfy every effort that the
16   FDA wanted in four months.
17      Q.  Do you know whether or not there were other
18   companies that were able to satisfy the FDA's
19   requirements with regard to their mesh kits?
20      A.  I would say very few because there was a mass
21   exodus from the marketplace at that time because of
22   the cost to do this.  Certainly this is a lot of
23   cost to do this work.  It would be very significant
24   to do and certainly not be able to be done in a

Page 97

1    four-month time period.
2       Q.  What is your understanding of why the Prolift
3    was removed from the market?
4       A.  I think it was a financial decision.  Was it
5    generating -- I don't know this.  This is just
6    opinion.  Was it generating as much for Ethicon as
7    they wanted it to?  Was it profitable to go forward,
8    or was this something that, given the climate at the
9    time, wasn't worth proceeding forward with.  And
10   they just retreated.  I don't know.  This is my
11   opinion.
12      Q.  Do you know what the 522 order that was
13   issued by the FDA said with regard to the Gynemesh
14   PS?
15      A.  I don't.
16      Q.  Do you know what Ethicon and Johnson &
17   Johnson did in response to the 522 order for the
18   Gynemesh PS?
19      A.  I don't.
20      Q.  Do you have an opinion -- do you intend to
21   offer an opinion in this case on whether or not the
22   Prosima device has a different safety profile than
23   the Gynemesh PS device because of the amount of mesh
24   contained in that device?

25 (Pages 94 to 97)

Stanley Zaslau, M.D.

Page 98

1    A.  Certainly that there is going to be similar
2  safety issues for any of these mesh products with
3  infection, erosion, pain, problems, each to varying
4  degrees, just on the basis of the material and the
5  defect.
6    Q.  Do you know whether or not the Gynemesh PS
7  product is still on the market today?
8    A.  I don't.
9    Q.  So would you agree that from the time that
10  Ethicon started legally marketing the Prolift device
11  to the time they removed it from the market was
12  approximately five years?
13    A.  So 2000 --
14        MS. ROBINSON:  Object to form.
15    A.  Well, from the time I began using it, 2005 to
16  2009.  Is that the five-year period?
17    Q.  But Ethicon wasn't legally marketing the
18  Prolift kit until 2008; correct?
19        MS. ROBINSON:  Object to form.
20    A.  Well, as far as the, quote, kit, no, not
21  until 2008.  But as far as, you know, I couldn't
22  have used it after 2009.  I didn't have access to
23  it.  2004 to 2009, I had five years to use the
24  product.

Page 99

1    Q.  Do you know what the shelf life of the
2  Prolift product is?
3    A.  No, I know that there's an expiration date on
4  every box, and once the expiration date has passed,
5  we don't use those products.
6    Q.  Would it -- do you believe that would be
7  within the standard of care to implant a Prolift
8  product that's expired?
9    A.  I haven't done it.
10    Q.  That's not my question.  My question was:  Do
11  you believe it would be within the standard of care
12  to implant an expired Prolift product?
13    A.  Well, the standard of care is not to harm the
14  patient at the end of the day.  If the physician
15  looked at the product, didn't find any obvious
16  defects in it before implanting it and made that
17  decision to do so, that would be fine.
18        Now, if the product is six years old,
19  which it shouldn't be because we go through the
20  shelves very regularly -- I can't imagine a
21  six-year-old product being implanted; a few weeks,
22  month, months -- that's going to be up to the
23  individual physician.  You inspect your products
24  before you ever implant them anyway.

Page 100

1    Q.  Do you know why a Prolift product has an
2  expiration date or a shelf life?
3    A.  No.
4    Q.  So not knowing whether or not the purpose is
5  of the shelf life or expiration date, do you know if
6  a physician inspecting the product would be able to
7  detect visually any defects in the product if it's
8  past its expiration date?
9    A.  Sure.  You should be able to look at it and
10  see, does it look to be its appropriate shape or
11  form, does it look to be woven appropriately.  And
12  certainly, you can look at it very easily and see if
13  it has any gross deformity to it.
14    Q.  But you don't know -- do you know whether or
15  not one of the reasons for an expiration date on a
16  polypropylene plastic mesh like Prolift is that it
17  can -- it's physical properties can change over
18  time?
19        MS. ROBINSON:  Object to form.
20    A.  You can see its physical properties.  That's
21  why you look at it.  They're visible.
22    Q.  So you don't believe that there could be
23  physical properties -- changes to the physical
24  properties of the mesh that occur after the

Page 101

1  expiration date that can't be seen with the human
2  eye?  That it could only be seen through more
3  rigorous testing?
4    A.  It's certainly possible if you can look at an
5  expired product under a microscope and might find
6  differences in them.  As you said, physical
7  properties, meaning properties that can you see,
8  gross properties, you can look at it and see if it
9  looks to be normal.  Or to be the way you would
10  expect it if you're going to implant it.
11    Q.  Would you agree that polypropylene, like any
12  plastic, if it's stored for a long period of time,
13  the physical properties of it can change, meaning
14  the tactile properties; it might change to the
15  touch?
16        MS. ROBINSON:  Object to form.
17    A.  We said before that the products are not kept
18  on the shelf for years.  Okay?  When we're talking
19  about beyond an expiration date, I'm talking to you
20  about months.  Because we would take any product
21  like that and return it if it's been past its
22  expiration date significantly.  So we're really not
23  in a situation where we're ever going to implant an
24  expired product.

26  (Pages 98 to 101)

Stanley Zaslau, M.D.

Page 102

1    Q. Do you know whether or not Ethicon was
2    accepting returns of the Prolift product after it
3    was removed from market?
4    A. I don't know whether they were accepting them
5    or not, but I know that when -- we may have had two
6    on the shelf or so, and we sent them back. I don't
7    know what happened to them, but we sent them back.
8    Q. Would you agree it would be a reasonable
9    thing to do for a company to accept returns of a
10   medical device that they decided to no longer market
11   and support with training?
12       MS. ROBINSON: Object to form.
13   A. Yeah, I don't -- that's up to their policies.
14   Those aren't my policies.
15   Q. But you as a physician, would you expect that
16   to be a reasonable thing for a medical device
17   company to do, to take the product back if they were
18   no longer going to support it or sell it?
19       MS. ROBINSON: Object to form.
20   A. That's up to -- that's up to the
21   manufacturer. That's up to them. That's their
22   policies.
23   Q. So you --
24   A. No, I broke my Fitbit watch. I can't get a

Page 103

1    new one and I asked, can I get one since the band
2    broke and they said, no, it's been a year and you'll
3    have to buy a whole new watch. And we're not giving
4    you a discount for it. That's their policy. It
5    would be nice if they would give it to me, discount
6    or something, I'm a customer, but that's up to the
7    company.
8    Q. But your watch isn't intended for permanent
9    implantation to the human body; right?
10   A. Right. But it's permanently implanted on my
11   arm. And these are products that have not been
12   used.
13   Q. And your Fitbit doesn't require specialized
14   training in order to implant; correct?
15   A. Well, it does, it requires specialized
16   charging each night to work.
17       MS. ROBINSON: And specialized walking.
18   Q. You had training on how to charge your Fitbit
19   watch?
20       MS. ROBINSON: You have to have training
21   on how to get those 10,000 steps a day.
22   Q. So you know at least for the Prolift product,
23   because you have some of the documents in front of
24   you, that Ethicon tried to convince the FDA to

Page 104

1    accept studies they had already done on the Prolift
2    instead of having to do additional studies; correct?
3        MS. ROBINSON: Object to form.
4    A. I mean, certainly the ones that they
5    submitted to them were studies that had follow-up,
6    were good quality studies, but the FDA wanted
7    additional materials. That was their impression.
8    Q. Right. So the FDA essentially said, you
9    don't have enough studies or clinical data on the
10   Prolift at this time, we want more; right?
11   A. They wanted more information, yes.
12   Q. And you disagree with the FDA's decision on
13   that?
14   A. I think there's a lot of good data that
15   they're suggesting the long-term follow-up, a
16   seven-year follow-up, a four-and-a-half-year
17   follow-up, studies with showing significant
18   improvement in the anterior compartment, the Schimpf
19   study, looking at a variety of different products
20   for prolapse, low dyspareunia rates, you know; I
21   thought there was a lot of good data there, from a
22   lot of different studies, including randomized
23   trials.
24       Now, did they have five, six,

Page 105

1    seven-year follow-up on these randomized trials.
2    No, they were shorter. They were one or two years.
3    If the FDA wants more data, you have to honor their
4    wishes and give them more data. There's a lot of
5    good data for Prolift.
6    Q. Just to be clear, you disagreed with the FDA
7    that there was more data needed on the Prolift
8    before selling the device?
9    A. Yeah, I did, I did.
10   Q. Do you believe it would be a reasonable
11   decision for a doctor to stop using the Prolift
12   device following the July 2011 FDA warning?
13   A. If they didn't understand it, I would expect
14   them to stop. But if they understood it, I'd expect
15   they would keep going.
16   Q. So you believed that the only type of doctor
17   that would stop using it, stop using the Prolift
18   after the July 2000 FDA warning, is a physician that
19   didn't understand the notice?
20   A. Right, they didn't understand the FDA -- they
21   didn't understand the FDA document in 2011.
22   Q. Do you agree that serious complications
23   associated with surgical mesh for transvaginal
24   repair of pelvic organ prolapse are not rare?

27 (Pages 102 to 105)

Stanley Zaslau, M.D.

| Page 106 |
|---|

1    A.  No, they're not rare.
2    Q.  So you agree with that statement or you
3  disagree?
4    A.  Well, when I say "rare," I'm talking about
5  less than 2 percent.  Okay?  So when you look at the
6  data for pelvic mesh complications, that
7  complication rate can be between zero percent and
8  some studies have quoted much higher percentages.
9  So it depends on how you define "rare."  A rare
10  disease may happen in 1 percent of people.  If you
11  sum together all potential complications a person
12  could have, it would be more than 1 percent.
13    Q.  Well, are you aware that the FDA public
14  health notice specifically states that serious
15  complications associated with surgical mesh for
16  transvaginal repair of pelvic organ prolapse are not
17  rare?
18    A.  Yes.
19    Q.  Do you agree with that statement?
20    A.  Yes, I do.
21    Q.  Do you disagree there is no evidence that
22  transvaginal repair with mesh provides any added
23  benefit compared with traditional surgery with mesh?
24    -- without mesh.  Strike that.  I need to start

| Page 107 |
|---|

1  over because I just butchered that terribly.
2          Do you disagree that there is no
3  evidence that transvaginal mesh repair with mesh
4  provides any additional benefit compared to
5  traditional surgery without mesh?
6    A.  Mesh does provide an added benefit, yes.
7    Q.  So you disagree with that statement?
8    A.  I do.  I also disagree with the other
9  statement -- with your discussion of not rare in the
10  context of where you're reading it from.  You're
11  reading it from, if I'm not mistaken, the 2011
12  statement where there's a discussion of the number
13  of cases performed in one year.  Okay?  I think
14  if -- I don't have the document in front of me, but
15  I think there were, what, 100,000 cases in 2010.
16  Was that the year?  Okay --
17    Q.  I don't know what you're talking about.
18    A.  Let's go through -- we'll spend time going
19  through the FDA discussion in detail.
20    Q.  No, we don't need to do that, Doctor.  You
21  have answered my question.
22    A.  I need to answer your question, so I'm going
23  to answer -- because you're talking about a document
24  I want in front of me, okay.  And you're referring

| Page 108 |
|---|

1  to it, and you're not giving it to me so I'm going
2  to take the time to find the things that you're
3  discussing.
4    Q.  I'm actually not referring to any specific
5  document, Doctor.  I'm just asking questions.
6    A.  All right.  Well, I'm just trying to answer
7  them for you.
8        MS. ROBINSON:  So we've spent another --
9  about another hour on the record.  Can we take a
10  break?  He can look for his FDA document, and we can
11  just take a -- little break.
12        MR. FAES:  Sure.
13        (A brief recess was taken from 4:16 p.m.
14  to 4:31 p.m.)
15  BY MR. FAES:
16    Q.  Doctor, we're back on the record after a
17  short break.  Are you ready to proceed?
18    A.  Yes.
19    Q.  I just want to follow up and ask you a couple
20  questions about your supplemental reliance list
21  marked as Exhibit No. 4.  Who prepared this list?
22    A.  Attorneys for Ethicon.
23    Q.  How were the materials that are on this list
24  selected?

| Page 109 |
|---|

1    A.  They were selected by Ethicon.  There are
2  additions made by me based on some things I asked to
3  include over the time.  This list has grown and
4  grown.  And they maintain them.  But it's a
5  supplement.  I mean, there are things in here,
6  articles I read all the time, and there's articles
7  that are referred to in our textbooks.  You know,
8  things that over a compendium of 15 years at WVU,
9  things I would know and work with.
10    Q.  Is there anything that you've asked Ethicon
11  and Johnson & Johnson for that -- or attorneys for
12  Ethicon and Johnson & Johnson that you were unable
13  to get?
14    A.  No.
15    Q.  Do you feel like you have seen everything
16  that you need to see in order to issue your opinions
17  in this case regarding the Prolift and Gynemesh PS?
18    A.  Yes.
19    Q.  Of course, you didn't put any page numbers on
20  this, but can you look at the -- I guess it would be
21  the third-to-last page or second-to-last page that
22  has writing on it.  It starts with expert reports,
23  Blaivas, Jerry?
24    A.  Yes.

Stanley Zaslau, M.D.

