# EXHIBIT K

Stanley Zaslau, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA


IN RE : ETHICON, INC.,          )
PELVIC REPAIR SYSTEM            )     Master File
PRODUCTS LIABILITY             )     No.
LITIGATION                      )     2:12-MD-02327
                                )
_____ )
                                )
THIS DOCUMENT RELATES TO        )
PLAINTIFF:                      )
                                )
Susan Guinn Case No.            )
2:12-cv-01121                   )

                    - - -
          DEPOSITION OF STANLEY ZASLAU, M.D.
              THURSDAY, MARCH 17, 2016
                    - -


        The Deposition of STANLEY ZASLAU, M.D., a

Witness herein, called by the Plaintiff, taken

pursuant to Notice of Deposition and the West

Virginia Rules of Civil Procedure, by and before

Faye Ann Lehman, a Commissioner in and for the

State of West Virginia, at The Waterfront Place

Hotel, 2 Waterfront Place, Morgantown, West

Virginia 26501, commencing at 11:30 a.m. on the day

and date above set forth.

                    - - -

Stanley Zaslau, M.D.

Page 2

1   APPEARANCES:
2
3   On behalf of the Plaintiff:
        Edward A. Wallace, Esquire
4       Wexler Wallace LLP
        55 West Monroe Street, Suite 3300
5       Chicago, Illinois 60603
        eaw@wexlerwallace.com
6
    On behalf of the Defendants:
7       Susan M. Robinson, Esquire
        Thomas Combs & Spann, PLLC
8       300 Summers Street, Suite 1380
        Charleston, West Virginia 25301
9       srobinson@tcspllc.com
                    - - -
10
            I N D E X
11  WITNESS                                         PAGE
12  STANLEY ZASLAU, M.D.
13  Direct Examination by Mr. Wallace 3
    Cross-Examination by Ms. Robinson 154
14  Redirect Examination by Mr. Wallace 162
15  EXHIBITS
16  No. 1 Notice to take Deposition 3
    No. 2 Expert Report, Guinn case 7
17  No. 3 Expert Report, Hendrix case 8
    No. 4 C.V. and Testimony List 8
18  No. 5 TVT IFU
        ETH.MESH.05225354 - 05225385   111
19  No. 6 TVT IFU, 2015 123
        (No Bates)
20  No. 7 AUGS/SUFU Position Statement   131
    No. 8 Email chain
21      ETH.MESH.00301741 - 00301742   135
    No. 9 Email chain
22      ETH.MESH.01822361 - 01822363   139
    No. 10 PA Consulting Group PowerPoint 141
23      (No Bates)
24                  - - -

Page 3

1           P R O C E E D I N G S
2                   - - -
3           STANLEY ZASLAU, M.D.,
4   the witness, having been first duly sworn, was
5   examined and testified as follows:
6           (Deposition Exhibit No. 1 was marked
7           for identification.)
8           DIRECT EXAMINATION
9   BY MR. WALLACE:
10  Q.   I'm going to hand you a document that's been
11  marked as Exhibit 1.  Tell me if you recognize it.
12  A.   I do.
13  Q.   Does it have your name on it?
14  A.   Yes.
15  Q.   Can you state and spell your name for me.
16  A.   My name is Stanley, S-T-A-N-L-E-Y, Zaslau,
17  Z-A-S-L-A-U.
18  Q.   Do you know why you're here today?
19  A.   Yes.
20  Q.   Why is that?
21  A.   I'm being deposed by you.
22  Q.   In connection with what?
23  A.   In connection with claims regarding a mesh
24  and mesh-based surgeries.

Page 4

1   Q.   Am I right that you brought a suitcase with
2   you today?
3   A.   Yes.
4   Q.   And what's in the suitcase?
5   A.   The suitcase has medical records and
6   literature, as well as thumb drives that I've
7   reviewed in preparation.
8   Q.   And why did you bring the suitcase full of
9   that material today?
10  A.   So I can refer to it as necessary.
11  Q.   Did you do anything in connection to a
12  request for documents from you having to do with
13  the reports that you've issued in this litigation?
14  A.   Yes.
15  Q.   What did you do?
16  A.   I read it and reviewed them and discussed
17  them with counsel.
18  Q.   And is it fair to say that you've made a
19  diligent and thorough search for any documents that
20  you've been asked to bring today?
21  A.   Yes.
22  Q.   Are you withholding anything?
23  A.   No.
24  Q.   Can you just identify more specifically

Page 5

1   what you've brought so we can just note it for the
2   record?
3   A.   I brought articles that I've reviewed in
4   preparation from a variety of different sources.  I
5   brought thumb drives with medical records and other
6   articles that were provided to me by Butler & Snow,
7   and I have brought medical records and depositions
8   that I've reviewed for this case and discussion.
9   Q.   And if I understand you correctly, you were
10  asked to look at materials and then provide an
11  opinion in this case, right?
12  A.   Yes.
13  Q.   And if I'm correct, you've provided a --
14  what is called a general opinion with respect to
15  the safety and efficacy of the TVT device, right?
16  A.   Yes.
17  Q.   But you've also reviewed medical records and
18  other information relating to two claimants, Susan
19  Guinn and Ms. Hendrix; is that right?
20  A.   Yes.
21  Q.   And you understand that my questions today,
22  Dr. Zaslau, are about the general TVT opinions and
23  not those two specific claimants, right?
24  A.   Yes.

2 (Pages 2 to 5)

Stanley Zaslau, M.D.

Page 6

1    Q.    And you understand that after we're done
2    today, that someone will be asking you questions
3    about your case-specific report for Ms. Guinn,
4    right?
5    A.    Yes.
6    Q.    Okay.  Thank you.  With respect to your
7    general TVT report, it's my understanding from
8    looking at the documents or the reports that you
9    provided that your general opinion is the same --
10   it was issued in the Guinn case and the Hendrix
11   case, but it's the same for both, right?
12   A.    Yes.
13   Q.    In other words, it's meant to apply to TVT
14   specifically without regard to who the plaintiff
15   might be?
16   A.    Well, if it were a TVT-O case, there's more
17   material regarding TVT-O in some than others.  I
18   don't believe that the reports are exact copies of
19   one another.  There are sections that are similar,
20   but certainly, other relevant research for TVT-O
21   that was more recent.
22   Q.    Why don't we do this, then, why don't we
23   mark both of the reports separately, just for the
24   record, and then the exhibits, as I understand

Page 7

1    them, are generally the same.
2         For example, your CV's the same, right?
3    A.    Yes.
4    Q.    Your list of testimony is the same?
5    A.    Yes.
6    Q.    Why don't we mark the Guinn report as
7    Exhibit 2, please.
8         (Deposition Exhibit No. 2 was marked
9         for identification.)
10   Q.    Do you recognize Exhibit 2?
11   A.    Yes.
12   Q.    What is it?
13   A.    It is the report for the Guinn case.
14   Q.    And, again, at the beginning of that, it
15   has a section that also provides general opinions?
16   A.    Correct.
17   Q.    And if I'm correct, Ms. Guinn had a TVT-O
18   implanted?
19   A.    Yes.
20   Q.    But you're here to testify about the TVT
21   today, right?
22   A.    Yes.
23   Q.    Now, if you look at the -- we're going to
24   mark the next exhibit, and that is Exhibit 3, which

Page 8

1    will be the Hendrix report.
2         (Deposition Exhibit No. 3 was marked for
3         identification.)
4    Q.    Have you seen Exhibit 3 before?
5    A.    Yes.
6    Q.    What is it?
7    A.    This is a general report for a retropubic
8    TVT, but also is case specific for the Hendrix
9    case.
10   Q.    So, in other words, just so we're clear,
11   even if we're not taking the Hendrix deposition
12   today, you know that you're here by agreement to
13   give opinions on your general TVT opinion?
14   A.    Yes.
15   Q.    And your general TVT opinion is contained in
16   Exhibit 3?
17   A.    Yes.
18   Q.    Let's mark as a group exhibit your CV and
19   your testimony list as Exhibit 4.
20        (Deposition Exhibit No. 4 was marked for
21        identification.)
22        MS. ROBINSON:  Did you say CV and?
23        MR. WALLACE:  Testimony list.
24        MS. ROBINSON:  As Exhibit 4?

Page 9

1         MR. WALLACE:  Yeah.
2    BY MR. WALLACE:
3    Q.    Do you recognize Group Exhibit 4?
4    A.    Yes.
5    Q.    What is that?
6    A.    This is a testimony -- a history for the
7    last four years and my current CV.
8    Q.    I notice that certain areas are blacked out.
9    Is that your doing or your counsel's doing?
10   A.    Counsel's doing.
11   Q.    With respect to the testimony list, please
12   take a look at it.
13   A.    Um-hmm.
14   Q.    It says "2014 - Edwards versus JNJ"?
15   A.    Yes.
16   Q.    That's a mesh case, correct?
17   A.    Yes.
18   Q.    And do you recall meeting Mark Mueller in
19   giving your deposition in that case?
20   A.    Yes.
21   Q.    Have you reviewed that transcript recently?
22   A.    I have not.
23   Q.    When's the last time you looked at it?
24   A.    Six months ago or more.

3 (Pages 6 to 9)

Stanley Zaslau, M.D.

Page 10

1  Q.   And why six months ago did you look at it?
2  A.   Because that's when I got it.
3  Q.   And so, since then, in connection with
4  preparing your reports in this case, you haven't
5  referenced it?
6  A.   I have not.
7  Q.   The Weaver versus WVUH case; what is that?
8  A.   That was a case -- a prostatectomy case, a
9  prostate cancer case that I was involved in that I
10  was since waived from its involvement and settled.
11  Q.   Oh, so, you were a party to that case?
12  A.   Yes.
13  Q.   And you testified in that case?
14  A.   Yes.
15  Q.   At deposition?
16  A.   At deposition only.
17  Q.   And you were later dismissed from the case?
18  A.   Yes.
19  Q.   And you didn't pay anything, did you?
20  A.   I did not pay anything.
21  Q.   The Stewart versus Bard case in 2014, what
22  is that?
23  A.   Yes.  I am the treating physician.
24  Q.   Is it a mesh case?

Page 11

1  A.   Yes.
2  Q.   Is it a case that's pending in the MDL
3  before Judge Goodwin, if you know?
4  A.   I do not believe so.
5  Q.   Do you know where it is pending?
6  A.   I do not.
7  Q.   Who, if anyone, has been dealing with you in
8  that case?
9  A.   Matt Teague, T-E-A-G-U-E.
10  Q.   He's from Beasley Allen; do you know?
11  A.   Yes.
12  Q.   So you've had interaction with him about
13  that case?
14  A.   Yes.
15  Q.   Did you provide a report in connection with
16  that case?
17  A.   No.
18  Q.   But you did give testimony?
19  A.   I gave a deposition for that.
20  Q.   And did you offer opinions in that
21  deposition?
22  A.   Whatever questions were asked of me, but I
23  was certainly not an expert.  I was a treating
24  physician.

Page 12

1  Q.   What was -- did you link the mesh to the
2  cause of Ms. Stewart's injuries?
3  A.   I don't remember the specifics of that
4  because it was some time ago.  I'd have to go back
5  and look to the details of it.
6  Q.   Do you recall giving testimony on behalf of
7  Bard in that case?
8  A.   No.  I was purely the treating physician,
9  opposed by that counsel.
10  Q.   The final one on the list is Burkhart,
11  B-U-R-K-H-A-R-T versus Life Chiropractic?
12  A.   Right.
13  Q.   What sort of testimony did you offer in that
14  case?
15  A.   It's a treating physician and expert in a
16  case of neurogenic bladder.  It's not a mesh-based
17  case.  It's a urinary retention case, unrelated to
18  any pelvic floor issues.
19  Q.   So you were retained by one of the parties
20  in the case?
21  A.   As a treating physician, but also served as
22  an expert.
23  Q.   On whose behalf?
24  A.   Patient.

Page 13

1  Q.   And so you testified that there was a
2  causal link between the actions of the defendant
3  and the plaintiff's injuries?
4  A.   That's correct.
5  Q.   If I also recall, you have offered testimony
6  in the past having to do with a case involving the
7  Veterans Administration, right?
8  A.   Yes.
9  Q.   So you remember what I'm talking about?
10  A.   Um-hmm.
11  Q.   Can you just give a brief description of
12  that, please?
13  A.   This was a patient who had an unrecognized
14  ureteral injury at the time of an anterior repair.
15  There may have been more procedures in addition to
16  that, but she had a complex pelvic prolapse case.
17  It was unrecognized.  She was referred for
18  treatment to our facility, for which we treated
19  her.  And it turns out her ureter was ligated
20  during the initial surgery, and subsequently that
21  case had been tried, lost, and then been tried
22  several other times.  I'm not sure how that all
23  played out, but it was -- the physician worked in a
24  facility that was a federal facility, so I don't

4 (Pages 10 to 13)

Stanley Zaslau, M.D.

Page 14

1    know if it was a federal case without a jury.
2    Q.    But as far as you know, the testimony that
3    you've given in the last four years are listed in
4    Group Exhibit 4?
5    A.    Yes.
6    Q.    And is your CV that you provided in
7    connection with your report up to date?
8    A.    Yes.
9    Q.    How much time did you spend preparing your
10   TVT report?
11   A.    About 30 hours.
12   Q.    Are those hours documented anywhere?
13   A.    I just keep a running list of them at the
14   end of the month. I'm involved in multiple cases,
15   so there's a lot of time that's spent each month
16   in reviewing records and writing reports and
17   opinions for a variety of things. So it's a summed
18   opinion --
19   Q.    I'm sorry. I didn't mean to interrupt.
20   A.    It's a summed, you know, time together.
21   Q.    Do you -- based upon your answer, do you
22   have any way to estimate the number of hours or
23   percentage of working time that you spend each
24   month on mesh-related matters?

Page 15

1    A.    I'd say the bulk of my free time is based on
2    that. I don't have any other things that are going
3    on. It doesn't mean I'm doing this every day, you
4    know, all hours of the day, but I would estimate
5    that I spend about two hours a day on average doing
6    this related work.
7         So I may spend up to 60 hours a month doing
8    something, but it can average between ten hours a
9    month, if things are quiet; but if there's multiple
10   cases -- here's these three going on -- and
11   reports, so I could spend upwards of 30 or more
12   hours a month.
13   Q.    Are these the only two cases in which you're
14   working on?
15   A.    These are the only cases I'm working on
16   right now that I've written reports for, but I've
17   reviewed many other cases that are in various other
18   stages or processes.
19   Q.    And you've reviewed those cases for Ethicon?
20   A.    For attorneys for Ethicon.
21   Q.    At the end of the day, though, it's -- your
22   bills are paid by them?
23   A.    Yes.
24   Q.    Do you have a retainer agreement that exists

Page 16

1    in that -- between you and the lawyers or between
2    you and Ethicon?
3    A.    I work with the Butler & Snow group. I
4    don't work with anyone else or any other mesh
5    companies, meaning, like, you know, Boston
6    Scientific or any of those others. I do not.
7    I've only worked exclusively with them.
8    Q.    Just to be clear, Susan is sitting next to
9    you. You'd assume she's part of the group, right?
10   A.    Susan's part of the group.
11   Q.    Okay, very fine lawyer I might add. I just
12   wanted to make that clear.
13        How much time did you spend preparing for
14   your deposition today?
15   A.    I spent probably about 20 hours of just
16   deposition prep.
17   Q.    Over how much time?
18   A.    Over the last two to three weeks.
19   Q.    And who did you meet with, if anyone?
20   A.    I've spoken with Susan, and I've spoken with
21   other counsel, part of Butler & Snow, part of the
22   group.
23   Q.    Who?
24   A.    Paul Rosenblatt.

Page 17

1    Q.    Who else?
2    A.    And I spoke with an attorney, Susan Pope,
3    for the Goodwin case.
4         MS. ROBINSON: Guinn.
5    A.    Well, no. Susan Pope is the Goodwin case.
6    I've been working on that as well. So you're
7    talking about -- she knows about this as well.
8    There's a lot of folks, as you know, that's
9    involved in this.
10   Q.    That's right. Just so we're clear, because
11   you talk a little fast, when you say "the Goodwin
12   case," you're not talking about Judge Goodwin.
13   There's another case that you're referring to that
14   exists out there that relates to Ethicon?
15   A.    Right.
16   Q.    And the lawyer you identified as Susan Pope
17   is connected to that case?
18   A.    Yes.
19   Q.    You're not from West Virginia, are you?
20   A.    No.
21   Q.    Where are you from?
22   A.    New York.
23   Q.    Brooklyn?
24   A.    Um-hmm.

5 (Pages 14 to 17)

Stanley Zaslau, M.D.

Page 18

1    Q.    And prior to coming to West Virginia, you
2    were a resident in New York, right?
3    A.    Yes.
4    Q.    And if I'm correct, you finished your
5    residency in --
6    A.    2000.
7    Q.    In 2000?
8    A.    Yes.
9    Q.    And came to West Virginia in 2001 as an
10   assistant clinical professor, right?
11   A.    Assistant professor, yes.
12   Q.    What's that mean?
13   A.    Well, I'll tell you, in between I spent a
14   year in -- achieving advanced training in
15   neurourology and voiding dysfunction in Brooklyn at
16   Long Island College Hospital as an assistant
17   attending.  So essentially an additional year of
18   training, a fellowship year.  And then I came for
19   an academic position at WVU as an assistant
20   professor.
21   Q.    Right.  An assistant attending, though, just
22   to be clear, is not a fellowship?
23   A.    It is not.  That's correct.  But this year
24   was meant to be additional training, so additional

Page 19

1    training in neurourology.  Back at that time, there
2    were very few formal fellowships, so if you wanted
3    additional training in this area, you could be
4    employed by a hospital and focus in those areas, so
5    that's what I did for that year, and then brought
6    that knowledge to WVU the following year.
7    Q.    Who recruited you?
8    A.    To where?
9    Q.    West Virginia.
10   A.    There was an advertisement looking for
11   someone who had done the things that I do, and I
12   had contacted Dr. Stanley Kandzari, who was the
13   chief of urology at the time, and we spoke, and I
14   came to interview, and I thought it was a great
15   opportunity.
16   Q.    And you've been here ever since?
17   A.    Um-hmm.
18         MS. ROBINSON:  Say "yes."
19   A.    Yes.
20   Q.    Let's go back to what your role was in 2001
21   for a moment.
22   A.    Okay.
23   Q.    I don't think that's clear.
24         What did you do as an assistant professor?

Page 20

1    A.    When you are an assistant professor, you're
2    a full member of the faculty, and so your
3    responsibility is patient care, surgery, and call
4    responsibilities.  But my focus and goal was to
5    build a center for voiding and sexual dysfunction
6    for the people of West Virginia, using knowledge
7    from my additional year of training and from Mount
8    Sinai and bring that here and build something that
9    didn't exist in our state.
10        So that's when I came here, and I started
11   to build that center of excellence for the center
12   for voiding and sexual dysfunction.
13   Q.    And to be clear, that had nothing to do with
14   mesh, right, between 2001 and 2004?
15   A.    No.  I mean, well, these were things that we
16   had done at the time, certainly.  We've done mesh
17   since 1998 as a resident, but coming here to build
18   this had nothing to do with mesh.
19   Q.    That's all I'm trying to make clear, that
20   the work that you did between 2001 to 2004 to try
21   and build this center that you're describing was
22   not mesh-related?
23   A.    That's correct.
24   Q.    And as I understand it, you became -- you

Page 21

1    had various titles all the way up to being named as
2    a professor in 2010, right?
3    A.    Yes.
4    Q.    And I take it that between 2001 and 2010,
5    you received pay raises?
6    A.    Yes.
7    Q.    And that with the change in titles that you
8    received in those intervening years, that that's
9    typically when the pay raises occurred, right?
10   A.    No.  They can happen annually.  You know,
11   we're salaried employees, so our salary is
12   dependent upon normative numbers that are used
13   nationally for academic professors, and so there
14   may be a raise each year.  Usually it's equivalent
15   to what would be a standard of living for that
16   salary level.  And the pay raise from -- actually,
17   from rank is actually very little.  It's really
18   more -- the way our system is based, you can be a
19   full professor, but you're really compensated more
20   based on your clinical productivity and the
21   national norms.
22   Q.    Between 2001 and 2010, would you consider
23   yourself in private practice?
24   A.    No.

