# EXHIBIT  D

Confidential - Harvey A. Winkler, M.D.

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     AT CHARLESTON
 4      -----------------------------:
        IN RE ETHICON, INC., PELVIC  :
 5      REPAIR SYSTEM PRODUCTS        : MASTER FILE
        LIABILITY LITIGATION         : No. 2:12-MD-02327
 6      _____:
                                      :
 7      THIS DOCUMENT RELATES TO      : MDL 2327
                                      :
 8      WAVE 4 CASES                  :
        TVT and TVT-EXACT             : JOSEPH R. GOODWIN
 9                                    : US DISTRICT JUDGE
        -----------------------------
10
11                     -   -   -
12                 March 12, 2017
13                     -   -   -
14                  CONFIDENTIAL
15          Deposition of HARVEY A. WINKLER, M.D.,
16      held at Butler Snow LLP, 1700 Broadway,
17      New York, commencing at 8:49 a.m., on the
18      above date, before Marie Foley, a Registered
19      Merit Reporter, Certified Realtime Reporter
20      and Notary Public.
21                     -   -   -
22            GOLKOW TECHNOLOGIES, INC.
23        877.370.3377 ph | 917.591.5672 fax
24               Deps@golkow.com
```

Page 2

1  A P P E A R A N C E S :
2
3  ZONIES LAW LLC
4  BY: GREG BENTLEY, ESQUIRE
5     CHELSEA THOMPSON, ESQUIRE
6     1900 Wazee Street, Suite 203
7     Denver, Colorado  80202
8     720.464.5300
9     Representing the Plaintiff
10
11
12
13  BUTLER SNOW LLP
14  BY: PAUL S. ROSENBLATT, ESQUIRE
15     1020 Highland Colony Parkway
16     Suite 1400
17     Ridgeland, Missouri  39157
18     601.948.5711
19     paul.rosenblatt@butlersnow.com
20     Representing the Defendant
21
22
23
24

Page 3

1        - - -
2       TRANSCRIPT INDEX
3           PAGE

4  APPEARANCES...................... 2
5  INDEX OF EXHIBITS................ 4 - 7
6  EXAMINATION OF HARVEY A. WINKLER, M.D.:
7  BY:  MR. BENTLEY................. 9, 360
8  BY:  MR. ROSENBLATT............... 317, 373
9  AFTERNOON SESSION................. 276
10  REPORTER'S CERTIFICATE............ 379
11  SIGNATURE PAGE.................... 377
12  ERRATA........................... 378
13
14  EXHIBITS WITH ORIGINAL TRANSCRIPT
15
16        - - -
17
18
19
20
21
22
23
24

Page 4

1        - - -
2       E X H I B I T S
3        - - -
4   NO.      DESCRIPTION          PAGE
5  Winkler 1   Amended Notice to Take      10
6            Deposition of Harvey
7            Winkler, M.D., dated March
8            9, 2017
9  Winkler 2   Expert Report of Harvey      10
10            Winkler, M.D. Regarding
11            TVT and TVT Exact, dated
12            February 5, 2017
13  Winkler 3   Curriculum Vitae of Harvey     11
14            Winkler, M.D.
15  Winkler 4   Supplemental General      11
16            Reliance List in Addition
17            to Materials Referenced in
18            Report MDL Wave 4
19  Winkler 21  E-mail chain ending August     96
20            15, 2001, Bates No.
21            ETH.MESH.25126573 through
22            ETH.MESH.25126575
23
24

Page 5

1        - - -
2       E X H I B I T S
3        - - -
4   NO.      DESCRIPTION          PAGE
5  Winkler 23  E-mail chain ending       99
6            February 7, 2005, Bates
7            No. ETH.MESH.25042561
8            through ETH.MESH.25042562
9  Winkler 24  Power Point presentation     102
10            Eastern Region Region of
11            the Year by Paul Parisi,
12            April 24, 2011
13  Winkler 20  Invoice No. 1011 of Harvey    107
14            Winkler, M.D., dated
15            January 17, 2017
16  Winkler 5   Power Point slide deck of     163
17            Harvey Winkler, M.D.
18  Winkler 6   Power Point slide deck of     166
19            Harvey Winkler, M.D.
20  Winkler 7   Power Point slide deck of     166
21            Harvey Winkler, M.D.
22  Winkler 8   Power Point slide deck of     166
23            Harvey Winkler, M.D.
24

Page 6

E X H I B I T S

NO.    DESCRIPTION                      PAGE
Winkler 9   Power Point slide deck of   167
             Harvey Winkler, M.D.
Winkler 10  Power Point slide deck of   167
             Harvey Winkler, M.D.
Winkler 11  Power Point slide deck of   167
             Harvey Winkler, M.D.
Winkler 12  Power Point slide deck of   168
             Harvey Winkler, M.D.
Winkler 13  Power Point slide deck of   168
             Harvey Winkler, M.D.
Winkler 14  Power Point slide deck of   168
             Harvey Winkler, M.D.
Winkler 15  Power Point slide deck of   169
             Harvey Winkler, M.D.
Winkler 16  Power Point slide deck of   169
             Harvey Winkler, M.D.
Winkler 17  Power Point slide deck of   169
             Harvey Winkler, M.D.
Winkler 18  Power Point slide deck of   169
             Harvey Winkler, M.D.

Page 7

E X H I B I T S

NO.    DESCRIPTION                      PAGE
Winkler 18  Power Point slide deck of   169
             Harvey Winkler, M.D.
Winkler 25  Color copy of photograph    182
Winkler 26  Shalom article              295
Winkler 27  Unger article               326
Winkler 28  Welk article                328
Winkler 29  Guideline for the Surgical  332
             Management of Female
             Stress Urinary
             Incontinence: 2009 Update
Winkler 30  Schimpf article             340
Winkler 31  Ford Cochrane review        341
Winkler 32  Ethicon Inc. Johnson &      376
             Johnson report dated March
             3, 2003

Page 8

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
Page  Line
- -none- -

REQUEST FOR PRODUCTION OF DOCUMENTS
Page  Line
- -none- -

STIPULATIONS
Page  Line
- -none- -

QUESTIONS MARKED
Page  Line
- -none- -

Page 9

- - -
8:49 a.m.
New York, New York
- - -
HARVEY A. WINKLER, M.D., the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:
EXAMINATION BY
MR. BENTLEY:
Q.  Good morning, Dr. Winkler.  My name is Greg Bentley.  We met shortly a couple minutes ago off the record.
Do you understand that you're here today for a deposition in the Ethicon MDL?
A.  Yes.
Q.  We're going to start this morning with a deposition covering your TVT and TVT-Exact report.
Is that fair?
A.  Fair.
Q.  I'm going to hand you what's

Confidential - Harvey A. Winkler, M.D.

Page 10

1 being marked as Exhibit 1, which is notice
2 of your deposition.
3      (Exhibit Winkler 1, Amended
4  Notice to Take Deposition of Harvey
5  Winkler, M.D., dated March 9, 2017,
6  was marked for identification, as of
7  this date.)
8 BY MR. BENTLEY:
9   Q.  Do you see that?
10  A.  Yes.
11  Q.  Have you seen that before today,
12 Doctor?
13  A.  Yes.
14  Q.  I'm going to hand you what's
15 being marked as Exhibit 2, which I believe
16 is a copy of your TVT and TVT-Exact
17 report.
18      (Exhibit Winkler 2, Expert
19  Report of Harvey Winkler, M.D.
20  Regarding TVT and TVT Exact, dated
21  February 5, 2017, was marked for
22  identification, as of this date.)
23 BY MR. BENTLEY:
24  Q.  Is that what that appear to be?

Page 11

1   A.  Yes.
2   Q.  And I'm handing you what's being
3  marked as Exhibit 3, which is I believe
4  your CV that was produced with your
5  report.
6      (Exhibit Winkler 3, Curriculum
7  Vitae of Harvey Winkler, M.D., was
8  marked for identification, as of this
9  date.)
10 BY MR. BENTLEY:
11  Q.  Is that what that appears to be?
12  A.  Yes.
13  Q.  And I'm going to hand you what's
14 being marked as Exhibit 4, which I believe
15 is a copy of your reliance materials that
16 was provided with your report.
17      (Exhibit Winkler 4, Supplemental
18  General Reliance List in Addition to
19  Materials Referenced in Report MDL
20  Wave 4, was marked for identification,
21  as of this date.)
22 BY MR. BENTLEY:
23  Q.  Is that fair?
24  A.  Yes.

Page 12

1   Q.  You provided the same CV and
2 reliance materials for both your TVT,
3 TVT-Exact, Prolift and Gynemesh reports;
4 is that correct?
5   A.  Yes.
6   Q.  For the record, we're going to
7 start this afternoon with your deposition
8 that covers your prolapse reports and
9 we'll probably enter the same deposition
10 exhibits that we need for that, okay?
11  A.  No problem.
12  Q.  Doctor, have you been deposed
13 before?
14  A.  Yes.
15  Q.  How many times have you been
16 deposed before?
17  A.  Twice, that I recall.
18  Q.  When was the first deposition
19 that you recall?
20  A.  That was years ago.  I don't
21 remember the name.  It was a obstetric
22 case while I was a resident at Einstein.
23  Q.  And what was the purpose of your
24 deposition, do you remember?

Page 13

1      MR. BENTLEY:  That may have been
2  a bad question.  Let me rephrase it.
3   Q.  Were you being deposed as a fact
4 witness?
5   A.  No.
6   Q.  Were you a party to the
7 litigation?
8   A.  Yes, as a resident.
9   Q.  Was it for a malpractice suit?
10  A.  Yes.
11  Q.  And what were the circumstances
12 of that suit?
13  A.  Goes back way far.  It was an
14 obstetric case.  I guess it was a bad
15 outcome.  I was dropped from the case.
16  Q.  Today if I ask you a bad
17 question, please just let me know and I'll
18 try and rephrase it.  That's entirely
19 possible, or probably more likely.
20      Likewise, if you answer the
21 question, is it fair to assume that you
22 understood the question?
23  A.  Yes.
24  Q.  And you understand today that

Confidential - Harvey A. Winkler, M.D.

Page 14

1  you're giving sworn testimony that would
2  be the same full effect as if you were
3  before a judge and a jury?
4      A.    Yes.
5      Q.    What was the second deposition
6  that you had?
7      A.    It was as a fact witness in this
8  MDL.
9      Q.    And when was that?
10     A.    About two weeks ago.
11     Q.    Was that for your treatment of
12 one of the patients?
13     A.    I was an explanting physician.
14     Q.    And was that in the Ethicon MDL?
15     A.    Yes.
16     Q.    You say you were an explanting
17 physician.
18         So you didn't implant the mesh
19 product in that?
20     A.    No.
21     Q.    Was that a prolapse or a TVT
22 product that you were explanting?
23     A.    I don't recall which one I
24 explanted.  It was either a TVT product or

Page 15

1  a Prolift.
2      Q.    So, your patient had both
3  products, both a prolapse and an
4  incontinence product --
5      A.    Yes.
6      Q.    And you removed some mesh, but
7  you don't recall which product it was?
8      A.    Correct.  It was years ago when
9  I removed it before all this MDL stuff
10 started.
11     Q.    Do you remember approximately
12 when you would have done that explant
13 surgery?
14     A.    I think it was 2011-ish, 2010,
15 '11, '12.  I don't remember the exact date
16 from the chart.
17     Q.    And where was that deposition?
18     A.    That was in Garden City at
19 Heidell, Pittoni, Murphy and Bach.
20     Q.    Have you seen that patient since
21 you did the explant surgery?
22     A.    So, I saw her subsequently
23 several times after.  We have not seen her
24 in a couple years in our practice.

Page 16

1      Q.    What was her indication of what
2  complications was she having that
3  necessitated you to do an explant surgery?
4      A.    She had a urethrovaginal
5  fistula.
6      Q.    Could you describe what that
7  means?
8      A.    So, she had a connection or a
9  hole going from her urethra, the urethra
10 is the tube where the urine comes out of,
11 into the vagina.
12     Q.    And what complications would
13 have manifested from that such that she
14 would end up with you?
15     A.    So, I don't remember what her
16 particular complications were offhand, but
17 she may have been losing urine.  She could
18 have had some urgency and frequency, or
19 just some vaginal bleeding and discomfort.
20     Q.    And you said that you saw her
21 after the explant surgery.
22         How did she progress after you
23 took some of the mesh out?
24     A.    With regards to my repair, she

Page 17

1  did well.  The urethrovaginal fistula was
2  healed and the majority of her urinary
3  complaints resolved.
4      Q.    What about with regard to her
5  discomfort or pain?
6      A.    Those resolved as well, to my
7  recollection.
8      Q.    How much mesh did you take out,
9  if you recall?
10     A.    I think I took out whatever I
11 saw in the urethra at that point in time.
12 Probably it was, I don't know, 1-by-3,
13 1-by-2, somewhere around there.  I don't
14 recall.
15     Q.    Are you talking about
16 centimeters or millimeters?
17     A.    Centimeters.
18     Q.    Would that have been blue mesh?
19     A.    I don't remember the color.
20     Q.    When you took that mesh out,
21 would you have sent it to pathology?
22     A.    Yes.
23     Q.    And what tests would you have
24 requested that pathology perform?

Confidential - Harvey A. Winkler, M.D.

Page 18

1    A.   They just did a gross look-see
2  at it.  They didn't comment on the color,
3  once again before all this MDL started, to
4  document that.
5    Q.   And did the gross examination
6  have any findings that you remember?
7    A.   No significant findings, that I
8  recall.
9    Q.   So, on Exhibit 2, Doctor, which
10 is your report.
11   A.   Okay.
12   Q.   It appears it's 61 pages and at
13 the end are almost 200 footnotes; is that
14 correct?
15   A.   Correct.
16   Q.   And those are citations to facts
17 you discussed in your report; is that
18 correct?
19   A.   Correct.
20   Q.   But you're reliance list shows
21 that you reviewed several more articles
22 than that, obviously, right?
23   A.   Correct.
24   Q.   On page 53 it indicates that you

Page 19

1  signed off on the report on February 5th,
2  2017.
3         Do you see that?
4    A.   Correct.
5    Q.   And is that accurate?
6    A.   Yes.
7    Q.   When did you write this report,
8  Doctor?
9    A.   My gosh, I spent all, like,
10 December and January writing these
11 reports.  My wife said, "When are you
12 coming back to visit the family?"
13        I spent the entire holiday weeks
14 writing the reports, weekends, nights,
15 days, all December and January literally.
16   Q.   Right.  And what was your -- how
17 did you go about deciding what to write?
18 What was your technique that you might
19 have done this, if you can describe?
20   A.   Well, I wanted to tell a little
21 bit about myself and how I got to where I
22 was and then to write about why I think
23 the TVT product has really made a
24 difference in many women's lives as -- for

Page 20

1  the positive, as well as to write the
2  scientific data that I was aware of
3  backing those claims.
4    Q.   Okay.  And does this report
5  include a complete list of all the
6  opinions you intend to offer at trial?
7    A.   I always reserve the right to
8  add additional opinions.
9    Q.   As you sit here today, do you
10 have any additional opinions that you
11 intend to offer at trial?
12   A.   Not that I'm aware of today.
13   Q.   And does this report contain a
14 complete list of the bases for your
15 opinions included within the report?
16   A.   Yes.
17   Q.   Do you still stand by all of
18 your opinions in this report?
19   A.   Yes.
20   Q.   Are there any changes you would
21 like to make to this report at this
22 moment?
23   A.   No.  Unless we find a typo here
24 and there.

Page 21

1    Q.   It's a long report.
2         Let's look at what I believe was
3  marked as Exhibit 3, which is your CV.
4    A.   Okay.
5    Q.   Did you prepare this CV?
6    A.   Yes.
7    Q.   And is this a true and accurate
8  reflection of your professional
9  experience?
10   A.   Yes.
11   Q.   Did you make this CV for this
12 case?
13   A.   No.
14   Q.   This is your CV you've used in
15 your normal day-to-day professional
16 activities?
17   A.   Yes, and it may get updated
18 every month, every two months, whatever.
19 You know, whenever I do something, I try
20 to put it in to try to keep track.
21   Q.   You add new information as you
22 have new items to add?
23   A.   Correct.
24   Q.   So your CV contains your

Confidential - Harvey A. Winkler, M.D.

Page 22

1  education, your training, your
2  publications, things like that?
3      A.   Correct.
4      Q.   And do you remember the last
5  time you updated this CV?
6      A.   I think the last update that I
7  did, this is it.  I haven't updated it
8  since.  I'll probably do an update in
9  about a month.
10     Q.   Do you have something you intend
11  to update it with?
12     A.   Going to Australia to be a
13  national speaker in their urogynecological
14  annual conference.
15     Q.   Other than that, are there any
16  things missing or that you would like to
17  change in your CV?
18     A.   No, nothing missing.  We've
19  submitted other publications, so if they
20  get accepted, I would add them.
21     Q.   And likewise there's nothing you
22  need to take out or that you know of
23  that's incorrect in there?
24     A.   Correct.

Page 23

1      Q.   Do you have multiple versions of
2  your CV that you would use for different
3  purposes?
4      A.   This is pretty much the one I
5  like -- I stand to use today.  I try to
6  send this one out.
7      Q.   Looking at Exhibit 3 which we
8  entered, which I believe is your reliance
9  list, is this a complete list as you sit
10  here today of all the reliance materials
11  you've reviewed --
12     A.   I have Exhibit 4.
13     Q.   I'm sorry, 4.  Thank you.  That
14  will probably happen again.
15     A.   That's okay.  As long as we're
16  looking at the same thing.
17     Q.   So, is this reliance list, as
18  you sit here today, a complete and
19  accurate list of materials you relied upon
20  in reaching your opinions in this case?
21     A.   Yes.
22     Q.   Is there anything that you would
23  like to add or take out of it today?
24     A.   Not right now.

Page 24

1      Q.   Do you have anything you intend
2  to supplement it with that you know of?
3      A.   The reliance list, no.  We did
4  bring --
5          THE WITNESS:  Should we take
6      that picture out?
7          MR. ROSENBLATT:  (Handing.)
8          MR. BENTLEY:  This is what
9      you're talking about?
10         THE WITNESS:  Yes.
11         That's the one we brought,
12     right?
13         MR. ROSENBLATT:  Greg, there's
14     another picture I need to get printed.
15         MR. BENTLEY:  We can do it at a
16     break.
17  BY MR. BENTLEY:
18     Q.   Doctor, can you please describe
19  for me a little bit about your education,
20  where you went to school and when?
21     A.   Sure.  Sure.
22     Q.   And if you want to review your
23  CV.
24     A.   No, it's just for the date.

Page 25

1  This way I don't have to memorize the
2  dates and whatnot.  Although I know them.
3  I did live them.
4          In 1988 I graduated from Yeshiva
5  University with a BA.  In 1992 I graduated
6  from the Albert Einstein College of
7  Medicine.  I then did a residency from '92
8  to '96 also at the Albert Einstein College
9  of Medicine in obstetrics and gynecology.
10  From '96 to '98 I did a fellowship in
11  urogynecology, what is now known as female
12  pelvic medicine and reconstructive
13  surgery, at Evanston Hospital in Chicago
14  under Peter Sand.  From '98 to 2002 I
15  worked at the Maimonides Medical Center as
16  the director of the division of
17  urogynecology there.
18     Q.   Where is that?
19     A.   That's in Brooklyn, New York.
20     Q.   Okay.
21     A.   And then from 2002 to present
22  day I've worked at North Shore LIJ, which
23  is know known as Northwell Health.  I'm
24  the co-chief of division of urogynecology

Confidential - Harvey A. Winkler, M.D.

Page 26

there.  I'm the program director for the fellowship in female pelvic medicine and reconstructive surgery there.  I'm an associate professor at the Hofstra Northwell School of Medicine.

Q.  What courses do you teach?

A.  So, I don't teach any courses in the medical school.  I teach residents in the hospital, medical students as well as the fellowship program.  I manage and direct that.

Q.  The medical school students that you teach, is that just general medical, or have they specialized at that point?

A.  Excuse me?

Q.  What do you teach the medical school students?

A.  So, medical students, generally I would teach them surgical principles.  I would have the most -- they don't come to our office, but they come to the operating rooms with us and give them the first introduction to surgical principles, risks and benefits of surgeries that we perform.

Page 27

Q.  Is that specific to urogynecological surgeries, or is that just general surgical principles?

A.  Well, they're general surgical principles in urogynecologic surgery, but we would then discuss specific to urogynecology.

Q.  And likewise you're seeing fellows or students in the fellowship program, what emphasis are you -- what surgical knowledge or what emphasis are you teaching them?

A.  Well, there's certain basic knowledge that I teach them always about surgical principles.  We treat the whole body, not just the pelvis, but we do specialize on the pelvis or complications that can occur or pathology that can occur with female pelvic disorders.

Q.  And what female pelvic disorders do you treat?

A.  So, I treat the main two that we treat are urinary incontinence and pelvic organ prolapse.  However, we'll also treat

Page 28

bladder pain syndromes.  We'll treat complications after pregnancy, vaginal complications.  We'll treat recurrent urinary tract infections.  We'll treat symptoms of vaginal atrophy.  Some of us will deal with sexual dysfunction, although I don't deal very much with sexual dysfunction, and we also will deal with complications regarding the bladder and/or vagina from surgery, so surgical postoperative surgical complications that can occur.

Q.  You said "some of us will treat sexual dysfunction."

How many other doctors are in your group?

A.  So, we have in the immediate practice where I practice we have two other physicians, two other attendings.  We have three nurse practitioners and we also have the fellows.  We have another -- Northwell has another practice out east with another doctor that we also work with with the fellowship program, but there's

Page 29

no intermingling of patients from those other practices.

Q.  When you treat stress urinary incontinence or incontinence generally, what are the treatment options that you would normally go through for any particular patient?

A.  So, for stress urinary incontinence, after our history and physical examination, we have a discussion about what -- I explain to them what the problem is and what the situation is, and we'd also have a discussion about treatment options.

First and foremost, every patient is told that she can do nothing, this is not a life-and-death situation; it's a quality-of-life situation.  So she can do nothing.  Obviously they're there for a reason.  They're not there to do nothing, but they do get all told that.

Then we will talk about behavioral modification and/or Kegel exercises associated with it.  We'll talk

Confidential - Harvey A. Winkler, M.D.

Page 30

1  about intravaginal devices or occlusive
2  devices, pessaries, vaginal inserts that
3  are options. We'll talk about off-label
4  use of medications. We'll also then talk
5  about surgical options. We'll talk about
6  midurethral slings.
7      Q.   I'm sorry to interrupt you.
8          When you're talking about
9  surgical options, you're starting to
10 delineate what the options are in that
11 category?
12     A.   Correct.
13     Q.   So, the first one you said was
14 midurethral slings?
15     A.   Midurethral slings.
16     Q.   What other surgical options do
17 you have?
18     A.   We have Burch procedures and
19 autologous pubovaginal slings and
20 periurethral bulking.
21     Q.   When you were in medical school
22 and your fellowship, what incontinence
23 procedures were available that you were
24 trained on?

Page 31

1      A.   So, in my fellowship I was
2  trained on Kelly-Keenedy plications,
3  anterior repairs, which nobody really does
4  today. For stress urinary incontinence
5  procedures, that was my primary teaching
6  in residency. In fellowship my primary
7  education was in Burch procedures and
8  pubovaginal slings and we did periurethral
9  bulking back then too.
10     Q.   And your fellowship was 1996 to
11 1998?
12     A.   Correct.
13     Q.   Then subsequently to your
14 fellowship, the midurethral slings came to
15 market and you learned how to implant
16 those, correct?
17     A.   Correct.
18     Q.   And how did you learn to implant
19 midurethral slings like the TVT?
20     A.   So, I was familiar already with
21 placing in pubovaginal slings. I went to
22 Philadelphia to talk and observe Dr.
23 Vincent Lucente, who had learned the
24 procedure, and after that I performed the

Page 32

1  procedures.
2      Q.   And who is Dr. Vincent Lucente?
3      A.   He was one of the preceptors for
4  Gynecare in 1999 when I learned how to do
5  the procedure.
6      Q.   Do you have an understanding of
7  whether Dr. Vincent Lucente works for
8  Ethicon or worked for Ethicon?
9          MR. ROSENBLATT: Object to form.
10     Q.   You can answer.
11     A.   He was a consultant. He wasn't
12 a employee of Ethicon.
13     Q.   He was getting paid by Ethicon.
14     A.   I know.
15     Q.   Can you describe for me what a
16 pubovaginal sling is made of?
17     A.   So, there are different types of
18 pubovaginal slings. There's autologous
19 pubovaginal slings which is where we
20 harvest or take a piece of tissue from the
21 patient that we're operating on. So it's
22 their own tissues.
23     Q.   And what part of the body do you
24 harvest that from?

Page 33

1      A.   Fascia lata which is a strip of
2  fascia from the thigh.
3          Then there are slings that you
4  can use from other humans, cadaveric
5  slings, so there was cadaveric tissue
6  slings that you can use, autografts. And
7  then there's something, xenografts which
8  are tissues from other animals.
9      Q.   And what animals would you
10 harvest from using -- or what --
11     A.   I get the question.
12     Q.   Let me just get the question
13 out.
14          What products are sold that are
15 xenografted?
16     A.   So, some products have been on
17 the market and then have left. There was
18 porcine dermis that was on the market.
19     Q.   Is that Pelvicol?
20     A.   Yes, Pelvicol.
21          Today you would use there's
22 bovine fetal pericardium, which is
23 something called Xenform, that you can go
24 ahead and use.

Confidential - Harvey A. Winkler, M.D.

Page 34

1     Q.   Who makes Xenform?
2     A.   Xenform, I don't know who makes
3 it, but Boston Scientific is the company
4 that you would buy it from, but another
5 companies harvests it.
6     Q.   Sometimes those are referred to
7 as biologics?
8     A.   Correct.
9     Q.   And do you use biologics today?
10     A.   I've used biologics in the past.
11 I haven't used biologics in the past
12 several years for vaginal surgeries.
13     Q.   Did you have bad results with
14 biologics?
15     A.   Biologics have not been shown to
16 really give you good long-term efficacy
17 for slings.
18     Q.   Are you talking about the
19 literature or in your personal experience?
20     A.   In the literature.
21     Q.   So in your personal experience,
22 you had good results with biologics?
23     A.   I would say my experience was
24 consistent with the literature.

Page 35

1     Q.   So we went through the
2 pubovaginal slings, Burch.
3         You still do Burch today?
4     A.   I still do Burch procedures.  I
5 offer Burch procedures.  I don't do as
6 many as I used to in the past, but it's a
7 procedure that I am entirely comfortable
8 with performing.
9     Q.   Are there different types of
10 Burch procedure?
11     A.   I do the Tanagho modification of
12 the Burch procedure and then there are
13 different ways that people -- not
14 different ways, but different sutures that
15 people may use for the Burch procedure.  I
16 prefer a 2-0 Gore-Tex suture and I put two
17 sutures on each side.  The Burch procedure
18 really works with scarring.  So you want
19 to try to increase the scarring that
20 occurs in the retropubic space.  So I also
21 put little pieces of gel foam underneath
22 the suture bridges to try to increase the
23 scarring that takes place in order to give
24 longevity to the procedure.

Page 36

1     Q.   How many patients do you treat
2 on average a week or a month, if you have
3 an estimate?
4     A.   I see approximately, me
5 personally and not the nurse practitioners
6 who see patients, I probably see about 50
7 to 60 patients a week.
8     Q.   And how many surgical procedures
9 do you estimate you do in a week?
10     A.   A week, I don't know.  I do
11 something -- at this point, I think I do
12 somewhere around 200, 225, somewhere
13 around the 200.
14     Q.   Per year?
15     A.   Per year, yeah.  225, somewhere
16 in there.
17     Q.   And approximately how many
18 procedures do you think you're performing
19 a year for incontinence, or to treat
20 incontinence?
21     A.   The majority of my patients I'm
22 treating with incontinence one way or the
23 other.  175, 200.  175-ish.
24     Q.   I'm just trying to get an idea.

Page 37

1     A.   Yeah, you know, listen, I
2 haven't looked at these numbers in a long
3 time.
4     Q.   Do you treat men and women?
5     A.   No, just women.
6     Q.   Of the 175 women that you do
7 surgery on per year for incontinence,
8 approximately how many of those would you
9 estimate are Burch procedure?
10     A.   Zero to 1.
11     Q.   So, the majority -- what
12 procedure are you performing on the 175
13 women to treat incontinence?
14     A.   Midurethral slings.
15     Q.   And what kind of slings are you
16 using?
17     A.   So, I use retropubic slings.  I
18 use transobturator slings, as well as the
19 mini sling.
20     Q.   Which retropubic sling are you
21 using today?
22     A.   So, I use TVT-Exact as well as
23 the Boston Scientific Advantage.
24     Q.   You don't currently use the

Confidential - Harvey A. Winkler, M.D.

Page 38

1   TVT-R, the classic TVT Retropubic?
2       A.   No.
3       Q.   Then you said you're also using
4   the Boston Scientific Advantage?
5       A.   Mm-hm.
6       Q.   One of the other things is we
7   need to have audible answers so Marie can
8   get the transcript down.
9       A.   Was I not talking loud enough?
10      Q.   You said "mm-hm."
11          So one of the retropubic slings
12  you're using today was the Boston
13  Scientific Advantage, correct?
14      A.   Correct.
15      Q.   And you have both of those
16  slings available for you in your operating
17  room for you to choose from?
18      A.   Correct.
19      Q.   And how do you decide with any
20  given patient if you want to use the
21  TVT-Exact or the Boston Scientific
22  Advantage?
23      A.   To be honest with you, I think
24  they're very similar.

Page 39

1           One of the things that we're
2   required to notify our patients of,
3   because of this MDL, is the recent
4   allegations against Boston Scientific that
5   it's a counterfeit mesh.  So if a patient
6   doesn't want a Boston Scientific mesh,
7   then I can use a TVT-Exact.
8       Q.   So your initial recommendation
9   is going to be Boston Scientific
10  Advantage, but you're going to present to
11  them that there's been some issues
12  potentially with the mesh and if they are
13  concerned about that, then you go to
14  TVT-Exact?  Is that a fair statement?
15          MR. ROSENBLATT:  Objection to
16  form.
17      A.   No.
18      Q.   Let's start with how do you
19  decide between TVT-Exact or Boston
20  Scientific Advantage if you're going to
21  recommend the retropubic sling for
22  patients with incontinence?
23      A.   So, if I'm doing it together
24  with another prolapse surgery, I prefer to

Page 40

1   stick with one company at this point in
2   time, use the same meshes.  So if I'm
3   doing, let's say, a sacrocolpopexy or
4   anything like that, then I would go ahead
5   and use the Boston Scientific mesh.  I
6   don't have a personal preference over one
7   or the other.  I think they're both
8   excellent slings and function pretty much
9   the same way and pretty much placed in the
10  same way.
11      Q.   So you have no preference one
12  way or the other of which sling you're
13  using?
14      A.   I don't think one is better than
15  the other, absolutely not.
16      Q.   What percentage of your women
17  that you treat for incontinence do you
18  think you use the retropubic sling?
19      A.   Thirty percent.
20      Q.   So, since slings have been
21  available, have you changed the product
22  that you use?  Or, which products --
23          MR. BENTLEY:  Let me strike
24  that.

Page 41

1       Q.   Which TVT retropubic slings have
2   you used throughout your career?
3       A.   So, the majority of them have
4   been TVT and Boston Scientific.
5       Q.   Okay.
6       A.   I have passed the AMS sling
7   retropubically.  They have the SPARC when
8   it came out I guess 15 years ago and then
9   they had a modification where they had a
10  bottom-up.  So I've used AMS or Astora's
11  slings.  I've also used maybe once or
12  twice a Caldera sling retropubically.
13      Q.   And you said you've used some
14  biologics.
15          Are retropubic slings available
16  in biologic mesh?
17      A.   There's tissue that's available
18  in biologics that you can go ahead and
19  use.  I don't know if they have a specific
20  indication for pubovaginal slings in terms
21  of biologics, but once again, I said I
22  don't really use biologics for my slings
23  because of the efficacy.
24      Q.   So we talked about approximately

Confidential - Harvey A. Winkler, M.D.

Page 42

1  30 percent of the women you treat for
2  incontinence and that you use slings for a
3  year, about 30 percent of those are
4  retropubic.
5      Approximately how many of the
6  175 sling procedures that you're doing are
7  obturator?
8      A.   Today, so things have shifted a
9  little, but today probably another 30 to
10  40 percent are transobturator.  Probably
11  about, you know, 40 percent.
12      Q.   And what are the advantages with
13  an --
14      A.   Forty-five, somewhere around
15  there.
16      Q.   Maybe a little bit more than
17  your retropubic?
18      A.   Maybe slightly more, yes.
19      Q.   What are some of the advantages
20  of having an obturator-based approached
21  versus the retropubic?
22      A.   So, the obturator approach has a
23  little less voiding dysfunction and lower
24  incidence of bladder perforation, not

Page 43

1  zero, but lower incidence, and it also
2  takes away the risk of bowel perforation.
3  Those are the main ones.
4      Q.   Do you tell your patients the
5  risks and benefits of retropubic versus
6  obturator approaches?
7      A.   Absolutely.
8      Q.   Because ultimately it's the
9  patient's decision on whether she wants to
10  undergo this procedure and take the risk
11  to get the benefits, right?
12      A.   I agree with you a hundred
13  percent.
14      And each of my patients gets
15  literature on the procedures.  They get
16  information on their stress incontinence,
17  and they ultimately decide whether or not
18  they want to go to the operating room to
19  undergo this procedure.
20      Q.   And which obturator slings are
21  you using?
22      A.   Today mostly Boston Scientific
23  Obtryx.
24      Q.   Is there a reason you don't use

Page 44

1  the Ethicon obturator sling?
2      A.   I've always liked the outside-in
3  procedure of placing the transobturator
4  sling.  I never had a problem with the
5  meshes.  And as you heard me say before, I
6  think they're very, very similar.  It's
7  just in terms of the way I was taught and
8  the way in my hands and I think it's a
9  little easier to teach as well, so I use
10  the transobturator sling outside-in.
11      Q.   We've talked about a couple of
12  different retropubic slings and obturator
13  slings, and those are all
14  polypropylene-based slings, right?
15      A.   Correct.
16      Q.   But as we've already discussed,
17  there's some advantages to the design of
18  some of the slings versus other slings; is
19  that correct?
20      A.   Correct.
21      Q.   Have you ever used any of the
22  Ethicon obturator slings?
23      A.   No, not that I recall.
24      Q.   And then the third type of sling

Page 45

1  that you're using is the mini sling; is
2  that correct?
3      A.   Correct.
4      Q.   And which mini sling are you
5  using?
6      A.   Boston Scientific Solyx.
7      Q.   So that would be approximately
8  another 30 to 40 percent, is that fair?
9      A.   I think it's probably closer to
10  about 20 percent right now.  I've recently
11  been using slightly more of the mini
12  slings as data has come out regarding
13  their efficacy.
14      Q.   And what would be the advantage
15  to using a mini sling?
16      MR. ROSENBLATT:  Object to form.
17      Q.   You can answer.
18      A.   As compared to the
19  transobturator sling, I think an advantage
20  is the decreased possibility of developing
21  groin pain.
22      Q.   Have you, in your experience
23  using mini slings, have you noticed any
24  advantages to using the mini sling versus

Confidential - Harvey A. Winkler, M.D.

Page 46

1  the other slings we've discussed?
2      A.   Besides the groin pain, no.
3      Q.   The groin pain is associated
4  with mini sling -- let me just clean this
5  up.
6          Doctor, you said that you're
7  using approximately 25 to 30 percent mini
8  slings today; is that correct?
9      A.   Something like that, yeah.
10     Q.   In your experience using those
11 slings, have you used any --
12         MR. ROSENBLATT:  Object to form.
13 I think he said 20 percent.  I just
14 wanted to make that clear.
15         MR. BENTLEY:  Okay.
16     A.   Twenty percent.
17     Q.   Doctor, in your experience using
18 mini slings today, have you noticed any
19 benefit to using those slings versus the
20 obturator or retropubic slings we already
21 discussed?
22     A.   So, I would use the mini sling
23 in place of patients who in the past I
24 would have put a transobturator sling in.

Page 47

1  The data is consistent out there right now
2  with mini slings as compared to
3  transobturator slings.  It would be
4  unusual for me to replace a retropubic
5  sling with a mini sling for the patients
6  that I use retropubic slings on.
7      Q.   That wasn't really my question.
8          My question is you're using a
9  mini sling today, correct?
10     A.   Correct.
11     Q.   And in your experience using the
12 mini sling, have you noticed any
13 advantages to using that sling versus a
14 full-length sling?
15     A.   I wouldn't use the mini sling in
16 the same patient I use the full-length
17 sling in.
18     Q.   So you have no reason to use
19 a -- why are you using a mini sling then?
20     A.   Okay.  So, my mini sling
21 patients, more commonly I'm putting them
22 in patients who have occult stress
23 incontinence.  These are patients who do
24 not have complaints of stress

Page 48

1  incontinence, but I'm doing a prolapse
2  repair on them and then as part of our
3  evaluation for the prolapse repair, we've
4  identified that there's a good possibility
5  that these patients are going to leak
6  postoperatively from stress incontinence.
7  So I'm using the mini sling in the
8  majority of my patients, not all, majority
9  of patients who would have occult stress
10 incontinence.
11     Q.   So you are implanting a sling in
12 women prophylactically during a prolapse
13 procedure with the anticipation that she
14 may develop incontinence later?
15     A.   No, that's not correct.  That's
16 not prophylactic.  A prophylactic
17 procedure is in a patient who would not
18 leak with reduction of her prolapse.
19         So these patients have stress
20 incontinence.  It's just being masked by
21 their prolapse.
22         So, I am not a fan of putting in
23 prophylactic slings.
24     Q.   That would be inappropriate?

Page 49

1          MR. ROSENBLATT:  Object to form.
2  BY MR. BENTLEY:
3      Q.   Do you have an opinion on
4  whether or not it would be inappropriate
5  to put a sling in during a prolapse
6  procedure if the woman wasn't currently
7  suffering from incontinence?
8      A.   Well, there's a risk for them
9  developing urinary incontinence after the
10 procedure.  So I think it's inappropriate.
11         I think this is a discussion
12 that you need to have with your patient of
13 whether or not the patient wants to take
14 on the risks of the additional surgery.
15 Any time you do surgery there are risks.
16 So you have a discussion with the patient
17 if they want to take on the risks of the
18 procedure for the 25 or 30 percent chance
19 that they may lose urine after the surgery
20 and whether or not it would be
21 symptomatic.
