EXHIBIT D2

Brian D. Parker, M.D

1    think there was a mention of other small societies and I

2    didn't have the acronyms for each one of those.  So I can

3    go back and review that and get that.

4            Q.      Sure.  And we can move on.  I don't want

5    to hold up to do that.  We can make a note to reference

6    what the five other studies were here.  And we'll move on

7    to TVT-Secur.

8                    Okay.  In this section, under Design, you

9    reference the fact that "Other companies were developing

10   their own type of single incision sling and cumulatively,

11   they were described as 'mini slings.'  I believe that the

12   TVT-Secur was safe in design and base this opinion on my

13   review of Ethicon documents, my discussions with colleagues

14   and my review of the medical literature."

15                   So is your opinion with regards to the

16   actual design of the device or on its application in your

17   practice?

18                   MR. WALKER:  Object to form.

19   BY MS. BAGGETT:

20           Q.      I guess what I'm trying to say --

21           A.      Is that two separate issues?

22           Q.      Well, let me see if I can make that

23   question a little better.  I may need to break it down.

24                   Okay.  So I guess what I want to get an

25   understanding of is the opinions that you hold in your

Brian D. Parker, M.D

1   report.  Are you an expert -- are you holding yourself out

2   as an expert on the design of medical devices?

3          A.      Only as they apply to how they are used

4   when the final product is available and used on a patient.

5   But the actual engineering, I wouldn't.

6          Q.      So you've never designed a medical device

7   in your practice?

8          A.      No, but I have been involved with a think

9   tank, help improve designs for the Medtronic Interstim

10  device.  I've helped with that, but I haven't physically

11  engineered any type of sling device.

12         Q.      Are you familiar -- as part of your review

13  in offering these opinions, did you make yourself familiar

14  with the standards a manufacturer must follow in designing

15  a mesh product?

16                 MR. WALKER:  Object to form.

17         A.      So you're asking me if there's a certain

18  set of guidelines that manufacturers have to follow?  No,

19  I'm not aware of how that process goes on.

20         Q.      And are you aware of any standards or

21  guidelines that must be followed in order to submit a

22  device, medical device, for approval or clearance through

23  the FDA?

24         A.      You lost me on that.  Say that again.

25         Q.      I'm just trying to understand if you

Brian D. Parker, M.D

1    are -- in addition to being familiar with how a company

2    manufactures a device, are you familiar with the

3    regulations surrounding designing a device that must be met

4    in order to satisfy the FDA in order to get the product on

5    the market?

6            A.      Is that not similar to what we discussed

7    earlier about the 510(k)?

8            Q.      It's similar to it, but with particular

9    regards to the design.  So there's safety and efficacy

10   things that can be done --

11           A.      Right.

12           Q.      -- but then there may be some --

13           A.      My knowledge of these devices comes from

14   going to meetings and talking to the different doctors who

15   have been involved in the different designs, or going and

16   reading the internal documents.  But in no way, shape or

17   form have I ever been involved in the day-to-day process of

18   designing these things.

19           Q.      So is it fair to say that you're not

20   familiar with the failure modes and effect analysis and its

21   role in the development of the device?  Do you know what

22   those are?

23           A.      I'm not familiar.

24           Q.      So you didn't review any procedures from

25   Ethicon's internal documents with regards to design, the

Brian D. Parker, M.D

1    designing of this device?

2            A.      I did read those.

3            Q.      You did?

4            A.      Yes.

5            Q.      And what, if anything, did that, in your

6    opinion, make you qualified to opine about with regards to

7    the design?

8            A.      So from the standpoint of all the

9    prototypes, no.  But once it gets to a certain prototype

10   and it starts to become -- when the device is actually to

11   the point where it's going through the different studies,

12   whether it be human or animal, at that point those studies

13   are important to me, and so I would give an opinion based

14   on that.

15           Q.      Do you know what a DDSA is?

16           A.      DDSA.  I'm not familiar.

17           Q.      And FMEA?  Those are not acronyms that you

18   would use routinely in your practice?

