# EXHIBIT  C

Steven Goldwasser, M.D.

```
 1           IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3
    IN RE:  ETHICON, INC., PELVIC REPAIR
 4  SYSTEM PRODUCTS LIABILITY  Master File No. 2:12-M-02327
    LITIGATION                 MDL No. 2327
 5                             General re: PROLIFT matter
    THIS DOCUMENT RELATES TO ALL
 6  WAVE 4 AND SUBSEQUENT WAVES CASES
    AND PLAINTIFFS:
 7
    Lisa Flowers
 8  Case No. 2:12-cv-03922
 9  Claudine Paul
    Case NO. 2:12-cv-04808
10
11  Betty Thornton
    Case No. 2:12-cv-05115
12  _____
13
14        DEPOSITION OF STEVEN GOLDWASSER, M.D.
             PURSUANT TO NOTICE OF DEPOSITION
15
16        Taken on Behalf of the Plaintiffs
17  DATE TAKEN:  March 29, 2017
    TIME:        8:37 a.m. - 12:19 p.m.
18  PLACE:       Courtyard Marriott Jacksonville Flagler
                 Center
19               14402 Old St. Augustine Road
                 Jacksonville, FL 32258
20
21      Examination of the witness taken before:
22            Stephanie Powers Cusimano
            Registered Professional Reporter
23             GOLKOW TECHNOLOGIES, INC.
          877.370.3377 ph -  917.591.5672 fax
24                 deps@golkow.com
25
```

Steven Goldwasser, M.D.

Page 2

```
 1         A P P E A R A N C E S
 2     GREGORY D. BENTLEY, ESQUIRE
 3     Zonies Law, LLC
       1900 Wazee Street
 4     Suite 203
       Denver, CO 80202
 5
 6     Appearing on behalf of Plaintiffs.
 7
 8     ERIC RUMANEK, ESQUIRE
 9     Troutman Sanders LLP
       Bank of America Plaza
10     Suite 5200
       600 Peachtree Street, N.E.
11     Atlanta, GA 30308-2216
12     Appearing on behalf of Defendant.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2  WITNESS:
 3  STEVEN GOLDWASSER, M.D.
    DIRECT EXAMINATION BY MR. BENTLEY .............4
 4  CROSS EXAMINATION BY MR. RUMANEK ............204
    REDIRECT EXAMINATION BY MR. BENTLEY .........221
 5  RECROSS EXAMINATION BY MR. RUMANEK ..........226
    FURTHER REDIRECT EXAMINATION BY MR. BENTLEY .226
 6
 7
 8
 9
10         E X H I B I T S
11  FOR IDENTIFICATION
    EXHIBIT 1 deposition notice ...................4
12  EXHIBIT 2 CV   ...............................15
    EXHIBIT 3 Goldwasser report .................43
13  EXHIBIT 4 reliance list .....................44
    EXHIBIT 5 5/09 e-mail .......................81
14  EXHIBIT 6 pre-study questionnaire ...........85
    EXHIBIT 7 publication .......................96
15  Exhibit 8 Exair Prolapse ....................98
    EXHIBIT 9 Neo usability study ..............103
16  Exhibit 10 Coloplast brochure .............113
    EXHIBIT 11 Committee Opinion 513 ...........149
17  EXHIBIT 12 Cochrane Group ..................164
    EXHIBIT 13 '13 abstract ....................181
18  EXHIBIT 14 2012 Stanford study .............189
    EXHIBIT 15 degradation article .............194
19
20
21
22
23
24
25
```

Page 4

```
 1         S T I P U L A T I O N
 2     It was stipulated and agreed by and between
 3  counsel for the respective parties, and the witness,
 4  that the reading and signing of the deposition by the
 5  witness not be waived.
 6            - - -
 7     STEVEN GOLDWASSER, M.D.,
 8  having been produced and first duly sworn as a
 9  witness, having responded, "I do," testified as
10  follows:
11         DIRECT EXAMINATION
12  BY MR. BENTLEY:
13     Q   Good morning, Dr. Goldwasser.  My name is
14  Greg Bentley.  We met briefly off the record.  Do
15  you understand that we're here today to take your
16  deposition for the plaintiffs in the Ethicon MDL?
17     A   Yes.
18     Q   And this is regarding your PROLIFT
19  opinions; is that correct?
20     A   Correct.
21     Q   I'm handing you what's being marked as
22  Exhibit 1, and this is a deposition notice for
23  today.  Have you seen that before?
24        (Exhibit 1 was marked for identification.)
25     A   No.
```

Page 5

```
 1     Q   If you'd look -- the first page is really
 2  just a legal document instructing you of the time
 3  and place, which we're here, so you made that, but
 4  there's some document requests at the back, I think
 5  it's in Exhibit A.  If you'd turn to that, please.
 6  You with me?
 7     A   I'm getting there.
 8     Q   And I guess just a little bit of
 9  background.  Doctor, have you been deposed before?
10     A   Yes.
11     Q   So you're probably familiar with the
12  rules, but just so we're clear, when I ask a
13  question, if you don't understand it, please let me
14  know.  And if you answer the question, I'm going to
15  assume that you understood it; is that fair?
16     A   Correct.
17     Q   And is there any reason why you can't
18  testify truthfully and accurately today?
19     A   No.
20     Q   And you understand that you're here today
21  to testify under oath like you're in front of a jury
22  or a judge?
23     A   Correct.
24     Q   And so turning back to Exhibit 1, are
25  you -- I think the document request's on Exhibit A?
```

Steven Goldwasser, M.D.

Page 6

1    A    Yes.
2    Q    And I think you said you didn't
3    necessarily review this document, but were you asked
4    to look for any documents in preparation for this
5    deposition?
6         MR. RUMANEK:  And let me just note on the
7    record, I mean, I don't want you to -- I'll say
8    on the record we've gone through it.  I don't
9    know whether he remembers seeing it or not.
10        MR. BENTLEY:  Sure.
11        MR. RUMANEK:  And we've brought some
12   documents --
13        MR. BENTLEY:  Right.
14        MR. RUMANEK:  -- to the deposition, so I
15   don't know if you want to identify those on the
16   record or if you want to go through it with
17   him, whatever --
18        MR. BENTLEY:  We can go through it in a
19   second and clean up.
20   BY MR. BENTLEY:
21   Q    Let's just briefly look at the categories,
22   Doctor.  If I could see Exhibit 1 real fast.  I
23   didn't bring another copy.
24        All right.  So the first item is a CV,
25   which I think you provided that to us; is that

Page 7

1    correct?
2    A    Correct.
3    Q    And have you updated your CV since you
4    provided it to us?
5    A    I don't believe so.
6    Q    And then item 2 is, "Any documents in your
7    possession, which you created or you have relating
8    to your opinions in this litigation."  Do any of
9    those documents exist or have you produced them?
10   A    Repeat that one more time.
11   Q    Have you created any documents in
12   preparation for --
13   A    Oh, no, no.
14        MR. RUMANEK:  Well, let me -- he's created
15   a report.  I don't know what --
16   Q    Right.  In addition to the report and to
17   the -- obviously the literature cited, which I
18   assume is in that binder, have you done any other
19   type of analysis, summaries, reports in preparation
20   for developing your opinions here?
21   A    Nothing written.
22   Q    And you have a binder in front of you, is
23   that the literature that you cited in your report?
24   A    Correct.
25   Q    In addition, you reviewed some other

Page 8

1    documents, as indicated on your reliance list, which
2    we'll look at in a little bit.  Are all the
3    documents you reviewed on your reliance list?
4    A    Correct.
5    Q    And you didn't bring any of the documents
6    you reviewed to the deposition today?
7         MR. RUMANEK:  Object to the form.
8    A    Any documents -- can you repeat that one
9    more time?
10   Q    Did you bring any of the other documents
11   except for the stuff in that binder?
12        MR. RUMANEK:  (Indicating.)
13        MR. BENTLEY:  Counsel is showing me a
14   flash drive.
15        MR. RUMANEK:  Yes, so we have a flash
16   drive that is noted as Goldwasser General
17   Materials, which has, I believe, everything
18   that's on his reliance list --
19        MR. BENTLEY:  Okay.
20        MR. RUMANEK:  -- certainly what was
21   provided to him.
22        MR. BENTLEY:  Good.
23   BY MR. BENTLEY:
24   Q    Do you have any Ethicon products in your
25   possession?

Page 9

1    A    No.
2    Q    Did you bring with you to the deposition
3    time sheets, invoices, things like that?
4    A    No.
5    Q    Did you bring copies of any consulting
6    agreements or reports you provided to Ethicon as a
7    consultant?
8    A    No, only this --
9    Q    Just the literature?
10   A    -- general report.
11   Q    Did you bring any information regarding
12   studies you've done or your case log or data
13   analyses?
14   A    Yeah, I do have an abstract of some --
15   Q    Other than that you didn't bring any
16   other --
17   A    Correct.
18   Q    And do you have other -- obviously other
19   information regarding your case log and analyses and
20   abstract and that such?
21        MR. RUMANEK:  Object to the form.
22   A    I do have an ongoing database --
23   Q    Right.
24   A    -- but I don't have it with me.
25   Q    And do you have summary reports that you

Steven Goldwasser, M.D.

Page 10

1  keep, or what type of analysis do you have?
2    A    Just what's in the abstracts presented.
3    Q    And who does the statistical analysis of
4  your case log?
5    A    I couldn't tell you exactly.
6    Q    You don't do it personally?
7    A    Correct.
8    Q    When have you been deposed before, Doctor?
9    A    I was deposed, I believe, sometime in
10  2016.
11    Q    And is that the only time you've been
12  deposed prior to today?
13    A    I think I was deposed one time prior, but
14  I couldn't tell you exactly.
15    Q    Let's start with the first time, what was
16  the context of that deposition?
17    A    You mean in 2016?
18    Q    Sure.
19    A    That was regarding product liability.  I
20  was deposed as an expert witness.
21    Q    And was that involving a mesh product?
22    A    I believe it was.
23    Q    And were you hired as a defense expert
24  witness?
25    A    I was -- I'm trying to think.  Yes.  Well,

Page 11

1  I actually treated the patient, so I was there in
2  that context.
3    Q    So, you know, it's a legal distinction,
4  I'm not sure -- I think you probably would
5  understand.  You know, if you're testifying as a
6  fact witness regarding your treatment of a patient,
7  that would be considered a fact witness versus today
8  you're here as an expert for the defendant, Ethicon;
9  is that correct?
10    A    Correct.
11    Q    And so in 2016 when you were deposed, what
12  was the context of your -- of your role in that
13  deposition?
14    A    I believe I was a -- well, I couldn't tell
15  you exactly.  I don't recall.
16        MR. RUMANEK:  I think it was in the
17  context of him as an implanting physician.
18    Q    Okay.  What --
19    A    Actually I was a treating -- I think I was
20  treating.
21    Q    Right.
22    A    I think I --
23        MR. RUMANEK:  Yes, it was as a fact
24  witness.
25        MR. BENTLEY:  Got you.  Got you.

Page 12

1    Q    And what product was in that -- was that
2  deposition concerning?
3    A    You know, I don't recall whether it was
4  Bard or Ethicon, I don't recall.
5    Q    So other than that deposition, have you
6  been deposed any other times in your career?
7    A    There was one other one in 2016, same
8  circumstances.
9    Q    Okay.
10    A    And prior to that, I couldn't tell you
11  exactly, I don't remember.
12    Q    Have you worked as an expert witness in --
13  any other time besides in this litigation today?
14    A    No.
15    Q    Have you ever testified at trial?
16    A    No.
17    Q    Are you excited to testify at trial?
18    A    Oh, sure.
19    Q    So let's talk about -- a little bit about
20  your preparation for today.  When did you start
21  working on your opinions in this case?
22    A    I believe it was, let's see, probably the
23  end of 2016.  I don't remember exactly which month,
24  but sometime right around there.
25    Q    And since we don't have the invoices, I'm

Page 13

1  going to go into this a little bit, approximately
2  how much time did you spend preparing your report?
3    A    Preparing the report, I couldn't tell you
4  exactly.  Probably at least 20 hours, possibly more.
5    Q    And have you billed for that time yet?
6    A    No.
7    Q    When do you anticipate billing for that
8  time?
9    A    At the end of the closing of this wave of
10  cases.
11    Q    You currently have time sheets recording
12  how much time you spent on that report?
13    A    Correct.
14    Q    When did you start preparing for this
15  deposition?
16        MR. RUMANEK:  Object to the form.
17    A    Probably about two or three weeks ago.
18  Originally it was scheduled and canceled and
19  rescheduled.  It's probably about three weeks ago.
20    Q    And did you meet with Counsel in
21  preparation for this deposition?
22    A    Correct.
23    Q    How many times did you meet?
24    A    Twice.
25    Q    And how long were those two meetings?

Steven Goldwasser, M.D.

Page 14

1    A    The first meeting was probably like around
2  six or seven hours, and the second meeting was
3  around four or five hours.  Probably about four
4  hours.
5    Q    And in addition to those meetings with
6  Counsel, did you do any preparation on your own for
7  the deposition today?
8    A    Correct.
9    Q    And how much time did you spend preparing
10  on your own?
11    A    Probably about 15 hours.
12    Q    Did you review materials in preparation
13  for today?
14    A    Correct.
15    Q    Did you review any materials in addition
16  to that which is cited in your report and listed on
17  your reliance list?
18    A    I don't believe so.
19      MR. RUMANEK:  Let me just clarify because
20  I'm not 100 percent sure.  I think we did -- he
21  did look at his abstracts, what he's brought
22  with him, and I'm not certain if those are
23  specifically on the reliance list.
24      MR. BENTLEY:  Okay.
25    Q    Doctor, let me hand you what's being

Page 15

1  marked as Exhibit 2, which I believe is a copy of
2  your CV.  Does that look correct?
3      (Exhibit 2 was marked for identification.)
4    A    Correct.
5    Q    And does this contain a complete and
6  accurate list of your education and experience and
7  publications and such?
8      MR. RUMANEK:  Object to form.
9    A    To the best of my recollection, correct.
10    Q    As you sit here today, do you have any
11  items that you need to add that you're aware of?
12    A    No.
13    Q    And let's just briefly go over your
14  education.  Where did you go to school, Doctor?
15    A    For undergraduate?
16    Q    Yeah.
17    A    University of California, San Diego.
18    Q    And then for med school?
19    A    Tulane.
20    Q    Tulane.  And then you did a fellowship
21  under Mickey Karram?
22    A    Correct.
23    Q    Do you still keep in touch with Mickey?
24    A    From time to time.
25    Q    And I noticed you did a -- you published

Page 16

1  with Dr. Karram?
2    A    Correct.
3    Q    On the last page of your CV, which is
4  marked as Exhibit 2, you have a section called
5  Inventions; do you see that?
6    A    Correct.
7    Q    And what device are you describing there?
8    A    This -- well --
9      MR. RUMANEK:  Object to form.  To -- are
10  you asking about the first one, the second one,
11  or both?
12    Q    Or are they the same device you're
13  talking --
14    A    No, they are two separate devices.
15    Q    So what are the devices that you're
16  talking about?
17    A    So the first one is regarding a product
18  called Ex- -- which actually came to be known as
19  Exair, which is a mesh-based product for the
20  treatment of prolapse, and the second one is a
21  surgical retractor.
22    Q    So let's talk about the first one.  It's
23  a -- you helped design a product called Exair?
24    A    Exair, correct.
25    Q    And who did you work on designing that

Page 17

1  product with?
2      MR. RUMANEK:  Object to the form.
3    A    A colleague of mine, another physician.
4    Q    And was that product eventually brought to
5  market?
6    A    Correct.
7    Q    And who marketed that product?
8    A    Coloplast.
9    Q    And was that for the treatment of
10  prolapse?
11    A    Correct.
12    Q    And it was a polypropylene-based product?
13    A    Correct.
14    Q    And what was your involvement in designing
15  that product?
16    A    Technique.  Bas- -- mainly technique
17  based.
18    Q    You didn't actually like design the mesh
19  itself?
20    A    Correct.
21    Q    Did you design maybe the inserters or --
22  I'm just trying to flush out what you actually did
23  on that imaging.
24    A    My role was the actual technique itself
25  for implant of the mesh, and the actual mesh itself

Steven Goldwasser, M.D.

Page 18

1 was -- was a product that Coloplast owned. The
2 inserters were developed by the engineers over
3 there.
4    Q    And did you assist in the development of
5 marketing materials for that product?
6    A    No.
7    Q    Did you assist in developing professional
8 education materials for that product?
9    A    I don't believe so directly.
10    Q    Would -- did you assist in the regulatory
11 submissions for getting approval for that product?
12    A    No.
13        MR. RUMANEK:  Object to the form.
14    Q    Did you assist in drafting the IFU for
15 that product?
16    A    I believe I was involved in reviewing it
17 but not directly hands on writing it.
18    Q    Would you have been involved in writing
19 the procedural aspects of the IFU maybe?
20    A    I believe so.
21    Q    Do you remember if you were involved in
22 writing the Adverse Reaction section?
23        MR. RUMANEK:  Object to the form.
24    A    No.
25    Q    I'm sorry, no, you don't remember or no,

Page 19

1 you weren't involved in that?
2    A    I don't think I was -- I don't think I was
3 involved.
4    Q    Is that product still on the market today?
5    A    No.
6    Q    Did you have a financial interest in that
7 product?
8    A    Just in the development consultation base.
9    A    It was an hourly?
10    A    Correct.
11    Q    So if I saw some documents to indicate you
12 had a financial interest, that wouldn't be correct?
13        MR. RUMANEK:  Object to the form.
14    A    Only as a consultant, correct.
15    Q    When you were designing that product, I
16 would assume you supported and you thought what you
17 were doing was useful, right?
18    A    Correct.
19    Q    Did you -- did you think that the finished
20 product you helped design was a safe and effective
21 device to be used?
22    A    Yes.
23    Q    And did you end up using that device once
24 it came on the market?
25    A    Correct.

Page 20

1    Q    I think I've seen you previously worked as
2 a preceptor for Ethicon; is that correct?
3    A    Correct.
4    Q    And when did you first -- or what is a
5 preceptor?
6    A    A preceptor is a -- well, I was actually
7 involved more so not -- I don't believe I was
8 demonstrating the procedure on patients in the
9 hospital with people visiting, I believe I was the
10 instructor for cadavers and reviewing the technique.
11    Q    And what products were you demonstrating
12 technique for on cadavers?
13    A    I believe it was the retropubic TBT and
14 the PROLIFT device.
15    Q    When do you think you were teaching on the
16 TBT retropubic?
17    A    At the -- I believe it was the same time
18 as the PROLIFT device.  I couldn't tell you the
19 exact year, but they overlap.
20    Q    Well, because -- do you have an
21 understanding that PROLIFT came on the market around
22 2005?
23    A    Correct.
24    Q    So you think that you didn't -- you
25 weren't teaching TBT until around 2005?

Page 21

1        MR. RUMANEK:  Object to the form.
2    A    You know, I don't recall whether I did
3 some separate things for them prior to that.
4    Q    When did you first begin using mesh
5 products in your practice?
6    A    Probably early 2000s, prior to 2005.
7    Q    And would you have first used the mesh --
8 a mesh product, like a mid urethral sling, to treat
9 incontinence?
10    A    Oh, no -- okay.  The first question was on
11 prolapse, you said?
12    Q    Just generally --
13    A    General.
14    Q    -- when did you -- I'm trying to see when
15 your experience began with mesh.
16    A    So first experience would be retropubic
17 slings in '98.
18    Q    And before that did you use any
19 non-polypropylene mesh products?
20        MR. RUMANEK:  Object to the form.
21    A    Not that I recall.
22    Q    And then around '98 when TBT classic came
23 to market, you began using it to treat women with
24 incontinence; is that correct?
25    A    Correct.

Steven Goldwasser, M.D.

Page 22

1    Q    And then subsequent to that, you began
2  using a mesh-based product to treat women that's
3  suffering from prolapse; is that correct?
4    A    Correct.
5    Q    And that -- what would have been the first
6  product that you used whether it was a
7  polypropylene-mesh-based product for prolapse
8  treatment?
9    A    Probably -- it was either a Bard product
10  or Gynemesh, one of the two.
11    Q    Okay.
12    A    I don't remember which I was using first.
13    Q    Are those the -- have you used products
14  from any other manufacturers besides Bard and
15  Ethicon, any other mesh products?
16        MR. RUMANEK:  Object to the form.
17    Q    To treat -- let me rephrase it.
18        Have you used any other polypropylene mesh
19  products besides those made by Bard and Ethicon to
20  treat prolapse or incontinence in the pelvic area of
21  women?
22        MR. RUMANEK:  And he's already mentioned
23  Coloplast.
24        MR. BENTLEY:  Okay.  Thank you.
25  Coloplast.  We'll go through it.

Page 23

1    A    I believe I may have used one of the AMS
2  devices and I think I've used a Boston Scientific
3  device as well.
4    Q    So going to the beginning, you initially
5  used an Ethicon TBT classic for incontinence around
6  '98; is that correct?
7    A    Correct.
8    Q    And then after that, do you have any
9  recollection of what mesh product you used next for
10  incontinence or prolapse?
11    A    I think I was using the Uro-Tex, which is
12  from Bard, for a period of time.
13    Q    And what is Uro-Tex used to treat?
14    A    Stress urinary incontinence.
15    Q    Do you recall when you switched or started
16  using that in addition to the Ethicon product?
17    A    I believe I started using that when I
18  joined the university in 2000.
19    Q    And when you started using the Uro-Tex,
20  was there a reason you switched to that product
21  instead of TBT or did you continue to use both of
22  them?
23    A    You know, I can't remember.  I think maybe
24  they didn't have it here when I arrived and so I
25  used the Bard.

Page 24

1    Q    And then around 2000 you began using the
2  Bard Uro-Tex to treat stress urinary incontinence.
3  What's the next polypropylene-based product that you
4  used?
5    A    For stress urinary incontinence?
6    Q    Sure.
7    A    I think I went back to the TBT after that.
8    Q    And then around when did you start using
9  polypropylene to treat prolapse?
10    A    Probably early 2000s, prior to 2000- --
11  prior to PROLIFT, I was using free-cut graft.
12    Q    And is it your testimony that you were
13  using either a Bard mesh or Ethicon Gynemesh mesh?
14    A    Correct.
15    Q    Did you have any preference to either of
16  those meshes or it was just what was available at
17  the hospital?
18    A    Basically what was available.
19    Q    And then did you continue using whatever
20  was available at the hospital until the kits came or
21  was there any -- did you change your preferences
22  before the kits were available for treating
23  prolapse?
24    A    You know, I don't recall exactly what went
25  into the thought process of what I was using at the

Page 25

1  time.
2    Q    Sure.  Did you have similar efficacy
3  results in your opinion regardless of whether it was
4  the Bard mesh or the other kind of mesh to treat
5  prolapse?
6    A    I believe so.
7    Q    And likewise, did you have similar
8  complication rates regardless of whether it was a
9  Bard mesh or the Ethicon mesh in treating prolapse?
10    A    You know, I don't recall specifically.
11    Q    You don't recall any differences between
12  the two?
13    A    Correct.
14    Q    And so that was around 2002, 2003
15  possibly, and then PROLIFT came to market around
16  2005; is that correct?
17    A    Correct.
18    Q    Was PROLIFT the first polypropylene-based
19  mesh kit that you used to treat prolapse?
20    A    Correct.
21    Q    And how did you become to use PROLIFT?
22    A    Basically I was introduced to the product
23  through probably a sales rep, and I think I started
24  reading some things about the product, about new
25  products on the market, progressed from there.

Steven Goldwasser, M.D.

Page 26

1    Q    And did you attend a training session for
2  PROLIFT?
3    A    Correct.
4    Q    And do you remember who you trained under?
5    A    I believe it was Jaime Sepulveda.
6    Q    And where was that training, if you
7  recall?
8    A    I remember being in Miami, that may have
9  been a preceptor, but I don't remember exactly where
10  the training per se I did, the cadaver training was.
11    Q    And do you recall if that was in 2005?
12    A    Probably right around that period of time,
13  yeah.
14    Q    And before -- let's back up a little bit.
15  Before you started using the free-cut mesh products
16  made from Bard and Ethicon to treat prolapse, how
17  were you treating women with prolapse?
18    A    With biologic grafts and plication, native
19  tissue repair.
20    Q    What biological grafts were you using?
21    A    I don't remember exactly what the brand
22  names were at the time.  They were --
23    Q    Were they porcine or do you remember?
24    A    There was -- I think there was a Cavender
25  fascia graft and also Bard made -- I don't remember

Page 27

1  what -- Pubcall or Pubalace [phonetic].  It was
2  either a porcine, but I don't remember exactly what
3  it was.
4    Q    And then you said you were also doing
5  native tissue repair at that time?
6    A    Correct.
7    Q    And how were you -- how would you decide
8  which treatment to recommend for any given patient
9  with prolapse?  You know, when you had biological
10  grafts and native tissue repair options, what was
11  your process for deciding which one you thought was
12  best for the patient?
13    A    It completely depended upon the
14  circumstances.
15    Q    So what circumstances would have made the
16  biological graft the appropriate -- in your opinion,
17  the appropriate treatment recommendation?
18    A    Patients with prior failures, potentially
19  a patient with just subjectively poor tissue
20  quality.  Those are the two most prominent ones that
21  come to mind.
22    Q    And that's for the biological grafts,
23  right?
24    A    Right.
25    Q    And so I think based on that answer, you

Page 28

1  would have recommended native tissue repair for
2  patients that had not had prior failures; is that
3  correct?
4        MR. RUMANEK:  Object to the form.
5    Mischaracterizes the testimony.
6    A    Repeat that one more time.
7    Q    Well, who would you -- I think you just
8  described the biological grafts you used for
9  patients maybe with prior failures who had
10  subjective tissue weaknesses or problems; is that
11  correct?
12    A    Correct.
13    Q    And so patients that didn't have prior
14  failures and that didn't have this objective tissue
15  quality issues, would those have been in the
16  patients you would have recommended native tissue
17  repair?
18    A    Not necessarily.
19    Q    Well, who would you have recommended
20  native tissue repair to?
21    A    It all depends on the circumstance.
22    Q    Right, and I'm trying to figure out those
23  circumstances here.
24    A    Well, again, there's a lot of factors that
25  come into play --

Page 29

1    Q    Right.
2    A    -- so I couldn't give you a specific broad
3  answer for that, but maybe a native tissue repair
4  might have to do with age, patient counseling,
5  things like that.
6    Q    So using your first condition, age, how
7  would that play into your decision of whether or not
8  to recommend native tissue repair?
9    A    Well, it depends, because your first
10  attempt to fix prolapse is usually your best shot at
11  it, and so based on age, type of work they do, the
12  failure rates associated with native tissue repair,
13  generalized counseling.  So there isn't -- you know,
14  I'd need a specific event, you know, a specific
15  patient and their profile to give you that, you
16  know, more specific answer.
17    Q    So I still just don't understand.  You
18  said that based on age, you may recommend native
19  tissue repair for a given patient.
20    A    Right.
21    Q    So if they were younger, would that lead
22  you more likely to recommend native tissue repair as
23  opposed to a biological graft; is that --
24    A    Not necessarily, because the younger you
25  are, the more chance you have for failure, and

Steven Goldwasser, M.D.

