Sarah Abbie Collins, M.D.

```
                                                              Page 1
 1            IN THE UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON
 2
 3    -------------------------  ) Master File No.
      IN RE:  ETHICON, INC.,     ) 2:12-MD-02327
 4    PELVIC REPAIR SYSTEM       )
      PRODUCTS LIABILITY         ) MDL 2327
 5    LITIGATION                 )
      -------------------------  ) JOSEPH R. GOODWIN
 6                               ) U.S. DISTRICT JUDGE
      THIS DOCUMENT RELATES TO   )
 7    ALL WAVE 4 AND SUBSEQUENT  )
      WAVE CASES AND             )
 8    PLAINTIFFS:                )
                                 )
 9    Sharon Bartley             )
      Case No. 2:12cv04270       )
10                               )
      Gladys Thruman             )
11    Case No. 2:12cv04930       )
                                 )
12    Sharon Kay Lunsford        )
      Case No. 2:12cv03308       )
13                               )
      Bertha Towns               )
14    Case No. 2:12cv03306       )
                                 )
15    Peggy Connolly             )
      Case No. 2:12cv04026       )
16                               )
      -------------------------  )
17
18              GENERAL EXPERT DEPOSITION OF
19                SARAH ABBIE COLLINS, M.D.
20                 **TVT and TVT Exact**
21
22                   March 6, 2017
23                 Chicago, Illinois
24
```

EXHIBIT A

Sarah Abbie Collins, M.D.

Page 2

1
2
3
4    The TVT and TVT Exact general expert
5    deposition of SARAH ABBIE COLLINS, M.D., called by
6    the Plaintiffs for examination, taken pursuant to
7    the Federal Rules of Civil Procedure of the United
8    States District Courts pertaining to the taking of
9    depositions, taken before CORINNE T. MARUT, C.S.R.
10   No. 84-1968, Registered Professional Reporter and a
11   Certified Shorthand Reporter of the State of
12   Illinois, at the offices of Kirkland & Ellis LLP,
13   Suite 700, 300 North LaSalle Street, Chicago,
14   Illinois, on March 6, 2017, commencing at 9:04 p.m.
15
16
17
18
19
20
21
22
23
24

Page 4

1                        I N D E X
2              GENERAL EXPERT DEPOSITION
3         TESTIMONY IN RE TVT - Pages 1 to 182
4    TESTIMONY IN RE TVT EXACT - Pages 182 to 331
5     Some areas of testimony re TVT and TVT Exact
         overlap per statement of counsel - Page 182
6
7  SARAH ABBIE COLLINS, M.D.        EXAMINATION
8     BY MS. LIU.................  5
      BY MR. RUMANEK.............  296
9     BY MS. LIU.................  315
      BY MR. RUMANEK.............  323
10    BY MS. LIU.................  328
      BY MR. RUMANEK.............  329
11    BY MS. LIU.................  330
12
13                    E X H I B I T S
14  COLLINS (TVT/TVT EXACT) EXHIBIT      MARKED FOR ID
15   No. 1   Notice to Take Deposition of      5
             Sarah Collins, MD
16
     No. 2   Invoice as of 1/29/17            21
17
     No. 3   Curriculum Vitae                 30
18
     No. 4   Expert Report of Sarah          113
19           Collins, M.D., TVT and TVT Exact
20   No. 5   Sarah Collins General Reliance   134
             List, MDL Wave 4
21
     No. 6   Sarah Collins Supplemental       134
22           Reliance List MDL Wave 4
23   No. 7   Thumb drive containing           183
             reliance materials
24

Page 3

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFF:
3     AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
       17 East Main Street
4      Suite 200
       Pensacola, Florida 32502
5      850-202-1010
       BY: MARY LIU, ESQ.
6      mliu@awkolaw.com
7
8
9  ON BEHALF OF THE DEFENDANTS:
10    TROUTMAN SANDERS LLP
       Bank of America Plaza
11     600 Peachtree Street, N.E.
       Suite 5200
12     Atlanta, Georgia 30308-2216
       404-885-2606
13     BY: ERIC RUMANEK, ESQ.
       eric.rumanek@troutmansanders.com
14
15
16
17
18
19  REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
20
21
22
23
24

Page 5

1              (WHEREUPON, the witness was duly
2         sworn.)
3              SARAH ABBIE COLLINS, M.D.,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6                     EXAMINATION
7    BY MS. LIU:
8         Q.   Good morning, Dr. Collins.
9         A.   Good morning.
10        Q.   For the record can you please state your
11   full name.
12        A.   Sarah Abbie Collins.
13        Q.   And what is your address for your place
14   of practice?
15        A.   250 East Superior Street, Suite 52370,
16   Chicago, Illinois, 60611.
17        Q.   Doctor, I am going to hand you real
18   quickly the Notice for Deposition.
19        MS. LIU:  Counsel.
20              (WHEREUPON, a certain document was
21         marked Collins (General TVT/TVT
22         Exact) Exhibit No. 1, Notice to
23         Take Deposition of Sarah Collins,
24         MD.)

2 (Pages 2 to 5)

Sarah Abbie Collins, M.D.

| Page 26 | Page 28 |
|---|---|
| 1 report that I did I got a little faster. So, like | 1    A.   It was during both. |
| 2 20 for two and then another... | 2    Q.   Can you -- would you be able to decipher |
| 3         Maybe 30 hours, 30 to 35. | 3 between how many were done in residency and how |
| 4 BY MS. LIU: | 4 many were done during your fellowship? |
| 5    Q.   And, Doctor, you said that you served in | 5    A.   Honestly, no. I don't think I could. |
| 6 five of the cases, served a report in five of the | 6 You know, in fellowship, we were doing a lot of |
| 7 cases. Did you actually draft a report for the | 7 transobturator and retropubic slings. Every |
| 8 other two? | 8 retropubic sling was the original TVT Retropubic |
| 9    A.   The other four? | 9 and I did -- I would say many more were from |
| 10   Q.   You mentioned you had seven. You were | 10 fellowship than were from residency. |
| 11 asked to do seven. | 11        In residency it's not uncommon for the |
| 12   A.   Oh. The other two. I see. | 12 attendings and fellows to not necessarily let the |
| 13        No, I did not. I didn't actually look | 13 resident pass the trocar. So, I probably did 10 to |
| 14 at those reports at all. | 14 20, but these are numbers that I'm kind of, you |
| 15   Q.   So, you did a total of five reports, | 15 know, just pulling out from, you know, my |
| 16 case-specific reports? | 16 recognition of the -- the way that training |
| 17   A.   Um-hmm. | 17 normally goes. |
| 18        MR. RUMANEK: Yes? | 18        And in fellowship I probably did 80, and |
| 19 BY THE WITNESS: | 19 I did many more than that of transobturator slings |
| 20   A.   Yes. | 20 too. |
| 21        MS. LIU: Thank you. | 21   Q.   And, Doctor, just so you understand, I |
| 22 BY MS. LIU: | 22 don't need an exact number and I don't want you to |
| 23   Q.   Doctor, is this the first time you've | 23 guess, but I am entitled to a fair estimate. |
| 24 been asked by a medical device company to serve as | 24        So, based on your recollection, if you |

| Page 27 | Page 29 |
|---|---|
| 1 an expert? | 1 can have a number that is a fair recollection of |
| 2    A.   Yes. | 2 what you remember, then I would appreciate that. |
| 3    Q.   So, you've never been asked by another | 3 So, thank you very much. |
| 4 medical device company and turned them down, is | 4        Now, you mentioned that in residency |
| 5 that correct? | 5 they didn't -- the attendings didn't let the |
| 6    A.   That's correct. | 6 residents pass a trocar or do that portion of the |
| 7    Q.   Doctor, I'm going to ask you right now | 7 procedure. |
| 8 about your experience with the TVT Retropubic and | 8        In these 10 to 20 that you mentioned, |
| 9 not the TVT Exact just yet. | 9 were these the ones where you actually performed |
| 10   A.   Okay. | 10 the procedure or were you just assisting the |
| 11   Q.   How many TVT Retropubics have you | 11 attending? |
| 12 implanted? | 12   A.   No, those have been ones where I |
| 13   A.   The TVT Retropubics that I implanted | 13 actually passed the trocars. |
| 14 were all done during training and I can't give you | 14   Q.   In fellowship, the 80 were ones that you |
| 15 an exact number, but I would say about 100. | 15 actually passed the trocars as well? |
| 16   Q.   And when you said "training," I saw that | 16   A.   Yes. |
| 17 on your background you were a fellow for a little | 17   Q.   Thank you, Doctor. |
| 18 while and then you also had your residency. So, | 18        Why have you not used the TVT Retropubic |
| 19 when was this training, the TVT Retropubic | 19 since fellowship? |
| 20 training? | 20   A.   Mainly because I used the TVT Exact when |
| 21   A.   That would have been between 2003 and | 21 I became an attending. It became readily |
| 22 2011. | 22 available. It was the sling that my group was |
| 23   Q.   Was it during one of your -- was it | 23 using and I found that I liked it a lot. |
| 24 during your residency or your fellowship? | 24   Q.   You liked it better than you liked the |

8 (Pages 26 to 29)

Sarah Abbie Collins, M.D.

|  | Page 30 |
|---|---|
| 1 | TVT Retropubic? |
| 2 | MR. RUMANEK: Object to form. |
| 3 | BY THE WITNESS: |
| 4 | A. No. I didn't necessarily like it |
| 5 | better, but I certainly found that I could use it |
| 6 | well and accomplish the same operation using the |
| 7 | TVT Exact. |
| 8 | So, sometimes it just makes sense to, |
| 9 | you know, conform to the, you know, the -- what the |
| 10 | group is doing in terms of, you know, our stock of |
| 11 | the sling and what we have. We can only buy one. |
| 12 | So, to me it made perfect sense to use the |
| 13 | TVT Exact. |
| 14 | Q. Doctor, you mentioned -- since you |
| 15 | mentioned your group, let me go ahead and switch |
| 16 | gears a little bit. |
| 17 | I am handing you what I have marked as |
| 18 | Exhibit 3. |
| 19 | (WHEREUPON, a certain document was |
| 20 | marked Collins (General TVT/TVT |
| 21 | Exact) Exhibit No. 3, Curriculum |
| 22 | Vitae.) |
| 23 | THE WITNESS: Do you want this back? |
| 24 | MS. LIU: Yes. Let's go ahead and put this |

|  | Page 32 |
|---|---|
| 1 | Q. Based on your CV, you joined this group |
| 2 | in June 2016, correct? |
| 3 | A. Correct. |
| 4 | Q. So, prior to that, you were with the |
| 5 | University of Chicago? |
| 6 | A. Correct. |
| 7 | Q. In their Ob-Gyn practice? |
| 8 | A. Correct. |
| 9 | Q. Were you also working in female pelvic |
| 10 | medicine and reconstructive surgery with University |
| 11 | of Chicago? |
| 12 | A. Yes. The practice was called gynecology |
| 13 | and reconstructive pelvic surgery, but it was |
| 14 | FPMRS. |
| 15 | Q. That was from August 2011 to May 2016, |
| 16 | is that correct? |
| 17 | A. Correct. |
| 18 | Q. When did you finish your fellowship? |
| 19 | A. In the end of June 2011. |
| 20 | Q. And then you moved to Chicago from that |
| 21 | point forward, is that correct? |
| 22 | A. Correct. |
| 23 | Q. Now, when you mentioned the group used |
| 24 | TVT Exact, are you talking about the University of |

|  | Page 31 |
|---|---|
| 1 | back here. |
| 2 | MR. RUMANEK: Do you need the Notice anymore? |
| 3 | MS. LIU: No. |
| 4 | MR. RUMANEK: Let's keep it stacked for the |
| 5 | Court Reporter. |
| 6 | BY MS. LIU: |
| 7 | Q. Doctor, I have handed to you what I have |
| 8 | marked as Exhibit 3. Do you recognize that |
| 9 | document? |
| 10 | A. Yes. |
| 11 | Q. It's your CV, is that correct? |
| 12 | A. Yes. |
| 13 | Q. Doctor, you mentioned your group. What |
| 14 | is the group that you are currently with? |
| 15 | A. I'm with Northwestern Medicine at this |
| 16 | time. |
| 17 | Q. And is it a specific urogynecology group |
| 18 | that you're with? |
| 19 | A. Yes. |
| 20 | Q. Can you explain how that works? |
| 21 | A. I am part of a university-based female |
| 22 | pelvic medicine and reconstructive surgery practice |
| 23 | at Northwestern University. We all have university |
| 24 | appointments as well as clinical responsibilities. |

|  | Page 33 |
|---|---|
| 1 | Chicago? |
| 2 | A. Yes. |
| 3 | Q. Now, since you've joined Northwestern |
| 4 | does your current group also use TVT Exact? |
| 5 | A. No. We use the Boston Scientific |
| 6 | Advantage Fit. |
| 7 | Q. And, Doctor, is that what you are |
| 8 | currently using, the Advantage Fit? |
| 9 | A. Yes. |
| 10 | Q. Since June of 2016? |
| 11 | A. Yes. |
| 12 | Q. Who makes that decision in your group? |
| 13 | A. It's a decision made between our |
| 14 | division director and operative -- OR purchasing. |
| 15 | Typically the vendors have package deals with the |
| 16 | hospital and, you know, certainly the clinicians |
| 17 | have input about which devices get purchased and |
| 18 | used regularly. But, yeah, that decision had |
| 19 | actually already been made when I joined the group. |
| 20 | Q. Have you made any suggestions to switch |
| 21 | to TVT or TVT Exact? |
| 22 | A. Honestly, no. I find the two devices |
| 23 | clinically almost identical. |
| 24 | Q. Which two devices are you talking about? |