Page 110

1    Q.  Easiest if you go from the back.  I see you
2  have some depositions listed down there, Dr. Eddie
3  Sze on 5/13 of 2006 (sic).  Do you see that?
4    A.  Yes.
5    Q.  How does Dr. Sze's deposition from May of
6  2016 support your opinions regarding the Prolift and
7  Gynemesh PS?
8    A.  Dr. Sze had a variety of different cases for
9  which he was the treating physician.  He was deposed
10  in Syracuse in May in about 15 different cases.  I
11  had reviewed a variety of these and some of which I
12  was the explanting physician of mesh.
13    Q.  But those depositions were regarding the TVT
14  device; right?  Not the Prolift or Gynemesh PS?
15    A.  Most likely were the TVT, but I would have to
16  look at each individual case.  Like I said, there's
17  a large number of cases, like 15 to 20 cases he was
18  deposed in over that period of time.
19    Q.  Can I have you turn back one, two, three more
20  pages to the page that starts, Company Witness
21  Depositions.  Are you there, Doctor?
22    A.  No.
23    Q.  Tell me when you're there.
24    A.  Company Witness Depositions, yes.

Page 111

1    Q.  And you see -- I see there that you reviewed
2  some testimony of Dr. Axel Arnauld from 2013.  Do
3  you see that?
4       (Witness reviews document.)
5    A.  Yes.
6    Q.  Were you aware that Dr. Arnauld was actually
7  deposed as well in 2012, specifically regarding the
8  Prolift device?
9    A.  He may have.  I don't remember.
10    Q.  Do you know if you've reviewed those
11  depositions prior to issuing your opinions in this
12  case?
13    A.  No.  This is a really exhaustive list of
14  things.  I haven't reviewed every single deposition
15  testimony of every single person who is here.  I
16  glanced at parts of things.  I glanced at parts of
17  some and glanced more of others and said I'm not going to review this any further.
18  and said I'm not going to review this any further.
19  It's just too big a body of information.
20    Q.  But my question is:  Do you recall if you've
21  ever actually reviewed Dr. Arnauld's testimony in
22  2012 regarding the Prolift device?
23    A.  I don't remember specifically reviewing that
24  testimony.

Page 112

1    Q.  Do you recall if he's one of the -- whether
2  or not he's one of the medical directors that
3  actually worked with Ethicon and Johnson & Johnson
4  in developing the Prolift device in France?
5    A.  No, I don't.
6    Q.  You think that would be important testimony
7  to have reviewed prior to issuing your opinions in
8  this case?
9    A.  Not necessarily.
10    Q.  Down further down you've got Charlotte Owens?
11    A.  Uh-huh.
12    Q.  And there's two depositions listed in 2013.
13  Do you see that?
14    A.  I do.
15    Q.  Are you aware that Dr. Owens was actually the
16  medical director for Ethicon and Johnson & Johnson
17  at the time the Prolift device was launched in the
18  United States?
19    A.  I was not, no.
20    Q.  Are you aware that she was actually deposed
21  as well in 2012, specifically regarding the Prolift
22  device?
23    A.  No.
24    Q.  Is that information you think might have been

Page 113

1  helpful to you in reaching your opinions in this
2  case?
3    A.  No.
4    Q.  You don't think the testimony of Ethicon's
5  medical director at the time the Prolift device was
6  launched in the United States would have anything
7  relevant to say that might affect any of your
8  opinions in this case?
9    A.  No.
10    Q.  Again, Dr. David Robinson, you've got three
11  dates listed for him.  Do you remember who he is?
12    A.  I do not, no.
13    Q.  If he was the medical director from -- for
14  Ethicon and Johnson & Johnson from 2005 to 2010 and
15  was also deposed in 2012, specifically regarding the
16  Prolift device, do you think those depositions would
17  have anything relevant to your opinions regarding
18  the Prolift or Gynemesh PS in this case?
19    A.  No.
20    Q.  Doctor, would you agree with me that you are
21  not an expert in polymer chemistry?
22    A.  I am not.
23    Q.  You're not an expert in chemical engineering?
24    A.  No.

29  (Pages 110 to 113)

Stanley Zaslau, M.D.

Page 114

1    Q.  You're not -- you don't hold yourself out to
2  be an expert in surgical pathology?
3    A.  I review urologic pathology for things.
4  Pathology is a part of the American Board of Urology
5  certifying examination, so I'm comfortable reading
6  pathology slides and interpreting pathologic
7  information.
8    Q.  And you, in fact, as a matter of course,
9  whenever you remove a foreign body from a patient,
10  including a surgical mesh, you generally send that
11  out for pathology; right?
12    A.  It depends on what the foreign body is.
13  Mesh, yes, we send our removals for pathology.
14    Q.  So you would agree with me that you have --
15  of all the mesh removals that you have sent out for
16  pathology, none have ever had any kind of chemical
17  testing done on those samples to determine if the
18  mesh has chemically degraded; correct?
19    A.  No.
20    Q.  No, I'm not correct, or yes, I'm correct?
21    A.  You are correct in that we have not sent any
22  of our meshes for testing for chemical degradation.
23    Q.  Have you ever done a microscopic analysis of
24  explanted mesh to determine whether or not the mesh

Page 115

1  degraded?
2    A.  Yes.
3    Q.  What type of microscopic analysis have you
4  done to determine whether or not the mesh degraded?
5    A.  Well, for the two case reports that we just
6  wrote with eroded prolene sutures from the Burch
7  case.  These were sutures that eroded into the
8  bladder.  So when we removed them, I looked at them
9  under the microscope to look and see what the fiber
10  looked like.  The fiber looked clean.  It didn't
11  have any obvious breaks in it.  Certainly, I didn't
12  do any staining for it.
13          Other than the stones that formed on
14  it from being eroded into the bladder ten years
15  prior, it looked and felt like a normal piece of
16  prolene mesh -- prolene suture.
17    Q.  But my question was, you haven't done --
18  you've done the -- looked at explanted prolene
19  sutures under a microscope, but you've never done a
20  microscopic analysis of explanted mesh to see if it
21  chemically degraded?
22    A.  Not for chemical degradation, no.
23    Q.  Okay.  Do you intend to offer any opinions in
24  this case regarding patient satisfaction rates for

Page 116

1  the Prolift or Gynemesh PS?
2    A.  In -- yes, you know, in review of literature,
3  and from our own population of patients, those who
4  we've implanted are satisfied with the procedure
5  that was performed and none, that I know of, of my
6  own patients have required any additional repairs,
7  meaning any additional prolapse repairs.
8    Q.  So do you intend to offer any opinions in
9  this case regarding any of your own patients who
10  have been implanted with the Prolift device?
11    A.  Other than explaining over the series that
12  patients have been satisfied and have not had any
13  significant adverse events, I would be saying that.
14    Q.  So how many patients are we talking about?
15    A.  Of the hundred that we know of and the three
16  mesh extrusions that I have dealt with over the
17  years and the follow-up of those patients that we
18  know of has been extremely satisfactory.
19    Q.  Have you done any kind of survey regarding
20  patient satisfaction of those patients?
21    A.  We have not done that yet, but that is a
22  consideration as a retrospective look, looking back
23  ten years, where these patients are now and how
24  they're doing.

Page 117

1    Q.  Do you know how many of those hundred
2  patients have been lost to follow-up?
3    A.  I don't.  I'd have to look.  We've had a
4  change in our electronic record systems, is what
5  makes this a little more challenging.  So we went
6  from paper to dictation to all computer in 2010.  So
7  searching for some of those paper charts is a little
8  more challenging.
9    Q.  Do you know at what interval each of those
10  patients have been evaluated for?
11    A.  At this level, patients should be evaluated
12  annually.  My rule is that we'll see patients at
13  least annually after any pelvic floor surgery.  So
14  we should have annual data for everyone.
15    Q.  But you don't know -- do you know as you sit
16  here today how many of those hundred patients have
17  actually -- have actually had annual data?
18    A.  I'd have to look specifically to do that.
19    Q.  Do you know what the average follow-up is for
20  those patients?
21    A.  Meaning average time period that they've been
22  followed?
23    Q.  Yes.
24    A.  The longest follow-up would be 12 years, from

30 (Pages 114 to 117)

Stanley Zaslau, M.D.

Page 118

1  2004 to 2016.  The shortest follow-up could be maybe
2  eight years or so.
3      Q.  But have you done any kind of formal analysis
4  of what --
5      A.  Not yet.
6      Q.  Let me get out the whole question.  Have you
7  done any kind of formal analysis of what the average
8  follow-up is for those patients?
9      A.  I have not yet, no.
10     Q.  What do you believe the reoperation rates are
11 for the Prolift device?
12     A.  That's a hard question to answer.  I don't
13 know what you mean by "reoperation."
14     Q.  Well, what do you believe are -- strike that.
15         Assuming that reoperation rates means
16 any kind of operation for mesh erosion, extrusion,
17 exposure, or failure, what do you believe the
18 reoperation rates are for the Prolift device?
19     A.  Let me make sure I understand.  You're saying
20 erosion, extrusion.
21     Q.  Exposure.
22     A.  Exposure.
23     Q.  Or failure of the --
24     A.  Okay.

Page 119

1      Q.  -- treatment, failure meaning recurrent
2  problems.  Requiring reoperation?
3         MS. ROBINSON:  And recurrent and treated
4  or untreated or -- securing this mesh.
5      A.  Can I take it apart?
6      Q.  Sure.  Actually, let me withdraw that
7  question and ask a better one.
8         What do you believe the erosion,
9  exposure and extrusion rates are for the Prolift
10 device?
11     A.  Okay.  Let's focus on -- let's define erosion
12 and extrusion; okay?  Extrusion is extrusion through
13 the vaginal wall.  Meaning seen vaginally.  Erosion
14 means that it erodes into another structure.
15 Meaning it erodes into the urethra or into the
16 bladder.  Unfortunately, the literature uses them
17 both the same, although really they're semantically
18 different things.  We'll say erosions and extrusions
19 for the purposes of this deposition is being
20 visualized through the vaginal wall.  Okay?
21     Q.  Okay.
22     A.  So the erosion rates can range from 0 percent
23 to as high as about 20 percent.  The problem is how
24 those are treated.  In many papers, the erosions can

Page 120

1  be managed medically with estrogen creams.  In some
2  of the papers, 50 percent of the patients with an
3  erosion were treated early with estrogen cream.  In
4  others, they were treated just with observation and
5  had improvement.
6         In terms of procedures -- but that
7  affects the overall erosion rate.  The overall
8  erosion rate might be as high as, in a study, 19
9  percent, but those that required a procedure for it
10 was only 3 or 4 percent.  So it depends on how --
11 how you look at what erosion means and does it mean
12 being treated, or does it mean being treated with
13 surgery, or does it mean simple excision in the
14 office.
15     Q.  So what do you believe the overall erosion
16 rate is including exposure and extrusion, for the
17 Prolift product for any of those things?
18     A.  It's very hard to determine.  Some of the
19 studies they break down the patients, of 21
20 patients, and a patient had three different
21 procedures.  So does that mean they eroded three
22 times, or is it a single erosion.  It's very hard to
23 determine what it truly is.
24     Q.  So yeah, I understand that it's difficult, so

Page 121

1  are you going to offer an opinion on this case on
2  what the overall erosion rate is for the Prolift
3  product?
4      A.  Yes, I'm going to say my opinion is that the
5  overall erosion rate is very difficult to determine,
6  which has been cited in the literature very clearly;
7  that there's different ways of determining what an
8  erosion is.  Does it require surgery?  Were they
9  seen by the same physician who did the surgery and
10 someone else postoperatively?  Was the same patient
11 counted twice if they had a recurrence, meaning that
12 they were treated medically, and then they didn't
13 get better and required surgically (sic), is that a
14 separate erosion or is that the same erosion?  So
15 the reporting of it is challenging as it is.
16     Q.  I understand, but do you intend to state an
17 overall erosion rate or an overall erosion rate
18 range regarding the Prolift device?
19     A.  I will say that there is a wide range of
20 numbers that are quoted in the literature, but when
21 those numbers are drilled down to what is surgically
22 significant, the erosion rate is most likely
23 somewhere between say 3 and 8 percent.
24     Q.  So you believe that the overall erosion rate

31 (Pages 118 to 121)

Stanley Zaslau, M.D.