6 (Pages 18 to 21)

Golkow Technologies, Inc. - 1.877.370.DEPS

Stanley Zaslau, M.D.

Page 22

1  Q.    What would you consider yourself working in?
2  A.    Academic practice.  Full-time academic.
3  Q.    So at no time between 2001, when you came to
4  West Virginia, to 2010 were you ever in private
5  practice?
6  A.    Not at all.
7  Q.    And to carry that forward, between 2010 to
8  today, at no time have you been in private
9  practice, correct?
10  A.    That's correct.
11  Q.    You would consider yourself an academic
12  practice from 2001 to the present?
13  A.    Yes.
14  Q.    And as an academic, are you paid by -- and
15  forgive me for not knowing, but are you essentially
16  paid by the taxpayers?
17  A.    Our salary comes partially from the state,
18  and our salary also comes from the university.
19  Q.    Which is the university is funded in part by
20  the state, correct?
21  A.    Well, the university part is more the
22  medical school part, which is the practice plan.
23  So there's a portion of our salary is state
24  funding and a portion of our salary is practice

Page 23

1  funding.
2  Q.    But whether or not you treat patients,
3  you're still not engaged in what you would call
4  private practice, right?
5  A.    Not at all.
6  Q.    Thank you.  You've listed that you're a
7  certified Six Sigma Black Belt?
8  A.    Um-hmm.
9  Q.    What is that?
10  A.    Six Sigma is a methodology of improving
11  process and flow through a variety of business
12  systems.  I took that as an online course in
13  conjunction with completing my MBA in 2005, just to
14  have knowledge of that system to help better
15  further our healthcare system, our WVU healthcare
16  system to be more economical, to be more oriented,
17  so that we can undertake tasks in a logical manner,
18  reduce waste, improve productivity across the
19  institution.
20  Q.    And just so we're clear, you mentioned an
21  MBA program.  You took courses both at -- in West
22  Virginia and at the University of Tennessee of
23  Knoxville with respect to an MBA, right?
24  A.    Yeah.  The WVU program was just a one-month

Page 24

1  course several evenings a week, just to kind of wet
2  your whistle and get your feet wet with this.  And
3  then the 2005 was an online program with some weeks
4  on campus to achieve the MBA over a one-year
5  period.
6  Q.    And would you agree with me that that
7  relates to the business of healthcare?
8  A.    It relates partially to the business of
9  healthcare.  It also relates to the understanding
10  of how to improve workflow and how to make a better
11  healthcare system.  It's not all about money, you
12  know.  Certainly money, you think MBA, you think
13  money, but it's also about improving your processes
14  and improving patient experiences and physician
15  experiences through a system.
16  Q.    Well, in discussing money for a second, why
17  don't we move on.
18         As someone in academics, you're well aware
19  of the issue of bias, right?
20  A.    Um-hmm.
21  Q.    What does that mean to you?
22  A.    Bias is a curbed opinion or a swayed opinion
23  based on some circumstance.
24  Q.    And I don't want to retread old ground

Page 25

1  that you've already testified about, but it's my
2  understanding that you agree that it's not a good
3  idea to induce physicians to buy a product on
4  anything other than science and good medicine,
5  right?
6         MS. ROBINSON:  Object to form.
7  A.    Say that again.
8  Q.    Well, let me preface where I'm going.  I
9  don't want to retread your prior testimony, for
10  example, that you gave in the Edwards case.  But I
11  just want to explore this issue of bias with you a
12  little bit more, so that's why I'm asking this
13  question.  So what I'm saying is -- let me start
14  over.
15         You agree with me it's not a good idea to
16  induce physicians to buy products from a medical
17  device manufacturer based on anything but science
18  and good medicine, right?
19  A.    I don't know what you mean by "induce."
20  What does that mean?
21  Q.    Well, you used the word "induce" in the
22  Edwards deposition, so what do you think it means?
23  A.    I don't remember the details of that.  If
24  you'd like to show me that, I can read you what I

7 (Pages 22 to 25)

Stanley Zaslau, M.D.

Page 26

1    had written.
2    Q.    I don't want you to read me what you wrote.
3    I want you to tell me what you think "induce"
4    means as it relates to physicians and healthcare
5    and bias.
6        Can you do that?
7    A.    I'm not sure where you're going with this,
8    and I don't know --
9    Q.    And I'm not trying to be flippant at all.
10   It doesn't matter where I'm going at this point.
11   What I'm asking you for is your understanding of
12   the word "induce."
13       It's your understanding.  It's not mine.
14   And you've used the word before, in all fairness.
15   A.    Okay.
16   Q.    So just exploring generally this idea of
17   bias, which I think you've had some things to say
18   about and agree with me that it's not a good idea
19   to, for example, take a physician on an exotic trip
20   simply to get them to buy a product, right?
21       MS. ROBINSON:  Object to form.
22   A.    Well, now, I understand what you're saying
23   with the word "induce."  You know, induce could be
24   to hint or to suggest or to gently nudge and say,

Page 27

1    "We'd like you to do something."  So when you use
2    the word "induce" in terms of trips or large
3    monetary things, then, no, it shouldn't be done.
4        Now, if induce means that we'd like to pay
5    for your expenses to go to a meeting to learn
6    something, I think that's a reasonable thing.
7    Q.    In fact, you've heard about trips where
8    physicians have been taken in an attempt to get
9    them to induce -- to get them to buy a certain
10   product from a company, right?
11   A.    I've heard about that, yes.
12   Q.    And you don't agree with that?
13   A.    I don't think that that should exist in
14   healthcare.
15   Q.    And you would agree with me that a company,
16   for example, a medical device manufacturer,
17   shouldn't pay for a study based upon the outcome of
18   that study?
19   A.    I don't know the specifics of what you mean
20   by that.  What do you mean by that?
21   Q.    Well, let me give you an example.
22       If you're running a study at your center,
23   you shouldn't be paid based upon the outcome.  The
24   outcome should be whatever it's going to be with

Page 28

1    respect to the study, right?
2        MS. ROBINSON:  Object to the form.
3    A.    Well, paid by who and for what?
4    Q.    You don't understand what I'm asking?
5    A.    No.  No. I don't understand what you're
6    trying to say.  Try again.
7    Q.    Because we're being polite to each other, I
8    will try again.
9        Do you believe it is appropriate for a
10   medical device manufacturer to pay, for example, a
11   doctor who is running a clinical trial based upon
12   the outcome of that clinical trial?
13       MS. ROBINSON:  Object to form.
14   A.    Not based on the outcome.  Based on the
15   materials that are needed to conduct the study, if
16   it were a product and they provide a product for
17   it.  If it were cost-related to undertaking the
18   study and coordinators or research or imaging
19   studies or things like that, yes.  But based on an
20   outcome, a defined outcome that you have to achieve
21   a certain thing beforehand, that's a different
22   story.
23   Q.    What do you mean by "that's a different
24   story"?

Page 29

1    A.    Well, I don't think it's appropriate for
2    someone to be paid for something and require
3    them to achieve a certain outcome.  In other
4    words, "You have to have a 100 percent success rate
5    of some procedure, or we're not going to fund your
6    procedure."  I don't think that that's appropriate.
7    Q.    Well, what if you're paid a bonus if you get
8    a 100 percent success rate?
9    A.    You could be paid a bonus.
10   Q.    Do you think that's appropriate?
11   A.    It could be, based on outcomes that were
12   discussed, mutually discussed before a trial began,
13   if people had done that.  And that's just the
14   industry paying for something.  That's not
15   published in a journal in that way.
16       Yeah, I mean, now, if something like that is
17   published and that support is not mentioned, that's
18   inappropriate.  But certainly, they can be funded
19   based on the agreement between two people.
20   Q.    So you think if somebody was paid a bonus if
21   they had, for example, no complications, they
22   received a substantial bonus, you think the fact
23   that there is a bonus and the amount of that bonus
24   should be disclosed in the study once it's

Stanley Zaslau, M.D.

Page 30

1    published?
2         MS. ROBINSON:  Object to form.  I
3       don't know if that correctly states his
4       testimony.
5    A.    Yeah, I don't know.  These are things that
6    have to be discussed between industry and the
7    individuals undertaking the study.  They can
8    discuss, "This is the sum of money that we're
9    giving you, and these are the outcomes that we're
10   looking for, and if these are achieved, these may
11   be compensated in some way."  I can't put a
12   monetary value.  I would not do that, and I
13   wouldn't engage in that, personally.
14   Q.    Why not?
15   A.    Because I want to be involved in randomized
16   trials.  I want to be the one doing the
17   randomizing.  If I'm sponsored, I just want to be
18   sponsored for expenses or things that are related
19   to that.  That's just my bias.  That's my opinion.
20   Q.    Okay.  So let's go back and answer my
21   question, though.  What I was trying to get at was
22   whether or not you thought -- whether or not I was
23   correct in understanding you, that if you are paid
24   a bonus based for a 100 percent success rate in a

Page 31

1    clinical trial that is later published, that the
2    amount of that bonus and the fact that there is a
3    bonus should be disclosed in the publication?
4    A.    Actually, now, with disclosure statements
5    for our own societies, those numbers are disclosed,
6    if somebody's receiving research money and how much
7    that is and for exactly what that is.
8    Q.    I'm not talking about now.  I'm talking
9    about your opinion as it exists.  What do you think
10   about it?
11   A.    I think that now, that that's how things
12   should be.
13   Q.    Do you think that it's appropriate to do
14   that five years ago?
15   A.    I think that's appropriate to do that
16   five years ago.
17   Q.    Why?
18   A.    Because when you interpret information, you
19   want to know, was it sponsored, and if so, what
20   level of sponsorship was it and what was the
21   involvement of the participants.
22   Q.    And all I'm trying to get at is that you and
23   I agree that if a physician who is conducting a
24   clinical trial is paid a bonus based upon a 100

Page 32

1    percent success rate with respect to that clinical
2    trial and the results of that trial are published,
3    that there needs to be full disclosure with respect
4    to the bonus in that amount, right?
5         MS. ROBINSON:  Object to form.  Asked
6       and answered.
7    A.    I told you that their involvement needs to
8    be disclosed.
9    Q.    When you said "their involvement," you mean
10   the bonus?
11   A.    The financial support.  I'm not saying that
12   they have to list the amount of what it is.  I
13   think they need to list that significant funding
14   was provided from this company for this research,
15   or so and so has this agreement -- this
16   investigator has this agreement with this industry.
17   Q.    In other words -- let's go to this case.
18   Ethicon, if they're paying for a study, that needs
19   to be disclosed?
20        MS. ROBINSON:  Object to form.
21   A.    I don't know.  If they're paying for the
22   study in what way?  So they're sponsoring the --
23   a study in question?  It should be disclosed if
24   they're sponsoring a study.

Page 33

1    Q.    You've given testimony about ghostwriting
2    before, right?
3    A.    Yes.
4    Q.    And what do you think of it?
5    A.    I think that writers can help others write
6    manuscripts or papers, and certainly that happens.
7    Q.    Writers can help others.  What do you mean?
8    Be more specific, please.
9    A.    In other words, you have a paper that's
10   written.  It may be written by someone else at
11   another level.  It may be from industry.  It may
12   be -- may be someone who's your lab instructor who
13   you work with, or your lab, you know, faculty
14   member, and they're writing a paper and you're part
15   of it and you'll offer your contributions and
16   opinions to it.  But you need to have -- take
17   ownership for that material if you're part of it.
18   Q.    What do you mean by taking ownership?
19   A.    Well, if your name is on it, that means that
20   you would agree with what's being said.
21   Q.    If a company representative has made
22   editorial changes to an article, should that be
23   disclosed in the final publication of the article?
24   A.    How do we know -- I don't know who they were

9 (Pages 30 to 33)

Stanley Zaslau, M.D.

Page 34

1    and how they did that or why they did that.
2    Q.    My question's much more simple.  I'm not
3    asking why they did it or those sorts of things.
4    I'm just asking you a much more basic question.
5         Can you answer it?
6    A.    They probably -- it would depend on the
7    specifics of what they edited.  You know, did they
8    edit and say that no one had any erosions in a
9    case when they actually had ten erosions?  Then
10   that's faulty.  Depends on what they edited.  Is it
11   a minor edit?  Is it a complete misrepresentation
12   of something?
13   Q.    So, in other words, if they provide
14   information or alter information, that probably
15   should be disclosed?
16        MS. ROBINSON:  Object to form.
17   A.    If they alter information that would have a
18   significant impact on someone's interpretation,
19   that would be important to know.
20   Q.    Let's move on.  You were a Bard Uretex
21   user, correct?
22   A.    Um-hmm.
23   Q.    Is Uretex spelled U-R-E-T-E-X?
24   A.    Yes.

Page 35

1    Q.    And what did you use that product for?
2    A.    I used that for suburethral slings.
3    Q.    To treat stress urinary incontinence in
4    women?
5    A.    Yes.
6    Q.    And when I use the acronym SUI, you know I'm
7    referring to stress urinary incontinence, correct?
8    A.    Um-hmm.
9    Q.    And it's fair to say that before 2004 you
10   were a Bard Uretex user and not a TVT user, right?
11   A.    I used them both.
12   Q.    Are you sure about that?
13   A.    Yep.
14   Q.    Have you ever testified differently?
15   A.    I've -- I used a lot more Bard than I had
16   used TVT for a short period of time, but I used TVT
17   as a resident and in some of the other cases that
18   were done in working with our gynecology faculty,
19   if they were going to use that or the resident
20   wanted to use that, we would use that.  But I did
21   use Bard for quite a bit of time from 2001 to 2004
22   or so.
23   Q.    And I'm not suggesting anything, but it
24   sounds like you may have explained things a little

Page 36

1    bit differently before.  So let me state what I
2    understand, and you tell me whether I'm right or
3    wrong.
4         I'll make it simple.  Before 2004, you were
5    primarily a Bard Uretex user when you were the
6    surgeon performing the stress urinary incontinence
7    surgery, correct?
8    A.    That's correct.
9    Q.    And TVT was used, for example, at some
10   points when you were a resident?
11   A.    Sometimes when I was a resident and also
12   working with a -- gynecology colleagues who we'd
13   worked with as well.
14   Q.    And that was my next question, so let me ask
15   that in the next sentence.
16        What changed in 2004 that caused you to
17   start using Ethicon products?
18   A.    Well, the Prolift mesh had come out as well.
19   The obturator approach had certainly changed the
20   traditional way of doing TVTs to an easier, more
21   simplistic way of approaching things, and if we can
22   avoid potential for bladder injury, I think that
23   would be good because with the Uretex, it was a
24   little higher incidence of that.

Page 37

1         Also, I thought the quality of the mesh
2    would be better and easier to implant.  I like the
3    concept of trocar-based that's similar to Prolift
4    in that the material -- the materials were easy to
5    use, easy to work with.
6    Q.    What was it about the quality of a TVT mesh
7    versus a Bard Uretex mesh that caused you to change
8    your --
9    A.    I thought it was softer.  I thought upon
10   implantation I liked how the mesh would sit in its
11   appropriate place, and it was very easy to do.  It
12   was very easy and quick.  It avoided the risk of
13   bladder injury, especially when the obturator
14   approach changed a lot of the things that we do.
15   Using the obturator fossa really has cut down on
16   risk of bladder injuries, risk of postoperative
17   pain, risk of voiding dysfunction.
18   Q.    In fact, you'd agree with me that the TVT-O
19   was invented to avoid some of those risks that
20   the TVT presented, which included bladder injuries?
21   A.    It certainly would improve those risks, yes.
22   Q.    Do you have partners in your academic
23   practice?
24   A.    Yes.

10  (Pages 34 to 37)

Stanley Zaslau, M.D.

Page 38

1  Q.   How many?
2  A.   We have, myself now included, five.
3  Q.   And what does having a partner mean to you?
4  A.   It means you work together.
5  Q.   You share information?
6  A.   About patient care.
7  Q.   Do you share information about
8  complications?
9  A.   We do.
10  Q.   And do you share information that may come
11  up in literature?
12  A.   Yeah.  Well, part of, you know, journal
13  clubs and conferences, yes.
14  Q.   In other words, you share healthcare
15  information with each other and expect your
16  partners to candidly share information with you
17  when they discuss it?
18  A.   Um-hmm.
19  Q.   How many years of experience do you have
20  with these partners?
21  A.   With our longest one, 15.
22  Q.   You believe Ethicon's a partner of yours,
23  right?
24  A.   Yes.

Page 39

1  Q.   And you expect the same from Ethicon, that
2  if it has information about its products that may
3  impact on your delivery of healthcare, you want to
4  know that information?
5  A.   Right.
6  Q.   What other surgeries have you done to treat
7  stress urinary incontinence?
8  A.   I've done pubovaginal slings.  I've done Raz
9  needle suspensions, Pereyra and Stamey needle
10  suspensions.  We've done certainly slings.  We've
11  done injections of material into the bladder neck.
12  I've assisted with MMKs and Burches when we do open
13  things with the gynecologists, only if they've
14  asked me to help them for some pelvic reason.  But
15  really, just you're helping them and it's their
16  procedure.
17  Q.   Do you ever have a complication with a
18  patient under general anesthesia?
19  A.   Such as -- you can have any complication,
20  sure.
21  Q.   I guess I'm asking a more specific question.
22  Have you ever had a complication during
23  surgery with a patient that had to do with the
24  anesthesia being delivered?

Page 40

1  A.   I have not, no.
2  Q.   Now, with respect to any of these surgeries
3  that you performed, including those with
4  polypropylene mesh, it's important for you to have
5  scientific data before you implant that product,
6  right?
7  A.   Yes.
8       MS. ROBINSON:  Object to form.
9  A.   Yes.
10  Q.   Or perform the procedure, if it's only
11  procedure-based?
12  A.   We'll perform it, yes.
13  Q.   And you wouldn't just implant a device or do
14  a procedure on a woman without having that data,
15  correct?
16       MS. ROBINSON:  Object to form.
17  A.   The data is important, but understanding the
18  procedure that you're going to do and how does it
19  relate to things that you've done already,
20  experience from lectures and national meetings on
21  this, is certainly important, as well, so it's a
22  combination of things.
23  Q.   And those -- the combination of those
24  things, including the data supporting the safety

Page 41

1  and efficacy of the procedure, would apply to
2  either a procedure or an implant, right?
3  A.   Combination of things, yes.
4  Q.   And with respect to the use of Ethicon mesh,
5  you would want to know that your healthcare
6  partner, Ethicon, gave you the necessary
7  information to make the right decision when
8  deciding to use the TVT, right?
9       MS. ROBINSON:  Object to form.
10  A.   I would want to know the pertinent
11  information that relates to me, yes.
12  Q.   And what type of information did you look at
13  to satisfy yourself that the TVT was safe and
14  effective when you started using it in your own
15  surgeries in or about 2004?
16  A.   I'd look at the instructions.  I'd look at
17  the presentations that were done at the AUA about
18  that time, what abstracts were presented,
19  information from other colleagues on an academic
20  level, you know, if we had a regional meeting and
21  these things were discussed, certainly, these
22  things would come into play.
23  Q.   What else?
24  A.   And your personal bias.  I think switching

11 (Pages 38 to 41)

Stanley Zaslau, M.D.