22     Q.   Do you recommend putting a sling
23 in prophylactically during prolapse if
24 she's not currently suffering from

Confidential - Harvey A. Winkler, M.D.

Page 50

1  incontinence?
2      A.   I never recommend putting in any
3  of these products.  It's ultimately the
4  patient's decision deciding whether or not
5  they want to undergo the procedure.
6      Q.   And going back to the
7  retropubic.
8          You said that, I believe you
9  said you use Boston Scientific Advantage
10 if you're also doing the abdominal
11 sacrocolpopexy; is that correct?
12     A.   Correct.
13     Q.   And if you're not doing the
14 abdominal sacrocolpopexy or ASC, are there
15 other situations where you would use the
16 Boston Scientific Advantage retropubic
17 sling?
18     A.   So, I can use the TVT or the
19 Boston Scientific Advantage if I'm just
20 putting in a sling.  It doesn't really
21 matter.  It depends on -- I don't have a
22 preference for one over the other.
23     Q.   What percent of the women where
24 you're putting a retropubic sling in are

Page 51

1  you also doing a ASC repair, if you have
2  an estimate?
3      A.   I do about six to eight ASC
4  repairs a month.  I would say 90 to 95 get
5  a sling, 90 percent.
6      Q.   So, 90, 95 percent of your ASC
7  repairs also get a sling?
8      A.   Yeah.
9      Q.   And so those would be the women
10 that would also get the Boston Scientific
11 Advantage because you want to use the same
12 company's product?
13     A.   Yeah, they would either get an
14 Advantage, an Obtryx or a Mini Sling.
15         Truthfully, the largest player
16 in the space right now and supporting the
17 space is Boston Scientific.
18     Q.   The third category of slings we
19 were discussing called mini slings, do you
20 have an understanding of why they're
21 called mini slings?
22     A.   They're shorter-length slings
23 than the traditional full-length slings.
24     Q.   What's the length of the Boston

Page 52

1  Scientific Solyx that you put in?
2      A.   I think it's 9 centimeters.
3      Q.   And do you know what the length
4  of the full-length slings are?
5      A.   Well, so, out of the box, I
6  don't recall.  Maybe it's 24.
7          Don't quote me on that.
8      Q.   Right.
9      A.   But we cut the slings.  So
10 depending on how big the patient is will
11 depend on how much sling gets implanted.
12     Q.   When the sling's implanted, when
13 the retropubic sling's implanted, what's
14 the general length it's implanted in the
15 woman's body?
16         MR. ROSENBLATT:  Object to form.
17     Q.   From your experience.
18     A.   Probably, if I'd have to guess,
19 somewhere around 18 centimeters.
20         No one's ever asked me that
21 question before.
22     Q.   Do you have an idea how much
23 mesh you're trimming off, on average
24 usually that's left over?

Page 53

1      A.   (Indicating.)
2      Q.   About six centimeters, is that
3  consistent with your --
4      A.   We're taking off, I guess, about
5  six on each side.
6      Q.   Is it fair to say that generally
7  you think the mini sling has half as much
8  mesh as the --
9          MR. BENTLEY:  Strike that.
10     Q.   Is it fair to say you think the
11 length of the retropubic full-length sling
12 is about twice as long as the mini sling?
13     A.   Yeah, we can say that.
14     Q.   Do you have an understanding of
15 why companies would introduce slings that
16 are smaller or mini?
17         MR. ROSENBLATT:  Object to form.
18     A.   I think they wanted to reduce
19 the incidence of the groin pain or some of
20 the complications that were occurring with
21 the full-length slings.
22     Q.   You said, I think, the mini
23 sling that you use is an obturator-based
24 approach?

Confidential - Harvey A. Winkler, M.D.

Page 54

1    A.   Yeah, they're all -- yeah, it's
2    an obturator-based approach.  That's what
3    I use it interchangeably for the
4    implanting is slightly different than an
5    obturator approach because I would do the
6    outside-in for the obturator and the mini
7    sort of is inside going into the obturator
8    muscle.
9        Q.   So you're using a mini version
10   of the Ethicon TVT-O which is inside-out?
11       MR. ROSENBLATT:  Object to form.
12       A.   I think I need to explain the
13   procedure a little.
14       Q.   Let me give you a question.
15       So, the Boston Scientific Obtryx
16   is an outside-in, right?
17       A.   Yes.
18       Q.   And then the mini sling that
19   you're using is an obturator-based
20   approach, correct?
21       A.   Theoretically, yeah.
22       Q.   But it's inside-out?
23       A.   Inside-out, yeah.
24       Q.   Are there mini slings available

Page 55

1    in the retropubic passage?
2        A.   Not right now, no.
3        Q.   Are there previously?
4        A.   I think TVT Secur was a little
5    more going in the same path as the
6    retropubic sling which would placed, but I
7    really didn't use that product.
8        Q.   What that --
9        A.   TVT Secur.
10       Q.   You did use it or you didn't use
11   it?
12       A.   I didn't use a TVT Secur.
13       Q.   You never did a TVT Secur?
14       A.   I may have done one, but it was
15   not a product that I used.
16       Q.   Let's go back.
17       You trained on TVT Retropubic,
18   the classic TVT from Dr. Lucente, correct?
19       A.   Correct.
20       Q.   Who did you train under with TVT
21   Obturator, or did you?
22       A.   Yeah, I did.  I went to a
23   cadaver lab and that was an AMS-sponsored
24   cadaver lab.

Page 56

1        Q.   Did you do any cadaver labs or
2    training for the Ethicon TVT-O?
3        A.   No, not that I recall.
4        Q.   Did you do the -- a cadaver lab
5    or training for TVT Secur?
6        A.   Not that I recall.
7        Q.   And did you do a cadaver lab or
8    any training for TVT-Exact?
9        A.   No, not that I recall.
10       Q.   Do you know if there's any
11   differences in the TVT-Exact as compared
12   to the TVT classic Retropubic?
13       A.   Yes, I know that there are
14   differences.
15       Q.   What are the differences?
16       A.   So, the needles are thinner, the
17   trocars to place the sling in, the --
18   there's a plastic sheathe that goes over
19   the TVT-Exact.  So you have different ways
20   of implanting the sheathe.  TVT-Exact is
21   laser-cut, the mesh that I use, and the
22   traditional TVT that I had used was
23   mechanically-cut.
24       Q.   Did you use laser-cut TVT-R?

Page 57

1        A.   Not that I recall.
2        Q.   You said there's sheathes with
3    TVT-Exact; is that correct?
4        A.   Yes.
5        Q.   Do you remember if there are
6    sheathes with TVT Retropubic?
7        A.   There's no sheathe that goes on
8    a TVT Retropubic.  It's sort of the needle
9    that screws into the device that you
10   would -- the TVT device that you would use
11   to implant the polypropylene and pass the
12   trocars.
13       Q.   Do you have an understanding of
14   why having a sheathe with the TVT-Exact is
15   helpful?
16       A.   I think it's an easy way to pass
17   the sling.  I've read in other reports
18   that people liked the TVT-Exact because
19   now they can do one cystoscopy.
20       To be honest with you, I've
21   always done one cystoscopy.  I just left
22   the trocar in from the traditional
23   retropubic and unscrewed it, went into the
24   other side and passed both in my slings.

Confidential - Harvey A. Winkler, M.D.

Page 58

1  It passes very nicely and very easily. It
2  does not require a tremendous amount of
3  force to put the sling in. It's a nice
4  delivery device.
5      Q.   When you say it's easy to pass,
6  are you talking about the -- can you
7  describe what you mean?
8      A.   So, the force that I would need
9  in order to perforate through tissues.
10     Q.   So it minimizes maybe the
11 friction of the implanting device against
12 the tissue?
13     A.   You can say that, yes.
14     Q.   And conversely, without the
15 sheathe, maybe there would be more
16 friction and more force required to
17 implant the device?
18     A.   So, I never tried with or
19 without the sheathe with the needle
20 because there was no reason to go ahead
21 and do that. But it is a thinner needle
22 than the classic. So it required less
23 force and passed nicely and, in my mind,
24 maybe there was less chance of

Page 59

1  perforation.
2      Q.   Do you know what the diameter of
3  the Exact trocars are?
4      A.   With -- I know there's a
5  difference with or without the sheathe.
6  Somewhere around the 3 millimeter range,
7  but I don't have that committed to memory.
8      Q.   Do you know what the diameter of
9  the TVT Retropubic classic was?
10     A.   Once again, not committed to
11 memory, but I think around 5 millimeters.
12     Q.   Do you have an understanding of
13 any clinical implications from having a
14 thinner trocar for the patient?
15     A.   I have not seen any clinical
16 implications of one versus the other that
17 one's better.
18     Q.   If there was some study showing
19 a difference, would you want to see those?
20     A.   I'm always willing to look at
21 studies, yes.
22     Q.   If there was studies that showed
23 decreased morbidity with a thinner needle,
24 would that be useful information for you?

Page 60

1      MR. ROSENBLATT: Object to form.
2      A.   Studies are -- all studies are
3  useful information to me, whether they're
4  good or bad, showing pluses or --
5  positives or negatives.
6      Q.   If there are studies showing
7  decreased morbidity with a thinner needle,
8  would that guide your selection of which
9  device to use?
10     A.   So, if there's one needle that
11 has decreased morbidity and it's a safer
12 needle, quote/unquote, sure, I would like
13 to use the one that's safer.
14     Q.   When did you start using
15 TVT-Exact, if you remember?
16     A.   I don't remember. I apologize.
17     Q.   Was there a break where you
18 stopped using TVT Retropubic and switched
19 to TVT-Exact that you remember?
20     A.   So, I think that the Boston
21 Scientific Advantage sling came out before
22 the TVT-Exact. So, I did, I think, if I
23 recall correctly, that you would use the
24 Boston Scientific Advantage slings, and

Page 61

1  then when TVT-Exact came out, once again I
2  said I think they're interchangeable at
3  this point in time.
4      Q.   The first polypropylene sling
5  that you trained on was a TVT, correct?
6      A.   Correct.
7      Q.   And then when would you have
8  trained on the Boston Scientific
9  Advantage?
10     A.   We're going back many years
11 here. I wish I could remember for you.
12     Q.   Was there a -- did you use the
13 TVT Retropubic exclusively for a while?
14     A.   Yes.
15     Q.   And then at some point you
16 trained on Boston Scientific Advantage?
17     A.   So, no.
18         So, first came the
19 Transobturator Monarch, right.
20     Q.   The AMS Monarch?
21     A.   Yes.
22     Q.   Let's go through the procession
23 of your history using slings.
24         Initially you used TVT

Confidential - Harvey A. Winkler, M.D.

Page 62

1 Retropubic, correct?
2    A.    Correct.
3    Q.    You trained under Lucente in
4 '98?
5    A.    Correct.
6    Q.    And then do you have a memory or
7 recollection of what sling you used next?
8    A.    So, I always continued to use
9 the retropubic.  It's not that I shifted
10 over one to the other.  But then the
11 transobturator sling came out and I also
12 learned that technique and offered those
13 slings to my patients as well.
14    Q.    So you went Ethicon TVT
15 Retropubic and then AMS Monarch.
16          Transobturator approach was
17 available and then you added that to your
18 surgical options to treat incontinence,
19 correct?
20    A.    Correct.
21    Q.    And then what came after that?
22    A.    So then after that, I think the
23 Boston Scientific Advantage sling came
24 out.  So I did transition some of my

Page 63

1 retropubics over to the Boston Scientific
2 Advantage.
3    Q.    And part of the reason for that
4 was because you wanted to -- if you were
5 using the Boston Scientific prolapse kit,
6 you also wanted to use the Boston
7 Scientific incontinence product; is that
8 correct?
9    A.    Yes.  And also if I was using
10 anything for prolapse, because I would do
11 transvaginal mesh procedures also, but if
12 I was using -- I tried to stick with the
13 same company, and I also liked the
14 smaller, thinner needles.
15    Q.    And which product had the
16 smaller, thinner needles?
17    A.    So, the Boston Scientific
18 Advantage.
19    Q.    Do you have an understanding --
20    A.    You know what, let me clarify.
21 You're probably right.
22          There's an Advantage Fit and
23 there's an Advantage.
24    Q.    And one of the advantages of the

Page 64

1 Advantage was smaller needles?
2    A.    The Advantage Fit had a smaller
3 needle.  I use it interchangeably because
4 they also had a thicker needle and that
5 was the regular Advantage.
6    Q.    Doctor, do you treat
7 complications that could arise from sling
8 procedures?
9    A.    Yes.
10    Q.    Do you treat complications that
11 arise from prolapse procedures?
12    A.    Yes.
13    Q.    Are you referred women who have
14 had a mesh implanted from some other
15 doctor?
16    A.    Sometimes.
17    Q.    And they're referred to you to
18 treat complications from some other
19 product that's been implanted that you did
20 not implant; is that correct?
21    A.    Correct.
22    Q.    And similarly, you have an
23 understanding that sometimes you might
24 implant a product in a female patient and

Page 65

1 she might seek treatment from another
2 doctor, for whatever reason, for a
3 complication, correct?
4    A.    Correct.
5    Q.    So it's hard to say what the
6 experiences of all of your patients that
7 you've implanted products in; is that
8 correct?
9          MR. ROSENBLATT:  Object to form.
10    A.    Correct.
11          However, I will tell you, and I
12 mean, it's a small community in the urogyn
13 field.  I've been in the New York area for
14 a long time, and I've actually asked some
15 of my colleagues have they seen any of my
16 complications and we do vice versa.  As
17 strange as it might seem, and I know all
18 doctors say this, the majority of patients
19 I know don't come back, but generally if
20 there was a real significant complication,
21 I think that I would hear about it.
22    Q.    Would you consider yourself a
23 high-volume mesh implanter?
24    A.    It depends what you consider

Confidential - Harvey A. Winkler, M.D.

Page 66

1 high volume, but I probably do more of
2 these procedures than a lot of people
3 around in the New York area.
4    Q.   And that probably affects your
5 complication rate probably.
6       The high volume helps you do it
7 safer; is that fair?
8      MR. ROSENBLATT: Object to form.
9      MR. BENTLEY: Let me rephrase it
10 a little bit.
11    Q.   Would you agree that you as a
12 high-volume or having more frequent
13 opportunity to implant these mesh devices
14 gives you enable ability to implant them
15 safer and have a reduced complication
16 rate; is that fair?
17    A.   I think my complication rate is
18 lower than what is quoted in the
19 literature.
20       However, generally when I
21 consent my patients, I use the
22 complication rate that's available in the
23 literature.
24    Q.   And we'll get to the literature

Page 67

1 in a little bit.
2       Would you agree that the
3 literature shows that more high-volume
4 implanters have a lower rate of
5 complications? Is that fair?
6    A.   Yeah, there's some data to show
7 that more experienced, quote/unquote,
8 surgeons may have a lower complication
9 rate.
10    Q.   How many women do you think you
11 treat a year for complications that arise
12 from a sling that was implanted to treat
13 incontinence?
14    A.   From a sling specifically?
15    Q.   Yes.
16    A.   Five to ten.
17    Q.   And how many women do you think
18 you treat a year that have complications
19 that might have arisen from a prolapse
20 treatment that used a polypropylene mesh?
21      MR. ROSENBLATT: Object to form.
22    A.   Repeat the question.
23    Q.   Sure. Well, we talked about you
24 think you do five to ten -- you think you

Page 68

1 see about five to ten women a year to
2 treat them for complications that arose
3 from a polypropylene sling for
4 incontinence; is that correct?
5    A.   Well, so, let's clarify what we
6 mean by a complication, because if voiding
7 dysfunction is a complication, I'm seeing
8 more of those. If we're talking other
9 complications, more significant ones,
10 that's what I'm talking about the five to
11 ten.
12    Q.   Let's go broad first.
13       Overall for all complications,
14 how many women do you think you see a year
15 that have complications that came from a
16 sling, a polypropylene sling that was
17 implanted to treat incontinence?
18    A.   Overall probably about, I don't
19 know, 15, 20, some of them, including my
20 patients.
21    Q.   And approximately five to ten of
22 those might have what you said I think is
23 serious complications?
24    A.   Complications that may require

Page 69

1 more treatment than, let's say, a
2 medication or something like that.
3    Q.   And what would the serious
4 complications include?
5    A.   So, the serious complications
6 that I would commonly see, the most common
7 is mesh exposure.
8    Q.   And what else?
9    A.   Sometimes patients will have
10 some pain with intercourse associated with
11 the implant. Some patients can have
12 fistulas or mesh erosion into the bladder
13 or the urethra.
14    Q.   The treatment can involve
15 surgery; is that correct?
16    A.   Correct.
17    Q.   And sometimes not surgery?
18    A.   Correct.
19    Q.   And sometimes multiple surgery,
20 correct?
21    A.   With a sling, you usually can
22 get it on the first surgical procedure.
23    Q.   Okay. You also see women that
24 have suffered complications after having a

Confidential - Harvey A. Winkler, M.D.

Page 70

1 mesh product implanted to treat prolapse,
2 correct?
3     A.   Yes.
4     Q.   And approximately how many women
5 do you think you see on average per year
6 that are suffering from complications from
7 a prolapse treatment that involved a mesh?
8     A.   About another -- about -- with
9 mesh, probably about five a year.
10         MR. ROSENBLATT:  Greg, I will
11     give you a little leeway, but just try
12     to separate the prolapse questions for
13     the afternoon depo.
14         MR. BENTLEY:  Okay.
15 BY MR. BENTLEY:
16     Q.   We said approximately there's
17 five to ten serious complications women
18 per year per sling and approximately five
19 prolapse.
20         Is there another group that
21 you're seeing that have complications that
22 had both a prolapse and an incontinence?
23 Is that like a separate group?
24     A.   No, that's probably all included

Page 71

1 in there.
2     Q.   So you're probably doing
3 approximately 10 to 15 revision surgeries
4 per year or --
5     A.   No.
6     Q.   How many revision surgeries do
7 you think you're doing per year?
8     A.   Five, six revision surgeries a
9 year.
10     Q.   And those revision surgeries are
11 usually for a mesh exposure?
12     A.   Exposure or erosion into
13 bladder, urethra.
14     Q.   Are you ever removing, going in
15 and removing the mesh, not just the
16 exposed mesh?
17     A.   So, it depends on what the
18 problem was.  I'll give you a for
19 instance, if you'd like.
20         In a patient who had a erosion
21 into the bladder from a Prolift mesh,
22 which is going to be later on in the
23 afternoon, I will take out a wider
24 dissection.

Page 72

1         We can save that for later, if
2 you want.
3     Q.   Of your five to six on average
4 revision surgeries per year, how many of
5 those do you think you're going in and
6 excising more mesh than just what's
7 exposed?
8     A.   Well, I always take out a little
9 more mesh than is exposed in order to get
10 fresh edges so I don't have tension on my
11 repair.  It really depends on why I'm
12 going in to take the mesh out.  I will say
13 rarely do I feel if it's a prolapse mesh
14 do I need to take the entire mesh out.
15         And for slings, if it's the
16 sling is working and it's a simple little
17 exposure, then I would just try to keep
18 the sling intact and remove the small
19 piece that is exposed in order to get a
20 fresh edge to close it out.
21     Q.   Some of the women that have had
22 a sling, they might have urinary
23 retention; is that correct?
24     A.   That's correct.

Page 73

1     Q.   And to surgically fix that, you
2 just go in and cut the mesh, correct?
3     A.   Correct.
4     Q.   It's called a release procedure
5 sometimes?
6     A.   Yeah.  So it's an incision into
7 the sling to release the sling.
8     Q.   And no mesh --
9     A.   I had to do one on a urologist's
10 wife once.
11     Q.   And no mesh is actually removed
12 in that procedure?
13     A.   I don't remove mesh in that
14 procedure.
15     Q.   When you're trimming or removing
16 mesh that's exposed, do you always send
17 that to a pathologist?
18     A.   I always send it to my path
19 department.  Generally they would just do
20 a gross on it.
21         However, there have been cases
22 where we've had to then send the mesh off
23 to plaintiff attorneys' path departments
24 and I happen to leave that to the path

Confidential - Harvey A. Winkler, M.D.

Page 74

1  department.
2      Q.   And for fairness, it also gets
3  examined by the defense pathologists.
4          Do you know that?
5      A.   Yes, I know that.
6      Q.   Doctor, have you ever done any
7  work as an expert in litigation before
8  this case or these reports?
9      A.   I've done some malpractice work,
10  but not -- this is my first product
11  liability type of work.
12      Q.   And did you submit expert
13  reports in those other cases?
14      A.   No.
15          I've also actually way back
16  when, I did some work for -- no reports,
17  but I did review some charts for Caldera.
18      Q.   Have you ever examined a patient
19  for what's called like a medical exam for
20  litigation purposes?
21      A.   Yes.
22      Q.   When did you do that?
23      A.   I think they've been mostly for
24  malpractice cases in the area when I was

Page 75

1  an expert on them.  I am not sure if I --
2          I have not done any examinations
3  for any patients, that I'm aware of, that
4  I remember, for this particular MDL.
5      Q.   But you've done some
6  examinations for med-mal cases; is that
7  correct?
8      A.   Correct.
9      Q.   Did you do those examinations on
10  behalf of the defendants or the
11  plaintiffs?
12      A.   Defendants.
13      Q.   Have you ever done any work on
14  behalf of plaintiffs?
15      A.   So, I've worked on charts and
16  reviewed charts for the plaintiffs.
17          However, I never have gone to
18  testify for plaintiffs.
19      Q.   Do you have any estimate of how
20  often you do work for plaintiffs versus
21  defendants?
22      A.   In the past, I did some more.
23  Probably right now it's down to about five
24  percent.  There's only one or two people

Page 76

1  that call me at this point in time.
2      Q.   So 95 percent of the work you do
3  for litigation is for defendants?
4      A.   Correct.
5      Q.   Has your practice changed in
6  that you see more patients now or less
7  patients throughout your career?  Or, can
8  you describe that for me?
9      A.   So, as I've been getting older,
10  I think the practice has changed a little,
11  and I'm seeing more surgical patients as
12  time goes on.  That's about it.  Surgery
13  seems to be getting busier.
14      Q.   You were initially trained on
15  the Burch, but today you don't really
16  perform it very frequently; is that
17  correct?
18      A.   Correct.
19      Q.   When do you think you, if you
20  remember, when did you stop doing Burch
21  probably?
22      A.   Probably somewhere in the late
23  2000s.
24      Q.   Okay.

Page 77

1      A.   I had a progression.  I mean,
2  so, the last patients that I did Burch on
3  were as part of the cure study where in
4  that case, they did recommend a
5  prophylactic procedure in patients who
6  were getting open abdominal
7  sacrocolpopexies, those were Burch
8  patients.  As I transitioned away from
9  open to robotic, we stopped doing the
10  Burch procedure.
11      Q.   You still do the robotic
12  procedures today, correct?
13      A.   I do the robotic procedure.  So,
14  we transitioned away from doing them open
15  abdominal sacrocolpopexy, and I
16  transitioned to more a more minimally
17  invasive technique with laparoscopic
18  robotic.
19      Q.   And that's for prolapse repair?
20      A.   That's for prolapse repair.
21      Q.   Doctor, have you ever done any
22  work consulting for a medical device
23  manufacturer?
24      A.   Yes.

Confidential - Harvey A. Winkler, M.D.

Page 78

1    Q.   Which companies have you worked
2    on behalf of?
3    A.   I'll try to remember them.  Most
4    of them are in the CV.
5    Q.   If you want to look at your CV,
6    that's fine.
7    A.   I've worked with Boston
8    Scientific on developing products.  I have
9    worked with Caldera, AMS.
10   Q.   What page are you on?
11   A.   Now I'm reading off memory, to
12   be honest with you.
13   Q.   Got you.
14   A.   In terms of devices, I have
15   consulted with Kimberly-Clark in terms of
16   an over-the-counter device for stress
17   incontinence.
18        I have -- I'm trying to think if
19   there's anything else.
20   Q.   You're talking about consulting
21   for product design?
22   A.   So product design, yes, I
23   consulted with Boston Scientific on
24   product design, as well as Caldera, and as

Page 79

1    well as probably with AMS Astora.
2    Q.   And then another -- I notice on
3    your CV it says you've taught or precepted
4    on behalf of AMS, correct?
5    A.   Correct.
6    Q.   And you've also taught on behalf
7    of Boston Scientific?
8    A.   Correct.
9    Q.   Have you talked on behalf of any
10   other companies?
11        MR. BENTLEY:  I'm sorry, that
12   was a horrible question.
13   Q.   Have you taught on behalf of any
14   other medical device manufacturers?
15   A.   In terms of cadaver labs, no.
16   These are the two that I recall that I've
17   done, the two companies.
18   Q.   Other than cadaver labs, have
19   you taught on behalf of any other medical
20   device manufacturer?
21   A.   So, I was a preceptor for J&J in
22   the early 2000s.
23   Q.   For what product?
24   A.   For TVT.  And I also -- I don't

Page 80

1    know if I ever -- I may have and I may not
2    have precepted for Caldera.  That I don't
3    really remember if anyone came to the OR
4    for that or not, to be honest with you.
5    Q.   For Caldera?
6    A.   Yeah.  And I precepted for
7    Boston Scientific as well.
8    Q.   If you could look at page 6 of
9    your CV, which is marked as 3.
10   A.   Yes.
11   Q.   There's a listing of your
12   teaching experience; is that correct?
13   A.   Yes.
14   Q.   And this has, for example in
15   August 2003 you did an AMS monarch cadaver
16   lab where you were lecturing an
17   instructor.
18        Do you see that?
19   A.   Yes.
20   Q.   And then there's an AMS below
21   that, then a Boston Scientific.
22        Does this reflect your teaching
23   on behalf of medical device companies?
24   A.   Yes.

Page 81

1    Q.   And you testified that you
2    taught on behalf of J&J in the early
3    2000s; is that correct?
4    A.   Yeah, but I don't think I ever
5    did a, like, a cadaver lab or anything
6    like that for them.  At least not that I
7    recall.  Some of this I'd have to put
8    together and think back.
9    Q.   So this is only teaching
10   experience specific to cadaver labs; is
11   that your testimony?
12   A.   Yes.
13   Q.   Why are these other entries on
14   here that don't say "cadaver lab"?
15   A.   Which one?
16   Q.   For example, April 2008 female
17   urology and urogynecology symposium
18   lecture, that's not a cadaver lab, is it?
19   A.   No.  So where it says, like,
20   October 2003 AMS Monarch cadaver lab.
21   Usually when I did a cadaver lab, I tried
22   to write it down.
23   Q.   Is there any reason why you
24   don't include your other teaching

Confidential - Harvey A. Winkler, M.D.

Page 82

1  employment on here from J&J?
2      A.   No.  This is for the medical
3  school.  So they want to know what I'm
4  treating and teaching, you know, in big
5  groups.  They're not really interested in
6  a doctor coming and watching and seeing
7  me.
8      Q.   When you say that you precepted
9  for J&J in the early 2000s, approximately
10  how many years did you teach on behalf of
11  J&J for?
12      A.   I don't think it was very long,
13  and I don't think it was a lot of docs.
14  It may have been for probably two, three
15  years only.
16      Q.   Did you get paid?
17      A.   Yes.
18      Q.   Are there other teaching
19  activities you've done on behalf of
20  medical device manufacturers that are not
21  included on here in addition to the J&J
22  work?
23      A.   For cadaver labs, I tried to
24  write them down.  If I was invited to a

Page 83

1  meeting or an advisory, I may have missed
2  that early on in my career, because to be
3  honest with you, I just didn't record all
4  that stuff back then.
5      Q.   But ultimately you started
6  including that information on your resume?
7      A.   Correct.
8      Q.   And where are those non-cadaver
9  lab stuff that later in your career you
10  started including on here?
11      A.   So, if I did an advisory board,
12  that would be on here.
13          Let's see what page that's on.
14      So, starting on page 2 Other
15  Professional Positions.  I wrote that I
16  was a consultant for AMS.  And once again,
17  it may have been earlier, but this form
18  for the medical school came out around, I
19  guess, somewhere several years ago when I
20  was up for associate professor, so five
21  years ago or somewhere.  So that's when I
22  started really recording.  Some of them I
23  have to go back to memory.  But right now
24  that's what I have and that's what's

Page 84

1  recent.
2      Q.   So if you were going to update
3  this today, would you add being a
4  consultant for Ethicon or J&J to your CV?
5      A.   I guess I would add it, yes, at
6  this point in time.  It's mostly for
7  precepting.  Once again, I didn't do
8  any -- I didn't do any cadaver labs or
9  whatnot, but I could add that, yes.
10      Q.   So it's your testimony today
11  that the only work you've done for J&J
12  other than this expert work in the MDL is
13  for preceptorship?
14      A.   So, I did that and I may have
15  gone to some meetings that they have
16  sponsored and I may have gotten paid for
17  that.  I don't recall what they were.
18      Q.   So you may have spoken on behalf
19  of --
20          MR. ROSENBLATT:  I just want to
21      object to form.  You're asking him
22      about the past 20 years or so.
23          MR. BENTLEY:  Right.
24

Page 85

1  BY MR. BENTLEY:
2      Q.   Your CV doesn't reflect any
3  employment for J&J whatsoever, does it?
4      A.   It doesn't -- I was never
5  employed by J&J.
6      Q.   You got paid by J&J, didn't you?
7      A.   Correct.
8      Q.   And your CV doesn't reflect any
9  of those payments or any of that work,
10  correct?
11      A.   Yes.  It's not because I'm
12  trying to hide anything like that.  Once
13  again, it's going back a long time.  I
14  totally forgot about the stuff that I did
15  for J&J when I put this together.  I
16  didn't include any of the other stuff that
17  I got paid for back then from Boston
18  Scientific or from AMS.  Once again, it
19  wasn't an academic thing, so I didn't put
20  it on my academic CV.
21          Today we have -- there's more
22  disclosure going on.  I fill out all my
23  conflict of interests and it's disclosed
24  on there, and you can go on the Web site

Confidential - Harvey A. Winkler, M.D.

Page 86

1  for Medicare and see it as well.
2     Q.   I mean, you would agree that
3  conflict disclosure is important
4  information, wouldn't you?
5     A.   I agree that's important, and I
6  usually adhere to the requirements of the
7  time.
8     Q.   So, in addition to the J&J work
9  that you did in the early 2000s, there's
10  also Boston Scientific and AMS work that's
11  not on this resume?
12     A.   There may be.  But once again,
13  some of the cadaver labs are on the CV.
14  So work that I did for them is there.
15        If I did any consulting on
16  device development or on any kind of
17  improvements to any of their devices that
18  I would have consulted on, I probably
19  didn't include that on here on this one.
20     Q.   You didn't include on here on
21  this one, you're talking about this CV?
22     A.   On my CV, I probably would not
23  have included the early 2000 stuff.
24        Once again, academically, it

Page 87

1  really wasn't pertinent at that point in
2  time, so I didn't include it.
3     Q.   That was in the early 2000s?
4     A.   Correct.
5     Q.   At what point would you have
6  changed and decided that information would
7  be pertinent to include on your CV?
8     A.   So, when I started doing this
9  and really updating this on an ongoing
10  basis when I was up for associate
11  professor, that's probably what I started.
12        And let's see when I was up for
13  an associate.  So, I was approved for an
14  associate professor in 2013.  I probably
15  started working on this format of this CV
16  about a year earlier in 2012.
17     Q.   So, you did some teaching on
18  behalf of, according to your CV, you did
19  some teaching on behalf of Boston
20  Scientific and AMS.
21        Additionally, did you do some
22  other work for those companies?
23     A.   Yeah.  I would consult with them
24  on device development.  I would consult

Page 88

1  with them if they were bringing in -- out
2  a new product, they would show it to me.
3  I would maybe do a cadaver lab with them.
4  I would give my advice on new product
5  development as well as products that they
6  have in development.
7     Q.   And that information is not
8  listed on your CV?
9     A.   Well, it is.  Consultant.  I
10  started putting, in 2012, I started
11  writing down when I was a consultant and
12  recording that kind of stuff.
13     Q.   So that information just isn't
14  recorded prior to 2012; is that fair?
15     A.   Yes.
16     Q.   And additionally, you did some,
17  it looks like, studies with some of these
18  companies; is that correct?
19     A.   Correct.
20     Q.   It says "Contracts, grants and
21  sponsor research" on page 9.
22        Do you see that?
23     A.   Okay.
24     Q.   And is this a list of the

Page 89

1  studies you worked on?
2     A.   Yes.  Not all the studies.  I
3  got some clarification on what studies
4  they really wanted on here, but these were
5  some of the major studies and anything
6  that would have a possibility with a grant
7  or grant money that was obtained, but we
8  do a lot of studies where in the office
9  where we don't get money for or we don't
10  get grants for and those generally aren't
11  included in here unless it's a large
12  multicenter study.
13     Q.   And the grant money doesn't go
14  to you; it goes to your hospital, right?
15     A.   Does not go to me.
16     Q.   But you included on here studies
17  that received grant money that went to
18  your hospital; is that fair?
19     A.   Yes.
20     Q.   Is this a complete list of the
21  work you've done or the studies you've
22  done that received grant money to your
23  hospital?
24     A.   That I'm aware of, yes.

Confidential - Harvey A. Winkler, M.D.

Page 90

1    Q.   Are there studies that you might
2  have forgotten about or didn't include?
3    A.   Yes, there's always that
4  possibility.  Once again, I started doing
5  this format around 2012.  So before that,
6  some of that may have been from memory and
7  just having to go back to some of the open
8  payroll, whatever accounts there were in
9  the hospital to find out from them if they
10 were -- if grant money was obtained.
11   Q.   So you went back to see if grant
12 money was obtained, you included those
13 studies on your CV?  Is that it?
14   A.   I tried to, yes.
15   Q.   And looking at your studies, it
16 looks like in 2003 you started a study
17 with the AMS Monarch.  Do you see that?
18 You were an investigator?
19   A.   Which one?
20   Q.   The second.
21   A.   On page 9?
22   Q.   Yes.
23   A.   Yes.
24   Q.   So that's a study that you did

Page 91

1  of the AMS Monarch that was from 2003 to
2  2005 $29,000 disclosed, correct?
3    A.   Correct.
4    Q.   So at least in -- some time in
5  the early 2000s, you were including
6  studies on here that you received money
7  for, correct?
8    A.   Correct.
9    Q.   Then two down from there there's
10 another AMS study that you participated
11 in?
12      Do you see that?
13   A.   Yes.
14   Q.   And that one was started in 2005
15 and ended in 2008; is that correct?
16   A.   Yes.  So once again, this is
17 going back eight years.  I'm going to
18 assume if I didn't put money down is we
19 probably didn't enroll patients in or the
20 study changed or something like that.
21   Q.   But if you enrolled patients,
22 you would have included on here?
23   A.   I likely would have.
24      Once again, this is going back a

Page 92

1  long time.  I don't really remember and if
2  we enrolled a patient or not.
3    Q.   I'm having a hard time.
4       How do we know what you worked
5  on in the 2000s?  Is there just no way to
6  know at this point?
7    A.   Whatever's here is what I
8  remember at this point in time.  Whatever
9  I thought was pertinent to in order to for
10 academically, that's why I put it on
11 there.  And there may have been a patient
12 or two in the perigee one, I just don't
13 recall.
14   Q.   Then on the next page the
15 complete entry on the top is 2006-2008.
16      Do you see that's a Boston
17 Scientific study you worked on?
18   A.   Yes.
19   Q.   And then I guess --
20   A.   See, I started to get better.
21   Q.   You get better at what?
22   A.   I started to get better at
23 recording the stuff and remembering it
24 because it was just available to me.

Page 93

1    Q.   What was available to you?
2    A.   No, the information to put down.
3    Q.   But the information was
4  available to you in the early 2000s also,
5  wasn't it?
6    A.   Yes, but I didn't put this CV
7  together then.
8    Q.   You didn't keep a CV from the
9  beginning of your career?
10   A.   I did.  Once again, not putting
11 down everything like I needed to put down
12 in this CV.
13   Q.   And it's your testimony that you
14 started making a complete CV around 2013
15 when you were up for assistant
16 professorship?
17      MR. ROSENBLATT:  Object to form,
18   characterization.
19   A.   So, I always had a CV.
20      When I needed to put this form
21 together, there was more information that
22 was requested than I probably had on my
23 old one, and that's why I needed to do
24 some going back.  Like I didn't keep a

Confidential - Harvey A. Winkler, M.D.

Page 94

1  record of every single grand rounds that I
2  did. I was doing a lot back then. I had
3  to go back and try to figure out which
4  ones I gave, where they were and whatnot.
5     Q.   Today would you like to go back
6  and update this CV and add some work for
7  any companies?
8     A.   I mean, I can add the consultant
9  for J&J. Once again, that was in the
10 early 2000s. I don't think academically
11 they would care at that point in time
12 going back, but sure, I'd put it down.
13 It's not a problem.
14    Q.   Today you'd like to do that?
15       MR. ROSENBLATT: Object to form.
16    You don't have to do anything.
17 BY MR. BENTLEY:
18    Q.   I'm not asking you what you have
19 to do.
20       If you had the opportunity to
21 update this CV, would you like to add --
22    A.   I probably wouldn't formally
23 update it at this point in time. I would
24 just leave it at this for the academic

Page 95

1  stuff 'cause once again that's 14 years
2  ago. If somebody wanted to know it, I
3  have no problem with disclosing it.
4     Q.   What was 14 years ago?
5     A.   When I did the consulting work
6  for J&J.
7     Q.   And today it's 2017.
8        Fourteen years ago would have
9  been?
10    A.   2003, '4. So 13, 14 years ago.
11    Q.   And your testimony today is
12 that's when your consulting with Ethicon
13 stopped?
14    A.   That's what I recall. I don't
15 remember, once again. I don't have the
16 1099s from back then. I don't have
17 information from back then or any tax
18 information.
19       MR. BENTLEY: Take a break?
20       MR. ROSENBLATT: Sure.
21       (Recess taken from 10:06 a.m. to
22    10:21 a.m.)
23 BY MR. BENTLEY:
24    Q.   Doctor, we're back from the

Page 96

1  short break.
2        Are you ready to go?
3     A.   Yes.
4     Q.   Before the break, we were
5  discussing that you may have worked as a
6  preceptor for Ethicon in the early 2000s.
7        Do you remember that?
8     A.   I didn't say "may." I did work
9  as a preceptor for them.
10       MR. BENTLEY: I'm going to hand
11 you what's being marked as Exhibit 21.
12       (Exhibit 21, e-mail chain ending
13 August 15, 2001, Bates No.
14 ETH.MESH.25126573 through
15 ETH.MESH.25126575, was marked for
16 identification, as of this date.)
17       THE WITNESS: I just want to
18 comment that on the grants, we
19 discussed this beforehand, but none of
20 this grant money went to me. It all
21 went to my hospital.