19           A.      No.

20           Q.      Do you have an understanding of whether or

21   not when Ethicon was designing the TVT, the prolene mesh

22   that was used in the TVT, the TVT-R and the TVT-S, if the

23   mesh was designed to rope?

24                   MR. WALKER:  Object to form.

25           A.      Well, the mesh was not designed to rope.

Brian D. Parker, M.D

```
 1    You're asking me if it was designed to rope?

 2           Q.      Do you know if the mesh was designed to

 3    rope?

 4           A.      I think the idea behind the mesh was for

 5    it to lie flat, but I don't know that there was any studies

 6    to look at roping on mesh.

 7           Q.      Do you know whether or not the mesh was

 8    designed to curl?

 9           A.      I can't comment on that, but in reality we

10    all know that it curls.

11           Q.      Do you know if it was designed -- that the

12    mesh in the prolene -- do you know if the mesh -- let me

13    just start over on that one.

14                   Do you know if the mesh used in these

15    devices was designed to fray?

16           A.      Was designed to fray?  I'm not privy to

17    that information.

18           Q.      Do you know if it was designed to lose

19    particles?

20           A.      I'm not aware of any documents on that.

21           Q.      Do you know if it was designed to shrink?

22           A.      No.  I'm not aware of any studies that

23    were designed to look at shrinkage of mesh.

24           Q.      Do you know if the mesh was designed to

25    deform easily?
```

Brian D. Parker, M.D

1        A.        I'm not aware of that either.

2        Q.        Would you agree that the things that I

3   just asked you about, each one of these, the roping, the

4   curling, the fraying, the particle loss, and shrinking and

5   deformation, that these would be considered unwanted or

6   unintended consequence of the mesh, whether they have

7   clinical impact or not?

8              MR. WALKER:  Object to form.

9        A.        No.  It depends on what they are using

10  them for.  Some of the things you're saying -- you lumped a

11  bunch of things together.  I don't know that, A, number

12  one, that some of the things you described are of any

13  negative consequence.  B, I think it depends on what you're

14  using the mesh for at the time it was studied.

15       Q.        And today, for the purposes of today's

16  discussions, we're talking about the use in the TVT-R, the

17  TVT-O and the TVT-S devices.  And my question is

18  specifically whether or not you agree if those qualities

19  would be unintended with regards to the design of the

20  devices, whether or not it has a clinical impact or not?

21             MR. WALKER:  Object to form.

22       A.        What you're describing there may -- well,

23  I don't know that it has a clinical impact.  If it were to

24  have a clinical impact, hypothetically, then I don't know

25  of it.  And I don't know of the ramifications of

Brian D. Parker, M.D

1    determining that and then what the next steps are to

2    rectify it.

3            Q.      But even more succinctly, do you agree

4    that these conditions were not the intended consequence in

5    designing the mesh?

6                    MR. WALKER:  Object to form.

7            A.      I can agree with that.

8            Q.      While we're on the subject of your

9    opinions, are you going to be offering opinions with regard

10   to warnings that were provide by Ethicon with regards to

11   the products at issue in this case?

12           A.      Yes.

13           Q.      What risk information are medical device

14   companies required to put in their IFUs?  Are you familiar

15   with the requirements?

16           A.      Their requirements?

17           Q.      Uh-huh.

18           A.      Adverse events that are reported in the

19   literature I suppose.  I don't know if there's a way that

20   the IFU is set that has to be met, but...

21           Q.      Do you know what the industry standards

22   are governing warnings on medical devices?

23           A.      I'm not aware of how those industry

24   standards are set.  I do know that from a -- again, this is

25   all from a clinician standpoint, how we perceive and look

Brian D. Parker, M.D

1    at those warnings.

2           Q.       And that's kind of what I'm trying to get

3    at.  As far as in your clinical practice, the way that you

4    perceive the warnings versus whether or not those warnings

5    met the expectations of the industry in complying with

6    regulations and standards.

7           A.       So you're taking that question and

8    assuming I know what the standards are.  I think they met

9    the standards, yes.

10          Q.       And you know what those standards are?

11          A.       What I'm saying, I'm speaking from the

12   standpoint of a clinician what those standards would be.