Page 30

1  failure has been established for native tissue
2  repair to a certain degree. So again, it really
3  depends on the circumstances.
4      Q   So older patients would be the ones you
5  would be more likely to recommend native tissue
6  to -- repair to?
7      A   In some cases.
8      Q   So for a younger patient, what would you
9  recommend back in the day before you were using
10 polypropylene mesh products?
11     MR. RUMANEK: Object to the form.
12     A   I would -- for a younger patient prior to
13 polypropylene, I was mainly doing native tissue
14 repair, however, intra-operatively if I talked to
15 them ahead of time about using biologics and I
16 thought that subjectively the tissue quality was
17 lesser than what I would have wanted, then I may
18 have put a biologic in.
19     Q   And then if the tissue quality was not
20 subjectively problematic or had quality issues, if
21 the tissue looked okay and they were a little bit
22 younger, that would be more likely your recommended
23 patient for native tissue repair; is that correct?
24     A   Not always, but typically correct.
25     Q   Generally, right. And I appreciate that

Page 31

1  there's exceptions and everything's very
2  individualized, but we're trying to understand, you
3  know, how you thought what was appropriate for any
4  given groups of patients, okay?
5      A   Okay.
6      Q   And I think you mentioned that, you know,
7  there was some failure issues with native issue
8  repair, which might have made you recommend other
9  options sometimes; is that correct?
10     A   Correct.
11     Q   And you're referring to your personal
12 experience, you had a lot of failures with native
13 tissue repair?
14     A   Not necessarily.
15     Q   Right, and you're talking about maybe some
16 literature that indicated there was failure rates;
17 is that --
18     MR. RUMANEK: Object to the form.
19     A   Well, a combination. Also another problem
20 with native tissue repair is that you do some
21 excision of the vaginal wall and that can create
22 dyspareunia and so forth. It's also something to
23 take into consideration.
24     Q   Yeah, and that wasn't really my question.
25 In your personal experience, did you have high

Page 32

1  failure rates with native tissue repair?
2      A   I couldn't tell you specifically.
3      Q   I mean, if you were having --
4      A   Well --
5      Q   -- problems with native tissue repair,
6  would you have been doing it -- would you have been
7  performing that procedure on your patients?
8      MR. RUMANEK: Hold up. Object to the
9  form.
10     A   What do you define as failure?
11     Q   Well, I'm asking you, Doctor. You're --
12 you testified that there was issues with failure of
13 native tissue, and I'm trying to see if you're
14 making a statement based upon your personal
15 experience doing this procedure, if you had patients
16 that were having massive failure rates or if you're
17 just basing that on the literature? Do you
18 understand kind of the distinction I'm making?
19     A   Yes, a combination of the two. I mean,
20 there weren't massive failure rates --
21     Q   Right.
22     A   -- but the literature also points to a
23 higher failure rate with native tissue repair, and
24 so taking these all into consideration.
25     Q   And we'll talk about the literature. I'm

Page 33

1  kind of right now trying to flush out what your
2  personal experience came to be --
3      A   Right.
4      Q   -- because you would agree every patient's
5  different, right?
6      A   Uh-huh.
7      Q   And every doctor's different surely,
8  right?
9      A   Right.
10     Q   And different surgeons have different
11 opportunities to do more surgery versus others,
12 right?
13     A   Correct.
14     Q   And you would agree that higher -- doctors
15 that do more frequent surgery have -- probably have
16 higher success rates, right?
17     MR. RUMANEK: Object to the form.
18     A   Correct.
19     Q   The literature shows that, right?
20     A   Correct.
21     Q   And you're a fairly busy surgeon doing
22 these surgeries, right?
23     A   Correct.
24     Q   So we would expect your surgery failure
25 rates to be pretty good, right?

Steven Goldwasser, M.D.

Page 34

1        MR. RUMANEK:  Object to the form.
2    A    Failure rates to be pretty low, you mean?
3    Q    I'm sorry, your success rates are going to
4 be pretty high, right?
5        MR. RUMANEK:  Object to the form.
6    A    I'd hope.
7    Q    Right, because you're -- I mean, part of
8 the reason -- I've seen documents, you're a great
9 surgeon, but you're also a busy surgeon, so you have
10 lots of experience, right?
11   A    Correct.
12   Q    All right.  So you were doing biological
13 grafts and native tissue repair prior to 2002
14 generally before the mesh -- the free mesh box came
15 on, and then around 2005 you started using a PROLIFT
16 kit; is that correct?
17   A    Correct.
18   Q    And when the PROLIFT kit -- when you
19 became -- when you were trained on PROLIFT and you
20 started using that, did you still continue to use
21 biological grafts in your practice?
22   A    I don't recall specifically, but I think I
23 was transitioning over at that point.
24   Q    You would have still done native tissue
25 repair based on some patients, though, at that time,

Page 35

1 right?
2    A    Possibly.
3    Q    Right.  So is it fair to say maybe
4 polypropylene kits like PROLIFT would have replaced
5 largely your biological grafts that you were using
6 as one of the surgical options for prolapse once
7 they came on the market?
8    A    Correct.
9    Q    And then after 2005 when you started to
10 use PROLIFT, did you continue to use that product or
11 when did you -- let me rephrase it.
12       After PROLIFT came to market and you were
13 trained on it and started to use that, did you
14 continue to use that for several years?
15   A    Correct.
16   Q    And did you incorporate or were you
17 trained on another mesh product after the PROLIFT to
18 treat prolapse?
19   A    Yes.
20   Q    And what was the next product that you
21 had?
22   A    I believe it was Avaulta.
23   Q    And who makes Avaulta?
24   A    Bard.
25   Q    And when were you trained on Bard Avaulta,

Page 36

1 if you remember?
2    A    I don't remember exactly when it came out,
3 no.
4    Q    But it's your recollection that you
5 probably trained on it somewhere around the time
6 when it came out?
7    A    Correct.
8    Q    It seems like you're a -- fairly early a
9 doctor, or you want to look at the new products that
10 came out; is that correct?
11   A    Correct.
12   Q    Did you incorporate the Bard Avaulta into
13 your practice after you trained on it?
14   A    I believe I did, correct.
15   Q    And so once you began incorporating the
16 Bard Avaulta into your practice, were you still
17 simultaneously also using the Ethicon PROLIFT?
18   A    I believe I was, correct.
19   Q    And was there some thought process that
20 you would use to decide whether you wanted to use an
21 Avaulta versus a PROLIFT for any given patient?
22   A    You know, I was still trying to get a feel
23 for what I thought was the most -- you know, the
24 best procedure for the patients, so it was sort of a
25 feeling-out process.

Page 37

1    Q    And I think I've seen some documents.  You
2 didn't necessarily follow the IFU procedural steps
3 on the PROLIFT step by step, I think you had some
4 tricks that you might have employed; is that
5 correct?
6    A    Correct.
7        MR. RUMANEK:  Object to the form.
8    Q    And when you were designing the Coloplast
9 Exair, would you have kind of incorporated your
10 personal experience in customizing the procedure to
11 get what you thought was the best product for
12 treatment of prolapse?
13       MR. RUMANEK:  Object to the form.
14   A    Correct.
15   Q    So after you trained on PROLIFT and began
16 using that in 2005 and then when Bard's Avaulta came
17 to market and you trained on that, what was the next
18 mesh-based kit that you would have learned or began
19 using?
20   A    So go back and restate it, the --
21   Q    I'm just trying to figure out, the first
22 kit you used for prolapse, I believe, is PROLIFT,
23 right?
24   A    Correct.
25   Q    And then the next one, I think, was Bard's

Steven Goldwasser, M.D.

Page 38

1  Avaulta?
2      A    Correct.
3      Q    And then after that, did you train or use
4  any other kits to treat prolapse?
5      A    I believe I trained on the AMS and the
6  Boston Scientific but never adopted those, and I
7  eventually was back using PROLIFT again.
8      Q    All right.  And when you trained on the
9  AMS and Boston Sci PROLIFT kits, was there any
10 reason you didn't incorporate those into your
11 practice?
12         MR. RUMANEK:  Object to the form.
13     A    You know, I don't remember the specifics
14 to it, but for whatever reason I had at the time, I
15 just didn't feel as though they were as good of a
16 product as the PROLIFT.
17     Q    Was that based upon your evaluation of
18 like the trocars or the mesh or what -- I'm just
19 trying to figure out what --
20     A    Probably subjective quality of mesh, the
21 technique, the shape of the mesh, you know, all
22 these factors come into play.
23     Q    Right.  And to be clear, the kit is not
24 just a piece of mesh, it's a procedure actually that
25 comes with instruments that are used specifically

Page 39

1  for that mesh to implant that device, right?
2      A    Right, it's a kit with -- with instruments
3  for implanting it and the mesh graft itself,
4  correct.
5      Q    And the instruments that -- for implanting
6  it, I'm assuming they're called trocars or cannulas,
7  those are different for each kit, right?
8      A    Same concept but a little different
9  design.
10     Q    And the design kind of dictates a little
11 bit of a different procedure for each kit; is that
12 correct?
13     A    Not necessarily.  I mean, as the
14 physician, you can use them any way you want.
15     Q    Right.  But at least the IFU procedural
16 steps are going to be tailored to that specific
17 instrumentation that comes with the kit, right?
18     A    Correct.
19     Q    When did you start working on designing
20 the Coloplast Exair?
21     A    I couldn't tell you the actual exact date.
22     Q    Around what year?
23     A    It was probably about two years or so
24 before it came out, so I -- I don't remember exactly
25 what year it came out.  Maybe 2010 or so, so maybe

Page 40

1  2008.
2      Q    What was different about that product as
3  compared to the kits that were already marketed?
4      A    What was different about it?  Well, it was
5  specifically focused on the technique that myself
6  and a colleague developed.
7      Q    Was that kind of the technique that you
8  used or that was kind of your customized PROLIFT
9  technique that you developed; is that correct?
10     A    Correct.
11     Q    And briefly what customization to the
12 PROLIFT technique did you incorporate, if you can
13 simplify that?
14     A    So the PROLIFT uses a transobturator pass
15 for an anterior repair for the apical portion of the
16 suspension, and the Exair uses a transgluteal pass
17 for the apical portion of the suspension.
18     Q    And I would assume if you're changing it,
19 there's some benefit that you saw, or why would you
20 have changed the transobturator to a transgluteal
21 pass?
22         MR. RUMANEK:  Object to the form.
23     A    My perception was that it gives better
24 apical support.
25     Q    So we're talking it would be a better --

Page 41

1  hopefully a better efficacy rate doing that change
2  as compared to the original PROLIFT procedure?
3          MR. RUMANEK:  Object to the form.
4      A    In terms of failure, correct.
5      Q    Right.  Did that -- in your experience did
6  changing the transobturator approach to the
7  transgluteal approach actually have better success
8  rates?
9      A    In my opinion, correct.
10     Q    And you testified that it was a couple of
11 years before the Exair came out is when you first
12 started working on it; is that correct?
13     A    Correct.
14     Q    Do you recall when that would have been?
15     A    When I started working on --
16     Q    Sure.  I don't know when Exair came out,
17 so I'm trying to go back two years.
18     A    Yeah, I don't remember exactly when it
19 came out either.  So do I recall when I started
20 using this new technique?
21     Q    Sure, let's start there.  That's a good
22 idea.
23     A    I don't.  I don't.  Sometime between when
24 PROLIFT came out and Exair came out.  You know, I
25 couldn't tell you exactly.

Steven Goldwasser, M.D.

Page 42

1    Q    Were you using that technique when you
2   were doing free-cut Gyenmesh before PROLIFT was out?
3    A    No, because there weren't any trocars
4   available.
5    Q    Doctor, do you know what a key opinion
6   leader is?
7    A    I have ideas.
8    Q    What's your idea?
9    A    My idea is that it's someone who, you
10  know, is respected within the medical community who
11  has an opinion on a certain topic.
12   Q    Do you consider yourself to be a key
13  opinion leader?
14   A    Yeah, in a --
15   Q    Do you know --
16   A    -- circumstance.
17   Q    -- if manufacturers of medical devices for
18  prolapse consider you a key opinion leader?
19       MR. RUMANEK:  Object to the form.
20   A    I don't know.
21   Q    Have you ever worked as a KOL, or key
22  opinion leader, for Ethicon?
23       MR. RUMANEK:  Object to the form.
24   A    I don't think I was.
25   Q    Have you ever worked as a KOL for any

Page 43

1   manufacturer?
2        MR. RUMANEK:  Object to the form.
3    A    Probably with Coloplast, I assume.
4    Q    Okay.  I'm going to hand you what's being
5   marked as Exhibit 3, and that's a copy of your
6   report; is that correct?
7        (Exhibit 3 was marked for identification.)
8    A    Yeah.
9    Q    And --
10       MR. RUMANEK:  Let me just look at it.
11       MR. BENTLEY:  Let me give you a copy.
12   Q    On the last page it indicates that you
13  signed the report on February 15th, 2017; is that
14  correct?
15   A    Correct.
16   Q    And is that consistent with your
17  recollection of when you finished this report?
18   A    Correct.
19   Q    And do you stand by all your opinions in
20  this report?
21   A    Yes.
22   Q    Is there anything that you need to add or
23  change in this report as you sit here?
24   A    Not as I am aware.
25   Q    And does this report provide a complete

Page 44

1   and accurate list of the opinions you intend to
2   offer at trial?
3        MR. RUMANEK:  Object to the form.
4    A    Correct.
5    Q    And does this report contain the bases for
6   your opinions --
7        MR. RUMANEK:  Object to the form.
8    Q    -- contained within?
9    A    In general, correct.
10   Q    And in this report, there's some
11  citations.  How did you come to decide which --
12  which literature to cite in this report versus which
13  ones made it on your reliances?
14   A    Just in reviewing the body of literature,
15  as I constructed the report, I found different
16  articles that -- that supported my thoughts.
17   Q    All right.  I'm going to hand you what's
18  being marked as Exhibit 4, which is, I believe, a
19  copy of your reliance list.  And this is the
20  supplemental one that was produced recently.
21       (Exhibit 4 was marked for identification.)
22  BY MR. BENTLEY:
23   Q    So generally there's a lot of articles
24  listed on your reliance list; is that correct?
25   A    Correct.

Page 45

1    Q    But there's not nearly as many cited in
2   your report, right?
3    A    Correct.
4    Q    So I'm just trying to synthesize down how
5   you -- how some of them made it in your report
6   versus not all of them.  I totally understand you
7   can't cite or discuss every article in here because
8   that would just be impossible, because I would still
9   find something that you didn't, trust me.
10       MR. RUMANEK:  You just answered your own
11       question.
12   A    I stand by your answer.
13   Q    Do you feel that the articles that you
14  discussed in your report are more important to your
15  opinions generally, or what's the significance of
16  the citations that are in your report to specific
17  articles?
18   A    Repeat that one more time.
19   Q    What's the significance of the articles
20  that you've chosen to cite in your report?  What's
21  the significance on those articles as opposed to
22  the -- you know, the large list of articles that
23  didn't make it into your report, you know, direct
24  citations in your report?
25       MR. RUMANEK:  Object to the form.

Steven Goldwasser, M.D.

Page 46

1    Q   Do you understand my question?
2    A   Yeah.
3        MR. RUMANEK:  I'm going to object just to
4    the broad scope of the question.  Go ahead.
5    A   Well, they support my opinion.
6    Q   What about articles that don't necessarily
7    support your opinion?  You reviewed articles that
8    are contrary to your opinions, right?
9    A   Correct.
10   Q   And you would agree that there's
11   substantial literature out there that isn't
12   necessarily in line with your opinions, correct?
13       MR. RUMANEK:  Object to the form.
14   A   Correct.
15   Q   And there is -- there's mixed literature
16   out there on this subject, correct?
17   A   Correct.
18   Q   And you chose articles that supported your
19   opinion to directly discuss in your report; is that
20   correct?
21   A   Correct.
22       MR. RUMANEK:  Object to the form.  If
23   you'll -- y'all are kind of talking quickly.
24   If you'll give me a chance after he asks a
25   question.  And, Greg, make sure you let him

Page 47

1    finish his answer before you start your
2    question.
3    Q   So in addition to the literature that's --
4    what did I mark it as, 4?
5        In addition to the literature that's
6    discussed in Exhibit 4, your reliance list, and in
7    addition to the literature discussed in your report,
8    one of the other bases for your opinions is, of
9    course, your clinical practice and your experience,
10   right?
11   A   Correct.
12   Q   And in your clinical practice, you
13   maintain a database of the patients you've treated
14   for prolapse; is that correct?
15   A   Correct.
16   Q   And I think I've seen different figures,
17   but you have approximately 450 to 500 patients in
18   that database; is that correct?
19   A   Correct.
20   Q   And I think also I've seen that you've
21   treated or done at least a thousand surgeries for
22   prolapses; is that correct?
23   A   Correct.
24   Q   So what happened to the other 500 patients
25   that aren't in your database, are those not mesh

Page 48

1    implants?
2    A   Correct.
3    Q   So your database only tracks mesh
4    implants; is that correct?
5    A   Vaginal mesh implants, correct.
6    Q   Oh, okay.  Why did you not want to -- or
7    let me back up.
8        Do you do abdominal repairs of prolapse
9    using mesh products?
10   A   Correct.
11   Q   Why didn't you want to track those in your
12   database?
13   A   It's an entirely different procedure.
14   Q   All right.  So the purpose of your
15   database was specifically to tract transvaginally
16   placed mesh-based products; is that correct?
17   A   Correct.
18   Q   So you're not tracking any biological
19   grafts in your database either?
20   A   Correct.
21   Q   So I guess enrollment in your database has
22   kind of slowed down?
23   A   Correct.  You're killing my database.
24   Q   In your database, which is only including
25   transvaginally placed polypropylene products to

Page 49

1    treat prolapse, does that database include -- let me
2    back up.
3        What products do you track in your
4    database?
5    A   Transvaginal mesh, correct?
6    Q   Right.  And when --
7    A   Products specifically?
8    Q   Right.
9    A   We were --
10   Q   Or do you -- in your database, do you keep
11   a data point as to what product specifically it was?
12   A   Correct.
13   Q   All right.  And what products are in your
14   database?
15   A   PROLIFT --
16   Q   Yeah.
17   A   -- PROLIFT+M, and the Exair.
18   Q   And what about the Bard Avaulta?
19   A   I don't believe so.
20   Q   But you were -- I think you testified that
21   you trained on Bard Avaulta and you were using Bard
22   Avaulta once it came out, right?
23   A   Yeah, I'm trying to remember whether there
24   are some Avaultas in there.  You know, that's a good
25   question.

Steven Goldwasser, M.D.

Page 50

1    Q   Would it be pretty easy for you to figure
2  out what numbers for which products are in your
3  database?
4    A   Yeah, I could get that, correct.
5    Q   Have you looked -- in preparing your
6  report, did you go back and look at your database to
7  see what numbers -- did you go back and look and see
8  how many PROLIFTs are in your database?
9    A   No, I just looked at the total number of
10  patients.
11    Q   Doctor, do you treat patients who have
12  complications after having a polypropylene mesh
13  implant for -- implanted for prolapse?
14    A   Yes.
15    Q   And approximately how -- or approximately
16  how often do you treat women who have complications
17  from meshed-based prolapse repair?
18    MR. RUMANEK:  Object to the form.
19    A   Treat surgically --
20    Q   Yeah.
21    A   -- or consultation-wise?
22    Q   Surgically.
23    A   Surgically.  How often as in a number?
24    Q   Yeah.
25    A   I'd say in a given year, probably, I don't

Page 51

1  know, maybe 20, 30.
2    Q   And roughly do you do about ten prolapse
3  procedures a month; is that --
4    MR. RUMANEK:  Object to the form.
5    A   No.
6    Q   How many -- on average per month how many
7  women are you doing surgical repair for prolapse?
8    A   Depends on the month.  I would say, let me
9  think about it, probably around 15 or so, maybe 15,
10  20.
11    Q   And has that been generally consistent
12  throughout your practice or --
13    A   Yeah, it's increased over a period of
14  practice.  Fluctuates on a monthly basis.
15    Q   Sure.  But on average you've done around
16  150 procedures for the treatment of prolapse during
17  your career; is that fair?
18    MR. RUMANEK:  Per year?
19    Q   Per year.
20    A   Per year?  Maybe -- let's see.  What did I
21  say?  Maybe 15 or 20 a month --
22    Q   Right.
23    A   -- so ten months would be --
24    Q   140, 150, just generally, right?
25    A   Yeah.

Page 52

1    Q   And so maybe 140, 150 women per year
2  you're treating for prolapse.  And you just
3  testified that you do about 20 to 30 surgical
4  revisions for women that have suffered complications
5  from a mesh-based PROLIFT repair?
6    MR. RUMANEK:  Object to the form.
7    A   No, not necessarily.
8    Q   Well, how many -- I'm trying to figure out
9  how many -- how often you treat women who have had
10  complications for -- complications that arise after
11  a mesh-based repair for prolapse.
12    MR. RUMANEK:  Let me just -- are you
13  saying after a mesh-based product --
14    MR. BENTLEY:  Well, you wouldn't have a
15  mesh complication before a procedure --
16    MR. RUMANEK:  -- procedure?  Are you
17  saying -- no, no, but you're --
18    MR. BENTLEY:  -- because that's --
19    MR. RUMANEK:  I just want to make sure the
20  question's clear because at one point --
21  BY MR. BENTLEY:
22    Q   Do you understand my question, Doctor, or
23  do you want me to rephrase it?
24    A   So when you said mesh-based --
25    Q   All right.  So after a woman has been

Page 53

1  treated with a mesh product for prolapse --
2    A   Right.
3    Q   -- sometimes they develop complications,
4  you would agree with that, right?
5    A   Correct.
6    Q   And a lot of times -- let me rephrase
7  that.
8    Sometimes those women that have a
9  complication after a mesh-based product implanted
10  for prolapse, sometimes those complications
11  necessitate a surgical repair, correct?
12    A   Sometimes.
13    Q   Which can require -- which can sometimes
14  be cutting out, or excising, some of the mesh,
15  right?
16    A   Correct.
17    Q   And I'm trying to see how often or how
18  many women you've treated in that situation, okay?
19    A   Okay.
20    Q   Because some surgeons don't really treat
21  complications, they refer them out, right?
22    A   Right.
23    Q   And is it your general practice to treat
24  complications that come to you or do you refer them
25  out?

Steven Goldwasser, M.D.

Page 54

1    A   I treat them.
2    Q   And so I'm just trying to get numbers on
3  how often that is as -- to get a big picture
4  compared to how often you're doing other things,
5  okay?
6    A   Okay.  All right.
7    Q   Some surgeons, that's like their
8  speciality, that's all they do all day, right?
9    A   No.  Thank God.
10    Q   I mean, it's a fairly specialized
11  practice, right?
12       MR. RUMANEK:  Object to the form.
13    Q   You would agree that some people that are
14  implanting mesh products really just don't have the
15  expertise to take them out?
16       MR. RUMANEK:  I'm going to just make sure
17  he lets me object to form before you answer.
18    Q   Do you understand my question?
19    A   Repeat it one more time.
20    Q   You would agree that some doctors that are
21  putting in mesh products or that were putting in
22  mesh products didn't necessarily have the expertise
23  to take them out?
24       MR. RUMANEK:  Object to the form.
25    A   Didn't necessarily have the expertise to

Page 55

1  take them out?
2    Q   Right.
3    A   Yes.  In general, correct.
4    Q   It's a little bit more of a specialized
5  practice, right?
6       MR. RUMANEK:  Object to the form.
7    A   Yeah, I think some people tend to do it
8  more often than others, correct.
9    Q   It's more invasive to go take it out than
10  to put it in a lot of times, right?
11    A   Not necessarily.
12       MR. RUMANEK:  Object to the form.  And
13    again, just -- y'all are talking quickly, and
14    you're probably making the court reporter pull
15    her hair out.  Just make sure -- give --
16    breathe for a second after he asks the question
17    so I can have a chance to object.
18    Q   So in the last -- let's talk about the
19  last year, and we can see if the numbers have
20  changed throughout the years.  Generally in the last
21  year, how many women do you think on average you've
22  had to surgically repair a mesh-based product in a
23  woman?
24       MR. RUMANEK:  Object to the form.
25    A   In this past year --

Page 56

1    Q   Sure.
2    A   -- 2017?
3    Q   Like right now, how often are you seeing
4  women that have complications that you have to do a
5  surgical repair?
6    A   You're talking about specifically for
7  incontinence, vaginal, or sacrocolpopexies?
8    Q   You can give me -- we can start broad.
9  How often are you treating women that have mesh
10  implant that are having problems that need surgery?
11       MR. RUMANEK:  Object to the form.
12    A   This year, 2017, I've probably had about
13  three so far.
14    Q   So one a month generally?
15    A   Yeah.
16    Q   And last year approximately how many women
17  do you think you treated surgically for a
18  complication that arose from a mesh-based repair?
19       MR. RUMANEK:  Object to the form.
20    A   My guess would be maybe around ten or so.
21    Q   Maybe -- probably once a month is still
22  consistent; is that correct?
23    A   Yeah.  It comes and goes in streaks, yeah.
24    Q   And has that been consistent throughout
25  the years in your practice or has it increased or

Page 57

1  decreased?
2       MR. RUMANEK:  Object to the form.
3    A   It fluctuates.  There's no real
4  consistency or inconsistency.
5    Q   So have you had substantially more than
6  one a month?
7       MR. RUMANEK:  Object to the form.
8    A   Sometimes I have --
9       MR. RUMANEK:  Object to the form.
10    A   At some times I've had more than one.
11  Sometimes I've had none.
12    Q   So generally -- or let's back up.
13       Do you track how many revision surgeries
14  you do?
15    A   No.
16    Q   Why not?
17       MR. RUMANEK:  Object to the form.
18    A   It's just part of the practice.  Just I
19  haven't made it a point to follow it.
20    Q   You don't think it's important to track
21  how many women are undergoing surgical procedures
22  after they've had a complication from a mesh-based
23  repair?
24       MR. RUMANEK:  Object to the form.
25    A   Well, I see --

Steven Goldwasser, M.D.

Page 58

1    MR. RUMANEK:  Mischaracterizes his
2  testimony.
3    A  I see them for a follow-up visit, but I'm
4  not physically tracking them in a database.
5    Q  Do you think that information is
6  important?
7    MR. RUMANEK:  Object to the form.
8    To whom?
9    Q  I'm asking you, to you.  To you as a
10  practicing physician that's treating women every
11  day, you don't think it's important to track how
12  many women are undergoing surgical procedures to
13  repair a mesh -- to repair mesh-based complications?
14    MR. RUMANEK:  Object to the form.
15  Mischaracterizes his testimony.
16    A  Yeah, I think it's important to be
17  knowledgeable about who you're treating, but I don't
18  make it a physical point to -- I'm not looking to
19  publish a study on it.
20    Q  Do you think it's important for the women
21  you treat to tell them how often you're seeing women
22  that have problems that necessitate a second
23  procedure to treat complications?
24    MR. RUMANEK:  Object to the form.
25    MR. BENTLEY:  You can have your objection

Page 59

1  to the form, that's fine.  Let's just keep it
2  to form because we have three hours.
3    Q  That's important for patients, right,
4  Doctor?
5    MR. RUMANEK:  Object to the form.
6    A  Repeat the question.
7    Q  Is it important for the women you treat
8  and you talk to and you counsel about surgical
9  operations, is it important for them to know how
10  often you're seeing women who have complications
11  that require surgical intervention?
12    MR. RUMANEK:  Object to the form.
13    A  Well, it's part of my consent.
14    Q  It's important for the patients, right?
15    MR. RUMANEK:  Object to the form.  Asked
16  and answered.  You've asked -- you're --
17    MR. BENTLEY:  Counsel.  Counsel.
18    MR. RUMANEK:  You're asking --
19    MR. BENTLEY:  You got form, that's it.
20    MR. RUMANEK:  Okay.
21    MR. BENTLEY:  You're wasting my time.
22    MR. RUMANEK:  You're asking questions --
23    MR. BENTLEY:  The record is what it is.
24    MR. RUMANEK:  You're asking questions over
25  and over.