9 (Pages 30 to 33)

Sarah Abbie Collins, M.D.

| Page 38 | Page 40 |
|---|---|
| 1 passed from the paraurethral dissection to the | 1 rep. |
| 2 medial thigh. | 2 Q. Do you remember any Ethicon reps? |
| 3 Q. And, Doctor, can you estimate the number | 3 A. No. |
| 4 of TOT approaches versus retropubic approaches that | 4 Q. And, Doctor, how many -- let me break |
| 5 you have performed personally? | 5 this down actually. |
| 6 A. I'd say if you were to tally it up right | 6 How many slings have you implanted since |
| 7 now, maybe half and half in my -- well, actually, I | 7 you've joined the practice at Northwestern? |
| 8 might correct that and say I've done more | 8 A. I don't know. Maybe -- I've been there |
| 9 retropubics at this point. | 9 less than a year. Sort of getting ramped up now |
| 10 In my fellowship we did more | 10 volume-wise. I would say 50. |
| 11 transobturators. But pretty soon after my | 11 Q. So, you implant around 50 slings at |
| 12 fellowship, when I became an attending, I started | 12 Northwestern. What about during your time at |
| 13 to do more retropubics and now I almost exclusively | 13 University of Chicago? |
| 14 do retropubics. | 14 A. A lot more. Maybe 200. |
| 15 Q. And why is that? | 15 Q. And then what about during your |
| 16 A. Some of the longer term data comparing | 16 fellowship? |
| 17 retropubic and transobturator slings indicate that | 17 A. I think I already gave you that number. |
| 18 the retropubic slings may be more effective. | 18 Q. Total between all of your slings. |
| 19 Q. So, you've -- you've determined that you | 19 A. Oh. Well, I think I told you about 80 |
| 20 want to do the retropubic approach over the | 20 retropubics and I would say for the Monarcs maybe |
| 21 transobturator approach, is that correct? | 21 250. So, maybe 300, what is that, 330, something |
| 22 A. Most of the time. Not exclusively, but | 22 like that. |
| 23 most of the time. | 23 MR. RUMANEK: Don't ask a lawyer to do math. |
| 24 Q. What percentage currently? | 24 MS. LIU: That part is so true. |

| Page 39 | Page 41 |
|---|---|
| 1 A. I would say 95% retropubic. | 1 BY MS. LIU: |
| 2 Q. And when you currently do do the | 2 Q. What about during your residency, you |
| 3 transobturator approach, do you still use the | 3 said residency wasn't that many, is that correct? |
| 4 Monarc sling? | 4 A. No, I would say 30 absolute max but |
| 5 A. The Monarc sling is no longer available. | 5 somewhere between 10 and 30 for all in. |
| 6 Q. Which sling do you use now? | 6 Q. So, in doing this math, we're looking at |
| 7 A. You know what? I can't remember the | 7 maybe around 600 total slings implanted during your |
| 8 name of it, which sounds ridiculous. I think it | 8 career, is that correct? |
| 9 might be -- I think it's the Obtryx. I can | 9 A. Probably. |
| 10 describe the device to you perfectly but I -- | 10 MR. RUMANEK: Just so it's clear, you're |
| 11 Q. Is it a Boston Scientific product? | 11 referencing polypropylene slings, correct? |
| 12 A. Yeah. I think so. | 12 MS. LIU: Correct. |
| 13 Q. At your current practice are they using | 13 BY MS. LIU: |
| 14 Boston Scientific exclusively? | 14 Q. Is that -- |
| 15 A. I don't know. | 15 A. Yeah. |
| 16 Q. Doctor, in your career as a surgeon have | 16 Q. -- what you're -- |
| 17 you been visited by sales reps? | 17 A. Yes. |
| 18 A. Yes. | 18 Q. The numbers that you gave me were |
| 19 Q. Sales reps for Ethicon? | 19 polypropylene slings? |
| 20 A. I don't know. Maybe very early on in | 20 A. Yes. |
| 21 my -- maybe in my residency. It's hard to say. By | 21 Q. So, 600 polypropylene slings during your |
| 22 the time I was in fellowship, TVT was so well | 22 career. Have you followed every single one of your |
| 23 incorporated into our practice that I don't know | 23 patients that you've implanted a sling in? |
| 24 that there would have been a role for an Ethicon | 24 A. I mean, I have seen all of my |

11 (Pages 38 to 41)

Sarah Abbie Collins, M.D.

| Page 58 | Page 60 |
|---|---|
| 1  meetings about monthly. | 1  up of anywhere from two to four people and they're |
| 2      Q.  And what committee are you with him on? | 2  supposed to -- typically there's a lead writer, not |
| 3      A.  I'm on the Clinical Guidelines Committee | 3  always but typically, and then the next step is |
| 4  of the American Urogynecologic Society. | 4  that outlines are created for what's going to be |
| 5      Q.  Is that AUGS? | 5  included in the document along with a review of the |
| 6      A.  Yeah. | 6  literature. |
| 7      Q.  And what does this Clinical Guidelines | 7          Then once the group approves the |
| 8  Committee do? | 8  outlines and, you know, feels that the outline will |
| 9      A.  We usually under the direction of the | 9  satisfy the breadth of what we're being asked to |
| 10  Board of the American Urogynecologic Society draft | 10  do, writing happens and then usually have about, I |
| 11  documents under certain clinical headings that we | 11  don't know, four to six weeks to do the writing, |
| 12  feel need such a document, and essentially we | 12  maybe even more, and then we submit the document to |
| 13  review the evidence extensively and produce usually | 13  the whole group. |
| 14  an expert opinion level document on a certain | 14          The whole group reviews it.  Changes are |
| 15  topic.  It will be evidence-based, but it wouldn't | 15  made based on the group's feedback.  And then there |
| 16  fit criteria for like a meta-analysis, for example. | 16  are readers then that actually handle the document |
| 17      Q.  So, it would not be a peer-reviewed | 17  outside of the group, and those are on the |
| 18  document, is that correct? | 18  Terminology Committee. |
| 19      A.  Well, no. | 19          We have a separate Terminology Committee |
| 20      MR. RUMANEK:  Object to form. | 20  of AUGS, and I'm actually a liaison to that |
| 21  BY THE WITNESS: | 21  committee from the Clinical Guidelines Committee. |
| 22      A.  Okay.  No, that's not correct.  They are | 22          So, we'll review the document through |
| 23  peer-reviewed and typically do get published.  I | 23  that committee, make sure that the terminology used |
| 24  only mean to say that they're not meta-analyses, | 24  in the document is consistent, and then at some |

| Page 59 | Page 61 |
|---|---|
| 1  which is a different type of -- | 1  point after that we will release the document to |
| 2  BY MS. LIU: | 2  the Board members and to ultimately the membership |
| 3      Q.  Can you explain what that means? | 3  at large of AUGS. |
| 4      A.  A meta-analysis is a very rigorous | 4          So, we get feedback from a lot of |
| 5  evaluation of multiple pieces of evidence, usually | 5  different people and then we finalize the document |
| 6  multiple articles addressing the same problem. | 6  and publish it. |
| 7  There is a combination of the data that is done | 7      Q.  Now, when you -- when you talked about |
| 8  through a very rigorous analytic process that | 8  the topics, who decides on the topics? |
| 9  requires some extensive knowledge in specifically | 9      A.  Like I said, a lot of times the Board of |
| 10  performing meta-analyses. | 10  the American Urogynecologic Society.  Anyone can |
| 11      Q.  Doctor, how many people are in this | 11  raise a topic that they think might be of interest. |
| 12  Clinical Guidelines Committee? | 12  And then usually before we put a lot of man-hours |
| 13      A.  Probably about a dozen. | 13  into it, we will discuss it with the Board and make |
| 14      Q.  And prior to any documents being | 14  sure that we feel there is a broad enough audience |
| 15  published, what process does it go through? | 15  for it. |
| 16      MR. RUMANEK:  Object to the form. | 16      Q.  And how many people are on the Board? |
| 17  BY THE WITNESS: | 17      A.  I don't know actually. |
| 18      A.  Well, we decide on a topic as a group. | 18      Q.  So, these topics that are brought in |
| 19  Dr. Tulikangas who is the chair of the group will | 19  your monthly meetings, they're topics that are |
| 20  be leading our meetings and we form writing groups. | 20  given to you guys by the Board, is that what I'm |
| 21  So, people will either request to be on a | 21  understanding? |
| 22  particular writing group or be asked to be on the | 22      MR. RUMANEK:  Object to the form; |
| 23  writing group. | 23  mischaracterizes the testimony. |
| 24          Typically the writing group will be made | 24  BY THE WITNESS: |

16 (Pages 58 to 61)

Golkow Technologies, Inc - 877.370.3377

Sarah Abbie Collins, M.D.