Page 122

1  for the Prolift device is between 3 and 8 percent?
2    A. I think it's very low. I think it's
3  overestimated and overstated.
4    Q. How high would the overall erosion rate of
5  the Prolift need to be in order for you to change
6  your opinion that Prolift is safe and effective for
7  the treatment of pelvic organ prolapse?
8    A. Say that again, how high?
9    Q. Yes.
10   A. What it needs to say that it's safe and
11 effective?
12   Q. I'll restate it. How high would the overall
13 erosion rate need to be or the overall rate range
14 need to be in order for you to change your opinion
15 that the Prolift device is safe and effective for
16 the treatment of pelvic organ prolapse?
17   A. Well, I think it is safe and effective
18 despite the FDA -- despite the -- Ethicon's decision
19 to not market it anymore. I think it's safe and
20 effective. It was safe and effective. And the data
21 is safe and effective.
22   Q. That's not my question. My question is --
23 well, you've issued an opinion in this case that the
24 Prolift is safe and effective for the treatment of

Page 123

1  pelvic organ prolapse; right?
2    A. Yes.
3    Q. And one of the measures of safety is the
4  erosion rate; right?
5    A. Yes.
6    Q. So how high would the erosion rate need to be
7  before you would say that's too high of an erosion
8  rate, it's not safe and effective?
9    A. I can't give you a number. Because it's not
10 based on a number. The number is factual. It's
11 going to be based on clinical experience. It's
12 going to be based on multiple papers suggesting the
13 same thing, that there's a problem. It's going to
14 be based on presentations at national meetings.
15 It's going to be based on book chapters describing
16 this, latest edition of Campbell's urology. I think
17 it's going to take a body of literature, of
18 significant, compelling literature.
19   Q. So if you can't give me a number, does that
20 mean that if it was shown that the Prolift eroded in
21 100 percent of cases, you might still say that it's
22 safe and effective?
23   A. I mean, I think that's -- that's not a very
24 sensible question. If something eroded in a hundred

Page 124

1  percent of cases. You know --
2    Q. So you'd agree that a mesh device for pelvic
3  organ prolapse that eroded in 100 percent of cases
4  would not be safe and effective?
5    A. I certainly would have a question of why is
6  there a hundred percent erosion rate. The first
7  thing is why is that the case.
8    Q. So you wouldn't even go that far in a case
9  where the erosion rate was 100 percent to say that
10 device isn't safe and effective?
11   A. The first question is why, why is the erosion
12 rate what it is? Why? And ascertain that
13 scientific approach to it. Why is it?
14       A number is a number. It doesn't have
15 any meaning unless it's interpreted in a context.
16 Like I'm describing to you about erosion rates, how
17 these numbers are extremely difficult for anyone to
18 understand. The numbers in all these different
19 papers. But when you break down the numbers of
20 things that are commonly quoted, especially by
21 Plaintiff attorneys, oh, the erosion rate is
22 36 percent. Yeah, but when you break down that
23 there are 21 patients and half of them are treated
24 medically, well, yeah, they had an erosion but it

Page 125

1  was treated in the office with medical therapy. So
2  it's really not significant. So the number has to
3  be drilled down to what does it mean.
4    Q. So potentially a mesh device for pelvic organ
5  prolapse could show an erosion rate of a hundred
6  percent and you potentially would not find that
7  device to be defective?
8       MS. ROBINSON: Object to form.
9    A. I said to you before, the first question is
10 why. Why is it a hundred percent. Is it the
11 product? Is it how it's delivered? Is it the
12 characteristics of it? Why is it? Why is the
13 number what it is? And then from there, you can
14 make determinations as to safety and efficacy.
15   Q. So are there any devices, medical devices out
16 there that you believe are not safe and effective
17 for their intended use?
18   A. Not that I work with in urology.
19   Q. What's an example of a medical device that
20 you think is not safe and effective for its intended
21 use?
22   A. I can't think of any.
23   Q. So help me understand, Doctor, you've issued
24 an opinion in this case that the Prolift device is

32 (Pages 122 to 125)

Stanley Zaslau, M.D.

Page 126

1  safe and effective. How would I know when a device
2  is not safe and effective?
3      MS. ROBINSON: Object to form.
4   Q. What objective standard are you using -- what
5  objective standard would you use to determine that a
6  device is not safe and effective?
7   A. I asked (sic) and answered that for you
8  already.
9      MS. ROBINSON: Object to form.
10  Q. So what was your answer, because I missed it?
11  A. Okay. I'll say it nice and slow.
12  Q. Okay.
13  A. When you said that a device has a hundred
14 percent erosion rate, what I said to you, is the
15 first question would be to ascertain why that is.
16 The characteristics of the device, the implantation
17 system, the patient selection, comorbidities, other
18 related factors to how that device is used. Okay?
19 An understanding of that conceptually, it's not hard
20 to do. It's actually straightforward.
21      Then to go to the literature, do other
22 people see the same thing, published literature,
23 textbooks, conferences, meetings; am I the only one
24 seeing this or is this a national trend? From

Page 127

1  there, using all of the compendium of information
2  ahead of me, then I can come to a logical
3  conclusion.
4   Q. So if, after looking at all that data and
5  determining that it wasn't anything to do with the
6  way the device was being implanted or surgical
7  technique or any outside factor, what rate of
8  erosion would be unacceptable to you to where you
9  would determine that that device is no longer safe
10 and effective?
11  A. Again, it's not a number. This is not a
12 number situation. You can't assign numbers to the
13 situation. It's the gravity of what it is.
14 Certainly if a device had a hundred percent erosion,
15 there would be tremendous questions and it wouldn't
16 be just from me. So that whole line doesn't make a
17 whole lot of sense. Nobody would do it.
18  Q. What if the device had 50 percent erosion?
19  A. It's the same logic. Why? The most likely
20 reason, okay, we'll continue down this pathway, is
21 it probably is the end user is the one that has an
22 issue with it. Probably the end user doesn't know
23 how to use it. Doesn't know the indications.
24 Doesn't know how to implant it.

Page 128

1   Q. Assuming that there's no issue with the end
2  user, what's the rate at which you would determine
3  that it's not safe and effective? There's no
4  number; right?
5   A. There is no number. There is no number. At
6  the end of the day, it usually is the end user;
7  that's where the problems start and finish.
8  Products, before they get approved, are trialed;
9  okay? This is very obvious with the TVT, it's very
10 obvious with Prolift. Complications, the problems
11 were described for Prolift ten years before Prolift
12 ever came on the market. Okay? Erosions,
13 extrusions, infections, fistulas, hematomas, injury
14 to bowel, injury to bladder, described, documented,
15 1996 to 1998. So we know already. We know all the
16 things.
17  Q. So let me ask you, unfortunately, the same
18 question with regard to efficacy rates. At what
19 point would the failure rate be too high where you
20 would say maybe this device is safe but it's not
21 effective?
22  A. Again, you can't draw a number. But by the
23 same token, you don't want to -- you don't want to
24 offer repeated surgeries for patients. You don't

Page 129

1  want to create morbidity as a result of something
2  that you've done. So you have to weigh the number
3  with the effect of a number. Okay?
4      Certainly the higher the number --
5  it's intuitive. The higher the number the more
6  likelihood there's some problem with it. But you
7  have to interpret it based on the problem and what
8  the problem is and why it's happening.
9   Q. Well, certainly the effectiveness rates of
10 alternative surgeries or devices would be a factor
11 that you would consider in whether or not a device
12 like the Prolift is effective; correct?
13  A. Right. You could look at competitor products
14 and efficacy.
15  Q. And so how different would the efficacy rate
16 need to be between the Prolift and an alternative
17 procedure before you would say that's not -- that's
18 not -- that the Prolift isn't effective? It's the
19 efficacy rates are too different. Is there a number
20 or not?
21  A. No. There would be statistical significance.
22 In other words, if you compared four products and
23 one showed statistical significance, then that would
24 suggest that one product might be better. Like

Stanley Zaslau, M.D.

Page 130

1    augmented grafts in the anterior compartment, you
2    can look and say, yeah, an augmented graft is better
3    than no graft. So we know that a graft is better,
4    more efficacy. The problem with your question on
5    erosions is that we only have a numerator. We know
6    how many erosions there are. We don't know the
7    denominator in a lot of cases. And that number is
8    extremely hard to know when it's significant or not.
9    So numbers are very difficult to interpret and need
10   to be in each respective context.
11   Q. Doctor, do you have -- strike that.
12        Doctor, do you know whether or not the
13   amount of mesh placed in a woman's pelvis for the
14   treatment of prolapse has an impact on the intensity
15   and duration of the foreign body reaction and the
16   inflammatory response? Do you have any opinion on
17   that?
18   A. Does the amount of mesh -- certainly for any
19   foreign body placed, there's going to be a foreign
20   body reaction. That would be expected. Mesh is a
21   foreign body, you do a sling, there will be a
22   reaction. Certainly there can be more with more
23   mesh placed. There's more foreign body. But mesh
24   is a foreign body; it's synthetic.

Page 131

1    Q. So you would agree with me that as a general
2    principle, the more mesh there is, the greater the
3    foreign body reaction and inflammatory response?
4    A. Inflammation is a part of healing, which is a
5    normal response to an implant being placed into the
6    body, which will then be replaced with scar over
7    time. It's not necessarily a bad thing.
8    Q. That's not my question, though. My question
9    is: Would you agree, in general, that the greater
10   amount of mesh material there is, the greater the
11   intensity and duration of the foreign body reaction
12   and inflammatory response?
13   A. No.
14   Q. No?
15   A. No.
16   Q. You don't think the amount of mesh material
17   has any bearing on any of -- either of those things?
18   A. No, I think that all grafts will have a
19   reaction. They will have a response with
20   inflammation, with scarring, and foreign body
21   reaction to it, be it autologous or cadaveric or
22   mesh.
23   Q. So you don't think that the amount of
24   inflammatory -- strike that.

Page 132

1        You don't think that the intensity and
2    duration of the foreign body reaction and
3    inflammatory response with, say, a total Prolift is
4    greater than that of, say, a TVT that's implanted?
5    A. Well, there's more mesh placed in a TVT, yes.
6    But that degree of reaction would only be determined
7    if you biopsied and removed those meshes. Part of
8    these reactions are normal responses to healing.
9    Inflammation is a normal response to healing. You
10   would expect that.
11   Q. Right. I'm not asking whether or not
12   inflammation is a normal response or not. I'm just
13   asking a very simple question of whether there
14   would, in general, be a greater inflammatory
15   response with a total Prolift as opposed to a much
16   smaller mesh like TVT. Can you answer that question
17   yes or no?
18   A. So you're saying a microscopic inflammatory
19   response or inflammatory cells that are present?
20   Q. I'm talking about a general inflammatory
21   response and foreign body reaction.
22   A. There will be a more localized inflammatory
23   response, but that's part of the healing process and
24   incorporation process for mesh because more mesh is

Page 133

1    used.
2    Q. Am I correct that you don't hold yourself out
3    as an expert with regard to the design of medical
4    device kits for the treatment of prolapse?
5    A. No, I'm not an expert.
6    Q. Am I correct in that I wouldn't expect you to
7    offer any opinions with regard to the design of the
8    Prolift?
9    A. No.
10   Q. I'm not correct or I am correct?
11   A. You are correct.
12   Q. Same question with regard to the Gynemesh PS.
13   A. Correct, I have no opinions on design.
14   Q. Do you know what a DFMEA is, a Design Failure
15   Modes and Effects Analysis?
16   A. I've heard of it, but I don't know the
17   specifics of what it means.
18   Q. Do you know if you reviewed one with regards
19   to the -- strike that. I'm not going to ask if you
20   know.
21        I'm going to ask, have you reviewed
22   one with regard to the Prolift or the Gynemesh PS
23   device?
24   A. No.

34 (Pages 130 to 133)

Golkow Technologies, Inc - 877.370.3377

Stanley Zaslau, M.D.

Page 134

1    Q. Am I correct that you don't hold yourself out
2  to be an expert with regard to the type of mesh used
3  in the Prolift?
4    A. Other than knowing its basic characteristics
5  and the type one macropore monofilaments, no.
6    Q. Am I correct in that you don't hold yourself
7  out to be an expert with regard to whether the mesh
8  pore size in the Prolift -- strike that.
9         When you're forming your opinions with
10 regard to pore size of the mesh, is your assumption
11 that the only standard that matters is the Amid
12 standard, which is 75 microns?
13   A. Yes, I use that.
14   Q. Is that the only standard that you use?
15   A. That's the only standard I use.
16   Q. Do you know when that standard was developed?
17   A. I don't recall off the top of my head.  I
18 would guess by saying mid-2000s, like 2005 to 2007
19 or so.
20   Q. Do you know whether or not the Amid standard
21 was developed to be applicable to hernia meshes or
22 pelvic floor meshes?
23   A. I thought it was to be applicable to all
24 meshes.  A lot of meshes from type one to type four

Page 135

1  and many of them were used for other reasons.
2    Q. Do you know if there are any more recently
3  updated standards for pore size other than the Amid
4  standard?
5    A. There certainly may be.  I don't know them.
6    Q. Have you ever specifically studied the
7  question of whether or not a one-millimeter pore
8  size under strain is of any significance with regard
9  to the Prolift or Gynemesh PS device?
10   A. I have not specifically answered that
11 question.
12   Q. Do you know what Ethicon thought internally
13 about the significance of having pores greater than
14 one millimeter when in actual use?
15   A. No.
16   Q. Would you defer to the scientists that
17 developed the Gynemesh PS and Prolift regarding that
18 question?
19   A. I would defer to the literature, if there
20 were papers that described that being of
21 significance:  Our core textbooks, Campbell's
22 Urology, which I looked at and reviewed last night;
23 and in the most recent edition there's no discussion
24 of pertinent pore size other than the Amid

Page 136

1  classification.
2    Q. So the textbook that you're referring to --
3  would you say that again -- Campbell's Urology, was
4  it?
5    A. Yes.
6    Q. What year was that published?
7    A. 2015.
8         MS. ROBINSON:  The year you're referring
9  to; right?
10        THE WITNESS:  Yes.
11   Q. Do you know whether or not scientists
12 internally at Ethicon believed that the Amid
13 standard is actually outdated?
14   A. No, I don't.
15   Q. Would that have any significance to your
16 opinions in this case at all?
17   A. No.
18   Q. So it wouldn't affect your opinions in any
19 way whether or not the engineers who are actually
20 responsible for designing and developing mesh at
21 Ethicon actually thought that the Amid standard was
22 outdated for pelvic mesh?
23   A. No, I think that the body of literature
24 speaks for itself.  The successes over time have

Page 137

1  been well described, its low erosion rates.
2    Q. Do you know what the weight is in grams per
3  meter squared of the Prolift mesh?
4    A. I can certainly look that up.
5         (Witness reviews document.)
6    A. Yes.
7    Q. What is that?
8    A. Your question was?
9    Q. Do you know what the weight of the mesh is in
10 the Prolift device in grams per meter squared?
11   A. It's 4.36 milligrams per cubic centimeter.
12   Q. You're reading from your report?  What page?
13   A. 21.  Under Gynemesh.
14   Q. Oh, okay.  That's in milligrams per
15 centimeter squared, not grams per meters squared, is
16 what threw me off.
17        Do you know whether or not Ethicon has
18 put any mesh on the market since the release of the
19 Gynemesh PS mesh which is heavier in weight than the
20 Gynemesh PS mesh?
21   A. No.
22   Q. Would you agree that the Prolift mesh, once
23 placed, can become scar plated?
24   A. Can become what?