Page 42

1  from Bard to switching from GYNECARE is actually
2  very easy.  It's an easier product to do.  It
3  follows the same things I've been doing.  At that
4  point in 2004, I've been doing this for eight
5  years already, including my residency.  So here,
6  all of a sudden, there's a better product, it's
7  easier to use, and it's very straightforward.
8  Q.    Did you rely on information from Ethicon
9  besides the instructions for use?
10  A.    No.
11  Q.    Why not?
12  A.    Didn't need to.
13  Q.    Why not?
14  A.    Because it's just a variation of what I've
15  been doing for eight years.  You know, whatever
16  complication was going to happen, I would've seen
17  it over the eight years or heard about it or had
18  those patients sent up to me.
19      One of the things about being a referral
20  center, where we are, is the -- a lot of
21  challenging patients that others have operated on,
22  so many of the issues that I would expect to see,
23  I had seen already.
24  Q.    So you thought you already knew what you

Page 43

1  were doing and you understood the material and the
2  procedure enough to go forward?
3  A.    Um-hmm.
4  Q.    Did you look to peer review journals for
5  data on the safety and efficacy of the TVT device?
6  A.    Yes.
7  Q.    What journals?
8  A.    "Journal of Urology," the "Gold Journal,"
9  many of the urogynecology journals, abstracts
10  presented at the AUA, updates to Campbell's
11  "Urology," "Female Urology," Shlomo Raz's initial
12  texts to learn about these procedures.  A variety
13  of different sources.
14  Q.    In other words, you felt after looking at
15  this data and having the experience of implanting
16  mesh for eight years that the use of mesh and
17  specifically Ethicon mesh in your hands was safe?
18  A.    Yes.
19  Q.    And you thought that, in part at least,
20  based upon your own understanding and confidence
21  and your skill level?
22  A.    Yes.  But also, you know, each year another
23  paper would come out.  More information would come
24  out, case reports, other experiences, variations of

Page 44

1  how to do things.  That shaped the knowledge that
2  we have.
3  Q.    Take a step back for a moment, though.
4      You know that there are thousands of women
5  that have claimed injuries from the implant of
6  vaginal mesh, right?
7      MS. ROBINSON:  Object to form.
8  A.    Many people have claimed that, yes.
9  Q.    Would you, as you sit here today, agree with
10  me that perhaps that mesh was too widely distribu-
11  ted to physicians and hospitals and put in too many
12  women too fast by experienced -- or I'm sorry, by
13  physicians who were not as experienced as you?
14      MS. ROBINSON:  Object to form.
15  A.    No.
16  Q.    Why not?
17  A.    I think that these physicians who implant,
18  or whatever surgery they did, need to have a full
19  understanding based on their skills and their
20  training about what they're going to do, and they
21  should be able to look at a product -- I mean,
22  mesh is no different than Prolene sutures we've
23  closed abdomens with and the same Prolene sutures
24  we've done MMKs with or Burches.  So they should

Page 45

1  know that based on their skills and training that
2  this is just a different application of something
3  that they've been doing for years.  And their
4  knowledge, their skills, that should be what moves
5  forward to whether they're going to adopt something
6  or not adopt something.
7  Q.    That's not an answer to my question, though.
8  My question was whether or not you believe that
9  mesh -- let me back up for a second.
10      I think you and I agree, don't we, that
11  physicians should be skilled in a procedure before
12  they do that procedure, correct?
13  A.    Physicians should be skilled in a procedure,
14  yes.
15  Q.    So we agree on that.  What I'm asking you,
16  though, is something different, which is, do you
17  believe that mesh was too widely distributed and
18  put in too many women too fast by inexperienced
19  physicians, which is perhaps one of the reasons why
20  we're seeing all these claims?
21      MS. ROBINSON:  Object to form.
22  A.    I don't think it had to do with the
23  physicians' experience.  I think that the
24  physicians who were using mesh are very

12 (Pages 42 to 45)

Stanley Zaslau, M.D.

Page 46

1  experienced. I don't think that they selected
2  their patients carefully based on their skills and
3  training. I think mesh is -- has done some amazing
4  things for people. You're only talking about all
5  the negative things. I don't have anything
6  negative to say about it. Mesh has shaped the way
7  we do surgery. Mesh has changed outcomes for
8  people that never would have the outcomes that
9  they do in a positive way.
10  Q.   You mentioned that they made a mistake in
11  the selection of their patients.
12       What do you mean by that?
13  A.   The IFU is very clear. It's very clear.
14  The first iteration of the IFU is very obvious.
15  Mesh is used in the treatment of stress urinary
16  incontinence. It's a treatment for stress urinary
17  incontinence. It's not a prevention. It's not
18  going to -- it's not going to treat something
19  that's not there. It doesn't say it's a treatment
20  for urge incontinence or mixed incontinence. It's
21  a treatment for stress incontinence.
22       It's very clear. Many people who have
23  implanted slings have not considered its true
24  indication. And when you implant mesh in those

Page 47

1  people, they have -- they are more likely than less
2  likely to have problems.
3  Q.   Why?
4       MS. ROBINSON: Can we go off the record
5  for a second?
6       MR. WALLACE: Yeah. Go ahead.
7       (Brief break.)
8  BY MR. WALLACE:
9  Q.   Just answer the why, and then we'll take a
10  break.
11  A.   Just reorient me to the -- you know.
12  Q.   My understanding of your testimony is that
13  you believe, as a physician who's implanted mesh
14  for a number of years, that one of the reasons why
15  there are so many complications with mesh is
16  because of patient selection, correct?
17  A.   Yes.
18  Q.   And that you believe, in part, that
19  physicians, when they're doing patient selection,
20  have sometimes implanted mesh in women that didn't
21  need it?
22  A.   That's correct.
23  Q.   And including in women that may not be
24  suffering from stress urinary incontinence but

Page 48

1  some other type of incontinence?
2  A.   That's correct.
3  Q.   And you believe that in seeing these
4  complications, that that behavior by these
5  physicians may be, in fact, a cause of those
6  complications, right?
7  A.   That's correct.
8  Q.   And I said to you, why do you believe those
9  complications come about?
10  A.   You have to look at the revisions of mesh,
11  the mesh removals to determine that. And when you
12  look at, in our practice, in which we've removed
13  probably close to 200 patients' mesh since we
14  started counting them, paying attention to that,
15  very few patients have had erosions. Most
16  patients, when you look at the original indication,
17  they had mixed incontinence, or they had urge
18  incontinence, or the sling was placed prophylac-
19  tically. And when you do that -- and that's
20  well documented. When you do these procedures, or
21  any stress incontinence procedure for that matter,
22  it's more likely to fail. And then, of course,
23  there's the patient comorbidities. Okay.
24  Q.   Let's stop there before we go on to

Page 49

1  comorbidities.
2       You said it's well documented. What do you
3  mean by that?
4  A.   Well, the literature has described for years
5  about who is more or less likely to do well when
6  they have a sling placed. And it's well documented
7  that patients with urge incontinence -- pure urge
8  incontinence, that is -- patients with mixed
9  incontinence, patients with multiple comorbidities,
10  patients who were having multiple procedures done
11  at the same time, like a hysterectomy and anterior
12  repair and a sling, are more likely to do poorly as
13  opposed to someone who just has a mesh placed or a
14  sling placed for stress incontinence.
15  Q.   Are there any peer review journals or
16  articles that come to mind when you make that
17  standpoint?
18  A.   About which statement?
19  Q.   The statement you just made about that
20  literature or that it's well documented.
21  A.   Yes.
22  Q.   Which ones?
23  A.   The Schimpf, the variety of Cochrane
24  reviews, the reviews from the "Journal of Urology"

13 (Pages 46 to 49)

Stanley Zaslau, M.D.

Page 50

1   as well. There are a variety of different reviews.
2   Q.   Okay.  Let's take a break.
3        (Brief break at 12:29 p.m.)
4        (Back on the record at 12:37 p.m.)
5   BY MR. WALLACE:
6   Q.   You mentioned some of the other non-mesh
7   procedures that you've done where you use sutures.
8        Do you recall talking about that earlier
9   today?
10  A.   Yes.
11  Q.   Are -- is using a mesh and doing, for
12  example, a Burch procedure present the same risk?
13  A.   Some are the same risk, but others are
14  different.
15  Q.   What are the differences?
16  A.   Well, mesh is placed under the urethra,
17  whereas Burch suspends it from above.  So the
18  complaints could be different.  Burch patients may
19  complain more of voiding dysfunction, difficulty
20  with their stream, urgency, frequency, obstructive
21  kind of symptoms.  Yes, you can see that with TVT
22  mesh-based pubovaginal slings, as well, but it's
23  more urethral-related, more towards where the
24  urethral meatus is.

Page 51

1        You can have more dyspareunia with
2   vaginal-based procedures as opposed to Burch-based
3   procedures, but that -- often they're combined
4   with other procedures, so they may be having an
5   anterior repair and a hysterectomy and an
6   incontinence procedure, so you have to look at the
7   whole picture of what they're having done as
8   opposed to just the individual A versus B.
9   Q.   But you would agree with me that there is a
10  risk of greater dyspareunia with a vaginal mesh
11  procedure?
12  A.   Not necessarily.  Again, it's the patient
13  factor.  So you operate on someone who's
14  postmenopausal, you can have dyspareunia with
15  either procedure, just because they're
16  postmenopausal.
17  Q.   You can have greater dyspareunia with a
18  vaginally-placed mesh product?
19  A.   Not necessarily.  I think that actually the
20  risk can be pretty similar.
21  Q.   And what science or data do you base that
22  on?
23  A.   Schimpf.  It's to say that all procedures --
24  Q.   Did you control, in Schimpf, when you looked

Page 52

1   at the table, did you control for all the
2   different products that were examined?
3   A.   You can't control for all of them.  There's
4   too many products.  There's too many things.
5   Because it's a meta-analysis, so what do you want
6   to pull out?  Which study are you going to pull out?
7   Q.   Right.  But you're relying on Schimpf, for
8   example, to give me your answer --
9   A.   Right.
10  Q.   -- so I'm trying to figure out how specific
11  you are.  If you're just giving me a general
12  opinion based upon a meta-analysis, that's fair.
13  I just need to know that.
14  A.   No.  Most of the studies that were within
15  Schimpf, when you're looking at a pubovaginal
16  sling, for an example, there's only one of the
17  studies that used mesh for its pubovaginal sling.
18  All the other ones used autologous or cadaveric
19  material.  So that's a fair comparison.  You don't
20  have to pull anything out for that information,
21  okay?  And the other ones, you know, use Burch or
22  MMK or other type of procedures.  They're all
23  pretty standard, how they're done, so there's
24  really not a lot of factoring.

Page 53

1   Q.   So in other words -- and let's suppose
2   you're wrong, that your reading of Schimpf is
3   wrong, that it isn't a straight comparison, in
4   fact.  Let's talk about autologous slings, for
5   example.
6        Do you think, when you use the word
7   "autologous" slings, are you saying that it only
8   had to do with fascia?
9        MS. ROBINSON:  Object to form.
10  A.   Autologous, by definition, means self, so
11  that means you got the fascia from that person.
12  Q.   So when you're using the word "autologous"
13  fascial slings in connection with the Schimpf
14  article, you are not, for example, referring to
15  Gore-Tex?
16  A.   Right.  One of the papers within Schimpf, of
17  the ones that look at pubovaginal slings, that
18  used -- I think it was Gore-Tex.  I have to look
19  specifically.  I don't remember off the top of my
20  head.  But the other ones used either cadaveric or
21  autologous material.
22  Q.   Do you believe that the risks of using a
23  suture that may erode present the same risks of a
24  mesh that may erode?

14  (Pages 50 to 53)

Stanley Zaslau, M.D.

Page 54

1    A.    They both can be very significant, yes.
2    Q.    Do they present the same risks?
3    A.    I think they present similar risks.  It
4    depends on where the sutures are placed.  You can
5    do an MMK or a Burch and you can put a stitch right
6    through the middle of the urethra and have a stone
7    form on it or right through the bladder.  And we've
8    removed cases of people who have had Burches or
9    MMKs and had erosion and had stones forming on
10   their suture.  So yeah, sutures that are
11   inappropriately placed can certainly do that.  Mesh
12   that's inappropriately placed or a pubovaginal
13   sling that's inappropriately placed can all have
14   significant effects.
15   Q.    You said that there are different risks with
16   mesh.  What are they?
17   A.    I don't know that they're different -- well,
18   some of the things relate to how they're implanted.
19   You wouldn't expect someone who had an MMK versus
20   a patient who had an obturator sling to have FIE
21   pain because of, just inherent to how a needle has
22   passed.  So they may have a different subset of
23   side effects based on the approach or what's been
24   performed for them.  Both can have voiding

Page 55

1    symptoms.  Both can have pain.  Both can have
2    dyspareunia, but they may be for different reasons,
3    or they may be for the same reason.  You know, they
4    may be -- like I said, they have atrophic
5    vaginitis.  They're postmenopausal.  They're not
6    on any estrogen.  Or they have other risk factors,
7    you know, age, parity, smoking, things like
8    that.
9    Q.    Are you aware of these mesh pain clinics
10   that have come about in the last few years?
11   A.    A mesh pain clinic?
12   Q.    For example, there's a clinic in North
13   Carolina that specializes in the removal of mesh
14   now.
15        Are you familiar with that?
16   A.    No.  No.
17   Q.    Are you familiar with the work that's going
18   on at UCLA?
19   A.    Which is what?
20   Q.    That there are clinics that specialize in
21   the removal of mesh?
22   A.    No.
23   Q.    Are you aware of any of the work that's
24   being done in Atlanta in that area?

Page 56

1    A.    No.
2    Q.    You would agree with me that there is no
3    center, nor was there ever any healthcare center,
4    that specialized in the removal of sutures in the
5    treatment of stress urinary incontinence, correct?
6         MS. ROBINSON:  Objection to the form.
7    A.    That has that written on their logo, you
8    know, on their advertisement, on their billboard?
9    I've never seen that, no.
10   Q.    Putting aside whether or not somebody has it
11   on a billboard, you would agree with me that that's
12   never existed?
13   A.    I've never seen it.
14   Q.    Now, when a woman comes to you for treatment
15   of stress urinary incontinence, do you typically
16   examine her?
17   A.    Yes.
18   Q.    Do you do urodynamics testing?
19   A.    Yes.
20   Q.    And if the patient, for example, wants to
21   bring in her spouse, is that okay to do?
22   A.    During what, during urodynamics testing?
23   Q.    During your pelvic exam, for example?
24   A.    Oftentimes they're in the room behind the

Page 57

1    curtain, of course, but they can be present.
2    Q.    You don't have a problem with that?
3    A.    No.
4    Q.    And you believe it might provide some
5    comfort to the woman that's being examined, right?
6         MS. ROBINSON:  Object to form.
7    A.    That's up to her.  I will ask each patient,
8    after I do an examination of them or recommend a
9    procedure for them, I will ask them, "Do I need to
10   speak to your family?"  And "Do you want me to
11   speak to your family?"  And if they want me to,
12   then I will, and discuss what's going on.
13   Q.    And the patient has a right to refuse
14   treatment at any time?
15   A.    Yes, they do.
16   Q.    What is informed consent?
17   A.    Informed consent is a process by which a
18   physician will speak to a patient regarding a
19   procedure or a test that they're going to have and
20   discuss with them the risks, the benefits, things
21   that may happen along the way, and have them sign a
22   generic form to document that that discussion was
23   had.  That's only one part of informed consent.
24   There's also things that are implied, that are

15  (Pages 54 to 57)

Stanley Zaslau, M.D.

Page 58

1  assumed, and that are discussed about with patients
2  that are not written on a form consent.
3  Q.   If you had diagnosed a woman with SUI and
4  have decided that surgical intervention is
5  appropriate, what options do you give that woman?
6  A.   I explain to them all of the options from
7  nonsurgical treatments to surgical treatments.
8  Q.   And what surgical options do you give her?
9  A.   That depends on what their situation is.  If
10  someone has sphincteric incontinence, they could be
11  offered injectable treatment.  If they have
12  hypermobility, they can be offered a sling via
13  autologous, via -- we're talking pubovaginal.  They
14  can be offered a pubovaginal sling via autologous
15  or cadaveric fascia.  They can be offered a
16  suburethral sling via mesh, and then now, for the
17  most part, I do them by the obturator approach.
18  Or they can be offered observation.
19  Q.   So you offer all those options to someone
20  that's been treated or diagnosed with stress
21  urinary incontinence?
22  A.   Yes.
23  Q.   And you would agree with me that some of
24  those surgical options, like Burch and non-mesh

Page 59

1  sling procedures, are perfectly appropriate, within
2  the standard of care?
3  A.   They can be offered to the patient, sure.
4  Q.   When you tell a woman that she can receive a
5  mesh polypropylene sling, what are you telling her?
6  A.   Explain to them the details of the
7  procedure.  Explain to them the risks of the
8  procedure, certainly, obvious things like bleeding,
9  injury to other structures along the way, including
10  the bladder.  I discuss with them the risks of
11  erosion and extrusion.  I discuss with them the
12  risks of pain, and I discuss with them the
13  importance of following up with me on an annual
14  basis because they may develop problems not only
15  initially, but years down the road.
16  Q.   And how long have you been telling that to
17  your patients?
18  A.   Since I started here.
19  Q.   2001?
20  A.   Yes.
21  Q.   So it's your testimony that since 2004 you
22  have told your patients that were deciding whether
23  or not to receive a mesh-based polypropylene sling
24  those things you just described?

Page 60

1          MS. ROBINSON:  Object to form.
2  A.   For any patient who I'm treating for stress
3  incontinence, that they should come back on an
4  annual basis, but in particular, people who've had
5  surgery.  If someone is treated with observation
6  and they want to come back, that's fine.  I give
7  them an appointment.  But for any patient that has
8  any surgical procedure, I want to follow them
9  annually.
10  Q.   Do you have a standard informed consent form
11  that you ask patients to read?
12  A.   I have a standard informed consent form.  We
13  use the hospital informed consent form.  But I read
14  to them an additional statement or statements that
15  becomes a part of their medical record, about
16  slings, the position statement on slings, the
17  complications, and the problems that can happen
18  with them.  And I do that for every procedure.
19  Q.   And how long have you been doing that?
20  A.   I've been doing that since 2010.
21  Q.   So you'd agree with me that prior to 2010,
22  you weren't reading that additional statement?
23  A.   No.  I was telling them all these things,
24  but, unfortunately, we're in a world now where you

Page 61

1  need to do more than that.
2  Q.   What -- as opposed to unfortunate, you
3  accused me of only looking at the negative things
4  earlier.  Isn't it more positive to look at it in a
5  way that you're giving better informed consent now
6  based upon the circumstances?
7          MS. ROBINSON:  Objection.
8  A.   No.  I think I'm giving them fine informed
9  consent.  When I have a patient come in to me who's
10  referred from -- just referred for a consideration
11  and says that "I need you to take out my mesh
12  because it's been recalled," you know, there's a
13  problem with interpretation of the world.  And I
14  have patients that come in and say, "Well, I don't
15  want mesh because it's bad for you."
16          We have a problem.  So we need to document
17  better because patients will turn around -- and,
18  you know, they may be contacted, patients are
19  cold-called now.  My patients have been cold-called
20  about a sling, and, you know, they want to know if
21  everything's okay.  I certainly didn't call them,
22  nor would I call them, but someone called them.
23          So, you know, now, unfortunately, we're in a
24  society where I know this is a standard procedure

16  (Pages 58 to 61)

Stanley Zaslau, M.D.