22       MR. BENTLEY: Appreciate that,
23 thank you.
24

Page 97

1  BY MR. BENTLEY:
2     Q.   So, Exhibit 21 is a e-mail,
3  Bates on the bottom right which we refer
4  to to identify pages, it's
5  ETH.MESH.25126573.
6        Do you see that?
7     A.   Yes.
8     Q.   And this is an e-mail from Greg
9  Slusser on August 2001.
10       Do you see that?
11    A.   Okay.
12    Q.   And do you know who Greg Slusser
13 is?
14    A.   I mean, he works for Ethicon. I
15 can see that.
16       Do I remember him? I don't --
17    Q.   It was a while ago.
18    A.   Yeah.
19    Q.   And you see the subject line of
20 the e-mail is "Preceptor summit
21 information"?
22    A.   Correct.
23    Q.   Then it's an e-mail string, you
24 can see further down is the earlier

Confidential - Harvey A. Winkler, M.D.

Page 98

1  message and the original e-mail from Brian
2  Luscombe on August 14th, 2001.
3       Do you see that?
4       A.   Yes.
5       Q.   And he starts the e-mail:
6  "Attached is the information recently
7  mailed to all preceptors with regard to
8  the TVT preceptor summit meeting."
9       Do you see that?
10      A.   Yes.
11      Q.   Then on the next page on Bates
12  the last three is '574, do you see there's
13  a list of people that have confirmed their
14  attendance?
15      A.   Yes.
16      Q.   And your name, Harvey Winkler,
17  is at the bottom of that first list.
18      Do you see that?
19      A.   Yes, it is.
20      Q.   And that's consistent with your
21  testimony today that in the early 2000s,
22  you were preceptor for J&J or Ethicon,
23  correct?
24      A.   Yes.

Page 99

1       Q.   Then I'm going to hand you
2  what's being marked as Exhibit 23.
3           (Exhibit Winkler 23, e-mail
4       chain ending February 7, 2005, Bates
5       No. ETH.MESH.25042561 through
6       ETH.MESH.25042562, was marked for
7       identification, as of this date.)
8  BY MR. BENTLEY:
9       Q.   This is another e-mail that was
10  produced to us by Ethicon, and its Bates
11  is 25042561.
12      Do you see that?
13      A.   Yes.
14      Q.   And this is an e-mail from
15  February 7th, 2005 from Donna Abely.
16      Do you see that?
17      A.   Mm-hm.
18      Q.   And she starts: "Thanks, Jim.
19  Dr. Hall is working on gathering all of
20  this information.  She just called to me
21  inform, however, that because Dr. Winkler,
22  the speaker, is traveling from the east
23  coast he's requesting a two-day
24  honorarium."

Page 100

1           Do you see that?
2       A.   Yes, I do.
3       Q.   And this is in 2005 you're
4  speaking on behalf of Ethicon, a J&J
5  subsidiary, correct?
6       A.   I don't know if I would call it
7  speaking on behalf of them.  If I remember
8  correctly, this was a lecture on the
9  pelvic floor incontinence and this was
10  about using mesh on the pelvic floor.
11      Q.   And you were being paid,
12  correct?
13      A.   I was being paid, yes.
14      Q.   Then I'm going to hand you
15  what's being marked as exhibit --
16      A.   And I think this is on my CV, by
17  the way.
18      Q.   Could you point me to what page
19  of Exhibit 3 it lists that you worked on
20  behalf of J&J and you spoke --
21      A.   It's page 7 of my CV,
22  Cedars-Sinai Medical Center.
23      Q.   On page 7 of Exhibit 3, which is
24  your CV, you spoke at Cedars-Sinai Medical

Page 101

1  Center; is that correct?
2       A.   That's what this was, correct.
3       Q.   And it says "guest lecture,"
4  correct?
5       A.   Yes.
6       Q.   And nowhere on your CV does it
7  say you got paid by Ethicon, correct?
8       A.   There's nowhere on this CV that
9  you need to write who your honorarium came
10  from.
11          MR. BENTLEY:  I'm going to move
12      to strike.
13          MR. ROSENBLATT:  Greg, let him
14      answer the question.  Then you can
15      move to strike.
16      Q.   Finish the answer, please.
17      A.   It's not required to put on your
18  CV where the honorarium comes from.
19      Q.   Do you remember what my question
20  was, Doctor?
21      A.   No.
22      Q.   Nowhere on this CV does it state
23  that you were paid by Ethicon to speak at
24  Cedars-Sinai, does it?

Confidential - Harvey A. Winkler, M.D.

Page 102

1    MR. ROSENBLATT: And you can
2  answer the question and provide the
3  context that you think is necessary.
4    A.   Once again, I wasn't paid to
5  speak there. They invited me. It was an
6  honorarium to compensate me for my out of
7  time out of the office.
8    Q.   My question is very precise, and
9  then if you need to explain afterward,
10 that's totally fine.
11   But my question is nowhere on
12 your CV does it say that you got paid to
13 speak at Cedars-Sinai by Ethicon, as we
14 just saw in that e-mail, does it?
15   MR. ROSENBLATT: Object to form;
16 asked and answered.
17   A.   It does not say that on my CV.
18   Q.   Doctor, I'm going to hand you
19 what's been marked as Exhibit 24.
20   (Exhibit Winkler 24, Power Point
21 presentation Eastern Region Region of
22 the Year by Paul Parisi, April 24,
23 2011, was marked for identification,
24 as of this date.)

Page 103

1  BY MR. BENTLEY:
2    Q.   This is a Power Point titled:
3  "Eastern Region Region of the Year," dated
4  April 24, 2011.
5    Do you see that?
6    A.   Yes.
7    Q.   And then on the bottom left
8  corner it says: "Professional education."
9    Do you see that?
10   A.   Yes, I do.
11   Q.   If you turn the page it says:
12 "Keys to winning," on the second page.
13   Do you see that?
14   A.   Yes.
15   Q.   In the bottom right corner it
16 says "KOLs."
17   Do you know what KOLs are?
18   A.   Key opinion leader, yes.
19   Q.   Were you a key opinion leader
20 for Ethicon?
21   MR. ROSENBLATT: Object to form.
22   Q.   If you know.
23   A.   I'm a key opinion leader today.
24   I did not know if I was a key

Page 104

1  opinion leader back in 2005, or who
2  considered me what.
3    Q.   But today you consider yourself
4  a key opinion leader for Ethicon?
5    MR. ROSENBLATT: Object to form.
6    A.   I consider myself knowledgeable
7  in the field. Am I -- if you want to
8  consider me a key opinion leader, yes,
9  some people may, some people may not.
10   Q.   If you turn the page on page 4
11 of this Power Point, there's a little 4 on
12 the bottom left.
13   Do you see?
14   A.   Mm-hm.
15   Q.   Yes?
16   A.   Yes, I do. I'm sorry.
17   Q.   That's okay.
18   Then on the bottom right --
19 well, on the top left it says "KOL."
20   Do you see that top heading?
21   A.   Yes.
22   Q.   Then on the bottom right it says
23 "Metro," and your name is listed under
24 "Metro."

Page 105

1    Do you see that?
2    A.   Yes, I do.
3    Q.   So 2011, at least according to
4  this Power Point, you're considered a key
5  opinion leader for professional education
6  for Ethicon.
7    Is that fair?
8    A.   Yes.
9    Q.   Today as we sit here and seeing
10 these documents, would you like to add
11 some of this information to your CV?
12   A.   I don't think that this is
13 pertinent to my CV.
14   If somebody asks me to disclose
15 any of this information, I have no problem
16 with disclosing it.
17   Q.   So you wouldn't want to add any
18 of this information to your CV?
19   MR. ROSENBLATT: Objection.
20   A.   I don't know if I would add it
21 or not to my CV. Once again, being a
22 consultant, I can put on. That's not a
23 problem. Whether or not it's going to
24 make a difference for academic promotion,

Confidential - Harvey A. Winkler, M.D.

Page 106

1 I don't think it will and that's why I
2 maintain the bulk of my CV.
3      But I don't think I was a
4 consultant for Ethicon in 2011.  I may
5 have been considered a key opinion leader,
6 but I don't recall being a consultant for
7 them in that year.
8      You probably have access to that
9 information easier than I do.
10   Q.   Just so I understand, for
11 purposes, for academic purposes, you don't
12 feel that you need to update your CV?  Is
13 that your testimony?
14      MR. ROSENBLATT:  Object to form;
15 mischaracterization.
16   A.   I didn't say that.  I said I
17 would think about it, if adding them as a
18 consultant to the CV.
19      Once again, I'm not going to do
20 it when I go back right away, but I don't
21 have a problem adding that to my CV and
22 disclosing that to anybody.
23   Q.   If you end up testifying at
24 trial before the jury, would you want to

Page 107

1 update your CV before beginning the trial
2 to include this work for Ethicon?
3      MR. ROSENBLATT:  Object to form.
4      Which consulting work are you
5 referring to?
6 BY MR. BENTLEY:
7   Q.   You can answer the question, if
8 you understand.
9   A.   So, I would consider adding my
10 consulting work that I did for J&J in the
11 early 2000s.  Thank you for reminding me.
12   Q.   Appreciate it.
13      Doctor, I just handed you an
14 exhibit, which is I believe your invoice
15 from the TVT report.
16      What number did I put on that
17 bottom right?
18   A.   20.
19      (Exhibit Winkler 20, Invoice No.
20      1011 of Harvey Winkler, M.D., dated
21      January 17, 2017, was marked for
22      identification, as of this date.)
23 BY MR. BENTLEY:
24   Q.   And does this Exhibit 20 reflect

Page 108

1 the work that you've billed on -- does
2 this Exhibit 20 reflect the work that
3 you've billed to prepare your TVT report?
4   A.   Yes.
5   Q.   And the description of your work
6 includes review of articles, research and
7 writing report; is that correct?
8   A.   Correct.
9   Q.   And is this all the time that
10 you put into those activities, reviewing,
11 researching and writing your report?
12   A.   I put some more activities in
13 together, but I've been so busy, I have
14 not had a time to add any of that stuff up
15 yet.
16   Q.   So as we sit here today, you
17 have more time that needs to be billed
18 that you know of?
19      MR. ROSENBLATT:  Object to form.
20      You're asking about what went
21      into his report, right?
22      MR. BENTLEY:  Right.  Thank you.
23 BY MR. BENTLEY:
24   Q.   Do you have any additional time

Page 109

1 to bill for the preparation of your report
2 that you know of today?
3   A.   I may have, yes.
4      Once again, I don't know the
5 hours or the numbers 'cause I had sent
6 this report in January 17th.  Today is
7 March -- what is today, March 12?
8   Q.   Right.
9   A.   I signed off on this report on
10 February 5th.  So I probably did more work
11 in between.
12   Q.   In between?
13   A.   In between January --
14   Q.   17?
15   A.   Well, this is up to January 3rd,
16 right.
17   Q.   I got you.
18   A.   I just sent out the bill on the
19 17th before I went away.
20      So, there may well be more time
21 that I have spent on, and likely there is.
22   Q.   Do you have an estimate of how
23 much more time after January 3rd you're
24 going to bill for --

Confidential - Harvey A. Winkler, M.D.

Page 110

1    A.   I don't recall.  I apologize.
2         MR. ROSENBLATT:  And Greg, I'm
3    happy to produce the information when
4    we get it.
5         THE WITNESS:  Yeah, not a
6    problem.
7    BY MR. BENTLEY:
8    Q.   Your hourly rate for preparing
9    report and reviewing material was $650 an
10   hour, correct?
11   A.   Correct.
12        It's expensive to live in New
13   York.
14   Q.   That's true.
15        Is that also your rate for this
16   deposition today?
17   A.   So, my deposition -- I didn't
18   really discuss this, to be honest with
19   you.  I thought this was going to be a
20   seven-hour deposition, and then you guys
21   increased it to a nine-hour deposition.
22        So, yes, it's either -- it will
23   be around the 650 an hour.  My deposition
24   daily rate is 7,000.  I was going to

Page 111

1    figure out what we were going to bill for
2    today.
3    Q.   Charge him more.
4    A.   I don't know about charge him
5    more.  I wouldn't charge more than the 650
6    an hour, but we will be here for 12 hour --
7    how long are you going to keep me here?
8    Q.   We'll see.
9         Is your daily rate for trial the
10   same?
11   A.   It's 8,000.  It's in my CV.
12        Trials don't go past nine
13   o'clock at night, right?
14   Q.   No comment.
15        So, let's look at your report.
16   A.   Okay.  The TVT report, to be
17   exact?
18   Q.   TVT report we've entered as
19   Exhibit 2, I believe.
20   A.   Okay, I'm ready.
21   Q.   If you could turn to page 7 of
22   your report, please.
23        THE WITNESS:  Could we go off
24   the record for a second?

Page 112

1         (Discussion held off the record.)
2    BY MR. BENTLEY:
3    Q.   Earlier we were discussing your
4    use of different polypropylene slings.
5         Do you remember that?
6    A.   Yes.
7    Q.   And you testified that you used
8    TVT classic.
9    A.   Okay.
10   Q.   I believe you said you used the
11   machine-cut TVT classic; is that correct?
12   A.   Yes.
13   Q.   And then today you use
14   TVT-Exact, correct?
15   A.   Correct.
16   Q.   And TVT Exact is laser-cut,
17   correct?
18   A.   Correct.
19   Q.   I thought you said you never
20   used a laser-cut TVT-R; is that correct?
21   A.   I don't think that I have.
22   Q.   And so on page 7, that last
23   paragraph, the third line down you say:
24   "I have implanted traditional TVT

Page 113

1    mechanically-cut and laser-cut."
2         Do you see that?
3    A.   Yes.
4         Okay.  So, what I mean to
5    clarify -- so, doesn't matter if you call
6    it -- I call TVT classic or
7    mechanically-cut, laser-cut.  Traditional
8    cut meant general TVT, not traditional
9    mechanical-cut.  So I've done both.
10        Do you understand?
11   Q.   I don't.
12        So, before you switched to
13   TVT-Exact, you were using TVT-R or TVT
14   classic, correct?
15   A.   Correct.
16   Q.   And you testified today that you
17   used mechanically-cut TVT-R, correct?
18   A.   Correct.
19   Q.   Which you no longer use today,
20   correct?
21   A.   Correct.
22   Q.   But your report says you used
23   TVT, mechanically-cut and laser-cut.
24        That's what that says, right?

Confidential - Harvey A. Winkler, M.D.

Page 114

1    A.   It does.
2    Q.   Can you explain that?
3    A.   I mean, what we're calling
4  traditional, classic, I just meant
5  traditional TVT as TVT-type slings and
6  then I separate it into I've done
7  mechanically-cut TVT slings and laser-cut
8  TVT slings.
9    Q.   Just so I understand, the
10 laser-cut retropubic device made by
11 Ethicon that you use is TVT Exact?
12   A.   Correct.
13   Q.   And did you use TVT Retropubic
14 laser-cut?
15   A.   Not that I recall.
16   Q.   Okay.  Doctor, on page 7 you
17 have some estimates of how many procedures
18 you've done.
19      Do you see that?
20   A.   Yes.
21   Q.   How did you come to those
22 numbers?
23   A.   These are very gross estimates.
24 I don't have case logs and whatnot.  So

Page 115

1  these are just trying to think back of how
2  many I do a year and how much I did in
3  fellowship.
4      It's very, very gross.
5    Q.   You didn't go back and review
6  any operative reports or anything like
7  that?
8    A.   No, no.
9    Q.   Do you have an estimate of how
10 many of the 3,000 midurethral slings
11 you've implanted, how many of those women
12 had complications?
13   A.   It depends what you consider a
14 complication.
15   Q.   Let's start broad.
16      Just any complication, do you
17 have an estimate of how many of the 3,000
18 slings you've implanted the woman had a
19 complication?
20   A.   I don't have my own estimate.  I
21 would go with pretty much what's in the
22 literature, to be honest with you.
23   Q.   My question is more in your
24 experience and estimate, taking the

Page 116

1  literature apart, or aside, in your
2  estimation, do you have any idea of how
3  many of the 3,000 slings you've implanted
4  that those women had any type of
5  complication?
6    A.   Any type of complication, if
7  we're talking about exposure, erosion,
8  going back I would say somewhere between,
9  I don't know, two, three percent.
10      Really this is gross 'cause once
11 again I have not gone back.
12   Q.   I'm not asking you to guess.
13   A.   Yeah, it's a guess.
14   Q.   And then likewise, you don't
15 have an estimate of how many of those
16 3,000 slings you implanted, you don't have
17 a reasonable or accurate estimate of how
18 many had an erosion, correct?
19      MR. ROSENBLATT:  Object to form.
20      MR. BENTLEY:  Let me rephrase
21 it.
22 BY MR. BENTLEY:
23   Q.   Do you have any reliable way of
24 calculating what percent of your 3,000

Page 117

1  slings you implanted, how many of those
2  women had an erosion?
3    A.   From the 3,000, absolutely not.
4  I don't have a reliable way.
5    Q.   And do you have a reliable way
6  of estimating how many of the women, of
7  the 3,000 women you implanted slings, how
8  many of those women developed dyspareunia?
9    A.   I don't have that number
10 available to me.
11   Q.   Do you have any reliable way of
12 estimating how many of the women that you
13 implanted slings in, your 3,000 women that
14 you implanted slings in, how many of those
15 women developed chronic pain?
16   A.   I don't have that number.
17 However, I do believe that number is low.
18   Q.   If you could turn your
19 attention, please, to page 8 of your
20 report.  At the top you say:  "I have had
21 extensive experience in treating
22 complications after gynecologic
23 surgeries."
24      Do you see that?

Confidential - Harvey A. Winkler, M.D.

Page 118

1   A.   Yes.
2   Q.   (Continuing) "Including after
3   Burch, needles procedures, autologous and
4   midurethral sling procedures."
5        Do you see that?
6   A.   Yes, I do.
7   Q.   Do you have any reliable
8   estimate or method for estimating how many
9   complications you've treated after a
10  midurethral sling procedure?
11  A.   A number?  I don't know.  If I
12  treated maybe a hundred or 50 to -- maybe
13  50, 75.
14       I don't really remember those
15  numbers.
16  Q.   In preparing this report, did
17  you undertake any investigation into how
18  many women you have treated for
19  complications from midurethral sling
20  procedures?
21  A.   I didn't do a review of my
22  studies of that, no.
23  Q.   Do you have that information
24  available for you to review if you wanted

Page 119

1   to?
2   A.   Not easily available, no.
3   Q.   The next paragraph on page 8,
4   you state that you received further
5   training in preventing, identifying and
6   treating surgical complications during
7   residency.
8        Do you see that?
9   A.   Yes.
10  Q.   Your residency was before the
11  midurethral slings were available,
12  correct?
13  A.   Correct.
14  Q.   So you couldn't have received
15  training on how to treat midurethral
16  slings, could you have?
17  A.   Well, all slings have the same
18  complications except for synthetic slings
19  which may have complication -- which do
20  have a complication of erosion or
21  exposure.  And we can debate whether or
22  not autologous or biologic slings have
23  that risk or not.
24       MR. BENTLEY:  Let me re-ask it.

Page 120

1   BY MR. BENTLEY:
2   Q.   During your medical residency,
3   did you receive training on how to treat
4   specifically complications of midurethral
5   slings made out of polypropylene?
6   A.   Yes, because those slings have
7   the same risks, except for erosion and/or
8   exposure, as do the autologous slings, as
9   do some Burch complications, and as do
10  general complications of surgical
11  procedures.
12  Q.   What training did you receive on
13  how to treat complications from
14  polypropylene slings during your
15  residency?
16  A.   During my residency, I did not
17  receive any training in polypropylene
18  slings.
19       I did receive training during my
20  fellowship in synthetic slings in treating
21  Gore-Tex slings that we had placed for
22  synthetics.
23  Q.   What slings were available that
24  were made out of Gore-Tex?

Page 121

1   A.   So, you would cut a sheet of
2   Gore-Tex at that point in time and use
3   that as your implantable.
4        In the late -- in the 1990s,
5   there was no specific indication for any
6   of the meshes that people were using at
7   that point in time, whether it was Marlex,
8   Mersilene, Gore-Tex.  People were cutting
9   their own pieces and using them as the
10  sling.
11  Q.   There was no sling product
12  manufactured that was made of Gore-Tex; is
13  that correct?
14  A.   Gore-Tex never made a sling,
15  that is correct.
16  Q.   Do you have an opinion as to
17  whether the Gore-Tex slings were safe and
18  effective?
19  A.   I think the Gore-Tex slings had
20  a high complication rate.
21  Q.   Do you have any understanding of
22  why they had a high complication rate?
23  A.   They're a microporous mesh and
24  the sling would get encapsulated as

Confidential - Harvey A. Winkler, M.D.

Page 122

1  opposed to integration into the tissue,
2  and that would have been one of the
3  reasons why they had a high complication
4  rate.
5      Q.   So, I think I understand.
6          Your testimony is that the
7  Gore-Tex slings had a high complication
8  rate because they were microporous, in
9  part?
10     A.   Yes.
11     Q.   And the slings, the size of
12 their pores is an aspect of the design of
13 the mesh; is that correct?
14     A.   Correct.
15     Q.   And the geometry of the mesh is
16 part of the design of the product,
17 correct?
18     A.   What do you mean by "geometry,"
19 that it's linear?
20     Q.   The mesh is a knitted product
21 that's they take a monofilament
22 polypropylene and knit it into a mesh,
23 correct?
24     A.   Correct.

Page 123

1      Q.   And it creates a certain pattern
2  or a pore structure, correct?
3      A.   Correct.
4      Q.   And there's large pores and
5  smaller pores and different pores,
6  correct?
7      A.   Correct.
8      Q.   And I believe it's your
9  testimony that the Gore-Tex slings had a
10 pore complication that fell apart because
11 they were microporous?
12     A.   Correct.
13     Q.   Which is the geometry of the
14 mesh or the knitting design, correct?
15     A.   Correct.
16     Q.   Okay.  Do you have an opinion as
17 to whether or not it was the Gore-Tex
18 material inherently causing the
19 complication, or was it the geometry of
20 the Gore-Tex pores that was causing the
21 complications?
22     A.   I don't have an opinion on
23 either.
24     Q.   But today there's no Gore-Tex

Page 124

1  slings available, correct?
2      A.   Not that I'm aware of, correct.
3      Q.   And you're not implanting
4  Gore-Tex slings today, right?
5      A.   No.
6      Q.   Doctor, you learned the Burch
7  procedure during your residency, correct?
8      A.   I was exposed to it in
9  residency.  I really learned it in
10 fellowship.
11     Q.   Thank you.
12          And you used it as a frequent
13 treatment for incontinence early on in
14 your career, correct?
15     A.   Yes, it was a primary procedure
16 for incontinence.
17     Q.   Did you have good results with
18 the Burch?  Doing that procedure, did you
19 have good results?
20     A.   Yes.
21     Q.   And by "good results," you had
22 good efficacy rates?
23     A.   Yes.
24     Q.   And low complication rates?

Page 125

1      A.   Depends what you consider low.
2  There were complications associated with
3  the Burch procedure, but it's a good
4  procedure.
5      Q.   At least in your hands, it was a
6  good procedure and safe and effective;  is
7  that fair?
8      A.   Yes.
9      Q.   Do you have any estimate as to
10 what your complication rate would have
11 been when you were doing the Burch
12 procedure to treat women with
13 incontinence?
14     A.   Once again, somewhere in the --
15 depends on what you consider a
16 complication, if a wound infection is a
17 complication.  So I think overall, I don't
18 have a -- that's really far back going
19 remembering, but if we're taking all
20 complications, wound infections, pain, you
21 know, could have been six to eight
22 percent.
23     Q.   Would you consider that low?
24     A.   Depends on what you're

Confidential - Harvey A. Winkler, M.D.

Page 126

1  considering a complication, again, and
2  what is a major complication, what's a
3  minor complication.
4       The most common complication
5  from all these anti-incontinence
6  procedures is actually a urinary tract
7  infection.  Many people don't consider
8  that a complication.
9       So it depends on what you
10  consider low and high.
11  Q.   Recurrent UTIs could be a more
12  serious complication; is that fair?
13  A.   Recurrent UTIs could be more
14  bothersome than just one UTI, for sure.
15  Q.   When you meet with women today
16  that are suffering from incontinence, you
17  discuss the various treatments, as we
18  discussed earlier, correct?
19  A.   Mm-hm.
20  Q.   Yes?
21  A.   Yes.
22       I'm sorry.  Once again I
23  apologize.  My fault.
24  Q.   And you discuss non-surgical and

Page 127

1  surgical interventions, correct?
2  A.   Correct.
3  Q.   And when you discuss surgical
4  interventions, you discuss the midurethral
5  slings, correct?
6  A.   Correct.
7  Q.   And do you still discuss the
8  Burch procedure as one of the options
9  today?
10  A.   I mention it to them.  Every
11  single -- I try to give every single
12  patient the IUGA handout, the
13  International Urogynecological Association
14  handout on stress incontinence on the
15  patient's first visit.  So in there it's
16  described all the options.  So if the
17  patience doesn't remember what the options
18  are, they can take it home and read it.  I
19  encourage them to go to the Web site.  I
20  encourage them to do their own research on
21  the options, as well as the products
22  themselves.
23  Q.   And when you discuss the Burch
24  procedure today with your patients as a

Page 128

1  potential option for treating the
2  incontinence, what do you generally tell
3  them is your complication rate with the
4  Burch procedure?
5  A.   So, I would tell them it's not a
6  commonly performed procedure today that I
7  do, as the midurethral sling has sort of
8  become the standard in treatment for
9  stress incontinence, which has been
10  ratified or promoted or agreed upon by the
11  major societies in the U.S. and
12  internationally.  I tell them my
13  complication rate is low with the Burch
14  procedure.  However, the overall morbidity
15  with abdominal incision, recovery is
16  longer associated with the Burch
17  procedure, and the data does not show that
18  the Burch procedure has a better overall
19  success rate than the midurethral slings.
20  Q.   So, you want to give patients
21  complete knowledge so they can make a full
22  and informed decision; is that fair?
23  A.   Yes, I do.
24  Q.   And when you discuss potential

Page 129

1  treatment options for incontinence, you
2  give them the option of Burch; is that
3  correct?
4  A.   It's in there, yes.
5  Q.   And what do you tell your
6  patients about the complication rate?  Do
7  you only classify it as low, or do you
8  give them an estimated complication rate?
9  A.   So, that's a really hard
10  question to answer about what the
11  complication rate is and even the
12  percentages are available even amongst the
13  studies that you're going to look at.  I
14  will tell them it is low.  The likelihood
15  of them having major complication, death
16  is a major complication, the likelihood of
17  that happening is low, but I try not to
18  quantify exactly what low and rare is, and
19  we try to come to an understanding with
20  the patient in order to figure out what's
21  going to be the most appropriate treatment
22  that they would like to go forward with.
23  Q.   Do you give your patients a
24  range of what you anticipate the

Confidential - Harvey A. Winkler, M.D.

Page 130

1  complication rate would be for Burch?
2      A.   They don't ask that.
3      Q.   So you don't tell them?
4      A.   I don't give them a range of
5  what the complication rate will be.
6      Q.   And similarly, do you give your
7  patients an estimate of what you think the
8  efficacy would be for Burch?
9      A.   I say they're comparable.  And I
10 usually would say somewhere around 80 to
11 85 percent success rate for a midurethral
12 sling, so you can extrapolate that.  It's
13 probably around the same for a Burch
14 procedure.
15     Q.   You haven't undergone any type
16 of statistical analysis to figure out what
17 the true complication rate is for Burch,
18 have you?
19     A.   Myself, I have not done that.  I
20 go by the literature and the systemic
21 reviews and the Level I evidence.
22     Q.   And in preparing this report,
23 you didn't do a statistical analysis of
24 what you think the true rate is of

Page 131

1  complications of Burch?
2      A.   I personally did not perform a
3  systemic analysis.
4           I did my own Pub Med searches.
5      Q.   You don't have SAS on your
6  computer at home, do you?
7      A.   No.
8      Q.   And similarly, you didn't do a
9  statistical analysis of what you think the
10 true complication rate is of polypropylene
11 slings, correct?
12     A.   I did not do a -- my own
13 systemic review.  I read the Level I
14 evidence, and I'm aware of the Level I
15 evidence that I've been reading throughout
16 my entire career.
17     Q.   What is the definition of Level
18 I evidence?
19     A.   So, Level I evidence is
20 meta-analysis and systemic reviews.  After
21 that would be randomized control trials.
22          So, I try to stick with Level I
23 and Level II evidence if it's available.
24     Q.   Is there a difference between

Page 132

1  systemic reviews and systematic reviews,
2  or is it just kind of synonymous?
3      A.   I use them interchangeably.
4      Q.   We talked about you have
5  experience treating complications,
6  including after Burch procedures; is that
7  correct?
8      A.   Yes.
9      Q.   How often do you see patients
10 that have had a complication from Burch?
11     A.   We don't see it commonly and
12 it's rare because there aren't that many
13 Burch procedures being done anymore.
14     Q.   Did you used to see more
15 patients that had complications from
16 Burch?
17     A.   Yes.
18     Q.   And what would the complications
19 that you --
20          MR. BENTLEY:  Let me rephrase
21     that.
22     Q.   The women that you saw that had
23 complications from Burch back when Burch
24 was done more commonly, what were the

Page 133

1  complications that you saw and treated?
2      A.   So, complications could be
3  urinary retention, voiding dysfunction,
4  suture erosion, hematoma developing from
5  the incision, pain with the incision,
6  infection with the incision.
7          THE WITNESS:  Can you read back
8     what I told him already?
9          (The requested portion of the
10     record was read by the Court Reporter.)
11     A.   And prolapse occurring after the
12 Burch procedure.
13     Q.   And what surgical interventions
14 did you have to perform to treat
15 complications that might have arisen from
16 Burch?
17     A.   So, it depends on what the
18 complication was.  Sometimes there were
19 sinus tracts that developed abdominally to
20 the suture that we put in.  So we would
21 need to go back in abdominally and remove
22 that permanent suture.  Sometimes the
23 patient would develop urinary retention or
24 significant voiding dysfunction, where we

Confidential - Harvey A. Winkler, M.D.

Page 134

1  would need to go in vaginally and do a
2  urethrolysis.  Those are the more common
3  procedures we were doing.
4      If someone had a prolapse
5  failure afterwards and wanted treatment
6  for that, we would go in and treat their
7  prolapse.
8      Q.   What kind of sutures were you
9  using to do your Burch procedures?
10     A.   2-0 Gore-Tex sutures is what I
11  used and what I would still use today.
12     Q.   Doctor, when we talk about mesh
13  erosion, sometimes I see "exposure" and
14  "extrusion."
15      Do you have some definition that
16  differentiates those three words, or are
17  they kind of interchangeable?
18     A.   So, what I like to use in my
19  documentation if I'm writing the note, I
20  prefer to use the word "exposure" when
21  there's mesh visible in the vagina.  I
22  prefer to use "erosion" when mesh has
23  migrated into a visceral organ,
24  specifically most commonly here would be

Page 135

1  either in urethra or into bladder.
2  Although mesh, and depending on what type
3  of meshes we're talking about, they can
4  migrate to other places.
5      Q.   And you don't use "extrusion" in
6  your practice?
7      A.   Not commonly.  It's not a common
8  term that I use.
9      Q.   On page 4 of your report,
10  there's a paragraph that starts -- I'm
11  sorry, on page 35 of your report there's a
12  paragraph that starts:  "The surgical
13  risks".
14      Do you see that?
15     A.   Yep.
16     Q.   About halfway down you say:
17  "Although if necessary, surgical
18  correction for exposure is a relatively
19  simple procedure performed on an
20  outpatient basis."
21      Do you see that?
22     A.   Yes, I do.
23     Q.   Sometimes it's not relatively
24  simple to fix the exposure; isn't that

Page 136

1  correct?
2      A.   An exposure from a TVT or any
3  type of midurethral sling, as a general
4  rule, is not that difficult a procedure to
5  perform.  It's right there in front of
6  you.  It's a vaginal procedure and you
7  don't -- it's not a terribly difficult
8  procedure.
9      Q.   Is it all --
10     A.   And you know what, you don't
11  have to perform it all the time.  If it's
12  not bothering the patient, you can leave
13  it.
14     Q.   But if it's symptomatic, you
15  need to do some sort of intervention,
16  correct?
17     A.   Correct.
18     Q.   And is it always performed on an
19  outpatient basis?
20     A.   Not always.  Sometimes I will
21  try to, and I'll discuss with the patient
22  of what they would rather me do, but
23  sometimes in the office we can try to, if
24  it's just a little piece of an edge

Page 137

1  eroding through, that we can try cutting
2  that little piece off in the office and
3  giving some vagina estrogen.  It doesn't
4  always have to be.
5      Q.   Okay.  And using your definition
6  that you just gave me, now I understand.
7      Your next sentence you say:
8  "Erosion of mesh into the bladder area is
9  rare."
10      Is the surgical intervention to
11  fix an erosion more invasive than the
12  surgical intervention to fix an exposure?
13     A.   I don't know if I want to use
14  the term "invasive."
15      I can use the term "a little
16  more complicated."
17     Q.   And by "complicated," there's
18  going to be more dissection, correct?
19     A.   There's more dissection.  If
20  there's an erosion into the bladder, I
21  need to repair the bladder.  And I have to
22  get to the bladder somehow, so I either
23  have to go in abdominally or go in
24  vaginally to repair those erosions into

Confidential - Harvey A. Winkler, M.D.

Page 138

1  those areas.
2      Q.   And that's not like the simple
3  office procedure?
4      A.   That is not a simple office
5  procedure.  But once again, those are --
6  those do not happen commonly.
7      Q.   In your experience, what's the
8  percentage of the women that you implant
9  with polypropylene slings that --
10     A.   Sorry, can you start over again?
11     Q.   Sure.
12         In your experience implanting
13  polypropylene slings, do you have an
14  estimate of how many women suffer from
15  voiding difficulties after the procedure?
16     A.   I don't have an estimate of my
17  own.
18     Q.   I may have already asked this.
19         In your experience doing the
20  Burch procedure to treat incontinence, do
21  you have an estimate of what percent of
22  the women suffer from voiding difficulties
23  after the procedure?
24     A.   I don't have an estimate for

Page 139

1  that, no.
2      Q.   Do you have some standard of
3  what you consider an acceptable rate of
4  voiding difficulty for a surgery to treat
5  incontinence?
6      A.   So, that's also a difficult
7  question 'cause we need to understand what
8  voiding dysfunction is, and once again is
9  the voiding dysfunction symptomatic or not
10  symptomatic.  Many women's sometimes will
11  just tell me their voiding pattern changes
12  after you put a sling in.  We're doing
13  surgery on them.
14         So that's why I don't have a
15  great estimate for you 'cause voiding
16  dysfunction is really a hodgepodge of
17  symptoms that a patient may have.
18     Q.   What voiding difficulty symptoms
19  would require surgical intervention?
20     A.   So, if there's any evidence of
21  obstructed voiding, that the sling has
22  some reason -- for some reason got a
23  little too tight around the urethra, or
24  underneath the urethra as opposed to

Page 140

1  around it, I apologize, and if someone is
2  complaining of difficulty urinating, she
3  feels that she's got the urgency, it's a
4  very slow stream, it's dribbling, she has
5  urinary retention, that may indicate to me
6  that this sling has gotten a little too
7  tight for her and we need to go back to
8  the operating room to do a revision or cut
9  the sling.
10     Q.   Do you have an estimate of how
11  often the women that you implant these
12  slings in have those obstructive voiding
13  complications?
14     A.   I have not done a systemic
15  review of my patients.
16         However, I think I'm cutting
17  about one sling a year, so it's about a
18  half, maybe a half percent or something
19  like that that I'm going back in, that I
20  know of, on these patients.
21     Q.   So maybe one out of
22  approximately 175 slings per year that you
23  implant the woman is going to develop some
24  obstructive voiding problem;  is that

Page 141

1  fair?
2      A.   That's going to develop some
3  kind of obstructive voiding problem that I
4  need to go back in and cut the sling, yes.
5      Q.   And that's because the sling had
6  gotten a little too tight maybe around the
7  urethra; is that correct?
8      A.   Yeah.  I pretty much put the
9  sling in the same way.  There's some
10  people who develop more scar and there's
11  some people who develop less scar.  And
12  yes, the sling has scarred in and gotten a
13  little too tight underneath the urethra
14  causing the obstruction, causing the
15  voiding difficulty.
16     Q.   And that's not because you put
17  it in incorrectly, is it?
18     A.   I don't think so.  It's a known,
19  commonly known complication for a
20  midurethral sling.  It's a commonly known
21  complication for any type of
22  anti-incontinence procedure that we're
23  performing.
24     Q.   And you put the sling in with

Confidential - Harvey A. Winkler, M.D.

Page 142

1 the same --
2     MR. BENTLEY: Let me rephrase
3 that.
4     Q.  When you put the sling in, you
5 always put them in tension-free, correct?
6     A.  Correct.
7     And I understand tension-free is
8 difficult.  It's just like when we're
9 doing obstetrics and we don't do traction
10 on the baby's head.
11     So, tension-free is one of those
12 words that we put in open and closed
13 quotations.
14     Q.  You don't put the slings in with
15 tension; is that fair?
16     A.  Try not to, yes.
17     Q.  But sometimes though some of the
18 women still develop obstructive voiding
19 because the sling got a little too tight?
20     A.  Correct, yes.
21     And once again, commonly known.
22     Q.  Those women that you sling that
23 develop obstructive voiding because the
24 sling got too tight, when in your

Page 143

1 experience does that occur; what time
2 frame after the implant?
3     A.  Generally within the first year
4 is I would see that.
5     Q.  Doctor, could you please turn to
6 page 7 of your report.  We started talking
7 about this a little bit.
8     I did it again, sorry.  Page 50.
9     A.  No problem.  Going back.
10     Q.  Going back forward.
11     A.  Yes.
12     Q.  All right.  On page 50.
13     A.  Yes.
14     Q.  (Reading)  "The most extensively
15 studied surgical treatment."
16     Do you see that paragraph that
17 begins with that?
18     A.  Yes.
19     Q.  A little bit down in that
20 paragraph you say: "Symptomatic reviews
21 of randomized control trials (Level I)
22 provide the most reliable data followed by
23 individualized randomized trails (Level
24 II), cohort studies (Level III), provide

Page 144

1 lower quality of evidence, and finally
2 case series provide the lowest (Level IV.)"
3     Is that correct?
4     A.  Correct.
5     Q.  Is that consistent with your
6 approach to evaluating literature in your
7 practice and in this report?
8     A.  It is today.
9     Q.  When you say "it is today," has
10 that changed in your experience, or have
11 you always considered Level I to be
12 systemic or systematic reviews of RCTs?