13   I'm not involved in, again, regulation, so I don't know how

14   those things are set.  Do I think the IFU is acceptable in

15   its either current or prior form?  Yes.

16          Q.       Have you, in your review and in drafting

17   your report, read any testimony from Ethicon employees

18   regarding Ethicon's position on what needs to be in the

19   IFU?

20          A.       Yes.

21          Q.       And do you have an opinion as to whether

22   or not there was some conflict between the employees at

23   Ethicon whether or not something should have been in the

24   device that never made it to -- or should have been in the

25   warnings that never made it to the warnings?

Brian D. Parker, M.D

```
 1                    MR. WALKER:  Object to form.

 2           A.      I don't know of -- I do know there were

 3   conversations among Ethicon representatives about certain

 4   items.  Again, from a clinical standpoint, that's kind of

 5   a ticky-tack question.  Most of those items they're

 6   discussing are already well-known complications, side

 7   effects, that we tend to deal with with any pelvic surgery.

 8   To me, I glanced through those, but in practice it's not

 9   much of an issue.

10           Q.      Do you agree that physicians should be

11   made aware of all the significant safety risks that are

12   associated with the product via the IFU?

13                    MR. WALKER:  Object to form.

14           A.      I'll just say this about the IFU.  The

15   IFU, to me, needs to be in there because it has to be in

16   there.  But I don't rely on the IFU.  I don't know other

17   surgeons who rely on the IFU.  I mean, to me, that would be

18   like relying on your builder to look at a printout of how

19   to put each board together.

20                    There are certain inherent things that are

21   in the IFU that I think are silly and don't need to be

22   there.  For instance, it says "Don't operate on people who

23   are on anticoagulation," or "Make sure you sew up your

24   incision."  So the IFU, from a clinician's standpoint, is

25   very -- it has to be there, but it's not something that we
```

Brian D. Parker, M.D

1    rely upon.

2           Q.      In our discussions earlier today we were

3    talking about how you were trained on the devices, and you

4    mentioned that the earlier devices you learned in

5    residency, through your residency programs, and that with

6    the TVT-S device you actually took the professional

7    education courses provided by Ethicon.  Do you recall that

8    conversation?

9           A.      Yes, ma'am.

10          Q.      Do you have an understanding of whether or

11   not -- and I know that you just recently testified that you

12   don't rely on the IFU -- do you have an understanding

13   whether or not the people that you learned the procedure

14   from, whether or not at some point they may have read and

15   relied on the IFU in relaying information to you?

16          A.      Well, I don't know that I testified

17   exactly that, said I don't rely on the IFU.  But it's not a

18   critical -- if I said that, really, my point of saying it

19   is it's not a critical part of a clinician's

20   decision-making process.  It can be helpful in certain

21   circumstances, but in reality we don't -- you know,

22   physicians don't look at that every time that we perform a

23   procedure.  Are there other physicians who may look at that

24   before?  I have no way of knowing.  I have no way of

25   knowing the people that I've trained from, whether they

Brian D. Parker, M.D

1   looked at that or not.

2          Q.      I guess what I'm getting at is who would

3   be in a better position to know all of the fine details of

4   the procedure than the designers of the device and the

5   procedure?

6                  MR. WALKER:  Object to form.

7          A.      So who would be better at knowing that

8   than the designers?  Are you talking about the

9   manufacturers?

10         Q.      Uh-huh.

11         A.      Well, isn't it kind of a combination of

12  the manufacturers and the physicians to come up with that?

13         Q.      Well, and, actually, I think the

14  manufacturers employ physicians that assist with this.  But

15  I guess what I'm saying is, you learn what you learn from

16  med school.  At some point someone has to be taught --

17  number one, shown that there is such a device and then

18  shown how to properly use the device, even if that

19  information passes from preceptor to preceptor to

20  preceptor.

21                 I guess what I'm trying to understand is,

22  who would be in the best position to know how to properly

23  perform that procedure than the manufacturer?