Page 60

1    MR. BENTLEY:  I entirely disagree.  The
2  record speaks for itself.  If we keep doing
3  this, I'm going to ask for more time.  I'm
4  already put in a -- I'm keeping the deposition
5  open because we didn't get any of the documents
6  I requested.  I'm requesting all the case log
7  summaries and stuff, which is directly
8  reliable -- or relevant to his opinions.  We're
9  keeping the deposition open for that.
10    MR. RUMANEK:  I don't --
11    MR. BENTLEY:  If we keep wasting time with
12  speaking objections, I'm going to go back and
13  ask for more time.
14    MR. RUMANEK:  Object to the form.  Asked
15  and answered.
16    MR. BENTLEY:  Respectfully form.  Thanks.
17  BY MR. BENTLEY:
18    Q  Doctor, you track transvaginal mesh
19  implants in your database, right?
20    A  Correct.
21    Q  Because you feel it's important
22  information to keep track of, right?
23    MR. RUMANEK:  Object to the form.
24    A  Correct.
25    Q  Right.  And that's important for women

Page 61

1  that are choosing which procedure to undergo to
2  correct or to treat their prolapse, right?
3    MR. RUMANEK:  Object to the form.
4    A  Correct.
5    Q  Right.  And it's also important for women
6  to know how often you're seeing other women that
7  have been -- that have undergone mesh-based repair
8  and have had to have surgical intervention because
9  of complications?  That's important information for
10  women, right?
11    MR. RUMANEK:  Object to the form.  Asked
12  and answered.
13    A  I base my counseling on my experience.
14    Q  Right.  And your experience includes
15  treating women, doing additional surgery on women
16  who have had products implanted, right?
17    MR. RUMANEK:  Object to the form.
18    A  My specific counseling has to do with my
19  database and my numbers because there's tremendous
20  variability in the physicians who implant it and the
21  circumstances.
22    Q  What creates the tremendous variability in
23  different physicians, it's -- expertise, is that
24  one?
25    MR. RUMANEK:  Object to the form.

Steven Goldwasser, M.D.

## Page 62

1    Q   Is that one aspect that would create
2 variability from different physicians?
3    A   It's one component, correct.
4    Q   So expertise.  Would it be training, who
5 they trained under and where they were, is that one
6 component?
7        MR. RUMANEK:  Object to the form.
8    A   Potentially.
9    Q   Would it be the frequency with which they
10 perform the procedures?
11       MR. RUMANEK:  Object to the form.
12    A   Potentially.
13    Q   Would it be their knowledge, you know, and
14 their -- how tied in they are to the literature and
15 the industry of these devices, do you agree there's
16 variability in that?
17       MR. RUMANEK:  Object to the form.
18    A   No.
19    Q   You think that every doctor reads exactly
20 every article that you read?
21       MR. RUMANEK:  Object to the form.
22    A   No.
23    Q   Different doctors read different journals,
24 right?
25    A   Correct.

## Page 63

1        MR. RUMANEK:  Object to the form.
2    Q   Different doctors read different journals?
3    A   Correct.
4    Q   Right.  And different journals are for --
5 are catered to different specialities, correct?
6    A   Correct.
7    Q   Some journals are catered to obstetrics,
8 correct?
9    A   Correct.
10    Q   Some are catered to gynecology, correct?
11    A   Correct.
12    Q   Some are catered to urology, correct?
13    A   Correct.
14    Q   Some are catered to pelvic reconstructive
15 surgery, correct?
16    A   Correct.
17    Q   And not every doctor necessarily reads
18 every one of those journals, right?
19    A   Correct.
20    Q   There's a differing level of edu- -- or a
21 differing level of knowledge depending on any one
22 doctor's specialty, right?
23       MR. RUMANEK:  Object to the form.
24    A   Correct.
25    Q   Right.  Doctor, when you've treated

## Page 64

1 patients who have had a complication after a
2 mesh-based repair, what complications have you seen?
3    A   Mesh-based repair, are we talking
4 sacrocolpopexy, transvaginal --
5    Q   Well, I'm sorry.
6    A   -- prolapse?
7    Q   Is it your opinion that there's different
8 mesh complications based on the approach?
9    A   Correct.
10    Q   And so what complications have you seen
11 after a transvaginal mesh-based repair for prolapse?
12    A   Erosions, or exposure in the vaginal
13 canal.  I have seen failures.  I've seen
14 overcorrections.  I've seen irritative voiding
15 symptoms.  I've seen overactive bladder symptoms in
16 general.
17    Q   I think I heard you say overcorrections?
18       MR. RUMANEK:  Were you -- I just want to
19    make sure you were finished.
20    Q   I'm sorry, are you done?
21    A   Yeah.
22    Q   I didn't mean to cut you off.  Generally
23 is it -- all right.  Overcorrection, is that -- are
24 you talking about too much tension on the mesh, is
25 that --

## Page 65

1    A   Not necessarily.  I mean, some patients --
2 well, let me rephrase that.
3        Not necessarily an overcorrection.  Some
4 patients can develop urinary incontinence after any
5 prolapse procedure.
6    Q   They consider -- I'm sorry.
7    A   So sometimes when they develop urinary
8 incontinence, it's -- it was an underlying problem
9 that now manifests itself.
10    Q   And you're calling that an overcorrection?
11    A   No, I take that back.
12    Q   Right.
13    A   It's not an overcorrection.
14    Q   But if -- these are supposed to be
15 implanted with tension free, right?
16    A   Correct.
17    Q   And if there's too much tension on the
18 mesh implant, that could be problematic for the
19 patient; is that fair?
20    A   Not necessarily.
21    Q   Can it be?
22    A   It can.
23    Q   What can happen if there's too much
24 tension placed on the mesh after it's implanted?
25       MR. RUMANEK:  Object to the form.

Steven Goldwasser, M.D.

Page 66

1    A    For an incontinence procedure retention?
2    Q    Right, for a prolapse procedure.
3    A    It varies.
4    Q    And let's talk about the varying gamut of
5  what can happen if there's too much tension on a
6  mesh product after prolapse.
7    A    Well, you can tear the graft.  You can --
8  potentially too much tension, you could -- it's
9  theoretical as to whether that causes pain or not.
10  It's really --
11    Q    You don't have an opinion one way or
12  another?
13    A    Correct.
14    Q    You haven't seen any literature that too
15  much tension causes pain?
16        MR. RUMANEK:  Object to the form.
17    A    Yeah, I came across that --
18    Q    You just discount it?
19        MR. RUMANEK:  Object to the form.
20    A    No, I just don't necessarily agree with
21  it.
22    Q    What reasons do you not agree with that?
23    A    Because nobody really knows the etiology
24  of pain because patients who have graft repair and
25  non-graft repairs, in general pain is a risk.

Page 67

1    Q    No other reason for discounting that
2  literature as you sit here today?
3        MR. RUMANEK:  Object to the form.
4    A    No other reason for discounting it.  It's
5  not that --
6    Q    Well, let me back up.  You agree that --
7  I'm sorry, not to cut you off, but that was a bad
8  question.
9        You agree there's some literature that
10  suggests or indicates that too much tension can
11  cause pain; is that fair?
12    A    It's been stated, correct.
13    Q    Right.  And you disagree with that
14  literature, correct?
15        MR. RUMANEK:  Object to the form.
16    Q    And -- correct, you disagree --
17    A    I wouldn't say I necessarily disagree with
18  it.  I just have not -- you know, I respect that
19  that's a finding in some of the literature, but I
20  also state that pain is a very common side effect of
21  pelvic surgery, and so I think it's impossible with
22  medical certainty to say that that pain necessarily
23  has to do with tension of the graft.
24    Q    Have you studied -- I'm sorry, are you
25  done?

Page 68

1    A    Yeah.
2    Q    Have you studied that specific question?
3    A    Just in my own -- no, not specifically,
4  I've not studied it.
5    Q    But is -- but there's some people that
6  have tried to study it, and it's a difficult
7  question, right?
8    A    Correct.
9    Q    And you would -- I'm just trying to figure
10  out what reasons -- what other reasons you disagree
11  with those findings from studies that have tried to
12  look at it, and I think I heard you say that, well,
13  there's pain, you know, that can happen with
14  anything.  I understand that.  That's one of your
15  explanations, right?
16        MR. RUMANEK:  Object to the form.
17        Compound question.
18    A    Yeah, pain would happen --
19    Q    And do you have any other reasons or
20  explanations for disagreeing with those studies as
21  you sit here today?
22        MR. RUMANEK:  Object to the form.
23    A    No.
24    Q    When you're treating women who have
25  suffered complications after having a mesh product

Page 69

1  implanted for prolapse, have you ever seen mesh
2  that's bunched?
3    A    I've seen -- repeat it one more time.
4    Q    In treating women who have
5  complications -- women come to you for complications
6  sometimes after they've had a mesh implant for
7  prolapse, right?
8    A    Correct.
9    Q    And you're familiar with the term "mesh
10  bunching"?
11    A    Correct.
12    Q    And have you ever seen in your personal
13  practice women suffering from mesh bunching, who
14  have their mesh that has -- presents as being
15  bunched?
16    A    I have seen patients who have mesh that's
17  bunched up with absolutely no symptoms at all and
18  I've seen patients who have mesh that's bunched up
19  with possibly a symptom associated with it.  So it's
20  impossible to conclude that mesh bunching is the --
21  part of their pain.
22    Q    And that wasn't really my question.  I was
23  just asking, you've seen mesh bunching when you're
24  treating women with complications, right?
25    A    Correct.

Steven Goldwasser, M.D.

Page 70

1   Q   Right.  And have you seen women -- in
2  treating women that have complications, have you
3  seen where the mesh is roped?
4   A   Not necessarily as their complication, but
5  correct.
6   Q   Right, I'm not trying to make any
7  causation leap here --
8   A   Okay.
9   Q   -- I'm just -- in your experience, you
10 understand what mesh roping is, right?
11  A   Correct.
12  Q   And I'm just asking, have you seen it when
13 you're treating women -- well, because presumably
14 you wouldn't see mesh roping -- let me strike that.
15      Have you ever seen mesh roping in a woman
16 that doesn't present to you with complications?
17  A   Yes.
18  Q   All right.  And how do you see the -- have
19 you ever seen a woman present to you who's had a
20 mesh implant for prolapse and you've noticed that
21 the mesh had roped?
22  A   Correct.
23  Q   And you -- when you've seen women with
24 roped mesh, sometimes they have complications and
25 sometimes they don't; is that --

Page 71

1   A   Correct.
2   Q   And how do you tell that the mesh is
3  roped?
4   A   Palpation.
5   Q   You can feel that the mesh is roped
6  through palpating?
7   A   Correct.
8   Q   And have you ever seen mesh that's curled?
9      MR. RUMANEK:  Object to the form.
10  A   Curled as in a surgical exploration I'm
11 visually seeing the mesh curling?
12  Q   I don't know.  Have you seen -- is that
13 how you've seen it?
14     MR. RUMANEK:  Object to the form.
15  A   Yes.
16  Q   Have you -- can you see curled mesh
17 through palpating?  Or can you feel mesh -- sorry
18 for the semantics.
19  A   You can perceive as such.
20  Q   Do you appreciate that pore sizes are
21 fairly important for a medical implant like mesh,
22 right?
23  A   According to the literature, correct.
24  Q   Do you have some reason to disagree with
25 the literature?

Page 72

1      MR. RUMANEK:  Object to the form.
2   A   Not necessarily.
3   Q   Do you have an opinion that pore size is
4  not an important factor of mesh implant?
5      MR. RUMANEK:  Object to the form.
6   A   I think it's one of the factors.
7   Q   It's -- it's important, right?
8   A   Yeah.
9      MR. RUMANEK:  Object to the form.
10  Q   Do you know what happens to the mesh
11 that's -- once it's roped?
12     MR. RUMANEK:  Object to the form.
13  A   No, I don't.
14  Q   Do you know what happens to the mesh pore
15 size once it's curled?
16     MR. RUMANEK:  Object to the form.
17  A   I can make some assumptions.
18  Q   What would your assumptions be?
19  A   My assumption would be that the pore size
20 may become smaller.
21  Q   And do you have any assumptions as to what
22 happens to the mesh pore size if it's bunched?
23     MR. RUMANEK:  Object to the form.
24  A   No.
25  Q   Do you know what happens if the pore size

Page 73

1  collapses or becomes smaller?
2      MR. RUMANEK:  Object to the form.
3   A   No, not specifically.
4   Q   Have you seen any literature discussing
5  that?
6      MR. RUMANEK:  Object to the form.
7   A   Yes.
8   Q   And what does the literature indicate?
9      MR. RUMANEK:  Object to the form.
10  A   The literature indicates that it could
11 contribute to scar formation.
12  Q   Do you have an understanding of the -- let
13 me -- your report discussed it.  You have an
14 understanding of the process of how the body
15 integrates into the mesh, right?
16  A   In theory.
17  Q   And the pore size is supposed to allow for
18 the body to more safely integrate into the mesh,
19 right?
20  A   Correct.
21  Q   And if the pore sizes collapse, that can
22 interfere with that ability of the mesh to integrate
23 into the body, right?
24     MR. RUMANEK:  Object to the form.
25  A   It's one of the theories.

Steven Goldwasser, M.D.

Page 74

1    Q   Have you ever seen scar plating --
2        MR. RUMANEK:  Object to the form.
3    Q   -- on mesh?
4    A   I can't say specifically that I know what
5 a scar plate is, but --
6    Q   Do you -- would you want -- when you're
7 implanting a mesh product, do you want to see a
8 hardened scar plate around the mesh, is that a
9 desired outcome for you?
10       MR. RUMANEK:  Object to the form.
11   A   Subjectively, no, but clinically speaking,
12 I don't know what the relevance is.
13   Q   Have you seen literature that suggests
14 there is a clinical relevance to a hardening scar
15 plate?
16       MR. RUMANEK:  Object to the form.
17   A   In regards to pain, but pain's
18 multifactorial.
19   Q   And we discussed --
20       MR. RUMANEK:  We've been going about an
21 hour, so whenever you get to a breaking point.
22   Q   We discussed this earlier, you testified,
23 and correctly, there's many etiologies for pain,
24 right?
25   A   Correct.

Page 75

1    Q   And one of the theories -- or one of the
2 things the literature suggests is the hardened scar
3 plate can also create pain, you've seen that
4 literature, right?
5    A   I've seen a theory that that could be a
6 contributing factor.
7    Q   And do you have any criticisms or
8 explanations of why you disagree with that theory or
9 literature?
10       MR. RUMANEK:  Object to the form.
11   A   Pain is multifactorial.
12   Q   And I get that --
13   A   Right.
14   Q   -- but specifically literature addressing
15 whether or not a hardened scar plate causes or, you
16 know, leads to increased pain, do you understand
17 what I'm asking, sir?
18   A   Correct.
19   Q   Do you have any criticisms or
20 disagreements or explanation why you discount that
21 theory and that literature?
22       MR. RUMANEK:  Object to the form.
23   A   Well, that scarring occurs with native
24 tissue repairs, any type of surgical repair, and so
25 theoretically everybody's going to have some

Page 76

1 scarring after surgery.  And some patients have pain
2 and some don't, so there's no real -- you know,
3 there's no real hard and fast predictability.
4    Q   Right.  And you understand there's
5 different levels of scarring, right?
6    A   Subjectively.
7    Q   Sure.  And you're not -- you testified
8 you're not looking for a hardened scar plate when
9 you implant a mesh product in a woman's pelvis,
10 right?
11       MR. RUMANEK:  Object to the form.
12   A   Subjectively, I would not look for that,
13 but it doesn't necessarily clinically manifest
14 itself of the problem.
15   Q   And my question is, you're aware that
16 there's some literature discussing the hardened scar
17 plate as opposed to the normal scarification
18 processes, that the hardened scar plate is a
19 contributor to pain syndrome?
20       MR. RUMANEK:  Object to the form.
21   Q   You agree with me that there's literature
22 and analysis and science discussing that, right?
23   A   I agree that pain is quoted as a possible
24 consequence of scarring, but it's not a direct
25 relationship in all circumstances.

Page 77

1    Q   And I'm trying to just understand your
2 discount of that literature and that science, okay?
3        MR. RUMANEK:  Object --
4    Q   And I understand that you -- that pain can
5 cause -- can happen with all surgeries and can be
6 caused by lots of different things, I understand
7 that, but specific to the science looking that
8 overly hardened scar plating after mesh implant,
9 that the scientists that have looked at that and
10 decide, hey, this probably creates more pain, in
11 addition to the pain can happen from lots of things,
12 I'm just trying to see if you have any criticisms or
13 explanation of why you discount that science.  Do
14 you understand my question, Doctor?
15       MR. RUMANEK:  I'm going to object to the
16   form --
17       MR. BENTLEY:  You can object to form.
18   Thank you.
19   Q   Do you understand --
20       MR. RUMANEK:  -- and your use of the term
21   "discounting."
22   Q   Do you understand my question?
23   A   Yes, but I need to see a specific report
24 to see how they derive their conclusion.
25   Q   And the reason I'm asking is because in

Steven Goldwasser, M.D.

Page 78

1 your report, you don't -- you state that pain can be
2 caused by a lot of things, I understand that, and I
3 don't see any discussion of your criticisms or
4 explanation of that data, and that's why -- today is
5 my only opportunity to find these things out. So
6 I'm just trying to see as you sit here today, do you
7 have any further explanation that you want to add as
8 to why you criticize or discount or you don't buy
9 that hardened scar plate causes or contributes to
10 pain? Do you have anything else to add?
11      MR. RUMANEK: Object to the form.
12      A  I can look at my report. Which page are
13 we specifically talking about?
14      Q  It's not in there, so I don't have a page
15 really to cite. And so I'm asking you if there's
16 anything else you would like to add today.
17      MR. RUMANEK: Object to the form.
18      A  To, okay, go back -- in summary, add to
19 the theory about scar plating?
20      Q  No, we've agreed -- I mean, you would
21 agree that there's evidence that a hardened scar
22 plate can cause or contribute to pain, and that's a
23 theory that's been tested, there's some science
24 showing it, right? You get that, right?
25      MR. RUMANEK: Object to the form.

Page 79

1      A  There are some articles that suggest that.
2      Q  Right. And -- and I'm simply asking --
3 you know, you don't tell me in here why you don't
4 buy that theory. I just -- and I understand that
5 you -- I understand that pain can come from a lot of
6 different reasons.
7      A  Correct.
8      Q  And just specific to that one theory, like
9 is there some problem that you see with that theory
10 or some -- you don't -- the authors aren't reliable,
11 they're poor journals, their analysis is bad? Do
12 you have any scientific bases for discounting that?
13      MR. RUMANEK: Object to the form.
14      A  Personal experience.
15      MR. BENTLEY: We can take a break.
16      (Recess from 9:42 a.m. to 9:47 a.m.)
17      MR. BENTLEY: And just to clear up the
18 record, on the document request that we were
19 looking at earlier, item 16 on Exhibit A is,
20 "any reports, documents, whether kept in hard
21 copy or electronic form, related to any other
22 matter involving any pelvic mesh product for
23 treatment of stress urinary incontinence or
24 pelvic organ prolapse," and Plaintiffs again
25 request that those document requests are

Page 80

1 responded to and plaintiffs request the reports
2 and summaries regarding that --
3 Dr. Goldwasser's database regarding mesh-based
4 products for prolapse. And those are relevant
5 to his opinions here and we request those in
6 preparation for trial.
7      MR. RUMANEK: And let me just note on the
8 record that we've filed an objection to the
9 document requests that were put forward.
10 BY MR. BENTLEY:
11      Q  Doctor, when did you train on PROLIFT+M?
12      A  I don't remember the exact year, but
13 whenever it was released, which was, I don't know,
14 maybe -- I don't remember exactly when it was
15 released. I want to say a year or two after maybe
16 PROLIFT came out.
17      Q  And we discussed you're a fairly early --
18 a doctor of new technology; is that fair?
19      A  Right.
20      Q  And you'll look at new technology and
21 decide whether it's appropriate to incorporate in
22 your practice; is that correct?
23      A  Correct.
24      Q  And you looked at, for example, some AMS
25 and Boston Sci products that you didn't incorporate,

Page 81

1 correct?
2      A  Correct.
3      Q  And you did incorporate PROLIFT+M into
4 your practice, though, right?
5      A  Correct.
6      Q  And you wouldn't have done that if you
7 didn't perceive a benefit for the product, right?
8      MR. RUMANEK: Object to the form.
9      A  It was uncertain as to whether there was a
10 benefit, so --
11      Q  Once you began using PROLIFT+M, you
12 continued to use it, right?
13      A  I believe it was -- I don't recall whether
14 that was the one we used. It may have been the only
15 thing that was available at the time.
16      Q  I'm going to hand you what's being marked
17 as Exhibit 5 and this an e-mail that will hopefully
18 refresh your memory on the time period. You can see
19 it's an e-mail from May 2009. You see that?
20      (Exhibit 5 was marked for identification.)
21      A  Correct.
22      Q  And the subject's New PROLIFT+M Order; do
23 you see that?
24      A  Correct.
25      Q  And --

Steven Goldwasser, M.D.

Page 82

1    MR. RUMANEK:  Just give him a chance to
2  look at it.
3    Q    And PROLIFT+M is just a PROLIFT product
4  with a partially absorbable mesh component, correct?
5    A    Right.
6    Q    And the ultimate goal of that is just to
7  have a lighter mesh implanted in the woman's pelvis
8  after part of the mesh is absorbed generally, right?
9    MR. RUMANEK:  Object to the form.
10   A    Correct.
11   Q    Right.  And the potential perceived
12  benefits is that is the mesh will be lighter weight
13  because there's less mesh left at the end, right?
14   MR. RUMANEK:  Object to the form.
15   A    That was the theory, correct.
16   Q    And this e-mail just shows that -- you can
17  see this is from David Jackson writing an e-mail to
18  Ramona Peterson.  Do you know either of those
19  people?
20   A    Yes.
21   Q    David Jackson was a sales rep in your
22  territory?
23   A    Correct.
24   Q    And you can see David Jackson says, "I
25  have not told Dr. Goldwasser this info because he

Page 83

1  needs to use the old PROLIFT that you have on the
2  shelf.  He did ask me about the new mesh yesterday,
3  and I told him it was still pending"; do you see
4  that?
5    A    Correct.
6    Q    And you can see this e-mail is just them
7  talking about you wanting to try PROLIFT+M, right?
8    MR. RUMANEK:  Object to the form.
9    A    If it says so.  I mean, I don't remember,
10  I guess --
11   MR. RUMANEK:  Take -- read that e-mail.
12   Q    It's merely just to refresh the time
13  period.  Is this consistent with your memory of when
14  you first trained on and started using PROLIFT+M?
15   A    I don't remember specifically just based
16  on the date on here.
17   Q    Do you have a recollection that's
18  different?  Do you think you started using plus M in
19  a different year?
20   A    No, I mean, I honestly don't remember when
21  I did.
22   Q    You don't have any reason to doubt this
23  e-mail, do you?
24   MR. RUMANEK:  Object to the form.
25   A    Doubt what?

Page 84

1    Q    You don't have any reason to doubt the
2  accuracy of David Jackson's representation about you
3  wanting to use PROLIFT+M around 2009, do you?
4    MR. RUMANEK:  Object to the form.
5    A    I honestly don't know.
6    Q    But your case log -- does your case log
7  differentiate between plus M and regular PROLIFT?
8    A    Correct.
9    Q    So that's information you could have
10  gotten from your case log, right?
11   A    I believe so, correct.
12   Q    Doctor, have you ever noticed when you're
13  implanting mesh that it doesn't lay flat?
14   MR. RUMANEK:  Object to the form.
15   A    When I'm implanting mesh, it does not lay
16  flat.
17   Q    Well, let me rephrase a little bit.
18        When you're implanting mesh, are you
19  always conscious to make sure that the mesh lays
20  flat, is that one of your goals?
21   A    It's one of the things that I'm aware of
22  when I'm doing the implantation, correct.
23   Q    But if it doesn't lay flat, that could
24  potentially lead to things we discussed like roping,
25  bunching and other such things, right?

Page 85

1    MR. RUMANEK:  Object to the form.
2    A    Not necessarily.
3    Q    What happens if it doesn't lay flat?
4    A    I don't know.  It's a problem.  Nobody
5  knows.
6    Q    So why don't you just curl it up when you
7  implant it?
8    MR. RUMANEK:  Object to the form.
9    A    Esthetically to me it looks better to lay
10  it flat.
11   Q    Who's looking at it, Doctor?
12   A    I am as I'm putting it in.
13   Q    So the only reason you're making sure the
14  mesh lays flat is for your personal esthetics?
15   MR. RUMANEK:  Object to the form.
16   A    Not at all.  My perception.
17   Q    Right.  I'm going to hand you what's being
18  marked as Exhibit 6.  And this is a Pre-study
19  Questionnaire that was produced by Ethicon to us,
20  and I think this just documents one of the
21  consulting projects you worked on for Ethicon.  Do
22  you recall consulting for Ethicon in 2010?
23       (Exhibit 6 was marked for identification.)
24   A    Not specifically that, but based on what
25  you're telling me.

Steven Goldwasser, M.D.

Page 86

1    Q    But you remember -- I mean, it's
2    interesting, the last page has some diagrams of, I
3    guess, your hands and measurements.  I think they
4    were looking at designing some new products, do you
5    remember that?
6    A    No, I honestly don't.
7    Q    All right.  Well, the first page of this
8    document, it says Pre-study Questions:
9    Dr. Goldwasser; do you see that?
10   A    Correct.
11   Q    And let's try and, I guess, see if this is
12   really you.  Do you know what your glove size is?
13   A    Correct.
14   Q    You do know --
15   A    Yes.
16   Q    And is this consistent with your glove
17   size?
18   A    Yes.
19   Q    7.5, right?
20   A    Yes.
21   Q    And you're right-handed?
22   A    Correct.
23   Q    And this document was made in November of
24   2010.  And the third question states that you've
25   been doing mesh-based repairs for, I guess, prolapse

Page 87

1    for about seven years; is that correct?
2        MR. RUMANEK:  Object to the form.
3    A    If they say so, correct.
4    Q    Well, you would have provided this
5    information to them, right?
6        MR. RUMANEK:  Object to the form.
7    A    It would have been my best guess.
8    Q    Right.
9    A    I mean, I couldn't tell you specifically
10   when I started.
11   Q    And this is consistent with your memory
12   and your testimony today that you started using
13   mesh-based repairs for prolapse around 2003, right?
14   A    Most likely, correct.
15   Q    And question 4 says you do about ten
16   procedures per month, that's consistent with what
17   you've testified to today, right?
18   A    Correct.
19   Q    And what's interesting is question 5, you
20   put -- or they recorded that you're doing
21   100 percent mesh-based repairs.  You would have
22   been using mesh-based repairs for some women and
23   doing native tissue repairs for others; isn't that
24   correct?
25       MR. RUMANEK:  Object to the form.