| Page 62 | Page 64 |
|---|---|
| 1    A.  Like I said, sometimes. But like I said | 1  systematic review. We think we could offer XYZ." |
| 2  also, anybody who has a good idea can raise that. | 2  And the group decides. |
| 3  BY MS. LIU: | 3    Q.  Is it a vote? |
| 4    Q.  And then ultimately who decides on what | 4    A.  Yeah, more or less. Usually we don't |
| 5  topics each of these writing groups work on? | 5  even have to do like a formal vote. It's more like |
| 6    A.  Well, if we've decided as a group to | 6  a -- there is a tone. |
| 7  take on a document, then it's usually, you know, a | 7    Q.  So, it's more of you guys have a |
| 8  conference call that we'll be having and | 8  discussion and ultimately decide to do it without a |
| 9  Dr. Tulikangas will say, "Who wants to participate | 9  vote? |
| 10  in this?" A few people will step up. | 10    MR. RUMANEK: Object to the form. |
| 11    Q.  So, who ultimately decides -- strike | 11  BY THE WITNESS: |
| 12  that. | 12    A.  Well, I mean, when you have 12 people, |
| 13    Does your group of 12 people decide on a | 13  it's usually pretty obvious whether everybody |
| 14  topic or topics to write on? | 14  agrees or not and it rarely comes down to six -- I |
| 15    A.  I feel like I've answered this already. | 15  don't think it's ever happened that six people want |
| 16  But essentially, I mean, sometimes Paul Tulikangas | 16  it and six people don't. So, a vote is just not |
| 17  will say, "The Board has mentioned that they would | 17  really necessary. |
| 18  like a document on X" or "I had a conversation with | 18  BY MS. LIU: |
| 19  a colleague the other day and they mentioned it | 19    Q.  Is it usually unanimous when you guys |
| 20  would be nice to have a document on Y." Anyone in | 20  decide -- |
| 21  the group could say that. | 21    A.  Yeah. |
| 22    Q.  And do you -- when somebody mentions, | 22    Q.  -- to do a project? |
| 23  "Okay, somebody would like a topic on this" or "a | 23    MR. RUMANEK: I note that we have been going |
| 24  topic on that," is that the time where you guys | 24  over an hour. I don't know if this is a good spot. |

| Page 63 | Page 65 |
|---|---|
| 1  decide, yes, we are going to do it? | 1    MS. LIU: Let's take a break. |
| 2    A.  Yes. | 2    (WHEREUPON, a recess was had |
| 3    Q.  Or how does that process work is what I | 3    from 10:10 to 10:20 a.m.) |
| 4  am asking. How does the process from the time | 4  BY MS. LIU: |
| 5  somebody mentions, "Hey, this would be a great | 5    Q.  Doctor, we were just talking about the |
| 6  topic" to ultimately deciding to work on that | 6  committee that you serve on with AUGS. |
| 7  topic? | 7    A.  Yes. |
| 8    A.  I mean, we have these meetings monthly. | 8    Q.  And you had mentioned that |
| 9  Typically the ideas come from some conversation in | 9  Dr. Tulikangas is the chair of that committee. Do |
| 10  the last month that people have had because we do | 10  you know how long he's been the chair? |
| 11  it every call. So, I would say it takes about a | 11    A.  I think he's been the chair for over a |
| 12  month to decide. | 12  year. |
| 13    But it could be something like, you | 13    Q.  And has he been on that committee prior |
| 14  know, "Hey, we, you know -- I was speaking with | 14  to being a chair? |
| 15  somebody on the Board. They'd love to have a | 15    A.  I don't know that. |
| 16  document on the efficacy of the anterior repair, | 16    Q.  And he was your fellowship director? |
| 17  native tissue anterior repair. What do you guys | 17    A.  Correct. |
| 18  think?" | 18    Q.  And so how -- what was the relationship |
| 19    And we'd say, "Well, there is already a | 19  between a fellow and the fellowship director at the |
| 20  systematic review on that, like XYZ. I don't know | 20  program that you were at? |
| 21  if there is a role for that kind of document in the | 21    A.  The fellowship director is often a |
| 22  literature at this point," one person may say. | 22  mentor to the fellows that are going through at |
| 23    And the other would say, "Well, you | 23  that time. Usually the fellowship director has a |
| 24  know, a couple new things have come out since X | 24  bit of a stronger relationship with the fellows |

17 (Pages 62 to 65)

Page 118

1    A.   Again, the surgery to place a TVT can
2  cause that complication, but the TVT itself cannot.
3  BY MS. LIU:
4    Q.   Do you agree that patients being placed
5  with TVT have the risk of having multiple revision
6  surgeries?
7    A.   There is a small risk that patients will
8  require a revision surgery after any surgery for
9  stress urinary incontinence, yes.
10   Q.   Now, Doctor, in your report, you had
11 talked about the risks of the 2015 IFU, is that
12 correct?
13   A.   That is correct.
14   Q.   And, Doctor, you haven't used the TVT
15 since 2011, is that correct?
16   A.   The TVT Retropubic.
17   Q.   Yes.
18   A.   I've just used the TVT Exact, that's
19 correct.
20   Q.   Correct. So, and when you talked about
21 the 2015 IFU, were you talking about the
22 TVT Retropubic or the TVT Exact?
23       MR. RUMANEK: Object to the form.
24 BY THE WITNESS:

Page 120

1  would be done for stress incontinence.
2  BY MS. LIU:
3    Q.   And, Doctor, did you review the IFUs
4  besides the 2015 one for this report?
5    A.   I reviewed one other version, but I
6  can't tell you specifically which one or whether it
7  was TVT or TVT Exact that I read that.
8    Q.   So, you read two IFUs in preparing your
9  report, is that correct?
10   A.   Yes.
11   Q.   And the two IFUs that you read, you
12 don't -- besides the 2015, you don't know which
13 other one that you read, is that correct?
14   A.   Correct, but I think it was an earlier
15 version.
16   Q.   Do you know how far back?
17   A.   No.
18   Q.   Now, do you know why the earlier
19 versions would not include all of the complications
20 that are listed in the 2015 IFU?
21       MR. RUMANEK: Object to the form.
22 BY THE WITNESS:
23   A.   You know, other than sort of, you know,
24 trying to be more proactively defensive, no.

Page 119

1    A.   I would have been referring to both of
2  them.
3  BY MS. LIU:
4    Q.   And do you agree that all the things
5  that I just listed that some of which you agreed
6  and some of which that you did not agree with are
7  in the 2015 IFU?
8    A.   Do I believe --
9        MR. RUMANEK: Object to the form.
10 BY THE WITNESS:
11   A.   -- that all of the complications that
12 you listed are in the -- I think that the IFU
13 refers to the body of possible complications that
14 any surgeon trained in anti-incontinence surgery
15 would know already.
16 BY MS. LIU:
17   Q.   So, you don't believe that what's in the
18 IFU is specific to the TVT?
19       MR. RUMANEK: Object to form.
20 BY THE WITNESS:
21   A.   I think that a lot of it as it relates
22 to the type of mesh, you know, the Type 1
23 polypropylene, is specific to the TVT but much of
24 it is actually just referring to any surgery that

Page 121

1  BY MS. LIU:
2    Q.   And do you believe that all risks should
3  be in an IFU?
4        MR. RUMANEK: Object to the form.
5  BY THE WITNESS:
6    A.   I think it's irrelevant whether all
7  risks are in the IFU.
8  BY MS. LIU:
9    Q.   So, you don't believe that all risks
10 should be in an IFU?
11       MR. RUMANEK: Object to the form.
12 BY THE WITNESS:
13   A.   I think that's correct, yes.
14 BY MS. LIU:
15   Q.   Now, Doctor, have you ever designed a
16 medical device?
17   A.   I've never designed a medical device.
18   Q.   Have you ever drafted an IFU?
19   A.   I have not.
20   Q.   Do you understand the regulations that
21 are involved in drafting an IFU?
22       MR. RUMANEK: Object to the form.
23 BY THE WITNESS:
24   A.   I am very vaguely aware of them but...

31 (Pages 118 to 121)

Sarah Abbie Collins, M.D.

| Page 122 | Page 124 |
|---|---|
| 1   BY MS. LIU:<br>2       Q.   So, you don't know as far as the<br>3   regulations are concerned what needs to be in an<br>4   IFU, is that correct?<br>5       MR. RUMANEK: Object to the form.<br>6   BY THE WITNESS:<br>7       A.   That's correct. I approach an IFU as a<br>8   clinician and a surgeon.<br>9   BY MS. LIU:<br>10       Q.   But not as somebody who would understand<br>11   the regulatory restrictions or regulatory<br>12   requirements of an IFU, is that correct?<br>13       MR. RUMANEK: Object to the form.<br>14   BY THE WITNESS:<br>15       A.   Probably, although I think the IFU is<br>16   written for me as a surgeon. I think that I'm the<br>17   target audience and so insofar as the, you know --<br>18   I think it doesn't necessarily matter what, you<br>19   know, regulatory bodies would think should go in an<br>20   IFU. If it doesn't help me, I don't know that it's<br>21   relevant.<br>22   BY MS. LIU:<br>23       Q.   So, if there are regulatory requirements<br>24   put down by the Government, you don't believe that | 1       Q.   So, you haven't been consulted by a<br>2   medical device company as to what should go in from<br>3   a clinician's perspective into an IFU, have you?<br>4       A.   No.<br>5       Q.   And as far as designing a medical<br>6   device, you testified that you have not, is that<br>7   correct?<br>8       A.   That's correct.<br>9       Q.   Have you ever participated in designing<br>10   a mesh product?<br>11       A.   No.<br>12       Q.   Have you ever been approached by a<br>13   company to help with designing a mesh product?<br>14       A.   No.<br>15       Q.   So, Doctor, you are not a biomaterials<br>16   engineer, are you?<br>17       MR. RUMANEK: Object to the form.<br>18   BY THE WITNESS:<br>19       A.   I am not an engineer.<br>20   BY MS. LIU:<br>21       Q.   And you wouldn't consider yourself to be<br>22   a biomechanical engineer, is that correct?<br>23       MR. RUMANEK: Object to the form.<br>24   BY THE WITNESS: |

| Page 123 | Page 125 |
|---|---|
| 1   the medical device company should follow those<br>2   regulations?<br>3       MR. RUMANEK: Object to the form, grossly<br>4   mischaracterizes her testimony.<br>5   BY THE WITNESS:<br>6       A.   I mean, I think that the device company<br>7   better follow the rules so that it doesn't get in<br>8   trouble. But as it relates to my practice, it<br>9   wouldn't make a difference.<br>10   BY MS. LIU:<br>11       Q.   But you don't have any experience<br>12   yourself in drafting an IFU?<br>13       A.   That's correct.<br>14       Q.   And would you consider yourself an<br>15   expert when it comes to drafting an IFU?<br>16       MR. RUMANEK: Object to the form.<br>17   BY THE WITNESS:<br>18       A.   To drafting an IFU?<br>19   BY MS. LIU:<br>20       Q.   Correct.<br>21       A.   No, I would not.<br>22       Q.   Have you ever provided any input in<br>23   drafting an IFU?<br>24       A.   I have not. | 1       A.   I think it's factual that I am not a<br>2   biomechanical engineer.<br>3   BY MS. LIU:<br>4       Q.   And you are not an expert in designing<br>5   mesh products, is that correct?<br>6       MR. RUMANEK: Object to the form of the<br>7   question.<br>8   BY THE WITNESS:<br>9       A.   I would say as it relates to<br>10   urogynecology, I'm an expert in the mesh products<br>11   that are used for urogynecology.<br>12   BY MS. LIU:<br>13       Q.   But you're not an expert in actually<br>14   designing the weave of the mesh, is that correct?<br>15       MR. RUMANEK: Object to the form.<br>16   BY THE WITNESS:<br>17       A.   That's correct.<br>18   BY MS. LIU:<br>19       Q.   Are you an expert when it comes to<br>20   developing the weight of the mesh?<br>21       MR. RUMANEK: Object to the form.<br>22   BY THE WITNESS:<br>23       A.   I am not an expert in developing the<br>24   weight of the mesh. |

32 (Pages 122 to 125)

Sarah Abbie Collins, M.D.

Page 126

1  BY MS. LIU:
2      Q.   What about in determining the pore size,
3  are you an expert in determining the pore size of
4  the mesh?
5          MR. RUMANEK: Object to the form.
6  BY THE WITNESS:
7      A.   No.
8  BY MS. LIU:
9      Q.   Do you know what the optimal pore size
10  should be in a sling?
11         MR. RUMANEK: Object to the form.
12  BY THE WITNESS:
13     A.   Yes.
14  BY MS. LIU:
15     Q.   And how do you know that?
16     A.   Well, there have been multiple studies
17  comparing different materials used for midurethral
18  slings and over the years we've attained a lot of
19  good data from the hernia literature as well and we
20  know that tissue ingrowth is maximized when the
21  pores are over 75 microns and when the mesh is
22  monofilamentous and that is an Amid Type 1 mesh.
23     Q.   So, you're basing this on the Amid
24  study, is that correct?