35 (Pages 134 to 137)

Stanley Zaslau, M.D.

Page 138

1    Q. Scar plated?
2    A. All pelvic floor grafts can develop scar.
3  That's part of how they heal.
4    Q. So is the answer to my question, yes, that
5  once the Prolift mesh is placed, it can become scar
6  plated?
7    A. No, the answer is all pelvic graft implant
8  sites can develop scar.
9    Q. I'm not asking about all meshes. I'm asking
10 specifically about the Prolift mesh.
11   A. Prolift can have -- can heal with scar
12 formation.
13   Q. So it can become scar plated; is that
14 accurate?
15   A. No. I said pelvic mesh can become scarred.
16   Q. Scarred but not scar plated?
17   A. Right.
18   Q. Would you agree that the scarring around the
19 mesh can harden the mesh of the Prolift?
20   A. That's part of scarring.
21   Q. So is the answer to my question yes?
22   A. Repeat your question.
23   Q. Would you agree that the scar around the
24 Prolift mesh can harden the mesh?

Page 139

1    A. It can harden the tissue by creating
2  scarring, and the mesh is part of the tissue.
3    Q. And, in fact, sometimes that scar tissue can
4  cause pain; correct?
5    A. There are a multitude of reasons for pelvic
6  floor pain. Scarring is one of many. More people
7  with pain actually have extrusions than they do the
8  scarring.
9    Q. But there are instances where the -- where
10 scar plating around the mesh can cause the patient
11 pain or discomfort with sexual intercourse; correct?
12   A. Scarring, in general -- there's really --
13 scar in general can cause pain in patients and it's
14 seen with all pelvic surgeries. But extrusions are
15 much more commonly associated with pain.
16   Q. But you'd agree with me -- in fact, in --
17 there's been at least one of your -- one patient
18 that's seen you that had scar plating surrounding
19 the mesh where you recommended an excision of that
20 mesh and concluded that it might give that patient
21 some relief from her pain; correct?
22   A. I'd have to look at the specifics of what
23 that case was, what were the specifics.
24   Q. So you don't remember any time during your

Page 140

1  career when a patient came to see you with a mesh
2  with scar tissue around it, and you told that
3  patient that removing that scar tissue may cause a
4  relief of their pain symptoms?
5    A. You're talking about a lot of different
6  things. And let me take a step back. You're
7  talking about scar plating, okay, which is different
8  than scarring. Scar plating can be an isolated
9  issue. Scar formation as you're talking about in
10 this particular patient may be an isolated spot
11 where there was pain or erosion, extrusion, and
12 certainly, in those patients with obvious point pain
13 and/or an erosion, that that can be treated and it
14 may need to be treated surgically.
15   Q. So it may -- it's possible that a patient may
16 have scar tissue surrounding the mesh causing pain
17 that may be treated successfully and resolve that
18 pain?
19   A. They may have an isolated area as such that's
20 associated with their pain. But as I said, usually
21 this is in the setting of erosion and not in
22 isolation. Usually it's in the setting of erosion.
23 And the same that we've seen with our own meshes
24 removed in patients with inflammatory reactions or

Page 141

1  lack thereof.
2    Q. But you would agree that scarring surrounding
3  the mesh can occur even in the absence of erosion or
4  exposure; correct?
5    A. You can have scarring in isolated areas of
6  mesh. You can have scarring in isolated areas of
7  biological grafts that cause pain.
8    Q. Do you know if the term "scar plating" had
9  any significance to Ethicon internally among its
10 doctors and scientists?
11   A. No.
12   Q. Would you agree that the Prolift mesh,
13 through the process of creating scar tissue and
14 fibrosis forming on the mesh, this process can also
15 be accompanied by contraction of the mesh?
16   A. Contraction is described with Prolift. It
17 can contract up to 20 percent, is expected with
18 that. It's part of its healing process. That was
19 well described by Ethicon in their physician
20 education materials over the years, 2005, 2007,
21 physician monograph, which leads to proper
22 positioning of mesh so that we limit issues with
23 pelvic pain, scarring, plating, things of that
24 nature.

36 (Pages 138 to 141)

Stanley Zaslau, M.D.

Page 142

1    Q.  Are you familiar with opinion 513 of the
2  joint opinion of ACOG and AUGS?
3    A.  You'd have to show me where you're referring
4  to.
5    Q.  Well, I'll represent to you that a portion of
6  the committee opinion says that the mesh kit should
7  only be used in high-risk individuals for which no
8  other options are available or appropriate.  Do you
9  agree with that opinion, or do you disagree with
10 that opinion?
11   A.  I'd like to see it with my own eyes and make
12 comment.  What were you referring to again?
13   Q.  I'm referring to -- I don't think you need to
14 look at the document, Doctor, you can answer as a
15 hypothetical question.
16        Assuming that the opinion 513, the
17 joint opinion of ACOG and AUGS states that the mesh
18 kit should only be used in high-risk individuals for
19 which no other options are available or appropriate;
20 do you agree or disagree with that opinion?
21   A.  I think that's very vague.  You know, what's
22 a high-risk individual?
23   Q.  So am I correct that you can't answer yes or
24 no whether you agree or disagree with that opinion?

Page 143

1    A.  It's a very vague opinion, okay?  It's very
2  vague.  What's a high-risk individual.
3    Q.  So you would agree with me that you can't
4  answer yes or no to that question because it's
5  vague?
6        MS. ROBINSON:  I think he would be more
7  comfortable answering the question if he had the
8  paper so he could see the context in which the
9  opinion is rendered.
10       MR. FAES:  I'm not interested in his
11 comfort level.
12       MS. ROBINSON:  No, I understand that.
13 But I think it's only fair that you provide him the
14 opportunity --
15       MR. FAES:  No, I don't have to provide
16 him.  The question stands.
17 BY MR. FAES:
18   A.  You can read me the question back.
19   Q.  So my question is:  Assuming that opinion
20 513, the joint opinion of ACOG and AUGS, states that
21 the mesh kit should only be used in high-risk
22 individuals for which no other options are available
23 or appropriate; do you agree or disagree with that
24 opinion, or can you not answer one way or the other?

Page 144

1    A.  I disagree with that opinion because -- well,
2  I'll leave it there.
3    Q.  Why?
4    A.  Because it's a very vague and open-ended,
5  up-for-interpretation statement.  Would you ever
6  operate on a high-risk patient?  Are they high risk
7  because of their comorbidities -- coronary disease,
8  diabetes, hypertension, obesity, parity, smoking,
9  prior prolapse surgery?  What makes them high risk?
10 There's no definition of what's a high-risk patient.
11 And if a high-risk patient is that kind of patient,
12 then they shouldn't have any surgery.  That
13 statement is not enough to make a logical
14 interpretation of what it means.
15   Q.  Do you agree that the Prolift device should
16 only be used in women for whom other approaches and
17 other alternative approaches are not reasonable?
18   A.  Each prolapse situation is unique.  Each
19 patient is unique.  As I mentioned, their
20 comorbidities, prior surgeries, the degree of
21 prolapse, all these have to be considered before any
22 such surgery is selected.
23        In general, Prolift will work better
24 for patients with larger defects, particularly

Page 145

1  defects in the anterior compartment.  It can also
2  work for multicompartment, significant-size defects.
3  And again, this is a decision made by the doctor and
4  the patient in review of their complete medical
5  records and exam.
6    Q.  Just give me a second, Doctor.  I'm looking
7  for your IFU section.
8        Doctor, do you intend to offer an
9  opinion in this case as to whether the warnings in
10 the Prolift IFU were sufficient to apprise doctors
11 of the risk of that product?
12   A.  Yes.
13   Q.  And what is that -- what is the opinion that
14 you intend to offer?
15   A.  The IFU -- initial IFU created in 2005 was
16 sufficient to warn physicians of the necessary
17 challenges with the product, as well as information
18 that they already know from doing pelvic floor
19 surgery.
20   Q.  So it's going to be your opinion in this case
21 that the Prolift IFU at all times was adequate to
22 warn physicians regarding the risks of that product?
23   A.  Yes.
24   Q.  And, in fact, you actually specifically

37 (Pages 142 to 145)

Stanley Zaslau, M.D.

| Page 146 | Page 148 |
|---|---|
| 1   discuss your opinion on page -- starting on page 47 | 1   A. Depends what the device is. For the Da Vinci |
| 2   of your report, I think. Through 51. | 2   robotic surgery, yes. For other devices that are |
| 3      (Witness reviews document.) | 3   standard within someone's practice, probably not. |
| 4   A. Yes. | 4   For something that involves say a laser or a newer |
| 5   Q. Do you know what standards Ethicon applied in | 5   procedure with surgical equipment, maybe. It |
| 6   terms of what warnings needed to be included in the | 6   depends on what it is. |
| 7   IFU for the Prolift device? | 7   Q. Did -- at the time it was in use in your |
| 8   A. I'm not a regulatory expert. I've never | 8   hospital, did a physician need to be credentialed on |
| 9   written an IFU. I've read a lot of them. But from | 9   the Prolift prior to using it at West Virginia |
| 10   my understanding, information in the IFU needs to | 10   University Hospital? |
| 11   be -- what information needs to be in the IFU is | 11   A. No. |
| 12   that that is unique to the product at hand. | 12   Q. So do you assume when you read an IFU that |
| 13   Q. Do you -- in your practice, do you review | 13   it's disclosing each of the risks and complications |
| 14   each IFU that you use for a medical device prior to | 14   the company knew about with regard to the IFU? |
| 15   using it for the first time? | 15   Specific to that device? |
| 16   A. I may look at it, but I certainly don't rely | 16      MS. ROBINSON: Object to form. |
| 17   on it. If I'm going to use a device, I should know | 17   A. I expect to include information that is |
| 18   what the IFU is before I even look at it. I should | 18   unique to that device and its usage. |
| 19   know what the device is. I should know how to use | 19   Q. Now, in your report, you note that the 2005 |
| 20   it or I shouldn't even think about using it. | 20   to 2009 Prolift IFUs do not specifically mention |
| 21   Q. So is it your testimony that at times you | 21   pain and dyspareunia, yet the IFU is still adequate. |
| 22   don't review an IFU for a medical device prior to | 22   Is that accurate? |
| 23   using it for the first time? | 23   A. Yes. |
| 24   A. What I'm saying is if I don't know how to | 24   Q. So you believe that putting the adverse event |

| Page 147 | Page 149 |
|---|---|
| 1   use -- how to intuitively use a device and have a | 1   of pain in the IFU is not necessary? |
| 2   good comprehensive understanding of the device, I | 2   A. Not at all, no. |
| 3   probably shouldn't be using it. | 3   Q. You believe that putting the adverse event of |
| 4   Q. I understand that, but that's not my | 4   dyspareunia in the Prolift IFU is unnecessary? |
| 5   question. My question is, had there been times | 5   A. Not necessary, no. |
| 6   where you've used a medical device for the first | 6   Q. But yet, Ethicon put those warnings in their |
| 7   time without having reviewed the IFU? | 7   IFU; correct? |
| 8   A. Yes. | 8   A. They did over time, yes. |
| 9   Q. What medical devices have you used without | 9   Q. So you believe that over time, Ethicon has |
| 10   reviewing the IFU? | 10   put unnecessary warnings in their IFU? |
| 11   A. Penile implants, new versions of penile | 11   A. No, I think they have put additional |
| 12   managements that are based on the same versions that | 12   information in the IFUs; as you've seen through the |
| 13   you know how to use and do. You know how to use | 13   years, they've become more comprehensive with more |
| 14   that from your skills and training and education. | 14   boldfaced terms, but each of those boldfaced terms |
| 15   You don't need an instruction guide to show you how | 15   were subjects that were well-known to physicians |
| 16   to do that. You should know how to do that. | 16   many years before Prolift ever came on market. |
| 17   Q. Did you use the Prolift device for the first | 17   Q. But you just said a minute ago they were |
| 18   time without ever having reviewed the IFU? | 18   unnecessary. So which are they: Are they |
| 19   A. I looked at it, but I certainly didn't rely | 19   unnecessary or just additional? |
| 20   on it or need it to use it. | 20   A. They're just additional. But they're not |
| 21   Q. At your hospital in West Virginia University, | 21   necessary. And any user who knows how to do pelvic |
| 22   does a physician need to be credentialed on a | 22   floor surgery knew those things. |
| 23   particular device before they're able to use it in | 23   Q. So they're additional unnecessary risks that |
| 24   the hospital? | 24   are included in the IFU? |

Stanley Zaslau, M.D.