Page 62

1  that's done wonderfully for my patients, but I need
2  to document everything that goes on because these
3  are now big issues.
4  Q.   Do you -- in documenting, do you keep a list
5  of all your patients that you've seen and put mesh
6  in over the years?
7  A.   Do I keep a separate list of them?  I have
8  access to that, yes.  I can look and see who's
9  followed up with me, our EMR list.
10  Q.   How many -- what percentage of your patients
11  have failed to follow up with you?
12  A.   I don't know.  I haven't looked at that and
13  summed that out.
14  Q.   Well, so, why don't you look at page 4 of
15  Exhibit 3.  Is that the Hendrix report?
16      And I'm sorry, Doctor, let's make sure
17  we're looking at the right thing.
18  A.   The Hendrix report.
19  Q.   Okay.  Thank you.
20      So is it fair to say that your testimony is
21  that you have not kept an actual log of patient
22  satisfaction over the last 16 years since you've
23  been in West Virginia treating women for stress
24  urinary incontinence?

Page 63

1  A.   You asked a whole lot of things.  First, it
2  was a patient log.  Now, you asked about a patient
3  satisfaction log.  I mean, those are two different
4  things.
5  Q.   Well, answer the question that I just asked,
6  then.
7  A.   I don't know.  I don't know what you're
8  asking.
9  Q.   Well, you say you don't keep a separate log
10  relating to your patients, right?
11  A.   No.  I didn't say that.  I said I only keep
12  a separate log of patients who've had implants.  I
13  know all the patients that we see because our EMR
14  can follow those patients.  I can look at the
15  diagnosis code, I can look at a procedure code, and
16  I can acquire information like that.  But I have
17  looked at our long-term results of patients -- I
18  have not published it -- and slings that I have
19  done 15 years ago of the patients who are still in
20  our practice.  I can tell how they're doing.
21  Q.   But you can't sit here today and tell me
22  how many of those patients that you've put slings
23  in over the last 16 years are unsatisfied?
24  A.   I would say that very few of them are

Page 64

1  unsatisfied.
2  Q.   Where's your proof?
3  A.   I have a very good track record of -- I'm
4  the only subspecialist who does female pelvic
5  medicine in the state of West Virginia.  So if
6  they're not going to come and follow with me,
7  they're going to go to Cleveland or Pittsburgh or
8  to another major center.  So I'm the only
9  sub-boarded specialist in my area.  I expect people
10  to follow with me.  I'm very direct about their
11  need to follow on an annual basis, and when they
12  don't follow, then, you know, I can't be held --
13  you know, I can't expect, you know, them to come
14  when I tell them to and they don't.
15      But it's very strong.  I have people that --
16  from back 15 years ago that still follow up because
17  they know it's important to do and they know when
18  they have problems to do.
19  Q.   And I'm pleased to hear that you impress
20  that upon them.  My questions, though, are more
21  basic.
22      As much as you might ask somebody to follow
23  up with you, a woman, if she is unsatisfied with
24  you, may choose not to, right?

Page 65

1  A.   They might, but they probably won't.
2  They'll -- initially, they come to you, so it's
3  your opportunity, on the one shot that they're
4  unsatisfied, to figure out why.  So most people
5  will come back when they're unsatisfied.  You'll
6  get another shot since you did their surgery.
7  Q.   So you disagree with literature suggesting
8  that 50 percent of women who are unsatisfied don't
9  follow up with the implanting physician?
10  A.   I think that's -- I know what paper you're
11  referring to.  But there's others that show that
12  they do follow up with their implanting physician.
13  Q.   And in your experience, just based upon your
14  review of your EMR system, you think that there's
15  excellent follow-up at your facility?
16  A.   I do think so, yes.
17  Q.   But you can't give me a number or percentage
18  today of the women that have failed to follow-up
19  with you, right?
20  A.   I can't.
21  Q.   So in other words, when you see on page 4 of
22  the general TVT report that you've had excellent
23  long-term patient satisfaction over 14 years, you
24  can't provide me with any statistical evidence of

17 (Pages 62 to 65)

Stanley Zaslau, M.D.

Page 66

1    that, as you sit here today?
2    A.    No.
3    Q.    And you, because we're at your deposition,
4    and you have brought documents, you haven't
5    provided anything to us today that would allow us
6    to make those calculations to verify the truth of
7    this statement that I just read from page 4, right?
8    A.    Right.  The statement is a true statement.
9    But to verify that statement, actually, would
10   require a study.  It would require an IRB for me to
11   look at my patients and to see who's satisfied and
12   not satisfied to report that to you.
13   Q.    Well, you would agree with me, though, that
14   we can't let anyone just say it's so just because
15   I'm a great physician and I say it's so, right?
16   Otherwise, anybody could come in the room and say
17   whatever the heck they want, right?
18   A.    Right.
19   Q.    So do you agree with me you can't just come
20   in the room and say it's so just because I say it's
21   so?
22          MS. ROBINSON:  Object to form.
23   A.    We have to assume that people are being
24   truthful in what they say.

Page 67

1    Q.    But I have the right to cross-examine you
2    and test the veracity of your statements, right?
3    A.    Sure.
4    Q.    And if I can't do that -- or I'm sorry, I
5    can't do that with this statement except just take
6    your word for it?
7    A.    That's correct.
8    Q.    I have no independent data to look to or
9    test?
10   A.    That's correct.
11   Q.    You said earlier you read the instructions
12   for use?
13   A.    Um-hmm.
14   Q.    And do you read the instructions for use
15   every time you do a surgery?
16   A.    Initially, sure.
17   Q.    When's the last time you put in a TVT?
18   A.    Last week.
19   Q.    Did you read the instructions for use before
20   you did it?
21   A.    Not before that procedure.  I've looked at
22   it in the past.
23   Q.    When's the last time you looked at the TVT
24   instructions for use?

Page 68

1    A.    Within the last year.
2    Q.    And you would agree with me that the
3    instructions for use are a primary way in which a
4    company can describe the procedure and give you the
5    contraindications and the warnings, right?
6          MS. ROBINSON:  Object to form.
7    A.    They can do that based upon information that
8    they know, whether they think it's important to be
9    included in there.
10   Q.    Right.  So if there are certain risks that
11   may come with the procedure, it should be in the
12   instructions for use, right?
13   A.    If it's unique to that procedure, then it
14   should be included in it.
15   Q.    You would agree with me that the implant of
16   a TVT can cause retropubic bleeding?
17   A.    The implant of a traditional TVT?
18   Q.    Yes.
19   A.    Yes, it could.
20   Q.    And it could cause erosion?
21   A.    Yes, it could.
22   Q.    It can cause extrusion?
23   A.    Yes, it could.
24   Q.    Can cause fistula formation?

Page 69

1    A.    Mm-hmm.
2    Q.    Chronic inflammation?
3    A.    I don't know about chronic inflammation.
4    Q.    Why not?
5    A.    Because it would depend on the setting of
6    when it is.  I mean, to have something that's
7    chronically inflamed would most likely be extruded,
8    so some of the things are going to go with other
9    things that you've mentioned.
10   Q.    Well, my question is, though, an implant of
11   a TVT can cause chronic inflammation, right?
12   A.    It would depend on the situation.  It
13   would depend on the clinical presentation of the
14   patient and whether that mesh were removed and
15   whether it was resolved of their symptoms
16   thereafter, and it would involve maybe looking at
17   the pathology of that as well.
18   Q.    In other words, it can?
19   A.    It may.  It depends on the circumstance.
20   Not in all circumstances, but it may.
21   Q.    And the chronic pain can be associated with
22   the implant of a TVT?
23   A.    It can be associated with any pelvic floor
24   surgery.

18 (Pages 66 to 69)

Stanley Zaslau, M.D.

Page 70

1    Q.    But I'm asking a question specific to the
2    TVT, so I'd like to limit our question and answer
3    to that.  So let me ask it again.
4          The implant of a TVT can be associated with
5    chronic pain, correct?
6    A.    It can.
7    Q.    And you would agree with me that there's a
8    difference between postoperative pain and chronic
9    pain?
10   A.    Yes.
11   Q.    And you would agree with me that the use of
12   the word "transitory" has to do with what would
13   typically be associated with postoperative pain,
14   right?
15   A.    Transitory would refer to postoperative
16   pain.
17   Q.    Transitory does not refer to chronic,
18   long-term pain?
19   A.    No.
20   Q.    And what is postoperative pain?
21   A.    It's pain that occurs postoperatively.
22   Q.    And it usually disappears within a few days
23   or sometimes a couple of weeks?
24         MS. ROBINSON:  Object to form.

Page 71

1    A.    It may, it may not.
2    Q.    Well, when it goes on for a period of
3    sustained time, that interferes with the patient's
4    quality of life well after the surgery, that's
5    chronic pain, right?
6    A.    It could be, yes.
7    Q.    Well, do you have another definition for
8    "chronic pain"?
9    A.    It could be, as you said, pain that affects
10   quality of life, pain that affects their activities
11   in some way.
12   Q.    And that can happen many years after the
13   implant of the medical device, correct?
14   A.    Yes.  But usually not.  Usually, the pain is
15   something that starts postoperatively and
16   continues.
17   Q.    But it can be different from the pain that
18   was postoperative, right?
19   A.    It usually is persistent.
20   Q.    Well, let's talk about the case of the
21   TVT.  You're aware of women that have been
22   pain-free for years and then suddenly years later
23   they develop chronic pain that they associate with
24   the TVT implant --

Page 72

1          MS. ROBINSON:  Object to form.
2    Q.    -- correct?
3    A.    They -- the patient may think that.
4    Q.    Would you agree that there are few studies,
5    if any, that track chronic long-term complications
6    associated with the TVT?
7    A.    No.  There's good data looking at long-term
8    erosions and long-term -- and most people with
9    erosions or extrusions are going to be the ones who
10   have pain.  Very few people who have had a
11   carefully-implanted device will have long-term
12   pain.
13   Q.    Name one article that tracks chronic
14   long-term pain associated with the TVT.
15   A.    The original work by Olmstead, in his 90
16   patients, he only had a single patient with issues.
17   Look at the extrusion rates from the Cochrane
18   review.  And I'd have to look for specific names of
19   other sources.  But there are a variety of others
20   that looked at erosions and extrusions and most of
21   which would have pain.
22   Q.    Okay.  But I didn't ask about erosions or
23   extrusions.  I asked you to name one study that
24   tracked chronic long-term pain associated with the

Page 73

1    TVT.
2    A.    I can't name one.
3          MS. ROBINSON:  Just to be fair, you're
4    not asking him to look at his records,
5    reports, or anything he has sitting in front
6    of him, right?
7          MR. WALLACE:  He can look at anything
8    he wants.
9          MS. ROBINSON:  Well, if he can look at
10   anything he wants, you might want to take a
11   few seconds and look at what he's got.
12         MR. WALLACE:  And just for the record,
13   we're letting Dr. Zaslau review his
14   materials in an attempt to answer the
15   question as to whether or not there's one
16   study that tracks long-term chronic pain
17   with the TVT.
18         THE WITNESS:  I can't think of or see
19   one that specifically refers to that for the
20   long-term.
21         MS. ROBINSON:  You also have your
22   studies in front of you as well.
23         THE WITNESS:  Right.
24         MS. ROBINSON:  And you've spent less

19 (Pages 70 to 73)

Stanley Zaslau, M.D.

Page 74

1   than a minute here looking through your
2   report.
3       MR. WALLACE:  You get to ask him
4   questions later.
5       THE WITNESS:  In the Tomaselli paper,
6   just looking at the long-term pain
7   complications of which the risks appear to
8   be very low, but can occur with minimally
9   invasive slings.
10  Q.   What's the citation of that, please?
11  A.   Tomaselli 2014.
12  Q.   How far out is that study?
13  A.   That is October 2014.
14  Q.   No.  I mean, how long did they follow the
15  patients for?
16  A.   It's searched up to -- it's another
17  meta-analysis, but the review is up through June of
18  2014.  Google databases up through June of 2014.
19  Also, the Unger paper from April of 2015 looked at
20  vaginal pain and groin pain and found a risk of
21  8 percent for vaginal pain and groin pain of
22  3.4 percent.
23  Q.   How long did they follow those patients?
24  A.   These are patients from June of 2003 to

Page 75

1   December of 2013, and the follow-up was -- the
2   median time is about 18 months.
3   Q.   So the median follow-up is about a year and
4   a half?
5   A.   Yes.
6   Q.   What qualifies as a long-term study?
7   A.   We like to see more than five years of data.
8   Q.   That doesn't qualify as a long-term study,
9   does it?
10  A.   No.
11  Q.   So in other words, that article, though you
12  have said it follows some back pain and groin pain,
13  it doesn't qualify as a long-term study following
14  chronic pain associated with the TVT even under
15  your definition, right?
16  A.   Um-hmm.
17  Q.   When you say "um-hmm," you mean you agree
18  with me?
19  A.   Yes.
20  Q.   Thank you.  When you counsel a patient that
21  is about to be implanted with a TVT, do you tell
22  her that she may have persistent pain with
23  intercourse?
24  A.   Yes.

Page 76

1   Q.   And she knows that that pain may, in fact,
2   if things don't go as planned, could last the rest
3   of her life?
4   A.   It can be long-term.
5   Q.   Can you yourself remove all of the mesh
6   from a woman that has had a TVT implanted in her?
7   A.   I wouldn't want to remove all of it.
8   Q.   That's not what I'm asking.  Can you?
9   A.   Depends when it was implanted.
10  Q.   What if it's been implanted for more than
11  six months?
12  A.   It's tougher.
13  Q.   What do you mean by that?
14  A.   It will integrate within normal tissues.
15  Q.   Have you ever removed the entirety of a TVT
16  from a woman?
17  A.   No.
18  Q.   And that would be a very morbid procedure,
19  wouldn't it?
20  A.   No.  It would be a very unnecessary
21  procedure.
22  Q.   Let's -- not disputing "necessary" right
23  now.
24      You don't think it would be morbid at all?

Page 77

1   A.   I didn't say it wouldn't be morbid.  I said
2   it wouldn't be necessary.
3   Q.   Putting aside whether or not you believe
4   it's necessary as a physician, would removal of the
5   entire TVT be a morbid procedure?
6   A.   It depends how it was placed.
7   Q.   Could it be more morbid than an autologous
8   sling, would you call morbid?
9   A.   It could be as morbid as an autologous
10  sling.  Autologous slings can be very difficult to
11  remove.
12  Q.   I'm talking about the -- removing the
13  fascia from the abdomen.  Do you follow me?
14  A.   No.
15  Q.   Let me back up, because I took a step that
16  perhaps we can deal with.
17      My -- let's go back to my simple question.
18  Even though you've never removed the entirety of a
19  TVT from a woman and disagree as to whether or not
20  that would be necessary, would you agree with me
21  that it is a procedure that would require
22  significant dissection?
23  A.   It could require significant dissection.
24  Q.   Of what?

20  (Pages 74 to 77)

Stanley Zaslau, M.D.

Page 78

1    A.    Of the tissue where it was placed.
2    Q.    Using what tools?
3    A.    Standard surgical equipment.
4    Q.    Like Metzenbaum scissors, for example?
5    A.    Right.
6    Q.    So, in other words, you literally have to
7    try to cut it out, but when you're cutting it out,
8    you're taking tissue with it?
9    A.    Well, it's hard to dissect because it's
10   grown into the tissues.
11   Q.    So you're taking tissue with it when you're
12   using these Metzenbaum scissors, right?
13         MS. ROBINSON: Object to form. Asked
14         and answered.
15   A.    You're taking tissue with it.
16   Q.    And that's undesirable?
17   A.    It may or may not be desirable. It depends
18   on what the patient's complaining of or what the
19   problem is.
20   Q.    Well, you'll agree with me that cutting into
21   a woman like that is not something that you would
22   do lightly?
23   A.    Cutting in to do what, to remove an implant?
24   Q.    Correct.

Page 79

1    A.    It's a very straightforward thing when it's
2    done for the right reasons, to remove what mesh
3    needs to be removed.
4    Q.    Have you ever seen a woman erode in one area
5    of the vaginal wall and you remove that mesh, and
6    then she has an erosion in another place later?
7    A.    Sure. You can have that, yes.
8    Q.    So when you just gave your answer that you
9    only remove what's necessary, how do you know that?
10   A.    You have to follow them and see. It depends,
11   again, on why you're removing the mesh. Why are we
12   removing this person's mesh that you're talking
13   about? Is it eroded? Is it extruded? Is it pain?
14   What are we removing it for?
15   Q.    What do you remove mesh for?
16   A.    All the reasons that I just said to you. So
17   someone's mesh is extruded, the easiest thing to do
18   is to remove the extruded portion of it and follow
19   them and see.
20   Q.    Have you always -- let me -- I'm sorry.
21         Are you done with your answer?
22   A.    No.
23   Q.    Go right ahead.
24   A.    So that doesn't mean they can't have

Page 80

1    another area of extrusion later, for other reasons,
2    such as being postmenopausal, being a smoker,
3    having atrophy. So they can have an erosion at
4    another time, from another area that wasn't a
5    problem before then, but then became a problem
6    years later.
7    Q.    Do you tell women that they may have to have
8    multiple -- or that they may have multiple erosions
9    and multiple surgeries?
10   A.    I tell people they need to follow up
11   annually so we can assess them and see what they
12   have that's going on.
13   Q.    But that doesn't answer my question.
14         Do you tell women that they may have
15   multiple erosions and multiple surgeries?
16   A.    It does answer your question, because you
17   have to see what they have that's going on to know
18   what to do for them. That's implied, is that they
19   had surgery, they could have problems that require
20   additional surgery or surgeries.
21   Q.    Again, I'm going to make my question even
22   more simple: Do you when you're consenting a
23   woman that's about to be implanted with
24   polypropylene mesh tell her that she may have

Page 81

1    multiple erosions that require multiple surgeries,
2    yes or no?
3    A.    Yes. I tell them that they will require --
4    that they can require multiple procedures down the
5    road.
6    Q.    Do you tell them that they may have multiple
7    erosions?
8    A.    I don't tell them that they'd have multiple
9    erosions. I tell them that they can have erosion
10   or erosions.
11   Q.    Do you tell them that they may be on chronic
12   pain medication for the rest of their lives?
13   A.    No. I tell them that they may have chronic
14   pain, and that pain -- they may have pain, and that
15   pain may be acute or it may persist and be chronic,
16   and they may require other therapies for that.
17   Q.    You agree that chronic pain is challenging
18   to treat?
19   A.    Yes.
20   Q.    And you would agree with me that improving
21   someone's baseline even 30 percent is sometimes a
22   good outcome?
23   A.    That's the goal of giving people narcotics,
24   to improve them by 30 percent. That's the

21 (Pages 78 to 81)

Stanley Zaslau, M.D.