13     A.  I've always considered that, but
14 there wasn't a lot of good Level I data
15 available in the late '90s, and early
16 2000s.
17     Q.  Right.  So, the levels of data,
18 the definitions of what Level I data,
19 that's nothing new, right?
20     A.  Yeah, I don't know when Oxford
21 came out with it, but it's been available,
22 yes.
23     Q.  And all things equal, you would
24 rather look at Level I data than Level II

Page 145

1 and Level III, correct?
2     A.  Correct.
3     Q.  What's your definition of Level
4 II data?
5     A.  Level II are individualized,
6 randomized control trials, ones that may
7 have not been so -- and ones that --
8 mostly randomized control trials and ones
9 that maybe were poorly structured or may
10 have had a large loss to follow-up.
11 They're not as strong as the
12 well-performed randomized control trials.
13     Q.  Could well-performed large
14 multicenter RCTs be Level I evidence?
15     A.  It depends on what other data's
16 available.
17     Q.  And cohort studies are lower
18 level of evidence, or Level III; is that
19 correct?
20     A.  Yes, cohort and case control
21 studies are lower levels.
22     Q.  So, when you're looking --
23     MR. BENTLEY: Let me rephrase
24 that.

Confidential - Harvey A. Winkler, M.D.

Page 146

1    Q.   When you are talking about,
2  quotes, reliable evidence, quote, does
3  that mean that you're looking for Level I
4  or Level II evidence?
5    A.   I'm always looking for Level I
6  or Level II.  If that doesn't exist, we
7  need to go to the III and the IV.
8    Q.   So, could you please turn to
9  page 42 of your report.
10    A.   Okay.
11    Q.   In that middle paragraph that
12  starts off:  "I was an early adopter of
13  TVT."
14        Do you see that?
15    A.   Yes.
16    Q.   Do you see about halfway down
17  say:  "I have seen reports and testimony
18  from experts, including Dr. Bruce
19  Rosenzweig, suggesting that both
20  mechanically-cut TVT and laser-cut TVT are
21  defective."
22        Do you see that?
23    A.   I see that.
24    Q.   The next sentence you put:

Page 147

1  "These opinions are not based on reliable
2  scientific data."
3    A.   Correct, because later on in my
4  report, and we can move to that page if
5  you like, there is some data on
6  mechanically-cut slings versus laser-cut
7  slings which did not show any difference.
8    Q.   So, just to be clear, in this
9  sentence when you're talking about it's
10  not reliable, you're not making a
11  reference to whether or not it's Level I,
12  Level II, Level III;  is that fair?
13    A.   I am not.
14        When I state that it's not
15  reliable -- where does it say -- okay.  I
16  have searched -- there are no reliable
17  clinical studies to back what he says,
18  that I'm aware of.  And when I say "he",
19  it's Dr. Rosenzweig.
20        If you can produce some data
21  that shows that mechanically-cut TVT and
22  laser-cut TVT have any differences, I'd be
23  glad to look at those.
24    Q.   So you reviewed Dr. Rosenzweig's

Page 148

1  report and reviewed the studies that he
2  looked at and discussed, correct?
3    A.   Yes.  I don't have it committed
4  to memory, but I did review his report.
5  He's written a number of them.
6    Q.   And you determined that the
7  evidence he was looking at was not
8  reliable scientific data, according to
9  your report, correct?
10    A.   According to my report, I did
11  not find any reliable clinical data to
12  support his claims.
13    Q.   And the next sentence you
14  discuss the Thubert 2016 study that showed
15  TVT versus TVT-Exact had similar peri and
16  postoperative complications.
17        Do you see that?
18    A.   Yes, I do.
19    Q.   Then you state:  "Both TVT and
20  TVT-Exact resulting in 0 percent mesh
21  exposure"?
22    A.   Yes, in that study.
23    Q.   And you don't have any
24  discussion of Dr. Rosenzweig's opinions or

Page 149

1  data regarding laser-cut or
2  mechanically-cut, in this paragraph at
3  least, do you?
4    A.   In this paragraph, I do not.  I
5  do remember Dr. Rosenzweig saying he has
6  implanted about 50 or 75 midurethral
7  slings, and I don't think he has anywhere
8  near the experience that I do in
9  implanting midurethral slings, nor the
10  clinical experience.
11    Q.   Okay.  I'm not really talking
12  about Dr. Rosenzweig's personal
13  experience.
14    A.   Okay.
15    Q.   In his report he discusses some
16  literature.
17        Do you recall reading that?
18    A.   Yeah, he discussed literature.
19        Once again, if you want to pull
20  out his report, I'm more than welcome to
21  look at it with you, but I'm not going to
22  remember it verbatim.
23    Q.   And you came to the conclusion
24  that his opinions were not based on

Confidential - Harvey A. Winkler, M.D.

Page 150

1  reliable scientific data, correct?
2      A.   His opinions were not based on
3  any reliable data that I was able to find.
4      Q.   So you looked at the data that
5  he reviewed and cited to, correct?
6      A.   I did my Pub Med searches in
7  terms to try to find the differences
8  between the TVTs and TVT-Exact and
9  laser-cut and non-laser-cut, Boston
10 Scientific meshes and not Boston
11 Scientific meshes, and I tried to find the
12 data where it said that mechanically-cut
13 was any better or worse than a laser-cut.
14     MR. ROSENBLATT:  He's asking if
15 you reviewed the studies that he
16 actually cited in the body of his
17 report.
18     THE WITNESS:  So, I went through
19 his --
20     MR. BENTLEY:  Thank you.
21     A.   Okay.  I went through the
22 reliance list, and I actually went through
23 some of the reports and studies from his
24 reports.

Page 151

1      Do I recall if I remember seeing
2  one on specific on mechanical and laser, I
3  don't.
4      But once again, if we can pull
5  out his study and see the citations, I'd
6  be glad to review those would be.
7      Q.   I'm just trying to -- there's
8  nowhere in your report that I found that
9  discusses your conclusion that Dr.
10 Rosenzweig's evidence that he relied upon
11 was -- I don't understand how you reached
12 that it's not reliable.
13     A.   Well, if we turn the page, we
14 can look at studies by Lim and Agarwala.
15     Q.   And that's not -- I appreciate
16 that you're citing to some other evidence.
17 I'm trying to see how you got to your
18 conclusion that the evidence that Dr.
19 Rosenzweig didn't rely upon reliable
20 evidence, and if you have any opinion
21 today as to your concern or criticism of
22 the studies that Dr. Rosenzweig cited, can
23 you share those with me, please?
24     A.   I don't recall in the

Page 152

1  particulars.
2      But once again, if we pull out
3  his report, I'm willing to go through that
4  with you why I reached that conclusion.
5      Q.   Okay.  I believe you testified
6  that you performed a Pub Med search, is
7  that what you said?
8      A.   Yes.
9      Q.   And you performed a Pub Med
10 search in response to Dr. Rosenzweig's
11 laser-cut opinions?
12     A.   No, I didn't put Rosenzweig in
13 there because he hasn't written any
14 scientific paper on this.
15     Q.   Right.
16     A.   I would have put in TVT
17 complications.  I would have put in mesh
18 erosion, mesh exposure, mesh extrusion.  I
19 can't remember every single term that I
20 went ahead and used in order to do my
21 searches.  And I would have tried to find
22 what he did and where he based his
23 opinions on and what I based my opinions
24 on.

Page 153

1      Q.   You have no record of what key
2  word searches you've done?
3      A.   I did not keep a running tab,
4  no.
5      Q.   We already talked about you
6  didn't do a systemic literature review,
7  correct?
8      A.   No.  I did my Pub Med searches
9  and sometimes on Google Scholar, and then
10 when I got to one paper, I would look at
11 the references on that paper.
12     You should see my library room
13 in my office.  My wife ain't happy.
14     Q.   You didn't have a preset
15 inclusion/exclusion criteria?
16     A.   What systemic searches and stuff
17 like that?
18     Q.   Correct.
19     A.   No, I didn't write a paper and
20 include that kind of stuff.
21     Q.   Do you have any type of record
22 of how many articles your key word
23 searches turned up?
24     MR. ROSENBLATT:  Object to form.

Confidential - Harvey A. Winkler, M.D.

Page 154

BY MR. BENTLEY:

1    Q.   Do you have any reliable record
2 of how many articles popped up in your Pub
3 Med search when you did a key word
4 search --
5    A.   I don't remember, but I can tell
6 you that I've been reviewing literature
7 throughout my entire career. I've been
8 reviewing the literature that's available
9 on slings, on prolapse. I did an
10 extensive search and even reviewed more
11 literature and more articles, many of
12 which I had seen in the past, for this
13 particular report.
14    Q.   Are there some studies that you
15 found more powerful or compelling than
16 others?
17    A.   As I stated before, I always put
18 more emphasis and I rely more on Level I
19 and Level II data than Level III and IV if
20 that data is available.
21    Q.   And if you had any type of
22 opinion as to which evidence was more
23 powerful or compelling, would you have

Page 155

1 provided those opinions in this report?
2    A.   I would have tried, yes.
3    Q.   And in this report you include a
4 lot of data, correct?
5    A.   I think I did, yeah.
6    Q.   And is that data limited to any
7 specific threshold of Level I or Level II?
8    How did you go about choosing
9 which articles to put in here?
10    A.   Once again, from my searches, if
11 Level I data existed, I tried to include
12 the Level I data. So with the highest
13 level of data that existed for that
14 particular topic, I tried to include.
15    Q.   Doctor, would you agree that
16 polypropylene mesh, once implanted, causes
17 a chronic inflammatory reaction?
18    MR. ROSENBLATT: Object to form.
19    A.   Any kind of foreign body that
20 you're going to place in the body is going
21 to create a foreign body reaction.
22    Q.   Right. It's a little more
23 specific.
24    The polypropylene slings that

Page 156

1 we're talking about here, the TVT and
2 TVT-Exact, once those are implanted, do
3 they cause a chronic inflammatory
4 reaction?
5    A.   Yes, when you implant a
6 polypropylene or any type of synthetic
7 slings, or any type of synthetic material
8 for that matter, you're going to get a
9 chronic inflammatory reaction.
10    Although, polypropylene slings
11 as compared to other slings have a -- seem
12 to have a lower chronic inflammatory
13 reaction than things that we used in the
14 past.
15    Q.   Do you have an understanding as
16 to whether the construction of the mesh
17 influences the level of inflammation?
18    A.   Yes, I do.
19    Q.   And what is that?
20    A.   So, the pore size will matter.
21 So you would like a pore size above 1
22 millimeter. You want a type 1 macroporous
23 mesh that is monofilament as opposed to
24 multifilament. So there are

Page 157

1 characteristics of the fiber and there are
2 characteristics of the knit that both, as
3 well as the weight of density of the
4 fiber, that come into play when you put a
5 polypropylene sling in.
6    Q.   Do you have an opinion as to
7 whether or not the cutting method of the
8 mesh influences the inflammation?
9    A.   In my experience, the laser-cut
10 and mechanically-cut have functioned the
11 same and come to the -- and have provided
12 the same results in efficacy as well as
13 safety.
14    Q.   My question is do you have an
15 opinion as to whether the cutting method
16 has any type of impact on the inflammatory
17 response once implanted?
18    A.   My opinion is that cutting or
19 laser-cut does not make a difference.
20    Q.   It doesn't make any difference
21 to the inflammatory --
22    A.   On the inflammatory response.
23    Q.   Thank you.
24    So, you've testified that the

Confidential - Harvey A. Winkler, M.D.

Page 158

1  polypropylene slings do have a chronic
2  inflammatory reaction, correct?
3      A.   Yes.
4      Q.   So, if the inflammatory reaction
5  was instead described as transient, would
6  that be incorrect?
7      A.   No, not necessarily, 'cause if
8  you remember, or if you recall, or I'll
9  tell you, there is two types of
10 inflammatory reactions that occur.
11 There's an acute inflammatory reaction and
12 a chronic inflammatory reaction that
13 occurs when you implant any foreign body.
14 So the acute one is transient, goes away.
15     Q.   So the chronic reaction is
16 chronic, is that what you're saying?
17     A.   The body responds to that
18 foreign body that's placed in, whether
19 it's a suture material, whether it's a
20 polypropylene mesh.  Generally these
21 products are safe and don't -- don't cause
22 complications.  But yes, the body still
23 knows that it's there.  That part of the
24 design was good.  For the body.

Page 159

1      Q.   So, if you were discussing the
2  inflammatory response that happens after
3  implanting this mesh in a woman's body, if
4  you were discussing that with one of your
5  patients, and this mesh is a permanent
6  implant, correct?
7      A.   Correct.
8      Q.   It's in a woman's body until you
9  take it out, correct?
10     A.   It's intended to last and it's
11 probably going to last longer than all of
12 us.
13     Q.   Because it's made of plastic,
14 correct?
15     A.   Correct.
16     Q.   And when you're discussing
17 whether or not to have this implant, do
18 you describe the inflammatory response
19 with your patients as chronic, or would
20 you describe it as transient?
21     A.   So, from what the patient is
22 going to realize, 'cause the chronic
23 inflammatory reaction is something that
24 the patients don't realize that there's a

Page 160

1  chronic inflammatory reaction going on.
2  So what I usually will discuss is with
3  them the -- the acute inflammatory
4  reaction, which is a little pain and
5  vaginal discharge that you can get with
6  these slings, as opposed to the,
7  quote/unquote, chronic inflammatory
8  reaction.
9          And, don't kid yourself, I tell
10 every single patient that this is a
11 permanent implant.  This is not meant to
12 go away.  It is not meant to be removed if
13 it is working.
14     Q.   And if there's a problem, you
15 still don't remove the whole mesh;  you
16 cut the piece that is sticking out and
17 leave the remainder of the mesh, correct?
18     A.   Once again, depends what the
19 problem is.  With slings, the most common
20 problem is an exposure or retention.  Then
21 we would just either cut or remove that
22 portion.  We would not go after the entire
23 rest of the sling because that just
24 increases the morbidity to the patient

Page 161

1  with no gain.
2      Q.   Have you, in fact, described the
3  mesh as like rebar in concrete?
4      A.   Okay.  So, what I was describing
5  is there, it's not like rebar in concrete.
6  What I was trying to show over there, and
7  you're going to pull out my picture, I got
8  it.  What I was trying to describe there
9  is that the repair is a more durable type
10 of repair.
11         And that wasn't to patients, by
12 the way.  That is meant to other
13 physicians.
14         But the repair there is for the
15 body to integrate into the mesh as the
16 concrete integrates into the rebar.
17     Q.   Using your analogy, how easy is
18 it to remove rebar from concrete?
19     A.   I have no clue.  I've never done
20 that.
21     Q.   And how easy is it to remove
22 mesh from the tissue once it's been
23 incorporated?
24     A.   Removing the slings, if it's an

Confidential - Harvey A. Winkler, M.D.

Page 162

1  exposure, I don't find is a terribly
2  difficult procedure, as I have mentioned
3  in my report already.  The more mesh you
4  need to take out, the more procedure you
5  need to go ahead and do.  But removing the
6  mesh, especially with sling mesh, you can
7  remove what you need to get out.
8     Q.   When you remove the mesh, do you
9  necessarily remove the tissue that it's
10  incorporated into?
11     A.   So, when I remove the mesh, I
12  try to not cut or damage any vital
13  structures.  So usually what I will be
14  doing is cutting on the mesh itself in
15  order to remove the mesh once I get a free
16  end.  I'm going to take my scissor or a
17  scalpel to try to shave off and shave out
18  the mesh and -- what was the question
19  again?
20     Q.   You lost me.
21        If you're treating an erosion
22  into the bladder, for example, there's no
23  mesh sticking out visibly, correct?
24     A.   Correct.

Page 163

1     Q.   And when you remove the mesh,
2  you're going to cut out some tissue with
3  it, correct?
4     A.   A very small amount, yes.
5     Q.   Because it's been incorporated,
6  right?
7     A.   The tissue in the interstices,
8  or in the pores usually would come out.
9     Q.   Because it's been integrated
10  into the body, correct?
11     A.   Correct.
12     Q.   By design, correct?
13     A.   Correct.
14     Q.   I'm handing you what's been
15  marked as Exhibit 5.
16        (Exhibit Winkler 5, Power Point
17        slide deck of Harvey Winkler, M.D.,
18        was marked for identification, as of
19        this date.)
20  BY MR. BENTLEY:
21     Q.   This is one of the Power Points
22  you provided to us prior to this
23  deposition.
24        On page -- first of all, what is

Page 164

1  this Power Point, Doctor?
2     A.   So, this was probably a talk or
3  a grand grounds that I gave at some point
4  in time in order to -- that I gave at some
5  point in time.
6     Q.   Would you have gotten paid to
7  give this talk?
8     A.   Not necessarily.
9     Q.   And on page I think it's 3.
10     A.   Okay.
11     Q.   On the bottom right corner you
12  have: "Mesh equals reinforced concrete."
13        Do you see that?
14     A.   Yes, I do.
15     Q.   And you have a picture with the
16  rebar on the left and then the concrete on
17  the right; is that correct?
18     A.   Yes, I do.
19     Q.   And that's the analogy you used
20  to describe the mesh here;  is that fair?
21        MR. ROSENBLATT:  Object to form.
22     A.   Well, once again, my analogy
23  here is for integration and native tissue
24  repair relies on your own tissues to

Page 165

1  support it.
2        We know that tissue has wear and
3  tear on it, and the idea over here is that
4  we're going to get a more durable and
5  longer-lasting repair and have better
6  efficacy if we go ahead and use that.
7     Q.   If you go ahead and use?
8     A.   And use that synthetic mesh or
9  sling.
10     Q.   That acts like a rebar in
11  concrete?
12     A.   I didn't say it acts like a
13  rebar in concrete.
14        I said the philosophy behind it
15  is that why is concrete stronger when you
16  put rebar into it?  Because you've got
17  something that it sticks on to, right.  So
18  the same philosophy here is when you're
19  going to put that mesh in, you've got your
20  tissue to stick onto.
21     Q.   It's an analogy you
22  appropriately used to describe the
23  integration of the mesh into tissue,
24  correct?

Page 166

1    A.   Correct, but taking out the mesh
2  is not equivalent to chiseling away on
3  concrete.
4    MR. BENTLEY:  I'm going to hand
5  you what's marked as Exhibit 6, which
6  is another one of the Power Points
7  that you produced.
8    (Exhibit 6, Power Point slide
9  deck of Harvey Winkler, M.D., was
10  marked for identification, as of this
11  date.)
12    MR. BENTLEY:  I'm going to hand
13  you what is marked as Exhibit 7, which
14  is another Power Point.
15    (Exhibit Winkler 7, Power Point
16  slide deck of Harvey Winkler, M.D.,
17  was marked for identification, as of
18  this date.)
19    MR. BENTLEY:  Here's Exhibit 8,
20  which is another Power Point you
21  produced.
22    (Exhibit Winkler 8, Power Point
23  slide deck of Harvey Winkler, M.D.,
24  was marked for identification, as of

Page 167

1  this date.)
2    MR. BENTLEY:  I'm going to hand
3  you Exhibit 9, which is another Power
4  Point.
5    (Exhibit Winkler 9, Power Point
6  slide deck of Harvey Winkler, M.D.,
7  was marked for identification, as of
8  this date.)
9    MR. BENTLEY:  I'm going to hand
10  you what is being marked as
11  Exhibit 10, another Power Point
12  produced.
13    (Exhibit Winkler 10, Power Point
14  slide deck of Harvey Winkler, M.D.,
15  was marked for identification, as of
16  this date.)
17    MR. BENTLEY:  Exhibit 11 is
18  another Power Point.
19    (Exhibit Winkler 11, Power Point
20  slide deck of Harvey Winkler, M.D.,
21  was marked for identification, as of
22  this date.)
23    MR. BENTLEY:  We can just set
24  these aside for now.

Page 168

1    THE WITNESS:  Okay.
2    MR. BENTLEY:  Exhibit 12 is
3  another Power Point.
4    (Exhibit Winkler 12, Power Point
5  slide deck of Harvey Winkler, M.D.,
6  was marked for identification, as of
7  this date.)
8    MR. BENTLEY:  Exhibit 13 is
9  another Power Point.
10    (Exhibit Winkler 13, Power Point
11  slide deck of Harvey Winkler, M.D.,
12  was marked for identification, as of
13  this date.)
14    MR. BENTLEY:  Exhibit 14,
15  another Power Point.
16    (Exhibit Winkler 14, Power Point
17  slide deck of Harvey Winkler, M.D.,
18  was marked for identification, as of
19  this date.)
20    THE WITNESS:  Are we just going
21  through all of them?
22    MR. BENTLEY:  I'm just entering
23  them for the record before I forget.
24    Exhibit 15.

Page 169

1    (Exhibit Winkler 15, Power Point
2  slide deck of Harvey Winkler, M.D.,
3  was marked for identification, as of
4  this date.)
5    MR. BENTLEY:  16.
6    (Exhibit Winkler 16, Power Point
7  slide deck of Harvey Winkler, M.D.,
8  was marked for identification, as of
9  this date.)
10    MR. BENTLEY:  17.
11    (Exhibit Winkler 17, Power Point
12  slide deck of Harvey Winkler, M.D.,
13  was marked for identification, as of
14  this date.)
15    MR. BENTLEY:  18.
16    (Exhibit Winkler 18, Power Point
17  slide deck of Harvey Winkler, M.D.,
18  was marked for identification, as of
19  this date.)
20    (Exhibit Winkler 19, Power Point
21  slide deck of Harvey Winkler, M.D.,
22  was marked for identification, as of
23  this date.)
24

Confidential - Harvey A. Winkler, M.D.

Page 170

BY MR. BENTLEY:

1  BY MR. BENTLEY:
2      Q.   Doctor, we've entered several
3  Power Point presentations that you
4  produced, and these Power Points, did you
5  make these yourself, or someone in your
6  office make them for you?
7      A.   The slides?
8      Q.   Yes.
9      A.   I made them most likely myself.
10  I don't remember going -- some of them are
11  going years back, if anyone helped me or
12  where I got the information from, but
13  generally I try to make my own slides.
14  Sometimes I do them with the fellows
15  today.
16      Q.   And these are all from
17  presentations you gave?
18      A.   In the past, yeah.
19      Q.   Do you have any way to tell what
20  dates these presentations were given on?
21      A.   Honestly, no.
22      Q.   If you could please turn to page
23  42 of your report.
24      A.   Got it.

Page 171

1      Q.   You state:  "I was an early
2  adopter of TVT which has been available in
3  mechanically-cut in the United States from
4  '98 to present, and I also used TVT
5  laser-cut mesh, in addition to TVT-Exact
6  (only available in laser-cut), and have
7  not seen any noticeable difference in
8  objective cure, subjective cure, or
9  complications including mesh exposures,
10  pelvic pain and dyspareunia."
11          Did I read that correct?
12      A.   Yes.
13      Q.   We've already discussed a little
14  bit we don't have any reliable way to
15  estimate how many of your patients had
16  complications, correct?
17      A.   I have never -- I haven't done a
18  systemic review.  Once again, I think my
19  complication rate is lower than the
20  literature.
21          However, I will tell patients
22  when I talk to patients it's what's quoted
23  in the literature.
24      Q.   Because you don't have a case

Page 172

1  log; you don't track complications?
2      A.   Correct.
3      Q.   So when you say you have not
4  seen any noticeable difference --
5      A.   But I will tell you I think my
6  complication rate is low 'cause, once
7  again, I'm not seeing that many patients
8  back that I'm taking back to the operating
9  room in order to treat for a complication.
10      Q.   Right.  And my question is when
11  you state in your report that you've not
12  seen any noticeable difference in cure
13  complications between the two meshes, is
14  that simply based upon your review of the
15  literature?
16      A.   So, it's based on what I've seen
17  in my patient population 'cause I switched
18  from one to the other.  I didn't see a
19  noticeable increase or decrease
20  complication rate and what I've reviewed
21  in the literature.
22          And I've been using both for
23  almost up 'til when AMS Astora went out of
24  business because, if I remember correctly,

Page 173

1  their transobturator sling is a
2  mechanically-cut sling.  So I was -- I've
3  been using mechanically-cut slings for
4  years.
5      Q.   And you don't cite to any study
6  here that you don't have a difference
7  between the --
8          MR. BENTLEY:  Strike that.
9      Q.   You don't cite to any study here
10  indicating that TVT-R, machine-cut is the
11  same as TVT laser-cut?
12      A.   Well, I have the Thubert study,
13  right.
14      Q.   And the Thubert study looks at
15  TVT-Exact, correct?
16      A.   Versus TVT.
17      Q.   Right, and we already discussed
18  the TVT-Exact has different diameter
19  trocars, correct?
20      A.   We have discussed that, yes.
21      Q.   And you don't cite any study
22  specifically comparing TVT machine-cut to
23  TVT laser-cut, correct?
24      A.   Yeah, but we're not -- the

Confidential - Harvey A. Winkler, M.D.

Page 174

1  trocars are not the issue here with the
2  mechanical-cut and the laser-cut.
3       We're talking about the mesh, so
4  what difference what trocar is attached
5  to?
6       Q.   What study do you have that
7  compares TVT-R machine-cut to TVT-R
8  laser-cut?
9       A.   In terms of the mesh itself, we
10 can look at the Thubert study.
11      Q.   The Thubert study uses
12 TVT-Exact, right?
13      A.   Versus TVT mechanical-cut.
14      Q.   And my question is using TVT
15 Retropubic machine-cut as compared to TVT
16 laser-cut, what study compares those two
17 head to head?
18      A.   I'm not aware of any study, but
19 once again, I'm not aware of what the
20 difference is on the mesh properties as
21 opposed to what needles you're putting in
22 to put them in there.
23      Q.   On the Thubert study, you state
24 that it is TVT versus TVT-Exact, correct?

Page 175

1       A.   Yes.
2       Q.   Do you know what percentage of
3  the TVT cases in Thubert were machine-cut?
4       A.   I don't recall, but I'd be glad
5  to look at that literature if you have it.
6            In addition, if you look at Lim
7  underneath that where they looked at
8  mechanically-cut TVT slings to the 108
9  Advantage slings, the needles on Advantage
10 slings were almost identical, or the
11 trocars are almost identical to the TVT-R
12 trocars.  So there is some literature of
13 comparable type of procedures.
14      Q.   Comparable, but it's not exactly
15 the TVT-R, correct?
16      A.   It's not the TVT-R.
17      Q.   Right.  Doctor, you started
18 using --
19           MR. BENTLEY:  Strike that.
20      Q.   You were trained on TVT
21 Retropubic in Philadelphia around 1998 by
22 Dr. Vincent Lucente, correct?
23      A.   Yes.
24      Q.   And do you recall that TVT

Page 176

1  Retropubic was initially a clear mesh?
2       A.   Yes.
3       Q.   And subsequent, Ethicon
4  introduced a blue mesh that replaced the
5  clear mesh, correct?
6       A.   Yes.
7       Q.   When Ethicon introduced the blue
8  mesh for TVT Retropubic, are you aware
9  that Ethicon received reports of blue
10 particles in unopened packaging?
11      A.   I'm aware of that today, yes.
12      Q.   When did you learn that?
13      A.   I learned that on my review of
14 the documents that Ethicon had sent over
15 to me, but I had looked at these meshes
16 and seen these meshes and it's not
17 something that overly surprised me that a
18 particle may have been in there,
19 especially in thousands of them that they
20 produced.
21      Q.   What if there was more than one
22 particle, that didn't concern you?
23      A.   No, it didn't concern me.
24      Q.   It doesn't concern you that

Page 177

1  particles were falling off mesh before
2  it was even implanted?
3       A.   I don't care what happens with
4  the particles falling off the mesh
5  implanted.  Once that mesh was implanted,
6  I don't believe that particles were
7  falling off, and I don't think it made any
8  difference clinically.
9       Q.   What studies do you have to
10 support your opinion that the particle
11 loss stopped once it was implanted?
12      A.   There's not going to be any
13 study on that.  No one's going to go back
14 and look on it.  But I don't have any
15 studies, that I'm aware of, whether it's
16 plaintiff studies or defense studies, that
17 actually show complete breakage of mesh
18 fibers in vivo.
19      Q.   You don't have any studies to
20 support your opinion that the particle
21 loss stops after implantation.
22           Do you have any reason or
23 explanation of why you think that the
24 particle loss would stop after it's

Confidential - Harvey A. Winkler, M.D.

Page 178

1  implanted?
2      A.   Once you get tissue integration
3  and once -- unless -- once you get tissue
4  integration around that mesh, why would I
5  assume that a piece would suddenly tear
6  off?
7          When you hold the mesh and you
8  put it down, it doesn't spontaneously come
9  out.  It's when you stretch it beyond its
10  limits that it's intended to when I put it
11  in surgically do we see that particle
12  fray.
13      Q.   Well, you know that unopened
14  packages before it was implanted, there's
15  some particles that fell off, correct?
16      A.   I don't know if it fell off or
17  if it fell off during the cutting.  I
18  don't know when it got into that box.
19      Q.   But it's your reason that you
20  intend to offer to the jury that the
21  particle loss stops once it's integrated;
22  is that correct?
23      A.   I have no reason to believe that
24  there are particles breaking off mesh once

Page 179

1  it's in the patient's body.
2      Q.   And your explanation is because
3  once it's integrated, it's not going to
4  fall apart?
5      A.   Well, you have tissues
6  supporting around it.  So you have other
7  tissue that's bearing load here as well.
8          I have no indication that, and I
9  do not believe that particles are
10  mysteriously just breaking off.
11      Q.   If they were, would that be a
12  problem?
13      A.   I don't think that would be a
14  problem, to be honest with you.  Unless
15  they were clinically causing an issue for
16  that patient.
17          We've been putting in these
18  sutures for the longest time and you have
19  little particles of suture and generally
20  it doesn't cause a problem.
21      Q.   Doctor, you say that mesh loses
22  particles when it's elongated at the 50
23  percent elongation, in your report I
24  believe on page 55.

Page 180

1      A.   I would just like to comment we
2  never stretch it out 50 percent when we're
3  putting it in a patient.
4      Q.   My question is in your report,
5  you state that the mesh loses particles
6  when it's elongated at 50 percent
7  according to studies done by Ethicon that
8  you cite in your report, correct?
9      A.   Correct, on page 45.
10      Q.   And it's your testimony that
11  that's beyond the physiological range of
12  elongation once implanted; is that
13  correct?
14      A.   That's correct.
15      Q.   And then --
16      A.   In my opinion.
17      Q.   -- what's your opinion as to
18  what the physiological range of elongation
19  is once it's implanted?
20      A.   I don't believe -- I don't have
21  a great answer for you of exactly how long
22  these meshes -- how long -- if -- if these
23  meshes do elongate when they're in the
24  body or they do stretch.  I would think if

Page 181

1  they were elongating or stretching at a
2  considerable rate, we would see a
3  significant decrease in efficacy as time
4  went on.
5          So, based on my clinical
6  opinion, I do not have experience in these
7  meshes -- in the midurethral sling meshes
8  significantly elongating.
9      Q.   In any of the plaintiff reports
10  that you read, did you notice any of the
11  evidence they cited discussing the
12  physiological range of elongation of the
13  mesh once implanted?
14      A.   I have not seen any clinical
15  data of how long these meshes are
16  elongating.  There's theoretical data of
17  how they will react, but I do not have any
18  solid clinical data to support any of
19  that.
20      Q.   I'm just trying to understand on
21  page 45 you put you've seen the Ethicon
22  Power Point relied upon by plaintiff's
23  experts comparing the physical differences
24  to TVT mechanical and laser-cut, and you

Confidential - Harvey A. Winkler, M.D.

Page 182

1  put: "When stretched beyond the
2  physiological range at 50 percent
3  elongation."
4       What's your basis that that's
5  beyond the physiological range?
6       A.   So, that's going to be doubling
7  the length of the sling.  So, when I go in
8  and if I have to do a mesh exposure or a
9  mesh erosion or a tightening of the sling,
10  I do not see stretching of that.
11       THE WITNESS:  And Paul, do we
12       have that picture of a sling that
13       eroded?
14       A.   There's a picture of a -- this
15  is a -- this is it.
16       MR. ROSENBLATT:  (Handing.)
17       (Exhibit Winkler 25, color copy
18       of photograph, was marked for
19       identification, as of this date.)
20  BY MR. BENTLEY:
21       Q.   Doctor, I marked what is labeled
22  as Exhibit 25, which is a picture you
23  brought to the deposition.
24       And could you describe what this

Page 183

1  is a picture of?
2       A.   This is a mesh exposure of what
3  I think is a TVT sling, and we can see in
4  this picture there's an exposure of the
5  mesh into the vagina.  And on exposures
6  either I would see something commonly like
7  this or -- and I don't see significant
8  elongation in opening of these meshes and
9  significant stretching of these meshes
10  when I remove them.  So there's no reason
11  for me to believe that these meshes
12  elongate up to 50 percent of their length.
13       Q.   Let's talk about that a little
14  bit.
15       It's a picture of an exposure
16  which, by your definition, that's a
17  externally visible piece of the mesh,
18  correct?
19       A.   Correct.
20       Q.   And looking at this picture, do
21  you have any way to determine what caused
22  that mesh exposure?
23       A.   No, I do not.
24       Q.   Do you have any reason to

Page 184

1  believe that that mesh was incorrectly
2  implanted by the implanting physician?
3       A.   I would find it hard to believe
4  that an implanting physician would leave a
5  piece of mesh like that when he's
6  implanting it.
7       Q.   And the mesh exposure could
8  develop postoperatively, correct?
9       A.   Correct.
10       Q.   And that could develop even if
11  the implanting physician put it in without
12  tension, as you do, correct?
13       A.   We have agreed that that's a
14  commonly known complication.
15       Q.   That can happen even if it's
16  implanted correctly, correct?
17       A.   It can happen, yes.
18       Q.   And we were discussing particle
19  loss previously.
20       Do you remember that?
21       A.   I do.
22       Q.   And you wanted to discuss this
23  picture in response to some of our
24  questioning about particle loss.

Page 185

1       Do you remember that?
2       A.   Yeah, I want to discuss this
3  picture in response to elongation.
4       Q.   Okay, thank you.
5       So, it's your testimony that
6  because this picture doesn't show
7  elongation, particle loss doesn't happen?
8       I'm trying to -- can you help
9  me?
10       A.   No.  You asked me how do you
11  know that elongation in the body does not
12  happen above 50 percent.  So I'm trying to
13  give you an example of how I base that
14  opinion on.
15       Q.   So, if there was elongation,
16  would you expect to see the mesh maybe
17  roped?
18       A.   I've never seen roping of the
19  TVT mesh, and I know that people have
20  described that.
21       What I usually -- if the mesh
22  gets a little -- can get a little too
23  tight, we're not going to see this kind of
24  a picture.  We're going to see more of

Confidential - Harvey A. Winkler, M.D.

Page 186

1  that voiding dysfunction or difficulty
2  urinating picture.
3        So, the interstices and pores
4  are still there.  It's just, yes, it does
5  get a little, I don't want to use the word
6  "roping."  It can get tight you are under
7  the urethra because it's scarring too
8  much.
9     Q.    But mesh can rope, you've read
10  about that, right?
11    A.    I've read about that, right.
12    Q.    You don't have any reason to
13  disbelieve people that have seen roped
14  mesh, do you?
15    A.    I don't have any disbelief in
16  that.
17        My opinion is that when you get
18  that roping, there may have been too much
19  tension applied on the implanting portion
20  of the procedure as opposed to all of a
21  sudden the mesh roping upon itself.
22    Q.    Have you seen bunched mesh in
23  your clinical experience?
24    A.    Yes, I have.  And there are

Page 187

1  reports of mesh moving and migration and
2  retracting.  Nothing -- you can't a
3  hundred percent guarantee that anything's
4  going to stay in the place that you put it
5  in.
6        MR. ROSENBLATT:  I wasn't able
7  to get my objection in in time.  I
8  don't know if you're asking about SUI
9  or POP.
10        MR. BENTLEY:  Sure.
11  BY MR. BENTLEY:
12    Q.    Have you seen reports of mesh
13  that's been implanted to treat
14  incontinence of the mesh being roped?
15        MR. ROSENBLATT:  Object to form.
16    A.    I have not seen roping occur
17  with a sling mesh.
18    Q.    Have you read reports or
19  literature that discusses TVT mesh that's
20  roped after implantation?
21    A.    I've read literature.  I can't
22  say a hundred percent if that literature
23  was based on a midurethral sling or if
24  that literature was based on meshes placed

Page 188

1  in for prolapse.
2     Q.    When you're implanting mesh, if
3  the stiffness of the mesh is different,
4  does that affect the level of tension that
5  is set during the implant?
6        MR. ROSENBLATT:  Object to form.
7        MR. BENTLEY:  That was awful.
8  BY MR. BENTLEY:
9     Q.    If a physician is -- if you
10  yourself are implanting a mesh and you've
11  developed a technique to implant it such
12  that there's minimal tension put on it,
13  correct, and that's your intended goal
14  when you're implanting the mesh is to have
15  tension-free, correct?
16    A.    Correct.
17    Q.    If the mesh is stiffer than what
18  you've been accustomed to, does it change
19  how you have to set the tension of that
20  mesh?
21    A.    I don't know how to answer that
22  question, to be honest with you.
23    Q.    If you have a mesh that's
24  stiffer than the one you've trained on

Page 189

1  that you're accustomed to, does that need
2  to change the forces to be applied during
3  implantation?
4     A.    Once again, I don't know the
5  answer to that question.
6        I would have to see the product,
7  look at it.  I would do a cadaver lab on
8  the product.  I would like to see data on
9  the product before I went ahead and
10  implanted it at this point in time.
11    Q.    Do you have an opinion as to
12  whether the stiffness of the mesh has any
13  clinical significance?
14        MR. ROSENBLATT:  Object to the
15  form.
16    A.    I don't know how to answer that
17  question in terms of if we're talking
18  about sling meshes, POP meshes.  And even
19  if you probably then separate them out, I
20  wouldn't know how to answer that question
21  for you.
22    Q.    With respect to slings that are
23  implanted to treat incontinence, do you
24  have any opinion as to whether a stiffer

Confidential - Harvey A. Winkler, M.D.

Page 190

1  mesh has clinical significance?
2      A.   Well, a stiffer mesh, it's
3  stiffer for a reason.  So why don't we
4  break it down into what the reason is?
5      Q.   Yeah, I'm just trying to get an
6  answer to that specifically, and then
7  we'll break it down from there.
8          Do you have any opinion as to
9  whether or not a polypropylene sling mesh
10 that's implanted to treat incontinence, if
11 the mesh is stiffer, does it have a
12 clinical significance for the patient?
13         MR. ROSENBLATT:  Object to form.
14     A.   Once again, I really don't know
15 how to answer that question for you.