24         A.      I understand what you're saying now.

25  Okay.  So there's multiple parts on the IFU.  The part

Brian D. Parker, M.D

```
 1    that's probably the most helpful may be the step-by-step

 2    way of putting the device in, the utilization of it.  The

 3    things that actually from a standpoint of -- I think it's

 4    kind of a little bit -- I don't know if not necessary is

 5    the right word, but of really no practical importance; you

 6    know, what patient is operated on, how long postoperatively

 7    to do things.  I mean, that's a little bit insulting to my

 8    intelligence to say that I went through all that training

 9    to have somebody tell me that I have to tell the patient

10    they must wait four weeks before intercourse after having

11    the sling procedure.  And there's a lot of stuff like that

12    that's in there, but of any to no practical use.

13              So that thing that is practical useful is

14    the actual, you know, where do my hands go, what do I need

15    do to put this in.  But the other part of it is, I mean,

16    it's already well-known, it's already something that's

17    reported in the literature, and it's not something we

18    gained just from the IFU.

19              So to answer your question is, there's no

20    other person that's better than all the physicians who use

21    it and the company that makes it combined together with all

22    the literature to come up with these IFUs.

23         Q.     I don't mean in any way to insult you and

24    your intelligence with my questions.

25         A.     You're not insulting me.
```

Brian D. Parker, M.D

1          Q.        I just want to make sure that you

2     understand that I've got my job to do to ask these

3     questions.

4          A.        No, ma'am, I don't take it from you at

5     all.

6          Q.        And I do understand where you're coming

7     from with the fact that certain things that are understood

8     in your practice may not be as necessary to state in the

9     IFU, but would you expect that the more important the

10    information is that the more -- I have a tendency to get my

11    whole thought process off.  So if that is common

12    information that every doctor should know, and you're not

13    going to pay any attention to it when you go and review it,

14    certainly if there's something that's not common, that

15    would be something that you would expect to learn from the

16    manufacturer of the device and not wait until the studies

17    that could be many years down the road come out that

18    suggest there's a problem, if they knew at the time the

19    device was manufactured.  Do you agree with that?

20                   MR. WALKER:  Object to form.

21         A.        That's a pretty convoluted question.

22         Q.        If you want me to restate it, I will, or

23    do you think you understand it?

24         A.        I think I understand it.

25         Q.        Because I don't want you to guess.  I

Brian D. Parker, M.D

1    don't want to confuse you.

2              A.       Right.  So are there things in there that

3    need to be stated that aren't well-known otherwise?  I

4    mean, by the time that these things are made or put in,

5    there's already data on it, so you have to come up with

6    that information somehow, right?  And that data -- I mean,

7    is there any data that we don't see that's out there?  I

8    wouldn't think there's very often that that occurs.  But

9    anything that I think is important could be put in there,

10   but it could not be put in there.

11             Again, as surgeons we just don't use that.

12   I mean, it's not a practical part of daily operation.  I

13   get an IFU every time that I put in an Interstim.  I've not

14   looked at one in years.  I don't understand why people feel

15   like that's the Holy Grail of what we do as surgeons.  I

16   mean, we learn how to do a procedure.  Once we learn how to

17   do the procedure, we already knew the risks and benefits

18   beforehand, we know what the potential side effects are

19   afterward.  I mean, all these things can happen.  We know

20   anything can happen with surgery.  So, you know, the IFU

21   doesn't really play a big role in this.

22             Q.       I guess what my distinction is, certainly

23   between the things that you know or should know as a

24   surgeon, and more focused on the things that you may not

25   have the ability to know because as far as the literature

Brian D. Parker, M.D

```
 1    available to you, it hasn't made its way into the common

 2    knowledge.

 3           A.      Well, I think things like -- for instance,

 4    if I put in a sling and they noticed that patients were

 5    having blue vision, I'd want to know that.  That's

 6    something that doesn't make any sense.  That's completely

 7    off the mark.

 8                   But anything that has to do with vaginal

 9    procedures, bleeding, pain, et cetera, et cetera,

10    et cetera, that's not a big surprise.  What would be a big

11    surprise is if they said that your right knee would hurt or

12    maybe your left elbow would hurt.  I mean, those are

13    off-the-wall things.  Yeah, those things I would want to

14    know, but anything other than that, it's all common

15    knowledge.

16           Q.      So for instance, with regards to the TVT-S

17    device, we discussed earlier about the fact that it was

18    laser cut.

19           A.      Okay.

20           Q.      If the manufacturers of the TVT device

21    understood that the laser-cut mesh had a propensity to

22    cause more frequent and more severe erosions or exposures

23    than the other devices, would that be something that you

24    would expect that they would -- whether it be in the IFU or

25    in the form of some other communication -- make you aware
```

Brian D. Parker, M.D

1  of as soon as they knew about it?