Page 88

1    A    I believe I did some native tissue
2    repairs.
3    Q    Because, like you said, there's no one
4    product that's appropriate for all patients, right?
5        MR. RUMANEK:  Object to the form.
6    A    Not necessarily.  I mean, I was using
7    PROLIFT at the time, but I would cut it to different
8    shapes if I needed to, so --
9    Q    Were you still doing native tissue repairs
10   when you were implanting PROLIFT?
11   A    It says 100 percent on here, but my guess
12   is I must have been doing some at the time.
13   Q    And question 6 says you're doing four to
14   five PROLIFTs per month and four to five Exairs per
15   month; do you see that?
16   A    Correct.
17   Q    How would you decide which patients to
18   recommend PROLIFT versus which patients to recommend
19   Exair?
20   A    I wasn't necessarily recommending one or
21   the other to the patients.  It probably has to do
22   with at the time, 2010, I was trying to figure out
23   which product may be best long term.  There were
24   different components of each product that I thought
25   were favorable.

Page 89

1    Q    And what were the components of the Exair
2    that you thought were favorable in comparison to
3    PROLIFT?
4    A    I liked the technique that was
5    specifically, you know, touted in the Exair device.
6    Q    That was your technique.
7    A    Correct.
8        MR. RUMANEK:  Were you done answering the
9    question?  I just want to make sure you have a
10   chance --
11   A    I also -- yeah, correct.  I also liked
12   the -- I actually like the introducers better on the
13   PROLIFT.  I thought they had a better surgical
14   device in terms of cannulas, trocars.
15   Q    But you designed the Exair, why didn't you
16   design the introducers --
17       MR. RUMANEK:  Were you done?  I just want
18   to make sure he's done answering the question.
19       THE WITNESS:  Yeah, yeah.
20   Q    You designed -- you helped design the
21   Exair.  Why didn't you design the introducers to
22   match what you thought were the best product
23   instruments to implant?
24   A    Because there was a patent --
25   Q    Okay.  Fair.

Steven Goldwasser, M.D.

Page 90

1    A   -- unfortunately.
2    Q   And really what I just want to draw your
3  attention to is down at the bottom under question
4  13, you state that one of the reasons you trim the
5  graft was it does not lay flat; do you see that?
6        MR. RUMANEK:  Object to the form, to the
7  characterization.
8    A   Yes.
9    Q   And we were discussing the perceived
10  benefits of mesh laying flat is -- is what?
11       (Off-the-record discussion.)
12  BY MR. BENTLEY:
13   Q   Number 13, the question is, "For which
14  specific reasons would you trim the graft?"  And
15  your answer is, "Does not lay flat"; do you see
16  that?
17       MR. RUMANEK:  Object to the form.
18  Mischaracterization.
19   A   Yes.
20       MR. RUMANEK:  Did you -- you answer out
21  loud.
22   A   Yes.
23   Q   Yes?  No?
24       And the reason you're trimming it is
25  because it doesn't lay flat.  And I'm just -- we're

Page 91

1  trying to figure out what your reason for wanting it
2  to lay flat is, and I think we were discussing this
3  a little earlier, but can you restate why you want
4  the mesh to lay flat in addition to esthetics?
5    A   Well, my perception is that if it lays
6  flat, it covers more of the surface area where the
7  prolapse is and that theoretically it may be more
8  beneficial for whatever reason.  It's really an
9  unknown -- it's an unknown.
10   Q   Well, why would you trim it if you wanted
11  more surface area and wider mesh?  Wouldn't having a
12  wider piece of mesh that's not cut cover more
13  surface area?
14       MR. RUMANEK:  Object to the form.
15   A   No.  I mean, there's excess mesh on it
16  that you don't need.  I mean, you want to use the --
17  you want to use just what you need.  I mean, there's
18  edges that you don't necessarily want sticking out
19  all over the place.
20   Q   Why?
21       MR. RUMANEK:  Object to the form.
22   A   Just my perception.
23   Q   Why in your perception do you not want
24  extra mesh?
25   A   It's not necessarily extra mesh.  My

Page 92

1  perception is that you put the device in to do the
2  dissection adequately so that the device can expand
3  and cover the suction area that you're trying to
4  treat.
5    Q   But you're trimming it so there's no extra
6  mesh, right?
7        MR. RUMANEK:  Object to the form.
8    A   I'm trimming it so it fits the patient.
9    Q   So it lays flat in the patient, right?
10       MR. RUMANEK:  Object to the form.
11   A   As flat as I can make it, correct.
12   Q   And why, why are you trying to do that?
13       MR. RUMANEK:  Object to the form.  Asked
14  and answered.
15   A   No specific data as to why I'm doing that.
16  It's my perception.
17   Q   So you're operating on patients and
18  treating patients for no perceived benefit or --
19  what's the perceived benefit?
20       MR. RUMANEK:  Object to the form.
21  Mischaracterizes his testimony.
22       MR. BENTLEY:  I didn't mischaracterize his
23  testimony.  I'm asking him a question.
24   A   Well, it's an unknown.  Nobody knows how
25  exactly the best method is for any of this stuff.

Page 93

1    Q   We're not talking about best method or
2  what everyone else knows.  I'm asking you, Dr. -- as
3  Dr. Goldwasser, who trims the mesh so it lays flat,
4  why are you doing that?
5        MR. RUMANEK:  Object to the form.  Asked
6  and answered.
7    A   Just in discussions with my colleagues,
8  you know, the perception was is that you want to do
9  the procedure where you lay the mesh flat.
10   Q   Why, though?  What's the perceived benefit
11  that you discussed with your colleagues that is
12  associated with mesh laying flat versus crumpled up
13  or not?
14   A   The perceived benefit was possibly less
15  exposure.  Nobody knew exactly what to expect from
16  these things.  I mean, you're -- you know, this is a
17  process in evolution basically.
18   Q   We're gaining knowledge as the product's
19  out there and we're implanting it, right?
20   A   Correct.
21   Q   As we're treating women, we're continuing
22  to look at it and see what happens, correct?
23   A   Correct.
24   Q   And our --
25       MR. RUMANEK:  Object to --

Steven Goldwasser, M.D.

Page 94

1    Q    And our knowledge base is increasing as
2  it's used more, right?
3    A    You'd hope.
4    Q    Right.  And you personally are increasing
5  your personal knowledge base using your database,
6  correct?
7    A    Correct.
8    Q    And that's to learn more about the product
9  because it's a new product, right?
10       MR. RUMANEK:  Object to the form.
11    A    Yeah, I mean, it was new and it's --
12    Q    And -- sorry.  And new products have
13  different complications associated with them, right?
14       MR. RUMANEK:  Object to the form.
15    A    All products have complications associated
16  with them.
17    Q    Sure.  Well -- but you just said you don't
18  know exactly what's going on with this product,
19  we're figuring it out, right?
20       MR. RUMANEK:  Object to the form.
21    Q    Right?
22       MR. RUMANEK:  Mischaracterizes his
23  testimony.
24    A    Correct.
25    Q    And it's a fairly new product, so we're

Page 95

1  just trying to figure out what happens if the mesh
2  lays flat versus not flat, that's one of the things
3  we're looking at, right?
4       MR. RUMANEK:  Object to the form.
5    A    One of the things that I'm looking at?
6    Q    Well, you're looking to keep it flat,
7  right?  Let's back up.
8       This is a new product that we're gaining
9  knowledge about, right?
10       MR. RUMANEK:  Object to the form.
11    A    Correct.
12    Q    And you're attempting to keep the mesh to
13  lay flat because you think there's some perceived
14  benefits, whether or not they're for sure, we don't
15  know, right?
16       MR. RUMANEK:  Object to the form.
17    A    Correct.
18    Q    And you just testified that one of the
19  potential benefits of keeping the mesh flat is
20  reduce complications such as erosion; is that
21  correct?
22       MR. RUMANEK:  Object to the form.
23    A    Potentially, correct.
24    Q    But we don't know necessarily yet because
25  there's not a lot of information available yet?

Page 96

1       MR. RUMANEK:  Object to the form.
2    A    There's information available, a lot of
3  information, but they're all theories.
4    Q    Right.  But at least based on the
5  information and the theories that you know, you're
6  at least attempting to keep it flat?
7    A    Correct.
8    Q    Doctor, I'm handing you what's being
9  marked as Exhibit 7, and this is, I think, one of
10  your early publications with Dr. Mickey Karram; do
11  you see that?
12    A    Yes.
13       (Exhibit 7 was marked for identification.)
14    Q    And the title of this is High Uterosacral
15  Vaginal Vault Suspension With Facial Reconstruction
16  For Vaginal Repair Of Enterocele And Vaginal Vault
17  Prolapse; is that correct?
18    A    Correct.
19    Q    And this was --
20    A    2001.
21    Q    A while ago?
22    A    Correct.
23    Q    And this was published in the American
24  Journal of Obstetrics and Gynecology actually in
25  December 2001; is that correct?

Page 97

1    A    Correct.
2    Q    All right.  And you're listed as one of
3  the authors on this article, correct?
4    A    Correct.
5    Q    And do you still perform high uterosacral
6  vaginal vault suspensions today?
7    A    Yes.
8    Q    Do you have good results with those?
9    A    Yes.
10    Q    All right.  And just briefly, on the third
11  page under Comment on the right --
12    A    Page -- okay.  Yes.  Yes.
13    Q    It's 1341 at the top.
14    A    Uh-huh.  Okay.
15    Q    Under Comment, you state that, "This study
16  and previous reports by Jenkins, Shull, et al, and
17  Barber, et al, indicate that the uterosacral
18  ligaments are durable, usable structures even in
19  patients with advanced pelvic organ prolapse, which
20  supports the concept that these structures do not
21  attenuate but break at specific points.  The
22  procedure described in this report not only suspends
23  the vaginal vault but also obliterates the
24  cul-de-sac, thus preventing any enterocele
25  recurrence"; is that correct?

Steven Goldwasser, M.D.

Page 98

1  A   Correct.
2  Q   And if you turn one more page to the end,
3  the very last paragraph, you conclude, "A high
4  uterosacral ligament suspension with fascial
5  reconstruction seems to be a durable procedure for
6  vaginal repair of enterocele and vaginal vault
7  prolapse"; do you see that?
8  A   Correct.
9  Q   Is that still true today?
10  A   Yes.
11  Q   And that's one of the options -- the
12  surgical options for treating apical prolapse,
13  correct?
14  A   Correct.
15  Q   Doctor, when you were working with
16  Coloplast to design the Exair, what kind of mesh was
17  used in that product?
18  A   I believe it was called Novasilk.
19  Q   I'm handing you what's being marked as
20  Exhibit 8, and this is something I pulled off the --
21  I think the Coloplast website, and it's -- looks
22  like an advertisement or a brochure for the Exair
23  Prolapse Repair System; do you see that?
24      (Exhibit 8 was marked for identification.)
25  A   Yes.

Page 99

1  Q   And would you have been familiar with a
2  document like this in using Exair, in helping
3  develop it?
4      MR. RUMANEK:  Object to the form.
5  A   No, I don't think I've seen this before.
6  Q   Well, let's look at it and maybe you can
7  just tell me what you think about these claims.  If
8  you'd turn to the second page, it's a description of
9  the Exair, the product that you helped to develop.
10  Does that look like the product you helped develop
11  on the bottom of those pictures?
12  A   Yes.
13  Q   And on the left it says Custom-shaped
14  Novasilk mesh, and that's the mesh that you were
15  describing that's used in this product, correct?
16  A   Correct.
17  Q   And it's a little bit different than the
18  Gynemesh mesh used in PROLIFT, correct?
19  A   Correct.
20  Q   And here the Novasilk is described as
21  light, "Lighter weight and lower density means less
22  implanted material for increased patient comfort";
23  do you see that?
24      MR. RUMANEK:  Object to the form.
25  A   Somewhere on here.

Page 100

1  Q   On the top left under Custom-shaped
2  Novasilk.
3  A   Oh, yeah, yeah.
4  Q   You with me?
5  A   Correct.
6  Q   And it's got a couple of aspects of the
7  Novasilk mesh; do you see that?
8  A   Correct.
9  Q   And the first one is Light and it says,
10  "Lighter weight and lower density means less
11  implanted" mesh -- or "less implanted material for
12  increased patient comfort"; do you see that?
13  A   Yes.
14  Q   And that's kind of consistent with what we
15  were just talking about, that there's a perceived
16  benefit of having less mesh, which is one of the
17  reasons why you would trim the mesh --
18      MR. RUMANEK:  Object to the form.
19  Q   -- is that fair?
20      MR. RUMANEK:  Object to form.
21  A   Yes, over a period of time that became the
22  perception, correct.
23  Q   Right.  And next it says Soft -- in that
24  second bullet, it says, "Soft-cut, non-fraying edges
25  help to lessen" mesh -- sorry, let me rephrase it.

Page 101

1      The next under Soft, it says, "Soft-cut
2  non-fraying edges help to lessen risk of extrusion";
3  do you see that?
4  A   Correct.
5  Q   And I think that's what you testified,
6  that one of the reasons you want to take the extra
7  mesh out is so it's not sticking there potentially
8  extruding or eroding out, correct?
9  A   Yeah.  That was one of the perceptions,
10  correct.
11  Q   And it could be a benefit for a patient --
12  a potential benefit for a patient, right?
13  A   Possibly.
14  Q   And next down it says Porous, "Large pore
15  microfiber knit supports tissue ingrowth and
16  incorporation of mesh into adjacent tissue"; do you
17  see that?
18  A   Correct.
19  Q   And that's kind of -- in part of our
20  discussion, we were talking about the pore size
21  allows for the mesh to incorporate into the body,
22  right?
23  A   Correct.
24  Q   And one of the perceived benefits here is
25  that the large pore of the Novasilk allows it to be

Steven Goldwasser, M.D.

Page 102

1 safely and comfortably incorporated into the body;
2 is that correct?
3     MR. RUMANEK:  Object to the form.
4   A   Correct.
5   Q   And, in fact, Novasilk is described as
6 soft as compared to some other meshes, right?
7   A   Correct.
8   Q   Right.  And the last -- or the next one
9 down, Compliant, it says, "Multidirectional
10 elasticity enables anatomic conformance and aids in
11 wrinkle-free positioning"; do you see that?
12   A   Correct.
13   Q   And that's another goal that we've seen --
14 or we've talked about, is you try to make the mesh
15 lay flat, which is -- here is described as wrinkle
16 free, which is kind of the same thing, right?
17     MR. RUMANEK:  Object to the form.
18   A   Correct.
19   Q   So, you know, this mesh that you -- this
20 mesh product that you helped design has some good
21 benefits potentially for the patient; is that
22 correct?
23   A   Well, correction --
24     MR. RUMANEK:  Object to form.
25   A   -- I didn't have anything to do with the

Page 103

1 mesh design.
2   Q   Well, you designed a product that used
3 this mesh that has these potential benefits, right?
4   A   Correct.  But I actually prefer the
5 Gynemesh over this.
6   Q   Right.  And I think you prefer the
7 Gynemesh because it was actually stiffer; isn't that
8 correct?
9   A   Correct.
10   Q   And you felt that it had better handling
11 characteristics when you were implanting it as
12 compared to the softer Novasilk, right?
13   A   Correct.
14   Q   But from the patient side, you noted that
15 the stiffness can be more perceived by the patient,
16 though; isn't that correct?
17     MR. RUMANEK:  Object to the form.
18   A   No, I didn't.  That was the strange part.
19   Q   I'm going to hand you what is being marked
20 as Exhibit 9.  This is another document produced to
21 us by Ethicon, and this is a -- at the top it says
22 Neo usability study 2, Post-study questions; do you
23 see that?
24     (Exhibit 9 was marked for identification.)
25   A   Yes.

Page 104

1   Q   And then the next line, it says,
2 "Dr. Goldwasser asked before he performed the
3 PROLIFT kit."  And --
4   A   Who this is from?
5   Q   This is -- you know, at the bottom right,
6 it has the --
7     MR. RUMANEK:  Take a --
8   Q   -- eth.mesh document; do you see that?
9     MR. RUMANEK:  You can review it if you'd
10 like.
11   A   Ethicon, okay.
12   Q   Well, your reliance list indicates you
13 reviewed -- reviewed some internal Ethicon
14 documents, correct?
15   A   Yes.
16   Q   Were you provided this document when you
17 were preparing for this deposition or your report?
18     MR. RUMANEK:  Object to the form.
19   A   It was in my list, correct.
20   Q   Do you recall reviewing this when you --
21   A   I've reviewed hundreds of articles --
22   Q   Did you --
23   A   -- so I couldn't tell you specifically.
24   Q   Yeah, and I'm not talking about articles.
25 I'm talking about the Ethicon documents.  You see on

Page 105

1 the bottom right it has the eth-mesh?
2   A   Correct.
3   Q   Right.  And you were provided some
4 documents with an eth-mesh on it?
5   A   Correct.
6   Q   And did you -- were you provided any
7 documents that reflected your consulting experience
8 with Ethicon?
9   A   I can't say for sure honestly.
10   Q   You don't remember seeing this document
11 specifically, though?
12   A   Correct.
13   Q   And we were talking about some of the
14 potential benefits of Exair, and I just want to draw
15 your attention down to mesh material, and the
16 question is, "Are you aware of Ultrapro mesh,
17 Gynemesh M mesh, or PROLIFT+M," it continues, and
18 you answered "yes, to all above."
19     MR. RUMANEK:  Object to the form.
20     MR. BENTLEY:  Well, I haven't even asked
21 the question yet, though, I appreciate that.
22   Q   And I really just want to draw your
23 attention to -- your next sentence, you say, "Exair
24 uses the Novasilk mesh and it's clear and hard to
25 see"; do you see that?

Steven Goldwasser, M.D.

| Page 106 |
| --- |

1  MR. RUMANEK:  Object to the form.
2  Q   The second sentence under your answer.
3      MR. RUMANEK:  Object to the form.
4  A   Under mesh material?
5  Q   Yes.
6  A   Yes --
7  Q   Okay.
8  A   -- to all the above -- oh, okay, I see.
9  Q   And that's consistent with the other
10 document we saw that said you're using PROLIFT and
11 Exair about 50/50 of the time, right?
12 A   Correct.
13 Q   Right.  And we were discussing some of the
14 attributes of Novasilk, or Exair, right?  And this
15 appears to confirm what you were just testifying to,
16 that's all I'm talking about.
17     MR. RUMANEK:  Object to the form.
18 Q   But you continue down in that, it says,
19 "The stiffness to it is better to discern the
20 patient tissues from the graft itself."  And there
21 you're talking about the PROLIFT or Gynemesh mesh,
22 which is stiffer, right?
23 A   Correct.
24     MR. RUMANEK:  Object to the form.
25 Q   And you note that you have an awareness of

| Page 107 |
| --- |

1  it, where you are, which you're just saying you have
2  better handling, you can -- you know what's going on
3  with the mesh better because if it's stiffer, right?
4      MR. RUMANEK:  Object to the form.
5  A   Correct.
6  Q   "But from the patient side, it can be
7  noticed from the male side.  It becomes an issue if
8  it is exposed"; do you see that?
9  A   Correct.
10 Q   And you finish, "It is a known risk as an
11 exposure if you are sexually active"; do you see
12 that?
13     MR. RUMANEK:  Object to the form.
14 A   Correct, I see that.
15 Q   And these two meshes have different
16 stiffness, right?
17 A   Correct.
18 Q   One of the aspects of the design of any
19 given mesh is the pore size is going to be
20 different, right?
21 A   Correct.
22 Q   And the geometry or pore configuration is
23 going to create a different stiffness of each mesh?
24 A   Right.
25 Q   It's going to probably have a different

| Page 108 |
| --- |

1  elongation profile, correct?
2  A   Correct.
3  Q   Different -- it stretches differently,
4  correct?
5  A   Correct.
6  Q   And just simply, the Novasilk mesh that
7  you used in the product, you helped to design, had a
8  different mesh construction as compared to the
9  Gynemesh, right?
10 A   Correct.
11 Q   And the Gynemesh mesh used in the PROLIFT
12 is a little stiffer, right?
13 A   Correct.
14 Q   And you liked the stiffer mesh because it
15 was easier to handle when you're implanting,
16 correct?
17 A   Correct.
18 Q   But you note here that the stiffer mesh
19 can be noticed by the male side and it becomes an
20 issue if it's exposed, correct?
21     MR. RUMANEK:  Object to the form.
22 A   It can be noticed if it's exposed during
23 sexual activity, correct.
24 Q   Right.  It's stiffer, you're going to feel
25 it more likely as opposed to a softer mesh; is that

| Page 109 |
| --- |

1  correct?
2      MR. BENTLEY:  Object to the form.
3  A   Not necessarily.
4  Q   Well, you state here that, "from the
5  patient side, it can be noticed from the male side"?
6      MR. RUMANEK:  Object to the form.
7  Q   That's what it says here, right?
8  A   But any mesh exposure can be noticed.
9  Q   Right.  But you note it here that the
10 PROLIFT is stiffer, right?
11     MR. RUMANEK:  Object to the form.
12 A   Right.
13 Q   And you note that, "From the patient side,
14 it can be noticed from the male side, it becomes an
15 issue if it is exposed," you noted, right?
16     MR. RUMANEK:  Object to the form.
17 A   If -- well, there are a lot of
18 asymptomatic exposures, so it could potentially --
19 any mesh exposure could be symptomatic or
20 asymptomatic.
21 Q   Right.  And a softer mesh, you're not
22 going to notice it as easily as a stiffer mesh,
23 generally, right?
24     MR. RUMANEK:  Object to the form.
25 A   It depends on where the exposure is.

Steven Goldwasser, M.D.

Page 110

1    Q   Right. I mean, if -- all things equal, a
2 softer mesh you're not going to notice as much if
3 it's exposed during sexual intercourse, that's all
4 you're noting here, right?
5       MR. RUMANEK: Object to the form. It
6 mischaracterizes the testimony.
7    A   It depends on the circumstance.
8    Q   Well, I'm trying to understand what your
9 words say here, Doctor. And I get that everything
10 is different, circumstances are different, patients
11 are different, but just generally, you're talking
12 about PROLIFT is stiffer than Novasilk, right?
13       MR. RUMANEK: Object to the form.
14    A   Correct.
15    Q   Right. And you're saying that there's a
16 difference if it exposes just because it's stiffer,
17 right?
18       MR. RUMANEK: Object to the form.
19    A   No, I'm not saying that at all.
20    Q   Then explain what you're saying here when
21 you're pointing out that the patient can notice it
22 from the male side.
23       MR. RUMANEK: Object to the form. Asked
24 and answered.
25    A   If there's any mesh exposure, regardless

Page 111

1 of the type of mesh, it can be noticed on the male
2 side depending on the circumstances.
3    Q   And here you're talking about the
4 stiffness differences of the two meshes, right?
5       MR. RUMANEK: Object to the form.
6    A   I'm saying my perception is that the
7 Gynemesh is stiffer --
8    Q   Right.
9    A   -- and so I would assume that there may be
10 a difference, but it's -- clinically speaking, it
11 doesn't always play out that way.
12    Q   Well, it's stiffer, we know that, right?
13 It's stiff -- the PROLIFT mesh is stiffer than
14 Novasilk, right?
15    A   Correct.
16    Q   Right. And there's a couple of things
17 that are -- that that stiffness creates that are
18 different. One of them is you have better handling
19 during implantation, right?
20    A   Agree.
21    Q   And you just said it, potentially you
22 might notice it more as compared to a softer mesh,
23 right?
24       MR. RUMANEK: Object to the form.
25 Mischaracterizes the testimony.

Page 112

1    A   Correct.
2    Q   Did you originally approach Ethicon or
3 J&J with the Exair before you took it -- before
4 you consulted with Coloplast to design it?
5    A   Yes.
6    Q   Do you remember why they didn't pursue
7 your product, why Ethicon didn't pursue your
8 product?
9       MR. RUMANEK: Object to the form.
10    A   I don't know why they ultimately didn't
11 pursue it, but one of their concerns was that the --
12 the trocar pass from the Exair may be more -- may
13 compromise the neurovascular bundle, Alcock's canal,
14 more so than their technique.
15    Q   And that's -- is that referring to your,
16 like, procedural customization of the PROLIFT?
17    A   Correct. Correct.
18    Q   But in your experience, you didn't
19 perceive any increased problems with using your
20 customized PROLIFT technique, right?
21    A   Correct.
22    Q   In fact, you had better results with it?
23       MR. RUMANEK: Object to the form.
24    Q   Let me rephrase it. In fact, your
25 customized -- with your customized PROLIFT

Page 113

1 technique, you had better success rates with the
2 patients you implanted the mesh, right?
3       MR. RUMANEK: Object to the form.
4    A   I believe so.
5    Q   Doctor, I'm handing you what's being
6 marked as Exhibit 10. It's another Coloplast
7 document I pulled off their website. Do you think
8 you ever reviewed one of the Coloplast patient
9 brochures with the patients that you were implanting
10 the Exair product in?
11       (Exhibit 10 was marked for
12 identification.)
13    A   No, I did not.
14    Q   Would you have given your patients -- I'm
15 sorry, are you done?
16    A   I had these brochures, but I didn't
17 specifically go over it with them.
18    Q   You had product brochures for like all the
19 products that you were offering patients; is that
20 fair?
21       MR. RUMANEK: Object to the form.
22    Q   Let me say, was it your -- if the sales
23 rep gave you brochures to go to patients for the
24 products you were implanting, you would have given
25 those to your patients?

Steven Goldwasser, M.D.

| Page 114 |
| --- |

1    MR. RUMANEK: Object to the form.
2    A   They were available, but I didn't
3 specifically give it to them.
4    Q   You didn't affirmatively recommend that
5 the patients should review the brochure?
6    A   I would review the technique and my risks
7 and benefits, so -- I have with them, but I didn't
8 always have these things around, so I may give it to
9 them if it was available.
10    Q   Sure.  But it could be a useful tool for
11 educating the patient about for the surgery they're
12 going to undergo; is that fair?  In addition to your
13 discussion, of course, correct?
14    MR. RUMANEK: You got to let me -- you got
15    to let him answer the question.
16    A   Yes, I think that my discussion and my
17 perception and experience were really what I based
18 my counseling on, and this was purely a supplement.
19    Q   And you had very detailed discussions with
20 your patients about the risks and benefits of these
21 procedures, right?
22    A   Correct.
23    Q   How long would those consent discussions
24 usually last?
25    MR. RUMANEK: Object to the form.

| Page 115 |
| --- |

1    A   Depends.  Anywhere from ten to 20 minutes.
2    Q   Were your discussions longer regarding
3 patient counseling on mesh procedures as opposed to
4 other procedures?
5    A   Yeah, there was more things to cover,
6 correct.
7    Q   Would you have described it as very time
8 consuming to counsel patients on mesh procedures?
9    MR. RUMANEK: Object to the form.
10    A   Over a period of time, it became more time
11 consuming.
12    Q   You know that that was appropriate in your
13 opinion, to fully educate the patients on a
14 procedure they were undergoing, right?
15    MR. RUMANEK: Object to the form.
16    A   It was in the basis of, you know, common
17 risks or things that I saw specific to that patient,
18 correct.
19    Q   And, Doctor, if you could turn your
20 attention on Exhibit 10 to page 9.  I just want to
21 see if you agree with some of these statements.  I
22 acknowledge this is obviously not an Ethicon product
23 brochure.  You see at the top, it says, "Are there
24 any risks with mesh?"
25    A   Correct.

| Page 116 |
| --- |

1    Q   And the second paragraph, the -- I guess
2 the third sentence says, "Potential complications
3 from mesh surgery may include:  pain, slow healing
4 of mesh infection or non-healing, mesh extrusion
5 from the vagina, mesh erosion into adjacent organs,
6 nerve injury, recurrent prolapse, inflammation,
7 adhesion formation, fistula formation, narrowing of
8 the vagina, scarring, pain with intercourse, and
9 mesh contraction."  And my question is, would you
10 agree that those are all potential complications
11 from mesh surgery like PROLIFT?
12    MR. RUMANEK: Object to form.
13    A   I think from any surgery.
14    Q   And so you would agree that those are all
15 potential complications from mesh surgery?
16    A   Let's see.  Yes.
17    Q   And you were discussing that, of course,
18 all procedures have --
19    A   Well, I take that back.
20    MR. RUMANEK: Hold on.
21    A   Infection, I don't see that as being
22 clinically significant in terms of what I've come
23 across.
24    Q   And the next paragraph, I think, addresses
25 what you were discussing, that, in fact, all

| Page 117 |
| --- |

1 procedures have some complications, right, just
2 generally; is that fair?
3    A   Correct.
4    Q   And as -- and this next sentence states,
5 "As with any surgery, other potential complications
6 can include bleeding, infection, injury to blood
7 vessels and nerves, bladder, urethra, or bowel
8 injury during mesh placement and may require
9 additional surgery to repair."  And you would agree
10 that other potential complications can include those
11 things, correct?
12    A   Correct.
13    Q   And here it's just differentiating between
14 mesh complications and stuff that are just generally
15 potential complications of any surgery; is that
16 fair?
17    MR. RUMANEK: Object to the form.
18    A   I would say that, you know, not
19 necessarily.  I mean, I'd say the biggest difference
20 between the general -- generalized surgery and a
21 mesh-based surgery would be mesh exposure.
22    Q   Well, what about -- so let's have it
23 defined, mesh exposure, are you talking about
24 extrusion to the vagina or are you talking about
25 mesh exposure in the organs?