Page 127

1          MR. RUMANEK: Object to the form.
2  BY THE WITNESS:
3      A.   Well, the Amid study is one, but there
4  are actually a lot of studies that have included,
5  you know, slings that have been made of other
6  materials as well and we know the outcomes of some
7  of the meshes that were used before the Amid
8  Type 1s.
9  BY MS. LIU:
10     Q.   So, now --
11     A.   And now we know --
12     Q.   Sorry.
13     A.   Sorry. And now we know, we have a lot
14  of data from the Amid Type 1s as well.
15     Q.   So, now, Doctor, have you compared the
16  slings that have been available during your career,
17  the pore size of that, compared with other types of
18  mesh, say, the Ultrapro, as far as pore size goes
19  for the safety of a sling?
20         MR. RUMANEK: Object to the form.
21  BY THE WITNESS:
22     A.   I don't know what an Ultrapro is.
23  BY MS. LIU:
24     Q.   Okay. Doctor, what meshes are you

Page 128

1  familiar with? I know you mentioned the Gynemesh.
2  You mentioned the midurethral slings. You've also
3  mentioned the IntePro Y mesh. Are you familiar
4  with any other mesh products?
5          MR. RUMANEK: Object to the form. She's
6  testified about a lot of other products other than
7  just those ones that you just mentioned and she
8  also mentioned that she had used a lot of other
9  products that she couldn't specifically remember.
10  BY MS. LIU:
11     Q.   Doctor, you've testified that you've
12  used multiple different products. I understand
13  that. I'm taking -- I'm putting slings in one
14  bucket right now.
15         The other sacral colpopexy meshes that
16  you have used, which ones are you most familiar
17  with? Which ones are you familiar with at all
18  actually?
19         MR. RUMANEK: Object to the form.
20  BY THE WITNESS:
21     A.   Well, the Gynemesh initial sheets that
22  we used to cut into Ys, the IntePro Y mesh, Alyte.
23  And then what we're using now is the Boston
24  Scientific mesh, and I can't remember the brand

Page 129

1  name of it. I would say I'm most familiar right
2  now with that one because it's what I use on a
3  regular basis.
4      Q.   And, Doctor, have you or do you know of
5  any studies that compare the pore size of these
6  types of pelvic organ prolapse meshes compared with
7  the midurethral sling of the TVT?
8          MR. RUMANEK: Object to the form.
9  BY THE WITNESS:
10     A.   I don't know of any studies specifically
11  comparing a sacral colpopexy mesh to a TVT mesh.
12  BY MS. LIU:
13     Q.   And, so, you would not be able to say
14  whether the pore size of, say, the BSC mesh that
15  you're using compared with the pore size of the TVT
16  as far as safety goes in a midurethral sling, is
17  that correct?
18         MR. RUMANEK: Object to the form of the
19  question.
20  BY THE WITNESS:
21     A.   No, that's not correct. Both of them
22  are Amid Type 1 meshes with large pore size and
23  both are monofilamentous. Beyond that, I think
24  that there isn't much more that matters to me.

33 (Pages 126 to 129)

Sarah Abbie Collins, M.D.

| Page 130 | Page 132 |
|---|---|
| 1    Q.  So, say, for example, the pore size of | 1    Q.  Okay.  And, Doctor, have you read in any |
| 2  the TVT is slightly over 1,000 microns, is that | 2  literature or any kind of internal documents that |
| 3  correct?  That's what you have in your report? | 3  state, you know, pore size is between, say, 2 and 4 |
| 4      MR. RUMANEK:  Object to the form. | 4  millimeters would be safer than the 1 millimeter |
| 5  BY THE WITNESS: | 5  pore size of the TVT? |
| 6    A.  That is correct. | 6      MR. RUMANEK:  Object to the form. |
| 7  BY MS. LIU: | 7  BY THE WITNESS: |
| 8    Q.  So, that's approximately 1 millimeter, | 8    A.  I have not.  I have -- I know that there |
| 9  is that correct? | 9  are some ultra-lightweight prolapse meshes that |
| 10    A.  Um-hmm. | 10  have pore sizes of that caliber.  But in terms of |
| 11      MR. RUMANEK:  Object to the form. | 11  projecting that on to whether or not the TVT would |
| 12  BY MS. LIU: | 12  be a safer device if it had that size of pores, I |
| 13    Q.  Now -- can you say yes or no? | 13  would say I've never heard that before or read that |
| 14    A.  Yes. | 14  before and I can't imagine that that's true. |
| 15    Q.  Okay.  So, do you know how that | 15  BY MS. LIU: |
| 16  1 millimeter is measured? | 16    Q.  And when you say you can't imagine that |
| 17    A.  Like with a ruler, is that what you're | 17  that's true, is that just based on speculation? |
| 18  asking? | 18      MR. RUMANEK:  Object to the form. |
| 19    Q.  Sorry.  No.  Do you know like as far as | 19  BY THE WITNESS: |
| 20  the pore size goes where the measurement is taken? | 20    A.  No, I think when you're talking about |
| 21    A.  My understanding is from one aspect of | 21  the efficacy of a midurethral sling, my sense of |
| 22  the repeated pattern to the beginning of the next. | 22  what's required of the material is based on my |
| 23  So -- | 23  experience of having placed these and then taking |
| 24    Q.  What shape is the pore in a TVT mesh? | 24  care of patients who have them implanted. |

| Page 131 | Page 133 |
|---|---|
| 1    A.  I don't know the exact shape of it. | 1      And I have used the ultra-lightweight |
| 2  Like I said, I haven't looked at it underneath a | 2  meshes in sacral colpopexy before and have found |
| 3  microscope to know whether it's round or orthogonal | 3  them to be prohibitively flimsy.  They've torn |
| 4  or... | 4  during handling in the operating room and that |
| 5    Q.  And -- | 5  concerns me with respect to function. |
| 6      MR. RUMANEK:  We have been going now over two | 6      Obviously you don't want to place any |
| 7  hours.  I don't know when a good stopping point is. | 7  material into a patient if it's not going to help |
| 8    MS. LIU:  Sure.  We can do a stop. | 8  them. |
| 9      (WHEREUPON, a recess was had | 9      And I believe that a really large pore |
| 10      from 11:22 to 11:33 a.m.) | 10  size would probably not be able to accomplish the |
| 11  BY MS. LIU: | 11  task of creating a good supportive scaffold for the |
| 12    Q.  Doctor, last we were talking about the | 12  urethra at the midpoint the way the midurethral |
| 13  pore size of the TVT sling. | 13  sling is supposed to. |
| 14    A.  Yes. | 14    Q.  And have you tested that theory? |
| 15    Q.  And I believe we were talking about how | 15    A.  I feel like my clinical experience |
| 16  it's measured from point A to point B.  You | 16  satisfies my curiosity about that, but I've never |
| 17  mentioned you didn't know whether or not it was a | 17  conducted an experiment. |
| 18  circular type of measurement.  Do you know how it | 18      I have handled ultra-lightweight meshes |
| 19  was measured? | 19  at the time of sacral colpopexy and have found them |
| 20    A.  I really don't.  I've never read about | 20  to be frustratingly flimsy. |
| 21  that particular aspect of measuring pore size. | 21    Q.  Doctor, have you heard of a product or a |
| 22    Q.  And -- | 22  mesh called Pronova? |
| 23    A.  I was assuming it was the actual pore | 23    A.  No. |
| 24  size but, you know, the dimension of the hole. | 24    Q.  Have you -- sorry.  Strike that. |

34 (Pages 130 to 133)

Page 138

1 Do you see that? Up top on to the left
2 corner.
3 A. Yes.
4 Q. Okay. Do you see that there are several
5 pages of internal documents that are listed on your
6 reliance list?
7 A. Yes.
8 Q. But you didn't actually rely on them, is
9 that correct?
10 A. That's correct.
11 Q. Did you rely on the two or the three
12 that you reviewed in generating your report?
13 A. Well, like I said, I read them after I
14 generated the report. So, no.
15 Q. So, you didn't rely on any internal
16 documents in generating your report?
17 A. No, I didn't think they were relevant to
18 what I was writing.
19 Q. Were they provided to you prior to
20 generating your report?
21 A. I mean, I -- I bet I had -- I bet they
22 were included in some of the materials that Butler
23 Snow sent me. They're just not helpful to what
24 I -- what I was writing.

Page 139

1 Q. So, you didn't review them prior to
2 writing your report?
3 A. Correct.
4 Q. Now, do you know how Butler Snow
5 determined the internal documents to send to you?
6 A. No.
7 Q. And you said you did not feel that they
8 were relevant. If you hadn't reviewed them, how
9 come you didn't feel that they were relevant?
10 MR. RUMANEK: Object to the form.
11 BY THE WITNESS:
12 A. Well, you know, in -- I was charged with
13 creating a document that talked about my opinions
14 related to the safety and efficacy of the TVT
15 especially as it compares to its alternatives.
16 And I don't think that -- I mean, I
17 think that the really robust scientific literature
18 about these devices is almost overwhelming in
19 quantity. I had my hands full with that and that I
20 do think is relevant to the safety and efficacy of
21 the device.
22 What different members of a corporation
23 are saying to each other about that device is not
24 helpful in my opinion about the safety and efficacy

Page 140

1 of the device.
2 Q. So, if the biomaterial engineers who
3 designed the product tested the product or later on
4 developed or later on -- strike that -- or later on
5 gathered information that related to the safety of
6 its product, you wouldn't find that that would be
7 relevant to your analysis?
8 MR. RUMANEK: Object to the form.
9 BY THE WITNESS:
10 A. I think it might be relevant but not
11 necessary because I have so much other data that,
12 you know, comes from the peer-reviewed body of
13 literature. I just can't imagine that that one
14 memo would change what I already know based on a
15 systematic review type level evidence.
16 BY MS. LIU:
17 Q. So, you're basically saying that in
18 any -- even if you had the entire body of internal
19 documents, you wouldn't consider them in generating
20 your report, is that correct?
21 MR. RUMANEK: Object to the form.
22 BY THE WITNESS:
23 A. If I had -- I can't say that. I mean, I
24 didn't read them all, you know. If there's a

Page 141

1 specific document you're referring to, I could look
2 at that.
3 But I, you know -- I kind of hold the
4 literature that I base my opinions on to a pretty
5 high standard and that's peer review and scientific
6 rigor, and I had that in the documents that were
7 available to me that I'm already familiar with and
8 I relied on those.
9 Q. But you did not consider or rely on any
10 internal documents in generating your general TVT
11 and TVT Exact report, is that correct?
12 A. That's correct.
13 MR. RUMANEK: Object to form.
14 BY MS. LIU:
15 Q. So, if internally Ethicon felt that
16 there was a better mesh than the TVT mesh for the
17 midurethral retropubic sling and felt that --
18 sorry. Strike that.
19 If internally there were documents that
20 show that Ethicon had believed, their material
21 engineers had believed there was a better mesh out
22 there over the TVT, you would not have considered
23 that information, is that correct?
24 MR. RUMANEK: Object to the form. She's

Page 150

1  BY MS. LIU:
2      Q.   Over the course of your 14 years.
3      A.   I'd say I've read about half of this.
4      Q.   And did you rely on any of this
5  material, the ones that you have read, in
6  generating your report?
7      A.   Yes.
8      Q.   But not all of the materials in here, is
9  that correct?
10     A.   Right, yes.
11     Q.   Now, Doctor, you mentioned that you rely
12 on medical literature in generating your report.
13 And that's basically what you relied on, is that
14 correct?
15     A.   Yes.
16         MR. RUMANEK:  Object to the form.
17 BY MS. LIU:
18     Q.   And in generating your report based on
19 that medical literature, what -- how do you usually
20 get your literature?
21     A.   Lots of different ways.  I receive
22 certain journals or the table of contents of
23 certain journals every month, so I know what's
24 being published, in the Green Journal, the Gray

Page 151

1  Journal, the Gold Journal, International
2  Urogynecology Journal.
3          And then twice a year there are national
4  conferences that I attend that, you know, highlight
5  a lot of new developments and kind of let you know
6  what's going to be coming down the pike in the
7  literature because a lot of the articles start as
8  research projects that get presented at national
9  conferences.
10         And then, you know, I work with people
11 in my field who talk about articles that they've
12 read and we send articles to each other frequently
13 and...
14     Q.   In generating your report did you read
15 all the literature that Ethicon sent to you?
16     A.   No.
17     Q.   Do you know how Ethicon generated its
18 literature list to send to you?
19         MR. RUMANEK:  Object to the form and the
20 characterization.
21 BY THE WITNESS:
22     A.   No.
23 BY MS. LIU:
24     Q.   When you read the literature for