Page 150

1    A. No, they're -- it's additional unnecessary
2  information of risks that are well-known to
3  physicians.
4    Q. Why do you think Ethicon would choose to put
5  unnecessary additional risks in their IFU?
6      MS. ROBINSON: Object to form.
7    A. I think they're putting additional
8  information into their materials to be more
9  complete, but that doesn't mean being complete is
10  necessary.
11    Q. So you'd agree that the later version of
12  Prolift IFU that includes pain and dyspareunia is
13  more complete than the prior versions that didn't
14  include those terms?
15    A. It makes the IFU now look like a textbook
16  chapter of information that was already known to
17  physicians who practice that. Again, not necessary,
18  known, well understood, well described, but now it
19  makes that with more complete information.
20    Q. Well, you'd agree that including too many
21  things can actually be more dangerous to a product;
22  correct?
23      MS. ROBINSON: Object to form.
24    A. I don't know if it's more dangerous. I think

Page 151

1  it -- it gives people more things to read.
2    Q. You don't think that providing unnecessary
3  warnings that people already know about distracts
4  people from the risks that they need to know about
5  that they don't already know about?
6      MS. ROBINSON: Object to form.
7    A. Does it distract them from the risks?
8    Q. Yes.
9    A. I don't think anyone is going to read them
10  who already knows that. They will look at that and
11  say, well, we knew this already. I don't need to
12  see this again, I know this. It's well described in
13  my textbooks. I know it causes pain. I know it
14  causes dyspareunia. I know that.
15    Q. But you would agree that there are different
16  types of pain, that not all pain is the same;
17  correct?
18    A. There are different types of pain, yes.
19    Q. Which do you think is the more appropriate
20  Prolift IFU, the one that includes dyspareunia and
21  pain as a potential adverse event or the one that
22  doesn't?
23      MS. ROBINSON: Object to form.
24    A. Which is more --

Page 152

1    Q. Which is more appropriate?
2    A. Which is more appropriate? I don't have an
3  opinion as to either of them. I think the one that
4  has it is more complete, but the initial one was
5  certainly appropriate because any pelvic surgeon
6  knows that. These are risks of pelvic floor
7  surgery. That's well-known and well described.
8    Q. You keep saying that it's well-known and well
9  described and physicians know that, and you've said
10  that many times in your report; correct?
11    A. I have, yes.
12    Q. Have you ever studied the question of what
13  risks and complications were known to doctors across
14  the country with various background, levels and
15  experience with regard to the use of the Prolift?
16      MS. ROBINSON: Object to form.
17    A. I'm not sure what you're referring to by
18  survey or what. What are you referring to?
19    Q. Have you ever done any kind of survey or used
20  any kind of formal methodology to determine what
21  physicians did or did not know with regard to the
22  risks of the Prolift?
23    A. You know, physicians have done a variety of
24  different things to learn about procedures from --

Page 153

1      MS. ROBINSON: First you can answer his
2  question on whether you have done any survey
3  yourself.
4    A. No, I have not done any survey myself.
5      MS. ROBINSON: Then you can explain.
6    A. Physicians have used a wide variety of ways
7  to learn about procedures, from attending meetings,
8  symposia, reading review articles and textbooks and
9  such. They have a multitude of sources in front of
10  them to know risks and things that are pertinent to
11  them.
12    Q. So have you done any kind of formal analysis
13  to determine, for example, what percentage of
14  Prolift users knew or didn't know that pain was a
15  potential risk from the Prolift IFU -- or chronic
16  pain?
17    A. No, I have not surveyed anyone or any -- any
18  group as to what their knowledge of the present
19  Prolift IFU was. But I know that anyone who reads a
20  core textbook in urology or gynecology, even written
21  as back as 1998, knows that pelvic mesh can be
22  associated with all of the complications that you've
23  mentioned, including pain.
24    Q. Have you done any type of formal analysis to

39 (Pages 150 to 153)

Stanley Zaslau, M.D.

Page 154

1    determine what percentage of pelvic floor surgeons
2    using the Prolift knew or didn't know about the risk
3    of chronic dyspareunia with the Prolift?
4        A. All I know is what -- the information
5    provided in their textbooks, which was provided well
6    in advance of them seeing a Prolift IFU. I know
7    that in 1998 in Campbell's Urology, there's a
8    complete discussion of the risks of pelvic floor
9    surgery. I know in 1997, in Danforth's Obstetrics
10   and Gynecology book for the gynecology colleagues
11   that there's extensive discussion for the risks of
12   pelvic floor surgery, including mesh-based surgery.
13   I know that in Mickey Karram's 1999 book of
14   urogynecology that there was access to that.
15           So what I'm saying is that for the
16   eight to ten years prior to Prolift IFU, that all
17   physicians, if they've opened a textbook, had access
18   to this information.
19       Q. But my question is specifically, you haven't
20   done any kind of formal analysis as to what
21   percentage of physicians who are using the Prolift
22   at any time knew or didn't know about the risk of
23   chronic dyspareunia with the Prolift device?
24           MS. ROBINSON: Object to form. Asked

Page 155

1    and answered.
2        A. I had answered that for you completely.
3        Q. I don't think you have, Doctor. Is the
4    answer, no, you haven't done any kind of formal
5    analysis --
6        A. I have not --
7            MS. ROBINSON: Same objection. And --
8        Q. -- and you don't know the percentage?
9        A. I have not done --
10           MS. ROBINSON: -- argumentative.
11       A. -- any formal analysis.
12           MR. FAES: He answered it with regard to
13   the pain but not dyspareunia. Now he's answered it
14   with regard to dyspareunia.
15       Q. So my next question is, Doctor, do you
16   believe, in 2009, if a doctor implanting the Prolift
17   device stated that he didn't know that the risks of
18   a chronic pain or chronic dyspareunia with the
19   Prolift, do you believe that that doctor has fallen
20   below the standard of care?
21       A. You know, I can't discuss what the standard
22   of care is, because the standard of care relates
23   more to malpractice than anything else. It would be
24   prudent for any physician to understand pelvic floor

Page 156

1    anatomy, pelvic surgeries before he or she ever
2    undertakes a prolapse surgery. It says that in the
3    IFU early on, that users should be familiar with the
4    risks and benefits of pelvic floor surgery of which
5    pain is one of them. So it's pretty up front and
6    out there for them. They should know that.
7        Q. As you sit here today, do you have any
8    understanding of any standard whatsoever as to what
9    risks and complications are supposed to be disclosed
10   in an IFU?
11       A. Again, I'm not a regulatory expert, but what
12   I do know and what I believe is that risks that are
13   unique to a specific product at hand, different than
14   any other product, should be disclosed in an IFU.
15       Q. So am I correct that you aren't aware of what
16   the legal standard is for what a company needs to
17   include in an IFU with regard to risks and
18   complications?
19       A. Again, I'm not a regulatory expert, so I
20   don't know the specifics of what they have to, but
21   the general knowledge that I know is that it has to
22   be specifically unique to the product at hand.
23       Q. Have you ever engaged in the study of
24   what -- strike that.

Page 157

1            Let me ask it a different way. Have
2    you ever studied the question of what needs to be
3    included in an IFU for a medical device? Have you
4    engaged in the study of that question?
5        A. No.
6        Q. Would you agree that excessive contraction or
7    shrinkage of the tissue surrounding the mesh,
8    vaginal scarring, tightening and/or shortening is a
9    potential adverse reaction of the Prolift mesh?
10       A. It's a potential adverse reaction of any
11   pelvic floor graft.
12       Q. Okay. Again, I'm not asking about any pelvic
13   floor graft. I'm specifically asking about the
14   Prolift. Is that a potential adverse reaction of
15   the Prolift mesh?
16       A. It is a potential adverse reaction of any
17   pelvic floor procedure involving a graft.
18       Q. Again, I'm not asking about any pelvic graft.
19   I'm specifically asking about the Prolift mesh. Is
20   that a potential adverse reaction of the Prolift
21   mesh?
22       A. Yes.
23       Q. Do you believe that that would be a
24   reasonable warning to include in the Prolift IFU?

40 (Pages 154 to 157)

Stanley Zaslau, M.D.

Page 158

1    A. No.
2    Q. So if Ethicon were to put that in their
3  Prolift IFU, you believe that that would be
4  unnecessary?
5    A. Right, because it was known ten years
6  earlier.
7    Q. If Ethicon put that adverse reaction in their
8  Gynemesh PS IFU, do you believe that would be
9  unnecessary?
10   A. Unnecessary, known prior.
11   Q. So if Ethicon did put that risk in their
12  Gynemesh PS IFU, you believe that they have placed
13  unnecessary additional information in their IFU?
14   A. No. I believe that this is additional
15  information that was known to physicians already.
16  They knew that already, so it was not necessary.
17   Q. What are you -- what are you basing your
18  opinion on that physicians already knew about that;
19  about the risk of excessive contraction or shrinkage
20  of tissue surrounding mesh, vaginal scarring,
21  tightening and shortening?
22   A. Well, when Ulmsten did his original papers in
23  1994 and 1996 describing -- actually '95, the
24  intravaginal slingplasty, and he talked in that

Page 159

1  paper about defective healing, he talked about the
2  importance of what happens when you have defective
3  healing; you have pain, you have sinus tract
4  formation and scarring. He talked about the forces
5  that the sling must be placed under to create
6  appropriate tension. And he says that the sling,
7  which certainly can be applied to Prolift, should
8  not elevate the urethra but should be tilted under
9  the organ, otherwise there is passive kinking and
10  postoperative voiding dysfunction. And these
11  adhesion forces act immediately so the correct
12  position is important. And this was ten years
13  prior. This is 1995.
14   Q. And do you have any kind of opinion as to
15  what percentage of physicians who use the Gynemesh
16  PS or the Prolift device has actually reviewed that
17  Ulmsten 1995 study?
18   A. Again, these were the first studies that have
19  come out. Over the three years, from 1995 to 1998,
20  the concept of erosion, extrusion, obstruction,
21  hematoma, pain, scarring, has been described in
22  multiple publications. And then, of course, there
23  are others from 2000 -- from 1998 to 2000.
24      So now you have a five-year period for

Page 160

1  physicians to certainly be aware of this, at their
2  meetings, through case reports, you know. And these
3  are significant studies. The number of patients in
4  this study -- this is not a case report. This is 50
5  patients studied here. Then Ulmsten again, two
6  years later, 63 patients. Here's Falconer, 1996, 75
7  patients, failures, rejection. Here's -- here's
8  1998, Ulmsten again, 131 patients. So here's --
9  Nilsson, 2001 -- scratch the discussion of Nilsson.
10      So you have the body of papers over a
11  three-year period already telling physicians these
12  are problems that can occur with mesh surgery. You
13  need to know about this. And certainly these are in
14  the textbooks as well.
15   Q. Am I correct that you cannot state to a
16  reasonable degree of certainty the percentage of
17  Prolift and Gynemesh PS users who knew or did not
18  know about the risk of excessive contraction or
19  shrinkage of the tissue surrounding the mesh?
20   A. I have no idea what each user of Gynemesh
21  knows. I can't be in their heads to know what they
22  know and what decisions they make in advising their
23  patients.
24   Q. So same question, am I correct that you can't

Page 161

1  state to a reasonable degree of medical certainty
2  what percentage of physicians who use the Gynemesh
3  PS and Prolift know about the risk of vaginal
4  scarring, tightening or vaginal shortening with the
5  mesh?
6    A. No, I can't state how many. But certainly
7  these are issues that are relevant to their board
8  certifications and such; and to go on further, sure,
9  female pelvic medicine and reconstructive surgery
10  now has part of their curriculum questions and such
11  on this, certainly that can be assessed. You would
12  have to go to that body of information.
13      MR. FAES: I'll object and move to
14  strike the answer I don't know how many.
15      Can we go off the record for a second.
16      (Discussion held off the record.)
17      (A brief recess was taken from 5:45 p.m.
18  to 5:48 p.m.)
19   BY MR. FAES:
20   Q. We're back on the record after a short break.
21  Are you ready to proceed?
22   A. Yes.
23   Q. Is it possible that you might know about a
24  complication with the Prolift device that another

41 (Pages 158 to 161)

Stanley Zaslau, M.D.

Page 162

1  doctor might not know about?
2    A. I shouldn't.
3      MS. ROBINSON: Object to form.
4    A. I shouldn't. We all should know the same
5  thing.
6    Q. But it's possible that you may; correct?
7    A. Well, we all have the same knowledge to learn
8  from, our textbooks, our materials, pelvic floor
9  surgery, chapters in our core books. We all should
10 know the same things.
11   Q. You would agree that one way to ensure that
12 all doctors know the same things about the risks of
13 the Prolift device is to include all the risks that
14 the company knows about in the IFU or instructions
15 for use?
16      MS. ROBINSON: Object to form.
17   A. No, that should be in their textbooks. It
18 should be -- things that are unique to the product
19 should be in the IFU. Anything else is just
20 additional known information.
21   Q. So you don't agree that that's one of the
22 ways that the company could ensure that everybody
23 knows about the risks?
24   A. They could ensure that, but the physician

Page 163

1  should know that already. They should know that
2  from their body of knowledge.
3      MR. FAES: I'll object to -- object and
4  move to strike the portion of the nonresponsive
5  answer.
6    Q. Now, Doctor, you've performed approximately a
7  hundred Prolift procedures; right?
8    A. Yes.
9    Q. And you removed pelvic organ prolapse meshes
10 in approximately 10 to 20 cases; right?
11   A. In -- much more than that. If we're talking
12 about TVT and TVT-O and other patients referred to
13 me for mesh removals.
14   Q. Let's back up a minute. My understanding was
15 that with regard to pelvic organ prolapse meshes
16 from your prior testimony, you had removed
17 approximately 10 to 20. I'm just talking about
18 pelvic organ prolapse meshes. Is that accurate or
19 not accurate?
20      MS. ROBINSON: That misstates his
21 testimony.
22   BY MR. FAES:
23   Q. I don't know if it does. Let me withdraw
24 that and I'll reask the question.

Page 164

1      My question Doctor is, approximately
2  how many pelvic organ prolapse meshes have you
3  removed in the course of your career?
4    A. I'd say 10 to 20.
5    Q. So you put in about a hundred and you removed
6  about 10 to 20?
7      MS. ROBINSON: Object to form.
8    A. I put in a hundred of my own. I've had three
9  patients with extrusions, two were trimmed in the
10 office. One was trimmed in the OR, because she had
11 a bladder tumor so we did that under anesthesia to
12 deal with her bladder tumor. And I don't count
13 those in the 10 to 20 removed because those were
14 done in the office. The ones I had done, the 10 to
15 20, are patients who were referred with a variety of
16 different complaints or problems from other
17 practices.
18   Q. Right. But in terms of your surgeries for
19 pelvic organ prolapse products -- strike that.
20      In terms of your surgeries for pelvic
21 organ prolapse meshes, about 10 to 15 percent is
22 taking them out and about 90 to 85 percent is
23 putting them in; is that fairly accurate?
24   A. No. Of my own meshes of my own patients, as

Page 165

1  I said, I've only had three that I have had issues
2  with.
3    Q. I'm not talking about just your patients.
4  I'm talking about your surgeries for pelvic organ
5  prolapse meshes in general. Is it correct that for
6  all of your pelvic organ prolapse mesh surgeries, in
7  general, approximately 10 to 15 percent is taking
8  them out and approximately 85 to 95 is putting them
9  in?
10   A. In most cases I'm putting them in, yes, and
11 the ones I'm taking out, I'm taking out for patients
12 referred to me for a variety of reasons. They're
13 not my own cases I'm removing mesh from.
14   Q. I understand that, Doctor.
15   A. Yes.
16   Q. But with that caveat in mind, is that
17 correct?
18   A. Yes. I need to take a break. I'm on vibrate
19 so I have a page.
20      MR. FAES: Off the record.
21      (A brief recess was taken from 5:54 p.m.
22 to 5:55 p.m.)
23   BY MR. FAES:
24   Q. Back on the record after a short break. Are

42 (Pages 162 to 165)

Stanley Zaslau, M.D.