Page 82

1  definition of pain improvement.
2  Q.   And you would agree with me that they're
3  still missing 70 percent improvement even with
4  narcotics?
5  A.   It depends on the other situation.  There's
6  multiple reasons why a person can have pain.
7  Q.   I'm just trying to get you to agree with
8  some simple math.
9  A.   I'm not understanding where you're getting
10 the simple math from.
11 Q.   You're improving someone's -- your
12 understanding of the reason why pain medications
13 are given is to improve someone's baseline of pain
14 30 percent, and if that happens, that is a good
15 outcome, correct?
16         MS. ROBINSON:  Object to form.
17         Misstates his testimony.
18 A.   That is the goal.  We'd like to improve them
19 more than 30 percent.
20 Q.   So if they only improve 30 percent, they
21 still have 70 percent to go?
22 A.   It may not be possible to obtain that.
23 Q.   And you have seen women that are being
24 treated for chronic pain that is associated with

Page 83

1  mesh that use tramadol?
2  A.   I've seen people use tramadol, yes.
3  Q.   And do you know that tramadol is used by NFL
4  players to treat their pain after games?
5  A.   I don't know what NFL players use to treat
6  their pain.
7  Q.   While we're sitting here in Morgantown, do
8  you know whether or not the Mountaineers use --
9  players use tramadol after games?
10 A.   I don't know that.
11 Q.   Would it surprise you to learn that that's a
12 commonly prescribed pain medication that's used for
13 those players that undergo those collisions?
14         MS. ROBINSON:  Object to form.
15 A.   It wouldn't surprise me, and it wouldn't
16 concern me.  It doesn't relate to me.
17 Q.   But you would believe that there are big
18 side effects associated with chronic pain
19 medication?
20 A.   There are.
21 Q.   And that's something you want to avoid, if
22 at all possible, right?
23 A.   You'd like to, yeah.
24 Q.   So for example, you're aware that Neurontin

Page 84

1  is another medication that's used to treat chronic
2  pain?
3  A.   Yes, it is.
4  Q.   In women that have mesh implants, right?
5  A.   These are all things that have been used,
6  but most people that I come across don't have
7  that and are easily fixed of their chronic pain.
8  Q.   I understand that you're a successful
9  doctor, but you would agree with me that you've
10 also seen women that are being treated with these
11 drugs?
12 A.   Initially, before they come to me, yes.
13 Q.   But you're not saying that it's
14 inappropriate to try to use these things to manage
15 chronic pain or anything?
16 A.   Yeah.  I think you need to find out why they
17 have chronic pain.  You need to figure out why --
18 treating pain only gets rid of the pain.  We need
19 to know what the source of the pain is.
20 Q.   You yourself have used Elavil?
21 A.   I have.
22 Q.   There are side effects associated with that?
23 A.   I prescribe Elavil, yes, if that's what you
24 mean, yes.

Page 85

1  Q.   Have you ever prescribed it to a woman with
2  a mesh implant?
3  A.   I have not.
4  Q.   And you've seen women go back to Neurontin,
5  for example.  That's a medication that has some
6  side effects, right?
7  A.   Sure.  These all do.  But I don't routinely
8  give any of these medicines to these people with
9  chronic mesh pain.
10 Q.   Are you saying that a doctor that tries to
11 do that for a patient that is suffering pain,
12 chronic pain, is not following the standard of
13 care?
14 A.   That's not a standard-of-care issue.  It's a
15 judgment call.  Their judgment is they want to
16 treat pain with pain medicines.  Another way of
17 treating their pain would be to go to what the
18 source might be, to a good physical exam,
19 urodynamics, if necessary, and see if that pain is
20 reproducible, and then there are certainly surgical
21 options that can be performed.
22 Q.   You believe that depression can come about
23 as a result of chronic pain, right?
24 A.   It can go either way.  You can have pain

22 (Pages 82 to 85)

Stanley Zaslau, M.D.

Page 86

1    that causes depression and depression that causes
2    pain.
3    Q.    And you've described that as a vicious
4    cycle?
5    A.    Yes.
6    Q.    Do you tell your clients that they may
7    have -- that may happen to them as a result of a
8    TVT implant?
9    A.    No.  Because they shouldn't have chronic
10   pain from this.  I tell them that they certainly
11   may have pain, but again, you're following them
12   regularly, so you'll know if something has changed
13   in them in their postoperative visits.
14   Q.    Would you agree with me that once somebody
15   starts taking medicine like that, we've described,
16   that there are some things that happen to them
17   medically that you just cannot explain?
18   A.    I don't know what you mean by that.
19   Q.    Well, that's your testimony before.  So
20   that's what you've said before.
21   A.    Well, I don't know the context that it was
22   said in.  What was the question?  What was the
23   situation?
24   Q.    Let me -- I can go there, if we need to, but

Page 87

1    let me try to short-circuit it, given our limited
2    time frame.
3          You've said before once people -- I'll take
4    whether or not you've said it before out of it.
5    I'll just ask you more directly:  Once people start
6    taking chronic -- I'm sorry, pain medication for
7    long-term chronic pain, there are sometimes things
8    that happen to them medically that are not readily
9    explainable?
10         MS. ROBINSON:  Object to form.
11   A.    Yeah.  Like I said, I don't know the context
12   of where that's coming from.
13   Q.    Do you recall saying in the Edwards
14   deposition that with medication there can be
15   idiosyncratic effects that happen that cannot be
16   explained?
17   A.    Yes.
18   Q.    Do you know why you said that?
19   A.    People can have -- idiosyncratic in medicine
20   implies that if something has happened to them that
21   is unexplainable, maybe they have a change in their
22   vision, maybe they have a new onset of muscle pain
23   in muscles that they have never had pain in, so
24   they can have responses or reactions that are not

Page 88

1    explained.
2    Q.    And we want to avoid synthetic things like
3    medicine when we can?
4    A.    Synthetic things?
5    Q.    Well, medicine -- the medicine that we've
6    been talking about is manmade.
7    A.    Right.
8    Q.    And we want to avoid foreign bodies when we
9    can?
10   A.    I don't know about that.
11   Q.    Why not?
12   A.    What do you mean by "foreign bodies"?
13   Q.    Well, you know that the body itself, when
14   it's implanted with anything or we take a drug,
15   there's a foreign body response?
16   A.    The same thing happens when you implant a
17   piece of your own body into it.
18   Q.    So you think that synthetic is preferable to
19   a nonsynthetic?
20   A.    In what context?  You talked to me before
21   about medicines, like Elavil and tramadol, and now
22   you're talking about something synthetic.  So I
23   don't know what you mean by synthetic as a
24   medicine, as opposed to not taking a medicine, or

Page 89

1    synthetic in another context?  I don't know what
2    you're asking me.
3    Q.    Would you agree with me that it's more
4    desirable to try to avoid taking medicines like
5    those we've just described, for example, Neurontin,
6    Elavil, perhaps even oxycodone, right?
7    A.    Yes.
8    Q.    Those are all manmade products?
9    A.    Um-hmm.
10   Q.    You said earlier that you removed -- if I
11   understood you correctly, approximately 200 slings
12   since you've been counting?
13   A.    Yes.
14   Q.    I thought you said in Edwards -- and maybe
15   the numbers have changed since then -- that it was
16   about 75?
17   A.    We're close to that.  My gynecology
18   colleague has -- we've done some together, so I've
19   looked at the patients that he's treated since, you
20   know, we worked together on some cases.  I'm
21   involved in his, and he's involved in mine.  So
22   within the bulk of us, we're probably close to 200.
23   Q.    How many of those are slings compared
24   to prolapses.

23  (Pages 86 to 89)

Stanley Zaslau, M.D.

Page 90

1  A.   Most of them are slings.  Very few of them
2  are prolapse.
3  Q.   Why is that?
4  A.   Slings more commonly performed in terms of a
5  procedure than a Prolift -- a prolapse case.
6  Q.   How many of those 200 were your implants?
7  A.   Two of them were, maybe three or so, but
8  really, less than a handful.
9  Q.   How do you know that?
10  A.   Because they were the only cases I did.
11  They had surgery somewhere else.
12  Q.   As you sit here -- and I'm not going to ask
13  you the names -- but as you sit here, do you know
14  the names of the individuals that had to have their
15  sling removed --
16  A.   No.
17  Q.   -- that were your patients?
18  A.   No.
19  Q.   So why do you come up with the two or
20  three?
21  A.   Because it's a very, very small number of
22  people over the years that I had to remove their
23  slings.
24  Q.   In other words, so approximately 197 or 198

Page 91

1  of the 200 are not implants of yours?
2  A.   That's right.
3  Q.   When you remove those slings, do you report
4  them as adverse events?
5  A.   No.
6  Q.   Why not?
7  A.   Because very few of them were extrusions, so
8  there's no reason to report that.
9  Q.   The few that were extrusions, did you report
10  those as adverse events?
11  A.   No.  Because those are expected
12  complications of the procedure.  The other ones
13  were removed either because patients wanted them
14  removed, or they had obstructive voiding symptoms,
15  or wanted some relief of whatever's going on with
16  them, be it dyspareunia or such.
17  Q.   When someone has dyspareunia and has
18  to have a mesh removed, that's an adverse outcome
19  of a procedure, correct?
20  A.   No.
21  Q.   You don't think so?
22  A.   No.  It is an expected --
23  Q.   Have you asked any of those women whether
24  they think that's a good thing or a bad thing?

Page 92

1  A.   Well, this is an expected complication of
2  pelvic floor surgery.  It's something that should
3  have been discussed with them by any person who
4  does pelvic floor surgery.
5  Q.   So if the rates of complications -- you
6  realize -- let me back up for a second.
7       You realize that there are many physicians,
8  in fact, lots of physicians besides you that
9  disagree with your definition of an "adverse event"
10  and report removals?
11       MS. ROBINSON:  Object to form.
12  Q.   Right?
13  A.   People have different practice ways.
14  Q.   Well, you'll agree with me that there are
15  many physicians because --
16  A.   I don't know who reports what and how -- and
17  what the individual practices are, of who reports
18  things.
19  Q.   So the only reporting that should be done
20  should be in connection with the study is your
21  opinion?
22  A.   I think it should be done in connection
23  with a study, yes.  Unless there's an egregious
24  issue that had gone on with a procedure that was

Page 93

1  untoward and unexpected in any imagination of how
2  it should be performed.
3  Q.   You used the word "untoward" in prior
4  testimony as well.
5       What do you mean by that?
6  A.   If you put a TVT trocar in and you
7  perforate someone's stomach, you should be nowhere
8  near someone to be able to do that, where you
9  perforate an organ that's nowhere in your surgical
10  field.
11  Q.   Wouldn't it be important for the public
12  and/or physicians and ultimately patients to know
13  that the rates of complications are high?
14  A.   Who said they were high?
15  Q.   Or low?
16  A.   Well, we know that they're low.  We've seen
17  that through the literature.
18  Q.   So the sole basis, besides what's in your
19  hands, meaning your own experience, that the
20  complications are low -- actually, I'm going to ask
21  the question a better way.
22       You rely on the literature and your own
23  experience to conclude that the complications
24  associated with the TVT are low, correct?

24 (Pages 90 to 93)

Stanley Zaslau, M.D.

Page 94

1    A.    I also rely on presentations of the AUA,
2    Webinars from other societies, position statements
3    by societies.
4    Q.    So if physicians believe that you should be
5    reporting removals for dyspareunia as an adverse
6    event, you would disagree with them?
7    A.    I didn't say I would disagree with them.  If
8    there's a national standard that has been accepted
9    and put in place by a specialty board, then we all
10   should follow the same standards.
11   Q.    Do you?
12   A.    I do not report them.
13   Q.    Do you follow the standards?
14   A.    Yes.
15   Q.    You're certain?
16   A.    I follow the standards.
17   Q.    Has it been your practice in all 200 or so
18   of those surgeries to send what you've removed to
19   pathology?
20   A.    Yes.
21   Q.    And if I understand what you've said before
22   about that, you see localized chronic inflammation
23   when you get it back?
24   A.    Yeah.  Well, the vast majority have

Page 95

1    localized chronic inflammation.
2    Q.    And you see some fibrotic bridging?
3    A.    We see some fibrosis.
4    Q.    What's the difference?
5    A.    Fibrosis is a scar formation as a result of
6    fibroblast infiltration of tissue.  Breaching may
7    be such that the pore size of the mesh will shrink
8    in a way to create more of a bridge of scar.
9    Q.    And you've seen that in some of these
10   pathology samples that -- where you've removed the
11   mesh, right?
12   A.    I haven't seen that, no.
13   Q.    You've seen fibrosis, though?
14   A.    I've seen fibrosis.
15   Q.    And the scarring, you believe, that's
16   undesirable?
17   A.    No.  Scarring is a part of healing.
18   Fibrosis is a part of healing.
19   Q.    Well, you have said before, though, that
20   with respect to tensioning, for example, that
21   getting scarring as a result of too much tension is
22   undesirable and can cause pain, right?
23   A.    Yes.
24   Q.    So you agree with the statement I just made?

Page 96

1    A.    That undue tensioning can be associated with
2    pain, yes.
3    Q.    And that's because of scarring?
4    A.    It may.  It may also be other causes as
5    well.
6    Q.    When you look at these pathological
7    examples, do you see evidence of foreign bodies?
8    A.    Some -- what do you mean by "foreign body"?
9    I mean, mesh is a foreign body.
10   Q.    What else do you see?
11   A.    It depends what the specimen is looked for.
12   Oftentimes I'll see evidence of chronic inflamma-
13   tion, multinucleated giant cells, areas of fibro-
14   blast infiltration.  Very few, if any, had any acute
15   inflammatory process, neutrophils and such.  And
16   some, depending upon the pathologist, may show the
17   presence of polarizing tissue or polarizing fibers.
18   Q.    And you've seen tissue that is wound up in
19   the mesh?
20   A.    I've seen tissue that's incorporated in the
21   mesh.
22   Q.    You don't test for degradation?
23   A.    Degradation, why?
24   Q.    No.  I just asked, do you test for

Page 97

1    degradation?
2    A.    We don't specifically test for it.
3    Q.    Have you ever had to tug on the mesh to get
4    it out when you're doing removal?
5    A.    I'm trying to dissect it to get down to
6    where you think it is.  Oftentimes there's a lot
7    of scar depending upon where it was placed and who
8    placed it.  And we try not to tug on it.  We try to
9    dissect it as free and as easily as we can.
10   Q.    Would you be surprised to know that even
11   some urologists that are even more experienced than
12   you have had to literally wrap their hands around
13   the a piece of mesh and tug on it to get the rest
14   of it out?
15         MS. ROBINSON:  Object to form.
16   A.    I would hope they wouldn't do that.  There's
17   no reason to do that.  I wouldn't be surprised that
18   they would do that, but it's not necessary.
19   Q.    Some have done that, right?
20   A.    I haven't heard of anyone who has, but since
21   you say, I'm sure somebody has, and there's no
22   reason for them to do it.
23   Q.    Can you guarantee a woman that you can get
24   all of her mesh out?

25 (Pages 94 to 97)

Stanley Zaslau, M.D.

Page 98

1  A.   No.  And there's no reason to.
2  Q.   Is it foreseeable that someone with a TVT
3  mesh in them may need to have other surgeries in
4  that area?
5  A.   Sure.
6  Q.   And, in fact, a woman may present to you as
7  healthy and a perfect candidate for the TVT on
8  April 1st of 2016, but by December 31st of 2016,
9  she may be in poor health and may need surgery in
10  the area in which that TVT was implanted?
11  A.   I don't understand what you're referring to.
12  They shouldn't need surgery there.  We assume
13  they've had a good exam, they have no other
14  prolapse and no other findings, that they shouldn't
15  need any other surgery.
16  Q.   But it's perfectly possible that they might?
17  A.   I'd have to know the situation.  I don't
18  know what we would possibly be going in there for.
19  Q.   Do you use the TVT mechanical-cut or the
20  TVT laser-cut mesh?
21  A.   I use them both.
22  Q.   Do you make a specific request for one over
23  the other?
24  A.   No.

Page 99

1  Q.   And how do you know whether or not you're
2  using a mechanical-cut versus a laser-cut mesh?
3  A.   Well, I actually didn't know the difference
4  until these litigation cases have brought this into
5  the world.  I've had no issues with -- in knowing
6  the difference in either of them, nor do I think it
7  has any clinical relevance.
8  Q.   Well, do you disagree with Ethicon?
9  A.   I don't see any difference in either of the
10  two.
11  Q.   Well, I'm asking you:  Do you disagree with
12  Ethicon?
13        MS. ROBINSON:  Object to form.
14  A.   With regard to what?
15  Q.   Well, Ethicon felt that there was a clinical
16  need for a laser-cut mesh, didn't it?
17        MS. ROBINSON:  Object to form.  If you
18        know the answer to it.
19  A.   I don't know that they -- I know that they
20  have -- that information had been given to them,
21  that, you know, maybe this should be considered,
22  and obviously they did.  But it wouldn't have
23  mattered to me.  I've not seen a difference or a
24  need for it.

Page 100

1  Q.   Okay.  So you personally have not seen a
2  different need for it, but you would agree with me
3  that Ethicon received information, and as a result
4  of receiving that information, it concluded that
5  there was a clinical need for laser-cut mesh?
6        MS. ROBINSON:  Object to form.
7  A.   I don't know that there's a true clinical
8  need.  It doesn't make sense to me that --
9  Q.   So in other words, there's no need for
10  laser-cut mesh?
11  A.   I don't think there's a need for it.
12  Q.   So Ethicon is just making this up?
13  A.   I didn't say they're making it up.  I just
14  said that I don't think there's a need for it.  I
15  haven't seen a difference in my patients that I can
16  say, "Wow, I'm so happy that I used laser-cut mesh
17  and not mechanically-cut mesh."
18  Q.   Well, you would expect Ethicon to make its
19  decisions based upon good medicine and science,
20  right?
21  A.   I would expect them to have good reason for
22  the things that they do.
23  Q.   So if they concluded that there was a
24  clinical reason to come up with a TVT laser cut,

Page 101

1  you'd have to trust their judgment?
2  A.   I would hope they would make good decisions.
3  Q.   And do you know how many TVT mechanical-cut
4  meshes you've implanted in your career?
5  A.   Well, the changeover is about 2007 or 2008,
6  so I don't know, 200 or so.
7  Q.   Do you know how many TVT laser-cut you've
8  implanted in your career?
9  A.   In 2007-2008 to the present, probably 150 or
10  so.
11  Q.   As you sit here today, do you believe that
12  laser-cut is the only type of TVT mesh that is
13  offered, or is mechanical-cut still available?
14  A.   No.  I think that mechanical is still
15  available.
16  Q.   Have you ever been told by Ethicon that
17  there are different risk profiles for the TVT
18  mechanically-cut versus the TVT laser-cut?
19  A.   What do you mean by "risk profile"?
20  Q.   That the TVT mechanical-cut comes with
21  different risks than the TVT laser-cut?
22  A.   Risks of what?
23  Q.   Risks to the patient.
24  A.   No.

26 (Pages 98 to 101)

Stanley Zaslau, M.D.

Page 102

1  Q.    Has anyone ever told you that the TVT
2  mechanical-cut mesh can rope?
3  A.    Yes, I've heard that.
4  Q.    From who?
5  A.    From review of the literature.
6  Q.    Have you ever observed that?
7  A.    Yes.
8  Q.    When?
9  A.    When we do different experiments with the
10 mesh ex vivo.  So when we pull on the mesh by
11 itself, be it mechanically-cut or laser-cut, it'll
12 rip and tear, and it won't regain its normal form.
13 And the pore size will certainly be distorted.
14 But, interestingly, when we do the same thing with
15 the plastic sheath over it, we can't move the mesh
16 despite how hard we pull.  We've actually even
17 looked with an operative telescope at patients
18 that we finished doing the TVT on to see if there
19 is any evidence of fiber loss or any change in
20 what I think the mesh should look like, and I've
21 never seen any.
22 Q.    Have you published the results of that
23 testing?
24 A.    We did not.