16         MR. ROSENBLATT:  What do you
17     mean by "stiffer"?  Maybe that might
18     help.
19         MR. BENTLEY:  Well, it's the
20     words -- well, we'll get to it.
21 BY MR. BENTLEY:
22     Q.   Do you want to turn to page 44
23 in your report?
24     A.   Sure.

Page 191

1      Q.   You state:  "Neuman 2011
2  suggested that the stiffer TVT Secur
3  laser-cut might have caused the de novo
4  dyspareunia."
5          Do you see that?
6      A.   Yes, I do.
7      Q.   Okay.  So what do you mean by
8  "stiffer mesh"?
9      A.   So, the laser-cut made it a
10 little less, quote/unquote, stretchy at
11 that point in time, in my opinion.  And I
12 did not think that that stretchiness made
13 a difference from when I implanted the
14 slings for TVT.  If you are going to give
15 me another sling, I'd have to see why it's
16 stiffer.
17     Q.   So, here you cite a study that
18 suggests that the stiffness might have
19 actually caused de novo dyspareunia; is
20 that correct?
21     A.   And that's with TVT Secur, which
22 once again is an entirely different
23 procedure, and placement for that is
24 entirely different.  So I will cite what

Page 192

1  they suggested.
2          Do I think that that's going to
3  happen with a TVT?  No.  The implantation
4  of a TVT Secur, entirely different than
5  any type of the slings than what we're
6  talking about right now.
7      Q.   As you sit here today, do you
8  have any criticism or critique of the
9  Neuman 2011 study?
10     A.   I mean, I think we're comparing
11 Secure to TVT-O.  I was not a big Secur
12 user, as we discussed in the past.  So, if
13 we want to go through criticism
14 particularly, we're going to need to pull
15 out that study, 'cause once again, I don't
16 remember it word for word.
17     Q.   So you don't think that Neuman
18 is really relative to the discussion of
19 whether or not a stiffer mesh can have
20 clinical implications for the patient?
21     A.   Well, especially if we're going
22 to talk about TVT Secur and TVT-O, a
23 transobturator sling, in my opinion, is
24 going to have a slightly higher

Page 193

1  dyspareunia rate risk than a retropubic
2  sling.
3      Q.   And I guess my question is then
4  why do you include this in your TVT
5  report?
6      A.   It was literature that I found.
7  I didn't want to not include it at that
8  point in time.
9      Q.   In your report, you don't
10 provide any analysis of why you discount
11 the study, correct?
12     A.   There's nothing more in my
13 report about this, yes.
14     Q.   And as you sit here today, you
15 don't have any analysis as to why you
16 discount this study, do you?
17         MR. ROSENBLATT:  Object to form.
18         If you want to pull it out, he
19     could provide his criticisms of it.
20     A.   Yeah, I mean, once again I said
21 that before.  If we want to criticize, I
22 can remember what I wrote.  I can't
23 remember what's in the paper.
24     Q.   And I can only read what you

Confidential - Harvey A. Winkler, M.D.

Page 194

1   wrote, right?
2       A.   Right.
3          So, I'm not saying that -- that
4   it's proven.  It's suggested and we're not
5   going to hide that.
6       Q.   Do you disagree with their
7   suggestion?
8       A.   With their suggestion?
9       Q.   Do you disagree with Neuman's
10  suggestion that stiffer mesh might have
11  caused de novo dyspareunia?
12      A.   Once again, I will not comment.
13  I am not a Secur expert whatsoever.  I am
14  not a TVT-O expert whatsoever.  So I don't
15  think my -- I'm an expert on
16  transobturator sling, but on the TVT-O
17  device, I never used that.  So I would
18  refrain from giving an expert opinion on
19  either of these two products.
20      Q.   So you're an expert on TVT
21  Retropubic classic machine-cut; is that
22  fair?
23      A.   So, I'm an expert on these
24  slings.  I'm not an expert on putting in

Page 195

1   the TVT-O.
2          MR. ROSENBLATT:  That's not a
3      requirement for your expert, sir?
4          Strike that.
5   BY MR. BENTLEY:
6       Q.   I'm trying to figure out --
7       A.   I never put a TVT-O in.  So
8   how -- I don't want to really comment on
9   the procedure.
10      Q.   And you wouldn't want to comment
11  on the safety profile of the TVT-O,
12  correct?
13      A.   I think the TVT-O is a safe
14  procedure.  I didn't say that it's not a
15  safe procedure.
16         I just said I would reserve
17  offering an expert opinion on placing it
18  and anything with dyspareunia.
19      Q.   Right.
20      A.   I'm an expert on the
21  complications of the TVT-O.  I'm an expert
22  on what's in the literature on the TVT-O.
23  I'm an expert on how to implant the TVT-O,
24  but since I have never done it, I would

Page 196

1   refrain from offering an expert opinion
2   particularly on TVT-O.
3       Q.   And in your TVT and TVT-Exact
4   report, you discuss the Neuman study,
5   correct?
6       A.   Yeah.
7          Do you mind getting the study?
8       Q.   And in your report, you note
9   that they suggested that a stiffer mesh
10  might have caused de novo dyspareunia; is
11  that correct?  Is that in your report?
12      A.   Correct.
13      Q.   As you sit here today, do you
14  have any study or evidence to indicate
15  that a stiffer mesh doesn't cause de novo
16  dyspareunia?
17      A.   I don't have evidence that a
18  stiffer mesh causes more or less de novo
19  dyspareunia.
20         They're suggesting it, and this
21  is one study, in, let's see, how many
22  people again?
23      Q.   The question, do you have any
24  evidence that indicates contrary to what

Page 197

1   you cite in your report, do you have any
2   evidence suggesting that, contrary to
3   Neuman, that stiffer mesh does not cause
4   de novo dyspareunia?
5       A.   I didn't say that a stiffer mesh
6   is.  The TVT Secur stiffer mesh.
7          So, how do you know it's the
8   mesh and not the implantation technique?
9       Q.   Doctor, my question is very
10  precise.
11         Do you have any evidence as you
12  sit here today that a stiffer mesh does
13  not cause de novo dyspareunia?
14      A.   I don't have any evidence that
15  it causes more or less de novo
16  dyspareunia.
17         I have one study that you just
18  pointed at of 79 patients in a different
19  type of procedure than we're discussing
20  today that may suggest it.
21      Q.   Doctor, do you hold yourself out
22  as an expert on FDA regulations?
23      A.   I am an expert on FDA
24  regulations when it comes to devices and

Confidential - Harvey A. Winkler, M.D.

Page 198

1  implants for incontinence as well as for
2  the pelvic floor, in my opinion.
3      Q.   Do you consider yourself an
4  expert regarding FDA requirements for
5  product labeling?
6      A.   I'm aware of what's required in
7  the -- I am aware of what's required in
8  product labeling for devices, yes.
9      Q.   What's required in product
10 labeling?
11     A.   So, any type of -- first of all,
12 you need to explain the indication for
13 what should be in the product label.  You
14 should try to explain who the device
15 should not be implanted in, and then you
16 would try to describe adverse events or
17 complications that are specific to the
18 device when used in that procedure the
19 device is indicated for.
20     Q.   And what's your basis for that
21 definition?
22     A.   I have read the, I think, the
23 CFR, CFR Rule 21.
24     Q.   The entire chapter?

Page 199

1      A.   No, I skimmed it.  I'm not going
2  to remember it word for word.
3      Q.   How did you decide which
4  sections to skim?
5      A.   I don't recall how I decided
6  which ones I thought were more pertinent
7  to others.
8      Q.   Did you review the 21 -- did you
9  skim the 21 CFR in preparation for this
10 report?
11     A.   Yes, I did.
12     Q.   In your report, you discuss the
13 IFU.  Let's turn to page 22.
14          As we discussed, throughout your
15 report you include a number of citations
16 to footnotes; is that correct?
17     A.   That's correct.
18     Q.   And on page 22, you have a
19 paragraph that begins "Furthermore."
20          Do you see that?
21     A.   Yes.
22     Q.   And the second to last sentence
23 you put: "An IFU must give surgeons the
24 ability to individualize the procedure and

Page 200

1  surgical management to each and every
2  unique patient."
3          Do you see that?
4      A.   Yes, I do.
5      Q.   What's your basis for that
6  opinion?
7      A.   I don't rely on IFUs, nor should
8  any surgeon rely on an IFU on how to do a
9  surgical procedure.  I don't rely on a
10 company to teach me the surgical procedure
11 in its entirety.  I don't rely on an IFU
12 to teach me that procedure.  Nor do I rely
13 on an IFU to tell me the commonly known
14 complications of a procedure.
15     Q.   So, your basis for that opinion
16 is your personal experience and your
17 personal practice with regards to IFUs?
18     A.   Well, it's my personal practice.
19 It's my discussion with other doctors.
20          There was a recent abstract that
21 shows that, was it Frommer, she's in
22 Hackensack.  I can't recall the name.
23 That actually shows that up to 40 percent
24 of doctors don't even read IFUs.

Page 201

1      Q.   Okay.  But as you sit here
2  today, you can't tell me one of the CFR
3  sections that you skimmed that supports
4  your opinion; is that correct?
5      A.   Can you show me the CFR?
6          MR. ROSENBLATT:  Object to form.
7  That mischaracterizes.
8  BY MR. BENTLEY:
9      Q.   Doctor, what CFR section
10 supports your opinion that an IFU must
11 give surgeons the ability to individualize
12 the procedure and surgical management to
13 each and every unique patient?
14     A.   I don't recall by heart.
15          Can we see the CFR?
16     Q.   You don't know it and it's not
17 in your report;  is that fair?
18     A.   I didn't say that.
19          MR. ROSENBLATT:  Can I show him
20 his reliance list?
21          MR. BENTLEY:  Please.
22     A.   But I'm not going to remember
23 the report.
24          What I will tell you is --

Page 202

1    MR. BENTLEY:  Actually, counsel,
2  he's got the reliance list right in
3  front of him.
4    A.   What I will tell you is the way
5  that we train doctors and the way we learn
6  is throughout medical school, throughout
7  residency and throughout fellowship, there
8  are certain basic requirements that we
9  need to teach.  We teach our residents,
10  our fellows to individualize the surgical
11  procedure for the patient.  We don't pick
12  a procedure and then find the right
13  patient for them.  We teach them the
14  risks, the benefits, the contraindications
15  of specific procedures, and we also teach
16  them the adverse reaction to the surgical
17  procedures that we do.  So we don't use an
18  IFU to teach us how to do surgery.
19    Q.   For your reference, Doctor, you
20  have your reliance list in front of you.
21  It's Exhibit 4.
22    A.   Yes.
23    Q.   And that Exhibit 4 is your
24  reliance list that you reviewed in

Page 203

1  preparation of this report?
2    A.   Yes.
3    Q.   On page 2 the top there's a CFR
4  cited.
5    A.   Yes, I do.
6    Q.   Is that your basis for this
7  opinion regarding what the requirements of
8  the IFU are?
9    A.   I don't remember -- that's the
10  reclassification for surgical mesh.  That
11  is not what the requirement of what needs
12  to be in a IFU.
13    Q.   Okay.
14    A.   Is it?
15    Q.   So, I believe the next CFR
16  reference you have in here is the third or
17  fourth last page and at the top it's got
18  July 25th.  I can tell you it's the fourth
19  from the back.
20    A.   21 CFR 801?
21    Q.   109 subsection C.
22    A.   Yes.
23    Q.   Is that your basis for the
24  opinion in your report?

Page 204

1    A.   That's what I put in the
2  reliance list.
3    Once again, I need to see 109(c)
4  to definitely confirm that.
5    Q.   Do you have any training in
6  interpreting federal regulations?
7    A.   I have training in using
8  devices.  I've had training in developing
9  devices.  I've had consulting train --
10  I've done consulting work with -- with
11  industry in order to do device
12  improvements, device development, new
13  devices.  I have written and signed off on
14  clinical evaluation report.  I have been
15  teaching on IFU complications what are
16  commonly known and what are specific to
17  devices throughout my entire career.
18    Q.   My question was specific to the
19  federal regulations that govern labeling.
20    A.   I'm not --
21    Q.   Have you had any training
22  regarding the federal regulations 21 CFR
23  801?
24    MR. ROSENBLATT:  Object to form.

Page 205

1    A.   We discuss -- we have had
2  training in terms of complications from
3  surgical procedures.  It is not the -- we
4  don't -- we are concerned, and the doctors
5  are concerned of the common complications
6  and we want to teach those as opposed to
7  regardless of what the government
8  regulations are of what needs to be
9  included or what does not need to be
10  included, we want to teach what the
11  complications, adverse events are,
12  regardless if the government requires it
13  or not.
14    Q.   Do you consult with companies
15  regarding compliance with federal
16  regulations?
17    A.   I have been to the FDA and have
18  consulted with a company regarding 522
19  study and some regulations regarding that.
20    Q.   What's a 522 study?
21    A.   So, a 522 is a post-market study
22  ordered by the FDA on devices.
23    Q.   When are those ordered?
24    A.   Usually they're ordered after a

Confidential - Harvey A. Winkler, M.D.

Page 206

1 device has been on the market.
2     Q.   In what situations are 522
3 orders requested?
4     A.   It's when the FDA decides that
5 they need more information on a device,
6 it's my understanding.
7     Q.   If you could please turn to page
8 40 in your report.
9     A.   Okay.
10     Q.   The bottom paragraph you wrote:
11 "The TVT IFU appropriately warned surgeons
12 of the potential adverse reactions
13 specific to the device, including damage
14 to vessels, nerves, bladder, urethra or
15 bowel, as well as the possibility of
16 extrusion, erosion, fistula formation or
17 inflammation."
18     And my question is your opinion
19 that the TVT IFU appropriately warns, is
20 that based upon your experience as a
21 physician or your interpretation of a
22 specific federal regulation governing
23 labeling?
24     A.   It's my interpretation of the

Page 207

1 CFR that says you do not need to include
2 commonly known adverse events.
3     Q.   And which CFR is that again?
4     A.   You have to remember -- it's CFR
5 21.  I don't remember the exact number.
6     Q.   So, it's your testimony and your
7 opinion that you intend to offer at trial
8 that Ethicon's IFU was in compliance with
9 the applicable 21 CFR 801 in governing
10 product labeling?  That's your opinion?
11     A.   That's my understanding, yes.
12     Q.   And that's what you seek to
13 testify to at trial regarding your
14 opinions, that the TVT IFU appropriately
15 warns?
16     A.   There's nothing in that IFU that
17 I don't think I knew beforehand that's
18 specific to the TVT device except for the
19 exposure or erosion with a synthetic mesh.
20     Some of the stuff -- some of the
21 commonly known chronic pelvic pain or
22 dyspareunia can happen with any surgery.
23 It can happen with any particular type of
24 vaginal surgery we do, and it can happen

Page 208

1 with any kind of surgery that you have
2 anywhere in your body, develop chronic
3 pain at that site.
4     MR. ROSENBLATT:  And I don't
5 mean to interject on the record, but
6 to the extent Judge Goodwin does not
7 allow FDA testimony at trial, we would
8 not be offering him as an expert on
9 FDA regulations, but for purposes of
10 explaining his opinion, we'll offer
11 him.
12 BY MR. BENTLEY:
13     Q.   And your basis for saying the
14 TVT IFU appropriately warns is based upon
15 your review of the applicable 21 CFR 801,
16 correct?
17     A.   It's based on my review of
18 multiple -- of my knowledge of the
19 procedure.  It's based on my knowledge of
20 how we train our residents and what we
21 inform our residents.  It's based on my
22 knowledge of continuing certification for
23 our doctors at this point in time, and
24 it's based on my reliance that device

Page 209

1 companies do not and should not be
2 teaching surgeons on how to operate and
3 who -- and who are not the right patients
4 on it.  They can give their opinions, but
5 it's ultimately the surgeon's decision.
6     Q.   Okay.  So, your standard for
7 what an appropriate IFU warning is, is
8 that based upon your review of the federal
9 regulations, or is that just your personal
10 opinion?
11     MR. ROSENBLATT:  Object to the
12 form.
13     I think he just explained that
14 it's both his --
15     MR. BENTLEY:  I'm more confused
16 now than I was to start.
17     THE WITNESS:  I'm sorry.
18 BY MR. BENTLEY:
19     Q.   Is your opinion that the TVT IFU
20 appropriately warns, is that opinion based
21 on your review of federal regulations, or
22 is that based upon your personal opinion
23 as a physician?
24     MR. ROSENBLATT:  Object to form;

Confidential - Harvey A. Winkler, M.D.

Page 210

1  asked and answered.
2      A.   It's based on both.  It's based
3  on my review, as well as the way in my
4  clinical experience and my teaching
5  experience we have trained our fellows,
6  trained other medical students, trained
7  our residents.  I may discuss
8  complications that aren't in an IFU with a
9  medical student, resident or fellow based
10  on specific to the surgical procedure that
11  we're performing.
12      Q.   Have you reviewed any guidance
13  documents that the FDA has put out
14  regarding their interpretation of the
15  labeling statutes?
16      A.   I think I have.
17          Can we show what we're talking
18  about?
19      Q.   Well, first do you know guidance
20  documents are put out by the FDA?
21      A.   Yeah, I went on the FDA
22  Web site.  I've seen some of the stuff.
23  I've done some searches.
24      Q.   And in interpreting FDA

Page 211

1  regulations, it's important to review
2  their guidance on how to interpret it,
3  right?
4      A.   If you're going to be writing an
5  IFU, I think it's important to review the
6  regulations.
7      Q.   Including the guidance documents
8  put out by the FDA?
9      A.   I would try to review all
10  documents if I was doing that.
11      Q.   And to reach an opinion
12  regarding the adequacy of the warnings
13  that are required per federal regulations,
14  it's important to review the guidance
15  documents that are put out by the FDA,
16  right?
17          MR. ROSENBLATT:  Object to form;
18      mischaracterization that a guidance
19      documents equals what are required.
20          MR. BENTLEY:  That's fair.
21  BY MR. BENTLEY:
22      Q.   You can answer.
23      A.   I would review the official
24  rule, and I can interpret it as per the

Page 212

1  ruling.
2      Q.   You can interpret it contrary to
3  what the FDA guidance document would put
4  out?
5      A.   No, what the FDA rule says is
6  what I need to follow.
7      Q.   So you could just discount their
8  guidance?
9      A.   You can't discount their
10  guidance.  But I don't -- I'm not a
11  lawyer, so, but I need to follow the rule
12  and I need to -- the guidance can guide me
13  on how to follow their rules.
14      Q.   So, your opinion is that the IFU
15  is adequate because it lists --
16          MR. BENTLEY:  Let me rephrase
17      that.
18  BY MR. BENTLEY:
19      Q.   You think the IFU is appropriate
20  because a lot of these complications are
21  commonly known; is that fair?
22      A.   They're commonly known to the
23  physicians, yes, performing these
24  procedures.

Page 213

1      Q.   Do you know whether or not the
2  FDA guidance documents instructs companies
3  to warn about hazards including the
4  severity or likelihood of the adverse
5  events?
6      A.   I think companies need to report
7  on adverse events that have been reported
8  with their devices and assess these
9  reports.
10      Q.   And that wasn't exactly my
11  question.
12          Do you know whether or not FDA
13  guidance documents providing guidance on
14  how to interpret 21 CFR 801, do you know
15  whether or not those guidance documents
16  instruct the adverse events should discuss
17  the severity and likelihood of the hazard?
18      A.   Do you have it in front of you?
19  Can I see it?
20      Q.   I'm just asking you as you sit
21  here.
22      A.   So, I'd like to see the document
23  in order to remember it.
24      Q.   It's your opinion that the IFU

Page 214

1  appropriately warns, correct?
2     A.   I've answered that.
3          Yes, correct.
4     Q.   And you don't in your report
5  discuss whether or not you have to warn
6  about the severity or likelihood; is that
7  correct?
8     A.   I report what the complications
9  are.  I'm not aware of any numbers that
10  need to be reported.
11     Q.   Well, for example, death is a
12  potential complication of any surgery;
13  isn't that correct?
14     A.   That's correct.
15     Q.   But it's highly unlikely with
16  most surgeries, correct?
17     A.   Correct.
18     Q.   But if death was actually more
19  likely with one procedure compared to
20  other ones, that would be important
21  information to be in a label, wouldn't it?
22          MR. ROSENBLATT:  Object to form.
23     A.   I mean, death is a really
24  serious complication that we're discussing

Page 215

1  here at this point in time.  So, I think
2  intuitively every patient knows that
3  complications can occur, and death can
4  occur with any surgery or any point in
5  time, unfortunately.
6     Q.   Okay.  And if death, which can
7  occur with any surgery, if the occurrence
8  was more frequent with one product, do you
9  understand that the manufacturer would
10  have an obligation to warn about the
11  increased frequency of that hazard?
12          MR. ROSENBLATT:  Object to form.
13          What do you mean by "more
14  frequent"?
15     A.   And I don't -- are you talking
16  about a procedure?  Are you talking about
17  a product?  I'm not aware of --
18     Q.   We're talking about products and
19  your opinions in the report that they
20  appropriately warn in the IFU.
21          And you're saying that these
22  complications are commonly known, correct?
23     A.   Correct.
24     Q.   If it's not commonly known that

Page 216

1  a complication actually has an increased
2  frequency with one product compared to
3  another one, assuming that, do you
4  understand that manufacturers of products
5  have an obligation to actually share that
6  frequency information with people?
7          MR. ROSENBLATT:  Object to form.
8     A.   I got to be honest, I don't
9  understand the question.
10     Q.   Right.
11     A.   It's long.
12     Q.   If you had reviewed the guidance
13  documents, would you include them in your
14  reliance list?
15     A.   If I remembered to, yes, I would
16  have included it.
17     Q.   In your report you state:
18  "There's no overt need to describe the
19  possibility of chronic pelvic pain or
20  dyspareunia because, as stated previously,
21  their inherent risk to surgery, and
22  vaginal surgery in particularly, which are
23  commonly known."
24          What's your basis for opining

Page 217

1  that the labels are adequate if there's an
2  increased frequency that people are not
3  commonly aware of?
4          MR. ROSENBLATT:  Object to form.
5     A.   I think anyone doing these
6  procedures knows that chronic pain or
7  dyspareunia can happen.  Anything in the
8  vagina, anything that we -- any kind of
9  surgery that we do can cause the
10  possibility of dyspareunia and chronic
11  pelvic pain can happen with any particular
12  surgery.
13     Q.   So it's your opinion that the
14  IFU doesn't need to warn about anything?
15          MR. ROSENBLATT:  Object to form;
16  mischaracterization.
17     A.   The IFU should warn, in my
18  opinion, IFUs should warn about adverse
19  events specific and unique to that
20  product, not necessarily the procedure.
21     Q.   And what are the adverse
22  reactions that are specific to the TVT and
23  TVT-Exact?
24     A.   In my opinion, all you need to

Confidential - Harvey A. Winkler, M.D.

Page 218

1  put in that -- if I was writing the
2  regulation, I think that what's specific
3  to TVT and midurethral slings is the risk
4  of, and synthetic slings, is the risk of
5  exposure and extrusion.
6      Q.   And that's all you would put in
7  the IFU based upon your understanding of
8  the federal regulations?
9      A.   No, I didn't say that and you
10 didn't ask me that.  I said if I was
11 making the regulation.
12          So, the regulation is of what
13 needs to be specific to that procedure and
14 unique -- no, specific and unique to the
15 device, not necessarily the procedure.
16     Q.   So in your opinion, what needs
17 to be in the IFU for TVT and TVT-Exact
18 regarding adverse events?
19     MR. ROSENBLATT:  Object to form.
20     I just want to make sure you're
21     not asking about contraindications?
22     MR. BENTLEY:  I said adverse
23     events, right.
24     A.   What's required by the CFR.

Page 219

1      Q.   That's not my question.
2          In your opinion as a expert in
3  this case that's offering the opinion that
4  the TVT IFU is appropriate and adequately
5  warned, in your opinion, what adverse
6  events need to be in the TVT and
7  TVT-Exact?
8      A.   In my opinion, from what was
9  known at that point in time, the IFU was
10 adequate.
11     Q.   I didn't ask that.
12         In your opinion, as you sit here
13 today with the knowledge you've got, what
14 adverse events need to be listed in the
15 TVT IFU and the TVT-Exact IFU?
16     MR. ROSENBLATT:  Object to form;
17     asked and answered.
18         He said mesh erosion and
19     exposure and that was it.
20     MR. BENTLEY:  He hasn't
21     answered -- you can look at the
22     transcript.
23
24 BY MR. BENTLEY:

Page 220

1      Q.   Do you know the question?
2      MR. ROSENBLATT:  Can we go back
3  and read that where he answered "mesh
4  erosion and extrusion"?
5      MR. BENTLEY:  I don't mean to
6  belabor this.  I'm going to keep
7  going.  I know he hasn't answered.
8  BY MR. BENTLEY:
9      Q.   As you sit here today --
10     MR. ROSENBLATT:  Hold on.  I
11 just want to hear what the previous
12 question and answer was, Greg.  I'm
13 not trying to be rude and interrupt.
14     If you want to spend more time
15 on it, I just want to make sure that
16 he already did.
17     MR. BENTLEY:  He's going to say
18 two things.  We've already spent more
19 time talking about it than the actual
20 answer would be if you'd give the
21 answer.
22     MR. ROSENBLATT:  I think he did
23 give the answer.  I just want to try
24 to figure it out here.

Page 221

1      (The requested portion of the
2  record was read by the Court Reporter.)
3      MR. BENTLEY:  He's talking about
4  writing the regulation.  I didn't ask
5  about writing regulation.
6      MR. ROSENBLATT:  Fair enough.
7      MR. BENTLEY:  Would you read
8  back my question, please?
9      (The requested portion of the
10 record was read by the Court Reporter.)
11     A.   So, in my opinion, the adverse
12 events that need to be there are --
13 include damage to vessels, nerves,
14 bladder, urethra or bowel and the
15 possibility of extrusion, erosion, fistula
16 formation or inflammation.
17     Q.   Are all of those complications
18 unique to the TVT and TVT-Exact?
19     A.   No, they're not.
20     Q.   So what's your standard for what
21 needs to be in the IFU?
22     A.   My standard for what needs to be
23 in the IFU is based on the government
24 guidelines.  Or, if I can correct,

Confidential - Harvey A. Winkler, M.D.

Page 222

1  government regulations as opposed to
2  guidelines.
3      Q.   Do you hold yourself out as an
4  expert in biomedical engineering?
5      A.   I hold myself out as an expert
6  when it comes to polypropylene and
7  synthetic materials and their
8  biocompatibility when placed in the pelvic
9  floor.
10     Q.   Have you ever designed a mesh?
11     A.   I've discussed mesh properties
12 with industry, but -- I've discussed
13 different mesh properties with industry
14 and how to design some meshes that we may
15 be doing research on.
16     Q.   And are you doing research on
17 partially absorbable meshes?
18     A.   Yes.  And there's going to be
19 some confidential information that I'm not
20 going to be able to share.
21     Q.   What's the purpose of
22 researching partially absorbable meshes?
23     A.   What's the purpose of
24 resourcing -- to see and try to find out

Page 223

1  if there is a different option for
2  patients using a partially absorbable --
3  an absorbable mesh as opposed to a
4  permanent mesh.
5      Q.   And what's the potential benefit
6  of a partially absorbable meshes?
7      A.   The potential benefit is that
8  this mesh gets absorbed and it does not
9  stay there forever.
10     Q.   And what's the ultimate clinical
11 outcome that that could potentially be for
12 a patient?
13         MR. ROSENBLATT:  Object to form.
14     I just want to make sure that
15     we're talking about incontinence.
16         MR. BENTLEY:  Yes.
17     A.   Talking about incontinence, so,
18 we know that there is a long-term risk of
19 placing in a polypropylene mesh.  We know
20 that although on the short-term most of
21 the complications happen, you can get
22 long-term complications as well.  And if
23 we can reduce that complication rate, mind
24 you with the same efficacy, then there

Page 224

1  would be a benefit.  But there's no proof
2  at this point in time, there's no clinical
3  data at this point in time that an
4  absorbable mesh would provide that
5  efficacy, nor is there any clinical data
6  that the absorbable mesh that we're
7  working on for slings would be a safer
8  option for them.
9      Q.   You're working on absorbable
10 mesh for the treatment of incontinence; is
11 that correct?
12     A.   No.  We're working on properties
13 of absorbable mesh in rabbits, so, and
14 comparing that to polypropylene.
15     Q.   And are you testing inflammation
16 in the rabbit?  Or what's your endpoint?
17     A.   There are multiple endpoints to
18 the --
19         MR. ROSENBLATT:  Object to form.
20     To the extent you can discuss it
21     and it's not confidential, you can
22     answer.
23     A.   There are multiple endpoints
24 to -- in the protocol.  I can't go through

Page 225

1  all those right now, nor do I remember
2  every single one of them.
3      Q.   As a physician and an expert in
4  this case, what endpoints would you look
5  for in researching a model involving
6  partially absorbable mesh versus permanent
7  mesh?
8      A.   So, some of the things that I
9  may look for will be inflammation, chronic
10 foreign body reaction that we discussed,
11 tissue strength, histopathology.  This
12 is --
13     Q.   Do you consider yourself -- I'm
14 sorry, were you done?
15     A.   This is a very early study,
16 obviously.
17     Q.   Do you consider yourself an
18 expert in histopathology?
19     A.   I have reviewed -- when I have
20 reviewed slides on the pelvic floor, I've
21 reviewed slides with pathologists.  I've
22 done this ever since I was a medical
23 student.  I have -- I will be reviewing
24 the slides from these rabbits that will

Confidential - Harvey A. Winkler, M.D.

Page 226

1  come out, and I've been reviewing that
2  throughout my career.
3      Q.    You'll personally be reviewing
4  the slides, or you're going to send them
5  to a pathologist for their review?
6      A.    Well, we're going to review them
7  with them.
8          So, I'm not a board certified
9  pathologist, but I've been looking at
10 slides throughout my entire career an
11 consider myself somewhat of an expert.
12     Q.    Why don't you order -- why do
13 you only order a gross specimen review
14 when you send something to a pathologist
15 that's been explanted?
16     A.    There's no other benefit to the
17 patient, and I would not want in order to
18 go any further.  What benefit would she
19 get out of me after taking out the mesh,
20 as opposed to spending the insurance
21 company's money?
22     Q.    What is the clinical
23 significance, in your opinion, of a mesh
24 roping?

Page 227

1          MR. ROSENBLATT:  Object to form.
2      A.    The clinical significance if a
3  mesh ropes?
4      Q.    Yes.
5      A.    So, if it -- if that mesh ropes,
6  it can then get too tight and get too
7  tense and migrate into structures that we
8  don't want it to go in.  It can create
9  increased scarring if it ropes.
10     Q.    How does roping mesh cause
11 increased scarring?
12     A.    So, if -- you may -- with a
13 roping mesh, you may get a band-like
14 effect in the vagina, and I would
15 attribute that to scarring.  It's not
16 like -- I would attribute that to
17 scarring.
18     Q.    Does the mesh roping and curling
19 affect the pore size?
20     A.    It may, but I will tell you I
21 have not seen mesh roping and curling.  I
22 know it's been reported.  I've not seen
23 that with midurethral slings.
24     Q.    If the mesh ropes and curls and

Page 228

1  makes the pores collapse, do you have an
2  opinion as to whether that causes
3  shrinkage and contraction?
4          MR. ROSENBLATT:  Object to form.
5          Are you asking a hypothetical?
6  BY MR. BENTLEY:
7      Q.    If you know.
8      A.    Say that again.
9      Q.    If the mesh ropes and curls,
10 thereby causing the pores to collapse,
11 does that cause shrinkage and contraction?
12         MR. ROSENBLATT:  Object to form.
13     A.    What I understand is that if the
14 pore size theoretically is less than a
15 certain size, you may get increased
16 scarring.
17     Q.    And that can happen through
18 roping, correct?
19     A.    I wouldn't say roping.  It -- I
20 would say it can happen through pore
21 collapse.
22         If it ropes, it still doesn't
23 have to collapse the pore, right?
24     Q.    If you want to look on page 22

Page 229

1  of your report, Doctor, you have a
2  paragraph that starts out "However."
3      A.    Okay.
4      Q.    You say:  "Additionally, when
5  placing the sling and moving the plastic
6  sheathes, as directed in the IFU," you
7  state: "averts the mesh from roping and
8  curling, thereby keeping the pores open
9  which prevents shrinkage and contraction."
10     A.    Yeah, and I think I already
11 stated that I do not see roping and
12 curling occurring with midurethral slings.
13     Q.    Maybe I just don't understand.
14         Your opinion is that roping and
15 curling causes the pores to collapse,
16 correct?
17     A.    I said roping and curling may
18 cause the pores to collapse.
19     Q.    Okay.  And if the pores
20 collapse, that can cause shrinkage and
21 contraction, correct?
22     A.    I don't think the mesh shrinks.
23 I think that you can get increased
24 scarring if the pores collapse.

Page 230

1    Q.   If the pores collapse, you can
2   get increased scarring, is that what you
3   testified to?
4    A.   If the pores collapse or if you
5   have small pores, there may be increased
6   scarring.
7    Q.   Okay.  And increased scarring
8   leads to shrinkage and contraction,
9   correct?
10    A.   Increased scarring may lead to
11   shrinkage and contraction.
12    Q.   And I mean, you're stating here
13   in your report that's what the importance
14   of having open pores is; is that correct?
15    A.   I'm not going to -- you want to
16   put that mesh in that the pores stay open,
17   yes.
18    Q.   Do you have any studies that
19   provide measurements of what the pore size
20   is after it's been implanted?
21    A.   I don't have any particular
22   studies, but I can show you a picture of,
23   and we can show it later, of a picture of
24   a transvaginal mesh that is seen

Page 231

1   abdominally without any evidence of pore
2   collapse.
3        THE WITNESS:  Want to pull that
4    picture out?
5        MR. ROSENBLATT:  He's got it
6    over there.
7        MR. BENTLEY:  I want to stick
8    with slings right now because we're in
9    the sling report.
10    A.   So, I mean, we're not taking out
11   slings with patients who are doing well
12   with them, so you're not going to find
13   that.
14    Q.   If you could please turn to page
15   27.
16    A.   Okay.
17    Q.   You have a paragraph that starts
18   "As a result."
19        Do you see that?
20    A.   Yes.
21    Q.   You say:  "The TVT mesh is a
22   suitable and currently one of the most
23   appropriate mesh implants for the
24   treatment of SUI."

Page 232

1        Did I read that correctly?
2    A.   Yes, you did.
3    Q.   And you stand by that opinion,
4   right?
5    A.   Yes, I do.  And it's also backed
6   by the nice study in the UK that I think
7   that came out from 2014.
8    Q.   And you state:  "It's a suitable
9   and one of the most appropriate meshes."
10        Right?
11        My question is what other
12   suitable and appropriate meshes exist
13   right now?
14        MR. ROSENBLATT:  Object to form.
15    You're asking about --
16        MR. BENTLEY:  The sentence in
17    the report.
18        MR. ROSENBLATT:  But you're
19    asking about incontinence right now?
20        MR. BENTLEY:  I'm asking in this
21    sentence he says that the mesh is a
22    suitable and appropriate mesh for
23    implant for the treatment of SUI.
24   BY MR. BENTLEY:

Page 233

1    Q.   My question is what other
2   products are suitable and appropriate for
3   the treatment of SUI?
4    A.   So, the most two suitable ones
5   that I'm aware of right now are the TVT
6   mesh as well as the Boston Scientific
7   Advantage mesh for slings.
8    Q.   Do you have any understanding or
9   appreciation of the difference in those
10   two meshes?
11    A.   They are very similar.  We can
12   pull out the Moalli study that I think has
13   that in there.  But they are very, very
14   similar in terms of I think the mesh fiber
15   thickness is exactly the same, and it
16   could be that the Boston Scientific pore
17   size is slightly less, but it's above 1
18   millimeter.  And I think the Caldera
19   slings are appropriate as well, but they
20   don't have the same long-term data behind
21   them as the two others do.
22    Q.   And those are three different
23   mesh constructions, correct?
24    A.   Well, the Boston Scientific

Confidential - Harvey A. Winkler, M.D.

Page 234

1 Advantage and the TVT are extremely
2 similar.
3        Why don't we pull out the study
4 and take a look?
5    Q.   I'm just trying to understand
6 your sentence here.
7    A.   So, I'm saying --
8    Q.   Obviously the mesh knitting is a
9 different design for different
10 manufacturers; isn't that correct?  It's
11 proprietary design?
12    A.   Correct.  Correct.
13    Q.   And that's going to necessarily
14 make different pore size, albeit you're
15 saying fairly similar, correct?
16    A.   Mm-hm.
17    Q.   And that's going to create
18 different mesh weight, correct?
19    A.   It may create different mesh
20 weight, yeah, the total weight.
21    Q.   And the mesh geometry or
22 knitting design will create a different
23 flexibility property, correct?
24    A.   It can, correct.  And if I

Page 235

1 recall, the Boston Scientific mesh and the
2 Advantage mesh, they're both a hundred
3 grams per meters -- per centimeter
4 squared.  They're both a fiber of .15
5 millimeters, and the main difference is
6 their pore size.
7        Another difference in the
8 midurethral portion is it's heat-sealed
9 and it hangs on the other side.
10    Q.   And they're going to have
11 different tensile strength based on their
12 knitting, correct?
13    A.   Yes.
14        And if we can look at the Moalli
15 study, it probably has tensile strength in
16 there.  I don't remember that.
17        MR. ROSENBLATT:  You have it in
18 your report.
19        THE WITNESS:  Yeah, but is
20 tensile strength in there?  I'm not
21 looking.
22        MR. ROSENBLATT:  You have it on
23 page 26.
24        THE WITNESS:  Okay.

Page 236

1        MR. BENTLEY:  I mean, I don't
2 have a question pending.
3        MR. ROSENBLATT:  Sure.
4 BY MR. BENTLEY:
5    Q.   Doctor, what's your definition
6 of "state of the art"?
7    A.   I don't know if I have a total
8 strict definition of "state of the art."
9 I think state of the art is what is
10 considered the best procedure that we have
11 available at the time.
12    Q.   What's your basis then for
13 saying the design of the TVT is state of
14 the art?
15    A.   I think that right now, the
16 design of the TVT was a revolutionary
17 concept and it is one of the standards
18 that other slings should be compared
19 against or the data on that type of sling
20 should be compared against if you're going
21 to change.
22    Q.   So, the mesh in the TVT, is that
23 mesh specifically, the design of that
24 mesh, is that the state of the art of the

Page 237

1 mesh?
2    A.   I think the whole procedure was
3 a state of the art procedure.  It was a,
4 you know, totally different concept and it
5 changed the way we treat stress urinary
6 incontinence in this country.