2  MR. WALKER: Object to form.

3  A.  So by stating that you're wanting me to

4  assume that's the truth, that there's a significant

5  difference in the two? Because I'm not going to answer in

6  a way that's going to tell you that I think there's a

7  difference significantly between a TVT-O --

8  Q.  I'm not asking it in the way that you --

9  A.  If you are asking hypothetically --

10  Q.  If there were documents that suggests --

11  A.  If there were documents, okay.

12  Q.  -- that Ethicon was aware of that suggest

13  that the device had a greater risk of erosion than the

14  mechanically-cut devices, and they knew that before they

15  offered that device, do you feel like the company is

16  obligated to make you aware of that before --

17  A.  If there's a huge --

18  MR. WALKER: Hang on a second. Did you

19  finish your question?

20  MS. BAGGETT: -- before you use that device

21  in one of your patients?

22  MR. WALKER: Object to form.

23  THE WITNESS: If there's an enormous

24  disparity, then I think there's something that

25  needs to be said. If it's an inconsistent, small,

Brian D. Parker, M.D

```
 1              then I think that there would be -- the margin of

 2              error or the -- I guess I'm blanking on what I'm

 3              trying to think of.  But the potential that

 4              happens by chance could accommodate for that.  But

 5              if there's a significant change, then that would

 6              be something that we would want to look at.

 7  BY MS. BAGGETT:

 8         Q.     And I understand that as far as this field

 9  of practice goes, you're at the upper end in a urologist's

10  understanding of female anatomy and the procedures and the

11  techniques, but as far as someone on that bottom layer --

12  and I think you also mentioned to me earlier that at least

13  unique to Knoxville, the gynecologists don't perform the

14  same stuff that the urologists do, they refer them to the

15  urologists.

16              So in situations where that's not the

17  case, this is not the norm, and you've got a doctor who is

18  not as well adept at the procedures and the anatomy and the

19  understanding of the disease processes, do you feel that

20  there's any obligation on the manufacturer of warning in a

21  way that helps that type of doctor understand the

22  seriousness of some of the adverse events, if only to allow

23  them to have that conversation with their patients when

24  deciding whether or not to use the device?

25              MR. WALKER:  Object to form.
```

Brian D. Parker, M.D

```
 1           A.       Well, that's a thought.  And I guess
 2    that's something that the individual physician probably
 3    needs to come to terms with, is do they feel comfortable
 4    doing that procedure or not.  I mean, there's certain
 5    procedures I don't feel comfortable with and I'll send off
 6    to others.  But, you know, that's part of the whole --
 7    you're asking me is that -- if you didn't know about a
 8    certain problem, and you were going to go ahead and perform
 9    a procedure, would that be something that you may have not
10    done if you had known there could be a problem to begin
11    with?  Is that what you're asking me?
12           Q.       Yes, sir.
13           A.       I think what you're insinuating there is
14    there's some type of significant discrepancy between what's
15    known and what's true, and that would be hard for me to
16    really believe.
17           Q.       And I'm not asking you to agree with me on
18    any given point whether or not there is such a thing,
19    because we don't have time to go through all the studies
20    and all the internal documents for me to show it to you,
21    and I know you're limited on what you can glean from the
22    few documents I've even shown you today.  Certainly that's
23    one document in millions.
24                    But for the sake of argument, as I said,
25    it's only if that were true and there were events that were
```