Steven Goldwasser, M.D.

Page 118

1    A   Both.
2    Q   So you're just using erosion
3 interchangeably?
4    A   Correct.
5    Q   Everyone is a little different?
6    A   Correct.
7    Q   What about mesh contraction, is that a
8 complication that's specific to a mesh implant?
9        MR. RUMANEK:  Object to the form.
10   A   Correct.
11   Q   Just change gears a little bit, Doctor.
12 Your report lays out your qualifications based on
13 your education and experience, and my question is,
14 you're not holding yourself out as an expert in the
15 design of biomaterials, are you?
16       MR. RUMANEK:  Object to the form.
17   A   Correct.
18   Q   Because, as you said, you didn't design
19 the Novasilk in the -- mesh in the Exair product
20 because you don't design meshes; is that --
21       MR. RUMANEK:  Object to the form.
22   A   Correct.
23   Q   And you're not holding yourself out as an
24 expert in epidemiology or statistical analyses,
25 right?

Page 119

1        MR. RUMANEK:  Object to the form.
2    A   Correct.
3    Q   Right.  Because even with your database,
4 you get the statistician to do the number-crunching
5 because that's not in your purview, right?
6        MR. RUMANEK:  Object to the form.
7    A   Correct.
8    Q   And you're not holding yourself out as an
9 expert in pathology analysis, are you?
10       MR. RUMANEK:  Object to the form.
11   A   Not in the general, but --
12   Q   Have --
13       MR. RUMANEK:  Hold up.  Let him answer the
14 question.
15   A   -- but, you know, more specifically to
16 things having to do with my field.
17   Q   Sure.  And if you excised, or removed,
18 some mesh after a woman who underwent a procedure
19 and had mesh implanted to treat prolapse, if you
20 removed some mesh, would you then send that mesh off
21 for a pathologic review?
22   A   Typically not.  It would be a gross
23 submission of products.
24   Q   And so you wouldn't -- I just want to be
25 clear, you yourself wouldn't do some sort of

Page 120

1 pathological review of the specimen other than just
2 the gross examination; is that correct?
3        MR. RUMANEK:  Object to the form.
4    A   Correct.
5    Q   So you never looked at the mesh under a
6 microscope, correct?
7    A   Correct.
8    Q   And you never looked under a -- I think a
9 scanning electron microscope either, correct?
10   A   Correct.
11   Q   Right.  And you would sometimes -- or
12 would you sometimes send the mesh specimen, the
13 explanted mesh specimen, to the pathologist to look
14 at?
15   A   Only if it was requested by the patient.
16   Q   How many times -- do you have an idea of
17 how many times you've had a patient request that
18 such that you've sent the mesh to a pathologist?
19   A   Typically it was if they're involved in
20 some litigation, they would ask for it to be sent.
21   Q   And would you request any specific
22 pathological -- would you request any specific tests
23 that the pathology department perform on the
24 explanted mesh?
25   A   No.

Page 121

1    Q   You would just -- whatever they felt was
2 appropriate testing, you would defer to them; is
3 that --
4        MR. RUMANEK:  Object to the form.
5    A   Correct.
6    Q   Doctor, you're not holding yourself out as
7 an expert in FDA regulations generally, are you?
8    A   Correct.
9    Q   Right.  Correct, you're not, right?
10   A   Correct, not.
11   Q   And you're also not holding yourself out
12 as an expert in the regulations or requirements
13 regarding instructions for use drafting, are you?
14       MR. RUMANEK:  Object to the form.
15   A   Correct.
16   Q   Right.  And you're not an expert in
17 medical device industry practices, right?
18       MR. RUMANEK:  Object to the form.
19   A   Correct.
20   Q   You're not -- well, you've done some
21 design of the medical device for Coloplast and the
22 Exair product, so are you holding yourself out as an
23 expert in the design control processes with regard
24 to medical devices?
25   A   The design control processes?

Steven Goldwasser, M.D.

Page 122

1    MR. RUMANEK: Object to the form.
2    Q   Right.
3    A   No.
4    Q   When you were helping design the Coloplast
5    pro- -- the Coloplast Exair product, that was really
6    you as a clinician giving your input into how the
7    procedure should go --
8        MR. RUMANEK: Object to the form.
9    Q   -- is that correct?
10   A   More or less, correct.
11   Q   Rather than how -- the design requirements
12   matrix versus the risks versus how all that stuff
13   goes together, you're not involving yourself in the
14   actual design process from the medical
15   manufacturer --
16       MR. RUMANEK: Object to the form.
17   Q   -- is that correct?
18   A   Correct.
19   Q   You're not an expert in drafting the
20   adverse of insections for instructions of use, are
21   you?
22       MR. RUMANEK: Object to the form.
23   A   Correct.
24   Q   Right. You're -- well, have you reviewed
25   Ethicon's internal design processes?

Page 123

1    A   No.
2    Q   They're really long.
3        Did you review the -- what's called the
4    DFMEA, or the Design Failure Modes Effects Analysis,
5    that was created for PROLIFT?
6    A   Not that I recall.
7    Q   That's a very long document.
8    A   A very long document, I'm sure.
9    Q   And also you didn't review the DDSA, or --
10   I can't remember what that stands for. Do you
11   recall reviewing the DDSA --
12       MR. RUMANEK: Object to the form.
13   A   No.
14   Q   -- another design document?
15   A   No, I don't.
16   Q   And you didn't review Ethicon's internal
17   protocols for design, you didn't review their DFMEA
18   or DDSA, so you don't know if Ethicon actually met
19   its own standards regarding its requirements for
20   design control, do you?
21       MR. RUMANEK: Object to form.
22   A   Well, I reviewed, you know, what's in the
23   list in general, so I can't say specifically I
24   recall these, but no, I don't.
25   Q   And last, you're not an expert in

Page 124

1    corporate conduct or industry practices, are you?
2        MR. RUMANEK: Object to the form.
3    A   No, I'm not.
4    Q   Doctor, I'd like to talk a little bit
5    about your personal definitions of some things here,
6    and you may not have answers to some of them,
7    fine -- which is totally fine, but do you have an
8    opinion as to what you think or what you intend to
9    testify to the jury as to what the true success rate
10   is for the PROLIFT device?
11       MR. RUMANEK: Object to the form.
12   A   The true success rate?
13   Q   Right. Or what -- there's a wide variety
14   of different numbers out there in the literature,
15   correct, and you're in part relying upon the
16   literature that you reviewed, right?
17   A   Correct.
18   Q   And in part you're relying upon your own
19   experience, correct?
20   A   That's correct.
21   Q   And I'm just asking, based off your review
22   of the literature and based off your personal
23   experience, do you intend to testify to the jury as
24   to a specific percentage success rate for women that
25   undergo an implant procedure with the PROLIFT

Page 125

1    device?
2        MR. RUMANEK: Object to the form.
3    A   When you say "success," can you be
4    specific as to what you --
5    Q   Sure. I mean, if there's some ways that
6    you'd want to -- it would be easier for you to give
7    me some numbers, if you intend to discuss numbers.
8    I just don't know if that is your intention.
9        MR. RUMANEK: Let me just -- there's a
10       whole lot of numbers in his -- are you saying
11       outside of what's already contained in his
12       report?
13   Q   Yeah, outside of just citing a bunch of
14   studies and findings, which there's a lot of them,
15   do you have any, like, after reviewing 20 studies,
16   I'm deciding that the success rate is 11 percent, or
17   have you made any type of calculation?
18       MR. RUMANEK: That would be a really low
19       success rate. Sorry.
20   Q   Or 11 percent failure.
21   A   Right. Right. You know, my -- what I
22   counsel people on is what I would -- my answer would
23   be, and that's based on my personal experience,
24   which has been in general around a 94 to 96 percent
25   success rate with using the transvaginal mesh.

Steven Goldwasser, M.D.

Page 126

1    Q    And how are you -- I'm sorry, how are you
2 defining success when you talk to your patients?
3    A    Success based on my database is lack of
4 recurrent prolapse.
5    Q    Total lack?
6    A    Lack of prolapse that the patient
7 perceives is one of the things I'm looking at and
8 lack of prolapse beyond the introitus.
9    Q    And those are different data points in
10 your database?
11    A    Correct.
12    Q    And so when you're counseling patients,
13 you're primarily giving them information based upon
14 your review of your database?
15    A    Correct.
16    Q    And you've also reviewed literature, but
17 your primary basis for your counseling is your
18 personal experience; is that correct?
19        MR. RUMANEK:  Object to the form.
20    A    Correct.
21    Q    And similarly, do you -- I would assume
22 your database has data points for complications; is
23 that correct?
24    A    Correct.
25    Q    And does your database track erosion

Page 127

1 separately?
2    A    Correct.
3    Q    Does it track dyspareunia separately?
4    A    Correct.
5    Q    Are you -- is your database tracking
6 de novo versus pre-existing dyspareunia?
7    A    Correct.
8    Q    So those are separate data points?
9    A    Correct.
10    Q    And is your database tracking chronic
11 vaginal pain?
12    A    No.
13    Q    Is your database tracking chronic pelvic
14 pain?
15    A    No.
16    Q    So when you're counseling patients, you're
17 going to -- is it fair to say you're going to
18 discuss erosions, expected erosion, expected
19 dyspareunia, the potential for those things
20 happening based upon your personal experience as
21 based on your experience documented in your
22 database, is that generally what's happening?
23        MR. RUMANEK:  Object to the form.
24    A    Correct.
25    Q    And then I would assume you're also

Page 128

1 discussing the potential for chronic vaginal pain
2 and chronic pelvic pain with patients also, right?
3    A    With any surgery, correct.
4    Q    Sure.  But you don't have any data in your
5 database to provide a basis for you to give like a
6 description of what you expect to the patients, just
7 solely based on your database?  You don't have that
8 information, right?
9        MR. RUMANEK:  Object to the form.
10    A    Specific to --
11    Q    That was a horrible question.
12        So your discussion with patients, you
13 know, is obviously going to involve all the
14 potential complications of the implant, right?
15        MR. RUMANEK:  Object to the form.
16    A    No.
17    Q    Well, it's going to -- your discussion
18 with patients is going to involve the potential
19 complications associated with the PROLIFT device,
20 correct?
21        MR. RUMANEK:  Object to the form.
22    A    Correct.
23    Q    And those would include potentially
24 erosion, dyspareunia, vaginal pain, and pelvic pain,
25 correct?

Page 129

1    A    Correct.
2    Q    And the basis for the information that
3 you're going to provide the patients when you're
4 counseling them for erosion and dyspareunia is data
5 points that you have in your database, right?
6        MR. RUMANEK:  Object to the form.
7    A    Correct.
8    Q    And your database just doesn't have data
9 points for the vaginal pain and pelvic pain, right?
10    A    Correct.
11    Q    So at that point you're relying upon your
12 general experience and the literature to discuss
13 those potential complications with patients; is that
14 correct?
15        MR. RUMANEK:  Object to the form.
16    A    It's more of a specific, you know, blanket
17 counseling that any pelvic surgery can result in
18 chronic pain that can be intractable.
19    Q    So you don't have any type of estimate as
20 to how often chronic vaginal pain occurs after
21 implantation of PROLIFT?
22        MR. RUMANEK:  Object to the form.
23    A    Correct.
24    Q    And similarly, you don't have an estimate
25 based -- of -- you don't have an estimate of how

Steven Goldwasser, M.D.

Page 130

1  often chronic pelvic pain might happen to a woman
2  after implantation of a PROLIFT; is that correct?
3       MR. RUMANEK:  Object to the form.
4    A   Say it one more time.  I don't have an
5  estimate.
6    Q   You don't provide an estimate or have any
7  type of estimate of the chronic -- of chronic pelvic
8  pain associated with PROLIFT, do you?
9       MR. RUMANEK:  From his database or are
10  you --
11      MR. BENTLEY:  From anything.
12      MR. RUMANEK:  Object to form.
13   A   No, I don't give them a specific number.
14   Q   Do you give them specific numbers for the
15  rate of erosion and dyspareunia?
16   A   I give them a specific number for rate of
17  erosion.
18   Q   Does your database track the reoperations?
19   A   I'm trying to think whether -- there is
20  some notation there of reoperations, but it's not --
21  I can't say there's specific data points for that.
22  It's in the comments.
23   Q   And I guess if you don't have a data point
24  for reoperation, you're not going to have a data
25  point for how often they had to have a reoperation

Page 131

1  for recurrence of prolapse; is that fair?
2       MR. RUMANEK:  Object to the form.
3    A   Well, I mean, that's a tricky question
4  because, you know, you can have prolapse in a
5  different compartment, which is a new type of
6  prolapse, versus recurrent prolapse.  So I am
7  tracking both new prolapse, recurrent prolapse, but
8  I don't have a specific number for the number of
9  people who actually are symptomatic from any of
10  these things who choose to have something done.
11   Q   Well, I mean, if you treated another
12  compartment of prolapse with mesh, that would --
13  that would show up in your database again, right?
14   A   Correct.  Correct.
15   Q   Right.  And does your database have data
16  points tracking reoperation for complications?
17   A   There's a notation in there but not a
18  specific column that I have.
19   Q   And when you counsel patients who are
20  undergoing -- or who are choosing to undergo a
21  PROLIFT procedure, you're discussing the risks and
22  benefits, would you discuss with them the rates of
23  reoperation?
24      MR. RUMANEK:  Object to the form.
25   A   No, I really don't make a specific number.

Page 132

1  I just say in general, there's a risk of failure.
2    Q   Like there is with any surgery --
3    A   Right.
4    Q   -- surgery, right?
5    A   Correct.
6    Q   And I'm going to ask you similar questions
7  with regard to native tissue repair, okay?
8    A   Sure.
9    Q   Do you have an opinion as to what the
10  overall success rate is for patients that undergo a
11  native tissue repair to treat prolapse?
12   A   Just solely based on the literature,
13  reoperation rates vary tremendously because, again,
14  it's very subjective.  In general, I think the most
15  commonly quoted statistic ranges around -- I'm
16  trying to remember exactly.  I tell patients in
17  general, there's a 30 to 50 percent rate of failure
18  with native tissue repair.
19   Q   And that's considerably higher than your
20  opinion as to the success rate with PROLIFT -- let
21  me rephrase that.
22      A 30 to 50 percent failure rate is
23  considerably higher than your experience and opinion
24  as to what the failure rate is with the PROLIFT; is
25  that correct?

Page 133

1    A   Correct.
2    Q   And you -- as we discussed, you don't
3  track native tissue repair in a database, correct?
4    A   Correct.
5    Q   So you're relying upon the literature,
6  correct?
7       MR. RUMANEK:  Object to the form.
8    A   I'm relying upon my clinical experience
9  subjectively --
10   Q   Sure.
11   A   -- and the literature, correct.
12   Q   To present some sort of estimate of
13  failure rates, numerically you're relying upon the
14  literature because you don't keep those numbers;
15  isn't that correct?
16      MR. RUMANEK:  Object to the form.
17      Mischaracterizes his answer.
18   A   I'm relying upon my -- my clinical
19  practice and just the generalized number of a 30 to
20  50 percent failure rate.
21   Q   How -- do you have some way to numerically
22  evaluate your clinical practice to know how many
23  women you do a native tissue repair on have failure?
24   A   Just from follow-up visits, but nothing
25  tracked in the database, that is correct.

Steven Goldwasser, M.D.

Page 134

1    Q    Right.  And there's no numerical
2 methodology that you've employed to evaluate your
3 clinical success rate on native tissue repair?
4        MR. RUMANEK:  Object to the form.
5    A    No numeric -- correct, correct.
6    Q    And let's talk about complications with
7 native tissue.  It's generally your opinion that
8 complications happen with mesh-based repairs and
9 native tissue as with any surgery, right?
10   A    Correct.
11   Q    But there can be differences in the
12 frequency of complications with different surgeries,
13 right?
14   A    Correct.
15   Q    There could be differences in the
16 frequency of complications with native tissue repair
17 as compared to PROLIFT, right?
18   A    Differences in the frequencies of
19 complications.  Different types of complications,
20 but yes.
21   Q    And there can even be differences in the
22 severity of complications from one procedure to
23 another; isn't that correct?
24       MR. RUMANEK:  Object to form.
25   A    Yeah.

Page 135

1    Q    For example, if you have a mesh erosion, a
2 serious mesh erosion that's going to require, you
3 know, invasive surgical intervention to excise it,
4 that erosion could be more severe than just a suture
5 eroding, couldn't it?
6    A    Potentially, correct.
7    Q    Do you have an opinion as to what the rate
8 of erosion is, I guess, of sutures with native
9 tissue repair?
10       MR. RUMANEK:  Object to the form.
11   A    Rate of erosion, no, I don't.
12   Q    Do you have an opinion as to what the rate
13 of dyspareunia is with native tissue repair?
14       MR. RUMANEK:  Object to the form.
15   A    It various tremendously.
16   Q    So you don't have an opinion as to --
17   A    Don't have a specific number in mind, no.
18   Q    And do you have an opinion as to what the
19 rate of de novo chronic vaginal pain is after a
20 native tissue repair?
21       MR. RUMANEK:  Object to the form.
22   A    Again, varies tremendously.  I don't have
23 a specific number.
24   Q    And do you have an opinion as to what the
25 rate of chronic pelvic pain is after a native tissue

Page 136

1 repair?
2        MR. RUMANEK:  Object to the form.
3    A    Again, same answer, varies tremendously,
4 no specific number.
5    Q    So if you were counseling your patients
6 and discussing a potential native tissue repair and
7 discussing the complications, you wouldn't provide
8 any numerical estimates of the frequency of those
9 complications; is that correct?
10       MR. RUMANEK:  Object to the form.
11   A    Complications being pain?
12   Q    Sure.
13   A    No.
14   Q    Would you provide a numerical estimate of
15 the frequency of chronic vaginal pain with patients
16 if they're deciding to undergo native tissue repair?
17   A    I would just discuss in general it's a
18 risk of any surgery, but nothing different between
19 the mesh and the native tissue.
20   Q    And would you discuss any numerical
21 estimate of the frequency of dyspareunia with native
22 tissue repair?
23   A    Say it one more time.
24   Q    And I'm just trying to get if you discuss
25 any of these estimates -- these frequency estimates

Page 137

1 with patients, and we've gone through I don't think
2 you have an opinion as to what they are.  I'm just
3 making sure you don't also tell patients something,
4 okay?
5    A    No.  Right, right.
6    Q    When you're counseling patients who are
7 considering undergoing a native tissue repair for
8 prolapse --
9    A    Right.
10   Q    -- do you discuss the frequency -- or what
11 you expect the frequency of dyspareunia to be?
12   A    No.
13   Q    And last, when you're counseling those
14 same patients, do you discuss the frequency or
15 expected frequency of an erosion?
16   A    For a graft repair, correct.
17   Q    But for a native tissue repair, do you
18 discuss the expected frequency of that?
19   A    Well, I tell them that if I'm using
20 permanent sutures, there's the risk of exposure, but
21 I don't have a specific number for that.
22   Q    And what kind of suture do you use?
23   A    For?
24   Q    For -- I'm sorry.  When you're doing a
25 native tissue repair, what kind of suture do you

Steven Goldwasser, M.D.

Page 138

1  use?
2       MR. RUMANEK:  Object to the form.
3    A   Typically I use at least one layer of
4  permanent sutures.
5    Q   And do you have any preference as to what
6  specific suture you're using?
7    A   Typically polypropylene or prolene.
8    Q   And that's just like a --
9       MR. RUMANEK:  Hold on a second.
10      (Off-the-record discussion.)
11      MR. BENTLEY:  Let's just take another
12  break.  It's been an hour or so.
13      MR. RUMANEK:  All right.
14      (Recess from 10:40 a.m. to 10:46 a.m.)
15      MR. RUMANEK:  If you intend to keep the
16  deposition open, my position will be that
17  you've got three hours.  If you want to reserve
18  some time to follow back up on certain issues,
19  you can do that.
20      MR. BENTLEY:  I appreciate that.  It's
21  hard to follow up on stuff I haven't gotten.
22  BY MR. BENTLEY:
23    Q   Doctor, we're back from a break.  Are you
24  ready to go?
25    A   Yeah.

Page 139

1    Q   We were discussing before the break what
2  sutures you use in native tissue repair, and I think
3  you said you used a -- like a single-strand prolene
4  suture; is that fair?
5    A   Correct.
6    Q   And I've seen some discussion in the
7  literature of braided sutures.  That's not what
8  you're using for native tissue repair, is it?
9    A   Yeah, sometimes braided tissue -- sutures
10  is what we buy from.
11    Q   Are you using braided sutures in your
12  native tissue repairs?
13    A   Yes.
14    Q   I thought you -- I'm con-- -- are you
15  using -- you testified that you used prolene
16  sutures; is that correct?
17    A   Correct.
18    Q   And prolene sutures are not braided, are
19  they?
20    A   Correct.  No, no, they're not.  They're
21  monofilament.
22    Q   Right.  And you testified that when you do
23  native tissue repair that you're using prolene
24  sutures; is that correct?
25    A   I use usually a combination.  So I may do

Page 140

1  like a two-layer plication, one layer being
2  synthetic -- I mean monofilament prolene, one layer
3  being monofilament -- I mean multifilament VICRYL.
4    Q   And which layer are you using the
5  multifilament VICRYL for?
6    A   Usually that's -- it varies a lot.
7  Sometimes I'll use it on a deeper layer.
8    Q   Sometimes, so that's not your regular
9  practice, it's in certain circumstances that might
10  dictate that's more appropriate?
11    A   Correct.  Correct.
12    Q   What circumstances necessitate you to use
13  a braided suture material?
14    A   Well, if I have a bladder injury and I'm
15  plicating next to that, I may use an absorbable
16  suture named VICRYL in this situation.
17    Q   Is that a braided suture?
18    A   Correct.
19    Q   Okay.
20    A   Correct.  I believe it's braided.
21    Q   Well, do you know?
22    A   I'm pretty sure it's braided, yeah.
23    Q   But it's absorbable?
24    A   It's absorbable, correct.
25    Q   And absorbable braided sutures you'll use

Page 141

1  sometimes if there's a bladder injury; is that
2  correct?
3    A   Correct.  Closer to like a viscous injury,
4  and then I'll put the permanent layer or the prolene
5  outside of that.
6    Q   So you're going to always use a prolene
7  monofilament suture when you're doing native tissue
8  repair, but there's some circumstances that require
9  you to use like maybe a heavier braided suture
10  like -- or a heavier suture like VICRYL to help
11  reinforce the tissue; is that --
12      MR. RUMANEK:  Object to the form.
13    Q   -- is that correct?
14    A   I use a combination and it depends on the
15  circumstance.  I couldn't say always.
16    Q   Sure.  So in the general patient that
17  doesn't have bladder injury, you're going to always
18  use the prolene monofilament suture, right?
19    A   No, not at all.  I mean, these -- it
20  depends on the circumstances.  I mean, sometimes I
21  use VICRYL on people, sometimes I use prolene.  It
22  depends on individuals.
23    Q   So those are the -- and those are the two
24  types of sutures you use?
25    A   Sometimes I'll even use GORE-TEX.

Steven Goldwasser, M.D.

Page 142

1    Q    And is that a monofilament or a braided
2  suture?
3    A    That is a -- I believe it's a braided
4  suture.  It's a permanent suture --
5    Q    Right.
6    A    -- but I think it's braided.  It's a -- I
7  think it's -- I don't recall exactly --
8    Q    And, of course, we're not here to guess,
9  you know, so if you don't know, you don't know.
10  That's totally fine.
11    A    I don't know.  I know it's a
12  non-absorbable suture.
13    Q    Right.  But as you sit here today, you
14  don't know exactly which sutures are braided or not,
15  but you know you do use at least prolene
16  monofilament --
17    A    Correct.
18    Q    -- VICRYL absorbable --
19    A    Correct.
20    Q    -- and sometimes GORE-TEX, correct?
21    A    Correct.
22    Q    All right.  Because in your report on --
23  on page 23, you're discussing that sutures can
24  erode -- if with you're me on page 23.  You see at
25  the very bottom, you say, "For example, exposure or

Page 143

1  erosion of permanent sutures or other graft
2  materials can occur with abdominal sacrocolpopexy
3  and other non-mesh procedures with rates as high as
4  45 percent"; do you see that?
5    A    Correct.
6    Q    And you cite to Toglia?  It says Toglia MR
7  after that?
8    A    Oh, yeah.
9    Q    And the title of that article is Suture
10  Erosion Rates and Long-term Surgical Outcomes in
11  Patients Undergoing Sacrospinous Ligament Suspension
12  With Braided Polyester Suture; do you see that?
13    A    Correct.
14    Q    You're -- we discussed you're not sure if
15  you use a braided suture, but do you know if you use
16  a polyester suture?
17    A    I'd have to know the brand name to it to
18  tell you whether it's polyester or not.
19    Q    But you know prolene is not polyester,
20  right?
21    A    Correct.
22    Q    Right.  And then you cite to another
23  article there by Yazdany, I guess, you see that, the
24  third citation you have?
25    A    Let's see.  Yes.

Page 144

1    Q    The title is Suture Complications In A
2  Teaching Institution Among Patients Undergoing
3  Uterosacral Ligament Suspension With Permanent
4  Braided Suture; do you see that?
5    A    Right.
6    Q    So do you have any other evidence to
7  support your contention that 40- -- that erosion of
8  sutures is as high as 45 percent, that that applies
9  to monofilament polypropylene suture that -- like
10  the prolene that you use?  Do you have any other
11  evidence to support that?
12        MR. RUMANEK:  Object to the form.
13    A    Okay.  I'm not sure I'm understanding --
14    Q    Let me back up a little bit.  One of
15  your -- your opinions here is that native tissue
16  repair has the same complications as mesh implants;
17  is that generally correct?
18        MR. RUMANEK:  Object to the form.
19    A    It can have complications.
20    Q    And we discussed one of the unique
21  complications to a mesh implant is that there can be
22  a mesh erosion, right?
23    A    Correct.
24    Q    And here you're saying, well, native
25  tissue repair, you just suture and the sutures can

Page 145

1  erode, right?
2    A    Correct.
3    Q    And here you're trying to estimate or give
4  some -- here you're citing to some studies that show
5  a 45 percent exposure rate of sutures, correct?
6        MR. RUMANEK:  Object to the form.
7    A    Correct.
8    Q    And the studies that you cite to are
9  discussing braided sutures; is that correct?
10        MR. RUMANEK:  Object to the form.
11    A    I believe that -- let me take a look
12  again.  It's been a while.  Braided polyester
13  suture.  Let me just finish this other one.  Yes,
14  this is specifically regarding braided suture.
15    Q    And also polyester suture, which is
16  different from polypropylene, right?
17    A    Polyester is different than polypropylene,
18  correct.
19    Q    And my question is, do you have any
20  articles or literature that you can cite -- that you
21  can cite to here to support your proposition that
22  suture erosions with native tissue repairs is
23  45 percent if it's a monofilament prolene
24  polypropylene suture?
25    A    I didn't cite one.