Page 152

1  generating your report, how did you choose which
2  pieces of literature to cite to?
3      A.   I selected the best quality study that I
4  felt best supported the point that I was trying to
5  make.
6      Q.   And, so, you specifically chose
7  literature that supported your viewpoint, is that
8  correct?
9          MR. RUMANEK:  Object to the form.
10 BY THE WITNESS:
11     A.   Well, I mean, I think it only makes
12 sense that if you're trying to make a point, that
13 you don't just state the point, that you actually
14 provide literature that that's true.
15         And sometimes I would provide, you know,
16 references to literature that posited the opposite
17 of the point that I was trying to make and then
18 another reference that would disprove that.
19 BY MS. LIU:
20     Q.   So, as far as the literature that was
21 opposite of your viewpoint, what kind of weight did
22 you give it?
23         MR. RUMANEK:  Object to the form.
24 BY THE WITNESS:

Page 153

1      A.   What do you mean?
2  BY MS. LIU:
3      Q.   So, you mentioned just now that you
4  would cite to literature that supported your
5  viewpoint and then you also sometimes would cite to
6  literature that was opposite of your viewpoint and
7  then after that you would cite to literature that
8  disproves the literature that was opposite your
9  viewpoint.
10         So, my question is:  In that literature
11 that you reviewed that was opposite your viewpoint,
12 how did you determine whether or not it was a
13 relevant study for you?
14         MR. RUMANEK:  Object to the form.
15 BY THE WITNESS:
16     A.   Well, I mean, scientific discovery is a
17 linear process and these articles were published
18 along the course of that linear process.  So, you
19 know, what was published in 2016 wasn't available
20 in 2008.
21         So, sometimes I'd be describing the
22 progression of a theory or the progression of
23 knowledge as it related, for example, to the
24 materials used for midurethral sling.  There were

| | Page 154 | | Page 156 |
|---|---|---|---|
| 1 | many that were tried before the Type 1, Amid Type 1 | 1 | articles? |
| 2 | polypropylene meshes. And so we had descriptions | 2 | A. Sometimes. |
| 3 | of what happened with some of those materials and | 3 | Q. But other times you do not? |
| 4 | then what happened next and then what happened next | 4 | A. It depends on the nature of the -- I |
| 5 | and then what happened next. | 5 | mean, there are many studies that are funded by |
| 6 | Q. So, Doctor, when you saw publications, | 6 | devices and device companies, but they are |
| 7 | peer-reviewed publications, that described | 7 | completely investigator-managed studies, |
| 8 | polypropylene slings causing chronic pain, what | 8 | investigator-designed studies. So, the company |
| 9 | kind of consideration did you give that in | 9 | doesn't actually have any input on the study design |
| 10 | generating your report? | 10 | or the conducting of the study. I think that those |
| 11 | MR. RUMANEK: Object to the form. | 11 | are still scientifically legitimate. |
| 12 | BY THE WITNESS: | 12 | Q. So, the studies that would have |
| 13 | A. I didn't see any publications that | 13 | investigator control that you mentioned, you know, |
| 14 | convinced me that the mesh caused chronic pain. | 14 | of the investigation, if those conflict of |
| 15 | BY MS. LIU: | 15 | interests were from, say, doctors that were |
| 16 | Q. But you do agree that there is | 16 | consultants or that had, you know, been preceptors |
| 17 | literature out there that states that midurethral | 17 | for a medical device company, would that be |
| 18 | slings can cause chronic pain, is that correct? | 18 | considered any kind of, in your mind, would that be |
| 19 | A. Again, I think that it's safe to say | 19 | considered input from the company? |
| 20 | that the surgeries used to implant the slings, some | 20 | MR. RUMANEK: Object to the form. |
| 21 | of those patients that underwent those surgeries | 21 | BY THE WITNESS: |
| 22 | developed chronic pain. I don't think anyone can | 22 | A. Maybe. But again, you know, there is -- |
| 23 | definitively say that the midurethral sling caused | 23 | there has to be scientific merit to the study. The |
| 24 | that pain. | 24 | data have to be supporting the conclusion that |

| | Page 155 | | Page 157 |
|---|---|---|---|
| 1 | Q. So, now in all of the literature that | 1 | they're trying to make. And I still think that it |
| 2 | you reviewed that was opposite from you, none of | 2 | would probably be irresponsible to throw out all |
| 3 | them convinced you of that the polypropylene | 3 | studies that, you know, are funded through a device |
| 4 | midurethral sling could cause chronic pain, is that | 4 | company. |
| 5 | correct? | 5 | Q. And you just said maybe. Was this |
| 6 | MR. RUMANEK: Object to the form, | 6 | something you thought about at all when you |
| 7 | mischaracterizes testimony. | 7 | generated your report? |
| 8 | BY THE WITNESS: | 8 | MR. RUMANEK: Object to the form. |
| 9 | A. I was not convinced. | 9 | BY THE WITNESS: |
| 10 | BY MS. LIU: | 10 | A. I mean, I relied on data that I believe |
| 11 | Q. Did you give it any consideration? | 11 | to be sound from studies that I believe to be |
| 12 | A. Of course. | 12 | well-designed. |
| 13 | Q. What kind of consideration did you give | 13 | BY MS. LIU: |
| 14 | it? | 14 | Q. And you believe them to be |
| 15 | A. I mean, I think scientific | 15 | well-designed. Did you look into whether or not |
| 16 | consideration, you know, what is the scientific | 16 | there were conflicts of interest at the time you |
| 17 | merit of the study, do the data produced support | 17 | considered them to be well-thought-of, designed |
| 18 | the conclusions or not. | 18 | studies? |
| 19 | Q. And -- | 19 | MR. RUMANEK: Object to the form. |
| 20 | MR. RUMANEK: Object to form. | 20 | BY THE WITNESS: |
| 21 | BY MS. LIU: | 21 | A. I mean, not past what it would have said |
| 22 | Q. And, Doctor, when you give weight to an | 22 | on the front page of the -- some of the studies |
| 23 | article, do you consider whether or not there are | 23 | that I read and cited are funded studies. Some of |
| 24 | conflicts of interest in the authors of those | 24 | them are funded by, you know, NIH and some of them |

Sarah Abbie Collins, M.D.

| | Page 198 | | Page 200 |
|---|---|---|---|
| 1 | MR. RUMANEK: Object to the form. | 1 | A. I know the density. I don't know the |
| 2 | BY THE WITNESS: | 2 | weight. If you were to discontinue it from its |
| 3 | A. No. I mean, there is so much clinical | 3 | trocars and put it on a scale, I don't know how |
| 4 | evidence and peer-reviewed evidence to suggest that | 4 | much it weighs. |
| 5 | the pore size is exactly right. If we were | 5 | Q. Do you know what the weight is per, say, |
| 6 | concerned about the pore size being too small, then | 6 | centimeter squared? |
| 7 | by definition we would be seeing a lot of infected | 7 | A. I believe it's 100 grams per centimeter |
| 8 | mesh and the truth is we're just not seeing that. | 8 | squared. |
| 9 | Clinically I have not seen it. I don't think I've | 9 | Q. And do you believe that to be |
| 10 | ever been able to definitively say that a Type 1 | 10 | lightweight? |
| 11 | polypropylene mesh is infected. | 11 | A. No, not lightweight. |
| 12 | BY MS. LIU: | 12 | Q. What weight would you consider that to |
| 13 | Q. So, what about -- we talked about | 13 | be? |
| 14 | shrinkage and contraction. So, with shrinkage and | 14 | A. I mean, the weight is 100 grams per |
| 15 | contraction, would the pore size -- if Ethicon's | 15 | centimeter cubed. |
| 16 | own scientists stated that the pore size was | 16 | Q. Would you consider -- sorry. Go ahead. |
| 17 | insufficient for contraction and shrinkage -- | 17 | Would you consider that to be a |
| 18 | A. Again, I -- | 18 | heavyweight mesh? |
| 19 | Q. Let me finish the question. | 19 | MR. RUMANEK: Object to the form. |
| 20 | MR. RUMANEK: Let her ask the question. Let | 20 | BY THE WITNESS: |
| 21 | me object. | 21 | A. I guess. I don't know. I don't really |
| 22 | BY MS. LIU: | 22 | consider it to be a heavyweight mesh. But in the |
| 23 | Q. Would that change your opinion? | 23 | classification system, I suppose. |
| 24 | MR. RUMANEK: Object to the form, misstates | 24 | BY MS. LIU: |

| | Page 199 | | Page 201 |
|---|---|---|---|
| 1 | the evidence. | 1 | Q. Do you believe a lighter weight mesh |
| 2 | BY THE WITNESS: | 2 | would have a better safety profile? |
| 3 | A. No. I think that the evidence is -- is | 3 | MR. RUMANEK: Object to the form. |
| 4 | what it is. We don't -- we don't just see those | 4 | BY THE WITNESS: |
| 5 | things happening. | 5 | A. I do not. |
| 6 | BY MS. LIU: | 6 | BY MS. LIU: |
| 7 | Q. So, even if Ethicon's own internal | 7 | Q. And even if Ethicon's own scientist |
| 8 | scientists stated as such, that would not be | 8 | believe that a lighter weight mesh would have a |
| 9 | something that you would rely upon in generating | 9 | better safety profile, you would not consider that |
| 10 | your opinion, is that correct? | 10 | information in your opinions? |
| 11 | MR. RUMANEK: Object to the form, | 11 | MR. RUMANEK: Object to the form. |
| 12 | mischaracterizes the evidence, asked and answered. | 12 | BY THE WITNESS: |
| 13 | BY THE WITNESS: | 13 | A. I would not. |
| 14 | A. I guess it's correct, yes. | 14 | BY MS. LIU: |
| 15 | BY MS. LIU: | 15 | Q. Have you done any -- have you reviewed |
| 16 | Q. Now, would it change your opinion if | 16 | any of the testing done by Ethicon? |
| 17 | Ethicon's own scientists believe that the Amid | 17 | A. No. |
| 18 | study was outdated? | 18 | Q. Do you have any opinions as to whether |
| 19 | MR. RUMANEK: Object to the form. | 19 | or not the TVT mesh frays? |
| 20 | BY THE WITNESS: | 20 | MR. RUMANEK: Object to the form. |
| 21 | A. No. | 21 | BY THE WITNESS: |
| 22 | BY MS. LIU: | 22 | A. I do not believe that it frays when used |
| 23 | Q. Do you know the weight of the TVT mesh | 23 | appropriately in a clinical setting. |
| 24 | or TVT Exact mesh? | 24 | BY MS. LIU: |

51 (Pages 198 to 201)

Page 206
1    Q.   If you had seen such a document, would
2    that change your opinion?
3        MR. RUMANEK: She doesn't know because you
4    haven't shown her the document.
5    BY MS. LIU:
6        Q.   Assuming that what I am telling you is
7    true. If you were to see that document, would that
8    change your opinion?
9        MR. RUMANEK: Object to the form.
10   BY THE WITNESS:
11       A.   I don't know.
12   BY MS. LIU:
13       Q.   Do you know what antioxidants are used
14   with the mesh that is weaved into the TVT?
15       A.   I don't specifically know which ones are
16   used.
17       Q.   And you do agree they use antioxidants,
18   correct?
19       MR. RUMANEK: Object to the form.
20   BY THE WITNESS:
21       A.   Correct.
22   BY MS. LIU:
23       Q.   Do you know what the clinical risks of
24   these antioxidants are?