Page 166

1  you ready to proceed?
2    A. Yes.
3    Q. Have you ever made any effort to confirm that
4  your understanding of what needs to be in the
5  Prolift and Gynemesh PS IFU is consistent with what
6  other doctors believe should be in the IFU?
7    A. No, I have not done any independent looking.
8    Q. In doing your work in this case, were you
9  ever curious as to what the regulatory affairs
10  professionals department in Ethicon, who are the
11  professionals that are required to make sure the IFU
12  complies with FDA regulations, were you ever curious
13  as to what they believe should be in the IFU?
14    A. No, I'm not a regulatory expert. But no,
15  I -- it never crossed my mind to question them.
16    Q. What about with regard to what the medical
17  directors at Ethicon or medical doctors thought
18  should be in the IFU?
19    A. No.
20    Q. Would you agree with me that if Ethicon
21  medical affairs knew that there was a potential risk
22  or complication attributable to the Prolift mesh or
23  the Gynemesh PS mesh itself, which, if it occurred,
24  could cause severe permanent injury to a woman, that

Page 167

1  those risks should be disclosed in the IFU?
2    A. If there were. If they were not known, and
3  certainly if they were not reported in any medical
4  literature, then, yes, that would be information
5  needed to be known. Being that these complications
6  and these issues come from literature that we have,
7  then we should already know that.
8        Ethicon should never know something
9  that we didn't know first from the field and from
10  trying. Again, from these articles ten years before
11  Prolift was ever released. We knew and we saw the
12  problems and the challenges ten years before they
13  happened and became mainstream.
14    Q. Would you agree that one of the risks of
15  Prolift and Gynemesh PS device is that the Prolift
16  and Gynemesh PS can lead to complex mesh erosions?
17    A. Any mesh that's used can have mesh erosions
18  and the complexity is going to depend upon patients
19  healing, comorbidities, other issues; that's
20  certainly obvious to all physicians.
21    Q. So you would agree that's one of the risks?
22    A. That's one of the risks, but it's well-known.
23    Q. Would you agree that one of the risks of the
24  Prolift device is neuromuscular problems including

Page 168

1  acute and/or chronic pain in the groin, thigh, leg,
2  pelvic and/or abdominal area?
3    A. They're extremely --
4        MS. ROBINSON: Object to form.
5    A. They're extremely rare complications. I was
6  fully looking at this in Campbell's last night, and
7  there were two citations, one by Stanford and the
8  other one I'm losing, where they talk about single
9  numbers of patients that had chronic groin or thigh
10  or leg pain. Single numbers of patients, so
11  extremely rare.
12    Q. But the answer to my question is yes, that's
13  a potential adverse reaction from the Prolift mesh?
14    A. Extremely rare, but yes.
15    Q. Would you agree that the approach
16  for -- strike that.
17        The approach for the Prolift posterior
18  mesh requires passage of the mesh through the
19  obturator foramen; correct?
20    A. Actually, it goes -- are you talking about
21  the anterior pass or the -- state your question
22  again.
23    Q. Would you agree with me that the placement of
24  the Prolift posterior mesh requires passage of the

Page 169

1  mesh through the obturator foramen?
2    A. I don't understand your question, and I'll
3  tell you why. In the anterior Prolift, there are
4  two passes, an anterior pass and a posterior pass,
5  of the anterior mesh. That goes through the
6  obturator foramen for an anterior kit. For
7  posterior kits, it goes directly through the ischia
8  rectal fossa through the sacrospinous ligament. So
9  that does not. If your question was in a posterior
10  kit, the answer is no, it does not go through the
11  obturator foramen.
12    Q. So in an anterior kit, it passes through the
13  obturator foramen; right?
14    A. That's correct.
15    Q. And it essentially follows the same path,
16  anatomical path that a physician would follow if
17  they were implanting a TVT-O device; correct?
18    A. The anterior much more than the posterior.
19  The posterior pass of the anterior mesh goes through
20  the sacrospinous ligament. It goes near it. And
21  that's a bit lower than they would be placing the
22  TVT or TVT-O. The anterior is much more likely.
23  It's higher up.
24    Q. Would you agree that in 2004, when the

43 (Pages 166 to 169)

Stanley Zaslau, M.D.

Page 170

1  Prolift device was first introduced, that passage of
2  the mesh through that obturator foramen was a
3  relatively new surgical approach?
4    A. It's a variation on things we've been using
5  in the past. It's variations on the staining
6  needles, it's variations on passing the needles
7  under vision or with tactile sensation. Variations
8  of things we have already known what to do.
9        That posterior pass is an easy pass,
10  and it can certainly be visualized as that is passed
11  if you set the retractors up correctly.
12    Q. You mentioned some staining needles and some
13  other things, but with regard to the passage of mesh
14  through that anatomical space, that was a relatively
15  new concept at the time the Prolift was introduced
16  in 2004; right?
17    A. Yes.
18    Q. It had only been around since approximately
19  with 2001; right?
20    A. Or so, yes.
21    Q. Would you agree that since the passage of
22  mesh through the obturator foramen space had only
23  been around for about three years at the time the
24  Prolift device was introduced, that the long-term

Page 171

1  effects of placing mesh in that area were not well
2  understood?
3    A. There's really not a lot of structures in
4  that area that have a need for additional
5  understanding. That posterior pass is just to allow
6  the mesh to sit posteriorly. It's nothing --
7  there's nothing additional and that wasn't
8  already known. The risks of injury to bowel,
9  bladder, nerves, blood vessels, still known to all
10  physicians who know the anatomy.
11    Q. So you don't believe that the fact that a
12  permanent mesh placed in that area could introduce
13  new and different risks, long-term risks that the
14  medical community didn't know about?
15    A. No. No. Pain, infection, erosion, fistula,
16  all well described beforehand. Nerve injury, nerve
17  entrapment described in 1998 in Campbell's for
18  variations of other types of suspensions that were
19  performed.
20    Q. What other types of suspensions?
21    A. Gittes, Raz, Pereyra. These were all needle
22  suspensions that were used at the time. Then there
23  were bone anchor procedures to the pelvic side wall
24  which fell out of favor because of osteitis and bone

Page 172

1  infection. The thought was, let's not do that,
2  let's just use the obturator foramen since there is
3  nothing anteriorly or medially, all the blood
4  vessels in there are lateral, so that would be a
5  good area to pass through. It was very intuitive
6  based on what we already knew.
7    Q. Would you agree that levator spasms are a
8  potential adverse reaction of placing a foreign
9  material like Prolift mesh in that area?
10    A. No. Levator spasms are actually more common
11  after the posterior pelvic floor surgery, rectocele
12  repair, levatorplasty, perineal body resections.
13        And that's actually been well studied,
14  that complications of pelvic pain and dyspareunia
15  when patients -- when those procedures are not
16  performed, meaning perineal body resection and
17  levatorplasty, that the risk of dyspareunia is
18  significantly lower.
19    Q. So you don't believe that levator spasms from
20  a mesh being placed in the obturator foramen is a
21  potential risk of Prolift mesh?
22    A. It's a risk of any posterior pelvic floor
23  surgery, especially those that are involving those
24  additional procedures I mentioned. Okay?

Page 173

1    Q. So you're --
2    A. If you put a mesh in in addition to doing
3  those things, you significantly heighten these
4  risks. A lot of the patients who had a posterior
5  Prolift often had these other procedures as well.
6  When those were omitted, these patients did quite a
7  bit -- did quite a bit better.
8    Q. Would you agree with me that considering that
9  native tissue repair for the repair of pelvic organ
10  prolapse is an option for many women, that makes
11  sense to use vaginal mesh judiciously for vaginal
12  mesh repairs of pelvic organ prolapse?
13    A. Certainly native tissue repairs are a choice,
14  but when compared to polypropylene mesh,
15  polypropylene mesh may afford patients a better
16  anatomical and a better subjective sense of bulge
17  reduction.
18    Q. But my question is, given that those options
19  are available, does it make sense to use vaginal
20  mesh judiciously for vaginal repairs of pelvic organ
21  prolapse?
22    A. As I said earlier, many times, each patient
23  is a unique patient. You have to consider the
24  degree of deficit, their prior surgeries. Their

44 (Pages 170 to 173)

Stanley Zaslau, M.D.

Page 174

1    past medical history, physical exam findings, their
2    desires, age, expectations.  It's an individual
3    decision.
4        Q. So in women with recurrent prolapse,
5    particularly in the anterior compartment and those
6    with medical comorbidities that may preclude more
7    invasive and open laparoscopic procedures, they may
8    be good candidates for vaginal mesh; is that what
9    you're saying?
10       A. No.  First of all, I wouldn't repair prolapse
11   laparoscopically, I might do an abdominal
12   sacrocolpopexy.  It's going to depend on, again, the
13   overall health of the patient.  Again, you have an
14   80-year-old woman with multicompartment prolapse who
15   failed a repair, we'll close her vaginal wall.
16   We'll do a colpocleisis, that's the best procedure
17   for her.  That's not a patient who should have mesh,
18   but you only know that by treating each patient as
19   an individual entity.
20       Q. You know how the Prolift device is cut by
21   Ethicon and Johnson & Johnson?
22       A. No.
23       Q. So since you don't know how it's cut, I
24   wouldn't expect you to offer any opinions in this

Page 175

1    case regarding how the cutting method affects the
2    physical properties of the mesh?
3        A. No.
4        Q. Same question for the Gynemesh PS; do you
5    know how the Gynemesh PS flat sheets are cut?
6        A. No.
7        Q. I wouldn't expect you to offer any opinions
8    in this case regarding how the cutting method for
9    the Gynemesh PS affects the physical properties for
10   the mesh.
11       A. No.
12       Q. Let me ask you something specific about the
13   Prolift IFU.  What specific information do you
14   believe that the Prolift IFU actually needs to say
15   in the adverse reactions section in order to warn
16   doctors about the complications?
17       MS. ROBINSON:  I'm going to object to
18   form.  You have a specific IFU you want him to refer
19   to?
20       MR. FAES:  No, I'm asking what he
21   believes needs to be in the Prolift IFU adverse
22   reaction section.
23       MS. ROBINSON:  Not as to a specific
24   Prolift --

Page 176

1        MR. FAES:  What?
2        MS. ROBINSON:  Not to as to a specific
3    IFU.
4        MR. FAES:  No, I'm basically asking what
5    he -- if he was writing the IFU, what adverse
6    reactions does he think need to be in there.
7        A. Well, I don't write IFUs, and I'm not a
8    regulatory expert of what needs to -- the wording of
9    such needs to be in the IFU, but I believe that
10   what's here in the 2005 IFU is reasonable and
11   materials that should be known by all physicians who
12   would perform this procedure.
13       Q. So is it your opinion that everything that's
14   included in the adverse reaction section of the 2005
15   IFU needs to be in there?
16       A. Well, there's words here that are written
17   here and there's information that's implied from
18   this material.  So you have to read the words and
19   understand what they mean.  So pain is not mentioned
20   here.  Nor is dyspareunia mentioned here.  Nor is
21   vaginal shortening or contraction, but these are --
22   I'm sorry, the contraction is mentioned there.
23       But for any patient to have these
24   particular symptoms, we will see erosion, extrusion,

Page 177

1    scarring, these are -- these are the ways they will
2    present, and we knew that in 1996 with Ulmsten's
3    original paper that his patients with erosions and
4    extrusions had pain.  That's how they came in.  So
5    pain is how these will manifest and it's known that
6    they can be painful.  And that's understood.
7        Q. My question is a little different.  My
8    question is specifically, do you believe that
9    everything that's included in the 2005 Prolift IFU
10   adverse events section needs to be in there?  Or is
11   there any, as we've talked about earlier, is there
12   any unnecessary or additional information that
13   doesn't need to be in there?
14       A. This is the information that must be in here.
15   These type of adverse events, these are things that
16   must be in here.  Punctures, lacerations of solid
17   organs, blood vessels, nerves, absolutely has to be
18   in there, although they are known to all physicians
19   who do this kind of surgery.  The others above are
20   certainly things that you would expect as a result
21   of using a mesh-based product.  And the fact that
22   pain is not mentioned and such, this is how these
23   patients are going to present.  They're going to
24   present with pain and that's known, known to all

45 (Pages 174 to 177)

Stanley Zaslau, M.D.