Page 103

1  Q.    Where's the data to back up that claim?
2  A.    It's personal experience and just bedside
3  teaching.
4  Q.    So I just have to take your word for it?
5  A.    That's correct.
6  Q.    There's no data that I can look at or cross
7  examine to test the veracity of that statement?
8  A.    To test the veracity of what I just said
9  about pulling them and rip -- and pulling them
10 apart?  Well, certainly, you can look at what your
11 own experts and the pictures that they have
12 provided about stretching mesh ex vivo and you'd
13 see particle movement and flaking of that,
14 certainly.
15 Q.    I'm talking about what you did, though.
16 A.    I don't know that anyone else has done that.
17 But --
18 Q.    So it's you and your partners looking
19 right after a surgery before there's been mesh
20 ingrowth?
21 A.    Right.
22 Q.    Have you ever been told that TVT mesh can
23 curl?
24 A.    I've been told that, yes.

Page 104

1  Q.    By whom?
2  A.    By review of the literature.
3  Q.    And have you ever been told that the TVT
4  mechanical-cut mesh can release -- that there can
5  be particle loss associated with the mechanical-cut
6  mesh?
7  A.    I've read that.
8  Q.    And my understanding is you don't believe
9  that has clinical significance?
10 A.    I don't think it does.
11 Q.    You would agree with me, though, that it's
12 well-established in the scientific and medical
13 literature that particles that are of a foreign
14 body cause a foreign body response, correct?
15 A.    When you say "foreign body," you're
16 referring to mesh as a foreign body, right?
17 Q.    Correct.
18 A.    So you're not referring to autologous
19 slings.  That's a foreign body, too.  It has no
20 blood supply, so they can cause a foreign body
21 reaction, too.
22 Q.    You're not answering my question.  I'm not
23 talking about autologous slings right now.  I'm
24 talking about particle loss associated with the

Page 105

1  mechanical-cut mesh.  Let's stick to that for a
2  moment, just to finish this line of questioning.
3         You would agree with me that you've seen
4  reports of that in the literature?
5  A.    Yes.
6  Q.    And you would agree with me, given your
7  hefty reliance list, that you've also seen some
8  Ethicon documents on that?
9  A.    Yes.
10 Q.    And you still conclude, even after reviewing
11 those documents and that literature, that there is
12 no clinical relevance to that issue?
13 A.    That's correct.
14 Q.    And you would agree with me that the
15 particle loss that Ethicon describes, as well as
16 the literature, is from the TVT mesh itself --
17        MS. ROBINSON:  Object to the form.
18 Q.    -- which is a foreign body?
19 A.    That the particle loss is from the TVT?
20 Q.    Correct.  It's pretty well-accepted, right?
21 A.    Yeah.
22 Q.    I'm not trying to start a disagreement
23 between us.  I'm just trying to get through this.
24        And you would agree with me that your

27 (Pages 102 to 105)

Stanley Zaslau, M.D.

Page 106

1  opinion differs from other physicians about the
2  clinical relevance of particle loss?
3  A.   It differs.
4  Q.   In what way?
5  A.   Well, experts believe that this can be a
6  source of pain for patients, and other associated
7  symptoms that are supposedly debilitating and
8  lifelong and very problematic.
9  Q.   And you would agree with me that Ethicon
10 itself concluded, at least in part, that the
11 clinical basis for coming up with the laser-cut
12 mesh was the particle loss associated with the
13 mechanical-cut mesh?
14         MS. ROBINSON:  Object to form.
15 A.   That may have been a consideration for them
16 but --
17 Q.   In fact, you've seen documents that suggest
18 that?
19 A.   Yeah.
20 Q.   And your reliance list.  Even you've seen
21 Ethicon documents that suggest that's a clinical
22 basis for changing the laser-cut mesh, right?
23 A.   It very well could be.
24 Q.   I mean, you're not going to disagree with a

Page 107

1  document that you've seen that says that, right?
2         MS. ROBINSON:  Object to form.  Asked
3      and answered 100 times.
4  Q.   Correct?
5  A.   I have no other comments.
6         MR. WALLACE:  Let's take a five-minute
7      break.
8         (Brief break at 1:41 p.m.)
9         (Back on at 1:44 p.m.)
10 BY MR. WALLACE:
11 Q.   These Ethicon documents that we've been
12 discussing for the last several minutes about
13 particle loss and the clinical implications of
14 that, did Ethicon share those with you prior to
15 your being hired as an expert?
16 A.   No.
17 Q.   Were any internal Ethicon documents ever
18 shared with you prior to you being hired as an
19 expert?
20 A.   No.
21 Q.   So the Ethicon documents that you had access
22 to would include anything that was provided to you
23 in the instructions for use and anything that might
24 have been given to you by a sales representative,

Page 108

1  right?
2  A.   Yes.
3  Q.   And as I understand it, given your
4  academic setting or at least your setup now at
5  the university, sales representatives don't have
6  unfettered access, do they?  Right?
7  A.   They do have significant access to us, yes.
8  Q.   They have access to you?
9  A.   Yes.
10 Q.   Have you ever testified differently?
11 A.   They have access to us, but in different
12 settings.  In other words, industry or
13 product-based reps can come to the operating room
14 They always have been able to, and they still are
15 able to.
16 Q.   So you see Ethicon representatives actually
17 in the operating room at the university when a
18 TVT's being implanted?
19 A.   We don't see them now.  We don't see -- we
20 just don't see reps from them.  I haven't seen an
21 Ethicon rep in years.
22 Q.   Why not?
23 A.   I don't know.  But they are allowed to.  We
24 have other device reps that are in the OR all the

Page 109

1  time.
2  Q.   I guess what I'm asking you is, what
3  information did you have from Ethicon up until the
4  time you were hired as an expert?
5  A.   The IFU.
6  Q.   What else?
7  A.   Certainly, the -- our classic core
8  textbooks, articles, meetings that we've attended.
9  Q.   Did you have textbooks from Ethicon?
10 A.   No.  The core textbooks of urology.
11 Q.   Okay.  I'm specifically asking you about
12 Ethicon documents.  There are things that are
13 called slick sheets, are you familiar with those?
14 A.   What sheets?
15 Q.   Slick sheets.
16 A.   What's that?
17 Q.   Okay.  The fact that you're asking about it
18 must mean that you don't have it.  Those are
19 laminated instructions.
20 A.   No.
21 Q.   So Ethicon didn't give you those?
22 A.   No.
23 Q.   You basically had the instructions for use,
24 and that was the only document, per se, that was

28 (Pages 106 to 109)

Stanley Zaslau, M.D.

Page 110

1  given to you by Ethicon in connection with the TVT
2  device, right?
3  A.   Yes.
4  Q.   In other words, you were never given the
5  seven-year Prolene dog study, right?
6  A.   No.
7  Q.   You were never given PowerPoints, for
8  example, that might have been put together on the
9  concept of degradation of polypropylene?
10  A.   No.
11  Q.   None of that information was shared with
12  you, right?
13  A.   That's correct.
14       MS. ROBINSON:  And just so the record's
15  clear --
16  Q.   Let me finish, and then you can make it.
17       And just to be clear, that information that
18  is included on your reliance list was only provided
19  to you after you agreed to testify on Ethicon's
20  behalf?
21  A.   Yes.
22       MS. ROBINSON:  That was my question.
23  You keep saying "never" and so forth.
24       MR. WALLACE:  I was going there.

Page 111

1       Can you mark this as an exhibit?
2       (Deposition Exhibit No. 5 was marked for
3            identification.)
4  Q.   You've been handed Exhibit 5.  Do you
5  recognize that as a set of instructions for use for
6  the TVT?
7  A.   Yes.
8  Q.   And it's in various languages.  Do you see
9  that?
10  A.   Yes.
11  Q.   Is this what would come in the package?
12  A.   Yes.  An instruction sheet comes in every
13  package.
14  Q.   And the instructions provide
15  contraindications and warnings, correct?
16  A.   It's supposed to.
17  Q.   Well, with respect to the TVT, it came with
18  that, correct?
19  A.   I'm trying to find the English one.  But
20  it's supposed to.
21  Q.   If you look at the Bates number ending in
22  383, and, actually, the page before it, 382 --
23  A.   Yes.
24  Q.   -- there's a list of contraindications and

Page 112

1  warnings.
2  A.   Um-hmm.
3  Q.   Do you see that?
4  A.   Yes.
5  Q.   It says that the Prolene polypropylene mesh
6  will not stretch significantly.  Do you see that?
7  A.   Um-hmm.
8  Q.   In fact, you would agree with me that mesh
9  shrinks?
10  A.   I don't know that it shrinks.
11  Q.   Well, you've said that hernia mesh shrinks,
12  right?
13  A.   Yes.
14  Q.   What's the difference between the mesh
15  that's used in Ethicon's hernia meshes and the TVT?
16  A.   Well, the data you're referring to is hernia
17  meshes that were removed, so they determined that
18  it contracted.  But TVT mesh or vaginal mesh might
19  behave differently.
20  Q.   Do you believe that the properties are
21  different?
22  A.   Yes.
23  Q.   How?
24  A.   Well, hernia mesh is often thicker,

Page 113

1  other materials are used for it.  It provides a
2  different kind of support.
3  Q.   Well, let's talk about Ethicon hernia mesh.
4  Ethicon hernia mesh, isn't that the same thing as a
5  TVT in terms of the material?
6  A.   If it's polypropylene macropore and
7  monofilament, then it should be the same.
8  Q.   Okay.  But you -- so in other words, you
9  have no scientific basis to disagree with me that
10  the TVT mesh contracts in the same way that the
11  hernia mesh does?
12  A.   There's other data that you can extrapolate,
13  physical exam data, Q-tip testing, and how that
14  doesn't result in a worsening of a patient's
15  hypermobility after a TVT is placed looking out at
16  a year, there's ultrasound data showing increase
17  in visualization of the mesh because of hyperechoic
18  particles of it that increase over time, suggesting
19  that it doesn't contract, it probably remains the
20  same, and it doesn't move, either.
21  Q.   So you don't believe that a TVT mesh, once
22  incorporated into -- as it incorporates into the
23  tissues contracts at all?
24  A.   As it incorporates in tissue, when placed

Stanley Zaslau, M.D.

Page 114

1  normally, when placed according to the IFU and also
2  placed according to what a reasonable surgeon
3  should know how to do in terms of dissection
4  and being away from the urethra and following a
5  normal tissue plane and placing it tension-free,
6  then yes, it shouldn't change.
7      Q.    In other words, if it's put in properly, you
8  do not believe that the TVT contracts?
9      A.    I don't think so.
10     Q.    Even when it's undergoing mesh incorporation
11  with the tissues in the body?
12     A.    It shouldn't contract.
13     Q.    And yet, you still believe that hernia mesh
14  contracts?
15     A.    Yes.
16     Q.    And you don't believe that the TVT Prolene
17  mesh is the same kind of mesh that exists in the
18  old hernia meshes at Ethicon?
19     A.    I'm not sure of the specifics of whether
20  it's the same or not.  I don't do hernia surgery.
21     Q.    What if they are?
22     A.    Then they are.
23     Q.    Does it change your opinion?
24     A.    No.

Page 115

1      Q.    Do you believe that tensioning affects
2  shrinkage?
3      A.    Placing something on tension that shouldn't
4  be tensioned can have significant changes to
5  outcome.
6      Q.    Do you believe Ethicon is responsible to
7  tell physicians how to properly tension the device?
8      A.    They have.
9      Q.    So you believe that they properly instruct
10  physicians on how to do that?
11     A.    I think their initial description of that
12  was adequate, and I think the modifications that we
13  have made from the original videos from 1998 and
14  the original teachings of it have made it --
15  created other opportunities for us to tension --
16     Q.    Who's "we"?
17     A.    "We" as in urologists who are -- and
18  urogynecologists and the gynecologists from the
19  publications, presentations.
20     Q.    What happens if the tension is not right?
21     A.    What does that mean by "not right"?
22     Q.    Too tight?
23     A.    Too tight, then you can have a whole host of
24  symptoms in patients.

Page 116

1      Q.    What does "minimal tension" mean?
2      A.    Minimal tension means that the graft is
3  placed without any other tissue or structure
4  impeding it, so it's not creating pressure on
5  another structure, such as the urethra or the
6  vaginal wall.
7      Q.    That's a subjective measurement.
8      A.    It's subjective, yes.
9      Q.    And using the word "loosely" is also a
10  subjective description, correct?
11     A.    That's right.
12     Q.    And if I understand your prior testimony
13  correctly, you don't place the TVT laser-cut mesh
14  any differently than you do the mechanical-cut
15  mesh?
16     A.    That's right.
17     Q.    And you would tell me that it's also your
18  testimony that whether or not it's laser-cut or
19  mechanical-cut does not affect the tension?
20     A.    It does not.
21     Q.    So you disagree with Ethicon's own medical
22  director on that?
23     A.    I don't think it has any difference in my
24  practice.

Page 117

1      Q.    If the device is not tensioned correctly, do
2  you believe that's the fault of the physician?
3      A.    Yes.
4      Q.    And you know that tension can cause
5  scarring, and you want to avoid that because that
6  can cause pain?
7      A.    Yes, it can.
8      Q.    Would you agree with me that overtightening
9  is easy to achieve?
10     A.    Oh, yes.
11     Q.    Where is chronic pain listed in Exhibit 5?
12     A.    I don't see that it is.
13     Q.    It's not listed in the instructions for
14  use that existed before 2015, right?
15     A.    Right.
16     Q.    And as an expert that's been hired by
17  Ethicon to opine on the safety and efficacy of
18  the TVT device, you would agree with me that the
19  2015 version of the IFU was much more complete
20  when it comes to listing the complications and
21  warnings that may be relevant to the TVT device,
22  right?
23         MS. ROBINSON:  Object to form.
24     A.    I'd say it's a more lengthy list of

30 (Pages 114 to 117)

Stanley Zaslau, M.D.

Page 118

1    complications.  I'm not saying that it should or
2    should not have been in the original version.
3    Q.    Does the original version list dyspareunia
4    as a risk?
5    A.    No.
6    Q.    Does it even use the word "dyspareunia"?
7    A.    No.  But that's understood.  It's a pelvic
8    surgery, and any pelvic surgery can have those
9    risks.
10   Q.    So you don't believe that a medical device
11   company is obligated to put in the risks that are
12   associated with this device?
13   A.    The risks associated with that specific
14   device that are different from other devices and/or
15   other surgeries and ways that we do things.
16   Q.    And you would agree with me that your
17   opinion is different from any other physician's on
18   that issue, correct?
19   A.    I don't know that.
20   Q.    You would agree with me that your opinion on
21   that issue is different than the standards that
22   apply to warnings, right?
23   A.    No.
24   Q.    You're not a warnings expert?

Page 119

1    A.    I am familiar with warnings, yes.
2    Q.    But you're not a warnings expert?
3    A.    Is it on my CV that I am?  No.
4    Q.    I don't see it.  I'm asking you, you're not
5    a warnings expert, are you?
6    A.    I'm knowledgeable about warnings.
7    Q.    But are you a warnings expert, yes or no?
8    A.    I can't answer that question.
9    Q.    Why not?
10   A.    I'm knowledgeable about warnings as they
11   pertain to me.
12   Q.    Why can't you answer that question?
13   A.    I can't answer that question.
14   Q.    Have you been hired to opine on the warnings
15   in this case as a warnings expert or not?
16   A.    Yes.
17   Q.    You have?
18   A.    Yes.
19   Q.    You believe you have?
20   A.    Um-hmm.
21   Q.    And you believe that you're an expert with
22   respect to the Ethicon warnings?
23   A.    Yes.
24   Q.    Why?

Page 120

1    A.    Because these -- the warnings that are
2    placed on us are warnings that are appropriate to
3    this particular device, that are germane to this
4    device.  But there are other warnings that are not
5    listed that could occur with this surgery or any
6    other ones that are performed.
7    Q.    And you realize that your testimony differs
8    from the standards that apply to warnings, right?
9    Because as a warnings expert that's been hired by
10   Ethicon, you've done your due diligence, naturally,
11   and have reviewed those standards, right?
12   A.    Yes.
13   Q.    And what are the standards?
14   A.    There's a standard form when an IFU is put
15   together.  There's material on sections that need
16   to be followed.  But the material that's placed in
17   there is under the discretion of the company itself
18   with further conjunction.
19   Q.    That's not true, is it?
20   A.    What's not true?
21   Q.    You are supposed to list all known risks.
22   That's what the standards require, right?
23   A.    All known risks related to that product.
24   Q.    So your definition that it has to be only

Page 121

1    related to that product is inaccurate, correct?  It
2    does not match the standards?
3    A.    No.
4    Q.    You just said, Doctor, that all known risks
5    related to the product have to be listed.
6    A.    That are specific to that product and not
7    other things that could be known by surgeons to do
8    other procedures.
9    Q.    And what's the name of the standard that
10   you're citing to?
11   A.    Citing to what?
12   Q.    That requires that only risks relating to
13   that product?
14   A.    That's the Blue Book for looking at the FDA
15   requirements.
16   Q.    Death is listed with anesthesia, and that's
17   not unique to anesthesia.
18   A.    Maybe.
19   Q.    So do you want to change your testimony?
20   A.    No.
21   Q.    So if the standard that you believe exists
22   that in -- and controls this issue is different
23   than your testimony, would you amend your
24   testimony to reflect that of the standard?

31 (Pages 118 to 121)

Stanley Zaslau, M.D.

Page 122

1  A.   If I'm told of other information, I
2  certainly would be happy to review it.
3  Q.   Fair enough, Doctor. But what I'm getting
4  at is, if your testimony directly conflicts with
5  this standard, would you agree that the standard
6  controls?
7        MS. ROBINSON:  Object to form. He's
8        asked and answered that question six times.
9  Q.   He has not answered that question. And I'm
10 going to ask the court reporter to read it back
11 now, and ask you to restrict your comments.
12       Please read the question back.
13       (Record read.)
14 Q.   Can you answer that question, yes or no?
15 A.   I can't answer it yes or no. I need to
16 review what the standard is or what you're
17 referring to.
18 Q.   Well, you cited the Blue Book. Are you
19 familiar with the Blue Book?
20 A.   I've looked at it.
21 Q.   And all I'm asking is if your testimony
22 conflicted with the Blue Book, would you or the
23 Blue Book control?
24 A.   The Blue Book controls.

Page 123

1        MR. WALLACE:  Can you mark this,
2        please?
3        (Deposition Exhibit No. 6 was marked for
4        identification.)
5  Q.   You've been handed what's been marked as
6  Exhibit 6; is that right?
7        And you recognize that as a 2015
8  instructions for use, correct?
9  A.   Yes.
10 Q.   And if you look to page 5 -- actually, pages
11 4 and 5, you'll see that under "adverse reactions,"
12 "Acute and/or chronic pain" is now listed, right,
13 on page 5?
14 A.   Yes.
15 Q.   And that was not in the prior instructions
16 for use, right?
17 A.   That's correct.
18 Q.   And the chronic pain is different from
19 transitory pain, right?
20 A.   Yes.
21 Q.   And "Pain with intercourse," which in some
22 patients may not resolve, is listed in the 2015
23 IFU, but not in the prior IFUs, correct?
24 A.   That's correct.

Page 124

1  Q.   And the adverse reaction that says "one or
2  more revision surgeries may be necessary to treat
3  these adverse reactions" is listed for the first
4  time in the 2015 IFU, correct?
5  A.   That's correct.
6  Q.   None of what I just read was in any prior
7  version of the instructions for use, correct?
8  A.   That's right.
9  Q.   You are aware, in connection with your
10 reliance list with documents, internal Ethicon
11 documents that state that fraying is a defect,
12 correct?
13 A.   No.
14 Q.   You haven't seen that?
15 A.   No.
16 Q.   Have you seen any documents concluding that
17 mesh degrades?
18 A.   No.
19 Q.   So you haven't seen any internal Ethicon
20 documents indicating that mesh degrades?
21 A.   No.
22 Q.   Did you ask for any?
23 A.   No.
24 Q.   Why not?