7    Q.   So, I think I understand, the
8 design of the TVT procedure itself, in
9 your opinion, that's state of the art?
10    A.   It was state -- yes, it's state
11 of the art.
12    Q.   And in that procedure, you use a
13 mesh, and you've just discussed several
14 different mesh products that are sold by
15 different companies that you think are all
16 suitable and appropriate for mesh
17 implantation; is that fair?
18    A.   Yes, there are different
19 companies that have suitable meshes.
20    Q.   And those meshes have slight
21 differences, as we have discussed, based
22 on their knitting and various design
23 properties, correct?
24    A.   Correct.

Confidential - Harvey A. Winkler, M.D.

Page 238

1    Q.   Doctor, there's been a -- we've
2  discussed this somewhat, but there's been
3  a various selection of different materials
4  that have been used as implants to treat
5  incontinence through the history of
6  treatment for incontinence; is that
7  correct?
8    A.   Correct.
9    Q.   And some of those materials were
10  Gore-Tex or Mersilene or polyester,
11  correct?
12    A.   Correct, yes.
13    Q.   And each one of the different
14  products had different results; isn't that
15  correct?
16    A.   Correct.
17    Q.   And a lot of the variation is
18  driven by, one, the material that goes
19  into making the product; is that correct?
20    A.   One of the components is the
21  material, yes.
22    Q.   And some other variation could
23  be by the way that material is made into
24  the mesh implant, the way it's designed;

Page 239

1  is that correct?
2    A.   The way it's knitted or weaved
3  is what you're getting at.
4    Q.   Sure.
5    A.   Okay.
6    Q.   And that will affect various
7  properties, such as weight, density,
8  flexibility, tensile strength, correct?
9    A.   Well, I think the density of the
10  fiber stays the same depending on what
11  fiber you use, but the weight of the mesh,
12  sure.
13    Q.   The ultimate mesh will have
14  different characteristics based on the
15  design of the mesh, correct?
16    A.   Correct.
17    Q.   So, there is some variation in
18  different mesh products even though they
19  all started at polypropylene; is that
20  correct?
21    A.   That's correct.  There are
22  different additives that I'm aware of that
23  companies put in in their polypropylene
24  that are proprietary.

Page 240

1    Q.   And those different properties
2  and additives and designs actually have
3  implications at the ultimate level for the
4  patient; is that correct?
5    MR. ROSENBLATT:  Object to form.
6    A.   They may.  I don't know if we're
7  going to be able to drill down and be
8  specific as to which product has, or which
9  additive, quote/unquote, has the specific
10  complication.
11    Q.   That's why it would be important
12  to look at safety and efficacy information
13  specific to the specific product; isn't
14  that correct?
15    MR. ROSENBLATT:  Object to form.
16  BY MR. BENTLEY:
17    Q.   You wouldn't want to establish
18  the safety of one product based off of
19  some other polypropylene product that has
20  a different design, would you?
21    A.   Well, I think there are some
22  assumptions that you can make and, at that
23  point in time, of how similar or
24  dissimilar the meshes are.  If you're

Page 241

1  going to show me a mesh and that's a .2
2  millimeter pore size and say use this for
3  stress urinary incontinence, I wouldn't
4  use that.
5    Q.   But if you had two products,
6  both made of polypropylene, similar width,
7  thickness, with different pore geometry,
8  you'd want to look at the safety
9  information for the specific one you're
10  using; is that fair?
11    A.   It's one of the components that
12  I would look at.  It's not the only
13  component about the product or device that
14  I would look at and take into
15  consideration.
16    Q.   Was it important to you that
17  Ulmsten found no defect in healing in his
18  initial study?
19    A.   Can you tell me what you're
20  referring to?
21    Q.   I'm sorry.
22      You know who Professor Ulmsten
23  is, don't you?
24    A.   Yes.

Confidential - Harvey A. Winkler, M.D.

Page 242

1  Q.  Who is Professor Ulmsten?
2  A.  He was one of the,
3  quote/unquote, fathers of the TVT
4  procedure.
5  Q.  And you cite to him in your
6  report as Ulmsten developed the TVT,
7  correct?
8  A.  Yes.
9  Q.  And Ulmsten did the first study
10 on TVT using Ethicon's Prolene mesh; is
11 that correct?
12 A.  Yeah.
13    Can you tell me what page you're
14 on there?
15 Q.  On page 27 of your report, at
16 the bottom you begin discussing the
17 Ulmsten prototype.
18    Do you see that?
19 A.  Yes, I do.
20 Q.  And then the next sentence
21 you're discussing the Falconer/Ulmsten '96
22 studies.
23    Do you see that?
24 A.  Yes, I do.

Page 243

1  Q.  And then on the next page, a
2  subsequent study for a publication you
3  say:  Ulmsten '96 discussed the
4  improvements in finding no defect in
5  healing."
6    Do you see that?
7  A.  Yes, I do.  In 1996 he did write
8  that.
9  Q.  And that's the first study where
10 he's using Prolene for TVT; is that
11 correct?
12 A.  That I'm aware of, that's
13 correct.
14 Q.  And you state that he found no
15 defect in healing, correct?
16 A.  Correct.
17 Q.  Would it concern you if he
18 misrepresented that result?
19 A.  At this point in time, it
20 doesn't concern me because the proven
21 safety and efficacy and multiple Level I
22 studies have shown that the device is safe
23 and efficacious.
24 Q.  So just so I'm clear, your

Page 244

1  testimony for the jury that you're
2  unconcerned that Ulmsten --
3    MR. BENTLEY:  Strike that.
4  Q.  If evidence shows that Ulmsten,
5  the creator of this device and the initial
6  publication regarding this, if he
7  misrepresented that there was no defect in
8  healing, you're not concerned about that?
9    MR. ROSENBLATT:  Object to form;
10 mischaracterization;  lack of
11 foundation.
12 A.  So, can you repeat the question?
13 Q.  Sure.
14    At trial, do you intend to tell
15 the jury that you're not concerned that
16 Ulmsten may have misrepresented --
17    MR. BENTLEY:  Strike that.
18 Q.  If you're presented with
19 evidence at trial, do you intend to tell
20 the jury that you're not concerned if
21 Ulmsten misrepresented the fact that TVT
22 in the initial study did indeed have a
23 healing defect?  Does that not concern
24 you?

Page 245

1    MR. ROSENBLATT:  Same objection.
2  A.  I would be concerned about
3  anybody who publishes a research article
4  if they misrepresent what they found.
5    I'm going to assume that he
6  didn't misrepresent it.
7  Q.  Okay.
8  A.  But if you tell me now that
9  there was an exposure rate of 2 percent,
10 I'll -- I believe it and I'm not going to
11 base the credibility of Ulmsten on what
12 the information that we have today.
13 Q.  Would it concern you if
14 information showed that there was a defect
15 in healing and that Ulmsten had a
16 pay-for-play agreement regarding the
17 product?
18    MR. ROSENBLATT:  Objection;
19 lack of foundation and
20 mischaracterization.
21 BY MR. BENTLEY:
22 Q.  You can answer.
23 A.  I understand that Ulmsten was
24 paid --

Confidential - Harvey A. Winkler, M.D.

Page 246

1    MR. ROSENBLATT: Argumentative.
2    A.   I understand that Ulmsten was
3  paid for his -- the product, and I
4  understand that he did get money for it.
5    What I do think is if someone
6  has product information or comes up with a
7  device, they should be able to be
8  compensated with an industry if it's their
9  intellectual property that's going to be
10  used.
11    Q.   My question was just do you
12  intend to tell the jury that that doesn't
13  concern you if he misrepresented data that
14  he was getting paid to present it
15  favorably?
16    MR. ROSENBLATT: Object to form.
17    Greg, let's pull it out and look
18  at it if you want to ask him about it.
19    MR. BENTLEY: I'm just talking
20  about the hypothetical.
21    We know what the data shows.
22    MR. ROSENBLATT: Well, let's
23  pull it out and look at the data so he
24  can give you a better answer.

Page 247

1    MR. BENTLEY: I don't care about
2    that.
3  BY MR. BENTLEY:
4    Q.   The hypothetical, just go with
5  this assumption. Assuming the data showed
6  that Ulmsten had healing defect in his
7  initial study and he was getting paid
8  based on whether or not he had no defects,
9  if he misrepresented that data, would that
10  concern you? My question is only would
11  that concern you?
12    MR. ROSENBLATT: Object to form;
13    lack of foundation.
14    A.   It may concern me on his
15  character, but it's not going to change
16  the way I feel and my opinions on
17  midurethral slings today.
18    Q.   Doctor, what would you consider,
19  or how would you describe your medical
20  expertise or specialty?
21    A.   I don't understand. What do you
22  mean?
23    Q.   How do you describe what you do?
24    A.   To people, let's say to a

Page 248

1  layman?
2    Q.   To me maybe.
3    A.   Yeah, no problem.
4    So, most commonly what I say to
5  people who ask me what I do is I do
6  urogynecological, that's female pelvic
7  reconstructive medicine. The most common
8  things that we deal with would be pelvic
9  organ prolapse, which is when something is
10  falling down or out of the vagina, and the
11  second most common thing that we will
12  manage and treat is stress urinary
13  incontinence -- is urinary incontinence,
14  and then they may ask me what urinary
15  incontinence is, and I may explain to them
16  the difference between stress and urge
17  incontinence.
18    Q.   So you would classify yourself
19  as a urogynecologist, right?
20    A.   I would classify myself as a
21  female pelvic medicine reconstructive
22  surgeon because that's what the board
23  certification is, but it's easier to say
24  urogynecologist, for sure.

Page 249

1    Q.   And that's of course different
2  than just a gynecologist, correct?
3    A.   That's correct.
4    Q.   And is that different from, in
5  your interpretation, is that different
6  from a urologist?
7    A.   From a general urologist, yes.
8    Q.   And each of those specialties
9  have, I presume, different certifications?
10    A.   Yes. So, both urology and
11  obstetrics and gynecology have general
12  board certification, and they also have
13  subspecialty board certification.
14    Q.   And they have different
15  training, I presume; is that correct?
16    A.   Well, the training for the
17  subspecialty for female pelvic medicine is
18  supposed to be, at this point in time, a
19  little more, what's the word I'm looking
20  for, structured, for lack of better terms
21  right now. Standardized, structured.
22    Q.   Fine.
23    Is there different
24  accreditation, I would presume, for the

Confidential - Harvey A. Winkler, M.D.

Page 250

1  different subspecialties?
2      A.  So, there's a combined board for
3  the female pelvic medicine and
4  reconstructive surgery certification, and
5  I'm not exactly sure on how the
6  credentialing works on the urology side.
7  They get their female pelvic medicine and
8  reconstructive surgery from the urology
9  side, but it's sort of a combined board
10 between OB-GYN and urology.  There are
11 three people from each specialty on that
12 board.
13     Q.   And there's urology-focused
14 journals, correct?
15     A.  Yes, there are.
16     Q.   And there's gynecology-focused
17 journals, correct?
18     A.  Yes, there are.
19     Q.   And there's actually, I think,
20 reconstructive pelvic medicine-focused
21 journals, correct?
22     A.  Yes.
23     Q.   And each of those journals
24 brings a different perspective to the

Page 251

1  table; is that fair?
2      A.  Yes, they do.
3      Q.   It's a little different
4  knowledge and practice in each one of
5  those?
6      A.  Theoretically.  I mean, yes,
7  theoretically there may be different ways
8  of looking at things, although in the
9  female pelvic medicine side, there has
10 been a lot of work in the last ten years
11 to try to more standardize that, whether
12 it's coming from the urology side or
13 whether it's coming from the GYN side.
14     Q.   In the last ten years, the
15 urology and gynecology have kind of
16 converged into female pelvic medicine
17 reconstructive surgery?
18     A.  Right.
19     Q.   And prior to them converging in
20 the middle, urologists might have
21 preferred one procedure for the same
22 indication as compared to gynecologists
23 were doing a different procedure for that
24 same indication?

Page 252

1      A.  Yeah, and I think I actually
2  wrote about that in my report.  In the
3  late '90s, urologists were more commonly
4  doing pubovaginal slings for urinary
5  incontinence and that's where their
6  training came from.  And they were almost
7  suggesting, and some urologists were
8  suggesting that everyone if they were
9  getting an anti-incontinence procedure, a
10 pubovaginal sling should be the primary
11 procedure that you're performing.
12          Gynecologists, as a general
13 rule, were more commonly performing Burch
14 procedures.
15     Q.   You were doing Burch procedures
16 in that time period predominantly?
17     A.   So, that was one of the things
18 that I got lucky with, I think, in terms
19 of my training.  That yes, we did
20 abdominal procedures, but we also did
21 pubovaginal sling procedures.  We also did
22 bone anchored procedures, not that bone
23 anchors are the way to go today, but I did
24 have -- and we did urethrolysis.  So I

Page 253

1  felt I got extensive training on both
2  sides of the spectrum, and I felt that I
3  was lucky because of that.
4      Q.   You don't have any criticism of
5  the urologists for preferring the
6  pubovaginal sling, do you?
7      A.   No, and I understand where that
8  came from.
9      Q.   It was based upon their
10 knowledge and training and they thought
11 that was the better procedure?
12     A.   Yeah, they're entitled.
13     Q.   And the other side, you don't
14 have any criticism of the gynecologists
15 who thought, based on their training and
16 knowledge, the Burch was better?
17         MR. ROSENBLATT:  Object to form.
18         Are you talking about then or
19     now?
20         MR. BENTLEY:  Then.
21         MR. ROSENBLATT:  Okay.
22 BY MR. BENTLEY:
23     Q.   You discussed in your report
24 that in the late '90s when urology and

Confidential - Harvey A. Winkler, M.D.

Page 254

1  gynecology were separate before they
2  converged that there was different
3  preferences in how to treat incontinence,
4  that the urologists preferred to do the
5  pubovaginal sling, correct?
6      A.   Correct.
7      Q.   And back then, the
8  gynecologists --
9      A.   I would say most urologists, not
10 all.
11     Q.   Of course.
12          And conversely, gynecologists
13 preferred to do the open Burch procedure,
14 correct?
15     A.   Correct.
16     Q.   And you don't have any criticism
17 of the gynecologists' preference for doing
18 the Burch back then, correct?
19     A.   No.  I think it was the
20 procedure that you can do back then.
21     Q.   And that's because they had
22 training and knowledge that indicates to
23 them that this was the more appropriate
24 procedure for them to recommend in the

Page 255

1  majority of the cases, and you're not
2  critical of that, are you?
3      A.   I'm not going to criticize what
4  they picked.  I think that most people
5  back then did the procedure that they were
6  comfortable and trained with.  If they
7  didn't know how to do a pubovaginal sling,
8  I don't think they were going to offer it.
9      Q.   Because they had a different
10 understanding and a different knowledge
11 base and that led them to a different
12 preference back then; isn't that correct?
13     A.   Yes, that led them to, based on
14 their training and education, led them to
15 the preference of one over the other.
16     Q.   Which may have been different
17 for urologists versus gynecologists,
18 correct?
19     A.   Yeah, I don't recall -- I'm
20 not -- I don't recall what the specific
21 training for urologists were back then.  I
22 can tell you what urogynecologists and
23 gynecologists were doing, but as a general
24 rule, we tended to lean more towards a

Page 256

1  Burch procedure for a primary repair as
2  opposed to an autologous sling procedure.
3      Q.   Doctor, in your report, you
4  mention that every patient is slightly
5  different, and that goes without saying,
6  right?
7      A.   Correct.
8      Q.   And every surgeon is different
9  how they would like to do something,
10 correct?
11     A.   Slightly, yes.
12     Q.   And a surgeon's differing
13 preference on how to do it is based in
14 part on his or her experience, correct?
15     A.   Correct, and it may be based on
16 their height, their weight.
17          I don't know what to tell you.
18     Q.   And based upon their knowledge
19 based on what journals they're reading?
20     A.   Correct.
21     Q.   And what training programs
22 they're going to, or CMEs, correct?
23     A.   Correct.
24     Q.   And everyone's slightly

Page 257

1  differently positioned, correct?
2      A.   You're talking about patients or
3  surgeon?
4      Q.   Well, actually both; isn't that
5  correct?
6      A.   Yeah, one surgeon may prefer to
7  position with one type of stirrups and
8  another surgeon may prefer to position
9  with another set of stirrups.  One surgeon
10 may want more flexation of the hips, one
11 person may want less flexation of the
12 hips.
13     Q.   Doctor, you're a member of the
14 ACOG and AUGS, correct?
15     A.   Correct.
16     Q.   And ACOG and AUGS put out
17 practice bulletins, correct?
18     A.   Yes, they do.
19     Q.   And you rely upon those, right?
20     A.   It's one of the things I rely
21 on.
22     Q.   You cite to them in your
23 reliance materials, right?
24     A.   That's correct.

Confidential - Harvey A. Winkler, M.D.

Page 258

1    Q.   Would you consider them
2   important evidence?
3    A.   I think those are some things
4   you should take into consideration when
5   you're doing these procedures, yes.
6    Q.   What level of evidence would you
7   classify those position statements as?
8    A.   I would classify those position
9   statements as guidelines as opposed to a,
10  quote/unquote, level of evidence.
11   Q.   Got you.
12       Do you have an opinion as to
13  whether TVT has rough edges or smooth
14  edges?
15       MR. ROSENBLATT:  Object to form.
16   A.   I don't have an opinion if one
17  is rough or smooth in particular.
18   Q.   If you want to look on page --
19   A.   I have an opinion that the
20  laser-cut TVT has a more of a rounded type
21  of edge and the TVT mechanical may have a,
22  quote/unquote, slightly pointier edge, and
23  how that feels to an individual surgeon
24  may be different.

Page 259

1       Clinically, I don't think that
2   it makes a difference if you have -- that
3   I've seen in my patients or that I've been
4   reported if there's a difference between
5   those two particular type of edges.
6    Q.   So, laser-cut mesh is going to
7   have more of a smooth sealed edge; is that
8   correct?
9    A.   So, if you're touching one of
10  the edges.
11   Q.   Right.
12   A.   It's, yeah, it's smoother.
13   Q.   And machine-cut's going to have
14  a little bit rougher edge without the
15  sealed laser-cut process?
16   A.   I mean, I don't know if I
17  describe it as a rougher edge all the
18  time, but I think that it may have a
19  different type of a feel to it, yeah.
20   Q.   And the feel or roughness of the
21  edge, that's a product of the cutting
22  process; isn't that correct?
23   A.   Yeah, the edges are a product of
24  the cutting.  How edges turn out are a

Page 260

1   product of the cutting process.
2    Q.   And that's part of the design of
3   the mesh, whether or not you design to be
4   laser-cut or machine-cut, right?
5    A.   I don't think it's the way of
6   the design of the mesh.  I think it's the
7   way that you're cutting the mesh.
8    Q.   Which is part of the design of
9   the manufacturer, correct?
10   A.   Okay.
11   Q.   I mean, if the design
12  specifications call for laser-cut, that's
13  part of the design?
14   A.   Correct.
15   Q.   And conversely, if the design
16  calls for a machine-cut, that's part of
17  the design, right?
18   A.   Correct.
19   Q.   And the resulting rough or not
20  as smooth edges is inherently part of the
21  design, right?
22   A.   The edges are inherently part of
23  the design, yes.
24   Q.   Okay.  On page 28 of your

Page 261

1   report, you have a paragraph that starts
2   "A standard weight mesh."
3       Do you see that?
4    A.   Yes.
5    Q.   And the second sentence you're
6   discussing the Prien-Larsen 2016 study and
7   you state that:  "They recently published
8   a prospective study comparing 100 grams
9   per meter squared with low stiffness and
10  rough edges similar to TVT."
11       Do you see that?
12   A.   Correct.  That's how they
13  described it in the paper.
14   Q.   Well, you're saying that that's
15  similar to TVT, so there you're talking
16  about machine-cut; is that correct?
17   A.   Yeah.
18       Can you pull out the paper, do
19  you mind?
20   Q.   I'm just talking about your
21  report.  There's not a direct quote in
22  that sentence, is there?
23   A.   No, there is not.
24   Q.   So you're just saying that the

Confidential - Harvey A. Winkler, M.D.

Page 262

1  rough edges are like the machine-cut TVT,
2  right?
3      A.   I said they're similar to the
4  TVT.
5      Q.   As we discussed, that would be
6  the machine-cut TVT as opposed to the
7  laser-cut?
8      A.   That's correct.
9      Q.   Doctor, you make a couple of
10 statements in your report talking about
11 your opinion as to what is commonly.
12         You're aware of that, right?
13     A.   That I used the word "commonly"?
14     Q.   Yes.
15     A.   I used it in my report.  I don't
16 know how many times I used it, but it's in
17 there.
18     Q.   On page 23 of your report, you
19 have a paragraph that starts with "The TVT
20 procedure has been shown."
21         Do you see that at the top?
22     A.   Yes.
23     Q.   And, I apologize, the paragraph
24 starts on page 22 and ends on 23.

Page 263

1      A.   Okay.
2      Q.   In that sentence that carries
3  over from 22 to 23 you state:  "Despite
4  the high success rate of TVT, there are
5  failures as with any procedure, and
6  surgeons are acutely aware that certain
7  types of patients may have higher success
8  rates than others."
9          My question is is there a
10 difference in your report when you use a
11 phrase such as "acutely aware" versus
12 "commonly aware" or "commonly known"?  How
13 are you choosing those?
14     A.   I probably didn't want to use
15 "commonly" so many times.  That's what I
16 learned in writing class as, well, you're
17 not supposed to use the same word twice in
18 a paragraph.  So that's probably why I
19 picked that word "acutely."
20     Q.   And when you're opining as to
21 what surgeons are acutely aware of, that's
22 based on your experience generally; is
23 that fair?
24     A.   That's based on the literature

Page 264

1  that's published, as well as my
2  experience.
3      Q.   That's based upon the literature
4  that you've reviewed and your experience,
5  correct?
6      A.   Correct.
7      Q.   Because you really -- we have no
8  way of knowing what every surgeon in the
9  U.S. and every geographic region and every
10 specialty reviews, right?
11         MR. ROSENBLATT:  Object to form.
12     A.   All I know is what every surgeon
13 and what every resident, and forget about
14 every resident and medical student should
15 be trained on.  That's what I know.
16     Q.   Right.
17     A.   Would I know what everyone else
18 is thinking?  Absolutely not.
19     Q.   And those can be, unfortunately,
20 slightly different;  is that fair?
21     A.   I will agree with you.
22     Q.   Some surgeons may not be acutely
23 aware of all of the complications and
24 their frequency?

Page 265

1      A.   So, in my opinion, if you're
2  doing a procedure, you should be aware of
3  the complications.
4      Q.   I give you that.  They should
5  be.
6      A.   Okay.
7      Q.   But you would give me that they
8  may not actually be aware, unfortunately?
9      A.   Once again, I can't opine on
10 what people know or don't know.  I can
11 only opine on what we're supposed to be
12 taught.
13     Q.   Appreciate that.
14         And then on page 35, you have a
15 paragraph in the middle that begins with
16 "The surgical risks."
17     A.   Yes.
18     Q.   And you state:  "The surgical
19 risks and complications for stress
20 incontinence procedures are commonly known
21 and not unique to TVT."
22         Is that correct?
23     A.   That is correct, that's what's
24 written.

Confidential - Harvey A. Winkler, M.D.

Page 266

1    Q.   I think I understand now, your
2   opinion there is based upon what you think
3   they should know; is that correct?
4    A.   My opinion is based on what we
5   are required to teach and what I teach and
6   what I know my fellow urogynecologists
7   teach upon discussion with them.
8    Q.   Right.  And that being said, we
9   still don't know exactly what every
10  surgeon knows, unfortunately?
11      MR. ROSENBLATT:  Object to form;
12  asked and answered.
13   A.   I can't opine on what people
14  know and what they don't know.
15   Q.   And there's no studies --
16   A.   There's no right answer for this
17  question.
18   Q.   There's no studies polling the
19  knowledge of surgeons as to their
20  knowledge of complications associated with
21  TVT products to treat incontinence, right?
22   A.   Say that again.
23   Q.   That was a great question, I'm
24  just going to read it back to you.

Page 267

1       There's no studies polling the
2   knowledge of all surgeons as to their
3   knowledge of complications associated with
4   the TVT products to treat incontinence,
5   right?
6    A.   I don't think there are any
7   studies.  I'm not aware of any studies
8   that will attest to what doctor knows
9   about incontinence and what they don't
10  know about incontinence.
11       I will tell you that there's a
12  certifying exam that if they want to be a
13  female pelvic medicine doctor will give
14  them certification in their knowledge of
15  the pelvic floor, for instance.
16       And there's a certifying exam
17  for the specialty as well in OB-GYN which
18  they have to pass if they want to call
19  themselves a board certified physician.
20   Q.   When did the FPMS --
21   A.   FPMRS.
22   Q.   FPMRS exam, when did that
23  accreditation come out?
24   A.   The first time that exam was

Page 268

1   given was in 2013.
2    Q.   And of course the slings have
3   been implanted since at least 1998, right?
4    A.   Yes.
5    Q.   And on page 41, you have one
6   paragraph that begins "The possibility."
7       Are you with me?
8    A.   Yes.
9    Q.   And you say:  "The possibility
10  of developing chronic pain and dyspareunia
11  are inherent to vaginal surgery
12  independently and do not need to be
13  explicitly mentioned in an IFU as every
14  implanting surgeon would have possessed
15  this knowledge through their education,
16  training and practice."
17       And to maybe make this more
18  clear, should that state that implanting
19  surgeons should have possessed this
20  knowledge, in your experience, because we
21  have no basis of knowing what they knew,
22  right?
23      MR. ROSENBLATT:  Object to form.
24   A.   So, my understanding on the

Page 269

1   educational process, and we have it -- I'm
2   going to say specific to OB-GYN, we can
3   talk about urology if you'd like, but
4   specific to OB-GYN, every single physician
5   when they do vaginal surgery is taught
6   that chronic pelvic pain and dyspareunia
7   can happen.  It can happen after a vaginal
8   delivery and an episiotomy repair.  It can
9   happen after hysterectomy.  These are
10  complications that should have been known
11  by everyone.  I can't imagine -- no one's
12  going through an OB-GYN residency without
13  doing a hysterectomy and no one's going
14  through an OB-GYN residency without doing
15  an episiotomy.
16   Q.   You're talking about just the
17  possibility of these complications
18  occurring, right?
19   A.   Correct.
20   Q.   And let's talk about the
21  frequency of these complications
22  happening, okay.  We're limiting it to
23  frequency, not possibility.
24       Are you with me?

Confidential - Harvey A. Winkler, M.D.

Page 270

1    A.    Yes.
2    Q.    Would you agree with me that not
3  everybody knows, necessarily, the true,
4  accurate frequency with which these
5  complications occur after the TVT
6  implantation?
7    A.    I can go based on the published
8  literature of what the frequency and the
9  complications are.
10   Q.    Right.
11   A.    Do we have a registry of every
12  single person who got a TVT in the world?
13  No, we don't.
14   Q.    All right.  So, based off your
15  review of the literature, what's your
16  opinion as to the true rate of erosion
17  after TVT implantation?
18   A.    On my review of the literature,
19  it's approximately 2 percent.
20   Q.    And you've reviewed an extensive
21  amount of literature, right?
22   A.    Yes, I have.
23   Q.    And you understand that some
24  doctors haven't reviewed as much

Page 271

1  literature as you have.  Would you agree
2  with that?
3    A.    I would agree that not every
4  doctor is reviewing as much literature in
5  this that I have, but the exposure rate is
6  something that is -- it's the most common
7  complication, almost, that we see when
8  we're talking about real complications as
9  opposed to like a urinary tract infection,
10  that anyone implanting that, anyone
11  implanting a foreign body would know that
12  exposure is a possibility.
13   Q.    And I'm not trying to talk about
14  possibility.  I'll give you that.
15   A.    Okay.
16   Q.    I'm saying that you know there's
17  physicians out there that haven't had the
18  opportunity to review this amount of
19  extensive literature that you have.
20        You agree with that, right?
21   A.    I agree with that, yes.
22   Q.    I mean, there's hundreds of
23  articles probably in here?
24   A.    It's a lot.

Page 272

1    Q.    And not every physician has time
2  to do that, unfortunately, right?
3    A.    That is correct.
4    Q.    And so it's possible that
5  there's doctors out there that don't have
6  the same high level of knowledge of the
7  literature regarding TVT complications as
8  you do, right?
9    A.    I think they would have the
10  basic knowledge on the complications of a
11  TVT.
12   Q.    But they don't have your
13  explicit extensive knowledge regarding the
14  frequency that's in the literature?
15   A.    I don't -- they may not have
16  done the same amount of literature
17  searches, but I can't comment if they know
18  the frequency or not.  That's pretty much
19  out there at 2 percent.
20   Q.    You just don't know what they
21  know, right?
22        MR. ROSENBLATT:  Object to form.
23   A.    Once again, I can't opine on
24  what they know.  I can opine on what they

Page 273

1  should know, in my opinion.
2    Q.    Doctor, what's your
3  understanding of whether or not --
4        MR. BENTLEY:  Let me rephrase
5  that.
6    Q.    What's your appreciation of when
7  a company such as Ethicon should introduce
8  changes to one of its marketed products?
9  Generally what's your standard?
10        MR. ROSENBLATT:  Object to form.
11        Are you talking about the
12  design?
13  BY MR. BENTLEY:
14   Q.    Do you understand my question?
15   A.    No.
16   Q.    If you want to turn to page 28.
17  You're talking about product design and
18  you start out "Due to the large volume."
19        Do you see that?
20   A.    Yes.
21   Q.    And you've testified that you've
22  consulted on product design with
23  companies, right?
24   A.    Correct.

Confidential - Harvey A. Winkler, M.D.

Page 274

1    Q.   And you have a sentence towards
2  the end you say: "Therefore, it was
3  appropriate for Ethicon to not introduce
4  changes to the mesh too rapidly."
5         Do you see that?
6    A.   I see that.
7    Q.   And you've consulted with
8  companies on what changes to make to their
9  products; is that correct?
10   A.   That's correct.
11   Q.   And my question simply is what
12 is your standard for whether or not it's
13 appropriate to introduce changes?  What's
14 your basis or your standard that you're
15 reaching this opinion?
16   A.   I don't think there's one
17 specific standard.
18        I think it depends on what
19 change you're making, what modification
20 you're making, and when in the time frame
21 of the product where it was would affect
22 when you should make your changes.
23   Q.   And it sounds like you're
24 applying maybe a common sense standard

Page 275

1  based on your experience as a practicing
2  surgeon.
3         Is that a fair summation of it?
4         MR. ROSENBLATT:  Object to form.
5    A.   That's the way -- you asked me
6  what my standard was.  That's what mine
7  is.
8    Q.   I'm just trying to figure out
9  your basis for that.
10   A.   Yeah, that's okay.
11   Q.   You're not citing or referring
12 to any federal regulation there;  is that
13 right?
14   A.   Yeah, I think a company can --
15 is allowed to make changes when they want.
16 They just need to apply to the rules and
17 regulations.
18        MR. BENTLEY:  Off the record.
19        (Luncheon recess taken from 1:22
20 p.m. to 2:13 p.m.)
21
22              - - -
23
24

Page 276

1      A F T E R N O O N   S E S S I O N
2  BY MR. BENTLEY:
3    Q.   Doctor, we're back from a quick
4  lunch.
5         Are you ready to go?
6    A.   Yes, I'm ready.
7    Q.   What suture material do you use,
8  generally?
9    A.   For what type of procedure?
10   Q.   For Burch procedure.
11   A.   2-0 Gore-Tex are my suspension
12 sutures, but then I'll use other sutures
13 to close fascia, close skin.
14   Q.   We previously discussed that in
15 the late '90s, doctors were trying to use
16 Gore-Tex material for slings to treat
17 incontinence.
18        Do you remember that?
19   A.   Yes, I do.
20   Q.   And those slings had poor
21 results; is that correct?
22   A.   Yes, the longer length slings.
23   Q.   So, just because you use a
24 Gore-Tex suture material today doesn't

Page 277

1  necessarily establish the safety and
2  efficacy of using Gore-Tex for a sling to
3  treat incontinence; is that correct?
4    A.   Yeah, they're different
5  materials that I'm using.  But they're
6  also using them for different purposes.
7    Q.   Doctor, before we broke, we were
8  discussing the inflammatory response to
9  TVT and TVT-Exact once it's implanted.
10        Do you remember that?
11   A.   Yes, I do.
12   Q.   And I believe you testified that
13 there's a chronic inflammatory response
14 and a transient inflammatory response?
15   A.   There's an acute and a chronic
16 one, is what I think I testified to.
17   Q.   You understand that the mesh
18 once implanted has a chronic inflammation
19 response that continues indefinitely?
20   A.   I think the fibers in the mesh
21 induce a chronic inflammatory response.
22   Q.   And that response is indefinite
23 while the mesh is implanted, correct?
24   A.   It's ongoing.  Clinically we

Confidential - Harvey A. Winkler, M.D.

Page 278

1  don't see an evidence, like evidence of an
2  inflammatory process going on in terms of
3  infection -- in terms of infectious areas,
4  fevers, erythema around those areas, but
5  yes, there is a long-term chronic
6  inflammatory response that occurs.
7      Q.   So you wouldn't tell your
8  patients that TVT inflammatory reaction is
9  transient, would you?
10      MR. ROSENBLATT:  Object to form.
11      MR. BENTLEY:  Let me rephrase
12  it.
13  BY MR. BENTLEY:
14      Q.   When you consent your patients,
15  you provide them truthful and accurate
16  information, right?
17      A.   I try to.
18      Q.   Right.  And if you were
19  discussing the inflammatory reaction that
20  can happen once the TVT mesh is implanted,
21  you wouldn't describe it as transient,
22  would you?
23      A.   Well, I wouldn't describe that
24  the chronic inflammatory reaction is

Page 279

1  clinically evident either.
2      Q.   You would tell them there's a
3  chronic reaction --
4      MR. BENTLEY:  Strike that.
5      Q.   You would tell your patients
6  there's a chronic inflammatory response
7  maybe in addition to the acute transient
8  response you were talking about?
9      A.   No, I would tell my patients
10  that this is a permanent implant.  Whether
11  or not they're going into inflammatory
12  responses would depend on their
13  questioning and what they -- how in-depth
14  they want to go on that.
15      Q.   And in that discussion, if it
16  did go into the topics of inflammation,
17  you wouldn't describe it to your patients
18  as transient?
19      A.   What I would describe is that
20  there's a chronic inflammatory process
21  that occurs with any type of implant that
22  is placed in the human body.
23      Q.   And are you aware that the IFU
24  for TVT states that the inflammatory

Page 280

1  reaction is transient?
2      A.   I'm aware of that.  And my
3  understanding of that is that of the acute
4  inflammatory reaction that occurs whenever
5  you have an incision in surgery.
6      Q.   And you understand that that
7  explanation is not provided in the IFU
8  though, right?
9      A.   It's not explicitly written in
10  the IFU.
11      Q.   Would you want to maybe provide
12  that better explanation in the IFU so it's
13  more clearly conveyed that there is indeed
14  a chronic inflammation response?
15      A.   Once again, I would put in the
16  IFU what federal regulations require me to
17  put in.
18      Q.   And you don't want to put
19  misleading information in the IFU, right?
20      A.   Once again, I would put in the
21  what the federal regulations require.
22      Q.   You can agree with me that the
23  federal regulations don't permit
24  misleading information, right?

Page 281

1      A.   I would agree with you that
2  federal regulations don't want
3  misrepresentation of what's going on.
4      Q.   So, to more clearly portray what
5  happens with the inflammatory response in
6  the body, if you're going to discuss the
7  inflammatory response in the IFU, you
8  would want to say that it's chronic,
9  correct?
10      MR. ROSENBLATT:  Object to form.
11      A.   No, I wouldn't.
12      I think that's pertaining to the
13  surgical procedure, what's mentioned in
14  the IFU.  Any type of implant is going to
15  cause a chronic inflammatory reaction.
16  It's commonly known.
17      So why would I need to include
18  that in my IFU?
19      Q.   Well, why would you say it's
20  transient in the IFU?
21      A.   'Cause I think they were trying
22  to explain to physicians about the process
23  of when you're putting it in and what
24  happens when it's placed in.

Confidential - Harvey A. Winkler, M.D.

Page 282

1 The IFU is never meant for
2 patients. It's meant for physicians.
3 Q. And you don't think that it's
4 more balanced to discuss the chronic
5 inflammatory response in addition to the
6 transient inflammatory response if you're
7 going to discuss the inflammatory response
8 in the IFU?
9 A. Well, I think the acute
10 inflammatory response is clinically
11 evident. The patient may feel incisional
12 pain and may feel cramping pain. The
13 chronic inflammatory response is not
14 clinically evident.
15 Q. So you don't think you should
16 put that in the IFU with the other
17 discussion to make it fair and balanced?
18 A. Once again, it's not my opinion
19 that counts in the IFU. It's what the
20 federal regulations and guidelines require
21 in the IFU.
22 Q. So, your opinion, Doctor,
23 generally your opinion is that the TVT is
24 safe and effective; is that correct?

Page 283

1 A. That is correct.
2 Q. And what do you consider as a
3 good efficacy rate for a product that's
4 implanted permanently to treat
5 incontinence?
6 A. Well, I wish we could get to a
7 hundred percent, but I know that's not
8 realistic, and I think a product that
9 gives us about the 80 to 85 percent
10 success rate, and if we can get a little
11 higher to closer to 90 percent, and some
12 studies have shown that, would be a good
13 product.
14 Q. Regarding a complication rate,
15 what would you consider an acceptable
16 reoperation rate for a permanent implant
17 that's used to treat incontinence?
18 A. Well, that's going to depend on
19 the patient, as well as what the other
20 procedures that I have available to me
21 are.
22 So, sometimes a 2 percent may be
23 acceptable, sometimes a 4 percent,
24 sometimes an 8 percent be acceptable.

Page 284

1 So I'm going to try to go to
2 fall back on the clinical literature to
3 see what the acceptable reoperation rates
4 or what the reoperation rates are with my
5 procedures now to try to come to a
6 determination of what it should be with a
7 TVT or any kind of midurethral sling.
8 Q. I need to nail this down,
9 Doctor.
10 Based on your review of the
11 literature, and we need to know what
12 you're going to tell the jury. It's
13 important. And based on your extensive
14 review of the literature and 60 pages of
15 reports and countless articles, have you
16 come to a conclusion of what an acceptable
17 rate is for a reoperation for a
18 permanently implantable device used to
19 treat incontinence?
20 A. So, I will base it on some of
21 the studies, the Canadian study that was
22 out there. I think somewhere between a 3
23 to 4 percent reoperation rates would be
24 acceptable.