Brian D. Parker, M.D

```
 1   serious enough that a doctor might reconsider using it,

 2   especially in a certain population of patients, or at the

 3   very least would have had that conversation with the

 4   patient and allowed them the opportunity to decide, that

 5   would be something important to relay to those doctors?

 6              MR. WALKER:  Object to form.

 7        A.    You know, I think that -- I'm trying to

 8   put myself in the position of those physicians.  And, you

 9   know, if it was a new procedure that just came on the

10   market and there was no precedents before it, it was

11   completely new, I can see that.  But when it's just a

12   variation of what's going on before, I think you already

13   have an idea about what to expect and not expect and side

14   effects and complications.

15              So at that point, you have to make the

16   decision.  And I think you have to be honest with the

17   patient and say, look, I haven't done many of these

18   procedures; if you would rather go see somebody else who

19   has, we can do that.  But it's the conversation.  And I

20   think if it's a completely new procedure that's never been

21   on the market, completely different than anything else, I

22   can see that.  I think in other ways, as a physician, you

23   can assimilate all that information fairly rapidly and come

24   to your own conclusion.

25              I do think there's some -- you know,
```

Brian D. Parker, M.D

1   obviously, the companies are trying to make it easier on

2   the physicians and, therefore, the patients.  And so they

3   don't want to -- they don't want to hide things from the

4   physicians, because if they start having problems, they're

5   going to have a big backlash against that product and they

6   are going to lose confidence in that product.  So I think

7   there's got to be a very open dialogue.  I would expect the

8   company would want that, because, otherwise, there would be

9   a mutiny.

10           Q.      And you were just describing a situation

11   where a product is new to the market.  With regard to the

12   TVT-S, are you aware of any discussions in any of the

13   documents that you've reviewed or in any of the testimony

14   that you've reviewed in preparing your report today of

15   whether or not one of the problems with the learning curve

16   situation with the TVT-S device was because doctors were

17   trying to rely on the procedure they had been taught with

18   the TVT-R and the TVT-O and that procedure was different

19   enough that it wasn't flowing perfectly with the way that

20   this procedure had to be performed, or do you have an

21   opinion at all?

22           MR. WALKER:  Object to form.

23           A.      Yeah, it would be hard for me to really

24   comment on how that all -- I mean, each individual

25   physician's ability to do that.  I mean, it would be a

Brian D. Parker, M.D

```
1   guess on my part.

2           Q.      And if you knew that -- and I think we may

3   have talked about this before, so if I'm repeating, I

4   apologize.  I'm just trying to make sure I've got it clear.

5   But if Ethicon was aware of enough of a difference in a

6   procedure that was subjecting women to additional

7   complications and/or failure of the device because of the

8   lack of proper training or information with regard to the

9   differences in the approach and the technique, do you feel

10  that it's their responsibility to make sure that that is

11  related to the doctors that are going to be using the

12  device?

13                  MR. WALKER:  Object to form.

14  BY MS. BAGGETT:

15          Q.      Do you understand what I'm asking you?

16          A.      So you're asking me if the complication

17  occurs or if there's a change in the procedure enough, that

18  that needs to be relayed to the physician?  Possibly.  This

19  is just so -- you know, I think that it is a new procedure,

20  or it was a new way of putting it in, and so there are

21  little nuances there that I think very quickly could be

22  disseminated to the physicians, either through the work of

23  their sales reps or what have you, or the proctors.  And

24  that could be something done very easily, just a phone call

25  or e-mail saying, hey, make sure you put this in this way,
```

Brian D. Parker, M.D

```
 1    a little bit tighter than normal with the obturator and the

 2    retropubic.  I think that could be a very easy way of

 3    disseminating that information.

 4                    Does that answer your question?

 5         Q.    It does.  Do you know who Dr. Lucente is?

 6         A.    Dr. Lucente?  I've never met the man.

 7         Q.    Have you read about him in the materials

 8    that you reviewed in drafting this report?

 9         A.    Yes, I do remember him, but I'm going to

10    have to go back and review precisely what his role was.

11         Q.    And I'll save you some trouble.  I just

12    want to know if you recall reading anything that suggested

13    that even Dr. Lucente -- who I'll represent to you was one

14    of the KOLs with Ethicon -- whether or not you read

15    anything suggesting he was having trouble with the learning

16    curve as well when he first began using the TVT device?

17                    MR. WALKER:  Object to form.

18         A.    Yeah, I don't recall exactly.

19         Q.    And that's fine.  You reference on page

20    16, in the second paragraph, "Other studies showed inferior

21    cure rates of the TVT-Secur and the TVT-O or

22    TVT-retropubic," and you chalked that up to the learning

23    curve for the placement of the sling because the only

24    variable was the surgeon.  Can you tell me exactly what you

25    meant by that?
```

Brian D. Parker, M.D

1    obligations with reporting, such as that, or tell me,

2    correct me, as to what your opinions will be.