Steven Goldwasser, M.D.

Page 146

1    MR. RUMANEK:  Object to the form.
2    A   I did not cite anything specifically here
3  regarding polypropylene suture.
4    Q   Right.  And I agree with that.
5    A   Right.  Right.  Right.
6    Q   But do you -- as you sit here today, can
7  you cite to anything else --
8    MR. RUMANEK:  Hold on.  Hold on.  I don't
9  think he was finished with his answer.
10   A   But I can't recall.  I've gone through,
11  you know, numerous articles --
12   Q   Sure.
13   A   -- and I don't -- I can't specifically
14  recall anything regarding polypropylene sutures --
15   Q   Right.
16   A   -- in a native tissue repair, erosions
17  with polypropylene suture.
18   Q   Right.  And it's not in your report here.
19   A   Right.
20   Q   And as you sit here, you just don't know
21  off the top of your head, right?
22   A   Correct.
23   Q   Doctor, when you're evaluating literature,
24  what are the things that you look for to decide
25  which articles have -- should be given greater

Page 147

1  weight as opposed to other articles?
2    MR. RUMANEK:  Object to the form.
3    Q   I'm assuming you perform that analysis,
4  right?
5    A   Correct.
6    Q   And what are the things you're looking for
7  that would guide your analysis of which articles are
8  more important in reaching your opinions?
9    A   Well, multiple factors.  I look at the
10  type of study, you know, the number of participants,
11  the methods involved, the follow-up, so, you know,
12  multiple factors go into it.
13   Q   And you're familiar with the levels of
14  evidence, the Oxford levels of evidence?
15   A   Correct.
16   Q   And do you have an appreciation of what
17  Level 1 evidence is?
18   A   Yes.
19   Q   What's Level 1 evidence?
20   A   Those would be randomized controlled
21  studies perspective.
22   Q   And systematic reviews of --
23   A   Correct.
24   Q   -- of evidence also?  And you -- of
25  course, you didn't provide -- or you didn't perform

Page 148

1  a systematic analysis here, did you?
2    A   Of?
3    Q   Let me rephrase it.  You didn't perform a
4  meta-analysis or a systematic review of the total
5  literature here, did you?
6    MR. RUMANEK:  Object to the form.
7    A   Correct.
8    Q   You're relying upon the epidemiologists
9  and statisticians that do that, right?
10   A   Correct.  I've reviewed a big body of
11  literature and yes, I'm just looking at conclusions
12  and results.
13   Q   Doctor, are you a member of ACOG, or the
14  American College of Obstetricians and Gynecologists?
15   A   Yes.
16   Q   Are you a member of the American
17  Urogynecologic Society?
18   A   Yes.
19   Q   Are those reputable organizations?
20   A   Yes.
21   Q   Are you familiar with Committee Opinion
22  Number 513?
23   A   No, you'd have to show me.
24   Q   Off the top of your head you're not --
25  it's fair.  It's totally fair.

Page 149

1    I'm going to hand you what's being marked
2  as Exhibit 11, and this is Committee Opinion 513
3  from ACOG and AUS.  Are you familiar with that
4  document?
5    (Exhibit 11 was marked for
6  identification.)
7    A   Yes, I've reviewed it.
8    Q   And this was put out in December 2011; do
9  you see that?
10   A   Yes.
11   Q   And the title of it's Vaginal Placement of
12  Synthetic Mesh for Pelvic Organ Prolapse; is that
13  correct?
14   A   Correct.
15   Q   And under the Abstract the author states,
16  "Since 2004, use of synthetic mesh has increased in
17  vaginal surgery for the treatment of pelvic organ
18  prolapse, however, concerns exist about the safety
19  and efficacy of transvaginally placed mesh.  Based
20  on the current available limited data, although many
21  patients undergoing mesh-augmented vaginal repairs
22  heal well without problems, there seems to be a
23  small but significant group of patients who
24  experience permanent and life-altering sequelae,
25  including pain and dyspareunia from the use of

Steven Goldwasser, M.D.

Page 150

1 vaginal mesh." Did I read that correctly?
2   A   Correct.
3   Q   And you would generally agree with that
4 statement, wouldn't you?
5   A   No, I not necessarily have found that in
6 my practice.
7   Q   But you understand the literature
8 documents women have suffered life-altering
9 complications such as pain and dyspareunia after the
10 implantation of vaginal mesh like PROLIFT?  You've
11 seen that literature, right?
12   A   I would say that that's a common
13 complication of any surgery, and they're
14 specifically talking about mesh in this case, but
15 it's a complication.
16   Q   But in your experience your patients seem
17 to be faring better because they haven't suffered
18 these complications as described here; is that
19 correct?
20   A   Not as many, correct.
21   Q   And this kind of goes back to our earlier
22 discussion, some doctors just have different
23 experience levels, expertise, and opportunities to
24 get better, correct?
25       MR. RUMANEK:  Object to the form.

Page 151

1   A   Correct.
2   Q   And luckily for your patients, your
3 patients aren't seeing these complications as
4 frequently; is that correct?
5       MR. RUMANEK:  Object to the form.
6   A   Correct.
7   Q   But regardless, ACOG and American
8 Urogynecologic Society issued a committee opinion to
9 highlight that this is an issue, right?
10       MR. RUMANEK:  Object to the form.
11   A   I think that they are making people aware
12 that there can be some complications, but, you know,
13 it's in general.  At the same time complications of
14 failure can be just as bad as some of these
15 complications too.
16   Q   Right.  And ACOG and American
17 Urogynecologic Society is aware of the complications
18 and failure rates of everything, they had that
19 information in mind when they issued this opinion,
20 wouldn't you assume?
21   A   But they're not specifically addressing
22 that.
23   Q   But they felt it -- or do you -- are you
24 critical of them taking the time to issue this
25 announcement?

Page 152

1       MR. RUMANEK:  Object to the form.
2   A   No, I think it's good to be aware that
3 they -- you know, they're bringing this to
4 knowledge, but I think you have to take it in
5 context of the general scheme of what surgery
6 involves.
7   Q   And they're bringing this out to the
8 general knowledge because some doctors just aren't
9 as versed in the literature and the complications as
10 you; is that fair?
11       MR. RUMANEK:  Object to the form.
12   A   Not necessarily.
13   Q   I mean, what's the purpose that you think
14 for them taking the time to write this article?
15       MR. RUMANEK:  Object to the form.
16   A   I think that they have an obligation to
17 explore different surgical techniques and publish
18 their opinions.
19   Q   This is important literature, right?
20       MR. RUMANEK:  Object to the form.
21   A   What specifically?
22   Q   These issues that they're addressing here
23 are very important, right?
24       MR. RUMANEK:  Object to the form.
25   A   I think they are complications, they're

Page 153

1 associated with any surgery, but they are bringing
2 it to light.
3   Q   And that's not a bad thing, is it?
4   A   I think it's important to have some
5 knowledge in the field, but no, I mean, I think
6 there's a good body of evidence that shows that
7 complications are not as -- as prevalent as in some
8 reports as in other reports.
9   Q   And you're -- I think you're talking about
10 maybe the frequency rates; is that --
11   A   Correct.
12   Q   And it looks here that they're not really
13 saying that the frequency is off the charts
14 necessarily, but the abstract just seems to be
15 saying that there's some of these complications that
16 are really severe; is that fair?
17   A   They're saying that there are definitely
18 complications associated with mesh implants, but I
19 think physicians have the knowledge that these
20 complications can occur with any surgery too.
21   Q   And it's important for them to note that
22 there's some complications that are life-altering
23 with these implants?
24       MR. RUMANEK:  Object to the form.
25   A   I think it's more to note that there's

Steven Goldwasser, M.D.

Page 154

1  life-altering complications with any surgical
2  procedure.
3      Q   Yeah, and I'm not talking about any
4  surgical procedure.  I'm just asking you in the
5  context -- I appreciate what you're saying, but ACOG
6  went to the time to write this specifically about
7  mesh implants for pelvic organ prolapse, right?
8      A   Correct.
9      Q   And they just thought it's important to
10 get this knowledge out there that some women are
11 having severe complications that are life-altering
12 and we need this information to get out there,
13 right?
14      MR. RUMANEK:  Object to the form.
15      A   Correct.
16      Q   Doctor, if you'd please turn to page 4,
17 and that first paragraph on the top left, they're
18 discussing native tissue rates, and it's similar to
19 what we've discussed today, and -- about -- you see
20 that line that starts "30 to 46 percent" on page 4?
21      A   Correct.
22      Q   And the authors here are noting, "These
23 low success rates were frequently cited as a reason
24 why innovations such as vaginal mesh were needed to
25 decrease failure rates."  And that's consistent with

Page 155

1  what you state in your report, right?
2      MR. RUMANEK:  Object to the form.
3      A   Correct.
4      Q   And the authors continue that, "The
5  original data from this study were recently
6  reanalyzed using modern outcome measures, composite
7  of anatomic outcomes and subjective success, and the
8  revised success rates for three arms of this RCT, or
9  randomized clinical trial, were comparable with
10 89 percent of women having no objective prolapse
11 beyond the hymen"; did I read that correctly?
12      A   You did read it correctly.
13      Q   And you're familiar that they went back
14 and did some reanalysis of the Weber study and found
15 that using modern outcomes, the data from the native
16 tissue repair was better?
17      MR. RUMANEK:  Object to the form.
18      Q   Are you familiar with that literature?
19      A   Yes, I've reviewed that.
20      Q   And do you have any criticisms or reasons
21 to discount the reanalysis of the Weber data using
22 modern outcomes?
23      MR. RUMANEK:  Object to the form.
24      A   Well, again, you know, success is in the
25 eye of the beholder, so, you know, specifically I'd

Page 156

1  have to see that article and look at what they're
2  defining success as.
3      Q   Would you agree that a composite of
4  anatomic outcomes and subjective success is a good
5  way to measure surgical success for treatment of
6  prolapse?
7      MR. RUMANEK:  Object to the form.
8      A   Say it one more time.  A composite --
9      Q   Are you familiar with the concept of a
10 composite of anatomic outcomes and subjective
11 success?
12      A   I've heard the term obviously, but, you
13 know, I'd have to see specifically an article or
14 something that you're citing.
15      Q   Okay.  Well, we're just looking at the
16 ACOG committee opinion --
17      A   Right.
18      Q   -- and they're mentioning that some
19 scientists went back and looked at the original
20 Weber data, which was -- is often cited for why
21 native tissue repair isn't as successful.
22      A   Right.
23      Q   And that's in part why you state why mesh
24 repairs are important because native tissue repair
25 wasn't very successful, right?

Page 157

1      MR. RUMANEK:  Object to the form.
2      A   We just thought that mesh might be more
3  successful.
4      Q   Right.  And these authors are merely
5  pointing out that, hey, we've changed the way we
6  look at success, because there's a lot of different
7  ways to look at it, right?
8      A   Correct.
9      Q   And we've gone back and looked at the
10 original Weber data using more modern outcomes,
11 which they're citing here as a composite index,
12 which we'll look at, and just using that, hey,
13 native issue is almost as efficacious as mesh-based
14 repairs.  Are you familiar with that literature
15 finding that that's what the Weber study showed
16 using modern outcomes?
17      A   You know, off the top of my head, no, I'd
18 have to look at it specifically.
19      Q   If that was the case, that would be
20 important evidence to look at, right?
21      MR. RUMANEK:  Object to the form.
22      A   Hypothetically speaking, but, you know, I
23 need to see the document and look at the specifics.
24      Q   Sure.  But if -- I mean, just generally,
25 if we're relying upon Weber 2001, which uses an

Steven Goldwasser, M.D.

Page 158

1 outdated measurement of success to make clinical
2 decisions, and then we find out that, hey, using
3 more modern outcomes to measure success, that that
4 data is really not so bad, that would be important
5 information to take into account, wouldn't it?
6     MR. RUMANEK:  Object to the form.
7     A   Again, it depends on -- you know, I'm not
8 saying -- it's not necessarily true that the older
9 model of success is any better or worse than the new
10 model.  It's just a different model.
11    Q   Sure.  And you just want to compare apples
12 to apples, right, generally?
13    MR. RUMANEK:  Object to the form.
14    A   Correct.
15    Q   Right.  And if Weber was using one
16 measurement for success and later we've shifted to
17 using a different measurement of success, you would
18 just want to compare them using the same outcome
19 measurements so you can have a fair understanding of
20 what the data really shows?  That's fair, right?
21    MR. RUMANEK:  Object to the form.
22    A   Well, again, I'd need to see a specific
23 article with what we're measuring as success because
24 I don't -- you know, if you can show me something, I
25 can read through it and look at what their

Page 159

1 methodology was and what they're defining, then I
2 could better answer your question.
3     Q   But you're relying upon the original Weber
4 data that showed that native tissue repair was not
5 very successful, though, right?
6     A   I'm relying --
7     MR. RUMANEK:  Object to the form.
8     A   I'm relying upon not specifically one
9 piece of information, but the literature in general
10 as well as my own clinical experience.
11    Q   Well, your clinical experience doesn't
12 numerically track native tissue repair, right?
13    MR. RUMANEK:  Object to the form.  Asked
14 and answered.
15    A   Correct, it does not specifically track
16 that.
17    Q   A little bit farther down on that page,
18 there's a section titled Who Are The Best Patients
19 For Transvaginally Placed Mesh; do you see that?
20    A   Yes.
21    Q   And we've discussed this, that not every
22 patient is appropriate for every surgical treatment,
23 right?
24    A   Yes.
25    Q   And you would agree that PROLIFT is not

Page 160

1 necessarily appropriate for every patient, right?
2     A   Correct.
3     Q   And that's an important analysis for you
4 as the physician to undertake to decide with this
5 specific patient, what is the appropriate treatment
6 method for that patient, right?
7     A   Correct.
8     Q   And these authors here, the second
9 sentence, they state, "Pelvic organ prolapse vaginal
10 mesh repair should be reserved for high-risk
11 individuals in whom the benefit of mesh placement
12 may justify the risks, such as individuals with
13 recurrent prolapse (particularly of anterior
14 compartment), or with medical co-morbidities that
15 preclude more invasive and lengthier open and
16 endoscopic procedures"; did I read that correctly?
17    A   You did.
18    Q   And would you agree with that statement,
19 Doctor?
20    MR. RUMANEK:  Object to the form.
21    A   I would say that over a period of time,
22 the thought process has evolved that mesh is not
23 necessarily indicated for initial repair, but, you
24 know, it's more focused now on recurrences.
25    Q   So you would agree with that statement,

Page 161

1 that mesh should be reserved for high-risk patients
2 such as failure, patients that have undergone
3 previous surgery and failed and had recurrent --
4     MR. RUMANEK:  Object to the form.
5     Mischaracterizes his testimony.
6     A   No, I don't think that's accurate because
7 I still use it as a primary repair or have used it
8 too as a primary repair, so I wouldn't think a
9 blanket statement --
10    Q   So let's break it down a little bit.
11    MR. RUMANEK:  Why don't you hold on.  He
12 didn't finish his answer.
13    A   Yeah, I don't think a blanket statement
14 necessarily is law.
15    Q   Okay.  You just repeated.  Thanks.
16    MR. RUMANEK:  No, actually you cut him
17 off.  He was in the middle of a sentence and
18 you cut him off.
19    Q   Let's talk about it.  You don't think --
20 or, first of all, do you agree or disagree with the
21 statement -- with the recommendation put out by ACOG
22 and AUS, who you're a member of, do you agree with
23 their recommendation for who the appropriate
24 patients are for mesh-based repair?
25    MR. RUMANEK:  Object to the form.  Asked

Steven Goldwasser, M.D.

Page 162

1    and answered.
2        A   Do I agree with the recommendation?  I
3    agree that it definitely needs to be taken into
4    account, but I don't think it is a hard and fast
5    answer.
6        Q   And you think PROLIFT is going to be
7    appropriate when a patient has failed an initial
8    surgery?  That's one patient population where it
9    could be appropriate to use a PROLIFT, when they've
10   failed a previous surgery, right?
11       MR. RUMANEK:  Object to the form.
12       A   It could be.
13       Q   And you testified that it could also be an
14   appropriate treatment as a primary surgery for
15   patients who have poor tissue quality; is that
16   correct?
17       A   Correct.
18       Q   Right.  Which is largely consistent with
19   the recommendation of these committees, right?
20       MR. RUMANEK:  Object to the form.
21       A   In general.
22       Q   Doctor, are you familiar with the Cochrane
23   Group?
24       A   Yes.
25       Q   Is that a reputable organization?

Page 163

1        A   Yes.
2        Q   They put out very extensive literature
3    reviews?
4        A   They do.
5        Q   And they spend a lot of time reviewing a
6    lot of literature and doing numerical analyses of a
7    vast body of literature; isn't that fair?
8        A   Correct.
9        Q   That's kind of their expertise --
10       A   Correct.
11       Q   -- right?
12           And you rely upon reviews done by the
13   Cochrane Group in reaching your opinions here,
14   correct?
15       A   It's part of what goes into my opinions.
16       Q   And they're listed on your reliance list,
17   correct?
18       A   Correct.
19       Q   And you cite to a lot of them in your
20   report even, right?
21       A   I do.
22       Q   And one of the Cochrane Reviews that you
23   cite to in your report is the 2016 Maher article.
24   You're familiar with that article, right?
25       A   Not off the top of my head.

Page 164

1        Q   I'm handing you what's being marked as
2    Exhibit 12, which is a very lengthy --
3        MR. RUMANEK:  There's a summary.
4        Q   We'll go to the summary.  And this article
5    is titled Transvaginal Mesh Or Grafts Compared With
6    Native Tissue Repair For Vaginal Prolapse (Review);
7    do you see that?
8        (Exhibit 12 was marked for
9    identification.)
10       A   Yes.
11       Q   And this is --
12       A   2016.
13       Q   -- 2016, okay.  And we were discussing the
14   levels of evidence, and this is a systematic review
15   or the highest level of evidence, right?
16       A   Correct.
17       Q   And let's look under -- on page 1 there's
18   an abstract, page 1, page -- yeah, it will start --
19       A   Yeah, okay.
20       Q   And the title is Transvaginal Mesh Or
21   Grafts Compared With Native Tissue Repair For
22   Vaginal Prolapse; do you see that?
23       A   Yes.
24       Q   And that's addressing the issue -- the
25   issues that we've been discussing here today; isn't

Page 165

1    that correct?
2        MR. RUMANEK:  Object to the form.
3        A   Yes.
4        Q   And down in the abstract, you can see the
5    objective is listed as, "to determine the safety and
6    effectiveness of transvaginal mesh or biological
7    grafts compared to native tissue repair for vaginal
8    prolapse."  Did I read that correctly?  Yeah, I'm
9    still in the abstract.
10       A   Yeah.
11       Q   And --
12       MR. RUMANEK:  He's right here.
13       Q   Just under the abstract.  I'm just going
14   to go over the methodology briefly.  They state that
15   they searched the Cochrane register, the MEDLINE,
16   and looked at journals and talked to authors.
17   Generally they're just documenting that they did a
18   fairly extensive search of the body of literature,
19   would you agree with that?
20       MR. RUMANEK:  Object to the form.  It
21   speaks for itself.
22       A   Agreed.
23       Q   And, in fact, they -- their selection
24   criteria, they note that they only looked at
25   randomized controlled trials; do you see that?

Steven Goldwasser, M.D.

Page 166

1    A    Yes.
2    Q    And so they performed a systematic
3 analysis and only evaluated RCTs; is that fair?
4    A    As it states, correct.
5    Q    And under Main Results, they note that
6 they included 37 RCTs comprising of 4,023 women; do
7 you see that?
8    A    Yes.
9    Q    Would you agree that's a fairly large
10 number of RCTs?
11    A    Yes.
12    Q    If you could turn your attention to page 2
13 under Authors' Conclusions, this -- the authors,
14 Chris Maher and everybody, summarized their
15 conclusions that are fairly detailed in 138 pages in
16 this literature review, which I won't take you
17 through, but --
18    A    You want to go through the whole --
19    Q    No.  So their conclusion they state,
20 "While transvaginal permanent mesh is associated
21 with lower rates of awareness of prolapse,
22 reoperation for prolapse and prolapse on examination
23 than native tissue repair is also associated with
24 higher rates of reoperation for prolapse stress
25 urinary incontinence or mesh exposure and higher

Page 167

1 rates of bladder injury at surgery and de novo
2 stress urinary incontinence."  Did I read that
3 correctly?
4    A    Correct.
5    Q    They continue, "The risk/benefit profile
6 means that transvaginal mesh has limited utility in
7 primary surgery"; do you see that?
8    A    Yes.
9    Q    And that's kind of in line with the ACOG
10 Committee Opinion 513 that we were just discussing;
11 is that correct?
12         MR. RUMANEK:  Object to the form.
13    A    They mention that it should be looked more
14 so for higher-risk surgery, correct, but it didn't
15 exclude using it.
16    Q    And they're not -- to be fair, they're not
17 saying it should be excluded entirely here, right?
18    A    Correct.
19    Q    They're just saying it has limited use in
20 primary surgery, right?
21    A    Correct.
22    Q    And they continue, "While it's possible
23 that in women with higher risk of recurrence, the
24 benefits may outweigh the risks, there is currently
25 no evidence to support this position"; do you see

Page 168

1 that?
2    A    Yes.
3    Q    And do you agree with that statement?
4    A    My personal experience doesn't dictate the
5 same.
6    Q    And let's break it down.  You would agree
7 that there's no evidence to support that position,
8 but your personal experience is slightly different;
9 is that correct?
10         MR. RUMANEK:  Object to the form.
11    Mischaracterizes his testimony.
12    A    I would say that, you know, in reviewing
13 the broad body of literature, there is definitely
14 articles that support the benefits of mesh.  Their
15 conclusion is their conclusion, but there are
16 definitely articles that support and go against the
17 use of mesh.
18    Q    So you disagree with the -- that sentence
19 from the Cochrane Review that we just read?
20    A    Well, it's their conclusion.  I don't -- I
21 mean, personally I have not seen that and I think
22 there's literature that supports it, but their
23 random -- their review is what they stated.
24    Q    So you agree that they reviewed 37 RCTs,
25 right?

Page 169

1    A    Correct.
2    Q    And based off that review, this is the
3 conclusion they came to, right?
4    A    This is their conclusion.
5    Q    And we don't doubt the methodology that
6 the Cochrane Group undertook to review literature,
7 right?
8         MR. RUMANEK:  Object to the form.
9    Q    Do you have a criticism of the methodology
10 the Cochrane Group undertook to review the 37 RCTs?
11    A    No, I don't.
12    Q    And you would probably defer to their
13 expertise in crunching the numbers here, right?
14         MR. RUMANEK:  Object to the form.
15    A    Yes.
16    Q    And do you have any criticisms or reasons
17 to discount the analysis they undertook in
18 performing this review?
19         MR. RUMANEK:  Object to the form.  Asked
20    and answered.
21    A    Yes, I think that, you know, a lot of
22 studies they reviewed may not necessarily have
23 conclusions that I would necessarily agree with, but
24 it's part of the randomized control of studies.  So
25 as a whole, they're looking at this answer, but

Steven Goldwasser, M.D.

Page 170

1 individually taken, I don't necessarily agree with
2 it.
3 Q So let me make sure I understand. You
4 don't have any criticisms of the methodology
5 employed by Maher and the Cochrane Review in doing
6 the analysis, their methodology specifically, right?
7 A I don't know their --
8 MR. RUMANEK: Object to the form.
9 A I have not reviewed their methodology.
10 Q But you do have some disagreement or
11 reason to doubt some of the studies they included in
12 their systematic review; is that correct?
13 MR. RUMANEK: Object to the form.
14 Mischaracterizes his testimony.
15 A I would say that there's many studies that
16 support and refute their conclusion, and you'd have
17 to go study by study, but I just don't necessarily
18 think that, clinically speaking, this necessarily
19 represents the broad body of literature that I like,
20 that I look at nor in my own clinical practice.
21 Q You would agree that they went and looked
22 at the study level, the strengths and weaknesses of
23 each of the studies they included, you know they did
24 that, right?
25 A If you say so. I didn't specifically read

Page 171

1 the methodology of this, but I'd assume they did.
2 Q Right. I mean, you would assume that they
3 undertook a fairly detailed analysis, it's 139
4 pages, right?
5 A Correct.
6 Q And you -- in your report, you cite to
7 this Cochrane Review, don't you?
8 A Yes.
9 Q But you don't discuss the authors'
10 conclusions that mesh like PROLIFT should be
11 reserved for high-risk patients, do you?
12 A I don't believe I specifically stated
13 that.
14 Q Right. And you don't also discuss the
15 conclusion that it should be -- that PROLIFT has
16 limited use in primary surgery, right?
17 MR. RUMANEK: Object to the form.
18 A I don't believe I specifically stated
19 that, correct.
20 Q And similarly, you don't discuss the ACOG
21 Committee Opinion 513 recommendations that's in line
22 with the Cochrane conclusions?
23 MR. RUMANEK: Object to the form.
24 A I don't specifically point that out,
25 correct.

Page 172

1 Q But in your report, you do discuss
2 literature, right --
3 A Yes.
4 Q -- that supports your opinions, right?
5 A Correct. Some of it does, some of it
6 doesn't.
7 Q But just not the Cochrane 2016 review,
8 right?
9 MR. RUMANEK: Object to the form. He does
10 cite to the Cochrane 2016 report.
11 Q Let me rephrase it. You discuss the
12 Cochrane 2016 in your report, but you don't discuss
13 their conclusions that are contrary to your opinions
14 here, do you?
15 MR. RUMANEK: Object to the form.
16 A Not specifically, correct.
17 Q And so as you sit here today, you've
18 testified that you disagree with some of the studies
19 that they included in their analysis, right?
20 MR. RUMANEK: Object to the form.
21 Mischaracterizes his testimony.
22 A I would say that they probably included
23 studies that I may agree or disagree with, but I
24 specifically haven't looked at each individual study
25 to see what they did here, you know.

Page 173

1 Q Well, like the Cochrane Group did, you
2 haven't done that analysis, right?
3 A I've not done their analysis, correct.
4 Q Right. And other than -- I understand
5 that criticism of the Cochrane analysis. Other than
6 that --
7 MR. RUMANEK: Hold on. I don't think
8 that's --
9 MR. BENTLEY: I haven't asked the
10 question. But, Counsel --
11 MR. RUMANEK: Okay. Go ahead.
12 Q Other than that critique, if you will,
13 of -- or reason for discounting the Cochrane's
14 conclusions, do you have any other qualms with the
15 methodology they employed or anything else they did?
16 MR. RUMANEK: Object to the form.
17 Mischaracterizes his testimony.
18 A I -- you know, again, I can't say that I
19 looked through their entire methodology, but their
20 conclusion is their conclusion, you know. And the
21 literature is very broad, and I don't think it
22 necessarily reflects my clinical experience.
23 Q All right. A lot of the studies that
24 the -- well, obviously your clinical experience is
25 different than the literature to some extent, right?