Page 207
1        MR. RUMANEK: Object to the form.
2    BY THE WITNESS:
3        A.   I don't believe there are any risks to
4    the antioxidants used.
5    BY MS. LIU:
6        Q.   And why -- how do you say that?
7        A.   Well, my understanding is that the --
8    there are antioxidants compounded with the mesh
9    material to prevent oxidation of the mesh in situ
10   in vivo and there haven't been any adverse events
11   that come from the antioxidant package per se and
12   so -- but since I can't name the specific
13   antioxidants, I can't tell you their profiles
14   specifically.
15       Q.   Now, in your report your opinion is that
16   the polypropylene mesh used to make the TVT or
17   TVT Exact is inert, is that correct?
18       MR. RUMANEK: Where are you referring
19   specifically?
20   BY MS. LIU:
21       Q.   Just in your report you've -- you've
22   stated in your report, it's your opinion that the
23   polypropylene mesh is inert, is that correct?
24       A.   Well, the polypropylene mesh with the

Page 208
1    antioxidant compound as is produced with the TVT,
2    yes, I believe that it is inert.
3        Q.   And how did you form this opinion that
4    it was inert?
5        A.   Well, you know, mostly my clinical
6    experience tells me that it's inert and, you know,
7    there are -- there is some recent literature from I
8    think it was even December of 2016, the Thames
9    report shows definitely that it is inert.
10       Q.   Now, have you reviewed any internal
11   documents by Ethicon that found microscopic changes
12   to the surface of the mesh after it's been
13   implanted?
14       MR. RUMANEK: Object to the form.
15   BY THE WITNESS:
16       A.   Not Ethicon documents that said that,
17   no.
18   BY MS. LIU:
19       Q.   And if you had seen Ethicon documents
20   where they've stated they've tested the mesh after
21   implantation and that there are changes to the
22   surface of the mesh, would that change your opinion
23   as to whether or not the polypropylene is inert?
24       MR. RUMANEK: Object to the form,

Page 209
1    mischaracterizes the evidence.
2    BY THE WITNESS:
3        A.   It would not.
4    BY MS. LIU:
5        Q.   So, you would not consider any of the
6    tests that Ethicon did during the development and
7    along the lines of them selling the TVT, you
8    wouldn't consider any tests that they did as part
9    of your report?
10       MR. RUMANEK: Object to the form. Are you
11   asking her did she consider it? She said numerous
12   times if you want to show her a document, she will
13   consider it. Are you asking did she consider it?
14   BY MS. LIU:
15       Q.   No. My question was if -- you had
16   stated that it wouldn't matter if you had seen
17   these documents, that you would not have considered
18   them in your report.
19           So, what I'm just trying to clarify is
20   that if you had seen tests with results from
21   Ethicon that showed that the polypropylene was not
22   inert, would you have considered that in generating
23   your report?
24       MR. RUMANEK: Object to the form.

Sarah Abbie Collins, M.D.

| Page 210 | Page 212 |
|---|---|
| 1  BY THE WITNESS:<br>2  A.  I mean I think the Thames paper is<br>3  irrefutable, and I have that data.  So, I'm not<br>4  sure that there is anything that I could read from<br>5  an internal document from Ethicon that would change<br>6  my mind about that.<br>7  BY MS. LIU:<br>8  Q.  And you also in your report noted the<br>9  Material Safety Data Sheet, is that correct?<br>10  A.  Yes.<br>11  Q.  And you also noted that based on the<br>12  Material Safety Data Sheet, you did not feel as<br>13  though -- that that had any bearing on your use of<br>14  the TVT mesh, is that correct?<br>15  MR. RUMANEK:  Object to the form to the extent<br>16  it mischaracterizes what's in the report.<br>17  BY THE WITNESS:<br>18  A.  Yes.  Did you want to -- where are you<br>19  in the report?<br>20  BY MS. LIU<br>21  Q.  I'm not sure exactly where I am<br>22  because -- but --<br>23  A.  There is no page number for you?<br>24  Q.  I wasn't looking at it when I was asking | 1  Q.  And, so, you didn't rely on the MSDS<br>2  when you formed your opinions, is that correct?<br>3  MR. RUMANEK:  Object to the form.<br>4  BY THE WITNESS:<br>5  A.  Correct.  I just want to clarify that I,<br>6  when thinking about the material of the TVT, is not<br>7  a raw polypropylene material.  It's actually there<br>8  is additives to it that make it not the same<br>9  material.<br>10  BY MS. LIU:<br>11  Q.  And, Doctor, you don't know what<br>12  those -- the added materials are, correct?<br>13  A.  I just know that they are --<br>14  MR. RUMANEK:  Object to the form.<br>15  BY MS. LIU:<br>16  Q.  And, so, you've never tested how these<br>17  antioxidants affect the mesh, correct?<br>18  MR. RUMANEK:  Object to the form.<br>19  BY THE WITNESS:<br>20  A.  Correct.  I don't see that that's<br>21  necessary.<br>22  BY MS. LIU:<br>23  Q.  And you've never seen any of the test<br>24  results that Ethicon may or may not have done with |

| Page 211 | Page 213 |
|---|---|
| 1  you the question.  So, I'm not sure.<br>2  But in your -- you did reference the<br>3  MSDS, correct?<br>4  MR. RUMANEK:  If you need to find it, take the<br>5  time to find it.  It's not a memory test.<br>6  BY MS. LIU:<br>7  Q.  Let's move on.<br>8  Doctor, have you reviewed the MSDS for<br>9  the -- Ethicon's TVT mesh?<br>10  A.  Yes.<br>11  Q.  Okay.  And did you consider the MSDS<br>12  when you drafted your report?<br>13  MR. RUMANEK:  Object to the form.<br>14  BY THE WITNESS:<br>15  A.  Not really, no.<br>16  BY MS. LIU:<br>17  Q.  I just found it too.<br>18  A.  Yeah.<br>19  Q.  So, you did not consider the data that<br>20  was in the MSDS, is that correct?<br>21  MR. RUMANEK:  Object to the form.<br>22  BY THE WITNESS:<br>23  A.  That's correct.<br>24  BY MS. LIU: | 1  the antioxidants on the polypropylene mesh for the<br>2  TVT?<br>3  MR. RUMANEK:  Object to the form.<br>4  BY THE WITNESS:<br>5  A.  Do you mean their own internal studies?<br>6  BY MS. LIU:<br>7  Q.  Correct.<br>8  A.  No.<br>9  Q.  And, so, you didn't consider any of that<br>10  material in generating your report, correct?<br>11  MR. RUMANEK:  Object to the form.<br>12  BY THE WITNESS:<br>13  A.  Right.<br>14  BY MS. LIU:<br>15  Q.  Have you seen evidence in the literature<br>16  that shows that the TVT mesh shrinks or contracts?<br>17  MR. RUMANEK:  Object to the form.<br>18  BY THE WITNESS:<br>19  A.  I have seen reports about the complex of<br>20  the mesh and the human tissue into which it's<br>21  implanted shrinking together a small amount, yes.<br>22  BY MS. LIU:<br>23  Q.  Did you, when you were researching to<br>24  draft your report, did you run any PubMed searches |

54 (Pages 210 to 213)

Page 222

1 have that perspective.
2 BY MS. LIU:
3    Q.   So you wouldn't consider yourself to be
4 a polymer expert, correct?
5       MR. RUMANEK: Object to the form,
6 mischaracterizes her testimony.
7 BY THE WITNESS:
8    A.   I would say I have an expert level of
9 familiarity with the midurethral sling.
10 BY MS. LIU:
11   Q.   From a clinical perspective, correct?
12   A.   Correct.
13   Q.   Not in the design perspective, correct?
14      MR. RUMANEK: Object to the form.
15 BY THE WITNESS:
16   A.   I think I've said that already.
17 BY MS. LIU:
18   Q.   And, so, that would be a yes?
19      MR. RUMANEK: Object to the form.
20 BY THE WITNESS:
21   A.   Yes.
22 BY MS. LIU:
23   Q.   Now, in the case-specific study or
24 expert reports that you've provided, have you

Page 223

1 concluded that all of them were -- all of the
2 complications that the Plaintiffs had in those
3 cases were not due to the TVT?
4       MR. RUMANEK: Object to the form.
5 BY THE WITNESS:
6    A.   I think that would be an
7 oversimplification of all of my expert reports.
8       I think I made this distinction earlier,
9 but I'll make it again, that the TVT is a tool
10 similar to a scalpel or a needle or a suture. It's
11 a surgeon's tool. A surgeon can use most tools to
12 hurt somebody. It's not the tool that's causing
13 the damage. It's the surgeon.
14 BY MS. LIU:
15   Q.   So, in every case that you have provided
16 an expert opinion on, you have concluded that it's
17 not the TVT but it's the surgeon that caused the
18 problems?
19      MR. RUMANEK: Object to the form.
20 BY THE WITNESS:
21   A.   Insofar as -- I mean, there were really
22 only two of the cases that I reviewed that actually
23 had injuries at all and those two injuries were
24 caused by surgeons.

Page 224

1 BY MS. LIU:
2    Q.   So, you concluded it was surgeon error?
3       MR. RUMANEK: Object to the form.
4 BY THE WITNESS:
5    A.   Correct.
6 BY MS. LIU:
7    Q.   Did you consider that it could have been
8 the TVT?
9    A.   Yes.
10   Q.   And what kind of consideration did you
11 give it?
12   A.   Well, I gave it I think a scientist's
13 consideration. This is one piece of the puzzle.
14 And you have to ask questions about feasibility,
15 scientific feasibility, of the mesh causing the
16 problems. Is there a mechanism by which that's
17 possible? And the answer is no.
18      Is there a likelihood or a body of
19 evidence that would support the mesh causing these
20 injuries? And the answer is clearly no.
21   Q.   So, in your opinion because you believe
22 that the TVT itself is a tool and cannot cause
23 these injuries in these patients, you automatically
24 assume that whenever a patient has complications,

Page 225

1 it is not due to the TVT mesh, is that correct?
2       MR. RUMANEK: Object to the form,
3 mischaracterizes her testimony.
4 BY THE WITNESS:
5    A.   I mean, I think at some point you're
6 splitting hairs a little bit. You can't -- the
7 mesh can't be placed without a surgery and I
8 believe it's the surgery that causes the injury.
9 BY MS. LIU:
10   Q.   Now --
11      MR. RUMANEK: Hold on. Were you finished?
12 BY THE WITNESS:
13   A.   No. I was just going to say that the --
14 it probably becomes hairsplitting to start to, you
15 know, try to parse out exactly what led to the
16 problem. By definition you can't have a sling
17 implanted without a surgery to implant it.
18 BY MS. LIU:
19   Q.   Now, the sling is a medical device that
20 is permanently implanted in the body, is that
21 correct?
22   A.   That's correct.
23   Q.   And it's meant to be permanent, correct?
24   A.   That's correct.