Page 178

1    physicians.
2       Q. So inflammation is a risk of the Prolift
3    that's known to all physicians?
4       A. Inflammation is the risk of any pelvic floor
5    graft procedure that's performed.
6       Q. But it's known to all physicians?
7       A. It's known to all physicians, yes.
8       Q. Then why does that need to be included in the
9    IFU but things like pain and dyspareunia don't need
10   to be included in the IFU?  Why is that not extra
11   information?
12      A. Because if a patient had significant
13   inflammation, they would have pain.  They would have
14   dyspareunia from the meshes in the vagina.
15   Inflammation will present with pain; adhesions will,
16   fistulas will, erosions will, extrusion will.  It's
17   all presented with pain.
18      Q. Do all physicians know that adhesion
19   formation is a potential risk of Prolift IFU?
20      A. Of any pelvic floor surgery.
21      Q. Then why does that need to be in the Prolift
22   IFU but a risk such as vaginal scarring or
23   shortening doesn't need to be?
24      A. Well, again --

Page 179

1       Q. Well, actually scarring is in there, so let
2    me rephrase that.
3       A. Sure.
4       Q. So why does adhesion formation need to be in
5    the IFU if all physicians know of that risk but a
6    risk like vaginal shortening doesn't need to be in
7    the IFU?
8       A. Well, adhesions can be the patient with
9    multicompartment prolapse that you didn't know until
10   you got inside.  Maybe they had a cystocele and a
11   large enterocele, and the enterocele had herniation,
12   and the sac was opened and there's adhesions from a
13   prior surgery that she had.  That would certainly be
14   important to know, that, hey, that may make this
15   worse.
16      Q. Fistula formation, erosion, extrusion and
17   scarring that implants -- strike that.
18          Fistula formation, erosion, extrusion,
19   and scarring that results in implant contraction are
20   all risks that physicians who implant the Prolift
21   already know about; right?
22      A. Yes.
23      Q. But you believe that even though they know
24   about those risks, they still need to be included in

Page 180

1    the IFU?
2       A. Yeah, I think it's reasonable that they be
3    here.
4       Q. Doctor, I want to ask you specifically about
5    page 20 of your report where you state Gynemesh PS
6    mesh used in Prolift is an excellent synthetic mesh
7    to be used in pelvic floor surgery.  First, it is
8    dynamic and has just the right amount of rigidity
9    and flexibility.  This allows it to mold well into
10   the vaginal wall.  Is that an opinion that you
11   intend to offer in this case?
12      A. Yes.
13      Q. How did you determine what -- just the amount
14   of rigidity and flexibility that a mesh needs for
15   repair of pelvic organ prolapse in order for it to
16   mold well into the vaginal wall?
17      A. Well, you have to try them.  You have to try
18   one.  You have to do it.  You have to see, once the
19   trocars are placed, how does the mesh lay in the
20   tissue that you propose it to.  Does it lay
21   comfortably?  Is it -- is it bunched upon itself?
22   Is it the appropriate size?
23          This is a very -- this is a very soft
24   mesh.  And something that certainly would fit very

Page 181

1    nicely into a space in the anterior posterior
2    compartment.
3       Q. What objective standard are you using for
4    your conclusion that the Gynemesh PS mesh has just
5    the right amount of rigidity and flexibility?
6       A. Well, if you compare it to something like the
7    original TVT prolene mesh, it doesn't weigh as much.
8    the pores are larger, it's more flexible, you know.
9    If you've used TVT -- original TVT mesh for a large
10   prolapse case, it probably wouldn't fit as well.  It
11   probably wouldn't heal as well for patients.
12          This is something that really is
13   incorporated well into tissues.  It's soft, it's
14   easy to mold.  The extrusions that I've had are
15   really very small and easily able to be trimmed.  So
16   it was the right -- the right product for the right
17   situation.
18      Q. So you would agree that the TVT mesh doesn't
19   have the same amount of rigidity and flexibility as
20   the Gynemesh PS mesh; correct?
21          MS. ROBINSON: Object to form.
22      A. I think the Gynemesh PS is more flexible.  I
23   think it's better suited for prolapse repair.
24      Q. So if the Gynemesh PS has just the right

Stanley Zaslau, M.D.

| Page 182 | Page 184 |
|---|---|
| 1  amount of rigidity and flexibility, which allows it<br>2  to mold well into the vaginal wall, does that mean<br>3  that the TVT mesh does not have the right amount of<br>4  flexibility and rigidity to mold into the vaginal<br>5  wall?<br>6      A. No, they're done for different reasons.  TVT<br>7  is a urethral sling.  It's meant for urethral<br>8  mobility.  Prolapse mesh is meant for a larger<br>9  surface area and to do something different to<br>10  reapproximate different structures that are lost in<br>11  patients, meaning their fascial support, their<br>12  pelvic floor fascial support.  So you want something<br>13  that's -- would be better incorporated and better<br>14  tolerated.<br>15      Q. Well, you know that the Prolift+M device<br>16  actually uses a different mesh that has a different<br>17  amount of rigidity and flexibility; right?<br>18      A. Yes.<br>19      Q. Is it your opinion that that mesh doesn't<br>20  have the right amount of rigidity and flexibility<br>21  that allows it to mold well into the vaginal wall?<br>22      A. I've never used Prolift+M, so I'm not going<br>23  to offer an opinion on that.<br>24      Q. You also state that the mesh is lightweight | 1  squared; right?<br>2      A. Yeah; but pore size and filament does, yes.<br>3      Q. So it's your opinion that any amount of<br>4  filament mesh with a pore size greater than 75<br>5  microns is considered a lightweight mesh?<br>6      A. Yes.<br>7      Q. Doctor, earlier we were talking about pages<br>8  47 through 51 of your report which discusses the<br>9  IFU, the Prolift IFU?<br>10      A. Yeah.<br>11      Q. Did you write a similar section with regard<br>12  to the Gynemesh PS IFU?<br>13      A. No.<br>14      Q. Do you intend to offer an opinion in this<br>15  case that the warnings in the Gynemesh PS IFU are<br>16  adequate?<br>17      A. No.<br>18          MR. FAES:  I guess I'll pass and reserve<br>19  my limited time.  Thank you, Doctor.  I don't have<br>20  any further questions at this time subject to<br>21  follow-up.<br>22          (A brief recess was taken from 6:22 p.m.<br>23  to 6:37 p.m.)<br>24              ----- |
| Page 183 | Page 185 |
| 1  and allows for good structural integrity to support<br>2  the native tissue.  What objective standard are you<br>3  relying on for your opinion that Gynemesh PS is<br>4  lightweight?<br>5      A. Just based on its -- on its comparison to<br>6  prolene mesh.  And the predecessors before it that<br>7  didn't do well, like Dacron and GORE-TEX and other<br>8  things like that that never made it as graft<br>9  material in the anterior compartment.<br>10      Q. So is it more accurate to say that the<br>11  Gynemesh PS is lighter weight than the TVT mesh, or<br>12  is it your opinion that it's lightweight?<br>13      A. I think they're both lightweight.  I think<br>14  the Gynemesh is a bit lighter weight than the TVT<br>15  mesh.<br>16      Q. So what does -- what standard are you<br>17  applying for when a mesh is lightweight versus not<br>18  lightweight?<br>19      A. Just the Amid classification.  Lightweight<br>20  macropore monofilament is all potential mesh to be<br>21  used in the pelvic floor.  Some may be better than<br>22  others.  Some mold better.<br>23      Q. Well, the Amid requirement doesn't have a<br>24  weight requirement in terms of grams per meter | 1              EXAMINATION<br>2  BY MS. ROBINSON:<br>3      Q. Doctor, if you'll turn to page 2 of your<br>4  report, I think it makes sense to start with some of<br>5  the last questions that you were asked by Mr. Faes.<br>6      A. Yes.<br>7      Q. You've offered the opinion that Gynemesh PS,<br>8  which is the mesh used in the Gynemesh PS as well as<br>9  the Prolift device; correct?<br>10      A. Yes.<br>11      Q. That that mesh, you believe, has the right<br>12  amount of rigidity and flexibility to be used in the<br>13  female pelvic floor; correct?<br>14      A. Yes.<br>15      Q. And for female pelvic organ prolapse repair?<br>16      A. Yes.<br>17          MR. FAES:  Object to the form.<br>18      A. Yes.<br>19      Q. Doctor, in rendering that opinion, were you<br>20  considering your experience with other graft<br>21  material that you had previously used in surgeries<br>22  for pelvic organ prolapse?<br>23          MR. FAES:  Object to form.<br>24      A. Yes. |

Golkow Technologies, Inc - 877.370.3377

Stanley Zaslau, M.D.

Page 186

1    Q. And what surgeries had you previously used
2  with graft material in pelvic organ prolapse that
3  you would use to compare the type of rigidity and
4  flexibility required for a repair?
5    A. Tutoplast pericardium, Pelvicol, cadaveric
6  dermis, fascia lata.
7    Q. And based on your experience with those types
8  of grafts, your -- you were able to render, in part,
9  your opinions about the rigidity and flexibility of
10  the Prolift and Gynemesh PS mesh?
11       MR. FAES:  Object to form.
12    A. Yes.
13    Q. Did you also, in coming to the opinion that
14  it had the right amount of rigidity for use in
15  pelvic organ prolapse repair, rely upon scientific
16  data and literature?
17       MR. FAES:  Object to form.
18    A. Yes.
19    Q. And what is it about the scientific data and
20  literature that you relied upon to help you come to
21  the decision that Gynemesh PS mesh and Prolift mesh
22  have the right amount of rigidity and flexibility
23  for use in pelvic organ prolapse?
24       MR. FAES:  Object to form.

Page 187

1    A. It's monofilament in nature.  Its large
2  pores.  Its ability to be placed in the area in
3  question and lie flat without any forces upon it.
4       Also, I also relied on information
5  from colleagues, from textbooks, from meetings,
6  opinion -- the key opinion leaders.
7    Q. And specifically, with regard to the body of
8  scientific literature and the opinions of your
9  colleagues and so forth, were you referring to the
10  type of complication rates that are associated with
11  the use of Gynemesh PS and Prolift?
12       MR. FAES:  Object to form.
13    A. Yes.
14    Q. And do you find that the complication rates
15  are all they -- strike that.
16       Have you found that the complication
17  rates that have been reported in the scientific
18  literature to support your opinions that the mesh
19  itself has the right amount of rigidity and
20  flexibility?
21       MR. FAES:  Object to form.
22    A. Yes, I thought so.
23    Q. Similar questions with regard to your opinion
24  that the mesh is lightweight and allows for good

Page 188

1  structural integrity necessary to support the
2  native -- native tissue of a woman:  What
3  information did you rely upon in rendering your
4  opinions about that?
5    A. Again, from personal experience with grafts,
6  cadaveric, the different types I've mentioned
7  before, personal experience, clinical experience,
8  literature, colleagues.
9    Q. And their personal experience with regard to
10  use specifically of the Gynemesh PS and the Prolift?
11    A. Yes.
12    Q. And the literature that you reviewed,
13  specifically with Gynemesh PS and Prolift?
14    A. Yes.
15    Q. For example, have you found in your own
16  clinical experience that the Gynemesh PS and the
17  Prolift provides better structural integrity than
18  cadaveric grafts, for example?
19       MR. FAES:  Object to form.
20    A. Yes.
21    Q. Have you reviewed literature that supports
22  your opinions on that?
23    A. Yes.
24    Q. And is that literature cited in the body of

Page 189

1  your report?
2       MR. FAES:  Object to form.
3    A. Yes, it is.
4    Q. Similar, is -- does the literature that you
5  have read, also support the fact that Gynemesh PS
6  and the mesh which is the mesh used in Prolift, is a
7  lightweight macroporous monofilament mesh?
8       MR. FAES:  Object to form.
9    A. Yes.
10    Q. And that has been determined in the
11  scientific literature; correct?
12       MR. FAES:  Object to form.
13    A. Yes.
14    Q. It's been recognized even beyond the Amid-
15  type papers; correct?
16       MR. FAES:  Object to form.
17    A. Yes.
18    Q. And that's information that you're also
19  relying upon for your opinions; correct?
20    A. Yes.
21    Q. You recall a line of questions that counsel
22  asked you regarding your opinions with the use of
23  the IFU; is that correct?
24    A. Yes.

48  (Pages 186 to 189)

Stanley Zaslau, M.D.

Page 190

1    Q. Doctor, during the course of your day-to-day
2  job, do you use IFUs for products in training your
3  resident physicians?
4    A. I review the IFU with the resident to make
5  sure they at least know what it is.  At least once,
6  so they know what it is.
7    Q. Okay.
8    A. But really it's their education and training,
9  core textbooks that give them the information they
10 need to know.
11   Q. But it's something that you're familiar with
12 and you know that IFUs come with products; correct?
13   A. Yes.
14   Q. And doctors know that IFUs come with
15 products?
16   A. Yes.
17   Q. And you make sure that your residents are
18 aware of that; correct?
19   A. Yes.
20   Q. And you make sure they review the technique
21 and description of how a product is used in the IFU;
22 correct?
23   A. Yes.
24   Q. And is that something you go over with

Page 191

1  them -- and please, just remind me, do you actually
2  have a -- a lecture sort of training sessions for
3  your residents?
4    A. Yes. There are core lectures in
5  urogynecology for the gynecology residents.
6    Q. And do you teach them?
7    A. I do. And also there are core lectures for
8  our own urology residents, my residents, on this.
9  So we cover the core aspects of these procedures,
10 indications, contraindications, review of the IFUs,
11 so at least they know what it is. When they see it
12 in practice, they will know what it is or if some
13 new product comes out, they will know what an IFU
14 is.
15   Q. Is an IFU something that you've been familiar
16 with throughout your entire career, essentially, as
17 a physician?
18   A. Yes.
19   Q. You have attended -- well, do you attend
20 meetings of other urologists?
21   A. Yes.
22   Q. Do you attend meetings of other
23 urogynecologists?
24   A. Yes.