Page 125

1  A.   Because it doesn't degrade.
2  Q.   So you disagree with Ethicon?
3  A.   I do.
4  Q.   And you would agree with me that there are
5  some very smart people at Ethicon?
6  A.   There are.
7  Q.   And you consider them your partners in
8  healthcare?
9  A.   My partners in healthcare --
10 Q.   That's what you said earlier.
11 A.   Sure. They're my partners in healthcare.
12 Q.   And you expect them to give you accurate
13 information?
14 A.   Right. When it's pertinent.
15 Q.   And you would agree with me that
16 polypropylene mesh can chemically degrade?
17 A.   No. I think it's conflicting. I certainly
18 know that your experts have data that states that
19 it may, and I can show you data that states that it
20 doesn't.
21 Q.   You don't recall saying that it's possible
22 that polypropylene mesh can degrade?
23 A.   I don't believe that it can have any
24 significant degradation. Certainly, mesh can

32 (Pages 122 to 125)

Stanley Zaslau, M.D.

Page 126

1  change.
2  Q.   Let's change the questioning so I don't have
3  to ask you 20 questions, and we're not arguing
4  about it.
5       I'm going to ask you a more basic question.
6  Putting aside whether you believe it has clinical
7  relevance, do you believe that mesh can chemically
8  degrade?
9  A.   I think mesh can degrade.  I don't know that
10  it can degrade chemically.
11  Q.   In any event, you believe that mesh can
12  degrade, but it is also your opinion that that has
13  no clinical relevance?
14  A.   Yes.
15  Q.   So you disagree with any Ethicon documents
16  or any literature anywhere that suggests that
17  degradation can cause pain in a person with mesh?
18       MS. ROBINSON:  Object to form.
19  A.   I'd have to see those documents in specific
20  of what you're referring to.
21  Q.   Well, why haven't you looked at them?
22  They've been provided to you by Ethicon.
23  A.   I've looked at material that I think is
24  pertinent for each case.

Page 127

1  Q.   Well, you're giving a general opinion about
2  the TVT, right?
3  A.   I'm giving a general opinion about the TVT,
4  yes.
5  Q.   And you agree with me that there are people
6  that have opined for Plaintiffs that mesh degrades
7  and has clinical relevance?
8  A.   They believe that it does, yes.
9  Q.   And you're aware of case reports, for
10  example, that demonstrate that the TVT is often
11  taken out in pieces?
12  A.   Yes.
13  Q.   Yet is it still your opinion, knowing all
14  of that, that you didn't think it was relevant to
15  review degradation documents?
16  A.   I didn't say I didn't review degradation
17  documents.  What I'm telling you is that I don't
18  believe that the information that your experts
19  suggest is clinically relevant, and I have the
20  documentation that believes otherwise.
21  Q.   Did you see any documents where Ethicon
22  believed that degradation might affect erosion
23  rates?
24  A.   No. I don't know of that.

Page 128

1  Q.   Would it surprise you to know that that was
2  investigated by Ethicon?
3  A.   I'm sure that they investigated a lot of
4  things.
5  Q.   Do you believe that those specific effects
6  of polypropylene degradation on erosion rates is
7  known?
8  A.   I don't think it's known completely, no.
9  Q.   Do you agree with Ethicon if it said
10  degradation is a process which initiates after a
11  few days postimplant?
12  A.   No.
13  Q.   Have you seen any documents that conclude
14  that, any animal studies, for example?
15  A.   That degradation occurs postimplant?  There
16  have been studies of dogs, there's some studies --
17  there's animal studies that people have looked at.
18  Q.   Anything else?
19  A.   There have been some mesh removal studies,
20  but I don't think that there are -- even the ones
21  that your own experts cite are not conclusive in
22  saying that there truly is degradation.
23  Q.   You don't know what additives are in the
24  mesh, right?

Page 129

1  A.   No.
2  Q.   And you haven't undertaken an investigation
3  to understand the process of degradation, right?
4  A.   I've taken an effort to understand the
5  process, yes.
6  Q.   What is it?
7  A.   What is what process?
8  Q.   Well, you've said you've undertaken an
9  effort to understand the process, so why don't you
10  tell me what the process is.
11  A.   Degradation would imply that there's
12  breakdown of mesh fibers, okay, and that could be
13  visualized on a specimen. So, certainly, you'd have
14  to remove mesh to look at the fibers and see if
15  that were the case.  The problems with that is that
16  studies that are often quoted were removed to
17  patients who have had pain or problems or
18  infection, so we don't know what happens in mesh
19  that's not removed in normal people.  So that's
20  certainly one of the problems.
21       The other problem is that even within those
22  studies, the type of reactions that occur are not
23  well understood or supported.  Further, the tissue
24  that you're removing, you're not just removing

33 (Pages 126 to 129)

Stanley Zaslau, M.D.

Page 130

1    mesh; you're removing tissue with the mesh, so
2    pulling it, stretching it, changing its
3    configuration is going to change what that mesh
4    looks like under the microscope.
5         Further, looking at things like formalin and
6    how that has been used, there have been studies
7    that show that formalin may cause degradation, but
8    there are others that specimens were preserved with
9    formalin that showed no change in it, so. . .
10   Q.   What are the studies that show formalin
11   causes degradation?
12   A.   Let me take a minute. I don't remember
13   the specific study that showed that. I do
14   remember reading that. But in some of the ones I
15   looked at for degradation, there was no formalin
16   effect. I think it's controversial. In a study by
17   Woodruff, which looked at these meshes and also
18   looked at biological grafts, these implants were
19   actually placed in formalin.
20   Q.   Okay. But I've asked you to explain the
21   process as you understand it. Can you tell me
22   anything chemically about the process of
23   degradation?
24   A.   Well, it may relate to oxidizers. It may

Page 131

1    relate to bacteria that theoretically could do
2    that, although that's not clearly proven. Peroxide
3    may have an effect on that as well, but that's not
4    entirely clear. And if that is -- and if it does
5    occur, it doesn't have any clinical significance.
6    Q.   But you agree with me that there are
7    documents and literature that show degradation in a
8    mesh, a transvaginal mesh that has been removed for
9    pain?
10   A.   There are documents that show that.
11   Q.   There are -- there's literature that shows
12   that, too?
13   A.   There are documents that show that.
14   Q.   And just so we're on the same page,
15   documents also means literature in your answer,
16   correct?
17   A.   They're papers. They're papers.
18   Q.   Peer-reviewed literature?
19   A.   Yes.
20   Q.   Thank you. You've seen the AUGS and SUFU
21   statement, right?
22   A.   Yes.
23        (Deposition Exhibit No. 7 was marked
24        for identification)

Page 132

1    Q.   You've been handed a document that's been
2    marked as Exhibit 7. Do you recognize it?
3    A.   Yes.
4    Q.   If you look at the bottom, you'll see the
5    statement that "'the safety and effectiveness of
6    multi-incision slings is well-established in
7    clinical trials that followed patients for up to
8    one year.'"
9         Do you see that? The very bottom of the
10   first page?
11   A.   Yes.
12   Q.   Is this what you give your patients?
13   A.   I don't give them that, no.
14   Q.   You referenced earlier, though, a statement?
15   A.   Yes.
16   Q.   About the position statement that you
17   provide to your patients.
18        What do you mean by that?
19   A.   With information from the position
20   statement, which is included further here, which
21   show the justifications. I provide them with the
22   justifications.
23   Q.   Okay. So in other words, you took the
24   justifications on page 2, which provide the reasons

Page 133

1    why polypropylene mesh should be used and give it
2    to your patients?
3    A.   I discuss each of these with them, yes.
4    Q.   When you say "each of these," there are four
5    reasons?
6    A.   Right.
7    Q.   Do you believe you're an advocate for the
8    use of mesh?
9    A.   I am.
10   Q.   And so in providing this to your patients
11   who may be considering this procedure, you're being
12   an advocate for mesh?
13   A.   Yes.
14   Q.   And would you agree with me that showing the
15   safety and effectiveness of a product up to one
16   year is not a long-term safety study?
17   A.   That's correct.
18   Q.   And would you agree with me that every one
19   of the authors that are listed on Exhibit 7 have
20   been paid by industry?
21   A.   In what sense have been paid by industry?
22   Q.   Well, you know who Dennis Miller is, right?
23   A.   Sure.
24   Q.   Who is he?

34 (Pages 130 to 133)

Stanley Zaslau, M.D.

| Page 134 | Page 136 |
|---|---|

**Page 134**

1    A.    He's on Saturday Night Live.
2    Q.    Who else is he?
3    A.    Actually, I don't know Dennis Miller.
4    Q.    You don't?  Do you know if he has anything
5    to do with mesh?
6    A.    I don't know, no.
7    Q.    So wouldn't you want to know if those people
8    -- I mean, we talked about bias earlier?
9    A.    Right.
10   Q.    Do you think that if somebody was given
11   millions of dollars as a result of mesh, do you
12   think that that might affect their opinion?
13   A.    It might.
14   Q.    Wouldn't you want to know, at least,
15   wouldn't you want it to be disclosed?
16   A.    Well, at the time that these positions
17   statements have come about, this is 2014, so we've
18   all had disclosures of each of us through the AUA
19   and through AUGS for members.  You know, we have
20   disclosures that we have to put on our Web site, so
21   I would expect that these people, if they are
22   getting funds, that they are disclosed in their
23   industry relations.
24   Q.    And it wouldn't surprise you to learn that

**Page 135**

1    every single one of them are connected to the mesh
2    industry in some way, right?
3    A.    It wouldn't surprise me, no.
4          MR. WALLACE:  Please mark this one.
5          (Deposition Exhibit No. 8 was marked for
6                identification.)
7    Q.    Can you look at Exhibit 8, please.  Do you
8    recognize it?
9    A.    I do not, no.
10   Q.    Have you seen it before?
11   A.    I have not.
12   Q.    Do you know whether or not it's included in
13   your reliance list?
14   A.    I don't believe that it is.  I don't recall
15   seeing this document in this form in this e-mail.
16   Q.    Have you looked at every single document on
17   your reliance list?
18   A.    I've looked at the vast majority of them,
19   yes, but not each and every one of them.  They're
20   there for me so I can look at them as I need to.
21   Q.    You would agree with me, if you'll look at
22   the middle of the way down the page, you'll
23   recognize some of the names.  Dan Lamont, Gene
24   Kammerer.  Do you see those names?

**Page 136**

1    A.    Yes.
2    Q.    You recognize those as people who are
3    pretty high up at Ethicon?
4    A.    No.  I don't know any of those names.
5    Q.    You don't?
6    A.    No.
7    Q.    Do you know anyone within Ethicon?
8    A.    No.
9    Q.    Have you as a result of being hired by
10   Ethicon taken it upon yourself to talk to any
11   employees of Ethicon?
12   A.    No.
13   Q.    You've had the opportunity to, didn't you?
14   A.    I'm sure I could have.
15   Q.    Wouldn't you, if you came across -- we
16   talked earlier about the fact that you've seen
17   documents that say particle loss is one of the
18   reasons for a laser-cut mesh.
19         Wouldn't you want to know more about that
20   and what Ethicon concluded internally about that
21   issue?
22   A.    If Ethicon had issues that were clinically
23   relevant, they would be brought to all of us as
24   clinicians, since we're users of the product.  The

**Page 137**

1    field team would come out to us -- the people would
2    come to us, if they were clinically relevant.  The
3    reason they haven't is because it's not clinically
4    relevant.
5    Q.    Well, look at the middle of the page.  It
6    says, "Particle loss is the reason why TVT wants to
7    use laser-cut mesh to eliminate particle loss
8    (which is critical to quality)."
9          Do you see that?
10   A.    I do.
11   Q.    Do you agree with that statement?
12   A.    I've not seen that as an issue, okay?  I've
13   also looked at mesh as it comes out of the package
14   from the very beginning.  I've not seen any -- even
15   any threads that are lost off of any mesh over the
16   years as we take it out and check its expiration
17   date and other opinion of it.  So to me, I don't
18   see any difference between laser-cut and
19   mechanical-cut mesh.
20   Q.    Have you seen any studies that conclude
21   otherwise?
22   A.    No.
23   Q.    You haven't?
24   A.    No.

35 (Pages 134 to 137)

Stanley Zaslau, M.D.

Page 138

1    Q.    Have you seen any documents where the -- one
2    of the coinventors of the TVT product believes
3    that they won't use laser-cut mesh?
4    A.    No.
5    Q.    You haven't seen that?
6    A.    No.
7    Q.    Wouldn't that affect your opinion?
8    A.    No.
9    Q.    Why not?
10   A.    Because I have 15 years of opinion, and as I
11   told you, I didn't know until 2007 that there was a
12   change, that there was any difference between these
13   two, because it has no clinical effect in our
14   practice.  It did not change any of the problems,
15   or. . .
16   Q.    And that's solely based upon your own
17   observations, right?
18   A.    Well, it's also been based upon
19   presentations at meetings.  I have not heard any
20   discussion about this difference until this has
21   been brought up most recently through these
22   processes.
23   Q.    Have you seen any documents that conclude
24   that the TVT could curl and rope, thereby reducing

Page 139

1    the surface area of the mesh under the urethra and
2    increasing the pressure in that area?
3    A.    No.
4         (Deposition Exhibit No. 9 was marked for
5              identification.)
6    Q.    Again, wouldn't you want to know that
7    information if Ethicon had it?
8    A.    Unless it's clinically relevant, I don't
9    need to know this.
10   Q.    Well, isn't it clinically relevant if the
11   mesh can curl and rope and increase pressure under
12   the urethra and cause pain in that area?
13   A.    I haven't opined to you that this is the
14   case in all patients.
15   Q.    I said the issue is whether it can, right?
16   A.    Can mesh curl and rope?  I've not seen that
17   that's -- that that occurs clinically.
18   Q.    Wouldn't you want to know if you're talking
19   about the safety and efficacy of a mesh device, a
20   TVT, what Ethicon's own opinions are about that
21   issue?
22   A.    Only if they're clinically relevant.  I have
23   my own -- after 15 years, I have my own opinions.
24   Q.    But your opinions doesn't necessarily make

Page 140

1    you the be-all-end-all on that, wouldn't you agree?
2    A.    That's right.
3    Q.    So -- okay.  So fair enough.  You just don't
4    consider Ethicon documents in that regard one way
5    or another to support your opinion?
6    A.    These have no effect on my opinion
7    whatsoever.
8    Q.    And you're just -- in other words, you just,
9    because of your own experience, you're just not
10   going to consider them?
11   A.    I don't have -- no.
12         MS. ROBINSON:  Object to form.
13   A.    I don't need to consider them.
14   Q.    Even if they disagree with your viewpoint?
15         MS. ROBINSON:  Object to form.  Asked
16   and answered.
17   A.    The way this is written and the way this is
18   theorized can apply just as easily to
19   mechanically-cut mesh or the laser-cut mesh.  The
20   issue with retention can be exactly the same.
21   If it's going to cause retention, okay?  And the
22   issue with roping or curling would be on the ends
23   of it, if it weren't placed in a tension-free
24   fashion and it weren't evaluated carefully upon

Page 141

1    completion of the procedure to know that it was --
2    whether it was placed properly.
3         And it also helps you -- it helps you, too,
4    by looking where the pressure localizes --
5         MS. ROBINSON:  Not a question.
6         MR. WALLACE:  Can you mark that?
7         (Deposition Exhibit No. 10 was marked for
8              identification.)
9    Q.    Can you please look at Exhibit 10 and tell
10   me if you have seen it before?
11   A.    I have not, no.
12   Q.    You've never seen the PA Consulting Group --
13   A.    No.
14   Q.    -- PowerPoint?
15   A.    Nope.
16   Q.    Do you realize that this PowerPoint
17   concludes that mesh can degrade, and it talks about
18   erosion in connection with degradation?
19         MS. ROBINSON:  He said he hasn't seen
20   it.
21   A.    I haven't seen it, so if you want to talk --
22   Q.    Well, you may have been told about it?
23   A.    No.  I've never been told about this
24   document.

36 (Pages 138 to 141)

Stanley Zaslau, M.D.

Page 142

1    Q.    Well, don't you want to know if information
2    that Ethicon has about degradation and its effect
3    on erosion, wouldn't you want to consider it, or
4    are you just going to sit here and say that your
5    15 years of experience is what matters?
6    A.    I'm going to say that in my 15 years of
7    experience and in materials that I have reviewed
8    and seen, that I don't think there's any clinical
9    relevance to degradation and its relationship to
10   erosion.
11   Q.    So in other words, if that document or other
12   documents like it conclude otherwise, you're just
13   not going to consider them?
14   A.    I have to read this.  I have not read this.
15   If you want to point me to a specific portion of
16   it --
17   Q.    Okay.  I'm going to let you read it, and
18   please do, but just, my question is more basic than
19   that.
20        If -- assuming this document is contrary to
21   your opinion, you're just not going to consider it
22   because you're going to rely more on your 15 years
23   of experience, right?
24   A.    I'm going to read it.  I'll read anything

Page 143

1    that's provided to me, but that doesn't mean my
2    opinion will change.
3    Q.    Go ahead.
4    A.    Well, this is going to take me an hour to
5    read all these slides, so I would suggest in the
6    essence of time that you point to me what you want
7    me to look at specifically.
8    Q.    Why don't you look at the second page, and
9    you'll see in the middle of the page it says "Mesh
10   erosion is complex, and the clinical studies do not
11   give a clear picture due to the diversity of
12   variables."
13        Do you agree with that statement?
14   A.    That's true.
15   Q.    Do you agree with the statement underneath
16   that, that says that "the causes of mesh erosion
17   are not well understood"?
18   A.    They're not well understood, yes.
19   Q.    Do you agree with the last bullet point in
20   that same slide in the middle of the page that says
21   "The situation is further complicated by known
22   factors, such as the propensity of polypropylene
23   (PP) to suffer degradation, and the specific
24   effects of polypropylene degradation on erosion

Page 144

1    rates is not known"?
2    A.    I think the degradation of polypropylene is
3    actually known.  It's been studied.  It doesn't
4    degrade.  It's not been uniformly shown that it
5    degrades in all studies.
6    Q.    Would you agree with the slide underneath it
7    that says "Mesh erosion is lower in polypropylene
8    meshes used in transabdominal surgery than in
9    transvaginal surgery"?
10   A.    That's actually -- well, when you refer to
11   transabdominal surgery, what do you mean by that?
12   Q.    I'm just asking you to look at the slide and
13   see whether or not you agree or disagree with the
14   statement.
15   A.    Well, transabdominal surgery is very big.
16   Are we talking about, say, sacrospinous ligament
17   fixation?  Are we talking about
18   abdominal sacrocolpopexy?  What are we talking
19   about?
20   Q.    So you just don't know?
21   A.    Well, it doesn't say.  It's a very vague
22   statement.  And, actually, it is lower with
23   polypropylene meshes used in vaginal surgery than
24   transabdominal surgery.