Page 285

1 Q. So something above that would be
2 unacceptable, using that standard?
3 MR. ROSENBLATT: Object to form.
4 A. I don't know if it would be
5 unacceptable. It's going to depend on the
6 patient. But if you're talking in
7 thousands of women, I think that those
8 numbers would be acceptable.
9 Q. Okay. And similarly, what is
10 your opinion based on your review of the
11 literature and your experience of an
12 acceptable rate of erosion for a
13 permanently implantable mesh like the TVT
14 and TVT-Exact used to treat incontinence?
15 A. I think the 2 percent erosion
16 rate that has been reported, the
17 approximate 2 percent erosion rate that's
18 been reported on TVT is acceptable.
19 Q. So using that standard,
20 something above 2 percent would be
21 unacceptable, in your opinion?
22 A. Once again, it depends how far
23 above that 2 percent is there. So if
24 you're going to tell me 2.1 percent, I

Confidential - Harvey A. Winkler, M.D.

Page 286

1  probably will say no, it doesn't matter.
2  If you're going to tell me 10 percent,
3  then I would consider it based on the
4  standard deviation and the statistics that
5  are provided to me.
6      Q.   And what is your definition of
7  what an acceptable rate of exposure is for
8  a permanently implantable device used to
9  treat stress urinary incontinence like TVT
10  and TVT-Exact?
11      A.   Well, I think you base the
12  standard rate based on the gold standard
13  right now.
14          So my acceptable rate, if I had
15  a product that was higher than the TVT or
16  the midurethral sling, I would have to
17  fall back and say the TVT is the standard.
18      Q.   I need to know what your opinion
19  is as to what you think the exposure rate
20  is, and so I need to know what you think
21  the acceptable rate is.
22          So my question is, Doctor, based
23  on your review of the literature and your
24  experience, what is an acceptable rate of

Page 287

1  exposure for a permanently implantable
2  device used to treat stress urinary
3  incontinence like TVT and TVT-Exact?
4      A.   In 2017 --
5          MR. ROSENBLATT:  Object to form.
6      Q.   You can answer.
7      A.   In 2017, I think a 2 percent
8  exposure rate is acceptable.
9      Q.   And just to clarify, your 2
10  percent exposure rate, is that you're
11  talking about external outside the body
12  exposure?
13      A.   Yes, I'm talking about an
14  exposure rate.  I'm not talking about
15  total reoperation rate.
16      Q.   And your definition of an
17  acceptable erosion rate, that was talking
18  about internal organ perforation type
19  erosion; is that correct?
20      A.   There is -- yes, there is an
21  acceptable rate.  That is even lower than,
22  I would say, what's the -- in my report,
23  we do have a number of the acceptable
24  rate.

Page 288

1          Can we find what that was?
2      Q.   Well, that's the problem is
3  there's a number of studies cited in here
4  and there's no analysis from you.  I don't
5  know what your opinion is.
6      A.   Okay.
7      Q.   What's your opinion based on the
8  literature and your experience of an
9  acceptable rate of erosion for a
10  permanently implantable device like the
11  TVT and TVT-Exact using your definition of
12  erosion that we had previously discussed?
13      A.   I would say it's .1 percent or
14  less would be acceptable.
15      Q.   And based on your review of the
16  literature as discussed in your report and
17  your experience, what is your definition
18  of an acceptable rate of de novo
19  dyspareunia after implantation of a
20  permanent device used to treat stress
21  urinary incontinence like the TVT and
22  TVT-Exact?
23          MR. ROSENBLATT:  Object to form.
24          When you're saying "acceptable,"

Page 289

1  do you mean what's commonly reported
2  in the literature or just his
3  personal?
4          MR. BENTLEY:  His report says
5  that it's 1 percent and it's 5 percent
6  and it's 15 percent.  But he says it's
7  safe and based off of 50 different
8  numbers.  I have no idea still exactly
9  what he thinks the rates are.
10          MR. ROSENBLATT:  I just can't
11  figure out if you're asking about what
12  he personally finds acceptable or
13  what's generally reported in the
14  literature.
15          MR. BENTLEY:  That's why I'm
16  saying based off his experience, what
17  is his rate.
18          MR. ROSENBLATT:  Okay.
19          MR. BENTLEY:  I'm just trying to
20  figure out what he thinks the rate is.
21  I don't know how else to.
22          MR. ROSENBLATT:  Got it.
23      A.   I understand.
24          I can tell you what I think the

Confidential - Harvey A. Winkler, M.D.

Page 290

1  rate is in my hands for retropubic slings,
2  and what -- and with the retropubic sling,
3  I think the incidence of chronic pain and
4  dyspareunia is low.  An acceptable rate
5  for me personally may be anywhere from,
6  for a retropubic sling anywhere between 2,
7  3, 4 percent.
8      Q.   For de novo dyspareunia, is your
9  testimony that an acceptable rate of
10  de novo dyspareunia for an implantable
11  permanent device to treat stress urinary
12  incontinence, your opinion is an
13  acceptable rate of de novo dyspareunia is
14  2 to 4 percent?
15      A.   I think it should be lower than
16  that, thinking of it that way.  With the
17  retropubic sling, I don't think we see it
18  more than 1 to 2 percent to the time in my
19  personal experience.  With some of the
20  other slings we may see it more.
21          And it's also going to depend on
22  the patient population that you're
23  treating, if you're treating
24  post-menopausal or pre-menopausal patient

Page 291

1  population.
2          It's also going to depend on if
3  there's pre-existing dyspareunia as well
4  and what are the other factors that are
5  associated with it.
6          It's hard to pin down an exact
7  number, and that's why a lot of these
8  studies don't give you that kind of exact
9  number.  It's hard to get to.
10      Q.   Your answer, I think you said,
11  was 1 to 2 percent; is that correct?
12      A.   Personally, if my patients had a
13  higher than 1 to 2 percent rate and that's
14  what I was finding out, I would look to
15  see what is going on.
16      Q.   You understand that you're in
17  this litigation to give general causation
18  opinions about the device?
19      A.   Correct.
20      Q.   And you're being presented to
21  testify to the jury as to what your
22  opinions are regarding the complications
23  to TVT and TVT-Exact, right?
24      A.   My understanding is that I'm

Page 292

1  testifying of whether or not the
2  complication rates are higher than with
3  what was commonly known out there and what
4  the rates are as opposed to the absolute
5  rates of the surgical procedures.
6      Q.   Do you have an acceptable --
7  Doctor, based on your literature review as
8  discussed in the TVT and TVT-Exact report
9  and based upon your clinical experience,
10  what is your opinion as to what is an
11  acceptable rate of chronic pain following
12  the implantation of a permanent medical
13  device, such as TVT and TVT-Exact, to
14  treat stress urinary incontinence?
15      A.   So, for this type of procedure,
16  I would like to see it around the 1
17  percent range, and I think that's what's
18  reported in the literature of chronic pain
19  at around the 1 percent range with the
20  retropubic sling.  And sexual dysfunction
21  is probably reported at 0 to 1 percent,
22  but I'm not going to say there's 0 for
23  anything.
24      Q.   Okay.  So, based off of the

Page 293

1  rates we've just discussed, you would
2  agree that there's a wide range of
3  complication rates discussed in your
4  report for the TVT and TVT-Exact; is that
5  correct?
6      A.   Yeah, that's correct.  Different
7  studies reported differently.  So once
8  again --
9      Q.   And some studies may be above
10  and some may be below your acceptable
11  rates; is that fair?
12      A.   That's fair.
13      Q.   And based on your review of the
14  literature, these are the rates that you
15  determined are safe and acceptable; is
16  that correct?
17      A.   I think this is what occurs in
18  the literature.
19      Q.   And you didn't do any type of
20  systemic analysis to combine all of those
21  figures and run a meta-analysis to tell me
22  what the combination of all of that data
23  spits out as the actual rate, right?
24      A.   No, I didn't.  I can base it on

Confidential - Harvey A. Winkler, M.D.

Page 294

1 the clinical literature and my personal
2 experience seeing patients back for
3 follow-up, seeing them postsurgically,
4 seeing them in the years after, seeing
5 them in social situations, seeing them in
6 the hospital, and from my referring
7 physicians telling me how these patients
8 are doing, as well as colleagues who would
9 tell me if I -- if they had saw a patient
10 of mine with one of these complications.
11    Q.   And is that the extent of the
12 basis?
13    A.   The clinical -- the literature
14 and my clinical experience, yes.
15    Q.   Doctor, you would agree that
16 different slings manufactured by different
17 companies have different efficacy rates
18 and complication rates, wouldn't you?
19    A.   Different slings can have
20 different efficacy rates and complication
21 rates, yes.
22    Q.   And one of the things you're
23 going to look at is ultimately the quality
24 of life after the implant procedure for

Page 295

1 the patient?
2    A.   That's one of the things that we
3 looked at for outcomes is quality of life,
4 correct.
5    Q.   That's an important measure?
6    A.   It is one of the important
7 measures.
8    Q.   And you've, in fact, studied
9 whether there is a difference between
10 different slings made by different
11 companies on patient quality of life,
12 right?
13    A.   There are studies out there
14 comparing slings, yes.
15    Q.   You have actually done those
16 studies, right?
17    A.   I did those studies.
18       I'm trying to recall which one
19 in particular you're talking about.  So I
20 can get to my CV and we'll take a look.
21    Q.   I'm going to hand you what is
22 being marked as 26.
23       (Exhibit Winkler 26, Shalom
24 article, was marked for

Page 296

1 identification, as of this date.)
2 BY MR. BENTLEY:
3    Q.   This is a study by you from 2011
4 that was published in the International
5 Journal of Gynecology and Obstetrics,
6 correct?
7    A.   Correct.
8    Q.   And the title of the study is
9 "Comparison of quality-of-life changes in
10 patients with stress urinary incontinence
11 after midurethral sling placement."
12       Correct?
13    A.   Correct.
14    Q.   And in this study, you evaluated
15 the Ethicon Retropubic TVT versus the AMS
16 SPARC; is that correct?
17    A.   Correct.  This particular data
18 was from a patient population from Dr.
19 Klapper.  I did work on the study, but it
20 was not patients that I operated on.
21    Q.   And your name's on the study,
22 right?
23    A.   Yeah.  I participated in the
24 study.  There's no question about it.

Page 297

1    Q.   It's a good study in a reputable
2 journal, right?
3    A.   I'm just telling you I didn't
4 operate on these patients.
5    Q.   And this study found that there
6 was a difference in quality of life
7 between the AMS sling and the Ethicon
8 sling, right?
9    A.   Let me just read it over again.
10 It's been a while since I've looked at
11 this study.
12       Well, the UDS scores for the
13 suprapubic versus transvaginal were the
14 same.  Postoperative patients underwent a
15 super -- yes, so the UDI-6 scores for the
16 transvaginal procedure were lower in this
17 study.
18    Q.   And in the last page, actually
19 the conclusion that you put, you and the
20 other authors on this article conclude:
21 "However, improvements in UDI-6 quality of
22 life scores was significantly better in
23 the suprapubic group."
24       And that's the AMS device,

Confidential - Harvey A. Winkler, M.D.

Page 298

1  right?
2      A.   That's the AMS device, the
3  SPARC, yes.
4      Q.   In this same column at the top,
5  you and the authors hypothesized that the
6  difference in diameter of the trocars may
7  have affected the quality of life; is that
8  correct?
9      A.   Can you show me where that is?
10      Q.   Sure.
11          At the top you put:  "There are
12  subtle differences between suprapubic and
13  the transvaginal instruments used for" --
14      A.   Yes, so that was a hypothesis
15  back in 2011.  Today I would base my
16  opinions and conclusions on Cochrane
17  reviews, which is higher level evidence
18  than my paper back then, stating that the
19  transvaginal approach is better.  It has a
20  slightly higher objective rate than the
21  suprapubic approach.  And clinically, my
22  patient population, I did see good results
23  with the transvaginal approach, and that's
24  why I continued with it.

Page 299

1      Q.   And in this published article
2  though, you note that the quality of life
3  was improved in the AMS device, right?
4      A.   Correct.
5      Q.   And one of the differences with
6  the AMS device is it has that 3 millimeter
7  trocar compared to the Ethicon TVT which
8  is 5 millimeter trocar, right?
9      A.   In 2011 I had already converted
10  away from the Ethicon larger trocar.
11      Q.   And in this article you found
12  that there was a difference in quality of
13  life, right?
14      A.   Correct.
15      Q.   And you hypothesized that maybe
16  it was due to the diameter in trocar,
17  right?
18      A.   There were subtle differences,
19  so we said that that may be one of the
20  reasons, correct.
21      Q.   And you explain that the
22  differences in diameter may result in a
23  more limited dissection and a resulting
24  tissue injury or inflammation.

Page 300

1          Do you see that?  It's in that
2  top right paragraph.
3      A.   Yes, I do.  And that would be on
4  acute inflammation and acute tissue
5  injury.
6      Q.   So maybe reducing the trocar
7  diameter could be a little bit safer, is
8  that what this is finding?
9      A.   That reducing the trocar
10  diameter may give you a slightly better
11  result, yes.
12      Q.   By better, safer, less
13  morbidity, right?
14      A.   Well, the quality of life is not
15  a morbidity question.  Quality of life is
16  how patients are feeling and how much it's
17  bothering them.
18      Q.   I appreciate that.
19          The difference in diameter may
20  result in a more limited dissection,
21  right?
22      A.   Correct.
23      Q.   Which could be safer, right?
24      A.   I wouldn't want to use "safer"

Page 301

1  'cause I don't think that one -- the
2  larger needles or the smaller needles
3  have -- one has been proven to be safer
4  than the other.  This is a hypothesis over
5  here, but I'm not aware of any clinical
6  data saying that the -- there were more --
7  one was safer than the other.
8      Q.   Just the patients had better
9  quality of life with the smaller needle;
10  whether or not that was the cause, you
11  don't know?
12      A.   Correct.  It's an hypothesis.
13      Q.   And you don't discuss this
14  article in your report.
15          Is there any reason for that?
16      A.   I don't think this article is on
17  the safety and efficacy of the TVT.  It
18  just shows us one component.
19          And like I said, there's much
20  better data out there than this study,
21  fortunately, to substantiate my claims in
22  my report.
23      Q.   And the TVT's a kit that's sold,
24  right?

Confidential - Harvey A. Winkler, M.D.

Page 302

1   A.   Yeah, I guess you can call it a
2   kit.
3   Q.   Well, the TVT actually includes
4   the trocars, right?
5   A.   Well, the TVT included the
6   trocar, I guess the T part in the TVT,
7   that was reusable.  You know, the handle
8   part, the Mickey Mouse handle part.
9   Q.   That would be TVT disposable.
10   But I think TVT comes with the
11   trocars, right?
12   MR. BENTLEY:  Let me rephrase
13   that.
14   Q.   Ethicon provides the trocars for
15   the TVT, right?
16   A.   Yeah, but there was a reusable
17   device that screwed on to the TVT-R.
18   Q.   Right.
19   A.   That you -- that was reusable.
20   That wasn't in the kit.
21   Q.   Who designs and manufactures
22   those?
23   A.   Ethicon, J&J.
24   But I'm just saying that wasn't

Page 303

1   part of the kit.
2   Q.   The trocar design was made by
3   Ethicon, right?
4   A.   The trocar design was made by
5   Ethicon.  That particular part of it was a
6   reusable part, so it wasn't in each and
7   every kit.
8   Q.   I think I understand, your
9   opinion is that the TVT and TVT-Exact are
10   safe because they're safer than some of
11   the other procedures.  Is that generally
12   it?
13   A.   I think they are -- are a safe
14   procedure, yes.
15   Q.   And we're having a difficulty
16   defining numerically what safe is, and I
17   think that it's a relative analysis; is
18   that correct?
19   A.   Right.  I think everyone's going
20   to decide what safe is and some patients
21   may consider one in a hundred safe, one in
22   a thousand safe, one in ten thousand safe.
23   So it's a really hard number to, or hard
24   word to explicitly design -- define.

Page 304

1   Q.   And part of the way we've
2   defined it today is safety, or your
3   analysis of safety is based upon the
4   relative safety of this device versus
5   alternative procedures and devices, right?
6   A.   Correct.
7   Q.   Because there's no absolute a
8   hundred percent safe?
9   A.   No.  Don't have surgery if
10   you're looking for a hundred percent of
11   anything.
12   Q.   And we discussed that you are
13   relying upon other people's systematic
14   reviews and meta-analysis, right?
15   A.   I'm relying on them as well as
16   my clinical experience.
17   Q.   Because we're not doing
18   statistical analysis here.  That's someone
19   else's expertise, right?
20   A.   When I reviewed a paper, I did
21   not do a statistical analysis.  I will try
22   to review the statistics, but I'm not
23   doing a breakdown of the analysis each
24   time.

Page 305

1   Q.   If you could please turn to page
2   52.  At the top of the page you're
3   discussing the Schimpf 2014 meta-analysis
4   review of RCTs.
5   Do you see that?
6   A.   Yes, I do.
7   Q.   And that's what we discussed
8   was -- on page 52 of your report you're
9   talking the Schimpf meta-analysis.
10   Do you see that?
11   A.   Yes, I do.
12   Q.   And you note that the Schimpf
13   meta-analysis which reflected RCTs with at
14   least 12 month follow-up, that --
15   A.   That's accurate.
16   Q.   And is 12 month follow-up
17   important to you to note that here?
18   A.   Well, I don't think if you're --
19   looking at data today, you wouldn't want
20   to look at any data less than 12 months,
21   for what's available.
22   Q.   Because most of the
23   complications occur within the first 12
24   months, right?

Confidential - Harvey A. Winkler, M.D.

Page 306

1    A.   Yes.  Many of the -- the
2  majority of complications will usually
3  occur in the first 12 months.
4    Q.   So this meta-analysis limited
5  their review to RCTs, which are randomized
6  control trials, right?
7    A.   Yes.
8    Q.   They have at least 12 month
9  follow-up, so they're going to hopefully
10  capture the majority of the complications
11  right?
12    A.   Well, there was at least
13  12-month follow-up, so there's follow-up
14  that's longer in there as well.
15    Q.   Even better, right?
16    A.   Correct.
17    Q.   And you note that they found
18  comparing midurethral slings to Burch
19  there's no difference in objective or
20  subjective cure, quality of life, or
21  sexual function to outcomes.
22        Do you see that?
23    A.   Yes, I do.
24    Q.   And these authors, after

Page 307

1  reviewing RCTs with at least 12-month
2  follow-up, found that there was really no
3  difference.
4        Do you have some criticism or
5  critique of their findings?
6    A.   I do not have criticism.  I have
7  never once stated that a Burch is a bad
8  procedure.  A Burch has a good outcome.
9  However, there's increased morbidity
10  associated with the procedure as compared
11  to midurethral slings.
12    Q.   And here they're saying it has
13  the same efficacy, right?
14    A.   That's a good thing.
15    Q.   Right?
16    A.   (No verbal response.)
17    Q.   And they note that with respect
18  to complications, the slings have a lower
19  rate of short-term complications compared
20  to Burch, right?
21    A.   Yes, they do.
22    Q.   But you state: "Not surprisingly,
23  the slings had a higher rate of long-term
24  return to the operating room for retention

Page 308

1  or erosion and OAB symptoms."
2        Is that correct?
3    A.   Yeah.
4        So, slings, whether it's a
5  synthetic sling or a pubovaginal sling,
6  have a higher risk of voiding dysfunction
7  or obstruction, so that's why it's going
8  to be a higher chance for those patients
9  to go back to the operating room to
10  release or cut the slings and there is
11  no -- there's less risk of exposure or the
12  incidence of exposure with a Burch
13  procedure in lower than with the sling
14  procedure.  So it's not surprising that
15  patients went to the back operating room
16  for that.
17    Q.   So, the Burch was as effective
18  as the slings, right?
19    A.   Yes.
20    Q.   And slings had a higher rate of
21  reoperation -- and the slings had a higher
22  rate of reoperation as compared to the
23  Burch, right?
24    A.   That's not what I said.  And if

Page 309

1  you read the next line:  "However, their
2  studies did not consider patients to
3  return to the operating room for prolapse
4  which occurs in 13.6 of patients who
5  undergo a Burch procedure."
6        So, they didn't include in the
7  study in their Burch patients the number
8  of patients that had to go back to the
9  operating room for a different reason.
10  So, I'm just saying it's a little hard to
11  make that comparison of reoperation rates.
12    Q.   Are you saying that the
13  development of prolapse is a complication
14  of the Burch?
15    A.   Prolapse can happen after the
16  Burch procedure, yes.  And that's a known
17  common complication.  And it's
18  hypothesized that you're lifting up that
19  anterior vaginal wall, there's more
20  pressure going posteriorly, so causing an
21  enterocele and prolapse.
22    Q.   And can prolapse happen after a
23  sling procedure?
24    A.   It's a different type of

Confidential - Harvey A. Winkler, M.D.

Page 310

1 procedure and we're not -- it can happen,
2 but there's no causality that people have
3 hypothesized that it's coming from the
4 sling procedure.
5     Q.   So --
6     A.   They're different operations.
7     Q.   I'm just trying to understand
8 how you've incorporated this meta-analysis
9 that use RCTs with 12-month follow-up that
10 appears to have findings not supportive of
11 your opinion. I'm trying to understand
12 why you discounted that.
13     A.   No, it's totally supportive of
14 my opinion. I think you're misreading it.
15     I'm just saying that they didn't
16 consider this component in their analysis
17 of what they were comparing reoperation
18 rates.
19     Q.   So this found there was a higher
20 reoperation rate with slings, right?
21     A.   Yes, for these problems, for
22 retention, erosion and OAB. And my
23 understanding is they didn't include
24 patients who had to go back to the

Page 311

1 operating room for prolapse that develops
2 after a Burch procedure. That's all I'm
3 saying.
4     Q.   Is that your one criticism or
5 critique of --
6     A.   That's the one that I wrote. If
7 we want to go through line-by-line for the
8 article.
9     Q.   Well, today is I've got to learn
10 all of the bases for why you're
11 discounting the study.
12     A.   I'm not discounting it. All I'm
13 saying is that is one thing they did not
14 consider.
15     I wouldn't discount an entire
16 study based on one thing.
17     Q.   Help me explain why is this
18 study supportive of your opinion then?
19     A.   Well, it says a couple of things
20 over here. That subjective cure outcomes
21 of TVT versus pubovaginal vaginal slings
22 after TVT. Retropubic slings had less
23 blood -- retropubic slings had less blood
24 loss, transfusions, wound infections,

Page 312

1 retention, OAB symptoms, shorter operating
2 time and hospital stay.
3     I'll read on.
4     Q.   No, hold on.
5     The fact that they had less
6 blood loss, that's important to you?
7     A.   Yes.
8     Q.   The fact that they had a shorter
9 operating time, that's important to you?
10     A.   Yes, that's the benefit to the
11 patient. Less blood loss, shorter
12 operating time is a benefit to the
13 patient.
14     Q.   Less obstruction is important,
15 right?
16     A.   Correct.
17     Q.   And less transfusions, right?
18     A.   Correct.
19     Q.   Those are all important
20 indicators of -- to take into account when
21 you're deciding whether or not to undergo
22 a procedure, right?
23     A.   Those are all components of
24 morbidity.

Page 313

1     Q.   And that was a comparison
2 between TVT and pubovaginal slings, right?
3     A.   Correct.
4     Q.   And then comparing the
5 midurethral slings to Burch, there was no
6 objective or subjective cure, quality of
7 life, or sexual function outcomes, right?
8     A.   Correct, and I think that's an
9 important statement.
10     Q.   That it's the Burch and the TVT
11 are essentially the same for efficacy and
12 for those outcomes?
13     A.   For those -- yes, for those
14 outcomes.
15     Q.   But retropubic slings had a
16 higher rate of reoperation than Burch,
17 right?
18     A.   So, that's where my criticism
19 comes in because we don't know the total
20 reoperation rate for patients with Burches
21 because they didn't include the patients
22 who may have gone back to the operating
23 room for prolapse.
24     Q.   At the bottom of that page,

Confidential - Harvey A. Winkler, M.D.

Page 314

1 Doctor, you note that "As a testament to
2 safety and efficacy."
3        Do you see that paragraph?
4    A.   Yes.
5    Q.   You end that paragraph with:
6 "The FDA is not requiring any further
7 studies for the TVT sling to support its
8 user safety."
9        Do you see that?
10   A.   Correct.
11   Q.   That's part of your explanation
12 as a testament to the safety and efficacy?
13   A.   Yeah, and if I remember
14 correctly, what the FDA, don't point me,
15 came out in their 2013 statement saying
16 that there was a safety and efficacy to
17 support the use of the full-length slings.
18   Q.   I think I understand.
19        So, you say: "As a testament to
20 the safety and efficacy," and you're
21 discussing the TVT slings, right?
22   A.   Correct.
23   Q.   And one of the bases for your
24 opinion that they're safe and effective is

Page 315

1 the FDA has not required further studies
2 of the TVT sling for support -- to support
3 its use or safety; is that correct?
4    A.   Correct.
5        And we discussed the 522 studies
6 which you asked me about prior.
7        MR. BENTLEY:  Thank you, Doctor.
8 That's all I have for right now.
9        THE WITNESS:  Okay.
10        MR. BENTLEY:  For those
11 products.
12        THE WITNESS:  I figured that
13 much.
14        MR. BENTLEY:  For the record,
15 plaintiffs are moving to keep the
16 deposition open pending review of the
17 production materials that were
18 produced prior to this deposition, it
19 was that thumb drive with extensive
20 materials on it that we haven't had a
21 full opportunity to review.  Should we
22 find something that is important, we
23 reserve our right to come back.
24        And it's our understanding

Page 316

1 there's also not a production of
2 internal documents associated with Dr.
3 Winkler that we still have not
4 adequately necessarily reviewed.  If
5 anything else pops up, we reserve our
6 right to come back.
7        MR. ROSENBLATT:  Objection
8 noted.
9        I would just like to say for the
10 record the flash drive that we
11 provided you is consistent with the
12 materials obtained -- that you can
13 find on the reliance list that was
14 produced with his report.
15        Additionally, we are under no
16 obligation to hand you on a platter
17 every single produced document that
18 references Dr. Winkler.  You guys have
19 access to those documents.
20        We have objected to your
21 document requests, and we'll object to
22 any deposition outside of today.
23        MR. BENTLEY:  And just to
24 clarify regarding the objections to

Page 317

1 the notice, there was a couple of RFPs
2 where they were simply objected to and
3 Ethicon did not state that it was
4 producing any responsive documents.
5 They were standing on the objections.
6 And it's our contention that there's
7 clearly relevant and responsive
8 material that we need in preparation
9 for this deposition that we may not
10 have found, and if it's in the
11 database, we would reserve our right.
12        Thank you.
13        MR. ROSENBLATT:  Okay.  We'll
14 maintain our objections to that, but
15 your objection is noted.
16 EXAMINATION BY
17 MR. ROSENBLATT:
18   Q.   Dr. Winkler, thank you for being
19 with us today.
20        My name is Paul Rosenblatt.  I
21 represent Ethicon Inc. and Johnson &
22 Johnson.
23        Doctor, you recall being asked
24 some questions about your CV?

Confidential - Harvey A. Winkler, M.D.

Page 318

1  A.  Yes, I do.
2  Q.  That was marked as Exhibit 3.
3     Do you have that in front of
4  you?
5  A.  I will try get that.
6     Yes, I got it.
7  Q.  On page 7 of your CV, you list
8  some of the national and international
9  courses or presentations that you've
10 given.
11    Is that accurate?
12 A.  That is accurate.
13 Q.  And if it's possible that there
14 may be a presentation or a professional
15 education event, such as a cadaver lab or
16 a preceptorship, that does not appear on
17 this list, did you leave any out
18 intentionally?
19 A.  I didn't leave anything out
20 intentionally.  There's always a
21 possibility that things were left out.
22    I had to go back in -- in 2011
23 to 2012 to try to figure out what courses
24 I've taught where and when, and it was not

Page 319

1  an easy task to piece together.
2  Q.  And you're certainly not trying
3  to hide in your CV that you might have had
4  some affiliations with industry in the
5  past;  is that fair?
6  A.  I don't hide it.  I think I
7  mention it in my reports as well.
8     I believe that physicians need
9  to work with industry as opposed to be
10 enemies with industry.
11 Q.  Doctor, if you turn to page 8,
12 it says:  "Mentoring of graduate students,
13 residents, postdoctoral fellows and
14 research."
15    Are these all of the graduate
16 students, residents and fellows that
17 you've taught throughout your career?
18 A.  These are not at all all of them
19 that I've taught.  This is just a
20 representation of residents that have
21 decided to go into or attempt to go into
22 female pelvic medicine who I had a closer
23 relationship with as opposed to the
24 hundreds and hundreds of residents that

Page 320

1  I've had exposure to throughout the
2  year -- years.
3  Q.  And on page 6 of your report,
4  you list some additional teaching
5  experience;  is that fair?
6  A.  Page 6 of my CV?
7  Q.  Correct.
8  A.  Yes.  So, like I said, I tried
9  to piecemeal together the early stuff that
10 I did.  Most of the early stuff that I did
11 I tried -- you're going to see it's mostly
12 local stuff.  There's very little national
13 or international stuff early on in my
14 career.  These were weekends that I took
15 off, days that I took off from work, days
16 that I was out of the office, days that I
17 was away from my family.  I did mostly
18 grand rounds back then to try to help
19 build my career and reputation and inform
20 other people.  But it was time away either
21 from the office or the family.
22 Q.  So if you received an honorarium
23 from whoever was sponsoring the event,
24 whether it was AMS or whoever, would that

Page 321

1  honorarium, or would you have been doing
2  that speaking event for the purposes of
3  getting that honorarium?
4  A.  No, I wouldn't do it for the
5  honorarium.
6     And back then, you know, things
7  were different than they are today.  So,
8  today you would get your honorarium from
9  the hospital that you were doing the grand
10 rounds in.  Back then, you may have gotten
11 your honorarium from a company supporting
12 it.
13    So, the -- the relationship that
14 industry has with physicians and the
15 relationship that industry has with
16 hospitals has evolved over time.
17 Q.  And for example, Doctor, if you
18 turn to page 9 of your CV, you list some
19 of the contracts, grants and sponsored
20 research.
21    Do you see that?
22 A.  Yes, I do.
23 Q.  If you go through page 9, 10,
24 11, and 12, it lists various grants,

Confidential - Harvey A. Winkler, M.D.

Page 322

1  predominantly sponsored by industry; is
2  that fair?
3      A.   That is fair.
4          And once again, I feel that we
5  need to work with industry in order to
6  meet our goal, improve patients' lives,
7  improve safety and efficacy of products
8  and to learn about products.  It's
9  expensive to run these studies, and
10 institutions just don't have that kind of
11 money sometimes.
12     Q.   Just taking one, for example, on
13 page 9 it says AMS and then $29,000,
14 essentially.
15         Would that be money that's paid
16 to you that goes into your pocket?
17     A.   Absolutely not.  None of this
18 money goes into my pocket anywhere,
19 actually.  This money goes into a -- to a
20 hospital fund, and we've been trying to
21 restrict any money that we make on a grant
22 to promote further research.
23     Q.   So, if it were suggested at
24 trial that you've been paid X-number of

Page 323

1  dollars from industry based on the
2  calculation of pages 9 to 12, would that
3  be accurate or inaccurate?
4          MR. BENTLEY:  Objection;
5      outside the scope;  leading;
6      compound.
7      A.   This is inaccurate.  Anything
8  that was paid over here would have been
9  paid to the hospital, and it will -- like
10 for instance, if you go on the government
11 Web site today, there is going to be a
12 differentiation of money that I received
13 to my pocket or money that I received for
14 research dollars.  And we didn't have that
15 kind of strict rules back then, but this
16 is all money that went to the hospital.
17     Q.   Doctor, just looking at your
18 list of publications, would it be fair to
19 say that you have extensive experience
20 publishing on treatments for stress
21 urinary incontinence?
22     A.   I have extensive experience on
23 that.  I've been reviewing journal
24 articles for years.  I've peer-reviewed

Page 324

1  journal articles for years.  I've written
2  journal articles with residents and
3  fellows and myself throughout the last 20
4  years.
5      Q.   What are some of the editorial
6  positions that you've had that are listed
7  on page 5 of your CV?
8      A.   So, I've been a reviewer for the
9  International Urogynecology Journal of
10 Female Pelvic Medicine and Reconstructive
11 Surgery.  I've done journal reviews for
12 the American Journal of Obstetrics and
13 Gynecology, and I've also been -- I was an
14 abstract reviewer, I guess for not this
15 past one, but the previous AUGS meeting.
16     Q.   Doctor, I want to show you your
17 reliance list.
18         Do you see I think it's the
19 fourth page from the end where it says "21
20 CFR 801.109(c) Device Labeling"?
21     A.   Yes, I do.
22     Q.   When you referenced the CFR that
23 you relied upon, is that, in fact, the
24 specific section that you relied upon?

Page 325

1      A.   Yes, it is.
2      Q.   Even though that is a specific
3  section, have you in fact read the entire
4  CFR related to, or at least skimmed the
5  CFR related to device labeling?
6      A.   Yes, I have.
7          THE WITNESS:  Could we go off
8      the record for a second?
9          (Discussion held off the record.)
10 BY MR. ROSENBLATT:
11     Q.   Doctor, you were asked some
12 questions about Burch and autologous
13 fascial slings.
14         Do you recall those questions?
15     A.   Yes, I do.
16     Q.   If someone were to suggest that
17 currently the Burch or the autologous
18 fascial sling is the current gold standard
19 treatment for uncomplicated stress urinary
20 incontinence, would that be accurate?
21     A.   It is not.  I would disagree
22 with that statement.  It is not the
23 current gold standard.
24         The current gold standard, as

Confidential - Harvey A. Winkler, M.D.

Page 326

1 noted in multiple publications, as well as
2 reviews, is the midurethral sling.
3    Q.   I want to jump around a little
4 out of order, Doctor.
5    A.   No problem.
6    Q.   You were asked some questions
7 about frequency and severity of
8 complications.
9    A.   Yes.
10    Q.   I believe you testified that you
11 primarily rely upon the Level I medical
12 literature for that information?
13    A.   Yes, I do.
14    Q.   Do you know if that's the
15 general practice of surgeons in your
16 field?
17    A.   It is the general practice to
18 rely on the highest quality data that's
19 available.
20        MR. ROSENBLATT:  Do you have the
21    exhibit stickers?
22        (Exhibit Winkler 27, Unger
23    article, was marked for
24    identification, as of this date.)

Page 327

1 BY MR. ROSENBLATT:
2    Q.   You were asked some questions
3 about reoperation rates.
4        Do you recall those questions?
5    A.   Yes, I do.
6    Q.   I'm marking Exhibit 27.
7        MR. BENTLEY:  Do you have a
8    copy?
9        MR. ROSENBLATT:  I've got them
10    here (indicating).
11        MR. BENTLEY:  Do you want to
12    pull it out, or can I look at the
13    binder or something?  I don't have it
14    necessarily.
15        MR. ROSENBLATT:  Go off the
16    record a second.
17        (Discussion held off the record.)
18 BY MR. ROSENBLATT:
19    Q.   Doctor, I've just handed you
20 Exhibit 27.
21        Is this a study that was
22 referenced in your report?
23    A.   Yes, it is.
24    Q.   And it's by Unger titled

Page 328

1 "Indications and Risk Factors For
2 Midurethral Sling Revision."
3        Do you see that?
4    A.   Yes, I do.
5    Q.   And they noted in the conclusion
6 the rate of sling revision after
7 midurethral sling placement was 2.7
8 percent?
9    A.   I see that and I agree with
10 that, correct.
11    Q.   And this was based on over 3,000
12 women?
13    A.   Who underwent the sling, yes.
14    Q.   So, do you rely on literature
15 such as the Unger study to get a better
16 understanding as to what the overall
17 expected and acceptable revision rates are
18 for midurethral slings?
19    A.   Yes, it's one of the studies
20 that I would rely on.
21        (Exhibit Winkler 28, Welk
22    article, was marked for
23    identification, as of this date.)
24

Page 329

1 BY MR. ROSENBLATT:
2    Q.   I'll hand you what I've marked
3 as Exhibit 28 which is a study by Welk
4 titled "Removal and Revision of Vaginal
5 Mesh Use For the Treatment of Stress
6 Urinary Incontinence."
7        Do you see that?
8    A.   Yes, I do.
9    Q.   Is this also a study that was
10 referenced in your report?
11    A.   Yes, it is.
12    Q.   You'll see that they noted:
13 "Complications were treated in 1,307 women
14 at a rate of 2.2 percent."
15    A.   Yes, I see that.
16    Q.   And the 10-year cumulative
17 incidence rate was 3.29.
18    A.   I see that.
19    Q.   And that the conclusion states:
20 "10 years after SUI surgery, 1 of every 30
21 women may require a second procedure for
22 mesh removal or revision."
23        Do you see that?
24    A.   Yes, I do.

Confidential - Harvey A. Winkler, M.D.

Page 330

1    Q.   And that:  "Patients of lower
2    volume surgeons have a 37 percent
3    increased likelihood of having a
4    complication."
5        Do you see that?
6    A.   I do see that.
7        This is what I based some of my
8    experience with, the literature that is
9    out there of the 1 in 30.  However, I'm a
10   higher-volume surgeon who does many of
11   these procedures.  So in my clinical
12   experience and my follow-up, we've seen a
13   slightly lower rate.
14   Q.   What does that indicate to you
15   as to whether or not the mesh of TVT or
16   midurethral slings is defective based on
17   there being a difference between
18   high-volume versus low-volume surgeon?
19       MR. BENTLEY:  Objection.
20   A.   I don't think it's defective on
21   the product at all.  I think it's based on
22   the decision process of who may be getting
23   a sling.  I think it may be based on the
24   decision of what type of sling was placed,

Page 331

1    and on the tissue quality, most
2    importantly, of some of these patients, as
3    well as the dissection that's performed by
4    these surgeons.
5    Q.   You were asked a lot of
6    questions about what you considered to be
7    acceptable complication rates.
8        Do you see those?
9    A.   Yes, I do.
10   Q.   If a study showed a slightly
11   higher rate based on the ones that you
12   discussed, would you automatically
13   consider that to be unacceptable?
14   A.   Absolutely not.  And once again,
15   it always depends on what those
16   complications are and what are we talking
17   about.  It all needs to be taken in
18   context as opposed to just the number.
19   Q.   So for example, are there
20   different patient types that might be more
21   prone to a complication, such as a smoker
22   versus a non-smoker?
23   A.   Yes, a smoker, somebody who may
24   be on chronic steroids, or age sometimes

Page 332

1    comes into play, postmenopausal, older
2    woman.  All these things have to factor in
3    when you're having a discussion with a
4    patient of acceptable surgical risks.
5    Q.   And so, if a patient had
6    dyspareunia before a midurethral sling
7    procedure and then had dyspareunia after a
8    midurethral sling procedure, would that
9    indicate that the sling is defective just
10   because the patient continued to have
11   dyspareunia?
12   A.   Absolutely not.  The patient had
13   dyspareunia.  And there's some data to
14   support that patients who have chronic
15   pain-type syndromes may have more
16   complications than patients who do not,
17   and that's something that we would discuss
18   with patients as well.
19   Q.   Doctor, I want to refer you to
20   what I've marked as Exhibit 29.
21       (Exhibit Winkler 29, Guideline
22   for the Surgical Management of Female
23   Stress Urinary Incontinence: 2009
24   Update, was marked for identification,

Page 333

1    as of this date.)
2    BY MR. ROSENBLATT:
3    Q.   This is the AUA Guideline For
4    the Surgical Management of Female Stress
5    Urinary Incontinence: 2009 Update.
6    A.   Yes.
7    Q.   It shows that it's revised in
8    2012.
9    A.   Yes.
10   Q.   Doctor, if you look on the
11   second to last page under "Slings
12   synthetic at midurethra" in the middle
13   column.
14   A.   Yes.
15   Q.   And you go down to "Subjective
16   Complaints," what is listed for pain?
17   A.   One percent.
18   Q.   What is listed for sexual
19   dysfunction?
20   A.   Zero percent.
21   Q.   What is listed for voiding
22   dysfunction?
23   A.   Two percent.
24   Q.   And is that generally consistent

Confidential - Harvey A. Winkler, M.D.

Page 334

1  with your understanding of the subjective
2  complication rates of pain, sexual
3  dysfunction and voiding dysfunction that
4  were reported for synthetic midurethral
5  slings in the clinical literature?
6      A.   Yeah, that's my understanding.
7          And acceptable is very
8  subjective type of a question.  That's why
9  I have difficulty answering it.
10     Q.   So, even though you were
11 answering questions about specifically
12 asking about acceptable, would it be more
13 appropriate to consider those just kind of
14 general rates that are more commonly seen
15 in the literature?
16     A.   Yes, I would agree with that.
17     Q.   And are the complications that
18 you notice in your practice generally
19 consistent with the medical literature
20 related to synthetic midurethral slings?
21     A.   Yes, absolutely.
22     Q.   And what is that based on?
23     A.   So, that's based on my review of
24 the literature and seeing patients back

Page 335

1  postoperatively, as well as reports from
2  patients, seeing them in the long-term,
3  long-term patients returning to my office
4  for various reasons, as well as discussion
5  with other referring physicians, and
6  colleagues that would manage complications
7  if this -- if a patient came back to
8  another physician and then telling me.  We
9  speak all the time and sometimes I even
10 ask have you seen any of my complications
11 recently.
12     Q.   And as I understand it, you may
13 not have a formal spreadsheet that tracks
14 all of your complications over the past
15 two decades.
16         But how would you say you're
17 able to characterize your general
18 understanding of complication rates and
19 whether or not they're higher or lower
20 than what you would expect?
21     A.   I don't see a significant number
22 of women coming back in complaining of
23 pain and/or dyspareunia.  Majority of the
24 women just say "I wish I would have done

Page 336

1  this earlier, this procedure, and not have
2  waited that long."
3      Q.   And do you track your
4  complications in more of an informal
5  basis?
6      A.   So, we track complications
7  formally.  However, we don't write down
8  our complications all the time.  We have
9  biweekly and/or monthly internal morbidity
10 and mortality meetings.  Thank God we
11 don't have too many people who died from
12 our procedures, or it's pretty rare.  But
13 we have morbidity where we talk about our
14 complications.  We talk about the
15 complications that have come into the
16 office and/or have gone to the operating
17 room.  So we do that on a formal and
18 informal basis.  And if we have a serious
19 complication, that may get presented in
20 hospital M&M rounds.  And M&M rounds are
21 protected by confidentiality.
22     Q.   And going back to the AUA
23 guideline that we are looking at.
24         The page showing suspensions in

Page 337

1  the middle column Burch suspension.
2      A.   Yes.
3      Q.   What does it report for pain?
4      A.   So, pain was 6 percent, sexual
5  dysfunction is 3 percent, and voiding
6  dysfunction is 10 percent.
7          Once again, difficult ways to
8  get pinned down of what's an acceptable
9  rate for anything.
10     Q.   And so, although those rates for
11 the Burch procedure with respect to pain,
12 sexual dysfunction, and voiding
13 dysfunction are higher than the reports
14 seen and the reports -- or the
15 complication rates that you discussed
16 earlier, that doesn't necessarily
17 automatically make those rates for that
18 procedure unacceptable;  is that fair?
19     A.   That's fair.  It's just
20 recording the rates, and nobody's making a
21 determination here of what's acceptable
22 and unacceptable.
23     Q.   And would it be fair to say that
24 rather than saying acceptable or

Confidential - Harvey A. Winkler, M.D.

Page 338

1  unacceptable, you would always perform a
2  risk-benefit analysis?
3    A.   Right.  So, with each individual
4  patient, you need to perform the
5  risk-benefit analysis of what's going to
6  be a more acceptable procedure risk-wise
7  for them.
8    Q.   And so, although I take it you
9  wouldn't necessarily consider the Burch
10  procedure to be an unsafe procedure, based
11  on your testimony, it sounds like after
12  performing a risk-benefit analysis with
13  your patients, they seldom select to
14  proceed with the Burch procedure;  is that
15  fair?
16    A.   That is fair.  And the clinical
17  data reports lower morbidity with
18  midurethral slings.
19    Q.   Looking under "Slings" where it
20  states:  "Autologous fascia without bone
21  anchors."
22        Do you see that?
23    A.   Yes, I do.
24    Q.   And if you go down to the

Page 339

1  subjective complications, what are the
2  complications reported for the autologous
3  fascial sling, based on the AUA's
4  analysis?
5    A.   Ten percent for pain, 8 percent
6  for sexual dysfunction.
7    Q.   And then there's an asterisk for
8  voiding dysfunction where it states:
9  "Only case reports of this complication
10  exist and data are insufficient to
11  estimate the frequency."
12        Do you see that?
13    A.   Yes, I do.
14    Q.   And so, based on the AUA's
15  analysis of the literature for synthetic
16  midurethral slings, autologous fascial
17  slings, and Burch, would it be fair to say
18  that pain, sexual dysfunction, voiding
19  dysfunction are typically lower with
20  synthetic midurethral slings?
21        MR. BENTLEY:  Objection; vague;
22    leading;  compound.
23    A.   Yes, they're lower with the
24  midurethral sling.

Page 340

1    Q.   Is that consistent with your
2  clinical practice?
3    A.   Yes, it is.
4        (Exhibit Winkler 30, Schimpf
5    article, was marked for
6    identification, as of this date.)
7  BY MR. ROSENBLATT:
8    Q.   I'm going to hand you what I've
9  marked as Exhibit 30, which is the Schimpf
10  meta-analysis.
11        Doctor, are you familiar with
12  what's been marked as Exhibit 30?
13    A.   Yes, I am.
14    Q.   And is this the systematic
15  review performed by the Society of
16  Gynecologic Surgeons?
17    A.   Yes, it is, by a committee from
18  them.
19    Q.   Doctor, if you turn to table 3
20  reporting adverse events.
21        What is the rate reported of
22  dyspareunia for retropubic midurethral
23  slings?
24    A.   It's 0 percent with a 95 percent

Page 341

1  confidence interval of .01 percent to 1.64
2  percent.
3    Q.   And for exposure, what is the
4  percentage listed for retropubic slings?
5    A.   Exposure retropubic slings is
6  1.4 percent.
7    Q.   And so, Doctor, although there
8  may be studies that show a higher rate or
9  a lower rate, do you rely on Level I
10  evidence such as systematic reviews like
11  the Schimpf review, in order to support
12  your opinions about generally accepted and
13  expected complication rates?
14    A.   Yes, I rely on the literature,
15  as well as my clinical experience.
16    Q.   Are the complications that you
17  see in your clinical experience generally
18  consistent with the Level I literature?
19    A.   Yeah, the complications that I
20  see are expected with the Level I
21  literature.
22        (Exhibit Winkler 31, Ford
23    Cochrane review, was marked for
24    identification, as of this date.)

Confidential - Harvey A. Winkler, M.D.

Page 342

1  BY MR. ROSENBLATT:
2      Q.   Handing you what I've marked as
3  Exhibit 31, which is the Ford Cochrane
4  review.
5          Is this a review that you
6  referenced in your report?
7      A.   Yes.
8      Q.   Doctor, this systematic review
9  is based on 81 randomized control trials
10 that evaluated over 12,000 women?
11     A.   Yes, that's accurate.
12     Q.   You recall being asked some
13 questions about SPARC versus the TVT?
14     A.   Yes, I do.
15     Q.   And the SPARC would be a
16 top-down sling?
17     A.   Yes, it is.
18     Q.   And TVT would be -- the TVT and
19 TVT-Exact that we're talking about today
20 would be a bottom-up approach?
21     A.   Yes, it is.
22     Q.   Do you see where it states: "A
23 retropubic bottom-to-top route was more
24 effective than top-to-bottom route for

Page 343

1  subjective cure.  It incurred
2  significantly less voiding dysfunction and
3  led to fewer bladder perforations and
4  vaginal tape erosions."
5          Do you see that?
6      A.   I see that and that's what I
7  hold by today.
8      Q.   Would a systematic review, such
9  as the Ford Cochrane review, look at more
10 patients and more data than the 2011
11 article that looked at 113 patients?
12     A.   Definitely.  That is a much --
13 the Cochrane review is a much higher level
14 of evidence than my paper.
15     Q.   And when you're practicing
16 evidence-based medicine, would you rely on
17 the results of Cochrane review such as
18 this Ford 2015 Cochrane review as opposed
19 to one study?
20     A.   A hundred percent I would rely
21 on the Cochran review over the one study,
22 and that's how I practice today.
23     Q.   Doctor, the authors' conclusions
24 for the Ford Cochran review states:

Page 344

1  "Midurethral sling operations have been
2  the most extensively researched surgical
3  treatment for stress urinary incontinence,
4  SUI, in women and have a good safety
5  profile."
6          Do you see that?
7      A.   Yes, I do.
8      Q.   And is that consistent or
9  inconsistent with your opinions in this
10 case?
11     A.   That's consistent with my
12 opinions.
13     Q.   Doctor, looking on page 10 of
14 the Ford review, do you see where they
15 describe synthetic meshes as being type 1,
16 type 2, type 3, or type 4?
17     A.   Yes, I do.
18     Q.   And they describe type 1 as
19 being macroporous and monofilament?
20     A.   Correct.
21     Q.   What is your understanding as to
22 what type of mesh Prolene TVT is?
23     A.   It's a macroporous monofilament
24 mesh.  It's a type 1.

Page 345

1      Q.   That's a type 1 classification?
2      A.   Yes, it is.
3      Q.   And this is from 2015?
4      A.   Correct.  Most recent Cochrane
5  review on slings.
6      Q.   And it states a little further
7  down: "Type 1 mesh has the highest
8  biocompatibility with the least propensity
9  for infection."
10         Is that consistent or
11 inconsistent with your opinion?
12     A.   That's consistent with my
13 opinion.
14     Q.   Doctor, if you could pull out
15 Exhibit 26, which is the study we were
16 just comparing there.
17     A.   Yes, I got it.
18     Q.   This is a study where you were a
19 co-author comparing Ethicon's TVT to AMS's
20 SPARC?
21     A.   Correct.
22     Q.   And on the last page, the last
23 paragraph states:  "In conclusion, both
24 the suprapubic and the transvaginal

Confidential - Harvey A. Winkler, M.D.

Page 346

1  procedures."
2      Which would be the TVT.
3      A.   Correct.
4      Q.   (Continuing) "were associated
5  with a significant improvement in quality
6  of life as measured by the UDI-6."
7      Do you see that?
8      A.   That is correct.
9      Q.   So they're not saying that there
10  was a worsening of quality of life after
11  TVT, but just that in this study with
12  these patients, the SPARC had a higher
13  increase in quality of life compared to
14  the TVT.
15      Is that accurate?
16      A.   That's accurate.
17      Q.   And under the "Discussion," the
18  first paragraph it says:  "The surgical
19  management of stress incontinence has
20  advanced from the Burch colposuspension
21  and pubovaginal sling techniques to the
22  newer midurethral approaches designed to
23  achieve at least similar efficacy while
24  reducing morbidity in postoperative

Page 347

1  recovery.  Midurethral sling procedures
2  are the most commonly performed
3  anti-incontinence procedures and are safe
4  and efficacious."
5      Do you see that?
6      A.   Yes, I do.
7      Q.   And is that consistent or
8  inconsistent with your opinions?
9      A.   Entirely consistent.
10      Q.   Although the authors on this
11  paper were suggesting that there might be
12  differences in the quality of life based
13  on the needle size, you see at the bottom
14  of the discussion here where it states:
15  "It is unclear why a significantly greater
16  improvement in UDI-6 was seen in the
17  suprapubic treatment group"?
18      A.   Yes.  We couldn't come up with a
19  clear explanation.
20      Q.   So, would you use this study to
21  definitively say that the needle size
22  definitively was the cause for the
23  increase or decrease in quality of life?
24      A.   Absolutely not.  We could not

Page 348

1  figure out causality.
2      Q.   In fact, in the conclusion it
3  states:  "Complication rates in new onset
4  urinary urge incontinence were low in both
5  groups"?
6      A.   Yes.  And then we even write
7  that the study design provided only Level
8  III evidence.
9      Q.   Which would be lower than, say,
10  a systematic review, right?
11      A.   Exactly.  Lower than Level I,
12  for sure.
13      Q.   And if you turn to the results
14  page in the paragraph that starts:
15  "Concomitant surgery was performed in 75.7
16  percent of patients who underwent the
17  suprapubic sling procedure."  Which would
18  be the TVT.  And in 90 percent of the --
19  or, the SPARC.
20      A.   Correct.
21      Q.   And in 90.7 percent of those who
22  underwent the transvaginal procedure.
23      A.   Correct.  So, those are all risk
24  factors for having possibly decreased

Page 349

1  quality-of-life rates afterwards.
2      Q.   And if you look at table 1, it
3  appears that the TVT group had more
4  concurrent prolapse surgeries, more
5  vaginal hysterectomies, more anterior
6  repairs, more posterior repairs, more
7  paravaginal repairs than the SPARC group.
8      Is that accurate?
9      A.   That is correct.
10      Q.   Okay.  You can put that aside.
11      Doctor, looking at your report
12  on page 26.
13      A.   Yes.
14      Q.   You were asked some questions
15  about mesh characteristics, and I think
16  you referred to the Moalli study.
17      A.   Yes.
18      Q.   Is this a chart from the Moalli
19  study?
20      A.   Yes, it is.
21      Q.   Under "Mesh Type" it lists six
22  different manufacturers.
23      A.   Yes, it does.
24      Q.   And Gynecare would be Ethicon?

Confidential - Harvey A. Winkler, M.D.

Page 350

1   A.   Yes.
2   Q.   And out of all of the
3   manufacturers, which mesh had the largest
4   pore size as described in the chart on
5   Moalli?
6   A.   The largest pore size is the
7   Ethicon Gynecare mesh.
8   Q.   And that shows 1,379 microns?
9   A.   Correct.
10  Q.   Compared to Boston Scientific's
11  Advantage mesh which was 1,182 microns?
12  A.   Correct.
13  Q.   But it looks like the fiber size
14  with respect to diameter was the same for
15  TVT versus Advantage mesh?
16  A.   That's correct.
17  Q.   And the weight is similar at 100
18  grams per meter squared for TVT versus the
19  Advantage mesh?
20  A.   Yes, that's true.
21  Q.   And the Advantage mesh made by
22  Boston Scientific has a laser or a
23  heat-sealed portion under the midurethra?
24  A.   That is correct.

Page 351

1   Q.   And then the rest of the sling
2   would be what we call a tanged or
3   mechanically-cut?
4   A.   Correct.
5   Q.   Have you ever noticed any
6   particle loss with the tanged or
7   mechanically-cut portion of the Advantage
8   mesh?
9   A.   I have not noticed any.
10  Q.   Have you noticed any
11  complications or any problems with
12  particle loss roping, fraying, curling,
13  degradation or cytotoxicity related to the
14  TVT mesh?
15  A.   No, I have not.
16  Q.   And regardless of whether the
17  TVT at the time you were using it was TVT
18  mechanically-cut or TVT laser-cut?
19  A.   Regardless, they were both the
20  same.
21  Q.   And although you don't have a
22  spreadsheet tracking the complications,
23  throughout your career, have you noticed a
24  difference in the complications between

Page 352

1   mechanically-cut versus laser-cut?
2   A.   I have not noticed an increase
3   or decrease in the complications or
4   patients returning for complications based
5   on either.
6   Q.   And is there any reliable
7   peer-reviewed clinical literature that has
8   confirmed that there is a difference?
9   A.   There is no reliable literature
10  that I'm aware of that has confirmed that.
11  Q.   And so, although there may be
12  studies where authors suggest, such as in
13  your paper where you're describing what
14  might be the cause for something, that
15  doesn't definitively establish causation,
16  correct?
17  A.   No, it does not, correct.
18  Q.   I believe you testified that
19  biologic slings don't have substantial
20  efficacy as reported by clinical
21  literature?
22  A.   That's true.
23  Q.   And so, would it be accurate or
24  inaccurate to refer to biologic slings for

Page 353

1   primary incontinence as the gold standard?
2   A.   They are not the gold standard.
3   It would be inaccurate to refer to
4   biologic slings as the gold standard.
5   Q.   And most of the long-term data
6   that exists for TVT, is that on the
7   laser-cut or the mechanically-cut?
8   A.   The long-term data is mostly on
9   the mechanically-cut.
10  Q.   You talked about having to
11  perform release procedures after
12  midurethral slings.
13      You recall those questions?
14  A.   Yes, I do.
15  Q.   Have you had to perform similar
16  release procedures for autologous fascial
17  slings or biologic slings?
18  A.   Well, for the autologous fascial
19  slings, the procedure for voiding
20  dysfunction actually is a little more
21  difficult.  Usually instead of just
22  incising the sling, you would do a full
23  urethrolysis where you would go in and
24  either cut the sling on both sides and go

Confidential - Harvey A. Winkler, M.D.

Page 354

1 behind the urethra and dissect behind to
2 take down some of the scarring that occurs
3 with the pubovaginal sling.
4    Q.   Doctor, jumping around a little
5 bit, we were talking about levels of
6 evidence and the Oxford levels.
7        Do you recall that?
8    A.   Yes, I do.
9    Q.   How does the quality of evidence
10 on Burch and autologous fascial slings and
11 biologic slings compare to the quality and
12 volume of evidence on TVT and synthetic
13 midurethral slings?
14    A.   The quality and volume of
15 evidence on TVT slings is significantly
16 more on those than on Burch and
17 pubovaginal slings and better quality and
18 more evidence.
19    Q.   When you were asked questions
20 about Dr. Rosenzweig's opinions on
21 mechanically-cut versus laser-cut, did
22 you, in fact, go through and review Dr.
23 Rosenzweig's expert report as well as the
24 materials that he cited in the body of his

Page 355

1 report?
2    A.   Yes, I did.
3    Q.   And did any of those materials
4 change your opinions?
5    A.   No, they did not.
6    Q.   You were asked about your
7 presentation that showed a image of mesh
8 being similar to reinforced concrete.
9        Do you recall that?
10    A.   Yes, I do.
11    Q.   Were you in any way trying to
12 suggest that mesh is difficult to remove
13 like rebar might be difficult to remove
14 from concrete?
15    A.   Absolutely not.  It was just a
16 philosophical type of explanation of what
17 the mesh does.
18    Q.   Was it more so just to describe
19 the scaffolding and how the mesh works by
20 providing support?
21    A.   Yes, it was.
22    Q.   Doctor, do you recall reviewing
23 a rabbit study where Ethicon looked for
24 mesh particles within the muscle?

Page 356

1    A.   Yes, I do.
2    Q.   In this column, what did they
3 show as far as whether there were any mesh
4 particles in the muscle?
5    A.   There was no evidence of such.
6        MR. BENTLEY:  Is it marked?
7        MR. ROSENBLATT:  No.  Do you
8    want me to mark it?
9        MR. BENTLEY:  I don't know.  I
10    just thought that --
11        MR. ROSENBLATT:  I was just
12    going to try to wrap up.
13        MR. BENTLEY:  That's fine.
14 BY MR. ROSENBLATT:
15    Q.   Doctor, you also brought with
16 you a photograph.
17    A.   This one (indicating)?
18    Q.   Exhibit 25.
19        Why did you bring this
20 photograph with you?
21    A.   I wanted to show that roping and
22 curling, even with erosions, does not
23 occur.  Usually it would, and the mesh is
24 not shrinking and contracting.  It's just

Page 357

1 being exposed out.
2    Q.   And how would you describe the
3 pore size of that TVT mesh?
4    A.   Without a ruler, it looks pretty
5 similar to how we put it in and above a
6 millimeter.
7    Q.   Does it look to be an open pore
8 or a collapsed pore?
9    A.   It's an open pore.
10    Q.   Doctor, I believe you had
11 testified a little bit about your
12 experience with companies and industry.
13        Have you consulted with industry
14 on safety of products and devices with
15 respect to warnings, as well as design?
16    A.   Yes, I have.
17    Q.   And did you describe some of
18 that experience throughout your
19 deposition?
20    A.   Yes, I have.
21    Q.   Doctor, on page 37 -- I'm sorry,
22 38 of your report.
23    A.   Okay.
24    Q.   If you could turn there for me.

Confidential - Harvey A. Winkler, M.D.

Page 358

1    The last paragraph you reference
2  the AUGS urogynecology resident
3  objectives.
4    Do you see that?
5    A.   Yes.
6    Q.   On the next page, the last
7  sentence says: "The resident should be
8  able to discuss risk, benefits, expected
9  outcomes of non-surgical and surgical
10 management of SUI."
11   Do you see that?
12   A.   Yes, I do.
13   Q.   You also identify the 2012 ABOG
14 and ABU guidelines for earning an FPMRS?
15   A.   Yes, I do.
16   Q.   You go through in your report
17 and identify some other documents that
18 you're relying upon.
19   Are these just some of the
20 documents that you're relying on to
21 demonstrate what surgeons are expected to
22 know?
23   A.   Yeah, these are some of them.
24   Q.   And so although you may not know

Page 359

1  exactly what every surgeon does or does
2  not know, what is your opinion as to what
3  surgeons should be expected to know about
4  commonly known complications?
5    MR. BENTLEY:  Objection.
6    A.   Surgeons should be expected to
7  know that based on their education,
8  training, and reading of the literature,
9  as well as maintenance of certification.
10   Q.   Doctor, you testified that
11 you're currently performing for your
12 retropubic slings either Boston
13 Scientific's Advantage mesh or the
14 TVT-Exact.
15   A.   Correct.
16   Q.   Does the fact that you're not
17 currently performing TVT mechanically-cut,
18 is that based on any concerns that you
19 have about the safety of TVT
20 mechanically-cut?
21   MR. BENTLEY:  Objection.
22   A.   That's not based on any of the
23 concerns.  I have not seen a noticeable
24 difference, nor is it reported clinically,

Page 360

1  of mechanically-cut versus laser-cut.
2    Q.   And are all of the opinions that
3  you've offered in your report, as well as
4  here today, held to a reasonable degree of
5  medical certainty?
6    A.   Yes, they are.
7    MR. ROSENBLATT:  No further
8  questions.
9  FURTHER EXAMINATION BY
10 MR. BENTLEY:
11   Q.   Doctor, you testified that you
12 wouldn't want to hide your affiliation or
13 work with industry.
14   Do you remember that?
15   A.   Yes.
16   Q.   And you --
17   A.   And I -- any time if I was
18 required to disclose it, I did disclose
19 it.
20   Q.   In your report for this matter
21 discussing the TVT and TVT-Exact, you note
22 that you've worked for industry, right?
23   A.   Yes.
24   Q.   And why in your report do you

Page 361

1  not discuss that you've worked for Ethicon
2  who's hired you to act as their expert in
3  this case?
4    A.   I don't put any of my expert
5  witness information on my CV.  I've done
6  expert witness for medical malpractice,
7  and I haven't put that on my CV.
8    Q.   I'm talking about in your TVT
9  and TVT-Exact report in which you disclose
10 that you've worked for industry, right?
11   A.   Yes.
12   Q.   Okay.  In your TVT and TVT-Exact
13 report, is there any reason why you don't
14 disclose that you've previously consulted
15 and taught for Ethicon?
16   A.   Did I write in my report that I
17 specifically consulted for other
18 companies?  I don't think I did that.  Why
19 should I single one out.
20   Q.   That wasn't my question.
21   Is there any reason why you
22 didn't disclose in your report regarding
23 TVT and TVT-Exact that you have
24 specifically consulted for the

Confidential - Harvey A. Winkler, M.D.

Page 362

1 manufacturers of these products?
2   A.   There's no reason for that.
3        And it explicitly says in my
4 report my fee schedule, and everyone in
5 the jury or everyone will know exactly
6 what I'm getting paid and how much I'm
7 getting paid, and you have my invoices.
8   Q.   If you were going to update your
9 report, would you want to include any
10 information about your previous consulting
11 work with Ethicon?
12   A.   I don't -- if -- I don't think
13 that's required in the report.  It's
14 not -- it's disclosable and I'm telling
15 you about it, but the report is really
16 based on my review of the literature and
17 my clinical experience today, not money
18 that I received 15 years ago.
19   Q.   When you were updating your
20 resume around 2013 and you went and added
21 a lot of the earlier 2000 AMS and Boston
22 Scientific work, how did you remember to
23 add that information in 2013?
24   A.   Some of that stuff I had written

Page 363

1 with some papers and whatnot.
2        There was a time when me and my
3 partner were combining our stuff that we
4 did.  There was a time that I was
5 recording it and there was a time that he
6 was recording it, or we had somebody else
7 recording it, and some of that stuff I had
8 written, but I didn't have all of it
9 recorded.  And then we stopped doing that
10 as well.
11   Q.   When did you first --
12   A.   But I don't -- I mean, if I -- I
13 don't recall, and it's possible I may have
14 taught one, but I did not do any
15 significant cadaver labs for Gynecare.  I
16 may have done one or two, I don't recall
17 those, and those are what I put on my CV
18 because those are teaching labs to --
19 that's teaching experience to multiple
20 doctors.
21   Q.   I think you're testifying that
22 you have notes or you had notes in 2013
23 documenting a lot of the work you did in
24 the early 2000s for AMS and Boston

Page 364

1 Scientific?
2   A.   No, I don't have notes.  I have
3 just some labs that I went to and what was
4 there.  I don't have specific -- I have
5 little tidbits here and there, and I have
6 some of that, but I don't have it all,
7 unfortunately.
8   Q.   When you did the updates in
9 2013, that was just based off your memory,
10 your recollection of what happened in the
11 early 2000s?
12   A.   It was based on my -- most of it
13 was based on my recollection, yes.
14   Q.   And you didn't recall that you
15 had also done work for Ethicon?
16   A.   No, I never denied that I was a
17 preceptor for Ethicon.  I don't recall
18 doing any kind of labs for Ethicon.
19   Q.   We looked at your study that was
20 comparing SPARC to TVT, and I believe your
21 explanation for not including that in your
22 report was because it was Level III
23 evidence.
24        Was that correct?

Page 365

1   A.   You're talking about my report
2 for --
3   Q.   Your report that found that AMS
4 product had a higher quality of life
5 compared to the TVT Retropubic.
6        Remember that?
7   A.   Yeah, I do.
8        First of all, I thought it was
9 low-quality evidence, and there was
10 nothing in that report that would show
11 that either of the slings, which are very,
12 very similar, was defective.
13   Q.   And my question is did you
14 include other Level III evidence in your
15 TVT report?
16   A.   I may have.  However, I -- once
17 again, if Level I data is available, I
18 would try to include the Level I data.  If
19 there's no Level I data, I would go to 2
20 and then I would go to 3.
21   Q.   I believe you testified that
22 Prolene is a type 1 macroporous mesh,
23 right?
24   A.   I think I testified that TVT is

Confidential - Harvey A. Winkler, M.D.

Page 366

1  a type 1 macroporous mesh, not Prolene.
2      Q.   You understand that TVT is made
3  from Ethicon's Prolene mesh, do you?
4      A.   I understand that.  But you can
5  weave Prolene differently.  You can make
6  the pores smaller.
7          So that's why I want to be
8  specific we're talking about that.
9      Q.   It's confusing.
10         Prolene is the name of a suture,
11 right?
12     A.   Yes.
13     Q.   And then the mesh construction
14 that's in the TVT product that Ulmsten
15 originally used and it's still --
16     A.   It's called the Prolene mesh, I
17 agree with you.
18     Q.   And that Prolene mesh is
19 considered type 1 macroporous per the Amid
20 classifications?
21     A.   If we're talking about the
22 Prolene mesh.
23     Q.   Right.
24     A.   Yes.

Page 367

1      Q.   Do you understand that that mesh
2  was created for application in hernia
3  repair?
4      A.   Yes, I do.
5      Q.   And do you understand Ethicon
6  subsequently made newer meshes, such as
7  Prolene Soft?
8      A.   Yes, I'm aware of that.
9      Q.   And subsequently Ethicon's made
10 ULTRAPRO also, which is I think a softer
11 mesh with a partially absorbable
12 component?
13     A.   Correct.
14     Q.   And those meshes are actually
15 lighter weight than the original Prolene
16 mesh that's used in TVT?
17     A.   That's correct.
18     Q.   And Ethicon never updated the
19 TVT mesh with those newer meshes, correct?
20     A.   Well, from the data, I think
21 they actually looked at using ULTRAPRO in
22 their mesh and they submitted to the FDA
23 and that was denied by the FDA.
24         And if I remember correctly,

Page 368

1  there was some problems removing the
2  sheathe using the ULTRAPRO mesh.  I think
3  in the sterilization process, the plastic
4  got stuck to the mesh.  So I think Ethicon
5  was trying to see if there were
6  alternatives to their mesh there.
7          There's also a study noted in my
8  report comparing the TVT -- comparing a
9  heavier-weight mesh, which you pointed out
10 to me, to a lighter-weight mesh, and the
11 lighter-weight mesh didn't perform as well
12 as the heavier-weight mesh.
13     Q.   And by "perform," you're talking
14 about its ability to effectively treat
15 incontinence; is that correct?
16     A.   So, I'm referencing the
17 Prien-Larsen study published a prospective
18 study comparing the 100 gram meters
19 squared with low stiffness and rough edges
20 to lighter weight 60 grams per meters
21 squared, and in 12 months there was a
22 significant difference in objective cure
23 rates favoring the heavier-weight mesh 86
24 versus 96 percent.

Page 369

1      Q.   Right.  And I'm just trying to
2  see do you understand that the purpose of
3  going to a lighter-weight mesh is to
4  reduce the histological response after
5  implantation?
6      A.   I understand that's the purpose,
7  but you need to maintain the efficacy as
8  well still.
9      Q.   Do you have an opinion of
10 whether Prolene Soft has a less
11 inflammation response as compared to
12 Prolene original that's in TVT?
13         MR. ROSENBLATT:  Object to form.
14     A.   The Prolene Soft fiber is a
15 smaller fiber than the fiber used in the
16 TVT mesh.  There has -- and so that may
17 result in a reduced chronic inflammatory
18 reaction, but once again clinically, we
19 don't see any clinical evidence from this
20 chronic inflammatory reaction with the
21 heavier-weight mesh.
22     Q.   Doctor, you mentioned a couple
23 of avenues by which physicians should know
24 about different complications, and I think

Confidential - Harvey A. Winkler, M.D.

Page 370

1 you talked about the literature and their
2 training.
3      Do you remember that?
4      A.   Yes, I do.
5      Q.   And do you understand that one
6 of the purposes of the IFU is to provide
7 another avenue of information for
8 physicians?
9      A.   Yes, the IFU can provide another
10 avenue.
11      Q.   It's actually written for
12 physicians, right?
13      A.   Correct, it's written for the
14 physicians.
15      Q.   Are you still working as a
16 consultant for Ethicon regarding product
17 design or --
18      A.   No, only for the expert work.
19      Q.   When did your consulting, your
20 non-litigation consulting work end with
21 Ethicon?
22      A.   So, I don't remember exactly.  I
23 don't have the contracts anymore, anything
24 like that.

Page 371

1      Somewhere probably in the
2 mid-2000s, '6, '7 -- probably '7, '8,
3 somewhere around there.
4      Q.   Definitely not after 2010?
5      A.   I don't think so.
6      Like I said, I don't have the
7 contracts, so I don't know.
8      Q.   Do you have the ability to find
9 out that information if you wanted to know
10 it?
11      A.   I don't think I have the
12 ability.
13      You have the ability though.
14      Q.   Have you asked Ethicon to
15 provide you with that information so you
16 can know when you were consulting for
17 them?
18      A.   I didn't ask them to
19 specifically provide that because I know
20 that I consulted for them and did
21 preceptorships for them and went to an
22 advisory board for that which I was
23 actually shown that I was at for
24 Gynemesh PS, which I'm sure will come out

Page 372

1 later.
2      Q.   Would you like to have a
3 complete record of your work for Ethicon
4 now that it's refreshed your memory that
5 you worked for them?
6      A.   I mean, to me it's past history.
7 So, you can give it to me.  I don't think
8 it's going to change any of my opinions
9 today.  I'm going to go with what the data
10 supports today.
11      I do expect to be paid for my
12 time away from my family and away from
13 leisure time watching T.V.  And, you know,
14 thing are expensive.  That's just -- got
15 to pay for the kids.
16      Q.   When you testify before a jury,
17 would you like to be able to provide a
18 full and accurate description of your
19 previous consulting work with Ethicon so
20 the jury can know that?
21      A.   I don't have a problem giving
22 that information to them.
23      Q.   So you'd want to know that?
24      A.   I didn't say that.  I said I

Page 373

1 wouldn't have a problem giving them that
2 information.
3      MR. BENTLEY:  Thank you, Doctor.
4      MR. ROSENBLATT:  Greg, if you
5 want to mark his training history and
6 go through that with him.
7      MR. BENTLEY:  I mean, it was in
8 my document request.  I don't know if
9 it was in the stuff that I was
10 produced.  I tried to find it.  And
11 that's part of the problem is there's
12 a lot of work and there's a lot of
13 gaps in it and I just don't know.
14      THE WITNESS:  Do you want to go
15 off the record for a second?
16      MR. BENTLEY:  That actually
17 needs to be on the record.
18      I'm good.  I have no further
19 questions.
20      THE WITNESS:  Okay.
21      MR. ROSENBLATT:  Just briefly.
22 FURTHER EXAMINATION BY
23 MR. ROSENBLATT:
24      Q.   Doctor, what was the purpose

Confidential - Harvey A. Winkler, M.D.

Page 374

1  of --
2       MR. ROSENBLATT:  Strike that.
3    Q.   Doctor, what was your
4  understanding of the purpose as to why you
5  were teaching various professional
6  education courses and preceptorships for
7  various companies, including Gynecare,
8  Ethicon?
9    A.   Okay.  So, there were a couple
10 of reasons.
11      First of all, I believe that we
12 need to continue furthering our physicians
13 and making sure that they are doing
14 procedures safely.  I think you want a
15 high-volume surgeon teaching these
16 procedures to others that may have not had
17 as much experience with them.  So I
18 believe in the continuing medical
19 education.
20      It is very hard for an attending
21 doctor to learn new procedures that are
22 out there.  They need to -- there are
23 resources, there's money that needs to be
24 spent, there's time away from the

Page 375

1  practice, and I wanted to be that
2  resource.
3       Specifically, also, if there
4  were people locally wanting to learn this
5  procedure, I wanted people to come to my
6  OR and for me to meet these people
7  learning this procedure so we can develop
8  relationships and referral patterns as
9  well.  There was benefit to me as well and
10 getting a reputation out there as being a
11 leading expert also when I taught these
12 procedures.  If they had a tough patient
13 that they would not want to operate on, I
14 welcomed the referral.
15      MR. BENTLEY:  I'm sorry.  I was
16 going to lodge an objection to the
17 extent it called for speculation.
18      And I'm going to object to the
19 response to the extent it exceeded the
20 question as non-responsive.
21      MR. ROSENBLATT:  Okay.
22 BY MR. ROSENBLATT:
23   Q.   Doctor, do you believe that your
24 previous consulting experience in any way

Page 376

1  biases your opinions that you've offered
2  in your report?
3    A.   No, I do not.
4       MR. ROSENBLATT:  No further
5  questions.
6       MR. BENTLEY:  Thank you, Doctor.
7       (Exhibit Winkler 32, Ethicon
8  Inc. Johnson & Johnson report dated
9  March 3, 2003, was marked for
10 identification, as of this date.)
11      (Deposition adjourned at 3:55 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 377

1    A C K N O W L E D G M E N T
2
3  STATE OF          )
4                    :ss
5  COUNTY OF         )
6
7    I, HARVEY A. WINKLER, M.D., hereby
8  certify that I have read the transcript of
9  my testimony taken under oath in my
10 deposition of March 12, 2017; that the
11 transcript is a true and complete record
12 of my testimony, and that the answers on
13 the record as given by me are true and
14 correct.
15
16
17 _____
18      HARVEY WINKLER, M.D.
19 Signed and subscribed to before me this
20 _____ day of _____, 2017.
21
22 _____
23 Notary Public, State of
24

Confidential - Harvey A. Winkler, M.D.

| Page 378 |
| --- |

E R R A T A

PAGE / LINE / CHANGE   /   REASON

1
2
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

| Page 380 |
| --- |

LAWYER'S NOTES

PAGE / LINE

1
2
3 ____ ____ _____
4 ____ ____ _____
5 ____ ____ _____
6 ____ ____ _____
7 ____ ____ _____
8 ____ ____ _____
9 ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____

| Page 379 |
| --- |

C E R T I F I C A T E

1
2 STATE OF NEW YORK
3 COUNTY OF NEW YORK
4
5      I, Marie Foley, RMR, CRR, a
6 Certified Realtime Reporter and Notary
7 Public within and for the State of New
8 York, do hereby certify:
9      THAT HARVEY A. WINKLER, M.D., the
10 witness whose deposition is hereinbefore
11 set forth, was duly sworn by me and that
12 such deposition is a true record of the
13 testimony given by the witness.
14      I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I am
17 in no way interested in the outcome of
18 this matter.
19      IN WITNESS WHEREOF, I have
20 hereunto set my hand this 15th day of
21 March, 2017.
22
23      _____
24         MARIE FOLEY, RMR, CRR