3              A.      My opinions are going to be based on

4    clinical work, not bench work.

5              Q.      And the next section on page 18, we talked

6    about degradation.  Is it fair to say that anything you

7    read with regards to the topic of degradation would have

8    been included in your reliance materials?

9              A.      Yes.

10             Q.      Okay.

11             A.      Well, yes.  I will say, though, that I

12   tried to get a little bit more familiar with that term.

13   And so there were some PubMed searches that I did that I

14   just kind of perused the abstracts of.  I didn't break down

15   every bit of it.  I just tried to learn a little bit more

16   about what that was all about.

17             Q.      But if it had an impact on or changed your

18   opinions, that would have been something you would have

19   listed in your reliance material?

20             A.      Yes.  Yes, ma'am.

21             Q.      Cytotoxicity.  We talked briefly about

22   whether or not the mesh was inert.  I just want to

23   understand whether or not your opinions on cytotoxicity

24   come, again, from your practice and experience with the

25   mesh or if there's some underlying research or material

Brian D. Parker, M.D

1    that you reviewed that you're going to testify with regards

2    to the more basic properties and such, like polymer science

3    and things like that.

4         A.    At this point I'm not planning on

5    testifying as an expert in those bench type of issues.  I

6    know some about it, but not enough that I would feel that I

7    can be -- I'm not going to be able to tell you how those

8    polymers are put together.  I'm not a chemist.

9         Q.    And, let's see, with regards to

10   contraction, your opinion with regard to whether or not

11   mesh contracts once it's in the body, have you read any

12   literature that suggests that the mesh contracts or shrinks

13   over time?

14        A.    The literature that I read suggests

15   there's some initial foreign body reaction, and that can

16   cause a kind of scarring which can cause that a bit.  But

17   when you actually look to see if it moves or contracts,

18   there's no data on that at all.  There were different

19   studies to look at placement of the mesh.  And the biggest

20   thing, from my perspective, that proves it is if there was

21   continued contraction, then we wouldn't see a worsening or

22   a decline in incontinence rates.  We'd see an improvement

23   in incontinence rates and we'd see also an increase in

24   retention rates, which we don't see.

25             So looking at different studies on whether

Brian D. Parker, M.D

1    dynamics, the difference between the dynamics of those two

2    applications?

3            A.      It could be, and let me tell you why it

4    couldn't be.  They used GORE-TEX for mesh repairs in the

5    past.  And then they tried to use that for female slings

6    and it just didn't work.  There was too many problems.  And

7    so that has been abandoned.  But prolene and polypropylene

8    is a different story.

9            Q.      And if you look to page 21, laser-cut mesh

10   versus mechanically-cut mesh, we talked about that briefly

11   earlier.  As far as your opinions here, you say that the

12   mesh is not defective because of the way that it's cut.

13   Can you tell us a little bit more about how you came to

14   that conclusion?

15           A.      Right.  So if you look at studies from

16   TVT-O, there's some TVT-O that's laser cut and some that's

17   mechanically cut.  Personally, I think if you polled most

18   physicians, they wouldn't know the difference in what they

19   were holding.  But if you were to look at the studies to

20   see if there was a difference, you're not going to find it.

21   And so based on that, you have to then conclude that

22   whether it's laser or mechanical cut, it's of no clinical

23   difference.  There's just no studies.  There's nothing

24   there to support it.

25           Q.      As far as your review in preparing your

Brian D. Parker, M.D

1    opinions on that matter in this case, do you recall

2    reviewing any documents, internal documents, from Ethicon

3    that suggest that there was a concern --

4         A.      Uh-huh.

5         Q.      -- with regard to these differences and

6    whether or not they actually did make a difference in the

7    success rates or the safety profile of the product?

8                 MR. WALKER:  Object to form.

9         A.      Yes, I do remember seeing internal

10   documents and there were conversations.  And I think those

11   conversations had to be had because there was a difference.

12   But, again, I'm looking at it from a perspective of is

13   there any data to suggest there's a problem or a

14   difference.  And if there is, I'm not aware of it.

15                So conversations and those things have to

16   take place within a company.  I'm not worried about that.

17   It doesn't change my viewpoint.  And I actually applaud

18   them for thinking outside the box.  But I don't see that

19   it's been borne out in any literature.

20        Q.      If Ethicon were to become aware of the

21   inferiority of a particular aspect of their product, would

22   you expect them to take the steps necessary to fix whatever

23   was making the product inferior in some aspect?

24                MR. WALKER:  Object to form.

25        A.      You know, in that situation, if you're

Brian D. Parker, M.D

```
 1            A.      As of now, yes.

 2            Q.      And are all of those opinions based on

 3    your education, training, experience, review of the medical

 4    literature?

 5            A.      Yes.

 6            Q.      Do you offer all of these opinions to a

 7    reasonable degree of medical certainty?

 8            A.      I do.

 9                    MR. WALKER:  That's all I have, Doctor.

10            Thank you.

11                    MS. BAGGETT:  Very quickly, just a couple

12            of things.

13                    (Time 1:34 p.m.)

14                            EXAMINATION

15    BY MS. BAGGETT:

16            Q.      Now, in the questioning by defense counsel

17    you were asked about particle loss and whether or not it's

18    had a clinically significant impact on patients that you've

19    treated.  At least that's the way I understood it.  You can

20    correct me if that's wrong.

21                    But my question is, have you been trained

22    in pathology or do you perform any activities involving

23    analysis of pathological specimens?

24            A.      We have been trained in pathology as part

25    of our residency training and part of the testing that we
```

Brian D. Parker, M.D

1 have to do when we get out of residency. As far as the

2 day-to-day processing of it, no, but it is something that

3 we will oftentimes go to the pathologist and review slides

4 and discuss things with him, go to tumor conferences, other

5 things where we have to discuss pathology and review

6 pathology.

7 Q. In your normal course of practice, is it

8 your habit to review the pathology that you remove from

9 your patients for any signs of particle loss or the impact

10 that it may or may not have on it? Is that something that

11 you do routinely in your practice?

12 A. That's something that nobody does

13 routinely, ma'am.

14 Q. And you have not undertaken any efforts to

15 study whether or not there is particle loss and whether or

16 not that particle loss has any clinically significant

17 impact on the outcomes of the patients who were implanted

18 with the device, have you?

19 A. So you're asking me if I've looked at any

20 studies based on particle loss?

21 Q. No. No. It's even simpler than that.

22 Have you conducted any studies or analyses and are you

23 involved in any study that looks at the pathology of

24 removed mesh devices to determine whether or not particle

25 loss is something that happens, that occurs and whether or

Brian D. Parker, M.D

1    not it's clinically significant?

2          A.      I'm not involved in a study of that

3    nature.

4          Q.      You were asked about ranking the

5    importance of information that you relied on in determining

6    your opinions in this case, and with respect to the

7    internal documents, obviously, they are not Level 1

8    evidence like a study would be, but do the internal

9    conversations and recordings of the device manufacturer

10   that place a product on the market have any bearing -- any

11   insight that you can glean from the development of that

12   product and the company's understanding of that product?

13                 MR. WALKER:  Object to form.

14         A.      That would be something that -- no, I

15   cannot tell from just those company documents what their

16   next step would be.  What I can tell you is when I see

17   company documents like that, it just tells me that the

18   company is always reviewing what's going on.  And I

19   wouldn't anticipate, even if they were doing -- whether the

20   product they feel is doing perfectly or there's some

21   improvements on it, I would anticipate internal documents

22   to try to comment on things they can continue to improve

23   on.  And whether that has -- you know, those things have no

24   basis as far as what actually happens with the patients and

25   the clinical data, all of that.  So it's something we