Steven Goldwasser, M.D.

Page 174

1    A    Some of it, right.
2    Q    I mean, you actually might be doing better
3 than a lot of other doctors out there; is that fair?
4    A    I might.
5    Q    And so maybe the clinical experience of
6 other doctors is better documented in the
7 literature, the Cochrane Review; is that correct?
8         MR. RUMANEK:  Object to the form.
9    A    I don't understand the clinical --
10    Q    I don't really understand what that was
11 either.  Withdrawn.  I'll give you that.
12         Doctor, if you'd turn to page 25.
13    A    Of?
14    Q    Your report, I'm sorry.  You can put that
15 aside.
16         On page 25, there's a pretty long
17 paragraph.  About half of the way through on the
18 right side, you state -- you note the Cochrane
19 Review.  I don't know how else to --
20    A    Okay.
21    Q    I'll represent to you that I think this is
22 the one sentence in your report that cites the 2016
23 Cochrane Review.  You state, "The Cochrane Review
24 has reported similar findings that there was no
25 increase rate of dyspareunia with transvaginal mesh

Page 175

1 augmentation compared to traditional prolapse repair
2 without mesh"; do you see that?
3    A    Yes.
4    Q    And my question is just simply, we looked
5 at the Cochrane Review, and the authors have many
6 findings and conclusions in addition to that one
7 sentence that you discuss in your report, right?
8    A    Correct.
9    Q    Okay.
10    A    You know, I've taken those into account,
11 obviously reviewing them, and this is what I've put
12 in my report.
13    Q    But they're not -- you don't discuss their
14 conclusions anywhere in your report, though, right?
15    A    Well, this is a specific chapter on -- or
16 section on dyspareunia and mesh contracture, and so
17 I simply --
18    Q    Right.
19    A    -- put their findings --
20    Q    Okay.  Well --
21    A    -- which reflect my clinical beliefs.
22    Q    Got it.  So the authors really were
23 looking at the success rates of PROLIFT compared --
24 or the authors of the Cochrane 2016 Review were
25 really looking at mesh-based repairs versus native

Page 176

1 tissue repair and the success rates, right?
2         MR. RUMANEK:  Object --
3    A    Correct.
4    Q    Which that's an issue covered in your
5 report, right?
6    A    Yes.
7    Q    Right.  And you cite the 2016 Cochrane
8 Review in your report --
9    A    Correct.
10    Q    -- but not under this section talking
11 about the efficacy of native tissue repair, right?
12    A    I don't know.  Let me look and see.  I
13 don't know what section it was.
14    Q    If you want to turn to page 13, you start
15 talking about native tissue repair, surgical
16 results.
17    A    Okay.
18    Q    So you start on page 13, "He notes that
19 the Altman study, the Benson study, the Whiteside
20 study"; you see those?
21    A    Yes.
22    Q    And those studies were included in the
23 analysis of the 2016 Cochrane Review, right?
24    A    I don't specifically know.
25    Q    But if they included all of those, you

Page 177

1 wouldn't be surprised, right?
2    A    No, I would not.
3    Q    And on the next page, you cite to Maher
4 2008; you see that?
5    A    Correct.
6    Q    And that's eight years before the 2016
7 Cochrane Review we were just looking at, right?
8    A    Correct.
9    Q    Right.  And to be fair, Maher and the
10 Cochrane Group continued to put out Cochrane Reviews
11 as more data was available, right?
12    A    Correct.
13    Q    And the 2016 review that we were just
14 looking at is the most current complete review of
15 the entire literature body, right, by the Cochrane
16 Group?
17    A    Yeah, as I'm aware, correct.
18    Q    That next paragraph you cite to Maher
19 2013; do you see that?
20    A    Yes, it's written 2013, yeah.
21    Q    And that's for the proposition that
22 "anterior repairs associated with more prolapse
23 than" -- "the native tissue anterior repair was
24 associated with more prolapse than polypropylene
25 mesh"; is that correct?

Steven Goldwasser, M.D.

Page 178

1    A   Correct.
2    Q   Right.  And three years later, the 2016
3 review changes course, right?
4        MR. RUMANEK:  Object to the form.
5    Completely mischaracterizes the evidence.
6    A   They're talking about -- well, what's he
7 talking about?  2016 --
8    Q   The title of the 2016 was Transvaginal
9 Mesh Or Grafts Compared With Native Tissue Repair
10 For Vaginal Prolapse, right?
11   A   Yeah, let me look back at their conclusion
12 here.  Actually it still says, "The transvaginal
13 mesh is associated with lower rates of awareness of
14 prolapse and reoperation of prolapse and prolapse on
15 examination than native tissue repair."
16   Q   Right.  And they conclude that, "Based
17 upon the risks and benefits, that the risk/benefit
18 profile does not support the use of mesh," right?
19       MR. RUMANEK:  Object to the form.
20   Mischaracterizes the evidence.
21   A   Correct.  This is the generalized
22 statement.
23   Q   Right.  So they're taking into account the
24 literature that they looked at in 2013 and they've
25 come to a conclusion that it's not appropriate in

Page 179

1 2016, right?
2        MR. RUMANEK:  Object to the form.
3    A   No, not at all.
4    Q   You think that in 2016 they're
5 recommending the use of mesh like PROLIFT for
6 primary repair?
7        MR. RUMANEK:  Object to the form.
8    A   They basically said that there's a lower
9 evidence -- rates of awareness of prolapse,
10 reoperation for prolapse, and perhaps on
11 examination, the native tissue repair.  That doesn't
12 say don't use mesh.  There's a benefit.
13   Q   In 2016, to be clear, the authors are
14 saying mesh has limited utility in primary surgery,
15 you would agree with that?
16   A   That's what they're saying.
17   Q   And you -- your opinion today is that you
18 agree that PROLIFT has limited use in primary
19 surgery with some circumstances, there are
20 exceptions that we've discussed, right?
21       MR. RUMANEK:  Object to the form.
22   A   We've discussed a lot of things, but in
23 general, it's used less often in primary repair.
24   Q   And --
25   A   Well, it's not available anymore, but --

Page 180

1    Q   Sure.
2    A   -- mesh is used less often in primary
3 repair currently.
4    Q   And the circumstances we talked about
5 where it would be appropriate for primary repair is
6 in a patient with decreased tissue quality, right?
7        MR. RUMANEK:  Object to the form.
8    Mischaracterizes the previous testimony.
9    A   That's one of the circumstances.
10   Q   Right.  And another circumstance where the
11 use of PROLIFT or mesh-based repair would be
12 appropriate is if they failed a previous surgery,
13 right?
14   A   That is another circumstance, correct.
15       THE WITNESS:  Are we at a point where we
16 can take a break?
17       MR. BENTLEY:  Sure.
18       (Recess from 11:26 a.m. to 11:29 a.m.)
19 BY MR. BENTLEY:
20   Q   Doctor, I'm handing you what's being
21 marked as Exhibit 13.  This an abstract from
22 Damoiseaux and the International Urogynecologic
23 Journal from 2015; you see that?
24       (Exhibit 13 was marked for
25 identification.)

Page 181

1    A   Yes.
2    Q   Are you familiar with this?
3    A   Not off the top of my head, but --
4        MR. RUMANEK:  Take a second to read it.
5    Q   I'll represent to you that it's included
6 on your reliance list, so presumably you reviewed it
7 at some point in preparing your report; is that
8 correct?
9    A   Correct.
10   Q   And let's just clear up, you actually
11 reviewed all the materials that are listed on your
12 reliance list?
13   A   To some degree.
14   Q   So are there some you didn't review?
15   A   I'm sure there's some I didn't review in
16 detail, correct.
17   Q   Right.  And there's a couple of pages of
18 deposition testimony on here.  Did you review all of
19 these corporate employee depositions?
20   A   No.
21   Q   Did you review any of them, do you recall?
22   A   Not that I recall.
23   Q   And there's a number of, looks like,
24 internal documents, did you review most of those or
25 do you recall?

Steven Goldwasser, M.D.

Page 182

1    A    I did review some of those, correct.
2    Q    You don't know which ones you did, though?
3    A    No.
4    Q    And how did you prepare --
5         MR. RUMANEK:  Were you done answering the
6    question?
7         THE WITNESS:  Yeah, I was done.
8    Q    How did you prepare this reliance list?
9    A    How did I prepare it?
10   Q    Uh-huh.
11   A    Articles were just provided in general.
12   Some were things that I requested.  Others were
13   just, you know, mass qualities of articles to put
14   forth, here is what you can review for your report.
15   Q    So you added things to this list as they
16   were given to you?
17        MR. RUMANEK:  Object to the form.  I'll
18   just note on the record to clear up any sort of
19   confusion, he didn't actually prepare, but --
20   he didn't type up --
21        MR. BENTLEY:  For the record, Plaintiffs
22   are going to request that we get an actual
23   reliance list and the materials the doctor
24   reviewed.  This is inaccurate and prevents me
25   from having a fair deposition to figure out

Page 183

1    what he actually reviewed and relied upon.  So
2    that's another reason we're requesting to keep
3    the deposition open.
4         MR. RUMANEK:  And I'll respectfully --
5    Q    All right.  Turning --
6         MR. RUMANEK:  Let me respond to that.
7         MR. BENTLEY:  Respectfully object.
8         MR. RUMANEK:  I disagree with that
9    analysis, and --
10        MR. BENTLEY:  He just testified that he
11   didn't review everything that's on this.  And
12   you just testified that -- or you just stated
13   that you prepared this, so it doesn't reflect
14   what he actually reviewed.  The record
15   states --
16        MR. RUMANEK:  And he's testified that the
17   materials that are on there were materials that
18   were provided to him, that he looked at in some
19   degree or another.
20        MR. BENTLEY:  The record speaks for
21   itself.
22        MR. RUMANEK:  And --
23        MR. BENTLEY:  We're not going to waste my
24   time.
25        MR. RUMANEK:  I just disagree with your

Page 184

1    objection.
2    BY MR. BENTLEY:
3    Q    Doctor, turning back to Exhibit, is that
4    15?
5    A    13.
6    Q    13, and Damoiseaux is on your reliance
7    list, and so now do you recall ever looking at this?
8    A    It looks -- off the top of my head, no, I
9    don't remember it exactly.
10   Q    All right.  And there is the problem, is
11   I thought you had looked at it.
12   A    It was a large body of --
13   Q    Totally.
14   A    -- of literature there.
15   Q    Right.  The title here is --
16        MR. RUMANEK:  Let him finish his answer.
17        MR. BENTLEY:  Well, that wasn't actually a
18   question.
19   Q    The title is Long-term Follow-up, Seven
20   Years Of A Randomized Control Trial, Trocar Guided
21   Mesh Compared With Conventional Vaginal Repair And
22   Recurrent Pelvic Organ Prolapse; do you see that?
23   A    Yes.
24   Q    And you'd agree that seven years is a
25   pretty long-term follow-up of literature, right?

Page 185

1    A    In general.
2    Q    That's useful information, right?
3         MR. RUMANEK:  Object to the form.
4    A    Seven years, it's good to know the term of
5    follow-up, correct.
6    Q    And here they're discussing -- on the
7    right side of the page, they state that, "The
8    primary outcome for this long-term follow-up was
9    composite success"; do you see that?
10   A    On the right side of the page?  Oh, okay.
11   Primary outcome -- okay.
12   Q    And they define it as "leading edge of
13   pelvic organ prolapse, not outside of the hymen
14   without bulge symptoms or reoperation for prolapse";
15   do you see that?
16   A    Yes.
17   Q    And would you agree that, I think, they're
18   defining a composite, it next says, "An anatomical
19   measurement plus patient satisfaction to some
20   extent"?
21        MR. RUMANEK:  Object to the form.
22   A    I don't know.  Does it define composite
23   index on here?
24   Q    Well, I think it does in the parenthesis.
25   Or how would you --

Steven Goldwasser, M.D.

Page 186

1   A   Being edge of prolapse, okay.  Okay.
2   Yeah.  Yeah.
3   Q   The bold --
4   A   I agree with that.
5   Q   The bold symptoms is probably the patient
6   subjective component of the next -- is that fair?
7   A   I would believe so, correct.
8   Q   And if you turn to the next page, on the
9   left side in the middle of the sentence, they state,
10  "The composite outcomes showed no difference in
11  success rate between trocar guided mesh or
12  conventional surgery using native tissues"; do you
13  see that?
14  A   On the left side, let me see, "No
15  difference in baseline characteristics" -- "equal
16  between both groups", correct.  "Composite showed no
17  difference in the success rate between trocar guided
18  mesh or conventional surgery" -- I'm just reading
19  this over for a minute.  So the anatomic success
20  rate was higher in the mesh group, particularly
21  significant for the anterior compartment.
22  Q   Which is meaning -- for all fairness, it's
23  consistent with what we looked at in the Cochrane
24  Review, right?
25  A   It didn't specifically state that.  It

Page 187

1   didn't specifically look -- I don't remember what --
2   Q   It's all right.  This is a seven-year
3   follow-up, right --
4   A   Right.
5   Q   -- using a composite index, which is a
6   combination of some sort of anatomic success plus
7   patient satisfaction, right?
8   A   Correct.
9   Q   And based off of that composite, turning
10  your attention to the conclusions, the authors here
11  conclude that, "Alternative non-mesh treatments,
12  including non-surgical, should seriously be
13  considered," on the bottom of the conclusion; do you
14  see that?
15  A   Let me just read through the whole
16  conclusion for a minute.
17  Q   Okay.  Well --
18  A   Found no difference in pain, dyspareunia
19  between the two groups --
20  Q   Doctor, their conclusion here --
21  A   Uh-huh.
22  Q   -- is based off of their data doing
23  seven-year follow-up using a composite index,
24  "Alternative treatments, non mesh, should seriously
25  be considered," that's their conclusion, right?

Page 188

1   MR. RUMANEK:  That's one -- object to the
2   form.  That's one sentence of the conclusion.
3   A   Yeah, that is one sentence.  In the
4   beginning it talks about rates of dyspareunia,
5   didn't -- different between two groups.
6   MR. BENTLEY:  I move to strike and just
7   ask my question again.
8   Q   It's very simple.  At the end of the
9   Conclusion section here, the authors conclude -- at
10  the end of this paragraph, the authors state,
11  "Alternative non-mesh treatments including" surgical
12  should seriously -- "including non surgical should
13  seriously be considered."  Based off of their
14  seven-year follow-up using a composite index, the
15  authors here have concluded that non-mesh treatment
16  should seriously be considered?  That's all I'm
17  asking.  That's their conclusion, right?
18  MR. RUMANEK:  Object to the form.  Speaks
19  for itself.
20  A   And one sentence of --
21  Q   Great.
22  A   -- of a long conclusion, that is correct.
23  Q   Right.  And as you sit here today, do you
24  have any criticism or critique or reason to discount
25  this seven-year follow-up using a composite index

Page 189

1   comparing native tissue repair to PROLIFT?
2   MR. RUMANEK:  Object to the form.
3   A   You know, I have not sat down and read
4   this in detail to give you an answer.
5   Q   Right.  But it's on your reliance list,
6   right?
7   A   Well, I've read a thousand --
8   Q   I'm going to hand you what's being marked
9   as Exhibit 14.  And this is a study by Stanford,
10  published in 2012; do you see that?
11  (Exhibit 14 was marked for
12  identification.)
13  A   Yes.
14  Q   Do you -- I'll represent to you that this
15  is on your reliance list.  Do you recall reviewing
16  this?
17  A   I don't remember this specifically, but it
18  is on my list.
19  Q   You're not familiar with this study by
20  Stanford?
21  MR. RUMANEK:  Object to the form.
22  A   Not off the top of my head.
23  Q   And this study is titled Traditional
24  Native Tissue Versus Mesh-augmented Pelvic Organ
25  Prolapse Repairs:  Providing An Accurate

Steven Goldwasser, M.D.

Page 190

1 Interpretation Of Current Literature; is that
2 correct?
3     A   Correct.
4     Q   And you had testified earlier that you
5 estimate the native tissue repair success -- strike
6 that.
7         You testified earlier that you think the
8 native tissue failure rate was somewhere around
9 what -- what do you think the native tissue repair
10 rate is?
11        MR. RUMANEK:  Object to the form.
12    A   I understand it's around 30 percent, 30 to
13 50 percent.
14    Q   Failure.  And if you would please turn to
15 page 25 under the Conclusions, the authors begin,
16 "Published success rate when recurrent prolapse is
17 the outcome measure for anterior repair alone is at
18 least 73 percent, taking into consideration all
19 studies.  Most, however, show a success rate around
20 92 percent"; do you see that?
21    A   Yes.
22    Q   And they're just stating here that the
23 evidence for native tissue repair is more favorable
24 than originally it was thought, is that a fair
25 representation?

Page 191

1        MR. RUMANEK:  Object to the form.
2    A   It's stating here from their conclusion --
3    Q   Right.
4    A   -- they're stating that as one statistic,
5 but there are plenty of articles in the body of
6 literature that have different numbers.
7    Q   Right.
8    A   This is their conclusion.
9    Q   And if you want to turn back to the first
10 page, you can see how they got to that conclusion.
11 Under the abstract, you can see the second sentence,
12 they state, "A comprehensive literature review was
13 performed using PubMed and bibliography searches to
14 compare the anatomic success rates of native tissue
15 in mesh-augmented prolapse repairs and to analyze
16 outcome measures used to" repair -- "to report
17 success rates"; do you see that?
18    A   Yes.
19    Q   So they did a comprehensive literature
20 review similar to Cochrane, and that's how they
21 reached their conclusion, right?
22        MR. RUMANEK:  Object to the form.
23    A   Yes, that's how they reached their
24 conclusion.
25    Q   And that conclusion's contrary to your

Page 192

1 opinion as to what the failure rate is of native
2 tissue repair, right?
3        MR. RUMANEK:  Object to the form.
4 Mischaracterizes the testimony.
5    A   That conclusion is contrary -- they're
6 citing a lower failure rate than I cite, correct.
7    Q   Much lower --
8        MR. RUMANEK:  Object to the form.
9    Q   -- right?
10    A   What do you define as much?
11    Q   Well, they're --
12    A   They're saying about a 17 percent failure
13 rate and I'm saying --
14    Q   At least 200 percent -- 200 to 300
15 percent --
16    A   Probably about 100 percent on the low end,
17 yeah.
18    Q   Right.  Do you want to update the figures
19 in your report as to what you think their failure
20 rate is of native tissue repair?
21        MR. RUMANEK:  Object to the form.
22    A   No.
23    Q   Do you have any reason to discount or
24 criticize the findings of the Stanford review?
25        MR. RUMANEK:  Object to the form.  Object

Page 193

1 to the form.
2    A   I have not had time to go through and read
3 this in detail right now to answer that question.
4    Q   Would you like to have time to go through
5 it and read it in detail?
6    A   Sure.
7    Q   Could that have affected your opinions in
8 your report?
9        MR. RUMANEK:  Object to the form.
10    A   No.
11    Q   Is there any literature out there that
12 could really change your opinions in your report --
13        MR. RUMANEK:  Object to the form.
14    Q   -- at this point?
15        MR. RUMANEK:  Object to the form.
16    A   My opinions are based on the broad scope
17 of literature and personal experience and not one
18 specific article.
19    Q   So is that a no?
20        MR. RUMANEK:  Object to the form.
21    Q   Is there any literature out there that
22 could change your opinions at this point?
23    A   There's -- possibly, but there's no
24 specific articles I'm aware of right now.
25    Q   If articles show that native tissue repair

Steven Goldwasser, M.D.

Page 194

1  was more effective than you've put in your report,
2  would that change your opinions?
3       MR. RUMANEK:  Object to the form.
4    A   I would -- my opinion's based on a
5  combination of literature, discussion with
6  colleagues, personal experience, so I can't tell you
7  there's a specific thing that would change my
8  opinion.
9    Q   Doctor, I'm handing you what's being
10 marked as Exhibit 15.  Change the subject a little
11 bit.  Is it your opinion that PROLIFT degrades
12 in vivo?
13      (Exhibit 15 was marked for
14 identification.)
15   A   No, or if it does, I don't believe there's
16 any clinical significance to that.
17   Q   Okay.  So which is it, does it degrade or
18 there's no clinical significance because it
19 degrades?
20      MR. RUMANEK:  Object to the form.
21   A   There are articles on both sides of the
22 argument, one saying it degrades, another says it
23 doesn't.  A lot of these have to do a lot with the
24 way the material's processed, so it's debatable.
25   Q   So you think that the problem with some of

Page 195

1  the degradation are -- let me rephrase it.
2       You admit some of the articles do show
3  degradation, right?
4       MR. RUMANEK:  Object to the form.
5    A   They think that they are showing
6  degradation.
7    Q   You agree that there's literature out
8  there on both sides of the debate regarding
9  degradation, right?
10   A   Correct.
11   Q   Right.  And your critique or reason to
12 discount some of the articles that show degradation
13 is because during processing, that may have created
14 the appearance of degradation?
15      MR. RUMANEK:  Object to the form.
16 Mischaracterizes the testimony.
17   A   There is one article that specifically
18 discusses processing, correct.
19   Q   And are you familiar with the Iakovlev
20 article that I just handed you?
21   A   Degradation -- it might have been one of
22 the ones that I reviewed.
23   Q   I represent to you it's on your reliance
24 list.  Are you familiar with it as you sit here
25 today?

Page 196

1    A   Not specifically in detail, correct.
2    Q   And, I mean, to be fair, this is published
3  in the Society for --
4    A   Biomaterials.
5    Q   -- Biomaterials, which is not exactly what
6  you practice in; is that correct?
7    A   I do not specifically practice
8  biomaterials, correct.
9    Q   Right.  And it's slightly different than
10 what your day-to-day practice is, right?
11      MR. RUMANEK:  Object to the form.
12   A   It is a journal that I'm not familiar
13 with, correct.
14   Q   And you testified that you don't do
15 microscopic examinations of explanted mesh, right?
16   A   Do not examine things microscopically,
17 correct.
18   Q   Right.
19   A   But I am familiar with, you know, these
20 things as they pertain to what I do.
21   Q   So if you'll turn to page 2, Doctor, on the
22 left side of that first paragraph, it ends -- the
23 second-to-last sentence they stated, "We employed a
24 different methodology by studying cross sections of
25 explanted mesh without its separation from tissues.

Page 197

1  This approach allowed us to avoid possible artifacts
2  associated with tissue removal and enabled
3  side-by-side comparison of degraded and non-degraded
4  polypropylene as well as the surrounding tissue
5  components"; do you see that?
6    A   Yes.
7    Q   And do you understand that these authors
8  tried to look at that very concern that you had with
9  some of the studies showing degradation, they tried
10 to figure out a way to not let processing in any way
11 affect degradation?  You understand that?
12      MR. RUMANEK:  Object to the form.
13   A   That was their intent, correct.
14   Q   Right.  And based off of that, if you turn
15 back to the abstract, for brevity here, on the right
16 side of the abstract, about halfway through, they
17 state, "Cracking of the degraded material indicated
18 a contribution to clinically important mesh
19 stiffening and deformation"; do you see that?
20   A   Yes.
21   Q   So these authors attempted to address your
22 concerns, and very rightly, the concerns that maybe
23 the explanting and processing has created
24 degradation, and these authors changed their
25 methodology to try and address that, and based off

Steven Goldwasser, M.D.

Page 198

1  of that, they still concluded that the mesh is
2  degrading; do you see that?
3          MR. RUMANEK:  Object to the form.
4      A    Specifically, let's see, chemical products
5  and degradation would be analyzed and studied for
6  that role.  Yeah, they are concluding their findings
7  where they thought that there was some degradation
8  of the mesh based on their technique, correct.
9      Q    Which attempted to address the issues that
10  have been raised, right?
11          MR. RUMANEK:  Object to the form.
12  Mischaracterizes the evidence.
13      A    Attempts, but is there -- this is just one
14  of many attempts.
15      Q    Correct.  And as you sit here today, do
16  you have any criticisms or reasons to discount this
17  study done by Iakovlev?
18          MR. RUMANEK:  Object to the form.
19      A    Well, my objection would be to the actual
20  clinical significance of this.
21      Q    Right.  So -- I understand that and we can
22  get that.  Do you have any criticisms of this
23  specific piece of evidence --
24          MR. RUMANEK:  Object to the form.
25      Q    -- other than your statement that there's

Page 199

1  no -- you don't think there's clinical significance?
2          MR. RUMANEK:  Object to the form.
3      A    I can't disagree with what they came up
4  with, correct.
5      Q    And regarding clinical significance, you
6  would agree that mesh stiffness does have a clinical
7  outcome, right?
8          MR. RUMANEK:  Object to the form.
9      A    Not necessarily.
10      Q    Different meshes have different outcomes
11  based off of the different mesh properties inherent
12  in the construction, right?
13          MR. RUMANEK:  Object to the form.
14      A    Repeat one more time.
15      Q    Different meshes have different
16  constructions, right?
17      A    Different -- well, different meshes,
18  you're talking about polypropylene here, correct?
19      Q    Sure.  All -- the construction of the mesh
20  dictates the pore size, right?
21      A    Correct.
22      Q    And we've discussed the mesh geometry and
23  construction and the knitting process, that dictates
24  the stiffness of the mesh, right?
25      A    It could, correct.

Page 200

1      Q    And different stiffness -- meshes with
2  different stiffness act differently, would you
3  agree?
4          MR. RUMANEK:  Object to the form.
5      A    In what way?
6      Q    I mean, it's a different product, it's
7  going to bend differently because it's stiffer,
8  right?
9          MR. RUMANEK:  Object to the form.
10      A    There are different products, but I can't
11  tell you clinically as to what the significance in
12  their difference is.
13      Q    All right.  But clearly here the author is
14  finding that degradation is causing stiffness, you'd
15  agree with that?
16          MR. RUMANEK:  Object to the form.
17      A    If that's what they state specifically.
18      Q    Right.
19      A    I think they did state that.
20      Q    Right.  He states, "Cracking of the
21  degraded material indicated a contribution to
22  clinically important mesh stiffening and
23  deformation"; do you see that?
24          MR. RUMANEK:  Object to the form.
25      A    Yes.

Page 201

1      Q    So he found that it was just stiffer
2  because it was -- the mesh that had degraded was
3  stiffer, that's just what they found, right?
4          MR. RUMANEK:  Object to the form.
5      A    That's what they found, correct.
6      Q    And he's asserting that a stiffer mesh
7  does have clinical significance, that's his
8  conclusion, right?
9          MR. RUMANEK:  Object to the form.
10  Mischaracterizes.  The evidence speaks for
11  itself.
12      A    I mean, but they don't specifically state
13  what the clinical significance is.
14      Q    Right.  But, I mean, that's their
15  conclusion here, though, is that they're --
16      A    Right, it says --
17          MR. RUMANEK:  Hold on.  Let him ask the
18  question, you answer the question.
19          THE WITNESS:  Okay.
20      Q    Their conclusion simply, whether or not
21  you agree with it, is that stiffer mesh -- the mesh
22  is stiffer because it's degrading, which has a
23  clinical impact, that's mainly what they found here,
24  right?
25          MR. RUMANEK:  Object to the form.  The

Steven Goldwasser, M.D.

Page 202

1  article speaks for itself.
2  A  That's what they stated --
3  Q  Right.
4  A  -- but they didn't state clinically what
5  they're calling a clinical problem.
6  Q  And so my question is, what -- what reason
7  do you have to discount the findings of this article
8  that was -- you reviewed in preparation for your
9  report?
10  MR. RUMANEK:  Object to the form.
11  A  No more than the ones that support that
12  there's no problem.
13  Q  And if mesh degrades and falls apart and
14  gives off particles, you understand that that's one
15  of the theories that happens, whether or not you
16  agree with it, but you understand that's one of the
17  theories, right?
18  A  Yes, correct, it's one of the theories.
19  Q  And if loose particles are released in the
20  body, you understand that that changes the
21  inflammatory response to an implant inside a woman's
22  body, right?
23  MR. RUMANEK:  Object to the form.
24  A  Not necessarily.
25  Q  You think it's a good thing for a product

Page 203

1  to fall apart in someone's body?
2  MR. RUMANEK:  Object to the form.  You're
3  arguing with him at this point.  That's not
4  even a question.
5  A  I don't know.  Clinically speaking, I
6  don't know what difference it makes.
7  Q  You would prefer for a mesh product that's
8  permanently implanted in someone's body not to fall
9  apart; is that -- you can't agree with that?
10  A  If you're trying to treat prolapse, then
11  the intention is to not have it fall apart.
12  Q  Right.  And you understand that having
13  more product spread out is increasing the
14  inflammatory response in the body?
15  MR. RUMANEK:  Object to the form.
16  A  Do you have anything specifically that
17  states that?
18  Q  You would disagree with that?
19  A  I don't necessarily agree or disagree.
20  I'm just asking if you have an article that supports
21  that.
22  MR. BENTLEY:  Where are we at?
23  COURT REPORTER:  One minute.
24  MR. BENTLEY:  I'll stop.
25  MR. RUMANEK:  Give me a couple of minutes

Page 204

1  to go over my notes.
2  Let's go on the record.
3  CROSS EXAMINATION
4  BY MR. RUMANEK:
5  Q  Dr. Goldwasser, I'm going to start at the
6  end and then work my way back towards the beginning.
7  At the end of the examination, Counsel
8  showed you an article by Dr. Iakovlev, which was
9  marked as Plaintiffs' Exhibit 15; do you see that?
10  A  Yes.
11  Q  Dr. Iakovlev and Dr. Guelcher are
12  Plaintiffs' experts in this litigation, are you
13  aware of that?
14  MR. BENTLEY:  Objection to testimony by
15  Counsel.
16  A  No, I was not aware of that.
17  Q  If you'd flip over to the last, or page
18  11, the Acknowledgments --
19  A  Okay.
20  Q  -- do you see that it notes that, "The
21  authors provided expert opinions for medico-legal
22  cases on matters related to polypropylene mesh"?  Do
23  you see that?
24  A  Yes.
25  Q  And did you review in the course -- in

Page 205

1  putting together your report, I believe you
2  testified -- when did you begin reviewing materials
3  to put together your report?
4  A  I believe it was the end of 2016.
5  Q  So approximately four months ago?
6  A  Four or five months, yeah.
7  Q  Do you remember every article that you
8  read in considering the materials in putting
9  together your report?
10  MR. BENTLEY:  Objection.  Vague.
11  A  Of course not.
12  Q  Do you recall reviewing articles on the
13  issue of polypropylene degradation that suggested
14  that there is degradation of polypropylene mesh?
15  MR. BENTLEY:  Leading.  Vague.  Compound.
16  A  Yes.
17  Q  Do you recall reviewing articles on the
18  other side of the issue, as Counsel noted, that
19  suggested that there is no degradation of
20  polypropylene mesh?
21  A  Yes.
22  MR. BENTLEY:  Objection.
23  Q  And did you consider those articles in
24  putting together the opinions set forth in your
25  report?

Steven Goldwasser, M.D.

Page 206

1  A  Yes.
2  Q  And with respect to the opinions on
3  degradation, do you hold the opinions set forth in
4  your report to a reasonable degree of medical
5  certainty?
6  A  Yes, I do.
7  Q  Do you have Exhibit 13 in front of you?
8  A  Yes.
9  Q  And this was an article that Counsel
10  showed to you, correct?
11  A  Correct.
12  Q  If you flip over to the second page of the
13  article, do you see that there's a Table 1?
14  A  Table 7 -- Table 1, yes.
15  Q  It says, "Results of seven-year
16  follow-up"?
17  A  Yes.
18  Q  You see that?
19  A  Yes.
20  Q  With respect to the composite success
21  within that table, do you see that overall the
22  composite success as set forth by the authors was
23  60 percent for mesh, 58 percent for non-mesh,
24  correct?
25  A  Correct.

Page 207

1  Q  So while it's close, the success for mesh
2  was, in fact, higher, correct?
3  A  Correct.
4  Q  If you look at the anatomic success, the
5  overall success listed there is 40 percent for mesh,
6  22 percent for conventional, correct?
7  A  Where you have an anatomic?  Oh, okay.
8  Right below.  Yes, correct.
9  Q  And I believe you mentioned earlier that
10  the native tissue success rate that you generally
11  provide is between 30 and 50 percent, correct?
12  A  Yeah, the failure rate for native tissue,
13  yeah.
14  Q  So if you look even in the composite
15  success rate at seven years, as noted in the article
16  that Counsel provided to you, the composite success
17  rate for native tissue repair is 58 percent,
18  correct?
19  A  Correct.
20  Q  Looking back at the overall success rate,
21  when you look in the different compartments within
22  the anterior compartment, the authors reflect a
23  success rate of 74 percent in the anatomic success
24  for mesh, correct?
25  A  Correct.

Page 208

1  Q  And 31 percent for conventional, correct?
2  A  Correct.
3  Q  And in the posterior they report a success
4  rate of 85 percent for mesh, correct?
5  A  Correct.
6  Q  And 66 percent for non-mesh, correct?
7  A  Correct.
8  Q  In the Conclusion section of this article,
9  Counsel focused on the last sentence of the
10  conclusion, which read, "Alternative non-mesh
11  treatments, including non-surgical, should seriously
12  be considered"; do you see that?
13  A  Correct.
14  Q  Does that conclusion state that mesh
15  procedures should not be performed?
16  A  Not at all.
17  Q  Looking up in the Conclusion, did the --
18  did the authors of this study determine that there
19  was no difference in pain or dyspareunia between the
20  mesh and non-mesh groups?
21  A  Correct.  No difference, correct.
22  Q  Can you go to Exhibit 12, which was the
23  2016 Cochrane Review, correct?
24  A  Yes.
25  Q  And Counsel noted that you did not cite

Page 209

1  the 2016 Cochrane in the section that was discussing
2  the efficacy of mesh, correct?
3  MR. BENTLEY:  Objection.  Improper
4  question.
5  A  Correct.
6  Q  If you turn over to the -- a few pages
7  within the document to the abstract; you see that?
8  A  Yes.
9  Q  At the very bottom of page 1 that really
10  continues on to page 2, there's a section that says
11  Permanent Mesh Versus Native Tissue Repair; do you
12  see that?
13  A  Yes.
14  Q  And if you flip over that page, the first
15  sentence says, "Awareness of prolapse at one to
16  three years was less likely after mesh repair,"
17  correct?
18  A  Correct.
19  Q  And the next paragraph, it says, "The
20  rates of repeat surgery for prolapse were lower in
21  the mesh group," correct?
22  A  Correct.
23  Q  It also says that, "There was no evidence
24  of a difference between the groups for rates of
25  repeat surgery for incontinence," correct?

Steven Goldwasser, M.D.

Page 210

1    A    Correct.
2    Q    If you look at the next paragraph, it
3  notes, "Recurrent prolapse on examination was less
4  likely after mesh repair," correct?
5    A    Correct.
6    Q    Do those findings in the 2016 Cochrane,
7  are they consistent with and do they support the
8  opinions set forth in the section of your report
9  that discusses the efficacy of mesh-augmented
10  prolapse repair?
11       MR. BENTLEY: Objection. Vague. Leading.
12  Compound.
13    A    Yes.
14    Q    And are they consistent with the 2013
15  Cochrane Review that you did cite in your report?
16       MR. BENTLEY: Same objections.
17    A    Correct.
18    Q    Counsel asked you whether or not you
19  numerically track as part of a database your success
20  rates with respect to native tissue repair, correct?
21    A    Correct.
22    Q    Can you speak to the clinical experience
23  that you have in performing native tissue repairs
24  without relying on a numerical tracking within a
25  database based on your experience?

Page 211

1       MR. BENTLEY: Objection. Vague.
2    A    Yes.
3    Q    And did you incorporate that into the
4  opinions that you formed in this case?
5    A    Yes.
6    Q    Counsel asked you a number of questions
7  regarding whether or not you hold yourself out as an
8  expert in various areas, including design,
9  biomaterials, industry practices, do you recall
10  those -- that set of questions?
11    A    Correct.
12    Q    You are a urogynecologist, correct?
13    A    Correct.
14    Q    Do you hold yourself out to the world as
15  an expert in any field other than urogynecology?
16    A    No.
17    Q    In the course of your training, education,
18  knowledge, your experience as a urogynecologist, do
19  you develop knowledge and expertise in other areas
20  other than just strictly urogynecology?
21    A    Yes.
22    Q    And do you believe to a reasonable degree
23  of certainty that you have the expertise and
24  experience to testify to the opinions that you've
25  set forth in your report?

Page 212

1       MR. BENTLEY: Objection.
2    A    Yes.
3    Q    Do you have expertise as it relates to
4  issues such as design of medical devices, pathology,
5  industry practices, IFUs to give the opinions that
6  you've set forth in your report?
7       MR. BENTLEY: Vague. Compound.
8    A    Yes.
9       MR. BENTLEY: Leading.
10    Q    If you could turn to Exhibit 10, which was
11  a Coloplast document with a woman on the front that
12  says Straight Talk. All right. If you'll turn over
13  to page 9 of that exhibit.
14    A    Okay.
15    Q    And Counsel went through the section that
16  was entitled, Are There Any Risks With Mesh,
17  correct?
18    A    Correct.
19    Q    If you look at the second paragraph, the
20  second sentence is -- begins, "Potential
21  complications from mesh surgery may include," and
22  then do you see various risks listed after that?
23    A    Correct.
24    Q    The first one is pain, correct?
25    A    Correct.

Page 213

1    Q    Is pain a risk of both mesh surgery and
2  non-mesh surgery?
3    A    Definitely.
4    Q    The next one says "slow healing or
5  non-healing"; do you see that?
6    A    Yes.
7    Q    Is slow healing or non-healing a risk of
8  both mesh surgery -- pelvic organ prolapse surgery
9  involving mesh and pelvic organ prolapse surgery
10  involving non-mesh repairs?
11    A    Correct.
12    Q    Can you have erosion or exposure of suture
13  material into the vagina or adjacent organs with
14  non-mesh surgery?
15    A    Yes.
16    Q    One of the risks listed is nerve injury.
17  Is nerve injury unique to pelvic organ prolapse
18  surgery with mesh?
19    A    Definitely not.
20    Q    And is that a risk of non-mesh repairs as
21  well?
22    A    Yes.
23    Q    Recurrent prolapse is listed as a
24  potential complication; do you see that?
25    A    Yes.

Steven Goldwasser, M.D.

Page 214

1    Q   Is recurrent prolapse a risk that's unique
2  to pelvic organ prolapse with mesh?
3    A   No, not at all.
4    Q   And can you have recurrent prolapse with
5  non-mesh repairs as well?
6    A   Definitely.
7    Q   The next risk that's listed is
8  inflammation.  In fact, let me just go through to --
9  in the interest of time, the remaining risks say,
10 "inflammation, adhesion formation, fistula
11 formation, narrowing of the vagina, scarring, pain
12 with intercourse," and let's stop there, pain with
13 intercourse.  Are those risks unique to pelvic organ
14 prolapse repairs using mesh?
15   A   Definitely not.
16   Q   And can all of those potential
17 complications be risks of non-mesh repairs as well?
18   A   Yes.
19   Q   And then it lists "mesh contraction."  Can
20 you have contraction of tissue or other material --
21 let me strike that.
22       If you're doing a non-mesh repair, can you
23 have -- a native tissue -- strike that.
24       If you are performing a native tissue
25 repair, can you have scarring that results in

Page 215

1  contraction of the implant?
2    A   Yes, that's a normal part of the healing
3  process.
4    Q   And if you're doing a biological graft
5  implant, can you have scarring and contraction of
6  that implant --
7    A   Yes.
8    Q   -- as a result of the procedure?
9    A   Yes.
10   Q   So is contraction a risk that's unique to
11 mesh surgery?
12   A   No.
13   Q   Counsel asked you a number of questions
14 that related to other physicians' knowledge and how
15 their knowledge and experience may compare with your
16 knowledge and experience.  Do you recall those
17 questions?
18   A   Yes.
19   Q   As a physician, who has the obligation of
20 making sure that they are adequately trained to form
21 a procedure on a patient?
22       MR. BENTLEY:  Objection.
23   A   The physician.
24   Q   And who has an obli- -- does the physician
25 have an obligation to investigate and be comfortable

Page 216

1  with the technique required in order to perform a
2  procedure?
3        MR. BENTLEY:  Objection.
4    A   Yes.
5    Q   Does -- does a physician also have an
6  obligation to understand the potential risks and
7  complications associated with a procedure or a
8  product that they're going to perform?
9        MR. BENTLEY:  Objection.
10   A   Of course.
11   Q   I'm going to look now at Exhibit 9.  And I
12 just want to clarify the record on this.  Do you
13 know when this document was created?
14   A   Do I?
15   Q   Exhibit 9.
16   A   Let's see.  I'm looking for a date.  No, I
17 don't know.  Let me -- what -- I don't see any
18 indication on here as to when it was created.
19   Q   Do you know who drafted this document?
20   A   No, I don't.
21   Q   Did -- did you type in the information?
22 Did you create this document?
23   A   No, I did not.
24   Q   Do you know how the information included
25 in this document came to be created?

Page 217

1    A   I don't.
2    Q   Counsel asked you some questions that -- I
3  think the words that he used were you noted this,
4  you said this.
5        MR. BENTLEY:  Objection.  Ask a question.
6    Q   Did you type any of the information or put
7  this into this document?
8    A   Not at all.
9    Q   There was some questions that were asked
10 about the sentence that says, "from the patient
11 side, it can be noticed from the male side," do you
12 remember those questions?
13   A   From today, correct, yes.
14   Q   Do you recall even communicating that
15 information to anyone?
16   A   I don't.
17   Q   Do you understand the context of what was
18 meant by that sentence right there?
19   A   I don't, not exactly.
20   Q   Do you have any idea whether this is an
21 accurate transcription or summary of any comments
22 that you did make?
23       MR. BENTLEY:  Vague.  Calls for
24 speculation.  Compound.
25   A   I don't.  I've never seen it and -- well,

Steven Goldwasser, M.D.

Page 218

1  don't recall seeing this until you highlighted it
2  today.
3      Q   If you'll look at Exhibit 6, which is
4  another document.  It should be over here.  You can
5  probably flip through faster than I can.
6          MR. BENTLEY:  What are you looking for?
7          MR. RUMANEK:  Exhibit 6.
8      Q   Here, you can just look at my copy.
9          MR. BENTLEY:  What is it, the
10  questionnaire?
11          MR. RUMANEK:  Yeah, the questionnaire.
12  BY MR. RUMANEK:
13      Q   The same questions, there's a date at the
14  top that says November 4th, 2010.  Do you know who
15  created this document?
16      A   No, I do not.
17      Q   Do you know -- did you create this
18  document?
19      A   No.
20      Q   Did you put the information in this
21  document to put it into the form that it was
22  provided to you by Counsel?
23      A   No, not as far as I recall.
24      Q   Do you know who put that information into
25  the document that was provided to you by -- as

Page 219

1  Plaintiffs' Exhibit 6?
2      A   I don't.
3      Q   Do you know -- do you recall telling
4  anyone from Ethicon the specific reasons that you
5  trim a mesh graft is because it does not lay flat?
6      A   I don't recall that specifically.
7      Q   Do you recall earlier in the deposition
8  being asked about literature on different topics,
9  one of which was literature related to scar plating?
10      A   Correct.
11      Q   At one point you said that you -- let me
12  ask -- strike that.
13          Did you review and consider literature
14  that related to scarring, contraction, and scar
15  plating with respect to mesh?
16      A   Yes.
17      Q   And I believe at one point you asked to
18  see particular articles that Counsel was referring
19  to, do you recall that?
20      A   Yes.
21      Q   Did Counsel show you any articles --
22          MR. BENTLEY:  Objection.
23      Q   -- in response to that?
24          MR. BENTLEY:  The record speaks for
25  itself.  Improper question.

Page 220

1      A   No.
2      Q   If Counsel had showed you that, do you
3  feel like you would better be able to answer
4  specific questions about the reliability or any
5  specific information contained within particular
6  studies?
7          MR. BENTLEY:  Objection.  Improper
8  hypothetical.  Improper question.
9      A   Yes.
10      Q   But you did review and consider
11  information and literature as it relates to
12  scarring, contraction, and scar plating in putting
13  together your opinion?
14          MR. BENTLEY:  Asked and answered.
15  Leading.  Compound.  Vague.
16      Q   Did you consider --
17          MR. BENTLEY:  Objection.
18      Q   -- literature --
19          MR. BENTLEY:  Same.
20      Q   Did you consider literature that discussed
21  scar plating, scarring, and tissue contraction with
22  respect to mesh implants?
23          MR. BENTLEY:  Same.
24      A   Yes.
25      Q   The opinions that you've given in the

Page 221

1  deposition today, do you hold those opinions to a
2  reasonable degree of medical certainty?
3      A   Yes.
4      Q   And based on the questions that you were
5  asked, the testimony that you've given, do you still
6  hold all the opinions set forth in your report to a
7  reasonable degree of medical certainty?
8      A   Yes.
9          MR. RUMANEK:  That's all the questions
10  I've got.
11          REDIRECT EXAMINATION
12  BY MR. BENTLEY:
13      Q   Doctor, on page 3 of your report, you're
14  discussing your mesh database, and you -- at the
15  bottom of the page, second-to-last paragraph on page
16  3, you note that your database contains over 450
17  patients to date.  Are you saying that -- I just
18  want to be clear, is that -- are you indicating that
19  there's 450 PROLIFT procedures in your database or
20  450 total procedures?
21      A   Total, total vaginal mesh procedures.
22      Q   As you sit here today, do you know how
23  many PROLIFT procedures your database contains?
24      A   Not off the top of my head.
25      Q   And you don't know how many PROLIFT+M

Steven Goldwasser, M.D.

Page 222

1 procedures?
2    A   Correct.
3    Q   If you'd please turn to page 28, we were
4 discussing degradation and the existence of various
5 studies on both sides of the debate, you remember
6 that?
7    A   Yes.
8    Q   And on page 28, that first full paragraph,
9 you note that you're not aware of any evidence both
10 personally or in the literature that suggests that
11 this substance degrades in the human body.  And my
12 question, that's not exactly accurate, is it,
13 because you know that evidence exists on both side
14 of the debate, right?
15       MR. RUMANEK:  Object to the form.
16    A   There is evidence on both sides of the
17 debate, correct.
18    Q   And throughout your report, Doctor, you
19 make statements that certain things are commonly
20 known.  And I understand that you're saying every
21 surgeon knows there's complications, right, but do
22 you have -- there's no evidence out there that
23 indicates doctors were polled or a survey was taken
24 to know exactly what each person knows, is there?
25       MR. RUMANEK:  Object to the form.

Page 223

1    A   No one did any polling for this.
2    Q   Right.
3       MR. RUMANEK:  I'll -- time's up.
4       MR. BENTLEY:  It's actually not.
5    Q   And one more question, when you're making
6 your opinions on the IFU, just to be clear, those
7 are based upon your own personal observations and
8 your clinical practice, not on Federal regulations,
9 right?
10       MR. RUMANEK:  Object to the form.
11    Mischaracterizes the report.
12    A   Specifically my knowledge of Federal
13 regulations in regards to the IFU?
14    Q   Right.
15    A   I'm really IFU based on my overall
16 knowledge of the product, but not specifically
17 regulation per se.
18    Q   That's fair, okay.  And last, you
19 didn't -- your opinion on the warnings and IFU,
20 that's not based upon your review of Ethicon's
21 internal protocols governing what needs to go into a
22 warning, right?
23       MR. RUMANEK:  Object to the form.
24    A   I know there are some, you know,
25 government stipulations as to what should be

Page 224

1 included in an IFU, and it seems like they hit those
2 targets.
3    Q   But your opinions here, though, are based
4 upon your clinical experience, not on the Federal
5 regulations and not upon Ethicon's internal
6 protocols --
7       MR. RUMANEK:  Object to the form.
8    Mischaracterizes the testimony.
9    Q   -- is that correct?
10    A   Well, I've reviewed what's in my reliance
11 list to some degree, some more so than others, and
12 yes, my conclusions are based on what I presented,
13 correct.
14    Q   Right.  And I'm just trying to be clear,
15 though, your conclusions regarding the warnings,
16 they're not based upon your review of Ethicon's
17 internal protocols governing the design of warnings?
18       MR. RUMANEK:  Object to the form.
19    A   I don't -- I can't specifically recall
20 their design of warnings.
21    Q   And they're not based upon your review of
22 the entirety of the Federal regulations governing
23 what needs to go in an IFU, right?
24       MR. RUMANEK:  Object to the form.
25    A   I've reviewed some of that, but I'm not --

Page 225

1 the entire regulation, correct.
2    Q   Because it's --
3       MR. RUMANEK:  All right.  That's it.
4    Q   Your opinion on the adequacy of the IFU is
5 not based upon the actual full IFU regulations,
6 right?
7       MR. RUMANEK:  Object to the form.  Asked
8    and answered.  He's answered that question.
9    We're past the three hours.  I was giving you
10    some leeway.
11    Q   You can answer it.
12       MR. RUMANEK:  You've said --
13       MR. BENTLEY:  You've talked on my record
14    for --
15       MR. RUMANEK:  -- the last question four
16    times.
17       MR. BENTLEY:  -- minutes upon minutes.
18    The question was not answered.  The testimony
19    will clearly speak for itself.
20       MR. RUMANEK:  The testimony will speak for
21    itself.
22 BY MR. BENTLEY:
23    Q   Doctor, if you can answer the question.
24 Can you answer it?
25       MR. RUMANEK:  He has answered it.

Steven Goldwasser, M.D.

Page 226

1     (Off-the-record discussion.)
2   BY MR. BENTLEY:
3     Q   Your report indicates that you looked at
4   801.109(c), and just your opinions on the IFU are
5   not based upon your review of the entire IFU
6   regulations, are they?
7         MR. RUMANEK:  Object to the form.
8     A   Correct.
9         MR. BENTLEY:  Thank you.  Doctor, I
10   appreciate your time.
11           RECROSS EXAMINATION
12   BY MR. RUMANEK:
13     Q   Dr. Goldwasser, did you review Federal
14   regulations as they relate to warnings and IFUs in
15   putting together your opinions in this case?
16     A   Yes.
17     Q   And did you consider the regulations that
18   you reviewed in forming the opinions related to the
19   IFU for PROLIFT in this case?
20         MR. BENTLEY:  Objection.
21     A   Yes.
22           FURTHER REDIRECT EXAMINATION
23   BY MR. BENTLEY:
24     Q   Doctor, in your report --
25         MR. RUMANEK:  We're done.  We're done.

Page 227

1     Q   -- you cite -- Doctor, in your report --
2         MR. RUMANEK:  We're done.  We're done.
3     Q   -- you don't cite to --
4         MR. RUMANEK:  We're done.
5     Q   -- any other regulations -- Doctor, in
6   your report you cite to 21 CFR 801.109(c), do you
7   see that on page 31?
8     A   Yes.
9     Q   Is there any other Federal regulation that
10   you're basing your opinion regarding the adequacy of
11   the IFU?  Is there any other regulation that you're
12   using to get to this opinion here?
13         MR. RUMANEK:  Object to the form.
14     A   I reviewed things on my reliance list, and
15   we can go back to that and we can pull specific
16   things, if need be, and I can tell you if I -- you
17   know, what I reviewed and what I didn't.
18     Q   Totally.  And I'm just asking -- I'm
19   trying to get what's the basis for your opinions of
20   the adequacy of the IFU and I'm trying to see if
21   there's any Federal regulation other than this one
22   section that's here.  Is there anything else that
23   supports your opinion?
24         MR. RUMANEK:  Object to the form.
25     A   I don't recall off the top of my head.

Page 228

1         MR. BENTLEY:  Thank you.
2   (Witness excused.)
3   (Deposition concluded at 12:19 p.m.)
4             - - -

Page 229

1         CERTIFICATE OF OATH
2
3   STATE OF FLORIDA )
4   COUNTY OF DUVAL  )
5
6     I, the undersigned authority, certify that
7   STEVEN GOLDWASSER, M.D., personally appeared before me
8   on March 29, 2017, and was duly sworn.
9
10     WITNESS my hand and official seal this 7th day of
11   April 2017.
12
13
14   _____
                     Stephanie Powers Cusimano, RPR, FPR
15                   Notary Public - State of Florida
                     My Commission No. GG 013532
16                   Expires:  August 3, 2020
17
18
19
20
21
22
23
24
25

Steven Goldwasser, M.D.

Page 230

1          REPORTER'S CERTIFICATE
2    STATE OF FLORIDA  )
3    COUNTY OF DUVAL  )
4
5       I, Stephanie Powers Cusimano, Registered
6    Professional Reporter, Florida Professional Reporter,
7    and Notary Public in and for the State of Florida at
8    Large, hereby certify that I was authorized to and did
9    stenographically report the deposition of STEVEN
10   GOLDWASSER, M.D.; that a review of the transcript was
11   requested; and that the foregoing transcript, pages 1
12   through 228, is a true record of my stenographic
13   notes.
14
15       I further certify that I am not a relative,
16   employee, attorney, or counsel of any of the parties,
17   nor am I a relative or employee of any of the parties'
18   attorney or counsel connected with the action, nor am
19   I financially interested in the action.
20
21       DATED this 7th day of April 2017.
22
23       _____ _____
           Stephanie Powers Cusimano, RPR,
24         FPR, Court Reporter
25

Page 231

1       E R R A T A  S H E E T
2    STATE OF FLORIDA:
     COUNTY OF DUVAL:
3
4       I, STEVEN GOLDWASSER, M.D., the
5    undersigned deponent, have this date read the
6    foregoing pages of my deposition, numbered 1 through
7    228, and with the suggestions noted below, if any,
8    these constitute a true and accurate transcription
9    of my deposition given on the 29th day of March
10   2017, at the time and place stated therein.
11
12   PAGE NUMBER     LINE NUMBER     SUGGESTION/REASON
13   _____      _____      _____
14   _____      _____      _____
15   _____      _____      _____
16   _____      _____      _____
17   _____      _____      _____
18   _____      _____      _____
19   _____      _____      _____
20   _____      _____      _____
21   _____      _____      _____
22
23       _____
           STEVEN GOLDWASSER, M.D.
24
25

Page 232

1          LAWYER'S NOTES
2    PAGE  LINE
3    _____ _____    _____
4    _____ _____    _____
5    _____ _____    _____
6    _____ _____    _____
7    _____ _____    _____
8    _____ _____    _____
9    _____ _____    _____
10   _____ _____    _____
11   _____ _____    _____
12   _____ _____    _____
13   _____ _____    _____
14   _____ _____    _____
15   _____ _____    _____
16   _____ _____    _____
17   _____ _____    _____
18   _____ _____    _____
19   _____ _____    _____
20   _____ _____    _____
21   _____ _____    _____
22   _____ _____    _____
23   _____ _____    _____
24   _____ _____    _____
25   _____ _____    _____