57 (Pages 222 to 225)

Sarah Abbie Collins, M.D.

| Page 294 | Page 296 |
|---|---|
| 1 items would be unwanted whether or not there would | 1 other. So they wouldn't know. |
| 2 be a clinical significance, is that correct? | 2 Q. And you didn't know, is that correct? |
| 3 MR. RUMANEK: Object to the form, | 3 A. That's correct. |
| 4 mischaracterizes the testimony. | 4 MR. RUMANEK: Object to the form. |
| 5 BY THE WITNESS: | 5 MS. LIU: I'm going to save the rest of my |
| 6 A. I think it only matters in that there | 6 time for rebuttal. Thank you. |
| 7 would be clinical significance. So, if there were | 7 Let's go off the record. |
| 8 not any clinical significance to any one of those, | 8 (WHEREUPON, discussion was had off |
| 9 then I really wouldn't care about it. | 9 the record.) |
| 10 BY MS. LIU: | 10 EXAMINATION |
| 11 Q. But you would still agree that it would | 11 BY MR. RUMANEK: |
| 12 be designed not to do any of those things, is that | 12 Q. Dr. Collins, I have a few follow-up |
| 13 correct? | 13 questions. |
| 14 MR. RUMANEK: Object to the form. | 14 Do you recall being asked by counsel |
| 15 BY THE WITNESS: | 15 about the mesh folding or curling as a result of |
| 16 A. I think you said that it was not | 16 going through where the trocars were placed? |
| 17 designed to do those things, not that it was | 17 A. Yes. |
| 18 designed not to do those things. So, In other | 18 Q. Do you recall those questions? |
| 19 words, that wasn't the point of the device. | 19 A. Yes. |
| 20 BY MS. LIU: | 20 Q. Are you aware of any clinical studies or |
| 21 Q. Right. So, regardless of whether or not | 21 clinical data that have attributed any |
| 22 there is a clinical impact, that wasn't the | 22 complications or adverse events to the mesh curling |
| 23 intention of the device, is that correct? | 23 as it goes through the place where the trocar was |
| 24 A. Correct. | 24 passed? |

| Page 295 | Page 297 |
|---|---|
| 1 MR. RUMANEK: Object to the form. | 1 MS. LIU: Objection; form. |
| 2 BY THE WITNESS: | 2 BY THE WITNESS: |
| 3 A. The intention of the device was to stop | 3 A. No. |
| 4 urinary incontinence. | 4 BY MR. RUMANEK: |
| 5 BY MS. LIU: | 5 Q. Have you had any discussions with |
| 6 Q. And I believe, and I just want to | 6 colleagues where they have observed any adverse |
| 7 clarify, that in your report you have offered the | 7 events or complications that they attributed the |
| 8 opinion that the laser-cut mesh and the | 8 mesh curling or folding on itself as a result of |
| 9 mechanical-cut mesh are essentially the same | 9 going through where the trocars passed? |
| 10 clinically, is that correct? | 10 MS. LIU: Objection; form. |
| 11 MR. RUMANEK: Object to the form. The report | 11 BY THE WITNESS: |
| 12 speaks for itself. | 12 A. In the retropubic space? |
| 13 BY THE WITNESS: | 13 BY MR. RUMANEK: |
| 14 A. That's correct. | 14 Q. Yes. |
| 15 BY MS. LIU: | 15 A. No, never. |
| 16 Q. Have you ever tracked the complaint | 16 Q. Have you ever seen that in your clinical |
| 17 rates between the laser-cut mesh and the | 17 practice? |
| 18 mechanical-cut mesh? | 18 A. No, never. |
| 19 A. No. | 19 Q. Do you recall counsel asking you |
| 20 Q. And how would a physician know whether | 20 questions about whether or not you had reviewed |
| 21 or not they were implanting a laser-cut or a | 21 internal documents, internal Ethicon documents? |
| 22 mechanical-cut mesh? | 22 A. Yes. |
| 23 A. I mean, I think that's the point. | 23 Q. And do you recall counsel asking you |
| 24 They're clinically indistinguishable from each | 24 questions about whether you had reviewed deposition |

75 (Pages 294 to 297)

Sarah Abbie Collins, M.D.

Page 298

1  testimony?
2  A. Yes.
3  Q. I believe you testified that you
4  reviewed, you believe, the general depositions of
5  Dr. Rosenzweig and Dr. Ostergard, is that correct?
6  A. Correct.
7  MS. LIU: Objection; mischaracterizes her
8  testimony.
9  BY MR. RUMANEK:
10  Q. Which general Plaintiffs' expert
11  depositions did you review?
12  A. Dr. Ostergard and Dr. Rosenzweig.
13  Q. Okay. And as part of those general
14  depositions, did they reference internal Ethicon
15  company documents and internal -- deposition
16  testimony of Ethicon employees?
17  MS. LIU: Objection; form.
18  BY THE WITNESS:
19  A. I can't remember.
20  BY MR. RUMANEK:
21  Q. If their reports referenced internal
22  documents or deposition testimony of internal
23  employees, would you have reviewed that in
24  preparing your expert report?

Page 300

1  MS. LIU: Objection; form.
2  BY MR. RUMANEK:
3  Q. And would you have reviewed what they
4  said about the Ethicon employee deposition
5  testimony in their general reports?
6  A. Yes.
7  MS. LIU: Objection; form.
8  BY MR. RUMANEK:
9  Q. Did anything that was cited in
10  Dr. Rosenzweig's expert report or Dr. Ostergard's
11  expert report change any of the opinions that you
12  formulated in putting together your expert report?
13  A. No.
14  Q. Did anything that you reviewed in their
15  expert reports cause you to request any internal
16  documents that they had referenced?
17  A. No.
18  Q. Did it cause you to go back and look
19  through the materials that you had been provided to
20  try to find those internal documents?
21  A. No.
22  Q. Did it cause you to go back and request
23  deposition testimony that may have been referenced
24  in their reports?

Page 299

1  MS. LIU: Objection; form.
2  BY THE WITNESS:
3  A. I wouldn't have. I think I would have
4  considered that biased and not borne out by the
5  evidence in the literature.
6  BY MR. RUMANEK:
7  Q. Would you have reviewed whatever was
8  included in their report with respect to how they
9  cited the Ethicon documents or deposition
10  testimony?
11  A. Sure.
12  MS. LIU: Objection. Are you talking
13  deposition or report because I think that's where I
14  am getting confused.
15  MR. RUMANEK: Sorry.
16  BY MR. RUMANEK:
17  Q. In your review of Dr. Ostergard and
18  Dr. Rosenzweig's general reports --
19  A. General reports.
20  Q. -- if they referenced in their general
21  reports Ethicon company documents, would you have
22  reviewed what they said about those documents in
23  their general report?
24  A. Yes.

Page 301

1  A. No.
2  Q. Did it cause you to go back through the
3  materials that had been provided to find deposition
4  testimony that they had referenced?
5  A. No.
6  Q. Dr. Collins, do you recall counsel
7  asking you some questions about the effective
8  porosity of the TVT mesh?
9  A. Yes.
10  Q. And did any of the questions that she
11  asked you about the effective porosity cause you to
12  question any of the opinions that are stated in
13  your report?
14  MS. LIU: Objection; form.
15  BY THE WITNESS:
16  A. No.
17  BY MR. RUMANEK:
18  Q. Did any of the questions that she asked
19  make you believe that you need to go back and
20  review additional documents or materials in order
21  to maintain the opinions that you've stated in your
22  report?
23  MS. LIU: Objection; form.
24  BY THE WITNESS:

76 (Pages 298 to 301)

Sarah Abbie Collins, M.D.

| Page 302 | Page 304 |
|---|---|
| 1    A.   No. | 1    offered that testimony? |
| 2    BY MR. RUMANEK: | 2    A.   Yes, I'm only aware of -- I'm actually |
| 3    Q.   In any of the data and literature that | 3    only aware of characterizing mesh according to |
| 4    you've reviewed during the course of your career in | 4    weight as it pertains to mesh used for pelvic organ |
| 5    your practice, have you reviewed any medical | 5    prolapse and the very lightweight meshes with |
| 6    literature that questioned the safety and | 6    increased pore size are markedly different than the |
| 7    effectiveness of the TVT sling based on its pore | 7    TVT mesh. |
| 8    size? | 8    Q.   Okay. Are you aware of any -- do you |
| 9    MS. LIU:   Objection; form. | 9    have an opinion as to whether or not TVT -- the |
| 10   BY THE WITNESS: | 10   mesh used in TVT is lightweight as it compares to |
| 11    A.   No. | 11   other midurethral slings? |
| 12   BY MR. RUMANEK: | 12     MS. LIU:   Objection; form. |
| 13    Q.   Have you reviewed any medical literature | 13   BY THE WITNESS: |
| 14   or data that attributed any complications or | 14    A.   I know that it has a relatively low |
| 15   adverse events to an inadequate pore size of the | 15   weight compared to other midurethral sling mesh. I |
| 16   TVT? | 16   think I might have been confused about if you were |
| 17    A.   No. | 17   to use those meshes then for pelvic organ prolapse. |
| 18    Q.   Dr. Collins, you were asked a number of | 18   I think that they would be considered heavier |
| 19   questions about what Ethicon knew or what Ethicon | 19   compared to the lightweight meshes that are used |
| 20   scientists knew. Do you recall counsel asking you | 20   for prolapse. |
| 21   those questions? | 21   BY MR. RUMANEK: |
| 22    A.   Yes. | 22    Q.   And are you aware of any data that |
| 23    Q.   Did counsel show you any of the | 23   suggest that using the lighter-weight prolapse |
| 24   documents that she was purporting to reference in | 24   meshes would be safer or more effective for use in |

| Page 303 | Page 305 |
|---|---|
| 1    her questioning? | 1    a midurethral sling than the TVT mesh? |
| 2    A.   No. | 2     MS. LIU:   Objection; form. |
| 3    Q.   If counsel had showed you those | 3   BY THE WITNESS: |
| 4   documents, is that something that you would have | 4    A.   No, I don't know of any evidence that |
| 5   considered relative to the opinions that are set | 5   that's the case. I'd be surprised if it were. |
| 6   forth in your report? | 6   BY MR. RUMANEK: |
| 7     MS. LIU:   Objection; form. | 7    Q.   And did you see any evidence in the or |
| 8   BY THE WITNESS: | 8   data in the expert reports of Dr. Rosenzweig or |
| 9    A.   It's hard to say. | 9   Dr. Ostergard that you can recall on that issue? |
| 10   BY MR. RUMANEK: | 10     MS. LIU:   Objection; form. |
| 11    Q.   Would you have reviewed those to see if | 11   BY THE WITNESS: |
| 12   they impacted your opinions? | 12    A.   No. |
| 13    A.   Yes, I would have reviewed them. | 13   BY MR. RUMANEK: |
| 14    Q.   I believe counsel asked you about | 14    Q.   What information would you want -- |
| 15   whether or not the mesh used in the TVT device, | 15   strike that. |
| 16   whether you would characterize that as heavyweight | 16     Counsel asked you some questions about |
| 17   or lightweight mesh. Do you recall those | 17   whether certain complications could be associated |
| 18   questions? | 18   with implanting a TVT mesh. Do you recall those |
| 19    A.   I do. | 19   questions? |
| 20    Q.   Are you aware -- strike that. | 20    A.   Yes. |
| 21     I believe you may have mentioned that it | 21    Q.   And she asked about chronic pain, |
| 22   could be characterized as heavyweight mesh? | 22   lifelong dyspareunia, voiding dysfunction, those |
| 23    A.   Correct. | 23   questions. Do you recall those? |
| 24    Q.   Can you explain what you meant when you | 24    A.   Yes. |

Sarah Abbie Collins, M.D.

Page 306

1   Q.   The complications that counsel mentioned
2   as being potentially related to a TVT, are those
3   also complications that are potentially associated
4   with doing a Burch procedure?
5       MS. LIU: Objection; form.
6   BY THE WITNESS:
7       A.   Yes.
8   BY MR. RUMANEK:
9       Q.   Are they associated with the
10  non-synthetic mesh slings that counsel asked you
11  about?
12      MS. LIU: Objection; form.
13  BY THE WITNESS:
14      A.   Pubovaginal slings?
15  BY MR. RUMANEK:
16      Q.   Yes.
17      A.   Yes.
18      Q.   Are you aware of any surgical procedure
19  to treat stress urinary incontinence that wouldn't
20  carry a risk of potential chronic pain or
21  dyspareunia or voiding dysfunction?
22      MS. LIU: Objection; form.
23  BY THE WITNESS:
24      A.   I can't think of one.

Page 307

1   BY MR. RUMANEK:
2       Q.   Dr. Collins, have you reviewed the
3   medical literature and data as it relates to the
4   complications that counsel asked you about?
5       A.   Yes.
6       Q.   With respect to pain, have you reviewed
7   medical literature that discusses complication
8   rates associated with pain?
9       A.   Yes.
10      Q.   And TVT -- and midurethral slings?
11      A.   Yes.
12      Q.   Have you reviewed medical literature
13  that discusses complication rates of dyspareunia
14  following midurethral slings?
15      A.   Yes.
16      Q.   Have you reviewed medical literature
17  that discusses complication rates of voiding
18  dysfunction after midurethral slings?
19      A.   Yes.
20      Q.   Have you read medical literature that
21  discusses other known complications associated with
22  midurethral slings?
23      MS. LIU: Objection; form.
24  BY THE WITNESS:

Page 308

1       A.   Yes.
2   BY MR. RUMANEK:
3       Q.   And do you have any opinions as to how
4   the safety of midurethral slings as it relates to
5   those complications compares with alternative
6   procedures?
7       MS. LIU: Objection; form.
8   BY THE WITNESS:
9       A.   I believe that the safety profile of the
10  TVT midurethral sling is better than both the Burch
11  and the pubovaginal sling with respect to all of
12  those complications.
13  BY MR. RUMANEK:
14      Q.   And what is the basis for that opinion?
15      A.   Well, there have been trials testing
16  this. We have the Ward-Hilton trial. We have --
17  we know baseline rates of all of these
18  complications from large trials like TOMUS, SISTEr,
19  that even if they weren't compared head-to-head, we
20  have numbers of women who experience these
21  complications. And I think every time you look at
22  it you will see that TVT is safer.
23      Q.   And you've reviewed Dr. Rosenzweig's
24  general report as well as Dr. Ostergard's general

Page 309

1   reports. Do you recall those reports talking about
2   potential cytotoxicity associated with
3   polypropylene used in the TVT and TVT Exact?
4       A.   Yes.
5       Q.   And based on your review of the data in
6   the medical literature have you found any evidence
7   that there are any adverse events or complications
8   reported in the literature related to cytotoxicity?
9       MS. LIU: Objection; form.
10  BY THE WITNESS:
11      A.   I have not. Sorry. I have not.
12  BY MR. RUMANEK:
13      Q.   Counsel asked you a number of questions
14  about whether you are an expert in chemistry,
15  whether you're an expert in chemical engineering,
16  whether you're an expert in design of medical
17  devices.
18          Do you remember that series of questions
19  where she asked you whether you're an expert in a
20  certain field?
21      A.   Yes.
22      Q.   Dr. Collins, do you have expertise as it
23  relates to the opinions that you've given in your
24  report?

78 (Pages 306 to 309)

Page 310

1    MS. LIU: Objection; form.
2    BY THE WITNESS:
3        A.    Yes.
4    BY MR. RUMANEK:
5        Q.    And to the extent that any of the
6    opinions that you've given in your report could be
7    characterized as relating to chemistry or chemical
8    engineering or polymers, do you believe that you
9    have expertise in order to offer those opinions?
10       MS. LIU: Objection; form.
11   BY THE WITNESS:
12       A.    I do.
13   BY MR. RUMANEK:
14       Q.    And what would be the basis for your
15   expertise in those areas?
16       A.    Clinical experience, familiarity with
17   the data, basic science training for a long time.
18       Q.    And have you in your practice evaluated
19   and considered different mesh devices?
20       A.    Yes.
21       MS. LIU: Objection; form.
22   BY MR. RUMANEK:
23       Q.    Have you considered the way different
24   mesh devices are designed?

Page 311

1        A.    Yes.
2        Q.    Have you considered the way that how
3    those mesh devices are designed may impact your
4    patients in your clinical outcomes?
5        MS. LIU: Objection; form.
6    BY THE WITNESS:
7        A.    Yes.
8    BY MR. RUMANEK:
9        Q.    Do you believe that you have expertise
10   in order to offer opinions about the design of the
11   TVT and TVT Exact as it relates to your clinical
12   practice, the medical literature and the outcomes
13   that you've observed?
14       MS. LIU: Objection; form.
15   BY THE WITNESS:
16       A.    Yes.
17   BY MR. RUMANEK:
18       Q.    Counsel also asked you whether you had
19   been involved in writing IFUs.  Do you recall those
20   questions?
21       A.    I do.
22       Q.    Have you offered opinions related to the
23   communication of risk information in your expert
24   report?

Page 312

1        A.    I did discuss that briefly.
2        Q.    And do you believe that those opinions
3    require you to have written an IFU in order to
4    offer the opinions that you've given?
5        MS. LIU: Objection; form.
6    BY THE WITNESS:
7        A.    Absolutely not.
8    BY MR. RUMANEK:
9        Q.    Dr. Collins, with respect to the IFUs
10   for the TVT and the TVT Exact device, who is the
11   audience -- I think you mentioned in your response
12   to a question from opposing counsel about who the
13   IFU is written for -- who is the audience, the
14   intended audience of an IFU?
15       A.    I believe the surgeons implanting the
16   device are the audience.
17       Q.    And I'm just going to read from the IFU,
18   a section from the IFU.
19            It says, "It is not a comprehensive
20   reference to surgical technique for correcting
21   stress urinary incontinence.  The device should
22   only be used by physicians trained in the surgical
23   treatment of stress urinary incontinence and
24   specifically implanting the TVT device.  These

Page 313

1    instructions are recommended for general use of the
2    device.  Variations in use may occur in specific
3    procedures due to individual technique and patient
4    anatomy."
5            Do you recall reviewing that language in
6    the IFU for the TVT?
7        A.    Yes.
8        Q.    And is that consistent with the audience
9    that you understand the IFU to be written to?
10       MS. LIU: Objection; form.
11   BY THE WITNESS:
12       A.    Yes.
13   BY MR. RUMANEK:
14       Q.    What does it mean for a -- what is your
15   understanding of the meaning where it says that the
16   device should only be used by physicians trained in
17   the surgical treatment of stress urinary
18   incontinence and specifically implanting the TVT
19   device?
20       A.    My understanding of that is that there
21   should be a baseline familiarity with the anatomy
22   of continence, female pelvic anatomy, experience
23   with other procedures to correct stress urinary
24   incontinence, and then there should be specific

Sarah Abbie Collins, M.D.

Page 322

1  at the end about, you know, whether or not a doctor
2  who relied solely on the IFU would be within the
3  standard of care? Do you remember that
4  questioning?
5      A.   Um-hmm.
6      Q.   Doctor, where are you licensed to
7  practice?
8      A.   Illinois and Indiana.
9      Q.   Anywhere else?
10     A.   I have had licenses in other states but
11  they're not current now.
12     Q.   What other states have you had licenses
13  for?
14     A.   Connecticut, New York and then I had a
15  training certificate for Ohio and I think I had a
16  training certificate for New Hampshire too for --
17     Q.   What is a training certificate?
18     A.   That just means that you don't have a
19  full license to independently practice. It's meant
20  for people that are residents or fellows who are
21  not practicing independently.
22     Q.   Doctor, are you offering an opinion on
23  the standard of care as it relates to all surgeons
24  that implant TVT?

Page 323

1      MR. RUMANEK:   Object to the form; overbroad,
2  non-specific.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MS. LIU:
6      Q.   So, you believe that you are able to
7  offer standard of care opinions on all surgeons for
8  TVT regardless of where they're practicing, is that
9  correct?
10     A.   Yes.
11     MS. LIU:   I believe that's all the questions
12  that I have right now.
13     MR. RUMANEK:   I have got just a few follow-up
14  questions.
15          FURTHER EXAMINATION
16  BY MR. RUMANEK:
17     Q.   Dr. Collins, are you aware of any
18  physicians who rely as part of their practice on
19  internal company e-mails with respect to making
20  decisions about which products they're going to
21  employ?
22     A.   No.
23     MS. LIU:   Objection; form, speculation.
24  BY MR. RUMANEK:

Page 324

1      Q.   Have any medical device manufacturers
2  ever sent you compilations of e-mails or internal
3  documents to review and consider in their products?
4      A.   No.
5      Q.   Counsel asked you -- opposing counsel
6  asked you some questions about whether or not you
7  were familiar with specific regulations for what
8  was included -- what was needed for an IFU. Do you
9  recall those questions?
10     A.   Um-hmm.
11     Q.   Dr. Collins, do you have expertise as it
12  relates to what is needed to be included within an
13  IFU from a physician's perspective?
14     MS. LIU:   Objection; form.
15  BY THE WITNESS:
16     A.   Sure.
17  BY MR. RUMANEK:
18     Q.   And what is the basis for that opinion?
19     A.   I am a surgeon that implants TVT and
20  there are very few things that I need from an IFU,
21  and I think that most well-trained surgeons are the
22  same in that respect.
23     Q.   And putting aside whether or not
24  something is within the, quote-unquote, "standard

Page 325

1  of care," are you aware of any physicians who have
2  relied solely on an IFU in order to understand how
3  to implant the TVT or TVT Exact or the
4  complications or potential risks associated with
5  that procedure?
6      A.   No.
7      MS. LIU:   Objection; form, asked and answered.
8  BY MR. RUMANEK:
9      Q.   And have you ever had any discussions
10  with colleagues who have indicated to you that they
11  relied solely on the IFU in order to understand how
12  to perform a surgical procedure or to learn about
13  the complications associated with the surgical
14  procedure?
15     A.   No.
16     MS. LIU:   Objection; form.
17  BY MR. RUMANEK:
18     Q.   Dr. Collins, are you aware of any IFUs
19  that are provided with respect to surgeons
20  performing a Burch procedure?
21     MS. LIU:   Objection; form.
22  BY THE WITNESS:
23     A.   No.
24  BY MR. RUMANEK:

82 (Pages 322 to 325)

Page 330

1  FURTHER EXAMINATION
2  BY MS. LIU:
3      Q.   Doctor, you reviewed the 2015 IFU, is
4  that correct?
5      A.   That's correct.
6      Q.   And you testified that you reviewed one
7  other IFU but you don't remember the year, is that
8  correct?
9      A.   That's correct.
10     Q.   And you believe the 2015 IFU is
11 sufficient, is that correct?
12     A.   That's correct.
13     Q.   Do you believe that the IFUs prior to
14 the 2015 is sufficient?
15     A.   I do.
16     Q.   Do you remember reading them?
17     A.   I do.
18     Q.   Which ones?
19     A.   Well, I told you I read one other -- I
20 remember reading that one.  Like I said, I don't
21 know which one it was.
22     Q.   And you don't remember when it came out?
23     A.   Right.  I know it was not the latest
24 iteration.

Page 331

1      Q.   Did you read the one that was from 2000?
2      A.   I don't know.
3      Q.   Or 2002?
4      A.   Like I said, I don't know the year.
5      Q.   Okay.  So, would you be able to
6  confidently testify that each and every iteration
7  of the IFU was sufficient if you haven't read them
8  all?
9      A.   I can tell you the ones I've read are
10 certainly sufficient.
11     Q.   And you definitively know 2015 but you
12 don't know the other one, correct?
13     A.   Correct.
14     MS. LIU:  That's it.  No further questions.
15     THE REPORTER:  Signature?
16     MR. RUMANEK:  We'll at least reserve the right
17 for her to read and sign.
18          (Time Noted:  3:49 p.m.)
19     FURTHER DEPONENT SAITH NAUGHT.
20
21
22
23
24

Page 332

1
2  I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
   Shorthand Reporter, do hereby certify:
3      That previous to the commencement of the
   examination of the witness, the witness was duly
4  sworn to testify the whole truth concerning the
   matters herein;
5      That the foregoing deposition transcript
   was reported stenographically by me, was thereafter
6  reduced to typewriting under my personal direction
   and constitutes a true record of the testimony
7  given and the proceedings had;
       That the said deposition was taken
8  before me at the time and place specified;
       That the reading and signing by the
9  witness of the deposition transcript was agreed
   upon as stated herein;
10     That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
11 such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in
12 the outcome of this action.
       It was requested before completion of
13 the deposition that the witness, SARAH ABBIE
   COLLINS, M.D., have the opportunity to read and
14 sign the deposition transcript.
15
16     CORINNE T. MARUT, Certified Reporter
17
       (The foregoing certification of this
18 transcript does not apply to any
   reproduction of the same by any means, unless under
19 the direct control and/or supervision of the
   certifying reporter.)
20
21
22
23
24

Page 333

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7          After doing so, please sign the errata
8  sheet and date it.
9          You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12         It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you.  If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18
19
20
21
22
23
24