Page 192

1    Q. And are devices such as the Prolift device
2  and the Gynemesh devices that are discussed at these
3  meetings?
4    A. Yes, they are.
5    Q. And during any of these meetings, have you
6  ever heard any of your colleagues express that the
7  Prolift IFU was not sufficient to warn them of the
8  particular adverse complications that could be
9  associated with that product?
10         MR. FAES: Object to form.
11   A. No physician ever mentioned to me any issues,
12 nor have I heard discussions in that area.
13   Q. If you look to page 50 in your expert report
14 -- page 50 of the expert report, it does refer to
15 regulatory -- a regulatory reference for IFUs; is
16 that correct?
17   A. Yes.
18   Q. And have you reviewed that regulatory
19 reference?
20   A. I have. I'm not a regulatory expert to know
21 all the details of it, but from a general sense, I
22 have. I have some understanding.
23   Q. And do you stand by the opinion that is in
24 your report with regard to that regulatory

Page 193

1  requirement and guidance concerning the IFU?
2    A. Yes.
3          MR. FAES: Object to form.
4    Q. And is that, in part, what you relied upon in
5  formulating your opinions about the adequacy of the
6  Prolift IFU?
7    A. Yes.
8    Q. Now, have you ever seen an IFU for an
9  anterior colporrhaphy?
10   A. It would have to be for a device.
11   Q. Okay. So there is none. For performing an
12 anterior colporrhaphy, there is nobody that writes
13 down for you from a device company about the
14 potential risks and warnings of performing an
15 anterior colporrhaphy; correct?
16   A. No.
17   Q. And is that the same with sacrospinous
18 ligament fixation procedure?
19   A. Yes.
20   Q. Same with the hysterectomy; right, there's no
21 IFU for that?
22   A. No, there is no IFU.
23   Q. You indicated, I believe, in your testimony
24 that, in part, you relied upon information that was

49 (Pages 190 to 193)

Stanley Zaslau, M.D.

Page 194

1 available to physicians during their training for
2 your opinion about their knowledge -- well, strike
3 all that.
4        In coming to the opinion that doctors
5 were aware of certain risks and warnings that are
6 contained in the IFU, what material did you rely
7 upon?
8   A. Core textbooks, meetings, lectures, papers,
9 clinical experience.
10   Q. And the doctors that we're referring to is
11 not the foot surgeon down the street; right?
12   A. No.
13   Q. We're talking about doctors who are
14 experienced in performing pelvic floor surgeries;
15 correct?
16   A. Right; urologists, urogynecologists,
17 gynecologists.
18   Q. And, in fact, the IFU indicates that those
19 should be the users of the device; is that correct?
20        MR. FAES:  Object to form.
21   A. Well, yes, but those who are familiar with
22 pelvic floor anatomy and surgeries of the pelvic
23 floor.
24   Q. Sure.  So not just any gynecologist, but a

Page 195

1 gynecologist who is out there performing pelvic
2 floor surgery; correct?
3   A. Yes.
4   Q. Mr. Faes asked you some questions about
5 whether you knew for a hundred percent certainty
6 that every doctor who performed procedures were
7 aware of every single complication; correct?
8        MR. FAES:  Object to form.
9   A. Yes.
10   Q. And, of course, you don't have -- you can't
11 get inside of a physician's head to know exactly
12 what they knew when, where and how; correct?
13   A. No, that's not possible for me to do that.
14   Q. But you are familiar with the type of
15 training a urologist and a female pelvic floor
16 surgeon as yourself goes through prior to performing
17 any pelvic floor surgery; correct?
18   A. Yes.
19        MR. FAES:  Object to form.
20   Q. You go to meetings that other surgeons who
21 perform pelvic floor surgeries go to; is that
22 correct?
23   A. I do.
24   Q. You review journals and literature that other

Page 196

1 surgeons who perform female pelvic floor surgeries
2 review; is that correct?
3   A. Yes.
4   Q. And are you also relying upon that body of
5 information, your education, training and experience
6 and your encounters with your colleagues, as well as
7 your education of current doctors to be surgeons in
8 the future, in stating your opinion that you believe
9 that the IFUs are adequate for use with the Gynemesh
10 PS and Prolift devices?
11        MR. FAES:  Object to form.
12   A. Yes, I agree based on what you had mentioned,
13 my education, skills, training, courses, literature
14 review.
15   Q. And your knowledge of what the other doctors
16 go through; correct?
17        MR. FAES:  Object to form.
18   A. Yes.
19   Q. Mr. Faes asked you some questions about
20 whether the amount of mesh had an impact on the
21 intensity and duration of fibrotic -- foreign body
22 reaction; correct?
23   A. Yes.
24   Q. And you recall that line of questions?

Page 197

1   A. I do.
2   Q. The fact that a woman may have more mesh in
3 her body than a woman who has a TVT procedure or
4 sling procedure, for example, does that fact
5 necessarily correlate to an adverse clinical impact
6 for the woman who has the larger amount of mesh in
7 her body?
8        MR. FAES:  Object to form.
9   A. No, not necessarily.
10   Q. Are there other factors that affect the
11 intensity and duration of a foreign body reaction?
12   A. Yes.
13   Q. And are those patient-type factors?
14   A. Yes.  Like their age, whether they're a
15 smoker, how much prolapse that they have, what prior
16 surgeries they've had from below or from above, how
17 many of those surgeries that they've had, how many
18 vaginal deliveries they've had, whether they had a
19 hysterectomy or not.
20   Q. Do those same -- are you done?  I didn't mean
21 to interrupt you.
22   A. Yes.
23   Q. Do those same factors also weigh in to the
24 foreign body reaction that those women may have to a

Golkow Technologies, Inc - 877.370.3377

Stanley Zaslau, M.D.

Page 198

1    cadaveric tissue implant or other biologic-type
2    implant?
3        A.  They can have foreign body reaction to any of
4    these.  This is well described in the literature by
5    Woodruff and also a paper by Daniel Elliot in
6    rabbits.
7        Q.  Mr. Faes asked you a few questions about what
8    standard you used to determine whether a product is
9    safe and effective.  Do you recall that general line
10   of questions?
11       A.  Yes.
12       Q.  Do you cover in your report your opinion on
13   the safety and effectiveness of the Gynemesh device?
14           MR. FAES:  Object to form.
15       A.  Yes, in a small section.
16       Q.  And do you cover in your report your opinion
17   with regard to safety and effectiveness of the
18   Prolift device in your report?
19       A.  In extensive detail.
20       Q.  Okay.  And the literature that you discuss,
21   does it -- did the literature -- strike that.
22           The literature that talks about the
23   Prolift device, does it also necessarily include
24   discussion of the Gynemesh PS mesh itself?

Page 199

1            MR. FAES:  Object to form.
2        A.  It may.  I have to look at the specific
3    papers of that.
4        Q.  Okay.  When -- I believe you stated this
5    earlier in your testimony, but when you used the
6    Prolift device, you essentially are delivering the
7    Gynemesh PS into the pelvic floor of a woman;
8    correct?
9        A.  Yes.
10       Q.  And the Gynemesh PS is what stays in a
11   woman's pelvic floor; correct?
12       A.  Yes.
13       Q.  So literature that describes the risks and
14   complications of the Prolift, would you agree that
15   those are necessarily describing the risks and
16   complications of the Gynemesh PS mesh itself?
17           MR. FAES:  Object to form.
18       A.  They certainly can.
19       Q.  And did you rely upon -- well, what did you
20   rely upon in forming your opinions that the Prolift
21   device is safe and effective?
22       A.  Review of the pertinent literature, papers,
23   book chapters, personal experience, discussion with
24   colleagues, the IFU.

Page 200

1        Q.  When we talk about a device as being safe and
2    effective, are we essentially talking about a risk-
3    benefit discussion?
4        A.  Yes.
5        Q.  And is that risk-benefit your standard for
6    determining whether a device is safe and effective?
7        A.  Yes.
8        Q.  Now, Ethicon, in addition to having the IFU,
9    provides -- makes training available to physicians;
10   correct?
11       A.  Yes.
12       Q.  And you went to that training yourself;
13   correct?
14       A.  Yes.
15       Q.  Did you find that training adequate and
16   helpful?
17           MR. FAES:  Object to form.
18       A.  Yes.
19       Q.  They've also published the surgeon's manual
20   monograph, for example; correct?
21       A.  They have, yes.
22       Q.  And that's discussed in your report as well?
23       A.  Right.  Which I had at the time when it came
24   out.

Page 201

1        Q.  And did you find that helpful as well?
2        A.  Yes.
3            MR. FAES:  Object to form.
4        Q.  Helpful information about the risks and
5    complications of the device?
6        A.  It was helpful, yes.
7        Q.  Mr. Faes was asking you some questions about
8    your own personal patient satisfaction rates;
9    correct?
10       A.  Yes.
11       Q.  And as you told him, you haven't analyzed
12   those rates in specific detail for your patients;
13   correct?
14       A.  I have not, no.
15       Q.  But are you -- well, in offering your
16   opinions that the Prolift and the Gynemesh PS
17   provides good satisfaction for patients, in addition
18   to your clinical experience, are you relying upon
19   any other information for that?
20       A.  Certainly the literature, the papers that
21   have come out over the years, information from
22   colleagues, discussion at meetings.
23       Q.  So I want you to look at, for example,
24   page 38 in your report.  You got a paragraph there

51 (Pages 198 to 201)

Stanley Zaslau, M.D.

Page 202

1  that starts with, "As demonstrated in the level 1
2  RCTs comparing Prolift to traditional prolapse
3  repairs"?
4  A. Yes.
5  Q. "No statistically significant difference in
6  vaginal."
7      (Court reporter interrupts.)
8  Q. "As demonstrated in the level 1 RCTs
9  comparing Prolift to traditional prolapse repairs,
10  there was no statistically significant difference in
11  vaginal length, de novo dyspareunia, sexual
12  function, pelvic pain or quality of life." Do you
13  see that?
14  A. I do, yes.
15  Q. And you cite a number of different randomized
16  control trials supporting those conclusions;
17  correct?
18  A. Yes, I do.
19  Q. And is that information also information that
20  you're relying upon for your opinions that patient
21  satisfaction is high with the Prolift and Gynemesh
22  PS devices?
23  A. Yes.
24  Q. And Doctor, you indicated before Prolift came

Page 203

1  out, you were performing prolapse surgeries in a
2  number of different ways; is that correct?
3  A. Yes.
4  Q. And since Prolift is no longer available,
5  you've gone back to doing some of those surgeries;
6  is that correct?
7  A. Yes.
8  Q. And, in fact, you assist in surgeries doing
9  abdominal sacrocolpopexy; is that correct?
10  A. Yes.
11  Q. Do you believe that the -- if you had a
12  choice in your patient between an abdominal
13  sacrocolpopexy and a Prolift procedure, which one
14  would you choose?
15  A. Certainly it would depend on the patient and
16  their prior surgical or medical history. So say a
17  patient who has had prior abdominal surgery who has
18  a high body mass index, they would be better served
19  with a vaginal procedure like a Prolift. The risk
20  in such a patient for small bowel obstructions,
21  adhesions, bowel injury, hernia, can be very high.
22  Q. Do you agree there are higher comorbidities
23  with the abdominal sacrocolpopexy?
24  A. Yes.

Page 204

1  Q. With a patient with a cystocele defect, would
2  you want to offer her the Prolift device today?
3  A. I would certainly, yes. If it were
4  available.
5  Q. Did you find when you were -- strike that.
6      MS. ROBINSON: That's all the questions
7  I have.
8      MR. FAES: I just have like three quick
9  follow-up.
10      -----
11      EXAMINATION
12  BY MR. FAES:
13  Q. Doctor, earlier defense counsel was asking
14  you about a section of your report regarding the IFU
15  on page 50 where 21 CFR 801.109(c) is cited?
16  A. Yes.
17  Q. Is that the only objective standard you're
18  relying on for your opinion regarding the
19  sufficiency of the IFU?
20      MS. ROBINSON: Object to form.
21  A. Again, I'm not a regulatory expert. I have
22  looked at that in some detail, and that is my
23  opinion. That manufacturers can omit warning
24  information that would be commonly known to

Page 205

1  practitioners that are licensed to use that device,
2  physicians to use that device in this case.
3  Q. What does CFR stand for?
4  A. CFR, I don't remember. Something -- I think
5  R was regulatory. I don't remember what the CF
6  stands for.
7  Q. How did you get that standard? Was that
8  provided to you by counsel?
9  A. It was, yes, and then I reviewed what that
10  was.
11  Q. So it's not any standard that you encountered
12  on your own through your own independent research?
13  A. No.
14  Q. Are you aware of any other standards that
15  state that any adverse reaction associated with a
16  medical device must be included in the IFU
17  regardless of whether or not a causal association
18  has been proven?
19  A. You know, I'm not a regulatory expert, so no,
20  I'm not aware.
21      MR. FAES: No further questions.
22      -----
23      (Signature was waived.)
24      (Whereupon, the above-entitled matter

52 (Pages 202 to 205)

Stanley Zaslau, M.D.

Page 206

1   was concluded at 7:06 p.m., this date.)
2                    -----
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    STATE OF WEST VIRGINIA)
2    COUNTY OF OHIO        )
3
        I, Constance Lee, Registered
4    Professional Reporter and Notary Public in and for
     the State of West Virginia, do hereby certify that
5    the witness was first duly sworn to testify the
     truth, the whole truth, and nothing but the truth;
6    that the foregoing deposition was taken at the
     time and place stated herein; and that the said
7    deposition was recorded stenographically by me and
     then reduced to typewriting under my direction,
8    and constitutes a true record of the testimony
     given by said witness, all to the best of my skill
9    and ability.
10       I further certify that the inspection,
     reading and signing of said deposition were waived
11   by counsel for the respective parties and by the
     witness.
12
         I further certify that I am not a
13   relative, or employee of either counsel, and that
     I am in no way interested, directly or indirectly,
14   in this action.
15       IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office this
16   22nd day of March, 2017.
17
18   _____
19   Constance Lee, RPR, CSR(IL)
20   NCRA Realtime Systems Administrator
21
22
23
24

53 (Pages 206 to 207)