Page 145

1    Q.    Can you look at page 6, please, the bottom
2    slide on the left?  Do you agree or disagree with
3    this statement that "polypropylene can suffer from
4    degradation following implant"?
5    A.    I disagree.
6    Q.    Look at the rest of the slide.  Can you read
7    that?  Look at the first bullet point.
8        I asked you earlier about animal studies in
9    connection with polypropylene.
10   A.    Yes.
11   Q.    And you'll see that the statement says that
12   there are animal studies that show that
13   degradation occurs a few days after post-implant,
14   or at least starts to occur.
15        Do you agree with that statement?
16   A.    In that study, I mean, but that's an animal
17   study.  It's not a human study.
18   Q.    And what's the science behind your basis to
19   conclude that there's a difference?
20   A.    Well, I can show you data.  I can show you
21   the Woodruff study, which actually looked at
22   polypropylene mesh and shows that it didn't
23   degrade in meshes that were removed compared to
24   autologous slings that actually did show the

37 (Pages 142 to 145)

Stanley Zaslau, M.D.

Page 146

1  degradation.
2  Q.   Woodruff was an animal study?
3  A.   No, Woodruff was a human study.
4  Q.   And you're also aware of other studies that
5  say that based upon explants that mesh degrades?
6  A.   As I said, it's not clear. I've mentioned
7  to you and cited a very important study that shows
8  that it doesn't degrade.
9  Q.   And you conversely also understand that
10  there are studies that show that it does?
11  A.   Hence the reason why there's controversy.
12  Q.   And wouldn't you want to know what Ethicon
13  has to say about that issue?
14  A.   If it were important, they would have told
15  me a long time ago.
16  Q.   But you didn't see this document before
17  today, did you?
18  A.   No. And it doesn't change my opinions now
19  seeing the document.
20  Q.   Why?
21  A.   Why what?
22  Q.   Why doesn't it change your opinions?
23  A.   Because if there were a significant issue
24  with this product that all physicians needed to

Page 147

1  know about that was different from what they
2  learned from their skills and training and
3  education that was unique to this product and
4  not any other one, they certainly would have told
5  us information in a timely fashion.
6  Q.   And even though you agree with the part of
7  the PowerPoint that I showed you that the concept
8  of mesh erosion, for example, and the studies
9  associated with it are complex and difficult to
10  understand?
11  A.   Um-hmm. They're certainly complex, yes.
12  Q.   Well, isn't that the most common
13  complication associated with mesh?
14  A.   Erosion?
15  Q.   Um-hmm.
16  A.   Actually, no, not that I see.
17  Q.   What are the most common complications?
18  A.   Most common complication that I see is
19  voiding dysfunction, urgency and frequency,
20  urge incontinence, pelvic pain. I actually see
21  very few mesh extrusions, and that's well
22  documented. The extrusion rate for vaginal mesh is
23  less than 1 percent on average.
24  Q.   Please turn to page 8 of your report in the

Page 148

1  Hendrix matter. And I'm specifically referring
2  to the general part of your report.
3      What do you mean when you use the word
4  "dense fibrosis" on page 8?
5  A.   Dense means thick. Fibrosis means scarring.
6  So thick scar.
7  Q.   I'm trying to use a lot of "it's important
8  to note" type of paragraphs, so I'm trying to
9  figure out what you're really saying in this
10  paragraph. Can you try to explain that to us?
11  A.   Yeah. And, actually, this is an
12  interpretation via the "Discussion" section of the
13  Wang paper, okay? And this -- Wang, et al. These
14  are the authors stating that the inadequate
15  vaginal tissue coverage during the operation, mesh
16  rigidity, propensity for an injury at a nearby
17  site, or localized inflammation is somewhat
18  plausible. So, in other words, it's localized
19  inflammation is what you're referring to now.
20      In patients who have complete epithelia-
21  lization of the mesh -- in other words, the vaginal
22  wall is well healed underneath -- and then their
23  mesh was removed for some other reason, like they
24  wanted it removed or had some other procedure,

Page 149

1  that even in these patients who don't have issues,
2  they have -- some of them have had a foreign body
3  reaction, fibrosis, and perivascular mononuclear
4  cell infiltrate, which means they had chronic
5  inflammatory evidence.
6      So the point is, the inflammation that is
7  seen as a histologic reaction can be present in
8  slings that have extruded, which they talked about
9  earlier. Epithelialized, in other words, maybe
10  they had an erosion, it was cut, and then the
11  vaginal tissue healed, or it looked completely
12  normal but they removed it for some other reason.
13  That's what that paper means.
14  Q.   Look at page 9. And just for clarification,
15  your report says three. You thought that maybe two
16  patients that had mesh extrusion.
17      You used the word "three" on page 9. Do you
18  see that?
19  A.   Yeah.
20  Q.   Is it three or two?
21  A.   It might be three. Again, this is -- you
22  know, off the top of my head.
23  Q.   Well, you want to be careful, right?
24  A.   Right.

38 (Pages 146 to 149)

Stanley Zaslau, M.D.

Page 150

1    Q.    It was just off the top of your head; is
2    that what you said?
3    A.    Yes.
4    Q.    When you say "off the top of your head,"
5    meaning, you believe, off the top of your head
6    there's been only three patients that you're aware
7    of?
8    A.    That I'm aware of that had TVT mesh erosion,
9    yes.
10   Q.    And why did you look at the mesh under a
11   magnifying glass?
12   A.    Where are we seeing that?
13   Q.    In that same paragraph.
14   A.    Well, the thing when you have a lot of mesh
15   is -- and certainly, there's a lot of different
16   theories about what happens to mesh, looked at
17   pathologically, and, you know, I thought it would
18   be interesting to just look and see. Actually,
19   we're looking even with optical loupes to look
20   and see what happens.
21          Usually, we're doing it when we're putting
22   them in. So in other words, after we're finished,
23   I put on my loupes and just look and see how the
24   mesh lays. And I've not seen any differences or

Page 151

1    any problems associated with it.
2    Q.    You'd agree with me that there are peroxides
3    present in the vaginal tissues?
4    A.    Vaginal tissues or. . .
5    Q.    Or vaginal space.
6    A.    That's two different things. Is it in the
7    vaginal space, i.e., the bacteria that are present
8    within the lumen of the vagina, yes.
9    Q.    And that's actually the area in which the
10   TVT is?
11   A.    No.
12   Q.    Goes through?
13   A.    No.
14   Q.    You don't think so?
15   A.    No.
16   Q.    You don't think it's ever exposed to any
17   clean -- or contaminated area?
18   A.    Well, the vagina always has bacteria, and we
19   know that in all surgeries that we do. But once
20   that area is closed and there's complete
21   epithelialization, there shouldn't be any type of
22   infection that occurs in these meshes.
23   Q.    But there's a possibility that -- of how
24   this device is put in that it can be exposed to a

Page 152

1    contaminated field?
2    A.    Contaminated in terms of what? Contaminated
3    in terms of infection or we also talked about
4    peroxides and other things?
5    Q.    Sure. Let's just stay with peroxide.
6    A.    Yes.
7    Q.    And you would agree with me that where it
8    sits, it's exposed to fibroblasts and neutrophils
9    at points in time?
10   A.    Let's go back to peroxidase, okay? Not all
11   bacteria secretes peroxidase. Not all
12   lactobacillus secretes peroxidase. And the
13   peroxidase levels -- peroxide levels change in
14   menopausal status with women.
15   Q.    So all women are different?
16   A.    So all women are different.
17   Q.    So one woman might have more reactive
18   oxidative species than another? Or she might have
19   cells, for example, that secrete more peroxidase?
20   A.    They might. But --
21   Q.    You would agree with me?
22   A.    Yeah. But that's probably not clinically
23   relevant.
24   Q.    Probably not?

Page 153

1    A.    Probably not.
2    Q.    In your opinion, based on what signs?
3    A.    Based on just looking at degradation of mesh
4    that was studied. Just looking at mesh that was
5    removed. Looking at the Woodruff study, and
6    looking at there was no degradation in that group
7    that had TVT mesh removed.
8    Q.    You would agree with me that there are some
9    women that are called high responders, right?
10   A.    What is a high responder?
11   Q.    Meaning that they might have a greater
12   inflammatory response than another woman because of
13   their status in life, just how they're made?
14          MS. ROBINSON: Object to form.
15   A.    It may -- it's -- probably is not that as
16   their basis. They probably have an underlying
17   condition, an underlying inflammatory condition,
18   which is well known. Things like lupus and
19   rheumatoid arthritis and other things. But that
20   inflammation doesn't necessarily relate to what the
21   bacteria in the vaginal canal are doing. That
22   may just be their own immunogenicity.
23   Q.    In other words, whether a woman secretes
24   more peroxidase than another, you don't believe

39 (Pages 150 to 153)

Stanley Zaslau, M.D.

Page 154

1    that that would have any clinical impact on their
2    healing or the mesh?
3    A.    No. It shouldn't have an impact on that.
4    And, furthermore, the issue with bacteria shouldn't
5    have any effect on it either, because in meshes
6    that were removed, even in Clavet's work, when he
7    looked at that, he couldn't conclude that there was
8    bacteria present, even in a patient with acute
9    inflammation, in group one, no bacteria genesis was
10   noted.
11          MR. WALLACE: Can we go off for a
12   minute?
13          (Off the record 2:43 p.m.)
14          (On the record at 2:45 p.m.)
15          MR. WALLACE: I have no further
16   questions.
17          MS. ROBINSON: I have a couple
18   follow-up.
19          CROSS-EXAMINATION
20   BY MS. ROBINSON:
21   Q.    Dr. Zaslau, do you recall counsel's
22   questions of you regarding whether you were an
23   advocate for mesh?
24   A.    Yes.

Page 155

1    Q.    And you responded that you were; is that
2    correct?
3    A.    Yes.
4    Q.    And what are you -- what does that mean to
5    you, being an advocate for mesh? What does that
6    mean for you?
7    A.    It means that in my clinical experience of
8    15 years, in my teaching to residents, as such,
9    and review of the literature that this is a
10   procedure that has worked well in my hands with
11   long-term efficacy.
12   Q.    And as a result of that, when you counsel
13   your patients and you talk to them about mesh, is
14   this a product that you feel that you want to offer
15   to them as a choice to use and help them with their
16   stress urinary incontinence?
17   A.    I do, yes.
18   Q.    When you indicate that you're an advocate
19   for mesh, does that correlate to being an advocate
20   for industry?
21          MR. WALLACE: Objection to form.
22   A.    I'm an advocate for mesh as a procedure. In
23   my hands, it's worked and it's worked well.
24          Do I support industry by using industry's

Page 156

1    products? Yes. Because without their products I
2    wouldn't be able to do these surgeries.
3    Q.    And you believe it's important for you to be
4    able to offer these products to your patients?
5    A.    Yes.
6    Q.    You were asked some questions by counsel
7    earlier about warnings and whether you were an
8    expert in warnings.
9          Would you agree with me in this case that
10   you've been asked to offer your opinion as to
11   whether the information provided by Ethicon in its
12   IFUs was sufficient for you as a physician and for
13   physicians in general to use their product?
14   A.    I think the information there is sufficient
15   to use.
16   Q.    But that's essentially what you've been
17   asked to opine on; is that correct?
18   A.    Yes.
19   Q.    About how you and other physicians read IFUs
20   and utilize them in your practice, correct?
21   A.    Yes.
22   Q.    Now, he was asking you more questions about
23   the technical requirements of what goes in the IFU
24   as to drafting and regulatory requirements and

Page 157

1    everything like that, correct?
2    A.    Yes.
3    Q.    You're not a regulatory expert, right?
4    A.    I am not.
5    Q.    And you're not holding yourself out to be
6    one; is that correct?
7    A.    Not at all.
8    Q.    So with regard to the information for use,
9    are the complications that you have seen in your
10   practice consistent with the warnings listed in the
11   "Adverse Reactions" section of the IFU, in
12   particular, the exhibit from 2001?
13          MR. WALLACE: Objection to form.
14   A.    It was sufficient, yes, but the other
15   issues that had come in the other iterations were
16   things that were already known to us. They were
17   just included for other reasons.
18   Q.    Counsel asked you whether chronic pain was
19   listed in the IFU in 2001, and it was not, correct?
20   A.    Right.
21   Q.    And you indicated, I believe, in your
22   response that you didn't feel that it was necessary
23   for chronic pain to be listed; is that correct?
24   A.    That's correct.

40 (Pages 154 to 157)

Stanley Zaslau, M.D.

Page 158

1  Q.    And why is that?
2  A.    Because it's known to all surgeons who do
3  any pelvic surgery that pain can result, and it
4  could be chronic.
5  Q.    So if I understand your testimony, it's
6  based on the fact that individuals using the
7  product are surgeons who operate in the pelvic
8  floor, correct?
9  A.    Yes.
10 Q.    And those surgeons are aware that any
11 surgery they do to correct stress urinary
12 incontinence, a hysterectomy, or otherwise can
13 result in having chronic pain, correct?
14 A.    Yes, it can.
15 Q.    And based on -- your testimony is based on
16 your own practice, correct?
17 A.    Yes.
18 Q.    But you're also a teacher, correct?
19 A.    Yes.
20 Q.    Do you teach your students utilizing IFUs at
21 times?
22 A.    We review for the first time when someone
23 does a procedure, I show them the IFU.  There's
24 nice pictures in it, pictorials, and also the

Page 159

1  step-by-step aspect of the procedure so they can
2  have something to take home and see what they've
3  done.
4  Q.    And so the IFU is more than just a list of
5  complications and adverse effects as counsel has
6  discussed with you, correct?
7  A.    Right, yes.
8  Q.    And have you found the Ethicon's IFU with
9  regard to the TVT and TVT-O products to have been
10 adequate for describing the procedure, as well as
11 the potential complications and risks of the
12 procedure?
13 A.    Yes.
14 Q.    Have you ever expressed any concern about
15 any complications that are not listed in the IFU?
16 A.    No.
17 Q.    When you have attended meetings of your
18 colleagues, of other urogynecologists or other
19 urologists or gynecologists, have they experienced
20 or expressed concerns to you about warnings and
21 complications that were not contained in the IFU
22 unrelated to mesh litigation?
23 A.    No.
24 Q.    Counsel also asked you a laundry list of

Page 160

1  questions concerning degradation and its effect
2  on erosion and extrusion of mesh, correct?
3  A.    Yes.
4  Q.    And he asked you a series of questions about
5  whether Ethicon had shared with you certain
6  documentation, studies, conclusions, and theories
7  offered by its various company employees, correct?
8  A.    Yes.
9  Q.    You indicated that you're not -- that that
10 kind of information isn't information that is
11 information that's important to you in your
12 practice; is that correct?
13 A.    That's correct.
14 Q.    And to a jury, that may sound like, "Well,
15 Dr. Zaslau has his head in the sand.  He just
16 doesn't want to know anything."
17        Would you agree with me that that's what
18 it sounds like?
19        MR. WALLACE:  Objection to form.
20 A.    I know that if there were anything
21 pertinent, internally, regarding this procedure
22 that Ethicon would have let physicians know
23 immediately.  Okay?
24 Q.    So my question of you is with regard to

Page 161

1  degradation and that process.
2  A.    Right.
3  Q.    Degradation in and of itself, is it a
4  complication?
5  A.    No, it's not a complication.
6  Q.    Does degradation have any impact in and of
7  itself on the woman that you are treating?
8  A.    No.
9  Q.    So degradation insofar as it may be linked
10 to mesh exposure or erosion, as counsel's been
11 asking you about, do you have knowledge of that
12 impact through the literature that you read, your
13 experience, and association and communications with
14 your colleagues?
15 A.    Right.
16 Q.    In other words, you know the mesh erosion
17 and extrusion rates, correct?
18 A.    Yes.
19 Q.    And you read about that in the literature
20 every day?
21 A.    Yes.
22 Q.    And it's been written about since mesh was
23 first used way back in --
24 A.    In 1998, or even before that with the other

41 (Pages 158 to 161)

Stanley Zaslau, M.D.

Page 162

1  meshes, the other procedures.  Right.
2  Q.    Correct.  To your knowledge, has degradation
3  resulted in any new complication that was unknown
4  to physicians who operate in the pelvic floor using
5  mesh?
6  A.    No.
7        MS. ROBINSON:  That's all the questions
8    I have.
9        REDIRECT EXAMINATION
10  BY MR. WALLACE:
11  Q.    Would you agree with me that a woman said --
12  who now has chronic pain that has been associated
13  with a TVT, who says that she was never told that
14  she might have chronic pain, that's an unfortunate
15  event, correct?
16  A.    Yes.
17  Q.    And you would agree with me that her
18  physician, even going all the way back to 2001,
19  should have told her about that, just like you've
20  told your patients?
21  A.    Physicians who do any pelvic surgery
22  should warn the patient that chronic pain can
23  happen from any procedure.
24  Q.    And specifically from the TVT procedure?

Page 163

1  A.    From any incontinence procedure.
2  Q.    Right.  And specifically from the TVT
3  procedure, because I'm talking about the TVT?
4  A.    Right.  Then yes.
5  Q.    Okay.  And -- but you would also agree with
6  me that a physician is entitled to rely on the
7  instructions for use?
8  A.    In part.  And the remainder is from their
9  clinical experience and education and teaching,
10  coursework, lectures, meetings.
11        MR. WALLACE:  I have no further
12    questions.
13        MS. ROBINSON:  I have nothing further.
14    Thank you.
15        (At 2:54 p.m., the deposition concluded
16    and signature was not waived.)
17
18
19
20
21
22
23
24

Page 164

1           C E R T I F I C A T E
2  STATE OF WEST VIRGINIA  )
3        I, Faye Ann Lehman, a Commissioner in
4  and for the State of West Virginia, do hereby
5  certify that before me personally appeared STANLEY
   ZASLAU, M.D., who was by me first duly cautioned
6  and sworn to testify to the truth, the whole truth
   and nothing but the truth in the taking of his oral
7  deposition in the cause aforesaid; that the
   testimony then given by him as above set forth is a
8  true record of the testimony given by the witness,
   and was reduced to stenotype by me in the presence
   of said witness and afterwards transcribed upon a
   computer.
10
11        I do further certify that this deposition
   was taken at the time and place specified in the
12  foregoing caption and was completed without
   adjournment.
13
        I do further certify that I am not a
14  relative of or counsel or attorney for any party
   hereto,
15
        IN WITNESS WHEREOF, I have hereunto set
16  my hand and affixed my seal of office on this 22nd
   day of March, 2016.
17
        The foregoing certification does not
18  apply to any reproduction of this transcript in any
   respect unless under the direct control and/or
19  supervision of the certifying reporter.
20  _____
        Faye Ann Lehman, Commissioner
21  My Commission Expires May 20, 2020
22
23
24

Page 165

1      - - - - - -
2      E R R A T A
3      - - - - - -
4
5  PAGE LINE CHANGE
6  _____ _____
7  ____ ____  _____
        REASON: _____
8  ____ ____  _____
9        REASON: _____
10  ____ ____  _____
11        REASON: _____
12  ____ ____  _____
13        REASON: _____
14  ____ ____  _____
15        REASON: _____
16  ____ ____  _____
17        REASON: _____
18  ____ ____  _____
19        REASON: _____
20  ____ ____  _____
        REASON: _____
21  ____ ____  _____
22        REASON: _____
23  ____ ____  _____
24        REASON: _____

Stanley Zaslau, M.D.

Page 166

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3          I,_____, do
 4     hereby certify that I have read the
 5     foregoing pages, and that the same is
 6     a correct transcription of the answers
 7     given by me to the questions therein
 8     propounded, except for the corrections or
 9     changes in form or substance, if any,
10     noted in the attached Errata Sheet.
11
12
13     _____
14     STANLEY ZASLAU, M.D.           DATE
15
16
17     Subscribed and sworn
18     to before me this
19     _____ day of _____, 20____.
20     My commission expires:_____
21
22     _____
23     Notary Public
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS